

FILED

2021 Nov-16  AM 10:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| EVAN MILLIGAN, SHALELA DOWDY, LETETIA JACKSON, KHADIDAH STONE, ADIA WINFREY, GREATER BIRMINGHAM MINISTRIES, and the ALABAMA STATE CONFERENCE OF THE NAACP,<br><br>*Plaintiffs*,<br><br>vs.<br><br>JOHN H. MERRILL, in his official capacity as Secretary of State of Alabama, and JIM MCCLENDON and CHRIS PRINGLE, in their official capacities as Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment,<br><br>*Defendants*. | **COMPLAINT**<br><br>**THREE-JUDGE PANEL REQUESTED** |

1.      Plaintiffs Evan Milligan, Shalela Dowdy, Letetia Jackson, Khadidah Stone, Adia Winfrey, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP bring this action to prohibit Defendants Secretary of State John H. Merrill and the Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment, Jim McClendon and Chris Pringle, from conducting elections under House Bill 1 (2021 Second Special Session). H.B. 1, 2d Spec. Sess. (Ala. 2021).

2.      House Bill 1 ("HB 1") is the latest example of a decades long pattern of the white-controlled Alabama Legislature enacting congressional and state legislative districts that discriminate against Black voters to maintain power. Over the last fifty years, federal courts or the U.S. Department of Justice have repeatedly found that the state's redistricting plans violate the

rights of Black voters under the Voting Rights Act of 1965 ("VRA") and the Fourteenth and Fifteenth Amendments to the United States Constitution.

3.      Plaintiffs allege that HB 1 is the Legislature's latest intentionally discriminatory scheme to pack and crack Black voters into Congressional districts in a manner that prevents the creation of a second majority-Black district. Plaintiffs further allege that this scheme is unconstitutional because race was the predominant motive in the drawing of the only majority-Black Congressional District ("CD") 7 in a way that is not narrowly tailored to comply with Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301.

4.      The consideration of race in drawing district lines may be permissible and necessary in many areas of Alabama to ensure compliance with Section 2 of the VRA. But Alabama's consideration of race in the drawing of H.B. 1 was not narrowly tailored to comply with the VRA. Rather, HB 1 reflects the Legislature's desire to use of race to maintain power by packing one-third of Black Alabamians into CD 7 and cracking the remaining Black community.

5.      Moreover, Alabamians were kept in the dark throughout the secretive map drawing process leading up to the introduction of HB 1. Only after the end of the public hearings and, at the eleventh hour, did the Legislature unveil congressional maps where race was the predominant factor in determining the district lines, not for any legitimate purpose, to prevent Black voters from having a fair opportunity to elect candidates of choice. The white-majority in the Legislature, including Rep. Pringle and Sen. McClendon, admitted that no racial-polarization analysis was conducted to determine whether the packing of CD 7 was necessary to satisfy the VRA. And the Legislature flatly rejected the requests from the Black community to conduct such an analysis or draw a second Black district. Indeed, the Legislature declined to share the map with Black legislators or the public before its introduction in the Legislative Committee on Reapportionment.

6.      Because the Committee drew, and the Legislature enacted CDs 1, 2, 3, and 7 in HB 1 using race as a predominant factor in a manner that was not narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest, these districts violate the Fourteenth Amendment to the United States Constitution and must be enjoined.

7.      HB 1 denies Black Alabamians an equal opportunity to participate in the political process by packing one-third of Black Alabamians into CD 7 in numbers unnecessary to assure them an equal opportunity to elect their preferred candidates. HB 1 also cracks the remaining Black population across CDs 1, 2, and 3 in a way that prevents them from having an opportunity to elect a representative of choice in a second congressional district.

8.      Among other deviations from traditional redistricting principles, the districts in HB 1 splits Montgomery County and places voters from the majority-Black counties in the Black Belt[1] into majority-white Congressional districts in low enough numbers that Black voters have no electoral influence. The Legislature enacted this plan even though it could have more naturally drawn a second majority-Black Congressional District that complies with traditional redistricting principles, like maintaining whole counties, and respects the contiguity and communities of actual interest in the Black Belt counties.

9.      The plan does so even though (1) voting-age Black Alabamians ("BVAP")[2] are sufficiently numerous and geographically compact to be a majority of the voting-age population

---

[1] The Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox, as well as Clarke, Conecuh, Escambia, Monroe, and Washington counties. The Black Belt is named for the region's fertile black soil. The region has a substantial Black population because of the many enslaved people brought there to work in the antebellum period. It has been a hotbed of racial discrimination and civil rights activism from the 1860s to today.
[2] "African American" or "Black" includes Hispanic Black people and people who are "Any Part Black," i.e., persons who identify as Black or another race on the Census. The "Black Voting Age

in two single member U.S. Congressional districts in Alabama; (2) the voting patterns of Black voters are politically cohesive; and (3) white voters in Alabama vote sufficiently as a bloc to typically defeat the candidates preferred by Black voters. Voting in Alabama has historically been and remains extremely racially polarized across the state—a fact of which numerous federal courts have taken notice. *See, e.g.*, *Ala. Legis. Black Caucus v. Alabama* ("*ALBC I*"), 575 U.S. 254, 277 (2015).

10.     Moreover, in the areas where a second majority-minority congressional district can and should be drawn, the white majority typically votes as a bloc to defeat Black voters' preferred candidates. In the twentieth century, Black Alabamians have never elected a congressional representative in any district other than the packed majority-Black CD 7. And CD 7 has only been a majority-Black district since 1992. As a result, Black Alabamians have the opportunity to elect a candidate of choice in only 14% of the congressional delegation (1 of 7) despite making up over 27% of Alabama's voting age population.

11.     Alabama's steadfast refusal to provide Black voters with adequate representation in Congress is a product of intentional discrimination and directly linked to the state's history and present conditions of discrimination against Black people. The state's intentional policy of disempowerment and discrimination has resulted in the denial of equal opportunity for Black people to participate in the political process in violation of the U.S. Constitution and the VRA. Under the totality of the circumstances, including, *inter alia*, Alabama's current practices and ongoing history of racial discrimination in voting, the continuing effect of racial discrimination on

Population" includes all individuals who are 18 years of age or older and who identify as Any Part Black. In *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003), the U.S. Supreme Court declared that, where, as here, "the case involves an examination of only one minority group's effective exercise of the electoral franchise . . . it is proper to look at all individuals who identify themselves as black."

Black people in areas like education, employment, and health, continuing racial appeals by political candidates, and the Legislature's lack of responsiveness to the Black community, help to demonstrate that Black voters are being prevented from participating equally in the political process and electing candidates of choice.

12.     Accordingly, HB 1 also violates Section 2 of the VRA and must be enjoined in favor of Plaintiffs' demonstrative plan (below in ¶ 88) or another remedial plan that completely cures the illegal vote dilution in HB 1 by establishing two majority-Black congressional districts.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343, and 1357 because the matters in controversy arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

14.     The Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

15.     The Court has personal jurisdiction over the Defendants, who are all citizens of Alabama.

16.     A three-judge panel is requested pursuant to 28 U.S.C. § 2284(a), as this action challenges "the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and because at least one Defendant resides in this district and all Defendants are Alabama residents.

## PARTIES

18.     Plaintiff Evan Milligan resides in Montgomery County, Alabama. He is a U.S. citizen and is a lawfully registered voter who resides in CD 7. As enacted in HB 1, the Legislature drew CD 7 as a majority-Black district. The Legislature used race as the predominant factor motivating its decisions to place a significant number of voters, like Mr. Milligan, within or outside of the district. CD 7 is not narrowly tailored to satisfy the VRA or any other compelling interest. HB 1 also packs Black voters like Mr. Milligan into CD 7 to prevent the creation of a second majority-Black congressional district and, thus, dilutes his vote in violation of the VRA. Under the demonstrative plan, Mr. Milligan would reside in the remedial second majority-Black district.

19.     Plaintiff Shalela Dowdy resides in Mobile County, Alabama. She is a U.S. citizen and is a lawfully registered voter who resides in CD 1. As enacted in HB 1, the Legislature drew CD 1 as a majority-white district. The Legislature used race as the predominant factor motivating its decisions to place a significant number of voters, like Ms. Dowdy, within or outside of the district. CD 1 is not narrowly tailored to satisfy the VRA or any other compelling interest. HB 1 also fragments Black voters like Ms. Dowdy to prevent the creation of a second majority-Black congressional district and, thus, dilutes her vote in violation of the VRA. Under the demonstrative plan, Ms. Dowdy would reside in the remedial second majority-Black district.

20.     Plaintiff Letetia Jackson resides in the City of Dothan, Alabama. She is a U.S. citizen and is a lawfully registered voter who resides in CD 2. As enacted in HB 1, the Legislature drew CD 2 as a majority-white district. The Legislature used race as the predominant factor motivating its decisions to place a significant number of voters, like Ms. Jackson, within or outside of the district. CD 1 is not narrowly tailored to satisfy the VRA or any other compelling interest. HB 1 also cracks Black voters like Ms. Jackson to prevent the creation of a second majority-Black congressional district and, thus, dilutes her vote in violation of the VRA.

21.     Plaintiff Khadidah Stone resides in Montgomery County, Alabama. She is a U.S. citizen and is a lawfully registered voter in CD 2. As enacted in HB 1, the Legislature drew CD 7 as a majority-Black district. The Legislature used race as the predominant factor motivating its decisions to place a significant number of voters, like Mr. Milligan, within or outside of the district. CD 7 is not narrowly tailored to satisfy the VRA or any other compelling interest. HB 1 also packs Black voters like Mr. Milligan into CD 7 to prevent the creation of a second majority-Black congressional district and, thus, dilutes his vote in violation of the VRA. Under the demonstrative plan, Mr. Milligan would reside in the remedial second majority-Black district.

22.     Plaintiff Adia Winfrey resides in Talladega County, Alabama. She is a U.S. citizen and is a lawfully registered voter who resides in CD 3. As enacted in HB 1, the Legislature drew CD 3 as a majority-white district. The Legislature used race as the predominant factor motivating its decisions to place a significant number of voters, like Ms. Jackson, within or outside of the district. CD 3 is not narrowly tailored to satisfy the VRA or any other compelling interest. HB 1 also cracks Black voters like Ms. Winfrey to prevent the creation of a second majority-Black congressional district and, thus, dilutes her vote in violation of the VRA.

23.     Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement and its transformative impact in Birmingham, Alabama, and across the United States. GBM seeks to address urgent human rights and social justice needs in the greater Birmingham area. GBM is a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people.

24.     GBM is dedicated to advancing social justice through political participation across Alabama. GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process. Toward that end, GBM regularly communicates with its members and works to register, educate, and increase voter turnout and efficacy, particularly among Black, Latinx, and low-income people and people with disabilities.

25.     GBM has around 5,000 individual members located primarily throughout the greater Birmingham, Alabama area. GBM also has members in other areas of Alabama including Mobile, Tuscaloosa, Montgomery, and Madison Counties. Many GBM members are Black registered voters. GBM has members who are registered voters who live and vote in CDs 1, 2, 3, and 7. These members have been and, if HB 1 is not enjoined, will continue to be harmed by HB 1's assignment of them to unconstitutionally racially gerrymandered districts. Members of GBM include Black voters whose votes are unlawfully diluted by the packing of Black voters into CD 2 and the cracking of Black voters residing in CDs 1, 2, and 3 in violation of the VRA. Members of GBM include Black voters who would reside in a remedial second majority-Black district.

26.     The Alabama State Conference of the N.A.A.C.P. ("Alabama NAACP") is the state conference of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of Black Americans and all other Americans. Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Alabama NAACP has participated in lawsuits to protect the right to vote, regularly engages in efforts to register and educate voters and encourages Black people to engage in the political process by turning out to vote on Election Day.

27.     The Alabama NAACP has thousands of members in Jefferson County, the Black Belt and other counties across the state. Most of the members of the Alabama NAACP are Black registered voters. The Alabama NAACP's members include registered voters who reside and vote in CDs 1, 2, 3, and 7. These members have been and, if HB 1 is not enjoined, will continue to be harmed by HB 1's assignment of them to unconstitutionally racially gerrymandered districts. The Alabama NAACP's members include Black registered voters whose votes are unlawfully diluted by the packing of Black voters into CD 2 and the cracking of Black voters in CDs 1, 2, and 3 in violation of the VRA. Members of the Alabama NAACP include Black registered voters who would reside in a remedial second majority-Black district.

28.     Defendant John H. Merrill is sued in his official capacity as Alabama Secretary of State. As Secretary of State, Defendant Merrill is the chief elections official in the State of Alabama. He must provide uniform guidance for election activities in the State and certify the elections of members to the Alabama Legislature and Congress. Ala. Code §§ 17-1-3, 17-12-21. Defendant Merrill also has responsibility for certifying the names of primary and general election candidates for the State Legislature and Congress, as well as issuing Certificates of Election following tabulation of vote results. Ala. Code §§ 17-13-5(b), 17-9-3(b), Ala. Code § 17-12-21.

29.     Defendants Jim McClendon and Chris Pringle are sued in their official capacities as Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"). Ala. Code § 29-2-51. In that capacity, Defendants McClendon and Pringle prepared and developed redistricting plans for the State following the decennial census and presided over the meetings of the Committee. The Committee was tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation

and formulation" of redistricting plans for the Senate, House, and congressional districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52. Defendants McClendon and Pringle led the drawing of CDs 1, 2, 3 and 7. Defendants McClendon and Pringle will lead the Legislature's efforts to re-draw and remedy the congressional districts' illegality if ordered to do so by this Court.

**STATEMENT OF FACTS**

**The History of Majority-Black Congressional District 7**

30.     The establishment of CD 7 as a majority-Black district in the 1990s redistricting cycle was the first time in the twentieth century that Black Alabamians had the opportunity to elect a candidate of choice to Congress.

31.     In 1992, Black voters challenged the failure of the Legislature to redistrict after the release of the 1990 census and the lack of a majority-Black congressional district under Section 2 of the VRA. Upon the stipulation of the parties, a court ordered the creation of CD 7 as a majority-Black congressional district to comply with the VRA. *See Wesch v. Hunt*, 785 F. Supp. 1491, 1498 (S.D. Ala.), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992).

32.     Because the Legislature failed to enact and preclear its own map, the court's plan remained in effect for the rest of the 1990s. After the 2000 and 2010 redistricting cycles, the Legislature continued to enact this version of CD 7 with changes only to address population shifts.

33.     Even today, the core of CD 7 remains the same as it was drawn by the *Wesch* court.

34.     In recent litigation, however, Alabama admitted that CD 7 "appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominate

10

purpose of drawing African American voters into the district." Secretary of State Merrill's Pretrial

Brief, Chestnut v. Merrill, No. 2:18-CV-00907 (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11.

35.     Despite this admission, neither the State Legislature, nor Defendants took steps to

remedy this racial gerrymander in the wake of the 2020 census. This racial gerrymandering was

not narrowly tailored to comply with the VRA. Rather the Legislature simply continued to

improperly use race to place Black voters into the existing supermajority Black CD 7, even though

the Legislature knew it was possible to draw CD 7 as an effective majority-Black district without

needlessly splitting political subdivisions, counties, and communities of actual shared interests.

### The Process Leading to the Enactment of H.B. 1

#### Joint Legislative Committee's Stated Redistricting Criteria

36.     On May 5, 2021, the Permanent Legislative Committee on Reapportionment (the

"Committee")—the Committee responsible for preparing and developing redistricting plans for

the State following each decennial census—enacted guidelines for the 2021 redistricting cycle.

The guidelines state that they are based on the requirements of the U.S. Constitution, Alabama

Constitution, and policies that "are embedded in the political values, traditions, customs, and

usages of the State of Alabama."

37.     The criteria for redistricting set by the Committee begin with requirements under

the U.S. Constitution and federal law, including compliance with the one-person, one-vote

requirement. The Committee instructed that Congressional districting maps "shall have minimal

population deviation" and comply with Section 2 of the VRA, meaning that districts have "neither

the purpose nor the effect of diluting minority voting strength." The Committee further stated that

districts cannot be drawn "in a manner that subordinates race-neutral districting criteria to

considerations of race, color, or membership in a language minority group, except that race, color,

or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice."

38.   Each district must also be "contiguous and reasonably compact," under the criteria.

39.   The criteria next require compliance with the Alabama Constitution, including that:

   a.   Districts are "drawn to reflect the democratic will of all the people concerning how their governments should be restructured";

   b.   Districts are drawn based on total population except that voting-age population may be considered to comply with Section 2 of the VRA and other laws;

   c.   The number of Senate districts is set at 35 and House districts at 105;

   d.   All districts must be single-member districts; and

   e.   All districts must be contiguous with each other.

40.   The criteria further require compliance with redistricting policies that are "embedded in the political values, traditions, customs, and usages of the State of Alabama . . . to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama," including:

   a.   Avoiding contests between incumbents where possible;

   b.   Permitting contiguity by water but not point-to-point or long-lasso contiguity;

   c.   Respect for "communities of interest, neighborhoods, and political subdivisions to the extent practicable," with a community of interest "defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities."

   d.   Minimization of the number of counties in each district; and

       e.   Preservation of the cores of existing districts.

41.    The Committee did not prioritize the criteria, except that "equality of population among districts and compliance with the Voting Rights Act of 1965" take priority when they conflict with other criteria.

The 2021 Legislative Process for Redistricting

42.    On August 12, 2021, the U.S. Census Bureau released the results of the 2020 Census. Alabama's population grew by 5.1% between 2010 and 2020. Alabama's current population identifies as 63.1% non-Hispanic white, 26.9% as any part Black, 5.3% as Hispanic or Latino, 2.3% as any part American Indian/Alaska Native, and 2% as any part Asian. Communities of color drove population growth in the 2020 census. The Black population grew by 3.5%, the Hispanic/Latino population by 42.3%, the Asian-American population increased by 43.4%, and the white population shrunk by 1%. The population identifying as solely Native American shrank as well, while the proportion of Alabamians identifying as multi-racial tripled.

43.    Once census data was released, the Committee, under the leadership of Sen. McClendon and Rep. Pringle began to develop redistricting plans for congressional districts. *See* Ala. Code § 29-2-50(2).

44.    The Committee consists of members of both the State House and Senate, with the Speaker of the House appointing one House member from each of the seven congressional districts and four additional House members and the Lieutenant Governor appointing one Senator from each of the seven congressional districts and four additional Senators. *See* Ala. Code § 29-2-51(c).

The 2021 Reapportionment Committee includes 21 members—15 white Republicans and six Black Democrats.[3]

45.     All Committee meetings must be open to the public and the Committee must provide a "[r]easonable opportunity" for members of the public to give comments and input regarding redistricting.

46.     Between September 1 and 16, well before the Committee released any draft maps or proposals, the Legislative Reapportionment Office held 28 public hearings across the state. All but one hearing—held at 6:00 pm at the Statehouse in Montgomery—was held between the normal workday hours of 9:00 am to 5:00 pm, i.e., times when the general public was least able to attend.

47.     Although Committee Co-Chair Sen. Jim McClendon claimed the public hearings served "to try to give the opportunity for any citizen to have input into the process," before the public hearings even began, he told the press that the new maps would not cause "any surprises for the candidates or for the voters." Mike Cason, *Alabama lawmakers begin task of drawing new political districts*, Ala. Media Group, Aug. 31, 2021, https://www.al.com/news/2021/08/alabama-lawmakers-begin-task-of-drawing-new-political-districts.html.

48.     On October 19, 2021, Plaintiffs the Alabama NAACP and Greater Birmingham Ministries, and others sent a letter to the Alabama Permanent Committee on Reapportionment reminding them of their obligations under Section 2 of the VRA, highlighting the Committee's obligation to conduct a racial-polarization analysis to ensure that the redistricting complied with the VRA and that the race was used only in a narrowly tailored manner to comply with a

---

[3] Ala. Legis., *Permanent Legislative Committee on Reapportionment*, http://www.legislature.state.al.us/aliswww/ISD/JointIntCommResults.aspx?OID_COMM=1300&COMMITTEE=PERMANENT%20LEGISLATIVE%20COMMITTEE%20ON%20REAPPORTIONMENT (last visited Nov. 4, 2021). An additional Republican committee member left the Legislature in July 2021. *See* Eddie Burkhalter, *Governor appoints Rep. Bill Poole as state finance director*, Ala. Pol. Rep., July 16, 2021, https://www.alreporter.com/2021/07/16/governor-appoints-rep-bill-poole-as-state-finance-director/.

compelling state interest. Letter from LDF et al. to Ala. Legislative Reapportionment Office, Oct. 19, 2021, https://www.naacpldf.org/wp-content/uploads/Letter-to-AL-Reapportionment-Committee-20211019-1-1.pdf.

49.     Governor Kay Ivey called the Special Legislative Session on redistricting in Alabama to begin on October 28, 2021.

50.     On October 26, 2021, the Committee held its first public meeting of this redistricting cycle. The proposed maps were not available to the public until the day before—October 25. A member of the Committee, Rep. Chris England, a Black legislator, published the proposed maps on Twitter. @RepEngland70, Twitter (Oct. 25, 2021, 12:30 p.m.), https://twitter.com/RepEngland70/status/1452674045804167169. The Committee itself did not release the maps to the public until the day of the Committee meeting, and many Committee members did not see the full proposed maps beyond their own districts and those surrounding their own district until the day before their meeting. Beyond the Committee, the Committee Co-Chairs and their staff met with each incumbent legislator or their staff either in person or online; individual legislators only viewed and provided feedback on draft maps of their districts, not maps of the entire state.

51.     The Co-Chairs asserted that the Committee's lawyer, Dorman Walker, reviewed the maps and determined that they all complied with Section 2 of the VRA and the Fourteenth Amendment of the U.S. Constitution but did not explain what analysis had been undertaken. Mr. Walker has been the Committee's lawyer for 25 years, including when a federal court held that 12 districts were unconstitutional racial gerrymanders. Sen. McClendon explained that Mr. Walker told him that racial-polarization analysis was only done for state legislative districts—by an

unnamed consultant in Georgia—where "it looked like there might possibly be a racial issue" rather than analyzing every district.

52.     No racial-polarization analysis was conducted for CD 7—the single majority-minority Congressional district in the state. Rep. Pringle told the Committee that Mr. Walker said that a racial-polarization analysis was unnecessary because the district has a BVAP of around 54%, but did not explain the significance of that number, and when Rep. England asked Sen. McClendon to explain the relationship between a BVAP of 54% and the actual or potential results of a racial-polarization study, Sen. McClendon replied, "I got no clue."

53.     No racial-polarization analysis for any districts was provided to Committee members before or during the meeting. Committee members only received demographic and population data for each district and neither Mr. Walker nor the unnamed Georgia consultant attended the Committee meeting.

54.     Rep. Laura Hall, a Black legislator, moved to postpone any vote on the proposed maps until the Committee members and the public had time to review the maps and accompanying racial-polarization analysis. That motion failed along racial lines—with all the Black committee members voting for it.

55.     Each of the maps passed along racial lines out of Committee—with all the Black members of the Committee voting against the maps.

56.     The Special Legislative Session for redistricting began a mere two days later, on October 28, 2021. Throughout the special session of the Legislature, the co-chairs of the Reapportionment Committee represented that the congressional districts were drafted by incumbent members of Alabama's Congressional delegation to maintain their current districts with only those changes necessary to equalize populations.

57.     On October 29, 2021, the Alabama House State Government Committee met to discuss the Reapportionment Committee's proposed districting plan for Alabama's U.S. House delegation. When asked what the process was for incorporating public comment into the proposed districting plans and whether a racial-polarization analysis had been conducted, Representative Chris Pringle said "no" and that "we're working on it."

58.     Multiple times throughout the Committee meeting, Rep. Pringle noted that he had not seen full plans from outside groups, including the Alabama NAACP and Greater Birmingham Ministries. Yet, without specifying when an analysis would be complete or on what maps, Rep. Pringle also stated that he was "running analysis" on maps from outside groups.

59.     Rep. John Rogers, a Black legislator, asked Rep. Pringle whether the Reapportionment Committee considered questions from organizations such as the Alabama NAACP and Greater Birmingham Ministries, particularly as to District 7. Rep. Pringle replied that "we're looking at everything." But Rep. Pringle couched his statement by noting "it's this horrific time crunch that we're under," and that he wished he "had more time to do this."

60.     Rep. Pringle again claimed that plans from outside groups were still being analyzed. He further admitted not knowing why there had not been a racial-polarization analysis of CD 7.

61.     Rep. Pringle stated that he would "go back and look at the numbers" but proceeded to call a vote on the map anyway. The Committee gave the congressional map a favorable report.

62.     Later in the Committee, Plaintiff Evan Milligan asked Rep. Pringle whether the Reapportionment Committee conducted racial polarization studies on any of the maps. Rep. Pringle replied that such studies were conducted on "some of the districts that we were concerned about," but that they "were still working on it." Again, Rep. Pringle offered no detail or timeline.

And Rep. Pringle did not answer whether the Committee lacked the necessary data to determine whether the map violated federal law.

63.     On. November 1, the full House considered the congressional map. Rep. England asked again why no racial-polarization study had been done for CD 7, and asked about the status of the racial-polarization study for CD 7 that he had requested in the Reapportionment Committee.

64.     Rep. Pringle replied that a racial-polarization study was done only for districts "if we thought it was necessary." In his view, only districts with a BVAP of 51% or less required a racial-polarization study. He did not state the legal or factual basis for this 51% or less rule.

65.     Rep. Pringle again admitted to Rep. England that "they didn't do" the racial-polarization study for CD 7, "not yet." But Rep. Pringle assured him that "somebody" would do the analysis for that district.

66.     Rep. England asked whether it was "by coincidence" that CD 7 happened to have a BVAP of around 55% when race was allegedly not taken into account during the initial drawing.

67.     Rep. Pringle responded that they "attempt[ed] to maintain the core of the existing districts." He noted that CD 7 originally was drawn in the early 1990s, "and we've maintained the core of that district ever since" despite significant population and demographic changes. Rep. Pringle specified that CD 7 was underpopulated by around 53,000 people. CD 7 had the most population to gain out of all the congressional districts.

68.     Rep. England reiterated his concerns about keeping CD 7 largely the same throughout the decades: "The 7th congressional district manages to maintain somehow almost the exact shape that it has had the last 20 years, but specifically the same sort of black voting age population" as the early 1990s, even when it needed to gain 53,000 people.

69.     The House passed the congressional map by a vote of 65-38.

70.     On November 2, 2021, the Senate General Fund and Appropriations Committee considered the State House and congressional maps.

71.     The Committee gave both maps a favorable report in under twenty minutes. Sen. Allen remarked that the Reapportionment Committee consulted members of Congress and attorneys about the congressional map but did not speak to any State Senator. Another Senator suggested that the Senate "lean[s] too heavily" towards the subjective advice of attorneys "without really getting involved and understanding the rationale as to why" the maps were drawn as-is.

72.     Regardless, the Committee gave the congressional map a favorable report.

73.     The next day, November 3, the full Senate considered the congressional map.

74.     Sen. Bobby Singleton, a Black legislator, asked Sen. McClendon whether anyone had considered maps that were proposed at public hearings months before—well before the 10-day rule for maps proposed by outside groups.

75.     Sen. McClendon indicated that he had seen the map proposed by the League of Women Voters but rejected it because of "serious flaws." Specifically, he found the map flawed because it put two members of Congress within the same district. Sen. McClendon alleged that pitting the incumbents around each other would violate Section 2 of the Reapportionment Committee Guidelines, "which says contests between incumbents will be avoided whenever possible."

76.     Sen. McClendon also offered that the League of Women Voters map would violate Section 2 of the VRA by eliminating the sole majority-minority district in the state.

77.     Sen. Singleton challenged Sen. McClendon on whether CD 7 is a racially gerrymandered district. Sen. McClendon replied "Gerrymandering is in the eye of the beholder."

78.     Sen. Rodger Smitherman, a Black legislator, offered a substitute whole-counties map, which he asserted was aimed at eliminating racial gerrymandering. This map included two districts with BVAP over 40%, but no majority-BVAP districts. Sen. Smitherman claimed that a racial-polarization analysis showed that these districts were Black "opportunity"-districts.[4]

79.     Sen. McClendon objected to the Smitherman plan because Sen. McClendon maintained that it violated the VRA and because it placed two incumbent congressmembers—one Black and one white—in the same majority-Black CD 7. The Senate voted 23-7 along racial lines to reject the Smitherman plan—with all Black Senators voting in favor of the Smitherman plan.

80.     Sen. Singleton also offered two substitute maps that, according to him, included two Black-opportunity congressional districts. These maps had only 2.6% and 0.7% deviation for District 7. He explained that, so long as a district provides voters with the opportunity to elect candidates of their choice, it was unnecessary for a district to have over 50% BVAP to comply with Section 2 of the VRA.

81.     The Senate tabled consideration of both maps.

82.     Sen. Kirk Hatcher, a Black legislator, offered the demonstrative map prepared by Plaintiffs Greater Birmingham Ministries and the Alabama NAACP as a substitute map. He stated that this map sought to ensure "that all Black Alabamians have an opportunity to elect their preferred congressional representatives." Sen. Hatcher's substitute map failed an up-or-down vote—with all Black legislators voting in favor of it.

83.     Again, Sen. McClendon repeated that the congressional maps in HB 1 were drawn "race blind" even though the mapping software could display race. Sen. McClendon contended

---

[4] In "opportunity" or "crossover" districts, the Black voters form a sizable enough minority to enable them, with help from some of the white majority in the district, to elect a candidate of choice. *Cooper v. Harris*, 137 S. Ct. 1455, 1472 (2017).

that the Supreme Court required "race blind" drawing of the congressional map after the 2010 Census. "The courts told us what we had to do, keeping in mind the whole time, this is a racial issue. This is not about splitting counties. And this is not about splitting precincts. This is about drawing maps based on race. That's not good." He further alleged that, at this point in the redistricting process, it would be impermissible to consider race when altering the map.

84. The Senate tabled several other substitute maps.

85. The Senate then passed the congressional map by a vote of 22-7—along racial lines with all Black senators voting against the map.

**Plaintiffs Satisfy the Three *Gingles* Preconditions for Proving a Vote Dilution Claim under Section 2 of the Voting Rights Act**

*Gingles* I: The Committee could have Drawn a Second Majority-Black Congressional District with a Reasonably Compact Black Population that is Linked as a Community by Common Interests

86. The Alabama's Black population is sufficiently large, geographically compact enough to constitute majorities of the voting age population in two congressional districts.

87. Per the demonstrative map in ¶ 89 below, CD 7 can be redrawn to include most of the City of Birmingham and the surrounding Black communities in Jefferson and southern Tuscaloosa Counties, all the majority-Black counties of Hale, Greene, Sumter, Perry, Dallas, most of majority-Black Marengo County, and portions of Choctaw, Autauga, Bibb, and Pickens Counties with large Black populations. Demonstrative CD 7 would have a BVAP of 52.6%, which is sufficient for Black voters to elect a representative of choice despite the persistence of racially polarized voting in Alabama. This CD 7 is narrowly tailored to comply with the VRA.

88. Demonstrative CD 2 can be redrawn as a second majority-Black district to include all of majority-Black Montgomery County, rather than splitting it between districts, all of the surrounding majority-Black counties of Lowndes, Wilcox, and Bullock, and part of majority-Black Macon and Marengo Counties, all of the over-40% Black counties of Pike, Butler, Barbour,

Conecuh, and Clarke, as well as the majority-Black City of Mobile. Demonstrative CD 2 would have a BVAP of 50.1%, which is sufficient for Black voters to elect a representative of choice despite persistent racially polarized voting. This CD 2 is narrowly tailored to comply with the VRA.

89.     The map below shows demonstrative CDs 2 and 7 as reasonably compact areas of Black voters with majorities in two Alabama congressional districts. The majority-Black CD 7 is colored teal, and the majority-Black CD 2 is colored orange. The map has zero population deviation, keeps most counties whole, and satisfies other redistricting criteria. Black voters in these districts are members of communities of interests with a shared history, political beliefs, cultural values, and economic interests. Their history includes a history of discrimination, and their shared beliefs include a desire for livable wages, quality healthcare, and a second majority-Black district.



90.     There are other ways to draw two majority-Black districts, however. For example, an alternative demonstrative CD 2 could be drawn as a second majority-Black district while adhering to all the state's redistricting criteria, like maintaining zero population deviation and whole counties. This CD 2 could include all of Montgomery County and the Black Belt counties in the western part of the state, while ceding Alabama's southernmost counties to CD 1.

*Gingles* II: Voting Remains Racially Polarized in Alabama Across the State

91.     Voting is racially polarized across the state. "The surest indication of race-conscious politics is a pattern of racially polarized voting." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984).

92.     Numerous federal courts in Alabama have found that the state's elections are racially polarized. *See, e.g., Ala. State Conf. of NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *17 (M.D. Ala. Feb. 5, 2020) (accepting the undisputed statistical evidence proving the existence of racially polarized voting statewide); *Jones v. Jefferson Cty. Bd. of Educ.*, No. 2:19-cv-01821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019) (concluding that "voting is racially polarized in the multimember district [of the Jefferson County school board] insofar as Black voters are politically cohesive and White people vote sufficiently as a bloc to enable them to defeat Black voters' preferred candidates."); *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-46 & n.3 (M.D. Ala. 2011) (finding that voting is racially polarized across Alabama); *see also ALBC I,* 575 U.S. at 277 (noting the existence of racially polarized voting in Alabama elections). "In an environment characterized by racially polarized voting, politicians can predictably manipulate elections—either by drawing districts or setting an issue for a referendum—to minimize or cancel out minority voters' ability to elect their preferred candidates." *McGregor*, 824 F. Supp. 2d at 1346 (internal citation, quotation marks, and alterations omitted).

93.     There is a causal relationship between racial bloc voting and the state's history of racial discrimination. "Racial bloc voting by whites is attributable in part to past discrimination, and the past history of segregation and discrimination affects the choices of voters at the polls." *Brown v. Bd. of School Comm'rs of Mobile Cty.*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd* 702 F.2d 1103 (11th Cir. 1983), *aff'd* 464 U.S. 1005 (1983).

94.     In 2013 and 2014, Burton LeFlore, a Black Democrat, sought election to the U.S. House from CD 1, but both times—as the candidate of choice for Black voters—LeFlore was defeated by Bradley Byrne, a white Republican, in wide margins that reflect the significant racially polarized voting in Alabama.

95.     In the 2008 U.S. Senate race, 90% of Black voters supported State Senator Vivian Figures, the Democratic candidate, while 89% of white voters voted for Republican U.S. Senator Jeff Sessions. In that race, Senator Sessions won the support of a majority of white voters regardless of party affiliation: 58% of white Democrats, 88% of white Independents, and 96% of white Republicans. By contrast, Sen. Figures won the support of 84% of non-white voters of any party.

96.     In 2018, Black candidates for Lieutenant Governor, State Auditor, and the Public Service Commission lost statewide general elections to white candidates wherein the Black candidates received upwards of 95% of Black voter support, and white candidates received upwards of 85% of white voter support.

97.     Voting in primary elections in Alabama is also racially polarized. That is, even when voters are choosing among candidates from the same party race still influences their vote. For example, in the 2008 Democratic presidential primary, Black people overwhelmingly voted for Barack Obama, whereas most white voters supported Hillary Clinton or other white candidates.

24

*Gingles* III: White Block Voting Typically Defeats Black Candidates of Choice

98.     In the areas where a second majority-minority congressional district can and should be drawn, the white majority votes as a bloc typically resulting in the defeat of Black voters' candidates of choice. In the twentieth century, Black Alabamians have never elected a congressional representative of choice outside of the majority-Black CD 7, and only since 1992. Thus, the lack of a second Black district restricts Black Alabamians influence to only approximately 14% of the congressional delegation, despite accounting for 27% of the state's population.

99.     In congressional races in the current majority-white CDs 1, 2, and 3, Black candidates and Black favored candidates have never won election to Congress.

100.    For example, in 2020 in District 1, white and white-preferred candidate Rep. Bradley Byrne defeated Black and Black-preferred candidate James Averhart by approximately 29 percentage points in a district that was approximately 25.7% BVAP. The same was true in 2018, with Rep. Byrne defeating Black and Black-preferred candidate Robert Kennedy Jr. by over 26 percentage points.

101.    In 2020 in District 2, which is 30.6% BVAP, white and white-preferred candidate Rep. Barry Moore defeated Black and Black-preferred candidate Phyllis Harvey-Hall by over 30 percentage points. In 2018 in District two, white and white-preferred candidate Rep. Martha Roby defeated Black-preferred candidate Tabitha Isner by 23 percentage points.

102.    In 2020 in District 3, which 25.8% BVAP, white and white-preferred candidate Rep. Mike Rogers defeated Black and Black-preferred candidate Adia Winfrey by 35 percentage points. Similarly, in 2018, Rep. Rogers defeated Black-preferred candidate Mallory Hagan by over 27 percentage points.

**The Totality of the Circumstances, Including Senate Factors Demonstrate that HB 1 Violates Prevents Black Voters in Alabama from Participating in the Political Process on Equal Terms and Electing Representatives of Choice**

103.    The three *Gingles* requirements are necessary preconditions but, to establish liability, Plaintiffs must also demonstrate that "the totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015).

104.    Although district courts must perform this totality-of-the-circumstances analysis, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Id*. (citation omitted).

105.    To undertake the totality-of-the-circumstances determination, courts use the nine factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the VRA, i.e., the "Senate Factors." *Id*. But courts are not limited to solely considering these factors, nor is there a requirement that "any particular number of factors be proved, or that a majority of them point one way or the other." *Id*. (internal citations and quotation marks omitted).

Senate Factor 1: Alabama has an Extensive and Ongoing History of Voting Discrimination

106.    In five of the six decennial redistricting cycles between 1960 to 2010, courts or the U.S. Department of Justice found that Alabama's congressional map or state legislative maps discriminated against Black voters in violation of the Constitution or the VRA.

107.    Prior to 1960, the Legislature failed to reapportion for 50 years—diluting the votes of residents in rapidly expanding counties. As a result, Alabama's entire legislative apportionment scheme was struck down for violating the principle of one person, one vote. *Reynolds v. Sims*, 377

U.S. 533, 568 (1964). On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108-109 (M.D. Ala. 1965).

108.    Following *Reynolds* and the 1970 Census, the Legislature again failed to redistrict and a three-judge federal court was forced to draw new district lines. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972). The court rejected the Alabama Secretary of State's proposed map because of its racially "discriminatory effect" on Black voters. *Id.* at 936. In the 1980s, the United States Attorney General denied preclearance under the VRA to maps drawn by the Legislature to redistrict State House and Senate maps because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. U.S. Dep't of Justice Ltr. to Ala. Attorney General Graddick, May 6, 1982, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf. Shortly thereafter, a three-judge court rejected Alabama's proposed interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' black districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 238 (M.D. Ala. 1982).

109.    After the 1990 census, the State entered a consent decree to resolve a VRA lawsuit filed on behalf of Black voters. *See Brooks v. Hobbie*, 631 So.2d 883, 884 (Ala. 1993).

110.    Most recently, after the 2010 census, Black voters and legislators successfully challenged state legislative districts as unconstitutional racial gerrymanders. *See Ala. Legis. Black Caucus v. Alabama* ("*ALBC II*"), 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017).

111.    Alabama's history of discrimination dates to the state's admission to the union. Before the Civil War, Black people were barred from voting in the state. After the passage of the

Reconstruction Acts and Amendments, Alabama was forced to allow Black men access to the franchise, and the 1867 Alabama Constitution granted every male person over the age of 21—who satisfied the citizenship and residency requirements—the right to vote. This meant that for the first time in Alabama's history, Black people voted and held public office.

112.    In response, white leaders reformed the Democratic party with the intent of "redeeming" the State and re-establishing white supremacy. This was accomplished by using violence to deter Black people from political participation and, once the Redeemers returned to political office, to pass racially discriminatory laws to cement their control.

113.    Between 1868 and 1872, the Ku Klux Klan maintained an active membership in Alabama's rural areas and suppressed the Black vote by beating and killing Republican leaders, burning their homes, lynching Black Americans, and sending bands of armed white men on horseback to break up Republican political rallies and intimidate voters.

114.    In 1874, Democratic candidates were elected to public office in large numbers, mainly due to the party's use of violence against and intimidation of Black voters. On election day, in Eufaula, Alabama, members of a white paramilitary group known as the White League, killed several unarmed Black Republican voters and turned away thousands of voters from the polls.

115.    The following year, in 1875, the Alabama legislature adopted a new state constitution and passed a series of local laws and ordinances designed to strip Black Americans of the civil rights they enjoyed briefly during Reconstruction.

116.    Violent intimidation of Black voters continued throughout the 1880s and 1890s, and by the twentieth century white leaders in Alabama had declared Black disenfranchisement a policy goal. At the 1901 Constitutional Convention, 155 white male delegates gathered in Montgomery with the express intention "to establish white supremacy in the State."

117.    The Convention ratified changes to the constitution that required literacy tests as a prerequisite to register to vote and mandated payment of an annual $1.50 poll tax, which was intended to and had the effect of disenfranchising Black voters. *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966).

118.    After the passage of the 1901 Constitution, the number of Black registered voters in Alabama dropped from 180,000 to 3,000.

119.    Alabama's discriminatory voter registration system, combined with continued violent intimidation, successfully suppressed Black voting in the state for several more generations, with no significant federal intervention until the passage of the VRA in 1965.

120.    In 1964 and 1965, Alabama's discrimination and brutality against Black voters was on full display in Selma, where Dallas County Sheriff Jim Clark, Alabama state troopers, and vigilantes violently assaulted peaceful Black protesters attempting to gain access to the franchise.

121.    On March 7, 1965, in what became known as Bloody Sunday, state troopers viciously attacked and brutally beat unarmed peaceful civil rights activists crossing the Edmund Pettus Bridge in Selma, where less than 5 percent of Black voters were registered to vote. Bloody Sunday helped pave the way for the passage of the VRA in 1965 and Alabama was declared a "covered" state under Section 4(b) of the Act.

122.    Between 1965 and 2013, at least 100 voting changes proposed by Alabama state, county or city officials were either blocked or altered pursuant to Section 5 of the Voting Rights Act. U.S. Dep't of Justice, Civil Rights Division, Voting Section, *Voting Determination Letters for Alabama*, https://www.justice.gov/crt/voting-determination-letters-alabama (last updated May 18, 2020). This includes at least 16 objections between 1969 and 2008 in cases where a proposed

state or local redistricting plan had the purpose or would have the effect of diminishing the ability of Black voters to elect their candidates of choice. *Id.*; *see* 52 U.S.C. § 10304(b).

123.    Beyond redistricting, Alabama has employed voting practices that impair Black electoral success. In 1986, for instance, a court found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1357 (1986). The court also found that from the late 1800s to the 1980s, Alabama had purposefully manipulated the method of electing local governments as needed to prevent Black citizens from electing their preferred candidates. *Id.*

124.    Ultimately, a defendant class of 17 county commissions, 28 county school boards, and 144 municipalities were found to be employing at-large election systems designed and motivated by racial discrimination. These cases resulted in settlement agreements with about 180 Alabama jurisdictions that were required to adopt new election systems including single-member districts, limited voting, and cumulative voting systems, in an attempt to purge the state's election systems of intentional discrimination. *See* James Blacksher, et. al., *Voting Rights in Alabama: 1982-2006*, 17 S. Cal. Rev. L. & Soc. Just. 249, 264 (2008).

125.    Federal courts have continued to rule against municipal at-large voting systems created by the State Legislature. *See, e.g.*, *Jones*, 2019 WL 7500528, at *4 (finding that the at-large multimember district used to elect board members violated Section 2 of the VRA); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019) (ordering changes to the city's at-large voting system to remedy an alleged violation of the VRA).

126.    Black voters have challenged other discriminatory Alabama voting laws under Section 2 of the VRA and the Constitution in federal court. *See, e.g.*, *People First of Alabama v. Merrill* ("*People First*"), 491 F. Supp. 3d 1076, 1106-1107 (N.D. Ala. 2020).; *Harris v. Siegelman*, 695 F. Supp. 517, 530 (M.D. Ala. 1988). For example, the Supreme Court struck down Alabama's discriminatory misdemeanant disfranchisement law, *Hunter v. Underwood*, 471 U.S. 222 (1985), and a state law permitting certain discriminatory annexations, *Pleasant Grove v. United States*, 479 U.S. 462, 466-67 (1987).

127.    Even in the wake of *Shelby County v. Holder*, Alabama is the only state in the nation where federal courts have ordered more than one political subdivision to be re-subjected to preclearance review under Section 3(c) of the VRA. *See Jones*, 2019 WL 7500528, at *4-5; *Allen v. City of Evergreen*, No. 13-0107, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014).

Senate Factor 5: Black Alabamians Continue to Bear the Effects of Past Socioeconomic Discrimination which Hinders their Ability to Participate Effectively in the Political Process

128.    Alabama has a long and well documented history of official and private discrimination which predates the state's admission to the union and has been well documented by the federal courts since at least the 1960s. As one federal court explained, Alabama's "unrelenting historical agenda, spanning from the late 1800s to [today], to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." *Dillard*, 640 F. Supp. at 1357.

129.    As a result of the history of official and private discrimination in Alabama, Black Alabamians have a lower socioeconomic status and lag behind white residents in many crucial aspects of public life, including employment, income, educational attainment, and access to health care. Black Alabamians also disproportionately bear the brunt of the consequences of the state's criminal legal system. All of this discrimination and its vestiges hinder Black Alabamians' ability to effectively participate in the political process.

130.    Alabama's history of denying Black people equal access to education persisted long after the Supreme Court's decision in *Brown v. Board of Education*. In 1956, after a federal court ordered the segregated University of Alabama to admit a Black woman named Autherine Lucy, white people gathered on campus, burned a cross, and marched through town chanting, "Hey, hey, ho, ho, Autherine has got to go!" Frye Gaillard, *Cradle of Freedom: Alabama and the Movement that Changed America,* 40 (Tuscaloosa: University of Alabama Press, 2004).

131.    Desegregation litigation continues in Alabama today. A December 2014 report found that 54 Alabama school districts remain under desegregation orders today as they still have not satisfied their constitutional obligations to integrate public schools and eliminate the vestiges of racial discrimination. *People First*, 491 F. Supp. 3d at 1108. For example, in 2018, in a case challenging the attempt by the City of Gardendale, which is 85% white, to form a school district separate from Jefferson County's more racially diverse district, the Eleventh Circuit affirmed a finding that "race was a motivating factor" in the city's effort. *Stout v. Jefferson Cnty. Bd. of Ed.*, 882 F.3d 988, 1007-1009 (11th Cir. 2018).

132.    Alabama's constitution still contains language that mandates separate schools for Black and white students after a majority of voters rejected repeal attempts in 2004 and 2012. Although the provision has not been enforceable for decades, its underlying prejudice continues to shape ongoing educational inequality.

133.    Alabama was the first state ever to be subjected to a statewide injunction prohibiting the state from failing to disestablish its racially dual school system. *Lee v. Macon Cty. Bd. of Ed.*, 267 F. Supp. 458 (M.D. Ala.), *aff'd* 389 U.S. 215 (1967).  The order resulted from the court's finding that the State Board of Education, through Governor George Wallace, had previously wielded its powers to maintain segregation across the state. *Id.* For decades, state officials ignored

their duties under the statewide desegregation order. *See Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1128-30 (M.D. Ala. 1997). The state did not satisfy its obligations to remedy the vestiges of segregation under this order until as late as 2007. *Lee v. Lee County Bd. of Educ.*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007).

134.   Alabama's institutions of higher education similarly remain plagued by the "vestiges of segregation," decades after Alabama colleges and universities were court-ordered to desegregate. *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991). In 1991, a trial court in *Knight v. Alabama* found that Alabama remained obligated to eliminate the lingering and continued effects of segregation and discrimination in the University of Alabama and Auburn University, as well as their proposed satellites, to try to recruit Black students to those schools and to recruit white students to the state's Historically Black Colleges and Universities (HBCUs). In 1995, the trial court issued a remedial decree analogous to the statewide injunction issued in *Lee v. Macon*, the implementation of which the court would oversee for over a decade. *Knight v. State of Ala.*, 900 F. Supp. 272 (N.D. Ala. 1995). And Alabama did not satisfy its obligations under the *Knight* order until as late as 2006. *Knight v. Alabama*, 469 F. Supp. 2d 1016 (N.D. Ala. 2006).

135.   Today, after increasing for many years, Black student enrollment in the state's higher education institutions has drastically declined. For example, Black enrollment at Auburn University peaked 14 years ago with Black students making up 8.7 percent of the student body. This year, the number of Black students in the freshman class at Auburn was a mere 3.2%. Drake Pooley, *Why Has Black Enrollment Fallen at an Elite Southern University*, N.Y. Times (Sept. 17, 2021).

136.    In 2016, all 76 of the schools labeled "failing" by Alabama were majority-Black schools and Black students constituted 91% of those Alabama students who were enrolled in "failing" public schools.

137.    More than 16% of Black adults in Alabama over the age of 25 have not completed high school, compared to 11.4% of white adults. For the same age group, only 17.3% of Black Alabamians hold a bachelor's degree or a higher qualification, compared to 28.3% of white adults. U.S. Census Bureau, Table S0201, 1-year 2018 American Community Survey 2018.

138.    Alabama also has a persistent history of denying its Black residents equal access to employment opportunities. More than one quarter (27.7%) of Black Alabamians live in poverty compared to only 11.3% of white Alabamians. *Id.*

139.    The unemployment rate among Black people over the age of 16 in Alabama is more than double the rate among white residents of the same age. And of those adults who are employed, Black Alabamians are more likely to work in lower paying jobs than white workers: 20.7% of Black employees work in service occupations compared to 14.8% of whites. *Id.*

140.    In Alabama, Black households also have fewer economic resources. The median household income for Black families is $33,503 compared to $58,257 for white households. *Id.*

141.    Black Alabamians are significantly more likely to rent their home and to lack a vehicle than white Alabamians.  About one in eight Black households (12.7%) lack access to a vehicle, while only 3.9% of white households lack a vehicle. *Id.* While 76.1% of white Alabamians are homeowners, only 49.9% of Black Alabamians own their homes. *Id.*

142.    About 19% of Black households lack a computer, smartphone, or tablet versus only about 11% of white households. *Id.* Black families are also less likely to have broadband internet access—29.6% compared to 17.2% of white households. *Id.*

34

143.    Rampant and overt discrimination in education works in tandem in Alabama with discrimination against Black people in employment. In 2019, there were 2,108 claims of employment discrimination submitted to the U.S. Equal Employment Opportunity Commission ("EEOC") from Alabama, of which 45.1% were racially based – the highest percentage of any state in the United States. U.S. Equal Employment Opportunity Commission, 2019 EEOC Charge Receipts for AL, https://www.eeoc.gov/statistics/enforcement/charges-by-state/AL; United States Census Bureau, Quick Facts, http://www.census.gov/quickfacts/table/PST045215/00,01. Alabama's race-based claims accounted for 2.9% of the racially based claims received by the EEOC in the entire country and Alabama's color-based claims represented 2.2% of the EEOC's color-based claims in the country, even though in 2010 Alabama accounted for only 1.7% of the national population.

144.    Income and education are independently important, but both also have a significant impact on political participation rates, which remains persistently lower among Black than among white Alabamians.

145.    Racial discrimination also finds expression in the healthcare system. Alabama has one of the highest maternal mortality rates in the country. In 2019, the infant mortality rate for Black infants was 12.0 deaths per 1,000 live births, which is more than twice the white infant mortality rate of 5.6 deaths. Ala. Public Health, *Alabama Infant Mortality Rate Shows Slight Uptick in 2019*, Dec. 16, 2020, https://www.alabamapublichealth.gov/news/2020/12/16.html As a gynecologic oncologist in Mobile recently stated, "It is more lethal to be Black and pregnant in Alabama than in some poor countries." Eyal Press, *A Preventable Cancer Is on the Rise in Alabama*, The New Yorker (Mar. 30, 2020), https://www.newyorker.com/magazine/2020/04/06/a-preventable-cancer-is-on-the-rise-in-alabama.

146.    The life-expectancy of Black Alabamians (72.9 years) is significantly shorter than that of whites (76 years). In Alabama's Black Belt, researchers have found that Black women, compared to white women, are more than twice as likely to die from cervical cancer. *Id.*

147.    In Lowndes County, scientists at the National School of Tropical Medicine at Baylor College of Medicine documented higher rates of hookworm infections among residents from exposure to raw sewage and inadequate wastewater management. A disease long thought to have been eradicated in the United States, hookworm infections cause anemia, iron deficiencies, cognitive delay, and stunted growth in children. The peer-reviewed study published in the *American Journal of Tropical Medicine and Hygiene* found that more than one in three Lowndes County residents tested positive for traces of hookworm. Equal Justice Initiative, *Researchers Find Hookworm Infection Linked to Extreme Poverty in Rural Alabama*, https://eji.org/news/researchers-find-hookworm-infection-linked-extreme-poverty-rural-alabama/.

148.    On November 9, 2021, the U.S. Department of Justice announced an investigation into the wastewater disposal and infectious disease and outbreaks programs of the Alabama Department of Public Health and the Lowndes County Health Department. The investigation is examining whether the Alabama and Lowndes County Health Departments operate their onsite wastewater disposal program and infectious diseases and outbreaks program in a manner that discriminates against Black residents in violation of Title VI of the Civil Rights Act of 1964. *See* U.S. Dep't of Justice Office of Public Affairs, *Justice Department Announces Environmental Justice Investigation into Alabama Department of Public Health and Lowndes County Health Department* (last updated Nov. 9, 2021), https://www.justice.gov/opa/pr/justice-department-announces-environmental-justice-investigation-alabama-department-public.

149.    The COVID-19 public health crisis that began in 2019 and the deaths associated with the novel and deadly respiratory virus have fallen most heavily on Black Alabamians as a result of centuries of discrimination against Black people in all manners of life in Alabama, including in health, income, and employment. Kesha Moore, COVID-19 Vaccinations In Alabama: Protecting and Perpetuating a Racial Divide, NAACP Legal Defense Fund (Apr. 2, 2021),  https://www.naacpldf.org/naacp-publications/ldf-blog/covid-19-vaccinations-in-alabama-protecting-and-perpetuating-a-racial-divide/. The continued effects of discrimination in Alabama are further evidenced by the fact that despite Black Alabamians having the highest rates of COVID-19 cases and disproportionately accounting for COVID-19 deaths. The COVID Tracking Project *Alabama: All Race & Ethnicity Data*, The Atlantic, https://covidtracking.com/data/state/alabama/race-ethnicity (last updated March 7, 2021).

Senate Factor 6: Overt and Subtle Racial AppeaLs Continue in Political Campaigns

150.    In the last decade, both overt and subtle racial appeals have defined political campaigns in Alabama. In 2011, at a town hall meeting, Alabama Congressman Mo Brooks stated that "[he] will do anything short of shooting them [undocumented immigrants]" to remove them from the United States.

151.    In the 2017 special election for the U.S. senate seat vacated by Jeff Sessions, then-candidate Roy Moore told a group of people in Jackson, Alabama that the VRA created new rights and "today we've got a problem." When asked to speak about a time when America was great, Moore replied, "I think it was great at the time when families were united—even though we had slavery—they cared for one another . . . Our families were strong, our country had direction."

152.    In the 2018 election for Chief Justice of the Alabama Supreme Court, at least two campaign ads run by Chief Justice Tom Parker were characterized by racial appeals.  In one of his

campaign ads, Chief Justice Parker, a white Republican, declared that he opposes "the leftist mob tr[ying] to destroy our society" and featured a clip of Congresswoman Maxine Waters. *Ala. State Conference of NAACP*, 2020 WL 583803, at \*56. A court recently found that this statement alongside images of Congresswoman Waters, i.e., a Black congresswoman from California who had no reason to appear in an ad for an Alabama judicial election, shows that "one of the motives of the ad was to draw attention to race." *Id*. In another of Justice Parker's ads, he targeted immigrant communities: "It's an invasion. What happens if they make it to Alabama?" *Id*. The ad then showed what appeared to be people of color trying to cross the southern border and concluded with a declaration that Justice Parker "stand[s] up for what we believe" and "stand[s] *with us*." *Id*.

Senate Factor 7: Black Alabamians Remain Woefully Underrepresented in Public Office

153.    Black people in Alabama remain underrepresented, as a proportion of the population, in public office.

154.    Even though Black people comprise approximately 27% of Alabama's population, only one of seven or approximately 14% of Alabama's congressional representatives is Black. This number of majority-Black congressional districts has remained constant since 1992, before which there had never been a Black congressional representative from Alabama in the twentieth century.

155.    None of the current statewide elected officials are Black. Only two Black people have ever been elected to statewide office. In both instances, the office was associate justice of the Alabama Supreme Court. In 1982 and 1988, the late Justice Oscar W. Adams, Jr. was elected to two consecutive terms; and, in 1994, Justice Ralph D. Cook won an unopposed statewide election. In 2000, both Justice Cook and the then-recently appointed Justice John England, a Black person, lost elections to white candidates.

156.    As of 2015, there were 757 local Black elected officials in Alabama, making up only 16.7% of elected offices.

157.    Alabama has never had a Black governor or Black senator representing the state in the U.S. Senate.

158.    There are currently no Black Republicans in either the state House of Representatives or the state Senate or in any statewide elective positions.

Senate Factor 8: Elected Officials are Unresponsive to the Needs of Black Alabamians

159.    Black Alabamians' lack of representation in public office has contributed to the failure of elected officials to respond to the particularized needs of the Black community. The Alabama Legislature rejected requests to expand Medicaid under the Affordable Care Act despite the racial gap in insurance coverage. Expanding Medicaid would have insured an additional 220,000 Alabamians, particularly benefiting Black residents. This disparity in healthcare and insurance coverage contributed to the vulnerability of Black Alabamians when the novel coronavirus surfaced in early 2020. *People First*, 491 F. Supp. 3d at 1109.

160.    Black residents in Alabama have the highest rates of COVID-19 cases and deaths in the state. As the pandemic has progressed, racial disparities in COVID-19 vaccine access have also become clear. This is a result of both inefficiencies in vaccine distribution and deliberate choices by state and local administrators to overlook majority Black communities. Kesha Moore, *COVID-19 Vaccinations In Alabama: Protecting And Perpetuating A Racial Divide*, NAACP LEGAL DEF. & EDUC. FUND (Apr. 2, 2021), https://www.naacpldf.org/naacp-publications/ldf-blog/covid-19-vaccinations-in-alabama-protecting-and-perpetuating-a-racial-divide/.

161.    In Birmingham, the Alabama Regional Medical Services (ARMS) reported geographic discrepancies in the government's distribution of COVID-19 vaccines. The state

distributed doses of the vaccine to affluent white suburbs as early as January 2021, while the ARMS, a health clinic that primarily serves a lower-income Black community in Birmingham, did not receive its first doses of COVID-19 vaccines until March 8, 2021.

162.    Black Alabamians' lack of access to vaccinations was also observed in Mobile County, where 14 of the 18 state vaccination sites were located in neighborhoods with a larger white population.

163.    Alabama's elected officials have also been unresponsive to the needs of Black Alabamians in other areas of government services. In 2014, following the Supreme Court's decision in *Shelby County v. Holder*, Alabama's photo identification law went into effect; and in 2015, the State announced that it was closing 31 of 75 driver license offices throughout Alabama. The planned closures overwhelmingly affected Black Alabamians, as the State specifically concentrated closures in the Black Belt. This decision was ultimately reversed as part of a settlement after the U.S. Department of Transportation determined that the closures had discriminated against Black people in violation of Title VI of the Civil Rights Act. *See* Mem. Agreement Between the U.S. Department of Transportation and the Alabama Law Enforcement Agency (Dec. 22, 2016), https://www.transportation.gov/sites/dot.gov/files/docs/ALEA US DOT Signed MOA_0.PDF.

**Congressional Districts 1, 2, 3, and 7 Are Racial Gerrymanders**

164.    Race was the predominant factor in drawing CDs 1, 2, 3, and 7, and the Legislature's use of race was not narrowly tailored to comply with the Section 2 of the VRA or any other compelling governmental interest. The Legislature subordinated traditional race-neutral districting principles, including compactness, contiguity, respect for maintaining whole counties and communities of actual shared interest, to racial considerations.

165.    In the HB 1 plan signed by the Governor, the BVAP in CD 1 is 25.6%, the BVAP in CD 2 is 30.1%, and the BVAP in CD 3 is 25%. In drawing these districts, the Committee cracked Black voters between CDs 1, 2, and 3, despite having sufficient numbers and being geographically compact enough to form an additional majority-Black opportunity district. Race was the predominant factor in drawing these districts, as evident by how the boundaries cut through Black communities.

166.    Under HB 1, for example, the City of Montgomery and Montgomery County, which has a Black population of 54.7%, are inexplicably split between CDs 2 and 7.

167.    HB 1 bizarrely divides Black communities of shared interests residing in Alabama's Black Belt region into multiple congressional districts. The Black Belt is made up of those majority-BVAP (or near majority-BVAP) counties that run through central Alabama and have a centuries-long shared culture and history of slavery, agriculture, civil rights activism, and poverty. Yet, HB 1 neatly splits the Black population in the eastern Black Belt in two at the border of CDs 2 and 3 with Bullock and Barbour Counties in CD 2 and Macon and Russell Counties in CD 3.

168.    CD 3 contains Macon County, which has a Black population of 82.6% and is home to the educational heart of the Black Belt: the historically Black college Tuskegee University. Clarke County in the Black Belt with its significant Black populations is in CD 7, whereas Conecuh County, another Black Belt County, is in CD 2.



169.    While CDs 1, 2, and 3 use race as a predominant factor in drawing their boundaries by cracking the Black population across the three districts, CD 7 does so by unnecessarily packing Black voters into that district. CD 7 has existed in roughly its current form since 1992, when a federal court drew it as a majority Black district to resolve allegations of malapportionment and that Alabama had violated the VRA. As a result, for the first time since Reconstruction, Black voters in CD 7 were able to elect their candidate of choice-Earl F. Hilliard, a Black man—to Congress. Today, CD 7 is represented by Terri Sewell, a Black woman first elected there in 2010.

170.    But the three-judge court that drew CD 7 as a majority-Black district in 1992 expressly declined to conduct an analysis of racially polarized voting, the *Gingles* preconditions,

or the totality of the circumstances in drawing CD 7 as a 65% or more majority-Black district. *Wesch*, 785 F. Supp. at 1498-99.

171.    Moreover, when the Legislature attempted to draw its own 1992 congressional plan and submitted that plan for preclearance review, the U.S. Attorney General objected under Section 5 of the VRA. *See* U.S. Dep't of Justice Ltr. to Ala. Att'y General Evans, Mar. 27, 1992, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1880.pdf. Because Alabama failed to enact or preclear an alternative congressional plan, the *Wesch* court's plan remained in effect.

172.    After the 2000 and 2010 censuses, the Legislature continued to draw CD 7 in a manner consistent with the 1992 plan adopted by the *Wesch* court. As a result, CD 7 in the state's 2011 redistricting plan was still unnecessarily packed, with a BVAP of 63.57%. Alabama never conducted the analyses required by the VRA or the Constitution to determine whether maintaining the core of CD 7 or a Black population of 63% therein was necessary to comply with the VRA, nor did Alabama consider Black legislators' proposals in 2011 to draw a second Black district.

173.    Today, the core of CD 7 remains the same as it was drawn in 1992. CD 7 includes Choctaw, Dallas, Greene, Hale, Lowndes, Marengo, Pickens, Perry, Sumter, and Wilcox counties, as well as portions of Clarke, Jefferson, Montgomery, and Tuscaloosa counties. The BVAP in CD 7 is 55.3%. The BVAP decline from the previous decade comes from population loss in the Black Belt, rather than any legislative efforts to address racial gerrymandering in CD 7.

174.    In recent litigation, Alabama admitted that CD 7—which remains in similar form now as it did then—"appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson

County was for the predominate purpose of drawing African American voters into the district." Secretary of State Merrill's Pretrial Brief, *Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11.

175.    Based on expert simulations, which looked at factors like racial demographics, partisan voting patterns and analyzed various potential district combinations along racial and partisan lines, it is clear that race was a primary driver and the most significant factor in creating district lines. Expert simulations also show that CD 7 is more of an extreme racial outlier than a partisan outlier. That is, the simulations show that race accounts for the drawing of the lines in CD 7 above and beyond partisan voting patterns.

176.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into CD 7 and to crack Black voters across CDs 1, 2, and 3. Under HB 1, the BVAP in CD 7 is 55.3%, which is still higher than necessary for Black voters to elect candidates of choice and appears to have been drawn with the mistaken legal belief that the BVAP and district boundaries should be altered as little as possible. Rep. Pringle further admitted that no racial-polarization or effectiveness analysis had been conducted by the Legislature regarding CD 7 or with respect to the redrawing of any redistricting plans. Instead, CD 7 was drawn by changing the previous version of the district, which Alabama admits was a racially gerrymander, as little as possible except to equalize populations. Thus, CD 7 is not narrowly tailored to comply with the VRA or any other compelling state interest.

**The Congressional Maps in HB 1 is the Product of Intentional Racial Discrimination**

177.    Prior to the 1990 census, Alabama never had a congressional district that allowed Black Alabamians any substantial influence and certainly not the ability to elect candidates of choice until litigation. As noted above in ¶ 31, VRA litigation brought by Black voters in the 1990

cycle resulted in the drawing of CD 7 as a majority-Black district. But the court that drew this majority-Black district did not conduct a Section 2 analysis. *Wesch*, 785 F. Supp. at 1498-99. Rather the court cited the parties' stipulation that it was possible to draw a Black district, *id*., and, thereafter, adopted a legislative proposal for CD 7 drawn by State Sen. Larry Dixon. *Id*. at 1495.

178.    The Legislature did enact a congressional redistricting plan with one majority-Black in 1992 during the *Wesch* litigation. But the *Wesch* court resolved to adopt its own plan and create a majority-Black CD 7 out of a concern that the state's plan would not be able to obtain the necessary VRA preclearance in time for the then-upcoming election deadlines. *Id*. at 1500.

179.    The court was correct to worry about this timing. The U.S. Attorney General did in fact object under Section 5 of the VRA to the Legislature's 1992 Congressional plan. The Attorney General found that the legislative plan was the product of intentional racial discrimination because it drew only one majority-Black district and "fragmented" the rest of the Black population across the state to dilute the Black vote. U.S. Dep't of Justice Ltr. to Ala. Att'y General Evans, Mar. 27, 1992,   https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1880.pdf.   In   the objection letter, the U.S. Attorney General noted a "concern" of the Black community that "an underlying principle of the Congressional redistricting was a predisposition on the part of the state political leadership to limit black voting potential to a single district." *Id*. Thus, because the state did not enact or obtain preclearance for an alternate plan, the *Wesch* court's plan remained in effect.

180.    Troublingly, however, the *Wesch* court's plan creating a majority-Black CD 7 was also potentially infected by the Legislature's discriminatory motive. This is because the court plan was based on a CD 7 map drawn by Sen. Dixon. *Wesch*, 785 F. Supp. at 1495. And Sen. Dixon had a contemporaneous history of hostility towards Black voters. *See Greater Birmingham Ministries v. Sec'y of State of Ala*., 992 F.3d 1299, 1306 (11th Cir. 2021) (quoting statements made

by Sen. Dixon about Black voters in 1995, 2001, and 2010); *People First*, 491 F. Supp. 3d at 1106 (noting that, in the 1990s, Sen. Dixon had "insisted that only Black voters engaged in voter fraud").

181.     Following the Justice Department's objection under Section 5 of the VRA to the discriminatory purpose embodied in the Legislature's 1992 congressional plan, neither Alabama, nor any federal court ever acted to correct this discrimination. *See Wesch*, 6 F. 3d at 1468-69.

182.     Rather, in the subsequent 2000 and 2010 redistricting cycles, the Legislature simply continued to reenact the same core district for CD 7 with only slight modifications to address population shifts. The Legislature did so with the same discriminatory motive of limiting Black electoral success to CD 7, while fragmenting the remainder of the BVAP in Alabama in a manner designed to protect white candidates. For instance, in the 2000 cycle, the Democratic-controlled Legislature packed CD 7, and cracked the remaining Black population into majority-white districts in a manner designed to bolster and protect white Democratic congressmen. In the 2010 cycle, the Republican Legislature continued to pack CD 7 while minimizing the number of Black voters residing in the other districts to favor white Republican candidates. Further, the 2010 congressional plan, which HB 1 is based on, was drawn by State Sen. Scott Beason who, like Sen. Dixon, has a history of discrimination. *See McGregor*, 824 F. Supp. 2d at 1344-48. Regardless of the party in power then, race—not partisanship—has driven Alabama's congressional redistricting decisions.

183.     The Legislature made these decisions despite requests from Black legislators and voters in each redistricting cycle since 1990 to unpack CD 7 and draw two Black-majority districts.

184.     In 2021 cycle, the congressional maps in HB 1 likewise disregarded public input which supported the creation of a second Black opportunity district. The maps were introduced a mere day before they were passed out of committee on a vote that fell along racial lines. In the State House, the majority party cut the floor debate on the congressional maps short and prevented

the Legislative Black Caucus members from formally introducing Plaintiffs' letter and demonstrative plan containing two majority-Black districts (*supra* ¶ 89) into the House record for a formal vote. Nonetheless, the Black Caucus members were able to submit Plaintiffs' plan and letter containing a racial-polarization analysis into the clerk's official legislative record for the day.

185.    In the Senate, Sen. Smitherman, Sen. Singleton, and Sen. Hatcher each presented three maps—including Plaintiffs' demonstrative map—that complied with the state's redistricting criteria and included either two majority-Black districts or two "opportunity" districts with BVAPs over 40%. Racial-polarization analyses showed that these maps would give Black voters the opportunity to elect candidates of choice. But the Legislature rejected these maps along racial lines.

186.    Indeed, despite the submission of three maps proving otherwise, Sen. McClendon claimed that "It's impossible to draw two congressional districts that are majority minority people. You can't do it, try how you may, and so that's the problem. If you go for two districts, the way folks are just distributed in Alabama, you put the one pretty certain district at risk." Mike Cason, *Alabama lawmakers give final approval to new congressional districts*, Ala. Media Group, Nov. 3, 2021, https://www.al.com/news/2021/11/alabama-senate-rejects-plan-for-new-swing-congressional-district.html.

187.    But, as noted above at ¶¶ 51-55, Sen. McClendon conducted no racial-polarization analysis, nor any other publicly released analysis to determine whether creating two majority-Black or Black-opportunity districts might "put the one pretty certain [CD 7] at risk."

188.    Even with the efforts of the Black Caucus, the congressional maps in HB 1 were passed out of the Legislature and then signed by the Governor a week afterwards with minimal debate, votes, or opportunity for public input on alternative maps containing two Black districts.

189.    Despite its options, the Legislature simply continued to use race to maintain the core of the 1992 redistricting plan for CD 7, even though that plan was drawn for the discriminatory purpose of limiting Black voter influence. HB 1 packs CD 7 in a manner not required by the VRA and cracks the remaining Black community by placing majority-Black counties into multiple congressional districts in which Black voters are no more than 30% of the voting-age population.

## CLAIMS FOR RELIEF

**Count One: Section 2 of the VRA, Vote Dilution**
**HB 1 violates Section 2 of the Voting Rights Act of 1965**
**52 U.S.C. § 10301**
**(Vote Dilution)**

190.    The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

191.    Voting in Alabama is racially polarized. Black voters in Alabama are politically cohesive and overwhelmingly support the same candidates in congressional and statewide elections. By contrast, the white majority usually votes as a bloc in congressional and statewide elections with the usual result of defeating Black voters' candidates of choice.

192.    In addition, Black voters in Alabama are sufficiently numerous and geographically compact enough to form two majority-BVAP Congressional districts.

193.    Moreover, considering the totality of the circumstances in Alabama, Plaintiffs, Black Alabamians and organizations of which they are a part, have less opportunity than other members of the Alabama electorate to participate in the political process and to elect representatives of their choice to Congress.

194.    Among other factors, there is a long history and ongoing pattern of discrimination in voting, education, employment, health, and other areas in Alabama that effect Black voters ability to participate equally in the political process, Black voters are underrepresented in the

state's congressional delegation, recent political congressional and other campaigns have been characterized by overt and subtle racial appeals, the Legislature and white Congressmembers have been unresponsive to the particular concerns of Black voters, and the state's justifications for decades of cracking Black voters across districts and packing of Black voters into CD7 are tenuous.

195.    These facts, as well as the particular circumstances surrounding the adoption of HB 1 by the Alabama legislature, demonstrate that the Legislature adopted the 2021 congressional redistricting plan with the intent and the result of diluting Black voter strength in violation of Section 2 of the VRA, 52 U.S.C. § 10301.

196.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to temporarily and permanently enjoin the conduct of elections under HB 1 and order the creation of two majority-minority congressional districts in CD 1, 2, 3, and 7, will irreparably harm Plaintiffs by subjecting them to racial vote dilution.

**Count Two: Racial Gerrymandering**
**HB 1 violates the Fourteenth Amendment to the U.S. Constitution**
**U.S. Const. amend. XIV; 42 U.S.C §1983**

197.    The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

198.    The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2.

199.    Race was the predominant factor in the Alabama Legislature's drawing and enactment of HB 1, creating and enacting CDs 1, 2, 3, and 7. The Legislature subordinated

traditional race-neutral districting principles, including compactness, contiguity, respect for maintaining whole counties and communities of actual shared interest, to racial considerations.

200.    The predominate consideration of race in the drawing of CD 1, 2, 3, 7 and the "cracking" and "packing" Black voters across those districts is not required to comply with the VRA and indeed prevents fulfillment of the VRA's requirements. The predominate racial motive in the drawing of CD 1, 2, 3, 7 is not justified by a compelling state interest.

201.    As a result, CDs 1, 2, 3, and 7 each violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

**Count Three: Intentional Discrimination**
**HB 1 violates the Fourteenth Amendment to the U.S. Constitution**
**U.S. Const. amend. XIV; 42 U.S.C §1983; 52 U.S.C. § 10301**

202.    The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

203.    The equal protection clause of the Fourteenth Amendment to the U.S. Constitution forbids states from enacting laws that for which a racially discriminatory intent or purpose is a motivating factor and which produce discriminatory results. This includes laws that use race as a means to gain political or partisan advantage.

204.    One of the motivating factors in the drawing and passage of HB 1 was a racially discriminatory purpose. Specifically, HB 1 was drafted and passed at least in part to minimize the political power of Black Alabamians by limiting their ability to influence congressional elections to a single district out of seven.

205.    HB 1 will also produce discriminatory results for Black Alabamians—a fact Defendants were well aware of when drafting, passing, and beginning to implement the new congressional maps. Indeed, although Black Alabamians make up over 27% of the State's voting-

age population, this provides them political influence in only one out of seven congressional districts, or approximately 14% of the districts in the State. It will also limit their influence to the specific region of the State containing CD 7 despite substantial clusters of Black Alabamians living in concentrated areas of the State outside of CD 7. Defendants were aware that Black Alabamians could elect candidates of choice in two congressional districts in the state in a manner that complies with the U.S. Constitution and federal law, yet purposefully drew the congressional maps to prevent this.

206.    Moreover, other circumstantial evidence supports discriminatory purpose as a motivating factor behind HB 1, including the Senate Factors outline above. For instance, Alabama has a well-documented and recent history of discriminating against Black Alabamians in districting, especially in congressional and state legislative redistricting.

207.    Alabama never had a congressional district that allowed Black Alabamians any substantial influence and certainly not the ability to elect candidates of choice until litigation after the 1990 cycle resulted in the drawing of CD 7. As noted above at ¶ 180, that district was first drawn crafted by Sen. Dixon, who had a history of overt hostility towards Black voters in Alabama.

208.    Moreover, even after the Justice Department objected to the 1990 congressional redistricting as the product of intentional racial discrimination, neither Alabama, nor any federal court ever acted to correct this discrimination. Rather, the Alabama Legislature simply continued to reenact the same packed CD 7 map in the 2000, 2010, and 2020 plans with only slight modifications to address malapportionment, but the same racially discriminatory intent and results.

209.    In 2021, the Legislature ignored the repeated requests from Black legislators and voters to unpack CD 7 and draw two Black-majority or opportunity districts. Accordingly, HB 1's congressional plan disregarded public input from the Black community, which supported creation

of a second Black district; instead the plan protects white incumbents from running in a Black-majority or Black-opportunity district while limiting Black voters influence to CD 7; the plan was introduced a mere day before it was passed out of committee on a vote that fell along racial lines; and then was passed out of the Legislature and signed by the Governor the following week after minimal debate and opportunity for public input as to the alternative plans put forward by Black legislators and voters.

210.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to temporarily and permanently enjoin the conduct of elections under HB 1 and ordering of a remedial map will irreparably harm Plaintiffs by subjecting them to racially discriminatory districts for the next decade.

## PRAYER FOR RELIEF

211.    WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare the challenged congressional districts adopted in HB 1 to be unconstitutional as violating the Fourteenth Amendment of the United States Constitution as racial gerrymanders and as passed with discriminatory intent as a motivating factor;

B.    Declare the congressional districting plan adopted in HB 1 a violation of Section 2 of the Voting Rights Act of 1965;

C.    Preliminarily and permanently enjoin the Defendants and their agents from holding elections in the congressional districts adopted in HB 1 and any adjoining districts necessary to remedy the constitutional violations including, if necessary, delaying the primary filing date until the Court adopts a remedial plan for 2022 elections and/or holding special elections;

D.     Order expedited hearings and briefing, consider evidence, and take any other action necessary for the Court to order a VRA-compliant plan for new congressional districts in Alabama.

E.     Set an immediate and reasonable deadline for the State of Alabama to adopt and enact a congressional redistricting plan that (1) includes two majority-minority districts, (2) does not dilute, cancel out, or minimize the voting strength of Black Alabamian voters or subject them to intentionally discriminatory districts, and (3) does not violate the VRA, federal and state constitutions, and other applicable laws;

F.     Award Plaintiffs' their costs, expenses, and disbursements, and reasonable attorneys' fees incurred in bring this pursuant to in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988;

G.     Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court;

H.     Retain jurisdiction over this matter and require all Defendants to subject future congressional redistricting plans for preclearance review from this court or the U.S. Attorney General under Section 3(c) of the VRA, 52 U.S.C. § 10302(c);

I.     Grant such other and further relief as the Court may deem just and proper.

DATED this 15th day of November 2021.

Respectfully submitted,

*/s/ Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan^ (ASB-517-E48T)
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org

Shelita M. Stewart*
Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*
Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

*/s/ Sidney M. Jackson*
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
Fax: (205) 254-1500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Julie Ebenstein*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org

*/s/ LaTisha Gotell Faulks*
LaTisha Gotell Faulks (ASB-1279-I63J)
Kaitlin Welborn*
AMERICAN CIVIL LIBERTIES UNION OF
ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org
kwelborn@aclualabama.org

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

*Attorneys for Plaintiffs*

Janette Louard*
Anthony Ashton*
Anna Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

*Attorneys for Plaintiff Alabama State Conference of the NAACP*


\* *Pro hac vice* motions forthcoming
^ Request for admission to the Northern District of Alabama forthcoming