FILED
2021 Dec-07  PM 06:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

EVAN MILLIGAN, *et al.*,

    Plaintiffs,

    v.

JOHN H. MERRILL, *et al.*,

    Defendant.

Case No. 2:21-cv-01530-AMM

## JOINT STIPULATED FACTS FOR PRELIMINARY INJUNCTION PROCEEDINGS[1]

Pursuant to this Court's November 23 scheduling order, Doc. 40 at 10, the parties in the above captioned case submit the following joint statement of facts that are stipulated for purposes of preliminary injunction proceedings:

## I. Plaintiffs

### A. Evan Milligan

1. Plaintiff Evan Milligan is Black.

2. Plaintiff Evan Milligan resides in Montgomery County, Alabama.

---

[1] For all cases and court opinions cited herein, no party has agreed to stipulate to the accuracy of any court's prior factual findings, and all parties reserve the right to present evidence disputing such findings.

3.     Plaintiff Evan Milligan is a U.S. citizen and a lawfully registered voter in Congressional District ("CD") 7.

4.     Under the Plaintiffs' Demonstrative Plan in ¶ 88 of the Complaint, Plaintiff Milligan would reside in a second, new majority-Black district.

**B. Shalela Dowdy**

5.     Plaintiff Shalela Dowdy is Black.

6.     Plaintiff Shalela Dowdy resides in Mobile County, Alabama.

7.     Plaintiff Shalela Dowdy is a U.S. citizen and a lawfully registered voter in CD 1.

8.     Under the Plaintiffs' Demonstrative Plan in ¶ 88 of the Complaint, Plaintiff Milligan would reside in a second, new majority-Black district.

**C.     Letetia Jackson**

9.     Plaintiff Letetia Jackson is Black.

10.     Plaintiff Letetia Jackson resides in the City of Dothan, Alabama.

11.     Plaintiff Letetia Jackson is a U.S. citizen and a lawfully registered voter in CD 2.

**D.     Khadidah Stone**

12.     Plaintiff Khadidah Stone is Black.

13.     Plaintiff Khadidah Stone resides in Montgomery County, Alabama.

2

14.     Plaintiff Khadidah Stone is a U.S. citizen and a lawfully registered voter in CD 2.

15.     Under the Plaintiffs' Demonstrative Plan in ¶ 88 of the Complaint, Plaintiff Milligan would reside in a second, new majority-Black district.

### E. Greater Birmingham Ministries ("GBM")

16.     Plaintiff GBM was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement and its transformative impact in Birmingham, Alabama, and across the United States. GBM describes itself as a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people.

17.     GBM describes itself as seeking to address urgent human rights and social justice needs in the greater Birmingham area. GBM describes itself as dedicated to advancing social justice through political participation across Alabama. GBM states that it actively opposes state laws, policies, and practices that it believes result in the exclusion of vulnerable groups or individuals from the democratic process.

18.     GBM states that to accomplish its goals, it regularly communicates with its members and works to register, educate, and increase voter turnout and efficacy,

particularly among Black, Latinx, and low-income people and people with disabilities.

**F. The Alabama State Conference of the N.A.A.C.P. ("Alabama NAACP")**

19.     Plaintiff Alabama NAACP is the state conference of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and considers itself one of the most significant civil rights organizations in Alabama, and it states that it works to ensure the political, educational, social, and economic equality of Black Americans and all other Americans.

20.     The Alabama NAACP states that two of its central goals are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. The Alabama NAACP claims that it advances its goals in part by participating in lawsuits, and that it regularly engages in efforts to register and educate voters and encourages Black people to engage in the political process by turning out to vote on Election Day.

**II.   Defendants**

**A. John H. Merrill**

21.     Defendant John H. Merrill is the Alabama Secretary of State and the chief elections official in the State of Alabama. Secretary Merrill is sued in his official capacity.

22.     Secretary Merrill provides uniform guidance for election activities in the State and certifies the elections of members to the Alabama Legislature and Congress. Ala. Code §§ 17-1-3, 17-12-21. Secretary Merrill also has responsibility for certifying the names of primary and general election candidates for the State Legislature and Congress, as well as issuing Certificates of Election following tabulation of vote results. Ala. Code §§ 17-13-5(b), 17-9-3(b), Ala. Code § 17-12-21.

**B. Sen. Jim McClendon and Rep. Chris Pringle**

23.     Defendants Senator Jim McClendon and Representative Chris Pringle are Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"). Ala. Code § 29-2-51. They are sued in their official capacity as co-chairs of the Committee.

24.     In that capacity, Sen. McClendon and Rep. Pringle led the Committee that was responsible for the preparation and development of redistricting plans for the State following the decennial census and presided over the meetings of the Committee. The Committee was tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate, House, and congressional districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52.

5

III.    **Demographics of Alabama**

  A. **Citizenship and Age by Race/Ethnicity**

25.    Alabama's population shifts between every census.

26.    Between the 2010 and 2020 census, Alabama's population increased from 4,779,736 to 5,024,279, a 5.1 percent increase.

IV.    **Alabama's Congressional Districts**

27.    From 1965 through 2013, Alabama was a covered jurisdiction under Section 5 of the Voting Rights Act, and Alabama's congressional plans therefore had to be precleared by the U.S. Department of Justice or a three-judge federal court in Washington, D.C.

28.    Since 1973, Alabama has had seven congressional seats. For each of the six congressional plans Alabama has had since the 1970 census, including the plan enacted in 2021, the plan has included all of Mobile, Baldwin, Washington, and Monroe Counties in CD 1. Likewise, in each plan, CD 2 has included all of Conecuh, Butler, Crenshaw, Covington, Pike, Bullock, Barbour, Coffee, Dale, Geneva, Henry, and Houston Counties; and CD 3 has included all of Calhoun, Cleburne, Talladega, Clay, Randolph, Tallapoosa, Chambers, Macon, Lee, and Russell Counties.

  A. **The History of the Majority-Black Congressional District 7**

29.    In 1992, Black voters and others challenged the failure of the State Legislature to redistrict congressional seats after the release of the 1990 census under

the Fourteenth Amendment to the U.S. Constitution and the lack of a majority-Black congressional district under Section 2 of the Voting Rights Act.

30.     On March 9, 1992, upon the stipulation of the parties, the three-judge court ordered the creation of CD 7 as a majority-Black congressional district to resolve the litigation. *See Wesch v. Hunt*, 785 F. Supp. 1491, 1498 (S.D. Ala.), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992).

31.     Concerning the parties to the case, the court noted as follows: "The Intervenor–Plaintiffs, Michael Figures and others, are African–American citizens of the United States and the State of Alabama. They have been allowed to intervene in this litigation both on their own behalf and on behalf of all African–American citizens of the State of Alabama." *Id.* at 1494.

32.     Under the 1992 Plan established by the *Wesch* court, Black people were 67.69% of the total residents of CD 7 and 63.58% of CD 7's voting age population ("VAP"). 785 F. Supp. at 1496.

33.     The *Wesch* court did not conduct a Section 2 analysis. *Id*. at 1498-99. Rather, the court cited the parties' stipulation that it was possible to draw a majority-Black VAP district, *id*., and, thereafter, adopted a legislative proposal for CD 7. *Id*. at 1495.

34.     Prior to the *Wesch* court establishing the 1992 Plan, however, the State Legislature did enact Act No. 92-65 (1992), a congressional redistricting plan with one majority-Black district.

35.     The *Wesch* court adopted its own plan and created a majority-Black CD 7 due to a concern that Act No. 92-65 would not obtain the required preclearance under Section 5 of the Voting Rights Act in time for the then-upcoming election deadlines. 785 F. Supp. at 1500.

36.     One of the plans submitted to the court had two majority-black districts. The court found: "The Hilliard Plan includes two majority African–American districts, with an African–American population of 59.33% and 61.98% respectively. Although this plan was submitted by the intervenors, they took the position that the Hilliard Plan probably provided obstacles of sufficient nature to cast doubt on their opportunity to elect candidates of their choice in these districts." *Id.* at 1496.

37.     Only two of the plans submitted by the parties achieved population equality, the "Pierce Plan" and the "Reed Plan," each of which had a district that was more than 65% black population. *Id.* at 1495-96. According to the *Wesch* court, the Pierce Plan was a "modification of a plan called the 'Larry Dixon Plan' which was considered by the Reapportionment Committee. The Pierce Plan modified the Larry Dixon Plan to some extent, but the basic format is similar." *Id*. at 1495.

38.    The court found that the Pierce Plan that was ultimately adopted was superior to the Reed Plan because "District 1 under the Reed Plan includes Mobile County to the south and Tuscaloosa County to the north. District 2 under the Pierce Plan is largely composed of counties in the southeast corner of the state, while the Reed Plan's District 2 stretches from Mobile County, in the extreme southwest corner of the State, to Lee County, in east central Alabama. The Pierce Plan is superior to the Reed Plan in terms of compactness." *Id.* at 1496.

39.     The Court also found that the Reed Plan split more counties and precincts than the Pierce Plan and that the Pierce Plan did a better job of preserving the core of districts and communities of interest. *Id.* at 1496-97.

40.    On March 27, 1992, the U.S. Attorney General objected to Act No. 92-65 under Section 5 of the Voting Rights Act. The Attorney General found that Act No. 92-65 was the product of intentional racial discrimination because it drew only one majority-Black district and "fragmented" the rest of the Black population in the state to dilute the Black vote. In the objection letter, the U.S. Attorney General noted a "concern" of the Black community that "an underlying principle of the Congressional redistricting was a predisposition on the part of the state political leadership to limit black voting potential to a single district."

41.    During this time, the Department of Justice was applying a "max-black" policy.

42.     Because the state did not obtain preclearance for Act No. 92-65 nor enact another plan, the *Wesch* court's 1992 Plan remained in effect for the remainder of the 1990s.

43.     In each redistricting cycle from at least the 1990 census through the 2020 census, some Black legislators and voters have lobbied for plans that include two Black-majority districts.

44.     After the establishment of CD 7 as a majority-Black district in the 1992 Plan, Earl Hillard became the first Black Alabamian to be elected to Congress in the Twentieth Century.

45.     After the 2000 redistricting cycle, the State Legislature enacted the 2002 Plan wherein Black people constituted 62.389% of the total population and 58.327% of the voting age population under the 2000 census.

46.     The 2002 Plan received preclearance under Section 5 of the Voting Rights Act.

47.     In the general congressional elections of 2002, 2004, 2006, and 2008, Artur Davis, a Black Democrat, was elected in CD 7 after winning a majority of Black voters.

48.     In each of the general congressional elections of 2002, 2004, 2006, and 2008, Representative Davis won election with no less than 74.9% of the vote.

49.    In the November 2010 general congressional election, Terri Sewell, a Black Democrat, was elected in CD 7 after winning a majority of Black voters.

50.    In the November 2010 general congressional election, Representative Sewell won election in CD 7 with 72% of the vote, beating her white opponent by 45 points.

51.    In 2010, CD 7 under the 2002 Plan had a Black voting-age population ("BVAP") of 60.11%.

52.    After the release of the 2010 census, the State Legislature enacted the 2011 Plan. The 2011 Plan increased the BVAP of CD 7 to 60.91% any-part Black and 60.55% single-race Black, according to 2010 Census data.

53.    In September 2011, the Alabama Attorney General's office sent a letter and related materials to the U.S. Department of Justice, which submitted the 2011 Plan for preclearance review under Section 5 of the Voting Rights Act (hereinafter, the "submission letter").

54.    The submission letter stated that the 2011 Plan "preserves the voting strength of the African-American community" and that the "percentage of total black and black voting age population in the new [2011] plan increased from the benchmark [2002 Plan] figures. That increase plainly cannot be regarded as retrogressive."

55.     The submission letter likened the CD 7 in the 2011 Plan to the CD 7 in the "1992 *Wesch* court plan and the [2002] plan" because "the new [2011] plan has one African-American majority district, District 7, which is located in the west central part of the state."

56.     The submission letter did not include a racial polarization analysis or otherwise attempt to demonstrate that maintaining the effectiveness of CD 7 required increasing the total Black or BVAP population in that district.

57.     The 2021 Plan enacted in HB 1 contains one majority-Black district with a BVAP of 55.3% any-part Black and 54.22% single-race Black under the 2020 census and assigns 30.86% of all single-race Black Alabamians to CD 7.

58.     CD 7 remains the only majority-BVAP congressional district in Alabama.

59.     In the 2021 Plan, the State Legislature sought to maintain the cores of each congressional district as they were drawn in the 2011 Plan.

60.     The Black Belt is named for the region's fertile black soil. The region has a substantial Black population because of the many enslaved people brought there to work in the antebellum period. All the counties in the Black Belt are majority- or near majority-BVAP.

61.     The Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo,

Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox. Clarke, Conecuh, Escambia, Monroe, and Washington counties are sometimes included within the definition of the Black Belt.

62.    In recent litigation, Secretary Merrill stated that CD 7 "appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominate purpose of drawing African American voters into the district." Secretary of State Merrill's Pretrial Brief, *Chestnut v. Merrill*, No. 2:18-CV-00907 (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11.

## B. Congressional Districts 1, 2, and 3

63.    In 2010, CDs 1, 2, and 3 under the 2001 Plan contained a combined AP Black population of 629,911, which was 92.3% of the ideal total population for a single congressional district, calculated by dividing the total population by the number of congressional districts. In 2010, CDs 1, 2, and 3 under the 2001 Plan contained a combined SR Black population of 615,896, which was 90.1% of the ideal total population for a single congressional district. This count includes Black voters in Mobile and Black voters in Anniston.

64.     According to 2010 Census data, CDs 1, 2, and 3 under the 2011 Plan contained a combined any-part Black population of 575,923, which is 84.3% of the total population of an ideal congressional district. Those districts contained a combined single-race Black population of 561,978, which is 82.3% of the total population of an ideal congressional district. This count includes Black voters in Mobile and Black voters in Anniston.

65.     The 2001 Plan split Montgomery County among two districts: CDs 2 and 3. The 2011 Plan split Montgomery County between three congressional districts: CDs 2, 3, and 7. Under the 2021 Plan, Montgomery County is split between two districts: CDs 2 and 7.

## C. State Board of Education ("SBOE") Plan

66.     The Alabama SBOE is a nine-member body that sets education policy for Alabama's K-12 schools. The Governor serves as the president of the SBOE, and the remaining eight members are elected to the Board from single-member districts.

67.     In 2021, Alabama adopted an eight-district SBOE Plan (the "2021 SBOE Plan") with two majority-Black districts, Districts 4 and 5.

68.     According to 2020 Census data, District 4 is 51% BVAP, and District 5 is 51% BVAP.

69.     In each election since 2011, a Black Democrat won a majority of Black voters and the election in Districts 4 and 5 of the SBOE. District 5 of the SBOE Plan connects the City of Mobile to the Black Belt Counties.

## V.     The Process Leading to the Enactment of H.B. 1

### A. Joint Legislative Committee's Stated Redistricting Criteria

70.     On May 5, 2021, the Permanent Legislative Committee on Reapportionment (the "Committee")—the Committee responsible for preparing and developing redistricting plans for the State following each decennial census—enacted guidelines for the 2021 redistricting cycle.

71.     The guidelines state that they are based on the requirements of the U.S. Constitution, Alabama Constitution, and policies that "are embedded in the political values, traditions, customs, and usages of the State of Alabama."

72.     The criteria for redistricting set by the Committee begin with requirements under the U.S. Constitution and federal law, including compliance with the one-person, one-vote requirement. The Committee instructed that Congressional districting maps "shall have minimal population deviation" and comply with Section 2 of the Voting Rights Act, meaning that districts have "neither the purpose nor the effect of diluting minority voting strength."

73.     The Committee stated that districts cannot be drawn "in a manner that subordinates race-neutral districting criteria to considerations of race, color, or

membership in a language minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice."

74.    Each district must also be "contiguous and reasonably compact," under the criteria.

75.    The criteria next require compliance with the Alabama Constitution, including that:

> a.    Districts are "drawn to reflect the democratic will of all the people concerning how their governments should be restructured";
>
> b.    Districts are drawn based on total population except that voting-age population may be considered to comply with Section 2 of the Voting Rights Act and other laws;
>
> c.    The number of Senate districts is set at 35 and House districts at 105;
>
> d.    All districts must be single-member districts; and
>
> e.    All districts must be contiguous with each other.

76.    The criteria require compliance with redistricting policies that are "embedded in the political values, traditions, customs, and usages of the State of

Alabama . . . to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama," including:

    a.    Avoiding contests between incumbents where possible;

    b.    Permitting contiguity by water but not point-to-point or long-lasso contiguity;

    c.    Respect for "communities of interest, neighborhoods, and political subdivisions to the extent practicable," with a community of interest "defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities."

    d.    Minimization of the number of counties in each district; and

    e.    Preservation of the cores of existing districts.

77.    The Committee's Redistricting Guidelines stated that "In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria."

**B.**    **The 2021 Legislative Process for Redistricting**

78.     On August 12, 2021, the U.S. Census Bureau released the results of the 2020 Census.

79.     Alabama's population grew by 5.1% between 2010 and 2020.

80.     Using population estimates from the Census Bureau, the Committee, under the leadership of Sen. McClendon and Rep. Pringle, began to develop redistricting plans for congressional districts in May of 2021. *See* Ala. Code § 29-2-50(2). Once census data was released in August, that work continued.

81.     The Committee consists of members of both the State House and Senate, with the Speaker of the House appointing one House member from each of the seven congressional districts and four additional House members and the Lieutenant Governor appointing one Senator from each of the seven congressional districts and four additional Senators. *See* Ala. Code § 29-2-51(c).

82.     The 2021 Reapportionment Committee includes 21 members—15 white Republican members and six Black Democratic members.

83.     All Committee meetings must be open to the public. The Committee Guidelines provide that "All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments

redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established."

84.    Between September 1 and 16, before the Committee released draft maps or proposals, the Legislative Reapportionment Office held 28 public hearings across the state.

85.    Every hearing, except one that was held at 6:00 pm at the Statehouse in Montgomery, was held between the hours of 9:00 am to 5:00 pm.

86.    On October 19, 2021, Plaintiffs the Alabama NAACP and Greater Birmingham Ministries and others sent a letter to the Alabama Permanent Committee on Reapportionment.

87.    The letter sought to remind the Committee of obligations under Section 2 of the Voting Rights Act and highlighted what the Plaintiffs believed to be the Committee's obligation to conduct a racial-polarization analysis to ensure that the redistricting complied with the Voting Rights Act and that the race was used only in a narrowly tailored manner to comply with a compelling state interest.

88.    Governor Kay Ivey called the Special Legislative Session on redistricting in Alabama to begin on October 28, 2021.

89.    On October 26, 2021, the Committee held its second public meeting of this redistricting cycle. The first public meeting was held in May 2021, when the Committee adopted redistricting guidelines.

90.    A member of the Committee, Rep. Chris England, a Black legislator, published the proposed maps on Twitter on October 25, 2021.

91.    The Committee released the maps to the public on the day of the Committee meeting.

92.    Many Committee members did not see the full proposed maps beyond their own districts and those surrounding their own district until the day before their meeting.

93.    Beyond the Committee, the Committee Co-Chairs and their staff met with each incumbent legislator or their staff either in person or online unless the legislator declined to meet.

94.    Individual legislators only viewed and provided feedback on draft maps of their districts and adjoining districts, not maps of the entire state.

95.    Mr. Dorman Walker has been the Committee's lawyer for the 2011 and 2021 redistricting cycles.

96.    Sen. McClendon explained that Mr. Walker told him that racial-polarization analysis was only done by Dr. M.V. "Trey" Hood III for state legislative districts where "it looked like there might possibly be a racial issue."

97.    No racial-polarization analysis was conducted for CD 7.

98.    No racial-polarization analysis for any districts was provided to Committee members before or during the meeting.

20

99.    Committee members only received demographic and population data for each district.

100.   Neither Mr. Walker nor Dr. Hood, who conducted racial-polarization analysis for the state legislative districts, attended the Committee meeting.

101.   Rep. Laura Hall, a Black legislator, moved to postpone any vote on the proposed maps until the Committee members and the public had more time to review the maps and accompanying racial-polarization analysis.

102.   All the Black Democratic committee members voted in favor of Rep. Hall's motion, which failed because nearly all white Republican committee members voted against it.

103.   Each of the maps passed out of Committee.

104.   All the Black Democratic members of the Committee voted against each of the maps.

105.   The Special Legislative Session for redistricting began two days later, on October 28, 2021.

106.   On October 29, 2021, the Alabama House State Government Committee met to discuss the Reapportionment Committee's proposed districting plan for Alabama's U.S. House delegation.

107.   The Committee gave the congressional map a favorable report. All the Black Democratic members of the Committee voted against the maps.

108.   On. November 1, the full House considered the congressional map.

109.   The House passed the congressional map by a vote of 65-38.

110.   On November 2, 2021, the Senate General Fund and Appropriations Committee considered the State House and congressional maps.

111.   The Committee gave both maps a favorable report. All the Black members of the Committee, each of whom is a Democrat, voted against the maps.

112.   The next day, November 3, 2021, the full Senate considered the congressional map.

113.   Sen. Kirk Hatcher, a Black legislator, offered the demonstrative map prepared by Plaintiffs Greater Birmingham Ministries and the Alabama NAACP as a substitute map. He stated that this map sought to ensure "that all Black Alabamians have an opportunity to elect their preferred congressional representatives."

114.   Sen. Hatcher's substitute map failed an up-or-down vote. All Black Senators voted in favor of it.


115.   The Senate tabled several other substitute maps.

116.   The Senate passed the congressional map by a vote of 22-7.

117.   All Black senators, each of whom is a Democrat, voted against the map.

**VI.   Other Stipulated Facts**

118.   Numerous federal courts in Alabama have found that the state's elections were racially polarized at the time and locations at issue in their respective cases. *See, e.g., Ala. State Conf. of NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *17 (M.D. Ala. Feb. 5, 2020) (accepting the undisputed statistical evidence proving the existence of racially polarized voting statewide); *Jones v. Jefferson Cty. Bd. of Educ.*, No. 2:19-cv-01821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019) (finding that voting is racially polarized in Jefferson County elections); *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-46 & n.3 (M.D. Ala. 2011) (finding that voting is racially polarized across Alabama).

119.   In 2008, Bobby Bright, a white Democrat, was elected to the U.S. House from CD 2.

120.   From 1973 until 2008, white Democrats were elected to the U.S. House from CD 5.

121.   In the November 2008 election, Democrats won three of Alabama's seven Congressional districts. White Democrats won in Districts 2 and 5. In the same election, John McCain, a white Republican candidate for President, won a majority of the votes statewide and won the most votes in six of the seven Congressional districts, including Districts 2 and 5. Barack Obama, a Black Democrat, received a majority of votes only in District 7.

122.   In 2013 and 2014, Burton LeFlore, a Black Democrat, ran for election to the U.S. House from CD 1, but both times LeFlore was defeated by Bradley Byrne, a white Republican, by wide margins.

123.   In 2017, Doug Jones, a white Democrat, was elected to the U.S. Senate in Alabama.

124.   In 2018, Black candidates for Lieutenant Governor, State Auditor, and the Public Service Commission lost statewide general elections to white candidates.

125.   In the Twentieth century, Black Alabamians have never elected a Black person to Congress outside of the majority-Black CD 7, and only since 1992.

126.   In congressional races in the current majority-white CDs 1, 2, and 3, Black candidates have never won election to Congress.

127.   For example, in 2020 in District 1, white Republican candidate Rep. Bradley Byrne defeated Black Democratic candidate James Averhart by approximately 29 percentage points in a district that was approximately 25.7% BVAP. The same was true in 2018, with Rep. Byrne defeating Black and Black-preferred candidate Robert Kennedy Jr. by over 26 percentage points.

128.   In 2020 in District 2, which is 30.6% BVAP, white Republican candidate Rep. Barry Moore defeated Black Democratic candidate Phyllis Harvey-Hall by over 30 percentage points. In 2018 in District two, white Republican

candidate Rep. Martha Roby defeated Democratic candidate Tabitha Isner by 23 percentage points.

129.   In 2020 in District 3, which is 25.8% BVAP, white Republican candidate Rep. Mike Rogers defeated Black Democratic candidate Adia Winfrey by 35 percentage points. Similarly, in 2018, Rep. Rogers defeated Democratic candidate Mallory Hagan by over 27 percentage points.

130.   Prior to 1960, the Legislature failed to reapportion for 50 years. As a result, Alabama's entire legislative apportionment scheme was struck down for violating the principle of one person, one vote. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108-109 (M.D. Ala. 1965).

131.   Following *Reynolds* and the 1970 Census, the Legislature again failed to redistrict and a three-judge federal court was forced to draw new district lines. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972). The court rejected the Alabama Secretary of State's proposed map because of its racially "discriminatory effect" on Black voters. *Id*. at 936.

132.   In the 1980s, the United States Attorney General denied preclearance under the Voting Rights Act to maps drawn by the Legislature to redistrict State House and Senate maps because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. U.S. Dep't of Justice Ltr. to Ala. Attorney General Graddick, May 6, 1982, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf. Shortly thereafter, a three-judge court rejected Alabama's proposed interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' black districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 238 (M.D. Ala. 1982).

133.   After the 1990 census, the State entered a consent decree to resolve a Voting Rights Act lawsuit filed on behalf of Black voters. *See Brooks v. Hobbie*, 631 So.2d 883, 884 (Ala. 1993).

134.   Most recently, after the 2010 census, Black voters and legislators successfully challenged 12 state legislative districts as unconstitutional racial gerrymanders. *See Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017).

135.  Today, Alabama has a majority-vote requirement in all primary elections.

136.   Before the Civil War, Black people were barred from voting in the state. After the passage of the Reconstruction Acts and Amendments, Alabama was forced to allow Black men access to the franchise, and the 1867 Alabama Constitution granted every male person over the age of 21—who satisfied the citizenship and residency requirements—the right to vote. This meant that for the first time in Alabama's history, Black people voted and held public office.

137.   In response, white leaders reformed the Democratic party with the intent of "redeeming" the State and re-establishing white supremacy. This was accomplished by using violence to deter Black people from political participation and, once the Redeemers returned to political office, to pass racially discriminatory laws to cement their control.

138.   In 1874, Democratic candidates were elected to public office in large numbers. On election day, in Eufaula, Alabama, members of a white paramilitary group known as the White League, killed several unarmed Black Republican voters and turned away thousands of voters from the polls.

139.   The following year, in 1875, the Alabama legislature adopted a new state constitution and passed a series of local laws and ordinances designed to strip Black Americans of the civil rights they enjoyed briefly during Reconstruction.

140.   At the 1901 Constitutional Convention, 155 white male delegates gathered in Montgomery with the express intention "to establish white supremacy in the State."

141.   The Convention ratified changes to the constitution that required literacy tests as a prerequisite to register to vote and mandated payment of an annual $1.50 poll tax, which was intended to and had the effect of disenfranchising Black voters. *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966).

142.   After the United States Supreme Court invalidated white-only primaries in 1944, Alabama passed the "Boswell Amendment" to its Constitution in 1946, adding an "understanding requirement" meant to give registrars broad discretion to deny African Americans the ability to register to vote.

143.   After a federal court invalidated the Boswell Amendment in 1949, Alabama replaced its understanding requirement with a literacy test, again with the purpose of preventing African Americans from registering to vote.

144.   After the Supreme Court outlawed the white primary in 1944, many Alabama counties shifted to at-large elections, the intent of which was to prevent African Americans from electing their candidates of choice.

145.   In 1951, Alabama enacted a law prohibiting single-shot voting in municipal elections, the intent of which was to prevent African Americans from electing their candidates of choice.

146.   In 1957, Alabama transformed the boundaries of the city of Tuskegee into a twenty-eight-sided figure designed to fence out African Americans from the city limits and ensure that only white residents could elect city officials. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

147.   In 1964 and 1965, Dallas County Sheriff Jim Clark, Alabama state troopers, and vigilantes violently assaulted peaceful Black protesters attempting to gain access to the franchise.

148.   On March 7, 1965, in what became known as Bloody Sunday, state troopers viciously attacked and brutally beat unarmed peaceful civil rights activists crossing the Edmund Pettus Bridge in Selma, where less than 5 percent of Black voters were registered to vote. Bloody Sunday helped pave the way for the passage of the Voting Rights Act in 1965 and Alabama was declared a "covered" state under Section 4(b) of the Act.

149.   Between 1965 and 2013, at least 100 voting changes proposed by Alabama state, county or city officials were either blocked or altered pursuant to Section 5 of the Voting Rights Act. No objection was raised after 2008. The objections include at least 16 objections between 1969 and 2008 in cases where a proposed state or local redistricting plan had the purpose or would have the effect of diminishing the ability of Black voters to elect their candidates of choice. The last sustained objection to an Alabama state law occurred in 1994.

150.   In 1986, a court found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1357 (1986). The court also found that from the late 1800s to the 1980s, Alabama had purposefully manipulated the method of electing local governments as needed to prevent Black citizens from electing their preferred candidates. *Id*.

151.   Ultimately, a defendant class of 17 county commissions, 28 county school boards, and 144 municipalities were found to be employing at-large election systems designed and motivated by racial discrimination. These cases resulted in settlement agreements with about 180 Alabama jurisdictions that were required to adopt new election systems including single-member districts, limited voting, and cumulative voting systems, in an attempt to purge the state's election systems of intentional discrimination.

152.   Between 1965 and 2021, subdivisions in Alabama continued to use at-large elections with numbered posts.

153.   Federal courts recently ruled against or altered local at-large voting systems with numbered post created by the State Legislature to address their alleged racially discriminatory purpose or effect. *See, e.g.*, *Jones*, 2019 WL 7500528, at \*4;

*Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019
WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019).

154.   Black voters have challenged other Alabama voting laws under the
Voting Rights Act and the Constitution in federal court. *See, e.g.*, *People First of
Alabama v. Merrill*, 491 F. Supp. 3d 1076, 1106-1107 (N.D. Ala. 2020); *Harris v.
Siegelman*, 695 F. Supp. 517, 530 (M.D. Ala. 1988). For example, the Supreme
Court struck down Alabama's discriminatory misdemeanant disfranchisement law,
*Hunter v. Underwood*, 471 U.S. 222 (1985), and a state law permitting certain
discriminatory annexations, *Pleasant Grove v. United States*, 479 U.S. 462, 466-67
(1987).

155.   In 2020, the United States District Court for the Middle District of
Alabama held as follows in a case where plaintiffs argued that Section 2 of the
Voting Rights Act requires Alabama to elect state appellate judges by districts:

> Alabama today is a vastly different place than it was even a half-century
> ago. Overt discriminatory election devices have long been eliminated.
> Voter registration and turnout rates among African-Americans and
> whites have reached parity. . . . In 2017, Doug Jones became the first
> Democrat to win a U.S. Senate seat in Alabama in a quarter century, in
> an election in which African-American votes were decisive. Plaintiffs
> simply have not shown that, in present-day Alabama, there are any
> barriers keeping African Americans from participating in the political
> process as voters. The level of black participation in the electoral
> process is not depressed.

156.   *Alabama State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at \*41 (M.D. Ala. Feb. 5, 2020) (citations omitted).

157.   Since the *Shelby County v. Holder* decision in 2013, federal courts have ordered more than one political subdivision in Alabama to be re-subjected to preclearance review under Section 3(c) of the Voting Rights Act. *See Jones*, 2019 WL 7500528, at \*4-5; *Allen v. City of Evergreen*, No. 13-0107, 2014 WL 12607819, at \*2 (S.D. Ala. Jan. 13, 2014).

158.   Individuals with lower household incomes are less likely to vote.

159.   Alabama's policy of denying Black people equal access to education persisted after the Supreme Court's decision in *Brown v. Board of Education*. In 1956, after a federal court ordered the segregated University of Alabama to admit a Black woman named Autherine Lucy, white people gathered on campus, burned a cross, and marched through town chanting, "Hey, hey, ho, ho, Autherine has got to go!"

160.   In 2018, in a case challenging the attempt by the City of Gardendale, which is 85% white, to form a school district separate from Jefferson County's more racially diverse district, the Eleventh Circuit affirmed a finding that "race was a motivating factor" in the city's effort. *Stout v. Jefferson Cnty. Bd. of Ed.*, 882 F.3d 988, 1007-1009 (11th Cir. 2018).

161.   Alabama's constitution still contains language that mandates separate schools for Black and white students after a majority of voters rejected repeal attempts in 2004 and 2012, although the provision has not been enforceable for decades.

162.   Alabama was the first state ever to be subjected to a statewide injunction prohibiting the state from failing to disestablish its racially dual school system. *Lee v. Macon Cty. Bd. of Ed.*, 267 F. Supp. 458 (M.D. Ala.), *aff'd* 389 U.S. 215 (1967). The order resulted from the court's finding that the State Board of Education, through Governor George Wallace, had previously wielded its powers to maintain segregation across the state. *Id.*

163.   A trial court found that for decades, state officials ignored their duties under the statewide desegregation order. *See Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1128-30 (M.D. Ala. 1997). A court also found that the state did not satisfy its obligations to remedy the vestiges of segregation under this order until as late as 2007. *Lee v. Lee County Bd. of Educ.*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007).

164.   In 1991, a trial court in *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991), found that Alabama had failed to eliminate the lingering and continued effects of segregation and discrimination in the University of Alabama and Auburn University, and at the state's public Historically Black Colleges and Universities (HBCUs).

165.   In 1995, the trial court issued a remedial decree analogous to the statewide injunction issued in *Lee v. Macon*, and the court oversaw implementation of that order for over a decade. *Knight v. State of Ala.*, 900 F. Supp. 272 (N.D. Ala. 1995). Alabama did not satisfy its obligations under that order until 2006. *Knight v. Alabama*, 469 F. Supp. 2d 1016 (N.D. Ala. 2006).

166.   Alabama has never had more than one African-American congressional representative, and no African American has been elected to the U.S. House of Representatives outside of CD 7.

167.   There are currently no African-American statewide officials in Alabama.

168.   Only two African Americans have been elected to statewide office in Alabama, and both ran as incumbents after first being appointed. No Black person has won statewide office in Alabama since 1996.

169.   The overwhelming majority of African-American representatives in the Alabama Legislature come from majority-minority districts.

170.   None of the current statewide elected officials are Black. Only two Black people have ever been elected to statewide office. In both instances, the office was associate justice of the Alabama Supreme Court. In 1982 and 1988, the late Justice Oscar W. Adams, Jr. was elected to two consecutive terms; and, in 1994, Justice Ralph D. Cook won an unopposed statewide election. In 2000, both Justice

Cook and the then-recently appointed Justice John England, both Black Democrats, lost elections to white Republican candidates.

171.   Kenneth Paschal is a Black Republican who currently represents District 73 in the Alabama House of Representatives. District 73 includes Shelby County. There are currently no Black Republicans in the state Senate or in any statewide elective positions.

172.   In 2014, following the Supreme Court's decision in *Shelby County v. Holder*, Alabama's photo identification law went into effect.

173.   The United States Bureau of the Census releases data to the states after each census for use in redistricting. This data includes population and demographic information for each census block.

174.   Following the 2020 Census, the Census Bureau was statutorily required to release this redistricting data no later than April 1, 2021. 13 U.S.C. § 141. However, in February 2021, the Census Bureau issued a press release stating that it would not release the redistricting data until September 30, 2021. On March 10, 2021, the State of Alabama sued the Census Bureau to require it to comply with the statutory deadline. *See Alabama v. United States Dep't of Com.*, No. 3:21-CV-211-RAH-ECM-KCN, (M.D. Ala.) (three-judge court). On March 15, 2021, the Census Bureau issued a further press release stating it could provide

redistricting data in a legacy format by mid-to-late August 2021. The Census Bureau provided initial redistricting data to Alabama on August 12, 2021.

175.   On May 5, 2021, the Reapportionment Committee of the Alabama Legislature passed the Redistricting Guidelines to be used by the Committee during the redistricting process. Those Guidelines passed on a 16-1 vote, with both Republicans and Democrats as well as Black and White legislators supporting the Guidelines.

176.   The Reapportionment Committee held 28 public hearings at locations around the state between September 1 and September 16. The public could attend these hearings in person or via videoconference.

177.   On October 25, 2021, Alabama Governor Kay Ivey officially called for the Legislature to convene in a special session to address redistricting.

178.   On October 26, 2021, the Reapportionment Committee met and considered a draft congressional plan.

179.   On October 28, 2021, the special session began and the Congressional Plan (then H.B. 1) was assigned to the House Committee on State Government. On October 29, the Congressional Plan (in addition to three other redistricting plans) was voted out of committee. All Black Representatives on the Committee voted against the map.

180.   On November 1, the House of Representatives considered the Congressional Plan. The same day, the House passed the Congressional Plan 65-38; in addition to every Democratic Representative, several Republicans voted against the plan. One Black Representative, Rep. Keith Paschal who is the sole Black Republican legislator, voted in favor of the Congressional Plan.

181.   On November 2, the Senate General Fund and Appropriations Committee considered the Congressional Plan. The Plan was voted out of Committee that same day. All Black Senators on the Committee voted against the map.

182.   On November 3, the full Senate approved the Congressional Plan 22-7 and forwarded the Plan to Alabama Governor Kay Ivey. All six Black Senators present and Billy Beasley, the sole White Democratic Senator, voted against the map. On November 4, Governor Ivey signed the Congressional Plan into law.

183.   Alabama's primary elections—including elections for U.S. Congress—are scheduled for May 24, 2022. Candidates seeking their party's nomination must file a declaration of candidacy with the state party chairman by January 28, 2022. *See* Ala. Code § 17-13-5(a).

184.   On Tuesday, July 23, a special election was held to fill a vacancy in District 73 of the Alabama House of Representatives. The winner was Kenneth Paschal, the Republican candidate, who received 2,743 votes. Representative

Paschal is African American. His white Democratic opponent received 920 votes.

District 73 is located in Shelby County, Alabama. Based on 2010 census data, the

voting-age population of District 73 was 84.12% white and 9.75% black.

Representative Paschal defeated a white Republican candidate in the primary

election by 64 votes. Representative Paschal received 1,476 votes, while his white

opponent received 1,412 votes.

DATED this 7th day of Dec. 2021.

Respectfully submitted,

/s/ Deuel Ross
Deuel Ross*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan^ (ASB-517-E48T)
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org

Shelita M. Stewart*
Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*
Harmony A. Gbe*

/s/ Sidney M. Jackson
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Davin M. Rosborough
Davin M. Rosborough*
Julie Ebenstein*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.

New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org

/s/ LaTisha Gotell Faulks
LaTisha Gotell Faulks (ASB-1279-I63J)
Kaitlin Welborn**
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org
kwelborn@aclualabama.org

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002

HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

(713) 632-1400
blayne.thompson@hoganlovells.com

***Attorneys for Plaintiffs***

Anthony Ashton*
Anna Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
aashton@naacpnet.org
abarnes@naacpnet.org

***Attorneys for Plaintiff Alabama State
Conference of the NAACP***

\* Admitted *Pro hac vice*
^ Request for admission to the Northern District of Alabama forthcoming

Steve Marshall
*Attorney General*

<u>s/ James W. Davis</u>
Edmund G. LaCour Jr. (ASB-9182-U81L)
*Solicitor General*

James W. Davis (ASB-4063-I58J)
*Deputy Attorney General*
A. Reid Harris (ASB-1624-D29X)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

**Counsel for Secretary Merrill**

Dorman Walker (ASB-9154-R81J)
Balch & Bingham LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 834-6500
dwalker@balch.com

**Counsel for Jim McClendon and
Chris Pringle**

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record.

This the 7th day of December 2021.

*/s/ Deuel Ross*
COUNSEL FOR PLAINTIFFS