FILED

2021 Dec-14  PM 04:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## MILLIGAN V. MERRILL
### Case No.: 2:21-cv-012921
### DECLARATION OF JOSEPH BAGLEY PHD

I.    CREDENTIALS, PURPOSE

I am an Assistant Professor of History at Perimeter College, Georgia State University. My specific area of study is United States constitutional and legal history, politics, and race relations, with a focus on Alabama and Georgia. I earned a Ph.D. in 2013 from Georgia State and an M.A. (2007) and B.A. (2004) from Auburn University. My first book, *The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools*, was published in November 2018 by the University of Georgia Press in the *Politics and Culture of the Twentieth Century South* series. There, I assert that Alabama lawmakers used lessons from the fight against school desegregation to perfect the process of "colormasking" legislation, or in creating racially discriminatory laws – such as those that maintain the political and electoral status quo when it comes to Black voting and political representation – that can withstand legal tests. My current projects include a book manuscript examining the struggle for voting rights in Alabama and a grant proposal for a National Endowment for the Humanities "Public Humanities Discussions" series focused on citizenship rights and obligations in Georgia.

I have been certified as an expert by this Court in previous voting rights litigation. I submitted a report, testified in a deposition and at trial, and was cited in the Court's opinion in *People First of Alabama v. Merrill* in 2020.[1] My academic work has been cited in the *Case Western Law Review*, the *Journal of Urban History*, *Rural Sociology*, the *Alabama Civil Rights and Civil Liberties Law Review*, and in the *New York Times Magazine* (*NYTM*). My doctoral thesis, "School Desegregation, Law and Order, and Litigating Social Justice in Alabama," which formed the basis of my book manuscript, was quoted multiple times by Pulitzer Prize winner Nikole Hannah-Jones in her September 6, 2017 piece in *NYTM*, "Resegregation in Jefferson County," in which Hannah-Jones examines the city of Gardendale's attempt to secede from the county school system – an issue litigated in the *Stout v. Jefferson County Board of Education* school desegregation case that remains before this Court.[2]

I include here a C.V. listing conference presentations, invited talks, essays, and solicited book and manuscript reviews that I have written for the University Press of Kansas, the *Alabama Review*, and journals such as *Urban History* and *History of Education Quarterly*. I am compensated at the rate of $150 per hour for my work in preparing this report. This compensation is not dependent upon my findings, and my opinions stated in this report do not necessarily represent the sum total of my opinions in this matter, which are subject to change upon further research or revelations.

I have been asked by plaintiffs' counsel in this case to examine any relevant historical and contemporary evidence and to determine if, in my opinion, Alabama House Bill 1 ("H.B. 1"), establishing the map redrawing the state's congressional districts following the release of the 2020 Census data, will result in an impairment of Black voters' ability to participate fully and equitably in the political process and to elect candidates of their choice. My analysis adheres to the common standards of historiography, meaning that I have objectively examined different types of sources – the legislative and judicial record, newspaper coverage, campaign literature, and public

---

[1] People First of Alabama v. Merrill, 467 F.Supp.3d 1179 (2020).

[2] Wendy Parker, "Why Alabama School Desegregation Succeeded (And Failed)," 67 *Case Western Law Review*, 1091 (2017); Rebecca Retzlaff, "Desegregation of City Parks and the Civil Rights Movement: The Case of Oak Park in Montgomery, Alabama," *Journal of Urban History* 47.4, 715 (2019); Erika Frankenberg, "The Impact and Limits of Implementing Brown: Reflections from Sixty-Five Years of School Segregation and Desegregation in Alabama's Largest School District," 11 *Alabama Civil Rights and Civil Liberties Law Review*, 33 (2019); Bryan Mann, "Segregation Now, Segregation Tomorrow, Segregation Forever? Racial and Economic Isolation and Dissimilarity in Rural Black Belt Schools in Alabama," *Rural Sociology* 86.3, 523 (2021). Nikole Hannah-Jones, "The Resegregation of Jefferson County," *The New York Times Magazine*, Sept. 6, 2017.

statements, for example, along with the existing scholarship and the established historical background – and weighed all of that material collectively in forming my opinions. In my evaluation of this evidence and in my effort to determine whether, in my opinion, H.B. 1 will deny Black citizens of Alabama an equitable right to elect candidates of their choice, I am also guided by the "totality of the circumstances" test, as applied using the factors set forth by the U.S. Senate Judiciary Committee during the amendment of Section 2 of the Voting Rights Act in 1982 and subsequently referenced by the Supreme Court in *Thornburg v. Gingles* (478 U.S. 30, 1986, "*Gingles I*") (the "Senate Factors").[3] There are seven core Senate Factors and two typical "additional" factors that might be considered to the extent that they are appropriate.

These include:

- The "extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process" [Factor 1]
- The "extent to which voting in the elections of the state or political subdivision is racially polarized" [Factor 2]
- The "extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group" [Factor 3]
- If "there is a candidate slating process, whether the members of the minority group have been denied access to that group" [Factor 4]
- The "extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process" [Factor 5]
- Whether "political campaigns have been characterized by overt or subtle racial appeals" [Factor 6]
- The "extent to which members of the minority group have been elected to public office in the jurisdiction" [Factor 7]
- Whether "there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" [Factor 8, Additional Factor]
- And "Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous" [Factor 9, Additional Factor].

These factors allow scholars and courts to undertake a "practical evaluation of the past and present realities" and to determine "whether the political process is equally open to minority voters" (*Gingles I* at 478). As the Court stated in *Gingles*, other additional factors may be considered, and there is no requirement that all factors be considered or that any particular weight be assigned to any one factor.[4]

---

[3] In 1980, the Supreme Court held in City of Mobile v. Bolden (446 U.S. 55) that discriminatory results alone did not warrant relief in voting rights litigation and that plaintiffs needed to establish discriminatory intent, prompting Congress to amend Section 2. The committee derived the relevant factors from pre-Bolden jurisprudence, especially Whitcomb v. Chavis (403 U.S. 124, 1971), White v. Regester (412 U.S. 755, 1973) and Zimmer v. McKeithen (485 F.2d 1297, 5th CCA, 1973). Report of the Committee on the Judiciary on S. 1992 (Voting Rights Act Extension), United States Senate, 97th Congress, 2nd Session, Report No. 97-417 [Senate Factors Report], p. 28, n. 113; Peyton McCrary, "History in the Courts: The Significance of City of Mobile v. Bolden," in Chandler Davidson (Ed.), *Minority Vote Dilution* (Washington, D.C.: Howard University Press, 1984), pp. 47-65.

[4] Senate Factors Report, pp. 28-9.

Given the nature of this case and my own expertise, my report focuses on Factors 1, 5, 6, 7, and 8. I will not systematically address here Factors 2, 3, or 4. While Factor 2 carries great weight in voting rights litigation, racially polarized voting ("RPV") analysis is generally the purview of specially trained political scientists. Plaintiffs may or may not employ such scholars to conduct RPV analysis, but I do not draw any conclusions based on RPV except to acknowledge that federal courts have repeatedly determined that voting in Alabama, including in congressional contests, has been racially polarized. [5] I discuss the kind of enhancing devices and schemes covered in Factor 3 in my treatment of Factor 1, and I contend that the discriminatory redistricting plans discussed therein are as much exemplary of the devices highlighted by this factor as the at-large election schemes and numbered place laws of the (somewhat) more distant past.

My summary findings as to the relevant Senate Factors with respect to this report are as follows:

Factor 1: the state of Alabama has an undisputed history of discrimination against Black citizens, especially when it comes to registering to vote, voting, and enjoying an equitable chance to participate in the political process, and this has been recognized by numerous courts. In particular, white legislators of both major political parties have, in the last 50 years, manipulated the redistricting process to prevent Black citizens from electing members of Congress or, in the last 30 years, to limit Black voters' ability to elect members of Congress from more than one district.

Factor 5: the effects of past and ongoing discrimination in education, employment, health, and criminal justice are profound and have had a significant impact on Black voters' ability to participate fully in the political process.

Factor 6: despite a decades-long tradition of color-masking racial appeals, campaigns and politicians' public statements have recently trended back towards more overt racial appeals, and these have been plentiful in Alabama and attributable to its current members of Congress and candidates for those offices.

Factor 7: the ability of Black Alabamians to elect candidates from among their own to statewide offices has been almost nonexistent, while Black candidates have had some success at the local level, thanks to litigation and federal government intervention.

Factor 8 (Additional Factor 1): white lawmakers have been generally unresponsive to the needs and demands of Black citizens, as suggested by the fight for Medicaid expansion, by the actions of the state legislature since *Shelby County v. Holder*, and by lawmakers' failure to address much of what I discuss under Factor 5. The Court should also consider the votes of the members of the state's congressional delegation on other bills that the Black community in the state would tend to support, especially a redistricting plan that would provide for a second majority-minority congressional district.

Given these conclusions, in my opinion H.B. 1 will deny Black Alabamians an equitable right to elect candidates of their choice.

## II.   FACTOR 1: HISTORY OF DISCRIMINATION

As this Court found in 2020, "Black Alabamians have consistently overcome barriers to exercising their fundamental right to vote, only to later have that right curtailed," and the state's history of official discrimination is

---

[5] Greater Birmingham Ministries v. Merrill, 284 F. Supp. 3d 1253, 1258 (ND AL, 2018); Alabama Legislative Black Caucus v. Alabama, 135 S.Ct. 1257, 1272 (2015); White v. Alabama, 867 F. Supp. 1519, 1552 (MD AL, 1994), vacated on other grounds, 74 F.3d 1058 (11th CCA, 1996); Dillard v. Baldwin County Commission, 222 F. Supp. 2d 1283, 1290 (MD AL, 2002), affirmed, 376 F.3d 1260 (11th CCA, 2004); Wilson v. Jones, 45 F. Supp. 2d 945, 951 (S.D. Ala. 1999), affirmed sub nom. Wilson v. Minor, 220 F.3d 1297 (11th CCA, 2000).

replete with facts that the Court described as "largely undisputed" (*People First of Alabama v. Merrill*, 467 F.Supp.3d 1179, ¶ 32, ND). Similarly, the court in *Alabama NAACP v. Alabama*, also in 2020, found that, "Alabama's history of discrimination against African Americans in all areas of life is long, well-documented, and undisputed" (CA 2:16-cv-00731-WKW-SMD, Feb. 5, 2020, MD, pp. 153-54). I will briefly summarize the history that is the basis for these findings for the Court, beginning with Reconstruction. As referenced, as recently as last year, federal courts in Alabama have ruled in favor of plaintiffs targeting vote dilution schemes that persist, having fallen through the cracks of administrative and judicial oversight.[6]

I conclude by examining the efforts of white Democrats and white Republicans in the state legislature, during the last 30 years, to manipulate the redistricting process to the detriment of Black voters. Of primary importance in this case, I trace the general characteristics of the state's 7th Congressional District from the redistricting litigation of the 1990s to the present.

a.  From Reconstruction to the Constitution of 1901

Alabama's effort to restrict the rights of its Black citizens began when the enslaved became citizens. A pattern of advancement and backlash was thus established at the very beginning of the story of Black citizenship. After the Civil War, Alabama was among the first former Confederate states to enact "Black Codes" limiting the citizenship rights of former slaves.[7] The 14th Amendment invalidated such laws on equal protection grounds, and the 15th Amendment guaranteed formerly enslaved men the right to vote. While the Union Army was empowered to combat the Ku Klux Klan and other white supremacist groups, Alabama was forced to accede to some measure of Black voting and to the election of a few Black candidates to office though, even then, most offices were won by white Republicans. When the Union Army was removed from the state and priorities in Washington began to shift, white Democrats unleashed a campaign of violence aimed at "redemption," or gaining back control of the state government. At the heart of that effort was the disenfranchisement of Black citizens. The party adopted the slogan "White Supremacy for the Right" (a slogan it did not abandon until 1966) and replaced the state's Congressional Reconstruction constitution with one that protected white people in majority-Black areas by severely restricting home rule and giving control over local governments to the governor and the state legislature.[8]

The "redeemer" Democrats used a variety of measures to consolidate that control: where white people constituted a local majority, legislators switched from district to at-large elections; where they did not, legislators eliminated elections in favor of gubernatorial appointment; they set higher bonds for office-holding, abolished courts, closed polling places, and eventually resorted to outright election fraud in the form of ballot-box stuffing. The legislature ultimately passed the Sayre Law, establishing what District Judge Myron Thompson would later describe as "a more respectable and cunning way of controlling or disenfranchising black voters" (*Harris v. Siegelman*, 695 F. Supp. 517, 522, MD, 1988). The Sayre Law replaced the "party ballot" with the "secret ballot,"

---

[6] Jones v. Jefferson County, No. 2:19-cv-01821-MHH (ND, 2019); Alabama State Conf. of the NAACP v. City of Pleasant Grove, No. 2:18-cv-02056 (ND, 2019).

[7] Alabama's Black Code was enacted on January 15, 1866. It subjected anyone convicted of vagrancy, including "stubborn servant[s]," runaway apprentices, and "any person who habitually neglect[ed] his employment," to a $50 fine which, if unpaid, would compel convicted to work for his employer, usually the former master, for free until it was paid off. William Warren Rogers and Robert David Ward, "From 1865 through 1920," in Rodgers, et al., Eds, *Alabama: The History of a Deep South State* (Tuscaloosa: University of Alabama Press, 1994), pp. 225-410, p. 238; Orville Vernon Burton, *The Age of Lincoln* (New York: Hill and Wang, 2008), pp. 267-69; Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863 – 1877* (New York: Harper Collins, 1988), pp. 199-201.

[8] Rogers and Ward, "From 1865 through 1920," pp. 244-45, 262-65; Peyton McCrary et al., "Alabama," in Chandler Davidson et al., Eds, *Quiet Revolution in the South: The Impact of the Voting Rights Act,1965-1990* (Princeton: Princeton University Press, 1994), pp. 38-66, pp. 41-2; Brian Wilhelm, "The Election Riots of 1874," *Encyclopedia of Alabama*, Nov. 6, 2009; Burton, *The Age of Lincoln*, pp. 300-322; Foner, *Reconstruction*, pp. 228-411.

which came with written instructions that could only be explained by a gubernatorially appointed poll official. Not only did this allow those officials to swindle Black voters, it discouraged many Black people from even bothering to go to the polls; the Sayre Law resulted in an immediate 22 percent drop in Black turnout.[9]

Emboldened by federal indifference, in 1901 Democrats held a constitutional convention for the expressed purpose of "avoid[ing] Negro domination" and "establish[ing] white supremacy." The delegates' "registered vow" was to "disfranchise every Negro in the state." The constitution they adopted, which is still operative, featured provisions for an accumulating poll tax; property ownership and employment requirements for registering to vote; disenfranchisement of anyone convicted of vagrancy or "crimes of moral turpitude," a deliberately chosen class of crimes for which Black people were more frequently convicted; and a literacy test to be administered by local (white) registrars, which is to say, one that could be discriminatorily administered and used to bar Blacks, but not poor whites, from registering to vote.[10]

Following the enactment of the new constitution, there was a 96 percent reduction in Black voter turnout, and the number of registered Black voters fell from 180,000 to 3,000. The constitution was upheld by the Supreme Court in *Giles v. Harris* (189 U.S. 475, 1903). The following year, the Alabama Democratic Party adopted the "white primary," whereby membership was limited, as in a club, to white people, thus barring Black people from participating in what had become the only election that mattered. White supremacy was the order of the day in Alabama from that point until the Second World War.

The constitution also institutionalized what had already been written into the state's penal code and had escaped Radical Republican censure – the new document included an anti-miscegenation clause that read, "The legislature shall never pass any law to authorize or legalize any marriage between any white person and a negro, or descendant of a negro." A "Negro" was anyone with "one drop" of Black "blood." The anti-miscegenation statute was revised in 1940 to read, "If any white person and any negro, or the descendant of any negro intermarry, or live in adultery or fornication with each other, each of them shall, on conviction, be imprisoned in the penitentiary for not less than two nor more than seven years." Such laws were invalidated in *Loving v. Virginia*, but the voters of Alabama did not overturn its ban officially until 2000.[11]

---

[9] Kousser, *The Shaping of Southern Politics*, pp. 133-35; McCrary, et al, "Alabama," p. 42-43; Rodgers and Ward, "From 1865 through 1920," pp. 311-14, 21-34; Peyton McCrary, "Minority Representation in Alabama: The Pivotal Case of *Dillard v. Crenshaw County*," in Raymond Arsenault et al. Eds, *Dixie Redux: Essays in Honor of Sheldon Hackney* (Montgomery: New South Books, 2013), pp. 379-97, pp. 382-83; J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restrictions and the Establishment of the One-Party South, 1880-1910* (New Haven: Yale University Press, 1974) pp. 45-79.

[10] Kousser, *The Shaping of Southern Politics*. pp. 165-71; McCrary et al., "Alabama," pp. 43-4; *Journal of the Proceedings of the Constitutional Convention of the State of Alabama, Held in the City of Montgomery, Commencing May 21, 1901* (Montgomery: Brown, 1901), at Alabama Department of Archives and History Digital Collections Online [hereinafter cited as ADAH Digital Collections], pp. 8-10, http://digital.archives.alabama.gov/cdm/compoundobject/collection/legislature/id/16317/rec/1; McCrary et al., "Alabama," pp. 44; Rodgers and Ward, "From 1865 through 1920," pp. 343-351; "delegates" quotation cited by the court in *United States v. Alabama*, 252 F. Supp. 95, 98 (MD, 1966); on crimes of moral turpitude, see Hunter v. Underwood, 471 U.S. 222, 232, 1985.

[11] Loving v. Virginia, 388 U.S. 1 (1967); Jeremy W. Richter, "Alabama's Anti-Miscegenation Statutes," *The Alabama Review*, Volume 68, Number 4 (October 2015): pp. 345-365, p. 345-46; Aaron Blake, "Alabama was a final holdout on desegregation and interracial marriage. It could happen again on gay marriage," *Washington Post*, Feb. 9, 2015, https://www.washingtonpost.com/news/the-fix/wp/2015/02/09/alabama-was-a-final-holdout-on-desegregation-and-interracial-marriage-it-could-happen-again-on-gay-marriage/.

b. <u>From World War II to the Civil Rights Movement</u>

The "white primary" was overturned when the Supreme Court handed down *Smith v. Allwright* in 1944 (321 U.S. 649). True to the pattern of advance-and-restrict, however, Alabama's white Democratic lawmakers responded by enacting the Boswell Amendment to the 1901 constitution – a facially race-neutral provision that required applicants for voter registration to "understand and explain" an article of the U.S. Constitution. One of the bill's framers admitted that this would enable boards of registrars to "prevent from registering those elements in our community which have not yet fitted themselves for self-government," meaning Black people.[12] Birmingham's Arthur Shores challenged the Boswell Amendment, and in 1949 a federal court found that the law was "intended to be, and [was] being used for the purpose of discriminating against applicants for the franchise on the basis of race or color" and gave registrars "naked and arbitrary power," which they were using to disqualify Black applicants using the "understand and explain" clause (*Davis v. Schnell*, 81 F. Supp. 872, 880, SD, quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 366, 1886).

The state legislature responded by presenting the almost exclusively white electorate with a Voter Qualification Amendment, which it ratified in 1951. The amendment replaced the "understand and explain" language with a deliberately byzantine application process devised by the state Supreme Court. Prospective voters had to navigate a lengthy questionnaire (21 questions),, perform a reading of the U.S. Constitution at the direction of a white registrar, and present a "supporting witness," an existing voter who would testify to the applicant's residence and good standing, as well as the witness's own occupation and employer.[13]

The state legislature also enacted an "anti-single-shot" voting law. When Black citizens began agitating for citizenship rights during and after World War II, many local governments, via state legislative delegations, switched to at-large electoral systems, as some had done during the "redemption," to avoid the election of Black officials in districts or wards that were predominantly Black. Black voters, though, realized that they could increase the numerical value of their vote by throwing all of their support behind one candidate. The anti-single-shot law, the brainchild of Sam Engelhardt, a pioneer of the white supremacist Citizens' Council in the state and the author of the infamous Tuskegee gerrymander, invalidated any ballot in an at-large election that did not include a full slate of choices. That law and the new voter registration questionnaire, along with tactics like simply closing a registration office when Black people came to register, served to limit Black access to the franchise at a time when the state's handful of Black attorneys, including Shores, had little help in assailing the legislative wall that the state had built over the preceding half century.[14]

---

[12] McCrary et al., "Alabama," p. 44-45; McCrary, "Minority Representation in Alabama," pp. 408-9; Brian Landsberg, *Free at Last to Vote: The Alabama Origins of the Voting Rights Act* (Lawrence: University Press of Kansas, 2007), p. 18; Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (New York, Columbia University Press, 1976), pp. 90-93; Scotty E. Kirkland, "Mobile and the Boswell Amendment," *Alabama Review*, 65 (July 2012), pp. 205-19; Donald S. Strong, *Registration of Voters in Alabama* (Bureau of Public Administration, University of Alabama, 1956), p. 22; Davis v. Schnell, (81 F. Supp. 872, 879, SD AL, 1949).

[13] Annotated copies of Alabama Voter Questionnaires, Papers of Frank M. Johnson, Library of Congress Manuscript Reading Room, Washington D. C. [hereinafter cited as Frank Johnson Papers LOC], Container 7, U.S. v. Alabama (Bullock County), Folders 5-6; *Anniston Star*, Feb. 28, 1951; *Talladega Daily Home*, Feb. 28, 1951; *Mobile Journal*, Oct. 3, 1952; *Dothan Eagle*, Feb. 28, 1951; McCrary et al., "Alabama," p. 45; Landsberg, *Free at Last to Vote*, p. 19, Strong, *Registration of Voters in Alabama*, p. 27, 34-35.

[14] McCrary et al., "Alabama," p. 46, 402 n 74; McCrary, "Minority Representation in Alabama," p. 409; Joseph Bagley, *The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools* (Athens: University of Georgia Press, 2018), pp. 19, 213; Gomillion v. Lightfoot, 364 U.S. 339 (1961); Sellers v. Wilson, 123 F. Supp. 917 (MD, 1954).

In 1957, Congress passed the first Civil Rights Act since Reconstruction, with no southern support. Three years later, it passed the Civil Rights Act of 1960. These acts created the Civil Rights Division ("CRD") within the Justice Department, tasked it with enforcing the 15th Amendment in the South, gave it the tools to bring suit on behalf of the United States against states that were discriminating in voter registration, and empowered it to seek the appointment of federal voting referees. The division subsequently sued the state of Alabama and registrars in numerous counties in the Alabama Black Belt – the old, black-soiled plantation belt where Black majorities threatened white supremacy in the most critical way. The CRD targeted the discriminatory use of the state's voter registration questionnaire.[15]

In one of the CRD's Black Belt suits, Judge Frank Johnson determined that "As to Negro applicants, the defendants used the [voter registration] questionnaire to obtain substantive information regarding the applicants' qualifications for registering and also as a tricky examination or test. If a Negro applicant failed to meet the standard required of him, he was denied registration regardless of whether the error or omission on the form was formal, technical, or inconsequential." Judge Johnson explained, "For white applicants, the questionnaire was not used as an examination or test" (*United States v. Penton*, 212 F. Supp. 193, 198, 1962).[16]

Not all of the CRD Black Belt suits were filed Johnson's Middle District. Wilcox County lies in the Southern District, where sat Judge Daniel Thomas, known to delay and frustrate civil rights actions on his docket.[17] The CRD alleged that in Wilcox, from January 1, 1959, through October 17, 1963, 29 Black residents tried to register and were denied, whereas 376/386 white applicants were able to register in the same period. Despite the fact that 70 percent of the county's voting age population was Black, zero Black people were registered to vote at the time the suit was filed. Judge Thomas declined to enjoin the county officials but was reversed by the 5th Circuit, which found that there was "substantial uncontradicted evidence in the record that the registration officials applied the supporting witness requirement in a discriminatory fashion" (*United States v. Logue*, 344 F.2d 290, 291-92, 1965). By the time of that decision, various aspects of the questionnaire had been enjoined, from Wilcox to Montgomery and from Sumter to Macon and Bullock.[18]

Beyond the questionnaire, local officials engaged in various other tactics to frustrate Black citizens from voting. Defendants in the Montgomery CRD case attempted to distort registration numbers by race by denying a few applications from white would-be voters; the court found this to be "nothing more than a sham and an attempt on the part of the [Montgomery] Board [of Registrars] to disguise their past discriminatory practices." Judge Johnson observed that this "approached the ridiculous when the Board rejected the law partner of one of the defense attorneys, a retired general and graduate of West Point, and the college graduate son of one of the State's attorneys general" (*Penton*, at 198). Officials in Elmore County denied applications from Black people on minor technical grounds, while not doing the same for white people; rendered assistance to white applicants and not to Black

---

[15] Landsberg, *Free at Last to Vote*, pp. 7, 26-27; Blacksher, et.al., "Voting Rights in Alabama, 1982-2006," 17 *Southern California Review of Law and Social Justice* 2, Spring 2008, pp. 249-281, pp. 252-53.

[16] The form used needlessly verbose language; for example, it prompted prospective voters to answer the "interrogatories propounded" by the board. It asked applicants to read selected portions of the Constitution in front of the registrars. Applicants had to produce a supporting witness in person who would vouch for their residency and good character. And the form eventually included an "Insert" section that allowed for rotating civics questions, so that voting rights organizations could not coach applicants on the answers. Memorandum in Support of Plaintiffs' Motion of Oct. 31, 1963, United States v. Penton, CA 1714-N, Appendix with Applications, in Frank Johnson Papers LOC, Container 18, Folder 1.

[17] Bagley, *Politics of White Rights*, p. 54.

[18] United States v. Alabama (Macon), 192 F.Supp. 677 (MD, 1961); United States v. Alabama (Bullock), Findings of Fact, Concl. Of Law, and Order, April 27, 1965 (MD, AL), Frank Johnson Papers, Container 7, Folder 4; *Birmingham News*, Sept. 8, 1959; *Huntsville Times*, March 21, 30, 1961, Dec. 16, 1963; *Opelika Daily News*, Jan. 21, 1961; *Montgomery Advertiser*, Dec. 17, 1963.

applicants; failed to notify Black applicants of the need to sign an oath, then disqualified them for not signing; failed to notify Black applicants when their registration was denied; and required that Black applicants wait three months before attempting again to register.[19]

Lawmakers then replaced the anti-single-shot law with a numbered post law in conjunction with a majority vote requirement and staggered terms. Judge Myron Thompson would later describe how the numbered place law "intentional[ly] . . . reshaped at-large systems into more secure mechanisms for discrimination" and became the "the discriminatory centerpiece" of a vote dilution scheme (*Dillard v. Crenshaw County*, 640 F. Supp, 1347, 1357, MD, 1986). Candidates had to run for specific, enumerated posts or places on a given body, be it a school board or county commission or city council. And with terms staggered, each contest would be head-to-head and at-large, which is to say county or city-wide. White majorities in registered voters could then use the majority vote requirement to win, potentially, each and every seat, each and every time.[20]

Democratic Party leader Frank Mizell laid bare the intent behind this arrangement in a meeting of the State Democratic Executive Committee, a transcript of which was later discovered by a historian working in the *Dillard v. Crenshaw* case. "If you have people who want to vote as a bloc," Mizell explained, using a euphemism for the Black vote, "it would be very easy under the single shot voting for all of them to come in, to put a scallowag or a Negro in there." There was, he said, a "situation in Alabama that we are becoming more painfully aware of every passing day," as there was now "a concerted desire and a campaign to register Negroes en masse, regardless of the fact that many of them ordinarily cannot qualify because of their criminal records, or criminal attitudes, because of the fact that they are illiterate and cannot understand or pass literacy tests." According to Mizell, it had "occurred to a great many people, including the legislature of Alabama, that to protect the white people of Alabama, that there should be numbered place laws."[21]

c.   Reapportionment, Redistricting, and the Voting Rights Act

Another tool used to deny Black citizens equitable access to the franchise has been the racial gerrymander. In 1960 Alabama state Senator Sam Engelhardt orchestrated the state's first modern attempt to use the racial gerrymander to disenfranchise Black citizens. Engelhardt was a large landowner from Macon County who lamented the possibility of Black electoral success by asking rhetorically, "If you had a nigger tax assessor, what would he do to you?" He purported to enter politics for the sole purpose of keeping Black tenant farmers from "stealing his property."[22] Engelhardt sponsored a bill that passed the state legislature that redrew the boundaries of the city of Tuskegee, home to the prestigious Tuskegee Institute and a seedbed of Black activism, to exclude nearly every single Black voter, and no white voters, from the city limits. Black plaintiffs brought suit and lost at trial, but the decision was reversed by the Fifth Circuit and the Supreme Court, which found that the gerrymander served no legitimate purpose beyond its being "used as an instrument for circumventing a federally protected right" (*Gomillion v. Lightfoot*, 364 U.S. 339, 347, 1960).

The 1960 Census was the first in American history in which respondents could select their own race; it had been determined by census-takers prior to that time. When the 1960 data was published, Alabama was revealed to have lost a seat in its Congressional delegation. The state faced the necessity of redistricting for the U.S. House

[19] United States v. Cartwright, 230 F. Supp. 873 (MD, 1964).

[20] McCrary et al., "Alabama," p. 46.

[21] Quoted in Dillard v. Crenshaw County, 640 F. Supp, 1347, 1357, MD, 1986.

[22] Gomillion v. Lightfoot, 364 U.S. 339 (1960); Engelhardt also argued that "Desegregating the schools will lead to rape!" He added, "Damn niggers stink. They're unwashed. They have no morals; they're just animals. The nigger is depraved! Give him the opportunity to be near a white woman, and he goes berserk!" The conclusion: "The nigger isn't just a dark-skinned white man. He's a separate individual altogether." Bagley, *Politics of White Rights*, pp. 19, 213

under the shadow of *Gomillion*. And yet the state legislature failed to pass a such a plan. Nor did the state pass any plan to redraw its state legislative districts. Indeed, despite a directive in the state constitution, Alabama had not once since 1901 reapportioned its legislature to account for population growth and shifts. With the urbanization that had taken place since the constitution was adopted, and especially since the end of World War II, this meant that white legislators from majority-Black rural areas, namely in the Black Belt, held a disproportionate share of seats in the state legislature. When the U.S. Supreme Court handed down *Baker v. Carr* in 1962, declaring reapportionment a justiciable issue, white Democrats from urban areas in Alabama filed *Sims v. Frink*. In the first of several rulings under the *Sims* mantle, a three-judge court decided to give the Alabama legislature a chance to rectify that situation on its own without further action on the court's part.[23]

The state submitted two state legislative plans that summer. Of these the court wrote, "We find that each . . . when considered as a whole, is so obviously discriminatory, arbitrary, and irrational that it becomes unnecessary to pursue a detailed development of each of the relevant factors of the [invidiousness] test" (*Sims v. Frink*, 208 F.Supp. 431, 437, MD). The court allowed for elections to be held that fall using a temporary plan that incorporated those elements of each state plans that did "correct a few of the most glaring discriminations" (440). In that same cycle, congressional elections in Alabama were held fully at-large for the first time since before the Civil War; the state legislature had failed still to pass a congressional redistricting plan following the state's loss of a seat in the House.[24]

The state Supreme Court held that all ballots in the 1962 congressional election had to include a full slate of 8 choices, essentially adding an anti-single shot provision. This came amid a rising Republican challenge. White Democrats in the South had begun, at a minimum, to support Republican candidates for President and, increasingly, switch parties altogether as part of a backlash against the Kennedy administration's actions – namely, sending federal troops to support the desegregation of the University of Mississippi and other fledgling measures in support of a growing civil rights movement. They nonetheless carried all 8 seats in the Alabama congressional election that year. The odd man left out of the Democratic slate was veteran lawmaker Frank Boykin of Mobile, representing the old 1st District wherein there were a "substantial number" of voters of the "so-called minority bloc," meaning Black voters.[25]

When the Supreme Court decided the appeal in the *Sims* case in 1964, it handed down its landmark one-person/one-vote ruling, styled *Reynolds v. Sims*. Alabama was again given a chance to correct its malapportioned state legislative scheme. A three-judge court the following year found the plan for the state Senate permissible but held that the plan for the state House contained numerous districts with wide population variances with no rational basis but "preventing the election of a Negro House member" (*Sims v. Baggett*, 247 F.Supp. 96, 109, MD, 1965). The court afforded great weight to the historical context, writing, "The House plan adopted by the all-white Alabama Legislature was not conceived in a vacuum. If this court ignores the long history of racial discrimination in Alabama, it will prove that justice is both blind and deaf" (*Sims v. Baggett*, Id.).

Lyndon Johnson signed the Civil Rights Act into law that same year, accelerating white flight to the Republican Party at a time when Alabama's public schools were being desegregated by way of litigation for just the second school year. Also that year, the U.S. Supreme Court decided *Wesberry v. Sanders*, wherein it held Georgia's 5th Congressional District to be malapportioned, applying the principles in *Baker* and *Reynolds* to

---

[23] Baker v. Carr, 369 U.S. 186 (1962); Sims v. Frink, 205 F.Supp. 245 (MD, 1962); Reynolds v. Sims, 377 U.S. 533 (1964); Anna Brown, "The changing categories the U.S. census has used to measure race," Pew Research Center, Feb. 25, 2021, https://www.pewresearch.org/fact-tank/2020/02/25/the-changing-categories-the-u-s-has-used-to-measure-race/.

[24] *Montgomery Advertiser*, Jan. 10, 1962; *Huntsville Times*, June 8, 1962; *Birmingham News*, May 27, 1962; *Anniston Star*, Feb. 4, 1962.

[25] *Birmingham News*, Nov. 4, 1962, Aug. 3, 1963; *Montgomery Advertiser*, Dec. 27, 1962.

congressional redistricting. Alabama finally passed a congressional redistricting plan in a special session that year. Some had pushed for maintaining the at-large election of the delegation, but with numbered posts; this was the impetus for the Mizell plea in the Executive Committee meeting – warning that voters could "put a scallowag [Republican] or Negro in there" – that became central to the *Dillard* litigation years later. White flight to the Republican Party had accelerated in response to the Johnson administration's actions, and Republicans took 5 of the 8 seats under the newly enacted district plan.[26]

The following year, 1965, in the aftermath of "Bloody Sunday" in Selma, the Voting Rights Act ("VRA") became law. At that time, 19 percent of Alabama's Black voting-age population was registered to vote, compared to 69 percent of the white voting-age population. That seemed destined to change with the VRA's prohibition on literacy tests, poll taxes, and other devices that would deny or abridge minority groups' access to the franchise. The CRD immediately sought a judgement striking down Alabama's poll tax, which Circuit Judge Richard Rives described as "one of the last great pillars of racial discrimination" (*United States v. State of Alabama*, 252 F. Supp. 95, 96, MD, 1966).

Section 5 of the VRA covered Alabama, meaning that, in order to make any changes to election law, including redistricting, the state needed to seek "preclearance" from the Attorney General (effectively the CRD and Assistant Attorney General for Civil Rights). The Attorney General soon registered objections when Alabama localities tried to require voters to sign poll lists in order to access voting machines. And the CRD sought to block, by way of litigation, Alabama officials' efforts to "freeze" in office those "who were elected when Negroes were being illegally deprived of the right to vote," while also "freez[ing] Negroes out of the electorate" (*Sellers v. Trussell*, 253 F. Supp. 915, MD, 1966). Within a year of the VRA's passage, 107,000 Black voters registered in the state, pushing Black voter registration to nearly 60 percent by the end of the decade, even as white registration increased apace, reaching nearly 90 percent by the same time.

Black leaders sought to capitalize and to organize. In 1968, Huntsville dentist John Cashin formed the National Democratic Party of Alabama (NDPA) which, that fall, ran several candidates in races across the Black Belt. But the names of the NDPA candidates were left off of the ballot or they were disqualified, either by way of new statutes designed for that purpose or by way of discriminatory use of existing statutes, both of which actions were subsequently enjoined by federal courts. NDPA candidates then won local elections in four Black Belt counties, and Fred Gray and Thomas Reed of Tuskegee, running as Democrats, became the first Black members of the state legislature since Reconstruction. Across the state, 23 Black candidates were elected to local bodies.[27]

With data from the 1970 census, the state legislature assumed its responsibility under the *Sims* decision to equitably reapportion and redistrict the state House and Senate. The court found the plans the state submitted to be "unacceptable since, in conjunction with their discriminatory effect, they fall considerably short of guaranteeing to each citizen of Alabama that his vote 'is approximately equal in weight to that of any other citizen in the State'" (*Sims v. Amos*, 336 F. Supp. 924, 936, MD, 1972).[28] The court ordered the implementation of the plaintiffs' plan,

---

[26] Reynolds v. Sims, 377 U.S. 533; Wesberry v. Sanders, 376 U.S. 1.

[27] Hadnott v. Amos, 394 U.S. 358 (1969); Jerris Leonard, Assistant Attorney General, Civil Rights Division, to MacDonald Gallion, Attorney General of Alabama, Aug. 1, 1969, CRD Voting Determination Letters; *New York Times*, Feb. 8, May 16, June 3, 1970; *Alabama Journal*, Nov. 27, 1970; Matthew Edmonds, "The National Democratic Party of Alabama," *Encyclopedia of Alabama*, May 1, 2008, Sept. 20, 2018, http://www.encyclopediaofalabama.org/article/h-1518; The NDPA continued to weather attempts by the legislature to bar it from full participation in politics; see e.g. Wm. Bradford Reynolds to Honorable Charles Graddick, May 6, 1976, CRD Voting Determination Letters (attempt to change date, time of primaries to stifle use of conventions to nominate).

[28] The CRD that year blocked two state laws that would have limited assistance to illiterate voters in municipal elections and another that would have increased the number of signatures necessary for candidates to qualify to run as

but it first gave the legislature another chance to produce a viable plan of its own. It submitted one in the spring of 1973, but the court rejected that plan as well. The court noted that a legislative floor leader for Governor George Wallace had instructed the reapportionment committee to take advantage of maximum-allowable deviations from one-person, one-vote. When the court ordered the implementation of plaintiffs' plan, Wallace himself called it "a most onerous and burdensome albatross around the necks of the people of Alabama." The following fall, Black voters were able to elect 13 preferred candidates to the state legislature.[29]

While 1973 marked the culmination of the *Sims* litigation, it marked only the beginning of redistricting battles. After the 1980 census, the legislature submitted its state House and Senate plan for preclearance, and the CRD concluded that if precleared and implemented, the plan would lead to "a retrogression in the position of black voters" through "unnecessary reconfiguration" in Jefferson County and in the Black Belt.[30] Black leaders in the state, meanwhile, filed suit seeking a preliminary injunction in advance of the September primaries. The court allowed the legislature to attempt to pass a constitutional plan via special session, but the CRD found the plan it produced to be objectionable due to the unnecessary cracking of Black communities in Jefferson County. The court in *Burton v. Hobbie* ordered the implementation of modifications for Jefferson County submitted by plaintiffs on an interim basis for that fall.[31]

The Attorney General's Section 5 objection rendered the plan as set out by the legislature legally unenforceable, so the court had not ruled on the merits of the plaintiffs' original claims. It had given the legislature yet one more chance to enact a plan that could pass muster, under the specter of Senate hearings on amending Section 2 of the Voting Rights Act to include the discriminatory results standard in response to the Supreme Court's decision in *City of Mobile v. Bolden*.

In 1983 Act No. 83-154 passed the Alabama legislature and was precleared. The court ordered its use in special elections that fall, refusing, it its words, "to approve a settlement which would result in the continuation in office for four years of legislators who were not elected under a valid reapportionment plan" (*Burton v. Hobbie*, 561 F.Supp. 1029, 1036, MD). Judge Johnson quoted Judge Rives, who had written previously in *Dent v. Duncan*, "I look forward to the day when the State and its political subdivisions will again take up their mantle of responsibility, treating all of their citizens equally, and thereby relieve the federal government of the necessity of intervening in their affairs." Johnson observed in *Burton*, "Despite the repeated efforts of this Court, the Alabama Legislature has failed to enact a valid reapportionment plan for over eighty years. The day has finally arrived" (Id).[32]

---

independents, in a plain effort to limit the ability of groups like NDPA to get candidates on the ballot. See Acts Nos 2229 and 2230, Alabama Legislative Acts, 1971, Organizational, Special, and Regular Sessions, Volume 5, pp. 3586-87, ADAH Digital Collections, http://digital.archives.alabama.gov/cdm/compoundobject/collection/legislature/id/145593/rec/1; David Norman, Assistant Attorney General, Civil Rights Division, to Leslie Hall, Assistant Attorney General, Alabama, April 4, 1972, and David Norman, Assistant Attorney General, Civil Rights Division, to William J. Baxley, Attorney General, Alabama, Aug. 14, 1972, CRD Voting Determination Letters.

[29] Sims v. Amos, 336 F.Supp. 924, 930-41 (MD, 1972); Act No. 3, Alabama Legislative Acts, 1973, Special and Regular Sessions, Volume 1, p. 6, ADAH Digital Collections, http://digital.archives.alabama.gov/cdm/compoundobject/collection/legislature/id/147440/rec/6; *Montgomery Advertiser*, Aug. 4, 1973; *Selma Times-Journal*, Aug. 6, 1973; *Alabama Journal*, Aug. 4, 1973; *Birmingham News*, May 2, 5, 8, 1974, Nov. 6, 7, 1974; *New York Times*, Dec. 4, 1974.

[30] William Bradford Reynolds, Asst. Attorney General, to Charlie Graddick, Attorney General of Alabama, May 6, 1982, CRD Section 5 Rejection Letters, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf.

[31] Burton v. Hobbie, 543 F.Supp. 235, 236-39 (MD, 1982); *Montgomery Advertiser*, June 9, 13, 1982; *Anniston Star*, June 10, 1976; Blacksher, et.al., "Voting Rights in Alabama," pp. 271-273.

In the November election, Black citizens gained two seats each in the state House and Senate, bringing their numbers to 19/105 in the House and 5/35 in the Senate. The Court soon thereafter handed down *Gingles I*, adopting the Senate Factors I use for guidance in this report. By that time, the CRD had sent federal observers to Alabama 107 times and had registered 59 objections to proposed changes in state or local election law.[33]

That same year, 1986, Judge Thompson issued the court's ruling in *Dillard* (649 F Supp. 289, MD). The principle target of the lawsuit was the numbered place law, which in conjunction with at-large elections, staggered terms, and majority vote requirements, served to deny Black citizens across the state an equitable chance to elect candidates of their choice. Judge Thompson cited, among other evidence, the comments of Frank Mizell, who insisted that numbered place laws were needed to "protect the white people of Alabama," as proof of discriminatory intent. The Court recognized that at-large systems themselves were relics of the redemption period and that, in the 1950s and 1960s, these new elements like numbered post requirements were added to strengthen those systems and to deny victories to Black candidates. Inspired by a statewide structural injunction that had been issued in the *Lee v. Macon* school desegregation litigation (discussed *infra*), plaintiffs in *Dillard* sought similar relief. *Dillard* would eventually compel 183 local governments (17 county commissions, 28 county school boards, and 144 cities) to discard at-large systems for single-member district plans, though some at-large electoral schemes have only recently been discarded by federal courts (see *Jones v. Jefferson County*, No. 2:19-cv-01821-MHH, ND, 2019, and *Alabama State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, ND, 2019).[34]

Throughout the 1980s and into the 1990s, the CRD continued to register Section 5 objections to numerous proposed changes in state and local election law in Alabama. The types of changes that failed to receive preclearance included a court-packing scheme, changes in candidate qualification and nomination procedures, changes in voter registration procedures, voter roll purges, changes in voter identification requirements, the addition of at-large seats on top of district schemes, racially motivated municipal severances, and racially selective annexations intended to protect white majorities. The City of Pleasant Grove (which was created for the purpose of white exclusivity and which attempted unsuccessfully to secede from the Jefferson County school system for the same purpose) challenged CRD objections to its racially discriminatory annexations and sought a declaratory judgment in the D.C. Circuit Court. The claim was denied, with the Supreme Court upholding in 1987. The following year, a trial court found that a state law, which required any voter seeking assistance "swear an oath to the inspectors that he or she is unable to write the English language" and which limited voters to 5 minutes in the voting booth, "continue[d] . . . to have substantial adverse effects on the black citizens of this state" (*Harris v. Siegelman*, 695 F. Supp. 517, 528, MD).[35]

d.   Redistricting since the 1990s Cycle

After the 1990 Census was published, Black plaintiffs brought suit challenging Alabama's legislative redistricting plan. The state ultimately negotiated a consent decree in circuit court after a federal trial court certified

---

[32] Burton v. Hobbie, 543 F.Supp. 235, 238-40 (MD, 1982), and 561 F. Supp. 1029, 1032-35 (MD, 1983); *Montgomery Advertiser*, Feb. 2, 1983; *Anniston Star*, Nov. 9, 1983; Blacksher, et.al., "Voting Rights in Alabama," pp. 271-73.

[33] James Blacksher, et al., "Voting Rights in Alabama, p. 253; Peyton McCrary, "History in the Courts," pp. 47-65; McCrary et al., "Minority Representation in Alabama," p. 414.

[34] *Anniston Star*, Aug. 27, 1986; *Selma Times-Journal*, June 25, 1989; Consent Order, Taylor v. Jefferson County Commission, No. 84-C-1730 (ND AL, Aug. 17, 1985); "White minority wins right to challenge at-large voting," *Chicago Tribune*, June 18, 1988; Blacksher, et.al., "Voting Rights in Alabama, 1982-2006," pp. 259-260.

[35] City of Pleasant Grove v. United States, 623 F. Supp. 782, DDC 1985, affirmed 479 U.S. 462, 1987; Blacksher, et.al., "Voting Rights in Alabama, 1982-2006," pp. 255-58, 268-69; CRD Voting Determination Letters; *Montgomery Advertiser*, April 12, 1984.

a question to the state Supreme Court regarding venue.[36] At the same time, the state legislature, then still controlled by white Democrats, submitted its congressional redistricting plan to the CRD, and the Attorney General objected. The CRD had determined that the legislators were cracking Black population centers due to "a predisposition on the part of state political leadership to limit black voting potential to a single district," while hiding behind the idea that the state was prioritizing a lack of retrogression by creating the one majority-Black district and packing it with Black voters. Assistant Attorney General John R. Dunne wrote, "The proposed plan provides for one such district based on black population concentrations in Jefferson County, Montgomery County and intervening areas. The remainder of the state's concentrated black population, however, is fragmented under the submitted plan among a number of districts none of which has a black population of as much as 30 percent."[37]

A white realtor in Mobile brought suit against the plan under a one-person/one-vote claim, and Black voters joined the suit as plaintiff-intervenors with a Section 2 claim, citing specifically the lack of a second majority-Black congressional district. The court in *Wesch v. Hunt* was compelled to order the implementation of a plan, choosing from several that had been considered by the newly created Permanent Committee on Reapportionment and Redistricting and submitted to the court, while adding the court's own modifications. A modified version of the "Pierce Plan" was adopted for Congressional elections that year, and the 7th District was created with a 65 percent Black majority of registered voters. The court in *Wesch* did not consider any analysis of racially polarized voting in the district, nor did it consider the "preconditions" established in *Gingles* or the totality of the circumstances.[38]

The Pierce Plan was originally the Larry Dixon Plan. Dixon was a white legislator who would later be recorded on tape making blatantly racist remarks directed against Black voters.[39] White lawmakers had acceded to the necessity that one Congressional district would have to be majority-minority, and all parties to the litigation had stipulated to as much. Birmingham's Earl Hilliard became the first Black representative from Alabama to sit in the U.S. Congress since Reconstruction when he was elected to represent the 7th District. That seat has subsequently been held by Artur Davis and Terri Sewell. These three represent the only Black Alabamians to serve in Congress since Reconstruction.

After the 2000 Census, the first in which Americans could choose more than one race to identify themselves, the legislature, then still under white Democratic control, failed in regular and special sessions to pass a viable Congressional redistricting plan.[40] Three separate actions challenging the failure were filed and consolidated, and

---

[36] Brooks v. Hobbie, 631 So.2d 883 (Ala., 1993); Peters v. Folsom, CA 93-T-124-N (MD) and Brooks v. Camp, CA 93-T-364-N (MD), consolidated, dismissed.

[37] John R. Dunne, Assistant Attorney General, to Jimmy Evans, Attorney General, March 27, 1992, CRD Voting Determination Letters.

[38] Wesch v. Hunt, 785 F. Supp. 1491, 1495-99 (SD, 1992), affirmed sub nom. Camp v. Wesch, 504 U.S. 902 (1992); Blacksher, et.al., "Voting Rights in Alabama, 1982-2006," pp. 273-75.

[39] A federal investigation in 2010 revealed an effort to keep a gambling referendum off of the 2010 ballot in order to limit Black voter turnout. Dixon was recorded saying, "Just keep in mind if [the gambling] bill passes and we have a referendum in November, every black in this state will be bused to the polls. And that ain't gonna help." Dixon added, "Every black, every illiterate" will be "bused on HUD financed buses" with free food provided. Dixon was also a chief sponsor of the state's voter photo ID law, which he argued would undermine the "black power structure" since the absence of such a law "benefits black elected leaders." *Anniston Star*, April 2, 2010; *Montgomery Advertiser*, June 19, Nov. 16, 2011.

[40] The 2020 Census, for the first time, allows respondents to clarify their heritage by not just choosing white or black, but by adding information about their origin. This is important as the state of Alabama, and white society in general, have by law and custom long considered anyone with African heritage to be "Negro" or Black. *See, e.g.*, Ala.Const. Art. IV, § 102 ("The legislature shall never pass any law to authorize or legalize any marriage between any white person and a negro, or descendant of a negro.") repealed by Amend. 667. Historically, and today, people with African ancestry self-identify and are categorized by society as "Black," not white, despite the reality that, since slavery, most Black Americans are mixed race.

the state was forced to acknowledge that it was malapportioned. A three-judge court invited the submission of plans from all parties, heard expert witness testimony, and even appointed two experts of its own, when the parties could not agree on any, to assist the court in what it admitted was extremely complex litigation. While that trial was ongoing, the legislature passed a plan for Congressional redistricting and submitted it for preclearance. The court hearing the consolidated cases deferred to the Justice Department and the state and, rather than enter an injunction or rule on the merits of the state's plan, awaited a preclearance ruling, which came in March of 2002. The legislature passed redistricting plans for state house and senate districts and state board of education districts that were precleared along with the Congressional plan. Despite calls from Black legislators to create a second majority-Black congressional district, the plan adopted by the legislature maintained only one such district.[41]

The Republican Party had begun siphoning local white Democrats and isolating Black elected officials and voters in the Democratic Party in the 1990s. White flight from the Democrats in presidential elections dated back at least to the Dixiecrats of 1948 if not the New Deal, but white voters remained loyal to the Democratic Party, in large part because George Wallace remained a dominant political force into the 1980s and never switched parties. Wallace retired in 1987, however, and was succeeded by Republican Guy Hunt. George Bush carried the state against Bill Clinton in 1992. In 1996, the GOP swept statewide elections. U.S. Senator Richard Shelby switched parties in 1998. Between the redistricting battles of the early 2000s and the end of the decade, Republican leaders began pressuring the remaining white Democrats, the so-called "Blue Dogs," to switch parties. The culmination of these efforts was the 2010 Republican takeover of the Alabama legislature after 136 years of Democratic Party rule.[42]

Republicans gained supermajorities in the state House and Senate, leading Senate President Pro-Tem Del Marsh to observe, "We are in the majority and in a position, if we have to, to run over people." It was those supermajorities that would oversee redistricting in the spring of 2011. White lawmakers had no need or incentive to bargain with Black Democrats. And if they could win at the ballot box, they would inherit, wholesale, the limited Congressional representation plan that provided for only one majority-minority district. After the 2010 elections, most white politicians in Alabama were Republican, and very nearly every Black politician a Democrat.[43]

Redistricting following the 2010 census was highly acrimonious. White Republican legislators made up a supermajority of the 22-member Permanent Joint Legislative Committee on Redistricting: 16 members were Republicans, and 6 members were Democrats. Black legislators insisted that this was not fair representation and proposed instead a nonpartisan appointed commission, but this proposal was rejected.[44] The committee was co-chaired by Senator Gerald Dial and then-Representative Jim McClendon, both white Republicans. The committee chairs held public hearings, ostensibly allowing for citizens' input, while the actual work of drafting a plan was farmed out, behind-the-scenes, and with minimal input from anyone, to attorney Dorman Walker, Georgia political consultant Randy Hinaman, and the late Thomas Hofeller, another consultant who has been called a "gerrymander

[41] Douglas v. Alabama, No. 01-D-922-N (MD), order dismissing consolidated Congressional cases as moot, Apr. 29, 2002; *Montgomery Advertiser*, Jan. 29, 30, March 5, 2002.

[42] Wayne Flynt, *Alabama in the Twentieth Century* (Tuscaloosa: University of Alabama Press, 2004), pp. 102-4; Merle Black and Earl Black, *The Rise of Southern Republicans* (New York: Belknap Press of Harvard, 2002), pp. 314-15; *Montgomery Advertiser*, March 14, Nov. 6, 2008, Aug. 23, Oct. 8, Nov. 14, 2010; *Anniston Star*, Aug. 1, 2008; *Alabama Journal*, Nov. 5, 1962.

[43] *Montgomery Advertiser*, Nov. 3, 2010, May 1, 2011; al.com and Mobile Press-Register Staff, "Republicans claim majority in Alabama House and Senate for 1st time in 136 years," Al.com Nov. 3, 2010, https://www.al.com/live/2010/11/republicans_historic_alabama_majority.html; Camille Corbett, " Hubbard reflects on GOP takeover," *The Crimson White*, Oct. 23, 2012, https://cw.ua.edu/13191/news/hubbard-reflects-on-gop-takeover/.

[44] Tim Reeves, "Congressional Redistricting: Piece by Piece," *Selma Times-Journal*, May 10, 2011.

whiz" and who worked on several redistricting plans that have been cited in state and federal courts as being racially gerrymandered.[45]

State Senator McClendon and Hofeller corresponded, in Sen. McClendon's case via private email account, on redistricting matters. These included a draft, which Hofeller edited, of the reapportionment committee's guidelines and the relevant racial data needed to draw the maps to the maximum benefit of white Republicans. Sen. McClendon later critiqued longtime state Senator Jimmy Holley, saying in an email that Holley was "bound and determined" to hold public hearings. Sen. McClendon also arranged a meeting between Hofeller, himself, and then Attorney General Luther Strange to discuss districts for the state board of education. Walker also communicated with Hofeller, commending his work in making changes to the committee guidelines document, under the email subject line "Confidential and Privileged Alabama Guidelines"; Walker added his own changes and emailed those back to Hofeller, Hofeller's associate John Odlham, and John Ryder, who was at that time serving as general counsel for the Republican National Committee. None of the members of the reapportionment committee were included in any of this correspondence. When asked to comment on his correspondence with Hofeller, Sen. McClendon said, "Knowing that everything is going to show up in court, then you have to be very thoughtful about what you say. For that reason. I don't say much."[46]

Sen. McClendon denied any recollection of the correspondence with Hofeller, though no one has denied that most of the work done in actually drafting the plans and making adjustments was handled by Walker and Hinaman. McClendon has explained, "The strategy was very simple, and it was understood by everybody. It was pretty commonplace. We did this for congressional districts and we did this for House districts. We drew minority districts first. That's how you guarantee they get to keep what they've got." This seems to underscore that the primary concern of avoiding retrogression in terms of majority-minority districts, allowing "they" – Black voters – to "keep what they've got." Sen. McClendon in 2019 stated that Black people accounted for about 25 percent of the state's population, and "25 percent of our legislators are blacks. Are you getting the picture here? Yeah. So. Okay. What do you want?"[47]

The map initially approved by the committee was introduced into the house by McClendon but was rejected. Meanwhile, the committee plan was introduced into the senate, only to meet concerted opposition there as well. Legislators from Montgomery County, including some of the very few remaining white Democrats, opposed splitting the county among three districts. Black Democrats argued that the plan packed Black voters into the 7th District, especially by moving the almost exclusively Black portion of western Montgomery County into the 7th District and then cracking Black voters in heavily-white remaining districts. Sen. Bobby Singleton observed flatly,

---

[45] Michael Wines, "Republican Gerrymander Whiz Had Wider Influence Than Was Known," *New York Times*, Sept. 10, 2019, https://www.nytimes.com/2019/09/10/us/republican-gerrymander-thomas-hofeller.html; Wines and Richard Fausset, "North Carolina's Legislative Maps Are Thrown Out by State Court Panel," *New York Times*, Sept. 3, 2019, https://www.nytimes.com/2019/09/03/us/north-carolina-gerrymander-unconstitutional.html; David Daley, "The Secrets of the Master of Modern Republican Gerrymandering," *The New Yorker*, Sept. 6, 2019, https://www.newyorker.com/news/news-desk/the-secret-files-of-the-master-of-modern-republican-gerrymandering.

[46] Brian Lyman, "Report: GOP redistricting expert was in touch with Alabama legislator, attorney," *Montgomery Advertiser*, Sept. 24, 2019, https://www.montgomeryadvertiser.com/story/news/2019/09/24/documents-gop-redistricting-expert-touch-alabama-legislator-attorney/2430518001/; David Daley, "GOP Racial Gerrymandering Mastermind Participated in Redistricting in More States Than Previously Known, Files Reveal," *The Intercept*, Sept. 23, 2019, https://theintercept.com/2019/09/23/gerrymandering-gop-west-virginia-florida-alabama/.

[47] Eddie Burkhalter, "Gerrymandering expert worked with Alabama Republicans on 2011 redistricting lines, documents show," *Alabama Political Reporter*, Sept. 24, 2019, https://www.alreporter.com/2019/09/24/gerrymandering-expert-worked-with-alabama-republicans-on-2011-redistricting-lines-documents-show/.

"I think it's political packing." The perennial population loss of the western Black Belt allowed the map-makers to excuse the packing by citing the necessity of upholding the one-person/one-vote principle.[48]

After debate in the Senate was cut off via a cloture vote, Sen. Scott Beason, a white Republican and another lawmaker recorded on tape making racist remarks, introduced an augmented version of the committee plan, with adjustments he had made to his own district.[49] When Democrats protested this irregularity – introducing a bill after debate had been terminated – then-Lieutenant Governor Kay Ivey allowed for three minutes of debate. After those three minutes, a vote was held, and the bill passed out of the senate. Black Democrats continued to protest but were cut off by Ivey. Senator Roger Bedford, a Black Democrat, called it a "back-room deal." Sen. Quinton Ross, also a Black Democrat, said, "Nothing about their plan was transparent."[50]

The House then approved a plan introduced by Representative Micky Hammon, a white Republican, that essentially restored the committee plan, leaving out the Beason adjustments. Black members of the House, including James Busky, made the same protestations as their colleagues in the senate – the plan packed Black voters into the 7th and cracked them everywhere else. Busky argued, "That's stacking blacks in a congressional district [and] there's no need to do it." Busky introduced a plan that would have placed some Black voters from the 7th into the 2nd District, but it failed along party lines. The bill that was finally approved, out of a six-member conference committee, essentially adopted the Hammon Plan, and therefore produced a map preserving the basic characteristics of the Larry Dixon Plan, as modified by Walker and Hinaman. It was signed by Governor Robert Bentley on June 8, 2011.[51]

The legislative Black Caucus and the state Democratic Conference challenged the state's plan as discriminatory, and a federal court took up the issue. Alabama Attorney General Luther Strange, after consulting with Sen. McClendon, asked a three-judge federal court in Washington D.C. to approve the plan, bypassing Section 5 administrative review under the Obama Administration Justice Department and likely with awareness that other relevant litigation was pending. A suit had been brought by officials in Shelby County, Alabama, seeking the end of Section 5 preclearance. The leader of the Alabama Democratic Conference, Joe Reed, argued that the state, in going to the court, was trying to fast-track preclearance in order make it harder for people to register opposition, particularly to the fact that a map could have been drawn that included either two majority-Black districts or at least 1 majority-Black district and one "opportunity" district. Two months later, and one day before the trail court upheld Section 5 in *Shelby County v. Holder*, the Attorney General precleared the state's congressional plan. This severed that issue from the *Alabama Legislative Black Caucus* case, which moved forward in a contentious battle over the state's legislative districts, the maps for which were drawn by Hinaman. Twelve of those districts were determined by the court to be unconstitutionally gerrymandered. The trial court ultimately approved the state's plans in 2017.[52]

---

[48] *Montgomery Advertiser*, May 27, June 1, 3, 2011.

[49] During a pay-for-play investigation conducted by the FBI, Beason wore a wire and captured himself referring to Black Belt Black citizens as "aborigines." Kim Chandler, "Sen. Scott Beason apologizes for comments revealed during bingo trial (video)," *al.com*, Sept. 27, 2011, https://www.al.com/spotnews/2011/09/sen_scott_beason_apologizes_fo.html.

[50] *Selma Times-Journal*, May 31, 2011.

[51] *Montgomery Advertiser*, June 1, 2, 3, 9, 2011.

[52] State of Alabama v. Holder, No. 1:11-cv-01628, Complaint filed (DC CCA), September 9, 2011; *Anniston Star*, Sept. 20, Dec. 21, 2011; *CNN*, "Justice Department approves congressional redistricting for Alabama," Nov. 21, 2011, https://www.cnn.com/2011/11/21/us/alabama-redistricting/index.html; Alabama Legislative Black Caucus v. Alabama, 989 F.Supp.2d 1227 (MD, 2013), vac. 135 S. Ct. 1257 (2015); Alabama Legislative Black Caucus v. Alabama, 231 F.Supp.3d 1026 (MD, 2017).

III.    FACTOR 5: EFFECTS OF PAST DISCRIMINTION

Education, income, health, and legal vulnerability adversely affect political participation. Black Alabamians still suffer under the socioeconomic weight of that past and from continuing racism, even at the highest levels of government.[53] As the court acknowledged in *Alabama State Conference of the NAACP v. Alabama* in 2020, "Though things have changed, the effects of . . . discrimination persist to some degree" (CA 2:16-cv-00731-WKW-SMD, Feb. 5, 2020, MD, pp. 153-54). Black citizens in Alabama lag behind their white counterparts in nearly every statistical socioeconomic category, due largely to a history of discrimination, only elements of which are sketched above. When Congress amended Section II of the VRA, amid the apportionment fight that immediately preceded the adoption of the Dixon Plan, the 11th Circuit recognized the impact that a century of discrimination had on Black Alabamians. In doing so, the court quoted the Senate Report from which the *Gingles* Senate Factors were derived:

> The courts have recognized that disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation . . .. Where these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.[54]

Today, white Alabamians with more education and therefore higher income can afford a car, internet service, a personal computer, or a smart phone; they can take time off from work; they can afford to contribute to political campaigns; they can afford to run for office; they have access to better healthcare. Education has repeatedly been found to correlate with income independently affects citizens' ability to engage politically. Black people in Alabama are demonstrably poorer, less educated, less healthy, and far more likely to be incarcerated than white people as a consequence of past and continuing racism and discrimination. According to the most recent available data from the U.S. Census Bureau's American Community Survey, Black Alabamians are less likely to have completed high school, more likely to live below the poverty line, more likely to be unemployed, more likely to work in a service industry job, more likely to rent rather than own their home, more likely to lack access to a vehicle, and more likely to have a significantly lower median household income than white households. These realities are inseparable from, and in significant part result from, the state's history of official discrimination.[55]

a.    Health, Employment, Criminal Justice

As the court observed in *People First v. Merrill* in 2020, "people who are Black, Latinx, or Native American are more likely to hold jobs that do not provide paid leave, cannot be performed remotely, and require more exposure to the public and, therefore, to COVID-19." The parties to that action stipulated to the fact that "the discrimination and systemic racism that contribute to elevated COVID-19 risk for Black people and other minorities nationally are evident in Alabama," wherein COVID-19 has also had a disproportionate impact on Black people in Alabama in terms of rate of infection and rate of death due to, in the words of the court, "pre-existing and evolving inequities

---

[53]  In 2011, the court in *United States v. McGregor* acknowledged that "racist sentiments . . . remain regrettably entrenched in the high echelons of [Alabama] state government" (824 F. Supp. 2d 1339, 1344-1348, MD).

[54]  Senate Report, quoted in U.S. v. Marengo Co. Comm., 731 F.2d 1546, 1568-70 (1984).

[55]  U.S. Bureau of Census, American Community Survey Data Profiles, Alabama, 2018, https://www.census.gov/acs/www/data/data-tables-and-tools/data-profiles/2018/.

in structural systems and social conditions.[56] The court in *People First* also acknowledged that "due to patterns resulting from a history of housing discrimination, Black and Latinx individuals are more likely to live in areas impacted by environmental pollutants, or in densely populated areas."[57] This includes areas in Alabama that have been designated as "Superfund" cleanup sites by the U.S. Environmental Protection Agency ("EPA"), which I discuss in more detail below.[58]

The COVID-19 pandemic has also had a disparate impact on Black school children. When school systems were forced to go online, Black children in the Black Belt in Alabama and in the state's urban areas were more likely to lack internet access or a computer, tablet, or smart phone, rendering them incapable of continuing in school. As a principal at a school in Perry County explained, "Our district cannot afford to get devices for our students. And then the biggest thing is connectivity. No broadband."[59] Many school systems across the state saw serious enrollment declines from 2019-2020 to school year 2020-2021. Most either stabilized or saw increases in enrollment from 2020-2021 to fall 2021-2022. All but one school system in the state that saw a 5 percent or greater continued loss of enrollment in that span are in the Black Belt; the other is Chickasaw City, which is an overwhelmingly Black system in greater Mobile.[60]

Black people in the state also continue to face workforce discrimination, including on the part of the state. Of the 1,539 claims of discrimination brought before the Equal Employment Opportunity Commission in 2020 from Alabama, 45 percent were racially based claims, the highest percentage of any state in America. Alabama's racially based claims accounted for 3.1 percent of national racial claims, although Alabama's population accounts, as of the last Census, for only 1.5 percent of the national population.[61] Litigation in the last 50 years (and within the last ten

---

[56] Findings of Fact and Conclusions of Law, C.A. 2:20-cv-00619-AKK (MD), pp. 15-16, ¶ 13-14. The *New York Times* published the results of a study, backed by input from healthcare experts, that found socioeconomic factors with historical roots – such as access to healthy food options, access to decent healthcare, inability to work from home, etc. – were causal factors in COVID-19's more deadly effects on Black persons. Infectious disease experts at the Centers for Disease Control ("CDC") also determined that "Long-standing systemic health and social inequities have put some members of racial and ethnic minority groups at increased risk of getting COVID-19 or experiencing severe illness, regardless of age." According to the CDC, at the height of the summer surge in COVID last year, "age-adjusted hospitalization rates [were] highest among non-Hispanic American Indian or Alaska Native and non-Hispanic black persons, followed by Hispanic or Latino persons." CDC figures indicated that the age-adjusted hospitalization rate for Black people was at that time "approximately 5 times that of non-Hispanic white persons." Richard A. Oppel Jr. et al, "The Fullest Look Yet at the Racial Inequity of Coronavirus," *New York Times*, July 5, 2020, https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html?action=click&module=Top%20Stories&pgtype=Homepage; No Author, "COVID-19 in Racial and Ethnic Minority Groups," Centers for Disease Control, June 25, 2020, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html.

[57] Id.

[58] The North Birmingham neighborhood has been determined to be so polluted by industrial waste that the EPA can use specially designated funds to remove and replace toxic soil.

[59] Nellie Peyton, "'Who is standing up for us?'- Black, rural students left behind as U.S. schools go online," *Reuters*, Aug. 28, 2020, https://www.reuters.com/article/us-health-coronavirus-usa-education-feat/who-is-standing-up-for-us-black-rural-students-left-behind-as-u-s-schools-go-online-idUSKBN25O1XR.

[60] Trisha Powell Crane, "Alabama public schools shrunk by 6,000 students during pandemic," *Al.com*, Nov. 16, 2021, https://www.al.com/news/2021/11/alabama-public-schools-shrunk-by-6000-students-during-pandemic.html.

[61] U.S. Equal Employment Opportunity Commission, 2020 EEOC Charge Receipts for AL, https://www.eeoc.gov/statistics/enforcement/charges-by-state/AL; United States Census Bureau, Quick Facts, https://www.census.gov/quickfacts/fact/table/US/PST045219.

years) has revealed numerous instances of racial discrimination in employment on the part of state entities – including the state Personnel Department and Personnel Board, the Department of Public Safety, the Alabama Cooperative Extension Service, the state Board of Education, and the state Department of Transportation – and also on the part of private employers.[62]

Recent research also demonstrates that the wage gap between white and Black workers, long thought to have been closing in the last 50 years, has actually increased. Studies have considered those who have given up on finding work and the incarcerated, both disproportionately Black groups, among the wage-earning citizenry. According to various scholars, this more accurately measures the wage gap as a socioeconomic indicator. The studies indicate that, when including these groups, the wage gap between Black and white men has grown steadily since the 1980s, a time when white backlash against civil rights and other issues coalesced in the Reagan revolution.[63]

Leaders in the city of Birmingham, most of them Black, attempted in 2016 to establish a minimum wage in the city higher than that of the federal minimum wage (Alabama has no minimum wage) to the rate of $10.10/hour. The white-controlled state legislature responded by passing a bill preventing local governments from establishing minimum wages, thus invalidating the city's effort. State Sen. Linda Coleman-Madison, a Black Democrat, said at the time, "Alabama is a poor state. But I say we are poor by choice, because of bills like this that keep people poor." Black wage earners in the city are disproportionately beholden to white business owners. Recent studies have demonstrated that "Black residents make up 74% of Birmingham's population, but only 50% of businesses are Black-owned" and that "white residents make up 22% of the population, but 47% of businesses are white-owned."[64]

Not only are Black men in Alabama more likely to find it difficult to get a job or higher wages, they have also been incarcerated at a disproportionate rate, especially since the declaration of a "war on drugs" in the 1980s. Scholars have described this racial mass incarceration as a "New Jim Crow." The state of Alabama also currently faces a federal lawsuit, initiated by the Department of Justice, alleging unconstitutional conditions in Alabama's prisons. These conditions continue to exist despite decades-long-running remedial litigation dating back to the 1970s, in which Judge Johnson issued a *Lee v. Macon*-style statewide injunction, and more recently filed litigation in which Judge Thompson concluded, in 2017, that mental healthcare in the state's prison system was "horrendously inadequate" (*Braggs v. Dunn*, 257 F.Supp.3d 1171, 1297, MD, 2017).[65] The Justice Department's current suit

---

[62] United States by Wallace v. Frazer, 317 F. Supp. 1079 (MD, 1970); United States v. Dothard, 373 F. Supp. 504 (MD, 1974); Strain v. Philpott, 331 F. Supp. 836 (MD, 1971); Brown v. Alabama Department of Transportation, 597 F. 3d 1160 (11th CCA, 2010); Reynolds v. Alabama Department of Transportation, 4 F. Supp. 2d 1068 (MD, 1998); Allen v. Alabama State Board of Education, 816 F.2d 575 (11th CCA, 1987), 976 F.Supp. 1410 (1997); Shuford v. Alabama State Board of Education, 897 F. Supp. 1535 (1995); United States v. Jefferson County, 2013 WL 4482970 (ND); Ensley Branch, NAACP v. Seibels, 31 F.3d 1548 (11th CCA, 1994); Adams v. Austal USA, 754 F.3d 1240 (11th CCA, 2014); Ferrill v. The Parker Group, 168 F.3d 468 (11th CCA, 1999).

[63] Patrick Bayer and Kerwin Kofi Charles, "Divergent Paths: A New Perspective on Earnings Differences Between Black and White Men Since 1940," *The Quarterly Journal of Economics*, 133.3 (Aug., 2018) pp. 1459 -1501; Becky Pettit, *Invisible Men: Mass Incarceration and the Myth of Black Progress* (Russell Sage Foundation, 2012); Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (The New Press, 2012); The Sentencing Project, "Fact Sheet: Trends in U.S. Corrections, U.S. State and Federal Prison Population, 1925-2017," https://sentencingproject.org/wp-content/uploads/2016/01/Trends-in-US-Corrections.pdf.

[64] Zachary Roth, "Birmingham Raises Minimum Wage and Alabama Takes it Away," *NBC*, Feb. 26, 2016, https://www.nbcnews.com/news/nbcblk/birmingham-raises-minimum-wage-alabama-takes-it-away-n526806; Sydney Cromwell, Birmingham Watch, "Business Capital, Knowledge Remains Out Of Reach For Many Minority Entrepreneurs," WBHM, https://wbhm.org/2020/business-capital-knowledge-remains-out-of-reach-for-many-minority-entrepreneurs/.

alleges that the Alabama Department of Corrections  ("ADOC") has failed to protect the incarcerated men from violence and sexual abuse at the hands of other prisoners, from excessive force by correctional officers, and from the inevitable consequences of unsafe and unsanitary housing. In both the Justice Department report and in a recent *New York Times* piece featuring letters from multiple inmates, a picture emerges of a system in Alabama in which correctional officers are so outnumbered and conditions are so systemically violent that officers and staff often simply hide behind barricades and allow the prison population to police itself. Rape, stabbings, attacks on both officers and other inmates, drug use, and corruption all appear to be commonplace.[66]

The representation of Black people among the incarcerated in Alabama is grossly disproportionate. As of a January 2020 report issued by the Alabama Department of Corrections ("ADOC"), Black inmates accounted for the majority of the inmate population, despite Black people only constituting 27 percent of the state's population. Alabama's prisons are also catastrophically overcrowded; the state was recently criticized for trying to address overcrowding by pledging funds intended for COVID-19 relief to the building of new prisons, thereby taking funds away from one crisis that disproportionately affects Black people to address another one.[67] Even when released, especially in Alabama, former Black inmates find it harder to exercise their right to vote. In the 1990s, the state reenacted its felon disenfranchisement law after the *Hunter v. Underwood* decision in 1985. The current law has disenfranchised 15 percent of the Black voting age population, and only 7 percent of the white voting age population.[68]

Beyond the issues with Alabama's penal system, broadly, Black youth, many of whom attend segregated schools deemed by the state to be "failing," also face disparities in the state's juvenile justice system. A 2017 report of the Alabama Juvenile Justice Task Force, chaired by two white Republicans, found that "Racial disparities exist throughout the juvenile justice system." The Task Force determined that "A larger share of black youth are placed in detention, out-of-home diversion, and DYS [Department of Youth Services] custody than their share of the overall youth population," and that "Black youth also receive a disproportionately high share of dispositions to DYS custody when compared to their share of initial complaints," a disparity that "holds true when comparing complaints and out-of-home placements for youth who commit misdemeanors or felonies."[69]

---

[65] Ivana Hyrnkiw, "Judge rules mentally ill Alabama prison inmates receive inadequate care," June 27, 2017, *Al.com*, https://www.al.com/news/2017/06/federal_judges_rules_in_mental.html; Larry Yackle, *Reform and Regret: The Story of Federal Judicial Involvement in the Alabama Prison System* (New York: Oxford University Press, 1989); James v. Wallace, 382 F.Supp. 1177 (MD, 1974); Pugh v. Locke, 406 F.Supp. 318 (MD, 1976).

[66] "Investigation of Alabama's State Prisons for Men," United States Department of Justice, Civil Rights Division, April 2, 2019, https://www.justice.gov/opa/press-release/file/1150276/download; New York Times Staff, "'No One Feels Safe Here': Life in Alabama's Prisons," *New York Times*, April 29, 2019, https://www.nytimes.com/2019/04/29/us/alabama-prison-inmates.html; Mike Cason, "New Department of Justice complaint says Alabama has not improved prison conditions since 2019 allegations," *al.com*, Nov. 23, 2021,  https://www.al.com/news/2021/11/new-department-of-justice-complaint-says-alabama-has-not-improved-prison-conditions-since-2019-allegations.html.

[67] "Alabama Department of Corrections, Monthly Statistical Report for January 2020 Fiscal Year 2020," Research and Planning division, State of Alabama, http://www.doc.state.al.us/docs/MonthlyRpts/DMR%2001%20January%202020PUB.pdf; Associated Press Wire, "Alabama to use Covid rescue funds to build prisons," NBC News, Oct. 2, 2021, https://www.nbcnews.com/news/us-news/alabama-use-covid-rescue-funds-build-prisons-n1280624.

[68] No author, "NAACP fights for prison registration," *Birmingham News*, Oct. 1, 2008; Desiree Hunter, "Pastor, state prisons settle suit on inmate voting," *Anniston Star*, Oct. 22, 2008.

[69] "Final Report," Alabama Juvenile Justice Task Force, December 2017, http://lsa.state.al.us/PDF/Other/JJTF/JJTF-Final-Report.pdf.

In terms of health, between Reconstruction and enactment of the Civil Rights Act of 1964, Black citizens had to fend for themselves, with help from charitable organizations like the Rosenwald Fund and the Catholic Church. Following the passage of the Civil Rights Act and the enactment of Great Society social welfare programs, Black Alabamians experienced racially discriminatory dispersion of federal aid in, for example, the program now known as Temporary Assistance to Needy Families, for which state dispersion of aid has been twice cited by federal courts for discrimination.[70]

Today, Black communities in the Black Belt continue to struggle in primitive conditions and suffer unusual health difficulties and lack of even the most basic services. A 2019 United Nations ("U.N.") mission to the United States aimed at examining conditions of "extreme poverty" found conditions in Alabama's that were "very uncommon in the First World." The U.N.'s Special Rapporteur on Extreme Poverty and Human Rights, Philip Alston, reported that Black residents lacked proper sewage and drinking water systems and had unreliable electricity. Residents had constructed homemade water delivery systems using PVC pipe, did not have consistent access to drinking water that had not been tainted by raw sewage, and often fell ill, entire households at a time, with E. Coli and hookworm. After visiting a Black man's Butler County home, where sewage was bubbling up out of the ground due to a failed septic tank, Alston assessed the situation, saying, "There is a human right for people to live decently, and that means the government has an obligation to provide people with the essentials of life, which include power, water and sewage service." He added, "But if the government says, 'oh no, we're not going to do it,' and leaves you to install very expensive septic tanks, that's not how it should work." Under H.B. 1, the state's current congressional plan, Butler County lies in the 2nd Congressional District.[71]

Black residents of Uniontown, in Perry County, fought a decision by the state to allow 4 million tons of potentially toxic coal ash to be transferred from the site of a coal-fired electrical plant accident in Tennessee to a landfill in the town. The coal ash was spilled into a river in Kingston, Tennessee, where years later multiple residents have been diagnosed with various forms of cancer. Then-Congressman Artur Davis protested the coal ash's transfer to Alabama, as did local residents, overwhelmingly Black, but met resistance from the state's Department of Environmental Management.[72]

Black communities in the state's urban areas suffer from industrial pollution as well, as the court in *People First* acknowledged. The North Birmingham neighborhood in the city of Birmingham is home to much of what remains of the city's heavy industry, including coke plants. At the height of the "Magic City's" rise, it provided company housing for workers. Over time it became an exclusively Black working class neighborhood. At the apex of the civil rights movement in Birmingham, it was the home of activist minister Fred Shuttlesworth's Bethel Baptist church and a focal point for civil rights organization. In 2013 the EPA designated the 35th Avenue area in North Birmingham a "Superfund" site, meaning the EPA can use specially designated funds to remove and replace soil laden with toxic materials from airborne and waterborne pollution emanating from nearby factories. The following year, the EPA moved to place the site on a priority list for cleanup. The state of Alabama, via its Department of Environmental Management Office of External Affairs and the Office of the Attorney General, has consistently

---

[70] Flynt, *Alabama in the Twentieth Century*, pp. 365-66; Smith v. King, 277 F.Supp. 31 (MD, 1968); Whitfield v. Oliver, 399 F. Supp. 348 (MD, 1975).

[71] Connor Sheets, "UN poverty official touring Alabama's Black Belt: 'I haven't seen this' in the First World," *al.com*, March 7, 2019, https://www.al.com/news/2017/12/un_poverty_official_touring_al.html.

[72] Marianne Engelman-Lado, et al., "Environmental Injustice in Uniontown, Alabama, Decades after the Civil Rights Act of 1964: It's Time For Action," American Bar Association, May 21, 2021, https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/vol--44--no-2--housing/environmental-injustice-in-uniontown--alabama--decades-after-the/; Kristen Lombardi, "Welcome to Uniontown: Arrowhead Landfill Battle a Modern Civil Rights Struggle," NBC News, Aug. 5, 2015, https://www.nbcnews.com/news/nbcblk/epa-environmental-injustice-uniontown-n402836; No Author, "Artur Davis Asks EPA For Coal Ash Standards," Alabama Public Radio, Oct. 16, 2009, https://www.apr.org/2009-10-16/artur-davis-asks-epa-for-coal-ash-standards;

opposed the move, which would require that the state help pay for the cleanup if the corporations the EPA has deemed responsible do not. Birmingham Mayor Randall Woodfin and Representative Terri Sewell support adding the site to the priority list. Sewell has insisted, "No family should have to live with a contaminated backyard, and no community should be left to clean up decades of industrial waste."[73]

b.  Education

Alabama has a long history of discrimination in education. In 1967 Alabama became the first state ever subjected to a statewide structural injunction. That year, 13 years after *Brown v. Board*, a 3-judge federal trial court found that state officials had, "through their control and influence over" local school boards, "flouted every effort to make the Fourteenth Amendment a meaningful reality to Negro school children in Alabama" (*Lee v. Macon County Board of Education*, 267 F.Supp. 458, MD, affirmed 389 U.S. 215). The court enjoined state officials and, by proxy, 99 school systems across the state, along with the state's junior colleges and trade schools, and eventually its teachers' associations and athletic associations. The state's actions before, during, and after the trial of that case on the merits demonstrate the vigor with which it resisted granting basic rights to Black citizens.

When *Brown* was decided in 1954, the NAACP in Alabama petitioned local school boards for a commitment to adhere to the ruling. White men who rejected the violent efforts of the Ku Klux Klan, especially the aforementioned state legislator Sam Engelhardt, responded by organizing Citizens' Councils, which used economic reprisal to punish Black people who pressed for school desegregation. Black plaintiffs nonetheless began to file suit in the late 1950s, seeking redress in federal courts, but not until 1963 did trial courts in four cases order the desegregation of a handful of all-white schools. Klansmen then bombed a Black church in Birmingham in response, killing four children, and the governor and state legislature reinvigorated an already decades-long running campaign to keep public schools in the state entirely white.[74]

After the passage of the Civil Rights Act in 1964, the U.S. Department of Health, Education, and Welfare ("HEW") pressed local school systems to desegregate. Governor George Wallace intimidated local school boards, threatening to remove state funding or to hold "mass meetings" in any county or town whose school board agreed to abide by HEW provisions or federal court orders. When the court added the United States as a party in *Lee v. Macon*, it brought the Justice Department into the case. Attorneys from the CRD and for the private litigants recognized that, not only had Wallace demonstrated that he had control over local school boards, but Alabama law gave the state Board of Education control over local boards, even in day-to-day affairs, a reality traceable to the state's first "redeemer" constitution. Plaintiffs asked the court to compel the state to use that power to desegregate, rather than to prevent desegregation, and to issue a statewide desegregation order, which it did in March 1967.[75]

---

[73] Steven Mufson, "The betrayal: How a lawyer, a lobbyist and a legislator waged war on an Alabama Superfund cleanup," *Washington Post*, Aug. 24, 2019, https://www.washingtonpost.com/national/health-science/the-betrayal-how-a-lawyer-a-lobbyist-and-a-legislator-waged-war-on-an-alabama-superfund-cleanup/2019/04/24/834087ae-4c1a-11e9-9663-00ac73f49662_story.html; Madison Underwood, "State fighting EPA drive to add North Birmingham pollution site to Superfund priority list," *al.com*, Feb. 7, 2020, https://www.al.com/news/birmingham/2014/11/state_at_odds_with_epa_on_nort.html; Elizabeth Patton, "Terri Sewell, Randall Woodfin weigh-in on Birmingham indictments surrounding EPA clean-up site," *Alabama Today*, Nov. 15, 2018, https://altoday.com/archives/27527-terri-sewell-randall-woodfin-weigh-in-on-birmingham-indictments-surrounding-epa-clean-up-site.

[74] Bagley, *The Politics of White Rights*, pp. 14-76; Armstrong v. Birmingham Board of Education, 220 F. Supp. 217 (ND); Davis v. Board of Commissioners of Mobile 219 F.Supp. 542 (SD); Hereford v. Huntsville Board of Education, *Race Relations Law Reporter* 8.3 (Fall, 1963, ND), p. 908; Lee v. Macon County Board of Education, 267 F.Supp. 458 (MD); U.S. v. Wallace, Civ. A. No. 1976-N (MD, 1963).

Judge Johnson, writing for the court, insisted that the relief awarded in *Lee v. Macon* had to "reach the limits of the defendants' activities." As Professor Brian Landsberg has explained, "Because the racial segregation was systemic, the violation could be cured only by systemic relief." What made the 1967 *Lee v. Macon* ruling extraordinary was that it provided that kind of remedial, sustained systemic relief on a statewide level.[76] Under the court's order, state officials, especially the state superintendent of education, were to ensure that the 99 school systems not already under court order in another case begin to disestablish their racially dual school systems by adopting the court's model desegregation plan that fall. Private plaintiffs and the CRD would monitor progress and submit motions for further relief, as necessary. Gradually, each local school system would become a defendant party in the suit. The court, with plaintiffs' counsel, determined when the systems had reached a point at which a consent decree could be entered and the individual system's case could be transferred to a single judge in their district. Plaintiffs and the court would continue to monitor progress until "unitary status," as articulated in *Green v. County School Board of New Kent County* (391 U.S. 430, 1968), had been achieved.

As a direct result of recalcitrance from officials at the state and local level, the "freedom of choice" plans adopted under the initial model plan had not, by the 1970s, resulted in actual integration, only token desegregation. And as Circuit Judge John Minor Wisdom explained, the goal of school desegregation litigation had always been to move beyond a scenario in which there were still "white schools or Negro schools" to one in where there were "just schools," or in other words, to have a "*bona fide* unitary system" (*U.S. v. Jefferson County Board of Education*, 372 F.2d 836, para. 172, 5th CCA, 1965). Courts began to grant relief when plaintiffs moved for the adoption of compulsory assignment plans. Compulsory assignment led to a renewed white revolt against desegregation – violent, litigious, political, and otherwise – and many whites fled for exclusively or overwhelmingly white suburbs or private schools.[77]

Desegregation litigation continues today, and in some areas, segregation has gotten worse. As of 2020 nearly 50 school systems remain under desegregation orders. The Huntsville schools case remains active before this Court, for example, as several more factors, including student discipline, have not been adequately addressed. In the 2019-2020 school year, for example, 52 percent of Black students at Huntsville High received a disciplinary referral, compared to just 12 percent of white students.[78]

---

[75] Bagley, *The Politics of White Rights*, pp. 87-88, 119-22; federal courts also issued desegregation orders and guidelines involving public schools in Alabama in, *inter alia*, U.S. and Bennett v. Madison County Board of Education, 219 F. Supp. 60 (ND, 1963); Brown v. Board of Education of Bessemer, 419 F.2d 1211 (5th CCA, 1964); Boykins and U.S. v. Fairfield Board of Education, 457 F.2d 1091 (5th CCA, 1972); U.S. and Miller v. Gadsden Board of Education, 482 F.2d 1234 (5th CCA, 1973); Huston v. Lawrence County Board of Education, 320 F.Supp 790 (ND, 1970); Harris v. Crenshaw County Board of Education, 259 F. Supp. 167 (MD, 1966); Franklin v. Barbour County Board of Education, 259 F. Supp. 545 (MD, 1966); Alabama State Teachers Association v. Lowndes County Board of Education, 289 F. Supp. 300 (MD, 1968); Adams v. Lucy, 228 F.2d 619 (5th CCA, 1955), cert. denied 351 U.S. 931 (1956); Franklin v. Parker, 223 F. Supp. 724 (MD, 1963), modified 331 F.2d 841 (5th CCA, 1964); Carr v. Montgomery County Board of Education, 395 U.S. 225 (1969); Alabama NAACP v. Wallace, 269 F.Supp. 346 (MD, 1967); U.S. v. Choctaw County Board of Education, 259 F.Supp. 458 (SD, 1966); U.S. v. Hale County Board of Education, 445 F.2d 1330 (5th CCA, 1971); see also notes 69, supra, and 74-77, infra.

[76] Bagley, *The Politics of White Rights*, pp. 119-22; Brian K. Landsberg, "Lee v. Macon County BOE: The Possibilities of Federal Enforcement of Equal Educational Opportunity," *Duke Journal of Constitutional Law and Public Policy* 12, No. 1: pp. 1-52, pp. 37-38.

[77] Bagley, *The Politics of White Rights*, pp. 146-79.

[78] Yue Qiu and Nikole Hannah-Jones, A National Survey of School Desegregation Orders, Dec. 23, 2014, *ProPublica*, https://projects.propublica.org/graphics/desegregation-orders; School Segregation Data, *ProPublica*, https://www.propublica.org/datastore/dataset/school-segregation-charter-district-data; Anna Claire Vollers, "Huntsville chips away at 57-year-old school desegregation order," Jan. 12, 2020, https://www.al.com/news/huntsville/2020/01/huntsville-chips-away-at-57-year-old-school-desegregation-order html; Hereford v. Huntsville Board of Education, No. 5:63-CV-

Segregation in the state's metropolitan areas is almost as profound, with white families having left cities like Birmingham and Montgomery for suburbs with majority white, independent school systems or for private schools. In the *Stout v. Jefferson County* case, this Court recently granted, in part, the motion of the City of Gardendale, to separate from the Jefferson County system, even though the Court found that "race was a motivating factor" and that such motivation was "deplorable" (*Stout v. Jefferson County Board of Education*, No. 2:1965cv00396 – 1141, ND, April 24, 2017). In February of 2018, the order was reversed by the 11th Circuit, which affirmed the finding of discriminatory intent and blocked the City of Gardendale's attempt to separate.[79]

Recent litigation has addressed ongoing inequities and discrimination in schools across the state. The mother of a former student at Franklin County's Phil Campbell High School filed suit in January after her son was subjected to numerous incidents of racist harassment by white students. White administrators not only failed to address the harassment, but punished the Black student on more than one occasion. The Leeds Board of Education, after being sued by the parents of Black children in an ongoing desegregation case, agreed to restart its school lunch program. The board had shut the program down, citing Governor Kay Ivey's COVID stay-at-home order. Plaintiffs successfully argued that school lunch programs were exempt from the order and that suspending the program disproportionately affected Black children enrolled in the school system, some 80 percent of whom are economically disadvantaged.[80]

As recently as November 2021, white students in Alabama schools have made patently racist remarks and posted them online. White students at Cullman High School circulated a video, which was received by Black students, of a white student chanting "white power" and "kill all the n----rs." The student was the child of a member of the local board of education. A year prior to that, white students at Mountain Brook High School circulated a video showing students laughing and doing the Nazi salute as another student paraded around with swastikas on his back. The school board formed a diversity committee, which recommended anti-bias training, which the school system never implemented. A year before that incident, students at Hoover High School were filmed having the following exchange: Student 1, "F--- n------'s, f--- Jews;" Student 2, "Jews are fine because they're white. We just need the n----'s gone."[81]

The Alabama Accountability Act, enacted in 2013, labels the bottom 6 percent of the state's schools, by proficiency in reading and math, as "failing," borrowing from the No Child Left Behind extension of the Elementary

---

00109-MHH, 2015, WL 13398941 (ND); No Author, "Huntsville City Schools granted partial unitary status in desegregation case," *al.com*, Jan. 9, 2009, WAFF48, https://www.waff.com/2020/01/10/huntsville-city-schools-granted-partial-unitary-status-desegregation-case/.

[79] Stout and U.S. v. Jefferson County Board of Education, 11th CCA, Feb. 13 (2018), http://media.ca11.uscourts.gov/opinions/pub/files/201712338.pdf.

[80] Stout v. City of Leeds Board of Education, No. 2:17-MC-681-MHH, 2020 WL 1983331; Ivana Hrynkiw, "Parent says son was harassed, sues Franklin County school for racial discrimination," Jan. 17, 2020, *al.com*, https://www.al.com/news/huntsville/2020/01/parent-says-son-was-harassed-sues-franklin-county-school-for-racial-discrimination html; Trisha Powell Crain, "Alabama school district restarts student meals after legal action filed," *al.com*, April 17, 2020, https://www.al.com/news/2020/04/stopping-school-meals-violates-federal-desegregation-order-group-says.html.

[81] Trisha Powell Crane, "Alabama high school students filmed using racist slurs," March 4, 2019," *al.com*, https://www.al.com/news/2019/03/alabama-high-school-students-filmed-using-racist-slurs.html; Crane, "Jewish Federation concerned about video of Mountain Brook children drawing swastika," May 13, 2020, *al.com*, https://www.al.com/news/2020/05/jewish-federation-concerned-about-video-of-mountain-brook-children-drawing-swastika html; Rebecca Griesbach, "'I can't say anything': Alabama students, parents wrestle with impact of racist video," al.com, https://www.al.com/news/2021/11/i-cant-say-anything-alabama-students-parents-wrestle-with-impact-of-racist-video.html.

and Secondary Education Act. For 2020-2021, as in previous years, all 75 schools on the list of failing schools were majority Black, most overwhelmingly so. Most of the schools are in majority-Black school systems in or around Birmingham, Montgomery, and Mobile, or in the Black Belt.[82]

Courts have also found that Alabama's institutions of higher learning have been plagued by "vestiges of segregation," decades after the initiation of court-ordered desegregation (*Knight v. Alabama*, 787 F.Supp. 1030, 1352, ND, 1991). The University of Alabama and Auburn University were desegregated in the 1960, but in 1991, a trial court in *Knight v. Alabama* found that the state was still obligated to eliminate the lingering effects of segregation and discrimination in those institutions, and their proposed satellites, and to make an effort to recruit Black students to those schools and to recruit white students to the state's Historically Black Colleges and Universities (HBCUs). After a partial reversal, the court in 1995 issued a remedial decree similar to that issued in *Lee v. Macon*, with the court overseeing implementation over the next decade.[83] Prior to that window closing, the *Knight* plaintiffs argued that the state had been "shielding the property of whites from being taxed to support the education of blacks," thereby "denying black citizens equal access to attend and to complete higher education." They cited two amendments to the state's 1901 constitution known as the "Lid Bills."[84]

c.   The Lid Bills

The original Lid Bill was conceived by state senator Walter Givhan, a Citizens' Council pioneer and arguably the most prolific segregationist lawmaker in Alabama history, in 1972. Four converging factors motivated Sen. Givhan: government-enabled white flight turning Black Belt public school systems all-Black; Black candidates beginning to get elected in those same districts thanks to enforcement of the VRA; the state legislature being forced to adopt an equitable reapportionment; and a federal trial court ruling in *Weissinger v. Boswell* insisting that the state overhaul its tax assessment system.[85] Givhan proposed constitutionalizing a scheme in which residential, farm, and timber land would be assessed at a lower percentage (15 percent) than commercial property (25 percent) or utilities property (30 percent). To this was added a 1.5 percent "lid" or cap on the total *ad valorem* tax revenue that could be collected from any piece of property. Underlying this effort was the fact that almost all of the land in the Alabama Black Belt was owned by white people or corporations controlled by them. The bill passed and was ratified by voters.[86]

By the end of the decade, white lawmakers and property owners had begun to worry that Black elected officials might exercise a "local option" in the original Lid Bill that allowed county or municipal governments to raise millage rates, provided such measures passed through the state legislature. With Black political representation increasing not just in the Black Belt but also in cities like Birmingham and Mobile, the fear was that an alliance of urban representatives, Black and white, and rural Black officials might allow the latter to raise tax millage rates. The Mobile *Press-Register* explained that white lawmakers were "fearful that the black political leaders, who also enjoy voting majorities, will exercise local options and set property taxes at the highest rates possible in order to raise additional funds for their governmental operations," with such taxes being paid by "white owners of large farms and corporate interests with large timberland holdings." As state Republican Party Chairman John Grenier would later acknowledge, "The problem with the property tax, like everything, goes back to race in Alabama. I

---

[82] Trisha Powell Crane, "Here's the new list of 'failing' schools in Alabama," *Al.com*, Nov. 1, 2019, https://www.al.com/news/2019/11/heres-the-new-list-of-failing-schools-in-alabama.html.

[83] Bagley, *The Politics of White Rights*, pp. 5-6, 223-24.

[84] Bagley, *The Politics of White Rights*, pp. 5-6, 223-24; Knight v. Alabama, affirmed in part, 14 F.3d 1534 (11th CCA, 1994), 900 F.Supp 272 (ND, 1995) (Knight II).

[85] Bagley, *The Politics of White Rights*, pp. 210-15; Weissinger v. Boswell, 330 F.Supp 615 (MD, AL 1971).

[86] Bagley, *The Politics of White Rights*, pp. 210-15.

think probably whites feel like they own the property, and the property tax goes up, and proceeds will go to blacks."[87] George Wallace lent his support to a new bill that removed the local option, lowered the assessment rate for farm and timber land, and lowered the overall lid to one percent. It also allowed for "current use" assessment of land, as opposed to fair market value, which considered potential development, among other factors. State voters ratified the new amendment in 1978.[88]

The plaintiffs in *Knight* called historians to testify, who linked the Lid Bills to the redeemer constitutions of 1875 and 1901 and to a historical rejection of white tax dollars for Black education. The experts argued that the lingering effects of the amendments prevented Black students from enjoying equal access to higher education in the state. The court in 2004 agreed that the Lid Bills were a part of Alabama's long and abysmal history of race discrimination but denied the plaintiffs' claim on the ground that the action was an improper venue for a claim seeking their invalidation or injunction. A new case, targeting only the Lid Bills, was filed in 2008.[89]

In a 2011 decision in *Lynch v. Alabama*, the court insisted that it was limited by the Supreme Court's decision in *San Antonio v. Rodriguez* – in which the Court denied that there is a fundamental constitutional right to equal educational opportunity – and that the defendants were arguably motivated by a history of antipathy to taxation that was independent of race discrimination. However, the court acknowledged, in a very lengthy opinion, the discriminatory effects of Alabama's property taxation scheme and cited the plaintiffs' expert witness historians, who fleshed out the testimony in *Knight*, linking the Lid Bills to the state's white supremacist constitutions. The court agreed that the property tax scheme enshrined by the amendments was "crippling" Black education in the state.[90]

At the time *Lynch* was decided, Alabama had not only the lowest property tax revenues in the United States, but they were also twice as low as the state coming in at number 49 and three times lower than the national average. A mere five percent of the state's tax revenue came from property taxes. Most of it came from regressive sales and incomes taxes that disproportionately affect poor people, of which Black people are disproportionately represented in Alabama. The 11th Circuit appellate court acknowledged this and insisted that it was "cognizant of Alabama's deep and troubled history of racial discrimination," which had been "illustrated vividly by the plaintiffs at trial." But it could find no legal fault in the trial court's ruling, since the plaintiffs were held to the standard of proving discriminatory intent. The Senate Factors, however, allow plaintiffs to consider the effects of past discrimination, which seem here to be relevant.[91]

## IV.    FACTOR 6: POLITICAL CAMPAIGNS CHARACTERIZED BY RACIAL APPEALS

White lawmakers in Alabama learned long ago to colormask their public statements, just as they have learned to colormask the legislation intended to protect their racial prerogatives. Not since the high-tide of brazen white supremacy, when George Wallace proclaimed, "segregation forever," have public figures been so bold. Skilled politicians have since mastered the art of deploying coded racial appeals, and historians have been able to home in on certain messages that lawmakers know will resonate with white voters. Yet even today, in campaign

---

[87] Grenier quoted in Allen Tullos, *Alabama Getaway: The Political Imaginary and the Heart of Dixie* (Athens: University of Georgia Press, 2011), p. 188; *Mobile Press-Register* quoted in Bagley, *The Politics of White Rights*, pp. 210-15.

[88] Bagley, *The Politics of White Rights*, pp. 210-15.

[89] Bagley, *The Politics of White Rights*, pp. 224-26.

[90] Lynch v. Alabama, 2011 U.S. Dist. LEXIS 155012 (ND, AL, 2011), 798-800, *Lexis-Nexis Academic*.

[91] Lynch v. Alabama, No. 11-15464 (11th CCA, 2014), published at *Justia*, pp. 2, 28, https://law.justia.com/cases/federal/appellate-courts/ca11/11-15464/11-15464-2014-01-10.html

ads and in other public speech, including on social media, white Alabama politicians reveal that direct invocations of race still appeal to white voters. This is not to say that this or that white elected official is "racist," but to acknowledge that racial appeals are present in campaigns.[92]

Former United States Senate candidate Roy Moore, who was twice removed from the state Supreme Court for failure to obey federal court orders, won the Republican Party nomination in 2017 for the seat vacated by candidate Jeff Sessions when he became Attorney General. During the campaign, Moore insisted that the United States would be better off without any of the Amendments to the Constitution that follow the 10th. Moore argued, "That would eliminate many problems. You know, people don't understand how some of these amendments have completely tried to wreck the form of government that our forefathers intended." This would of course include the 13th Amendment, which ended slavery, and the 15th Amendment, which established voting rights for Freedmen. Moore singled out the 14th Amendment, which was enacted to protect the rights of former enslaved people, insisting that it "allow[s] the federal government to do something which the first 10 amendments prevented them from doing." Moore has also described the antebellum period in the South as follows: "I think it was great at the time when families were united — even though we had slavery. They cared for one another. People were strong in the families. Our families were strong. Our country had a direction."[93]

Another Alabama jurist, state Supreme Court Chief Justice Tom Parker, in 2018 ran a campaign ad that a federal trial court found to be based upon a racial appeal. Justice Parker targeted the Southern Poverty Law Center, an advocacy group for minorities, and made clear that he opposed "the leftist mob tr[ying] to destroy our society" showing at that moment images of U.S. Congresswoman Maxine Waters, a Black member of Congress from California. The trial court concluded that, "when juxtaposed with images of an African-American Democratic congresswoman from California who had no other reason to appear in an ad for an Alabama judicial race … one of the motives of the ad was to draw attention to race" (*Alabama State Conf. of the NAACP v. Alabama*, CASE NO. 2:16-CV-731-WKW, @ p. 153).

Mo Brooks, Republican U.S. Congressman for Alabama's 5th District, has repeatedly claimed that Democrats are waging a "war on whites" by "claiming that whites hate everybody else." In 2016, Brooks explained, "They are trying to motivate the African American vote to vote-bloc for Democrats by using every Republican as a racist tool that they can envision." Brooks has also characterized people who receive assistance through the Supplemental Nutrition Assistance, or SNAP, program as undeserving. In applauding cuts to the program, the beneficiaries of which in Alabama would include tens of thousands of Black people, Brooks said, "It is wrong to let slackers take roughly $70 billion per year from hard-working taxpayers who need that money for their own needs." Such colormasked appeals are a product of half a century of connecting federal welfare and public health programs with racial animosity and deploying coded attacks on the former with appeals to the latter.[94]

---

[92] Bagley, *The Politics of White Rights*, pp.7-11. See also Wayne Flynt, *Alabama in the Twentieth Century*, pp. 104-5; *Dan Carter, From George Wallace to Newt Gingrich: Race in the Conservative Counterrevolution, 1963-1994* (Baton Rouge: Louisiana State University Press, 1999), and Joseph Crespino, *In Search of Another Country: Mississippi and the Conservative Counterrevolution* (Princeton University Press, 2009), passim.

[93] Philip Bump, "Roy Moore: America was great in era of slavery, is now 'focus of evil in the world,'" *Washington Post*, Dec. 8, 2017, https://www.washingtonpost.com/news/politics/wp/2017/12/08/roy-moore-america-was-great-in-era-of-slavery-is-now-focus-of-evil-in-the-world/; German Lopez, "Roy Moore was once again caught making that can be interpreted as okay with slavery: maybe he believes what he keeps saying," *Vox*, Dec. 11, 2017, https://www.vox.com/policy-and-politics/2017/12/7/16748038/roy-moore-slavery-america-great; Scott Douglas, "The Alabama Senate Race May Have Already Been Decided," *New York Times*, Dec. 11, 2017, https://www.nytimes.com/2017/12/11/opinion/roy-moore-alabama-senate-voter-suppression.html.

Representative Bradley Byrne of the state's 1st Congressional District, when he was vying for a Senate seat, aired a campaign ad in which he condemned Black people by placing their images in a fire. The television spot begins with Byrne staring into a wood fire in a backyard and lamenting the loss of his brother in the armed services. He shifts to lamenting the course the country is taking, as the faces of Black and Brown people appear in the fire. Former National Football League quarterback Colin Kaepernick appears in the fire, as Byrne calls him an "entitled athlete dishonoring" the American flag. Members of the Congressional caucus known as "The Squad," including Ilhan Omar and Alexandria Ocasio Cortez, appear in the fire and are accused of "attacking America" and "cheapening 9/11." No white people appear in the fire.[95]

U.S. Representative Barry Moore has repeatedly downplayed the January 6, 2021, U.S. Capitol insurrection and has Tweeted about the shooting of Capitol-infiltrator Ashli Babbitt by U.S. Capitol Police, "I understand it was a black police officer that shot the white female veteran. You know that doesn't fit the narrative." Congressman Moore has also Tweeted out a meme that suggested people injured by a car driven into an unarmed crowd of protestors in Charlottesville in 2017 "didn't fight back."[96]

Finally, Representative Chris Pringle, co-chair of the Reapportionment Committee, previously gave up his seat in the state House to run for U.S. Congress in the 1st District. In a campaign ad, Pringle proudly labels himself "politically incorrect" and insists, "These days if you look like me and believe like me, everything that's wrong in our society is your fault." He explains, "If you're straight, southern, conservative, and heaven forbid, Christian, they call you a racist and blame you for everyone else's problems."[97]

## V.     FACTOR VII: THE EXTENT TO WHICH MINORITIES HAVE BEEN ELECTED TO OFFICE

Since Reconstruction, three Black candidates have won election to the U.S. House of Representatives from majority-Black districts, with never more than one serving at any given time. Despite constituting almost 27 percent

---

[94] Massie, "Rep. Brooks: Dems' 'war on whites' behind some criticism of Sessions"; Leada Gore, "Rep. Mo Brooks: People who live 'good lives' should pay less for health insurance," May 2, 2017, *al.com*, https://www.al.com/news/2017/05/rep_mo_brooks_people_who_live.html; Jonece Starr Dunigan, "Mo Brooks: 'War on whites' led to criticism of Jeff Sessions," *al.com*, Jan. 12, 2020, https://www.al.com/news/2017/01/mo_brooks_criticism_of_jeff_se.html; Sam Levine, "GOP Congressman Accuses Democrats Of Waging A 'War On Whites,'" *Huffington Post*, Aug. 4, 2014, https://www.huffpost.com/entry/mo-brooks-war-on-whites_n_5647967; Paul Gattis, "No more 'war on whites': Rep. Mo Brooks says RNC chair wants 'better descriptive phrase,'" al.com, Aug. 8, 2014, https://www.al.com/news/2014/08/no_more_war_on_whites_rep_mo_b.html; Paul Gattis, "Rep. Mo Brooks: Democrats 'dividing America by race' in 'waging a war on whites,'" *al.com*, Aug. 4, 2014, https://www.al.com/news/2014/08/rep_mo_brooks_democrats_dividi.html; Chris Massie, "Rep. Brooks: Dems' 'war on whites' behind some criticism of Sessions," CNN.com, Jan. 12, 2016, https://www.cnn.com/2017/01/11/politics/kfile-mo-brooks-war-on-whites/index.html?sr=twCNN011117kfile-mo-brooks-war-on-whites1042PMVODtopPhoto&linkId=33295365; Anna Claire Vollers, "Mo Brooks outspoken in Senate run, 'I believe we need another Jeff Sessions,'" *al.com*, June 6, 2017, https://www.al.com/news/2017/06/mo_brooks_senate_alabama_jeff.html.

[95] Maria Pitofsky, "GOP rep releases campaign ad ripping Kaepernick, 'The Squad,'" *The Hill*, Jan. 7, 2020, https://thehill.com/blogs/blog-briefing-room/news/477092-gop-rep-releases-campaign-ad-ripping-kaepernick-the-squad.

[96] Lawrence Specker, "Rep. Barry Moore Deletes Twitter account after suspension, controversial Capitol riot tweets," Jan. 11, 2021, *al.com*, https://www.al.com/news/mobile/2021/01/rep-barry-moore-deletes-personal-twitter-account-after-suspension.html; Meghan Roos, "Alabama GOP Congressional Candidate Faces Backlash after Posting and Deleting Meme on Kenosha Shooting Suspect," *Newsweek*, Aug. 30, 2020, https://www.newsweek.com/alabama-gop-congressional-candidate-faces-backlash-after-posting-deleting-meme-kenosha-shooting-1528614.

[97] Brent Wilson, "Chris Pringle: White Straight Southern Christian Conservatives Under Attack," *Bama Politics*, Feb. 18, 2020, https://www.bamapolitics.com/47024/chris-pringle-white-straight-southern-christian-conservatives-under-attack/.

of the state's voting-age population, Black voters only form an effective voting majority, or anything approaching that, in one out of the state's seven congressional districts (14 percent).[98]

Black citizens hold no statewide offices in Alabama. Only three Black individuals have ever held any statewide office, despite Black candidates having run for Governor, Lieutenant Governor, U.S. Senate, Secretary of State, and state Auditor. Civil rights attorney Oscar Adams was appointed to a justiceship on the state Supreme Court in 1980 and won reelection in 1982 and 1988. Adams was replaced by Ralph Cook upon his retirement in 1993, and Justice Cook was able to win reelection in 1994. Justice John England was appointed to the court in 1999, but both he and Cook lost their reelection bids in 2000. Cook and Adams are the only African American candidates to ever run for and win statewide office. There are currently no Black judges on the state's Supreme Court or the Courts of Appeals.[99]

Only through enforcement of the VRA, through CRD administrative action, and through litigation, including *Gingles* and *Dillard*, were Black voters able to register to vote and to elect candidates of their choice to the Alabama state legislature. The vast majority of Black representatives in the legislature today represent majority-Black districts that were created with judicial oversight, federal administrative oversight, or under the specter of litigation.

## VI.    FACTOR IX: LACK OF RESPONSIVENESS

The state's lack of responsiveness to the needs of Black Alabamians is exemplified by Black lawmakers failed efforts to advocate for a second majority-minority Congressional district, something that has been repeatedly rejected by white lawmakers. State representative Prince Chestnut, named-plaintiff in a redistricting lawsuit that pending when the 2020 Census was published, argued that a second Congressional majority-minority district would not only more accurately reflect, in the ability of Black voters to elect candidates of their choice to Congress, the percentage of the Black voting age population, it would also, "have the effect of more people in Alabama having representation that is congruent with their beliefs and ideals."[100]

Representative Merika Coleman, Senate Minority Leader Bobby Singleton, and Senator Rodger Smitherman introduced Congressional redistricting plans in 2021 that provided for a either a second majority-minority district or a Black "opportunity" district, but these were brushed aside by the Senator McClendon and Representative Pringle, the co-chairs of the Redistricting Committee. Senator McClendon has said of the possibility of drawing a second majority-minority district, "There is probably a way to maneuver around [and create two majority-minority districts], but it would be gerrymandering at its best [and] doesn't make sense at all."[101]

Lack of responsiveness is also evident in the state's response to the COVID-19 crisis. Black citizens have experienced higher rates of infection and death, and they have suffered from inequitable distribution of vaccines. White neighborhoods and suburbs in Birmingham and Mobile, for example, received vaccine doses months before, and in higher proportions, than poorer Black communities in those cities did.[102] As of June 23, 2020, there had been

---

[98] 2020 U.S. Census Quick Facts, Alabama,  https://www.census.gov/quickfacts/AL.

[99] Blacksher, et.al., "Voting Rights in Alabama, 1982-2006," pp. 277-78.

[100] *Selma Times-Journal*, Nov. 16, 2019; *Montgomery Advertiser*, May 2, Nov. 3, 2021.

[101] *Montgomery Advertiser*, Nov. 3, 5, 2021.

[102] Margaret Newkirk, "A Black Neighborhood in Alabama Has Yet to Get a Single Vaccine, In a nearby wealthy White suburb, the doses flow," Bloomberg, Feb. 25, 2021, https://www.bloomberg.com/news/features/2021-02-25/a-black-neighborhood-in-alabama-has-yet-to-get-a-single-vaccine; Seam McMinn et al, "Across The South, COVID-19 Vaccine Sites

30.4 deaths per 100,000 people in the state among Black people and 12.5 deaths per 100,000 among white people. State Health Officer Scott Harris explained that this was not a biological phenomenon independent of sociohistorical factors. Harris said, "This is a disease that has worse outcomes in people that already have other social determinants like chronic health problems or issues just related to education and income." As of March 2021, data by race still bore out that Black people were contracting the disease and dying from it at higher rates than white people.[103]

Much of what I discuss above under Factor 5 applies here as well. Black citizens who live in impoverished areas with lack of basic services and suffer the accompanying health issues, whose children attend "failing" schools and who lack transportation, or who otherwise do not have the means to attend some other school; whose children are disciplined more frequently in school or are subject to unequal treatment in the criminal justice system; whose school systems are crippled by underfunding thanks to the state's property tax scheme; who suffer discrimination in the workplace; who supported Birmingham's effort to raise the minimum wage only to see the state legislature block that effort: these are all people whose needs are not being met with a positive legislative response, either in the state legislature or in Congress. Alabama also recently enacted a Photo ID law that Black plaintiffs challenged in court as discriminatory, and it has closed numerous drivers' license offices in predominantly Black areas, drawing censure from the U.S. Department of Transportation.[104]

The state of Alabama's failure to respond to the needs of its Black citizens is also exemplified by its refusal to expand Medicaid under the Affordable Care Act (ACA). When a task force convened by then-governor Robert Bentley recommended in 2015 that the state reverse the course it had taken since the ACA was enacted in 2011 and opt-in to the expansion, state Senator Quinten Ross, an African American and a Democrat, applauded the recommendation and insisted that this was what the state's Democratic Caucus had "been saying all along." More recently, amid the COVID-19 pandemic, other Black leaders in the state legislature have insisted, "It is high time that we expand Medicaid to provide vital coverage to the more than 340,000 uninsured Alabamians," adding, "There's a reason this virus is killing African Americans and those in poorer communities at a much higher rate. … outcomes are undoubtedly worse for those without coverage."[105]

Proponents argue that a Medicaid expansion under the ACA would close the "coverage gap" that exists between current Medicaid and ACA marketplace parameters. Around 134,000 Alabamians were in that gap as of 2018, about 40 percent of them minorities (the vast majority of whom were/are Black). Black citizens in Alabama are disproportionately harmed by the existence of the gap and the state's refusal to close it, despite insistence from

Missing From Black And Hispanic Neighborhoods," NPR *Morning Addition*, Feb. 5, 2021, https://www.npr.org/2021/02/05/962946721/across-the-south-covid-19-vaccine-sites-missing-from-black-and-hispanic-neighbor; Abby Goodnough and Jan Hoffman, "The Wealthy Are Getting More Vaccinations, Even in Poorer Neighborhoods," *The New York Times*, Feb. 2, 2021, https://www.nytimes.com/2021/02/02/health/white-people-covid-vaccines-minorities.html;

[103] Alabama Race and Ethnicity Date, Covid Tracking Project, Atlantic Monthly Group, https://covidtracking.com/data/state/alabama/race-ethnicity; APM Research Lab, "The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in U.S.," June 24, 2020, https://www.apmresearchlab.org/covid/deaths-by-race; Ramsey Archibald, "Death rate due to coronavirus highest for black Alabamians," *al.com*, April 8, 2020, https://www.al.com/news/2020/04/death-rate-due-to-coronavirus-highest-for-black-alabamians.html; Brownlee, "Governor: It would be "irresponsible" for Alabama to expand Medicaid right now."

[104] Melanie Zanona, "Feds: Closing driver's license offices in Ala. violates civil rights," *The Hill*, Dec. 28, 2016, https://thehill.com/policy/transportation/312055-feds-closing-driver-license-offices-in-alabama-violates-civil-rights.

[105] Mike Cason, "Gov. Robert Bentley's task force recommends Medicaid expansion," *al.com*, Nov. 18, 2015, https://www.al.com/news/2015/11/gov_robert_bentleys_task_force.html; Anthony Daniels and Bobby Singleton, "Coronavirus crisis begs for Alabama Medicaid expansion," *Alabama Political Reporter*, April 17, 2020, https://www.alreporter.com/2020/04/17/opinion-coronavirus-crisis-begs-for-alabama-medicaid-expansion/.

Case 2:21-cv-01530-AMM   Document 68-2   Filed 12/14/21   Page 31 of 36

the governor's own task force that doing so would actually have long-term fiscal and economic benefits for the state. According to a June 2020 report released by the Urban Institute in conjunction with the Robert Wood Johnson Foundation, Alabama would see the largest decrease in its uninsured rate, 43 percent, in the nation if it were to adopt expansion. According to a 2020 Kaiser Family Foundation report, some 224,000 Alabamians would become Medicaid eligible under expansion, 34 percent of them Black.[106]

Representative Sewell earlier this year cosponsored a bill that would allow the Centers for Medicare and Medicaid Services to bypass state governments and work directly with local government entities and expand Medicaid coverage. Sewell has said of the bill, "Because of the State of Alabama's refusal to expand Medicaid, more than 200,000 low-income Alabamians who would otherwise qualify for health insurance coverage are being forced to go without care, putting their health and their lives at risk. If the State of Alabama won't expand access to health care for our underserved communities, local governments should have the power to do it themselves."[107]

Representative Sewell is the only member of Alabama's Congressional delegation who voted Yes to the infrastructure bill that recently passed Congress with bipartisan support. All other representatives voted No, including one who subsequently touted a project that can now move forward with the funding that the state will be awarded under the bill.[108]

VII: CONCLUSION

Given Alabama's history of discrimination against Black citizens, the ongoing effects of that discrimination, the inability of Black voters to elect candidates of their choice to statewide office, the relative lack of representation of Black citizens in the state's Congressional delegations, and lawmaker's consistent lack of responsiveness to the needs of Black voters, the totality of the circumstances demonstrate that Black Alabamians lack an equal opportunity to right to participate in the political process and elect candidates of their choice.

---

[106] Cason, "Gov. Robert Bentley's task force recommends Medicaid expansion"; Rachel Garfield et al., "The Coverage Gap: Uninsured Poor Adults in States that Do Not Expand Medicaid," Kaiser Family Foundation (KFF), Jan. 14, 2020, https://www.kff.org/report-section/the-coverage-gap-uninsured-poor-adults-in-states-that-do-not-expand-medicaid-data-and-methods/; KFF, "Who Could Get Covered Under Medicaid Expansion? State Fact Sheets," Jan 23, 2020, http://files.kff.org/attachment/fact-sheet-medicaid-expansion-AL; Michael Simpson, "The Implications of Medicaid Expansion in the Remaining States: 2020 Update," Urban Institute/ Robert Wood Johnson Foundation, June 2020, https://www.rwjf.org/en/library/research/2020/06/the-implications-of-medicaid-expansion-in-the-remaining-states--2020-update html?cid=xem_other_unpd_ini:quickstrike_dte:20200608_des medicaid%20exp.

[107] Press Release from Office of Congresswoman Sewell, July 17, 2021, "Rep. Sewell Introduces COVER Now Act to Empower Local Governments to Overcome Obstruction to Medicaid Expansion," https://sewell.house.gov/media-center/press-releases/rep-sewell-introduces-cover-now-act-empower-local-governments-overcome.

[108] Naomi Jagoda, "Alabama Republican touts provision in infrastructure bill he voted against," The Hill, Nov. 17, 2021, https://thehill.com/policy/finance/581934-alabama-republican-touts-provision-in-infrastructure-bill-he-voted-against; Lazaro Gamio and Alicia Parlapiano, "How Every House Member Voted on the Infrastructure Bill," *New York Times*, Nov. 5, 2021, https://www.nytimes.com/interactive/2021/11/05/us/politics/house-vote-infrastructure html.

---------------------------------------------------------------------------------------------------------------

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge:

Respectfully Submitted and Executed, this day, _12-10-21_,

JOSEPH BAGLEY, PhD

32

**Joseph Bagley, PhD**
**Curriculum Vitae**

Assistant Professor of History
Honors Program Coordinator
Perimeter College, Newton Campus      Email:  jbagley3@gsu.edu
Georgia State University      Home: 10210 Northlake Heights Circle
239 Cedar Lane, Covington GA, 30014            Atlanta, GA 30345
     Cell:    770-815-3771
     Office:  404-413-6364

**Education**

___

PhD, History, 2013, Georgia State University
       "School Desegregation, Law and Order, and Litigating Social Justice in Alabama, 1954-1974"
MA, History, 2007, Auburn University
BA, History, 2004, Auburn University

**Major Publications**

___

*The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools*
       (University of Georgia Press, Nov. 2018)

**Teaching and Administrative Experience**

___

<u>Honors Program Coordinator</u>, Perimeter College, Georgia State University, 2019 – Present

<u>Assistant Professor</u>, Perimeter College, Georgia State University, 2017 – Present (5/4/2 Load)
       AAS 1142, African American History since 1865
       AAS 2010, Introduction to Africana Studies
       HIST 1111, Survey of World History to 1500
       HIST 1112, Survey of World History since 1500
       HIST 2110, Survey of United States History

<u>Lecturer</u>, Georgia Perimeter College, 2015 – 2017 (6/6/2 Load)
       HIST 1112, Survey of World History since 1500
       HIST 2111, Survey of U.S. History to 1865; HIST 2112, Survey of U.S. History since 1865
       HIST 2110, Survey of U.S. History

<u>Visiting Lecturer</u>, Georgia State University, 2013 – 2015 (4/4/2 Load)
       HIST 2110, Survey of United States History

<u>Graduate Instructor of Record</u>, Georgia State University, 2009 – 2013 (1/1/1 Load)
       HIST 1112, Survey of World History since 1500
       HIST 2110, Survey of United States History

<u>Graduate Teaching Assistant</u>,
       Georgia State University, 2008-2009, 2013
           HIST 1112, Survey of World History since 1500; HIST 2110, Survey of United States History
           HIST 3000, Introduction to Historical Studies; HIST 4990, Historical Research (co-taught)
       Auburn University, 2004-2008
           HIST 1010, Survey of World History to 1789; HIST 1020,Survey of World History since 1789

**Joseph Bagley, PhD**
**Curriculum Vitae**



## Invited Talks

Symposium on the Struggle for Black Freedom, Georgia State University, Perimeter College, Keynote Address, February 11, 2020, "The Struggle for Black Voting Rights: from Reconstruction to *Right Now*."

Georgia State University Constitution Day Event, September 18, 2019, "'To Abridge and Deny': Vote Dilution, Section 5 Preclearance, and Undermining the 15th Amendment."

Auburn University Critical Studies Working Group, College of Education, April 12, 2019, "*Teach Us All*, The Little Rock Nine, and Contemporary School Segregation."

League of Women Voters of Greater Jefferson County, February 21, 2019, "School Desegregation in Alabama."

Auburn University Caroline Marshall Draughon Center for the Arts and Humanities, January 29, 2019, Book Talk.

Alabama Department of Archives and History, *Alabama in the Age of Aquarius* Symposium, August 19, 2016, "Desegregating Alabama's Schools: the Montgomery Experience."

Alabama Department of Archives and History, Monthly Lecture Series, May 15, 2014, "Now a Single Shot Can Do It': *Lee v. Macon County Board of Education* and School Desegregation in Alabama."

## Published Essays

"The Long, White History of 'Law and Order' Rhetoric: From Nixon to the Original Klan," *Tropics of Meta*, June 23, 2020.

"*Selma*, George Wallace, and the Real Legacy of White Resistance," *Tropics of Meta*, Feb. 23, 2016.

## Notable Citations

Nikole Hannah-Jones, "The Resegregation of Jefferson County," *The New York Times Magazine*, Sept. 6, 2017.

Wendy Parker, "Why Alabama School Desegregation Succeeded (And Failed)," 67 *Case Western Law Review*, 1091 (2017).

Rebecca Retzlaff, "Desegregation of City Parks and the Civil Rights Movement: The Case of Oak Park in Montgomery, Alabama," *Journal of Urban History* 47.4, 715 (2019).

Erika Frankenberg, "The Impact and Limits of Implementing *Brown*: Reflections from Sixty-Five Years of School Segregation and Desegregation in Alabama's Largest School District," 11 *Alabama Civil Rights and Civil Liberties Law Review*, 33 (2019).

Bryan Mann, "Segregation Now, Segregation Tomorrow, Segregation Forever? Racial and Economic Isolation and Dissimilarity in Rural Black Belt Schools in Alabama," *Rural Sociology* 86.3, 523 (2021).

**Joseph Bagley, PhD**
**Curriculum Vitae**



## Service

Newton Academic Community Engagement, 2019-present
Chair, Search Committee, Lecturer in History, Fall 2019
Search Committee, Adjunct Faculty in African American Studies, Summer 2019
Search Committee, Faculty Associates to Center for Excellence in Teaching and Learning, Summer 2018
Search Committee, Lecturers in History, Spring 2018
Panthers Vote Presidential Election Panel, Fall 2016
History 2110 Assessment Committee for the Georgia State-Georgia Perimeter Consolidation, 2016 - 2017
Consultant, Shiloh Community Restoration Foundation, Notasulga, Alabama, 2014 - 2015
Coordinating Committee, First Annual Atlanta Graduate Student Conference in History, Emory University, 2012

## Conference Presentations

"'We Have Had a Dream, Too': School Desegregation Litigation, Racial Innocence, and Politics in Alabama," Organization of American Historians Annual Conference, St. Louis, Missouri, April 16, 2015.

"'Life, Liberty, and the Pursuit of Alabama's Happiness': School Desegregation, the 'Law and Order' Narrative, and Litigating Social Change in Alabama, 1954-75," Midwest Political Science Association Annual Conference, Chicago, Illinois, April 12, 2013.

"Black Alabamians' Efforts to Desegregate Schools, 1954-1963: Civil Rights, Litigation, and the Road to *Lee. v. Macon*," presented at the University of Alabama History Department's Graduate Conference on Power and Struggle, March 3, 2012.

## Solicited Manuscript and Book Reviews

Outside Reader for Book Manuscript, Brian K. Landsberg, *Revolution by Law: The Federal Government and the Desegregation of Alabama Schools*, University of Kansas Press (Spring 2021)

Camille Walsh, *Racial Taxation: Schools, Segregation, and Taxpayer Citizenship, 1869-1973* (UNC Press, 2018), *The Alabama Review* (Pending, Spring 2021)

Outside Reader for Essay Manuscript for *Urban History* (Fall, 2019), Anonymous

Stephanie R. Rolph, *Resisting Equality: The Citizens' Council, 1954-1989* (LSU Press, 2018), in *The Journal of Mississippi History* (Fall, 2019)

Wayne A. Weigand and Shirley A. Weigand, *The Desegregation of Public Libraries in Jim Crow South: Civil Rights and Local Activism* (LSU Press, 2018), in *Georgia Historical Quarterly* (Summer, 2019)

Leeann G. Reynolds, *Maintaining Segregation: Children and Racial Instruction in the South, 1920-1955* (LSU Press, 2018), in *The Alabama Review* (Summer, 2019)

Outside Reader for Essay Manuscript for *History of Education Quarterly* (Fall, 2018), Anonymous

James Turner, *Selma and the Liuzzo Murders: The First Modern Civil Rights Convictions* (University of Michigan Press, 2018), in *Law and History Review, The Docket,* Vol. 1, Issue 2 (August, 2018)

**Joseph Bagley, PhD**
**Curriculum Vitae**



**Solicited Manuscript and Book Reviews Cont.**

Tracy E. K'Meyer, *From* Brown *to* Meredith*: The Long Struggle for School Desegregation in Louisville, Kentucky, 1955—2007* (University of North Carolina Press, 2013), in *The Journal of Southern History* 80, No. 4 (Nov, 2014): pp. 1019-20

Frank Sikora, *The Judge: The Life and Opinions of Alabama's Frank M. Johnson, Jr.* (New South Books, 2007), in *The Alabama Review* 61, No. 2 (April, 2008): 153-4

**Awards**

- John M. Matthews Distinguished Dissertation Award, 2013, Georgia State University

**Examination Fields**

- 19th-20th Century United States History
- United States Legal and Constitutional History
- History of South Africa

**Professional Organizations**

- Organization of American Historians
- American Historical Association
- American Society for Legal History
- Southern Historical Association
- Alabama Historical Association

**Languages**

- Spanish: Reading, Good
- French: Reading, Good