

FILED
2021 Dec-15  PM 10:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

EVAN MILLIGAN, et al.,

    *Plaintiffs*,

vs.

JOHN H. MERRILL, et al.,

    *Defendants*.

No. 2:21-cv-01530-AMM

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT THEREOF

# TABLE OF CONTENTS

Page

FACTUAL BACKGROUND ................................................................................2

I.    History of the Challenged Districts ................................................................2

II.   2021 Legislative Redistricting Process ...........................................................3

III.  Injury and Irreparable Harm to Plaintiffs ....................................................4

ARGUMENT ....................................................................................................5

I.    Plaintiffs are Likely to Prevail on the Merits. ...............................................5

      A.    HB1 Violates Section 2 of the Voting Rights Act. .............................5

            1.    *Gingles* Preconditions ................................................................6

            2.    Totality of the Circumstances ...................................................11

      B.    Congressional Districts 1, 2, 3 and 7 are Racial Gerrymanders. ........14

            1.    Race Predominated in Drawing the Challenged Districts. .......14

            2.    The Challenged Districts were not Narrowly Tailored.............26

      C.    Requested Relief.............................................................................31

      D.    The Threat of Irreparable Harm and Equities Favor Relief ...............32

CONCLUSION ..............................................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)................................................................26, 30

*Ala. Legislative Black Caucus v. Alabama*,
   575 U.S. 254 (2015).....................................................................*passim*

*Bethune-Hill v. Va. State Bd. of Elections*,
   137 S. Ct. 788 (2017).........................................................14, 15, 25, 29

*Bethune-Hill v. Va. State Bd. of Elections*,
   326 F. Supp. 3d 128 (E.D. Va. 2018) ...........................................23, 28

*Bethune-Hill v. Va. State Bd. of Elections*,
   368 F. Supp. 3d 872 (E.D. Va. 2019) ...............................23, 24, 25, 31

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   408 F. 3d 1349 (11th Cir. 2005) ......................................................6, 35

*Clark v. Putnam Cty.*,
   293 F.3d 1261 (11th Cir. 2002) ...........................................................15

*Cooper v. Harris*,
   137 S. Ct. 1455 (2017)...................................................................*passim*

*Covington v. North Carolina*,
   270 F. Supp. 3d 881 (M.D.N.C. 2017) .................................................34

*Covington v. North Carolina*,
   No. 1:15CV399, 2018 WL 604732 (M.D.N.C. Jan. 26, 2018) ......18, 19

*Davis v. Chiles*,
   139 F.3d 1414 (11th Cir.1998) ..............................................................7

*Elrod v. Burns*,
   427 U.S. 347 (1976)..............................................................................32

*Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*,
   118 F. Supp. 3d 1338 (N.D. Ga. 2015)................................................34

*Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs,*
  775 F.3d 1336 (11th Cir. 2015) ...................................................................6, 11

*Georgia v. Ashcroft,*
  539 U.S. 461 (2003)......................................................................................3

*Johnson v. De Grandy,*
  512 U.S. 997 (1994)......................................................................................11

*Larios v. Cox,*
  305 F. Supp. 2d 1335 (N.D. Ga. 2004).........................................................34, 35

*LULAC v. Perry,*
  548 U.S. 399 (2006).....................................................................6, 30, 31, 32

*Meek v. Metropolitan Dade Cty.,*
  985 F.2d 1471 (11th Cir. 1993) ....................................................................13

*Miller v. Johnson*
  515 U.S. 900 (1995) .....................................................................................32, 35

*Navajo Nation v. San Juan Cty.,*
  929 F.3d 1270 (10th Cir. 2019) ....................................................................30

*North Carolina v. Covington,*
  138 S. Ct. 2548 (2018).............................................................................*passim*

*Page v. Va. State Bd. of Elections,*
  No. 3:13cv678, 2015 WL 3604029 (E.D. Va. June 5, 2015) ...........................29

*Perry v. Perez,*
  565 U.S. 388 (2012)......................................................................................33

*Personhuballah v. Alcorn,*
  155 F. Supp. 3d 552 (E.D. Va. 2016) ............................................................32

*Reynolds v. Sims*
  377 U.S. 533 (1964) .....................................................................................33

*Shaw v. Reno,*
  509 U.S. 630 (1993).................................................................................*passim*

*Smith v. Beasley*,
   946 F. Supp. 1174 (D.S.C. 1996) ........................................................29

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)..................................................................*passim*

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) .................................................33, 35

*United States v. Dallas Cty. Comm'n*,
   850 F.2d 1433 (11th Cir. 1988) ......................................................35

*Voinovich v. Quilter*,
   507 U.S. 146 (1993)........................................................................7

*Wesch v. Hunt*,
   785 F. Supp. 1491 (S.D. Ala.),
   *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992)..........................................2

*Wright v. Sumter Cty. Bd. of Elections*,
   979 F.3d 1282 (11th Cir. 2020) .......................................9, 13, 34, 35

## Statutes

Voting Rights Act of 1965 ..............................................................*passim*

## Other Authorities

Fourteenth Amendment ....................................................................1, 2

House Bill 1 .................................................................................*passim*

Since its admission into the union, Alabama's history has been indelibly scarred by efforts to diminish its Black citizens' political power. One pernicious means of marginalizing Black voting power has been the Alabama legislature's (the "Legislature") decades long pattern of racially discriminatory redistricting plans.

House Bill 1 ("HB1") is Alabama's latest attempt to use the redistricting process to unfairly constrain the power of Black voters. The 2021 congressional redistricting map enacted in HB1 (the "2021 plan") places a third of all Black voters into one majority-Black district in numbers greater than necessary to elect a representative of choice. It then cracks the remaining Black population to prevent the formation of a second majority-Black or Black-opportunity district. In doing so, HB1 violates Section 2 of the Voting Rights Act ("VRA") and the Fourteenth Amendment by using race as the predominant factor for placing significant numbers of voters within or without of Districts 1, 2, 3, and 7 (the "challenged districts") in a manner that both denies Black voters the opportunity to elect candidates of choice from two districts and is not narrowly tailored to satisfy a compelling state interest.

Plaintiffs respectfully move for a preliminary injunction to stop Defendants from conducting the 2022 congressional elections under the unconstitutional HB1 plan. Additionally, Plaintiffs request the Court to order Defendants to adopt a redistricting plan that contains two effective majority-Black districts or, if the Court orders preliminary relief only based on Plaintiffs' racial gerrymandering claim, the

alternative relief described below at 30-32. If Defendants fail to adopt a remedial plan in a timely manner, Plaintiffs request that the Court order an interim plan.

## FACTUAL BACKGROUND

### I.    History of the Challenged Districts

In 1992, Black voters and others successfully challenged the Legislature's failure to redistrict congressional seats after the 1990 census as a violation of the Fourteenth Amendment and Section 2 of the VRA.  The three-judge court ordered the creation of Congressional District ("District") 7 as a majority-Black district. Stipulated Facts, Doc. 53 ¶¶ 29-30; *see also Wesch v. Hunt*, 785 F. Supp. 1491, 1498 (S.D. Ala.), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992).

Under the *Wesch* map, District 7 had a 63.58% Black voting age population ("BVAP"). Doc. 53 ¶ 32. The *Wesch* court did not analyze whether this 63.58% BVAP was necessary to comply with Section 2. *Id.* at ¶ 33. From 1992 through 2021, the core geographic boundaries of District 7 have remained largely unchanged.  *Id.* at ¶¶ 40, 42, 52, 59.  In 2019, the Secretary admitted that District 7, as drawn in the 2011 plan, "appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County." *Id.* at ¶ 62.

Like District 7, Alabama has maintained Districts 1, 2, and 3 in roughly similar form since the 1990s as well. *Id.* ¶ 28. Those plans have consistently divided

Montgomery County—a majority-Black county with a high BVAP—between two or three districts. *Id.* ¶ 65.  In HB1, Montgomery County, was split between two districts as it was in prior redistricting plans. *Id.*  In the 2000 and 2010-cycle maps, combined Districts 1, 2, and 3 contained between 82% and 92% of the Black population needed to form an entire congressional district themselves. *Id.* ¶¶ 63-64. Yet in HB1, as in the previous two cycles, the BVAP of Districts 1, 2, and 3 do not exceed approximately 30% in any one district. *See* 2021 Redist. Plans Comparative by Dist. Analysis, attached as Ex. 6.

| Black Voting Age Population[1] % – AL congressional districts | | | | |
|---|---|---|---|---|
| **District** | **1992 plan** | **2002 plan** | **2011 plan** | **2021 plan** |
| 1 | 28.5% | 25.7% | 25.8% | 24.8% |
| 2 | 24.1% | 27.4% | 27.9% | 29.2% |
| 3 | 26.0% | 30.2% | 24.0% | 24.2% |
| 7 | 63.6% | 58.3% | 60.6% | 54.2% |

In the twentieth and twenty-first centuries, Alabama has not elected a Black representative to Congress outside of CD 7.  *Id.* at ¶ 125.

## II.     2021 Legislative Redistricting Process

The Legislature's Permanent Legislative Committee on Reapportionment ("the Committee") develops redistricting plans for the State of Alabama following each decennial census.  *Id.* at ¶ 70.

---

[1]     These data reflect BVAP at the time of the maps' passage and include only individuals identifying as Black alone to ensure consistency of data. Plaintiffs maintain, however, that "any part Black" remains the most appropriate metric in this case. *See Georgia v. Ashcroft*, 539 U.S. 461, 474 n.1 (2003) ("[I]t is proper to look at all individuals who identify themselves as black.").

No proposed maps for the entire state were available to the public or individual legislators until October 25, 2021. *Id*. ¶¶ 90, 92, 94. No racial-polarization analysis was conducted for any congressional districts. *Id*. ¶¶ 96-98; *see also* Hinaman Dep., attached as Ex. 7, at 167:23-169:4. The Committee voted in favor of each of the introduced maps over the opposition of all its Black members. Doc. 53 ¶¶ 103-04.

Governor Kay Ivey called the Special Legislative Session on redistricting to begin on October 28, 2021, three days after the maps were made available to the public. Doc. 53 ¶ 88. Within five days, the Alabama House and Senate had considered and voted in favor of the proposed maps. *Id*. ¶¶ 105-17. Senator Kirk Hatcher, a Black legislator, introduced a map with two majority-Black congressional districts. *Id*. ¶ 113. His map failed in an up-or-down vote with all Black Senators voting in favor of it. *Id*. ¶ 114. All but one Black member of the Alabama House voted against HB1. *Id*. ¶ 180. Black senators voted against HB1. *Id*. ¶ 117.

### III.   Injury and Irreparable Harm to Plaintiffs

Plaintiffs Evan Milligan, Letetia Jackson, Shelela Dowdy, and Khadidah Stone are Black residents of Alabama.  Doc. 53 ¶¶ 1, 2, 5, 6, 9, 10, 12, 13. The individual Plaintiffs are registered voters in Congressional Districts 1, 2, and 7.  Doc. 53 ¶¶ 3, 7, 11, 14.  Under the Plaintiffs' illustrative plans, Plaintiffs Milligan, Dowdy, and Stone would reside in a second, new majority-Black district.  *Id*. ¶¶ 4,

8, 15. Plaintiffs Greater Birmingham Ministries ("GBM") and the Alabama NAACP (collectively, "Organizational Plaintiffs") have members who are Black registered voters, including Black registered voters who reside in CDs 1, 2, 3, and 7. Douglas Decl. ¶¶ 5-11, attached as Ex. 8; Simelton Decl. ¶¶ 6-7, attached as Ex. 9. Both Organizational Plaintiffs have members who would reside in a second, new majority-Black district, under the Plaintiffs' illustrative plans. Douglas Decl. ¶¶ 5-9; Simelton Decl. ¶¶ 6-7.

If HB1 remains operative, the individual Plaintiffs and members of GBM and Alabama NAACP will vote in districts drawn by Alabama in a way that was impermissibly motivated by race and their votes will be diluted in violation of the VRA.

## ARGUMENT

To obtain a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) that the equities favor Plaintiffs; and (4) that the injunction favors the public interest. *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F. 3d 1349, 1354 (11th Cir. 2005). Because all criteria are met here, the Court should issue an injunction.

## I.     Plaintiffs are Likely to Prevail on the Merits.

### A.     HB1 Violates Section 2 of the Voting Rights Act.

To prove a violation of Section 2 of the VRA, Plaintiffs must satisfy the three *Gingles* preconditions by showing that: (1) Black voters are "sufficiently large and

geographically compact to constitute a majority in a single-member district;" (2) Black voters are "politically cohesive;" and (3) the white majority "votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *LULAC v. Perry*, 548 U.S. 399, 425 (2006) (cleaned up).

Once all *Gingles* preconditions are met, Plaintiffs must also prove that "the totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) ("*Fayette*"). This practical evaluation involves the nine factors drawn from a Senate Judiciary Committee report from the VRA's 1982 amendments, i.e., the "Senate Factors." *Id*. But there is no requirement to prove "any particular number of factors" or "that a majority of them point one way or the other." *Id*. (cleaned up).

### 1. *Gingles* Preconditions

***Gingles* I**. Alabama violated Section 2 through the "packing" or "concentration of black[] [voters] into [District 7] where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986). To satisfy the first *Gingles* precondition, Plaintiffs must show that Black voters are "sufficiently large

and geographically compact" to be a majority in two districts, *id*. at 50, but are "packed into [one] district[ ]."[2] *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993).

Plaintiffs' expert, Dr. Moon Duchin, created four illustrative plans: Plans A, B, C, and D. *See* Duchin Report, Doc. 68-5 (Ex. 5). Each illustrative plan shows that it is possible to create two majority-Black districts with zero population deviation that are reasonably compact, respect political boundaries, and satisfy other traditional districting principles. *Id.* at 2-7. Each of the plans satisfy *Gingles* I.

All four illustrative plans retain most of Birmingham in District 7. Both Plaintiffs and Randy Hinaman, the Legislature's map-maker who drew HB1, agree that the Black Belt is a community of interest. Hinaman Dep. at 154:14-155:7; Dowdy Decl. ¶¶ 7-9, attached as Ex. 10; Milligan Decl. ¶¶ 10-12, attached as Ex. 11; Simelton Decl. ¶¶ 11-14; *see also* Bagley Report at 7, 18, 21, Doc. 68-2 (Ex. 2). Consistent with this understanding, the illustrative plans keep the Black Belt and Montgomery County together. Unlike HB1, Plaintiffs' illustrative plans keep Montgomery County whole, place all or nearly all the Black Belt counties in no more

---

[2]     While the illustrative plans are consistent with traditional redistricting principles, more compact than HB1, and narrowly tailored to satisfy the "significant state interest in eradicating the effects of past racial discrimination," *Shaw v. Reno*, 509 U.S. 630, 656 (1993), a plan drawn to satisfy *Gingles I* is not subject to a racial predominance analysis. *See Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir.1998) (holding that the *Gingles* I requirement that a proposed district be drawn "consistent with traditional districting principles" is analytically distinct from the question in racial gerrymandering cases of whether traditional principles were "subordinated to racial objectives").

than two districts, and contain two effective majority-Black districts with BVAPs that are just above 50%.

In addition, on average, all four illustrative plans are more compact than HB1 using the Polsby-Popper score, one of the most common measures of compactness. Duchin Report at 6. Plaintiffs' plans are consistent with Alabama's established policy of connecting Mobile to the Black Belt in the State Board of Education's eight-district plan. *Id.* at 10; Doc. 53 ¶ 69. Black voters in the Black Belt and Mobile County have shared interests. *See* Dowdy Decl. ¶¶ 7-9. And most of Plaintiffs' plans are comparable to HB1 as to the number of split localities (counties or cities) and three plans split fewer majority-Black cities than HB1 does. Duchin Report at 5.

For example, Plan D splits fewer counties (five) than the six counties split in HB1, keeps the Black Belt in only two districts that are majority-Black, rather than splitting the Black Belt among four districts. Duchin Report at 5, 10. Similarly, Plan B handily beats HB1 on average Polsby-Popper compactness and splits fewer localities overall than HB1 while splitting only one additional county. *Id.* at 5-6. Plan B splits only two majority-Black cities whereas HB1 splits five Black cities. *Id.*

The two Black districts in the illustrative plans have BVAPs of about 51%. *Id.* at 7. Dr. Baodong Liu, Plaintiffs' expert, conducted analyses showing that, despite racial bloc voting, Black candidates would win in these two districts. Liu Report at 15-18, Doc. 68-1 (Ex. 1).

*Gingles* **II and III: Racial Polarization.** To establish the existence of racially polarized voting, Plaintiffs must demonstrate that (1) Black voters constitute a "politically cohesive unit," *Gingles*, 478 U.S. at 56-63; and (2) white people "vote sufficiently as a bloc usually to defeat the minority's preferred candidates," *id*. at 57.

"[E]ndogenous elections"—ones involving the seats at issue—"[are] more important than exogenous elections," and evidence "from elections involving black candidates is more probative" than elections involving only white candidates. *Wright v. Sumter Cty. Bd. of Elections*, 979 F.3d 1282, 1292-93 (11th Cir. 2020) (citation omitted); *see also Gingles*, 478 U.S. at 68 ("it will frequently be the case that a black candidate is the choice of blacks, while a white candidate is the choice of whites.").

Here, it is undisputed that Black people have voted as a cohesive bloc in District 7 since 2002, in recent elections for Districts 1, 2, and 3, and in the State Board of Education's two majority-Black districts. Doc. 53 ¶¶ 47-49, 69, 126-29. Dr. Liu, Plaintiffs' expert, also used ecological inference to review 13 biracial elections from 2008 to 2020, including seven endogenous congressional general and primary elections and six exogenous statewide elections. Liu Report at 18. In all 13 elections, voting was highly racially polarized. *Id*.

In recent endogenous general elections, Black voter support for the Black candidate was highly cohesive, ranging from 92.6% to 96.3%. *Id*. at 9. White support for the Black candidates in the 2018 and 2020 general elections for Districts 1, 2,

and 3 never rose above 12.6%, resulting in the defeat of the Black candidates. *Id*. White support for Black candidates was also a mere 16.7% in the 2020 District 1 Democratic primary. *Id*. The Black candidate ultimately won that primary in a runoff only because Black voters constituted a majority of the primary electorate. *Id*.

In District 7, Congresswoman Terri Sewell, a Black woman, was first elected in a biracial general election in 2010 and last faced a general election opponent in 2012. White support for Rep. Sewell ranged from 19.3% in 2010 to 26.1% in 2012, while over 95% of Black voters supported Rep. Sewell in both races. *Id*. at 9. Only in the majority-Black District 7 did the Black candidate win an endogenous general election despite highly racially polarized voting. *Id*. at 9-10.

In exogenous statewide elections, Dr. Liu found similar results. White voter support ranged from 11% to a "high" of a mere 15% for Black candidates for U.S. President in 2008 and 2012, Lt. Governor and Secretary of State in 2014, and Lt. Governor and State Auditor in 2018. *Id*. at 11. White bloc voting resulted in the defeat of the Black candidates statewide and in every congressional district in Alabama except the majority-Black District 7. *Id*. at 12-14. While Section 2 does not guarantee Black electoral success, "[o]ne may suspect vote dilution from political famine." *Johnson v. De Grandy*, 512 U.S. 997, 1017-18 (1994).

### 2.     Totality of the Circumstances

"[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Fayette*, 775 F.3d at 1342. This is not an unusual case. Rather the nine Senate Factors used to examine the totality of circumstances simply confirm the Section 2 violation.[3]

The two "most important" factors are: racially polarized voting and a lack of Black electoral success. *Gingles*, 478 U.S. at 48 n.15; *see also Fayette*, 775 F.3d at 1347 n.9. Here, their presence alone "point[s] commandingly" in Plaintiffs' favor. *Fayette*, 775 F.3d at 1347 n.9. It is essentially undisputed that voting is racially polarized, *supra* at 9-10, and no Black candidate has ever won in a majority-white congressional district. Doc. 53 ¶¶ 44, 121. Indeed, no Black person has won a statewide race in a generation. *Id*. ¶¶ 167-68. And nearly all other Black legislators in Alabama are elected from majority-Black districts created to comply with the VRA or Constitution. *Id*. ¶ 169.

---

[3]     The Senate factors are: (1) a history of voting-related discrimination in the state; (2) racially polarized voting in the relevant jurisdiction; (3) practices that enhance the opportunity for discrimination; (4) the exclusion of minorities from candidate slating processes; (5) the effects of any past racial discrimination in education, employment, health, etc. on minorities' ability to participate in the political process; (6) the use of racial appeals in political campaigns; (7) the extent to which minorities have been elected to office; (8) unresponsiveness of elected officials to the needs of minority-group members; and (9) the tenuous nature of that the policy underlying the law challenged. *See Gingles*, 478 U.S. at 44-45.

Other factors are also present here. Despite Black Alabamians constituting nearly 27% of the population, they only have meaningful influence in one of the seven (14%) congressional seats (factor seven).  Bagley Report at 28-29, Doc. 68-2.

Alabama has an undisputed and ongoing history of discrimination against Black people in voting, education, employment, health, and other areas. *Id*. ¶¶ 130-54, 157-65. As to Senate Factor One, among other evidence, in five of the six redistricting cycles since 1960, Alabama's maps have violated either the VRA or the Constitution. Bagley Report at 8-16. As recently as 2017, a three-judge court found that Alabama had racially gerrymandered 12 state legislative districts. *Id*. at 16.

Discrimination against Black Alabamians in employment, health, and education has led to ongoing racial disparities, which satisfies factor five. *Id.* at 17. For example, Alabama has the highest per capita number of federal administrative charges for race discrimination in the nation and a recent history of discrimination in state public employment. *Id*. at 18. In education, about 50 Alabama school districts remain subject to an injunction originally imposed to combat the State's policy of resistance to desegregation. *Id*. at 23. Only in 2006 and 2007 did courts find that the State had finally addressed its role in perpetuating segregation in grade schools and universities. Doc. 53 ¶¶ 163-65. The State has also failed to provide basic sanitation and health services to Black Belt residents, Bagley Report at 21-22,

and has rejected federal efforts to expand healthcare to low-income Black people, *id*. at 31.

This discrimination has resulted in large racial disparities in college degrees, income, employment, and health outcomes. *Id*. at 17. Individuals with lower household incomes are less likely to vote. Doc. 53 ¶ 158. Black people with lower incomes are also less likely to contribute to political campaigns and run for office. Bagley Report at 17. "Once lower socio-economic status of black[ ] [Alabamians] has been shown, there is no need to show the causal link of this lower status on political participation." *Wright*, 979 F.3d at 1294 (citation omitted).

Racial campaign appeals have been used in recent congressional campaigns in Alabama (factor six). *See* Bagley Report at 26-28. These appeals "divide[ ] the community" and generate "animosities" that drive racial bloc voting. *Meek v. Metro. Dade Cty.*, 985 F.2d 1471, 1487 (11th Cir. 1993). Alabama primaries still use majority-vote requirements (factor three). Doc. 53 ¶ 135. The congressmen elected from majority-white districts are unresponsive to the needs of Black Alabamians. Jackson Decl. ¶¶ 9-12, attached as Ex. 12; Simelton Decl. ¶¶ 12-16. They often vote against bills supported by most Black voters (factor eight), Bagley Report at 26-28.

Because Plaintiffs' evidence satisfies all three *Gingles* preconditions and eight Senate factors, they have shown a high likelihood of success on their Section 2 claim.

**B.      Congressional Districts 1, 2, 3 and 7 are Racial Gerrymanders.**

Racial gerrymandering claims require a two-step inquiry. First, Plaintiffs must prove that race was the predominant factor in placing "a significant number of voters within or without a particular district." *Cooper v. Harris*, 137 S. Ct. 1455, 1463-64 (2017) (citation omitted). Plaintiffs may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* at 1464. Second, if race did predominate, strict scrutiny applies, and Defendants bear the burden of proving that the use of race was "narrowly tailored" to satisfy a "compelling interest," such as compliance with the VRA. *Id.*

This inquiry demands a district-specific analysis, though statewide evidence may be relevant. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262–63 (2015) ("*ALBC*"). Here, the evidence shows that race predominated in placing a significant number of Black voters within and without Districts 1, 2, 3, and 7. Defendants cannot show the packing and cracking of Black voters in these districts was narrowly tailored to satisfy the VRA or another compelling interest.

**1.      Race Predominated in Drawing the Challenged Districts.**

Race predominates where the legislature "'subordinated traditional race-neutral districting principles . . . to racial considerations.'" *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797 (2017). "Race may predominate even when a reapportionment plan respects traditional principles." *Id.* at 798. The possibility "that

14

other considerations may have played a role in . . . redistricting does not mean that race did not predominate." *Clark v. Putnam Cty.*, 293 F.3d 1261, 1270 (11th Cir. 2002). Plaintiffs need only show the intent to "segregate voters on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642-43 (1993) ("*Shaw I*") (cleaned up). The one-person-one-vote rule is not a factor to consider in this analysis, as it is a background rule against which redistricting takes place. *ALBC*, 575 U.S. at 273.

The consideration of the role race played requires a "holistic analysis." *Bethune-Hill*, 137 S. Ct. at 800. Thus, an "insistence that the [ ] legislature did not look at racial data" in drawing districts does not negate other evidence revealing the "sort[ing] voters on the basis of race." *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018). Further, this "inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 137 S. Ct. at 799.

**Race Predominated in District 7.** Direct and overwhelming circumstantial evidence proves that race was the predominant factor in the design of District 7.

Direct evidence of racial predominance includes statements indicating that the legislature deliberately sought to maintain District 7 as a packed majority-Black district with a 55% BVAP floor without narrowly tailoring the design and demographics of the district to comply with the VRA. *See ALBC*, 135 S. Ct. at 1273.

Here, it is undisputed that, in 1992, a court first redrew District 7 for the express purpose of creating a nearly 65% BVAP district to resolve VRA litigation. Doc. 53 ¶¶ 30-35. HB1 and all past plans "preserved the core of districts" as drawn in 1992. Answer, Doc. 52 ¶ 33; *see also* Doc. 53 ¶¶ 45-46, 51-59. In the 2011 plan, the State went further and increased the total Black and BVAP in District 7 from the 2002 plan for the purported purpose of avoiding retrogression under Section 5 of the VRA. *Id.* ¶¶ 51-54. Yet "Section 5 does not require maintaining the same population percentages in majority-minority districts as in the prior plan;" nor did it require an increase in the BVAP. *ALBC*, 135 S. Ct. at 1272-73. It is "satisfied if minority voters retain the ability to elect their preferred candidates." *Id*. For that reason, it is more likely that Alabama packed District 7 in the 2011 plan for the predominant racial motive of maintaining a particular BVAP in District 7 and lower BVAPs in Districts 1, 2, and 3.

Randy Hinaman drew the 1992 and 2011 plans, and the 2021 plan in HB1. He conceded that race was the predominant factor in his design of the 1992 plan. Hinaman Dep. at 35:12-36:4, 171:11-172:12. He also admittedly preserved the core of District 7 as drawn in 1992—and corresponding high BVAP—in HB1 and other previous maps. *Id*. *at* 222:2-20. Perhaps for that reason, in 2019, the Secretary admitted that District 7 as drawn in 2011 "appears to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the

black population of Jefferson County." Doc. 53 ¶ 62. Mr. Hinaman made no effort to address the concern that race predominated in the packing of District 7. Hinaman Dep. at 170:21-173:13. HB1 simply retained the core of District 7 as it was racially gerrymandered in the 2011 plan. Doc. 53 ¶ 59.

In fact, this district has changed little from how it was initially drawn in 1992. In the 1992 plan, District 7 contained all of Sumter, Choctaw, Greene, Hale, Perry, Dallas, Lowndes, Wilcox, and Marengo Counties and parts of Jefferson, Tuscaloosa, Pickens, Clarke, and Montgomery Counties, with a total BVAP of approximately 63.6%. *Id.* ¶ 32. In 2002 and 2011, Alabama only slightly changed District 7, preserved most of the district's core, and kept the BVAP in the range of 58–61%. *Id.* ¶¶ 45, 52. Current District 7 makes only minimal changes from the 2011 plan. It contains all the same whole counties, continues to split Montgomery, Jefferson, and Tuscaloosa Counties, and now contains all rather than part of Clarke County.

The State's admission that the previous District 7 "appears" to be a racial gerrymander, and the minimal changes that HB1 made to the current district— including retaining the "finger sticking up from the black belt," *id.* ¶ 62—is direct evidence of the predominance of race in the design of District 7.

17

*Figure 1 – 1992 Plan*                    *Figure 2 – 2021 Plan (HB1)*

     

In *Covington*, the Supreme Court approved a district court's decision to enjoin redrawn districts that "retain[ed] the core shape" of previously racially gerrymandered because the redrawn districts continued to bear the hallmarks of racial predominance. 138 S. Ct. at 2551. As the district court there explained, if the legislature "*chooses* to rely on redistricting criteria highly correlated with race, like preserving the 'cores' of unconstitutional districts," it cannot leapfrog the predominant use of race. *Covington v. North Carolina*, No. 1:15CV399, 2018 WL 604732, at *4 (M.D.N.C. Jan. 26, 2018). Here, there was little change from the prior districts that Defendants admit were drawn predominantly based on race and the lines and demographics of the current districts where race continues to predominate.

18

Other direct evidence of a racial predominance includes the maintenance of a high BVAP in District 7 and the Legislature's use of a racial target of 55% BVAP for all majority-Black districts as a safe harbor. For instance, according to the 2020 census, the BVAP in District 7 under the 2011 plan had dropped to roughly 55% and District 7 needed to add 53,143 people to satisfy one-person-one-vote. 2021 Redist. Plans Comparative by Dist. Analysis. Most of the decrease in District 7's BVAP from 60% in the 2011 plan to around 55% in HB1 came from population loss in the Black Belt rather than changes to the district lines. *Id*. It is telling then that, even after redrawing District 7 to add 53,000 people, Mr. Hinaman ensured that the newly enacted District 7 also kept a BVAP of around 55%. Doc. 53 ¶ 57.

There is also direct evidence that Legislature pursued 55% BVAP districts based on the mistaken belief that such districts offered safe harbors from racial gerrymandering claims. The Legislature conducted no narrow tailoring or pre-enactment analysis of districts that reached the 55% target. For example, Sen. Pringle stated that the Legislature did not conduct a racial polarization analysis or believe that such an analysis was needed for any districts like District 7 with over 54% BVAPs. Oct. 26 Reapportionment Comm. Transcript at 19, attached as Ex. 13; Hall Decl. ¶¶ 17-18, attached as Ex. 14. The Legislature assumed that so long as a district's BVAP stayed over 55%, its continued effectiveness at electing a Black candidate was presumed and no further analysis was necessary. But this presumption

19

Alabama has again incorrectly employed "mechanical racial targets." *ALBC*, 135 S. Ct. at 1267.

Yet throughout the public hearings and legislative special session, Defendants disclaimed any use of race in the initial construction of congressional districts. Oct. 26 Reapportionment Comm. Transcript at 10 (Sen. McClendon stating that District 7 "was drawn blind, the race was turned off on the drawing."); *see also id*. at 19-20. Their map-drawer, Mr. Hinaman, also claimed that he drew HB1 without viewing race data. Hinaman Dep. at 97:20-98:23. Yet he admits that he sought to maintain a majority-Black District 7 and he reviewed racial data after initially drafting the map to ensure this outcome. *Id*. at 98:17-99:23, 117:2-5, 142:13-20. Further, Mr. Hinaman lives in Alabama and drew the District 7 in the 1992 and 2011 plans and, therefore, has a deep knowledge of the racial and geographic makeup of Alabama. *Id*. at 26:3-27:3, 35:12-24, 154:14-155:4, 161:1-164:6. Based on this knowledge and experience, he likely did not need to view the racial data to draw a map where race predominated.

In *Covington*, the Court explained that an "insistence that the [ ] legislature did not look at racial data in drawing [ ] districts does little to undermine [a court's] conclusion—based on evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race." 138 S. Ct. at 2553. Rather, it affirmed that there was "sufficient circumstantial evidence

that race was the predominant factor governing" the drawing of the districts "based on evidence concerning the shape and demographics of those districts." *Id.* So too here, where the districts' designs and demographics show that race predominated.

Even without this direct evidence, compelling expert evidence establishes that District 7 was drawn in a way that used race to pack Black voters. As compared to thousands of other potential maps, HB1 splits counties and is drawn in a way only explainable by Defendants' racially predominant packing. Plaintiffs' experts have employed different methods of quantitative analysis showing that District 7 was drawn in a manner that splintered the Black community using race as the predominant factor.

Dr. Kosuke Imai—a professor and founding developer of simulation algorithms used to evaluate redistricting—performed several statistical analyses that all identified District 7 as an extreme outlier in terms of its consideration of race as compared to thousands of other simulated maps. Imai Report, Doc. 68-4 (Ex. 4). First, he created an algorithm that produced 10,000 simulated plans. This "race-neutral" simulation drew maps that ignored the State's obligation to comply with the VRA but followed the stated guidelines of creating seven contiguous districts, keeping population deviations to a minimum and never above ±0.5%, developing districts that are reasonably compact, respecting county boundaries where possible, and avoiding incumbent pairings. Imai Report ¶¶ 18-19, 26-29. The results for the

district corresponding to District 7 based on incumbent location are striking: out of the 10,000 generated districts, *not a single simulated plan* had a BVAP as high as District 7. *Id.* ¶¶ 28-29. This alone shows that HB1 used race as a predominant factor to crowd Black voters into District 7, without regard to whether this packing was needed to maintain District 7 as an effective district for Black voters.

Dr. Imai conducted additional analysis that supports race as the predominant factor in drawing District 7. His same race-neutral simulations evaluated the likelihood of splitting Jefferson and Montgomery Counties between districts, the likelihood of particular district splits, and the way the counties are divided between districts in terms of race. For example, HB1 splits Montgomery County into Districts 2 and 7. Yet Montgomery County remains whole in 97% of simulations. *Id.* ¶ 33. HB1 packs Black voters in the western part of Montgomery city into District 7 rather than placing those voters in District 2 to create a second Black influence district. *Id.*

Different methods of statistical analysis performed by Dr. Ryan Williamson, a political science professor at Auburn University, also establish the predominant role of race in packing District 7. Williamson Report, Doc. 68-3 (Ex. 3). Given the guidelines' preference against county splits, Doc. 53 ¶ 77(d), Dr. Williamson analyzed the three counties split between District 7 and other districts to determine any racial patterns. Williamson Report at 3. The three counties split—Jefferson, Montgomery, and Tuscaloosa—have BVAPs of 41.5%, 56.3%, and 29.5%

respectively and three of the five highest BVAP totals in the state, as compared to a statewide median county BVAP of 22.5%. *Id.* These county splits create an inference that race played a role.

The specific decision to split these counties provides strong evidence that race predominated in drawing District 7. *See, e.g.*, *Cooper*, 137 S. Ct. at 1477-78 (relying on expert testimony about the race of the voters moved in redistricting); *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 148 (E.D. Va. 2018) (three-judge court) ("*Bethune-Hill II*") (similar).

This evidence plainly shows that race predominated in drawing District 7.

**Race Predominated in Districts 1, 2, and 3.** The predominance of race in drawing District 7 naturally led to some voters being assigned or excluded from Districts 1, 2, and 3 predominately because of race. *See Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 879 (E.D. Va. 2019) ("*Bethune-Hill III*"). HB1 preserves the core of prior plans in which the BVAP of these districts was kept around 30%. Doc. 53 ¶¶ 55, 59; *see also* 2021 Redist. Plans Comparative by Dist. Analysis. Yet, expert analyses reveal that the low BVAPs in these districts do not flow from neutral redistricting rules, but rather race-based choices.

Circumstantial evidence and expert analysis by Dr. Imai and Dr. Williamson establish that race was the predominant motive in the drawing of Districts 1, 2, and 3. As discussed above, Dr. Imai found that in 97% of his race-neutral simulations

Montgomery County remains whole. Imai Report ¶ 33. Dr. Imai performed a second set of 10,000 simulations that constrained the BVAP in District 7 to 50%+1 to 51%, and otherwise applied the race-neutral traditional redistricting criteria. *Id*. ¶ 35. Significantly, Montgomery County also remains whole in over 62% of these simulations. *Id.* ¶ 37. Even in those 38% of simulations where it is split, less than 4,000 Black adults in Montgomery County are placed in District 7 as compared to 39,000 in HB1. *Id.* ¶ 38. Only racial predominance explains HB1's excessive removal of Black voters from District 2 and their placement in District 7.

Without the use of race in HB1 to fragment Montgomery and the Black Belt, a race-neutral plan would more naturally place the Black voters in those areas in a second majority-Black or opportunity district. After unpacking District 7 to 51% BVAP but otherwise running race-blind simulations, Districts 1, 2, and 3 look significantly different from HB1. The simulations produce BVAPs in District 2 as high as 39.7%. *Id.* ¶ 41. Just 3.7% of simulations have a BVAP less than the 30.1% in the enacted plan. *Id.* Only the use of race to crack Black communities and prevent the formation of a second Black district or any district with a BVAP above 30% explains HB1's design of Districts 2. This is clear evidence of racial predominance.

Additionally, Dr. Williamson uses several well-founded methods to demonstrate how Districts 1, 2, and 3 use race to cut through Black communities and stop another opportunity district's creation. First, his analysis shows that Black

Alabamians are more likely to be diffused across districts in the portion of the State in which they are geographically concentrated. *Id*. at 7. The portion of the Black Belt not drawn into District 7 was split across Districts 1, 2, and 3. Williamson Report at 9–10.

Dr. Williamson also looked at the relationship between racial makeup of counties in Districts 2 and 3 and whether they share any part of their border with another district. *Id.* at 7–8. In a cracking analysis, if race did not play a major role in determining district boundaries, a county's BVAP should not consistently predict adjacency to a different district. *Id.* Dr. Williamson's analysis showed, however, that a strong relationship exists between race and bordering another district: counties with higher Black populations were more likely to border another district, indicating cracking. *Id.*

Finally, Dr. Williamson examined which census blocks were moved into and out of each district and which ones remained from the previous map and analyzed the relationship of these movements with race. *Id.* at 8–9. His analysis determined that the BVAP of a block was a significant predictor of whether that block was moved. Majority BVAP blocks were much more likely to be moved out of Districts 1, 2, and 3 and replaced with disproportionately white blocks. *Id.; see Bethune-Hill II*, 326 F. Supp. 3d at 148–49 (using a similar analysis to show racial predominance).

Each aspect of expert analyses of demographics, lines, and movement of people provides strong evidence of racial predominance in Districts 1, 2, 3— together, they show that HB1's maps are unexplainable on grounds other than race.

### 2.    The Challenged Districts were not Narrowly Tailored.

Because Plaintiffs have demonstrated that race predominated in the challenged districts, strict scrutiny applies, and Defendants bear the burden of proving that the use of race was narrowly tailored to serve a compelling interest. *Cooper*, 137 S. Ct. at 1464. "[O]ne compelling interest is complying with operative provisions of the Voting Rights Act of 1965." *Id.* There is a "significant state interest in eradicating the effects of past racial discrimination." *Shaw I*, 509 U.S. at 656. But "race-based" districting is "narrowly tailored" to advance the VRA only when "good reasons" for drawing the *specific* majority-Black district at issue. *ALBC*, 135 S. Ct. at 1274. A state will have "good reasons" if it conducts a "pre-enactment analysis with justifiable conclusions" of what the VRA demands before placing a significant number of minorities into a district. *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

Here, Plaintiffs accept that Alabama had good reasons to draw *a* majority-Black District 7, but they contend that Alabama lacked "good reason" for drawing the *specific* packed version of District 7 in HB1. From 1992 to 2021, the State has never conducted the pre-enactment analysis necessary to justify its predominant use of race to place a third of all Black voters into District 7 while keeping Black voters

26

out of Districts 1, 2, and 3 in a manner that maintained a 30% threshold. Rather, from 1992 to 2011, Alabama kept District 7's BVAP between 58% and 65%, Doc. 53 ¶¶ 32, 51, 52, despite Black candidates winning there with over 72% of the vote from 2002 through today. *Id*. ¶¶ 47-50. In this period, District 7's BVAP percentage was static even though the VRA "d[id] not require a covered jurisdiction to maintain a particular numerical minority percentage" in a district. *ALBC*, 135 S. Ct. at 1272.

Rather, the VRA requires legislatures to ask: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?" *Id*. at 1274. The 55% BVAP in District 7 does not result from any pre-enactment effort by Alabama to answer that question or otherwise narrowly tailor the district by determining whether its 55% BVAP is too high or too low to maintain District 7 as an effective district for Black voters.

While the Court does "not insist that a legislature guess precisely what percentage" BVAP is needed, a state must have a "strong basis in evidence" for the BVAP of a challenged district. *Id*. at 1273–74. Thus, HB1's use of race to maintain a high BVAP in District 7, which "has long elected to office black voters' preferred candidate," cannot be narrowly tailored absent a pre-enactment effort to explain "just why" HB1 needs to use race to "predominately to maintain" its elevated BVAP. *Id*.

Defendants conducted no pre-enactment analysis at all. Doc. 53 ¶¶ 97-98. Neither Defendants nor Mr. Hinaman consulted the incumbent, election returns,

voter turnout, or racial polarization data to justify District 7's high BVAP. Hinaman Dep. 117:2-119:4, 167:10-169:4, 174:16-176:16; *see also* Doc. 53 ¶¶ 96-98.

The Legislature assumed that so long as a district's BVAP stayed around or over 55%, it would maintain its effectiveness at electing a Black candidate and no further analysis was necessary. *Supra* at 19-20. But this presumption that districts with BVAPs around 54-55% required no analyses reveals Alabama's return to employing "mechanical racial targets." *ALBC*, 135 S. Ct. at 1267.

Of course, "[a]sking the wrong question may well have led to the wrong answer." *Id*. at 1274. Defendant McClendon said an analysis was conducted for all districts where "it looked like there might possibly be a racial issue"—all of them state legislative districts. Oct. 26 Reapportionment Comm. Transcript at 18–19, 28. Merely analyzing certain majority-Black districts to ensure they perform, however, does not answer the important questions of whether they need to exist and were narrowly tailored. Defendants had to ensure that the BVAP of the District 7 enacted in HB1 was narrowly tailored to satisfy the VRA. "[A] legislature undertaking a redistricting must assess whether the new districts it contemplates (not the old ones it sheds) conform to the VRA's requirements." *Cooper*, 137 S. Ct. at 1471.

Courts have repeatedly rejected 55% BVAP districts as a safe harbor in which no further analysis is necessary. *See, e.g.*, *Bethune-Hill II*, 326 F. Supp. 3d  at 178 (finding that 11 districts drawn using a 55% BVAP floor were not narrowly tailored

because the state failed to conduct any pre-enactment analysis to justify this floor and where the plaintiffs' expert showed that the districts would remain effective with lower BVAPs); *Page v. Va. State Bd. of Elections*, No. 3:13cv678, 2015 WL 3604029, at *17-18 (E.D. Va. June 5, 2015) (three-judge court) (holding that a 55% BVAP district was not narrowly tailored where there was no pre-enactment basis for believing that a 53% BVAP district would not allow for the election of a Black candidate); *Smith v. Beasley*, 946 F. Supp. 1174, 1207 (D.S.C. 1996) (three-judge court) (rejecting a state's reliance on a 55% BVAP safe harbor in the absence of district-specific "evidence as to registration or voter turnout").

A racial polarization analysis might not have been necessary if Alabama had made other pre-enactment inquiries to try to narrowly tailor the BVAP in District 7, such as discussing District 7's racial makeup with the incumbent, and reviewing election returns and turnout data. *Cf. Bethune-Hill*, 137 S. Ct. at 801. Yet Alabama failed to make any such good-faith inquires at all.

Had the Legislature conducted racial polarization or elections analyses, it would have seen that the high BVAP in District 7 was not narrowly tailored to comply with the VRA. Dr. Liu determined that District 7 would remain effective with a BVAP as low as just over 50%, despite the existence of significant racial bloc voting. Liu Report at 16. Even a simple review of election results in District 7 shows that packing Black voters into District 7 is unnecessary to ensure its effectiveness.

Black preferred-candidates have won reelection in District 7 with over 72% of vote in every election from 2002 to 2012 and, after 2012, faced no opposition at all. Doc. 53 ¶¶ 47-50. The State's failure to conduct proper analyses led the State to rely on a racial target and needlessly pack a third of all Black voters in District 7.

"[I]n the absence of any investigation into what § 2 might require," Defendants "lack[ ] any basis to argue that it had good reasons to believe § 2 of the VRA required . . . race-based boundaries." *Navajo Nation v. San Juan Cty.*, 929 F.3d 1270, 1289 (10th Cir. 2019); *see also Abbott*, 138 S. Ct. at 2334 (the state lacked a "good reason" where it failed to analyze racially polarized voting or conduct more than cursory reviews of election results); *Cooper*, 137 S. Ct. at 1490 & n.5 (statewide polarization analyses were insufficient to justify the BVAPs of specific districts).

As to Districts 1, 2, and 3, Defendants have not cited and cannot cite the VRA or any other compelling government interest that justifies their predominant use of race to crack Black voters in these districts. *Cf. LULAC*, 548 U.S. at 440 (concluding that the state's cracking of cohesive minority voters in a manner that prevented the formation of an additional effective minority district violated Section 2 and "could give rise to an equal protection violation"). As such, none of the four challenged districts survive strict scrutiny and all should be enjoined as racial gerrymanders.

## C.    Requested Relief

Because Plaintiffs are very likely to succeed on both their Section 2 and racial gerrymandering claims, the remedy is clear: Defendants must adopt a plan that contains two majority-Black districts. *See LULAC*, 548 U.S. at 435 (ordering an additional effective majority-minority district to remedy a Section 2 violation). If Alabama fails to quickly adopt a new plan, this Court can order an interim plan. *See Covington*, 138 S. Ct. at 2550 (ordering an interim plan after the state failed to act).

If, however, at this stage, the Court orders relief only as to Plaintiffs' racial gerrymandering claim, then any remedial map must decrease the BVAP in District 7 to around 50% to narrowly tailor that district to comply with the VRA, and revise Districts 1, 2, and 3 so that Black voters are no longer artificially denied electoral influence in a second district. Under Dr. Imai's simulations, race-neutral maps resulted in District 2 plans with BVAPs as high as almost 40% as opposed to the current 30% BVAP. Imai Report ¶ 41. A race-neutral plan would require the State to keep the Black Belt and Montgomery County whole within one district. *Id.* ¶ 33.

A neutral plan will require that "many black voters formerly subjected to race-based inclusion [or exclusion] in the invalidated districts will be assigned to surrounding non-challenged districts" resulting in an increase in "the BVAP of adjacent non-challenged districts." *Bethune-Hill III*, 368 F. Supp. 3d at 879. For that reason, courts have often ordered similar relief in other racial gerrymandering cases.

*See Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 565 (E.D. Va. 2016) (ordering that the BVAP in a challenged district be lowered to 45% and increasing the BVAP in a close-by district from 30% to 41%).

In *Covington v. North Carolina*, for example, the court adopted a plan that decreased the BVAP in a challenged district by 13-points and increased the BVAP in an unchallenged district from 11% to 40%. 283 F. Supp. 3d 410, 455-56 (M.D.N.C. 2018). The court rejected the argument that this remedy was improper solely because it increased the BVAP of the unchallenged district, *id*. at 456, and the Supreme Court affirmed. *Covington*, 138 S. Ct. at 2554.

### D.    The Threat of Irreparable Harm and Equities Favor Relief

Any loss of constitutional rights is presumed to be an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Because race was the legislature's predominant motive in drawing the challenged districts but not used in a narrowly tailored manner, Plaintiffs suffer from the state's "offensive and demeaning" conduct, *Miller v. Johnson*, 515 U.S. 900, 912 (1995), which "bears an uncomfortable resemblance to political apartheid." *Shaw I*, 509 U.S. at 647 "[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to [e]nsure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). This is not an unusual case.

Rather, the equities favor Plaintiffs because of their particularly strong interest in exercising their right to vote free from a racially discriminatory districting scheme that dilutes their vote. *See, e.g., LULAC*, 548 U.S. at 440-41 (striking down a congressional plan as violative of Section 2). Racial discrimination is "odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw I*, 509 U.S. at 643 (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

In comparison, the purported burdens on Defendants and harms to the State to correct the constitutional violation are minimal. Defendants may contend that an injunction against a duly enacted state law harms the State or that the administrative burdens of redrawing districts or modifying upcoming election deadlines is too great. But there is "no harm from the state's nonenforcement of invalid legislation." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012). And any alleged harm to the State is mitigated by the fact that, in an interim plan, this Court must treat HB1 as a "starting point" and "appropriately confine[ ] itself to drawing interim maps that comply with the Constitution and the [VRA], without displacing legitimate state policy judgments with the court's own preferences." *Perry v. Perez*, 565 U.S. 388, 394 (2012). This Court has "its own duty to cure illegally gerrymandered districts through an orderly process in advance of elections." *Covington*, 138 S. Ct. at 2553.

With respect to purported administrative burdens, the legislature enacted HB1 in a five-day special session and, if needed, could quickly enact constitutionally

compliant remedial maps in the regular session that begins on January 11, 2022.  If the Legislature fails to pass a map expeditiously, this Court could exercise its authority to draw interim maps. *Wright*, 979 F.3d at 1304 (affirming the imposition of a remedial map drawn by special master); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1342 (N.D. Ga. 2004) (three-judge court) (requiring a state to redraft congressional maps eight months before the general election and retaining jurisdiction for the court to draw an interim plan if the legislature failed to act in time). In either scenario, upcoming elections would go forward with constitutionally valid maps with minimal burden to Defendants, while protecting the constitutional credibility of the electoral process.

Indeed, the primaries are over six months away and the general election is still over 11 months off—filing deadlines for a handful of Congressional candidates can be shifted a few weeks with relatively little, if any, disruptions for a discrete number of potential candidates, and no adverse impact on voters. As "sovereignty lies with the people . . . inconvenience to legislators elected under an unconstitutional districting plan resulting from such legislators having to adjust their personal, legislative, or campaign schedules to facilitate a [constitutional redistricting] does not rise to the level of a significant sovereign intrusion." *Covington v. North Carolina*, 270 F. Supp. 3d 881, 895 (M.D.N.C. 2017) (three-judge court). "[T]he harm [Plaintiffs] would suffer by way of vote dilution outweighs the harm" or other

potential inconveniences to Defendants. *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1348 (N.D. Ga. 2015).

At most, administrative deadlines may have to be shifted to assure constitutionally compliant maps are applied in the 2022 congressional elections. *See Wright*, 979 F.3d at 1286 (affirming a remedial order that altered election dates); *United States v. Dallas Cty. Comm'n*, 850 F.2d 1433, 1437 (11th Cir. 1988) (tolling a qualification period until the entry of a remedial plan); *see also Larios*, 305 F. Supp. 2d at 1343 (noting the court's authority to extend election-related deadlines).

Finally, the "protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Cox*, 408 F.3d at 1355. Racial gerrymanders "cause society serious harm," *Miller*, 515 U.S. at 912, and the State's "[f]rustration of federal statutes and prerogatives are not in the public interest," *Alabama*, 691 F.3d at 1301. The public interest favors a court-ordered remedy to these discriminatory districts to protect the fundamental rights of all Alabamians—whatever their race.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that the Court grant their motion.

Respectfully submitted,

DATED this 15th day of December 2021.

/s/ Deuel Ross
Deuel Ross*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org

Shelita M. Stewart*
Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

/s/ Sidney M. Jackson
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Davin M. Rosborough
Davin M. Rosborough*
Julie Ebenstein*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org

/s/ LaTisha Gotell Faulks
LaTisha Gotell Faulks (ASB-1279-I63J)
Kaitlin Welborn*
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org
kwelborn@aclualabama.org

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200

Michael Turrill*
Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com


*Attorneys for Plaintiffs*


Anthony Ashton*
Anna Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
aashton@naacpnet.org
abarnes@naacpnet.org

*Attorneys for Plaintiff Alabama State Conference of the NAACP*


*Admitted *Pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record.

This the 15th day of December 2021.


*/s/ Deuel Ross*
COUNSEL FOR PLAINTIFFS