FILED
2021 Dec-16 AM 11:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

**BOBBY SINGLETON, *et al.*,**

**Plaintiffs,**

**v.**

**JOHN H. MERRILL, *in his official capacity as Alabama Secretary of State, et al.*,**

**Defendants.**

**Case No.: 2:21-cv-1291-AMM**

**THREE-JUDGE COURT**

---

**EVAN MILLIGAN, *et al.*,**

**Plaintiffs,**

**v.**

**JOHN H. MERRILL, *in his official capacity as Secretary of State of Alabama, et al.*,**

**Defendants.**

**Case No.: 2:21-cv-1530-AMM**

**THREE-JUDGE COURT**

Before MARCUS, Circuit Judge, MANASCO and MOORER, District Judges.

BY THE COURT:

**ORDER ON MOTION FOR PROTECTIVE ORDER**

These redistricting cases, which have been consolidated for the limited purpose of preliminary injunction proceedings, are before the court on a motion for

a protective order filed by two Defendants in the *Milligan* case — Senator Jim McClendon and Representative Chris Pringle ("the Legislators"). *Milligan* Doc. 55. Senator McClendon and Representative Pringle serve as Chairs of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"). The Legislators request an order forbidding their depositions and written discovery on grounds of legislative immunity and privilege. The court **DENIED** their motion in a short order on December 13, 2021. *Milligan* Doc. 59. We now explain the reasons for that ruling.

## I. BACKGROUND

On November 4, 2021, Alabama Governor Kay Ivey signed into law Alabama's 2021 congressional redistricting plan for its seven seats in the United States House of Representatives ("HB1", or "the Plan"). That same day, the *Singleton* plaintiffs amended their complaint to assert two constitutional challenges to the Plan. *Singleton* Doc. 15.

Although the *Singleton* plaintiffs did not name the Legislators as defendants, *id.*, Senator McClendon had been involved in the case before the complaint was amended. On October 21, 2021, he signed a declaration in support of a motion filed by Secretary Merrill to dismiss the lawsuit on mootness grounds; in that declaration, he explained the work that the Alabama Legislature had performed in anticipation of receiving the census data necessary to complete the redistricting process, and he

testified that he had "every reason to believe that when the redistricting special session opens, the Redistricting Committee will present to the Legislature redistricting plans, including a plan for Congressional districts, that comply with federal . . . requirements." *Singleton* Doc. 11-1 ¶ 12.

On November 8, 2021, the Legislators filed an unopposed motion to intervene in *Singleton*. *Singleton* Doc. 25. The Legislators asserted that they must be allowed to intervene as of right because "[t]he relief sought by Plaintiffs . . . would necessarily impair and impede the [Legislators'] ability to protect the Reapportionment Committee's interest in conducting Congressional redistricting[,]" Secretary Merrill "has no authority to conduct redistricting," "[t]he Reapportionment Committee . . . [is] the real party in interest" in the case, and that "[n]o other party adequately represents the [Legislators'] interest." *Id.* ¶¶ 8–9. In the alternative, the Legislators asserted that they should be permitted to intervene "to assert both factual and legal defenses in support of the constitutionality and lawfulness" of the Plan and that they are "uniquely positioned to present such . . . defenses because of their leadership of the Reapportionment Committee." *Id.* ¶¶ 12–13. "Without intervention," the Legislators argued, "Sen. McClendon and Rep. Pringle will not be able to protect their interests as Chairs of the Committee and state legislators." *Id.* ¶ 18. Notably, the Legislators did not assert (or even mention) legislative immunity or privilege in their motion to intervene. *Id*.

On November 9, 2021, we held a Rule 16 conference in *Singleton*. Counsel appeared for the plaintiffs, for Secretary Merrill, and for the Legislators as putative intervenors. We discussed with counsel the substance of the case, the motion to intervene, and a schedule for preliminary injunction proceedings. Again, counsel for the Legislators made no mention of their legislative immunity or privilege. After the conference, we entered an order setting a preliminary injunction hearing and prehearing deadlines. *Singleton* Doc. 29. We later granted the Legislators' unopposed motion to intervene. *Singleton* Doc. 32.

On November 16, 2021, the *Milligan* plaintiffs filed their lawsuit against Secretary Merrill and the Legislators. *Milligan* Doc. 1. The *Milligan* plaintiffs assert a statutory challenge to the Plan under Section Two of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section Two"), and two constitutional challenges. *Id*. at 48–52. Although the *Singleton* plaintiffs and the *Milligan* plaintiffs assert different theories of liability and request different remedies, both sets of plaintiffs request that the court enjoin Secretary Merrill from conducting elections according to the Plan.

*Singleton* and *Milligan* are two of three redistricting cases pending in the Northern District of Alabama that challenge the Plan. We consolidated *Singleton* and *Milligan* "for the limited purposes of discovery and a hearing relevant to the

applications for preliminary injunctive relief in those cases." *Milligan* Doc. 40 at 6.[1] We directed the parties to "file in both cases any pleadings or other papers that are relevant to consolidated proceedings" because "consolidation is for a limited purpose." *Id*. at 6–7.

The preliminary injunction proceedings are highly time sensitive because of two statutory deadlines applicable to Alabama's next congressional election. Alabama Code Section 17-13-5(a) effectively establishes a deadline of January 28, 2022 for candidates to qualify with major political parties to participate in the 2022 primary election for the United States House of Representatives and Senate. And Alabama Code Section 17-13-3(a) establishes the date of that primary election as May 24, 2022.

Accordingly, after we conducted a Rule 16 conference that included parties in all three cases about the congressional electoral map, on November 23, 2021 we ordered both the *Singleton* and the *Milligan* plaintiffs to file their motions for preliminary injunctive relief on or before December 15, 2021; set briefing deadlines; set discovery and other prehearing deadlines for both sets of plaintiffs, Secretary Merrill, and the Legislators; and set a consolidated preliminary injunction hearing

[1] A third redistricting case, *Caster v. Merrill*, No. 2:21-cv-1536-AMM (N.D. Ala. filed Nov. 16, 2021), is pending before a single judge who is also a member of the three-judge panels for *Singleton* and *Milligan*. Though not formally consolidated, the *Caster* plaintiffs are also participating in the same preliminary injunction hearing for consolidation of party and judicial resources.

for January 4, 2022. *Singleton* Doc. 45 at 10, 12; *Milligan* Doc. 40 at 10, 12. We set a deadline of December 17, 2021 for the plaintiffs, Secretary Merrill, and Legislators to complete all discovery related to the motion for a preliminary injunction. *See Singleton* Doc. 45 at 11; *Milligan* Doc. 40 at 11.

The *Milligan* plaintiffs noticed the depositions of the Legislators and served them with requests for production. *Milligan* Doc. 55-1 at 1–18. The *Milligan* plaintiffs requested the following categories of documents:

> **REQUEST FOR PRODUCTION NO. 1:** Any and all correspondence, maps, memoranda, expert reports, racial polarization analyses, or other documents, including electronically stored information, related to the State of Alabama's submission of congressional maps in the 1990, 2000, and 2010 redistricting cycles for preclearance review pursuant to Section 5 of the Voting Rights Act. 52 U.S.C. §10304. This request includes, but is not limited to, any correspondence with the U.S. Department of Justice for the 1990, 2000, and 2010 redistricting cycles, all communications involving the Reapportionment Committee and its chairs including internal correspondence and correspondence with members of Congress for the 2010 cycle, and all communications among representatives of the State or between such representatives and other governmental officials concerning any such submissions.
>
> **REQUEST FOR PRODUCTION NO. 2:** All documents and communications, including electronically stored information, concerning the drawing of the congressional districts adopted in HB 1, including but not limited to all communications with and documents provided to, considered, or relied upon by persons who drew, reviewed, approved, or adopted the determination to draw districts as reflected in HB 1.
>
> **REQUEST FOR PRODUCTION NO. 3:** Any maps, draft maps, memoranda, reports, analyses, correspondence, or other documents, including electronically stored information, concerning the drawing of the congressional districts in 2021 including those adopted in HB 1. This Request includes, but is not limited to, documents concerning the decision to maintain congressional district 7 as a majority-Black district, the decision to maintain the general shapes of the 2011 districts, racial polarization in the Alabama electorate, including congressional districts or state legislative districts, the role of race in drawing districts, and correspondence between or among You, individuals in the Legislative Reapportionment Office, any map drawers, experts, legislators, members of Congress, or anyone else concerning the drawing of the challenged congressional districts or any draft maps of the challenged congressional districts considered but not adopted.
>
> **REQUEST FOR PRODUCTION NO. 4:** Documents, including electronically stored information, sufficient to show any and all criteria used in drawing and approving the contours, limits, or boundaries included in the congressional districts adopted in HB 1.

**REQUEST FOR PRODUCTION NO. 5:** All documents, including electronically stored information, concerning any analysis or evaluation, including but not limited to racial polarization analysis or other analysis concerning voting patterns, that were conducted, reviewed, or relied upon in drawing, reviewing, adopting, or approving the congressional districts adopted in HB 1, including but not limited to communications with the person(s) who conducted any such analysis. This request includes, but is not limited to all documents and communications concerning whether to conduct or use any racial polarization analyses or any other analyses concerning voting patterns, regardless whether such analyses were actually used or conducted, including but not limited to the materials relied upon to determine which districts received any racial polarization study, in connection with drawing the congressional districts adopted in HB 1.

**REQUEST FOR PRODUCTION NO. 6:** All transcripts, minutes, or other notes, including electronically stored information, recording or referencing the conduct of any meetings of any legislative committee or subcommittee in connection with or in furtherance the adoption of HB 1.

**REQUEST FOR PRODUCTION NO. 7:** All documents, including electronically stored information, provided to or relied upon by (a) any expert who defendants intend to call to testify in this matter; or (b) any consultant, advisory, or other individual who provided advice or consultation concerning, or participated in the drawing, evaluation, or analysis of, the congressional districts adopted in HB 1.

*Id.* at 6-7. The *Milligan* plaintiffs, in their response to the Legislators' motion for a protective order, noted that the parties had come to an understanding regarding requests for production 1, 3, 4, 6, and 7. *Milligan* Doc. 56 at 2 n.1.

On December 6, 2021, the Legislators filed in *Milligan* only (and not *Singleton*) a motion for a protective order "forbidding their depositions and production of documents in violation of their legislative immunity and privilege." *Milligan* Doc. 55 at 2.[2] The Legislators request an "order that Sen. McClendon and Rep. Pringle not be deposed and that the written discovery not be had." *Id.* at 10.

[2] The Legislators later amended their motion for a protective order, so citations are to their Second Amended Motion, *Milligan* Doc. 55.

The next day, the Legislators filed answers in both *Singleton* and *Milligan*. *Singleton* Doc. 48; *Milligan* Doc. 51. The Legislators asserted in those answers numerous factual and legal defenses involving their work on the Plan and the Committee's intent when drawing the electoral map that the Plaintiffs challenge. *See, e.g.*, *Singleton* Doc. 48 at ¶¶ 3, 65, 8 (p.10); *Milligan* Doc. 51 at ¶¶ 3, 5, 56–57, 60, 62–66, 176, 182, 184, 187, 208, 9 (p.33), 24 (p.35). For example, in their answer to the *Singleton* complaint, the Legislators "den[ied] that the State drew any Congressional district in 2021 with the intent of drawing a majority-black district." *Singleton* Doc. 48 at ¶ 3. Likewise, in their answer to the *Milligan* complaint, the Legislators "[d]enied that the Legislature intentionally discriminated on the basis of race or used race to draw any majority-black congressional districts." *Milligan* Doc. 51 at ¶ 3. The Legislators asserted legislative immunity and privilege in a single sentence at the end of each answer. *Singleton* Doc. 48 at ¶ 13 (p.11); *Milligan* Doc. 51 ¶ 25 (p.35).

That same day, the Legislators filed joint stipulations of fact in both *Singleton* and *Milligan* for purposes of preliminary injunction proceedings. *Singleton* Doc. 47; *Milligan* Doc. 53. Those stipulations do not mention the Legislators' claimed legislative immunity or privilege. *Singleton* Doc. 47; *Milligan* Doc. 53.

The *Milligan* Plaintiffs then filed their opposition to the Legislators' motion for a protective order, *Milligan* Doc. 56, and the Legislators filed their reply, *Milligan* Doc. 58.

To date, the Legislators have not moved to dismiss *Singleton* or *Milligan*, in whole or in part, on the basis of legislative immunity.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 26(c)(1) provides that "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending" and the court may, for good cause, issue an order forbidding discovery. Fed. R. Civ. P. 26(c)(1)(A). Rule 26(c)(2) provides that, "[i]f a motion for a protective order is wholly or partly denied, the court may, on just terms, order that any party or person provide or permit discovery."

## III. ANALYSIS

The Legislators request a protective order providing that they "not be deposed and that the written discovery not be had" because "[l]egislative immunity and its corollary, legislative privilege, protect state legislators from discovery into the legislative process." *Milligan* Doc. 55 at 2, 10.

The *Milligan* plaintiffs respond that (1) the Legislators waived their immunity when they intervened in *Singleton*, and (2) even if the Legislators did not waive their immunity, legislative privilege "is qualified and cedes to important federal interests,

as numerous cases have found in the redistricting context." *Milligan* Doc. 56 at 2. The *Milligan* plaintiffs urge us to apply a five-part test that some district courts have applied to pierce the privilege in redistricting cases on the ground that legislative intent is particularly relevant (and legislator testimony thus particularly important) in the redistricting context. *Id.* at 10–13.

The Legislators reply that they "did not waive legislative immunity by intervening in *Singleton*" because it is "fitting for members of the Legislature to be able to participate in litigation over the plan they have helped enact and any possible remedy the Court might order." *Milligan* Doc. 58 at 2. The Legislators suggest that "[i]t would be ironic and wrong if, in order to argue against Plaintiffs' efforts to wrest redistricting from the Legislature, [the Legislators] had to forfeit their immunity from discovery into the legislative process." *Id.* at 5. The Legislators also assert that they did not waive their legislative privilege because of the rule that "[t]he privilege applies whether or not legislators have been sued." *Id.* at 2 (citing *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015) (citation and quotation marks omitted)). The Legislators resist application of the five-part test on the ground that under controlling precedent, the relevance and importance of their testimony are insufficient bases to pierce the privilege. *Id.* at 6–9. Finally, the Legislators indicate that "[n]otwithstanding disagreement over the scope of the privilege," they have

agreed to produce some factual documents sought by the *Milligan* plaintiffs. *Id.* at 10.

Legislative immunity is a broad and robust form of immunity. The Speech or Debate Clause of the United States Constitution, U.S. Const., Art. I, § 6, cl. 1, protects members of the United States Congress "from criminal or civil liability and from questioning elsewhere than in the Senate, with respect to the events occurring . . . [during] the legislative process." *Gravel v. United States*, 408 U.S. 606, 614–16 (1972). "The purpose of this immunity is to insure that the legislative function may be performed independently without fear of outside interference." *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731 (1980).

The Supreme Court has held that legislative immunity applies to all civil actions, regardless of whether they are brought by private citizens or public entities and regardless of whether they seek prospective relief or damages. *See, e.g.*, *id.*; *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975). Further, "[t]o preserve legislative independence [the Supreme Court has] concluded that legislators engaged in the sphere of legitimate legislative activity should be protected not only from the consequences of litigation's results but also from the burden of defending themselves." *Sup. Ct. of Va.*, 446 U.S. at 731–32 (internal citations and quotation marks omitted).

Accordingly, legislative immunity comprises both immunity from civil liability and an evidentiary privilege to be free from compulsory process in civil litigation. "[A] private civil action . . . creates a distraction and forces Members [of Congress] to divert their time, energy, and attention from their legislative tasks to defend the litigation. Private civil actions also may be used to delay and disrupt the legislative function. Moreover, [when] . . . a civil action is brought by private parties, judicial power is . . . brought to bear on Members of Congress and legislative independence is imperiled." *Eastland*, 421 U.S. at 503.

State legislators "enjoy common-law immunity from liability for their legislative acts, an immunity that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause." *Sup. Ct. of Va.*, 446 U.S. at 732 (citing *Tenney v. Brandhove*, 341 U.S. 367, 373 (1951)); *accord Bogan v. Scott-Harris*, 523 U.S. 44, 46 (1998). "The privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings has taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries." *Tenney*, 341 U.S. at 372. Indeed, the Speech or Debate Clause "was a reflection of political principles already firmly established in the States." *Id.* at 373. In civil cases, the Supreme Court "generally ha[s] equated the legislative immunity to which state legislators are entitled . . . to that accorded Congressmen under the Constitution." *Sup. Ct. of Va.*, 446 U.S. at 733 (collecting cases).

Legislative immunity has a single, simple trigger: whether the legislator's act was legislative. "[O]nce it is determined that Members [of Congress] are acting within the legitimate legislative sphere the Speech or Debate Clause is an absolute bar to interference." *Eastland*, 421 U.S. at 503 (internal quotation marks omitted). "In determining whether particular activities other than literal speech or debate fall within the 'legitimate legislative sphere' . . . [courts] must determine whether the activities are 'an integral part of the deliberative and communicative processes by which Members [of Congress] participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.'" *Id.* at 503–04 (quoting *Gravel*, 408 U.S. at 625).

"Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 45. Thus "[t]he claim of an unworthy purpose does not destroy the privilege." *Tenney*, 341 U.S. at 377. This is because "[l]egislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Id.*; *see also Bogan*,

523 U.S. at 55 (citing *Tenney* and explaining that *Tenney* extended immunity to a state legislator "even though he allegedly singled out the plaintiff for investigation in order to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights").

Although the Supreme Court has not directly decided the question whether legislative immunity can be waived in a civil action,[3] federal jurisprudence reflects no doubt that it can. *See, e.g.*, *Alexander v. Holden*, 66 F.3d 62, 68 n.4 (4th Cir. 1995); *Powell v. Ridge*, 247 F.3d 520, 527 (3d Cir. 2001); *Lee v. Va. State Bd. of Elections*, No. 3:15CV357, 2015 WL 9461505, at *7 (E.D. Va. Dec. 23, 2015); *Favors v. Cuomo*, 285 F.R.D. 187, 211 (E.D.N.Y. 2012); *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *11 (N.D. Ill. Oct. 12, 2011); *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 298 (D. Md. 1992). Furthermore, the party holding a privilege can, in general, waive its privilege implicitly through litigation conduct in a civil case. *See, e.g.*, *Cox v. Admin. United States Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir. 1994) (attorney-client privilege can be implicitly waived). The Legislators identified no authorities establishing or suggesting that legislative immunity cannot be waived in a civil action.

[3] The Supreme Court has held in a criminal case that, assuming legislative immunity may be waived, waiver may "be found only after explicit and unequivocal renunciation of the protection." *United States v. Helstoski*, 442 U.S. 477, 491 (1979).

Accordingly, we reject summarily the Legislators' contention that regardless of their participation in these cases "to defend their work," they have not waived their legislative privilege because "[t]he privilege applies whether or not legislators have been sued." *Milligan* Doc. 58 at 2 (citing *In re Hubbard*). That quotation means only that a legislator may assert legislative immunity regardless of whether the legislator is a named defendant or a nonparty subject to compulsory process. *See In re Hubbard*, 803 F.3d at 1308. The quotation does not mean (or even suggest) that regardless of what steps a legislator takes in response to being sued or otherwise compelled to participate in civil litigation, the legislator's litigation conduct cannot waive his or her legislative privilege. *See id.* There was no waiver issue in *Hubbard*.

The *Milligan* plaintiffs urge us to consider the Third Circuit's waiver analysis in *Powell*. Although that court ultimately dismissed that appeal for lack of jurisdiction, it first concluded that a group of legislator intervenor-defendants had waived their legislative immunity:

> Despite their understanding of legislative immunity's broad parameters, however, the Legislative Leaders are not seeking immunity from this suit which, it must be remembered, they voluntarily joined. Nor are the Legislative Leaders seeking any kind of wholesale protection from the burden of defending themselves. Instead, the Legislative Leaders build from scratch a privilege which would allow them to continue to actively participate in this litigation by submitting briefs, motions, and discovery requests of their own, yet allow them to refuse to comply with and, most likely, appeal from every adverse order. As we noted at the outset, and as the Legislative Leaders conceded at oral argument, the privilege they propose would enable them to seek discovery, but not respond to it; take depositions, but not

> be deposed; and testify at trial, but not be cross-examined. In short, they assert a privilege that does not exist.
>
> . . .
>
> [T]he Legislative Leaders voluntarily installed themselves as defendants. And, unlike the reluctant participants in those [other] cases [the Legislative Leaders cited], the Leaders wish to remain as defendants and participate as long as this case is around; at no time, we note, have they invoked legislative immunity as a basis for any of their various motions to dismiss. This is simply not a case of legislators caught up in litigation in which they do not wish to be involved. Rather, these are self-made defendants who seek to turn what has heretofore been the shield of legislative immunity into a sword.

247 F.3d at 525.

The Legislators here have the same sword/shield problem. The Legislators seek to use their unique position as HB1's principal drafters as a sword to defend the law on its merits, but intermittently seek to retreat behind the shield of legislative privilege when it suits them. At every turn, and in every way, the Legislators have sought to participate — and actually participated — in these cases as fully engaged defendants. Most importantly, (1) they intervened in *Singleton* (which intervention they sought before *Milligan* was filed naming them as defendants), *Singleton* Doc. 25; (2) they intervened on the ground that they needed "to assert both factual and legal defenses in support of the constitutionality and lawfulness" of the Plan and that they are "uniquely positioned to present such . . . defenses because of their leadership of the Reapportionment Committee," *id.* ¶¶ 12–13, while making no mention of legislative immunity; (3) they have not moved to dismiss either *Singleton* or *Milligan*

on the basis of legislative immunity; and (4) they answered fully in both cases, putting in issue various factual and legal defenses that involve their work as legislators on the Plan and depend on their assertions about their intent and motives during the redistricting process, *see, e.g.*, *Singleton* Doc. 48 at ¶¶ 3, 65, 8 (p.10); *Milligan* Doc. 51 at ¶¶ 3, 5, 56–57, 60, 62–66, 176, 182, 184, 187, 208, 9 (p.33), 24 (p.35). Additionally, the Legislators have fully participated in prehearing motion practice (including by filing a declaration and joint factual stipulations) and Rule 16 conferences setting prehearing deadlines for discovery and motions, without giving the slightest indication that they were participating in the litigation for the limited purpose of asserting legislative immunity. *See supra* at 2–9.

The Legislators argue that *Powell* is both distinguishable and wrong. The Legislators first argue that they are unlike the legislators in *Powell* because they "oppose being called to testify at trial just as they oppose being deposed." *Milligan* Doc. 58 at 3. But this distinction makes no difference because it does not answer the sword/shield problem: the Legislators have put in issue factual and legal defenses that depend on their assertions about their intent and motives during the legislative process, but they refuse to participate in any discovery that would allow the *Milligan* plaintiffs to challenge those assertions.

Alternatively, the Legislators accuse the Third Circuit of "overlook[ing] . . . the dimension of the privilege relevant here: . . . to protect the integrity of the

legislative process by insuring the independence of individual legislators." *Id.* at 4 (quoting *United States v. Brewster*, 408 U.S. 501, 507 (1972)). We have sufficiently studied the privilege and are fully aware of its purpose. *See supra* at 11–14. Still, the only reasonable inference from the Legislators' litigation conduct is that they have decided to forego that "protect[ion]," *id.*, in pursuit of an opportunity to defend in court their decisions as legislators – they did not move to dismiss, they did move to intervene, they did not participate solely for the purpose of asserting their immunity, they did put in issue the very facts that they now assert their immunity covers. Ultimately, there is no inference needed: on reply, the Legislators explicitly say that it is "fitting" for them "to be able to participate in litigation over the plan they have helped enact" and "error" to conclude that their "ability to defend their work" in litigation waives their privilege. *Id.* at 2.

The Legislators urge us that it would be "ironic and wrong" to follow the reasoning in *Powell* because, "if the mere allegation that a valid legislative act was undertaken for an unworthy purpose" could destroy immunity, then legislative immunity "would not provide the protection" that it historically has offered. *Id.* at 5 (quoting *Eastland*, 421 U.S. at 508–09). But the Legislators have missed the point – it is not (and could not be, *see supra* at 13–14) the *Milligan* plaintiffs' assertion of an unworthy purpose that destroyed the Legislators' immunity and privilege. It is

the Legislators' extensive litigation conduct in response to that assertion that worked the waiver.

Because we conclude that the Legislators' litigation conduct waived their legislative immunity and privilege, we do not reach the other grounds the *Milligan* plaintiffs offered in their opposition to the motion for a protective order.

## IV. CONCLUSION

For the reasons stated above, Defendants McClendon and Pringle's Second Amended Motion for a Protective Order, Doc. 55, is **DENIED**.

**DONE** and **ORDERED** this 16th day of December, 2021.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE
for the court