# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY SINGLETON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1291-AMM |
| | ) | |
| JOHN H. MERRILL, *in his* | ) | THREE-JUDGE COURT |
| *official capacity as Alabama* | ) | |
| *Secretary of State, et al.* | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| EVAN MILLIGAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1530-AMM |
| | ) | |
| JOHN H. MERRILL, *in his* | ) | THREE-JUDGE COURT |
| *official capacity as Alabama* | ) | |
| *Secretary of State, et al.* | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| MARCUS CASTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1536-AMM |
| | ) | |
| JOHN H. MERRILL, *in his* | ) | |
| *official capacity as Alabama* | ) | |
| *Secretary of State,* | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION[1]

---

[1] Because of the overlapping issues raised by the motions for preliminary injunction filed in *Singleton v. Merrill*, No. 2:21-cv-1291 (N.D. Ala.), *Caster v. Merrill*, No. 2:21-cv-1536 (N.D. Ala.), and *Milligan v. Merrill*, No. 2:21-cv-1530 (N.D. Ala.), Defendants submit one consolidated response. Defendants will file an identical copy of this response in each of the three cases.

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................... i

TABLE OF AUTHORITIES .....................................................v

INTRODUCTION ................................................................1

BACKGROUND ...................................................................5

    A.   Continuity in Alabama's Congressional Maps..................6

    B.   The 1992 Map...............................................................7

    C.   The 2001 and 2011 Maps ................................................12

    D.   The 2021 Map...............................................................13

        1.  The Committee's Public Hearings and Redistricting Guidelines..13

        2.  The Map-Drawing Process............................................14

        3.  Enactment of Ala. Act 2021-555 ..................................17

    E.   The *Singleton* Plaintiffs' Equal Protection Claim ...........18

    F.   The Caster Plaintiffs' VRA Claim .................................20

    G.   The Milligan Plaintiffs' Equal Protection and VRA Claims............22

    H.   The Impending 2022 Elections.......................................26

STANDARD OF REVIEW ......................................................27

ARGUMENT .......................................................................29

    I.   The Singleton and Milligan Plaintiffs' Fourteenth Amendment Claims Fail on the Merits. ....................................................29

A.   Racial considerations did not predominate over traditional redistricting criteria in drawing the new lines in the 2021 congressional map. ................................................................32

B.   Plaintiffs Cannot Allege Predominance in the 2021 Maps Based on the Permissible Consideration of Race in Previous Redistricting Cycles..........................................................39

C.   The Singleton Plaintiffs Have No Legal Entitlement to Whole-County Congressional Districts.......................................................45

II.   The Milligan and Caster Plaintiffs' Section 2 Claims Fail on the Merits......................................................................................48

A.   Plaintiffs Fail to Satisfy the Necessary *Gingles* Preconditions. .......50

1.  The Minority Group Is Not "Sufficiently Large." .........................52

2.  The Minority Population is Not "Compact." .................................54

a.  *Gingles*'s "Compactness" Incorporates Traditional Districting Principles Beyond Geographical Compactness. .......54

b.  Plaintiffs' Proposed Maps Are Not Compact, Prioritizing Race Above Traditional Redistricting Principles.......................58

3.  Plaintiffs Fail to Show the Racial Polarization Necessary to Satisfy *Gingles*'s Second and Third Preconditions.......................81

B.   The "Totality of Circumstances" Confirms That the 2021 Map Does Not Violate Section 2. ............................................................84

1.  The Senate Factors Favor the State...............................................86

a.  Senate Factor 1: Alabama Has Overcome Its History. ..............87

b.  Senate Factor 2: Racial Polarization Is a Product of Politics, Not Race. ...................................................................................91

c. Senate Factor 3: Alabama Does Not Use Practices or Procedures That Enhance the Potential for Discrimination. .......94

d. Senate Factor 4: No Formal Slating Process Exists in Alabama. .....................................................................................95

e. Senate Factor 5: Plaintiffs Cannot Show That Disparities in Education, Employment, and Health Are Products of Discrimination. ...........................................................................95

f. Senate Factor 6: Political Campaigns in Alabama Are Not Characterized by Overt or Subtle Racial Appeals......................98

g. Senate Factor 7: Minorities Have Achieved Success in Alabama Elections. ......................................................................99

h. Senate Factor 8: Elected Officials Do Not Lack Responsiveness to Minority Needs. ..........................................102

i. Senate Factor 9: The State's Districts Are Not "Tenuous."......104

2. Considering the Totality of Circumstances, Black Alabamians Enjoy "Equally Open" Political Processes and Suffer No "Abridgement" to Their Rights "On Account of Race or Color." 105

C. Plaintiffs' Proposed Remedies Violate the Constitution. ...............109

1. Plaintiffs' Preferred Maps Discriminate on Account of Race. ....111

2. Plaintiffs' Preferred Maps Cannot Meet Strict Scrutiny..............113

D. Plaintiffs' Interpretation Is Unconstitutional and Thus Warrants Avoidance of Section 2 ..................................................115

E. Section 2 Does Not Provide Plaintiffs a Private Cause of Action. 117

III. The Balance Of Equities Weighs Heavily Against Abandoning Longstanding Congressional Districts On The Eve Of An Election. ....120

CONCLUSION ......................................................................130

CERTIFICATE OF SERVICE ...............................................132

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
138 S. Ct. 2305 (2018) .................................................................................. passim

*Abrams v. Johnson*,
521 U.S. 74 (1997) ....................................................................................... passim

*Alabama Legislative Black Caucus v. Alabama*, (*ALBC*),
575 U.S. 254 (2015) ................................................................................... 112, 113

*Alabama State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama*,
(*Alabama NAACP*)
No. 2:16-CV-731-WKW, 2020 WL 583803 (M.D. Ala. Feb. 5, 2020) ......................... passim

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ................................................................................... 119, 120

*Allen v. City of Evergreen, Alabama*,
2014 WL 12607819 (S.D. Ala. Jan. 13, 2014) ...................................................... 92

*American Legion v. American Humanist Ass'n*,
139 S. Ct. 2067 (2019) .................................................................................. 42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................... 32

*Balderas v. Texas*,
No. 6:01-cv-158, 2001 WL 34104833 (E.D. Tex. Nov. 28, 2001) ......................... 47

*Baldus v. Members of the Wis. Gov't Accountability Bd.*,
549 F. Supp. 2d 840 (E.D. Wis. 2012) ................................................................ 48

*Bartlett v Strickland*,
556 U.S. 1 (2009) ............................................................................. 36, 53, 55, 75

*Beer v. United States*,
425 U.S. 130 (1976) ...................................................................................... 44

*Bethune-Hill Virginia State Bd. of Elections*,
137 S. Ct. 788 (2017) ................................................................................... 111

v

*Brnovich v. Dem. Nat'l Comm.*,
141 S. Ct. 2321 (2021) ............................................................................... 39, 119

*Brown v. Sec'y, U.S. Dep't of Health & Human Servs.*,
4 F.4th 1220 (11th Cir. 2021) ........................................................................ 28, 29

*Burton v. City of Belle Glade*,
178 F.3d 1175 (11th Cir. 1999) ........................................................ 50, 52, 55, 111

*Bush v. Vera*,
517 U.S. 952 (1996) .............................................................................. 59, 78, 81

*Camp v. Wesch*,
503 U.S. 954 (1992) ...................................................................................... 12

*Camp v. Wesch*,
504 U.S. 902 (1992) ...................................................................................... 12

*Chestnut v. Merrill*,
446 F. Supp. 3d 908 (N.D. Ala. 2020) ............................................................... 67

*Chestnut v. Merrill*,
No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019) ............................................ 44

*Chisom v. Roemer*,
501 U.S. 380 (1991) ...................................................................................... 85

*City of Carrollton Branch of the N.A.A.C.P. v. Stallings*,
829 F.2d 1547 (11th Cir. 1987) ...................................................................... 102

*City of Mobile v. Bolden*,
446 U.S. 55 (1980) ................................................................................. 115, 118

*Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*,
906 F.2d 524 (11th Cir. 1990) .......................................................................... 83

*Cooper v. Harris*,
137 S. Ct. 1455 (2017) ............................................................................. passim

*Covington v. North Carolina*,
No. 1:15CV399, 2018 WL 604732 (M.D.N.C. Jan. 26, 2018) ............................... 46

*Davis v Chiles*,
139 F.3d 1414 (11th Cir. 1998) ................................................................ 110, 111

*Diaz v. Silver,*
932 F. Supp. 462 (E.D.N.Y. 1996) .................................................. 122

*Easley v. Cromartie,*
532 U.S. 234 (2001)................................................................. 2, 35

*Edmonson v. Leesville Concrete Co.,*
500 U.S. 614 (1991) ..................................................................... 73

*Edwards v. Prime, Inc.,*
602 F.3d 1276 (11th Cir. 2010) ................................................... 111

*Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.,*
441 F.2d 560 (5th Cir. 1971) .................................................. 29, 99

*Favors v. Cuomo,*
881 F. Supp. 2d 356 (E.D.N.Y. 2012) ................. 122, 123, 125, 129, 131

*Gill v. Whitford,*
138 S. Ct. 1916 (2018)................................................................ 46

*Gonzaga Univ. v. Doe,*
536 U.S. 273 (2002)................................................................. 120

*Graves v. City of Montgomery,*
807 F.Supp.2d 1096 (M.D. Ala. 2011) ........................................ 129

*Growe v. Emison,*
507 U.S. 25 (1993)..................................................................... 47

*Hereford v. United States,*
2015 WL 13398941 (N.D. Ala. Apr. 21, 2015) .............................. 91

*Holder v. Hall,*
512 U.S. 874 (1994).................................................................. 118

*In re Wild,*
994 F.3d 1244 (11th Cir. 2021) ................................... 119, 120, 121

*J.I. Case Co. v. Borak,*
377 U.S. 426 (1964)................................................................. 119

*Johnson v De Grandy*,
    512 U.S. 997 (1994)................................................................................ 85, 115

*Johnson v. Governor of State of Fla.*,
    405 F.3d 1214 (11th Cir. 2005) ........................................................... 43

*Jones v. Jefferson Cnty. Bd. of Education*,
    No. 2:19-CV-1821-MHH (DE9) (N.D. Ala. Nov. 9, 2019)................... 92

*Karcher v. Daggett*,
    462 U.S. 725 (1983)................................................................... 56, 63, 80

*League of United Latin Am. Citizens v. Perry*, (*LULAC*)
    548 U.S. 399 (2006)................................................................... passim

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, (*Clements*)
    999 F.2d 831 (5th Cir. 1993) ............................................................ 86, 93

*Mac Govern v. Connolly*,
    637 F. Supp. 111 (D. Mass. 1986) .......................................... 121, 122

*Martinez v. Mathews*,
    544 F.2d 1233 (5th Cir. 1976) ............................................................. 29

*Miami Beach Fed. Sav. & Loan Ass'n v. Callander*,
    256 F.2d 410 (5th Cir. 1958) ................................................. 29, 52, 85

*Miller v. Johnson*,
    515 U.S. 900 (1995)................................................................... passim

*N.A.A.C.P., Jacksonville Branch v. Duval Cty. Sch.*,
    273 F.3d 960 (11th Cir. 2001) ............................................................ 91

*N.W. Austin Mun. Utility Dist. No. One v. Holder*,
    557 U.S. 193 (2009)................................................................ 50, 97, 118

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990) ........................................................... 28

*NFIB v. Sebelius*,
    567 U.S. 519 (2012)........................................................................... 118

*Nipper v Smith*,
    39 F.3d 1494 (11th Cir. 1994) ............................................... 56, 110, 111

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984) ...................................................................... 47, 48, 49

*Personnel Adm'r of Mass. v. Feeney,*
442 U.S. 256 (1979) ........................................................................ 41, 42

*Pileggi v. Aichele,*
843 F. Supp. 2d 584 (E.D. Pa. 2012) ................................................... 124

*Pope v. County of Albany,*
687 F.3d 565 (2d Cir. 2012)........................................................ 52, 53, 82

*Purcell v. Gonzalez,*
549 U.S. 1 (2006) ............................................................................... 5, 29

*Reynolds v Sims,*
377 U.S. 533 (1964) ..................................................................... 122, 123

*Rodriguez v. Popular Democratic Party,*
457 U.S. 1 (1982) ................................................................................. 120

*Roman v. Sincock,*
377 U.S. 695 (1964).............................................................................. 122

*Rucho v. Common Cause,*
139 S. Ct. 2484 (2019) ................................................................... 46, 115

*S. Christian Leadership Conf. of Alabama v. Sessions,*
56 F.3d 1281 (11th Cir. 1995) ............................................................. 111

*School Dist. of Abington Twp., Pa. v. Schempp,*
374 U.S. 203 (1963) .............................................................................. 42

*Sensley v. Albritton,*
385 F.3d 591 (5th Cir. 2004) ....................................................... 59, 61, 62

*Shaw v. Hunt,* (*Shaw II*)
517 U.S. 899 (1996)........................................................................ passim

*Shaw v. Reno,* (*Shaw I*)
509 U.S. 630 (1993)........................................................................ passim

*Shelby County v. Holder*,
570 U.S. 529 (2013).................................................................. 87, 89, 108, 118

*Solomon v Liberty Cnty. Comm'n.*
221 F.3d 1225 (11th Cir. 2000) ...................................................... 86, 92

*Stenger v. Kellett*,
No. 4:11-cv-2230, 2012 WL 601017 (E.D. Mo. Feb. 23, 2012) .......................... 31

*Swain v. Junior*,
958 F.3d 1081 (11th Cir. 2020) ......................................................... 29

*Thornburg v. Gingles*,
478 U.S. 30 (1986)................................................................... passim

*United States v. Georgia*,
546 U.S. 151 (2006).................................................................... 116

*United States v. Lambert*,
695 F.2d 536 (11th Cir. 1983) .......................................................... 28

*United States v. Marengo Cty. Comm'n*,
731 F.2d 1546 (11th Cir. 1984) ......................................................... 97

*United States v. Ohayon*,
483 F.3d 1281 (11th Cir. 2007) ........................................................ 111

*Upham v. Seamon*,
456 U.S. 37 (1982).................................................................... 47

*Vieth v. Jubelirer*,
541 U.S. 267 (2004).................................................................... 31

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)................................................................... 31

*Waldman v. Conway*,
871 F.3d 1283 (11th Cir. 2017) ........................................................ 48

*Wesberry v. Sanders*,
376 U.S. 1 (1964)................................................................... 20, 21

*Wesch v. Folsom*,
6 F.3d 1465 (11th Cir. 1993) ........................................................... 6

*Wesch v. Hunt,*
   785 F. Supp. 1491 (S.D. Ala. 1992) ........................................................ passim

*White v. Weiser,*
   412 U.S. 783, 791-92 (1973) ...................................................... 26, 63

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ...................................................................... 28

*Wise v. Lipscomb,*
   437 U.S. 535 (1978) .................................................................. 122

*Wright v. Sumter County Board of Education and Registration,*
   979 F.3d 1282 (11th Cir. 2020) .................................................... 97

*Ziglar v. Abbasi,*
   137 S. Ct. 1843 (2017) .............................................................. 119

## Statutes

42 U.S.C. § 1973(b) ....................................................................... 85

52 U.S.C. § 20302(a)(8) ............................................................... 128

52 U.S.C. §10301 ........................................................................ 106

52 U.S.C. §10301(a) ............................................................ 86, 88, 110, 120

52 U.S.C. §10301(b) .................................................................. passim

52 U.S.C. §10302 ........................................................................ 120

Ala. Code § 17-6-4(d) ................................................................. 128

Ala. Code § 17-9-3 ....................................................................... 27

Ala. Code § 17-9-3(a) .................................................................. 126

Ala. Code § 17-6-22 .................................................................... 126

Ala. Code §§ 17-6-22(a)(1) ............................................................ 27

Ala. Code. § 17-13-1 ............................................................................................. 125

Ala. Code. § 17-13-3(a) .......................................................................................... 27

Ala. Code § 17-13-5(a) ........................................................................................... 27

Ala. Code. § 29-2-51 ............................................................................................... 14

## Constitutional Provisions

U.S. Const. amend. XV, § 2 ......................................................................... 116, 117

U.S. Const. art. I, § 2 ............................................................................................. 47

## Other Authority

Alabama Act, 2021-555 ........................................................................... 17, 23, 31, 32

*Alabama Democratic Conference* (last accessed December 20, 2021), available at:
   www.aldemco.org .............................................................................................. 10

*Alabama NAACP Hosts Vaccine Roundtable with State and Local Health Leaders*,
   6WBRC (Mar. 4, 2021), available at: https://www.wbrc.com/2021/03/05/alabama-
   naacp-hosts-vaccine-roundtable-with-state-local-health-leaders/
   (last accessed December 22, 2021) ..................................................................... 104

*Alabama Republican Party Launches New Minority Outreach Effort*,
   AL.com (Oct. 21, 2021), available at: https://perma.cc/3X2P-FRW4 .................. 108

Alabama Secretary of State, Elections Data Downloads: Voter Registration Statistics - 2021
   (October) *available at* https://sos.alabama.gov/alabama-votes/voter/election-data
   (last visited Nov. 22, 2021) ............................................................................... 126

Alabama State Department of Education, *State Board of Education*,
   https://www.alabamaachieves.org/state-board-of-education/ (last visited Dec. 20, 2021) .. 102

Ashley Nellis, *The color of justice: Racial and ethnic disparity in state prisons* (2021), available
   at https://perma.cc/2YU3-4BXQ ........................................................................... 98

Bradley Byrne for U.S. Senate, *Dale* (Jan. 6, 2020)
    https://www.youtube.com/watch?v=31HHFy8JkoU ............................................. 100

Doug Bell for U.S. Congress, Get Involved, *available at* https://dbellforuscongress.com/
    get-involved/ (last visited Nov. 21, 2021) ........................................................................... 126

Federal Election Commission, Alabama – House District 05, Candidate Financial Totals,
    *available at* https://www.fec.gov/data/elections/house/AL/05/2022/
    (last visited Nov. 21, 2021) .................................................................................................. 125

Federal Election Commission, Candidate Profiles: Felix Barry Moore, Spending,
    *available at* https://www.fec.gov/data/candidate/H8AL02171/?cycle=2022&election_full=
    true&tab=spending (last visited Nov. 21, 2021) ................................................................. 125

Federal Election Commission, Candidate Profiles: Terri A. Sewell, Spending,
    *available at* https://www.fec.gov/data/candidate/H0AL07086/?cycle=2022&election_full=
    true&tab=spending (last visited Nov. 21, 2021) ................................................................. 125

Federal Election Commission, Candidates (limited to the 2022 election for Alabama House who
    have raised money), *available at* https://www.fec.gov/data/candidates/?election_year=
    2022&office=H&state=AL&is_active_candidate=true&has_raised_funds=true
    (last visited Nov. 21, 2021) .................................................................................................. 125

John Sharp, *Redistricting Alabama: How South Alabama could be split up due to Baldwin
    County's growth*, AL.com (Sep. 20, 2021), available at https://perma.cc/8PME-JA5W .......... 69

*Kenneth Paschal Wins House District 73 Special Election*, Alabama Political Reporter
    (Jul. 14, 2021), available at: https://perma.cc/2CEJ-C37B .................................................... 94

Persily, *In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to
    Incumbent-Protecting Gerrymanders*, 116 Harv. L. Rev. 649, 671 (2002) ..................... 31, 62

Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting
    Plans*, 73 Geo. Wash. L. Rev. 1131 (2005) ................................................................. 123, 129

Persily, *The Law of the Census*, 32 Cardozo L. Rev. 755 (2011) ................................................. 53

Reapportionment Committee Hearing Schedule, available at https://perma.cc/4GFX-Z9TJ
    (last visited Dec. 20, 2021) ................................................................................................... 15

S. Rep. No. 97-417, 97th Cong.2nd Sess. 28 (1982) ........................................................... 88, 105

U.S. Census Bureau, *Alabama*, available at
    https://data.census.gov/cedsci/profile?g=0400000US01 (last visited Dec. 22, 2021)............ 90

U.S. Census Bureau, *American Community Survey Database*,
    https://perma.cc/4LCA-W796 (last visited Dec. 22, 2021) .................................................... 98

U.S. Census Bureau, *Voting and Registration in the Election of November 2016*,
Table 4b: Reported Voting and Registration by Sex, Race and Hispanic Origin, for States:
November 2016, https://www.census.gov/topics/public-sector/voting/data/tables.html...... 107

U.S. Census Bureau, *Voting and Registration in the Election of November 2018*, Table 4b:
Reported Voting and Registration by Sex, Race and Hispanic Origin, for States:
November 2018, https://www.census.gov/topics/public-sector/voting/data/tables.html
.................................................................................................................................. 107, 108

## INTRODUCTION

Alabama, like most States, must redraw its congressional districts every ten years to ensure rough equality of population across each district. And in 2021, Alabama, like most States, followed the "common practice" of "start[ing] with the plan used in the prior map and … chang[ing] the boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends." *Cooper v. Harris*, 137 S. Ct. 1455, 1492 (2017) (Alito, J., concurring in part). The State followed the traditional redistricting criteria of retaining the core of its existing districts while making those districts more compact. Race played no role in that process. Rather, undisputed testimony from the State's map-drawer confirmed that he adjusted the districts' population without examining racial demography. Likewise, there is no evidence to suggest the 2021 Legislature adopted this ordinary map for racially discriminatory reasons.

Despite following this familiar, race-neutral approach, Alabama now faces three challenges to its map. Together these cases raise the question whether the Equal Protection Clause or Section 2 of the Voting Rights Act required the 2021 Legislature to substitute traditional redistricting criteria for Plaintiffs' race-based approach to redistricting. The answer is clear. Nothing in the Constitution or the VRA entitles Plaintiffs to court-ordered districts of their preferred racial composition—especially not at the preliminary injunction stage with election deadlines just weeks away.

Plaintiffs' Fourteenth Amendment "racial gerrymandering" claims fail at the starting gate because race did not influence—much less predominate—in any aspect of the 2021 redistricting plan. To the contrary, Alabama's objective was to equalize population while retaining the core of existing districts and making them more compact. "The State's policy of adhering to other districting principles instead of creating as many majority-minority districts as possible does not support an inference that the plan so discriminates on the basis of race or color as to violate the Constitution." *Miller v. Johnson*, 515 U.S. 900, 924 (1995) (quotations omitted). And Plaintiffs' complaint that District 7 looks too much like it has looked since 1992 ignores that "the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority." *Easley v. Cromartie*, 532 U.S. 234, 249 (2001). Such districts are fine when—as here—they are drawn for "traditional … districting motivations." *Id*. If anything, it is *Plaintiffs'* preferred maps that would involve an unconstitutional racial gerrymander by dismantling and upending districts that have remained largely unchanged for decades solely to impose explicit racial quotas.

Plaintiffs' VRA claims fare no better. The core of these claims is that Section 2 requires Alabama to draw two majority-black districts with slim black majorities as opposed to one majority-black district with a slightly larger majority. But nothing in the VRA mandates this choice. Plaintiffs' proposed maps all fail the Supreme

Court's test for vote dilution because they are unable to produce maps with a second majority-black district unless they completely ignore traditional districting criteria such as compactness and maintaining communities of interest. Indeed, Plaintiffs' maps would eviscerate the State's political geography by carving up Alabama's longstanding existing districts (such as the unprecedented splitting of Mobile County), splicing together areas with no common interests (such as the shipyards of Mobile and the peanut farms of Dothan), and consequently pitting incumbents against each other. Even the Milligan Plaintiffs' own expert, Dr. Kosuke Imai, confirms that race predominates in the Caster and Milligan plans, for when he used an algorithm to randomly generate 10,000 redistricting plans from scratch that purportedly respected most redistricting principles (except retaining cores of districts), *none* of his plans contained two districts with majority black voting age population. By Plaintiffs' and their experts' logic, the only way the Caster and Milligan map-drawers could generate such plans was by subjugating traditional districting criteria to race. Nothing in Section 2 supports Plaintiffs' extraordinary request that this Court impose districts with Plaintiffs' surgically targeted racial compositions while jettisoning numerous traditional districting criteria. If that is what Section 2 requires (it is not), then its constitutionality is in serious doubt.

Finally, the equitable factors strongly counsel against any issuance of a preliminary injunction. The Supreme Court has emphasized time and again that state

legislatures have primacy in redistricting, and there would be considerable sovereignty and federalism harms were this Court to override the enacted maps. Those concerns apply with even greater force here given that Alabama's 2021 maps *largely keep existing districts intact*. For this reason, the balance of equities is not close: Alabama's enacted map largely retains the status quo, whereas Plaintiffs seek an affirmative injunction that would upend the State's longstanding political geography and dismantle the core of enduring districts and communities of interest. Finally, the timing of this suit further counsels against preliminary injunctive relief. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006). Primary candidates seeking their party's nomination must declare their candidacy by January 28, 2022, and there has already been significant campaigning, organizing, and fundraising activity in direct reliance on the existing districts. Moreover, local election officials across the State would be forced to try to reassign hundreds of thousands, if not millions, of voters to different congressional districts and precincts to ensure they receive the correct ballots when absentee voting begins on March 30, 2022. The confusion and errors that would follow show that an injunction is decidedly not in the public interest. Plaintiffs' extraordinary requests to enjoin the use of Alabama's ordinary map should be rejected.

## BACKGROUND

For nearly 50 years, Alabama's congressional districts have remained remarkably similar. *See Singleton* DE1:6, 14-15, 18, 23, 25 (figures 1, 4-8). [2] Following the 1970 census, Alabama dropped from eight congressional districts to seven. Ever since, District 1 has included the Gulf Coast counties; District 2, the Wiregrass and all or parts of Montgomery; District 3, the eastern-central parts of the State; District 4, the rural northwestern counties and the Sand Mountain area; District 5, the northernmost Tennessee Valley area; District 6, much of Jefferson County; and District 7, the western Black Belt counties and parts of Tuscaloosa and/or Jefferson Counties. *Id.* Over the decades, representatives have learned the needs of their districts and gained seniority, allowing them to better meet those needs.

As part of redistricting litigation in the 1990s, a three-judge court imposed a congressional plan (the 1992 Map) containing a majority-black District 7. *See Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992); *Wesch v. Folsom*, 6 F.3d 1465 (11th Cir. 1993). After the 2000 and 2010 redistricting cycles, congressional districts remained largely the same, with the Legislature enacting laws to equalize population. *Singleton* DE1:6, 25. Neither the 2001 Map nor the 2011 Map were ever declared unlawful by a court and both were precleared by the Department of Justice.

---

[2] "DE" refers to docket entries in the relevant case, with the number immediately following DE signaling the specific entry. Where a colon follows "DE," the number following the colon provides a pin cite. Pin cites align with ECF pagination.

That brings us to the only law challenged in this litigation. Following the 2020 census, Alabama maintained its seven congressional districts. Because Alabama's population grew from 4,779,736 to 5,024,279 between 2010 and 2020, the Legislature had to update Alabama's congressional map. District 7 in particular fell far below the ideal population for a congressional district, requiring the addition of over 50,000 people to make up the difference. District 5, by comparison, exceeded the ideal population by over 40,000 people. In 2021, the Legislature added or subtracted people to the districts as necessary to equalize their populations. In so doing, the Legislature closed county splits in Cherokee and Clarke Counties, made District 7 more compact, and reconnected a community of interest in the Shoals. And it did all this without considering race.

Because many of Plaintiffs' claims turn on purportedly racist intent behind the 1992, 2001, or 2011 Maps, we provide a brief summary of those maps before discussing the 2021 Map and the three sets of challenges to the law that created it.

A.    **Continuity in Alabama's Congressional Maps**

Following the 1970 census, Alabama dropped from eight seats in Congress to seven. The congressional maps Alabama has since used have generally maintained certain cores, even as population has shifted over the decades. Indeed, for each of

the congressional plans Alabama has had since the 1970 census—including the plan enacted in 2021—the following districts have included the following counties[3]:

District 1: Mobile, Baldwin, Escambia, Washington, and Monroe;

District 2: Conecuh, Butler, Crenshaw, Covington, Montgomery, Pike, Bullock, Barbour, Coffee, Dale, Geneva, Henry, and Houston;

District 3: Calhoun, Cleburne, Talladega, Clay, Randolph, Tallapoosa, Chambers, Macon, Lee, and Russell;

District 4: Franklin, Marion, Winston, Lamar, Fayette, Walker, Cullman, Marshall, DeKalb, and Etowah;

District 5: Jackson, Madison, Morgan, Limestone, and Lauderdale;

District 6: Jefferson; and

District 7: Jefferson, Tuscaloosa, Greene, Hale, Perry, Dallas, Sumter, Marengo, and Choctaw.

*See Singleton* DE15:9, 17-18, 26, 28, 36.

**B.    The 1992 Map**

Alabama's first majority-black congressional district, District 7, was imposed by court order in 1992. In 1990, the Alabama Legislature created the Permanent Legislative Committee on Reapportionment to lead redistricting efforts in the 1992

---

[3] All of these counties have remained whole in each plan except for Escambia, Montgomery, Jackson, Lauderdale, Morgan, Jefferson, and Tuscaloosa.

cycle. Ex. 1 (1992 Preclearance Letter) at 2. The Committee held public meetings and reviewed numerous proposed congressional redistricting plans in September and October 1991, expecting the Alabama Governor to call a special session for redistricting that fall. *Id.* at 3. He did not. *Id.* at 4. Instead, on September 23, 1991, a plaintiff filed suit against the Governor and other state officials, alleging that holding the 1992 elections with the then-existing congressional plan would violate the United States Constitution. *See Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992). Intervenors joined the case "on their own behalf and on behalf of all African-American citizens of the State of Alabama," raising a Section 2 claim. *Id.* at 1493.

The Committee continued its work developing a congressional plan for the 1992 election. *See* Ex. 1 at 4. "Virtually all" congressional plans submitted to the Committee contained one "solid" majority-black district. *Id.* The Committee considered creating a plan with "two predominantly black districts," *id.* at 9, but no serious plan including two majority-black districts was submitted to the Committee or introduced in the Legislature, *id.* at 14. Similarly, in the *Wesch* litigation, the intervenors submitted a plan that created two districts "with an African-American population of 59.33% and 61.98% respectively," but intervenors informed the court that they doubted African-Americans would have an "opportunity to elect candidates of their choice in these districts." *Wesch*, 785 F. Supp. at 1496.

Alabama's most prominent black political leaders vocally opposed a congressional map with two majority-black districts. Four testified before the Committee: Joe Reed, Chair of the Alabama Democratic Conference ("ADC")[4]; Jerome Gray, the ADC's Field Director; Albert Turner Sr., a "west Alabama political veteran affiliated with the" Alabama New South Coalition; and Lillian Jackson, President of the Alabama NAACP. *Id.* at 9. For example, Mr. Gray stated that he had "serious reservations regarding whether blacks can get elected in either one of the districts" in a plan with two majority-black districts. *Id.* at 11. Mr. Turner Sr. was less circumspect: "I have no intention at all of trying to support a [map with] two black congressional seats in Alabama. I think it's ludicrous, to be honest with you. I don't see no possibility of having two seats that black folks can win in Alabama." *Id.* at 12. Ms. Jackson dispelled the apparent belief that the Alabama NAACP—a Plaintiff in this litigation—supported a map with two majority-black districts, stating that such a plan would "lessen our chances of getting a minority or a black elected to congress. It would weaken our ability to raise funds or the candidate's ability because the resources would be greatly split." *Id.* at 13.

On February 27, 1992, the Alabama Legislature passed a plan containing one majority-black district. *Id.* at 5. After the Legislature overrode a gubernatorial veto

---

[4] The ADC refers to itself as "the Black Caucus of the Alabama Democratic Party." Homepage, *Alabama Democratic Conference* (last accessed December 20, 2021), available at: www.aldemco.org.

on March 5, *id.*, the State submitted the plan to the Department of Justice for pre-clearance on March 10, 1992, *id.* at 1.

Meanwhile, a two-day trial occurred before a three-judge court. *Wesch v. Hunt*, 785 F. Supp. at 1492. On January 3, during the trial, the parties stipulated that "the African American population in the State of Alabama is sufficiently compact and contiguous to comprise a single member significant majority (65% or more) African American Congressional district" and that such a district "should be created." Ex. 2 (*Wesch* Supplemental Stipulation). On March 6, the State filed a motion for the three-judge court to adopt the plan passed by the Legislature. Ex. 3 (*Wesch* App'x Excerpt) at 185a. On March 9, the court declared unconstitutional the State's then-existing map (enacted in the 1980s) because of the State's failure to timely re-draw its congressional map. 785 F. Supp. at 1500-01. The court denied the State's motion to adopt the legislative plan and ordered the State to adopt a court-ordered plan that ensured District 7 would have at least a 65% black majority, while "maintaining the cores of existing Districts 1 and 2," and thus "better preserv[ing] the communities of interests in those two districts" than the only other plan submitted to the court that achieved population equality among the districts. *Wesch*, 785 F. Supp. 1495-97. As a result, if the Department of Justice precleared the State's plan by March 27, it would take effect; otherwise, 1992 elections would occur using the court's plan. *Id.* at 1501.

On March 27, the Department of Justice denied preclearance. It emphasized "at the outset the extreme time constraints imposed by the order of the Court." Ex. 4 (1992 DOJ Objection Letter) at 1. "For that reason, our review to date necessarily has been limited, and similarly, the short time available has limited the state's ability to meet its burden under Section 5." *Id.* Despite the testimony of many of Alabama's black political leaders, the Department opined—based on limited information—that Alabama's black population was unnecessarily fragmented and that creating an additional majority-minority district would "enhance the ability of black voters to elect representatives of their choice." *Id.* at 2. In closing, the Department again emphasized the hurried nature of its review and its apparent inability to fully grapple with the issues involved in the proposed districts. *Id.* at 2.[5] Accordingly, the State's plan never took effect. The State sought to stay the three-judge court's order on March 24, 1992, but the Supreme Court denied the application, *Camp v. Wesch*, 503 U.S. 954 (1992), and summarily affirmed the three-judge court, *Camp v. Wesch*, 504 U.S. 902 (1992). The Department of Justice never sought to modify the court-adopted

---

[5] At this time during the 1990s, the Department of Justice was enforcing a "max-black" policy that the Supreme Court later held to be a misapplication of the VRA. *See Miller v. Johnson*, 515 U.S. 900, 924-25 (1995).

plan that went into force after preclearance of the enacted plan was denied. An illustration of the 1992 Map is reproduced here. *See also Singleton* DE15:26; *Wesch*, 785 F. Supp. at 1582.



### C. The 2001 and 2011 Maps

Both the 2001 and 2011 maps maintained the cores of districts, changing them only to equalize population. The 2011 map largely built off the 2001 map, which itself built off the 1992 map. *Milligan* DE70-2:38-40. Both of these maps received preclearance from the Department of Justice and neither was ever deemed unlawful. They are reproduced below. *See also Singleton* DE15:9, 28.





### D. The 2021 Map

#### 1. The Committee's Public Hearings and Redistricting Guidelines

The Committee prepares and develops redistricting plans for the State following each decennial census. The Committee is composed of members from the State House and Senate. *Milligan* DE53:18 ¶ 81 (citing Ala. Code § 29-2-51).

On May 5, 2021, at its first public meeting of the redistricting cycle, the Committee enacted guidelines for the 2021 redistricting plan. *Id.* at 19 ¶ 89. The Committee based these guidelines on the requirements of the U.S. Constitution, the Alabama Constitution, and policies "embedded in the political values, traditions, customs, and usages of the State of Alabama." *Id.* at 15 ¶ 71. These policies include, among other things, "[p]reservation of the cores of existing districts"; "[r]espect for 'communities of interest, neighborhoods, and political subdivisions to the extent practicable'"; and "[a]voiding contests between incumbents where possible." *Id.* at 16 ¶ 76. The Committee defined "communities of interest" as "as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities." *Id.*

In September 2021, the State solicited public input and provided numerous opportunities for citizens to express their opinions about the redistricting process. From September 1 to September 16, the Committee held twenty-eight public hearings across the State. *Id.* at 19 ¶ 84. These hearings could be attended in person or

via videoconference. *Singleton* DE47:8 ¶ 34; *see also* Reapportionment Committee Hearing Schedule, available at https://perma.cc/4GFX-Z9TJ (last visited Dec. 20, 2021).

## 2. The Map-Drawing Process

The Legislature's map-drawer, Randy Hinaman, followed the Committee's guidelines as he drafted a map for the Legislature. *See Milligan* DE70-2 (Deposition of Randy Hinaman) at 136. Hinaman began working on the map in earnest in May 2021, after the Census Bureau released the results of the 2020 Census and the State learned it would retain its seven districts. *Id.* at 65. At the outset, he met with six of Alabama's seven sitting members of Congress (and met with Rep. Mo Brooks's chief of staff) to discuss the redistricting process. *Id.* at 68-69.

Following release of the 2020 Census data, Hinaman began drawing the 2021 Map this past August. The process took place "[e]ntirely" on "the State's computers and software" in "the reapportionment office at the state house, Room 316." *Id.* at 78. Throughout this drafting, Hinaman again met "with all of the members of congress … or their chief of staff" to discuss the 2020 Census data and potential map adjustments. *Id.* at 84. During these meetings, Hinaman would "share [his] screen to be able to show what the map look[ed] like" to each Congressman. *Id.* at 85.

Hinaman "used [the] 2011 congressional map"—or, "the cores of the existing districts"—as his "starting point in drafting the 2021 congressional map." *Id.* at 93-

94. Because 2020 Census data showed District 7 was underpopulated, Hinaman altered its footprint to increase that district's population. *Id.* at 95-97. While adding population to District 7, Hinaman "didn't look at race at all." *Id.* at 97-98.

Entering the final stretch of the congressional map-drawing process, in "mid to late September" Hinaman solicited feedback on his proposed map from Alabama's Congressmen. *Id.* at 103-105; *see also id.* at 122-35. Aside from a few minor adjustments, Hinaman made no further changes to his map. *Id.* He based his final draft "on the congressional representatives' feedback" while adhering to the guidelines. *Id.* at 106.

Upon completing his final draft, and just one "week before the special session" scheduled for the Legislature to vote on the congressional map, Hinaman for the first time examined the racial composition of the map in order to "comply with the Voting Rights Act." *Id.* at 99. To reiterate, prior to evaluating the map for possible VRA issues the only data Hinaman analyzed was "total pop[ulation] and geography," *id.*; thus, the only factors he considered when making any alteration to the 2011 map were race-neutral, *id.* at 100; *see also id.* at 145-46 ("I made sure that when I added—I used traditional redistricting principles of total pop and geography considerations to add and subtract to these districts, and that that was not based on race."). After the final draft was complete, Hinaman's VRA check with the map-making software revealed that District 7 contained approximately 54% single-race

black[6] voting-age population ("BVAP"). (In the 2011 plan, by comparison, District 7 was approximately 60.5% BVAP. *See Milligan* DE53:11 ¶ 52.).

What follows are illustrations of (1) the map Hinaman drew (and the Legislature later enacted) in 2021 (*Singleton* DE15:36), and (2) a map (from *Milligan* DE66-2:52) showing the changes between the 2011 and 2021 maps:



---

[6] "Single-race black" refers to Alabamians who self-identify only as black and not any other race.

16

### 3. Enactment of Ala. Act 2021-555

Hinaman's map was a draft without any force of law. Both houses of the Legislature, and their respective committees, would have the opportunity to consider the map and propose alternatives. Governor Ivey called a special legislative session on redistricting to begin on October 28, 2021. *Milligan* DE53:19 ¶ 88. The Committee released the draft congressional map and draft maps for the State House, Senate, and Board of Education to the public and held a public meeting on October 26, 2021. *Id.* at 19-20 ¶¶ 89, 91. All four maps passed out of the Committee along partisan lines. *Id.* at 21 ¶¶ 103-04. On October 29, 2021, the House State Government Committee discussed the proposed districting plan. *Id*. at 21 ¶ 106. It voted along partisan lines to adopt the map. *Id*. at 21 ¶ 107.

The full House considered the congressional plan on November 1, 2021. *Id.* at 22 ¶ 108. It considered various substitute plans from both Republicans and Democrats, none of which was adopted. *Id.* at 22 ¶¶ 108-16. The House passed the plan by a vote of 65 to 38. *Id.* at 22 ¶ 109. While the bill did not garner any Democratic support, it did not strictly pass on racial lines, as Republican Representative Kenneth Paschal, who is black, voted in favor of the bill. *Id.* at 37 ¶ 180.

The Senate General Fund and Appropriations Committee considered the congressional map on November 2, 2021, and approved the map along partisan lines. *Id*. ¶¶ 110-11. The full Senate considered the congressional map the next day. *Id.*

¶ 112. Like the House, the Senate rejected several alternative plans. *Id.* ¶¶ 114-15. The Senate passed the plan by a vote of 22-7 along partisan lines. *Id.* ¶ 116-17.

### E.     The *Singleton* Plaintiffs' Equal Protection Claim

Even before the 2021 Map had been drawn, the Singleton Plaintiffs filed suit, alleging that the 2011 plan created a racially gerrymandered congressional map. *See Singleton* DE1:1. Following passage of the 2021 plan, the Singleton Plaintiffs filed an amended complaint alleging that the 2021 plan violated the Equal Protection Clause. *See Singleton* DE15:2.

The Singleton Plaintiffs' equal protection theory traces back to the 1992 Map. In their view, that map was drawn to create a majority-black District 7, the redistricting laws passed in 2001 and 2011 "perpetuated the racially gerrymandered District 7," and the 2021 Legislature "intentionally perpetuated the unconstitutional racial gerrymandering." *Singleton* DE1:1-2. They also contend that "the Voting Rights Act no longer requires maintenance of a majority-black Congressional District in Alabama," and thus that the VRA does not "justify splitting county boundaries when Districts drawn without racial gerrymandering provide black voters constituting less than a majority, combined with reliably supportive white voters, an opportunity to elect candidates of their choice." *Id.* at 2. Thus, their theory is that at some point since 1992, a springing Fourteenth Amendment violation arose and

the Legislature became obligated to fundamentally alter District 7. The 2021 Legislature's failure "to remedy the racial gerrymander inherent in the 2011 plan" is (Plaintiffs say) proof of discriminatory intent, and "District 7 will constitute a racial gerrymander until the Legislature or this Court redraws it using traditional districting principles that comply with the Constitution." *Singleton* DE57:23, 25.

The Singleton Plaintiffs have a favorite districting principle that they would have this Court elevate above all others: whole counties. They ask the Court to require a "whole county plan" that "accept[s]" what they consider to be "slight deviations in population to accommodate Alabama's strong historical preference for not splitting counties." *Id.* at 47. The Singleton Plaintiffs assert that strict adherence to county boundaries will cure the ills of alleged racial gerrymandering. Simultaneously, they tout the racial makeup of their proposed plan, which they assert is superior because it increases the likelihood that candidates supported by black voters will prevail in two districts. *Id.* 26-27. The Singleton Plaintiffs never allege that any statutory or constitutional provision requires their particular configuration of counties or any particular racial breakdown in the resulting districts. Nor do they cite any state or federal law mandating whole-county preeminence among all other districting principles. And Alabama has not adopted a whole-county congressional plan since 1964, when the Supreme Court held in *Wesberry v. Sanders* that redistricting

based on county lines alone could violate the Fourteenth Amendment's one-person/one-vote requirement. 376 U.S. 1 (1964).

The Singleton Plaintiffs' "Whole County Plan" includes no majority-minority districts, opting instead to "afford African Americans an opportunity to elect candidates of their choice in at least two districts." *Singleton* DE15:5. Albert Turner Jr., a black Democrat on the Perry County Commission and son of civil rights leader Albert Turner Sr., addressed this plan at one of the State's 28 public redistricting hearings: "I heard … something about Senator Singleton is going to be supporting a plan. Senator Singleton is not going to be representing any plan that's got 40-something percent voting age black population and think that's going to pass. That's not going to pass, and blacks sure aren't supporting that." Ex. 5 (Shelton State Community College Public Hearing Transcript) at 28.

### F.    The Caster Plaintiffs' VRA Claim

The Caster Plaintiffs filed suit on November 4, 2021, alleging the 2021 plan violates Section 2 of the VRA because it includes only one majority-black district instead of two such districts. *Caster* DE3:2. They assert that while black Alabamians compose "nearly 26 percent of the state's voting age population, they have the opportunity to elect a candidate of their choice in just one out of seven districts." *Id.*

In trying to prove that black Alabamians are sufficiently numerous and "geographically compact to constitute a majority of eligible voters in two congressional

districts," *id*. at 30, the Caster Plaintiffs have introduced six illustrative maps drawn by their expert, Bill Cooper. *See Caster* DE48:20-35. Each map reshapes Districts 1 and 2 in similarly dramatic ways.

First, Districts 1 and 2 would lose their identities as districts anchored by the Gulf and the Wiregrass respectively. For the first time since 1972, District 1 would no longer contain all of Washington, Mobile, and Monroe Counties, and the district would stretch along the Florida line from the southwest tip of Alabama to the Georgia border. Likewise, District 2 would lose many Wiregrass counties and would stretch back west to the Mississippi border, dipping into Mobile County to grab much of the county's black population, while leaving many white Mobilians in District 1. Any of these maps would represent the first time since the 1970s that the State's two Gulf counties—Mobile and Baldwin—would be broken up between two districts. And each would be the first time in Alabama history that Mobile County would be split. Cooper's first map (*Caster* DE48-17) is included here as a reference.



While the Caster Plaintiffs assert in their motion for preliminary injunction that Cooper's maps adhere to the "traditional redistricting principle" of "protection of incumbents," (DE56:12 citing Cooper Rep. at 21 ¶¶ 45-47), Cooper does not make that same claim in his report, and five of his six maps pair incumbents in the same district. *See* Ex. 6 (Thomas M. Bryan Supplemental Report ("Bryan Supp. Rep.")) at 16.

Cooper reports the following any-part black[7] voting age population percentages for his VRA districts:

|  | Plan 1 | Plan 2 | Plan 3 | Plan 4 | Plan 5 | Plan 6 |
|---|---|---|---|---|---|---|
| **District 2 BVAP** | 50.09% | 50.88% | 50.27% | 50.07% | 50.24% | 51.28% |
| **District 7 BVAP** | 53.28% | 53.79% | 50.09% | 50.09% | 50.09% | 51.09% |

When single-race black is used instead, the numbers drop below 50% in nine of the twelve proposed districts. *See* Bryan Supp. Rep. at 28-31.

|  | Plan 1 | Plan 2 | Plan 3 | Plan 4 | Plan 5 | Plan 6 |
|---|---|---|---|---|---|---|
| **District 2 BVAP** | 48.7% | 49.5% | 49.0% | 48.7% | 48.9% | 50.0% |
| **District 7 BVAP** | 52.0% | 52.6% | 48.9% | 48.9% | 48.9% | 49.9% |

## G.     The Milligan Plaintiffs' Equal Protection and VRA Claims

The Milligan Plaintiffs filed suit on November 15, 2021, alleging that the 2021 plan is racially discriminatory and violates Section 2 of the VRA. *See Milligan* DE1.

---

[7] "Any-part black" refers to individuals identifying as either single- or multi-race black.

Like the Singleton Plaintiffs, the Milligan Plaintiffs argue that the 2021 Legislature's purportedly discriminatory actions were sins of omission. They assert that Act 2021-555 results in a map that looks too much like the 2011 Map (and the 2001 and 1992 Maps before it). *See Milligan* DE1:11. In their view, the earlier maps were racial gerrymanders, and the Legislature's failure to take "steps to remedy this racial gerrymander in the wake of the 2020 census" resulted in a discriminatory map. *Id.*

In their preliminary injunction motion, the Milligan Plaintiffs introduce another theory—that the Legislature used "a racial target of 55% BVAP for all majority-black districts as a safe harbor." *Milligan* DE69:24. They appear to base this 55% racial-target allegation on the fact that District 7 ended up with a BVAP of 54% (down from 60% in 2011), and because Senator McClendon stated (accurately) that there was no legal requirement to add more black voters to the district following the race-blind draft by Hinaman. *Id.* (citing DE70-8 at 19).

The Milligan Plaintiffs' Section 2 claim is similar to the one raised in *Caster*. They assert that black voters are "packed" into District 7, and that "it is possible to create two majority-black districts with zero population deviation that are reasonably compact, respect political boundaries, and satisfy other traditional districting principles." *Milligan* DE69:12. To try to prove their Section 2 claim, they present four maps drawn by their expert, Dr. Moon Duchin. *See Milligan* DE68-5:7.



Like the Caster maps, the Milligan maps would completely restructure Districts 1 and 2, separate the Gulf counties, and split Mobile County for the first time ever. Unlike the original six Caster maps, the Milligan maps also completely restructure many other districts in the State. For example, District 5 no longer runs along most of the Tennessee border with District 4 below it. And District 6, which currently covers all of Shelby County, loses much of that county and darts east to the Georgia border, taking counties from District 3.

Duchin's report states that three of her four plans split more counties than the 2021 plan. *Milligan* DE68-5:8. She asserts that by one metric—the Polsby-Popper test—each of her plans is more compact than the 2021 plan based on the average compactness scores of all seven districts. But Duchin fails to provide the compactness score for any of the individual districts she drew and thus fails to provide a compactness score for her majority-black versions of District 2. *Id.* at 9. Demographer Thomas Bryan thus analyzed her plans by district and found that "in all four of

Dr. Duchin's plans, Districts 1 and 2 … were made far less compact." Ex. 6, Bryan Supp. Rep. at 18, 57. The average score of her plans was higher than the 2021 plan because she offset low compactness scores for Districts 1 and 2 by significantly re-drawing Districts 4 and 5 to make them far more compact. *Id.* at 18, 57.

| District | 2021 Plan | Duchin A | Duchin B | Duchin C | Duchin D |
|---------|-----------|----------|----------|----------|----------|
| 1 | 0.20 | 0.13 | 0.16 | 0.16 | 0.13 |
| 2 | 0.26 | 0.16 | 0.19 | 0.15 | 0.15 |
| 3 | 0.25 | 0.26 | 0.23 | 0.28 | 0.26 |
| 4 | 0.19 | 0.37 | 0.40 | 0.32 | 0.36 |
| 5 | 0.32 | 0.38 | 0.53 | 0.53 | 0.38 |
| 6 | 0.15 | 0.22 | 0.25 | 0.18 | 0.19 |
| 7 | 0.19 | 0.28 | 0.23 | 0.18 | 0.27 |
| Sum | 1.55 | 1.80 | 1.98 | 1.80 | 1.75 |
| Average | 0.22 | 0.26 | 0.28 | 0.26 | 0.25 |

Duchin identifies only one community of interest that she considered when drawing her maps—the Black Belt. *Id.* at 9-10. And she admits that her maps did not try to preserve the cores of prior districts—despite the Legislature's stated policy for doing so. *Id.* at 10; *cf. White v. Weiser*, 412 U.S. 783, 796 (1973) (noting legislature's redistricting "decisions were made by the legislature in pursuit of what were deemed important state interests" and such "decisions should not be unnecessarily put aside," even "in the course of fashioning relief" for malapportionment claim).

Duchin reports the following any-part BVAP rates for her VRA districts:

| | Plan 1 | Plan 2 | Plan 3 | Plan 4 |
|---|--------|--------|--------|--------|
| **District 2 BVAP** | 51.37% | 51.06% | 50.06% | 50.05% |
| **District 7 BVAP** | 51.50% | 50.24% | 53.50% | 51.73% |

When single-race BVAP is used instead, the numbers drop below 50% in half of her districts. *See* Bryan Supp. Rep. at 25-27.

|  | Plan 1 | Plan 2 | Plan 3 | Plan 4 |
|---|---|---|---|---|
| **District 2 BVAP** | 50.0% | 49.7% | 48.7% | 48.7% |
| **District 7 BVAP** | 50.3% | 49.1% | 52.3% | 50.5% |

### H.     The Impending 2022 Elections

Each set of Plaintiffs seeks a mandatory preliminary injunction that would either require the Legislature to enact a new set of districts or would have this Court draw and impose a map before the upcoming primary elections on May 24, 2022, and the even earlier deadlines preceding election day. *See* Ala. Code. § 17-13-3(a). Candidates seeking their party's nomination must file a declaration of candidacy with the state party chairman by January 28, 2022. *Caster* DE44:14 ¶ 91; *see also* Ala. Code § 17-13-5(a). And any individual seeking a spot on the ballot as an independent candidate in a congressional district or any organizations petitioning for ballot access as a political party must submit by May 24, 2022, thousands of signatures from registered voters within that district to appear on the ballot. *See* Ex. 7 (Clay Helms Declaration ("Helms Decl.") at 6-7 ¶¶ 21-23; Ala. Code §§ 17-6-22(a)(1); 17-9-3.

To implement new district lines for the upcoming elections, each county's Board of Registrars—State officials charged with overseeing voter registration in

each county—is responsible for reassigning that county's registered voters to the correct precincts and to the correct districts, in conjunction with the county commissions. Helms Decl. at 3 ¶ 6. In most Alabama counties, this is a time-consuming, manual process—potentially taking upwards of three months—but it is essential to make sure each voter receives the correct ballot that includes all the candidates for which the voter is entitled to vote. Helms Decl. at 2-3 ¶¶ 6-11.

## STANDARD OF REVIEW

"A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Brown v. Sec'y, U.S. Dep't of Health & Human Servs.*, 4 F.4th 1220, 1224 (11th Cir. 2021) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). "Indeed, the grant of a preliminary injunction is 'the exception rather than the rule.'" *Id.* (quoting *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983)). Thus, "[t]he preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites. The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1286 (11th Cir. 1990) (quotations omitted).

Those four prerequisites that a movant must show to obtain a preliminary injunction are: "(1) a substantial likelihood of success on the merits; (2) a likelihood

of suffering irreparable harm without a preliminary injunction; (3) that the threat-ened injury to the party outweighs any harm that might result to the defendants; and (4) that an injunction is not adverse to the public interest." *Brown*, 4 F.4th at 1224. Where a government entity is involved, "'its interest and harm merge with the public interest,' so [a court] may consider the third and fourth factors to-gether." *Id.* (quoting *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)).

Where, as here, a preliminary injunction is sought to *change* the status quo and force another party to act, it becomes a "mandatory or affirmative injunction" and the burden on the moving party increases. *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971). Thus, a mandatory injunction "'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" *Id.* (quoting *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958)); *see also Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.").

Plaintiffs' burden to show that facts and law *clearly* favor their position is all the heavier considering that their requested relief will almost certainly obstruct the State's upcoming elections. *Purcell v. Gonzalez*, 549 U.S. 1 (2006). When evaluat-ing challenges to electoral processes "just weeks before an election," federal courts

must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Id.* at 4. "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4-5.

Moreover, the Supreme Court has repeatedly recognized that "[r]edistricting is primarily the duty and responsibility of the State, and federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (cleaned up). Thus, when "assessing the sufficiency of a challenge to a districting plan, a court must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. And the good faith of the state legislature must be presumed." *Id.* (internal citations and quotation marks omitted). And, as particularly relevant here, courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

## ARGUMENT

### I. The Singleton and Milligan Plaintiffs' Fourteenth Amendment Claims Fail on the Merits.

The 2021 Legislature enacted an entirely ordinary redistricting law for entirely ordinary and permissible reasons. "When a new census requires redistricting, it is a common practice to start with the plan used in the prior map and to change the

29

boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends." *Cooper*, 137 S. Ct. at 1492 (Alito, J., concurring in part).[8] Doing so "honors settled expectations and, if the prior plan survived legal challenge, minimizes the risk that the new plan will be overturned." *Id.* That is precisely what the Alabama Legislature did this year. Once the State learned it would be keeping all seven of its congressional seats, the Legislature's map-drawer "used the cores of the existing districts as a starting point," never considered race when making the necessary adjustments to rebalance the districts, and otherwise adhered to traditional redistricting criteria. *Milligan* DE70-2:93-94 97-98, 100, 145-46. The result was a map that was more compact than its immediate predecessor, had fewer county splits, and (incidentally) lowered BVAP in District 7 from about 60% to about 54%. The Legislature then enacted Act 2021-555, which adopted the race-blind map without change.

The Singleton and Milligan Plaintiffs contend that Act 2021-555 violates the Equal Protection Clause. But "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). And "the burden of

---

[8] *See also* Nathaniel Persily, *In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders*, 116 Harv. L. Rev. 649, 671 (2002); *Vieth v. Jubelirer*, 541 U.S. 267, 357-358 (2004) (Breyer, J., dissenting) (collecting sources); *Stenger v. Kellett*, No. 4:11-cv-2230, 2012 WL 601017, at *3 (E.D. Mo. Feb. 23, 2012) ("A frequently used model in reapportioning districts is to begin with the current boundaries and change them as little as possible while making equal the population of the districts.").

proof lies with the challenger, not the State," a "rule [that] takes on special significance in districting cases." *Abbott*, 138 S. Ct. at 2324. Neither set of Plaintiffs can shoulder this burden. Particularly considering the "obvious alternative explanation" for Act 2021-555—that it retains cores of districts and longstanding communities of interest, and protects incumbents—Plaintiffs' assertion that the Act was passed for discriminatory purposes is not even "a plausible conclusion." *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009).

Lacking in contemporary evidence, both the Singleton and Milligan Plaintiffs look back nearly three decades to the congressional map imposed by the 1992 *Wesch* decision. *See* 785 F. Supp. 1491. But no one alleges that the *Wesch* court violated the Equal Protection Clause or argues that the 1992 plan was unlawful when drawn (nor could they, considering that the plan was approved by three federal judges and affirmed by the Supreme Court affirmed). And there is no basis in law or fact to support the notion that any alleged discrimination in the 1992 Map infected (and reinfected, and reinfected again) each Legislature that subsequently enacted a congressional map resembling its predecessor. "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case." *Abbott*, 138 S. Ct. at 2324-25 (cleaned up).

Thus, "there can be no doubt about what matters: It is the intent of the 20[21] Legislature." *Abbott*, 138 S. Ct. at 2324. Any consideration of race in past redistricting cycles—which itself would have been done in the light of the State's obligations under the VRA—cannot support a springing Equal Protection claim with respect to the *present* redistricting cycle. Plaintiffs thus fail to overcome the presumption of legislative good faith, and their requests for injunctive relief should be denied.

### A. Racial considerations did not predominate over traditional redistricting criteria in drawing the new lines in the 2021 congressional map.

**1.** Plaintiffs' Fourteenth Amendment claims fail because race was not "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper*, 137 S. Ct. at 1463. Even a cursory glance at the 2021 Map compared to its 2011 predecessor shows that the Legislature's predominant purposes were both legitimate and race-neutral: preserve cores of districts; preserve the communities of interest within those districts; avoid pairing incumbents; equalize district populations; and, in doing so, make the districts more compact and minimize splits of counties and other political subdivisions. *See Milligan* DE66-2:52. These are traditional redistricting criteria routinely relied on by legislatures. *See id.* at 9. Expert demographer Thomas Bryan has helped quantify how well the 2021 Map performed on these measures. *See* DE66-2:23 (showing core retention rates between 87.8% and 98.8% for the districts); *id.* at 28

(showing that the districts avoid pairing incumbents); *id.* at 30-31 (showing that the 2021 Plan is more compact than the 2011 Plan on at least four different measures of compactness); *id.* at 17-18 (discussing the community of interest kept together in District 1 that Plaintiffs' illustrative plans would divide).

Deposition testimony from Randy Hinaman, drafter of the 2021 Map, further confirms that racial considerations played no role in the map-drawing process itself. *See, e.g.*, DE70-2:at 93-94, 97-98, 100, 145-46. The Committee, through the guidelines provided to and followed by Hinaman, prioritized traditional districting criteria. The Singleton Plaintiffs even seem to recognize as much, noting that "the 2021 plan started with the 2011 plan and added or subtracted population from each district to maintain population equality …." *Singleton* DE57:23.[9] Indeed, their very complaint seems to be "that the new redistricting plan was designed largely to preserve existing districts." *Id.* at 24. But that is a perfectly valid, race-neutral justification for the latest changes to the congressional map. *See, e.g.*, *Abrams v. Johnson*, 521 U.S. 74, 99-100 (1997) (affirming state interest in "maintaining core districts"). And "the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority. It simply imposes an obligation not to create such districts for predominantly racial, as opposed

---

[9] Plaintiff Senator Bobby Singleton voted in favor of the Guidelines as a member of the Reapportionment Committee. *See* Ex. 8 (Guidelines Vote Count).

to political or traditional, districting motivations." *Easley*, 532 U.S. at 249. Thus, the Legislature was not required to cast aside traditional redistricting criteria simply because District 7's core contained more black voters than some Plaintiffs deem optimal. *Cf. Cooper*, 137 S. Ct. at 1464 (explaining racial gerrymandering can be shown by "demonstrating that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations.'").

**2.** The Singleton Plaintiffs contend that the Legislature was required to do more than employ these traditional redistricting criteria. They rely heavily (at DE57:9, 25-28) on *Cooper v. Harris*, but that case in no way supports their claim of racial gerrymandering. In *Cooper*, there was no serious question that race was the predominant factor in drawing District 1 because North Carolina sought to achieve an *express racial target* of 50% BVAP. *See Cooper*, 137 S. Ct at 1468. The key question in *Cooper* was whether that specific use of race could be justified by the VRA on the facts of the case, and the Supreme Court answered in the negative.

This case is on altogether different footing. Unlike *Cooper*, the Singleton Plaintiffs do not dispute that the changes Alabama made to its district lines in 2021 were *not* predominantly based on race and were instead designed only to equalize population while retaining the cores of existing districts. Yet Plaintiffs attempt to invoke *Cooper* to force the State to engage in a pervasively race-based districting

process that would dismantle District 7 and draw another new district with an explicit racial target. One searches *Cooper* in vain for even a hint of support for Plaintiffs' theory that the Fourteenth Amendment requires Alabama to redraw its congressional map to achieve Plaintiffs' desired racial makeup of various districts.

At bottom, the Singleton Plaintiffs appear to believe that *Cooper* requires the opposite of what *Cooper* actually says. In *Bartlett v. Strickland*, the Supreme Court clarified that States have no obligation to create crossover districts to "maximiz[e] minority voting strength." 556 U.S. 1, 23 (2009) (citation omitted). And in *Cooper*, the Supreme Court found that a 50% "target" for BVAP could not withstand strict scrutiny. Here, Plaintiffs effectively ask this Court to do what the Supreme Court rejected in *Strickland* and restricted in *Cooper*. They invite the Court to set a *ceiling* on BVAP in District 7 and draw a second race-based district to boot. *See Singleton* DE57:48 (asking the Court to adopt one of Plaintiffs' two-crossover-district plans). It is passing strange for Plaintiffs to invoke a Supreme Court decision that broadly *prohibits* the use of race in redistricting as a basis for *mandating* the use of race to achieve their desired racial outcomes.

**3.** In support of their racial gerrymandering claim, the Milligan Plaintiffs repeat many of the Singleton Plaintiffs' errors but add to them wild speculation and factual misstatements. First, the Milligan Plaintiffs contend that the "legislature deliberately sought to maintain District 7 as a packed majority-black district with a

55% BVAP floor." *Milligan* DE59:20. There are multiple problems with this theory, chief among them that Plaintiffs cite *no evidence whatsoever* for a 55% BVAP "floor." Another is that BVAP in the district is 54% single-race black. *Milligan* DE53:12. And though the District is 55.3% any-part black (a decrease from 60.11% in 2011), *id.*, the Milligan Plaintiffs simply assume in circular fashion that because District 7 ended up with 55.3%, the 2021 Legislature must have begun the redistricting process with a floor of 55% in mind. No evidence supports this conjecture. Later the Milligan Plaintiffs note that "[m]ost of the decrease in District 7's BVAP from 60% in the 2011 plan to around 55% in HB1 came from population loss … rather than changes to the district lines." DE69:24. They then find it "telling" that when Hinaman added 53,000 people to District 7, the district was still around 55%. But because Hinaman was adding population from areas contiguous with the current district without consideration of race, it should hardly be surprising that the district's racial makeup remained stable. To find otherwise based on Plaintiffs' unsupported *ipse dixit* about a racial "floor" would turn the legislative presumption of good faith on its head. *See Abbott*, 138 S. Ct. at 2325.

The Milligan Plaintiffs attempt to bolster their assumption with a misstatement, contending that in 2011 the State "increased the total Black and BVAP in District 7 from the 2002 plan for the purported purpose of avoiding retrogression under Section 5 of the VRA." DE69:21 (citing DE53:11, *Milligan* Stipulations

¶¶ 51-54). The problem is that the stipulated facts to which the Milligan Plaintiffs cite say nothing about a *purposeful* increase of black population or BVAP in 2011. Rather, the stipulations simply note an increase in black population and BVAP between the 2001 and 2011 plans, and quote from the State's 2011 preclearance submission letter, which states that such an "increase plainly cannot be regarded as retrogressive." DE53:11 ¶ 54.

The Milligan Plaintiffs next fault the Legislature for failing to conduct a racial polarization analysis of the 54% BVAP district, DE69:24, even though Plaintiffs argue elsewhere that there is no doubt that District 7 provides adequate opportunity for black Alabamians to elect their candidate of choice, *see id.* at 26 (complaining of "packing"). But they fail to explain why Senator McClendon's confidence that a 54% BVAP district would elect a Democrat is proof that the "Legislature pursued a 55% BVAP district[] based on the mistaken belief that such districts offered safe harbors from racial gerrymandering claims." DE69:24. These strained efforts to conjure up a racial target fail.

The Milligan Plaintiffs surmise that because the Legislature's map-drawer "lives in Alabama" and has experience drawing districts in 1992 and 2011, "he likely did not need to view the racial data to draw a map where race predominated." *Id.* at 25. Yet again, they ask this Court to apply a presumption of bad faith. *But see Abbott*, 138 S. Ct. at 2325. And, in any event, the relevant intent is ultimately that of the

Legislature, not its map-drawer. *See Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) ("Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools."). The Milligan Plaintiffs marshal no evidence (because there is none) that the Legislature was "motivated by" the racial makeup of District 7, rather than at most merely "being aware of" it. *Miller*, 515 U.S. at 916.

Finally, the Milligan Plaintiffs turn to a pair of experts who purport to show with mathematical precision that racial discrimination drove the 2021 Legislature's design of District 7. *Milligan* DE69:26-27. Both reports are fundamentally flawed. Dr. Kosuke Imai claims he used algorithms to randomly build from scratch "10,000 simulated plans" that kept "population deviations to a minimum and never above ±0.5%, develop[ed] districts that are reasonably compact, respect[ed] county boundaries where possible, and avoid[ed] incumbent pairings." *Id.* at 26. Because none of these maps produced a District 7 with a BVAP as high as the real District 7, the Milligan Plaintiffs proclaim that "[t]his alone shows that HB1 used race as a predominant factor." *Id.* at 27. Likewise, they rely on Ryan Williamson's observation that the three counties split between District 7 and other districts have "BVAPs of 41.5%, 56.3%, and 29.5% … as compared to a statewide median county BVAP of 22.5%" to conclude that discrimination motivated the 2021 Legislature. *Id.* at 27-28.

The flaw in both analyses is obvious. While professors might draw maps on blank slates, States generally do not, and Alabama certainly didn't in 2021. Rather, the 2021 plan began—like most redistricting processes do—with the preexisting districts and then made adjustments for population equality while preserving the cores of existing districts. *Milligan* DE70-2 at 38:22-40:8. Both experts could (and should) have taken this into account. Indeed, Imai himself admitted that he could have started with the existing plan and modified it, but he did not. He instead used a method that "draw[s] redistricting plans from scratch." *Milligan* DE68-4:18. His fanciful premise produced irrelevant conclusions. Similarly, Williamson's analysis largely ignores the 2011 plan or any plan before it. He and the Milligan Plaintiffs thus studiously avoid the obvious explanation for why District 7 contained splits in 2021—the splits were already there. In sum, the blank-slate approaches used by these experts reveal nothing about the real-world intentions of the 2021 Legislature.

**B.    Plaintiffs Cannot Allege Predominance in the 2021 Maps Based on the Permissible Consideration of Race in Previous Redistricting Cycles.**

Unable to show that race predominated in this redistricting cycle, the Singleton and Milligan Plaintiffs spill much ink on the alleged intent embodied in past redistricting cycles and attempt to impute that decades-old intent to the current Legislature. For several interrelated reasons, those arguments are overwhelmingly likely to fail on the merits.

**1.** Plaintiffs cannot salvage their Fourteenth Amendment claim by imputing the alleged purpose of *past* redistricting plans to the 2021 Map, for "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324. Thus "[t]he 'ultimate question remains whether a discriminatory intent has been proved in a given case,'" meaning that "what matters" in this case is the intent of the Legislature that enacted the 2021 Map. *Id.* at 2324-25.

Plaintiffs thus must show that the 2021 Legislature acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). That is especially so here, where courts "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Miller*, 515 U.S. at 915-16. "Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." *Id.* at 916.

Thus, arguments that the 2021 Legislature made "only minimal changes from the 2011 plan" do not move the ball. *Milligan* DE69:22. At most, Plaintiffs allege that Alabama somehow acted improperly by failing to affirmatively create districts with Plaintiffs' preferred racial compositions. *See Singleton* DE15:3-4 ¶ 6 (alleging that Legislature "refus[ed] to adopt plans that replaced the racially gerrymandered

majority-black District 7 with two reliable crossover districts drawn with race-neutral traditional districting principles"); *Singleton* DE57:36-37 (asserting that Legislature could have drawn "two opportunity districts" with BVAP of 40-45%). But that theory runs headlong into *Feeney*. Even if the Legislature *could* have drawn a whole new map instead of retaining the core of District 7, there is not a whit of plausible evidence showing that its decision to retain district cores was "because of" and not merely "in spite of" racial concerns. *Feeney*, 442 U.S. at 279.

**2.** Plaintiffs also unsuccessfully assert that racial considerations predominated in the 2021 redistricting plan because the plan allegedly "[c]arried [f]orward" racial considerations that affected districting plans adopted decades earlier. *See Singleton* DE57:23. As noted above, this is simply not how constitutional analysis of legislative purpose works —particularly in the redistricting context. *Abbott*, 138 S. Ct. at 2324-25. Even if the "original purpose" motivating a law is problematic, "the passage of time may obscure that sentiment." *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067, 2083 (2019); *see also School Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 264 (1963) (Brennan, J., concurring) ("[The] government may originally have decreed a Sunday day of rest for the impermissible purpose of supporting religion but abandoned that purpose and retained the laws for the permissible purpose of furthering overwhelmingly secular ends"). It necessarily follows

here that the "original purpose" motivating a past law cannot be imputed to the passage of an entirely new bill for this redistricting cycle.

More fundamentally, actions by a 1992 federal court, 2001 Legislature, or 2011 Legislature do not taint the actions of the 2021 Legislature. The Supreme Court's explicit admonition in *Abbott* reiterated what the Eleventh Circuit—and many others—already knew: "it is not reasonable to assign any impermissible motives held by" one legislature to another. *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1226 (11th Cir. 2005) (en banc). And rejecting Plaintiffs' theory of uncurable taint makes good sense; "if the court were to accept the plaintiffs' standard, then the more dubious an allegation of past discrimination in a predecessor provision, the more difficult it becomes for a state to extinguish it because it would be unlikely that the present day legislators would be aware of the past discrimination." *Id.* at 1225 n.21. "The result would be to reverse the presumption that a State's laws are constitutional, and plunge federal courts into far-reaching expeditions regarding the sins of the past in order to question the laws of today"—precisely what Plaintiffs demand of this Court. *Id.*

**3.** Even if racial considerations predominated in 1992, and even if any of that intent could be imputed to the 2021 Map (despite binding Supreme Court and Eleventh Circuit precedents holding otherwise), Plaintiffs have not actually argued that the 1992 Map violated the Equal Protection Clause. And indeed, it would be a tough

argument to make considering that the 1992 Map was imposed by a federal court. Under existing precedent, race-based redistricting has been justified under strict scrutiny if the State had "good reasons" to believe that the VRA required the actions in question. *Cooper*, 137 S. Ct. at 1469. Plaintiffs do not allege that the parties or the *Wesch* court in 1992 lacked "good reasons" to believe that the VRA required that consideration of race. *Cooper*, 137 S. Ct. at 1469.

Nor have Plaintiffs shown that the 2001 or 2011 maps ran afoul of the Equal Protection Clause. During those redistricting cycles, Alabama was covered by Section 5 of the VRA, which blocked any changes to voting laws that would result in "retrogression." *See Beer v. United States*, 425 U.S. 130, 141 (1976) ("the purpose of §5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise"). Considering that both plans received preclearance under Section 5, Plaintiffs' omission is not surprising.[10]

In sum, Plaintiffs are unable to impute any *unconstitutional* intent to the 2021 Map. The past maps were the product of a court order and the VRA's then-existing requirements, along with normal changes in population that occur over the course of

---

[10] The Singleton Plaintiffs assert that "Secretary Merrill has ... conceded that the 2001 and 2011 plans were drawn the way they were because of race." DE57:8. That's not right. All the Secretary "conceded" is that VRA Section 5's anti-retrogression requirement applied to those plans and limited the State's options with regard to District 7. *See Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11-12. That is not a concession that the Legislature adopted the 2001 or 2011 plans for a predominantly racial purpose.

a decade. No court invalidated those maps, and the 2001 and 2011 Maps both satisfied Section 5's then-extant preclearance requirements. Alabama's retention of the cores of its longstanding districts was a perfectly legitimate policy choice, and Plaintiffs' eleventh-hour attempt to upend those plans cannot overcome the presumption of the current Legislature's good faith.

**4.** Finally, Plaintiffs note (and Alabama's Secretary of State has acknowledged) that the VRA might not have required District 7 to be created in its current form if the issue arose for the first time *today*. That is irrelevant. The question here is not whether Alabama, drawing on a blank slate, could have considered race in drawing District 7 in its current configuration. The question is instead whether, after 30 years of history with the current districts, Alabama may adopt a 2021 map that largely maintains existing districts consistent with the State's policy of maximizing core retention, continuity of representation, and keeping communities of interest in their existing districts. The radical changes to the maps sought by Plaintiffs, by comparison, would result in a significant scrambling of political coalitions, communities of interest, representatives, and the State's overall political geography.

Plaintiffs' theory of racial predominance also proves far too much. By their lights, any time the compelling conditions justifying creation of a VRA district in the past dissipate, the State may find itself with a springing Fourteenth Amendment

violation based on the *original* creation of that district.[11] Plaintiffs cite no court that has embraced their radical theory, and this Court should reject it.

### C. The Singleton Plaintiffs Have No Legal Entitlement to Whole-County Congressional Districts.

Further, the Singleton Plaintiffs' claims must fail because there is no authority to grant them the relief they seek: a whole-county plan. Plaintiffs cite no provision of Alabama law for the proposition that congressional districts *must* be drawn with whole counties, rather than by considering county splits as just one factor among several traditional redistricting criteria. *Cf. Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (explaining federal court's "authority to act … is 'grounded in and limited by the necessity of resolving, according to legal principles, a plaintiff's particular claim of legal right'" (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018))). They assert only a supposed "historical practice of drawing Congressional districts with whole counties," which they wrongly believe vests them with an enforceable legal right. *See, e.g.*, *Singleton* DE15:1 ¶ 1.

---

[11] The Milligan Plaintiffs' comparison (at DE69:23) of this case to *Covington v. North Carolina*, No. 1:15CV399, 2018 WL 604732 (M.D.N.C. Jan. 26, 2018), fails because the *Covington* court expressly limited its discussion of North Carolina's reliance on core retention to the remedial context. The court had declared several districts to be unconstitutional racial gerrymanders, and the plan drawn up by the legislature failed to remedy that violation. Thus, the court "found that in the *remedial context* the General Assembly should be conscious of the prior racially-drawn districts to ensure that its remedial plan remedies the racial gerrymander, particularly where, as here, the General Assembly *chooses* to rely on redistricting criteria highly correlated with race …." *Id.* at *4. But the court reaffirmed that outside "the remedial context[,] … the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority." *Id.* at *5. Here, of course, the 2021 Map was enacted not "pursuant to an order of this Court," but rather on the Legislature's "own initiative." *Id.* at *4.

But Alabama has not drawn whole-county congressional districts in nearly sixty years. *See id.* ¶¶ 35-40. Plaintiffs cannot sue to enforce that illusory "historical practice." However weak or strong this alleged practice might be, "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts." *Growe v. Emison*, 507 U.S. 25 (1993) (citing U.S. CONST. art. I, § 2). How to weigh the retention of whole counties against other traditional redistricting criteria is a choice for the Legislature, not for private plaintiffs or a federal court. *See Upham v. Seamon*, 456 U.S. 37, 43 (1982) (federal courts are "not free … to disregard the political program" of a State's legislature even where a reapportionment plan is found to violate federal law except to the extent "necessary to cure any constitutional or statutory defect").

Plaintiffs' whole-county theory also exceeds this Court's Article III jurisdiction under *Pennhurst*. The gravamen of their complaint is that state officials are violating state law by splitting counties—something federal courts are powerless to do anything about. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."); *see also, e.g.*, *Balderas v. Texas*, No. 6:01-cv-158, 2001 WL 34104833, at *2 n.9 (E.D. Tex. Nov. 28, 2001) ("To the extent the plaintiffs raise claims that ask that this court enforce state law against the State, they are barred by the Eleventh

Amendment, and this court has no jurisdiction to hear them, whether for injunctive or for declaratory relief."); *Baldus v. Members of the Wis. Gov't Accountability Bd.*, 549 F. Supp. 2d 840, 849 (E.D. Wis. 2012) ("we say nothing about any arguments that could be understood to be based on allegations that the state officials have failed to follow state law," because "such claims are beyond our authority under the principles announced in [*Pennhurst*]"); *Waldman v. Conway*, 871 F.3d 1283, 1290 (11th Cir. 2017) (holding that a purported federal challenge based on state prison officials' failure to follow classification manual "is not a procedural due process challenge— it is a claim that state officials violated state law in carrying out their official responsibilities," which *Pennhurst* bars).

Here, Plaintiffs hardly even try to obscure the true nature of their claims. Right off the bat, they assert in their amended complaint that "[t]he original Complaint, filed September 27, 2021, put the Legislature on notice that it had a constitutional duty to eliminate the District 7 racial gerrymander *by returning to its historical practice of drawing Congressional districts with whole counties.*" *Singleton* DE1:1 ¶ 1 (emphasis added). And the "original Complaint" could hardly have been clearer: "This action is brought to require the Alabama Legislature to enact a new plan with 2020 census data that remedies the existing unconstitutional gerrymander *by restoring Alabama's traditional redistricting principle of drawing its Congressional*

*districts with whole counties.*" (emphasis added)). DE1:1 ¶1. Plaintiffs may not circumvent the Eleventh Amendment by laundering state-law claims through federal labels. Where, as here, "claim[s] necessarily rel[y] on a determination that state officials ha[ve] not complied with state law," *S&M Brands*, 925 F.3d at 1204, *Pennhurst* bars them.

## II.    The Milligan and Caster Plaintiffs' Section 2 Claims Fail on the Merits.

The Milligan and Caster Plaintiffs assert that Section 2 of the Voting Rights Act requires two majority-minority black districts where there is currently one. By their lights, Section 2 mandates that Alabama subordinate traditional districting criteria to racial considerations in order to draw two slightly-less safe majority-black districts rather than the one slightly safer black-majority district that resulted from a race-neutral redistricting process. But nothing in Section 2 mandates that policy choice, and the Constitution forecloses it. Like the arguments underpinning Plaintiffs' Fourteenth Amendment claims, numerous defects doom Plaintiffs' misuse of the Voting Rights Act.

To show their Section 2 claims are viable, Plaintiffs must first satisfy each threshold precondition the Supreme Court set out in *Thornburg v. Gingles*, 478 U.S. 30 (1986). Their claims never make it off the ground; Plaintiffs fail to satisfy even *Gingles*'s first precondition. Nor do they experience much greater success on the second two. Their Section 2 claims end there.

But even if Plaintiffs could meet *Gingles*'s threshold requirements they would then proceed to Section 2's "totality of circumstances" inquiry, yet another insurmountable barrier to their success. The "totality of circumstances" demands a holistic investigation aimed at one question: "[W]hether members of a racial group have less opportunity than do other members of the electorate." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425-26 (2006) ("*LULAC*"). They don't. Federal courts at all levels have recognized that "[t]hings have changed in the South," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009), and Alabama is no different, *see Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *38 (M.D. Ala. Feb. 5, 2020) ("*Alabama NAACP*").

What's more, Plaintiffs must "demonstrate the existence of a proper remedy" to succeed on their Section 2 claims, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999), but each proposed map they offer constitutes an obvious racial gerrymander that subordinates traditional districting criteria "solely to effectuate the perceived common interests of one racial group," *Shaw I*, 509 U.S. at 648. And, while racial gerrymanders may meet strict scrutiny where they satisfy a "compelling state interest" and are narrowly tailored, *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) ("*Shaw II*"), no such interest or tailoring exists here.

The VRA "forbids a State to take action that would worsen minorities' electoral opportunities; it does not require action that would improve them." *LULAC*, 548 U.S. at 519 (Scalia, J., concurring in part). Indeed, the VRA *expressly repudiates* any claim for proportional representation, *see* 52 U.S.C. §10301(b), which is effectively what Plaintiffs are seeking here. Nor does the statute require that the State disregard long held redistricting principles for the sake of drawing two majority-minority districts at razor-thin margins to maximize the number of majority-minority districts across the State. If Plaintiffs' interpretation of the Section 2 is correct, then Section 2 is unconstitutional.

### A. Plaintiffs Fail to Satisfy the Necessary *Gingles* Preconditions.

Under *Gingles*'s three-part test, the viability of a Section 2 "vote dilution" claim turns on three threshold requirements. *First*, "a 'minority group' must be 'sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district." *Cooper*, 137 S. Ct. at 1470 (quoting *Gingles*, 478 U.S. at 50). *Second*, "the minority group must be 'politically cohesive.'" *Id.* And *third*, "a district's white majority must "vote [ ] sufficiently as a bloc" to usually "defeat the minority's preferred candidate." *Id.*

*Gingles*'s first precondition is by far its most demanding—hardly as perfunctory as the recitation in Plaintiffs' briefs. The Eleventh Circuit "ha[s] repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence

of a proper remedy." *Burton*, 178 F.3d at 1199. This means that, in a Section 2 challenge, proposing a workable alternative map is not "merely an evidentiary tool," *Cooper v. Harris*, 137 S. Ct. 1455, 1480; it is a requirement. That "proper remedy" must also account for all of the State's "traditional redistricting principles"—including, among other things, retaining the cores of districts, protecting incumbents, and maintaining communities of interest. *See, e.g.*, *LULAC*, 548 U.S. at 402. Plaintiffs' proposed remedies do not come close to satisfying the first *Gingles* precondition.

But even assuming Plaintiffs could satisfy *Gingles*'s first requirement, the second two preconditions do not "clearly … favor" them. *Callander*, 256 F.2d at 415. Indeed, as discussed below, it appears Plaintiffs have attempted to use two different definitions of "black" to satisfy *Gingles*'s discrete tests—any-part black to show a sufficiently large minority group and a different demographic to show racially polarized voting. But litigants attempting to satisfy *Gingles* "must be consistent," *Pope*, 687 F.3d 565, 577 n.11 (2d Cir. 2012); Plaintiffs plainly "cannot argue one *Gingles* factor by reference to a particular minority group, only to recast the minority group in arguing another factor," *id*. Moreover, Plaintiffs' racial-polarization analysis omits conspicuous electoral achievements black Alabamians have recently enjoyed, undermining assertions of structural barriers or obstacles to voting.

### 1. The Minority Group Is Not "Sufficiently Large."

The first *Gingles* precondition requires plaintiffs to show "the minority group" is "sufficiently large" to "constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. "[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Strickland*, 556 U.S. at 18. If not, the Section 2 claim fails at the starting gate. *Id.* at 18-20.

If the minority group is defined as single-race black—as it appears to be for Plaintiffs' racial polarization analysis at the *second* step of *Gingles*—the Caster Plaintiffs have failed to demonstrate that Alabama could create a second majority-minority district, and only one of the four plans provided by the Milligan Plaintiffs clears the numerosity threshold. The "sufficiently large" minority group a Section 2 litigant defines in the first *Gingles* precondition must be the same minority group to whom the second and third preconditions apply. *See, e.g.*, *Pope v. County of Albany*, 687 F.3d at 577 n.11; *see also* Nathaniel Persily, *The Law of the Census*, 32 Cardozo L. Rev. 755, 772 (2011) (recognizing that while choice of more expansive minority group may assist plaintiffs in satisfying first *Gingles* factor, it may also add to their burden in demonstrating political cohesion). Indeed, *Gingles* refers to "the minority group"—not "a minority group"—when articulating each of its three requirements. *Gingles*, 478 U.S. at 50-51. And this makes perfect sense; otherwise, a viable Section

2 claim could exist without a specific minority group capable of showing injury and receiving redress. Plaintiffs may not, therefore, mix and match minority groups to satisfy the threshold *Gingles* factors.

Yet it appears that this is exactly what the Caster and Milligan Plaintiffs attempt to do. To compile their proposed majority-minority District 2 pursuant to *Gingles*'s first precondition, Plaintiffs defined the relevant "minority group" as any-part black Alabamians. *See Milligan* DE68-5 at 7 n.4 ("[W]e use the so-called 'Any Part Black' definition."); *Caster* DE48 (creating districts using "AP Black" population); *see also* Bryan Supp. Rep. at 6-9, 24-32 (showing Plaintiffs' proposed maps would fail had they adopted a the single-race black definition of "black"). But Plaintiffs do not appear to have used this same group to satisfy *Gingles*'s second and third preconditions. Although the Caster Plaintiffs' expert defines the relevant minority group as "Non-Hispanic Black," *see* Palmer Rep. 4 (*Caster* DE49:4), which does not indicate whether they used single-race black or any-part black, and the Milligan Plaintiffs' expert claims to have used "any part Black VAP" for his racial-polarization analysis, *see Milligan* DE68-1:15, both experts fail to provide sufficient information about the sources supporting their analysis. Indeed, it is unclear what data sources could have provided this information; racial-polarization analysis typically requires examination of voter-registration data, but Alabama's voter-registration data "does not permit multiple or combination answers" for race; rather,

"[i]f a prospective registrant has checked more than one race category, the default is for the registrar to enter 'other.'" Helms Decl. at 9-10 ¶¶ 27-28. *See also Milligan* DE74-2 (Supplemental Expert Report of M.V. Hood III) at 4 ("To the best of my knowledge, racial classifications in the Alabama voter registration database are based on single-race categories.").This is likely why the single-race black definition "has been most defensible from a political science / *Gingles* 2 voting behavior perspective." Bryan Supp. Rep. at 5.

The problem for Plaintiffs is that eligible voters of the minority group they almost certainly analyzed for *Gingles*'s second and third preconditions (single-race black) cannot constitute two majority-minority districts in nearly any of their proposed maps, *see* Bryan Supp. Rep. at 24-32. The *Strickland* Court upheld Section 2's majority-minority requirement and, in so doing, "decline[d] to depart from the uniform interpretation of § 2 that has guided federal courts and state and local officials for more than 20 years." 556 U.S. at 19. This Court should do the same.

### 2. The Minority Population is Not "Compact."

#### a. *Gingles*'s "Compactness" Incorporates Traditional Districting Principles Beyond Geographical Compactness.

The first *Gingles* factor requires Plaintiffs "demonstrate the existence of a proper remedy." *Burton*, 178 F.3d at 1199. And because "[n]othing in the Voting Rights Act suggests an intent on the part of Congress to permit the federal judiciary to force on the states a new model of government," that remedy must fall "within the

confines" of the State's congressional model. *Nipper*, 39 F.3d at 1525 (plurality opinion). Whether a remedy is permissible turns on whether it "take[s] into account 'traditional districting principles.'" *LULAC*, 548 U.S. at 433 (quoting *Abrams*, 521 U.S. at 92); *see also Alabama NAACP*, 2020 WL 583803 at *18-25 (analyzing "traditional redistricting principles" under *Gingles*'s "compactness" inquiry).

The State's "traditional districting principles" are policies "embedded in the political values, traditions, customs, and usages of the State of Alabama." *Milligan* DE53:16-17. To the extent consistent with the Constitution, these principles include, among other things, "[p]reservation of the cores of existing districts"; respect for "communities of interest," which the State "define[s] as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities"; "[m]inimization of the number of counties in each district"; and "[a]voiding contests between incumbents." *Id.* at 17.

None of these principles is unique to Alabama. To the contrary, the Supreme Court has repeatedly reaffirmed their validity in redistricting cases nationwide. *See, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (noting States' legitimate interests in "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives"); *Abrams*, 521 U.S. at 98 (referring to "traditional districting principles" as, among other things, "maintaining communities of interest and traditional boundaries").

Moreover, the Supreme Court has emphasized that "communities of interest" should not give way to callous racial presumptions; indeed, the "recognition of nonracial communities of interest reflects the principle that a State may not assume from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." *LULAC*, 548 U.S. at 433-34 (cleaned up).

The Milligan and Caster Plaintiffs attempt to leapfrog *Gingles*'s most demanding inquiry, dedicating the vast bulk of their arguments to *Gingles*'s "totality of circumstances" analysis. Indeed, they dedicate barely three-and-a-half pages—combined—to satisfying *Gingles*'s holistic compactness requirement. *See Milligan* DE69:6-8; *Caster* DE56:5-7. Plaintiffs may not simply skip past *Gingles*'s most robust precondition, and they to satisfy it.

The Milligan Plaintiffs' expert, Dr. Duchin, does not even consider the State's traditional interests in avoiding contests between incumbents, *see Milligan* DE68-5:4-7, conflates "communities of interest" with "attempting to keep intact as many localities … as possible," *id.* at 5, and affirmatively rejects the State's desire to preserve core districts, *id.* at 7. Further, she fundamentally confuses the robust *Gingles* compactness inquiry with a narrow focus on geographic compactness, emphasizing the Polsby-Popper score of her illustrative maps. *Id.* at 9. Indeed, every one of Duchin's proposed maps results in multiple incumbent faceoffs and unrepresented districts. *See* Bryan Supp. Rep. at 16.

The Caster Plaintiffs pay *Gingles*'s first precondition even less mind. After conflating *Gingles*'s compactness inquiry with mere geographic compactness, the Caster Plaintiffs summarily allege that "Mr. Cooper's illustrative maps also adhere to other traditional redistricting principles, including population equality, contiguity, maintaining political and geographical boundaries, protection of incumbents, and maintaining communities of interest." *Caster* DE56:12. To support this claim, Plaintiffs cite the report of their expert, William Cooper.

Here is what Cooper's report says (in its entirety) about his plans' respect for Alabama's traditional redistricting criteria: "All six illustrative plans comply with traditional redistricting principles, including population equality, compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength." *Caster* DE48:21. That bare *ipse dixit* flouts the Supreme Court's unequivocal statement that "mere recitation of purported communities of interest" will not suffice, *Miller*, 515 U.S. at 919, to say nothing of the Middle District of Alabama's admonition of Cooper's work for virtually the same deficiencies less than two years ago, *see Alabama NAACP*, 2020 WL 583803 at *24 (finding Cooper failed to "discuss the regional, cultural, social, economic or political ties, if any" between disparate black populations in previously proposed plans). Moreover, the Caster Plaintiffs' claim that their proposed maps provide "protection of incumbents,"

*Caster* DE56:12, is false; all but one of their maps pit Reps. Moore and Carl against each other in District 1 and leaves District 2 unrepresented. Bryan Supp. Rep. at 16.

"[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush v. Vera*, 517 U.S. 952, 979 (1996). *Gingles*'s compactness inquiry—and with it, the State's traditional redistricting criteria—are thus integral to Plaintiffs' claim. Plaintiffs' proposed maps disregard the State's longstanding districting principles, subordinating them to racialized head counts and thus flunking *Gingles*'s threshold compactness requirement.

**b. Plaintiffs' Proposed Maps Are Not Compact, Prioritizing Race Above Traditional Redistricting Principles.**

***Geographic Compactness:*** While Section 2's compactness analysis is not limited to the shape of a proposed district, "the geographical shape of any proposed district necessarily directly relates to the geographical compactness and population dispersal of the minority community in question" and thus "is a significant factor that courts can and must consider in a *Gingles* compactness inquiry." *Sensley v. Albritton*, 385 F.3d 591, 596 (5th Cir. 2004). This factor weighs heavily against the Milligan and Caster Plaintiffs, as each of their plans depends on stretching District 2 across the southern half of the State to pick up discrete pockets of black voters. The resulting districts are not "reasonably compact." *Abrams*, 521 U.S. at 91-92.

The maps tell the tale. Take for example Duchin's Plan A (*Milligan*, DE68-5:7; DE71-1:69). District 2 drops into the City of Mobile to pick up black voters,

stretches the width of the State, and then executes the same maneuver in Houston County to pull in many of Dothan's black voters. And while none of Duchin's other plans snag Dothan voters, each connects Mobile to the Georgia border.



Duchin claims that her "plans are superior to the State's plan on the Polsby-Popper metric" based on her finding that, *on average* across all seven districts, her plans outscored the 2021 Map. *Milligan* DE68-5:9. But her statement is both irrelevant and misleading. It is irrelevant because compactness must be measured at the district level. *See Abrams*, 521 U.S. at 91 (considering whether a minority population "is sufficiently large and geographically compact to constitute a majority in a single-member district"). And it is misleading because her new District 2 is far *less* compact than that in the 2021 plan. Not that Duchin revealed this; her report lists *only* the average score across districts. But Bryan's Supplemental Report shows what was held back: "Districts 1 and 2 (one of her purported majority-BVAP districts) were made far less compact." Bryan Supp. Rep. at 18, 57.

| District | 2021 Plan | Duchin A | Duchin B | Duchin C | Duchin D |
|----------|-----------|----------|----------|----------|----------|
| 1 | 0.20 | 0.13 | 0.16 | 0.16 | 0.13 |
| 2 | 0.26 | 0.16 | 0.19 | 0.15 | 0.15 |
| 3 | 0.25 | 0.26 | 0.23 | 0.28 | 0.26 |
| 4 | 0.19 | 0.37 | 0.40 | 0.32 | 0.36 |
| 5 | 0.32 | 0.38 | 0.53 | 0.53 | 0.38 |
| 6 | 0.15 | 0.22 | 0.25 | 0.18 | 0.19 |
| 7 | 0.19 | 0.28 | 0.23 | 0.18 | 0.27 |
| Sum | 1.55 | 1.80 | 1.98 | 1.80 | 1.75 |
| Average | 0.22 | 0.26 | 0.28 | 0.26 | 0.25 |

The numbers also explain why, in Duchin's attempt to draw a new District 2, she so dramatically altered Districts 4 and 5 on the opposite end of the State. Her changes to those districts drove up their compactness scores, in turn offsetting the low scores she produced by gerrymandering Districts 1 and 2.[12]

Cooper's maps also do strange things in their search for "majority-black electoral districts" despite "the uneven geographical dispersal of the African-American population" in Alabama. *Sensley*, 385 F.3d at 597. For example, District 2 in Cooper's Illustrative Plan 6 starts with part of Pickens County, then heads south to scoop down and around part of Mobile County, reaching back into the City of Mobile. *See*



---

[12] Cooper, the Caster Plaintiffs' expert, seems to have adopted Duchin's misleading approach in his rebuttal report's "Illustrative Plan 7," which he filed two days ago. *See Caster* DE65:6-8.

*Caster* DE48-43; *Milligan* DE74-1:88. The district also stretches nearly all the way to Georgia. Despite the district's abysmal compactness score, *see Caster* DE48:36, it still barely manages to surpass 50% any-part BVAP. *Id.* at 34. The similar flaws in Cooper's other maps "constitute[] strong evidence that the black minority populations contained therein are not 'reasonably compact.'" *Sensley*, 385 F.3d at 597.

***Preserving the Cores of Districts***: Alabama has a strong interest in "[p]reserv[ing] … the cores of existing districts." *Milligan* DE53:17.[13] Among other things, this interest serves to ensure the efficacy of the districts' representatives. As Bradley Byrne, former congressional Representative for District 1, explained in sworn testimony, the continuing relationships between him and his fellow representatives allowed them to "compl[e]ment one another" and, in turn, help Alabama "punch[] above its weight" in Congress. Ex. 9 (Testimony from *Chestnut v. Merrill*, 446 F. Supp. 3d 908 (N.D. Ala. 2020) ("*Chestnut* Tr.")) at 684.

This makes sense. "Long-term representatives have a chance to learn about and understand the unique problems of their districts and to pursue legislation that remedies those problems." *See* Nathaniel Persily, *In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders*, 116 Harv. L. Rev. 649, 671 (2002). As their tenure progressed and they

---

[13] "Cores of districts" are territorial, often comprising "the key counties that make up the current district." *Milligan* DE70-2:159; *see also id.* at 161 (explaining "core of District 1 … would be Mobile and Baldwin counties" because they are the district's "predominant counties").

achieved seniority in Congress, Rep. Byrne explained, Alabama's congressional delegation could "get far more for the buck than most states do." *Chestnut* Tr. at 684; *see also, e.g.*, *White v. Weiser,* 412 U.S. 783, 791-92 (1973) (explaining States have a legitimate interest in "promot[ing] 'constituency-representative relations,' a policy frankly aimed at maintaining existing relationships between incumbent congressmen and their constituents"); *Karcher*, 462 U.S. at 740.

Ever since Alabama has had seven Congressional districts (beginning in the 1970s), Alabama's districts have encompassed virtually the same geography of the State after each redistricting cycle, excepting minor changes required to equalize population among the districts. *See Singleton* DE57-7:37-43; *Milligan* DE70-2:38-40; *see also Singleton* DE57-4 (2021 Reapportionment Committee Guidelines) at 4 (specifying that preserving the cores of existing districts is a policy "embedded in the political values, traditions, customs, and usages of the State of Alabama"). This stability evidences the Legislature's enduring interest in preserving the cores of districts.

As discussed above, the 1992 Map led to a substantial change in which District 7 expanded into District 6 to create the State's first majority-black congressional district. But since the 1992 Map took effect, the Legislature has continued its practice of maintaining the districts' core shapes and populations. The image below (from *Milligan* DE66-2:52) demonstrates the continuance of this tradition, highlighting the extraordinary similarity between the 2021 Map and the 2011 Map. As the *Singleton* Plaintiffs aptly note, "[t]hese observations are consistent with the evidence that the new redistricting plan was designed largely to preserve existing districts." *Singleton* DE57:17. And, again, this is what one would expect from a Legislature and map-drawer interested in effecting the least changes possible.



The hard data bear out exactly what this image suggests. As the table below demonstrates, the 2021 Map retains over 90 percent (comfortably over, in most cases) of six of Alabama's seven congressional districts, with District 6 coming in just short of that threshold at 87.8 percent. And black retention mirrors total-population retention, further demonstrating that the Legislature's map drawer was agnostic to the races of those he would add or subtract from each district.



Plaintiffs' proposed maps are a different story entirely. As Tom Bryan illustrates in his Rebuttal Report, *none* of Plaintiffs' ten proposed maps retains as much of the previous district as the 2021 Map's *least retentive* district. *See* Bryan Supp. Rep. at 33-43. Indeed, only two of the Milligan Plaintiffs' proposed maps contain a district cresting 80 percent retention—and in these two maps, only District 7 does

so. *See id.* at 34-37. More astonishingly, in every one of the Milligan Plaintiffs' proposed maps all but one district retains only about half of its population. *Id.* So much for core preservation.[14]

Plaintiffs' proposed maps render the State's existing congressional districts unrecognizable. Perhaps more jarringly, these maps appear to target black Alabamians for much of their manipulation. *See id.* at 33-43. Even if Plaintiffs could plausibly claim that their proposed districts respect the State's traditional interest in minimizing changes and retaining districts' cores, the obvious racial calculus underpinning the map patently offends the Constitution. *Shaw I*, 509 U.S. at 645. But more on that later, *see infra* §II.C; for now, it is enough to note that unapologetically scooping and relocating *between 60 and 75 percent* of District 1's black population—and roughly half the black population in District 6—accords with no traditional districting principle.

What's more, Plaintiffs propose to split Mobile and Baldwin Counties between two districts for the first time since Alabama's congressional delegation dropped to seven representatives in the 1970s. *See* Bryan Supp. Rep. at 15. As discussed below, the Gulf Counties comprise some of Alabama's most well-known

---

[14] Considering that Alabama's Board of Registrars would be tasked with reassigning all these voters on an expedited timetable, Plaintiffs' substantial distortions necessarily impact the equities at stake in this litigation. *See infra* §III.

communities, and splitting them would likely leave half the counties' constituents with a representative unfamiliar with their unique interests.

Despite the Supreme Court's admonition that "[l]egitimate yet differing communities of interest should not be disregarded in the interest of race," *LULAC*, 548 U.S. at 434, there can be no doubt that elevating race above other districting criteria is precisely what Plaintiffs are doing. This Court should reject the invitation to blindly subordinate the State's core-retention principle to Plaintiffs' racial quotas.

***Maintaining Communities of Interest***: "[T]he § 2 compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997). "Those communities of interest might be based on location (rural, urban, coastal, or mountain), occupation (industrial or agricultural), political ties, social similarities, or cultural connections." *Alabama NAACP* at *19 (citing *Miller v. Johnson*, 515 U.S. 900, 908 (1995)). A legislature may be conscious of race when conducting its community-of-interest-analysis, but race may not constitute the "predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916.

The Legislature respected strong communities of interest when it drew Districts 1 and 2 in 2021. Two former Congressmen from District 1, Bradley Byrne and Jo Bonner (who has also served as Governor Kay Ivey's chief of staff), recently gave

sworn testimony about these communities during *Chestnut v. Merrill*, 446 F. Supp. 3d 908 (N.D. Ala. 2020), a case in which plaintiffs brought similar Section 2 claims seeking two majority-minority districts. *See Chestnut* Tr. Because the Legislature retained the core of the districts from the 2011 Map in its 2021 Map—including, as particularly relevant here, keeping Alabama's Gulf Coast region unified in District 1—the former Congressmen's 2019 testimony remains relevant today.

District 1 comprises Alabama's Gulf Coast region, a discrete community of interest with unique cultural, economic, and historical traits not shared by the rest of the State. The communities in District 1 share a highway and river system; Mobile Bay and the Gulf of Mexico; and employers whose work centers around the Port of Mobile. *Id.* at 667-74, 677-81, 764-75. The people of District 1 also share a unique history, including heavy Spanish and French influence, the origination of Mardi Gras in the New World, and all the attributes that come from being Alabama's only coastal region. *See Barnhart v. Ingalls*, 275 So. 3d 1112, 1117 n.1 (Ala. 2018) (citing Ala. Code § 1-3-8(c)) ("Mardi Gras is observed as a State holiday only in Mobile and Baldwin Counties, and State offices in those locales are accordingly closed on that holiday."); *Chestnut* Tr. at 671-74, 677-79, 764, 773-74, 778. As Mr. Bonner testified, "There is definitely a chemistry ... that exists in this district that is unique." *Id.* at 765. Mobile and Baldwin Counties are as closely related today as they have ever been. *Id.* at 679-80, 744-48, 770-71. More recently, Rep. Adline Clarke, a black Democrat from

Mobile, echoed these themes: "I consider Mobile and Baldwin counties one political subdivision and would prefer that these two Gulf Coast counties remain in the same congressional district because government, business and industry in the two counties work well together—with our congressman—for the common good of the two counties." John Sharp, *Redistricting Alabama: How South Alabama could be split up due to Baldwin County's growth*, AL.com (Sep. 20, 2021), https://perma.cc/8PME-JA5W. Because the Port of Mobile facilities so much trade, the economic health of District 1 "benefits … virtually every county in the state of Alabama." *Chestnut* Tr. at 673.

Like its westerly counterpart, District 2 respects communities of interest. Centered on the Wiregrass region and including the Montgomery metropolitan area, District 2 revolves around agricultural and military concerns. *Id.* at 683-84, 687, 780-81. While District 1 also has military interests (a Navy shipyard), these military interests differ from District 2's (Air Force and Army aviation). *Id.* at 683-84, 781. And while both districts share an abstract interest in agriculture, District 1's agricultural interests are different in kind than District 2's; "[c]attle is a very different thing than growing crops," and "when you start looking at the federal agriculture programs and how they apply …, there's a great deal of difference." *Id.* at 687; *see also id.* at 688, 768-69. Moreover, people from the Wiregrass do not commute to Mobile for work, *id.* at 687, 766, and the industries in the Wiregrass do not use the port, *id.* at 687. Put simply, these are different communities; someone from Mobile who was called to

represent the Wiregrass would have "a lot to learn about their culture, their way of life, [and] their economic engine." *Id.* at 782.

Unsurprisingly, for all these reasons former District 1 Congressmen Bonner and Byrne have emphatically stated that representing both these regions adequately would be nearly impossible. Travel throughout the districts would be difficult, limiting a Representative's ability to hold town hall meetings and connect with constituents. *Id.* at 684-86, 775-776. A Representative would also face difficulty finding the budget to staff sufficient offices for such a broad area. *Id.* at 689. Moreover, combining the diverse interests of two distinct communities would result in a smattering of issues that no Representative could effectively address. *Id.* at 685, 782-83. It would, for example, be exceedingly challenging to effectively advocate for constituents' interests in the seafood industry, and in peanut subsidies, and in the port, and in military aviation, and in the shipyard—to say nothing of these constituents' interests in cattle ranching and timber. *Id.* at 687; *see also* Ex. 10 (Rep. Callahan Testimony) at 7-12 (former District 1 Rep. Callahan explaining "the worst vote you can cast on the floor of the House of Representatives is a vote that may help one part of your district but conceivably can harm another"; also noting "Baldwin County and Mobile County … both have interest in legislation that affects the Gulf of Mexico").

Nevertheless, the Caster and Milligan Plaintiffs ask this Court to break up the Gulf Coast and scramble it with the Wiregrass, patching discrete communities together and leaving them with a congressional representative unlikely to effectively represent their interests. These Plaintiffs' new District 2 scoops high-BVAP portions of urban Mobile County and lumps them in with black Alabamians plucked from Montgomery and rural, high-BVAP counties, some as far east as the Georgia border. And their new District 1 connects Baldwin County and rural Mobile County—at least the parts that are heavily white—with the Wiregrass. Each plan requires the State to separate Mobile and Baldwin Counties for the first time in half a century and to split Mobile County for the first time in the State's history, in the process dividing some of the State's most historic and economically important regions.

Remarkably, the Milligan and Caster Plaintiffs claim their maps honor Alabama's communities of interest. Attempting to justify a district spanning from Mobile through central Alabama's rural farmland to the State's eastern border, the Milligan Plaintiffs assert that all black voters in the district "are members of communities of interest" because they share "a history of discrimination, and their shared beliefs include a desire for livable wages, quality healthcare, and a second majority-Black district." *Milligan* DE1:22.[15]

---

[15] The *Milligan* Plaintiffs also assert "the Black Belt is a community of interest." Milligan, DE69:12. This is an odd way for Plaintiffs to justify their respect for the State's communities of

But aside from race, these purported interests are merely about political preferences as abstract as they are commonplace. While "[a] State is free to recognize communities that have a particular racial makeup," that recognition must be "directed toward some common thread of relevant interests." *Miller*, 515 U.S. at 920. Plaintiffs' insistence that a black dockworker in Mobile shares more "relevant interests" with a black grad student at Troy or black farmer near the State's eastern border than with any non-black dockworkers in the same shipyard demonstrates that the Milligan Plaintiffs' new "community of interest" is merely a blunt proxy for skin color. Never mind that "[l]egitimate yet differing communities of interest should not be disregarded in the interest of race," *LULAC*, 548 U.S. at 434, or that the Supreme Court has roundly condemned incorporating "in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin," *Shaw v. Reno*, 509 U.S. 630, 647 (1993) ("*Shaw I*"). Plaintiffs' race-centric conception of community "bears an uncomfortable resemblance to political apartheid," *id.*, and "[i]f our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards

interest, given that they divide the Black Belt between Districts 2 and 7 in every one of their four plans. *See supra* p. 24.

that progress and causes continued hurt and injury," *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630-631 (1991).

Moreover, the notion that all black Alabamians "desire … a second majority-Black district" is both patronizing and verifiably incorrect. Indeed, at one of the public hearings the Reapportionment Committee held to solicit input regarding 2021 redistricting, Albert Turner Jr. opined that "55 percent or somewhere in that neighborhood is what's needed to ensure African-Americans being represented in Congress." Ex. 5 at 28. Turner went on to state he was "satisfied we don't have enough black people in Alabama to create two 55 percent districts, but [he] [was] satisfied to make sure we have one African-American in Congress that can speak on our behalf." *Id.* at 29.

Undeterred, the Milligan Plaintiffs attempt to prove up their blanket racial assumptions with testimony from one of their named plaintiffs, Shalela Dowdy. In Dowdy's view, Mobile County and the Black Belt constitute one "community of interest" because "many Black people in the Mobile area" share "family ties to the Black Belt," experience "similar struggles," and suffer from "not being able to elect someone who will fight for the things that Black people in the Black Belt and Mobile find important." *Milligan* DE70-5:2. In other words, Dowdy claims these disparate communities comprise a discrete community of interest because they have many black Alabamians and because, by Dowdy's lights, black Alabamians want the same

things. This is exactly the sort of rationale the Supreme Court forbids States from adopting, and rightly so. *See Shaw I*, 509 U.S. at 647.

As noted above, the Caster Plaintiffs offer even less respect to Alabama's communities of interest. Unlike their Milligan counterparts, the Caster Plaintiffs (perhaps wisely) do not attempt to explain how connecting geographically and culturally dispersed Alabamians constitutes a "community of interest" sufficient to satisfy *Gingles*'s compactness inquiry. Instead, Plaintiffs' expert, Cooper, simply assumes the truth of the proposition he is tasked with proving. *Caster* DE48:21 ("All six illustrative plans comply with traditional redistricting principles, including … respect for communities of interest."). This sort of cursory disregard for a critical indicium of compactness is insufficient to satisfy *Gingles*'s first precondition, and is precisely what the *Alabama NAACP* court took Cooper to task for less than two years ago:

> Mr. Cooper did not discuss the regional, cultural, social, economic, or political ties, if any, among the African-American communities in Birmingham, in the Black Belt, or in any other area in District 1 of the AC plans. … Mr. Cooper testified that he joined the substantial African-American population of Jefferson County for the sheer sake of satisfying a numerical threshold. His explanation reveals that maintaining communities of interest, if considered at all, was subordinated to the necessity of creating an African-American, voting-age population in District 1 of his AC plans with a 50% plus one voting-age population. This feature illustrates the warning of *Shaw v. Reno*. The physical dispersal of the African-American population in District 1 of the AC plans is an indicator of non-compactness.

2020 WL 583803 at *24 (internal citations, quotations omitted).

Cooper and the Caster Plaintiffs appear to have disregarded the court's admonition. Just like the plaintiffs in *Alabama NAACP*, the Caster Plaintiffs—with Cooper's help—again subordinate any consideration for the State's communities of interest to "creating an African-American, voting-age population … with a 50% plus one voting-age population." *Id*. For example, in only two of Cooper's seven proposed iterations of District 2 does BVAP for any-part-black voting-age Alabamians reach even 51 percent. *See* Bryan Supp. Rep. at 28-31. The laser precision with which Plaintiffs attempt to comply with *Gingles*'s 50-percent-plus-one requirement is obviously not coincidental. *Shaw I*, 509 U.S. at 645. And, as Bryan's report explains, had Cooper used only those Alabamians who identify as single-race black (as opposed to any-part-black), only one of his proposed District 2s would have even reached *50* percent, leaving the rest short of numerical sufficiency under *Gingles*'s first requirement. *Strickland*, 556 U.S. at 18.

But if any doubt remained about the motives behind these aberrational districts, one glimpse of the districts' racial compositions dispels it:



*See* Bryan Supp. Rep. 77-78.[16]

And, unsurprisingly, Duchin and the Milligan Plaintiffs' proposed maps fit this same mold:

---

[16] To preserve space, this Response includes only the Caster Plaintiffs' first map. Each of their six maps, however, bears similar racial composition.



*See* Bryan Supp. Rep. 68-69.[17]

Plaintiffs' maps speak for themselves. Both Cooper's and Duchin's Districts 1 and 2 were "obviously drawn for the purpose of separating voters by race," *Shaw I*, 509 U.S. at 645, subordinating the State's traditional communities of interest Plaintiffs' own "predominant, overriding desire to create [two] majority-black districts," *Abrams*, 521 U.S. at 81 (internal quotation marks omitted).[18]

---

[17] As with the Caster Plaintiffs' maps, *see supra* n.15, each of the Milligan Plaintiffs' four maps features similar racial composition.

[18] It is no answer to assert that the State drew Board of Education Districts that bear some resemblance to Plaintiffs' proposals. The tasks facing a member of the State's Board of Education bear little resemblance to those demanded of a congressional representative. *Chestnut* Tr. 697-99, 825.

"[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush*, 517 U.S. at 979. Plaintiffs' proposed congressional map guts communities of interest to round up geographically distant voters and allocate them to districts using precisely calibrated racial quotes; indeed, only "racial lines" explain each proposed District 2. The Caster and Milligan Plaintiffs' racialized districting strategies thus cannot satisfy *Gingles*'s communities-of-interest inquiry, further demonstrating why Section 2 does not require a second majority-minority district in Alabama. *See id.* ("If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district.").

*Minimizing the Number of Counties in Each District*: The Reapportionment Guidelines provide that the Legislature "shall respect communities of interest," which include counties. DE57-4:2. The 2021 Map has six county splits (Lauderdale, Jefferson, Tuscaloosa, Chilton, Montgomery, and Escambia), all necessary to equalize population. Bill Cooper's maps for the Caster Plaintiffs also split six counties, matching the 2021 Plan.

The Milligan Plaintiffs, however, hide the ball when they claim that "most of [their] plans are comparable to HB1 as to the number of split localities." *Milligan* DE69:8. In fact, despite agreeing that only six county splits are necessary to equalize population, *see* Duchin Report at 5, all but one of Duchin's plans split more localities

and municipalities than the 2021 Map, *id.* None of Plaintiffs' maps has fewer county splits than the 2021 Map, and many have far more.[19]

***Avoiding Contests Between Incumbents***: Plaintiffs' proposed maps force contests between incumbents where the 2021 Map demonstrates none need exist. Each of the Milligan Plaintiffs' maps places four Congressmen in contests against each other, leaving either two or three districts unrepresented. *See* Bryan Supp. Rep. at16. Needless to say, maps pitting more than half of the State's sitting Congressmen against each other do not respect incumbency protection.

And, of the Caster Plaintiffs' six proposed maps, only one protects incumbents from running against each other. *Id.* This despite the Caster Plaintiffs' representation to this Court that their proposed maps "adhere to other traditional redistricting principles, including … protection of incumbents." *Caster* DE56:12.[20]

This traditional criterion strongly favors the 2021 Map.

***Plaintiffs' Proposed Remedies Violate the Constitution***: Finally, Alabama's redistricting criteria forbid any conflict with "the Constitution and laws of the United

---

[19] Per Duchin's expert report, *Milligan* DE68-5:7, 8, her maps show the following splits: Plan A has 9 county splits (Limestone, Jefferson (twice), Shelby, Dallas, Russel, Choctaw, Houston, and Mobile); Plan B has 7 county splits (Madison, Etowah, Jefferson, Shelby, Barbour, Clarke, and Mobile); Plan C has 9 county splits (Madison, Cullman, Etowah, Jefferson, Tuscaloosa, Talladega, Clarke, Washington, and Mobile); and Plan D has 6 county splits (Limestone, Jefferson, Jefferson, Shelby, Russell, and Mobile).

[20] Irrespective whether this was a good-faith mistake, the Caster Plaintiffs' material misrepresentation illustrates the hazards inherent in this litigation's extraordinarily expedited schedule, duly counseling against granting the extraordinary relief Plaintiffs seek during the leadup to an election. *See infra* §III.

States." *Milligan*, DE53:17. Plaintiffs' proposed maps are unconstitutional racial gerrymanders, and this Response addresses their unconstitutionality in detail below, *see infra* §I.C.

Notably, the very logic Plaintiffs embrace to decry the 2021 Map applies doubly against the impermissible remedies they propose. *See infra* §I.C.1.a. The Legislature's decision not to enact those racially gerrymandered maps accords with its traditional redistricting principles.[21]

\*    \*    \*

In sum, Plaintiffs' proposed remedies demand that the State disregard perhaps the three most important districting principles in its traditional criteria: preserving the cores of existing districts; maintaining communities of interest; and avoiding contests between incumbents. Their maps also produce more county splits and new districts that are less geographically compact. All this despite the Supreme Court's repeated admonition that the first *Gingles* preconditions requires these principles'

---

[21] Several, though not all, of Plaintiffs' proposed maps also appear to violate the Supreme Court's one-person-one-vote principle. In *Karcher v. Daggett*, the Supreme Court explained that "[a]dopting any standard other than population equality … would subtly erode the Constitution's ideal of equal representation, 462 U.S. 725, 731 (1983), meaning any deviations must have a legitimate justification, *id.* at 740-41. While all of the State's maps have held populations equal to ±1 deviation, two of Duchin's maps (Plans B and D when the misplaced islands are reassigned) and one of Cooper's maps (Illustrative Plans 3 and 7) inexplicably fail to comply with this principle. *See* Bryan Supp. Rep. at 7-10. Because Duchin and Cooper do not attempt to justify these deviations with specificity based on a legitimate state objective, those plans violate the one-person-one-vote principle and are thus unconstitutional. *Karcher*, 462 U.S. at 731.

consideration. The natural question for Plaintiffs is, "Why?" The answer is too obvious to ignore. *See supra* pp. 70-71. Plaintiffs seek to override the State's sovereign prerogative, demolish historic districts that honor Alabama's communities of interest, pit sitting congressmen against each other, and impose unprecedently disruptive districts on all Alabamians for one reason: Race.

But "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact,'" *Bush*, 517 U.S. at 979, nor will a "State's policy of adhering to other districting principles instead of creating as many majority-minority districts as possible … support an inference that the plan so discriminates on the basis of race or color as to violate the Constitution," *Shaw v. Hunt*, 517 U.S. 899, 913 (1996) ("*Shaw II*") (cleaned up). Indeed, a legislature *cannot* satisfy *Gingles*'s compactness requirement if it "subordinate[s] traditional districting principles to race." *Miller*, 515 U.S. at 919. Yet this is just what the *Milligan* and *Caster* Plaintiffs demand.

Under *Gingles*'s first precondition, traditional districting principles are a necessary component of a viable Section 2 claim. *LULAC*, 548 U.S. at 433. Because Plaintiffs impermissibly subordinate virtually all of the State's redistricting interests to race, their Section 2 claims end here.

### 3. Plaintiffs Fail to Show the Racial Polarization Necessary to Satisfy *Gingles*'s Second and Third Preconditions.

Plaintiffs also struggle to satisfy the second and third *Gingles* preconditions, which address racial bloc voting. "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56. "Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices." *Id.*

As explained above, *see supra* §I.A.1, the "sufficiently large" and "compact" minority group that a Section 2 litigant defines in the first *Gingles* precondition must be the same minority group to whom the second and third preconditions apply. *Pope v. County of Albany*, 687 F.3d at 577 n.11. The minority group Plaintiffs chose to satisfy *Gingles*'s first precondition was any-part-black Alabamians. But in preconditions two and three, Plaintiffs appear to have swapped that demographic out for single-race black Alabamians. *See supra* §I.A.1.

Plaintiffs have therefore failed to show that "the minority group" they used to satisfy step one has satisfied each *Gingles* requirement, nullifying their Section 2 claim. It is no answer to presume that racially polarized voting similarly affects "any part black" and "all black" Alabamians. The Supreme Court "ha[s] rejected such

perceptions elsewhere as impermissible racial stereotypes," *Shaw I*, 509 U.S. at 647, and, likely for this very reason, "the results test does not assume the existence of racial bloc voting; plaintiffs must prove it." *Gingles*, 478 U.S. at 46; *see also Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*, 906 F.2d 524, 527 (11th Cir. 1990) (holding that plaintiffs must prove cohesiveness of different minority groups if plaintiffs use two groups to satisfy first *Gingles* precondition).

Even assuming *Gingles* permitted Plaintiffs to mix and match their preferred minority groups and accepting the assumption that those who identify as any-part black necessarily share the same political goals as those who identify as all black, the analytical deficiencies in Plaintiffs' racial-polarization analysis shows that they do not "clearly" meet *Gingles*'s second and third requirements. *Mathews*, 544 F.2d at 1243. Plaintiffs' racial-polarization analysis selectively highlights Alabama's recent electoral history, leaving out necessary context and election results that do not fit their narrative. Due to the expedited nature of this briefing, the State's Response highlights three critical points that Plaintiffs omit; there are doubtless more.

First, the Milligan Plaintiffs rely on the expert testimony of Dr. Baodong Liu, who claims to have "identified and reviewed" all Alabama Congressional general and primary elections that involved both black and white candidates. *Milligan* DE68-1:4. That is not true. Liu failed to include in his analysis the 2020 Democratic primary election in District 2, in which a black woman—Phyllis Harvey-Hall—

defeated a white man, Nathan Mathis. *See* Ex. 11 (2020 Democratic Primary Results for Districts 1 and 2). Second, it is worth noting that the ADC supported Kiani Gardner, a non-black woman, in the District 1 Democratic primary. *See Alabama Democratic Conference Endorses Michael Bloomberg for President*, Alabama Political Reporter (Feb. 12, 2020), available at: https://perma.cc/89ZG-2LHK ("The ADC liked both Kiani Gardner or James Averhart in Alabama's First Congressional District."). Gardner won the most votes in the Democratic primary before narrowly losing to James Averhart, a black man, in a runoff election with much lower turnout. *See* Ex. 12 (2020 Democratic Primary Runoff Results). And third, 2020 was not the first time the ADC endorsed a non-black candidate—in Alabama's 2017 Democratic primary for U.S. Senate, the ADC endorsed Doug Jones, a white man, over a black candidate, Robert Kennedy Jr., even though Kennedy was leading Jones in public polls at the time. *See Alabama Democratic Conference Endorses Doug Jones for U.S. Senate*, CBS42 (Aug. 3, 2017), available at: https://perma.cc/9T7Q-SHBS. This is the very same Robert Kennedy who won the Democratic Party's nomination in the 2018 District 1 election. *See* DE68-1:9-10. Jones went on to win the statewide election.

Plaintiffs have failed to show that *Gingles*'s racial-polarization preconditions clearly support the extraordinary relief they seek. First, they impermissibly swapped one minority group for another—on its own, a sufficient ground for rejecting their

Section 2 claims. But second, the obvious flaws with Plaintiffs' electoral analysis demonstrate that "the facts and law" do not "clearly favor" their position, thus prohibiting the injunctive relief they seek. *Mathews*, 544 F.2d at 1243.

### B. The "Totality of Circumstances" Confirms That the 2021 Map Does Not Violate Section 2.

Only if Plaintiffs meet *Gingles*'s first three requirements does the Court then "consider[] whether, 'on the totality of circumstances,' minorities have been denied an 'equal opportunity' to 'participate in the political process and to elect representatives of their choice.'" *Abrams v. Johnson*, 521 U.S. at 91 (quoting 42 U.S.C. § 1973(b)); *Johnson v. De Grandy*, 512 U.S. 997, 101 (*Gingles* factors not "sufficient in combination" to "prove a § 2 claim"). Plaintiffs have failed to show a likelihood of success on the *Gingles* preconditions—let alone that these threshold requirements "clearly … favor the moving party." *Callander*, 256 F.2d at 415. But even if Plaintiffs could satisfy *Gingles* preconditions, the "totality of circumstances" underscores the weakness of their position.

"[T]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." *Chisom v. Roemer*, 501 U.S. 380, 397 (1991). "The general terms of the statutory standard 'totality of circumstances' require judicial interpretation. For this purpose, the Court has referred to the Senate Report on the 1982 amendments to the

Voting Rights Act, which identifies factors typically relevant to a § 2 claim." *LULAC*, 548 U.S. at 426. These are colloquially known as the "Senate factors," and feature extensively below.

Critically, "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates," *Solomon*, 221 F.3d at 1225, so Section 2 claims present courts with an "often-unstated danger": "Unless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena," subjecting political winners to "a heavy price by using the judicial process to engage in political trench warfare for years on end." *Cooper*, 137 S. Ct. at 1490 (2017) (Alito, J., concurring in part) (quoting *Miller*, 515 U.S. at 916).

Because "[e]lectoral losses that are attributable to partisan politics do not implicate the protections of § 2," *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 863 (5th Cir. 1993) (en banc) ("*Clements*"), Section 2's "totality of circumstances" test, with guidance from the Senate factors, ultimately asks whether the "results" established by *Gingles*'s threshold requirements exist "on account of race." 52 U.S.C. § 10301(a). The answer to this question is plainly "no," despite Plaintiffs' attempts to portray otherwise. Things in Alabama have not just

changed, they have "changed dramatically." *Shelby County v. Holder*, 570 U.S. 529, 547 (2013). The totality of circumstances supports the State.

### 1. The Senate Factors Favor the State.

The *Gingles* Court listed the Senate factors as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

> whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

> whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

478 U.S. at 36-37 (quoting S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982)).

The Senate factors appear nowhere in the text of Section 2. Nevertheless, courts frequently cite them as suitable heuristics to help determine whether the minority vote has been diluted "on account of race or color." 52 U.S.C. §10301(a). In some of those cases, the factors may have been probative. Here, it is less clear why, for example, Plaintiffs think a brief interruption in a school-lunch program during a global pandemic speaks to whether black voters have an equal opportunity to participate in the electoral process and elect their candidate of choice for Congress. *See Milligan* DE68-2:24. Because Plaintiffs structure their arguments around these factors, Defendants will respond in kind. The balance of these factors favors the State.

### a. Senate Factor 1: Alabama Has Overcome Its History.

"[O]fficial discrimination … touch[ing] the right of [black Alabamians] to register, to vote, or otherwise to participate in the democratic process" is undoubtedly a part of Alabama's history. *Id.* at 36. This sordid history will never change, and it should never be forgotten. When evaluating "the extent" of this history, however, the fact that more than half a century has passed since the State's most shameful actions illustrates this history's limitations in a totality-of-circumstances analysis.

"[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324. Thus, despite their repeated invocations of Alabama's 1901 constitutional convention and Bloody

Sunday, such "generalized assertion[s] of past discrimination in a particular … region [are] not adequate" to support Plaintiffs' Section 2 claims. *Shaw II*, 517 U.S. at 909-10. Doubly so where, as here, "[o]vert discriminatory election devices have long ceased to exist" and "voter registration and turnout rates among blacks and whites have reached parity." *Ala. NAACP*, 2020 WL 583803 at *41 (citing *Shelby County*, 570 U.S. at 535, 548).

Moreover, Plaintiffs' claims regarding this first Senate factor turn on unsupportable inferences and factual misstatements. As a threshold observation, Plaintiffs often do not even attempt to tie the alleged official discrimination to black Alabamians' ability to vote. And where they do, that link is tenuous. *See, e.g.*, *Milligan* DE69:17-18 (providing no support for the substantial claim that alleged discrimination produced the disparate socioeconomic outcomes that exist today). The expedited briefing schedule does not permit the State to address each of Plaintiffs' assertions, but several are too misleading to ignore.

First, the Milligan Plaintiffs contend that Alabama employers account for a disproportionate number of racial-discrimination claims. *Milligan*, DE69:12. This is misleading. The expert they cite for support, Dr. Bagley, states: "Alabama's racially based claims accounted for 3.1 percent of national racial claims, although Alabama's population accounts, as of the last Census, for only 1.5 percent of the national population." DE68-2:18. Critically, though, Alabama is home to 3.1 percent of black

people nationwide. *See* U.S. Census Bureau, *Alabama*, available at: https://data.census.gov/cedsci/profile?g=0400000US01 (last visited Dec. 22, 2021). Context matters; it is not unusual that Alabama's percentage of the Equal Employment Opportunity Commission's racial-discrimination claims reflects its share of black Americans.

In this same vein, the Milligan Plaintiffs assert that Alabama has a "recent history of discrimination in state public employment." *Milligan* DE68-2:18. Plaintiffs again cite Dr. Bagley, who states that there are "numerous instances of racial discrimination in employment on the part of state entities . . . and also on the part of private employers." *Id.* at 19. To support this claim, Dr. Bagley cites 11 cases dating back to 1970. *Id.* at 19 n.62. As of 2020, the State of Alabama employs more than 30,000 people, 43 percent of whom are black, *see* Ex. 13 (Alabama State Personnel Board 2020 Annual Report) at 18; Plaintiffs' purported evidence—a handful of cases spanning over half a century—cannot demonstrate a "recent history of discrimination in state public employment," DE68-2:18.

The Milligan Plaintiffs then allege that "about 50 Alabama school districts remain subject to an injunction originally imposed to combat the State's policy of resistance to desegregation." DE69:17. But retaining an injunction does not show modern-day discrimination, much less "resistance to desegregation." To dissolve a desegregation injunction, a local school system must, among other requirements,

"prove that it has . . . eliminated the vestiges of prior *de jure* segregation to the extent practicable." *N.A.A.C.P., Jacksonville Branch v. Duval Cty. Sch.*, 273 F.3d 960, 966 (11th Cir. 2001). As far back as 2007, a majority of Alabama school systems had affirmatively proven this negative, which shows the extraordinary progress Alabama has made in the decades since its shameful past. Ex. 14 (*Becoming Less Separate*, United States Commission on Civil Rights (Sept. 2007) at 111-19.

Dr. Bagley specifically calls out Huntsville City Schools for evidence of resistance to desegregation. Bagley Rep. at 23. But the ProPublica source Bagley cites in his report lists Huntsville as having a "*Voluntary* Desegregation Order"—just the opposite of what one might expect from a city trying to resist racial progress. DE68-2:23 n.78. Indeed, as the court approving Huntsville's voluntary consent decree noted, "[t]here is a light at the end of the tunnel, and it is bright, much like the future of the district and its public school students." *Hereford v. United States*, 2015 WL 13398941, at *11 (N.D. Ala. Apr. 21, 2015). That Huntsville is working to remedy the effects of past discrimination cannot weigh against the State.

The Caster Plaintiffs' assertions are similarly misrepresentative. As supposed evidence of present-day discrimination in Alabama, they cite two municipal subdivisions that were "bailed-in" to VRA preclearance. *Caster* DE56:17-18. In the first, the defendant City of Evergreen (home to fewer than 4,000 people) agreed to limited

preclearance, which covered only local redistricting and municipal voter qualification. *Allen v. City of Evergreen, Alabama*, 2014 WL 12607819, at *1 (S.D. Ala. Jan. 13, 2014). The Caster Plaintiffs also forgot to mention that the City's order by its own terms extended only to December 2020. *Id*. at *2.

In Plaintiffs' second example, VRA preclearance was not involved at all. A group of plaintiffs (including Greater Birmingham Ministries, Plaintiffs in this litigation) challenged a 1975 law under Section 2 and the Fourteenth Amendment. They did so even after the defendant Jefferson County Board of Education had agreed to modify its electoral districts. *See* Joint Mot. for Entry of Consent Order, *Jones v. Jefferson Cnty. Bd. of Education*, No. 2:19-CV-1821-MHH (DE9) (N.D. Ala. Nov. 9, 2019). These two instances—each of which was resolved by a consenting defendant—say nothing about discrimination in Alabama today, much less evidence any sort of defiance against racial progress.

While nothing can erase Alabama's "history of official discrimination," *Gingles*, 478 U.S. at 36, the past is not the present, and Plaintiffs have failed to make out any case for that official discrimination impedes their right to vote today.

### b. Senate Factor 2: Racial Polarization Is a Product of Politics, Not Race.

Explained above, what Plaintiffs characterize as racial bloc voting is more readily explained as the result of politics, not race. *Solomon*, 221 F.3d at 1225. Thus

the inquiry here goes substantially deeper than *Gingles*'s effects-based preconditions. "There, the inquiry focused solely on 'how' black and white voters voted," whereas "[t]he focus now, at the totality-of-circumstances stage, is on evidence of causation, which looks to 'why' voters cast their ballots for certain candidates." *Alabama NAACP*, 2020 WL 583803 at *41.

Black Alabamians' "candidates of choice" tend to lose elections in Alabama not because they are black or because they receive black support, but because they are Democrats. "Alabama is indeed a ruby red state—one of the most Republican states in the entire South," and, as the federal court for the Middle District of Alabama recently found, this reality "has made it virtually impossible for Democrats—of any race—to win statewide in Alabama in the past two decades." *Id.* at *42. Since 2008, the only Democrat to win a statewide race is Doug Jones. *Id.* The court also found "[t]hat white Democratic primary voters appear to give equal support to black Democratic candidates," *id.*, which "suggests that black candidates are not penalized" solely on account of race. *Id.* at 43 (citing *Clements*, 999 F.2d at 879). These findings (among many others that favored the State) led the court to conclude that "Senate factor 2 weighs heavily in favor of the State." *Id.* at 53

And in the less-than-two-year span since the *Alabama NAACP* court published this conclusion, the State's case has only strengthened. Though the State

argued in *Alabama NAACP* that "white voters would equally support a black Republican and a white Republican candidate," *id.* at 43, the court lacked "empirical evidence supporting or discrediting the theory" because the State could offer no hard data "inlud[ing] an election with an African-American Republican." *Id.* The results are in. Kenneth Paschal, a black Republican, recently won election to represent District 73—anchored by Shelby County—in the Alabama House of Representatives, *see Caster* DE44:20. Representative Paschal defeated a white Republican in the primary, and then proceeded to defeat a white Democrat—by nearly 50 percentage points—in the general election. *Id.*

District 73's predominantly white constituents were agnostic to Representative Paschal's race. Alabama Republican Party Chairman John Wahl stated that "[t]he Alabama Republican Party [was] incredibly enthusiastic about the election of Kenneth Paschal to House District 73," a man with "exceptional character whose 'God and Country' campaign resonated with Shelby County residents." *See Kenneth Paschal Wins House District 73 Special Election*, Alabama Political Reporter (Jul. 14, 2021), available at: https://perma.cc/2CEJ-C37B. And Representative Paschal, while "recogniz[ing] the historical significance" of being the first black Republican elected to the Alabama Legislature since Reconstruction, explained that "[t]he voters of District 73 didn't choose [him] because of the color of [his] skin"; "[t]hey got to

know [him]" and "saw a God-fearing man of integrity who values and defends our Constitution." *Id.* Those values—not skin color—drive voting in Alabama.

### c. Senate Factor 3: Alabama Does Not Use Practices or Procedures That Enhance the Potential for Discrimination.

The following represents the sum total of the *Milligan* Plaintiffs' attempt to show that Alabama's practices or procedures enhance the potential for discrimination: "Alabama primaries still use majority-vote requirements (factor three)." *Milligan* DE69:18. They do not contend that the State adopted this requirement for nefarious reasons—much less that Alabama actively maintains majority-vote primaries to discriminate against its black population today. And they ignore that this system led to a black candidate defeating a non-black candidate in a primary runoff election after the non-black candidate had garnered the most votes in the original primary election. *See* Ex. 11, Ex. 12.

The Caster Plaintiffs' claims are similarly misguided. They assert that the third Senate factor "strongly counsels in favor of a Section 2 violation" because, for example, Alabama has used "numbered-place requirements … to discriminate against its Black voters." *Caster* DE56:26. But Alabama's "numbered-post law was about giving advantage to incumbents against Klan-backed factions within the Democratic Party, not about racial discrimination." *Alabama NAACP*, 2020 WL 583803 at *54. Aside from recycling the Milligan Plaintiffs' majority-primary assertion above (also lacking any support or analysis), the Caster Plaintiffs further claim that

Alabama's at-large judicial elections constitute forms of racial discrimination. In a remarkably thorough, 137-page opinion that followed six days of trial, the federal court for the Middle District of Alabama rejected this claim. 2020 WL 583803 at 55 (finding insufficient evidence that any current procedures were adopted or maintained for discriminatory reasons). In any event, Alabama's congressional elections (like every other State's) are not at-large elections; a single member is chosen from each district, as required by federal law. 2 U.S.C. §2c.

### d. Senate Factor 4: No Formal Slating Process Exists in Alabama.

"There is no slating process involved in Alabama's congressional elections," *see Caster* DE44:19, so this factor is irrelevant to the totality of circumstances.

### e. Senate Factor 5: Plaintiffs Cannot Show That Disparities in Education, Employment, and Health Are Products of Discrimination.

The fifth Senate factor analyzes "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37. "Thus the court must find that (1) past discrimination in these areas existed, (2) that those effects are borne by African Americans today, and (3) that these effects hinder African Americans' present ability to participate in the political process." *Alabama NAACP*, 2020 WL 583803 at 39.

The Caster and Milligan Plaintiffs both incorrectly argue that they do not bear the burden to demonstrate this causal connection. *See Caster* DE69:18; *Milligan* DE56: 27. The Milligan Plaintiffs cite *Wright v. Sumter County Board of Education and Registration*, 979 F.3d 1282 (11th Cir. 2020), but as *Wright* noted, while "disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation," it is "[w]here these conditions are shown, *and where the level of black participation is depressed*, [that] plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." *Wright*, 979 F.3d at 1294 (quoting *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1568 (11th Cir. 1984)) (emphasis added). When the Eleventh Circuit decided *Marengo County* in 1984, "Blacks still register[ed] and vote[d] in *significantly* lower numbers than whites." 731 F.2d at 1568. That is not the case today. *See infra* § II.B.2. "Things have changed in the South." *N.W. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009). "Voter turnout and registration rates now approach parity," *id.*, and "[t]he level of black participation in the electoral process is not depressed," *Ala. NAACP*, 2020 WL 583804 at *41. With no "depressed level of political participation" to cite for support, *Wright*, 979 F.3d at 1294, Plaintiffs must prove up the third prong of this factor.

The State does not contest that "past discrimination in these areas existed." However, Plaintiffs have failed to show that black Alabamians still "bear the effects of discrimination," let alone that these effects "hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37. The Caster and Milligan Plaintiffs cite various sources that support the unsurprising proposition that lower socioeconomic status leads to lower participation in the political process. *See Caster* DE69:13; *Milligan* DE56:21-22. But this proposition is not race-specific; it applies to whites and blacks alike. *See, e.g.*, Bagley Report at 17 ("Education has repeatedly been found to *correlate* with income independently affects citizens' ability to engage politically") (emphasis added); *see also* King Report ¶ 96.

Even if lower socioeconomic status affected only black participation in the political process (which it doesn't) Plaintiffs have failed to connect the dots from historical discrimination to those current outcomes. That socioeconomic differences based on race also play out in States that lack Alabama's history of discrimination seriously undermines the causal nexus Plaintiffs must establish. For example, Cooper explains that the poverty rate for blacks (23.4%) more than doubles that of whites (11.5%), *Caster* DE48:37; but in Connecticut, the poverty rate for blacks (19.1%) more than triples that of whites (5.9%).[22] And though the Caster Plaintiffs

---

[22] *See* U.S. Census Bureau, *American Community Survey Database*, https://perma.cc/4LCA-W796 (last visited Dec. 22, 2021).

decry (at DE56:30) the "wildly disparate incarceration rates" in Alabama supposedly documented by their expert, Dr. King, the very source she relies on (at *Caster* DE50:39 ¶ 112 n.127) shows that Alabama has the second *lowest* black-white incarceration differential in the country, behind only Hawaii.[23]

At the preliminary injunction stage, Plaintiffs must clearly show that this factor weighs in their favor. *See Exhibitors Poster Exch.*, 441 F.2d at 561. Plaintiffs' inability to support their assertions or show causation keeps them from satisfying their burden.

### f. Senate Factor 6: Political Campaigns in Alabama Are Not Characterized by Overt or Subtle Racial Appeals.

Just last year, the Middle District of Alabama concluded that "[t]here is no evidence that Alabama political campaigns generally … are characterized by racial appeals." *Ala. NAACP*, 2020 WL 583803, at *58. Plaintiffs' attempts to show that racial appeals characterize Alabama's political campaigns only reaffirm the *Alabama NAACP* court's holding. As an initial matter, their invocations of George Wallace and other historic racial appeals "are not probative of current conditions," "no longer ha[ve] any signaling effect to voters," and thus do not assist them in making their showing under this factor. *Id.*

---

[23] *See* Ashley Nellis, *The color of justice: Racial and ethnic disparity in state prisons*, The Sentencing Project at 20, Table 7, (2021) available at https://perma.cc/2YU3-4BXQ.

Plaintiffs' other proffered incidents reach too far, revealing their lack of evidence on this factor. Illustrative of this overreach is the Caster Plaintiffs' description of Bradley Byrne's campaign ad, which they assert features congresswomen and Colin Kaepernick "burning in a fire." *Caster* DE56:33. Defendants encourage the Court to watch the commercial at issue: https://www.youtube.com/watch?v=31HHFy8JkoU. Former Congressman Byrne sits at a campfire, reminiscing on his deceased brother's military service and lamenting that, in his view, several notable politicians and activists were "cheapening 9/11," "dishonoring our flag," and "attacking America." None of these individuals shown in the commercial are "burning" in the fire—they appear in overlays (just as an image of 9/11 does). To the extent this or the other campaign messages Plaintiffs cite bear on this litigation, they demonstrate only the lack of support Plaintiffs have mustered to support their claims.

### g. Senate Factor 7: Minorities Have Achieved Success in Alabama Elections.

Section 2 explains that "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" in evaluating a Section 2 claim's sufficiency. 52 U.S.C. §10301(b). Cribbing from the statute, the seventh Senate factor examines "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.

While the relevant "minority group" is clear (black Alabamians), the parameters of "the jurisdiction" are not. Plaintiffs do not allege that "the minority group" they sought to define at *Gingles*'s first step (*see supra* §I.A.1-2) are all members of one "political subdivision" or "jurisdiction"; indeed, the lack of a majority-minority jurisdiction comprising "the minority group" is precisely the issue in this litigation. That there is no specific "State or political subdivision" at issue where litigants seek to establish a new political district suggests that the relevant language from Section 2(b)—and its corresponding Senate factor—are inapplicable to this case.

But even to the extent the seventh Senate factor applies here, this Court should not constrain its analysis to only those congressional and statewide elections Plaintiffs cite. Given that congressional races are districted rather than statewide, the success of minority candidates in districted races for a State-level office (e.g., the State Legislature) is sufficiently comparable to congressional elections to warrant consideration.

The *Alabama NAACP* court, finding this factor's language ambiguous where, as here, "[t]here [was] no political subdivision at issue," explained that "local, districted elections" within the broader jurisdiction (here, the State) are "entitled to some weight for purposes of the seventh senate factor," and concluded that "Senate factor 7 weighs in favor of Plaintiffs on statewide elections but weighs in favor of the State on elections statewide." 2020 WL 583803 at *62. This Court should do the

same. The *Alabama NAACP* court's interpretation accords with Section 2's text, asking only whether black Alabamians "have been elected to office *in the* State or political subdivision. 52 U.S.C. 10301(b) (emphasis added). An inquiry into districted elections is important in showing this factor, and shows that minorities have achieved electoral success in Alabama. *See Ala. NAACP*, 2020 WL 583803, at 58-59; *but see City of Carrollton Branch of the N.A.A.C.P. v. Stallings*, 829 F.2d 1547, 1560 (11th Cir. 1987) ("The political jurisdiction in question here is the county, not the cities of Villa Rica, Whitesburg, or Carrollton.").

Minority candidates have achieved a great deal of electoral success in Alabama's districted races for State offices. Looking to the State House of Representatives, 27 of the chamber's 105 members are black—25.7% of Alabama's state representatives. *See Caster* DE50:51 ¶ 146. In the State Senate, 7 of the chamber's 35 senators are black—making up 20% of that body's members. *See id.* And a quarter of the State Board of Education's members—including the Board's President Pro Tem—are black. *See* Alabama State Department of Education, *State Board of Education*, https://www.alabamaachieves.org/state-board-of-education/ (last visited Dec. 20, 2021). Accordingly, this factor "weighs in favor of the State on elections statewide." *Ala. NAACP*, 2020 WL 583803 at *62.

### h. Senate Factor 8: Elected Officials Do Not Lack Responsiveness to Minority Needs.

The eighth factor asks "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. Plaintiffs fail to bear this burden.

Start with the Caster Plaintiffs' charge that "[t]he State's response to the COVID pandemic has exemplified and exacerbated its historical neglect of its Black residents." DE56:36. Nothing could be further from the truth. As the Chief Medical Officer for the Alabama Department of Health ("ADPH"), Dr. Mary McIntyre, M.D., M.P.H., explains in her sworn declaration, *see* Ex. 15 (Declaration of Dr. Mary McIntyre ("McIntyre Decl.")), the State engaged in extensive outreach to all socially vulnerable Alabamians,[24] with particular focus on the black community. McIntyre Decl. 2-4.

To "reach out to the African American community and help improve vaccine confidence," the State "partnered with various organizations," including "the Alabama Conference of Black Mayors, Historically Black Colleges and Universities like Tuskegee University and Alabama State University, the Alabama State Missionary Baptist Convention, and the Governor's Office of Minority Affairs." *Id.* at 2. The State also "created yard signs promoting vaccination and distributed them to various

---

[24] ADPH "use[s] the Social Vulnerability Index (SVI) as part of [their] data-driven efforts to respond to COVID-19" and focus their efforts where they are most needed. McIntyre Decl. 1-2.

leaders in communities of color around Alabama," and created "video Public Service Announcements with the Alabama Conference of Black Mayors in an attempt to educate Black Alabamians about COVID-19 symptoms and testing." *Id.* The State even conducted "joint presentations with the Alabama NAACP"—a Plaintiff in this litigation[25]—to "target[] Alabama's African American community." *Id.* at 3.

Nor is there anything to Plaintiffs' claim that "the State failed its Black residents" because "[w]hen vaccines were rolled out, white communities received them before Black communities." *Caster* DE56:37. As Dr. McIntyre explains, "[t]he State's initial selection of vaccine locations was based on which facilities, almost all of which were hospitals, volunteered that they would be able to handle the product from a logistics standpoint." McIntyre Decl. at 4. And "[w]hen the Federal Pharmacy vaccine program was rolled out," she continues, "ADPH spent a great deal of time convincing [its] pharmacy partners to place vaccine in high-SVI areas," *id.*; "[t]hey eventually agreed to do so," *id.* Moreover, the State activated its National Guard to effect its vaccine-outreach campaign, targeting the most vulnerable counties for COVID-related support. *Id.* at 3.

---

[25] *See also, e.g.*, *Alabama NAACP Hosts Vaccine Roundtable with State and Local Health Leaders*, 6WBRC (Mar. 4, 2021), available at: https://www.wbrc.com/2021/03/05/alabama-naacp-hosts-vaccine-roundtable-with-state-local-health-leaders/ (documenting "roundtable discussion" between "the state NAACP" and, among others, Dr. McIntyre) (last accessed December 22, 2021).

The State's efforts bore fruit. Today, not only are "vaccines available in every single county health department in Alabama," but "[a] higher percentage of Black Alabamians have received the COVID-19 vaccine than White Alabamians." *Id.* at 4. Indeed, "[t]he county with the highest vaccination rate is Lowndes County, which is a majority-Black county." *Id.* Plaintiffs' scathing rhetoric withers under scrutiny.

Plaintiffs also argue that the Legislature's failure to enact certain Democratic policy items, such as Medicaid expansion, evidences racial bias. But whether to expand the State's participation in a massive federal welfare program is a paradigmatic *political*, rather than racial, decision. It should hardly be surprising that a politically conservative State declined the administrative costs and tax hikes that Medicaid's expansion likely would have required. Twelve other States (including Wyoming, Wisconsin, and Florida) have made the same choice as Alabama, and that policy decision is irrelevant to this case. Despite Plaintiffs' heated accusations, the record shows substantial solicitude to black Alabamians' needs, and Plaintiffs have failed to prove otherwise.

### i. Senate Factor 9: The State's Districts Are Not "Tenuous."

The final Senate factor asks "whether the policy underlying" the "standard, practice or procedure" at issue "is tenuous." *Gingles*, 478 U.S. at 36-37. According to the Senate Report, an electoral practice is "tenuous" if "the procedure markedly

departs from past practices or from practices elsewhere in the jurisdiction." S. Rep. 97-417, 29 n.117.

The Alabama Legislature produced the 2021 Map using the same common-place process previous Legislatures had used: begin with the currently existing maps; evaluate where population had increased and decreased; and then—without incorporating race—add or reduce population to achieve equality. *See supra* Background §D.[26] The Alabama Legislature also followed its predecessors' substantive traditions, incorporating Alabama's longstanding district cores into the 2021 Map. *See supra* §I.A.2. The "procedure" that produced the districts in the 2021 Map is "the very opposite of tenuous: It is weighty." *Ala. NAACP*, 2020 WL 583803 at 62. Accordingly, this Senate factor "weighs heavily in favor of the State." *Id.*

> **2. Considering the Totality of Circumstances, Black Alabamians Enjoy "Equally Open" Political Processes and Suffer No "Abridgement" to Their Rights "On Account of Race or Color."**

This "comprehensive, not limited, canvassing of relevant facts," *Johnson*, 512 U.S. at 1011, shows that black Alabamians' relative difficulty "elect[ing] representatives of their choice" is not a product of "race or color." 52 U.S.C. §10301. Any such difficulty is instead a predictable result of bloc-voting for Democrat candidates

---

[26] To the extent Plaintiffs complain that the process was "rushed," *see, e.g.*, *Caster* DE56:8, the response is obvious: Any accelerated timing was due to the months-long delays in getting Census data, which was totally beyond the State's control.

in "one of the most Republican states in the entire South." *Alabama NAACP*, 2020 WL 583803 at 42 (internal quotation marks omitted).

According to the Census Bureau, in 2018, Alabama had the second highest black voter registration rate in the entire country, behind only Mississippi.[27] And in 2016, black voter turnout in Alabama surpassed white voter turnout by 4.6%.[28] Nationally, there was a 2.3% gap going the other way—more white voters than black voters as a percentage of the population—but in Alabama 60.2% of blacks voted compared with 55.6% of whites. By comparison, in New Jersey (which had not been covered by Section 5) 56.6% of whites and just 48.7% of blacks voted in the November 2016 election—a racial gap of 7.9%.[29] In Connecticut, the gap was 13.1%.[30]

The 2018 midterm elections tell a similar story. Nationally, the racial gap in voter registration rates was 3.5%, with more whites than blacks voting as a percentage of population. In Alabama, the gap was just 0.8%, with 68% of whites compared

---

[27] *See* U.S. Census Bureau, *Voting and Registration in the Election of November 2018*, Table 4b: Reported Voting and Registration by Sex, Race and Hispanic Origin, for States: November 2018, https://www.census.gov/topics/public-sector/voting/data/tables.html. The comparisons are drawn from looking at the "percent registered" of total population for the "black alone" number for each State.

[28] U.S. Census Bureau, *Voting and Registration in the Election of November 2016*, Table 4b: Reported Voting and Registration by Sex, Race and Hispanic Origin, for States: November 2016, https://www.census.gov/topics/public-sector/voting/data/tables.html.

[29] *Id.*

[30] *Id.*

to 67.2% of blacks registering to vote.[31] For comparison, in Colorado the voter-registration gap was 22.8%; in Connecticut, 14.2%; in Michigan, 8.6%; and in New Jersey, 3.8%.[32] Turnout was roughly the same—a national 3.1% gap compared to 0.7% in Alabama. Again, in Colorado the voter-turnout gap was 28.1%; in Connecticut, 12.3%; in Michigan, 5.3%; and in New Jersey, 4.6%.[33]

Similarly, black Alabamians enjoy substantial representation in public office throughout the State. And both major political parties recognize the strength of the black franchise in Alabama and actively court black support. *See, e.g.*, *Alabama Republican Party Launches New Minority Outreach Effort*, AL.com (Oct. 21, 2021), available at: https://perma.cc/3X2P-FRW4 (describing Alabama Republican Party's "formation of a minority outreach team to try to increase the number of Black people who are active in the party and run for office") (last accessed December 22, 2021)

In sum, "things have changed dramatically" in Alabama, *Shelby County*, 570 U.S. at 547, and "Plaintiffs simply have not shown that, in present-day Alabama, there are any barriers keeping African Americans from participating in the political process as voters," just as plaintiffs failed to show the same in *Alabama NAACP*. 2020 WL 583804 at *41. "The level of black participation in the electoral process is

---

[31] U.S. Census Bureau, *Voting and Registration in the Election of November 2018*, Table 4b: Reported Voting and Registration by Sex, Race and Hispanic Origin, for States: November 2018, https://www.census.gov/topics/public-sector/voting/data/tables.html.
[32] *Id.*
[33] *Id.*

not depressed," *id.*, and, in a deeply red State like Alabama, "it is not surprising that black-preferred candidates … are losing because they are campaigning as Democrats," *id.* at *62.

Nor does any other circumstantial evidence militate in Plaintiffs' favor. In *LULAC*, for example, the Court explained there was "a denial of opportunity in the real sense of that term" where a "rise in Latino voting power" and "the near-victory of the Latino candidate of choice" constituted "the very reasons that led the State to redraw the district lines," thus "prevent[ing] the immediate success of the emergent Latino majority." 548 U.S. at 428-29. Nothing of the sort occurred here. The Alabama Legislature did not seek to stymie black Alabamians' political momentum. To the contrary, the Legislature deliberately eliminated consideration of race throughout the map-drawing process, *see Milligan* DE70-2:100, 136, 145-46—and enacted a map that adhered to the State's traditional redistricting criteria over the last several decades while making minimal changes to equalize population.

As the *Abrams* Court explained, "[t]he appropriate benchmark" against which to measure alleged vote dilution is the previous map. *Abrams*, 521 US. at 97. The Singleton Plaintiffs rightly point out that "[t]he circumstances here are very much like those in *Abrams v. Johnson*," *Singleton* DE15:3; indeed, the 2021 Map "was designed largely to preserve existing districts" from the 2011 Map, *Singleton* DE57:17. And like in *LULAC* and *Abrams*, "[Plaintiffs] have not shown that black

voters in any particular district suffered a retrogression in their voting strength under the [new] plan measured against the [previous] plan." *Abrams*, 521 U.S. at 97.

Neither the Senate factors nor any circumstantial electoral inference tips the scales in Plaintiffs' favor. The totality of circumstances unmistakably demonstrates that the 2021 Map does not "den[y] or abridge[] … the right of [black Alabamians] to vote on account of race or color." 52 U.S.C. §10301(a).

### C. Plaintiffs' Proposed Remedies Violate the Constitution.

Plaintiffs' Section 2 claims suffer yet another defect: their proposed remedies are "obviously … created solely to effectuate the perceived common interests of one racial group," which is "altogether antithetical to our system of representative democracy." *Shaw I*, 509 U.S. at 648. Indeed, the "[r]acial classifications" that animate Plaintiffs' proposed remedies "are antithetical to the Fourteenth Amendment, whose central purpose was to eliminate racial discrimination emanating from official sources in the States." *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) ("*Shaw II*"). Because Plaintiffs "cannot obtain relief unless [they] can establish … the existence of a permissible remedy," *Nipper*, 39 F.3d at 1524, their proposed remedies' unconstitutionality is dispositive.[34]

---

[34] The Milligan Plaintiffs (at DE69:12 n.2) incorrectly suggest that dicta from *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998), permits them to institute racial gerrymanders that erode traditional redistricting principles. That position is clearly incorrect. First off, the *Chiles* Court rearticulated Eleventh Circuit doctrine holding that *Gingles*'s first precondition requires "a permissible remedy." *Id.* at 1425 (quoting *Nipper*, 39 F.3d at 1530-31). An unconstitutional remedy is definitionally not a "permissible" one, meaning it would fail under Eleventh Circuit precedent.

To be sure, "under certain circumstances, drawing racial distinctions is permissible where a governmental body is pursuing a 'compelling state interest.'" *Id.* at 908. And the Supreme Court has "assume[d], without deciding, that the State's interest in complying with the Voting Rights Act [is] compelling." *Bethune-Hill Virginia State Bd. of Elections*, 137 S. Ct. 788, 801 (2017). But "the purpose of the Voting Rights Act [is] to eliminate the negative effects of past discrimination," *Gingles*, 478 U.S. at 65, and "[a] State's interest in remedying the effects of past or present racial discrimination" will only "rise to the level of a compelling state interest" if the State "satisf[ies] two conditions," *Shaw II*, 517 U.S. at 909. First, "the discrimination must be identified discrimination." *Id.* (internal quotation marks, citation omitted). This means that "[a] generalized assertion of past discrimination in

<hr />

Nor does *Chiles* actually dispute this; the Court's quarrel was with the ostensible lack of evidence supporting the district court's conclusion that the plaintiff's proposed remedy constituted a racial gerrymander. *Id.* at 1425-26. But insofar as *Chiles* could be read to suggest a proposed remedy might be "permissible" despite its unconstitutionality, the portion of *Chiles* from which this argument derives is dicta, *see Chiles*, 139 F.3d at 1426 (Fay, J., concurring specially) (declining to join relevant section because it "is simply unnecessary and therefore dicta with which [he] disagree[d] but [found] no need to discuss"), "[a]nd dicta is not binding on anyone for any purpose," *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010).

Further, Plaintiffs' reading would unavoidably conflict with both *Nipper* and the Eleventh Circuit's *en banc* holding in *S. Christian Leadership Conf. of Alabama v. Sessions*, 56 F.3d 1281, 1289 (11th Cir. 1995): "[T]o obtain relief under section 2 of the Voting Rights Act, the plaintiffs must establish the following: First, the plaintiffs must show that an appropriate remedy can be fashioned." The Eleventh Circuit's prior-panel-precedent rule thus clearly forecloses Plaintiffs' interpretation. *See, e.g.*, *United States v. Ohayon*, 483 F.3d 1281, 1289 (11th Cir. 2007) ("When a decision of this Court conflicts with an earlier decision that has not been overturned en banc, we are bound by the earlier decision."). Accordingly, the Eleventh Circuit explained—a year after *Chiles*'s publication—that the Court "ha[s] repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy." *Burton*, 178 F.3d at 1199.

a particular industry or region is not adequate," and, as a corollary, that "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Id.* at 909-10. And second, a legislature "must have had a strong basis in evidence to conclude that remedial action was necessary, *before* it" acts based on race. *Id.* at 910 (internal quotation marks, citation omitted; emphasis in original).

Plaintiffs' repeated invocations of atmospheric racism do not constitute "identified discrimination" for purposes of the map before the Court today. *Id.* at 909-10. And, as shown in the preceding section, the bulk of Plaintiffs' more recent claims are misleading or unsupported. Had the Alabama Legislature approved the maps Plaintiffs propose, such a racial gerrymander would have violated the Constitution— a remedy no plaintiff may compel.

### 1. Plaintiffs' Preferred Maps Discriminate on Account of Race.

A map that evinces a "policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote)" constitutes "evidence that race motivated the drawing of particular lines." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 267 (2015) ("*ALBC*"). That is precisely what Plaintiffs' proposed plans do here.

Plaintiffs have subverted every race-neutral, traditional redistricting factor to "racial tinkering." *Miller*, 515 U.S. at 919. To reiterate, Plaintiffs' maps break down communities of interest, radically restructure the cores of existing districts, and pit

incumbents against each other. *See supra* §II.A. That they subordinate these traditional districting principles to race is obvious, borne out by their attempts to precisely calibrate the racial compositions of their proposed districts and to scoop black Alabamians from Mobile and lump them together with black Alabamians from the Wiregrass. Plaintiffs' racially gerrymandered remedies speak for themselves. They "expressly adopt[] and appl[y] a policy of prioritizing mechanical racial targets above all other districting criteria." *ALBC*, 575 U.S. at 267; *see also Shaw II*, 517 U.S. at 907.

The most telling example is Plaintiffs' inability to explain their universal decision to split Mobile County except as a means to reallocate enough black voters to meet their race-based target. All traditional criteria would lead a map-drawer to keep Mobile whole and to keep it with the other Gulf Coast counties that share common interests, and Plaintiffs muster no race-neutral explanation for this split. Section 2 cannot possibly compel that subversion of traditional redistricting criteria, and this map would be an unconstitutional racial gerrymander if it did.

Moreover, Dr. Imai's analysis reveals that race predominated in the Caster and Milligan plans. As an initial matter, Imai's report sheds no light on the 2021 Legislature's intent because Imai mistakenly assumed the Legislature drew on a blank slate rather than one with preexisting districts. *See supra* §I.A. Setting that error aside, Imai's report reveals that Plaintiffs' proposals by Duchin and Cooper are

the true outliers. They actually did draw their proposed maps on a blank slate by disregarding preexisting districts, and their two-district proposals appear nowhere in Imai's set of 10,000 imaginary maps. *Milligan* DE68-4:7-9 ¶¶ 18-19, 26. In fact, of the 10,000 imaginary, race-neutral maps, not a single map creates *even one* majority-BVAP district. *Id.* at 9-10 ¶¶ 27-28. Dr. Imai's analysis shows that each of Duchin's and Cooper's maps are virtual impossibilities—unless, of course, race predominated in their design. As the Milligan Plaintiffs and Imai have argued, this statistical impossibility alone shows that race was the predominant factor in drawings Districts 2 and 7 in all of Duchin's and Cooper's illustrative plans.

### 2. Plaintiffs' Preferred Maps Cannot Meet Strict Scrutiny.

Any of the Plaintiffs' uncontrovertibly race-based VRA proposals would flunk strict scrutiny, the "most rigorous and exacting standard of constitutional review." *Miller*, 515 U.S. at 920; *see also id.* at 921 ("[C]ompliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws."). Discussed among the Senate factors above, Plaintiffs contend that race-based congressional redistricting plans are required merely based on "generalized assertion[s] of past discrimination" and "an effort to alleviate the effects of societal discrimination" that have occurred in Alabama. *Shaw II*, 517 U.S. at 909-10. Those do not constitute a "compelling interest." *Id.*

Congressional elections are "equally open" to all Alabamians, and black Alabamians enjoy unimpeded ability to vote throughout the State. *See, e.g.*, *Alabama NAACP*, 2020 WL 583803 at *41 ("Overt discriminatory election devices have long been eliminated. Voter registration and turnout rates among African-Americans and whites have reached parity. … The level of black participation in the electoral process is not depressed.").

Fundamentally, Plaintiffs' proposed remedies are naked attempts to extract from Section 2 a non-existent right to proportional (indeed, maximal) racial representation in Congress. But Section 2 expressly rejects such a strategy, explaining "[t]hat nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. §10301(b); *accord, e.g.*, *De Grandy*, 512 U.S. at 1016 ("[R]eading the first *Gingles* condition in effect to define dilution as a failure to maximize in the face of bloc voting … causes its own dangers, and they are not to be courted."); *Gingles*, 478 U.S., at 94-95 (O'Connor, J., concurring in judgment) ("[T]here is no indication that Congress intended to mandate a single, universally applicable standard for measuring undiluted minority voting strength."). Nor does the Constitution provide Plaintiffs any support. *See, e.g.*, *Rucho*, 139 S. Ct. at 2499; *City of Mobile v. Bolden*, 446 U.S. 55, 75-76 (1980) (plurality) ("The Equal Protection Clause … does not require proportional representation as an imperative of political organization.").

"[C]ompliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws." *Miller*, 515 U.S. at 921. Because Plaintiffs fail to show "identified discrimination" or provide a "strong basis in evidence" that any such discrimination required remedy under Section 2, their racially gerrymandered remedies are constitutionally impermissible. *Shaw II*, 517 U.S. at 909-10.

### D. Plaintiffs' Interpretation of Section 2 Is Unconstitutional and Thus Warrants Avoidance.

Congress derived its authority to enact the VRA pursuant to the Fourteenth and Fifteenth Amendments' sweeping clauses, which permit Congress to "enforce" those amendments' substantive provisions "by appropriate legislation." U.S. CONST. amend. XIV, § 5; XV, § 2. Congress has the power to enforce the substantive provisions of these Amendments "by creating private remedies against the States for *actual violations* of those provisions." *United States v. Georgia*, 546 U.S. 151, 158 (2006) (emphasis added).

Plaintiffs' interpretation of Section 2 disproportionately construes the statute in relation to vote dilution, dragging it into unconstitutional waters. *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Geographic and temporal limitations on the scope of a prophylactic laws "tend to ensure Congress' means are proportionate."

*College Savings*, 527 U.S. at 647. One of the characteristics of Section 5 in the original VRA that contributed to its initial constitutional validity, for example, was that it was "confined to regions of the country where voting discrimination had been most flagrant." *City of Boerne*, 521 U.S. at 532-33. It was to last only for a limited time and thus had to be renewed.

Because Section 2's boundless geographic scope and temporal indeterminacy may "offend[] against this principle" of proportionality, *College Savings*, 527 U.S. at 647—and thus draw the statute's "appropriate[ness]" under the Fifteenth Amendment further into question—any interpretation of the statute must properly calibrate Section 2's application to circumstances relevant to Alabama *today*. Current redistricting doctrine attempts to do so focusing its ultimate inquiry on whether, considering the State's "traditional redistricting principles" and the "totality of circumstances," the relief Plaintiffs seek under Section 2 would be "appropriate," U.S. CONST. amend. XV, § 2.

But instead of focusing on Alabama today, Plaintiffs seek to mire the State— and the statute—in historical conditions that no longer pertain to black Alabamians' ability "to participate in the political process." 52 U.S.C. §10301(b). By ignoring evidence unequivocally demonstrating that, *today*, black Alabamians exercise their voting rights to the same or greater extent than do their white counterparts, Plaintiffs correspondingly ignore the Fifteenth Amendment's appropriateness requirement and

unmoor Section 2 from its constitutional authority. *City of Boerne v. Flores*, 521 U.S. at 520; *see also Shelby County*, 570 U.S. at 547.

Under the avoidance canon, "[t]he question is not whether" the saving interpretation of a statute "is the most natural interpretation ... but only whether it is a 'fairly possible' one." *NFIB v. Sebelius*, 567 U.S. 519, 563 (2012). Indeed, the Supreme Court has invoked constitutional avoidance in interpreting other provisions of the VRA to avoid exacerbating their "federalism costs" and to maintain their constitutionality. *See Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193, 202 (2009) (applying the avoidance canon in interpreting Section 5). Accordingly, insofar as any doubt exists whether Section 2 permits Plaintiffs to propound a reading that disregards its very foundation in the Fifteenth Amendment, this Court should resolve that doubt by rejecting Plaintiffs' interpretation.[35]

### E. Section 2 Does Not Provide Plaintiffs a Private Cause of Action.

While the Supreme Court has often "[a]ssum[ed], for present purposes, that there exists a private right of action to enforce" Section 2, it has never so held. *Bolden*, 446 U.S. at 60 (plurality). So whether "the Voting Rights Act furnishes an

---

[35] Plaintiffs' claims also illustrate why Section 2's statutory text never should have been read to apply to allegedly dilutive political districting. "Only a 'voting qualification or prerequisite to voting, or standard, practice, or procedure' can be challenged under § 2." *Holder v. Hall*, 512 U.S. 874, 892 (1994) (Thomas, J., concurring). "[T]he gloss [the Supreme Court] ha[s] placed on the words 'standard, practice, or procedure' in cases alleging dilution is at odds with the terms of the statute and has proved utterly unworkable in practice." *Id.* Thus, while current precedent allows vote dilution claims to proceed under Section 2, Defendants preserve for possible appellate review the argument that Section 2 does not apply to such claims.

implied cause of action under § 2" is "an open question." *Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring).

Under modern Supreme Court precedent, the answer to this "open question" is "no." Absent clear expression of Congress's intent to provide a private right of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). "Moreover, a reviewing court may not plumb a statute's supposed purposes and policies in search of the requisite intent to create a cause of action; rather, the inquiry both begins and ends with a careful examination of the statute's language." *In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc). If this careful textual analysis does not reveal a private cause of action, a court should presume none exists; "under *Sandoval* and its progeny, the question isn't whether Congress 'intended to preclude' a private right of action, but rather, whether it intended to provide one." *Id.* at 1259 (citation omitted).[36]

Nothing in Section 2 "clearly and affirmatively manifest[s] its intent—as reflected in the Act's text and structure—to create a private right of action," *id.* at

---

[36] Nor is it relevant that courts at one time "assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). The Court has clearly stated that time has passed; since jettisoning the "*ancien regime*," *id.*, the Supreme Court has "not returned to it since," *Sandoval*, 532 U.S. at 287.

1256—let alone a private remedy. Section 2 contains no "'rights-creating' language." *Sandoval*, 532 U.S. at 288. While the statute refers to "the right . . . to vote," 52 U.S.C. § 10301(a), that right is based on state law, *see Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982), and the Fifteenth Amendment. Referring to a right is a far cry from "clearly and affirmatively manifest[ing] [] intent … to create a private right of action," *In re Wild*, 944 F.3d at 1256, and thus surely does not create any such right "in [the] clear and unambiguous terms" that precedent requires, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002).

Equally significant, other sections of the VRA show that Congress knew how to create private rights yet declined to do so in Section 2. Take Section 3, which authorizes specific federal actions when other statutes trigger them. 52 U.S.C. §10302. There, Congress thrice contemplates situations in which "proceeding[s] [are] instituted by the Attorney General *or an aggrieved person* under *any statute* to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* (emphasis added). The statute clearly considers other statutes that provide private rights of action allowing "aggrieved individuals" to enforce the Reconstruction Amendments, yet not once refers to any such statutes within the VRA. Moreover, Section 2 never invokes the "aggrieved person" language to which its statutory neighbor referred. "Far from a *Sandoval*-qualifying clear statement of congressional intent to

create a private right of action," Section 3's implications "very nearly foreclose[] one." *In re Wild*, 994 F.3d at 1259.

Because Section 2's text does not "clearly and affirmatively manifest" a private cause of action, none exists. *In re Wild*, 944 F.3d at 1256. Plaintiffs' inability to privately prosecute their claims offers this Court additional, independent grounds on which to reject Plaintiffs' claims.

## III. The Balance Of Equities Weighs Heavily Against Abandoning Longstanding Congressional Districts On The Eve Of An Election.

In addition to Plaintiffs' extremely low likelihood of success on the merits, it is far too late in the day to grant the preliminary relief that Plaintiffs seek. They request a complete overhaul of Alabama's longstanding congressional map, and the Court cannot grant such relief at this eleventh hour without inflicting grave harm on the public interest. Enjoining the State from using the 2021 Map would throw the current election into chaos and leave insufficient time for maps to be redrawn, hundreds of thousands of voters to be reassigned to new districts, and thousands of new signatures to be obtained by candidates and political parties seeking ballot access. And those harms would be vastly magnified here given that the State's 2021 map largely preserves preexisting, decades-old districts while making minimal changes to equalize population. "When the massive disruption to the political process of the [State] is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that [this Court]

deny relief." *Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986) (three-judge court).

Courts often reject requests to preliminarily enjoin the use of redistricting plans in impending elections, and the Court should do the same here. As those courts have recognized, "elections are complex to administer, and the public interest [is] not … served by a chaotic, last-minute reordering of ... districts. It is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012) (three-judge court) (citing *Diaz v. Silver,* 932 F. Supp. 462, 466-68 (E.D.N.Y. 1996) (three-judge court)). Thus, "[t]he Supreme Court has held that an injunction may be inappropriate even when a redistricting plan has actually been found unconstitutional because of the great difficulty of unwinding and reworking a state's entire electoral process." *Id.* (citing *Reynolds v. Sims,* 377 U.S. 533, 585 (1964); *Roman v. Sincock,* 377 U.S. 695, 709-10 (1964)).

Relatedly, there would be no time for the State to exercise its sovereign prerogative and craft an appropriate remedy. The Supreme "Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978). Thus, when a federal court declares an "apportionment scheme

unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Id.* at 540. But drawing new maps takes time. One expert advises courts that are considering map-drawing themselves to budget "one month for the drawing of a plan and an additional month for hearings and potential modifications to it … so that all concerned can proceed in a nonfrenzied fashion." Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1147-48 (2005). And a legislature—unlike a court—must also be sure to draw a map that can garner sufficient support in two legislative chambers and secure the governor's signature. Plaintiffs' eleventh-hour suit must not deprive the Legislature of that prerogative.

Finally, redistricting litigation is often "legally and factually complicated. The greatest public interest must attach to adjudicating these claims fairly—and correctly." *Favors*, 881 F. Supp. 2d at 371. Courts should "have little confidence that a few weeks of discovery and an abbreviated trial leaves enough time for the parties to marshal all the relevant facts and make their best arguments." *Id.* Accordingly, "[s]ince the *Reynolds* decision, a number of federal courts have withheld the granting of relief, and even dismissed actions, where an election was imminent and the

election process had already begun." *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 593 (E.D. Pa. 2012) (three-judge court) (collecting cases).

Those serious concerns about timing and administrability apply with full force here. As Alabama's Director of Elections Clay Helms has attested, "[t]here are substantial obstacles to changing the Congressional districts at this late date." Helms Decl. at 2 ¶ 2. Indeed, pandemic-related delays to census numbers stalled the redistricting process, in turn creating a situation in which "local election officials are already under time pressures created by the fact that the maps were adopted in November, 2021." *Id.* To fully grasp how late the hour really is, it is important to recognize that the critical date for having maps in place is not May 24, 2022, when the primary election will be held, nor even March 30 when absentee voting will begin, but months earlier still. Indeed, as the Singleton Plaintiffs noted, "[t]he clock is already ticking on potential candidates in raising funds. In addition, candidates should know the District in which they will run weeks before January 28, 2022." DE15:38 ¶ 55. Defendants agree. And by the time the hearings on the three preliminary injunction motions have concluded and findings of fact and conclusions of law are submitted five days later, there may be but two weeks left for "candidates [to] know the District in which they will run."

The harms that would flow from enjoining the 2021 Map are varied and certain. Candidates seeking to run in major party primaries have expended significant

time and money ahead of the January 28 qualifying deadline. There appear to be thirteen candidates actively running for an Alabama congressional seat.[37] Barry Moore is running for re-election in District 2 and has spent more than $130,000 since January 1.[38] Terri Sewell, in District 7, has spent about $380,000 in the same time period.[39] There are multiple candidates competing for the open seat in District 5, and they have collectively raised nearly one million dollars and spent a combined total of nearly $400,000.[40] A primary will be required for voters to choose among them. *See* Ala. Code § 17-13-1. Much of the time and money spent to engage with potential voters would prove wasted if those voters are later moved to a different district. One of many reasons "[i]t is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors*, 881 F. Supp. 2d at 371.

---

[37] Federal Election Commission, Candidates (limited to the 2022 election for Alabama House who have raised money), *available at* https://www.fec.gov/data/candidates/?election_year=2022&office=H&state=AL&is_active_candidate=true&has_raised_funds=true (last visited Dec. 22, 2021). This information is taken from the Federal Election Commission website since the January qualification deadline has not yet passed and candidates have not yet been certified by the parties to the Secretary of State, *see* Helms Decl. Ex. A (Administrative Calendar 2022 Statewide Elections).

[38] Federal Election Commission, Candidate Profiles: Felix Barry Moore, Spending, *available at* https://www.fec.gov/data/candidate/H8AL02171/?cycle=2022&election_full=true&tab=spending (last visited Dec. 22, 2021).

[39] Federal Election Commission, Candidate Profiles: Terri A. Sewell, Spending, *available at* https://www.fec.gov/data/candidate/H0AL07086/?cycle=2022&election_full=true&tab=spending (last visited Dec. 22, 2021).

[40] Federal Election Commission, Alabama – House District 05, Candidate Financial Totals, *available at* https://www.fec.gov/data/elections/house/AL/05/2022/ (last visited Dec. 22, 2021).

Moreover, organizations seeking ballot access as political parties and individuals seeking to appear on the ballot as independent candidates for Congress must submit a petition no later than the May 24, 2022 primary date. Ala. Code § 17-6-22; Ala. Code § 17-9-3(a). That petition must be signed by at least three percent of voters *in the relevant congressional district* who cast ballots in the 2020 gubernatorial race. Ala. Code § 17-6-22; Ala. Code § 17-9-3(a). An independent candidate running to represent District 3, Doug Bell, recognizes he will need 6,977 signatures.[41] The number of needed signatures varies by district, reaching a maximum of around 8,400 signatures required. Helms Decl. at 7 ¶¶ 22-23. Changing the district lines in the next few weeks could hamper petitioning efforts by rendering signatures gathered by a candidate invalid when voters are drawn out of the district.

Last-minute changes could have other effects on voters as well, for redrawing district lines means updating voter registration records to reflect the new lines. *Id.* at 1-6 ¶¶ 1-2, 6-10, 15-18. While this is easily done in some counties, it is a tedious, time-consuming, manual process in the other 45 counties, where it can take months as each voter is assigned to her proper precinct to ensure she receives the correct

---

[41] Doug Bell for U.S. Congress, Get Involved, *available at* https://dbellforuscongress.com/get-involved/ (last visited Nov. 21, 2021); *see also* Helms Decl. at 7 ¶ 22.

ballot. *Id.* at ¶¶ 7-10. And as the following table shows, each congressional district has counties that perform the reassignment task manually. [42]

| Counties Where the Reassignment Process is Manual, Organized by Cong. District | | | | | | |
|---|---|---|---|---|---|---|
| District 1 | District 2 | District 3 | District 4 | District 5 | District 6 | District 7 |
| Escambia (26,329) | Barbour (17,020) | Chambers (25,353) | Colbert (42,694) | Jackson (38,305) | Bibb (14,543) | Choctaw (10,705) |
| Monroe (16,010) | Bullock (7,108) | Chilton (28,916) | Cullman (61,745) | Lauderdale (65,686) | Blount (40,961) | Greene (6,627) |
| Washington (13,315) | Butler (14,190) | Clay (10,207) | DeKalb (44,574) | | Chilton (28,916) | Hale (11,890) |
| | Coffee (35,786) | Cleburne (11,158) | Etowah (74,062) | | | Perry (7,769) |
| | Conecuh (9,742) | Coosa (8,074) | Fayette (12,440) | | | Pickens (13,795) |
| | Covington (27,311) | Macon (16,651) | Franklin (19,193) | | | Sumter (9,617) |
| | Crenshaw (10,335) | Randolph (17,803) | Lamar (10,647) | | | Wilcox (8,559) |
| | Dale (34,297) | Russell (41,885) | Lauderdale (65,686) | | | |
| | Elmore (59,388) | Tallapoosa (31,156) | Lawrence (24,812) | | | |
| | Geneva (19,443) | | Marion (21,573) | | | |
| | Henry (13,779) | | Walker (47,182) | | | |
| | | | Winston (16,837) | | | |

"The Census Bureau's delay has delayed redistricting and shortened the time available for local officials to assign voters to districts and precincts." *Id.* at 5 ¶ 15. "[L]ocal election officials are already under time pressures created by the fact that the maps have just been adopted earlier this month," *id.* at 2 ¶ 2, and the process of reassignment has already begun, *id.* at 3 ¶ 6. "If the Congressional districts change,

---

[42]    The table was compiled by comparing Helms's declaration to Alabama's adopted Congressional plan. The number with each county represents the total active and inactive registered voters in the county, all of whom are eligible to vote. The data are from the Secretary of State's website. Elections Data Downloads: Voter Registration Statistics – 2021 (October), *available at* https://www.sos.alabama.gov/alabama-votes/voter/election-data (last visited Nov. 22, 2021).

local officials will have to start over in the process of assigning new Congressional districts, making the already shortened time for the assignment process even shorter." *Id.* at 5 ¶ 17. "[C]hanging the Congressional district lines again at this late date is likely to cause confusion, additional costs, and a rushed district assignment process that potentially increases the risk of mistaken assignments." *Id.* at 2 ¶ 2; *see also id.* at 6 ¶ 18. "Completing the reassignment process before the next election provides times for notifying voters of any changes, which both reduces voter confusion and improves turnout. It also provides the county commissions with the information they need to ensure that each voting place has no more than 2,400 voters and, for those that do, adjusting precinct boundaries or designating additional voting places (which may not be changed within three months of an election). *See* Ala. Code § 17-6-4(d); Helms Decl. 4 ¶ 11.

Absentee ballots and supplies are to be delivered to the absentee election managers by March 30, 2022. Helms Decl. 5 ¶ 16 Absentee voting should begin as soon as the supplies are available, *see id.* at 4 ¶ 12 ("In Alabama, absentee voting begins 55 days before the primary election . . . ."), and federal law requires that the ballots of certain voters be transmitted no later than April 9, 2022, *see id.* at 4 ¶ 13; 52 U.S.C. § 20302(a)(8). Where recent experience shows that election officials struggled to complete the district-assignment process within four months following

remedial redistricting, *see id.* ¶ 10, there is no reason to believe that potentially hundreds of thousands of voters could be swapped among districts in the three months between the January 4 preliminary injunction hearing and the April 9 deadline to have absentee ballots for Uniformed and Overseas Citizens Absentee Voting Act voters out the door for congressional primary elections.

*   *   *

In short, "the election machinery wheels [are] in full rotation," *Graves v. City of Montgomery,* 807 F.Supp.2d 1096, 1112 (M.D. Ala. 2011), and can't be stopped without grave damage to the public. There is little time for the Legislature to draw a new map, and it would be inequitable for Plaintiffs with no accountability to voters to simply substitute one of their racially gerrymandered plans for a legislatively drawn map. Moreover, if this Court were to draw a map, it "should have [had] as its goal the imposition of a plan no later than one month before candidates may begin qualifying for the primary ballot,' which 'means that the court should [have] beg[u]n drawing its plan about *three months* before the beginning of ballot qualification in order to build in time for possible hearings and adjustments to the plan.'" *Favors*, 881 F. Supp. 2d at 364 (quoting Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. at 1147). It is too late for all that now. Because any attempt to redo months of legislative work in a matter of weeks is likely to cause massive administrative and practical problems and do

more harm than good, preliminary injunctive relief would cause grave and irreparable hardship to the State, its political subdivisions, and its citizens.

In comparison, Plaintiffs assert irreparable harm from purportedly having to vote in a district that they feel should have a different racial makeup. But this factor does not weigh heavily in their favor; most (if not all) of these Plaintiffs apparently could have lodged nearly identical arguments against the 2011 Map years ago. Yet—with the exception of a few Caster Plaintiffs who were also plaintiffs in the unsuccessful 2018 *Chestnut* challenge to the 2011 Map—none of these Plaintiffs did so.

Moreover, preliminary injunctive relief is especially inappropriate because the 2021 Map largely retains the core of districts that have been in place for decades, while making only minimal changes to equalize population. Plaintiffs are thus seeking an affirmative, mandatory injunction that would upend decades of political geography, while the State is simply seeking to implement maps that largely carry forward the districts that have been in place since at least 1992. Plaintiffs' weak substantive claims do not come close to meeting the heightened standard for a court to enter the fray and issue a mandatory injunction in this area in which deference to a State legislature should be at its zenith.

Finally, is worth considering how little time has passed since the 2021 Map was enacted by the Legislature and challenged on November 5, 2021. In the few short weeks that have followed, Plaintiffs have deluged Defendants and the Court

with hundreds of pages of pleadings and expert reports. The Court will soon hear from at least a dozen witnesses addressing "the complex interplay of forces that enter a legislature's redistricting calculus," *Miller*, 515 U.S. at 915-16, and the Court will be asked to conduct a "totality of circumstances" analysis that, by its very nature, is wide-ranging, 52 U.S.C. § 10301(b). The State deserves more than "a few weeks of discovery and an abbreviated trial … to marshal all the relevant facts and make their best arguments" before forever losing the right to enforce its districting plan in the 2022 election. *Favors*, 881 F. Supp. 2d at 371. Each of the Plaintiffs' extraordinary requests for a preliminary injunction should be denied.

## CONCLUSION

Thirty years ago, District 7 was reshaped into a court-approved majority-BVAP district to comply with the VRA. But these suits do not challenge past redistricting plans. They invoke the Fourteenth Amendment's guarantees in an attempt to invalidate the State's newly enacted plan, for which race indisputably did not predominate and, indeed, played no role at all. Nor do these suits provide anything approaching the strong evidentiary record required to permit—much less require—their race-focused Section 2 remedy. Alabama has no constitutional or statutory obligation to dismantle the 2021 Map and adopt a plan featuring any of the Plaintiff's preferred racial compositions. If anything, it is Plaintiffs' proposed maps, not the

State's enacted map, that raise serious constitutional questions. All three motions for

preliminary injunction should be denied.

Respectfully submitted,

Steve Marshall
  *Attorney General*

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

**Counsel for Sen. McClendon and Rep. Pringle**

*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*
Thomas A. Wilson (ASB-1494-D25C)
  *Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
A. Reid Harris (ASB-1624-D29X)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

**Counsel for Secretary Merrill**

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this document using the Court's

CM/ECF system on December 22, 2021, which will serve all counsel of record.

/s/Edmund G. LaCour Jr.
Edmund G. LaCour
*Counsel for Secretary Merrill*
