FILED
2021 Dec-22 PM 11:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# OFFICE OF THE ATTORNEY GENERAL



**JIMMY EVANS**
ATTORNEY GENERAL
STATE OF ALABAMA

ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, ALABAMA 36130
AREA (205) 242-7300

March 10, 1992

Chief, Voting Section
Civil Rights Division
United States Department of Justice
HOLC Bldg., Room 617
320 First Street, NW
Washington, D.C. 20001

> Re:   Section 5 Submission by State of Alabama
>       Congressional Redistricting Plan

Dear Sir:

The State of Alabama submits for review, pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. §1973c, Act No. 92-63, its congressional redistricting plan based on the 1990 decennial census. For reasons discussed below, the Attorney General is requested to give **EXPEDITED CONSIDERATION** to this submission.

I

### Introduction and Overview

Alabama currently has seven (7) congressional districts, a number unaffected by the 1990 census. As expected, a review of the 1990 populations of the existing districts, which are set out in Exhibit 1, confirmed that adjustments to the existing districts would be necessary for one person, one vote reasons; and, moreover, substantial, broad-based sentiment had developed during the 1980s for the creation -- for the first time in modern history -- of a predominantly black congressional district. The plan submitted today addresses both goals.

Alabama's redistricting effort -- later to be sidetracked by a dispute between the Legislature and the Governor -- began in earnest in 1987 with the creation and organization

SOS007085

of a Task Force on Reapportionment.[1]  This six-member legislative group, including Senator Fred Horn, who is black, did the basic preparation for the redistricting process by creating and training a staff, securing necessary equipment and expertise, conducting preliminary public hearjngs and educational workshops relating to the forthcoming effort, and preparing (after opportunity for public comment) proposed redistricting guidelines.[2]   Its work complete, the Task Force delivered its final report to the legislative leadership on November 6, 1990 (Exhibit 6).

Responsibility for the redistricting effort has since that time been vested in the Permanent Legislative Committee on Reapportionment.  Created by Act No. 90-388 (Exhibit 7), this bi-racial committee met for the first time in March of 1991.[3]  Following up on the work of the Task Force, the Permanent Committee reviewed and adopted guidelines for congressional redistricting and legislative reapportionment, secured additional needed equipment, established rules for legislative and public access to the Reapportionment Office's facilities and expertise, and, among other activities, established a schedule for public hearings across the state on congressional redistricting issues.[4]

As explained in the affidavit of Reapportionment Office Director Marilyn Akers Terry (Exhibit 11), the Permanent Committee intended from the outset to have the Legislature deal with congressional redistricting in a special session in the fall of 1991.[5]

---

[1]   The Task Force was created by Act No. 87-356, Exhibit 2.

[2]   A summary of the activities of the Task Force is found in Exhibit 3.  Copies of the public notice inviting comments on the proposed guidelines, comments received, and notes of changes made as a result of the comments are labeled collectively as Exhibit 4.  The final guidelines are included as Exhibit 5.

[3]   Membership of the Permanent Committee, by race, is shown on Exhibit 8. The Committee was expanded in size by Act No. 91-347 (Exhibit 9), and two Republican legislators thereafter became members.

[4]   A summary of the Permanent Committee's activities through October of 1991, including educational activities conducted by Task Force members, Committee members, and staff, is found in Exhibit 10.

[5]   The 1991 regular legislative session was required by law to conclude no later than July 30, 1991, and in fact ended on that date.  The Committee early on concluded that all the work necessary to adopt a congressional plan could not be completed in time for the Legislature to act on a plan in the 1991 regular session, especially since the Committee wanted to await the Secretary of Commerce's July 15, 1991 decision on the census adjustment (see Exhibit 12).  The 1992 regular session would not commence until February 4, 1992.

SOS007086

Congressional redistricting would be tackled before legislative reapportionment because Alabama's next legislative elections will not be held until 1994.

With a fall 1991 legislative session in mind, the Permanent Committee established a public hearing and committee work schedule stretching through the summer. During May and June, over 2000 public hearing notices were mailed to local government officials, legislators, major political and racial minority organizations, all newspapers, radio and television stations in the State, and contacts on the Reapportionment Office's mailing list.[6] Public hearings were conducted in 16 separate locations across the State during May and June. [7]

After the Secretary of Commerce announced on July 15, 1991 that there would be no adjustment to the previously released 1990 census numbers, the Permanent Committee on July 30, 1991 decided to hold a series of public work sessions to consider proposed congressional redistricting plans.[8] While setting a deadline of September 4, 1991 for the submission by legislators and members of the public of proposed district plans, the Permanent Committee also established dates for its own work sessions. Public notice of the submission deadline and the work sessions was sent to the groups and individuals on the Reapportionment Office's main mailing list, which included all principal minority contacts. (Exhibit 15).

In a series of public meetings conducted during September and early October, the Permanent Committee reviewed and heard presentations on approximately 25 congressional redistricting plans.[9] Plans were submitted by a broad range of citizens with diverse interests, including persons affiliated with the State Republican Party, the State Democratic Party, the Alabama Democratic Conference ( "ADC", Alabama's oldest and largest predominantly black political organization), and the Alabama New South Coalition ("ANSC", another

---

[6] An example notice is included as Exhibit 13. A list of those receiving notice is also being furnished. See note 7, infra.

[7] A summary of the comments from the public hearings is included as Exhibit 14. Transcripts of the proceedings in each of these public hearings are also being provided as part of this submission. They are located in a separate box clearly marked as to content. Also included in this box is a list of the persons and organizations to which notice of the public hearings was sent.

[8] The preliminary census numbers were received by the Reapportionment Office on February 7, 1991, and were over the ensuing weeks loaded on the computer system and used to create numerous preliminary reports.

[9] All these plans are included in a notebook which is being provided as part of this submission. This notebook was given to all Committee members for their use in the work sessions.

3

SOS007087

influential predominantly black political organization). Any individual supporting a plan was given an opportunity to present the plan before the Committee, argue its merits, and field questions from Committee members and other attendees.

It was during the September sessions that the Committee became aware that Governor Guy Hunt was reconsidering his commitment to call the Legislature into a fall special session to deal with congressional redistricting. Committee leaders engaged in hopeful negotiations with the Governor, pointing out that they had relied on the Governor's willingness to call a fall session as the cornerstone for their scheduling of redistricting activities. Despite the Governor's refusal to take a final position on a special session, the Committee pushed forward with its work.

On about September 25, 1991, legislative leaders learned that two days earlier a suit had been filed in the United States District Court for the Southern District of Alabama requesting that a three-judge court be convened to order into effect a congressional redistricting plan for the 1992 elections. The complaint, filed by a Mobile Republican Party official, alleged that the Legislature had failed to act in a timely manner and that court intervention was necessary.[10]

The Committee authorized counsel to attempt to intervene in the federal lawsuit in order that its position could be made known to the court, but the Committee also pushed forward with its work. Virtually all the plans brought to the Committee included a solid majority black district, in recognition of the substantial sentiment which had developed for that approach. At its meeting on October 1, 1991, the Committee made it clear that it would not give serious consideration to any proposal that did not include a solid black district. On October 1 and October 2, the Committee narrowed the proposed plans to five, and finally to two, which would be recommended to the full Legislature for its consideration once the Legislature was in session. These two plans, commonly known as the "Reed Plan" (for its chief proponent Joe L. Reed, chair of the ADC) and the "Dixon Plan" (for its sponsor, Republican Senator Larry Dixon of Montgomery), both featured a predominantly black district, but differed dramatically in their treatment of partisan political issues such as preservation of incumbents.[11]

The Governor refused to call a special session and a trial of the Wesch case in federal court was held on January 3-4, 1992. Having been denied intervention, the Permanent Committee appeared as amicus curiae urging the three-judge court to defer to

---

[10] The complaint in Wesch v. Hunt, Civil Action No. 91-0787, is included as part of Exhibit 16, along with other key pleadings and papers, including the January 27, 1992 interim decision of the three-judge court.

[11] Descriptions and maps of these two proposals are included with this submission. See Exhibits 17 and 18.

SOS007088

the Alabama Legislature. With the exception of Governor Hunt, the other state defendants, along with a group of black intervenors, urged the court to adopt an approach that would allow the Legislature an opportunity to fashion a plan. Attorneys for plaintiff Wesch, on the other hand, urged the court to order into effect the so-called "Sam Pierce Zero Plan", one of the plans considered by the Permanent Committee which was almost identical to the "Dixon Plan."[12]

On January 27, 1992, the three-judge court ordered that unless the Legislature were to adopt and have precleared its own plan in time for the 1992 elections, those elections would be held under a court-ordered plan that is a slightly modified version of the plaintiffs' proposal.[13]  See Exhibit 20.  The court's interim plan includes a majority black district with a black total population of 67.53% and a black VAP of 63.51%.

The Alabama Legislature convened in its 1992 regular session on February 4, 1992. As explained in more detail below, interested legislators almost immediately began an effort to forge a legislative consensus on a plan which could be used in the 1992 elections instead of the court-ordered interim plan.  As later explained, consensus developed in favor of a plan which had never formally been submitted to the Committee, but which largely satisfied the congressional delegation and, more importantly, created a solid majority black district and equalized population among the districts.  It should be noted that, unlike the court-ordered plan, the legislative plan places white Democrat incumbents Erdreich and Harris together in district 6; and has no incumbent in proposed majority black district 7.

On February 27, 1992, the Alabama Legislature approved Senate Bill 73, the bill which is the subject of this submission.  The bill was vetoed by the Governor on March 5, 1992, but the Legislature overrode the veto that same day and the bill therefore became law. The redistricting bill was thereafter entitled Act No. 92-63.

It was recognized by the proponents of the legislative plan that it would be desirable also to extend the qualifying deadline for the party primaries in order to allow more time for candidates to qualify based on the new legislatively approved districts (legislation extending the qualifying deadline will be the subject of a separate submission).  Alabama's 1992 party primaries are scheduled for June 2, 1992. Many pre-election deadlines, described in a publication of the Secretary of State (Exhibit 21), must be met by state and local election officials as well as candidates.  It is therefore essential that the Attorney General give **EXPEDITED CONSIDERATION** to this submission.

---

[12] The "Sam Pierce Zero Plan" is described in Exhibit 19.

[13] The principal change was to place white Democrat incumbent Claude Harris in the new predominantly black district instead of in a district with white Democrat incumbent Ben Erdreich, as the "Sam Pierce Zero Plan" proposed by the plaintiff did.  See Exhibit 20.

5

SOS007089

## II

### The Proposed Congressional Plan

The proposed congressional redistricting plan is highlighted by a zero population deviation and the inclusion of a strong predominantly black district. As shown in more detail in Exhibit 22, the proposed districts would have the following populations, by race:

| District | Total Pop. | Black Pop. (%) | % Black VAP |
|---|---|---|---|
| 1 | 577,226 | 28.41 | 25.39 |
| 2 | 577,228 | 23.75 | 20.97 |
| 3 | 577,227 | 18.89 | 17.11 |
| 4 | 577,224 | 5.91 | 5.31 |
| 5 | 577,227 | 14.48 | 13.31 |
| 6 | 577,228 | 18.73 | 16.51 |
| 7 | 577,227 | 66.66 | 62.48 |

Consistent with the redistricting guidelines, the proposed plan violates few county lines[14] and builds to a large extent on county precincts established pursuant to Act No. 89-952.[15] To the extent consistent with other overriding considerations (including particularly the need to create a predominantly black district), the proposed plan also attempts to preserve the cores of existing congressional districts. A discussion of the events leading up to the Legislature's passage of the plan follows.

The legislature never had an opportunity, of course, to consider in a special session the two plans recommended by the Committee, because the Governor failed to call the session. Prior to the convening of the regular session on February 4, 1992, the United States District Court for the Southern District of Alabama issued a preliminary order, dated January 27, 1992, in Wesch v. Hunt. In its order, the court stated that it intended to order an interim congressional redistricting plan in the event that the Alabama Legislature failed

---

[14] Only seven counties are split by the proposed plan. The only county which the proposed plan splits which would not otherwise have to be split to attain zero population deviation in the plan is Pickens County, which is split between districts 4 and 6. At the request of long-time Representative Tom Bevill, who represents all of Pickens in the existing plan but will lose most of Pickens in the proposed plan, a small part of Pickens on the Tennessee-Tombigbee Waterway is kept in Mr. Bevill's district because the Tom Bevill Welcome Center is located on the Waterway in that part of Pickens County.

[15] See Exhibit 23. Act No. 89-952, which was precleared by the Attorney General on July 30, 1989 (Exhibit 24), requires counties to re-draw their precincts to conform to visible features, thus enhancing the possibility of using precincts as building blocks in district plans.

SOS007090

to adopt a redistricting plan and have it precleared in time for the election cycle "under the timetables presently provided for by Alabama law."[16]

The court's plan, which was an adaptation of the Sam Pierce Zero Plan, protected Alabama's two incumbent Republican Congressmen and created a district in Jefferson-Shelby-Bibb-Tuscaloosa that appeared favorable to a Republican candidate. Therefore, Republican legislators were generally satisfied with the court-ordered plan. However, minority groups and their representatives had expressed considerable dissatisfaction with the Sam Pierce Plan, from which the court plan was derived, because they had had no input into its formulation.[17]

As the regular session began, state legislators interested in forging a consensus spent many hours trying to get the congressional delegation to agree on a plan. It was understood, of course, that one incumbent was likely to be eliminated because of the virtual certainty that a black candidate would be elected in the new predominantly black district which everyone agreed should be created.

A group of legislators believed strongly that the Legislature should make every effort to enact its own plan, rather than deferring to any non-legislative plan. Some Democrat legislators were anxious, moreover, to protect against a Republican district in the Jefferson County area. There was thus renewed an effort to pass a legislative plan. Obvious to be considered were the two plans which the Reapportionment Committee had recommended, the Dixon Plan and the Reed Plan.

The Dixon Plan was not acceptable to a number of Democrat legislators, because in addition to protecting the two Republican incumbents, it would create a Jefferson-Shelby-Bibb-Tuscaloosa district that would be heavily white, probably Republican, and would pit Democratic incumbents Harris and Erdreich against one another. In addition, similar to the court-ordered plan, the Dixon Plan was derived from an earlier version of the Sam Pierce Zero Plan, known as the Pierce Plan, and thus minorities had not been involved in its formulation.

---

[16] January 27, 1992 order in Wesch v. Hunt, CV 91-00787 (Exhibit 16).

[17] Sam Pierce, the designer of the Sam Pierce Zero Plan, did not consult with or receive input from any black persons in drafting his plan. Exhibit 25, Pierce deposition at 107, 108. At the Wesch v. Hunt trial, several prominent black political leaders testified as to their concerns regarding the Sam Pierce Zero Plan. Exhibit 26, testimony of State Senator Michael Figures, Past President of Alabama New South Coalition (a predominantly black political organization) in the Wesch trial transcript at 125; Exhibit 27, testimony of Carol P. Zippert, President of the New South Coalition in Wesch trial transcript at 216.

7

SOS007091

The Reed Plan, in contrast, was backed by Dr. Joe Reed, a black, and leader of the Alabama Democratic Conference, Alabama's largest predominantly black political organization. Like the Dixon Plan and the court-ordered plan, the Reed Plan created a majority black congressional district. However, the Reed Plan substantially altered the configuration of the districts of Republican Congressmen Dickinson and Callahan, and thus was objectionable to them, to Republican state legislators, and even to some Democrat legislators who disliked the massive realignment of counties called for by the Reed Plan.

Legislators interested in passing a legislative plan soon recognized that neither the Reed Plan nor the Dixon Plan could pass without significant modification, and that it would accordingly be necessary to develop a plan which could be broadly supported. Legislators interested in forging a consensus spent many hours trying to get the congressional delegation to agree on a plan they could all live with, even if some aspects of it were objectionable. It was understood, of course, that one incumbent was likely to be eliminated because of the virtual certainty that a black candidate would be elected in the new predominantly black district which everyone agreed should be created.

The most likely incumbents to be eliminated were Representative Harris from Tuscaloosa County (existing district 7) and Representative Erdreich of Jefferson County (existing district 6). To the extent possible, the Democratic legislators working toward a consensus plan wanted to give both Harris and Erdreich an opportunity to compete in 1992 in a district in which a Democrat could possibly win. The court-ordered plan, of course, put Erdreich in the Jefferson-Shelby-Bibb-Tuscaloosa district which might well go Republican, and put Harris in the predominantly black district.

Conscious of the need to get as much legislative support as possible, the proponents also sought to fashion a plan that was acceptable to the Republican incumbents, Dickinson and Callahan. Congressman Dickinson wanted as much of the existing second district to remain intact as possible, and Congressman Callahan wanted essentially the same thing for the first district. Congressman Browder was willing to make some concessions in the third district but was not agreeable to wholesale changes. Congressman Bevill and Cramer in north Alabama were largely insulated from drastic changes, but were watching carefully -- as evidenced by Mr. Bevill's late request that the part of Pickens County in which the Tom Bevill Welcome Center is located be included in his district. Central to the entire effort was the acknowledged need to fashion the predominantly white districts around a fair, solid majority black district.

Eventually a consensus was reached, with all the incumbent congressmen acknowledging at least moderate satisfaction with the outcome. The consensus plan drew from both the Reed Plan -- particularly with respect to the configuration of the predominantly black district -- and the Dixon Plan -- with regard particularly ɔ protecting the districts of the two Republican Congressmen. Callahan and Dickinson would remain alone in their respective districts, with the cores of those districts intact. Browder's district would change somewhat (principally to take in Shelby County while giving up most of his

8

SOS007092

southern tier of counties), and both Bevill and Cramer would be essentially unaffected. Erdreich and Harris would be placed together in a district including about 350,000 people from Jefferson County, Erdreich's home, 150,000 from Tuscaloosa, Harris' home, and the remainder from the west Alabama counties of Choctaw, Hale, Marengo, Pickens, and Sumter. This district was designed to achieve a rough balance, and thus fairness, between Erdreich's home territory and Harris' home territory and was thought to be a district in which a Democrat could have a chance of winning the general election. All this was to be accomplished while simultaneously creating a solid majority-black district with a 66.66% (62.48% VAP) black population.

The only other plan that was actually considered in the regular session was a plan introduced in the Senate as Senate Bill 73 by Doug Ghee of Calhoun County (Exhibit 28). This plan was acceptable to the Democrat incumbents in Congress, but was viewed by legislative leaders principally as a vehicle to advance the legislative process. On the Senate floor, the eventual legislative plan -- in a slightly earlier version -- was substituted for the Ghee Plan, was passed, and sent to the House. Slight modifications were made at the request of Congressman Bevill in Committee (the Welcome Center change) and on the floor at the request of Congressman Dickinson (to swap one white area for another). This revised plan passed the House, passed the Senate and eventually became Act No. 92-63 -- the subject of this submission.

The Permanent Committee examined the possibility of creating a plan with two predominantly black districts. However, knowledgeable black political leaders -- including Joe Reed, chair of the ADC; Jerome Gray, ADC's Field Director; Albert Turner, a west Alabama political veteran affiliated with the ANSC; and Lillian Jackson, President of the Alabama NAACP -- not only advocated the adoption of a plan with a single predominantly black district, but also testified before the Committee that it would be adverse to the interests of black voters in Alabama to attempt to create two predominantly black districts.[18] Excerpts from the testimony of these individuals are very illuminating. For example, Mr. Reed testified as follows:

> So -- but I have not seen a plan yet and I do not take the position under no circumstances can a Black win a district that's less than 65% black. I don't take that position.

> However, I do take the position -- I have not seen a [two black district] plan presented around here that I'm willing for a black to run in for a congressional seat because there are several

[18] The entire testimony of Mr. Reed, Mr. Gray, and Ms. Jackson are found in Exhibit 29. The quoted portions are found on pp. 14-16 (Reed); 18-20 (Gray); and 21-24 (Jackson). Mr. Turner's testimony is in Exhibit 30, with the quoted portion found at pages 24-25.

SOS007093

factors, and I think you have to get this down, this is very important, aside from population, that satisfies the one-person, one-vote theory, but there are some other practical effect that one must look at.

Also you get to the question of your VAP, your voting age population. Your voting age population varies from as much 3, I guess, to 5% from your total population. Which means if your total population, let's say is, I'll just pull out a figure, 60%, then you're voting age population, let's pull out a figure, is 56%, maybe 4% less. Then once you get to your voting age population, then you've got to get your voter registration figures, which are usually among blacks less than whites. That may be as much, as high as a 3% variation.

Then you get, not only your voter registration population, then you've got to get your voter turnout. Then even aside from your voter turnout, when you take in the fact that many blacks have not yet, even this day and time, never still because of education and what have you, don't have all of the political skills that whites have had who have been operating government for hundred and hundred of years, then that's another factor.

Then you get into your factor, your economic factor in a campaign, that's your raising money. Most black candidates can't raise money among poor black folks, they don't have any. We're unemployed and you also get your quasi-captive vote. What's the captive vote, that's the quasi-captive, that's the vote that white folks still control among black folks, that's the best way to put it.

We used to call it captive vote where they use to load them up on the truck and take them down and vote them. That had happened, though, during a period of reconstruction. But I'm talking about now where you've got a quasi-captive vote where many blacks are still subjected to the influence of their employers and so forth where they simply don't know.

So all these factors, we put all these elements together, I have not seen a plan that put these elements together that will give us hope of electing two black congressmen. I wish that I had a plan that could to that.

10

SOS007094

Mr. Gray, one of the state's most effective and knowledgeable political organizers and the person chiefly responsible for ADC's field operations, shared Mr. Reed's view:

> There has been some discussion regarding whether two majority black districts can be created in the State of Alabama. And I have seen the proposed NAACP proposal and have talked with some of their attorneys about the plan that they have floated around in this state. **I've looked at the plan and I have serious reservations regarding whether blacks can get elected in either one of the districts under their proposed plan.**
>
> The plan proposes, it's a partial plan, you don't see the whole plan, so that certainly concerns me that you're looking at just a piece of the puzzle. And they based the plan on precinct data and you really don't have the whole plan in front of you to analyze. And they do cut up a lot of counties in drawing the two proposed majority black districts.
>
> The one thing -- the one concern that I have is Joe outlined the things we look at in terms of whether we think a district will be able to elect a black candidate. And looking at those two districts they're right on the borderline, about 61%. Looking at the voting age population in both those districts, the voting age population falls under 55% in terms of black voting age population in those two districts.
>
> And if you look at the counties that make up the two districts, even though they rely upon urban centers for picking up their population, but they also combine a lot of rural counties in their plan, their proposed plan.
>
> And one thing I know that is, in trying to turn out the black vote in rural areas it's more difficult because you have, you know, more miles to cover, more folk, you know, longer distance to go pick up folk and it's just more difficult to turn out folks when you have more counties involved and more rural areas making up that proposed district.
>
> The NAACP has used the argument that there are districts around the nation where blacks have won in less than, say, 65%, that is true. But if you look at the black congressmen who have won in districts that are less than 65% black they're virtually all in urban centers.

11

SOS007095

The only district, congressional district that I know of, a nationwide black district where you have a black congressman, is in Mississippi where you have a district that's less than 65% that's not in an urban area. You have -- Mike Epsey does have Jackson, and it goes out in the Mississippi Delta, but that's the only other place. Every other black congressional district is located almost totally within an urban center where it's easier to turn out the vote and mobilize your voting population.

But under these two districts that's proposed by the NAACP, they rely upon a lot of rural counties to make up that population base to create those two districts. **And I have serious concerns about whether either one of those districts could elect a black.**

Albert Turner of Perry County voiced a similar view at a public hearing on August 21, 1991:

In my philosophizing of this plan, I had been told from the black community that it was various black people who had an interest in running for the congressional seat. And by the way, I want to dispel all theory, I have no intention at all of trying to support a two black congressional seats in Alabama. I think it's ludicrous, to be honest with you. **I don't see no possibility of having two seats that black folks can win in Alabama.** In fact, I have a problem in trying to get one that they can win knowing the black belt of Alabama and the State of Alabama, and I intend to take that position with Justice and anybody else. I'm not interested in trying to take a fold of the population of Alabama and try to make two black seats out of it. I do not buy that theory that a 50% black seat or a 55% black seat is electable.

So, my sole interest was to develop a plan that was as fair as possible and as close as possible to a 65% black. My theory is that we would like to have one seat in congress that we can say we sent somebody to. I feel very strongly that if it's 50% or 55% whoever wins that plan will win as a result of whatever the whites in that district does. And I'm interested in trying to have at least one out of seven. I would like for the record to show that and I intend to take that position all the way.

12

SOS007096

Ms. Jackson of the NAACP made it clear that her organization does <u>not</u> endorse any effort to create two majority black districts, explaining as follows:

> Good morning. I do represent the Alabama State Conference of Branches of the National Association for the Advancement of Colored People. And I think first off I need to, perhaps clarify something that has transpired that may have caused some confusion. The NAACP has not submitted a plan with two districts. I think a suggestion came down from our national office and inadvertently, perhaps, a copy was submitted to this committee as well. And I think there are some other persons, perhaps, who are supporting that plan. But that is not the plan that the NAACP in Alabama is supporting.
>
> **We have some very serious problems with a two district plan.** We believe that a plan that only has 60% black population is not what we would consider a safe district. And it would have only approximately a 56% voting age population. We think that a plan would need to have, at least, 65% blacks in a district with at least 61% voting age population.
>
> We see a number of other problems with a two district plan as well. We do have a large number of rural counties. And I don't want to go into a lot of things, repeat what has already been said, but it is a very strong concern of the NAACP, and we are a nonpartisan organization, but we are very concerned in political matters.
>
> And in Alabama, in a black district, regardless if it's one or two, it would have to encompass a large number of rural areas. And history has proven that we have more difficulty in getting people registered to vote in rural areas; more difficulty in getting them to the polls to vote and, therefore, we would have very serious problems with a plan that would only have about a 60% black population.
>
> Realistically it would lessen the chances of getting a minority or a black elected to congress. It would weaken our ability to raise funds or the candidate's ability because the resources would be greatly split.
>
> So, at this point, we have looked at a number of plans that have been submitted to this committee. And the NAACP here in Alabama set up a committee, we studied the ones that have

13

SOS007097

> been submitted to you, and we have decided and taken a vote that the plan that we see at this particular point that we would most support would be the plan that was drawn by Representative Buskey and some others.
>
> So I do want to clear the record. We do not support a two district plan. Currently we support the plan that Mr. Buskey worked on and I believe that is one that people are referring to as the ADC plan. Thank you.

These black leaders pointed out that any predominantly black district would necessarily have to include substantial rural areas, and voiced concern that unless a district had a substantial black majority (about 65%), there would be a real threat of black voters being unable to elect a candidate of their choice in that district. An attempt to create two majority black districts, they observed, would likely lead to black voters being unsuccessful in both districts. While clear in their view that two black districts were preferable if such districts were really feasible, these leaders pointed out that neither through their own analyses or those of others had they discovered any reasonable way to fashion two sound black districts.

As noted in the testimony highlighted above, there were efforts to draw a district plan with two predominantly black districts. No such plan was ever submitted to the Committee nor introduced in the Legislature.[19] But enough study was done to clearly support the conclusion of the black leaders described above that a sensible and racially fair plan should not feature two marginal black districts, but rather should contain a single district with a solid black majority.

The first contact with the Reapportionment Office regarding a potential plan with two black districts came in the form of a telephone call from Mr. Clifford Collins of the NAACP's Voter Participation Project. Mr. Collins advised the staff that his organization might submit a plan containing two predominantly black districts. On September 4, 1991, the Reapportionment Office received a facsimile transmission from Sam Walters, Assistant General Counsel of the NAACP in Baltimore (Exhibit 31). Mr. Walters provided a rough description of two majority black districts, but not a complete plan as required by the Redistricting Guidelines. The Committee met that same day, and Representative John Buskey of Montgomery -- a Committee member and chair of the state NAACP's redistricting committee -- advised the Reapportionment Office and the Committee leadership that the

---

[19] Except by Republican Representative Johnny Curry as a delaying tactic, as more fully explained hereinafter.

14

SOS007098

state NAACP did not support a two-district plan.[20]  In any case, the NAACP proposal was not distributed because it was not a complete plan and had not been verified.

On September 20, 1991, Senator Earl Hilliard of Jefferson County sent the Reapportionment Office a computer diskette said to contain the data which had been faxed on September 4, 1991.  Senator Hilliard, who is black, requested the staff to use the information from the fax and the diskette to try to build a plan with two majority black districts.  The diskette was not formatted to be compatible with the Reapportionment Office's computer system, and despite the staff's efforts -- including calling in their computer consultant -- the diskette's information could not be loaded.  Consequently, the staff took the written information in the fax as its starting point.

First, the staff built a plan around the two proposed black districts, which were determined to have black populations of 59.74% (55.47% VAP) and 59.70% (55.41% VAP), respectively.  The overall plan split 29 counties (out of 67) and did not have an acceptable population deviation.  See Exhibit 32.  This plan, along with the refined version described below, were given to Senator Hilliard.

To meet Senator Hilliard's request, the staff modified the two-district plan in an effort to increase the black population percentages and get the deviation to zero.  The resulting black districts were 60.07% (55.79% VAP) black and 61.18% (56.92% VAP) black.  This version also split 29 counties.  See Exhibit 33.  This plan, too, was provided to Senator Hilliard, with the understanding that some fine-tuning was needed, but would be done only if he decided to pursue the plan.[21]

On December 10, 1991 -- while preparation for the trial of the federal lawsuit was going strong -- Senator Hilliard requested the staff to create a plan including a 65% black district in the south and a 55% black district in the north.  The staff was able to draw a 59.33% (55.06% VAP) black district along with a 61.98% (57.75% VAP) black district.  See Exhibit 34.  This plan did not have a zero deviation and split 31 counties.  It was this version of the Hilliard plan that was submitted to the three-judge court in Mobile as one of the alternatives suggested by the black plaintiffs-intervenors.

In January of 1992, while the three-judge court was considering the evidence presented at trial, the staff, at Senator Hilliard's request, furnished him with a refined version of the plan, having a zero population deviation and the following predominantly black districts:  59.41% (55.14% VAP) and 61.91% (57.68% VAP).  See Exhibit 35.  The

---

[20]  This position is explained in the testimony of state NAACP leader Lillian Jackson which is quoted above.

[21]  These events occurred around mid-October of 1991 when it was still hoped that Governor Hunt would call a special session.

SOS007099

plan split 29 counties.  Despite their best efforts, the staff was unable to meet Senator Hilliard's 55%-65% request.

Between January 9 and January 17, 1992, Mr. Selwyn Carter of the Southern Regional Council in Atlanta came to the Reapportionment Office and spent considerable time in an effort to build a plan with two predominantly black districts.  Mr. Carter concentrated on trying to achieve a 65% district and a 55% district, consistent with Senator Hilliard's earlier request.  While Mr. Carter was working on that approach, a software problem developed which made it impossible to display a map of the plan on which he was working, and thus Mr. Carter never finished his effort.  While a written report of the status of Mr. Carter's work is available (Exhibit 36), no map can be produced.[22]  The staff cannot verify Mr. Carter's work, but believes that changes would have to be made to complete it, and that it is uncertain how those changes would affect the overall plan.  As currently drawn, the plan splits 33 counties.

Mr. Albert Turner of Perry County, who is on record opposing any effort to create two black districts, also spent time in the Reapportionment Office in January studying once again -- particularly in light of Senator Hilliard's efforts -- whether a two-district plan could be drawn.  After substantial efforts, Mr. Turner abandoned his effort, concluding that his original assessment was accurate.

At no time did any black legislator, political leader or other citizen present to the Reapportionment Committee or the Legislature a proposal containing two black districts; nor has such an approach ever been publicly advocated before the Committee or the Legislature.  Indeed, the only time such a plan was brought forward at all was when Republican Representative Johnny Curry, apparently believing that by introducing a number of bills that might have to be read at length he could delay the House's vote on the plan which eventually passed, introduced several plans, including the Reed Plan, the Dixon Plan, the Court Plan, an earlier version of the plan adopted by the Legislature, and the Hilliard two-district plan.  Mr. Curry's effort to delay was not successful.

### III

### Other Relevant Information

To the extent it is not fully provided in the preceding sections of this letter, the information required by 28 C.F.R. §51.27 is set out below.

(a)    A certified copy of Act No. 92-63 is included as Exhibit 37.

---

[22]  The Reapportionment Office's software vendor, Public Systems Associates, has been working to remedy the problem, which it also experienced in Louisiana.

SOS007100

(b)     *Ala. Code* §17-20-1 (included as Exhibit 38) describes the existing congressional districts. For an analysis of the population, by race, of the existing districts under the 1980 census, see Exhibit 39. For a comparable analysis under the 1990 census, see Exhibit 1.

(c)     See Sections I and II.

(d)     This submission is being made by James H. Evans, Attorney General of the State of Alabama (205-242-7300); and David R. Boyd, Counsel to the Permanent Committee (205-834-6500).

(e)     The Alabama Legislature is the branch of state government responsible for the proposed change in congressional districts; the State of Alabama is the submitting authority.

(f)     Not applicable.

(g)     The Alabama Legislature is responsible for making the change by way of a legislative act.

(h)     The Legislature is authorized by the United States Constitution art. I, §2, cl.3 and art. I, §4, and the Constitution of Alabama (1901) art. IV, §44 to make the proposed change. The required procedures are described in Section I.

(i)     Act No. 92-63 was passed by the Legislature on February 27, 1992 and became law on March 5, 1992.

(j)     The new congressional districts would take effect with party primaries on June 2, 1992, subject to the approval of the three-judge federal district court discussed in Section I. If for any reason the proposed plan cannot be used for the 1992 elections, and the court's plan is used instead, the State intends for the proposed plan to be used in 1994 and thereafter.

(k)     The proposed districts have not yet been used.

(l)     Not applicable.

(m)     See Section I.

(n)     The proposed congressional districts will likely result in the election for the first time since Reconstruction of a black member of Congress from Alabama. No adverse effect on black voters is anticipated; indeed, the proposed plan is racially fair in all respects.

(o)     See Section I for discussion of the proceedings before the three-judge court in the Southern District of Alabama. There have been three other legal proceedings filed

17

over the general subject of congressional redistricting.  On October 29, 1991, two black residents of Tuscaloosa County and Greene County, respectively, filed suit against Governor Guy Hunt and various other state officials, including legislative leaders, in the United States District Court for the Northern District of Alabama, Western Division.  This suit, filed after the Wesch case, alleged that the existing congressional districts violated federal law and requested a three-judge court be convened to declare the existing districts unlawful and to order the Governor to call a special session to give the Legislature an opportunity to enact a new district plan, failing in which the court would order a plan implemented.  See Exhibit 40.  Other pleadings related to this action are also included as part of Exhibit 40.  On December 4, 1991, United States District Judge Sam C. Pointer, Jr., for the three-judge court, ordered the case to be stayed pending the outcome of the Wesch case, and invited the plaintiffs to seek intervention in the case pending in Mobile.  See Exhibit 40.

On about December 9, 1991, two residents of Barbour County, Alabama, filed suit in the circuit court of Barbour County against Governor Hunt and various other state officials requesting the circuit court to order Governor Hunt to call a special session of the Alabama Legislature to deal with the issue of congressional redistricting.  See Exhibit 41.  After pleadings and evidentiary proceedings, the circuit court issued a final order requiring Governor Hunt to call a special session of the Legislature on or before January 8, 1992, failing in which the court would itself fashion an appropriate remedy.  Governor Hunt appealed and sought a stay of the circuit court's order.  On January 7, 1992, the Alabama Supreme Court, in a unanimous decision highlighted by Justice Gorman Houston's special concurring opinion, granted the stay of the circuit court order, and that stay remains in effect.  See Exhibit 41.

On about January 14, 1992, the Lieutenant Governor, the Speaker of the House, and a number of Alabama Legislators filed an original petition in the Supreme Court of Alabama requesting that the Supreme Court enter an order establishing interim congressional districts until the Legislature had an opportunity to adopt such districts.  See Exhibit 42. The Supreme Court has taken no such action on the petition and, of course, the Legislature has now adopted the plan being submitted herewith.

(p)     The existing congressional district plan, to be replaced by the proposed plan, was precleared by the Attorney General on February 26, 1982.  See Exhibit 43.

(q)     Reports showing 1990 total and voting age populations of counties, the existing congressional districts, and the proposed congressional districts are included as Exhibits 44, 1 and 22, respectively.  As explained in the next section, we also presently intend to furnish information about the proposed district plan, the court-ordered plan, the Reed Plan, and perhaps other alternatives, on magnetic tape pursuant to 28 C.F.R. §51.20, as amended. Maps of the existing and proposed districts are included in Exhibits 1 and 22 and are appropriately labeled.

18

As suggested by the Section 5 regulations, the State is providing the following additional information: (1) the number of registered voters, by race, at the county level as of January, 1992 (Exhibit 45); (2) a map showing the location of black citizens in Alabama (Exhibit 46); (3) the names and addresses of a number of black citizens interested in the redistricting process (minorities highlighted in Exhibit 47); (4) numerous items identified in Section I demonstrating the publicity of redistricting activities and the extent of opportunity for minority participation; and (5) newspaper clippings covering essentially the entire redistricting process (lcoated in separate box).

As suggested by 28 C.F.R. §51.28(g), notice of the availability at the Reapportionment Office of a copy of this submission and all exhibits thereto will be sent to all the persons and organizations on the Reapportionment Office mailing list.

## IV

### Provision of Data on Magnetic Tape

Supplemental to the written materials submitted herewith and in accordance with 28 C.F.R. §51.20, as amended, the State of Alabama presently intends to submit descriptive data of its proposed congressional redistricting plan, as well as the court-ordered plan, the Reed Plan, and perhaps other alternatives, on magnetic tape. These materials will be provided through a supplement to this submission.

## V

### Request for Expedited Consideration

Pursuant to 28 C.F.R. §51.34 and for the reasons described herein, the Attorney General is requested to give this submission **EXPEDITED CONSIDERATION**. Assuming the legislation extending candidate qualifying to May 3, 1992 is precleared, preclearance of the proposed congressional districts is needed as far in advance of that date as possible. The very earliest consideration is requested in order to give candidates, voters and election officials as much time as possible to prepare for the June 2, 1992 primary elections.

19

SOS007103

## VI

### Conclusion

For the reasons explained above, and supported by the accompanying materials, the State of Alabama urges the Attorney General to give **EXPEDITED CONSIDERATION** to this submission and to act upon it favorably.

Respectfully submitted,

James H. Evans
Attorney General

David R. Boyd
Counsel to Permanent Legislative Committee
on Reapportionment

DRB:tak

Enclosures

20

SOS007104