FILED

2021 Dec-23  PM 04:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# TRANSCRIPT OF
# SENATE FLOOR DEBATE
# NOVEMBER 3, 2021

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**[00:10:00]**

**[00:11:09]**

**SENATOR SINGLETON:**  Mr. Chairman.

**MR. PRESIDENT:**  Senator Singleton.

**SENATOR SINGLETON:**  While we're waiting on here, can I just get a [INDISCERNIBLE 00:11:16].

**MR. PRESIDENT:**  You're recognized.

**SENATOR SINGLETON:**  I just want the body to know and I'm going to turn this back over, is that we here today on this congressional plan are going to present a couple of plans today and we just ask for your patience. This is not going to be a lockdown filibuster or anything. We just want to be able to ask pertinent questions about this, be able to take our time to walk through the process. I know I have a map or two that I want to introduce. Senator Smitherman has a map that he's going to introduce. I think also Senator Wagner may even have a map that he's going to introduce. So, we're just going to take our time to go through this process. There's no need to cloture anyone. We're not here to lock down anything. We just want to be able to ask pertinent questions and deal with the Chairman, who has done a great job at this point. So, thank you, Mr. President, for that point of personal privileges.

**MR. PRESIDENT:**  Thank you, Senator Singleton.

**CHAIRMAN MCCLENDON:**  Mr. President.

**MR. PRESIDENT:**  Senator McClendon.

**CHAIRMAN MCCLENDON:**  The house plan we have before us today is the plan that came out of the Redistricting Committee earlier last week and it is also the plan as it came out from the House of Representatives. The members were met with in person and sometimes on Microsoft Teams, sometimes on the phone. All their issues have been addressed. We've been made aware of their problems. Everyone that had an interest had input into the plan. There are exceptions for a handful of members who, in fact, are not running again, who chose not to meet with us. The committee guidelines have been met on all aspects of this plan. It complies with Section 2 of the Voting Rights Act and the Equal Protection Clause. There is a minimum population deviation between the districts. Ideal population for a house district is 47,850. All districts are within plus or minus 5% of the ideal. It respects counties to the extent possible, given the requirements for equal population. It does not require incumbents to run against each other. However, there are a few members who are not running, who would be in a different district from the one that they currently represent. All the districts are contiguous and reasonably compact, attempting to respect communities of interest and to try to preserve cores of existing districts. Copies of Pringle House Plan 4 are available to you. This plan splits a minimum number of counties and

1

precincts. Thirty-nine counties are split under this proposed map and compare that to the 46 counties that are split under the existing maps.

**[00:15:12]**

Precinct 57 are split in order to get the deviation. This plan contains 27 majority black districts including the creation of a new majority black district in Montgomery County, which would be House District 74. In addition, House District 53 held by Minority Leader Daniels has a BVAP of 48.15% with which he said, he was comfortable. With that being said, if you would like to look over these and see the details, the breakdown of the splits and the population; again, these districts were drawn with race blindness that committed data was removed from the screen when they were created as we're charged to do. You will see that the House Districts all fall within the deviation. The population summaries are attached to the maps that you have with a mean deviation of 3.18 and standard deviation of 1,682.66. The range on the districts on population size went from a low of 45,466 to 50,225. All of that information is presented up here. I will talk about historically how this has worked with the House considering senate maps and the Senate considering house Maps, which is where we are today on this fifth day of our legislative session, special session that in the past the Senate has been essentially hands off of the house maps accepting what is produced by the House and their efforts. And the expectation is the same that the Senate will leave the house maps, House will leave the Senate maps alone. At least that's how we hope it will work. Now, I see my friend Senator Singleton, you have some discussion on these maps, Senator, I would welcome the input.

**MR. PRESIDENT:**  All right, Senator McClendon, do you yield the mic?

**CHAIRMAN MCCLENDON:**  I yield the mic.

**MR. PRESIDENT:**  Okay. Senator Singleton, you're up in the house.

**SENATOR SINGLETON:**  Thank you, Mr. President. When I look at this plan, it says Pringle House Plan number 4. Is this a substitute plan that he made down? Because I don't remember a plan number 4 before the committee that we adopted out of the committee.

**CHAIRMAN MCCLENDON:**  Yes, it is a substitute plan.

**SENATOR SINGLETON:**  Okay. So this is not the committee plan. So this is a substitute plan?

**CHAIRMAN MCCLENDON:**  Correct.

**SENATOR SINGLETON:**  Okay. I heard you say the committee plan. Because I don't remember seeing a plan number 2 or 3. You know? Now we here, we are looking at a plan 4. What is the difference between the plan that we adopted and this plan?

**CHAIRMAN MCCLENDON:**  There was input from the members. As, you know, that's when you got to get their votes and some changes were made. I don't think any of them were drastic

changes, but I was not involved in the drafting process of this map. Since it is a house map, House members were involved in it and Representative Pringle managed that and I was basically hands off that map.

**SENATOR SINGLETON:** I understand. So what you're telling me is that Representative Pringle went back and made changes to get the Bill passed, not necessarily an illegal bounds to make sure that something was legally done to meet the voters' right and to make sure that communities of interest, all of those things that we do to make sure under the legal status of being able to get a map drawn and get it constitutionally passe.

**[00:20:15]**

Those things was -- those changes wasn't there. He changed this specifically to make sure that get some votes. That's what I'm hearing you say.

**CHAIRMAN MCCLELLAN:** No, that's not what I said. What I said was I was not involved in that process.

**SENATOR SINGLETON:** I understand. But you mentioned that he had to get some votes.

**CHAIRMAN MCCLELLAN:** No. What I said was or intended to say was that he worked with members of the House to make changes. Now, what was involved in that whether involved votes or --

**SENATOR SINGLETON:** Do you know whether or not he had met with any African-American members to make any changes or memos of the minority party?

**CHAIRMAN MCCLELLAN:** No, I was not involved in that process so I can't really give you the details of how Representative Pringle and the House came up with the plan.

**SENATOR SINGLETON:** I understand. When I look at this map, I see a lot of splits in less whole counties that we sent out as a committee to try to do as much as whole counties as we possibly could. And when I look at this map and I understand you got 105 members and you got to work through the process so you may not have as many whole counties, and the map would look a little different at the senate and the School Board and Congress that then it does with the House because of 105 members have to be divided within six to seven counties. I understand you're going to get some splits, but in terms of unnecessary splits that are related, I looked at -- there's a district in Haysville which is a minority district that only has about 38% Black. How do you justify maintaining the voter's right with a 38% African-American district in the Haysville area that has been held by a minority already?

**CHAIRMAN MCCLELLAN:** Are you referring to House District 74?

**SENATOR SINGLETON:** I think that's what it is, I think.

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**CHAIRMAN MCCLELLAN:**  The BVA paying for that district is 48.15 and the current holder of that district was okay with that. He did not have a problem with it.

**SENATOR SINGLETON:**  Well, I'm sure he did not suggest because of the fact to see exactly what it is that you're going to do with it. Let me ask you this question then. Had he had problems, would you think that Mr. Pringle would have made those adjustments or the demographer would have made the adjustment as you've done with the majority members to get all the way down to a plan forward to make the adjustments that they want to make?

**CHAIRMAN MCCLELLAN:**  Your question is would Representative Pringle worked with the House member?

**SENATOR SINGLETON:**  And had made those changes to get him a higher number if he possibly could?

**CHAIRMAN MCCLELLAN:**  I'm certain he would work with him. He had input and the representative from 74 was placed with this district, assets drawn, assets presented to us today.

**SENATOR SINGLETON:**  Well, I'm not certain. When I talked to him, I'm not certain about how pleased he is. He thought that that's all he could get based on what was offered to him and that's the difference in being you got to be just pleased with based on what people say that they - - that's all they can give you which you offer. So, you're pleased, you walk away okay with it, okay? And with the splits that you have gone in the Jefferson County area, again, and I think that you find that the people from Jefferson over my side would still talk about the unnecessary splits and splitting up Jefferson and how Jefferson is being split up and that's the argument we've already made, and I think that argument is consistent with all of the maps, okay? So, we're going to have to continue to beat that horse down the road in terms of the splits in Jefferson. Also, on the whole county provision, it is very few whole counties that you could see in this map. I see Randolph was left whole. Barber was probably left whole, Bulloch was left whole, Butler and after that, when you go across the map just about every other county is split. Were those splits necessary to maintain and to achieve the necessary parameters that we looked at in terms of not gerrymandering, making sure that we have communities of interest, making sure -- because we're supposed to be dealing on a whole county perspective and those were the rules that we adopted in the committee.

**[00:24:59]**

And when I look at this map, I see less whole counties as -- that possibly could've had some more unnecessary splits and that's what bothers me is that we are way down to a Pringle 4 and you don't understand and know where exactly what Mr. Pringle did to get the Pringle 4 and it is hard for me to ask you those questions, and it's unfair almost for me to stand here to ask you those questions because you may not understand exactly what he did to get down to a Pringle 4. And that's what's troubling is that the committee adopted a plan and then we get here and there's been a two, three and now has changed to a four and so that just kind of puzzling here today.

**[OVERLAY]**

**SENATOR SINGLETON:**  I'm sorry, Mr. President, for the silence. I apologize.

**CHAIRMAN MCCLELLAN:**  No need to apologize.

**SENATOR SINGLETON:**  But that's where I am, Mr. Chairman, and then I noticed that, you know, again, you let the House handle the House and that's what kind of disturbing to me again is that we are down to a plan number 4 that as members of the committee we had never seen before. I'm sure you probably had even vetted this map that much to have seen a plan number 4, you know, and that's why you're standing here trying to do your best and struggle through some answers and the only thing that you can do is based on the information that you give currently in terms of your introduction whether or not you met the standards or not, you know, and that's what you can give. You can't explain to me exactly what the Chairman down there did in terms of his splits and why he made those splits because you have been able to do it on plan number 1 because you're always around each other doing it. But this is a plan number 4. A plan number 4 that we've gone all the way to a 4 that none of the committee members, Republican or Democrats in this body, has ever seen this. Somebody's member don't know -- what the House district even looked like now. They don't know. But as everybody is sitting back all cool and calm and collected, some of these folks problems have been running against them because they probably got what they wanted in the House District to run against them in the Senate Districts. But everybody happy, because everybody's just binding to it but this is a Pringle 4 that nobody knows what's in this Pringle 4. The map is so vague that we can't hardly look into to see exactly what it is that we are looking at in terms of real numbers and split because you can't see everything on these maps, and that bring polls for us to stand here and talk about it and then for you not to be able to answer any questions is even more disturbing, is even more disturbing. So, you know, I'm just as appalled that we went down this road with the House. And let me say to you, Mr. Chairman, I appreciate your steadfastness and at least stand on top of it in maintaining your map to do what you did, okay? I'm going to had to vote against it, I may not like everything, but at least you stood strong and you didn't go through a whole lot of changes based on what we had already seen. But this is a plan 4, that's disturbing to me. That mean you have gone through out the one that we drafted -- we will adopt it in the committee on last week, Tuesday I think it was. He has come along and drafted three more plans that we hadn't seen. Now, if that was going to be the plan, you know, I don't know what all the trickery going on here, you know, and we can keep saying that because he went back and met with folks, yeah I already met these folks already prior to this. So, what's the difference between plan 1 and plan 4 that he had to satisfy somebody about? Because that's all it was about. He wanted by into the legal reasons that we changed because something might have been unconstitutional, we didn't follow an x-trail or map or water or -- you know, we went over here and we took some VIP for someone else that we need to bring it back and bag out over there, none of those reasons that I understand this morning but here we are with a Plan No. 4.

**[00:30:02]**

And I don't know why we're at a Plan No. 4 and that's pretty disturbing to me as a member of the Permanent Reapportionment Committee that we have to stand up here and see something different than what we drafted. It almost looked like a backdoor job to me, Mr. Chairman and

I'm sorry and it is not at you but this is at the chairman on the house side. This is disturbing that he had to go and change it. I don't know what the minimum change or what it is, major changes I don't know because you weren't in there so you can answer those questions for me. Because I don't know and then plus, I can't see this map as clear to be able to know whether or not there is some major gerrymandering going on or whether he packed or he stacked in folks in areas and that's the problem that I have here today. So, I'm not going to prolong it, Senator Smitherman, do you have any questions on this map that you have to ask. Mr. President, I would like to yield if the gentleman will allow me to yield to Senator Smitherman to ask some questions about this house plan.

**MR. CHAIRMAN:**  Senator Singleton, you got the mic. If you want to yield, that's your choice.

**SENATOR SINGLETON:**  I want to yield.

**MR. CHAIRMAN:**  All right, yeah. All right, Senator Smitherman.

**SENATOR SMITHERMAN:**  Thank you, Mr. President, may I be recognized?

**MR. PRESIDENT:**  You're recognized.

**SENATOR SMITHERMAN:**  Thank you. Hey, my friend, how you doing?

**SENATOR MCCLENDON:**  Senator Smitherman, I recognize you as well.

**SENATOR SMITHERMAN:**  Thank you. I appreciate you.

**SENATOR MCCLENDON:**  I'm glad to have you --

**SENATOR SMITHERMAN:**  Senator [INDISCERNIBLE 00:31:30] was absolutely right. As he stated, what lack of better word, I appreciate the opportunity to have to dialogue and to be able to discuss the different plans that will be before us. I just want to tell you that because that clearly will allow each person to see and make a determination what they feel would be the advantages or disadvantages for either one of the plans. So, thank you very much. And I did tell what he said about you being steadfast and being strong and set in and in the spirit of which we operate up here and that is we are very open and straightforward with each other and so having said that this -- I noticed in the meetings having the opportunity to be a member of the Reapportionment Committee, I noticed in the meetings that there seem to be some kind of, lack of a better word, friction among the house members themselves being in the meeting and it seems to me that the Chairman from the house kind of got a little irritated about fundamental procedures that were taking place and I think you know what I'm probably making reference to that situation. I said that because I'm concerned that the motivation to alter the plan to Plan No. 4 could have been driven by that friction of animosity. I don't know that and will make sure you understand that I don't have any clue to that effect, nobody came and told me. They're just only from my observation of the situation. I wish he could have provided for the committee because if I had to say it for the Senate, he would have said, "Well, we don't have to provide for the Senate so I will say it at the committee." that he co-chairs members. The updated information as it

relates to this -- this is plan on House Plan 4 as it relates to this plan because as it's been previously stated, the first time I actually heard that there were plans for was here in the debate. I mean, in the -- it's not debate. Here in the dialogue that's taking place regarding the plan. So, I am totally taken by the fact that this is truly the first eyes that I have laid up on Plan 4. Now, did he share any notes with you, talking points about their plan that you can share about any changes that may have --

[00:35:07]

I'm not even asking you to go get the map and show me only land, where it is or anything. It's just maybe you can share that with me in a conversation that would in such a manner that it will allow me to kind of get an idea as to why we are in a Plan 4.

**SENATOR MCCLENDON:**  The most definitive information I have is the information that I provided with this body when this plan was first brought up when I talked about compliance with the Voting Rights Act and the equal protection clause and thank you for the opportunity. I mentioned earlier, I talked about a mislabeled district in North Alabama held by the minority leader. That district is 53. I called it by the wrong number, 74. So let me make that correction that I just called a wrong number out but that District 53 held by the minority leader is the one that had the 48.15% [INDISCERNIBLE 00:36:24] and in fact, the current office holder who is a minority member was okay with that. He didn't have a problem with it. But other than that, as far as the information that I have before me here pertains to the map we have before me. What I don't have is what we used to have in House District 1 and where those changes occurred. I've just got the information that we have before us and that, hopefully, eventually, we'll have a vote on and treat the House with the respect. We hope they will treat us and we'll leave the House map unscathed as it came out of the House the way they would like to have their districts drawn and of course, we expect that we get the same treatment in the House. They will have the senate map today. They may have it now. I don't know what their calendar looks like but of course our hope is that the map that this body approved and sent to the lower chamber that they will proceed to accept that and not get involved really in what's our business and my hope is that we don't get involved in their business.

**SENATOR SMITHERMAN:**  Well, I understand what you're saying and I understand that that is a courtesy that you are saying that you hope that they provide for us and as such, that is an approach you would like to take in relationship to how we address what they have sent up here to us.  The approach is not in question as to what you know or prefer. What's in question is that what are they asking us to defer on? I mean, at least tell us what deal we are deferring so that at least we can have an understanding of what's before us. That's all that -- I don't mean you personally but I'm just saying the House should have sent that -- the chairman should have had a talking point sheet for everybody in here. It should be 35, let's see, 36, it should 36 because the lieutenant governor should get one as well. It's actually, they have 36 of those talking points and so that we could go -- and 36 of these little maps so that we could go and then at least question that aspect of it. What I've heard from some of the house members is that the same thing took place with them, is that when they got it, they didn't get the information. Instead of getting some responses, they at least understand it. They were put in a position that you know, [INDISCERNIBLE 00:39:42] made a vote and yet to this moment, they still don't know the

answers to these situations so I would think in reference to the point that you shared with me that even if you take that position, if the body takes that position,

**[00:40:01]**

we should at least return or defer action on this until they get us the information. That's all I'm saying. Yeah, you know. Yes, [INDISCERNIBLE 00:40:16] call the Chair, anything like that to the -- at least until they get the information to us, you know all that, you know, if they trying to get it that if you don't want to carry it over then let's just continue the dialogue. Well, we need to do it. It's not a filibuster but like something essentially saying it's no objected to filibuster. Let me just clear you up again on that aspect, but I'm talking about to get the information. If they could get it to us in 15 minutes, that's fine. If they could get it to us in 5, then it wouldn't be necessary what I'm talking about. If they get it [INDISCERNIBLE 00:40:53] we all got -- we don't have -- we're going to need time to get it. I'm willing to work with them on that time. I just think that it's important that they get us the information so that leaves, as I said earlier, you know, we can understand. You know, what kind of substitute changes are -- changes in general that is in this Plan 4. Do you think that you could [INDISCERNIBLE 00:41:17]. I don't know if y 'all got a bat phone. That's what they call them. Yeah, my whole little bat phone. Can you get the bat phone and when you see that thing beep, beep, beep, beep, then you know who called you and then you just shared with him. You know, as I was spokesman from the Senate that there are senators here, who -- you know, can you provide us some information regarding just those subsequent, even if you don't want to get a little [INDISCERNIBLE 00:41:48], the subsequent adjustment and changes, that's caused us to have a Plan 4. I know you shared a few of them with me and I appreciate that but the other ones, you know, like you were just saying moving in and moving out just because it's obvious that would you share with us. And I see you because you our Chair here in the Senate. What you share with us only committed when there was adjustments, then the numbers change, you know how to debate number change. Yeah, and that's all, -- and he should have that. If you want to hold map, you got to know what's in that district and we're not -- that comes out just like that. I said it because I have it here. I have some numbers myself from the house on the other plan, so that's why all about. I don't have this because I didn't get that. So, can you call or say no more, you don't have to, [INDISCERNIBLE 00:42:47]. I know you got staff and stuff, but can you make the hook up for us to get down there so they can get that information up here to us?

**SENATOR MCCLENDON:**  You know, I can certainly check with Representative [PH 00:43:01] Pringle to see if he has any summary or notes.  I don't have a problem doing that. If I get a --

**SENATOR SMITHERMAN:**  What about a reapportionment offer? They may have it too. The numbers, I mean. We don't have to draw them out, nothing stuff like that.

**SENATOR MCCLENDON:**  Now, we do have attached to what you've been provided. The numbers that are associated with this map, you have in front of you and that's really -- of course that's really what the issue is. I know we did take a senate map and did an overlay at the redistricting meeting which was interesting but the fact is what we're voting on today are -- let's hope we vote on today, is the plan we have before. So, we've got all the details of the plan

you've been presented. And the truth of the matter is, we do have maps and proposals that come before this body that nobody has seen before except maybe one person or two people. They come up with not a lot of details behind it. We may in fact, according to Senator Singleton. There may be maps offered today that nobody in this body has seen before except perhaps the sponsor of the bill or maybe someone who is behind them and supporting them out that come up at essentially the last minute and Senator Smitherman. Let's hope it's not only the last minute, but let's hope it's the last day for what we're doing --

**[00:45:05]**

-- but if I get a chance, I will communicate with my counterpart in the House and see if he's got any information prepared. I don't think that our redistricting office as a comparison sheet [INDISCERNIBLE 00:45:25] have time to put it together. They were here last night, late last night trying to help some legislators with some changes that they might want to propose to this body and maybe to the house. I don't know. So, that information may be available. But I'd be surprised if it's to the extent that you're looking for and would make [INDISCERNIBLE 00:45:58]. What we do have in front of us is what the details on each of these 105 districts. We've got that attached to the document before you and available to anyone in this House that would like to or anyone in this body that would like to go over those details.

**SENATOR SMITHERMAN:** Well, Mr. Chair, I think that you spoke accurate when you said that that would be maps that we presented before the body, that some of the maps that it may be the first time that they have a chance to see those maps. But now, let me share you the difference and what we are requesting in the relationship to the map they're putting the House Plan 4 versus the maps that are going to be presented in here. The maps that are going to be presented in here, the people who are presenting the maps right here to where the same questions that I'm asking that they can answer them verbatim to every person in this body. So that means that 34 people have the opportunity to literally go to a mic and ask any question they want to. And if any person represents the map as the knowledge, then they get answer on the spot any of those questions that may come before them. In this case, we don't have that luxury because he's not here. Do you see what I mean? That's why we are asking as the only difference. That's why we are asking that. Now, if that's not a situation that can be expedited, then I think it will be nice if we had a brief recess. Well, it's 30 minutes, just 30 minutes. Do you see what I mean? I mean, the lazed, I have to say that because some people may think that. No, it's just 30 minutes to get -- they're not doing nothing. How's not doing anything right now?

**SENATOR MCCLENDON:** Are they not in?

**SENATOR SMITHERMAN:** Are they in? I don't think, they're coming in about 1.

**MR. CHAIR:** I think 1 o'clock is when the House [INDISCERNIBLE 00:48:32].

**SENATOR SMITHERMAN:** 1 o'clock. So, if, but he's here. I mean, because -- where is this district?

**SENATOR MCCLENDON:** Right in those mobile?

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:**  Oh, yeah. He can go back in the mobile yesterday and come back [INDISCERNIBLE 00:48:45] 1 o'clock. So, he's here. I can go back to that bat phone. Remember I said a bat phone? Hit that [INDISCERNIBLE 00:48:51]. Ask him, do you want to [INDISCERNIBLE 00:48:55] with anything they're doing in the House because as we said, they don't go until 1:00 and then we can recess for 30 minutes and go to Star Wars. I just said Star Wars, you know, it could be anywhere the majority want to go, okay? 200. If y 'all got a little extra food in there, you can bring us [INDISCERNIBLE 00:49:15] room. It doesn't make any difference but just get him there so that he could just explain it. Okay? That's all, for 30 minutes, that will be wonderful because then we at least have a clear understanding and really it's the same 30 minutes that we will be trying to struggle through to get out. So, you know what I mean?

**SENATOR MCCLENDON:**  Yeah.

**SENATOR SMITHERMAN:**  Yeah. Right now, so, it wouldn't be a dilatory use of time or anything like that. So, at least think about it and see if you think that's something that might be feasible. I appreciate that you've given it the attention and I know you will because you did the other day. So, I don't question whether you get it, you know, at least give us some consideration. I do want to talk a little bit about this [PH 00:50:06] Jone plan as a whole that has been presented. But before I go there, I want to take a look at this map and this is the Pringle Plan 4. And I think that that's yeah. Look at Pringle Plan 4 and look at Winston County when you get a chance.

**SENATOR MCCLENDON:**  All right. I already found it.

**SENATOR SMITHERMAN:**  Okay. Just tell me when you found it.

**SENATOR MCCLENDON:**  Tell me where it is.

**SENATOR SMITHERMAN:**  A little bit there. Going toward the top on the left hand side, not all the way to the corner. And it's kind of light, what we would call --

**SENATOR MCCLENDON:**  Yeah, okay. Is that the free State of Winston that I've heard so much about?

**SENATOR SMITHERMAN:**  Yeah. Look. That's why I want you to look at it.

**SENATOR MCCLENDON:**  I see it.

**SENATOR SMITHERMAN:**  Do you see how that district is -- Winston County, it comes around and then it goes around the county under it and then it comes up underneath and then it goes straight in the Jefferson County. You see that? You see how bizarre and gerrymandering and snake look that this district is. Taken, I mean, I'm not exaggerating by using certain words. You need to look at anybody that think that is exaggerating. Look at this map.

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SENATOR MCCLENDON:**  Are you talking about 14?

**SENATOR SMITHERMAN:**  Yeah. I think that's it, 14. You see how it hoops around and comes around and circle around and it's come back onto and it comes straight down. Then it sneaks into Jefferson County and pick up some people right there. You know what? That one district alone, that district and when you get a chance, when you get a chance of reapportionment, ask them to send you a copy to your office of the very first district that the course out of North Carolina, I think it was a congressional district that the court ruled that it was bizarre and that it wasn't a good district. It looked just like this one.

**SENATOR MCCLENDON:**  Are you talking about -- I believe it was in New Jersey when Governor Gary approved the plan that looked like a salamander?

**SENATOR SMITHERMAN:**  Excuse me.

**SENATOR MCCLENDON:**  I was asking if you were referring to the original source of the name gerrymandering.

**SENATOR SMITHERMAN:**  Am I familiar with -- one more time.

**SENATOR MCCLENDON:**  The source of the name gerrymandering.

**SENATOR SMITHERMAN:**  Yeah.

**SENATOR MCCLENDON:**  That's the district you're talking about now?

**SENATOR SMITHERMAN:**  I think that's it. I think that's the one I'm talking about.

**SENATOR MCCLENDON:**  I don't think the court threw that out. I just think the opponents pointed out that and in so doing created the new term gerrymandering because it looked like a claim that district -- like a salamander. I think that district survived.

**SENATOR SMITHERMAN:**  Well, you know, the ruling, I think that they used it as a visual example of the county district they were talking about. There were no good districts.

**SENATOR MCCLENDON:**  We've certainly heard about that district now. That was in the 1800s. So, we've been hearing about that district for a long time.

**SENATOR AIDEN:**  Mr. President.

**MR. CHAIR:**  Senator Aiden.

**SENATOR AIDEN:**  Mr. President, I appreciate my colleague giving me the microphone and I want my members to hear this. We are not going to be comfortable with anyone in another chamber working on senate maps without any engagement from the members of this body. I'm asking for this bill be carried over to the call of the Chair.

11

**MR. CHAIR:** All right. All those in favor, say "Aye."

**SENATOR MCCLENDON:** Aye.

**MR. CHAIR:** Any -- all right, bill is carried over. All right, secretary, call the next bill.

**[00:55:00]**

**SENATOR SMITHERMAN:** Mr. President.

**MR. CHAIR:** On Page 2 of the calendar. House Bill No. 1 by Representative Pringle relating to reapportionment. Senator McClendon?

**SENATOR MCCLENDON:** Thank you Mr. Chairman. Let's find the -- got everybody. Okay, here we go. I think we'll just put this house map to the side for now. The congressional plan that the Reapportionment Committee sent to the Alabama house was approved intact by the house members and in developing this plan, all of our congressional representatives were met with in person and then subsequently over the phone, our own Microsoft Teams until their current concerns had been addressed, one exception to this would be Congressman Mo Brooks who is running for another office. And he did not meet in person nor did he send a staff member. All representatives had input into the plan. The plan that you have before you now is in compliance with Section 2 of the Voting Rights Act and meets all obligations under the equal protection clause. There is a minimal population deviation between the districts. Six of the districts are ideal at 717,754 and the second congressional district is one over that.

**SENATOR COLEMAN-MADISON:** Senator McClendon, if you could maybe try to talk into the mic a little bit more. If not, we'll raise the volume, okay?

**SENATOR MCCLENDON:** Okay. Senator Coleman-Madison, is that any better? I'm talking. I do have some competition. The map that you have before you respects counties to the extent possible given the requirements for equal population. It does not require any incumbents to run against each other. I would remind all of you that this is one of the guidelines for the redistricting committee that we do not put two incumbents in the same district. The districts are contiguous and they are reasonable compact respecting communities of interest and we work at preserving the core. It splits a minimum of counties and precincts. Six counties are split and seven precincts are split to manage to get to the zero deviation. This is over the current law which splits seven counties. Those splits are located in Lauderdale, two splits; Tuscaloosa, two; Jefferson, two, Chilton, two; Montgomery, two. I would point out that's an improvement. Escambia between Districts 1 and 2. This district contains one majority black district or this plan contains one majority black district with a BVAP of 54.22%.

**[01:00:00]**

Now if there are any questions on this, I would be interested in -- in hearing what anyone has to say. Otherwise if you're ready to vote. Senator Singleton!

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SENATOR SINGLETON:**  Yes sir. Thank you Mr. President.

**MR. CHAIRMAN:**  All right, hold on. So you yelled.

**MR. PRESIDENT:**  I do you.

**MR. CHAIRMAN:**  All right, Senator Singleton, you're recognized.

**SENATOR SINGLETON:**  Thank you Mr. President. Thank you Mr. Chairman. On this Congressional map, you know, ever since the month of probably August, September, you all knew that the League of Women Voters were presenting a map and it was -- it was presented at all of our public hearings that was held around the state that someone was there from the -- from the League of Women Voters to present a map and as you know, in the month of September that myself and Senator Smitherman became plaintiffs, in that case with the League of Women Voters on their behalf to -- on the redistricting. We introduced maps and gave maps to the committee for consideration and I guess my question -- first question was being that that map was sent into reapportionment, it was in the system well, before the 10 days rule that we have and the fact that we got it in -- in time, the question is, was that map was set in by the League of Women Voters. It wasn't just a district, but it was a full Congressional map of the entire state of Alabama. I know as a committed member that it was never given any consideration. So, I guess the question I have is whether or not among the Chairmans and among the attorneys in the democra fur was that map of the League of Women Voters given any consideration to be the official map in the state of Alabama?

**MR. CHAIRMAN:**  Well, of course it was, it was I believe you have that map. In fact ---

**SENATOR SINGLETON:**  I'm asking the question to you Mr. Hillman, Mr. Dorman Walker, Mr. Pringle whether or not you all looked at that map and whether or not you all ever considered that to bring it before the committee, to be -- to look at us an official map for the state of Alabama.

**MR. HILLMAN:**  I'll speak for myself.

**SENATOR SINGLETON:**  Okay.

**MR. HILLMAN:**  And that -- that map had some serious flaws I thought compared with the other map, the one that you have before you now and as a result of those flaws, it was rejected.

**SENATOR SINGLETON:**  Yeah. Do you have a copy of your Congressional map over there? Is -- do we have copies of it like we did the house frame?

**MALE 1:**  You got it, I put I can tag it up on an evening.

**SENATOR SINGLETON:**  Well –

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**[OVERLAY]**

**MR. CHAIRMAN:**  In case anybody is wondering what we're doing we -- we have two Pringle Congressional One Maps here that we have provided an enlargement and I think we've got some small versions. But anyway, yes, sir.

**SENATOR SINGLETON:**  You know that scares me because it says Pringle Congressional One and I guess I don't want it to be like world has a map that Pringle whole is all that information that is here and you know because I do want to ask these questions, that's what scares me there.

**[01:05:02]**

And I guess when I want to go back to the question, you just answered the question about the legal women defense map based on that that you thought that there were flaws, when you said flaws, what kind of flaws were you speaking of? Are you talking about split counties, deviations, what kind of flaws are you -- are you basically speaking of?

**MR. CHAIRMAN:**  Are you ready?

**SENATOR SINGLETON:**  Sir?

**MR. CHAIRMAN:**  Are you ready? Among other things, we have a really severe violation of the guideline to not hit incumbents and this plan puts representative Rogers and representative – or I should say Congressman Rogers and Congressman Palmar have been placed in the same district.

**SENATOR SINGLETON:**  Okay.

**MR. CHAIRMAN:**  This is the issue this violates Section 2(j)(i), which says contest between incumbents will be avoided, whenever possible. So, excuse me just –

**MR. PRESIDENT:**  No, please go ahead.

**MR. CHAIRMAN:**  I'm getting [INDISCERNIBLE 01:06:24] to market. Now okay, senator, I'm back with you again. So right -- right off the bat this proposal, which came from -- this proposal that came from the League of Women Voters immediately violates the concept of taking two existing office holders and placing them in the same district.

**SENATOR SINGLETON:**  Is that a legal argument though or is that just a rule?

**MR. CHAIRMAN:**  Section 2(j)(i) –

**SENATOR SINGLETON:**  That's of our rules but is there a legal argument?

**MR. CHAIRMAN:**   It's the – it's part of our own -- it would be a violation of the guidelines that we adopted.

**SENATOR SINGLETON:**  Okay I got you.

**MR. CHAIRMAN:**  So we would be the – and you see the problem with that. That's, that's a problem. So Section 2 of the Voting Rights Act requires the legislature to draw majority black district when it can be done. Generally speaking and Reapportionment Committee's plan demonstrates that it is possible to do that. In the committee's plan, City 7 has a strong black voting-age population of BVAP of 54.22%.

**SENATOR SINGLETON:**  Would you admit that that district is gerrymandered, no in order to keep that population?

**MR. CHAIRMAN:**  No, gerrymandering, gerrymandering is in the eye of the beholder.

**SENATOR SINGLETON:**  No, gerrymandering is legal, it is, that doesn't had a hold. There is a definition, there is a legal concept for gerrymandering, it's not in the eyes of the beholder. It is a legal concept that has been ruled on by the court. It's just not in the eyes of the beholder.

**MR. CHAIRMAN:**  The League of Women Voters plan does not -- in fact, have a majority Black District. It has only two districts, 6 and 7, with a high BVAP compared to other districts. And therefore the League of Women Voters plan violates -- violates Section 2 of the Voting Rights Act. There is two -- two strikes against it right there, Senator but I could go on if you would like for me to.

**SENATOR SINGLETON:**  Yeah. Well, I think that once the – once you look at the whole County Provisions, the court has made different rulings based on whole counties that when you're looking at opportunity districts in terms of whether or not you are in violation of the Voters Right Act, I'm not going to get into the legal arguments about that. But I think that the court, I think that you will find that the court will be satisfactory that the Voters Rights Act would be satisfactory when you're looking at opportunity districts and based on whole county provisions, okay, and I think that that's one and I understand that maybe you got some direction from your attorney in that that was in violation of and at least you answered the question and I appreciate that. I have a couple more questions about -- about -- about this, this concept?

**[01:10:04]**

**MR. CHAIRMAN:**  Which concept?

**SENATOR SINGLETON:**  The whole map.

**MR. CHAIRMAN:**  Okay. Got it.

**SENATOR SINGLETON:**  Number one, do you know who really participated in the drawing of this map? Was it Mr. Randy Hillman who did this? Heineman I think that's his name.

**MR. CHAIRMAN:** Heinaman.

**SENATOR SINGLETON:** Hienaman. H-I-E-N-A-M-A-N Hienaman. Okay.

**MR. CHAIRMAN:** Hienaman, correct. Yes, he was the demographer, which he said, by the way, I thought that was the correct term for him, and he told me later that's not the correct term. I'm not sure what it is. Let's call him a map drawer.

**SENATOR SINGLETON:** Map drawer. So demographer is not the right term. I've been saying it all my time also.

**MR. CHAIRMAN:** Well, I just learned it, and I've been using it every day when I had a chance, but I found out. But anyway, the answer to your question is, yes. The map drawer drew the map.

**SENATOR SINGLETON:** Okay. Do you know how many sessions that they had with the United States Congresspeople on this map?

**MR. CHAIRMAN:** No, not a total. I'd say they had at least six because –

**SENATOR SINGLETON:** So they did them individually. And there was no -- because he's a session among them all.

**MR. CHAIRMAN:** I don't know. I think that is a correct statement that they didn't all get together at the same place and the same time.

**SENATOR SINGLETON:** I would assume that because this Pringle playing on the top of it, that Mr. Pringle was probably in the room when the drawing was done. Were you in that room when the drawing was done on the map?

**MR. CHAIRMAN:** I was not.

**SENATOR SINGLETON:** Okay. Do you know whether or not Mr. Walker was there?

**MR. CHAIRMAN:** Well, I wasn't there. So I'm just not sure about that. In fact, I think initially Mr. Hienaman went to DC to meet with the congressman or their representative. So I would kind of think that Mr. Walker probably did not accompany him, but I don't know the answer to that question.

**SENATOR SINGLETON:** Let me ask that question. Did we pay for his travel to go to DC to meet with Congresspeople to do this, something that he could possibly could have did over Zoom? Will we the state of Alabama have to pay for that? For his travel?

**MR. CHAIRMAN:** No. But we did pay him. And I don't know how that money. I don't know if it was a separate allocation.

**SENATOR SINGLETON:**  I'm just asking that because he said I didn't that before.

**MR. CHAIRMAN:**  I didn't. Yeah. He went up there. Well, they were in session, and he had to meet with them. That's why he went up there.

**SENATOR SINGLETON:**  Okay. The other question I have. I understood that there was a statement made by Mr. Pringle in the committee meeting that there was a consulting team or someone that you all consulted in the state of Georgia on the Voters Right Act in terms of whether or not these plans actually was meeting the statutory bounds of the Voters Right Act. Do you know who that person was in the state of Georgia that they met with?

**MR. CHAIRMAN:**  I've never met him. His first name is Trey, and I can't recall his last name. I never met him or talked to him but –

**SENATOR SINGLETON:**  But we can get that for Mr. Walker.

**MR. CHAIRMAN:**  Yeah, he would know him. Basically, any time it looked like there might be some racial issue in conflicts. Then he's an expert in that area, and he would do an analysis of that district. And, in fact, there were some instances where he advised us to make some changes to make it what we hope will be more acceptable to the courts.

**SENATOR SINGLETON:**  So Mr. Walker consulted a Georgia firm to talk about the Voters Right Act, whether or not. And that would really be particularly on one district, which was going to be seven because that was the only one that's considered. Would you agree that Congressional District seven really only makes up about 13 point some percent of the African American community when we're represented by 26%?

**MR. CHAIRMAN:**  Are you saying –

**SENATOR SINGLETON:**  Total population of state?

**MR. CHAIRMAN:**  Did one congressperson out of seven is 13% of the congressional delegation?

**SENATOR SINGLETON:**  No other total population of black folk in the state?

**MR. CHAIRMAN:**  Well, yes, I would say that's right. Because they have 1/7 of the population of Alabama.

**[01:15:01]**

An equal amount with every other district. And so I would say that if that's not right on that's pretty close.

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SENATOR SINGLETON:**  When you look at the state school board, when you do home counties, you can come up with two, two African American districts out of that, okay? And they basically use just about the same population that a US congressman uses, correct?

**MR. CHAIRMAN:**  Not correct. You have to divide the population of Alabama by eight.

**SENATOR SINGLETON:**  I understand. But the numbers are almost congruently the same around 600,000.

**MR. CHAIRMAN:**  They're in a ballpark there.

**SENATOR SINGLETON:**  Yeah. So when we do that, we can come up with two dividing by eight. But we can only come up with one dividing it by seven.

**MR. CHAIRMAN:**  There you go.

**SENATOR SINGLETON:**  Okay. So that puzzles me, because if you can get two out of the eight, you could have gotten two out of the seven. And I think that that was not an attempt. I know, not by the committee, because we as a committee only met one time, to be able to approve map versus having any input as a committee member, I go on the record to say that. And secondly, when you look at that map, it is really one of the most gerrymandered maps, probably in the United States right now. And I think that the courts even looked at data at in the last real portion and talked about –

**MR. CHAIRMAN:**  Which map are you talking about?

**SENATOR SINGLETON:**  This salamander that you run around just to pick up black folk all over the places. That's what I'm talking about your map.

**MR. CHAIRMAN:**  Right. And as I stated earlier, we do have an obligation. If we can draw a majority minority district, we're obligated to do so that's the result.

**SENATOR SINGLETON:**  What we're going to do here in a minute. I'm not going to prolong this. This is your map. What we're going to do. I'm going to let Senator Smitham come on. And I think he's going to want to put a substitute on the table. We're going to show you where whole counties could have been drawn and where we could get two opportunity districts that doesn't violate the Voters Right Act, but still given opportunity for African Americans to be represented in Congress equally to the proportion of the population that we are in the state. And so Senator Smitham will come along now. And I guess when you started looking at whether they pitted folks or the deviations, and I have two other maps that are going to come back and show you down to a .7 deviation and also to a 0. deviation, still using whole counties with less splits and being able to show you how we can achieve this outside of just what you all did with this one district, and I know the body may not adopt it. All we ask for is up and down vote at the time that this up or down vote is needed. Thank you, Mr. Chairman. I really appreciate the work that you're doing. I'm basically about finished with the questions that I wanted to ask. And I'm going to allow Senator Smitham to come to offer his substitute at this time. Thank you.

**ALBRITTON:**  Thanks, Senator Singleton.

**SENATOR SINGLETON:**  Right.

**ALBRITTON:**  All right, Senator Smithman.

**SMITHMAN:**  Thank you, Mr. President. And thank you, Senator McClendon, for allowing me to come before the body to have a brief discussion regarding an alternative plan for consideration and explaining this particular plan to each and every person that's here with us.

**[BACKGROUND CONVERSATION]**

**ALBRITTON:**  What's the question?

**[BACKGROUND CONVERSATION]**

**MR. CHAIRMAN:**  Is that you over there, Senator?

**[BACKGROUND CONVERSATION]**

**ALBRITTON:**  All right, Senator Smithman.

**SMITHMAN:**  Thank you, Mr. President. First before at present the substitute and then out given the opportunity, I'll explain it, and then we'll move from that point.

**[01:20:07]**

We have -- let me see -- where is he?  Let me see, wait a minute.

**[BACKGROUND CONVERSATION]**

**SMITHERMAN:**  What I've done, I have put the plan that came out of the committee. This is the plan that we present to you initially when the Chair would gather up and welcome you before you. This is the map. This is the map in how that plan looks irregards to is make up, the counties that it takes into consideration, the counties that it goes up into and how it looks in terms of what you're asked to vote on. This particular plan is -- you can tell very obvious that it's [PH 01:21:21] Jared Manning and writing here in that is going up in the Jefferson County, but it's limited purpose to grab a whole to African-Americans, and really this is a big bulk of the population here. And yet you communities of interest, you turn around in this one, and this one has about 24% of African-Americans and you have Macon County right here and they don't bit more have a community of interest with people up here than the man in the Moon. And yet, they are place it over here in this particular area. This is the same concerns that I just mentioned about in that [INDISCERNIBLE 01:22:13] where you're a man then going back up in to a county. We all heard me up here talking about that Jefferson County is one of the most used counties to satisfy. We'll split it up so many different ways that the system that would prefer that that county

19

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

stayed whole. They've been asking, many are asking have to be whole. Not all of them -- I want to say that not all of them, but they are many of them who said that even if under a scenario [INDISCERNIBLE 01:22:57] that you're looking at coming up in here that day then make them all of just of this, but they want to be whole. Now, that's not the feeling of everybody because we have another plan. I'm just [INDISCERNIBLE 01:23:12] that it's going to come to this, this will move some people from one or the other because some of them want to stay they are, but vast majority of people I talked to, they [INDISCERNIBLE 01:23:23]. That can be done and that can be done on the plan that I'm going to talk to you all in regards to about. So, at this time Mr. Chairman, so that I can get on this plan, I want to offer the substitute so we can have conversation regarding it and it's comparison to the other plan. Mr. Chairman, [INDISCERNIBLE 01:24:00].

**MR. CHAIRMAN:**  [INDISCERNIBLE 01:24:03], you may want to pull your mic back around.

**SMITHERMAN:**  Thank you very much. Thank you. You know, you a good coach, I see why your sons and your kids are winning this ball game.

**MR. CHAIRMAN:**  I had this game and watched you.

**SMITHERMAN:**  You can. [INDISCERNIBLE 01:24:22] tomorrow night. Playing my first ball game of the season a bit.

**MR. CHAIRMAN:**  What time?

**SMITHERMAN:**  At 6:30.

**MR. CHAIRMAN:**  Okay. I'm going to come and watch you.

**SMITHERMAN:**  An then in Friday night, we come back again and play against Guntersville in the [INDISCERNIBLE 01:24:38] playoffs, so I'm hoping you to allowed me to [INDISCERNIBLE 01:24:40] as well.

**MR. CHAIRMAN:**  Good deal.

**SMITHERMAN:**  Mr. [PH 01:24:43] Brosman, I'd like to offer the substitute for consideration.

**MR. CHAIRMAN:**  All right Senator [INDISCERNIBLE 01:24:48] received the substitute.

**SMITHERMAN:**  And as to speak on it but --

**MR. CHAIRMAN:**  Substitute for House Bill No. 1 by Senator Smitherman.

**[01:25:00]**

**SMITHERMAN:**  Is it okay for them to read what that says on that?

**MR. CHAIRMAN:**  Yeah. Could you all I read the substrate please.

**MALE 1:**  Substitute for House Bill 1 by Senator Smitherman. To repeal and reenact Section 17-14-70, Code of Alabama 1975. You want just the title read?

**SMITHERMAN:**  No, I really wanted them to know what was in it, but I mean if it's some problem, it's not to be dilatory, it's to be informative. But if for some reason that it caused a problem --

**MR. CHAIRMAN:**  We're good. Will have him read it.

**SMITHERMAN:**  Okay.

**MALE 1:**  Substitute for House Bill 1 by Senator Smitherman. To repeal and reenact Section 17-14-70, Code of Alabama 1975 to provide for the reapportionment and redistricting of the states. United States congressional districts based on the 2020 federal census be enacted by the Legislature of Alabama. Section 2 Section 17-14-70, Code of Alabama 1975 relating to the existing congressional districts is repealed. Section 2 Section 17-14-70 is added to the Code of Alabama 1975 to read as follows:  Section 17-40-70, (a) The State of Alabama is divided into seven congressional districts as provided in subsection (b). (b) The numbers and boundaries of the districts are designated and established by the map prepared by the Permanent Legislative Committee on reapportionment and identified and labeled as Singleton Congressional Plan 1, including the corresponding boundary description provided by the census tracts, blocks and counties and are incorporated by reference as part of this section. (c) The legislature shall post for viewing on its public website the map referenced in subsection (b), including the corresponding boundary description provided by the census tracts, blocks and counties and any alternative map including the corresponding boundary description provided by the census track, blocks and counties introduced by any member of the legislature during the legislative session in which this section is added or amended. (d) Upon enactment of this act, adding the section and adapting the map identified in subsection (b), the clerk of the House of Representatives or the secretary of the Senate as appropriate shall transmit the map and the corresponding boundary description provided by the census tracts, blocks and counties identified in subsection (b) for certification and posting on the public website of the Secretary of State. (e) The boundary descriptions provided by the certified map reference in subsection (b) shall prevail over the boundary descriptions provided by the census tracts, blocks and counties generated for the map. Section 3, the provisions of this act are severable. If any part of this act is declared invalid or unconstitutional, that declaration shall not affect the part which remains. Section 4, this act shall become effective immediately upon its passage and approval by the governor or upon its otherwise, becoming a law.

**MR. CHAIRMAN:**  Thank you Mr. Secretary. Mr. Smitherman?

**SMITHERMAN:**  [INDISCERNIBLE 01:28:05] be recognized to speak to the substitute.

**MR. CHAIRMAN:**  Yeah, you're recognized.

**SMITHERMAN:**  All right. Thank you very much. Now, I want to talk a little bit about the comparison of the maps and then I'll go to the maps [INDISCERNIBLE 01:28:25] give a visual. Then I was shipped back to you for any comments, anything that you would like to do. Okay Mr. Chairman?

**MR. CHAIRMAN**:  I'm with you.

**SMITHERMAN:**  Okay. I want everyone to look at the current Alabama congressional map. Well basically not the current, but look at that map and as because I call it current, but that's the map of [PH 01:28:50] fools. As you heard the senator in his presentation, it is looks like a salamander. This type of weird shape is part of where the words gerrymanding comes from. The Seventh District has a long arm reaching from Tuscaloosa into Birmingham, dropping down beyond [INDISCERNIBLE 01:29:13], and a finger reaching back to Montgomery. In other words, it's ugly. This weird shape gerrymandered districts, split seven Alabama counties and even divide Montgomery among three congressional districts. The undisputed purpose of these weird shape is race. District 7 not only had sufficient minorities to have a minority representative from Alabama intended to comply with the Voting Rights Act, but also packed as many minorities as possible into District 7 we can in minority voting influence throughout the state. The U.S. Supreme Court has made clear that under the U.S. constitution, any racial gerrymandering must be based on a compelling state interest and will be strictly scrutinized by the courts.

**[01:30:08]**

If any fairly drawn alternative exists for minority presentation, courts are highly likely to reject such gerrymandering districts based on race. District lines also must meet another constitutional principle. One person, one vote. In other words, district populations must come as close as practical ability to the same number of people. The current Alabama Congressional map is a modification of a racial gerrymandering first drawn in 19 92. It was adjusted only to meet one person, one vote every decade since then. And if this history is allowed to repeat itself, the congressional map drone with the 2020 C data will have the same ratio of gerrymandering. Now I want to point out about the new map. The whole County map. Look at the proposed Alabama Whole County map. I want you all to look at it. It uses county lines and only county lines for all seven congressional districts. Instead of district boundaries based on racial gerrymandering. The U.S. Supreme Court has said traditional boundaries should be used. Traditional boundaries are usually county, municipal or similar boundaries. We could also be rivers, highways, or whatever else has traditionally been used instead of racial gerrymandering. In Alabama, the traditional boundaries for congressional districts were county lines only. Before the Supreme Court announced that one person, one vote ruled in 1964, Alabama split no counties. From 1964 to 1880, Alabama split only Jefferson County because his population was too large for a single district. In 1981, Alabama split only Jefferson and St. Clair Counties. Since 1992, Alabama has split seven counties to racially gerrymandering Districts. When joining Alabama congressional districts, the issue of Voting Rights Act compliance remains. As to the Voting Rights Act compliance, the proposed Alabama whole County map and that's this map right here makes it easy for citizens to know which congressional district they live in and creates two districts, six and seven that provide black citizens an equal opportunity to elect candidates of their choice. The

U.S. Supreme Court has said that one person, one vote principal can be more flexible when using traditional boundaries. The proposed Alabama whole County map has a maximum population deviation of only 2.46. For Alabama, it has the lowest possible population deviation based on whole county districts. It eliminates the racial gerrymandering, and it better complies with the Voting Rights Act. For Alabama congressional districts, the whole county map is the best possible map. Now, I want to share that with each person and then I want to walk you through it again. This district here is district seven. It has a majority or minority population. This district keeping Jefferson County whole and connected to these two counties here provides a swing district. This district is right at about 42% African-American and 58% non-African-American. But this district basically reflects this general area of the state of these counties and of the population. This is a golden opportunity for us to be in compliance. Number one to eliminate gerrymandering. Number two, to be in compliance with the Section 199 of the Constitution, which require us to consider and provide whole counties in drawing our districts so that the citizens once again can have an opportunity to be represented.

[01:35:04]

**SMITHERMAN:**  And you keep intact as well. communities of interest. Mr. Chairman, I will shift back to you at this moment.

**MR. CHAIRMAN:**  Thank you, Senator. I appreciate that.

**MR. PRESIDENT:**  Senator Smitherman, you have the mic.

**SMITHERMAN:**  If you have any questions or comments or anything like that, I would.

**MR. PRESIDENT:**  Okay.

**MR. CHAIRMAN:**  All right. I will point out with this particular map from the legal women voters. There are really big problems here. Really big problems. You put two incumbents. It violates our rules. You eliminate a majority, minority district that violates the Voting Rights Act. And with that and I will make one correction. I believe you stated that the proposed map, the Pringle map splits Montgomery County three ways. It is currently split three ways. The new map that I have proposed splits it in two different. And with that, Mr. President, I moved to table.

**MR. PRESIDENT:**  All right. All those in favor say.

[OVERLAY]

**MR. PRESIDENT:**  The motion is non-debatable.

**MR. CHAIRMAN:**  Mr. President, I said I year for any question or comment. I didn't hear for any motion. I was specific. I think I was.

**MR. PRESIDENT:**  The Motion's up, so you can kill it. What do you want? No, you can't speak to the table of motion. There're three hands up. So, you all want to roll call vote?

**MR. CHAIRMAN:**  Yes, that's fine. And then I like to be recognized afterwards.

**MR. PRESIDENT:**  Sir. Terry. All right. Call the role.

**MR. PRESIDENT:**  Mr. Albritton?

**MR. ALBRITTON:**  Yes.

**MR. PRESIDENT:**  Mr. Allen. Mr. Barfoot. Mr. Beasley, Mr. Butler.

**MR. BUTLER:**  Alright.

**MR. PRESIDENT:**  Mr. Chambless. Mr. Chestein. Ms. Coleman Madison.

**MS. COLEMAN MADISON:**  Yeah.

**MR. PRESIDENT:**  Ms. Dunn. Mr. Elliot.

**MR. ELLIOT:**  Alright.

**MR. PRESIDENT:**  Ms. Figurs.

**MS. FIGURS:**  No.

**MR. PRESIDENT:**  Mr. Givanne.

**MR. GIVANNE:**  Not.

**MR. PRESIDENT:**  Mr. Gujar. Mr. Hatcher. Mr. Holly.

**MR. HOLLY:**  Alright.

**MR. PRESIDENT:**  Mr. Jones. Mr. Livingston. Mr. Marsh. Mr. McClendon.

**MR. MCCLENDON:**  Hi.

**MR. PRESIDENT:**  Mr. Milson. Mr. Oer. Mr. Price. Mr. Reed. Mr. Roberts. Ms. Sanders 48.

**MS. SANDERS 48:**  Hey.

**MR. PRESIDENT:**  Mr. Schofield. Mr. Sessions. Mr. Shellnut. Mr. Singleton.

**MR. SINGLETON:**  No.

**MR. PRESIDENT:**  Mr. Smitherman.

**MR. SMITHERMAN:** No.

**MR. PRESIDENT:** Mr. Stuttz Mr. Wagner. Ms. Weaver. Mr. Watley. Mr. Williams.

**MR. WILLIAMS:** Not.

**MR. PRESIDENT:** Twenty-three us, seven nays. The table in motion passes.

**MALE 1:** Mr. President, can I be recognized?

**MR. PRESIDENT:** You're recognized. Yes.

**MALE 1:** I didn't use at that moment for that purpose. I actually went through talking. I know the vote. Let me just finish. It's not about what the vote would have been. It's about the process to get to that ultimate vote. Now, I don't fault the desk at all because the motion they all right. The motion was made by you to do that, and it's non-debatable. I want them to understand that. But the proper thing for you to do, based on when you saw that I came up and said that because of the way that we are conducting ourselves in this process, which is really not adversarial about the issues, would be to withdraw your motion so that I could finish. And then when I made might give me the opportunity to make my motion. Then you come in with your table in motion, and we still would have voted, and it would have been down.

[01:40:11]

**MALE 1:** Okay. That's the second time that whatever reason that we've had these close scrimmages. Yesterday, when we came back, I heard no bail or nothing about one exact time that we supposed to be here. And some of you all didn't either, because you was running down the hall with me. So, I know that, now I'm up here and you kind of pull the trigger real fast, and that was necessary. That's not necessary because you're going to be up here for the rest of these that we're going through, that ain't necessary. You don't have to do that. That's why I gave a mic back to you. I wasn't trying to shield the mic from you doing something like that. You saw how this okay is back to you. I thought you might ask something you want to say. You did. You made some comments, and I thought I was clear. I said for the comments or whatever, because you still going to get your shot to bring your motion to table it. But as we go forward, please, because let me say this, we are in a scrimmages about this. But we're in a war about downstairs. Am I right? Okay. So that's all I'm saying. Don't make this a war up here. We didn't come trying to fight no war. You know, if we were, we will be fighting it. So, you know that. So that ain't a confusion. You know what, I'm being honest. So, all I was saying was just that, please, as we go forward, don't pull the trigger like that. That's all I'm asking you. There's a request.

**SMITHERMAN:** Let me respond.

**MALE 1:** Okay.

**SMITHERMAN:**  my clear intention is clear. Make sure I understand what your intentions are. I have a problem with you having your turn and more at the mic and expressing yourself.

**MALE 1:**  And I know you don't.

**SMITHERMAN:**  I have no problem with that.

**MALE 1:**  I believe that.

**SMITHERMAN:**  I think, in fact, that it's important that it'd be done. So, let's just make sure as we go through this process today and there's going to be more that we're real clear with each other what our intentions are.

**MALE 1:**  Okay.

**SMITHERMAN:**  And you all have been, I think, very cooperative in this process and very civil. And it is my intent to try to return that favor equally, if not more so. But I appreciate your comments, and I'll take them to heart.

**MALE 1:**  Thank you very much. And I appreciate you, too, as well as saying that anyone else come up understand that we will be crystal clear. Okay. We're going to be crystal clear. We're going to respond to what you asked us to do. We're going to be crystal clear. And then I think by being that way, with you being focused on the concern that we may not have to even address anything like that again. Thank you, Senator.

**SMITHERMAN:**  Yes, sir.

**MALE 1:**  I appreciate the body allowing me to present the plan to show you the advantages of it. And at this time, I'll yield to Mr. Chairman [INDISCERNIBLE 01:43:35].

**MR. PRESIDENT:**  Yeah. You got the mic. You can yield who you all right.

**MALE 1:**  I'll yield Senator Singleton.

**MR. PRESIDENT:**  Alright Senator Singleton.

**SENATOR SINGLETON:**  Yes, Mr. President. I think the protein wants to come. And I think at this time, the protein wants to do a recess at this particular time, and then we'll come back because I have a substitute that I want to offer. And he wanted to break at, like, 11:30. I know 10 minutes won't do me. So, it'll be a good time to go on to do that recess now and then come back if we're going to do a time, Sir, North to call at a chair, see what we're going to do. And then we'll start back up with real push again.

**MR. PRESIDENT:**  Thank you, Senator.

**MALE 2:**  Mr. President.

**MR. PRESIDENT:**  [INDISCERNIBLE 01:44:15]

**MALE 2:**  Yes, sir. We've had good debate this morning. I appreciate those that have already been engaged, a lot of good information being shared. Thank the chairman again for his constant diligence on listening to everybody and moving through this process. So, I will go ahead and have us in recess. I'm just trying to debate if we come back for, let's say 1:15 back time at 1:15.

**MR. PRESIDENT:**  All right. You all heard the motion. All right, all those in favor say Aye.

**ALL:**  Aye.

**MR. PRESIDENT:**  Any opposed, we send in recess.

**MALE 2:**  Thank you, Mr. President.

**[01:45:20]**

**CHAIRMAN MCCLENDON:**  Senator Singleton, are you up here to brag on House Bill 1 and talk about what a good bill it is, or did you have something else in mind?

**SENATOR SINGLETON:**  I am here to brag on House Bill 1 and just how bad a bill it is.

**CHAIRMAN MCCLENDON:**  Senator!

**SENATOR SINGLETON:**  But you know, I give you credit for doing what you thought was best, but I think that we could have done better and Mr. President, at a proper time, I'm going to be introducing a substitute, okay and I just want to buy, now I have two substitutes, and I'm not here to talk long on them, because they are basically off the same substitute that Senator Smitherman had. The substitute that Senator Smitherman had was based on a 2.64% deviation, and we know when we draw congressional districts that they wanted to be at basically a 0% deviation. And what -- what I'm going to prove here today is that we have two other maps that can lower those deviations to a 0.7% deviation and to a 0% deviation still utilizing less splits and Mr. McClendon, Mr. Chairman I just want you to know that I heard that your reason for not accepting Senator Smitherman's map plan number one. I just want you to know in 2019, the state of Alabama itself conceded in the current District 7 map was unconstitutional. The state of Alabama at the Supreme Court concluded and they conceded that the District 7 map was unconstitutional because of the way it was drawn. Okay? The defendant does not believe that the law will permit Alabama to draw that District today. I don't believe we can draw it today and if we drew it today, then it would be unconstitutional. And you look at a case called Chestnut v. Merrill, John Merrill, the Reapportionment Committee in 2021 Congressional player perpetuates the current ratio gerrymandering district. It continues that same old map that leaps around, stick a finger up in Birmingham, more of an elbow now because you got rid of the finger, and you put a little elbow up in the Birmingham now and you go in there and then you are coming back across the Black belt. And so with a lot of unnecessary splits there. To justify the ratio gerrymandered district, to reach a 50% Black voting-age population, a state must have a strong basis in evidence

that the Voter Right Bill has been -- requires -- that requires it. Here our congressional district plan does not violate the Voting Rights Act just because it does not have a district with a Black voting-age population of 50%. Your claim is that the reason you all drew the map was based on the fact that there was, you had to reach at least a 50% majority-Black age population and we're continuing that the court says that that does not happen. A congressional district redistricting plan does not violate the Voting Right Act just because it does not have a district with a Black voting-age population majority of 50%. The case in point is Cooper v. Harris in North Carolina. You've mentioned this North Carolina case earlier. North Carolina contended that to avoid a voting age -- the Voting Right Act violation, it had to increase to over 50% of Black voting-age population in the district where 48% and 43% Black voting-age population was. The Supreme Court rejected that argument and held that 50% Black voting-age population was unconstitutional race gerrymandering and because this was enough white -- that was enough white crossover votes in the 48% of the 43% Black voting-age population district to provide Black voters an equal opportunity to elect candidates of their choice and that's what we're doing here is providing opportunity district. The whole county plan eliminates the Alabama congressional ratio gerrymander district and keeps the county whole and that's where Senator Smitherman introduced here today and the two maps that I have here today is slight variations of Senator Smitherman and therefore, my presentations won't be very long, okay.

**[00:04:56]**

Therefore, what I'm here to say today is to you Senator is that the committee what we adopted based on Congressional District 7 is unconstitutional. Maintaining the ratio gerrymandering of District 7 cannot be jusitfied by claiming it was necessary to draw new district with zero population deviation. Like I said, the first map that that Senator Smitherman brought up was a 2.64 deviation. I have two maps up here and the one I'm dealing with now, I'm going to be dealing with Plan #2 that basically have a .7% deviation and when you look at Plan #3, it still holds whole counties and show a 0% deviation. Hold on a second.

**[OVERLAY]**

**SENATOR SINGLETON:**  This is what I am saying. Okay one at a time because I mean introduce two different bills, okay, and what I would like to do right now, Mr. President, is to introduce the Singleton's Plan #2, can I have a pen to sign this, please. All right.

**MR. PRESIDENT:**  Substitute? All right, Secretary [INDISCERNIBLE 00:06:33] received the substitute.

**SECRETARY:**  Substitute for House Bill 1 Singleton's Congressional Plan #2 by Senator Singleton.

**SENATOR SINGLETON:**  Thank you.

**MR. PRESIDENT:**  All right Senator Singleton.

**SECRETARY:**  2 is --

**SENATOR SINGLETON:**  I think everybody like my coloring you know, as a little boy, you know when you're in grade school, they tell you the color within your lines, so we didn't go all over the place, that's why you don't see a lot of splits, that's why they like it because we color within the lines which makes whole counties, okay. So we kept counties whole so therefore, that's why they're all attracted to this map. Okay, they want to see it and it kept communities of interest together. We were able to keep to meet the voters right of violations to where it's not unconstitutional with the voters right because we're already said to you that, we don't have to have a 50% deviation when we are 50% of voting age population, when we're dealing with whole counties. If the drafters contend as you are, that the 2.47% that Senator Smitherman introduced is too high of a deviation. The whole county plan that's modified to drop the maximum deviation below a 0.79%, which is my Plan 2 that I'm presenting today, which was approved by the Supreme Court in Tennant v. Jefferson County, West Virginia with only splitting three counties, and that's what we are achieving here today. And we want to be able to show that that is a modification of and we want to be able to show that it was reasonable and it could be done and it does not violate the Voters Right Act and we still can draw two opportunity districts that will allow African-Americans and/or democrats to be elected to a congressional seat that is proportional to the population here at the state of Alabama. And so Mr. President, that's basically all I have to say about my substitute. I'm willing to give it an up or down vote at this time on this one, unless he has something he wants to refute to what I said.

**MR. PRESIDENT:**  Go have the mic.

**MALE 1:**  Oh Senator Singleton, you got the mic, do you want to yield the mic to him?

**SENATOR SINGLETON:**  Well I know you got to -- you got to vote to table it. I just want to up or down vote if you would, just let it be up down is the same as your table in motion and now there is no debate with it anyway, it's the same thing.

**MR. PRESIDENT:**  Yeah, my preference is to table and -- and the reason for that preference Senator is I'd like to be consistent on how I handle these other documents that come through. So --

**SENATOR SINGLETON:**  If you're going to do a table, if you're going to do a table in motion on me at this particular time, then I don't need and it's okay, because at the same thing it really doesn't matter, whether it's a table in motion or whether it's a motions for me to be able to allow up or down vote. It's still an up or down vote on your table in motion. But let me just talk about a little bit more before you table it, okay.

**MR. PRESIDENT:**  Sure.

**SENATOR SINGLETON:**  And I won't be very long.

**MR. PRESIDENT:**  You go right ahead.

**[00:09:58]**

**SENATOR SINGLETON:**  All right. So what I hear to say is that, you know, that, if you modify, we can show that our splits are less than what you have in your map. We can show the opportunity districts are there and that you don't have to draw based on any digression or anything that you don't have to draw a Black majority district to the extent that you all did in your map in terms of gerrymandering it. You don't have to do that. And that is the overall goal here today is to show you where there could be a different plan and that the consideration was not made by this -- by the body in terms of the permanent joint commission, a committee on reapportionment. I know as a member we never considered any other map besides what you did. I think that what you have said here today, if I'm correct that based on putting in commerce together number one, and based on the fact of the other deviation, number two, is the reason why you all didn't consider it. Because you thought it would violate the rules that have been set forth by the committee. I say again, that this does not violate the committee rules. Number one, we had it in before 10 days. Number two, it gives an opportunity district. You know, while we trying to protect incumbents, then the other part of the three is that none of us as the members of this committee was contacted by congressional districts prior to your drawing congressional districts, and we seeing them for the first time when we saw them last week. So at this time -- I'm sorry.

**[BACKGROUND CONVERSATION]**

**SENATOR SINGLETON:**  Yes, and when you look at it on the congressional district, you know, I don't know -- could you tell me whether or not congressional members have a permanent residence to where they have to run from? Do they have to say that I live in this particular district just to run from it? Or do I have to live over in this area to be able to run from it? Is that something on the congressional level that has to happen as we do on the Senate school board in the house member level?

**MR. PRESIDENT:**  You know, I think that they don't have that same requirement that we do.

**SENATOR SINGLETON:**  Well, if they don't have that same requirement, then that refutes the argument of do we put in two people against each other. So therefore the argument that you make whether or not we put two incumbents against each other in the same district is null and void based on your answer. They don't have to be from the same. They don't have to run from the area that they're living in. It refutes your answer. So therefore what you all based you're not dealing with this, this without plan was because of the flaws that you said it had was based on the fact that it put two incumbents together is null and void. Two incumbents being together does not matter here in the State of Alabama on the congressional district. So therefore that was another void issue that you considered before you even looked at displaying. And I'm here to say to you today, that the plan that Senator Smitherman introduced earlier that you did a tabling motion on had been in the bosom of the reapportionment committee well before the 10 days that was required by the rules and therefore under the rules you only consider it based on the fact that they fitted two incumbents together and you thought that maybe the deviations were off. And I think that those are two basic reasoning that does not hold constitutional muster. They don't hold constitutional muster because your answer to my question at the end of the day, they don't have to live in the area by which they run and when you look at it, when you provided a whole county in the court has basically said when there is a whole kind of provision that's being provided that

the voting age population of 50% or above does not matter and it does not violate the Voter's Right Act. And all we are saying that these are two opportunity district. I'm not trying to say that they are minority-majority districts. No, they're not. I appreciate you want to make sure that they're at least was one minority-majority district. But what we're saying here is that we believe and we feel that we can have more representation in Washington based on the maps that we have and that this committee and this body did not make any consideration to that prior to bringing the solution to bringing the map before the permanent committee and before this body.

[00:15:17]

And so, we think that hopefully that this body would look at this and I would offer them to vote yes, on this particular map. Not yes, on your tabling motion, but yes, on this particular map to be able to say what is fair in the State of Alabama. What is fair, not just what is convenient. Because what you did was, you took what was already said again, in 2019 by the State's Attorneys that they believe that the Congressional District 7th was gerrymandered, okay? And the court agreed with them that it was a gerrymandered district even though that is she wasn't before them at that particular time but it was a gerrymandered district. And in other cases across the state, Chestnut v. Merrill basically said that also. So what we want to say is that let's get it right in 2021. We didn't have it right at '19. We didn't have it right in '12. Let's get it right in 2021 and adopt the map that we have before you. If you don't like Senator Smitherman where he has a 2.64 deviation, I have two other maps sitting up here. One has a 0.079% deviation and the other one which is plan 3 that I will introduce next has a 0% deviation with less splits and splits that are unnecessary, that this body could adopt today and call it fairness in the State of Alabama. And call it fairness in the State of Alabama. So I think that we didn't look close enough. We were doing what was expedient because all we did was took that finger that was up in Jefferson County and split Jefferson and put an elbow in it. Widen it out a little bit, picked up some populations, ran over the Black cost of Black belt, went to Montgomery, split Montgomery up to three ways and ran across the Black belt to say because you didn't move away from what was already there. And we already know that that was a gerrymandered district. And so, all we're asking today, and I ask you as a chairman, let's give this some consideration and allow this map to be what needs to be correct. We could do this without going to court and letting the court do it if we go on an adopted today. The State of Alabama will save a whole lot of money, whole lot of money, whole lot of money, you know, from because the Attorney General is not going to argue with himself. He's going to hire an outside firm to do it which we're going to have to pay. Okay? We will have to pay to defend it. Then you have to pay -- if we win, you got to pay our attorneys. From winning it. State of Alabama, will be on a whole lot of money when we could just go on and sell it right here, right now. Then be through with it and everybody would be happy. Governor signs it, we go on a run on it. Everybody be good. You know, the people in Washington, they won't get a vote here. But we gave them consideration to look at it, but they don't get a vote. You and I have that vote here today. You and I have that vote. That's why they give it to the states. If congress were to draw them, we probably wouldn't even have a district up there. But here in the State of Alabama, all I'm saying is that the one district that you did does not represent the full population of African-Americans in this state, school board it does, the Senate, it does. The House of Representative, it does also but at the end of the day, the Congress is the only body that does not represent the 26% of the population of African-American and/or the 30% of the minorities whether they're African-American, Asian, Hispanic, or whatever they

are in this state, Native Americans in this state that are minorities, ethnic minorities, that population is not represented under that one congressional district. And I would say that if we are about fairness and not just doing what is expedient and what we think we can get away with legally because what you're going to find is that you haven't won a Supreme Court case in a long time. We won them all. We even won in 2012. It just affected the way the court reverted it back to the states that you ended up drawing the way you did, you didn't win then, we won.

[00:20:01]

And we'll probably win again so, you're going to continue to pay attorneys whom we can go on and adapt these maps and let that be. We're not pitting people together. They may not like it but we're not pitting them together. They're going to run on whether they want to run from in the congressional district. What we are doing now is that if you don't like the 2.64%, if you think that does not meet the constitutional muster, then I'm okay with that. But I have two other maps going to get down to a 0.79% and the other one, plan 3 that I'm going to introduce in a minute goes to 0%, okay? Zero percent which meets all the criterias. All right? So, Mr. President, I'm not going to be labeled this unless one of my colleagues has something to say about this map but I'm not going to be labeled anymore. If you want to run a table motion to go on and do what you need to do to vote it down but I will suggest to this body let's do the right thing and let's do right before the State of Alabama and the minority population here in the State of Alabama, let's do the right thing. And I'll turn it over to you for your motions or anything else that you have at this point in time. I'm good with that.

**MR. PRESIDENT:**  All right. Senator McClendon, you're recognized.

**CHAIRMAN MCCLENDON:**  Thank you Senator Singleton for your comments. Mr. President, I move the table and I believe this is Singleton No. 2. Singleton No. 2 would be correct.

**SENATOR SINGLETON:**  It will be Singleton No. 1. It will be legal women voting number two but it's Singleton No.1.

**MR. PRESIDENT:**  You all want a roll call?

**SENATOR SINGLETON:**  A roll call vote, yes please. Let's sustain it with roll call, yes.

**MR. PRESIDENT:**  Yeah, all right. Secretary, call the roll on the table in motion.

**SECRETARY:**  Mr. Albritton?

**SENATOR ALBRITTON:**  Aye.

**SECRETARY:**  Mr. Allen? Mr. Barfoot?

**SENATOR BARFOOT:**  Aye.

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SECRETARY:**  Mr. Beasley?

**SENATOR BEASLEY:**  I'll oblige.

**SECRETARY:**  Mr. Butler?

**SENATOR BUTLER:**  Aye.

**SECRETARY:**  Mr. Chambliss? Mr. Chesteen?

**SENATOR CHESTEEN:**  Aye.

**SECRETARY:**  Ms. Coleman-Madison?

**SENATOR COLEMAN-MADISON:**  No.

**SECRETARY:**  Ms. Dunn? Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:**  No.

**SECRETARY:**  Mr. Givan?

**SENATOR GIVAN:**  Aye.

**SECRETARY:**  Mr. Gudger?

**SENATOR GUDGER:**  Aye.

**SECRETARY:**  Mr. Hatcher?

**SENATOR HATCHER:**  No.

**SECRETARY:**  Mr. Holley?

**SENATOR HOLLEY:**  Aye.

**SECRETARY:**  Mr. Jones?

**SENATOR JONES:**  Aye.

**SECRETARY:**  Mr. Livingston?

**SENATOR LIVINGSTON:**  Aye.

**SECRETARY:**  Mr. Marsh? Mr. McClendon?

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**CHAIRMAN MCCLENDON:**  Aye.

**SECRETARY:**  Mr. Melson?

**SENATOR MELSON:**  Aye.

**SECRETARY:**  Mr. Orr?

**SENATOR ORR:**  No.

**SECRETARY:**  Mr. Price?

**SENATOR PRICE:**  You've got it proxy.

**SECRETARY:**  Mr. Reed? Mr. Roberts? Ms. Sanders-Fortier?

**SENATOR SANDERS-FORTIER:**  No.

**SECRETARY:**  Mr. Scofield?

**SENATOR SCOFIELD:**  Aye.

**SECRETARY:**  Mr. Sessions.

**SENATOR SESSIONS:**  Aye.

**SECRETARY:**  Mr. Shelnutt? Mr. Singleton?

**SENATOR SINGLETON:**  No.

**SECRETARY:**  Mr. Smitherman.

**SENATOR SMITTHERMAN:**  No.

**SECRETARY:**  Mr. Stutts? Mr. Waggoner? Ms. Weaver?

**SENATOR WEAVER:**  Aye.

**SECRETARY:**  Mr. Whatley?

**SENATOR WHATLEY:**  Aye.

**SECRETARY:**  Mr. Williams?

**SENATOR WILLIAMS:**  Aye.

**SECRETARY:**  Twenty-two ayes, seven nos. The table in motion passes.

**CHAIRMAN MCCLENDON:**  Mr. President, I'll be glad to yield the mic to --.

**MR. PRESIDENT:**  All right, Senator Singleton.

**SENATOR SINGLETON:**  Yes, Mr. President. I would like to introduce Singleton 2 which will be my number three plan.

**MR. PRESIDENT:**  All right. Secretary, read and receive the sub sheet.

**SECRETARY:**  Substitute for House Bill 1 by Senator Singleton.

**MR. PRESIDENT:**  All right, Senator Singleton?

**SENATOR SINGLETON:**  Mr. President, I won't belay with this body a long time with this. My argument is basically the same. This map is just dealing with a 0% deviation based on whole counties. It only has a small split in Jefferson County and you have a couple of splits that may be down in the southern part of the region but Jefferson County only takes out about 3,500 people out of Jefferson County totally.

[00:25:03]

And you keep communities with interest together, if you look across the map, across the top of the map, the northern end, it maintains those communities of interest. I think there may be a split. It just had little split there, a little split, yeah on Coosa County. Coosa, Crenshaw and Jefferson and St. Clair which gives us maybe about six splits I think in this whole map. Yes, give us six splits in this whole map which is lower than what the plan is for the State of Alabama that's presented today. It provides whole counties, keep communities of interest together and what it does is a 0% deviation. And what we're here to show you is that we could draw two opportunity districts. Again, we made the argument that pitting two incumbents together is not an issue here and we show that we are able to get a small deviation in Jefferson County. We do a small variation of a split in Jefferson. There's a little split in Crenshaw, small split in St. Clair. The splits are missed out of the Voter Rights Act, there's no violations there. It gives us an opportunity to be able to give minorities an opportunity to have more than one representative in congress. Again, it is not a great deviation for the maps that are already there but we're here to show that we could do a 0% deviation and still achieve the same goal and being able to have opportunity district that this committee, this chairman, the lawyers, not a demographer, gave an opportunity for this to happen or even insisted on it being presented by the committee. As a member of the permanent committee, I was there at all 90% -- let me just say I wasn't there at all of them, but 90% of all the public hearings, I was there. And each and every one where the league of women voters presented a map on their behalf, I made it clear to the body, to the chairmans of both houses, to the attorneys that was in the room that I, Bobby Singleton, was going to be a plaintiff on behalf of the legal women voters to bringing this case. And I went to the chairman and asked them that whether or not we could work this out without having to go to court and hopefully that the map that we presented would have some consideration before the

body. And none of that happened. There was no map considered outside the plan and the chairman today has given us a reason why they did not consider the league of women voters' plan. Number one, because they thought they were pitting incumbents together and number two, they thought the flaws based on the deviation and that it violated the Voters Right Act by not giving a strong minority majority African-American district in the State of Alabama. We contend today once again that 50% of the voter age population in terms of Black voter aged population in the district does not violate the Voters Right Act. We also contend that the argument of whether or not we can make two incumbents together does not hold constitutional muster because incumbents does not have to live within the district that they are running. So, I say to you Mr. President, I'm willing to go on and not belaying the point because they're basically the same maps that only have a small deviation in it and members can see that. Again, we split Jefferson just a little and I would like at least to have an up-down vote on this particular map also.

**MR. PRESIDENT:**  All right. Thanks Senator Singleton. Senator McClendon?

**[00:30:00]**

**CHAIRMAN MCCLENDON:**  I don't have a prob -- let's do an up or down vote on this.

**MR. PRESIDENT:**  Okay, so the motion --

**MALE 1:**  Call role.

**MR. PRESIDENT:**  All right. Secretary, call the long role.

**SECRETARY:**  Mr. Albritton?

**SENATOR ALBRITTON:**  It's a no.

**SECRETARY:**  Mr. Allen?

**SENATOR ALLEN:**  No.

**SECRETARY:**  Mr. Barfoot?

**MR. BARFOOT:**  No.

**SECRETARY:**  Mr. Beasley?

**SENATOR BEASLEY:**  Aye.

**SECRETARY:**  Mr. Butler?

**SENATOR BUTLER:**  No.

**SECRETARY:**  Mr. Chambliss?

**SENATOR CHAMBLISS:** No.

**SECRETARY:** Mr. Chesteen?

**SENATOR CHESTEEN:** No.

**SECRETARY:** Ms. Coleman-Madison?

**SENATOR COLEMAN-MADISON:** Aye.

**SECRETARY:** Ms. Dunn?

**SENATOR DUNN:** Aye.

**SECRETARY:** Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:** Aye.

**SECRETARY:** Mr. Givan?

**SENATOR GIVAN:** No.

**SECRETARY:** Mr. Gudger? Mr. Hatcher?

**SENATOR HATCHER:** Aye.

**SECRETARY:** Mr. Holley?

**SENATOR HOLLEY:** No.

**SECRETARY:** Mr. Jones?

**SENATOR JONES:** No.

**SECRETARY:** Mr. Livingston? Mr. Marsh?

**MR. MARSH:** No.

**SECRETARY:** Mr. McClendon?

**CHAIRMAN MCCLENDON:** No.

**SECRETARY:** Mr. Melson? Mr. Orr?

**SENATOR ORR:** [INDISCERNIBLE 00:31:23].

**SECRETARY:**  Mr. Price? Mr. Reed? Mr. Roberts? Ms. Sanders-Fortier?

**SENATOR SANDERS-FORTIER:**  Aye.

**SECRETARY:**  Mr. Scofield? Mr. Sessions?

**SENATOR SESSIONS**: No.

**SECRETARY:**  Mr. Shelnutt? Mr. Singleton?

**SENATOR SINGLETON:**  Aye.

**SECRETARY:**  Mr. Smitherman?

**SENATOR SMITHERMAN:**  Aye.

**SECRETARY:**  Mr. Stutts? Mr. Waggoner?

**SENATOR WAGGONER:**  No.

**SECRETARY:**  Ms. Weaver?

**SENATOR WEAVER:**  No.

**SECRETARY:**  Mr. Whatley?

**SENATOR WHATLEY:**  No.

**SECRETARY:**  Mr. Williams?

**SENATOR WILLIAMS:**  No.

**MR. PRESIDENT:**  Seven ayes, 23 nays. The motion to adapt fails.

**SENATOR SINGLETON:**  Mr. President?

**MR. PRESIDENT:**  Senator Singleton?

**SENATOR SINGLETON:**  Just a short [INDISCERNIBLE 00:32:31].

**MR. PRESIDENT:**  You're recognized.

**SENATOR SINGLETON:**  I would like to thank the body for indulging us in this. I thank you Mr. Chairman for answering the questions to the best of your ability on this. I think that we've missed an opportunity today to stay out of federal court. We may be spending a whole lot of

more money but I at least consider, that we considered to continue to gerrymander an African-American community where we can have two districts that will be opportunity districts. So again, I just want to thank this body for indulging us and I would like to turn it over to Senator Hatcher after my point of person of privilege who has another map that he would like to introduce to you today, Mr. President. Thank you, Mr. Chairman and I appreciate the work that you've done in this body, thank you.

**CHAIRMAN MCCLENDON:**  Thank you, Senator Singleton.

**MR. PRESIDENT:**  All right, Senator Hatcher.

**SENATOR HATCHER:**  Thank you for the recognition, Mr. President. Thank you, Senator Singleton. Chairman McClendon, one of the things that I've learned in a very short span of time being in this body as that obviously this is my first opportunity with reapportionment and good God Almighty, it is complicated and tedious. And so, for those who have been here who've gone through this, my hat's off to you, all of you.

**CHAIRMAN MCCLENDON:**  Thank you.

**SENATOR HATCHER:**  I would like to offer this substitute in consideration from -- in support --.

**MR. PRESIDENT:**  All right. Secretary, read and receive the substitute.

**SECRETARY:**  Substitute for House Bill No. 1 by Senator Hatcher.

**[BACKGROUND CONVERSATION]**

**MR. PRESIDENT:**  All right, Senator Hatcher.

**SENATOR HATCHER:**  The only thing I would like to offer Chairman McClendon is to, obviously in keeping with the same spirit of Senators Singleton and Smitherman is we are offering this one as an example of a map that creates two majority minority opportunity districts here in Alabama and this one is strongly supported by the legal defense fund, ACLU and the greater Birmingham ministries.

**[00:35:11]**

Unless there are some discussions on it, I'd like to -- any questions or move for an up and down vote?

**MR. PRESIDENT:**  All right. So, Senator McClendon, we have a motion for an up and down vote, did you want to discuss this?

**CHAIRMAN MCCLENDON:**  No, but when the proper time comes, I'd move to table this map.

**MR. PRESIDENT:**  Okay, so you still got the mic right now.

**SENATOR HATCHER:**  Well, the one thing I would offer, thank you, Mr. President, is again, what its seeking to do is to make fair the representation that you've heard already. And in out of respect for the things that have been shared already, I do not wish to duplicate that but to simply say that all of us are seeking the best we can to represent all of the people of the State of Alabama. And I think you heard the statistic where it says that nearly 28% of Alabama's residents identified as either Black or multiracial identity. And the idea is to simply represent the interest of all of these different groups and there are clear reasons that I've already been outlined for why that is important to the community. One of the things I would share that is a part of what I want to put in consideration for that substitute, when I mention the fact that according to the 2021 census data, nearly 28% of Alabama's residents identify as Black, either alone or as part of a multiracial identity. It is fair, necessary and logical that all Black Alabamians have an opportunity to elect their preferred congressional representatives. Members of Congress make decisions and influence policies that impact every aspect of American life including but not limited to access to education, economic opportunity, housing, healthcare and the direct and collateral consequences of criminal legal systems. An additional majority minority opportunity district which Section 2 of our constitution likely requires and does would provide Black voters with representation to address the state's pervasive and ongoing record of inequality of opportunity in various aspects of life. And I want to take an opportunity to simply add this piece. As Senator Singleton pointed out just here in Montgomery, we are split in three different ways in this area. So, this is one way to offer some relief and remedy. So, with that being said, Mr. President, unless there are some questions from the Chairman, I would request an up and down vote.

**MR. PRESIDENT:**  All right.

**CHAIRMAN MCCLENDON:**  I concur. Up or down vote recognized.

**MR. PRESIDENT:**  Okay.  All right. Secretary, call the role.

**SECRETARY:**  Mr. Albritton?

**SENATOR ALBRITTON:**  No.

**SECRETARY:**  Mr. Allen.

**SENATOR ALLEN:**  [INDISCERNIBLE 00:38:21].

**SECRETARY:**  Mr. Barfoot?

**SENATOR BARFOOT:**  No.

**SECRETARY:**  Mr. Beasley?

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SENATOR BEASLEY:**  Aye.

**SECRETARY:**  Mr. Butler? Mr. Chambliss? Mr. Chesteen?

**SENATOR CHESTEEN:**  No.

**SECRETARY:**  Ms. Coleman-Madison?

**SENATOR COLEMAN-MADISON:**  Aye.

**SECRETARY:**  Ms. Dunn?

**SENATOR DUNN:**  [INDISCERNIBLE 00:38:46].

**SECRETARY:**  Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:**  Aye.

**SECRETARY:**  Mr. Givan? Mr. Gudger? Mr. Hatcher? Mr. Holley?

**SENATOR HOLLEY:**  No.

**SECRETARY:**  Mr. Jones?

**SENATOR JONES:**  No.

**SECRETARY:**  Mr. Livingston?

**SENATOR LIVINGSTON:**  No.

**SECRETARY:**  Mr. Marsh?

**SENATOR MARSH:**  No.

**SECRETARY:**  Mr. McClendon?

**CHAIRMAN MCCLENDON:**  No.

**SECRETARY:**  Mr. Melson? Mr. Orr? Mr. Price? Mr. Reed?

**SENATOR REED:**  No.

**SECRETARY:**  Mr. Roberts? Ms. Sanders-Fortier? Mr. Scofield?

**SENATOR SCOFIELD:**  [PH 00:39:34] No.

**SECRETARY:**  Mr. Sessions?

**SENATOR SESSIONS**:  No.

**SECRETARY:**  Mr. Shelnutt? Mr. Singleton? Mr. Smitherman?

**SENATOR SMITHERMAN:**  [PH 00:39:59] No.

**[00:40:00]**

**SECRETARY:**  Mr. Stutts? Mr. Waggoner? Ms. Weaver? Mr. Whatley? Mr. Williams?

**SENATOR WILLIAMS:**  No.

**MR. PRESIDENT**:  All right. Five ayes, 22 nays, the Senator Hatcher substitute fails. Thanks Senator Hatcher.

**SENATOR HATCHER:**  Thank you Mr. President.

**CHAIRMAN MCCLENDON:**  Thank you Senator Hatcher. I admire you coming forward first time around and getting into this [INDISCERNIBLE 00:40:38].

**MR. PRESIDENT:**  All right. Senator McClendon?

**CHAIRMAN MCCLENDON:**  I believe my good friend Senator Waggoner.

**MR. PRESIDENT:**  All right, Senator Waggoner.

**SENATOR WAGGONER:**  Mr. President, I have a substitute.

**MR. PRESIDENT:**  All right. Secretary, read and receive the substitute.

**SECRETARY:**  Substitute for House Bill 1 by Senator Waggoner.

**SENATOR WAGGONER:**  Mr. President.

**MR. PRESIDENT:**  Senator Waggoner.

**SENATOR WAGGONER:**  Mr. President, this involves two areas in Jefferson County. One area is represented by Congressman Gary Palmer, the other one is represented by Congresswoman Sewell. There are two changes in the present proposal; one involves Center Point, East Lake and Roebuck and Northeast Jefferson County. Those areas are presently served by Congresswoman Sewell. Under this proposal, they would -- under the present proposal, they would be represented by Congressman Palmer. The other one is two areas in Homewood, Alabama. They're served by Congressman Palmer and this would swap those two areas. Ms. Sewell would take the area represented by Congressman Palmer in Homewood, Alabama. There

are two precincts involved. And Congressman Palmer would take over the Center Point, East Lake, and Roebuck area. Some of us from Jefferson County have problems with this area, this proposal. We would like for them to stay as they are. Congressman Palmer would stay in Homewood, Congresswoman Sewell would keep her Center Point, East Lake, Roebuck area. Demographically, Center Point, East Lake and Roebuck favor Ms. Sewell and demographically, Homewood favors Congressman Palmer. So, my substitute would keep Congressman Palmer in Homewood instead of changing him to Ms. Sewell's district. My proposal would keep Congresswoman Sewell in Center Point, East Lake and Roebuck. Under the proposal by Senator McClendon, it would swap those two areas. So, mine would keep them as is. I think it's important to know that these districts as they are today, they met all the requirements of the Voting Rights Act three years ago and received approval from the U.S. Justice Department. There's zero deviation in the proposal. So basically, that's what my substitute does. The mayor of Center Point wants it to stay as is with Ms. Sewell, Congresswoman Sewell remaining their congressman. The mayor of Homewood and a multitude of other people would like Representative Congressman Gary Palmer to remain in Homewood. So, Mr. President basically, that's what this substitute does. I know it's a very controversial issue, I know many of my colleagues have issues with it and I want them to feel very comfortable about what they want to do. This is an important vote, it's an important issue we're dealing with, and I want them to feel comfortable voting their conscience.

[00:45:06]

I know how I feel. I know that I would like my congressman to stay in place in Homewood. I like for Congresswoman to stay where she is in Center Point, East Lake and Roebuck. And I said demographically, their areas favor them as Congresswoman Sewell and Congressman Palmer. And with that, Mr. President, I'd be glad to entertain any questions.

**MR. PRESIDENT:**  All right, thank you. Senator Roberts?

**SENATOR ROBERTS:**  Mr. President.

**MR. PRESIDENT:**  Yeah, Senator Roberts.

**SENATOR ROBERTS:**  Senator Waggoner, I have the opportunity to share Homewood together and we have been reached out to non-stop since this became public. Our whole objective is communities of interest, keep them in together which was one of the things we were after and that is why we're very interested in seeing this come to fruition. Thank you.

**MR. PRESIDENT:**  Thank you Senator Roberts. All right, Senator McClendon?

**CHAIRMAN MCCLENDON:**  Thank you Mr. President. I would like to try to clear up. The first question is how did this district -- why did this change occur? What happened? Well, there were three cases following the 2010 census which is how it has been in the past and the court required that the districts be drawn race blind although our mapping equipment can display races, it changes. You can turn that off and that's exactly what we did. We turned it off. The second factor that was important was that Congressional District 7 was short by 53,000 people

and we had to go somewhere to get those people to get to our deviation. Homewood, adjacent to City 7, is a population-dense area. So, to add an east-west shape which is where we are today to add this shape or the increase to size east and west was far superior over moving in a north-south direction. The reason that was done was to prevent claims that this part of Jefferson County was a racial gerrymander. This is because Section 5 is no longer there and this explains why what could be done in 2010 and was approved by the justice department in 2010 is not okay in 2020. It will not be approved by the justice department today. Consequently, when these changes were made, the tip of the 2010 incursion, the Center Point precincts were not needed and were put into City 6. So, the next question is, so now we know how we got there. We got there because the courts told us what we had to do keeping in mind the whole time this is a racial issue. This is not about splitting counties, this is not about splitting precincts, this is about drawing maps based on race that's not good. The two Homewood precincts are majority White. The four Center Point area precincts are majority Black. Switching Black and White precincts at this point after the plan was drawn race blind would be a race conscious effort and that would violate Section 2 of the Voting Rights Act unless it were done in fulfillment of a compelling state interest. Under the Voting Rights Act, the state has no compelling interest in making the race conscious reassignments that has been proposed by Senator Waggoner.

[00:50:07]

So, the bottom line is the Waggoner, what are we calling this? The Waggoner sub? The Waggoner sub is clearly based on race, clearly, and it will in fact create a storm legally for all of us in this room. With that being said --.

**MR. PRESIDENT:**  All right. Senator Smitherman.

**CHAIRMAN MCCLENDON:**  Senator Smitherman, go ahead please.

**SENATOR SMITHERMAN:**  Thank you Mr. Chairman. Mr. Chairman, I think that the process that everybody in here went through when you went downstairs, I think that that was an attempt for that process by the lawyer and what do they call it, the one that draw the maps?

**MALE 1:**  Demographer.

**SENATOR SMITHERMAN:**  Demographer to present areas of the district in the language about precincts. Once precincts will put in, then I think that the numbers whatever was in the precincts were reflected on when you got a total back in terms of the population. And I think if everybody win, I guarantee you two thirds of the people will be doing this if I asked them to be honest and say yes or no. I said that to say this is that, I haven't heard one time in any conversation that I had with Senator Waggoner regarding this issue in our county him say the first thing about those African-Americans that stay over there, those Black people that stay over or those White people stay over here. There has been no conversation related to race as it relates to the changing of these people. The only conversation that has come up with him and I'm sitting here because I'm on the juror and I want to see it, was dealing with the community of interest. And other than Senator Waggoner, when it comes to one of those communities, I don't think that anybody else would be aware or have a clear understanding of the concern for community of

interest simply because he and I split the area straight down in line. We represent the same people and so, I said that just to say that may be something that is being mentioned from your responses but it's nothing in the amendment that says that it's switching race. There's nothing I've ever heard of him so I'm sitting up here that that's the case and there's nothing I've heard in any conversation. The last thing I want to add is this, and I'm not trying to be funny when I say this but I'm trying to just speak what I think is a statement of fact. I wouldn't even be worried about the fact that it may change a little bit the way that the district is shaped here versus there because the whole district as I said earlier is bizarre. So that don't change bizarreness. It don't create any more or any less bizarreness. It's just if it's that plan because he goes up in there just because the corner up here is changing and anybody down here decide over here changing, this syllogist is bizarre and gerrymandering going up in there. So in conclusion, I just wanted to say that to the body that no, this doesn't violate any of that whatsoever in my opinion because that is not based on that, it's based on communities of interest. And I just really think that that's -- I know that's an opinion that you spoke but I can say that based on the facts that I have presented and as I know them that that opinion and theory is not applicable at this time. Thank you for allowing me to speak and thank you Mr. President.

**MR. PRESIDENT:**  Thank you Senator Smitherman. Senator Del Marsh?

**SENATOR DEL MARSH:**  Thank you Mr. President. First I want to say, Senator, I want to thank you as this whole body shared for the work you've done on this project. I mean, it's not an easy project to deal with a lot of personalities, a lot going on and same thing with President Pringle in the house.

[00:55:00]

You all worked through countless hours. What I want to try to do is make sure there's clarity here I think and I don't think you meant to do it in any way but the way I see this is, because I know I've had enough discussions with members of the body including Senator Singleton, Senator Waggoner and I truly believe their concerns are community of interest. I really believe that, we've talked about it and the fact that these previous districts were the way they want to go back to, I think Senator and I believe your comments is what you want to make sure happens here as we all do is that we send a plan that is upheld by the federal court, bottom line. And I think I want to bring the clarity in that. I do not think and I don't think you think that race was the issue with these two senators but it could be perceived in your opinion from the justice department that that is the issue and that's why I think it is very important. Now things has been made clear today that the community of interest issue is the issue to us in this chamber and what we would stand behind should this go to court in that form. But I support you for what you've done, I continue to support but I do think it's very critical to this those watching these proceedings understand that what someone may perceive of what reality and reality in this chamber as far as I'm concerned is community of interest. Thank you.

**CHAIRMAN MCCLENDON:**  Thank you. Mr. President, I'd like to make a comment.

**MR. PRESIDENT:**  Thanks Senator Del Marsh. All right.

**CHAIRMAN MCCLENDON:**  I want to talk just briefly about community of interest. Community of interest is a guideline that we have adopted here in drawing our lines. We said what we want to try to do is keep guidelines together. Our guidelines are trumped by the Voting Rights Act and the justice department. They're interested in race, they're not as interested in guidelines. I will assure you keeping a clarity of interest together is good but that is secondary or tertiary from the federal courts perspective. The racial aspect of this is absolutely primary. And while we drew these things race-blind, the fact is this proposal moves a majority of Black voters out of a white congressional district puts them in a Black congressional district moves a majority of Black voters that are in a white district and puts them in a Black district. And there's no way we don't know what's going on. So, I'm just saying Senator Singleton, I didn't mean to take up any of your time.

**[OVERLAY]**

**SENATOR SINGLETON:**  Mr. Chairman, you can take as much time as you want because I like your explanation. It helps the case, okay? Because while you say community of interest is just a guideline, a community interest is a legal concept. I keep telling you just like you said that gerrymandering was in the eyes of the beholder. It's not in the eyes of the beholder, it is a legal concept. Community of interest is a legal concept that the court has ruled on when you started looking at taking communities of interest. Now, it's just not something that we think of in the State of Alabama that we would own somebody who have thought of this and you're not dealing with racial gerrymandering when you're dealing with under the run versus him to where you can achieve the voting age population by going out and reaching and getting those Black population to create that but you already got a gerrymandering district anyway. So you're not going to hurt the district no more than what you're already doing by switching these people that they want. You're already gerrymandering. Okay? So on the run versus him, one man one vote, you can achieve what you want without saying that it is about race, okay? And what you've done here is that that population was over in that district before you all just went and switch. All you're doing is switching back to people that they already had. Thank you very much.

**MR. PRESIDENT:**  Thanks Senator Singleton. All right. Senator Waggoner?

**SENATOR WAGGONER:**  Mr. President, the bottom line is in this issue, the people in these two communities like it the way it is. They do not want to swap congressman.

**[01:00:00]**

People in Center Point like their congresswoman, people in Homewood like their congressmen and here, we're violating the wishes of the two congressmen. They like it the way it is. That's the way I like it because I live in one of those communities. I've heard from a number of people in both the communities and here we're swapping congressmen and congresswoman when the communities do not accept that, they do not like it, they do not want it. But we're violating the wishes of the people in those two communities and I don't understand it. And of course I'm going to vote for my substitute which allows these two communities to stay whole. Thank you Mr. President.

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**MR. PRESIDENT:**  All right, so we're on your substitute.

**SENATOR WAGGONER:**  With that, I move adoption of the substitute.

**MR. PRESIDENT:**  All right, we got a motion for adoption of the substitute. You may want to talk on them this motion.

**CHAIRMAN MCCLENDON:**  I wouldn't make a comment. Just to make a correction, I want everybody to know that we talked to Congressperson Sewell ahead of time and she was happy with this plan that we've had here. And we attempted to talk with Congressman Palmer and was unsuccessful in doing so. So as far as I'm concerned, are you ready to vote this up or down? What that your motion?

**MR. PRESIDENT:**  That was the motion, yes.

**CHAIRMAN MCCLENDON**:  I'm sorry. Now for the vote.

**MR. PRESIDENT**:  All right. Secretary, call the role.

**SECRETARY:**  Mr. Albritton?

**SENATOR ALBRITTON:**  No.

**SECRETARY:**  Mr. Allen.

**SENATOR ALLEN:**  [INDISCERNIBLE 01:01:51].

**SECRETARY:**  Mr. Barfoot?

**SENATOR BARFOOT:**  Aye.

**SECRETARY:**  Mr. Beasley?

**SENATOR BEASLEY:**  Okay.

**SECRETARY:**  Mr. Butler? Mr. Chambliss? Mr. Chesteen? Ms. Coleman-Madison? Ms. Dunn? Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:**  Aye.

**SECRETARY:**  Mr. Givan?

**SENATOR GIVAN:**  No.

**SECRETARY:**  Mr. Gudger? Mr. Hatcher?

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SENATOR HATCHER:**  Aye.

**SECRETARY:**  Mr. Holley?

**SENATOR HOLLEY:**  No.

**SECRETARY:**  Mr. Jones?

**SENATOR JONES:**  No.

**SECRETARY:**  Mr. Livingston?

**SENATOR LIVINGSTON:**  No.

**SECRETARY:**  Mr. Marsh? Mr. McClendon?

**CHAIRMAN MCCLENDON:**  No.

**SECRETARY:**  Mr. Melson?

**SENATOR NELSON:**  No.

**SECRETARY:**  Mr. Orr?

**SENATOR ORR:**  No.

**SECRETARY:**  Mr. Price?

**SENATOR PRICE:**  No.

**SECRETARY:**  Mr. Reed? Mr. Roberts?

**SENATOR ROBERTS:**  Aye.

**SECRETARY:**  Ms. Sanders-Fortier?

**SENATOR SANDERS-FORTIER:**  Aye.

**SECRETARY:**  Mr. Scofield? Mr. Sessions? Mr. Shelnutt? Mr. Singleton?

**SENATOR SINGLETON:**  [INDISCERNIBLE 01:03:19].

**SECRETARY:**  Mr. Smitherman?

**SENATOR SMITHERMAN:**  Aye.

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SECRETARY:** Mr. Stutts? Mr. Waggoner? Ms. Weaver? Mr. Whatley? Mr. Williams?

**SENATOR WILLIAMS:** No.

**SECRETARY:** Ten ayes, 18 nos, one abstention.

**MR. PRESIDENT:** Ten ayes, 18 nos, one abstention. The substitute fails. Thank you, Senator Waggoner.

**SENATOR BARFOOT:** Mr. President?

**MR. PRESIDENT:** All right. Senator Barfoot?

**SENATOR BARFOOT:** I could be recognized, I thank you. I also want to thank Senator McClendon, Representative Pringle for all the hard work that has gone into making overall what I think is a fairly accommodating map and work within the guidelines. I do have an amendment or a substitute, excuse me that I will offer to the body that makes --.

**MR. PRESIDENT:** All right. Secretary, read and receive the substitute, please.

**SECRETARY:** Substitute for House Bill 1 by Senator Barfoot.

**MR. PRESIDENT:** All right, Senator Barfoot?

**SENATOR BARFOOT:** Thank you Mr. President. The substitute that I am offering affects basically moves about 700 or so voters.

**[01:05:00]**

Excuse me, persons in the district. And so, with that being said, Escambia County currently under existing congressional plans is whole. It is whole in the first congressional district. The plan that the committee has brought before us has the second congressional district encroaching on Escambia County, a portion of the Escambia County. My plan simply in a nutshell makes Escambia County whole once again. It continues to keep Escambia County whole once again and allows the first congressional district to represent the entirety of Escambia County. It also moves those 700 or so individuals that the first congressional district loses into Montgomery so that the second congressional district would take in an extra 700 and some odd individuals. It furthermore takes the seventh congressional district into Monroe County to make up that 700 and so individuals. I believe that this plan, I know that this plan has a zero deviation. It also, when we talked about communities of interest, it keeps Escambia County whole and it is my understanding and belief that it falls within the guidelines as set forward as far as racial neutrality. With that, I believe -- if there's a question.

**MR. PRESIDENT:** All right, Senator McClendon.

**CHAIRMAN MCCLENDON:**  Yes sir. This plan that came from representative from Congressman Moore and carried by my friend, Senator Barfoot, does involve 739 people. Under the committee's plan, the one we had before us, Moore had two split, Sewell had three. Under the Barfoot plan, Moore ends up with only one split, Sewell ends up with four which should be more than any other member of congress. The problem is, Congressperson Sewell is, she's not only a democrat, she's Black and a federal court could very well look at this and say that this has become a racial issue. Same, each new county split will be more work for her and less work for Congressman Moore. And the part of Escambia County that would go to Moore under this plan has no incorporated areas. In fact, most of it is the good part of is the Conecuh National Forest. And of course, when you put the underpopulated or zero populated area in there, it sure makes life easier and less work to do. This will be argued as racially discriminatory by the plaintiffs that are attacking the Moore plan and we can't say if the claim would be successful but it puts an unnecessary lightning rod on CD 7. That is sure to draw attention from the three-judge court or the Supreme Court if we end up there. And that'll give them more reason to say the plan is racially biased. Should that happen, well, we know what should happen if that happens. With that being said, that's my comment on this plan and at the appropriate time when everyone has had their say so, I would move to table. Mr. President.

**MR. PRESIDENT:**  All right, Senator Albritton?

**SENATOR ALBRITTON:**  Thank you for the recognition, sir. I come to stand. I'm not involved with how this was done or whatever. But I do come here with those counties that's been mentioned, the Escambia and Monroe Counties, that's currently within my district area. I come here to stand to say that this plan or the substitute has not been brought to me or discussed with me prior to today about this. I would suggest that the congressman from District 1 who is affected by this has not given me any direction or has talked to me about it.

**[01:10:00]**

I would suggest my purpose of being here is telling the body that this affects me and my district and I'm going to vote to either table or to vote no on it.

**MR. PRESIDENT:**  All right. Thank you, Senator Albritton. Senator McClendon?

**CHAIRMAN MCCLENDON:**  Senator Barfoot, I think I got the mic but do you have -- is there something else you would like to say before we make a decision?

**SENATOR BARFOOT:**  There is.

**CHAIRMAN MCCLENDON:**  I'll yield.

**SENATOR BARFOOT:**  And something that I did not accurately or maybe I didn't articulate to the best of my ability. Escambia County has never to my knowledge been in the second congressional district. Your plan does put Escambia County into the second congressional district and this creates no more splits than what your plan has communities of interest are not split and counties are not split. So that, I'd ask the body to vote against your motion to table.

**MR. PRESIDENT:**  All right, Senator McClendon?

**CHAIRMAN MCCLENDON:**  Move to table.

**MR. PRESIDENT:**  All right.

**CHAIRMAN MCCLENDON:**  Vote aye please.

**MR. PRESIDENT:**  All those in favor, say aye.

**[OVERLAY]**

**MR. PRESIDENT:**  Any oppose? Table in motion passes.

**CHAIRMAN MCCLENDON:**  And we're back on the bill?

**MR. PRESIDENT:**  We are.

**CHAIRMAN MCCLENDON:**  There's no other discussion on the bill. I ask final passage of HB 1.

**MR. PRESIDENT:**  All right. Secretary, call the long roll.

**SECRETARY:**  Mr. Albritton?

**SENATOR ALBRITTON:**  Aye.

**SECRETARY:**  Mr. Allen? Mr. Barfoot? Mr. Beasley?

**SENATOR BEASLEY:**  Allen's an aye.

**SECRETARY:**  Mr. Butler? Mr. Chambliss? Mr. Chesteen? Ms. Coleman-Madison? Ms. Dunn? Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:**  No.

**SECRETARY:**  Mr. Givan?

**SENATOR GIVAN:**  Aye.

**SECRETARY:**  Mr. Gudger?

**SENATOR GUDGER:**  Chesteen's aye.

**SECRETARY:**  Mr. Hatcher? Mr. Hawley? Mr. Jones?

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SENATOR JONES:**  Aye.

**SECRETARY:**  Mr. Livingston?

**SENATOR LIVINGSTON:**  Aye.

**SECRETARY:**  Mr. Marsh?

**SENATOR MARSH:**  Aye.

**SECRETARY:**  Mr. McClendon?

**CHAIRMAN MCCLENDON:**  Aye.

**SECRETARY:**  Mr. Melson?

**SENATOR MELSON:**  Aye.

**SECRETARY:**  Mr. Orr? Mr. Price?

**SENATOR PRICE:**  Aye.

**SECRETARY:**  Mr. Reed? Mr. Roberts?

**SENATOR ROBERTS:**  Aye.

**SECRETARY:**  Ms. Sanders-Fortier.

**SENATOR SANDERS-FORTIER:**  No.

**MALE 1:**  Reed's aye.

**SECRETARY:**  Mr. Scofield?

**SENATOR SCOFIELD:**  Aye.

**SECRETARY:**  Mr. Sessions?

**SENATOR SESSIONS:**  Aye.

**SECRETARY:**  Mr. Shelnutt? Mr. Singleton?

**SENATOR SINGLETON:**  No.

**SECRETARY:**  Mr. Smitherman? Mr. Stutts?

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SENATOR STUTTS:**  No.

**SECRETARY:**  Mr. Waggoner?

**SENATOR WAGGONER:**  Aye.

**SECRETARY:**  Ms. Weaver?

**MALE 1:**  Orr is an aye.

**SECRETARY:**  Mr. Whatley? Mr. Williams?

**[BACKGROUND CONVERSATION]**

**MR. PRESIDENT:**  All right, 22 ayes, 7 nays. House Bill 1 passes. Thank you Senator McClendon.

**[01:14:09]**



I, Anders Nelson, hereby certify that the document "Pt. 1 Day 5_11_03_ Senate Chamber" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

# Anders Nelson

Digitally signed by
Anders Nelson
Date: 2021.12.14
15:45:50 -05'00'

Anders Nelson
Project Manager

December 14, 2021



I, Anders Nelson, hereby certify that the document "Pt. 2_Day 5_11_03_Senate Chambers" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

# Anders Nelson

Digitally signed by Anders Nelson
Date: 2021.12.14 15:47:06 -05'00'

Anders Nelson
Project Manager

December 14, 2021