Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

- - - - - - - - - - - - - - - +
LAKEISHA CHESTNUT, et al.    |
        Plaintiffs,          |
                             | Case No.
    vs.                      | 2:18-CV-00907-KOB
                             |
JOHN H. MERRILL, Secretary   |
of State,                    |
        Defendant.           |
- - - - - - - - - - - - - - - +

Washington, D.C.
Wednesday, July 24, 2019
        Deposition of CONGRESSMAN BRADLEY BYRNE, a
witness herein, called for examination by counsel for
Plaintiffs in the above-entitled matter, pursuant to
notice, the witness being duly sworn by MICHELE E.
EDDY, RPR, CRR, a Notary Public in and for the
District of Columbia, taken at the Rayburn House
Office Building, 45 Independence Avenue, Southwest,
Washington, D.C., at 9:58 a.m.

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

---

1               A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFFS:
3       BRUCE V. SPIVA, ESQUIRE
        LALITHA D. MADDURI, ESQUIRE
        Perkins Coie
4       700 13th Street, Northwest
5       Suite 600
6       Washington, D.C.  20005
7       (202) 654-6203
8       BSpiva@perkinscoie.com
9       LMadduri@perkinscoie.com
10
11  ON BEHALF OF THE DEFENDANT:
        JIM DAVIS, ESQUIRE
12      Deputy Attorney General
13      Division Chief, Constitutional Defense
14      Office of the Attorney General
15      501 Washington Avenue
16      Montgomery, Alabama  36130
17      (334) 353-1356
18      jim.davis@ago.state.al.us
19
20  ALSO PRESENT:
        Mitch Relfe, Legislative Director for
21          Congressman Bradley Byrne
22      Daniel Holmstock, Videographer

---

Page 3

1           EXAMINATION INDEX
2                                           PAGE
3   EXAMINATION BY MR. SPIVA                    5
4
5
6           E X H I B I T S
7   DEPOSITION EXHIBIT                        PAGE
8   Exhibit 1  Revised Plan 1, Alabama -- U.S. House   14
9   Exhibit 2  Alabama -- U.S. House, Revised Plan 2   16
10  Exhibit 3  Alabama -- U.S. House, Revised Plan 3   16
11  Exhibit 4  Alabama -- U.S. House, Illustrative     17
12      Plan 4
13  Exhibit 5  2011 State Board of Education Districts  25
14  Exhibit 6  Current map of the U.S. House Districts  46
15      in Alabama
16
17
18
19
20
21
22

---

Page 4

1           P R O C E E D I N G S
2               Washington, D.C.
3               July 24, 2019
4                   - - -
5           THE VIDEOGRAPHER:  This is Video No. 1
6   in the video-recorded deposition of Congressman
7   Bradley Byrne taken in the matter of Lakeisha
8   Chestnut, et al. versus John H. Merrill in his
9   official capacity as Alabama Secretary of State.
10  It is pending before the United States District
11  Court for the Northern District of Alabama,
12  Southern Division, Case Number 2:18-CV-00907.
13          This deposition is being held at the
14  Rayburn Office -- House Office Building at 45
15  Independence Avenue, Southwest, in Washington,
16  D.C., on July 24th, 2019.  The time on the video
17  screen is 9:59 a.m.
18          My name is Daniel Holmstock, and I'm the
19  legal videographer from Digital Evidence Group.
20  Our court reporter is Michele Eddy, in association
21  with Digital Evidence Group.
22          For the record now, will counsel please

Case 2:21-cv-01530-AMM Document 80-5 Filed 12/23/21 Page 2 of 77

**Page 5**

1  introduce themselves and whom they represent.
2         MR. SPIVA:  My name is Bruce Spiva.  I
3  represent the plaintiffs in the action.
4         MS. MADDURI:  Lali Madduri, also for the
5  plaintiffs.
6         MR. RELFE:  Mitch Relfe.  I'm counsel
7  for the office of Congressman Byrne.
8         MR. DAVIS:  Jim Davis representing
9  Secretary of State John Merrill.
10        THE VIDEOGRAPHER:  Will the court
11 reporter please administer the oath.
12        - - -
13        CONGRESSMAN BRADLEY BYRNE,
14 having been duly sworn, testified as follows:
15        EXAMINATION BY COUNSEL FOR PLAINTIFFS
16 BY MR. SPIVA:
17     Q   Good morning, Congressman Byrne.
18     A   Good morning.
19     Q   Thank you very much for taking your time
20 out.  I know you have a busy schedule.  We
21 appreciate that.
22     A   Sure.

**Page 6**

1      Q   We'll try to keep the encroachment on
2  your time to a minimum.
3         If you can just state your full name for
4  the record.
5      A   My name is Bradley Byrne, B-Y-R-N-E.
6      Q   What is your address, Congressman Byrne?
7      A   22489 Sea Cliff Drive, Fairhope,
8  Alabama, 36532.
9      Q   Have you ever been deposed before?
10     A   I have.
11     Q   In what capacity?
12     A   When I was a member of the State School
13 Board, there was a lawsuit against the State
14 School Board in our official capacity, and I
15 believe when I was Chancellor of Postsecondary
16 Education, there was a lawsuit against the
17 Department of Postsecondary Education, and in my
18 capacity as CEO of the system, I think I was
19 deposed a couple of times.
20     Q   Okay.  Other than those times, can you
21 recall any other times that you were deposed?
22     A   I can't.

**Page 7**

1      Q   Have you ever testified -- we've got a
2  little --
3      A   Doesn't mean anything.
4      Q   Okay.  Have you ever testified in trial
5  before?
6      A   Yes, I believe there was a trial
7  regarding the redistricting of the State School
8  Board in the Federal District Court of the
9  Southern District of Alabama, and I think I and
10 perhaps other members of the State School Board
11 were required to come and testify at that trial.
12        There was also a trial in the Montgomery
13 County Circuit Court that I was a very brief
14 witness in, and I think it was another one of
15 those redistricting cases.
16     Q   Okay.  And were you deposed in either of
17 those cases?
18     A   I don't believe I was.
19     Q   Okay.  In connection with the school
20 board redistricting case, about what time period
21 was that?  Maybe I'll try to refresh your memory.
22 Was it mid '90s?

**Page 8**

1      A   No.
2      Q   Was it more recent than that?
3      A   It was more recent than that, but I
4  can't remember exactly when it was.
5      Q   Okay.  And do you recall what you
6  testified about in that redistricting case before
7  the Board of Education?
8      A   There was some sort of a proposal, and I
9  don't know if it was a legislative proposal or
10 not, regarding the makeup of the districts and the
11 State School Board.  There are eight districts.
12 And I was asked about my opinion about how my
13 district -- my State School Board district would
14 be put together.
15     Q   Okay.  And so I take it at that time you
16 were a member of the State Board of Education?
17     A   I think I was.  I can't remember, to be
18 sure.
19     Q   All right.  And do you recall whether
20 the districts changed as a result of that lawsuit?
21     A   I don't know what became of that
22 lawsuit.  I was just a witness.

Page 9

```
 1    Q    Okay.  So let me just -- I'll briefly --
 2  you've been deposed before, but I'll just briefly
 3  go over kind of some of the, you know, usual
 4  ground rules.  We're doing great so far.  Usually
 5  because the court reporter has got to take
 6  everything down, I will try to wait until you've
 7  completed your answer before asking you the next
 8  question or jumping in.  I would just ask if you
 9  would do the same, just wait for the whole
10  question to come out before you answer, just so
11  she can get everything down.
12        If I ask a question and it doesn't make
13  sense to you, please ask me and I will do my best
14  to rephrase it.  If you answer it, I'll assume
15  that you understand it as asked.  If you want to
16  take a break at any time, you know, just let me or
17  your counsel know and we can -- we can do that.
18  Just -- we just ask that while a question is
19  pending, if you can -- if you can answer the
20  question and then we can take a break at that
21  point.
22        I don't think there's anything else.
```

Page 10

```
 1        And there's no reason why you can't
 2  testify completely and truthfully today?  You're
 3  not on any medications or anything like that?  I
 4  have to ask everybody that.
 5    A    No, I'm not.
 6        THE VIDEOGRAPHER:  Your microphone fell,
 7  counsel.
 8        MR. SPIVA:  Oh, thank you.  The question
 9  is where did it fall to.
10    Q    And I will try to not gesticulate with
11  my hands so that I don't knock the microphone off.
12        And how did you -- how did you learn
13  about this case, Congressman Byrne?
14    A    I believe I received notification of it
15  from the Attorney General's office, State Attorney
16  General's office.  I may have read about it in the
17  news before, but I can't be certain about that.
18    Q    Do you recall who you first talked about
19  this case with?
20    A    There was a call in which there was a
21  member of the Attorney General staff on the call,
22  and there was a lawyer from a law firm in
```

Page 11

```
 1  Montgomery, maybe two lawyers from that law firm
 2  in Montgomery that were on the call.
 3    Q    And do you recall who from the AG's
 4  staff was on that call?
 5    A    No.
 6    Q    Do you recall the names of the lawyers?
 7    A    Not really.
 8    Q    Was one of them Dorman?  I'm forgetting
 9  Dorman's last name.
10        MR. DAVIS:  Walker.
11    Q    Was one of them Dorman Walker?
12    A    I think Dorman may have been on the
13  call.
14    Q    You're familiar with Dorman Walker?
15    A    Oh, I've known Dorman a long time.  His
16  wife used to practice law with me.
17    Q    Okay.  And about when was that that you
18  received that call?
19    A    This year, but I can't remember when.
20    Q    Can you tell me what was discussed on
21  the call?
22    A    That the case was pending, that there
```

Page 12

```
 1  may be a need for me to give testimony and so sort
 2  of in general what my understanding of the case
 3  was, what my understanding of the proposed new
 4  districts would be, and what my attitude and
 5  concerns would be about that.
 6    Q    Okay.  And what did you say in response
 7  to those -- to those inquiries?
 8    A    Well, somebody showed me at that time
 9  the actual proposed districts, and I told them I
10  had great concerns about it.
11    Q    Okay.  And we'll get into that in a
12  minute.  Did they show you anything else other
13  than the proposed maps?
14    A    I may have seen a copy of the complaint,
15  but if I did, I didn't read it very carefully.
16    Q    Okay.  I guess that's probably one of
17  the benefits of being a member of Congress and not
18  a practicing lawyer anymore.
19    A    That is one of the benefits, and I
20  greatly appreciate that benefit.
21    Q    I don't blame you at all.
22        And do you recall anything else about
```

Page 13

1  that conversation?

2      A    I really don't.

3      Q    Have you had any other conversations

4  about the case since then?

5      A    Yes, just one to get us set up for this

6  deposition today.

7      Q    Okay.  Who did you talk to to get this

8  set up for the depo?

9      A    I think, once again, there was somebody

10  from the Attorney General's office.  Mr. Walker

11  may have been on that one, too.

12      Q    All right.  Did you do anything to

13  prepare for the deposition today?

14      A    Just to make sure I remembered some

15  things about the district and some of the things

16  that we had done in the district, particularly my

17  town halls.  I've done a lot of town halls.  I

18  wanted to go back and make sure that I was certain

19  about what we had done.

20      Q    Did you look at any documents to

21  prepare?

22      A    Not any documents per se, no, just where

Page 14

1  did we have town halls, how often, et cetera.

2      Q    All right.  To refresh your recollection

3  about that, did you talk to staff or --

4      A    Yes, my staff would give me this

5  information.

6      Q    Got you.

7          And any other conversations or meetings

8  to prepare for today's deposition?

9      A    No.

10      Q    Let me -- I'm not going into detail just

11  yet, but let me -- just so I know what you -- what

12  you looked at in preparing for today's deposition,

13  let me hand you -- I'm going to have marked a few

14  exhibits and then we'll -- I'll ask you whether

15  these are the documents that you looked at.

16          MR. SPIVA:  Give us just a second.

17  We're just going to gather them up here.

18          Let me give these out one at a time so

19  we don't get confused.  If we could -- if we could

20  have this one marked as Exhibit 1, please.

21          (Exhibit 1 was marked for identification

22  and attached to the deposition transcript.)

Page 15

1  BY MR. SPIVA:

2      Q    And, Congressman Byrne, if you could

3  just take a look at that.  Like I said, we'll get

4  into detail in a little bit, but is that one of

5  the proposed maps that you looked at?

6          And just for the record, this one is

7  labeled "Revised Plan 1, Alabama -- U.S. House."

8      A    I saw several.  They were -- some of

9  them were pretty similar so I can't tell you for

10  sure that this is one that I saw, but it looks

11  like it might have been.

12      Q    Okay.  Do you know -- did anybody tell

13  you that the plans -- that the maps that you saw,

14  or the proposed maps that you saw, came from an

15  expert report of the plaintiffs?

16      A    They may have, but I don't remember

17  that.

18      Q    Okay.  All right.  I'll tell you what,

19  let me -- just as a matter of housekeeping, I'm

20  going to give you all four of these and then we'll

21  -- we'll come back to them in a minute.

22          MR. SPIVA:  So if we could mark this as

Page 16

1  Exhibit 2, please.

2          (Exhibit 2 was marked for identification

3  and attached to the deposition transcript.)

4  BY MR. SPIVA:

5      Q    Congressman Byrne, Exhibit 2 is a

6  document that's labeled at the bottom "Alabama --

7  U.S. House, Revised Plan 2."  Does this appear to

8  be one of the maps that you reviewed?

9      A    The same answer on this one.  They're --

10  they're all sort of different, but they're also

11  sort of the same, so it looks like it's one I may

12  have looked at.

13      Q    Pretty similar to the ones you looked --

14  you probably looked at?

15      A    Right.

16          MR. SPIVA:  Okay.  And I'll give you

17  what will be marked as Exhibit 3.

18          (Exhibit 3 was marked for identification

19  and attached to the deposition transcript.)

20  BY MR. SPIVA:

21      Q    Congressman Byrne, this is -- this

22  Exhibit 3 is labeled "Alabama -- U.S. House,

Page 17

1    Revised Plan 3."  And really the same question,
2    does this appear to be one of the ones you may
3    have looked at?
4        A    The same answer.
5        Q    Okay, got you.
6            MR. SPIVA:  Just so we have them all out
7    on the table, if this could be marked as Exhibit
8    4.
9            (Exhibit 4 was marked for identification
10   and attached to the deposition transcript.)
11   BY MR. SPIVA:
12       Q    Congressman Byrne, this one is labeled
13   "Alabama -- U.S. House, Illustrative Plan 4."
14   Does that -- does that appear to be one that you
15   reviewed in preparation?
16       A    The same answer.
17       Q    We'll come back to those in a minute.
18   Let me just ask you a few questions just kind of
19   about your background and the current -- and the
20   current map.
21           You're currently the congressional
22   representative for Alabama's First Congressional

Page 18

1    District?
2        A    I am.
3        Q    Okay.  And can you describe your
4    district geographically?
5        A    Uh-hmm.  It's all of Mobile and Baldwin
6    Counties, all of Escambia County, all of
7    Washington County, and all of Monroe County and a
8    part of Clarke County.
9        Q    And can you describe your constituents?
10       A    Well, I have over 700,000 people that
11   live in my district.  Some people live in urban
12   areas.  Some people live in suburban areas.  Some
13   people live in rural areas.  Some people are
14   working in one type of work.  Some people are
15   working in different types of work.  So it's a
16   fairly diverse district.  I like that, by the way.
17   And we try to make sure we stay in touch with
18   everybody in our district, wherever they live.
19       Q    What are the racial demographics of your
20   district?
21       A    Well, I don't know precisely.
22       Q    Sure.  I'm not asking for precise

Page 19

1    numbers, but -- sorry to interrupt, but if you
2    could give kind of a general description, that
3    would be helpful.
4        A    Well, the majority would be white.
5    There would be a substantial African-American
6    population and much smaller numbers of Hispanic
7    Americans.  And we do have Asian-Americans
8    particularly in the southern part of Mobile
9    County.
10       Q    And you gave a little bit of that in the
11   last part of your answer, but can you describe how
12   the various racial groups, you know, how they're
13   kind of spread over the district in terms of
14   geographically?  Are they segregated?  Are they --
15   is it pretty spread evenly over the district?
16       A    Well, the district's got so many
17   counties in it that you have white and
18   African-American people in every county.  The
19   Asian-American population tends to be, not
20   exclusively, but the vast majority of them are in
21   Mobile County.  And you do have a fairly sizable
22   Hispanic population in the southern part of

Page 20

1    Baldwin County.  That's not to say there aren't
2    Asian-Americans --
3        Q    Sure.
4        A    -- and Hispanic-Americans in other
5    places, but that's where you tend to find them.
6        Q    Okay.  How about African-American
7    residents and white residents of the district, are
8    there -- can you describe kind of patterns of
9    residential -- residential patterns among those
10   two groups?
11       A    Well, if you get into the four rural
12   counties, Monroe, Clarke, Escambia, and
13   Washington, I don't -- I don't know that there is
14   any sort of pattern.  If there is, I haven't been
15   aware of it.  In Baldwin County, there's a smaller
16   African-American population, smaller percentage,
17   but it's not like they're just in one part of the
18   county.  You'll find pockets, I guess, of
19   African-Americans in different parts of Baldwin
20   County.
21           In Mobile County, it used to be that
22   African-Americans were only -- the majority were

Page 21

1  found in the eastern part of the City of Mobile,
2  Prichard, southern part of the City of Mobile, et
3  cetera, but there has been in the last, at least
4  several years, since I've been in Congress, a
5  growing number of African-Americans that are
6  moving out and they're locating in other areas.
7  So they're actually dispersing more, from my
8  experience.  Some of that comes from the fact that
9  when I campaign, I go door to door, so I'm
10  literally seeing people when they come to the
11  door.  And some of it is when I go out and do my
12  town halls, I'm seeing people in different parts
13  of my district.  I know when people come to the
14  district, well, they come from this community.  So
15  that's been a change in the last several maybe
16  more years.
17  Q.   In the City of Mobile, are there racial
18  patterns in terms of where people live?
19  A.   Well, as I said, you find a
20  disproportionately high number of
21  African-Americans in what I call the eastern part
22  of Mobile, east of where I-65 bisects the city.

Page 22

1  And also in the southern part of Mobile, we call
2  that area Down the Bay, Maysville, et cetera.
3  But, in my experience, in the last
4  several years, I'm seeing more African-Americans
5  moving west of I-65, and there's a more integrated
6  population out west than there used to be, and
7  that seems to be something that is evolving and
8  getting stronger.
9  Q.   Okay.  How long have you seen that
10  pattern that you just described occurring?
11  A.   You know, I didn't notice it until I ran
12  for Congress in 2013.  I think it was occurring
13  before I noticed it, but I certainly noticed it
14  when I ran for Congress the first time in 2013
15  because I went to so many different neighbors
16  knocking on doors.  So you begin to see, you know,
17  there are a lot of African-Americans that are
18  living in Sims, for example, and so you see that
19  pattern begin to emerge.  Since I was elected in
20  2013, I'm seeing it occur more and more
21  frequently.
22  Q.   Got you.

Page 23

1  Did you grow up in Alabama, Congressman?
2  A.   I did.
3  Q.   Where did you grow up in Alabama?
4  A.   I grew up in Mobile.
5  Q.   Did you grow up in the City of Mobile?
6  A.   I did.
7  Q.   And you previously served as a State
8  Senator from Alabama's 32nd State Senate District;
9  is that right?
10  A.   I did.
11  Q.   And what time period did you serve as
12  State Senator?
13  A.   I was elected in 2002.  You assume the
14  office the moment of your election, so November of
15  2002 until I resigned to become Chancellor of
16  Postsecondary Education in May of 2007, I believe.
17  Q.   Okay.  Were you ever involved in any
18  redistricting in any capacity in that role?
19  A.   Other than being a witness that I told
20  you about previously, but I wasn't on the
21  reapportionment committee, no.
22  Q.   I assume from the time period, too, it

Page 24

1  was probably either after the last redistricting
2  or before the next one.
3  A.   Yes, I don't remember when I was in the
4  legislature that I as a legislator ever actually
5  dealt with any reapportioning.
6  Q.   Okay.  And you also previously served as
7  a member, as we briefly discussed earlier, as a
8  member of Alabama's Board of Education.
9  A.   Right.
10  Q.   And let me actually give you another
11  exhibit.  Actually before I do that, what -- about
12  what time period were you on the Board of
13  Education?
14  A.   I was elected in 1994 in November.  My
15  predecessor was appointed to be the DA of Mobile
16  County, and the Governor appointed me to serve out
17  the remainder of his term.  So I actually assumed
18  my office in December of 1994 and left that office
19  when I was elected to the State Senate in November
20  of 2002, so eight years.
21  Q.   All right.  I'm going to give you
22  another exhibit, which will be, I think, Exhibit

Case 2:21-cv-01530-AMM Document 80-5 Filed 12/23/21 Page 7 of 77

Page 25

```
1   5.
2        A    I'll move these up here.
3        Q    Sure, yes.
4             (Exhibit 5 was marked for identification
5   and attached to the deposition transcript.)
6   BY MR. SPIVA:
7        Q    Congressman Byrne, this one is labeled
8   at the top "2011 State Board of Education
9   Districts."  I realize that was well after the
10  time that you served on the BOE, but does -- does
11  this map appear to be pretty similar to the way
12  the districts were drawn when you were on the
13  board?
14       A    It is not.
15       Q    It's not, okay.
16            What are the major differences that you
17  see?
18       A    Well, I can't speak to the other
19  districts, but my district, which is District 1,
20  was all of Mobile County, all of Baldwin County,
21  and all of Escambia County.  No part of Mobile
22  County was a part of District, I guess that's --
```

Page 26

```
1        Q    Five?
2        A    Five?  And I did not represent
3   Covington, Butler, Conecuh, or Crenshaw.
4        Q    Okay.  And when you were on the Board,
5   was there ever a court ordered change to the Board
6   of Education districts?
7        A    No, I don't think so.
8        Q    Okay.  You don't recall like in 1996
9   there wasn't any kind of a change to the
10  districts?
11       A    Not that I can recall.  It certainly
12  didn't affect my district.
13       Q    Okay.  So during the time that you were
14  on there, as you recall, you didn't -- you
15  represented, as you said, Mobile, the whole county
16  of Mobile?
17       A    Yes.  My district from the moment I was
18  on the Board to the moment I left was all of
19  Mobile County, all of Baldwin County, all of
20  Escambia County.
21       Q    What district did you represent?  I
22  realize this is not the same configuration --
```

Page 27

```
1        A    It was called District 1.
2        Q    And it included, I think you said,
3   Mobile; did it also include Baldwin?
4        A    All of Mobile, all of Baldwin, all of
5   Escambia.
6        Q    Any other counties?
7        A    No.
8        Q    Were you aware that at some point after
9   you were on the Board that the map for the Board
10  of Education districts had changed?
11       A    I was.
12       Q    Okay.  And what was your understanding
13  of what brought about that change?
14       A    Well, I don't know what brought about
15  that change.
16       Q    What -- strike that.
17            When you first got on the Board, you
18  were a Democrat at that point.
19       A    I was.
20       Q    When you ran for reelection, what year
21  was that?
22       A    1998.
```

Page 28

```
1        Q    '98.  Or I guess I should say election
2   because you had been appointed.  Did you serve
3   through '98?
4        A    I was actually elected in '94.  My
5   predecessor, John Tyson, was appointed by Governor
6   Folsom to be the DA in Mobile County.  So he had
7   two months left on his term, and so the Governor
8   appointed me to serve out those two months before
9   I assumed my full four-year term in January of
10  1995.
11       Q    I see, okay.
12            So when you first ran, you ran as a
13  Democrat.
14       A    I did.
15       Q    Okay.  And you later -- you're currently
16  a member of the Republican party.
17       A    Right.
18       Q    And you at some point changed from the
19  Democratic party to the Republican party.
20       A    In January of 1997.
21       Q    Okay.  Why did you switch parties?
22       A    Because the Democratic party no longer
```

Page 29

1    represented the principles that I stood for
2    politically.  And I was regularly told by
3    Democratic party leaders that I was not a Democrat, that
4    I was really a Republican.  I was regularly told
5    by Republican leaders that I was not a Democrat, I
6    was really a Republican.  And I sat down with
7    myself one day and said, you know what, you're not
8    really a Democrat, you're really a Republican.
9    And I think I was being honest with myself and my
10   constituents.  I think it was the right thing to
11   do.
12       Q    I know these things can be complicated,
13   but is there a way to describe in general terms
14   what principles you felt made you fit more with
15   the Republican party than with the Democratic
16   party?
17       A    There were a bunch.  And some of them
18   really came to focus for me being on the State
19   School Board.  I was very much an education
20   reformer.  I believed that our education system
21   should be there to serve the children, their
22   parents, not other things.  And I found that the

Page 30

1    Democratic party stood for taking care of adults
2    first.  And I found that to be totally contrary to
3    my view of things.  I was not familiar before I
4    became on the State School Board with a two-year
5    college system.  At that time we go to a two-year
6    college system, and I was not in agreement with
7    the way that the Democratic party approached the
8    two-year college system.  I had great
9    disagreements with them about that.  I also
10   disagreed with the Democratic party on basic
11   issues like abortion, gaming, Second Amendment
12   rights.  And I was already at odds with the
13   National Democratic Party.  What really startled
14   me was how much at odds I was with the State
15   Democratic Party.  And that made it very clear to
16   me that I should change parties because, once
17   again, I was being honest with myself and with the
18   people I represent about where I stand on issues.
19       Q    And on abortion, what -- how did you
20   differ from the Democratic party on the issue?
21       A    I'm ardently pro life.
22       Q    And on the Second Amendment, how did you

Page 31

1    differ from the Democratic party?
2        A    I'm ardently pro Second Amendment.
3        Q    Okay.  Are you antigun control?
4        A    Yes, I'm antigun control.  I think we
5    have a right to bear arms under the Second
6    Amendment.
7        Q    And there was another issue other than
8    education that you mentioned.
9        A    Gaming.
10       Q    Gaming.  What was -- what was your
11   difference with the Democratic party on gaming?
12       A     Well, again, the Democratic party was
13   very pro gaming and I was not.  You remember in
14   1999, Governor Siegelman pushed a so-called
15   education lottery.  And he expected the State
16   School Board to be supportive of his education
17   lottery.  And I remember calling him on the phone
18   and telling him, because I wanted him to hear it
19   from me, that I was not supportive of his lottery.
20   I did not think his lottery was good for the
21   education system in the State of Alabama.
22       Q    You became at some point the Chancellor

Page 32

1    of the Alabama Department of Postsecondary
2    Education?
3        A    Uh-hmm.
4        Q    When was that?
5        A    That was May of 2007.
6        Q    Okay.  So that was after your time as a
7    State Senator?
8        A    I was a State Senator and then Governor
9    Bob Riley called me and wanted me to leave the
10   State Senate, leave my private practice of law and
11   take on the role of Chancellor with a two-year
12   college system, a full-time job.  When he
13   initially asked me to do it, I turned him down.
14   But he came back to me, and some other people came
15   back to me and persuaded me to do it, and I did
16   it.
17       Q    And what were your -- what was the time
18   period that you did that role?
19       A    I was the Chancellor from May of 2007
20   until I think May or June of 2009.
21       Q    And what did you do after you were the
22   Chancellor of the Alabama Department of

Case 2:21-cv-01530-AMM   Document 80-5   Filed 12/23/21   Page 9 of 77

1   Postsecondary Education?

2      A   I ran for Governor and lost.

3      Q   Sounds like that was probably the only

4   election you ever lost, though.

5      A   It's the only election I ever lost, but

6   I'll never forget it.

7      Q   Yeah. I've heard from people that

8   that's the case, right, that's the -- you never

9   forget that one.

10      A   That's true.

11      Q   Yes.

12      So -- and what were your

13   responsibilities generally as the Chancellor?

14      A   The Chancellor is the Chief Executive

15   Officer of Alabama's two-year college system. At

16   that time, the governing board was the State Board

17   of Education so I was formally appointed by the

18   State Board of Education. That's who I answered

19   to. They were like my Board of Directors. Since

20   then they've created a separate board to govern

21   that system. That's the way it was then.

22      So I was responsible for making sure

---

1   that we carried out the laws, that we carried out

2   the directives and policies of the State Board of

3   Education, and that the system was delivering on

4   our mission. At the time I took over, the

5   two-year college system was in a true crisis.

6   There were two Grand Jury investigations going on.

7   The Birmingham News had just won the Pulitzer

8   Prize reporting on corruption in the system.

9      Q   It's never -- when you get the Pulitzer

10   Prize for a system that is corrupt, right --

11      A   Yes. I mean, when the biggest newspaper

12   in your state gets the Pulitzer Prize, reporting

13   about the corruption of the system you've just

14   been appointed to take over -- and we were

15   attracting a lot of new jobs to Alabama. The

16   two-year college system is a critical, if not the

17   critical component to providing the workforce

18   education the people need to be able to be

19   prepared for those jobs. And so the Governor

20   said, look, I need for you to first and foremost

21   clean up the corruption in the system. And the

22   corruption was endemic in the system. Secondly,

---

1   you've got to turn this system to be a much more

2   effective provider of this education as we

3   continue to develop Alabama economically. And

4   then later on, after I became Chancellor, because

5   of the recession, I had to do all of that while we

6   were cutting tens of millions of dollars out of

7   the system, but it was a daunting task. But I

8   understood how important it was to the state and,

9   despite the fact I did not want to do it -- and

10   Governor Riley can tell you how much I did not

11   want to do it -- I did it. I'm glad I did, and

12   I'm proud of the work that we did.

13      Q   That's great.

14      And you also practiced law, I know, over

15   a long period of time. What kind of law did you

16   practice?

17      A   I tell everybody I started out my career

18   as a commercial litigator who did labor and

19   employment law on the side and at the end of my

20   career I was a labor and employment lawyer who did

21   commercial litigation on the side. Both sides of

22   law, obviously, and doing a lot of litigation.

---

1      Q   And where did you practice when you were

2   practicing law?

3      A   I started out -- well, all of my

4   practice was in Mobile -- geographically I was

5   headquartered in Mobile. Obviously I had cases

6   all over the State of Alabama, some in the

7   panhandle of Florida, a couple in the Gulf Coast

8   of Mississippi.

9      Q   Okay. Let me ask you, I know you've --

10   it sounds like you've only had brief conversations

11   kind of about this case, but you understand, I

12   take it, Congressman, that you've been listed as a

13   potential witness for the Secretary.

14      A   Yes, I have.

15      Q   And what topics do you expect to testify

16   about at trial?

17      A   About the proposals that would

18   significantly change District 1.

19      Q   Okay. Anything else?

20      A   No, sir.

21      Q   And what do you expect to testify about

22   concerning that topic?

Page 37

```
 1      A    I would be testifying, I assume, about
 2  the significant concerns I have about the
 3  proposals in each of Exhibits 1, 2, 3, and 4, for
 4  the redrawing of District 1.
 5      Q    We'll dive into that in just a minute.
 6           And let me just ask you before we do
 7  that, did you participate in any capacity in
 8  Alabama's redistricting process in the 2011
 9  redistricting cycle?
10      A    No, I was not in the legislature.
11      Q    Okay.  Did you provide any input, have
12  any conversations, anything like that?
13      A    Not about congressional districts.  I
14  think after the fact I had a discussion with Randy
15  Davis who was the House Member somewhat -- in some
16  way involved in doing this about the School Board
17  District (indicating).
18      Q    And you're pointing to what I believe
19  was marked as Exhibit 5?
20      A    Exhibit 5, yes.  He and I had a
21  discussion about that.  It may have been after the
22  fact.  I'm not certain.
```

Page 38

```
 1      Q    After it had changed to this current
 2  configuration?
 3      A    It was either as it was being proposed
 4  in this configuration or after it had been
 5  adopted.
 6      Q    Okay.  And can you tell me, Congressman
 7  Byrne, about that conversation with Mr. Davis?
 8      A    Yes, I was concerned about taking away
 9  any part of Mobile County and putting it into
10  another district.  He and I had a discussion about
11  why they decided to do that.
12      Q    And why were you concerned?
13      A    Because I think it's important to keep
14  counties whole.  I think it's problematic for a
15  State School Board member from Montgomery to be
16  able to understand the problems with the school
17  system in Mobile County.
18      Q    Okay.  And what was your understanding,
19  if any, of why the current configuration was being
20  proposed?
21      A    Well, because the population changes
22  within District 5, they needed to grow it, and so
```

Page 39

```
 1  they were looking for ways to grow it.  And they
 2  decided to put part of it, as you can see from
 3  Exhibit 5, in the northeastern quadrant of Mobile
 4  County.  And so I was expressing concerns about
 5  having two school board members dealing with the
 6  Mobile County School System.  That was my primary
 7  concern.
 8      Q    Did you have any understanding of
 9  whether -- of what the change to the current
10  configuration of the Board of Education districts
11  did in terms of majority-minority districts,
12  either in District 5 or District 4?
13      A    We didn't get into that.  I was more
14  concerned about the problem of a person from
15  Montgomery trying to understand all of the issues
16  regarding the Mobile County School System.
17      Q    Did you -- did you have an understanding
18  that District 5 is now in the State Board of
19  Education district -- State Board of Education
20  map, that that is not a majority-minority
21  district?
22      A    Well, it was when I was on board.  It
```

Page 40

```
 1  just wasn't configured this way.  But it was a
 2  majority-minority district then.
 3      Q    Okay.  And was that true the whole time
 4  that you were on the school board?
 5      A    Yes, there were -- there were two
 6  different members.  I have forgotten the man that
 7  was the member on it when I first was elected.
 8  But he was retired and was replaced by Ms. Ella
 9  Bell.  So I worked with both of them and actually
10  spent a little bit of time in various places in
11  that district with them because they were
12  different school board members.  And particularly
13  because I had a contiguous district to work with
14  them, there were times when there were people in
15  some of the counties just to the north of my State
16  School Board district would call me for help on
17  things, and I would tell them, I'm not your school
18  board member, but I'm happy to help.
19      Q    Right.
20      A    And I would always inform the member
21  from that district, hey, I've had this request
22  from people in your district.  I don't want to do
```

Page 41

1  anything in your district unless you're okay with
2  it.  In every case they would say, no, fine, I
3  appreciate you doing it.  Sometimes that was true
4  because of the geographic proximity.  It's a lot
5  easier for somebody from Mobile to deal with
6  Washington, Clarke, and Monroe, for example, than
7  it is for somebody from Montgomery.  So I could
8  physically be present where it was very difficult
9  for somebody from Montgomery to physically be
10 present.
11      Q    I take it from kind of the beginning of
12 your answer, it sounds like there were two
13 majority-minority districts in the plan while --
14 during the time that you were on the school board?
15      A    Yes, there was this district, District
16 5, and I can't remember the number of the
17 district, but it was Dr. Hall or Dr. Hall's
18 district.  That was mainly Birmingham.  I know it
19 was more than that.  Dr. Hall was the vice chair
20 of the Board when I was on the Board.  Vice chair
21 is elected by the Board.  The governor's formally
22 the chair of the Board, but the vice chair really

Page 42

1  functions as the chair of the Board.  So Dr. Hall
2  was our vice chair chair the whole time I was on
3  the Board, and I certainly had a lot of
4  interaction with Dr. Hall and sometimes in her
5  district.
6      Q    Okay.  Just looking at Exhibit 5, do you
7  recall if Dr. Hall represented what's labeled as
8  District 4 which kind of goes up into Jefferson
9  County and Birmingham?
10     A    Yes, I think she did, but I don't know
11 that it was configured this way.  I can't tell you
12 for sure.
13     Q    Sure.
14     A    Mainly when I was interacting with
15 Dr. Hall in her district, I was in the Birmingham
16 area.
17     Q    What kinds of interactions did you have
18 with Dr. Hall concerning her district?
19     A    We would have State School Board
20 meetings in her district.  She would have other
21 meetings in her district pertaining to education,
22 and she would invite some or all of us to come to

Page 43

1  these meetings.
2      Q    Sure.
3      A    I tried to accommodate Dr. Hall every
4  chance I could.  I had tremendous respect for her.
5  She was our leader.  And if she asked me to do
6  something, if I could do it, and I was a
7  practicing attorney so I -- lawyer duties, but if
8  I could do it, I tried to make my schedule
9  available for her.
10     Q    How about in District 5, it sounds like
11 you had some interactions with the representative
12 from -- school board member, I should say, from
13 District 5 as well?
14     A    Oh, yes, yes.  We had not just those
15 three counties, just above District 1, which would
16 be Washington, Clarke, and Monroe, but we had
17 meetings in Selma, Tuskegee.  Lots of things
18 around Montgomery.  Of course, when we met
19 formally, usually we were meeting in Montgomery,
20 but we had other things around Montgomery like the
21 Trenholm State Technical College there in
22 Montgomery.  So I had a fair amount of meetings in

Page 44

1  District 5.
2      Q    Okay.  And who represented District 5
3  when you were on the Board?
4      A    I think the gentleman's name when I was
5  first elected was Dr. Willie Paul, and then he
6  retired and he was replaced by Ella Bell, who I
7  think is still on.
8      Q    Okay.  Did you work with either Dr. Paul
9  or Ms. Bell?
10     A    A lot.
11     Q    What kinds of things did you work with
12 them on?
13     A    Just about everything you can imagine
14 that was within the jurisdiction of the State
15 School Board.  So it could be K-12 matters.  It
16 could be postsecondary matters.  There was a lot
17 of that.  A lot of the good things about the Board
18 when I was on it was we all interacted with one
19 another about one another's districts a lot, and I
20 really appreciated, when I was first on the Board
21 and not as familiar with that district, Dr. Paul
22 was really good about explaining things to us,

Page 45

1  taking us there.  I remember we had a State School
2  Board meeting in Tuskegee and we got there the day
3  before, spent the night.  We got to tour, learned
4  all about Tuskegee.  So I think Dr. Paul did a
5  really good job of making sure we knew about his
6  district, in each of his district, and I really
7  enjoyed doing that.
8      Q    So let me shift gears again here and
9  just ask you if you're familiar with the term
10 "communities of interest" as it applies to
11 redistricting.
12     A    I couldn't define it for you.
13     Q    Okay.  Not a formal definition, but do
14 you have a sense of kind of what that means or --
15     A    No, you would have to tell me.
16     Q    Okay.  In your view, are there
17 communities of interest in your district?
18     A    Of course.
19     Q    Your congressional district?
20     A    Yes.
21     Q    Is there a way you can describe those?
22     A    Yes.

Page 46

1      Q    I can -- I can give you a current -- I
2  know you know it very well, but if it's easier to
3  talk about, looking at the current map, I can --
4  why don't we mark one just so we all have it in
5  front of us while you're -- while you're
6  discussing.  So this will be Exhibit 6.
7          (Exhibit 6 was marked for identification
8  and attached to the deposition transcript.)
9  BY MR. SPIVA:
10     Q    If you want to do it in connection with
11 Exhibit 6, which is the current map of the U.S.
12 House Districts in Alabama, or if you want to just
13 do it, you know, without referencing it, however
14 is, you know, easiest for you, but if you could
15 kind of describe the communities of interest in
16 your district.
17     A    Sure.  And I'll start with Exhibit 6
18 because it is helpful.  If you look at this map of
19 those counties, everything feeds into Mobile
20 Baldwin, okay?  First of all, you have two major
21 river systems that come together, and those two
22 river systems help define both the economy and the

Page 47

1  culture and the communities of that area, going
2  back hundreds of years.  Many of the jobs for the
3  district are there in Mobile and Baldwin Counties,
4  and so you have people from Washington, Clarke,
5  Monroe, and Escambia, who travel into those
6  counties for their work and then go home at the
7  end of the day.  So just sort of center of
8  everything is here in Mobile and Baldwin Counties
9  just because of what they do economically.  A lot
10 of what the people in that area also get in terms
11 of information comes from the three television
12 stations there because people all get those
13 television stations, and they obviously get their
14 news from that.  It used to be we had a common big
15 urban newspaper, the Mobile Register, we still do,
16 but it only prints three days a week so it's not
17 quite as strong as it used to be.
18     Q    It's kind of a common thing around the
19 country, the local papers going online or just
20 going out of business.
21     A    Well, in Alabama, the three biggest
22 newspapers have gone to I think three days a week.

Page 48

1  They have this online presence called AL.com.  So
2  -- but it used to be that even people in Monroe
3  would get the Mobile Press-Register.  That's where
4  they got a lot of their news.  But certainly today
5  they get a lot of their news from those three
6  local television stations.
7          Also because of the fact that you've got
8  an urban area there in Mobile, a lot of people are
9  pulled into that for cultural activities, civic
10 activities, entertainment and things.  So Mobile
11 and now -- now that Baldwin County has grown so
12 much, they're kind of a magnet for those four
13 counties north of there and pull people in, both
14 for work and for the other things I mentioned.
15     Q    Okay.  Now, I notice that Clarke County
16 is only partially in your -- in your district.  Is
17 there -- to your knowledge, is there a reason why
18 that piece of Clarke County is included in
19 District 1 but not the rest of Clarke County?
20     A    Well, I wasn't a congressman when this
21 --
22     Q    Sure.

Page 49

1   A   -- map was done so I'm not sure what
2  their motives were, but if you followed U.S. 43
3  north of Washington County, it would go
4  basically through the middle of what you see there
5  as part of District 1.  So that includes two key
6  communities, Jackson and Grove Hill.  That's not
7  all of the city limits of Jackson or all the city
8  limits of Grove Hill, but a big part of each of
9  those run right where U.S. 3 goes through there.
10  And so the people in Grove Hill and Jackson will
11  drive down to U.S. 43 to get to Mobile both for
12  work and those other things that I mentioned.
13   Q   Right.  Okay.  Any other things that you
14  would describe as communities of interest in your
15  district?
16   A   Well, everything keys off of what I said
17  before.  Obviously jobs, economics pull people in.
18  You've got that river system.  A lot of us like to
19  hunt and fish and so the Mobile-Tensaw River Delta
20  is a very rich place in terms of habitat.  We're
21  all interested in that.  This is the oldest part
22  of the state of Alabama, founded by the French in

Page 50

1  1701, but you had other people that came in there
2  to form that area.  So you have this sort of
3  historical tradition there.  Mobile was a French
4  city where Mardi Gras started in the United
5  States.  So Mobile -- used to be Mobile had Mardi
6  Gras parades, nobody else did.  Now these other
7  places all have Mardi Gras parades.  And so Mardi
8  Gras has become something that pulls people
9  together.  We have a major university, University
10  of South Alabama.  It not only pulls people in
11  from those areas, it does things out into these
12  counties.  So everything comes back to that for
13  those four counties outside of Mobile and Baldwin
14  County, everything comes back to that.
15   Now, the fastest growing county in the
16  State of Alabama, and, therefore, in my district,
17  is Baldwin County on the eastern side of Mobile
18  Bay.  And so you used to just talk about Mobile,
19  but my answer previously included Baldwin County
20  because increasingly you've got Baldwin County
21  pulling people in, whether it's to the eastern
22  shore of Baldwin County or down there on the

Page 51

1  beaches, Orange Beach and Gulf Shores, which are
2  tremendous hubs for tourism activity -- people
3  play and have fun.  Also as part of our sort of
4  shared culture down there is we love seafood.  And
5  the seafood industry is very important to that
6  district.  Lots of restaurants, not just in Mobile
7  and Baldwin Counties, but even these other places,
8  lots of restaurants specialize in seafood.  So
9  that's another part of it.  Gosh.  While the
10  economy is diverse in that area, there are certain
11  things about the economy of that area that are
12  unique.  For example, you've got a port.  No other
13  part of Alabama has a port on the ocean or the
14  Gulf of Mexico.  As I said, seafood is a big part
15  of it.  And recreational fishing is a big part.
16  So you have -- if you just think about that part
17  of Alabama, and every part of Alabama is unique
18  and has its own good attributes, but those --
19  those are unique attributes, good attributes for
20  that part that pull people together.
21   Q   Okay.  Do you believe that communities
22  of interest under the current Alabama map -- but

Page 52

1  here I'm not just focusing on your district but
2  the whole state -- do you think they're generally
3  kept together under the current map?
4   A   Well, I haven't thought about it for
5  other districts, and I can't claim that I have the
6  same level of knowledge about the other districts.
7   Q   Sure.
8   A   But knowing what I know about them, I
9  think there are common interests in each of these
10  districts.  You can look at the map and tell that
11  there are some districts that are geographically
12  larger than others.  And the larger they are, the
13  more geographic area you cover, the less you have
14  communities of interest.  So that might be the
15  case.  But when you look at like the District 5,
16  which I call the Tennessee Valley.  My daughter
17  actually lives up there so I'm familiar with it
18  through her, but I've also spent a lot of time
19  working up there.  That is clearly a community of
20  interest because of the fact that they share the
21  Tennessee River.  The Tennessee Valley Authority
22  provides their power.  They have their own unique

Page 53

```
1   history up there.  Huntsville, which is right near
2   Madison County, is where they made the rocket for
3   Apollo 11.  So there's a lot of pride around that
4   for obvious reasons.  It's a more mountainous
5   area.  Where I live, it's more of a flat, coastal
6   plain going down to the beaches area.  So those
7   two areas are pretty distinct.  You can tell that.
8           District 2 is mainly -- we know it
9   mainly as the wiregrass, plus Montgomery and some
10  suburban counties.  Wiregrass is a pretty
11  well-defined region that has its own separate
12  economy, special features, culture.  Their
13  agriculture is somewhat different from the
14  agriculture that I have in my district.  So
15  they're more common that way.
16          District 7 is largely what we would know
17  as the Black Belt in Alabama, not because of
18  people's race but because of the soil.
19      Q   Right.  Yes.
20      A   And so those counties have a lot in
21  common with one another.  And it's contiguous to
22  my county, and obviously I have a part of Clarke
```

Page 54

```
1   County that is considered to be a part of it.  So
2   Representative Sewell, who represents District 7,
3   and I work together in that because we have a lot of
4   things that we have in common.
5       Q   I went to law school with Representative
6   Sewell.
7       A   Well, she and I -- she was, by the way,
8   the bond lawyer -- one of the bond lawyers --
9   outside bond lawyers when I was Chancellor of the
10  Postsecondary system.  This is before she was in
11  Congress.
12      Q   Right, yes, sure.
13      A   So before she and I were colleagues, she
14  was my lawyer.
15      Q   Oh, okay.
16      A   So she and I have a good working
17  relationship.  I knew some from my time before
18  being in Congress about that district, Dr. Paul
19  obviously introduced me to a lot, but I think
20  Representative Sewell does a good job of that as
21  well.  So I see her district as having a community
22  of interest.
```

Page 55

```
1           East of Alabama, District 3, that's Mike
2   Roger's district.  It's a little bit
3   geographically bigger, but we kind of tend to see
4   east Alabama as its own geographic region within
5   the state.  It goes from Russell all the way up to
6   Cherokee, but you've got Opelika and Auburn where
7   Auburn University is, an extremely important asset
8   to the State of Alabama.
9           And then District 4, which is Robert
10  Aderholt's district, is over there just below the
11  Tennessee Valley.  You have Cullman.  You have
12  Jasper.  These are -- they tend to be kind of the
13  same area.  And that area right in the center,
14  District 6, that's Gary Palmer's district.  That's
15  mainly the suburban areas to the City of
16  Birmingham.  The part of District 7 that gets up
17  into Jefferson County is mainly -- mainly the City
18  of Birmingham.  So all of this area of District 6
19  is the suburban areas to Birmingham.
20          So when I look at those, with not having
21  the same level of knowledge about each of those
22  districts as I do about my own, I do see that they
```

Page 56

```
1   have a lot in common and that sort of grouping
2   makes sense to me.
3       Q   Okay.  Does it make sense to, with
4   respect to kind of what you just said, District 6
5   and District 7, to separate the suburban areas of
6   Birmingham from the -- from the city itself?
7       A   Well, I would prefer -- this is not with
8   regard to that district -- with all districts -- I
9   prefer to keep counties whole.  But -- and I don't
10  know why they chose to do it this way.  It may be
11  that they thought putting Birmingham together with
12  the Black Belt districts made more of a community
13  of interest than the suburban counties for
14  Birmingham.  I don't know.  But I just -- just
15  knowing those counties, I think that they have a
16  lot in common.
17      Q   Okay.  Do you think the City of Mobile
18  has anything in common with the Black Belt
19  counties?
20      A   Not as much.  Mobile historically --
21      Q   I keep mispronouncing it.  I tried to
22  get it right, but I keep -- I keep saying it
```

Page 57

```
 1   wrong.
 2       A    It's real simple.  It's Mobile.
 3       Q    Mobile, yes.
 4       A    Mobile historically was the port through
 5   which timber and agricultural products moved from
 6   the interior of the state of Alabama and then out
 7   to the world.
 8       Q    Right.
 9       A    And so back in those days, when that was
10   a very important part of the economy of the
11   interior of the state, then there probably was
12   more contact between Mobile and the Black Belt.
13   That's not nearly as important anymore.  So I
14   don't see as much contact and have not in my life
15   have seen as much contact between those Black Belt
16   counties and the southwestern part of the state.
17   They just don't have that connection as much as
18   they used to.  I wish we had more of a connection,
19   to be honest with you, but it's just the
20   practicalities of the economy that they have
21   there.  Mobile is not as important to them because
22   they're not moving things through the port as much
```

Page 58

```
 1   as they used to.
 2       Q    Right.  Okay.
 3            Let me ask you, if you would, can we
 4   flip back to the current Board of Education map,
 5   which I think is Exhibit 5.
 6       A    Five.
 7       Q    Five, yes.  I apologize.  There are a
 8   couple questions I think I neglected to ask you
 9   when we were talking about that.  Do you -- do you
10   view the 2011 Board of Education plan as --
11   respecting communities of interest?  And in
12   particular, kind of focusing on your area of the
13   state and the area above it, so kind of what are
14   now labeled District 1 and District 5.  I mean, do
15   you -- do you view that as respecting communities
16   of interest, or not really?
17       A    Not really.
18       Q    How come?  I apologize, I know you
19   covered some of this before.
20       A    That's fine.
21            I don't think that Conecuh, Butler,
22   Crenshaw, and Covington look to Mobile very much,
```

Page 59

```
 1   whereas obviously the people in the northeast
 2   quadrant of Mobile County that are in District 5,
 3   they look to Mobile all the time.  So they've been
 4   essentially for purposes of the State School Board
 5   taken out and put into a district that looks more
 6   to Montgomery.
 7       Q    Okay.  When you say "looks to," I think
 8   I kind of like intuitively understand what you
 9   mean, but can you explain a little bit more what
10   you mean by "looks to"?
11       A    Where do you get your news from.  Where
12   is the big city that you go shopping.  Where are
13   the commonalities of the economy.  Where is the
14   commonality in your traditions.  You think of
15   Conecuh, Butler, Crenshaw, and Covington being
16   more a part of what we call the wiregrass.  And,
17   like I say, they look to Dothan and Montgomery.
18   They don't look to Mobile as much.
19       Q    Okay.  Has -- I think you -- you said or
20   named the current representative as Ms. Bell, I
21   believe?
22       A    Ella Bell.
```

Page 60

```
 1       Q    Ella Bell, yes.
 2            Has she ever expressed to you any
 3   concerns about the current configuration of the
 4   district -- of her district?
 5       A    I don't think I've talked to Ms. Bell
 6   since the current configuration of this district
 7   was made.
 8       Q    Okay.  Have you -- have you heard from
 9   anybody concerns about the current configuration,
10   especially with respect to District 5?
11       A    Well, I referenced earlier the
12   conversations I had with Mr. Davis, who was the
13   representative who was in charge of putting
14   together the State School Board districts.  I
15   certainly registered to him my concerns.  I don't
16   know that I remember hearing anybody else have the
17   same concerns or at least voice them.
18       Q    Okay.  So let's maybe now turn back to
19   what we've been calling the proposed plans or
20   revised plans.  Why don't -- why don't we start
21   with what was Exhibit 1, which is labeled "Revised
22   Plan 1, Alabama -- U.S. House, Revised Plan 1."
```

Page 61

1     A    Uh-hmm.

2     Q    As soon as I can get it in front of me,

3 let me just ask you, what is your view of revised

4 plan 1, which is Exhibit 1?

5     A    I don't think it's good for the counties

6 that are presently in District 1 that would remain

7 in this district, which would be Mobile, Baldwin,

8 and Escambia. And I don't think it's good for the

9 counties that are presently in District 2, which

10 are Covington, Coffee, Dale, Henry, Houston, and

11 Geneva.

12     Q    Why not?

13     A    Well, they are two different regions of

14 the state, and they don't have the commonality

15 that you see presently existing within present

16 Districts 1 and 2. It's a long way from West

17 Mobile to the eastern part of Houston County. So

18 a congressman has to cover that whole area if

19 they're doing their job right. So it is -- if you

20 look at the present composition of District 1,

21 it's not easy, but it's not as hard to get around

22 that district and cover all those different

Page 62

1 communities. Whereas if you had to go all the way

2 from West Mobile County to Houston County, it

3 would be far more difficult to cover all of those

4 communities. I mentioned earlier, I do a lot of

5 town halls. I do them in every community you can

6 imagine, big, small, rural, doesn't matter.

7     Q    Yes.

8     A    It would be very difficult for me to be

9 able to cover what's here in District 1 and have

10 the same level of town halls and certainly get to

11 the variety of places I try to get to. Plus

12 there's such a difference in the economies, et

13 cetera, and what you're an advocate for in

14 Congress, that you would still be an advocate for

15 the entire district, but it would dilute your

16 ability to be the advocate for the district. A

17 Senator and a Governor represent the whole state,

18 and they have to look out for the whole state. A

19 congressman looks out for their district.

20     Q    Right.

21     A    They're the ones totally focused on the

22 district. So right now as a congressman from

Page 63

1 District 1, I can totally focus on what I

2 described to you earlier as the economy and the

3 other needs for the present composition of

4 District 1. What you would be asking a

5 congressman to do under Exhibit 1 is to take that

6 same level of effort and spread it out over a much

7 broader array of interests. I wouldn't say that a

8 congressman wouldn't try to do it, but I don't

9 think even somebody working as hard as they

10 possibly could, could do it as well or with the

11 same level of attention and focus that there needs

12 to be, plus you're splitting Mobile County up

13 between District 2 and District 1, and I do not

14 think it's in the district -- in the interest of

15 the people of Mobile County to be split up like

16 that. I think they need to have a whole county

17 working with one congressman. I think they need

18 to be conjoined with the whole county of Baldwin

19 County.

20     Q    Okay. Do you think there would be any

21 benefits to the people of the City of Mobile to a

22 configuration such as this?

Page 64

1     A    I think it would be to the detriment of

2 the people to the City of Mobile. I've been very

3 involved in economic development efforts in that

4 area for a long time. And splitting up our

5 congressional representation would hurt those

6 economic development efforts which have, frankly,

7 done an amazing -- we have gotten an amazing

8 result these last several years. Airbus has a

9 plant there, for example. That Airbus plant just

10 didn't show up there. There was substantial

11 effort to make it happen. We have a Navy shipyard

12 there in Mobile. That Navy shipyard didn't just

13 show up there and still remain there. There's

14 substantial effort for that to happen. I'm

15 picking out some big examples.

16     Q    Sure.

17     A    I would -- I would think it would hurt

18 those efforts based upon my experience going

19 forward for there to be two congressmen

20 representing that area rather than one.

21     Q    Something you mentioned a minute ago or

22 kind of at the beginning of the answer you gave

Page 65

1  about the map, you said that it would be
2  difficult, I think, to kind of represent --
3  effectively represent the whole area because --
4  was that in terms of the wiregrass counties in the
5  eastern part of the proposed District 1, is that
6  mainly because of the distance or because of other
7  factors?
8      A     Other factors as well. Distance,
9  certainly, is a big part of it. It's a larger
10  geographic area, therefore, more difficult to
11  cover. But there's a big difference in the
12  Covington and Geneva, Coffee, Dale, Henry, Houston
13  economy, what they focus on, than there is in the
14  Escambia, Baldwin and Mobile, of the counties
15  presently in there. One of the big things about
16  those eastern counties is you've got right in the
17  middle of that Fort Rucker.
18      Fort Rucker is a major focus for any
19  congressman representing that area. It represents
20  an enormous number of jobs, not just at the Fort
21  but private sector businesses that do business
22  with the Fort. You've got a lot of military

Page 66

1  retirees around in the -- in the communities
2  around the Fort.
3      Houston County and Dothan, they have two
4  or three different very important businesses going
5  on there, but one of their newest things, they've
6  got an osteopath college, a medical school,
7  osteopath school. That's very different from a
8  medical school like you have at the University of
9  South Alabama in Mobile. Not worse or better,
10  just different.
11      Q     Right.
12      A     You have a major university in Mobile
13  County. They do not have a major university in
14  the eastern counties in District 1, but they look
15  just north to Pike where Troy University is. Troy
16  University is a very different university from the
17  University of South Alabama. Not better or worse.
18  Different.
19      Q     Right.
20      A     So the interest that you would be trying
21  to represent in these eastern counties are
22  fundamentally different from the interests over

Page 67

1  here in the western part, Mobile, Baldwin, and
2  Escambia. Even though there's some commonality in
3  agriculture, the agriculture is different.
4  They've got more poultry and cattle over there
5  than we do on our side. We have more row crops
6  than they do. So even though the agriculture may
7  be similar, there's still some significant
8  differences. So, for example, in Mobile and
9  Baldwin Counties where I focus on things like
10  fixing the red snapper season, which is a federal
11  thing, believe it or not, making sure that we have
12  the proper funding for the Navy shipyard in
13  Mobile. I can really focus on things like that.
14  But if you throw into the mix Fort Rucker, Troy,
15  these other agricultural interests that are
16  different from mine, then, once again, not just
17  from the geography, but from the diversity of
18  interest, I'm spreading my focus. I'm spreading
19  my efforts over a much broader array of interests.
20      Q     Okay. Are there any issues like that
21  that you can think of where it would present kind
22  of a conflict in the way you would need to vote on

Page 68

1  a given issue? I understand that they're
2  different, they're kind of different issues, but
3  where you would say, well, gosh, I got to vote
4  for, you know, some water issue over here but I've
5  got -- I've got to vote contrary to that because,
6  you know, it's a more land-based area. Can you
7  think of anything like that?
8      A     You know, I'll give you an example. We
9  had a water bill that moved through Congress a
10  couple years ago, and because I represent these
11  seafood areas, some of the seafood interests came
12  to me and said we want to include in the bill the
13  authorization of a study about oyster production.
14  Okay? Very important to that area. The Georgia
15  members saw that language and thought that it was
16  there to try to protect the flow of water that
17  ultimately gets down to Appalachia Cola because
18  they have their own oysters. And that's where the
19  Chattahoochee flows out of Georgia along the line
20  with Alabama, and then through Florida.
21      And so I was able to tell them, no, this
22  has to do with my district, which is over here.

Page 69

1    Q    Right.

2    A    It doesn't have to do with this side

3    over there, and I'm not getting into your water

4    wars because there's a water war between Alabama,

5    Georgia, and Florida --

6    Q    Right.

7    A    -- with regard to the Chattahoochee and

8    water coming out of the Atlanta. So that was -- I

9    was able to escape what would have been a blocking

10   vote from the Georgia delegation over that. But,

11   in large part, it's not necessarily how you vote.

12   It's how much time -- there's only so many hours

13   in the day.

14   Q    Right.

15   A    I only have so many people on my staff.

16   Okay? If you make me take my time, my staff and

17   I divide it along a much greater geographic area, a

18   much wider area of interest, each one of those is

19   going to get less attention, less effort.

20   Something is going to suffer. That's just the

21   nature of the world that we live in.

22   Q    Right.

Page 70

1    A    So, once again, that's the difference

2    between being a congressman and a Senator.

3    Q    Right.

4    A    A Senator looks after the entire state.

5    Q    Right.

6    A    The congressman is focused on his or her

7    district. I focus on my district. Congresswoman

8    Roby who presently represents District 3 -- is

9    that what it is?

10   Q    I think so, yes.

11   A    Yes. Is it 2?

12   Q    Two.

13   MR. DAVIS: Roby is 2.

14   A    She really focuses on her district. She

15   knows that stuff about Fort Rucker. And she got

16   it. And if she needs my help, she'll call me and

17   I'll give it to her, but I recognize her as the

18   expert on Fort Rucker. If she needs some help

19   with Troy, even though I don't represent Troy, she

20   calls me and I'm going to help her, but I

21   recognize that she's got the expertise on that.

22   All of us in the Alabama delegation have that

Page 71

1    understanding. If Congresswoman Sewell tells me

2    "I need some help with something in the Black

3    Belt," you tell me where you want to go, I'm going

4    to get behind you and help you. We do that for

5    one another. It's one of the strengths of our

6    delegation, is that we do that. But we have to

7    have that focus and expertise by the member from

8    that district to lead the rest of us and, frankly,

9    to lead the state as to where we need to go.

10   Q    Right. I understand you are -- you are

11   seeking to be the next Senator from Alabama.

12   A    I am. I am.

13   Q    You're going to have a change of focus.

14   A    I am. I am. And that's why right now I

15   can sort of see the difference.

16   Q    Right.

17   A    There is -- there is a fundamental

18   difference between being a Senator, for that

19   matter a Governor, and being a congressman.

20   Congressmen or congresswomen focus on their

21   district. They're the advocate for their

22   district. And that's true not just in legislation

Page 72

1    but in federal programs, federal grants, and even

2    in economic development. Believe it or not,

3    they'll take a congresswoman or congressman when

4    they're doing -- pitching somebody to come to an

5    area and bring them in the room and say this is

6    why this area is so important. This is why you

7    should bring your business or factory and locate

8    it here. I play that role. I know everybody else

9    in delegation plays that role as well.

10   Q    Sure, okay.

11   MR. DAVIS: Before you go to the next

12   question, Congressman, do you need a break or a

13   cup of water?

14   THE WITNESS: I would love a cup of

15   water.

16   MR. SPIVA: I'm sorry. I apologize.

17   I've been sitting here drinking this.

18   THE WITNESS: Are we taking a break?

19   MR. SPIVA: Yes, why don't we take a

20   few-minute break.

21   MR. DAVIS: Just a couple minutes.

22   THE WITNESS: Yes, that would be great.

Page 73

1     THE VIDEOGRAPHER:  The time is 11:06
2   a.m. and we're going off the record.
3        (A brief recess was taken.)
4     THE VIDEOGRAPHER:  The time is 11:11
5   a.m. and we're back on the record.
6     MR. DAVIS:  Before we continue, Bruce,
7   am I correct that we have an understanding that
8   this deposition be used only for purposes of this
9   litigation?
10    MR. SPIVA:  Yes.
11    MR. DAVIS:  Including the video, the
12  deposition transcript, all of that.
13    MR. SPIVA:  Yes, yes.  It's not under
14  seal, obviously, but we have no intent of like,
15  you know, displaying this on the evening news or
16  anything, you know -- anything like that, yes,
17  right, exactly.  I mean, I just -- I just want to
18  be careful that I'm not like agreeing to keep it
19  under seal because then it creates all kinds of
20  problems when you have, as you know, Congressman,
21  when you have to file, you have to file with a
22  motion, and, you know, if there's anything that's

Page 74

1   referenced or anything like that --
2     MR. DAVIS:  No, no, I'm not suggesting
3   it should be under seal.  I just want the typical
4   understanding that with most depositions, it would
5   be used for purposes of the litigation.
6     MR. SPIVA:  Yes, that is -- that is -- I
7   will agree to that, yes.
8   BY MR. SPIVA:
9      Q     So, Congressman Byrne, was there
10  anything else that was of concern to you regarding
11  revised plan 1, which is I think labeled as
12  Exhibit 1?
13     A     Well, at least in general I've covered
14  all of it, but there's -- there are a lot more
15  details I could go into with regard to the
16  different economies, et cetera.  But, in general,
17  I think I've told you about the spread of time,
18  spread of resources and advocate over a greater,
19  not only geographic area, but greater different
20  types of interests.
21     Q     And then maybe just focusing on, for a
22  minute, the CD 2 under the revised plan 1, and if

Page 75

1   it's helpful to look at the current plan.
2      A     Yes.
3      Q     In looking at that --
4      A     Yes, here.
5      Q     -- do you have any further concerns
6   other than the ones you've already articulated
7   concerning the proposed CD 2 under revised plan 1?
8      A     Well, I think I said this earlier, but
9   I'll make sure I say it again.  I think putting
10  that part of Mobile or any part of Mobile County
11  in the same district with the county that's
12  basically centered on Montgomery is going to
13  dilute the efforts that we're making there to
14  build our economy, and also it's asking somebody
15  who is basically focused on Montgomery to try to
16  learn completely different, you know, economic
17  setting, cultural setting, civic setting.  And I
18  think that's asking a whole lot from the person
19  that represents District 2.  I don't think they
20  could do it as well.  I'm not saying that they
21  wouldn't put their effort forth.  For example, if
22  that was Terri Sewell, I think she would put all

Page 76

1   of her effort into it, but as smart and capable
2   and hardworking as she is, I don't think she could
3   do it as well.
4      Q     And you noted -- well, I'll note, and
5   tell me if you agree, the proposed District 7
6   under revised plan 1, that actually is a lot more
7   kind of compact than the District 7 and
8   Representative Sewell's district in the current
9   plan.
10     A     Yes.
11     Q     Would you agree with that?
12     A     I would.  I do have concerns about
13  splitting Tuscaloosa County.  I think that split
14  into Jefferson County, but it's presently split
15  into Tuscaloosa County.  And I think Congressman
16  Aderholt or Congressman Sewell will handle it very
17  well, but I think Tuscaloosa will be better off
18  with one congressman.
19     Q     Right.  And Jefferson is currently split
20  as well.
21     A     Yes.
22     Q     So any other concerns about any of this,

Page 77

1  you know, District 7, District 2, District 1 under

2  revised plan 1?

3      Q    I have focused just on what it does to

4  District 1.  I haven't really looked that much at

5  Exhibit 1 as to what it would do to the other

6  districts.  It does make some changes, but I think

7  from my perspective, the biggest problem is what

8  it does to District 1 and District 2 and -- let's

9  see, District 1 and District 2.

10     Q    Okay.  As you know from, you know, at

11 least briefly reviewing the complaint and, you

12 know, you understand kind of the basic allegations

13 in this complaint, that the plaintiffs are seeking

14 to create a second majority African-American

15 district.  Do you think there would be a benefit

16 to the African-American community to having a

17 second majority African-American district?

18     A    I don't really have an opinion about

19 that.  I'm more concerned about the people where I

20 live.  I don't think it's a benefit to the people

21 of Mobile County, whether they're

22 African-American, white, Hispanic, or

---

Page 78

1  Asian-American, to have a congressman from

2  Montgomery.  I don't care what the race of the

3  congressman is.  I don't -- if Martha Roby is

4  going to be the congressman that would come in

5  there, I don't think it's good for the people in

6  my district to have a congressman who is mainly

7  focused on Montgomery.

8      Q    Okay.  Now, would you agree that the

9  voting in your district in the current

10 configuration is fairly racially polarized?  When

11 I -- just to get a little definition, I mean, you

12 know, the vast majority of African-Americans in

13 your district tend to vote, you know, for your

14 opponent, for the Democratic candidate, and the

15 vast majority of whites tend to vote for yourself.

16          MR. DAVIS:  Object to the form.

17     A    I don't -- I don't know the numbers.

18 Frankly, I don't pay that close attention to that.

19 In general I know that more African-American's

20 vote Democrat.  More whites vote Republican.

21 There has been more -- some shifting going on

22 there, as a matter of fact.  You're seeing, like

---

Page 79

1  in Mobile, the City of Mobile, you're seeing more

2  whites voting Democrat.  And in Baldwin County

3  where I live, you're seeing more African-Americans

4  vote Republican.  So even that's shifting around.

5      Q    Okay.  You haven't actually seen the

6  plaintiff's expert reports in this case, have you?

7      A    No.

8      Q    Would it surprise you that an estimated

9  97 percent of African-Americans in your district

10 voted -- sorry, it sounds impolite -- but voted

11 against you, voted for your opponent in the last

12 election?

13          MR. DAVIS:  Object to form.

14     A    I don't know the numbers and so I can't

15 say I'm surprised.  Like I say, when I look at the

16 results of an election, I'm really not paying that

17 close of attention to it or concerned about that.

18     Q    Okay.  Do you know whether -- what the

19 African-American candidate of choice was in the

20 last congressional election?

21     A    Well, my opponent -- are you talking

22 about my election?

---

Page 80

1      Q    Yes.

2      A    My opponent, the Democrat, was Robert

3  Kennedy.  But I don't know -- as I said, I don't

4  go back and look at the results after the fact.  I

5  don't know exactly how the vote split out.  I know

6  generally how many votes I got, generally how many

7  votes he got, but I can't tell you where they came

8  from.

9      Q    Okay.  How about the City of Mobile, do

10 you know how the votes split out in the City of

11 Mobile in the --

12     A    In my election?

13     Q    Yes.

14     A    I didn't look that closely.  I think I

15 carried Mobile, but I don't know.

16     Q    Okay.  And I think you acknowledged a

17 minute ago that, you know, most African-Americans

18 in your district tend to vote Democratic as

19 opposed to the majority of whites voting

20 Republican.  Why do you think that's the case?

21          MR. DAVIS:  Object to form.

22     A    That is a great question, and it's

Page 81

1  something that I not only have thought a lot
2  about, I've worried over because I don't think
3  it's healthy.  I think there's some traditional
4  things going on.  African-Americans look to the
5  Democratic party as the party that primarily
6  ushered through the civil rights legislation in
7  the '60s.  Although, if you go back and look at
8  the history, it would not have happened without
9  Republican votes in both the House and the Senate,
10 and there were key opponents to that legislation
11 that were southern Democrats, but I think
12 African-Americans look to that and look to that
13 history.  But more and more I think what's
14 happening in my district is really reflective of
15 what's happening in the country.  People are
16 finding differences -- I don't want to use the
17 word polarization.  I don't like it.  People find
18 differences among one another because they have a
19 different view of what American -- what the
20 federal government should do for America, so it's
21 more ideological in my mind than it is racial.
22     Q    Why do you think that -- well, first let

Page 82

1  me ask you, would you agree, though, that that --
2  that ideological difference closely tracks with
3  race, corresponds to race?
4     A    I don't know because I've never actually
5  seen a study on that, but I know from talking to
6  people, be they white or African-American or
7  Hispanic or Asian-American, it really starts with
8  their role of the federal government or what's the
9  role that should be of the federal government.
10 So, clearly you've got people in my district of
11 different races who see that in completely
12 different ways.
13        And so I think it's more of what's
14 happening across the country, that is that we have
15 difference -- those of us who view the federal
16 government as something that should be far more
17 active than some of the rest of us do.
18     Q    Do you think African-Americans tend to
19 view the role of the federal government more
20 robustly as one that should be more active than
21 white Alabamans tend to view it?
22     A    I think that -- I don't know about more

Page 83

1  white Alabamans, but the African-Americans that I
2  have talked to about this express their desire to
3  have the federal government do more.
4     Q    Would you say that's because those
5  African-Americans that you talked to view that as
6  in their interest?
7     A    I'm not sure we drilled down that far to
8  know.  Sometimes people will take an ideological
9  point of view that's not congruent with their
10 interests.  So I can't say that for sure.
11     Q    Okay.  Do you believe that the needs of
12 African-Americans in your district differ from the
13 needs of other constituents in your district?
14     A    No.
15     Q    Why not?
16     A    Because I think what people need is the
17 same.  What they need from their families is the
18 same.  What they need from their communities is
19 the same.  What they need from their nation is the
20 same.
21     Q    Do you have a sense of whether there are
22 certain -- let me strike that.

Page 84

1        What issues, if any, do you believe are
2  important to the African-American community in
3  your district?
4     A    The same issues that are important to
5  the white people in my district.  Their jobs, the
6  education of their children, the safety of their
7  homes and their community, the continuation of the
8  opportunities that have been afforded to them.
9  They want more opportunities for their children
10 and their grandchildren.  I just don't see a
11 difference there.  When you really sit down and
12 talk with them, as I do in my town hall
13 meetings -- I had one in Prichard on Friday, for
14 example.  The main issue in my town hall meeting
15 on Friday was tolls for the new bridge coming
16 across I-10.  And there were white and
17 African-American people there who had the same
18 type of disagreement with the tolls, same
19 intensity of disagreement with the tolls.  It
20 didn't make any difference.
21     Q    That was a green disagreement, right,
22 about how much green they're going to have to

Case 2:21-cv-01530-AMM   Document 80-5   Filed 12/23/21   Page 22 of 77

Page 85

1   spend.

2      A    Most things are like that. In my

3   experience, most things are like that. People are

4   people are people are people are people. They

5   have the same concerns. You might find like, for

6   example, Friday, that one concern there is,

7   there's a community in Mobile County called

8   Africatown. And it's a very important community.

9   It's where the last group of slaves who were

10   illegally brought here, by the way, in 1860 or

11   1861, it's where they congregated and formed a

12   community. We just recently found the ship that

13   they came over on. It's a big deal.

14      Q    I read about that.

15      A    We've got some ideas on trying to build

16   on that and build that community. One concern

17   that they have that's specific to them, but this

18   is -- it's more geographic -- it's one of the

19   routes that people might take to get around the

20   bridge would come right through Africatown and

21   would harm, potentially, the activities a lot of

22   us are interested in looking at to try to build up

---

Page 86

1   Africatown. But I can tell you from talking to

2   the Mayor of Mobile, who happens to be white, that

3   that is not something that is white or

4   African-American. That is, hey, this is a major

5   opportunity for Mobile. Let's not let this bridge

6   thing mess up what could be a major opportunity.

7   But the -- but the concerns that people have were

8   the same.

9      Q    What about in terms of socioeconomic

10   needs? I mean, does the African-American or at

11   least on average -- obviously all of these things

12   you can't -- you can't talk about everybody

13   because there are people of different

14   socioeconomic needs of all races -- but on

15   average, are the socioeconomic needs of

16   African-Americans in your district greater than

17   the socioeconomic needs of whites?

18      A    Well, in general the answer is no, but

19   there are some specifics, I think, that are

20   important. This is not just true in Mobile

21   County. It's true in other places in Alabama.

22   Unfortunately a disproportionate number of

---

Page 87

1   African-American children are going to some of our

2   worse schools. If you want to give everybody an

3   opportunity in America, they got to get a good

4   quality education. So the one of the reasons why

5   I got so involved in education reform prior to

6   going to the school board was -- in my view was

7   the next real fight in the civil rights movement

8   is over education. How do we get quality

9   education to every child in Alabama, be they

10   white, be they African-American, be they Asian, be

11   they Hispanic. That should be something that we

12   should all be concerned about. But in terms of

13   the actual need, it's the same. It's just that

14   we've got a specific manifestation of it

15   disproportionately affecting young

16   African-Americans.

17      Q    Would you say that the income level, the

18   average income level of African-Americans in your

19   district is lower than the average income of

20   whites in your district?

21      A    I've not seen any data on that so I

22   can't give you an answer.

---

Page 88

1      Q    Okay. What about educational

2   attainment, do you know whether there's a lower

3   level of educational attainment on average among

4   black -- blacks in your district than whites?

5      A    Well, as I said earlier, I think some of

6   them got lower quality education, a

7   disproportionate number of them got lower quality

8   education. So I don't know the actual data, but I

9   would not be surprised to see -- if you don't get

10   education early, it tends to have a going-on

11   effect. You may not be able to get into college

12   or you may not think about going to college. So I

13   think it's one of the most important, if not the

14   most important thing we need to be working on is

15   how do we give everybody, wherever they come from,

16   whoever their parents are, the best possible

17   education we can give them.

18      Q    That's right. You did speak to that.

19   Sorry to repeat, but what -- what about

20   healthcare, are there -- and health outcomes, have

21   you seen any data on whether African-Americans on

22   average in your district have kind of lower

Page 89

1  healthcare outcomes, greater healthcare needs than

2  whites on average in your district?

3      A   I've not seen any data, but I've been

4  very involved with community health centers in my

5  district.  In fact, I got an award for that.

6  Community health centers tend to be more prevalent

7  in African-American districts.  They're not only

8  in African-American communities.  So I do try to

9  work with community health centers because I think

10 that they're the best way to provide healthcare to

11 people that are in poor communities.  And so I do

12 see that there's a need for us to do more with

13 those community health centers.  I am glad to see

14 the University of South Alabama Medical Center

15 providing really good, quality healthcare to

16 everybody in our area.  And it just happens to be

17 located in an African-American community.  So the

18 people in that community are like right there,

19 easy for them to access.  So I can't give you

20 anything from the data, but I do think that

21 there's a need for us to work harder at that.

22      Q   Am I right that you supported the repeal

Page 90

1  of ObamaCare?

2      A   I did.

3      Q   Do you believe that most -- the majority

4  of African-Americans in your district supported

5  the repeal of ObamaCare?

6      A   I don't know.

7      Q   And from the people you've talked to,

8  the African-Americans you talked to in your

9  district, do you get the sense that they support

10 the repeal of ObamaCare?

11     A   Some have told me that they do.  Some

12 have told me that they don't.  I can't quantify

13 that, though, because it's not like we

14 scientifically polled it or even tried to go out

15 and figure out the race of people who are

16 responding on the telephone or by email to the

17 office.  But I have had African-Americans say that

18 they didn't like ObamaCare.  They wanted us to do

19 something different.

20     Q   Right.

21     A   And I've had -- I have had

22 African-Americans say that they supported it.  One

Page 91

1  of the things that -- going back to community

2  health centers.  100 percent of African-Americans

3  that I've talked to about community health centers

4  like community health centers.  That's one of the

5  reasons I'm so focused on community health

6  centers.  The reason they are, as these community

7  health centers are located in their communities,

8  in their neighbors.  It's easy -- it's easy for

9  them to physically access these centers.  And the

10 centers are really set up to focus primarily on

11 the person.  And so you can see where people would

12 say "I really like going there because they really

13 care about me."  And so I do think that community

14 health centers are in my mind a big part of what

15 should be a solution to the healthcare problem

16 throughout America, particularly in my district,

17 and I think we could put more resources into that

18 by putting less resources into ObamaCare.

19     Q   Are those community health centers

20 supported by the expansion of Medicaid under

21 ObamaCare?

22     A   No, they're supported by direct money

Page 92

1  that comes from the federal government community

2  health centers.  I've forgotten the name of the

3  program.  But in a community health center, you go

4  and they take care of you and have a sliding scale

5  of what you pay based on your income.  It may be

6  that some people go into community health centers

7  have Medicaid.  Some of them may be on Medicare.

8  Some of them I know, because I've talked to them,

9  are on private insurance and they prefer to use

10 their private insurance at a community health

11 center for all the reasons I said earlier.  So I

12 don't know that it -- that they're benefiting any

13 more than any other healthcare institution is from

14 any expansion of Medicaid.

15     Q   Has Alabama accepted the expansion of

16 Medicaid under ObamaCare?

17     A   No.

18     Q   That's not really an option, I guess,

19 for people who wouldn't otherwise qualify for

20 Medicaid, to take advantage of the expansion of

21 Medicaid under ObamaCare in Alabama.

22     A   A lot of people who don't qualify for

Page 93

1    Medicaid are accessing healthcare through these
2    community health centers.  And, as I say, they
3    take you regardless of your circumstances and
4    figure on the sliding scale how much you will
5    contribute.
6         Q    Okay.  Have you seen any polling either
7    in Alabama or nationwide about whether
8    African-Americans support the repeal of ObamaCare?
9         A    I haven't.
10        Q    Do you believe that African-Americans in
11   your district supported the Tax Cuts and Jobs Act?
12        A    I'm not sure I've ever heard from an
13   African-American one way or the other.  Let me
14   think about that for a second.  I can't -- they
15   may have, but I can't recall any particular
16   conversation at this point in time.
17        Q    Okay.  About whether an African-American
18   or the African-American community at large
19   supports -- supported the Tax Cuts and Jobs Act?
20        A    I don't remember any conversation about
21   that.
22        Q    Okay.  You were supportive of the Tax

---

Page 94

1    Cuts and Jobs Act.
2         A    Oh, I absolutely was, yes, sir.
3         Q    And have you -- since you've been a
4    congressman, have you taken a vote on the
5    reinstatement of kind of Section 4, Section 5 of
6    the Voting Rights Act?
7         A    I don't believe I have.  I don't think
8    we have.  Yeah.
9         Q    Are you familiar with HR 1, the For The
10   People Act which expands voter registration,
11   voting access that was passed this year?
12        A    Yes.
13        Q    It was passed by the House this year.
14        A    Yes.
15        Q    Were you in support of that?
16        A    I was not.
17        Q    And --
18        A    But not because it did the things you
19   mentioned, but because of other things.
20        Q    Why were you against it?
21        A    Because they put a bunch of other stuff
22   in there that I thought was not germane to what it

---

Page 95

1    was supposed to be about and I did not think would
2    be helpful to what we're trying to do in America.
3    I want everybody to vote, and I'm actually
4    encouraged by the number and percentage of people
5    that have been voting, particularly in Alabama,
6    these last two or three or four election cycles.
7    I'm pretty passionate about that.  But I don't
8    think -- I think that bill, while it pretended to
9    be for that, I don't think it actually was going
10   to accomplish that.  I think it did some other
11   things that I didn't think were pertinent to that
12   effort.
13        Q    Do you recall what it was that you
14   didn't like about the bill?
15        A    We can give a full breakdown.  We had --
16   I think we put out a statement at the time or we
17   can give you something.  But that bill was pretty
18   vague and complex.  It would take me a while to
19   take you through everything that was a problem
20   with it.
21        Q    Okay.  I just didn't know if there was
22   any like major thing that stood out.

---

Page 96

1         A    No, there was a ton of stuff.  One of
2    the things that disappointed me about that was, it
3    was a bill that was just loaded up.  And a lot of
4    mistakes we make around here are when we take a
5    good idea, if this is a good idea, we start
6    loading other things on there.  Then we destroy
7    the good idea.  That's not a Republican or
8    Democrat thing, but everybody does that around
9    here from time to time.
10        Q    Right.
11        A    And I was disappointed in a bill that
12   could have been such a good bill that could have
13   gotten a lot of bipartisan support I think was put
14   together in such a way to where we were guaranteed
15   it was only going to be partisan.
16        Q    Do you think that African-Americans in
17   your district on average support the measures that
18   were in HR 1?
19        A    I've never had anybody in an
20   African-American community talk to me about HR 1.
21        Q    What about -- would you support the
22   reinstatement of Section 5 of the Voting Rights

Page 97

1  Act? This is the portion that was struck down by
2  the --
3      A    The formula?
4      Q    Yes. Yes.
5      A    The formula? No. I think there's a
6  better way to do that.
7      Q    And what's that?
8      A    I think we should have it apply to
9  everybody in America.
10     Q    You would support something that would
11 apply essentially to the preclearance review to
12 all states?
13     A    Yes, what I keep saying is, if it's good
14 enough for Alabama, why isn't it good enough for
15 California? Are we saying Alabama is more raciest
16 than California? Are we saying Alabama is more
17 racist than Missouri? Are we saying Alabama is
18 more racist than Maryland? Because if you look at
19 what's happened in the last several years, you'll
20 find more racial incidences in places like that
21 than you will in Alabama, yet we're going to take
22 a law and formula and use it to only focus on a

Page 98

1  few parts of America. If it's good for Alabama,
2  it's good enough for everybody.
3      Q    Right. And I'm not -- I'm not
4  disagreeing with that at all. But there was like
5  a coverage formula that, you know, involved
6  looking at registration rates and --
7      A    Which I think was prejudicial to
8  Alabama, and I'm afraid a new one would be equally
9  prejudicial. That's why I said the easiest way to
10 do this is, if we're going to do this at all,
11 apply it to everybody.
12     Q    Would you support that? Would you
13 support reinstating a preclearance regime if it
14 applied to all states?
15          MR. DAVIS: Object to form.
16     Q    Go ahead.
17     A    When that is conjoined with some other
18 things, I might. For example, I don't think you
19 should have preclearance. I think maybe the best
20 way to do it is tell everybody in America, every
21 local, state, et cetera, jurisdiction, you submit
22 to the Justice Department before you implemented

Page 99

1  the things that preclearance states you used to
2  have to do. And that gives a heads-up to the
3  Justice Department. If they want to bring an
4  action in Federal Court, they can because they
5  have that power to do that today, the Justice
6  Department does today. Private individuals have
7  the right to do that today. That wasn't taken
8  away by the Supreme Court ruling. I just don't
9  want Alabama to be singled out, and I think we
10 have been. I think in the last couple, three
11 decades that's been unfair, and I don't want that
12 -- I'm not going to vote for something that
13 singles out Alabama in a negative way like that.
14     Q    I mean, you would agree with me, though,
15 that there was -- there was quite a history in
16 Alabama of suppressing black voting rights.
17     A    Oh, yes. I mean, prior to the civil
18 rights laws in the 1960s, sure there were. But
19 we're 50-plus years past that. And there's been a
20 dramatic change in Alabama. I was a kid in the
21 '60s so I wasn't an adult when all of that was
22 going on, but I know the difference between the

Page 100

1  way things were in the '60s and the way they are
2  today, and they're dramatically different.
3      Q    Do you -- do you know whether your
4  African-American constituents agree with you that
5  that preclearance regime shouldn't be
6  reimplemented, whether it's implemented just for
7  Alabama or for the whole country?
8      A    Never had an African-American
9  constituent talk about that with me.
10     Q    Do you know what position the state
11 NAACP in Alabama has taken on that issue?
12     A    I don't.
13     Q    Do you know the current president of the
14 state NAACP?
15     A    I don't think I do.
16     Q    I assume you haven't met with the
17 president of the NAACP of the State of Alabama?
18     A    I don't think we've had a request from
19 the state or local NAACP for a meeting. We take a
20 lot of meetings with groups. We can't always give
21 it to them exactly when they want them, but when
22 they make a request, we try to figure out a way to

Page 101

1    set up the meeting.  And I just can't recall ever

2    getting a request for a meeting from them.

3        Q.   Okay.  I take it from your answer, then,

4    it sounds like you haven't met with the local

5    NAACP?

6        A.   I don't -- well, not formally.  There

7    may be some members of that group that have met

8    with me in other ways.

9        Q.   Yes.

10       A.   But -- and we have people that come to

11   my town hall meetings.  I have no idea whether

12   they are or they aren't.

13       Q.   Right.

14       A.   There are times where they identify

15   themselves, but it's not unusual for them to come

16   and not identify themselves as being a member of

17   this group or that group.  So I could have had a

18   large number of members --

19       Q.   Sure, right.

20       A.   -- of the local NAACP be at a town hall

21   meeting and I wouldn't know it.

22       Q.   Right.  But it's not like you -- you

---

Page 102

1    haven't had a meeting with, say, the president of

2    the City of Mobile's NAACP chapter?

3        A.   I don't think I have.  I don't think

4    they have requested one.

5        Q.   Have you ever requested one of them?

6        A.   No.  I mean, I typically don't request

7    meetings with people.  They request meetings with

8    me.  I was telling you earlier, there's only so

9    many hours in the day.

10       Q.   Sure.

11       A.   I try to respond to other -- my

12   constituents' request.  There are times when I

13   reach out to a group, but there's usually a

14   particular reason for that, some event has

15   occurred or something that does involve my job

16   where I feel like, hey, I need to go out and reach

17   out to them.

18       Q.   Sure.

19       A.   But in 90-plus percent of the cases,

20   people are calling up and say we want to meet with

21   our congressman, and my staff tries to figure out

22   how to fit it into my schedule.

---

Page 103

1        Q.   Is there an Urban League Chapter in

2    Mobile?

3        A.   I don't know of one if there is.

4        Q.   I assume you haven't met with the head

5    of the Urban League in the City of Mobile?

6        A.   I don't think I've ever had a request

7    from them for a meeting.

8        Q.   Are you familiar with an organization

9    called LULAC?  It's the League of United Latin

10   American Citizens.

11       A.   I'm not familiar with them.

12       Q.   I think I got -- I think I probably got

13   the acronym a little bit wrong.  It's Swedish

14   LULAC, but I got the -- I think I mixed up the

15   words.  But you never met with LULAC, I take it,

16   either?

17       A.   Not that I know of.

18       Q.   Are there any other African-American or

19   Latino or Hispanic-focused organizations like the

20   NAACP, like the urban league, that you have taken

21   a meeting with since you've been congressman?

22       A.   I've met with so many groups.  I would

---

Page 104

1    have to go back through my calendar going back to

2    when I started.  I meet with a lot of

3    African-Americans.  I don't always know, as I said

4    --

5        Q.   Who they're affiliated with?

6        A.   -- who they're affiliated with because

7    they tend to come to me because of a concern about

8    a particular issue.  So we're being responsive to

9    a particular issue.

10       Q.   Sure.

11       A.   They may be there as part of a group and

12   I just don't know it.

13       Q.   Yes, totally understand.  I know a lot

14   of -- the job of a Congress person, you're mainly

15   doing a lot of what is constituent services,

16   right?

17       A.   Right.

18       Q.   It's not a Republican or Democratic

19   issue.

20       A.   Oh, yeah, and sometimes it may be a

21   concern -- a specific concern for a community.

22       Q.   Right.

Case 2:21-cv-01530-AMM   Document 80-5   Filed 12/23/21   Page 27 of 77

Page 105

1   A. And you may have a group of people come
2 to see you because of that concern for that
3 community, but you don't necessarily know what
4 organizations they're with or not. They're just
5 there because they all agree about this one issue.
6 And so we try to take -- if somebody asks for a
7 meeting, we try to figure out a way to make that
8 meeting happen. We try to figure out a way to
9 make it happen as close to where they live as we
10 can because I know it's difficult for people to
11 come to places. So I frequently try to go out to
12 people. So if a group in a community says we need
13 to meet with you about X, if it's possible, I try
14 to go out to them. It's not always possible
15 because of my schedule having to be up here voting
16 so much. So sometimes they have to come to my
17 office, but I prefer to go to them.
18   Q. You mentioned town halls. Have you had
19 town halls in the City of Mobile?
20   A. Oh, yes. Lots of them.
21   Q. Have you had town halls in kind of
22 African-American residential sections of Mobile?

Page 106

1   A. I have.
2   Q. Tell me about that.
3   A. Well, it's more than once. It goes back
4 several years from now. We just pick places -- we
5 try -- we don't stay in the same place.
6   Q. Right.
7   A. So I've had them downtown. Downtown is
8 -- tends to be more African-American than not.
9 We've had them in -- there's a high school in what
10 I was calling the southern part of Mobile.
11 There's a high school there that we had a town
12 hall in, which was more memorable for me because
13 we had a lot of planned parenthood people there.
14 We didn't know that we were going to have that.
15 Instead of being focused on that community, which
16 is what I like my town halls to be on, we had a
17 lot of planned parenthood people that showed up
18 for some reason.
19   We've had lots of meetings in -- this is
20 just outside the city limits of Mobile in
21 Prichard, like we just had one last week. I think
22 we -- some of the data I told you, I think we

Page 107

1 found out that almost half of my town halls are in
2 African-American communities, but that's spread
3 out all over the district, not just the City of
4 Mobile.
5   Q. Have any people at those town halls, any
6 African-Americans expressed any disagreement with
7 your stances on any particular bill or issues?
8   A. Yes. I have -- in my town halls it's
9 not unusual for people of all races to disagree
10 with me. That's why I have my town halls.
11   Q. It comes with the territory.
12   A. Yes, that's why I have my town halls. I
13 think people deserve to have their representative
14 come to their communities and listen to them. And
15 so it's not infrequent that I go to a town hall
16 and have people stand up and disagree with me.
17 I've had African-Americans disagree with me. I've
18 had white people disagree with me, some of them my
19 friends. But that's the essence of being a
20 congressman. If you only hear what you want to
21 hear, you're not going to be a very good
22 congressman.

Page 108

1   Q. What about on issues of civil rights? I
2 know that that's kind of a broad term. Have you
3 had African-Americans at any of these town halls
4 or elsewhere express to you that they disagreed
5 with your position on civil rights?
6   A. Not civil rights per se. It may be a
7 particular issue that someone might associate with
8 civil rights.
9   Q. Can you give me an example?
10   A. Well, I'm trying to think of one because
11 I said might.
12   Q. Right. Right.
13   A. I do remember one of the times that I
14 ran, I ran against a Democrat by the name of
15 Burton LaFlore. I think Burton raised something
16 in that race, but it's been several years ago and
17 I don't recall now exactly what it was.
18   Q. Right.
19   I forgot to ask you about one -- when we
20 were talking about the various bills, the First
21 Step Act involving federal sentencing and prison
22 laws.

Page 109

1    A    Oh, yes.

2    Q    Did you --

3    A    The one that the President supported?

4    Q    Yes.

5    A    I did not support that.

6    Q    Okay.  Why didn't you?

7    A    Because I thought that it had the

8  potential for releasing people too early who had

9  committed some pretty serious crimes, not just

10 possession, but people were actually actively

11 involved in the distribution of very dangerous

12 drugs.  I'm much more concerned about the people

13 that are involved in distributing the drugs than I

14 am the people that are using the drugs.  The

15 people that use the drugs need help.  The people

16 who are distributing the drugs need to be put in

17 jail and stay in jail.

18    Q    Do you remember whether

19 African-Americans in your district supported the

20 First Step Act?

21    A    Never heard anything from any of them

22 about that.

Page 110

1    Q    Let me just take a quick look at my

2  notes.  I think we're getting close to the end

3  here.

4    A    Sure.

5         (Discussion off the record.)

6    Q    Just one more.  Are you familiar with

7  the Southern Christian Leadership Conference, the

8  SCLC?

9    A    Oh, yes.

10    Q    Do you know who the Alabama chapter

11 president is of that now?

12    A    I do not.

13    Q    Have you met with them?

14    A    I don't believe they've ever requested a

15 meeting, but I'm obviously familiar with that

16 group.

17    Q    Famous -- has a famous founder, right?

18    A    Absolutely.  Representative Sewell

19 brings a group down, we call it The Pilgrimage

20 every year.  It's really sponsored by a group

21 called Faith In Politics.  So I've tried to

22 participate in that every year.  I've been very

Page 111

1  interested in the civil rights movement going back

2  several years.  I've got a lot of books about it.

3  And my wife's family was sort of around it.  She

4  lived in Montgomery.  Her parents -- her mother in

5  particular were friends with some of the people

6  who were very active in the civil rights movement

7  in the Montgomery area.  So I've always been

8  interested in it.  I'm very familiar with the

9  history of it.

10         I don't know who's in charge of it in

11 Alabama right now, but if anybody in any of those

12 groups wants a meeting with them, they're going to

13 get it.  And I'm probably seeing them at The

14 Pilgrimage every year, but I don't always know

15 who's who.

16    Q    Right.

17    A    And there's a lot of people there.  But

18 I love going to The Pilgrimage.  I love the time

19 we get to spend together talking about what

20 happened in the '60s and '70s and what we can do

21 to work together today.

22    Q    And tell me what that is again.  You

Page 112

1  mentioned it briefly, what is The Pilgrimage?

2    A    There's a group here called Faith In

3  Politics here in Washington.  And they started

4  working some years ago with Representative John

5  Lewis from Georgia.  And they bring people to

6  Birmingham, Montgomery, and Selma.  They call it

7  The Pilgrimage because it's like coming back.  Not

8  only do they go -- we go to the main sites of

9  civil rights actions in Birmingham and Montgomery

10 and Selma, but we have programs as part of it.

11 People make presentations.  When Representative

12 Sewell was elected, because she's from Selma,

13 she's a daughter of Selma.

14    Q    Right.  Yes.

15    A    She became a lot more active in it.

16 After I was elected, she said -- knowing me like

17 she did, she said, "Bradley, you need to be

18 involved in The Pilgrimage.  I said, "What is it?"

19 She told me.  I said, "Wow, that's really cool."

20 So we participated at least in some part of it

21 every year since my first year.  I couldn't do it

22 my first year because I had a conflict.  So we

Page 113

1  were actually there with John Lewis and all of
2  them for the 50th Anniversary of the Selma to
3  Montgomery march, which was one of my sort of top
4  10 experiences in my life to be with John Lewis at
5  that very important -- President Obama spoke, as
6  you probably know, in Selma.  That was a really
7  cool experience.
8       What I'm saying is, I'm probably talking
9  to some of the people you're talking about when
10 I'm at The Pilgrimage every year, but I don't
11 always know who's an officer of what because --
12      Q    Sure.
13      A    -- I know it's important, but we're so
14 caught up in what's going on with the event of
15 that day.
16      Q    Sure.
17           Give me just one second to confer with
18 my co-counsel --
19      A    Sure.
20      Q    -- the real brain here, and then --
21      A    I used to have one of those.
22           MR. SPIVA:  Thank you so much,

Page 114

1  Congressman Byrne.  It's been a pleasure.  I
2  appreciate you taking the time to do it.
3           THE WITNESS:  Good to see you.
4           MR. SPIVA:  We can go off the record.
5           Oh, sorry.  You -- I'm sorry, Jim.
6           MR. DAVIS:  It's okay.  For the record,
7  I do not have any questions.
8           THE VIDEOGRAPHER:  That's what I was
9  waiting for.  Okay.  The time is 11:49 a.m., July
10 24th, 2019.  We are going off the record,
11 completing the videotaped deposition.
12
13           (Signature having not been waived, the
14 deposition of Congressman Bradley Byrne was concluded
15 at 11:48 a.m.)
16
17
18
19
20
21
22

Page 115

1           CERTIFICATE OF SHORTHAND REPORTER
2
3           I, Michele E. Eddy, Registered Professional
4  Reporter and Certified Realtime Reporter, the court
5  reporter before whom the foregoing deposition was
6  taken, do hereby certify that the foregoing transcript
7  is a true and correct record of the testimony given;
8  that said testimony was taken by me stenographically
9  and thereafter reduced to typewriting under my
10 supervision; and that I am neither counsel for,
11 related to, nor employed by any of the parties to this
12 case and have no interest, financial or otherwise, in
13 its outcome.
14           IN WITNESS WHEREOF, I have hereunto set my
15 hand and affixed my notarial seal this 28th day of
16 July, 2019.
17
18 My commission expires July 14, 2022
19
   _____
20 MICHELE E. EDDY
21 NOTARY PUBLIC IN AND FOR
22 THE DISTRICT OF COLUMBIA

Page 116

1  Congressman Bradley Byrne, c/o
   Office of the Attorney General
2  501 Washington Avenue
   Montgomery, Alabama 36130-0152
3
4  Case: Lakeisha Chestnut, et al., v. John M. Merrill
   Date of deposition: July 24, 2019
5  Deponent: Congressman Bradley Byrne
6
7  Please be advised that the transcript in the above
8  referenced matter is now complete and ready for signature.
9  The deponent may come to this office to sign the transcript,
10 a copy may be purchased for the witness to review and sign,
11 or the deponent and/or counsel may waive the option of
12 signing. Please advise us of the option selected.
13 Please forward the errata sheet and the original signed
14 signature page to counsel noticing the deposition, noting the
15 applicable time period allowed for such by the governing
16 Rules of Procedure. If you have any questions, please do
17 not hesitate to call our office at (202)-232-0646.
18
19
20      Sincerely,
   Digital Evidence Group
21 Copyright 2019 Digital Evidence Group
   Copying is forbidden, including electronically, absent
22 express written consent.

Page 117

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

1. SIGNATURE PAGE
   Case: Lakeisha Chestnut, et al., v. John H. Merrill
   Witness Name: Congressman Bradley Byrne
   Deposition Date: July 24, 2019

   I do hereby acknowledge that I have read
   and examined the foregoing pages
   of the transcript of my deposition and that:

   (Check appropriate box):
   (  ) The same is a true, correct and
   complete transcription of the answers given by
   me to the questions therein recorded.
   (  ) Except for the changes noted in the
   attached Errata Sheet, the same is a true,
   correct and complete transcription of the
   answers given by me to the questions therein
   recorded.

   _____        _____
   DATE                   WITNESS SIGNATURE

   _____        _____
   DATE                   NOTARY

www.DigitalEvidenceGroup.com   Digital Evidence Group C'rt 2019   202-232-0646

Page 118

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C.  20036
(202)232-0646

ERRATA SHEET

Case: Lakeisha Chestnut, et al., v. John H. Merrill
Witness Name: Congressman Bradley Byrne
Deposition Date: July 24, 2019
Page No.     Line No.      Change

                 _____        _____
                 Signature                Date

www.DigitalEvidenceGroup.com   Digital Evidence Group C'rt 2019   202-232-0646



Alabama -- U.S. House
Revised Plan 1



Alabama -- U.S. House
Revised Plan 2









2011 State Board of Education Districts

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
 2                    SOUTHERN DIVISION

 3
        LAKEISHA CHESTNUT,  an individual; *
 4      MARLENE MARTIN, an individual;      *   2:18-cv-00907-KOB
        BOBBY DUBOSE, an individual;        *   November 7, 2019
 5      RODNEY LOVE, an individual; KAREN   *   Birmingham, Alabama
        JONES, an individual; JANICE        *   9:00 a.m.
 6      WILLIAMS, an individual; RODERICK   *
        CLARK, an individual; JOHN HARRIS,  *
 7      an individual,                      *
                 Plaintiffs,               *
 8                                          *
        vs.                                 *
 9                                          *
        JOHN H. MERRILL, in his official    *
10      capacity as Alabama Secretary of    *
        State,                              *
11               Defendant.                 *
        **********************************
12
                   TRANSCRIPT OF BENCH TRIAL
13                        VOLUME IV
               BEFORE THE HONORABLE KARON O. BOWDRE
14               CHIEF UNITED STATES DISTRICT JUDGE

15
        FOR THE PLAINTIFFS:
16      Abha Khanna, Esq.
        PERKINS COIE LLP
17      1201 Third Avenue
        Suite 4900
18      Seattle, Washington 98101
        (206) 359-9000
19
        Bruce V. Spiva, Esq.
20      PERKINS COIE LLP
        700 13th Street, NW
21      Suite 600
        Washington, DC 20005
22      (202) 654-6338

23      Richard P. Rouco, Esq.
        QUINN CONNOR WEAVER DAVIES & ROUCO LLP
24      2 20th Street North
        Suite 930
25      Birmingham, Alabama 35203
        (205) 870-9989
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1        Daniel C. Osher, Esq.
          PERKINS COIE LLP
 2        700 13th Street NW
          Suite 600
 3        Washington, DC 20005
          (202) 654-6338
 4
          Lalitha D. Madduri, Esq.
 5        PERKINS COIE LLP
          700 13th Street NW
 6        Suite 600
          Washington, DC 20005
 7        (202) 654-6322

 8

 9        FOR THE DEFENDANT:
          James W. Davis, Esq.
10        Laura E. Howell, Esq.
          OFFICE OF THE ATTORNEY GENERAL
11        501 Washington Avenue
          P.O. Box 300152
12        Montgomery, Alabama 36130-0152
          (334) 242-7300
13
          J. Dorman Walker, Esq.
14        BALCH & BINGHAM LLP
          P.O. Box 78
15        Montgomery, Alabama 36101
          (334) 834-6500
16

17

18        COURTROOM DEPUTY:  Sarah Hollingsworth

19
          COURT REPORTER:  Christina K. Decker, RMR, CRR
20
       Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
21     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
         and Procedures Vol. VI, Chapter III, D.2.  Transcript
22                 produced by computerized stenotype.

23

24

25
```

1                          **I N D E X**

2    BRADLEY BYRNE                                          664
     DIRECT EXAMINATION                                    664
3    BY MR. DAVIS
     CROSS-EXAMINATION                                     713
4    BY MR. SPIVA
     REDIRECT EXAMINATION                                  743
5    BY MR. DAVIS

6
     JOSIAH BONNER, JR.                                    762
7    DIRECT EXAMINATION                                    762
     BY MR. DAVIS
8    CROSS-EXAMINATION                                     813
     BY MR. SPIVA
9    REDIRECT EXAMINATION                                  849
     BY MR. DAVIS
10   RECROSS-EXAMINATION                                   855
     BY MR. DAVIS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**P R O C E E D I N G S**

2          (In open court.)

3          THE COURT:  You may be seated.  Good morning.

4          MR. DAVIS:  Good morning, Your Honor.

10:32:26 5          THE COURT:  Defense may call your next witness.

6          MR. DAVIS:  Your Honor, the defense calls Congressman

7    Bradley Byrne.

8                    BRADLEY BYRNE,

9    having been first duly sworn by the courtroom deputy clerk, was

10:32:44 10   examined and testified as follows:

11          THE COURTROOM DEPUTY CLERK:  Please state your name in

12    the microphone for the record.

13          THE WITNESS:  My name is Bradley Byrne; B-R-A-D-L-E-Y;

14    B-Y-R-N-E.

10:32:55 15         THE COURTROOM DEPUTY CLERK:  Thank you.

16                    DIRECT EXAMINATION

17    BY MR. DAVIS:

18    Q    Good morning, Congressman Byrne.

19    A    Good morning.

10:33:02 20   Q    Thank you for being here today.  Do you represent

21    Alabama's first district in the United States Congress?

22    A    I do.

23    Q    How long have you served in the Congress?

24    A    I am at the end of my sixth year.

10:33:11 25   Q    Let's go back a little bit and talk about your background.

```
 1          You are an attorney, correct?
 2    A     I am.
 3    Q     Have you practiced in private practice?
 4    A     I have.
 5    Q     Where did you practice?
 6    A     I practiced all over the state of Alabama.  In fact, I've
 7    been in this courtroom in this building before, but primarily
 8    in the southwestern part of the state.
 9    Q     Where is your home?
10    A     Presently, it's in Fairhope.  But I was born and raised in
11    Mobile.  And my wife Rebecca and I lived over there until we
12    moved to Fairhope in 2001.
13    Q     Thank you.
14          And, Congressman, you and I both are going to have to
15    remember they're taking down what we say.  If I start talking
16    too fast, I will try to remember to slow down.  Let's both do
17    that so they can take it all.
18    A     Okay.
19          THE COURT:  Well, I think Ms. Christina will let you
20    know when she's having any problems, right, Ms. Christina?
21          THE COURT REPORTER:  Yes.
22          MR. DAVIS:  I'm trying to keep anybody from being mad
23    at me this morning.
24          THE COURT:  I don't know how it is for you, but for
25    me, that would be a tall order.
```

BY MR. DAVIS:

Q    Congressman, have you ever been a member of the Alabama Legislature?

A    I have.

Q    Where did you serve, and approximately what years?

A    I represented Senate District 32, which was Baldwin County, but not all of Baldwin County.  I represented part of it.  I was elected in November of 2002.  And under Alabama law, you take your seat the moment the general election is decided. And I served there until I resigned in May of 2007 to become the chancellor of post-secondary education for the state of Alabama.

Q    And how long did you serve as chancellor of the two-year college system?

A    Almost precisely two years, maybe a little bit over.

Q    And you said you have been a member of the state board of education?

A    I have; for eight years.

Q    Is that an elected position?

A    It is.

Q    Do you serve by districts?

A    We did, and they still do.

Q    Where was your district located in the state of Alabama?

A    It was District 1, so it was the southern part of the state, southwestern part of the state.  It was all of Mobile,

1  Baldwin, and Escambia counties.

2  Q    Okay.  I would like you to look, Congressman, at

3  Plaintiffs' Exhibit 15.  You have a hard copy, and there's a

4  picture on the screen.  And I represent to you that this is

10:35:21 5  Alabama's 2011 congressional district plan, so you see there

6  the boundaries of the districts as they are at present.

7       Could you describe your district for the Court,

8  particularly focusing on any ways that in your opinion this

9  area within District 1 is bound together in part of a community

10:35:40 10  of interest?

11  A    So as you can see here, it is all of Mobile County, which

12  is the urban or metropolitan county; all of Baldwin County,

13  which is the fastest growing county in the state of Alabama;

14  all of Escambia County; all of Monroe County; all of Washington

10:35:56 15  County; and a portion of Clarke County that primarily includes

16  parts of the city of Jackson and the city of Grove Hill.

17       What you can't see here there are two large river systems

18  that go through the center of that district and empty out into

19  Mobile Bay.  And what you also can't see here are some U.S.

10:36:16 20  highways that connect these counties primarily from the

21  northern part of the district to the southern part of the

22  district which people use to get to work.

23       There's a lot of people in Washington, Clarke, and

24  Escambia that work in either Mobile or Baldwin County.  They go

10:36:34 25  there to shop, or they go there for their hospital, or they go

1  there for entertainment.

2      So the way it's aligned is that the people in those four

3  counties outside of Mobile and Baldwin travel into and out of

4  Mobile and Baldwin.  I won't say all of them do, but a good

10:36:49 5  many of them do.

6  Q    Where do people who live in the first district get their

7  news, their media?

8  A    They get it from the television -- local television

9  stations in Mobile.  They get it from the *Mobile Press*

10:37:02 10  *Register*.  They get it from some radio stations that are

11  primarily centered in Mobile.  And to some extent, they get it

12  from the local weekly newspapers and local radio stations.

13  Q    Okay.  Where would a person in, say, Washington, Monroe,

14  and Escambia County go for major hospital care?

10:37:18 15  A    They would go into Mobile.  You have the University of

16  South Alabama Medical Center, Mobile Infirmary, Springhill

17  Infirmary, and Providence Hospital.  Those are the four large

18  hospitals in my district.

19      So it's not unusual at all to see people from one of those

10:37:32 20  four counties who either they or people in their family are

21  having to either stay in their hospitals or go there for

22  outpatient care.

23  Q    Are there any major four-year universities located within

24  the present first district?

10:37:45 25  A    There are.  There's the University of South Alabama, a

regional public university that has over 15,000 students in
Mobile.  There's also Springhill College, a smaller private
Jesuit college in the city of Mobile.  And just outside of
Mobile in Mobile County, there's the University of Mobile.

10:38:02 Q    And would a lot of students from those universities that
you mentioned come from Washington, Monroe, Escambia, and
Baldwin counties?

A    Yes.  Most of the students in those four rural counties,
if they're going to a public four-year college or even private
10:38:19 four-year college, most of them are coming into Mobile to go to
one of those three colleges.

Q    Let's talk about some of the employers in the region.
Well, first off, there's a major port in Mobile, is there not?

A    Yes, sir.  The Port of Mobile is one of the fastest
10:38:33 growing ports in the United States of America.  It's really the
reason Mobile's there to begin with.

    It started out as a French trading post.  But during the
boom years in the 19th century, there was a lot of product that
was being moved from the interior of the state of Alabama
10:38:49 through the Port of Mobile and out to ports in Europe.  It was
mainly cotton, but it was also timber products, et cetera.

    So the connections of those counties north of Mobile to
Mobile literally go back centuries.

Q    You sometimes see major industries located along river
10:39:04 system.  Are there any major industries located along the

1   rivers that flow into Mobile Bay?

2   A    Yes, sir.  If you go up on the eastern part of Mobile

3   County into Washington County, at the end of that part of my

4   district that's Clarke County, you have U.S. 43.  And along

10:39:20  5   U.S. 43, you have a number of steel plants, chemical plants, a

6   power generating plant for Alabama Power Company, and some

7   other manufacturing concerns.

8   Q    And you've said that a lot of people from these outlying

9   counties come into Mobile County to work.  What are some of the

10:39:40 10   major employers in the Mobile area?

11   A    The largest single private sector employer is Austal

12   shipyard that's located on the water front in Mobile.  It

13   employs 4,000 direct employees and about another 1,000 contract

14   employees.

10:39:56 15       Then you have Airbus, which has not only an assembly line

16   there for the A320 and soon the A220.  They have an engineering

17   facility there.  And out there by the Mobile Airport an actual

18   facility that services the military.

19       You have, as I said, three steel mills there in Mobile

10:40:15 20   County, a number of chemical companies.

21       The University of South Alabama is a major employer.

22       The Mitchell Cancer Center is there, as is the University

23   of South Alabama Medical Center, another major employer.

24       And then, of course, the Port of Mobile and interests

10:40:31 25   related to the port are major employers.

1       One of the fastest growing employers is now, however, is

2  over in the southern part of Baldwin County where we have this

3  major tourism industry.  We have a number of people coming from

4  the rural counties to go down to work in whatever the retail or

10:40:47  5  other things that are related to the tourism industry in south

6  Baldwin County, which is also fast growing.

7  Q     You mentioned tourism.  Does the fact that the first

8  district is located on the coast, is that something that binds

9  this region together?

10:41:03 10  A     Oh, yeah.  Very much so.  It almost doesn't matter where

11  you live in my district, you've got some connection to the

12  water.  It may be because you like to fish.  It may be because

13  you like to eat seafood.  It may be you just like being there

14  near the water and seeing it and enjoying it.

10:41:20 15       So we have -- in that whole area in southwest Alabama,

16  we've always recognized Mobile Bay and the waters that flow

17  into and around Mobile Bay as a part of who we are.

18  Q     Is there a strong seafood industry in the first district?

19  A     There is indeed.  In south Mobile County and south Baldwin

10:41:37 20  County, there is a very strong long-term seafood industry.

21       A number of people are employed in various parts of that

22  industry.  As I say, a lot of people like to come down there

23  and buy their seafood directly because it's fresh and you've

24  got a reasonable price on it.

10:41:52 25  Q     Back to some of the industry we're discussing.  Is there

```
 1  any industry upriver that uses the port system to ship its
 2  product?
 3  A    Virtually all of them do both in and out.  Sometimes with
 4  the chemical companies they have other things -- substances are
 5  coming from other places that is brought into their facility.
 6  They do whatever their process is to turn it into something
 7  else, and then it goes right back out again.
 8         So it's not unusual -- and same is true for the steel
 9  companies and for some of the other manufacturing concerns.
10  For example, the -- for Airbus, you have a number of parts and
11  large parts of the jet that come in by barge or large ocean
12  going ship and they go to a special port there, and then they
13  are trucked back over to the Airbus facility.
14         So the port is critically important to the manufacturing
15  concerns all over my district.
16  Q    Would it be fair to say, Congressman, that the health of
17  the economies of the entirety of your first district is linked
18  to the health of the port system?
19  A    Very much so.
20  Q    And other industries, such as Airbus and the shipyard?
21  A    Very much so.  I don't know that a lot of those industries
22  would be there but for the port.  In fact, I think they
23  wouldn't be there but for the port.
24  Q    And the port doesn't just benefit the economy of Mobile
25  County.  Would it also benefit the economy of Washington,
```

Line timestamps: 10:42:10 (5), 10:42:27 (10), 10:42:45 (15), 10:42:58 (20), 10:43:14 (25)

673

1 Monroe, Escambia, and Clarke counties?

2 A     The port benefits those counties and virtually every

3 county in the state of Alabama.

4 Q     Sure.  Well, that's a good point.  Does the economic

10:43:27  5 health of the first district benefit the entirety of the state?

6 A     Very definitely.  Most of the tourism, the tourist tax

7 revenue for the state of Alabama comes from Baldwin County, for

8 example.  A lot of the things that are flowing into our

9 automobile plants, the parts, et cetera, flow through the Port

10:43:47 10 of Mobile.

11        The Port of Mobile is presently constructing a facility

12 where they can actually take automobiles out of that port and

13 ship to other places.  So the port of Mobile is a big part of

14 the economic development of the state of Alabama.

10:44:02 15 Q     But you would agree that there's a strong direct link to

16 these people in Washington, Monroe, Escambia, Clarke, Baldwin

17 counties who go into Mobile County to get their paycheck?

18 A     Absolutely.  You have a large number of people who drive

19 in from those counties into Mobile, maybe to a lesser extent

10:44:21 20 Baldwin County for their work.  As I say, they may be going

21 there for their health care.  They may be going there to shop.

22 And they may be going there for just pure entertainment

23 purposes.  It's sort of the center right there for those things

24 for southwest Alabama.

10:44:36 25 Q     Let's talk about the social and cultural life of the first

```
 1   district.  What are some things socially and culturally that
 2   bind that region together?
 3   A    Well, the biggest is Mardi Gras.  We like to tell the
 4   people in New Orleans that we have the first Mardi Gras.  They
 5   don't like that, but it's the truth.  And that Mardi Gras has
 6   always bound that area together.  And in some of the towns
 7   outside of Mobile County, they've actually started their own
 8   little Mardi Gras parades there that are very fun to go to.
 9        I think everybody understands that's kind of a way of
10   expressing our joy of life.  We like to have fun.  We like to
11   eat.  We like to go to parades.  We like to spend time with one
12   another.
13        Our Mardi Gras is very family oriented.  You have families
14   who for generations have been coming into Mobile for Mardi Gras
15   so they can partake of that.
16              THE COURT:  And moon pies.
17              THE WITNESS:  And moon pies.
18              THE COURT:  You can't forget the Mobile moon pies.
19              THE WITNESS:  Very good microwaved with some ice cream
20   on top of it.
21              THE COURT:  I haven't it that way.  I will have to
22   see.
23   BY MR. DAVIS:
24   Q    Are you aware of any counties outside of the first
25   district that celebrate Mardi Gras?
```

1  A     There are some in Mississippi and some in Florida.  But

2  I'm not aware of any others in Alabama.

3  Q     Okay.  I meant to limit my question to Alabama counties.

4  So thank you for being more specific.

10:45:52 5      What about the demographics of the first district?  Is

6  this a diverse district?

7  A     Extremely diverse.  You've got an urban center there in

8  Mobile.  You've got a major tourist destination in south

9  Baldwin County.

10:46:09 10      As you said, we have the seafood industries in both south

11  Mobile County and south Baldwin County.  In south Mobile County

12  a big part of that seafood industry is a southeast Asian

13  population that immigrated there at the end of Vietnam war.

14      Then you move up into the northern part of the both Mobile

10:46:27 15  and Baldwin counties and spreading out to the rural counties.

16      Timber is a big thing.  We do have agriculture.  Cotton

17  and peanuts are big.  Some soybean.

18      We have -- sort of a unique part of agricultural industry

19  in my district is we have a lot of nurseries.  Some of them

10:46:44 20  small, some of them big in both Mobile and Baldwin counties.

21      And then you've got some tourism, a little less tourism up

22  in the northern part of my district where people like to go

23  hunt and fish.  We've been trying to develop that.

24      So you've got very rural sparsely populated areas, very

10:47:01 25  urban densely populated areas.  You have got areas that are

1   well-to-do, areas that are not so well-to-do, areas that are

2   developing, areas that are declining.  It's a very diverse

3   district.

4   Q    So you have constituents who are Asian American?

10:47:14  5   A    Yes.

6   Q    You have constituents who are African-American?

7   A    Yes, sir.  And Hispanic.

8   Q    And Hispanic.  You've served in the state legislature.

9   You've been elected to the board of education.  You have been

10:47:30 10   elected to Congress.  Do you spend much of your time

11   campaigning door to door?

12   A    I do.  That's one of the things that I enjoy doing.  And I

13   learn a lot by going door to door.  I enjoy the interaction I

14   have with the people when I do it.

10:47:43 15   Q    What, if anything, have you noticed during your

16   door-to-door campaigning about where people live in your

17   district, particularly where people live of different races?

18   A    Well, the populations are shifting.  Families, white or

19   black, are trying to move to the suburban areas.

10:48:03 20        So as I go through suburban areas of west Mobile city,

21   west Mobile County, I notice a pretty good integration,

22   increasing integration of African-American families.  It's

23   almost always families, people with children.

24        On the other side, you've got more and more younger

10:48:19 25   people, white and black, moving into the downtown and midtown

            1   area because that's sort of the hot, hip place to live.  And so

            2   you're seeing two areas that used to be more or less segregated

            3   are beginning to integrate because the younger people want to

            4   go be downtown or near downtown.

10:48:35    5        The people with families want to be out in the suburban

            6   areas that are little more kid friendly.

            7   Q    So are you seeing the Mobile area becoming more integrated

            8   residentially --

            9   A    Yes.

10:48:45   10   Q    -- over time?

           11   A    Absolutely.

           12   Q    Is there anything unique about the history of this part of

           13   Alabama?

           14   A    Well, we were founded first by the French in the early

10:48:57   15   18th century, and then had the Spanish come in for a number of

           16   years.  Then the British took over for a number of years.  Then

           17   the Spanish came back.  Then the British came back.

           18        And in 1710, we and some places over what is now

           19   Mississippi tried to form our own country called West Florida.

10:49:15   20   And the only thing that the British and the new American

           21   Republic could agree upon was they weren't going to let us form

           22   our own country.

           23        So ultimately the Americans took over our part of Alabama

           24   during the War of 1812.  So by the time that part of the state

10:49:32   25   came into the United States of America, we had this very sort

1   of cosmopolitan beginning.

2        So you have a lot of people there -- and I'm one of them

3   who have French or Spanish forbearers.  And we have that sort

4   of culture that comes into who we are.  So that's unique.

10:49:49 5        The fact that we are a port city is unique in Alabama.  We

6   have inland ports that are very important.  But we're the only

7   deep water ocean port.

8        And we went through a period of time during the 19th

9   century when we were very outward looking towards the rest of

10:50:07 10  the world.  In fact, when they referred to Mobile in London and

11  Paris newspapers in the 19th century, they never said Mobile,

12  Alabama or Mobile, USA.  They just said Mobile because

13  everybody knew who it was.

14       In the latter part of the 19th century, we had three

10:50:23 15  German language newspapers.  We had a vast influx of Germans.

16  About at the same time, we were bringing a lot of Greeks in

17  that ended up in a place called Malbis in Baldwin County.  And

18  we found a number of people from Scandinavia and places like

19  Czechoslovakia that were moving into the area.

10:50:43 20       So we've had this type of history of different types of

21  nationalities, ethnicities, and even religions moving into our

22  area.  And I see a lot of that around the state of Alabama.  I

23  don't see it to the extent that I see it in my part of the

24  state.

10:50:57 25  Q    Would you agree, Congressman Byrne, that Mobile and

1   Baldwin County are closely connected culturally and

2   economically?

3   A    I have to quote Winston Churchill.  Winston Churchill said

4   that the Americans and the British were separated by a common

10:51:10  5   language.  And I tell people all the time Mobile and Baldwin

6   County are separated by a common bay and river system.  We're

7   very integrated with one another.

8        My family actually started out in Baldwin County and

9   migrated over the Mobile County.  We have had our feet in both

10:51:25 10   sides of the bay for generations.  And we're not unusual.

11       So you've got people who have some sort of a connection on

12   both sides of the bay.  And we've found over the last 20 years

13   that the economic development efforts of both sides of the bay

14   have been merging.

10:51:41 15       And so we're actually doing a lot more cooperative things

16   between the two counties.  And each county sort of living off

17   of the other in various ways.

18       So the cooperation between local government, local

19   economic developers, local civic leaders on both sides of the

10:51:58 20   bay is something we've worked very, very hard on.  And it's

21   paying off for us in a big way.

22   Q    Are Mobile and Baldwin counties becoming more or less

23   connected over time?

24   A    Much more connected.  In fact, right now we have a problem

10:52:10 25   that in order to keep us connected we have got to build a new

         1   Interstate 10 bridge across our river.  We're struggling with
         2   that there's so much connection.  But that's a good thing.
         3       I think it benefits both counties.  And I think it's
         4   benefited the incredible economic development efforts we have
10:52:26 5   had there in the last 20 years.
         6   Q   I didn't ask you, Congressman -- what, if any, committees
         7   do you serve on in Congress?
         8   A   I'm on two.  I'm on the House Armed Services Committee and
         9   on the Education and Labor Committee.  When I say education and
10:52:38 10  labor, it's both K-12 and higher education policy on the
        11   education side.
        12       But on the labor side, it's my old area of law practice,
        13   which is traditional labor and then traditional employment law,
        14   Title VII, et cetera.  So that committee actually lines up
10:52:53 15  pretty well with what my experience was before coming to
        16   Congress.
        17   Q   Okay.
        18           THE COURT:  Wait a minute.  Education and Labor are
        19   one committee?
10:53:01 20          THE WITNESS:  Yes, ma'am.
        21           THE COURT:  That's an interesting combination.
        22           THE WITNESS:  Yes, ma'am.  But because of my
        23   background, it sort of fits being on the state school board,
        24   being chancellor, and being a former labor and employment
10:53:14 25  lawyer.  So I'm always uniquely suited to be on that committee.

```
 1  I fact, I think I'm the only person in Congress that can say
 2  all that.
 3          THE COURT:  I was about to say you're probably unique
 4  in that in more ways than one.
 5  BY MR. DAVIS:
 6  Q    What issues do you need to focus on when you represent the
 7  first district, Congressman?  If your colleagues saw you coming
 8  down the hall, they say, Here comes Congressman Byrne.  He
 9  probably wants to talk to me about -- what?
10  A    Oh, well.  If you asked the House leadership, they'd say,
11  When Byrne comes down the hall, he's interested in that ship --
12  those ships, the fish, red snapper, and he's interested in that
13  bridge.  In fact, they can go down the line and say one, two,
14  three.
15          And part of the reason for that is that I have just
16  focused on it, focused on it, focused on it.  And they know
17  what I'm interested in and what they need to be working with me
18  on.
19          That's true for most successful members of Congress.
20  You've got to get everybody to understand this is what's
21  important to my district, and I'm going to focus on it, and you
22  have to focus on it with me if you want me to be cooperative.
23  Q    So are those things important to you because they're
24  important to your constituent in the first district?
25  A    Absolutely.
```

```
 1  Q    Are those things that Congressman Roby is known for
 2  focusing on as she represents the second district?
 3  A    Oh, yeah.  She's got Fort Rucker, a major army helicopter
 4  base kind of in the center of her district.  So Fort Rucker is
 5  important to her.  She has Maxwell Air Force Base up there in
 6  Montgomery.  Obviously very important to her.  Maxwell Air
 7  Force Base does a lot of different things, but a lot of it is
 8  training and education.
 9       She's got very important agricultural interests in her
10  district -- cotton, peanuts, cattle primarily.
11       She's got a university in the center of her district, Troy
12  University.  That's a regional university that also has an
13  international reach even having campuses in southeast Asia and
14  China.  She also has the University of Troy in Montgomery,
15  Auburn University in Montgomery, and Alabama State University.
16  So she's got four different universities that she works with.
17       There are also some other specialty businesses in her
18  district.  Great Southern Wood Preserving, which we all know as
19  YellaWood, is located in Abbeville in her district.  It's the
20  largest treated lumber company in the world.
21       And there is a plastic recycling business in Troy that's
22  the largest in the world.
23       And then you have a number of defense-related businesses
24  both around Fort Rucker and around Troy University itself,
25  including the site where they make the Thad missile system, et
```

1    cetera.

2         So she's got some very important economic development,

3    economic interests in her district, and military interest in

4    her district that she has to focus on.  And everybody in

10:56:00  5    Washington knows that.

6    Q    Well, you have the naval shipyard in the first district?

7    A    Right.

8    Q    And she has Fort Rucker and Fort --

9    A    Maxwell Air Force.

10:56:10 10    Q    -- Maxwell Air Force Base.  So there are military

11   interests in both districts?

12   A    Right.

13   Q    Are they the same?

14   A    No.  So the Armed Services Committee is broken up into

10:56:20 15   subcommittees.  One of those subcommittees is the Seapower

16   Committee.  It makes sense if you represent a naval shipyard to

17   be on the Seapower Committee.  If you don't represent a naval

18   shipyard, you wouldn't necessarily want to be on the Seapower

19   Committee.

10:56:35 20        She would be interested and was when she was on the Armed

21   Services Committee and being on tactical land and air, which

22   deals with things like Fort Rucker and Maxwell.

23        So if you were just looking at those two, they are two

24   different areas of focus within military defense matters.

10:56:53 25        It doesn't mean that she wouldn't know anything about my

1   shipyard or that I don't know about her military bases.  We

2   both do, and we work with one another.  But she's the leader

3   over there, with regard to Rucker and Maxwell.  I follow her

4   lead.  I'm the leader with regard to the shipyard in my area.

10:57:10 5   She follows my lead, as others do.

6        And so we're able to separate our areas of expertise,

7   strengthen ourselves.  And by complimenting one another,

8   Alabama actually punches above its weight.  If you look at how

9   many members we have in our seniority, we get far more for the

10:57:28 10   buck than most states do.

11   Q    Right now, looking at the current borders of the first

12   district, do you find that this area's connected enough to make

13   it easier for you to focus on a narrow set of issues?

14   A    Yes, sir.  I can tell you -- I meet once a year with

10:57:48 15   economic developers, once a year with our superintendents of

16   education, once a year with our higher ed leadership, once a

17   year in various ways with local elected leadership so that --

18   and it's compact enough that I can do that.  And then in

19   between those yearly meetings, we stay in touch with one

10:58:05 20   another.

21        Plus it's pretty easy to get around my district driving

22   wise.  I can get to even the furthest part of my district

23   fairly easily.  So from my perspective, that sort of

24   compactness of the district gives me the ability to focus on

10:58:20 25   the things I need to focus on and get my job done.

```
 1  Q     Where do you have offices?
 2  A     I have one in Mobile, and I have one in Summerdale, which
 3  is on Alabama 59 just north of Foley.  If you're going to the
 4  beach, you go right past my office.
 5             THE COURT:  Is that in Baldwin County?
 6             THE WITNESS:  Yes, ma'am.
 7  BY MR. DAVIS:
 8  Q     How easy would it be to focus not just on snapper and
 9  ships and the bridge, but to also focus on timber and peanuts
10  and army helicopters and the other things that are in the
11  second district?
12  A     Well, you know, if that was your job, you would do it.
13  But there's only so many hours in the day.  You only have so
14  much staff.  And when you spread yourself over that much of a
15  geographic area with those different interests, by definition,
16  you're going to get less attention to each of those.
17       So anybody who would try to represent both of those I'm
18  sure would do the best they could, but they couldn't do it as
19  well as if you keep these districts compact.
20  Q     Congressman, the plaintiffs in this lawsuit have argued
21  that Alabama should draw different districts, and they've made
22  a series of proposals to suggest different ways that may be
23  done.  What I have put on the screen is Plaintiffs' Exhibit 61
24  also known as their Revised Plan 1.
25       Look at the first district, as is configured here on
```

10:58:37   5
10:58:52  10
10:59:06  15
10:59:22  20
10:59:47  25

```
 1   Plaintiffs' Exhibit 61.  What response do you have to this
 2   district?
 3   A    Well, I'd be living on Interstate 10 getting back and
 4   forth between the western most part of my district to the
 5   eastern most part of my district, because that's the most
 6   efficient way to get from the western part of that district to
 7   the eastern part of the district.  It takes a long time to get
 8   from far west Mobile County to get to Dothan over there in the
 9   southeastern part of Houston County.
10        And then if you go up to Henry County where Abbeville is,
11   you would be even further because you would have to go over
12   Interstate 10, come up through Dothan, then go even further
13   north.  That's not to say if that was my district I wouldn't do
14   it.  Of course, I would do it.  But because of the geographic
15   distance there, I would not be able to do as much.
16        So in the past six years, I've done over 130 town halls in
17   55 different localities in my district.  I would not be able to
18   do that many town halls nor reach that many localities if that
19   were my district.
20   Q    Are there communities of interest that unite southwest
21   Mobile County with Houston and Henry counties?
22   A    I can't think of any.
23   Q    Okay.  Do they have any common industry?
24   A    There is some agriculture in southwest Mobile County.
25   Some of it's common to Houston County, et cetera.  But some of
```

it's not.  For example, you have got a lot of pecans in

southwest Mobile County.  You have a lot of watermelons there.

I don't think they do over there.  You have some of the

nurseries there in southwest Mobile County.  They don't over

11:01:25  there.  And then they don't have any seafood.  In the far

southern part of Mobile County, you have all those seafood

interests.

So, yes, there's agriculture, but it's different

agriculture.  And you might not think that they're that

11:01:39  different.  But when you start looking at the federal

agriculture programs and how they apply here, there's a great

deal of difference.

Cattle is a very different thing than growing crops.  And

they have a lot of cattle over there in that part of Alabama.

11:01:55  Q    Do people from Henry and Houston County come to Mobile to

work?

A    No.

Q    Do a lot of industries in Henry and Houston County use

ports to ship their products?

11:02:06  A    No, sir.  There is a port there in Panama City, and that's

closer to them to be able to truck things.  So I can't say that

there aren't any.  But all that I know of is being shipped from

that part of the state of Alabama through the port there in

Panama City.

11:02:22  Q    Now, look at the yellow district, Exhibit 2 -- excuse

```
 1  me -- District 2 here on Plaintiffs' Exhibit 61.
 2  A    Uh-huh.
 3  Q    It connects -- would you agree that it includes the more
 4  urban parts of Mobile?
 5  A    It does.  It also includes some of the less-populated
 6  parts of the northern part of Mobile County, as well.
 7  Q    And then it goes to connect those areas of Mobile County
 8  with Montgomery, Macon, and Bullock County.  Are there strong
 9  connections between urban Mobile and Macon, Bullock, and
10  Montgomery counties?
11  A    As far as I know, there are no connections.
12  Q    Does anyone from Montgomery, Macon, or Bullock County come
13  to Mobile to work?
14  A    Not that I've ever known of.  That'd be a pretty far
15  commute.  It would be a long commute.
16  Q    Do they get their media from Mobile?
17  A    No.  They get their media from Montgomery.
18  Q    Are there communities of interest that you're aware of
19  that bind -- that bind urban Mobile County with Lowndes,
20  Montgomery, Macon, and Bullock County?
21  A    Not that I know of.  I've never known of any sort of
22  cross-fertilization, in terms of what we're doing economically.
23  I've worked with people in those counties.
24  Q    Sure.
25  A    But not on things that have anything in common with what
```

11:02:37 (line 5)
11:02:58 (line 10)
11:03:10 (line 15)
11:03:29 (line 20)
11:03:43 (line 25)

1   we do down in the southwest Alabama.

2   Q     Looking back at District 1, the pink district, if that

3   were your district, where would you need to have offices?

4   A     Certainly you would want to have an office in Dothan.  You

11:04:04 5   probably would try to have something either in Brewton or

6   Andalusia, one in Mobile.  But then you've got three offices,

7   and we only have so much money in the budgets they give us to

8   run our offices.

9        And so you would definitely sacrifice, in my judgment, the

11:04:20 10   one in Baldwin County.  And the one you had either in Brewton

11   or Andalusia would have to be a pretty small office because you

12   couldn't afford it any other way.  It's hard to maintain more

13   than two offices in your district under the budget we have got.

14   Q     So District 1, as it's proposed here on Plaintiffs'

11:04:39 15   Exhibit 61, would that be more difficult for you to represent

16   than the district you presently represent?

17   A     Far more difficult.  I would try.  Don't get me wrong.

18   And I think any representative would try.

19        But I think the reality is it's so broad geographically,

11:04:56 20   and it has such differences in their, you know, economies, et

21   cetera, I think it would be very difficult.

22   Q     Would District 2, as it's configured here on Plaintiffs'

23   Exhibit 61, would it be more difficult to represent than the

24   present District 2 that Congresswoman Roby serves?

11:05:14 25   A     Absolutely.  I mean, you've got to represent Montgomery

1  and Mobile.  And Montgomery and Mobile are friends, but they

2  are two different economies.  They've got two different sets of

3  things trying to accomplish.  And trying to master what the

4  needs are of those two distinct areas and regions would be very

11:05:34 5  difficult, I would think.

6      Congressman Roby would throw herself at it and I think do

7  well at it.  But I think even as good as she is and as hard as

8  she works, I think she would find it extremely difficult to

9  represent an area that looks like that.

11:05:48 10      THE COURT:  Is it fair to say that sometimes Mobile

11  and Montgomery may be somewhat of competitors, as well as

12  friends?

13      THE WITNESS:  Yes, ma'am.  That's not unusual, you

14  know, when you're going after an economic development prospect.

11:06:05 15  You're friends and work together on things you can.  But if

16  there's one prospect and you both want to go get them, you're

17  competitors.

18      THE COURT:  And isn't there a little bit of maybe

19  sibling rivalry as to who is the largest city at what time, and

11:06:22 20  things of that nature?

21      THE WITNESS:  There's some sibling rivalry going on

22  there, yes, ma'am.  We have a close connection to the people in

23  Montgomery.  We have lots of friendships.

24      But let's face it.  When you're trying to develop your

11:06:35 25  area economically and you're competing for a new plant or

```
 1  factory business, you know, everybody's on their own.  And
 2  we're going to -- we're going to compete very hard against one
 3  another.  And I think that's what's made Alabama so successful
 4  economically is we cooperate when we can.  But, buddy, when
 5  it's time to, you know, to suit up and go after it, we go after
 6  it.  And we've been a very successful as a state because of
 7  that.
 8  BY MR. DAVIS:
 9  Q    Congressman, I've put on the screen now Plaintiffs'
10  Exhibit 61, which is Plaintiffs' Revised Plan 2.
11         A slightly different configuration.
12              THE COURT:  I think it's 67.
13              THE WITNESS:  Yeah.
14              MR. DAVIS:  I'm sorry if I misspoke.  Plaintiffs'
15  Exhibit 67.
16  BY MR. DAVIS:
17  Q    Congressman, would this configuration of districts present
18  the same concern as the Revised Plan 1 we just saw?
19  A    It would even more so in some respects because you're
20  going even deeper into parts of Mobile County that have very
21  different interests.
22         So -- and I'm just looking at what it would take to drive
23  from Tuskegee to -- I guess that's Fowl River in the southern
24  part of Mobile County.  That would be quite a hike.
25  Q    If someone were running from -- wanting to represent
```

```
 1   District 2, if it were drawn as it is here on Plaintiffs'
 2   Exhibit 67 -- let's say you had a candidate running in a
 3   primary from downtown Mobile and a candidate running from the
 4   Montgomery area.  Do you have any sense of which candidate
 5   might have a stronger base of support?
 6   A    Yeah.  The Montgomery candidate.  So and think about that.
 7   That means you just hurt Mobile.  If you do that district --
 8   that district you got in Plaintiffs' Exhibit 67 hurts Mobile,
 9   everybody in Mobile.
10   Q    Well, and then I guess you would have an election for
11   District 1 at the same time.  You could have a candidate from
12   west Mobile County and a candidate from Dothan.  You could have
13   a candidate elected from Dothan to represent District 1, a
14   candidate from Montgomery to represent District 2, and no one
15   anywhere -- who was -- lives anywhere around Mobile County?
16   A    That's right.
17   Q    Would you not?
18   A    That would be devastating for Mobile.
19   Q    Would that be good -- you said it would be bad for Mobile.
20   Would it be good for the state of Alabama?
21   A    No.  You would lose a congressman or woman who was focused
22   on that very economically dynamic part of the state.
23        And I would say the same thing by the way if we were
24   talking about Huntsville.  I mean, Congressman Mo Brooks
25   represents Huntsville.  If we lost one congressperson looking
```

1  out for that incredibly dynamic economy in Huntsville, it would
2  hurt the entire state of Alabama.
3  Q    I'll show you now, Congressman, Plaintiffs' Exhibit 73
4  which is Plaintiffs' Revised Plan 3.  It is a third
11:09:37 5  configuration of your districts.
6       Would this plan present some of the same concerns as the
7  other two we saw?
8  A    Yes, sir.  And I will add an additional concern that would
9  be true for this one and the rest of them.  One of the things
11:09:48 10  we've been trying to do very hard is to not separate parts of
11  Mobile from others.  And we don't want to separate Baldwin
12  County from Mobile.  All of these start to break up Mobile,
13  which is something we're trying to stop.
14       Our mayor in Mobile Sandy Stimpson, his motto is One
11:10:06 15  Mobile.  We start doing things like, this we're going against
16  that.  We have a group that's trying to make sure we integrate
17  Mobile and Baldwin County together.  This goes against that.
18  So this actually hurts those efforts.
19  Q    Would your concerns be the same or even greater if not
11:10:21 20  only were Mobile divided, but if it were divided along racial
21  lines?
22  A    I would be even more concerned.  I think dividing along
23  racial lines is really bad.
24  Q    And now --
11:10:36 25       THE COURT:  Why do you think that is really bad,

```
       1   dividing among racial lines?

       2           THE WITNESS:  Well, I think it's morally bad.  But

       3   when you start to sell your area economically, the last thing

       4   an economic development prospect wants to see is that you have

11:10:52 5   got division with your community, and particularly racial

       6   division.

       7       They like seeing people who are unified, who work

       8   together, who overcome problems -- not expect you to have no

       9   problems.  They want to see that you have unified efforts to

11:11:05 10  overcome those problems.

      11       And areas that have racial divisions are areas that start

      12   with a handicap in trying to attract economic development

      13   prospects.

      14           THE COURT:  Thank you.

11:11:15 15          THE WITNESS:  Yes, ma'am.

      16   BY MR. DAVIS:

      17   Q    Do you think it would promote racial unity and thus

      18   economic development and all the other benefits of racial unity

      19   if we said this part of Mobile is in a district designed to be

11:11:33 20  an African-American district, and this part of Mobile is in a

      21   district designed to be a white district?

      22   A    I think it would greatly harm all of our efforts if we did

      23   that.  That's why I strongly support Mayor Stimpson's motto,

      24   One Mobile.

11:11:45 25  Q    Congressman, I've put on the screen now Plaintiffs'
```

```
 1   Exhibit 40, which is Plaintiffs' Illustrative Plan 4.  It's a
 2   fourth proposed configuration of districts.
 3        Does this configuration present some of the same concerns
 4   as you had when we looked at the other plans?
 5   A    Yes, sir.  And when it snakes up into Pike County, that's
 6   where Troy is.  That's where Troy University is.  So let me
 7   tell you about what that means.
 8        Troy and the University of South Alabama are football
 9   rivals.  So a couple of years ago, Congresswoman Roby and I
10   went to a Troy game in Troy.  She walked out on the field with
11   the Troy team that she represents.  I walked out on the field
12   with the University of South Alabama that I represent for the
13   coin toss.  And, of course, we had a bet on the game.
14        Well, if I am the congressperson representing both of
15   those districts, which team am I going to walk out on the field
16   with?  If I'm a smart congressman, I am not going to walk out
17   on that field.
18        Now, that may seem like a little thing.  But by doing that
19   you're communicating, if you're Martha Roby, to the people that
20   are in Troy and live around Troy, and big Troy supporters who
21   you are and how you're going to support that university.  Same
22   for me.  Spreading yourself out like that is probably not a
23   good idea.
24   Q    Are you suggesting that Alabamians are interested in
25   college football?
```

```
 1   A    Yes, sir.  I think Alabamians are interested in college
 2   football.
 3        We have the President of the United States coming to
 4   Tuscaloosa Saturday, game day for ESPN, and the Number 1 team
11:13:12  5   is playing the Number 2 team.  I think we're interested in
 6   college football.
 7   Q    Now, as you mentioned, Congressman, you've served on the
 8   state board of education, correct?
 9   A    Yes, sir.
11:13:28 10   Q    I've put on the screen now Plaintiffs' Exhibit 4 which
11   I'll represent to you is a map of the present state board of
12   education districts.
13        How many districts are in the state board of education
14   map?
11:13:43 15   A    There are eight.
16   Q    Was this the configuration of districts when you served on
17   the state board of education?
18   A    It was not.
19   Q    Okay.  Your District 1, then, looked different from this
11:13:53 20   District 1?
21   A    Very different.
22   Q    How did your District 1 look?
23   A    It was all of Mobile County.  So it was no part of like
24   this finger comes down from District 5.  It was all of Baldwin,
11:14:06 25   all of Escambia which is the same here.  But I did not have
```

1   Conecuh, Butler, Crenshaw, or Covington.

2   Q    Who represented District 5 when you served on the state

3   board of education?

4   A    My first six years it was Dr. Willie Paul.  And then the

11:14:24 5   last two years I was on there, it was Ms. Ella Bell, who passed

6   away earlier this week.

7   Q    Did only people from your district call you with any state

8   board of education business?

9   A    No.  People in Washington County and Monroe County either

11:14:40 10   got confused about whether I was their school board member or

11   because I was so close by wanted me to come up there and do

12   things with them.  So it was not unusual for me to get a call

13   from a school or a school system or education advocate saying,

14   would you come up and meet with us?

11:14:56 15        And I would always call the board member from that

16   district and say, Look, I got this phone call.  I want to go up

17   there and be helpful to them.  But it's your district, and I am

18   not going to go in your district.  And without fail, they would

19   say, No, I appreciate your doing it because it's hard for me to

11:15:10 20   get down there.  So thank you for going up and doing that.

21        So even though they weren't my constituent on the school

22   board, I would go up and have meetings and do things and then

23   transmit whatever I learned about that to Dr. Paul or Ms. Bell

24   when I saw them next.

11:15:22 25   Q    Congressman, do you support a state board of education

1  plan that divides Mobile County in this way?

2  A    No.  And I was pretty outspoken about it.

3       Mobile County -- the Mobile County school system is the

4  largest school system in the state.  It's gone through some

11:15:41  5  difficult times.  But it's has made some real strides recently

6  because of substantial efforts that the leadership within the

7  system and people in the system had been making.  Montgomery

8  County schools, as you probably know, have had a lot of

9  problems recently and are really struggling.

11:15:57  10      It would be very difficult to be a state school board

11  member representing two such large urban districts that have

12  issues, but different issues.  In addition to which, you're

13  going to have a lot of these rural areas.  You are going to

14  have those rural areas or some rural areas no matter which one

11:16:14  15  you have.

16      But to have both urban areas, I think one of us is going

17  to get the short end of the stick.  And because -- I'm not

18  taking anything away from anybody involved with this -- because

19  the primary focus of that district is Montgomery, it's going to

11:16:30  20  the Mobile County school system.

21  Q    Hypothetically, even if everyone in the room thought this

22  was a great way to configure the state board of education

23  districts, does that mean it would be a good way to configure

24  congressional districts?

11:16:43  25  A    No.  Being a congressman and being a state school board

member, I am one and I was the other.  They are two completely
different things.  It is far, far, far more involved to be a
congressman.

When you're in the state school board, you have got a
relatively narrow range of issues that you're focusing on.
When you're a congressman, you're focusing on an incredibly
broad array of issues; everything from foreign and military
policy to health policy, et cetera.

And to be able to deal with that in all of its local
manifestations, and there are local manifestations to all of
these issues.  To try to cover something of that breadth in two
different distinct metro areas, I think would be extremely
difficult.

Q    Okay.  Well, I don't want to suggest that communities of
interest are not important when you're drawing board of
education districts.  But would you agree that if you have
districts that break up communities of interest for a board of
education plan, that that doesn't present as many problems as
if you break up communities of interest for a congressional
district?

A    Oh, yeah, I agree with that.  But I still don't like this
state school board configuration.  I have been very vocal about
that.

Q    Now, you said you hold -- I'm going to put the present
districts back up.

```
 1  A    Okay.

 2            THE COURT:  Just for the record -- Plaintiffs' 15?

 3            MR. DAVIS:  Plaintiffs' 15.

 4            THE COURT:  Thank you.

11:18:11  5  BY MR. DAVIS:

 6  Q    You said you hold town hall meetings in your district?

 7  A    Yes, sir.

 8  Q    Where?

 9  A    Everywhere.  I have had over 130 town hall meetings in

11:18:22 10  six years across 55 different communities.  I don't just have

11  them in Mobile.  I just don't have them in Baldwin County.  I

12  have them everywhere.  And so we've been to the tiniest places

13  you can imagine because I think those people deserve to see

14  their congressman too.

11:18:39 15  Q    Do you hold town hall meetings in precinct that maybe you

16  didn't carry in the election?

17  A    Yes.  I've done that many times.

18  Q    Do you hold precincts in communities that have a large

19  African-American population?

11:18:51 20  A    Yeah.  Of those 55 different communities, not quite half

21  of them are majority African-American and have African-American

22  mayors, et cetera.  So there are local officials there that are

23  African-American.

24  Q    Do you have a sense of how many town hall meetings you may

11:19:10 25  have held in areas with a strong African-American presence?
```

A    Well, if I have had 130 across 55 different communities,
it's probably at least 50, maybe more.  And there are multiple
ones in different ones, too.

So Mobile, for example, I've had town halls in different
parts of Mobile, the eastern half and the western half, all
over.  There's an African-American community up in the northern
part of Mobile County called Mount Vernon, another Pritchard.
I've been to Pritchard a number of times at their request.

So we try to spread it around as much as we can.  And we
always respond to requests.  For example, if a community says,
We want you to come back, we come back.

So we've been to Grove Hill.  I think this is my -- I was
over there the other day.  I think I've been there six times in
six years.

So we try to be as responsive to the people in these areas
as we can.

We actually had a CBS news crew -- morning news crew come
down with us a year and half ago.  They followed us for an
entire day.  And I was real proud of that.  And at the end of
the day, the news crew turned to me and said, These were some
of the nicest people we've ever met -- even people that
disagreed with you.  And there were people that disagreed with
me in my town halls.  They were so nice.  I said, That's how we
roll down here in southwest Alabama.

Q    When you have a town hall meeting, do you call only on

1  people who you think will give you a friendly question?

2  A    I wish I had that clairvoyance, but I don't.  The way I

3  run my town halls is this:  We gather -- whoever the host is

4  welcomes everybody and we usually have a pledge, or something

11:20:52  5  like that.  Then I get up and say, Look, I am not going to give

6  you a speech.  I'm just going to take your questions and

7  comments.  I only have one rule and that's we respect one

8  another.  And I say, Who wants to start us off?  And people

9  raise their hands.

11:21:04 10      Now, most of the people, the vast majority of the people

11  in those rooms, I don't know who they are.  And I have no idea

12  what questions I'm going to get.  I've had national news

13  reporters with me, and I've warned them, I have no idea what

14  they're going to ask me.  So when I call on somebody, I

11:21:18 15  literally don't know what they're going to ask or say.

16      And I try to -- I pick, but I try to bounce around the

17  room.  And I try not to go back to the same person more than

18  once.  Although sometimes you do that because nobody else is

19  asking questions.

11:21:31 20      And so I try to call on as much of a diverse array of

21  people in that room as I can.  And we get some very diverse

22  array of comments and questions.  And like I say, sometimes

23  people agree with me, and sometimes they do not.

24  Q    Do you want to hear the concerns and points of view of

11:21:47 25  people who don't agree with you?

1  A    Absolutely.  I tell people all the time at the end that

2  you don't get to do this in the People's Republic of China or

3  Iran.  And the great thing about America is that we get to have

4  that sort of interchange between the government and the people,

11:22:02  5  and that government has to hear even things that's not, you

6  know, with what I think is the right policy option.

7       But I think that's valuable to me to do that.  And that's

8  why I do it.  And I do a lot more than most people in Congress

9  do.

11:22:15 10  Q    Do you run for office under the manner of any particular

11  political party?

12  A    Yeah.  I'm a Republican.

13  Q    Do you consider yourself to represent constituents even if

14  they're members of a different political party?

11:22:31 15  A    Of course.  When you run in an election as a Republican or

16  Democrat, when the election is over, you have a job to do.  And

17  your job is to represent the entirety of your district.  All

18  700-plus thousand people, your job is to represent them.

19       So, you know, but most of the time when you have contact

11:22:48 20  with people, it's not over some grand issue.  It's because they

21  have a problem with the VA, or social security, or whatever.

22  And my job is to be their congressman.  And we work very hard

23  on doing things for them.

24       So probably the number one thing that I interact with my

11:23:04 25  constituents about are problems they have with the VA, whether

1  they're African-American, white, or anything.  And so that's

2  what they want out of their congressman is somebody that's

3  going to take those sorts of things seriously.  And when they

4  have a policy position, they want us to listen to them.

11:23:18  5  They're not always expecting me to agree with them.  But at

6  least they want me to listen to them, and I try do that.

7  Q    Is there anything, Congressman, that you have worked on

8  and fought for during your service that you're particularly

9  proud of that may have had a special benefit towards the

11:23:33 10  African-American communities?

11  A    Yeah.  There are two.

12  Q    What's that?

13  A    I am the -- there are two of us.  There are two cochairs

14  for the historically Black College and University Caucus in the

11:23:44 15  United States House of Representatives.

16      The other cochair is Alma Adams, a Democrat from North

17  Carolina.  And she and I over the last three or four years --

18  and I'm going to give her more credit than me because she has

19  been great at this --- have grown that caucus into a fairly

11:24:01 20  large caucus in the House.  We've been able to pass some

21  legislation that I think is important.

22      Equally important, is we've been bringing people in from

23  the private sector who have not interacted with HBCUs.  To get

24  people -- major companies, et cetera to try to understand what

11:24:17 25  an HBCU is, the importance of their mission, their students, so

1  they're paying more attention to their students.  And that has

2  been a great joy for me.

3      I was able to put an amendment on a bill that came through

4  the House education committee -- education labor committee last

11:24:32 5  week that spread out and added to some programatic offerings

6  that HBCUs could have under some federal programs.  Because of

7  that, I received the Thurgood Marshall College award.  The

8  Thurgood Marshall fund works with HBCUs, African-Americans

9  students to try to provide them more opportunity.  And I was

11:24:53 10  very proud they gave me that award.

11      The second is that I work with community health centers.

12  Now, community health centers are not focused just in

13  African-American communities.  But at least in my district,

14  there are a lot of community health centers in hard to reach,

11:25:07 15  underserved areas that are predominantly African-American.

16      So I've been one of the leaders in Congress in trying to

17  provide more authority and more resources to these community

18  health centers because I think they do the best job of anybody

19  I've seen of getting health care to people who really need

11:25:24 20  them, can't afford it, and probably wouldn't access it any

21  other way.  And I received an award for that, as well.

22      So if I think of the top two things, I would think about

23  those.  But as I said earlier, the day in and day out stuff I

24  do for individual constituents, a lot of whom are

11:25:41 25  African-Americans whether they're working with VA or social