FILED

2021 Dec-23 PM 04:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Treva Thompson, Timothy Lanier, Pamela King, Darius Gamble, and Greater Birmingham Ministries, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 2:16-cv-783-ECM-SMD |
| John H. Merrill, in his official capacity as Secretary of State, Cindy Sahlie, in her official capacity as Chair of the Montgomery County Board of Registrars, and Leigh Gwathney, in her official capacity as Chair of the Board of Pardons and Paroles, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ALABAMA SECRETARY OF STATE JOHN H. MERRILL'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO HIM**

Pursuant to Fed. R. Civ. P. 26 and Fed. R. Civ. P. 33, Secretary of State John H. Merrill, who is sued in his official capacity in this litigation, hereby objects and responds to Plaintiffs' interrogatories to him dated March 11, 2020, as set out below.[1]

**General Statement**

Secretary Merrill has relied on the information presently available to him. Further or different information may be discovered during this phase of the litigation. Secretary Merrill will amend his Objections and Responses to the extent required under Fed. R. Civ. P. 26.

Secretary Merrill's Answers to each Interrogatory are made subject to all objections as to privilege, competence, relevance, materiality, propriety, and admissibility, as well as any and all

---

[1] Due to the COVID-19 pandemic, in emails dated March 26, 2020, the State Defendants requested, and were granted, an extension of time until May 11, 2020 to respond.

other objections and grounds that would require the exclusion of evidence. Secretary Merrill reserves the right to make any and all such objections at the appropriate time.

**General Objections**

Secretary Merrill objects to each and every one of Plaintiffs' *Definitions* and *Instructions* to the extent they purport to impose any requirements or obligations different from, or greater than, those contained in the Federal Rules of Civil Procedure, applicable orders of the Court, and/or related agreements.

Secretary Merrill objects to each and every one of Plaintiffs' *Definitions* and *Instructions* as inconsistent with the GUIDELINES TO CIVIL DISCOVERY PRACTICE IN THE MIDDLE DISTRICT OF ALABAMA which provide that "Lengthy and complex preambles and definitions in discovery requests are discouraged, particularly where they operate to give unexpected breadth or inappropriate effect to the meaning of words which are otherwise reasonably clear." GUIDELINES TO CIVIL DISCOVERY PRACTICE IN THE MIDDLE DISTRICT OF ALABAMA at § I. C.

Secretary Merrill objects to *Definition no. 1* and *Instruction no. 3* which purport to impose a duty on the Secretary to consult with "all persons acting or purporting to act on his behalf, including but not limited to his predecessors, agents, representatives, employees, officers, consultants, and/or contractors" and consultants, respectively. Secretary Merrill will not look beyond his own current employees. Not only do his predecessors not act on his behalf, but it is unreasonable to expect him to provide sworn testimony about information unknown to his office, *e.g.,* consultants and contractors. Additionally, Plaintiffs' *Definition no. 1* and *Instruction no. 3* attempt to impose a burden that is not proportional to the needs of the case.

Secretary Merrill objects to *Instruction no. 1* which states that "these Interrogatories seek responsive information and Documents authored, generated, disseminated, drafted, produced,

reproduced, or otherwise created or distributed relating to the period from January 1, 2015 to the present." While Secretary Merrill will read each Interrogatory as seeking information from no earlier than January 1, 2015, Interrogatories do not seek documents, and Plaintiffs' Instruction is thus contrary to Fed. R. Civ. P. 33 and the GUIDELINES TO CIVIL DISCOVERY PRACTICE IN THE MIDDLE DISTRICT OF ALABAMA. Should Secretary Merrill opt to produce business records to answer an Interrogatory, he will do so consistent with Fed. R. Civ. P. 33(d), and not with the Plaintiffs' contrary *Instruction No. 2.*

Secretary Merrill objects to *Instruction no. 8* which purports to add a discrete subpart to each Interrogatory seeking a description of "all efforts made . . . to obtain the information necessary to answer the Interrogatory" if he lacks knowledge himself.

Secretary Merrill objects to *Instruction no. 10* which purports to add a discrete subpart to each Interrogatory seeking identification of any individual whom he believes may have "knowledge necessary to respond to the Interrogatory" if he does not.

Secretary Merrill objects to Plaintiffs' use of the phrase "HB 282." It is highly unlikely that there is any Regular Session of the Alabama Legislature in which there is not a bill introduced bearing the designation HB 282 and, further, if the legislation had not been passed by the Legislature and signed into law by the Governor (or otherwise become law), it would be irrelevant. The legislation became Ala. Act No. 2017-378 and should be so cited, or, when appropriate, a citation to the codification at Ala. Code § 17-3-30.1 may be used.

Finally, Secretary Merrill notes there are two Interrogatories numbered 6, two Interrogatories numbered 11, and two Interrogatories numbered 12. Thus there are no fewer than 19 Interrogatories, despite the fact that the highest number assigned by Plaintiffs is 16. Moreover, multiple Interrogatories contain discrete subparts and should be fairly counted as more than one

Interrogatory, bringing the total to 25 or more  While Secretary Merrill will respond to these

Interrogatories (except for the additional discrete subparts in *Instruction no. 8* and *Instruction no.*

*10*, objected to above), he is not waiving, and, in fact, expressly reserves, the right to object to any

subsequently-propounded Interrogatories as beyond the number permitted by Fed. R. Civ. P. 33 or

any Order of this Court.

## Interrogatory No. 1

Identify each person involved in the preparation of your responses to these interrogatories.

**Answer:**

David Brewer, Chief of Staff
Clay Helms, Deputy Chief of Staff/Director of Elections
Ed Packard, Administrator of Elections
Jeff Elrod, Supervisor of Voter Registration
Hugh R. Evans, III, General Counsel
Grace Newcombe, Press Secretary/Legislative Liaison

Counsel and their staff were additionally involved in the preparation of these responses.

## Interrogatory No. 2

Identify the [S]tate interests served by Alabama's disenfranchisement of people with
felonies involving moral turpitude.

**Answer:**

Alabama is a sovereign with an inherent right to determine who shall be a part of her

electorate.[2]  "The States have long been held to have broad powers to determine the conditions

---

[2]     The default rule is that the States set voter qualifications, even in federal elections.  U.S.
Const. Art. I § 2 cl. 1 (In House elections, ". . . Electors in each State shall have the Qualifications
requisite for Electors of the most numerous Branch of the State Legislature."); U.S. Const. Amend.
XVII (Senators elected by the same electors as House Members); *see also* U.S. Const. Art. II § 1
cl. 2 (Presidential Electors need not even be selected by election); U.S. Const. Amend. XIV
(recognizing the State's right to set qualifications and, specifically, to disenfranchise felons).  The
Constitution has, of course, been amended to impose some limits on that power, U.S. Const.
Amend. XV (eliminating disenfranchisement based on "race, color, or previous condition of

under which the right of suffrage may be exercised, absent of course the discrimination which the Constitution condemns." *Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959) (internal citations omitted). In this area, "there is wide scope for exercise of [the State's] jurisdiction. Residence requirements, age, *previous criminal record* are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters." *Id.* at 51 (internal citations omitted; emphasis added).

The practice of disenfranchising those convicted of certain crimes comes from the very first democracies. "In ancient Athens, the penalty for certain crimes was placement in a state of 'infamy,' which entailed the loss of those rights that enabled a citizen to participate in public affairs, such as the rights to vote, to attend assemblies, to make speeches, and to hold public office." *Hayden v. Pataki*, 449 F.3d 305, 316 (2d Cir. 2006) (*en banc*) (citing Mirjan R. Damaska, *Adverse Legal Consequences of Conviction and their Removal: A Comparative Study*, 59 J. Crim. L., Criminology & Police Sci. 347, 351 (1968)). "The Roman Republic also employed infamy as a penalty for those convicted of crimes involving moral turpitude." *Id.*

Felon disenfranchisement is based on the philosophy of republican government and theory of social compact. "[S]uch provisions are for the protection of the public by permitting only those who have lived up to certain minimum moral and legal standards (by not committing a crime classed as a felony) to exercise the hight privilege of participating in government by voting." *State ex rel. Barrett v. Sartorious*, 175 S.W.2d 787, 788 (Mo. 1943) (*en banc*). The Alabama Supreme Court has explained that, like children or the insane, "[t]he presumption is, that one rendered infamous by conviction of felony, or other base offense indicative of great moral turpitude, is unfit

---

servitude"); U.S. Const. Amend. XIX (enfranchising women); U.S. Const. Amend. XXVI (lowering the voting age to 18), and to eliminate poll taxes, U.S. Const. Amend. XXIV.

to exercise the privilege of suffrage, or to hold office, upon terms of equality with freemen who are clothed by the State with the toga of political citizenship." *Washington v. State*, 75 Ala. 582, 585 (1884). These are Alabama's interests.

Judge Friendly offered the following State interests, which Alabama asserts as her own:

The early exclusion of felons from the franchise by many [S]tates could well have rested on Locke's concept, so influential at the time, that by entering into society every man 'authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due.' [An Essay Concerning the True Original, Extent and End of Civil Government P89.] A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact. On a less theoretical plane, it can scarcely be deemed unreasonable for a [S]tate to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases. This is especially so when account is taken of the heavy incidence of recidivism and the prevalence of organized crime. *See* The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice, 45-47, 187-196 (1967). A contention that the equal protection clause requires New York to allow convicted mafiosi to vote for district attorneys or judges would not only be without merit but as obviously so as anything can be.

*Green v. Bd. of Elections*, 380 F.2d 445, 451-52 (2d Cir. 1967) (bracketed citation replaces a footnote in the original).

The United States Constitution expressly approves of the right of a State to disenfranchise felons. "[T]he exclusion of felons from the vote has an affirmative sanction in [section] 2 of the Fourteenth Amendment," which requires that Congressional apportionment include persons who are denied the right to vote "for participation in rebellion, or other crime." *Richardson v. Ramirez*, 418 U.S. 24, 54, 72 (1974). Indeed, when the Fourteenth Amendment was ratified, "29 States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes." *Richardson*, 418 U.S. at

6

48.[3] Judge Friendly tells us that "the total [had] risen to forty-two" by 1967. *Green*, 380 F.2d at 450.

Alabama's Constitution has always disenfranchised persons who have been convicted of certain crimes. The 1819 Constitution provided that those convicted of "bribery, perjury, forgery, or other high crimes or misdemeanors" lost their right to vote. ALA. CONST. of 1819, art. VI, § 5. The 1865 Alabama Constitution, when Alabama was under military rule, provided that "no person who shall have been convicted of bribery, forgery, perjury, or other high crime or misdemeanor which may be by law declared to disqualify him, shall be entitled to vote at any election in this State." ALA. CONST. of 1865, art. VIII, § 1. The 1868 Radical Republican Constitution, the 1875 Constitution, and the 1901 Constitution all denied the vote to, *inter alia*, those convicted of felonies. ALA. CONST. of 1868, art. VII, § 3; ALA. CONST. of 1875, art. VIII, § 3; ALA. CONST. art. VIII, § 182 (now repealed). The 1996 constitutional amendment[4] challenged here narrowed the scope of disenfranchisement to only those felonies which involve moral turpitude. ALA. CONST. art. VIII, § 177. Thus, Alabama disenfranchised persons convicted of certain crimes back to the time she gained statehood and while slavery was legal and practiced here, and blacks were lawfully disenfranchised under that regime. She continued to disenfranchise based on criminal convictions during the Reconstruction Legislature and, like many other States, does so today.

Alabama specifically and emphatically denies any State interest in disenfranchising felons whose convictions are for felonies of moral turpitude as a means to disenfranchise based on race: Alabama has no interest in disenfranchising blacks on the basis of race.

---

[3] The Fourteenth Amendment was ratified in 1868, at which time there were 37 States.

[4] The 1996 constitutional amendment was adopted again in 2012 with an additional provision concerning the right to a secret ballot included.

Alabama disenfranchises persons who have self-selected to become felons and who are convicted of their felonious conduct, and, even then, only when the felony involves moral turpitude. "Moral turpitude signifies an inherent quality of baseness, vileness and depravity. It is immoral in itself, regardless of the fact that it is punished by law." *Ex parte McIntosh*, 443 So. 2d 1283, 1284 (Ala. 1983) (quoting C. Gamble, *McElroy's Alabama Evidence*, § 145.01(7) (3d ed. 1977)). Moral turpitude is a long-established legal term used in a variety of Alabama laws, most often concerning competence to hold office or for licensure,[5] including in a provision impacting

---

[5]   *E.g.,* Ala. Const. art. VII, § 173(a) ("The Governor, Lieutenant Governor, Attorney General, State Auditor, Secretary of State, State Treasurer, members of the State Board of Education, Commissioner of Agriculture and Industries, and justices of the supreme court may be removed from office for willful neglect of duty, corruption in office, incompetency, or intemperance in the use of intoxicating liquors or narcotics to such an extent, in view of the dignity of the office and importance of its duties, as unfits the officer for the discharge of such duties for any offense involving moral turpitude while in office, or committed under color thereof, or connected therewith."); Ala. Code § 5-2A-6(a)(7) ("The superintendent or any member of the Banking Board may be removed from office by a vote of two thirds of the members of the entire banking board for: . . . (7) Any offense involving moral turpitude while in office, committed under color thereof or connected therewith."); Ala. Code § 5-6A-1 ("No person convicted of a felony or a crime involving moral turpitude shall serve as a director" of a bank.); Ala. Code § 5-17-44(a)(7) ("The administrator or any member of the Credit Union Board may be removed from office by a vote of two thirds of the members of the entire Credit Union Board for: . . . (7) any offense involving moral turpitude while in office, committed under color thereof or connected therewith."); Ala. Code § 5-17-55(c)(1) ("If a member of the Credit Union Board of the Alabama Credit Union Administration . . . is convicted of a felony or any other crime involving moral turpitude . . . the office of the member shall be declared vacant by the administrator."); Ala. Code § 8-6-9(3)(b) ("The Securities Commission shall issue an order denying effectiveness to, or suspending or revoking the effectiveness of, any registration statement in the sale of securities if it finds that the order is in the public interest and that: . . . (3) The issuer, any partner, officer, or director of the issuer, any person occupying a similar status or performing similar functions, or any person directly or indirectly controlling the issuer, or any underwriter has: . . . b. Has (*sic*) been convicted of a felony or any misdemeanor involving moral turpitude, a security, or any aspect of the securities business."); Ala Code § 8-19A-11 (a)(1) ("The division may deny licensure to any applicant who: (1) Has been convicted of racketeering or any offense involving fraud, theft, embezzlement, fraudulent conversion, or misappropriation of property, or any other crime involving moral turpitude. . . ."); Ala Code § 11-5-33(a)(6) ("No person shall be eligible to hold the office of coroner unless he or she meets the following qualifications: . . . (6) Has not been convicted of a felony offense or any offense involving moral turpitude contrary to the laws of Alabama, or any other state, or the United States."); Ala Code § 11-43-210(b) ("Any person

8

desiring appointment as a reserve law enforcement officer after April 12, 1990, shall submit a written application to the municipal appointing authority certifying that the applicant is 19 years of age or older, of good moral character and reputation, and that he or she has never been convicted of a felony or of a misdemeanor involving force, violence, or moral turpitude. . . ."); Ala Code § 11-43C-17 (". . . If the councilman shall cease to possess any of these qualifications or shall be convicted of crime involving moral turpitude, his office shall immediately become vacant."); Ala Code § 11-44E-42 (". . . If the commissioner shall cease to possess any of these qualifications or shall be convicted of a crime involving moral turpitude, his (her) office shall immediately become vacant."); Ala Code § 11-49B-6(d) ("The appropriate appointing authority may remove a member of the board only for neglect of duty, an unexcused failure to attend more than one of the regularly scheduled meetings held in a calendar year during the term in office of the member, malfeasance, violation of this chapter, or conviction of a felony or other crime of moral turpitude."); Ala Code § 12-16-60(a)(4) ("A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also: . . . (4) Has not lost the right to vote by conviction for any offense involving moral turpitude."); Ala. Code § 12-21-162(b) ("As affecting his credibility, a witness may be examined touching his conviction for a crime involving moral turpitude, and his answers may be contradicted by other evidence."); Ala. Code § 15-13-159(4)(c) (". . . That any agency, company, corporation, or other entity that represents the professional surety company in the county, has no owners or other persons having a direct or indirect financial interest in such agency, company, corporation, or other entity, that have been convicted of a felony or a crime involving moral turpitude. If any person having a direct or indirect financial interest in such agency, company, corporation, or other entity has been convicted of a felony or a crime involving moral turpitude, then the affidavit or certification shall certify that there has been such conviction, providing the name of the person convicted, and certify that the person convicted has been pardoned or has had a restoration of civil rights."); Ala. Code § 15-13-160(3)(d) ("That no person having a direct or indirect financial interest in the professional bail company has been convicted of a felony or a crime involving moral turpitude. Notwithstanding the foregoing, if any person having a direct or indirect financial interest in the bonding business has been convicted of a felony or a crime involving moral turpitude, then the person making the certification shall certify that there has been a conviction, provide the name of the person convicted, and certify that the person convicted has been pardoned or has had a restoration of civil rights."); Ala. Code § 16-24B-3(e)(1)(d) ("An employing board may cancel the contract of a contract principal for cause at any time for any of the following reasons: . . . Conviction of a felony or a crime involving moral turpitude."); Ala. Code § 22-18-6(f)(8) ("The board, following the contested case provisions of the Administrative Procedure Act, may suspend or revoke the license or certificate of an EMSP at any level, or a provider service, or it may refuse to grant a license or certificate to any individual or entity at any time that any of the following is determined with respect to the holder or applicant: . . . (8) Has been convicted of a crime involving moral turpitude, or a crime in which the victim is an EMSP provider service or an EMS patient, unless the board determines that the fact of the conviction would not likely interfere with the performance of EMS duties."); Ala. Code § 22-30D-8(b) (". . . Any board member may be removed by the Governor after notice and hearing for incompetence, neglect of duty, malfeasance in office, or moral turpitude."); Ala. Code § 27-40-5(a)(5) ("The commissioner may revoke or suspend the license of any premium finance company when, and if, after complaint and investigation, it appears to the commissioner that: . . . (5) No

9

the practice of law.[6]  Moral turpitude is used in federal law as well.[7]  This standard reflects Alabama's interest in excluding from the franchise those felons whose criminal conduct is particularly reprehensible.

---

license shall issue or remain in force if any principal of the licensee has been convicted of a crime involving moral turpitude."); Ala. Code § 34-2-34(3)(c) ("The board shall have the following disciplinary powers: . . . (3) To refuse to issue a certificate, to suspend a certificate for a definite period, or to revoke the certificate of registration of an architect who is found guilty of: . . . c. A felony or misdemeanor involving moral turpitude by a court of competent jurisdiction . . . ."); Ala. Code § 34-4-21(c) (" . . . The board shall require, and it shall be the responsibility of any applicant for an initial, renewal, or reciprocal license to disclose any prior felony conviction, any prior misdemeanor conviction involving moral turpitude, any pending criminal arrest of any nature except misdemeanor traffic violations, and any prior or pending disciplinary proceedings against the applicant before a board of auctioneers or real estate commission in this or any other [S]tate. . . ."); Ala. Code § 34-4-29(c)(6) (". . . The board may also suspend or revoke the license of any licensee for any of the following acts: . . . (6) Being convicted in a court of competent jurisdiction of this or any other state of a criminal offense involving moral turpitude or a felony."); Ala. Code § 34-8A-4(f) (". . . Any board members may be removed by the Governor, after notice and hearing, for incompetence, neglect of duty, malfeasance in office, or moral turpitude. . . ."); Ala. Code § 34-8A-16(a)(1) ("(a) The board by a majority of the board members present and voting is authorized to withhold, deny, revoke, or suspend, any license or certificate issued or applied for in accordance with this chapter or otherwise discipline a licensed professional counselor or associate licensed counselor upon proof by proper hearing that the applicant, licensed professional counselor, or associate licensed counselor: (1) Has been convicted, within or without the jurisdiction of this state, of a felony, or any offense involving moral turpitude, the record of conviction being conclusive evidence thereof."); Ala. Code § 34-9-10(d)(12) ("The applicant shall not have been convicted of a felony or misdemeanor involving moral turpitude or of any law dealing with the administering or dispensing of legend drugs, including controlled substances."); Ala. Code § 34-9-18(a)(11) ("The board may invoke disciplinary action as outlined in subsection (b) whenever it shall be established to the satisfaction of the board, after a hearing as hereinafter provided, that any dentist or dental hygienist has been guilty of the following: . . . (11) Conviction in any court of competent jurisdiction of a felony or a misdemeanor involving moral turpitude."); Ala. Code § 34-13-56(c)(1) ("The board may suspend, revoke, or place on probation a license if the licensee is found guilty of any of the following: (1) Conviction of a crime involving moral turpitude including, but not limited to, any crime where the individual has to register as a sex offender in any jurisdiction.").

[6]    Ala. Code § 34-3-86(1) ("An attorney must be removed for the following causes by the circuit court: (1) Upon his or her being convicted of a felony other than manslaughter or of a misdemeanor involving moral turpitude, in either of which cases the record of his or her conviction is conclusive evidence.").

[7]    *E.g.,* 8 U.S.C. § 1227 (deportable aliens); 8 U.S.C. § 1182 (inadmissible aliens); 21 U.S.C. § 206 (revocation of pharmacy license in areas of China); U.S. Vet. App. R. Admis & Prac, Rule 7.

**Interrogatory No. 3**

Identify and describe in detail Alabama's definition of "moral turpitude" prior to the passage of HB 282, and list every felony conviction YOUR office determined was a crime involving moral turpitude or for which a person was disqualified from voting prior to the passage of HB 282.

**Objections:**

The Secretary objects to the first discrete subpart of this Interrogatory which calls for him to describe in detail the legal definition of moral turpitude, which is a pure question of law. Fed. R. Civ. P. 33(a)(2) allows for interrogatories that call "for an opinion or contention that relates to fact or the application of law to fact," but does not authorize Plaintiffs to demand that the Secretary define the meaning of a legal term. The Secretary further objects to the suggestion that moral turpitude meant something different in Alabama than in other places.

The Secretary objects to the second discrete subpart of this Interrogatory which calls for him to list every felony conviction which his office, between January 1, 2015 and the implementation of Ala. Act No. 2017-378, advised involved moral turpitude, such that it was disenfranchising under Alabama law. To the extent that this Interrogatory contains a third subpart that calls for the Secretary to list every felony conviction for which someone in Alabama was denied application or removed from the voter rolls on the basis of a felony conviction for a crime of moral turpitude, between January 1, 2015 and the implementation of Ala. Act No. 2017-378, the Secretary objects to that subpart as well. These demands are not "relevant to any party's claim or defense and proportional to the needs of the case, considering . . . the parties' relative access to the relevant information, the parties resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

11

First, with respect to access to the information, the Secretary's office does not keep a list of every felony it has advised to involve moral turpitude and so has no handy answer to the second subpart. Indeed, there are emails which have been produced in this case wherein only the questions, and not the answers, are recorded. Additionally, the Secretary's office does not actually deny voter registration or remove voters from the rolls for convictions of felonies involving moral turpitude; that work is done by the Boards of Registrars in each of the 67 counties. Accordingly, the Secretary could only answer these subparts by reviewing the extensive documents already produced in this case for evidence of advice given (as to the second subpart), and by analyzing the databases produced in this case for evidence of actual registration denials and voter removals (as to the third subpart) and/or reaching out to the Boards of Registrars in the 67 counties to inquire as to their information (as to both subparts). To the extent that the answers, incomplete though they may be, are found in documents and databases already produced in this case, Plaintiffs have equal access to the information.

Second, the work involved in securing this information, which will surely be incomplete, would be extremely burdensome and in no way important to, or justified by, the needs of this case. Each individual Plaintiff's felony was disenfranchising at the time it was committed. Plaintiff Treva Thompson was convicted of theft of property (1st degree) in 2005, years after it was established that theft is a crime of moral turpitude, *Stahlman v. Griffith*, 456 So.2d 287 (Ala. 1984). Plaintiff Timothy Lanier and Plaintiff Pamela King were convicted of felonies (burglary 1st and murder, respectively) before the 1996 Constitutional Amendment; at the time they committed their felonies, all felonies were disenfranchising under Alabama law. Plaintiff Darius Gamble trafficked in cannabis in 2006, years after it was established that this was a felony of moral turpitude, *Ex parte McIntosh*, 443 So.2d 1283 (Ala. 1983). Thus, none of the individual Plaintiffs is disqualified

based on felonies that had not been determined to be disqualifying at the time of the offense. The presence of Greater Birmingham Ministries as a Plaintiff in this case should not be allowed to exponentially expand discovery. Ultimately, Plaintiffs are swatting at gnats in insisting on delving into any lack of clarity or consistency before the implementation of Ala. Act No. 2017-378 because there has been no evidence that race was a factor (such that this discovery could relate to Counts 1 or 2, since it is plainly not relevant to any others) and because the felons had the opportunity to appeal their disenfranchisement to the Alabama court system, where their qualification (or not) to vote could be authoritatively established.

     **Answer:**

     In 1908, the Supreme Court of Arkansas explained that "'Moral turpitude is defined to be an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellowmen or to society in general.' 20 Am. & Eng. Ency. of Law, 872. *See, also, Ex parte Mason*, 29 Or. 18, 43 Pac. 651, 54 Am. St. Rep. 772; *In re Kirby*, 10 S. D. 322, 414, 73 N. W. 92, 907, 39 L. R. A. 856. Moral turpitude implies something immoral in itself, regardless of the fact whether it is punishable by law. The doing of the act itself, and not its prohibition by statute, fixes the moral turpitude. It seems clearly deducible from the above-cited authorities that the words 'moral turpitude' had a positive and fixed meaning at common law . . . ." *Fort v. Brinkley*, 112 S.W. 1084, 1084 (Ark. 1908). In 1916, the Supreme Court of Alabama quoted *Fort v. Brinkley* in saying "Moral turpitude implies something immoral in itself, regardless of the fact whether it is punishable by law. The doing of the act itself, and not its prohibition by statute, fixes the moral turpitude." *Pippen v. State*, 73 So. 340, 342 (Ala. 1916).

     Similar language has been used to discuss moral turpitude many other times. For instance, in 1959, the Alabama Supreme Court explained that moral turpitude refers to "something immoral

in itself, regardless of the fact that it is punished by law.  It must not merely be *mala prohibita*, but the act itself must be inherently immoral. The doing of the act itself, and not its prohibition by statute, fixes the moral turpitude." *Sims v. Callahan*, 112 So. 2d 776, 785 (Ala. 1959).

In 1972, the Alabama Supreme Court leaned on a Wisconsin decision in making a similar statement: "Moral turpitude has been defined as 'as act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen or to society in general.' *Lee v. Wisconsin State Board of Dental Examiners*, 29 Wis.2d 330, 139 N.W.2d 61 [(Wisc. 1966)]. The inherent nature of the offense itself, rather than the mere fact that such acts are made criminal offenses, determines whether any given offense involves moral turpitude." *Meriwether v. Crown Inv. Corp.*, 268 So. 2d 780, 787 (Ala. 1972).

And, in 1983, the Supreme Court of Alabama quoted Professor Charles Gamble: "Moral turpitude signifies an inherent quality of baseness, vileness and depravity.  It is immoral in itself, regardless of the fact that it is punished by law." *Ex parte McIntosh*, 443 So. 2d 1283, 1284 (Ala. 1983) (quoting C. Gamble, *McElroy's Alabama Evidence*, § 145.01(7) (3d ed. 1977)).

In 2005, the Alabama Attorney General issued an opinion on the meaning of moral turpitude.  Opinion to Hon. William C. Segrest, Executive Director, Board of Pardons and Paroles, dated March 18, 2005, A.G. No. 2005-092.  That opinion said:

> The Alabama Supreme Court has defined moral turpitude as "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen or to society in general." *G.M. Mosley Contractors, Inc. v. Phillips*, 487 So. 2d 876 (Ala. 1986); *Meriwether v. Crown Inv. Corp.*, 289 Ala. 504, 512, 268 So. 2d 780, 787 (1972). An act involving moral turpitude is immoral in itself, regardless of the fact that it is punished by law. *Id.* The Court also notes that all felonies do not, per se, involve moral turpitude. *Owens v. State*, 291 Ala. 107, 278 So. 2d 693 (Ala. 1973).
>
> The Alabama Supreme Court also has explained that, while a crime is not required to have fraud as an element to be considered a crime

14

> involving moral turpitude, the presence of fraud in a crime ensures a finding
> of moral turpitude: "Without exception, Federal and State Courts have held
> that a crime in which fraud is an ingredient involves moral turpitude."
> *Phillips*, 487 So. 2d at 878, *citing Jordan v. DeGeorge*, 341 U.S. 223, 227
> (1951).

Opinion to Hon. William C. Segrest, Executive Director, Board of Pardons and Paroles, dated

March 18, 2005, A.G. No. 2005-092 at 2.

Prior to the implementation of Ala. Act No. 2017-378, the Secretary of State's office

advised that at least the following felonies involved moral turpitude:

- Murder

- Old Code murder (Ala. Code 014-314)

- Capital murder (Ala. Code § 13A-5-40(A)(1)-(18)

- Murder (Ala. Code § 13A-6-2)

- Murder - reckless/vehicle (Ala. Code § 13A-6-2(A)(2))

- Felony murder - reckless/vehicle (Ala. Code § 13A-6-2(A)(3))

- Manslaughter

- Rape (any degree)

- Burglary

- Burglary 1st degree

- Burglary 2nd degree

- Burglary 3rd degree

- Robbery

- Robbery 1st degree

- Robbery 2nd degree

- Robbery 3rd degree

15

- Income tax evasion

- Forgery

- Forgery 1st degree

- Forgery 2nd degree

- Conspiracy to commit fraud

- Aggravated assault

- Assault 1st degree

- Assault 1st degree (liquor)

- Assault 2nd degree

- Possession of marijuana for resale

- Possession of marijuana 1st degree

- Sale of marijuana

- Sale of cocaine

- Unlawful distribution/furnishing of a controlled substance

- Manslaughter

- Theft

- Theft of property 1st degree – shoplifting

- Theft by deception 1st degree

- Theft of property 1st degree

- Theft 1st degree – charitable organization

- Theft of property 2nd degree – shop lifting

- Theft by deception 2nd degree

- Theft of property 2nd

- Theft 2nd degree – charitable organization

- Theft of lost property 1st degree

- Theft of lost property 2nd degree

- Theft trade secret/ trademark

- Transporting stolen vehicles across State lines

- Unauthorized sale of controlled substances

- Bigamy

- Impeachment

- Sodomy (any degree)

- Sexual abuse (any degree)

- Sexual abuse – child less than 12 years old

- Incest

- Sexual torture/abuse

- Enticing a child to enter a vehicle for immoral purposes

- Soliciting a child by computer

- Production of obscene matter involving a minor

- Production of obscene matter

- Parents or guardians permitting children to engage in obscene matter

- Possession of obscene matter

- Possession with intent to distribute child pornography

- Display of obscene matter involving minors

- Obscene material – distribution/possession

- Obscene material – distribution/possession by wholesaler

- Obscene material - production

- Treason

- Child abuse

- Intimidating a witness

- Obstruction of justice

- Making false representation

- Knowledge of such false representation by the perpetrator

- Reliance on the representation of the person defrauded

- An intent to defraud

- Fraud

- Arson

- Blackmail

- Embezzlement

- Extortion

- False pretenses

- Larceny (grand or petty)

- Malicious destruction of property

- Knowingly receiving stolen goods

- Transporting stolen property

- Bribery

- Counterfeiting

- Fraud against revenue or other government functions

- Mail fraud

- Perjury

- Harboring a fugitive from justice (with guilty knowledge)

- Tax evasion (willful)

**Interrogatory No. 4**

Identify and describe all known instances of disagreements among [S]tate officials—including Board of Pardons and Paroles' officials, county election officials, and Secretary of State officials—about which felonies involv[e] moral turpitude.

**Objections:**

The Secretary objects to this Interrogatory as not "relevant to any party's claim or defense and proportional to the needs of the case, considering ... the parties' relative access to the relevant information, the parties resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). With respect to access to the information, the Secretary's office does not keep a list of such disagreements and will not review the extensive documents already produced in this case for such disagreements as that evidence, if any, is now equally available to the Plaintiffs. The work involved doing so would be extremely burdensome and in no way important to, or justified by, the needs of this case. Each individual Plaintiff's felony was disenfranchising at the time it was committed. Plaintiff Treva Thompson was convicted of theft of property (1st degree) in 2005, years after it was established that theft is a crime of moral turpitude, *Stahlman v. Griffith*, 456 So.2d 287 (Ala. 1984). Plaintiff Timothy Lanier and Plaintiff Pamela King were convicted of felonies (burglary 1st and murder, respectively) before the 1996 Constitutional Amendment; at the time they committed their felonies, all felonies were disenfranchising under Alabama law. Plaintiff Darius Gamble trafficked in cannabis in 2006, years after it was established that this was a felony of moral turpitude, *Ex parte McIntosh*, 443 So.2d 1283 (Ala. 1983). Thus, none of the

individual Plaintiffs is disqualified based on felonies that had not been determined to be disqualifying at the time of the offense. The presence of Greater Birmingham Ministries as a Plaintiff in this case should not be allowed to exponentially expand discovery. Ultimately, Plaintiffs are swatting at gnats in insisting on delving into any lack of clarity or consistency before the implementation of Ala. Act No. 2017-378 because there has been no evidence that race was a factor (such that this discovery could relate to Counts 1 or 2, since it is plainly not relevant to any others) and because the felons had—and still have—the opportunity to appeal their disenfranchisement to the Alabama court system, where their qualification (or not) to vote could be authoritatively established.

**Answer:**

While there may have been disagreements, we have no known instances of disagreement based upon present recollection.

**Interrogatory No. 5**

Identify each person involved—and their role—in the proposing, drafting, revising, or finalizing of the bill YOU proposed to the Legislature to define felonies "involving moral turpitude," which ultimately was enacted as HB 282.

**Objections:**

The Secretary objects because this Interrogatory calls for information protected by legislative privilege. As Magistrate Judge Doyle has recently explained, legislative privilege "'protects the legislative process itself' and covers 'legislator's actions in the proposal, formulation, and passage of legislation.'" Doc. 199 at 4 (*quoting In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015)). "'The privilege applies with *full force* against requests for information about the *motives* for legislative votes and legislative enactments.'" Doc. 199 at 4 (*quoting In re Hubbard*, 803 F.3d at 1310)) (emphasis by the *Thompson* court). "The immunity applies to executive officials and other non-legislators when they are performing a legislative function," doc.

199 at 5, and thus protects Secretary Merrill and his staff. *See also id.* at 6 ("Therefore the privilege is not waived by discussions with third parties, such as the committee members here, who are integral to the formulation, proposal, and passage of legislation."). Magistrate Judge Doyle specifically held that legislative immunity applies to the activity of the Voter Disenfranchisement and Restoration of Rights Exploratory Committee "because it directly concerned the formulation, proposal, and passage of the legislation." Doc. 199 at 6. Additionally, Plaintiffs have already taken extensive testimony on the work of the Exploratory Committee in deposing Ed Packard, John Bennett, Win Johnson, and Judge Tim Jolley; there is no reason to breach the privilege here.

Moreover, even if we assumed *arguendo* that the Exploratory Committee was somehow not engaged in a legislative function sufficient to invoke legislative immunity, then it would be hard to see why anything the committee did would be discoverable in this case. Discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," which includes consideration of "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Here, the Exploratory Committee was not the final decisionmaker[8] and so anything that happened there is of little import in proving the decisionmaker's intent. Further, the supplemental complaint does not allege that Ala. Act No. 2017-378 was passed with a discriminatory intent, see doc. 93 at ¶¶ 46-47, 50-51, and Plaintiffs have no right to discovery on claims they have not brought.

---

[8] The Supreme Court has explained: "The legislative or administrative history may be highly relevant, especially where there are contemporary statements *by members of the decisionmaking body*, minutes of *its* meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, *although even then such testimony frequently will be barred by privilege.*" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (citations and footnote omitted; emphasis added).

Secretary Merrill further objects to this Interrogatory as not "proportional to the needs of the case, considering . . . the parties' relative access to the relevant information, the parties resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit," Fed. R. Civ. P. 26(b)(1), in that it would be unduly burdensome to fully respond.

**Answer:**

It is public information that the following persons were members of, or attended the meetings of, the Voter Disenfranchisement and Restoration of Voting Rights Exploratory Committee:

- Secretary of State John H. Merrill
- State Senator Linda Coleman, Minority Senate Leader
- Holly Caraway, Chief Counsel for the Office of the Minority Senate Leader
- State Senator Cam Ward
- State Representative David Faulkner
- State Representative Chris England
- Michael Coleman, Hope Inspired Ministries
- Darlene Biehl, crime victim's advocate
- Jeff Dunn, Alabama Department of Corrections
- Pastor Kenneth Glasgow, a felon, representing The Ordinary Peoples Society
- Will Harrell, ACLU
- Marissa Dodson, ACLU
- Carol Hill, Shelby County Board of Registrars
- Quin Hillyer, freelance journalist

- Win Johnson, Administrative Office of Courts

- Rich Hobson, Director of Administrative Office of Courts

- Summer Scruggs, Clark County Circuit Clerk

- Gabrelle Simmons, Board of Pardons and Paroles

- Cliff Walker, Board of Pardons and Paroles

- Joel Laird, then Chief Legal Counsel of the Secretary of State

- Ed Packard, employee of the Secretary of State

- Tim Jolley, then Circuit Judge for the 27th Judicial Circuit

Additionally, John Bennett attended one or more of the Exploratory Committee meetings. There may have been additional persons, but this is the present recollection of membership/participation in public meetings based upon available resources.

**Interrogatory No. 6**

Identify each legislator or other public official that YOU consulted with, the date of those consultation(s), and the nature of your consultation(s) about the bill YOU proposed to the Legislature to define felonies "involving moral turpitude," which ultimately was enacted as HB 282.

**Objections:**

The Secretary objects because this Interrogatory calls for information protected by legislative privilege. As Magistrate Judge Doyle has recently explained, legislative privilege "'protects the legislative process itself' and covers 'legislator's actions in the proposal, formulation, and passage of legislation.'" Doc. 199 at 4 (*quoting In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015)). "'The privilege applies with *full force* against requests for information about the *motives* for legislative votes and legislative enactments.'" Doc. 199 at 4 (*quoting In re Hubbard*, 803 F.3d at 1310)) (emphasis by the *Thompson* court). "The immunity applies to executive officials and other non-legislators when they are performing a legislative function," doc.

23

199 at 5, and thus protects Secretary Merrill. *See also id.* at 6 ("Therefore the privilege is not waived by discussions with third parties, such as the committee members here, who are integral to the formulation, proposal, and passage of legislation.").

Moreover, here Plaintiffs seek to inquire into the conversations of the legislators through Secretary Merrill and so the legislators' privilege is directly implicated. Two legislators subpoenaed by Plaintiffs in this case have argued that the privilege is broad, doc. 146 at 2, and that it is intended "to foster the free flow of information critically needed by legislators to discharge their official duties free of the burden or threat of defending litigation either as a party or witness," *id.* at 10. While interrogating Secretary Merrill does not convert the legislators to parties or witnesses, it would stifle the free flow of information if legislators and executive officials were unable to openly communicate about legislative matters for fear of being subject to discovery about those conversations in the future.

Secretary Merrill also objects to this Interrogatory as beyond the proper scope of discovery. Discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," which includes consideration of "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Here, the Secretary was not the final decisionmaker[9] and so anything he did is of little import in proving the decisionmaker's intent. Further, the supplemental complaint does not allege that Ala. Act No. 2017-378 was passed with

---

[9]     The Supreme Court has explained: "The legislative or administrative history may be highly relevant, especially where there are contemporary statements *by members of the decisionmaking body*, minutes of *its* meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, *although even then such testimony frequently will be barred by privilege.*" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (citations and footnote omitted; emphasis added).

24

a discriminatory intent, see doc. 93 at ¶¶ 46-47, 50-51, and Plaintiffs have no right to discovery on claims they have not brought. And, finally, trying to answer this Interrogatory would be unduly burdensome.

**Answer:**

The Secretary stands on his objections.

## Interrogatory No. 6 (sic)

Identify the [S]tate interest(s) served by denying people with past convictions a CERV because they have outstanding legal financial obligations from their criminal sentence that they cannot afford to pay.

**Objections:**

The Secretary objects to this Interrogatory because it exclusively concerns Count 13, and he is not a party as to that claim, doc. 1 at ¶¶ 245-52; doc. 93 at ¶¶ 65-69. *See* Fed. R. Civ. P. 33(a) (". . . a party may serve on any other party . . . ."); *Ward v. Empire Vision Centers, Inc.,* 262 F.R.D. 256, 261 (W.D.N.Y.) (magistrate judge) ("Notwithstanding the timeliness issue, the federal rules provide that interrogatories may only be served upon parties to the lawsuit. Fed. R. Civ. P. 33 ('a *party* may serve on any other *party* no more than 25 written interrogatories') (emphasis added). Thus, service upon a non-party is inappropriate.").

**Answer:**

The Secretary of State is not a party to Count 13.

## Interrogatory No. 7

Identify the reason why YOUR office excluded bribery, public corruption, and voter fraud from YOUR draft bill defining felonies "involving moral turpitude."

**Objections:**

The Secretary objects because this Interrogatory calls for information protected by legislative privilege. As Magistrate Judge Doyle has recently explained, legislative privilege

"'protects the legislative process itself' and covers 'legislator's actions in the proposal, formulation, and passage of legislation.'" Doc. 199 at 4 (*quoting In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015)). "'The privilege applies with *full force* against requests for information about the *motives* for legislative votes and legislative enactments.'" Doc. 199 at 4 (*quoting In re Hubbard*, 803 F.3d at 1310)) (emphasis by the *Thompson* court). "The immunity applies to executive officials and other non-legislators when they are performing a legislative function," doc. 199 at 5, and thus protects Secretary Merrill and his staff. *See also id.* at 6 ("Therefore the privilege is not waived by discussions with third parties, such as the committee members here, who are integral to the formulation, proposal, and passage of legislation."). Magistrate Judge Doyle specifically held that legislative immunity applies to the activity of the Voter Disenfranchisement and Restoration of Rights Exploratory Committee "because it directly concerned the formulation, proposal, and passage of the legislation." Doc. 199 at 6. Additionally, Plaintiffs have already taken extensive testimony on the work of the Exploratory Committee in deposing Ed Packard, John Bennett, Win Johnson, and Judge Tim Jolley; there is no reason to breach the privilege here.

Moreover, even if we assumed *arguendo* that the Exploratory Committee was somehow not engaged in a legislative function sufficient to invoke legislative immunity, then it would be hard to see why anything the committee did would be discoverable in this case. Discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," which includes consideration of "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Here, the Exploratory Committee was not

the final decisionmaker[10] and so anything that happened there is of little import in proving the decisionmaker's intent. Further, the supplemental complaint does not allege that Ala. Act No. 2017-378 was passed with a discriminatory intent, see doc. 93 at ¶¶ 46-47, 50-51, and Plaintiffs have no right to discovery on claims they have not brought.

**Answer:**

The Secretary stands on his objections.

**Interrogatory No. 8**

Identify all research or analysis YOUR office conducted with respect to the potential racial impact of the chosen felony convictions included in YOUR draft bill defining felonies "involving moral turpitude."

**Objections:**

The Secretary objects because this Interrogatory calls for information protected by legislative privilege. As Magistrate Judge Doyle has recently explained, legislative privilege "'protects the legislative process itself' and covers 'legislator's actions in the proposal, formulation, and passage of legislation.'" Doc. 199 at 4 (*quoting In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015)). "'The privilege applies with *full force* against requests for information about the *motives* for legislative votes and legislative enactments.'" Doc. 199 at 4 (*quoting In re Hubbard*, 803 F.3d at 1310)) (emphasis by the *Thompson* court). "The immunity applies to executive officials and other non-legislators when they are performing a legislative function," doc. 199 at 5, and thus protects Secretary Merrill and his staff. *See also id.* at 6 ("Therefore the privilege

---

[10] The Supreme Court has explained: "The legislative or administrative history may be highly relevant, especially where there are contemporary statements *by members of the decisionmaking body*, minutes of *its* meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, *although even then such testimony frequently will be barred by privilege.*" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (citations and footnote omitted; emphasis added).

is not waived by discussions with third parties, such as the committee members here, who are integral to the formulation, proposal, and passage of legislation."). Additionally, Plaintiffs have already taken extensive testimony on the work of the Exploratory Committee in deposing Ed Packard, John Bennett, Win Johnson, and Judge Tim Jolley; there is no reason to breach the privilege here.

**Answer:**

The Secretary stands on his objections.

**Interrogatory No. 9**

Identify each person involved in drafting, proposing, and finalizing all administrative regulations, policies, guidelines, or guidance relating to the implementation of Alabama's constitutional provision disenfranchising persons convicted of a felony involving moral turpitude or HB 282 from January 1, 2015 through the present, whether proposed or finalized, including such person's title and office at the time, a description of the person's involvement in those activities, and the dates of such involvement.

**Answer:**

The Secretary of State's office has neither adopted nor drafted any administrative rules or guidelines relating to Ala. Act No. 2017-378.

**Interrogatory No. 10**

Identify and describe all actions, formal or informal, taken by YOU from 2017 to the present to inform, educate, or explain the requirements of HB 282 to election officials or the public, and specify the amount of money budgeted and spent on this activity.

**Answer:**

The role of voter registration falls primarily on the Boards of Registrars in the counties. In conjunction with Auburn University, the Secretary of State's office provides on average, seven annual training sessions for registrars. A small portion of the training does involve Ala. Act No. 2017-378. We have prepared and distributed a Registrar Handbook, which also covers the topic.

While there is some variance, this year we budgeted $94,000 for registrar training. Again, this covers more than just Ala. Act No. 2017-378.

In addition to registrar training, the Secretary of State's office has conducted a number of activities that inform the general public or portions thereof. With the exception of the printing costs for new voter registration forms, these activities are included in our general budget funding and the office is unable to break out actual costs or expenses. As to the costs for printing the revised voter registration forms, see the Answer to Interrogatory 13, below.

The activities to inform the general public or portions thereof are:

- Making mobile unit visits in each county in the State. At these visits, we have available posters, voter guides and photo ID guides.

- Adding the list of felonies involving moral turpitude found in Ala. Act No. 2017-378 to the Secretary of State's website.

- Revising the voter registration forms (paper-based and on-line) to include information on where to find the list of felonies involving moral turpitude found in Ala. Act No. 2017-378 on the Secretary of State's website.

- Working with the Alabama Board of Pardons and Paroles to revise the poster on restoration of voting rights. A second revision to the poster was recently approved.

- Working with Alabama Board of Pardons and Paroles to develop and revise voter disqualification forms that are used in the process of discharging felons from custody.

- Revising the Board of Registrars handbooks.

- Working with others in revising elections handbooks.

- Conducting events with Legal Services of Alabama and ACLU after Ala. Act No. 2017-378 was enacted.

29

- Issuing press releases.

In addition, information provided by our office is used by the United States Elections Assistance Commission (the "EAC) to inform the public about voter registration via its website: https://www.eac.gov/voters/register-and-vote-in-your-state. For example, to access an Alabama registration form using the EAC website, the prospective voter would click on https://www.alabamainteractive.org/sos/voter_registration/voterRegistrationWelcome.action which contains a link to the list of disqualifying felonies:

 https://www.sos.alabama.gov/sites/default/files/voter-pdfs/Updated%20Version%20of%20Moral%20Turpitude%20Crimes.pdf.

**Interrogatory No. 11**

Identify and describe all requests for guidance or inquiries YOUR office has received about whether a specific criminal conviction—including Alabama, out-of-state, and federal offenses—of an applicant is disqualifying under HB 282 and YOUR office's response to such requests or inquiries.

**Objections:**

The Secretary objects to this Interrogatory as not "relevant to any party's claim or defense and proportional to the needs of the case, considering . . . the parties' relative access to the relevant information, the parties resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). With respect to access to the information, the Secretary's office does not keep a list of such requests or inquiries and will not review the extensive documents already produced in this case for such requests or inquiries as that evidence, if any, is now equally available to the Plaintiffs. The work involved in doing so would be extremely burdensome and in no way important to, or justified by, the needs of this case. Moreover, each individual Plaintiff's felony is included in Ala. Code § 17-3-30.1 and any phone call about those felonies (if one has been

made) should have been answered accordingly. The presence of Greater Birmingham Ministries as a Plaintiff in this case should not be allowed to exponentially expand discovery.

**Answer:**

While there may have been such requests, we have no way of tracking this information and there is no present recollection as to any specific instance.

## Interrogatory No. 11 (sic)

Identify the number of phone calls YOUR office has received on the toll-free line indicated on the voter registration form for questions related to felonies involving moral turpitude, identify the person responsible for responding to that phone line and the hours worked by that individual, and describe the nature of the inquiries received.

**Objections:**

The Secretary objects to this Interrogatory as not "relevant to any party's claim or defense and proportional to the needs of the case, considering . . . the parties' relative access to the relevant information, the parties resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). With respect to access to the information, the Secretary's office does not keep a list of such phone calls and will not review the extensive documents already produced in this case looking for notes of such calls as that evidence, if any, is now equally available to the Plaintiffs. The work involved doing so would be extremely burdensome and in no way important to, or justified by, the needs of this case. Moreover, each individual Plaintiff's felony is on the list in Ala. Code § 17-3-30.1 and any phone call about those felonies (if one has been made) should have been answered accordingly. The presence of Greater Birmingham Ministries as a Plaintiff in this case should not be allowed to exponentially expand discovery.

31

**Answer:**

While the Secretary of State's office may have received such phone calls, we have no way of tracking this information and there is no present recollection as to any specific instance.

**Interrogatory No. 12**

State all facts supporting YOUR contention that "the requirement that felons pay 'all fines, court costs, fees, and victim restitution ordered by the sentencing court at the time of sentencing on the disqualifying cases,' Ala. Code § 15-22-36.1(a)(3), is not severable."

**Objections:**

The Secretary objects to this Interrogatory because it exclusively concerns Count 13, and he is not a party as to that claim, doc. 1 at ¶¶ 245-52; doc. 93 at ¶¶ 65-69. *See* Fed. R. Civ. P. 33(a) (". . . a party may serve on any other party . . . ."); *Ward v. Empire Vision Centers, Inc.,* 262 F.R.D. 256, 261 (W.D.N.Y.) (magistrate judge) ("Notwithstanding the timeliness issue, the federal rules provide that interrogatories may only be served upon parties to the lawsuit. Fed. R. Civ. P. 33 ('a *party* may serve on any other *party* no more than 25 written interrogatories') (emphasis added). Thus, service upon a non-party is inappropriate.").

**Answer:**

The Secretary of State is not a party to Count 13, and thus the contention is not his.

**Interrogatory No. 12 (sic)**

State all facts supporting YOUR contention that "Plaintiffs Thompson and Gamble have unclean hands as to Count 13."

**Objections:**

The Secretary objects to this Interrogatory because it exclusively concerns Count 13, and he is not a party as to that claim, doc. 1 at ¶¶ 245-52; doc. 93 at ¶¶ 65-69. *See* Fed. R. Civ. P. 33(a) (". . . a party may serve on any other party . . . ."); *Ward v. Empire Vision Centers, Inc.,* 262 F.R.D. 256, 261 (W.D.N.Y.) (magistrate judge) ("Notwithstanding the timeliness issue, the federal rules

provide that interrogatories may only be served upon parties to the lawsuit. Fed. R. Civ. P. 33 ('a *party* may serve on any other *party* no more than 25 written interrogatories') (emphasis added). Thus, service upon a non-party is inappropriate.").

**Answer:**

The Secretary of State is not a party to Count 13, and thus the contention is not his.

**Interrogatory No. 13**

Identify which constitutional provision YOU rely upon in contending that "[i]f Plaintiffs are correct that the NVRA requires the State to list on voter registration forms each and every disenfranchising felony, then the provisions so requiring are unconstitutional" and all facts supporting that contention.

**Objections:**

To the extent this Interrogatory calls for an interpretation of the law, *i.e.,* presents a pure question of law, the Secretary objects. Fed. R. Civ. P. 33(a)(2) allows for interrogatories that call "for an opinion or contention that relates to fact or the application of law to fact," but does not authorize Plaintiffs to demand that the Secretary brief legal issues or provide Plaintiffs legal research.

**Answer:**

Alabama is a sovereign with an inherent right to determine who shall be a part of her electorate.  Indeed, the default rule is that the States set voter qualifications, even in federal elections.  U.S. Const. Art. I § 2 cl. 1 (In House elections, ". . . Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."); U.S. Const. Amend. XVII (Senators elected by the same electors as House Members); *see also* U.S. Const. Art. II § 1 cl. 2 (Presidential Electors need not even be selected by election); U.S. Const. Amend. XIV (recognizing the State's right to set qualifications and, specifically, to disenfranchise felons).  The Constitution has, of course, been amended to impose some limits on

that power, U.S. Const. Amend. XV (eliminating disenfranchisement based on "race, color, or previous condition of servitude"); U.S. Const. Amend. XIX (enfranchising women); U.S. Const. Amend. XXVI (lowering the voting age to 18), and to eliminate poll taxes, U.S. Const. Amend. XXIV. Thus, the Supreme Court has recognized that "[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, absent of course the discrimination which the Constitution condemns." *Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959) (internal citations omitted). In this area, "there is wide scope for exercise of [the State's] jurisdiction. Residence requirements, age, *previous criminal record* are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters." *Id.* at 51 (internal citations omitted; emphasis added). The Tenth Amendment to the United States Constitution may protect this inherent right of sovereignty.

If Plaintiffs' interpretation of the NVRA as requiring the State to list on voter registration forms each and every disenfranchising felony were to prevail, it would severely interfere with Alabama's ability to "determine the conditions under which the right of suffrage may be exercised." *Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. at 50 (internal citations omitted). Prior to Ala. Act No. 2017-378, Alabama had no comprehensive and authoritative list of which felonies involve moral turpitude. Thus, prior to the implementation of Ala. Act No. 2017-378, it would have been impossible for Alabama to comply with a requirement to list each and every disenfranchising felony on her voter registration forms while maintaining her chosen moral turpitude standard. To list each and every disenfranchising felony, Alabama would have had to abandon her chosen standard and adopted a reasonably-listed one.

While Alabama has now legislatively adopted a comprehensive and definitive list, the threat made to Alabama's sovereignty by Plaintiffs' interpretation remains. First, there is always the possibility that Ala. Act No. 2017-378 could be invalidated by a State court. Second, experience already shows that the comprehensive and definitive list, codified at Ala. Code § 17-3-30.1, may be amended. In 2019, the Alabama Legislature created a new felony of aggravated theft by deception and added that new felony to Ala. Code § 17-3-30.1. Ala. Act No. 2019-513. Under Plaintiffs' theory, Alabama's voter registration forms would have immediately been in violation of the NVRA as soon as Ala. Act No. 2019-513 took effect. Replacing the forms to add a new felony would be so expensive and cumbersome as to potentially discourage the State from refining its electoral standard in the manner it deems appropriate.

Recently, the Alabama Secretary of State's office undertook a revision of the State's voter registration forms. The primary substantive change was to add, in the Voter Declaration section, the following language: "(The list of disqualifying felonies is available on the Secretary of State's website at sos.alabama.gov/mtfelonies)". There are six paper variants of the voter registration form to which this change was made: (1) Agency-Based Voter Registration Form (2-part form); (2) Medicaid Variant of Agency-Based Form; (3) Agency-Based Voter Registration Application (1-part form); (4) Mail-In Voter Registration Application; (5) Department of Human Resources Variant of Mail-In Voter Registration Application; and (6) Medicaid Variant of Mail-In Voter Registration Application. The Secretary of State's office printed a total of 1,650,000 forms at a price of $114,682.10.[11] Once received, the new voter registration forms had to be distributed to

---

[11] The declaration of Ed Packard filed as doc. 171-1 discussed the process while it was still on-going and thus included estimates. The Secretary incorporates all details of that declaration by reference and produces the business records attached thereto, pursuant to Fed. R. Civ. P. 33(d), by specifying that they may be found in the Court's records at doc. 171-1 at pages 8 through 21.

the following entities throughout the State: Boards of Registrars, Alabama Medicaid Agency, Rehabilitation Services, WIC Program/Public Health, Department of Human Resources, and public libraries. Old forms are never fully retrieved or discarded, and, in fact, continue to be accepted. In addition to the paper-based forms, the Secretary of State makes a fillable PDF available on his website as well as an online form that can be completed electronically. The Secretary's office has had an app to assist voters in registering as well. All of these paper and electronic versions of the voter registration form would also need to be updated every time a change was made to the list of moral turpitude felonies under Plaintiffs' reading of the NVRA. Accordingly, it would be expensive and cumbersome and may discourage the State from refining its electoral standard in the manner it deems appropriate.

The Secretary of State's practice of providing information about where a list of felonies involving moral turpitude may be found and of providing contact information for his office and for the Boards of Registrars on the voter registration forms and online allows the State to determine who shall be a part of its electorate while providing applicants the opportunity to determine whether their felonies are disenfranchising.

**Interrogatory No. 14**

Describe in detail the process by which, and reasons why, YOU determined that HB 282 applies retroactively to those with felony convictions pre-dating the passage of HB 282 and all individuals you consulted in making that determination and their role in the process.

**Objections:**

The Secretary objects to this Interrogatory insofar as it calls for an interpretation of the law, *i.e.*, presents a pure question of law. Fed. R. Civ. P. 33(a)(2) allows for interrogatories that call "for an opinion or contention that relates to fact or the application of law to fact," but does not authorize Plaintiffs to demand that the Secretary brief legal issues or provide Plaintiffs legal research.

36

**Answer:**

Ala. Act No. 2017-378 applies to elections held within the State of Alabama after its effective date (indeed, the Secretary encouraged the Boards of Registrars to allow persons whose felony convictions were not on the Ala. Act No. 2017-378 list to register to vote even before the effective date so that they would be able to participate in a special federal election for United States Senate that took place shortly after the effective date). That Ala. Act No. 2017-378 applies to elections held within the State of Alabama after its effective date is so plainly obvious that Plaintiffs' interpretation has, as far as we know, never been raised to this office by anyone else or considered outside the context of addressing this litigation. That is, no "process" was necessary.

**Interrogatory No. 15**

Identify and describe all policies, procedures, and/or guidance—informal or formal—that YOUR office has created, disseminated, or communicated related to the voter registration process for individuals who have received a pardon or CERV, including whether a copy of that pardon or CERV must be provided and, if so, if it must be provided even if the voter has previously registered after receiving the pardon or CERV.

**Objections:**

The Secretary objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case brought against him because this Interrogatory is unrelated to any of the Plaintiffs' actual situations. Fed. R. Civ. P. 26(b)(1). None of the Plaintiffs have a pardon or CERV; if they did, it would moot the particular claims they actually bring in this litigation, as it did for former Plaintiff Anna Reynolds, for example. Based on this objection, and consistent with Fed.R.Civ.P.26(b)(1), Plaintiffs should not be permitted to inquire about

registration for persons who have been granted a pardon or CERV when they have not received either.  Plaintiffs cannot demand discovery on the behalf of strangers to this litigation.[12]

      **Answer:**

      No Plaintiff has received a pardon or CERV.  The Secretary stands on his objections.

**Interrogatory No. 16**

      Identify and describe all instances when YOUR office has identified errors, problems, or inaccuracies in the processing of voter registration applications or voter registration removals with respect to people with criminal convictions and YOUR response to addressing those errors, problems, or inaccuracies.

      **Objections:**

      The Secretary objects to this Interrogatory as not "relevant to any party's claim or defense and proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  It is not at all plain why any answer would be relevant to any Count in this litigation, and thus the Interrogatory is not important to resolving the issues. Moreover, the Interrogatory is not proportional because it is clear that each individual Plaintiff's felony is disenfranchising, and there has been no indication that a mistake of the sort inquired

---

[12]    *Cf.* doc. 200 at 4-5 ("However, plaintiffs' motion to compel fails for a more fundamental reason.  Following denial of class certification, there are not only two named plaintiffs, Gamble and Thompson, pursuing County 13. (Doc. 194 at 2).  Plaintiffs' requests for production numbers 16-24 that seek information from the pardon files of every CERV applicant in the State of Alabama are now grossly disproportional to the needs of the case.  Fed. R. Civ. P. 26(b)(1).  Gamble and Thompson have not established how information in non-parties' parole files is relevant to their individual claims.  Plaintiffs' sweeping discovery request that were clearly aimed at supporting the LFO subclasses' claim now impose a burden and expense on Pardons and Paroles that completely outweighs any conceivable benefit to Gamble and Thompson. . . . [T]he Court will not order Pardons and Paroles to produce anything from their files in response to the current overbroad requests.") (paragraph break omitted).

about here impacted any of them. The presence of Greater Birmingham Ministries as a Plaintiff in this case should not be allowed to exponentially expand discovery.

**Answer:**

While errors, problems, or inaccuracies may have occurred, we have no way of tracking this information and there is no present recollection as to any specific instance.

***

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

Executed on: 5/11/2020

Clay Helms
Deputy Chief of Staff/Director of Elections
Alabama Secretary of State

Respectfully submitted,

Steve Marshall
 *Attorney General*

James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*

s/ Winfield J. Sinclair
Winfield J. Sinclair (ASB-1750-S81W)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Brad Chynoweth (ASB-0030-S63K)
*Assistant Attorneys General*


Office of the Attorney General
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
telephone:  334.353.8674
facsimile:  334.353.8400
Jim.Davis@AlabamaAG.gov
Winfield.Sinclair@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brad.Chynoweth@AlabamaAG.gov


## Certificate of Service

 Pursuant to an agreement memorialized in the Report of the Parties' Planning Meeting, electronic service is acceptable for this document. I hereby certify that I have served a copy of the foregoing document on Danielle Lang (dlang@campaignlegalcenter.org), Mark P. Gaber (mgaber@campaignlegal center.org), Molly Danahy (mdanahy@campaignlegal.org); Jim Blacksher (jblacksher@ns.sympatico.ca), Jason P. Hipp (JHipp@jenner.com), and J. Mitch McGuire (jmcguire@mandabusinesslaw.com), six of the counsel for Plaintiffs, *via* email on this the 11th day of May 2020.


   s/ Winfield J. Sinclair
    Of Counsel