FILED
2021 Dec-27 AM 11:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# PUBLIC HEARING

JOINT LEGISLATIVE COMMITTEE

ON

REAPPORTIONMENT

Joint Briefing Room
Alabama State House
Montgomery, Alabama

October 2, 1991

9:00 a.m.

SHORES REPORTING SERVICES, INC.
413 NORTH 21ST STREET
BIRMINGHAM, ALABAMA 35203
(205) 251-2427



COMMITTEE MEMBERS

SENATOR RYAN DEGRAFFENRIED, 21st Senate District, Tuscaloosa, Alabama.

REPRESENTATIVE JAMES M. CAMPBELL, 36th House District, Anniston, Alabama.

REPRESENTATIVE W. C. BOWLING, 2nd House District, Cullman, Alabama.

REPRESENTATIVE MICHAEL E. BOX, 96th House District, Satsuma, Alabama.

REPRESENTATIVE JOHN BUSKEY, 77th House District, Montgomery, Alabama.

SENATOR DANNY CORBETT, 28th Senate District, Phenix City, Alabama.

REPRESENTATIVE JOHNNY CURRY, 50th House District, Bessemer, Alabama.

SENATOR LARRY DIXON, 25th Senate District, Montgomery, Alabama.

REPRESENTATIVE STEVE FLOWERS, 89th House District, Troy, Alabama.

REPRESENTATIVE JOE FORD, 28th House District, Gadsden, Alabama.

REPRESENTATIVE ALBERT HALL, 22nd House District, Gurley, Alabama.

SENATOR FRED HORN, 18th Senate District, Birmingham, Alabama.

SENATOR CHARLES LANGFORD, 26th Senate District, Montgomery, Alabama.

SENATOR TED LITTLE, 27th Senate District, Opelika, Alabama.

REPRESENTATIVE FRANK ROGERS, 51st House District, Birmingham, Alabama.

SENATOR JIM SMITH, 2nd Senate District, Madison, Alabama.





REPRESENTATIVE JAMES L. THOMAS, 69th House District, Selma, Alabama.

SENATOR STEVE WINDOM, 35th Senate District, Theodore, Alabama.





PROCEEDINGS

October 2, 1991 9:00 a.m.

REPRESENTATIVE CAMPBELL: We have a quorum. I assume the Republicans caucus will come in out of the hall at the appropriate time.

Fellow committee members before we commence reviewing the plans, we cut things down, one of the matters that is floating around is a plan that has been proposed, it has not been submitted to us, that creates two districts that have a majority Black population in them.

This plan, I believe, is something that the National NAACP has submitted to us in a format that was incompatible with our computer. They sent us a list of what counties would comprise or what parts, the counties and parts of counties that would comprise the two Black districts and said y'all figure out what the other five districts look like. But based on Alabama's population, theoretically it's possible to have two districts that have a Black population and a majority.

And one of the things that we have done is I wanted to ask for some testimony on the feasibility of such a plan because somebody's

going to draw one and somebody is going to submit it and this is as a good a time as any to request some feelings, particularly from those that are effected.

At this time I'm going to call on Mr. Joe Reed. Mr. Reed would you tell us.

It's nice of all you folks in the Republican caucus to join us.

SENATOR CORBETT: Now, wait a minute. I'm not in the Republican caucus, I was just out there lobbying.

REPRESENTATIVE CAMPBELL: Mr. Reed.

DOCTOR REED: Mr. Chairman and members of the Committee I have two or three things I would like to say in opening.

First, I would like to thank you for inviting me to participate and allowing me to participate before this very important committee.

I would also say while we're standing I do strongly encourage, and I would commend you for the way you're going about your job and the seriousness of it, I do commend you for that.

And I would say to you that as Judge, the late Judge Richard Reeves said, I think if you go back and look at the court opinion in the case







of Buskey, not Buskey, but Burden versus Hobby, that was the most recent legislative reapportionment case where you are now under where Judge Johnson was citing Judge Reeves' statement that said he had longed for the day when the Alabama Legislature would do its constitutional duty. And went on to commend the Alabama Legislature for passing a reapportionment plan that they said met the constitution.

Of course, Judge Reeves has passed away, but he was an Alabamian whose soul and everything rested in this state and so was Judge Johnson. They were simply saying that they were just, in effect, glad to see the Alabama Legislature do its duty on this last reapportionment plan. That was 19 -- the plan which you're now serving under.

And I say that only to say again to you here today that I would strongly encourage you and call upon you and I know you will, do your duty in this reapportionment plan. That is to say, that while there are some plans before you, and all of us who drafted plans would encourage that plan be adopted.

I'm kind of reminded of the statement







Abraham Lincoln made in his second inaugural address that he said both the North and the South both prayed to God for victory. Let each side be victorious over the other. But he says very obvious God wasn't going to answer both prayers.

And I know it's kind of like these reapportionment plans. Everybody has a plan out and they want the Legislature to take their plan, they think it's somehow endowed with some ingenuity that no other plan has in it.

So I would say that it is very obvious the Legislature can't adopt all plans, but I would ask you to do one thing is, not withstanding all other, adopt a plan that meets the law.

You have taken an oath to uphold the Constitution of Alabama and the Constitution of the United States and I would urge you to adopt a plan that meets the law first, it has to meet the law first.

I would not be intimated by the executive branch of the government saying it's not going to call a special session, so what. And I don't think you've got to worry about that. I'd wait until to the regular session, in fact, maybe save some money. If they want to call one, fine,







but if it does not want to call one, don't worry about that, pass it in the regular session and you've got time to pass it.

The last time around it took us three days to get the last plan precleared. John Teague, you remember so well, that we carried the plan up on Thursday, I received a call from Brad Reynolds, I believe that Saturday, says stay here until Monday so we can have a joint press conference so we can hail the Alabama plan as a model for the nation.

And I'll have you to believe now if you go to the Department of Justice, Civil Rights Division, you will find a picture of Alabamians hanging in that Frederick Douglas Room representing Alabama. Roy Johnson was there and some others were there, but I just happen to see two persons who participated in that various ways.

But the point I'm trying to make is, it took us three days to get a plan precleared. I'm not suggesting to you that it would take only three days for this. I'm suggesting to you that you do have time. If no special session is called, you do have time to pass a plan. And I wouldn't fret and be intimated. And I don't think

that the Legislature of Alabama ought to have to commit to anybody in advance of what it's going to do on a legislative reapportionment plan in order to get a special session of the Legislature.

I think you've got an obligation to meet the law. And the most you ought to commit to is we will pass a plan that satisfies the United States Constitution; that satisfies the 1965 Voting Rights Act; and one to the extent that you're required to do so to satisfy the Alabama Constitution and that's your obligation. And I will call on you to do that.

I know that oftentimes there's somebody been involved in some judicial mischief, judge shopping and that's okay, except that, you know, and I commend you for saying to your lawyer that do whatever is necessary. And I think one of you said yesterday, I believe it may been Mr. Campbell, I think the paper quoted him as saying, that they thought the case may have been premature and that's okay.

But that's not the big thing. The most important thing for you to do is, if you pass a plan that meets the Constitution, you don't have to worry anybody else because the judiciary has a





responsibility to uphold the Constitution. But you do -- if you -- the only way this state will fall short is for you not to do your duty. And I will call upon you to do it. I know you know how to do it, you're capable of doing it and I know you've got the courage to do what you're suppose to do.

Now, turning to some of these other plans. I do understand, and I've been dealing reapportionment, for the person for the record, I know you're trying to get in the record, so I'll help you out a little bit. I'm not being facetious, I just want to lay it out.

I'm Joe Reed, I'm Chairman of the Alabama Democratic Conference. I'm 53 years old; I'm a native Alabamian; I've studied Alabama politics carefully since 1960.

I've been involved in numerous political battles, won some and lost some.

I've been involved in many reapportionment plans, won most, because basically we fundamentally believe that you must follow the law.

And we have been involved in legislative reapportionment plan, the Kirvin Plan,





which the Alabama Legislature has operated. Was a plan that I was the chief architect for that particular plan. That was the first plan that passed this Legislature, passed the Justice Department, and was blessed by the United States Middle District Court, Judge Frank N. Johnson presiding. That plan you and I operated under.

I've also drafted a plan for the State Board of Education, in which the State Board of Education is now operating under. That's a case called Watkins versus Hobby, I believe it is. And that case involved the reapportionment of the Alabama State Board of Education. That plan resulted in two Blacks being elected to the State Board of Education out of eight, a membership of eight.

The first Blacks were elected to the State Board since -- that was the first Black who were elected to the State Board since 1874. Peyton Finley was the last Black to serve on the State Board of Education in Alabama. Well, that plan now has two Blacks, that plan resulted in two Blacks being elected. One, of course, being Reverend Willie Paul and Doctor Ethel Hall.

I have also drafted, chief drafter for





the city council plan that we currently are under. Montgomery has four Blacks out of nine on the Montgomery City Council.

The current plan for the Montgomery School Board, Montgomery School Board has four Blacks out of seven on the Montgomery School Board. Those are district plans.

Also there are numerous other plans across the State of Alabama we've helped to draft, helped to participate. And we're very pleased about our record of success.

In drawing a reapportionment plan one doesn't have to be a genius, just have to have the know how and be willing to meet the law. In every plan we've drafted we've simply turned to the lawyers and said what's the law, and the lawyers said this is the law. They said this is the law. We simply follow the law and that's why we have been successful.

One doesn't have to be a genius, just have enough courage to follow the law. So I want to get that in the record.

Now, there's a plan, one of the plans before you now is commonly referred to as the Reed-Buskey Plan. That plan satisfies, has one

Black district, several influence districts. The counties, seven counties are divided in that particular plan. And someone alluded yesterday, I saw in the press where they said that the current congressional district plan is only two counties divided.

But I'll have you to know now your current congressional districts are malapportioned. If you don't know that they are malapportioned. They were malapportioned when they were passed ten years ago, we just didn't bother it, didn't have the time, we were so busy trying to do the legislature reapportioned. But the congressional district plan which you operate under the last ten years is malapportioned. It did not follow the one-person, one-vote. They just got by for ten years but that's over now because it's a different day.

But -- so the fact that only two counties were divided was not something that was so good and great about it, it's just that nobody challenged the makeup.

If you draw, or if anyone draws, I don't think anyone has drawn a plan yet that has no deviations and left -- has less than two







counties divided.

Now, I have not counted all of the counties to determine all of the plans to determine how many counties are divided in each plan. But I would say to you that the plan we have does divide seven counties and it has one district.

Now, I understand there's another plan that the NAACP has floated about and I tip my hat to the NAACP for what it has done over the years. I have not yet been able to put that plan together because it is not a plan in its totality. So in order to judge a plan, one must see it in its totality. You really can't take a plan and loop some counties together or loop some census tracts together or loop some districts together and say this is a plan. You don't know where you're going to go land when you finish.

So -- but I have not seen a plan yet and I do not take the position under no circumstances can a Black win a district that's less than 65% Black. I don't take that position.

However, I do take the position -- I have not seen a plan presented around here that I'm willing for a Black to run in for a







congressional seat because there are several factors, and I think you have to get this down, this is very important, aside from population, that satisfies the one-person, one-vote theory, but there are some other practical effect that one must look at.

Also you get to the question of your VAP, your voting age population. Your voting age population varies from as much 3, I guess, to 5% from your total population. Which means if your total population, let's say is, I'll just pull out a figure, 60%, then you're voting age population, let's pull out a figure, is 56%, maybe 4% less. Then once you get to your voting age population, then you've got to get your voter registration figures, which are usually among Blacks less than Whites. That may be as much, as high as a 3% variation.

Then you get, not only your voter registration population, then you've got to get your voter turnout. Then even aside from your voter turnout, when you take in the fact that many Blacks have not yet, even this day and time, never still because of education and what have you, don't have all of the political skills that Whites





Attorney Work Product

have had who have been operating government for hundred and hundred of years, then that's another factor.

Then you get into your factor, your economic factor in a campaign, that's your raising money. Most Black candidates can't raise money among poor Black folks, they don't have any. We're unemployed and you also get your quasi-captive vote. What's the captive vote, that's the quasi-captive, that's the vote that White folks still control among Black folks, that's the best way to put it.

We used to call it captive vote where they use to load them up on the truck and take them down and vote them. That had happened, though, during a period of reconstruction. But I'm talking about now where you've got a quasi-captive vote where many Blacks are still subjected to the influence of their employers and so forth where they simply don't know.

So all these factors, we put all these elements together, I have not seen a plan that put these elements together that will give us hope of electing two Black congressmen. I wish that I had a plan that could do that.

So, in a nutshell, based on what I have, what I have seen and what I understand all these plans to be, I have not seen one that would give us that result.

Thank you, Mr. Chairman. I appreciate y'all listening to me.

REPRESENTATIVE CAMPBELL: Thank you, Mr. Reed. Does anybody have any questions of Mr. Reed about his testimony?

SENATOR DIXON: Only a comment, Mr. Chairman, is his definition of quasi-captive vote. I think a proper definition, that's the vote that Joe Reed doesn't control.

DOCTOR REED: Thank you, Larry.

SENATOR CORBETT: Have you two ever agreed on anything?

REPRESENTATIVE CAMPBELL: I'd like to hear now from Jerome Gray, also from the Alabama Democratic Conference.

MR. GRAY: Good morning. Thank you, Mr. Chairman. I'm Jerome Gray, State Field Director for the Alabama Democratic Conference. I too have reviewed all the plans that have been -- that have come before this committee and I've seen a number of plans that I do feel would enable a







Black candidate to be elected in a majority Black district.

There has been some discussion regarding whether two majority Black districts can be created in the State of Alabama. And I have seen the proposed NAACP proposal and have talked with some of their attorneys about the plan that they have floated around in this state. I've looked at the plan and I have serious reservations regarding whether Blacks can get elected in either one of the districts under their proposed plan.

The plan proposes, it's a partial plan, you don't see the whole plan, so that certainly concerns me that you're looking at just a piece of the puzzle. And they based the plan on precinct data and you really don't have the whole plan in front of you to analyze. And they do cut up a lot of counties in drawing the two proposed majority Black districts.

The one thing -- the one concern that I have is Joe outlined the things we look at in terms of whether we think a district will be able to elect a Black candidate. And looking at those two districts they're right on the borderline, about 61%. Looking at the voting age population







in both those districts, the voting age population falls under 55% in terms of Black voting age population in those two districts.

And if you look at the counties that make up the two districts, even though they rely upon urban centers for picking up their population, but they also combine a lot of rural counties in their plan, their proposed plan.

And one thing I know that is, in trying to turn out the Black vote in rural areas it's more difficult because you have, you know, more miles to cover, more folk, you know, longer distance to go pick up folk and it's just more difficult to turn out folks when you have more counties involved and more rural areas making up that proposed district.

The NAACP has used the argument that there are districts around the nation where Blacks have won in less than, say, 65%, that is true. But if you look at the Black congressmen who have won in districts that are less than 65% Black they're virtually all in urban centers.

The only district, congressional district that I know of, a nationwide Black district where you have a Black congressman, is in





Attorney Work Product



Mississippi where you have a district that's less than 65% that's not in an urban area. You have -- Mike Epsey does have Jackson, and it goes out in the Mississippi Delta, but that's the only other place. Every other Black congressional district is located almost totally within an urban center where it's easier to turn out the vote and mobilize your voting population.

But under these two districts that's proposed by the NAACP, they rely upon a lot of rural counties to make up that population base to create those two districts. And I have serious concerns about whether either one of those districts could elect a Black.

The other thing that I don't know from looking at their plan is whether any of the incumbents, present incumbent congressmen are in those two districts.

As Joe talked about the captive vote, one thing that we know is that you do have Blacks, who will for whatever reasons, support White candidates in races. And particularly if you've got a White incumbent in either one of those two proposed districts, then you can see the problem that might create where you have a White incumbent

in one of those two, or in either one of those two proposed districts. And we don't know whether there is an incumbent congressman in one of those districts.

I think in all the other plans that have created a majority Black district, there is not a White incumbent in the majority Black district, maybe with the exception of, maybe, one or two plans that I saw. But I think usually the plans, most of the plans that came before this committee tried to avoid putting an incumbent in the majority Black district. But I can't say whether that NAACP plan dodges putting a White incumbent in those two districts. Thank you.

REPRESENTATIVE CAMPBELL: Anybody got any questions of Mr. Gray. We also have with us this morning, we have Ms. Lillian Jackson, who is, I understand, is the chairman of the state NAACP; is that correct?

Ms. Jackson, we'd like to hear from you. We're glad to have you with us today.

MS. JACKSON: Good morning. I do represent the Alabama State Conference of Branches of the National Association for the Advancement of Colored People. And I think first off I need to,





perhaps, clarify something that has transpired that may have caused some confusion. The NAACP has not submitted a plan with two districts. I think a suggestion came down from our national office and inadvertently, perhaps, a copy was submitted to this committee as well. And I think there are some other persons, perhaps, who are supporting that plan. But that is not the plan that the NAACP in Alabama is supporting.

We have some very serious problems with a two district plan. We believe that a plan that only has 60% Black population is not what we would consider a safe district. And it would have only approximately a 56% voting age population. We think that a plan would need to have, at least, 65% Blacks in a district with at least 61% voting age population.

We see a number of other problems with a two district plan as well. We do have a large number of rural counties. And I don't want to go into a lot of things, repeat what has already been said, but it is a very strong concern of the NAACP, and we are a nonpartisan organization, but we are very concerned in political matters.

And in Alabama, in a Black district,





regardless if it's one or two, it would have to encompass a large number of rural areas. And history has proven that we have more difficulty in getting people registered to vote in rural areas; more difficulty in getting them to the polls to vote and, therefore, we would have very serious problems with a plan that would only have about a 60% Black population.

Realistically it would lessen the chances of getting a minority or a Black elected to Congress. It would weaken our ability to raise funds or the candidate's ability because the resources would be greatly split.

So, at this point, we have looked at a number of plans that have been submitted to this committee. And the NAACP here in Alabama set up a committee, we studied the ones that have been submitted to you, and we have decided and taken a vote that the plan that we see at this particular point that we would most support would be the plan that was drawn by Representative Buskey and some others.

So I do want to clear the record. We do not support a two district plan. Currently we support the plan that Mr. Buskey worked on and I





believe that is one that people are referring to as the ADC Plan. Thank you.

REPRESENTATIVE CAMPBELL: Thank you, Ms. Jackson. Anybody got any questions of Ms. Jackson? We appreciate your coming today and Jerome and Joe Reed we appreciate y'all being with us today.

We went a long way yesterday under the able guidance of Senator deGraffenried. I told him I thought he ought to preside again and he said no.

SENATOR WINDOM: Lightning doesn't strike twice.

REPRESENTATIVE CAMPBELL: So the baton has passed. And I guess now we'll open the floor to committee members and see if we want to try to go further than we went yesterday or what procedure we want to take.

I recognize Representative Box.

REPRESENTATIVE BOX: Thank you, Mr. Chairman. In looking at the five plans that are remaining, there are three that are very similar, so similar, in fact, that I think with modifications within a matter of minutes they can be converted from one to the other. That's the

plan that I have remaining, the plan offered by Senator Dixon, and the plan drafted by Senator Mitchell.

My suggestion at this time is going to be to eliminate two of those so that we will then have three totally different approaches left on the table. So with that thought in mind, I'm going to move at this time to indefinitely postpone my plan and to indefinitely postpone Senator Mitchell's plan.

SENATOR CORBETT: Second that motion, Mr. Chairman.

REPRESENTATIVE CAMPBELL: And that would leave us with the ADC Plan, Dixon Plan and the least acceptable of the remaining three.

SENATOR CORBETT: Mr. Chairman, if you'd like to entertain a substitute motion, I think probably you and I have some of the same reasons there.

REPRESENTATIVE BOX: Let's take this one at a time.

SENATOR CORBETT: Well, wait a minute.

SENATOR DEGRAFFENRIED: Let's don't get carried away. I would like the Chair to entertain a substitute motion to IPP the Box, Mitchell, and







deGraffenried, ditto, Plan 25.

SENATOR DEGRAFFENRIED: I've got a substitution motion to that. We report 25 out and the Dixon Plan and the Reed Plan.

REPRESENTATIVE CAMPBELL: Do y'all want to go through all these procedures. Let's go with what Mike Box has proposed, which is to indefinitely postpone his own plan and the --

SENATOR CORBETT: I second the motion.

REPRESENTATIVE CAMPBELL: -- Mitchell Plan; is that right?

And there's a second by Senator Corbett. Is there any discussion about this? All right. All in favor of Representative Box's motion say aye. Opposed no. Anybody want to be on record as voting no?

Then the Box Plan E, Mitchell Plan 3 are now indefinitely postponed and what we have remaining are three plans.

SENATOR DIXON: Mr. Chairman.

REPRESENTATIVE CAMPBELL: Senator Dixon.

SENATOR DIXON: Representative Box has done a tremendous amount of work on this and obviously he has a tremendous interest and a lot







of energy and I commend him on the motion he just made. And I think it was done in an effort to move this committee forward and to be able to accomplish our responsibility as legislators and I commend him for the work he has done and the motion he has made.

REPRESENTATIVE CAMPBELL: We will issue a certificate of commendation at the appropriate time. And considering some of the plans that he made, perhaps, y'all might want to make him an honorary Republican.

Representative Ford. Then I'll get to Senator Corbett.

REPRESENTATIVE FORD: We are down to three plans and that's the only three we've got before the Committee as I understand it.

REPRESENTATIVE CAMPBELL: That's correct.

REPRESENTATIVE FORD: Would it be proper to entertain a motion now to let this committee take these three plans to the Legislature now?

REPRESENTATIVE CAMPBELL: That's -- any kind of motion like that would be in order. And we, of course, we can do whatever we want to. I







want to make sure that everybody understands that once we get to the legislative process that all 25 plans, plus a few others, will probably be back on the table.

SENATOR DEGRAFFENRIED: Mr. Chairman, members of the Committee, with respect to the plan that I offered yesterday, I've got a substitute plan.

What it does, and I'd like to get, John, if you would, whoever has got copies of this, to please pass them out. It makes two changes.

It accommodates Congressman Callahan as far as Crenshaw and Monroe counties are concerned. That's the only change that is made. And if we're going to report three plans out, I would like for this plan to be.

SENATOR DIXON: Move to adopt the substitute.

REPRESENTATIVE CAMPBELL: So we now have Plan 25-A.

Representative Buskey.

REPRESENTATIVE BUSKEY: I understand what the Co-chairman is trying to do --

REPRESENTATIVE CAMPBELL: Y'all hold it

down and let Representative Buskey have the floor.

REPRESENTATIVE BUSKEY: I understand what Senator deGraffenried is trying to do with his plan. In looking at it in all fairness I think this is the most unrealistic plan I have seen. And there is no way that I can see that this plan would ever have much of a chance passing the Legislature.

The configuration of a Black district takes it from East Alabama, Macon, Bullock counties, Pike County to Mobile to Jefferson to Tuscaloosa and Greene. And I just don't see -- I think it's just too unrealistic. Like I say, I think I know what he is trying to do and it just does not cut it in trying to even provide any kind of compactness. And I -- well, I'll just wait to make any kind of motion.

REPRESENTATIVE CAMPBELL: We're going to give everybody the opportunity to speak.

Senator Corbett now.

SENATOR CORBETT: Mr. Chairman, I guess I basically concur with what Mr. Buskey has just said, probably in different reasons. We're down, you know, we've done a monumental job coming from 25 down to 3 plans. And I, for one, I had always





longed for this committee to report out one plan. And I have come to the conclusion that that's probably not possible simply because the remaining two plans that I think are acceptable are variations of so much else that we have had put before us. And as you so aptly stated earlier, when we go in session some version of these 25 plans is going to surface anyway as modifications, amendments, substitutes or whatever.

The plan that Senator deGraffenried has in front of us, while it may accommodate Senator -- Congressman Callahan or others, it obviously skews some congressional districts around all over the state, acknowledging what Mr. Buskey has said about the obvious makeup of the purported Congressional District Two.

Congressional District Three skews all over the place and runs in what I consider an unacceptable fashion as being from that part of the state. I'm sure there are others in this room, that, for whatever reason, may find it that one of these other districts that I'm not so familiar with skews all over the place.

I think that we find ourselves in a posture of being in a situation where we can put





out a purported quote, unquote, "Black Plan," one that appears to be fairly acceptable to this committee.

And I think through Senator Dixon's efforts, that we find ourselves in the posture in having a plan that we would call, quote, unquote, a "Republican Plan," that this committee could find some merits in.

And at the proper time I'm going to move or will vote with someone else, or if someone else makes a motion before I do, to indefinitely postpone Plan 25. And that's in all due deference to the pro tem, but simply I don't think we ought to put three plans out of this committee that are so radically different that it does not signal anything to anyone as far as some coming together of this committee.

As we presently sit, if we put out these three plans, they are so radically different that we are simply saying that this committee is so indecisive that it can't even come to some sort of conclusion and report something out.

I ask you to, at least, think about that when the proper time comes as far as getting to a vote.





SENATOR DEGRAFFENRIED: I would like to respond to that. And I'm going to ask John Teague to speak also. But members of the Committee we're down to trying to come up with something to recommend to the Legislature. And one of the things that I think that we have always tried to keep in mind is that we would love to preserve the integrity of all the congressional districts, but it's just not humanly possible when we know that we've got the responsibility to create one Black district.

There have been some discussions between our current congressional delegation, and I'm going to let Mr. Teague address those, and, obviously, we can't satisfy everybody, and I understand. I talked with Congressman Browder this morning.

SENATOR CORBETT: I don't need to talk to him, I can just look at the map.

SENATOR DEGRAFFENRIED: I understand that. But that's where the -- and, again, it still preserves him as far as an incumbent and electability, it just may be inconvenient. But we may have to inconvenience somebody, but we can still pretty much design a district where they can

be successful.

John, do you want to speak to that?

MR. TEAGUE: Thank you, Mr. Chairman, Committee members. If I could just briefly address this plan, and I will be brief, and also give you some background on this, the reasonings that went in behind this plan.

Originally I was contacted by Congressman Erdreich's office and Congressman Harris' office about representing them in the redistricting proposal. And at that time I thought that I would be representing the entire congressional delegation. But what has transpired is basically I'm representing Congressman Erdreich because after a visit to Washington it became apparent that everyone was interested, or most everyone was interested in preserving their own area and cared little about anything else.

In this plan I think that, other than the numbers, that you also need to look at the political considerations of members of this Legislature. In this plan there is a 65% Black district. It also has a 61.2% voting age Black proportion in this Black district.

I think that an effort was made in the





ADC Plan to take in a large segment of the Black population out of Jefferson County and they accomplished this. In meeting with the different, various peoples that I met with we also wanted to maintain a large segment of the Black population in Jefferson County. And those people who have expressed an interest in running for Congress in the Black district are covered within this area. There is some 117,000 voters I believe out of Jefferson County.

You also have a consideration where you have with the other group, organized group in the state, the New South Coalition who were unhappy with the Reed Plan and had expressed so to me.

At the same time Senator Figures, who is a very influential and powerful senator, Senator Sanders who is also influential and powerful, do not support the other plans, but they do support this plan. They said that this encompasses what they desired, which is a portion of Mobile, predominately a Black population out of Mobile. And it also includes Perry, Hale and Greene counties, which they wanted included within this plan as well as taking in the Jefferson County portion.





It's my understanding that with the effort that was made by Congressman Callahan last week, the last week of the session, and the support that he had to preserve his district as intact as possible, this was done within this plan.

Congressman Harris is in support of this plan.

Congressman Erdreich is in support of this plan.

And I want to be extremely careful about what I say about Congressman Bevill, but Congressman Bevill said he can live with the Reed Plan or this plan. He does support or endorse either one.

Congressman Cramer says that since he isn't effected, that he has no problems and he -- and I don't want to say support this plan, but certainly does not oppose it.

The opposition, the basic opposition comes from Congressman Browder, who is my congressman and also a personal friend. And it takes Talladega County out of his district and goes down into Barbour, Henry and takes some 12,000 votes out of Houston County, which they are





Black, predominately Black votes.

I am convinced, myself, after looking, because my interest is to try to preserve the Democratic congressional districts. And to keep those incumbents who have built years of seniority in Washington because, unlike the state legislature where a freshman can come in and display talents, in Washington it is 99% seniority, and the longer you're there, the more powerful you become. So this was a real concern of -- that went behind this plan.

Excluding Lee and Russell counties, Congressman Browder still has approximately 300,000 population in counties north of Russell and Lee County which he would consider his base.

The counties that are included are Democratic counties with Henry and Barbour County and the portion of Houston County is also Democratic.

The congressman has received tremendous support out of Lee and Russell counties the times that he has run, even though he had a person who resided in those counties that ran against him.

So I'm firmly convinced that Congressman Browder's position is not jeopardized.

I think it is a district that will remain Democratic and I think that he will remain as a congressman. If I were not convinced of that, then I could not lend support, support simply this for personal reasons.

And I would like to ask you, taking all of these factors into consideration, and I can assure you that if some of things that I've addressed are not considered, if you just report the two plans out, if they're not considered, then there is going to be opposition and the threat of the courts and the threat of a lot of other things will probably come true.

And I think that if we had -- if you had three workable plans that have logical reasons too, and has support from various people within the legislative process, then you'll come close to having a consensus than if you were to just report the two out because the entire Legislature then could act on those.

I'll be happy to respond to any questions.

REPRESENTATIVE CAMPBELL: First of all, we're going to have Representative Thomas.

REPRESENTATIVE THOMAS: Mr. Chairman,





Co-Chair, I really have a great deal of problem respectfully for this plan.

First of all, it encompasses some 20 counties, that's the first thing, and it extends east to west to extreme south into Mobile.

I talked with the chairperson, or the president of Alabama New South last evening. Alabama New South really does not have a problem with a district that does not encompass Mobile. That was the position that was stated to me on last evening. As a matter of fact, the president indicated that she would be here today to speak to that if necessary.

I think their concerns, more so than anything, is that they want to keep the Black Belt as contiguous as possible in that Choctaw, Sumter, Greene and would Hale be a part of the Black Belt. I think that can be accomplished with the Dixon Plan and merging it with somehow the Reed Plan. I think those two plans are the best plans, working instrument going to the Legislature with.

And because of that, my idea is to report these two plans out and let's see can we come to some common ground in as much as they're both somewhat similar. And this plan here is





totally different from those two plans. I think we can use those two plans, merge them and have a workable situation, where this tends to cloud everything as far as the members of the Legislature is concerned.

With that, Mr. Chair, I respectfully and I reiterate, that I respectfully would request that we would lay this plan on the table.

REPRESENTATIVE CAMPBELL: We're going to get around to everybody. We'll go with Senator Corbett and then Senator Dixon wants to be heard and Representative Rogers and we're going to hear everybody.

SENATOR CORBETT: I want to ask a question of Mr. Teague. You indicated, if I heard you right, that -- let me preface my question by saying that as a member of the Committee I'm not committed to try and save any congressman's seat, I'm simply committed to trying to get a plan that works and that the Feds will approve and that this Legislature will approve.

But you made the remarks to a fact that Henry and Houston counties, the portion of it that you depicted in this map in your defense of protecting Congressman Browder, along with the





couple of congressmen, I assume, who are paying for your services, that Henry and Houston counties were Democrat.

Now, in the maps that I have looked at, in both the '90 governor's race and the past presidential race, those two counties were decidedly Republican counties.

Are you telling me that those maps are inaccurate? I realize that there are Democratic legislators in terms of state legislators, but in terms of congressional, presidential and gubernatorial, those counties, which you have told this committee are Democrat, are decidedly Republican.

MR. TEAGUE: With all due respect, Senator Corbett, the portion of Houston County that is taken out and put in Congressman Browder's district is 55% Black. It is not the Dothan area, which is the bulk of the population which carries Houston County Republican.

And I don't mean to --

SENATOR CORBETT: What about Henry?

MR. TEAGUE: In Henry County in the congressional races have supported the democratic nominees.

SENATOR CORBETT: What about the gubernatorial race and the presidential race?

MR. TEAGUE: Senator Corbett, I think that you and I both know in the gubernatorial race, and in the senatorial race, that they probably, I don't know, but I'll take your word, they went Republican. In the congressional race it went Democrat.

SENATOR CORBETT: I'm operating off of memory, but I've got a map in my office that depicts some of this and I think I'm correct in saying that Henry County has consistently gone Republican.

MR. TEAGUE: Not in congressional races and not in legislative races, state legislative races.

And in the senatorial race, Henry County went 73% for the democratic nominee.

SENATOR CORBETT: Well, let me finally say that I'm going to echo what some other folks have said and I'm going to hush.

The two plans that we have, other than this one, have some workability, this plan for those of us in the Third District, I think you will see when the time comes to vote is







unacceptable. Apparently, a goodly number of Blacks on the Committee find it unacceptable because of the gerrymandering effect that it does all over the state to get the purported Second District.

And I'm either going to make a motion or concur with the motion at the proper time, that we indefinitely postpone this plan and produce two plans coming out of this committee that have, not only a Black interest, but also have a nonpartisan or Republican interest as the case may be, Senator Dixon. And that, at least, we've got two workable plans that are somewhat compatible, instead of just saying that this committee is so indecisive that we're going to throw three plans out there, recommending absolutely nothing would be the effect of. Thank you, Mr. Chairman.

REPRESENTATIVE CAMPBELL: Senator Dixon.

SENATOR DIXON: Senator Teague, what is the number of counties that are divided in this plan?

MR. TEAGUE: Senator, I don't have that number.

SENATOR DIXON: It looks to me like







it's a higher number than some of the other plans. Obviously, you know, this is adverse to Congressman Dickinson.

MR. TEAGUE: Yes, sir.

SENATOR DIXON: And I must say, I readily and wholeheartedly concur with your explanation of how valuable many of the democratic congressmen are in this state and how their seniority has been instrumental in achieving great gains for Alabama.

I would like to echo those comments to include Congressman Dickinson who has been there since 1964 and has been more than instrumental in securing all of kinds government projects and defense department projects for the entire State of Alabama. And then because it does treat him so adversely, I cannot support it either.

REPRESENTATIVE CAMPBELL: Let me ask a question about this. I note that it, and, I guess what's now the Third Congressional District, that there is some 82,000 people in Montgomery County that are put in this district. Does that also include Congressman Dickinson's hometown or not, address?

SENATOR DIXON: I can't tell.







REPRESENTATIVE CAMPBELL: Or is Congressman Dickinson and Congressman Browder thrown against one another in this as they were in another plan?

MR. TEAGUE: Yes, sir, they are.

REPRESENTATIVE CAMPBELL: Representative Rogers.

REPRESENTATIVE ROGERS: Mr. Chairman, I think this plan is viable, I think it's reasonable, I think it's rationale and I also think it's legal.

Now, every plan I have seen looks like some Chinese puzzle, and true, this one is. And I've heard a number of people mention, make a projection of what they think the courts will do. And it's an opinion from everybody I've heard that that's where, whatever plan we pass, will wind up in the court for the court to determine what is proper. But it is my judgment and belief that this one will stand because we're in a unique situation due to the fact that we have got to, to put it simple I would say, gerrymander to get a Black district. That's what this whole thing is all about really.

And to do that, we're going to have to

run from one side of the state to the other. And I think that the deGraffenried Plan meets all of the requirements that have been stipulated to us regarding preservation of districts, one-man, one-vote and so on down the line. And I would encourage you to let's put this plan out on the floor also.

Thank you, Mr. Chairman.

REPRESENTATIVE CAMPBELL: Representative Buskey.

REPRESENTATIVE BUSKEY: Mr. Chairman, thank you. An additional comment I wanted to make about this particular plan, and, of course, some of the comments, you know, if our only objective was to draw a Black district, then that may be one thing, but there are some other considerations as well you know about an overall plan.

Now, my biggest concern, of course, is for the make-up of a Black district. And I think there is some economic factors to be considered. When you talk about the person or persons running from the district, with this kind of configuration, and the media outlets that he has to serve these areas that he's going to have to advertise on this kind of campaign in this





district is one factor.

I think there's no way that this district can be called compact. And I think you would be stretching it to say that it's contiguous, even though the lines connect. I think it's stretching it to say that it's contiguous in that sense because stretching all the way down really, with regard to what I'm looking at here, all the way down into Mobile, which is extreme south. And I guess the only reason for going up to the center of the state is to go up into Birmingham, around Shelby and up into Birmingham in order to pick up any Blacks up there. This would be an expensive campaign for anybody, an expensive district for anybody to run in.

And for those reasons and many others, I guess, we haven't had a chance to break this plan down, but I don't think it's a workable plan. And it would be unfair to Blacks to even to be forced to run in this district.

SENATOR DEGRAFFENRIED: Can I respond to that?

REPRESENTATIVE CAMPBELL: Let me get -- I'm going to get Representative Flowers, and then





I'll get Senator deGraffenried.

REPRESENTATIVE FLOWERS: Mr. Chairman, I concur with my colleague, Mr. Buskey, that this plan is one I think that it would be laughable if it weren't for the deference of our committee Co-chairman who's a good friend of my mine. I think he's -- because of this deference we're looking at it. This is the least homogeneous plan I've ever seen presented to the Legislature. It stretches the Black district like a snake all over the state, it's kind of hard to imagine.

Furthermore, the one prevailing view that we had in our public hearings in the Southeast Alabama area of the state commonly known as the Wiregrass, is the one thing we were united on, all the members of the Legislature from that area is that we keep our area known as the Wiregrass intact. It splits it in half and uses us kind of as a dumping ground for the rest of the state, even to the point of coming in and getting part of Houston County, you know, which I could hardly imagine anybody in that area would be for that.

There are certain programs that effect the Wiregrass, especially the peanut program, that





a congressman could not represent this area and work diligently on that program.

So I would say this, if it were not for Senator deGraffenried, who is a good friend of mine and member of this committee, this plan is pretty laughable. So I urge us to indefinitely postpone it.

REPRESENTATIVE CAMPBELL: I'm going to let Senator deGraffenried respond to that and then we'll get to Senator Horn.

Senator deGraffenried.

SENATOR DEGRAFFENRIED: I appreciate all the political rhetoric, it's great play in your hometown newspapers.

Representative Buskey, there is no cheap congressional race in the State of Alabama.

REPRESENTATIVE BUSKEY: I agree.

SENATOR DEGRAFFENRIED: So you know whoever is going to run it's going to be expensive, whether they're Black or White.

Now, as far as this plan is concerned, Representative Flowers, obviously, everybody is not going to be happy. I'm not happy with the Reed Plan, quite frankly. I don't like it any more than you like mine, Representative Thomas.

REPRESENTATIVE THOMAS: I can appreciate that.

SENATOR DEGRAFFENRIED: But this is a viable plan and I'm going to ask members of the Committee to report this plan out at the proper time.

REPRESENTATIVE CAMPBELL: Senator Horn.

SENATOR HORN: Yes, sir. In due time and in deference to my chairman, I'm going to have to ask him to go back and get him another plan for a lot of reasons and some of them may I state.

And being one of the first ones on this committee that traveled throughout these United States at reapportionment hearings we heard and digested a lot. And some of that we heard dealt with that we must bring back a plan that met certain criteria. And out of those, one-man, one-vote; they must be contiguous counties, districts; the preservation of county lines; protecting the incumbents. Furthermore, thinking in terms of more ways, institutionalized ways of thought patterns of people that they think alike. This plan here violates all of that.

First off, we have too many counties involved, the splitting of too many counties.







Long story short. Justice told us whatever you do, do not bring back a plan that looks like a salamander, do not bring back a plan that looks like a salamander. Those were the verbatim words. And here we have a plan, not only looks like a salamander, but looks like a sick amoeba.

Ryan, get you another one.

SENATOR DIXON: Mr. Chairman, I think the Chair --

REPRESENTATIVE CAMPBELL: Senator Smith. The long, silent Tennessee Valley will now be heard.

SENATOR SMITH: Mr. Chairman, members of the Committee, I am not really ecstatic about Ryan's plan, but I wanted to say this for the record.

This is obviously done to assist Representative Harris. Representative Harris cast one of the crucial votes in Congress to preserve the space station which is really critical to my district. And he did that at some personal sacrifice potentially to his district visa-vis that that money was going to be used for some housing program. I talked to him and he delivered







one of the critical votes and it was something that took a lot of courage and I think it was something that was essential for, not only for my district, but for the security of the nation.

And for that reason, you know, I'm committed to assist him in helping him in any way that I can.

REPRESENTATIVE CAMPBELL: Representative Box.

REPRESENTATIVE BOX: Thank you, Mr. Chairman. In all fairness, I don't know how many of the members of the Committee have looked at congressional plans of other states, but if you do, I think you'll see that the plan offered by Senator deGraffenried is actually fairly compact compared with what some other states have done.

In all fairness, we've got three very different approaches and I don't particularly like the plan offered by Senator deGraffenried, but then I'm not overly fond of the plan offered by Representative Buskey either. But if we're going to submit more than one plan anyway, I see no rationale for eliminating deGraffenried's plan and not Reed's.

REPRESENTATIVE CAMPBELL:







Representative Box.

REPRESENTATIVE THOMAS: Could I make one comment as it relates to Congressman Harris?

REPRESENTATIVE CAMPBELL: Quick.

REPRESENTATIVE THOMAS: It will be quick. I wish to state for the record that it is certainly my hope and my desire that we can accommodate the good congressman from West Alabama. And I think that it can be done with the Reed and the Dixon plan. It's my intent, my whole intent to support that effort as it relates to some of the other guys.

So I think that we can still accomplish what I believe that you wish to accomplish with the two plans. But the plan that you've submitted here causes me all kind of grief and for that, again, respectfully, I would like to lay it on the table this plan at this point.

SENATOR CORBETT: Are you making a motion?

REPRESENTATIVE THOMAS: Indefinitely postpone.

SENATOR CORBETT: I'm going to second Mr. Thomas' motion.

REPRESENTATIVE CAMPBELL: We're not

going to cut off anybody.

REPRESENTATIVE THOMAS: I withdraw it.

REPRESENTATIVE CAMPBELL: No. You go and make a motion and second the motion.

SENATOR DEGRAFFENRIED: Let me do this. Rather than having to go through two votes, John, what I want to do is get this substitute adopted. And then if you want, instead of having --

SENATOR DIXON: There's a motion on the table, I made a motion and you seconded it.

REPRESENTATIVE CAMPBELL: That's true. We've got a motion to substitute his Plan 25-A for Plan 25, which I think just swapped two counties around.

SENATOR CORBETT: I think the proper motion would be, rather than split all the votes up, just substitute motion to indefinitely postpone the Plan 25 and appending substitute.

REPRESENTATIVE CAMPBELL: You can do it that way if you want to.

SENATOR DIXON: I'd speak to that motion.

REPRESENTATIVE CAMPBELL: Now, is that what you want to do?

Representative Thomas has moved that







Senator deGraffenried's, all of his proposals, both the one that's already before the Committee and the one he has proposed to substitute be indefinitely postponed and Senator Corbett has seconded that. I'll recognize Senator Dixon.

SENATOR DIXON: It's been the tradition in the Legislature, the years that I have been here, when a sponsor of a resolution or a plan or a bill asks to substitute and have the substitute be considered as the new proposal, that it is a traditional responsibility that I feel to allow him that courtesy. And, therefore, I would urge you to table the substitute motion that would supersede my motion to adopt the substitute on the floor as a courtesy to Senator deGraffenried.

REPRESENTATIVE THOMAS: Let me simply withdraw my motion out of courtesy.

REPRESENTATIVE CAMPBELL: Without objection, we'll do that. Is there any further discussion about the substitution?

SENATOR CORBETT: This is a vote on adopting the substitution?

REPRESENTATIVE CAMPBELL: This is a vote on substituting the plan. And, Senator, you might want to one more time tell everybody what







the difference is between the plan, as it's now before the Committee, and the one that you're proposing.

SENATOR DEGRAFFENRIED: The only difference is that it swaps, Crenshaw, is it, John?

MR. TEAGUE: Monroe and Crenshaw and Dale.

SENATOR CORBETT: That's all the questions.

REPRESENTATIVE CAMPBELL: The question then is to adopt the substitute. Is there anyone that wants a roll call vote on this? All in favor of adopting the substitute say aye. Opposed no. And we now have Plan 25-A.

Now, Representative Thomas.

REPRESENTATIVE THOMAS: I renew my motion now to move to indefinitely postpone.

SENATOR CORBETT: I second the motion.

SENATOR DEGRAFFENRIED: I'll ask for a voice vote.

REPRESENTATIVE CAMPBELL: There is a motion by Representative Thomas and seconded by Senator Corbett to indefinitely postpone Senator deGraffenried's plan. And the Senator has asked







that the ayes and no's be called for. And the Secretary will call the roll.

SENATOR DEGRAFFENRIED: I urge you to vote no.

THE SECRETARY: Senator Barron. Representative Bowling.

REPRESENTATIVE BOWLING: Aye.

THE SECRETARY: Representative Box.

REPRESENTATIVE BOX: No.

THE SECRETARY: Representative Buskey.

REPRESENTATIVE BUSKEY: Aye.

THE SECRETARY: Representative Campbell.

REPRESENTATIVE CAMPBELL: Aye.

THE SECRETARY: Senator Campbell. Senator Corbett.

SENATOR CORBETT: Aye.

THE SECRETARY: Representative Curry

REPRESENTATIVE CURRY: Aye

THE SECRETARY: Senator deDraffenried.

SENATOR DEGRAFFENRIED: No.

THE SECRETARY: Senator Dixon.

SENATOR DIXON: Aye.

THE SECRETARY: Representative Flowers.

REPRESENTATIVE FLOWERS: Aye.

THE SECRETARY: Representative Ford.

REPRESENTATIVE FORD: Aye.

THE SECRETARY: Senator Hale. Representative Hall.

REPRESENTATIVE HALL: Aye.

THE SECRETARY: Senator Horn.

SENATOR HORN: Aye.

THE SECRETARY: Senator Langford.

SENATOR LANGFORD: Aye.

THE SECRETARY: Senator Little.

SENATOR LITTLE: Aye.

THE SECRETARY: Representative Rogers.

REPRESENTATIVE ROGERS: No.

THE SECRETARY: Senator Smith.

SENATOR SMITH: No.

THE SECRETARY: Representative Thomas.

REPRESENTATIVE THOMAS: Aye.

THE SECRETARY: Senator Windom.

SENATOR WINDOM: No.

THE SECRETARY: 13 yeahs and five nayes.

REPRESENTATIVE CAMPBELL: The motion to indefinitely postpone prevails.

SENATOR CORBETT: Mr. Chairman.

REPRESENTATIVE CAMPBELL: I was







reminded of something in the first roll call, and I forgot it in the second roll call.

All of the members of the Committee need to know that Representative Bobbie McDowell is having open-heart surgery today at UAB and that's the reason for her absence.

SENATOR WINDOM: What is she having?

REPRESENTATIVE CAMPBELL: She's going to have by-pass surgery.

SENATOR DIXON: That's rather sudden; isn't it?

REPRESENTATIVE CAMPBELL: Apparently she went to the doctor for a routine checkup last week and thought it was indigestion and turned out that she had about 80% blockage.

SENATOR CORBETT: Mr. Chairman, I'm going to move at this time, I think the plans have been discussed and hashed and discussed and recussed and I'm going to move that this committee recommend the Reed and Dixon plans as the Committee's recommendations to be forwarded to the Legislature as our plans.

REPRESENTATIVE BUSKEY: Seconded it.

REPRESENTATIVE CAMPBELL: Senator Corbett has moved and Representative Buskey has







seconded that the two plans, the Reed Plan and the Dixon Plan, be recommended to the Legislature by the Reapportionment Committee.

SENATOR LITTLE: Mr. Chairman, can we have a division of the voting?

REPRESENTATIVE CAMPBELL: Yes, sir. Is there any further discussion on this? The Secretary will call the roll.

SENATOR CORBETT: Are you going to divide the question? I have no objection to that.

REPRESENTATIVE CAMPBELL: We're going to go on and call, we're going to go on and have a roll call vote.

SENATOR WINDOM: He meant on each plan.

SENATOR CORBETT: Are you going to divide the question? He wants to be able to vote separately on the plans, I have no objection.

REPRESENTATIVE CAMPBELL: Oh, two things. Fine. We'll first vote on the ADC-Reed Plan. Those in favor of recommending that as one of the two plans will vote aye and opposed no and the Secretary will call the roll.

THE SECRETARY: Senator Barron. Representative Bowling.

REPRESENTATIVE BOWLING. Aye.







THE SECRETARY: Representative Box.

REPRESENTATIVE BOX: Aye.

THE SECRETARY: Representative Buskey.

REPRESENTATIVE BUSKEY: Aye.

THE SECRETARY: Representative Campbell.

REPRESENTATIVE CAMPBELL: Aye.

THE SECRETARY: Senator Campbell. Senator Corbett.

SENATOR CORBETT: Aye.

THE SECRETARY: Representative Curry.

REPRESENTATIVE CURRY: Abstain.

THE SECRETARY: Senator deGraffenried.

SENATOR DEGRAFFENRIED: No.

THE SECRETARY: Senator Dixon.

SENATOR DIXON: Abstain.

THE SECRETARY: Representative Flowers.

REPRESENTATIVE FLOWERS: Aye.

THE SECRETARY: Representative Ford.

REPRESENTATIVE FORD: Aye.

THE SECRETARY: Senator Hale. Representative Hall.

REPRESENTATIVE HALL: Aye.

THE SECRETARY: Senator Horn.

SENATOR HORN: Aye.

THE SECRETARY: Senator Langford.

SENATOR LANGFORD: Aye.

THE SECRETARY: Senator Little.

SENATOR LITTLE: No.

THE SECRETARY: Representative Rogers.

REPRESENTATIVE ROGERS: No.

THE SECRETARY: Senator Smith.

SENATOR SMITH: Aye.

THE SECRETARY: Representative Thomas.

REPRESENTATIVE THOMAS: Aye.

THE SECRETARY: Senator Windom.

SENATOR WINDOM: No.

THE SECRETARY: I have 12 yeahs and 4 nays.

REPRESENTATIVE CAMPBELL: 12 ayes and 4 nays.

THE SECRETARY: And two abstentions.

REPRESENTATIVE CAMPBELL: Two abstentions. The Reed Plan is recommended as one of the plans.

Now, the question will be and we'll -- Senator Corbett would move and Representative Buskey would second that we also report the Dixon Plans as the other plan to the Legislature.

SENATOR HORN: Mr. Chairman, I might be







out of order if I would ask my colleagues not to abstain and not vote no on this motion.

REPRESENTATIVE CAMPBELL: Do what, I'm sorry?

SENATOR HORN: Would I be out of order if I were to ask my colleagues not to abstain or vote no on this motion?

SENATOR CORBETT: I think if we followed Senator Dixon's lead on this one, he might not get his plan out, but I think we're bigger than that. So let's vote.

REPRESENTATIVE CAMPBELL: Secretary call the roll.

THE SECRETARY: Representative Bowling.

REPRESENTATIVE BOWLING: Aye.

THE SECRETARY: Representative Box.

REPRESENTATIVE BOX: Aye.

THE SECRETARY: Representative Buskey

REPRESENTATIVE BUSKEY: Abstain.

THE SECRETARY: Representative Campbell.

REPRESENTATIVE CAMPBELL: Aye.

THE SECRETARY: Senator Campbell. Senator Corbett.

SENATOR CORBETT: Aye.







THE SECRETARY: Representative Curry.

REPRESENTATIVE CURRY: Aye.

THE SECRETARY: Senator deGraffenried.

SENATOR DEGRAFFENRIED: Aye.

THE SECRETARY: Senator Dixon.

SENATOR DIXON: Aye.

THE SECRETARY: Representative Flowers.

REPRESENTATIVE FLOWERS: Aye.

THE SECRETARY: Representative Ford.

REPRESENTATIVE FORD: Aye.

THE SECRETARY: Senator Hale. Representative Hall.

REPRESENTATIVE HALL: Aye.

THE SECRETARY: Senator Horn.

SENATOR HORN: I was out of order so I won't vote.

THE SECRETARY: Senator Langford.

SENATOR LANGFORD: Abstain.

THE SECRETARY: Senator Little.

SENATOR LITTLE: Aye.

THE SECRETARY: Representative Rogers.

REPRESENTATIVE ROGERS: No.

THE SECRETARY: Senator Smith.

SENATOR SMITH: Aye.

THE SECRETARY: Representative Thomas.







REPRESENTATIVE THOMAS: Abstain.

THE SECRETARY: Senator Windom.

SENATOR WINDOM: Aye.

THE SECRETARY: I have 13 yeas, 3 abstentions and 1 nay.

REPRESENTATIVE CAMPBELL: 13 yeas, 3 abstentions and 1 nay and Senator Dixon's plan is also reported as a plan that's recommended by the Committee.

Now, let's turn our thoughts to -- I personally think, and Senator deGraffenried thinks that what we ought to do is to send a letter to the Governor saying that we have gotten down two plans and ask him if we would now consider calling a special session on congressional reapportionment. And I'd like to have some discussion.

SENATOR CORBETT: Before you make that motion, let's try one other thing.

REPRESENTATIVE CAMPBELL: And I think that's something that we need to do.

SENATOR CORBETT: In deference to Senator Dixon and to Buskey and others, you know, we've hashed this out and we've come down to two plans that are going to come out of this

REPRESENTATIVE THOMAS: Abstain.

THE SECRETARY: Senator Windom.

SENATOR WINDOM: Aye.

THE SECRETARY: I have 13 yeas, 3 [illegible]tions and 1 nay.

REPRESENTATIVE CAMPBELL: 13 yeas, 3 [illegible]tions and 1 nay and Senator Dixon's plan is also reported as a plan that's recommended by the Committee.

Now, let's turn our thoughts to -- I personally think, and Senator deGraffenried thinks that what we ought to do is to send a letter to the Governor saying that we have gotten down two plans and ask him if we would now consider calling a special session on congressional reapportionment. And I'd like to have some discussion.

SENATOR CORBETT: Before you make that motion, let's try one other thing.

REPRESENTATIVE CAMPBELL: And I think that's something that we need to do.

SENATOR CORBETT: In deference to Senator Dixon and to Buskey and others, you know, we've hashed this out and we've come down to two plans that are going to come out of this





committee. And y'all may shoot me down at this point, and I realize that everybody doesn't take the posture that it takes, but I'm going to make one motion that these two plans are the recommendation of this committee by acclamation and let's put it out of here that way. I think that's important.

REPRESENTATIVE FORD: I agree with that. We've already had a vote, you know, I think it would be to the benefit of trying to pass a plan in the Legislature, that's a good move. We should do this.

REPRESENTATIVE CAMPBELL: We've got a motion and a second.

Representative Buskey.

REPRESENTATIVE BUSKEY: Mr. Chairman, I'm against that motion, and I'll tell you why.

REPRESENTATIVE CAMPBELL: Well, so much for that. Do you want to withdraw it now, Senator Corbett?

SENATOR CORBETT: No. I'd like to hear why.

REPRESENTATIVE BUSKEY: Any plan that's passed by the Reapportionment Committee or passed by this Legislature will go to Justice and I don't





want to be in a position of having voting for a plan that I am opposed to. But I would rather, for the record, reflect that I'm against it. But I have no problem, you know, with the Committee passing it out, but I do want the record to reflect that I'm against it. I would like my vote to stand.

SENATOR DIXON: Had we not divided the question, I would have voted aye on the original motion. I feel like and I know Mr. Curry does too, because we discussed this repeatedly, I feel like for the record it was important for us to be opposed to a plan we might have to testify against later.

In the spirit of what Mr. Corbett is proposing, I would not be adversed, and I don't think Mr. Buskey would either knowing him as I do, if we just had a nonrecorded voice vote by acclamation majority we're sending these out as a package. I could certainly support that. Otherwise, I couldn't go back on --

SENATOR CORBETT: Why don't I modify my motion, Mr. Chairman, make it a voice vote only for the purposes of, I guess, committee togetherness at this point.





In respect to both of your positions that you may feel that at some point you may need to go to court, I then modify my motion that we have a voice vote of committee acclamation on these two plans.

REPRESENTATIVE CAMPBELL: Senator Little.

SENATOR LITTLE: Mr. Chairman, I, in all due respect to what apparently we're trying to do, I know of no committee in the Alabama Legislature that operates with such nonsense. We've never gone down to the extreme of trying to decide how we're going to bring a bill out with a total consensus and I'm totally opposed to it.

REPRESENTATIVE HALL: Both bills are out.

SENATOR LITTLE: I know that, but not by unanimous.

SENATOR DEGRAFFENRIED: You know, all this -- with all due respect, Senator Corbett, it sounds nice, but when the record is sitting over there reflecting Representative Buskey and others are opposed to it, a voice vote ain't going to show any kind of unanimity.

REPRESENTATIVE CAMPBELL: Do you

Attorney Work Product

gentlemen want to withdraw the mo[illegible] let's get on with other matters. [illegible]

Representative Box.

REPRESENTATIVE BOX: [illegible] want to move that the co-chairs, [illegible] delegation, I would suggest the [illegible] that met with the Governor -- I [illegible] Chair inform the Governor and t[illegible] officers of the two Houses of the decision made by the Reapportionment Committee to encourage the Governor to call a special session for the purpose of passing an act.

SENATOR WINDOM: Second.

REPRESENTATIVE CAMPBELL: It's moved by Representative Box and seconded by Senator Windom that the Co-chairman inform the Governor's office and the presiding officer of the two Houses in writing of the Committee's decision that we urge the Governor to call a special session to address congressional reapportionment.

REPRESENTATIVE FORD: You know, I'm a little bit concerned about this last vote and here's why. I voted out of the spirit of cooperation of this committee to report two plans out.





gentlemen want to withdraw the motion now and let's get on with other matters.

Representative Box.

REPRESENTATIVE BOX: Mr. Chairman, I want to move that the co-chairs, along with a delegation, I would suggest the same as the one that met with the Governor -- I move that the Chair inform the Governor and the presiding officers of the two Houses of the decision made by the Reapportionment Committee to encourage the Governor to call a special session for the purpose of passing an act.

SENATOR WINDOM: Second.

REPRESENTATIVE CAMPBELL: It's moved by Representative Box and seconded by Senator Windom that the Co-chairman inform the Governor's office and the presiding officer of the two Houses in writing of the Committee's decision that we urge the Governor to call a special session to address congressional reapportionment.

REPRESENTATIVE FORD: You know, I'm a little bit concerned about this last vote and here's why. I voted out of the spirit of cooperation of this committee to report two plans out.





Now, Larry made a statement in case he has to go to court to go against one of these plans. Well, you know, this committee voted, just a technicality, this committee voted more for the Republican plan than they did the Democratic plan.

So I think Danny made a real good move to kind of clear everybody, you know, make it, you know, sound even. But if we're going to get down to technicalities of going to court --

REPRESENTATIVE HALL: I don't think that will make no difference, Joe.

REPRESENTATIVE FORD: I think it may make a difference and I don't want to be the one to hang out, you know. I'm not sure we shouldn't have a re-vote on these things.

REPRESENTATIVE CAMPBELL: We've got another motion before us and then we'll go back to addressing that just as soon as we get through with that.

Is there any discussion on the method by which we inform the Governor and the presiding officers of both Houses?

All in favor of Representative Box's motion say aye. Opposed no. And that motion is adopted by acclamation.





Now, does anybody want to readdress the matter that Representative Ford brought up?

Representative Hall.

REPRESENTATIVE HALL: We've done got our plans out, I just move we adjourn.

REPRESENTATIVE BOX: I second.

REPRESENTATIVE CAMPBELL: All in favor of adjournment say aye. Opposed no.

We're adjourned.

END OF HEARING

C E R T I F I C A T E

STATE OF ALABAMA )
JEFFERSON COUNTY )

I, ROBERT KEITH KENNEDY, Notary Public for the State of Alabama at Large, hereby certify that I am the Court Reporter who made machine shorthand notes of the foregoing proceedings at the time and place stated in the Caption thereof; that I later reduced my shorthand notes into typewriting; that the foregoing pages numbered four through seventy, both inclusive, contain a full, true, and correct transcript of proceedings had on said occasion.

I further certify that I am in no way related to nor employed by any of the parties, the witness or counsel, and that I have no interest in the outcome of this matter.

Given under my hand and seal this the 11th day of November, 1991.

Robert Keith Kennedy
Notary Public

My Commission Expires
September 5, 1994