
FILED
2021 Dec-27 AM 11:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# OFFICE OF THE ATTORNEY GENERAL




JIMMY EVANS
ATTORNEY GENERAL
STATE OF ALABAMA

ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, ALABAMA 36130
AREA (205) 242-7300

March 10, 1992

Chief, Voting Section
Civil Rights Division
United States Department of Justice
HOLC Bldg., Room 617
320 First Street, NW
Washington, D.C. 20001

Re: Section 5 Submission by State of Alabama
Congressional Redistricting Plan

Dear Sir:

The State of Alabama submits for review, pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. §1973c, Act No. 92-63, its congressional redistricting plan based on the 1990 decennial census. For reasons discussed below, the Attorney General is requested to give **EXPEDITED CONSIDERATION** to this submission.

I

## Introduction and Overview

Alabama currently has seven (7) congressional districts, a number unaffected by the 1990 census. As expected, a review of the 1990 populations of the existing districts, which are set out in Exhibit 1, confirmed that adjustments to the existing districts would be necessary for one person, one vote reasons; and, moreover, substantial, broad-based sentiment had developed during the 1980s for the creation -- for the first time in modern history -- of a predominantly black congressional district. The plan submitted today addresses both goals.

Alabama's redistricting effort -- later to be sidetracked by a dispute between the Legislature and the Governor -- began in earnest in 1987 with the creation and organization

of a Task Force on Reapportionment.[1] This six-member legislative group, including Senator Fred Horn, who is black, did the basic preparation for the redistricting process by creating and training a staff, securing necessary equipment and expertise, conducting preliminary public hearings and educational workshops relating to the forthcoming effort, and preparing (after opportunity for public comment) proposed redistricting guidelines.[2] Its work complete, the Task Force delivered its final report to the legislative leadership on November 6, 1990 (Exhibit 6).

Responsibility for the redistricting effort has since that time been vested in the Permanent Legislative Committee on Reapportionment. Created by Act No. 90-388 (Exhibit 7), this bi-racial committee met for the first time in March of 1991.[3] Following up on the work of the Task Force, the Permanent Committee reviewed and adopted guidelines for congressional redistricting and legislative reapportionment, secured additional needed equipment, established rules for legislative and public access to the Reapportionment Office's facilities and expertise, and, among other activities, established a schedule for public hearings across the state on congressional redistricting issues.[4]

As explained in the affidavit of Reapportionment Office Director Marilyn Akers Terry (Exhibit 11), the Permanent Committee intended from the outset to have the Legislature deal with congressional redistricting in a special session in the fall of 1991.[5]

---

[1] The Task Force was created by Act No. 87-356, Exhibit 2.

[2] A summary of the activities of the Task Force is found in Exhibit 3. Copies of the public notice inviting comments on the proposed guidelines, comments received, and notes of changes made as a result of the comments are labeled collectively as Exhibit 4. The final guidelines are included as Exhibit 5.

[3] Membership of the Permanent Committee, by race, is shown on Exhibit 8. The Committee was expanded in size by Act No. 91-347 (Exhibit 9), and two Republican legislators thereafter became members.

[4] A summary of the Permanent Committee's activities through October of 1991, including educational activities conducted by Task Force members, Committee members, and staff, is found in Exhibit 10.

[5] The 1991 regular legislative session was required by law to conclude no later than July 30, 1991, and in fact ended on that date. The Committee early on concluded that all the work necessary to adopt a congressional plan could not be completed in time for the Legislature to act on a plan in the 1991 regular session, especially since the Committee wanted to await the Secretary of Commerce's July 15, 1991 decision on the census adjustment (see Exhibit 12). The 1992 regular session would not commence until February 4, 1992.

Congressional redistricting would be tackled before legislative reapportionment because Alabama's next legislative elections will not be held until 1994.

With a fall 1991 legislative session in mind, the Permanent Committee established a public hearing and committee work schedule stretching through the summer. During May and June, over 2000 public hearing notices were mailed to local government officials, legislators, major political and racial minority organizations, all newspapers, radio and television stations in the State, and contacts on the Reapportionment Office's mailing list.[6] Public hearings were conducted in 16 separate locations across the State during May and June. [7]

After the Secretary of Commerce announced on July 15, 1991 that there would be no adjustment to the previously released 1990 census numbers, the Permanent Committee on July 30, 1991 decided to hold a series of public work sessions to consider proposed congressional redistricting plans.[8] While setting a deadline of September 4, 1991 for the submission by legislators and members of the public of proposed district plans, the Permanent Committee also established dates for its own work sessions. Public notice of the submission deadline and the work sessions was sent to the groups and individuals on the Reapportionment Office's main mailing list, which included all principal minority contacts. (Exhibit 15).

In a series of public meetings conducted during September and early October, the Permanent Committee reviewed and heard presentations on approximately 25 congressional redistricting plans.[9] Plans were submitted by a broad range of citizens with diverse interests, including persons affiliated with the State Republican Party, the State Democratic Party, the Alabama Democratic Conference ( "ADC", Alabama's oldest and largest predominantly black political organization), and the Alabama New South Coalition ("ANSC", another

---

[6] An example notice is included as Exhibit 13. A list of those receiving notice is also being furnished. See note 7, infra.

[7] A summary of the comments from the public hearings is included as Exhibit 14. Transcripts of the proceedings in each of these public hearings are also being provided as part of this submission. They are located in a separate box clearly marked as to content. Also included in this box is a list of the persons and organizations to which notice of the public hearings was sent.

[8] The preliminary census numbers were received by the Reapportionment Office on February 7, 1991, and were over the ensuing weeks loaded on the computer system and used to create numerous preliminary reports.

[9] All these plans are included in a notebook which is being provided as part of this submission. This notebook was given to all Committee members for their use in the work sessions.

influential predominantly black political organization). Any individual supporting a plan was given an opportunity to present the plan before the Committee, argue its merits, and field questions from Committee members and other attendees.

It was during the September sessions that the Committee became aware that Governor Guy Hunt was reconsidering his commitment to call the Legislature into a fall special session to deal with congressional redistricting. Committee leaders engaged in hopeful negotiations with the Governor, pointing out that they had relied on the Governor's willingness to call a fall session as the cornerstone for their scheduling of redistricting activities. Despite the Governor's refusal to take a final position on a special session, the Committee pushed forward with its work.

On about September 25, 1991, legislative leaders learned that two days earlier a suit had been filed in the United States District Court for the Southern District of Alabama requesting that a three-judge court be convened to order into effect a congressional redistricting plan for the 1992 elections. The complaint, filed by a Mobile Republican Party official, alleged that the Legislature had failed to act in a timely manner and that court intervention was necessary.[10]

The Committee authorized counsel to attempt to intervene in the federal lawsuit in order that its position could be made known to the court, but the Committee also pushed forward with its work. Virtually all the plans brought to the Committee included a solid majority black district, in recognition of the substantial sentiment which had developed for that approach. At its meeting on October 1, 1991, the Committee made it clear that it would not give serious consideration to any proposal that did not include a solid black district. On October 1 and October 2, the Committee narrowed the proposed plans to five, and finally to two, which would be recommended to the full Legislature for its consideration once the Legislature was in session. These two plans, commonly known as the "Reed Plan" (for its chief proponent Joe L. Reed, chair of the ADC) and the "Dixon Plan" (for its sponsor, Republican Senator Larry Dixon of Montgomery), both featured a predominantly black district, but differed dramatically in their treatment of partisan political issues such as preservation of incumbents.[11]

The Governor refused to call a special session and a trial of the Wesch case in federal court was held on January 3-4, 1992. Having been denied intervention, the Permanent Committee appeared as amicus curiae urging the three-judge court to defer to

---

10 The complaint in Wesch v. Hunt, Civil Action No. 91-0787, is included as part of Exhibit 16, along with other key pleadings and papers, including the January 27, 1992 interim decision of the three-judge court.

11 Descriptions and maps of these two proposals are included with this submission. See Exhibits 17 and 18.

the Alabama Legislature. With the exception of Governor Hunt, the other state defendants, along with a group of black intervenors, urged the court to adopt an approach that would allow the Legislature an opportunity to fashion a plan. Attorneys for plaintiff Wesch, on the other hand, urged the court to order into effect the so-called "Sam Pierce Zero Plan", one of the plans considered by the Permanent Committee which was almost identical to the "Dixon Plan."[12]

On January 27, 1992, the three-judge court ordered that unless the Legislature were to adopt and have precleared its own plan in time for the 1992 elections, those elections would be held under a court-ordered plan that is a slightly modified version of the plaintiffs' proposal.[13] See Exhibit 20. The court's interim plan includes a majority black district with a black total population of 67.53% and a black VAP of 63.51%.

The Alabama Legislature convened in its 1992 regular session on February 4, 1992. As explained in more detail below, interested legislators almost immediately began an effort to forge a legislative consensus on a plan which could be used in the 1992 elections instead of the court-ordered interim plan. As later explained, consensus developed in favor of a plan which had never formally been submitted to the Committee, but which largely satisfied the congressional delegation and, more importantly, created a solid majority black district and equalized population among the districts. It should be noted that, unlike the court-ordered plan, the legislative plan places white Democrat incumbents Erdreich and Harris together in district 6; and has no incumbent in proposed majority black district 7.

On February 27, 1992, the Alabama Legislature approved Senate Bill 73, the bill which is the subject of this submission. The bill was vetoed by the Governor on March 5, 1992, but the Legislature overrode the veto that same day and the bill therefore became law. The redistricting bill was thereafter entitled Act No. 92-63.

It was recognized by the proponents of the legislative plan that it would be desirable also to extend the qualifying deadline for the party primaries in order to allow more time for candidates to qualify based on the new legislatively approved districts (legislation extending the qualifying deadline will be the subject of a separate submission). Alabama's 1992 party primaries are scheduled for June 2, 1992. Many pre-election deadlines, described in a publication of the Secretary of State (Exhibit 21), must be met by state and local election officials as well as candidates. It is therefore essential that the Attorney General give **EXPEDITED CONSIDERATION** to this submission.

---

[12] The "Sam Pierce Zero Plan" is described in Exhibit 19.

[13] The principal change was to place white Democrat incumbent Claude Harris in the new predominantly black district instead of in a district with white Democrat incumbent Ben Erdreich, as the "Sam Pierce Zero Plan" proposed by the plaintiff did. See Exhibit 20.

## II

## The Proposed Congressional Plan

The proposed congressional redistricting plan is highlighted by a zero population deviation and the inclusion of a strong predominantly black district. As shown in more detail in Exhibit 22, the proposed districts would have the following populations, by race:

| District | Total Pop. | Black Pop. (%) | % Black VAP |
|---|---|---|---|
| 1 | 577,226 | 28.41 | 25.39 |
| 2 | 577,228 | 23.75 | 20.97 |
| 3 | 577,227 | 18.89 | 17.11 |
| 4 | 577,224 | 5.91 | 5.31 |
| 5 | 577,227 | 14.48 | 13.31 |
| 6 | 577,228 | 18.73 | 16.51 |
| 7 | 577,227 | 66.66 | 62.48 |

Consistent with the redistricting guidelines, the proposed plan violates few county lines[14] and builds to a large extent on county precincts established pursuant to Act No. 89-952.[15] To the extent consistent with other overriding considerations (including particularly the need to create a predominantly black district), the proposed plan also attempts to preserve the cores of existing congressional districts. A discussion of the events leading up to the Legislature's passage of the plan follows.

The legislature never had an opportunity, of course, to consider in a special session the two plans recommended by the Committee, because the Governor failed to call the session. Prior to the convening of the regular session on February 4, 1992, the United States District Court for the Southern District of Alabama issued a preliminary order, dated January 27, 1992, in Wesch v. Hunt. In its order, the court stated that it intended to order an interim congressional redistricting plan in the event that the Alabama Legislature failed

---

[14] Only seven counties are split by the proposed plan. The only county which the proposed plan splits which would not otherwise have to be split to attain zero population deviation in the plan is Pickens County, which is split between districts 4 and 6. At the request of long-time Representative Tom Bevill, who represents all of Pickens in the existing plan but will lose most of Pickens in the proposed plan, a small part of Pickens on the Tennessee-Tombigbee Waterway is kept in Mr. Bevill's district because the Tom Bevill Welcome Center is located on the Waterway in that part of Pickens County.

[15] See Exhibit 23. Act No. 89-952, which was precleared by the Attorney General on July 30, 1989 (Exhibit 24), requires counties to re-draw their precincts to conform to visible features, thus enhancing the possibility of using precincts as building blocks in district plans.

to adopt a redistricting plan and have it precleared in time for the election cycle "under the timetables presently provided for by Alabama law."[16]

The court's plan, which was an adaptation of the Sam Pierce Zero Plan, protected Alabama's two incumbent Republican Congressmen and created a district in Jefferson-Shelby-Bibb-Tuscaloosa that appeared favorable to a Republican candidate. Therefore, Republican legislators were generally satisfied with the court-ordered plan. However, minority groups and their representatives had expressed considerable dissatisfaction with the Sam Pierce Plan, from which the court plan was derived, because they had had no input into its formulation.[17]

As the regular session began, state legislators interested in forging a consensus spent many hours trying to get the congressional delegation to agree on a plan. It was understood, of course, that one incumbent was likely to be eliminated because of the virtual certainty that a black candidate would be elected in the new predominantly black district which everyone agreed should be created.

A group of legislators believed strongly that the Legislature should make every effort to enact its own plan, rather than deferring to any non-legislative plan. Some Democrat legislators were anxious, moreover, to protect against a Republican district in the Jefferson County area. There was thus renewed an effort to pass a legislative plan. Obvious to be considered were the two plans which the Reapportionment Committee had recommended, the Dixon Plan and the Reed Plan.

The Dixon Plan was not acceptable to a number of Democrat legislators, because in addition to protecting the two Republican incumbents, it would create a Jefferson-Shelby-Bibb-Tuscaloosa district that would be heavily white, probably Republican, and would pit Democratic incumbents Harris and Erdreich against one another. In addition, similar to the court-ordered plan, the Dixon Plan was derived from an earlier version of the Sam Pierce Zero Plan, known as the Pierce Plan, and thus minorities had not been involved in its formulation.

---

[16] January 27, 1992 order in Wesch v. Hunt, CV 91-00787 (Exhibit 16).

[17] Sam Pierce, the designer of the Sam Pierce Zero Plan, did not consult with or receive input from any black persons in drafting his plan. Exhibit 25, Pierce deposition at 107, 108. At the Wesch v. Hunt trial, several prominent black political leaders testified as to their concerns regarding the Sam Pierce Zero Plan. Exhibit 26, testimony of State Senator Michael Figures, Past President of Alabama New South Coalition (a predominantly black political organization) in the Wesch trial transcript at 125; Exhibit 27, testimony of Carol P. Zippert, President of the New South Coalition in Wesch trial transcript at 216.

The Reed Plan, in contrast, was backed by Dr. Joe Reed, a black, and leader of the Alabama Democratic Conference, Alabama's largest predominantly black political organization. Like the Dixon Plan and the court-ordered plan, the Reed Plan created a majority black congressional district. However, the Reed Plan substantially altered the configuration of the districts of Republican Congressmen Dickinson and Callahan, and thus was objectionable to them, to Republican state legislators, and even to some Democrat legislators who disliked the massive realignment of counties called for by the Reed Plan.

Legislators interested in passing a legislative plan soon recognized that neither the Reed Plan nor the Dixon Plan could pass without significant modification, and that it would accordingly be necessary to develop a plan which could be broadly supported. Legislators interested in forging a consensus spent many hours trying to get the congressional delegation to agree on a plan they could all live with, even if some aspects of it were objectionable. It was understood, of course, that one incumbent was likely to be eliminated because of the virtual certainty that a black candidate would be elected in the new predominantly black district which everyone agreed should be created.

The most likely incumbents to be eliminated were Representative Harris from Tuscaloosa County (existing district 7) and Representative Erdreich of Jefferson County (existing district 6). To the extent possible, the Democratic legislators working toward a consensus plan wanted to give both Harris and Erdreich an opportunity to compete in 1992 in a district in which a Democrat could possibly win. The court-ordered plan, of course, put Erdreich in the Jefferson-Shelby-Bibb-Tuscaloosa district which might well go Republican, and put Harris in the predominantly black district.

Conscious of the need to get as much legislative support as possible, the proponents also sought to fashion a plan that was acceptable to the Republican incumbents, Dickinson and Callahan. Congressman Dickinson wanted as much of the existing second district to remain intact as possible, and Congressman Callahan wanted essentially the same thing for the first district. Congressman Browder was willing to make some concessions in the third district but was not agreeable to wholesale changes. Congressman Bevill and Cramer in north Alabama were largely insulated from drastic changes, but were watching carefully -- as evidenced by Mr. Bevill's late request that the part of Pickens County in which the Tom Bevill Welcome Center is located be included in his district. Central to the entire effort was the acknowledged need to fashion the predominantly white districts around a fair, solid majority black district.

Eventually a consensus was reached, with all the incumbent congressmen acknowledging at least moderate satisfaction with the outcome. The consensus plan drew from both the Reed Plan -- particularly with respect to the configuration of the predominantly black district -- and the Dixon Plan -- with regard particularly to protecting the districts of the two Republican Congressmen. Callahan and Dickinson would remain alone in their respective districts, with the cores of those districts intact. Browder's district would change somewhat (principally to take in Shelby County while giving up most of his

southern tier of counties), and both Bevill and Cramer would be essentially unaffected. Erdreich and Harris would be placed together in a district including about 350,000 people from Jefferson County, Erdreich's home, 150,000 from Tuscaloosa, Harris' home, and the remainder from the west Alabama counties of Choctaw, Hale, Marengo, Pickens, and Sumter. This district was designed to achieve a rough balance, and thus fairness, between Erdreich's home territory and Harris' home territory and was thought to be a district in which a Democrat could have a chance of winning the general election. All this was to be accomplished while simultaneously creating a solid majority-black district with a 66.66% (62.48% VAP) black population.

The only other plan that was actually considered in the regular session was a plan introduced in the Senate as Senate Bill 73 by Doug Ghee of Calhoun County (Exhibit 28). This plan was acceptable to the Democrat incumbents in Congress, but was viewed by legislative leaders principally as a vehicle to advance the legislative process. On the Senate floor, the eventual legislative plan -- in a slightly earlier version -- was substituted for the Ghee Plan, was passed, and sent to the House. Slight modifications were made at the request of Congressman Bevill in Committee (the Welcome Center change) and on the floor at the request of Congressman Dickinson (to swap one white area for another). This revised plan passed the House, passed the Senate and eventually became Act No. 92-63 -- the subject of this submission.

The Permanent Committee examined the possibility of creating a plan with two predominantly black districts. However, knowledgeable black political leaders -- including Joe Reed, chair of the ADC; Jerome Gray, ADC's Field Director; Albert Turner, a west Alabama political veteran affiliated with the ANSC; and Lillian Jackson, President of the Alabama NAACP -- not only advocated the adoption of a plan with a single predominantly black district, but also testified before the Committee that it would be adverse to the interests of black voters in Alabama to attempt to create two predominantly black districts.[18] Excerpts from the testimony of these individuals are very illuminating. For example, Mr. Reed testified as follows:

> So -- but I have not seen a plan yet and I do not take the position under no circumstances can a Black win a district that's less than 65% black. I don't take that position.
>
> However, I do take the position -- I have not seen a [two black district] plan presented around here that I'm willing for a black to run in for a congressional seat because there are several

[18] The entire testimony of Mr. Reed, Mr. Gray, and Ms. Jackson are found in Exhibit 29. The quoted portions are found on pp. 14-16 (Reed); 18-20 (Gray); and 21-24 (Jackson). Mr. Turner's testimony is in Exhibit 30, with the quoted portion found at pages 24-25.