FILED

2021 Dec-27  AM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

No. A-_____


IN THE

SUPREME COURT OF THE UNITED STATES

October Term, 1992

————————————


BILLY JOE CAMP,

Appellant,

v.

PAUL CHARLES WESCH,

Appellee.

————————————


Appeal From The United States District Court
For The Southern District of Alabama


————————————


APPLICATION OF APPELLANT BILLY JOE
CAMP, SECRETARY OF STATE OF ALABAMA,
FOR STAY OF JUDGMENT PENDING APPEAL


To the Honorable Anthony Kennedy, Associate Justice of the
United States and Circuit Justice for the Eleventh Circuit:

Pursuant to Rule 23 of the Supreme Court Rules, Appellant
Billy Joe Camp, Secretary of State of Alabama ("Secretary Camp"),
respectfully applies for a stay of the final judgment entered on

March 9, 1992 by the three-judge court in <u>Wesch v. Hunt</u>, Civil

Action No. 91-0787 (S.D. Ala.).  That judgment (Exhibit A hereto)

ordered into effect a reapportionment plan re-drawing Alabama's

seven congressional districts for the 1992 primary and general

elections.  The judgment enjoins Secretary Camp and other State

officials with responsibility for administering Alabama's

elections from "failing to conduct congressional elections in 1992

in accordance with a redistricting plan adopted by the court,"

unless the Alabama Legislature "duly enacts a redistricting plan

for the conduct of congressional elections in 1992 and has the

same precleared [under Section 5 of the Voting Rights Act of 1965,

as amended, 42 U.S.C. § 1973c] no later than 12:00 noon, Central

Time, March 27, 1992 . . . ."  Exhibit A at 2.[1]

The three-judge court entered this judgment even though

the Alabama State Legislature had already enacted its own

congressional redistricting plan and asked the court to adopt it

on March 6, 1992.  (The Legislature submitted this plan to the

Department of Justice for preclearance on March 10, 1992.)[2]  In

---

[1]      Under Section 5 of the Voting Rights Act, before Alabama
may implement any new redistricting plan or other change in laws
affecting voting, the State must obtain "preclearance," _i.e._, a
determination from either a three-judge federal court in the
District of Columbia or the United States Attorney General that
the plan does not have the purpose and will not have the effect of
discriminating against minorities.  42 U.S.C. § 1973c.

[2]      Pursuant to 28 C.F.R. § 51.34, the State has asked for
expedited consideration of its preclearance submission.  Section
5, however, expressly gives the Attorney General 60 days to decide
whether to preclear the plan, 42 U.S.C. § 1973c, and thus there
can be no assurance that the Attorney General will be able to
(Footnote continued)

- 2 -

prohibiting the use of this plan unless the Legislature obtains preclearance by March 27, the three-judge court disregarded this Court's precedents.  These decisions establish

> (a) that redistricting is primarily a task for State Legislatures, and not the federal courts;
>
> (b) that even when a federal court is called upon to draw a redistricting plan or choose from among plans proposed by the parties, that court must adhere as closely as possible to the State Legislature's plan, except where doing so would violate federal constitutional or statutory requirements; and
>
> (c) that, if it is necessary to modify a State Legislature's plan in order to satisfy such requirements, the federal court must do so in a way that makes the fewest modifications to the Legislature's plan.

Because the three-judge court gave short shrift to these principles, there is a substantial likelihood that this Court will note probable jurisdiction and reverse the final judgment of the three-judge court.[3]  Moreover, unless stayed, the final judgment will result in irreparable harm to both the State and its citizens.  Accordingly, Secretary Camp respectfully submits that this application should be granted and that the final judgment entered by the three-judge court on March 9, 1992 should

---

(Footnote continued)
respond before the three-judge court's March 27 deadline.  See also 28 C.F.R. § 51.34(b) ("the Attorney General cannot guarantee that such consideration can be given").

[3]      Secretary Camp will be filing a Jurisdictional Statement within a few days, together with a motion for expedited consideration.

be stayed pending a disposition by this Court of the merits of
this appeal.

## STATEMENT OF FACTS

This case arises from the efforts of the Alabama State
Legislature to enact new districts for the upcoming congressional
elections.  (The primary is scheduled for June 2, 1992 and the
general election for November 3, 1992.)  Following the receipt of
the 1990 census data on February 8, 1991, which showed that
Alabama's existing congressional districts (i.e., those drawn in
1981 and now codified in Ala. Code § 17-20-1) were no longer equal
in population, the State set about drawing new congressional
district lines.  Wesch v. Hunt, Civil Action No. 91-0787,
Memorandum Opinion at 3-5, (S.D. Ala. March 9, 1992) (Exhibit B
hereto).

On April 2, 1991, the Legislature's Permanent Joint
Legislative Committee on Reapportionment ("Reapportionment
Committee") adopted a set of guidelines for redistricting.
Exhibit B at 6.[4]  These guidelines included compliance with the
"one person, one vote" rule and the Voting Rights Act of 1965, as
amended, 42 U.S.C. §§ 1971 et seq.  Exhibit B at 6.  The
guidelines also directed that congressional districts be composed
of "contiguous and reasonably compact geography"; that, where
possible, districts "should attempt to preserve communities of

---

[4]    The Reapportionment Committee was made up of both blacks
and whites.  Exhibit B at 9.

- 4 -

interest, including without limitation municipalities and concentrations of blacks and other ethnic minorities"; that counties "should be used as district building blocks where possible"; and that cores of existing districts be preserved consistent with the other criteria. Id. The three-judge court expressly found that the guidelines "set forth a fair set of criteria for congressional redistricting." Id.

Having developed these guidelines, the Reapportionment Committee and its staff proceeded to hold a series of hearings on congressional redistricting issues. Id. at 9. These hearings were open to the public, and the three-judge court expressly found that the Reapportionment Committee received public input from both blacks and whites. Id.

Despite its prompt start on the task of redistricting, the Legislature could not, as a practical matter, begin drawing districts until the United States Secretary of Commerce decided whether to adjust the census figure to compensate for possible "undercounting" of certain segments of the population. It was not until July 15, 1991, that the Secretary of Commerce announced that the 1990 census figures would not be adjusted. Exhibit B at 5. At that point there were only two weeks left before the scheduled adjournment date of the Legislature's 1991 regular session. This two-week period was not sufficient for plans to be drawn, checked for statistical accuracy, and presented to the Reapportionment Committee; for the Committee to complete public hearings, consider

- 5 -

such plans, and report them to the floor; and for the Legislature
as a whole to debate and vote upon them.  Consequently, the
Legislature adjourned its 1991 regular session on July 29, 1991,
without having enacted a congressional redistricting plan.  See
Exhibit B at 6.

It was the understanding of the Legislature, however, that
the Governor had agreed to call a special session in the fall of
1991 in order for the Legislature to take up the matter of
congressional redistricting.  Indeed, a State court later found,
based on the uncontradicted testimony of James Clark, the Speaker
of the Alabama House of Representatives, that Governor Hunt had
"promised" Clark and other members of the Legislature's leadership
that he "would call a special session of the Legislature in
October, 1991, to deal with the question of Congressional
Redistricting."  Morris v. Hunt, Case No. CV-91-145, Order at 2
(Barbour County Cir. Ct. Dec. 19, 1991) (Exhibit C hereto).[5]  The
court further found that Governor Hunt had subsequently "breached
his promise" and "failed to call a special session of the
Legislature."  Exhibit C at 2.  On December 19, 1991, the State
court issued an order requiring the Governor to call a special
session of the Legislature to address congressional redistricting.
Id. at 3.  The court subsequently issued a final order reaffirming
its earlier direction that the Governor call a special session.
See Exhibit E hereto.  On January 7, 1992, however, the Alabama

---

[5]      The relevant pages of Speaker Clark's testimony are
contained in Exhibit D hereto.

- 6 -

Supreme Court stayed this order, pending appeal.  See Exhibit F
hereto.  That appeal has not yet been resolved, and the result of
the Alabama Supreme Court's stay order was that no special session
was called.  Thus, the State Legislature was unable to take up
congressional redistricting until it reconvened for its next
regular session, on February 4, 1992.

Meanwhile, on September 23, 1991, Plaintiff-Appellee Paul
Charles Wesch brought the present case.  The complaint named as
defendants the Governor, the Attorney General, the Secretary of
State, and several Probate Judges, all of whom were alleged to
have responsibilities for the administration of congressional
elections in Alabama.  Complaint ¶¶ 7-17 (Exhibit G hereto).
Wesch alleged that the existing congressional districts (i.e.,
those enacted in 1981 and presently codified in Alabama Code § 17-
20-1) had become substantially unequal in population and therefore
violated the one person, one vote principle.  Exhibit G ¶¶ 19, 23-
24.  The complaint further alleged that the State Legislature had
the duty to draw new congressional districts but that it had
adjourned its regular session without doing so and that the
Governor had no intention of calling a special session for the
purpose of adopting a redistricting plan.  Id. ¶¶ 21-22.  As a
result, Wesch alleged, there was little or no likelihood that the
Legislature would adopt a valid redistricting plan in time for use
in the June 2, 1992 primary.  Id. ¶ 22.  The complaint sought a
declaration that the existing congressional districts were
unconstitutional, an injunction against their further use, and an

- 7 -

order redistricting the State into seven congressional districts of substantially equal population pursuant to a plan offered by Wesch.

The <u>Wesch</u> case was tried on January 3-4, 1992. The parties offered six plans for the three-judge court's consideration. Exhibit B at 8. By stipulation, all parties agreed that any plan adopted by the three-judge court should contain a district that was at least 65 % black. <u>Id</u>. at 5.

The Legislature convened its 1992 regular session on February 4, 1992. Legislators almost immediately began an effort to forge a legislative consensus on a congressional districting plan. By February 27, 1992, barely three weeks after coming into session, the Legislature passed a new congressional redistricting plan, known as Senate Bill 73. Senate Bill 73 was vetoed by the Governor on March 5, 1992, but the Legislature overrode the veto that same day and the bill, therefore, became law, under the designation Act No. 92-63. (A copy of Act No. 92-63 is contained in Exhibit H hereto.)

The Legislature's plan achieves virtually precise population equality among Alabama's congressional districts.[6]

---

6      . Three of the seven districts in the plan contain the ideal district population, rounded, of 577,227. Two districts contain one person more than ideal, one district contains one person less than ideal, and the remaining district contains three people less than the ideal. <u>See</u> page 2 of Exhibit B to the Motion to Adopt State of Alabama's Congressional Redistricting Plan, <u>Wesch</u> v. <u>Hunt</u>, Civil Action No. 91-0787 (S.D. Ala., filed March 6, 1992). This Motion is Exhibit H to the present application.

Significantly, the plan also creates a 66.66 % black district (District 7). (<u>See</u> page 3 of Exhibit B to Exhibit H hereto.) This district is an "open" one, <u>i.e.</u>, one with no incumbent. To make the district "open," the Legislature paired two incumbent members of Congress, Claude Harris and Ben Erdreich (both of whom are Democrats), in an adjacent district (District 6).[7]

On March 6, the day after the Legislature's plan became law, Secretary Camp filed a motion (Exhibit H) with the three-judge court asking it to adopt that plan as an interim congressional redistricting plan until such time as preclearance could be obtained from the United States Department of Justice. On March 9, 1992, however, the three-judge court denied the motion. (The court's order is Exhibit I hereto.)

That same day, the three-judge court also entered the final judgment that is the subject of this application for stay. In the final judgment, the three-judge court adopted a modified version of a plan known as the "Sam Pierce Zero Plan" as the interim plan for the 1992 congressional elections. Like the Legislature's plan, the plan chosen by the three-judge court

---

[7]     Representative Harris lives in Tuscaloosa County, Tract 123.01, Block 143, and Representative Erdreich lives in Jefferson County, Tract 47.01, Block 723. <u>See</u> Appendix E to Exhibit B. Under the Legislature's plan, both of these census tracts are located within District 6. <u>See</u> page 31, line 28, of Exhibit A to Exhibit H (indicating that all of Tuscaloosa County is within District 6); <u>id</u>. at page 16, lines 27-30 (indicating that Jefferson County, Tract 47.01, Block 723 is within District 6).

- 9 -

achieves population equality among districts and creates one
district that is over 65 % black.  Exhibit B at 10.

Notwithstanding these similarities, however, the three-
judge court's plan is quite different from the plan enacted by the
Legislature.  Indeed, the court found that the Legislature's plan
"substantially differs from any plan that was submitted to this
Court."  Exhibit B at 9-10.  Unlike the Legislature's plan, the
court's plan places an incumbent (Representative Harris, who is
white) in the predominantly black district.  The presence of a
white incumbent in this district in all likelihood will reduce the
opportunity for the black community to elect a candidate of its
choice.[8]  Moreover, during the Wesch trial, several prominent
black political leaders testified to their reservations about the
lack of minority input in the drawing of this plan.[9]

In addition, the Legislature's plan configures the
minority district in a different manner from the court's plan.  In
the Legislature's plan, Macon and Bullock Counties (two
predominantly black counties located directly to the east of
Montgomery, the state capital) are included in District 7 (the

[8]      In hearings held by the Reapportionment Committee,
minority witnesses expressed the concern that placing a white
incumbent in a predominantly black district would reduce the
opportunity of the minority community to elect a candidate from
that district.  Transcript, Reapportionment Committee hearing, at
20-21 (October 2, 1991) (Exhibit J hereto).

[9]      See Trial Transcript at 125 (testimony of State Senator
Michael Figures); id. at 216 (testimony of Carol Zippert) (Exhibit
K hereto).

predominantly minority district), while Sumter, Choctaw and
Marengo Counties in western Alabama are placed within the adjacent
District 6.  By contrast, the court's plan includes the latter
three counties in the predominantly minority district, while
placing Macon County in District 3 and Bullock County in District
2.  The two plans also differ in the way they configure Alabama's
other congressional districts.  Compare Exhibit A to Exhibit H
hereto (listing the various counties and census tracts contained
within each district in the Legislature's plan) with Appendix A to
Exhibit A (listing the same information for each district in the
court's plan).

        The final judgment enjoins Secretary Camp and the other
defendants from failing to conduct congressional elections in 1992
in accordance with the plan adopted by the court, unless the
Legislature enacts and obtains preclearance of a congressional
redistricting plan by 12:00 Noon, Central Time, on March 27, 1992.
Exhibit A at 2.  The final judgment further enjoins the defendants
from failing to conduct subsequent congressional elections in
accordance with the plan adopted by the court, provided that, if
the Legislature enacts and obtains preclearance of a congressional
redistricting plan in time for these congressional elections to
proceed without delay, the Legislature's plan will be used.  Id.

        In its Memorandum Opinion (Exhibit B), the three-judge
court sought to explain the reasoning underlying its final
judgment.  The court acknowledged repeatedly that "[c]ongressional

- 11 -

districting is primarily and foremost a state legislative responsibility." Exhibit B at 14; see also id. at 22 ("this court recognizes that congressional redistricting is properly a matter to be determined by the legislature"). The court also conceded that "[i]f it is possible under constitutional restrictions, a court should consider expressed state policies and preferences." Id. at 16. Finally, the court admitted that the Legislature's plan "substantially differs" (id. at 9) from any of the other plans submitted to the court and that the plan adopted by the court "does not reflect the policy choices of the elected representatives of the people." Id. at 20. Nonetheless, the court apparently felt compelled to disregard the Legislature's plan because it has not yet been precleared by the United States Department of Justice pursuant to Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. (As noted above, the Legislature's plan has been submitted to the Department for preclearance on an expedited basis.)

As we now show, the fact that the Legislature's plan has not been precleared did not justify the court's decision to impose a wholly different plan for use in the 1992 elections. To the contrary, the court should have accepted the Legislature's plan as the interim plan, even though it has not been precleared, because of the exigent circumstances created by the impending congressional primary. Alternatively, the court could have modified the Legislature's plan so as to eliminate any perceived constitutional or statutory flaws. By failing to follow either of

these sensible courses, the three-judge court committed reversible error.  Unless stayed, the court's final judgment will cause irreparable harm to the State of Alabama and its citizens. Accordingly, Secretary Camp respectfully submits that this application for stay should be granted.

<u>ARGUMENT</u>

The rules governing a determination on this application for stay are set forth in Rule 23 of the Supreme Court Rules and in Justice Brennan's opinion as Circuit Justice in <u>Karcher</u> v. <u>Daggett</u>, 455 U.S. 1303 (1982).  Rule 23 requires as a prerequisite to any application for stay that the applicant first seek a stay in the court below.  Once an applicant has done so, he must then demonstrate to this Court that a stay is warranted using the four-part analysis outlined in <u>Karcher</u>.

**A.   Secretary Camp Has Requested Relief in the Court Below**

Rule 23.3 provides in relevant part as follows:

> An application for a stay must set forth with particularity why the relief sought is not available from any other court or judge thereof. Except in the most extraordinary circumstances, an application for a stay will not be entertained unless the relief requested has first been sought in the appropriate court or courts below or from a judge or judges thereof.

Because the present case is a direct appeal from a three-judge panel pursuant to 28 U.S.C. § 1253, that panel is the only court

below to which a motion for stay could be directed.[10]  Secretary
Camp filed such a motion on March 16, 1992 (Exhibit L hereto), and
the court denied it the following day (Exhibit M hereto).

> **B.    Secretary Camp's Application For Stay Meets
> The Four-Part Test of Karcher v. Daggett**

In Karcher, 455 U.S. 1303, Justice Brennan restated the
four controlling principles that guide a decision regarding an
application for stay:

> First, it must be established that there is a
> 'reasonable probability' that four justices will
> consider the issue sufficiently meritorious . . .
> to note probable jurisdiction.  Second, the
> applicant must persuade [the Circuit Justice] that
> there is a fair prospect that the majority of the
> Court will conclude that the decision below was
> erroneous. . . .  Third, there must be a
> demonstration that irreparable harm is likely to
> result from the denial of the stay.  And fourth, in
> a close case it may be appropriate to 'balance the
> equities' -- to explore the relative harms to
> applicant and respondent, as well as the interests
> of the public at large.

---

10        28 U.S.C. § 1253 provides in relevant part as follows:

> [A]ny party may appeal to the Supreme Court
> from an order granting or denying, after
> notice and hearing, an interlocutory or
> permanent injunction in any civil action,
> suit or proceeding required by any Act of
> Congress to be heard and determined by a
> district court of three judges.

The three-judge panel in this case was appointed pursuant to 28
U.S.C. § 2284(a), because plaintiff in this case challenged "the
constitutionality of the apportionment of congressional
districts."  Id.  The panel has enjoined the Secretary of State of
Alabama from holding elections based on any plan other than the
congressional plan adopted by the three-judge court.  Thus, this
application is properly before this Court.

- 14 -

Id. at 1305-06 (quoting Rostker v. Goldberg, 448 U.S. 1306, 1308 (1980)). Irreparable harm is the single most important factor in this analysis. As Justice Blackmun noted in Ruckleshaus v. Monsanto Co., 463 U.S. 1315, 1317 (1983): "An applicant's likelihood of success on the merits need not be considered . . . if the applicant fails to show irreparable injury from the denial of the stay." Due to the significance of the "irreparable harm" factor, it will be discussed first.

> 1. Both the State and its Citizens Will Suffer
> Irreparable Harm if the 1992 Elections Are
> Held under the Three-Judge Court's Plan

Chief Justice Rehnquist has observed that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." New Motor Vehicle Board v. Orrin W. Fox Co., 434 U.S. 1345, 1351-52 (1977). The irreparable harm that Alabama will suffer in this case, unless a stay is granted, is all the greater because of the fundamental nature of the rights at stake. Article I, Section 4, of the United States Constitution provides that "the Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof. . . ."

Consistent with this express constitutional mandate and with basic principles of federalism, this Court consistently has recognized that "state legislatures have 'primary jurisdiction' over legislative reapportionment." White v. Weiser, 412 U.S. 783,

- 15 -

795 (1973); accord, e.g., Reynolds v. Sims, 377 U.S. 533, 586
(1964) ("reapportionment is primarily a matter for legislative
consideration and determination").  Given the magnitude of the
State Legislature's interests in redistricting, and the three-
judge court's disregard for those interests when it refused to
adopt the Legislature's congressional plan, there can be little
doubt that Alabama will suffer irreparable harm if the final
judgment of that court is not stayed.

In addition to the injury incurred by the State, the
citizens of Alabama will suffer a related but distinct injury if a
stay is not granted.  Because redistricting is in the first
instance the prerogative of State Legislatures -- the people's
elected representatives -- it is the citizens of a State who
ultimately suffer irreparable harm when a federal court interferes
with that prerogative.

If Alabama's 1992 congressional elections are held under
the plan adopted by the three-judge court, the citizens of Alabama
will be prohibited from voting in congressional districts drawn by
the Legislature duly elected by those citizens.  Cf. Reynolds, 377
U.S. at 555 (any restrictions on the right to vote "strike at the
heart of representative government").  The people of Alabama
cannot be compensated for this injury through monetary damages or
any other form of relief.  Accordingly, they will suffer
irreparable harm if the State is forced to hold elections under
the three-judge court's plan.  See Karcher, 455 U.S. at 1306; see

- 16 -

also <u>Wise</u> v. <u>Lipscomb</u>, 434 U.S. 1329, 1334 (1977) (Powell, Circuit Justice) (irreparable harm would result if stay not granted because issue would be mooted by the time Supreme Court ruled on merits of appeal); <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526, 541 (1973) (noting that State held elections under non-precleared legislative plan in light of Supreme Court stay).

> 2. There is a Reasonable Probability that Four Justices Will Consider the Issues on Appeal Sufficiently Meritorious to Note Probable Jurisdiction and that Secretary Camp Will Succeed on the Merits

This appeal raises issues of significant importance to both the State of Alabama and the nation as a whole.  By adopting a non-legislative plan despite the Alabama Legislature's express preference for its own plan, the three-judge court ignored established precedent of this Court holding that "a district court should . . . honor state policies in the context of congressional reapportionment."  <u>White</u>, 412 U.S. at 795.

As discussed above, the rule that State Legislatures should have primary jurisdiction over legislative reapportionment is rooted in basic principles of comity and federalism and arises out of the express mandate of Article I, Section 4, of the Constitution.  When, due to exigent circumstances, a district court is forced to intervene in the apportionment process, the court should, to the extent possible, "follow the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed

by the state legislature. . . ."  See White, 412 U.S. at 795;
accord Terrazas v. Clements, 537 F. Supp. 514, 528 (N.D. Tex.
1982); Burton v. Hobbie, 543 F. Supp. 235, 238 (M.D. Ala.), aff'd,
459 U.S. 961 (1982).  "The only limits on judicial deference to
state apportionment policy . . . [are] the substantive
constitutional and statutory standards to which such state plans
are subject."  Upham v. Seamon, 456 U.S. 37, 42 (1982).  Thus,
"[i]n choosing among plans for implementation, a court should
select the plan most nearly adhering to the district
configurations in the state's enactment to the extent such
adherence does not detract from constitutional requirements."
Terrazas, 537 F. Supp. at 528; see White, 412 U.S. at 797 ("the
District Court should defer to state policy in fashioning relief .
. . where that policy is consistent with constitutional norms and
is not itself vulnerable to legal challenge.").

In White, this Court reversed a three-judge court for
doing exactly what the three-judge court did here, i.e., adopting
a plan that did not reflect, to the extent possible, the policy
choices of the State Legislature.  In White, the lower court,
having struck down the Texas Legislature's congressional
redistricting plan on one person, one vote grounds, proceeded to
choose among proposed remedial plans.  The court rejected a
proposal known as "Plan B," which "represented an attempt to
adhere to the districting preferences of the state legislature
while eliminating population variances."  412 U.S. at 796.
Instead, the court adop0ted "Plan C," which "ignored legislative

districting policy and constructed districts solely on the basis of population considerations." Id. at 796.  This Court stayed the lower court's order, id. at 789, and then reversed on the merits, holding that the lower court "should have implemented Plan B, which most clearly approximated the reapportionment plan of the state legislature, while satisfying constitutional requirements." Id. at 796.

Contrary to White and the other precedents discussed above, the three-judge court did not even consider, much less defer to, the Alabama Legislature's plan.  The court conceded that "congressional redistricting is properly a matter to be determined by the legislature and that the federal courts should intervene only if the legislature fails to act in a constitutional manner." Exhibit B at 22.  The court determined, however, that it had "no legal authority . . . [to] adopt this expression of the legislative will as the court's plan," id., because the Legislature's plan had not been precleared.  Id. at 23.

When faced with facts nearly identical to those in the instant case, the court in Burton v. Hobbie, 543 F. Supp. at 239, held that it was compelled to adopt the Alabama Legislature's redistricting plan, on an interim basis, notwithstanding the fact that the Justice Department was still considering at that time whether to preclear certain of Alabama's legislative districts. This Court affirmed, 459 U.S. 961 (1982), even though the Attorney General ultimately interposed an objection to those districts

- 19 -

while the case was pending on appeal.  See Burton v. Hobbie, No. 82-360, Motion to Dismiss or Affirm at 8 (U.S.).  Similarly, in Terrazas, 537 F. Supp. at 537-40, the court adopted a legislative plan, to which the Department of Justice had entered formal objections, as an interim plan for use in the 1982 elections.  The district court adopted wholesale the portions of the plan to which no objections had been made and re-drew the districts to which the Department had objected.  Id. at 539-40; cf. Georgia v. United States, 411 U.S. at 541 (holding that elections held under plan not precleared by the Department need not be set aside).

The three-judge court here ignored this established line of cases and consequently failed to adhere to its duty to defer to the express policies and preferences of the Alabama Legislature.[11] To do so, the lower court should have used the Legislature's plan as its starting point.  The court should then have analyzed the substantive merits of the legislative plan and modified it only to the extent "necessary to cure any constitutional or statutory defect."  See Upham, 456 U.S. at 43 (holding that lower court erred in re-drawing not only district to which the Attorney General had objected but also other districts to which no objection had been interposed).  Absent a finding that the Alabama Legislature's plan did not comport with applicable substantive legal standards, the court was obligated to use the legislative plan as its interim plan.

---

[11]     In fact, the three-judge court did not address the substantive merits of the legislative plan at all.

- 20 -

In light of the three-judge court's clear abdication of its duty to defer to legislative policy regarding the reapportionment of Alabama's congressional districts, there is a high likelihood that at least four Justices will note probable jurisdiction of this case and that Secretary Camp will succeed on the merits of his appeal.

### 3. The Balance of Equities Weighs in Favor of Granting a Stay

The district court's March 9, 1992 Order imposes a plan for Alabama's congressional districts on the citizens of that State that does not reflect the will of the Alabama Legislature and thus deprives the citizens of the State of Alabama of a fundamental right guaranteed by the Constitution of the United States and prior decisions of this Court.  The citizens of Alabama will have but one opportunity to vote on congressional representation in the 1992 elections.  If forced to elect representatives using the three-judge court's plan, these citizens will lose irretrievably their right to elect representatives from legislatively drawn districts during the upcoming election cycle. Therefore, the equities weigh heavily in favor of permitting the people of Alabama to elect representatives from districts that were drawn pursuant to constitutional mandate.

In contrast, the factors favoring immediate implementation of the three-judge court's interim plan carry little weight.  That court expressly stated that it adopted its interim plan based on

- 21 -

an erroneous belief that the court could not consider the
Legislature's plan because it had not been precleared.  As
discussed in Section 3, <u>supra</u>, the court's analysis is completely
without merit and is in direct contradiction to this Court's prior
decisions on this point.  Moreover, the three-judge court did not
identify any constitutional or statutory deficiencies in the
Alabama Legislature's plan that would prevent its implementation.
Finally, the court's concern that the primary elections go forward
on schedule is not affected regardless of which plan is used.  <u>See</u>
Exhibit B at 14 n.4, 23.[12]  It is clear, therefore, that the
equities weigh heavily in favor of staying implementation of the
district court's plan.

CONCLUSION

The facts of this case meet all of the <u>Karcher</u> criteria
for granting a stay:  there is a likelihood of irreparable harm to
Alabama and its citizens if the stay is not granted; there is a
reasonable likelihood that this Court will note probable
jurisdiction and that appellant will succeed on the merits; and
the equities weigh in favor of granting the stay.

---

[12]    Absent a ruling by this Court on the merits of this
appeal, if this stay is granted and the Legislature's plan is
precleared subsequent to March 27, 1992, Alabama's 1992 elections
will be held pursuant to that plan.  By contrast, if a stay is not
granted and preclearance is eventually obtained, the 1992
elections will be held under the court's plan and the 1994
elections under the Legislature's plan.  This change in district
lines would result not only in substantial additional cost to the
State but also in voter confusion that will decrease turnout,
which would impact disproportionately on the prospects for
minority candidates.  <u>See</u> <u>Terrazas</u>, 537 F. Supp. at 527.

WHEREFORE, Secretary Camp respectfully requests that his Application for Stay of Judgment Pending Appeal be granted.

Dated:   March 19, 1992                    Respectfully submitted,

                                           JAMES H. EVANS
                                           ATTORNEY GENERAL
                                           STATE OF ALABAMA


                                           Andrew P. Miller
                                           Mark A. Packman
                                           Melinda Burrows
                                           DICKSTEIN, SHAPIRO & MORIN
                                           2101 L Street, N.W.
                                           Washington, D.C. 20037
                                           (202) 785-9700

                                           Attorneys for
                                             Secretary of State Camp


## REQUEST FOR ORAL ARGUMENT

Secretary Camp hereby requests oral argument on the issues addressed by this Application for Stay.

- 23 -