FILED
2021 Dec-27  AM 11:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Barriers to Voting in Alabama



# A Report by the Alabama Advisory Committee to the United States Commission on Civil Rights

## February 2020

**Advisory Committees to the U.S. Commission on Civil Rights**

By law, the U.S. Commission on Civil Rights has established an advisory committee in each of the 50 states and the District of Columbia. The committees are composed of state citizens who serve without compensation. The committees advise the Commission of civil rights issues in their states that are within the Commission's jurisdiction. More specifically, they are authorized to advise the Commission in writing of any knowledge or information they have of any alleged deprivation of voting rights and alleged discrimination based on race, color, religion, sex, age, disability, national origin, or in the administration of justice; advise the Commission on matters of their state's concern in the preparation of Commission reports to the President and the Congress; receive reports, suggestions, and recommendations from individuals, public officials, and representatives of public and private organizations to committee inquiries; forward advice and recommendations to the Commission, as requested; and observe any open hearing or conference conducted by the Commission in their states.

**Letter of Transmittal**

**To:      The U.S. Commission on Civil Rights**

Catherine E. Lhamon (Chair)

Debo P. Adegbile                                David Kladney

Gail Heriot                                        Michael Yaki

Peter N. Kirsanow                              Stephen Gilchrist

**From: The Alabama Advisory Committee to the U.S. Commission on Civil Rights**

The Alabama State Advisory Committee to the U.S. Commission on Civil Rights (hereafter "the Committee") submits this report, "Barriers to Voting" as part of its responsibility to examine and report on civil rights issues in Alabama under the jurisdiction of the Commission. This report is the result of numerous working group sessions, extensive research, and a public hearing held in February 2018. The report was approved by the Committee on June 22, 2020 by a vote of 7 yea, 2 nay, with no members abstaining.

The Committee chose the topic of barriers to voting as the subject of our first report as we recognize both the significance of this right to our democracy and the outsized role that Alabama has played in shaping this right, particularly in relation to the Voting Rights Act of 1965. In an effort to focus the project on current barriers, we began by identifying voting regulations instituted since the United States Supreme Court's decision in *Shelby County, Alabama v. Holder*, 570 U.S. 529 (2013) (henceforth "*Shelby County*"). We then considered the effects of such regulations on the citizens of our state.

The Committee discovered, through research and testimony presented at a public hearing conducted by the Committee in 2018, two important phenomena that informed our report. First, while state officials identify the need to prevent election and voter fraud as the motivating animus behind the regulations we considered, there was little evidence that the type of fraud identified actually occurred in the state at an alarming rate prior to the passage of these regulations nor was there evidence that such regulations would actually serve to mitigate this fraud if it presented. Second, while the post-*Shelby County* regulations each appeared neutral on their face, their effect once implemented was anything but. In fact, the Committee concluded that such regulations create often insurmountable barriers to voting for marginal populations in Alabama.

While the Committee recognizes the importance of protecting voter and election integrity, our examination of voting regulations in Alabama raises concerns that these laudable goals are not realized through the state's efforts. Instead, Alabama has conceived of voting as a right that the citizen must win from the state by clearing a series of qualifying and complex hurdles. This construction of voting not only serves to exclude many poor, rural and minority voters, but it is at odds with the larger concept of the right itself. Instead, the Committee believes that the right to vote is one that fundamentally and wholly belongs to the citizen, not the state. Accordingly, it is the Committee's belief that before the state can regulate the right to vote, the state must bear the

burden of demonstrating that it has struck a proper balance in enacting a regulation is narrowly conceived to promote some collective good and in ensuring that the regulation does not overly interfere with the citizen's realization of his or her right.  In the case of voting, it is the Committee's belief that Alabama has mis-struck this balance.

This report presents both an overview of current voting regulation in Alabama and offers specific recommendation to help policymakers better ensure that the voting rights of all of the residents of Alabama are appropriately protected.

Respectfully,

Jenny Carroll, *Chair*

Alabama Advisory Committee to the U.S. Commission on Civil Rights

**Alabama Advisory Committee to the**
**U.S. Commission on Civil Rights**

The Alabama Advisory Committee to the U.S. Commission on Civil Rights submits this report detailing civil rights concerns associated with barriers to voting in Alabama. The Committee submits this report as part of its responsibility to study and report on civil rights issues in the state of Alabama. The contents of this report are based on testimony the Committee heard during a hearing held on February 22, 2018 in Montgomery, Alabama, and subsequent interviews and correspondence with state and local officials.

This report documents civil rights concerns with respect to barriers to voting throughout the state of Alabama and discusses possible strategies for improving voter access in Alabama. Based on the findings of this study, the Committee offers to the Commission recommendations for addressing this issue of national importance. The Committee recognizes that the Commission has previously issued important studies about voting and civil rights nationwide and hopes that the information presented here aids the Commission in its continued work on this topic.

**Alabama State Advisory Committee to the**
**U.S. Commission on Civil Rights**

Jenny Carroll, *Chair, Alabama Advisory Committee*

| | |
|---|---|
| Marc Ayers | Martha Shearer |
| Craig Hymowitz | Maurice Shevin |
| Michael Innis-Jimenez | Cameron Smith* |
| Peter Jones | David Smolin |
| Angela Lewis | Daiquiri Steele* |
| Raphael Maharaj | Tari Williams |
| Isabel Rubio | |

*Resigned from the Committee prior to this report

# Contents

Introduction ........................................................................................................................... 1

**Background** ......................................................................................................................... 2

**Findings** .............................................................................................................................. 3

**Pre-Voting Regulations** ...................................................................................................... 4

    A. Voter Identification Requirements ................................................................................ 4

       i.    The Scope of the Law and Challenges to Acquiring Identification ......................... 5

       ii.   The Specter of Fraud ......................................................................................... 12

       iii.  Recommendations ............................................................................................. 14

    B. The Registration Process ............................................................................................ 15

       i.    Registering to Vote ............................................................................................ 16

       ii.   Why require registration? ................................................................................. 18

       iii.  Recommendations ............................................................................................. 18

    C. Felon Disenfranchisement ......................................................................................... 19

       i.    The History ....................................................................................................... 20

       ii.   The Implementation .......................................................................................... 24

       iii.  Recommendations ............................................................................................. 29

    D. Voter Roll Purging ..................................................................................................... 31

       i.    Details and Implementation of Purging Policies ................................................ 31

       ii.   The Effect of Purges ......................................................................................... 35

       iii.  Recommendations ............................................................................................. 37

**Regulations Surrounding Polling** ...................................................................................... 38

    A.   Polling Place Closures ................................................................................................ 38

    B.   Poll Hours .................................................................................................................. 41

    C.   District Gerrymandering ............................................................................................ 42

    D.   Poll Worker Training .................................................................................................. 43

**Barriers to Alternative Voting Procedures** ....................................................................... 44

    A.   Absentee Voting ........................................................................................................ 44

    B.   Early Voting or Extended Voting Times ...................................................................... 46

    C.   Provisions for Ballots Cast at the Wrong Location ...................................................... 46

**Recommendations** ........................................................................................................... 47

**Conclusion** ...................................................................................................................... 48

List of Appendices

Appendix 1  News Release with Agenda                    Page 59

Appendix 2  Transcript - AL SAC Briefing 2/22/18        Page 62

Appendix 3  Alabama Photo Voter ID Guide               Page 366

Appendix 4  Alabama App. for Free Voter ID Card        Page 384

Appendix 5  Alabama Voter Registration Form            Page 388

Appendix 6  Crimes Involving Moral Turpitude           Page 391

Appendix 7  Marc Ayers Statement of Dissent            Page 394

Appendix 8  Craig Hymowitz Statement of Dissent        Page 400

Appendix 9  Dr. Peter Jones Stment of Concurrence      Page 415

# Introduction

The U.S. Commission on Civil Rights (Commission) is an independent, bipartisan agency established by Congress and directed to study and collect information relating to discrimination or a denial of equal protection of the laws under the Constitution because of race, color, religion, sex, age, disability, national origin, or in the administration of justice. The Commission has established advisory committees in each of the 50 states and the District of Columbia. These State Advisory Committees advise the Commission of civil rights issues in their states that are within the Commission's jurisdiction.

The Alabama Advisory Committee (Committee) to the U.S. Commission on Civil Rights voted to undertake a study focused on access to voting in the State of Alabama which may have a disparate impact on voters on the basis of race, color, national origin, disability status, or religion, or those that undermine the administration of justice. The objective of the study was to determine whether any changes in Federal law or policy are necessary to guarantee protected classes of individuals the right to vote.

As one of the preclearance states under the Voting Rights Act of 1965[1], the Alabama Committee chose to examine the impact of the *Shelby County v. Holder*[2] decision, as well as that of any legislation passed following the *Shelby County* decision, on voter access. The Committee hopes that such information will lead to a better understanding of the current state of access to the franchise, as well as to specific recommendations for addressing identified problems. The Committee presents its findings and offers advice to the Commission which include recommendations to the Commission for federal policy and statutory changes.

This report is intended to provide testimony, findings, and recommendations to the Commission in hopes of providing a boots-on-the-ground view of the current status of access to voting in the state of Alabama.

---

[1] Voting Rights Act of 1965, Pub. L. No 89-110 (codified as amended at 52 U.S.C. § 10101).
[2] 570 U.S. 529(2013).

## Background

Alabama played an outsized role in the passage of the Voting Rights Act of 1965.[3]  From post-Reconstruction restrictions on the ballot[4] to efforts of Civil Rights activists in Birmingham[5], Montgomery[6] and Selma[7], President Johnson noted the State's bloody history in the road to the ballot box when he signed the Voting Rights Act into law.[8]  Nearly fifty-years later, Alabama again played a critical role this time in shaping the future of the Voting Rights Act. In the 2013 decision in *Shelby County v. Holder*[9], the Supreme Court struck down the formulation contained in Section 4 of the Voting Rights Act as unconstitutional and as such removed Section 5's preclearance obligations from Alabama.[10]

The decision also heralded a new wave of state election law reforms in Alabama. These laws, from photo identification requirements, to voter roll purging procedures, to closures of polling places, and others, form the subject of this report.  The Alabama State Advisory Committee (hereafter the "Committee") has gathered data on the impact of such post-*Shelby County* reforms on minority

---

[3]  52 U.S.C. § 10101 et seq.

[4]  The 1901 Constitution adopted a series of voting requirements that were designed to, and did in fact, exlude black voters.  This included an education requirement or proof of eligibility under a grandfather clause which consisted of demonstrated that your grandfather could vote in 1867 (something no black voter could demonstrate as it predated black enfranchisement).  *See* Peyton McCrary et al., *Alabama*, in QUIET REVOLUTIONIN THE SOUTH:  THE IMPACT OF THE VOTING RIGHTS ACT 1965-1990 (1994), pg. 44 (describing such mechanisms of disenfranchisement and their impact). Prior to the 1901 Constitution, Alabama had instituted election codes requiring proof of payment of a poll tax. *See* Frank B. Williams, Jr., *The Poll Tax as a Suffrage Requirement in the South, 1870-1901*, 18 THE J. OF SOUTHERN HISTORY 469 (1952). The tax requirement, which could be waived by election officials, was commonly used to exclude black voters. *Id.* An editorial in the Tuscaloosa News offered a "justification" for the poll tax, stating:  *"This newspaper believes in white supremacy, and it believes that the poll tax is one of the essentials for the preservation of white supremacy."  See* Kelly Phillips Erb, *For Election Day, a History of Poll Tax in America*, FORBES, Nov. 5, 2018, at:  https://www.forbes.com/sites/kellyphillipserb/2018/11/05/just-before-the-elections-a-history-of-the-poll-tax-in-america/#5bc78dee4e44.

[5] *See* DIANE MCWHORTNER, CARRY ME HOME:  BIRMINGHAM, ALABAMA: THE CLIMATIC BATTLE OF THE CIVIL RIGHTS REVOLUTION (2013).

[6] *See* JO ANN ROBINSON, THE MONTGOMERY BUS BOYCOTT AND THE WOMEN WHO STARTED IT:  THE MEMOIR OF JO ANN GIBSON ROBINSON (1987).

[7] *See* DAVID GARROW, PROTEST AT SELMA: MARTIN LUTHER KING, JR. AND THE VOTING RIGHTS ACT OF 1965 (2015).

[8]  Johnson, Lyndon B. "Remarks in the Capitol Rotunda at the Signing of the Voting Rights Act," 6 August 1965, in *Public Papers of the Presidents of the United States: Lyndon B. Johnson, 1965,* bk. 2, 1966.

[9] 570 U.S. 529 (2013) (henceforth *Shelby County*).

[10]  The Voting Rights Act sought to correct the "blight of racial discrimination in voting" that had "infected the electoral process in parts of our country for nearly a century."  *Shelby County*, 570 U.S. at 545 (quoting South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966)). Toward that end, Section 2 of the Act barred any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen …. To vote on account of race or color."  52 U.S.C. §10301(a). Given the history of discrimination in states like Alabama, however, the Act further provided in Section 4 a "coverage formula" based on historically discriminatory practices.  52 U.S.C. §10303 (4).  Jurisdictions "covered" under Section 4 were in turn subject to Section 5's requirement of that any change in voting procedures be approved, or pre-cleared, by officials in Washington, D.C. *Id.* This preclearance requirement placed the twin burdens of proof and cost of litigation on the State to demonstrate that the proposed change was not discriminatory. *Id.*

and poor populations in the State.  It is the conclusion of this Committee that such post-*Shelby County* regulations, though facially neutral, raise potential concerns about access to franchise for the very populations the Voting Rights Act of 1965 was enacted to protect.

Current voting requirements may produce a disparate impact on marginal[11] populations in our state. To highlight this concern, this report examines several, though not all, post-*Shelby County* reforms – in their construction and implementation.  While it is beyond the scope of this report, or this Committee's capacity, to measure the effect of all such reforms, the information uncovered by this Committee paints a picture of significant challenges imposed on Alabama's poor and racial minority populations, particularly in rural counties, as they seek to realize one of the most fundamental rights of a citizen – the right to vote. The Committee bases this conclusion on oral and written testimony received during the February 22, 2018 hearing conducted in Montgomery, Alabama, as well as the Committee's own research.

## Findings

This report proceeds in four parts.  First, it examines pre-voting regulations, including those pertaining to identification requirements, registration processes, felon re-enfranchisement and voter verification and purging procedures. Second, it turns to regulations surrounding polling itself, including polling place closure, polling hours, poll worker training and redistricting. Third, the report examines alternative voting procedures, including absentee balloting, early voting, provisions for ballots cast at incorrect locations and provisional ballot procedures.  The report concludes with a series of global recommendations regarding the removal of potential barriers to voting in Alabama.

Before turning to the substance of the report, it is important to note that the work of this Committee could not occur without the assistance of the citizens of our state.  Individual citizens contacted the Committee to provide vital first-hand accounts of their lived experiences under Alabama's post-*Shelby County* regime. The reality that emerged through the information they provided, and the testimony received by this Committee is a perception of the right to vote fundamentally at odds with the reality the Voting Rights Act of 1965 imagined.

Post-*Shelby County* regulations were described by state witnesses and officials as necessary to protect the vote from fraud and corruption.[12] Citizens and public interest organizations described such regulations as rendering enfranchisement an increasingly difficult right to realize for those without money, access to transportation, housing security and reliable information regarding voter

---

[11] For the purpose of this report, the consensus of the Committee agrees to the definition of marginal as "people who, for whatever reason, are denied involvement in mainstream economic, political, cultural and social activities."

[12] *See* John Park, testimony, *Briefing Before the Alabama Advisory Committee to the U.S. Commission on Civil Rights, Access to Voting in Alabama*. Montgomery, AL, Feb. 22, 2018, transcript, pp 91-92. (*hereinafter Alabama Transcript*); *also* Merill Testimony, *Alabama Transcript*, p. 14.

3

eligibility.[13] In this, the state apparently imagines the right to vote as its own to guard against the citizen who would vote without right.  And the citizen in turn imagines, through the lens of the State's regulations, the vote as a right that must be earned from the State. This conception of the vote fundamentally mischaracterizes the nature of the right.

The right to vote is not a prize to be won from the State. It is the citizen's right and mechanism to hold the State accountable.[14] While the citizen clearly has an interest in protecting the right to vote from abuse or fraud, the Voting Rights Act recognized in Section 2[15] that state regulation of that right must constantly be weighed against the purported benefit it brings and the access it may curtail.  The findings of this Committee highlight concern that the current balance is skewed – that regulations, even those with noble goals, can create real barriers to voting for the very people whose rights the Voting Rights Act and even the regulations described below claim to protect.

## Pre-Voting Regulations

Following the Court's decision in *Shelby County*, Alabama instituted a variety of statutes and administrative rules that regulate voter eligibility.  These establish not only who may vote, but also govern voter registration, voter roll purging processes, and identification requirements.[16]  In the process, these statutes and rules control access to the ballot prior to voting itself.  A citizen ineligible to vote, unable to register, purged from voter rolls, or lacking proper identification may be disenfranchised through these regulations before he or she even has the opportunity to cast a ballot. This section considers such statutes.

### A. Voter Identification Requirements

Following the *Shelby County* decision, one of the first changes Alabama made to its voting laws was to institute one of the most rigorous voter identification requirements in the nation.[17]  This law requires all voters present one of eleven approved forms of identification or be positively identified by two election officials.[18] If the voter lacks the approved identification and cannot be positively identified by two election officials, the voter may cast a provisional ballot.[19]  In order for that provisional ballot to be counted, the voter must present "a proper form of photo

---

[13] *See* Douglas Testimony, *Alabama Transcript*, pp. 203-204; Pickett Testimony, *Alabama Transcript*, p280; Simelton Testimony, *Alabama Transcript*, p. 252; Holmes Testimony, *Alabama Transcript*, pp. 168-169; Blocker Testimony, *Alabama Transcript*, p.177; Crayton Testimony, *Alabama Transcript*, pp. 41, 44, 46; Boone Testimony, *Alabama Transcript*, pp.104-107; Merrill Testimony, *Alabama Transcript*. P.21; Morrison Testimony, *Alabama Transcript*, p.221.

[15] Pub. L. No. 89-110 § 2.
[16] *See* Ala. Code § 17-9-30 (2019), Ala. Code § 17-3-30.1 (2019), Ala. Code § 17-3-31 (2019), Ala. Code § 17-3-50 (2019), Ala. Code § 17-4-30 (2019), Ala. Code § 17-17-14 (2019).
[17] Ala. Code § 17-9-30 *et seq*.
[18] Ala. Code § 17-9-30(e).
[19] Ala. Code § 17-9-30(d).

identification to the Board of Registrars no later than 5:00 p.m. on the Friday following election day."[20]

The Committee heard testimony that identification requirements were enacted to reduce individual voter fraud by ensuring that the person casting the ballot is in fact the eligible voter listed on the voting rolls for a given polling place.[21] While these are clearly laudable goals, it is less clear either that this concern is significant or in the alternative that the voter identification requirement alleviates that concern to an order to justify the barrier to voting that it creates. In short, it is the conclusion of this Committee that Alabama's voter identification requirement, while appearing neutral on its face, disproportionately impacts poor, minority and rural populations in the state and may not be justified.

i.      The Scope of the Law and Challenges to Acquiring Identification

At its core, Alabama's voter identification law requires a potential voter to either present an acceptable form of identification or to be identified before they are permitted to vote.[22] While Alabama accepts eleven different forms of identification for voting, Secretary of State John Merrill testified that the most common forms of voter identification are state issued identification cards – such as a driver's license, a nondriver identification, or an Alabama Photo Voter ID card.[23] These are procured through Motor Vehicles Division ("MVD") offices, the County Clerk's office or, in some counties, a library or the Secretary of State's mobile identification unit ("mobile ID unit"). Despite the variety of identifications accepted, Alabama's voter identification law remains one of the most restrictive in the nation. Only 19 states require some form of photo identification to vote.[24] In contrast, 14 states have no ID requirements and 19 states accept non-photo IDs.[25] This places Alabama's photo ID law among the 19 most restrictive laws nationwide.

The impact of this law on marginalized populations becomes apparent when considering how one might acquire a form of identification the law requires. Recent efforts by the state to close or limit hours at MVD offices, courts, libraries, and other public places where voters might acquire the necessary identification to vote has rendered the photo identification law in Alabama a significant barrier for poor, minority and rural populations in the state.

Consider the case of MVD offices. In 2015, in response to a budget dispute, then Governor Robert Bentley closed 31 MVD offices in Alabama.[26] In 2016, the Department of Transportation ("DOT")

---

[20] Ala. Code § 17-10-1.
[21] Park Testimony, *Alabama Transcript*, p.92, Boone Testimony, *Alabama Transcript*, pp. 149-150.
[22] Ala. Admin. Code 820-2-9-.02 (2013).
[23] Merrill Testimony, *Alabama Transcript*, pp. 28-29.
[24] Photo ID Laws by State. Spread the Vote. http://www.Spreadthevote.org/voter-id-states.
[25] *Id.*
[26] *See* https://www.al.com/news/montgomery/2016/12/feds_alabama_to_expand_drivers.html (noting that the DOT concluded that the closures caused a "disparate and adverse impact on the basis of race").

conducted an investigation into these closures and concluded that they adversely affected counties with majority black and rural populations.[27] Statistics from the Alabama Law Enforcement Agency ("ALEA") and census data for the state show that of the 11 counties in Alabama that have a majority or near majority black population, eight (72.7 percent) suffered closure of MVD offices in their counties as a result of Gov. Bentley's budgetary decision, compared to 23 (41.1 percent) of the 56 majority white counties in the state.[28] The three counties that did not suffer such closures are located in Montgomery (the state capital), Birmingham, and Selma, the most populous cities in the state.

In response to the DOT's findings, the state re-opened offices in some of the affected counties with limited hours. Two such counties were Wilcox and Bullock.  Both are poor, predominantly black and rural counties.  Wilcox County, according to the 2010 census, is 72.5 percent black and 26.8 percent white.  The median family income is a little over $22,000.[29] Trying to learn the hours of the Wilcox County MVD office over the past year has been an act in frustration. The single location listed online offered no website that might reveal its hours and, when the Chair of the Committee attempted to call the listed telephone number, no one answered the phone regardless of when she called.  There was no recorded message to offer hours of operation. A call made by the Chair of the Committee to the Wilcox County clerk's office produced a suggestion that she travel to another county to obtain a driver's license.

Efforts to gather information about the MVD office in Bullock County were met with similar frustration.  Like Wilcox County, Bullock County is majority-minority according to the 2010 census – 70.2 percent black and 23.0 percent white – and is poor (the median family income in Bullock County was just under $24,000).[30]  Efforts to learn the MVD hours for Bullock County's one MVD office were challenging:

1. The Bullock County MVD office has no website,
2. No one answered the phone regardless of when called and there was no voice mail or recorded information,
3. A call to the Bullock County's Clerk of Court's office revealed that the MVD office was open one day a week, though the individual reached to did not know what day the office was open or who a person seeking an identification could speak to find out,
4. The same official in the Clerk's office suggested that if a person wanted to obtain an identification from the MVD in Bullock County, that person should drive to the office to find out the hours of operation,
5. While the individual in Clerk of Court's office was not aware of the MVD's precise operation schedule, she was sure that it would not be open on the weekend.

---

[27] *Id.*
[28] *Id.*
[29] United States Census Bureau. 2010 Census. https://www.census.gov/quickfacts/wilcoxcountyalabama .
[30] United States Census Bureau. 2010 Census. https://www.census.gov/quickfacts/bullockcountyalabama.

It is true that the hours of operation for these MVD offices, and all MVD offices in the state, are available on the ALEA website, however this information proved of little utility for the counties in question. Efforts to reach MVD offices during the hours provided by the ALEA website proved fruitless. This suggests that either the posted hours are incorrect or that they are not consistently kept.  Either possibility creates a hurdle for a voter seeking an identification from the offices in question.

For potential voters with limited windows and long distances to travel to obtain identification from such offices (and perhaps little access to the internet) it seems odd that such offices would not at a minimum offer information telephonically regarding their location and hours of operation. It also does not engender confidence that such offices are in fact operational if efforts to contact them during alleged office hours (according to the ALEA website) results in an unanswered telephone. In a May 17, 2019 letter to Chairwoman Marcia Fudge and Ranking Member Rodney Davis, of the Committee on House Administration, Subcommittee on Elections, in response to concerns about the lack of information regarding MVD office hours, Attorney General Steven Marshall, helpfully offered that a voter could rely on a statewide website (algeohub) to obtain information. Unfortunately, typing in a variety of iterations of Wilcox County or Bullock County and driver's license (or identification) office into the search bar on the webpage suggested, only produced a response that nothing matching the search criteria could be found. It did not produce any information regarding when one might expect to obtain an identification from either office.

Finally, the Attorney General's letter provided two numbers which he suggested would offer information about the hours of operation of the MVD offices in question.  Use of these numbers, however, did not produce the purported result.  The first number simply referred the caller back to the ALEA website for hours of operation at particular offices, and the second number went straight to voicemail, where despite leaving messages requesting information, no returned call was ever received by the Committee.

These experiences, attempting to ascertain hours of operation, locate a person in the MVD offices, or following the Attorney General's suggestions, do not alleviate the Committee's concerns that actually confirming the hours of operation at a supposedly open MVD office is a time consuming and ultimately, perhaps, futile task.  Simply put, for citizens in these predominately black, predominately poor, and predominantly rural counties, like those in other similar counties, the MVD office is an illusory source of voting identification.  To the extent that MVD offices continue to exist in Wilcox and Bullock Counties, they can hardly be described as easily accessible or reliable sources of a voter identification card. Obviously, this is not meant as an indictment of the men and women who work at the MVD offices, but it does highlight the challenges that poor, minority and rural citizens have in accessing the photo identification required to vote.

7

Compare Wilcox and Bullock Counties to two urban, predominantly white counties.  According to the 2010 census, Shelby County has an 83 percent white and 10.6 percent black population. Its median family income of over $68,000.[31] Shelby County has three MVD offices open five days a week from 8:00 a.m. to 4:30 p.m.[32] Tuscaloosa County, who according to the 2010 census had a 66.3 percent white population, a 29.6 percent black population and a median family income over $58,000[33], has a MVD office open five days a week from 8:30 a.m. to 5:00 p.m.[34]  Both Shelby and Tuscaloosa County's MVD offices have convenient websites that not only provide basic information such as the location of the offices and their hours of operations, but also permit an id seeker to fill out forms prior to arrival at the office and to set appointments to obtain identification. No such conveniences appear to exist in Wilcox and Bullock Counties, or if they do exist, they are not well advertised.

Offices in counties like Shelby or Tuscaloosa County provide services to larger populations and therefore must be more numerous and provide more service hours. But the fact that there are sparse populations in the counties where the MVD offices were closed or suffered curtailed hours does not mean that there is no need for an MVD office in these counties. According to ALEA statistics in 2014 (prior to the closures) the thirty-one closed MVD locations issued 3,149 drivers' licenses and over 5,000 learner's permits.[35] Under the new reduced hours, these offices issued less than 1,000 drivers' licenses in 2016 and 2017.[36]

Counties such as Choctow, Sumter, Hale, Greene, Perry, Wilcox, Lowndes, Butler, Crenshaw, Macon, and Bullock are all poor[37] (in fact some are some of the poorest counties in our nation), are all primarily black (some with black populations as high as 82 percent) and all lack a single full time MVD office. In the end, budget figures available on AL.gov show that closures of the 31 MVD offices saved the state an estimated $200,000-300,000 out of a general budget that exceeded $100 million.[38] The amount of money saved was small, but the impact on marginal voters was large.

Why do MVD closures and offices with limited hours matter? The MVD, after all, is not the only source of acceptable voter identification, though it is the most common source in Alabama.  Clerk's offices can issue such identifications, and, as Secretary of State John Merrill testified, he has

---

[31] United States Census Bureau. 2010 Census. http://www.shelbycountyalabama.
[32] Shelby County License Offices. http://www.shelbyal.com/581/shelby-county-license-offices.
[33] United States Census Bureau. 2010 Census. http://www.tuscaloosacountyalabama.
[34] Tuscaloosa County License Department. http://www.tuscco.com/government/departments/license-department.
[35] *See Feds: Alabama to Exand Driver's License Office Hours After Probe,* AL. COM January 13, 2019, at: https://www.al.com/news/montgomery/2016/12/feds_alabama_to_expand_drivers.html
[36] *Id.*
[37] United States Department of Agriculture. Economic Research Service. https://data.ers.usda.gov/reports.aspx?ID=17828#P6974cfd63ce14f2aa561a56ced8b3418_3_153iT1
[38] *See* Kyle Whitmire, *As it Turns Out … Bentley's Diver's License Closures were Racial,  After All,* Al.com, March 6, 2019 at: https://www.al.com/opinion/2017/01/as_it_turns_out_bentleys_drive.html

created a mobile identification unit that will travel to potential voters to generate ID. These solutions, however, are not a panacea. Turning first to alternative identification locations such as clerk's offices. These offices, like MVD offices, are not open on weekends and are usually open only eight hours during the day, with some taking breaks for lunch.  For working men and women, dependent on a job and its paycheck, standing in line during work hours to acquire identification to vote creates a financial burden.

For some in rural counties, such offices, like MVD offices are located at county seats which may be a great distance from the potential voter's home or work, creating an additional burden.  This burden is compounded if the clerk's office keeps irregular and/or poorly posted hours of operation. For those with private transportation, traveling to an alternative identification location may be a lesser inconvenience; but for those without private transportation, they must depend on either someone else's willingness to transport them or near non-existent public transportation.

Finally, such alternative locations to obtain ids are closed in the midst of the COVID-19 public health crisis.[39] This renders MVD offices one of, if not the only source of identification necessary for voting.

To offer additional opportunities to obtain the required identification, the Secretary of State's Office has created a mobile ID unit that has travelled to a variety of locations (schedule available at:    https://www.sos.alabama.gov/alabama-votes/photo-voter-id/mobile-id-locations).        This Committee does not doubt the benefit of the mobile id unit in light of the state's requirement of photo identification to vote.  And while in rural communities, the mobile ID unit may be located near the very locations where free identification are already available, such as the Registrar's Office, the courthouse or the local MVD,  according to the published schedule, the mobile ID unit has provided free identification when the Board of Registrar's office may be closed either on weekends, state holidays or outside of normal business hours. This is clearly one of the advantages of the mobile ID unit, and Secretary of State Merrill has repeatedly expressed his commitment to being thoughtful about the timing as well as the location of mobile ID unit's appearances.  Beyond this, the mobile ID unit is valuable not only because it signifies the willingness of the state to make good on its promise to make IDs available to all who want one, but because it actually creates an opportunity for folks to get those IDs.  In short, no one contests that the mobile ID unit, and Secretary of State Merrill's commitment to making the unit available, is valuable.

This is not to say, however, that the use of the mobile ID unit does not raise concerns or should not be subject to criticism.  The Committee remains concerned that the mobile ID unit is not reaching those most in need of its services because of its limited appearances in limited locations. This is particularly true now, in the midst of state wide closures as a result of the COVID-19 public

---

[39] For a list of closures *see* https://www.al.com/news/2020/03/coronavirus-shutdowns-whats-open-whats-closed.html.

health crisis, where the posted schedule reveals no available mobile-ID locations. Given closures at other state offices that might issue id outside of MVDs, access to identification required for voting in Alabama is increasingly limited. Further, as Secretary of State Merrill notes and is evident from the schedule posted by his office prior to closures as a result of the COVID-19 public health crisis, the mobile ID unit operates for only two to three hours at each location.[40] State officials often point to efforts to procure the necessary identification for particular individuals,[41] such efforts are laudable, but also appear to be extraordinary, rather than the ordinary practice of Alabama's government for ordinary folks seeking to vote in Alabama. For those unable to attend the Chilton County Peach Festival, the Watermelon Festival, the National Shrimp Festival, the Magic City Bowl or any of the other events listed on the mobile ID unit's schedule for any of a variety of reasons, or unable to locate an open MVD office in their county, the question lingers: why require a photo ID to vote at all?

Secretary of State Merrill testified that Alabama passed its voter ID law to thwart individual voter fraud.[42] The risk of voter fraud will be discussed at greater length in the next section, however it is worth noting here that the Committee is unconvinced that the evidence available to it proves that voter fraud plagued Alabama elections prior to the passage of the photo ID requirement based on Secretary of State Merrill's testimony at the February 22, 2018 hearing in Montgomery. Further, according to Merrill, since his election as Secretary of State there have been six prosecutions for voter fraud and three elections overturned.[43] The Alabama advisory committee does not mean to mean to minimize any concerns about the integrity of the vote; it does mean to raise concern that the possibility of voter fraud is being used by the State to justify a photo identification requirement that, for a variety of reasons disproportionately impacts poor, minority, and rural voters despite the fact that little evidence has been presented that such fraud occurs on a wide scale. In fact, studies suggest just the contrary: that it is a rare and ineffective way to disrupt an election.[44]

Contrast this to the impact of the voter identification requirement on marginalized citizens in the state. On its face, the voter identification law does not appear to have a discriminatory intent or purpose. It applies uniformly to all voters and seeks to ensure a common goal – voter integrity. Likewise, the state's willingness to accept a variety of forms of identification procured from a variety of locations, as described above, speaks to an effort to include and accommodate, rather

---

[40] There were exceptions to this two to three-hour limit, for example on June 15 the mobile ID unit will be available at the Juneteenth Festival in Birmingham, AL from 10:00 a.m.- 2:00 p.m. and on October 5 the mobile ID unit will be available at the Face in the Window Fest in Carrollton, AL from 9:00 a.m. – 1:00 p.m.

[41] Douglas Testimony, *Alabama Transcript*, p.209.

[42] John Merrill, Testimony, *U.S. Comm'n on Civil Rights Briefing Meeting,* Feb. 2, 2018. P.155 (2018).

[43] Merrill, Testimony, *Alabama Transcript*, p.15.

[44] Justin Levitt, *A Comprehensive Investigation of Voter Impersonation finds 31 Credible Incidents out of One Billion Ballots Cast*, WASHINGTON POST, (Aug. 6, 2014) https://www.washingtonpost.com/news/wonk/wp/2014/08/06/a-comprehensive-investigation-of-voter-impersonation-finds-31-credible-incidents-out-of-one-billion-ballots-cast/.

10

than to exclude potential voters.  Both efforts to ensure voter integrity and to create multiple locations and means by which to obtain identification necessary to vote are laudable.

Such efforts, however, obscure the effect of the law.  The Alabama Advisory Committee heard testimony that suggests that the reality is that Alabama's voter identification law creates impediments for the poor, minority and rural voters who may have limited access to locations that can issue identification, may lack the underlying documentation necessary to receive such identification, or have neither the time nor transportation to gain such identification.[45] Further, the law seeks to address a problem – individual voter fraud – without any evidence that such a problem existed prior to the law's passage. In short, the law, for all its good intentions, can prevent people from realizing their right to vote for little reason other than their lack of ability to procure state sanctioned identification.

As discussed above, the mobile unit, while enjoying the benefit of being open on weekends, has made limited appearances. While Secretary of State Merrill testified that he is willing to take the mobile identification unit throughout the state[46], a noble goal to be sure, logistically this solution has limited value if locations are poorly advertised. Beyond this, such a solution assumes that potential voters have equal transportation opportunities and available free time to access the mobile unit.

In addition, the Committee heard testimony that the same underlying documents required for MVD issued identification are required for the mobile identification unit.[47]  This means that even if the identification unit comes to the voter, the same impediments to acquiring the identification persists for marginal voters.  Beyond this, the closures of MVD offices matter because, like the voter identification law itself, these closures send a strong message that it will be harder to qualify to vote in Alabama if you are poor and live in a rural county.

MVD closures, however, are not the only challenge to those seeking necessary identification to vote. For those in rural areas, or those that lack housing security, acquiring the necessary proof of identity to obtain a driver's license or other form of acceptable identification poses additional challenges.  While the Committee recognizes (and applauds) the state's effort to ensure that free identification is available, proof of identity is not free for those who must acquire it.  For those born at home, or those who do not have ready access to a copy of their birth certificates, documentation of identity must be purchased from state agencies. Depending on where a person was born the costs of acquiring a birth certificate can range from $50 to over $100.[48]  Proof of residency may prove equally challenging.  Marginalized people may not have common proof of residency such as a formal lease, a utility or cable bill, or deed to property.

---

[45] *See Supra* Note 12.
[46] Merrill Testimony, *Alabama Transcript*, p. 12.
[47] Douglas Testimony, *Alabama Transcript*, P. 218.
[48] Morrison Testimony, *Alabama Transcript*, p. 210.

At the polling place, a voter must present his or her identification in order to vote. Despite the Secretary of State's effort to provide a clear list of acceptable identifications, voters in recent election reported confusion among poll workers over what constituted proper identification. Identifications such as passports, student identifications, Tribal identifications, and Military identifications all met with challenges including concerns that photos were outdated and addresses were not listed on the identification.[49] While these objections to the identification are incorrect as a matter of law, they highlight yet another concern over an identification requirement, as applied, and suggest the need for more statewide training of election-administrating personnel.

A voter without proper identification who cannot be identified by election workers at the polling place must cast a provisional ballot. This provisional ballot will only be counted if the voter presents the proper identification to the Board of Registrars no later than 5:00 p.m. on the Friday following the election day.[50]  Again, those without transportation, time, access to an identification location, or the requisite supporting documents to support the identification, may find themselves disenfranchised, even if they are registered to vote, because they cannot produce identification at the polling place or within the time frame permitted following the election as required under Alabama's voter identification law.

In the end, the real lived experience of the poor, minority and rural, and working people in the state is that acquiring the ID required by the state to vote poses significant logistical challenges. That it is possible in theory does not mitigate that challenge. To avoid disparate impact, the voter identification law requires a world in which all people have the ability and the means to acquire an acceptable identification. Yet for many in Alabama that world is not their reality. For these citizens, the voter identification law is an impediment as insurmountable as a sheriff in the doorway to the polling place or an archaic history test or other Jim Crow Era voting barriers. The effect is the same.  For residents on the margins in Alabama, voting is long and difficult journey.

ii.      The Specter of Fraud

Weigh these challenges to acquiring acceptable identification against the harm the voter identification law was implemented to prevent individual voter fraud.  Secretary of State Merrill acknowledged in his testimony that prior to the passage of the voter identification law there were no reported or investigated incidents of individual voter impersonation.[51]  This is consistent with Prof. Justin Levitt's testimony before the North Carolina State Advisory Committee, which shows that in fourteen years there have been thirty-one credible cases of voter fraud by impersonation out

---

[49] Boone Testimony, *Alabama Transcript*, pp.103-104., Simelton Testimony, *Alabama Transcript*, p.253.
[50] Merrill Testimony, *Alabama Transcript*, p. 28.
[51] Merrill Testimony, *Alabama Transcript*, p. 14.

of more than 1 billion ballots cast during that period.[52]   As Director Kareem Crayton testified such fraud is "infinitesimal."[53]   It is simply not the way elections are stolen.

Even setting aside concerns about the ability to track down employees of driver license offices or the curtailed hours of such locations or the challenges to acquire acceptable identification, the fundamental question remains: why require a photo identification in the first place? As noted above, the requirement of a photo identification to vote is not a common requirement.  In fact, the majority of states have no such requirement and no federal law requires such a form of identification to vote.

The requirement of a photo identification is entirely of Alabama's own making.  Attorney General Marshall offered in his May 17th letter what he characterizes as "substantial evidence of the existence of … fraud and more limited evidence of actual in-person fraud." (page 7-8, FNs 11-22)[54].  The evidence he presents in the letter, which is consistent with that of Secretary of State Merrill and that of John Park (who also testified at the February 22 hearing), is in fact of limited allegations of fraud and appears to this Committee inadequate to justify the voter identification requirement in light of the impediment such a requirement poses to marginalized persons in our state.

The Attorney General further notes in his May 17th letter that evidence of individual voter fraud is often hard to gather and cases are difficult to prosecute.[55] His suggestion seems to be that this accounts for a relatively small number of prosecutions in the face of a larger possibility of individual voter fraud occurring. Although this is theoretically possible, a study by Professor Justin Levitt—who has conducted extensive research into the occurrence of individual voter fraud over a fourteen-year period and is a nationally recognized expert on the topic— found 31 cases of voter fraud by impersonation out of more than 1 billion ballots cast.[56] In short, even if these cases are difficult to detect, studies designed to locate such fraud failed to find a significant concern.

To be clear, the Committee does not quibble with anyone who expresses a concern about individual voter fraud.  In fact, the Committee firmly believes that the integrity of the vote is critical to a functioning democracy.  What is puzzling however is the repeated assertion by state officials that individual voter fraud poses such a great risk to Alabama's elections such that photo identification laws and curtailed absentee balloting (which will be discussed in Part III of this report) are necessary to curve this fraud.

---

[52] Levitt Testimony, *U.S. Comm'n on Civil Rights Briefing Meeting,* Feb. 2, 2018. p.105.
[53] Crayton Testimony, *Alabama Transcript,* p.63.
[54] Marshall
[55] Marshall
[56] *Supra* note 49.

In fact, Mr. Park and Dr. Crayton both described instances of systematic fraud – in which election officials destroyed or miscounted ballots – as having a far greater effect on election outcomes given the number of ballots in question.[57]  Yet this type of voting fraud remains manifestly unaddressed by an identification requirement, or, as will be discussed later, limited absentee balloting or denial of early voting.

The concern, one that remains unaddressed by the State, is that Alabama is seeking to prevent what appears to be a limited and poorly documented fraud concern and in the process is creating hurdles for legitimate voters' access to the ballot.  This would seem to be an odd goal of government and a perversion of the duty of those officials charged with protecting the election process.

There is little to no evidence that the state identification law keeps our elections safe from fraud. Instead the law serves create barriers for the most marginalized of Alabama's voters. To require an identification prior to voting is one way to ensure that only those with time and resources may vote in Alabama.

iii.    Recommendations

On the most basic level, the disparate impact created by the requirement of sanctioned identification to vote in Alabama supports a return to preclearance status under Section 5 of the Voting Rights Act. While the requirement of identification, like other voting regulations discussed throughout this report, appears neutral on its face, the identification requirement creates a barrier to voting that is disproportionate for Alabama's marginalized citizens – including poor, minority and rural populations  The lack of preclearance places the burden on the disenfranchised individuals to demonstrate this disparate impact. Given the economic reality of such individuals, this is a heavy burden to take on.  Returning to preclearance status would flip this burden, ensuring review of laws effecting voting rights.[58]

Beyond this global recommendation with regard to the Alabama's voter identification requirement, the Committee also has some specific recommendations:

1.  The Committee remains unconvinced that a photo identification requirement as reflected in Alabama's current law actually accomplishes its articulated goal and that this goal – the reduction of individual voter fraud – outweighs the burden of the voter identification law on those citizens most at risk for disenfranchisement. Accordingly, the Committee's first recommendation would be a reconsideration of the state's voter identification law,

---

[57] Crayton Testimony, Alabama Transcript, pp. 63-64., *See also* John Park, *Oral remarks for February 2018 Hearing to access to Voting*, written testimony submitted to Alabama Advisory Committee.
[58] This will be discussed further in the Global Recommendation Section.

including but not limited to considering abolishing the requirement or increasing the types of acceptable identification.

2.  If the state is disinclined to do away with the voter identification requirement, the state should increase access to locations that can produce the required identification.

3.  Multiple mobile identification units would increase access to identification, though the schedules of such units must be well advertised and varied in an effort to accommodate a variety of voters in need of identification.

4.  MVD offices, the location Secretary of State Merrill identified as the most likely source of an identification, must not only be open in all counties in the state, but such hours of operation must be readily accessible (and accurate) for those seeking identification. The state must also work to ensure a variety of hours of operation for all identification producing locations to ensure access for even marginal citizens in the state.

5.  Finally, the State should work to reduce costs identification by broadening not only the type of identification accepted, but also the documentation necessary to obtain that identification.

## B. The Registration Process

In addition to identification requirements, like most states, Alabama requires voters to register in order to vote.[59]  In many ways, Alabama has done a good job of streamlining this process, offering multiple means and methods to register and minimizing documentation required for registration.[60] This streamlining, however, has not eliminated obstacles to enfranchisement created by registration requirements.  Even in its streamlined form, registration is a multi-step process that requires affirmative actions by the potential voter.

While the requirement of registration is the overwhelming norm in the United States, the commonality of this requirement obscures the fundamental question of why the default position in the state is not automatic registration of all eligible citizens?[61]  Put another way, the state fails to offer meaningful explanations of why registration is required for citizens to realize their right to vote or why the state is impeded from adopting as system of automatic registration.

---

[59] Only North Dakota does not require voters to register. *See* https://vip.sos.nd.gov/PortalListDetails.aspx?ptlhPKID=79&ptlPKID=7. For Alabama's registration requirement, *see* Ala. Code § 17-3-50.

[60] Voter registration procedures in Alabama only require that the voter provide a copy of valid identification. *Id.*

[61] Eighteen states and the District of Columbia do offer automatic voter registration.

i.      Registering to Vote

Alabama offers a variety of methods of registration, however, according to the Secretary of State's testimony, the primary access to voter registration in Alabama is through driver's license acquisition at the MVD.[62]  At the time the driver's license is issued, the elector is given a card to return to voter registrar's office via mail or in person. Voters may also register in person at the Board of Registrar's office or at other state government offices.[63]  In addition, voters may register online or download a pdf application and return it via mail or in person.[64] Those requiring help may contact the voter hotline (run by the Secretary of State's office) or seek assistance through a variety of third-party websites such as rockthevote.org, voterparticipation.org or votesmart.org, to name just a few.  These multiple points of access to the voter registration process is undoubtedly an improvement over systems that offer only one form of registration.  The state's commitment to maintaining these points of access is laudable, however, even this system creates challenges for marginalized voters that may prevent enfranchisement.

This reality is borne out by the fact that only 69.2 percent of Alabama's eligible population are registered to vote.[65]  The Secretary of State in his testimony noted that these registration numbers are the highest in the State's history[66], however, registration among the black population in the state and in predominately black counties continue to lag behind white populations and majority white counties.[67]  This Committee acknowledges that it is always hard to determine why nearly 30 percent of a population fails to do something – in this case register to vote; however, information provided by witnesses at the February 22 hearing as well as antidotal evidence provided by press coverage and citizen comment suggest some systematic impediments to registration.

First, the registration process requires the voter to produce valid identification.[68]  As a result, voter registration suffers all the challenges of voter identification described above.  Voters with limited access to locations that produce the necessary identification or the underlying documents necessary to procure such identification such as birth certificates, social security cards, or bills demonstrating residency may be unable to register even under an improved registration system.  Accordingly, from the perspective of the voter, registration may present an insurmountable financial or temporal burden.

---

[62] John Merrill, *Answers to Follow Up Questions to Feb. 22 testimony*. May 16, 2018.
[63] Merrill testimony, *Alabama Transcript*, pg. 10
[64] *Id.*
[65] *See* Barry-Blocker Testimony, *Alabama Transcript*, pp. 178-183., *See also* Findings of 2016 Election Administration and Voting Survey Report,
https://www.eac.gov/assets/1/6/2016_EAVS_Comprehensive_Report.pdf.
[66] Merrill Testimony, *Alabama Transcript*, pg. 14.
[67] *See* Findings of 2016 Election Administration and Voting Survey Report,
https://www.eac.gov/assets/1/6/2016_EAVS_Comprehensive_Report.pdf.
[68] Ala. Code § 17-3-52 (2019).

Consider the statewide computer failure at MVD offices prior to the 2018 mid-term elections. This failure was brief – approximately 45 minutes – but it occurred during the last week to register to vote and during the period of the failure the MVD was unable to produce any documents or identifications. For those with limited time and resources, such a failure – even a very brief one like this – may create a barrier to gaining the materials necessary to register to vote. The fact that alternative locations might exist that could provide identification or registration forms may offer little comfort to those unable to travel to alternative locations.

Even if a voter is able to appear in person at the Board of Registrar's Office, inconsistent information about registration eligibility seems to plague the process. In the 2018 mid-term election voters who attempted to register in person at the Board of Registrar's Office reported being told that they were required to bring documentation not actually required by the state to register. For example, a group of Latinx voters were told at one Registrar's Office that they could not register without proof of U.S. citizenship.[69] While Secretary of State John Merrill was responsive to this problem when alerted to it, it is unclear how often such irregularities occur without coming to official notice. The confusion created by this misinformation ironically is propagated by the very offices charged with the registration of voters. This misinformation also suggests that better training is required with regard to voter registration.

Secretary of State John Merrill has acknowledged that registration can pose challenges and, in response, has created both a registration website and a registration application that allows voters to register either online or with the app.[70] There is no question that the availability of online and app based registration tools facilitate registration and reduce travel and time burdens on citizens. These tools, however, are not panaceas and may be of limited utility for poor and rural voters.

Both require internet access – a challenge in some rural counties. In addition, the app appears to require access to a smartphone. This level of technology is not always accessible for marginalized citizens. Beyond this, lingering questions remain regarding the app. The Secretary of State's office did not respond to the State Advisory Committee's inquiries regarding the app's platform, how it processes information, who has access to this information (such as law enforcement agencies), whether the app engages in data collection, and whether or not it can be used on any smartphone or other equivalent technology. Finally, both the app and online registration platforms may only be used if a person has already acquired the requisite identification.[71] This means that, for those with difficulties obtaining identification required to vote, the registration website and app will provide no assistance.

---

[69] While U.S. Citizenship is a prerequisite for voter registration in Alabama, proof of such citizenship is not required for registration under federal law. Secretary of State Merrill has indicated that he does not enforce the state law that conflicts with the federal law. *See* Transcript p. 17, ln. 16-23 – p. 18 ln. 1-17.

[70] See Alabama Secretary of State, Register to Vote/Update your Information, https://www.sos.alabama.gov/alabama-votes/voter/register-to-vote.

[71] Merrill Testimony, Alabama Transcript, p.10.

Finally, the Secretary of States' Office uses the Electronic Registration Information Center ("ERIC") to send mailings to eligible but unregistered voters.[72]  The use of this resource is a positive step to ensure that voters have the information and opportunity to register to vote.  These proactive policies are both positive and demonstrate a commitment to enfranchisement, however they may fail to reach those with housing insecurity and/or lack of regular access to mail.

ii.    Why require registration?

Like identification requirements, the justification for registration is based on fraud prevention.  As discussed above there is little evidence that individual voter fraud is significant in our State. Beyond this, states that offer automatic registration do not report increased voter fraud. This suggests that proactive registration requirements, like identification requirements, may be remedies to a non-existent problem and may present barriers to enfranchisement.

iii.    Recommendations

While the requirement of registration appears neutral on its face, the voter registration process creates barriers to voting that is disproportionate for Alabama's marginalized citizens – including poor, minority and rural populations.  This burden is multiplied by the lack of consistent information regarding registration requirements at state government offices and the failure of infrastructure in the registration process.  Further, the Committee remains unconvinced that voter registration requirements as reflect in Alabama's current law actually accomplishes its articulated goal and that this goal – the reduction of individual voter fraud – outweighs the burden of voter registration on those citizens most at risk for disenfranchisement.

1.  The Committee recommends reconsideration of the state's current voter registration process, including but not limited to considering abolishing the requirement of registration or in the alternative adopting a system of automatic registration for eligible citizens.

2.  If the state is disinclined to do away with the voter registration requirement, the state should increase access to registration by allowing same day registration for elections,

3.  The state of Alabama should expand locations that permit in person registration,

4.  The state of Alabama should offer free and accessible access to online and app-based registration platforms with a guarantee that such platforms do not engage in data gathering or sharing beyond that necessary to maintain voter records.

---

[72] Electronic Registration Information Center (ERIC), *Which States Are Members of ERIC*, https://ericstates.org/.

5.  The Alabama Advisory Committee recommends creating consistent and accessible sources of information for citizens and those who run points of access to registration (such as MVD and Board of Registrar's Offices). The Current Election Handbook is dense, complicated and often repetitive. Recent efforts by the Secretary of State's Office to provide concise sources of relevant information is good first step towards ensuring that misinformation regarding registration is kept to a minimum. These efforts not only need to continue, but they need to be coupled with regular training and monitoring of offices.

## C. Felon Disenfranchisement

According to Alabama's 1901 Constitution[73] (hereafter "Alabama Constitution") and Amendment XXVI for the United States Constitution[74] a person must be 18 years of age and a citizen of the United States and Alabama to vote in an election in the state. While Federal and State elections carry no residency requirement, Sections 11-46-38(b) and 11-46-109(b), governing elections in certain cities or towns having mayor-council form of government, carry a 30-day residency requirement for voting in local elections.[75]

In addition, under Article VIII, Section 177 of the Alabama Constitution a person must be duly registered in Alabama and must vote in the county and voting place where they live.[76] While voting registration will be discussed at greater length in Section II of this part, it is important to note here that the general description of voter eligibility in Alabama does not appear to deviate significantly in its general construct from other state's requirements – a voter must be a requisite age and must register to vote in the jurisdiction in which he or she wishes to cast a ballot. While these general requirements appear relatively routine, restriction of eligibility to vote for those convicted of a crime while not unique to Alabama, does create particular barriers in the State.

Alabama law restricts the right to vote of those convicted of particular crimes. The Alabama Constitution permits disenfranchisement of those convicted of felonies of moral turpitude.[77] In 2016, in response in part to unequal enforcement of this constitutional provision across counties, Alabama designated specific crimes of moral turpitude that produce disenfranchisement in the Definition of Moral Turpitude Act.[78] In this sense, the Definition of Moral Turpitude Act is a post-*Shelby County* regulation that improved, rather than diminished access to the ballot.

By defining disenfranchising offenses, the Act prevented inconsistent disenfranchisement across counties and opened a path towards restoration for those previously disenfranchised. Under the

---

[73] Ala. Const. § 177.
[74] U.S. Const. amend. XXVI.
[75] Ala. Code §§ 11-46-38(b), and 11-46-109(b).
[76] Ala. Code §17-9-10.
[77] Ala. Const. § 182, (1901), see also Ala. Code § 17-3-30.1.
[78] Definition of Moral Turpitude Act, HB 282, (2017), see Ala. Code. § 17-3-30.1.

current statute, those convicted of a crime of moral turpitude, are eligible to seek restoration of their voting rights through the Alabama Board of Pardons and Paroles provided they have no pending felony charges, they have paid all fines, court ordered costs, fees and restitution ordered at the time of sentencing on disqualifying cases in full, their sentence is complete, and they have successfully completed probation or parole.[79]   The existence of this process of restoration and the standardization of disenfranchising crimes, however, have created a far from certain path to the ballot box for hundreds of thousands of eligible voters in our state.   This section explores barriers created by Alabama's current felon enfranchisement restrictions.

Despite this standardization (and limitation) of disenfranchising crimes, studies suggest 286,266 people or 7.62 percent of the state's voting age population remain disenfranchised. [80]

  i.    The History

To understand the significance of Alabama's current felon disenfranchisement/restoration procedures, it is helpful to understand both the history of race-based voting regulations in the State and the relationship between such regulations and the criminal system.   Alabama's history of race-based disenfranchisement is well documented.   Since the Civil War, Alabama utilized violence, terror, economic intimidation, all white primaries, bans on single shot balloting in at-large elections, literacy tests, poll taxes, grandfather clauses and good character tests to exclude black voters.[81]   John Knox, the president of Alabama's all white 1901 Constitutional Convention, which produced the state's current Constitution, described the purpose of the Convention as to "establish white supremacy."[82]  To accomplish this end, the Convention adopted a constitution that imposed various voter qualifications designed to disenfranchise the black population of the state.[83]   One such qualification was Section 182 of the constitution. This section disqualified

*those who shall be convicted of treason, murder, arson, embezzlement, malfeasance in office, larceny, receiving stolen property, obtaining property or money under false pretenses, perjury, subornation of perjury, robbery, assault with intent to rob, burglary, forgery, bribery, assault and battery on the wife, bigamy, living in adultery, sodomy, incest, rape, miscegenation, crime against nature, or any crime punishable by imprisonment in the penitentiary, or of any infamous crime or crime involving moral turpitude, also any person who shall be convicted as a vagrant or tramp, or of selling or offering to sell his vote or the vote or another, or of buying*

---

[79] Ala. Code. § 17-3-31.
[80] Christopher Uggen Et Al., 6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement, 2016, p. 15. https://www.sentencingproject.org/wp-content/uploads/2016/10/6-Million-Lost-Voters.pdf.
[81] *See* Dillard v. Crenshaw County, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986)(describing Alabama's "unrelenting historical agenda spanning from the late 1800's to the 1980's to keep its black citizens economically, socially, and politically downtrodden.").
[82] Hunter v. Underwood, 471 U.S. 222, 229 (1985).
[83] *Id.*

20

*or offering to buy the vote of another, or of making or offering to make a false return in any*
*election by the people or in any primary election to procure the nomination or election of any*
*person to any office, or of suborning any witness or registrar to secure the registration of any*
*person as an elector….[84]*

While this criminal disenfranchisement provision may appear race neutral on its face, John
Fielding Burns, who had introduced the provision, removed any doubt that the goal of the provision
was to disenfranchise black voters. At the time he offered the proposed restriction at the convention
he predicted that the "the crime of wife-beating alone would disqualify sixty percent of Negroes."[85]

That Burns could feel confident in this prediction reflected, and continues to reflect, the reality of
the disproportionate impact of the criminal system on minority communities in Alabama.  Knox
himself had justified voter qualification provisions as grounded in the moral superiority of white
citizens.  Knox stated "[t]he justification for whatever manipulation of the ballot that has occurred
in this State has been the menace of negro domination….These provision are justified in law and
in morals, because it is said that the negro is not discriminated against on account of his race, but
on account of his intellectual and moral condition."[86]  Coupled with a criminal system that was
more likely to investigate, arrest and convict black citizens, Knox's and Burns' belief of moral
superiority followed a circular logic.  Black citizens should be denied the vote because they were
less moral as evidenced by their high rate of conviction.  Likewise, black citizens should be
investigated, charged and convicted because they presented a moral threat.  Whatever facial
neutrality the criminal exclusion policies presented, the reality was that such policies were
motivated by and furthered a system that denied access to the ballot based on race.

The criminal system became a tool to disenfranchise black voters in Alabama and a method of
retaining physical and economic control over the black population.  While the horrible history of
convict leasing is beyond the scope of this report, it is worth noting here that the State directly
profited from a criminal system that served to undermine the 13th Amendment's prohibition
on involuntary servitude by arresting black citizens for violations of "Black Codes" and petty crimes
and then leasing those prisoners to private employers as forced laborers.[87]  This practice was not
unique to Alabama – in fact convict leasing was utilized across of the South in the period following
the Civil War, however Alabama created the largest convict leasing system and was the last to
outlaw the practice.[88] Leased prisoners were nearly exclusively black and in an average year during

---

[84] Ala. Const. § 182 (1901).

[85] *See* Andrew L. Shapiro, *Challenging Criminal Disenfranchisement Under the Voting Rights Act: A New Strategy*, 103 YALE L.
J. 537, 541 (1993); JIMMIE F. GROSS, ALABAMA POLITICS AND THE NEGRO, 1874-1901, at 244 (1969). *See also* MALCOLM C.
MCMILLAN, CONSTITUTIONAL DEVELOPMENT IN ALABAMA, 1798-1901, at 275 n. 76 (1955) (noting that Burns, a justice of the
peace, also wanted to disenfranchise "those who are bastards or loafers or who may be infected with any loathsome or contagious
disease.").

[86] John B. Cox, *Opening Address to the 1901 Constitutional Convention*, at 12 (1901).
http://digital.archives.alabama.gov/cdm/singleitem/collection/voices/id/8516/rec/171

[87] *See* DOUGLAS BLACKMON, SLAVERY BY ANOTHER NAME (2008).

[88] *Id.*

this period of convict leasing 97 percent of those convicted of minor offenses in the State were black.[89]

In 1973, in an effort to update the State's Constitution, a Constitutional Commission recommended limiting the criminal disenfranchisement clause of the Constitution to those convicted of a felony of moral turpitude.[90]   The Commission, however, failed to offer any guidance as to what constituted a disqualifying offense under the simplified provision. Instead the Commission left the designation of crimes of moral turpitude to "constitutional interpretation or constitutional amendment."[91] In addition, the Commission offered no guidance of the motivation behind either the decision to streamline Section 182 or to base that "streamlining" on the general language of "moral turpitude" found in the original 1901 draft.[92]   Whatever their motive the proposed amendment failed and Section 182 lingered as originally drafted.[93]

In the 1980s Section 182 was challenged as intentionally racially discriminatory.[94]  In finding the "moral turpitude" language unconstitutional, the Eleventh Circuit wrote "[t]he attorney general in his opinion has acknowledged that the classification of presently unaddressed offenses 'will turn upon the moral standards of the judges who decide the question. Thus does the serpent of uncertainty crawl into the Eden of trial administration."[95]  This lack of clarity surrounding which crimes "qualified" as those of "moral turpitude" and so produced disenfranchisement ultimately led the Court to conclude that the State had failed to demonstrate that the provision promoted the articulated state interest.[96] The Supreme Court affirmed the Eleventh Circuit's decision, holding that Section 182's provision surround moral turpitude was motivated by racial animus.[97]

In the wake of these decisions, in 1996, Alabama adopted Amendment 579 to the Constitution which was the 1973 proposed amendment to Section 182.  Amendment 579 added Section 177(b) to the Constitution providing that: "[n]o person convicted of a felony involving moral turpitude, … shall be qualified to vote until restoration of civil and political rights or removal of disability."[98] At the time of its adoption, the sponsor of the amendment represented that the language was meant to simplifying the criminal disenfranchisement clause and would make no substantive changes to

---

[89] *Id.*

[90] Albert Brewer, "A Broad Initiative: Alabama's Citizens' Commission on Constitutional Reform." *Cumberland Law Review* 33 (2002-2003): 187-93.

[91] *See* First Draft of Proposed Alabama Constitution at 8 (Oct. 23, 1970).

[92] *Id.* The 1901 version of Section 182 barred voting if a person had been convicted of a series of articulated offenses "or crime involving moral turpitude."

[93] *See* William H. Stewart, *The Tortured History of Efforts to Revise the Alabama Constitution of 1901*, 53 Ala. L. Rev. 295 (2001).

[94] *See* Underwood v. Hunter, 730 F.2d 614 (11th Cir. 1984).  The challenged focused specifically on criminal disenfranchisement language surrounding misdemeanor convictions and crimes of moral turpitude.

[95] *Id.* At 626, n.2.

[96] *Id.* at 620. Indeed, the Eleventh Circuit expressed doubt that Section 182 was ever mean to serve the state's interest.  *Id.*

[97] Hunter, 471 U.S. at 232.

[98] Ala. Const. § 182.

the Constitution.  At the time of the amendment in 1996, roughly 70 percent of Alabama's prison population was black.[99]

While Amendment 579 may have simplified the criminal disenfranchisement clause, it offered little guidance as to what constituted a crime of moral turpitude.  For their part, counties were left to their own devises to determine what qualified as a disenfranchising offense.  The resulting inconsistency led to the passage of the Definition of Moral Turpitude Act in 2017 (HB 282).[100] This Act offered an enumerated list of disenfranchising crimes.  This list served not only to narrow the felonies that qualified under the criminal disenfranchisement clause, but it removed county discretion regarding that qualification.  The effect was twofold.  First the Act created much needed uniformity in Alabama regarding felon disenfranchisement.  Second, it re-enfranchised tens of thousands of Alabamians.

There is no question that this Act, perhaps more than any other reform in the State, served at least on its face to protect the voting rights of citizens previously excluded.  Before turning to the implementation of the Act, it is important to put it in context.  At the time of the passage of the Definition of Moral Turpitude Act, the state prison population had nearly doubled from 1985 when *Hunter* was decided.[101]  At that time the incarceration rate was approximately 300 per 100,000 but by 2017 it was nearly 500 per 100,000.[102]  A 2016 study by the Sentencing Project estimated that 8 percent of the voting age population in Alabama was disenfranchised as a result of the criminal disenfranchisement clause.[103]  This increased incarceration rate continued to have a disproportionate impact on the State's black population.  The Sentencing Project study noted that 15 percent of the black voting age population was disenfranchised as a result of felony conviction compared to less than 5 percent of the white voting age population.[104]

This historical context is important to any discussion of criminal disenfranchisement as a barrier to voting.  First, modern felon disenfranchisement statutes in Alabama are the products of a criminal system that has historically and continues to disproportionately impact the black

---

[99] Anne Hull, *Chained to a New Kind of Justice,* St. Petersburg Times, June 25, 1995, at A1.  It is also significant to note that one year prior to the Amendment, Governor had reinstituted Alabama's chain gang.  *See* Nancy A. Ozimek*, Reinstitution of the Chain Gang:  A Historical and Constitutional Analysis*, 6 B.U. Pub. Int. L. J.  753, 758-59 (1997).

[100] *Supra* note 72.

[101] Prison Policy Initiative, Alabama Profile, https://www.prisonpolicy.org/profiles/AL.html.

[102] *Id.*

[103] The Sentencing Project, *6 million Lost Voters: State-Level Estimates of Felony Disenfranchisement* (2016). https://www.sentencingproject.org/publications/6-million-lost-voters-state-level-estimates-felony-disenfranchisement-2016/

[104] *Id*.

population of the state.[105]  Black citizens are more likely to be the subject of police investigation, to be arrested, to be charged, to be convicted and to be sentence in Alabama than white citizens.[106]

Second, the inequality of the criminal system is parlayed through the criminal disenfranchisement clause into a mechanism to exclude black voters. Simply put, a black Alabama voter is three times more likely to be disenfranchised as a result of criminal conviction than a white Alabama voter and black voters comprise one half of all individuals disenfranchised on the basis of their convictions despite the fact that they are approximately one quarter of the total voting age population.[107]

ii.     The Implementation

Under the current criminal disenfranchisement policies in Alabama only those convicted of crimes listed in the Definition of Moral Turpitude Act are disenfranchised.  Those convicted of other, non-listed offenses or those adjudicated guilty under Alabama's Youthful Offender procedure do not lose their right to vote. People who have not been disenfranchised who are incarcerated may register to vote under Alabama's law and request an absentee ballot to vote by mail.[108] Absentee ballots must be separately requested for each eligible voter and for each election.

Those convicted of disqualifying crimes may apply to the Board of Pardons and Paroles for restoration of their voting rights or a Certification of Restoration of Eligibility to Vote (CERV) provided they have no pending felony charges, they have paid all fines, court ordered costs, fees and restitution ordered at the time of sentencing on disqualifying cases in full, their sentence is complete, and they have successfully completed probation or parole.[109] These requirements create significant impediments to voting.

As discussed above, there can be little question that the Definition of Moral Turpitude Act promotes consistent application of the criminal disenfranchisement clause.  The Act not only limits the number of disenfranchising crimes by listing qualifying offenses, but it binds the county registrars to that list.  In short, while this Act does little to address the underlying concern regarding the disparate impact of the criminal system on black citizens in the state, it does create a known list of qualifying offenses and ensures that county registrars apply a uniform standard in determining disqualification.

---

[105] Blair Bowie, Campaign Legal Center, *Challenge to Alabama's Felony Disenfranchisement Moves Toward Trial*, (2018) https://campaignlegal.org/update/challenge-alabamas-felony-disenfranchisement-moves-toward-trial.
[106] *Id.*
[107] *Id.*
[108] Merrill Testimony, *Alabama Transcript*, p. 22.
[109] Barry-Blocker Testimony, *Alabama Transcript*, pp. 184-188.

Despite these benefits, disparity in the implementation of the criminal disenfranchisement clause under the Definition of Moral Turpitude Act lingers.  First, failure to widely publicize the crimes enumerated under the Act undermines the purported goals of the Act – to limit disqualifying offenses and to avoid improper disenfranchisement.  The Act limits the vague standard of "crimes of moral turpitude" by providing a list of about forty crimes that constitute "disqualifying offense." The problem, however, is that the list itself evades logic or intuition.[110]  The absence of a readily apparent, coherent theory to the list renders it something that must be seen to know.  Included offenses are the opposite of Justice Stewart's pornography[111], neither a convict nor a county registrar will necessarily know it when they see it.  The impact of this vague standard regarding which offense are included is underscored by an alarming number of unnecessary applications for restoration by those who never lost their rights under the Act.[112]  Despite the non-intuitive nature of the list, voter registration forms indicates only that a person must not have been convicted of a "disqualifying felony" while offering no reference as to what is a disqualifying felony or the Act.[113]

Second, while inclusion on the list of crimes of moral turpitude does not produce permanent disenfranchisement per se, for some offenses, the imposition of high fees on the poorest population in the state renders these offenses de facto permanent bars to restoration.[114]  Consider drug trafficking offenses – a category of offenses producing disenfranchisement under the Moral Turpitude Act.[115]  Conviction of a drug trafficking offense results in the imposition of both mandatory minimums and the highest category of fines – some as high as $200,000.[116]  In order to be eligible for restoration under Alabama's law, a person convicted of a drug trafficking offense must first serve the imposed sentence and must pay the imposed fine – a fine subject to a 30 percent fee for late payment (discussed below).  For many, this path to restoration is an impossible one. The combined statutory minimums and heavy fines coupled with the requirement that both sentence and financial obligations be completed prior to restoration serve as de facto permanent barriers to enfranchisement.  This reality is troubling on its face, but it is rendered more problematic by statistical evidence showing that convictions rates for this class of offenses in Alabama (and throughout the nation) disproportionately impact poor and minority populations. Third, while the state does provide a restoration process for those convicted of qualifying offenses, like the list of such offenses this process is far from intuitive.  It requires completion of specified qualifications and application submitted to the Board of Pardons and Paroles.  Given the current

---

[110] The state legislature provided no rationale as to why some crimes were included in the list and others were left off.  Many of the crimes are those that are ineligible for CERV. Others, which would seem to implicate morality, however, are oddly absent – such as embezzlement of public funds, abuse of office or even voter fraud.  *See* Barry-Blocker Testimony, *Alabama Transcript*, p. 180.

[111] Jacobellis v. Ohio, 378 U.S. 184, 197 (1964).

[112] *See* Marc Meredith and Michael Morse, *Discretionary Disenfranchisement:  The Case of Legal Financial Obligations*, 46 The J. of Legal Studies 309 (2017); *see also* Barry-Blocker Testimony, *Alabama Transcript*, p.180.

[113] *Supra* note 65.

[114] Barry-Blocker Testimony*, Alabama Transcript,* pp. 183-184.

[115] *Supra* note 74.

[116] *Id*.

uncertainty of the Board of Pardons and Paroles in Alabama[117], reliance on this agency to regulate restoration is concerning.  The vagrancies of the list of disqualifying crimes coupled with the procedural complexity of restoration, renders the distribution of information regarding both the enumerated offenses that produce disqualification as well as the restoration process an imperative to a voting a system that seeks to ensure that eligible citizens can restore their rights or are not improperly disenfranchised in the first place.

Yet, in Alabama it is clear that confusion and inconsistencies around disqualification and the process of restoration persists.  The state's failure to widely publicize or offer education around designated crimes or the restoration process have furthered such confusion.  During his testimony, Secretary of State Merrill noted that he did not assist, provide applications, or even publicize the process of restoration (known as a CERV).[118]  Instead, the Secretary of State, who regulates all other aspects of elections in Alabama and self-identifies a mission of registering all eligible voters, jettisons the distribution of information about restoration to third parties and the CERV process itself to the Board of Pardons and Paroles.

To further complicate matters, the Board of Pardons and Paroles often denies CERV's to eligible voters or fails to make re-enfranchisement applications available at the time of either conviction, sentencing, or release.[119]  Potential voters have reported challenges in acquiring such applications.[120] Further, testimony from the Alabama Voting Rights Project before the Committee on Administration, Subcommittee on Elections on May 13, 2019, revealed that citizens often believe they are not entitled to vote when they either have never lost their right to vote or in the alternative are eligible for restoration under the CERV process.[121]

This testimony was confirmed by a 2016 study that compared a list of all Alabamians whose voter registration had been cancelled or rejected because of a felony conviction to the Alabama Criminal Records Database (Alacourt).[122]  This study found that between 29,000 and 36,000 individuals who had been removed from voter rolls or denied registration were in fact eligible to vote under the HB 282 because they had not been convicted of disqualifying offenses.[123] As disturbing as this study is, it only accounts for those who were registered to vote prior to their conviction or who tried to register to vote following conviction.[124] It provides no data about the number of citizens

---

[117] Times Daily, Parole Board Cancels Hearings Next Week, March 13, 2020, https://www.timesdaily.com/news/state/parole-board-cancels-hearings-next-week/article_f86a099c-7162-5caf-b537-8478f86de3a5.html
[118] Merrill Testimony, *Alabama Transcript*, pp. 24-27.
[119] Pickett Testimony, Alabama Transcript, pp.292-293.
[120] *Id.*
[121] Alabama Voting Rights Project, *Testimony Before the U.S. House of Representatives Committee on Administration, Subcommittee on Elections*, May 13, 2019. https://campaignlegal.org/sites/default/files/2019-10/AVRP percent20Testimony percent20Subcommittee percent20on percent20Elections.pdf
[122] *Supra* note 78.
[123] *Id.*
[124] *Id.*

26

who have never tried to register to vote because they mistakenly believe they are not entitled to do so. Ironically, the State holds the power to remedy this lack of information, however, to date Alabama has failed to distribute information either directly to effected citizens or to fund and facilitate registration among the convicted population.

Given the disparate impact of the criminal system on minority populations in the state, this failure to make CERV applications widely available or to educate citizens regarding  their eligibility to register or the process of restoration implicates not only Alabama's long history of race based exclusion from the ballot, but it perpetuates this disparity. Further, the state is in a unique position to individually notify those convicted of either their eligibility to register to vote or in the alternative the process of restoration.  Nowhere is that more evident than in the reality that for many of these citizens it was the State that first individually notified them of their ineligibility to vote prior to the passage of the Definition of Moral Turpitude Act.[125]

Beyond the failure to provide information about the Act and restoration processes, Alabama requires payment of all fines and fees attached to the original sentence of the disqualifying case as a prerequisite for restoration.[126]   Alone, this places a financial barrier to restoration that disproportionately impacts low income individuals.[127]   This financial burden is exasperated, however, by the requirement that individuals pay any collection fee attached to such fines and fees in order to clear the original debt.[128] This collection fee, which attaches when the debt is 90 days old and has been referred to the district attorney's office for non-payment, is 30 percent of the original debt.[129] For an individual ordered to pay $1000 in fines, for example, the addition of the collection fee renders the total debt due $1300.  In addition, efforts to contact different counties regarding how the collection fee is calculated – a one-time fee, annually, or in some other method – produced inconsistent results.

While the payment of the collection fee itself is not required to be CERV eligible (only fines, court ordered costs, fees and restitution ordered at the time of sentencing on disqualifying cases must be paid in full), under Attorney General Opinion 2011-049 issued March 30, 2011, the collection fee may be collected first prior to the collection of any underlying debt.[130] The result is that the collection fee must be paid in order for the fines, court ordered costs, fees and restitution ordered at the time of sentencing on disqualifying cases to be paid. The individual who owes $1000 plus the $300 collection fee will therefore have to pay the full $1300 before he or she may apply for CERV.  Thus, while Secretary of State Merrill has indicated that payment of the collection fee is

---

[125] Ala. Code § 17-3-31
[126] *Id*.
[127] The Board of Pardons and Paroles may reduce of forgive such fees.  In addition, those not convicted of disqualifying felony remain eligible to vote regardless of outstanding fines and fees.
[128] *Supra* note 119.
[129] Ala. Code § 45-20-82.65
[130] A.G. No. 2011-049, *Restitution Recovery*, https://www.alabamaag.gov/Documents/opin/2011-049.pdf.

not required to obtain CERV, for those unable to pay the entirety of the fees, costs and fines within the prescribed ninety days, the collection fee must be paid before one can even begin to address the original debt. The purported distinction between payment of this additional collection fee and payment of the original fines and fees is therefore a distinction without a difference for the poor and serves to only compound confusion and restrict access to the ballot for poor populations in our state.

The imposition of this extraordinarily high collection fee (in other contexts a 30 percent state-imposed interest rate would seem unconscionable) and the requirement that it be paid first, as opposed to last or on a pro rata basis, not only seems to defeat whatever purpose such court imposed fines and fees might serve, but also disproportionately disadvantages the poor who lack the resources to pay the imposed debt prior to the 90-day deadline. Such fines and fees are often set, mandatory amounts, unconnected in any way to the facts of the case or the harms the defendant inflicted with his or her crime.[131] To link other rights to them therefore seems to serve little purpose but to ensure that those without economic resources remain ineligible to vote. This is especially troubling when one considers that poverty disproportionately impacts minority citizens in our state. This reality again raises the specter that Alabama's current CERV process propagates the same race-based policies that led to the Voting Rights Act of 1965.

This year, the Administrative Office of Courts published a form to allow felons to request that any money they pay be applied to outstanding fines, fees and costs.[132] Prior to the creation of this form, felons could request that courts "reprioritize" the order of the application of payments made. Counties also have the option to not order the collection fee immediately or to apply payments to fines, fees and costs prior to the imposed collection fee. Despite the state's claim that such options mitigate the impact of the collection fee on felon re-enfranchisement process,[133] requests for information regarding how frequently these options are utilized or even inquiries into how well they are publicized have gone unanswered.

In short, there is no data that this Committee can locate to suggest that these remedies are either widely known or utilized. Beyond this, even as these remedies may offer relief for some, they impose additional procedural hurdles that felons must clear before restoration and at best serve only as an alternative to the state's endorsed norm that collection fees may be imposed and can be collected first.

In contrast to this lack of information, data regarding the impact of legal financial obligations as a requisite for restoration is plentiful. A recent study concluded that one third of CERV applications are denied due to outstanding court debt. The same study also found a statistically significant

---

[131] Ala. Code § 13A-5-11(a).
[132] Alabama Municipal Form MC-17, Distribution Schedule of Costs, Fees and Fines in Municipal Courts (2019) https://eforms.alacourt.gov/media/orkbukj5/distribution-schedule-of-costs-fees-and-fines-in-municipal-courts.pdf
[133] *Supra* note 51, pp.10-11.

28

correlation between outstanding court debt and indigency with 82.3 percent of those assigned a public defender based on an indigency assessment having an outstanding balance on imposed fines and fees compared to only 67.1 percent of those who retained private counsel.  In short, the absence of an indigency consideration prior to the imposition of fines and fees following conviction disproportionately burdens poor defendants at the time the court imposes the financial obligation.[134]   The burden is then aggravated for these same poor defendants through the imposition of the 30 percent late payment fee.  And finally, is perpetuated as restoration procedures require payment of the originally imposed amount.  In short, these financial obligations ensure that marginal populations in the state remain disenfranchised.

iii.     Recommendations

On the most basic level the long history of a disparate impact as a result of the criminal disenfranchisement clause in Alabama supports a return to preclearance status under Section 5 of the Voting Rights Act. While the clause, and the subsequent Definition of Moral Turpitude Act which streamlines implementation of the clause, appear neutral on their face, the history of the clause as well as the disparate rates of incarceration for the black population in the state establishes that despite this facial neutrality the clause creates a barrier to voting that is disproportionate for black citizens.  The lack of preclearance places the burden on the disenfranchised individuals to demonstrate this disparate impact. Given the economic reality of such individuals, this is a heavy burden to take on.  Returning to preclearance status would flip this burden, ensuring review of laws effecting voting rights.[135]

Beyond this global recommendation with regard to the criminal disenfranchisement procedures in Alabama, the Committee also has some specific recommendations:

1. The twin aims of the Definition of Moral Turpitude Act to ensure consistent application of the criminal disenfranchisement statute in Alabama and to limit "qualifying" convictions are undermined by the failure to directly communicate with those previously disenfranchised as a result of pre-Act convictions that no longer serve as qualifying.  This failure to communicate directly with those effected by the change in the classification of qualifying offenses implicates a disparate impact given the disproportionate impact of the criminal disenfranchisement clause and its implementation on black potential voters. The Committee therefore recommends that the state undertake direct communication with such potential voters.

---

[134] While beyond the scope of this Report, it is important to note that such financial obligations serve to perpetuate cycles of poverty and are criminogenic.  A 2014 TASC study found that financial burdens were borne not only by the defendant but by his/her family and entire community.  In addition, many self-reported resorting to criminal activity including theft and drug distribution to raise funds to repay court imposed financial obligations.  *See* Foster Cook, *The Burden of Criminal Justice Debt in Alabama* (2014).
[135] This will be discussed further in the Global Recommendation Section.

2. Second, the State's failure to make CERV applications widely available as part of the standard voter registration process – a process overseen by the Secretary of State and County Registrars – has not only created a barrier to restoration for eligible candidates, but by relying on an underfunded parole and pardon system has essentially pushed the burden for restoration to private actors who currently provide information about the CERV process.[136] This reliance on third party actors represents a dereliction of the state's duty to enforce statutory mandates – in this case, the restoration of voting rights to those eligible. The Committee therefore recommends that the CERV process be treated as part of the voter registration process and that the Secretary of State's Office assume some responsibility to providing both information about this process and also applications for restoration. To be clear, it is not the recommendation of the Committee that the Secretary of State's Office be charged with determining CERV eligibility, but rather that the Secretary's Office treat the CERV application consistently with other applications relating to voting eligibility. It is the belief of this Committee that centralizing information about voter eligibility on a single platform will promote voter awareness and decrease barriers to the ballot.

3. Third, this Committee recommends that the requirement of payment of all fines and fees imposed at the time of the conviction be removed as a barrier to CERV eligibility. This requirement places an undue burden on poor voters in our state.

4. Finally, it is the recommendation of the Committee that the Attorney General's Office rescind its Opinion 2011-049 issued March 30, 2011, in which the Office indicated that counties may collect the 30 percent the collection fee on unpaid court fines and fees prior to collecting any underlying debt. While an outstanding collection fee is not a barrier to CERV eligibility, permitting counties to collect the fee first creates an unnecessary hurdle for those seeking restoration of their voting rights following a disqualifying felony conviction and available alternative remedies are insufficient.  Not only do such financial burdens disproportionately impact low income voters, but there is little evidence that they are designed to address particular harms created either by the initial offense or the delayed collection of the originally imposed fines and fees at conviction. With the exception of restitution, such fines and fees are imposed based on a schedule that does not account for a defendant's particular act.  Likewise, the 30 percent collection fee imposed is a standard fee which does not take into account the defendant's ability to pay, his payment history or the offense for which he was convicted.  In this it is clear that the original fines and fees serve as a financial sanction and the collection fee as a means to perpetuate the punishment of the poor. The Attorney General's opinion exasperates this disparity by permitting collection of the fee prior to the outstanding principle creating one more barrier to enfranchisement for Alabama's marginalized populations.

---

[136] Merrill Testimony, *Alabama Transcript*, p. 23.

D. Voter Roll Purging

Assuming the voter is able to register, staying registered as an active voter is another story. Once a person is registered to vote, voter roll purging policies may remove a voter. Since 2015, Alabama has removed an estimated 658,000 voters from registration lists, 340,000 in 2017 alone.[137] Such purging policies do not prevent a person entitled to vote from casting a ballot – in fact the state offers procedures to vote even if the voter's name has been removed from the voting rolls – however, purging policies may have a chilling effect on voting as they require voters to complete additional paper work prior to voting and may be susceptible to misinformation and improper application.

In addition, those with housing insecurity or lack of regular access to the mail may suffer purges even as they remain eligible to vote in a particular precinct.  Again, this policy, while facially neutral, may have a disparate impact on the state's poor, minority and rural voters.  Simply put, the Committee's global concern is that inactive voter policies may negate many of the advances made in the area of registration.  It is likewise unclear what function voter purging policies serve.

i.      Details and Implementation of Purging Policies

At their most basic level, purging policies are designed to separate active voters from those who are inactive or ineligible to vote.  Such policies work in conjunction with registration processes to ensure that voting lists maintained either at the state level or at the precinct level accurately reflect eligible voters in each precinct.  Inactive voters are designated on separate voting lists and must update their voter registration record before being permitted to vote.[138] Such update forms are available at the polling place.[139] If the voter completes the update form, he or she may vote and may not be required to vote a provisional ballot.

While no precise motivation for such policies has been articulated to this Committee, on his website the Secretary of State indicates that the purpose of voter roll purging is efficiency. It is not clear how the presence of a non-voter on any particular voter roll effects the efficiency of state elections.  Presumably such a voter would be uninterested in or unable to vote in the precinct for which they are improperly registered. This raises the question if the more accurate motive for purging policies is concern over voter fraud – the concern that inaccurate voter rolls might permit an ineligible voter to vote.  While vote integrity is important in any democracy, the risk of individual voter fraud, while serving as a catchall justification for many restrictions on voting,

---

[137] Tim Lockette, *Purge of Voter Rolls Creates Stir in Alabama Congressional Race*, THE ANISTON STAR,  Oct. 22, 2018, https://thevotingnews.com/purge-of-voter-rolls-creates-stir-in-alabama-congressional-race-anniston-star/
[138] Ala. Code § 17-4-9.
[139] Ala. Admin. Rule 820-2.2-.13(2).

remains an unproven proposition.  In addition, in a state that requires both proactive registration and identification to vote, it is unclear what role purging plays in ensuring vote integrity.

What is clear is that since taking office, Secretary of State Merrill has engaged in an aggressive voter purging policy.  In Alabama, voters are purged, or removed from polling lists for three reasons: disqualification; continuous purging; and when the voter has failed to provide address verification.[140]

### a. Disqualification

Turning first to disqualification.  Disqualification occurs when the voter has died, is mentally incompetent, has been convicted of a disqualifying offense, or when the Board of Registrars has received at least one of two types of written notification that the registrant has moved outside the jurisdiction.[141]  As discussed above, a voter who has been convicted of a disqualifying offense may be restored under felon restoration procedures.  Likewise, a voter disqualified because he or she left the jurisdiction, may register to vote upon returning to the jurisdiction.  Whether restoration is based on a CERV or on registration itself, both processes require a voter to take actions to ensure that he or she is returned to the voter rolls.  In this, voter purging procedures raise the same risk of exclusion that felon restoration and registration requirements pose as discussed above.

Disqualification based on mental incompetence in contrast, seems to suffer from fundamental misunderstandings and misinformation among election officials, judicial officials, and the disability community in Alabama regarding this basis for removal.  During the 2018 election, voters with developmental delays reported being told by election officials, often at the polling place, that they could not vote because of mental incompetence.[142]  Likewise, a communal belief persists that those with subnormal or low IQ or who have been given accommodations under individual education plans for developmental delay are not eligible to vote under the mental incompetence provision.[143] This belief, while not necessarily promulgated by the state, is also not disputed explicitly by the state and likely effects voter registration.

Finally, judges considering guardianship applications for adults with developmental delays and low IQ frequently include a rote finding of mental incompetency that precludes voter registration. This finding is often made without any evidentiary record to support its use or without specific consideration of the long-term effect of the finding on voter eligibility.   This basis of disqualification therefore raises concerns that, in its implementation, it serves to improperly exclude some voters and excludes other without any meaningful process.

---

[140] Ala. Code §§ 17-4-3 and 17-4-4.
[141] Ala. Code § 17-4-30.
[142] Persons with developmental disabilities have the right to vote and participate in the political process. *See* Americans With Disabilities Act, 42 U.S.C. § 12132. Ala. Code §§ 38-9C-4(7) and 4(5).
[143] *Id.*

b. *Continuous Purging and Address Verification Processes*

In January 2017, in compliance with the National Voter Registration Act, the Secretary of State's Office began contacting voters in an effort to verify or update their voter registration. This process of continuous purging consists of a two-part mailing.  First, the Secretary of State's office mailed all registered voters in the state non-forwardable postcards to verify the registration information the voter provided, including his or her address.[144] This non-forwardable postcard asked the voter to review their registration information contained on the postcard.  If the information on the postcard was accurate, the voter could retain the card.  A retained card is considered a successful delivery to registrant.  If this successful delivery of the non-forwardable postcard occurs within 90 days of the original mailing, it indicated valid registration information and served to verify the registrant's address.[145]  If verification occurs, there is no change in the voter's registration status – he or she remains on the voting rolls as an active voter.

If, however, the information on the non-forwardable was inaccurate or required updating, the recipient was instructed to update the card.  The voter could do so through a variety of options, in person at their board of registrar's office, by returning the card, by utilizing the Secretary of State's website or by using the voter registration app.  If the voter updated their information, the confirmation process appears to begin again, though the Secretary of State's website is unclear if the updated information constitutes verification or not.

If the voter listed on the non-forwardable postcard no longer lived at the address to which the card was sent, the recipient of the card is instructed to mark the card "return to sender" and place it back in the mail.  Cards marked return to sender and placed back in the mail were delivered to the local county board of registrar's office and were recorded as "returned."[146]  When this occurred the verification had failed as the non-forwardable postcard was considered undeliverable.

At this point, a second forwardable notice was sent. This second notice indicates that the first non-forwardable mailing was returned and that the voter must either update his or her voter registration information or contact the registrar's office to have their name removed if they are no longer living in the state.  The second forwardable notice provides a postage-paid confirmation card.[147]  In addition, voters receiving this second forwardable card may update their registration information in person, through the Secretary of State's website or through the registration app.[148]

If the second forwardable address confirmation card is returned as undeliverable, or if the voter did not return the address confirmation card within 90 days of the second mailing, the registrant's

---

[144] Ala. Code § 17-4-30(a).
[145] Ala. Code § 17-4-30(b).
[146] Ala. Code § 17-4-30.
[147] Ala. Code § 17-4-30(c).
[148] *Id*.

name is placed on the inactive list and in a suspended file.  Inactive voter registration status does <u>not</u> bar a voter from voting as a normal voter on election day.[149]  An inactive voter may vote and may not be required to vote a provisional ballot, however prior to voting, he or she must update his or her voter registration information at the polling place.[150]

Under Alabama's continuous purging procedures, voters are purged from voters rolls only if during a four-year election cycle, they fail to respond to the two part mailing process and do not participate in any election during the same four-year period.[151]  In other words, if a voter whose name is in the suspended file does not vote in an election conducted during the two consecutive federal election cycles (4 years) or does not provided updated information of his or her address, his or her name is purged from the voter rolls.  His or her name will not appear on the voting rolls as a registered voter when he or she appears at the polling place to cast a ballot.

If the person's name is not on the list of registered voters or if it is listed as an inactive voter, he/she must provide proof of registration -- a certificate from the board of registrars.[152]  As per the Alabama Election Handbook, "the certificate issued to voters when they originally register is not collected when people change their residence or otherwise become ineligible, so it is good practice to check with board of registrars or the judge of probate if a person presents an old certificate. It is recommended that the certificate be taken up and kept with the list of registered voters so that it cannot be used twice in a single election and so that it will be available in the event of a contest."[153]  Once acceptable proof is presented, the person may be added to the list of registered voters and should be allowed to vote.

Any qualified voter residing in the precinct or voting district who cannot provide proof of registration may vote a provisional ballot if their name is not on the official voter rolls.[154] In order for the provisional ballot to be counted, however, the voter must present proof to the Board of Registrars no later than 5:00 p.m. on the Friday following election day that he or she is an eligible voter in the precinct in question.[155]  If the voter has not voted in the proper precinct, the provisional ballot will not be counted.[156]

If a voter whose name appears on the inactive list appears on election day, he or she must be allowed to reidentify and vote a regular ballot.[157]  Reidentification procedures are set by the Secretary of State and pre-date the *Shelby County* decision, i.e. they were pre-cleared by the

---

[149] Ala. Code § 17-4-30.
[150] Ala. Admin. Code Rule 820-2.2-.13(2).
[151] Ala. Code § 17-4-30(c).
[152] Ala. Code § 17-10-3.
[153] Alabama Election Handbook, Eighteenth Edition, p. 137 (2017-2018).
[154] *Supra* note 146.
[155] Ala. Code § 17-10-2 (a)(3).
[156] Ala. Code § 17-10-2 (a)(5)(c).
[157] Ala. Code § 17-4-9.

Department of Justice.[158] Official lists of qualified voters in a county are then compiled and furnished to the election manager by the judge of probate at least 55 days before the election and in the case of municipal elections at least 35 days prior to the election.[159]

    ii.    The Effect of Purges

Compared to registration and identification processes, purging and address verification processes are among the most complicated regulations in Alabama's election code.  This is not helped by the fact that the purging and verification polices are governed by federal and state statutes and Administrative Rules. While overseen by the Secretary of State's Office, these policies rely on local Registrar's Offices and the postal service to function.  In short, this is a confusing process that only becomes more confusing if the voter is unable to receive and retain the initial non-forwardable mailer.

It is also not clear on the most basic level if the non-return of the mailer actually serves as a verification.  Put another way, as a matter of logic, the fact that the mailer does not come back provides limited information and is subject to a variety of variables that may produce a false verification.  To name a few, the mailer could have been misdelivered or a person could have failed to return the mailer despite the fact that the names on the mailer did not match the residents of the house.  That there are spaces for failure does not render a policy *per se* irredeemable but given the apparent goals accuracy, a system prone to failure seems an odd choice particularly when the system may exclude, or disadvantage particular populations as discussed below.

    *a.    The Challenges of Mailings*

In addition to concerns expressed previously about disqualification, a system of purging that is dependent on mailing raises concerns for those with housing insecurity or who may not receive mail at their place of residence.  Poor and rural populations may not remain at a residence for extended period of times or may pick up mail periodically at a non-residential location such as a P.O. Box.  This implicates not only purging methods but address verification itself.

Voting regulations in Alabama permit voting if a voter maintains residency in a precinct even if they have moved from the original address of registration or do not receive mail at that address. A voter therefore could have moved or not receive mail and still be eligible to vote within a precinct despite having not received direct mailings to confirm residence or having voted in last two federal election cycles (statistically some elections simply do not draw large voting populations). In short, despite their compliance with Alabama's voting requirements *vis a vis* residency, their lack of

---

[158] Ala. Code §§ 17-4-9, 17-1-2(5), 17-9-15.
[159] Ala. Code § 17-11-5(b)).

address confirmation and active voting will render them inactive and potentially purged from election rolls.

Continuous purging methods also assumes that a voter, even one that remains at a particular address, may receive mail and be able to return a card in a designated time – a requirement not indicated in any Alabama statute as a requisite to vote.  Not all eligible voters however may be able to meet this requirement.  Those with housing insecurity are most likely to fail to meet this requirement, but seasonal workers or those who must travel for work may face similar challenges. The fact that these voters may undergo procedures to reinstate their voting status does not mitigate the effect of such regulations or lessen the persistent message that voting is easier for some populations than others. It also raises the more fundamental question of what precisely are voter purging processes accomplishing in a state that requires affirmative registration and identification to vote?

  *b.  The Challenges of Reinstatement*

In addition to the concerns surrounding these purging processes discussed above, the process of updating and address verification raises concern for their effect on marginalized populations. Updated forms take time to complete. Working voters often appear at polling places during limited windows – statistics suggest prior to work, lunchtimes, and after work time slots are more commonly used in Alabama. For workers casting ballots during these times, polling places are often crowded and the process of voting is time-consuming.  Filling out an update form takes additional time a voter may or may not be able to sacrifice.  Simply put, a voter may have to choose between completing the required form and getting to work on time or picking up a child or caring for a family member. Such a voter may cast a provisional ballot in order to avoid having to fill out the update form, but in order to have that ballot counted, he or she will have to provide the required documentation (discussed later) prior to 5:00 p.m. on the Friday following the election.[160] For working men and women without flexible work schedules, caregivers, or those without ready access to transportation this may be an insurmountable burden.

Given that the system of verification depends on voters receiving (or in the case of inactive voters not receiving) mailings, voters may not realize they have been purged or placed on inactive voter rolls until they actually show up to vote.  For their part, polling officials do not appear to always understand regulations that permit the voter to cast a ballot as opposed to a provisional ballot.[161] This potentially creates confusion when a voter is told he or she is not on the rolls, as well as frustration when the voter is told he or she may not vote or must vote provisionally.  Further confusion seems to persist among members of the public about what happens to provisional ballots and when they are counted and when they are not. Lack of information about this process and

---

[160] Ala. Code § 17-10-2 (a)(3).
[161] Crayton Testimony, *Alabama Transcript*, p.67.

conflicting recitations of how this process works creates not only confusion but a sense that voter purging methods are designed to disenfranchise. Even if this is not the case, the perception is significant as it erodes faith in the democratic and electoral process.

This is further complicated by the fact that errors in voter rolls appear to persist despite the two-part mailing process.  In the 2017 election, the NAACP reported that properly registered voters had been improperly placed on either inactive voter or told that they had to present identification with an address that matched that on the voter roll (not actually a requirement in Alabama).[162]  In addition, the Equal Justice Initiative found that Alabama was not following its own purging procedure – removing voters prior to the expiration of the two federal election cycles using a third party source to establish that the voter had moved or was no longer eligible to vote.[163]  Again this suggests that polling workers and the process of voter verification itself suffers from misinformation and misuse that appears to disproportionately effect those with the fewest resources and those historically disenfranchised.

Finally, construction of voter rolls themselves presents a problem in our state. Under Alabama law, the deadline to register to vote is 14 days prior to elections[164], but official lists of voters are furnished well in advance of this deadline (55 or 35 days depending on the election).[165]  These different time frames – between registration deadlines and the issuance of voter rolls -- creates confusion at polling places and has the potential either to force some voters to cast provisional ballots who should not have to or to cause some voters not to vote at all – in short, a type of de facto purging.  This Committee has yet to be able to track down an explanation of why these timeframes are not coordinated.

iii.    Recommendations

As with other voting regulations in Alabama, it is not clear what function purging processes or address verification process serve.  Setting aside for a moment the question of whether or not individual voter fraud poses a significant threat to elections sufficient to justify the chilling effect that current voting regulations produce on poor, minority and rural communities, to the extent that "accurate" voter rolls are an important state goal, it is not clear that the current system achieves these.  Misinformation, inaccurate and inconsistent procedures and mechanisms of verification with error built in, to name a few, render voter rolls inaccurate despite of and perhaps because of purging and address verification policies.  Further, such policies may discourage or prevent eligible

---

[162] *See* https://www.naacpldf.org/files/about-us/2017%2012%2014%20LDF%20Letter%20re%20Issues%20Concerning%20the%20Special%20Election.pdf
[163] *See* https://eji.org/news/voter-suppression-persists-through-purging/
[164] Ala. Code § 17-3-50.
[165] *See* Ala. Code § 17-11-5(b).

voters from casting ballots.  In addition, identification and registration requirements would seem to accomplish accuracy goals rendering address verification and purging processes unnecessary.

One possibility is to forgo purging processes altogether.  To the extent that this is not possible, the state could adopt a system that relies on multiple alternative methods of notification and verification. While the current system allows verification in a variety of ways (through mailings, in person at the board of registrar's office or online), other possibilities exist and may be more accessible.  In the alternative, relying on voters to provide updated information themselves may be sufficient to accomplish state goals.

## Regulations Surrounding Polling

In addition to regulations relating to pre-voting processes, following the Court's decision in *Shelby County*, Alabama adopted a variety of polices that relating to polling itself.  Such policies are less focused on the voter and more focused on the infrastructure of voting.  Nonetheless, these policies may affect voting in a variety of ways regulating polling places, polling hours, construction of voting districts and the training poll workers receive.  Like their pre-voting counterparts, these policies control access to the ballot by controlling when people can vote, where they can vote and what information a voter receives at the polling place.   This section considers these policies.

A.  Polling Place Closures

From 2013, following the *Shelby County* decision, to 2016, a study found that 12 counties in Alabama closed 66 polling places.[166]  Another study put the number of closures at 72 from 2013 to 2019.[167]  Testimony received at the February 22, 2018, hearing revealed that the closing of polling places and confusion regarding new polling locations persists in Alabama effecting ballot access.[168]

The presence of consistent and reliable polling locations is critical to a functioning democracy, particularly among populations that may have limited windows of time to vote and limited access to transportation.  The closure of a polling place can present a barrier to voting, even if notice of such closings are publicized.  Unfortunately, in Alabama, polling place closures often took place without clear notice and without any effort to gain the approval from the impacted voters and other

---

[166] *See* The Leadership Conference Education Fund, The Great Poll Closure, (Nov. 2016) http://civilrightsdocs.info/pdf/reports/2016/poll-closure-report-web.pdf.  This study relied on limited data, examining 18 total counties in Alabama with a total of 12 reporting 66 closings.
[167] *See* The Leadership Conference on Civil and Human Rights, Democracy Diverted: Polling Place Closures and the Right to Vote.  http://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf.
[168] Simelton Testimony, *Alabama Transcript*, p.254.

community stakeholders.[169] As well, voters were often not given information about how closure decisions were made or why. This lack of transparency and effort to obtain input from effected communities creates an additional potential barrier to voting by suggesting that citizen engagement was unnecessary and that state officials would determine where voters could exercise their rights. This suggestion is reinforced when state officials offer limited or pretextual explanation for polling place closures, as they did in Alabama.

Alabama officials offered five explanations for polling closures:  budget constraints, compliance with the Americans with Disabilities Act (ADA), school safety concerns, limited parking and changes in voter turnout.[170]  The most common explanations offered were that there were too many voters for the polling place to accommodate or that the polling place had to be removed from schools under state law, [171] though no state law requires such removal.[172]  In addition, media inquiries regarding polling place closure often resulted in silence from state officials. This not only precludes residents from understanding why polling places were closed, but it obscures and prevents challenges to the official reason for the closure by declining to provide information about such closures.  While the citizen may be able to protest the closure itself (assuming he or she realizes it has occurred), the citizen cannot protest reasons he or she does not know.

This trend is particularly troubling given its impact on poor, minority and rural communities in which most closures occurred.  Rural areas may also face particular challenges as Alabama law requires the county commission to select at least one polling place for each precinct.[173]  "In an effort to reduce costs for elections some counties have moved to voting centers.  Voting centers combine voters from two or more precincts and allow them to vote in a centralized location."[174] In practical terms this means polling places may be farther away from the very voters who have the least access to public transportation and the internet.

The decision to create voting centers, in the process closing neighborhood polling places in predominantly low-income locations and in black belt and rural areas where public transport is scarce, has created logistical challenges for voters in Alabama.  Testimony from the Secretary of State, Mr. Parks, and representatives from the NAACP, ACLU, and the Equal Justice Initiative (EJI) highlight how contested the effect of such closures on voting populations are.[175]  At a

---

[169] *See* Mary Sell, *In Some Counties, Alabama Voters Have Lost a Quarter of Their Polling Places Since 2010*, BIRMINGHAM WATCH (Nov. 2, 2018). https://birminghamwatch.org/counties-alabama-voters-lost-quarter-polling-places-since-2010/.

[170] *Id.*

[171] *Supra* note 163.

[172] *See* Donna Thornton, *Possible Changes in District 2 Polls Bring Opposition*, GADSEN MESSENGER (Sep. 6, 2013), https://gadsdenmessenger.com/2013/09/06/possible-changes-in-district-2-polls-bring-opposition/.

[173] Ala. Code §§ 17-6-3 and 17-6-4.

[174] Alabama Election Handbook, Eighteenth Edition, p.240 (2017-2018).

[175] Parks Testimony, *Alabama Transcript*, p.113, Holmes Testimony, *Alabama Transcript*, p.169, Crayton Testimony, *Alabama Transcript*, p.55.

minimum, the state should conduct a study to determine the effect. Our state should not accept that a promise of notice of a polling place closure will somehow render all who might seek to vote either aware of the closure or able to travel to a new location. Again, for those with limited time, resources, and transportation access, such changes may result in choosing between life's necessities and casting a ballot.

To Secretary of State Merrill's credit, up-to-date polling location information is available through the Secretary of State's website. The existence of such information permits voters to learn of polling place closures quickly and efficiently. Concerns persist that those without access to the internet may have difficulty accessing information about closures in a timely fashion, particularly when such closures occur for the first time or with short notice. In addition, any notice regarding closure will not mitigate the devastating effect of polling place closures among marginalized communities who lack transportation to new polling places or lack a means to discern when and if previous polling places have been closed.

In addition to sending a message that some voters may be undervalued by the state and creating practical barrier to voting, polling place closures also propagate confusion that can result in disenfranchisement by creating a risk that the voter may be voting in the wrong precinct. Under Alabama's voting regulations, if a person not listed on the voter rolls at a precinct seeks to vote he or she may cast a provisional ballot.[176] If, however, this provisional ballot is cast in the wrong polling place or precinct then it may not be counted.[177] Ideally, if the person is at the wrong precinct, he or she should be directed to the correct polling place. The voter must then travel to the new polling place and seek to cast a ballot within the provided poll hours.

This ideal system, however, depends on members of the Board of Registrars offices actually being able to speak to poll officials to confirm where the voter should vote and/or the voter being able to travel to a new location to vote. This may be challenging during peak voting hours or if the voter has limited time, resources, or access to transportation. It is not clear that such communication is always occurring. Reports from the 2018 mid-term elections suggested that poll officials were not always able to determine where a voter should cast a ballot.[178] As a result, some voters were given provisional ballots despite the fact that they were voting in the wrong precinct.[179] A voter's failure to appear at the correct precinct may be attributable to a variety of factors – poll location change, voter error or misinformation – but a failure to provide the voter with the correct information about the appropriate location to vote is problematic and attributable entirely to the state. Such a failure has been exasperated by the mass closure of polling places.

---

[176] Ala. Code § 17-10-2.
[177] Ala. Code § 17-10-3.
[178] Boone Testimony, Alabama Transcript, p.118.
[179] *Id.* at 149.

It is not clear what the precise basis for the state's decision to close polling places was or what effect such closure had on voting.  Therefore, it is the recommendation of this Committee that the state seek information regarding the effect of particular populations with an eye towards notice, transportation and transparency with regards to basis for the closures.

B.  Poll Hours

Just as limited access to polling locations may present a barrier to voting, so too may limited polling hours. Under Alabama laws, polls in state and county elections must remain open between the hours of 7 a.m. and 7 p.m.[180]  Anyone within the polling place or in line to vote at the closing time who has not had an opportunity to vote must be permitted to do so.[181]  If, however, a voter leaves the line to vote, he or she may not return after the polls have closed to cast a ballot.[182] After the time of closing, the voter must remain in line to vote in order to be eligible to cast a ballot. A federal or state court order may extend polling times beyond 7 p.m., but anyone who votes during the extended period must cast a provisional ballot.[183]

At first glance a twelve-hour voting window appears to accommodate those who work or have caregiver obligations, but this first impression is deceiving.  Given increasingly long commute times and irregular work hours, a 7-7 polling window effectively places voting within working and child-care hours.  Given that peak voting times (mornings, lunch time and evenings after 5:00 p.m.) coincide with work and familial obligations and that Alabama provides no "state holiday" for voting, long lines at polling places may discourage or prevent some voters from ultimately casting a ballot. This problem is exacerbated by the closure and combining of polling places, which have increased the voting population at particular locations and/or increased the distance between the polling place and the voter's place of work or home.

Single day, limited polling hours (even ones that span for 12 hours) may be especially challenging for those without access to reliable or public transportation, those who work multiple jobs in which their salary or wage is dependent on their presence, those with childcare or elder care obligations and those who must travel long distances between their work and polling place. While Alabama limits the distances a polling place can be from the voter's residence no such limitations exist for distances between a voter's job and the polling place. For marginal voters, voting during work times may force a difficult choice between earning needed income and realizing the right to vote.

Again, it is unclear what the state's rationale is for single day voting and limited voting hours.  In the past the State has argued that limited voting times promote efficiency. Even if this were true,

---

[180] Ala. Code §§ 17-9-6 and 11-46-28(a).
[181] Ala. Code § 17-12-1.
[182] *Id*.
[183] Ala. Code § 17-10-2 (4).

efficiency concerns should not unduly burden access to the ballot.  This Committee recommends reconsideration of contracted voting periods to allow for voting on multiple days including on weekends.  This would give voters a variety of available times to cast ballots and might actually promote efficiency by ensuring that voters were not all arriving on a single day.  While it might not be feasible to offer such extended voting periods at all polling places, limited extended voting in other jurisdictions has proven both efficient and also has not demonstrated any particular susceptibility to fraud.[184]

### C.  District Gerrymandering

Questions about redistricting in Alabama have long been at the forefront.  Prior to the *Shelby County* decision, the Alabama Legislative Black Caucus and the Alabama Democratic Caucus challenged Alabama's 2011 legislative map.[185]   In 2017, a three-judge panel ruled that 12 legislative districts in the 2011 legislative map were unconstitutional racial gerrymanders as a result of a policy adopted by the Alabama legislature that required that the population of majority Black districts to be kept at pre-redistricting levels under Section 5 of the VRA.[186]  The result was that certain districts had to be significantly reshaped in order to equalize population.  Alabama adopted this policy to avoid retrogression under Section 5.[187]

A three-judge panel of the United States District Court for the Middle District of Alabama ruled on April 5, 2013 that the plaintiffs had not shown that the districts were redrawn primarily on the basis of race and rejecting other non-race-based claims.[188]  The Alabama Legislative Black Caucus and the Alabama Democratic Caucus appealed the ruling to the Supreme Court, seeking that the decision of the United States District Court for the Middle District of Alabama be reversed and remanded.[189]

The plaintiffs argued, among other things, that the state's fixed racial percentages for districts, which the state adopted without conducting any factual analysis, fundamentally misconstrued the requirements of Section 5 of the Voting Rights Act and imposed racial quotas that cannot be justified by any compelling state interest.[190]  They further claimed that Section 5 requires a much more nuanced and factual analysis to ensure that the VRA is not used as pretext for diminishing or harming the political rights of minority voters.[191]

---

[184] *See* https://bipartisanpolicy.org/wp-content/uploads/2019/03/Improving-The-Voter-Experience-Reducing-Polling-Place-Wait-Times-by-Measuring-Lines-and-Managing-Polling-Place-Resources.pdf which found extending voting hours was one way to reduce voter wait times and increase voter turn out.
[185] Ala. Legislative Black Caucus, et al v. Alabama, 989 F. Supp. 2d 1227.
[186] *Id*.
[187] *Id*.
[188] *Id*.
[189] *Id*.
[190] *Id*.
[191] *Id*.

On March 25, 2015, the Supreme Court issued its ruling in *Alabama Legislative Black Caucus v. Alabama*.[192] In a 5-4 decision, the Court reversed the district court's decision, finding that it had erred in three ways: first, by failing to consider the role of race on a district by district level, instead by asking whether race predominated in the drawing of the maps as a whole; second, by accepting the need to eliminate population deviations as evidence that the map was not drawn "predominately on the basis of race;" and third, by concluding that Alabama's use of race was narrowly tailored because it had relied on a "highly mechanistic" reading of Section 5 when it decided to adopt fixed racial targets.[193] The Court remanded the case back to the district court for further proceedings.

On remand, the Eleventh Circuit panel upheld the constitutionality of all but 12 districts.[194] The court has ordered the legislature to adopt a remedy correcting the deficiencies in the 12 unconstitutional districts in time for the 2018 elections.[195]

With the approach of the 2020 census redistricting discussions occurring outside of preclearance requirements are raising concern particularly among minority populations. Testimony from the NAACP and others indicated concern that given Alabama's status as a "single party" state in state government, that there will not be meaningful opportunity to challenge redistricting.[196] Certainly, the shift in burdens regarding proof of improper reliance on race without preclearance requirements will render any potential challenge more daunting, time consuming and costly. This will be discussed further in the conclusion of this report but is important to note here as well. Finally, this Committee recommends at a minimum true bipartisan participation and a study into the impact of redistricting on poor, minority and rural populations in the state. Access to the ballot is certainly important, however that access is limited if votes are corralled and cabined by districting policies that dilute minority and dissenting voices or confine them to limited representation that fails to reflect their actual population presence.

### D.   Poll Worker Training

In addition to policies that may affect the voters' polling locations, the hours they can vote and the voting district to which they are assigned, conversations with advocates and voters raised concerns about the level of training poll workers receive particularly in light of the complicated and often redundant nature of Alabama's voting statutes and administrative regulations.[197] Testimony received suggested that polling workers provided misinformation to voters about when provisional

---

[192] *Id*.
[193] *Id*.
[194] Ala. Legislative Black Caucus, et al. v. Alabama, 231 F.Supp. 3d 1026 (2017).
[195] *Id*.
[196] Holmes Testimony, *Alabama Transcript*, p.
[197] Boone Testimony, *Alabama Transcript*, p.107.

ballots had to be cast, the significance of the provisional ballot, what type of identification was necessary to vote and where the voter's correct polling location was.[198]  This misinformation is particularly troubling as it comes from the very officials charged with ensuring that voters are able to vote and that election integrity is maintained.[199]

Accordingly, this Committee recommends a revised training for poll workers and magistrate judges (who oversee elections on the county level) and that election information is produced in a concise and understandable format so that both workers and voters can clearly understand what requirements exist for voting and how, where and when a voter can cast a ballot.  Secretary of State Merrill has made progress is setting upon up a website with easily accessible information regarding voting requirements and the registration process.  Likewise, he has overseen training of polling officials in an effort to ensure consistent and accurate information.  These are positive steps, however, additional training, including training closer to the time of the election will further these efforts and reduce the type of misinformation that has plagued past elections.  Second, this Committee recommends increasing pay to poll workers to better reflect the importance of their work and to better incentivize well qualified individuals to serve as poll workers. Finally, this Committee recommends a meaningful investigative process must exist to explore allegations of misinformation.

## Barriers to Alternative Voting Procedures

Alabama has instituted limited alternative voting procedure that may also serve as an impediment for the most vulnerable voters. Such alternatives including absentee balloting, early voting or extended voting times and provisions for ballots cast at incorrect locations and provisional ballot procedures all facilitate voting for those who either have limited access to transportation or in the alternative may not be able to vote during designated times.

A.      Absentee Voting

Alabama permits limited absentee balloting.[200] A voter who will be out of country or state, has physical illness or infirmity which prevents attendance, works a 10 hour shift that coincides with polling hours, is an enrolled student outside of the county of personal residence, is a member of the armed forces or spouse or dependent of such a member, is an election official or poll worker, or is a jailed but not convicted person may vote under Alabama's absentee ballot provisions.[201] To do so, the voter must apply for an absentee ballot at least 5 days prior to election.[202] The voter may

---

[198] Id. 105-107.
[199] Id.
[200] Ala. Code § 17-11-3.
[201] Id.
[202] Id. at 3(a)

apply by handwritten application, but all applications must contain sufficient information to identify the applicant as a registered voter. Each voter's application must be separate and a voter must apply for each election he or she seeks to vote absentee in.[203]   A voter may receive an emergency absentee ballot upon proof of emergency treatment by a licensed physician within the five-day deadline for absentee ballots.[204]

If the voter is summoned out of the county on an unforeseen business trip, he or she may apply for an emergency absentee ballot any time before the close of business the day before the election, but must sign an affidavit swearing that the voter was unaware of the trip prior to the five-day deadline.[205]Any voter casting an absentee ballot must provide a copy of their identification with the absentee ballot.[206]   Military absentee ballots are covered by the Uniformed and Overseas Citizens Absentee Voting Act and the Military and Overseas Voter Empowerment Act, under which the voter must send an application for a local absentee ballot at least 30 days prior to election.[207]   Voters under the act are not required to produce identification prior to voting.[208]

While Alabama does offer absentee ballot provisions as described above, the state does not offer "no excuse" absentee balloting. Voters who face the logistical challenges to voting at particular locations or during particular hours may not qualify under the articulated categories for absentee ballots.  Further, the requirement to provide copy of identification imposes complication and costs on voters, particularly on those without access to copying machines. Finally, despite the fact that the voter is not obligated to remain at a single address but is eligible to vote if residing in precinct, if a voter requests an absentee ballot with a different address than that on the voter list, the ballot is mailed to the address shown on the voter list as per Attorney General Opinions s2000-156 and 2000-193.[209] This policy increases the probability that the voter may not receive the requested absentee ballot.

There is limited information regarding the state's reasons for limiting absentee balloting.  The restriction appears linked, as with other restrictions, to concern that excessive absentee balloting may promote individual voter fraud.  These concerns are certainly heightened by events in North Carolina during the 2018 election.[210]   Despite that occurrence there is little evidence to suggest that absentee ballots are routinely manipulated, however there is good evidence to suggest that the presence of no excuse absentee voting promotes increased voter participation.

---

[203] Ala. Code § 17-11-3.

[204] *Id*.

[205] Ala. Code § 17-11-3 (d).

[206] Ala. Code § 17-11-3.

[207] *Supra* note 199.

[208] Ala. Code §§ 17-9-20 (d) and 17-17-28.

[209] A.G. Opinion 2000-156, *Elections-Absentee Voting-Absentee Ballots-Residence Requirements* (2000). https://www.alabamaag.gov/Documents/opin/2000-156.pdf.

[210] Associated Press, Timeline: *North Carolina's Absentee Ballot Scandal*, Feb. 27, 2019. https://apnews.com/7fcfea814fe3479eb5623ce9511b09f0

Accordingly, it is the strong recommendation of this Committee that Alabama extend absentee balloting.  Absentee ballots offer an opportunity for those unable to attend traditional voting poll places to vote.  Such ballots serve to ensure efficient vote calculation (they can be counted early) and reduce congestion at polling places. Finally, absentee ballots can be a cost-efficient mechanism for the state to conduct elections.[211] Some jurisdictions, recognizing this fact, permit no excuse absentee balloting or conduct mail-in elections in which any citizen can mail a ballot. Despite these benefits Alabama has opted to take a restrictive stance on absentee balloting. And once again, those most affected by this decision are likely to be those with the fewest resources in our community.

B.     Early Voting or Extended Voting Times

As discussed in the polling hours section (above), even a twelve-hour voting window may pose challenges for particular voters including those with child or elder care obligations, inflexible work schedules and long commutes.  Despite these impediments, Alabama does not currently permit early voting and requires a federal or state court order to extend polling times beyond 7 p.m. under Alabama law.[212]  As discussed above limited voting hours, coupled with a restrictive absentee ballot provision, assumes a voter will be able to cast a ballot on a particular day in a particular time window.  For some voters, this is simply not the case.  In contrast, allowing early voting or the option to extend voting times – either in terms of offering additional days to vote or additional hours to vote on election day – creates additional forums that accommodate voter's schedules.  As with absentee balloting, in jurisdictions in which early voting has been offered at central locations, voting efficiency has actually increased as fewer voters appear on election day at polling places reducing congestion.[213]  Accordingly, this Committee urges the state to consider the adoption of early voting options and extended voting times.

C.     Provisions for Ballots Cast at the Wrong Location

As discussed above, a provisional ballot will only be counted if a voter can demonstrate proof of identity, registration and that he or she is an eligible voter in the precinct in question to the Board of Registrars no later than 5:00 p.m. on the Friday following election day. If the voter has not voted in the proper precinct, the provisional ballot will not be counted. This timeframe places an unquestionable burden on voters, but beyond this, in the 2018 election voters reported confusion surrounding both when provisional ballots were appropriate and what the consequences of a ballot cast in an incorrect location would be (it would not be counted).  This confusion is both unacceptable and obscures a larger question of why ballots cast in incorrect locations are simply

---

[211] See Crayton Testimony, *Alabama Transcript*, pp. 58-59.
[212] Ala. Code § 17-10-2(4).

not transported to the correct precinct.  Given that voting in any precinct in Alabama cannot occur without demonstration of identity and registration as per the procedures described above, the risk of voter fraud would appear minimal.  Accordingly, this Committee recommends adoption of policies to ensure that valid provisional ballots are counted in the precinct in which the voter is entitled to vote.

## Recommendations

Throughout this report, this Committee has made a variety of recommendations based on testimony received and data collected.  These recommendations are both broad and narrow and are as follows:

1. Return Alabama to preclearance status
2. Reconsider voter identification law, including but not limited to considering abolishing the requirement or increasing the types of acceptable identification
3. Increase access to locations that can produce the required identification.
4. Create multiple mobile identification units
5. Ensure a variety of hours of operation for all identification producing locations to ensure access for even marginal citizens in the state
6. Reduce costs identification by broadening not only the type of identification accepted, but also the documentation necessary to obtain that identification
7. Reconsider the current voter registration process, including but not limited to considering abolishing the requirement of registration or in the alternative adopting a system of automatic registration for eligible citizens
8. If the state is disinclined to do away with the voter registration requirement, increase access to registration by allowing same day registration for elections, by expanding locations that permit in person registration and by offering free and accessible access to online and app based registration platforms with a guarantee that such platforms do not engage in data gathering or sharing beyond that necessary to maintain voter records.
9. Create consistent and accessible sources of information for citizens and those who run points of access to registration (such as MVD and Board of Registrar's Offices).
10. Inform those previously disenfranchised as a result of pre-Moral Turpitude Act convictions that their convictions no longer serve as disqualifying.  This communication must come from the State.
11. Make CERV applications widely available as part of the standard voter registration process. To be clear, it is not the recommendation of the Committee that the Secretary of State's Office be charged with determining CERV eligibility, but rather that the Secretary's Office treat the CERV application consistently with other applications relating to voting eligibility. It is the belief of this Committee that centralizing

information about voter eligibility on a single platform will promote voter awareness and decrease barriers to the ballot.

12. Remove the requirement of payment of all fines and fees imposed at the time of the conviction as a barrier to CERV eligibility

13. The Attorney General's Office should rescind its Opinion 2011-049 issued March 30, 2011, in which the Office indicated that counties may collect the 30 percent the collection fee on unpaid court fines and fees prior to collecting any underlying debt.

14. Forgo purging processes or to the extent that this is not possible, the state could adopt a system that relies on multiple alternative methods of notification and verification.

15. Seek information regarding the effect poll place closures of particular populations with an eye towards notice, transportation and transparency with regards to basis for the closures

16. Reconsider of contracted voting periods to allow for voting on multiple days including on weekends

17. True bipartisan participation and study into the impact of redistricting on poor, minority and rural populations in the state

18. Revise training for poll workers and magistrate judges (who oversee elections on the county level)

19. Produce election information in a concise and understandable format so that both workers and voters can clearly understand what requirements exist for voting and how, where and when a voter can cast a ballot

20. Offer increased pay to poll workers

21. Create a more robust, transparent, and easily accessible data reporting system including not just new poll locations but also a record of past poll locations, as well as number of poll workers and other relevant information

22. Extend absentee balloting to include no excuse absentee balloting and other mail-in election procedures

23. Adopt of early voting options and extended voting times

24. Adopt policies to ensure that valid provisional ballots are counted in the precinct in which the voter is entitled to vote

The reasons for these recommendations are described in this report. In addition, many of these recommendations overlap one another and may require modification based on what the state choses to implement.  Each of these recommendations are designed to address a current barrier to voting in our state.

## Conclusion

While Alabama has made strides toward protecting the right to vote for poor, rural and minority populations in the state, for many, voting remains hard to come by in reality.  Registration and

48

identification requirements create barriers, as do voter-purging procedures and a complex, financially burdensome process for restoration following some convictions. Such requirements may appear neutral in their construction, but they disproportionately impact the poor, rural and minority voters in our state and so raise concern.

The state has posited that such voting regulations ensure fair elections and protect the integrity of the vote. These are laudable goals. The Committee's concern, however, is that in the name of promoting these goals, the state has created a system that denies eligible citizens the vote without demonstrating that the regulations put in place protect against fraud or indeed that such fraud is present without the regulations. This is troubling not only because it suggests a dissonance between the state's goals and the reality of voting in Alabama, but because such regulations infringe on one of the most fundamental rights of a citizen in a democracy – the right to vote.

Access to voting is criticial to a successfully functioning democracy. Voting is not only a mechanism of governance, but a means of dissent and accountablility. And, at its core, the right to vote is a right that belongs to the citizen. As noted in the introduction to this report, the right to vote is not a prize to be won or earned from the state. It is an inherent and fundamental individual right. One that the state may regulate it only to the extent that such regulation promotes the collective good. Regulations that stifle the citizen's right to vote without apparent benefit or nexus with appropriate state goals are both antidemocratic and unacceptable.

In Alabama, this Committee fears that the balance between efforts to "protect" the integrity of the vote and the citizen's ability to realize his or her right to vote has gone askew. In implementing a series of voting regulations in the name of vote protection, the state has created what for some are insurmountable barriers to voting with little evidence that the regulations in question address a real and present danger or that they are effective in curbing a perceived risk. Instead, these regulations render the road to the ballot box harder and longer for poor, rural and minority voters in Alabama.

Voter identitication requirements, registration verficiation process, purging methods, restrictive absentee balloting, and limited polling locations and hours all serve to hinder voter access and exclude eligible voters in our state. Requirements of payment of collecting fees and lack of reliable information about restoration after conviction excludes still others. The pervasive confusion over everything from the hours or even existence of MVD offices in rural areas to provisional ballot or CERV procedures and beyond all create a climate in which voters may be exluded from realizing their right to vote. The fact that this Committee spent literally weeks trying to track down information – wading through complex policies and contacting multiple invidiuals before it could find answers (often unsuccessfully) to the most basic questions reveals a system that is difficult to navigate even for well resourced individuals. To be clear, state officials were cooperative and responsive to this Committee throughout the process. Often, however, they simply told the Committee they did not know the answer to the Committee's questions.

In the face of concerns about the impact of voting regulations raised during the Committee's hearing, Secretary of State John Merrill challenged all those who question the validity of Alabama's policies to produce voters who are unable to vote. The Committee understands the Secretary of State's efforts and is congnizant of his articulated commitment to voting. The challenge he proposed however fundamentally mischaracterizes the obligation of the government

49

to the citizen. Simply put, the citizen should not have to show that the process has rendered him or her unable or unwilling to vote. The citizen should not have to prove that he or she has tried to earn the right to vote from the state and failed. Rather the onus should fall to the state to prove that those we trust with the most sacred obligation to run our government in our names have taken every step to ensure that our fundamental right to vote is preserved and maintained. The burden should be on the state to show that whatever regulations they create are narrowly constructed to address a specific concern without creating unnecessary and insurmountable obstacles for the very citizens the state is obligate dto serve. The state, not the citizen, should have to demonstrated that it has not impeded the citizen's right without good cause.

In the end, as a result of Alabama's voting regulations, marginal citizens in our state face a peril that they will be left unable to realize their right to vote. The most marginal among us struggle to gain id, to meet registration requirements, to make polling hours, to remain on active voting rolls, to pay collection fees and to access and complete CERV applications. The most marginal among us lose their right to vote because they cannot navigate the system and they cannot clear the hurdles the state has set. This result is untennable and must change. The Committee's recommendations are designed to facilitate that change by returning to the citizens what was theirs all along – the right to a voice in our democracy through their vote.

**Alabama Advisory Committee to the U. S. Commission on Civil Rights**



Contact:        Regional Programs Coordination Unit
                U.S. Commission on Civil
                Rights 230 South Dearborn
                St., Suite 2120 Chicago, IL
                60604
                Tel: (312) 353-8311
                TTY: (312) 353-8362

This report is the work of the Alabama Advisory Committee to the U.S. Commission on Civil Rights. The report, which may rely on studies and data generated by third parties are not subject to an independent review by Commission staff. State Advisory Committee reports to the Commission are reviewed by Commission staff only for legal and procedural compliance with Commission policies and procedures.  State Advisory Committee reports are not subject to Commission approval, fact-checking, or policy changes. The views expressed in this report and the findings and recommendations contained herein are those of a majority of the State Advisory Committee members and do not necessarily represent the views of the Commission or its individual members, nor do they represent the policies of the U.S. Government. For more information, please contact the Regional Programs Coordination Unit.

# Appendix 1

# Access to Voting New Release with Agenda



**NEWS RELEASE**
February 15, 2018

Contact: David Barreras
(202) 499-4066
dbarreras@usccr.gov

### Alabama Advisory Committee to the U. S. Commission on Civil Rights
### Announces Public Meeting: *Access to Voting in Alabama* – February 22, 2018

Montgomery, Alabama – **On February 22, in Montgomery**, the Alabama state Advisory Committee (SAC) to the U.S. Commission on Civil Rights will convene the first of a series of public panel discussions on access to voting in Alabama. The Committee seeks to examine barriers to voting which may have a discriminatory impact on voters based on race, color, disability status, national origin, and/or the administration of justice. The Committee will hear testimony from academics, policy makers, community groups, and civil society actors.

The meeting will take place on **Thursday, February 22, 2018, from 9:00 a.m. to 5:00 p.m. CST, at the Connecting Life Center (Old Bellingrath Center), 70 West Edgemont Avenue, Montgomery, AL.** This meeting is free, open to the public, and parking is available on site.

Members of the public will be invited to speak during the open forum session, tentatively scheduled from 4:00 p.m. to 5:00 p.m. CST. The Committee will also accept written testimony submitted to dbarreras@usccr.gov by March 31, 2018.

Persons with disabilities requiring reasonable accommodations should contact our Midwest Regional office at (312) 353-8311, prior to the meeting, to make appropriate arrangements.

Advisory Committee Chair Jenny Carroll stated: "The right to vote is fundamental to our democratic process. Laws that impede that right therefor hurt us all regardless of their intent at their creation. Our Committee will gather information on the impact that voting regulation in our state has on our citizens.  We invite members of the community to attend the hearing and to participate in person or in writing. The information we gather will help paint a fuller picture of the state of voting rights in Alabama. We look forward to hearing from experts and members of the public alike."

## Access to Voting in Alabama
## February 22, 2018 - Montgomery, AL
## Agenda

**I. Introduction: Jenny Carroll, Chair, Alabama SAC: 9:00 a.m. – 9:05 a.m. CST**

**II. Speaker: 9:05 a.m. – 9:30 a.m.**

- **John Merrill**, Secretary of State, Alabama

**III. Speaker: 9:35 a.m. – 10:15 a.m.**

- **The Honorable Terri Sewell,** U.S. Representative

**IV. Break: 10:30 a.m. – 10:45 a.m.**

**V. Panel One: 10:45 a.m. – 12:00 p.m.**

- **George Hawley,** Professor of Political Science, University of Alabama
- **John J. Park Jr.,** Counsel, Strickland, Brockington, Lewis LLP
- **Brock Boone,** Alabama Chapter, American Civil Liberties Union (ACLU)
- **Additional panelists to be confirmed**

**VI. Lunch Break 12:00 p.m.  – 1:00 p.m.**

**VII. Panel Two: 1:00 p.m. – 2:15 p.m.**

- **Scott Douglas,** Greater Birmingham Ministries
- **Jonathan Barry-Blocker,** Southern Poverty Law Center
- **TBD,** NAACP Legal Defense Fund
- **TBD,** Equal Justice Initiative

**VIII. Panel Three: 2:30 p.m. – 4:00 p.m.**

- **Benard Simelton,** President, Alabama NAACP
- **Kenneth Glasglow,** The Ordinary People's Society
- **Callie Greer,** Impact Statement
- **Additional panelists to be confirmed**

**IX. Open Public Comment Period: 4:00 p.m. – 5:00 p.m.**

**X.  Closing Remarks: 5:00 p.m.**

*Stay abreast of updates at www.usccr.gov and on Twitter and Facebook.*

#####

The U.S. Commission on Civil Rights, established by the Civil Rights Act of 1957, is the only independent, bipartisan agency charged with advising the President and Congress on civil rights and reporting annually on federal civil rights enforcement. Our 51 state Advisory Committees offer a broad perspective on civil rights concerns at state and local levels. The Commission: in our 7th decade, a continuing legacy of influence in civil rights. For information about the Commission, please visit http://www.usccr.gov and follow us on Twitter and Facebook.

# Appendix 2

# Transcript – Feb. 22, 2018 Briefing

1

2

3

4              ALABAMA ADVISORY COMMITTEE

5      TO THE U.S. COMMISSION ON CIVIL RIGHTS

6               February 22, 2018

7              Montgomery, Alabama

8

9

10

11

12      BOARD MEMBERS PRESENT:

13      Jenny Carroll

14      Marc Ayers

15      Michael Innis-Jimenez

16      Peter Jones

17      Martha Shearer

18      Maurice Shevin

19      Daiquiri Steele

20      Tari Williams

21      Angela Lewis

22

23