FILED
2021 Dec-27  AM 11:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

1            MS. CARROLL:  Okay.  So I'm going to go

2     ahead and call this meeting of the Alabama

3     Advisory Committee for the U.S. Commission on

4     Civil Rights to order.  I am Jenny Carroll.  I am

5     the Alabama state chair.  I do have some opening

6     remarks, but I'm going to save them until after

7     our first two speakers.  As I understand,

8     Secretary of State Merrill has another speaking

9     obligation, so we want to be sensitive to his time

10    constraints.

11            I also want to remind folks that Miss

12    Kaitlin Lloyd, our court reporter, is making a

13    record of this meeting.  So please be mindful to

14    speak clearly and slowly and also not to interrupt

15    or speak over one another so she can make the

16    record.  At this point, I would like to introduce

17    chair of the U.S. Commission on Civil Rights,

18    Catherine Lhamon.  She will introduce herself, and

19    then we'll hear testimony from Secretary of State

20    Merrill.

21            MS. LHAMON:  Thank you so much.  Can you

22    all hear me?  Is this microphone -- now can you

23    hear me?

1          MS. CARROLL:  Yes.

2          MS. LHAMON:  Thank you so much.  I really

3     appreciate all of you coming together for this

4     briefing.  I want to start by thanking each of the

5     members of the Alabama State Advisory Committee

6     for your service to your state, to the country,

7     and to civil rights.  The work that you do on a

8     volunteer basis is incredibly important to all of

9     us, and I'm very, very grateful to you for coming

10    together today and for all of the meetings that

11    you will conduct and the work that you do.

12          In addition, I want to thank the Secretary

13    of State for giving his time and all of us for

14    coming together to think about what you have to --

15    to bring and expertise to bear on this issue.  As

16    you know, voting rights are our core component of

17    the statutory charge of the U.S. Commission on

18    Civil Rights for 60 years, have been a core

19    component of the work that we, the Commission,

20    have done to take a look at what civil rights mean

21    for the country.  So I'm deeply, deeply interested

22    in hearing what it is that you all will conclude

23    following this briefing, and I'm grateful that you

1    have taken up this topic.

2          Now, today, I really appreciate your chair

3    and each one of you for the work that you are

4    doing.  I also am so grateful to see, again, the

5    Secretary of State and also Jack Park, who both

6    came to North Carolina to the U.S. Commission on

7    Civil Rights briefing with respect to voting

8    rights, and I'm interested to hear what you have

9    to say specific to Alabama as well.

10          This issue is an issue that we are hearing

11    about across the country from many of our state

12    advisory committees.  We've already received

13    reports from California and from Kansas, and we

14    look forward to receiving reports from several

15    other states in addition to Alabama, including

16    Texas, Ohio, Indiana, Illinois, Arizona, Alaska.

17          So we should be hearing views about voting

18    access around the country, and we will incorporate

19    it into what the Commission itself will have to

20    say about this topic.  This issue is deeply,

21    deeply important to us.  I appreciate the

22    seriousness with which you take it in and I look

23    forward to today.

1       MS. CARROLL:  Thank you.  So without

2  further adieu, I will introduce Alabama Secretary

3  of State John Merrill.  We appreciate you being

4  here. I know your schedule is busy.  I will ask

5  that you, like all our speakers, limit your

6  comments to 15 minutes so that members of the

7  committee have an opportunity to ask questions.

8       To facilitate that, I have this handy

9  timer.  Green will probably be within your

10  15-minute zone.  At three minutes, it will turn

11  yellow.  And then at one minute, it will turn red,

12  and that's when you should shut it down because

13  you don't want me to have to tell you to stop

14  talking.  So with that, we welcome you and we're

15  glad to hear from you.

16       MR. MERRILL:  Thank you so much.  I'm

17  honored to be with you this morning.  Thank you

18  for allowing me to come and share with you the

19  work that we're doing in the State of Alabama.  As

20  the chair said, I had the opportunity to visit

21  with her and other members of the Commission in

22  Raleigh a couple of weeks ago.  I was excited

23  about that opportunity and to be able to share

1    with them some of the things that we have done

2    here, some of the things we've experienced.  And I

3    hope that you'll feel comfortable asking me

4    questions.

5         I want to make sure that you know what my

6    intentions are, what my intentions were after I

7    became Alabama's 53rd Secretary of State.  One of

8    the commitments that I made to the people in the

9    State of Alabama January the 19th, 2015, which is

10   when I was sworn in, is that we want to ensure

11   that each and every eligible U.S. citizen that's a

12   resident of the State of Alabama is registered to

13   vote and has a photo ID.

14        Now, that's real important, so I'm going

15   to say it again.  We want to ensure that each and

16   every eligible citizen of the United States that's

17   a resident of our state is registered to vote and

18   has a photo ID.  So how do we go about

19   accomplishing that.

20        First and foremost, we reached out to all

21   140 members of the Alabama legislature.  We said

22   give us three locations in your district where

23   you'd like us to go to conduct a voter

1  registration photo ID drive.  We gave them an
2  example.  We said we'll go to the Walmart in
3  Pelham on a Saturday between 10:00 and 4:00.  Does
4  anybody gather why we might go to the Walmart in
5  Pelham on a Saturday between 10:00 and 4:00?
6  Because that's where the people are.
7          Then we said we'll go to Brown Chapel
8  Church in Selma on Sunday between 10:00 and 2:00.
9  We don't want to go to Brown Chapel Church in
10 Selma on Tuesday night between 5:00 and 7:00.
11 That's defeating the purpose.  If it makes people
12 want to come out to go to the event, that's not
13 what it's all about.  And then, we said don't
14 worry about setting it up.  We just want to know
15 where you'd like us to go.  So then we proceeded
16 from there.
17          Then we reached out to all the probate
18 judges.  We said give us a can't-miss festival
19 event or activity in your community where you'd
20 like us to go to conduct a voter registration
21 photo ID drive.  So we've been to Chilton County
22 Peach Festival in Clanton.  We've been to the
23 Peanut Butter Festival in Brundidge down in Pike

1    County.  We've been to the Peanut Festival in
2    Dothan in Houston County.  We've been to the
3    Tomato Festival in Slocomb in Geneva County.  I
4    was a grand marshal of that parade.
5         We've been to the Magic City Classic in
6    Birmingham where Alabama State and Alabama A&M
7    played.  And we've been to the Rattlesnake Rodeo
8    in Opp down in Covington County.  We want to go
9    where people are and make it easy for them so they
10   can just see that we're set up.  And if they're
11   not registered or if they don't have an ID, they
12   can come where we are and then we can help take
13   care of them and meet their needs.
14        I still wasn't sure that we were reaching
15   everybody.  So one of the things I did was, I said
16   how can we make sure that people are aware of what
17   we're trying to do statewide?  So I called the two
18   most recognizable people in the State of Alabama
19   and I asked them if they'd help us promote voter
20   registration photo ID.
21        And in our state, those people are
22   University of Alabama head football coach Nick
23   Saban and Auburn University head football coach

1    Gus Malzahn.  They both agreed, they both helped

2    us, and had a very successful effort as we moved

3    forward in 2015.

4           2016, thought we needed to go a different

5    direction.  So I asked Deontay Wilder, who is a

6    heavyweight boxing champion, he's from Tuscaloosa,

7    holds the World Boxing Council title, and Charles

8    Barkley who played 16 years in the National

9    Basketball Association.  He went to Auburn

10   University, he's from Leeds High School, and he's

11   in the Hall of Fame twice as a player and as a

12   member of the Dream Team for basketball.

13          They both agreed, helped us.  I was

14   actually with Charles last night at the

15   Alabama-Auburn game.  Unfortunately, that didn't

16   go the way I wanted it to, but it went the way

17   Charles wanted it to.

18          Then 2017, we reached out to two other

19   folks to go another direction.  One was Jessica

20   Procter, who was -- the current Miss Alabama.  She

21   finished seventh in Miss America this past year.

22   And the other one was Dr. Mae Jemison, who's one

23   of the first African-American astronauts, and a

1    brand new high school in Huntsville is named for

2    her.  So we were excited to get them and to get

3    their support.

4            This year, we're going to be using

5    American Idol winner from season five, Taylor

6    Hicks, and the two most recognizable radio

7    personalities in the State of Alabama, Bill Bussey

8    and Rick Burgess, who, if you're from our state,

9    you know are Rick and Bubba.

10           So we're excited about that as we continue

11   to move forward.  But I still wasn't sure that we

12   were reaching everybody.  So one of the other

13   things that we did in January of 2016, we

14   introduced a mechanism to make it very easy to

15   register to vote.

16           If you have an iPhone or if you have an

17   Android, you can go to the app store and you can

18   download the mobile app at Vote For Alabama, and

19   you can register to vote for the very first time

20   as long as you have a valid Alabama driver's

21   license.  If you don't have a driver's license,

22   you can still register the old-fashioned way by

23   filling out the paperwork.

1          But that makes it easy for people if

2    they're changing their voter registration record

3    or if they're registering for the very first time.

4    We've had more than 350,000 people that have used

5    that system today, and we're very excited about

6    that.

7          Now, with all of that being said, someone

8    may say, okay, I know that you have a board of

9    registrar office open each and every day in all 67

10   counties.  I know that you visit all 67 counties

11   and promote voter registration and photo ID.  This

12   is the sixth year in a row that I've done that.

13   Last year, I made 414 unique visits to the 67

14   counties in order to promote voter registration

15   photo ID.

16         Then they may say, I know you go to all

17   the festivals.  I know you go to all the events

18   and all the activities.  I know you go where the

19   legislators encourage you to go.  But what if

20   somebody can't go to any of those places?  What if

21   they don't have transportation?  What if they

22   can't get out?  What if they're homebound?  In

23   those rare instances where that has occurred and

1    been introduced to us, we have gone to those
2    people's homes and we have given them photo IDs
3    and we have made sure they were registered to
4    vote.
5            Now, I will tell you this, no other state
6    in the Union is doing what we're doing.  Nobody
7    runs multimarketing campaigns like we do.  Nobody
8    goes to all the festivals, events, and activities
9    like we do.  Nobody goes to people's homes like we
10   do and registers folks to vote and gives them
11   photo ID.
12           You know, somebody may ask me -- and
13   people ask me when we went to people's houses the
14   very first time, which was back in 2015.  They
15   said, why are you doing that?  Because if you're
16   doing that, you're setting a precedent, and you
17   have to do it for anybody that wants it.
18           And I said, you're exactly right.  That's
19   why I'm doing it because I cannot, in good
20   conscience, sit here in Montgomery, Alabama and
21   tell you I'm going to do whatever it takes to
22   ensure that each and every eligible U.S. citizen
23   that's a resident of our state, is registered to

1    vote, and has a photo ID unless I'll do whatever

2    it takes to make it happen.  And that's the reason

3    that I do it.

4          And frankly, I think in Alabama sometimes,

5    we have to try harder because there are people who

6    look at our state and they don't think that we've

7    done as much as we need to do in the past.  And I

8    can't do anything about what's happened in the

9    past, but I can do something about where we are

10   today.  And that's what I've been doing for the

11   last three years and more than a month that I've

12   been the Secretary of the State of Alabama, and

13   I'm going to continue to do that as long as I have

14   the privilege to serve in this capacity.  Matter

15   of fact, it's been three years and one month and

16   three days today.

17         Now, let me say this to you, your next

18   question may be, well, what does all that really

19   mean?  What has it meant to us?  This is what it's

20   meant:  March 1st, 2016, the last time we had a

21   statewide primary -- regular primary for

22   president, we broke every record in the history of

23   the state for voter participation.  1.25 million

1   Alabamians went to the polls and voted for their

2   candidate for president in the democratic or

3   republican primary.

4        Then, on November the 8th, 2016, the last

5   regularly scheduled general election that we had,

6   we broke every record for voter participation in

7   the history of the state.  More than 2.1 million

8   Alabamians went to the polls and voted for their

9   candidate for president, breaking every record

10  that had ever been set for voter participation in

11  the history of the state.  November the --

12  December the 12th, last year, we had a special

13  election for the U.S. senate, and 1.3 million

14  Alabamians went to the polls and voted for the

15  candidate of their choice and sent Senator Jones

16  to Washington to represent us, breaking every

17  record in the history of the state for a special

18  election.  Not one instance has been reported

19  since we passed the voter photo ID law where an

20  individual has gone to the poll and been denied

21  access to participation.  All we've tried to do is

22  to make it easy to vote and hard to cheat.

23        Now, there's another thing that you need

1   to be aware of.  And that's, since I've been the

2   Secretary of State, we've had six convictions of

3   voter fraud, and we've had three elections that

4   have been overturned.  Before I became Secretary

5   of State, it had been more than a decade since

6   that had occurred.  We have introduced new

7   opportunities for people to be involved through

8   the mobile app, by going to folks' homes, by going

9   to those remote locations in all 67 counties.  But

10  we've also tried to make it easier for people when

11  they go to the polls.

12          If this were a polling place, for example,

13  we now have the electronic poll book in place

14  where people can go and they can participate in a

15  faster environment, a faster setting, and with

16  more efficiency through the check-in procedure

17  where people are able to go and be processed a lot

18  quicker.  That reduces the wait time some 60 to 75

19  percent, depending on the voter and depending on

20  the poll worker.  So we're excited about that.

21          But I'm not satisfied with what we've

22  done.  We got to take additional steps and do

23  other things that will allow us to be more

1    efficient, more effective, and more responsive to

2    the people in the state of Alabama.  But I am

3    excited about the things that we have

4    accomplished, which is more than any other state

5    in the Union.  As a matter of fact, we now have --

6    your next question should be, what has all this

7    really meant as far as numbers are concerned?

8          Since January the 19th, 2015, we've

9    registered 914,697 new voters.  914,697 new

10   voters.  We now have 3,347,398 registered voters

11   in Alabama.  Both those numbers are unprecedented

12   and unparalleled in the history of the state.  I'm

13   really excited about that.

14         Now, I know I still have some time, but

15   I'll yield the balance of my time.  If you have

16   some questions, I'd be delighted to entertain

17   them.

18         MS. CARROLL:  Great.  Thank you.  So just

19   to remind everybody, obviously, you are encouraged

20   to ask questions.  This is a fact-finding mission,

21   so we want to ask questions, and Secretary of

22   State Merrill has obviously generously allowed us

23   to do so.

1          But I would ask you to limit your

2    questions in terms of it's a question; it's not a

3    statement.  And of course, the U.S. Commission and

4    our state advisory committee have a policy not to

5    defame anyone, so please be civil in your

6    questioning.  I know I can count on you all for

7    that.  If you have a question, just give me a

8    signal that you'd like to ask, and I'll recognize

9    you.  I'm actually going to start out --

10         MR. MERRILL:  Sure.

11         MS. CARROLL:  -- if you don't mind,

12   Secretary of State, with a question, and then

13   we'll go around to other folks.  And I have -- I

14   have several questions for you --

15         MR. MERRILL:  Yes, ma'am.

16         MS. CARROLL:  -- so you may hear from me

17   again.  So my -- my initial question that I want

18   to ask is, I know that Alabama state law requires

19   proof of citizenship in order to vote.  The

20   federal law does not.  In the past, you have

21   indicated that will not enforce the state law and

22   have essentially two policies that are different

23   between federal and state elections.  Is that

1    still the position in Alabama?

2            MR. MERRILL:  We've not enforced that law,

3    even though in February of 2016, the Election

4    Assistance Commission had indicated that we could

5    ask that question.  As a matter of fact, I got a

6    call from a secretary in another state that told

7    me before the ruling was actually made public, you

8    need to go ahead and start implementing this.  And

9    I said, I don't think I'll do that.  I said, we're

10   three weeks from our election, which was the SEC

11   primary, that we had passed legislation in order

12   to get to that point.  And I said, I don't want to

13   cause any confusion for anybody.  We're going to

14   continue to do what we've been doing, which is

15   what we have been doing, and we continue to do

16   that to this point forward.  And that's where

17   we're continuing to move at this time.

18           MS. CARROLL:  Great.  Thank you.  Do other

19   folks have questions?  All right.  So -- please.

20           MS. SHEARER:  Hi.  My name is Martha

21   Shearer.  And --

22           MR. MERRILL:  Yes, ma'am.

23           MS. SHEARER:  -- my question is, you

1    stated that each and -- you wanted to make sure

2    that each and every citizen that is eligible?

3             MR. MERRILL:  That's correct.

4             MS. SHEARER:  My question is, those people

5    that have convictions --

6             MR. MERRILL:  Yes, ma'am.

7             MS. SHEARER:  -- and many of them are now

8    eligible citizens but do not have access, are not

9    told the process to getting their voting rights

10   restored, as well as those who have never lost

11   their right to vote.

12            MR. MERRILL:  Yes, ma'am.

13            MS. SHEARER:  And so those individuals are

14   not being reached.

15            MR. MERRILL:  Well, let me say this -- and

16   this is something that I think is important for

17   y'all to know, and I'm not sure how you would know

18   it.

19            But one of the things that concerned me

20   when I was campaigning for this office was that I

21   would hear from people in communities throughout

22   the state that people had been denied the

23   opportunity to vote because of being convicted of

1    crimes of moral turpitude.  And one of the things
2    that we discovered was that in certain parts of
3    the state, they were interpreting the moral
4    turpitude laws in different ways.  And so we
5    actually brought forth legislation to ensure that
6    the moral turpitude law was only going to be
7    interpreted and enforced in one way, and that was
8    according to what statute indicated that it should
9    be.
10          And it passed the House in 2015, got in
11   the Senate.  Passed the House 2016, passed the
12   Senate in a different form, passed the House out
13   of conference, died in the Senate on the last day
14   again.  2017, it passed both chambers in the same
15   form.  It's now law.  So there's an established
16   procedure for moral turpitude being interpreted in
17   order to make sure that only the people who have
18   been convicted of crimes of moral turpitude that
19   have lost their opportunity to vote are not
20   allowed to vote.
21          Now, another thing that we did in 2016, a
22   part of that moral turpitude legislation, was to
23   create a law for restitution and restoration of

1  voting rights.  Whenever someone -- this is where

2  our law stands today.  If someone has paid --

3  served all their time associated with their

4  original sentence and paid all their fees and

5  fines associated with their original sentence,

6  their voting rights are automatically restored.

7  The procedure has been expedited, it has reduced

8  the wait time that they had experienced before.

9  We have initiated in this law that when people are

10  being qualified for discharge in the location

11  where they're being held, they have to be told

12  what their rights are, they have to be provided

13  with information to register to vote, they have to

14  have the opportunity to register to vote.  That's

15  a part of their packet.  We want to make sure that

16  that is being communicated and that is being done.

17            Another thing that we did, we made it very

18  clear to all the sheriffs and all the other penal

19  authorities throughout the state and the

20  Department of Corrections, there are a number of

21  people in our state and other states in the Union

22  who are incarcerated but have not lost their

23  voting rights.  And so if someone wants to vote

1    and they're incarcerated, then they need to have

2    the opportunity to do so.

3              So we have made sure that posters are

4    placed in all of those institutions throughout the

5    state, made sure they've got access to absentee

6    applications.  Now, we're not going to let them

7    out and let them go vote and let them come back,

8    but if they want to vote absentee, they're welcome

9    to do that.  And we're wanting to make that

10   opportunity happen for them.

11             So those are some of the standards that we

12   have set that we think are supposed to be set

13   because it's the right thing to do, not because

14   we're trying to give anybody any special

15   privileges.

16             MS. CARROLL:  If I could just follow up

17   with this question.  I understood, Martha, you

18   were asking not only about folks who are currently

19   incarcerated but also folks who, perhaps, were

20   convicted in the past under the old law.

21             MR. MERRILL:  Right.

22             MS. CARROLL:  What -- what are you doing

23   to get information to those --

1          MS. SHEARER:  That's my question.

2          MR. MERRILL:  Well, again, let -- let me

3    say this.  We're not doing anything specific or

4    special for any group in the state, period, and we

5    don't intend to do so.  Because I told you, my

6    goal is to ensure that each and every eligible

7    U.S. citizen that's a resident of Alabama is

8    registered to vote and has a photo ID.  So we go

9    all over the state.  We meet with different

10   groups.  We speak to different groups.

11         I personally have been a part of four

12   different meetings.  Other members of my staff, my

13   assistant director of elections, our chief legal

14   counsel have been a part of at least four others

15   that I can think of off of the top of my head, and

16   I have another one scheduled next week where we

17   have gone to visit with people who, in the past,

18   have been convicted and now have been released

19   because they've served their time to make sure

20   that they can ask questions in an environment that

21   is comfortable for them in order to ensure that if

22   they want to be registered to vote again, they

23   obviously can be.  And we provided that

1  opportunity for leadership for them to be able to

2  exercise that.

3        MS. CARROLL:  And I believe, Martha, you

4  have a follow-up.

5        MS. SHEARER:  Yeah.  Another question is,

6  I've been in several environments where the

7  Secretary of State have been there to make sure

8  that people could register to vote.  But for those

9  that have been formerly incarcerated, there has

10  not been any information there to let those

11  individuals know about it.  There's a form called

12  a Certificate of Eligibility to get your rights

13  restored.  You guys do not provide those forms at

14  the table.

15        MR. MERRILL:  No.  Those are supposed to

16  be done by Pardons and Paroles because they're the

17  ones that can provide that, not us.

18        MS. SHEARER:  Well, the forms are free for

19  anyone because I keep some.  I even got a text

20  last night from somebody asking me what do they

21  need to do because that's the type of work that I

22  do in the community is help people to get their

23  rights restored, as well as get individuals

1   registered to vote.

2          But there is no information for people

3   like the people that you say you've contacted over

4   the years to get it out there, like Rick and Bubba

5   and Saban and all of those people.  They're not

6   reaching the people that have been formerly

7   incarcerated or those individuals that have not

8   even been convicted but thought they lost their

9   rights.

10          MR. MERRILL:  Well, I'll say this to you

11   about that.  Okay?  And this kind of reminds me of

12   something else I didn't share with y'all earlier,

13   but I will share it with you now.

14          One of the things that the NAACP Legal

15   Defense Fund -- Sherrilyn Ifill is the executive

16   director -- that she said to me when they were

17   talking to us and then they ended up suing us, was

18   that there was 188,000 Alabamians that are

19   eligible to register to vote and can't get photo

20   IDs.  And this is what I said to her publicly and

21   privately and what I'll share with y'all today,

22   that's not true.

23          And this is why I know it's not true,

1   because I have challenged her to do this -- and

2   I'll tell y'all this today.  If she believes that,

3   all she has to do is tell me who one of them is.

4   I don't need to know all 188,000.  Just tell me

5   one.

6           Give me their name.  Give me a way to

7   contact them.  If you don't want to give me their

8   telephone number, that's fine.  You can give me

9   their address.  We will contact them, and then

10  we'll go to their house.

11          And when I get in the car to leave y'all

12  to go to Anniston so I can be there at 11:30 this

13  morning, I will call my office.  And I will have

14  them contact them, and they'll go to their house

15  today and do it.  So I'm kind of tired of hearing

16  things about what we're not doing or what we're

17  not willing to do.

18          And I'll tell you this too.  When the

19  lawsuit went forward and the judge read my

20  deposition and he also read the other depositions

21  about what we're doing, that lawsuit, four weeks

22  ago yesterday, was summarily dismissed with

23  prejudice because he said no other state in the

1    Union is doing what we're doing.  And if anybody

2    wanted to follow our model, then there wouldn't be

3    any need to challenge photo ID requirements

4    anymore because nobody is going to the same level

5    of support that we are to ensure that people are

6    able to participate.

7           MS. CARROLL:  And just so the record is

8    clear though, in answer to Member Shearer's

9    question, are the CERV documents then not on the

10   tables when you're going to these -- these

11   satellite --

12          MR. MERRILL:  We don't coordinate the

13   event.

14          MS. CARROLL:  Okay.

15          MR. MERRILL:  We just were a participant

16   in those events.  And in the ones that I

17   participated in, Pardons and Paroles have provided

18   that information.

19          MS. CARROLL:  Okay.  Are there other

20   questions?  I'm going to go down the row.  And I

21   realize we're running short on time, so if you can

22   keep it to a short question.

23          DR. LEWIS:  In your statement, you said

1   that not one instance has been reported of anyone

2   being denied access to participation.  Can you

3   tell us how you define not being denied access to

4   participation?

5          MR. MERRILL:  Yeah.  If somebody wants to

6   vote and they can't, that would be denied access,

7   in my opinion.

8          DR. LEWIS:  Okay.  So what -- what happens

9   if for some reason they don't have a photo ID?

10  What happens in those instances?

11         MR. MERRILL:  Well, part of our law -- and

12  I was in the legislature when we passed this law

13  -- is that if you don't have a photo ID, you can

14  be identified by two polling officials and you, at

15  that point, are able to vote by them signing an

16  affidavit and you signing the statement that would

17  indicate that they know who you are.  So you don't

18  have to have an ID to even vote, and you could

19  vote a provisional ballot and then bring your ID

20  by that Friday after the election and have it

21  confirmed as well.

22         But very few instances of those -- I can't

23  even identify one for you that I know has

1  occurred.  But very few instances of those have

2  even occurred.

3          MS. CARROLL:  Tari, did you have a

4  question?

5          MS. WILLIAMS:  Yes.  I've recently read

6  that several states are moving to automatic

7  registration --

8          MR. MERRILL:  Yes, ma'am.

9          MS. WILLIAMS:  -- at 18.  And I was

10  wondering if there are any future plans for

11  Alabama to do that.

12          MR. MERRILL:  You know, usually my

13  question when somebody raises that point is, what

14  does automatic registration mean to you.  And

15  typically, what they say is, well, when you go to

16  get your driver's license, you would be able to

17  share your information and then when you turn 18,

18  you would automatically become registered.

19          And we already have today that

20  availability when people go get their driver's

21  license.  That option is already available for

22  people to register at the DMV.  We made sure that

23  we were compliant.  We are now compliant with all

1  aspects of the 1993 act, and that had never

2  happened before I became Secretary of State.

3         Another thing that we do and that I check

4  on frequently is to ensure that at Medicaid

5  agencies, ensure at Department of Human Resources

6  that they're offering that as an option when

7  people come in to be able to vote.  So I would say

8  this, what -- what my question is when we talk

9  about automatic voter registration is the next

10  question to the individual that asked me that

11  question is, do you think there's a possibility

12  that at least one person might not want to be

13  registered to vote, at least one somewhere in the

14  67 counties.

15         And in all but one instance whenever I've

16  asked that question, people have said, yeah,

17  there's probably one.  And then I said, well, if

18  there's that one, would you be in favor of giving

19  them a knock-out provision, and in all but one

20  instance, everybody has said yes, I think we

21  should have a knock-out provision where if they

22  didn't want to be registered to vote, they don't

23  have to be registered to vote.

1              That one instance, a woman said, no,

2       everybody ought to be registered and they ought to

3       be required to.  Well, I don't live in her world,

4       but that was her opinion.  And my next question to

5       them was, then what's the difference between that

6       and what we have today.  Because now you just have

7       to opt in instead of opting out, and there's less

8       than 350,000 people in the state of Alabama that

9       are not registered to vote, period.

10             I mean, we are leading the nation per

11      capita in the number of folks that are eligible

12      and that are registered, and we're going to

13      continue to campaign as long as I serve in this

14      role.

15             MS. CARROLL:  All right.

16             MR. MERRILL:  Yes, ma'am.

17             MS. CARROLL:  Unfortunately, we are out of

18      time.  I do have two quick clarifications on the

19      record for you.

20             MR. MERRILL:  Yes, ma'am.

21             MS. CARROLL:  You had indicated that

22      people could register at the voter registrar's

23      office every day.  In fact, those are located at

1    courthouses and libraries, correct?  And those are
2    not open every day?
3            MR. MERRILL:  They're open every day the
4    courthouse is open.
5            MS. CARROLL:  Correct.  But not every day
6    of the week, correct?
7            MR. MERRILL:  Every day the courthouse is
8    open.
9            MS. CARROLL:  Okay.  And --
10           MR. MERRILL:  Which is usually Monday
11   through Friday and usually from about 8:00 until
12   4:30 or 5:00, depending on the hours of the
13   courthouse in that county.
14           MS. CARROLL:  Perfect.  And the last
15   clarification that I have for you is kind of the
16   reverse of what you were --
17           MR. MERRILL:  But let me share this too.
18           MS. CARROLL:  Oh, please.
19           MR. MERRILL:  If they have an ID, driver's
20   license, they can register anytime, 365, 24/7.
21           MS. CARROLL:  On the app?
22           MR. MERRILL:  Yes, ma'am.
23           MS. CARROLL:  Okay.  Perfect.  And then my

1    other question for you real quick is kind of the

2    reverse of what you were asking Ms. Ifill.  In

3    terms of -- you said the voter ID law was passed

4    originally to ensure integrity in the vote.  Was

5    there actually evidence that there were folks who

6    were voting who were not who they claimed to be?

7             MR. MERRILL:  When I went to the office of

8    the Secretary Of State, one of the first things I

9    asked for were the files on voter fraud.  They

10   could not produce a file.  They could not produce

11   an instance.  Which is why we started a

12   relationship with Alabama Law Enforcement Agency

13   and the attorney general's office to create the

14   Alabama Election Fairness Project which put us in

15   a position to do what we've done, which is why I

16   told you we've had six convictions on voter fraud

17   and we've had three elections overturned and we've

18   got some indictments that are ready right now.

19             MS. CARROLL:  Right.  But --

20             MR. MERRILL:  This is just since I've been

21   the Secretary of State, we've got indictments that

22   are ready right now if we can get the attorney

23   general's office or the local district attorney to

1   move because we've already provided enough

2   evidence to move toward an indictment.

3           MS. CARROLL:  And -- and I appreciate all

4   that.  My -- my question is just slightly

5   different though, and I want to make sure you have

6   an opportunity to answer that.  Which is, prior to

7   the institution of the voter ID law in Alabama,

8   was there evidence that people were actually

9   showing up and not being who they claimed to be?

10          MR. MERRILL:  They had no files in our

11  office to indicate that.  That does not mean it

12  didn't occur.

13          MS. CARROLL:  Right.

14          MR. MERRILL:  Because I don't know what

15  would have happened if we hadn't established the

16  -- the plan that we've established.  But I know

17  what's happening today, and I know whoever follows

18  me in this role will have information we didn't

19  have when we started.  And that's real important

20  to me.

21          MS. CARROLL:  All right.  Well, we really

22  appreciate you being here.  I know your time is

23  precious.  I'm curious how you get a parking place

1   on Saturday in the Walmart parking lot, so I'm

2   impressed by that as well.  But thank you for

3   joining us and best of luck driving to Anniston.

4          MR. MERRILL:  Well, and let me share this

5   with you before I go.  Because one of the things

6   that I do no matter where I go is I tell people my

7   cell phone number.  And if y'all would like to

8   call me anytime you see something that is of

9   concern or of interest to you, please call me

10  personally, and we will have a team member that

11  will get on it.

12         That number is 334-328-2787.

13  334-328-2787.  I work for you.  I work for the

14  people of Alabama.  And I want to make sure that

15  we're providing the highest quality service in all

16  areas that we can possibly provide.  And I

17  appreciate the opportunity to come and share with

18  you today.  Thank you.  And thank you for what

19  you're doing.

20         MS. CARROLL:  Thank you.  And Secretary of

21  State, just one more thing.

22         MR. MERRILL:  Yes, ma'am.

23         MS. CARROLL:  The record is open for 30

1  days following this hearing.

2        MR. MERRILL:  Yes, ma'am.

3        MS. CARROLL:  If you'd like to file

4  additional information, you're welcome to it.  I

5  also know other members did have questions they

6  didn't get to ask.

7        MR. MERRILL:  Yes, ma'am.

8        MS. CARROLL:  So you may get some more

9  questions from us.  You're going to regret giving

10  us this cell number.

11        MR. MERRILL:  And you can e-mail me, and

12  we can give you a formal response in a text

13  delivery system, whatever is best and most

14  convenient for you.

15        MS. CARROLL:  Perfect.  Thank you so much.

16        MR. MERRILL:  Thank y'all.  Appreciate it.

17        MS. CARROLL:  So our next speaker is

18  Mr. Kareem Crayton.  Mr. Crayton, again, is

19  joining us from the Southern Coalition For Justice

20  where he is the interim director.  And when he is

21  not serving as interim director, I understand he's

22  also a law professor.

23        MR. CRAYTON:  Correct.

1          MS. CARROLL:  So it's a noble job, sir.
2    So welcome.  And again, same reminder, 15 minutes.
3    You'll have a timer, and I hate to have to cut you
4    off because I like to be a nice person.
5          MR. CRAYTON:  I'll keep it brief.  Thank
6    you, members of the committee, for the invitation.
7    I'm delighted to be here.  As the chair mentioned,
8    I am serving as the interim executive director of
9    the Southern Coalition For Social Justice.  It's
10   located in Durham, North Carolina.
11          Our goal is to bring opportunity and tools
12   to communities that have not had as many
13   opportunities as others on issues involving
14   election law -- voting rights, that is -- criminal
15   justice reform, and youth justice, and we do it
16   across the south.  I'm also obliged to tell you
17   that I'm actually from Montgomery.  I grew up
18   here, was educated in this county's public school
19   system and have lived here and still vote here.
20   My residence is still here in Alabama.  So I'm
21   connected to this for a number of reasons, but
22   this is -- election law and voting rights are my
23   life's work, and I'm excited to be part of a

1    process that is examining the current state of
2    voting rights in this state.
3          I'd like to, in the few minutes I have,
4    talk a bit broadly about some of the themes that
5    the Secretary of State offered and tie them into,
6    at least, my own observations as they apply to
7    Alabama.  And to start, I want to just say some
8    general things about principles because I think
9    it's important for everyone to know at least how I
10   look at voting rights.  They are some things that
11   overlap with what the Secretary had to say and
12   some things that are distinct, but I welcome
13   engagement on these topics.  And there are three
14   general principles, as I look at it.
15         I think the way we think about regulating
16   voting ought to usually be based on evidence,
17   data.  I think we all have our whims and fancies
18   about which candidate or which party should win,
19   but I think ultimately, just like who wins and who
20   loses, is dependent upon numbers.  I think numbers
21   should drive at least in part the factual basis on
22   which we make a decision about how to structure an
23   election system.

1           The second thing, and it's related to the
2   first, is it ought to be transparent.  You, the
3   citizen, ought to know the reasons and the facts
4   that the State uses in order to structure an
5   election system in a particular way.  I should not
6   have to go behind a closed door or not hold a
7   public meeting to defend a choice that I've made.
8   In part, I think that's crucial because we expect
9   our elected officials to be accountable to us, and
10  we can't have accountability without transparency.
11  So I generally am in favor of rules that permit
12  public dialogue and presentation of evidence.
13          And the last, and this may be, again, a
14  place where I differ from others, I believe
15  democracy actually should be something that as
16  many people as possible who are eligible
17  participate in.  So in this respect, I applaud the
18  Secretary of State to have so much emphasis placed
19  on registration.  That is a significant part of
20  the process of participation, but it is not all
21  that there is.  In fact, I think you have to take
22  account of whether people who are registered
23  actually show up to vote, and I think that the

1   State has an obligation to do all that it can to

2   encourage that.  Not everyone does.  I do.

3       I think part of our idea of thinking about

4   citizenship is having a right to vote.  It does

5   not mean it is a privilege.  There are

6   administrative tasks, of course, that one has to

7   conduct to assure that the State applies it

8   correctly, but it strikes me that citizenship, if

9   it really is going to include voting as a right,

10  does impose upon the State some obligation.  And I

11  think the State should do some work to make

12  certain that as many people want to vote can vote.

13      So I will take the invitation to submit

14  written comments a bit later.  But what I want to

15  do in these few moments is talk a bit about two or

16  three themes, and I welcome your questions about

17  those or any others.

18      First, I would be remiss if I didn't talk

19  about the one case that has sort of been in the

20  atmosphere so far, but I think it is worth

21  conversation because it bears on, I think, the

22  state of things currently, not just in this state

23  but the entire country.  And it is a case that

1    came out of this state, Shelby County.  Shelby

2    County versus Holder, a case heard by the United

3    States Supreme Court, issued a decision in 2013

4    that essentially rendered section four of the

5    Voting Rights Act null.  And it essentially

6    removed a significant protection that most voters

7    in this neck of the woods, in this region of the

8    country had to assure that new laws on the books

9    did not reduce the opportunity for people to cast

10   a ballot.  That had a significant effect in

11   Alabama.

12          And I just want to talk about two or three

13   of them because I think they are significant, and

14   they don't necessarily render themselves apparent,

15   I think, on first blush.  The one issue that most

16   people tend to forget is how quickly the State

17   adopted laws after Shelby County was placed on the

18   books that radically changed the way that our

19   election system worked.  One of things that

20   section five of the Voting Rights Act rendered,

21   for most of us, is an election system that was

22   more or less one that was predictable.  Systems

23   worked pretty much in a particular order.  Most

1    people understood that if it was going to

2    radically change, there would be a great deal of

3    conversation, maybe even debate, before it could

4    be adopted.

5            Now, some would argue that that process

6    was a cumbersome one.  I tend to take a different

7    view, and I'll tell you why shortly.  But I do

8    think the expense of having those conversations in

9    an administrative review process is different from

10   a litigation-heavy process, which is what we

11   occupy now.  But I want to go to the point about

12   some of the examples that the state legislature

13   pursued that do, I think, make voting more

14   challenging, more difficult.  One of them has to

15   do with the moving of precincts.

16           The Secretary of State has oversight over

17   where precincts are located.  Once upon a time,

18   under section five, that had to go through a

19   thorough review process before those changes were

20   put into place.  At this point now, there is no

21   federal oversight.  And for that matter, the

22   Secretary of State's office does not have the same

23   level of oversight over each of the counties.

1          So essentially, the counties change

2     precincts pretty much, if not arbitrarily,

3     unexpectedly, so that if you're going to look to

4     find out where a person is eligible to vote or,

5     for that matter -- and this is the more recent

6     consideration -- where a candidate is eligible to

7     run, it may be a surprise when you show up at the

8     local registrar and find that your house which you

9     thought was in precinct A is actually in precinct

10    B and you're not eligible to run.

11          That's a real problem for another reason,

12    and that's redistricting.  As you know, the State

13    of Alabama has been in the midst of a lot of

14    litigation about redistricting.  The Supreme Court

15    found that districts drawn by the state

16    legislature at the state legislative level violate

17    the 14th Amendment of the Constitution, which

18    forbids racial gerrymandering.  In solving that

19    problem -- in trying to solve that problem last

20    session, the legislature created a new plan that

21    organized districts in yet another way.  And what

22    was not quite apparent, and still isn't apparent

23    to a lot of people, is where those lines actually

1    match up to these precincts which, again, have

2    been sort of unexpectedly changed county by

3    county.

4              That leads to a third problem, and the

5    third problem is the one I think all of us should

6    be concerned about.  And that is, the ability of

7    the voter on election day to show up at a place

8    and know that the place they cast the ballot is

9    the correct place.  And one of the real challenges

10   -- to go to Committee Person Lewis' comment, one

11   of the challenges is when you show up for

12   elections and you find out that either you're not

13   in the right place or that there's some confusion

14   at the polls about whether or not you are in the

15   right place or perhaps even the person in front of

16   you is in the right place.

17             So there's a difference between the

18   example of the person at the polling place telling

19   you, oh, no, I don't like you, you can't vote, and

20   the example where there's this administrative

21   confusion.  The outcome in both cases though is

22   that lines are longer, and it takes a longer time

23   for the average person to cast a ballot.

1           Now, that's not the State explicitly
2    telling you, we don't like you, you can't cast a
3    ballot.  But if you work an hourly job, if you
4    only have an hour available to cast a ballot, then
5    you may actually effectively be cut out of the
6    opportunity to cast a ballot, and that's of
7    concern.  This leads me to take an aside to make a
8    point about one issue that the Secretary of State
9    mentioned.  He put a lot of emphasis, as I said,
10   on registration, and I applaud him for it.  I've
11   said that before.  Registration is an important
12   part of the process.  I'd be really excited, to be
13   frank about it, if this were 1966 or 1982.
14           Alabama consistently -- God love us -- we
15   find ourselves at the back of the pack in adopting
16   innovations that make voting more accessible to
17   more people.  The measure that the Secretary of
18   State mentioned was registration, and, again,
19   there have been a number of people that have been
20   put on the rolls.  But in terms of voting, I'm sad
21   to tell you, the State of Alabama is, at best, in
22   the middle of the pact compared to other states in
23   terms of turnout.

1          And part of the reason that is the case is

2     that we don't adopt measures that make voting more

3     accessible.  So for example, just as much as the

4     State could go to Walmart on Saturday or church on

5     Sunday to register people, why is it that we don't

6     allow early voting or Sunday voting or more

7     reasonable opportunities to cast an absentee

8     ballot?

9          Those are things that other states do that

10    are farther ahead of us on turnout, and I wish we

11    would take that as a consideration of what marks

12    whether or not we, as a state, are doing well in

13    terms of voting and political opportunity for

14    people casting a ballot.

15         The point that was made earlier, and I

16    appreciate it, about people who have some

17    relationship with the correction system is another

18    example of where I think there's a difference

19    between the State saying we made something

20    available and the State taking an effort to make

21    sure that people who are citizens have their

22    entitled right to cast a ballot.  It is very

23    confusing.  I've only looked at it.  I'm not a

criminal defense attorney or not really had a lot
of writing in the area.  But on this topic, I've
learned a lot about the process.

The administrative process of just
corrections itself is terribly confusing to know
what your sentence is.  To know when you're no
longer under supervision is itself a complex
process.  To know when you cast a ballot is an
even more complicated process, that is, when you
are eligible once again.

And if the State decided, for example, to
make it easy to determine whether you've entered a
particular phase of supervision or you've ended it
and we actually make sure that you're
automatically put on the rolls, that actually
might make things a little bit more simple from
the user's perspective.

And on this topic, I need to get to
another theme, and I want to -- I don't want to
run out of time here.  But one of the issues that
always comes up in the conversation, well, what
happens if you raise the specter of fraud.  And I
am sensitive to the issue of fraud.  Nobody wants

1    a corrupted election system.  We also don't want a

2    corrupted money system.  And we have,

3    unfortunately, any number of examples of people in

4    elected office using money in illegal manner.

5         And I think one of the things we have to

6    recognize is that balancing is just as important

7    on the money side of things as it is on the voting

8    side of things.  We have to make sure that we're

9    not sending messages to people, particularly

10   people who are still alive, who have an experience

11   of being told, you can't vote because you fit in a

12   category.  We have to be careful that we make sure

13   that the vote and the ballot box has a welcome mat

14   in front of it.

15        So how do we think about fraud?  Again,

16   going back to my principle, I think it ought to be

17   data-driven.  We don't have a lot of instances of

18   fraud in this state.  And even when the Secretary

19   of State invested a lot of money to investigate

20   that during the December primaries -- or the

21   primaries leading to the December election last

22   year, he found that, roughly, 600 or so examples

23   that he submitted to the local county registrars,

1    and they reported back that those were

2    administrative errors.

3           Now, again, I'm not saying that it is not

4    worthy to have laws in the books and effort to put

5    in to make sure that we don't engage in fraud or

6    that others don't, but what I'm saying is at the

7    same time, if we're going to put money into that,

8    why not put money also into expanding the ways in

9    which the State puts out a welcome mat to make

10   sure that people who want to vote can.

11          Now, I've just mentioned a couple of

12   examples that we can adopt pretty easily to expand

13   opportunity.  I want to mention one last to go

14   back to the point about automatic registration.

15   We don't have automatic registration in this

16   state, and we should.  I can't quite understand

17   why there's not a system that allows people to opt

18   out if they want but too, just as you would get a

19   graduation diploma out of high school, also

20   automatically get your ballot, so long as you're

21   qualified to -- to cast one.

22          That doesn't really compute to me to a

23   message that you send to young people who

1    increasingly, as we all know, are facing many of

2    the challenges and responsibilities of citizenship

3    to actually also be able to enjoy one of the

4    rights associated with citizenship as well.

5              So I know I'm short on time, so let me

6    just say the last point, which to me, again, is my

7    view of the measure, not just of how our election

8    system works but how the people who are elected to

9    manage the election system work.  I think we

10   should be graded on our ability to make sure that

11   more Alabamians who are eligible to vote do vote

12   and that we do everything that we can to assure

13   that we don't do so in a discriminatory manner but

14   that we set the welcome out.  We were first in the

15   nation during a period of time where nobody wants

16   to go back where we kept people away from the

17   ballot.  I think we ought to be first in the

18   nation to make sure that we open up the ballot box

19   and that we make sure every Alabamian who is

20   eligible to vote has an opportunity to cast a

21   ballot and that we measure ourselves by how well

22   we do in bringing them in.

23             So I'll stop there.  Thank you for the

1  time, and I'm happy to welcome your questions.

2          MS. CARROLL:  Great.  Thank you.  So,

3  again, I will start.  And then if you would like

4  to ask a question to Director Crayton, please give

5  me a signal and I'll be happy to call on people.

6  And remember to pass the microphone.

7          So one question I had is you spoke of

8  other mechanisms that ensure access to vote in

9  other jurisdictions.  You mentioned early voting

10  and absentee balloting.  I was wondering if you

11  could speak to other types of IDs that different

12  jurisdictions might accept to support this notion

13  of access as well as registration.

14          MR. CRAYTON:  Right.  So I currently live

15  in North Carolina -- or I'm working in North

16  Carolina for this particular period.  And prior to

17  the time of Shelby, North Carolina had actually

18  adopted a fairly open system to allow more people

19  to qualify.  Once the Shelby County decision came

20  down, the legislature adopted a law that was -- as

21  the Fourth Circuit said, surgically precise at

22  identifying the people that they didn't want to

23  have access to the ballot and fenced out their

1    IDs.  Among them were State-issued student IDs.

2           Now, there are questions about where the

3    person decides to reside, but I don't believe that

4    those would get in the way of allowing a state

5    agency that has issued an ID to count just as much

6    as a gun license.  Yet, the State, in that

7    instance, made a distinction between the two in

8    allowing which would be eligible and which would

9    not.  Student IDs are one way of doing it, and we

10   might need to do work to ensure that the student

11   IDs meet the minimum qualifications.  We currently

12   use federal IDs of different types, but certain

13   states do fence out certain examples of those

14   depending on the agency at issue.

15          But it seems to me that if we establish

16   the minimum standards that open up our access for

17   any person that has an ID, that has a photo, and

18   is issued by some state agency that has some sense

19   of verification, that ought to qualify.  But,

20   again, the thing that I always find remarkable is

21   passports qualify.  Your passport has no

22   information at all about where you live.  So if

23   I'm at the polling place, there's no means of

1   verifying where I happen to be qualified to cast a

2   ballot, and that's seen as the sort of gold

3   standard for ID.

4          So it seems to me that to the extent that

5   we're going to really try to be particular about

6   it, I think we should sort of step back and say if

7   our goal is to make more people have access, how

8   many IDs can we reasonably say fit the category?

9   And if we're going to allow passports -- which,

10  again, I'm in favor of if you're going to have an

11  ID system, then we should be more expansive than

12  that for places where we can find IDs that have

13  your photo and some indication or means of

14  verifying where you happen to live, that you're in

15  the state.

16         MS. CARROLL:  Okay.  Thank you.  Do other

17  folks -- I'm going to start at that end.  And

18  Marc, I'm going to pass you the microphone so --

19  well, that one has got a cord attached to it.   So

20  I'm going to recognize Committee Member Ayers.

21  We'll let him ask a question.

22         MR. AYERS:  You mentioned -- I want to

23  discuss with you your welcome mat, so I don't

1    think you had a lot of time to really kind of talk

2    about what you meant.  Because -- and a lot of

3    this is trying to achieve the right balance

4    between, you know, what -- what the State should

5    do and then the obligations of the voter.

6    Obviously, these are rights, and always with

7    rights come some responsibility.

8              You can't literally drag people out.  You

9    could, but that's not what we want, and make them

10   vote.  What we need is -- we're trying to achieve

11   that good balance of, you know, reasonable access,

12   tear down any artificial barriers that are -- that

13   are unreasonable, obviously.  You mentioned a few

14   welcome mats, not just registration.  I mean, you

15   applaud the Secretary of State saying this is --

16   done a very good job to be very broad in

17   registration, but the actual voting is what we --

18   is what we want to do.  I'm just curious as to

19   what other welcome mats, to use your term, you

20   would suggest to actually increase the vote

21   participation itself to, I guess, encourage the

22   vote participation itself.

23             MR. CRAYTON:  Well, I can offer you a

1    couple of examples that come from other states.

2    But before I do that, let me suggest there's

3    always improvement that we can do as a state on

4    registration.  And I think one of the things that

5    came up in the dialogue with the Secretary of

6    State was making registration available in

7    courthouses.

8          As we know in this state, we had a pretty

9    big debate during a budget crisis about the

10   closure of a lot of facilities that might

11   otherwise be available.  And courthouses aren't

12   distributed equally around the state.  So there's

13   work to be done at making registration more

14   available.

15         But as far as the question about

16   participation is concerned, I think that there are

17   things that states have done like preregistration

18   for high school students.  You can identify where

19   they're located.  They usually can be ID'd at some

20   point.  But if you give people an informational

21   session early on about the importance of voting,

22   it strikes me that by the time they are actually

23   eligible to vote at 18, A, the State has already

1    done the work to put people on the rolls.  But B,

2    you actually have encouraged them, and by giving

3    them all the reasons that it's important to vote.

4         We've been talking about a lot of

5    different ways of opening up the absentee ballot

6    process.  Again, I know that there's a balance

7    between making sure that we are getting the people

8    who actually have an interest in voting and not

9    the people who are interested in doing, you know,

10   anything that would corrupt the system.  But we

11   have one of the more limited opportunities in this

12   state to cast a ballot by absentee.  Not everybody

13   can get to the polls on election day.  And

14   frankly, it costs us more and more money to get

15   sometimes these longer lines available to us.

16        I guess the other thing I would say is,

17   you know, the legislature recently adopted a

18   statutory provision that would cut off the

19   opportunity to have a special election.  And I

20   find it troubling, no matter what the outcome is,

21   where the people have fewer opportunities to vote,

22   particularly for somebody who is going to have

23   such significant effect on national policy.  I

1    don't necessarily feel comfortable with leaving

2    more and more decisions to people who are

3    unelected when we have a representative body.  So

4    I think those are a couple of examples.  I may

5    have more later.

6          MR. AYERS:  Well, just to follow up on

7    that, you mentioned the absentee -- well, I guess

8    two things.  First, you mentioned an informational

9    session.  Like first of all, who would -- like

10   where would that be and who would give that if

11   you're talking about the schools or whatever?

12          And then on the absentee ballot issue, you

13   mentioned that ours is limited.  Could you explain

14   how it's limited?  Because we actually do have a

15   pretty substantial record in this state of

16   absentee ballot issues.  I mean, we've got a lot

17   of cases and so forth and elections that have been

18   overturned by absentee ballots showing up in

19   people's trunks, you know, this type of thing that

20   have been signed by multiple folks or whatever it

21   is.  How do you see that as limited?

22          MR. CRAYTON:  Well, I think there are

23   states out there that have -- that give

1   opportunities to people who cast an absentee
2   ballot on a regular basis.  So you can be a
3   consistent absentee ballot voter.  That's not
4   readily available in this state.  That's just one
5   example.
6           I take your point, there are always going
7   to be considerations about making sure that people
8   are -- are who they say they are when they cast a
9   ballot, but those exist.  You sign a ballot, for
10  example.  There's some, you know, backchecks that
11  you can do once you take these ballots in.  But to
12  me, the interest in making sure that more people
13  have access has to be taken into account.  And I
14  don't think we could do as much as we could do.
15          Again, this is open for a discussion about
16  how that looks in practice, but I don't see an
17  overwhelming argument in terms of the integrity of
18  a process on its own that would argue against
19  having a more open opportunity for people to cast
20  absentee ballots.
21          By the way, there are other states that
22  have mail-in ballots entirely that do this on a
23  regular basis.  I mean, if you're talking about

1    saving money, if that's a consideration, that

2    turns out to be a lot cheaper to run an election

3    system, including special elections, than having a

4    full-dress in-person ballot casting process.

5         MS. CARROLL:  And I'm going to recognize

6    now Member Mike Innis-Jimenez.

7         MR. INNIS-JIMENEZ:  Good morning.  A

8    question -- you talked a little bit about early

9    voting, and I want to hear a little bit more about

10   that.  I know part of it's absentee, you know,

11   unless there's people in the military or different

12   eligibility that can never go to the ballots, that

13   the ballots go to them.  But for example, Iowa,

14   for about three or four weeks before, you can go

15   to the local mall, you can go to the student

16   center and cast your ballot.  You don't have to

17   worry about what district you're in.  They have

18   the polls there.  What would this state need to do

19   to get there?

20        MR. CRAYTON:  Well, it's a good question.

21   I think part of it is establishing what particular

22   protocol is -- is kind of the most desirable.  I

23   think one of the issues that most states that have

1    adopted versions of this have found is it actually

2    makes the job of the registrar easier because you

3    can predict what your likely turnout is going to

4    be as you see sort of the buildup towards election

5    day.

6            And just as an aside, one of things that I

7    noticed in the special election was the Secretary

8    of State really underestimated what the turnout

9    would be.  And part of that was it hadn't been

10   done before, but part of it also was, it was

11   really hard to get a gauge on the public

12   excitement about it.

13           My concern is that if we're not paying

14   enough attention to turnout and trying to drive it

15   out, then we've got a problem when we get, all of

16   a sudden, people who show up and cast ballots.

17   But if you had something like early voting, we

18   could see some buildup and then try to make

19   provisions for it.  So what would we do?  What

20   might we do?

21           One element is, there's nothing that says

22   we can't try this out in a couple of counties to

23   sort of figure out what fits best.  Because it's

1    not obvious that smaller counties like, you know,

2    Hale County would work the same as a Jefferson or

3    a Madison County.  But if you place them in more

4    -- more locations, right, more people who don't

5    normally have the ability to get to the

6    courthouse, for example, to cast a ballot might

7    have other opportunities to cast, and they can do

8    so on weekends where sometimes, you know, people

9    have a little bit more time to, you know, stand in

10    line if they need to.  But I think one

11    establishing a general protocol of how it might

12    work, how many we would have in each given

13    election, and then perhaps also tracking how well

14    we're doing.

15          Because I think, again, if you're thinking

16    about this as a data-driven process, some of this

17    is going to require us to calibrate as we go

18    along.  So I think in a, for example, midterm

19    election, we may not have as huge a turnout as we

20    might in a presidential year.  And that kind of

21    adjustment, I think, is something that early

22    voting allows us to do more of.  If we have a lot

23    of voting at the outset and we don't see that

1    there's going to be a lot of stuff on election

2    day, we can pull back on the time and the people

3    that we put on the -- on the job.  But those are

4    at least a couple of things.

5            But as you kind of think through, you

6    know, how robust you want the system to be, one

7    can apply a lot more consideration to either

8    different forms of voting, again, the number of

9    days on which you vote.  You can even -- if you

10   chose to, we have them now on election day, have

11   polling places in churches.  There's nothing to

12   say we can't do that for early voting as well.

13           MS. CARROLL:  If you don't have a

14   follow-up, I'm going to recognize Member Peter

15   Jones.

16           MR. JONES:  Thank you again for being

17   here.  So you mentioned data-driven process.  And

18   coming back on Committee Member Ayers said,

19   there's a balance between protecting or being

20   against voter fraud and opening it up.  Right.

21   You're trying to strike this delicate balance.  So

22   what type of data sources have other states used

23   to -- to gauge both voter fraud and voter

1    participation?

2          And then a -- that third thought -- or a

3    third data source that I'm curious about is the

4    cause.  Right.  So are there other data sources

5    that -- we knew people collected those precinct

6    changes.  Have people looked at other types of

7    things that maybe led to increases, decreases in

8    voter fraud; increases, decreases in voter

9    participation?  So can you share with us any of

10   those -- any data sources getting at any of those

11   three.

12         MR. CRAYTON:  Sure.  Well, I think the

13   important thing to see about voter fraud, it is --

14   as you know, every study that has attempted to

15   track this, nearly infinitessimal, if not, you

16   know, negligible, zero.  And part of it -- and

17   that -- I guess it depends upon the kind of fraud

18   you're speaking about.  I should emphasize that.

19   In person at the polls voting fraud.  I show up

20   and I'm not the person who I claim to be.  That's,

21   you know, pretty low.

22         And as I've said in my classes often,

23   that's actually the most inefficient form of fraud

1    in any case.  If I want to turn an election -- not

2    that I would -- but if I did, I would want to do a

3    lot of the work in the registrar's office, and

4    that kind of work can always be monitored.  And I

5    think one of things that we have to do, we always

6    need to do -- and I know the Secretary of State

7    agrees with this -- that we have to have a lot of

8    safeguards in place so that polling workers and

9    registrars are monitored such that the votes, once

10   they're bundled, accurately, reflect the votes

11   that were cast.  And so one of the things that we

12   do with -- auditing tries to accomplish that.

13            To get to your question about in-person

14   voting fraud, I mean, one of the things that we

15   have -- I think that one of the advocates -- one

16   of the reasons advocates support voter ID is to

17   assure that we have some check and balance to have

18   a record demonstrated to people who show up do.

19   And in this regime, and it just hasn't been

20   present here in Alabama, there are very, very few

21   instances of that.  I mean, you know, you've seen

22   -- if you haven't, I may have to show you the

23   reports.  A colleague of mine at Loyola in Los

1    Angeles -- it essentially concluded that you are

2    more likely to get struck by lightning than to

3    have found an instance of in-person voting fraud.

4         And so, you know, I think the existing

5    safeguards out there are enough, but I'm happy to

6    share with you that study and a couple of others

7    that I've seen that just go to look at, you know,

8    billions of ballots cast to find like less than a

9    few hundred examples of in-person voting fraud.

10        And in those cases, by the way, even from

11   those, you usually will find it's an example of a

12   mistake, which, again, if you want to take the

13   strict liability version of that, you can.  But

14   even taking that, that's a pretty small number in

15   terms of regulation.  And so I think a little bit

16   about the cost that goes into regulating that

17   versus the instance, the -- the prevalence of that

18   in the sort of overall body of votes that are

19   cast.

20        MS. CARROLL:  So I'd recognize Member

21   Lewis.

22        DR. LEWIS:  Thank you for coming.  So you

23   actually got to my point.  You talked about you

1    want to make sure the votes cast are actually

2    registered and tallied.  And one of the things I

3    wanted to follow up with the Secretary of State is

4    the provisional ballots.  He spoke that not one

5    instance where someone has been turned away

6    because of an ID.  So there were two, you know,

7    ways you could participate, either from the

8    affidavit, from two coworkers, or through the

9    provisional ballots.  So do know -- and I'll

10   submit this question to him -- what is the process

11   for what they do with those provisional ballots

12   after they're cast?

13          MR. CRAYTON:  So it's a good question.

14   Under current law -- and, again, you should.  I

15   want to let the Secretary speak for himself.  My

16   understanding, in all the states that apply this

17   rule based on federal law, is that there's no

18   obligation for the State to count those

19   provisional ballots unless the outcome of the

20   election is likely swayed by the number of

21   provisional ballots that are cast.

22          So, you know, it gets -- the complexity of

23   your question earlier about what are those

1    instances when you're denied access, you may cast

2    a ballot but getting that ballot counted is

3    another affair, particularly when you get slotted

4    toward provisional ballots.  And I can tell you

5    any number of examples, not just in this state,

6    where you get to the polling place and because of

7    confusion, a pollster says -- and I think with no

8    ill intent -- oh, just cast a provisional ballot.

9    You'll get your ballot counted and, you know,

10   it'll be fine.  But they want to keep the line

11   moving.  But that has an effect on the person who

12   casts a ballot.  And usually, that person doesn't

13   know that those ballots don't get counted.

14          Now, again, I get the efficiency argument

15   about not counting the ballot, but if we're trying

16   to improve our ability to send messages to people

17   that this is a welcome process, and one in which

18   you have a full partnership, it seems to me that

19   we've got a limit.  We've got to find a way of

20   lowering the number of instances where we're

21   slotting people to provisional ballots.  They will

22   always be, you know, part of the process.  That's

23   fine.  But if we do our best to make sure that

1    people who show up and are eligible cast a ballot,

2    I think we're doing our job well.

3            MS. CARROLL:  I just have a follow-up

4    question real quick, Marc, to Angela's question,

5    and then I'm happy to pass it back to you.  So --

6    and this actually links in.  Dr. Lewis had

7    mentioned the issue of provisional ballots.  But I

8    also wanted to link it into what you raised about

9    changing precincts.  What happens in Alabama if

10   someone casts a provisional ballot in the improper

11   precinct?

12           MR. CRAYTON:  Well, that becomes another

13   of these problems.  We don't know.  Essentially,

14   what is the -- a provisional ballot can sometimes

15   be directed in an instance where the person shows

16   up and the polster doesn't -- a polling worker

17   doesn't think that they are eligible.  That can be

18   one solution.

19           Another solution is that they send you to

20   another precinct, and that precinct may not be in

21   the building where you happen to show up.  It may

22   be in another location entirely.  So, again,

23   that's another of those, what we call in law

1    school, is constructive denial, even if it's not

2    intentionally meant to fence you out.

3            The question as to a provisional ballot in

4    the instance that you're offering though is one

5    that can be kind of complex.  Going to the earlier

6    point, provisional ballots usually get counted

7    where the outcome of the election is at issue, but

8    if the provisional ballot is disputed as to which

9    precinct they belong to, the question as to

10   whether it's in doubt is itself in doubt because

11   we don't know the quantum of actual provisional

12   ballots that should apply in that particular

13   precinct.  It leads to more confusion.

14           And going to what I intended to say more

15   about with respect to Shelby County, it increases

16   the amount of litigation.  One of the things that

17   the Supreme Court asserted in getting rid of

18   section four, at least rendering it to a nullity,

19   was that the change wouldn't make a really huge

20   difference on the extent to which courts would get

21   backlogs of cases.

22           And the truth of the matter is, and I

23   think for goodwill, again, a lot of plaintiffs who

1    find moments like these really confusing but

2    really want to know the right answer to the

3    outcome of an election find that their only answer

4    is to go to a court, and it ends up spending a lot

5    of time and money.

6         And one of the problems of these kinds of

7    cases -- and I've good done a lot of them -- is

8    elections are always the train that runs on time.

9    That is, there will always be elected members

10   passing laws.  And the unfortunate part is, if you

11   find that there has been a mistake and there needs

12   to be a change, nothing undoes the decisions that

13   have been taken of the people who were elected in

14   office.  So the point that you're mentioning is

15   one among many of these confusing spaces where

16   litigation unfortunately turns out to be the only

17   strategy.  And that becomes, I think, a real

18   challenge for us if we're trying to get final

19   answers about who runs government and how it ought

20   to work.

21         MS. CARROLL:  I would recognize Member

22   Ayers.

23         MR. AYERS:  Just very quickly.  And this

1    may be something that you want to supplement if

2    you have anything.  But early in your comments,

3    you mentioned about, you know, people showing up

4    and not knowing and there being confusion about

5    wait, am I supposed to be here and so forth.  Are

6    you aware of any like studies or statistics that

7    can kind of give a sense for how many times that

8    happens?  Or I mean, I -- you may have anything

9    like that?

10           MR. CRAYTON:  Well, because it's fairly

11   recent that we've gotten into this space, at least

12   in Alabama, I don't have any current, you know,

13   what I would describe as sort of a comprehensive

14   study on that.  But I can tell you, and I'm happy

15   to offer it, there have been several instances,

16   just in this election including in this county, of

17   people who want to run for office who are told

18   when they get to the -- the registrars that your

19   home is no longer in this precinct.  You thought

20   it was here; it's not, and you're no longer

21   eligible.

22           And often, I'll be frank about it, what

23   they're looking at is a map that they're having to

1    eyeball.  And because in our computer-driven age,
2    we sometimes divide even sides of streets so that
3    one side of the street is in a precinct and the
4    other is not, those eyeballing tactics don't
5    usually work as well and so can lead to that kind
6    of confusion.
7          But I will clearly make a note, and I'm
8    happy to argue a couple of those instances where
9    that's true.  But I do think, as we get probably a
10   year or so into this, we'll have more
11   comprehensive studies of how often it happens.
12   But for voters, the same problem does exist, and
13   often it's tied to the number of provisional
14   ballots.  But I think we're likely to see that too
15   because we're using a plan that will be enacted
16   for the first time in this election.  And I'm a
17   little concerned about the -- what the Secretary
18   of State thinks in Montgomery are the precinct
19   lines and what each of the county registrars
20   believe the precinct lines are.  And I think if we
21   don't do a lot of work to make sure that everybody
22   is operating off of the same set of facts, we may
23   have a lot more issues when the voters are at the

1    polls.

2          MS. CARROLL:  And I have a quick follow-up

3    about that too.  Sorry.  So in terms of who

4    determines the precinct's lines and where the

5    precinct is located, that's the county

6    commissioner, you indicated?

7          MR. CRAYTON:  Yes.  In most of these

8    counties, the immediate authority would rest with

9    the counties.  But, of course, because we have,

10   you know, an interesting relationship between

11   county and state government, the state legislature

12   could legislate.  And to some degree, the

13   Secretary of State has oversight authority over

14   counties.

15          But in most of these instances, the county

16   commissions can make these decisions.  And because

17   we don't have section five, there's no regular way

18   in which we know when everybody knows when there's

19   going to be a report that the lines are going to

20   change.  And so unless there is a lot of

21   information sharing and not just with, you know,

22   the elected leaders but with the voters, you may

23   find out for the first time on election day.

1          MS. CARROLL:  And --

2          MR. JONES:  Well, you -- you stole one --

3    you stole my question.

4          MS. CARROLL:  So Member Jones had a

5    follow-up question that I apparently stole, but he

6    has another one.  Go ahead.

7          MR. JONES:  So the Secretary of State can

8    supersede a county redistricting, for lack of a

9    better term.  What type of oversight does the

10   Secretary of State have and have they exercised

11   such oversight in the past?

12         MR. CRAYTON:  Again, I will say that's

13   probably a question best answered by the Secretary

14   of State.

15         MR. JONES:  Okay.

16         MR. CRAYTON:  To my knowledge though,

17   yeah, there is some statutory authority that

18   allows for that, but, again, the Secretary of

19   State has to know that there's a change in order

20   to supercede it.

21         MR. JONES:  Okay.

22         MR. CRAYTON:  And I think one of the

23   challenges is that, you know, when the lines are

1   redrawn, it may be that because the lines make it

2   more convenient for precincts to change at the

3   local level, they may make these changes and

4   either not report them or report them in a delayed

5   manner so that, you know, people haven't quite

6   caught up with what the changes are.

7            And so, you know, a lot of decisions get

8   taken informationally about, you know, what the

9   voters know based on what those lines are with

10  what the -- the elected people think that the

11  lines are.  And what I would suggest, I mean, that

12  there needs to be more symmetry between those

13  choices once they're made, and people in

14  Montgomery, and, again, the voters more generally.

15           MS. CARROLL:  So I have -- we've got you

16  for another three minutes, and I'm going to use

17  it.

18           MR. CRAYTON:  Sure.

19           MS. CARROLL:  So you and the Secretary of

20  State have both spoken in terms of opt-out versus

21  opt-in procedures.  Is there any data -- and this

22  kind of goes to your point, Marc Ayers.  Is there

23  any data that suggests that -- that we see higher

1    turnout rates in opt-in versus opt-out proceedings

2    or vice versa?  Do we see higher turnout in opt

3    out versus opt in?  And if you don't know the

4    answer off the top of your head, if you're willing

5    to file it as a written answer, I would -- I would

6    appreciate that as well.

7            MR. CRAYTON:  Okay.  So it's hard to give

8    you a clear answer to that problem, in part,

9    because every state that I know that has an

10   automatic registration provision essentially

11   adopts an opt-out approach.  So if the question is

12   those versus the current system that we have,

13   which requires you to take some steps to register,

14   turnout, with few exceptions, is higher in the

15   opt-out states, the automatic registration states,

16   I'll call them.  But I'm happy to offer some

17   information that supports that assertion.

18           MS. CARROLL:  And then the other question

19   I had for you is a similar question that you've

20   alluded to, and I asked it to the Secretary of

21   State also at the end.  To the extent that voter

22   ID laws are driven by this desire for voter

23   integrity, do you have any information about

1    evidence of voter fraud prior to the institution

2    of these voter ID laws?  In other words, are they

3    really being driven by this desire to ensure voter

4    integrity and is that supported by data?

5         MR. CRAYTON:  Well, I can tell you what

6    the United States Supreme Court said when it

7    allowed Indiana first to adopt voter ID law, and

8    that was that there was an absence of a lot of

9    evidence or any evidence but that it understood

10   that the State had the ability to take as a sort

11   of rational precautionary measure some protective

12   methods.

13        In Alabama, there weren't any instances,

14   the Secretary of State says, because there was no

15   evidence.  But, you know, it could easily be just

16   because there hadn't been work, as it could be

17   that there was no work to find.  There was -- that

18   is, there was no instance to find it if you had

19   done the work.

20        I think this gets me to the question about

21   sort of what's the point of criminal law

22   enforcement.  And, again, people will come at this

23   from different perspectives.  We can sometimes

1  give messages to would-be criminals even if we

2  haven't seen instances of crime.  We don't want

3  you to do X.  But usually, we do that with

4  awareness of that has a cost too.

5        And my approach to this would be to think

6  about what the costs of constructing that kind of

7  regime would be, both in terms of money --

8  because, again, that investigation that the

9  Secretary of State conducted cost a lot of money

10  -- but also, again, more important to me, anyway,

11  is the message that it sends to voters.  And if

12  people are fearful of showing up at the ballot

13  box, and sometimes even wrongfully, it does have

14  an effect on, I think, the general message that

15  people understand the State is offering us.  But

16  more important, it actually may sway outcomes of

17  elections if fewer people show up to vote.

18        And, again, I don't think you really have

19  to care which D or R wins.  I think we as a state

20  ought to be at the forefront making sure that most

21  people in this state, if not all people who are

22  eligible, cast a ballot.

23        MS. CARROLL:  Well, thank you very much

1    for your time.  You are now off the hook at this

2    point.  But I do remind you that the record is

3    open for 30 days, and I anticipate some folks may

4    have questions.  So if we can send those to you,

5    we would appreciate it so much.

6           MR. CRAYTON:  You certainly may.  I'm not

7    going to give you my cell number, but I'm happy to

8    share my e-mail address, just because I don't

9    return e-mail -- voice mails as much as I should.

10   But, yeah, I can be reached at Kareem,

11   K-A-R-E-E-M, @SCSJ, Southern Coalition for Social

12   Justice, .org.

13          MS. CARROLL:  Great.  Thank you.

14          MR. AYERS:  You don't -- you don't want to

15   improve access to your cell phone?

16          MR. CRAYTON:  If you want to answer my

17   cell phone, then I would be delighted.

18          MS. CARROLL:  I was going to say maybe he

19   does want to improve access but for only certain

20   folks.  So thank you so much, Director Crayton.

21          MR. CRAYTON:  Thank you so much.  I

22   appreciate it.

23          MR. INNIS-JIMENEZ:  Madam chairman?

```
1              MS. CARROLL:  Well, we actually don't have
2       a break, but yes.
3              MR. INNIS-JIMENEZ:  Can you clarify the
4       changes in the schedule?
5              MS. CARROLL:  Yes.  And I -- I have an
6       opening statement too that we didn't get to make,
7       and so I'm going to make it now.  And then I will
8       also discuss the schedule as a component of that.
9       And that was Michael --
10             MR. BARRERAS:  Madam chair?
11             MS. CARROLL:  -- Innis-Jimenez, the member
12      who made that statement.
13             MR. BARRERAS:  Madam chair?
14             MS. CARROLL:  Yes.
15             MR. BARRERAS:  While we wait for Mr. Boone
16      and Mr. Park, could the committee gather by the
17      banner so we can take a quick photo for the
18      Facebook page?
19             MS. CARROLL:  I actually have on my
20      schedule right now that we're supposed to be --
21      I'm supposed to be doing my remarks right now,
22      then we have a break.  Could we do it during the
23      break?
```

```
 1          MR. BARRERAS:  Yeah.
 2          MS. CARROLL:  Okay.  I'm just trying to
 3   run the train on time, just like an election.  All
 4   right.  So the statement that I did not get to
 5   make in the beginning -- give me one second and I
 6   will locate it and then we'll talk to you about
 7   the schedule and then we'll take a picture.
 8          All right.  So we are -- excuse me -- the
 9   Alabama Advisory Committee to the U.S. Commission
10   on Civil Rights.  The meeting, obviously, has
11   already come to order.  My name is Jenny Carroll.
12   I'm the chair of the Alabama State Advisory
13   Committee.
14          I'd also like to introduce, going around
15   the room, other members of the state advisory
16   committee here, if you could just give a smile,
17   nod, or wave or whatever you want to do.
18          I'm going to start with you, Marc Ayers,
19   Daiquiri Steele, Michael Innis-Jimenez, Tari
20   Williams, Dr. Angela Lewis, Maurice Shevin and
21   Peter Jones and Martha Shearer.  I'd also like to
22   acknowledge, as we already did, but Chair
23   Catherine Lhamon is also present.  I'd like to
```

1    also acknowledge Dr. David Mussatt who is here

2    assisting us as well.  He is regional programs

3    chief, I should say.  I'll give you your title.

4           We also the ever valuable David Barreras,

5    who is our civil rights analyst who we all know

6    from telephone calls.  But David is a tremendous

7    support to the committee.  We also have Corrine

8    Sanders, our support specialist, who has made this

9    meeting possible.

10          We are established as an independent

11   bipartisan fact-finding federal agency.  The

12   United States Commission on Civil Rights informs

13   the development of national civil rights policies

14   and enhances enforcement of federal civil rights

15   laws.  The Commission pursue this mission by

16   studying alleged deprivations of voting rights,

17   alleged discrimination based on race, color,

18   religion, sex, age, disability, or national origin

19   or in the administration of justice.  The

20   Commission plays a vital role in advancing the

21   civil -- in advancing civil rights through

22   objective and comprehensive investigation,

23   research, and analysis on issues of fundamental

1    concern to the federal government and the public.

2         There are, in all 50 states as well as the

3    District of Columbia, bipartisan advisory

4    committees just as ours.  And, again, we are the

5    Alabama Advisory Committee.  We aid the Commission

6    in its statutory obligation to serve as a national

7    clearinghouse for civil rights information.  We

8    will hear testimony today regarding barriers to

9    voting in Alabama.  The testimony we gather today

10   is going to be made available to the Commission

11   for its fiscal 2018 statutory report on voting

12   rights that will be submitted to the President and

13   to Congress.

14        I will remind speakers who are present as

15   well as committee members if they veer away from

16   the civil rights questions at hand or go off

17   topic, I will politely interrupt you and ask you

18   to remain on topic.  You will also not receive a

19   cupcake at the end of our meeting.  This meeting

20   is also being transcribed by our court reporter,

21   Kaitlin Lloyd.  It's for public record.  So I

22   would just remind you all again not to interrupt,

23   to speak clearly and slowly so that Miss Lloyd can

1   do her job.

2        We also -- today's hearing, rather, is the

3   first in a series of inquiries we will make into

4   the State of Alabama.  We're fortunate and

5   thankful to have such a diverse and balanced group

6   of panelists to provide testimony here today, two

7   of which we've already heard from.  This hearing

8   will also operate under the provisions of The

9   Federal Advisory Committee Act.  The federal

10  officer designated to this committee is David

11  Barreras.  He is present.

12        This is a public meeting, which means it

13  is open to the media and general public.  We do

14  have a full schedule of panelists who will be

15  making presentations within the limited time

16  available.  This will include a presentation by

17  each panelist that will not run more than 15

18  minutes or I'll have to interrupt them.  After all

19  the panelists have concluded their statements,

20  committee members, as they already have, will have

21  an opportunity to ask questions and hopefully

22  receive answers.  And, again, if you want to ask a

23  question, just indicate to me that you want to ask

1    a question so we can make sure that you get the

2    mic passed to you and you can be recognized.

3            To accommodate persons who are not on the

4    agenda but who wish to make statements, we do have

5    an open session scheduled at 4:00 p.m. today.  If

6    you wish to speak, you may add your list to the

7    name [sic] at the registration table, which is

8    located at the entrance to this chamber.  In

9    addition, we accept written statements that are --

10   that may be made and submitted by mail to the U.S.

11   Commission on Civil Rights at 55 West Monroe

12   Street, Suite 410, Chicago, Illinois 60603 or by

13   e-mail to dbarreras -- that's two Rs, E-R-A-S --

14   @usccr.gov.  Please call (312) 353-8311 for more

15   information.  I feel like a prescription ad

16   telling you all that.

17           All right.  Some statements made today may

18   be controversial.  I want to ensure that all

19   invited guests understand they are to keep from

20   defaming or degrading any person or organization

21   in their testimony.  As the chair, I reserve the

22   privilege to cut short any statements that defame,

23   degrade, or do not pertain to the issue at hand.

1    In addition, the federal officer has the authority

2    to end these proceedings if, in his opinion, it is

3    in the public interest to do so.  We don't want

4    that to happen.

5            To ensure that all aspects of the issues

6    are fairly represented, knowledgeable persons from

7    a wide variety of experiences and viewpoints have

8    been invited to share information with us here

9    today.  Any person or organization may provide a

10   public response during the open comment period.

11   Alternatively, such persons or organizations who

12   may feel they have been defamed, degraded, or

13   misrepresented can file a written statement for

14   inclusion in the proceedings.  The Alabama

15   Advisory Committee appreciates the willingness of

16   all participants to share their views and

17   experiences here today.

18           Finally, the rule for question and answer

19   portions of the panel are as follows:  After all

20   speakers on a given panel have had an opportunity

21   to provide their prepared statements, the

22   committee, and only the committee, may ask

23   questions.  Committee members must be recognized

1   by the chair before asking questions of the

2   panelists.  Questions may be directed to the

3   entire panel or to individual members of the

4   panel.  To ensure that all committee members get a

5   chance to address the panel, committee members

6   will be limited to one question plus a follow-up.

7          And I would just add in addendum to that,

8   as we have discussed before, the questions should

9   be to the point; they shouldn't be statements.  We

10  will have plenty of time to talk about what we're

11  hearing and the concerns that we have when we

12  construct our report.  This is our opportunity to

13  gather facts from the folks who are joining us

14  here today.  And there are the ground rules for

15  the hearing.

16         Now I'm supposed to turn it over to the

17  next panelist, but I won't actually.  But just to

18  review the schedule, as Michael Innis-Jimenez has

19  requested, obviously we moved Interim Director

20  Crayton up from panel three to speak in the place

21  of Terri Sewell's office.  They were not able to

22  provide us with a representative who could be on

23  the panel.  So our next panel, panel three, which

will begin at 10:45 and run to noon, will be John
Park and Brock Boone.  We'll then have a lunch
break from noon until 1:00.

Panel four will then consist of Jennifer
Holmes, Scott Douglas, Jonathan Barry-Blocker, and
Charlotte Morrison in place of TBD.  And panel
five will be Benard Simelton, Kenneth Glasglow,
Jaffe Pickett, and Callie Greer.  We will then
turn to the open forum, which will be our period
for public comment.  I will then make closing
remarks, and then you all will have a safe drive
back to your homes, I hope.

Are there any other questions?  Hearing
none, we can now take a brief break.  There are
muffins in the back that you all should
participate in.  There's coffee, water as well.
We have plenty.  I can put out more.  And we
appreciate y'all being here.

(A brief recess was taken.)

MS. CARROLL:  We're now at 10:45, which is
when we were scheduled to begin again.  Our

1    panelists for this panel, which is panel three --

2    panel three but first in our hearts still -- is

3    Brock Boone, who is from the Alabama Chapter of

4    the American Civil Liberties Union and

5    John J. Park, Jr., who is counsel at Strickland,

6    Brockington, and Lewis.  And that is in

7    Birmingham;  is that correct?

8           MR. PARK:  It's -- it's an Atlanta law

9    firm, a small Atlanta law firm.

10          MS. CARROLL:  All right.  I apologize.

11   Thank you.  So in Atlanta, Georgia.  And, again,

12   just to remind the speakers, you'll have 15

13   minutes to present comments based on the timer.

14   You'll then receive questions from the committee

15   members.  So with that, I will turn it over to

16   you, Mr. Park.

17          MR. PARK:  Madam chair and members of the

18   Alabama Advisory Committee, thank you for the

19   opportunity to participate in this hearing on

20   access to voting.  I'm delighted to return to

21   Alabama where I spent 21 years of my adult life

22   working in Birmingham and here in Montgomery.  I

23   hope that my remarks, which I will provide and

1    submit, will be helpful to the committee.

2            I'd like to start by responding to the --

3    some of what we've heard.  First, with respect to

4    provisional voting, if you go to the wrong

5    precinct, one of the things you need to understand

6    is they're not going to have your ballot.  They're

7    going to have the ballot for that precinct.  Now,

8    there may be common races -- common elections, but

9    you'll only be able to vote -- the only votes that

10   you can conceivably count are the ones for those

11   common ones.

12           So how do you know what precinct you're

13   in?  You get a postcard from the local registrars,

14   right?  And if you've got a problem with that,

15   then you take it up with your local registrars.

16   The Secretary of State -- yes, under federal law,

17   the Secretary of State is the chief election

18   official officer for the state, but the Secretary

19   of State has pretty limited authority over the

20   county registrars.  And the -- you know, the

21   reason -- one reason why to take it up with the

22   county registrars is you're more likely to know

23   them.  You know, they're -- they're in your

1    county.  They're not -- you don't have to come to

2    Montgomery and talk to somebody.

3            We've heard talk about early voting.

4    Early voting, first, is not constitutionally

5    required, but it may be a good idea.  That's for

6    the political branches to decide.  But there are

7    studies that say early voting does not increase

8    turnout.  What it does is move turnout around.  So

9    you're going to have -- you're going to get

10   turnout, but it's going to be in a different

11   pattern than all showing up on election day.

12           And I'll be happy to provide cites for

13   those studies when I submit my written remarks.

14   Early voting has another potential problem.  Back,

15   I think it was 2016, out in Montana, the senate

16   race, right before the election, Greg Gianforte,

17   the republican candidate, got in a pushing match

18   with a local reporter.  By the time of that

19   pushing match, a lot of votes were already in.

20   You know, some people might have wanted to revisit

21   their vote if they had cast it for Gianforte, but

22   they don't have that opportunity.  If you vote

23   early, you can't respond to the last-minute

1    surprises.  You know, we've had last-minute

2    surprises in frequent elections.  It may be a good

3    idea, as a voter, to hold your fire.

4         Let's talk -- we talked a little bit about

5    photo ID.  What photo ID does is it deters

6    in-person fraud.  In-person fraud is really hard

7    to catch.  In one Alabama case back in 2002,

8    someone voted in her sister's name, and we found

9    the fraud -- or the found -- the fraud was found

10   when her sister showed up to vote and was told she

11   had already voted.  So that -- that's one way you

12   can find it.

13        I'm told of another case down in Mobile

14   where Hernandez Hernandez was receiving Social

15   Security benefits for someone else, and when the

16   person who should have been receiving Social

17   Security benefits went to complain, they found

18   that Hernandez Hernandez had been illegally

19   voting.  Hernandez Hernandez is not a citizen.  So

20   he'd been -- he'd been illegally voting.  So, you

21   know, it does take some -- but what does it do?

22   It does deter in-person fraud.

23        There are a wide variety of IDs that you

1    can use, and what -- and it makes it a lot harder
2    to represent yourself to be someone else.  The
3    other thing it does is helps to build confidence
4    in the system.  If you think that your vote is
5    going to be counted and that the votes -- that
6    illegal votes are not going to be counted, then
7    that helps build confidence in the system.  And
8    one of the things I'll submit with my written
9    remarks is there are studies which suggest wide
10   public support for photo ID.  Republicans
11   typically like it a whole lot, but independents
12   like it and so do a majority of democrats,
13   according to the survey.
14           One of the points I'd like -- I'd like to
15   make a couple points, and then, if it's okay, talk
16   about -- one of the big issues is preclearance,
17   right?  Since Shelby County, Alabama doesn't have
18   to submit changes in vote and the county
19   commissions don't have to submit changes in voting
20   laws for preclearance -- and I'd like to suggest
21   some things that we ought to consider that would
22   or would not, should or should not put us back
23   under a preclearance regime.

1          But first, I'd like to talk about the
2     importance of instilling confidence in the
3     electoral system.  And some -- there are a number
4     of surveys that show that the American people have
5     little confidence.  In August 2017, a Rasmussen
6     Report National Telephone and Online Survey found
7     that 54 percent of likely U.S. voters say voter
8     fraud is at least a somewhat serious problem, and
9     27 percent say it's a serious -- very serious
10    problem.

11         A 2016 Rasmussen poll reported that only
12    41 percent of those polled believe that American
13    elections are fair to voters.  A 2016 Washington
14    Post ABC poll found that 46 percent of those
15    polled believed that voter fraud happens somewhat
16    or very often.  And a 2016 Gallup poll, taken
17    before the party's national convention, found that
18    the United States ranked 90th out of 112 counties
19    -- countries in terms of their confidence in the
20    honesty of their elections.

21         Of the true electoral democracies in the
22    world, only Mexico ranked worse in that confidence
23    rating than the United States.  But only 30

1    percent of those polled said they had that

2    confidence in honest elections while 69 percent

3    said they did not.  So what those surveys suggest

4    is that we should find ways to shore up public

5    confidence in our electoral system.

6              One of the things that I want to mention

7    is Alabama has a pretty rich history of absentee

8    ballot problems.  We -- the Secretary of State

9    said that since he's been in office, he had --

10   there's been three elections overturned, and he

11   said that there were six convictions of voter

12   fraud.  I know of elections that have been

13   overturned or subject to question in Phenix City,

14   in Wetumpka, and in Guntersville because of

15   problems with voter registration or absentee

16   ballot -- voter fraud.  In the November 2017

17   election for District Two of the Phenix City

18   Council down there on the Chattahoochee River

19   across from Columbus, Georgia, at least 32 voters

20   who registered used their business addresses in

21   violation of Alabama law.  And they may have --

22   that may have affected the election results.

23             And significantly, the local NAACP called

1    for the voter rolls in Phenix City to be cleaned

2    up, and in that regard, the voter fraud

3    investigation in Phenix City turned up 82 voters

4    who registered using their business addresses in

5    violation of law -- state law, as well as

6    convicted felons who had not had their voting

7    rights restored, included some dead people and

8    some people from Georgia.  People coming over from

9    Columbus across the river.

10              In the August 2016 election for Wetumpka

11   City Council District Two, the Circuit Court of

12   Elmore County overturned the election results

13   because 8 -- just 8 -- absentee ballots were found

14   to be fraudulent -- illegally cast.  The initial

15   count declared one candidate to be the winner by a

16   count of 168 to 165.  But eight absentee ballots

17   for the -- for the winner were thrown out because

18   the ballot was not properly signed or witnessed as

19   required by state law.

20              And, again, what's significant about that

21   is these are really tight races.  So absentee

22   ballot fraud can have a disproportionate impact.

23   And in my written remarks, I'll submit a number of

1    other instances of absentee ballot fraud.

2            But what I'd like to talk about is just

3    the preclearance regime.  Why did -- Alabama and

4    the other covered jurisdictions ended up under it

5    because when federal courts told them to do

6    something or they couldn't do something, the state

7    legislature would change the law and, say, well --

8    they'd end run the court rulings in an equally

9    discriminatory way.  And so what the preclearance

10   regime did was put a stop to that.  They said

11   before you can change your laws to evade federal

12   court rulings, you got to send them up to

13   Washington or go up to the -- to the -- D.C. to

14   get them precleared.  So it's a pattern of evasion

15   of court orders.  It was a repeated pattern, and

16   there were substantial disparities in the rates of

17   African-American voter registration and turnout

18   and white voter registration turnout.

19           In 1965, I think in the Congressional

20   Record, it was like six and a half percent of the

21   eligible African-Americans in Alabama were

22   registered to vote, and things have changed.

23   You've heard the Secretary of State say that

1    things that have changed.  We know about turnout.
2    There was a great disparity in turnout in the --
3    and Alabama was covered, along with the other
4    jurisdictions, because they used illiteracy tests
5    and they had that disparity in turnout.  Literacy
6    tests haven't been used since 1974, so that's off
7    the table.
8           The difference in turnout has disappeared.
9    But if you look at somebody -- states that have
10   less than 50 percent turnout, you're going to find
11   places like Delaware and Hawaii, which were never
12   covered.  And my first point would be if you're
13   going to reimpose preclearance, you can't just do
14   it to the old southern jurisdictions.  You've got
15   to go a little farther, and there's a serious
16   political barrier doing that.
17          If Illinois had -- if your -- one of your
18   metrics is the number of cases of section two of
19   the Voting Rights Act, lawsuits and losses.
20   Illinois was up there.  But why -- why won't we
21   get Illinois in there?  Look at who represents
22   Illinois in the United States Senate.  They're not
23   going to -- it's far easier for Illinois to say

1    Alabama should be covered than Illinois should be
2    covered.
3            Second thing, it shouldn't be a one up.
4    Look at Katzenbach.  It shouldn't be one loss in
5    federal court.  It should take a number of them,
6    and it should take a pattern of disregarding
7    federal laws.
8            Third thing is, it shouldn't arise out of
9    disparate impact.  Disparate treatment, treating
10   someone differently because of their race or
11   some -- some other characteristic is
12   unconstitutional.  Disparate impact is a law or
13   practice that looks to be neutral on its face but
14   has a disproportionate impact on some minorities.
15   Disparate impact though is not unconstitutional,
16   and that's the nature of the attack on the Alabama
17   voter ID law.  They say it has a disparate impact
18   on African-American residents of Alabama.
19           Third thing, it shouldn't arise out of
20   racial gerrymandering claims.  Federal law says
21   that when you're drawing legislative districts,
22   you -- you have to take race into account.  If
23   there's a compact contiguous group of minority

1    citizens that's big enough to be a majority in a

2    district, you draw a district around them.  Right?

3    That's the first Gingles factor.  So you have to

4    be conscious of race.

5            Race -- the problem is, that you can be

6    too conscious of it or can you be not enough

7    conscious, and you don't know that you've done

8    something wrong until a federal court tells you

9    you've done something wrong.

10           Finally, real quick, if there's going to

11   be a preclearance regime imposed, it should be the

12   wrongdoer only.  So if Calera in Shelby County is

13   the problem, put Calera under the preclearance

14   regime.  Don't put Shelby County under it.  Shelby

15   County can't tell Calera what to do.  And don't

16   put Alabama under it because Alabama can't really

17   tell either Shelby County or Calera what to do.

18   Thank you.

19           MS. CARROLL:  Thank you.  So as usual, we

20   will take questions from Mr. Park but not until

21   after Mr. Boone speaks.  So we're going to

22   complete the panel before we field questions.  So

23   Mr. Boone, you will have the same amount of time,

1   15 minutes, and then we'll go to questions for

2   both of y'all.

3        MR. BOONE:  Thank you, madam commissioner,

4   and thank you to the Commission for having me

5   today.  There's some barriers of access I would

6   like to cover:  The voter ID law, false address

7   requirements, the moral turpitude law, fines and

8   fees that keep the poor from voting, the crossover

9   voting law, voting bureaucracy, absentee voting,

10  and inactive status.  First, we are troubled by

11  the photo ID laws.  Voter identification laws are

12  part of an ongoing strategy to roll back decades

13  of progress on voting rights.  It reduces

14  participation and stands in direct opposition to

15  our country's trend of including more Americans in

16  the democratic process.

17       Voter ID laws are discriminatory.  Voter

18  ID laws are a solution in search of a problem.

19  Not only does Alabama enact voter ID laws, but

20  then the State of Alabama made it more difficult

21  to obtain a photo ID, in particular a driver's

22  license, by closing 31 county driver's license

23  offices, including every county in which 70

1    percent or more of the population is black.  A

2    federal investigation determined that these

3    closures had a disparate and adverse effect based

4    upon race.

5           The state was ordered to reopen the

6    offices, but many of the offices are reopened on a

7    very limited schedule.  For example, a person in

8    Sumter County, which is a majority-black county,

9    can only visit the driver's license office on the

10   2nd and 4th Tuesday of the month from 8:00 to

11   12:00 and from 12:30 to 2:30 to get a driver's

12   license.  If they arrive without the proper

13   paperwork, of course, you don't get the

14   identification.  They must wait a significant

15   amount of time, if you can even get back for

16   another chance, not to mention the work

17   requirements and traveling.  And if someone has

18   very low income, it's difficult to get up there.

19          As the Commission should know, in-person

20   voter fraud is virtually nonexistent across the

21   country.  And in Alabama, as stated in the recent

22   case of Greater Birmingham Ministries versus

23   Merrill -- this decision just came out in January