FILED
2021 Dec-27  AM 11:25
U.S. DISTRICT COURT
N.D. OF ALABAMA



# Appendix 6

# Alabama Crimes Involving Moral Turpitude

# CRIMES INVOLVING MORAL TURPITUDE INCLUDE:

**Listed under the Felony Voter Disqualification Act Codified as Code of Alabama (1975), section 17-3-30.1**
**Effective August 1, 2017 per Act #2017-378**

- Murder – Section 13A-5-40 (A) 1-19
- Murder (Non-Capital, Reckless, Felony Murder, etc.) – Section 13A-6-2
- Manslaughter – Section 13A-6-3     Exceptions: 13A-6-20 (A) (5) and 13A-6-21
- Assault 1st Degree – Section 13A-6-20
- Assault 2nd Degree – Section 13A-6-21
- Kidnapping 1st Degree – Section 13A-6-43
- Kidnapping 2nd Degree – Section 13A-6-44
- Rape 1st Degree – Section 13A-6-61
- Rape 2nd Degree – Section 13A-6-62
- Sodomy 1st Degree – Section 13A-6-63
- Sodomy 2nd Degree – Section 13A-6-64
- Sexual Torture – Section 13A-6-65.1
- Sexual Abuse 1st Degree – Section 13A-6-66
- Sexual Abuse 2nd Degree – Section 13A-6-67
- Sexual Abuse of a child less than 12 years old – Section 13A-6-69.1
- Enticing a child to enter a vehicle, house, etc. for immoral purposes – Section 13A-6-69
- Facilitating solicitation of unlawful sexual conduct with a child – Section 13A-6-121
- Electronic solicitation of a child – Section 13A-6-122
- Facilitating the on-line solicitation of a child – Section 13A-6-123
- Traveling to meet a child for an unlawful sex act – Section 13A-6-124
- Facilitating the travel of a child for an unlawful sex act – Section 13A-6-125
- Human Trafficking 1st Degree – Section 13A-6-152
- Human Trafficking 2nd Degree – Section 13A-6-153
- Terrorism – Section 13A-10-152
- Soliciting or providing support for an act of terrorism – Section 13A-10-153
- Hindering prosecution of terrorism – Section 13A-10-154
- Endangering the water supply – Section 13A-10-171
- Possession, manufacture, transport, or distribution of a destructive device or bacteriological weapon, or biological weapon – Section 13A-10-193
- Selling, furnishing, giving away, delivering, or distribution of a destructive device, a bacteriological weapon, or biological weapon to a person who is less than 21 years of age – Section 13A-10-194
- Possession, manufacture, transport, or distribution of a detonator, explosive, poison, or hoax device – Section 13A-10-195
- Possession or distribution of a hoax device represented as a destructive device or weapon – Section 13A-10-196 (c)
- Attempt to commit an explosives or destructive device or bacteriological or biological weapons crime – Section 13A-10-197
- Conspiracy to commit an explosives or destructive device or bacteriological or biological weapons crime – Section 13A-10-198
- Hindrance or obstruction during detection, disarming, or destruction of a destructive device or weapon –

Section 13A-10-199

- Possession or distribution of a destructive device or weapon intended to cause injury or destruction – Section 13A-10-200
- Treason – Section 13A-11-2
- Dissemination or public display of obscene matter containing visual depiction or persons under 17 years of age involved in obscene acts – Section 13A-12-191
- Possession and possession with intent to disseminate obscene matter containing visual depiction of persons under 17 years of age involved in obscene acts – Section 13A-12-192
- Parents or guardians permitting children to engage in production of obscene matter – Section 13A-12-196
- Production of obscene matter containing visual depiction of persons under 17 years of age involved in obscene acts – Section 13A-12-197
- Distribution, possession with intent to distribute, production of obscene material, or offer or agreement to distribute or produce – Section 13A-12-200.2
- Trafficking in cannabis, cocaine, or other illegal drugs or trafficking in amphetamine and methamphetamine – Section 13A-12-231
- Bigamy – Section 13A-13-1
- Incest – Section 13A-13-3
- Torture or other willful maltreatment of a child under the age of 18 – Section 26-15-3
- Aggravated child abuse – Section 26-15-3.1
- Prohibited acts in the offer, sale, or purchase of securities – Section 8-6-17
- Burglary 1st Degree – Section 13A-7-5
- Burglary 2nd Degree – 13A-7-6
- Theft of Property 1st Degree – Section 13A-8-3
- Theft of Property 2nd Degree – Section 13A-8-4
- Theft of Lost Property 1st Degree – Section 13A-8-7
- Theft of Lost Property 2nd Degree – Section 13A-8-8
- Theft of trademarks or trade secrets – Section 13A-8-10.4
- Robbery 1st Degree – Section 13A-8-41
- Robbery 2nd Degree – Section 13A-8-42
- Robbery 3rd Degree – Section 13A-8-43
- Forgery 1st Degree – Section 13A-9-2
- Forgery 2nd Degree – Section 13A-9-3
- Any crime as defined by the laws of the United States or by the laws of another state, territory, country, or other jurisdiction, which, if committed in this state, would constitute one of the offenses listed in this subsection.

# Appendix 7

# Alabama Advisory Committee Member Marc Ayers Statement of Dissent

Statement of Dissent from Report of the Alabama Advisory Committee
to the United States Civil Rights Commission
on "Barriers to Voting in Alabama"

Marc James Ayers
June 22, 2020

Although I express disagreement with some of the core conclusions reached by the Committee majority, I want to express my thanks to the Committee for the hard work and thoughtfulness it put into this worthy effort. The Committee, and the witnesses who testified before the Committee, certainly raised matters worthy of further discussion concerning Alabama's voter ID and felon voting laws.

For example, to the extent that county offices wherein citizens can obtain photo IDs are not reasonably accessible – the Report discusses potential issues in Wilcox and Bullock Counties – such situations certainly need to be evaluated by State officials. Also, there is a need to evaluate the available election law training to ensure that poll workers and other state workers understand the laws concerning what is necessary to vote and how to acquire sufficient identification. While no system will be perfect – as there will always be human error – we should strive to maintain sufficient, uniform training so that errors in this regard are kept to a minimum. These and other kinds of concrete issues can be easily evaluated and addressed, and, to the extent that problems exist, their correction should be a great help to Alabama voters, especially those in poorer and more rural areas of the state.

However, in my opinion, the main conclusions reached by the majority here do not necessarily follow from the limited evidence presented at the hearing, but are driven by certain presuppositions or worldviews with which I cannot agree. For example, during the Committee's discussion of Alabama's felon voting law, one of the main concerns for one witness (Ms. Charlotte Morrison from the Equal Justice Initiative) was that Alabama's statute defining "felonies of moral turpitude" (Ala. Code 1975, § 17-3-30.1, 2019) was problematic in that it listed some felonies but not others. I suggested one solution to resolve that concern: classify all felonies to be of "moral turpitude." Personally, as a Christian, I could certainly make the argument that any crime serious enough to be a felony involved some form of moral turpitude.

In a somewhat surprising response, Ms. Morrison stated that that would not work, because the entire United States criminal justice system was (apparently) institutionally racist, and that if all felonies were crimes of "moral turpitude," police and prosecutors would simply choose to charge white defendants with misdemeanors and would charge minority defendants with felonies (purportedly to prevent them from voting in the future). *See* Transcript at 232-35 (stating her belief that "we know that the criminal justice system has a racial disparate impact," and that, even if all felonies were included as crimes of "moral turpitude," felony charges – as opposed to misdemeanor charges – are "going to be disproportionately levied against certain segments of the community").

At the very least, Ms. Morrison's belief concerning the US criminal justice system is highly debatable, and I do not believe that the facts support any conclusion that the criminal justice system

1

is systemically racist.[1]   I do not believe that police or prosecutors are operating in such a reprehensible manner (although I would be happy to engage in an analysis of that issue).  But if one holds this as the lens by which all issues will be examined, then any disparity in criminal justice statistics will be interpreted as proof of some kind of intentional discrimination.  If that lens is defective – as I believe it is – then any conclusions based on this worldview are wrong as well.[2]

With regard to the issue of felon disenfranchisement, I believe that it would be more beneficial to focus on concrete solutions to ensure that (1) those who have truly "paid their debt to society" can be restored to vote, and (2) that there are no unreasonable barriers to paying that "debt."  Of particular concern for me was the testimony concerning the assessment of high (30%) fees to fines.  *See* Transcript at 194-95, 201-02.  Fines are, in fact, part of paying one's "debt to society," but they must be reasonably "payable."   In my view, it would be simply immoral to impose on newly freed convicts fines that are economically unfeasible to pay back (barring some truly extraordinary windfall).  We believe in justice, but we must also believe in mercy to those truly repentant who seek to pay for their crimes and to be restored to society.  This principle applies to anyone – black or white, rich or poor, male or female.

Concerning Alabama's Voter ID law, Ala. Code 1975, § 17-9-30 (2019), in *Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253 (N.D. Ala. 2018), the United States District Court for the Northern District of Alabama held that that law is a constitutional exercise of Alabama's duty to protect the integrity of the franchise, and did not constitute a violation of the Voting Rights Act.  In its opinion, the federal district court described in detail the numerous forms of identification that can be used to allow a person to vote (in addition to the exception allowing a person to vote if two poll workers can personally identify the voter), the fact that a free compliant ID will be issued to anyone who needs one, and the extraordinary lengths that the Alabama Secretary of State has gone to help ensure that valid  IDs are available (including even a "mobile ID unit" that actually drives around the State to provide IDs).  *See Greater Birmingham Ministries*, 284 F. Supp. 3d at 1260-64.  After analyzing the voluminous amount of evidence presented, the court concluded that it was "easy to get a photo ID in Alabama." *Id.* at 1274; *see also id.* at 1277 ("In sum, the 'impact' of the law should not be measured by how many people lack a given ID at a given point in time, but  by whether someone without an ID can easily get one. In Alabama, the law has no

---

[1]  I also do not believe that there are "black crimes" and "white crimes," as such concepts contain repugnant assumptions.  There are just "crimes," regardless of who commits them.

[2]  Some of the language included in the  Report illustrates the presence of such fundamental but unproven presuppositions.  For example, throughout the Report, the majority characterizes certain matters as "discriminatory" when describing certain statistical differences.  But "discriminatory" in today's parlance carries a connotation of a malicious intent, and disparities do not prove such discrimination.  For example, the fact that a majority of players on a sports team are non-white players does not necessarily mean that the owner of the team "discriminates" against white players, and, rightly, nobody today uses the term "discrimination" to apply to such a situation.  There are numerous completely benign factors that could lead to such a result.

Similar is the majority's definition of "marginal" as referring to "people who, for whatever reason, are denied involvement in mainstream economic, political, cultural and social activities." Report at 3 n.11.  I am concerned that this definition also carries certain unargued presuppositions, as it is not clear how anyone is actually "denied" – which implies some kind of affirmative barring or preclusion – "involvement" in these things today.  Certainly, the fact that someone might not have the means or support to achieve their desired end – something that everyone (rich or poor, black or white, male or female) faces to one degree or another – does not necessarily mean that they have been "denied involvement."

discriminatory impact because it does not prevent anyone from voting, not when free IDs are issued in every county, or at home, under conditions that any registered voter can meet.").

The court also noted the numerous forms of documentation that are acceptable in order to provide citizens with IDs sufficient to vote. For example, citizens may obtain free voter photo IDs by providing any "non-photo identity document" that "includes both the person's full legal name and date of birth" (such as a birth or marriage certificate) and almost anything "with the voter's name and address on it, such as a utility bill or a pay stub." *Id.* at 1275. Speaking of the "mobile ID unit" which provides IDs to citizens all over the state (and even directly to people's homes) the court stated that:

> the mobile ID unit has issued free photo voter ID cards based upon the presentation of a wide variety of documents, including voter registration forms, registration update forms, arrest records, bank documents, Birmingham Housing Authority ID cards, expired county employee IDs, court paternity documents, fishing licenses, EBT cards, pay stubs, Sam's Club cards, and a ticket issued by a municipality.

*Id.* at 1275 n.8. Furthermore, "[i]f the voter does not have a copy of her birth or marriage certificate, the registrar can get a copy at no charge to the voter, due to Secretary Merrill's contracting with the ADPH to pay for ADPH to perform the search." *Id.* at 1275-76.

Secretary Merrill discussed many of these aspects of the Voter ID law at this Committee's hearing, along with the impressive levels of voter registration and participation in we have achieved in Alabama. There are, of course, always possible improvements that can be made, as is the case in almost any government program. However, in my opinion, these aspects and accomplishments were often met with a "Yes, but" response that dismissed the State's overall success in an area by focusing on a small remaining gap or scattered human errors that would then be used to argue that in fact the program was not a success at all. I do not believe that that is the proper standard. Indeed, no government requirement can possibly account for, and create exceptions for, every possible extraordinary scenario.

The question before this Committee is not whether the Voter ID law is legal. That is the role of the courts, and to date the courts have ruled that it is. Rather, this Committee is analyzing the general reasonableness and workability of Alabama's undisputedly facially-neutral Voter ID requirement; that is, whether the Voter ID requirement is a reasonable balance of the State's duty to maintain the integrity of the vote with the fundamental right to vote. I believe that it is, by any objective standard, and that I and the majority simply have a fundamental disagreement as to the nature of the State's duties and obligations concerning providing access to the vote and the citizen's role duties and obligations concerning taking the steps necessary to vote.

Only adults can vote, and therefore when attempting to strike this balance, the State knows that any requirement will be faced by an adult populace. The State can also assume that those who truly wish to vote will prioritize that desire to engage in the political process and take whatever reasonable steps are necessary to do so. (Indeed, some simply choose not to engage, as people also have the right not to vote.) In 2020, a photo ID is not some kind of unusual thing foreign to the citizenry at large. A valid photo ID is required for any number of things in everyday life for the vast majority of Alabama citizens (and citizens of other states). Viewing the requirement

objectively and as a whole, I believe that the Voter ID requirement – especially Alabama's – is more than reasonable. Voting is limited by one's state, county, city, precinct, age, criminal record, etc. Accordingly, requiring one to provide this baseline level of proof to protect their vote is not, in my opinion, an unreasonable burden. Therefore, I cannot agree with the majority's conclusions that the Voter ID requirement creates an unreasonable barrier to voting, especially given the fact that, even after photo ID became a requirement, Alabama's historic voter turnout – including minority turnout – remained high.

This conclusion is bolstered when one considers the potentially immense impact of voting on the individual rights of the citizenry. Governments can create and have created laws that send citizens to prison for certain acts – acts which were perhaps historically lawful and even common. Through the power to tax, Governments can confiscate large percentages of one's earned income, often for programs with which many disagree or find wasteful, detrimental or even immoral. Governments can give themselves new powers and controls over an individual's life and livelihood, the raising of one's children, one's right to worship, one's right to hire and fire in one's own business, etc.

In other words, unlike with other fundamental rights – which might affect only the person exercising them – the voting process determines which persons, and accordingly which political worldview, will hold the keys of power to make decisions that can drastically impact every citizen's individual life, liberty and property. It follows then that a State has not only the ability but the duty to take all reasonable steps to ensure that whatever worldview governs does so only by the consent of those actually legally entitled to vote.

Further, any conclusion that requiring a voter ID is somehow not effective in deterring voter fraud is not well founded. Of course such a requirement deters voter fraud, at least to some degree. It makes it more difficult to impersonate another voter, it ensures that the person showing up to vote is actually who they say they are, and ensures that officials can determine whether that person is entitled to vote (or at least entitled to vote at that voting place).

However, the majority's focus appears to be based on an assumption that a State must demonstrate a proven history of a substantial amount of a specific type of voter fraud within the State – here, voter fraud that is identification-related – before that State is justified in taking steps to prevent that kind of fraud. There is no such requirement, and such a requirement would in fact be quite unwise. A homeowner would not be faulted for including window bars in addition to door locks on the owners' home to prevent break-ins, even if that homeowner had no evidence of window-based home invasions in that neighborhood.

In the end, the purported issues with the Voter ID requirement – issues surrounding travel, cost, timely access to locations wherein an ID can be procured, etc. – concern the effect on the poor (*i.e.*, those with less means to cover these matters), not on racial minorities. Many of these issues are absolutely worthy of consideration to ensure that the State's requirements do not amount to unreasonable barriers. However, it is also a universal truth that virtually any legal requirement of any kind will impact poor people differently from those with means. The question is whether the requirement it is a reasonable balance between the ends to be achieved and the normal expectations upon any adult citizen. While I would be the first to support any reasonable

suggestions to make the system better – some of which are included in the Report – I believe that Alabama's generous Voter ID law represents just such an acceptable balance.

However, on another, related note, I think Alabama should stay far away from any policy that would make broad assumptions about individuals – their abilities, priorities, political leanings, etc. – based on their race.  Nobody on this Committee has done so, of course, and hopefully everyone would agree that minority communities – just like non-minority communities – are filled with individuals who are intelligent, sophisticated, mobile and technologically savvy.  However, at times arguments against photo ID laws come dangerously close to demeaning racial minorities through assumptions or insinuations such as the idea that obtaining a photo ID creates a particular hardship simply due to racial considerations.  Such a reprehensible position not only flies in the face of the core message of the Civil Rights Movement – that people should be defined as individuals made in God's image and not as members of this or that racial classification – but also hits a particular chord with me.

To offer my own anecdote, when I was in school I saw the devastation caused to many of my minority friends by what several African American scholars have called "the soft racism of low expectations," often at the hand of school officials who thought they were "helping" by expecting less of these students.  This is precisely the opposite of what was taught by a great man who holds a firm and proud place in Alabama's history, Booker T. Washington – a personal hero of mine and the subject of one of two non-family portraits in my office (the other being another personal hero, Frederick Douglass) – who, with great success, taught that one's skin color or history did not limit one from achieving excellence, contrary to the disgusting views of "white supremacy" held by many at the time.  Although only a powerless, pathetic few hold such disgusting views today, I fear that some arguments against photo ID requirements could be used by those few to erode the progress for which Washington and others fought.  Alabama should strive to ensure that that does not happen.

# Appendix 8

# Alabama Advisory Committee Member Craig Hymowitz Statement of Dissent

**Statement and Dissent by Member Craig Hymowitz.**

I dissent from the Committee's Report as I cannot agree with its conclusions or recommendations.[1]  Our election system in Alabama is not perfect, nor will it ever be, but it has achieved tremendous success in expanding Alabama's overall voter registration and turnout rates.[2]  The Committee's Report, however, does not focus on these successes.  Instead, the Majority concludes that under our current election laws, "the balance between efforts to 'protect' the integrity of the vote and the citizen's ability to realize his or her right to vote has gone askew,"[3] and recommend a wholesale revision of Alabama and federal election law I cannot support.

## I.  Deciding How We Register and Vote Are Policy Choices

Laws governing the "who, what, where, when and how" of voting and voter registration seek to balance the competing interests between requirements that promote election certainty, prevent fraud, and protect the integrity of eligible voters versus policies that make it easier, or unnecessary, to register and provide additional/alternative times, places, and manners for one to cast their vote.  As economist Thomas Sowell has said, "There are no solutions, there are only trade-offs; and you try to get the best trade-off you can get, that's all you can hope for."

In the context of voting, the trade-offs center around how to protect the votes of legally entitled voters from their vote being diluted or stolen by those who are not.  Where a state strikes that balance is a policy choice that reasonable people can disagree over - including the U.S. Civil Rights Commission (the "USCCR").[4]

In seeking to justify its policy choices, the Committee's Report details the problems and obstacles it views as impediments to the remaining pool of unregistered eligible voters from registering and voting.  In its rush to point out its gaps and declare the current process untenable, the Committee failed to analyze Alabama's actual voter registration and turnout rates under the current system.  In that data lies the true story of voting in Alabama, and it a story of overwhelming success.[5]  Contrary to the conclusions of the Committee, Alabama has found a sweet-spot in the voting policy debate.  Alabama has dismantled barriers to voting and expanded the franchise, all while simultaneously enacting efforts to protect the integrity of the ballot.  As a result, in 2019, Alabama had its highest level of active voter registration in history; 86% of all potential voters were registered compared to 71% in 2010. See App. A at Table 7.[6]

The Report ignores this data and fails to discuss the impact its sweeping recommendations would have on the integrity, efficiency, and cost to the state's election process.  Instead, the Committee's Report based on one-day of testimony and member's individual research purports to reach a completely different view of where the balance between ease of voting and election integrity should lie.  As such, the Committee recommends wholesale revisions to Alabama (and Federal) election law based on its conclusion that Alabama's current voting laws place an undue burden on the voting rights of certain "marginal" groups based on racial, socio-economic, rural vs. urban, or convicted felon status.[7]

---

[1]  The Committee chose to hold a single vote on the report as a whole, rather than votes on the individual proposals.  As I cannot support certain of the recommendations such as those calling for returning AL to preclearance status, repeal of photo voter ID, and elimination of voter registration, I dissent from the entire report.

[2]  To provide the USCCR and reader with the relevant current and historical voter registration and turnout efforts in Alabama, I have prepared an appendix of charts and raw data.  See Appendix A:  Data Sources and Charts of Alabama Voter Registration and Turnout Data 2010 – 2019 attached hereto.

[3]  Committee Report at p. 51

[4]   See *An Assessment of Minority Voting Rights in the United States*, USCCR, 2018 Statutory Report, "Summary of The Commission's Past Voting Rights Briefing Reports" at Appendix. A (hereinafter, the "2018 USCCR Report.").

[5]  It is important that the USCCR and the reader understand that while individual efforts were made by Committee members to gather information for the Report, the Committee's findings are based primarily on one day of testimony from representatives of several interest groups, government officials, and individuals who submitted information.

[6]  Each citizen, of course, also has the right not to exercise their franchise.  So one can assume that some choose not to register.

[7]  Committee Report at pp. 3-4, 48-53.

I have enjoyed the robust debate we have engaged in over this topic and respect the hard work put in by my colleagues, even if I disagree with their focus and conclusions. Based on the actual voter registration and turnout data evidence, however, I believe the real story about "barriers to voting" in Alabama is how they've been knocked down. Alabama's achievements in expanding voter registration and increasing turnout should be praised, not criticized simply because there is still some remaining room for improvement.[8]

## II.    Alabama's Success in Expanding the Voter Registration.

By any measure, the improvements in Alabama's Voter Registration rate from 1965 to today have been tectonic. Since passage of the Voting Rights Act of 1965, the gap between White and Black/African-American voters in Alabama has been eliminated.[9] A momentous accomplishment the USCCR recognized in its own 2008 Report. A trend that has continued to today:

**Table 1: Voter Registration Rates for Whites & Blacks in Alabama: 1965 vs. 2004 vs. 2019**

| 1965 | | | 2004 | | | 2019 | | |
|------|------|------|------|------|------|------|------|------|
| White | Black | Gap | White | Black | Gap | White | Black | Gap |
| 69.2% | 19.3% | 49.9% | 73.8% | 72.9% | 0.9% | 87.1% | 84.3 | 2.8% |

Moreover, the data suggest that whatever impact the enactment of Alabama's Voter ID law in 2014 had on voter registration, it was minimal and temporary. As shown in Table 1A and 1B, the gap between registration rates increased in 2016 and 2017, before declining back to pre-voter ID levels by 2019. The percentages of White and Black voter registration dipped in 2015, rose in 2016 (a Presidential election year), dropped again in 2017, but then increased significantly in 2018 and 2019.[10]



**Table 1B: Percentage of Active Voter Registration Rate Between White and Black Citizens 2010 – 2019[11]**

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|------|------|------|------|------|------|------|------|------|------|
| % White Active Regis. Voters | 73.6% | 74.6% | 75.2% | 79.8% | 78.5% | 78.0% | 82.9% | 80.2% | 85.0% | 87.1% |
| % Black Active Regis. Voters | 70.0% | 71.2% | 71.7% | 80.4% | 78.9% | 78.0% | 81.1% | 75.6% | 81.0% | 84.3% |

---

[8]  Similarly, I think the Committee discounts too heavily the human element in some of the stories of election frustration we heard in favor of presuming a broader institutional problem. Elections occur under high stress, at most a few times a year, and often with new rules or equipment versus the last contest. To the extent that election workers give incorrect advice or make an error in processing a voter, I have seen no evidence presented that this was the result of anything but unintentional human error. I would readily support additional training, resources, and election planning to better prepare our election workers and provide increased awareness of polling place locations and DMV hours.

[9]  2018 USCCR Report. at p.53, Table 2.

[10]  The number of total votes cast in Alabama increased between the 2012 and 2016 election by approximately 63,000, even though the turnout percentage dropped from73.2% to 66.8%. See Appendix A Table 8-10A.

[11]  See Appendix A at Table 7 for the source data for Tables 1A-B.

Alabama currently has approximately 4.9 million residents.[12]   Approximately 1.1 million are under the age of eighteen, leaving a maximum pool of roughly 3.8 million residents (including citizens, legal residents, and illegal aliens) over the age of 18 ("Potential Voters").  From this pool of Potential Voters, 3.25 million were active registered voters in 2019 equating to an active voter registration rate of approximately 86%, the state's highest rate ever.[13]  See App. A at Tables 4 & 7.

While the percentage of White and Black Alabamians over 18 has remained flat over the last decade (2010-2019), their participation rate as Active Voters increased.[14]  White active voter registration has gone from 73.6% in 2010 to 87.1% in 2019.  Black active voter registration jumped from 70.0% in 2010 to 84.3% in 2019.  See App. A at Tables 2 & 3.

Thus, it is difficult to reconcile the state's increasing registration and turnout numbers with the Committee's conclusion that "the state has created what for some are insurmountable barriers to voting."[15]  As the Secretary of State testified at the Committee's hearing back in February 2018,  "Not one instance has been reported since we passed the voter photo ID law where an individual has gone to the poll and been denied access to participation. All we've tried to do is to make it easy to vote and hard to cheat."[16]  As a result of the Secretary of State's efforts, he estimated in February 2018, that out of roughly 4.85 million residents, "[t]here's less than 350,000 people in the state of Alabama that are not registered to vote, period."[17]

## III.   Voter Fraud, Maintaining Accurate Voter Rolls, and Voter ID

Voter ID law's ability to prevent voter fraud versus the increased burden that could depress voter registration and voting remains uncertain.  A fact the Committee initially accepted when it wrote "[t]he testimony at the Montgomery Hearing indicated voter fraud was either a serious problem, or nonexistent, depending on which panelist was speaking."[18]  The same bi-polar conclusion that the venerable Carter-Baker Report found in 2005 when it stated:

> There is no evidence of extensive fraud in the U.S. elections or of multiple voting, but both occur, and it could affect the outcome of a close election. The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters. . . . While the Commission is divided on the magnitude of voter fraud – with some believing the problem is widespread and others believing that it is minor – there is no doubt that it occurs.[19]

---

[12]  See U.S. Census Bureau, Quick Facts, AL, https://www.census.gov/quickfacts/fact/table/US/PST045219. (July 1, 2019).

[13]  In addition, there were another 254,285 "inactive" registered voters in 2019.  Id.

[14]  Alabama's population of White and Black residents between 2010 and 2019 stayed very consistent.  The White percentage dropping slightly from 69.9% in 2010 to 69.1% in 2019, and Black Alabamians increasing slightly from 26.1% in 2010 to 26.8% in 2019.  See App. A at Table 5.

[15]  Committee Report at p. 52.

[16]  Testimony of Merrill at Transcript p. 14

[17]  Quoted in the Summary of Testimony, at p.15.  See, Merrill Testimony at pp 15-16 ("We now have 3,347,398 registered voters in Alabama. . . [but] I'm not satisfied with what we've done. We got to take additional steps and do other things that will allow us to be more efficient, more effective, and more responsive to the people in the state of Alabama.").  As of May 2020, there were 3,357,082 Active Registered Voters. See https://www.sos.alabama.gov/alabama-votes/voter/election-data.

[18]  "A Summary of Testimony received by the Alabama Advisory Committee to the United States Commission on Civil Rights," June 2018 at p.12  (hereinafter "Summary of Testimony").

[19]  "*Report of the Commission on Federal Election Reform, Building Confidence in U.S. Elections*" at p. 9 (Sept. 2005) Finding that even post-HAVA, "irregularities and fraud still occur," citing ineligible felon voting and voting by the dead….; "more than 200 cases of felons voting illegally and more than 100 people who voted twice, used fake names or false addresses, or voted in the name of a dead person. . . . The Commission made five broad recommendations "to increase voter participation and to assure the integrity of the electoral system. Id. at p. 6 (Recommending improving voter registration that "produces complete, accurate, and valid lists of citizens who are eligible to vote;  and voter identification, tied directly to voter registration, that enhances ballot integrity without introducing new barriers to voting") (hereinafter "Carter-Baker Report").

Similar sentiments were expressed at our hearing by the Secretary of State[20] and a representative from the Alabama Attorney General's Office.[21]  In fact, the USCCR itself recommended Voter ID, cleaning up/purging of voter registration lists, and other anti-fraud measures more than ten years ago.  In 2008, the USCCR issued a report on Voter Fraud and Intimidation[22] finding:

> that both fraud and intimidation disenfranchise voters and weaken the overall political system.  Thus, the Commission found that achieving accurate voter rolls seems to be essential in assuring civilians that elections are accurate and have full participation of the voting public. The Commission also offered recommendations that state and municipal governments improve poll worker training, and that states adopt a photo ID requirement for both registration and voting.[23]

In 2009, the USCCR issued a report "urging the [Department of Justice] to: (1) combat voter fraud and initiate action to prevent illegal voting, and (2) take aggressive steps to ensure that all states comply with HAVA's requirement that each state implement an official computerized voter registration list."[24]

Concurrent with the Carter-Baker Report, the REAL ID Act of 2005 was signed into law.  It required all "states to verify each individual's full legal name, date of birth, address, Social Security number, and U.S. citizenship before the individual is issued a driver's license or personal ID card."[25] This is now the law in Alabama and precludes the state from issuing a driver's license or other ID without confirming the required information.  While the Committee heard testimony that these requirements are overly burdensome on certain segments of the public,[26] it also heard testimony regarding the Secretary of State's extensive efforts to accommodate any citizen's difficulty in obtaining an ID.

There is no doubt obtaining a REAL ID/STAR ID imposes a greater burden on certain segments of the population than others.  I do not believe, and there has been no evidence presented, that Congress sought to use the heightened proof requirements to intentionally impose an unfair burden on any specific group.  Whatever impact it does impose, based on the state's ever-increasing voter registration numbers, the people of Alabama seem capable of overcoming it.

When it came time to write the final report, however, the Committee was no longer uncertain about what balance it wanted to strike.  Despite the success of Alabama's voter registration efforts and the fact that the overwhelming majority of citizens have the necessary ID, the Committee decided it all had to go, recommending not only that the state get repeal its Voter ID requirement,[27] but also its entire voter registration process concluding that "the voter registration process creates barriers to voting that is disproportionate for Alabama's marginalized citizens – including poor, minority and rural populations."[28]  A conclusion, I cannot support.

---

See also, The Heritage Foundation Election Fraud Database (https://www.heritage.org/voterfraud) chronicling over 1200 proven instances of election fraud across the country.

[20] See Summary of Testimony at p.12.

[21] Id. at pp. 12-13.

[22] USCCR, Voter Fraud And Voter Intimidation, 1 (2008), http://www2.law.umaryland.edu/marshall/usccr/documents/cr12v962006.pdf.

[23] 2018 USCCR Report, at p. 337. (internal footnotes omitted).

[24] Id. at 338 (internal footnotes omitted). While in the dissent, the statement of Commissioner Gail Hariot in response to the 2018 USCCR is equally applicable here:

> Along with the right to the ballot is the right to have one's ballot count, which requires the exclusion of those who are not entitled to a ballot. Policies that are intended to facilitate the right to cast a ballot—like early voting and requirements that election officials take the voter's word for his or her identity—can increase the likelihood of voter fraud. . . . On the other hand, requirements that voters present an ID can exclude the occasional voter who does not have an ID and cannot get one except at great inconvenience. How do we reconcile those two competing considerations?

[25] Carter-Baker Report at pp. 18-19.

[26] See Summary of Testimony at pp. 11-12.

[27] Committee Report at p. 15.

[28] Committee Report at pp.18-19.

## IV.     Alabama's Success in Expanding Voter Turnout.

The Committee heard testimony that while registration numbers have gone up, voter turnout is a better metric to measure voter participation and the barriers individuals may face in attempting to vote. Even if so, the most recent data from the 2018 midterm elections put Alabama on top again.  As Secretary Merrill put it:  "'We've also broken every record in the history of the state for participation in elections in the last four major elections that we've had.'"[29]

In the 2018 elections (where turnout is historically lower than presidential years[30]), the gap between white and black voter turnout in Alabama was only 3.1% compared to 6.4% nationwide.[31]  The gap in Alabama's Black and White voter turnout was smaller than in other states, including those that did not require Voter ID ("The [U.S.] census report, [released last week] . . . indicates little correlation between voter ID laws and racial parity in voting during last year's midterms.").[32]  In reaction to the report, Sec. Merrill said:

he knows of no voters turned away from the polls in Alabama last year because they did not have photo ID.  "That would be zero," he said. "Because, if there had been more than zero, you would have heard a national outcry about how Alabama is mistreating her people, about how Alabama is not allowing her people to participate at the polls.  Id.

## V.     Conclusion

The Committee's Report bases its conclusions on the testimony and individual investigations of Committee members, rather than an objective analysis of Alabama's actual voter data.  When Alabama's voter registration and turnout data is taken into account, I see no justification for the Committee's proposed comprehensive overhaul of Alabama election law.

As with most elements of modern society, the difficulties testified to in relation to obtaining ID and voting were predominantly correlated with socio-economic status, rural vs urban living situation, and some human error and inefficiencies in the operation of some Alabama DMV offices.  These barriers, however, have successfully been navigated by Alabama voters and do not support the Committee's conclusion that "the balance between efforts to 'protect' the integrity of the vote and the citizen's ability to realize his or her right to vote has gone askew."[33]

That does not mean that improvements cannot be made, and special efforts to reach our rural and poor citizens to allow them an equal opportunity to gain the necessary ID, if they need it, register, and vote if they choose to do so.  But the barriers testified to, compared to the actual results reflected in the state's voter registration and turnout numbers do not justify the Committee's conclusion or recommendation for a wholesale revision of Alabama voting laws.[34]  Thus, I respectfully dissent.

---

[29]  Branden Kirby, "*Voter suppression? Alabama black, white citizens voted at similar rates in 2018,*" www.Fox10tv.com (April 29, 2019); quoting Secretary of State Merrill (hereinafter "Kirby Article") (https://www.fox10tv.com/news/alabama/voter-suppression-alabama-black-white-citizens-voted-at-similar-rates-in-2018/article_d1082cdc-6ad1-11e9-9d83-fbb4b61be738.html).

[30]  See App. A at Tables 8-10 plotting overall Alabama voter turnout from 1986-2018.

[31]  Kirby, ("Alabama Secretary of State John Merrill said the numbers refute oft-repeated allegations that the state's voter identification law and other election integrity measures suppress the African-American vote.").

[32]  Id.  Noting that the gap between black and white voters in states without Voter ID were often higher than Alabama which has a Voter ID requirement. The gap noted in states that did not require Voter ID were: Nevada (19.8%), Washington, D.C. (15.8%), Massachusetts (11.7%), California (10.8%), Minnesota (10.1%), Maryland (9.7%), New Jersey (6.4%), North Carolina (2.6%), Pennsylvania (1.9%), New York (1.6%), and Illinois (0.3%).

[33]  Committee Report at p. 51

[34]  The Report's recommendations include a call to "restructure Section 4 of the Voting Rights Act and return Alabama to preclearance status." How this could be accomplished is not discussed in the Committee Report.  Any such effort, as the U.S. Supreme Court noted, would require legislation by Congress.  That legislation would be required under *Shelby County* to emerge from a re-survey of each state in the Union.  Based on Alabama's success in increasing minority voter registration and turnout, it is unlikely that even if Congress reimposes preclearance on a subset of states rather than uniformly across the country Alabama would qualify as a state with significant enough barriers to minority voting to require preclearance.

**Statement and Dissent by Member Craig Hymowitz.**

**Appendix A:  Data Sources and Charts of Alabama Voter Registration and Turnout Data 2010 – 2019**

U.S. Census Data:

1.  U.S. Census Bureau, Quick Facts, Alabama.  As of July 1, 2019, Alabama's racial and ethnic breakdown was:  White (69.1%), Black or African American (26.8), American Indian (.7%), Asian (1.5%), Native Hawaiian (.1%), and two or more races ( 1.7%). 4.4% of Alabamians identified themselves as Hispanic or Latino. By comparison, the United States as a whole was:  White (76.5%), Black or African American (13.4%), American Indian (1.3%), Asian (5.9%), Native Hawaiian (.2%), and two or more races (2.7%).  18.3% of Americans identified themselves as Hispanic or Latino.  Available at: https://www.census.gov/quickfacts/fact/table/US/PST045219.;

2.  Data for Alabama's population for 2010 – 2018 over the age of 18 and by race was pulled from the U.S. Census' American Community Survey 5-Year Estimate tables available at: https://data.census.gov/cedsci/table?q=alabama%20voting%20age%20population&g=0400000US01&hidePreview=false&tid=AC SDP5Y2011.DP05&t=Age%20and%20Sex&vintage=2018&layer=VT_2018_040_00_PY_D1&cid=DP05_0001E.  Data for 2019 was found at https://www.census.gov/quickfacts/fact/table/US/PST045219; http://censusviewer.com/state/AL.

Alabama Voter Registration and Turnout Data

1.  Data for the number active and inactive Alabama registered voters, and their racial and ethnic makeup was derived from the annual Voter Registration Data files available at the Alabama Secretary of State's website at: https://www.sos.alabama.gov/alabama-votes/voter/election-data

2.  Data for Alabama's overall active voter registration and turnout is excerpted from the Alabama Secretary of State, "Comprehensive Voter Turnout 1986--2020" file, available at:  https://www.sos.alabama.gov/sites/default/files/election-data/2020-05/Comprehensive%20Voter%20Turnout%201986-2020.pdf

A-1

| Data Tables and Charts | Page |
| --- | --- |
| Table 1: Voter Registration Rates for Whites & Blacks in Alabama: 1965 vs. 2004 vs. 2019 | 2 |
| Table 1A:  Gap in Active Voter Registration Rate Between White and Black Citizens 2010-2019 | 2 |
| Table 1B:  Percentage of Active Voter Registration Rate Between White and Black Citizens 2010 – 2019 | 2 |
| Table 2: Potential Pool of Alabama Voters vs. Active Registered Voters 2010 – 2019:  All, White, and Black | A-3 |
| Table 3: Percentage of Alabamians (White and Black) over 18 and Percentage of Active Voter Registration (White and Black) 2010 – 2019 | A-4 |
| Table 4: Alabama Active and Inactive Voter Registrant Data | A-5 |
| Table 5: U.S. Census Community Survey 5-Year Estimates 2010-2018 | A-5 |
| Table 6: Alabama Active vs Inactive Voter Registrants 2010-2020 | A-5 |
| Table 7: Analysis of Alabama Secretary of State Election Data 2010 – 2019 | A-6 |
| Table 8: AL Active Voter Registration and Turnout % 1986 – 2018 | A-7 |
| Table 9: AL Presidential Election Year Turnout 1988 - 2016 | A-7 |
| Table 10: AL Mid-Term Election Year Turnout 1986 – 2018 | A-8 |
| Table 8-10A:  Alabama Active Voter Registration and Turnout 1986 -2018 | A-9 |



Table 2: Potential Pool of Alabama Voters vs. Active Registered Voters 2010 - 2019: All, White, and Black

| | 2010 | 2011 | 2012 | 2013 | 2014 - Voter ID Goes Into Effect | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| % over 18 | 76.0% | 76.2% | 76.3% | 76.6% | 76.8% | 77.0% | 77.2% | 77.3% | 77.4% | 77.5% |
| % of Active Reg. Voters over 18 | 71% | 72% | 73% | 78% | 77% | 76% | 81% | 77% | 82% | 86% |
| % of Whites Over 18 | 69.9% | 69.7% | 69.5% | 69.3% | 69.1% | 68.8% | 68.7% | 68.4% | 68.2% | 69.1% |
| % of Blacks over 18 | 26.1% | 26.2% | 26.3% | 26.3% | 26.4% | 26.4% | 26.5% | 26.5% | 26.6% | 26.8% |
| % White Active Reg. Voters | 73.6% | 74.6% | 75.2% | 79.8% | 78.5% | 78.0% | 82.9% | 80.2% | 85.0% | 87.1% |
| % Black Active Reg. Voters | 70.0% | 71.2% | 71.7% | 80.4% | 78.9% | 78.0% | 81.1% | 75.6% | 81.0% | 84.3% |

A-3



**Table 3: Percentage of Alabamians (White and Black) over 18 and Percentage of Active Voter Registration (White and Black)  2010 - 2019**

| | 2010 | 2011 | 2012 | 2013 | 2014 - Voter ID Goes Into Effect | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| % of Whites Over 18 | 69.9% | 69.7% | 69.5% | 69.3% | 69.1% | 68.8% | 68.7% | 68.4% | 68.2% | 69.1% |
| % of Blacks over 18 | 26.1% | 26.2% | 26.3% | 26.3% | 26.4% | 26.4% | 26.5% | 26.5% | 26.6% | 26.8% |
| % White Active Reg. Voters | 73.6% | 74.6% | 75.2% | 79.8% | 78.5% | 78.0% | 82.9% | 80.2% | 85.0% | 87.1% |
| % Black Active Reg. Voters | 70.0% | 71.2% | 71.7% | 80.4% | 78.9% | 78.0% | 81.1% | 75.6% | 81.0% | 84.3% |

A-4

## Table 4:  Alabama Active and Inactive Voter Registrant Data

| Year | Total Active & Inactive Registrants | Active Asian | American Indian | Black | Federally Registered (may be of any race) | Hispanic | Korean | White | Other | Not Identified | Total Active | Inactive Asian | American Indian | Black | Federally Registered (may be of any race) | Hispanic | Korean | White | Other | Not Identified | Total Inactive |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 2,937,756 | 9,343 | 7,293 | 654,385 | 3,353 | 10,215 | 44 | 1,841,343 | 26,917 | 59 | 2,552,952 | 1,674 | 1,318 | 109,290 | 210 | 2,077 | 2 | 263,105 | 7,098 | 30 | 384,804 |
| 2011 | 2,960,142 | 9,984 | 7,872 | 674,667 | 3,219 | 11,203 | 50 | 1,880,458 | 27,750 | 53 | 2,615,256 | 1,578 | 1,192 | 96,389 | 172 | 1,955 | 1 | 236,997 | 6,572 | 30 | 344,886 |
| 2012 | 3,016,879 | 10,596 | 8,375 | 688,192 | 3,088 | 12,504 | 44 | 1,904,994 | 28,032 | 518 | 2,656,343 | 1,779 | 1,302 | 103,727 | 154 | 2,244 | 4 | 244,184 | 7,106 | 36 | 360,536 |
| 2013 | 2,951,341 | 13,132 | 9,706 | 776,844 | 2,961 | 16,317 | 47 | 2,031,569 | 31,205 | 3,537 | 2,885,315 | 324 | 318 | 23,848 | 18 | 523 | 4 | 39,713 | 1,238 | 40 | 66,026 |
| 2014 | 2,969,077 | 13,441 | 9,925 | 771,005 | 2,784 | 16,931 | 46 | 2,007,738 | 30,547 | 4,079 | 2,856,497 | 615 | 581 | 36,371 | 55 | 1,030 | 4 | 71,734 | 2,073 | 117 | 112,580 |
| 2015 | 2,997,340 | 13,803 | 10,101 | 765,820 | 2,662 | 17,765 | 51 | 1,996,330 | 29,739 | 4,601 | 2,840,867 | 964 | 884 | 53,137 | 64 | 1,653 | 8 | 96,294 | 3,229 | 240 | 156,473 |
| 2016 | 3,164,155 | 16,314 | 10,865 | 802,989 | 2,475 | 22,558 | 51 | 2,128,755 | 30,377 | 6,932 | 3,021,316 | 914 | 780 | 49,747 | 56 | 1,557 | 8 | 86,559 | 2,976 | 242 | 142,839 |
| 2017 | 3,280,898 | 17,365 | 10,865 | 750,720 | 2,040 | 24,801 | 40 | 2,056,161 | 24,297 | 9,852 | 2,895,020 | 2,350 | 1,711 | 120,926 | 234 | 4,072 | 8 | 249,385 | 5,818 | 1,374 | 385,878 |
| 2018 | 3,403,719 | 18,705 | 9,749 | 811,719 | 1,849 | 28,339 | 37 | 2,183,164 | 23,306 | 13,175 | 3,090,043 | 2,226 | 1,423 | 96,675 | 172 | 3,837 | 6 | 202,921 | 5,150 | 1,266 | 313,676 |
| 2019 | 3,502,308 | 20,457 | 9,544 | 857,674 | 1,646 | 32,830 | 36 | 2,286,352 | 22,497 | 16,987 | 3,248,023 | 1,972 | 1,141 | 77,190 | 137 | 3,409 | 5 | 164,803 | 4,477 | 1,151 | 254,285 |
| 2020 | 3,590,837 | 21,960 | 9,687 | 883,906 | 1,508 | 36,192 | 32 | 2,356,799 | 22,366 | 19,230 | 3,351,680 | 1,955 | 1,043 | 72,588 | 129 | 3,387 | 4 | 154,598 | 4,305 | 1,148 | 239,157 |

Source: Alabama Secretary of State
As of July for 2010 - 2019. As of April for 2020.

### Percentages by Category: Active vs. Inactive.

| Year | Active Asian | American Indian | Black | Federally Registered (may be of any race) | Hispanic | Korean | White | Other | Not Identified | Total Active | Inactive Asian | American Indian | Black | Federally Registered (may be of any race) | Hispanic | Korean | White | Other | Not Identified | Total Inactive |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 0.37% | 0.29% | 25.63% | 0.13% | 0.40% | 0.00% | 72.13% | 1.05% | 0.00% | 100.00% | 0.44% | 0.34% | 28.40% | 0.05% | 0.54% | 0.00% | 68.37% | 1.84% | 0.01% | 100.00% |
| 2011 | 0.38% | 0.30% | 25.80% | 0.12% | 0.43% | 0.00% | 71.90% | 1.06% | 0.00% | 100.00% | 0.46% | 0.35% | 27.95% | 0.05% | 0.57% | 0.00% | 68.72% | 1.91% | 0.01% | 100.00% |
| 2012 | 0.40% | 0.32% | 25.91% | 0.12% | 0.47% | 0.00% | 71.71% | 1.06% | 0.02% | 100.00% | 0.49% | 0.36% | 28.77% | 0.04% | 0.62% | 0.01% | 67.73% | 1.97% | 0.01% | 100.00% |
| 2013 | 0.46% | 0.34% | 26.92% | 0.10% | 0.57% | 0.00% | 70.41% | 1.08% | 0.12% | 100.00% | 0.49% | 0.48% | 36.12% | 0.03% | 0.79% | 0.01% | 60.15% | 1.88% | 0.06% | 100.00% |
| 2014 | 0.47% | 0.35% | 26.99% | 0.10% | 0.59% | 0.00% | 70.29% | 1.07% | 0.14% | 100.00% | 0.55% | 0.52% | 32.31% | 0.04% | 0.91% | 0.00% | 63.72% | 1.84% | 0.10% | 100.00% |
| 2015 | 0.49% | 0.36% | 26.96% | 0.09% | 0.63% | 0.00% | 70.27% | 1.05% | 0.16% | 100.00% | 0.62% | 0.57% | 33.96% | 0.04% | 1.06% | 0.01% | 61.54% | 2.06% | 0.15% | 100.00% |
| 2016 | 0.54% | 0.36% | 26.58% | 0.08% | 0.75% | 0.00% | 70.46% | 1.01% | 0.23% | 100.00% | 0.64% | 0.55% | 34.83% | 0.04% | 1.09% | 0.01% | 60.60% | 2.08% | 0.17% | 100.00% |
| 2017 | 0.60% | 0.36% | 25.93% | 0.07% | 0.86% | 0.00% | 71.02% | 0.84% | 0.34% | 100.00% | 0.61% | 0.44% | 31.34% | 0.06% | 1.06% | 0.00% | 64.63% | 1.51% | 0.36% | 100.00% |
| 2018 | 0.61% | 0.32% | 26.27% | 0.06% | 0.92% | 0.00% | 70.65% | 0.75% | 0.43% | 100.00% | 0.71% | 0.45% | 30.82% | 0.05% | 1.22% | 0.00% | 64.69% | 1.64% | 0.40% | 100.00% |
| 2019 | 0.63% | 0.29% | 26.41% | 0.05% | 1.01% | 0.00% | 70.39% | 0.69% | 0.52% | 100.00% | 0.78% | 0.45% | 30.36% | 0.05% | 1.34% | 0.00% | 64.81% | 1.76% | 0.45% | 100.00% |
| 2020 | 0.66% | 0.29% | 26.37% | 0.04% | 1.08% | 0.00% | 70.32% | 0.67% | 0.57% | 100.00% | 0.82% | 0.44% | 30.35% | 0.05% | 1.42% | 0.00% | 64.64% | 1.80% | 0.48% | 100.00% |

Source: Alabama Secretary of State

## Table 5:  U.S. Census Community Survey 5-Year Estimates 2010-2018

### Alabama Total Population per U.S. Census Survey

| Year | Total AL Population | Total Population over 18 | % over 18 | % of Total Population = White | % of Total Population = Black |
|---|---|---|---|---|---|
| 2010 | 4,712,651 | 3,580,348 | 76.0% | 69.9% | 26.1% |
| 2011 | 4,747,424 | 3,615,219 | 76.2% | 69.7% | 26.2% |
| 2012 | 4,777,326 | 3,647,097 | 76.3% | 69.5% | 26.3% |
| 2013 | 4,799,277 | 3,675,910 | 76.6% | 69.3% | 26.3% |
| 2014 | 4,817,678 | 3,699,760 | 76.8% | 69.1% | 26.4% |
| 2015 | 4,830,620 | 3,718,646 | 77.0% | 68.8% | 26.4% |
| 2016 | 4,841,164 | 3,735,975 | 77.2% | 68.7% | 26.5% |
| 2017 | 4,850,771 | 3,748,089 | 77.3% | 68.4% | 26.5% |
| 2018 | 4,864,680 | 3,765,887 | 77.4% | 68.2% | 26.6% |
| 2019 | Census Data has not been Released | | | | |
| 2020 | Census Data has not been Released | | | | |

Source: 2010 -2018 American Community Survey 5-Year Estimates.

## Table 6:  Alabama Active vs Inactive Voter Registrants 2010-2020

### Alabama Active vs Inactive Voter Registrants

| Year | % Active Registrants | % of Inactive Registrants |
|---|---|---|
| 2010 | 86.9% | 13.1% |
| 2011 | 88.3% | 11.7% |
| 2012 | 88.0% | 12.0% |
| 2013 | 97.8% | 2.2% |
| 2014 | 96.2% | 3.8% |
| 2015 | 94.8% | 5.2% |
| 2016 | 95.5% | 4.5% |
| 2017 | 88.2% | 11.8% |
| 2018 | 90.8% | 9.2% |
| 2019 | 92.7% | 7.3% |
| 2020 | 93.3% | 6.7% |

Source: Alabama Secretary of State

Table 7:  Analysis of Alabama Secretary of State Election Data 2010 – 2019

| Year | Total AL Population | Total Population over 18 | % over 18 | % of Active Reg. Voters over 18 | Total Active Reg. Voters | % of White of Total Pop. | % of Black of Total Pop. | Whites Over 18 | Blacks Over 18 | % of Whites Over 18 | % of Blacks over 18 | No. of White Active Reg. Voters | No. of Black Active Reg. Voters | % White Active Reg. Voters | % Black Active Reg. Voters | Gap Btwn Active Reg. White & Black Voters |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 4,712,651 | 3,580,348 | 76.0% | 71% | 2,552,952 | 69.9% | 26.1% | 2,502,663 | 934,471 | 69.9% | 26.1% | 1,841,343 | 654,385 | 73.6% | 70.0% | 3.5% |
| 2011 | 4,747,424 | 3,615,219 | 76.2% | 72% | 2,615,256 | 69.7% | 26.2% | 2,519,808 | 947,187 | 69.7% | 26.2% | 1,880,458 | 674,667 | 74.6% | 71.2% | 3.4% |
| 2012 | 4,777,326 | 3,647,097 | 76.3% | 73% | 2,656,343 | 69.5% | 26.3% | 2,534,732 | 959,187 | 69.5% | 26.3% | 1,904,994 | 688,192 | 75.2% | 71.7% | 3.4% |
| 2013 | 4,799,277 | 3,675,910 | 76.6% | 78% | 2,885,315 | 69.3% | 26.3% | 2,547,406 | 966,764 | 69.3% | 26.3% | 2,031,569 | 776,844 | 79.8% | 80.4% | -0.6% |
| 2014 - Voter ID Goes Into Effect | 4,817,678 | 3,699,760 | 76.8% | 77% | 2,856,497 | 69.1% | 26.4% | 2,556,534 | 976,737 | 69.1% | 26.4% | 2,007,738 | 771,005 | 78.5% | 78.9% | -0.4% |
| 2015 | 4,830,620 | 3,718,646 | 77.0% | 76% | 2,840,867 | 68.8% | 26.4% | 2,558,428 | 981,723 | 68.8% | 26.4% | 1,996,330 | 765,820 | 78.0% | 78.0% | 0.0% |
| 2016 | 4,841,164 | 3,735,975 | 77.2% | 81% | 3,021,316 | 68.7% | 26.5% | 2,566,615 | 990,033 | 68.7% | 26.5% | 2,128,755 | 802,989 | 82.9% | 81.1% | 1.8% |
| 2017 | 4,850,771 | 3,748,089 | 77.3% | 77% | 2,895,020 | 68.4% | 26.5% | 2,563,693 | 993,244 | 68.4% | 26.5% | 2,056,161 | 750,720 | 80.2% | 75.6% | 4.6% |
| 2018 | 4,864,680 | 3,765,887 | 77.4% | 82% | 3,090,043 | 68.2% | 26.6% | 2,568,335 | 1,001,726 | 68.2% | 26.6% | 2,183,164 | 811,719 | 85.0% | 81.0% | 4.0% |
| 2019 | 4,903,185 | 3,798,031 | 77.5% | 86% | 3,248,023 | 69.1% | 26.8% | 2,624,439 | 1,017,872 | 69.1% | 26.8% | 2,286,352 | 857,674 | 87.1% | 84.3% | 2.9% |

Source: Alabama Secretary of State (https://www.sos.alabama.gov/alabama-votes/voter/election-data)

A-6



Table 8:  AL Active Voter Registration and Turnout % 1986 - 2018



Table 9:  AL Presidential Election Year Turnout 1988 - 2016

A-7



| Table 8-10A:  Alabama Active Voter Registration and Turnout 1986 -2018 | | | |
| Year | Active Voter Registration on Election Day | Total Votes Cast | Turnout Percentage |
|---|---|---|---|
| 1986 | 2,362,361 | 1,233,366 | 52.0% |
| 1988 | 2,451,491 | 1,377,970 | 56.0% |
| 1990 | 2,381,992 | 1,215,626 | 51.0% |
| 1992 | 2,210,617 | 1,687,337 | 76.0% |
| 1994 | 2,283,484 | 1,199,095 | 53.0% |
| 1996 | 2,470,766 | 1,533,226 | 62.0% |
| 1998 | 2,316,598 | 1,314,901 | 57.0% |
| 2000 | 2,528,963 | 1,665,573 | 66.0% |
| 2002 | 2,356,423 | 1,367,053 | 58.0% |
| 2004 | 2,597,629 | 1,883,415 | 72.5% |
| 2006 | 2,469,807 | 1,250,401 | 50.6% |
| 2008 | 2,841,195 | 2,096,114 | 73.8% |
| 2010 | 2,586,282 | 1,486,182 | 57.5% |
| 2012 | 2,833,938 | 2,074,338 | 73.2% |
| 2014 | 2,986,782 | 1,191,274 | 39.8% |
| 2016 | 3,198,703 | 2,137,482 | 66.8% |
| 2018 | 3,457,572 | 1,725,877 | 50.0% |

Source: Alabama Secretary of State, "Comprehensive Voter Turnout 1986 - 2020"
https://www.sos.alabama.gov/sites/default/files/election-data/2020-
05/Comprehensive%20Voter%20Turnout%201986-2020.pdf

A-9

# Appendix 9

# Alabama Advisory Committee Member
# Dr. Peter Jones
# Statement of Concurrence

Alabama Advisory Committee        Peter Jones – Concurring Statement

I am in full support of the report drafted by the Alabama State Advisory Committee, of which I am a member, and I offer the following as a concurring statement. Specifically, I overview the published academic research regarding the consequences of voter ID laws across U.S. states.

The most recent published literature is conclusive that voter identification (ID) laws have had a "negative impact on the turnout of racial and ethnic minorities in primaries and general elections."[1] The causal question—whether voter ID laws cause lower turnout for minority populations—is a difficult one to answer for a variety of methodological reasons, but the most recent peer-reviewed studies provide evidence that state voter ID laws produce disparities in voter turnout between whites and minorities.[2],[3] Specifically, voter turnout for minorities has either decreased or not increased at the same rate, relative to white voter turnout. These results are unsurprising two reasons. First, the lack of identification is particularly acute among the minority population, the poor, and the young.[4] In fact, Berreto et al. (2019) found that even controlling for education and income, African Americans were five percent less likely to have an ID.[5] Second, voter identification laws are applied unequally in that voters of a minority race are more likely to be asked for identification.[6],[7]

After the Help American Vote Act (HAVA) in 2002, states adopted a variety of new identification requirements, which variated in the stringency of their requirements.[8] Early work examining the effects of these laws provided clear evidence that that stricter voter ID laws did decrease turnout,[9],[10],[11],[12] though evidence was mixed as to whether there was a disparate impact on

[1] Hajnal, Z., Lajevardi, N., & Nielson, L.,, *Voter Identification Laws and the Suppression of Minority Votes*, The Journal of Politics, 79(2), (Jan. 2017) at 363-379.
[2] Burden, Barry C., *Disagreement Over ID Requirements and Minority Voter Turnout.* The Journal of Politics 80.3 (April 2018), at 1060-1063.
[3] Highton, Benjamin. *Voter Identification Laws and Turnout in the United States.* Annual Review of Political Science 20 (May 2017), at 149-167.
[4] Barreto, M. A., & Sanchez, G. R., *Accepted Photo Identification and Different Subgroups in the Eligible Voter Population, State of Texas, 2014,* (2014) (*Expert report submitted on behalf of plaintiffs in Veasey v. Perry, Case No. 2:13-cv-00193*).
[5] Barreto, M. A., Nuño, S., Sanchez, G. R., & Walker, H. L., *The Racial Implications of Voter Identification Laws in America*, American Politics Research, 47(2), (2019) at 238-249.
[6] Atkeson, L. R., Kerevel, Y. P., Alvarez, R. M., & Hall, T. E., *Who Asks for Voter Identification? Explaining Poll-worker Discretion*, The Journal of Politics, 76(4), (Oct. 2014) at 944-957.
[7] Atkeson, L. R., Bryant, L. A., Hall, T. E., Saunders, K., & Alvarez, M., *A New Barrier to Participation: Heterogeneous Application of Voter Identification Policies*, Electoral Studies, 29(1), (Mar. 2010) at 66-73.
[8] Underhill, Wendy, *Voter Identification Requirements*, Nat'l Conference of State Legislatures, (Feb. 2, 2020) https://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.
[9] Vercellotti, Timothy, and David Anderson.. *Protecting the Franchise or Restricting It? The Effects of Voter Identification Requirements on Turnout*, Presented at the annual conference of the American Political Science Association, Philadelphia (2006).
[10] Alvarez, Michael, Delia Bailey, and Jonathan Katz.*The Effect of Voter Identification Laws on Turnout*, (California Institute of Technology, Pasadena, CA Social Science Working Paper No. 1267R,2008).
[11] Alvarez, Michael, Delia Bailey, and Jonathan Katz.. *An Empirical Bayes Approach to Estimating Ordinal Treatment Effects*, Political Analysis 19 (1), (Winter 2011) at 20–31.
[12] Hood III, M. V., and Charles S. Bullock III, *Much Ado About Nothing? An Empirical Assessment of the Georgia Voter Identification Statute,* State Politics & Policy Quarterly 12.4 (Oct. 2012) at 394-414.

minorities.[13],[14] Following this initial wave of studies, researchers considered the methodical challenges associated with modeling the causal impact of voter identification laws on turnout.[15]

Descriptively, researchers had observed a decrease in turnout, particularly for minority voters, but it was hard to statistically determine whether voter ID laws were the cause. In response to these challenges, more recent research has employed careful statistical techniques and observed more elections to measure the impact of voter ID laws. As such, the last decade of research is an appropriate reflection of where experts stand on whether voter ID laws suppress votes.

A few examples of this more recent research include:

1. A GAO study from 2014 that overviewed the previous decade of research and included a methodologically rigorous evaluation of voter ID laws in Kansas and Tennessee. Compared to less restrictive (at the time) states, turnout among eligible and registered voters decreased by 1.9 to 2.2 percentage points in Kansas and 2.2 to 3.2 percentage points in Tennessee. As well, turnout dropped by larger amounts for African-American registrants, compared to White, Asian-American, and Hispanic registrants.
2. Highton (2017) reviewed the theory, methodological challenges, and evidence we have so far. He summarizes the state of research as:
3. Empirically, a small number of studies have employed suitable research designs and generally find modest, if any, turnout effects of voter identification laws. This may indicate that voter identification laws have only minor effects on turnout, or it may be due to the fact that the type of voter identification law that may have the most significant effects—a strict photo identification law—is a relatively recent phenomenon.
4. Hajnal et al. (2017) provided a much more substantive evaluation of voter ID laws. Those authors used the validated voting data from the Cooperative Congressional Election Study for several recent elections, and their findings showed that strict identification laws had a "negative impact on the turnout of racial and ethnic minorities in primaries and general elections."

It should be noted that Grimmer et al. (2018) responded to Hajnal et al. (2017) with a methodological critique.[16],[17] This prompted a response from Hajnal et al. (2018), who pointed out that Grimmer et al. (2018) fundamentally agreed with their findings, noting that Grimmer et al.'s (2018) reanalysis "confirms the core conclusion of our 2017 article—that strict voter identification

[13] Lott, John R. *Evidence of Voter Fraud and the Impact That Regulations to Reduce Fraud Have on Voter Participation Rates*, Public Choice  & Political Economy eJournal (2006), available at SSRN 925611.

[14] Mycoff, J. D., Wagner, M. W., & Wilson, D. C., *The Empirical Effects of Voter-ID Laws: Present or Absent?*, PS: Political Science & Politics, 42(1), (Jan. 2009) at121-126.

[15] For a review of these challenges, see Erikson, R. S., & Minnite, L. C., *Modeling Problems in the Voter Identification—Voter Turnout Debate*, Election Law Journal, 8(2), (2009) at 85-101, http://www.columbia.edu/~rse14/erikson-minnite.pdf

[16] Grimmer, J., Hersh, E., Meredith, M., Mummolo, J., & Nall, C.. *Comment on "Voter Identification Laws and the Suppression of Minority Votes,"* Journal of Politics, 79(2), (August 2017).

[17] Grimmer, J., Hersh, E., Meredith, M., Mummolo, J., & Nall, C., *Obstacles to Estimating Voter ID Laws' Effect on Turnout*, The Journal of Politics, 80(3), (April 2018) at 1045-1051.

laws have a racially disparate impact." Burden (2018) summarized this debate between two scholars.[18] As for what they agree:

> The authors appear to agree that, given the data available, the most appropriate statistical models indicate that state ID laws produce larger disparities in voter turnout between whites and Hispanics. If this disparity is the quantity of interest, then all of the authors have little to dispute.

Burden (2018) continues by explaining the main point of disagreement:

> The main point of contention is whether minority turnout actually declines when ID is required—or whether it merely increases by a smaller increment than does white turnout. This is essentially a disagreement about whether minority turnout is depressed in absolute terms or relative terms.

In research, it is important to consider the evolution of a field's analytical approach to evaluating a question. More recent studies have had additional elections to observe, and researchers were able to use more advanced statistical techniques with better data. Though there are exceptions,[19] the majority of current published academic research provides exhaustive evidence that voter identification laws had a negative and disproportionate impact on the voter turnout of racial and ethnic minorities.

---

[18] Burden, B. C., *Disagreement Over ID Requirements and Minority Voter Turnout*, The Journal of Politics, 80(3), (July 2018) at 1060-1063.
[19] Cantoni, E., & Pons, V., *Strict ID Laws Don't Stop Voters: Evidence from a US Nationwide Panel, 2008–2016* (Nat'l Bureau of Econ. Research, Working Paper No. 25522, 2019).,
https://www.hbs.edu/faculty/Pages/item.aspx?num=55734.