FILED

2021 Dec-27  AM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA


EVAN MILLIGAN, et al.,          )

                               )          CIVIL CASE NO.

        Plaintiffs,            )     2:21-CV-01530-AMM

VS.                            )     VIDEO DEPOSITION OF:

JOHN MERRILL, et al.,          )       RANDY HINAMAN

                               )

        Defendants.            )


S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

RANDY HINAMAN,

may be taken before LeAnn Maroney, Notary Public, State at Large, at the law offices of Balch & Bingham, 105 Tallapoosa Street, Montgomery, Alabama, 36104, on December 9, 2021, commencing at 9:13 a.m.

Randy Hinaman
December 09, 2021

Page 2

1         IT IS FURTHER STIPULATED AND AGREED that
2   the signature to and reading of the deposition by
3   the witness is waived, the deposition to have the
4   same force and effect as if full compliance had
5   been had with all laws and rules of Court relating
6   to the taking of depositions.
7
8         IT IS FURTHER STIPULATED AND AGREED that
9   it shall not be necessary for any objections to be
10  made by counsel to any questions, except as to form
11  or leading questions, and that counsel for the
12  parties may make objections and assign grounds at
13  the time of the trial, or at the time said
14  deposition is offered in evidence, or prior
15  thereto.
16
17
18        ***
19
20
21
22
23
24
25

Page 3

1       A P P E A R A N C E S
2
3   FOR THE MILLIGAN PLAINTIFFS:
4       MICHAEL L. TURRILL
5       Attorney at Law
6       Hogan Lovells US LLP
7       1999 Avenue of the Stars, Ste. 1400
8       Los Angeles, California  90067
9       michael.turrill@hoganlovells.com
10
11      BLAYNE R. THOMPSON
12      Attorney at Law
13      Hogan Lovells US LLP
14      609 Main Street, Ste. 4200
15      Houston, Texas  77002
16      blayne.thompson@hoganlovells.com
17
18      DEUEL ROSS (Via Zoom)
19      Attorney at Law
20      NAACP Legal Defense & Educational Fund
21      700 14th Street N.W., Ste. 600
22      Washington, DC  20005
23      dross@naacpldf.org
24
25

Page 4

1       DAVIN M. ROSBOROUGH (Via Zoom)
2       JULIE A. EBENSTEIN
3       Attorneys at Law
4       American Civil Liberties Union Foundation
5       125 Broad Street
6       New York, New York  10004
7       drosborough@aclu.org
8
9       LaTISHA GOTELL FAULKS (Via Zoom)
10      Attorney at Law
11      American Civil Liberties Union of Alabama
12      P.O. Box 6179
13      Montgomery, Alabama  36106
14      tgfaulks@aclualabama.org
15
16  FOR THE SINGLETON PLAINTIFFS: (Via Zoom)
17      JAMES URIAH BLACKSHER
18      Attorney at Law
19      825 Linwood Road
20      Birmingham, Alabama  35222
21      jublacksher@gmail.com
22
23
24
25

Page 5

1   MYRON C. PENN
2       Attorney at Law
3       Penn & Seaborn
4       1971 Berry Chase Place
5       Montgomery, Alabama  36117
6       myronpenn28@hotmail.com
7
8   ELI J. HARE
9       Attorney at Law
10      Dicello Levitt Gutzler
11      420 20th Street North, Ste. 2525
12      Birmingham, Alabama  35203
13      Ehare@dicellolevitt.com
14
15  HENRY C. QUILLEN (Via Zoom)
16      Attorney at Law
17      Whatley Kallas, LLP
18      159 Middle Street, Ste. 2C
19      Portsmouth, New Hampshire  03801
20      hquillen@whatleykallas.com
21
22
23
24
25

Randy Hinaman
December 09, 2021

Page 6

```
 1  FOR THE CASTER PLAINTIFFS: (Via Zoom)
 2        LALI MADDURI
 3        Attorney at Law
 4        Elias Law Group
 5        10 G Street NE, Ste. 600
 6        Washington, DC  20002
 7        lmadduri@elias.law
 8
 9  FOR DEFENDANT JOHN H. MERRILL:
10        JIM DAVIS
11        Assistant Attorney General
12        Office of the Attorney General
13        501 Washington Avenue
14        Montgomery, Alabama  36130
15        jim.davis@alabamaag.gov
16
17  FOR THE DEFENDANTS JIM McCLENDON & CHRIS PRINGLE:
18        DORMAN WALKER
19        Attorney at Law
20        Balch & Bingham
21        105 Tallapoosa Street, Ste. 200
22        Montgomery, Alabama  36104
23        dwalker@balch.com
24
25
```

Page 8

```
 1  (5-5-21 Reapportionment Committee
 2   Redistricting Guidelines)
 3  Plaintiff's Exhibit 8 -            160
 4  (District 1-7 maps, RC 000556-562)
 5  Plaintiff's Exhibit 9 -            179
 6  (List of 2021 congressional plans)
 7  Plaintiff's Exhibit 10 -           201
 8  (State of AL v. US Department of Commerce
 9   Introduction)
10  Plaintiff's Exhibit 11 -           203
11  (9-1-21 public hearing transcript excerpt)
12  Plaintiff's Exhibit 12 -           208
13  (Whole County Plan)
14  Plaintiff's Exhibit 13 -           213
15  (Tuscaloosa and Montgomery Whole)
16  Plaintiff's Exhibit 14 -           213
17  (Data table)
18
19
20
21
22
23
24
25
```

Page 7

```
 1  ALSO PRESENT:
 2        Paige Ali, Videographer
 3        Elizabeth Baggett
 4
 5
 6             I N D E X
 7  MR. THOMPSON:    11-197
 8  MR. BLACKSHER:  197-229
 9
10
11        E X H I B I T   L I S T
12                              PAGE
13  Plaintiff's Exhibit 1 -           14
14  (Depo notice)
15  Plaintiff's Exhibit 2 -           14
16  (Subpoena)
17  Plaintiff's Exhibit 3 -           21
18  (CV)
19  Plaintiff's Exhibit 4 -           25
20  (Declaration)
21  Plaintiff's Exhibit 5 -           92
22  (2021 Alabama Congressional Plan, RC 000553)
23  Plaintiff's Exhibit 6 -           93
24  (2011 Congressional Districts)
25  Plaintiff's Exhibit 7 -          135
```

Page 9

```
 1        I, LeAnn Maroney, a Court Reporter of
 2  Birmingham, Alabama, and a Notary Public for the
 3  State of Alabama at Large, acting as commissioner,
 4  certify that on this date, pursuant to the Federal
 5  Rules of Civil Procedure and the foregoing
 6  stipulation of counsel, there came before me on
 7  December 9, 2021, RANDY HINAMAN, witness in the
 8  above cause, for oral examination, whereupon the
 9  following proceedings were had:
10             * * * * *
11        THE VIDEOGRAPHER:  This marks the
12  beginning of the deposition of Randy Hinaman in the
13  matter of Evan Milligan, et al, versus John H.
14  Merrill, et al., Civil Case Number 2:21-CV-01530-AMM
15  filed in the United States District Court for the
16  Northern District of Alabama.  The date is December
17  9, 2021.  The time is 9:13 a.m
18        All attorneys present, will you please
19  state your names and whom you represent.
20        MR. HARE:  Eli Hare on behalf of the
21  Singleton plaintiffs.
22        MR. DAVIS:  Jim Davis for Secretary
23  Merrill.
24        MR. WALKER:  Dorman Walker for the
25  Committee Chairs, Senator Jim McClendon and
```

Randy Hinaman
December 09, 2021

Page 10

1 Representative Chris Pringle.
2            MR. PENN:  Myron Penn for the Singleton
3 plaintiffs.
4            MR. TURRILL:  Mike Turrill for the
5 Milligan plaintiffs.
6            MR. THOMPSON:  And Blain Thompson for
7 the Milligan plaintiffs.
8            MR. BLACKSHER:  And Jim Blacksher for
9 the Singleton plaintiffs.  I'll be asking questions
10 virtually.
11            MS. MADDURI:  Lali Madduri for the
12 Caster plaintiffs.
13            MR. QUILLEN:  Henry Quillen for the
14 Singleton plaintiffs.
15            MR. ROSS:  Deuel Ross for the Milligan
16 plaintiffs.
17            MR. ROSBOROUGH:  Davin Rosborough for
18 the Milligan plaintiffs.
19            MS. EBENSTEIN:  Good morning.  Julie
20 Ebenstein for the Milligan plaintiffs.
21            MS. FAULKS:  Good morning.  Tish Faulks
22 for the Milligan plaintiffs.
23            MS. BAGGETT:  Good morning.  It's
24 Elizabeth Baggett for the Milligan plaintiffs.  I'm
25 a law clerk, not an attorney.

Page 11

1            THE VIDEOGRAPHER:  Court Reporter, will
2 you please swear in the witness.
3            RANDY HINAMAN,
4 having been duly sworn, was examined and testified
5            as follows:
6            THE REPORTER:  Usual stipulations?
7            MR. WALKER:  The ones that we've just
8 discussed.
9            MR. THOMPSON:  Yes.
10            Mr. Walker, did you want to say
11 something before we begin?
12            MR. WALKER:  Yes.  I'd like to put on
13 the record that the committee chair, Senator Jim
14 McClendon, and Representative Chris Pringle have
15 asserted their legislative privilege and immunity in
16 this case.  Of course, the Court has not yet ruled
17 on that.  Thank you.
18 EXAMINATION BY MR. THOMPSON:
19 Q.         Good morning, sir.
20 A.         Good morning.
21 Q.         Please state your name for the record.
22 A.         Randy Hinaman.
23 Q.         Mr. Hinaman, you understand that you're
24 testifying under oath right now?
25 A.         I do.

Page 12

1 Q.         Is there anything that might prevent you
2 from understanding my questions or answering
3 truthfully today?
4 A.         No.
5 Q.         Are you being represented by a lawyer
6 today?
7 A.         Dorman Walker with the reapportionment
8 committee.
9 Q.         Are you paying Mr. Walker to be your
10 lawyer today?
11 A.         I am not.
12 Q.         Do you assume that plaintiffs or the
13 State of Alabama is paying Mr. Walker to be your
14 lawyer today?
15 A.         I do.
16 Q.         Have you ever been deposed before?
17 A.         I have.
18 Q.         How many times?
19 A.         Once.  Once is all I remember, not
20 counting trial.
21 Q.         And was that in the ALBC versus the
22 State of Alabama lawsuit?
23 A.         Yes, sir.
24 Q.         All right.  So I'll go over a few of the
25 key rules.

Page 13

1            I think that last deposition was about
2 eight years ago.  Is that correct?
3 A.         Yes, sir.
4 Q.         Okay.  So I'll be asking questions
5 today.  And then after I'm done, there will be
6 several other people asking questions, as well.
7            If you don't understand a question, just
8 let me know.  Is that okay?
9 A.         Yes, sir.
10 Q.         If you answer a question, I will assume
11 that you understood it.  Is that fair?
12 A.         Yes.
13 Q.         Also, as you can see, we have a court
14 reporter here who is doing an amazing job typing
15 everything that we say as we go.  But it's very
16 important, because she's typing it, that we both
17 speak one at a time.  So I'll do my best to wait
18 until you're done answering questions.  And if you
19 can do the same, that will help her out a lot.  Is
20 that all right?
21 A.         Yes.
22 Q.         And then we'll take a break about every
23 hour.  If you need a break before then, just let us
24 know, and we can do that as long as there's not a
25 question pending.  Fair?

Randy Hinaman
December 09, 2021

Page 14

1  A.          Very well.

2

3              (Plaintiff's Exhibits 1&2

4         were marked for identification.)

5

6  Q.          I'm handing you what's been marked as

7  Exhibit 1 and Exhibit 2.

8              MR. THOMPSON:  I've got copies for

9  everyone else to the extent you would like one.

10 Q.          This is a copy of the deposition notice

11 and subpoena.

12             MR. WALKER:  Which one is which?

13             MR. THOMPSON:  Exhibit 1 is the notice.

14             MR. WALKER:  Okay.

15             MR. THOMPSON:  And Exhibit 2 is the

16 subpoena.

17             MR. WALKER:  Thanks.

18 Q.          Have you seen a copy of these documents

19 before today?

20 A.          I have.

21 Q.          Both of them?

22 A.          Yes, sir.

23 Q.          Who provided them to you?

24 A.          Dorman Walker.

25 Q.          And when was that?

Page 15

1  A.          The end of last week.  Friday maybe.

2  Q.          All right.  You can set those aside.

3              Without disclosing the content of any

4  discussions that you had with your attorneys, what

5  did you do to prepare for your deposition today?

6  A.          I met with Dorman Walker and Jim Davis

7  and others and did some -- just reviewed numbers and

8  talked about the process we followed.

9  Q.          When did you meet with them?

10 A.          Monday and Tuesday, Monday morning and

11 -- Monday afternoon really and Tuesday morning of

12 this week.

13 Q.          About how long would you say you met

14 with them?

15 A.          I guess about four -- four or five hours

16 on Monday.  We also had lunch in there.  And three

17 hours on Tuesday.

18 Q.          Did you meet with anyone who was not an

19 attorney?

20 A.          No, I don't believe so.

21 Q.          Did you review any documents in

22 preparation for today?

23 A.          I just reviewed some of the census

24 numbers and the guidelines, the committee

25 guidelines.  That would be about it.

Page 16

1  Q.          Did you review any of the complaints in

2  this lawsuit?

3  A.          No, I didn't.

4  Q.          Did you review any maps?

5  A.          Yeah.  I looked -- I looked at the

6  current -- the map that was passed.  And I also

7  looked briefly at some of the other maps that were

8  offered to the legislature.

9  Q.          Which other maps did you look at?

10 A.          The Singleton --

11             MR. BLACKSHER:  Randy needs to speak up

12 a little bit, please.

13             THE WITNESS:  Sure.

14 A.          The Singleton maps, the Coleman map, and

15 the Hatcher map, I believe.

16 Q.          Had you reviewed those maps, any of

17 those maps, before preparing for your deposition?

18             MR. WALKER:  Objection to form.

19 Q.          You mentioned that you reviewed several

20 of those maps in preparation for your deposition,

21 correct?

22 A.          Correct.

23 Q.          Before then, had you reviewed any of

24 those maps?

25 A.          I looked at them when they were offered

Page 17

1  on the floor of either -- whatever body they were

2  offered in.

3  Q.          Other than in preparation for your

4  deposition last Monday and Tuesday, have you

5  discussed this lawsuit with anyone?

6  A.          No.

7  Q.          Did you do anything else to prepare for

8  your deposition today?

9  A.          I did not.

10 Q.          Are you being compensated by anyone for

11 being here today?

12 A.          I assume I am.  I haven't -- I haven't

13 billed anybody yet.  But I'm planning to.

14 Q.          And who do you plan to bill for today?

15 A.          The attorney general's office.

16 Q.          How much do you plan to bill the

17 attorney general's office for your time today?

18 A.          $400 an hour.

19 Q.          Is that pursuant to some agreement that

20 you have with the attorney general's office?

21 A.          Well, we really haven't even discussed

22 it, honestly.  I guess I'll send them the bill, and

23 we'll see if they pay it.

24 Q.          Fair enough.

25             Similarly, do you expect to be

Randy Hinaman
December 09, 2021

Page 18

1  compensated in any way to testify at trial?
2  A.          I would assume the same arrangement.
3  Q.          By the attorney general's office, as
4  well?
5  A.          Yes.
6  Q.          All right.  Taking a step back and just
7  talking about your background a little bit, can you
8  please state your date of birth?
9  A.          5-5-57.
10 Q.          What's your address?
11 A.          33267 River Road, Orange Beach, Alabama,
12 36561.
13 Q.          Is that your full-time address now here
14 in Alabama?
15 A.          Yes, sir.
16 Q.          You previously lived in Virginia; is
17 that correct?
18 A.          That's correct.
19 Q.          When did you make that move?
20 A.          I bought this property about five years
21 ago.  But I really technically moved probably about
22 three years ago.
23 Q.          Do you have a telephone number?
24 A.          Just my cell phone.
25 Q.          What's that number?

Page 19

1  A.          (703)598-8383.
2  Q.          Do you have an email account?
3  A.          I do.
4  Q.          What is that?
5  A.          Sharhl@comcast.net.
6  Q.          Do you have any other email addresses?
7  A.          I do not.
8  Q.          Have you ever been involved in any other
9  lawsuits?
10 A.          No.  I mean, not as a witness or -- no.
11 Q.          What's the highest level of education
12 you've completed?
13 A.          I attended Cornell University.
14 Q.          Was that for undergraduate?
15 A.          Yes.
16 Q.          Did you graduate?
17 A.          I did not.
18 Q.          What did you study at Cornell?
19 A.          Political science.  Really they called
20 it government.
21             MR. WALKER:  Called it what?
22             THE WITNESS:  Government.  Anywhere else
23 on earth, it would be political science.
24 Q.          And if you don't mind me asking, you
25 said you did not graduate.  Is there a reason why?

Page 20

1  A.          Yeah.  In the middle of that, I was
2  offered a position with the Reagan campaign, which
3  was sort of my dream job to work for his
4  presidential race.  So I left to take on that
5  responsibility for the national field director for
6  the Reagan Youth Campaign.
7  Q.          How far along had you gotten in your
8  studies when you left?
9  A.          Two years.
10 Q.          Do you have any other -- excuse me.  Do
11 you have any educational certificates or anything
12 like that?
13 A.          No.
14 Q.          Do you have any certain specializations
15 in anything?
16 A.          No.
17 Q.          Mr. Hinaman, what do you do for a
18 living?
19 A.          I do political consulting and lobbying.
20 Q.          Where do you work?
21 A.          I work for my own company out of my
22 residence in Orange Beach.
23 Q.          What's the name of that company?
24 A.          R. Hinaman, LLC.
25 Q.          And what is your -- do you have a formal

Page 21

1  title within R. Hinaman, LLC?
2  A.          I guess I would be the president of R.
3  Hinaman, LLC.
4  Q.          Are there other employees of that
5  company?
6  A.          There are not.
7  Q.          If you can, explain to me briefly what
8  you do as a political consultant and lobbyist.
9  A.          Sure.  On the political consulting
10 front, I usually do -- I consult political
11 campaigns, usually on the federal level, mostly
12 congress, put together the campaign team for various
13 candidates to get elected to those offices.
14             On the lobbying side, which I'm doing
15 less and less and less of, I did lobbying on the
16 federal level for various companies and
17 organizations.
18
19             (Plaintiff's Exhibit 3 was
20             marked for identification.)
21
22 Q.          I think I can short-circuit our
23 discussion about your background a little bit here.
24 This is Exhibit 3.
25             MR. THOMPSON:  I can get you a copy, as

Randy Hinaman
December 09, 2021

Page 22

1  well, Mr. Walker.
2  Q.        And I'll state for the record that this
3  is a copy of your resume that was shown to you in a
4  prior deposition that you gave on June 25, 2013.  I
5  believe this was PX3 in that deposition.
6            Do you recognize this document?
7  A.        I do.
8  Q.        Does this appear to be a true and
9  correct copy of your resume as of June 25, 2013?
10  A.       It does.
11  Q.       Is this resume up to date?
12  A.       It is not.
13  Q.       What has changed?
14  A.       Well, technically, the name of my
15  company changed because I moved from Virginia to
16  Alabama.  Obviously, my address has changed, again
17  because of moving.  Obviously, I've had some
18  additional clients since 2013.
19  Q.       Who have your additional clients been?
20  A.       I was afraid you would ask me that.
21  Congressman Ben Cline, I did his
22  campaign to replace Bob Goodlatte who retired in
23  2018.  Let's see.  The American Dental Association
24  is on there.
25            That's the major one.  I can't say there

Page 23

1  wasn't another campaign in there.
2  Q.        On here, it says that your company name
3  is Hinaman & Company, Inc.  Did that change at some
4  point?
5  A.        Yeah, when I moved.  That was an LLC in
6  Virginia.  And when I moved to Alabama, I formed a
7  new LLC.
8  Q.        And when was that?
9  A.        Again, approximately about three years
10  ago.
11  Q.       Does a more current version of your
12  resume exist anywhere?
13  A.       Yeah, I'm sure it does.
14  Q.       Is that something that you could produce
15  in this case if you were asked to?
16  A.       Yes.
17  Q.       What experience do you have working with
18  redistricting?
19  A.       Obviously, I drew three of the four maps
20  for Alabama ten years ago, 2011, 2012.  I drew the
21  congressional maps and the two legislative maps.  I
22  also worked for the republican congressmen in
23  Virginia to draw their map in 2012.
24            And before that, I worked with
25  Congressman Callahan, who was my -- I was his chief

Page 24

1  of staff at one point and then his consultant in
2  Alabama, and helped draw a map in 1992 which was
3  then put into practice by a federal court.
4  Q.        Anything beyond that?
5  A.        No.  I mean, I assisted the majority
6  leader of the Virginia senate in some of his efforts
7  on redistricting ten years ago.  Actually, it was
8  more like 20 years ago.  But I wasn't really the
9  lead on it.  I was just assisting his office.
10  Q.       Outside of Alabama and Virginia, have
11  you ever worked in redistricting for any other
12  states?
13  A.       I have not.
14  Q.       How did you get involved in drawing maps
15  originally?
16  A.       Well, my first effort, I guess, was way
17  back in 1992 when the legislature failed to draw a
18  map for congress in Alabama.  I was working for
19  Congressman Callahan.  And with him and some of the
20  other members of the delegation, we decided that we
21  needed to file a lawsuit to remedy that situation.
22  And so I helped produce a map that was filed with
23  that lawsuit.  That was my first endeavor.
24  Q.       Had you ever drawn a map before then?
25  A.       I had not.

Page 25

1  Q.        So how did they come about saying,
2  "Randy, we want you to draw this map"?
3  A.        I guess we drew straws and I lost.
4  Q.        Fair enough.
5
6            (Plaintiff's Exhibit 4 was
7            marked for identification.)
8
9  Q.        I'm going to hand you another exhibit
10  here.  This is being marked as Plaintiff's Exhibit
11  4.  This is also from the ALBC versus Alabama
12  lawsuit.  This is a declaration that was signed by
13  you.
14            And you can see at the top there,
15  there's a date that says this was filed on June 17,
16  2013, in the Alabama Legislative Black Caucus for
17  the State of Alabama lawsuit.  Do you see that?
18  A.       I do.
19  Q.       Do you recognize this document?
20  A.       Not particularly.
21  Q.       If you can, flip to Page 7.  Do you see
22  there's a signature?
23  A.       Yes.
24  Q.       And your name?
25  A.       Yes.

Randy Hinaman
December 09, 2021

Page 26

1  Q.         Does that appear to be your signature?
2  A.         Yes, sir.
3  Q.         Does this appear to be a true and
4  correct copy of your declaration?
5  A.         Again, it doesn't ring a bill. But I
6  have no reason to believe it isn't.
7  Q.         Take a look at paragraph two. It
8  states, "I have substantial experience in drafting
9  redistricting plans in Alabama, including drawing
10 the congressional plan adopted by the three-judge
11 federal district court in Mobile in 1992 and work on
12 the 2011 congressional plan." Excuse me. "And work
13 on the 2001 congressional plan. In 2011, I
14 developed the redistricting plan for the Alabama
15 congressional delegation. In that work, I worked
16 within the guidelines for redistricting adopted by
17 the reapportionment committee."
18              Do you see that?
19 A.         I do.
20 Q.         Is that an accurate description of your
21 experience in drafting redistricting plans in
22 Alabama?
23 A.         It is. I mean, I don't know what that
24 -- the sentence on 2001, I did not draft the 2001
25 plans. But I did work with the leaders in the

Page 27

1  legislature who did draft those plans. I didn't
2  want it to imply that I drew those maps. I don't
3  know that it does imply that.
4  Q.         Okay. Well, let's go to the first part
5  there where you said that you -- your experience did
6  include drawing the congressional plan adopted in
7  1992. Does that mean that you did draw that map?
8  A.         I did, yes.
9  Q.         Is that the map that was used for the
10 Alabama congressional elections in the '90s?
11 A.         Yes, sir.
12 Q.         Did that map serve as the starting
13 point, then, for the congressional map that was
14 drafted for 2001?
15 A.         I didn't draw that map.
16 Q.         You said you worked on drawing that map.
17 What does that mean?
18 A.         The legislature at that time was
19 controlled by the democrats, and I was representing
20 some republican Congressman in just interacting with
21 them. But they -- they drew the map. I was just
22 trying to give our point of view to it.
23 Q.         Are you familiar at all with how that
24 map was drawn in 2001?
25 A.         Vaguely, but not -- not the specifics of

Page 28

1  it.
2  Q.         What's your understanding?
3  A.         Well, it was essentially a continuation
4  of the 1992 map, just updated for the most part for
5  population shift.
6  Q.         And you said you were working with the
7  republican legislators?
8  A.         I was working with Congressman Callahan
9  at that point.
10 Q.         Did you have any role whatsoever in
11 drawing that map in 2001?
12 A.         I had no official role other than I was
13 working with the leaders -- the democratic leaders
14 who were working on that map. I would occasionally,
15 you know, talk to them about the changes that were
16 made, and for especially Congressman Callahan's
17 district. But I didn't -- I didn't have control of
18 the process, if that makes any sense.
19 Q.         Do you know who did draw the map?
20 A.         Senator Enfinger, I believe.
21 Q.         Did he --
22 A.         Well, that's who the -- he was the -- I
23 don't know who he hired. That's who I interfaced
24 with. Let's put it that way.
25 Q.         Understood. That was going to be my

Page 29

1  next question.
2              You said you spoke to several members of
3  the legislature. Do you remember who you spoke to?
4  A.         In 2001?
5  Q.         Yes.
6  A.         My primary -- my primary interface on
7  that map was Senator Enfinger.
8  Q.         When you spoke with Senator Enfinger,
9  did you provide any sort of input or recommendations
10 about how the map should be drawn?
11 A.         Only as to how -- he had a draft, I
12 believe, and was talking about the changes he wanted
13 to make in various districts. And my primary focus
14 was the first district because I was working for
15 Congressman Callahan.
16              So he had come with some suggestions,
17 and we just talked about those. They were not -- I
18 don't think I had any tremendously substantive
19 changes to recommend. So I think it was pretty much
20 what he had drawn, we were comfortable with.
21 Q.         Did you provide any other sort of
22 feedback in drawing the 2001 congressional map
23 beyond what you just mentioned with District 1?
24 A.         I did not.
25 Q.         Do you know if it was a goal in the 2001

Randy Hinaman
December 09, 2021

Page 30

1 congressional map to make sure that District 7
2 remained a majority black district?
3 A.        I do not.
4 Q.        Do you know if it was considered in 2001
5 to draw two majority black districts?
6 A.        I do not, no.
7 Q.        Let's go back to the 1992 congressional
8 map.  Because you said you did draw that one,
9 correct?
10 A.        Yes, sir.
11 Q.        The 1992 congressional map created the
12 first majority black congressional district in
13 Alabama history; is that correct?
14 A.        I believe so, yes.
15 Q.        And you said you drafted that map?
16 A.        I did.
17 Q.        So you drafted District 7 as it stood in
18 1992?
19 A.        Yes, sir.
20 Q.        Who asked you to draw that map?
21 A.        I was working for Congressman Callahan
22 and some of the other members of the Alabama
23 delegation.
24 Q.        Did you work with Senator Larry Dixon in
25 drafting the map?

Page 31

1 A.        Probably, yes.
2          I will point out that this was 30 years
3 ago.  So if you ask me a specific question, it's
4 probably going to be hard for me to answer.
5 Q.        Understood.
6          Do you remember any other legislators
7 that you worked with directly in drafting the 1992
8 map?
9 A.        I do not.  As you know, the legislature
10 did not ultimately pass a map.  So we went -- it was
11 a court action that imposed this map.
12 Q.        Were you asked to create a majority
13 black district in drawing the 1992 map?
14 A.        I guess -- I guess I was, yeah.
15 Q.        Who asked you to do that?
16 A.        I think the -- well, Congressman
17 Callahan and the delegation probably in concert with
18 the NRCC.
19 Q.        Do you know why you were asked to do
20 that?
21 A.        At the time, I believe they thought that
22 was the proper thing to do under the Voting Rights
23 Act.
24 Q.        Did you receive any instructions from
25 the court?

Page 32

1 A.        No, sir.
2 Q.        Did you draw District 7 with the intent
3 to make it a majority black district?
4 A.        I did.
5 Q.        How did you make sure that District 7
6 would have a majority black voting age population?
7 A.        I just included areas of high
8 concentration of African American voters.
9 Q.        How did you do that?
10 A.        By assigning counties and precincts that
11 fit that definition.
12 Q.        Did you have a particular percentage of
13 black voters that you were shooting for?
14 A.        I did not.
15 Q.        How did you go about choosing District 7
16 to be the district that has the majority black
17 voting age population?
18 A.        I don't -- I mean, I think it was a
19 function of geography, I mean, where areas with
20 concentration of black voters were.
21 Q.        And how did you gather that information?
22 A.        Census data.
23 Q.        What specifically?
24 A.        Just the census data from the -- related
25 to population and race.

Page 33

1 Q.        So when you were drawing it, you were
2 able to pull up and see black voters, white voters
3 in different areas?
4 A.        Yes.
5          MR. WALKER:  Objection to form.
6 Q.        How did you see that information when
7 you were drawing the map in 1992?
8 A.        I'm not sure I understand your question.
9 Q.        Did you use a software to draw the map
10 in 1992?
11 A.        As I remember -- again, it was 30 years
12 ago -- I believe I used the computers at the Alabama
13 reapportionment office to draw the map.  So I don't
14 know what their software was, to be honest with you.
15 Q.        What specific racial data did you have
16 in front of you when you were drawing that map?
17 A.        I would have total pop, total African --
18 total black, and voting age data.
19 Q.        Was that broken down by county,
20 precinct, neighborhood, block?
21 A.        County, precinct, block, yes.  Yes, sir.
22 Q.        And I realize it was 30 years ago.  How
23 did you go about drawing District 7 in 1992?
24 A.        Again, it was 30 years ago.  I don't
25 remember the machinations that went into drawing the

Randy Hinaman
December 09, 2021

Page 34

1  map.
2  Q.        Did you have in your mind a certain
3  black voting age population that you were shooting
4  for?
5  A.        No.
6  Q.        So you just drew general lines and you
7  found that it came to a certain percentage of black
8  voting age population, and you thought that was
9  good?
10 A.        Obviously, I was -- I had in my mind
11 that we wanted it to be majority black district.
12 But in terms of above 50 percent, I didn't have a
13 specific number in mind.
14 Q.        Did you take into account any other
15 characteristics of the black voting age population
16 that you were looking at when you drew that map in
17 1992?
18 A.        Such as?
19 Q.        For instance, did you look at any
20 socioeconomic factors?
21 A.        I did not.
22 Q.        Did you look at attitudes?
23 A.        I did not.
24 Q.        Interests?
25 A.        (Witness shakes head).

Page 35

1  Q.        Type of employment?
2  A.        I did not.
3  Q.        Income?
4  A.        I did not.
5  Q.        Educational level?
6  A.        No.
7  Q.        Voter turnout?
8  A.        No.
9  Q.        Election results to assess party
10 affiliation amongst the black voting age population?
11 A.        No, I don't believe so.
12 Q.        When you drew District 7 in 1992, did
13 you determine that to be a community of interest?
14 A.        Yeah.  Well, I think it included most of
15 the black belt.  I would say they had a community of
16 interest along -- yeah.  So yes.
17 Q.        And what was the basis for that
18 determination?
19 A.        Well, geography and like demographics.
20 Q.        And race?
21 A.        And race.
22 Q.        Was race the main factor you considered
23 in drawing District 7?
24 A.        It was a major factor.
25 Q.        Was there a more predominant factor than

Page 36

1  race?
2  A.        Other than geography and deviation.
3  Those would be the top -- obviously, things had to
4  be contiguous.
5  Q.        If District 7 did not have a majority
6  black population, would it have passed?
7  A.        Passed what?
8  Q.        Would it have been approved?
9  A.        You're asking me to question what three
10 federal judges would approve?
11 Q.        You were asked to draw a map that had a
12 majority black district, correct?
13 A.        Yes.
14 Q.        If you had turned in a map that did not
15 have a majority black district, would you have done
16 what you were asked to do?
17 A.        You mean turned into Congressman
18 Callahan?
19 Q.        Correct.
20 A.        No.  I think our goal was to draw a
21 majority black district.
22 Q.        Why did you draw only one majority black
23 district?
24 A.        That was our -- that was our goal, to
25 draw a district.

Page 37

1  Q.        Your goal was to draw only one district?
2  A.        Well, I'm not sure at that -- I don't
3  remember the numbers exactly.  I'm not sure -- I'm
4  not sure whether it would have been possible to draw
5  two or not.  I don't know that it would have.
6  Q.        Did you consider drawing two majority
7  black districts?
8  A.        I did not.
9  Q.        Did anyone suggest to you to draw that?
10 A.        They did not.
11 Q.        Did you review or comment on any other
12 maps that contained two majority black districts at
13 the time?
14 A.        I don't --
15            MR. WALKER:  Objection to form.
16 A.        I don't remember seeing any majority two
17 district maps.
18 Q.        Did you consider race in drawing any of
19 the other districts in 1992?
20 A.        I did not.  I mean, other than -- I did
21 not, no.
22 Q.        Skipping ahead to the 2011 congressional
23 map.  You also drew that map, correct?
24 A.        Yes.  But may I go back just one?
25 Q.        Sure.

Randy Hinaman
December 09, 2021

Page 38

1  A.        Obviously, we drew this map -- I drew
2  this map, and it was submitted in a lawsuit.  I had
3  no idea what would happen to it from there.  So it's
4  not like I -- you know, I didn't know whether the
5  judges would change it or what would happen.
6  Q.        That's a good point.  Did the judges
7  change it after you submitted it?
8  A.        I don't -- no, I don't believe they did.
9            Sorry.  Go ahead.
10 Q.        So you stated that you also drew the
11 2011 congressional map, correct?
12 A.        Yes, sir.
13 Q.        That one is a little bit more recent,
14 ten years ago.  Do you recall the general method
15 that you used in drawing that map?
16 A.        Yeah.  I mean, essentially it was
17 updating the 2001 map based on demographic changes
18 that had happened over the last ten years and
19 working with the -- all of the -- I was hired by all
20 of the members to update the map and submit a --
21 submit a map to the legislature for approval.
22 Q.        So correct me if I'm wrong.  But
23 generally when you're drawing these maps, it's more
24 of a redrawing than a drawing from scratch.  Is that
25 fair to say?

Page 39

1  A.        That is fair to say.
2  Q.        So the general process is that you will
3  use the existing map from the prior census data and
4  update it with the new census data, correct?
5  A.        That's correct.  And obviously, whether
6  it's a congressional map or any other maps, you have
7  officeholders who have an interest in, for the most
8  part, keeping the voters that they've had for the
9  last ten years.  So, most of them would not go into
10 a redistricting process looking for wholesale
11 change.
12 Q.        So the 2021 map, for instance, can be
13 traced back to the 2011 map, the 2001 map, and the
14 1992 map in that order, correct?
15 A.        Yeah.  Preserving cores of existing
16 districts was a guideline for the 2021 map.
17 Q.        For instance, the 2001 map used the 1992
18 map as a starting point, true?
19 A.        I didn't draw that map.
20 Q.        Do you have any other understanding of
21 how that map was drawn?
22 A.        I mean, if you look at it, it looks like
23 it was continuing that map, yes.  But I didn't --
24 the democratic legislature drew that map.
25 Q.        Is it a fair assumption to say that they

Page 40

1  probably used the 1992 map in drawing the 2001 map?
2  A.        That's an -- a fair assumption, I guess.
3  Q.        And the 2011 map then that you drew used
4  the 2001 map as its starting point?
5  A.        Yes, sir.
6  Q.        And then the 2021 map that you drew used
7  the 2011 map as its starting point?
8  A.        Yes, sir.
9  Q.        In drawing the 2011 congressional map,
10 did you speak to members of congress?
11 A.        I spoke to all of them, yes, sir.
12 Q.        All seven of the incumbents?
13 A.        Yes.
14 Q.        And what did you speak to them about?
15 A.        We're talking about 2011?
16 Q.        Correct.
17 A.        I spoke to them about the over and under
18 nature of their districts, whether they needed to
19 gain population or lose population.  And based on
20 that, where they would like to gain or where they
21 would like to -- where they would be -- you know,
22 like to lose.
23            And I tried to work with adjacent
24 districts to make sure that if person X wanted to
25 give up this county, that the other person would be

Page 41

1  amenable to taking it.  So I tried to negotiate a
2  map that everybody was happy with.
3  Q.        Did you consult the state's
4  redistricting criteria in drawing that map?
5  A.        I did.
6  Q.        Did you review election returns in
7  drawing that map?
8  A.        They were part of it, yes.
9  Q.        What data did you have on that?
10 A.        I don't remember if all their races were
11 in there.  But I had the latest last three or four
12 state-wide races that were available.
13 Q.        And how did you use that information?
14 A.        I didn't use it all that much.  It was a
15 common -- you know, a common question from a member
16 might be, you know, what did the governor get in my
17 district?  And if we make this change -- or what did
18 whomever ran for president in the race before that,
19 whoever that was.
20            But I didn't use it so much in drawing
21 the map.  It was more of confirming to them that
22 their district was going to perform similarly to how
23 the previous district had performed electorally.
24 Q.        Did that data give you information on
25 party affiliation?

Randy Hinaman
December 09, 2021

Page 42

1  A.        I don't believe so.  I think it was just
2  election returns.
3  Q.        Was that aggregate election returns?  Or
4  was that by individual counties or precincts?  Does
5  that make sense?
6  A.        Yeah.  It was precinct-based.  But then
7  it was aggregate for counties and then for the
8  districts.
9  Q.        You can look at all of that?
10  A.        Yes.
11  Q.        Understood.
12            Did you look at any racial polarization
13  data in drawing the 2011 map?
14  A.        I did not.
15  Q.        Did you look at any other voter behavior
16  data?
17  A.        I did not.
18  Q.        Was it a goal in drafting the 2011
19  congressional map to make sure that District 7
20  remained a majority black district?
21            (Zoom interruption.)
22  A.        What is that?
23  Q.        It sounds like we might have a singer.
24            MR. TURRILL:  Someone is off on mute on
25  the line there.

Page 43

1  Q.        I think we're good now.
2  A.        Can you ask -- I'm sorry.  Can you ask
3  that again?
4  Q.        No problem.
5            Was it a goal in drafting the 2011
6  congressional map to make sure that District 7
7  remained a majority black district?
8  A.        Yeah.  Obviously, Congresswoman Sewell
9  was one of my -- one of my clients for that map.
10  And she wanted to maintain her majority black
11  district, yes.
12  Q.        When you say that she was one of your
13  clients, what do you mean?
14  A.        She was one of the members of congress
15  who paid me to draw the map.
16  Q.        Did you have a contract with those
17  members of congress?
18  A.        Verbally.
19  Q.        You didn't have a written contract?
20  A.        No.
21  Q.        What was the verbal contract?
22  A.        That they would all put in $10,000 to
23  draw -- each to draw -- pay me to draw this map.
24  Q.        That each individual congressman or
25  woman would put in $10,000?

Page 44

1  A.        Their campaigns, yes.
2  Q.        Was that the extent of the verbal
3  agreement?
4  A.        It was.
5  Q.        Was it a goal in drafting that 2011
6  congressional map to make sure that District 7 kept
7  a 60 percent black voting age population?
8  A.        No.
9  Q.        Was there any sort of specific black
10  voting age population percentage that you were
11  shooting for?
12  A.        No.
13  Q.        Were you successful in making sure that
14  District 7 remained a majority black district?
15  A.        We were.
16  Q.        How did you make sure of that?
17  A.        By whatever -- you know, whatever -- and
18  I don't even remember the various counties ten years
19  ago.  If you handed me a map, I could probably tell
20  you.
21            But by what we added county and
22  precinct-wise to make sure it did not dramatically
23  alter the makeup of the district.
24  Q.        Explain that to me a little bit further.
25  So what changes were you making in 2011?

Page 45

1  A.        Again, I don't even know how much -- I'm
2  going to hazard a guess that District 7 was
3  underpopulated in 2011.  I don't remember the exact
4  numbers.  It was ten years ago.
5            But I'm going to guess that it was
6  underpopulated.  And so then the discussion with
7  Congresswoman Sewell would be, you know, where --
8  what areas would we add to your district to get your
9  district to ideal population.
10            And, obviously, in looking at those
11  areas, we, you know, wanted to make sure that we
12  preserved the majority black district.
13  Q.        I know some of this was discussed in
14  your deposition eight years ago.  So I'll try not to
15  tread the same water too much.
16            But explain to me just a little bit
17  about the process when you were drawing the 2011
18  congressional map.  So did you start with District
19  7?
20  A.        I probably did start with District 7.  I
21  don't really remember, to be honest with you.  I
22  mean, I -- you know, I was meeting -- I met with the
23  entire delegation to start.  And then we went from
24  there.
25            But preserving Congresswoman Sewell's

Randy Hinaman
December 09, 2021

Page 46

1 majority black district was a priority for the
2 delegation.
3 Q.        And that was the priority for you, as
4 well?
5 A.        Yes.
6 Q.        Do you remember generally what sort of
7 changes you made to District 7 in 2011?
8 A.        I really don't.  I mean, I apologize.
9 But I did so many maps and plans in the last ten
10 years that I don't.
11 Q.        What other maps and plans have you done
12 in the last ten years?
13 A.        Well, we just did four in the last
14 couple of months.
15 Q.        Anything else?
16 A.        Those are the ones that are mostly stuck
17 in my brain.
18 Q.        Are there any others?
19 A.        No.
20         MR. WALKER:  What was the question
21 again?
22         MR. THOMPSON:  He said there were so
23 many maps that he had drawn in the last ten years.
24 And I asked him which ones, and he said just the
25 four that he just did.

Page 47

1 A.        Well, "drawn" is -- we could find the
2 exact number.  But I think in this last legislative
3 session, there were something like 41 various maps
4 and plans that were submitted to the legislature.
5 So while I certainly didn't draw most of those, I
6 did look at them.
7         So to ask me to go back ten years, it's
8 hard to -- when you have some 41 pieces of 41 maps
9 in your head, it's hard to expand back ten years.
10 Q.        So you reviewed all 41 maps that were
11 submitted?
12 A.        I didn't review them all, but I looked
13 at most of them.
14 Q.        What's the difference between looking at
15 them and reviewing them?
16 A.        Well, reviewing them would take more
17 time.  Looking at them would be, okay, this is a --
18 this is a house map or a senate map or whatever.  I
19 just looked at the cover sheet and maybe the overall
20 numbers, but didn't review -- didn't -- some of them
21 were never offered, obviously.  So if they weren't
22 offered, I didn't look at them more seriously than
23 that.
24 Q.        Did you review all of the maps that were
25 offered?

Page 48

1 A.        I looked at --
2         MR. WALKER:  And you're talking about --
3 Q.        We're talking about 2021 now.  Did you
4 review all the maps that were offered in the
5 legislature in 2021?
6 A.        Yes, I tried to.  Some of -- some of
7 that may have been a very short review because some
8 of those maps were literally submitted 24 hours
9 before they were offered either on the floor or at
10 committee.  So it's not like it was a long review.
11 Q.        One more question going back to the 2011
12 congressional map.  Did you consider race -- excuse
13 me.  A couple more questions, to be fair.
14         Did you consider race in drawing any of
15 the other districts other than District 7 in 2011?
16         MR. WALKER:  Congressional.
17 Q.        The congressional map in 2011.
18 A.        Not specifically.  I mean, I'm not sure
19 I know what "consider" means.  But, obviously, all
20 that information was available on each district.
21 But --
22 Q.        Did you review the racial data for each
23 district when you were drawing the 2011
24 congressional map?
25 A.        As a matter of course, yeah.  I mean,

Page 49

1 it's all there.
2 Q.        Explain that.
3 A.        Well, when you finish -- when you draw a
4 map, obviously, you've got seven districts.  And
5 you're going to have -- if you look at the, you
6 know, top data for each district, it's going to have
7 race and voting age, black, so forth and so on for
8 each district.  It's not like it just only comes up
9 on the majority black district.  It would come up on
10 all of them, obviously.
11 Q.        Did you review that data for each
12 district?
13 A.        I looked at it.
14 Q.        What did that data tell you?
15 A.        Nothing specifically.
16 Q.        Did you do anything with that data?
17 A.        I did not.
18 Q.        Did you consider drawing two majority
19 black districts when you drew the 2011 congressional
20 map?
21 A.        I really did not.
22 Q.        Why not?
23 A.        Well, primarily because the people who
24 were paying me to draw these maps preferred the
25 districts similar to how they were.

Randy Hinaman
December 09, 2021

Page 50

1  Q.          Did the people that were paying you to
2  draw the map prefer not to have a second majority
3  black district?
4  A.              I don't know about that.  But they
5  preferred to have their districts as close to what
6  they had under that map going forward.
7  Q.          Did you discuss with anyone the
8  possibility of creating a second majority black
9  district?
10 A.         I don't believe so.
11 Q.          Were you aware of requests in the
12 legislature in 2011 to create a second majority
13 black district?
14 A.          Again, I don't have a -- I don't have a
15 complete recollection of ten years ago what maps
16 were offered or not offered on the -- I don't want
17 to guess on what was offered and what wasn't
18 offered.
19 Q.          Do you know if it would have been
20 possible to create a second majority black district
21 in 2011?
22              MR. DAVIS:  Object to the form.
23              MR. WALKER:  Objection.  Go ahead.
24 A.          I did not do it.  So I -- I don't have
25 an opinion on whether it was possible.

Page 51

1  Q.          To be clear for the timeline, I'm moving
2  ahead now to 2021 for the most recent maps that were
3  drawn.
4  A.         Yes, sir.
5  Q.          And I'm going to refer now to the 2021
6  congressional map.  When I refer to that, I mean the
7  one that was enacted.  It was also referred to, I
8  believe, as HB-1 and then ultimately Act 2021-555.
9  Is that fair?
10 A.         Yes, sir.
11 Q.          And I'll refer to that either as the
12 2021 map or the 2021 congressional map.  Is that
13 okay?
14 A.         Yes, sir.
15 Q.          When were you first approached about
16 drawing the 2021 congressional map?
17 A.          That probably would have been the end --
18 sometime in September or October of 2020.
19 Q.          Of 2020 or 2021?
20 A.          2020.  About a year out, I would say.
21 Q.          Who approached you?
22 A.          Senator McClendon and Representative
23 Pringle on behalf of the republican leadership.
24 Q.          What were you asked to do?
25 A.          They asked me if I would be interested

Page 52

1  in drawing all four maps that they -- the
2  congressional, as well as the other maps that needed
3  to be drawn in this session.
4  Q.          And those four would be the
5  congressional, the house and senate for the state
6  legislature, and the board of education?
7  A.          Yes, sir.
8  Q.          Did you agree to draw all four?
9  A.          I did.
10 Q.          When were you officially retained?
11 A.          Around that time, I would think.  Like
12 maybe October of 2020.
13 Q.          And who officially retained you?
14 A.          Well, I was working for the two chairs
15 of the -- the house chair, Representative Pringle,
16 and the senate chair, Senator McClendon.
17 Q.          Did you sign a contract?
18 A.          I did.
19 Q.          When did you sign that contract?
20 A.          Again, I don't have that in front of me.
21 But September or October of 2020, I would imagine.
22 Q.          Is the contract with you individually,
23 or is it with your company?
24 A.          It was with R. Hinaman, yes.
25 Q.          And who is the other party that you

Page 53

1  contracted with?
2  A.          Citizens for Fair -- Citizens for Fair
3  Representation.  Or maybe Alabamians for Fair
4  Representation.
5  Q.          Do you recall which one it is?
6  A.          Not off the top of my head.
7  Q.          Who is Citizens for Fair Representation
8  or Alabamians or Fair Representation?  Whichever the
9  name is, who is that group?
10 A.          It's a 501(c)(4) which also paid me to
11 do the map drawing that I did in 2011.
12 Q.          And what's your understanding of why you
13 were contracted by this particular group?
14 A.          Meaning?
15 Q.          As opposed to the State of Alabama, the
16 legislature, anyone else.  Why this 501(c)(4)
17 organization?
18 A.          The leadership had set up that (c)(4)
19 for the purpose of drawing districts in 2020 -- 2011
20 and then continued it for 2021.
21 Q.          So this 501(c)(4) organization was
22 created for the purpose of drawing the redistricting
23 in the state of Alabama?
24 A.          In 2011, that's my understanding, yes.
25 Q.          Do you know if that organization does

Randy Hinaman
December 09, 2021

Page 54

1  anything else?
2  A.        I do not.
3  Q.        The contract that you signed around
4  September, October of 2020, did you draft that
5  contract?
6  A.        I did.
7  Q.        What does the contract call for you to
8  do?
9  A.        It calls for me to work with the two
10  chairs and the leadership of the house and the
11  senate to draw four maps, congressional, state
12  senate, state house, and state board of education.
13  And to the extent practical and possible, meet with
14  the officeholders for those four maps to get their
15  interest in changes and so forth.
16  Q.        In that last part, you said "to meet
17  with the officeholders"?
18  A.        Yes.
19  Q.        Is that basically the incumbents for
20  each of the various districts on each of those maps?
21  A.        Correct.
22  Q.        Do you have a copy of that contract?
23  A.        Not with me.  But yes, I do.
24  Q.        Is that something that you could produce
25  if you were requested in this case?

Page 55

1  A.        Yes.
2  Q.        What were the terms of your compensation
3  in that contract?
4  A.        Four payments spaced out over various
5  months, four payments of $50,000 spaced out over the
6  length of the contract.
7          I believe when we actually signed the
8  contract back in September or October, we were
9  hoping or planning to do a special session in July.
10  So we didn't at that time know that COVID was going
11  to delay the census numbers and so forth and so on.
12          So when I started the process at the end
13  of 2020, the theory was we would, you know, probably
14  have a special session in June or July sometime to
15  pass these maps.
16  Q.        You said you started the process around
17  the end of 2020.  What do you --
18  A.        Well, when I signed the contract.
19  Q.        You also said that there was -- the
20  contract called for four payments of $50,000.  Is
21  that four separate payments of 50,000 each, for a
22  total of --
23  A.        Yes, sir.
24  Q.        --- 200,000?
25  A.        Yes, sir.

Page 56

1  Q.        Have you been fully paid at this point?
2  A.        I have.
3  Q.        Was any part of your compensation
4  contingent on anything?
5  A.        No.  However, the -- just to be clear on
6  the payment, because the time frame of the project
7  changed -- I mean, when we initially signed the
8  contract, the theory was, again, we would have the
9  census data in March and we would pass a plan in
10  July.  Obviously, that didn't happen.
11          So my timeline for when I was supposed
12  to get those four payments I modified so that they
13  didn't have to pay me before I had actually even had
14  census data.  So we changed the timeline.  But yes.
15  Q.        Were you able to do any work on the maps
16  before you got the census data?
17  A.        Yeah.  We -- especially the state-wide
18  ones such as congress and state board of education.
19  We had to -- we had the estimates, county estimates,
20  from the census bureau.  I guess it would have been
21  the 2019 numbers.
22          So it was possible to look at them and
23  say, okay, this district is likely to be under, this
24  district is likely to be over, which on the
25  congressional level allowed me to start meeting with

Page 57

1  members before we had the official census data which
2  we didn't get until the end of August.
3  Q.        So you didn't get the official census
4  data until the end of August.  But you had
5  unofficial estimates from the census before then?
6  A.        Correct.
7  Q.        And when did you receive those
8  unofficial results?
9  A.        I don't -- I don't know when the 2019
10  numbers were updated.  But I'm going to say around
11  the end of -- somewhere around the end of 2020.  But
12  I don't know that exactly.
13  Q.        Did you begin working on the
14  congressional map before you received the official
15  census data?
16  A.        Yes, sir.
17  Q.        When did you begin working on that map?
18  A.        In earnest probably in May of 2021.
19  Q.        What do you mean "in earnest"?
20  A.        Well, meeting with members and talking
21  substantively about potential changes.
22  Q.        Before we get into the specifics of
23  that, just on your compensation real quick, were you
24  paid or retained by anyone else?
25  A.        No.  I mean, I assume you mean relative

Randy Hinaman
December 09, 2021

Page 58

1  to redistricting.

2  Q.      Certainly.  You've received other

3  payments --

4  A.      Yes.

5  Q.      -- for other --

6  A.      Consulting.

7  Q.      Correct.

8          So you stated that you began drawing the

9  2021 map in earnest in May of 2021.  Did you do

10 anything else in preparation for drawing the maps

11 before that date?

12 A.      No.  I mean, I had conversations with

13 members of the congressional delegation.  And as you

14 may -- may know, there was considerable

15 concerns/discussion about whether Alabama would have

16 seven members of congress or six.

17         And until we really knew the answer to

18 that -- which I think we were told by the census

19 bureau in April, sometime in April what the answer

20 to that question was -- there really wasn't much --

21 I didn't -- my position with the congressmen was it

22 would not make sense to work on a map until we knew

23 how many districts we were going to have.

24         Because, obviously, working on a

25 six-person map where somebody would be paired with

Page 59

1  somebody was not going to be a lot of fun.  And

2  there was no need to do that if we didn't ever have

3  to.

4  Q.      Certainly.  So the census bureau

5  informed --

6  A.      All the states, I think, in April of how

7  many -- how many members of congress they would

8  have.  And then that allowed me to set up meetings

9  and work off of the estimates of 2019 to talk about

10 whether your district was over or under and so

11 forth.

12 Q.      And you began those meetings around May

13 of --

14 A.      I went to DC with the goal to meet with

15 everybody in May, yes, sir.

16 Q.      So you said you went to DC.  So I assume

17 that you're referring to meetings with the

18 congressional members.

19 A.      Yes.

20 Q.      Did you meet with any other -- for

21 instance, did you meet with anybody in the Alabama

22 state legislature in the spring of 2021?

23 A.      Well, I met with the two co-chairs to

24 talk about my plan to how to -- you know, how to

25 move forward on the congressional, that we would

Page 60

1  wait until we knew how many districts the state

2  would have.  And then I would go to Washington and

3  meet with the members and start formulating a plan

4  from there to hopefully reach some consensus on a

5  map.

6  Q.      Before you received word from the census

7  bureau that there were going to be seven districts

8  in Alabama again, did you do anything else in

9  furtherance of drawing the 2021 congressional map?

10 A.      I did not.

11 Q.      When did you actually begin redrawing

12 the 2021 congressional map?

13 A.      After my May round of meetings in

14 Washington.

15 Q.      You say after then.  Would that have

16 been in May?  Or June, July?

17 A.      I think the end of May, beginning --

18 again, this was all based on estimates.  We did not

19 have the real census data.  So I just -- I probably

20 roughed out a map sometime in May or June based off

21 of the estimates, knowing full well they were not

22 going to be completely accurate.

23 Q.      From the time that you started drawing

24 the 2021 congressional map until it was completed,

25 about how much time did you spend in terms of hours

Page 61

1  on drawing that map?

2  A.      I have no idea.  I guess I would make a

3  bad lawyer.

4  Q.      Well, I don't want you to guess.

5          When was the map completed for the 2021

6  congressional?

7  A.      Complete.  When was I done with what I

8  was doing with it?

9  Q.      Correct.

10 A.      Probably the Friday before the week we

11 went into session.  So whatever that -- October 23rd

12 or -- I'm making up that date.  Whatever the Friday

13 before we went into session was.

14 Q.      And you're referring to the special

15 session that was called in the fall of 2021?

16 A.      Correct.

17 Q.      Going back to how much time it took you

18 in terms of hours.  Would you say that you spent

19 more than 100 hours drawing the congressional map in

20 2021?

21 A.      Well, if you're including meetings and

22 discussions about it, yeah, probably.

23 Q.      Would you say you spent more than 150

24 hours?

25 A.      I don't know.  I just -- I don't really

Page 62

1  have a -- I didn't think of it in terms of hours.
2  My contract didn't -- my contract was just you were
3  going to draw these four maps.  And whether it took
4  123 hours or 217 was irrelevant to what I was doing.
5  Q.          Right.  I'm just trying to get an idea
6  about how long it took you.  I know there were
7  months involved.
8              But how much time you were actually
9  spending on this in that time frame, would you say
10 it took you more than 200 hours?
11 A.          I have no way of even guessing that.  I
12 really -- I apologize, but I don't.
13 Q.          Were you doing other things work-wise
14 between May 2021 and -- when was the special
15 session?  Was it in October?
16 A.          October of 2021, yes.
17 Q.          Between May 2021 and October 2021, were
18 you doing anything else work-wise other than drawing
19 these four maps?
20 A.          Not very much because it was an
21 off-year, obviously.  I had clients that I did
22 things for, obviously, in 2020, working up to the
23 November 2020 election.  But -- and I still had an
24 ongoing relationship with some of -- a couple of my
25 clients.  But there wasn't a lot of work that needed

Page 63

1  to be done in the off-year.
2  Q.          Were you working full 40-hour weeks
3  during that entire time?
4  A.          By and large, yes.
5  Q.          Did you take any trips or personal
6  vacation time during that time period?
7  A.          Well, it was during COVID.  So I didn't
8  travel a whole lot.  But it was a crazy time, as you
9  all remember.
10 Q.          Did you take any time off?
11 A.          Sure.
12 Q.          About how long did you take off?
13 A.          I don't know.  A couple of weeks.
14 Q.          And in that -- you had mentioned that
15 you weren't able to begin redrawing the
16 congressional map before you received the census
17 estimates in April of 2021.  Does that apply to all
18 --
19 A.          Before I received how many districts we
20 had in April of 2021.
21 Q.          Correct.  Does that --
22 A.          I think we had the census estimates
23 before that.  I'm saying we just didn't know how
24 many districts there were.
25 Q.          Fair enough.  Thank you for the

Page 64

1  clarification.
2              Does that apply to all four of the maps
3  that you were drawing?
4  A.          No.  That's obviously the -- the only
5  one that the census determined how many members
6  there would be would be -- was congress.
7  Q.          Because you said you had unofficial
8  census data on, I guess, population prior to that?
9  A.          By county, yes.
10 Q.          And did you use that unofficial data for
11 the other maps?
12 A.          I used it -- I used it to start working
13 with the state school board members.
14             It was less effective at the senate and
15 house levels, virtually useless at the house level
16 because it was mostly county data at the beginning.
17 And so most house districts are not made up of full
18 counties, obviously.  So it was less valuable in
19 those maps and more valuable in the statewide maps.
20 Q.          When did you begin drawing the state
21 house and senate maps in 2021?
22 A.          I did not start on a house map until we
23 actually had all of our census data at the end of
24 August.  I had roughed out a few of the rural senate
25 districts based on some of the estimates.  But it

Page 65

1  wasn't particularly effective.
2              So I would -- I would really say I
3  didn't seriously start drawing those maps until
4  August of 2021.
5  Q.          And what about the board of education
6  map?
7  A.          The board of education I was doing
8  simultaneously to congress because that was
9  obviously a statewide map.  And the county numbers
10 were more usable in that type of map than they were
11 in a 105-member state house map.
12 Q.          So you began drawing the board of
13 education map around --
14 A.          The same times as congress.
15 Q.          Which was around May of 2021?
16 A.          Correct.  I think I started meeting with
17 those members in May, as well.
18 Q.          We've been going about an hour.  Do you
19 want to take a break?
20 A.          Sure.
21             THE VIDEOGRAPHER:  We're off the record.
22 The time is 10:17 a.m.
23             (Recess was taken.)
24             THE VIDEOGRAPHER:  We are back on the
25 record.  The time is now 10:35 a.m.

Randy Hinaman
December 09, 2021

Page 66

1  Q.          Mr. Hinaman, when we left off, we were
2  talking about the preparation that you did starting
3  to get into the beginnings of drawing the 2021 map.
4                Prior to May 2021, did you anything in
5  furtherance of drawing the 2021 congressional map?
6  A.          Other than reviewing the 2019 census
7  estimates by county, no.
8  Q.          And what did you do when you were
9  reviewing the --
10 A.          I was trying to get a feel for what
11 districts would be underpopulated and what districts
12 would be overpopulated based on those estimates.
13               And while the estimates in the end
14 didn't turn out to be obviously particularly close
15 to the actual numbers, in order -- they were -- they
16 were close in that they did predict the three
17 districts that would be under and the four districts
18 that would be over.
19               So it was helpful to pay attention to
20 that when I started to do my round of meetings with
21 the members of congress.
22 Q.          Did you do anything else prior to May
23 2021 in furtherance of drawing the 2021
24 congressional map?
25 A.          No.  I mean, obviously, I -- at some

Page 67

1  point in that time frame, the reapportionment
2  committee met and passed their guidelines.
3  Obviously, I reviewed those and how they would
4  impact the drawing of the maps.  But that was --
5  that was about the May time frame, as well.  It may
6  have been early May rather than later May.
7  Q.          You met with members of congress in DC
8  in May of 2021, correct?
9  A.          Yes.
10 Q.          Was that the first thing that you did
11 after the census data came out in 2021?
12 A.          Well, the data --
13 Q.          Let me take a step back there.
14               You said that prior to May 2021, the
15 only thing that you had done was review some of the
16 unofficial census data to get a feel for
17 underpopulation, overpopulation?
18 A.          Yes.
19 Q.          Then the census bureau announced around
20 April 2021 that there will be seven congressional
21 districts again in Alabama?
22 A.          Correct.
23 Q.          Was the next step that you did flying to
24 DC to meet with the congressional members?
25 A.          Yes.  And that was, again, after

Page 68

1  guidelines had been passed in early May.
2                The only other thing in there, obviously
3  I had talked -- before we knew seven to six, I had
4  talked to, obviously, all of the offices, the
5  congressional offices, about what my -- what our
6  proposed timeline was going to be based on the fact
7  that the census data was delayed, and that hopefully
8  we would be able to set up a round of meetings in
9  May and then we would get our data in August or
10 whatever, and then we would fine tune it from there.
11 Q.          So those were more of administrative
12 coordination discussions?
13 A.          Yes, sir.
14 Q.          You flew to DC, you said, in May of 2021
15 to meet with the congressional members.  Did you
16 meet with each -- all seven congressional members?
17 A.          I met with five in person, one by Zoom.
18 And one of the members declined to meet because they
19 were more interested in running for a different
20 office, I guess.
21 Q.          Which member was that that declined to
22 meet?
23 A.          Mo Brooks.  I met with his chief of
24 staff, but I did not meet with Congressman Brooks
25 directly.

Page 69

1  Q.          You met with each of the other
2  congressional members?
3  A.          Five in person and one by Zoom.
4  Q.          Who was the one you met with by Zoom?
5  A.          Congresswoman Sewell.  She was back in
6  Alabama on a personal matter.  So I met with her by
7  Zoom.
8  Q.          Did you meet personally with Congressman
9  Sewell by Zoom?
10 A.          Yes.
11 Q.          And when was that?
12 A.          During the May trip.  Is that what
13 you're asking me?
14 Q.          Correct.  Because you went to DC to meet
15 with some of them.
16 A.          Yes.  And she was not in DC because of a
17 personal matter.  So we did a Zoom call.
18 Q.          You were in DC when you had the
19 Zoom call?
20 A.          And she was in Birmingham, I believe.
21 Q.          Was it just one call that you had with
22 Congressman Sewell?
23 A.          During that trip, just one call.
24 Q.          Have you had other meetings with
25 Congressman Sewell?

Page 70

1  A.          I've had other Zoom meetings with her.
2  Microsoft Teams, technically.  But yes, Zoom
3  meetings.
4  Q.          Have you had any in-person meetings with
5  Congressman Sewell?
6  A.          No, I don't think I did this time.  I
7  mean, as -- in-person meetings were rather
8  difficult.  It was actually May when I went to --
9  the house office buildings were actually closed and
10 didn't allow visitors.  So meeting anybody in person
11 was a bit challenging during that time.
12          I would have met with her in person on
13 that trip had she been in town.  But she was not.
14 But the other members that I met with were all
15 off-campus, so to speak, because we couldn't go to
16 -- I couldn't go to their offices.
17 Q.          As far as Congressman Brooks goes, you
18 said you met with somebody from his staff?
19 A.          I met with his chief of staff, yes.
20 Q.          And what did you discuss with these
21 representatives when you met with them in May of
22 2021?
23 A.          I discussed the over and under nature of
24 their district.  And if their district was
25 underpopulated based on the estimates, I said, you

Page 71

1  know, "Where would you envision picking up
2  population?"  If you were over populated, "What
3  areas of your district would you envision
4  potentially losing?"
5  Q.          Did you discuss anything other than
6  population changes with them?
7  A.          Population changes and potential
8  timelines and when we might get the real census
9  data.
10 Q.          Anything else that you discussed with
11 them?
12 A.          That was about it.
13 Q.          What did you do next after meeting with
14 the representatives in May of 2021?
15 A.          I took -- took back that information and
16 looked at it in terms of a map, and then waited for
17 the real census data to come to see where we really
18 were.
19 Q.          You said you took back that information.
20 What sort of information did you get from these
21 meetings?
22 A.          When somebody said if I need to lose
23 10,000, I would like to lose them in county X or
24 place Y or whatever.
25 Q.          And so you said you took that

Page 72

1  information.  And then what did you do with it?
2  A.          Tried to rough it out in an estimated
3  map, but again knowing that it was going to change
4  because the estimates were not going to be
5  completely accurate.
6          And, again, I didn't want to -- if there
7  was a conflict somewhere between some -- two members
8  wanted county X, I didn't really want to litigate
9  that until we had real numbers because it may become
10 irrelevant when it turns out that their district was
11 10,000 off of what the estimate said.
12          So I tried not to get into any
13 negotiations at that point.
14 Q.          Were there some disputes in the
15 recommendations and requests that you received?
16 A.          Minorly, yeah.
17 Q.          Were there specific counties that more
18 than one representative wanted?
19 A.          Yeah.  I mean, for example, the 1st
20 District was going to be over.  The 1st District was
21 going to be overpopulated, and it was going to have
22 to lose some.  And the 1st District congressman
23 wanted to probably lose some to the 2nd in Monroe,
24 but the 2nd District congressman wanted to gain some
25 from the 1st in Escambia, just things like that.

Page 73

1  They were not major.
2          But, again, it really wasn't worth the
3  point of negotiating it fully until we knew the real
4  numbers.  Because as it turned out, it only ended up
5  being 739 people, and it wasn't particularly
6  important which county it was in the scheme of
7  717,000 voters or citizens in a district.
8  Q.          You said you then took that information
9  from those meetings with the representatives and
10 roughed out a map.  What does that mean?
11 A.          It means I took the -- we had the
12 estimates on Maptitude at the state reapportionment
13 office.  And I just roughed without -- I mean, I
14 didn't get anywhere close to zero deviation because
15 there was no point in it.
16          I just generally roughed out based on
17 what we had discussed in DC, knowing that it was all
18 going to change when we got the real numbers.  But
19 just explored some of the potential.
20 Q.          And to be clear, for somebody that
21 doesn't draw maps, what does "roughed out" mean?
22 A.          Meaning assigned various counties to
23 districts just in an effort to get things closer to
24 the ideal population.
25 Q.          Kind of playing with the numbers, just

Randy Hinaman
December 09, 2021

Page 74

1  kind of seeing what works as a preliminary
2  standpoint, I guess?
3  A.          Yes.  And just to be clear, that was all
4  on total population.  Because I certainly didn't
5  have the ability or trust the internals of any of
6  those -- I mean, I wouldn't have trusted like BVAP
7  or anything else to the extent it wouldn't have made
8  any sense to look at it at that point.
9  Q.          Did you have any data on the black
10 voting age population at that --
11 A.          I don't know what the estimates had.
12 But I didn't even look at it because I knew it
13 wasn't going to be significant to what we were
14 doing.
15 Q.          Did you do anything else before you
16 received the official census data in August of 2021?
17 A.          No.
18 Q.          Did you review any other materials in
19 that time frame before August 2021?
20 A.          Obviously, I reviewed the guidelines and
21 had discussions with the two chairs of how we will
22 proceed once we get the data in terms of all the
23 maps.
24 Q.          What were those discussions like?
25 A.          Just mostly timing and how we would --

Page 75

1  how we would go forward.  And hopefully we could get
2  some consensus on the state school board members and
3  some consensus with the congressional members.
4            And, obviously, the house map I couldn't
5  do anything with until we got the real numbers.  The
6  senate map I could do next to nothing with.  I mean,
7  I could look at a few of the more rural districts
8  because they were whole counties.  But once you got
9  into major metropolitan areas, I couldn't come up
10 with too many suggestions for that then.
11 Q.          Other than Pringle and McClendon, did
12 you meet with any other members of the Alabama
13 legislature?
14 A.          I don't believe so at that time.
15 Q.          And "that time" being before August
16 2021, correct?
17 A.          Correct.
18 Q.          Did you review any election returns in
19 that time frame?
20 A.          I did not.
21 Q.          Did you review any voter registration
22 info in that time frame?
23 A.          I did not.
24 Q.          Did you review any voter primary
25 participation data in that time frame?

Page 76

1  A.          No, sir.
2  Q.          And then in August 2021, you received
3  the official census data, correct?
4  A.          Correct.
5  Q.          What did you do once you received that
6  data?
7  A.          Well, the State received it.
8  Q.          And then ultimately it was passed on to
9  you, correct?
10 A.          Well, it was -- I used the state
11 computer.  So their -- that data was then given to
12 Maptitude.  This is my understanding.  I did not do
13 any of this.
14            That data was given to Maptitude, and
15 Maptitude turned it into their workable -- put it
16 into their program and sent it back to the State.
17 And the State loaded it into their computers, which
18 all took another week.  And then I was able to
19 manipulate it on -- use it on a computer at that
20 point.
21 Q.          So walk me through that.  So Maptitude
22 is a software on a computer, correct?
23 A.          Yes.
24 Q.          A map-drawing software?
25 A.          Correct.

Page 77

1  Q.          Is it the same software that you had
2  used previously in drawing maps?
3  A.          I used it in 2011, yes, sir.
4  Q.          Did you ever use it before then?
5            THE WITNESS:  I used it in 2011.  The
6  State used ESRI.
7  A.          Excuse me?
8  Q.          Did you use it before 2011?
9  A.          I don't think so.
10 Q.          And you were clarifying with Mr. Walker
11 that you used in 2011 --
12 A.          Yeah.  In 2011, I had a computer, and I
13 had Maptitude on it.  The State used -- the State of
14 Alabama used a different software, I think, called
15 ESRI.
16            THE REPORTER:  Called what?
17 A.          ESRI.
18 Q.          Can you spell that?
19 A.          I don't know.
20            MR. WALKER:  E-S-R-I, all capital
21 letters.
22 Q.          And what is ESRI?
23 A.          It's just a -- it's similar to Maptitude
24 software for using the census data.
25 Q.          So in 2011, you drew the map using your

Page 78

1  own computer and your own software?
2  A.          Correct.
3  Q.          Was that then imported into ESRI for the
4  State?
5  A.          Yes, sir.
6  Q.          The file types can be imported from one
7  to the other?
8  A.          Yes, sir.
9  Q.          Then in 2021, you did not use your own
10 computer and software, correct?
11 A.          That's correct.
12 Q.          You used the State's computers and
13 software?
14 A.          Entirely.
15 Q.          Where was that physically?
16 A.          In the reapportionment office at the
17 state house, Room 317.
18 Q.          So any time that you wanted to actually
19 work on redrawing the map, you had to --
20 A.          Physically be there.
21 Q.          How often --
22 A.          Sorry.  I didn't mean to finish your
23 sentences.
24 Q.          That's fine.  And we're doing a pretty
25 decent job.  But let's try to remember to let each

Page 79

1  other finish so that the court reporter can type
2  everything down.
3           How often -- starting in August 2021,
4  how often would you go to the -- what did you say it
5  was?  The reapportionment office?
6  A.          Reapportionment office.
7  Q.          How often would you go to the
8  reapportionment office after August 2021?
9  A.          Once the -- once the material was loaded
10 into the computer, which was probably the last week
11 of August maybe, I was there once or twice a week
12 for the next week or so.  And then after that, I was
13 there four or five days a week until we were through
14 the special session.  I basically lived in
15 Montgomery.  For all intents and purposes, I lived
16 in Montgomery for a couple of months.
17 Q.          From, say, the beginning of September
18 through the end of October?
19 A.          Yeah.  Certainly Labor Day until the end
20 of October.
21 Q.          Would you work on weekends, as well?
22 A.          Rarely.  I mean, once we got very close
23 to the session, yes.  But not -- not normally.
24 Q.          Of the four maps you were -- you were
25 working on all four maps in that time frame, right,

Page 80

1  starting in August 2021 through October 2021?
2  A.          Yes.
3  Q.          And all four maps, you were doing the
4  same process using the State's computers and using
5  Maptitude, correct?
6  A.          Correct.
7  Q.          Were there any of those maps that took a
8  significantly larger portion of your time to draw?
9  A.          Well, obviously, including meetings with
10 members.  105 house members are significantly more
11 meetings than, you know, seven for congress and
12 eight for school board.
13           So, obviously, the house map probably
14 took a lot longer just in terms of meeting with 105
15 different -- I didn't meet with everybody.  But the
16 vast majority of 105 people -- and sometimes more
17 than once -- took a lot longer than meeting with
18 seven congressmen, for example.
19 Q.          In addition to meeting, I assume that
20 drawing 105 districts probably takes a lot more of
21 your time to do than just drawing seven.  Is that
22 fair?
23 A.          That's fair.
24 Q.          If you had to put very rough percentages
25 on the amount of time you spent on the congressional

Page 81

1  map versus the other ones, about how much of your
2  time would you say you spent?
3  A.          Now you're -- now you're making me a
4  lawyer again.  And I'm not good at this.
5           I really -- I don't really know how to
6  do that.  I mean, you would be correct that the
7  majority -- I mean, I put more time into the house
8  map than I put into the state school board and the
9  congressional.  But I really don't have a way to
10 quantify that.
11 Q.          Did you put more time into the senate
12 map, as well?
13 A.          Yeah.  Obviously, it's 35 members versus
14 seven or eight.  It just takes longer to do the
15 meetings and follow-ups and so forth.
16 Q.          And the state school board --
17 A.          Is eight members.
18 Q.          Eight members.  Did that take you about
19 the same amount of time to draw as the --
20 A.          Yeah.
21 Q.          Sorry.  Let me make sure that I can
22 finish.
23           Did drawing the state school board map
24 take you about the same amount of time as it did for
25 drawing the congressional map, given that they have

Page 82

1  about the same number of districts?
2  A.        Yes.
3  Q.        Going back to the software, this
4  Maptitude software, you said that it took about a
5  week for the census information to be uploaded; is
6  that correct?
7  A.        Yeah, that's what I said.
8  Q.        What does that mean?
9  A.        Again, this was not part of my
10  responsibility.  But the State got the data, as I
11  understood it, and gave it to Maptitude.  Maptitude
12  translated it into their software and sent it back
13  to the State to be loaded on the State computer.
14            But, again, this is all my secondhand
15  knowledge of what was going on.  I was not doing
16  this.
17  Q.        From your perspective, once you arrived
18  around the end of August looking at Maptitude and
19  the software, you were able to see what information
20  has been uploaded, correct?
21  A.        Well, once it's -- yeah.  Once it's
22  uploaded, yes.
23  Q.        What sort of information is -- was
24  available to you on the Maptitude software regarding
25  the districts?

Page 83

1  A.        Once it's all loaded in, I have, you
2  know, total population and voting age population and
3  race down to the block level.
4  Q.        Is there any other information that's
5  available to you in Maptitude?
6  A.        I don't believe so.
7  Q.        Did you, yourself, upload any additional
8  information into Maptitude?
9  A.        I did not.
10  Q.        Did you review any other data in
11  preparing the maps?
12  A.        I did not.
13  Q.        Did you meet with anyone between August
14  2021 and the time that you submitted the maps before
15  the special session in furtherance of drawing the
16  2021 congressional map?
17  A.        Well, I met with virtually all of the
18  officeholders.
19  Q.        You met with each of the seven
20  congressional representatives again?
21  A.        Oh, yeah.  I had Zoom calls with -- with
22  them.  And then -- are you talking just
23  congressional now, or all of it?
24  Q.        Focusing on the 2021 congressional map.
25  A.        Yes.

Page 84

1  Q.        Who did you meet with to discuss the
2  drawing of the map between August 2021 and when you
3  submitted the map in the week before the special
4  session?
5  A.        Once we had the real data, I went back
6  and had Zoom calls with all of the members of
7  congress or their -- or their chief of staff to talk
8  about what the differences were from the estimates
9  versus the actual census data and to reiterate, you
10  know, what we discussed in May, what was still
11  operable and what needed to be slightly
12  revised based on what our thoughts were.
13            Then after those round of Zoom calls, I
14  went back and drew a proposed map.  Which I then did
15  another round of calls, Zoom calls with, to look at
16  the final -- semifinal, final version, I guess.
17  Q.        In those meetings, did you discuss
18  anything with the representatives other than changes
19  that needed to be made for population deviation?
20  A.        No.
21  Q.        How many meetings would you say you had
22  with each of the representatives in that time frame?
23  A.        It varied.  For example, Mo Brooks would
24  be zero because he again was not interested to
25  participate.  Others took, you know, three, four,

Page 85

1  five phone calls.  Some were one or two.
2            In the final end, Representative Palmer
3  decided not to do the final call.  So I didn't have
4  a final call with him.  But everybody else, I had at
5  least two, if not more.
6  Q.        Were all of the meetings with the
7  representatives from August 2021 through the special
8  session by Zoom?
9  A.        Yes.
10  Q.        When you had those meetings, would you
11  share your screen to be able to show what the map
12  looks like?
13  A.        Exactly, yes.
14  Q.        Did you discuss with each of the
15  representatives the map as a whole or just their
16  specific districts?
17  A.        Their specific districts and an adjacent
18  district if there was some change there.
19  Q.        You stated for the 2011 congressional
20  map that you were actually hired by the seven
21  congressional representatives, correct?
22  A.        Correct.
23  Q.        That was not the case for 2021, correct?
24  A.        That's correct.
25  Q.        Why not?

Randy Hinaman
December 09, 2021

Page 86

1  A.        That was not my -- the leadership
2  decided that they would, you know, hire me through
3  the 501(c)(4), which -- which is how they hired me
4  for legislative.  I did the legislative maps in
5  2021, and I guess they preferred that model over the
6  other one.  I don't know.  That was their choice,
7  not mine.
8  Q.        Did you receive any other instructions
9  or requests from the congressional representatives
10 other than changes to make to account for population
11 deviation?
12 A.        No.
13 Q.        Did you meet with any members of the
14 Alabama state legislature to discuss the 2021
15 congressional maps?
16 A.        Just -- just the two co-chairs, two
17 chairs.
18 Q.        And that's --
19 A.        Senator McClendon and Representative
20 Pringle.
21 Q.        What did you discuss with Senator
22 McClendon and Representative Pringle?
23 A.        I would just update them on our progress
24 and discussions with various members.  And to the
25 extent that there were conflicts like the one I

Page 87

1  described between the 1st and the 2nd, I just
2  updated on that in case they were to receive a call
3  from somebody, they would know what was happening.
4  Q.        In these meetings with Senator McClendon
5  and Representative Pringle, were you pretty much
6  just providing information to them?
7  A.        Yeah, pretty much.
8  Q.        Did you receive any feedback or
9  particular requests from them about how to draw the
10 map?
11 A.        No.
12 Q.        Beyond anything that you were told from
13 the congressional -- U.S. congressional
14 representatives, were you given any instructions or
15 requests about how to draw the 2021 congressional
16 map from anyone?
17 A.        No.
18 Q.        And how many times did you meet with
19 Representative Pringle and Senator McClendon in
20 preparation for drawing the 2021 congressional maps?
21 A.        I don't -- I mean, this was during the
22 course in time when they were also in town doing
23 meetings with their colleagues.  So maybe I updated
24 them every other week.  It was rather -- I mean, it
25 wasn't a formally structured we meet every Tuesday

Page 88

1  at 10:00 o'clock.  It was just when they were both
2  there or singularly there, I would just give them a
3  quick update.
4  Q.        Were these updates by phone or email or
5  in person?
6  A.        Usually in person.
7  Q.        Were there ever communications by email
8  with them?
9  A.        No.
10 Q.        Did you attend any of the public
11 hearings in preparation for the 2021 congressional
12 maps?
13 A.        I didn't.  They were happening
14 simultaneously with me being in Montgomery.  And I
15 would occasionally walk in the room while they were
16 happening to talk to somebody else or whatever.  But
17 I didn't officially attend them.
18 Q.        There were a few that you walked into
19 the room while they were going, you said?
20 A.        Well, they were being done in an
21 adjacent room, and I occasionally walked in.  And I
22 would also occasionally -- either the co-chairs or
23 Dorman Walker or somebody would come back and update
24 me as to something somebody said if they thought it
25 was significant to my drawing.

Page 89

1  Q.        Do you recall what any of those sort of
2  comments would have been?
3  A.        Yeah.  For example -- and this was
4  already in process, so it wasn't a tremendous shock.
5  But there were comments, for example, in the
6  Montgomery meeting that they didn't want to be split
7  into three districts as they were in 2001, that they
8  would prefer Montgomery not -- probably they
9  preferred it not to be split at all.  But if it were
10 going to be split, to certainly not three ways and
11 have it be two, which was a feature of a map I was
12 already working on.  But things like that.
13 Q.        Do you remember any other specific
14 feedback that you received from the public hearings?
15 A.        Just areas like the Shoals area wanted
16 to be kept as intact as possible.  And people in
17 Madison and Morgan wanted to be -- they thought
18 there was obviously a lot of community of interest
19 between those areas in north Alabama.  People in
20 Baldwin and Mobile wanted to be kept together.
21 There was a lot of community of interest between
22 those counties.  Things like that.
23 Q.        When you refer to "the Shoals area,"
24 you're referring to Muscle Shoals?
25 A.        Yes.

Page 90

1  Q.        Any other specific feedback that you
2  recall receiving from the public hearings?
3  A.        Not on congressional. There was a lot
4  of feedback on state maps that we also talked about.
5  Q.        And did you ever personally sit in on
6  any of these hearings or hear anything that was
7  being said personally?
8  A.        I did for ten-minute snippets
9  occasionally when I was waiting to talk to somebody
10 in that room.
11 Q.        Did you gather anything from the time
12 that you spent in the hearing personally?
13 A.        Nothing other than observations that I
14 relayed to you a minute ago.
15 Q.        You mentioned that Montgomery County,
16 the public hearings provided feedback that they
17 didn't want to be split. Do you remember why that
18 was?
19 A.        I think -- I think both in Montgomery
20 County and most any county when you have split
21 counties or split precincts, there's confusion as to
22 who somebody's -- who their representative may be.
23           And it was a -- it was obviously a
24 guideline of the committees on all these maps to try
25 to split less precincts and less counties.

Page 91

1  Q.        Do you know when Montgomery County was
2  originally split?
3  A.        Originally split?
4  Q.        Correct.
5  A.        No. I mean -- no, I don't.
6  Q.        The first map you drew was in 1992. Was
7  Montgomery County already split prior to that?
8  A.        I have no idea. I'm sorry. I don't
9  even remember the map I drew, whether it was split,
10 to be honest with you.
11 Q.        Did any of the information that you
12 received from the public hearings impact the way you
13 drew the 2021 congressional map?
14 A.        No, other than things like I said, not
15 splitting Montgomery three ways, putting as much of
16 the Shoals area together, keeping Mobile and Baldwin
17 together, keeping Madison and Morgan together.
18 Q.        Was that something that you specifically
19 made changes to your map to accommodate?
20 A.        No. Most of those features were already
21 happening. It just -- I kept it in mind. For
22 example, when -- we eventually had to split
23 Lauderdale County between 5 and 4. And when we were
24 doing that, I was trying to keep Florence and Muscle
25 Shoals together as much as possible when we were

Page 92

1  doing that split. So yes, it was in my mind when we
2  were, for example, doing that split.
3  Q.        Other than the accommodations for the
4  Lauderdale, Muscle Shoals area, did any of the
5  public feedback that you received from the public
6  hearings tangibly impact a change that you made on
7  the map?
8  A.        Not so much a change. But it did -- it
9  did confirm that our theory of putting -- not
10 splitting Montgomery three ways was a worthy goal.
11 And I worked to get Congressmen Rogers to agree to
12 come out of Montgomery County because he was
13 partially in Montgomery County.
14 Q.        Since we're talking about it, this may
15 help a bit.
16
17           (Plaintiff's Exhibit 5 was
18           marked for identification.)
19
20 Q.        I'm handing you Exhibit 5. I don't want
21 this to be a memory test for you. So this is a copy
22 of the 2021 --
23 A.        I've had enough -- I've had enough of
24 those already.
25 Q.        This is a copy of the 2021 congressional

Page 93

1  map. Do you recognize this?
2  A.        I do.
3  Q.        Does this appear to be a true and
4  correct of the 2021 congressional map?
5  A.        It does.
6  Q.        We were talking about Montgomery County
7  here not wanting to be split.
8  A.        Three ways, yes.
9
10           (Plaintiff's Exhibit 6 was
11           marked for identification.)
12
13 Q.        I'm also going to hand you what's being
14 marked as Plaintiff's Exhibit 6 for your reference.
15 This is a copy of the 2011 congressional map.
16           So looking at Montgomery County, it
17 looks like in -- well, first off, Plaintiff's
18 Exhibit 6, does that appear to be a true and correct
19 copy of the 2011 congressional map, to your
20 knowledge?
21 A.        It does.
22 Q.        We were -- and you used this 2011
23 congressional map as the starting point in drafting
24 the 2021 congressional map, correct?
25 A.        I used the cores of the existing

Page 94

1 districts as a starting point, yes.

2 Q.        Is that different from using this map as

3 the starting point?

4 A.        I don't know.  I don't think so.

5 Q.        When you began drawing the 2021

6 congressional map, you didn't start from scratch,

7 right?

8 A.        No.  Correct.

9 Q.        You started using the 2011 congressional

10 map?

11 A.        Correct.

12 Q.        Looking at Montgomery County, so that

13 was split into three districts in 2011; is that

14 right?

15 A.        That's correct.

16 Q.        Do you know why that was split into

17 three districts at the time?

18 A.        Not specifically, other than, obviously,

19 it had been -- Congressman Mike Rogers in the 3rd

20 District had had an office in Montgomery, that part

21 of Montgomery County, and had represented it for a

22 while and probably didn't -- didn't want to lose

23 that base of support and financial support and so

24 forth.

25 Q.        In the 2011 congressional map, District

Page 95

1 7 reaches into a portion in the middle of Montgomery

2 County.  Do you know why it does that?

3 A.        To gain population for that district.

4 Q.        Was District 7 reaching into a portion

5 of Montgomery County in the prior 2001 congressional

6 map?

7 A.        I don't know.

8 Q.        Do you remember if Montgomery County --

9 do you remember if District 7 reached into a portion

10 of Montgomery County in the 1992 congressional map

11 that you drew?

12 A.        I do not remember, no.  I'm sure

13 somebody has a map and could tell me.  But I don't

14 know.

15 Q.        So it looks like from the 2011

16 congressional map to the 2021 congressional map, you

17 were able to take District 3 out of Montgomery so

18 that it's not split three ways anymore and is only

19 split two ways; is that correct?

20 A.        That's correct.

21 Q.        Is there a reason why it still needed to

22 be split into two different districts?

23 A.        Yeah.  I mean, obviously, the 7th

24 District was underpopulated.  So if you took it all

25 the way out of Montgomery, then you would have to

Page 96

1 add a number of different counties to make up that

2 population.

3 Q.        Well, it looks like District 7 also

4 includes only a portion of Tuscaloosa County and

5 Jefferson County, correct?

6 A.        That's correct.

7 Q.        So could you not have taken more of

8 either Tuscaloosa County or Jefferson County and

9 then been able to leave Montgomery County as being

10 solely in one district?

11 A.        Well, yeah, it would have been possible

12 certainly in Jefferson.  I don't know about

13 Tuscaloosa.  I don't think actually -- I think there

14 are many more people in the 7th District portion of

15 Montgomery than there are in the 4th District

16 portion of Tuscaloosa.  But yes, certainly in

17 Jefferson that would have been possible.

18        But as you know, they -- these all have

19 to fit back together at the end.  So what might have

20 been a perfect map for somebody in Montgomery may

21 not have created a perfect situation for whatever

22 member represented Jefferson or wherever.

23 Q.        Did you consider moving -- did you

24 consider making Montgomery County solely District 2?

25 A.        I did not.

Page 97

1 Q.        Why not?

2 A.        Because, again, I didn't think it --

3 while that may look like geographically not a very

4 large area, it has a considerable number of voters

5 in it.  And it would have been hard to take that out

6 of 7 and make up the population somewhere else.

7        About the only place, as you pointed

8 out, to do that might have been Jefferson.  But,

9 again, we have two representatives in Jefferson

10 County right now.  And it would have been hard to

11 eliminate one from that process.

12 Q.        Is there anything in particular about

13 this specific portion of Montgomery County that's in

14 District 7 that makes it a community of interest or

15 something that ties it into District 7 versus

16 District 2?

17 A.        Not necessarily.  I mean, obviously,

18 geographically it's next to -- it's adjacent to

19 Lowndes County.

20 Q.        Did you look at racial data in including

21 that portion of Montgomery County in District 7?

22 A.        I didn't.  When we started doing -- I

23 didn't initially.  When we started filling in this

24 -- all these discussions we've had up until now have

25 all been based on total pop.  I didn't look at race

Randy Hinaman
December 09, 2021

Page 98

1 at all on the computer when we were adding folks to
2 these districts or subtracting folks from these
3 districts.
4          So at this point, I've basically just
5 been looking at total pop and where do you get the
6 total pop to get the districts back to ideal
7 population.  So at that point, there was no
8 discussion of race.  It was all a discussion of
9 total pop.
10 Q.          You say "at this point."  Where are we
11 talking in the timeline?
12 A.          Up until -- up until we finished the
13 map.
14 Q.          Finishing the map being the week before
15 the special session?
16 A.          Correct.
17 Q.          So is it your testimony that you did not
18 look at race at all in 2021 before submitting the
19 maps to the special session?
20 A.          No, I did not look at it up until the
21 week before we submitted the maps, when at that
22 point we did turn on race and look at the racial
23 breakdowns in the various maps.
24 Q.          Why did you look at the racial breakdown
25 that week before the special session?

Page 99

1 A.          Well, to -- obviously, we wanted to see
2 what the, you know, outcomes of our changes were.
3 Q.          What do you mean?
4 A.          We wanted to see what -- the changes we
5 had made to get the population balanced among all
6 these districts, if it changed any of the, you know,
7 racial makeup of the districts.
8 Q.          Why did you want to know that?
9 A.          Well, one of our guidelines is to comply
10 with the Voting Rights Act.
11 Q.          And you say "we wanted."  Who is "we"?
12 A.          The two co-chairs, myself, and legal
13 counsel.
14 Q.          "Legal counsel" being Mr. Dorman --
15 A.          Yes.
16 Q.          -- Walker?
17 A.          Yes.
18 Q.          And prior to that week before the
19 special session, it's your testimony that you did
20 not look at any of the racial data at all for any
21 of the districts in drawing the 2021 congressional
22 map?
23 A.          That's correct.
24 Q.          What data did you look at?
25 A.          Just -- just total pop and geography.

Page 100

1 Q.          Anything else?
2 A.          That's it.
3 Q.          Other than modifying the existing
4 district lines to account for population changes,
5 did you make any other changes from the 2011
6 congressional map?
7 A.          I'm not sure I follow that.
8 Q.          You made changes to the 2011
9 congressional map for the 2021 map based on changes
10 in population, correct?
11 A.          Correct.
12 Q.          Did you make any changes based on any
13 other factors?
14 A.          Are we talking -- we're talking the 2021
15 map?
16 Q.          Correct.  So in drawing the 2021 map,
17 you made certain changes from the prior map based on
18 changes in population, correct?
19 A.          Correct.
20 Q.          Did you make any changes based on any
21 other factors?
22 A.          No.  I didn't make any changes.
23 Obviously, where members lived was a consideration.
24 I certainly would be mindful -- when I was moving a
25 precinct in Jefferson County, for example, I

Page 101

1 couldn't move Congresswoman Sewell out of her
2 district, for example.  But I didn't make any
3 changes based on that.
4 Q.          Other than population data and race data
5 starting the week before the map was submitted, did
6 you review any other data about the constituents or
7 the districts when drawing the 2021 map?
8 A.          I did not.
9 Q.          If any changes were made to the 2021
10 map, would you have been the one to physically make
11 those changes on the computer?
12 A.          Yes.
13 Q.          Was there anyone else who physically sat
14 on the computer and made any changes for the 2021
15 map?
16 A.          I don't believe so.  I mean, Donna
17 Loftin, who heads the reapportionment office,
18 certainly was capable of doing that.  But I don't
19 believe she ever -- she's not really authorized to
20 change a map, I guess, without me asking her to.
21 Q.          Do you know if she made any changes?
22 A.          I don't believe she did, no.
23 Q.          Did anyone else assist you in drawing
24 the map?
25 A.          Nobody assisted me in drawing the map.

Randy Hinaman
December 09, 2021

Page 102

1  Q.        When did you have a -- when did you
2  first have an initial draft map completed?
3  A.        Using the real data?  I mean, not an
4  estimate.
5  Q.        Did you have an initial draft made from
6  the estimates?
7  A.        I had a -- I roughed -- again, it wasn't
8  -- it wasn't something that would have -- it wasn't
9  to zero deviation.  It was just roughed-out
10 counties.
11           So yes, when I came back from my May
12 meetings, I roughed out a map using the estimates on
13 Maptitude just to get a feel for what areas needed
14 to be added and subtracted from various districts.
15           But, again, it was -- it was not -- it
16 was not to deviation and it was knowing that the
17 estimates were going to be off by thousands, if not
18 tens of thousands, which they turned out to be.
19 Q.        When was that draft completed?
20 A.        The end of May.
21 Q.        Did you save a copy of that draft?
22 A.        No.
23 Q.        After that, when was the next draft
24 using official data completed?
25 A.        After my round of calls in September.

Page 103

1  So probably mid -- mid to late September would have
2  been the next draft.  And then I did a round of
3  calls to go over those maps and make any last
4  changes before the last week.
5  Q.        A round of calls being the calls that
6  you discussed with the U.S. congress
7  representatives?
8  A.        Yes.
9  Q.        Did you make any further changes to the
10 draft based on any feedback you received from those
11 calls?
12 A.        Very minorly.  Congresswoman Sewell, I
13 had split a precinct in Montgomery County that she
14 did not want split.  So I put it back together and
15 split in a different -- an adjacent precinct.  But
16 very, very minorly.
17 Q.        What precinct was that?
18 A.        It was the Acadome precinct.  I had
19 split the university into two different districts,
20 and she, I think wanted it all in her district.  So
21 I put that back together.
22 Q.        Do you know why she wanted that all in
23 her district?
24 A.        I don't.  I mean, other than that was
25 one of her principles in this redistricting process.

Page 104

1  She felt strongly about picking up facilities and
2  universities and things rather than just random
3  citizens.
4  Q.        And what precinct did you take out from
5  District 7 in exchange?
6  A.        Well, it was a split at an adjacent
7  precinct.  Whitfield, I think, was the name of it.
8  Q.        How do you choose that precinct?
9  A.        It just was adjacent to it.
10 Q.        That was the only factor?
11 A.        That was the only factor.
12 Q.        So you had the draft completed, you
13 said, mid September?
14 A.        Yeah.  And just to give a more complete
15 answer, I also had to do a -- change the split a
16 little bit in Lauderdale based on conversations with
17 Congressman Aderholt.  I had conversations with
18 Representative -- Congressman Moore's
19 representative, Bill Harris, about he would have
20 preferred a change in Monroe rather than the way I
21 did it in Escambia.
22           So they were each -- not every district.
23 But a number of districts had these little minor
24 things that we talked through at that point.
25 Q.        Beyond any minor changes -- and I assume

Page 105

1  this is more kind of a precinct-by-precinct type
2  change that you're referring to there, correct?
3  A.        Yes, sir.
4  Q.        Beyond that, were there any changes that
5  you made based on those calls that you would
6  consider to be significant changes?
7  A.        No.
8  Q.        So once you had the draft completed in
9  mid September and then had the calls with the
10 various representatives to go over that, then you
11 made whatever minor changes you could based on that
12 feedback.
13           When did you have the next draft
14 completed?
15 A.        Going into the last -- the next to last
16 week of October.  And in some of these -- as you
17 well know, with congressional schedules, it's not
18 like I had seven congressmen lined up to talk to me
19 at 9:00 o'clock on a Monday morning.  This took over
20 a course of weeks.  I would, you know, schedule, and
21 move and change for voting schedules and all the
22 wonderful things that go on with dealing with
23 congressmen.
24 Q.        And in that same time frame, you were
25 also drawing three other maps?

Randy Hinaman
December 09, 2021

Page 106

```
 1  A.          Correct.
 2  Q.          And meeting with all of the
 3  representatives and senators and all of that?
 4  A.          Yes, sir.
 5  Q.          Was there any other drafts that you had
 6  other than the first one that you made using the
 7  unofficial data in the summer of 2021, the next
 8  draft that you made using the official data in mid
 9  September 2021, and then the draft that you had
10  based on the congressional representatives' feedback
11  that was completed the week before the special
12  session in October of 2021?  Were there any other
13  drafts that you made of the 2021 congressional map?
14  A.          No.
15  Q.          Between those last two drafts that we
16  discussed, between September 2021 and the special
17  session, did you meet with anyone else to discuss
18  the redrawing of the 2021 map, congressional map,
19  other than the seven representatives and Senator
20  McClendon and Representative Pringle?
21  A.          And legal counsel.
22  Q.          Anyone else?
23  A.          No.
24  Q.          At that time, did you consider
25  Mr. Walker to be your attorney?
```

Page 107

```
 1  A.          I considered him to be the
 2  reapportionment committee's attorney.
 3  Q.          Did you consider him to represent you
 4  personally?
 5  A.          I don't know how to answer that.  I
 6  didn't -- I didn't feel I needed representation at
 7  that point personally.
 8  Q.          Did you have any sort of retention
 9  agreement with Mr. Walker or his office?
10  A.          No.
11  Q.          Once you had the draft completed of the
12  2021 congressional map the week before the special
13  session, who did you provide it to?
14  A.          Well, obviously, all of the members saw
15  their districts.  But they didn't really see the
16  rest of the map.  The members of congress saw their
17  district, but they didn't really -- and adjacent
18  districts.  But they didn't really see the rest of
19  the map.
20           I think at that last week, I went
21  through that map with Representative Pringle and
22  Senator McClendon and Dorman Walker.  Obviously,
23  Donna Loftin, who runs the office, was in the
24  background during most of this.
25  Q.          What sort of feedback did you receive
```

Page 108

```
 1  when you met with Senator McClendon and
 2  Representative Pringle about the draft map?
 3           MR. WALKER:  I'm going to object to
 4  attorney-client privilege to the extent that I was
 5  present in the room and we were having an
 6  attorney-client communication.  If you had any
 7  communications with them that I was not present, you
 8  may answer the question.
 9  A.          There were -- they just looked at the
10  map.  There was nothing substantive in terms of a
11  response.
12  Q.          And are you going to refuse to answer
13  any questions that I were to ask you that would
14  involve any discussions that you had where
15  Mr. Walker was present?
16           MR. WALKER:  I would instruct him not to
17  answer those questions if other conditions
18  indicating it was an attorney-client privilege were
19  present.
20           Let me -- let me clarify that for you.
21  If I believed we had a conversation that was an
22  attorney-client privilege, I would -- I would
23  instruct him not to answer the question.  I don't
24  think that all the conversations I had with him were
25  covered by the privilege.
```

Page 109

```
 1           MR. THOMPSON:  When you say you don't
 2  think that all of the conversations you had with
 3  him, do you mean nonsubstantive conversations like
 4  lunch and dinner?
 5           MR. WALKER:  Certainly that would be
 6  included.  What I'm saying is there -- I can think
 7  of times when he and I were speaking, although I may
 8  not know exactly what we were talking about, when
 9  there were other people in the room who were not
10  within the privilege.  And we may have been talking
11  about the map.  I just don't know.
12           But there were certain times when I
13  reviewed with him specifically the map.  And I would
14  contend that that's covered by the attorney-client
15  privilege.
16           MR. THOMPSON:  Understood.  And you
17  would instruct him not to answer on those.
18           MR. WALKER:  Yeah.
19  Q.          And would you follow that instruction?
20  A.          Yes.
21  Q.          So walk me through the timeline, then,
22  once you provided the draft to Senator McClendon and
23  Representative Pringle.  What happened with the map
24  at that point?
25  A.          I mean, once it was finalized and they
```

Page 110

1 made no changes to it, it was submitted to be drawn
2 up into a bill and prepared to be presented at the
3 -- be sent out to the members of the reapportionment
4 committee the following Monday and then voted on in
5 committee on Tuesday.
6 Q.        Were there any changes made to the map
7 by the reapportionment committee?
8 A.        No.
9 Q.        Were there any changes made to the map
10 after it was submitted to the legislature?
11 A.        No.
12 Q.        So the version of the map that you
13 completed the week before the special session is
14 identical to the version of the map that was
15 ultimately enacted that we've marked as Exhibit 5,
16 Plaintiff's Exhibit 5, correct?
17 A.        Correct.
18 Q.        Did you save any drafts of the 2021
19 congressional map?
20 A.        No, sir.  The way Maptitude works is it
21 just -- every time you make a change, it saves -- it
22 saves the map at that point.  So previous iterations
23 don't -- don't really exist.
24 Q.        Did you print out any copies of any
25 drafts?

Page 111

1 A.        No.
2 Q.        Do you have any notes that you took or
3 used while drafting the 2021 congressional map?
4 A.        No.  I mean, I'm sure I had a scrap of
5 paper somewhere that said Congressman Moore would
6 rather split Escambia and Congressman Carl would
7 rather split Monroe.  But they were -- all these
8 things were so -- there were not very many of them.
9 There weren't too may.  I didn't need notes to
10 remember that.
11 Q.        Do you have any of those notes saved?
12 A.        No.
13 Q.        If you needed to modify the maps now, do
14 you have any estimate of about how long that would
15 take you to do?
16 A.        Modify in what way?
17 Q.        For instance, are you familiar with what
18 this lawsuit is about?
19 A.        Well, it's three different lawsuits, if
20 I understand it correctly.
21 Q.        What is your understanding of the three
22 different lawsuits?
23 A.        I think two of the -- well, two of the
24 lawsuits I think would have preferred two majority
25 black districts.  And the Singleton lawsuit would

Page 112

1 have preferred sort of a whole county map with
2 two -- I would call them influence districts.
3         THE REPORTER:  What districts?
4 A.        Influence districts
5 Q.        Would that be the same as -- I've heard
6 "opportunity district."  Would "influence district"
7 and "opportunity district" be about the same?
8 A.        Yes, sir.
9 Q.        And what's your understanding of what an
10 influence district or opportunity district is?
11 A.        It would be a district that would be
12 less than a majority of BVAP, but still have a
13 substantial population of minorities that could
14 potentially impact the election of a candidate of
15 their choice.
16 Q.        And when we say "minorities" here
17 specifically, are we referring to the black voting
18 age population?
19 A.        Primarily here in Alabama, you would be
20 referring to the black voting age population.
21 Q.        So if in this case the court were to
22 find that the maps do not comply with the Voting
23 Rights Act or the 14th Amendment and they needed to
24 be modified, do you expect that you would be the one
25 that would be asked to make those modifications?

Page 113

1 A.        I don't have a crystal ball.  I can't
2 predict the future.
3 Q.        Is that something that's covered in your
4 contract?
5 A.        It is not.
6 Q.        If you were asked to modify the map to
7 make changes to comply with the Voting Rights Act or
8 the 14th Amendment, in that situation, do you have
9 any estimate about how long it would take you to do
10 that?
11 A.        No.  I mean, asked by whom?
12 Q.        The Alabama state legislature, the
13 courts, Mr. Walker, any of us.
14 A.        No.  I mean, I -- conceptually, I guess
15 that would depend on what the court deemed changes
16 were.
17 Q.        Is that something that you think you
18 could complete within a month?
19 A.        I would hope so.  I don't know.
20 Q.        Is it something you think you could
21 complete within a week?
22 A.        You're asking me a hypothetical about
23 something that hasn't happened, and I don't have a
24 clue what the changes would be.
25 Q.        When you met with Congressman Sewell,

Randy Hinaman
December 09, 2021

Page 114

1  did you receive any specific instructions from her
2  about how to draw District 7?
3  A.          No, not specifically.  Again, it was
4  more of -- our initial meetings were more of here is
5  what the estimates show, here is -- you're
6  obviously -- the district is going to be
7  underpopulated.  Let's talk about areas where you
8  may -- may pick up population to get closer to the
9  ideal.
10          As I said earlier, she was interested in
11  facilities and universities and some companies and
12  military, like Maxwell, and so forth.  So she was
13  interested in things above and beyond just picking
14  up additional voters or citizens.  So we talked
15  about that briefly.
16          And then we just went through the most
17  likely areas where she could pick up additional
18  population.  And the most likely in my mind, again,
19  to present to her as options were counties that were
20  split.
21          For example, Clarke County was -- under
22  this map, the 2011 map, was split between 7 and 1.
23  We know 1 is going to be over.  We knew -- at the
24  beginning, we didn't know how much.  But we knew 1
25  would be over, and we knew 7 would be under.

Page 115

1          So a logical thing, in my mind anyway,
2  would be let's put Clarke County back together.  And
3  whatever population that is, let's put that into 7.
4          And also we talked about some of the
5  changes that would happen that would cascade to her
6  from north Alabama.  As we knew, District 5 would be
7  over.  The only place District 5 can go to is to
8  District 4 because it's the only district adjacent
9  to it.  And that would then put District 4 over.
10  And one of the options was for her to pick up some
11  more of District 4 in Tuscaloosa.  So we talked
12  about that.
13          And then we talked about potential
14  changes in Jefferson, another area where she could
15  pick up additional population.
16  Q.          You mentioned that she wanted
17  universities in her district.  What were the names
18  of the universities she wanted?
19  A.          She wanted to make sure that whatever
20  changes we made in Tuscaloosa, we kept the
21  University of Alabama in her district.  She was
22  interested in picking up Maxwell Air Force Base in
23  Montgomery, if that was a possibility.
24          As I discussed earlier, I had split a
25  precinct that had a university in Montgomery.  And

Page 116

1  she wanted that in her district not split.  So we
2  talked about things like that.
3  Q.          Do you remember the name of that
4  university in Montgomery?
5  A.          Yeah, I do.  I'm blanking on it at the
6  moment.  Alabama -- is it State?
7          MR. WALKER:  Alabama State, ASU.
8  A.      ASU.  ASU.  Sorry.
9  Q.          Other than those things that you just
10  discussed, did you receive any other instructions or
11  feedback from Congressman Sewell about how to draw
12  District 7?
13  A.          No, not at that time.  We did -- in the
14  next round of those talks after we had real numbers,
15  we did talk about some of the changes in Jefferson.
16          In this -- in the 2011 map, some of the
17  precincts of Homewood -- I think there were three or
18  four Homewood precincts.  Some were in her district,
19  and some were in 6.  She thought that maybe it might
20  make sense for all of them to be in one district.
21  She would be happy if they were hers, which I did.
22          So we talked about a few things like
23  that in the next round of discussions.
24  Q.          Did you discuss anything else with her
25  about how to draw her map?

Page 117

1  A.          No.
2  Q.          Did you discuss race at all with
3  Congressman Sewell?
4  A.          No.
5  Q.          Did she give you any instructions or
6  requests about a certain black voting age population
7  percentage that she wanted in District 7?
8  A.          She did not, other than I think there
9  was -- we both assumed, and I think she would
10  confirm, that she wanted a majority -- a majority
11  black district for her district.
12          And she also, I should add -- there was
13  one other thing.  When we initially asked every
14  member for their home addresses so we made sure we
15  had them inside their own districts, she actually
16  sent in two addresses, knowing that only one of them
17  was her official home address.
18          One of them was also her home -- her
19  mother's home or whatever in Dallas County.  And she
20  wanted -- would prefer that both of those addresses
21  be inside her district.  So that was one request she
22  made.
23  Q.          Was that an accommodation you had to
24  change the map to --
25  A.          No.  They were -- it was already

Page 118

```
 1   happening.  They both were -- they both under this
 2   map were in her district, and they both under this
 3   map were in her district.
 4   Q.            Going back to your prior statement, you
 5   said that you didn't discuss race with Congressman
 6   Sewell; is that correct?
 7   A.            Not at that point.
 8   Q.            Did you at some point?
 9   A.            In the last week, she did ask what was
10   the BVAP of my -- her district.
11   Q.            And what did you tell her?
12   A.            I told her it was 54.22.
13   Q.            And what did she say?
14   A.            She didn't -- I mean, she was
15   comfortable with that, I guess.  She didn't comment
16   further.  She didn't ask me to make any changes, I
17   guess, if that's what you're asking me.
18   Q.            You said before then that you both
19   assumed that she wanted a majority black population.
20   What are you basing that off of?
21   A.            I don't even know if it's an assumption.
22   I think she -- I think she did say that, that she
23   would prefer to continue to have a majority black
24   district.
25   Q.            You think she said that, or you know she
```

Page 119

```
 1   said that?
 2   A.            I think she -- yeah, I think -- I think
 3   she said that.
 4   Q.            But you don't know for certain?
 5   A.            I'm pretty confident she said that, yes.
 6   Q.            Are you certain that she said that?
 7   A.            I'm pretty confident that she said that.
 8   Q.            Just to be clear, pretty confident, but
 9   not 100 percent certain, fair?
10   A.            Sure.
11   Q.            Did she say anything about any sort of
12   percentage of black voting age population that she
13   wanted in District 7?
14   A.            No.
15   Q.            Did you discuss race with any of the
16   other representatives?
17   A.            I did not.
18   Q.            So Congressman Sewell was the only
19   Congressman you discussed race with?
20   A.            Well, she's the only one who asked at
21   the end of the process what her black -- black
22   voting age population was.
23   Q.            Other than the U.S. congressional
24   representatives and Senator McClendon and
25   Representative Pringle, did you speak with any other
```

Page 120

```
 1   Alabama legislators or their staff about the 2021
 2   congressional maps?
 3   A.            No.  Maybe -- maybe right before we went
 4   to the floor, I think I probably had a conversation
 5   with the pro tem and speaker just briefly to say
 6   that the members of congress were reasonably in
 7   agreement on this map.  But it was just sort of a
 8   pro forma discussion, not about the details of the
 9   map.
10   Q.            Did you speak with anyone else?
11   A.            No.
12   Q.            Did you correspond with anyone by email
13   regarding the redistricting process?
14   A.            No.
15   Q.            Did you make any recommendations to the
16   committee, the reapportionment committee, about how
17   the map should be drawn beyond just providing them a
18   copy of the map?
19   A.            No.
20   Q.            Did the reapportionment committee make
21   any requests or recommendations to you about how the
22   map should be drawn or changed?
23   A.            None other than the guidelines they
24   passed.
25   Q.            Did you receive any requests or
```

Page 121

```
 1   instructions about how to draw the 2021
 2   congressional map from anyone else that we haven't
 3   discussed yet?
 4   A.            No.
 5   Q.            Did you receive any feedback from anyone
 6   else that we haven't discussed yet about the way
 7   that the 2021 congressional map was drawn?
 8   A.            No.  I'm assuming you're including
 9   chiefs of staff as a subset of a congressman.
10   Q.            Certainly.  No one other than the
11   congressmen or their chiefs of staff or anyone else
12   that we've discussed?
13   A.            Right.
14                 MR. THOMPSON:  Dorman, I think we've
15   been going a little over an hour.  We're approaching
16   that lunch time.  We could go a little bit longer,
17   or we could go ahead and break now.  What do you
18   prefer?
19                 MR. WALKER:  I'm happy with whatever
20   y'all want to do.
21                 MR. THOMPSON:  Are you hungry, sir?
22                 THE WITNESS:  Not overly.  But I'm happy
23   to --
24                 MR. WALKER:  I usually go to lunch at
25   11:30.  So I'm happy to take a lunch break.
```

Randy Hinaman
December 09, 2021

Page 122

1     MR. THOMPSON:  Let's -- let's take a
2  lunch break, then.
3          MR. WALKER:  All right.
4          THE VIDEOGRAPHER:  We're off the record.
5  The time is 11:42 a.m.
6          (Lunch break was taken.)
7          THE VIDEOGRAPHER:  We are back on the
8  record.  The time is 12:57 p.m.
9  Q.          Mr. Hinaman, before we broke for lunch,
10  we had discussed some of the conversations that you
11  had with the seven U.S. congressmen.  Do you recall
12  that?
13  A.      Yes.
14  Q.          And we went into some specifics about
15  your discussions with Congressman Sewell.  Or
16  Congresswoman Sewell.  Excuse me.  I would like to
17  discuss some of the specifics with the other
18  representatives.  So I just kind of want to go down
19  the line.
20          So starting with Representative Carl in
21  District 1, can you tell me what specifics you
22  recall from your discussions with him?
23  A.          Yes.  But just to be clear, are we --
24  you just want -- over the whole time frame, just
25  capsulize it?  Or are you talking about a specific

Page 123

1  time frame?
2  Q.          At any point in the discussions you had
3  with them in drawing the 2021 congressional map.
4  A.      Okay.  So essentially from May to
5  October?
6  Q.      Correct.
7  A.      Okay.  Yeah.  So we talked about Clarke
8  County which was split, of course, between 7 and
9  District 1.  And we talked that the 1st District
10  would likely be over or was over after we got the
11  real numbers, and that one of the solutions to that
12  would be putting Clarke County back together and be
13  putting it in 7.
14          And then whatever else the overage was,
15  which turned out to be 739 people, that we would
16  take those out of either -- initially we said Monroe
17  or Escambia.  And as it turned out, we fine tuned it
18  to Escambia.  And that's where we made that change.
19          And those are basically the discussions
20  with the 1st District congressman.
21  Q.          Did he have any objections to putting
22  all of Clarke County in District 7?
23  A.      He did not.
24  Q.      All right.  Tell me what specifics you
25  recall from your discussions with Congressman Moore

Page 124

1  in District 2.
2  A.          Well, we talked again about making
3  Montgomery County only split between 7 and 2 and
4  getting the 3rd District out of Montgomery County,
5  which was good because 2 was under anyway.  So they
6  needed to pick up some people.
7          Initially I said, well, depending on
8  what the numbers are, we might need to split off a
9  little bit of Elmore to balance out 3 if we're not
10  splitting Montgomery.  But as it turned out, we
11  didn't have to do that.  We did -- we did make some
12  changes to 3 in Coosa and Chilton, but we made no
13  further changes in the 2nd.
14          We talked a little bit about the
15  Escambia and Monroe thing.  Again, he would have
16  preferred not to have picked up another county.  But
17  unfortunately, that was not in the cards by 739
18  people.  So he needed to -- he did end up picking up
19  Escambia.
20          And we talked about just geographically
21  making the 7th District a little more compact in
22  Montgomery from where the 2011 lines were versus to
23  what they are now in the 2021 plan.
24          And at the end of it -- I mean, we had
25  some discussions about Maxwell going into the 7th,

Page 125

1  which surprisingly he wasn't too excited about
2  initially, but at the end was comfortable with I
3  think primarily because there was some talk of
4  another BRAC, base closing commission.
5          And Congressman Moore probably thought
6  it would be helpful to have Terri representing part
7  -- that part of Maxwell that she would have, and he
8  represents another part of Maxwell, the annex, in
9  his district.  So two congresspeople fighting that
10  was maybe better than one.
11  Q.      Where is Maxwell?
12  A.      Maxwell is in the northern little part
13  of Montgomery County here that was -- in 2011 was in
14  the 2nd, but is now in the 7th.
15  Q.      With Congressman Sewell, especially in
16  the area you were just discussing there, it had
17  gotten as granular was this college or whatnot.  Did
18  you have discussions to that detail with either of
19  the two representatives in District 1 or 2?
20  A.      No, other than the Maxwell, Maxwell
21  annex thing we just talked about with Congressman
22  Moore.  He wanted to make sure he still had one of
23  them.  And he has the annex one, which is further
24  west in Montgomery, but not the actual base itself.
25  Q.      Do you know why he wanted that in his

Page 126

1 district?
2 A.          Again, so they had two voices on base
3 closing issues rather than one.
4 Q.          Do you recall anything else specifically
5 from your discussions with Congressman Moore?
6 A.          No.
7 Q.          How about Congressman Rogers in District
8 3?
9 A.          Well, we talked briefly.  There was a
10 little piece of Cherokee County that was split off
11 in the last redistricting, which was really somewhat
12 needless.  So we talked about putting that back
13 together.
14          We talked about again him getting out of
15 Montgomery County so that it would only be split two
16 ways instead of three.  And then we talked about
17 what that might mean in terms of where he would pick
18 up.
19          Coosa had been in the 3rd in some
20 earlier maps, meaning 2001 or sometime back in the
21 past.  So he was fine picking up Coosa County from
22 6.  And then for population -- obviously, population
23 reasons, he needed a little more than that.  So we
24 took, I think, like 12,000 people from Chilton and
25 put it into 3 to get his population to where it

Page 127

1 needed to be.
2 Q.          Anything else you recall?
3 A.          No.
4 Q.          What about Congressman Adderholt in
5 District 4?
6 A.          Yeah, I talked to him numerous times.
7 Part of it is, obviously, he was going to pick up a
8 lot of folks from the 5th district.  And there was
9 initial discussion on which end of the 5th, should
10 we take them from Jackson County or should we take
11 them from Lauderdale, and how was the best way to do
12 that.
13          And we had a couple of different
14 discussions about that, and finally decided that
15 putting the Shoals -- Muscle Shoals area back
16 together as much as possible in Lauderdale was the
17 preferable way to do that.  And that's what we
18 talked about.
19          And then, obviously, that required him
20 to lose some of Tuscaloosa, a few precincts in
21 Tuscaloosa, to make up for -- to get the population
22 to equal out.
23          And also he had a little chunk of Blount
24 County, as well, from 6.  And we talked about making
25 Blount whole again and not splitting it between two

Page 128

1 congressional districts.
2 Q.          Did you have any discussions with him
3 about which specific areas of Tuscaloosa to include
4 or not include?
5 A.          A little bit.  I mean, we talked about
6 the precincts, the next most likely geographical
7 precincts to add into 7.  We talked about them.  It
8 was sort of obvious geographically where he had to
9 go next.  So there wasn't much discussion about it.
10 Q.          How did you choose the precincts you
11 chose other than geography?
12 A.          Well, that's -- population and geography
13 were the only two ways to choose them.
14 Q.          Do you recall anything else, specifics
15 about your conversations with Congressman Adderholt?
16 A.          No.  And then at the end -- as I said, I
17 had splint a precinct in Lauderdale to get to zero
18 deviation in District 5, and he referred a different
19 precinct split.  So I changed it to the one he
20 preferred.  So that was -- that was one of the final
21 changes at the end that we made.
22 Q.          Moving on to Congressman Brooks in
23 District 5.  What do you recall from those
24 conversations?
25 A.          Well, there weren't any because

Page 129

1 Congressman Brooks decided not to meet -- this is my
2 presumption -- because he was running for the senate
3 and had less interest in how this was going to come
4 out.
5          I did meet the first time with his chief
6 of staff just to talk about keeping Morgan and
7 Madison together.  But that was -- that was about
8 it.
9 Q.          What was the discussion there about
10 keeping Morgan and Madison together?
11 A.          The community of interest.  And a number
12 of people that, obviously, live in northern Morgan
13 work in Huntsville, in Madison County, and so forth,
14 and thought it was a good combination to keep them
15 whole and together.
16 Q.          Other than that first meeting -- and I
17 guess that would have been back in May --
18 A.          May.
19 Q.          -- of 2021 with the chief of staff for
20 Congressman Brooks, did you meet with anybody else
21 on behalf of Congressman Brooks or his office?
22 A.          No.  I called his chief of staff back
23 once we had, you know, roughed out a -- gotten the
24 math from the real data.  And he -- he didn't call
25 me back.  I called him a couple of times.  And I

Randy Hinaman
December 09, 2021

Page 130

1  assumed that meant he was less interested in how
2  this was going to go.
3  Q.        And then finally, what about Congressman
4  Palmer in District 6?  What do you recall about
5  those conversations?
6  A.        Well, I talked to him about again
7  putting Blount back together and giving that all to
8  him.  I talked to him -- in the meantime, he had --
9  he had initially, I thought, lived in Jefferson
10  County.  And then he had moved to Shelby.
11           So I talked a little bit about making
12  sure I had the right home address for him.  Because
13  I initially thought he still lived in Jefferson, but
14  he didn't.  So we did have the right address in
15  Shelby.  So that was fine.
16           I talked about he may loose Coosa to the
17  3rd and a little part of Chilton.  He was
18  comfortable with that.  And I talked to him about
19  some of the changes in Jefferson in the 7th District
20  where geographically I was trying to make the 7th
21  District's footprint in Jefferson more compact by
22  adding western Jefferson and shortening the district
23  on the top.  And I wanted him to be aware of that.
24           But as I said earlier, we had initial
25  meetings and even a follow-up call.  But when the

Page 131

1  final map was done, meaning that last week of
2  October, he -- he allowed as how he didn't really
3  want to -- his chief of staff told me that the
4  congressman did not really want to talk about it,
5  that he was convinced we were going to go to court,
6  and he didn't really see a need to discuss it.
7  Q.        Who was that that told you that?
8  A.        Congressman Palmer's chief of staff.
9  Q.        And when was that discussion?
10  A.        That was in mid October.
11  Q.        And why did he say that he was convinced
12  that this was going to go to court?
13  A.        I don't know.  He was -- the chief of
14  staff said that -- the chief of staff said that he
15  had been told, I think, by the NRCC that this map
16  was going to go to court, and that Congressman
17  Palmer had decided to not discuss it further.
18  Q.        Did you ask him why he thought it was
19  going to court?
20  A.        No.  I accepted his answer.
21  Q.        Did you have any idea about why this
22  would go to court based on that discussion?
23  A.        No.
24  Q.        And you didn't care to ask?
25  A.        It was his opinion.  I didn't think it

Page 132

1  was relevant to what I was doing.
2  Q.        Jefferson County, the way it's split in
3  the 2021 congressional map, is not exactly a
4  straight line.  How did you decide which areas of
5  Jefferson County would move from District 6 to
6  District 7?
7  A.        I was looking geographically to widen
8  the face of the protrusion into Jefferson -- if you
9  want to call it that, into Jefferson County.  I was
10  looking to not split precincts.  Those are all,
11  except for one that's split for deviation -- well,
12  two, technically.  One Congressman Sewell --
13  Congresswoman Sewell lives in and another one.
14           But I was trying not to split precincts.
15  I was picking whole precincts.  And I was trying to
16  make the district more compact, meaning widen it as
17  it goes into Jefferson County and eliminate some of
18  the longer, further-away ones at the northern part
19  of the county.
20  Q.        So how does that process work when
21  you're choosing which precincts to pick up?  Are you
22  just kind of choosing at random geographically as
23  you move up and seeing what works?  Or are there
24  other factors at play that you're considering?
25  A.        No, that's exactly it, seeing what works

Page 133

1  numerically and making something, in my mind, look
2  more compact geographically.
3  Q.        Are there any other factors or data that
4  you're considering when you're choosing which
5  precincts to include?
6  A.        No.  I mean, other than -- we had that
7  discussion about Homewood where she allowed that --
8  we had split a couple of Homewood precincts, some on
9  one side of her line in 7 and some on the other side
10  in 6, and thought it might be good to group them all
11  together.
12  Q.        You mentioned that there were two
13  precincts that were split for deviation purposes,
14  one of which Congressman Sewell lives in you said.
15  What were those two precincts?
16  A.        The names?
17  Q.        Do you recall?
18  A.        I do not.
19  Q.        This isn't a memory test.  I just --
20  A.        I do not.
21  Q.        Okay.
22  A.        And the reason it's not one -- I was
23  trying to make the split just solely in one
24  precinct.  But unfortunately the census blocks
25  didn't cooperate very much.  And when I got to where

Page 134

1  I got to geographically in the one -- the precinct
2  she lived in, I was hoping I could pick up the right
3  number of populations.
4              But unfortunately I hit a situation
5  where there was like a 550 block next to it, and
6  that was too many.  So that was not going to work.
7  So I had to split another precinct to get to zero
8  deviation.
9  Q.        Do you recall anything else specifically
10 from your discussions with Congressman Palmer or his
11 chief of staff in furtherance of drawing the 2021
12 congressional map?
13 A.        No.
14 Q.        And I think we discussed this earlier.
15 But in any of those discussions with any of those
16 congressmen, Congressmen Carl, Moore, Rogers,
17 Adderholt, Brooks, Palmer, did race ever come up in
18 your discussions with any of them or their staff?
19 A.        No.
20             I mean, I'll amend that slightly.  I do
21 think in the final when I went through with
22 everybody, I think maybe Congressman Moore's
23 district director, Bill Harris, who I was talking
24 to, may have asked, "Can you tell me what the BVAP
25 of the 2nd District is now?"  I think I probably

Page 135

1  gave him that number.
2  Q.        And when was that?
3  A.        In the last -- that last week when we
4  turned race on.
5  Q.        You gave him the --
6  A.        He asked --
7  Q.        -- black voting age population?
8  A.        Yeah.  He asked what the BVAP for that
9  district was, and I gave him that number.
10 Q.        Was there any further discussion about
11 it?
12 A.        No.
13
14             (Plaintiff's Exhibit 7 was
15             marked for identification.)
16
17 Q.        I'm handing you what's been marked as
18 Plaintiff's Exhibit 7.  This is a copy of the
19 reapportionment committee redistricting guidelines
20 that was produced in this lawsuit.  The Bates number
21 at the bottom is RC 043723, and it's dated May 5th
22 2021.
23             Do you see that?
24 A.        I do.
25 Q.        Do you recognize this document?

Page 136

1  A.        I do.
2  Q.        What is this document?
3  A.        These are the guidelines that were
4  approved by the reapportionment committee for
5  drawing the four maps?
6  Q.        Were you provided a copy of these
7  redistricting guidelines before you drafted the 2021
8  congressional map?
9  A.        I was.
10 Q.        Who provided it to you?
11 A.        The two co-chairs, probably with Dorman
12 Walker, as well.  I'm not sure who handed it to me.
13 Q.        And when was that?
14 A.        It would have been around the time it
15 was passed, May 5th.
16 Q.        What --
17 A.        Which very importantly happens to be my
18 birthday.
19 Q.        That is an important note.  Thank you
20 for letting me know.  Happy belated birthday.
21 A.        Thank you.
22 Q.        What were you told when you were
23 provided these guidelines?
24 A.        I was told these were the guidelines for
25 drawing the four maps that you've been contracted to

Page 137

1  draw, and to follow them to the best of my
2  abilities.
3  Q.        Anything else that you recall?
4  A.        No.
5  Q.        And did you, in fact, follow these
6  guidelines in drawing the 2021 congressional map?
7  A.        I did.
8  Q.        Let's take a look at the criteria that's
9  listed here.  So starting on Page 1, you see Line 10
10 there.  It says Section II, Criteria for
11 Redistricting.
12 A.        Yes, sir.
13 Q.        I want to talk through these with you.
14 So Sections II and b both state that the
15 congressional district should equalize total
16 population and have minimal population deviation.
17             Do you see that?
18 A.        I do.
19 Q.        What does minimal population deviation
20 mean to you?
21 A.        I took that to mean for the
22 congressional districts, that that was -- they
23 should be zero for six of the districts and plus one
24 for the remaining district because the population
25 was not divisible by seven.  So six were to zero

Page 138

1  deviation, and one should be plus one.
2  Q.        Which district did you choose to be the
3  plus one deviation?
4  A.        I knew you would ask me that.  I don't
5  -- I would have to look.  I think it was the 6th
6  maybe.  I would have to look at a map.  I don't have
7  numbers.  I'm sorry.
8  Q.        Was it District 7?
9  A.        No, I don't think so.  I think it was 2
10 or 6, but I can't remember which.
11 Q.        And what did you do to make sure that
12 your map complied with that zero deviation for six
13 of the districts and plus or minus one for the
14 other?
15 A.        I moved -- I split seven precincts down
16 to the census block level to get to zero deviation
17 for six of the districts and plus one for the
18 seventh one.
19 Q.        Did anyone tell you that zero percent
20 deviation was required or that there was a certain
21 cutoff that you had to reach to satisfy this
22 criteria?
23          MR. WALKER:  Objection to form.  You can
24 answer.
25 A.        I was told that it was literally zero

Page 139

1  deviation, meaning zero -- not percent, but zero
2  people except for the one that had to be plus one.
3  Q.        Is that plus one person?
4  A.        Yes.
5  Q.        Understood.
6  A.        Sorry.  Plus one person.
7  Q.        And who told you --
8  A.        Dorman Walker, legal counsel.
9  Q.        Section II c looks like it's about
10 legislative and board of education districts.  So I
11 don't think that would apply to the congressional
12 map.  Is that correct?
13 A.        Correct.
14 Q.        Section II d says that the plan must
15 comply with the one person, one vote principle of
16 the Equal Protection Clause of the 14th Amendment of
17 the United States Constitution.
18          Do you understand what the one person,
19 one vote principle is?
20 A.        I think I do.
21 Q.        What's your understanding?
22 A.        Again, that's so no -- so people have
23 equal representation, the representatives in those,
24 in the congressional case, should be representing
25 the same number of people.

Page 140

1  Q.        So that goes back to the population
2  deviation?
3  A.        Correct.
4  Q.        And where does that understanding come
5  from?
6  A.        Where does my understanding come from?
7  I'm sure if I had any questions about it, I asked
8  legal counsel.
9  Q.        So other than what you just discussed
10 doing for Sections II a and b in adjusting for the
11 population, did you do anything else to make sure
12 that your plan complies with the one person, one
13 vote principle?
14 A.        No.
15 Q.        Section II e looks like it just states
16 that a plan that does not comply with the population
17 requirements above will not be approved.
18          Is there anything additional you needed
19 to consider here for this section e beyond what
20 we've already discussed?
21 A.        I don't believe so.
22 Q.        Section II f states, "Districts shall be
23 drawn in compliance with the Voting Rights Act of
24 1965 as amended.  A redistricting plan shall have
25 neither the purpose nor the effect of diluting

Page 141

1  minority voting strength, and shall comply with
2  Section 2 of the Voting Rights Act and the United
3  States Constitution."
4          Are you familiar with the Voting Rights
5  Act of 1965?
6  A.        I'm not a lawyer, but I'm familiar with
7  it.
8  Q.        What is your understanding?
9  A.        Well, that the -- a plan should not have
10 the intent or purpose of discriminating against any
11 minority population.
12 Q.        Where does that understanding come from?
13 A.        Just conversations with legal counsel
14 and others during the process.
15 Q.        Are you familiar with Section 2 of the
16 Voting Rights Act?
17 A.        Again, I'm not a lawyer.  But vaguely.
18 Q.        Have you ever read Section 2 of the
19 Voting Rights Act?
20 A.        I'm not sure I have.
21 Q.        What is your understanding of what
22 Section 2 requires?
23 A.        Where there -- I guess my understanding
24 of it, a layman's understanding of it, would be
25 where there's a sufficient and compact enough

Page 142

1  population of -- minority population to create a
2  district, a congressional district in this case,
3  that a district should be drawn if it's compact and
4  sort of meets the Gingles, I guess, requirements,
5  compact, contiguous population.
6  Q.        Where there would be a majority black
7  district?
8  A.        Right, and would have the opportunity to
9  elect a candidate of their choice.
10 Q.        And does that understanding come from
11 the same sources, conversations with counsel?
12 A.        Yes, sir.
13 Q.        What did you do to make sure that your
14 plan complies with Section 2 of the Voting Rights
15 Act?
16 A.        Again, once it was done and we turned on
17 race, we talked about it.  No one asked me to make
18 any other changes.  And I talked to legal counsel
19 and, I guess, concluded that it satisfies Section 2
20 of the Voting Rights Act.
21 Q.        Anything else?
22 A.        No.
23 Q.        Did you personally make a determination
24 that your plan does not have the purpose or effect
25 of diluting minority voting strength?

Page 143

1  A.        I'm -- I'm not a lawyer, so I don't know
2  that I can make that -- I don't know that it's my
3  job to make that distinction.  But I don't believe
4  it discriminated against anyone.
5  Q.        Did you do anything to make that
6  determination yourself?
7  A.        Other than talk to legal counsel, no.
8  Q.        Other than potentially legal counsel,
9  did you have discussions with anyone else about
10 whether your plan complied with Section II of the
11 Voting Rights Act?
12 A.        No.
13 Q.        In making the determination, whether
14 that's through conversation with legal counsel or
15 not, about whether your plan complies with this
16 policy, did that require you to review the racial
17 makeup of the districts?
18 A.        Well, yeah.  I mean, race -- at that
19 point, we had turned race on.  So the BVAPs and
20 numbers were available.
21 Q.        And you say they were available.  So
22 then you had to review them, as well, to make sure
23 that everything was in compliance with this policy?
24 A.        Well, we -- the numbers were then
25 revealed or available, and we discussed the various

Page 144

1  numbers related to the map.
2  Q.        Did you have anyone other than
3  Mr. Walker or someone with his firm analyze your map
4  at any point to confirm that it complies with
5  Section 2 of the Voting Rights Act?
6  A.        I did not.
7  Q.        Do you know if anyone reviewed the map
8  to determine whether it complies with Section 2 of
9  the Voting Rights Act, other than potentially
10 Mr. Walker and his firm?
11 A.        I do not, no.
12 Q.        And other than what we've discussed
13 already, did you do anything else to make sure that
14 your plan complies with Section 2 of the Voting
15 Rights Act?
16 A.        I did not.
17 Q.        Moving on to the next criteria, Section
18 II g.  This one is a little longer.
19           It states, "No district will be drawn in
20 a manner that subordinates race-neutral districting
21 criteria to considerations of race, color, or
22 membership in a language-minority group, except that
23 race, color, or membership in a language-minority
24 group may predominate over race-neutral districting
25 criteria to comply with Section 2 of the Voting

Page 145

1  Rights Act, provided there is a strong basis in
2  evidence in support of such a race-based choice.  A
3  strong basis in evidence exists when there is good
4  reason to believe that race must be used in order to
5  satisfy the Voting Rights Act."
6           Do you see that?
7  A.        I do.
8  Q.        What is your understanding of what that
9  section requires?
10 A.        My understanding of what that section
11 requires is that's why -- when we made all of our
12 changes to the districts by adding or subtracting
13 population, that's why race was not on.  We did it
14 based on total population.  And then at the end of
15 the process, we did turn race on to look at various
16 districts.
17           And because we were doing a number of
18 these maps at the same time, there were a couple of
19 instances in the other maps where we did look at
20 race to add to a district.  But that did not come
21 into play in congressional.
22 Q.        What, if anything, did you do to make
23 sure that specific congressional districts complied
24 with this policy?
25 A.        I made sure that when I added -- I used

Randy Hinaman
December 09, 2021

1  traditional redistricting principles of total pop
2  and geography considerations to add and subtract to
3  these districts, and that that was not based on
4  race.
5  Q.        Flip the page to Page 2.  The next
6  section is Section 2 h, and it states that districts
7  must be composed of contiguous and reasonably
8  compact geography.
9              What is your understanding of what this
10 section requires?
11 A.           Yeah, obviously contiguous counties
12 and/or precincts had to be adjacent, to be hooked
13 together, to form a district.  You couldn't have
14 part of Madison County tied to Mobile or something
15 crazy like that.
16             And to the extent possible, I was trying
17 to, when changing things inside a county as
18 Jefferson, I was trying to make -- or Montgomery,
19 for that matter, tried to make districts more
20 geographically compact so they were not as spread
21 out.
22 Q.        Beyond what you just mentioned with
23 Montgomery -- sorry.  Was that Jefferson County?
24 A.        And Montgomery, too.
25 Q.        And Montgomery County.  Beyond that,

1  what did you do to make sure that your plan complies
2  with this policy?
3  A.        That's about it.
4  Q.        Moving on to the next section, Section
5  II i.  It lists several requirements of the Alabama
6  Constitution.  I'm not going to read all of them
7  here.
8              Did you consider these factors in
9  drawing your map?
10 A.        I did.
11 Q.        It appears, just by looking at them,
12 that most of them do not apply to the congressional
13 map.  Rather, they talk about Alabama senate and
14 Alabama house.  Is that right?
15 A.        Correct.
16 Q.        How did you consider these factors here
17 under Section II i in drawing the congressional map?
18 A.        Well, I don't know how far down this
19 list -- I don't know how far down this list you're
20 counting.
21 Q.        It looks likes II i.  It's from Line 3
22 down to Line 20 on Page 2 of Exhibit 7.
23 A.        As you say, most of them don't really
24 apply.  They are all -- all districts will be
25 single-member districts, they're contiguous.  That's

1  already basically been covered in other things we've
2  discussed.
3  Q.        Anything else that you had to take into
4  account to comply with this policy?
5  A.        I don't think so.
6  Q.        Section II j starting at Line 21 there.
7  Section II j lists six redistricting policies.  Do
8  you see that?
9  A.        Uh-huh.
10 Q.        Sorry.  Can you answer verbally?
11 A.        Yes.  Sorry.
12 Q.        That's fine.
13             Did you consider these redistricting
14 policies when drawing your map?
15 A.        I did.
16 Q.        How?
17 A.        Well, I wanted to make sure that no --
18 to the extent possible that no incumbents were put
19 together, which they were not, in the congressional
20 map.  While continuity by water was allowed, I was
21 trying to not use that.  Which I don't think we did.
22             I don't know how far down your --
23 Q.        I can walk through them with you.  That
24 might make more sense.
25             First off, did anyone explain to you

1  what these policies mean?
2  A.        No.  I'm sure if I had a question, I
3  would have asked legal counsel.  But I don't
4  remember asking.
5  Q.        Similarly, did anyone explain to you how
6  to apply these policies in drawing the map?
7  A.        No.
8  Q.        What is your understanding of the
9  priority amongst these various policies?
10 A.        I think the only two that are paramount
11 to the rest of them would be one person, one vote
12 and the Voting Rights Act.
13             The rest of them are somewhat -- can
14 occasionally be in conflict.  And it depends on the
15 various situations where one might trump the other
16 or vice versa.
17             You may have two incumbents that live
18 very close to one another.  Maybe they need to be
19 split apart.  That may make the districts not quite
20 as compact as you would like.  But one of those --
21 you know, you couldn't put the two incumbents
22 together.  So sometimes they are in conflict, and
23 you have to resolve that.
24 Q.        Other than the two you just mentioned,
25 one person, one vote and the Voting Rights Act, did

Page 150

1  you place any greater importance on one of these
2  policies over the other?
3  A.          No.
4  Q.          Let's walk through these.  So the first
5  policy under Section J starting on Line 25 there
6  states, "Contests between incumbents will be avoided
7  whenever possible."
8              What's your understanding of what this
9  requires?
10 A.          That when -- certainly when possible, I
11 would not put incumbents in the same district.
12 Q.          What did you do to make sure that you
13 complied with that?
14 A.          Retrieved -- made sure that we retrieved
15 all of the home addresses and looked to where they
16 were and made sure two of them were not in the same
17 district.
18 Q.          You might have answered this earlier.
19 But did you have to make any modifications to your
20 map to comply with this?
21 A.          Not the congressional map.
22 Q.          This factor applies equally to both
23 parties, correct?
24 A.          Certainly, yes.
25 Q.          So you applied it equally to all

Page 151

1  incumbents, both the republicans and to the
2  democrat, correct?
3  A.          Correct.
4  Q.          The second policy there, Section II
5  j(ii) starting on Line 26, states -- I don't know
6  why I'm having trouble pronouncing the word.
7  "Contiguity by water is allowed, but point-to-point
8  contiguity and long-lasso contiguity is not."
9              What is your understanding of what that
10 policy requires?
11 A.          I'm not sure I even know what long-lasso
12 contiguity is, to be honest with you.
13             But point-to-point, occasionally you can
14 have a precinct or a census block that connects to
15 the next one just by one point in space.  And that's
16 not -- under their guidelines, not allowable in
17 terms of connecting them together.
18             Again, on the congressional map, it
19 didn't come into play very much because I tried not
20 to split -- I only split seven precincts and tried
21 not to have situations where census blocks were --
22 weren't any -- weren't close to any of those options
23 there.
24 Q.          Did you have to do anything else to make
25 sure your plan complied with this policy?

Page 152

1  A.          No.
2  Q.          Did you have to make any modifications
3  to your map to comply with this policy?
4  A.          I did not.
5  Q.          The third one -- the third policy, which
6  is Section II j(iii,) states, "Districts shall
7  respect communities of interest, neighborhoods, and
8  political subdivisions to the extent practicable and
9  in compliance with paragraphs a through i."
10             What is your understanding of what this
11 policy requires?
12 A.          It requires -- like I said earlier, in
13 areas; for example, Mobile and Baldwin which wanted
14 to stay together or Madison and Morgan that had
15 specific communities of interest, it was to keep
16 areas together that have similar -- and, obviously,
17 there are lots of different communities of interest.
18 So I tried to keep areas, to the extent possible,
19 together.
20             Obviously, this comes into conflict with
21 county lines, precinct lines, other things.  So it's
22 not always -- and everybody has -- a number of
23 people have different views of what communities of
24 interest are.  So it's certainly not always possible
25 to keep all of them together.

Page 153

1  Q.          What is your definition of a community
2  of interest?
3  A.          My definition of community of interest,
4  it can be geographic, it can be economic, where
5  people work, it can be racial, it could be
6  geography, it could be people on the bay, for
7  example, for Mobile and Baldwin counties.  A host
8  of -- a host of communities of interest.
9  Q.          What do you consider to be communities
10 of interest in Alabama?
11 A.          All those things I just listed.
12 Q.          Is there any sort of particular
13 communities of interest that are well established or
14 a list of any of these?  Or is this just something
15 that is subjectively known but doesn't really exist
16 in writing anywhere?
17 A.          I don't know of a definitive list of all
18 the communities of interest in Alabama.
19 Q.          Are there any specific communities of
20 interest that come to mind for you right now?
21 A.          No, other than the ones I listed.  I
22 mean, precincts can be -- counties are, I guess,
23 communities of interest sometimes.  I mean, it's --
24 there are a whole host of things.
25 Q.          It sounds like communities of interest

Page 154

1  can be somewhat fluid.  Is that fair to say?
2  A.        It is fair to say.
3  Q.        One area, say, where we're sitting right
4  now in Montgomery, could be part of three, four,
5  five, six different communities of interest
6  depending on what factors you're looking at?
7  A.        Yeah, whether they're economic or racial
8  or social or everybody roots for the same football
9  team, I suppose.
10  Q.        Do they?
11  A.        No.
12  Q.        I see.  I see.  That would be a
13  community of interest perhaps.
14          Are you familiar with the black belt?
15  You mentioned that earlier.
16  A.        I am.
17  Q.        What is the black belt?
18  A.        It's a group of mostly rural counties
19  that have a -- for the most part have a majority
20  black population.
21  Q.        Do you know what counties are in the
22  black belt?
23  A.        I'm not sure I can list every one.  But
24  yeah, in general, I do.
25  Q.        What counties would you say are in the

Page 155

1  black belt?
2  A.        I would say Sumpter, Greene, Choctaw,
3  Marengo, Hale, Perry, Dallas, Wilcox, Lowndes, I
4  guess Macon and Bullock.  Some would say Montgomery.
5  Q.        Do you consider the black belt to be a
6  community of interest?
7  A.        I do.
8  Q.        So in drawing your map, what did you do
9  to make sure that your plan complies with this
10  policy, that it respected communities of interest?
11  A.        Again, I mean, because there are so many
12  different communities of interest, they're not -- I
13  mean, no plan is going to respect all of them.  So
14  there are trade-offs.
15          There are also -- you know, the entire
16  black belt I imagine if you made into a
17  congressional district would accomplish -- would hit
18  up against other one person, one vote issues and
19  other issues in here, as well.  So they are
20  sometimes in conflict.  So you can't -- you can't
21  satisfy all communities of interest.
22  Q.        Did you have to make any specific
23  modifications to your map to make sure that you were
24  respecting communities of interest?
25  A.        No.  Although, again, I tried to keep,

Page 156

1  for example, the Muscle Shoals area together in
2  the -- in the 4th District when we split Lauderdale.
3  Not that it was at issue, but the people in Mobile
4  and Baldwin very much wanted to be together because
5  they share the bay.  But that didn't require a
6  change.  It just is a . . .
7  Q.        Other than the modification for the
8  Muscle Shoals community, are there any other
9  specific modifications that you felt like you made
10  in drawing the 2021 map?
11  A.        No, not specifically.
12  Q.        Does your map split any communities of
13  interest?
14  A.        Oh, I'm sure it does.  I mean, all maps
15  split some communities of interest.
16  Q.        And part of that is because of what we
17  just discussed, that communities of interest can
18  mean lots of different things?
19  A.        To different people, I'm sure.
20  Q.        Looking at the bottom of Section II
21  j(iii,) that third policy, it gives a definition.
22  It says, "The term communities of interest" --
23  excuse me.
24          It says, "A community of interest is
25  defined as an area with recognized similarities of

Page 157

1  interests, including but not limited to ethnic,
2  racial, economic, tribal, social, geographic, or
3  historical identities.  The term communities of
4  interest may in certain circumstances include
5  political subdivisions such as counties, voting
6  precincts, municipalities, tribal lands and
7  reservations, or school districts."
8          Did you review any ethnic, racial,
9  tribal, or other similar data to identify
10  communities of interest?
11  A.        I did not.
12  Q.        Moving to the next policy, the fourth
13  policy, Section II j(iv.)  It states, "The
14  legislature shall try to minimize the number of
15  counties in each district."
16          I think that's pretty self-explanatory.
17  But what is your understanding of what that policy
18  requires?
19  A.        Yeah, that's sort of a compactness
20  thing.  I was trying to keep the fewest number of
21  counties necessary to -- and it's not always --
22  there are other -- the next one down says
23  "preserving cores of existing districts."
24          I mean, some of these things come into
25  conflict.  But to where possible, I tried to deal in

Randy Hinaman
December 09, 2021

Page 158

1  whole counties, keeping counties whole, and the
2  minimum number to reach the ideal population.
3  Q.        Did you have to make any specific
4  modifications to your map to comply with that
5  policy?
6  A.        No.  Although it does come into effect
7  when people were talking about adding -- where you
8  split a -- for example, the Escambia County split,
9  you know, where does that go.
10        I was trying to keep districts so that
11  not all of the splits were in the same district and
12  the number of counties in a particular district
13  didn't grow a lot.  Because for a congressional
14  office, that takes on local governments and more
15  work.  So I tried to be mindful of that when looking
16  at it.
17  Q.        Other than trying to be mindful of that,
18  did you have to make any specific changes?
19  A.        No.
20  Q.        You referenced it just now.  The next
21  policy, the fifth policy, Section II j(v) states,
22  "The legislature shall try to preserve the cores of
23  existing districts."
24        What is your understanding of what that
25  policy requires?

Page 159

1  A.        That's basically the cores of the -- of
2  existing districts or the counties that make up the
3  majority of those districts, to keep them together
4  in the same district.
5        Obviously, incumbents have a preference
6  to not have to add folks they haven't represented
7  when they can continue to keep the folks they have
8  been representing.
9  Q.        What, in your mind, is the core of an
10  existing district?
11  A.        The core of an existing district is
12  basically -- I view it as geography.  It's the
13  county -- the key counties that make up the current
14  district, current as in 2001.
15  Q.        Where --
16  A.        Or 2011 I mean.
17  Q.        Where does that understanding come from?
18  A.        I don't know.  That understanding comes
19  from what the cores of a district are.
20  Q.        Your understanding of what a core of a
21  district is comes from --
22  A.        I mean, that's what the definition of
23  those words are to me anyway.
24  Q.        Did you have some sort of metric to use
25  when determining what the core of an existing

Page 160

1  district is?
2  A.        I did not.
3  Q.        Does maintaining the core of districts
4  require considerations of racial data?
5  A.        I don't think it does, no.
6
7        (Plaintiff's Exhibit 8 was
8        marked for identification.)
9
10  Q.        I'm handing you what's been marked as
11  Plaintiff's Exhibit 8.  This is a document that was
12  produced in this lawsuit.  The Bates number in the
13  corner is RC 00056.  It's a seven-page document.
14  Each page has one of the seven congressional
15  districts from the 2021 congressional map.
16        Do you see that?
17  A.        I do.
18  Q.        Have you seen this document before?
19  A.        I have not.
20  Q.        And you can take a look through it if
21  you don't believe me.  But these are the seven --
22  these are maps of each of the seven congressional
23  districts in the 2021 map that you drew; is that
24  correct?
25  A.        Yes, sir.

Page 161

1  Q.        Looking at page one here, District 1,
2  show me on here where the core of District 1 is.
3  A.        Well, the core of District 1 to me would
4  be Mobile and Baldwin counties.
5  Q.        Flipping over to -- and why do you
6  consider those two --
7  A.        Well, that's --
8  Q.        -- to be the core?
9  A.        Those are the two predominant counties.
10  They have the vast majority of the population in the
11  district.
12  Q.        Flipping the page to District 2.  What
13  do you consider to be the core of District 2?
14  A.        The core of District 2 is a little more
15  complicated than that, I guess.  You have the Wire
16  -- you have Dothan, which is Houston County, you
17  have the Wiregrass region, you have Montgomery, and
18  then you have Autauga and Elmore on top -- of top of
19  them.
20  Q.        And why do you consider those counties
21  to be the core of this district?
22  A.        Again, that's where the majority of the
23  population is.  And they've been for the most part
24  consistently inside the 2nd District for a
25  considerable period of time.

Randy Hinaman
December 09, 2021

Page 162

1  Q.          Moving the page to District 3, the same
2  question.  What do you consider to be the core of
3  District 3?
4  A.          The core of District 3 would be Calhoun
5  and St. Clair.  And then obviously more down, Lee
6  and Russell, which are very fast-growing counties,
7  especially Lee County.  That would be the core of
8  the district to me.
9  Q.          And why do you say that?
10 A.          Again, it's the vast majority of the
11 population.  It's also -- those areas have been
12 pretty much continuously in the 3rd District.
13 Q.          Turning the page to District 4, same
14 question.  What do you consider to be the core of
15 District 4?
16 A.          The core of District 4 would be sort of
17 the Winston, Walker, Cullman area, and then northern
18 Tuscaloosa which was only added ten years ago but
19 certainly plays a key role in the district now.  And
20 then sort of Marshall, Etowah, again large
21 population, have been in the district a considerable
22 amount of time.
23 Q.          Is your answer for why those are the
24 core based on population again?
25 A.          Population, yeah.

Page 163

1  Q.          Flipping the page to District 5, same
2  question.  What's the core there?
3  A.          The core would be Madison and Morgan and
4  Limestone, which is now rapidly growing, as well.
5  Again, population, and they've been in that district
6  for a considerable period of time.
7  Q.          Any other reasons?
8  A.          No.
9  Q.          Turning the page to District 6, same
10 question.
11 A.          District 6, obviously Shelby and then
12 Jefferson because of population would be, in my
13 mind, the core of that district.
14 Q.          Any other reasons?
15 A.          No.  It's population primarily.
16 Q.          Finally flipping the page to District 7.
17 What would you consider to be the core of District
18 7?
19 A.          I would say the core of District 7 is
20 the black belt counties that we talked about earlier
21 from Choctaw through to Lowndes, and then also the
22 portions of Tuscaloosa and Jefferson.
23 Q.          What are the reasons for considering
24 those to be the core?
25 A.          Again, population and that they've been

Page 164

1  in that district for a long period of time.
2  Q.          And going through each of these counties
3  that you consider to be the core of each district,
4  is that a determination that you made?  Or is that
5  something that you were told by someone else?
6  A.          That's a determination I made.
7  Q.          Have you discussed what you consider to
8  be the core of each of these districts with anyone
9  else?
10 A.          I may have discussed it with legal
11 counsel.  But I don't have a specific recollection
12 of the discussion.
13 Q.          Has anyone ever told you before what the
14 core of each district is?
15 A.          No.
16 Q.          Looking back at the policy that we were
17 referencing here about preserving the cores of each
18 of the districts, what did you do to make sure that
19 your plan preserved the core of each of these
20 districts?
21 A.          I kept the areas we referenced by
22 district inside that district.
23 Q.          Did you have to make any specific
24 modifications to comply with this?
25 A.          No.

Page 165

1  Q.          Where did this policy rank in comparison
2  to the other policies?
3  A.          It was equal to all except one person,
4  one vote and the Voting Rights Act.
5  Q.          We're almost through the criteria here.
6  The last policy, Section II j(vi) states, "In
7  establishing legislative districts, the
8  reapportionment committee shall give due
9  consideration to all the criteria herein.  However,
10 priority is to be given to the compelling state
11 interests requiring equality of population among
12 districts and compliance with the Voting Rights Act
13 of 1965, as amended, should the requirements of
14 those criteria conflict with any other criteria."
15           That sounds to be pretty much what you
16 just said to me, correct?
17 A.          Correct.
18 Q.          To your knowledge, was there any
19 conflict between the five policies we just discussed
20 and the requirements regarding equality of
21 population?
22 A.          No.  I mean, obviously, there can be
23 conflicts between one person, one vote and
24 communities of interest and one person, one vote and
25 how many counties are in a district.  But not on

Page 166

1 that level, I guess.  You would have to ask me that
2 one again.
3 Q.          And did you run into any of those
4 conflicts?  Did you have to make any modifications
5 based on any sort of conflict like that in drawing
6 the map?
7 A.          Well, I mean, I didn't run into them.
8 But, I mean, I kept those in mind when we were doing
9 our initial additions or subtractions to the plan.
10 Q.          Same question.  To your knowledge, was
11 there any conflict between those five policies we
12 just discussed and the requirements under the Voting
13 Rights Act of 1965?
14 A.          No.  As I stated, when I added
15 population to the 7th district, for example, I was
16 not looking at race.  So there was no conflict with
17 any of it to the Voting Rights Act.
18          THE REPORTER:  There was no conflict
19 what?
20 A.          With any of those to the Voting Rights
21 Act.
22 Q.          I don't think it's another policy.  But
23 looking down here at the bottom, g, the last section
24 under the criteria.  Section g states that the six
25 policies we just discussed in paragraphs j(i)

Page 167

1 through (vi) are not listed in order of precedence,
2 and in each instance where they conflict, the
3 legislature shall at its discrimination determine
4 which takes priority.
5          Were you given any instruction on which
6 policy should take priority over the others?
7 A.          No, other than section 6 that says
8 clearly one person, one vote and the Voting Rights
9 Act.  But other than that, no.
10 Q.          Is there anything else in Exhibit 8,
11 which is the reapportionment committee redistricting
12 guidelines, that you considered other than the
13 criteria we just discussed in Section II?
14 A.          No.
15 Q.          In looking back at these criteria in
16 Exhibit 8, Section II, were these the main factors
17 that you considered when drawing the 2021
18 congressional map?
19 A.          They were.
20 Q.          Did you consider any other factors when
21 drawing the 2021 congressional map?
22 A.          I did not.
23 Q.          Are you aware of any racial polarization
24 analysis that was done on any of the districts on
25 the 2021 congressional map?

Page 168

1 A.          I'm not.
2 Q.          What is your understanding of what a
3 racial polarization analysis entails?
4 A.          I think it -- I've never done one, and
5 I'm not an expert.  But my understanding -- a
6 layman's understanding of it, it is an analysis of
7 performance of how a district would perform in terms
8 of electing a candidate of choice for a minority
9 candidate.
10 Q.          Do you know why a racial polarization
11 analysis was not conducted?
12 A.          I do -- that was -- I do not.
13 Q.          Did you ever suggest one?
14 A.          I did not.
15 Q.          Why not?
16 A.          It wasn't under my purview.
17 Q.          What do you mean?
18 A.          It wasn't part of my -- I was asked to
19 draw four maps and submit them to the legislature.
20 Q.          Did anyone ever talk to you about a
21 racial polarization analysis?
22 A.          Counsel.  We talked -- we've talked
23 about --
24          MR. WALKER:  Objection to form.
25 Q.          Without going into any discussion that

Page 169

1 you had with Mr. Walker, did anyone else ever talk
2 to you about any racial polarization analysis being
3 done for the 2021 congressional map?
4 A.          No.
5          MR. THOMPSON:  For the record, Counsel,
6 I have a copy here of the joint stipulated facts
7 that were agreed to by counsel and filed this past
8 Friday.  I only have one copy.
9          MR. WALKER:  Do you want me to get a
10 copy made, copies made?
11          MR. THOMPSON:  We can.  I just have a
12 question about one of these.  So if it works, I can
13 just read it into the record and show the witness.
14          MR. WALKER:  That's fine.
15 Q.          Paragraph 62 of -- for your knowledge,
16 sir, this is a document titled Joint Stipulated
17 Facts for Preliminary Injunction Proceedings.  And
18 this was a document of stipulated facts that the
19 parties in the three lawsuits here have agreed to.
20 Does that make sense?
21 A.          Yes.
22          MR. DAVIS:  Actually, there are
23 differences.  What one set of counsel agreed to with
24 us may not be exactly what another set of counsel
25 agreed with us.  So you might want to clarify for

Page 170

1 the record in which case those stipulations are.
2          MR. THOMPSON:  This is the Milligan
3 plaintiffs versus Merrill stipulations.
4 Q.        All right.  Paragraph 62 in this -- and
5 I'll read it to you, and then I can show it to you.
6          It states, "In recent litigation,
7 Secretary Merrill stated that CD 7," which is
8 Congressional District 7, "appears to be racially
9 gerrymandered, with a finger sticking up from the
10 black belt for the sole purpose of grabbing the
11 black population of Jefferson County.  Defendant
12 does not believe that the law would permit Alabama
13 to draw that district today if the finger into
14 Jefferson County was for the predominant purpose of
15 drawing African American voters into the district."
16 And that's from Secretary of State Merrill's
17 pretrial brief in Chestnut v. Merrill.
18          And I'll show that to you.  Just let me
19 know when you've had a chance to look at it.
20 A.        Okay.
21 Q.        Do you agree with Secretary Merrill that
22 District 7 appears to be racially gerrymandered?
23          MR. DAVIS:  Object to the form.
24          MR. WALKER:  Object to the form.
25          MR. DAVIS:  Which District 7?  What

Page 171

1 year?
2          MR. THOMPSON:  I believe this was in
3 reference to the 2011 --
4          MR. WALKER:  Right.
5          MR. THOMPSON:  -- congressional map.
6 Correct?
7          MR. DAVIS:  I just want to make sure
8 it's clear if, in fact, you're asking him about the
9 2011 district, that y'all are on the same page.
10          MR. THOMPSON:  Thank you.
11 Q.        So do you agree with Secretary Merrill
12 that District 7 in the 2011 Alabama congressional
13 map appears to be racially gerrymandered?
14 A.        Well, again, I'm not a lawyer nor an
15 expert.  But I think it's clear there is a racial
16 component to the finger that goes into Jefferson
17 County.
18 Q.        And why do you say that?
19 A.        Well, I think because of shape and size
20 and what have you.  And, again, I haven't done -- I
21 haven't looked at it specifically.  But I imagine,
22 obviously, the majority of the folks inside that
23 finger, for lack of a better word, are probably
24 African American and the majority of folks on the
25 outside probably aren't.

Page 172

1 Q.        And you drew the original District 7
2 back in 1992, we discussed, right?
3 A.        Correct.
4 Q.        So you drew that original, for lack of
5 better terms, finger that extends into District 6?
6 A.        Yeah.  And I'm not sure it looked
7 exactly like that.  But yes, I did.
8 Q.        And why did you draw that long finger
9 extension into District 6?
10 A.        Well, it partially probably had to do
11 with where the incumbent lived at that point.  But
12 also to create a majority black district.
13 Q.        Moving ahead to the 2021 congressional
14 map.  Were you asked to do anything to District 7 so
15 that it does not appear to be racially
16 gerrymandered?
17 A.        I wasn't asked to do anything.  But when
18 I was looking at adding population to District 7, I
19 was hoping -- my goal was to make it more compact
20 and geographically comprehensible in terms of, for
21 example, Jefferson County.  So that's why I was
22 adding west Jefferson County and gaining population
23 there.
24 Q.        Did you do anything specifically in
25 drawing the 2021 congressional map to modify it so

Page 173

1 that District 7 does not appear to be racially
2 gerrymandered?
3 A.        I don't know how to answer that other
4 than I tried to make it more geographically compact
5 in shape.
6 Q.        Other than that, did you make --
7 A.        And not -- and not split precincts.
8 Which I think a number of precincts were split in
9 this version.
10 Q.        Other than trying to make it
11 geographically compact and not splitting precincts,
12 did you make any other changes for that purpose?
13 A.        No.
14          MR. WALKER:  Just so the record is
15 clear, the witness' reference to "this version" was
16 to the 2011 version.
17 A.        When I said they were split.  Is that
18 what you're talking -- yeah.
19          MR. THOMPSON:  Thank you.
20 Q.        And I'm referring to when you were
21 drawing the 2021 map now.  So thank you for the
22 clarification.
23          Did you specifically make any changes in
24 drawing the 2021 map to ensure that District 7 does
25 not appear to be racially gerrymandered?

Randy Hinaman
December 09, 2021

Page 174

1  A.          No, other than -- other than making the
2  district more compact and more geographically
3  contiguous.
4  Q.          Anything else?
5  A.          And not split precincts.
6  Q.          Anything beyond that?
7  A.          No.
8  Q.          Do you know if District 7 would still be
9  majority black without that finger sticking up into
10 Jefferson County?
11 A.          I do not.
12 Q.          Have you looked at that?
13 A.          No.  But, of course, it's not really a
14 finger anymore.  It was basically the southwestern
15 part of the county.
16 Q.          In drawing the 2021 congressional map,
17 were you asked to consider anything about race when
18 drawing District 7?
19 A.          No.
20 Q.          Did you consider anything about race
21 when drawing District 7?
22 A.          No.
23 Q.          And you say "No."  That was before the
24 week before you submitted this to the special
25 session, correct?

Page 175

1  A.          Correct.  But even once we turned race
2  on, nobody asked me to make any changes to District
3  7 or any other district.
4  Q.          And did you make any changes to District
5  7 at that point?
6  A.          No.
7  Q.          Did you look at the racial makeup of
8  certain neighborhoods that week before the special
9  session?
10 A.          I did not.
11 Q.          Did you take into account any of the
12 other characteristics of the black voting age
13 population when drawing District 7?
14 A.          Help me with that one.
15 Q.          Similar to what I asked before.  Did you
16 take into account different socioeconomic factors
17 within the black voting age population?
18 A.          No, sir, I did not.
19 Q.          Attitudes?
20 A.          No, sir.
21 Q.          Interests?
22 A.          No.
23 Q.          Type of employment?
24 A.          No.
25 Q.          Income?

Page 176

1  A.          No.
2  Q.          Educational level?
3  A.          No.
4  Q.          Favorite football team?
5  A.          No.
6  Q.          Voter turnout?
7  A.          No, sir.
8  Q.          Election results to assess party
9  affiliation?
10 A.          No.
11 Q.          Were you asked to consider anything
12 about race when drawing any of the other districts?
13 A.          I was not.
14 Q.          Did you consider anything about race
15 when drawing Districts 1 through 6?
16 A.          I did not.
17 Q.          Did you consider whether it would be
18 possible to create a second black majority district
19 when drawing the 2021 congressional map?
20 A.          I did.
21 Q.          When did you make that -- when did you
22 consider that?
23             MR. WALKER:  I'm going to asset the
24 attorney-client privilege.
25             THE REPORTER:  I'm sorry?

Page 177

1              MR. WALKER:  I'm asserting the
2  attorney-client privilege in response to that
3  question.
4              MR. THOMPSON:  To the question of when?
5              MR. WALKER:  He can answer when.
6  Q.          When did you consider whether making a
7  -- excuse me.  Let me ask the question again.
8              When did you consider whether it would
9  be possible to create a second majority black
10 district?
11 A.          After we got the final census results.
12 So early September.
13 Q.          Did anyone ask you to consider that?
14             MR. WALKER:  Objection.
15             MR. THOMPSON:  Was that an instruction
16 not to answer, or just an objection?
17             MR. WALKER:  I think he can tell you
18 that I asked him to consider that.
19 Q.          I'll go ahead and let you --
20 A.          Dorman Walker asked me to take -- to
21 look at it, yes.
22 Q.          Did you attempt to draw such a plan?
23             MR. WALKER:  Objection.  I instruct the
24 witness not to answer.  It's privileged.
25 Q.          Beyond your discussion with Mr. Walker,

Page 178

1  did you discuss with anyone else the possibility of
2  creating a second majority black district?
3  A.        I did not.
4  Q.        Do you agree that it would be possible
5  to create a second majority black district in
6  Alabama?
7            MR. DAVIS:  Object to the form.
8            MR. WALKER:  Same objection.
9            THE WITNESS:  Does that mean I'm not
10 supposed to answer?
11           MR. WALKER:  It's an objection to the
12 form of the question.
13 A.        I think it would be possible.  It's a
14 question of whether -- how many counties and
15 precincts you feel comfortable splitting to do so
16 and how -- what the shape and size and scope of it
17 would be.
18 Q.        Would it be possible to create a second
19 majority black district and still comply with the
20 reapportionment committee redistricting guidelines?
21 A.        I would not think so.
22 Q.        Why not?
23 A.        Well, I can't say every -- some of the
24 plans that were submitted that did that either
25 paired incumbents or disallowed cores of districts

Page 179

1  or made an inordinate number of splits or had 20
2  counties in a congressional district or some other
3  thing that was not positive in our guidelines.
4  Q.        You said some of the other plans that
5  were submitted.  I know we referenced this way back
6  earlier there morning --
7  A.        Yes.
8  Q.        -- that there were, you said,
9  approximately 41 plans that were offered at some
10 point in the special --
11 A.        Not congressional.  All the -- all the
12 whole.  That was all.  That was legislative, that
13 was everything.
14 Q.        Understood.  This may help.
15
16           (Plaintiff's Exhibit 9 was
17           marked for identification.)
18
19 Q.        I'm marking Plaintiff's Exhibit 9.  This
20 is another document that was produced in this
21 lawsuit.  It's Bates number RC 000007.  And I will
22 represent to you that the file name for this
23 document is Congressional Plans Introduced in 2021
24 Special Session.
25           Have you seen this document before?

Page 180

1  A.        I don't think I have.
2  Q.        Does this appear to be a list of the
3  congressional plans that were introduced in the 2021
4  special session?
5  A.        It does.
6  Q.        Did you review any of these maps?
7  A.        I looked at most all of them, yes.
8  Q.        Earlier today you made a distinction
9  between looking at and reviewing.
10 A.        Well, because a couple of these plans I
11 know were put into the system very, very late in the
12 process.  So my quote, unquote review of them may
13 have been ten minutes.
14 Q.        Which plans were those?
15 A.        Well, Senator Coleman's plan.  Senator
16 Hatcher's plan, I think, came in very late.  A
17 couple of these others which are full plans,
18 obviously, but they were more amendments.  Like
19 Waggoner and Barfoot were done on the last day.  So
20 I looked at them, but I didn't have very long to
21 look at them.
22 Q.        Did you have an opportunity to review
23 the Holmes congressional plan?
24 A.        Yeah.  Again, that was basically a
25 change for Congressman Moore when we were discussing

Page 181

1  the whole Escambia versus Monroe thing.  So it
2  was -- it was not really a whole -- it was a whole
3  plan.  But the changes were very specific to
4  Congressman Moore.  So yes, I'm familiar with it.
5  Q.        Did you have an opportunity to review
6  the Faulkner congressional plan two?
7  A.        I did.  Those were changes that were
8  primarily in Jefferson County.  Again, the vast
9  majority of the plan was the same this as the
10 Pringle plan.  So I was familiar with those changes.
11 Q.        You may or may not know the answer to
12 this.  There's only one Faulkner plan listed here,
13 but it's numbered two.  Do you know if there was a
14 Faulkner plan one?
15 A.        I don't know.  I don't know.
16 Q.        It seems to be like the school prank
17 where you number the pigs one, two, and four.
18 A.        One would guess there would be a one.
19 But I don't -- I don't know that.
20           MR. WALKER:  I think that's the best
21 extraneous comment in a deposition I've ever heard.
22 Q.        Understood.
23           Then did you review the Singleton
24 congressional plans?  And there's three of those
25 here.

Randy Hinaman
December 09, 2021

Page 182

1  A.        The first one, the whole county plan, I
2  did because that was a plan that was submitted to
3  public hearings along the way and had been in the
4  office for quite a while.  So yes, I did.  I did
5  have more time to look at that one, yes.
6  Q.        And that's plan one, the --
7  A.        Plan one, yeah, SB-10.  Yes, sir.
8  Q.        I'm sorry.  Go ahead.
9  A.        Yes, plan one, SB-10.
10 Q.        And are you aware that that one was
11 submitted by the League of Women Voters?
12 A.        Yes, sir.
13 Q.        And there is also two other plans, plan
14 two and plan three.  Did you have an opportunity to
15 review those?
16 A.        Much more quickly.  I mean, they were
17 offshoots of the initial plan that just changed
18 deviation for the most part.
19 Q.        I want to walk through those, the Holmes
20 plan, the Faulkner plan, and the Singleton plan.
21           Starting with the Holmes plan, why did
22 you review that one?
23 A.        I reviewed that because that was put in
24 essentially for Congressman Moore because he did not
25 want to pick up another county.  And instead of

Page 183

1  splitting Escambia between 1 and 2, he wanted to
2  split Monroe between 1 and 7 so that District 7
3  would pick up an additional county and he would not,
4  and then make the corresponding change in Montgomery
5  to offset the 739 people that were needed to get 1
6  to zero deviation.  To my knowledge, those were the
7  only changes.
8  Q.        You had had conversations with
9  Congressman Moore when you were creating your map,
10 correct?
11 A.        Correct.
12 Q.        Were these changes in the Moore --
13 excuse me.
14           Were these changes in the Holmes plan
15 changes that you did not want to or did not for some
16 reason make in the 2021 map that you drew?
17 A.        That's correct.
18 Q.        And why did you not make those changes?
19 A.        Because I didn't think it was fair to
20 put the majority of split counties into the 7th
21 District.
22 Q.        Why not?
23 A.        I just didn't think any one district
24 should have to have four split counties when other
25 districts only had one.

Page 184

1  Q.        Was that the only reason you didn't make
2  those changes?
3  A.        Primarily.  I didn't think it was a good
4  -- first of all, it's 739 people.  It's not really
5  -- you couldn't make a case that Congressman Moore
6  was going to lose re-election over gaining 739
7  republicans in Escambia County.
8           So I was not concerned about what it did
9  to his district.  I was concerned about the fairness
10 issue of putting all of the splits in one
11 congressional district.
12 Q.        Were there any other reasons why you
13 didn't incorporate those changes in the Holmes plan
14 into your map?
15 A.        That was -- that was the primary reason.
16 Q.        Were you asked by anybody to review the
17 Holmes congressional plan?
18 A.        Well, when it was offered on the
19 floor -- I'm not sure where it was offered.  The
20 house floor maybe.  This doesn't say on here.
21           But whatever chair where that was being
22 offered asked me to, I'm sure, tell him what I knew
23 about the Holmes plan.
24 Q.        What did you tell him?
25           MR. WALKER:  You can tell him.

Page 185

1           THE WITNESS:  I thought you didn't want
2  me to --
3           MR. WALKER:  You can tell him.
4  A.        I told him that I didn't -- I didn't
5  think that was a good change to our map because,
6  again, it put all of -- not all.  But put another
7  split into the 7th District.  Which I didn't think
8  it was equitable to put most of the splits in one
9  congressional district.
10 Q.        Did you tell him anything else?
11 A.        That's basically it.
12 Q.        Did you provide any evaluations or
13 recommendations regarding that map?
14 A.        Other than voting it down, no.  I
15 suggested they not vote for it.
16 Q.        Moving to the Faulkner congressional
17 plan two.
18 A.        Yes.
19 Q.        Why did you review that map?
20 A.        That was the change where I had put
21 Homewood back together that made a few people in
22 Jefferson County, I guess, unhappy.
23           So representative Faulkner, who is from
24 Jefferson County, had a map that took the three
25 Homewood precincts out of District 7 and put them

Randy Hinaman
December 09, 2021

Page 186

1  into District 6, and took four precincts in the
2  Center Point area, which is the northern end of
3  District 7, and put those back into District 7. So
4  I reviewed those changes.
5  Q.        Similar to before, were you asked by
6  anybody to review that plan?
7  A.        I was. And whatever -- again, I think
8  these were offered in the house. So I think it
9  probably would have been Representative Pringle that
10 asked me for a quick analysis of what the plan
11 changes were.
12 Q.        And what did you tell him?
13 A.        I told him that it moved the Homewood
14 area into District 6, and it took those four
15 precincts at the northern end of district -- who
16 were in District 7 and added them back into District
17 7.
18        And I allowed as how I didn't think that
19 was really a good thing to do because it eliminated
20 some of my geographical compactness of what I was
21 trying to do when we were adding in western
22 Jefferson and not extending the quote, unquote
23 finger further north into Jefferson County.
24 Q.        To your knowledge, did any of the
25 changes from your plan to the Faulkner plan have to

Page 187

1  do with any racial factors?
2  A.        I don't know -- I mean, I don't know
3  about the motivations of who drew the Faulkner plan.
4  Q.        Are you aware of any racial
5  considerations that were taken in account in drawing
6  the Faulkner plan?
7  A.        I'm not.
8         MR. WALKER: Objection to form. You may
9  answer.
10 Q.        What about the Singleton plan? Why did
11 you review that plan?
12 A.        Well, that was one that -- the initial
13 Singleton plan was one that was offered at a number
14 of public -- virtually every public hearing, I
15 believe. It had been in existence for quite a
16 while.
17        So I looked at it for what it -- you
18 know, for what it was doing. And I had a little
19 more time to look at it, actually, than some of
20 these other ones that came in at the last minute.
21 Q.        Do you know what feedback there was from
22 the public hearings on the Singleton plan?
23 A.        Not specifically. I really don't.
24 Q.        Did you ever hear of any public feedback
25 on the Singleton plan?

Page 188

1  A.        Not that comes to mind, no.
2  Q.        Were you asked by anybody to review the
3  Singleton plan?
4  A.        Again, I was when it was offered in the
5  house or senate -- I guess it was offered on the
6  senate floor maybe first. Whichever chair of
7  wherever it was offered, I was asked to comment on
8  it.
9  Q.        And what did you tell that chairperson?
10 A.        Well, the initial Singleton plan was not
11 a zero deviation plan. So it really didn't meet our
12 guidelines. I also think it paired a couple of
13 incumbents, if I'm remembering the plan correctly,
14 in the 3rd District. I think it put in -- put maybe
15 Shelby County in the 3rd. So it would have paired
16 Gary Palmer and Mike Rogers. And it wasn't to zero
17 deviation. Also, it didn't have a majority black
18 district in it.
19 Q.        Was that an issue to you, that there's
20 not a majority black district?
21 A.        Yeah. Well, it -- it was an observation
22 that it did not have a majority black district.
23 Q.        Does that matter for any particular
24 reason to you?
25 A.        Well, it matters -- again, I'm not a

Page 189

1  lawyer. But I suppose there would be some question
2  to how well it comported with Section 2 of the
3  Voting Rights Act. But, again, that wasn't my major
4  concern with it.
5  Q.        There were two subsequent Singleton
6  plans, plan two and three.
7  A.        Yeah.
8  Q.        Both of which you stated -- and it
9  describes here in Exhibit 9 as having adjustments
10 for population deviation.
11        Were there any other changes in
12 Singleton plan two and three other than changes to
13 deviation, to your knowledge?
14 A.        Not to my knowledge. And, again, I
15 looked at -- I didn't look at these plans
16 extensively. But to my knowledge, it was just a
17 change in deviation.
18 Q.        Were those other observations that you
19 made to Singleton plan one regarding incumbents
20 being paired up against each other, a lack of a
21 black majority district, any other observations you
22 made, were any of those addressed with Singleton
23 plan two or three?
24 A.        Not that I'm aware of.
25 Q.        Were you asked by anybody to review

Page 190

1  Singleton plan two and three?
2  A.        Again, in whatever body they were
3  offered in, the chair would have asked me about
4  them, yes.
5  Q.        Do you recall what recommendations or
6  observations you provided?
7  A.        Basically the same ones.  The narrow
8  deviation, again while a more narrow deviation, was
9  not to zero deviation.  And I think it still paired
10 the incumbents.  And as I remember, the BVAPs on the
11 districts were very similar between -- among the
12 three.  So I don't think it changed any of those
13 things.
14 Q.        You also mentioned that you looked at
15 briefly the Coleman plan, Hatcher plan, Waggoner
16 plan, and Barfoot --
17 A.        Yeah.
18 Q.        -- plan.
19 A.        Yes, sir.
20 Q.        Did you make any observations from your
21 looking at or review of those?
22 A.        No.  Well, the Barfoot plan was sort of
23 just the senate version of the Holmes plan making
24 the change for Representative Moore.
25           The Wagner plan was basically Faulkner

Page 191

1  and Barfoot put together or Barfoot and Holmes put
2  together.  It also made the Moore change, but made
3  the Faulkner change in Jefferson County.  So they
4  were just sort of different versions or compilations
5  of those two things.
6  Q.        I'm going to stop you right there
7  because I think there's -- it looks like there's two
8  Waggoner plans here.  Which one are you referring
9  to, three or one?
10 A.        Three was the combination.  One -- one
11 was essentially the Faulkner version of the plan,
12 only in a -- drawn up by a senator or offered by a
13 senator.
14 Q.        And I interrupted you there.  I think
15 the only other plan we haven't discussed yet is the
16 Hatcher plan.
17 A.        Right.  And, again, that came in, if I
18 remember correctly, the night before it was offered
19 on the floor.  So I really looked at it for
20 literally ten minutes before whoever -- wherever it
21 was offered.  I guess on the senate side.  So I
22 didn't do a very deep analysis of the Hatcher plan.
23 Q.        For each of these plans that you said
24 you just looked at briefly, the Coleman plan, the
25 Waggoner plans, the Barfoot plan, and the Hatcher

Page 192

1  plan, is it a similar response as you had to the
2  other ones, that you were asked to look at those by
3  whoever was presenting them on the floor?
4  A.        Whoever was managing the time, the time
5  on the floor.
6  Q.        And as to each of those, do you recall
7  what your feedback was?
8  A.        Yeah.  I mean, obviously, the Waggoner
9  plan was the same as the Faulkner plan.  So I didn't
10 think it was a good change.  And the Barfoot plan
11 was essentially the same as the Holmes plan.  So I
12 didn't think that was a good change.  And the
13 Waggoner three was just a compilation of the two of
14 them added together, which didn't do anything to
15 move the bar.
16 Q.        What about the Coleman plan?
17 A.        The Coleman plan, again, I didn't look
18 -- didn't have a chance to look at very much.  I
19 believe it paired two incumbents in 1, in District
20 1, Carl and Moore.  And it certainly didn't respect
21 the cores of districts because I think it had
22 District -- District 7 went from Mobile to
23 Tuscaloosa maybe.
24           Anyway, again, I didn't spend a lot of
25 time on either of those, looking at either of those

Page 193

1  plans.
2  Q.        What about the Hatcher plan?
3  A.        The Hatcher plan I think was obviously a
4  two black district plan.
5           THE REPORTER:  Two?
6  A.        Two black district plan.  I do think it
7  -- I think it paired incumbents, but maybe I'm
8  wrong.  Again, geographically it was not very
9  compact.  I think it went from Mobile to Russell
10 essentially on one of the black districts.
11           So I didn't think it -- I didn't think
12 it followed our guidelines very well in terms of
13 compactness.
14 Q.        Other than compactness --
15 A.        And splits.  I think it also had like 13
16 county splits, where the Pringle plan had six.  I
17 think it split a lot more precincts.
18 Q.        Other than compactness and splitting
19 precincts, was there any other reason that you felt
20 that the Hatcher plan did not comply with the
21 guidelines?
22 A.        Those were the main issues.
23 Q.        Were there any other issues?
24 A.        I don't think so.
25 Q.        And with the Singleton plan, were there

Page 194

1 any reasons why you felt that the Singleton plan did
2 not comply with the redistricting guidelines?
3 A.        Yeah.  Well, the initial Singleton plan
4 was not to zero deviation.  It did pair incumbents
5 again in the 6th -- in the 3rd District, it had two
6 incumbents together, Moore and -- not Moore.  Palmer
7 and Mike Rogers.
8 Q.        Any other reasons?
9 A.        And, again, it didn't have a majority
10 black district.
11 Q.        Speaking of that, when you drew your
12 map -- which on this table, I would assume that's
13 the Pringle congressional plan.  Correct?
14 A.        Yes, sir.
15 Q.        When you drew the 2021 congressional
16 map -- remind me.  Did you start with drawing
17 District 7?
18 A.        No.  Actually, I started -- I started
19 with District 5 because I knew it had to spill into
20 4.  And I had to do that before I could do much else
21 there.
22 Q.        What order did you go in for drawing the
23 districts after that?
24 A.        I basically moved down -- moved down the
25 state.  I did 5 to 4.  And then the changes that 4

Page 195

1 -- putting Cherokee back together in 3, putting
2 Blount back together in 6, corresponding changes in
3 Tuscaloosa in 7.  I basically worked down the map
4 from there.
5 Q.        And you stated that you did not look at
6 the racial data in drawing the 2021 map until the
7 week before the special session, correct?
8 A.        Correct.
9 Q.        When you did review the racial data, if
10 it had shown that District 7 was below 50 percent
11 black voting age population, what would you have
12 done?
13 A.        I would have talked to legal counsel
14 about what steps to take at that point.
15 Q.        Do you believe that you would have
16 needed to make modifications to make the black
17 voting age population percentage higher than 50
18 percent?
19          MR. WALKER:  Object to the form, calls
20 for speculation.
21 Q.        You can answer.
22 A.        I'm sorry.  Say that again.
23          MR. THOMPSON:  Can I have the question
24 read back?
25          (Record read.)

Page 196

1 A.        I think if it had come back under 50
2 percent, in consultation with legal counsel, I
3 assume we would have, under the guidelines, looked
4 for a basis and evidence to see if one existed to
5 add African Americans to the district.
6 Q.        Did you draw any other maps other than
7 -- let me take a step back.
8          Did you draw any other congressional
9 maps other than the HB-1 Pringle congressional plan
10 that was ultimately enacted?
11 A.        This cycle -- I don't know what time
12 frame we're talking about.
13 Q.        I'll try again.  Sorry.
14          In drawing the 2021 congressional maps,
15 through that process you drew the map that was
16 ultimately enacted, correct?
17 A.        Yes, sir.
18 Q.        Did you draw any other maps in that
19 cycle --
20          MR. WALKER:  I'm going to --
21 Q.        -- for the congressional plan?
22          MR. WALKER:  -- object to the extent
23 that -- and you may not be intending to.  You're
24 asking him whether he tried to draw a two majority
25 black district --

Page 197

1 Q.        I'm just asking if you drew any other
2 maps at all.
3          MR. WALKER:  And my instruction to you
4 is if you did anything at the instruction of me
5 alone, then that would not be part of your answer.
6 A.        Other than that, no.
7 Q.        I've gone a little over an hour there,
8 but I wanted to finish up.  I think I'm done with my
9 questions for now.  So I think we'll take a break
10 and then allow some other folks to ask you some
11 questions.  Is that fair?
12 A.        That's fair.
13          THE VIDEOGRAPHER:  We are off the
14 record.  The time is 2:28 p.m.
15          (Recess was taken.)
16          THE VIDEOGRAPHER:  We are back on the
17 record.  The time is now 2:47 p.m.
18          MR. THOMPSON:  At this time, I'm going
19 to pass the questions to Mr. Blacksher.
20 EXAMINATION BY MR. BLACKSHER:
21 Q.        Good afternoon, Mr. Hinaman.
22 A.        Good afternoon.
23 Q.        So it was Dorman Walker who told you you
24 were required to achieve zero population deviation;
25 is that right?

Page 198

1        MR. WALKER: Object to the form.
2  Q.        You know, I'm having -- I've had trouble
3  hearing you throughout.  So I'm going to have to ask
4  you to speak up a little louder.
5            What was your last response?
6        MR. WALKER: Are you talking to me, Jim?
7        MR. BLACKSHER: The witness didn't
8  respond?  That was you?
9        MR. WALKER: That was I who said "Object
10 to the form."  He doesn't make objections.
11       MR. BLACKSHER: Oh, you said objection?
12       MR. WALKER: Yes.
13 Q.        Okay.  I'm going back to what you said
14 in your examination, your direct examination, I
15 guess we call it, where you said you were advised
16 that you needed to use zero deviation in your plan.
17 Is that right?
18 A.        That's correct.  Under two criteria for
19 redistricting, B, "Congressional districts shall
20 have minimal population deviation."
21           I was told by counsel that that was zero
22 for six districts and plus one for one district.
23 Q.        And when you say "by counsel," you mean
24 -- well, I didn't ask you.  Were you advised by
25 lawyers other than Dorman Walker?

Page 199

1  A.        No.
2  Q.        So it was Dorman who told you that
3  minimal deviation means zero deviation?
4  A.        That's correct.
5  Q.        Okay.  So you also drew the plan in
6  1992.  And did you read the opinion of the court in
7  West v. Hunt, the 1992 opinion that adopted your
8  plan?
9  A.        I'm sure I did in 1992 or '93.  But I
10 sure don't remember it today.
11 Q.        You don't recall -- well, let me ask you
12 this:  Did counsel tell you or remind you that in
13 that decision, the three-judge court said that
14 because it was a court-approved plan, a
15 court-ordered plan, it felt constrained to have
16 perfect or zero deviation.  But that if the
17 legislature had drawn the plan itself, it would have
18 had greater leeway with respect to deviation?
19       MR. WALKER: Objection.
20 Q.        Do you recall reading that?
21       MR. WALKER: Jim, you've asked that
22 question several ways.  And one -- it could be
23 interpreted in one way to be whether or not I gave
24 him advice on that.  If that's what you're asking, I
25 object to that.

Page 200

1  Q.        Okay.  So if you read the West v. Hunt
2  opinion -- let me ask this question -- do you recall
3  the court saying that it felt compelled, because it
4  was a court-ordered plan, to use zero deviation?
5  A.        I do not.  As I said, I probably read it
6  30 years ago.  I certainly don't remember what it
7  said today.
8  Q.        Were you advised to use zero deviation
9  by anybody -- any lawyers in Washington, say,
10 connected with the republican party, the RNC or --
11 what was that other organization that you used
12 letters for?  NRRC or something?
13 A.        No.  In terms of the -- are you talking
14 about the 2021 plan?
15 Q.        The 2021 plan, yes.
16 A.        No, I did not speak to anybody at the
17 NRCC or the RNC or anybody in Washington other than
18 members of congress and their staffs.
19 Q.        Okay.  NRCC, what does that stand for?
20 A.        National Republican Congressional
21 Committee.
22 Q.        Okay.  But they didn't give you any
23 instructions or any advice about zero deviation?
24 A.        No, sir.
25 Q.        What about the members of congress in

Page 201

1  the Alabama delegation?  Did they give you any
2  instructions to use zero deviation?
3  A.        No, sir.
4        MR. BLACKSHER: Eli, did I print out a
5  copy of the passage from State of Alabama versus
6  U.S. Department of Commerce that you can show him?
7        MR. HARE: Let me see here.
8        MR. BLACKSHER: It's got a highlighted
9  section in it.
10       MR. HARE: Yes.
11       MR. BLACKSHER: Okay.  Can you mark that
12 as -- what did you say, PX 10?
13       MR. HARE: Right.  It's PX 10.
14
15            (Plaintiff's Exhibit 10 was
16            marked for identification.)
17
18       MR. BLACKSHER: And show that to
19 Mr. Hinaman
20            That, Randy, is the document that was
21 filed by the State of Alabama, as you can see, in
22 Montgomery's federal court against the census bureau
23 and styled 21-211.
24            And would you please read the
25 highlighted part in Paragraph 116 of the State's

Page 202

1  complaint?
2  A.        The part --
3  Q.        Read it into the record.
4  A.        I must admit highlighting in it in blue
5  makes it rather hard to read.  But nevertheless.
6            "Even at the higher census geography of
7  Alabama's congressional districts, the November 2020
8  demonstration data indicated that the differential
9  privacy algorithm skewed the data enough to create
10 population deviation on a level that courts have
11 found in other contexts to violate the supreme
12 court's equal population jurisprudence."
13 Q.        Thank you.
14           And under that language is a table that
15 shows what the State thought were errors caused by
16 differential privacy in the demonstration.  And they
17 were congressional districts.
18           Did counsel tell you that the State of
19 Alabama thought that the zero deviation requirement
20 was using flawed data, in their opinion?
21           MR. WALKER:  Objection to form.  And I
22 instruct the witness not to answer.
23 Q.        Okay.  Are you going to follow counsel's
24 advice not to answer my question, Mr. Hinaman?
25 A.        I am.

Page 203

1  Q.        So aside from what counsel told you,
2  were you aware that the State of Alabama took the
3  position in federal court that the -- that the 2020
4  census, because of differential privacy, would not
5  be reliable enough to use for zero -- for separating
6  people at that level?
7  A.        I was not.
8            MR. BLACKSHER:  Eli, if you can find
9  that passage from the public hearing at Northeast
10 Alabama Community College.
11           MR. HARE:  I've got it right here.
12           MR. BLACKSHER:  And mark that as Exhibit
13 11, please.
14
15           (Plaintiff's Exhibit 11 was
16           marked for identification.)
17
18           MR. BLACKSHER:  And show that to Randy,
19 to Mr. Hinaman.
20 Q.        As you can see, this is a transcript of
21 the reapportionment committee's hearing on September
22 1 at Northeast Alabama Community College.  And I've
23 printed out Page 12 and highlighted it.
24           Would you read the highlighted statement
25 of one Toni McGriff who lives in Dutton?  Would you

Page 204

1  read into that into the record, please?
2            MR. WALKER:  You haven't highlighted the
3  whole statement.  You've highlighted Lines 5 through
4  16.  Is that what you want him to read?
5            MR. BLACKSHER:  Yes, the highlighted
6  lines, please.
7  A.        "Most of Jackson County, particularly
8  all of Jackson County -- practically all of Jackson
9  County is in Congressional District 5.  But there is
10 a tiny little sliver of southern Jackson County
11 that's in 4.  And I understand about trying to get
12 everything equalized in terms of population.  But
13 the very few people who live there very frequently
14 think they're in District 5 and do not know who to
15 vote for.  And I would ask that you consider that
16 when you are redistricting so that you don't have
17 that tiny little sliver out of that county.  It is
18 in a section called Macedonia.  Senator Livingston
19 would know where I'm talking about, I'm sure."
20 Q.        Thank you.
21           So did anyone on the reapportionment
22 committee, the chairs or counsel, show you or tell
23 you about that testimony?
24           MR. WALKER:  Objection as to what he may
25 have been told my counsel.  Otherwise, he may answer

Page 205

1  the question.
2  A.        I was not familiar with that testimony.
3  But I did, of course, put Jackson County back
4  together.
5  Q.        You sure did.  And who paid the price
6  for that?  Lauderdale County?
7  A.        Well, you're comparing 17 people to
8  43,000 or something.  I'm not sure that's a fair
9  comparison.  But yes.
10 Q.        Was it 17 people in Jackson County?
11 A.        I'm making up that number.  You're
12 comparing a few people to many tens of thousands.
13 But nevertheless.
14 Q.        In most of the cases on the 2021 plan,
15 the enacted plan, for example, down in Escambia
16 County where you had to put the eastern slice of
17 Escambia into 2?
18 A.        Yeah, 739 people.
19 Q.        739 people.  Do you think that they're
20 going to share the sentiment of Mr. Toni McGriff in
21 Jackson County?
22 A.        They may very well.
23 Q.        And what I'm saying, what I'm trying to
24 point out, can't we agree that most of these tiny
25 splits to achieve zero population result in people

Randy Hinaman
December 09, 2021

Page 206

1  being basically separated from their home county and
2  put in a district where they really don't have much
3  influence at all over the member of congress, right?
4  A.        In the Escambia County case, I would
5  agree with that.  Although looking at the map, there
6  aren't many examples of that.  Because most of the
7  other splits in the enacted map are much larger
8  segments of folks.
9  Q.        Okay.  Now, you said that you began
10 working on the congressional plan in May at some
11 point; is that correct, when you found out that
12 Alabama would have seven seats in congress
13 apportioned to it?
14 A.        Yes, once we found out seven.  And also
15 the guidelines were passed on May 5th.  I started
16 work thereafter.
17 Q.        And you were using estimated census data
18 to sort of rough out what that plan might look like;
19 is that correct?
20 A.        That's correct.
21 Q.        And those estimated census data were
22 only available for whole counties, right?
23 A.        I believe that's the case, yes.
24 Q.        So you were having to work with whole
25 counties.  And when the final census data came out,

Page 207

1  you simply had to adjust with the correct 2020
2  legacy data; is that correct?
3  A.        That's correct.  Although while the
4  estimates captured the flavor of the changes that
5  happened over the last ten years, meaning four
6  districts were over and three districts were under
7  and the estimates properly identified those
8  districts, they didn't really capture the magnitude
9  of it.
10           Because I think the estimates had the
11 7th District being 30,000 and some odd number under
12 when it ended up being 54, and it had the 5th
13 District being something like 23,000 over when it
14 was really 43.
15           So while it captured the over/under
16 nature of the districts, it didn't -- it didn't do a
17 particularly good job of capturing the ultimate
18 numbers.
19 Q.        Did you attempt drawing a whole county
20 plan at that point in May of 2021?
21 A.        No.  I just -- no.
22 Q.        Why not?
23 A.        Well, I won't even consider it a plan.
24 I mean, I was just lumping together -- and I do
25 think I was able to split.  I just don't think the

Page 208

1  answers were very accurate on what Maptitude had for
2  estimates.
3           So I didn't -- I didn't -- I lumped some
4  counties together and I split some larger counties
5  based on precincts, knowing that those numbers were
6  not going to be very accurate, and then waited until
7  we got the real numbers.
8  Q.        Okay.  And when you got the real
9  numbers, did you attempt to draw a whole county
10 plan?
11 A.        I did not.
12 Q.        And why did you not attempt to do that?
13 A.        No one asked me to do that.  And, again,
14 my understanding of our guidelines would be that
15 that would not have followed the proper deviation.
16 Q.        Take a look at our whole county --
17           MR. BLACKSHER:  Can you mark a copy -- I
18 don't think it's been passed around yet -- just so
19 we can be talking from something, the same thing?
20           MR. HARE:  This will be Plaintiff's
21 Exhibit 12.
22
23           (Plaintiff's Exhibit 12 was
24           marked for identification.)
25

Page 209

1  Q.        So think along with me, Mr. Hinaman,
2  about how you might have attempted to reproduce your
3  starting point of the plan, which was the 2011 plan,
4  right?
5  A.        Yes, sir.
6  Q.        And if you were going to attempt to take
7  the 2011 plan and create whole districts and you
8  start with Congressional District 7, then you would
9  try to make Jefferson, Tuscaloosa, and Montgomery
10 whole.  And that's what this plan does, doesn't it?
11 A.        It does.
12 Q.        You would have attempted to keep as much
13 of the black belt together as you could.  And that's
14 what this plan does, doesn't it?
15           MR. WALKER:  Objection.  I'm not sure,
16 Jim, the way you're phrasing your questions, what
17 you're asking him.  You seem to be telling him what
18 he would have been doing and then -- I'm just
19 confused.
20           MR. BLACKSHER:  I'm asking leading
21 questions, Counsel.  Is that all right?
22           MR. WALKER:  Well, you're allowed to ask
23 leading questions.  I just didn't understand what
24 you were doing.  So go ahead, if that's what you
25 want to do.

Page 210

```
1              MR. BLACKSHER:  Can you read the
2   question back, please, Court Reporter?  I'm sorry.
3              (Record read.)
4              MR. WALKER:  Objection to form.
5   A.         It does, I guess.  Hale and Perry I
6   think would be considered part of the black belt,
7   and that's in a different district.  But by and
8   large, you're correct, yes.
9   Q.         Switching gears for a minute.  When you
10  met with Congresswoman Sewell, do I understand you
11  to say that she -- your testimony was that
12  Congresswoman Sewell wanted to keep her district the
13  way it is, adjusted for the population deviation
14  known; is that correct?
15  A.         I would phrase it this way:  I met with
16  Congresswoman Sewell and told her her district was
17  54,000 under.  And I gave her some options of where
18  it made, in my opinion anyway, sense to gain folks
19  to make up that 54,000 difference.  And then we
20  worked through that on the map.  That's how I would
21  phrase it.
22  Q.         Did Congresswoman Sewell tell you she
23  was opposed to attempting to draw two districts in
24  which blacks could elect candidates of their choice?
25  A.         She did not.  She didn't offer an
```

Page 211

```
1   opinion, to my knowledge, on that issue.
2   Q.         Say again.
3   A.         She didn't offer an opinion on that, to
4   my knowledge.
5   Q.         And you didn't ask her about it?
6   A.         I did not.
7   Q.         Were you aware of all of the
8   nongovernmental organizations and grass roots
9   organizations in Alabama who have been urging the
10  legislature to draw two districts from which blacks
11  can elect candidates of their choice?
12  A.         I'm not sure that I was that aware of it
13  in our initial meetings in May.  Obviously, once
14  public hearings were held and your whole county plan
15  came out and so forth and so on, I was obviously
16  more aware of it at that point.
17  Q.         Okay.  So what you're saying is that you
18  simply sat down with Ms. Sewell and made suggestions
19  on how to increase -- get 53,000 and some odd
20  additional population in District 7, correct?
21  A.         That's correct, and keeping her existing
22  -- the core of her existing district together.
23  Q.         And didn't I hear you say you suggested
24  that one option might be to making Tuscaloosa County
25  and Montgomery County whole; that is, swapping the
```

Page 212

```
1   population in Montgomery -- in Tuscaloosa County,
2   north Tuscaloosa County, with a population that
3   extends into Montgomery County?
4   A.         I didn't offer that.
5   Q.         What did -- you said something in your
6   earlier examination about considering that option.
7   A.         If I did, I didn't mean to.  I did not
8   consider that option.
9   Q.         You did not consider that option?
10  A.         No, I did not.
11  Q.         Why not?
12  A.         Because I started with her existing
13  cores of districts and I looked at what she needed
14  to gain, and I suggested areas that she may wish to
15  gain in.  And we worked through the map and made
16  those changes.
17  Q.         Well, I mean, was the -- is the little
18  -- the extension of District 7 that goes into
19  Montgomery County part of the core of that
20  district, in your opinion?
21  A.         It may be now.  It probably wasn't at
22  the -- obviously, I don't think it existed at the
23  beginning.  It's a lot of people.  I mean, I don't
24  know the exact number.  We can obviously look it
25  up.  But it's --
```

Page 213

```
1   Q.         Well, I can tell you that based on the
2   data that Dorman Walker and the reapportionment
3   committee provided to us, the population of
4   District 7 in Montgomery County is 62,519.
5   A.         Okay.
6   Q.         And the population of the portion of
7   Tuscaloosa County that's in District 4, the
8   northern part of Tuscaloosa County, is 42,770.  So
9   there's about a 20,000 difference between those two
10  split counties making them whole in District 7.
11             MR. BLACKSHER:  So I'm going to ask
12  Eli, if he would, to mark up those two documents
13  that show -- that are labeled Plan Tuscaloosa and
14  Montgomery Whole and show it to Mr. Hinaman.
15             MR. HARE:  I'm going to mark them as
16  -- the map as Plaintiff's 13, and then the chart or
17  the data sheet as Plaintiff's 14, Jim.
18
19             (Plaintiff's Exhibits 13&14
20             were marked for identification.)
21
22  Q.         I'll tell you, Mr. Hinaman, that I did
23  this with Dave's Redistricting app.  Are you
24  familiar with Dave's Redistricting app?
25  A.         I've heard of it.  I've never used it.
```

Randy Hinaman
December 09, 2021

Page 214

1  Q.        Okay.  And I did exactly what I just
2  suggested.  I made -- took Montgomery County
3  completely out of District 7, and I put all of
4  Tuscaloosa County into District 7.  And that 20,000
5  difference I got out of Jefferson County.
6              Otherwise, it looks pretty close to
7  the map that you ended up drawing and that was
8  enacted.  But, of course, would you -- would agree
9  that it otherwise (inaudible) the one that you
10  drew?
11  A.        Yeah.  Obviously, there's a split in
12  Blount and a split in Etowah that I don't have.
13  But yeah.
14  Q.        Well, this is a good point.  When you
15  talk about making changes in District 7 like I just
16  did with Dave's, you end up requiring changes in
17  several of the surrounding districts.
18              I mean, for example, because District
19  6 lost population to District 7, I elected to get
20  some population out of Blount.  And that ended up
21  splitting Blount.
22  A.        Right.
23  Q.        And because Montgomery County went
24  into District 2, I ended up having to do a little
25  split of Elmore County, right?

Page 215

1  A.        Yes, sir.
2  Q.        And on up the line, if you will.  But,
3  of course, I didn't have to interfere with the
4  split you made in Lauderdale County.  And these are
5  -- and this is not zero deviation.
6              If you look to the left in that table,
7  you will see that there are as many as 471 people
8  in District 2 who are going to have to be -- I'm
9  sorry.  District 3 who are going to have to be
10  taken out, right?
11  A.        Yeah.  I'll take -- I can't find that
12  number on this sheet.  But I'll take your word for
13  it.
14  Q.        Well, it's on the map.
15  A.        Oh, I'm sorry.  Yeah, I see it.  Thank
16  you.  I was looking on the corresponding number
17  sheet.  Sorry.
18  Q.        The point I want to make here is isn't
19  it true when you're drawing maps and you get to 471
20  people who have to be moved in order to get to zero
21  deviation, you go down to the block level, right?
22  A.        Most times, yeah.  Precincts aren't
23  going to have an exact number or that small a
24  number.
25  Q.        And I'll represent to you that I

Page 216

1  didn't -- this is drawn with precincts.  So you're
2  going to have to split some precincts, right?
3  A.        Yes, sir.
4  Q.        But that usually can be done after you
5  have achieved the goal you set out to in broader
6  terms in your districting scheme, right?
7  A.        Sure.
8  Q.        There are a lot of ways that you can
9  split precincts or counties in order to achieve
10  this -- this sacred zero deviation objective.  And
11  yet you didn't consider this option at all when you
12  were going over the plan with Congresswoman Sewell;
13  is that correct?
14  A.        That's correct.
15  Q.        She did not -- she did not have an
16  option to consider this arrangement, right?
17              MR. WALKER:  Objection to form.
18  A.        Obviously, she could have said how
19  about if I get all of Tuscaloosa County and come
20  out of Montgomery?  Which she said neither.
21  Q.        Well, I wonder if the reason she said
22  neither is because it turns out that doing that
23  reduces the BVAP, the black voting age population,
24  to 49.79 percent?
25              MR. WALKER:  For CD 7?

Page 217

1              THE REPORTER:  For what?
2              MR. WALKER:  CD 7.
3  Q.        Do you see that in the statistical
4  table?
5  A.        Yes, sir, I do.
6  Q.        So would that have been a problem for
7  Terri Sewell based on what she was telling you were
8  her objectives?
9  A.        I don't know specifically.  I don't
10  think she considered this map.  So I can't -- I
11  don't really know how to answer your question.
12  Q.        Okay.  Did you and Congresswoman
13  Sewell discuss the whole county plan, the League of
14  Women Voters' whole county plan?
15  A.        We did not.  I don't think it -- in
16  our initial meetings, I don't think it existed.  Or
17  at least I was not aware of it.  I don't think she
18  was.  So we really did not.
19  Q.        It didn't exist in May, but it did
20  exist before you finalized the plan that became
21  HB-1, right?
22  A.        Correct.
23  Q.        And September 1, 2021, was the first
24  public hearing of the reapportionment committee.
25  And the League of Women Voters was the first

Randy Hinaman
December 09, 2021

Page 218

1  witness at the first hearing offering that plan;
2  isn't that correct?
3  A.        I wasn't at that hearing.  But I'll
4  take your word for it.
5  Q.        So you're telling us that the
6  whole county plan offered by the League of Women
7  Voters was never discussed at all when you were
8  communicating with Congresswoman Sewell?
9  A.        I don't believe it -- maybe it was
10 discussed at the very end about what other plans
11 are out there.  We may have had a minor discussion
12 about -- frankly, I think at that point in time
13 yours would have been the only other publicly
14 acknowledged congressional plan.  So she may have
15 mentioned it.  But we didn't have a very healthy
16 discussion about it.  Let's put it that way.
17 Q.        What do you mean not healthy?
18 A.        Very long, very detailed.  She was
19 asking what other plans have you heard about.  And
20 I think at that point, yours was the only one that
21 was public at that point in time.
22 Q.        Did she tell you she would object to
23 that plan?
24 A.        We didn't have that detailed a
25 discussion about it.

Page 219

1  Q.        So we don't know -- we don't know
2  whether Congresswoman Sewell would be happy with
3  the whole county plan or not; is that correct?
4  A.        I do not know, no.  You may know.
5  Q.        Sir?
6  A.        I don't know.  I mean, you may have
7  talked to her about it.  I don't have any knowledge
8  of it directly.
9  Q.        I understand.
10           Can you take another look at the
11 whole county plan map, please?
12 A.        Yes, sir.
13 Q.        And compare it -- and compare it with
14 the map of the 55 -- 555 plan, HB-1, the enacted
15 plan.
16 A.        Yes, sir.  Exhibit 5.
17 Q.        If the court wanted to -- was drawing
18 a remedial plan in this case, just for the sake of
19 argument, it had reached the point where it was
20 going to draw its own plan, and it wanted to change
21 the whole county plan to look more like the plan
22 that the legislature enacted, that would simply be
23 a matter of changing the array between Districts 5
24 and 4, correct?
25 A.        No.  I mean -- well, first of all,

Page 220

1  Terri Sewell doesn't even live in District 7 under
2  your whole county plan.  She lives in District 6.
3  Q.        I'm sorry.  I'm not being clear, and
4  my question was not understood by you.
5           I'm just asking if the court wanted to
6  change the array -- if it was drawing a
7  court-ordered plan and it wanted to make the whole
8  county plan 5 and 4 look more like the whole --
9  like the 5 and 4 districts in the enacted plan, it
10 would simply be a matter of balancing out the
11 populations between 4 and 5, correct, splitting
12 some counties as needed?
13 A.        Yeah.  Obviously, 4 has changes in
14 Tuscaloosa and St. Clair that are different than
15 the enacted plan.
16 Q.        Every -- every change has a ripple
17 effect, right?
18 A.        Yes, sir.
19 Q.        All right.  But there would be no
20 problem in putting Lauderdale, Colbert, and
21 Franklin in CD 4 and moving Morgan County back up
22 into CD 5 if the court wanted to do that and made
23 the splits necessary to bring it into population
24 equality; isn't that correct?
25 A.        Yeah.  These hypothetical the court

Page 221

1  wants to change things are hard for me.  But yes, I
2  guess that's correct.
3  Q.        I'm looking at the map of the plan you
4  drew in 1992 that was adopted by the three-judge
5  court in West versus Hunt.  Did that map ever get
6  shown to you today, or not?
7  A.        It has not been shown to me today.
8           MR. BLACKSHER:  Okay.  I'm looking at
9  it in the amended complaint.  I don't know if
10 anyone has a copy there that they can show
11 Mr. Hinaman or not.
12           But do you recall, Mr. Hinaman, that
13 the plan you drew in 1992 included all of the same
14 counties that are in the plan you drew in 2021?
15 A.        I'm not sure I -- I'm not sure I know
16 what that -- I'm not sure I know what you mean by
17 that.
18 Q.        The plan that you drew in 1992 had
19 Clarke split, it had Pickens split, Tuscaloosa and
20 Jefferson split, and Montgomery County split.
21           Now, your plan in 2021 leaves Pickens
22 whole, correct?
23 A.        Correct, and Clarke whole.
24 Q.        And Clarke whole.  But Tuscaloosa,
25 Jefferson, and Montgomery are still split?

Randy Hinaman
December 09, 2021

Page 222

1  A.          Yes, sir.
2  Q.          So your 2021 plan, the plan you drew
3  and that was enacted by the legislature in 2021,
4  preserves the core of the 1992 plan that you drew;
5  is that correct?
6  A.          It's -- it's correct.  But you've
7  missed a few steps along the way, obviously.
8  Because as we discussed earlier in the deposition
9  testimony, it more preserves the cores of the 2011
10  districts, which I guess by chain preserve some of
11  the 2001 districts, which the legislature preserved
12  some of the 1992 districts, if that made any sense.
13          In other words, I did not use the 1992
14  map as the starting point for my 2021 map.
15  Q.          No.  You used the 2011 plan, correct?
16  A.          Correct.
17  Q.          And isn't it true that the 2002 plan
18  and the 2011 plan preserved the cores -- the core
19  of the 1992 plan?
20  A.          For the most part.
21  Q.          Can we sum up your testimony about how
22  you went about drawing the 2021 enacted plan by
23  saying that you drew the plan so that it satisfied
24  what each incumbent member of the Alabama
25  congressional delegation wanted?  That was your

Page 223

1  primary guideline, right?
2  A.          Well, that was a part of it.  My
3  primary guidelines were the guidelines given to me
4  by the reapportionment committee, and then based
5  off of the subsequent population shifts over the
6  last ten years to repopulate or take away from,
7  depending on the over/under of each district,
8  population, and geography to reach the required
9  guidelines of zero deviation and preserving the
10  cores of districts.
11          And, of course, where possible -- and
12  we've had a couple of minor cases where it wasn't,
13  as we discussed with Representative Moore and so
14  forth.  But preserving what the incumbents would
15  have -- would like to accomplish, as well.
16  Q.          But your testimony is that nobody else
17  but the members of the Alabama congressional
18  delegation had any input into the decisions you
19  made about how to draw that plan; isn't that
20  correct?
21  A.          That's pretty much correct, yes, sir.
22  Q.          No member of the Alabama legislature's
23  reapportionment committee, including its chairs,
24  had any input into that plan; isn't that correct?
25  A.          They had all the input they wanted

Page 224

1  into the plan.  But they chose to allow the members
2  of congress to talk about what areas they wanted to
3  gain and lose underneath the guidelines that they
4  had already passed.
5  Q.          And, in fact, in 19 -- let's see.
6  Excuse me.
7          In 2011, that's what the legislature
8  did, as well.  They simply deferred to what the
9  congressional delegation wanted in redrawing that
10  plan, right?
11  A.          No, that's not -- that was the goal I
12  had.  But that's not what happened.  When we got --
13  as you may remember, when we got to the senate
14  floor, there were some members of the senate who
15  may have wanted to run in one district or another
16  who moved some things around.
17          My map -- my initial map in 2011
18  didn't even have the 4th District in Tuscaloosa.
19  It had the 6th District in Tuscaloosa.
20          So there were numerous changes made on
21  the senate floor and probably subsequently the
22  house floor from the map that the members and I
23  worked on, members of congress and I worked on.
24  Q.          But that didn't happen in 2021?
25  A.          It did not happen in 2021.  The map

Page 225

1  that came out of -- the map that I gave to the
2  chairs that was offered at the reapportionment
3  committee was not amended through the process.  So
4  it was identical to what was passed into law and
5  signed by the governor.
6  Q.          Okay.  So let me just go over -- I
7  think I'm about finished here.  I want to make sure
8  I understand what your testimony is.
9          You considered no other plans that did
10  not have a zero deviation; is that correct?  You
11  never considered drawing a plan that did not have a
12  zero deviation?
13  A.          That's correct.  My understanding and
14  -- my understanding of the guidelines required us
15  to be at zero deviation.
16  Q.          And you understood, didn't you, that
17  Jefferson County was now at a population level that
18  was smaller than an ideal congressional district
19  and, therefore, no longer needed to be split?  You
20  were aware of that, weren't you?
21  A.          I'm aware of it.  I'm not sure I
22  focused on it.  But what you say is true.
23  Q.          It wasn't -- it wasn't a priority for
24  you to try to make Jefferson County whole?  That's
25  what you're saying?

Page 226

1  A.         That's correct.

2          And, frankly, when I started the
3  meetings, I didn't even -- at the time I started
4  the meetings -- subsequently I realized it.  But at
5  the time I started the meetings, I actually thought
6  that both Representative -- Congresswoman Sewell
7  and Congressman Palmer both lived in Jefferson
8  County.  As I turned out, he had -- Representative
9  Palmer had moved over the last few years into
10  Shelby.

11          But at the time, I would have thought
12  that that wasn't possible under our guidelines.
13  Because when I started the process, I thought they
14  both lived in Jefferson County.

15  Q.         But, in fact, you found out that
16  Congressman Gary Palmer lives about three blocks
17  south of the Jefferson County line in Shelby
18  County, and Congresswoman Sewell lives about a mile
19  away from where Palmer lives.  But she's on the
20  Jefferson side of the line in Lake Cyrus, right?

21  A.         That's correct, yeah.

22  Q.         But I also understood you to say that
23  Congresswoman Sewell considered making her
24  residence, for purpose of redistricting, Dallas
25  County.  Am I correct?

Page 227

1  A.         I'm not sure I would phrase it that
2  way.

3          When asked what residence -- when
4  asked for her residence address so it could be put
5  in the computer so that we would make sure she was
6  inside her district, she gave us both her address
7  where she votes at, which is obviously Jefferson
8  County, and her ancestral home.  I don't know the
9  right way to phrase it.  Where she grew up in
10  Dallas County.

11  Q.         She grew up in Selma, right?

12  A.         Yes.  Yes, sir.

13  Q.         Okay.  And you're aware, aren't you,
14  that there is no residency requirement for members
15  of congress, aren't you?

16  A.         I am aware.  I'm also aware it's
17  exceedingly difficult to get elected when you're
18  outside of your district.  It makes a rather good
19  TV spot.

20  Q.         So even though congress -- Congressman
21  Palmer still lives in the city of Birmingham, he's
22  in that part that extends into Shelby County, he
23  would not feel comfortable representing the
24  Birmingham area again; is that right?

25  A.         I don't know that.  He may feel

Page 228

1  perfectly comfortable.  But I've -- I've seen in
2  other races where, you know, the fact that somebody
3  doesn't reside in their district is not a positive
4  when you get around to campaigning.

5  Q.         Okay.  I think I'm about done here.  I
6  need one more look at my notes.

7          That's it.  Thank you very much,
8  Mr. Hinaman.

9  A.         Thank you.

10          MS. MADDURI:  This is Lali Madduri for
11  the Caster plaintiffs.  We don't have any
12  questions.

13          MR. THOMPSON:  I think that's all the
14  questions that I have at this time, too.  So on
15  behalf of all the plaintiffs, I'll pass the witness
16  at this time.

17          MR. WALKER:  Let us have a few
18  minutes.

19          THE VIDEOGRAPHER:  We're off the
20  record.  The time is 3:34 p.m.

21          (Recess was taken.)

22          THE VIDEOGRAPHER:  We are back on the
23  record.  The time is 3:39 p.m.

24          MR. WALKER:  We have nothing to ask
25  Mr. Hinaman.  So I guess we're done.  Thank you

Page 229

1  very much, everyone.

2          THE VIDEOGRAPHER:  This ends the
3  deposition of Randy Hinaman.  The time is now
4  3:40 p.m.

5

6          (DEPOSITION ENDED AT 3:40 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Randy Hinaman
December 09, 2021

Page 230

1   STATE OF ALABAMA )

2   JEFFERSON COUNTY )

3

4              I hereby certify that the above

5   proceedings were taken down by me and transcribed

6   by me using computer-aided transcription and that

7   the above is a true and correct transcript of said

8   proceedings taken down by me and transcribed by me.

9              I further certify that I am neither of

10  kin nor of counsel to any of the parties nor in

11  anywise financially interested in the result of

12  this case.

13             I further certify that I am duly

14  licensed by the Alabama Board of Court Reporting as

15  a Certified Court Reporter as evidenced by the ACCR

16  number following my name found below.

17             So certified on December 9, 2021.

18

19

20

21

22      _____

        LeAnn Maroney, Commissioner

23          ACCR# 134, Expires 9/30/25

            505 North 20th Street, Suite 1250

24          Birmingham, AL  35203

25

1  STATE OF ALABAMA )

2  JEFFERSON COUNTY )

3

4        I hereby certify that the above

5  proceedings were taken down by me and transcribed by

6  me using computer-aided transcription and that the

7  above is a true and correct transcript of said

8  proceedings taken down by me and transcribed by me.

9        I further certify that I am neither of

10  kin nor of counsel to any of the parties nor in

11  anywise financially interested in the result of this

12  case.

13        I further certify that I am duly

14  licensed by the Alabama Board of Court Reporting as a

15  Certified Court Reporter as evidenced by the ACCR

16  number following my name found below.

17

18

19

20

21  LeAnn Maroney, Commissioner
   ACCR# 134

22

23

24

25

Randy Hinaman
December 09, 2021

| Exhibits | | | |
|---|---|---|---|
| **EX 0001 Randy Hinaman 1209 21**<br>  7:13 14:7,13 | **EX 0010 Randy Hinaman 1209 21**<br>  8:7 201:15 | **1** | **12,000**<br>  126:24<br>**123**<br>  62:4 |
| **EX 0002 Randy Hinaman 1209 21**<br>  7:15 14:7,15 | **EX 0011 Randy Hinaman 1209 21**<br>  8:10 203:12, 13,15 | **1**<br>  14:7,13<br>  29:23<br>  114:22,23,24<br>  122:21 123:9<br>  125:19 137:9 | **12:57**<br>  122:8<br>**13**<br>  193:15<br>  213:16 |
| **EX 0003 Randy Hinaman 1209 21**<br>  7:17 21:19, 24 | **EX 0012 Randy Hinaman 1209 21**<br>  8:12 208:21, 23 | 161:1,2,3<br>  176:15<br>  183:1,2,5<br>  192:19,20<br>  203:22<br>  217:23 | **13&14**<br>  213:19<br>**14**<br>  213:17<br>**14th**<br>  112:23 113:8 |
| **EX 0004 Randy Hinaman 1209 21**<br>  7:19 25:6, 10,11 | **EX 0013 Randy Hinaman 1209 21**<br>  8:14 | **1&2**<br>  14:3<br>**10**<br>  137:9<br>  201:12,13,15 | 139:16<br>**150**<br>  61:23<br>**16**<br>  204:4 |
| **EX 0005 Randy Hinaman 1209 21**<br>  7:21 92:17, 20 110:15,16 219:16 | **EX 0014 Randy Hinaman 1209 21**<br>  8:16 | **10,000**<br>  71:23 72:11<br>**100**<br>  61:19 119:9<br>**105**<br>  80:10,14,16, 20 | **17**<br>  25:15 205:7, 10<br>**19**<br>  224:5 |
| **EX 0006 Randy Hinaman 1209 21**<br>  7:23 93:10, 14,18 | **$**<br>**$10,000**<br>  43:22,25<br>**$400**<br>  17:18 | **105-member**<br>  65:11<br>**10:00**<br>  88:1<br>**10:17** | **1965**<br>  140:24 141:5<br>  165:13<br>  166:13<br>**1992** |
| **EX 0007 Randy Hinaman 1209 21**<br>  7:25 135:14, 18 147:22 | **$50,000**<br>  55:5,20 | 65:22<br>**10:35**<br>  65:25<br>**11**<br>  203:13,15 | 24:2,17<br>  26:11 27:7<br>  28:4 30:7, 11,18 31:7, 13 33:7,10, 23 34:17 |
| **EX 0008 Randy Hinaman 1209 21**<br>  8:3 160:7,11 167:10,16 | **(**<br>**(c)(4)**<br>  53:18 | **116**<br>  201:25<br>**11:30**<br>  121:25<br>**11:42** | 35:12 37:19<br>  39:14,17<br>  40:1 91:6<br>  95:10 172:2<br>  199:6,7,9 |
| **EX 0009 Randy Hinaman 1209 21**<br>  8:5 179:16, 19 189:9 | **0**<br>**000007**<br>  179:21<br>**00056**<br>  160:13<br>**043723**<br>  135:21 | 122:5<br>**12**<br>  203:23<br>  208:21,23 | 221:4,13,18<br>  222:4,12,13, 19<br>**1st**<br>  72:19,20,22, 25 87:1 |

Randy Hinaman
December 09, 2021

123:9,20

**2**

**2**
  14:7,15
  96:24 97:16
  124:1,3,5
  125:19 138:9
  141:2,15,18,
  22 142:14,19
  144:5,8,14,
  25 146:5,6
  147:22
  161:12,13,14
  183:1 189:2
  205:17
  214:24 215:8
**20**
  24:8 147:22
  179:1
**20,000**
  213:9 214:4
**200**
  62:10
**200,000**
  55:24
**2001**
  26:13,24
  27:14,24
  28:11 29:4,
  22,25 30:4
  38:17 39:13,
  17 40:1,4
  89:7 95:5
  126:20
  159:14
  222:11
**2002**
  222:17
**2011**
  23:20 26:12,
  13 37:22
  38:11 39:13
  40:3,7,9,15
  42:13,18
  43:5 44:5,25

45:3,17 46:7
48:11,15,17,
23 49:19
50:12,21
53:11,19,24
77:3,5,8,11,
12,25 85:19
93:15,19,22
94:9,13,25
95:15 100:5,
8 114:22
116:16
124:22
125:13
159:16
171:3,9,12
173:16
209:3,7
222:9,15,18
224:7,17
**2012**
  23:20,23
**2013**
  22:4,9,18
  25:16
**2018**
  22:23
**2019**
  56:21 57:9
  59:9 66:6
**2020**
  51:18,19,20
  52:12,21
  53:19 54:4
  55:13,17
  57:11 62:22,
  23 202:7
  203:3 207:1
**2021**
  9:7,17
  39:12,16
  40:6 48:3,5
  51:2,5,12,
  16,19 53:20
  57:18 58:9
  59:22 60:9,
  12,24 61:5,
  15,20 62:14,

16,17 63:17,
20 64:21
65:4,15
66:3,4,5,23
67:8,11,14,
20 68:14
70:22 71:14
74:16,19
75:16 76:2
78:9 79:3,8
80:1 83:14,
16,24 84:2
85:7,23
86:5,14
87:15,20
88:11 91:13
92:22,25
93:4,24 94:5
95:16 98:18
99:21 100:9,
14,16 101:7,
9,14 106:7,
9,12,13,16,
18 107:12
110:18 111:3
120:1 121:1,
7 123:3
124:23
129:19 132:3
134:11
135:22 136:7
137:6 156:10
160:15,23
167:17,21,25
169:3
172:13,25
173:21,24
174:16
176:19
179:23 180:3
183:16
194:15 195:6
196:14
200:14,15
205:14
207:20
217:23
221:14,21
222:2,3,14,

22 224:24,25
**2021-555**
  51:8
**21**
  148:6
**21-211**
  201:23
**217**
  62:4
**23,000**
  207:13
**23rd**
  61:11
**24**
  48:8
**25**
  22:4,9 150:5
**26**
  151:5
**2:21-CV-
01530-AMM**
  9:14
**2:28**
  197:14
**2:47**
  197:17
**2nd**
  72:23,24
  87:1 124:13
  125:14
  134:25
  161:24

**3**

**3**
  21:19,24
  95:17 124:9,
  12 126:8,25
  147:21
  162:1,3,4
  195:1 215:9
**30**
  31:2 33:11,
  22,24 200:6
**30,000**
  207:11

Randy Hinaman
December 09, 2021

**317**
78:17
**33267**
18:11
**35**
81:13
**36561**
18:12
**3:34**
228:20
**3:39**
228:23
**3:40**
229:4,6
**3rd**
94:19 124:4
126:19
130:17
162:12
188:14,15
194:5

---

**4**

**4**
25:6,11
91:23 115:8,
9,11 127:5
162:13,15,16
194:20,25
204:11 213:7
219:24
220:8,9,11,
13,21
**40-hour**
63:2
**41**
47:3,8,10
179:9
**42,770**
213:8
**43**
207:14
**43,000**
205:8
**471**
215:7,19

**49.79**
216:24
**4th**
96:15 156:2
224:18

---

**5**

**5**
91:23 92:17,
20 110:15,16
115:6,7
128:18,23
163:1
194:19,25
204:3,9,14
219:16,23
220:8,9,11,
22
**5-5-57**
18:9
**50**
34:12
195:10,17
196:1
**50,000**
55:21
**501(c)(4)**
53:10,16,21
86:3
**53,000**
211:19
**54**
207:12
**54,000**
210:17,19
**54.22**
118:12
**55**
219:14
**550**
134:5
**555**
219:14
**5th**
127:8,9
135:21

136:15
206:15
207:12

---

**6**

**6**
93:10,14,18
116:19
126:22
127:24 130:4
132:5 133:10
138:10
163:9,11
167:7 172:5,
9 176:15
186:1,14
195:2 214:19
220:2
**60**
44:7
**62**
169:15 170:4
**62,519**
213:4
**6th**
138:5 194:5
224:19

---

**7**

**7**
25:21 30:1,
17 32:2,5,15
33:23 35:12,
23 36:5
42:19 43:6
44:6,14
45:2,19,20
46:7 48:15
95:1,4,9
96:3 97:6,
14,15,21
104:5 114:2,
22,25 115:3
116:12 117:7
119:13

123:8,13,22
124:3 128:7
132:6 133:9
135:14,18
138:8 147:22
163:16,18,19
170:7,8,22,
25 171:12
172:1,14,18
173:1,24
174:8,18,21
175:3,5,13
183:2 185:25
186:3,16,17
192:22
194:17
195:3,10
209:8 211:20
212:18
213:4,10
214:3,4,15,
19 216:25
217:2 220:1
**703 598-8383**
19:1
**717,000**
73:7
**739**
73:5 123:15
124:17 183:5
184:4,6
205:18,19
**7th**
95:23 96:14
124:21,25
125:14
130:19,20
166:15
183:20 185:7
207:11

---

**8**

**8**
160:7,11
167:10,16

Randy Hinaman
December 09, 2021

**9**

**9**
9:7,17
179:16,19
189:9
**90s**
27:10
**93**
199:9
**9:00**
105:19
**9:13**
9:17

**A**

**a.m**
9:17
**a.m.**
65:22,25
122:5
**abilities**
137:2
**ability**
74:5
**able**
33:2 56:15
63:15 68:8
76:18 82:19
85:11 95:17
96:9 207:25
**above**
9:8 34:12
114:13
140:17
**Acadome**
103:18
**accepted**
131:20
**accommodate**
91:19
**accommodation**
117:23

**accommodation
s**
92:3
**accomplish**
155:17
223:15
**account**
19:2 34:14
86:10 100:4
148:4
175:11,16
187:5
**accurate**
26:20 60:22
72:5 208:1,6
**achieve**
197:24
205:25 216:9
**achieved**
216:5
**acknowledged**
218:14
**Act**
31:23 51:8
99:10 112:23
113:7 140:23
141:2,5,16,
19 142:15,20
143:11
144:5,9,15
145:1,5
149:12,25
165:4,12
166:13,17,21
167:9 189:3
**acting**
9:3
**action**
31:11
**actual**
66:15 84:9
125:24
**add**
45:8 96:1
117:12 128:7
145:20 146:2
159:6 196:5

**added**
44:21 102:14
145:25
162:18
166:14
186:16
192:14
**Adderholt**
104:17 127:4
128:15
134:17
**adding**
98:1 130:22
145:12 158:7
172:18,22
186:21
**addition**
80:19
**additional**
22:18,19
83:7 114:14,
17 115:15
140:18 183:3
211:20
**additions**
166:9
**address**
18:10,13
22:16 117:17
130:12,14
227:4,6
**addressed**
189:22
**addresses**
19:6 117:14,
16,20 150:15
**adjacent**
40:23 85:17
88:21 97:18
103:15
104:6,9
107:17 115:8
146:12
**adjust**
207:1
**adjusted**
210:13

**adjusting**
140:10
**adjustments**
189:9
**administrativ
e**
68:11
**admit**
202:4
**adopted**
26:10,16
27:6 199:7
221:4
**advice**
199:24
200:23
202:24
**advised**
198:15,24
200:8
**affiliation**
35:10 41:25
176:9
**afraid**
22:20
**African**
32:8 33:17
170:15
171:24 196:5
**afternoon**
15:11
197:21,22
**age**
32:6,17
33:18 34:3,
8,15 35:10
44:7,10 49:7
74:10 83:2
112:18,20
117:6
119:12,22
135:7
175:12,17
195:11,17
216:23
**aggregate**
42:3,7

Randy Hinaman
December 09, 2021

ago
  13:2 18:21,
  22 23:10,20
  24:7,8 31:3
  33:12,22,24
  38:14 44:19
  45:4,14
  50:15 90:14
  162:18 200:6
agree
  52:8 92:11
  170:21
  171:11 178:4
  205:24 206:5
  214:8
agreed
  169:7,19,23,
  25
agreement
  17:19 44:3
  107:9 120:7
ahead
  37:22 38:9
  50:23 51:2
  121:17
  172:13
  177:19 182:8
  209:24
Air
  115:22
Alabama
  9:2,3,16
  12:13,22
  18:11,14
  22:16 23:6,
  20 24:2,10,
  18 25:11,16,
  17 26:9,14,
  22 27:10
  30:13,22
  33:12 53:15,
  23 58:15
  59:21 60:8
  67:21 69:6
  75:12 77:14
  86:14 89:19
  112:19
  113:12

115:6,21
  116:6,7
  120:1 147:5,
  13,14
  153:10,18
  170:12
  171:12 178:6
  201:1,5,21
  202:19
  203:2,10,22
  206:12 211:9
  222:24
  223:17,22
Alabama's
  202:7
Alabamians
  53:3,8
ALBC
  12:21 25:11
algorithm
  202:9
allow
  70:10 197:10
  224:1
allowable
  151:16
allowed
  56:25 59:8
  131:2 133:7
  148:20 151:7
  186:18
  209:22
alter
  44:23
amazing
  13:14
amenable
  41:1
amend
  134:20
amended
  140:24
  165:13 221:9
  225:3
Amendment
  112:23 113:8
  139:16

amendments
  180:18
American
  22:23 32:8
  170:15
  171:24
Americans
  196:5
amount
  80:25 81:19,
  24 162:22
analysis
  167:24
  168:3,6,11,
  21 169:2
  186:10
  191:22
analyze
  144:3
ancestral
  227:8
and/or
  146:12
annex
  125:8,21,23
announced
  67:19
answer
  13:10 31:4
  58:17,19
  104:15 107:5
  108:8,12,17,
  23 109:17
  131:20
  138:24
  148:10
  162:23 173:3
  177:5,16,24
  178:10
  181:11 187:9
  195:21 197:5
  202:22,24
  204:25
  217:11
answered
  150:18

answering
  12:2 13:18
answers
  208:1
anybody
  17:13 59:21
  70:10 129:20
  184:16 186:6
  188:2 189:25
  200:9,16,17
anymore
  95:18 174:14
anyone
  15:18 17:5,
  10 37:9 50:7
  53:16 57:24
  83:13 87:16
  101:13,23
  106:17,22
  120:10,12
  121:2,5,11
  138:19
  143:4,9
  144:2,7
  148:25 149:5
  164:8,13
  168:20 169:1
  177:13 178:1
  204:21
  221:10
apart
  149:19
apologize
  46:8 62:12
app
  213:23,24
appears
  147:11
  170:8,22
  171:13
applied
  150:25
applies
  150:22
apply
  63:17 64:2
  139:11

Randy Hinaman
December 09, 2021

147:12,24
149:6
**apportioned**
206:13
**approached**
51:15,21
**approaching**
121:15
**approval**
38:21
**approve**
36:10
**approved**
36:8 136:4
140:17
**approximately**
23:9 179:9
**April**
58:19 59:6
63:17,20
67:20
**area**
89:15,23
91:16 92:4
97:4 115:14
125:16
127:15 154:3
156:1,25
162:17
186:2,14
227:24
**areas**
32:7,19 33:3
45:8,11 71:3
75:9 89:15,
19 102:13
114:7,17
128:3 132:4
152:13,16,18
162:11
164:21
212:14 224:2
**argument**
219:19
**around**
52:11 54:3
55:16 57:10,

11 59:12
65:13,15
67:19 82:18
136:14
208:18
224:16 228:4
**arrangement**
18:2 216:16
**array**
219:23 220:6
**arrived**
82:17
**asked**
23:15 30:20
31:12,15,19
36:11,16
46:24 51:24,
25 112:25
113:6,11
117:13
119:20
134:24
135:6,8
140:7 142:17
149:3 168:18
172:14,17
174:17
175:2,15
176:11
177:18,20
184:16,22
186:5,10
188:2,7
189:25 190:3
192:2 199:21
208:13
227:3,4
**asking**
10:9 13:4,6
19:24 36:9
69:13 101:20
113:22
118:17 149:4
171:8 196:24
197:1 199:24
209:17,20
218:19 220:5

**asserted**
11:15
**asserting**
177:1
**assess**
35:9 176:8
**asset**
176:23
**assigned**
73:22
**assigning**
32:10
**assist**
101:23
**assisted**
24:5 101:25
**assisting**
24:9
**Association**
22:23
**assume**
12:12 13:10
17:12 18:2
57:25 59:16
80:19 104:25
194:12 196:3
**assumed**
117:9 118:19
130:1
**assuming**
121:8
**assumption**
39:25 40:2
118:21
**ASU**
116:7,8
**attempt**
177:22
207:19
208:9,12
209:6
**attempted**
209:2,12
**attempting**
210:23
**attend**
88:10,17

**attended**
19:13
**attention**
66:19
**attitudes**
34:22 175:19
**attorney**
10:25 15:19
17:15,17,20
18:3 106:25
107:2
**attorney-
client**
108:4,6,18,
22 109:14
176:24 177:2
**attorneys**
9:18 15:4
**August**
57:2,4 64:24
65:4 68:9
74:16,19
75:15 76:2
79:3,8,11
80:1 82:18
83:13 84:2
85:7
**Autauga**
161:18
**authorized**
101:19
**available**
41:12 48:20
82:24 83:5
143:20,21,25
206:22
**avoided**
150:6
**aware**
50:11 130:23
167:23
182:10 187:4
189:24 203:2
211:7,12,16
217:17
225:20,21
227:13,16

**B**

**back**
18:6 24:17
30:7 37:24
39:13 47:7,9
48:11 55:8
61:17 65:24
67:13 69:5
71:15,19
76:16 82:3,
12 84:5,14
88:23 96:19
98:6 102:11
103:14,21
115:2 118:4
122:7 123:12
126:12,20
127:15
129:17,22,25
130:7 140:1
164:16
167:15 172:2
179:5 185:21
186:3,16
195:1,2,24
196:1,7
197:16
198:13 205:3
210:2 220:21
228:22
**background**
18:7 21:23
107:24
**bad**
61:3
**Baggett**
10:23,24
**balance**
124:9
**balanced**
99:5
**balancing**
220:10
**Baldwin**
89:20 91:16
152:13 153:7

156:4 161:4
**ball**
113:1
**bar**
192:15
**Barfoot**
180:19
190:16,22
191:1,25
192:10
**base**
94:23 115:22
125:4,24
126:2
**based**
38:17 40:19
60:18,20
64:25 66:12
68:6 70:25
73:16 84:12
97:25 100:9,
12,17,20
101:3 103:10
104:16
105:5,11
106:10
131:22
145:14 146:3
162:24 166:5
208:5 213:1
217:7 223:4
**basically**
54:19 79:14
98:4 123:19
148:1 159:1,
12 174:14
180:24
185:11
190:7,25
194:24 195:3
206:1
**basing**
118:20
**basis**
35:17 145:1,
3 196:4
**Bates**
135:20

160:12
179:21
**bay**
153:6 156:5
**Beach**
18:11 20:22
**began**
58:8 59:12
65:12 94:5
206:9
**begin**
11:11 57:13,
17 60:11
63:15 64:20
**beginning**
9:12 60:17
64:16 79:17
114:24
212:23
**beginnings**
66:3
**behalf**
9:20 51:23
129:21
228:15
**behavior**
42:15
**belated**
136:20
**believe**
15:20 16:15
22:5 26:6
28:20 29:12
30:14 31:21
33:12 35:11
38:8 42:1
50:10 51:8
55:7 69:20
75:14 83:6
101:16,19,22
140:21 143:3
145:4 160:21
170:12 171:2
187:15
192:19
195:15
206:23 218:9

**believed**
108:21
**below**
195:10
**belt**
35:15
154:14,17,22
155:1,5,16
163:20
170:10
209:13 210:6
**Ben**
22:21
**best**
13:17 127:11
137:1 181:20
**better**
125:10
171:23 172:5
**bill**
17:14,16,22
26:5 104:19
110:2 134:23
**billed**
17:13
**Birmingham**
9:2 69:20
227:21,24
**birth**
18:8
**birthday**
136:18,20
**bit**
16:12 18:7
21:23 38:13
44:24 45:16
70:11 92:15
104:16
121:16
124:9,14
128:5 130:11
**black**
25:16 30:2,
5,12 31:13
32:3,6,13,
16,20 33:2,
18 34:3,7,

11,15 35:10,
15 36:6,12,
15,21,22
37:7,12
42:20 43:7,
10 44:7,9,14
45:12 46:1
49:7,9,19
50:3,8,13,20
74:9 111:25
112:17,20
117:6,11
118:19,23
119:12,21
135:7 142:6
154:14,17,
20,22 155:1,
5,16 163:20
170:10,11
172:12 174:9
175:12,17
176:18 177:9
178:2,5,19
188:17,20,22
189:21
193:4,6,10
194:10
195:11,16
196:25
209:13 210:6
216:23
**blacks**
210:24
211:10
**Blacksher**
10:8 16:11
197:19,20
198:7,11
201:4,8,11,
18 203:8,12,
18 204:5
208:17
209:20 210:1
213:11 221:8
**Blain**
10:6
**blanking**
116:5

**block**
33:20,21
83:3 134:5
138:16
151:14
215:21
**blocks**
133:24
151:21
226:16
**Blount**
127:23,25
130:7 195:2
214:12,20,21
**blue**
202:4
**board**
52:6 54:12
56:18 64:13
65:5,7,12
75:2 80:12
81:8,16,23
139:10
**Bob**
22:22
**body**
17:1 190:2
**bottom**
135:21
156:20
166:23
**bought**
18:20
**BRAC**
125:4
**brain**
46:17
**break**
13:22,23
65:19
121:17,25
122:2,6
197:9
**breakdown**
98:24
**breakdowns**
98:23

**brief**
170:17
**briefly**
16:7 21:7
114:15 120:5
126:9 190:15
191:24
**bring**
220:23
**broader**
216:5
**broke**
122:9
**broken**
33:19
**Brooks**
68:23,24
70:17 84:23
128:22
129:1,20,21
134:17
**buildings**
70:9
**Bullock**
155:4
**bureau**
56:20 58:19
59:4 60:7
67:19 201:22
**BVAP**
74:6 112:12
118:10
134:24 135:8
216:23
**BVAPS**
143:19
190:10

─────────
C
─────────

**Calhoun**
162:4
**call**
54:7 69:17,
19,21,23
85:3,4 87:2
112:2 129:24

130:25 132:9
198:15
**Callahan**
23:25 24:19
28:8 29:15
30:21 31:17
36:18
**Callahan's**
28:16
**called**
19:19,21
55:20 61:15
77:14,16
129:22,25
204:18
**calls**
54:9 83:21
84:6,13,15
85:1 102:25
103:3,5,11
105:5,9
195:19
**campaign**
20:2,6 21:12
22:22 23:1
**campaigning**
228:4
**campaigns**
21:11 44:1
**candidate**
112:14 142:9
168:8,9
**candidates**
21:13 210:24
211:11
**capable**
101:18
**capital**
77:20
**capsulize**
122:25
**capture**
207:8
**captured**
207:4,15
**capturing**
207:17

Randy Hinaman
December 09, 2021

cards
  124:17
care
  131:24
Carl
  111:6 122:20
  134:16
  192:20
cascade
  115:5
case
  9:14 11:16
  23:15 54:25
  85:23 87:2
  112:21
  139:24 142:2
  170:1 184:5
  206:4,23
  219:18
cases
  205:14
  223:12
Caster
  10:12 228:11
Caucus
  25:16
caused
  202:15
CD
  170:7 216:25
  217:2
  220:21,22
cell
  18:24
census
  15:23 32:22,
  24 39:3,4
  55:11 56:9,
  14,16,20
  57:1,3,5,15
  58:18 59:4
  60:6,19
  63:16,22
  64:5,8,23
  66:6 67:11,
  16,19 68:7
  71:8,17

74:16 76:3
77:24 82:5
84:9 133:24
138:16
151:14,21
177:11
201:22 202:6
203:4
206:17,21,25
Center
  186:2
certain
  20:14 34:2,7
  100:17
  109:12 117:6
  119:4,6,9
  138:20 157:4
  175:8
certainly
  47:5 58:2
  59:4 74:4
  79:19 89:10
  96:12,16
  100:24
  101:18 109:5
  121:10
  150:10,24
  152:24
  162:19
  192:20 200:6
certificates
  20:11
certify
  9:4
chain
  222:10
chair
  11:13 52:15,
  16 184:21
  188:6 190:3
chairperson
  188:9
chairs
  9:25 52:14
  54:10 74:21
  86:17 204:22
  223:23 225:2

challenging
  70:11
chance
  170:19
  192:18
change
  23:3 38:5,7
  39:11 41:17
  72:3 73:18
  85:18 92:6,8
  101:20
  104:15,20
  105:2,21
  110:21
  117:24
  123:18 156:6
  180:25 183:4
  185:5,20
  189:17
  190:24
  191:2,3
  192:10,12
  219:20
  220:6,16
  221:1
changed
  22:13,15,16
  56:7,14 99:6
  120:22
  128:19
  182:17
  190:12
changes
  28:15 29:12,
  19 38:17
  44:25 46:7
  54:15 57:21
  71:6,7 84:18
  86:10 91:19
  99:2,4
  100:4,5,8,9,
  12,17,18,20,
  22 101:3,9,
  11,14,21
  103:4,9
  104:25
  105:4,6,11
  110:1,6,9

113:7,15,24
115:5,14,20
116:15
118:16
124:12,13
128:21
130:19
142:18
145:12
158:18
173:12,23
175:2,4
181:3,7,10
183:7,12,14,
15,18 184:2,
13 186:4,11,
25 189:11,12
194:25 195:2
207:4 212:16
214:15,16
220:13
224:20
changing
  146:17
  219:23
characteristi
cs
  34:15 175:12
chart
  213:16
Cherokee
  126:10 195:1
Chestnut
  170:17
chief
  23:25 68:23
  70:19 84:7
  129:5,19,22
  131:3,8,13,
  14 134:11
chiefs
  121:9,11
Chilton
  124:12
  126:24
  130:17
Choctaw
  155:2 163:21

Randy Hinaman
December 09, 2021

choice
  86:6 112:15
  142:9 145:2
  168:8 210:24
  211:11
choose
  104:8
  128:10,13
  138:2
choosing
  32:15
  132:21,22
  133:4
chose
  128:11 224:1
Chris
  10:1 11:14
chunk
  127:23
circumstances
  157:4
citizens
  53:2,7 73:7
  104:3 114:14
city
  227:21
Civil
  9:5,14
Clair
  162:5 220:14
clarification
  64:1 173:22
clarify
  108:20
  169:25
clarifying
  77:10
Clarke
  114:21 115:2
  123:7,12,22
  221:19,23,24
Clause
  139:16
clear
  51:1 56:5
  73:20 74:3
  119:8 122:23

171:8,15
173:15 220:3
clearly
  167:8
clerk
  10:25
clients
  22:18,19
  43:9,13
  62:21,25
Cline
  22:21
close
  50:5 66:14,
  16 73:14
  79:22 149:18
  151:22 214:6
closed
  70:9
closer
  73:23 114:8
closing
  125:4 126:3
clue
  113:24
co-chairs
  59:23 86:16
  88:22 99:12
  136:11
Colbert
  220:20
Coleman
  16:14 190:15
  191:24
  192:16,17
Coleman's
  180:15
colleagues
  87:23
college
  125:17
  203:10,22
color
  144:21,23
combination
  129:14
  191:10

come
  25:1 29:16
  49:9 71:17
  75:9 88:23
  92:12 129:3
  134:17
  140:4,6
  141:12
  142:10
  145:20
  151:19
  153:20
  157:24 158:6
  159:17 196:1
  216:19
comes
  49:8 152:20
  159:18,21
  188:1
comfortable
  29:20 118:15
  125:2 130:18
  178:15
  227:23 228:1
comment
  37:11 118:15
  181:21 188:7
comments
  89:2,5
Commerce
  201:6
commission
  125:4
commissioner
  9:3
committee
  9:25 11:13
  12:8 15:24
  26:17 48:10
  67:2 110:4,
  5,7 120:16,
  20 135:19
  136:4 165:8
  167:11
  178:20
  200:21
  204:22 213:3
  217:24

223:4,23
  225:3
committee's
  107:2 203:21
committees
  90:24
common
  41:15
communicating
  218:8
communication
  108:6
communication
s
  88:7 108:7
communities
  152:7,15,17,
  23 153:8,9,
  13,18,19,23,
  25 154:5
  155:10,12,
  21,24
  156:12,15,
  17,22 157:3,
  10 165:24
community
  35:13,15
  89:18,21
  97:14 129:11
  153:1,3
  154:13 155:6
  156:8,24
  203:10,22
compact
  124:21
  130:21
  132:16 133:2
  141:25
  142:3,5
  146:8,20
  149:20
  172:19
  173:4,11
  174:2 193:9
compactness
  157:19
  186:20
  193:13,14,18

Randy Hinaman
December 09, 2021

companies
  21:16  114:11
company
  20:21,23
  21:5  22:15
  23:2,3  52:23
compare
  219:13
comparing
  205:7,12
comparison
  165:1  205:9
compelled
  200:3
compelling
  165:10
compensated
  17:10  18:1
compensation
  55:2  56:3
  57:23
compilation
  192:13
compilations
  191:4
complaint
  202:1  221:9
complaints
  16:1
complete
  50:15  61:7
  104:14
  113:18,21
completed
  19:12  60:24
  61:5  102:2,
  19,24  104:12
  105:8,14
  106:11
  107:11
  110:13
completely
  60:22  72:5
  214:3
compliance
  140:23
  143:23  152:9

165:12
complicated
  161:15
complied
  138:12
  143:10
  145:23
  150:13
  151:25
complies
  140:12
  142:14
  143:15
  144:4,8,14
  147:1  155:9
comply
  99:9  112:22
  113:7  139:15
  140:16  141:1
  144:25  148:4
  150:20  152:3
  158:4  164:24
  178:19
  193:20  194:2
component
  171:16
comported
  189:2
composed
  146:7
comprehensibl
e
  172:20
computer
  76:11,19,22
  77:12  78:1,
  10  79:10
  82:13  98:1
  101:11,14
  227:5
computers
  33:12  76:17
  78:12  80:4
concentration
  32:8,20
conceptually
  113:14

concern
  189:4
concerned
  184:8,9
concerns/
discussion
  58:15
concert
  31:17
concluded
  142:19
conditions
  108:17
conducted
  168:11
confident
  119:5,7,8
confirm
  92:9  117:10
  144:4
confirming
  41:21
conflict
  72:7  149:14,
  22  152:20
  155:20
  157:25
  165:14,19
  166:5,11,16,
  18  167:2
conflicts
  86:25  165:23
  166:4
confused
  209:19
confusion
  90:21
congress
  21:12  24:18
  40:10  43:14,
  17  56:18
  58:16  59:7
  64:6  65:8,14
  66:21  67:7
  80:11  84:7
  103:6  107:16
  120:6

200:18,25
  206:3,12
  224:2,23
  227:15,20
congressional
  23:21  26:10,
  12,13,15
  27:6,10,13
  29:22  30:1,
  7,11,12
  37:22  38:11
  39:6  40:9
  42:19  43:6
  44:6  45:18
  48:12,16,17,
  24  49:19
  51:6,12,16
  52:2,5  54:11
  56:25  57:14
  58:13  59:18,
  25  60:9,12,
  24  61:6,19
  63:16  66:5,
  24  67:20,24
  68:5,15,16
  69:2  75:3
  80:25  81:9,
  25  83:16,20,
  23,24  85:19,
  21  86:9,15
  87:13,15,20
  88:11  90:3
  91:13  92:25
  93:4,15,19,
  23,24  94:6,
  9,25  95:5,
  10,16  99:21
  100:6,9
  105:17
  106:10,13,18
  107:12
  110:19  111:3
  119:23  120:2
  121:2,7
  123:3  128:1
  132:3  134:12
  136:8  137:6,
  15,22
  139:11,24

Randy Hinaman
December 09, 2021

142:2
145:21,23
147:12,17
148:19
150:21
151:18
155:17
158:13
160:14,15,22
167:18,21,25
169:3 170:8
171:5,12
172:13,25
174:16
176:19
179:2,11,23
180:3,23
181:6,24
184:11,17
185:9,16
194:13,15
196:8,9,14,
21 198:19
200:20
202:7,17
204:9 206:10
209:8 218:14
222:25
223:17 224:9
225:18
**congressman**
22:21 23:25
24:19 27:20
28:8,16
29:15 30:21
31:16 36:17
43:24 68:24
69:8,22,25
70:5,17
72:22,24
94:19
104:17,18
111:5,6
113:25
116:11 117:3
118:5
119:18,19
121:9 122:15
123:20,25

125:5,15,21
126:5,7
127:4
128:15,22
129:1,20,21
130:3 131:4,
8,16 132:12
133:14
134:10,22
180:25 181:4
182:24 183:9
184:5 226:7,
16 227:20
**congressmen**
23:22 58:21
80:18 92:11
105:18,23
121:11
122:11
134:16
**congresspeopl
e**
125:9
**Congresswoman**
43:8 45:7,25
69:5 101:1
103:12
122:16
132:13
210:10,12,
16,22 216:12
217:12 218:8
219:2 226:6,
18,23
**connected**
200:10
**connecting**
151:17
**connects**
151:14
**consensus**
60:4 75:2,3
**consider**
37:6,18
48:12,14,19
49:18 96:23,
24 105:6
106:24 107:3

140:19
147:8,16
148:13 153:9
155:5 161:6,
13,20 162:2,
14 163:17
164:3,7
167:20
174:17,20
176:11,14,
17,22 177:6,
8,13,18
204:15
207:23
212:8,9
216:11,16
**considerable**
58:14 97:4
161:25
162:21 163:6
**consideration**
100:23 165:9
**consideration
s**
144:21 146:2
160:4 187:5
**considered**
30:4 35:22
107:1
167:12,17
210:6 217:10
225:9,11
226:23
**considering**
132:24 133:4
163:23 212:6
**consistently**
161:24
**constituents**
101:6
**Constitution**
139:17 141:3
147:6
**constrained**
199:15
**consult**
21:10 41:3

**consultant**
21:8 24:1
**consultation**
196:2
**consulting**
20:19 21:9
58:6
**contained**
37:12
**contend**
109:14
**content**
15:3
**Contests**
150:6
**contexts**
202:11
**contiguity**
151:7,8,12
**contiguous**
36:4 142:5
146:7,11
147:25 174:3
**contingent**
56:4
**continuation**
28:3
**continue**
118:23 159:7
**continued**
53:20
**continuing**
39:23
**continuity**
148:20
**continuously**
162:12
**contract**
43:16,19,21
52:17,19,22
54:3,5,7,22
55:3,6,8,18,
20 56:8 62:2
113:4
**contracted**
53:1,13
136:25

Randy Hinaman
December 09, 2021

control
  28:17
controlled
  27:19
conversation
  108:21 120:4
  143:14
conversations
  58:12
  104:16,17
  108:24
  109:2,3
  122:10
  128:15,24
  130:5 141:13
  142:11 183:8
convinced
  131:5,11
cooperate
  133:25
coordination
  68:12
Coosa
  124:12
  126:19,21
  130:16
copies
  14:8 110:24
  169:10
copy
  14:10,18
  21:25 22:3,9
  26:4 54:22
  92:21,25
  93:15,19
  102:21
  120:18
  135:18 136:6
  169:6,8,10
  201:5 208:17
  221:10
core
  159:9,11,20,
  25 160:3
  161:2,3,8,
  13,14,21
  162:2,4,7,
  14,16,24

163:2,3,13,
  17,19,24
  164:3,8,14,
  19 211:22
  212:19
  222:4,18
cores
  39:15 93:25
  157:23
  158:22
  159:1,19
  164:17
  178:25
  192:21
  212:13
  222:9,18
  223:10
Cornell
  19:13,18
corner
  160:13
correct
  13:2 16:21,
  22 18:17,18
  22:9 26:4
  30:9,13
  36:12,19
  37:23 38:11,
  22 39:4,5,14
  40:16 54:21
  57:6 58:7
  61:9,16
  63:21 65:16
  67:8,22
  69:14 75:16,
  17 76:3,4,9,
  22,25 78:2,
  10,11 80:5,6
  81:6 82:6,20
  85:21,22,23,
  24 91:4
  93:4,18,24
  94:8,11,15
  95:19,20
  96:5,6 98:16
  99:23
  100:10,11,
  16,18,19

105:2 106:1
  110:16,17
  118:6 123:6
  139:12,13
  140:3 147:15
  150:23
  151:2,3
  160:24
  165:16,17
  171:6 172:3
  174:25 175:1
  183:10,11,17
  194:13
  195:7,8
  196:16
  198:18 199:4
  206:11,19,20
  207:1,2,3
  210:8,14
  211:20,21
  216:13,14
  217:22 218:2
  219:3,24
  220:11,24
  221:2,22,23
  222:5,6,15,
  16 223:20,
  21,24
  225:10,13
  226:1,21,25
correctly
  111:20
  188:13
  191:18
correspond
  120:12
corresponding
  183:4 195:2
  215:16
counsel
  9:6 99:13,14
  106:21 139:8
  140:8 141:13
  142:11,18
  143:7,8,14
  149:3 164:11
  168:22
  169:5,7,23,

24 195:13
  196:2
  198:21,23
  199:12
  202:18 203:1
  204:22,25
  209:21
counsel's
  202:23
counties
  32:10 42:4,7
  44:18 64:18
  72:17 73:22
  75:8 89:22
  90:21,25
  96:1 102:10
  114:19
  146:11
  153:7,22
  154:18,21,25
  157:5,15,21
  158:1,12
  159:2,13
  161:4,9,20
  162:6 163:20
  164:2 165:25
  178:14 179:2
  183:20,24
  206:22,25
  208:4 213:10
  216:9 220:12
  221:14
counting
  12:20 147:20
county
  33:19,21
  40:25 44:21
  56:19 64:9,
  16 65:9 66:7
  71:23 72:8
  73:6 90:15,
  20 91:1,7,23
  92:12,13
  93:6,16
  94:12,21
  95:2,5,8,10
  96:4,5,8,9,
  24 97:10,13,

Randy Hinaman
December 09, 2021

19,21 100:25
103:13 112:1
114:21 115:2
117:19
123:8,12,22
124:3,4,16
125:13
126:10,15,21
127:10,24
129:13
130:10
132:2,5,9,
17,19
146:14,17,
23,25 152:21
158:8 159:13
161:16 162:7
170:11,14
171:17
172:21,22
174:10,15
181:8 182:1,
25 183:3
184:7
185:22,24
186:23
188:15 191:3
193:16
204:7,8,9,
10,17 205:3,
6,10,16,21
206:1,4
207:19
208:9,16
211:14,24,25
212:1,2,3,19
213:4,7,8
214:2,4,5,
23,25 215:4
216:19
217:13,14
218:6 219:3,
11,21 220:2,
8,21 221:20
225:17,24
226:8,14,17,
18,25 227:8,
10,22

couple
 46:14 48:13
 62:24 63:13
 79:16 127:13
 129:25 133:8
 145:18
 180:10,17
 188:12
 223:12
course
 11:16 48:25
 87:22 105:20
 123:8 174:13
 205:3 214:8
 215:3 223:11
court
 9:1,15 11:1,
 16 13:13
 24:3 26:11
 31:11,25
 79:1 112:21
 113:15
 131:5,12,16,
 19,22 199:6,
 13 200:3
 201:22 203:3
 210:2 219:17
 220:5,22,25
 221:5
court's
 202:12
court-
approved
 199:14
court-ordered
 199:15 200:4
 220:7
courts
 113:13
 202:10
cover
 47:19
covered
 108:25
 109:14 113:3
 148:1
COVID
 55:10 63:7

crazy
 63:8 146:15
create
 31:12 50:12,
 20 142:1
 172:12
 176:18 177:9
 178:5,18
 202:9 209:7
created
 30:11 53:22
 96:21
creating
 50:8 178:2
 183:9
criteria
 41:4 137:8,
 10 138:22
 144:17,21,25
 165:5,9,14
 166:24
 167:13,15
 198:18
crystal
 113:1
Cullman
 162:17
current
 16:6 23:11
 159:13,14
cutoff
 138:21
cycle
 196:11,19
Cyrus
 226:20

_____

D

_____

Dallas
 117:19 155:3
 226:24
 227:10
data
 32:22,24
 33:15,18
 39:3,4 41:9,

24 42:13,16
 48:22 49:6,
 11,14,16
 56:9,14,16
 57:1,4,15
 60:19 64:8,
 10,16,23
 67:11,12,16
 68:7,9 71:9,
 17 74:9,16,
 22 75:25
 76:3,6,11,14
 77:24 82:10
 83:10 84:5,9
 97:20 99:20,
 24 101:4,6
 102:3,24
 106:7,8
 129:24 133:3
 157:9 160:4
 195:6,9
 202:8,9,20
 206:17,21,25
 207:2 213:2,
 17
date
 9:4,16 18:8
 22:11 25:15
 58:11 61:12
dated
 135:21
Dave's
 213:23,24
 214:16
Davin
 10:17
Davis
 9:22 15:6
 50:22 169:22
 170:23,25
 171:7 178:7
day
 79:19 180:19
days
 79:13
DC
 59:14,16
 67:7,24

Randy Hinaman
December 09, 2021

68:14 69:14,
16,18 73:17
deal
  157:25
dealing
  105:22
December
  9:7,16
decent
  78:25
decide
  132:4
decided
  24:20 85:3
  86:2 127:14
  129:1 131:17
decision
  199:13
decisions
  223:18
declaration
  25:12 26:4
declined
  68:18,21
deemed
  113:15
deep
  191:22
Defendant
  170:11
deferred
  224:8
defined
  156:25
definition
  32:11 153:1,
  3 156:21
  159:22
definitive
  153:17
delay
  55:11
delayed
  68:7
delegation
  24:20 26:15
  30:23 31:17

45:23 46:2
58:13 201:1
222:25
223:18 224:9
democrat
  151:2
democratic
  28:13 39:24
democrats
  27:19
demographic
  38:17
demographics
  35:19
demonstration
  202:8,16
Dental
  22:23
Department
  201:6
depend
  113:15
depending
  124:7 154:6
  223:7
depends
  149:14
deposed
  12:16
deposition
  9:12 13:1
  14:10 15:5
  16:17,20
  17:4,8 22:4,
  5 45:14
  181:21 222:8
  229:3,6
described
  87:1
describes
  189:9
description
  26:20
detail
  125:18
detailed
  218:18,24

details
  120:8
determination
  35:18 142:23
  143:6,13
  164:4,6
determine
  35:13 144:8
  167:3
determined
  64:5
determining
  159:25
Deuel
  10:15
developed
  26:14
deviation
  36:2 73:14
  84:19 86:11
  102:9,16
  128:18
  132:11
  133:13 134:8
  137:16,19
  138:1,3,12,
  16,20 139:1
  140:2 182:18
  183:6
  188:11,17
  189:10,13,17
  190:8,9
  194:4 197:24
  198:16,20
  199:3,16,18
  200:4,8,23
  201:2
  202:10,19
  208:15
  210:13
  215:5,21
  216:10 223:9
  225:10,12,15
difference
  47:14 210:19
  213:9 214:5
differences
  84:8 169:23

different
  33:3 68:19
  77:14 80:15
  94:2 95:22
  96:1 103:15,
  19 111:19,22
  127:13
  128:18
  152:17,23
  154:5 155:12
  156:18,19
  175:16 191:4
  210:7 220:14
differential
  202:8,16
  203:4
difficult
  70:8 227:17
diluting
  140:25
  142:25
dinner
  109:4
direct
  198:14
directly
  31:7 68:25
  219:8
director
  20:5 134:23
disallowed
  178:25
disclosing
  15:3
discriminated
  143:4
discriminatin
g
  141:10
discriminatio
n
  167:3
discuss
  50:7 70:20
  71:5 84:1,17
  85:14 86:14,
  21 106:17