UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

EVAN MILLIGAN, et al.,

    Plaintiffs,

v.

JOHN H. MERRILL, et al.,

    Defendant.

Case No. 2:21-cv-01530-AMM

### DECLARATION OF LAURA HALL

I, Laura Hall, declare as follows to the best of my knowledge, information, and belief:

1. I am a resident of Huntsville and I am a registered voter in Congressional District 5, located in Madison County, Alabama. I've been a resident of the State of Alabama for 48 years.

2. I am Black or African American.

3. I was first elected to the Alabama House of Representatives as the Democratic nominee for Alabama House District 19 in 1993. I was reelected to represent District 19 in 1994, 1998, 2002, 2006, 2010, 2014 and 2018.

4. Since being elected to the Alabama House, I have been a member of the Alabama Legislative Black Caucus.

5. I currently serve on the Alabama Permanent Legislative Committee on Reapportionment (the "Reapportionment Committee").

6. The Reapportionment Committee is responsible for preparing and developing redistricting plans for the Alabama Legislature and Congressional delegation after each U.S. census. The 2021 Reapportionment Committee includes 21 members – 15 white Republicans and six Black Democrats.

7. On May 5, 2021, the Reapportionment Committee enacted guidelines for the 2021

redistricting cycle. Senator Jim McClendon and Representative Chris Pringle, the co-chairs of the Committee (the "Co-Chairs"), sent the guidelines to me via email the weekend before May 5. During the meeting, the Co-Chairs asked the Reapportionment Committee, including myself, to vote to approve the guidelines without amendment at the May 5 meeting.

8. During my time on the Reapportionment Committee, I requested that the Committee undertake a racial polarization study and otherwise ensure compliance with the Voting Rights Act and U.S. Constitution, but the Co-Chairs allowed very little discussion even with respect to the guidelines.

9. The U.S. Census Bureau released the results of the 2020 Census on August 12, 2021.

10. Once census data was released, the Reapportionment Committee, under the leadership of the Co-Chairs, began to develop redistricting plans for Alabama's congressional districts.

11. Between September 1 and 16, before the Reapportionment Committee released any draft maps or proposals, the Committee held 28 public hearings across the state. All public hearings were held on weekdays between the normal workday hours of 9:00 am to 5:00 pm, except for one hearing held at 6:00 pm at the Statehouse in Montgomery. The Reapportionment Committee's decision to hold public hearings on weekdays during workday hours made it difficult for the general public to attend or otherwise participate in the meetings.

12. On October 19, 2021, the Alabama State Conference of the NAACP, Greater Birmingham Ministries and other civic groups sent a letter to the Reapportionment Committee. The letter reminded the Reapportionment Committee of our obligations under Section 2 of the Voting Rights Act and highlighted the Committee's obligation to conduct a racial-polarization analysis. The letter also stated that redistricting should comply with the Voting Rights Act and the Constitution and ensure that the use of race in redistricting was narrowly tailored to comply with a compelling state interest.

13. The Reapportionment Committee did not release the maps to the public until the day of the second, and last, Committee meeting. I did not see the full proposed maps beyond my own district

and those surrounding it until the day before the Reapportionment Committee's second meeting on October 26, 2021.

14. No racial-polarization analysis for any districts was provided to the Reapportionment Committee's members before or during our October 26, 2021 meeting. Reapportionment Committee members only received racial demographic and population data for each district under the proposed maps.

15. At the October 26 meeting, the Co-Chairs stated that the Reapportionment Committee's lawyer, Dorman Walker, reviewed the maps presented and introduced, including the map for U.S. Congressional districts that became H.B. 1, and determined that they all complied with Section 2 of the Voting Rights Act and the Fourteenth Amendment to the U.S. Constitution. The Co-Chairs did not explain what, if any, factual or legal analysis had been undertaken to reach this conclusion.

16. I asked the Co-Chairs whether a racially polarized voting study was done. Other members of the Reapportionment Committee asked the same question. Rep. Pringle told me and other Reapportionment Committee members that no racially polarized voting analysis was conducted for Congressional District 7. He told us this was unnecessary.

17. Rep. Pringle told the Reapportionment Committee that Dorman Walker had advised him that a racial-polarization analysis was unnecessary because Congressional District 7 has a Black voting-age population ("BVAP") of around 54%. Rep. Pringle did not explain the significance of that number to the Reapportionment Committee. When Rep. England asked Sen. McClendon to explain the relationship between a BVAP of 54% and the actual or potential results of a racial polarization study, Sen. McClendon replied, "I got no clue."

18. During that October 26th meeting, Sen. McClendon explained that Dorman Walker advised him that racial-polarization analyses were only done for state legislative districts—by an unnamed consultant in Georgia—where "it looked like there might possibly be a racial issue" because the district fell below 54% BVAP. Sen. McClendon said that the Georgia consultant had not done a

racial polarization analysis for every majority-minority district.

19. Neither Mr. Walker nor the Georgia consultant attended any Committee meetings.

20. I moved to postpone any vote on the proposed Congressional and state legislative maps until all Reapportionment Committee members and the public had time to review the maps and any related racial-polarization analyses. My motion failed—all six of the Reapportionment Committee's Black members voted for my motion while all white Reapportionment Committee members voted against it.

21. The Congressional and State legislative maps also passed the Reapportionment Committee along Black/white lines—with all six of the Black members of the Reapportionment Committee voting against the maps and all 15 white members voting for the maps.

22. The Special Legislative Session for redistricting began a mere two days later, on October 28, 2021.

23. On November 1, 2021, I wrote a note of dissent in the legislative Journal following the House floor vote on HB 1, the Congressional redistricting map.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on __13__ day of December 2021.

_____
Rep. Laura Hall