FILED
2021 Dec-27  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# In The Matter Of:

# Evan Milligan,et al v. John H.Merrill, et al.

---

Chris Pringle

*December 17, 2021*

---

US Legal

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

```
 1          UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF ALABAMA
 3
 4
 5
 6 EVAN MILLIGAN, et al., )
 7                        )        CIVIL CASE NO.
 8       Plaintiffs,      )    2:2021-CV-01530-AMM
 9 VS.                    )   VIDEO DEPOSITION OF:
10 JOHN MERRILL, et al.,  )        CHRIS PRINGLE
11                        )
12       Defendants.      )
13
14
15
16        S T I P U L A T I O N S
17        IT IS STIPULATED AND AGREED, by and between
18 the parties through their respective counsel, that
19 the deposition of:
20             CHRIS PRINGLE,
21 may be taken before LeAnn Maroney, Notary Public,
22 State at Large, at the law offices of Balch &
23 Bingham, 105 Tallapoosa Street, Montgomery, Alabama,
24 36104, on December 17, 2021, commencing at 9:14 a.m.
25
                                            Page 1
```

```
 1        IT IS FURTHER STIPULATED AND AGREED that the
 2 signature to and reading of the deposition by the
 3 witness is waived, the deposition to have the same
 4 force and effect as if full compliance had been had
 5 with all laws and rules of Court relating to the
 6 taking of depositions.
 7
 8        IT IS FURTHER STIPULATED AND AGREED that it
 9 shall not be necessary for any objections to be made
10 by counsel to any questions, except as to form or
11 leading questions, and that counsel for the parties
12 may make objections and assign grounds at the time
13 of the trial, or at the time said deposition is
14 offered in evidence, or prior thereto.
15
16
17               ***
18
19
20
21
22
23
24
25
                                            Page 2
```

```
 1            A P P E A R A N C E S
 2
 3 FOR THE MILLIGAN PLAINTIFFS:
 4       MICHAEL L. TURRILL
 5       Attorney at Law
 6       Hogan Lovells US LLP
 7       1999 Avenue of the Stars, Ste. 1400
 8       Los Angeles, California  90067
 9       michael.turrill@hoganlovells.com
10
11       KATHRYN SADASIVAN
12       Attorney at Law
13       NAACP Legal Defense & Educational Fund
14       40 Rector Street, FL 5
15       New York, New York  10006
16       ksadasivan@naacpldf.org
17
18       DEUEL ROSS (Via Zoom)
19       Attorney at Law
20       NAACP Legal Defense & Educational Fund
21       700 14th Street N.W., Ste. 600
22       Washington, DC  20005
23       dross@naacpldf.org
24
25
                                            Page 3
```

```
 1       JULIE A. EBENSTEIN
 2       DAVIN M. ROSBOROUGH
 3       Attorneys at Law
 4       American Civil Liberties Union Foundation
 5       125 Broad Street
 6       New York, New York  10004
 7       drosborough@aclu.org
 8
 9       KAITLIN WELBORN
10       LaTISHA GOTELL FAULKS
11       Attorneys at Law
12       American Civil Liberties Union of Alabama
13       P.O. Box 6179
14       Montgomery, Alabama  36106
15       kwelborn@aclualabama.org
16
17 FOR THE SINGLETON PLAINTIFFS: (Via Zoom)
18       JAMES URIAH BLACKSHER
19       Attorney at Law
20       825 Linwood Road
21       Birmingham, Alabama  35222
22       jublacksher@gmail.com
23
24
25
                                            Page 4
```

Evan Milligan,et al v. John H.Merrill, et al.

<div align="right">Chris Pringle<br>12/17/2021</div>

| | |
|---|---|
| 1 FOR THE CASTER PLAINTIFFS: (Via Zoom) | 1       I, LeAnn Maroney, a Court Reporter of |
| 2     DAN OSHER | 2 Birmingham, Alabama, and a Notary Public for the |
| 3     Attorney at Law | 3 State of Alabama at Large, acting as commissioner, |
| 4     Elias Law Group | 4 certify that on this date, pursuant to the Federal |
| 5     10 G Street NE, Ste. 600 | 5 Rules of Civil Procedure and the foregoing |
| 6     Washington, DC  20002 | 6 stipulation of counsel, there came before me on |
| 7     dosher@elias.law | 7 December 17, 2021, CHRIS PRINGLE, witness in the |
| 8 | 8 above cause, for oral examination, whereupon the |
| 9 FOR DEFENDANT JOHN H. MERRILL: | 9 following proceedings were had: |
| 10     JIM DAVIS | 10       * * * * * |
| 11     Assistant Attorney General | 11     THE VIDEOGRAPHER:  This marks the |
| 12     Office of the Attorney General | 12 beginning of the deposition of Chris Pringle in the |
| 13     501 Washington Avenue | 13 matter of Evan Milligan, et al., versus John H. |
| 14     Montgomery, Alabama  36130 | 14 Merrill, et al., Civil Case Number 2:21-CV-01530-AMM |
| 15     jim.davis@alabamaag.gov | 15 filed in the United States District Court for the |
| 16 | 16 Northern District of Alabama.  The date is December |
| 17 FOR THE DEFENDANTS JIM McCLENDON & CHRIS PRINGLE: | 17 17, 2021.  The time is 9:14 a.m. |
| 18     DORMAN WALKER | 18     All attorneys present, will you please |
| 19     Attorney at Law | 19 state your names and whom you represent. |
| 20     Balch & Bingham | 20     MS. WELBORN:  Kaitlin Welborn from the |
| 21     105 Tallapoosa Street, Ste. 200 | 21 ACLU of Alabama representing the plaintiffs. |
| 22     Montgomery, Alabama  36104 | 22     MS. FAULKS:  LaTisha Gotell Faulks, ACLU |
| 23     dwalker@balch.com | 23 of Alabama, representing the plaintiffs. |
| 24 | 24     MR. WALKER:  Dorman Walker, Balch & |
| 25                     Page 5 | 25 Bingham, representing the intervenor defendants,   Page 7 |

| | |
|---|---|
| 1 ALSO PRESENT: | 1 Senator Jim McClendon and Representative Chris |
| 2     Paige Ali, Videographer | 2 Pringle. |
| 3     Elizabeth Baggett | 3     MR. DAVIS:  Jim Davis, Alabama Attorney |
| 4 | 4 General's office, representing Secretary of State |
| 5 | 5 John Merrill. |
| 6       I N D E X | 6     THE VIDEOGRAPHER:  All attorneys on |
| 7 MS. WELBORN:    9-120 | 7 Zoom. |
| 8 MR. OSHER:    120-125 | 8     MS. SADASIVAN:  This is Kathryn |
| 9 MR. BLACKSHER: 125-140 | 9 Sadasivan from LDF for the Milligan plaintiffs. |
| 10 MR. DAVIS:    140-141 | 10     MR. ROSS:  Deuel Ross for the Milligan |
| 11 | 11 plaintiffs. |
| 12     E X H I B I T   L I S T | 12     MR. TURRILL:  Michael Turrill for the |
| 13                PAGE | 13 Milligan plaintiffs. |
| 14 Plaintiff's Exhibit 1 -     12 | 14     MR. OSHER:  Hi.  This is Dan Osher from |
| 15 (Depo notice) | 15 Elias Law Group representing the Caster plaintiffs. |
| 16 Plaintiff's Exhibit 2 -     52 | 16 Good to see you all. |
| 17 (Reapportionment Guidelines) | 17     MR. WALKER:  Good to see you, Dan. |
| 18 Plaintiff's Exhibit 3 -     55 | 18     MR. ROSBOROUGH:  Good morning.  I'm |
| 19 (Proposed guidelines handout) | 19 Davin Rosborough for the Milligan plaintiffs. |
| 20 Plaintiff's Exhibit 4 -    104 | 20     MS. EBENSTEIN:  Julie Ebenstein for the |
| 21 (Transcript of 10-26-21) | 21 Milligan plaintiffs. |
| 22 Plaintiff's Exhibit 5 -    116 | 22     MR. BLACKSHER:  Jim Blacksher for the |
| 23 (Transcript of 11-1-21) | 23 Singleton plaintiffs. |
| 24 Plaintiff's Exhibit 6 -    119 | 24     MS. BAGGETT:  Elizabeth Baggett.  I'm a |
| 25 (2021 Congressional map)   Page 6 | 25 law clerk with the ACLU, not an attorney, for the   Page 8 |

<div align="right">Page: 2 (5 - 8)</div>

Evan Milligan,et al v. John H.Merrill, et al.

1 Milligan plaintiffs.
2             THE VIDEOGRAPHER:  Court reporter, will
3 you please swear in the witness.
4             CHRIS PRINGLE,
5 having been duly sworn, was examined and testified
6             as follows:
7             THE REPORTER:  Usual stipulations?
8       MS. WELBORN:  Yes.
9             MR. WALKER:  Yeah.  Kaitlin, that means
10 -- okay.
11       MS. WELBORN:  Yes, I understand.
12 EXAMINATION BY MS. WELBORN:
13 Q.             Representative Pringle, my name is
14 Kaitlin Welborn from the ACLU of Alabama.  I
15 represent the Milligan plaintiffs.
16             Could you please state your full name
17 for the record?
18 A.       Christopher Paul Pringle.
19 Q.       And do you understand that you're
20 testifying under oath right now?
21 A.       I do.
22 Q.       Is there anything that might prevent you
23 from understanding my questions or answering
24 truthfully today?
25 A.       No.
                                        Page 9

1 A.             2003.
2 Q.       And what was the case?
3 A.       Mr. Blacksher, redistricting.
4 Q.       Okay.  And what was it -- it was about
5 redistricting.  Do you know what the result of that
6 case was?
7 A.       No.
8 Q.       So I'll just go over some key rules of
9 the road as a refresher.  I'll ask the questions.
10 And if you don't understand a question, let me know,
11 just like you did just now.  And if you answer a
12 question, I will assume that you understood that
13 question.  Is that fair?
14 A.       Yes.
15 Q.             The court reporter is here, and she's
16 typing everything you and I say and everybody else
17 says.  And she'll type everything said by anyone in
18 the room or on Zoom.
19             It's really important that only one
20 person speaks at a time.  So if you could just allow
21 me to finish my questions and sentences, and I'll do
22 my best to allow you to finish your answers before
23 jumping on to the next question.  Okay?
24             I'd like to introduce my first exhibit,
25 which is the deposition notice.
                                        Page 11

1 Q.             Are you represented by a lawyer today?
2 A.       Yes.
3 Q.       And who is that lawyer?
4 A.       Dorman Walker.
5 Q.       And is he the same lawyer who represents
6 plaintiffs -- or defendants in this lawsuit?
7 A.       Yes.
8 Q.       And --
9             MR. WALKER:  I'm not sure what the
10 question is.
11 A.       The defendants are --
12       MS. WELBORN:  That's okay.
13 Q.       The intervenors.  He represents the
14 intervenors --
15 A.       Yes.
16 Q.       -- is that correct?  Okay.
17             And are you paying Mr. Walker to be your
18 lawyer today?
19 A.       No.
20 Q.       And do you assume that the State of
21 Alabama is paying Mr. Walker to be your lawyer?
22 A.       Yes.
23 Q.       Have you ever been deposed before?
24 A.       One time.
25 Q.       And when was that?
                                        Page 10

1             MR. WALKER:  Are you -- are you
2 numbering these sequentially from the last --
3             MS. WELBORN:  We'll start over.  So this
4 will be Plaintiff's Exhibit Number 1.
5
6             (Plaintiff's Exhibit 1 was
7             marked for identification.)
8
9 Q.       So have you seen this document before?
10 A.       Yes, ma'am.
11 Q.       And without disclosing the content of
12 any discussions with your attorney, what did you do
13 to prepare for your deposition today?
14 A.       We met yesterday to discuss the
15 deposition.
16 Q.       With Mr. Walker?
17 A.       Yes.
18 Q.       With anybody else?
19 A.       Mr. Davis and Senator McClendon.
20 Q.       Okay.  And for how long did you meet?
21 A.       An hour an 45 minutes, two hours maybe.
22 It wasn't long.
23 Q.       Okay.  And other than Senator McClendon,
24 did you meet with anyone who's not an attorney?
25 A.       No.
                                        Page 12

**Evan Milligan,et al v. John H.Merrill, et al.**

| | |
|---|---|

1    MS. WELBORN:  I'm sorry.  I don't know
2 if you're an attorney or not.
3    MR. McCLENDON:  No.
4    MS. WELBORN:  I'm from DC.  I just
5 assume everybody is an attorney.
6    MR. WALKER:  He's an eye doctor, if you
7 have any issues there.  But he's not an attorney.
8    MS. WELBORN:  Well, clearly, I do.
9 Q.    Okay.  And did you review any documents
10 for today?
11 **A.    No.**
12 Q.    Okay.  You didn't review the complaint
13 for this case?
14 **A.    No.**
15 Q.    And have you discussed this case with
16 anyone other than your attorney, Mr. Davis, and
17 Senator McClendon?
18 **A.    No.**
19 Q.    And have you discussed your deposition
20 with anyone?
21 **A.    I told people I was being deposed.  But**
22 **that was the extent of it.**
23 Q.    Okay.  And who first told you that this
24 lawsuit had been filed?
25 **A.    Was this the one that was filed before**

1 **government, I couldn't even tell you.**
2 Q.    And that's your legislative --
3 **A.    Yes.**
4 Q.    -- email address?
5    Do you have any other email accounts?
6 **A.    No.**
7 Q.    Do you have an email account for any
8 PAC, for example?
9 **A.    No.**
10 Q.    So everything goes to either your
11 legislative account or your personal account?
12 **A.    Yes.**
13    Okay.  Do you have any personal social
14 media accounts?
15 **A.    I have a Facebook page.**
16 Q.    So Twitter, anything like that, for
17 personal use?
18 **A.    Not for me, no.**
19 Q.    Okay.
20 **A.    I mean, there -- there are Twitter**
21 **accounts for me, but I didn't use them.  I didn't --**
22 **they had my name on them, but I never used them.**
23 Q.    Okay.  And on your personal Facebook
24 account, it's just your name on the account; is that
25 correct?

1 we even introduced a bill?
2 Q.    No.
3 **A.    Okay.  So I have no recollection.**
4 Q.    And who first told you that your
5 deposition had been requested?
6 **A.    My attorney.**
7 Q.    And when was that?  Do you remember?
8 **A.    Shortly after y'all noticed it.**
9 Q.    Okay.  Which was --
10 **A.    Just a couple of days ago.**
11 Q.    Just a few days ago.
12    Are you being compensated by anyone to
13 be here today?
14 **A.    I'm getting my usual legislative per**
15 **diem for travel, which all state employees are**
16 **entitled to.**
17 Q.    Right.  And do you expect to be
18 compensated in any way if you testify at trial?
19 **A.    I will receive the same compensation for**
20 **travel that all state employees are entitled to.**
21 Q.    Okay.  Do you have an email account?
22 **A.    Yes.**
23 Q.    And what is that email account?
24 **A.    My private personal is**
25 **chrispringle@southerntimberlands.com.  My state**

1 **A.    Yes.**
2 Q.    Okay.  And have you been involved in any
3 lawsuits other than the redistricting one with
4 Mr. Blacksher?
5 **A.    No.**
6 Q.    Okay.  What's the highest level of
7 education that you've completed?
8 **A.    A graduate of the University of Alabama.**
9 Q.    And when was that?
10 **A.    August 11th 1984.**
11 Q.    And what degree did you obtain?
12 **A.    I got a degree in communications with a**
13 **minor in political science.**
14 Q.    Okay.  Do you have any certificates or
15 any specialties, any certifications in anything?
16 **A.    I'm a licensed realtor.  I'm a licensed**
17 **homebuilder.  I'm a licensed general contractor.**
18 **And until I let it expire, I was a certified control**
19 **burn specialist.**
20    THE REPORTER:  Control what?
21 **A.    Control burn.  You know when you see the**
22 **woods on fire?  Guys like me are burning it on**
23 **purpose.**
24 Q.    Okay.  Well, if I need to fix anything
25 in my apartment, it sounds like you're the person to

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 come to.

2 A.          I don't fight fires.

3 Q.          Well, no fires.  I hope there's not a

4 fire in my apartment.

5           So what do you do for a living other

6 than burn things?

7 A.          I actually quit doing that.  I am a real

8 estate agent with Southern Timberlands.  We

9 specialize in timberland sales and acquisitions.

10 And I am a licensed homebuilder and a licensed

11 general contractor.  I build houses, hunting camps,

12 and I do commercial remodeling work.

13 Q.          Who so is your employer?  I'm sorry.

14 A.          Southern Timberlands.

15 Q.          Okay.  And so all of those, the realtor

16 and being a contractor, et cetera, that's all for

17 that company, correct?

18 A.          No.

19 Q.          No?

20 A.          My real estate license is held at

21 Southern Timberlands, a division of Cooper &

22 Company, Incorporated.

23 Q.          Okay.

24 A.          My contracting license are held under

25 Chris Pringle, Incorporated.

Page 17

1 Q.          Okay.  Any other employers?

2 A.          Alabama House of Representatives.

3 Q.          Right.  And at Southern Timberlands,

4 what's your title?

5 A.          Realtor, agent.

6 Q.          Right.  Okay.  And how long have you

7 worked there?

8 A.          27 plus years.

9 Q.          Okay.  And how long have you been a

10 contractor?

11 A.          Since about 2007.

12 Q.          And what's your current role in the

13 legislature?

14 A.          I'm a state representative from House

15 District 101 in Mobile.

16 Q.          I'm sorry.  Could you repeat that?

17 A.          State representative from House District

18 101.

19 Q.          Okay.  And what portion of the state is

20 that?

21 A.          Mobile.

22 Q.          Okay.  And how long have you been in

23 office?

24 A.          I was elected in 1994.  I served two

25 terms.  I left in 2002.  I was re-elected in '14.

Page 18

1 So seven years now.  I mean seven years my second

2 term.

3 Q.          Okay.

4 A.          So about 15 years.

5 Q.          And currently are you on any committees?

6 A.          Yes.

7 Q.          Which ones?

8 A.          I chair the committee on state

9 government.  I am cochairman of the house --

10 cochairman of the reapportionment committee.  I

11 serve on constitution, campaigns, and elections;

12 internal affairs; the oversight committee of public

13 examiners; contract review.  I believe that's all.

14 Q.          Okay.  And during your first stint in

15 the legislature -- so that's your first two terms.

16 I'll just refer to it as your first stint.  Is that

17 okay?

18 A.          That's fine.

19 Q.          Or is there a different term that you --

20 A.          That works.

21 Q.          -- prefer?  And what district did you

22 represent at that time?

23 A.          101.

24 Q.          Okay.  So the same district?

25

Page 19

1 A.          Yes.

2 Q.          And were you on any committees then?

3 A.          Yes.

4 Q.          Do you remember which ones?

5 A.          I know I served on reapportionment.  I

6 served on boards and commissions, I served on

7 health, I served on constitution, campaigns, and

8 elections, I served on contract review.  And that's

9 all I can remember right now.

10 Q.          Okay.  Did you chair any of those

11 committees?

12 A.          No.

13 Q.          Okay.  I'm sorry.

14 A.          We were in the superminority at that

15 time.

16 Q.          Right.  Well, were you the ranking

17 member in any of the committees?

18 A.          No.

19 Q.          And why did you leave office?

20 A.          I decided not to run and sought higher

21 office and was defeated.

22 Q.          And other than serving in the house of

23 representatives, have you served in any other public

24 office?

25 A.          No.

Page 20

Evan Milligan,et al v. John H.Merrill, et al.

<div align="right">

Chris Pringle
12/17/2021

</div>

1 Q.          Okay.  And you mentioned that you were
2 on the reapportionment committee during your
3 first --
4 A.       Yes.
5 Q.       -- stint in the legislature.  So you
6 were involved in the redistricting process, correct?
7 A.       Yes.
8 Q.          And what role did you have in the
9 redistricting process?
10 A.        I was the ranking minority party member
11 in the house, not the senate.
12 Q.       Okay.  For the republicans, the minority
13 party, correct?
14 A.       Yes.
15 Q.          And why did you become involved in
16 redistricting?
17 A.        Congressman Sonny Callahan, who I had
18 previously worked for in Washington, wanted me to
19 serve on the committee because they were trying to
20 draw him out of his district.  He believed they were
21 trying to draw him out of his district.  Let me --
22 Q.       I see.  Any other reason?
23 A.       No, ma'am.  I like serving.
24 Q.          And so that redistricting process ended
25 in 2001; is that correct?

<div align="right">Page 21</div>

1 A.        No.
2 Q.          So the 2002 congressional map, can you
3 be a little more specific about what your
4 involvement was in helping to draw that map?
5 A.        Virtually none.
6 Q.       Okay.
7 A.        Those maps were drawn off -- what we
8 call off campus.  They were not drawn in the state
9 house.
10 Q.          Can you explain more about what that
11 means?
12 A.        They were drawn by somebody off -- they
13 were not drawn in the reapportionment office in the
14 state house.
15 Q.       Okay.  So they were drawn by somebody
16 other than someone in the legislature?
17 A.       Yes.
18 Q.       Do you know who that was?
19 A.       No.
20 Q.       Did you work with anyone to change the
21 map at all?
22 A.       Yes.
23 Q.       Who was that?
24 A.       Randy Hinaman.
25 Q.       Okay.  And what did you do with him?

<div align="right">Page 23</div>

1 A.        January of 2002.
2 Q.       Of 2002.  Okay.
3 A.        In the special session.
4 Q.       Okay.  So the special session was in
5 January of 2002?
6 A.       Yes, ma'am.
7 Q.       Okay.  And what was the result of that
8 redistricting?
9 A.        The democratic leadership drew the plans
10 and passed them.
11 Q.          And how did you become a cochair -- I'm
12 sorry.  What is your role in the 2021 redistricting
13 process?
14 A.       I'm the house cochairman.
15 Q.       Okay.  And is that a nonpartisan role?
16 A.        I was elected by the members of the --
17 the house members of the committee.
18 Q.       Okay.  And why did you decide to seek
19 that role?
20 A.        The house member that chaired it prior
21 to me was leaving, and we needed somebody with
22 experience to step up and be the house chairman.
23 Q.          And other than currently and the 2002
24 redistricting cycle, have you been involved in any
25 other redistricting process?

<div align="right">Page 22</div>

1 A.        We were in contact with Congressman
2 Callahan.  And he was in contact with the other
3 members of the congressional delegation who had
4 actually -- this is my memory, now.
5 Q.       Sure.
6 A.        The members of congress hired
7 Mr. Hinaman to represent them on drawing --
8 redrawing the congressional maps in 2002.
9 Q.          And so ultimately do you know who drew
10 the 2002 map?
11 A.        I do not know who the democrats
12 retained, no, ma'am.
13 Q.       Okay.  But it was the democratic party
14 of Alabama?
15 A.        They had somebody, yes.  I don't know
16 who.
17 Q.       Do you know the general method that was
18 used to draw the map?
19 A.        I would -- I'm assuming that the
20 guidelines we adopted in 2002 were used by them to
21 draw the 2002 plan.
22 Q.       Do you know the software that was used
23 to draw the maps?
24 A.       No, ma'am.
25 Q.       Do you know the data that was used to

<div align="right">Page 24</div>

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 draw the maps?
2 A.          No, ma'am.
3 Q.          So the 1992 congressional map created
4 the first majority black congressional district in
5 Alabama history.  That's District 7.  Do you know if
6 that map served as the starting point for the 2002
7 congressional map?
8 A.          You are -- that is the Reed Buskey plan,
9 correct?
10 Q.          To be honest, I don't know.  I don't
11 know the answer to that question.
12 A.          I'm pretty sure that's what we refer to
13 as the Reed Buskey plan.
14 Q.          Okay.
15 A.          That was -- that was the first time that
16 a map was drawn where a majority minority
17 congressional district was created.
18 Q.          And so --
19 A.          And I know that the guidelines in 2002
20 said we shall use the core of existing districts and
21 not -- use the core of existing districts.
22 Q.          Okay.  So is it fair to say that Reed --
23 well, who drew the 1992 map?  You don't know?
24 A.          I just know it's referred as the Reed
25 Buskey plan because Representative Buskey and I

Page 25

1 served together, and he's a personal friend of mine.
2 Q.          Okay.  So you said that it was in the
3 legislative guidelines to maintain the cores of
4 prior districts?
5 A.          If I remember the 2002 guidelines
6 correctly, that's been a longstanding tradition of
7 the Alabama legislature.
8 Q.          Okay.  Do you know if it was -- and
9 we're talking still about the 2002 redistricting
10 process -- if it was a primary goal of the
11 legislature to keep the racial demographics of each
12 district the same?
13 A.          I couldn't answer that.  I don't know.
14 Q.          Okay.  So you wouldn't know if it was a
15 primary goal to keep about a 60 percent black
16 population in District 7?
17 A.          I don't remember.  I have no -- no
18 recollection of that.
19 Q.          Do you know if the legislature took into
20 account any other characteristics other than keeping
21 the core of each district the same?
22 A.          In 2002?
23 Q.          Yes.
24 A.          No, ma'am.
25 Q.          Okay.

Page 26

1 A.          Now, we're talking just the
2 congressional plan, correct?
3 Q.          Yes.  That's right.  And that's
4 throughout this -- throughout the deposition we're
5 referring to the congressional plans.  If we refer
6 to any other plans, I'll make sure to be more
7 specific.
8          MR. OSHER:  I'm sorry to interrupt.
9 Would it be possible to move the microphone a little
10 closer to the witness?
11          (Discussion held off the record.)
12 Q.          Okay.  So for the 2001 congressional
13 map, do you know the -- did you know the racial
14 makeup of districts other than District 7?
15 A.          No.
16 Q.          Did you know the racial makeup of
17 District 7?
18 A.          No.  I mean, after the maps were passed,
19 yes, we knew it.
20 Q.          Okay.
21 A.          But going into it --
22 Q.          Do you recall what they were?
23 A.          No.
24 Q.          And do you know if the legislature
25 considered race in drawing any districts other than

Page 27

1 District 7?
2 A.          In 2001?
3 Q.          That's right.
4 A.          Those maps were drawn off campus.
5 That's the reason that ten-day rule comes into --
6 into play.  If you draw a map outside of the
7 legislature reapportionment office, you have to
8 submit it ten days before it can be introduced into
9 the legislature so it can be put into the computer
10 and analyzed.
11          And those maps were drawn exactly ten
12 days out at the last minute before the special
13 session in 2020 -- in 2002.
14 Q.          And when did that rule come into play?
15 A.          It was there in 2002.  Now, when it came
16 into the guidelines, I don't know.
17 Q.          Okay.  Do you know if in -- during the
18 2001-2002 process if legislators advocated for
19 two majority black districts?
20 A.          Not to my recollection.
21 Q.          And if the 2000 -- well, did you vote
22 for the 2002 congressional map?  Did you vote to
23 approve it?
24 A.          Yes.
25 Q.          And if --

Page 28

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 A.        To the best of my recollection, I did.
2 It protected Congressman Sonny Callahan and his
3 district, so I'm assuming I voted for it.
4 Q.        Okay.  And all of this is to the best of
5 your --
6 A.        Yes.
7 Q.        -- recollection.
8 A.        Yes.
9 Q.        If the 2002 map had contained two
10 majority black districts, would you have voted for
11 it?
12 A.        I can't answer that.
13 Q.        Why not?
14 A.        Because I didn't look at how they would
15 have drawn it.
16 Q.        Okay.
17 A.        It was never presented to me.  So I
18 can't tell you how I would vote on something I've
19 never seen.
20 Q.        Do you think that the legislature as a
21 whole would have approved a congressional map like
22 that?
23 A.        I'm not going to speak to that.
24 Q.        Did you play a role in the 2011
25 congressional redistricting process?
Page 29

1 A.        No.
2 Q.        Okay.  And do you happen to know, even
3 though you weren't there, if the 2001 congressional
4 map or 2002 congressional map was considered as the
5 starting point for the 2011 congressional map?
6 A.        No.
7 Q.        So you are the cochair of the
8 reapportionment committee for this year's
9 congressional redistricting process.  What does it
10 mean to be the cochair of the reapportionment
11 committee?
12 A.        I work with members of the Alabama house
13 on drawing their districts, their legislative
14 districts.
15 Q.        And for congress, as well?
16 A.        No.
17 Q.        So who works on the congressional map?
18 A.        Mr. Hinaman worked with members of
19 congress to help -- for them to draw the maps.
20 Q.        Okay.
21 A.        To have input from the members of
22 congress on their districts, what they wanted.
23 Q.        So what is the role of the
24 reapportionment committee with respect to
25 congressional maps or the congressional map?
Page 30

1 A.        We adopted the guidelines.  If you read
2 the guidelines, they lay out what we expect the
3 committee and the plans to look like, to respect
4 communities of interest, not to pit incumbents
5 against each other.  There's a whole list of things
6 that we put into the guidelines that we wanted to
7 see in our plans.
8           And Mr. Hinaman was given those
9 guidelines and instructed to draw those plans in a
10 race-neutral manner following the guidelines and
11 work with members of congress in how they wanted
12 their districts drawn.
13 Q.        And as a member of the reapportionment
14 committee, do you have any input on how the
15 congressional maps are drawn?
16 A.        We voted on the guidelines.
17 Q.        Okay.  You voted on --
18 A.        We gave Mr. Hinaman the
19 guidelines and told him to follow those guidelines
20 and to draw those -- those maps in a race-neutral
21 manner.
22 Q.        Okay.  Any other way that the members of
23 the reapportionment committee are involved in
24 drawing the congressional map?
25 A.        Once they were finished, we looked at
Page 31

1 them in committee.
2 Q.        Okay.  And anything else?
3 A.        Not that I can remember right now.
4 Q.        Okay.  And what are your
5 responsibilities as the cochair of the
6 reapportionment committee?
7 A.        We -- we set -- we oversaw the public
8 hearings, the 28 public hearings we had dealing with
9 congressional, state board of education, state
10 senate, and state house maps and districts.
11          And I worked with members of the Alabama
12 house to work on their districts and what they
13 wanted and how we could address communities of
14 interest.
15          But on congressional, I allowed
16 Mr. Hinaman to meet with members of congress and
17 take the information we gathered in the public
18 hearings that was available to him and the
19 guidelines.
20 Q.        Any other responsibilities?
21 A.        Not that I can think of right now.
22 Q.        And so what was the starting point for
23 drawing the 2021 congressional map?
24 A.        I would say the guidelines.  And part of
25 our guidelines are preserve the core of the existing
Page 32

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 districts and not pit incumbents against each other.
2 Q.            And so is it fair to say that the 2011
3 congressional map served as the starting point for
4 the 2021 congressional map?
5 A.            I would assume it would.  But I wasn't
6 there when Mr. Hinaman started drawing them.
7 Q.            Did you instruct him to use the 2011 map
8 as a starting point?
9 A.            I mean, the guidelines say preserve the
10 core of the existing districts.  So I would assume
11 that if the committee told him to start with the
12 core of the existing districts, he would start with
13 the core of the existing districts.
14 Q.            Which is the 2011 congressional map,
15 correct?
16 A.            Yes, ma'am.
17 Q.            And just really quickly going back to
18 the 2001, 2002 redistricting process.  You mentioned
19 that it was a priority to protect Senator Callahan's
20 district, correct?
21 A.            For Sonny Callahan, yes, and me.
22 Q.            And for you?
23 A.            Yes.
24 Q.            Right.  Did you have any other
25 priorities for the 2002 congressional map?

Page 33

1 A.            No.  Just protect the congressman --
2 Q.            Okay.
3 A.            -- who I worked for at one time.
4 Q.            Right.  So you were -- you worked for
5 him before you were in the --
6 A.            Yes.
7 Q.            -- Alabama legislature.  So when you
8 were in the Alabama legislature, you wanted to
9 protect his seat, correct?
10 A.            Yes.
11 Q.            Okay.  So that was really your
12 motivation?
13 A.            Yes.
14 Q.            Anything else?
15 A.            I was trying to see if we could draw
16 legislative districts.  But that's not the point
17 today.
18 Q.            I'm sorry?
19 A.            State legislative districts, also.
20 Q.            Right.
21 A.            But that was a different story.
22 Q.            Okay.  Thank you.
23            So now back to today's redistricting
24 process.  When did you first start planning for the
25 2021 redistricting process?

Page 34

1 A.            Probably 2019.  You know, we were
2 working on trying to come up with some type of
3 schedule.  But with the census being delayed and
4 getting the numbers so late, we were working on a
5 schedule of public hearings and working on the
6 guidelines.
7 Q.            Do you remember when in 2019 you
8 started?
9 A.            No, ma'am.
10 Q.            So what was your first step?
11 A.            We had a -- the first step was actually
12 getting me reelected house chairman after the 2018
13 election.  Because I was -- I assumed -- I came on
14 the committee in 2000 and, I want to tell you, 17
15 when Mr. Davis stepped down.  And then after the
16 election, I had to be reelected by my colleagues to
17 serve as the house -- the house cochairman.
18            Then we began the process of updating
19 the guidelines to conform with what we considered
20 be the law dealing with reapportionment and
21 redistricting to make sure our guidelines complied
22 with the law.
23            Then we had extensive conversations,
24 Mr. Davis and Mr. Dorman and Senator McClendon and
25 I, in the reapportionment office about public

Page 35

1 hearings and how we were going to address public
2 hearings, which all changed because of COVID-19.
3            We began the process of laying out
4 those -- talking about those meetings and where we
5 were going to have them and how we were going to
6 publicize them and conduct them.
7 Q.            Okay.  So do you recall when you first
8 started thinking about updating the reapportionment
9 guidelines?
10 A.            2019, 2000.  I can't remember the exact
11 date.  But that was one of the first things we
12 addressed, making sure our guidelines were updated
13 based on the current reapportionment law and court
14 cases.
15 Q.            Is it required to update the guidelines
16 every redistricting cycle?
17 A.            Well, the law changes.  So yes, you have
18 to update your guidelines.  I mean, the courts are
19 constantly telling us -- handing down their rulings.
20 And we have to update based on those rulings.
21 Q.            But it's not required by Alabama law or
22 by any legislative rule to update the guidelines
23 every -- you know, every cycle?
24 A.            I can't imagine not updating the
25 guidelines going into this process if you know the

Page 36

Evan Milligan,et al v. John H.Merrill, et al.

<div align="right">

Chris Pringle
12/17/2021

</div>

1 law has changed.  You have to.

2 Q.          If you could just give a broad overview
3 or a timeline of the 2021 redistricting process for
4 me.

5 A.          We were supposed to receive our initial
6 numbers at the end of January.  Then they -- then we
7 were going to get our finals in April.

8 Q.          I'm sorry?

9 A.          We were supposed to get our initial --
10 if I remember this correctly, we were supposed to
11 get our initial census numbers in, I think, January.
12 Yeah, January.  And then we would get our final
13 numbers in April.

14          That all got bumped to -- we didn't get
15 any numbers until the middle of the August.  And we
16 were trying to work out a schedule of public
17 hearings from the spring and the summer.  But we
18 couldn't -- we couldn't engage in those public
19 hearings because we had no numbers.

20          And when we finally got our numbers in
21 the middle of August, we immediately -- we laid out
22 a series of public hearings, sent a notice to all
23 the members of the committee.  I think it was 22
24 public hearings we had -- we proposed.

25          Representative Hall sent us a letter

<div align="right">Page 37</div>

1 requesting six additional public hearings in various
2 parts of the state.  We accepted her request and
3 added the six additional public hearings Ms. Hall
4 asked for, then published a list to everybody in the
5 media and advertised that those are the public
6 hearings we would be holding all over the state.  As
7 soon as we could get it to, we got it to.

8          And as soon as those meetings were over,
9 we took that information and began drawing
10 districts.  Because the secretary of state had given
11 us a deadline of the 1st of November to have our
12 plans passed in order for all the work behind the
13 scenes that has to be done to get ready for the next
14 election to occur.

15 Q.          So you started drawing the maps after
16 the public hearings; is that correct?

17 A.  Yes, ma'am.

18 Q.          Okay.  And when you said "we," who do
19 you mean?

20 A.          Well, Randy Hinaman.  And we began
21 meeting with the individual house members about
22 their -- their individual districts.

23 Q.          Okay.  But for the congressional map,
24 you mean primarily Mr. Hinaman?

25 A.  Yes.

<div align="right">Page 38</div>

1 Q.          And then what happened after that point?

2 A.          We worked right up to the last possible
3 minute drawing those -- meeting with members, trying
4 to adjust the districts to make sure the members
5 were happy with them.

6          But I'm talking about the state
7 legislature.

8 Q.  Right.  Right.

9 A.          The congressional, Mr. Hinaman met with
10 the members of congress, and he worked on that.  He
11 -- I didn't.  I was busy working on the state house.

12 Q.          Okay.  For the congressional districts,
13 what happened for you in between the public hearings
14 and the reapportionment committee meeting at the end
15 of October?

16 A.          Mr. Hinaman met with the members of
17 congress.  I did not.

18 Q.          Did you do anything else during that
19 time with respect to the congressional map?

20 A.          No, ma'am.  The closest I came, I walked
21 in the room and he was on a team call with a member
22 of congress.  I picked up my paper and walked out of
23 the room.  I wasn't there but just a minute.

24 Q.  Okay.

25 A.          I didn't participate in any of those

<div align="right">Page 39</div>

1 meetings.

2 Q.          And what happened -- I'm just trying to
3 get like a timeline of events rather than the
4 specifics.

5          So after the reapportionment committee
6 met on, I think, October 26th of 2020, what happened
7 after that point?

8 A.          We adopted the plans.  And we were in
9 special session dealing with the prisons.  So we
10 went -- we went straight into special session
11 dealing with the prison system.

12          I was not there that week.  I was only
13 there one day.  I had a prior contractual obligation
14 to finish a construction project that I had to stay
15 on.  So I came one day that week, and that was it.

16 Q.          Okay.  And regarding redistricting, what
17 was the first thing that happened for redistricting
18 after the reapportionment committee on October 26th?

19 A.          I don't understand the question.

20 Q.          Well, what happened next?  How --
21 eventually the maps were passed and signed by the
22 governor, including the congressional map.  So they
23 made it out of the reapportionment committee.  Then
24 what happened?

25 A.          They made it out of the committee.  They

<div align="right">Page 40</div>

<div align="right">

</div>

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 became public.  And when we went into the special
2 session for redistricting, they were introduced in
3 bill form.
4 Q.            Okay.  And can you explain in sort of a
5 Schoolhouse Rock way how that bill became a law?
6 A.            It was brought up -- it was introduced
7 into the house.  It passed.  It was assigned to the
8 state government committee where it passed.  It was
9 given a second reading on the floor.  It was put on
10 the calendar.  It was brought up on the floor, and
11 it was passed by the members of the Alabama house of
12 representatives.
13 Q.            And then what happened?
14 A.            It was sent to the senate --
15 Q.            Okay.
16 A.            -- where it went to committee, went to
17 the floor, and passed, was signed by the governor.
18 Q.            So I just wanted to make sure that I had
19 the full -- the full process.
20 A.            All nine steps occurred.
21 Q.            Okay.  Well, I'm glad that I paid
22 attention to Schoolhouse Rock, then.
23             I'm sorry to keep jumping back and
24 forth, but I'm just going to go back to the 2001,
25 2002 process really quickly.

Page 41

1 Which district did Representative
2 Callahan represent?
3 A.            The 1st congressional district.
4 Q.            And what area of the state is that?
5 A.            At that time, it was Mobile, Washington,
6 Clarke, Monroe, Escambia, and Baldwin County.
7 Q.            Okay.
8 A.            I believe it lost Wilcox County in -- I
9 believe the Buskey Reed plan took Wilcox County out
10 of the 1st congressional district, I believe.
11 Q.            Okay.  And do you remember the racial
12 makeup of Representative Callahan's district?
13 A.            No, ma'am.
14 Q.            Do you have any sense at all?
15 A.            No, ma'am.
16 Q.            10 percent black, 90 percent black?
17 A.            No, ma'am.
18 Q.            None at all?
19 A.            No.
20 Q.            Let's say that Representative Callahan's
21 district had -- previously had 40 percent black
22 population.  If, in the redistricting cycle, his
23 district had an increase of black voters in the
24 district to 50 percent, would that be something that
25 you would have supported?

Page 42

1 A.            I can't answer that.  That's
2 speculation.  I don't know.
3 Q.            Okay.  When you said that you were
4 protecting Representative Callahan's seat, what does
5 that mean?
6 A.            There was a plan produced that used the
7 Mobile ship channel to come up.  They turned and
8 used the Dog River channel.  And they hit
9 Congressman Callahan's property line, and they came
10 down his property line to the road and went up the
11 road to the other side and back down his property
12 line and back out into the Dog River ship channel
13 and back out into the Mobile ship channel.  They
14 carved just his house into the 1st congressional
15 district and sent it all the way to Dothan.
16 Q.            So what was your -- what was your
17 response to that?
18 A.            It's quicker to drive to Huntsville,
19 Alabama, from Mobile than it is to drive to Dothan.
20 Think about that.  It's quicker for us to get in a
21 car and drive to Huntsville, Alabama, than it is to
22 drive to Dothan or Henry County.  The congressman
23 was adamant that we would not do that to him.
24 Q.            So what was the ideal outcome of the --
25 of that situation?

Page 43

1 A.            We kept the core of the existing 1st
2 Congressional District intact.  We kept Washington,
3 Clarke, Mobile, Monroe, Escambia, and Baldwin
4 County.
5 Q.            Okay.  And what about Representative
6 Callahan's house?
7 A.            All of Mobile County was in the
8 district.
9 Q.            Okay.
10 A.            All of Mobile, all of Baldwin, all of
11 Washington, all of Monroe, all of Escambia.  And I
12 believe that was the first time Clarke County was
13 split to achieve zero deviation.
14 Q.            So your aim was -- is it fair to say
15 that your aim was to keep Senator Callahan's
16 residence within his district?
17 A.            Yes, ma'am.
18 Q.            Okay.  Is that what you mean by
19 protecting his district?
20 A.            Well, I mean, to draw just the lot his
21 house is on out of the district using a ship channel
22 or a boat channel, we didn't consider that to be
23 reasonable.
24 Q.            So what would be reasonable?
25 A.            Well, I mean, they didn't have the

Page 44

Evan Milligan,et al v. John H.Merrill, et al.

1 **Gingles test then. But we didn't consider that to**
2 **be compact, concise, or a community of interest to**
3 **send one lot in Mobile County and share it with**
4 **Dothan in Houston and Henry County.**
5 Q.        Do you mean -- were there any other ways
6 that you wanted to protect Representative Callahan's
7 seat?
8 A.        **Well, of course. He was elected by the**
9 **people in that district, and they -- he wanted to**
10 **continue to represent those people. That's why he**
11 **won reelection so overwhelmingly every time he ran.**
12 Q.        Is it fair to say that you wanted to
13 make sure that Representative Callahan remained in
14 the 1st District so that he could win reelection?
15 A.        **I wanted to make sure he continued to**
16 **represent the people that had elected him, yes. And**
17 **they continued to reelect him overwhelmingly for**
18 **years.**
19 Q.        So you mentioned that one of the first
20 steps of the 2021 redistricting cycle were updating
21 the reapportionment committee redistricting
22 guidelines; is that correct?
23 A.        **(Witness nods head).**
24 Q.        When did that happen?
25 A.        **I'm going to yield to the attorneys.**
                                                   Page 45

1 But I remember sitting at a table with Mr. Davis,
2 **Representative McClendon, and Mr. Walker, and we**
3 **began the process of working on those guidelines to**
4 **update.**
5            MR. OSHER:  We can't hear you.
6 A.        **I remember sitting at a table in the**
7 **reapportionment office with Mr. Davis, Senator**
8 **McClendon, Mr. Walker, and myself, and we began**
9 **reviewing the guidelines from the past**
10 **redistricting. And the discussion to update them**
11 **based on new -- the current law and court rulings.**
12           **I think the Gingles test came into play**
13 **first. Because I don't think Gingles was in effect**
14 **in 2011. But I'm not an attorney.**
15           MR. WALKER:  I'm going to instruct you,
16 given that Mr. Davis and I were there, not to
17 discuss what we discussed at that meeting because it
18 was an attorney-client meeting.
19           THE WITNESS:  Okay.
20 Q.        When did that meeting occur?
21 A.        **2019 or '20.**
22 Q.        Do you have any sense of what time of
23 the year?
24 A.        **No, ma'am, I don't remember.**
25 Q.        And did you bring any materials to that
                                                   Page 46

1 meeting?
2 A.        **No, ma'am.**
3 Q.        And was anybody in -- was anybody else
4 in attendance other than Mr. Walker, Mr. Davis, and
5 Senator McClendon?
6 A.        **Not to my recollection, no.**
7            MS. SADASIVAN:  The audio has stopped
8 again.
9            MS. WELBORN:  Can you hear me, Kathryn?
10           MS. SADASIVAN:  I can hear you now.  But
11 the audio keeps coming in and out.
12 Q.        Did you -- was that your only meeting to
13 talk about revising the reapportionment committee
14 redistricting guidelines?
15 A.        **No.**
16           How many other meetings did you have, if
17 you recall?
18 A.        **I don't recall.**
19 Q.        Do you have a sense of how many meetings
20 you had?
21 A.        **I would hate to put a number on it. But**
22 **it was several.**
23 Q.        Five, let's say?
24 A.        **It was several meetings.**
25 Q.        Okay.  But less than ten?
                                                   Page 47

1 A.        **I would -- I would say that, yes.**
2 Q.        Okay.  And who was at those meetings?
3 A.        **I remember Mr. Davis, Senator McClendon,**
4 **Mr. Walker, and myself.**
5 Q.        Anybody else?
6 A.        **I'm going to say maybe a member of the**
7 **reapportionment staff was there.**
8 Q.        From the reapportionment office?
9 A.        **Yes.**
10 Q.        And do you know who that was?
11 A.        **To err on the safe side, I would say**
12 **Ms. Overton.**
13 Q.        And what's her role?
14 A.        **She is the director of the**
15 **reapportionment staff.**
16 Q.        And do you remember when that meeting
17 occurred?
18 A.        **No, ma'am.**
19 Q.        And what was the goal of these meetings?
20 A.        **To write committee guidelines that we**
21 **thought would conform with the existing**
22 **reapportionment law.**
23 Q.        So on May 5th 2001 there was a meeting
24 of the reapportionment committee; is that right?
25 A.        **I believe you.**
                                                   Page 48

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1  Q.          Okay.  Well, when were there meetings of
2  the reapportionment committee since 2019?
3  A.          I -- I couldn't answer that.  I just
4  don't remember.
5  Q.          Do you remember any --
6          MR. ROSBOROUGH:  I'm sorry.  Everyone's
7  audio has completely dropped out again.
8          MS. FAULKS:  We should take a break.
9          MS. SADASIVAN:  I think we should break
10  possibly to resolve the audio issues quickly because
11  we keep going in and out.
12          THE VIDEOGRAPHER:  We are off the
13  record.  The time is 10:03 a.m.
14          (Recess was taken.)
15          THE VIDEOGRAPHER:  We are back on the
16  record.  The time is 10:22 a.m.
17          THE WITNESS:  Can they hear me now?  Is
18  this better?
19          MS. SADASIVAN:  Right.  Thank you so
20  much.
21  Q.          So before the break, we were talking
22  about the reapportionment committee.  How many times
23  has the reapportionment committee met in 2021, if
24  you can recall?
25  A.          I don't remember.  20 --

Page 49

1  Q.          This year.
2  A.          I don't remember the exact number.
3  Q.          A handful?
4  A.          Yes.
5  Q.          Okay.  Is there a regular schedule for
6  the reapportionment committee to have meetings?
7  A.          No reapportionment committee I've ever
8  served on had a regular schedule.
9  Q.          So how --
10  A.          I mean, like my state government
11  committee meets every Wednesday at 3:00 o'clock.
12  Q.          Right.
13  A.          Reapportionment doesn't do that.
14  Q.          So how do you decide when you have to
15  have a meeting?
16  A.          When we have something to discuss.
17  Q.          Okay.
18          MS. WELBORN:  So if there -- so we know
19  that there was a reapportionment committee meeting
20  on May 5th and one on October 26th.  Mr. Walker, if
21  there were any other committee meetings for the
22  reapportionment committee, we would request any
23  records or recordings of those.
24          MR. WALKER:  Let me represent to you
25  that I'm not aware of any other reapportionment

Page 50

1  committee meetings in 2021 except for the May 5th
2  and the October 26th meetings.
3          MS. WELBORN:  Okay.  Thank you.  I just
4  wanted to double-check.
5  Q.          So for the May 5th meeting, do you --
6  did you do anything to prepare for the meeting that
7  you recall?
8  A.          Nothing out of the -- that's -- that's
9  the day we voted on the guidelines.
10  Q.          That's correct.
11  A.          Yes.  I mean, I read the proposed
12  guidelines and went over them with the attorney.
13  Q.          Okay.  Did you do anything else to
14  prepare?
15  A.          No, ma'am.
16  Q.          And other than the meetings with the
17  attorneys and Senator McClendon to talk about the
18  revised guidelines, did you talk to anyone else
19  about the May 5th meeting ahead of time?
20  A.          I may have talked to the committee
21  members in the house, but I don't recall any
22  specific conversations.
23  Q.          So at the May 5th meeting, what
24  happened?
25  A.          The guidelines were sent to the members

Page 51

1  prior to the meeting for their review and input.
2  And at the meeting, we talked about the guidelines.
3  And if I remember correctly, the attorney explained
4  them to the members of the committee, and we passed
5  them.  We adopted them.
6  Q.          And do you remember when the proposed
7  guidelines were sent to members of the committee?
8  A.          No, ma'am.  I know it was prior to the
9  meeting.
10  Q.          And did you take any notes at the
11  meeting?
12  A.          No, ma'am.
13
14          (Plaintiff's Exhibit 2 was
15          marked for identification.)
16
17  Q.          So I would like to introduce as
18  Plaintiff's Exhibit 2 the reapportionment committee
19  redistricting guidelines from May 5th of 2021.
20  There's a copy.
21          And did you have any role in drafting
22  this document?
23  A.          It was reviewed with me by Mr. Walker,
24  and we discussed it.
25  Q.          Okay.  Did you have any other role in

Page 52

Evan Milligan,et al v. John H.Merrill, et al.

1 drafting the document?

2 A.          No, ma'am.

3 Q.          Who drafted the document?

4 A.          I would say Mr. Walker.  Now, who he was

5 in conjunction with, I do not know.

6 Q.          And is that normal to have an attorney

7 draft the guidelines, would you say?

8 A.          Attorneys draft about everything we do.

9 I'm not an attorney.  I make no bones about it.

10 Q.          So the members of the reapportionment

11 committee did not draft this document; is that

12 correct?

13 A.          They were -- they reviewed it and the

14 attorneys explained it to them.

15 Q.          Okay.  Did anyone on the reapportionment

16 committee make any changes to the document at that

17 -- at the May 5th meeting?

18 A.          Not that I remember.

19 Q.          Do you know if they made any changes

20 after the meeting?  I guess they couldn't have if

21 you voted on them.

22 A.          Right.

23 Q.          Sorry.  I answered my own question for

24 you.

25              So what are these guidelines?

Page 53

1 A.          That's the parameters that we used in

2 order to draw districts we thought complied with the

3 Voting Rights Act and the 14th amendment to the

4 Constitution and the court rulings that the courts

5 had handed down in redistricting.

6 Q.          And so what is your understanding --

7 when you say "comply" with the Voting Rights Act or

8 the constitution and court rulings, what do you mean

9 by that?

10 A.          I mean, it deals with drawing districts

11 on a race neutral -- race neutral.  We didn't look

12 at race while we were drawing the districts.  And it

13 complies with not putting incumbents together and

14 respecting single-member districts and eliminating

15 contests between incumbents.  Everything is spelled

16 out here.  That was just a few of the highlights.

17 Q.          And other than compliance with federal

18 laws, are there any other reasons why you have the

19 guidelines?

20 A.          Just a road map for everybody to follow

21 when we're drawing lines.  It's agreed to by the

22 committee and the members of the committee and what

23 we prioritize as what we need to do.

24 Q.          And do you recall what updates there

25 were to the law that needed to be put into the

Page 54

1 guidelines?

2 A.          I don't recall any specifics.  But there

3 were a -- there were a handful of changes to update.

4 But I don't remember the exact specifics.

5 Q.          And who provided you with those

6 specifics?

7 A.          Our attorney.

8 Q.          Mr. Walker?

9 A.          Yes.

10 Q.          And do you know -- do you know why those

11 specifics were chosen?

12 A.          It was my understanding that the courts

13 had handed down additional rulings since the last

14 reapportionment guidelines were adopted.  And we

15 updated them to reflect those changes in the law.

16 Q.          And do you know how those specifics were

17 chosen?

18 A.          Changes in the law in courtrooms.

19

20              (Plaintiff's Exhibit 3 was

21              marked for identification.)

22

23 Q.          Let me introduce Plaintiff's Exhibit 3.

24 This is the proposed guidelines handout.

25              Do you recognize this document?

Page 55

1 A.          It looks like the one I saw earlier,

2 yes, ma'am, back in May.

3 Q.          And when you say you saw it earlier,

4 could you explain?

5 A.          Back during the discussion of the

6 guidelines.

7 Q.          And who provided this document to you?

8 A.          Mr. Walker.

9 Q.          And do you know when he provided it to

10 you?

11 A.          Prior to -- I believe every member of

12 the committee saw these -- the existing, the

13 proposed changes, and the enrolled changes prior to

14 the meeting for their review.

15 Q.          And did you see it before -- as a

16 cochair, did you see it before any of the other

17 members of the reapportionment committee?

18 A.          Yes, ma'am.

19 Q.          Did you have any role in drafting this

20 document?

21 A.          No, ma'am, other than it was reviewed

22 with me prior to that.

23 Q.          Okay.  But you did discuss revisions to

24 the guidelines prior to this document --

25 A.          Yes, ma'am.

Page 56

Evan Milligan,et al v. John H.Merrill, et al.

<div align="right">

Chris Pringle
12/17/2021

</div>

1 Q.        -- being drafted?
2 A.        Yes, ma'am.
3 Q.        Do you know if any of your discussions
4 went into the creation of this document?
5 A.        I couldn't answer that question.
6 Q.        Okay.  Do you know if any of the updates
7 that you wanted to make to the guidelines made it
8 into this document?
9 A.        I know I was in favor of the 5 percent
10 deviation.
11 Q.        And that's for the state --
12 A.        Yes.
13 Q.        -- legislative maps, correct?
14          Anything else?
15 A.        Not that I recall.
16 Q.        Okay.  Do you know what the process was
17 for drafting this document?
18 A.        Our attorney met with us and we went
19 over the old guidelines, some proposed changes, and
20 what we thought we needed to update to comply with
21 the law.
22 Q.        And did you suggest any changes?
23 A.        The 5 percent.
24 Q.        Anything else?
25 A.        Not that I recall.
                                              Page 57

1 Justice under Section 5.
2 Q.        Okay.
3 A.        And they were -- they were drawn fairly
4 closely alined with the committee guidelines at that
5 time.
6          And so you believe that the 2010
7 guidelines, then, were based on the 2002 guidelines
8 for that reason?
9 A.        What I remember from 2002, when they
10 brought the 2010, I saw similarities that I
11 remembered from both of them to the -- to the 2020
12 guidelines, yes.
13 Q.        Okay.  So one of the reasons that the
14 2021 guidelines are based on the 2010 guidelines is
15 because you believe that they would be -- they would
16 have complied with Section 5 of the Voting Rights
17 Act had that -- if that were still in effect?
18 A.        They would comply with Section 1 of the
19 Voting Rights Act.  I mean Section 2.  I'm sorry.
20 Section 2 of the Voting Rights Act.  But they were
21 precleared under Section 5.
22 Q.        Right.
23 A.        And I also thought they would comply
24 with the 14th Amendment, one man, one vote.
25 Q.        Okay.  Is there any other reason why you
                                              Page 59

1 Q.        And just to make sure, other than
2 Mr. Walker, Mr. Davis, and Senator McClendon, and
3 perhaps one member of the reapportionment committee,
4 did you speak to anyone else about revising the
5 guidelines prior to the May 5th meeting?
6 A.        I can't recall.
7 Q.        Were the -- so on this document there
8 are the 2010 guidelines.  Would you say that it's
9 fair -- is it fair to say that those were the basis
10 for the 2021 guidelines?
11 A.        I would say that, yes.
12 Q.        Why did you choose to rely on the 2010
13 guidelines rather than starting from scratch?
14 A.        Because the 2010 were based off the 2002
15 guidelines, I would assume.  I wasn't there.
16 Q.        Right.
17 A.        But I would just assume that they used
18 the 2002 as the basis for the 2010, and we used them
19 for the 2020.
20 Q.        Is there a reason why you would want to
21 rely on the past documents?
22 A.        Because we had passed plans that were
23 approved by the justice department under Section 5.
24 In 2002, remember our plan -- our congressional plan
25 was precleared by the United States Department of
                                              Page 58

1 based the 2021 guidelines off of the 2010 guidelines
2 other than that you think that it would -- that they
3 would have complied with federal law?
4 A.        Well, when I read the 2010, they were
5 very similar to what I remember the 2002 guidelines.
6 I remember specifically the ten-day rule was there
7 in 2002.
8 Q.        Is it a principle that the committee
9 follows to generally use what has come before, use
10 materials that have come before?
11 A.        Yes.
12 Q.        Out of ease of use or out of tradition
13 or because the -- you know, because you believe that
14 they comply with the law?  What -- what is the
15 reason for reusing?
16 A.        I would say all three of those.
17 Q.        Is anything more important, any of those
18 more important than the other?
19 A.        Complying with the law.
20 Q.        That's pretty important, huh?
21 A.        Yeah.
22 Q.        I think we all can agree on that.
23          And do you know how the 2010 guidelines
24 were created --
25 A.        No.
                                              Page 60

<div align="right">

Page: 15 (57 - 60)

</div>

Evan Milligan, et al v. John H. Merrill, et al.

Chris Pringle
12/17/2021

1 Q.          -- other than being based off of the
2 2002?
3 A.          **No, ma'am.**
4 Q.          Who would know how the 2010 guidelines
5 were created?
6 A.          **I would say Mr. Walker.**
7 Q.          Okay.  Anybody else?
8 A.          **I wasn't there.**
9 Q.          Okay.
10 A.          **I take that back.  I said Senator**
11 **McClendon was there in 2010.  I wasn't.**
12 Q.          Let's see.  If you could flip to Pages 7
13 and 8.  Let's start with 7.  And as you'll see, that
14 third box is entirely striked out in the middle with
15 the proposed changes.
16 A.          **Uh-huh.**
17 Q.          That's the section on communities of
18 interest.  If you'd like to read through those boxes
19 on Pages 7 and 8, it might be helpful.
20 A.          **Okay.**
21 Q.          So it looks to me like this subsection
22 was entirely rewritten.  Do you know why?
23 A.          **I can't answer with certainty.  But I**
24 **believe it goes back -- and I'm just supposing -- to**
25 **the Gingles test.**

Page 61

1 Q.          And what's your understanding of the
2 Gingles test?
3 A.          **Compactness, contiguity, and communities**
4 **of interest, I would assume.  I don't know.**
5 Q.          Can you think of any other reason why
6 the section on communities of interest would be
7 entirety rewritten?
8 A.          **Other than a court ruling that gave a**
9 **better definition, I don't know.**
10 Q.          Did you have any role in this particular
11 change?
12 A.          **No, ma'am.**
13 Q.          Do you know who made this particular
14 change on the document?
15 A.          **You would have to talk to the attorney.**
16 Q.          Talk to Mr. Walker?
17 A.          **Mr. Walker.**
18 Q.          In this section, if you compare the 2010
19 guidelines to the enrolled guidelines, the 2021
20 guidelines eliminate partisan interest from the
21 definition of communities of interest.
22          So in 2010, partisan interests were part
23 of the definition of community of interest.  But in
24 2021, they're not.  Do you know why that is?
25 A.          **No, ma'am.**

Page 62

1 Q.          Who would know why?
2 A.          **I would suggest you talk to my attorney.**
3 Q.          Okay.
4 A.          **When you get into legal definitions --**
5 Q.          I understand that lawyers are pretty
6 fond of legal definitions.
7          So in the May 5th meeting, you mentioned
8 that Mr. Walker discussed these proposed changes.
9 Do you know if there were any other changes made at
10 that meeting other than the ones proposed by
11 Mr. Walker?
12          MR. WALKER:  I think the way that
13 question is asked, I need to assert the
14 attorney-client privilege.
15 Q.          I guess what I'm saying is did any --
16 are there any differences between these proposed
17 changes that were presented in the meeting and the
18 final version in Exhibit 2, the final guidelines?
19 Did anybody suggest any other changes?
20 A.          **Not that I recall.**
21 Q.          So the version that is here of these
22 proposed changes, they were accepted in whole and no
23 other changes were made?
24 A.          **No changes were made after the committee**
25 **adopted them.**

Page 63

1 Q.          Well, I guess I'm talking about at the
2 -- at the committee meeting.
3 A.          **I don't -- I don't remember.**
4 Q.          Okay.  And did you talk to anyone about
5 the May 5th meeting after it happened?
6 A.          **I'm sure I did.  But I don't recall.**
7 Q.          Do you recall what you would have talked
8 about?
9 A.          **The general guidelines that we adopted,**
10 **the guidelines that would control the committee's --**
11 **the way we drew plans.  But they were public record**
12 **at that point.**
13 Q.          So what happened next in the
14 redistricting process?
15 A.          **Then we began trying to work on public**
16 **hearings and how we were going to handle public**
17 **hearings with COVID-19.**
18 Q.          Okay.
19 A.          **So we had -- we had to come up with a**
20 **way to handle the public hearings and where we were**
21 **going to hold them and how we were going to hold**
22 **them.**
23 Q.          So why did you hold public meetings?
24 A.          **It's part of the guidelines, and it's**
25 **tradition.  They've been held -- I've heard they did**

Page 64

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 them in 2010.  I know we did them in 2002.
2 Q.          And what's the purpose of the public
3 meetings?
4 A.          To take input from the community at
5 large, the people that live in the communities and
6 what they like or dislike about the existing plan
7 and what they would like to see changed.
8 Q.          Was there a draft -- when you say
9 "existing plan," what do you -- what do you mean by
10 that?
11 A.          The plan that we were currently
12 operating under.
13 Q.          So you mean the 2011 map?
14 A.          Yes.
15 Q.          So the purpose of the public meetings is
16 for people to express what they like or do not like
17 about the current setup?
18 A.          Yes.
19 Q.          Is there any other reason why public
20 meetings are held?
21 A.          Well, we go to the public and show them
22 the existing plans and where the population has
23 shifted and how they would like to see the lines
24 drawn.
25 Q.          So you mentioned that there were public

Page 65

1 there were people that liked their members of
2 congress and wanted the maps to stay the way they
3 were.
4 Q.          Was there a draft of the congressional
5 map prepared before the public meetings occurred?
6 A.          No, ma'am.
7 Q.          And when did the public meetings occur?
8 Not every single one, but in general.
9 A.          As soon as we had numbers from the
10 census bureau and we could tell the people whether
11 their congressional district was overpopulated or
12 underpopulated and how many people they had to gain
13 or lose based on the new -- we didn't know what the
14 number was going to be to get to zero deviation on
15 the congressional map until we had the census
16 numbers.
17          So we couldn't go out and talk to people
18 about how they wanted to see their congressional
19 district change in order to comply with one man, one
20 vote.
21 Q.          Why is it -- why was it necessary to
22 have the census numbers if you don't have a map yet?
23 I guess I'm curious why the -- why the census
24 numbers are necessary to hold the public hearings.
25 A.          We had a map.

Page 67

1 meetings that were also held in 2001 when you were
2 part of that redistricting process.  Do you think
3 that people's -- do you recall if people's -- their
4 concerns are different now than they were then?
5 A.          Explain what you mean by that question.
6 Q.          Well, I guess I'm not talking about the
7 nitty-gritty little, you know, this block here, this
8 block there, but general opinions about how maps
9 should be drawn or what a community of interest is
10 or anything like that.
11          Do people -- do you think that people
12 felt the same way at public meetings back in 2001 as
13 they did in the meetings this year?
14 A.          I would say, generally speaking, they
15 held the same views.
16 Q.          And what sorts of views are those?
17 A.          I mean, some communities wanted to --
18 I'm having -- I would have to separate congressional
19 from --
20 Q.          Right.
21 A.          -- legislative.
22          Some people wanted to see maps drawn
23 differently.  There was numerous people there to
24 present the map for the League of Women Voters and
25 discuss it.  They asked us to look at that map.  And

Page 66

1 Q.          The 2010?
2 A.          The existing map.
3 Q.          Okay.
4 A.          And then after we got the numbers, we
5 knew which congressional district was over and which
6 congressional districts were underpopulated and the
7 amount of people we needed in each congressional
8 district in order to comply with one man, one vote.
9 Q.          Okay.
10 A.          The same thing we did in 2001.  We
11 presented the existing map to the people in all the
12 public hearings.  And after the public hearings,
13 then and only then was a map produced.  And we had a
14 lot more time in '01.
15 Q.          Right.
16          Did the public have access to the
17 numbers of people that would need to move between
18 districts, about the overpopulation and
19 underpopulation numbers?  Did they have access to
20 that?
21 A.          That was gone over in every public
22 hearing.
23 Q.          Okay.  Why was it necessary to have
24 those numbers before holding the public hearings?
25 A.          So we could -- we knew how many people

Page 68

Evan Milligan, et al v. John H. Merrill, et al.

Chris Pringle
12/17/2021

1 went into a district and how many people were in the
2 current district.
3 Q.          Well, I guess people have concerns about
4 -- well, did people have concerns about districts
5 other than, you know, the pure numbers?  Did they
6 have opinions about how maps should be drawn period
7 regardless of the census numbers?  Do you understand
8 what I'm saying?
9 A.          If you are referring to the League of
10 Women Voters who sent somebody to virtually every --
11 Q.          I'm talking in general.
12 A.          There were people there every -- every
13 meeting that had their talking points that basically
14 read them that all said the same thing.  They wanted
15 to adopt another plan that created two majority
16 minority districts.
17 Q.          Well, I assume that there were people at
18 the meetings who didn't share that view.
19 A.          Yeah.
20 Q.          Do you think -- I guess wouldn't it be
21 possible to have that opinion before the census
22 numbers were even out?
23 A.          Well, they did have the opinion before
24 the numbers were out.
25 Q.          Okay.  I guess I'm just not really

Page 69

1 Q.          Well, there are people -- so the map
2 changed between 2010 and today, right?
3 A.          Yes.
4 Q.          And there are members who have kept
5 their -- there are citizens who have kept their
6 representatives even though the lines of the
7 districts have changed, right?
8 A.          Correct.
9 Q.          So you could keep your representative
10 even though the line of the district changes,
11 correct?
12 A.          Correct.
13 Q.          So when people are saying "I'm happy
14 with my representative," are they just saying that
15 they don't want the district to change at all?  Or
16 what -- what do you think that they're saying?
17 A.          I would hate to interpret what they
18 would mean by that.  They said they were happy with
19 their representative.
20 Q.          Okay.  And how many of the public
21 hearings did you participate in?
22 A.          All 28.
23 Q.          Did you go in person --
24 A.          Yes.
25 Q.          -- to all 28?

Page 71

1 understanding why the -- why you had to wait to hold
2 the public hearings until the census numbers were
3 out.
4 A.          Accuracy.
5 Q.          Okay.  So you had mentioned that at the
6 public meetings, public hearings, some people liked
7 their members of congress and wanted to keep them.
8 What did you mean by that?
9 A.          They were happy with the representation
10 they were receiving from their elected
11 representatives.
12 Q.          So what does that mean for those
13 representatives' districts?  Would they want to keep
14 them the same or --
15 A.          Our guidelines say we try to protect the
16 core of the existing districts, yes.
17 Q.          Well, I guess if you're happy with your
18 representative, that doesn't mean that -- you could
19 still live in the district and have the rest of the
20 district change and still keep your representative
21 if like, you know, they're on the margins.  The rest
22 of the district could change.  If you live in the
23 center of the district, you're still going to keep
24 your representative, right?
25 A.          I couldn't answer that question.

Page 70

1 A.          Yes.  I want to say I -- I don't
2 remember missing any of them, no.
3 Q.          Okay.  And how were the public meetings
4 held?
5 A.          Virtually, just like this meeting.  We
6 were -- we were in COVID and we had to get as many
7 locations as we could to get as much input as we
8 could in a very compressed time period.  So we did
9 it remotely.
10 Q.          And in person?
11 A.          Yes.  We had one in the state house.
12 Q.          But 27 out of 28 were only held
13 virtually; is that right?
14 A.          Just like this meeting, yes, ma'am.
15 Q.          Okay.  And what was your role in the
16 public meetings?
17 A.          I was to go over the -- to listen to the
18 house, when they talked about the state house
19 districts.  And I listened to all the house,
20 congressional, senate, state school board, yes.
21 Q.          And were you just there to listen?  Or
22 did you do anything else?
23 A.          I listened.
24 Q.          And did you answer any questions from
25 the public?

Page 72

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1  A.           I believe I answered one.
2  Q.           And what was that question?
3  A.           I don't remember.
4  Q.           Was it about the congressional map?
5  A.           I don't remember.
6  Q.           And was Mr. Walker present at these
7  public meetings?
8  A.           He was our moderator.  Yes, ma'am.
9  Q.           Okay.  And what does that mean?
10  A.          He conducted the meeting.
11  Q.          Okay.  And is it fair to say that
12  Mr. Walker primarily addressed or answered audience
13  questions during the hearings?
14  A.          There was a time when people could
15  either ask a question or submit a question
16  electronically.
17  Q.          Okay.
18  A.          And he would address those questions.
19  Q.          And he addressed most of -- I'm sorry.
20  Of the questions that were answered, Mr. Walker was
21  the one who answered most of them?
22  A.          Yes, ma'am.
23  Q.          Okay.  And did audience members ever
24  direct questions to you specifically?
25  A.          I can't remember.
                                          Page 73

1  in order to get to zero deviation.
2  Q.           And who created that document?
3  A.           I'm not sure.
4  Q.           Do you know -- sorry.
5              Did you take any notes during any of the
6  public meetings?
7  A.           Any notes I took, I turned over in my
8  evidence.  They were handwritten on those -- those
9  documents.
10  Q.          But you did take some --
11  A.          Very few.
12  Q.          -- notes?  Okay.
13             Did you take any notes after any of the
14  public meetings?
15  A.          No, ma'am.
16  Q.          And did you talk to anyone about the --
17  what happened in the public hearings?
18  A.          I'm sure I did.  But I don't recall
19  specifics.
20  Q.          Did you talk to Mr. Hinaman about what
21  happened in the public meetings?
22  A.          Yes, ma'am.
23  Q.          And what did you tell him?
24  A.          Most of the conversations at the public
25  hearings were dealing with state legislative races,
                                          Page 75

1  Q.           And do you know if they directed
2  questions to Senator McClendon specifically?
3  A.           I don't remember.
4  Q.           Did you prepare for any of the public
5  meetings?
6  A.           We had the maps in front of us and the
7  demographic shifts in front of us.  And we would --
8  I would read those as we went through the meetings.
9  Q.           And by "the maps," you mean the 2011 --
10  A.          Yes.
11  Q.          -- maps?  Because you didn't have draft
12  maps of the 2021 --
13  A.          No.
14  Q.          -- at that time.  Okay.
15             And what demographic figures are you
16  talking about?
17  A.          The over and underpopulations, whether
18  they had too many or too few people in them to stay
19  within -- of course, I'm kind of talking legislative
20  here and not congressional.  Because congressional,
21  we went to zero deviation.  But we looked at the
22  congressional districts to see which ones were
23  overpopulated and which ones were underpopulated.
24  Q.          Okay.
25  A.          And how many people would have to change
                                          Page 74

1  if I remember correctly.
2  Q.           But occasionally people talked about
3  congress, right?
4  A.           Yes.  But we had not seen -- I had not
5  seen the numbers on any plans until after they were
6  submitted to reapportionment.
7              So until I saw the -- you know, that
8  ten-day rule kicked in and these plans that had been
9  drawn off campus were submitted to the
10  reapportionment office.  Then and only then could we
11  look at the demographics, the population changes,
12  and the deviations in those districts.
13  Q.          Well, you had the demographic shift
14  numbers to get to zero deviation during the public
15  meetings, right?
16  A.          I had the number that we needed to get
17  to, correct.
18  Q.          So you did talk to Mr. Hinaman about
19  what was brought up at the public hearings about
20  congress, correct?
21  A.          We talked -- I would assume we discussed
22  it, yes.
23  Q.          And do you recall any specifics of what
24  you talked about?
25  A.          Just the difference -- we were trying to
                                          Page 76

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

```
 1 get to zero deviation.
 2 Q.          Did you relay any specific concerns that
 3 someone had a public meeting about the
 4 congressional map to Mr. Hinaman?
 5 A.          I was concerned about the deviations in
 6 any other proposed plans.
 7 Q.          Well, the public, though, I'm talking
 8 about, what they brought up at the public hearings.
 9 Did you relay any of those specifics to Mr. Hinaman?
10 A.          I don't remember.
11 Q.          Do you recall discussing any of those
12 kinds of specifics that the public had about
13 congress to anyone else?
14 A.          I'm sure we did.  I mean, it was the
15 same talking points at every public hearing on the
16 congressional plan.
17 Q.          I mean, that suggests that there was
18 really only one view about the congressional map
19 coming up at the public hearings.
20 A.          Well, it was the plan produced by the
21 League of Women Voters.  Every -- if I remember
22 correctly, almost every single public hearing we
23 had, somebody stood up with their talking points and
24 read them to us and entered them into the record.
25 Q.          But not everybody who attended the
                                          Page 77
```

```
 1 public hearings would have known about the League of
 2 Women Voters' map, right?
 3 A.          Somebody was there at virtually every
 4 meeting that I remember to talk about it.
 5 Q.          Did anyone discuss anything about the
 6 congressional map that wasn't related to the League
 7 of Women Voters' map that you recall?
 8 A.          I don't recall.
 9 Q.          Do you know how many of the 28 meetings
10 were held on weekdays during working hours, 9:00 to
11 5:00?
12 A.          Like this one here, all but one of them.
13 Q.          Okay.  And most people are working on
14 weekdays during working hours from 9:00 to 5:00,
15 right?
16           That's a yes?
17 A.          That's -- I know a lot of people that
18 work different hours.
19 Q.          But most people work on weekdays from
20 the hours of around 9:00 to 5:00, would you say?
21 A.          I would say it's very common, yes.
22 Q.          Okay.  Do you think that that had an
23 impact on who could attend the public meetings?
24 A.          I don't know.
25 Q.          I mean, if I'm at work, I tend to not be
                                          Page 78
```

```
 1 doing other things that aren't work related during
 2 the work hours.  Do you think that that would have
 3 had an impact at all on --
 4 A.          Well, the schedule of the public
 5 hearings was public.  It was released.  The links
 6 were public.  You might not have been able to make
 7 one specific meeting, but you could have logged into
 8 any of the other 28 at any given time on any given
 9 day that we held them and listened and interjected
10 into the congressional plan.
11 Q.          Well --
12 A.          I mean, you had 28 opportunities to log
13 on over a three-week period that you could have come
14 in and watched.  It's not like you had to drive to a
15 location like in the old days when you had to drive
16 somewhere during the daytime to come hear us.  You
17 were able to listen at any time.
18 Q.          But even so, if you work at McDonald's
19 from 9:00 to 5:00 and you're at the cash register,
20 how are you going to attend one of those meetings?
21 A.          There are 28 different meetings at all
22 different times of the day.
23 Q.          Well, not -- they're all between 9:00
24 and 5:00 except for one.
25 A.          Then you could have logged in that night
                                          Page 79
```

```
 1 and watched.
 2 Q.          For that one meeting?
 3 A.          Exactly.  And you could have spoken your
 4 mind or emailed in your questions or your concerns
 5 at that time.
 6 Q.          Okay.  But you and others from the
 7 reapportionment committee set the times of those
 8 meetings, correct?
 9 A.          Yes, ma'am.
10 Q.          Primarily you and Senator McClendon; is
11 that right?
12 A.          In conjunction with the other members.
13 Like I said, we produced a list of 22.  And Ms. Hall
14 asked us to add six meetings in communities she
15 thought did not have enough representation or enough
16 opportunities.  So we added those additional six
17 meetings and included them in our press releases so
18 anybody could log in.
19 Q.          Did you consider holding more meetings
20 in the evening other than just the one?
21 A.          I couldn't answer that question.
22 Q.          Before the public hearings happened,
23 Senator McClendon told the press that the new maps
24 wouldn't cause, quote, any surprises for the
25 candidates or for the voters.  I'll just represent
                                          Page 80
```

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 to you that that happened.

2          Do you know what the basis was for that

3 statement?

4 A.         You'll have to ask Senator McClendon.

5 Q.         Do you agree with that statement, that

6 even before the public hearings would have happened,

7 that there wouldn't be surprises for candidates or

8 for the voters?

9 A.         I think every time you change the lines,

10 you surprise people.

11 Q.         But on the whole, would you say that

12 that statement was true?

13 A.         Well, when your guidelines are to keep

14 the core of the existing districts intact as much as

15 practicable, it shouldn't be too earth shattering,

16 some of the changes around the edges.

17 Q.         And do you know if any work had been

18 conducted on drafting the congressional map prior to

19 the public hearings?

20 A.         No, ma'am.

21 Q.         Do you know if any decisions on the

22 lines for the congressional maps had been made

23 before holding the public hearings?

24 A.         No, ma'am.

25 Q.         Are you familiar with the black belt

Page 81

1 counties in Alabama, that term?

2 A.         I sell timberland.  I work all through

3 the black belt.

4 Q.         Okay.

5 A.         I've spent more time in the black belt

6 than . . .

7 Q.         And what's your understanding of the

8 black belt?

9 A.         It's a region in the middle of the state

10 of Alabama that got its name because of the rich

11 soils.

12 Q.         And what counties are in it?

13 A.         It's like 28 counties, I think,

14 something like that.  I spend most of my time in

15 Wilcox, Marengo, Lowndes, Perry, Hale, those areas.

16 Q.         And if you could just describe what

17 portion of the state are we talking about.

18 A.         Central Alabama.

19 Q.         Do you recall if anyone discussed the

20 black belt at any of the public hearings?

21          MR. WALKER:  What was --

22          MS. WELBORN:  If anyone at the public

23 meetings discussed the black belt.

24 A.         It's a term that's often used in

25 Alabama.  But I don't remember specifically.

Page 82

1 Q.         Would you agree that the black belt is a

2 community of interest?

3 A.         It's a very broad area that stretches

4 from one side of the state to the other.  I believe

5 it has some communities of interest in it, yes.

6 Q.         But as a whole, is the black belt a

7 community of interest?

8 A.         I couldn't answer that.

9 Q.         Why not?

10 A.         Because while I work in Wilcox and

11 Marengo and Perry, I don't go to Macon or the

12 counties on the other side.  So I don't really know

13 much about them.

14 Q.         But that's true for other communities of

15 interest in other parts of the state, right?

16 A.         Explain that one to me.

17 Q.         I guess if the legislature -- if the

18 reapportionment committee is tasked with approving a

19 congressional map that keeps, you know, communities

20 of interest together, you don't personally know

21 about every community of interest in the same way

22 that you do know about those particular counties,

23 right?

24 A.         I mean, you know, I'm from Mobile.  And

25 we run up and -- it's the river system.  So many of

Page 83

1 the families in Mobile come from northern counties

2 because of the way the river system is.  We have

3 very little to nothing in common with the people in

4 the Wiregrass.  It's not -- it's almost a totally

5 different state over there.

6          So I don't know -- if you're asking me

7 do the people in Wilcox County have something in

8 common with the people in Macon County, I can't

9 answer that.  But I know the people in Wilcox

10 County.  We go up and down the rivers.

11 Q.         Right.  I guess what I'm saying is you

12 still approve a map even though you don't have

13 personal experience with every single community of

14 interest, right?

15 A.         The state legislature approved the map,

16 yes, ma'am.

17 Q.         Well, you voted for it, right?

18 A.         Yes.

19 Q.         So just going back to the black belt.

20 Even though you don't necessarily have personal

21 experience with every single county, can you still

22 form an opinion about in general whether that is a

23 community of interest?

24 A.         I know it's a very rural part of the

25 state of Alabama.

Page 84

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
12/17/2021

1 Q.          Does that make it a community of
2 interest?
3 A.          I don't know what your definition of a
4 community of interest is.
5 Q.          Well, the reapportionment committee has
6 a definition of community of interest, right?
7 A.          Yes.
8 Q.          So looking at that definition, would you
9 consider the black belt to be a community of
10 interest?
11 A.         Our definition of community of interest
12 is in certain circumstances to include political
13 subdivisions such as counties, voting precincts,
14 municipalities, tribal lands, reservations, or
15 school districts.  Those counties -- the counties
16 are a community of interest.
17 Q.         Well, it also includes ethnic, racial,
18 economic, tribal, social, geographic, and historical
19 identities.
20 A.         Yes.
21 Q.         Under any of those aspects, does the
22 black belt constitute a community of interest?
23 A.         I know it's -- it is predominantly
24 African American.
25 Q.         And the black belt is a historical term,
                                                    Page 85

1 right?
2 A.          Based on the soil, yes, ma'am.
3 Q.          Okay.  And that term goes back quite a
4 long time?
5 A.          It was developed because of the rich
6 soil in that area.
7 Q.          So yes or no, under these guidelines,
8 does the black belt constitute a community of
9 interest?
10 A.         I couldn't answer that question.  I just
11 couldn't answer that.
12 Q.         I don't understand why not.
13 A.         Because I'm not sure they are
14 politically cohesive and compact and contiguous
15 enough to constitute one.
16 Q.         What, if anything, did you learn or take
17 away from the public hearings?
18 A.         What do you mean by that?
19 Q.         Well, did you learn anything from what
20 you heard at the public hearings?
21 A.         I walked away thinking most people in
22 the state of Alabama were happy with their
23 representation the way it was in congress.
24 Q.         And do you recall any specifics about --
25 about that?
                                                    Page 86

1 A.          The general public -- I mean, every
2 committee meeting had somebody standing up and
3 reading the talking points on the League of Women
4 Voters' plan.  So if you read the record, it's all
5 in there.  They all talked about that specific plan
6 on their talking points.
7 Q.          But the --
8 A.          I don't remember the general public
9 being dissatisfied with the members of congress.
10 Q.         Meaning other people at the -- at the
11 public meetings --
12 A.         Yes.
13 Q.         -- were not --
14 A.         I don't remember them being
15 dissatisfied, no, ma'am.
16 Q.         Okay.  So how -- but you still took away
17 the idea that the general public was happy with
18 their current representation?
19 A.         Yes, ma'am.
20 Q.         Okay.  And what did you do with that
21 information?
22 A.         I mean, it's all part of the permanent
23 record.  I remembered it because I listened to all
24 of it.
25 Q.         Right.
                                                    Page 87

1 A.          We put it in the record.  It's all
2 there.
3 Q.          After -- after the meetings, what did
4 you do with that information?
5 A.          It was put into the official record of
6 the committee.
7 Q.          I guess I'm -- did any of what you
8 learned at the public hearings influence how the
9 congressional map was drawn?
10 A.         I can't answer that.  I don't -- I
11 wasn't a member -- that map was drawn by Mr. Hinaman
12 and in conjunction with the members of congress.
13 Q.         But you did discuss what you learned
14 about the public meetings with Mr. Hinaman with
15 respect to the congressional meetings at some point?
16 A.         That somebody had come to every meeting
17 and read the League of Women Voters' talking points,
18 yes.
19 Q.         But did you express to Mr. Hinaman your
20 sentiment that the general public was happy with
21 their representation?
22 A.         I don't remember.
23 Q.         Do you remember telling him, about the
24 congressional map, anything other than about the --
25 from the public hearings other than the League of
                                                    Page 88

Evan Milligan,et al v. John H.Merrill, et al.

1 Women Voters' talking points?

2 A.            Not that I can recall.

3 Q.            And how much weight did you give to

4 those -- the sentiment that the general public was

5 happy with their representation in terms of its

6 importance in drawing the map?

7 A.            We listened to the people.  I was

8 anxious to see what the League of Women Voters' map

9 turned out to be.

10 Q.            Did you -- did you consider it to be

11 more important when the congressional map was being

12 drawn that the general public was satisfied with

13 their representation compared to what was said about

14 the League of Women Voters' map?

15 A.            You know, when every meeting somebody

16 stands up and reads the same talking points and you

17 could tell they've been prompted just to go say that

18 to get it into the record, I put more weight on the

19 people who came out of a true sense of wanting to

20 express their opinion, not the opinion that was

21 written down on a piece of paper form them by an

22 attorney.  What I assume was an attorney.  I'm

23 sorry.

24 Q.            So you gave less weight to those League

25 of Women Voter talking points than you did the

Page 89

1 people who were discussing on their own that they

2 were happy with their representation?

3 A.            Somebody that was put in the room to put

4 statements into the record is not, in my opinion,

5 the same as somebody who comes on their own free

6 will and their own fruition to express their

7 personal opinion about their representation.

8 Q.            So did you give any instructions to

9 Mr. Hinaman to change anything about the

10 congressional map because of the public hearings?

11 A.            Not that I recall.

12 Q.            Did you give instructions to anyone else

13 about changing the map because of the public

14 hearings?

15 A.            Not that I recall.

16 Q.            At the public hearings, do you recall

17 anyone discussing the need to have two majority

18 black districts for congress?

19 A.            Two majority black congressional

20 districts, yes, ma'am.

21 Q.            Yes.  Who mentioned that?

22 A.            I don't recall specifically.

23 Q.            Was it mentioned often, would you say?

24 A.            I don't remember.

25 Q.            Was it something that only came up once

Page 90

1 or twice?

2 A.            I don't remember the number of times.

3 But it came up a few.

4 Q.            A few.  But not at every meeting?

5 A.            I don't remember it coming up at every

6 meeting, no.

7 Q.            What was your response to the suggestion

8 that there should be two majority black

9 congressional districts?

10 A.            If somebody could show me a plan that

11 met the guidelines, I would be interested in looking

12 at it.

13 Q.            And what do you mean by "interested in

14 looking at it"?

15 A.            I mean I would give it due consideration

16 if it met the guidelines.

17 Q.            If you have competing maps that all meet

18 the guidelines, how do you choose one over the

19 other?

20 A.            I would go with the one that's most in

21 line with the guidelines.

22 Q.            How do you determine what is most in

23 line with the guidelines?

24 A.            The number of county splits, the

25 deviations.

Page 91

1 factors more important than the other?

2 A.            Deviations.

3 Q.            That's the most important factor, in

4 your opinion?

5 A.            Yes, ma'am.

6 Q.            And how important are the county splits?

7 A.            Well, we tried to split as the few

8 counties as possible in order to achieve the zero

9 deviation.

10 Q.            Just quickly going back to talking about

11 this sentiment that people were happy with their

12 representation.  How did you know or how did you

13 determine who was there with their talking points

14 and who was there, you know, coming of their own

15 volition?

16 A.            If they're reading a piece of paper and

17 it's the same talking points you've heard, I would

18 assume they were sent there to read it.  If they're

19 talking extemporaneously and they don't line up with

20 the talking points you've heard before, I would

21 assume they were talking of their own fruition.

22 Q.            Did you ask anyone at any of the public

23 meetings if they were part of a particular group?

24 A.            They were instructed by Mr. Dorman to

Page 92

1 Okay.  Is something -- is one of those

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 state their name and who they represented.
2 Q.        And did you ask any of them if they were
3 sent there by somebody else?
4 A.        No.  They -- when they were called to
5 speak, they were to state their name and who they
6 represented.
7 Q.        Okay.  And did you -- did you consider
8 -- if someone came there, you know, with a prepared
9 set of talking points, did you consider their
10 opinion to be less -- less important to drawing the
11 map than someone who came there to speak
12 extemporaneously, like you said?
13 A.        I believe I answered that question
14 already, didn't I?
15 Q.        Do you know if a map with two majority
16 minority districts was proposed at any point?
17 A.        During the legislative process when we
18 were in session, yes, ma'am.
19 Q.        Do you know if any were proposed before
20 the special session?
21 A.        We have a rule that any plan drawn off
22 campus, outside the reapportionment office, has to
23 be turned over ten days before it can be introduced
24 as a bill.
25         So after they were turned over, at
Page 93

1 whatever point they were turned over and they were
2 put through our computers and we could get the
3 information on them, the deviations and the county
4 splits, we looked at them then.
5 Q.        So if someone submitted an outside plan,
6 let's say, 30 days before the special session, so
7 more than ten days, when would you have had access
8 to that plan?
9 A.        I don't remember seeing the demographics
10 of any plan that was introduced earlier than that.
11 Q.        I'm sorry.  Could you --
12 A.        I don't remember seeing a plan that was
13 submitted before then.
14 Q.        Before the ten days?
15 A.        Ten days, yes, ma'am.
16 Q.        Okay.  And once a plan is submitted by
17 outside groups, what happens?
18 A.        It's put through the computer and turned
19 into what we call bill form.  And then you have to
20 find a member of the legislature that's willing to
21 introduce it.
22 Q.        Okay.  But you mentioned deviation and
23 demographic data.  Does the computer program also
24 give you that information?
25 A.        Yes.
Page 94

1 Q.        What --
2 A.        Until it -- until it reaches that bill
3 form and we can analyze it based on the population
4 and the deviations, I don't consider it a plan.
5 Q.        Okay.  What all information could you
6 look at from any plan at that point?
7 A.        At that point?
8 Q.        Uh-huh.
9 A.        After it's introduced from the outside
10 source?
11 Q.        Yes.
12 A.        Then we look at the population, we look
13 at the deviations, we look at the county splits, and
14 we look at the BVAP, we look at the racial makeup of
15 the district.
16 Q.        And when you say "BVAP," just for the
17 record, what do you mean?
18 A.        Black voting age population.
19 Q.        And is that all black or any part black?
20 Do you know?
21 A.        No, I couldn't answer that.  I've seen
22 both columns, but I don't know.
23 Q.        So just to clarify, you did not see a
24 map for two majority minority or majority black
25 congressional districts prior to the ten-day mark?
Page 95

1 A.        I did not see a plan that had the
2 deviations in the populations until then.  There's a
3 difference between just color coding a map and
4 letting me see an actual plan.
5 Q.        Okay.  What's the difference?
6 A.        Well, you can -- you can draw anything
7 you want to on a map.  But until you actually have
8 the census numbers and the demographic numbers in
9 it, I don't consider it a plan.
10 Q.        And why not?
11 A.        Because until I know the population in
12 that district -- the whole basis of redistricting is
13 the 14th Amendment to the Constitution, equal
14 protection, that my vote for a member of congress
15 counts the same as another person in the state of
16 Alabama's vote.  That's the reason why we go through
17 this process.  It's one man, one vote.  And until I
18 look at a plan and the numbers associated with that
19 plan, I don't consider it a full plan.
20 Q.        So I just want to make sure that I'm
21 getting this right.  I'm not trying to ask you over
22 and over and over again.
23         Is it right that you did not look at
24 what you considered to be a plan, so an analyzed,
25 you know, map with all that demographic information
Page 96

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 and deviation information, until after that ten-day
2 mark?
3 **A.         Until after it was analyzed and I could**
4 **get the numbers, yes.**
5 Q.        Okay.
6 **A.         Then we looked at it to see what the**
7 **deviation was, the overall deviation of the plan,**
8 **and how many splits there were in counties and what**
9 **counties were split.**
10 Q.        Okay.  And at that point, were there any
11 maps that were -- had two majority black districts?
12 **A.         I don't remember seeing two majority**
13 **black districts.  I remember seeing one -- two of**
14 **what they call opportunity districts, what they were**
15 **calling -- the districts were not 50 percent**
16 **minority.**
17 Q.        Could you define your understanding of
18 an opportunity district?
19 **A.         That's what they were calling them.**
20 **They called them opportunity districts, and they**
21 **were both under 50 percent minority.**
22        THE REPORTER:  Under 50 percent what?
23 **A.         Minority population.**
24 Q.        And who is "they"?
25 **A.         The people who introduced them, the**

Page 97

1 **League of Women Voters and -- I can't remember who**
2 **introduced the bill in the house.**
3 Q.        Okay.  And -- sorry.  One second.
4        If a district has under a 50 percent
5 minority population, what is the importance of that
6 number, I guess?  Why was that number important?
7 **A.         Under Section 2 of the Voting Rights**
8 **Act, we can't do anything to diminish the ability or**
9 **protect a class of minority citizens from electing**
10 **or defeating a candidate of their choice.**
11 Q.        So if a district has under 50 percent
12 voting age population -- sorry.  Under 50 percent
13 minority population, does that automatically
14 diminish their ability to choose a candidate of
15 their choice under Section 2?
16 **A.         You're asking an attorney question.**
17 Q.        Well, I mean, ultimately it's your
18 responsibility to --
19 **A.         It would -- it would -- I would give**
20 **great caution in order to draw a district that was**
21 **less than 50 percent, yes.**
22 Q.        Under 50 percent minority population?
23 **A.         Yes.  I would be very cautious.**
24 Q.        Okay.  And by "very cautious," does that
25 mean you are -- what does that mean?

Page 98

1 **A.         I'm afraid we would run afoul of Section**
2 **2 of the Voting Rights Act.**
3 Q.        Okay.
4        MR. DAVIS:  Can I ask how we're doing on
5 time?  This was -- I know we had a break, a long
6 break, for audio.  This was a two-hour deposition
7 that was noticed.  We've got three PI motions we
8 need to get back to work on.  This seems to be
9 really dragging.
10        MS. WELBORN:  Well, I mean, we have up
11 to 7 hours under the Rules of Federal Procedure.
12        MR. DAVIS:  You're going to take 14?
13        MS. WELBORN:  I would hope -- I would
14 really like to not do that.  But it certainly is our
15 right to do that.  I can't really tell you at this
16 point exactly how much longer.  But I'm happy to
17 take a break right now to help confer --
18        MR. DAVIS:  I'm hearing a lot of
19 repetition and a lot of arguing with the witness.
20 If you're going to do this discovery before the
21 preliminary injunction hearing, it needs to get
22 pretty focused and be a little sensitive and
23 courteous towards everything that we've got to do on
24 the defense side to get ready to respond to your
25 motions.

Page 99

1        MS. WELBORN:  I understand what you're
2 saying.
3        MR. ROSBOROUGH:  Counsel, I thought we
4 were going to refrain from speaking objections.
5        MR. DAVIS:  What did he say?
6        THE REPORTER:  Refrain from speaking
7 objections.
8        MS. WELBORN:  Let's take a break.  Let's
9 go off the record.  And we'll come back and talk
10 after that.
11        THE VIDEOGRAPHER:  We are off the
12 record.  The time is 11:26 a.m.
13        (Recess was taken.)
14        THE VIDEOGRAPHER:  We are back on the
15 record.  The time is 12:06 p.m.
16 Q.        So I'd like to talk about the October
17 26th reapportionment committee meeting.  Do you
18 remember if you did anything to prepare for that
19 meeting?
20 **A.         Yes.  We sent the proposed maps to all**
21 **the members for their review prior to the meeting.**
22 Q.        And by "we," who do you mean?
23 **A.         The staff at the reapportionment**
24 **committee.**
25 Q.        Okay.  And do you remember how far in

Page 100

Evan Milligan,et al v. John H.Merrill, et al.

1 advance you sent them out?

2 A.          As fast as we could.  Remember this
3 whole process was very condensed, very condensed.

4 Q.          I think it was the day before the
5 meeting.  Is that right?

6 A.          Yes, ma'am, which is standard operating
7 procedure.  We get bills usually about a day before.

8 Q.          Okay.

9 A.          Usually.  Not all the time.

10 Q.          And did you talk to anyone about this
11 meeting beforehand?

12 A.          I approached the members of my -- the
13 house members of the committee to make sure they
14 read their information and make sure they came to
15 the meeting.

16 Q.          And other than the maps themselves, did
17 you provide any materials to the members of the
18 committee?

19 A.          Whatever the committee sent with the
20 notice.

21 Q.          With the -- I'm sorry.  What do you mean
22 by the notes?

23 A.          They were sent an email notifying them
24 of the meeting.  Whatever was contained in that
25 notification of the meeting.

Page 101

1 Q.          And do you know who sent that email?

2 A.          Somebody on the reapportionment staff.

3 Q.          Okay.  So a considerable portion of that
4 meeting was about racial polarization analysis,
5 which I'll also refer to as RPV.  Does that --

6 A.          RP what?

7 Q.          RPV.  Have you heard that term before?

8 A.          I've heard of racial population
9 analysis.

10 Q.          I'll try to refer to it as racial
11 polarization analysis.  But that's also a lot of
12 words.

13 A.          You can use the acronym.

14 Q.          So what's your understanding of racial
15 polarization analysis?

16 A.          My understanding is that is done
17 particularly for the courts to determine whether we
18 either on purpose -- intentionally or
19 unintentionally violated Section 2 of the Voting
20 Rights Act and denied a group of protected class of
21 minority citizens from electing or defeating a
22 candidate of their choice based on the analysis of
23 the historical vote.

24 Q.          And do you know how it's done?

25 A.          No, ma'am.

Page 102

1 Q.          Who decides whether a racial
2 polarization analysis should be done for a
3 particular district?

4 A.          Not me.

5 Q.          Do you know who does decide?

6 A.          I would -- I would assume it would be
7 our attorney.

8 Q.          Why that assumption?

9 A.          Because he's an attorney and he
10 understands Section 2.

11 Q.          But the actual analysis itself is math,
12 right?

13 A.          I would assume.  But I've never -- never
14 done it.

15 Q.          Okay.  Would anyone other than your
16 attorneys make the decision to have a racial
17 polarization analysis done for a particular
18 district?

19 A.          Not that I'm aware of.  I'm sure if I
20 asked for one, I could get it.

21 Q.          Okay.  Can anyone ask for it?

22 A.          I don't know the answer to that
23 question.

24 Q.          Well, could a member of the
25 reapportionment committee ask for it and have it be

Page 103

1 performed?

2 A.          I'm sure if a member of the
3 reapportionment committee wanted one, they could
4 approach the legal counsel of the committee and
5 request one.

6 Q.          How do you decide which district a
7 racial polarization analysis should be done for?

8 A.          I didn't make that decision.

9 Q.          So you don't play any role in deciding
10 district X should have a racial polarization
11 analysis done?

12 A.          I did not, no.

13 Q.          Okay.  Do you know if there are any
14 written guidelines for how someone should decide
15 whether a racial polarization analysis should be
16 done?

17 A.          I don't recall ever seeing any.

18 Q.          Do you know if there are any informal
19 guidelines?

20 A.          I don't recall ever seeing any.

21 Q.          Or hearing of any?

22 A.          No.

23

24          (Plaintiff's Exhibit 4 was

25          marked for identification.)

Page 104

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**Page 105**

```
1
2 Q.          I'd like to introduce Exhibit 4.  This
3 is a transcript of the reapportionment committee
4 meeting from October 26th.
5      MS. WELBORN:  And we will provide
6 electronic copies.
7      MR. WALKER:  I understand.  My only
8 caveat is while I don't have any reason to believe
9 that these are inaccurate, we haven't had a chance
10 to check it.
11      MS. WELBORN:  Of course.
12 Q.         I'll get to that in a second.
13           But do you know when a racial
14 polarization analysis is conducted?  At what point
15 in the process, I mean.
16 A.          I was under the assumption that after we
17 passed the bills, that a racial polarization
18 analysis would be done for the lawsuits.
19 Q.         Okay.  So after they are already
20 enacted, right?
21 A.          Well, given the timeline.
22 Q.         Okay.
23 A.          We didn't have time to.
24 Q.         If you could turn to Page 20.  I'm
25 sorry.  It's Page 18.  And at the very bottom,
```

**Page 106**

```
1 Senator McClendon says, "Can I ask something?  The
2 question you're asking, the answer is our attorney,
3 mine and your attorney, set that data off for
4 districts that it looked like there might possibly
5 be a racial issue."
6           And this is referring to a racial
7 polarization analysis.  That is, that racial
8 polarization is done -- analysis is done for
9 districts where it looked like there might possibly
10 be a racial issue.
11           Is that your understanding of when
12 racial polarization -- that that is why a racial
13 polarization analysis is done, is because there
14 might possibly be a racial issue?
15 A.          I read that as our attorney was going to
16 make that determination.
17 Q.         And is it your understanding that
18 looking like there might possibly be a racial issue
19 is the criteria for determining whether a racial
20 polarization analysis should be conducted for a
21 particular district?
22 A.          Again, I was leaving that to the
23 attorney to determine, what we would have to prepare
24 for court cases.
25 Q.         So talking about might possibly be a
```

**Page 107**

```
1 racial issue, do you have an understanding of what
2 that means?
3 A.          You would have to ask Mr. -- Senator
4 McClendon.
5 Q.         Okay.  Did you encounter any possible
6 racial -- racial issues over the course of the
7 redistricting process?
8      MR. WALKER:  Objection to form.  I'm
9 just not sure what you mean.
10 Q.         When did you take race into account in
11 the redistricting process?
12 A.          Mr. Hinaman was directed by the
13 committee to follow the guidelines and to draw those
14 plans race neutral, without looking at race until
15 after he had developed a plan.  That's my
16 understanding.  The plan was developed, and race was
17 not looked at until after it was drawn.
18 Q.         And then how was -- it was looked at
19 after the plan was drawn?
20 A.          After the plan was drawn, yes, ma'am, in
21 conjunction with the members of congress.
22 Q.         And do you know how it was looked at?
23 A.          No.  He met with members of congress to
24 go over it.
25 Q.         And do you know what data was looked at?
```

**Page 108**

```
1 A.          No, ma'am.
2      MR. WALKER:  Did you say date?
3      MS. WELBORN:  Data.
4 Q.         And do you know anything that would have
5 changed because race was taken into account in the
6 congressional map?
7 A.          No, ma'am.
8 Q.         And when you said the committee gave
9 instructions to Mr. Hinaman, who are you referring
10 to specifically?
11 A.          I would say Chairman McClendon and I
12 told Mr. Hinaman to follow the guidelines in drawing
13 these maps.
14 Q.         And in doing so, that means taking a
15 race-neutral approach to drawing the first map; is
16 that right?
17 A.          Yes, ma'am.  The congressional map, yes,
18 ma'am.
19 Q.         Did you give any other instructions to
20 Mr. Hinaman?
21 A.          Follow the guidelines.
22 Q.         But that's it?
23 A.          That's the reason why we adopted the
24 guidelines.
25 Q.         And how did you communicate with
```

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 Mr. Hinaman?

2 A.          I would see him in the reapportionment

3 office, and on the telephone.

4 Q.          Okay.  Did you ever email with him?

5 A.          No, ma'am.  I'm not a big email person.

6 Q.          I suppose that means you didn't text him

7 either.

8 A.          Nothing of substance.

9 Q.          Okay.

10 A.          And I'll be glad to show you the texts.

11 Q.          So are you aware of any racial

12 polarization analysis that was done for any district

13 in the 2001 -- or 2021 congressional map prior to

14 this meeting on October 26th?

15 A.          No, ma'am.

16 Q.          So not for District 7?

17 A.          No, ma'am.

18 Q.          Had a racial polarization analysis been

19 done for some state legislative districts?

20 A.          No, ma'am.

21 Q.          Was any racial polarization analysis

22 conducted for any of the maps at any point before

23 October 26th?

24 A.          No, ma'am.

25 Q.          So a racial polarization analysis

Page 109

1 couldn't be taken into account for drawing the

2 initial map?

3 A.          We drew them race blind.

4 Q.          Do you know when the first time a racial

5 polarization analysis was conducted for any district

6 for the congressional map?

7 A.          My understanding, they were sent off

8 sometime after the bills at the end of the special

9 session.

10 Q.          Do you know who requested that?

11 A.          I believe Mr. Walker.

12 Q.          And do you know why that request was

13 made?

14 A.          Because we already had a lawsuit filed.

15 We had a lawsuit filed against us before we ever

16 filed a bill.

17 Q.          Who -- do you know who did the racial

18 polarization analysis?

19 A.          No, ma'am.

20 Q.          Do you know if a consultant was hired to

21 do it?

22 A.          There was somebody hired.  I do not know

23 who.

24 Q.          So just to be clear, nothing changed as

25 a part of the maps after the racial polarization

Page 110

1 analysis was done because the maps had already

2 passed, right?

3 A.          Yes.

4 Q.          Sorry.  I'm not trying to trick you.

5 A.          No.  I had to think about it.  Yes,

6 we -- we passed the maps.

7 Q.          Okay.  Did you ever suggest having a

8 racial polarization analysis done before the maps

9 were passed?

10 A.          I didn't consider it an option.  We were

11 under such a tight timeline.  We knew we would have

12 to do it because of the lawsuit that had already

13 been filed before we ever filed a bill, and we knew

14 it would be done.  We just didn't have time to . . .

15 A.          To get it done.

16 A.          To get it done.

17 Q.          Do you know how long it takes to perform

18 a racial polarization analysis?

19 A.          No, ma'am.

20 Q.          Do you know if anyone suggested doing a

21 racial polarization analysis prior to the bill's

22 passing?

23 A.          It came up in the committee meeting.

24 And we assured them that we were going to perform

25 them, the ones that our attorneys deemed necessary,

Page 111

1 and we would get that to them when we had the

2 information.

3 Q.          Do you know if a racial polarization

4 analysis had been done for congressional maps in

5 previous redistricting cycles?

6 A.          I have no knowledge.

7 Q.          You don't remember from the 2001, 2002

8 cycle if that happened?

9 A.          Remember we were under Section 5

10 preclearance at the time.  And once they called and

11 said we had been precleared -- I had never heard the

12 term before that.

13 Q.          Okay.  So do you know when the racial

14 polarization analysis for the congressional map was

15 finished?

16 A.          I have not seen it.

17 Q.          You have not seen it?

18 A.          I have not seen it.

19 Q.          Okay.  Have you asked to look at it?

20 A.          No, ma'am.

21 Q.          Have you talked to anyone about it?

22 A.          You.

23 Q.          So why don't you do the racial

24 polarization analysis for all districts just as a

25 matter of course?  And I'm not talking -- I

Page 112

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 understand there's a time crunch here.  But in
2 general, why isn't it done for all of the districts
3 just because?
4 A.        I don't see a need for some of the
5 districts.  They're not being challenged in court,
6 are they?
7 Q.        Well, Districts 1, 2, and 3 are also
8 being challenged.
9 A.        Okay.
10 Q.        And when you say you don't see a need,
11 why is that?
12 A.        If you're not challenging them in court,
13 I mean, I don't see the need to do an analysis on
14 them.
15 Q.        Okay.  But four of seven districts are
16 being challenged in this lawsuit.
17 A.        Okay.
18 Q.        If you turn to Page 19, Senator
19 McClendon and Representative England have a
20 back-and-forth here about a number, 54 percent of
21 black voting age population for District 7.  So 54
22 percent BVAP.
23        And Representative England is asking
24 that a racial polarization analysis be done.  And
25 Senator McClendon says that he was told by

Page 113

1 Mr. Walker that a racial polarization analysis for
2 District 7 is unnecessary because District 7 has a
3 BVAP of around 54 percent.
4        Why would it be unnecessary to conduct a
5 racial polarization analysis if a district has a
6 BVAP of around 54 percent?
7 A.        I think you need to ask Senator
8 McClendon that.  I didn't say that.
9 Q.        But do you have an opinion on that?
10 A.        No, ma'am.
11 Q.        Do you think that having a BVAP of
12 around 54 percent for a particular district is
13 important?
14 A.        I -- it's my understanding that's --
15 that's the plan that Congresswoman Sewell agreed to.
16 Q.        And what do you mean by that?
17 A.        Mr. Hinaman worked with the members of
18 congress, and they signed off on the map that he had
19 drawn and said they agreed to it and would accept
20 it.  I was not privy to that conversation, though.
21 That's secondhand.  I was just told that.
22 Q.        Who told you that?
23 A.        I don't remember.
24 Q.        So do you have any opinion on whether
25 District 7 should have a BVAP of around 54 percent?

Page 114

1 A.        No, ma'am, I have no opinion.
2 Q.        Do you know what the relationship is
3 between having a BVAP of 54 percent and the decision
4 to do a racial polarization analysis?
5 A.        No, ma'am.
6 Q.        Do you know at what percent of BVAP a
7 district would have that you would need to do a
8 racial polarization analysis?
9 A.        No, ma'am.
10 Q.        So would you agree with the statement
11 that if a black district has a BVAP of under 54
12 percent, that requires a racial polarization
13 analysis?
14 A.        I can't agree or disagree with that
15 statement.  I think it depends on the district.  But
16 I don't know.
17 Q.        What would -- what do you mean by
18 "depends on the district"?
19 A.        I've seen majority minority districts
20 elect nonminorities.
21 Q.        I would like to introduce another
22 exhibit.  This is the transcript of the floor
23 debate, Plaintiff's Exhibit 5, on November 1st.
24 A.        All right.
25

Page 115

1        (Plaintiff's Exhibit 5 was
2        marked for identification.)
3
4 Q.        And if you'll flip to Page 20.
5        MR. WALKER:  And, Kaitlin, I'll just put
6 on the record that we also have not had a chance to
7 check this.  I don't have any reason to believe it's
8 inaccurate.  But I just note that for the record.
9        MS. WELBORN:  Yes.  We will stipulate to
10 that for all of the transcripts.
11        MR. WALKER:  Okay.
12 Q.        So you're having a back-and-forth here
13 with Representative England who again is asking why
14 a racial polarization analysis was not done on
15 District 7.
16        And at the very bottom of the page, you
17 said, "We thought it was necessary, but they cut it
18 off, I think, at 51 percent.  Anything under 51
19 percent they did it on.  Anyone over that, they
20 didn't do it."
21        Do you know what you mean -- what you
22 meant by that statement?
23 A.        I don't remember.  I really -- I think
24 that what I was talking about at that point was
25 trying to get something done rapidly, as fast as

Page 116

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 possible.  And we didn't have time to do 140
2 legislative districts, eight school board digits,
3 and seven congressional districts given the time
4 frame we had.
5 Q.        And the 51 percent is BVAP.  I'll tell
6 you that that.
7                Okay.  And when you said, "We thought it
8 was necessary," do you know who you were referring
9 to?
10 A.        I would assume it was Mr. Walker and
11 Mr. Hinaman and myself.
12 Q.        Okay.  And when you said they --
13 A.        Because on that floor -- at this time,
14 I'm sure you have my talking points.
15 Q.        Yes.
16 A.        I was going -- I was using my talking
17 points.  And remember this was rapid fire, as fast
18 as -- and I was -- this was late into the session.
19                And Mr. England is a very skilled
20 attorney and chairman of the democratic party.  So
21 he is quite, quite gifted in the way he can ask
22 questions and get people that are not attorneys to
23 answer them.
24 Q.        And so when you said that they cut it
25 off at 51 percent, do you know who the "they" is?

Page 117

1 A.        I would assume I was referring to
2 Mr. Walker and Mr. Hinaman.
3 Q.        And how was that 51 percent number
4 chosen?
5 A.        I'm sure I was just reading the talking
6 point.
7 Q.        And who prepared those talking points?
8 A.        Mr. Walker and, I believe, Mr. Hinaman.
9 Q.        And did you discuss those talking points
10 with either Mr. Walker or Mr. Hinaman?
11 A.        They were getting them to me as fast as
12 they could.  This was rapid fire.
13 Q.        What is your understanding of how you
14 can tell whether minorities can elect their
15 candidate of choice?
16 A.        In the congressional maps?
17 Q.        Yes.
18 A.        I don't really understand that question.
19 Would you repeat it, please?
20 Q.        How can you tell whether minorities can
21 elect their candidate of choice in a particular
22 district?
23 A.        In a particular congressional district?
24 Q.        Well, any district.  But in this case,
25 yes, we're talking about a congressional district.

Page 118

1 A.        That's a question I really can't -- I
2 don't think there's a magic number that exists to
3 guarantee the election or defeat of a minority
4 candidate.
5 Q.        Is there some range?
6 A.        Again, I was told that Congresswoman
7 Sewell was comfortable with the plan that had been
8 presented and was in support of that plan.  And the
9 other members of congress were in support of it.
10 Q.        I would like to introduce Plaintiff's
11 Exhibit 6, which is the final 2021 map for congress.
12
13                (Plaintiff's Exhibit 6 was
14                marked for identification.)
15
16 Q.        And District 7 is the one in brown.
17 Would you agree that District 7 appears to be
18 racially jerrymandered?
19 A.        I think just District 7 is in large part
20 the same district that was drawn under the Reed
21 Buskey, just adjusted for population increases.
22 Q.        And how would you describe the shape of
23 District 7?
24 A.        Again, we try and maintain the core of
25 existing districts.  And this district created

Page 119

1 in 1992 by the Reed Buskey plan.
2        MS. WELBORN:  I would like to take just
3 a short break.  We might be finished.  I just want
4 to double-check.
5            MR. WALKER:  Would you like for us to
6 leave the room?
7            MS. WELBORN:  Let's go off the record.
8        THE VIDEOGRAPHER:  We are off the
9 record.  The time is 12:33 p.m.
10            (Recess was taken.)
11        THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 12:40 p.m.
13        MS. WELBORN:  The Milligan plaintiffs
14 are finished asking questions.  I'm not sure if the
15 Singleton or Caster plaintiffs have any questions
16 for you.  But after that, we can break for lunch and
17 you'll be done.
18    MR. WALKER:  Yay.
19    MS. WELBORN:  Yay.
20        MS. FAULKS:  Do the Caster plaintiffs
21 have any questions?
22        MR. OSHER:  Can you hear me?
23    (Discussion held off the record.)
24 EXAMINATION BY MR. OSHER:
25 Q.        I only have a few questions.  So this

Page 120

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 should be -- this should be very quick.
2 Representative, thank you for your time.  My name is
3 Daniel Osher.  I am an attorney for the plaintiffs
4 in the Caster litigation.
5         You might have said this before.  And I
6 apologize if you did, Representative.  How long have
7 you served in the Alabama legislature?
8 **A.        I was first elected in 1994.  I served**
9 **two terms.  I left in 2002.  And I was reelected in**
10 **2014 and '18.**
11 Q.        Okay.  So that's roughly how many years?
12 **A.        12.  How many years total?  I'll be 16**
13 **years in the legislature with a 12-year gap.**
14 Q.        Great.  Thank you.
15         And have you been a member of the
16 republican party that whole time?
17 **A.        I've been an elected republican**
18 **official.  But I've never been an official member of**
19 **the Alabama Republican Party.**
20 Q.        I understand.  Have you always
21 considered yourself a republican?
22 **A.        Yes, sir.**
23 Q.        Based on your 16 years serving in the
24 legislature, in your view, do the views of members
25 of the democratic party in Alabama differ from the
Page 121

1 members of the republican party in Alabama when it
2 comes to removing confederate monuments from public
3 spaces?
4 **A.        I mean, you're asking me to suppose what**
5 **other people are thinking.  But I would say yes.**
6 Q.        And based -- based on your 16 years in
7 the legislature, do the views of members of the
8 democratic party in Alabama differ from the members
9 of the republican party in Alabama when it comes to
10 affirmative action?
11         MR. WALKER:  Objection to form.  Dan,
12 I'm not sure that we have a clear understanding of
13 what affirmative action is these days.
14         MR. OSHER:  I didn't catch that, Dorman.
15 Can you say that again?
16         MR. WALKER:  Yeah.  I'm not sure that I
17 would have a clear understanding of what affirmative
18 action is these days.
19         MR. OSHER:  Sure.
20 Q.        Representative, in your 16 years of
21 service in the legislature, have you had an
22 opportunity to view what the general views of each
23 of the major parties in the state are?
24 **A.        On which issue?**
25 Q.        On various issues.
Page 122

1 **A.        I'm assuming that I've had numerous**
2 **conversations with both republicans and democrats,**
3 **yes.**
4 Q.        And do you have a general sense of how
5 one party views a major issue in Alabama as opposed
6 to another party?
7 **A.        I'm sure we differ on specific issues,**
8 **yes.**
9 Q.        Okay.  So based on your 16 years serving
10 in the legislature, do the views of members of the
11 democratic party in Alabama generally differ from
12 the members of the republican party in Alabama
13 generally when it comes to affirmative action?
14 **A.        Again, your definition of affirmative**
15 **action I don't know.**
16 Q.        Policies implementing a preference for
17 individuals while considering their race.
18 **A.        I think given my history of being in the**
19 **Alabama legislature when the democrats were in**
20 **supermajority, it's a pretty wide spectrum across**
21 **political lines.**
22 Q.        So you're saying that the two major
23 parties in Alabama do not have the -- have the same
24 view when it comes to affirmative action?
25 **A.        I couldn't answer that.  I've run across**
Page 123

1 **varying opinions in different members.**
2 Q.        Okay.  Based on your 16 years in the
3 legislature, do the views of members of the
4 democratic party in Alabama generally differ from
5 members of the republican party in Alabama generally
6 when it comes to criminal justice reform?
7 **A.        I think -- I think there's a divide,**
8 **yes.  But I know some -- some conservatives that are**
9 **in favor of criminal justice reform themselves.**
10 Q.        And just to clarify, you're saying that
11 there is a difference between the general views of
12 the democratic party -- members of the democratic
13 party and members of the republican party when it
14 comes to criminal justice reform?
15 **A.        There could be, yes.**
16 Q.        Is it -- in your view, is there a divide
17 between the members of the party or not?
18 **A.        I think some members hold different**
19 **opinions, yes.**
20 Q.        And the same question.  Based on your
21 experience in serving in the legislature, do the
22 views of the members of the democratic party
23 generally in Alabama differ from the members of the
24 republican party generally in Alabama when it comes
25 to the view of whether there's a significant amount
Page 124

Evan Milligan,et al v. John H.Merrill, et al.

1 of discrimination against black individuals in the
2 state?
3 A.        Yes.
4              MR. OSHER:  Okay.  That's all I have.
5 Thank you very much for your time, Representative.
6              MR. WALKER:  Thank you.  Thank you,
7 Daniel.
8              MS. FAULKS:  Singleton plaintiffs, do
9 you have any questions?
10             MR. BLACKSHER:  Did I get called?
11             MR. WALKER:  You did.  You did, Jim.
12             MR. BLACKSHER:  Well, thank you.
13 EXAMINATION BY MR. BLACKSHER:
14 Q.        Representative Pringle, I hope you make
15 it back to Mobile before the night is over.
16 A.        Thank you.  So do I.
17 Q.        I wouldn't want to stay in Montgomery
18 overnight if I could get back to Mobile on a Friday
19 night.
20 A.        See, we have a lot in common,
21 Mr. Blacksher.
22 Q.        Yeah.
23 A.        I'm not --
24 Q.        I just have a --
25             MR. WALKER:  Go ahead.

Page 125

1 Q.        I just have -- I have very few
2 questions.
3              Representative Pringle, you said that --
4 and I haven't been in on your whole discussion.  I
5 confess I had to jump off on some other calls while
6 it was all going on.  So I apologize if I go over
7 something that you've already spoken about.
8              But I did hear you say with a smile on
9 your face that there was a lawsuit filed even before
10 you passed a plan.  And that would be referring to
11 the Singleton case, right?
12 A.        I refer to it as the League of Women
13 Voters.  But yes, sir.
14 Q.        The League of Women Voters.  It was the
15 lawsuit that was advocating the League of Women
16 Voters whole county plan?
17 A.        Yes, sir.
18 Q.        Okay.  And who informed you that that
19 suit had been filed?  It was Mr. Walker, wasn't it?
20 A.        Yes, sir.
21 Q.        And did you get a chance to read the
22 complaint?
23 A.        No, sir.
24 Q.        And did Mr. Walker tell you what the
25 lawsuit was about?

Page 126

1 A.        You were asking for a plan that had all
2 whole counties that created two opportunity
3 districts.
4 Q.        Did he tell you that the lawsuit
5 contended that the plan that was enacted in 2011 was
6 racially jerrymandered?
7              MR. WALKER:  I'm going to -- I'm going
8 to assert privilege.  You might be able to ask that
9 question a different way, Jim.  But I think the way
10 you've asked it, it calls -- or could call for an
11 attorney-client communication.
12 Q.        Okay.  I lost you.  All I see is a
13 telephone screen now.  Oh, there you are up in the
14 corner.
15              Let me ask it this way, Representative
16 Pringle.  Were you aware and are you aware now that
17 the Singleton complaint alleged, when it was filed
18 September 27th, that the plan enacted in 2011 was
19 unconstitutional because it was racially
20 jerrymandered?
21 A.        Not specifically.
22 Q.        Okay.  Were you aware that the state
23 attorney general's office had said in a lawsuit in
24 Birmingham in 2019 that the 2011 plan was racially
25 jerrymandered?

Page 127

1              MR. DAVIS:  Object to the form.
2              MR. WALKER:  Jim, did you hear that
3 objection to form from Jim Davis?
4              MR. BLACKSHER:  Yes.
5              MR. DAVIS:  That's not what it said.
6 Q.        Are you aware that that is what the
7 complaint that Singleton filed alleged, that the
8 state attorney general had conceded in federal court
9 in 2019 that the 2011 plan was racially
10 jerrymandered?  Were you aware of that?
11             MR. DAVIS:  Object to the form.
12             MR. WALKER:  Object to form.
13 Q.        You -- you can answer.
14             MR. WALKER:  I'm sorry.  You can answer,
15 if you can.
16 A.        No.
17 Q.        You weren't aware of that.
18 Q.        Were you aware -- did anyone tell you
19 that the lawsuit contended that when drawing a new
20 congressional plan with 2020 census data, that the
21 legislature had a constitutional obligation to
22 remedy a racial jerrymandering?
23 A.        No.
24 Q.        Okay.  And as chair of the
25 reapportionment committee, you can testify that

Page 128

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1 there was no effort made by the reapportionment
2 committee to remedy any racial jerrymandering in the
3 2011 claim; isn't that correct?
4 **A.        I testified that Mr. Hinaman was**
5 **directed to draw those seven congressional districts**
6 **based on the guidelines of the committee.**
7 Q.         Yeah.  And no one informed you, and you
8 -- excuse me.
9          The committee never attempted to remedy
10 a racial jerrymandering; is that correct?
11 **A.        I did not know there was a  --**
12 Q.         Racial jerrymandering?
13 **A.        Yes.**
14 Q.         Okay.  Now, my understanding from your
15 testimony is that Mr. Walker advised you as chair of
16 the reapportionment committee that the congressional
17 redistricting plan had to have zero deviation; is
18 that correct?
19 **A.        Yes.**
20 Q.         So did anyone else give you that advice,
21 zero deviation?
22 **A.        Mr. Hinaman.**
23 Q.         So Mr. Hinaman advised you that the plan
24 had to be zero deviation?
25 **A.        Well, Mr. Blacksher, was not the 2011**
                                    Page 129

1 **and the 2002 plans all zero deviations, and the 1992**
2 **plan?**
3 Q.         Well, what I asked -- the question was
4 did Mr. Hinaman advise you that it needed to be zero
5 deviation.
6 **A.        Again, Mr. Hinaman has been part of this**
7 **for years.  And I think every plan has been drawn to**
8 **zero deviation.**
9 Q.         Okay.  Does that mean that he did advise
10 you to keep it at zero deviation?
11 **A.        Yes.  Because all the other plans had**
12 **been drawn to zero deviation.**
13 Q.         Okay.  That's fine.
14          And did anyone besides Mr. Walker and
15 Mr. Hinaman advise the committee that the plan had
16 to keep a zero deviation?
17 **A.        Not to my knowledge.**
18 Q.         Did the -- did you as chair or did
19 anyone on the committee seek the advice of the
20 Alabama attorney general's office on whether it
21 needed to have zero deviation?
22 **A.        I did not.**
23 Q.         Are you aware of anyone on the
24 committee who did?
25 **A.        No, sir.**
                                    Page 130

1 Q.         Are you aware of any -- anyone -- did
2 Mr. Walker, by the way, advise you that he had
3 consulted other lawyers to reach this opinion?
4          MR. WALKER:  Jim, I'm going to object on
5 the grounds of privilege to that.  You can ask it
6 some other way.
7 Q.         I'm just trying to get everything you
8 knew or did not know about the requirement of zero
9 deviation.
10          And what I've heard you say,
11 Representative Pringle, is that you were aware,
12 since you've been involved in one way or the other
13 with redistricting, that it had been going on for
14 several decades, right?
15 **A.        Zero deviation in congressional races?**
16 Q.         Yes.
17 **A.        Yes.**
18 Q.         Okay.  And when it came to drawing the
19 2020 plan, you were advised that that needed to
20 continue, zero deviation needed to continue.  And
21 that advice came from Mr. Walker and Mr. Hinaman; is
22 that correct?
23          MR. WALKER:  Objection to form to the
24 extent it calls for an attorney-client
25 communication.
                                    Page 131

1 Q.         But you can answer, I think.
2          MR. BLACKSHER:  Counsel, can he answer?
3 Q.         Okay.  Let me ask another question.
4          Did Mr. Walker also advise you that in
5 order to comply with the Voting Rights Act, the
6 congressional redistricting plan had to have a
7 majority black district?  Is that correct?
8          MR. WALKER:  Objection, attorney-client
9 privilege.
10 Q.         Well, that's in the talking points,
11 isn't it?  Isn't that -- isn't the requirement of a
12 majority black district one of the things that's in
13 the talking points that you've exchanged with us
14 that you -- that you read from on the floor of the
15 legislature?
16 **A.        I don't have any direct recollection of**
17 **that at this time.**
18 Q.         So did anyone advise you, as chair of
19 the reapportionment committee, that in order to
20 comply with the Voting Rights Act, the plan had to
21 have one majority black district, at least one
22 majority black district?
23          MR. WALKER:  Object to the question to
24 the extent it calls for an attorney-client
25 communication.  Otherwise, you can answer.
                                    Page 132

Evan Milligan,et al v. John H.Merrill, et al.

**Chris Pringle**
**12/17/2021**

1 A.        We instructed Mr. Hinaman, quoting the
2 guidelines, to protect the core of the existing
3 districts to the extent possible and to draw it to
4 zero deviation.
5 Q.        Okay.  Representative Pringle, there's
6 absolutely no mention of majority black in the
7 guidelines.
8          So the question is:  In complying -- the
9 guidelines say that you had to comply with the
10 Voting Rights Act, right?
11 A.        Yes, sir.
12 Q.        Okay.  But it doesn't say majority
13 black, right?
14 A.        The guidelines, I don't recall them
15 saying that.
16 Q.        Right.  So the question is:  Were you
17 advised that to comply with the Voting Rights Act,
18 there had to be a majority black district?
19          MR. WALKER:  Objection that I've made
20 before to the extent it calls for attorney-client
21 communication.  Otherwise, he can answer.
22 A.        Again, those plans are drawn in a
23 race-neutral manner based on the guidelines to
24 preserve the core of the existing congressional
25 districts.
                                        Page 133

1 Q.        Yes, sir.  I've heard that testimony.
2          My question, though, is were you advised
3 that the Voting Rights Act required there to be a
4 majority black district?
5          MR. WALKER:  Same objection.
6 A.        The Voting Rights Act requires that we
7 in no way intentionally nor unintentionally diminish
8 the ability of a protected class of minority
9 citizens from electing or defeating a candidate of
10 their choosing.
11 Q.        And did that mean a majority black
12 district?
13 A.        It means we had -- we drew a district
14 that would allow -- that maintained the core of an
15 existing minority district.  But we did it in a
16 race-neutral way.
17 Q.        Your understanding of the requirement of
18 maintaining the cores and drawing a race-neutral
19 plan meant that you needed to end up with a majority
20 black district.  Am I hearing you correctly?
21 A.        We -- we made every opportunity to
22 protect the incumbents who were seeking reelection.
23 Q.        That's not the question I asked you
24 about the incumbent.
25          I asked if you were advised and did you
                                        Page 134

1 understand that you needed to have a majority black
2 district.
3 A.        I understood that we needed to draw
4 districts to help protect the incumbent, yes.
5 Q.        And to you, that meant a majority black
6 district, protecting the incumbent.  Is that your
7 answer?
8 A.        Well, I acquiesced to Mr. Hinaman who
9 met with the members of the congress and talked to
10 them about their districts and what they wanted and
11 how they wanted them drawn.  And he presented a plan
12 to me that he said the members of congress agreed to
13 that were seeking reelection, that they had agreed
14 to.
15 Q.        Okay.  Let's talk for just a second
16 about the League of Women Voters' whole county plan.
17          According to the talking points, you
18 were advised that that plan would be
19 unconstitutional because its deviation was too
20 large; isn't that correct?
21 A.        That was in my -- the analysis I
22 received, yes.
23 Q.        And that information came from whoever
24 wrote the talking points?
25 A.        Yes.  That would be Mr. Hinaman and
                                        Page 135

1 Mr. Walker.
2 Q.        Okay.  And the talking points also
3 advised, didn't they, that the League of Women
4 Voters' plan would violate the Voting Rights Act
5 because it did not have a majority black district;
6 isn't that correct?
7 A.        It could potentially violate Section 2
8 by diminishing the ability of a protected class of
9 citizens from electing or defeating a candidate of
10 their choosing, yes.
11 Q.        I'm just asking if the talking points
12 said -- you know, I don't have them in front of me.
13 You've probably been looking at them all morning.
14 A.        Actually, I haven't.
15 Q.        The talking points actually said, didn't
16 it -- the talking points actually said that the
17 League of Women Voters' whole county plan would
18 violate the Voting Rights Act because it did not
19 have a majority black district.
20          Now, did you -- did anyone else give you
21 that advice other than what was in the talking
22 points?
23          MR. DAVIS:  Object to the form.
24          MR. WALKER:  Object to the form.
25          THE WITNESS:  Can I answer?
                                        Page 136

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

1          MR. WALKER:  You can answer to the
2 extent that you do not discuss any communication you
3 may have received from an attorney, in particular
4 one from the AG's office.
5 A.          I was reading the talking points that
6 you have before you.
7 Q.          Actually, I don't have them before me.
8 I'm sorry.
9          But in any event, let me -- let me wrap
10 this up this way.  Was the -- was the committee ever
11 presented in writing a statement that the League of
12 Women Voters' whole county plan violated the Voting
13 Rights Act?
14 A.          If my memory serves me correctly, we did
15 not yet have the official League of Women Voters'
16 plan in the computer at the time of the committee
17 meeting.  I think it was introduced later.
18 Q.          Okay.  You're going to have to listen to
19 the question again.
20          MR. BLACKSHER:  Could I ask the court
21 reporter to read the question back, please?
22          (Record read.)
23 A.          Was the committee ever presented --
24          MR. WALKER:  Was the committee ever
25 presented in writing.
                                        Page 137

1 "minimal deviation," you interpreted that on your
2 own as meaning zero deviation; is that correct?
3 A.          Based on my knowledge and history of
4 reapportionment, congressional reapportionment, and
5 the fact that we have drawn zero deviation
6 districts, yes, sir.
7 Q.          Okay.  So that would -- and you reached
8 that conclusion independently of anybody's advice,
9 right?
10 A.          Well, Mr. Walker and Mr. Hinaman and I
11 all concurred that minimum deviation means zero.
12 And based on my readings, I would concur with that,
13 what I read.
14 Q.          Thank you, Representative Pringle.
15 Those are the only questions that I have.
16 A.          Mr. Blacksher, it's always a pleasure.
17 Q.          I hope to see you again soon.
18 A.          I'm sure you will.
19          MR. WALKER:  I think that can be
20 arranged.
21          MS. FAULKS:  Dorman, with that, I think
22 that we are done.  For lunch, how long do we want to
23 break?
24          MR. WALKER:  Wait.  Can we have 30
25 seconds to confer?
                                        Page 139

1 A.          I have no recollection of that.
2 Q.          Okay.  Thank you.
3          And was the committee ever presented in
4 writing a statement that the League of Women Voters
5 -- I'm sorry.  Let me strike that.  Let me start
6 over.
7          Was the committee ever presented in
8 writing a statement that the congressional plan had
9 to have zero deviation?
10 A.          I don't understand the question.
11 Q.          Did the committee have in writing a
12 statement that the congressional plan had to have
13 zero deviation?
14 A.          The guidelines called for it, which has
15 been done for -- as you know, for years and years.
16 For decades, we've always drawn down to zero
17 deviation in congressional.
18 Q.          Okay.  So the guidelines say that the
19 congressional plan must have minimal deviation.
20 A.          Which we interpret to be -- which we
21 interpret to be zero deviation just like it was, you
22 know, in 2011, 2002, 1992.
23 Q.          Okay.  That's good.
24          So in other words, when you saw, as
25 chair of the committee, that the guidelines said
                                        Page 138

1          THE VIDEOGRAPHER:  We're off the record.
2 The time is 1:05 p.m.
3          (Recess was taken.)
4          THE VIDEOGRAPHER:  We're back on the
5 record.  The time is 1:08 p.m.
6 EXAMINATION BY MR. DAVIS:
7 Q.          Representative Pringle, this is Jim
8 Davis.  I represent Secretary Merrill in this
9 lawsuit.  I have just a couple of follow-up
10 questions.
11          Did you instruct Mr. Hinaman to -- when
12 he drew a congressional plan, that it had to include
13 a majority black district?
14 A.          No.
15 Q.          Did you instruct him to include
16 districts with any particular demographics?
17 A.          No.
18 Q.          Are you aware of any member on the
19 reapportionment committee who gave him such
20 instructions?
21 A.          No.
22 Q.          Did you decide in advance that there had
23 to be a majority black district in Alabama's
24 congressional plan?
25 A.          No.
                                        Page 140

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

```
 1              MR. DAVIS:  Thank you.  No other
 2 questions.
 3              THE VIDEOGRAPHER:  This ends the
 4 deposition of Chris Pringle.  The time is now
 5 1:09 p.m.
 6
 7         (DEPOSITION ENDED AT 1:09 P.M.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                                        Page 141

```
 1 STATE OF ALABAMA )
 2 JEFFERSON COUNTY )
 3
 4              I hereby certify that the above
 5 proceedings were taken down by me and transcribed by
 6 me using computer-aided transcription and that the
 7 above is a true and correct transcript of said
 8 proceedings taken down by me and transcribed by me.
 9              I further certify that I am neither of
10 kin nor of counsel to any of the parties nor in
11 anywise financially interested in the result of this
12 case.
13              I further certify that I am duly
14 licensed by the Alabama Board of Court Reporting as
15 a Certified Court Reporter as evidenced by the ACCR
16 number following my name found below.
17              So certified on December 17, 2021.
18
19
20
21
22
                 LeAnn Maroney, Commissioner
23               ACCR# 134, Expires 9/30/25
                 505 North 20th Street, Suite 1250
24               Birmingham, AL  35203
25
```

                                        Page 142

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

### WORD INDEX

< 0 >
01   68:14

< 1 >
1   6:14   12:4,
6   59:18   113:7
1:05   140:2
1:08   140:5
1:09   141:5, 7
10   5:5   42:16
10:03   49:13
10:22   49:16
10004   4:6
10006   3:15
101   18:15, 18
19:24
10-26-21   6:21
104   6:20
105   1:23   5:21
11:26   100:12
11-1-21   6:23
116   6:22
119   6:24
11th   16:10
12   6:14   121:12
12:06   100:15
12:33   120:9
12:40   120:12
120-125   6:8
125   4:5
1250   142:23
125-140   6:9
12-year   121:13
134   142:23
14   18:25   99:12
140   117:1
1400   3:7
140-141   6:10
14th   3:21
54:3   59:24
96:13
15   19:4
16   121:12, 23
122:6, 20
123:9   124:2
17   1:24   7:7,
17   35:14
142:17
18   105:25

121:10
19   113:18
1984   16:10
1992   25:3, 23
120:1   130:1
138:22
1994   18:24
121:8
1999   3:7
1st   38:11
42:3, 10   43:14
44:1   45:14
115:23

< 2 >
2   6:16   52:14,
18   59:19, 20
63:18   98:7, 15
99:2   102:19
103:10   113:7
136:7
2:2021-CV-01530-
AMM   1:8
2:21-CV-01530-AMM
7:14
20   46:21
49:25   105:24
116:4
200   5:21
2000   28:21
35:14   36:10
20002   5:6
20005   3:22
2001   21:25
27:12   28:2
30:3   33:18
41:24   48:23
66:1, 12   68:10
109:13   112:7
2001-2002   28:18
2002   18:25
22:1, 2, 5, 23
23:2   24:8, 10,
20, 21   25:6, 19
26:5, 9, 22
28:13, 15, 22
29:9   30:4
33:18, 25
41:25   58:14,
18, 24   59:7, 9
60:5, 7   61:2
65:1   112:7

121:9   130:1
138:22
2003   11:1
2007   18:11
2010   58:8, 12,
14, 18   59:6, 10,
14   60:1, 4, 23
61:4, 11   62:18,
22   65:1   68:1
71:2
2011   29:24
30:5   33:2, 7,
14   46:14
65:13   74:9
127:5, 18, 24
128:9   129:3,
25   138:22
2014   121:10
2018   35:12
2019   35:1, 7
36:10   46:21
49:2   127:24
128:9
2020   28:13
40:6   58:19
59:11   128:20
131:19
2021   1:24
6:25   7:7, 17
22:12   32:23
33:4   34:25
37:3   45:20
49:23   51:1
52:19   58:10
59:14   60:1
62:19, 24
74:12   109:13
119:11   142:17
20th   142:23
22   37:23   80:13
26th   40:6, 18
50:20   51:2
100:17   105:4
109:14, 23
27   18:8   72:12
27th   127:18
28   32:8   71:22,
25   72:12   78:9
79:8, 12, 21
82:13

< 3 >

3   6:18   55:20,
23   113:7
3:00   50:11
30   94:6   139:24
35203   142:24
35222   4:21
36104   1:24
5:22
36106   4:14
36130   5:14

< 4 >
4   6:20   104:24
105:2
40   3:14   42:21
45   12:21

< 5 >
5   3:14   6:22
57:9, 23   58:23
59:1, 16, 21
112:9   115:23
116:1
5:00   78:11, 14,
20   79:19, 24
50   42:24
97:15, 21, 22
98:4, 11, 12, 21,
22
501   5:13
505   142:23
51   116:18
117:5, 25   118:3
52   6:16
54   113:20, 21
114:3, 6, 12, 25
115:3, 11
55   6:18
5th   48:23
50:20   51:1, 5,
19, 23   52:19
53:17   58:5
63:7   64:5

< 6 >
6   6:24   119:11,
13
60   26:15
600   3:21   5:5
6179   4:13

< 7 >

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**7**   25:5   26:16
27:14, 17   28:1
61:12, 13, 19
99:11   109:16
113:21   114:2,
25   116:15
119:16, 17, 19,
23
**700**   3:21

**< 8 >**
**8**   61:13, 19
**825**   4:20

**< 9 >**
**9/30/25**   142:23
**9:00**   78:10, 14,
20   79:19, 23
**9:14**   1:24   7:17
**90**   42:16
**90067**   3:8
**9-120**   6:7

**< A >**
**a.m**   1:24   7:17
49:13, 16
100:12
**ability**   98:8,
14   134:8   136:8
**able**   79:6, 17
127:8
**absolutely**   133:6
**accept**   114:19
**accepted**   38:2
63:22
**access**   68:16,
19   94:7
**According**   135:17
**account**   14:21,
23   15:7, 11, 24
26:20   107:10
108:5   110:1
**accounts**   15:5,
14, 21
**ACCR**   142:15, 23
**Accuracy**   70:4
**achieve**   44:13
92:9
**ACLU**   7:21, 22
8:25   9:14
**acquiesced**   135:8

**acquisitions**
17:9
**acronym**   102:13
**Act**   54:3, 7
59:17, 19, 20
98:8   99:2
102:20   132:5,
20   133:10, 17
134:3, 6   136:4,
18   137:13
**acting**   7:3
**action**   122:10,
13, 18   123:13,
15, 24
**actual**   96:4
103:11
**adamant**   43:23
**add**   80:14
**added**   38:3
80:16
**additional**   38:1,
3   55:13   80:16
**address**   15:4
32:13   36:1
73:18
**addressed**   36:12
73:12, 19
**adjust**   39:4
**adjusted**   119:21
**adopt**   69:15
**adopted**   24:20
31:1   40:8
52:5   55:14
63:25   64:9
108:23
**advance**   101:1
140:22
**advertised**   38:5
**advice**   129:20
130:19   131:21
136:21   139:8
**advise**   130:4, 9,
15   131:2
132:4, 18
**advised**   129:15,
23   131:19
133:17   134:2,
25   135:18
136:3
**advocated**   28:18
**advocating**

126:15
**affairs**   19:12
**affirmative**
122:10, 13, 17
123:13, 14, 24
**afoul**   99:1
**afraid**   99:1
**African**   85:24
**age**   95:18
98:12   113:21
**agent**   17:8
18:5
**ago**   14:10, 11
**agree**   60:22
81:5   83:1
115:10, 14
119:17
**AGREED**   1:17
2:1, 8   54:21
114:15, 19
135:12, 13
**AG's**   137:4
**ahead**   51:19
125:25
**aim**   44:14, 15
**al**   1:6, 10
7:13, 14   142:24
**ALABAMA**   1:2, 23
4:12, 14, 21
5:14, 22   7:2,
3, 16, 21, 23
8:3   9:14
10:21   16:8
18:2   24:14
25:5   26:7
30:12   32:11
34:7, 8   36:21
41:11   43:19,
21   82:1, 10, 18,
25   84:25
86:22   121:7,
19, 25   122:1, 8,
9   123:5, 11, 12,
19, 23   124:4, 5,
23, 24   130:20
142:1, 14
**Alabama's**   96:16
140:23
**Ali**   6:2
**alined**   59:4
**alleged**   127:17
128:7

**allow**   11:20, 22
134:14
**allowed**   32:15
**amendment**   54:3
59:24   96:13
**American**   4:4,
12   85:24
**amount**   68:7
124:25
**analysis**   102:4,
9, 11, 15, 22
103:2, 11, 17
104:7, 11, 15
105:14, 18
106:7, 8, 13, 20
109:12, 18, 21,
25   110:5, 18
111:1, 8, 18, 21
112:4, 14, 24
113:13, 24
114:1, 5   115:4,
8, 13   116:14
135:21
**analyze**   95:3
**analyzed**   28:10
96:24   97:3
**Angeles**   3:8
**answer**   11:11
25:11   26:13
29:12   43:1
49:3   57:5
61:23   70:25
72:24   80:21
83:8   84:9
86:10, 11
88:10   95:21
103:22   106:2
117:23   123:25
128:13, 14
132:1, 2, 25
133:21   135:7
136:25   137:1
**answered**   53:23
73:1, 12, 20, 21
93:13
**answering**   9:23
**answers**   11:22
**anxious**   89:8
**anybody**   12:18
47:3   48:5
61:7   63:19

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

80:18
anybody's   139:8
anywise   142:11
apartment   16:25
  17:4
apologize   121:6
  126:6
appears   119:17
approach   104:4
  108:15
approached
  101:12
approve   28:23
  84:12
approved   29:21
  58:23   84:15
approving   83:18
April   37:7, 13
area   42:4
  83:3   86:6
areas   82:15
arguing   99:19
arranged   139:20
asked   38:4
  63:13   66:25
  80:14   103:20
  112:19   127:10
  130:3   134:23,
  25
asking   84:6
  98:16   106:2
  113:23   116:13
  120:14   122:4
  127:1   136:11
aspects   85:21
assert   63:13
  127:8
assign   2:12
assigned   41:7
Assistant   5:11
associated   96:18
assume   10:20
  11:12   13:5
  33:5, 10   58:15,
  17   62:4   69:17
  76:21   89:22
  92:19, 22
  103:6, 13
  117:10   118:1
assumed   35:13
assuming   24:19
  29:3   123:1

assumption
  103:8   105:16
assured   111:24
attempted   129:9
attend   78:23
  79:20
attendance   47:4
attended   77:25
attention   41:22
Attorney   3:5,
  12, 19   4:19
  5:3, 11, 12, 19
  8:3, 25   12:12,
  24   13:2, 5, 7,
  16   14:6   46:14
  51:12   52:3
  53:6, 9   55:7
  57:18   62:15
  63:2   89:22
  98:16   103:7, 9
  106:2, 3, 15, 23
  117:20   121:3
  127:23   128:8
  130:20   137:3
attorney-client
  46:18   63:14
  127:11   131:24
  132:8, 24
  133:20
Attorneys   4:3,
  11   7:18   8:6
  45:25   51:17
  53:8, 14
  103:16   111:25
  117:22
audience   73:12,
  23
audio   47:7, 11
  49:7, 10   99:6
August   16:10
  37:15, 21
automatically
  98:13
available   32:18
Avenue   3:7
  5:13
aware   50:25
  103:19   109:11
  127:16, 22
  128:6, 10, 17,
  18   130:23

131:1, 11
  140:18

< B >
back   33:17
  34:23   41:23,
  24   43:11, 12,
  13   49:15   56:2,
  5   61:10, 24
  66:12   84:19
  86:3   92:11
  99:8   100:9, 14
  120:11   125:15,
  18   137:21
  140:4
back-and-forth
  113:20   116:12
Baggett   6:3
  8:24
Balch   1:22
  5:20   7:24
Baldwin   42:6
  44:3, 10
based   36:13, 20
  46:11   58:14
  59:7, 14   60:1
  61:1   67:13
  86:2   95:3
  102:22   121:23
  122:6   123:9
  124:2, 20
  129:6   133:23
  139:3, 12
basically   69:13
basis   58:9, 18
  81:2   96:12
began   35:18
  36:3   38:9, 20
  46:3, 8   64:15
beginning   7:12
believe   19:13
  42:8, 9, 10
  44:12   48:25
  56:11   59:6, 15
  60:13   61:24
  73:1   83:4
  93:13   105:8
  110:11   116:7
  118:8
believed   21:20
belt   81:25
  82:3, 5, 8, 20,

23   83:1, 6
  84:19   85:9, 22,
  25   86:8
best   11:22
  29:1, 4
better   49:18
  62:9
big   109:5
bill   14:1
  41:3, 5   93:24
  94:19   95:2
  98:2   110:16
  111:13
bills   101:7
  105:17   110:8
bill's   111:21
Bingham   1:23
  5:20   7:25
Birmingham   4:21
  7:2   127:24
  142:24
black   25:4
  26:15   28:19
  29:10   42:16,
  21, 23   81:25
  82:3, 5, 8, 20,
  23   83:1, 6
  84:19   85:9, 22,
  25   86:8   90:18,
  19   91:8   95:18,
  19, 24   97:11,
  13   113:21
  115:11   125:1
  132:7, 12, 21,
  22   133:6, 13,
  18   134:4, 11,
  20   135:1, 5
  136:5, 19
  140:13, 23
BLACKSHER   4:18
  6:9   8:22
  11:3   16:4
  125:10, 12, 13,
  21   128:4
  129:25   132:2
  137:20   139:16
blind   110:3
block   66:7, 8
board   32:9
  72:20   117:2
  142:14

Evan Milligan, et al v. John H. Merrill, et al.

Chris Pringle
12/17/2021

boards   20:6
boat   44:22
bones   53:9
bottom   105:25
 116:16
Box   4:13   61:14
boxes   61:18
break   49:8, 9,
 21   99:5, 6, 17
 100:8   120:3,
 16   139:23
bring   46:25
Broad   4:5
 37:2   83:3
brought   41:6,
 10   59:10
 76:19   77:8
brown   119:16
build   17:11
bumped   37:14
bureau   67:10
burn   16:19, 21
 17:6
burning   16:22
Buskey   25:8, 13,
 25   42:9
 119:21   120:1
busy   39:11
BVAP   95:14, 16
 113:22   114:3,
 6, 11, 25   115:3,
 6, 11   117:5

< C >
calendar   41:10
California   3:8
call   23:8
 39:21   94:19
 97:14   127:10
Callahan   21:17
 24:2   29:2
 33:21   42:2
 45:13
Callahan's
 33:19   42:12,
 20   43:4, 9
 44:6, 15   45:6
called   93:4
 97:20   112:10
 125:10   138:14
calling   97:15,
 19

calls   126:5
 127:10   131:24
 132:24   133:20
campaigns   19:11
 20:7
camps   17:11
campus   23:8
 28:4   76:9
 93:22
candidate   98:10,
 14   102:22
 118:15, 21
 119:4   134:9
 136:9
candidates
 80:25   81:7
car   43:21
carved   43:14
CASE   1:7   7:14
 11:2, 6   13:13,
 15   118:24
 126:11   142:12
cases   36:14
 106:24
cash   79:19
CASTER   5:1
 8:15   120:15,
 20   121:4
catch   122:14
cause   7:8
 80:24
caution   98:20
cautious   98:23,
 24
caveat   105:8
census   35:3
 37:11   67:10,
 15, 22, 23   69:7,
 21   70:2   96:8
 128:20
center   70:23
Central   82:18
certain   85:12
certainly   99:14
certainty   61:23
certificates
 16:14
certifications
 16:15
certified   16:18
 142:15, 17

certify   7:4
 142:4, 9, 13
cetera   17:16
chair   19:8
 20:10   128:24
 129:15   130:18
 132:18   138:25
chaired   22:20
chairman   22:22
 35:12   108:11
 117:20
challenged
 113:5, 8, 16
challenging
 113:12
chance   105:9
 116:6   126:21
change   23:20
 62:11, 14
 67:19   70:20,
 22   71:15
 74:25   81:9
 90:9
changed   36:2
 37:1   65:7
 71:2, 7   108:5
 110:24
changes   36:17
 53:16, 19   55:3,
 15, 18   56:13
 57:19, 22
 61:15   63:8, 9,
 17, 19, 22, 23,
 24   71:10
 76:11   81:16
changing   90:13
channel   43:7, 8,
 12, 13   44:21, 22
characteristics
 26:20
check   105:10
 116:7
choice   98:10,
 15   102:22
 118:15, 21
choose   58:12
 91:18   98:14
choosing   134:10
 136:10
chosen   55:11,
 17   118:4

CHRIS   1:10, 20
 5:17   7:7, 12
 8:1   9:4
 17:25   141:4
chrispringle@south

erntimberlands.com
 14:25
Christopher   9:18
circumstances
 85:12
citizens   71:5
 98:9   102:21
 134:9   136:9
CIVIL   1:7   4:4,
 12   7:5, 14
claim   129:3
clarify   95:23
 124:10
Clarke   42:6
 44:3, 12
class   98:9
 102:20   134:8
 136:8
clear   110:24
 122:12, 17
clearly   13:8
clerk   8:25
closely   59:4
closer   27:10
closest   39:20
cochair   22:11
 30:7, 10   32:5
 56:16
cochairman   19:9,
 10   22:14   35:17
coding   96:3
cohesive   86:14
colleagues   35:16
color   96:3
columns   95:22
come   17:1
 28:14   35:2
 43:7   60:9, 10
 64:19   79:13,
 16   84:1   88:16
 100:9
comes   28:5
 90:5   122:2, 9
 123:13, 24
 124:6, 14, 24

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

comfortable
 119:7
coming   47:11
 77:19   91:5
 92:15
commencing   1:24
commercial   17:12
commissioner
 7:3   142:22
commissions   20:6
committee   19:8,
 10, 12   21:2, 19
 22:17   30:8, 11,
 24   31:3, 14, 23
 32:1, 6   33:11
 35:14   37:23
 39:14   40:5, 18,
 23, 25   41:8, 16
 45:21   47:13
 48:20, 24   49:2,
 22, 23   50:6, 7,
 11, 19, 21, 22
 51:1, 20   52:4,
 7, 18   53:11, 16
 54:22   56:12,
 17   58:3   59:4
 60:8   63:24
 64:2   80:7
 83:18   85:5
 87:2   88:6
 100:17, 24
 101:13, 18, 19
 103:25   104:3,
 4   105:3
 107:13   108:8
 111:23   128:25
 129:2, 6, 9, 16
 130:15, 19, 24
 132:19   137:10,
 16, 23, 24
 138:3, 7, 11, 25
 140:19
committees   19:5
 20:2, 11, 17
committee's
 64:10
common   78:21
 84:3, 8   125:20
communicate
 108:25
communication
 127:11   131:25

132:25   133:21
 137:2
communications
 16:12
communities
 31:4   32:13
 61:17   62:3, 6,
 21   65:5   66:17
 80:14   83:5, 14,
 19
community   45:2
 62:23   65:4
 66:9   83:2, 7,
 21   84:13, 23
 85:1, 4, 6, 9,
 11, 16, 22   86:8
compact   45:2
 86:14
Compactness   62:3
company   17:17,
 22
compare   62:18
compared   89:13
compensated
 14:12, 18
compensation
 14:19
competing   91:17
complaint   13:12
 126:22   127:17
 128:7
completed   16:7
completely   49:7
compliance   2:4
 54:17
complied   35:21
 54:2   59:16
 60:3
complies   54:13
comply   54:7
 57:20   59:18,
 23   60:14
 67:19   68:8
 132:5, 20
 133:9, 17
Complying   60:19
 133:8
compressed   72:8
computer   28:9
 94:18, 23
 137:16

computer-aided
 142:6
computers   94:2
conceded   128:8
concerned   77:5
concerns   66:4
 69:3, 4   77:2
 80:4
concise   45:2
conclusion   139:8
concur   139:12
concurred   139:11
condensed   101:3
conduct   36:6
 114:4
conducted   73:10
 81:18   105:14
 106:20   109:22
 110:5
confederate
 122:2
confer   99:17
 139:25
confess   126:5
conform   35:19
 48:21
congress   24:6
 30:15, 19, 22
 31:11   32:16
 39:10, 17, 22
 67:2   70:7
 76:3, 20   77:13
 86:23   87:9
 88:12   90:18
 96:14   107:21,
 23   114:18
 119:9, 11
 135:9, 12
Congressional
 6:25   23:2
 24:3, 8   25:3,
 4, 7, 17   27:2,
 5, 12   28:22
 29:21, 25   30:3,
 4, 5, 9, 17, 25
 31:15, 24   32:9,
 15, 23   33:3, 4,
 14, 25   38:23
 39:9, 12, 19
 40:22   42:3, 10
 43:14   44:2
 58:24   66:18

67:4, 11, 15, 18
 68:5, 6, 7
 72:20   73:4
 74:20, 22   77:4,
 16, 18   78:6
 79:10   81:18,
 22   83:19   88:9,
 15, 24   89:11
 90:10, 19   91:9
 95:25   108:6,
 17   109:13
 110:6   112:4,
 14   117:3
 118:16, 23, 25
 128:20   129:5,
 16   131:15
 132:6   133:24
 138:8, 12, 17,
 19   139:4
 140:12, 24
Congressman
 21:17   24:1
 29:2   34:1
 43:9, 22
Congresswoman
 114:15   119:6
conjunction
 53:5   80:12
 88:12   107:21
conservatives
 124:8
consider   44:22
 45:1   80:19
 85:9   89:10
 93:7, 9   95:4
 96:9, 19   111:10
considerable
 102:3
consideration
 91:15
considered
 27:25   30:4
 35:19   96:24
 121:21
considering
 123:17
constantly   36:19
constitute
 85:22   86:8, 15
constitution
 19:11   20:7
 54:4, 8   96:13

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

constitutional
128:21
construction
40:14
consultant
110:20
consulted   111:3
contact   24:1, 2
contained   29:9
101:24
contended   127:5
128:19
content   12:11
contests   54:15
contiguity   62:3
contiguous   86:14
continue   45:10
131:20
continued   45:15,
17
contract   19:13
20:8
contracting
17:24
contractor
16:17   17:11,
16   18:10
contractual
40:13
control   16:18,
20, 21   64:10
conversation
114:20
conversations
35:23   51:22
75:24   123:2
Cooper   17:21
copies   105:6
copy   52:20
core   25:20, 21
26:21   32:25
33:10, 12, 13
44:1   70:16
81:14   119:24
133:2, 24
134:14
cores   26:3
134:18
corner   127:14
correct   10:16
15:25   17:17
21:6, 13, 25

25:9   27:2
33:15, 20   34:9
38:16   45:22
51:10   53:12
57:13   71:8, 11,
12   76:17, 20
80:8   129:3, 10,
18   131:22
132:7   135:20
136:6   139:2
142:7
correctly   26:6
37:10   52:3
76:1   77:22
134:20   137:14
counsel   1:18
2:10, 11   7:6
100:3   104:4
132:2   142:10
counties   82:1,
12, 13   83:12,
22   84:1   85:13,
15   92:9   97:8,
9   127:2
counts   96:15
County   42:6, 8,
9   43:22   44:4,
7, 12   45:3, 4
84:7, 8, 10, 21
91:24   92:7
94:3   95:13
126:16   135:16
136:17   137:12
142:2
couple   14:10
140:9
course   45:8
74:19   105:11
107:6   112:25
COURT   1:1   2:5
7:1, 15   9:2
11:15   36:13
46:11   54:4, 8
62:8   106:24
113:5, 12
128:8   137:20
142:14, 15
courteous   99:23
courtrooms   55:18
courts   36:18
54:4   55:12

102:17
COVID   72:6
COVID-19   36:2
64:17
created   25:3,
17   60:24   61:5
69:15   75:2
119:25   127:2
creation   57:4
criminal   124:6,
9, 14
criteria   106:19
crunch   113:1
curious   67:23
current   18:12
36:13   46:11
65:17   69:2
87:18
currently   19:5
22:23   65:11
cut   116:17
117:24
cycle   22:24
36:16, 23
42:22   45:20
112:8
cycles   112:5

< D >
DAN   5:2   8:14,
17   122:11
Daniel   121:3
125:7
data   24:25
94:23   106:3
107:25   108:3
128:20
date   7:4, 16
36:11   108:2
DAVIN   4:2   8:19
DAVIS   5:10
6:10   8:3
12:19   13:16
35:15, 24   46:1,
7, 16   47:4
48:3   58:2
99:4, 12, 18
100:5   128:1, 3,
5, 11   136:23
140:6, 8   141:1

day   40:13, 15
51:9   79:9, 22
101:4, 7
days   14:10, 11
28:8, 12   79:15
93:23   94:6, 7,
14, 15   122:13,
18
daytime   79:16
DC   3:22   5:6
13:4
deadline   38:11
dealing   32:8
35:20   40:9, 11
75:25
deals   54:10
debate   115:23
decades   131:14
138:16
December   1:24
7:7, 16   142:17
decide   22:18
50:14   103:5
104:6, 14
140:22
decided   20:20
decides   103:1
deciding   104:9
decision   103:16
104:8   115:3
decisions   81:21
deemed   111:25
defeat   119:3
defeated   20:21
defeating   98:10
102:21   134:9
136:9
DEFENDANT   5:9
Defendants   1:12
5:17   7:25
10:6, 11
Defense   3:13,
20   99:24
define   97:17
definition   62:9,
21, 23   85:3, 6,
8, 11   123:14
definitions
63:4, 6
degree   16:11, 12
delayed   35:3
delegation   24:3

Case 2:21-cv-01530-AMM   Document 89-2   Filed 12/27/21   Page 44 of 184

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                 12/17/2021

democratic    22:9
  24:13    117:20
  121:25    122:8
  123:11    124:4,
  12, 22
democrats    24:11
  123:2, 19
demographic
  74:7, 15    76:13
  94:23    96:8, 25
demographics
  26:11    76:11
  94:9    140:16
denied    102:20
department
  58:23, 25
depends    115:15,
  18
Depo    6:15
deposed    10:23
  13:21
DEPOSITION    1:9,
  19    2:2, 3, 13
  7:12    11:25
  12:13, 15
  13:19    14:5
  27:4    99:6
  141:4, 7
depositions    2:6
describe    82:16
  119:22
determination
  106:16
determine    91:22
  92:14    102:17
  106:23
determining
  106:19
DEUEL    3:18
  8:10
developed    86:5
  107:15, 16
deviation    44:13
  57:10    67:14
  74:21    75:1
  76:14    77:1
  92:10    94:22
  97:1, 7    129:17,
  21, 24    130:5, 8,
  10, 12, 16, 21
  131:9, 15, 20
  133:4    135:19

138:9, 13, 17,
  19, 21    139:1, 2,
  5, 11
deviations
  76:12    77:5
  91:25    92:3
  94:3    95:4, 13
  96:2    130:1
diem    14:15
differ    121:25
  122:8    123:7,
  11    124:4, 23
difference
  76:25    96:3, 5
  124:11
differences
  63:16
different    19:19
  34:21    66:4
  78:18    79:21,
  22    84:5    124:1,
  18    127:9
differently
  66:23
digits    117:2
diminish    98:8,
  14    134:7
diminishing
  136:8
direct    73:24
  132:16
directed    74:1
  107:12    129:5
director    48:14
disagree    115:14
disclosing    12:11
discovery    99:20
discrimination
  125:1
discuss    12:14
  46:17    50:16
  56:23    66:25
  78:5    88:13
  118:9    137:2
discussed    13:15,
  19    46:17
  52:24    63:8
  76:21    82:19, 23
discussing
  77:11    90:1, 17
Discussion
  27:11    46:10

56:5    120:23
  126:4
discussions
  12:12    57:3
dislike    65:6
dissatisfied
  87:9, 15
DISTRICT    1:1, 2
  7:15, 16    18:15,
  17    19:22, 25
  21:20, 21    25:4,
  5, 17    26:12, 16,
  21    27:14, 17
  28:1    29:3
  33:20    42:1, 3,
  10, 12, 21, 23,
  24    43:15    44:2,
  8, 16, 19, 21
  45:9, 14    67:11,
  19    68:5, 8
  69:1, 2    70:19,
  20, 22, 23
  71:10, 15
  95:15    96:12
  97:18    98:4, 11,
  20    103:3, 18
  104:6, 10
  106:21    109:12,
  16    110:5
  113:21    114:2,
  5, 12, 25    115:7,
  11, 15, 18
  116:15    118:22,
  23, 24, 25
  119:16, 17, 19,
  20, 23, 25
  132:7, 12, 21,
  22    133:18
  134:4, 12, 13,
  15, 20    135:2, 6
  136:5, 19
  140:13, 23
districts    25:20,
  21    26:4    27:14,
  25    28:19
  29:10    30:13,
  14, 22    31:12
  32:10, 12    33:1,
  10, 12, 13
  34:16, 19
  38:10, 22    39:4,
  12    54:2, 10, 12,

14    68:6, 18
  69:4, 16    70:13,
  16    71:7    72:19
  74:22    76:12
  81:14    85:15
  90:18, 20    91:9
  93:16    95:25
  97:11, 13, 14,
  15, 20    106:4, 9
  109:19    112:24
  113:2, 5, 7, 15
  115:19    117:2,
  3    119:25
  127:3    129:5
  133:3, 25
  135:4, 10
  139:6    140:16
divide    124:7, 16
division    17:21
doctor    13:6
document    12:9
  52:22    53:1, 3,
  11, 16    55:25
  56:7, 20, 24
  57:4, 8, 17
  58:7    62:14
  75:2
documents    13:9
  58:21    75:9
Dog    43:8, 12
doing    17:7
  79:1    99:4
  108:14    111:20
DORMAN    5:18
  7:24    10:4
  35:24    92:25
  122:14    139:21
dosher@elias.law
  5:7
Dothan    43:15,
  19, 22    45:4
double-check
  51:4    120:4
draft    53:7, 8,
  11    65:8    67:4
  74:11
drafted    53:3
  57:1
drafting    52:21
  53:1    56:19
  57:17    81:18
dragging    99:9

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

draw    21:20, 21
  23:4    24:18, 21,
  23    25:1    28:6
  30:19    31:9, 20
  34:15    44:20
  54:2    96:6
  98:20    107:13
  129:5    133:3
  135:3
drawing    24:7
  27:25    30:13
  31:24    32:23
  33:6    38:9, 15
  39:3    54:10, 12,
  21    89:6    93:10
  108:12, 15
  110:1    128:19
  131:18    134:18
drawn    23:7, 8,
  12, 13, 15
  25:16    28:4, 11
  29:15    31:12,
  15    59:3    65:24
  66:9, 22    69:6
  76:9    88:9, 11
  89:12    93:21
  107:17, 19, 20
  114:19    119:20
  130:7, 12
  133:22    135:11
  138:16    139:5
drew    22:9
  24:9    25:23
  64:11    110:3
  134:13    140:12
drive    43:18, 19,
  21, 22    79:14, 15
dropped    49:7
drosborough@aclu.o
  rg    4:7

dross@naacpldf.org
  3:23
due    91:15
duly    9:5
  142:13
dwalker@balch.com
  5:23

< E >
earlier    56:1, 3

94:10
earth    81:15
ease    60:12
EBENSTEIN    4:1
  8:20
economic    85:18
edges    81:16
education    16:7
  32:9
Educational
  3:13, 20
effect    2:4
  46:13    59:17
effort    129:1
eight    117:2
either    15:10
  73:15    102:18
  109:7    118:10
elect    115:20
  118:14, 21
elected    18:24
  22:16    45:8, 16
  70:10    121:8, 17
electing    98:9
  102:21    134:9
  136:9
election    35:13,
  16    38:14    119:3
elections    19:11
  20:8
electronic    105:6
electronically
  73:16
Elias    5:4    8:15
eliminate    62:20
eliminating
  54:14
Elizabeth    6:3
  8:24
email    14:21, 23
  15:4, 5, 7
  101:23    102:1
  109:4, 5
emailed    80:4
employees    14:15,
  20
employer    17:13
employers    18:1
enacted    105:20
  127:5, 18
encounter    107:5

ended    21:24
  141:7
ends    141:3
engage    37:18
England    113:19,
  23    116:13
  117:19
enrolled    56:13
  62:19
entered    77:24
entirely    61:14,
  22
entirety    62:7
entitled    14:16,
  20
equal    96:13
err    48:11
Escambia    42:6
  44:3, 11
estate    17:8, 20
et    1:6, 10
  7:13, 14    17:16
ethnic    85:17
EVAN    1:6    7:13
evening    80:20
event    137:9
events    40:3
eventually    40:21
everybody    11:16
  13:5    38:4
  54:20    77:25
Everyone's    49:6
evidence    2:14
  75:8
evidenced    142:15
exact    36:10
  50:2    55:4
exactly    28:11
  80:3    99:16
examination    7:8
  9:12    120:24
  125:13    140:6
examined    9:5
examiners    19:13
example    15:8
exchanged    132:13
excuse    129:8
Exhibit    6:14,
  16, 18, 20, 22,
  24    11:24    12:4,
  6    52:14, 18
  55:20, 23

63:18    104:24
  105:22    115:22,
  23    116:1
  119:11, 13
existing    25:20,
  21    32:25
  33:10, 12, 13
  44:1    48:21
  56:12    65:6, 9,
  22    68:2, 11
  70:16    81:14
  119:25    133:2,
  24    134:15
exists    119:2
expect    14:17
  31:2
experience
  22:12    84:13,
  21    124:21
expire    16:18
Expires    142:23
explain    23:10
  41:4    56:4
  66:5    83:16
explained    52:3
  53:14
express    65:16
  88:19    89:20
  90:6
extemporaneously
  92:20    93:12
extensive    35:23
extent    13:22
  131:24    132:24
  133:3, 20    137:2
eye    13:6

< F >
face    126:9
Facebook    15:15,
  23
fact    139:5
factor    92:4
factors    92:2
fair    11:13
  25:22    33:2
  44:14    45:12
  58:9    73:11
fairly    59:3
familiar    81:25
families    84:1
far    100:25

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

**fast**   101:2
116:25   117:17
118:11
**FAULKS**   4:10
7:22   49:8
120:20   125:8
139:21
**favor**   57:9
124:9
**Federal**   7:4
54:17   60:3
99:11   128:8
**felt**   66:12
**fight**   17:2
**figures**   74:15
**filed**   7:15
13:24, 25
110:14, 15, 16
111:13   126:9,
19   127:17
128:7
**final**   37:12
63:18   119:11
**finally**   37:20
**finals**   37:7
**financially**
142:11
**find**   94:20
**fine**   19:18
130:13
**finish**   11:21,
22   40:14
**finished**   31:25
112:15   120:3,
14
**fire**   16:22
17:4   117:17
118:12
**fires**   17:2, 3
**first**   11:24
13:23   14:4
19:14, 15, 16
21:3   25:4, 15
34:24   35:10,
11   36:7, 11
40:17   44:12
45:19   46:13
108:15   110:4
121:8
**Five**   47:23
**fix**   16:24
**FL**   3:14

**flip**   61:12
116:4
**floor**   41:9, 10,
17   115:22
117:13   132:14
**focused**   99:22
**follow**   31:19
54:20   107:13
108:12, 21
**following**   7:9
31:10   142:16
**follows**   9:6
60:9
**follow-up**   140:9
**fond**   63:6
**force**   2:4
**foregoing**   7:5
**form**   2:10
41:3   84:22
89:21   94:19
95:3   107:8
122:11   128:1,
3, 11, 12
131:23   136:23,
24
**forth**   41:24
**found**   142:16
**Foundation**   4:4
**four**   113:15
**frame**   117:4
**free**   90:5
**Friday**   125:18
**friend**   26:1
**front**   74:6, 7
136:12
**fruition**   90:6
92:22
**full**   2:4   9:16
41:19   96:19
**Fund**   3:13, 20
**FURTHER**   2:1, 8
142:9, 13

**< G >**
**gain**   67:12
**gap**   121:13
**gathered**   32:17
**General**   5:11,
12   16:17
17:11   24:17
64:9   66:8
67:8   69:11

84:22   87:1, 8,
17   88:20   89:4,
12   113:2
122:22   123:4
124:11   128:8
**generally**   60:9
66:14   123:11,
13   124:4, 5, 23,
24
**General's**   8:4
127:23   130:20
**geographic**   85:18
**getting**   14:14
35:4, 12   96:21
118:11
**gifted**   117:21
**Gingles**   45:1
46:12, 13
61:25   62:2
**give**   37:2
89:3   90:8, 12
91:15   94:24
98:19   108:19
129:20   136:20
**given**   31:8
38:10   41:9
46:16   79:8
105:21   117:3
123:18
**glad**   41:21
109:10
**go**   11:8   41:24
65:21   67:17
71:23   72:17
83:11   84:10
89:17   91:20
96:16   100:9
107:24   120:7
125:25   126:6
**goal**   26:10, 15
48:19
**goes**   15:10
61:24   86:3
**going**   27:21
29:23   33:17
36:1, 5, 25
37:7   41:24
45:25   46:15
48:6   49:11
64:16, 21
67:14   70:23
79:20   84:19

92:11   99:12,
20   100:4
106:15   111:24
117:16   126:6
127:7   131:4,
13   137:18
**Good**   8:16, 17,
18   138:23
**GOTELL**   4:10
7:22
**government**   15:1
19:9   41:8
50:10
**governor**   40:22
41:17
**graduate**   16:8
**great**   98:20
121:24
**grounds**   2:12
131:5
**Group**   5:4
8:15   92:24
102:20
**groups**   94:17
**guarantee**   119:3
**guess**   53:20
63:15   64:1
66:6   67:23
69:3, 20, 25
70:17   83:17
84:11   88:7
98:6
**Guidelines**   6:17,
19   24:20
25:19   26:3, 5
28:16   31:1, 2,
6, 9, 10, 16, 19
32:19, 24, 25
33:9   35:6, 19,
21   36:9, 12, 15,
18, 22, 25
45:22   46:3, 9
47:14   48:20
51:9, 12, 18, 25
52:2, 7, 19
53:7, 25   54:19
55:1, 14, 24
56:6, 24   57:7,
19   58:5, 8, 10,
13, 15   59:4, 7,
12, 14   60:1, 5,
23   61:4   62:19,

20    63:18    64:9,
10, 24    70:15
81:13    86:7
91:11, 16, 18,
21, 23    104:14,
19    107:13
108:12, 21, 24
129:6    133:2, 7,
9, 14, 23
138:14, 18, 25
Guys    16:22

< H >
Hale    82:15
Hall    37:25
38:3    80:13
handed    54:5
55:13
handful    50:3
55:3
handing    36:19
handle    64:16, 20
handout    6:19
55:24
handwritten    75:8
happen    30:2
45:24
happened    39:1,
13    40:2, 6, 17,
20, 24    41:13
51:24    64:5, 13
75:17, 21
80:22    81:1, 6
112:8
happens    94:17
happy    39:5
70:9, 17    71:13,
18    86:22
87:17    88:20
89:5    90:2
92:12    99:16
hate    47:21
71:17
head    45:23
health    20:7
hear    46:5
47:9, 10    49:17
79:16    120:22
126:8    128:2
heard    64:25
86:20    92:18,
21    102:7, 8

112:11    131:10
134:1
hearing    68:22
77:15, 22
99:18, 21
104:21    134:20
hearings    32:8,
18    35:5    36:1,
2    37:17, 19, 22,
24    38:1, 3, 6,
16    39:13
64:16, 17, 20
67:24    68:12,
24    70:2, 6
71:21    73:13
75:17, 25
76:19    77:8, 19
78:1    79:5
80:22    81:6, 19,
23    82:20
86:17, 20    88:8,
25    90:10, 14, 16
held    17:20, 24
27:11    64:25
65:20    66:1, 15
72:4, 12    78:10
79:9    120:23
help    30:19
99:17    135:4
helpful    61:19
helping    23:4
Henry    43:22
45:4
Hi    8:14
higher    20:20
highest    16:6
highlights    54:16
Hinaman    23:24
24:7    30:18
31:8, 18    32:16
33:6    38:20, 24
39:9, 16    75:20
76:18    77:4, 9
88:11, 14, 19
90:9    107:12
108:9, 12, 20
109:1    114:17
117:11    118:2,
8, 10    129:4, 22,
23    130:4, 6, 15
131:21    133:1

135:8, 25
139:10    140:11
hired    24:6
110:20, 22
historical
85:18, 25
102:23
history    25:5
123:18    139:3
hit    43:8
Hogan    3:6
hold    64:21, 23
67:24    70:1
124:18
holding    38:6
68:24    80:19
81:23
homebuilder
16:17    17:10
honest    25:10
hope    17:3
99:13    125:14
139:17
hour    12:21
hours    12:21
78:10, 14, 18,
20    79:2    99:11
House    18:2, 14,
17    19:9    20:22
21:11    22:14,
17, 20, 22    23:9,
14    30:12
32:10, 12
35:12, 17
38:21    39:11
41:7, 11    43:14
44:6, 21    51:21
72:11, 18, 19
98:2    101:13
houses    17:11
Houston    45:4
huh    60:20
hunting    17:11
Huntsville
43:18, 21

< I >
idea    87:17
ideal    43:24
identification
12:7    52:15

55:21    104:25
116:2    119:14
identities    85:19
imagine    36:24
immediately
37:21
impact    78:23
79:3
implementing
123:16
importance    89:6
98:5
important    11:19
60:17, 18, 20
89:11    92:2, 4,
7    93:10    98:6
114:13
inaccurate
105:9    116:8
include    85:12
140:12, 15
included    80:17
includes    85:17
including    40:22
Incorporated
17:22, 25
increase    42:23
increases    119:21
incumbent
134:24    135:4, 6
incumbents    31:4
33:1    54:13, 15
134:22
independently
139:8
individual
38:21, 22
individuals
123:17    125:1
influence    88:8
informal    104:18
information
32:17    38:9
87:21    88:4
94:3, 24    95:5
96:25    97:1
101:14    112:2
135:23
informed    126:18
129:7
initial    37:5, 9,

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

*11* 110:2
**injunction**   99:21
**input**   30:21
  31:14   52:1
  65:4   72:7
**instruct**   33:7
  46:15   140:11,
*15*
**instructed**   31:9
  92:25   133:1
**instructions**
  90:8, 12   108:9,
*19*   140:20
**intact**   44:2
  81:14
**intentionally**
  102:18   134:7
**interest**   31:4
  32:14   45:2
  61:18   62:4, 6,
*20, 21, 23*   66:9
  83:2, 5, 7, 15,
*20, 21*   84:14,
*23*   85:2, 4, 6,
*10, 11, 16, 22*
  86:9
**interested**
  91:11, 13
  142:11
**interests**   62:22
**interjected**   79:9
**internal**   19:12
**interpret**   71:17
  138:20, 21
**interpreted**
  139:1
**interrupt**   27:8
**intervenor**   7:25
**intervenors**
  10:13, 14
**introduce**   11:24
  52:17   55:23
  94:21   105:2
  115:21   119:10
**introduced**   14:1
  28:8   41:2, 6
  93:23   94:10
  95:9   97:25
  98:2   137:17
**involved**   16:2
  21:6, 15   22:24

  31:23   131:12
**involvement**   23:4
**issue**   106:5, 10,
*14, 18*   107:1
  122:24   123:5
**issues**   13:7
  49:10   107:6
  122:25   123:7
**its**   82:10
  89:5   135:19

< J >
**JAMES**   4:18
**January**   22:1, 5
  37:6, 11, 12
**JEFFERSON**   142:2
**jerrymandered**
  119:18   127:6,
*20, 25*   128:10
**jerrymandering**
  128:22   129:2,
*10, 12*
**JIM**   5:10, 17
  8:1, 3, 22
  125:11   127:9
  128:2, 3   131:4
  140:7
**jim.davis@alabamaa**
**g.gov**   5:15
**JOHN**   1:10   5:9
  7:13   8:5
**jublacksher@gmail.**
**com**   4:22
**JULIE**   4:1   8:20
**jump**   126:5
**jumping**   11:23
  41:23
**justice**   58:23
  59:1   124:6, 9,
*14*

< K >
**KAITLIN**   4:9
  7:20   9:9, 14
  116:5
**KATHRYN**   3:11
  8:8   47:9
**keep**   26:11, 15
  41:23   44:15
  49:11   70:7, 13,
*20, 23*   71:9

  81:13   130:10,
*16*
**keeping**   26:20
**keeps**   47:11
  83:19
**kept**   44:1, 2
  71:4, 5
**key**   11:8
**kicked**   76:8
**kin**   142:10
**kind**   74:19
**kinds**   77:12
**knew**   27:19
  68:5, 25
  111:11, 13
  131:8
**know**   11:5, 10
  13:1   16:21
  20:5   23:18
  24:9, 11, 15, 17,
*22, 25*   25:5, 10,
*11, 19, 23, 24*
  26:8, 13, 14, 19
  27:13, 16, 24
  28:16, 17   30:2
  35:1   36:23, 25
  43:2   48:10
  50:18   52:8
  53:5, 19   55:10,
*16*   56:9   57:3,
*6, 9, 16*   60:13,
*23*   61:4, 22
  62:4, 9, 13, 24
  63:1, 9   65:1
  66:7   67:13
  69:5   70:21
  74:1   75:4
  76:7   78:9, 17,
*24*   81:2, 17, 21
  83:12, 19, 20,
*22, 24*   84:6, 9,
*24*   85:3, 23
  89:15   92:13,
*15*   93:8, 15, 19
  95:20, 22
  96:11, 25   99:5
  102:1, 24
  103:5, 22
  104:13, 18
  105:13   107:22,
*25*   108:4
  110:4, 10, 12,

*17, 20, 22*
  111:17, 20
  112:3, 13
  115:2, 6, 16
  116:21   117:8,
*25*   123:15
  124:8   129:11
  131:8   136:12
  138:15, 22
**knowledge**   112:6
  130:17   139:3
**known**   78:1
**ksadasivan@naacpld**
**f.org**   3:16
**kwelborn@aclualaba**
**ma.org**   4:15

< L >
**laid**   37:21
**lands**   85:14
**Large**   1:22
  7:3   65:5
  119:19   135:20
**late**   35:4
  117:18
**LaTISHA**   4:10
  7:22
**law**   1:22   3:5,
*12, 19*   4:3, 11,
*19*   5:3, 4, 19
  8:15, 25   35:20,
*22*   36:13, 17,
*21*   37:1   41:5
  46:11   48:22
  54:25   55:15,
*18*   57:21   60:3,
*14, 19*
**laws**   2:5   54:18
**lawsuit**   10:6
  13:24   110:14,
*15*   111:12
  113:16   126:9,
*15, 25*   127:4,
*23*   128:19
  140:9
**lawsuits**   16:3
  105:18
**lawyer**   10:1, 3,
*5, 18, 21*
**lawyers**   63:5
  131:3

**lay** 31:2
**laying** 36:3
**LDF** 8:9
**leadership** 22:9
**leading** 2:11
**League** 66:24
  69:9   77:21
  78:1, 6   87:3
  88:17, 25   89:8,
  14, 24   98:1
  126:12, 14, 15
  135:16   136:3,
  17   137:11, 15
  138:4
**LeAnn** 1:21
  7:1   142:22
**learn** 86:16, 19
**learned** 88:8, 13
**leave** 20:19
  120:6
**leaving** 22:21
  106:22
**left** 18:25
  121:9
**Legal** 3:13, 20
  63:4, 6   104:4
**legislative**
  14:14   15:2, 11
  26:3   30:13
  34:16, 19
  36:22   57:13
  66:21   74:19
  75:25   93:17
  109:19   117:2
**legislators**
  28:18
**legislature**
  18:13   19:15
  21:5   23:16
  26:7, 11, 19
  27:24   28:7, 9
  29:20   34:7, 8
  39:7   83:17
  84:15   94:20
  121:7, 13, 24
  122:7, 21
  123:10, 19
  124:3, 21
  128:21   132:15
**letter** 37:25
**letting** 96:4
**level** 16:6

**Liberties** 4:4,
  12
**license** 17:20,
  24
**licensed** 16:16,
  17   17:10
  142:14
**liked** 67:1
  70:6
**line** 43:9, 10,
  12   71:10
  91:21, 23   92:20
**lines** 54:21
  65:23   71:6
  81:9, 22   123:21
**links** 79:5
**Linwood** 4:20
**list** 31:5
  38:4   80:13
**listen** 72:17,
  21   79:17
  137:18
**listened** 72:19,
  23   79:9   87:23
  89:7
**litigation** 121:4
**little** 23:3
  27:9   66:7
  84:3   99:22
**live** 65:5
  70:19, 22
**living** 17:5
**LLP** 3:6
**location** 79:15
**locations** 72:7
**log** 79:12
  80:18
**logged** 79:7, 25
**long** 12:20, 22
  18:6, 9, 22
  86:4   99:5
  111:17   121:6
  139:22
**longer** 99:16
**longstanding**
  26:6
**look** 29:14
  31:3   54:11
  66:25   76:11
  95:6, 12, 13, 14
  96:18, 23
  112:19

**looked** 31:25
  74:21   94:4
  97:6   106:4, 9
  107:17, 18, 22,
  25
**looking** 85:8
  91:11, 14
  106:18   107:14
  136:13
**looks** 56:1
  61:21
**Los** 3:8
**lose** 67:13
**lost** 42:8
  127:12
**lot** 44:20
  45:3   68:14
  78:17   99:18,
  19   102:11
  125:20
**Lovells** 3:6
**Lowndes** 82:15
**lunch** 120:16
  139:22

**< M >**
**ma'am** 12:10
  21:23   22:6
  24:12, 24   25:2
  26:24   33:16
  35:9   38:17
  39:20   42:13,
  15, 17   44:17
  46:24   47:2
  48:18   51:15
  52:8, 12   53:2
  56:2, 18, 21, 25
  57:2   61:3
  62:12, 25   67:6
  72:14   73:8, 22
  75:15, 22   80:9
  81:20, 24
  84:16   86:2
  87:15, 19
  90:20   92:6
  93:18   94:15
  101:6   102:25
  107:20   108:1,
  7, 17, 18   109:5,
  15, 17, 20, 24
  110:19   111:19

**112:20   114:10**
  115:1, 5, 9
**Macon** 83:11
  84:8
**magic** 119:2
**maintain** 26:3
  119:24
**maintained**
  134:14
**maintaining**
  134:18
**major** 122:23
  123:5, 22
**majority** 25:4,
  16   28:19
  29:10   69:15
  90:17, 19   91:8
  93:15   95:24
  97:11, 12
  115:19   132:7,
  12, 21, 22
  133:6, 12, 18
  134:4, 11, 19
  135:1, 5   136:5,
  19   140:13, 23
**makeup** 27:14,
  16   42:12   95:14
**making** 36:12
**man** 59:24
  67:19   68:8
  96:17
**manner** 31:10,
  21   133:23
**map** 6:25   23:2,
  4, 21   24:10, 18
  25:3, 6, 7, 16,
  23   27:13   28:6,
  22   29:9, 21
  30:4, 5, 17, 25
  31:24   32:23
  33:3, 4, 7, 14,
  25   38:23
  39:19   40:22
  54:20   65:13
  66:24, 25   67:5,
  15, 22, 25   68:2,
  11, 13   71:1
  73:4   77:4, 11
  78:2, 6, 7
  81:18   83:19
  84:12, 15   88:9,
  11, 24   89:6, 8,

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

11, 14    90:10,
13    93:11, 15
95:24    96:3, 7,
25    108:6, 15,
17    109:13
110:2, 6
112:14    114:18
119:11
maps    23:7
24:8, 23    25:1
27:18    28:4, 11
30:19, 25
31:15, 20
32:10    38:15
40:21    57:13
66:8, 22    67:2
69:6    74:6, 9,
11, 12    80:23
81:22    91:17
97:11    100:20
101:16    108:13
109:22    110:25
111:1, 6, 8
112:4    118:16
Marengo    82:15
83:11
margins    70:21
mark    95:25
97:2
marked    12:7
52:15    55:21
104:25    116:2
119:14
marks    7:11
Maroney    1:21
7:1    142:22
materials    46:25
60:10    101:17
math    103:11
matter    7:13
112:25
McCLENDON    5:17
8:1    12:19, 23
13:3, 17    35:24
46:2, 8    47:5
48:3    51:17
58:2    61:11
74:2    80:10, 23
81:4    106:1
107:4    108:11
113:19, 25

114:8
McDonald's    79:18
mean    15:20
19:1    27:18
30:10    33:9
36:18    38:19,
24    43:5    44:18,
20, 25    45:5
50:10    51:11
54:8, 10    59:19
65:9, 13    66:5,
17    70:8, 12, 18
71:18    73:9
74:9    77:14, 17
78:25    79:12
83:24    86:18
87:1, 22    91:13,
15    95:17
98:17, 25
99:10    100:22
101:21    105:15
107:9    113:13
114:16    115:17
116:21    122:4
130:9    134:11
Meaning    87:10
139:2
means    9:9
23:11    107:2
108:14    109:6
134:13    139:11
meant    116:22
134:19    135:5
media    15:14
38:5
meet    12:20, 24
32:16    91:17
meeting    38:21
39:3, 14    46:17,
18, 20    47:1, 12
48:16, 23
50:15, 19    51:5,
6, 19, 23    52:1,
2, 9, 11    53:17,
20    56:14    58:5
63:7, 10, 17
64:2, 5    69:13
72:5, 14    73:10
77:3    78:4
79:7    80:2
87:2    88:16
89:15    91:4, 6

100:17, 19, 21
101:5, 11, 15,
24, 25    102:4
105:4    109:14
111:23    137:17
meetings    36:4
38:8    40:1
47:16, 19, 24
48:2, 19    49:1
50:6, 21    51:1,
2, 16    64:23
65:3, 15, 20
66:1, 12, 13
67:5, 7    69:18
70:6    72:3, 16
73:7    74:5, 8
75:6, 14, 21
76:15    78:9, 23
79:20, 21    80:8,
14, 17, 19
82:23    87:11
88:3, 14, 15
92:24
meets    50:11
member    20:17
21:10    22:20
31:13    39:21
48:6    56:11
58:3    88:11
94:20    96:14
103:24    104:2
121:15, 18
140:18
members    22:16,
17    24:3, 6
30:12, 18, 21
31:11, 22
32:11, 16
37:23    38:21
39:3, 4, 10, 16
41:11    51:21,
25    52:4, 7
53:10    54:22
56:17    67:1
70:7    71:4
73:23    80:12
87:9    88:12
100:21    101:12,
13, 17    107:21,
23    114:17
119:19    121:24
122:1, 7, 8

123:10, 12
124:1, 3, 5, 12,
13, 17, 18, 22,
23    135:9, 12
memory    24:4
137:14
mention    133:6
mentioned    21:1
33:18    45:19
63:7    65:25
70:5    90:21, 23
94:22
MERRILL    1:10
5:9    7:14    8:5
140:8
met    12:14
39:9, 16    40:6
49:23    57:18
91:11, 16
107:23    135:9
method    24:17
MICHAEL    3:4
8:12
michael.turrill@ho
ganlovells.com
3:9
microphone    27:9
middle    37:15,
21    61:14    82:9
MILLIGAN    1:6
3:3    7:13    8:9,
10, 13, 19, 21
9:1, 15    120:13
mind    80:4
mine    26:1
106:3
minimal    138:19
139:1
minimum    139:11
minor    16:13
minorities
118:14, 20
minority    21:10,
12    25:16
69:16    93:16
95:24    97:16,
21, 23    98:5, 9,
13, 22    102:21
115:19    119:3
134:8, 15
minute    28:12

**Evan Milligan,et al v. John H.Merrill, et al.**

**Chris Pringle**
**12/17/2021**

39:3, 23
minutes   12:21
missing   72:2
Mobile   18:15,
21   42:5   43:7,
13, 19   44:3, 7,
10   45:3   83:24
84:1   125:15, 18
moderator   73:8
Monroe   42:6
44:3, 11
Montgomery   1:23
4:14   5:14, 22
125:17
monuments   122:2
morning   8:18
136:13
motions   99:7, 25
motivation   34:12
move   27:9
68:17
municipalities
85:14

< N >
N.W   3:21
NAACP   3:13, 20
name   9:13, 16
15:22, 24
82:10   93:1, 5
121:2   142:16
names   7:19
NE   5:5
necessarily
84:20
necessary   2:9
67:21, 24
68:23   111:25
116:17   117:8
need   16:24
54:23   63:13
68:17   90:17
99:8   113:4, 10,
13   114:7   115:7
needed   22:21
54:25   57:20
68:7   76:16
130:4, 21
131:19, 20
134:19   135:1, 3
needs   99:21
neither   142:9

neutral   54:11
107:14
never   15:22
29:17, 19
103:13   112:11
121:18   129:9
New   3:15   4:6
46:11   67:13
80:23   128:19
night   79:25
125:15, 19
nine   41:20
nitty-gritty
66:7
nods   45:23
nonminorities
115:20
nonpartisan
22:15
normal   53:6
North   142:23
NORTHERN   1:2
7:16   84:1
Notary   1:21
7:2
note   116:8
notes   52:10
75:5, 7, 12, 13
101:22
notice   6:15
11:25   37:22
101:20
noticed   14:8
99:7
notification
101:25
notifying   101:23
November   38:11
115:23
Number   7:14
12:4   47:21
50:2   67:14
76:16   91:2, 24
98:6   113:20
118:3   119:2
142:16
numbering   12:2
numbers   35:4
37:6, 11, 13, 15,
19, 20   67:9, 16,
22, 24   68:4, 17,
19, 24   69:5, 7,

22, 24   70:2
76:5, 14   96:8,
18   97:4
numerous   66:23
123:1

< O >
oath   9:20
Object   128:1,
11, 12   131:4
132:23   136:23,
24
Objection   107:8
122:11   128:3
131:23   132:8
133:19   134:5
objections   2:9,
12   100:4, 7
obligation
40:13   128:21
obtain   16:11
occasionally
76:2
occur   38:14
46:20   67:7
occurred   41:20
48:17   67:5
o'clock   50:11
October   39:15
40:6, 18   50:20
51:2   100:16
105:4   109:14,
23
offered   2:14
Office   5:12
8:4   18:23
20:19, 21, 24
23:13   28:7
35:25   46:7
48:8   76:10
93:22   109:3
127:23   130:20
137:4
offices   1:22
official   88:5
121:18   137:15
Oh   127:13
okay   9:10
10:12, 16   11:4,
23   12:20, 23
13:9, 12, 23
14:3, 9, 21

15:13, 19, 23
16:2, 6, 14, 24
17:15, 23   18:1,
6, 9, 19, 22
19:3, 14, 17, 22,
25   20:10, 13
21:1, 12   22:2,
4, 7, 15, 18
23:6, 15, 25
24:13   25:14,
22   26:2, 8, 14,
25   27:12, 20
28:17   29:4, 16
30:2, 20   31:17,
22   32:2, 4
34:2, 11, 22
36:7   38:18, 23
39:12, 24
40:16   41:4, 15,
21   42:7, 11
43:3   44:5, 9,
18   46:19
47:25   48:2
49:1   50:5, 17
51:3, 13   52:25
53:15   56:23
57:6, 16   59:2,
13, 25   61:7, 9,
20   63:3   64:4,
18   68:3, 9, 23
69:25   70:5
71:20   72:3, 15
73:9, 11, 17, 23
74:14, 24
75:12   78:13,
22   80:6   82:4
86:3   87:16, 20
92:1   93:7
94:16, 22   95:5
96:5   97:5, 10
98:3, 24   99:3
100:25   101:8
102:3   103:15,
21   104:13
105:19, 22
107:5   109:4, 9
111:7   112:13,
19   113:9, 15,
17   116:11
117:7, 12
121:11   123:9
124:2   125:4

Case 2:21-cv-01530-AMM   Document 89-2   Filed 12/27/21   Page 52 of 184

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                12/17/2021

126:18   127:12,
22   128:24
129:14   130:9,
13   131:18
132:3   133:5,
12   135:15
136:2   137:18
138:2, 18, 23
139:7
old   57:19
79:15
Once   31:25
90:25   94:16
112:10
ones   19:7
20:4   63:10
74:22, 23
111:25
operating   65:12
101:6
opinion   69:21,
23   84:22
89:20   90:4, 7
92:5   93:10
114:9, 24
115:1   131:3
opinions   66:8
69:6   124:1, 19
opportunities
79:12   80:16
opportunity
97:14, 18, 20
122:22   127:2
134:21
opposed   123:5
option   111:10
oral   7:8
order   38:12
54:2   67:19
68:8   75:1
92:9   98:20
132:5, 19
OSHER   5:2   6:8
8:14   27:8
46:5   120:22,
24   121:3
122:14, 19
125:4
outcome   43:24
outside   28:6
93:22   94:5, 17

95:9
overall   97:7
overnight   125:18
overpopulated
67:11   74:23
overpopulation
68:18
oversaw   32:7
oversight   19:12
Overton   48:12
overview   37:2
overwhelmingly
45:11, 17

< P >
p.m   100:15
120:9, 12
140:2, 5   141:5,
7
P.O   4:13
PAC   15:8
PAGE   6:13
15:15   105:24,
25   113:18
116:4, 16
Pages   61:12, 19
paid   41:21
Paige   6:2
paper   39:22
89:21   92:17
parameters   54:1
part   32:24
62:22   64:24
66:2   84:24
87:22   92:24
95:19   110:25
119:19   130:6
participate
39:25   71:21
particular
62:10, 13
83:22   92:24
103:3, 17
106:21   114:12
118:21, 23
137:3   140:16
particularly
102:17
parties   1:18
2:11   122:23
123:23   142:10

partisan   62:20,
22
parts   38:2
83:15
party   21:10, 13
24:13   117:20
121:16, 19, 25
122:1, 8, 9
123:5, 6, 11, 12
124:4, 5, 12, 13,
17, 22, 24
passed   22:10
27:18   38:12
40:21   41:7, 8,
11, 17   52:4
58:22   105:17
111:2, 6, 9
126:10
passing   111:22
Paul   9:18
paying   10:17, 21
people   13:21
45:9, 10, 16
65:5, 16   66:11,
22, 23   67:1, 10,
12, 17   68:7, 11,
17, 25   69:1, 3,
4, 12, 17   70:6
71:1, 13   73:14
74:18, 25   76:2
78:13, 17, 19
81:10   84:3, 7,
8, 9   86:21
87:10   89:7, 19
90:1   92:12
97:25   117:22
122:5
people's   66:3
percent   26:15
42:16, 21, 24
57:9, 23   97:15,
21, 22   98:4, 11,
12, 21, 22
113:20, 22
114:3, 6, 12, 25
115:3, 6, 12
116:18, 19
117:5, 25   118:3
perform   111:17,
24
performed   104:1

period   69:6
72:8   79:13
permanent   87:22
Perry   82:15
83:11
person   11:20
16:25   71:23
72:10   96:15
109:5
personal   14:24
15:11, 13, 17,
23   26:1   84:13,
20   90:7
personally   83:20
PI   99:7
picked   39:22
piece   89:21
92:17
pit   31:4   33:1
Plaintiffs   1:8
3:3   4:17   5:1
7:21, 23   8:9,
11, 13, 15, 19,
21, 23   9:1, 15
10:6   120:13,
15, 20   121:3
125:8
Plaintiff's
6:14, 16, 18, 20,
22, 24   12:4, 6
52:14, 18
55:20, 23
104:24   115:23
116:1   119:10,
13
plan   24:21
25:8, 13, 25
27:2   42:9
43:6   58:24
65:6, 9, 11
69:15   77:16,
20   79:10   87:4,
5   91:10   93:21
94:5, 8, 10, 12,
16   95:4, 6
96:1, 4, 9, 18,
19, 24   97:7
107:15, 16, 19,
20   114:15
119:7, 8   120:1
126:10, 15
127:1, 5, 18, 24

Evan Milligan,et al v. John H.Merrill, et al.                Chris Pringle
                                                             12/17/2021

128:9, 20
129:17, 23
130:2, 7, 15
131:19   132:6,
20   134:19
135:11, 16, 18
136:4, 17
137:12, 16
138:8, 12, 19
140:12, 24
planning   34:24
plans   22:9
27:5, 6   31:3,
7, 9   38:12
40:8   58:22
64:11   65:22
76:5, 8   77:6
107:14   130:1,
11   133:22
play   28:6, 14
29:24   46:12
104:9
please   7:18
9:3, 16   118:19
137:21
pleasure   139:16
plus   18:8
point   25:6
30:5   32:22
33:3, 8   34:16
39:1   40:7
64:12   88:15
93:16   94:1
95:6, 7   97:10
99:16   105:14
109:22   116:24
118:6
points   69:13
77:15, 23   87:3,
6   88:17   89:1,
16, 25   92:14,
18, 21   93:9
117:14, 17
118:7, 9
132:10, 13
135:17, 24
136:2, 11, 15,
16, 22   137:5
polarization
102:4, 11, 15
103:2, 17
104:7, 10, 15

105:14, 17
106:7, 8, 12, 13,
20   109:12, 18,
21, 25   110:5,
18, 25   111:8,
18, 21   112:3,
14, 24   113:24
114:1, 5   115:4,
8, 12   116:14
Policies   123:16
political   16:13
85:12   123:21
politically
86:14
population
26:16   42:22
65:22   76:11
95:3, 12, 18
96:11   97:23
98:5, 12, 13, 22
102:8   113:21
119:21
populations   96:2
portion   18:19
82:17   102:3
possible   27:9
39:2   69:21
92:9   107:5
117:1   133:3
possibly   49:10
106:4, 9, 14, 18,
25
potentially
136:7
practicable
81:15
precincts   85:13
preclearance
112:10
precleared
58:25   59:21
112:11
predominantly
85:23
prefer   19:21
preference
123:16
preliminary
99:21
prepare   12:13
51:6, 14   74:4
100:18   106:23

prepared   67:5
93:8   118:7
PRESENT   6:1
7:18   66:24
73:6
presented   29:17
63:17   68:11
119:8   135:11
137:11, 23, 25
138:3, 7
preserve   32:25
33:9   133:24
press   80:17, 23
pretty   25:12
60:20   63:5
99:22   123:20
prevent   9:22
previous   112:5
previously
21:18   42:21
primarily   38:24
73:12   80:10
primary   26:10,
15
principle   60:8
PRINGLE   1:10,
20   5:17   7:7,
12   8:2   9:4,
13, 18   17:25
125:14   126:3
127:16   131:11
133:5   139:14
140:7   141:4
prior   2:14
22:20   26:4
40:13   52:1, 8
56:11, 13, 22,
24   58:5   81:18
95:25   100:21
109:13   111:21
priorities   33:25
prioritize   54:23
priority   33:19
prison   40:11
prisons   40:9
private   14:24
privilege   63:14
127:8   131:5
132:9
privy   114:20
Probably   35:1
136:13

Procedure   7:5
99:11   101:7
proceedings   7:9
142:5, 8
process   21:6, 9,
24   22:13, 25
26:10   28:18
29:25   30:9
33:18   34:24,
25   35:18   36:3,
25   37:3   41:19,
25   46:13   57:16
64:14   66:2
93:17   96:17
101:3   105:15
107:7, 11
produced   43:6
68:13   77:20
80:13
program   94:23
project   40:14
prompted   89:17
property   43:9,
10, 11
Proposed   6:19
37:24   51:11
52:6   55:24
56:13   57:19
61:15   63:8, 10,
16, 22   77:6
93:16, 19
100:20
protect   33:19
34:1, 9   45:6
70:15   98:9
133:2   134:22
135:4
protected   29:2
102:20   134:8
136:8
protecting   43:4
44:19   135:6
protection   96:14
provide   101:17
105:5
provided   55:5
56:7, 9
Public   1:21
7:2   19:12
20:23   32:7, 8,
17   35:5, 25
36:1   37:16, 18,

22, 24    38:1, 3,
5, 16    39:13
  41:1    64:11, 15,
16, 20, 23    65:2,
15, 19, 21, 25
  66:12    67:5, 7,
24    68:12, 16,
21, 24    70:2, 6
  71:20    72:3, 16,
25    73:7    74:4
  75:6, 14, 17, 21,
24    76:14, 19
  77:3, 7, 8, 12,
15, 19, 22    78:1,
23    79:4, 5, 6
  80:22    81:6, 19,
23    82:20, 22
  86:17, 20    87:1,
8, 11, 17    88:8,
14, 20, 25    89:4,
12    90:10, 13,
16    92:23    122:2
publicize    36:6
published    38:4
pure    69:5
purpose    16:23
  65:2, 15    102:18
pursuant    7:4
put    28:9    31:6
  41:9    47:21
  54:25    88:1, 5
  89:18    90:3
  94:2, 18    116:5
putting    54:13

< Q >
question    10:10
  11:10, 12, 13,
23    25:11
  40:19    53:23
  57:5    63:13
  66:5    70:25
  73:2, 15    80:21
  86:10    93:13
  98:16    103:23
  106:2    118:18
  119:1    124:20
  127:9    130:3
  132:3, 23
  133:8, 16
  134:2, 23

137:19, 21
138:10
questions    2:10,
11    9:23    11:9,
21    72:24
  73:13, 18, 20,
24    74:2    80:4
  117:22    120:14,
15, 21, 25
  125:9    126:2
  139:15    140:10
  141:2
quick    121:1
quicker    43:18,
20
quickly    33:17
  41:25    49:10
  92:11
quit    17:7
quite    86:3
  117:21
quote    80:24
quoting    133:1

< R >
race    27:25
  54:11, 12
  107:10, 14, 16
  108:5    110:3
  123:17
race-neutral
  31:10, 20
  108:15    133:23
  134:16, 18
races    75:25
  131:15
racial    26:11
  27:13, 16
  42:11    85:17
  95:14    102:4, 8,
10, 14    103:1,
16    104:7, 10,
15    105:13, 17
  106:5, 6, 7, 10,
12, 14, 18, 19
  107:1, 6
  109:11, 18, 21,
25    110:4, 17,
25    111:8, 18,
21    112:3, 13,
23    113:24
  114:1, 5    115:4,

8, 12    116:14
  128:22    129:2,
10, 12
racially    119:18
  127:6, 19, 24
  128:9
ran    45:11
Randy    23:24
  38:20
range    119:5
ranking    20:16
  21:10
rapid    117:17
  118:12
rapidly    116:25
reach    131:3
reached    139:7
reaches    95:2
read    31:1
  51:11    60:4
  61:18    69:14
  74:8    77:24
  87:4    88:17
  92:19    101:14
  106:15    126:21
  132:14    137:21,
22    139:13
reading    2:2
  41:9    87:3
  92:17    118:5
  137:5
readings    139:12
reads    89:16
ready    38:13
  99:24
real    17:7, 20
really    11:19
  33:17    34:11
  41:25    69:25
  77:18    83:12
  99:9, 14, 15
  116:23    118:18
  119:1
realtor    16:16
  17:15    18:5
Reapportionment
  6:17    19:10
  20:5    21:2
  23:13    28:7
  30:8, 10, 24
  31:13, 23    32:6
  35:20, 25    36:8,

13    39:14    40:5,
18, 23    45:21
  46:7    47:13
  48:7, 8, 15, 22,
24    49:2, 22, 23
  50:6, 7, 13, 19,
22, 25    52:18
  53:10, 15
  55:14    56:17
  58:3    76:6, 10
  80:7    83:18
  85:5    93:22
  100:17, 23
  102:2    103:25
  104:3    105:3
  109:2    128:25
  129:1, 16
  132:19    139:4
  140:19
reason    21:22
  28:5    58:20
  59:8, 25    60:15
  62:5    65:19
  96:16    105:8
  108:23    116:7
reasonable
  44:23, 24
reasons    54:18
  59:13
recall    27:22
  36:7    47:17, 18
  49:24    51:7, 21
  54:24    55:2
  57:15, 25    58:6
  63:20    64:6, 7
  66:3    75:18
  76:23    77:11
  78:7, 8    82:19
  86:24    89:2
  90:11, 15, 16,
22    104:17, 20
  133:14
receive    14:19
  37:5
received    135:22
  137:3
receiving    70:10
Recess    49:14
  100:13    120:10
  140:3
recognize    55:25

Case 2:21-cv-01530-AMM   Document 89-2   Filed 12/27/21   Page 55 of 184

Evan Milligan,et al v. John H.Merrill, et al.                          Chris Pringle
                                                                      12/17/2021

recollection
 14:3    26:18
 28:20    29:1, 7
 47:6    132:16
 138:1
record    9:17
 27:11    49:13,
 16    64:11
 77:24    87:4, 23
 88:1, 5    89:18
 90:4    95:17
 100:9, 12, 15
 116:6, 8    120:7,
 9, 12, 23
 137:22    140:1, 5
recordings    50:23
records    50:23
Rector    3:14
redistricting
 11:3, 5    16:3
 21:6, 9, 16, 24
 22:8, 12, 24, 25
 26:9    29:25
 30:9    33:18
 34:23, 25
 35:21    36:16
 37:3    40:16, 17
 41:2    42:22
 45:20, 21
 46:10    47:14
 52:19    54:5
 64:14    66:2
 96:12    107:7,
 11    112:5
 129:17    131:13
 132:6
redrawing    24:8
Reed    25:8, 13,
 22, 24    42:9
 119:20    120:1
reelect    45:17
reelected    35:12,
 16    121:9
re-elected    18:25
reelection
 45:11, 14
 134:22    135:13
refer    19:16
 25:12    27:5
 102:5, 10
 126:12
referred    25:24

referring    27:5
 69:9    106:6
 108:9    117:8
 118:1    126:10
reflect    55:15
reform    124:6, 9,
 14
refrain    100:4, 6
refresher    11:9
regarding    40:16
regardless    69:7
region    82:9
register    79:19
regular    50:5, 8
related    78:6
 79:1
relating    2:5
relationship
 115:2
relay    77:2, 9
released    79:5
releases    80:17
rely    58:12, 21
remained    45:13
remedy    128:22
 129:2, 9
remember    14:7
 20:4, 9    26:5,
 17    32:3    35:7
 36:10    37:10
 42:11    46:1, 6,
 24    48:3, 16
 49:4, 5, 25
 50:2    52:3, 6
 53:18    55:4
 58:24    59:9
 60:5, 6    64:3
 72:2    73:3, 5,
 25    74:3    76:1
 77:10, 21    78:4
 82:25    87:8, 14
 88:22, 23
 90:24    91:2, 5
 94:9, 12    97:12,
 13    98:1
 100:18, 25
 101:2    112:7, 9
 114:23    116:23
 117:17
remembered
 59:11    87:23

remodeling    17:12
remotely    72:9
removing    122:2
repeat    18:16
 118:19
repetition    99:19
Reporter    7:1
 9:2, 7    11:15
 16:20    97:22
 100:6    137:21
 142:15
Reporting    142:14
represent    7:19
 9:15    19:23
 24:7    42:2
 45:10, 16
 50:24    80:25
 140:8
representation
 70:9    80:15
 86:23    87:18
 88:21    89:5, 13
 90:2, 7    92:13
Representative
 8:1    9:13
 18:14, 17
 25:25    37:25
 42:1, 12, 20
 43:4    44:5
 45:6, 13    46:2
 70:18, 20, 24
 71:9, 14, 19
 113:19, 23
 116:13    121:2,
 6    122:20
 125:5, 14
 126:3    127:15
 131:11    133:5
 139:14    140:7
Representatives
 18:2    20:23
 41:12    70:11,
 13    71:6
represented
 10:1    93:1, 6
representing
 7:21, 23, 25
 8:4, 15
represents    10:5,
 13
republican
 121:16, 17, 19,

 21    122:1, 9
 123:12    124:5,
 13, 24
republicans
 21:12    123:2
request    38:2
 50:22    104:5
 110:12
requested    14:5
 110:10
requesting    38:1
required    36:15,
 21    134:3
requirement
 131:8    132:11
 134:17
requires    115:12
 134:6
reservations
 85:14
residence    44:16
resolve    49:10
respect    30:24
 31:3    39:19
 88:15
respecting    54:14
respective    1:18
respond    99:24
response    43:17
 91:7
responsibilities
 32:5, 20
responsibility
 98:18
rest    70:19, 21
result    11:5
 22:7    142:11
retained    24:12
reusing    60:15
review    13:9, 12
 19:13    20:8
 52:1    56:14
 100:21
reviewed    52:23
 53:13    56:21
reviewing    46:9
revised    51:18
revising    47:13
 58:4
revisions    56:23
rewritten    61:22
 62:7

Evan Milligan,et al v. John H.Merrill, et al.                    Chris Pringle
                                                                   12/17/2021

rich    82:10
86:5
right    9:20
14:17    18:3, 6
20:9, 16    27:3
28:3    32:3, 21
33:24    34:4, 20
39:2, 8    48:24
49:19    50:12
53:22    58:16
59:22    66:20
68:15    70:24
71:2, 7    72:13
76:3, 15    78:2,
15    80:11
83:15, 23
84:11, 14, 17
85:6    86:1
87:25    96:21,
23    99:15, 17
101:5    103:12
105:20    108:16
111:2    115:24
126:11    131:14
133:10, 13, 16
139:9
Rights    54:3, 7
59:16, 19, 20
98:7    99:2
102:20    132:5,
20    133:10, 17
134:3, 6    136:4,
18    137:13
River    43:8, 12
83:25    84:2
rivers    84:10
Road    4:20
11:9    43:10, 11
54:20
Rock    41:5, 22
role    18:12
21:8    22:12, 15,
19    29:24
30:23    48:13
52:21, 25
56:19    62:10
72:15    104:9
room    11:18
39:21, 23    90:3
120:6

ROSBOROUGH    4:2
8:18, 19    49:6
100:3
ROSS    3:18    8:10
roughly    121:11
RP    102:6
RPV    102:5, 7
rule    28:5, 14
36:22    60:6
76:8    93:21
rules    2:5    7:5
11:8    99:11
ruling    62:8
rulings    36:19,
20    46:11    54:4,
8    55:13
run    20:20
83:25    99:1
123:25
rural    84:24

< S >
SADASIVAN    3:11
8:8, 9    47:7,
10    49:9, 19
safe    48:11
sales    17:9
satisfied    89:12
saw    56:1, 3, 12
59:10    76:7
138:24
saying    63:15
69:8    71:13, 14,
16    84:11
100:2    123:22
124:10    133:15
says    11:17
106:1    113:25
scenes    38:13
schedule    35:3,
5    37:16    50:5,
8    79:4
school    72:20
85:15    117:2
Schoolhouse
41:5, 22
science    16:13
scratch    58:13
screen    127:13
seat    34:9
43:4    45:7

second    19:1
41:9    98:3
105:12    135:15
secondhand
114:21
seconds    139:25
Secretary    8:4
38:10    140:8
Section    58:23
59:1, 16, 18, 19,
20, 21    61:17
62:6, 18    98:7,
15    99:1
102:19    103:10
112:9    136:7
see    8:16, 17
16:21    21:22
31:7    34:15
56:15, 16
61:12, 13    65:7,
23    66:22
67:18    74:22
89:8    95:23
96:1, 4    97:6
109:2    113:4,
10, 13    125:20
127:12    139:17
seeing    94:9, 12
97:12, 13
104:17, 20
seek    22:18
130:19
seeking    134:22
135:13
seen    12:9
29:19    76:4, 5
95:21    112:16,
17, 18    115:19
sell    82:2
senate    21:11
32:10    41:14
72:20
Senator    8:1
12:19, 23
13:17    33:19
35:24    44:15
46:7    47:5
48:3    51:17
58:2    61:10
74:2    80:10, 23
81:4    106:1

107:3    113:18,
25    114:7
send    45:3
sense    42:14
46:22    47:19
89:19    123:4
sensitive    99:22
sent    37:22, 25
41:14    43:15
51:25    52:7
69:10    92:19
93:3    100:20
101:1, 19, 23
102:1    110:7
sentences    11:21
sentiment    88:20
89:4    92:12
separate    66:18
September    127:18
sequentially
12:2
series    37:22
serve    19:11
21:19    35:17
served    18:24
20:5, 6, 7, 8,
23    25:6    26:1
33:3    50:8
121:7, 8
serves    137:14
service    122:21
serving    20:22
21:23    121:23
123:9    124:21
session    22:3, 4
28:13    40:9, 10
41:2    93:18, 20
94:6    110:9
117:18
set    32:7    80:7
93:9    106:3
setup    65:17
seven    19:1
113:15    117:3
129:5
Sewell    114:15
119:7
shape    119:22
share    45:3
69:18
shattering    81:15

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

she'll   11:17
shift   76:13
shifted   65:23
shifts   74:7
ship   43:7, 12,
13   44:21
short   120:3
Shortly   14:8
show   65:21
91:10   109:10
side   43:11
48:11   83:4, 12
99:24
signature   2:2
signed   40:21
41:17   114:18
significant
124:25
similar   60:5
similarities
59:10
single   67:8
77:22   84:13, 21
single-member
54:14
SINGLETON   4:17
8:23   120:15
125:8   126:11
127:17   128:7
sir   121:22
126:13, 17, 20,
23   130:25
133:11   134:1
139:6
sitting   46:1, 6
situation   43:25
six   38:1, 3
80:14, 16
skilled   117:19
smile   126:8
social   15:13
85:18
software   24:22
soil   86:2, 6
soils   82:11
somebody   22:21
23:12, 15
24:15   69:10
77:23   78:3
87:2   88:16
89:15   90:3, 5

91:10   93:3
102:2   110:22
Sonny   21:17
29:1   33:21
soon   38:7, 8
67:9   139:17
sorry   13:1
17:13   18:16
20:13   22:12
27:8   34:18
37:8   41:23
49:6   53:23
59:19   73:19
75:4   89:23
94:11   98:3, 12
101:21   105:25
111:4   128:14
137:8   138:5
sort   41:4
sorts   66:16
sought   20:20
sounds   16:25
source   95:10
Southern   17:8,
14, 21   18:3
spaces   122:3
speak   29:23
58:4   93:5, 11
speaking   66:14
100:4, 6
speaks   11:20
special   22:3, 4
28:12   40:9, 10
41:1   93:20
94:6   110:8
specialist   16:19
specialize   17:9
specialties
16:15
specific   23:3
27:7   51:22
77:2   79:7
87:5   123:7
specifically
60:6   73:24
74:2   82:25
90:22   108:10
127:21
specifics   40:4
55:2, 4, 6, 11,
16   75:19

76:23   77:9, 12
86:24
spectrum   123:20
speculation   43:2
spelled   54:15
spend   82:14
spent   82:5
split   44:13
92:8   97:9
splits   91:24
92:7   94:4
95:13   97:8
spoken   80:3
126:7
spring   37:17
staff   48:7, 15
100:23   102:2
standard   101:6
standing   87:2
stands   89:16
Stars   3:7
start   12:3
33:11, 12
34:24   61:13
138:5
started   33:6
35:8   36:8
38:15
starting   25:6
30:5   32:22
33:3, 8   58:13
State   1:22
7:3, 19   8:4
9:16   10:20
14:15, 20, 25
18:14, 17, 19
19:8   23:8, 14
32:9, 10   34:19
38:2, 6, 10
39:6, 11   41:8
42:4   50:10
57:11   72:11,
18, 20   75:25
82:9, 17   83:4,
15   84:5, 15, 25
86:22   93:1, 5
96:15   109:19
122:23   125:2
127:22   128:8
142:1
statement   81:3,
5, 12   115:10,

15   116:22
137:11   138:4,
8, 12
statements   90:4
STATES   1:1
7:15   58:25
stay   40:14
67:2   74:18
125:17
Ste   3:7, 21
5:5, 21
step   22:22
35:10, 11
stepped   35:15
steps   41:20
45:20
stint   19:14, 16
21:5
stipulate   116:9
STIPULATED   1:17
2:1, 8
stipulation   7:6
stipulations   9:7
stood   77:23
stopped   47:7
story   34:21
straight   40:10
Street   1:23
3:14, 21   4:5
5:5, 21   142:23
stretches   83:3
strike   138:5
striked   61:14
subdivisions
85:13
submit   28:8
73:15
submitted   76:6,
9   94:5, 13, 16
subsection   61:21
substance   109:8
suggest   57:22
63:2, 19   111:7
suggested   111:20
suggestion   91:7
suggests   77:17
suit   126:19
Suite   142:23
summer   37:17
supermajority
123:20

Evan Milligan, et al v. John H. Merrill, et al.

Chris Pringle
12/17/2021

superminority
 20:14
support   119:8, 9
supported   42:25
suppose   109:6
 122:4
supposed   37:5,
 9, 10
supposing   61:24
sure   10:9
 24:5   25:12
 27:6   35:21
 36:12   39:4
 41:18   45:13,
 15   58:1   64:6
 75:3, 18   77:14
 86:13   96:20
 101:13, 14
 103:19   104:2
 107:9   117:14
 118:5   120:14
 122:12, 16, 19
 123:7   139:18
surprise   81:10
surprises   80:24
 81:7
swear   9:3
sworn   9:5
system   40:11
 83:25   84:2

< T >
table   46:1, 6
take   32:17
 49:8   52:10
 61:10   65:4
 75:5, 10, 13
 86:16   99:12,
 17   100:8
 107:10   120:2
taken   1:21
 49:14   100:13
 108:5   110:1
 120:10   140:3
 142:5, 8
takes   111:17
talk   47:13
 51:17, 18
 62:15, 16   63:2
 64:4   67:17
 75:16, 20
 76:18   78:4

 100:9, 16
 101:10   135:15
talked   51:20
 52:2   64:7
 72:18   76:2, 21,
 24   87:5
 112:21   135:9
talking   26:9
 27:1   36:4
 39:6   49:21
 64:1   66:6
 69:11, 13
 74:16, 19   77:7,
 15, 23   82:17
 87:3, 6   88:17
 89:1, 16, 25
 92:11, 14, 18,
 20, 21, 22   93:9
 106:25   112:25
 116:24   117:14,
 16   118:5, 7, 9,
 25   132:10, 13
 135:17, 24
 136:2, 11, 15,
 16, 21   137:5
Tallapoosa   1:23
 5:21
tasked   83:18
team   39:21
telephone   109:3
 127:13
tell   15:1
 29:18   35:14
 67:10   75:23
 89:17   99:15
 117:5   118:14,
 20   126:24
 127:4   128:18
telling   36:19
 88:23
ten   28:8, 11
 47:25   93:23
 94:7, 14, 15
tend   78:25
ten-day   28:5
 60:6   76:8
 95:25   97:1
term   19:2, 19
 82:1, 24   85:25
 86:3   102:7
 112:12

terms   18:25
 19:15   89:5
 121:9
test   45:1
 46:12   61:25
 62:2
testified   9:5
 129:4
testify   14:18
 128:25
testifying   9:20
testimony
 129:15   134:1
text   109:6
texts   109:10
Thank   34:22
 49:19   51:3
 121:2, 14
 125:5, 6, 12, 16
 138:2   139:14
 141:3
thereto   2:14
thing   40:17
 68:10   69:14
things   17:6
 31:5   36:11
 79:1   132:12
think   29:20
 32:21   37:11,
 23   40:6   43:20
 46:12, 13   49:9
 60:2, 22   62:5
 63:12   66:2, 11
 69:20   71:16
 78:22   79:2
 81:9   82:13
 101:4   111:5
 114:7, 11
 115:15   116:18,
 23   119:2, 19
 123:18   124:7,
 18   127:9
 130:7   132:1
 137:17   139:19,
 21
thinking   36:8
 86:21   122:5
third   61:14
thought   48:21
 54:2   57:20
 59:23   80:15

 100:3   116:17
 117:7
three   60:16
 99:7
three-week   79:13
tight   111:11
timberland   17:9
 82:2
Timberlands
 17:8, 14, 21
 18:3
time   2:12, 13
 7:17   10:24
 11:20   19:23
 20:15   25:15
 34:3   39:19
 42:5   44:12
 45:11   46:22
 49:13, 16
 51:19   59:5
 68:14   72:8
 73:14   74:14
 79:8, 17   80:5
 81:9   82:5, 14
 86:4   99:5
 100:12, 15
 101:9   105:23
 110:4   111:14
 112:10   113:1
 117:1, 3, 13
 120:9, 12
 121:2, 16
 125:5   132:17
 137:16   140:2,
 5   141:4
timeline   37:3
 40:3   105:21
 111:17
times   49:22
 79:22   80:7
 91:2
title   18:4
today   9:24
 10:1, 18   12:13
 13:10   14:13
 34:17   71:2
today's   34:23
told   13:21, 23
 14:4   31:19
 33:11   80:23
 108:12   113:25

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

114:*21, 22*
119:6
**total**   121:*12*
**totally**   84:*4*
**tradition**   26:*6*
60:*12*   64:*25*
**transcribed**
142:*5, 8*
**Transcript**   6:*21,
23*   105:*3*
115:*22*   142:*7*
**transcription**
142:*6*
**transcripts**
116:*10*
**travel**   14:*15, 20*
**trial**   2:*13*
14:*18*
**tribal**   85:*14, 18*
**trick**   111:*4*
**tried**   92:*8*
**true**   81:*12*
83:*14*   89:*19*
142:*7*
**truthfully**   9:*24*
**try**   70:*15*
102:*10*   119:*24*
**trying**   21:*19,
21*   34:*15*   35:*2*
37:*16*   39:*3*
40:*2*   64:*15*
76:*25*   96:*21*
111:*4*   116:*25*
131:*7*
**turn**   105:*24*
113:*18*
**turned**   43:*7*
75:*7*   89:*9*
93:*23, 25*   94:*1,
18*
**TURRILL**   3:*4*
8:*12*
**twice**   91:*1*
**Twitter**   15:*16,
20*
**two**   12:*21*
18:*24*   19:*15*
28:*19*   29:*9*
69:*15*   90:*17,
19*   91:*8*   93:*15*
95:*24*   97:*11,*

12, 13*   121:*9*
123:*22*   127:*2*
**two-hour**   99:*6*
**type**   11:*17*
35:*2*
**typing**   11:*16*

< U >
**Uh-huh**   61:*16*
95:*8*
**ultimately**   24:*9*
98:*17*
**unconstitutional**
127:*19*   135:*19*
**underpopulated**
67:*12*   68:*6*
74:*23*
**underpopulation**
68:*19*
**underpopulations**
74:*17*
**understand**   9:*11,
19*   11:*10*
40:*19*   63:*5*
69:*7*   86:*12*
100:*1*   105:*7*
113:*1*   118:*18*
121:*20*   135:*1*
138:*10*
**understanding**
9:*23*   54:*6*
55:*12*   62:*1*
70:*1*   82:*7*
97:*17*   102:*14,
16*   106:*11, 17*
107:*1, 16*
110:*7*   114:*14*
118:*13*   122:*12,
17*   129:*14*
134:*17*
**understands**
103:*10*
**understood**
11:*12*   135:*3*
**unintentionally**
102:*19*   134:*7*
**Union**   4:*4, 12*
**UNITED**   1:*1*
7:*15*   58:*25*
**University**   16:*8*
**unnecessary**
114:*2, 4*

**update**   36:*15,
18, 20, 22*   46:*4,
10*   55:*3*   57:*20*
**updated**   36:*12*
55:*15*
**updates**   54:*24*
57:*6*
**updating**   35:*18*
36:*8, 24*   45:*20*
**URIAH**   4:*18*
**use**   15:*17, 21*
25:*20, 21*   33:*7*
60:*9, 12*   102:*13*
**Usual**   9:*7*
14:*14*
**usually**   101:*7, 9*

< V >
**various**   38:*1*
122:*25*
**varying**   124:*1*
**version**   63:*18,
21*
**versus**   7:*13*
**VIDEO**   1:*9*
**Videographer**
6:*2*   7:*11*   8:*6*
9:*2*   49:*12, 15*
100:*11, 14*
120:*8, 11*
140:*1, 4*   141:*3*
**view**   69:*18*
77:*18*   121:*24*
122:*22*   123:*24*
124:*16, 25*
**views**   66:*15, 16*
121:*24*   122:*7,
22*   123:*5, 10*
124:*3, 11, 22*
**violate**   136:*4,
7, 18*
**violated**   102:*19*
137:*12*
**Virtually**   23:*5*
69:*10*   72:*5, 13*
78:*3*
**volition**   92:*16*
**vote**   28:*21, 22*
29:*18*   59:*24*
67:*20*   68:*8*
96:*14, 16, 17*
102:*23*

**voted**   29:*3, 10*
31:*16, 17*   51:*9*
53:*21*   84:*17*
**Voter**   89:*25*
**voters**   42:*23*
66:*24*   69:*10*
77:*21*   78:*2, 7*
80:*25*   81:*8*
87:*4*   88:*17*
89:*1, 8, 14*
98:*1*   126:*13,
14, 16*   135:*16*
136:*4, 17*
137:*12, 15*
138:*4*
**Voting**   54:*3, 7*
59:*16, 19, 20*
85:*13*   95:*18*
98:*7, 12*   99:*2*
102:*19*   113:*21*
132:*5, 20*
133:*10, 17*
134:*3, 6*   136:*4,
18*   137:*12*
**VS**   1:*9*

< W >
**wait**   70:*1*
139:*24*
**waived**   2:*3*
**walked**   39:*20,
22*   86:*21*
**WALKER**   5:*18*
7:*24*   8:*17*
9:*9*   10:*4, 9,
17, 21*   12:*1, 16*
13:*6*   46:*2, 8,
15*   47:*4*   48:*4*
50:*20, 24*
52:*23*   53:*4*
55:*8*   56:*8*
58:*2*   61:*6*
62:*16, 17*   63:*8,
11, 12*   73:*6, 12,
20*   82:*21*
105:*7*   107:*8*
108:*2*   110:*11*
114:*1*   116:*5,
11*   117:*10*
118:*2, 8, 10*
120:*5, 18*
122:*11, 16*

Evan Milligan,et al v. John H.Merrill, et al.

Chris Pringle
12/17/2021

125:6, 11, 25
126:19, 24
127:7   128:2,
12, 14   129:15
130:14   131:2,
4, 21, 23   132:4,
8, 23   133:19
134:5   136:1,
24   137:1, 24
139:10, 19, 24
want   35:14
58:20   70:13
71:15   72:1
96:7, 20   120:3
125:17   139:22
wanted   21:18
30:22   31:6, 11
32:13   34:8
41:18   45:6, 9,
12, 15   51:4
57:7   66:17, 22
67:2, 18   69:14
70:7   104:3
135:10, 11
wanting   89:19
Washington   3:22
5:6, 13   21:18
42:5   44:2, 11
watched   79:14
80:1
way   14:18
31:22   41:5
43:15   63:12
64:11, 20
66:12   67:2
83:21   84:2
86:23   117:21
127:9, 15
131:2, 6, 12
134:7, 16
137:10
ways   45:5
Wednesday   50:11
week   40:12, 15
weekdays   78:10,
14, 19
weight   89:3, 18,
24
WELBORN   4:9
6:7   7:20   9:8,
11, 12, 14
10:12   12:3

13:1, 4, 8
47:9   50:18
51:3   82:22
99:10, 13
100:1, 8   105:5,
11   108:3
116:9   120:2, 7,
13, 19
Well   13:8
16:24   17:3
20:16   25:23
28:21   30:15
36:17   38:20
40:20   41:21
44:20, 25   45:8
49:1   60:4
64:1   65:21
66:6   69:3, 4,
17, 23   70:17
71:1   76:13
77:7, 20   79:4,
11, 23   81:13
84:17   85:5, 17
86:19   92:8
96:6   98:17
99:10   103:24
105:21   113:7
118:24   125:12
129:25   130:3
132:10   135:8
139:10
went   40:10
41:1, 16   43:10
51:12   57:4, 18
69:1   74:8, 21
we're   26:9
27:1, 4   54:21
99:4   118:25
140:1, 4
We've   99:7, 23
138:16
wide   123:20
Wilcox   42:8, 9
82:15   83:10
84:7, 9
willing   94:20
win   45:14
Wiregrass   84:4
witness   2:3
7:7   9:3
27:10   45:23

46:19   49:17
99:19   136:25
Women   66:24
69:10   77:21
78:2, 7   87:3
88:17   89:1, 8,
14, 25   98:1
126:12, 14, 15
135:16   136:3,
17   137:12, 15
138:4
won   45:11
woods   16:22
words   102:12
138:24
work   17:12
23:20   30:12
31:11   32:12
37:16   38:12
64:15   78:18,
19, 25   79:1, 2,
18   81:17   82:2
83:10   99:8
worked   18:7
21:18   30:18
32:11   34:3, 4
39:2, 10   114:17
working   35:2, 4,
5   39:11   46:3
78:10, 13, 14
works   19:20
30:17
wrap   137:9
write   48:20
writing   137:11,
25   138:4, 8, 11
written   89:21
104:14
wrote   135:24

< Y >
y'all   14:8
Yay   120:18, 19
Yeah   9:9
37:12   60:21
69:19   122:16
125:22   129:7
year   46:23
50:1   66:13
years   18:8
19:1, 4   45:18
121:11, 12, 13,

23   122:6, 20
123:9   124:2
130:7   138:15
year's   30:8
yesterday   12:14
yield   45:25
York   3:15   4:6

< Z >
zero   44:13
67:14   74:21
75:1   76:14
77:1   92:9
129:17, 21, 24
130:1, 4, 8, 10,
12, 16, 21
131:8, 15, 20
133:4   138:9,
13, 16, 21
139:2, 5, 11
Zoom   3:18
4:17   5:1   8:7
11:18



PLAINTIFF'S EXHIBIT

1

C. Pringle

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

|  |  |
|---|---|
| EVAN MILLIGAN, et al., | |
| *Plaintiffs*, | |
| v. | Civil Case No. 2:21-CV-01530-AMM |
| JOHN H. MERRILL, et al., | **PLAINTIFFS' NOTICE OF DEPOSITION** |
| *Defendants*. | **FOR DEFENDANT CHRIS PRINGLE** |

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure, Counsel for Plaintiffs Evan Milligan, Khadidah Stone, Letetia Jackson, Shalela Dowdy, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP, (collectively, "Plaintiffs") will take the deposition of Defendant Chris Pringle, in his official capacity as the Co-Chair of the Alabama Permanent Legislative Committee on Reapportionment. The deposition will commence on December 17, 2021, at 9:00 am CDT, at the law offices of Balch & Bingham, 105 Tallapoosa Street, Montgomery, AL 36104 (or at such other time and place as the parties may mutually agree upon), pursuant to the Court's December 14, 2021, Order on Motion for Protective Order (ECF No. 59) and Order on Discovery Disputes (ECF No. 64). The deposition will be recorded stenographically by a certified court reporter and by video by a certified videographer. The deposition will take place in-person and by videoconference, or according to a schedule mutually agreed upon by the parties, until completed.

1

DATED this 14th day of December 2021.

Respectfully submitted,

/s/ *Sidney Jackson*
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen
WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB
301 19th Street North
Birmingham, AL 35203
(205) 549-4565
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-5178-E48T)
Brittany Carter*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org

Jessica L. Ellsworth*
Shelita M. Stewart*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue

/s/ *Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Davin M. Rosborough*
Julie A. Ebenstein*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org

LaTisha Gotell Faulks (ASB-1279-I63J)
Kaitlin Welborn*
AMERICAN CIVIL LIBERTIES UNION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org
kwelborn@aclualabama.org

Michael Turrill*
Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com

2

New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

harmony.gbe@hoganlovells.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

Anthony Ashton*
Anna-Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
aashton@naacpnet.org
abarnes@naacpnet.org
*Attorneys for Plaintiff Alabama*
*State Conference of the NAACP*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 14, 2021, a true and correct copy of the

foregoing was served on all counsel of record by electronic mail.

/s/ Kathryn Sadasivan
Kathryn Sadasivan
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, FL 5
New York, NY 10006
(332) 600-9546
ksadasivan@naacpldf.org



PLAINTIFF'S
EXHIBIT
2
C. Pringle

1   **REAPPORTIONMENT COMMITTEE REDISTRICTING GUIDELINES**

2   <center>May 5, 2021</center>

3   **I. POPULATION**

4   The total Alabama state population, and the population of defined subunits
5   thereof, as reported by the 2020 Census, shall be the permissible data base used
6   for the development, evaluation, and analysis of proposed redistricting plans. It is
7   the intention of this provision to exclude from use any census data, for the purpose
8   of determining compliance with the one person, one vote requirement, other than
9   that provided by the United States Census Bureau.

10   **II. CRITERIA FOR REDISTRICTING**

11   a.    Districts shall comply with the United States Constitution, including the
12   requirement that they equalize total population.

13   b.    Congressional districts shall have minimal population deviation.

14   c.    Legislative and state board of education districts shall be drawn to achieve
15   substantial equality of population among the districts and shall not exceed an
16   overall population deviation range of ±5%.

17   d.    A redistricting plan considered by the Reapportionment Committee shall
18   comply with the one person, one vote principle of the Equal Protection Clause of
19   the 14th Amendment of the United States Constitution.

20   e.    The Reapportionment Committee shall not approve a redistricting plan that
21   does not comply with these population requirements.

22   f.    Districts shall be drawn in compliance with the Voting Rights Act of 1965, as
23   amended. A redistricting plan shall have neither the purpose nor the effect of
24   diluting minority voting strength, and shall comply with Section 2 of the Voting
25   Rights Act and the United States Constitution.

26   g.    No district will be drawn in a manner that subordinates race-neutral
27   districting criteria to considerations of race, color, or membership in a language-
28   minority group, except that race, color, or membership in a language-minority
29   group may predominate over race-neutral districting criteria to comply with
30   Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in
31   support of such a race-based choice. A strong basis in evidence exists when there
32   is good reason to believe that race must be used in order to satisfy the Voting Rights
33   Act.

RC 044593

h.   Districts will be composed of contiguous and reasonably compact geography.

i.   The following requirements of the Alabama Constitution shall be complied with:

(i)   Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

(ii)   Districts shall be drawn on the basis of total population, except that voting age population may be considered, as necessary to comply with Section 2 of the Voting Rights Act or other federal or state law.

(iii)   The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35.

(iv)   The number of Alabama Senate districts shall be not less than one-fourth or more than one-third of the number of House districts.

(v)   The number of Alabama House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106.

(vi)   The number of Alabama House districts shall not be less than 67.

(vii)   All districts will be single-member districts.

(viii)   Every part of every district shall be contiguous with every other part of the district.

j.   The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama:

(i)   Contests between incumbents will be avoided whenever possible.

(ii)   Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not.

(iii)   Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting

2

10213405.2

RC 044594

1  precincts, municipalities, tribal lands and reservations, or school districts. The
2  discernment, weighing, and balancing of the varied factors that contribute to
3  communities of interest is an intensely political process best carried out by elected
4  representatives of the people.

5  (iv)    The Legislature shall try to minimize the number of counties in each district.

6  (v)    The Legislature shall try to preserve the cores of existing districts.

7  (vi)    In establishing legislative districts, the Reapportionment Committee shall
8  give due consideration to all the criteria herein. However, priority is to be given to
9  the compelling State interests requiring equality of population among districts and
10  compliance with the Voting Rights Act of 1965, as amended, should the
11  requirements of those criteria conflict with any other criteria.

12  g.    The criteria identified in paragraphs j(i)-(vi) are not listed in order of
13  precedence, and in each instance where they conflict, the Legislature shall at its
14  discretion determine which takes priority.

15  **III. PLANS PRODUCED BY LEGISLATORS**

16  1.    The confidentiality of any Legislator developing plans or portions thereof
17  will be respected. The Reapportionment Office staff will not release any
18  information on any Legislator's work without written permission of the Legislator
19  developing the plan, subject to paragraph two below.

20  2.    A proposed redistricting plan will become public information upon its
21  introduction as a bill in the legislative process, or upon presentation for
22  consideration by the Reapportionment Committee.

23  3.    Access to the Legislative Reapportionment Office Computer System, census
24  population data, and redistricting work maps will be available to all members of
25  the Legislature upon request. Reapportionment Office staff will provide technical
26  assistance to all Legislators who wish to develop proposals.

27  4.    In accordance with Rule 23 of the Joint Rules of the Alabama Legislature
28  "[a]ll amendments or revisions to redistricting plans, following introduction as a
29  bill, shall be drafted by the Reapportionment Office." Amendments or revisions
30  must be part of a whole plan. Partial plans are not allowed.

31  5.    In accordance with Rule 24 of the Joint Rules of the Alabama Legislature,
32  "[d]rafts of all redistricting plans which are for introduction at any session of the
33  Legislature, and which are not prepared by the Reapportionment Office, shall be
34  presented to the Reapportionment Office for review of proper form and for entry
35  into the Legislative Data System at least ten (10) days prior to introduction."

3

RC 044595

## IV. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS

1. All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public.

2. Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public.

3. Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public.

4. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established.

5. Notice of all Reapportionment Committee meetings will be posted on monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office.

## V. PUBLIC ACCESS

1. The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment.

2. A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee.

10213405.2

4

RC 044596

1  3.     Any proposed redistricting plan drafted into legislation must be offered by a
2  member of the Legislature for introduction into the legislative process.

3  4.     A redistricting plan developed outside the Legislature or a redistricting plan
4  developed without Reapportionment Office assistance which is to be presented for
5  consideration by the Reapportionment Committee must:

6  a.     Be clearly depicted on maps which follow 2020 Census geographic
7  boundaries;

8  b.     Be accompanied by a statistical sheet listing total population for each district
9  and listing the census geography making up each proposed district;

10  c.     Stand as a complete statewide plan for redistricting.

11  d.     Comply with the guidelines adopted by the Reapportionment Committee.

12  5.     Electronic Submissions

13  a.     Electronic submissions of redistricting plans will be accepted by the
14  Reapportionment Committee.

15  b.     Plans submitted electronically must also be accompanied by the paper
16  materials referenced in this section.

17  c.     See the Appendix for the technical documentation for the electronic
18  submission of redistricting plans.

19  6.     Census Data and Redistricting Materials

20  a.     Census population data and census maps will be made available through the
21  Reapportionment Office at a cost determined by the Permanent Legislative
22  Committee on Reapportionment.

23  b.     Summary population data at the precinct level and a statewide work maps
24  will be made available to the public through the Reapportionment Office at a cost
25  determined by the Permanent Legislative Committee on Reapportionment.

26  c.     All such fees shall be deposited in the state treasury to the credit of the
27  general fund and shall be used to cover the expenses of the Legislature.

28                                   **Appendix.**

29            **ELECTRONIC SUBMISSION OF REDISTRICTING PLANS**

30            **REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA**

10213405.2

RC 044597

1

2 The Legislative Reapportionment Computer System supports the electronic
3 submission of redistricting plans. The electronic submission of these plans must
4 be via email or a flash drive. The software used by the Reapportionment Office is
5 Maptitude.

6 The electronic file should be in DOJ format (Block, district # or district #,
7 Block). This should be a two column, comma delimited file containing the FIPS
8 code for each block, and the district number. Maptitude has an automated plan
9 import that creates a new plan from the block/district assignment list.

10 Web services that can be accessed directly with a URL and ArcView
11 Shapefiles can be viewed as overlays. A new plan would have to be built using this
12 overlay as a guide to assign units into a blank Maptitude plan. In order to analyze
13 the plans with our attribute data, edit, and report on, a new plan will have to be
14 built in Maptitude.

15 In order for plans to be analyzed with our attribute data, to be able to edit,
16 report on, and produce maps in the most efficient, accurate and time saving
17 procedure, electronic submissions are REQUIRED to be in DOJ format.

18 Example: (DOJ FORMAT BLOCK, DISTRICT #)

19 SSCCCTTTTTTBBBBDDDD

20 SS  is the 2 digit state FIPS code

21 CCC  is the 3 digit county FIPS code

22 TTTTTT is the 6 digit census tract code

23 BBBB  is the 4 digit census block code

24 DDDD   is the district number, right adjusted

25 **Contact Information:**

26 Legislative Reapportionment Office

27 Room 317, State House

28 11 South Union Street

29 Montgomery, Alabama 36130

30 (334) 261-0706

10213405.2

RC 044598

1   For questions relating to reapportionment and redistricting, please contact:

2   Donna Overton Loftin, Supervisor

3   Legislative Reapportionment Office

4   donna.overton@alsenate.gov

5   Please Note: The above e-mail address is to be used only for the purposes of
6   obtaining information regarding redistricting. Political messages, including those
7   relative to specific legislation or other political matters, cannot be answered or
8   disseminated via this email to members of the Legislature. Members of the
9   Permanent Legislative Committee on Reapportionment may be contacted through
10  information contained on their Member pages of the Official Website of the
11  Alabama Legislature, legislature.state.al.us/aliswww/default.aspx.

10213405.2

RC 044599

PLAINTIFF'S EXHIBIT 3  C. Prinale  PENGAD 800-631-6989

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| **I. POPULATION**  The total Alabama resident state population of 4,779,736 persons, and the population of defined subunits thereof, as reported by the 2010 Census, shall be the permissible data base used for the development, evaluation, and analysis of proposed redistricting plans. It is the intention of this provision to exclude from use any census data, for the purpose of determining compliance with the one person, one vote requirement, other than that provided by the United States Census Bureau. | **I. POPULATION**  The total Alabama ~~resident~~ state population ~~of 4,779,736 persons~~, and the population of defined subunits thereof, as reported by the ~~2010~~ 2020 Census, shall be the permissible data base used for the development, evaluation, and analysis of proposed redistricting plans. It is the intention of this provision to exclude from use any census data, for the purpose of determining compliance with the one person, one vote requirement, other than that provided by the United States Census Bureau. | **I. POPULATION**  The total Alabama state population, and the population of defined subunits thereof, as reported by the 2020 Census, shall be the permissible data base used for the development, evaluation, and analysis of proposed redistricting plans. It is the intention of this provision to exclude from use any census data, for the purpose of determining compliance with the one person, one vote requirement, other than that provided by the United States Census Bureau. |
| donna  **II. EQUAL POPULATION REQUIREMENT: ONE PERSON, ONE VOTE** | **II. CRITERIA FOR REDISTRICTIG**  ~~II. EQUAL POPULATION REQUIREMENT: ONE PERSON, ONE VOTE~~ | **II. CRITERIA FOR REDISTRICTING** |
|  | a. ~~The populations of congressional districts shall be as equal as is practicable.~~ Districts shall comply with the United States | a. Districts shall comply with the United States Constitution, including the requirement that they equalize total population. |

RC 044468

RC 044469

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| | Constitution, including the requirement that they equalize total population. | |
| In accordance with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, legislative districts will be drawn to achieve "substantial equality of population among the various districts." | b. In accordance with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, legislative Legislative and state board of education districts will shall be drawn to achieve "substantial equality of population among the various districts." and shall not exceed an overall population deviation range of 5%. | b. Legislative and state board of education districts shall be drawn to achieve substantial equality of population among the districts and shall not exceed an overall population deviation range of 5%. |
| a. A redistricting plan considered by the Reapportionment Committee shall comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution. | a. c. A redistricting plan considered by the Reapportionment Committee shall comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution. | c. A redistricting plan considered by the Reapportionment Committee shall comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution. |
| b. In every redistricting plan submitted to the Reapportionment Committee, individual district | b. In every redistricting plan submitted to the Reapportionment Committee, | de. The Reapportionment Committee shall not approve a redistricting plan that does not |

9077489.6

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| populations should not exceed a 2% overall range of population deviation. The Reapportionment Committee will not approve a redistricting plan that does not comply with this requirement. | ~~individual district populations should not exceed a 2% overall range of population deviation.~~ d. The Reapportionment Committee ~~will~~ shall not approve a redistricting plan that does not comply with ~~this requirement.~~ these population requirements. | comply with these population requirements. |
| **III. VOTING RIGHTS ACT**<br><br>Districts shall be drawn in in compliance with the Voting Rights Act of 1965. A redistricting plan will not have either the purpose or the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution. | ~~III. VOTING RIGHTS ACT~~<br><br>e. Districts shall be drawn in ~~in~~ compliance with the Voting Rights Act of 1965, as amended. A redistricting plan ~~will not have either~~ shall have neither the purpose ~~or nor~~ the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution. | e. Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution. |
| **IV. CRITERIA FOR LEGISLATIVE DISTRICTS**<br><br>1. No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations that stereotype | ~~IV. CRITERIA FOR LEGISLATIVE DISTRICTS~~<br><br>~~1.~~ f. No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations ~~that stereotype~~ | f. No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations of race, color, or |

RC 044470

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| voters on the basis of race, color, or membership in a language-minority group, except that race may predominate over other districting criteria, if necessary, to comply with Section 2 of the Voting Rights Act. | ~~voters on the basis~~ of race, color, or membership in a language-minority group, except that race, color, or membership in a language-minority group may predominate over ~~other~~ race-neutral districting criteria, ~~if necessary,~~ to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act. | membership in a language-minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act. |
| 2. Legislative districts will be composed of contiguous and reasonably compact geography. | ~~2.~~ g. ~~Legislative districts~~ Districts will be composed of contiguous and reasonably compact geography. | g. Districts will be composed of contiguous and reasonably compact geography. |
| 3. The following requirements of the Alabama Constitution shall be complied with: | ~~3.~~ h. The following requirements of the Alabama Constitution shall be complied with: | h. The following requirements of the Alabama Constitution shall be complied with: |

4

RC 044471

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| a. Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured. | a. (i) Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured. | (i) Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured. |
| b. House and Senate districts shall be drawn on the basis of total population, except that voting age population may be considered, if necessary, to comply with Section 2 of the Voting Rights Act. | b. (ii) House and Senate districts Districts shall be drawn on the basis of total population, except that voting age population may be considered, if as necessary, to comply with Section 2 of the Voting Rights Act or other federal or state law. | (ii) Districts shall be drawn on the basis of total population, except that voting age population may be considered, as necessary to comply with Section 2 of the Voting Rights Act or other federal or state law. |
| c. The number of Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35. | c. (iii) The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35. | (iii) The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35. |
| d. The number of Senate districts shall be not less than one-fourth or more than one-third of the number of House districts. | d. (iv) The number of Alabama Senate districts shall be not less than one-fourth or more than one-third of the number of House districts. | (iv) The number of Alabama Senate districts shall be not less than one-fourth or more than one-third of the number of House districts. |

5

RC 044472

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| e. The number of House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106. | e. (v) The number of Alabama House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106. | (v) The number of Alabama House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106. |
| f. The number of House districts shall not be less than 67. | f. (vi) The number of Alabama House districts shall not be less than 67. | (vi) The number of Alabama House districts shall not be less than 67. |
| g. All legislative districts will be single-member districts. | g. (vii) All legislative districts will be single-member districts. | (vii) All districts will be single-member districts. |
| h. Every part of every district shall be contiguous with every other part of the district. | h. (viii) Every part of every district shall be contiguous with every other part of the district. | (viii) Every part of every district shall be contiguous with every other part of the district. |
| 4. The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama: | 4. i. The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama: | i. The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama: |

RC 044473

6

9077489.6

RC 044474

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| a. Contests between incumbent members of the Legislature will be avoided whenever possible. | a. (i) Contests between incumbents members of the Legislature will be avoided whenever possible. | (i) Contests between incumbents will be avoided whenever possible. |
| b. Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not. | b. (ii) Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not. | (ii) Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not. |
| c. The integrity of communities of interest shall be respected. For purposes of these Guidelines, a community of interest is defined as an area with recognized similarities of interests, including but not limited to racial, ethnic, geographic, governmental, regional, social, cultural, partisan, or historic interests; county, municipal, or voting precinct boundaries; and commonality of communications. The Reapportionment Committee will attempt to accommodate communities of interest identified by people in a specific location. It is inevitable, however, that some | c. (iii) The integrity of communities of interest shall be respected. For purposes of these Guidelines, a community of interest is defined as an area with recognized similarities of interests, including but not limited to racial, ethnic, geographic, governmental, regional, social, cultural, partisan, or historic interests; county, municipal, or voting precinct boundaries; and commonality of communications. The Reapportionment Committee will attempt to accommodate communities of interest identified by people in a specific location. It is inevitable, however, that some | (iii) Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and after compliance with paragraphs g through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting precincts, municipalities, tribal lands and |

9077489.6

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| interests will be advanced more than others by the choice of particular district configurations. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people. | ~~interests will be advanced more than others by the choice of particular district configurations. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.~~ Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and after compliance with paragraphs g through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts. | reservations, or school districts. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people. |

8

RC 044475

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| | The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people | |
| d. The Legislature shall try to minimize the number of counties in each district. | d. (iv) The Legislature shall try to minimize the number of counties in each district. | (iv) The Legislature shall try to minimize the number of counties in each district. |
| | e. (v) The Legislature shall try to preserve the cores of existing districts. | (v) The Legislature shall try to preserve the cores of existing districts. |
| e. In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling state interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria. | e. (vi) In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling state State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria. | (vi) In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria. |

RC 044476

9077489.6

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| f. The criteria identified in subsections (a)-(d) of this paragraph are not listed in order of precedence, and in each instance where they conflict, the Legislature shall at its discretion determine which takes priority. | f. g. The criteria identified in subsections  paragraphs  (a) (d)  (i)- (vi) of this paragraph are not listed in order of precedence, and in each instance where they conflict, the Legislature shall at its discretion determine which takes priority. | g. The criteria identified in paragraphs i(i)-(vi) are not listed in order of precedence, and in each instance where they conflict, the Legislature shall at its discretion determine which takes priority. |
| V.  PLANS  PRODUCED  BY LEGISLATORS | V.  III.  PLANS  PRODUCED  BY LEGISLATORS | III.  PLANS  PRODUCED  BY LEGISLATORS |
| 1. The confidentiality of any Legislator developing plans or portions thereof will be respected. The Reapportionment Office staff will not release any information on any Legislator's work without written permission of the Legislator developing the plan, subject to paragraph two below. | 1. The confidentiality of any Legislator developing plans or portions thereof will be respected. The Reapportionment Office staff will not release any information on any Legislator's work without written permission of the Legislator developing the plan, subject to paragraph two below. | 1. The confidentiality of any Legislator developing plans or portions thereof will be respected. The Reapportionment Office staff will not release any information on any Legislator's work without written permission of the Legislator developing the plan, subject to paragraph two below. |
| 2. A proposed redistricting plan will become public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the Reapportionment Committee. | 2. A proposed redistricting plan will become public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the Reapportionment Committee. | 2. A proposed redistricting plan will become public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the Reapportionment Committee. |

10

9077489.6

RC 044477

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| 3. Access to the Legislative Reapportionment Office Computer System, census population data, and redistricting work maps will be available to all members of the Legislature upon request. Reapportionment Office staff will provide technical assistance to all Legislators who wish to develop proposals. | 3. Access to the Legislative Reapportionment Office Computer System, census population data, and redistricting work maps will be available to all members of the Legislature upon request. Reapportionment Office staff will provide technical assistance to all Legislators who wish to develop proposals. | 3. Access to the Legislative Reapportionment Office Computer System, census population data, and redistricting work maps will be available to all members of the Legislature upon request. Reapportionment Office staff will provide technical assistance to all Legislators who wish to develop proposals. |
| 4. In accordance with Rule 23 of the *Joint Rules of the Alabama Legislature* (2015) all amendments or revisions to redistricting plans, following introduction as a bill, shall be drafted by the Reapportionment Office. | 4. In accordance with Rule 23 of the *Joint Rules of the Alabama Legislature* (2015) "[a]ll amendments or revisions to redistricting plans, shall following introduction as a bill, shall be drafted by the Reapportionment Office." Amendments or revisions must be part of a whole plan. Partial plans are not allowed. | 4. In accordance with Rule 23 of the *Joint Rules of the Alabama Legislature* "[a]ll amendments or revisions to redistricting plans, following introduction as a bill, shall be drafted by the Reapportionment Office." Amendments or revisions must be part of a whole plan. Partial plans are not allowed. |
| 5. Drafts of all redistricting plans which are presented for introduction at any session of the Legislature, and which are not prepared by the Reapportionment | 5. Drafts of all redistricting plans which are presented for introduction at any session of the Legislature, and which are not prepared by the Reapportionment | 5. In accordance with Rule 24 of the *Joint Rules of the Alabama Legislature,* "[d]rafts of all redistricting plans which are for introduction at any session of the |

11

RC 044478

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| Office, must be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data Bank. | Office, ~~must be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data Bank~~. In accordance with Rule 24 of the *Joint Rules of the Alabama Legislature*, "[d]rafts of all redistricting plans which are for introduction at any session of the Legislature, and which are not prepared by the Reapportionment Office, shall be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data System at least ten (10) days prior to introduction." | Legislature, and which are not prepared by the Reapportionment Office, shall be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data System at least ten (10) days prior to introduction." |
| **VI. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS**<br><br>1. All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public. | **~~VI.~~ IV. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS**<br><br>1. All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public. | **IV. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS**<br><br>1. All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public. |

9077489.6

RC 044479

RC 044480

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| 2. Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public. | 2. Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public. | 2. Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public. |
| 3. Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public. | 3. Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public. | 3. Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public. |
| 4. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established. | 4. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established. | 4. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the |

13

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| | | minimal criteria herein established. |
| 5. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established. | 5. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established. | 5. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established. |
| 6. Notices of all Reapportionment Committee meetings will be posted on the fifth, sixth, seventh, and eighth floors of the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of | 6. Notices of all Reapportionment Committee meetings will be posted on ~~the fifth, sixth, seventh, and eighth floors of~~ monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. | 6. Notice of all Reapportionment Committee meetings will be posted on monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee |

14

RC 044481

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office. | Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office. | meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office. |
| VII. PUBLIC ACCESS | VII V. PUBLIC ACCESS | V. PUBLIC ACCESS |
| 1. The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment. | 1. The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment. | 1. The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment. |

15

RC 044482

9077489.6

RC 044483

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| 2. A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee. | 2. A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee. | 2. A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee. |
| 3. Any proposed redistricting plan drafted into legislation must be offered by a member of the Legislature for introduction into the legislative process. | 3. Any proposed redistricting plan drafted into legislation must be offered by a member of the Legislature for introduction into the legislative process. | 3. Any proposed redistricting plan drafted into legislation must be offered by a member of the Legislature for introduction into the legislative process. |
| 4. A redistricting plan developed outside the Legislature or a redistricting plan developed without Reapportionment Office assistance which is to be presented | 4. A redistricting plan developed outside the Legislature or a redistricting plan developed without Reapportionment Office assistance which is to be presented | 4. A redistricting plan developed outside the Legislature or a redistricting plan developed without Reapportionment Office assistance which is to be presented for consideration by |

16

9077489.6

RC 044484

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| for consideration by the Reapportionment Committee must: | for consideration by the Reapportionment Committee must: | the Reapportionment Committee must: |
| a. Be clearly depicted on maps which follow 2010 Census geographic boundaries; | a. Be clearly depicted on maps which follow ~~2010~~ 2020 Census geographic boundaries; | a. Be clearly depicted on maps which follow 2020 Census geographic boundaries; |
| b. Be accompanied by a statistical sheet listing total population for each district and listing the census geography making up each proposed district; | b. Be accompanied by a statistical sheet listing total population for each district and listing the census geography making up each proposed district; | b. Be accompanied by a statistical sheet listing total population for each district and listing the census geography making up each proposed district; |
| c. Stand as a complete statewide plan for redistricting, or, if presenting a partial plan, fit back into the plan which is being modified, so that the proposal can be evaluated in the context of a statewide plan (i.e., all places of geography must be accounted for in some district); | c. Stand as a complete statewide plan for redistricting~~, or, if presenting a partial plan, fit back into the plan which is being modified, so that the proposal can be evaluated in the context of a statewide plan (i.e., all places of geography must be accounted for in some district)~~. | c. Stand as a complete statewide plan for redistricting. |
| d. Comply with the guidelines adopted by the Reapportionment Committee. | d. Comply with the guidelines adopted by the Reapportionment Committee. | d. Comply with the guidelines adopted by the Reapportionment Committee. |
| 5. Electronic Submissions | 5. Electronic Submissions | 5. Electronic Submissions |
| a. Electronic submissions of redistricting plans will be accepted | a. Electronic submissions of redistricting plans will be accepted | a. Electronic submissions of redistricting plans will be |

17

RC 044485

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| by the Reapportionment Committee. | by the Reapportionment Committee. | accepted by the Reapportionment Committee. |
| b. Plans submitted electronically must also be accompanied by the paper materials referenced in this section. | b. Plans submitted electronically must also be accompanied by the paper materials referenced in this section. | b. Plans submitted electronically must also be accompanied by the paper materials referenced in this section. |
| c. See the Appendix for the technical documentation for the electronic submission of redistricting plans. | c. See the Appendix for the technical documentation for the electronic submission of redistricting plans. | c. See the Appendix for the technical documentation for the electronic submission of redistricting plans. |
| 6. Census Data And Redistricting Materials | 6. Census Data And Redistricting Materials | 6. Census Data And Redistricting Materials |
| a. Census population data and census maps will be made available through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment. | a. Census population data and census maps will be made available through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment. | a. Census population data and census maps will be made available through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment. |
| b. Summary population data at the precinct level and a statewide work maps will be made available to the public through the Reapportionment Office at a cost | b. Summary population data at the precinct level and a statewide work maps will be made available to the public through the Reapportionment Office at a cost | b. Summary population data at the precinct level and a statewide work maps will be made available to the public through the Reapportionment |

9077489.6

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| determined by the Permanent Legislative Committee on Reapportionment. | determined by the Permanent Legislative Committee on Reapportionment. | Office at a cost determined by the Permanent Legislative Committee on Reapportionment. |
| c. All such fees shall be deposited in the state treasury to the credit of the general fund and shall be used to cover the expenses of the legislature. | c. All such fees shall be deposited in the state treasury to the credit of the general fund and shall be used to cover the expenses of the ~~legislature~~ Legislature. | c. All such fees shall be deposited in the state treasury to the credit of the general fund and shall be used to cover the expenses of the Legislature. |
| **Appendix.** ELECTRONIC SUBMISSION OF REDISTRICTING PLANS REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA | **Appendix.** ELECTRONIC SUBMISSION OF REDISTRICTING PLANS REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA | **Appendix.** ELECTRONIC SUBMISSION OF REDISTRICTING PLANS REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA |
| The Legislative Reapportionment Computer System supports the electronic submission of redistricting plans. The electronic submission of these plans must be on either a flash drive or CD ROM. The software used by the Reapportionment Office is the Esri Redistricting Online (RO) Solution. | The Legislative Reapportionment Computer System supports the electronic submission of redistricting plans. The electronic submission of these plans must be ~~on either via~~ email or a flash drive~~, or CD ROM.~~ The software used by the Reapportionment Office is ~~the Esri Redistricting Online (RO) Solution.~~ Maptitude. | The Legislative Reapportionment Computer System supports the electronic submission of redistricting plans. The electronic submission of these plans must be via email or a flash drive. The software used by the Reapportionment Office is Maptitude. |

19

9077489.6

RC 044486

RC 044487

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| The electronic file should be in DOJ format (Block, district # **or** district #, Block). This should be a two column, comma delimited file containing the FIPS code for each block, and the district number. The Esri RO Solution has an automated plan import that creates a new plan from the block/district assignment list. | The electronic file should be in DOJ format (Block, district # **or** district #, Block). This should be a two column, comma delimited file containing the FIPS code for each block, and the district number. ~~The Esri RO Solution~~ Maptitude has an automated plan import that creates a new plan from the block/district assignment list. | The electronic file should be in DOJ format (Block, district # **or** district #, Block). This should be a two column, comma delimited file containing the FIPS code for each block, and the district number. Maptitude has an automated plan import that creates a new plan from the block/district assignment list. |
| Web services that can be accessed directly with a URL and ArcView Shapefiles can be viewed as overlays. A new plan would have to be built using this overlay as a guide to assign units into a blank RO Solution plan. In order to analyze the plans with our attribute data, edit, and report on, a new plan will have to be built in the RO Solution. | Web services that can be accessed directly with a URL and ArcView Shapefiles can be viewed as overlays. A new plan would have to be built using this overlay as a guide to assign units into a blank ~~RO Solution plan.~~ Maptitude plan. In order to analyze the plans with our attribute data, edit, and report on, a new plan will have to be built in ~~the RO Solution.~~ Maptitude. | Web services that can be accessed directly with a URL and ArcView Shapefiles can be viewed as overlays. A new plan would have to be built using this overlay as a guide to assign units into a blank Maptitude plan. In order to analyze the plans with our attribute data, edit, and report on, a new plan will have to be built in Maptitude. |
| In order for plans to be analyzed with our attribute data, to be able to edit, report .on, and | In order for plans to be analyzed with our attribute data, to | In order for plans to be analyzed with our attribute data, |

9077489.6

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| produce maps in the most efficient, accurate and time saving procedure, electronic submissions are REQUIRED to be in DOJ format. | be able to edit, report on, and produce maps in the most efficient, accurate and time saving procedure, electronic submissions are REQUIRED to be in DOJ format. | to be able to edit, report on, and produce maps in the most efficient, accurate and time saving procedure, electronic submissions are REQUIRED to be in DOJ format. |
| Example (DOJ FORMAT BLOCK, DISTRICT #)<br><br>SSCCCTTTTTTBBBBDDDD<br><br>SS is the 2 digit state FIPS code<br>CCC is the 3 digit county FIPS code<br>TTTTTT is the 6 digit census tract code<br>BBBB is the 4 digit census block code<br>DDDD is the district number, right adjusted | Example (DOJ FORMAT BLOCK, DISTRICT #)<br><br>SSCCCTTTTTTBBBBDDDD<br><br>SS is the 2 digit state FIPS code<br>CCC is the 3 digit county FIPS code<br>TTTTTT is the 6 digit census tract code<br>BBBB is the 4 digit census block code<br>DDDD is the district number, right adjusted | Example (DOJ FORMAT BLOCK, DISTRICT #)<br><br>SSCCCTTTTTTBBBBDDDD<br><br>SS is the 2 digit state FIPS code<br>CCC is the 3 digit county FIPS code<br>TTTTTT is the 6 digit census tract code<br>BBBB is the 4 digit census block code<br>DDDD is the district number, right adjusted |
| Contact Information:<br>Legislative Reapportionment Office<br>Room 303, State House<br>11 South Union Street | Contact Information:<br>Legislative Reapportionment Office<br>Room 303, State House<br>11 South Union Street | Contact Information:<br>Legislative Reapportionment Office<br>Room 303, State House<br>11 South Union Street |

21

RC 044488

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| Montgomery, Alabama 36130 (334) 242-7941 For questions relating to reapportionment and redistricting, please contact: Donna Shanholtzer Supervisor Legislative Reapportionment Office donna@al-legislature.gov Please Note: The above e-mail address is to be used only for the purposes of obtaining information regarding redistricting. Political messages, including those relative to specific legislation or other political matters, cannot be answered or disseminated to members of the Legislature. Members of the Permanent Legislative Committee On Reapportionment may be contacted through information contained on their Member pages of the Official Website of the Alabama Legislature. | Montgomery, Alabama 36130 (334) 242-7941 269-0706 For questions relating to reapportionment and redistricting, please contact: Donna Overton Loftin Supervisor Legislative Reapportionment Office donna.overton@alsenate.gov Please Note: The above e-mail address is to be used only for the purposes of obtaining information regarding redistricting. Political messages, including those relative to specific legislation or other political matters, cannot be answered or disseminated via this email to members of the Legislature. Members of the Permanent Legislative Committee On Reapportionment may be contacted through information contained on their Member pages of the Official Website of the Alabama Legislature. | Montgomery, Alabama 36130 (334) 269-0706 For questions relating to reapportionment and redistricting, please contact: Donna Overton Loftin Supervisor Legislative Reapportionment Office donna.overton@alsenate.g ov Please Note: The above e-mail address is to be used only for the purposes of obtaining information regarding redistricting. Political messages, including those relative to specific legislation or other political matters, cannot be answered or disseminated via this email to members of the Legislature. Members of the Permanent Legislative Committee On Reapportionment may be contacted through information |

RC 044489

9077489.6

| 2010 GUIDELINES | PROPOSED CHANGES | ENROLLED GUIDELINES |
|---|---|---|
| | legislature.state.al.us/aliswww/defa ult.aspx. | contained on their Member pages of the Official Website of the Alabama Legislature, legislature.state.al.us/aliswww/de fault.aspx. |

RC 044490

9077489.6


PLAINTIFF'S
EXHIBIT
4
C. Pringle

# TRANSCRIPT OF
# REAPPORTIONMENT COMMITTEE
# MEETING
# OCTOBER 26, 2021

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**FEMALE 1:** Senator Allen? Senator Holley?

**SENATOR HOLLEY:** Yes

**FEMALE 1:** Senator Livingston?

**SENATOR LIVINGSTON:** Here.

**FEMALE 1:** Senator McClendon?

**SENATOR MCCLENDON:** Here.

**FEMALE 1:** Senator Melson?

**SENATOR MELSON:** Here.

**FEMALE 1:** Senator Orr?

**SENATOR ORR:** Here.

**FEMALE 1:** Senator Roberts?

**SENATOR ROBERTS:** Here.

**FEMALE 1:** Senator Scofield?

**SENATOR SCOFIELD:** Here.

**FEMALE 1:** Senator Singleton?

**SENATOR SINGLETON:** Here.

**FEMALE 1:** Ms. Smitherman? Senator Williams?

**SENATOR WILLIAMS:** Here.

**FEMALE 1:** Representative Boyd?

**REPRESENTATIVE BOYD:** Here.

**FEMALE 1:** Representative Clouse? Representative Ellis?

**REPRESENTATIVE ELLIS:** Here.

**FEMALE 1:** Representative England?

1

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**REPRESENTATIVE ENGLAND:** Here.

**FEMALE 1:** Representative Greer?

**REPRESENTATIVE GREER:** Here.

**FEMALE 1:** Representative Hall?

**REPRESENTATIVE HALL:** Here.

**FEMALE 1:** Representative Jones?

**REPRESENTATIVE JONES:** Here.

**FEMALE 1:** Representative Lovvorn?

**MALE 1:** He's on his way. He's in traffic.

**FEMALE 1:** Representative Pringle?

**REPRESENTATIVE CHRIS PRINGLE:** Here.

**FEMALE 1:** Representative South? Representative Wood?

**REPRESENTATIVE WOOD:** Here.

**FEMALE 1:** We have 19 present. We have a quorum.

**MALE 2:** Thank you, members, if you would, please, you will see a copy of the Minutes from the last meeting, May 5th of this year. I would ask you to quickly look over those. We have a motion to approve and let's have a roll call on that please.

**FEMALE 1:** Senator Allen? Senator Holley?

**SENATOR HOLLEY:** Aye.

**FEMALE 1:** Senator Livingston?

**SENATOR LIVINGSTON:** Aye.

**FEMALE 1:** Senator McClendon?

**SENATOR MCCLENDON:** Aye.

**FEMALE 1:** Senator Melson?

2

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR MELSON:** Aye.

**FEMALE 1:** Senator Orr?

**SENATOR ORR:** Aye.

**FEMALE 1:** Senator Roberts?

**SENATOR ROBERTS:** Aye.

**FEMALE 1:** Senator Scofield?

**SENATOR SCOFIELD:** Aye.

**FEMALE 1:** Senator Singleton?

**SENATOR SINGLETON:** Aye.

**FEMALE 1:** Senator Smitherman? Senator Williams?

**SENATOR WILLIAMS:** Aye.

**FEMALE 1:** Representative Boyd?

**REPRESENTATIVE BOYD:** Aye.

**FEMALE 1:** Representative Clouse? Representative Ellis?

**REPRESENTATIVE ELLIS:** Aye.

**FEMALE 1:** Representative England?

**REPRESENTATIVE ENGLAND:** Aye.

**FEMALE 1:** Representative Greer?

**REPRESENTATIVE GREER:** Aye.

**FEMALE 1:** Representative Hall? Representative Jones?

**REPRESENTATIVE JONES:** Aye.

**FEMALE 1:** Representative Lovvorn? Representative Pringle?

**REPRESENTATIVE CHRIS PRINGLE:** Aye.

3

**FEMALE 1:**  Representative South? Representative Wood?

**REPRESENTATIVE WOOD:**  Aye.

**FEMALE 1:**  We have 17 yes. The motion passed.

**MR. CHAIRMAN:**  Thank you. I'd like to make just a preliminary statement about the workings of this committee. This time around has been rather unique because of the compactness of the time. Federal Law requires Census Bureau to provide the states with the data no later than March and the year after Census is conducted. In 2011, we received it in mid-February, about six weeks before their deadline. This time, the Census Bureau seriously lied. Instead of getting the data in February or March, we did not receive the data until August 12, actually became usable to us closer to the 17th or 18th of August. It took some amount of time to convert that data to match up our software. August 17 was the first time this committee and our staff, who I'm forever grateful for, for all their hard work was the first time that we actually hadn't data that we could work with and dealing with the Congressional plan, State Board plan, the Senate plan and the House plan.

[00:05:06]

Since that time, since August 17, we have met with seven Congressional Representatives, our staff, eight Board of Education members and all the members of the Senate and the House that are running for reelection. In most cases, there was not just one meeting with any particular office holder. There were repeated meetings with individual officeholders and often with groups of officeholders, these meetings continued right up to the close of business last Friday. It took an enormous effort to prepare these plans in the short amount of time available. And unlike after the 2010 census, when we were able to split the redistricting over a two-year period, we did Congressional and State Board in 2011, and then we did the two legislative plans in 2012. This time, not only did we get the data late, but we had to prepare all four plans at the same time. And I will -- you those of us who worked in this room in this office have seen the dedication of our redistricting staff, of our attorney advising us, of our demographer drawing the maps, they have literally worked day and night and over the weekends in order to reach this point. And I think you'll soon see that they have done a heroic job. I am very grateful for their dedication. At this point, we are going to now go into consideration of these four maps I mentioned. We'll do them in this order for committee members. You'll see, you have an agenda in front of you that shows the order. We'll do this and we're going to start off with congressional districts. Representative Pringle will handle that in the House. Then we'll go to State Board districts. I'll handle that for introduction into the Senate. Then we'll go to the state Senate districts that will first be introduced into the Senate. And once it comes out of this committee, and finally, we'll do the committee plan for the State House, which Representative Pringle, of course, will handle and will introduce on Thursday into the House of Representatives. Let me recognize the House Chair for Redistricting Representative Chris Pringle turn your mic go.

**REPRESENTATIVE CHRIS PRINGLE:**  Thank you, Senator. Again, I am Chris Pringle, State Representative from House District 1 of Automobile. The members of the committee

4

would go to the congressional plan and open your folder. You'll see the proposed map that we're going to discuss here from this committee. You'll have it. If you'll note, this is a zero-deviation plan with a minimum number of split counties. There's a one-person difference between all seven districts. Som the deviations on this plan are zero. In developing this plan, all Congressional Representatives were met with in person and then subsequently over the phone our Microsoft teams until their concerns have been addressed. An exception in the Representative Mo Brooks was running for another office. He did not want to meet in person instead of staff member instead. All representatives have had input into this plan. This plan meets the Committee guidelines. It complies a Section 2 the Voting Rights Act and Equal Protection Clause. There's a minimal population deviation between the District 6.

[00:09:59]

Between the District 6 are districts who had ideal population of 717,754 and the second district is one person over. In respects to counties that extend possibly given the requirement for equal population. I'll repeat, it respects counties to the extent possible given the requirements for equal population. It does not require any incumbents to run against each other. All districts are contiguous and reasonably compact. It respects communities of interests. It preserves the cores of existing districts. It splits a minimum number of counties and precincts. Six counties are split and seven are split to get to zero deviation an improvement over the current law which splits seven counties. Splits are, Lauderdale County is split between District 4 and 5. Tuscaloosa County is split between Districts 4 and 7. Jefferson County, between Districts 6 and 7. Chilton County between Districts 3 and 6. Montgomery County between Districts 2 and 7. Escambia County between Districts 1 and 2. This plan contains one majority black district with a black voting age population of 54.22%, thank you.

**MALE 2:** Motion to adopt.

**MALE 3:** Mr. Chairman, I'd like to speak to the motion.

**REPRESENTATIVE ENGLAND:** I would too.

**MR. CHAIRMAN:** Mr. England.

**REPRESENTATIVE ENGLAND:** First of, thank you for recognition. I'm pretty sure Ms. Overton probably would doesn't like me very much right now because I harassed her for days on end. Because as a member of this committee, I did not see these maps until yesterday. I think we're undertaking a pretty massive task to be told to come in here with the amount of information presented to us to come here and say, "I need you to vote today." Personally, I may be just speaking for myself, but I think this is doing a disservice to the process and also to the people that we represent because they haven't seen this map either, unless you were following me on Twitter. So, I think it needs to be said that this process itself, there's got to be a better way to do this. I think it's flawed and I don't really think this is the best way for us to walk into this process without any information and to come in here today look at it and say, "I want you to approve it." With that being said, I'm not diminishing the fact this was probably a very difficult task. It's a lot of information to process, but I think it probably would have been better for all of

5

us have we all seen the whole entire map and not be drawn into short meetings individually where we can only see our district? For me, that's how the process worked. I was only told I could see the district. My district game me immediate area around my district, and I think it would have been better for the public and all of us to digest the information in front of us by just seeing the whole map so we could see how our district worked relative to the districts around us. And with that being said in your initial statement, you mentioned that this map complies with the Voting Rights Act. Several questions that I have about that. First, I'd like to know who drew the map. Was it drawn in-house or did somebody else draw it? Also, I'd like to know how it complies with the Voting Rights Act. Was there a racial polarization study done to figure out exactly how we comply with the Voting Rights Act? And I'd also like to know since I wasn't afforded an opportunity to see the entire map, I would like to know if anybody else was, whether it be staff, whether it be other members, or whether it be someone hired as a consultant to take a look at these maps. Those are my three initial questions. One, who drew it? Two, can you explain to all of us how it satisfies the Voting Rights Act and how this map was drawn? So, I just like to start there, thank you.

**MR. CHAIRMAN:** Senator Singleton?

**SENATOR SINGLETON:** You're not going to answer those question?

**MR. CHAIRMAN:** I've done listened to it, and we're going to get back with him, okay.

**FEMALE 1:** Oh Jesus.

**[00:14:59]**

**REPRESENTATIVE ENGLAND:** Point of order, so we're not answering questions today?

**MR. CHAIRMAN:** I'm going to answer your questions. We're just trying to get all the questions asked.

**MALE 4:** Ms. Chairman, point of order. The point is that I think that we opened ourselves up for confusion of responses and questions and confusions of focusing in on the specific points. So, we're going to take all these varying questions. And then after we take all the various questions, I think that the questions' point of order are to be in relationship to the questions. The answer should be in relationship to the questions as answered and they should be addressed. Questions that [INDISCERNIBLE 00:15:45] may have over there, I saw his hand, and I have is may be totally relevant, but maybe totally different at the same time in parts. So, I think in order to understand that -- and I'm going to make a special request that we put these maps on the board. We have a big old board up there, put the whole maps. Each one of these things we talk, it relates to a map. It needs to be sitting up there in large, of the map.

**[OVERLAY]**

**FEMALE 2:** --so we can it.

6

**MALE 4:**  Yeah, we can see it. Not the small one where we don't know what it's touching and what it's doing, but actually a large one that deals which shows the precincts.

**MR. CHAIRMAN:**  The map is on the board, ladies and gentlemen, I'm hoping the people online can see it. Can they see the map online?

**MALE 5:**  Yes.

**MR. CHAIRMAN:**  These maps are drawn in this room using the staff here and our lawyer that we've hired has done redistricting for 25 years, has worked with us and told us that he thinks these maps comply with section to the Voting Rights Act and the Fourteenth Amendment to the Constitution.

**REPRESENTATIVE ENGLAND:**  Can you explain it now?

**MR. CHAIRMAN:**  I'm not the attorney, but Dorman Walker sat here and went through every one of this our attorney. You know Dorman, he's done this for 25 years.

**[OVERLAY]**

**REPRESENTATIVE ENGLAND:**  Again, can I say that I was appointed to this committee.

**MR. CHAIRMAN:**  Yeah.

**REPRESENTATIVE ENGLAND:**  You stated that it complies with the Voting Rights Act. You also stated that it complies with the Fourteenth Amendment Equal Protection, so I'm asking you how. I just want to make this -- that's obviously –

**[OVERLAY]**

**MR. CHAIRMAN:**  Okay, representative. That's fine, let's do this.

**REPRESENTATIVE ENGLAND:**  That's a very component of this.

**MR. CHAIRMAN:**  I understand that and I see where you're going and let's do this. You tell me where it doesn't, how's that?

**REPRESENTATIVE ENGLAND:**  First and foremost, if we didn't do a racial polarization study you don't know how it applies. I'll ask you this question, you and the attorney that you consulted, have you all done a racial polarization study?

**MR. CHAIRMAN:**  Yeah, the guy in Georgia did one. It was sent to him Friday and he came back.

**REPRESENTATIVE ENGLAND:**  So, who's the guy in Georgia? Can we see the results of that study?

**MR. CHAIRMAN:** The attorney has hired a consultant out of Georgia and he's looked at it.

**REPRESENTATIVE ENGLAND:** Can we—

**MR. CHAIRMAN:** There's nothing that's going to be hidden. We're getting it to you as fast as we have it of course.

**REPRESENTATIVE ENGLAND:** Okay.

**MR. CHAIRMAN:** We don't have it. You understand, I had to do 28 public hearings. I had to meet with 105 house members, 35 senators, seven members of congress and eight members of the schoolboard and many of these people we met with multiple, multiple times to try and work this out, all in a very short period of time. We didn't have the luxury they had a couple of years ago, having two years to do this. We had about three months.

**REPRESENTATIVE ENGLAND:** I could understand your frustration, but as the Chair, you're in charge with the responsibility of answering these questions.

**MR. CHAIRMAN:** Yeah.

**REPRESENTATIVE ENGLAND:** So, I sympathize with the smaller shortened timeframe, but I do still get as a response -- as part of my responsibility as being a member of this committee is to ask these questions and to get answers because I'm not just asking for me. Because remember, the entire State of Alabama, the first time they lay my eyes on this map was yesterday. I think it's pretty legitimate for us to have these questions since we could not get access to this information before. One of the ways --

**[OVERLAY]**

**MR. CHAIRMAN:** The first time I saw it was yesterday too.

**REPRESENTATIVE ENGLAND:** That makes me feel worse, but to be quite honest with you. So, you ask me, I'll point out just that one thing. I need you to help me understand if a racial polarization study was done. I need to know who did it. I need to know what the results are, so I can tell you if I believe that one that matches up with the standards that have been set by federal courts in the Supreme Court, because very recently we had issues with the Supreme Court. We just lost the lawsuit behind some of this stuff, so I need to have something so I can draw some comparative analysis between the two. So, on record, you're telling me that a racial polarization study has been done?

**MR. CHAIRMAN:** Our attorney looked at it and assured us that we are incompliance with Section 2 of the Voting Rights Act.

**REPRESENTATIVE ENGLAND:** The question I asked you, you're assuring me right now that a racial polarization study has been done?

**MR. CHAIRMAN:** According to my attorney, yes.

**REPRESENTATIVE ENGLAND:** Okay.

**MR. CHAIRMAN:** According to the committee's attorney.

**[00:20:00]**

It's the attorney that's done reapportionment for 25 years.

**REPRESENTATIVE ENGLAND:** Okay. And you can provide that information to us so we can draw an analysis between the maps, the numbers and the study?

**MR. CHAIRMAN:** I have no problem when you look at all of our reports.

**REPRESENTATIVE ENGLAND:** All right. You said also that this map was prepared here in-house?

**MR. CHAIRMAN:** Yeah, it was drawn right here in this room.

**REPRESENTATIVE ENGLAND:** All right.

**MR. CHAIRMAN:** I mean, you sat here with us, and I know several times why we drew these maps.

**REPRESENTATIVE ENGLAND:** No. Actually, I've only seen my district up until yesterday when I got the maps.

**MR. CHAIRMAN:** No. I sat here when you're on a call.

**REPRESENTATIVE ENGLAND:** No. On that call, we looked at my district.

**MR. CHAIRMAN:** Yeah.

**REPRESENTATIVE ENGLAND:** Period. I haven't seen a map. This is the first time I've actually seen a physical copy of the map since yesterday. Now, that I've answered your question, can you answer mine? What other ways does this map --

**MR. CHAIRMAN:** Let me report. On district seven, there was not a functional analysis done on it simply because it was drawn blind, the race was turned off on the drawing, and after the district was drawn and we looked at the black voting age population, it was determined there was no reason to do an analysis on it.

**REPRESENTATIVE ENGLAND:** So, you have not done analysis on that?

**MR. CHAIRMAN:** I just found out seven because of the BVAP, no analysis was deemed necessary.

**REPRESENTATIVE ENGLAND:** So, we don't know if it complies with the Voting Rights Act just based on an attorney's opinion?

**MR. CHAIRMAN:** Yeah. I mean, it complies.

**REPRESENTATIVE ENGLAND:** We don't know that.

**MR. CHAIRMAN:** Well, the attorney that his committee hired says it does.

**REPRESENTATIVE ENGLAND:** But he also didn't do what's necessary to figure that out. Interestingly enough, the only district –

**MR. CHAIRMAN:** The BVAP of that district is 54.2%.

**REPRESENTATIVE ENGLAND:** But again, the study demonstrates how much of that actual percentage is a voting percentage. So, there's a difference between just throwing out a percentage and actually knowing if that's functional or not. And also, interestingly enough, the Seventh Congressional District is the only district that splits counties. Is there a particular reason for that?

**MR. CHAIRMAN:** That's not true. I just told you, I just run off of the county to split.

**REPRESENTATIVE ENGLAND:** There's one in District One, you have one in the Escambia County?

**MR. CHAIRMAN:** No. Lauderdale is split between four and five, Tuscaloosa is split between four and seven, Jefferson is split between six and seven, Chilton is split between three and six, Montgomery is split between two and seven, Escambia is split between one and two.

**REPRESENTATIVE ENGLAND:** I'm sorry.

**MR. CHAIRMAN:** Every district has at least one split.

**REPRESENTATIVE ENGLAND:** I'll rephrase. Seven has the most splits. That correct?

**MR. CHAIRMAN:** One, two, three. Yes, sir.

**REPRESENTATIVE ENGLAND:** All right. Is there any particular reason why seven has the most splits?

**MR. CHAIRMAN:** No. Because four has got two, two has two, three has one, and one has one.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**REPRESENTATIVE ENGLAND:**  Is there any particular reason why seven has the most split districts? Including in Jefferson --

**MR. CHAIRMAN:**  Trying to get the zero deviation, I'm assuming. We tried to respect -- we had to get to zero deviation.

**REPRESENTATIVE ENGLAND:**  Do you think it has anything to do with making sure that each split holds a particular percentage of African-Americans into it?

**MR. CHAIRMAN:**  I have no knowledge of that now.

**REPRESENTATIVE ENGLAND:** Okay.

**MALE 3:**  Senator, I was hoping that we wouldn't be so contentious in here today, and I think I've been here with you gentlemen over the period of time trying to ask that we can get to this point. We sit around this table and I know that this is probably one of the most contentious sessions that we can have because everybody's for themselves. Everybody's looking out for what they got and it's all about territory. But I just wanted to ask a question about the map, and I guess go down the same line that Chris was representing England in terms of District Seven. In the last redistributing, we saw and heard from the United States Supreme Court that basically said that District Seven was the most gerrymandered district in the State of Alabama, and when you look at that, it almost looks like a salamander and the way it shaped, I see where you tried to come into your county boundaries to do that this time. But however, the Supreme Court has basically already ruled that, and so I just want this body to know that I will be introducing another map because when you look at the State School Board, it is representative of 26% of the African-American community giving it two districts. The house and the Senate also. The congressional district is the only district, the only map that we would draw as a body that does not represent the 26% of African-Americans. It only represents 13% of those African-American population. We believe that based on whole county, and what you can draw based on zero percentage, we can get two majority districts out of this, and I think that this body or the chairman has not tried to do that, just stay with what they were used to doing, and it's like we just drew over the same lines and didn't even try to come up with anything else different.

**[00:25:08]**
And that's what you get when you don't get input from everybody else, and when everything is kind of hidden and indoor. And so, with that, I know this is not the proper time to introduce the map, but I would do it officially when we have the next meeting, I will introduce a map even if it gets voted down and we will introduce them again on the floor. It will be on the map to concept, and I just want to let you know that I think that we can get two districts out of here that will show favorably for African-Americans across the state outside of just gerrymandering in this district with the unnecessary splits that we've gotten. Thank you very much.

**MR. CHAIRMAN:**  Thank you, Senator. Did you say you have a map that has two majority black districts in it?

**MALE 3:**  Yes.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:**  Okay. All right. Senator Smithman.

**SENATOR SMITHMAN:**  Thank you very much Mr. Chairman. Chairman's, let me say this first, I noticed the Senator mentioned a level of frustration, a level of uncomfortableness or whatever words you want to use is coming from our leader. Let me say this, that's what you get paid the big bucks for. You asked to be chairman, you asked. Now, you accepted it. So, get all that comes with it, so, relax and take a deep breath because it's coming. Questions coming, they're coming, they're coming. So, just relax and I understand, but you're the leader, so, that what comes with the territory. Let me piggyback first on starting with this map. In whether or not, -- let me just say this; I asked for a map that shows the precincts, I know we got them. And the reason I'm saying that to everybody in here to do that, yes. It's going to take more time. It's going to be detailed, because you're asking questions about this or that. But as a committee, and thank you for putting me on the committee. Whoever appointed me, I know who did; so thank you. But as a committee, we have to go through this mundane process if members have the question. We are in a committee meeting now; and in here, any of those questions that we have. the means of being able to provide, we have a right to get that information. Let's not vote it all up and down by memos, each member has that right to get that particular information. So, with that in mind, that's the first thing because I like to see what Senator was saying about the drawing to see what it brings in and what it doesn't. I can't tell a lick about Jefferson County, where the line cut off from this map. I don't know if it cut off on south side, if it cut off on far apart. I don't know if it cut off above Fire Park above Center Point. I don't know where it cuts off by looking at this, and along with being here, I'm a citizen in that particular district as well. So, I would like to see that number one. Number two, I think if that information is available that the representative requested, I think that it should be provided immediately if we operated off of it and didn't have the actual information here, then I think that needs to be known. But I think that any information in this meeting not a week later, not two days, not a month later, but should be provided in here. If it's on a computer, push a button, push print, print it out, and then give it to whoever else have requested it. So, I said that to say that it may not happen, but to count all these things right here, you might want to pipe in dinner[PH 00:29:00] because we need to go through these and to ask questions, is going to seem whatever you want to call it, but that's why I say get the frustration down because we have questions, I have questions, and I like to get answers as a committee member. Nobody else may not be concerned about these things, and I understand. But if one member is, we need to address that. The other thing I want to say is this is that there's two other things, and I'll move near the mic. Number one is that the Senator mentioned correctly about the 26% African-Americans. But we we're actually talking about 30 something percent of minorities. One third of them as it relates to minority population itself should be represented. We're talking about that it should be two as it relates to African-American population as a minority because it's a super population of minorities.

**[00:30:00]**

But there are other minorities, Asians, there are Latinos, there are all these people in this State and men of my registered voters that make that percentage goes up to 30 something percent. The third thing is that I've had opportunities to see the map that Senator Singleton is talking about, and that map does not split one count, one county, the congressional map that he's talking about.

It keeps every county whole for all the congressional districts that exist on that map. So, I would think that as a committee, whether the committee ultimately votes it up that as he said, I think that as a committee, that we should consider any of those plans in this meeting if it made those 10 days, I think the requirement that you made that that would be submitted. If they were submitted there in the committee, should take those up -- that was committee rules, that's committee adopted and last, but not least, I'll say this is that I think that the process itself has not addressed the area of compromise, and I'm not talking about somebody's individual districts. I'm talking about the issues that's before you it relates to minorities. I know nobody sat down and talked about the concerns that I split and when we get to that area in the [INDISCERNIBLE 00:31:28] plans, I expressed that I had a concern about that area and no other conversation has been had about it. So, that kind of disappoints me because it's kind of saying that "I don't give a heck what you think or say. So, take me to court." That's what it says to me. I don't give a rip what you think, I don't want to talk to you. I don't want to compromise; this is what I'm going to do. So, take me, so I hope that isn't what it's saying, because I'm not saying anything but anything. I think past involvement says that that has happened. So, I would hope if we are trying to get around and work together in this situation, that we'll find some way to compromise with both sides. I know you've been working hard on your side because I've talked to some of my colleagues and I know some of those concerns, but I'm talking about all of us as a whole. Thank you very much.

**CHAIRMAN:** Thank you, Senator. Ms. Hall?

**REPRESENTATIVE HALL:** Thank you, Mr. Chairman and Chairman. I want to reiterate the comment that was made earlier in terms of the response when questions are raised. That we are all in here because we want to do what is right. So, I would hope that we would be considerate of that in light of the fact of the response that I've heard with the comments that have been made up to this point, I'd like to make a motion. I am going to make a motion. My motion is that we postpone the votes on these proposed maps until members of this committee and the public has had adequate time to review and consider the details as well as provide the ratio polarization data study that you said was done.

**FEMALE 2:** Mr. Chairman, I second the motion.

**MALE 2:** Mr. Chairman, I think that motion is inappropriate. We have business to tend to at this meeting. Everyone knows it and if it would be --

**[OVERLAY]**

**MALE 2:** Would you mind if I get to my comment, please without interrupting? I have not interrupted you and I don't want to be interrupted.

**FEMALE 2:** I appreciate that, but when you make a comment like that, I'm sorry. I should have held my --

**MR. CHAIRMAN:** Move to table. We have a motion to table. All in favor. Say, aye.

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**MALE 2:** Aye.

**FEMALE 2:** I oppose.

**[OVERLAY]**

**FEMALE 2:** Roll call. I will ask that each vote just as you did on the minutes that you would have the roll call vote on each action, thank you. And I would ask that you reconsider at this time.

**MR. CHAIRMAN:** So, you have a motion to reconsider?

**FEMALE 2:** Yes, sir.

**MALE 3:** Second.

**MALE 2:** I second it.

**MR. CHAIRMAN:** All in favor, say, aye.

**[OVERLAY]**

**MR. CHAIRMAN:** Nay?

**[OVERLAY]**

**FEMALE 2:** I did request a roll call on each motion hereon and that you didn't.

**[OVERLAY]**

**FEMALE 2:** No, you didn't, because you'd reconsider.
**MR. CHAIRMAN:** Oh, now we have a motion to give this plan a favorable report in a second.

**MALE 4:** Mr. Chairman.

**MR. CHAIRMAN:** Roll call, please.

**MALE 4:** Mr. Chairman?

**CHAIRMAN:** Yes, sir?

**MALE 4:** I'm ready. I'd like to be recognized.

**CHAIRMAN:** Okay, sure.

**MALE 4:** So, are we saying that, it doesn't matter what we think at all?

14

**[00:35:00]**

We just come in here to go through the functions. We're not going to consider anything whatsoever that if we have a concern or anything, you're saying it don't matter that we're in here because that's what we're saying. I didn't say what the final vote after we go through the process of consideration. But we're not going to consider anything that we got to say?

**MR. CHAIRMAN:** No.

**MALE 4:** I mean, is this a segregated movement or something? Because you haven't considered nothing we're saying over here. So, I'm just asking you as a chairman, is that where we're going with this?

**MR. CHAIRMAN:** And I'm allowing each of you to speak. Ms. Boyd.

**REPRESENTATIVE BOYD:** Thank you so much, Mr. Chairman. We've sat around this table many times. It's disgusting when you walk into a room for me and somebody approach me. "May I help you?" That was the first thing; but being as old as I am, and I haven't taught school 45 years and 6 months I've been here, I've learned a lot. At our very first meeting, I asked, "Is this one going to be better than any of those in the past that we do it fairly and collectively?" We know the process, we know who has the vote, all we want, Mr. Chairmans, is the opportunity to be heard fairly and from the way we are starting off here, it doesn't seem that way. Only God Almighty can change hearts. We can sit here forever and look at each other and do what we're told to do when it comes to voting. I would hope not. But we're speaking, I have people at home who are very much concerned about the senatorial. What is shown and as it relates to congressional seats. If that shoe was on the other foot, that's all I'm going to ask you to do when I close. Just think about if the shoe was on the other foot and you were sitting in my seat and my place, oh, our places here, would you act in the same manner? Thank you so much for the opportunity.

**MALE 2:** Roll call?

**MR. CHAIRMAN:** Another roll call vote on approving the congressional plan. Mr. Jones, [INDISCERNIBLE 00:38:05]

**REPRESENTATIVE JONES:** Thank you for the recognition, Mr. Chairman. I think on my visit here last week, I mentioned that this would be the way this process would turn out. It is not logical to think that we can digest the data that's here in the period of time that we received it. Nor is it logical to think that we would vote on something that we actually have no knowledge about and can't even talk to anyone in our district about because we don't know. How do you vote and then go back home and explain when someone asks, "Well, why did you vote for this?" and start asking the questions that's being asked here? What do we do with that? I understand the time. I understand how hard people have worked. I've been up here a couple of times, and I've seen the work that's taking place up here, and that's admirable. I've seen a lot of people working hard. The bottom line, though, we cannot disregard transparency based on urgency, especially in

15

this process. I know that there are some time periods we have to meet. To me, the questions that's been asked are logical questions. If someone is really interested in what they're doing and the people they represent, they are logical questions. Now maybe because this is my first time in this process, someone told, I think the attorney mentioned to me, "Well, they've been doing it like this a long time" and let me respond to what I told him. "That does not mean that that's right or fair regardless of whether Democrats did it or Republicans did it, the right way is the right way regardless to who's doing it."

[00:40:00]

And I just think that we ought to give some concern for some of the questions that's being asked here, because those same questions are going to be asked to me as soon as I get back to mobile account and I have no answers. You give me a lot of data here, but it probably takes me a few days to read through it, but it's over then. I've already voted. So that's really my statement and I just want you to consider some of those things as I go forward.

**SENATOR MCCLENDON:** Ladies and gentlemen, let me point out. What we have before today is simply a recommendation. It will be put in Bill Form. It will be introduced into both chambers of the house. It will be assigned to committee in both chambers, and then it will be debated fully on the floor of both chambers. We're just trying to get to the point where we've been called into extraordinary session. That deadline is set. We have to have something to put into a bill by 04:00 Thursday afternoon, and we need to get something out of here so LSA can put it into Bill Form so we can give it to everybody because it's not in Bill Form until it comes out of here. You will have the time in both the House Standing Committee and the Senate Standing Committee and the floor of the house and the floor of the senate to fully vet and look at these bills. But there's not a bill yet. I don't have a bill because I can't say anything to LSA until I get something from this committee. This is simply a recommendation to send to LSA for us to begin the full-scale debate on the floor. Senator Smitherman.

**SENATOR SMITHERMAN:** Are you saying, I said you go to the chairman and you're speaking. Are you saying that we can't vet it here wherein the committee itself that we denied the opportunity to vet it? I'm just asking a question. I didn't say you said it or not. You answer, we answer that. Are you telling me that what you just see, all that's going to happen out there -- are you saying that we -- but however, in this committee, we are denied that opportunity to do the same thing in our committee work on reapportionment?

**SENATOR MCCLENDON:** No.

**SENATOR SMITHERMAN:** Well, if we did that like for it to be done. That's all I'm at right now. I like this [INDISCERNIBLE 00:42:09].

**SENATOR MCCLENDON:** You got the populations, the deviations of black age voting population in every different. You have all the information that I have.

**SENATOR SMITHERMAN:** And I like to vet it in here. Me vet in at, we leave out here means nothing because the vote is going to be taken.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR MCCLENDON:** I don't have a bill before you because I can't get a bill draft until after it comes out to LSA, and I can't see anything to LSA until it comes out of here.

**SENATOR SMITHERMAN:** Unless I'm going to be on what -- we vote now. Whether we vote now today. I would like for it to be vetted the same way that you said that it could be vetted in those committees. Why? One of the main reasons we are supposed to have the experts in here. Our reapportionment director will not be on the floor. If it's not a public hearing, she cannot come on the senate floor. This lawyer cannot come on the senate floor itself. This is where the work has to be done to answer those questions in this committee. Not out there. You all know the rules. I don't have to even speak them. The people can't come out there. They are going to be out there. It's going to be somebody at the mic going to be saying the same thing. Well, they did it. And the answer is goes they did it. I would like to know how you came about it. Whatever the process to get to what you said that they say, "Okay to." And this is the place that it should be done right in here, and that's all that I'm asking. The exposure of the process and information be brought out in here so questions and follow up questions can be addressed to that information.

**SENATOR MCCLENDON:** Yes, Ms. Hall.

**REPRESENTATIVE HALL:** I needed to go back to make sure I have the correct information as relates to what you said about the racially polarized voting study that was done. Did you say it was done?

**SENATOR MCCLENDON:** Because of the black age voting population in Congressional District 7, there was not one needed because it was over 54% black voting age population.

**REPRESENTATIVE HALL:** So you're saying that we don't have a black, we don't have a polarization, racially polarization study?

**SENATOR MCCLENDON:** None. Because the voting age is 54. What is it? I got it right here.

**REPRESENTATIVE HALL:** And you use District 7 as the basis for not having such a study done?

**SENATOR MCCLENDON:** The black voting age population of the district is sufficient enough to where you don't need a study done on it.

**REPRESENTATIVE HALL:** Are you saying that would not be a part or should not have been a part of this process?

**SENATOR MCCLENDON:** Once we drew the process, once we drew the plan with no race on the computer --

**[00:45:00]**

-- then after the plan was drawn, we turned on the race and we looked at District 7 and saw that it had a black voting age population that was sufficient enough to not require an analysis. And we put any more African-Americans on the race. We're afraid we'd be sued for packing.

**REPRESENTATIVE HALL:** So that was just District 7. What about the other districts? If we did those on these, I really would like -- I was trying to get that information. I'd like to have that information. I'm requesting that information.

**SENATOR MCCLENDON:** The demographics of the district. Yeah. It's right here, it's in your folder.

**REPRESENTATIVE HALL:** So you're saying the data that we have makes of the --?

**SENATOR MCCLENDON:** Yeah. Here's the data right here. It's in your folder. It shows you the percentage of African-Americans of whites, the 18 plus populations, everything. It tells you to give you all that information.

**REPRESENTATIVE HALL:** I just want to make sure what you're saying that the data that we're receiving here today on each one of the districts provides us the data that we would have received or that would be received as a part of a racial polarization voting study.

**SENATOR MCCLENDON:** I'm being told that at 54 plus percent of the African-American vote, it was high enough not to warrant a polarization study. It was a majority-minority district.

**REPRESENTATIVE HALL:** And that came from our attorney or the committee's attorney?

**SENATOR MCCLENDON:** Yes. That came from the committee's attorney. Yes, ma'am.

**REPRESENTATIVE HALL:** And so, at this point, we do not have that.

**SENATOR MCCLENDON:** Not on District 7. No, ma'am. Yes. Chris. The representative of England, I'm sorry.

**REPRESENTATIVE ENGLAND:** All right. You're referring to that -- as if the District 7 was the only district that you did not do that on. So did you do that on other districts?

**SENATOR MCCLENDON:** We have the breakdown of black and white population.

**REPRESENTATIVE ENGLAND:** No, not that. I'm talking about you mentioning that racial -- that you didn't do the study on seven. Did you do it on any other district?

**SENATOR MCCLENDON:** Can I ask something? The question you're asking, the answer is our attorney, mine and your attorney set that data off for districts that it looked like there might possibly be a racial issue. And we did that on all of these maps that we've done today. So he received the information on those districts where it looked like it could possibly be questionable, and wherever it was questionable, if necessary, we made adjustments. So the answer to your

18

question would be a general statement that in any districts where it looked like it possibly was an issue, we had those districts analyzed. And if necessary to make changes in those districts to try to stay in compliance with the Voting Rights Act, then we made those moves. So you can ask that question about any one district and I will answer that by saying any district that looked like it needed to be done, we did it.

**REPRESENTATIVE ENGLAND:**  It would appear that District 7 would look like that would need to be done if the methodology that you said you used was, we didn't think about race and then we drew the map, and then we said, "Okay, well, this is a result." So it appears to me that if we're doing this in the logical way, that District 7 just -- as it appears on a map, would produce a certain percentage. Now, according to what you've been telling me, that the percentage is not the decision that you made looking at it on the paper and saying that 54% is enough, you actually consulted with an attorney to make sure. So it would appear to me that if you're applying the logic that you just gave me that if we just looked at the district to see if it was in compliance, we would actually do District 7 before we did the others. So I would like to request that study be done on District 7. And what is the relationship between the 54% that you're citing and the actual results or potential results of a racial polarization study? What is the relationship between those two?

**[00:50:00]**

**SENATOR MCCLENDON:**  I got no clue.

**REPRESENTATIVE ENGLAND:**  And that's the point.

**SENATOR MCCLENDON:**  That's, that's the reason why we have the expert.

**REPRESENTATIVE ENGLAND:**  Again, but hold on. That's point. If you can't explain to me why the 54% that you're telling us satisfies the threshold that you have not created or satisfied yet, that would probably make it necessary for you to conduct a study to see if that 54% actually represent, which represents what you think it does. So for -- I would like to request as a member of the committee that that study be done on the Congressional District 7. I would also like to request because the way you keep describing the map itself, is that Districts 1 through 6 may have caused the question or may not have caused to question so there is a situation where that same study may have been done on the other districts. I would also like to see that information as well. Can I get that? First, can I get the study done on Congressional District 7 to make sure that the 54% represents what you think you're saying? And then also, can I get this, the results of the studies that they've been done on other district? Because Senator McClendon, you represented that they had been. So I would like to see that data as well. Is that possible?

**SENATOR MCCLENDON:**  Is there a particular percentage you'd be interested in seeing in District 7?

**REPRESENTATIVE ENGLAND:**  That's the whole point. I want the study done so I'll know. I'm not going to -- I can't just blindly tell you what are percentage I would need in an area to make sure that it complies with the Voting Rights Act, one, but two, it is a -- I guess what you

would consider a safe majority-minority district. That's the whole point of the study. So I would like the study to be done on Congressional District 7 and I would also like for you to give me the results of the other studies on the other districts that you mentioned may or may not have caused to you some consternation.

**SENATOR MCCLENDON:**   Okay, Mr. England, here's what I'll do. I'll request a study on District 7 for you, and I'll request the study be done on Senator Singleton's bill that he introduced also. How's that?

**REPRESENTATIVE ENGLAND:**  Yes.

**SENATOR MCCLENDON:**  It's possible to do it. I mean, we're going to talk about it. Okay. I'll do on both of them.

**REPRESENTATIVE ENGLAND:**  To also kind of take a step back, this process isn't result-oriented. Meaning, that we're not collected here to go over the data and the maps just to meet the deadline. We are actually supposed to do some qualitative work on the information that you provided us so we don't send maps or information to LRS to be drawn up into something that can't pass. I mean, and I get it. I mean, we work with deadlines all the time, but this committee structure was set up especially for this component because it's actually a joint committee for the house and the senate that goes over all four maps. So we can actually take a deep dive in that information, in the data and actually produce a map that actually satisfies all the things that you've been mentioning since the very beginning about keeping counties whole, about not splitting precincts, about making sure that equal protection is valid and making sure that the Voting Right Act is complied with. That's what this process is for, is to vet the information that we're getting. Because we may go through this process and discover that some of the is corrupted and it's not reliable or, we may actually if we had done a racial polarization study, we may actually find out that that 54% that you're talking about doesn't actually represent the information that you're giving us, and that you have made an assumption that could jeopardize an entire map. So again, not trying to diminish the effort, the herculean effort that you had to undertake to get us to this point, the point here isn't just to get it done so we can get a bill prepared. The point here is to actually vet the information so we know what we're actually doing in this process.

**SENATOR MCCLENDON:**  I understand, and I tell you we're going to spend a lot of time on this differential privacy, and that's going to come up sooner or later. Senator Smitherman?

**SENATOR SMITHERMAN:**  I would just -- if you all, I would like to know first on any of the congressional districts, did you all receive a written report regarding the study that he is requesting on 7? We say it that on some of them, it was done. All right. So whatever ones that were done, do we have a written report from that attorney, from whoever it is that we had to do it. We are saying that it was done on A B, C, or D. Do we have anything in writing that was sent to this committee to you all or sent to the community itself that would suggest that that is actually a fact? That's the first question. Do we have anything?

[00:55:13]

**SENATOR MCCLENDON:**  When we saw that 54% plus in the Seventh District majority-minority, we didn't think it needed a racial polarization analyzation and a lot to be analyzed and we didn't request racial voting polarization study on the majority of white districts.

**SENATOR SMITHERMAN:**  Okay. So we don't have that, that's the correct answer. We don't have anything in writing that's been sent to you all regarding that you should --

**SENATOR MCCLENDON:**  I have not seen anything.

**SENATOR SMITHERMAN:**  Okay. All right. So we can't hold out then that that has been done. Okay. So that's the first thing. The second thing is this. We have an attorney that as you say very capable of being able to do what's necessary. I cannot understand the most important, the most important and really the only opportunity we as a committee member while we are going through these maps. I cannot understand for the love of life why he is not even sitting over there or he is not on Zoom. That doesn't make any sense. We are asking questions and we can't, you all cannot give the detail. I didn't say it to generalization, but you cannot give the detailed answer -- we keep telling them whether attorney need, an attorney and that's fine. Because if that's the answer. But then, that attorney need to be over there to answer what you just said that he did. I mean, that's an attorney for the committee and that is the most important meeting that he could ever be at being able to get him on there to give those responses as to the things that you all don't have first of all, documentation and secondly, that he in fact was the person who created, who suggested it and it was adopted to present to us by you all. So I'm asking to get him on here. I don't care if the phone.

**SENATOR MCCLENDON:**  [INDISCERNIBLE 00:57:18]

**SENATOR SMITHERMAN:**  Yeah. I don't care if you get the phone or we can't Zoom, we deserve to have those people in here where we can ask those questions to get answers. Thank you.

**SENATOR MCCLENDON:**  Yes, Ms. Hall?

**REPRESENTATIVE HALL:**  Thank you. You indicated in your report about meeting with all of the members of congress, except for one. Are you able to tell me that once the maps were drawn, did they have an opportunity to view this map? And, what was their impression?

**SENATOR MCCLENDON:**  They all saw. The one that we didn't meet was Mo Brooks because he's no longer running. But they've all had the opportunity to look at them and make suggestions, make requests in what they would like to see in their district, yes.

**REPRESENTATIVE HALL:**  And did they indicate that they felt that what you've presented is fair and --?

**SENATOR MCCLENDON:**  To the best of my knowledge, yes. I was not in the meetings.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**REPRESENTATIVE HALL:** Thank you.

**MALE 1:** Mr. Chairman, our renewed motion for roll call vote.

**M SENATOR MCCLENDON:** We have a motion before us to adopt the congressional plan. Clerk, recall the roll.

**CLERK:** Senator Holley?

**SENATOR HOLLEY:** Aye.

**CLERK:** Senator Allen?

**SENATOR ALLEN:** Aye.

**CLERK:** Senator Levison?

**SENATOR LEVISON:** Aye.

**CLERK:** Senator McClendon?

**SENATOR MCCLENDON:** Aye.

**CLERK:** Senator Melson?

**SENATOR MELSON:** Aye.

**CLERK:** Senator Orr?

**SENATOR ORR:** Aye.

**CLERK:** Senator Roberts?

**SENATOR ROBERTS:** Aye.

**CLERK:** Senator Scofield?

**SENATOR SCOFIELD:** Aye.

**CLERK:** Senator Singleton?

**SENATOR SINGLETON:** No.

**CLERK:** Senator Smitherman?

**SENATOR SMITHERMAN:** No.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**CLERK:** Senator Williams?

**SENATOR SMITHERMAN:** Yeah.

**CLERK:** Representative Boyd?

**REPRESENTATIVE BOYD:** No.

**CLERK:** Representative Clouse?

**REPRESENTATIVE CLOUSE:** Aye.

**CLERK:** Representative Ellis?

**REPRESENTATIVE ELLIS:** Aye.

**CLERK:** Representative England?

**REPRESENTATIVE ENGLAND:** No.

**CLERK:** Representative Greer?

**REPRESENTATIVE GREER:** Aye.

**CLERK:** Representative Hall?

**REPRESENTATIVE HALL:** No.

**CLERK:** Representative Jones?

**REPRESENTATIVE JONES:** No.

**CLERK:** Representative Lovvorn?

**REPRESENTATIVE LOVVORN:** Aye.

**CLERK:** Representative Pringle?

**REPRESENTATIVE PRINGLE:** Aye.

**CLERK:** Representative South?

**REPRESENTATIVE SOUTH:** Aye.

**CLERK:** Representative Wood?

**REPRESENTATIVE WOOD:** Aye.

**CLERK:** Fifteen yeses, six nos. The motion passed.

**SENATOR MCCLENDON:** Thank you committee members. Coming forth now is the State Board of Education in development of this plan. All state board members were met with in person or by phone, follow up meetings were held, sometimes by phone, some on Microsoft Team until all of their concerns were addressed. All board members had inputs. This plan meets our committee guidelines, complies with Section 2 of the Voting Rights Act and Equal Protection clause. There is a minimum population deviation between the districts, all population state board is 628,035 plus or minus five.

**[01:00:10]**

Respects counties to the extent possible of taking into consideration requirements for equal population does not require incumbents to run against each other. District continuous and reasonably compact, respects communities of interest, preserves the course of existing districts, the precinct splits, five counties are splits, five counties with zero splits. It's an improvement over the current law with 12 versus 5 splits. Tuscaloosa County, Jefferson, Talladega, Montgomery and Mobile each have our split. Contains two majority-black, Districts 4 and 5. The BVAP for 4 is 51.2 1%. BVAP for 5 is 51.2 7% and the functionality studies that we've talked about indicate that Section 2 requires no further adjustment to these BVAPs in order to fulfill our obligation under the Voting Rights Act. With that introduction, I move adoption of the plan as you have received. I have a second on that, a motion and adoption and I recognize my good friend Senator Smitherman.

**SENATOR SMITHERMAN:** Thank you Senator. I can't speak for anybody that's in here, but I have no knowledge of which changes had to be made in here. Is that I would like to go through the changes in each district adjustments. What is the adjustment that you had to make in drawing some out? We can start with warning going all the way to the last one there.

**SENATOR MCCLENDON:** The changes are detailed. You've got a folder Senator.

**SENATOR SMITHERMAN:** I would have to read.

**SENATOR MCCLENDON:** That's the changes in it and from -- let me tell you this.

**SENATOR SMITHERMAN:** Mr. Chairman, do you want me to -- if you recognize me, I'll take this folder and then read them out. But tell me, I got, so Smitherman is that last vote. I don't like them. I am not even seen none of these until I just walked in at one o'clock. So I don't understand. But I'm requesting either that we go over or I'm requesting the opportunity to -- if I got to read it, let me read it out loud and everybody sit here and we read and then we have discussions about it. I don't mind doing whatever you tell me to do. But I do want to go over these. I mean just to ram them down my throat, that is not right. If I can't go over them, then you're ramming it down my throat because I just got this. I mean, I came down here and you

meet you and nobody said nothing about change, anything, it was about this. Nobody gave me anything. I am not saying nothing until I got this right now. So I'm asking, please tell me whether we change in one? What we change in two, that's reasonable.

**SENATOR MCCLENDON:**  Would you like a little five-minute break to read over that thing Senator?

**SENATOR SMITHERMAN:**  It'd take more than five minutes to read because I still got questions. Reading don't eliminate the questions because I need a big old map up there. I need a map, I need the overlay. Since you all know what I need, I will need to overlay and then I could see where that is and I could say, "Well, what area is that and then what's the result of that? What impact did it have on initial?" So that I've been asking for the maps and I know that they have it because I saw overlay when I came in here. So I know we have the capability and that's all I'm asking.

**SENATOR MCCLENDON:**  I wish you'd let us know ahead of time. Well Senator, if you want to talk about this, this is your opportunity to go ahead and do that. Now, I will tell you as far as asking me a lot of details on the BOA map, I was not involved and I was involved peripherally but not in detail. So if there's things you would like to discuss and ask and talk about on this thing that you have the floor and you're just welcome to do so.

**SENATOR SMITHERMAN:**  I could do a decent job of that if I got the map up there, well I can ask. That doesn't tell me anything. I'm looking at the one, it didn't tell me anything. It just tell me that these are the new lines. They didn't tell me what's the overlay, what we're taking out, what we had to add in anything like that in terms of the precincts.

**[01:05:05]**

**SENATOR MCCLENDON:**  So do you have specific questions about parts of the map and I'll see what I can find out.

**SENATOR SMITHERMAN:**  Yes sir.

**SENATOR MCCLENDON:**  I narrow it down and help me out here and I'll see what I can do.

**SENATOR SMITHERMAN:**  The basic question I like to overlay, like to see the comparison and contrast, either way that it's set up that you got to set up in the machine -- presently and what changes this.

**SENATOR MCCLENDON:**  Okay I'll see what you want. I don't know if we're capable of doing that but why don't you talk about any parts of this that catches your attention and I'll check and see what our IT folks can do as far as complying with your request. We might be able to put them side-by-side with the new one. We might be able to do that. I don't know, but I'll be glad to check on that and see what we can do.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:**  Well specific questions, I can't give them to you because I don't know the overlay. That's why I got to have it. I mean, this is the finished product and I'm asking about the contrast between old product and the finished and I don't even have that before me in this where I can do that sitting in, you can think of anything. I don't have it. That's why I'm asking for it and I know we got it because like I said, I was here and I saw that we have overlaying capabilities.

**SENATOR MCCLENDON:**  We did have, and I think we put online. I'm not sure, but I think we put online today old map, new map. We'll see.

**SENATOR SMITHERMAN:**  I did the first time, I've seen this.

**SENATOR MCCLENDON:**  While he makes that request, is anybody else. We'll get back to you Senator.

**REPRESENTATIVE ENGLAND:**  I have questions.

**SENATOR MCCLENDON:**  Under the current map that we're looking at now, was this drawn based on the 5% deviation plus-minus?

**REPRESENTATIVE ENGLAND:**  Yes, sir.

**SENATOR MCCLENDON:**  Could you tell me in District 4 and District 5 what was the population gain or population loss for you to be able to -- because in order for you to do the 5% deviation, you had to look at the gain or loss in that. So therefore, you had to move around in precincts.

**REPRESENTATIVE ENGLAND:**  I don't have a -- it's 27,686 people under that deal. It's 228,659 whites, 319,828 blacks.

**SENATOR MCCLENDON:**  So there's about 27,000 population loss in that district?

**REPRESENTATIVE ENGLAND:**  It's under population idea by 27, has a deviation of minus 4.61%. It's 38.9% white, 53.27% black.

**SENATOR MCCLENDON:**  Where would you have made that part pull more citizens black there in Jefferson County to make up that deviation?

**REPRESENTATIVE ENGLAND:**  I'm not sure where it came from Senator. I'm sorry.

**SENATOR MCCLENDON:**  See, that's the kind of stuff we would need to know in order to be able to approve maps when you start making these kinds of adjustments. I definitely would like to know that because it's not detailed on these maps where your adjustments came in terms of making adjustment to make up that. If you look at the next one and which covers most of the black built, I'm certainly there was some loss there.

26

**REPRESENTATIVE ENGLAND:** District 5?

**SENATOR MCCLENDON:** Yes.

**REPRESENTATIVE ENGLAND:** Which is 621,817 people which is a 6,218.

**SENATOR MCCLENDON:** How many?

**REPRESENTATIVE ENGLAND:** 6,218.

**SENATOR MCCLENDON:** Okay.

**REPRESENTATIVE ENGLAND:** 252,012 whites, 326,931 blacks. That's 40.53% white, 52.58 blacks. In fact, voting age population is 51.27%.

**SENATOR MCCLENDON:** Okay. And again, you can't tell me where the makeup of that population, which direction you went to get the makeup in that population in your precincts?

**REPRESENTATIVE ENGLAND:** I can't tell you right off the top of my head, no sir.

**[01:10:00]**

**SENATOR MCCLENDON:** Thank you.

**MR. CHAIRMAN:** Senator Smitherman rest assured. We're over here chasing some electrons around trying to.

**SENATOR SMITHERMAN:** Thank you Mr. Chairman.

**MR. CHAIRMAN:** Representative Hall, did you have something to say in the event?

**REPRESENTATIVE HALL:** I do. I'd like to ask a question that I asked earlier as it relates to the school board plan. Did we do the ratio polarization polarized voting study on these districts?

**MR. CHAIRMAN:** Okay. My answer would be the same as it was before. Any time there was any suspicion that there might be a racial issue, we did submit these to a political scientist to give us an analysis.

**MALE 1:** Mr. Chairman.

**MR. CHAIRMAN:** Just a minute.

**MALE 1:** Okay.

**MR. CHAIRMAN:** You're still up.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**REPRESENTATIVE HALL:** Okay. Yeah. So you're saying that when you felt that was not a given, that was not part of the process of drawing the maps. So I'm going to get the same response on each one of the --

**MR. CHAIRMAN:** Yes, ma'am we didn't. I'm sorry, I didn't mean to interrupt you, Ms. Hall. We didn't automatically do every district on every map. We only sent the district's offer analysis where it looked like there might be an issue. If there's any suspicion of an issue, we had them analyzed, and then using that data, we tried to make them -- that wouldn't be an issue where we comply with the voting rights there. Does that answer your question?

**REPRESENTATIVE HALL:** Yeah. I'm just trying to make sure I was understanding correctly. So, we didn't do that for congressional and we didn't do it for school boards. I've done it for any of the others.

**MR. CHAIRMAN:** All right. I'm going back if you'll hang on just a minute. Senator Smitherman, have we got the map up done? Okay. There you go.

**SENATOR SMITHERMAN:** Now, what's the overlay? I'm okay side by side or whatever you want to call it.

**MR. CHAIRMAN:** According to my expert, the blue lines are the old and the colors are the new.

**SENATOR SMITHERMAN:** Okay.

**MR. CHAIRMAN:** So he said there's been a good bit of rearranging. But there always is when you have the population changes like we've had in Alabama this past decade.

**SENATOR SMITHERMAN:** My first question would be, why is Jefferson County split three different ways? I mean, we just split Chow for every one of these maps we got. Why come into our county and split it three different ways?

**MR. CHAIRMAN:** You know, these maps were created pretty much in the same style that the senate maps which you participated in and house maps, and that we worked with each of the existing board members, and so many times these changes were made in consultation with the existing board members. Just like you had input into your senate map, they had input into this map.

**SENATOR SMITHERMAN:** I appreciate you giving them input but I will say this, after the input and everything is done. They don't vote for this. We do.

**MR. CHAIRMAN:** Right.

**SENATOR SMITHERMAN:** So, the input all right, but the input are not like ours, because we don't want going to vote. And so that's why it's important for us to understand. They may like something. I got constituents that don't like it. I got a lot of them that don't like the fact that we

split up three ways in here. I'm talking about seriously. They don't want to be split up like that. That's why I said what I said in that regard. What about the other ones? What was the rationalization for the other changes that exist in the other ones? And this one, too. What was the rationalization? Why was it split three ways?

**MR. CHAIRMAN:** That was probably the biggest part of it is dealing with the existing members. That's where the most input came from.

**SENATOR SMITHERMAN:** Okay. So, we took in consideration what individual people won't, and I'm not saying you didn't take it at all but it seems to me that, and you correct me if it's not right. I don't mind being corrected. Well, we seem that we were focusing more on what they wanted than what the citizens wanted or what the better way to draw that map without splitting those counties.

[01:15:02]

Because I'm telling you what citizens are concerned about, they telling you what individual they want and don't want and that takes us out of the game, because we're represent those same citizens and we vote. So I would ask that you all go back and look at where you don't have to split Jefferson County like that, and then provide a map that does not do that. But now what's the other deviations and the changes? In the other deviations, what did you all have to pick up and what did you lose?

**MR. CHAIRMAN:** Well, the deviations of course are in compliance with the guidelines that this committee adopted and every district within plus or minus 5% of the target. So we've stayed -- this map is inside the deviations that we established really is our own guidelines to how to do this and how to do it in a sense of fairness.

**SENATOR SMITHERMAN:** Okay. In regards to follow up on Senator Sings question, I know he mentioned something about one of those districts. It was 26% population. Can you tell us what population each one of those? On each one of them.

**MR. CHAIRMAN:** I think you've got that data.

**SENATOR SMITHERMAN:** I don't have it all in one though. I got what you say it is in the new district.

**MR. CHAIRMAN:** Well, because we know what the target. So we got that in this folder? Okay. It's in the back of your folder. You got it in writing.

**SENATOR SMITHERMAN:** The old and under?

**MR. CHAIRMAN:** Well, you may have to add or subtract from the target to see what the difference is.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:** Well in that case, I move a 30 minutes recess. I got to do some math. [INDISCERNIBLE 1:17:03] some math. Give me time to do. The figure is all over that low. I mean, I know they are. You all could tell me about my own district. You know about every district in every plan it is.

**MR. CHAIRMAN:** All right. I'm looking at the data that you've got in your folder, and I'm looking at district five. It gives the ideal population, gives the actual population then it gives the deviation. So, you've got all of that information in writing in your folder?

**SENATOR SMITHERMAN:** What's the ideal population? The actual population?

**MR. CHAIRMAN:** It's at the very back of your

**SENATOR SMITHERMAN:** I see that part what you're saying right. I see it. Now, the other question there, where did we make of those numbers from? What precincts?

**MR. CHAIRMAN:** I was moved around to create the district.

**SENATOR SMITHERMAN:** Yeah.

**MR. CHAIRMAN:** I don't know the answer to that. Oh, no.

**SENATOR SMITHERMAN:** Do we have the answer in this room?

**MR. CHAIRMAN:** A lot of precincts. Well, it doesn't matter. What you know is what the old district is and now, before you, you have what the new district is. So now where some people came from, that is the overlay.

**SENATOR SMITHERMAN:** You said it don't matter, it does to me. I just wanted to say that it may not to nobody else, but it does. That's why I'm asking the question. I wouldn't ask the question being dealing --

**MR. CHAIRMAN:** Are you asking me and listen Senator Smitherman, I'm trying to get what you want here, but you want to know where people came from or where they went. That's what your overlay map shows us, where the changes were made, which precincts were in a district before and which ones are in our district now. Does that answer your question?

**SENATOR SMITHERMAN:** It answers 50%.

**MR. CHAIRMAN:** Okay.

**SENATOR SMITHERMAN:** But the other part is that it does not talk about what area. [INDISCERNIBLE 1:18:56] and put it over here. That's what I'm saying. We don't have any writing up there. I wouldn't have to ask, and we do have maps that is that detail. You all know that. I know you do, because you all the chairman's. You know we do, and that's what I was asking. I mean, do we have capabilities of doing that? Yes. And that's all I'm asking. In every

30

one of these things, we're going to do -- I would like to see that. So that at the, we can make a better understanding of what we vote on and taking places from people, because people ask us especially up in mayor. They don't want to be over here. They want the county to be whole. And so when you make the moves, and that tells me what people will move and what people will left and that has a basis too of the way I feel about this plan because all of us, we are here to represent the people in our district, and these are concerns of people in the district. Is there any way to know that?

[01:20:02]

**MALE 1:** No, sir.

**SENATOR SMITHERMAN:** It's not? You sure now? I mean, I was here when we did it, when we provided it.

**MALE 1:** Well, it could be that.

**SENATOR SMITHERMAN:** So even in man, I saw precincts. You remember you were in here when I came. I saw precincts. So I'm not making up some, you was in there with me when we saw those precincts.

**SENATOR MCCLENDON:** Now we can bring that down and we can get that to you but as far as it's coming before this committee, what we have presented and this is what we've got before us today.

**SENATOR SMITHERMAN:** And I have no problem with you presented and that's what before us. I just want some answers of what's before us. That's all I'm asking.

**MALE 1:** All right, sir.

**SENATOR SMITHERMAN:** So, can we get that information? Can we break it down? Let me just say this, I understand that we can, all we have to do, even out there is take number one and then put the details in and put it across there. That's all we got to do and then we'll see where it comes from. We should put that old, that blue line or whatever that line over there and that's like it is right there. The old and new and put the detail in there and it's over there in that computer right there. That's all we got to do. It's right there. I ain't asking for the man who ain't that available lawyer we got. I'm asking him about that computer right there.

**SENATOR MCCLENDON:** Okay, where we're examining on the capability of this system that we have now to the extent that we can.

**SENATOR SMITHERMAN:** Okay. There we go. That's what I'm talking about. That's I'm saying pop up there.

**SENATOR MCCLENDON:** Is there any particular area that you would like to look at?

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:** I like to --

**SENATOR MCCLENDON:** Do you want to look at your area and --

**SENATOR SMITHERMAN:** First all [INDISCERNIBLE 01:22:03], I like to look at the one above and I think that's six or whatever that is above that, every part, me particularly every one of those districts that Jefferson County, I like to see that part, that district that touches. It's three of them and I like to be told what I'm looking at, so I'll be sure of what I see. Yeah, you getting it. I was looking over that Tarrant and I'm looking at Inglenook, Brownsville. I'm looking at those.

**SENATOR MCCLENDON:** Senator Smitherman.

**SENATOR SMITHERMAN:** Yes, sir.

**SENATOR MCCLENDON:** We're going to spend, if you want to spend, we're going to spend about 10 minutes with you.

**SENATOR SMITHERMAN:** That's fine, I'll take it here.

**SENATOR MCCLENDON:** [INDISCERNIBLE 01:23:10] on this and then we're going to get you back on business.

**SENATOR SMITHERMAN:** 10 is better than zero. Take the 10.

**SENATOR MCCLENDON:** You're always a 10 Senator Smitherman.

**SENATOR SMITHERMAN:** Thank you, Senator. Sun Valley, so that the blue is the new, right?

**MALE 1:** That's right.

**SENATOR SMITHERMAN:** The blue is old. Blue is old and the colors are new. Okay. What district is that green? What number district? Four? It's number four? Blue, that y 'all call it blue. Okay. All right. So, it's the color is a change? Let me see. And it's four, four is the C5 and what six is the majority of the districts, five and; no, five and what? What number Mr. Chairman? I was just trying to speed up the process. Which one is five and what's the other one you say is a majority? African-American district, [INDISCERNIBLE 01:24:42] voting population? It's five and it's four and five?

**MALE 2:** Five, four is 51.2. Five is 51. [INDISCERNIBLE 01:24:57].

**[01:25:00]**

**SENATOR SMITHERMAN:**  How can we tighten it up that you don't have already splits in that county? Did y 'all look at that? Did you play with the map and look at it and see what it looked like?

**SENATOR MCCLENDON:**  We played with a map and you certainly will have an opportunity if you've got a better plan for us. You'll have an opportunity to like that proposal to the legislator when we meet.

**SENATOR SMITHERMAN:**  So, that's four, that all the four right there? I see some more at the bottom, is that part of four? And above four is what, seven? That's at the top of Jefferson County?

**MALE 2:**  Yes, sir.

**SENATOR SMITHERMAN:**  What percentage of seven is in Jefferson County? Anybody can tell me that? So we got three in Jefferson County and we got four and we got seven. Now, those are three at [INDISCERNIBLE 01:26:13] Jefferson County?

**MALE 2:**  Yes.

**SENATOR SMITHERMAN:**  Three, four and seven. It's seven, four and three. So in four, we went straight up. We did like the old seven in congressional. We went straight up in the Jefferson County to pull those people out, is that correct? Why we could not make Jefferson County whole or Tuscaloosa whole and keep those whole and satisfy that population? Did y 'all try to do that? And if you did - -

**SENATOR MCCLENDON:**  I'm sure that was looked at and considered.

**SENATOR SMITHERMAN:**  But you're not sure though. Okay, I was going to ask why. I'm not going to put you on the spot if you don't know, you know. Okay. All right, Mr. Chair, I see what's been done and I know what the people want. Thank you very much on that.

**SENATOR MCCLENDON:**  Senator Smitherman, thank you for your participation and your comments. As always, a pleasure. Call a question. Roll call vote. There's no more discussion and let me see, Senator Singleton, do you have a question before we call roll? Call roll, please.

**FEMALE 1:**  Senator Allen?

**SENATOR ALLEN:**  Aye.

**FEMALE 1:**  Senator Holly?

**SENATOR HOLLY:**  [INDISCERNIBLE 01:27:59].

**FEMALE 1:**  Senator Livingston?

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR LIVINGSTON:** Aye.

**FEMALE 1:** Senator McCLendon?

**SENATOR MCLENDON:** Aye.

**FEMALE 1:** Senator Melson?

**SENATOR MELSON:** Aye.

**FEMALE 1:** Senator Orr?

**SENATOR ORR:** Aye.

**FEMALE 1:** Senator Roberts?

**SENATOR ROBERTS:** Aye.

**FEMALE 1:** Senator Scofield?

**SENATOR SCOFIELD:** Aye.

**FEMALE 1:** Senator Singleton?

**SENATOR SINGLETON:** No.

**FEMALE 1:** Senator Smitherman?

**SENATOR SMITHERMAN:** No.

**FEMALE 1:** Senator Williams?

**SENATOR WILLIAMS:** [INDISCERNIBLE 01:28:20].

**FEMALE 1:** Representative Boyte?

**REPRESENTATIVE BOYTE:** No.

**FEMALE 1:** Representative Clouse?

**REPRESENTATIVE CLOUSE:** Aye.

**FEMALE 1:** Representative Ellis?

**REPRESENTATIVE ELLIS:** Aye.

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**FEMALE 1:**  Representative England?

**REPRESENTATIVE ENGLAND:**  No.

**FEMALE 1:**  Representative Greer?

**REPRESENTATIVE GREER:**  Aye.

**FEMALE 1:**  Representative Hall?

**REPRESENTATIVE HALL:**  No.

**FEMALE 1:**  Representative Jones?

**REPRESENTATIVE JONES:**  No.

**FEMALE 1:**  Representative Lovvorn?

**REPRESENTATIVE l:**  Aye.

**FEMALE 1:**  Representative Pringle?

**REPRESENTATIVE CHRIS PRINGLE:**  Aye.

**FEMALE 1:**  Representative South?

**REPRESENTATIVE SOUTH:**  Aye.

**FEMALE 1:**  Representative Woolett?

**REPRESENTATIVE WOOLETT:**  Aye.

**FEMALE 1:**  16 yes, 6 no. It's passed.

**SENATOR MCCLENDON:**  BOE, bill to favorable report by this committee. We are now moving into the Senate bill. I'm going to take that bill. All senators were met with multiple times. Most of them wanted to. Sometimes we met on the phone, sometimes in person, sometime over Microsoft Team when there was a group. Senator Don, who is not running for re-election. We met with her representative speaking on her behalf. All senators had input into the plan. This plan follows our guidelines, compliance with Section 2. Minimal population deviation. Ideal pop is 143,551. All of the districts that are on this map that you have in your folder and which will get displayed are within plus or minus 5%.

**[01:30:00]**

35

We respect County Lowndes to the extent possible, given the requirement of equal population. We are not requiring any incumbents to run against each other; districts are continuous and they're not reasonably compact. We try to respect calamities of interest and we preserve the cores of the existing district. The existing plan, the one we're under right now splits 26 counties under the plan that is being proposed that you have on the Board now. We are split 19 counties. This plan contains eight majority black districts. These districts fulfill the state's obligation under the Voting Rights Act. I have a Motion for a favorable report and a second Senator Melson, are there any -- Senator Smitherman, it's about time you chimed in. Got involved in this.

**SENATOR SMITHERMAN:** This is one that goes even deeper than that what I've been talking about. I got serious concerns about the fact -- let me say this first.

**MR. CHAIRMAN:** Yes sir.

**SENATOR SMITHERMAN:** I'm going to make a personal comment; and then I'm going to get into this. I enjoy very much working with my delegation, let me make sure you understand that. We've done a lot of good things together; so by no means that I have any problem with any individual in my district, I mean, in my delegation. But let me say this to you, there's no reason under the earth why Jefferson County is split among seven senators. We have a population of 670,000 people. When you do the math, just divide it into that, that's 4.7 senators. That's what we should have in terms of our county. Whole county, keeping the county whole. Number one, let me say this; and I think -- that's why I wish the lawyer was here because he wouldn't have a choice but to say you were right. The Constitution in Section 199 and Section 200 states and I state that the counties are to be maintained to be kept whole in terms of drawing these districts. The only deviation that it talks about is simply this; is that where you have to provide a minority district; then you go outside of the counties to succeed to do that. In Jefferson County, that does not apply. All three minority districts are inside of the county. So, as a result of that, there is no reason that that county should have those splits, based on the constitution, not based on an opinion or how I feel. I've mentioned that when I was in here, I mentioned that my concern, when I was asked the question that you satisfied, not the word satisfied, but that's with the district, and my comment is that I was concerned about whole counties, and I say that even if the Supreme Court ruled that way that I had to have this district then I will live with it, that's what my comment so I don't want to be misconstrued or what I say it in there. I'm saying it officially here. But in terms of Jefferson County, there's no reason why we should be split seven ways and I mentioned that to it made that known, no effort was made to deal with that issue. No effort was made to deal with that issue based on the constitution. So, I want to make that known that I put it out there, nothing was done about it, so, that is my concern. If you remember, that last time that we went to the Supreme Court, they took up the house issue and they addressed it in the house and said that the house should be a certain way because of dealing with this issue. Now, we're looking at the senate district that the committee has made no changes whatsoever and as a result of that, as I said, we have seven senators who represent one county. So, I'm asking the committee to go back to address section 199 and section 200 of the constitution that talks about whole counties and has laid out the proper legal basis of why we should do that especially as it relates to Jefferson County where all three minority districts encompass inside of the county.

[01:35:00]

36

**MR. CHAIRMAN:** Okay, anyone else? Seeing no other discussion, I call for the roll call vote. Representative England, I missed you over there, hold that roll call vote. Representative England, you are recognized sir.

**REPRESENTATIVE ENGLAND:** I'm just trying to figure out almost the same lines that Senator Smitherman identified that's Lucy County for whatever reason has three senators and it is carved up. It's going to be 200,000 people total and it has three senators that come from -- don't really represent the same sort of communities of interest and Senator Singleton is my friend. He is my senator, but his district goes from Tuscaloosa County all the way down to Choctaw. Senator Reed who is also a friend, his district goes from Tuscaloosa County all the way to the northern tip of Walker all the way to Lamar. These are not communities of interest. The City of Tuscaloosa proper only has average three-member senate delegation; only one of the senators live actually inside of Tuscaloosa County. So, the people in Tuscaloosa County, there are people who have more influence or just as much influence of his own city in county business that live outside the county as members that who do. Now, we're not talking about the house delegation yet, but the house delegation is worse. So, I am just as many other senators and representatives, where you have a major city, it is often sacrificed in order to make up population for other districts. As a result, it sacrifices the amount of representation that we have. So, I just want to go on record once again to state that Tuscaloosa County is possible to draw a map without splitting it into three different districts, thank you.

**MR. CHAIRMAN:** Thank you Representative England for your remarks. Senator Smitherman, back to you.

**SENATOR SMITHERMAN:** At the proper time, I have a substitute motion.

**MR. CHAIRMAN:** Let's see, anyone else have anything else to say? Yes, sir, Mr. [PH 01:37:24] Myer. Did you want to get in on this?

**MR. MYER:** I'm just concerned about, I guess the Senate District 33 is now in Baldwin County but it's traditionally all in Mobile County and then some of the Baldwin County senators are now in Mobile County; I didn't quite understand that. The Baldwin County is the largest grove county around the state. How did we get a senator from Baldwin County in Mobile and then the senators from Mobile in Baldwin? Who are they coming to cross path like that?

**MR. CHAIRMAN:** Is that a question?

**MR. MYER:** Yes, it is.

**MR. CHAIRMAN:** You know, the answer is pretty easy, isn't it? Just like in the house districts, we had to sit down and work with each of the incumbents to resolve their issues and that appears to be the resolution. Senator Smitherman, are you back?

**SENATOR SMITHERMAN:** Yes sir, I'm back.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:** Yes sir, I recognize you. You're okay?

**MALE 1:** No, I'm not okay but -- Senator Smitherman.

**MR. CHAIRMAN:** Yes sir, Senator Smitherman, you're recognized.

**SENATOR SMITHERMAN:** Thank you, Mr. Chairman. I like to make a substitute motion that we carry over this plan and the motion ask the committee to go back and to look at making the basis for drawing this plan to perseveration of this provision of the constitution which is Section 199, 200 deals with whole counties and that in particular, the counties who have an excess amount of representation as it relates to the population in reference I'm talking to primarily Jefferson County, but all other counties that we would not go forward with this until that issue is addressed and corrected to reflect out of the 678 -- 70 something thousand people that the proper number of representation in the senate honoring whole counties would be five senators, 4.7 or 5 senators, thank you.

**MR. CHAIRMAN:** Thank you Senator Smitherman. Now, my commotion to table, I would ask that you all vote aye all in favor, say aye.

**[01:40:00]**

**SENATOR SMITHERMAN:** That's a rollcall, remember --

**[OVERLAY]**

**MR. CHAIRMAN:** Senator Smitherman, you're recognized.

**SENATOR SMITHERMAN:** A request was made for rollcall on all the votes from --

**[OVERLAY]**

**MR. CHAIRMAN:** Yes, sir, the chairman decided to make that a voice vote.

**SENATOR SMITHERMAN:** So you're not honoring her request for -- she made a formal request.

**MR. CHAIRMAN:** That's okay.

**SENATOR SMITHERMAN:** Okay, what's the rule does a committee regarding? I know on the floor what you had two or three hands up. Is there any rules that we can -- as a committee be recognize so that we can have a roll call vote?

**MR. CHAIRMAN:** That's a discretion of the chairman.

**SENATOR SMITHERMAN:** So they go back to what I say. Okay. All right, thank you.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:** Senator Singleton, did you decide you want to join in?

**SENATOR SINGLETON:** Obviously not now.

**SENATOR SMITHERMAN:** You have time later, don't worry, you have time later. You have some time.

**MR. CHAIRMAN:** Do you want the floor Senator Singleton?

**SENATOR SINGLETON:** No sir.

**MR. CHAIRMAN:** Okay. Thank you. Let's roll call vote. Please call the room.

**FEMALE 1:** [PH 01:41:10] Barry Allen.

**MALE 1:** Let's make it a voice vote.

**[BACKGROUND CONVERSATION]**

**FEMALE 1:** Senator Allen.

**SENATOR ALLEN:** Aye.

**FEMALE 1:** Senator Holley.

**SENATOR HOLLEY:** Aye.

**FEMALE 1:** Senator Livingston.

**SENATOR LIVINGSTON:** Aye.

**FEMALE:** Senator McClendon.

**SENATOR MCCLENDON:** Aye.

**FEMALE 1:** Senator Melson.

**SENATOR MELSON:** Aye.

**FEMALE 1:** Senator Orr?

**SENATOR ORR:** Aye.

**FEMALE 1:** Senator Roberts?

**SENATOR MELSON:** Aye.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**FEMALE 1:** Senator Scofield.

**SENATOR SCOFIELD:** Aye.

**FEMALE 1:** Senator Singleton.

**SENATOR SINGLETON:** No.

**FEMALE 1:** Senator Smitherman.

**SENATOR SMITHERMAN:** No.

**FEMALE 1:** Senator Williams.

**SENATOR WILLIAMS:** Aye.

**FEMALE 1:** Representative Boyte.

**REPRESENTATIVE BOYTE:** No.

**FEMALE 1:** Representative [PH 01:41:45] Clouse.

**REPRESENTATIVE CLOUSE:** Aye

**FEMALE 1:** Representative Ellis.

**REPRESENTATIVE ELLIS:** Aye

**FEMALE 1:** Representative England.

**REPRESENTATIVE ENGLAND:** No.

**FEMALE 1:** Representative Greer.

**REPRESENTATIVE GREER:** Aye.

**FEMALE 1:** Representative Hall.

**REPRESENTATIVE HALL:** No.

**FEMALE 1:** Representative Jones.

**REPRESENTATIVE JONES:** No.

**FEMALE 1:** Representative Lovvorn.

**REPRESENTATIVE LOVVORN:**  Aye.

**FEMALE 1:**  Representative Pringle.

**REPRESENTATIVE CHRIS PRINGLE:**  Aye.

**FEMALE 1:**  Representative South

**REPRESENTATIVE SOUTH:**  Aye.

**FEMALE 1:**  Representative Wood.

**REPRESENTATIVE WOOD:**  Aye.

**FEMALE 1:**  16 yeses, 6 nos. It's passed.

**MALE 1:**  Thank you, senator. Ladies and gentlemen, now we move to the House of Representatives plan. In developing this plan, house members were met with in person. And subsequently over the phone on Microsoft teams and told many of their concerns have been addressed. All representatives had input into this plan. The exceptions are a handful of members who are not running for re-election and who chose not to meet with us. This plan meets our committee guidelines. It complies of section two of the Voting Rights Act and the Equal Protection Clause for the Constitution. There is a minimal population deviation between the districts, ideal population for house district is 47,850. All districts are within plus or minus 5% of ideal population. It respects counties to the extent possible, given the requirements for population on the 14th Amendment of the Constitution. It is not required incumbents to run against each other however there are a few members who are not running who are in other districts. All districts are continuous and reasonably compact under the Gingles test. It respects communities of interest and preserves the course of existing districts. It splits a minimum number of counties in voting precincts, 39 counties for split and 57 voting precincts for split to get the deviation. This is improvement of the current law which split 46 counties. This plan contains 27 majority minority black districts including the creation of a new majority black district in Montgomery which is House District 74. In addition, House District 53 held by minority leader Daniels has a black voting population of 48.15% which he said he was comfortable having. Well that ladies and gentlemen, are there any questions?

**MALE 2:**  Motion to adopt.

**REPRESENTATIVE ENGLAND:**  I have a question.

**MR. CHAIRMAN:**  Okay, Representative England.

**REPRESENTATIVE ENGLAND:**  Its seems like the whole county constitutional requirement applies everywhere but Tuscaloosa County. Again, there are 200% people inside the Tuscaloosa County and as it stands, there are seven members in that delegation. Of the seven, only four live

within the county. You mentioned in your discussions, you said we try to keep communities of interest together, representative Ralph Howards, district now draws all the way into Tuscaloosa -- not only Tuscaloosa County but in the city limits. He goes into the west side of Tuscaloosa which is majority minority.

[01:45:08]

**MR. CHAIRMAN:** And he is very happy with that by the way because he told me how excited he was.

**REPRESENTATIVE ENGLAND:** I appreciate you offering editorial for me. Secondly, District 71 goes into downtown or to the west side of Tuscaloosa. It also encompasses Pickens, Sumter and Marengo counties. It also goes into the west of Tuscaloosa and it captures the other half of the black population on the west side of Tuscaloosa. I don't think that's by accident. As it stands, the City of Tuscaloosa also now has a seven-member delegation of which three do not live anywhere near the county. The minority majority area of the city is represented by representatives that live an hour and hour and a half away. It is carved up in the City of Tuscaloosa to the point where it is very difficult to say for us to suggest that people that live in the county that the people that live outside the county don't have as much influence on what we do as the people who live inside of the county, especially the city limits. You also mentioned that it [PH 01:46:35] complies with the Voting Rights Act. I would also like to request the same information that I have requested all day long. I would like the same results from the same studies that we're conducting and that there has not been a study done on my District, District 70, 71, 72 or any district within the city of Tuscaloosa, I would like to have the results of those studies but not only that, I would like to also know who conducted the study and I would like to see the results. As far as across the state, I get the whole concept of try to keep counties whole and whatnot. But it does not appear that that was a guiding principle whenever you got to areas that where districts were minority. It seems like you dove into cities just to capture the black population and to pack them into districts to re-establish a population but to make sure that their influence does not spread outside to potentially impact an election in what would be a traditionally white or republican district specifically, in Tuscaloosa. So as I said, I would love to see -- I'm requesting the same information I have requested about the congressional districts and also, if there's any districts out where there are racial polarization studies were done, I would also like to see those as well.

**MR. CHAIRMAN:** Thank you and duly noted, we will get back to you. [PH 01:48:06] Senator Smitherman.

**SENATOR SMITHERMAN:** Two questions, one statement one question. I would request the same thing for all senator districts, okay. That study that they are trying to get, I would like for all senator districts. So I wanted to say that, I'm not saying you would but don't make a judgment [INDISCERNIBLE 01:48:28]. As a member, I am entitled to and I would ask for that. If we don't have it, spend the money and why we [PH 01:48:36] appropriate it. So any savings of money, either is about getting the necessary stuff that we need to get. The other question I would ask because I kind of heard you. Un your statement you said, you went on like you spoke to in your statement but I would like to know how many districts have been combined to where you

have now someone who is either waiting for a position that's open, that's obviously right now or who is -- or has been placed where two incumbents are now having to run against each other?

**MR. CHAIRMAN:** In the house plan, there is zero.

**SENATOR SMITHERMAN:** What about that [INDISCERNIBLE 01:49:20]?

**MR. CHAIRMAN:** No.

**SENATOR SMITHERMAN:** There is not?

**MR. CHAIRMAN:** No.

**SENATOR SMITHERMAN:** Okay. So he is not in the district with -- what's the other [PH 01:49:27] sister that's in Montgomery?

**MR. CHAIRMAN:** He passed away but the candidate -- there are no two candidates that I know off. I don't know if he is going to run but no.

**SENATOR SMITHERMAN:** Can she run? Ms. [PH 01:49:40] Morris and that's --

**MR. CHAIRMAN:** I don't know the name of anybody.

**SENATOR SMITHERMAN:** No, I was just saying Ms. Morris, that's [INDISCERNIBLE 01:49:49] putting Ms. Morris' district. Not understanding. Is that right? Am I wrong or right? Correct me if I'm wrong because I try to make statements that's right.

**[01:50:00]**

**MALE 2:** Yeah, couple of house district.

**SENATOR SMITHERMAN:** Right. So, you know, what are we going to do to correct that? And I'll stop when you said it, I want to make a comment. All I want to say is this and the records speak for itself and if Senator [INDISCERNIBLE 01:50:16] was in here, he would, I think vouch for that. We made sure that no districts when we were in the majority ever, to republicans or to democrats that they had to run against each other. That's traditionally what we've done in here. All the time that I've been had the blessings and opportunity to be on Reapportionment and that since 1994. So now why are we doing that? And why are we doing it in a minority district? I mean, we got 105 seats out there now, why are we picking these minority district? They have two of them run against each other.

**MR. CHAIRMAN:** Not that I'm aware of in Montgomery County. And I know when I ran in 94, I defeated -- two incumbents were put in the same district and I beat two of them. Not to get two incumbents.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:** There was a 94 run. Remember I said I've been here since 1994, it hasn't happened. He will vouch how much I folded in my [INDISCERNIBLE 01:51:10] and make sure that wouldn't happen.

**MR. CHAIRMAN:** We did not place any incumbents together.

**MALE 2:** Mr. Chairman, why you may say you didn't have any incumbents together, but you did have a candidate that was out there running in 76. That are currently running in 76. You have candidates that are currently running and 76 who would now not be in 76 because if they wanted them, they would not represent 76.

**MR. CHAIRMAN:** I don't believe that's the best the case anymore.

**MALE 2:** That is the case.

**MR. CHAIRMAN:** I don't believe it is anymore.

**MALE 2:** Explain the new district 74 if Represented [INDISCERNIBLE 01:51:50] was living today.

**MR. CHAIRMAN:** He would be in another district but--

**MALE 2:** It will be in another district, so he wouldn't be in 76.

**MR. CHAIRMAN:** Yeah but the person running his district is in that district.

**MALE 2:** In what district in the new district?

**MR. CHAIRMAN:** [INDISCERNIBLE 01:52:01].

**[BACKROUND CONVERSATION]**

**MALE 2:** No but now, they are tagged with another incumbent, who lives in that area now.

**MR. CHAIRMAN:** I'm aware of what you believe, but I promise you the plan has been changed.

**MALE 2:** The plan has been changed?

**MALE 1:** Can you show us a change?

**MALE 2:** Could you explain the changes?

**[OVERLAY]**

**MALE 1:** We can't see it. It doesn't clearly show here. Yeah, help me out with that.

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**[BACKGROUND CONVERSATION]**

**MALE 1:** 76 is the new 74 that's been fixed.

**[BACKGROUND CONVERSATION]**

**MR. CHAIRMAN:** While we're doing that, Mr. Clouse is there anything you would like to say? We are going to pull that.

**MALE 2:** Yeah, well you can be seen.

**MR. CLOUSE:** I just want to make a clarification on my friend Senator Smitherman. It might have been after 2000 census when the democrats were in the majority there were no republicans put together in the Senate.

**SENATOR SMITHERMAN:** That's what I'm talking about.

**MR. CLOUSE:** Right. But in the house, there were two districts, where two republican incumbents were put together.

**SENATOR SMITHERMAN:** Yeah well let me come down and I'll [PH 01:53:45] refer it.

**MR. CLOUSE:** Yeah okay.

**SENATOR SMITHERMAN:** Republican Senate did that they won. See, we'll be fair about this thing. That's what I'm talking about. They'll tell you, I'll hide them for them. There isn't anybody allowing for them right now, but us.

**[BACKGROUND CONVERSATION]**

**SENATOR SMITHERMAN:** Is that a new district now?

**MR. CHAIRMAN:** That's a new district.

**SENATOR SMITHERMAN:** That district?

**MR. CHAIRMAN:** That is.

**SENATOR SMITHERMAN:** That has been in the county though but that is?

**MR. CHAIRMAN:** That is. That's whole precincts. So are there any more questions? Now we have a motion? Move to have a final approval to this.

**FEMALE 1:** Question.

**MR. CHAIRMAN:** Yeah, I have done that once. Call roll.

**SENATOR SMITHERMAN:** She had a question.

**MR. CHAIRMAN:** All right, let Ms. Hall ask her question.

**REPRESENTATIVE HALL:** I was just trying to follow up with what you were saying in terms of the counties. Are we clear and what you're saying in reference to the county that Singleton and Smitherman mentioned as it relates to the candidates, whether the candidate is alive or not does that --

**[01:55:00]**

**MR. CHAIRMAN:** Where is perfectly thought.

**REPRESENTATIVE HALL:** All right, and so the -- this is the last activity that we are doing, right?

**MR. CHAIRMAN:** Yes, ma'am.

**REPRESENTATIVE HALL:** I would also like to request precincts for each one of these proposals that you provided today. I'd like to have that.

**MR. CHAIRMAN:** I will be more than happy to give you all breakdowns with all this stuff.

**REPRESENTATIVE HALL:** And then as we look at the rules, it says a legislator shall try to minimize the number of counties in each district. It seems like we're being a bit confused here with what we've heard today. We use the word "shall," it says that you must follow, trial indicates that you might not. And so, would you tell me based on what we have today and what instant would you not minimize the number of counties or the process that you've used here today?

**MR. CHAIRMAN:** Ma'am we did our very best to respect voting precincts and county lines and keep as many counties hold as possible but the overriding principle of reapportionment is one man one vote. When we went by whole counties in the State of Alabama -- in 1947 the United Supreme Court said the redistricting was a judicial ticket in which the court should not weighed and declared it non-despicable. Until the State of Alabama came and rentals [PH 01:56:37] via sims and our whole our whole county plan where they ruled that it was so egregious that denied people their constitutional right to fair representation. And that's the lawsuit just started all redistricting and the Fourteenth Amendment requires one man one vote and we respect county lines as much as we could but the overriding principle is to draw districts that each person in this room represents the [PH 01:56:59] apportionment the same number of people as every other person.

**REPRESENTATIVE HALL:** So it still appears that we've still dividing counties and it's just -- and so you're saying that process was necessary.

**MR. CHAIRMAN:** We split counties and precincts solely for the purpose of population deviations.

**MALE 3:** Mr. Chairman?

**REPRESENTATIVE HALL:** But we did not do the population study on all of these counties?

**MR. CHAIRMAN:** No, well, we're going to do the voting studies on the ones we think are necessary, but you don't need a voting study on my district. It's just not needed.

**REPRESENTATIVE HALL:** But I'm saying if we're being fair, when you do a study, you study all you don't study what you think.

**MR. CHAIRMAN:** No reason.

**REPRESENTATIVE HALL:** So help me to understand what the standard is.

**MR. CHAIRMAN:** Why would you study racial polarized voting in my district?

**REPRESENTATIVE HALL:** I don't know.

**MR. CHAIRMAN:** I mean, you just --

**REPRESENTATIVE HALL:** Other than in fact you want a process --

**[OVERLAY]**

**MR. CHAIRMAN:** I mean the reason we do this to ensure we don't run up against a regression on law suit and violate section two of the Voting Rights Act.

**REPRESENTATIVE HALL:** I shouldn't have said I don't know. I would think you don't do it because you would --

**MR. CHAIRMAN:** We were doing everything we can to prevent a regression problem and violate section two of the Voting Rights Act. I mean we're trying to follow the law and we don't have a retrogression issue and violate section two.

**REPRESENTATIVE HALL:** So would you violate the law if you did all of this information --

**[OVERLAY]**

**MR. CHAIRMAN:** We asked for polarized voting analysis on districts that we were concerned about whether we whether intentionally or unintentionally diminish the ability of a protected class of minority citizens from electing or defeating the candidate of their choice. That's what

we're looking at. We are making sure a protected class minor and compact and cohesive but minority class is able to elect to defeat the candidates of their choosing.

**REPRESENTATIVE HALL:** And I want to make sure that the record is clear. I'm not asking you to violate the law but I would ask you to be consistent and fair and across the board in the process.

**MR. CHAIRMAN:** We have met with every member trying to make him happy. Yes, senator?

**SENATOR SMITHERMAN:** I would just add that you quoted [INDISCERNIBLE 01:59:12] but if you go further it addresses what I see it. You did say what you said but you see what I see it after they said all that bizarre stuff they said however, counties should be made whole where there's possibility except one of the criteria was when you were trying to create a minority district. Unless you're getting ready to give up four in Jefferson County instead of three then we got out inside the county and that does not apply.

**MR. CHAIRMAN:** I'm a humble contractor and you're a scholared attorney. Well, that we had a question before us, I believe we have a roll call vote, clerk call the roll.

**FEMALE 1:** Senator Allen

**SENATOR ALLEN:** Aye.

**FEMALE:** Senator Holley.

**SENATOR HOLLEY:** Aye.

**FEMALE:** Senator Livingston

**SENATOR LEVISTON:** Aye.

**[02:00:00]**


TRANSPERFECT

I, Anders Nelson, hereby certify that the document "Reapportionment committee 10.26.21" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

# Anders Nelson

Digitally signed by Anders Nelson
Date: 2021.12.14 15:46:45
-05'00'

Anders Nelson
Project Manager

December 14, 2021



PLAINTIFF'S
EXHIBIT
5
C. Pringle

# TRANSCRIPT OF
# HOUSE FLOOR DEBATE
# NOVEMBER 1, 2021

**REP. BARBARA BOYD:**  Right there, isn't that generally, the request that is made that on all district, a polarization study is done.

**REP. CHRIS PRINGLE:**  Well, again, there are a lot of things I can do if I had time to do it, but in this horrifically compressed timeframe, if I look at a district that's 85% white, is it going to be racially polarized voting, that's going to show up in there.

**REP. BARBARA BOYD:**  But that's your perception, that is not based on a study.

**REP. CHRIS PRINGLE:**  I'm trying to get you the information you need on the districts that are in question as fast as I can possibly get to you. We can play this game, but you could do more, couldn't you? You can, you can always do more.

**[OVERLAY]**

There's always somebody to come down this well, and tell me, "I can do more to appease them" but there's only so much I can do in the amount of time I've been given.

**REP. BARBARA BOYD:**  And you know what, you are so right.

**REP. CHRIS PRINGLE:**  Yeah.

**REP. BARBARA BOYD:**  But the other side of that, while we were talking about building prisons; to me, if I was doing this, this would have been the process that would have been in place. You would not have had that pressure, just think about that. If you're done, and we came into a special session dealing with building prisons, as opposed to dealing with -- and then you tell me about all of this pressure that you're under, because of such a slim timeline we have, you at least would have had an opportunity doing that, if that had been first, and then move to. You know, I said, "if you want my opinion." And I know that's not something that you would be asking for, but I thought I'd share it anyway. I mean, to me it's a self-inflicted crisis that we are in. We blame the Census Bureau. So, I plan the prison system in terms of [INDISCERNIBLE 00:02:06] And then you tell me, you're not going to do the polarization study, because you -- if a district based on your experience, and based on your information that is not necessary, because you are going to have a district that's 87% black, no white. Why would you do that?

**REP. CHRIS PRINGLE:**  I really don't know what my percentage is. It's just some of them are very high, so.

**REP. BARBARA BOYD:**  Some of your percentage is what?

**REP. CHRIS PRINGLE:**  Some of the percentages are high. I don't even know what the percentages of my district.

**REP. BARBARA BOYD:**  Yeah, and that's another question I have. How do you have such high percentages in a predominantly white district, and it's not stacked. But you do that, --
**[OVERLAY]**

**REP. BARBARA BOYD:** --you look at some of the districts we have are the percentages are quite questionable. Good. I mean, that's my observation.

**REP. CHRIS PRINGLE:** We preserve the existing core of the districts to the extent possible, and I'm –

**[OVERLAY]**

**REP. BARBARA BOYD:** I am sorry; you do what?

**REP. CHRIS PRINGLE:** And I am not – you know, the bit of that prison special session, you know what I was? It gave us the opportunity to begin meeting with every single member of this body, because they were here, that we meet with you in person, and go over your district with you in person.

**REP. BARBARA BOYD:** No.

**REP. CHRIS PRINGLE:** You didn't even also at all.

**REP. BARBARA BOYD:** Yes. I met. No, I didn't meet with neither one of the chairs. I met with a man called [PH 00:03:22] Hannaman.

**REP. CHRIS PRINGLE:** Yes. He was working for – he was working for the committee.

**REP. BARBARA BOYD:** Well, I'm just saying.

**[OVERLAY]**

**REP. CHRIS PRINGLE:** And you met with him, and you went over your district, and he showed you what was in your district.

**REP. BARBARA BOYD:** He did.

**REP. CHRIS PRINGLE:** And he showed you the numbers, and he asked you if that was okay, --

**[OVERLAY]**

**REP. CHRIS PRINGLE:** -- and you agreed to it.

**[OVERLAY]**

**REP. BARBARA BOYD:** And you know what I said. No. You know what I said to him? I do not agree to anything until I get the following things: precinct centers in my districts, and I am able to sit, and look at the changes in the district, and how they are impacting what I had before.

**House Floor Debate**
**November 1, 2021**
**Transcript by TransPerfect**

And what have been – no, you didn't get an okay from me. No, sir. You got -- what I just told you, and that's fine.

**REP. CHRIS PRINGLE:** Yeah.

**REP. BARBARA BOYD:** You know, as I look at this process and look at where we are, I did hear you say you were bringing, and admit a substitute?

**REP. CHRIS PRINGLE:** Yes.

**REP. BARBARA BOYD:** Did I hear that?

**REP. CHRIS PRINGLE:** Yes, ma'am.

**REP. BARBARA BOYD:** All right. So obviously, some of the concerns that have been raised, those have gotten your attention since the committee met.

**REP. CHRIS PRINGLE:** Yes, ma'am.

**REP. BARBARA BOYD:** I just want to know if that was the same opportunity that was provided for every other member?

**REP. CHRIS PRINGLE:** Yes, ma'am.

**REP. BARBARA BOYD:** Every other member in here?

**REP. CHRIS PRINGLE:** Yes, ma'am.

**REP. BARBARA BOYD:** 105 members had an opportunity.

**REP. CHRIS PRINGLE:** Yes, ma'am.

**REP. BARBARA BOYD:** I didn't hear anything about that. When did you put that out?

**REP. CHRIS PRINGLE:** Ma'am, they will come to me, and we will meet with them.

**REP. BARBARA BOYD:** Oh, you had to come see you.

**REP. CHRIS PRINGLE:** Members that expressed concern with their districts were met with. And if you had a concern with your district, all you had to do is talk to me or anybody else in the reapportionment offers.

[OVERLAY]

**REP. BARBARA BOYD:** Really?

3

**REP. RUSSELL BEDSOLE:**  Yeah.

**[00:04:58]**

**REP. BARBARA BOYD:**  Everybody had that opportunity. My colleagues, how many of the colleagues, well anyway, I didn't hear anybody else saying they had that opportunity. Now, remember, I did not hear those members that are in the cognizant I'm in had that opportunity. I did not hear that. And I will, when I finish my few minutes, I will certainly check to see how many of them had problems, and they spoked, because I think that is so important. So, would you tell me about the report from the hearings that were held? I made a request also for a report, the report, information that was gathered during the hearings that went around the State. Where is that report?

**REP. CHRIS PRINGLE:**  They are in the Reapportionment Office. The testimony was – in the 28 public hearings we got all this State.

**REP. BARBARA BOYD:**  Right. And so, from that report, how much of that information, and what part of that information was used in the process of joining the district.

**REP. CHRIS PRINGLE:**  In fact, I personally went back and re-read some of the testimony given, personally I did.

**REP. BARBARA BOYD:**  How much of that information?

**[OVERLAY]**

**REP. CHRIS PRINGLE:**  All of it. We took notes.

**REP. BARBARA BOYD:**  How much of the information that was done during the hearing, presented during the hearing was used to –

**[OVERLAY]**

**REP. CHRIS PRINGLE:**  We looked at all of it, and our attorney was there doing the whole thing, the whole process, and I went back and actually re-read some of the transcripts, yeah.

**REP. BARBARA BOYD:**  But you didn't say that. In what part of that that you read? What I am asking for a specific, what specific part in the hearing was used during the join of the districts?

**REP. CHRIS PRINGLE:**  Which part are you asking about?

**REP. BARBARA BOYD:**  If we had here is all over the state, how many we did? 28, right?

**REP. CHRIS PRINGLE:**  And I sat there, and the chairman sat there. The whole part, the whole thing.

4

**REP. BARBARA BOYD:**  And you went through all of it? My question is still –

[OVERLAY]

**REP. CHRIS PRINGLE:**  I sat through all of the public hearings, yes ma'am.

**REP. BARBARA BOYD:**  My question still is, what part of that hearing? It sounds like, things in that going quite right, because they are about to tell you something. That, at what part of the hearing was used in the process of drawing the districts?

**REP. CHRIS PRINGLE:**  The whole process, the whole part.

**REP. BARBARA BOYD:**  The report? So, are we able to have a copy of that report?

**REP. CHRIS PRINGLE:**  Yes, ma'am. Yes, ma'am.

**REP. BARBARA BOYD:**  Well, is that available now?

**REP. CHRIS PRINGLE:**  Yes, ma'am.

**REP. BARBARA BOYD:**  So, may I? Make sure we request that, that I get a copy of that report.

**REP. CHRIS PRINGLE:**  Well, it's not a report. It's the whole series of court reporters. I mean you are more welcome to go down, and read the transcript from all 28 hearings.

**REP. BARBARA BOYD:**  It is my understanding generally. And let me say this, I'm talking about a process, and I'm talking about a process by, which there creates a certain level of comfort. It doesn't mean that you agree or disagree with it. One, we had 28 hearings. It seems to me that at some point during that hearing, we would have received a report from the hearings. That's one thing. That to me is significant. Two, the polarization study. According to the Voting Rights Act, that is a statement that should, and is requested that should occur. You indicated that that is not the case, only if you thought that might be necessary. But that is not what the process says it should be. That concerns me. When we are talking about doing things that is right in there. I don't have to agree with it. And it doesn't have to be in my favor. But at least, the process by which it was done should help me to feel like, "Okay, I didn't get what I wanted, I don't like it. But at least, they were fair, and they followed the rules." Thank you.

**REP. CHRIS PRINGLE:**  Andy! And the Chair thanks the lady. The Chair now recognizes the gentleman from Elmore County, Representative Holmes.

**REP. MIKE HOLMES:**  Thank you Mr. Speaker. I've been in this Body now, and working on the 8th year. And I want to say to everybody, and particularly the Chairman of this committee, and the Speaker, I have never seen this kind of confusion and frustration of anything we faced in the eight years I've been here. It's discouraging to me, because we're hurrying up every step, and

5

we really don't have adequate, accurate information to make the kind of the momentous decision that we are being asked to make.

[00:10:03]

I think we need to slow this process down, and let's get the answers that we need. And then, let's move on and make a deliberate informed decision on these very, very important questions. And I know Mr. Chairman that, this mostly caused by the census, and the tardiness of the census, I understand that. But we have now, we're in what? Third or fourth day in this special session. We still got nine days to go. We could take that time, and use it for education in discussions over some of these very important decisions. One of the ones I want to talk about now is the one we're on now, as congressional races. One of our former colleagues Congressman Barrymore in District 2 has made some requests that the committee has already been through it, and considered them. I think they agreed there pretty much neutral. So, I brought a substitute that I would like to offer.

**MR. SPEAKER:** All right. Proceed to the substitute.

**REP. MIKE HOLMES:** Substitute House Bill No. 1, by Representative Holmes.

**MR. SPEAKER:** And Representative Holmes.

**REP. MIKE HOLMES:** As I said, it impacts Congressional District 2. This substitute impacts Congressional District 2, and that will make it, that the changes that have been proposed would make it the largest landmass in the State for one congressional district. It's going to be about 1/4 of the State's going to be in Congressional District 2. And I understand that a lot of this is pure arithmetic Mr. Chairman. I understand that, when you push with numbers, like we've had, the growth we've had in Huntsville. But essentially, what to we've come up with actually pushes the numbers around to reduce the geography a little bit. And come up with the same balances, the same numbers; all those things, pretty much stay the same. So, with that, unless there are questions, I would like to move the passage of this substitute.

**MR. SPEAKER:** And Chairman Pring will comment.

**REP. CHRIS PRINGLE:** Ladies and gentlemen, this plan is identical to the plan that you see here with two changes. Now, let me go over them. The committee's plan more has a sliver of east Escambia County with a population of only 739 people. In Morris' plan that county split has moved to Monroe County where it gets through an additional 739 people. So, it's a person for person split. However, under Morris has two county splits, and Sewell has three currently. Under Morris plan, he has only one county split and Congresswoman Sewell now has four county splits. So, he's given one of his splits to her. That will make her have more county splits than any other member of congress in Alabama. The congressman's argument is that, he has 16 districts in this plan, and that's more districts than anybody else.

**REP. MIKE HOLMES:** 16 Districts?

6

**REP. CHRIS PRINGLE:** 16 counties, I'm sorry 16 counties. Ladies and gentlemen, Representative Terri Sewell is the only Democrat member of the United States Congress from the State of Alabama. That would give her more county splits than any other member of Congress. And it's going to be awfully hard to explain to a three-judge federal panel while we stuck the Democrat with all the splits, and not the Republicans. We have to be fair. We have to be equitable, and I think that's putting two new splits in her district. This 739 people that Congressman Moore would receive in this plan are very rural; there's no city, there's no elected officials. I mean, as far as a city councilor or mayor or anything. It's probably not more than 260 voters. Congressman Carl has no problem with this, and keeping it. And I think, it would give the Democrats a tremendous advantage, and argue in a racially-motivated plan that we adopt this plan over the committee plan. And I think, it's something that Democrats will have a strong argument against us, and against the plan we adopted. With that, Mr. Speaker, I move to table.

**MR. SPEAKER:** All right members, you've heard the motion before, there was a substitute offered on the floor by Representative Holmes and the sponsor of the bill Chairman Pringle has brought forth the tabling motion. If you are in favor of the tabling motion, your vote will be. "Aye", if you are opposed, your vote is "No".

**[OVERLAY]**

For the table motion your vote is "Aye", if you opposed your vote is "No."

**REP. CHRIS PRINGLE:** Please both Yes.

**MR. SPEAKER:** All right and the clerk will lock the machine, the members will vote.

**[00:15:00]**

**[BACKGROUND CONVERSATION]**

**MR. SPEAKER:** All the members are voting. -- All the member are voting. And the clerk will lock machine. Members are called to vote, and the tabling motion does prevail. And the Chair, thanks the gentleman. All right, let's move on who Chair recognizes the gentleman from Jefferson, Representative Faulkner.

**[BACKGROUND CONVERSATION]**

**[OVERLAY]**

**MR. SPEAKER:** Representative Faulkner, you are recognized.
**[OVERLAY]**

**REP. DAVID FAULKNER:** Representative Pringle.

**REP. CHRIS PRINGLE:** Yes Sir.

**REP. DAVID FAULKNER:**  How are you?

**REP. CHRIS PRINGLE:**  I'm wonderful my good friend, how are you?

**REP. DAVID FAULKNER:**  I'm good. We had talked about this, and before I make these comments, I want to make sure I tell you I understand how much work, and how much time you had put in on this process, and that is not been missed by me or anybody, I don't think. And I also know that your considerations of this whole process are bigger than looking at anyone district or congressional district. So, what I am asking for is to allow the status quo, and you're aware of this to allow the status quo members to two of my voting precincts. In my district, that have always been represented by the 6th Congressional District in Gary Palmer's district, had been proposed under this plan to be moved into Terri Sewell's district. The counter to that is, is that some voting precincts in Center Point that had been in the 7th Congressional District had been moved into Gary Palmer's district. Rolanda Hollis represents those boxes in Center Point. Rolanda is on her way here, and I've spoken to her. I've also gotten word from the Center Point mayor, that they would like to remain in Terri Sewell's district. This is a 700 -- and may be Representative Pringle, you can tell me. This is the 7th District has about how many 750,000?

**REP. CHRIS PRINGLE:**  They're all the same.

**REP. DAVID FAULKNER:**  Somewhere in that. It's over 700,000 people, right?

**REP. CHRIS PRINGLE:**  Yes.

**REP. DAVID FAULKNER:**  Yeah. So, these congressional districts over 700,000 people. And all I'm wanting to do is keep two districts, two voting precincts in the 6th Congressional District, and keep four precincts that are in the 7th Congressional District, where they are? And the people that live in those districts, the ones that have reached out to me want to keep it that way. So, we're talking about keeping things for two minor voting districts in a congressional district that's over 700,000 people keeping them the way that they were, and just by the Justice Department approved, the last go around. There's no way those two small precincts can mess anything up for this entire congressional district. And so, I am asking for those two small voting precincts to be kept where they were and the foreign Center Point to be kept where they are, where the people that live there would like. And that includes the mayor of Center Point that represents those boxes, that are being proposed to be switched to the 6th Congressional District. So, in the total scheme of that of over 700,000 people, we're talking about an equal population deviation to keep those four boxes in Center Point in the 7th, and keep the two in Homewood in the 6th --

[00:20:13]

**REP. DAVID FAULKNER:**00where they'd been, and in that huge congressional district, that cannot be messing up anything that would violate the law. And with that, Mr. Speaker, I have a substitute, because they don't let you do amendments. Members, you have to do a substitute.

**MR. SPEAKER:**  All right, and --

**REP. DAVID FAULKNER:** That accomplishes moving -- keeping those two boxes.

**MR. SPEAKER:** All right, and the clerk receive the substitute.

**MR. CLERK:** Substitute to House Bill No. 1 by Representative Faulkner.

**MR. SPEAKER:** And Representative Faulkner, any other comments.

**REP. DAVID FAULKNER:** Well, members, I think that sums up what we're trying to do, keep two boxes where they are that are in my district. And I want you to know, I didn't see this before. I've never saw the congressional district map. I'd had no idea that these two voting precincts in my district were coming out. I'm not talking about my State house district now. I'm talking about the congressional district.

**MR. SPEAKER:** Okay, and Chairman Frank or Representative Daniels, you, you -- okay.

**REP. ANTHONY DANIELS:** Mr. Faulkner, I want to make certain that I heard you correctly. You're saying that the Mayor of Center Point, and some other member of politician is asking you to remove two precincts from congressional districts area?

**REP. DAVID FAULKNER:** No. No, no, no.

**REP. ANTHONY DANIELS:** So, --

**REP. DAVID FAULKNER:** Representative Daniels --

**REP. ANTHONY DANIELS:** You want to remove two precincts?

**REP. DAVID FAULKNER:** So, I am -- there are two precincts in my house district that are being proposed to be moved from the Sixth Congressional District to the Seventh.

**REP. ANTHONY DANIELS:** Yes –

**[OVERLAY]**

**REP. DAVID FAULKNER:** Those were in my --

**REP. ANTHONY DANIELS:** I'm sorry. They newly proposed lines, congressional lines, right?

**REP. DAVID FAULKNER:** Yes, the newly proposed lines would take two of my voting precincts in my house district, and move them from Congressional Six to Congressional Seven.

**REP. ANTHONY DANIELS:** So, what you're saying is –

9

**House Floor Debate**
**November 1, 2021**
**Transcript by TransPerfect**

**[OVERLAY]**

**REP. DAVID FAULKNER:**  And then at the same time, it's moving some voting precincts that are in seven into six, and those are in Center Point. I don't represent Center Point. I'm representing Hollister.

**REP. ANTHONY DANIELS:**  So, can you help me understand the reason that you are against moving those precincts, because they're in your districts, and what else?

**REP. DAVID FAULKNER:**  Because the people in my district, they have been in the Sixth Congressional District, and they have reached out to me and they want to stay in the Sixth Congressional District. And the people who are in Center Point, this has come into me, I didn't speak with him directly, but I'm being told that the Mayor of Center Point would also like to stay in Terri Sewell's district. So –

**[OVERLAY]**

**REP. ANTHONY DANIELS:**  So, are the people in the area saying they want this district, these lines to be moved or the politicians are saying that?

**REP. DAVID FAULKNER:**  Now, the people are fine where they are. The people are fine staying where they are and what's been approved previously. The plan is to change that.

**REP. ANTHONY DANIELS:**  But it appeared to me that, the politicians are the ones indicating that they want to move back to their original districts, proposed districts before the proposal.

**REP. DAVID FAULKNER:**  No, the people.

**REP. ANTHONY DANIELS:**  So, the people, I guess we hadn't heard from many people that have mentioned. I have not received an email as a member of this Body. I don't know that the Reapportionment Committee members have --

**[OVERLAY]**

**REP. DAVID FAULKNER:**  I don't think anybody knows about this change largely but the people who have found out about the change have been saying, "Wait a minute. I don't want to move. Why can't we stay exactly where we are," and the same goes for and I will let her speak for her district.

**REP. ANTHONY DANIELS:**  Have you have you explained to the people that, they're moving in a district where these members on the Appropriations Committee, which is the most powerful committee in Congress?

**REP. DAVID FAULKNER:**  I did not tell them that.

**REP. ANTHONY DANIELS:**  I think these are important points for these folks to understand when you're talking about moving on because of an individual or because of party label versus

being taking advantage of resources in moving that district. So, I'm just trying to -- I think for me, and you referenced a couple of politicians. I think for me; it's -- we should be beyond the point of where we are allowing politician to choose their constituents instead of the politicians.

[00:25:07]

**REP. DAVID FAULKNER:** Yeah, this is not politicians.

**REP. ANTHONY DANIELS:** Well, you mentioned you referenced some politicians –

[OVERLAY]

**REP. DAVID FAULKNER:** As far as the people who have reached out to me, the district I serve, all of those are people who have reached out to me and said, "I want to remain in the Sixth Congressional District."

**REP. ANTHONY DANIELS:** Well, they can remain in the Sixth Congressional District by finding some type of residency somewhere else in that district. So, tell them they have options to move, and they move in the district that they want to be in or try to work with the current, the proposed, the representative, their new representative, to figure out how they can maintain the same quality of life that they've been enjoying up until this point. So, I'm just trying to understand the reasoning for that. I don't want to make any assumptions, all right? But I have looked at some of the data on the precincts that you're referencing, and it lands to some interpretation that is obvious that, I don't want to make the assumption about, but I'm just really disturbed that as diverse as we're trying to be as a state, and as a country and as inclusive as we're trying to be, that individual would be paying this close attention to two precincts will be paying that much closer attention.

**REP. DAVID FAULKNER:** The people in those precincts do care.  Yeah.

**REP. ANTHONY DANIELS:** Yes, the two precincts to say they want to move, but they don't know what reason.

**REP. DAVID FAULKNER:** No, they don't. One, they want to stay where they are, and the people in Center Point want to stay where they are.

**REP. ANTHONY DANIELS:** I understand that. So, the way the lines are drawn, I'd say that, I'm just trying to understand.

[OVERLAY]

**REP. DAVID FAULKNER:** Somebody, not the people, the people didn't draw these lines. Politicians drew the lines. The people are who are saying, "We didn't want to be moved."

**REP. ANTHONY DANIELS:** Demographer drew the line.

**House Floor Debate**
**November 1, 2021**
**Transcript by TransPerfect**

**REP. DAVID FAULKNER:** Who?

**REP. ANTHONY DANIELS:** Demographer. Demographer -- they are the team drawing the lines based upon not wanting to go to court, right? So, they're reasonable for drawing the lines --

**REP. DAVID FAULKNER:** Yeah, but that's not the people.

**REP. ANTHONY DANIELS:** So, does these two precincts, are they contiguous to -- how close are they, these four precincts?

**REP. DAVID FAULKNER:** So, Representative Daniels, I have a district that's like you that represents 50,000 people. And two of my voting precincts in that district, all the district -- all the precincts in my house district are under the Sixth Congressional District. Right now, currently, this proposes to take two of those and move them out of the sixth.

**[OVERLAY]**

**REP. ANTHONY DANIELS:** So, let me ask you this question. Did any precincts move out of your district this time in your new map in the house? Did you pick up any additional precincts?

**REP. DAVID FAULKNER:** No, my district doesn't change, precinct wise.

**[OVERLAY]**

**REP. ANTHONY DANIELS:** Your district doesn't change at all?

**REP. DAVID FAULKNER:** Correct.

**REP. ANTHONY DANIELS:** So, all of the other members that have had different precincts in their respective districts or add precincts or whole precincts as opposed to strict split precincts, right? So --

**REP. DAVID FAULKNER:** No, they said, we were not going to avoid that.

**REP. ANTHONY DANIELS:** Yeah, well, my point is --
**REP. DAVID FAULKNER:** And it is --

**REP. ANTHONY DANIELS:** Well, my point is, have we -- do we know why these particular lines were drawn and the manner to change those four precincts out?

**REP. DAVID FAULKNER:** I'm not a member of the Reapportionment Committee. What I'm saying is --

**[OVERLAY]**

**REP. ANTHONY DANIELS:** But you've been involved process.

**REP. DAVID FAULKNER:** This does not split precincts. This does not split a county. This is putting two precincts back in the sixth where they were, keeping them there, and keeping four in the seventh where they were.

**REP. ANTHONY DANIELS:** I understand what you're saying, but I'm saying, there has to be some reasoning for them to draw those two particular precincts out of all of precincts that we're dealing with.

**REP. DAVID FAULKNER:** Well, no, there are words that as you know, that congressional district changed more than that.

**REP. ANTHONY DANIELS:** The guidelines for congressional maps are of slightly different than State maps. Right?

**REP. DAVID FAULKNER:** And so, I didn't draw those –

**[OVERLAY]**

**REP. ANTHONY DANIELS:** Precincts in counties can be split in a congressional map. But it is very unlike -- they should not be as much as possible split in a house district, a State house district with State city district. But in congressional district there are guidelines that allow them, and they were to expand to that point.

**REP. DAVID FAULKNER:** There were more changes made to the congressional districts in this particular congressional district, I'm sure. But taking two precincts out of the sixth, and putting them in the seventh, and taking four precincts that were in the seventh, and putting them in the sixth is not going to violate the law, and I don't know why they made them, but the ones I'm interested in, all the other changes made, the only ones I'm interested in, are the ones that are in my house district where my constituents have called me.

**REP. ANTHONY DANIELS:** Well, I'm getting a call saying that, "If David Faulkner passes this, if this amendment passes, we're sure to go to court."

**REP. DAVID FAULKNER:** You're sure to go to court probably anyway because I understand lawsuits are already filed.

**[00:30:03]**

But I mean, I think we know that, but I can assure you it won't be over this little change.

**REP. ANTHONY DANIELS:** Are you willing to put the bill for the state going to court in these maps because of their change?

**REP. DAVID FAULKNER:** Let me tell you something, if I find out that putting -- keeping two districts that were already justice department approved back in the 6 and keeping 4 were at the 7 that that is the whole reason we go to court, then yes, I'd be happy to --

**REP. ANTHONY DANIELS:** You'll be happy to --

**REP. DAVID FAULKNER:** If that is the only reason we go to court, yes. Because this isn't going to make it go to court [INDISCERNIBLE 00:30:40]. That's what --

**REP. ANTHONY DANIELS:** Members, you heard him. David Faulkner is putting the bill for all lawsuits moving forward to the State of Alabama.

**REP. DAVID FAULKNER:** No. My good friend, no. I do hear these lawyers.

**REP. ANTHONY DANIELS:** But, David, I'll pray for you on that effort.

**REP. DAVID FAULKNER:** The lawyers that are involved in this probably didn't make a good hourly rate, Representative Daniels, and I would love to make that, but no. What I'm saying is this little minor change to keep the status quo for these few boxes --

**REP. ANTHONY DANIELS:** So ask this question. Is it an even swap in population?

**REP. DAVID FAULKNER:** Yes.

**REP. ANTHONY DANIELS:** Is it contiguous to --?

**REP. DAVID FAULKNER:** Yeah, it's keeping its just keeping two districts in the 6th congressional and it's keeping four in the 7th.

**REP. ANTHONY DANIELS:** And the two is the equal population of the four?

**REP. DAVID FAULKNER:** Right. The two for the four. It's an equal population so there's no deviation. It's all within Jefferson County. It's keeping them where they were, where they've been justice department approved before. It's not splitting a precinct and this is none of that.

**MR. SPEAKER:** End of gentleman's time.

**REP. DAVID FAULKNER:** Oh, thank you.

**MR. SPEAKER:** Alright, and now we're back on the motion and the substitute that's been introduced, Mr. Chairman.

**REP. CHRIS PRINGLE:** Ladies and gentlemen, this is a substitute bill -- let me -- it does do exactly what he says. But remember when I told you earlier, we drew this plan with no race up on the board. It was turned off. And what we were attempting to do is take that finger that sticks up into Jefferson County, and make it rounder, and take more Jefferson County and put it into

the 7th Congressional District. Under this plan right here, if we do it, the Congressional District 7, it changes the black voting-age population in Congressional District 7 from 54.22%, to 57.58% African-American. Ladies and gentlemen, that won't draw an allegation of vote packing African-Americans into a district. If it was a neutral move, it'd be one thing. But if you take and we pull two districts out and put two district in, they're going to hang a racial packing charge against us and it violates Section 2 of the Voting Rights Act. In my opinion, it is a clear violation. That's the reason why we didn't do it. And with that Mr. Speaker, I move to table the substitute of Mr. Faulkner.

**REP. DAVID FAULKNER:**  Can I ask the Chairman a question?

**MR. SPEAKER:**  Well, you've been talking for 20 minutes. You've had two times. I mean, really, we've had plenty of debate. I'll let you make one comment though.

**REP. DAVID FAULKNER:**  I just wanted to ask a question on those figures that you said it would change that percentage, and it's a 730,000-member congressional district and there -- I don't see how there's any possible way switching these boxes to keep them where they were, could make a change in the racial makeup as you've described in the entire congressional district.

**REP. CHRIS PRINGLE:**  Because you take two white precincts, move them out of the 7th, put them in the 6th and take two black precincts out of the 6th and put 7th. By the very nature of that action, you are packing more African-Americans into the 7th District.

**REP. DAVID FAULKNER:**  What? No, it's 10,000 people and it's keeping them where they are. There's no way that could make that variation in percentage.

**REP. CHRIS PRINGLE:**  Well, the computer which is much smarter than me kicks out that it goes from 54.22% to 57.58%. That, my friend, is packing.

**REP. DAVID FAULKNER:**  I just don't think that those numbers are right, Mr. Chairman. With all due respect.

**REP. CHRIS PRINGLE:**  The computer spits it out when we point-and-click, point-and-click, the computer kicks back and says, that's what it does to the district. And again, Mr. Speaker, I move my motion to table the substitute by Mr. Faulkner.

**MR. SPEAKER:**  All right, members, the question before us now is going to be on a tabling motion to vote on the tabling motion for the substitute entered by Representative Faulkner. You've heard the explanation on both and we've had about a 20-minute -- more over 20-minute debate on it. So, at this point, we are ready to vote on the tabling motion.

**[00:35:00]**

If you're in favor of the tabling motion, your vote is aye. If you're opposed, your vote is no. Carefully unlock the machine, the members will vote.

**[BACKGROUND CONVERSATION]**

**MR. SPEAKER:**  All the members voted.

**[BACKGROUND CONVERSATION]**

**MR. SPEAKER:**  All the members voted? Carefully unlock the machine recorded the vote. There are 51 yeas, 18 nays, 24 extensions and the tabling motion does prevail. All right, we're back now on the bill on the floor, and the chair recognizes the gentleman from Marengo County, Representative McCampbell.

**[BACKGROUND CONVERSATION]**

**REP. ARTIS MCCAMPBELL:**  Thank you, Mr. Speaker, for the recognition. Will the gentleman yield? I know you got quite a few things going on.

**REP. CHRIS PRINGLE:**  That's okay. For you, Sir, I will yield gladly.

**REP. ARTIS MCCAMPBELL:**  Okay. I just have some general questions that I want to see if I can get answers to. The first one is --

**REP. CHRIS PRINGLE:**  Thank you. I'm listening, I'm hanging.

**REP. ARTIS MCCAMPBELL:**  Who actually drew the congressional maps? Who actually drew them?

**REP. CHRIS PRINGLE:**  They were drawn in the office in the committee, the staff and a man named Mr. Randy Henneman.

**REP. ARTIS MCCAMPBELL:**  Who was --

**REP. CHRIS PRINGLE:**  Randy?

**REP. ARTIS MCCAMPBELL:**  Randy Henneman. He was hired by the committee?

**REP. CHRIS PRINGLE:**  I'm not sure if he was hired by them.

**REP. ARTIS MCCAMPBELL:**  Okay. But -- all right.

**REP. CHRIS PRINGLE:**  He's the one that's done it for several years.

**REP. ARTIS MCCAMPBELL:**  He's drawn these maps for several years.

**REP. CHRIS PRINGLE:**  He did it 2002 and he did it in '12 and now, yeah.

**REP. ARTIS MCCAMPBELL:**  Okay. Is he a state employee, do you know?

**REP. CHRIS PRINGLE:**  Not to my knowledge, no.

**REP. ARTIS MCCAMPBELL:**  He's not. So, can you find out then for me who actually hired him because that to me is important. As you're looking at drawing maps of this nature, I want to know what was his -- who instructed him because whoever is paying him, and I know he's not doing it out of the goodness of his heart. Do you think he is?

**REP. CHRIS PRINGLE:**  I think he's a very nice gracious young man.

**REP. ARTIS MCCAMPBELL:**  You think he is doing it out of the goodness of his heart.

**REP. CHRIS PRINGLE:**  I would rather doubt that.

**REP. ARTIS MCCAMPBELL:**  Okay. Well, if you will, I'd like to know, you know, who actually hired him to draw the maps.

**REP. CHRIS PRINGLE:**  I'll tell you who instructed him, is he followed the committee guidelines that are adopted by the committee.

**REP. ARTIS MCCAMPBELL:**  Okay, he followed the committee guidelines adopted by the committee. And what members of the committee, other than yourself, had contact with the monographer before he actually began drawing? What other members were involved in it, if there were any others other than yourself.

**REP. CHRIS PRINGLE:**  I was not there for every meeting but he was available to meet with everybody and he met with every member of this room, every member of the Senate, every member of Congress and every member of the school board was asked to come in and meet with him and everybody had access to him and everybody had access to look at their districts. She was a man that was available to meet with everybody.

**REP. ARTIS MCCAMPBELL:**  But I'm asking about your committee and in particular. What members of your committee, as you all were looking at the different drawing of the congressional maps, what members were involved of your Committee in looking with you and whatever Congressman had the maps themselves?

**REP. CHRIS PRINGLE:**  Again, I was not available for every meeting, so I don't know who came in and met with them, but I'm assure you that anybody that wanted to could. But I wasn't there, so I can't -- I'm not going to answer that question. If any answer I give you, it would be second hand knowledge.

**[00:40:11]**

**REP. ARTIS MCCAMPBELL:**  Okay. And what were the committee's instructions in terms of -- the specific instructions in terms of the drawing of the congressional maps?

17

**REP. CHRIS PRINGLE:**  That we would maintain the core, the existing districts, we would reach zero deviation and comply with Section 2 of the Voting Rights Act, but in a nutshell I mean there's more to it than that but that's the main point you're after.

**REP. ARTIS MCCAMPBELL:**  Okay, so and when I look at the makeup of the different districts, you have a copy of this.

**REP. CHRIS PRINGLE:**  No, I do not. I'm frantically looking for it.

**REP. ARTIS MCCAMPBELL:**  There's one right there.

**[OVERLAY]**

**REP. ARTIS MCCAMPBELL:**  All right, let's go to page one of your -- let's see it there. When I look at it is each district has a population of 717,754 except for District 2, which means it has one additional voter am I -- or one additional person because this is not the voting population. This is merely the population in general.

**REP. CHRIS PRINGLE:**  Yes, sir.

**REP. ARTIS MCCAMPBELL:**  So when you divide it out into seven districts, that number seven 117,754 people is the number we are working with so we had to put that one extra person in some way and they just fell into House District. I mean Congressional District 2, am. I correct?

**REP. CHRIS PRINGLE:**  Yes, sir. There are 253,000 census blocks in the State of Alabama that all had to be assigned to a district and we cannot break a census block. Do you understand, a track and a block are different, you cannot break a census block.

**REP. ARTIS MCCAMPBELL:**  Right.

**REP. CHRIS PRINGLE:**  That block had one person in it or whatever.

**REP. ARTIS MCCAMPBELL:**  And so my colleagues and I will all understand the congressional census blocks are different from the precincts that we normally are talking about when we talking about House and Senate Maps, am I correct?

**REP. CHRIS PRINGLE:**  No, the blocks are the same. The precincts are the same.

**REP. ARTIS MCCAMPBELL:**  The blocks are the same.

**REP. CHRIS PRINGLE:**  The blocks and the precincts are exactly the same. House, Senate and Congress.

**REP. ARTIS MCCAMPBELL:**  Blocks and precincts are exactly --

**House Floor Debate**
**November 1, 2021**
**Transcript by TransPerfect**

**[OVERLAY]**

**REP. ARTIS MCCAMPBELL:**  Okay, and what I'm looking at is in District 1, we have a 64 to 26 break in terms of the population diversity. We have 6% to 4% white population. In District 2, we have a 60% white population. District 3, 6% to 6.8% white population. District 4, 81% white population. So, then I want you to look over on page -- look at the front page of the map. If you would look at the map, if you would look at District 4, it runs from one -- from our Westernmost Border, all the way through the state to our Easternmost Border, am I correct?

**REP. CHRIS PRINGLE:**  Yes, sir.

**REP. ARTIS MCCAMPBELL:**  And the little connecting part is between Coleman and Marshall, am I correct there?

**REP. CHRIS PRINGLE:**  Yes, sir.

**REP. ARTIS MCCAMPBELL:**  But we have a split up in Lauderdale, do we not?

**REP. CHRIS PRINGLE:**  Yes sir.

**REP. ARTIS MCCAMPBELL:**  And my question then, would it have been a more fair map I guess you could say, if either Lauderdale was a whole and either DeKalb or Marshall or Etowah or Jackson or any of those were combined in that manner making it a more condensed area because what I look at is when you are coming from the West all the way to the East.

**[00:45:07]**

Yeah, there may be similarities up there, but I'm thinking that's a long road to travel and you know, I just questioned why we would go and configure something of that nature. Can you -- and that's a district that has 81% white population if I'm not mistaken, am I correct?
**REP. CHRIS PRINGLE:**  According to this yes sir. 81.18%.

**REP. ARTIS MCCAMPBELL:**  And 7% black population, am I correct? But in order to achieve that, we have to go from all the way West to the all the way East and I think we could have changed that and it could have been a bit more condensed and it would then, you know, be a much better district. Thank you. Mr. Speaker.

**MR. SPEAKER:**  And Chair, thank you gentlemen. All right, the Chair now recognizes the gentleman from Tuscaloosa Representative England.

**[BACKGROUND CONVERSATION]**

**REP. CHRIS ENGLAND:**  Thank you for the recognition Gentleman [INDISCERNIBLE 00:47:14].

**MR. SPEAKER:**  I sure do.

**REP. CHRIS ENGLAND:** Okay, it's good to be here. For the second time -- for the third time this year, this is beginning to become a real bad habit. And, you know, I always wonder why they call these things special sessions because there ain't nothing special about them, you know. But anyway, I'm not going to be here long, I just want to follow up on some things that we talked about in committee, and I just wanted to reiterate that there was some requests for information concerning racially polarized voting studies that it was sort of alluded to in our committee meeting that they had been done on when I guess when it was deemed necessary to do them and then also deemed you know, if you reached a certain threshold you decided not to do it. So as far as that's concerned, I wanted to make sure this reiterate that I've you know, requested that and I'm still hopeful to get those before we adjourn or before we walk out of the building at some point this week. That's the first thing, and the second thing is, because you mentioned, I think you said the 7th Congressional District was 54%, is that right? As far as black voting-age population is concerned?

**REP. CHRIS PRINGLE:** The 7th or is now 55.77%, this is what the sheet is telling.

**REP. CHRIS ENGLAND:** Okay, you said 55.7%?

**REP. CHRIS PRINGLE:** Yeah.

**REP. CHRIS ENGLAND:** Okay. And you said on its phase, you felt like without any other further study or any other further information that you felt like that satisfied the Voting Rights Act.

**REP. CHRIS PRINGLE:** Under the 7th Congressional District?

**REP. CHRIS ENGLAND:** Yes.

**REP. CHRIS PRINGLE:** But I'm afraid is if we do it Mr. Faulkner we'll run a ground of a packing allegation.

**REP. CHRIS ENGLAND:** No, I'm asking you about you mentioned that you said before and we in the committee that the reason why you did not do a racial polarized voting study is because of the 55% and that was -- because there were that many I guess African-Americans in the district then you decided that whoever it was decided that that wasn't necessary, correct?

**REP. CHRIS PRINGLE:** Correct.

**REP. CHRIS ENGLAND:** All right, and at the time, you also mentioned that you would do it if we requested it?

**REP. CHRIS PRINGLE:** We thought it was necessary but they cut it off I think at 51%. Anything under 51%, they did it on, anyone over that, they didn't do it.

**[00:50:04]**

Not yet. I mean, we're just -- we're working on it. But I can assure you no one was coming that somebody is going to do a racial polarization analysis on that district.

**REP. CHRIS ENGLAND:**  Yeah. That's what I'm hoping, that we get before we adjourn. And also, you mentioned something else that I did not know; you said that prior to the maps being created, that race wasn't taken into account at all, --

**REP. CHRIS PRINGLE:**  We turned them on, drew maps, then turned on the race, yes, that's what I was told. That race was not on when the maps were originally drawn. The original brush through, yes.

**REP. CHRIS ENGLAND:**  So, it's just by coincidence that seven congressional district ended up with a 55% black voting age population?

**REP. CHRIS PRINGLE:**  Remember, we attempt to maintain the core of the existing districts. Seven congressional district was drawn how many years ago? 1990, 1992? It was drawn by-- yeah. I think Mr. Joe Reed played a large poll on the Alabama democratic conference and creating the seventh congressional district and we've maintained the core of that district ever since.

**REP. CHRIS ENGLAND:**  Not necessarily. I mean because as we've gone over the last 20 or so years in the quest to make sure that there is a certain percentage of voters in the seventh congressional district and the fact that population is shifted, the demographics have changed, the seventh congressional district has actually worked its way down into Montgomery County where it did not use -- I mean, it's actually taking in more and more the City of Montgomery. I mean, it has grown significantly in the quest to continue to put as many African-American voters as you can find into the seventh congressional district.

**REP. CHRIS PRINGLE:**  Now, what is done is it has grown because it is 53,000 people off and we had to go find, I think it was 53,000 people, it was underpopulated. Every district had to gain population and I believe the seventh had to gain the most.

**REP. CHRIS ENGLAND:**  No question. I think that's one of the kind of one of the two things that do not really kind of work well in this discussion is that we're trying to maintain the core of a seventh congressional district that really doesn't exist as it did 20 or so years ago, and the fact to the matter is, it's not necessarily the quest to maintain a core as it is to maintain one Democratic district at a seven and I think -- and that's kind one of the core issues here is like when you got a list of things that you have to comply with, whether it'd be minimizing deviation, whether it'd be trying to keep communities of interest together or whether it means trying to make sure that one district in particular remains packed as possible with African-Americans in it when you got the lofty goals, the political goals kind of always keep you from reaching those lofty goals. So, what is happening is, the State of Alabama changes the demographic shift people move, but the districts never do because -- I mean, I'm not crazy, this is a political process. There are states across the country that are using this particular process to allow politicians to pick their voters, one; but two to also try to change the markings in a very tight house. So, it wouldn't be to your political benefit if someone who's drawing the map is a republican to create two

opportunity districts for example. It wouldn't be in your best interest if somebody who's drawn the map for the republicans to potentially lose a congressional seat considering how close the balance is in congress. I mean, I don't think you should be shy about that, it's a political process. But when that is your quest, when your quest is to do that, other things start getting sacrificed. So, one of the things that you mentioned, when you were talking to Representative Faulkner about that rounding off of that finger in Jefferson County, part of the reason that you're doing that is because drawing in a particular way maintains what you believe is safely creating a safe seventh congressional district for the only black member in the delegation, but it also serves the other purpose to make sure that those folks can't go into the sixth congressional district and have any real impact of what goes on there.

[00:55:07]

So, it's kind of hard to say we're complying with the voting rights act and we're trying to keep communities of interest together, but then there's always that shadow concern that lurks in the background; we need to make sure that we've got -- we want to make sure that we minimize the influence of those folks whether they can impact the second congressional district if you expanded the second congressional district into Montgomery County or their impact in the sixth congressional district if he moves that line a little bit further south, west or southeast; or four congressional district as well. So, I mean, it's not, I don't think these things happen by coincidence. Just like when you say we didn't have race on, but the seventh congressional district manages to maintain somehow almost the same exact shape that it's had the last 20 years; but specifically, the same sort of black voting age population. I mean; so, that's why I think the racial polarize study is so important because it gives us a better understanding and perspective of the work that's being done, what that 55% actually means, and also, it's impossible to make more than one congressional district that's minority-majority. Thank you.

**MR. SPEAKER:** Thanks the gentleman. All right, the Chair recognizes the lady from Jefferson, representative Givan.

**REP. JUANDALYNN GIVAN:** Representative Pringle.

[BACKGROUND CONVERSATION]

**REP. JUANDALYNN GIVAN:** Since your chief of staff is up here Mr. Speaker you need to give me some of my second. He needs to come on back to the house of representatives, but we love Ms. [INDISCERNIBLE 00:57:25].

**MR. SPEAKER:** He's doing his job.

**REP. JUANDALYNN GIVAN:** He is. Let me say he's doing it mister speaker, not you.

**MR. SPEAKER:** Okay.

**REP. JUANDALYNN GIVAN:** Listen; thank you all for the recognition Mr. speaker. Pringle?

**House Floor Debate**
**November 1, 2021**
**Transcript by TransPerfect**

**REP. CHRIS PRINGLE:** Yes ma'am?

**REP. JUANDALYNN GIVAN:** I am standing up here today for the first time in 14 years to honestly say I haven't a clue what is going on. So, could you just tell me what in the slim shiggity is going on? What are we doing? I got here a little late. And I'm not embarrassed to come up here and say that. I just wish some of my colleagues would take note that when they don't know what they're doing and they come up here [INDISCERNIBLE 00:58:04] the ball on the one-yard line, they just need to take some time to acknowledge that they just don't know what's going on. But I promise I was going to be good this week, let me stop, let me be good. But no, seriously, I'll be good. I'll be gone. What's is going on? What are we doing? Because I was listening to Faulkner who was tap dancing like he was on a Broadway stage and he should've just come here to tell the people what it was really about and that was the fact that Congresswoman Sewell represents a portion of Center Point and that he did not want those lines to cross over into his lily white district and he had problems with it. And that's really what it's all about. And he knows, and we know it, and us from Jefferson County definitely know it, and then he came alive on my colleague about it; and he should've just said what it is; I think we should just speak truth to power when we come to this microphone and I'm going to do it and I don't care if I don't get onto the community or what I don't have, I'm going to be free. Free. I had somebody to tell that to just be you. So, I'm going to be me, and I like it. So, I'm just trying to get some understanding and clarity what are we doing now with regards to these maps, what's going on, I'm just trying to get brought up to speed.

**REP. CHRIS PRINGLE:** Ms. Givan what we're doing is the committee on reapportionment has brought forth an excellent plan that complies with the law, it complies with our guidelines of the committee. It's a good plan, it's a fair plan, it's an [INDISCERNIBLE 00:59:46] plan, and I look forward to you voting with me to pass my plan.

**REP. JUANDALYNN GIVAN:** You do?

**REP. CHRIS PRINGLE:** Yes ma'am.

**REP. JUANDALYNN GIVAN:** Now, Pringle, you and I have been here together right here, right here, all of these years.

**REP. CHRIS PRINGLE:** Yeah.

**[01:00:00]**

**REP. CHRIS PRINGLE:** Yeah.

**REP. JUANDALYNN GIVAN:** And I think we worked very, very well together. But I guess my question is, I'm seeing from not only on my side of the aisle, some of your good Republican folks have some issues with their maps or the Congressional Maps. Can you address what those issues are for me because I'm trying to understand them.

23

**House Floor Debate**
**November 1, 2021**
**Transcript by TransPerfect**

**REP. CHRIS PRINGLE:**  Well I can tell you that Mr. Faulkner bought a plan that switched two voting precincts out of the 7th and put them in the 6th and gave two from the 6th to the 7th. I said, I thought it was violation of Section 2 and a racial gerrymander and I move.

**REP. JUANDALYNN GIVAN:**  I agree with you on this, we're on the same page.

**REP. CHRIS PRINGLE:**  And the committee agreed with me. I mean the body agreed with me. We have a motion.

**REP. JUANDALYNN GIVAN:**  Okay, I agree with you on that one.

**REP. CHRIS PRINGLE:**  Mr. Holmes bought forth a plan that --.

**REP. JUANDALYNN GIVAN:**  You don't have to do nothing to say his name, next.

**REP. CHRIS PRINGLE:**  Well, I said it was a violation of Section 2 as a racial gerrymander, so we table and that's where we are now. I'm waiting on Ms. Coleman; she has a plan that I've gotten some statistics on it. We carried --.

**REP. JUANDALYNN GIVAN:**  Are we going to Ms. Coleman's plan?

**REP. CHRIS PRINGLE:**  Well, we can't carry over a substitute, so we put it down, it's good to roll, but she's going to be called on in a few minutes to reoffer her substitute and we'll discuss her substitute to this plan.

**REP. JUANDALYNN GIVAN:**  Well she's going to reoffer next?

**REP. CHRIS PRINGLE:**  Yeah.

**REP. JUANDALYNN GIVAN:**  She's already offered it.

**REP. CHRIS PRINGLE:**  Yeah, but you can't carry over a substitute, it had to be withdrawn.

**REP. JUANDALYNN GIVAN:**  So she withdrew herself?

**REP. CHRIS PRINGLE:**  Graciously yes ma'am, to allow me some opportunity to look at, which has been done and when the time is appropriate, Ms. Coleman is going to be invited back up, really up for her.

**[OVERLAY]**

**REP. JUANDALYNN GIVAN:**  So then when she comes back, you're not going to vote to table it?

**REP. CHRIS PRINGLE:**  The plan I think if fraught with problems. So we're going to go over those problems when they're up here.

**REP. JUANDALYNN GIVAN:** Okay, so when you start out with the word "problem" that means it's not going to get any better because we're not going to have an opportunity obviously to mitigate those problems.

**REP. CHRIS PRINGLE:** I'll be more than happy to talk to her and explain the problems I found with the plan.

**REP. JUANDALYNN GIVAN:** Oh okay.

**REP. CHRIS PRINGLE:** Well the problems the attorneys have found with it.

**REP. JUANDALYNN GIVAN:** So explain but not mitigate?

**REP. CHRIS PRINGLE:** Well, I have a good -- sorry about that.

**REP. JUANDALYNN GIVAN:** You go ahead and take your call.

**REP. CHRIS PRINGLE:** That's my brother.

**REP. JUANDALYNN GIVAN:** My brother is in the hospital; he fell very ill this Friday.

**REP. CHRIS PRINGLE:** I'm sorry.

**REP. JUANDALYNN GIVAN:** Yeah.

**REP. CHRIS PRINGLE:** Is he here in Alabama?

**REP. JUANDALYNN GIVAN:** Yes. But you know, that's okay, I remember -- everybody, I remember the other year about the fathers and mothers was dying and everything and Mr. Speaker made sure that he acknowledged everybody. I had a death and nobody even knew it, but that's the story of my relationship in the House at this point. But anyway I digress. Okay, so we are at this point where you want to -- we're going to bring back the Congressional Map that was proposed by Representative Coleman for which you already have some problems and I don't at this point see an avenue to mitigate those problems at this point. So right now, it's just going to be going through a formation, so at least at this point to vote it up or vote it down. Do you know what's the schedule is like this week? I know we probably won't get the bill back from the Senate. I'm assuming this whatever is going to pass today, what are we passing today? The congressional or --.

**REP. CHRIS PRINGLE:** In calendar today is Congressional plan then the State House plan.

**REP. JUANDALYNN GIVAN:** So we're going to pass out both of those plans?

**REP. CHRIS PRINGLE:** And the Senate has, the Senate plan and the State School Board plan.

House Floor Debate
November 1, 2021
Transcript by TransPerfect

**REP. JUANDALYNN GIVAN:**  And the Senate has State School Board plan. We will get those probably today and we'll vote this out probably sometime today, am I correct?

**REP. CHRIS PRINGLE:**  If that's the will of the body, we will pass it both today, yes ma'am.

**REP. JUANDALYNN GIVAN:**  Okay, and then so at least by Friday, do you think we'll finish this session by Friday?

**REP. CHRIS PRINGLE:**  If that's the will of the body, but I'm not in control.

**REP. JUANDALYNN GIVAN:**  Oh you're in control now.

**REP. CHRIS PRINGLE:**  No.

**REP. JUANDALYNN GIVAN:**  You're in control to a lot of this process Mr. Pringle. Okay, well, at least we know a little bit more now about what's going on. Okay well, I just want to come up here because I saw Mr. Faulkner tap dance and then doing an electric slide and a cute shuffle and the hustle and everything else. So I just thought it's just quite interesting that he came up to speak about Representative Hollis' district and she comes in and says that he's telling a lie about it. So I just wanted to come back up and just see what was going on and make sure that there was some clarity for the folks in House District 60 and House District 2 as would exist to understand that we have a representative that has problems with the way the lines are drawn because they don't want Congresswoman Sewell to represent any portion of the 6th Congressional District.

**[01:05:17]**

And so I just believe that when we come to this microphone that we should not try to sprinkle and tinkle on the little legs and toes and hands and feet of the people, and we should just speak the truth, the power and say what it is, but I'm glad that piece of legislation was voted down and that it went up in flames. I think you've done a decent job in trying to bring everybody together as it relates to their lines. I know we have a little more work to do and I'm glad I had this opportunity to come to the microphone to speak to you about these issues. And then I hope when I get a chance to come back up and talk about House District 60, why you're laughing Pringle?

**REP. CHRIS PRINGLE:**  Because I know how excited you were when you came out and met with us.

**REP. JUANDALYNN GIVAN:**  Oh Lord, now that's supposed to be my secret and your secret, you are telling our secret now, you can't tell our secret. But you know, I don't have many issues with a lot of things these days. I'm trying to say just float through this process and live my best life and be through with it. I've only got one life to live and I'm going to -- I had a great weekend, I talk about that when I come back up here, hopefully this week will allow me to come back and I'll give a chance to finish this discussion and hopefully give a chance to speak with you about my map once we get to the house legislative maps here in Alabama House of

Representatives with such distinguished men and women, boys and girls, all the great little people of the world, thank you.

**REP. CHRIS PRINGLE:** Thank you.

**MR. SPEAKER:** And the Chair thanks the lady. The Chair recognizes now the lady from Jefferson, Representative Coleman, I think we're now ready to address your issue back and keep in mind your earlier motion was withdrawn, so we're back on fresh.

**REP. MERIKA COLEMAN:** Thank you Mr. Speaker for the recognition. I'm going to have to tell, first of all, would the gentleman yield?

**REP. CHRIS PRINGLE:** Yes ma'am.

**REP. MERIKA COLEMAN:** Now you know you had me going downstairs, running downstairs fussing at the wrong folks. Because you know, what you said and I want to make sure the staff is clear about why I was fussing downstairs. So of course the process is you put reapportionment on notice which I did with my substitute, and then they generate everything, send everything to LSA, which they did. And so, I thought I heard you in our exchange that you were told that no -- I need my mask down?

**[BACKGROUND CONVERSATION]**

**REP. MERIKA COLEMAN:** Okay, from our exchange I was under the impression that you said you were told that they didn't have the map which I knew that they did because they had done the work and I went down there and they explained to me that one person had been working the map which was Donna and Randy had not seen it, which is who you text instead of Donna. So, I had to apologize to the staff for fussing a little bit. I just had my mother fussed mode on just a little bit because we had worked really hard on the fair and equitable map because I have that social justice personality.

**REP. CHRIS PRINGLE:** Yes ma'am.

**REP. MERIKA COLEMAN:** And so just really quick to reiterate the point just in case those folks -- it's been a lot of other substitutes right now. This is the 7th Congressional District, the ideal district size we agree on, 717,754. This plan meets the one person one vote requirement by the US Constitution, five of the seven districts have the same population. Two districts though one, District 4 has 43 persons more District 6 has 43 persons less than the ideal number just to preserve the counties. I think, I remember you saying -- well I feel confident I remember you saying that you had eight or nine county splits and our plan or in the fair and equitable plan there's only four county splits and with that Mr. Speaker, I would like to offer the substitute to Chris Pringle's plan, the Chairman's plan, the Coleman Congressional Plan 1.

**MR. SPEAKER:** All right [INDISCERNIBLE 01:09:44] the substitute.

**MR. CLERK:** Substitute to House Bill No. 1 by Representative Coleman.

**MR. SPEAKER:** And Representative Coleman.

**[BACKGROUND CONVERSATION]**

**[01:10:00]**

**MR. SPEAKER:** Where is your map?

**REP. MERIKA COLEMAN:** Yeah, do you need the big version of the map and for the members, there are copies of the map here, I have a really big one.

**[BACKGROUND CONVERSATION]**

**REP. MERIKA COLEMAN:** I need that big version myself.

**[BACKGROUND CONVERSATION]**

**REP. MERIKA COLEMAN:** Thank you so much Mr. Speaker, if there are no questions on the map, I move passage of the Coleman Congressional Map Plan 1 substitute.

**REP. CHRIS PRINGLE:** Ms. Coleman, let me ask you, because I'm looking at some numbers here, go over with me real quickly, Congressional District 1 has, what's the number of people over ideal?

**REP. MERIKA COLEMAN:** The total number 717,764 then 717,754 and so on and so forth.

**REP. CHRIS PRINGLE:** What's the number over ideal?

**REP. MERIKA COLEMAN:** 43 was supposed to be, now I'm not a mathematician, you know, I'm political science, but it's supposed to be 43 over ideal in two of the separate districts.

**REP. CHRIS PRINGLE:** I've got Congressional District 1 has seven people over ideal population.

**REP. MERIKA COLEMAN:** Oh it does say that, seven over here and then 44,251 over negative 71 and 6 and 22 and 7.

**REP. CHRIS PRINGLE:** Okay, yeah.

**REP. MERIKA COLEMAN:** But what's the phrase should be used? De minimis? Those would still constitute de minimis deviations.

**REP. CHRIS PRINGLE:** So, you're over by 0.02% population. Ladies and gentlemen, what this bill will do, it creates a district that District 1 is seven people overpopulated, District 2, zero, District 3, zero, District 4.

**REP. MERIKA COLEMAN:** 42.

**REP. CHRIS PRINGLE:** No, there's no district -- congressional, yeah, District 4 is 42 people overpopulated. District 5 is one. District 6 is 71 people underpopulated and District 7 is 22 people overpopulated.

**REP. MERIKA COLEMAN:** So can I ask you a question of what that definition de minimis means? Tell me what that means as it relates to numbers? Would you?

**REP. CHRIS PRINGLE:** It means if you have a map and you can prove you can get the zero, you have to get the zero.

**REP. MERIKA COLEMAN:** But if part of the court cases that we've been dealing with have been about preserving county lines, correct?

**REP. CHRIS PRINGLE:** Yes, ma'am.

**REP. MERIKA COLEMAN:** How many splits did your map have?

**REP. CHRIS PRINGLE:** Six counties.

**REP. MERIKA COLEMAN:** Okay, 16 splits?

**REP. CHRIS PRINGLE:** Six.

**REP. MERIKA COLEMAN:** Six splits. Well that's a little bit less than what we talked about earlier, but it's still more than the four splits that I have in my substitute.

**REP. CHRIS PRINGLE:** Yeah it is and if you look at District No. 1, it runs all the way down the western side of the state, the whole -- it splits Mobile, splits Washington County and it separates Mobile and Baldwin County.

**REP. MERIKA COLEMAN:** So can I ask you this question? So you just mentioned, let's look at your map.

**REP. CHRIS PRINGLE:** Yeah.

**[OVERLAY]**

**REP. CHRIS PRINGLE:** Well I mean, these counties are big, I realized that but you're splitting Mobile and Baldwin County which as you probably know are a very strong community of interest, a very cohesive community that we all work and live together and interchange back and forth across that day way where by the way we need a new bridge in order to keep our community of interest together.

**REP. MERIKA COLEMAN:** Well on the house maps because we will get to those, we feel that same way in Jefferson County and while didn't respect that in Jefferson, so they're going to be some situations where you're going to have to go down the state across the state. And again, remember I told you that personality test I took, fair and equitable. This is the most fair and equitable plan in my opinion that we have before us today and I'm going to ask the members to support this plan.

**REP. CHRIS PRINGLE:** Ladies and gentleman, also let me point out under this plan, the BVAP, the black population under this plan will take this district. I'm getting two different numbers here, one minute. It would go to 62.63% African-American.

**[01:15:07]**

**REP. MERIKA COLEMAN:** The only reason -- thank you so much for asking that question. So the only reason it goes, so then you're talking about Congressional District 7?

**REP. CHRIS PRINGLE:** Yes ma'am.

**REP. MERIKA COLEMAN:** It's only because we were trying to preserve those counties. That's how we got to that number.

**REP. CHRIS PRINGLE:** Yes, ma'am. I understand that and that you kept that finger in Jefferson County very skinny and you obviously drew basically on racial lines in Jefferson County.

**REP. MERIKA COLEMAN:** Well, that's not true. That was supposed your plan not mine. Well because actually -- well if you make the allegations so you know, you have to let me defend the allegation. Now again remember, this is about a fair and equitable plan, this is not about Merika Coleman, because if it was about Merika Coleman, then the entire seven congressional, all of Jefferson County would be in the 7th, because I have the opportunity to be able to -- that particular congressperson speaks directly to me, so this is not about me. This is about what's fair and equitable.

**REP. CHRIS PRINGLE:** Yes, ma'am.

**REP. MERIKA COLEMAN:** And so if you make the allegation, I have to defend myself. It was only done to be able to preserve those other counties.

**REP. CHRIS PRINGLE:** I understand that. I do. But if we pass a plan out of here with 62.63% African-Americans packed into the 7th Congressional District, it's going to clearly be a red flag for the court system and they will probably throw this plan out.

**REP. MERIKA COLEMAN:** I don't think it'll be a red flag for the point system if an African-American woman is carrying it and we end up voting for work because an African-American voted for [INDISCERNIBLE 01:16:34] and we all voted for, it won't be a red flag, it'll be a red

flag on your plan if there's nobody African-American that supports it, that's where the red flag is.

**REP. CHRIS PRINGLE:** I don't know the courts are going to pay attention that have voted for against the plan as much as -- they're going to look at that.

**REP. MERIKA COLEMAN:** But you just brought the issue of -- Mr. Chairman.

**REP. CHRIS PRINGLE:** No, no, no [INDISCERNIBLE 01:16:51]. You're packed in that district with African-Americans and raised in the black population up there, a high and it doesn't need to be in this. Look, the courts are going to look at that as a plan that packs.

**REP. MERIKA COLEMAN:** So since you know, go ahead and tell me then, tell all of us then, you just said as a number of for African-Americans that it does not have to be. So tell me what that number is because I actually was not talking -- I didn't bring up race in the discussion, I brought up equity. You brought up race, I didn't.

**REP. CHRIS PRINGLE:** All right it's --.

**MR. SPEAKER:** The lady's time has expired but go ahead and respond.

**REP. CHRIS PRINGLE:** We have a plan that proves it can be a majority-minority district the way it is that we can say complies with Section 2 of the Voting Rights Act but if we go back and pack it with more African-Americans when we've proven we don't need to, we're going to run into a packing allegation and I think we'll go run a file of Section 2 of the Voting Rights Act.

**REP. MERIKA COLEMAN:** So just the last comment --.

**REP. CHRIS PRINGLE:** Because the last time, the reason they left that finger in Jefferson County was under Section 5, we would be faced with a retrogression issue if we didn't maintain it. We don't have retrogression anymore because Section 5 was gone, but we still have Section 2, we have to comply with fully.

**REP. MERIKA COLEMAN:** So just to round it off, thank you so much. The gentleman did not give us the number. I asked him the question. He did not give us the number. Again, this is the fair and equitable plan and I would ask the members to support the substitute.

**MR. SPEAKER:** All right, and Mr. Chairman, you need to make a comment, how do you want to handle this motion?

**REP. CHRIS PRINGLE:** I'm going to move the table floor in a count.

**MR. SPEAKER:** All right members, the question on the floor now is going to be the substitute offered by Representative Coleman, and the Chairman has recommended that we table. We're voting on a tabling motion. If you are in favor of the tabling motion, your vote will "Aye", if you're opposed your vote is "No." The clerk will unlock the machine and the members will vote.

**REP. MERIKA COLEMAN:**  Vote "No" please on the tabling motion, vote "No."

**[BACKGROUND CONVERSATION]**

**MR. SPEAKER:**  All the members voted. All the members voted?

**REP. MERIKA COLEMAN:**  If you want to be fair and equitable vote "No." Don't send the message to the rest of the country that this is not -- that we're going to end up having a plan that's not fair and equitable.

**MR. SPEAKER:**  All right, hold on. All the members voting. All right, Clerk will lock the machine. Go with the vote. All right, the 74 yeas, 28 nays, 0 abstention and the substitute does not prevail.

**REP. MERIKA COLEMAN:**  Well, we've sent the message. We are, thank you.

**MR. SPEAKER:**  All right and the Chair thanks the lady. All right. And gentleman from Jefferson, Representative Rogers, you're recognized.

**[BACKGROUND CONVERSATION]**

**REP. JOHN ROGERS:**  Thank you Mr. Speaker. Now, I know the votes that are due -- well I can't wait to Mr. Speaker tell what our scheduling going to be all rest of the week because they get interesting.

**[01:20:02]**

The thing I was concerned about that [INDISCERNIBLE 01:20:08] is that in looking at all the numbers here that on this anything is that there is no deviation in any district, right?

**REP. CHRIS PRINGLE:**  In the congressional plans --.

**[OVERLAY]**

**REP. JOHN ROGERS:**  Yeah, basically we got one that's 0% deviation.

**REP. CHRIS PRINGLE:**  Yes, sir.

**REP. JOHN ROGERS:**  Okay. If you were to do the plus or minus deviation, you're really going to get two -- basically, you got a black district and you got an influence district. You went ahead -- because of the fact yeah, I know what we say we don't -- I don't even admit to the fact about by the race or not, but it's clearly a clear example of stacking and packing in a way because if you look at that one district with 81% white, that could be spread out. Do you think so? I mean, I know you drew the plan, it's part of drawing a plan, but talking to the senators, it

clearly could be a black district and a good influence district because in fact I don't forget the plan.

**REP. CHRIS PRINGLE:** So you're saying that the 81% white district could be spread out and made an influence district?

**REP. JOHN ROGERS:** O yeah. I mean I've talked to Terri Sewell. I've talked to several people who draw maps and back 10 years ago, we could've had two black districts, two basically districts where we could win. That was 10 years ago and it went freed the horn all over the drawing maps [INDISCERNIBLE 01:21:45] all those drawing maps, you can either clearly get out of there, but when you start -- I don't want to try and say it's racial, but it's a little stacking and a little packing there on the side that looked like to me, especially with the 81%. If you did a 2% or 1% deviation, all listen to our district, you can make it. And you still would have to break out too many [INDISCERNIBLE 01:22:09]. And the reason I know you can do it because we lay it on the floor and drew the maps earlier. Ten years ago you could have done it.

**REP. CHRIS PRINGLE:** There are a lot of things you can do but that doesn't make it legal. I mean, I can do a lot of things that are --.

**REP. JOHN ROGERS:** What's illegal about it? You're not stacking or packing, you spread an area around, so it's like you don't need a district without a chance you take they telling me sometimes that if you try to divide up two equally, you stand a chance of losing a minority representative, but you could have a district where it'll be influenced district. So therefore, you can almost do it when you get to about 50%, 55% or 51% minority district, 52% minority district.

**REP. CHRIS PRINGLE:** That's what Ms. Sewell's district is.

**REP. JOHN ROGERS:** I know, but you get two of them.

**REP. CHRIS PRINGLE:** Well, if you bring a plan down here that gives two majority-minority districts, we'll look at it.

**REP. JOHN ROGERS:** Okay, I can do that. I can bring a plan from 10 years ago that we drew.

**REP. CHRIS PRINGLE:** I don't think 10 years ago would work as the census have changed.

**REP. JOHN ROGERS:** I know, but yes it won't work the same as it is now, but it's the same thing. It's basically the same, the numbers are there.

**REP. CHRIS PRINGLE:** No, this changed.

**REP. JOHN ROGERS:** But you got to do 1% deviation. You can do a 5% deviation or you can do a 1% deviation, you got your numbers. No trouble about two, but 1% deviation will get you where you want to get to. And the other question I need to ask is that you said one time that you had done a racially poor voting study. Who did it? I've been checking since you told me that.

[OVERLAY]

**REP. CHRIS PRINGLE:**  Well, I'm working on getting that. It was a gentleman out of Georgia and I don't know his name.

**REP. JOHN ROGERS:**  Well, we need to know because that could be part of the law.

**REP. CHRIS PRINGLE:**  I know it. I'm going to get it to you. I'm going to have the information. Everything I've done is going to be part of the law, it's all going to be open, it's all going to be in the record.

**REP. JOHN ROGERS:**  Okay. I've now see a real full here, everybody said it's fine. I mean, I don't see anybody here with this plan, which makes it kind of funny, but Republican against it, the Democrats against it, only body supporting it you and [INDISCERNIBLE 01:24:34] and they haven't been linked. But the thing about it is that the guy -- where you say he's from?

**REP. CHRIS PRINGLE:**  Out of Georgia, the gentleman out of Georgia did the racial polarization study. I have no clue what his name is.

**REP. JOHN ROGERS:**  When we did that, just because the district is a -- you don't need a 65% black district to win.

**REP. CHRIS PRINGLE:**  I don't know what you need. I'm not going to give you a number.

[01:25:02]

**REP. JOHN ROGERS:**  I think the most out is 62%.

**REP. CHRIS PRINGLE:**  I believe that's 65% came when Joe Reed was drawing the district.

**REP. JOHN ROGERS:**  Yeah, let's say disagreement in the district.

**REP. CHRIS PRINGLE:**  Who?

**REP. JOHN ROGERS:**  [INDISCERNIBLE 01:25:14].

**REP. CHRIS PRINGLE:**  Yeah.

**REP. JOHN ROGERS:**  He's doing primarily Caucasian, but they're Democrats and a lot of people in his House were feeling real short [INDISCERNIBLE 01:25:28] they feel that they could make a new district -- I'm going to run, they're telling me because of the fact that this map is causing him to have some heartburn because of the fact that they can't win. I even have one telling that I'm going to vote for the plan because I'm part Republican and I got you, but I can't win, I'm not going to run again. So what I'm saying to you that there's a way they could draw this where it'd be like -- draw it in line where they're much better.

34

**REP. CHRIS PRINGLE:**  Are we talking about Congress or the House.

**REP. JOHN ROGERS:**  I'm talking about Congress.

**REP. CHRIS PRINGLE:**  Okay. So a member of Congress.

**REP. JOHN ROGERS:**  I'm really talking about both of them really.

**REP. CHRIS PRINGLE:**  Yeah, a member of Congress told you they weren't going to run again because of where this was going?

**REP. JOHN ROGERS:**  It's not Congress but the House, a lot of the House members.

**REP. CHRIS PRINGLE:**  Okay. I'm just trying to figure out which House.

**REP. JOHN ROGERS:**  Everybody cover, hey, they got -- Congress got two House map. Hey, if I was [INDISCERNIBLE 01:26:29], I'd run too. With this deal here, they guarantee to win. I mean, because of the fact that I agree we're going to have to start going to [INDISCERNIBLE 01:26:43] country store. We're going to do that this time. In fact, I talked to some people who are basically are Republican, but they're liberal Republican, they talk. We got to get them to realize that we're all in the ballgame together. It's not me against you or you against me. But I think we can do a lot of recruits so to speak. But if we shared the map -- this congressional map a little bit, a little tweaking here and there, we could have a good district. We can get probably a 55, 54 district out of this map beside you're still having the settlement we got, we could have eight congressmen in Washington.

**REP. CHRIS PRINGLE:**  We can't have eight congressmen.

**REP. JOHN ROGERS:**  Because we're getting two black, we can get a black district and we can get an influence district. You keep that.

**REP. CHRIS PRINGLE:**  Mr. Rogers, let me explain this. We can't decide how many members of Congress we have. They apportioned it and they gave us seven seats. We can't just tell them, "No, we think we're going to draw eight."

**REP. JOHN ROGERS:**  Hey, we could get seven, but out of that seven, we could have a black district [INDISCERNIBLE 01:28:05] black district and an influence district out of the seven. Now that could have -- but you would have -- you had 6th coming as one of those numbers down like 81% down, we would have 81%, you would have 81% district. You could spread that out [INDISCERNIBLE 01:28:25]. And so that way, it'll be a much fair representation and we've drawn that map several times. As a matter of fact, one of the maps you going to get submitted going to have two plans to it. They got two, but you can still have one, they can have two. I mean, we can go back -- like where there were a lot of Democrats who speak to other Republican Party. They still basically have not run again. They just switch and just run at a party, so they can run again but they'd run as a more liberal Republican, whatever if there is such liberal Republican. Therefore, we would have a better chance at getting an influence district. Otherwise,

you can't have a majority of black district, but you'd be a district where you got influence. They both not totally Republican and we can draw that. I mean, I got those maps they drew from two years ago where we sit on floor because we didn't have no computer. We draw them there. When they first had the first congressional black district.

**REP. CHRIS PRINGLE:** Then what year was that? Was it 1990?

**REP. JOHN ROGERS:** That was that two years ago.

**MR. SPEAKER:** And the gentleman's time.

**REP. CHRIS PRINGLE:** No, it was longer than that. It was 1990.

**REP. JOHN ROGERS:** Hey, I could show it to you.

**REP. CHRIS PRINGLE:** [INDISCERNIBLE 01:29:52]

**REP. JOHN ROGERS:** Yeah, but we could've had two winners here. Thank you.

**MR. SPEAKER:** And the chair thanks the gentleman. All right. Chair now will recognize the lady from Madison, Representative Hall.

**[01:30:08]**

Representative Hall in the chamber. All right members I thank Mr. Chairman. Hold on, they're checking the restroom to make sure we didn't miss anybody.

**[BACKGROUND CONVERSATION]**

**REP. CHRIS PRINGLE:** Ms. Hall, I thought Ms. Hall was coming. I'm not going to deny Ms. Hall the ability to ask me questions.

**MR. SPEAKER:** Well, I wouldn't want to do that either. Okay, all right. Well, let's go ahead. I think we're ready for the question, Mr. Chairman.

**REP. CHRIS PRINGLE:** Mr. Speaker, I move to pass this as House Bill 1.

**MR. SPEAKER:** All right, the question before us is going to be passage of House Bill No. 1. If you're in favor of this bill, your vote will be "Aye." If you're opposed, your vote is "No." Clerk will unlock the machine and the members will vote. Final passage of House Bill 1.

**[BACKGROUND CONVERSATION]**

**MR. SPEAKER:** All the members voted?

**[BACKGROUND CONVERSATION]**

**MR. SPEAKER:** All the members had an opportunity to vote. All right. Clerk will unlock the machine and record the vote. There are 65 yeas, 38 nays, 0 abstention and House Bill 1 is passed. All right, members, we'll move to -- the first bill. Now Mr. Clerk, let's go to the next bill on the calendar.

**MR. CLERK:** On Page 1 of the calendar, House Bill No. 2 by Representative Pringle relating to reapportionment and re-districting of the Alabama House of Representatives.

**MR. SPEAKER:** Chairman Pringle, you're recognized.

**REP. CHRIS PRINGLE:** Thank you, ladies and gentlemen. Can I get me a second to reload here?

**[BACKGROUND CONVERSATION]**

**REP. CHRIS PRINGLE:** They all should be up there. The House maps are supposed to be up there. Ladies and gentlemen, there are supposed to be House maps here in the chamber for the House plan and I'm going to need somebody to bring me a copy of the House -- the big copy of the House plan.

**[BACKGROUND CONVERSATION]**

**REP. CHRIS PRINGLE:** I need a big map for my House plan. They never sent it up me.

**[BACKGROUND CONVERSATION]**

**REP. CHRIS PRINGLE:** Yeah.

**MR. SPEAKER:** They have it down there?

**REP. CHRIS PRINGLE:** They should. But I need the existing and I need the substitute.

**[01:33:44]**



**TRANSPERFECT**

I, Anders Nelson, hereby certify that the document "Day 3 11_1_2021 - House Bill 1 debate" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

# Anders Nelson

Digitally signed by
Anders Nelson
Date: 2021.12.14 15:45:28
-05'00'

Anders Nelson
Project Manager

December 14, 2021



## 2021 Alabama Congressional Plan

PLAINTIFF'S EXHIBIT
6
C. Pringle

©2021 CALIPER; ©2020 HERE

RC 000553