FILED
2021 Dec-27 PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# In The Matter Of:

# Evan Milligan,et al v. John H.Merrill, et al.

---

Jim McClendon

*December 17, 2021*

---

US Legal

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF ALABAMA
 3
 4
 5
 6 EVAN MILLIGAN, et al.,  )
 7                         )        CIVIL CASE NO.
 8         Plaintiffs,     )     2:2021-CV-01530-AMM
 9 VS.                     )     VIDEO DEPOSITION OF:
10 JOHN MERRILL, et al.,   )     JAMES McCLENDON
11                         )
12         Defendants.     )
13
14
15
16        S T I P U L A T I O N S
17         IT IS STIPULATED AND AGREED, by and between
18 the parties through their respective counsel, that
19 the deposition of:
20              JAMES McCLENDON,
21 may be taken before LeAnn Maroney, Notary Public,
22 State at Large, at the law offices of Balch &
23 Bingham, 105 Tallapoosa Street, Montgomery, Alabama,
24 36104, on December 17, 2021, commencing at 1:57 p.m.
25
                                              Page 1
```

```
 1         IT IS FURTHER STIPULATED AND AGREED that the
 2 signature to and reading of the deposition by the
 3 witness is waived, the deposition to have the same
 4 force and effect as if full compliance had been had
 5 with all laws and rules of Court relating to the
 6 taking of depositions.
 7
 8         IT IS FURTHER STIPULATED AND AGREED that it
 9 shall not be necessary for any objections to be made
10 by counsel to any questions, except as to form or
11 leading questions, and that counsel for the parties
12 may make objections and assign grounds at the time
13 of the trial, or at the time said deposition is
14 offered in evidence, or prior thereto.
15
16
17                      ***
18
19
20
21
22
23
24
25
                                              Page 2
```

```
 1              A P P E A R A N C E S
 2
 3 FOR THE MILLIGAN PLAINTIFFS:
 4         MICHAEL L. TURRILL
 5         Attorney at Law
 6         Hogan Lovells US LLP
 7         1999 Avenue of the Stars, Ste. 1400
 8         Los Angeles, California  90067
 9         michael.turrill@hoganlovells.com
10
11         KATHRYN SADASIVAN
12         Attorney at Law
13         NAACP Legal Defense & Educational Fund
14         40 Rector Street, FL 5
15         New York, New York  10006
16         ksadasivan@naacpldf.org
17
18         DEUEL ROSS (Via Zoom)
19         Attorney at Law
20         NAACP Legal Defense & Educational Fund
21         700 14th Street N.W., Ste. 600
22         Washington, DC  20005
23         dross@naacpldf.org
24
25
                                              Page 3
```

```
 1         JULIE A. EBENSTEIN
 2         Attorney at Law
 3         American Civil Liberties Union Foundation
 4         125 Broad Street
 5         New York, New York  10004
 6         jebenstein@aclu.org
 7
 8         KAITLIN WELBORN
 9         Attorney at Law
10         American Civil Liberties Union of Alabama
11         P.O. Box 6179
12         Montgomery, Alabama  36106
13         kwelborn@aclualabama.org
14
15 FOR THE CASTER PLAINTIFFS: (Via Zoom)
16         DAN OSHER
17         Attorney at Law
18         Elias Law Group
19         10 G Street NE, Ste. 600
20         Washington, DC  20002
21         dosher@elias.law
22
23
24
25
                                              Page 4
```

Evan Milligan,et al v. John H.Merrill, et al.                                    Jim McClendon
                                                                                 12/17/2021

| | |
|---|---|
| 1 FOR DEFENDANT JOHN H. MERRILL: | 1       I, LeAnn Maroney, a Court Reporter of |
| 2       JIM DAVIS | 2 Birmingham, Alabama, and a Notary Public for the |
| 3       Assistant Attorney General | 3 State of Alabama at Large, acting as commissioner, |
| 4       Office of the Attorney General | 4 certify that on this date, pursuant to the Federal |
| 5       501 Washington Avenue | 5 Rules of Civil Procedure and the foregoing |
| 6       Montgomery, Alabama  36130 | 6 stipulation of counsel, there came before me on |
| 7       jim.davis@alabamaag.gov | 7 December 17, 2021, JAMES McCLENDON, witness in the |
| 8 | 8 above cause, for oral examination, whereupon the |
| 9 FOR THE DEFENDANTS JAMES McCLENDON & JAMES | 9 following proceedings were had: |
| 10 McCLENDON: | 10           * * * * * |
| 11       DORMAN WALKER | 11       THE VIDEOGRAPHER:  This marks the |
| 12       Attorney at Law | 12 beginning of the deposition of Jim McClendon in the |
| 13       Balch & Bingham | 13 matter of Evan Milligan, et al., versus John H. |
| 14       105 Tallapoosa Street, Ste. 200 | 14 Merrill, et al., Civil Case Number 2:21-CV-01530-AMM |
| 15       Montgomery, Alabama  36104 | 15 filed in the United States District Court for the |
| 16       dwalker@balch.com | 16 Northern District of Alabama.  The date is December |
| 17 | 17 17, 2021.  The time is 1:57 p.m. |
| 18 | 18       All attorneys present, will you please |
| 19 ALSO PRESENT: | 19 state your names and whom you represent. |
| 20       Paige Ali, Videographer | 20       MR. DAVIS:  Jim Davis, Alabama Attorney |
| 21 | 21 General's Office, for Secretary of State John |
| 22 | 22 Merrill. |
| 23 | 23       MR. WALKER:  Dorman Walker, Balch & |
| 24 | 24 Bingham, for Senator Jim McClendon. |
| 25                               Page 5 | 25       MS. SADASIVAN:  This is Kathryn |
| | 25                               Page 7 |

| | |
|---|---|
| 1         I N D E X | 1 Sadasivan for plaintiffs Evan Milligan, Shalela |
| 2    MS. SADASIVAN:  9-103 | 2 Dowdy, Letetia Jackson, Greater Birmingham |
| 3    MR. OSHER:    104-111 | 3 Ministries, and the NAACP of Alabama. |
| 4    MR. DAVIS:    111-114 | 4       I'm still having trouble hearing you |
| 5 | 5 all, though.  The audio is going out.  Are you able |
| 6 | 6 to move the place where -- anything towards the |
| 7    E X H I B I T   L I S T | 7 witness, a phone, audio of some sort? |
| 8                            PAGE | 8       (Discussion held off the record.) |
| 9    Plaintiff's Exhibit 1 -        35 | 9       THE VIDEOGRAPHER:  Okay.  The attorneys |
| 10   (Talk points) | 10 that are on Zoom, if you'll do your introductions. |
| 11   Plaintiff's Exhibit 2 -        36 | 11       MR. TURRILL:  Michael Turrill of Hogan |
| 12   (2011 reapportionment guidelines) | 12 Lovells on behalf of the Milligan plaintiffs. |
| 13   Plaintiff's Exhibit 3 -        47 | 13       MR. ROSS:  Deuel Ross for the Milligan |
| 14   (Montgomeryadvertiser.com) | 14 plaintiffs. |
| 15   Plaintiff's Exhibit 4 -        61 | 15       MR. OSHER:  Dan Osher for the Caster |
| 16   (Public hearing schedule) | 16 plaintiffs. |
| 17   Plaintiff's Exhibit 5 -        64 | 17       MS. EBENSTEIN:  Julie Ebenstein for the |
| 18   (2021 reapportionment guidelines) | 18 Milligan plaintiffs. |
| 19   Plaintiff's Exhibit 6 -        76 | 19       THE VIDEOGRAPHER:  Do you want to swear |
| 20   (Transcript of October 26, 2021) | 20 him in? |
| 21   Plaintiff's Exhibit 7 -        94 | 21       JAMES McCLENDON, |
| 22   (Transcript of November 3, 2021) | 22 having been duly sworn, was examined and testified |
| 23   Plaintiff's Exhibit 8 -       100 | 23       as follows: |
| 24   (Hall request for additional meetings) | 24       THE REPORTER:  Usual stipulations? |
| 25                               Page 6 | 25       MR. WALKER:  Meaning that the only |
| | 25                               Page 8 |

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                   12/17/2021

1 objections that need to be made are to the form of
2 the question.  Yes, Katherine?
3            MS. SADASIVAN:  Yes.
4            THE VIDEOGRAPHER:  We are off the
5 record.  The time is 1:59 p.m.
6            (Recess was taken.)
7            THE VIDEOGRAPHER:  We are back on the
8 record.  The time is 2:04 p.m.
9 EXAMINATION BY MS. SADASIVAN:
10 Q.        Good afternoon, Mr. McClendon.  My name
11 is Kathryn Sadasivan and I work for the NAACP Legal
12 Defense & Educational Fund.  I represent the
13 plaintiffs in this case, Milligan versus Merrill.
14 Thank you for making yourself available for today's
15 deposition.
16            Do you understand that you're here today
17 because you've been served with a notice of
18 deposition and you are a defendant in Milligan
19 versus Merrill in your official capacity as cochair
20 of the Alabama permanent legislative committee on
21 reapportionment?
22 A.        I do.
23 Q.        Before going any further, can you please
24 state and spell your name for the record?
25 A.        James H. McClendon, M-c-C-L-E-N-D-O-N.
                                                Page 9

1 Q.        And your first name, as well, please.
2 A.        J-A-M-E-S.
3 Q.        Have you ever been deposed before?
4 A.        Yes.
5 Q.        When?
6 A.        Roughly ten years ago during
7 redistricting last time.
8 Q.        And what was your role in the
9 litigation?
10 A.        I was house chairman of redistricting at
11 that time.
12 Q.        Were you a defendant?
13 A.        Yes.
14 Q.        Were you -- have you been involved in
15 any other cases?
16 A.        Any?  No.
17 Q.        You are sworn and under oath.  Do you
18 understand that for purposes of my questioning, you
19 must testify truthfully and as completely as
20 possible as though we were before a judge in a
21 courtroom?
22 A.        Yes.
23 Q.        Is there any reason you cannot give
24 truthful and complete testimony today?
25 A.        No.
                                                Page 10

1 Q.        Are you taking any medication that might
2 affect your ability to understand the questions that
3 I ask or provide answers to those questions?
4 A.        No.
5 Q.        Do you have any condition that would
6 affect your ability to understand the questions that
7 I ask and provide answers to the questions?
8 A.        No.
9 Q.        Do you understand that today's
10 deposition is being conducted via web
11 videoconference?
12 A.        Yes.
13 Q.        Do you understand that a court reporter
14 is transcribing this deposition, meaning that they
15 are writing down everything that you, your counsel,
16 and I say today?
17 A.        Yes.
18 Q.        It's important that all of your answers
19 are verbal.  This will allow the court reporter to
20 record our statements.  The court reporter won't be
21 able to record gestures or nodding.  Do you
22 understand?
23 A.        I do.
24 Q.        Likewise, it's important that we don't
25 speak over one another.  I will wait until you
                                                Page 11

1 finish your answer, and I ask that you please wait
2 until I finish my question before answering.  Do you
3 understand?
4 A.        I do.
5 Q.        If you don't understand a question that
6 I ask, please just let me know, and I'll rephrase
7 it.  If at any point you recall additional
8 information that is responsive to a question that I
9 asked you earlier, please let me know, and I will
10 allow you to clarify the record.  Do you understand?
11 A.        I do.
12 Q.        Please do not guess or assume when
13 answering.  Be sure to state only that which you
14 know to be true based on your personal knowledge.
15 Will you do that?
16 A.        Yes.
17 Q.        You may hear your attorney, Mr. Walker,
18 object to a question from time to time.  His
19 objections are being made for the record, and you
20 are still required to answer my question unless you
21 are instructed by your attorney not to answer.  Do
22 you understand?
23 A.        I'm not sure about that.  Maybe say it
24 again.  Let me hear you say that one more time.
25 Q.        You may hear your attorney object to a
                                                Page 12

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 question from time to time throughout this
2 deposition.  Those objections are made largely for
3 the record.  And you understand you are still
4 required to respond to my question unless you are
5 instructed by your attorney not to?
6 A.        Okay.
7 Q.        Do you understand that?
8 A.        I've got it.
9 Q.        Is that a yes?
10 A.       Yes.
11 Q.       Thank you.
12         Since we're conducting this deposition
13 remotely and we're not together in the same room, I
14 ask that you please keep your cell phone off unless
15 we are on a break.  Can you do that?
16 A.       I understand.
17 Q.       Please don't refer to any documents or
18 other materials during our conversation today.  Will
19 you do that?
20 A.       Did you say don't refer to any materials
21 or documents today?  Is that what you said?
22 Q.       Do you have any documents with you?
23 A.       I do not.
24         MR. WALKER:  Oh, did you mean don't look
25 at any documents?
                                              Page 13

1 A.        Correct.  Yes, it is.
2          MR. WALKER:  Kathryn, can I ask that
3 this personal information be redacted with anything
4 you file with the court?
5 Q.        Do you have any other phone numbers?
6 A.        Well, I do have a phone in my office in
7 the Alabama state house, but I'm not sure what the
8 number is.
9 Q.        Do you have an email account?
10 A.       I do.  I have two.
11 Q.       And what are they?
12 A.       My personal email is
13 jimmcc@windstream.net.  My senate email is
14 jim.mcclendon@alsenate.gov.
15 Q.       Do you have any personal social media
16 accounts?
17 A.       Facebook, yes.
18 Q.       You just have a Facebook account?
19 A.       Correct.
20 Q.       No Twitter?
21 A.       No Twitter.
22 Q.       And where were you born?
23 A.       Mobile, Alabama.
24 Q.       And where did you go to high school?
25 A.       Springville, Alabama.
                                              Page 15

1 Q.        Do you have any -- if you don't have any
2 documents with you, please don't look at any
3 documents other than those that I will give you.  Do
4 you understand that?
5 A.        I do.
6 Q.        Thank you.  Sorry for all the
7 preparatory language.
8          Finally, if you need a break at any
9 time, please just let me know.  If there's a
10 question pending, I just ask that you answer that
11 question before going on a break.  Do you
12 understand?
13 A.       I do.
14 Q.       Thank you.
15         I'm going to ask you some background
16 questions to get to know you a little bit better.
17         What is your date of birth?
18 A.       1-10-43.
19 Q.       That's January 10, 1943?
20 A.       Correct.
21 Q.       What's your address?
22 A.       361 Jones Road, Springville, Alabama.
23 Q.       And your telephone number?
24 A.       (205)999-8096.
25 Q.       Is that a mobile phone number?
                                              Page 14

1 Q.        Where did you go to college?
2 A.        My undergraduate degree is from
3 Birmingham Southern College in Birmingham, and my
4 doctorate is from the University of Houston,
5 Houston, Texas.
6 Q.        And what is your doctorate in?
7 A.        Optometry.
8 Q.        And what courses did you take at
9 Birmingham Southern?
10 A.       Just pretty much premed-type courses.
11 Q.       And have you studied anywhere else?
12 A.       No, other than continuing education
13 courses required to maintain my optometry license.
14 Q.       So you are an optometrist?
15 A.       Correct.  Yes, I am.
16 Q.       Have you -- are you married?
17 A.       I am.
18 Q.       How long have you been married?
19 A.       26 years.
20 Q.       Congratulations.
21         Do you have kids?
22 A.       I do.
23 Q.       How many?
24 A.       One child.
25 Q.       One child.  And how old are they?
                                              Page 16

Evan Milligan,et al v. John H.Merrill, et al.                                    Jim McClendon
                                                                                12/17/2021

| | |
|---|---|
| 1 A. | She is 50. |
| 2 Q. | And what does she do for a living? |
| 3 A. | A school teacher. |
| 4 Q. | In Alabama? |
| 5 A. | Yes. |
| 6 Q. | Where? |
| 7 A. | In the Jefferson County system. |
| 8 Q. | And where do you work? |
| 9 A. | I'm a -- I'm retired from optometry. |
| 10 Q. | So you are not employed currently? |
| 11 A. | As an optometrist, no, I am not. |
| 12 Q. | Are you employed anywhere currently? |
| 13 A. | Only as an Alabama senator. |
| 14 Q. | So you're working as an Alabama senator? |
| 15 A. | Well, I am a senator, and we do work |
| 16 from time to time. | |
| 17 Q. | Are you paid? |
| 18 A. | Yes. |
| 19 Q. | Do you know why you're here today? |
| 20 A. | Yes. |
| 21 Q. | Why? |
| 22 A. | A lawsuit concerning redistricting that |
| 23 we just completed in the Alabama legislature. | |
| 24 Q. | Did you read the complaint in the case |
| 25 in which you're sitting for a deposition today? | |

Page 17

| | |
|---|---|
| 1 A. | I didn't quite understand.  Did you say |
| 2 will you read or did you read? | |
| 3 Q. | Did you read. |
| 4 A. | I have not read it, no. |
| 5 Q. | Do you know what the case is about? |
| 6 A. | Yes.  This case has to deal with the |
| 7 congressional districts. | |
| 8 Q. | Are you represented by counsel today? |
| 9 A. | I am. |
| 10 Q. | Who is your counsel? |
| 11 A. | Dorman Walker. |
| 12 Q. | And how did you prepare for this |
| 13 deposition today? | |
| 14 A. | I came in yesterday and we met for a |
| 15 couple of hours and we sort of talked about how this | |
| 16 works and what to expect.  But that was the only | |
| 17 preparation. | |
| 18 Q. | And who is "we"? |
| 19 A. | Jim Davis was here and Chris -- |
| 20 Representative Pringle was here and I was here.  So | |
| 21 it was four of us present. | |
| 22 Q. | So you -- the only preparation you did |
| 23 for this deposition was to meet with Chris Pringle, | |
| 24 Jim Davis, and Mr. Walker yesterday for a few hours? | |
| 25 A. | That is correct. |

Page 18

| | |
|---|---|
| 1 Q. | Did you review any documents? |
| 2 A. | Yes. |
| 3 Q. | Which documents? |
| 4 A. | There were two.  Actually, I can't say I |
| 5 reviewed them.  I looked at the cover.  One of them | |
| 6 had to do with the notes -- the bullet points we | |
| 7 used on the floor, in my case on the floor of the | |
| 8 senate. | |
| 9 | And the other one -- I can't even |
| 10 remember what the other one was.  But I gave them | |
| 11 back to my attorney.  I didn't take them home and | |
| 12 read them or study them. | |
| 13 Q. | So I am going to try to drop in the chat |
| 14 a document that I'll ask the court reporter to mark | |
| 15 as Exhibit 1.  And I can show it on my screen, as | |
| 16 well. | |
| 17 | Is this the document that you reviewed |
| 18 in advance of your deposition today?  Let me share | |
| 19 my screen. | |
| 20 | Senator McClendon, is this the document |
| 21 that you were referring to? | |
| 22 A. | I really can't read that.  I see talking |
| 23 points -- okay.  Scroll it up and let me see it. | |
| 24 Well, that looks similar.  I don't know if that's | |
| 25 exactly the same document.  But that's sort of the | |

Page 19

| | |
|---|---|
| 1 format that was used. | |
| 2 Q. | I'll represent that this was produced in |
| 3 this litigation and that I have given it to the | |
| 4 court reporter and hopefully you also have a copy. | |
| 5 | And what was this document? |
| 6 A. | What you and I were just discussing was |
| 7 talking points that I was provided by our attorney | |
| 8 when the issue of the congressional map came before | |
| 9 the senate as a body. | |
| 10 Q. | And who gave you this document? |
| 11 A. | Pardon? |
| 12 Q. | Who gave that document to you? |
| 13 A. | One of the staff members of the |
| 14 redistricting -- not committee, but the | |
| 15 redistricting department there in the state house. | |
| 16 Q. | What is the difference between the |
| 17 redistricting committee and the redistricting | |
| 18 department? | |
| 19 A. | Well, the redistricting office is |
| 20 staffed by state employees.  And the redistricting | |
| 21 committee is composed of elected senators and | |
| 22 representatives. | |
| 23 Q. | So you were given this document when? |
| 24 A. | Well, prior to it going on the floor for |
| 25 debate, and not much sooner than that. | |

Page 20

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 Q.          Prior to what going on the floor for
2 debate?
3 A.          **The congressional bill.**
4 Q.          And do you remember when that was?
5          MR. WALKER: Hang on.  Kathryn, when you
6 say "this document," are you talking about Talking
7 Points for Likely Issues No. 1?  Or are you talking
8 about the collection of talking points?
9 Q.          Well, does that change your answer?
10 A.          **Well, I don't think it does.  I got that**
11 **prior to the bill going on the floor for debate.  In**
12 **fact, I may have gotten it prior to the committee --**
13 **the standing committee meeting.  That would -- that**
14 **would make sense.**
15 Q.          And what standing committee meeting are
16 you talking about?
17 A.          **The bills that -- the redistricting**
18 **committee is considered an interim committee.  And**
19 **the bills that come out of interim committees must**
20 **go to a standing committee before they can go to**
21 **rules in order to get on the floor.**
22          **So there was a standing committee --**
23 **which happened to be general fund -- that was**
24 **handling not only a general fund bill but all the**
25 **redistricting bills, as well.  So that would have**

Page 21

1 been the standing committee that this bill went to
2 after it came to the senate from the house.
3 Q.          You said you reviewed the talking points
4 that we discussed.  And what else before this
5 deposition?
6 A.          **What did I review?  Well, no.  The**
7 **talking points was the -- that was the purpose of**
8 **having the talking points, is I had a summary of the**
9 **main points that needed to be shared with the**
10 **standing committee members so they would be able to**
11 **vote however they wanted to.**
12 Q.          I'm sorry.  I meant -- just going back,
13 what documents other than this talking points did
14 you look at to prepare for this deposition today?
15 A.          **Well, I looked at a number of documents**
16 **during the process of the bill going through the**
17 **redistricting committee.  But there wasn't anything**
18 **in particular that I did to review that prior to the**
19 **meeting of the standing committee.  They were all**
20 **summarized.  So --**
21 Q.          For this deposition, though, you
22 mentioned that you met yesterday with Mr. Davis,
23 Mr. Walker, and Mr. Pringle and that you looked at
24 several documents.
25 A.          **Yes.**

Page 22

1 Q.          Besides the talking points, what other
2 documents did you look at?
3 A.          **It may have been a summary of this**
4 **lawsuit.  But I'm not -- Kathryn, I'm really not --**
5 **I really don't remember what it was.  I didn't pay**
6 **much attention to it.**
7 Q.          You say "a summary of this lawsuit."
8 Would you mind giving me a summary of this lawsuit?
9 A.          **I can't do it.  Sorry.  I wish I could.**
10 Q.          You testified earlier that you were a
11 party to a lawsuit in the last redistricting cycle;
12 is that correct?
13 A.          **Correct.**
14 Q.          Was that a redistricting case?
15 A.          **Yes.**
16 Q.          And you were deposed?
17 A.          **Yes.**
18 Q.          Did you testify at trial?
19 A.          **I'm sorry.  I didn't understand you.**
20 Q.          Sorry.  Did you testify at trial?
21 A.          **Yes.**
22 Q.          And what was that case about?
23 A.          **That case, I believe, was -- legislative**
24 **was the target, not congressional.  The issue was --**
25 Q.          And when you say --

Page 23

1 A.          **I'm sorry.**
2 Q.          I'm sorry.
3 A.          **It's my turn?**
4          **My point is that case was not**
5 **congressional.  That had do with house and senate**
6 **districts.**
7 Q.          And when you say "the target," you mean
8 what?
9 A.          **That the object, the goal of the case**
10 **was to challenge the way house and senate districts**
11 **were drawn.**
12 Q.          And do you remember under what law those
13 were challenged?
14 A.          **No.**
15 Q.          So let's talk about your career in
16 public service.  When were you first elected to
17 public office?
18 A.          **2001.**
19 Q.          And what were you elected -- where were
20 you elected?
21 A.          **What or where?  Which one do you want?**
22 Q.          I was elected --
23 Q.          What district (inaudible.)
24 A.          **Alabama house of representatives, House**
25 **District 50.**

Page 24

**Evan Milligan,et al v. John H.Merrill, et al.**

**Jim McClendon**
**12/17/2021**

1 Q.        And did you run as a -- with the support
2 of a political party?
3 A.        Well, there was a primary with
4 republican -- I don't think the republican party
5 endorsed any of the republican candidates.
6 Q.        You ran as a republican?
7 A.        Yes, I did.
8 Q.        Why did you run as a republican?
9 A.        Why did I run as a republican?  Is that
10 what you said?
11 Q.        Yes, sir.
12 A.        Because I am a republican.
13 Q.        What does it mean to be a republican?
14 A.        I would say the first word that comes to
15 mind would be "conservative."  And that would be
16 socially conservative and fiscally conservative.
17 Q.        And when you say "socially
18 conservative," what do you mean?
19 A.        It has to do with policies that we make
20 that are conservative in nature.
21 Q.        And what is a policy that is
22 conservative in nature?
23 A.        I would say one of the things that
24 conservatives believe in is law and order.
25 Q.        Okay.  So how long did you serve in

Page 25

1 house district 50?
2 A.        I served three four-year terms.  I went
3 into office -- well, I went into office in 2021.  So
4 three four-year terms.
5 Q.        And are you currently a member of the
6 house of representatives?
7 A.        No.  I'm a member of the Alabama senate.
8 Q.        And when were you first elected to the
9 Alabama senate?
10 A.        It must have been '14.  Yeah, 2014.
11 Q.        Prior to --
12 A.        Your turn.
13 Q.        I'm so sorry.  I said don't cut each
14 other off, and I'm cutting you off.  I'm sorry.
15 A.        I answered your -- 2014, which is the
16 answer to the question.
17 Q.        Thank you.  Sorry again.
18          What legislative committees have you
19 served on during your very long tenure in the
20 Alabama legislature?
21 A.        Well, in the senate, I'm currently on
22 the health committee, I am on the general fund
23 committee, I am on the education trust fund
24 committee, and I am on education policy.  And I
25 chair the health committee.

Page 26

1 Q.        Those are all of the committees that you
2 have ever served on?
3 A.        No.  No.  In the house, I served on
4 several different committees over three terms.  And,
5 of course, I served on redistricting, as well, ten
6 years ago and became -- and was house chair of
7 redistricting.
8 Q.        And when you say "redistricting," you
9 mean the permanent -- the Alabama legislative
10 committee on reapportionment?
11 A.        That's exactly what I mean.
12 Q.        Okay.  So if I say redistricting for the
13 reapportionment committee or if you say those
14 things, you mean the permanent committee on
15 reapportionment?
16          Is that a yes?
17 A.        You know, there's a little difference in
18 there.  During the interim years when there's not
19 redistricting activity going on, there is a
20 permanent redistricting committee composed of three
21 members of the house and three of the senate.
22          And then as we approach the
23 redistricting time period where the activity goes
24 up, then -- then it converts over to 11 and 11 for
25 the actual process.

Page 27

1 Q.        That makes sense.  So it's the same
2 committee, just getting bigger or larger or smaller
3 based on the time period?
4 A.        Correct.
5 Q.        What was your role in Alabama's 2011
6 redistricting process?
7 A.        I was house chairman.
8 Q.        And what are the responsibilities of the
9 house chairman for redistricting?
10 A.        Well, part of -- essentially part of a
11 leadership team that makes preparations for the
12 actual process, meets with the attorney and can meet
13 with the person that draws the maps, and begins
14 discussions and review, for example, of our
15 guidelines to see if they need to be updated or
16 changed, and also help time the scheduling of the
17 actual meeting of the full redistricting committee.
18 Q.        Do you have any other responsibilities?
19 A.        No.  I think that pretty well summarizes
20 it.  I'm sure there's some other things that we do
21 that are not big items.  But I think that summarizes
22 the things worth discussing.
23 Q.        And when you said you meet with the
24 attorney and you -- as the cochair, you meet with
25 the attorney and you meet with the person who draws

Page 28

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 the map, what do you -- what do you do during those
2 meetings?  Or what is your role during those
3 meetings?
4           MR. WALKER:  I'll instruct you not to
5 discuss anything that I may have told you or you may
6 have told me during those meetings.
7 A.        Yes, ma'am.  Do you mind me correcting
8 you on a phrase?
9           Actually, if you look at the law, there
10 is a house chair and a senate chair.  They are not
11 cochairs, although that seems to be a well-kept
12 secret.  But now you know.
13           So now --
14 Q.        The secret is out.
15           So as the house chair of the
16 redistricting committee, what do you mean -- what
17 was your responsibility with respect to your
18 meetings with the attorney and the meetings with the
19 person who draws the map?
20           MR. WALKER:  Same instruction.
21           THE WITNESS:  Okay.  Well, stop me if I
22 go astray here.
23           MR. WALKER:  Okay.
24 A.        Of course, probably the single most
25 important role of the attorney is to help the

Page 29

1 elected members of this committee know what the law
2 is and what -- and keep us up to date on recent
3 court cases so we can do our best to be in
4 compliance with what the law says and what the
5 courts have subsequently interpreted.
6 Q.        So as the house chair of the
7 reapportionment committee, what were -- what was
8 your role in those meetings?
9 A.        Well, I guess my role was to be there
10 and to make sure that we stay -- are we -- I guess
11 we're talking generically here.  We're not talking
12 about 2011 or 2021.  Are we just talking about being
13 a chair, a redistricting chair?  Is that what the
14 discussion is?  Or are we talking about a certain
15 time period?
16 Q.        So when I asked you what your
17 responsibilities were as house chair of the
18 reapportionment committee, you said, among other
19 things, you meet with the attorney, you meet with
20 the person who draws the map, meeting with the
21 reapportionment committee.  And I'm just asking what
22 you meant by that as your role.
23           What was your role in those meetings
24 with the attorney and with the drawer?
25 A.        To discuss the -- one of the issues, of

Page 30

1 course, is the time schedule on when we can carry
2 out the duties and when we need to carry out the
3 duties.  And then another thing has to do with
4 making sure that we stay in compliance with the
5 courts and the law and recent court cases.
6 Q.        Who selected the attorney?
7           MR. WALKER:  At what time are you
8 talking about?
9           MS. SADASIVAN:  In 2011.
10 A.        I do not know the answer to that.
11 Q.        Did you have any involvement in the
12 selection of the attorney --
13 A.        No.
14 Q.        -- for the reapportionment committee?
15 A.        No.
16 Q.        Did you have any role in the selection
17 of the demographer as the house chair of the
18 reapportionment committee?
19 A.        No.
20 Q.        Do you know who made the decision?
21 A.        I do not.
22 Q.        How were you selected to serve as the
23 house chair of the reapportionment committee?
24 A.        By the speaker of the house.
25 Actually --

Page 31

1 Q.        Who was that?
2 A.        -- I was -- he selected me to be on the
3 committee.  And then the house members on that
4 committee elected the house chair.
5 Q.        I see.  So you were elected by the other
6 house members of the reapportionment committee to
7 serve as the house chair?
8 A.        Correct.
9 Q.        And who was the senate chair of the
10 reapportionment committee in 2011?
11 A.        Gerald Dial.
12           THE REPORTER:  Gerald who?
13 A.        D-I-A-L.
14 Q.        And was the starting point -- what was
15 the starting point for drawing the congressional
16 maps in 2011?
17 A.        The starting point would be the existing
18 lines.
19 Q.        What existing lines?
20 A.        The congressional lines that were
21 current at that time.
22 Q.        And how did you go about deciding how to
23 update those lines based on the census data in 2011?
24 A.        Actually, I didn't make those decisions.
25 Q.        Who did?

Page 32

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

| | |
|---|---|
| 1 A.          The map drawer met with and talked to | 1 look at a map? |
| 2 the members of the congressional delegation.  And, | 2 A.          Well, the map and the data was put |
| 3 of course, once we had the data, the population | 3 before them at the committee meeting. |
| 4 numbers, then they knew if a district needed to have | 4 Q.          I'm dropping into the chat and I will |
| 5 an increase or a decrease in population. | 5 ask the court reporter to mark as McClendon Exhibit |
| 6 Q.          Did the legislature conduct public | 6 2 -- |
| 7 hearings in the redistricting process? | 7          MR. WALKER:  Kathryn, what was Exhibit |
| 8 A.     Yes. | 8 1?  I'm sorry.  Was that the talking points? |
| 9 Q.          Following the (inaudible.) | 9          MS. SADASIVAN:  Yes, sir. |
| 10 A.          What was the last thing you said? | 10          MR. WALKER:  Okay.  Let me -- let me -- |
| 11 Following? | 11 I'm your secretary in this.  So let me take care of |
| 12 A.     The 2010 census. | 12 it. |
| 13 A.          Yeah, the -- correct, we did have public | 13          MS. SADASIVAN:  Oh, thank you so much, |
| 14 hearings. | 14 Dorman.  I'm sorry about that.  I appreciate it. |
| 15 Q.     How many? | 15          MR. WALKER:  We're a full-service law |
| 16 A.     22. | 16 firm. |
| 17 Q.          And when did those hearings occur? | 17          MS. WELBORN:  I'm happy to play the |
| 18 A.          I just -- I do not remember.  I don't | 18 role. |
| 19 remember those dates. | 19          MR. WALKER:  Well, I've got them spread |
| 20 Q.          How many meetings did the | 20 out over here. |
| 21 reapportionment committee hold in 2011? | 21 |
| 22 A.          I can't tell you exactly.  I don't know | 22          (Plaintiff's Exhibit 1 was |
| 23 the exact number.  I don't -- I don't remember the | 23          marked for identification.) |
| 24 exact number. | 24 |
| 25 Q.          Was it more than one? | 25 Q.          Senator McClendon, do you have the |
| Page 33 | Page 35 |
| 1 A.     Yes. | 1 document that I've asked the court reporter to mark |
| 2 Q.          Was it more than two meetings? | 2 as McClendon Exhibit 2 in front of you? |
| 3 A.          I'm sorry?  What was the last word you | 3          MR. WALKER:  I'm sorry.  Which one is |
| 4 said?  It came out fuzzy. | 4 it?  Tell me. |
| 5 Q.          Was it more that two meetings? | 5 A.     Exhibit what? |
| 6 A.          I'm just guessing.  And I can't answer | 6          MR. WALKER:  No.  Don't say anything. |
| 7 that question because I don't remember. | 7 Exhibit 2, just tell me what it is. |
| 8 Q.          What was the role of the reapportionment | 8 Q.          Do you recognize the document in front |
| 9 committee in the map drawing process in 2011? | 9 of you? |
| 10 A.          Are we talking congressional maps? | 10          MS. WELBORN:  What is the document, |
| 11 Q.     Yes. | 11 Kathryn?  Which one is it? |
| 12 A.          The role of the reapportionment | 12          MS. SADASIVAN:  I just dropped it into |
| 13 committee was to take the map that was submitted, | 13 the chat.  It is the 2011 legislative |
| 14 that was put together by the -- with the approval of | 14 reapportionment committee guidelines. |
| 15 the congressional delegation, and to approve or | 15          MR. DAVIS:  The chat is not going to |
| 16 disapprove that map and submit it for introduction | 16 work because the system is pretty far away from us |
| 17 to the legislature. | 17 all.  Nobody can get to the chat easily. |
| 18 Q.          And how did the committee go about | 18          MS. SADASIVAN:  Okay.  Would it help if |
| 19 approving or disapproving of the map drawn? | 19 I pull it up so you can see it? |
| 20 A.          A roll call vote. | 20          MR. WALKER:  The May 2011 guidelines? |
| 21 Q.          Were members given any guidance on how | 21          MS. SADASIVAN:  This is the document |
| 22 to vote? | 22 we're looking at. |
| 23 A.          I don't quite understand that -- that | 23 |
| 24 question, were they given guidance. | 24          (Plaintiff's Exhibit 2 was |
| 25 Q.          Any information on how to vote or how to | 25          marked for identification.) |
| Page 34 | Page 36 |

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

```
 1
 2 Q.          Do you recognize this document, Senator
 3 McClendon?
 4 A.          Yes.  It looks -- it looks familiar.
 5 Q.          How do you recognize this document?
 6 A.          The first part of what you said was cut
 7 off.  Say it again.
 8 Q.          How do you recognize this document?
 9 A.          How do I recognize it?  I mainly
10 recognize it by the fact that it's reapportionment
11 committee guidelines.  And I recall going through
12 that process and the adoption of those guidelines.
13 Q.          Do you know who drafted the document?
14 A.          Did I draft the document?
15 Q.          Do you know who drafted the 2011
16 reapportionment --
17 A.          Do I know who drafted it.  I think I
18 have a good idea.  But I can't say that I'm a
19 hundred percent certain who drafted the document.
20 So the answer to the question would be no.
21 Q.          Who do you think drafted it?
22 A.          I imagine it was our attorney at the
23 time.  But I'm just not sure about that.
24 Q.          Can you read please on Page 1 under May
25 2011 the paragraph beginning with "Pursuant"?
                                          Page 37
```

```
 1 A.          I see that.
 2 Q.          Could you read it, please?
 3 A.          To myself or to you?
 4 Q.          Out loud.  Thank you.
 5 A.          "Pursuant to the constitution of the
 6 United States and the Constitution of the State of
 7 Alabama, the Alabama state legislature is required
 8 to review 2010 federal decennial census data
 9 provided by the U.S. Bureau of the Census to
10 determine if it is necessary redistrict Alabama's
11 congressional, legislative, and state board of
12 education districts because of population changes
13 since the 2000 census.
14              Accordingly, the following guidelines
15 for congressional, legislative, and state board of
16 education redistricting have been established by the
17 legislature's permanent joint legislative committee
18 on reapportionment, (hereinafter referred to as the
19 'reapportionment committee.')
20              There you go.
21 Q.          Thank you.
22              In the paragraph that you just read
23 where you said that the guidelines were established
24 by the committee, what does that mean?
25 A.          Okay.  Let me find it.
                                          Page 38
```

```
 1 Q.          It's in the sentence beginning with
 2 "Accordingly."
 3 A.          Yeah, I see it.
 4              Well, that means the committee, the
 5 reapportionment committee, adopted the guidelines,
 6 had a vote and said that's our guidelines.
 7 Q.          Will you please go to page two and read
 8 under numeral III Voting Rights Act, and read the
 9 two paragraphs below it?
10 A.          "Districts shall be drawn in accordance
11 with the laws of the United States and the State of
12 Alabama, including compliance with protections
13 against the unwarranted retrogression or dilution of
14 racial or ethnic minority voting strength.  Nothing
15 in these guidelines shall be construed to require or
16 permit any districting policy or action that is
17 contrary to the U.S. Constitution or the Voting
18 Rights Act."
19              Number 2, "Redistricting plans are
20 subject to the preclearance process established in
21 Section 5 of the Voting Rights Act."
22 Q.          I'm sorry.  I'll have you read Page
23 4, Paragraph 2 and 3 under Plans Produced by
24 Legislators.  2, 3, and 4.  I apologize.
25 A.          2, 3, and 4 under Roman numeral V.  Is
                                          Page 39
```

```
 1 that what you're asking for?  It must be.  That's
 2 the only 2, 3, and 4 on the page.
 3              "A proposed redistricting plan will be
 4 public information upon its introduction as a bill
 5 in the legislative process, or upon presentation for
 6 consideration by the reapportionment committee."
 7              "Access to the legislative
 8 reapportionment office computer system, census
 9 population data, and redistricting work maps will be
10 available to all members of the legislature upon
11 request.  Reapportionment office staff will provide
12 technical assistance to all legislators who wish to
13 develop proposals."
14              Number 4, "In accordance with Rule 23 of
15 the joint rules of the Alabama legislature (2011)
16 all amendments or revisions to the redistricting
17 plans, following introduction as a bill, shall be
18 drafted by the reapportionment office."
19 Q.          I'm going to ask you to quickly scan the
20 lest of the guidelines and then let me know if you
21 followed those guidelines in 2011.
22              MR. WALKER:  Objection to form.  You may
23 answer the question.
24 A.          Yes, ma'am, it's my belief that we
25 followed the guidelines.
                                          Page 40
```

Evan Milligan,et al v. John H.Merrill, et al.

**Jim McClendon**
**12/17/2021**

---

1 Q.      And how did you go about following the
2 guidelines in the map-drawing process?
3 A.      Well, you just read the guidelines and
4 try to stay -- and try to do what it says.
5 Q.      What action did you take to make sure
6 that the guidelines were followed?
7 A.      What action did I take to make sure they
8 were followed.  I consulted with the attorney and
9 with the person drawing the map to make sure that
10 they were following the rules that we had before us.
11 Q.      And how did you do that?
12 A.      I just looked them in the eye.
13 Q.      You looked them in the eye and what?
14 A.      And said, "Are we staying within the
15 guidelines?"  I'm not even sure I said that.  We did
16 -- we did talk about the importance of the
17 guidelines.  And it was understood everybody would
18 use that as exactly what they're called, guidelines.
19 Q.      And so when you said you talked about
20 the guidelines and that they were important, were
21 you explaining the guidelines to the demographer?
22 A.      I was not explaining them, no.  We would
23 talk about them from time to time.  But it was just
24 so well known that we followed the guidelines.
25 That's what we did.  That's our job.

Page 41

---

1 Q.      Do you know if anyone else talked to the
2 person -- the attorney or to the map drawer about
3 the guidelines?
4 A.      Do I know?  No, I do not.
5 Q.      How many congressional redistricting
6 plans were considered by the reapportionment
7 committee in 2011?
8 A.      I don't recall.
9 Q.      How did the reapportionment committee
10 decide on which Alabama congressional map to
11 introduce?
12 A.      We took the map that the members of the
13 congressional delegation had -- proved to be
14 satisfied with.
15 Q.      That was the starting point in the 2001
16 map?
17 A.      Yes.
18 Q.      Was the goal in drafting to make sure
19 the congressional districts remained roughly the
20 same as in 2001?
21 A.      One of the goals is that we keep the
22 core of the districts recognizable, or we attempt to
23 do that.
24 Q.      Was it a primary goal to keep the same
25 racial demographics for each district?

Page 42

---

1 A.      To keep the what demographics?
2 Q.      The racial demographics.
3 A.      Racial demographics.  In 2011, you know,
4 I don't know the answer to that.
5 Q.      Was it a primary goal to keep District 7
6 the same black population as in 2001?
7 A.      I do not know the answer to that
8 question.
9 Q.      Did you consider race in drawing any of
10 the districts in 2011?
11 A.      No.
12 Q.      Why was there only one district with a
13 majority black voting age population in 2011?
14        THE REPORTER:  I'm sorry.  Could you say
15 that question over?
16 Q.      Why was there only one district with a
17 majority black voting age population in 2011?
18 A.      Well, I -- I don't need to speculate.  I
19 will say I do not know why.
20 Q.      What is Section 5 of the Voting Rights
21 Act?
22 A.      Section 5 has to do with racial
23 injustice or racial problems when it comes to
24 elections.  And it provides some solutions to that.
25 Or remedy, I should say.

Page 43

---

1 Q.      What is a racial problem?
2 A.      What is a racial problem?  Are you
3 asking for an example or something?  I don't quite
4 -- I don't understand your question, what is a
5 racial problem.
6 Q.      I'm asking you what you meant by your
7 statement.  Do you want your court reporter to read
8 your answer about what Section 5 is back?
9 A.      To make sure that every -- every group,
10 subgroup, race had a fair opportunity to express
11 themselves at the polls.
12 Q.      And why did Section 5 apply to Alabama?
13        THE REPORTER:  I'm sorry.  What?
14 Q.      Why did Section 5 apply to Alabama?
15 A.      You know, I could -- I could guess at
16 that.  But I don't want to do that.  So I'll say I
17 don't know.
18 Q.      You don't know why Section 5 applied to
19 Alabama?
20 A.      Like I said, I could guess at it.  But I
21 don't want to do that.  So I don't know.
22 Q.      And I'm just asking you don't know why
23 Section 5 applied to Alabama?
24 A.      Correct.
25 Q.      The guidelines mention preclearance

Page 44

---

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                12/17/2021

1 under Section 5 of the VRA.  What involvement did
2 you have in obtaining justice department
3 preclearance of a proposed congressional plan in
4 2011?
5 A.         None.
6 Q.         Did you have any role in proposing
7 judicial preclearance of the 2021 map?
8 A.         Did I have any -- I'm really having a
9 time understanding you.  Did I have any -- okay.
10 Say that -- say that again, please, ma'am.
11 Q.         Did you have any role in proposing
12 judicial preclearance in the redistricting process
13 in 2011?
14 A.         No.
15 Q.         Did you introduce any proposed
16 redistricting plans for the Alabama congressional
17 delegation in 2011?
18 A.         I do not recall if the bill started in
19 the house or in the senate.  I don't know.  So I
20 can't answer the question.
21 Q.         Did you introduce any redistricting
22 bills in the 2011 legislative session?
23 A.         Any redistricting bill.  So we've gone
24 outside of congressional.
25           Yes, I'm sure I introduced the house
                                               Page 45

1 bill in the house.  I don't remember who did the BOE
2 bill, who started it.  I don't remember who started
3 the congressional bill.
4 Q.         Did you consider a plan permitting two
5 majority minority districts in 2011?
6 A.         Not to my knowledge.
7 Q.         Why?
8 A.         It wasn't brought before us.
9 Q.         It wasn't brought before who?
10 A.         That is correct.
11 Q.         Who?  You said, "It wasn't brought
12 before us."  It wasn't brought before who?
13 A.         The redistricting committee.
14 Q.         Did you have the opportunity to consider
15 a map with two majority minority districts in the
16 legislature?
17 A.         No, I don't think so.
18 Q.         You did not?
19 A.         I don't remember that at all, if we did.
20 Q.         I'm going to -- I'm dropping it in the
21 chat, as well, in case it's helpful.  I know it's
22 probably not.
23           I am going to show you what I ask the
24 court reporter to mark as McClendon Exhibit 3.  And
25 let me just share my screen quickly.  It is exhibit,
                                               Page 46

1 and then the number after it is SOS 001929.  And
2 this is what the document looks like.
3           MR. WALKER:  Can you describe it,
4 please?
5           THE WITNESS:  Look up here.
6           MR. WALKER:  Oh, that.  Okay.  We've got
7 it.
8
9           (Plaintiff's Exhibit 3 was
10           marked for identification.)
11
12 Q.         Do you recognize this document, Senator
13 McClendon?
14 A.         No.
15 Q.         I will represent to you that this is a
16 news article produced by the secretary of state, a
17 defendant in this case.  In it, Brian Lyman is
18 discussing a plan put forward by Mr. Buskey which
19 would have created two majority minority districts.
20           And in this article, you were quoted as
21 saying -- on Page 2, the second paragraph on Page 2,
22 as saying, The Buskey plan would lead to
23 "retrogression," or a retreat from minority
24 population benchmarks set by the department of
25 justice.  Under the Voting Rights Act, the DOJ must
                                               Page 47

1 approve the state's redistricting plan before it can
2 be implemented.  If the redistricting plan retreats
3 from the justice department benchmarks, such as
4 reducing minority population in a
5 previously-approved congressional district, the
6 state must show that it had no discriminatory
7 purpose in the move and did not reduce minority
8 voters' effective exercise of the electoral
9 franchise.
10           Does that sound familiar to you?
11           MR. WALKER:  Are you asking him if he
12 said that, or what?
13 Q.         I'm just asking if that helps refresh
14 your memory.
15 A.         Well, it provides a memory.  I don't --
16 I don't remember this.
17 Q.         So you don't know why you believed that
18 the map introduced by Representative Buskey would
19 have led to retrogression?
20 A.         So what did he introduce?  No.  I'm
21 really lost on trying to decipher this.
22 Q.         So is that -- did you say the quote that
23 I just read to you?
24 A.         I don't recall saying it.  I don't
25 recall the article.
                                               Page 48

Evan Milligan,et al v. John H.Merrill, et al.                                    Jim McClendon
                                                                                   12/17/2021

1 Q.          How about I give you a few minutes to
2 look through the article, and then I'll ask you some
3 questions again.
4            MR. WALKER:  Kathryn, we've been going
5 for about an hour, and I need to step out for a
6 second.  Would you mind if we took a five-minute
7 break?
8            MS. SADASIVAN:  If you don't mind, we'll
9 just finish this question after Senator McClendon
10 has a chance to look at it.  And then after that, we
11 can take a break.
12            MR. WALKER:  Certainly.  No problem.
13            MS. SADASIVAN:  Thank you so much,
14 Dorman.
15 **A.          I'm ready when you are.**
16 Q.          Do you have any reason to believe that
17 quote is inaccurate?
18 **A.          Now, what did you --**
19            MR. WALKER:  Which quote?
20 **A.          Yeah.  My question is what quote are you**
21 **talking about?**
22 Q.          On Page 2 of the exhibit I just shared
23 with you beginning with Rep Jim McClendon,
24 R-Springville, who carried the plan in the house.
25 There are two paragraphs where Senator McClendon
                                                    Page 49

1 **A.          I do not.**
2            MR. DAVIS:  Are we breaking now?
3            MS. SADASIVAN:  No.  I'm sorry.  I asked
4 a question.
5            MR. DAVIS:  And he answered it.
6 Q.          You don't recall seeing two majority
7 minority districts in the Alabama congressional plan
8 in 2011?
9 **A.          I do not recall it.**
10 Q.          Okay.  Thank you so much.
11            MS. SADASIVAN:  We can take a break now.
12            MR. WALKER:  Thank you.
13            THE VIDEOGRAPHER:  We are off the
14 record.  The time is 3:09 p.m.
15            (Recess was taken.)
16            THE VIDEOGRAPHER:  We are back on the
17 record.  The time is 3:22 p.m.
18 Q.          Senator McClendon, I just want to
19 clarify really quickly Exhibit 3.  You stated that
20 you don't remember being interviewed for that
21 article, right?
22 **A.          I do not.**
23 Q.          And you don't remember saying anything
24 about retrogression?
25 **A.          Yes.  The answer is the same as it was**
                                                    Page 51

1 quoted.  And I'm asking if you have any reason to
2 believe that that quote is inaccurate.
3 **A.          Well, there are no -- the only quotation**
4 **marks are around the word "retrogression" and around**
5 **the words "effective exercise of the electoral**
6 **franchise."  There's no -- I don't see where I was**
7 **attributed a quote in those paragraphs.**
8 Q.          Do you have any reason to believe that
9 that paragraph discussing -- beginning with "Rep Jim
10 McClendon" and continuing on until "This plan, as
11 far as the justice department and Voting Rights Act
12 goes, it's a failure," do you have any reason to
13 believe that that is inaccurate?
14 **A.          Well, the only part that has quotes is**
15 **the one you just read.  And I do not recall making**
16 **that statement.**
17 Q.          So you don't think that that was an
18 accurate reflection of what you thought at the time?
19            MR. WALKER:  Objection to form.  You may
20 answer it.
21 **A.          I just -- I don't recall making the**
22 **statement.**
23 Q.          And you don't recall having the
24 opportunity to see two majority minority districts
25 in a congressional plan?
                                                    Page 50

1 **before.  I do not remember.**
2 Q.          If there was a plan in 2011 that
3 complied with all the districting principles and the
4 guidelines and created two majority minority
5 districts, would you have voted for it?
6 **A.          Okay.  Say that again.  We're having a**
7 **hard time.**
8            THE REPORTER:  I think if you would slow
9 down just a little bit, that would help.
10            MS. SADASIVAN:  If I come in a little
11 bit, is this better?
12            MR. WALKER:  No.  Slow down.
13 Q.          If there was a plan that complied with
14 the redistricting guidelines and created two
15 majority minority districts in 2011, would you have
16 voted for it?
17 **A.          Thank you.  I -- I understood you very**
18 **well.**
19            **I would certainly have considered it and**
20 **would -- but part of that is looking at what else is**
21 **available.  So I would have put it on the list for**
22 **consideration, yes.**
23 Q.          Let's move to the 2021 redistricting
24 process.
25 **A.          Good.**
                                                    Page 52

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                  12/17/2021

1  Q.         What was your role in the
2  reapportionment committee in 2021?
3  A.         Senate chair.
4  Q.         And what were your responsibilities as
5  senate chair?
6  A.         Pretty much the same as it was as house
7  chair, to confer with the attorney and the map
8  drawer, to help try to set the schedule of events as
9  they were going to unfold.
10  Q.        And when you say "confer with the
11  attorney and map drawer, I'm not asking for
12  attorney-client information.  But generally as
13  senate chair, what responsibilities did conferring
14  with the attorney and map drawer entail?
15  A.        Well, for quite some time, we were
16  trying to decide when we could actually get started
17  on the process.  And we spent a little bit of time
18  wondering when we were going to get the data.  We
19  spent a lot of time wondering when we were going to
20  get the data.  And we shared some speculation about
21  when it would show up.  So we did the timing of the
22  -- and sequence of events is one of the things
23  initially that we talked about.
24  Q.        And so conferring with the attorney and
25  the map drawer, you were trying to reach decisions
                                                    Page 53

1  about the timeline?
2  A.         Correct.
3  Q.         Anything else?
4  A.         That's the main -- at that point, that
5  was the main thing, when can we get started.
6  Q.         At what point?
7  A.         Was that a question?
8  Q.         Yes.  You said "at that point."  And I'm
9  just asking at what point was that the main --
10  A.        That was prior to receiving the data
11  from the census bureau.
12  Q.        And did your responsibilities to confer
13  with the attorney and the map drawer change after
14  you received census data?
15  A.        I'm not sure I understand your question.
16  Do it again and let me listen carefully.
17  Q.        You just shared that your
18  responsibilities before the census numbers came out
19  with respect to the attorney and the map drawer as
20  senate chair of the reapportionment committee was to
21  determine a timeline.
22          And I'm asking if your responsibilities
23  as senate chair of the reapportionment committee
24  with respect to conferring with the attorney and map
25  drawer changed once you received census data.
                                                    Page 54

1  A.         Well, no.  It was just part of a
2  continuum of setting the schedule and seeing when
3  things would work out, how things -- in what order
4  things needed to unfold in order to get the job done
5  in a timely manner.
6  Q.         And other than you and the map drawer
7  and the attorney, who else was involved in that
8  decision-making?
9  A.         Representative Pringle.
10  Q.        Anybody else?
11  A.        No.
12  Q.        So you, the attorney, Representative
13  Pringle, and the map drawer determined when you
14  would begin the public hearings or the
15  reapportionment committee meetings?
16  A.        Well, the staff, the reapportionment
17  staff, had some input into it.  Although the public
18  hearings, we gave -- we gave a time frame to the
19  community -- the community college system.  The
20  chancellor loaned us one of his personnel to help us
21  coordinate those public hearings.  And so he's the
22  one that actually set up the dates, locations, and
23  times for the public hearings.
24          I think we told him we wanted to get
25  this done the first couple of weeks in September.
                                                    Page 55

1  And then one of the representatives asked for
2  additional meetings, so it spilled over into the
3  third week into September.
4  Q.         So just going back to your role as
5  senate chair of the reapportionment committee and
6  your responsibilities to confer with the attorney
7  and the map drawer, what were -- the public hearings
8  -- strike that.
9          Going back to your role as senate chair
10  of the reapportionment committee and your
11  responsibilities to confer with the attorney and map
12  drawer, what other timelines did you discuss?
13  A.        We also needed to be able to give some
14  idea as to when we would actually be prepared for a
15  legislative session, for the governor to call a
16  special session to consider redistricting.
17  Q.        And how did you arrive at that
18  information of when that should be?
19  A.        There was -- we just sort of projected
20  forward saying we need -- we'll need X amount of
21  time for the public hearings and then we'll need X
22  amount of time to meet with the legislators and the
23  congressional delegation and the board of education.
24          And then we basically set a timeline and
25  said we can -- then at this point we'll be ready
                                                    Page 56

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 to ask the governor to call a special session.
2 Q.        And were other members of the
3 reapportionment committee besides House Chair
4 Pringle involved in that decision?
5 A.        No.
6 Q.        When did you start planning for the 2021
7 redistricting process?
8 A.        We probably started thinking about it a
9 year and a half ahead of time or more, two years
10 maybe ahead of time.
11 Q.        And what were the first steps that you
12 took to prepare for the redistricting process?
13 A.        The first thing that I personally tried
14 to figure out was what the timeline was going to be.
15 And, of course, that proved to be futile because of
16 the delay in receiving the data and another delay
17 and another delay.
18 Q.        When was your first meeting on
19 redistricting in 2021?
20 A.        You know, I don't know the date.
21 Q.        Do you know who it was with?
22 A.        Are you talking about the redistricting
23 committee?  Or who are -- what kind of meeting are
24 you talking about?
25 Q.        I'm talking about a meeting between you,
Page 57

1 Senator McClendon, and any other person about
2 redistricting in 2021.
3 A.        Okay.  I don't know the answer to that
4 question.
5 Q.        What role did you play in setting the
6 schedule of the public hearings on redistricting?
7 A.        I talked to the chancellor of the
8 two-year system and asked him to designate someone
9 to work with our staff.  And then they worked it out
10 from there and came back with a schedule and a plan.
11 Q.        Did you review the locations of the
12 public hearings?
13 A.        Yes, I looked at what they put together.
14 And we were just about ready to announce it when
15 Representative Hall requested that we add some more,
16 which we did.
17 Q.        When were you preparing to announce the
18 dates and locations of the public hearings?
19 A.        You know, I don't know why I would
20 remember this, but I think June 30th was our target
21 date to do that.  And then I believe it was the day
22 before we got a letter, an email maybe -- I didn't
23 get it.  The staff received communications from one
24 of the members of our redistricting committee
25 requesting that there be another half dozen added on
Page 58

1 to it.
2        So we sort of had to work on that before
3 we actually announced it.  And I don't know the
4 final date that we came out with it.
5 Q.        And that's Representative Laura Hall?
6 A.        Yes.
7 Q.        And there was no deadline to decide on
8 public hearings?
9 A.        Well, there was a deadline.  June 30th.
10 Q.        Who set the deadline?
11 A.        But on June -- I think it was June 29th,
12 we received communication from her.  So we sort of
13 scrapped the deadline in order to the comply with
14 her request.
15 Q.        Is there a time to determine public
16 hearings set by law in Alabama?
17 A.        Ask that again, now.
18 Q.        Is there any law governing public
19 redistricting hearings in Alabama?
20 A.        Not to my knowledge.
21 Q.        Was there any committee deadline or a
22 committee -- rather a committee rule setting a
23 deadline to determine public hearings?
24 A.        Not to my knowledge.
25 Q.        Who developed the deadline on
Page 59

1 determining the time, location, and manner of public
2 hearings?
3 A.        I think the staff, in conjunction with a
4 representative from the community system, said we
5 feel like we can get it done by this date, and
6 actually communicated with members of the
7 redistricting committee for suggestions and asked
8 that they have those suggestions in by June 30.
9 Q.        When did you discuss public hearings
10 with the reapportionment committee?
11 A.        When did who?
12 Q.        When did you discuss -- you or other
13 members of the legislative delegation of the
14 reapportionment committee discuss the public
15 hearings?
16 A.        I don't know the answer.
17 Q.        What venues did you consider in
18 Montgomery for public hearings?
19 A.        Well, we held one at the -- the public
20 one was at the state house.
21 Q.        Were there any others?
22 A.        I don't know the answer to that.  I
23 don't have that schedule in front of me.  I would be
24 surprised if we had more than one, but I don't know
25 for sure.
Page 60

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                  12/17/2021

1          MS. SADASIVAN:  I am going to drop into
2 the chat -- again, I know you all can't see it.  So
3 I will share my screen.
4          But I would ask the court reporter to
5 mark it as McClendon Exhibit 4.  It is a document
6 that says 2021 Legislative Reapportionment Public
7 Hearings Final.
8          Do you have that before you, Senator
9 McClendon?
10         MR. WALKER:  Give me just a second.
11
12         (Plaintiff's Exhibit 4 was
13         marked for identification.)
14
15         MR. WALKER:  Is this it?  Is that what
16 she's showing?
17         THE WITNESS:  That looks like it.  It's
18 hard to tell.  It does look similar to it.
19         MS. WELBORN:  That's it.
20 A.       Does yours start off with Drake State in
21 the upper left?
22 Q.       Yes, sir.
23 A.       Okay.  Then we probably have -- I
24 probably have that document before me, yes.
25 Q.          And can you look through that document
                                                  Page 61

1 and just see if you had any other public hearings in
2 Montgomery?
3 A.       Well, I don't see any.
4 Q.          Did you consider any historically black
5 colleges or universities when you were scheduling
6 the public hearings?
7 A.          Well, I wasn't doing the considering.
8 It was the staff in the two-year college.
9          The original idea started with having
10 these meetings at our two-year colleges because they
11 are spread all over the state.  And so that's why we
12 got a liaison from them to help schedule these
13 things.
14          So whether they -- I think I saw one
15 with Troy on here.  And if I recall -- yeah, here is
16 one at Trojan Center Ballroom.  And that's because
17 there was not a community college close by or
18 something like that.
19          So by and large, we focused on our
20 community college system to host us, to host these
21 meetings.  So --
22 Q.       How many meetings did --
23 A.       I'm sorry.  Go ahead.  Your turn.
24 Q.          I was just asking how many meetings did
25 the reapportionment committee hold in 2021?
                                                  Page 62

1 A.       22.
2          MR. WALKER:  No.  Meetings.
3 A.       Oh, meetings.  I can think of two
4 meetings that we had.  I don't know if there was a
5 third or not.
6 Q.       What were the dates of those meetings?
7 A.       I'm thinking the first one was during
8 the legislative session, probably the very -- toward
9 the very end of the regular session, which would
10 have put it in May.  We did it because we had -- you
11 know, everybody in town.
12          And then the next meeting that I am
13 thinking about was held just prior to the special
14 session that was called for consideration of the
15 bills, the redistricting bills.
16          MS. SADASIVAN:  So I am going to drop in
17 the chat an exhibit that I'll ask the court reporter
18 to mark as McClendon Exhibit 4.  I'm going to pull
19 it up on my screen and share my screen with you so
20 you can see it.
21          MR. WALKER:  I think this is five.
22          MS. SADASIVAN:  I'm sorry.  Five.  Thank
23 you.
24 Q.       Can you see my screen?
25 A.       Reapportionment Committee Redistricting
                                                  Page 63

1 Guidelines, May 5th.  Okay.
2
3          (Plaintiff's Exhibit 5 was
4          marked for identification.)
5
6 Q.       Have you seen this document before,
7 Senator McClendon?
8 A.       Give me a second to look at it.  Yes.
9 It looks -- it looks familiar.
10 Q.       Where have you seen this document
11 before?
12 A.       Where?  At the state house.
13 Q.       How do you recognize it?
14 A.       I'm just looking at -- well, I look at
15 the title, I look at the date, I look at the plus or
16 minus 5 percent, and some of the other topics.  And
17 those all appear to be the guidelines that we --
18 that the redistricting or reapportionment committee
19 adopted prior to the map-making process.
20 Q.       And did you endeavor to comply with
21 these policies in the 2021 redistricting --
22 A.       Did I --
23 Q.       -- process?
24 A.       Did I try to comply with these policies?
25 Is that your question?
                                                  Page 64

Evan Milligan,et al v. John H.Merrill, et al.                              Jim McClendon
                                                                           12/17/2021

1  Q.         Did you comply with these -- yes.  Did
2  you comply with these policies in the 2021
3  redistricting process as senate chair of the
4  reapportionment committee?
5  A.         I did.
6  Q.         Section II f states, "Districts shall be
7  drawn in compliance with the Voting Rights Act of
8  1965, as amended.  A redistricting plan shall have
9  neither the purpose nor the effect of diluting
10 minority voting strength, and shall comply with
11 Section 2 of the Voting Rights Act and the United
12 States Constitution."
13         How did you go about complying with
14 Section 2 of the Voting Rights Act?
15 MR. WALKER:  Are you -- may I ask,
16 Kathryn, are you talking about for the congressional
17 plan?
18         MS. SADASIVAN:  I'm asking -- he said
19 Senator McClendon tried to comply with these
20 guidelines as senate chair of the redistricting
21 committee.  I'm asking how in general did Senator
22 McClendon, as senate chair of the reapportionment
23 committee, go about ensuring compliance with this
24 particular policy.
25 A.         Well, subsequent to us adopting these
                                                       Page 65

1 guidelines, then I was dependent on the attorney,
2 Dorman Walker, and the map drawer during the
3 process, once they started actually putting lines
4 down on paper, to stay inside those guidelines.
5 Q.         So your role was overseeing the
6 map-drawing process to ensure that it complied with
7 the guidelines?
8 A.         One of my goals was to be in compliance
9 with the Voting Rights Act of 1965.  That was one of
10 my jobs.  And, of course --
11 Q.         It was your job to ensure compliance
12 with the Voting Rights Act of 1965?
13 A.         Yes.
14 Q.         And how did you go about doing that?
15 A.         Well, I counted on these experts that
16 were working for me and working for the committee to
17 follow those guidelines and be familiar with the
18 court cases and with the law and with the rulings.
19 Q.         And what is required to determine if a
20 map complies with Section 2 of the Voting Rights
21 Act?
22 A.         Say that again.  Once again -- something
23 about the audio.  It could be me.  But go ahead and
24 try it again.
25 Q.         It's probably me.  I'm also a
                                                       Page 66

1 southerner, so I talk quickly, and I'm probably
2 using too many adjectives.
3         I was asking you what is required to
4 determine whether a map complies with the Voting
5 Rights Act.
6 A.         Well, it's -- I would say it's a legal
7 opinion first to be familiar with the Voting Rights
8 Act and subsequent cases, and then to be able to
9 compare what we have produced, what's in front of
10 us, with the knowledge of the requirement of the
11 Constitution and the Voting Rights Act.
12 Q.         And when did you compare what was
13 produced by your demographer with the requirements
14 of the Voting Rights Act?
15 A.         I think probably every time we talked,
16 this was part of it.  It came up in the conversation
17 as we went through the map-drawing process.  And
18 both the attorney and the map drawer would be quick
19 to say that could -- that particular line moved over
20 there could be a problem, and we need to look at it.
21 Q.         And when you say "could be a problem,"
22 you mean could be a problem under the Voting Rights
23 Act?
24 A.         Yes.
25 Q.         And what was your understanding of what
                                                       Page 67

1 was required to comply with the Voting Rights Act?
2 A.         Well, as far as what's in the Voting
3 Rights Act, I couldn't quote it.  But that's why I
4 have an attorney.
5 Q.         How many times did you have a
6 conversation where the map drawer said if you move
7 this line, you could have a problem under the Voting
8 Rights Act?
9 A.         I can say I heard that several times.
10 Q.         And who did you hear that from?
11 A.         I heard it both from the attorney and
12 the map drawer, not necessarily at the same time.
13 Q.         You were --
14 A.         Pardon?
15 Q.         You were advised several times by your
16 attorney and by the map drawer that the way that a
17 particular line was drawn could violate the Voting
18 Rights Act?
19 A.         Or the way a line was proposed to go.
20 That was their job.
21 Q.         And did that occur with respect to the
22 congressional map?
23 A.         Not to my knowledge.  Because I was not
24 involved in drawing the congressional map.
25 Q.         Who was involved in drawing the
                                                       Page 68

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 congressional map?

2 A.        The map drawer met with the
3 congressional delegation or their representative
4 sometimes in person, sometimes virtually like this,
5 and really worked this out with the members of the
6 congressional delegation.

7 Q.        Were the members of the congressional
8 delegation responsible for ensuring that map
9 complied with the Voting Rights Act?

10 A.       That's a good question.  I don't know
11 the answer to that question.

12 Q.       Were you responsible for ensuring that
13 the congressional map complied with the Voting
14 Rights Act?

15 A.       Yes.  I would say that was one of my
16 responsibilities.

17 Q.        In the conversations that you had
18 regarding potential violations of the Voting Rights
19 Act, did you or anyone else discuss racial
20 polarization analysis?

21 A.       No.  No.

22 Q.        Do you know what the basis for -- in
23 these conversations when you heard there might be a
24 potential Voting Rights Act violation, do you know
25 what that was based upon?

Page 69

1 communities of interest, communities that have a
2 particularly common political interest, keep them
3 together, keep them in the same whatever it is,
4 house direct, congressional district, BOE district,
5 if possible.

6 Q.        You said "common political interests."
7 Is that your definition of community of interest?

8 A.        There's a -- there's a definition right
9 here in whatever this is on Line 30.  Line 30
10 through 32 is a definition of communities of
11 interest.

12 Q.        So you just mentioned a common political
13 interest, and I was wondering if that was part of
14 your definition of communities of interest.

15 A.        Oh, that's just one -- that's just one
16 part of it, one part -- one way you could have a
17 community of interest.  There's a lot of different
18 ways you can have a community of interest.

19 Q.        What do you consider to be communities
20 of interest in Alabama?

21 A.        There are -- there's not a community of
22 interest in Alabama.  There are many communities of
23 interest.

24 Q.        Such as?

25 A.        Well, a city.  A city is a community of

Page 71

1 Well, I think at different times there
2 were different issues.

3 Q.        Such as?

4 A.        On the congressional side, I cannot --
5 as far as the congressional districts go, I can't
6 give you a single example because I simply wasn't
7 involved in that process.

8 Q.        When did you adopt the guidelines that
9 we're talking about right now?

10 A.       Maybe May the 5th of 2021.  That's the
11 date on the document.  And that was one of the
12 purposes of -- objectives of that particular meeting
13 of the committee, was to have the guidelines in
14 place before we got the data and before we started
15 working with the elected officials.

16 Q.        So the third policy in Section II j
17 (iii) in McClendon Exhibit 5 that we're talking
18 about now, the May 5, 2021, redistricting criteria,
19 says, "Districts shall respect communities of
20 interest, neighborhoods, and political subdivisions
21 to the extent practicable and in compliance with
22 paragraphs 1 through 1."

23        What is your understanding of what that
24 policy requires?

25 A.        Well, when possible, it's good to keep

Page 70

1 interest.

2 Q.        Is Montgomery a community of interest?

3 A.        Yes.  Montgomery is a city.

4 Q.        What are some other communities of
5 interest?

6 A.        You can have parts of a city that are a
7 community of interest.  There are -- a county is a
8 community of interest.

9 Q.        What is the black belt in Alabama?

10 A.       It's a geographic area pretty much
11 across the middle of the state from east to west.
12 And it has to do with the rich soil that's found in
13 that area.

14 Q.        Do you know what counties are in the
15 black belt?

16 A.       I couldn't name -- I could name a few
17 counties.  But I cannot -- I cannot name the
18 counties in the black belt.

19 Q.        Is there anything other than the soil
20 that might define the black belt?

21 A.       I don't know what you're fishing for.

22 Q.       I can ask the question again.

23        What are other characteristics that you
24 know of of the black belt?

25 A.        That's a better question.

Page 72

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                 12/17/2021

1        Well, I think there's a perception that
2  there's a lower socioeconomic income level across
3  the black belt.  There's probably -- there may be --
4  that would probably be the main thing.
5  Q.        Do you consider the black belt a
6  community of interest?
7  A.        No, not necessarily, because it's
8  multiple counties, multiple communities.
9  Q.        Going back to your testimony earlier
10 about maintaining the core of districts.  Does
11 maintaining the core of the existing congressional
12 districts require consideration of racial data?
13 A.        Say that again and slow down again.  I'm
14 not listening very fast today.
15 Q.        I'm sorry.  I'm speaking quickly.  And I
16 like that term, "listening fast."
17        So what I asked was you testified
18 earlier was you maintaining -- or attempting
19 to maintain the core of exhibiting districts in the
20 congressional map.  And I'm asking whether that
21 requires the consideration of racial data.
22 A.        Well, we don't -- no.   We don't -- we
23 don't use racial data except after the fact.
24 Q.        After what fact do you use racial data?
25 A.        After the lines are drawn.
                                                      Page 73

1  Q.        And how do you see that racial data when
2  you decide to look at it?
3  A.        The software will produce that.
4  Q.        What software?
5  A.        The software used to draw the maps.
6  Q.        Do you know what that software is?
7  A.        Give me a multiple choice, and I'll give
8  it to you.  Not right off the bat, no.  You know,
9  it's like I know it when I see it.  But, you know, I
10 never used it.  But it's a new system for us.  We
11 recently adopted it.
12 Q.        When was the second meeting of the
13 reapportionment committee in 2021?
14 A.        If, in fact, there were just the two
15 meetings, it would have been immediately -- let me
16 see.  It would have been on the Tuesday prior to the
17 special session convening on a Thursday.  So
18 whatever those dates are.
19 Q.        Do you have reason to believe that there
20 was another meeting of the reapportionment committee
21 other than the two we're discussing now?
22 A.        No, I don't.  But I wouldn't be
23 surprised.  But I just don't believe there was.
24 Q.        I unfortunately don't have the exhibits
25 (inaudible) the meetings, so we'll just move on.
                                                      Page 74

1        So you said you met the Tuesday before
2  the Alabama special legislative session began on
3  redistricting?
4  A.        Correct.
5  Q.        And that was the second meeting in your
6  memory of the reapportionment committee?
7  A.        That is -- I believe that is correct,
8  yes.
9  Q.        Were there other meetings of the
10 reapportionment committee outside of those two to
11 draw the map that we're discussing today?
12 A.        No, not of the -- not of the committee.
13 Not a regular committee meeting, no.
14 Q.        What about a subset of the committee?
15 A.        What about what?
16        MS. WELBORN:  A subset.
17 Q.        Were there other meetings of a subset of
18 the committee?
19 A.        No.
20 Q.        What was the agenda for your October
21 26th meeting, reapportionment committee meeting?
22 A.        To select -- so is that the date,
23 October 26th?  That was meeting number two?
24        A goal for that committee was to select
25 the bills, the maps, that would be introduced to the
                                                      Page 75

1  legislature on Thursday.
2  Q.        And how many congressional maps did the
3  members of the reapportionment committee vote on?
4  A.        I think just the one.  But I can't -- I
5  can't swear to that.
6  Q.        So when you say "select the map," you
7  mean to vote on the one map?
8  A.        I can't remember if a substitute
9  congressional map was offered or not.
10 Q.        I am going to drop into chat, and I will
11 share my screen, as well.  I will represent to you
12 that this is a certified transcript of the October
13 26, 2021, meeting of the reapportionment committee.
14
15        (Plaintiff's Exhibit 6 was
16        marked for identification.)
17
18 Q.        Do you see this?
19 A.        I do.
20        MS. SADASIVAN:  I'm going to ask
21 Mr. Walker if you would be so kind to mark this as
22 Exhibit 6.
23        MR. WALKER:  I have done so.  It is
24 marked.
25        MS. SADASIVAN:  Thank you, sir.
                                                      Page 76

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                  12/17/2021

1  Q.         I'll let you quickly scan -- it's quite
2  a long document.  I'll let you just scan through it.
3  And if you wouldn't mind just letting me know if
4  this looks familiar to you.
5  A.         Well, I've glanced through it.  It looks
6  familiar.  But it's really --
7  Q.         Okay.  Again, I'll represent to you that
8  it's a transcript of the October 26, 2021, meeting
9  of the reapportionment committee, as you likely
10 remember.  And as you can see from the transcript, a
11 considerable portion of the meeting was about racial
12 polarization analysis.
13         What is your understanding of racial
14 polarization in voting?
15 A.         In this case, this -- this is an
16 additional evaluation or test of the data to any
17 place it's suspicious that there could be racial
18 discrimination.  It's an extra test tacked on to
19 what we normally do to see if, in fact, we are in or
20 out of compliance with the Voting Rights Act and our
21 own guidelines and the court cases.
22 Q.         And what would give rise to suspicious
23 racial discrimination that would require a racial
24 polarization analysis?
25 A.         What would -- what would make you think
                                                    Page 77

1  that that's an issue?  Is that what you're asking,
2  that racial discrimination is an issue?
3          I guess, you know, the first thing I
4  would say is if we had an incumbent minority person
5  and there was such a change in the composition of
6  the voters in that district, that that -- that
7  district may no longer have -- have less of a chance
8  of having a minority representative.  That would be
9  -- I think that would be a red flag.
10 Q.         So a suspicious racial issue would be if
11 a minority representative were no longer able to win
12 an election in their district?
13 A.         Or threatened if they -- yeah.  Roughly
14 what you said.  I don't exactly agree word for word.
15 But yeah, that's the idea.
16 Q.         What is your understanding of why RPV --
17 and when I say RPV, I mean racially polarized
18 voting.  What is your understanding of why RPV was
19 discussed in the October 26th meeting?
20 A.         Wait a minute.  I missed one word I
21 didn't understand.  Why is it what in the meeting?
22    MS. WELBORN:  Discussed.
23 A.         "Discussed," is that the word you used?
24 Q.         Yes, sir.
25 A.         Oh, okay.  Well, it was brought up by
                                                    Page 78

1  one of the committee members.
2  Q.         Who?
3  A.         It might have been Representative
4  England.  I think that's who it was.  I'm not a
5  hundred percent sure.  I think he had a good bit to
6  say about it.
7  Q.         And why did -- what was your
8  understanding of why Representative England was
9  concerned about racially polarized voting?
10 A.         I didn't have an understanding of why he
11 was concerned.  He just let it be known that he was
12 concerned.
13         Did anyone else express concerns about
14 racially polarized voting?
15 A.         I don't remember.
16         What was the conversation?
17 A.         I don't know.  If we've got the
18 transcript, we can take a look at it.
19         I think there was someone that may have
20 even suggested we should have evaluated all 140
21 races for this.  I don't remember who that was.
22 Q.         So if you wouldn't mind turning to Page
23 17 of McClendon Exhibit 5.
24         MS. WELBORN:  I think it's Exhibit 6.
25 Q.         Exhibit 6.  I apologize.
                                                    Page 79

1  A.         I'm on Page 17.  Yep, Smitherman.
2  Q.         All right.  So you'll see that
3  Representative Laura Hall asked you about a racially
4  polarized voting study done.
5          Can you read where it says Senator
6  McClendon beginning with "Because"?
7  A.         "Because of the black age voting
8  population in Congressional District 7, there was
9  not one needed because it was over 54 percent black
10 voting age population."
11 Q.         And then will you also read what
12 Representative Hall said in response?
13 A.         "So you're saying that we don't have a
14 black -- we don't have a polarization, racially
15 polarization study?"
16         And then please read your response.
17 A.         "None.  Because the voting age" -- well,
18 I suspect that's a transcript error.  "What is it?
19 I got it right here."
20         "Because the voting age is 54."  Don't
21 you think that's the VAP, 54, instead of the voting
22 age?
23 Q.         And then -- I'm sorry.  Can you please
24 just read it as it is on the transcript, what
25 Representative Hall said after that beginning with
                                                    Page 80

Evan Milligan, et al v. John H. Merrill, et al.                                          Jim McClendon
                                                                                         12/17/2021

1 "And"?
2 A.          "And you use District 7 as the basis for
3 not having such a study done?"
4 Q.          And then please read your response.
5 A.          The black vote -- "The black VAP of the
6 district is sufficient to where you don't need a
7 study done."
8 Q.          Who makes the decision to undertake an
9 RPV analysis?
10 A.         The attorney.
11 Q.         If you asked the attorney to undertake
12 an RPV analysis, what would happen?
13 A.         We would discuss whether, in his
14 opinion, the issue was actually there or not and
15 needed to be decided and further information
16 gathered on the outside.  I mean, his job is not
17 just to jump.
18 Q.         If you asked Mr. Walker to conduct an
19 RPV analysis, would one be conducted?
20 A.         First, I don't think -- I would not ask
21 Mr. Walker to do something.  I would ask Mr. Walker,
22 "What is your opinion?  Do we need to do this or
23 not?"  That's how it works.
24 Q.         I understand.  And if you asked him to
25 undertake a racial polarization analysis, would one

Page 81

1 A.          You know, I don't know the answer to
2 that question.
3 Q.          You don't know whether or not you could
4 undertake --
5 A.          I don't know.  The only way I would know
6 is if I had exercised that and see how it worked
7 out.  But I've never exercised it, never thought
8 about exercising it.  So I don't know the answer to
9 that.
10 Q.         You didn't think about asking for an RPV
11 analysis when Representative England and
12 Representative Hall asked for one to be undertaken?
13 A.         It's like -- it's highly probable that
14 we discussed doing that afterwards, after the
15 meeting.  I may have discussed it with Mr. Walker.
16 And if he had thought it was of value and worthwhile
17 to do and would give us additional information that
18 we needed, it would have been ordered.  And if he
19 had felt like it was an exercise in futility and a
20 waste of time and money, he would have made that
21 expression, as well.
22 Q.         And did you ask Mr. Walker to undertake
23 an RPV analysis after the October 26th meeting?
24 A.         We may have talked about it.  But I
25 don't remember exactly doing that.

Page 83

1 be undertaken?
2 A.          You know, that's a hypothetical.  And
3 I'm not going to do a hypothetical.
4 Q.          Do you have the power, as senate chair
5 of the reapportionment committee, to ensure that the
6 individuals, the attorney, and the map drawer, for
7 example, comply with the Voting Rights Act?
8 A.          Well, yes.  That's their responsibility.
9 Q.          And if you decided that you needed a
10 racially polarized voting study done, could you
11 insist that they undertake one?
12 A.         Well, once again, you're doing something
13 hypothetical.  I depend on Mr. Walker for his legal
14 opinion and his experience.  He's got many more
15 years of experience than I do.
16           And what I most likely do with him is
17 say, "Dorman, what do you think about this?  Do we
18 need to do this or not?  Does it make any sense?"
19 Q.         Senator McClendon, I understand that
20 you're very personable and you rely on the opinions
21 of your attorneys.
22           What I'm asking you is if you have the
23 power to insist, as senate chair of the
24 reapportionment committee, that a racially polarized
25 voting study be undertaken?

Page 82

1 Q.          How much did Alabama's population change
2 between 2011 and 2021?
3 A.          I believe it increased about 5 percent.
4 I think it went from 4.88 to a little over 5
5 million, 5,020,000 or something like that.
6 Q.          In this redistricting cycle, was
7 District 7 over or underpopulated?
8 A.          I think it was under.  Yes, I'm sure it
9 was under.
10 Q.         I'm going to go back to McClendon
11 Exhibit 6.  If you wouldn't mind please turning to
12 Page 19.
13           And if you could look at the second
14 paragraph on the page after Representative England
15 said, "It would appear that District 7 would look
16 like that would need to be done," referring to an
17 RPV analysis.
18           He goes on, "So it appears to me that if
19 we're doing this in the logical way, that District 7
20 just -- as it appears on a map, would produce a
21 certain percentage."
22           And he asks, "And what is the
23 relationship between the 54 percent that you're
24 citing and the actual results or potential results
25 of a racial polarization study?  What is the

Page 84

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1 relationship between the two?"
2 A.        Let me --
3          Would you read your response?
4 A.        I'm sorry.  I thought you were done.  Go
5 ahead.
6 Q.         Would you please read your response?
7 A.        Let me read this sentence you just read.
8 So I would like to request that the study be done on
9 District 7.  And what is the relationship between
10 the 54 percent that you're citing and a racial
11 polarization study?  What is the relationship?
12          My response is, "I got no clue."
13 Q.         Does this seem like an accurate
14 representation of your conversation in the meeting,
15 the October 26 reapportionment committee meeting?
16 A.        I think it's fairly accurate.  I've
17 certainly found some errors in here.  But it's
18 probably close enough.
19 Q.         And do you still have no clue what the
20 relationship between the 54 percent number that you
21 cited earlier as not a threshold by which you would
22 consider an RPV analysis and the actual or potential
23 results of a racial polarization analysis?
24 A.        Okay.  Give me -- break that up.  That
25 was a couple of questions.  Give me the first one.
                                        Page 85

1 Q.         It's just one question, but it's long.
2          I'm asking you if you still have no clue
3 with respect to the question that Representative
4 England asked you and that you just read?
5 A.        Here -- here's the issue.
6 Representative England apparently was targeting that
7 number of 54 percent of BVAP as if it were some sort
8 of threshold of do or die.
9          And even the courts, to my knowledge,
10 have never come up with a number that says you've
11 got to have this percent or you can't go below this
12 percent.  It's never happened.
13          So when somebody picks out a number of
14 54 percents and says that's good or bad, well,
15 Congresswoman Sewell was happy with it.  And she's
16 probably got a whole lot more information on her
17 electability in her own district than I have.
18 Q.         So I'm just going to point you back to
19 Page 17 of the transcript of your October 26th
20 meeting of the reapportionment committee where
21 before Representative England brought that up, you
22 had said, "Because of the black voting age
23 population in Congressional District 7, there was
24 not one needed," referring to an RPV analysis,
25 because it was over 54 percent BVAP.
                                        Page 86

1          What did you mean by that?
2 A.        What I meant by that was it didn't look
3 like it was -- that a minority congresswoman was at
4 risk.  If she wanted to be elected again -- and
5 apparently she does -- there was nothing to suggest
6 it was close enough to think there was a threat to
7 her reelection.
8 Q.         And how is that related to the black
9 voting age population in District 7 at 54 percent?
10 A.        Well, most of the voters are a minority.
11 Q.         And so you were assuming that black
12 voters would vote for a black representative?
13 A.        That's pretty -- a pretty safe bet here
14 in Alabama.
15 Q.         And where did the 54 percent number come
16 from?
17 A.        Those -- those numbers are generated by
18 the software when the district is drawn.  But they
19 are generated after the district is drawn.
20 Q.         Did you talk to Representative Sewell
21 about the black voting age population in her
22 district?
23 A.        No, I did not.
24 Q.         Did you talk to Representative Sewell
25 about the congressional map?
                                        Page 87

1 A.        No, I did not.
2 Q.         How do you know that Representative
3 Sewell was okay with the district, as you suggested,
4 based on the BVAP?
5 A.        I was told that by the map drawer who
6 interviewed Representative Sewell I think once in
7 person and once virtually.  Or it may have been a
8 staff person.  But they were okay with the district.
9 Q.         So you wanted to ensure that the BVAP in
10 districts with a minority candidate representing
11 them was not too low?
12 A.        Correct.
13 Q.         Did you take any steps to ensure that
14 the BVAP in any district was not too high?
15 A.        Not to my knowledge.
16 Q.         Who drew the maps for you in 2021?
17 A.        Randy Hinaman.
18 Q.         What is Randy Hinaman's role in the
19 redistricting process?
20 A.        He's the map drawer.
21 Q.         When did you first meet with Mr. Hinaman
22 about the redistricting cycle in 2021?
23 A.        In the spring of 2021, I guess.  I
24 don't -- I don't remember an exact date.
25 Q.         Who did you meet with Mr. Hinaman with?
                                        Page 88

**Evan Milligan,et al v. John H.Merrill, et al.**

Jim McClendon
12/17/2021

Page 89

```
1 A.        I don't remember who was there.
2 Q.        What was discussed?
3 A.        Pardon me?  What was what?
4 Q.        What did -- what did you all discuss?
5 A.        I would just guess.  And I would say we
6 probably discussed when are we going to see the data
7 so we can go to work.
8 Q.        Did you provide any instructions to
9 Mr. Hinaman in the spring of 2021?
10 A.        No.
11 Q.        Why not?
12 A.        He was -- he was more experienced than
13 me.
14 Q.        Did you provide Mr. Hinaman with any
15 materials throughout any of the process of him
16 drawing the 2021 Alabama maps?
17 A.        No.
18 Q.        Why?
19 A.        There was no need to.
20 Q.        Why was there no need to?
21 A.        Well, he was the map drawer.  He knew
22 his job.
23 Q.        Where was his job description?
24 A.        Where was his job description?
25          Defined.
```

Page 90

```
1 A.        You know, he -- I don't know the answer
2 to that.
3          MS. SADASIVAN:  Would you mind if we
4 take a five-minute break?
5          THE VIDEOGRAPHER:  We are off the
6 record.  The time is 4:26 p.m.
7          (Recess was taken.)
8          THE VIDEOGRAPHER:  We are back on the
9 record.  The time is 4:37 p.m.
10 Q.        Senator McClendon, thank you again for
11 sitting for the deposition and for your time.
12          Following up on McClendon Exhibit 6
13 where we were discussing the quote where you said
14 that because of the black voting age population in
15 Congressional District 7, there was not one needed
16 with respect to an RPV analysis because the district
17 was over 54 percent BVAP.  That was the October 26th
18 meeting of the reapportionment committee.
19          Did Mr. Walker tell you that a racial
20 polarization analysis was unnecessary because
21 District 7 had a BVAP of 54 percent?
22          MR. WALKER:  Object on the basis of
23 attorney-client privilege.
24 Q.        Were you told that a racial polarization
25 analysis was unnecessary because District 7 had a
```

Page 91

```
1 BVAP of around 54 percent?
2 A.        I was told that in any of the districts
3 that were drawn that needed this additional
4 analysis, it had been requested.
5 Q.        Can you repeat your answer, please?
6 A.        I was told that any of the districts
7 that needed additional analysis, that that analysis
8 had been requested.
9          And were you told which districts
10 required analysis?
11 A.        No.
12 Q.        Did you know any criteria for which
13 districts required an analysis?
14 A.        I did not know the criteria.
15 Q.        When did you determine that your plan
16 didn't violate the Voting Rights Act?
17 A.        Well, sometime -- sometime prior to
18 submitting it to the redistricting committee for
19 consideration.  That was like part of the process,
20 to make sure we were in compliance before
21 introducing it for consideration for the other
22 committee members.
23 Q.        And when did you submit the
24 congressional redistricting bill for consideration
25 by the reapportionment committee?
```

Page 92

```
1 A.        The date -- the date we met that Tuesday
2 prior to the special session convening on Thursday.
3 Q.        So you determined before the October
4 26th meeting that your map, the congressional
5 redistricting map you introduced, didn't violate the
6 VRA?
7 A.        I felt confident that was the case, yes.
8 Q.        Do you know if an RPV analysis was
9 conducted for Congressional District 1?
10 A.        Do I know if it was conducted?  Is that
11 your question?
12          No, I don't know if it was conducted.
13 Q.        Who would know?
14 A.        The attorney.
15 Q.        And who is that?
16 A.        His name is Dorman Walker.
17 Q.        When did the special legislative session
18 on redistricting begin in Alabama in 2021?
19 A.        The Thursday of that week following the
20 redistricting committee meeting.  And I don't
21 remember what the date was.
22 Q.        Did you do anything to prepare for the
23 special session?
24 A.        Well, yes.
25 Q.        What did you do to prepare for the
```

Evan Milligan, et al v. John H. Merrill, et al.                          Jim McClendon
                                                                           12/17/2021

Page 93

1  special session?
2  A.        I tried to get the -- first, we handled
3  -- the senate handled the senate and the BOE map
4  first.  And so I wanted my information in place in
5  my hand that I would present to the standing
6  committee and ultimately to the senate floor.  So my
7  preparation was to have my bullet points convenient
8  before those meetings.
9  Q.        Did you review any maps of two majority
10 black districts in 2021?
11 A.        No.
12 Q.        Did you have the opportunity to vote on
13 any two majority black congressional district plans
14 in 2021?
15            MR. WALKER:  Did you say have the
16 opportunity to vote?
17            MS. SADASIVAN:  Yes.
18            MR. WALKER:  Okay.
19 A.        There may -- I don't -- and I'm not
20 certain.  But I think one was introduced on the
21 senate floor.  But I'm not sure.
22 Q.        You think that a bill creating two
23 majority minority districts was introduced on the
24 senate floor?
25            MR. WALKER:  May.

Page 94

1  A.        May have been introduced on the senate
2  floor.  Introduced on the senate floor.
3  Q.        So I am dropping into the chat and I'll
4  ask Mr. Walker to mark as Exhibit 7 or McClendon
5  Exhibit 7 a document that is the transcript of the
6  senate floor debate in Alabama on November 3, 2021.
7            Do you recognize the document?  It's on
8  my screen so you can see it.
9            MR. WALKER:  Oh, okay.  This is 7?
10           MS. WELBORN:  Yes.
11           MS. SADASIVAN:  Yes, sir.
12
13           (Plaintiff's Exhibit 7 was
14           marked for identification.)
15
16 Q.        And I have the exhibit pulled up, as
17 well.  Take a minute to look at it, Senator
18 McClendon, please.
19 A.        What did you say?
20 Q.        Will you just take a minute to look at
21 the transcript, and at the end confirm yes or no
22 whether it generally appears accurate of the senate
23 floor debate in 2021 on the various redistricting
24 bills in the special legislative session.
25 A.        Where does this start dealing with the

Page 95

1  congressional plan?
2  Q.        Let me just scroll down.
3            I guess my question was initially -- and
4  I'm seeing on Page 27 there's the beginning of a
5  discussion between Senator McClendon and Senator
6  Singleton.
7            But I had first asked, Senator
8  McClendon, if you could look through the transcript
9  and see if it generally appears accurate of the
10 senate floor debate on November 3, 2021, in the
11 Alabama senate.  I will represent to you that it's
12 the transcript from the video that we received.
13 A.        And I'll accept that, that it is a
14 transcript of the senate floor.
15 Q.        And in this transcript, you vote against
16 a map introduced by Senator Singleton and Senator
17 Hatcher.  Can you --
18 A.        What page is that on?
19 Q.        I believe the motion is -- the
20 substitute was offered by Senator Hatcher on Page
21 39.
22 A.        Okay.
23 Q.        And Senator McClendon moved it for an up
24 or down vote on Page 40, and then votes against it
25 on Page 41.  Do you see that?

Page 96

1  A.        Okay.  Yeah, I do.  I do.
2  Q.        Can you tell me why you voted against
3  Senator Hatcher's two majority minority district
4  plan?
5  A.        You know, if I recall correctly, his map
6  pitted -- put two incumbent congressional members in
7  the same district.
8            Did you hear me?
9  Q.        I can.  I asked you why you voted
10 against Senator Hatcher's plan.
11 A.        And my response was that, among other
12 things, the most blatant thing and easiest to notice
13 was that he had put two incumbents in the same
14 district.
15 Q.        You agree that the black voting age
16 population of the state of Alabama is approximately
17 27 percent of the state?
18 A.        Approximately.
19 Q.        Did that factor in to how you voted on
20 Senator Hatcher's map?
21 A.        It had nothing to do with it.
22 Q.        Did you have the opportunity to vote on
23 Senator Singleton's proposed map?
24 A.        I did.
25 Q.        And how did you vote?

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                    12/17/2021

1  A.       A nay.
2  Q.       And why did you vote nay?
3  A.       I think the blatant problem with his map
4  was that no minority candidate had a majority
5  district.  He had --
6  Q.       And when you say a minority candidate
7  had a majority district, what do you mean?
8  A.       I think he drew two districts they
9  called opportunity districts.  But no minority
10 candidate had a majority of the voters in either of
11 those districts.
12 Q.       With respect to Senator Hatcher's map,
13 you said you voted against it because two incumbents
14 were paired?
15 A.       I think that is -- I think that's
16 correct.
17 Q.       And what is -- in terms of your
18 understanding of the law, what is a more important
19 criteria for a map proposed by the Alabama
20 legislature?  Compliance with federal law and the
21 Voting Rights Act or ensuring incumbents are not
22 paired?
23 A.       You're asking me to say what's most
24 important among those three or what takes precedent?
25 Is that what your question is?
                                                    Page 97

1  Q.       Yes, sir.
2  A.       Well, you always have to assume that
3  federal law supersedes state law.  But in this case,
4  it was -- it didn't matter.  It was just -- it was
5  an -- it was an inappropriate situation.
6           Actually, what happens when you pit two
7  incumbents, suddenly the redistricting committee is
8  picking winners and losers.  And that should be up
9  to the voters.
10 Q.       The reapportionment committee -- just to
11 go back a little bit to the public hearings that you
12 held on redistricting.  How many were there?
13 A.       Still 28.
14 Q.       And how many occurred between the hours
15 of 9:00 and 5:00?
16 A.       Well, I don't know.  I would have to --
17 I would have to go back.  I think most -- most of
18 them did, yeah.
19 Q.       If I say the McClendon exhibit, I'm
20 afraid I will get it wrong.  But it has the schedule
21 of the public hearings.
22 A.       That would be Number 4.
23 Q.       Thank you, sir.
24 A.       Okay.  What is your question, now?
25 Q.       I asked how many of the 28 public
                                                    Page 98

1  hearings occurred between the hours of 9:00 a.m. and
2  5:00 p.m.
3  A.       Most all of them did.  I guess there's
4  one exception to that.  And that would have been the
5  meeting at the state house in Montgomery.
6  Q.       How many public hearings were held at
7  the same time as another public hearing?
8  A.       Zero.
9  Q.       In other words, how many public hearings
10 overlapped with another one of the public hearings?
11 A.       Zero.
12 Q.       No public hearings occurred at the same
13 time as another public hearing?
14 A.       Correct.
15 Q.       And when did you finalize the times of
16 the public hearings?
17 A.       It would have been sometime in July,
18 early July.  Actually, it was done twice.  The first
19 time, it was targeted to be completed by June 30th.
20 And then we added six more, and that just tacked
21 them on the end.  So it was in the early part of
22 July.
23 Q.       So you added six more why?
24 A.       Representative Hall requested it.
25 Q.       How did she request additional hearings?
                                                    Page 99

1  A.       Email.
2  Q.       Sir, I am going to drop in the chat and
3  I will share my screen and ask Mr. Walker if he
4  could please mark this as, I believe, McClendon
5  Exhibit 7.
6           MR. WALKER:  Eight.
7           MS. SADASIVAN:  Eight.  Gosh.  Why am I
8  always one off?  It's Friday.
9  Q.       So I'm showing you what I've asked
10 Mr. Walker to mark as McClendon Exhibit 8.  I'm
11 scrolling down to the bottom where it says RC
12 045704.
13          MS. WELBORN:  Kathryn, can you scroll
14 all the way up?  We don't know what the document is.
15          MS. SADASIVAN:  So the document says RC
16 045697.  This was produced by Mr. Walker yesterday.
17          MS. WELBORN:  What does it look like on
18 the first page so we can figure out which one it is?
19          MS. SADASIVAN:  It looks like this.
20          MR. WALKER:  Okay.
21
22          (Plaintiff's Exhibit 8 was
23          marked for identification.)
24
25 A.       Is this -- okay.  Exhibit 8.
                                                    Page 100

Evan Milligan,et al v. John H.Merrill, et al.                                      Jim McClendon
                                                                                     12/17/2021

1          MR. WALKER:  She's turned it back a page
2 or two.
3 Q.          So if you look on Page 12 of the exhibit
4 that Mr. Walker handed you, it's marked at the
5 bottom with Bates number RC 045712.
6 A.          **712.  Okay.  I've got 712.  What page?**
7 Q.          045712.  It's page 12 of that PDF.
8 A.          **712.  I've got Page 1.**
9 Q.          Do you recognize on Page -- I guess the
10 page that we just landed on, did you recognize the
11 document that you're looking at, Mr. McClendon?
12 A.          **Yes.  Well, I have it in front of me.**
13 **Let me look at it.**
14          **Yes, I've seen this before.**
15 Q.          Where have you seen it before?
16 A.          **I probably -- I probably received a copy**
17 **of it, of the email.**
18 Q.          What is this that you're looking at?
19 A.          **This is Representative Hall, I guess.**
20 **Yes.  This is when she made a request for additional**
21 **meetings.  And she sent that to the staff office and**
22 **they forward a copy to me.**
23 Q.          So in her email that we're looking at
24 right now, Representative Hall says, "During the May
25 5th committee meeting, members agreed to hearing
                                                            Page 101

1 locations that would not require constituents to
2 travel more than one county.  However, the proposed
3 location map will require interested parties to
4 travel significant distances to participate."
5          Going down, it says, "While it may not
6 be feasible for all committee members to attend
7 every public hearing, the proposed schedule requires
8 members to 'pick and choose' hearings and will not
9 have the full benefit of the public hearing
10 testimony and discussion of any alternative maps
11 introduced."
12          On the second page -- on the following
13 page, which is Bates number RC 045713,
14 Representative Hall says, "In addition, the timing
15 of each hearing is unsatisfactory.  Hearings held
16 during working days cannot be viewed objectively as
17 providing the opportunity for public input."
18          How did you respond to Representative
19 Hall's concerns about the timing of the public
20 hearings?
21 A.          **I think I called my attorney and**
22 **basically said, "How do you want to handle this?**
23 **What do you think we need to do?"  And --**
24          MR. WALKER:  Do not discuss what I said
25 to you.
                                                            Page 102

1 A.          **But I cannot discuss what he said to me.**
2 Q.          You stated earlier that the time and
3 manner of the public hearings is not governing by
4 Alabama law, correct?
5 A.          **Not to my knowledge.**
6 Q.          So when Representative Hall asked for
7 other times for the public hearings, was there any
8 legal constraints to the times that you could select
9 for the public hearings?
10 A.          **Not to my knowledge.**
11 Q.          Why did you not change the times of the
12 public hearings based on this email?
13 A.          **That was being -- we used our staff and**
14 **we used our liaison from the community college**
15 **system to contact the local community colleges and**
16 **locations and to see what would work out for**
17 **everybody involved.  And that's how it came about.**
18          MS. SADASIVAN:  I think that's all the
19 questions I have.  The Singleton and the Caster
20 plaintiffs may have questions.
21          MR. OSHER:  I have a few questions.
22 Jim, if you want to go first for Singleton, you're
23 more than welcome to.  He might not be on.
24          Okay.  Senator, give me one moment, sir.
25
                                                            Page 103

1 EXAMINATION BY MR. OSHER:
2 Q.          Senator McClendon, can you hear me?
3 A.          **I can hear you very well.**
4 Q.          Oh, well that's a surprise.  That never
5 happens.  Thank you for your time today.  I just
6 have a few questions.
7          I believe -- am I correct that you were
8 in the room when Representative Pringle was taking
9 his deposition?
10 A.          **You are correct.**
11 Q.          Or I should say was having his
12 deposition taken.
13          And so I assume that you heard the
14 questions that I asked him.  Is that correct?
15 A.          **That is correct.**
16 Q.          I'm just going to ask you the same
17 questions.
18          How long have you been serving in the
19 Alabama legislature?
20 A.          **19 years.**
21 Q.          19 years.  And have you been a member of
22 the republican party that whole time?
23 A.          **Well, I've always run as a republican.**
24 **And I believe I've been a dues-paying member of the**
25 **county republican group that whole time.**
                                                            Page 104

Evan Milligan,et al v. John H.Merrill, et al.                                                    Jim McClendon
                                                                                                  12/17/2021

1  Q.          And have you -- have you always been a
2  member of the republican party?
3  **A.          Well, "always been" goes back a long**
4  **way.  I think I've been a member of the republican**
5  **party as long as I've been a candidate or an elected**
6  **official.**
7  Q.          And how long does that date back until
8  in the -- in the past?
9  **A.          2001.**
10 Q.          Okay.  Based your 19 years serving in
11 the legislature, in your view, do the views of the
12 members of the democratic party in Alabama generally
13 differ from the members of the republican party in
14 Alabama when it comes to the issue of removing
15 confederate monuments from public spaces?
16 **A.          You know, I think if you make that broad**
17 **and say generally, I think I can agree with that**
18 **statement.  There -- there are definitely**
19 **exceptions.  But I think with the "general" in**
20 **there, I can say I generally agree with your**
21 **statement.**
22 Q.          So the answer to my question was yes?
23 **A.          Yes.**
24          MR. WALKER:  Objection to form.  He
25 answered that he can generally agree.
                                                        Page 105

1  Q.          My question was do the members of the
2  democratic party, generally do their views generally
3  -- I should start over.
4          Do the views of the members of the
5  democratic party generally differ from the views of
6  the members of the republican party in Alabama
7  generally when it comes to removal of confederate
8  monuments in public spaces?
9  **A.          I think I can agree with that.**
10 Q.          You think you can agree?  Can you give
11 me a yes or no answer on that question?
12          MR. DAVIS:  Objection, asked and
13 answered.
14          THE WITNESS:  So objection, what does
15 that mean for me?
16          MR. WALKER:  That means you don't
17 answer.
18 Q.          Well, it doesn't mean you don't answer.
19 I believe that's a form objection.
20          MR. WALKER:  Excuse me.  Forgive me.
21 You're right.  Sorry, Dan.
22          MR. OSHER:  That's okay.
23 Q.          Senator, if you wouldn't mind answering
24 the question.
25 **A.          Yes.**
                                                        Page 106

1  Q.          Thank you.  I appreciate it.  A few
2  more.
3          Based on your 19 years in the Alabama
4  legislature, do the views of the members of the
5  democratic party in Alabama generally differ from
6  the members of the republican party in Alabama when
7  it comes to the issue of affirmative action?
8  **A.          And we'll get back to the discussion you**
9  **had earlier on affirmative action.  I'm not even**
10 **exactly sure of a definition of affirmative action.**
11 **I remember hearing that term some years ago.  But it**
12 **hasn't been around in a while.  So I'm real hesitant**
13 **about answering that question.**
14          **One other thing I would like to point**
15 **out.  You're talking about members of the democratic**
16 **party, members of the republican party, right?**
17 **That's who you're asking me about.**
18          **Well, I don't attend any of the**
19 **democratic party meetings.  Now, I know a lot of**
20 **democrats that are in the legislature.  So I'm more**
21 **likely to have a feeling for a democratic rather**
22 **than a member of the democratic party.  Do you**
23 **understand what I'm saying?**
24 Q.          So let me ask you this:  In your 19
25 years serving in the -- in the Alabama legislature,
                                                        Page 107

1  have you worked with your democratic party -- your
2  democratic party colleagues on issues related to
3  pending legislation?
4  **A.          Yes.**
5  Q.          And have you worked with republican
6  members of the Alabama legislature on pending
7  legislation and other issues?
8  **A.          Yes.**
9  Q.          And in that time, have you gained a
10 general view of what the democratic party in Alabama
11 supports and what the republican party in Alabama
12 supports?
13 **A.          Yes.**
14 Q.          Okay.  So you -- in terms of affirmative
15 action, let's define affirmative action as giving
16 preference to individual -- considering individual
17 race when making certain decisions about admission
18 to programs or access to benefits.
19          Using that definition, based on your
20 experience in the legislature, do the views of the
21 democratic party in Alabama generally differ from
22 the members -- the views of the members of the
23 republican party in Alabama?
24 **A.          I really don't have an opinion on that.**
25 **And the reason is the issue simply has not come up,**
                                                        Page 108

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

1  it's not in front of me, and I have no experience
2  with members of the democrats or the republicans on
3  that issue.  So I can't speak for something that
4  hasn't happened.
5  Q.        Sure.
6            Based of your experience in the Alabama
7  legislature, do the views of members of the
8  democratic party in Alabama generally differ from
9  the members of the republican party in Alabama when
10 it comes to criminal justice reform?
11 A.        Okay.  And your question is they have
12 disparate or different views?  Republicans have
13 different views from democrats on criminal justice
14 reform?  That's your question, correct?
15 Q.        As a general matter, correct.
16 A.        As a general matter, I agree with that
17 statement.
18 Q.        And based on your experience in the
19 legislature, do the views of the members of the
20 democratic party in Alabama differ from the views of
21 the members of the republican party in Alabama when
22 it comes to whether there is a significant amount of
23 discrimination against black residents of the state
24 today?
25 A.        Once again, I need to take a party
                                          Page 109

1  business out.  I see the party as these two
2  organizations.  These people I know claim to be
3  democrats.  Some of them claim to be republicans.
4  Whether they belong to -- are active in a party or
5  not, I have no idea.
6            Now let's go back to the heart of your
7  question, and I'll try to answer it.  With that in
8  mind, ask me your -- ask me your question.  What is
9  the topic here?
10 Q.        The fourth topic that I'm asking if the
11 members -- if the views of the members of the
12 democratic party generally differ from the views of
13 the members of the republican party generally.
14           Based on your experience working in the
15 legislature with members of both parties, do their
16 views generally differ when it comes to the issue of
17 whether there is a significant amount of
18 discrimination against black residents of Alabama
19 today?
20 A.        Yes.
21           MR. OSHER:  Thank you very much.  That's
22 all I have for you.  Thank you for your time,
23 Senator.
24 A.        You're very welcome.
25           MR. WALKER:  Are we done?
                                          Page 110

1            MR. DAVIS:  Any questions from the
2  Singleton plaintiffs?
3            I've got just a couple.
4  EXAMINATION BY MR. DAVIS:
5  Q.        Hello, Senator.
6  A.        Hello.
7  Q.        Jim Davis representing Secretary
8  Merrill.
9            Senator, how many members are there of
10 the Alabama senate?
11 A.        35.
12 Q.        And do they all have a vote on
13 legislation?
14 A.        Yes, they do.
15 Q.        Does that include redistricting
16 litigation?
17 A.        That is correct.
18 Q.        Excuse me.  I said "litigation."  I
19 meant legislation.
20 A.        Legislation.
21 Q.        Do all senators' votes count the same?
22 A.        Yes.
23 Q.        Do you know why any other member of the
24 Alabama senate voted for or against a redistricting
25 plan?
                                          Page 111

1  A.        No.  That's an individual decision.
2  Q.        And how many members are there of the
3  Alabama house of representatives?
4  A.        105.
5  Q.        And they all have votes on legislation?
6  A.        They certainly do.
7  Q.        Including redistricting legislation?
8  A.        Correct.
9  Q.        And their votes all count the same as
10 one anothers?
11 A.        That's correct.
12 Q.        Do you know why any member of the
13 Alabama house of representatives voted for or
14 against any plan, any redistricting plan?
15 A.        No.  That's an individual decision.
16 Q.        Did you instruct Randy Hinaman to be
17 sure to include a majority black district in an
18 Alabama congressional plan draft?
19 A.        I did not.
20 Q.        Did you decide ahead of time that
21 Alabama's plan must include a majority black
22 district?
23 A.        I did not.
24 Q.        Was your understanding that those
25 districts, when drafted, would be done so without
                                          Page 112

**Evan Milligan,et al v. John H.Merrill, et al.**

**Jim McClendon**
**12/17/2021**

| | |
|---|---|
| 1 consideration of race? | 1 STATE OF ALABAMA ) |
| 2 **A.**        **That is correct.** | 2 JEFFERSON COUNTY ) |
| 3 Q.        To the best of your knowledge, was that, | 3 |
| 4 in fact, how it was done? | 4        I hereby certify that the above |
| 5 **A.**        **That is exactly how it was done.** | 5 proceedings were taken down by me and transcribed by |
| 6        MR. DAVIS:  Thank you, Senator. | 6 me using computer-aided transcription and that the |
| 7 **A.**        **You're welcome.** | 7 above is a true and correct transcript of said |
| 8        MR. WALKER:  Do we have anything | 8 proceedings taken down by me and transcribed by me. |
| 9 further? | 9        I further certify that I am neither of |
| 10        MS. SADASIVAN:  Nothing from the | 10 kin nor of counsel to any of the parties nor in |
| 11 Milligan plaintiffs.  Thank you, Senator, for your | 11 anywise financially interested in the result of this |
| 12 time and sitting for the deposition.  I appreciate | 12 case. |
| 13 it. | 13        I further certify that I am duly |
| 14        MR. OSHER:  Nothing from the Caster | 14 licensed by the Alabama Board of Court Reporting as |
| 15 plaintiffs.  Thank you all. | 15 a Certified Court Reporter as evidenced by the ACCR |
| 16        MR. WALKER:  Kathryn, I need to get to | 16 number following my name found below. |
| 17 you, in addition to my privilege log, the final | 17        So certified on December 17, 2021. |
| 18 statement of -- you know, the sheet where I state | 18 |
| 19 the request for production and then I state | 19 |
| 20 underneath the documents.  Can I get that to you on | 20 |
| 21 Monday?  You've got all the documents.  I just need | 21 |
| 22 to give you the sheet that says which ones refer to | 22 |
| 23 which of your requests. | 23     LeAnn Maroney, Commissioner |
| 24        THE REPORTER:  Are we on the record? | 24     ACCR# 134, Expires 9/30/25<br>     505 North 20th Street, Suite 1250 |
| 25        MS. WELBORN:  Can we go off the record | 24     Birmingham, AL  35203 |
| Page 113 | Page 115 |

| | |
|---|---|
| 1 now? | |
| 2        MR. WALKER:  Yeah, sure. | |
| 3        THE VIDEOGRAPHER:  This ends the | |
| 4 deposition of Jim McClendon.  The time is now | |
| 5 5:12 p.m. | |
| 6 | |
| 7        (DEPOSITION ENDED AT 5:12 P.M.) | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| Page 114 | |

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

**WORD INDEX**

< 0 >
001929   47:1
045697   100:16
045704   100:12
045712   101:5, 7
045713   102:13

< 1 >
1   6:9   19:15
21:7   35:8, 22
37:24   70:22
92:9   101:8
1:57   1:24   7:17
1:59   9:5
10   4:19   14:19
100   6:23
10004   4:5
10006   3:15
104-111   6:3
105   1:23   5:14
112:4
11   27:24
1-10-43   14:18
111-114   6:4
12   101:3, 7
125   4:4
1250   115:23
134   115:23
14   26:10
140   79:20
1400   3:7
14th   3:21
17   1:24   7:7,
17   79:23   80:1
86:19   115:17
19   84:12
104:20, 21
105:10   107:3,
24
1943   14:19
1965   65:8
66:9, 12
1999   3:7

< 2 >
2   6:11   35:6
36:2, 7, 24
39:19, 23, 24,
25   40:2   47:21

49:22   65:11,
14   66:20
2:04   9:8
2:2021-CV-01530-
AMM   1:8
2:21-CV-01530-AMM
7:14
200   5:14
2000   38:13
20002   4:20
20005   3:22
2001   24:18
42:15, 20   43:6
105:9
2010   33:12
38:8
2011   6:12
28:5   30:12
31:9   32:10, 16,
23   33:21   34:9
36:13, 20
37:15, 25
40:15, 21   42:7
43:3, 10, 13, 17
45:4, 13, 17, 22
46:5   51:8
52:2, 15   84:2
2014   26:10, 15
2021   1:24
6:18, 20, 22
7:7, 17   26:3
30:12   45:7
52:23   53:2
57:6, 19   58:2
61:6   62:25
64:21   65:2
70:10, 18
74:13   76:13
77:8   84:2
88:16, 22, 23
89:9, 16   92:18
93:10, 14   94:6,
23   95:10
115:17
205)999-8096
14:24
20th   115:23
22   33:16   63:1
23   40:14
26   6:20   16:19
76:13   77:8
85:15

26th   75:21, 23
78:19   83:23
86:19   90:17
92:4
27   95:4   96:17
28   98:13, 25
29th   59:11

< 3 >
3   6:13, 22
39:23, 24, 25
40:2   46:24
47:9   51:19
94:6   95:10
3:09   51:14
3:22   51:17
30   60:8   71:9
30th   58:20
59:9   99:19
32   71:10
35   6:9   111:11
35203   115:24
36   6:11
361   14:22
36104   1:24
5:15
36106   4:12
36130   5:6
39   95:21

< 4 >
4   6:15   39:23,
24, 25   40:2, 14
61:5, 12   63:18
98:22
4.88   84:4
4:26   90:6
4:37   90:9
40   3:14   95:24
41   95:25
47   6:13

< 5 >
5   3:14   6:17
39:21   43:20,
22   44:8, 12, 14,
18, 23   45:1
64:3, 16   70:17,
18   79:23   84:3,
4
5,020,000   84:5

5:00   98:15
99:2
5:12   114:5, 7
50   17:1   24:25
26:1
501   5:5
505   115:23
54   80:9, 20, 21
84:23   85:10,
20   86:7, 14, 25
87:9, 15   90:17,
21   91:1
5th   64:1
70:10   101:25

< 6 >
6   6:19   76:15,
22   79:24, 25
84:11   90:12
600   3:21   4:19
61   6:15
6179   4:11
64   6:17

< 7 >
7   6:21   43:5
80:8   81:2
84:7, 15, 19
85:9   86:23
87:9   90:15, 21,
25   94:4, 5, 9,
13   100:5
700   3:21
712   101:6, 8
76   6:19

< 8 >
8   6:23   100:10,
22, 25

< 9 >
9/30/25   115:23
9:00   98:15
99:1
90067   3:8
9-103   6:2
94   6:21

< A >
a.m   99:1
ability   11:2, 6

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

able   8:5
11:21     22:10
56:13     67:8
78:11
accept   95:13
Access   40:7
108:18
accordance
39:10     40:14
account   15:9, 18
accounts   15:16
ACCR   115:15, 23
accurate   50:18
85:13, 16
94:22     95:9
Act   39:8, 18,
21   43:21
47:25   50:11
65:7, 11, 14
66:9, 12, 21
67:5, 8, 11, 14,
23   68:1, 3, 8,
18   69:9, 14, 19,
24   77:20   82:7
91:16   97:21
acting   7:3
action   39:16
41:5, 7   107:7,
9, 10   108:15
active   110:4
activity   27:19,
23
actual   27:25
28:12, 17
84:24   85:22
add   58:15
added   58:25
99:20, 23
addition   102:14
113:17
additional   6:24
12:7   56:2
77:16   83:17
91:3, 7   99:25
101:20
address   14:21
adjectives   67:2
admission   108:17
adopt   70:8
adopted   39:5
64:19   74:11

adopting   65:25
adoption   37:12
advance   19:18
advised   68:15
affect   11:2, 6
affirmative
107:7, 9, 10
108:14, 15
afraid   98:20
afternoon   9:10
age   43:13, 17
80:7, 10, 17, 20,
22   86:22   87:9,
21   90:14   96:15
agenda   75:20
ago   10:6   27:6
107:11
agree   78:14
96:15   105:17,
20, 25   106:9,
10   109:16
AGREED   1:17
2:1, 8   101:25
ahead   57:9, 10
62:23   66:23
85:5   112:20
al   1:6, 10
7:13, 14   115:24
ALABAMA   1:2, 23
4:10, 12   5:6,
15   7:2, 3, 16,
20   8:3   9:20
14:22   15:7, 23,
25   17:4, 13, 14,
23   24:24   26:7,
9, 20   27:9
38:7   39:12
40:15   42:10
44:12, 14, 19,
23   45:16   51:7
59:16, 19
71:20, 22   72:9
75:2   87:14
89:16   92:18
94:6   95:11
96:16   97:19
103:4   104:19
105:12, 14
106:6   107:3, 5,
6, 25   108:6, 10,
11, 21, 23
109:6, 8, 9, 20,

21   110:18
111:10, 24
112:3, 13, 18
115:1, 14
Alabama's   28:5
38:10   84:1
112:21
Ali   5:20
allow   11:19
12:10
alternative
102:10
amended   65:8
amendments   40:16
American   4:3, 10
amount   56:20,
22   109:22
110:17
analysis   69:20
77:12, 24   81:9,
12, 19, 25
83:11, 23
84:17   85:22,
23   86:24
90:16, 20, 25
91:4, 7, 10, 13
92:8
Angeles   3:8
announce   58:14,
17
announced   59:3
anothers   112:10
answer   12:1, 20,
21   14:10   21:9
26:16   31:10
34:6   37:20
40:23   43:4, 7
44:8   45:20
50:20   51:25
58:3   60:16, 22
69:11   83:1, 8
90:1   91:5
105:22   106:11,
17, 18   110:7
answered   26:15
51:5   105:25
106:13
answering   12:2,
13   106:23
107:13
answers   11:3, 7,

18
Anybody   55:10
anywise   115:11
apologize   39:24
79:25
apparently   86:6
87:5
appear   64:17
84:15
appears   84:18,
20   94:22   95:9
applied   44:18,
23
apply   44:12, 14
appreciate
35:14   107:1
113:12
approach   27:22
approval   34:14
approve   34:15
48:1
approving   34:19
approximately
96:16, 18
area   72:10, 13
arrive   56:17
article   47:16,
20   48:25   49:2
51:21
asked   12:9
30:16   36:1
51:3   56:1
58:8   60:7
73:17   80:3
81:11, 18, 24
83:12   86:4
95:7   96:9
98:25   100:9
103:6   104:14
106:12
asking   30:21
40:1   44:3, 6,
22   48:11, 13
50:1   53:11
54:9, 22   62:24
65:18, 21   67:3
73:20   78:1
82:22   83:10
86:2   97:23
107:17   110:10
asks   84:22

assign   2:12
assistance   40:12
Assistant   5:3
assume   12:12
 98:2   104:13
assuming   87:11
astray   29:22
attempt   42:22
attempting   73:18
attend   102:6
 107:18
attention   23:6
Attorney   3:5,
 12, 19   4:2, 9,
 17   5:3, 4, 12
 7:20   12:17, 21,
 25   13:5   19:11
 20:7   28:12, 24,
 25   29:18, 25
 30:19, 24   31:6,
 12   37:22   41:8
 42:2   53:7, 11,
 14, 24   54:13,
 19, 24   55:7, 12
 56:6, 11   66:1
 67:18   68:4, 11,
 16   81:10, 11
 82:6   92:14
 102:21
attorney-client
 53:12   90:23
attorneys   7:18
 8:9   82:21
attributed   50:7
audio   8:5, 7
 66:23
available   9:14
 40:10   52:21
Avenue   3:7   5:5

< B >
back   9:7
 19:11   22:12
 44:8   51:16
 56:4, 9   58:10
 73:9   84:10
 86:18   90:8
 98:11, 17
 101:1   105:3, 7
 107:8   110:6
background   14:15
bad   86:14

Balch   1:22
 5:13   7:23
Ballroom   62:16
based   12:14
 28:3   32:23
 69:25   88:4
 103:12   105:10
 107:3   108:19
 109:6, 18
 110:14
basically   56:24
 102:22
basis   69:22
 81:2   90:22
bat   74:8
Bates   101:5
 102:13
began   75:2
beginning   7:12
 37:25   39:1
 49:23   50:9
 80:6, 25   95:4
begins   28:13
behalf   8:12
belief   40:24
believe   23:23
 25:24   49:16
 50:2, 8, 13
 58:21   74:19,
 23   75:7   84:3
 95:19   100:4
 104:7, 24
 106:19
believed   48:17
belong   110:4
belt   72:9, 15,
 18, 20, 24   73:3,
 5
benchmarks
 47:24   48:3
benefit   102:9
benefits   108:18
best   30:3
 113:3
bet   87:13
better   14:16
 52:11   72:25
big   28:21
bigger   28:2
bill   21:3, 11,
 24   22:1, 16
 40:4, 17   45:18,

23   46:1, 2, 3
 91:24   93:22
bills   21:17, 19,
 25   45:22
 63:15   75:25
 94:24
Bingham   1:23
 5:13   7:24
Birmingham   7:2
 8:2   16:3, 9
 115:24
birth   14:17
bit   14:16
 52:9, 11   53:17
 79:5   98:11
black   43:6, 13,
 17   62:4   72:9,
 15, 18, 20, 24
 73:3, 5   80:7,
 9, 14   81:5
 86:22   87:8, 11,
 12, 21   90:14
 93:10, 13
 96:15   109:23
 110:18   112:17,
 21
blatant   96:12
 97:3
board   38:11, 15
 56:23   115:14
body   20:9
BOE   46:1   71:4
 93:3
born   15:22
bottom   100:11
 101:5
Box   4:11
break   13:15
 14:8, 11   49:7,
 11   51:11
 85:24   90:4
breaking   51:2
Brian   47:17
Broad   4:4
 105:16
brought   46:8, 9,
 11, 12   78:25
 86:21
bullet   19:6
 93:7
Bureau   38:9

54:11
business   110:1
Buskey   47:18,
 22   48:18
BVAP   86:7, 25
 88:4, 9, 14
 90:17, 21   91:1

< C >
California   3:8
call   34:20
 56:15   57:1
called   41:18
 63:14   97:9
 102:21
candidate   88:10
 97:4, 6, 10
 105:5
candidates   25:5
capacity   9:19
care   35:11
career   24:15
carefully   54:16
carried   49:24
carry   31:1, 2
CASE   1:7   7:14
 9:13   17:24
 18:5, 6   19:7
 23:14, 22, 23
 24:4, 9   46:21
 47:17   77:15
 92:7   98:3
 115:12
cases   10:15
 30:3   31:5
 66:18   67:8
 77:21
CASTER   4:15
 8:15   103:19
 113:14
cause   7:8
cell   13:14
census   32:23
 33:12   38:8, 9,
 13   40:8   54:11,
 14, 18, 25
Center   62:16
certain   30:14
 37:19   84:21
 93:20   108:17

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

Certainly   49:12
52:19   85:17
112:6
certified   76:12
115:15, 17
certify   7:4
115:4, 9, 13
chair   26:25
27:6   29:10, 15
30:6, 13, 17
31:17, 23   32:4,
7, 9   53:3, 5, 7,
13   54:20, 23
56:5, 9   57:3
65:3, 20, 22
82:4, 23
chairman   10:10
28:7, 9
challenge   24:10
challenged   24:13
chance   49:10
78:7
chancellor
55:20   58:7
change   21:9
54:13   78:5
84:1   103:11
changed   28:16
54:25
changes   38:12
characteristics
72:23
chat   19:13
35:4   36:13, 15,
17   46:21   61:2
63:17   76:10
94:3   100:2
child   16:24, 25
choice   74:7
choose   102:8
Chris   18:19, 23
cited   85:21
citing   84:24
85:10
city   71:25
72:3, 6
CIVIL   1:7   4:3,
10   7:5, 14
claim   110:2, 3
clarify   12:10
51:19

close   62:17
85:18   87:6
clue   85:12, 19
86:2
cochair   9:19
28:24
cochairs   29:11
colleagues   108:2
collection   21:8
college   16:1, 3
55:19   62:8, 17,
20   103:14
colleges   62:5,
10   103:15
come   21:19
52:10   86:10
87:15   108:25
comes   25:14
43:23   105:14
106:7   107:7
109:10, 22
110:16
commencing   1:24
commissioner
7:3   115:22
committee   9:20
20:14, 17, 21
21:12, 13, 15,
18, 20, 22   22:1,
10, 17, 19
26:22, 23, 24,
25   27:10, 13,
14, 20   28:2, 17
29:16   30:1, 7,
18, 21   31:14,
18, 23   32:3, 4,
6, 10   33:21
34:9, 13, 18
35:3   36:14
37:11   38:17,
19, 24   39:4, 5
40:6   42:7, 9
46:13   53:2
54:20, 23
55:15   56:5, 10
57:3, 23   58:24
59:21, 22   60:7,
10, 14   62:25
63:25   64:18
65:4, 21, 23
66:16   70:13
74:13, 20   75:6,

10, 12, 13, 14,
18, 21, 24   76:3,
13   77:9   79:1
82:5, 24   85:15
86:20   90:18
91:18, 22, 25
92:20   93:6
98:7, 10
101:25   102:6
committees
21:19   26:18
27:1, 4
common   71:2, 6,
12
communicated
60:6
communication
59:12
communications
58:23
communities
70:19   71:1, 10,
14, 19, 22   72:4
73:8
community   55:19
60:4   62:17, 20
71:7, 17, 18, 21,
25   72:2, 7, 8
73:6   103:14, 15
compare   67:9, 12
complaint   17:24
complete   10:24
completed   17:23
99:19
completely   10:19
compliance   2:4
30:4   31:4
39:12   65:7, 23
66:8, 11   70:21
77:20   91:20
97:20
complied   52:3,
13   66:6   69:9,
13
complies   66:20
67:4
comply   59:13
64:20, 24   65:1,
2, 10, 19   68:1
82:7
complying   65:13

composed   20:21
27:20
composition   78:5
computer   40:8
computer-aided
115:6
concerned   79:9,
11, 12
concerning   17:22
concerns   79:13
102:19
condition   11:5
conduct   33:6
81:18
conducted   11:10
81:19   92:9, 10,
12
conducting   13:12
confederate
105:15   106:7
confer   53:7, 10
54:12   56:6, 11
conferring
53:13, 24   54:24
confident   92:7
confirm   94:21
Congratulations
16:20
congressional
18:7   20:8
21:3   23:24
24:5   32:15, 20
33:2   34:10, 15
38:11, 15   42:5,
10, 13, 19   45:3,
16, 24   46:3
48:5   50:25
51:7   56:23
65:16   68:22,
24   69:1, 3, 6,
7, 13   70:4, 5
71:4   73:11, 20
76:2, 9   80:8
86:23   87:25
90:15   91:24
92:4, 9   93:13
95:1   96:6
112:18
Congresswoman
86:15   87:3
conjunction   60:3

Case 2:21-cv-01530-AMM   Document 89-3   Filed 12/27/21   Page 35 of 244

Evan Milligan,et al v. John H.Merrill, et al.                    Jim McClendon
                                                                12/17/2021

conservative
  25:15, 16, 18,
  20, 22
conservatives
  25:24
consider   43:9
  46:4, 14   56:16
  60:17   62:4
  71:19   73:5
  85:22
considerable
  77:11
consideration
  40:6   52:22
  63:14   73:12,
  21   91:19, 21,
  24   113:1
considered
  21:18   42:6
  52:19
considering
  62:7   108:16
constituents
  102:1
constitution
  38:5, 6   39:17
  65:12   67:11
constraints
  103:8
construed   39:15
consulted   41:8
contact   103:15
continuing
  16:12   50:10
continuum   55:2
contrary   39:17
convenient   93:7
convening   74:17
  92:2
conversation
  13:18   67:16
  68:6   79:16
  85:14
conversations
  69:17, 23
converts   27:24
coordinate   55:21
copy   20:4
  101:16, 22
core   42:22
  73:10, 11, 19

Correct   14:20
  15:1, 19   16:15
  18:25   23:12,
  13   28:4   32:8
  33:13   44:24
  46:10   54:2
  75:4, 7   88:12
  97:16   99:14
  103:4   104:7,
  10, 14, 15
  109:14, 15
  111:17   112:8,
  11   113:2   115:7
correcting   29:7
correctly   96:5
counsel   1:18
  2:10, 11   7:6
  11:15   18:8, 10
  115:10
count   111:21
  112:9
counted   66:15
counties   72:14,
  17, 18   73:8
County   17:7
  72:7   102:2
  104:25   115:2
couple   18:15
  55:25   85:25
  111:3
course   27:5
  29:24   31:1
  33:3   57:15
  66:10
courses   16:8,
  10, 13
COURT   1:1   2:5
  7:1, 15   11:13,
  19, 20   15:4
  19:14   20:4
  30:3   31:5
  35:5   36:1
  44:7   46:24
  61:4   63:17
  66:18   77:21
  115:14, 15
courtroom   10:21
courts   30:5
  31:5   86:9
cover   19:5
created   47:19

52:4, 14
creating   93:22
criminal   109:10,
  13
criteria   70:18
  91:12, 14   97:19
current   32:21
currently   17:10,
  12   26:5, 21
cut   26:13   37:6
cutting   26:14
cycle   23:11
  84:6   88:22

< D >
DAN   4:16   8:15
  106:21
data   32:23
  33:3   35:2
  38:8   40:9
  53:18, 20
  54:10, 14, 25
  57:16   70:14
  73:12, 21, 23,
  24   74:1   77:16
  89:6
date   7:4, 16
  14:17   30:2
  57:20   58:21
  59:4   60:5
  64:15   70:11
  75:22   88:24
  92:1, 21   105:7
dates   33:19
  55:22   58:18
  63:6   74:18
DAVIS   5:2   6:4
  7:20   18:19, 24
  22:22   36:15
  51:2, 5   106:12
  111:1, 4, 7
  113:6
day   58:21
days   102:16
DC   3:22   4:20
deadline   59:7,
  9, 10, 13, 21, 23,
  25
deal   18:6
dealing   94:25

debate   20:25
  21:2, 11   94:6,
  23   95:10
December   1:24
  7:7, 16   115:17
decennial   38:8
decide   42:10
  53:16   59:7
  74:2   112:20
decided   81:15
  82:9
deciding   32:22
decipher   48:21
decision   31:20
  57:4   81:8
  112:1, 15
decision-making
  55:8
decisions   32:24
  53:25   108:17
decrease   33:5
DEFENDANT   5:1
  9:18   10:12
  47:17
Defendants   1:12
  5:9
Defense   3:13,
  20   9:12
define   72:20
  108:15
Defined   89:25
definitely
  105:18
definition   71:7,
  8, 10, 14
  107:10   108:19
degree   16:2
delay   57:16, 17
delegation   33:2
  34:15   42:13
  45:17   56:23
  60:13   69:3, 6,
  8
democratic
  105:12   106:2,
  5   107:5, 15, 19,
  21, 22   108:1, 2,
  10, 21   109:8,
  20   110:12
democrats
  107:20   109:2,
  13   110:3

demographer
 31:17   41:21
 67:13
demographics
 42:25   43:1, 2,
3
department
 20:15, 18   45:2
 47:24   48:3
 50:11
depend   82:13
dependent   66:1
deposed   10:3
 23:16
DEPOSITION   1:9,
19   2:2, 3, 13
 7:12   9:15, 18
 11:10, 14   13:2,
12   17:25
 18:13, 23
 19:18   22:5, 14,
21   90:11
 104:9, 12
 113:12   114:4, 7
depositions   2:6
describe   47:3
description
 89:23, 24
designate   58:8
determine   38:10
 54:21   59:15,
23   66:19   67:4
 91:15
determined
 55:13   92:3
determining   60:1
DEUEL   3:18
 8:13
develop   40:13
developed   59:25
Dial   32:11
D-I-A-L   32:13
die   86:8
differ   105:13
 106:5   107:5
 108:21   109:8,
20   110:12, 16
difference
 20:16   27:17
different   27:4
 70:1, 2   71:17

 109:12, 13
diluting   65:9
dilution   39:13
direct   71:4
disapprove   34:16
disapproving
 34:19
discrimination
 77:18, 23   78:2
 109:23   110:18
discriminatory
 48:6
discuss   29:5
 30:25   56:12
 60:9, 12, 14
 69:19   81:13
 89:4   102:24
 103:1
discussed   22:4
 78:19, 22, 23
 83:14, 15   89:2,
6
discussing   20:6
 28:22   47:18
 50:9   74:21
 75:11   90:13
Discussion   8:8
 30:14   95:5
 102:10   107:8
discussions
 28:14
disparate   109:12
distances   102:4
DISTRICT   1:1, 2
 7:15, 16   24:23,
25   26:1   33:4
 42:25   43:5, 12,
16   48:5   71:4
 78:6, 7, 12
 80:8   81:2, 6
 84:7, 15, 19
 85:9   86:17, 23
 87:9, 18, 19, 22
 88:3, 8, 14
 90:15, 16, 21,
25   92:9   93:13
 96:3, 7, 14
 97:5, 7   112:17,
22
districting
 39:16   52:3

districts   18:7
 24:6, 10   38:12
 39:10   42:19,
22   43:10   46:5,
15   47:19
 50:24   51:7
 52:5, 15   65:6
 70:5, 19   73:10,
12, 19   88:10
 91:2, 6, 9, 13
 93:10, 23   97:8,
9, 11   112:25
doctorate   16:4,
6
document   19:14,
17, 20, 25   20:5,
10, 12, 23   21:6
 36:1, 8, 10, 21
 37:2, 5, 8, 13,
14, 19   47:2, 12
 61:5, 24, 25
 64:6, 10   70:11
 77:2   94:5, 7
 100:14, 15
 101:11
documents   13:17,
21, 22, 25   14:2,
3   19:1, 3
 22:13, 15, 24
 23:2   113:20, 21
doing   62:7
 66:14   82:12
 83:14, 25   84:19
DOJ   47:25
DORMAN   5:11
 7:23   18:11
 35:14   49:14
 66:2   82:17
 92:16
dosher@elias.law
 4:21
Dowdy   8:2
dozen   58:25
draft   37:14
 112:18
drafted   37:13,
15, 17, 19, 21
 40:18   112:25
drafting   42:18
Drake   61:20
draw   74:5
 75:11

drawer   30:24
 33:1   42:2
 53:8, 11, 14, 25
 54:13, 19, 25
 55:6, 13   56:7,
12   66:2   67:18
 68:6, 12, 16
 69:2   82:6
 88:5, 20   89:21
drawing   32:15
 34:9   41:9
 43:9   68:24, 25
 89:16
drawn   24:11
 34:19   39:10
 65:7   68:17
 73:25   87:18,
19   91:3
draws   28:13, 25
 29:19   30:20
drew   88:16
 97:8
drop   19:13
 61:1   63:16
 76:10   100:2
dropped   36:12
dropping   35:4
 46:20   94:3

dross@naacpldf.org
 3:23
dues-paying
 104:24
duly   8:22
 115:13
duties   31:2, 3
dwalker@balch.com
 5:16

< E >
earlier   12:9
 23:10   73:9, 18
 85:21   103:2
 107:9
early   99:18, 21
easiest   96:12
easily   36:17
east   72:11
EBENSTEIN   4:1
 8:17

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

education   16:12
  26:23, 24
  38:12, 16   56:23
Educational
  3:13, 20   9:12
effect   2:4
  65:9
effective   48:8
  50:5
Eight   100:6, 7
either   97:10
electability
  86:17
elected   20:21
  24:16, 19, 20,
  22   26:8   30:1
  32:4, 5   70:15
  87:4   105:5
election   78:12
elections   43:24
electoral   48:8
  50:5
Elias   4:18
email   15:9, 12,
  13   58:22
  100:1   101:17,
  23   103:12
employed   17:10,
  12
employees   20:20
endeavor   64:20
ENDED   114:7
endorsed   25:5
ends   114:3
England   79:4, 8
  83:11   84:14
  86:4, 6, 21
ensure   66:6, 11
  82:5   88:9, 13
ensuring   65:23
  69:8, 12   97:21
entail   53:14
error   80:18
errors   85:17
essentially
  28:10
established
  38:16, 23   39:20
et   1:6, 10
  7:13, 14
ethnic   39:14

evaluated   79:20
evaluation   77:16
EVAN   1:6   7:13
  8:1
events   53:8, 22
everybody   41:17
  63:11   103:17
evidence   2:14
evidenced   115:15
exact   33:23, 24
  88:24
exactly   19:25
  27:11   33:22
  41:18   78:14
  83:25   107:10
  113:5
examination   7:8
  9:9   104:1
  111:4
examined   8:22
example   28:14
  44:3   70:6
  82:7
exception   99:4
exceptions
  105:19
Excuse   106:20
  111:18
exercise   48:8
  50:5   83:19
exercised   83:6,
  7
exercising   83:8
Exhibit   6:9, 11,
  13, 15, 17, 19,
  21, 23   19:15
  35:5, 7, 22
  36:2, 5, 7, 24
  46:24, 25   47:9
  49:22   51:19
  61:5, 12   63:17,
  18   64:3   70:17
  76:15, 22
  79:23, 24, 25
  84:11   90:12
  94:4, 5, 13, 16
  98:19   100:5,
  10, 22, 25   101:3
exhibiting   73:19
exhibits   74:24
existing   32:17,

19   73:11
expect   18:16
experience
  82:14, 15
  108:20   109:1,
  6, 18   110:14
experienced
  89:12
experts   66:15
Expires   115:23
explaining
  41:21, 22
express   44:10
  79:13
expression   83:21
extent   70:21
extra   77:18
eye   41:12, 13

< F >
Facebook   15:17,
  18
fact   21:12
  37:10   73:23,
  24   74:14
  77:19   113:4
factor   96:19
failure   50:12
fair   44:10
fairly   85:16
familiar   37:4
  48:10   64:9
  66:17   67:7
  77:4, 6
far   36:16
  50:11   68:2
  70:5
fast   73:14, 16
feasible   102:6
Federal   7:4
  38:8   97:20
  98:3
feel   60:5
feeling   107:21
felt   83:19
  92:7
figure   57:14
  100:18
file   15:4
filed   7:15
final   59:4

61:7   113:17
finalize   99:15
Finally   14:8
financially
  115:11
find   38:25
finish   12:1, 2
  49:9
firm   35:16
first   10:1
  24:16   25:14
  26:8   37:6
  55:25   57:11,
  13, 18   63:7
  67:7   78:3
  81:20   85:25
  88:21   93:2, 4
  95:7   99:18
  100:18   103:22
fiscally   25:16
fishing   72:21
five   63:21, 22
five-minute
  49:6   90:4
FL   3:14
flag   78:9
floor   19:7
  20:24   21:1, 11,
  21   93:6, 21, 24
  94:2, 6, 23
  95:10, 14
focused   62:19
follow   66:17
followed   40:21,
  25   41:6, 8, 24
following   7:9
  33:9, 11   38:14
  40:17   41:1, 10
  90:12   92:19
  102:12   115:16
follows   8:23
force   2:4
foregoing   7:5
Forgive   106:20
form   2:10   9:1
  40:22   50:19
  105:24   106:19
format   20:1
forward   47:18
  56:20   101:22
found   72:12

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

85:17   115:16
Foundation   4:3
four   18:21
fourth   110:10
four-year   26:2,
4
frame   55:18
franchise   48:9
50:6
Friday   100:8
front   36:2, 8
60:23   67:9
101:12   109:1
full   2:4
28:17   102:9
full-service
35:15
Fund   3:13, 20
9:12   21:23, 24
26:22, 23
FURTHER   2:1, 8
9:23   81:15
113:9   115:9, 13
futile   57:15
futility   83:19
fuzzy   34:4

< G >
gained   108:9
gathered   81:16
General   5:3, 4
21:23, 24
26:22   65:21
105:19   108:10
109:15, 16
generally   53:12
94:22   95:9
105:12, 17, 20,
25   106:2, 5, 7
107:5   108:21
109:8   110:12,
13, 16
General's   7:21
generated   87:17,
19
generically
30:11
geographic   72:10
Gerald   32:11, 12
gestures   11:21
getting   28:2

give   10:23
14:3   49:1
56:13   61:10
64:8   70:6
74:7   77:22
83:17   85:24,
25   103:24
106:10   113:22
given   20:3, 23
34:21, 24
giving   23:8
108:15
glanced   77:5
go   15:24   16:1
21:20   29:22
32:22   34:18
38:20   39:7
41:1   62:23
65:13, 23
66:14, 23
68:19   70:5
84:10   85:4
86:11   89:7
98:11, 17
103:22   110:6
113:25
goal   24:9
42:18, 24   43:5
75:24
goals   42:21
66:8
goes   27:23
50:12   84:18
105:3
going   8:5
9:23   14:11, 15
19:13   20:24
21:1, 11   22:12,
16   27:19
36:15   37:11
40:19   46:20,
23   49:4   53:9,
18, 19   56:4, 9
57:14   61:1
63:16, 18   73:9
76:10, 20   82:3
84:10   86:18
89:6   100:2
102:5   104:16
Good   9:10
37:18   52:25

69:10   70:25
79:5   86:14
Gosh   100:7
gotten   21:12
governing   59:18
103:3
governor   56:15
57:1
Greater   8:2
grounds   2:12
Group   4:18
44:9   104:25
guess   12:12
30:9, 10   44:15,
20   78:3   88:23
89:5   95:3
99:3   101:9, 19
guessing   34:6
guidance   34:21,
24
guidelines   6:12,
18   28:15
36:14, 20
37:11, 12
38:14, 23   39:5,
6, 15   40:20, 21,
25   41:2, 3, 6,
15, 17, 18, 20,
21, 24   42:3
44:25   52:4, 14
64:1, 17   65:20
66:1, 4, 7, 17
70:8, 13   77:21

< H >
half   57:9
58:25
Hall   6:24
58:15   59:5
80:3, 12, 25
83:12   99:24
101:19, 24
102:14   103:6
Hall's   102:19
hand   93:5
handed   101:4
handle   102:22
handled   93:2, 3
handling   21:24
Hang   21:5
happen   81:12

happened   21:23
86:12   109:4
happens   98:6
104:5
happy   35:17
86:15
hard   52:7
61:18
Hatcher   95:17,
20
Hatcher's   96:3,
10, 20   97:12
health   26:22, 25
hear   12:17, 24,
25   68:10   96:8
104:2, 3
heard   68:9, 11
69:23   104:13
hearing   6:16
8:4   99:7, 13
101:25   102:7,
9, 15   107:11
hearings   33:7,
14, 17   55:14,
18, 21, 23   56:7,
21   58:6, 12, 18
59:8, 16, 19, 23
60:2, 9, 15, 18
61:7   62:1, 6
98:11, 21   99:1,
6, 9, 10, 12, 16,
25   102:8, 15,
20   103:3, 7, 9,
12
heart   110:6
held   8:8
60:19   63:13
98:12   99:6
102:15
Hello   111:5, 6
help   28:16
29:25   36:18
52:9   53:8
55:20   62:12
helpful   46:21
helps   48:13
hereinafter
38:18
hesitant   107:12
high   15:24
88:14
highly   83:13

Hinaman   88:17,
21, 25   89:9, 14
112:16
Hinaman's   88:18
historically
62:4
Hogan   3:6   8:11
hold   33:21
62:25
home   19:11
hopefully   20:4
host   62:20
hour   49:5
hours   18:15, 24
98:14   99:1
house   10:10
15:7   20:15
22:2   24:5, 10,
24   26:1, 6
27:3, 6, 21
28:7, 9   29:10,
15   30:6, 17
31:17, 23, 24
32:3, 4, 6, 7
45:19, 25   46:1
49:24   53:6
57:3   60:20
64:12   71:4
99:5   112:3, 13
Houston   16:4, 5
hundred   37:19
79:5
hypothetical
82:2, 3, 13

< I >
idea   37:18
56:14   62:9
78:15   110:5
identification
35:23   36:25
47:10   61:13
64:4   76:16
94:14   100:23
II   65:6   70:16
III   39:8   70:17
imagine   37:22
immediately
74:15
implemented   48:2
importance   41:16

important   11:18,
24   29:25
41:20   97:18, 24
inaccurate
49:17   50:2, 13
inappropriate
98:5
inaudible   24:23
33:9   74:25
include   111:15
112:17, 21
including   39:12
112:7
income   73:2
increase   33:5
increased   84:3
incumbent   78:4
96:6
incumbents
96:13   97:13,
21   98:7
individual
108:16   112:1,
15
individuals   82:6
information
12:8   15:3
34:25   40:4
53:12   56:18
81:15   83:17
86:16   93:4
initially   53:23
95:3
injustice   43:23
input   55:17
102:17
inside   66:4
insist   82:11, 23
instruct   29:4
112:16
instructed
12:21   13:5
instruction
29:20
instructions
89:8
interest   70:20
71:1, 2, 7, 11,
13, 14, 17, 18,
20, 22, 23   72:1,
2, 5, 7, 8   73:6

interested
102:3   115:11
interests   71:6
interim   21:18,
19   27:18
interpreted   30:5
interviewed
51:20   88:6
introduce   42:11
45:15, 21   48:20
introduced
45:25   48:18
75:25   92:5
93:20, 23   94:1,
2   95:16   102:11
introducing
91:21
introduction
34:16   40:4, 17
introductions
8:10
involved   10:14
55:7   57:4
68:24, 25   70:7
103:17
involvement
31:11   45:1
issue   20:8
23:24   78:1, 2,
10   81:14   86:5
105:14   107:7
108:25   109:3
110:16
Issues   21:7
30:25   70:2
108:2, 7
items   28:21
its   40:4

< J >
Jackson   8:2
JAMES   1:10, 20
5:9   7:7   8:21
9:25
J-A-M-E-S   10:2
January   14:19
jebenstein@aclu.or
g   4:6
Jefferson   17:7
JIM   5:2   7:12,
20, 24   18:19,

24   49:23   50:9
103:22   111:7
114:4
jim.davis@alabamaa
g.gov   5:7
jim.mcclendon@alse
nate.gov   15:14
jimmcc@windstream.
net   15:13
job   41:25
55:4   66:11
68:20   81:16
89:22, 23, 24
jobs   66:10
JOHN   1:10   5:1
7:13, 21
joint   38:17
40:15
Jones   14:22
judge   10:20
judicial   45:7,
12
JULIE   4:1   8:17
July   99:17, 18,
22
jump   81:17
June   58:20
59:9, 11   60:8
99:19
justice   45:2
47:25   48:3
50:11   109:10,
13

< K >
KAITLIN   4:8
Katherine   9:2
KATHRYN   3:11
7:25   9:11
15:2   21:5
23:4   35:7
36:11   49:4
65:16   100:13
113:16
keep   13:14
30:2   42:21, 24
43:1, 5   70:25
71:2, 3
kids   16:21
kin   115:10
kind   57:23
76:21

knew   33:4
89:21
know   12:6, 9,
14   14:9, 16
17:19   18:5
19:24   27:17
29:12   30:1
31:10, 20
33:22   37:13,
15, 17   40:20
42:1, 4   43:3,
4, 7, 19   44:15,
17, 18, 21, 22
45:19   46:21
48:17   57:20,
21   58:3, 19
59:3   60:16, 22,
24   61:2   63:4,
11   69:10, 22,
24   72:14, 21,
24   74:6, 8, 9
77:3   78:3
79:17   82:2
83:1, 3, 5, 8
88:2   90:1
91:12, 14   92:8,
10, 12, 13   96:5
98:16   100:14
105:16   107:19
110:2   111:23
112:12   113:18
knowledge   12:14
46:6   59:20, 24
67:10   68:23
86:9   88:15
103:5, 10   113:3
known   41:24
79:11
ksadasivan@naacpld
f.org   3:16
kwelborn@aclualaba
ma.org   4:13

< L >
landed   101:10
language   14:7
Large   1:22
7:3   62:19
largely   13:2
larger   28:2
Laura   59:5
80:3

law   1:22   3:5,
12, 19   4:2, 9,
17, 18   5:12
24:12   25:24
29:9   30:1, 4
31:5   35:15
59:16, 18
66:18   97:18,
20   98:3   103:4
laws   2:5   39:11
lawsuit   17:22
23:4, 7, 8, 11
lead   47:22
leadership   28:11
leading   2:11
LeAnn   1:21
7:1   115:22
led   48:19
left   61:21
Legal   3:13, 20
9:11   67:6
82:13   103:8
legislation
108:3, 7
111:13, 19, 20
112:5, 7
legislative
9:20   23:23
26:18   27:9
36:13   38:11,
15, 17   40:5, 7
45:22   56:15
60:13   61:6
63:8   75:2
92:17   94:24
Legislators
39:24   40:12
56:22
legislature
17:23   26:20
33:6   34:17
38:7   40:10, 15
46:16   76:1
97:20   104:19
105:11   107:4,
20, 25   108:6,
20   109:7, 19
110:15
legislature's
38:17
lest   40:20

Letetia   8:2
letter   58:22
letting   77:3
level   73:2
liaison   62:12
103:14
Liberties   4:3,
10
license   16:13
licensed   115:14
Likewise   11:24
line   67:19
68:7, 17, 19
71:9
lines   32:18, 19,
20, 23   66:3
73:25
list   52:21
listen   54:16
listening   73:14,
16
litigation   10:9
20:3   111:16, 18
little   14:16
27:17   52:9, 10
53:17   84:4
98:11
living   17:2
LLP   3:6
loaned   55:20
local   103:15
location   60:1
102:3
locations   55:22
58:11, 18
102:1   103:16
log   113:17
logical   84:19
long   16:18
25:25   26:19
77:2   86:1
104:18   105:3,
5, 7
longer   78:7, 11
look   13:24
14:2   22:14
23:2   29:9
35:1   47:5
49:2, 10   61:18,
25   64:8, 14, 15
67:20   74:2
79:18   84:13,

15   87:2   94:17,
20   95:8
100:17   101:3,
13
looked   19:5
22:15, 23
41:12, 13   58:13
looking   36:22
52:20   64:14
101:11, 18, 23
looks   19:24
37:4   47:2
61:17   64:9
77:4, 5   100:19
Los   3:8
losers   98:8
lost   48:21
lot   53:19
71:17   86:16
107:19
loud   38:4
Lovells   3:6
8:12
low   88:11
lower   73:2
Lyman   47:17

< M >
ma'am   29:7
40:24   45:10
main   22:9
54:4, 5, 9   73:4
maintain   16:13
73:19
maintaining
73:10, 11, 18
majority   43:13,
17   46:5, 15
47:19   50:24
51:6   52:4, 15
93:9, 13, 23
96:3   97:4, 7,
10   112:17, 21
making   9:14
31:4   50:15, 21
108:17
manner   55:5
60:1   103:3
map   20:8   29:1,
19   30:20   33:1
34:9, 13, 16, 19
35:1, 2   41:9

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

42:2, 10, 12, 16
45:7   46:15
48:18   53:7, 11,
14, 25   54:13,
19, 24   55:6, 13
56:7, 11   66:2,
20   67:4, 18
68:6, 12, 16, 22,
24   69:1, 2, 8,
13   73:20
75:11   76:6, 7,
9   82:6   84:20
87:25   88:5, 20
89:21   92:4, 5
93:3   95:16
96:5, 20, 23
97:3, 12, 19
102:3
**map-drawing**
41:2   66:6
67:17
**map-making**   64:19
**maps**   28:13
32:16   34:10
40:9   74:5
75:25   76:2
88:16   89:16
93:9   102:10
**mark**   19:14
35:5   36:1
46:24   61:5
63:18   76:21
94:4   100:4, 10
**marked**   35:23
36:25   47:10
61:13   64:4
76:16, 24
94:14   100:23
101:4
**marks**   7:11
50:4
**Maroney**   1:21
7:1   115:22
**married**   16:16,
18
**materials**   13:18,
20   89:15
**matter**   7:13
98:4   109:15, 16
**McCLENDON**   1:10,
20   5:9, 10
7:7, 12, 24

8:21   9:10, 25
19:20   35:5, 25
36:2   37:3
46:24   47:13
49:9, 23, 25
50:10   51:18
58:1   61:5, 9
63:18   64:7
65:19, 22
70:17   79:23
80:6   82:19
84:10   90:10,
12   94:4, 18
95:5, 8, 23
98:19   100:4,
10   101:11
104:2   114:4
**M-c-C-L-E-N-D-O-N**
9:25
**mean**   13:24
24:7   25:13, 18
27:9, 11, 14
29:16   38:24
67:22   76:7
78:17   81:16
87:1   97:7
106:15, 18
**Meaning**   8:25
11:14
**means**   39:4
106:16
**meant**   22:12
30:22   44:6
87:2   111:19
**media**   15:15
**medication**   11:1
**meet**   18:23
28:12, 23, 24,
25   30:19
56:22   88:21, 25
**meeting**   21:13,
15   22:19
28:17   30:20
35:3   57:18, 23,
25   63:12
70:12   74:12,
20   75:5, 13, 21,
23   76:13   77:8,
11   78:19, 21
83:15, 23
85:14, 15
86:20   90:18

92:4, 20   99:5
101:25
**meetings**   6:24
29:2, 3, 6, 18
30:8, 23   33:20
34:2, 5   55:15
56:2   62:10, 21,
22, 24   63:2, 3,
4, 6   74:15, 25
75:9, 17   93:8
101:21   107:19
**meets**   28:12
**member**   26:5, 7
104:21, 24
105:2, 4
107:22   111:23
112:12
**members**   20:13
22:10   27:21
30:1   32:3, 6
33:2   34:21
40:10   42:12
57:2   58:24
60:6, 13   69:5,
7   76:3   79:1
91:22   96:6
101:25   102:6,
8   105:12, 13
106:1, 4, 6
107:4, 6, 15, 16
108:6, 22
109:2, 7, 9, 19,
21   110:11, 13,
15   111:9   112:2
**memory**   48:14,
15   75:6
**mention**   44:25
**mentioned**   22:22
71:12
**MERRILL**   1:10
5:1   7:14, 22
9:13, 19   111:8
**met**   18:14
22:22   33:1
69:2   75:1
92:1
**MICHAEL**   3:4
8:11
**michael.turrill@ho**
**ganlovells.com**
3:9
**middle**   72:11

**MILLIGAN**   1:6
3:3   7:13   8:1,
12, 13, 18   9:13,
18   113:11
**million**   84:5
**mind**   23:8
25:15   29:7
49:6, 8   77:3
79:22   84:11
90:3   106:23
110:8
**Ministries**   8:3
**minority**   39:14
46:5, 15   47:19,
23   48:4, 7
50:24   51:7
52:4, 15   65:10
78:4, 8, 11
87:3, 10   88:10
93:23   96:3
97:4, 6, 9
**minus**   64:16
**minute**   78:20
94:17, 20
**minutes**   49:1
**missed**   78:20
**mobile**   14:25
15:23
**moment**   103:24
**Monday**   113:21
**money**   83:20
**Montgomery**   1:23
4:12   5:6, 15
60:18   62:2
72:2, 3   99:5
**Montgomeryadvertis**
**er.com**   6:14
**monuments**
105:15   106:8
**motion**   95:19
**move**   8:6   48:7
52:23   68:6
74:25
**moved**   67:19
95:23
**multiple**   73:8
74:7

**< N >**
**N.W**   3:21
**NAACP**   3:13, 20
8:3   9:11

name    9:10, 24
  10:1   72:16, 17
  92:16   115:16
names    7:19
nature    25:20, 22
nay    97:1, 2
NE    4:19
necessarily
  68:12   73:7
necessary    2:9
  38:10
need    9:1   14:8
  28:15   31:2
  43:18   49:5
  56:20, 21
  67:20   81:6, 22
  82:18   84:16
  89:19, 20
  102:23   109:25
  113:16, 21
needed    22:9
  33:4   55:4
  56:13   80:9
  81:15   82:9
  83:18   86:24
  90:15   91:3, 7
neighborhoods
  70:20
neither    65:9
  115:9
never    74:10
  83:7   86:10, 12
  104:4
New    3:15    4:5
  74:10
news    47:16
nodding    11:21
normally    77:19
North    115:23
NORTHERN    1:2
  7:16
Notary    1:21
  7:2
notes    19:6
notice    9:17
  96:12
November    6:22
  94:6   95:10
Number    7:14
  14:23, 25   15:8
  22:15   33:23,
  24   39:19

40:14    47:1
  75:23   85:20
  86:7, 10, 13
  87:15   98:22
  101:5   102:13
  115:16
numbers    15:5
  33:4   54:18
  87:17
numeral    39:8, 25

< O >
oath    10:17
object    12:18,
  25   24:9   90:22
Objection    40:22
  50:19   105:24
  106:12, 14, 19
objections    2:9,
  12   9:1   12:19
  13:2
objectively
  102:16
objectives    70:12
obtaining    45:2
occur    33:17
  68:21
occurred    98:14
  99:1, 12
October    6:20
  75:20, 23
  76:12   77:8
  78:19   83:23
  85:15   86:19
  90:17   92:3
offered    2:14
  76:9   95:20
Office    5:4
  7:21   15:6
  20:19   24:17
  26:3   40:8, 11,
  18   101:21
offices    1:22
official    9:19
  105:6
officials    70:15
Oh    13:24
  35:13   47:6
  63:3   71:15
  78:25   94:9
  104:4

Okay    8:9   13:6
  19:23   25:25
  27:12   29:21,
  23   35:10
  36:18   38:25
  45:9   47:6
  51:10   52:6
  58:3   61:23
  64:1   77:7
  78:25   85:24
  88:3, 8   93:18
  94:9   95:22
  96:1   98:24
  100:20, 25
  101:6   103:24
  105:10   106:22
  108:14   109:11
old    16:25
once    33:3
  54:25   66:3, 22
  82:12   88:6, 7
  109:25
ones    113:22
opinion    67:7
  81:14, 22
  82:14   108:24
opinions    82:20
opportunity
  44:10   46:14
  50:24   93:12,
  16   96:22   97:9
  102:17
optometrist
  16:14   17:11
Optometry    16:7,
  13   17:9
oral    7:8
order    21:21
  25:24   55:3, 4
  59:13
ordered    83:18
organizations
  110:2
original    62:9
OSHER    4:16
  6:3    8:15
  103:21   104:1
  106:22   110:21
  113:14
outside    45:24
  75:10   81:16

overlapped    99:10
overseeing    66:5

< P >
p.m    1:24   7:17
  9:5, 8   51:14,
  17   90:6, 9
  99:2   114:5, 7
P.O    4:11
PAGE    6:8
  37:24   39:7, 22
  40:2   47:21
  49:22   79:22
  80:1   84:12, 14
  86:19   95:4, 18,
  20, 24, 25
  100:18   101:1,
  3, 6, 7, 8, 9, 10
  102:12, 13
paid    17:17
Paige    5:20
paired    97:14, 22
paper    66:4
paragraph    37:25
  38:22   39:23
  47:21   50:9
  84:14
paragraphs    39:9
  49:25   50:7
  70:22
Pardon    20:11
  68:14   89:3
part    28:10
  37:6   50:14
  52:20   55:1
  67:16   71:13,
  16   91:19   99:21
participate
  102:4
particular
  22:18   65:24
  67:19   68:17
  70:12
particularly
  71:2
parties    1:18
  2:11   102:3
  110:15   115:10
parts    72:6
party    23:11
  25:2, 4   104:22
  105:2, 5, 12, 13

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

106:*2, 5, 6*
107:*5, 6, 16, 19,*
*22* 108:*1, 2, 10,*
*11, 21, 23*
109:*8, 9, 20, 21,*
*25* 110:*1, 4, 12,*
*13*
**pay** 23:*5*
**PDF** 101:*7*
**pending** 14:*10*
108:*3, 6*
**people** 110:*2*
**percent** 37:*19*
64:*16* 79:*5*
80:*9* 84:*3, 23*
85:*10, 20* 86:*7,*
*11, 12, 25* 87:*9,*
*15* 90:*17, 21*
91:*1* 96:*17*
**percentage** 84:*21*
**percents** 86:*14*
**perception** 73:*1*
**period** 27:*23*
28:*3* 30:*15*
**permanent** 9:*20*
27:*9, 14, 20*
38:*17*
**permit** 39:*16*
**permitting** 46:*4*
**person** 28:*13,*
*25* 29:*19*
30:*20* 41:*9*
42:*2* 58:*1*
69:*4* 78:*4*
88:*7, 8*
**personable** 82:*20*
**personal** 12:*14*
15:*3, 12, 15*
**personally** 57:*13*
**personnel** 55:*20*
**phone** 8:*7*
13:*14* 14:*25*
15:*5, 6*
**phrase** 29:*8*
**pick** 102:*8*
**picking** 98:*8*
**picks** 86:*13*
**pit** 98:*6*
**pitted** 96:*6*
**place** 8:*6*
70:*14* 77:*17*
93:*4*

**Plaintiffs** 1:*8*
3:*3* 4:*15* 8:*1,*
*12, 14, 16, 18*
9:*13* 103:*20*
111:*2* 113:*11,*
*15*
**Plaintiff's** 6:*9,*
*11, 13, 15, 17,*
*19, 21, 23*
35:*22* 36:*24*
47:*9* 61:*12*
64:*3* 76:*15*
94:*13* 100:*22*
**plan** 40:*3*
45:*3* 46:*4*
47:*18, 22* 48:*1,*
*2* 49:*24* 50:*10,*
*25* 51:*7* 52:*2,*
*13* 58:*10* 65:*8,*
*17* 91:*15* 95:*1*
96:*4, 10*
111:*25* 112:*14,*
*18, 21*
**planning** 57:*6*
**plans** 39:*19, 23*
40:*17* 42:*6*
45:*16* 93:*13*
**play** 35:*17*
58:*5*
**please** 7:*18*
9:*23* 10:*1*
12:*1, 6, 9, 12*
13:*14, 17* 14:*2,*
*9* 37:*24* 38:*2*
39:*7* 45:*10*
47:*4* 80:*16, 23*
81:*4* 84:*11*
85:*6* 91:*5*
94:*18* 100:*4*
**plus** 64:*15*
**point** 12:*7*
24:*4* 32:*14, 15,*
*17* 42:*15* 54:*4,*
*6, 8, 9* 56:*25*
86:*18* 107:*14*
**points** 6:*10*
19:*6, 23* 20:*7*
21:*7, 8* 22:*3,*
*7, 8, 9, 13*
23:*1* 35:*8*
93:*7*

**polarization**
69:*20* 77:*12,*
*14, 24* 80:*14,*
*15* 81:*25*
84:*25* 85:*11,*
*23* 90:*20, 24*
**polarized** 78:*17*
79:*9, 14* 80:*4*
82:*10, 24*
**policies** 25:*19*
64:*21, 24* 65:*2*
**policy** 25:*21*
26:*24* 39:*16*
65:*24* 70:*16, 24*
**political** 25:*2*
70:*20* 71:*2, 6,*
*12*
**polls** 44:*11*
**population** 33:*3,*
*5* 38:*12* 40:*9*
43:*6, 13, 17*
47:*24* 48:*4*
80:*8, 10* 84:*1*
86:*23* 87:*9, 21*
90:*14* 96:*16*
**portion** 77:*11*
**possible** 10:*20*
70:*25* 71:*5*
**potential** 69:*18,*
*24* 84:*24* 85:*22*
**power** 82:*4, 23*
**practicable**
70:*21*
**precedent** 97:*24*
**preclearance**
39:*20* 44:*25*
45:*3, 7, 12*
**preference**
108:*16*
**premed-type**
16:*10*
**preparation**
18:*17, 22* 93:*7*
**preparations**
28:*11*
**preparatory** 14:*7*
**prepare** 18:*12*
22:*14* 57:*12*
92:*22, 25*
**prepared** 56:*14*
**preparing** 58:*17*

**PRESENT** 5:*19*
7:*18* 18:*21*
93:*5*
**presentation**
40:*5*
**pretty** 16:*10*
28:*19* 36:*16*
53:*6* 72:*10*
87:*13*
**previously-**
**approved** 48:*5*
**primary** 25:*3*
42:*24* 43:*5*
**principles** 52:*3*
**Pringle** 18:*20,*
*23* 22:*23* 55:*9,*
*13* 57:*4* 104:*8*
**prior** 2:*14*
20:*24* 21:*1, 11,*
*12* 22:*18*
26:*11* 54:*10*
63:*13* 64:*19*
74:*16* 91:*17*
92:*2*
**privilege** 90:*23*
113:*17*
**probable** 83:*13*
**probably** 29:*24*
46:*22* 57:*8*
61:*23, 24* 63:*8*
66:*25* 67:*1, 15*
73:*3, 4* 85:*18*
86:*16* 89:*6*
101:*16*
**problem** 44:*1, 2,*
*5* 49:*12* 67:*20,*
*21, 22* 68:*7*
97:*3*
**problems** 43:*23*
**Procedure** 7:*5*
**proceedings** 7:*9*
115:*5, 8*
**process** 22:*16*
27:*25* 28:*6, 12*
33:*7* 34:*9*
37:*12* 39:*20*
40:*5* 41:*2*
45:*12* 52:*24*
53:*17* 57:*7, 12*
64:*19, 23* 65:*3*
66:*3, 6* 67:*17*

70:7   88:19
89:15   91:19
**produce**   74:3
84:20
**produced**   20:2
39:23   47:16
67:9, 13   100:16
**production**
113:19
**programs**   108:18
**projected**   56:19
**proposals**   40:13
**proposed**   40:3
45:3, 15   68:19
96:23   97:19
102:2, 7
**proposing**   45:6,
11
**protections**
39:12
**proved**   42:13
57:15
**provide**   11:3, 7
40:11   89:8, 14
**provided**   20:7
38:9
**provides**   43:24
48:15
**providing**   102:17
**Public**   1:21
6:16   7:2
24:16, 17   33:6,
13   40:4   55:14,
17, 21, 23   56:7,
21   58:6, 12, 18
59:8, 15, 18, 23
60:1, 9, 14, 18,
19   61:6   62:1,
6   98:11, 21, 25
99:6, 7, 9, 10,
12, 13, 16
102:7, 9, 17, 19
103:3, 7, 9, 12
105:15   106:8
**pull**   36:19
63:18
**pulled**   94:16
**purpose**   22:7
48:7   65:9
**purposes**   10:18
70:12

**pursuant**   7:4
37:25   38:5
**put**   34:14
35:2   47:18
52:21   58:13
63:10   96:6, 13
**putting**   66:3

< Q >
**question**   9:2
12:2, 5, 8, 18,
20   13:1, 4
14:10, 11
26:16   34:7, 24
37:20   40:23
43:8, 15   44:4
45:20   49:9, 20
51:4   54:7, 15
58:4   64:25
69:10, 11
72:22, 25   83:2
86:1, 3   92:11
95:3   97:25
98:24   105:22
106:1, 11, 24
107:13   109:11,
14   110:7, 8
**questioning**
10:18
**questions**   2:10,
11   11:2, 3, 6,
7   14:16   49:3
85:25   103:19,
20, 21   104:6,
14, 17   111:1
**quick**   67:18
**quickly**   40:19
46:25   51:19
67:1   73:15
77:1
**quite**   18:1
34:23   44:3
53:15   77:1
**quotation**   50:3
**quote**   48:22
49:17, 19, 20
50:2, 7   68:3
90:13
**quoted**   47:20
50:1
**quotes**   50:14

< R >
**race**   43:9
44:10   108:17
113:1
**races**   79:21
**racial**   39:14
42:25   43:2, 3,
22, 23   44:1, 2,
5   69:19   73:12,
21, 23, 24   74:1
77:11, 13, 17,
23   78:2, 10
81:25   84:25
85:10, 23
90:19, 24
**racially**   78:17
79:9, 14   80:3,
14   82:10, 24
**ran**   25:6
**Randy**   88:17, 18
112:16
**RC**   100:11, 15
101:5   102:13
**reach**   53:25
**read**   17:24
18:2, 3, 4
19:12, 22
37:24   38:2, 22
39:7, 8, 22
41:3   44:7
48:23   50:15
80:5, 11, 16, 24
81:4   85:3, 6,
7   86:4
**reading**   2:2
**ready**   49:15
56:25   58:14
**real**   107:12
**really**   19:22
23:4, 5   45:8
48:21   51:19
69:5   77:6
108:24
**reapportionment**
6:12, 18   9:21
27:10, 13, 15
30:7, 18, 21
31:14, 18, 23
32:6, 10   33:21
34:8, 12   36:14
37:10, 16

38:18, 19   39:5
40:6, 8, 11, 18
42:6, 9   53:2
54:20, 23
55:15, 16   56:5,
10   57:3   60:10,
14   61:6   62:25
63:25   64:18
65:4, 22   74:13,
20   75:6, 10, 21
76:3, 13   77:9
82:5, 24   85:15
86:20   90:18
91:25   98:10
**reason**   10:23
49:16   50:1, 8,
12   74:19
108:25
**recall**   12:7
37:11   42:8
45:18   48:24,
25   50:15, 21,
23   51:6, 9
62:15   96:5
**received**   54:14,
25   58:23
59:12   95:12
101:16
**receiving**   54:10
57:16
**Recess**   9:6
51:15   90:7
**recognizable**
42:22
**recognize**   36:8
37:2, 5, 8, 9,
10   47:12
64:13   94:7
101:9, 10
**record**   8:8
9:5, 8, 24
11:20, 21
12:10, 19   13:3
51:14, 17   90:6,
9   113:24, 25
**Rector**   3:14
**red**   78:9
**redacted**   15:3
**redistrict**   38:10
**redistricting**
10:7, 10   17:22
20:14, 15, 17,

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

19, 20   21:17,
25   22:17
  23:11, 14   27:5,
7, 8, 12, 19, 20,
23   28:6, 9, 17
  29:16   30:13
  33:7   38:16
  39:19   40:3, 9,
16   42:5   45:12,
16, 21, 23
  46:13   48:1, 2
  52:14, 23
  56:16   57:7, 12,
19, 22   58:2, 6,
24   59:19   60:7
  63:15, 25
  64:18, 21   65:3,
8, 20   70:18
  75:3   84:6
  88:19, 22
  91:18, 24   92:5,
18, 20   94:23
  98:7, 12
  111:15, 24
  112:7, 14
reduce   48:7
reducing   48:4
reelection   87:7
refer   13:17, 20
  113:22
referred   38:18
referring   19:21
  84:16   86:24
reflection   50:18
reform   109:10,
14
refresh   48:13
regarding   69:18
regular   63:9
  75:13
related   87:8
  108:2
relating   2:5
relationship
  84:23   85:1, 9,
11, 20
rely   82:20
remained   42:19
remedy   43:25
remember   19:10
  21:4   23:5
  24:12   33:18,

19, 23   34:7
  46:1, 2, 19
  48:16   51:20,
23   52:1   58:20
  76:8   77:10
  79:15, 21
  83:25   88:24
  89:1   92:21
  107:11
remotely   13:13
removal   106:7
removing   105:14
Rep   49:23   50:9
repeat   91:5
rephrase   12:6
Reporter   7:1
  8:24   11:13, 19,
20   19:14   20:4
  32:12   35:5
  36:1   43:14
  44:7, 13   46:24
  52:8   61:4
  63:17   113:24
  115:15
Reporting   115:14
represent   7:19
  9:12   20:2
  47:15   76:11
  77:7   95:11
representation
  85:14
Representative
  18:20   48:18
  55:9, 12   58:15
  59:5   60:4
  69:3   78:8, 11
  79:3, 8   80:3,
12, 25   83:11,
12   84:14   86:3,
6, 21   87:12, 20,
24   88:2, 6
  99:24   101:19,
24   102:14, 18
  103:6   104:8
representatives
  20:22   24:24
  26:6   56:1
  112:3, 13
represented   18:8
representing
  88:10   111:7

republican   25:4,
5, 6, 8, 9, 12,
13   104:22, 23,
25   105:2, 4, 13
  106:6   107:6,
16   108:5, 11,
23   109:9, 21
  110:13
republicans
  109:2, 12   110:3
request   6:24
  40:11   59:14
  85:8   99:25
  101:20   113:19
requested   58:15
  91:4, 8   99:24
requesting   58:25
requests   113:23
require   39:15
  73:12   77:23
  102:1, 3
required   12:20
  13:4   16:13
  38:7   66:19
  67:3   68:1
  91:10, 13
requirement
  67:10
requirements
  67:13
requires   70:24
  73:21   102:7
residents
  109:23   110:18
respect   29:17
  54:19, 24
  68:21   70:19
  86:3   90:16
  97:12
respective   1:18
respond   13:4
  102:18
response   80:12,
16   81:4   85:3,
6, 12   96:11
responsibilities
  28:8, 18   30:17
  53:4, 13   54:12,
18, 22   56:6, 11
  69:16
responsibility
  29:17   82:8

responsible
  69:8, 12
responsive   12:8
result   115:11
results   84:24
  85:23
retired   17:9
retreat   47:23
retreats   48:2
retrogression
  39:13   47:23
  48:19   50:4
  51:24
review   19:1
  22:6, 18   28:14
  38:8   58:11
  93:9
reviewed   19:5,
17   22:3
revisions   40:16
rich   72:12
right   51:21
  70:9   71:8
  74:8   80:2, 19
  101:24   106:21
  107:16
Rights   39:8, 18,
21   43:20
  47:25   50:11
  65:7, 11, 14
  66:9, 12, 20
  67:5, 7, 11, 14,
22   68:1, 3, 8,
18   69:9, 14, 18,
24   77:20   82:7
  91:16   97:21
rise   77:22
risk   87:4
Road   14:22
role   10:8
  28:5   29:2, 25
  30:8, 9, 22, 23
  31:16   34:8, 12
  35:18   45:6, 11
  53:1   56:4, 9
  58:5   66:5
  88:18
roll   34:20
Roman   39:25
room   13:13
  104:8
ROSS   3:18   8:13

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

Roughly   10:6
42:19   78:13
RPV   78:16, 17,
18   81:9, 12, 19
83:10, 23
84:17   85:22
86:24   90:16
92:8
R-Springville
49:24
Rule   40:14
59:22
rules   2:5   7:5
21:21   40:15
41:10
rulings   66:18
run   25:1, 8, 9
104:23

< S >
SADASIVAN   3:11
6:2   7:25   8:1
9:3, 9, 11
31:9   35:9, 13
36:12, 18, 21
49:8, 13   51:3,
11   52:10   61:1
63:16, 22
65:18   76:20,
25   90:3   93:17
94:11   100:7,
15, 19   103:18
113:10
safe   87:13
satisfied   42:14
saw   62:14
saying   47:21,
22   48:24
51:23   56:20
80:13   107:23
says   30:4
41:4   61:6
70:19   80:5
86:10, 14
100:11, 15
101:24   102:5,
14   113:22
scan   40:19
77:1, 2
schedule   6:16
31:1   53:8
55:2   58:6, 10

60:23   62:12
98:20   102:7
scheduling
28:16   62:5
school   15:24
17:3
scrapped   59:13
screen   19:15,
19   46:25   61:3
63:19, 24
76:11   94:8
100:3
Scroll   19:23
95:2   100:13
scrolling   100:11
second   47:21
49:6   61:10
64:8   74:12
75:5   84:13
102:12
secret   29:12, 14
Secretary   7:21
35:11   47:16
111:7
Section   39:21
43:20, 22   44:8,
12, 14, 18, 23
45:1   65:6, 11,
14   66:20   70:16
see   19:22, 23
28:15   32:5
36:19   38:1
39:3   50:6, 24
61:2   62:1, 3
63:20, 24   74:1,
9, 16   76:18
77:10, 19   80:2
83:6   89:6
94:8   95:9, 25
103:16   110:1
seeing   51:6
55:2   95:4
seen   64:6, 10
101:14, 15
select   75:22,
24   76:6   103:8
selected   31:6,
22   32:2
selection   31:12,
16
senate   15:13
19:8   20:9

22:2   24:5, 10
26:7, 9, 21
27:21   29:10
32:9   45:19
53:3, 5, 13
54:20, 23   56:5,
9   65:3, 20, 22
82:4, 23   93:3,
6, 21, 24   94:1,
2, 6, 22   95:10,
11, 14   111:10,
24
Senator   7:24
17:13, 14, 15
19:20   35:25
37:2   47:12
49:9, 25   51:18
58:1   61:8
64:7   65:19, 21
80:5   82:19
90:10   94:17
95:5, 7, 16, 20,
23   96:3, 10, 20,
23   97:12
103:24   104:2
106:23   110:23
111:5, 9   113:6,
11
senators   20:21
111:21
sense   21:14
28:1   82:18
sent   101:21
sentence   39:1
85:7
September   55:25
56:3
sequence   53:22
serve   25:25
31:22   32:7
served   9:17
26:2, 19   27:2,
3, 5
service   24:16
serving   104:18
105:10   107:25
session   45:22
56:15, 16   57:1
63:8, 9, 14
74:17   75:2
92:2, 17, 23
93:1   94:24

set   47:24
53:8   55:22
56:24   59:10, 16
setting   55:2
58:5   59:22
Sewell   86:15
87:20, 24   88:3,
6
Shalela   8:1
share   19:18
46:25   61:3
63:19   76:11
100:3
shared   22:9
49:22   53:20
54:17
sheet   113:18, 22
show   19:15
46:23   48:6
53:21
showing   61:16
100:9
side   70:4
signature   2:2
significant
102:4   109:22
110:17
similar   19:24
61:18
simply   70:6
108:25
single   29:24
70:6
Singleton   95:6,
16   103:19, 22
111:2
Singleton's
96:23
sir   25:11
35:9   61:22
76:25   78:24
94:11   98:1, 23
100:2   103:24
sitting   17:25
90:11   113:12
situation   98:5
six   99:20, 23
slow   52:8, 12
73:13
smaller   28:2
Smitherman   80:1
social   15:15

socially   25:16, 17

socioeconomic 73:2

software   74:3, 4, 5, 6   87:18

soil   72:12, 19

solutions   43:24

somebody   86:13

sooner   20:25

Sorry   14:6 22:12   23:9, 19, 20   24:1, 2 26:13, 14, 17 34:3   35:8, 14 36:3   39:22 43:14   44:13 51:3   62:23 63:22   73:15 80:23   85:4 106:21

sort   8:7 18:15   19:25 56:19   59:2, 12 86:7

SOS   47:1

sound   48:10

Southern   16:3, 9

southerner   67:1

spaces   105:15 106:8

speak   11:25 109:3

speaker   31:24

speaking   73:15

special   56:16 57:1   63:13 74:17   75:2 92:2, 17, 23 93:1   94:24

speculate   43:18

speculation 53:20

spell   9:24

spent   53:17, 19

spilled   56:2

spread   35:19 62:11

spring   88:23 89:9

Springville 14:22   15:25

staff   20:13 40:11   55:16, 17   58:9, 23 60:3   62:8 88:8   101:21 103:13

staffed   20:20

standing   21:13, 15, 20, 22   22:1, 10, 19   93:5

Stars   3:7

start   57:6 61:20   94:25 106:3

started   45:18 46:2   53:16 54:5   57:8 62:9   66:3 70:14

starting   32:14, 15, 17   42:15

State   1:22 7:3, 19, 21 9:24   12:13 15:7   20:15, 20 38:6, 7, 11, 15 39:11   47:16 48:6   60:20 61:20   62:11 64:12   72:11 96:16, 17   98:3 99:5   109:23 113:18, 19 115:1

stated   51:19 103:2

statement   44:7 50:16, 22 105:18, 21 109:17   113:18

statements   11:20

STATES   1:1 7:15   38:6 39:11   65:6, 12

state's   48:1

stay   30:10 31:4   41:4 66:4

staying   41:14

Ste   3:7, 21 4:19   5:14

step   49:5

steps   57:11 88:13

STIPULATED   1:17 2:1, 8

stipulation   7:6

stipulations 8:24

stop   29:21

Street   1:23 3:14, 21   4:4, 19   5:14   115:23

strength   39:14 65:10

strike   56:8

studied   16:11

study   19:12 80:4, 15   81:3, 7   82:10, 25 84:25   85:8, 11

subdivisions 70:20

subgroup   44:10

subject   39:20

submit   34:16 91:23

submitted   34:13

submitting   91:18

subsequent 65:25   67:8

subsequently 30:5

subset   75:14, 16, 17

substitute   76:8 95:20

suddenly   98:7

sufficient   81:6

suggest   87:5

suggested   79:20 88:3

suggestions 60:7, 8

Suite   115:23

summarized   22:20

summarizes 28:19, 21

summary   22:8 23:3, 7, 8

supersedes   98:3

support   25:1

supports   108:11, 12

sure   12:13, 23 15:7   28:20 30:10   31:4 37:23   41:5, 7, 9, 15   42:18 44:9   45:25 54:15   60:25 79:5   84:8 91:20   93:21 107:10   109:5 112:17   114:2

surprise   104:4

surprised   60:24 74:23

suspect   80:18

suspicious 77:17, 22   78:10

swear   8:19 76:5

sworn   8:22 10:17

system   17:7 36:16   40:8 55:19   58:8 60:4   62:20 74:10   103:15

< T >

tacked   77:18 99:20

take   16:8 19:11   34:13 35:11   41:5, 7 49:11   51:11 79:18   88:13 90:4   94:17, 20 109:25

taken   1:21 9:6   51:15 90:7   104:12 115:5, 8

takes   97:24

Talk   6:10 24:15   41:16, 23   67:1   87:20, 24

talked   18:15 33:1   41:19 42:1   53:23 58:7   67:15 83:24

Evan Milligan,et al v. John H.Merrill, et al.

Jim McClendon
12/17/2021

talking   19:22
 20:7    21:6, 7,
8, 16    22:3, 7,
8, 13    23:1
 30:11, 12, 14
 31:8    34:10
 35:8    49:21
 57:22, 24, 25
 65:16    70:9, 17
 107:15
Tallapoosa   1:23
 5:14
target   23:24
 24:7    58:20
targeted   99:19
targeting   86:6
teacher   17:3
team   28:11
technical   40:12
telephone   14:23
tell   33:22
 36:4, 7    61:18
 90:19    96:2
ten   10:6    27:5
tenure   26:19
term   73:16
 107:11
terms   26:2, 4
 27:4    97:17
 108:14
test   77:16, 18
testified   8:22
 23:10    73:17
testify   10:19
 23:18, 20
testimony   10:24
 73:9    102:10
Texas   16:5
Thank   9:14
 13:11    14:6, 14
 26:17    35:13
 38:4, 21    49:13
 51:10, 12
 52:17    63:22
 76:25    90:10
 98:23    104:5
 107:1    110:21,
22    113:6, 11, 15
thereto   2:14
thing   31:3
 33:10    54:5
 57:13    73:4

things   25:23
 27:14    28:20,
22    30:19
 53:22    55:3, 4
 62:13    96:12
think   21:10
 25:4    28:19, 21
 37:17, 21
 46:17    50:17
 52:8    55:24
 58:20    59:11
 60:3    62:14
 63:3, 21    67:15
 70:1    73:1
 76:4    77:25
 78:9    79:4, 5,
19, 24    80:21
 81:20    82:17
 83:10    84:4, 8
 85:16    87:6
 88:6    93:20, 22
 97:3, 8, 15
 98:17    102:21,
23    103:18
 105:4, 16, 17,
19    106:9, 10
thinking   57:8
 63:7, 13
third   56:3
 63:5    70:16
thought   50:18
 83:7, 16    85:4
threat   87:6
threatened   78:13
three   26:2, 4
 27:4, 20, 21
 97:24
threshold   85:21
 86:8
Thursday   74:17
 76:1    92:2, 19
time   2:12, 13
 7:17    9:5, 8
 10:7, 11    12:18,
24    13:1    14:9
 17:16    27:23
 28:3, 16    30:15
 31:1, 7    32:21
 37:23    41:23
 45:9    50:18

51:14, 17    52:7
 53:15, 17, 19
 55:18    56:21,
22    57:9, 10
 59:15    60:1
 67:15    68:12
 83:20    90:6, 9,
11    99:7, 13, 19
 103:2    104:5,
22, 25    108:9
 110:22    112:20
 113:12    114:4
timeline   54:1,
21    56:24    57:14
timelines   56:12
timely   55:5
times   55:23
 68:5, 9, 15
 70:1    99:15
 103:7, 8, 11
timing   53:21
 102:14, 19
title   64:15
today   9:16
 10:24    11:16
 13:18, 21
 17:19, 25    18:8,
13    19:18
 22:14    73:14
 75:11    104:5
 109:24    110:19
today's   9:14
 11:9
told   29:5, 6
 55:24    88:5
 90:24    91:2, 6,
9
topic   110:9, 10
topics   64:16
town   63:11
transcribed
 115:5, 8
transcribing
 11:14
Transcript   6:20,
22    76:12    77:8,
10    79:18
 80:18, 24
 86:19    94:5, 21
 95:8, 12, 14, 15
 115:7

transcription
 115:6
travel   102:2, 4
trial   2:13
 23:18, 20
tried   57:13
 65:19    93:2
Trojan   62:16
trouble   8:4
Troy   62:15
true   12:14
 115:7
trust   26:23
truthful   10:24
truthfully   10:19
try   19:13
 41:4    53:8
 64:24    66:24
 110:7
trying   48:21
 53:16, 25
Tuesday   74:16
 75:1    92:1
turn   24:3
 26:12    62:23
turned   101:1
turning   79:22
 84:11
TURRILL   3:4
 8:11
twice   99:18
Twitter   15:20,
21
two   15:10
 19:4    34:2, 5
 39:7, 9    46:4,
15    47:19
 49:25    50:24
 51:6    52:4, 14
 57:9    63:3
 74:14, 21
 75:10, 23    85:1
 93:9, 13, 22
 96:3, 6, 13
 97:8, 13    98:6
 101:2    110:1
two-year   58:8
 62:8, 10

< U >
U.S   38:9    39:17
ultimately   93:6

undergraduate
16:2
underneath
113:20
underpopulated
84:7
understand   9:16
10:18   11:2, 6,
9, 13, 22   12:3,
5, 10, 22   13:3,
7, 16   14:4, 12
18:1   23:19
34:23   44:4
54:15   78:21
81:24   82:19
107:23
understanding
45:9   67:25
70:23   77:13
78:16, 18   79:8,
10   97:18
112:24
understood
41:17   52:17
undertake   81:8,
11, 25   82:11
83:4, 22
undertaken   82:1,
25   83:12
unfold   53:9
55:4
unfortunately
74:24
Union   4:3, 10
UNITED   1:1
7:15   38:6
39:11   65:11
universities
62:5
University   16:4
unnecessary
90:20, 25
unsatisfactory
102:15
unwarranted
39:13
update   32:23
updated   28:15
upper   61:21
use   41:18
73:23, 24   81:2

Usual   8:24

< V >
value   83:16
VAP   80:21   81:5
various   94:23
venues   60:17
verbal   11:19
versus   7:13
9:13, 19
VIDEO   1:9
95:12
videoconference
11:11
Videographer
5:20   7:11
8:9, 19   9:4, 7
51:13, 16   90:5,
8   114:3
view   105:11
108:10
viewed   102:16
views   105:11
106:2, 4, 5
107:4   108:20,
22   109:7, 12,
13, 19, 20
110:11, 12, 16
violate   68:17
91:16   92:5
violation   69:24
violations   69:18
virtually   69:4
88:7
vote   22:11
34:20, 22, 25
39:6   76:3, 7
81:5   87:12
93:12, 16
95:15, 24
96:22, 25   97:2
111:12
voted   52:5, 16
96:2, 9, 19
97:13   111:24
112:13
voters   48:8
78:6   87:10, 12
97:10   98:9
votes   95:24
111:21   112:5, 9

Voting   39:8, 14,
17, 21   43:13,
17, 20   47:25
50:11   65:7, 10,
11, 14   66:9, 12,
20   67:4, 7, 11,
14, 22   68:1, 2,
7, 17   69:9, 13,
18, 24   77:14,
20   78:18   79:9,
14   80:4, 7, 10,
17, 20, 21   82:7,
10, 25   86:22
87:9, 21   90:14
91:16   96:15
97:21
VRA   45:1   92:6
VS   1:9

< W >
wait   11:25
12:1   78:20
waived   2:3
WALKER   5:11
7:23   8:25
12:17   13:24
15:2   18:11, 24
21:5   22:23
29:4, 20, 23
31:7   35:7, 10,
15, 19   36:3, 6,
20   40:22   47:3,
6   48:11   49:4,
12, 19   50:19
51:12   52:12
61:10, 15   63:2,
21   65:15   66:2
76:21, 23
81:18, 21
82:13   83:15,
22   90:19, 22
92:16   93:15,
18, 25   94:4, 9
100:3, 6, 10, 16,
20   101:1, 4
102:24   105:24
106:16, 20
110:25   113:8,
16   114:2
want   8:19
24:21   44:7, 16,

21   51:18
102:22   103:22
wanted   22:11
55:24   87:4
88:9   93:4
Washington   3:22
4:20   5:5
waste   83:20
way   24:10
68:16, 19
71:16   83:5
84:19   100:14
105:4
ways   71:18
web   11:10
week   56:3
92:19
weeks   55:25
WELBORN   4:8
35:17   36:10
61:19   75:16
78:22   79:24
94:10   100:13,
17   113:25
welcome   103:23
110:24   113:7
well   10:1
15:6   17:15
19:16, 24
20:19, 24   21:9,
10, 25   22:6, 15
25:3   26:3, 21
27:5   28:10, 19
29:21   30:9
35:2, 19   39:4
41:3, 24   43:18
46:21   48:15
50:3, 14   52:18
53:15   55:1, 16
59:9   60:19
62:3, 7   64:14
65:25   66:15
67:6   68:2
70:1, 25   71:25
73:1, 22   76:11
77:5   78:25
80:17   82:8, 12
83:21   86:14
87:10   89:21
91:17   92:24
94:17   98:2, 16
101:12   104:3,

4, 23    105:3
106:18    107:18
well-kept    29:11
went    22:1
26:2, 3    67:17
84:4
we're    13:12, 13
30:11    35:15
36:22    52:6
70:9, 17    74:21
75:11    84:19
101:23
west    72:11
we've    45:23
47:6    49:4
79:17
win    78:11
winners    98:8
wish    23:9
40:12
witness    2:3
7:7    8:7
29:21    47:5
61:17    106:14
wondering    53:18,
19    71:13
word    25:14
34:3    50:4
78:14, 20, 23
words    50:5
99:9
work    9:11
17:8, 15    36:16
40:9    55:3
58:9    59:2
89:7    103:16
worked    58:9
69:5    83:6
108:1, 5
working    17:14
66:16    70:15
102:16    110:14
works    18:16
81:23
worth    28:22
worthwhile    83:16
writing    11:15
wrong    98:20

< Y >
Yeah    26:10
33:13    39:3

49:20    62:15
78:13, 15    96:1
98:18    114:2
year    57:9
years    10:6
16:19    27:6, 18
57:9    82:15
104:20, 21
105:10    107:3,
11, 25
Yep    80:1
yesterday    18:14,
24    22:22
100:16
York    3:15    4:5

< Z >
Zero    99:8, 11
Zoom    3:18
4:15    8:10

## TALK POINTS FOR LIKELY ISSUES, No. 1

- The Barry Moore Congressional Plan

  o Sen. Will Barfoot (SD25, Crenshaw, Elmore, and Montgomery) and Rep. Mike Holmes (HD31, Elmore) are sponsoring an alternative Congressional Plan for Congressman Barry Moore.

  o This plan, called "The Preferred Congressional Plan for Alabama," originally differs from the Committee' plan in several respects, but Rep. Holmes will offer an improved version called the "Holmes Congressional Plan 1," that is identical to the Committee's plan **except** that takes a county split that the Committee's plan has in Moore's district, CD2, and transfers it to Terri Sewell's district, CD7.

  o In the Committee's plan, Moore has a sliver of east Escambia County populated by 739 people. In Moore's plan, that county split is moved to Monroe County, where it gives Sewell an additional 739 voters.

  o Under the Committee's plan, Moore has 2 county splits and Sewell has 3. Under Moore's plan, he has only 1 county split and Sewell has 4 – more than any other Member of Congress.

  o Moore's only stated argument for relocating the split is that with Escambia County, his district has the most counties of all districtsdonna: 16. The unstated argument, of course, is that Sewell is a Democrat and too bad if she gets dumped on.

  o The problem, of course, is that Sewell is not only a Democrat, she's Black, and this may look like race discrimination to a federal court. In fact, the number of splits in Terri Sewell's district was the first



PLAINTIFF'S EXHIBIT
I
J. McClendon
PENGAD 800-631-6989

RC 045524

objection brought up by Black Committee members when the Reapportion Committee met Tuesday.

o   Bill Harris, Moore's District Director explained why Moore did not want the Escambia County split: it's an additional county that Moore has to service and each additional county takes more work for Moore and his staff, and he already has 15 counties. But this same argument works for Sewell. Each new county split is more work for her, no less than Moore, and she already has 3 splits. No other Member has more than 2.

o   Also, the part of Escambia County given to Moore has no incorporated cities, and a great deal of it is in the Conecuh National Forest:



o

o   The burden of representing this sparsely populated, unorganized area of Escambia County is a light one. There is no civic group or city council, *etc.*, that has to be courted.

o   There's no doubt that adding another county split to Sewell's district – especially if done in committee or on the floor – will be argued as racially discriminatory by plaintinffs attacking the Moore Plan if the Legislature adopts it in favor of the Committee Plan.

11386967.1

2

RC 045525

o  We can't say if that claim will be successful. It depends in large part on how skillfully it is argued, but clearly, if the Legislature adopts the Moore Plan instead of the Committee Plan, it puts an unnecessary lighting rod on CD7 that is sure to draw attention from the three-judge court or the Supreme Court, and will give them one more reason to see the plan as racially biased. Should that happen, we'll be having a special session to correct the plan, and possibly new elections.

RC 045526

## TALK POINTS FOR LIKELY ISSUES, No. 3

- The League of Women Voter's Plan

- The League of Women Voter's Plan is a whole-county plan. It does not split any county. But it has a lot of problems.

- The plan puts two incumbents in the same district, CD3. Rep. Mike Rogers lives in Calhoun County, and Rep. Gary Palmer lives in Shelby County. Both counties are in CD3. This violates section II(j)((i), which says: "Contest between incumbent swill be avoided whenever possible."

- Section 2 of the Voting Rights Act requires the Legislature to draw a majority-Black district when it's possible to do so, generally speaking, and the Reapportionment Committee's Congressional Plan demonstrates that it's possible to draw one. In the Committee's plan, CD7 is majority Black and has a strong Black Voting Age Population, or "BVAP" of 54.   % The LWV's plan has no majority-Black district. Instead, it has only two districts – CD6 and CD7 - with high BVAPs compared to the other Congressional Districts. Thus the LWV Plan violates Section 2 of the Voting Rights Act.

- CD6 consists of 4 whole counties: Jefferson, Bibb, Hale, and Perry. Terri Sewell lives in this district. The BVAP for CD6 is 40.44%, which is well below a majority.

- CD7 is made up of 18 counties: Bullock, Butler, Choctaw, Clarke, Conecuh, Crenshaw, Dallas, Greene, Lowndes, Macon, Marengo, Monroe, Montgomery, Pickens, Sumter, Tuscaloosa, Washington, and Wilcox. Eighteen counties is far more than any other districts has.

  o CD1 has only 4,

- o CD2 has 12,

- o CD3 has 11,

- o CD4 has 12,

- o CD 5 has 6, and , as I've mentioned,

- o CD 6 has only 4.

- o The BVAP for CD7 is only 45.82% - better than CD6 but still less than a majority. And unlike CD6, in which Representative Terri Sewell resides, there is no incumbent in CD7. It seems unlikely that a Black Democrat candidate without the strength of incumbency will carry a district that is only 45.82% BVAP. It seems more than likely that CD7 is not a Black district at all.

- CD7 violates the race-neutral criteria in the Reapportionment Committee's Redistricting Guidelines in several ways:

  - o Guideline II(h) says: "Districts will be composed of contiguous and reasonably compact geography." CD7 is contiguous, but it is not reasonably compact. It starts in Tuscaloosa and executes a huge curve south and then east, ending in Macon and Bullock Counties, just short of the Georgia line.

  - o Guideline II(j)(iv) says: "The Legislature shall try to minimize the number of counties in each district." It's apparent that no attempt was made to minimize the number of counties in CD7. To the contrary, the LWV *maximized* the number of counties in CD7 in order to get as many Black persons in the districts as possible.

11387417.1

2

RC 045528

o   Guideline II(j)(iv) says: "The Legislature shall try to preserve the cores of existing districts." CD 7 as drawn by the LWV does not do that. Existing CD7 has 10 whole counties and 4 split counties. The LWV plan adds to CD7 7 completely new counties – Bullock, Butler, Conecuh, Crenshaw, Macon, Monroe, and Washington – and removes 3 counties – Hale, Jefferson, which is the population core of the existing CD7, and Perry. So, the LWV's CD7 does not preserve the core of the existing CD7.

o   The LWV Plan does not preserve the core of existing CD2. At present, CD 2 has 14 whole counties and part of another, Montgomery. The whole counties are: Autauga, Barbour, Bullock, Butler, Crenshaw, Coffee, Conecuh, Covington, Dale, Elmore, Geneva, Henry, Houston, and Pike. The LWV's proposed CD2 loses 7 of these counties – Autauga, Bullock, Butler, Crenshaw, Conecuh, Elmore, and Montgomery. It retains only 7 of its current counties – Barbour, Covington, Coffee, Dale, Geneva, Henry, Houston, and Pike. And it picks up an additional 5 completely new counties – Chambers, Elmore, Lee, Russell, and Tallapoosa. The LWV's CD2 does not preserve the core of the existing district.

o   The LWV plan also does not preserve the core of CD3. Presently, CD 3 has 11 whole counties – Calhoun, Chambers, Clay, Cleburne, Lee, Macon, Randolph, Russell, St. Clair, Talladega, and Tallapoosa – and parts of two other counties – Cherokee and Montgomery. But as drawn by the LVW, CD# has 11 whole counties, of which only 6 are in the present CD6. These are Calhoun, Cherokee, Clay, Cleburne, Randolph, and Talladega. CD 3 gains 5 entirely new counties – Autauga, Chilton, Coosa, Etowah, and Shelby, and loses 7 that it currently includes – Lee, Chambers, Macon, Montgomery, Russell,

3

RC 045529

St. Clair, and Tallapoosa. The LWV's CD3 does not preserve the core of the existing district.

o

- CD6 and CD7 are both racial gerrymanders. A district is racially gerrymandered when a substantial number of people have been included in it, or excluded from it, because of race. There is no way these districts were drawn race-blind. In fact, CD6 and CD7 are drawn as they are *because of race*. Not only that, but in order to draw these districts, as we've just seen the LWV trampled on or subordinated the Legislature's race-neutral criteria.

- Drawing districts to have a Black population majority might be OK if it were done in order to comply with Section 2 of the Voting Rights Act and there were a strong basis in evidence to support it. But the Voting Rights Act does not apply to districts like CD6 and CD7 that are below 50% BVAP. CD6 and CD7 are not majority-Black districts; they are what are called "influence districts," and the Voting Rights Act does not apply to them. It necessarily follow that CD6 and CD7 violate the Equal Protection Clause, because they classify voters by race without a compelling state interest in doing so.

- The LWV Plan violates the Guidelines, and the law, in another way. Guideline II(b) says: "Congressional districts shall have minimal population deviation." The Committee's plan complies with this requirement. Six of the Committee's Congressional Districts has the same population, and the other Congressional District has one additional person. But instead of minimal deviation, the LWV Plan has a total deviation of 2.47%. That would be OK if it were any type of plan *except* a Congressional plan, but Congressional plans must have zero deviation. 2.47% is well in excess of what the Guidelines and Supreme Court case law allow. This deviation will not pass muster in federal court.

11387417.1

RC 045530

- The LWV is aware of the problem caused by their plan's excessive total deviation. And they will make the argument that this excessive total deviation is allowed by a case the Supreme Court decided in 2012 called *Tennant v. Jefferson County [West Virginia] Commission.* The Tarrant case is very specific to the facts the Court was considering in that case, and that case does not apply to Alabama. The LWV argues in the complaint they filed in federal court that their plan's excessive total deviation "can be justified as a remedy of the racial gerrymander preserved in the 2011 plan and by Alabama's historic policy of preserving whole counties." This is just an argument, and it's one that have not been tested in federal court. We believe it's wrong, and that in Alabama, congressional plan must have minimal deviation.

11387417.1

5

RC 045531

## TALK POINTS FOR LIKELY ISSUES, No. 4

- The Faulkner Congressional District Plan No. 1

   o The Faulkner Congressional Plan No. 1 changes the Committee's Plan in Jefferson County only.

   o The Faulkner Plan takes Homewood out of CD7, which is represented by Terri Sewell, and put it in CD6, represented by Gary Palmer.

   o If this plan is passed, it will be sued as violating the Voting Right Act. In response to such a lawsuit, the State might argue that taking Homewood from CD7 and putting it in CD6 is politically motivated, but there is a strong possibility that a court would the change view it as racially motivated. If so, it's a fair conclusion that the court would find that the reassignment of Homewood was a race-conscious change made without the necessary "strong basis in evidence." This would lead to a holding that the plan violates the Voting Rights Act and the Equal Protection Clause.

   o In addition, the Faulkner Plan increases CD7's BVAP from 54.22% to 57.58%. This increase in Black BVAP is likely to draw an allegation that more Black residents have been put into CD7 than are necessary, which is called "packing," and which violates the Voting Rights Act and the Equal Protection Clause.

RC 045532

## The Jabo Waggoner Substitute Plan

Q: Why was it OK to have Homewood in CD6 and the Centerpoint precincts in CD7 in 2010 but now it's not OK?

A: Two factors are involved: First, in three cases after the 2010 Census, the Supreme Court required that districts be drawn race-blind, and so the Congressional Plan was. Second, there was a need to add 53,000+ people to CD7, and most of them had to come from Jefferson County, given that many of the other counties in CD7 lost population under the 2020 Census. Together, these factors led to the inclusion of population-dense Homewood into CD7. In addition, it was necessary to give the CD7 incursion into Jefferson County more of an East-West shape, rather than a North South shape, in order to prevent claims that this part of Jefferson County was a racial gerrymander. This is a consequence of the fact that Section 5 is no longer enforceable, and explains why what was OK in 010 and was approved by the Justice Department then is not OK in 2020, and would not be approved by the Justice Department today. Consequently, when these changes were made, the tip of the 2010 incursion – the Centerpoint Precincts – were not needed and were put into C6.

Q: Why can't they just be switched back?

A: The two Homewood Precincts are majority white. The four Centerpoint-area precincts are majority black. Switching black and white precincts it at this point, after the plan was drawn race-blind, would be a race-conscious action that would violate Section 2 of the Voting Rights Act unless it were done in fulfillment of a "compelling state interest.' Under the Voting Rights Act, the State has no compelling interest in making these race-conscious reassignments.

RC 045533

## Hassell Senate Plan No. 1 Compared
*with*
## McClendon Senate Plan No. 1

### Pairing Incumbents in the Same Districts

The Hassell Plan pairs 8 incumbent Senators in 4 districts:

- 14 – Pairs Senators Chambless and Weaver
- 27 – Pairs Senators Price and Watley
- 17 - Pairs Senators Reed and Shellnut
- 8 – Pairs Senators Butler and Givhan

The McClendon Pan, which the Senate has passed, does not pair any incumbents.

### County and Precincts Splits

The Hassell Plan splits 31 counties and 320 precincts.

The McClendon Plan spits 19 counties and 13 precincts.

The McClendon Plan does a much better job of respecting communities of interest and keeping counties whole.

### Significantly Changes Shapes of Senate Districts

A cursory look at the Hassell Plan shows that it makes major changes to Senatorial Districts, from top to bottom of the State. Just a few examples:

McClendon's SDs 4, 5, and 6 are largely combined into Hassell SD 2

The Jefferson County Districts are more or less redrawn

SD 34 goes from being part of Mobile County to including parts of Clarke, Choctaw, and Mobile Counties and all of Washington County

RC 045534

Many more changes are apparent merely by looking at the two maps. The McClendon Pan is based on repeated meetings with Senators over the past 2 and a half months; working with Senators to give them what they wanted or to work out compromises. There's no indication that Hassell met with anyone, or has Senatorial buy-in to his plan. If the House starts changing Senate Districts that Senators have agreed to, it can only expect that the Senate will do likewise to House Districts.

2

RC 045535

Committee Draft Congressional Plan

Talking Points

1. In developing this plan, all Congressional Representatives were met with in person and then subsequently over the phone or on Microsoft Teams until their concerns had been addressed. An exception is Representative Mo Brooks, who is running for another office. He did not want to meet in person and sent a staff member in his stead. All Representatives had input into this plan.

2. This plan meets our Committee Guidelines.
   a. It complies with Section II of the Voting Rights Act and the Equal Protection Clause.
   b. There is minimal population deviation between the districts. Six of the districts are at ideal population -- 717,754 and the 2nd District is one person over.
   c. It respects counties to the extent possible given the requirement for equal population.
   d. It does not require any incumbents to run against each other.
   e. All districts are contiguous and reasonably compact.
   f. It respects communities of interest.
   g. It preserves the cores of existing districts.

3. It splits a minimum number of counties and VTDs (or precincts) -- 6 counties are split and 7 VTDs are split to get to zero deviation. An improvement over current law which splits 7 counties.
   Splits are:
   Lauderdale County between districts 4 and 5
   Tuscaloosa County between districts 4 and 7
   Jefferson County between districts 6 and 7
   Chilton County between districts 3 and 6
   Montgomery County between districts 2 and 7
   Escambia County between districts 1 and 2

4. This plan contains one majority-black district with a BVAP of 54.22%.

RC 045536

Hatcher Congressional Plan No. 1

• This plan purports to have two majority-Black districts. These are CDs 2 and 7. CD7 has a BVAP of 52.55%, but CD2's BVAP is only 50.05%. That means CD2 is a majority-Black district by only .05% . This is not a functional majority, and given the margin of error in the Census data, it may not even be a majority-Black district at all. By comparison, the Reapportionment Committee's plan, which the House has passed, has one majority-Black district with a strong BVAP of 54.22. So the Hatcher Congressional Plan reduces the BVAP of CD7 in order to draw a district, CD2, as only marginally majority-Black. Reducing the BVAP of CD7 to create a majority-Black district that may not in fact be majority-Black is likely to draw a "cracking" lawsuit in violation of the Voting Rights Act.

• The Hatcher Congressional Plan No. 1 splits 13 counties. The Reapportionment Committee's plan has only 6 county splits.

• The Hatcher Congressional Plan No. 1 puts two pairs of incumbents in the same district. CD1 contains the residences of both Rep. Carl and Rep. Moore. In addition, it puts Rep. Sewell and Rep. Palmer both in CD6.

**Walker, Dorman**

| | |
|---|---|
| **From:** | Walker, Dorman |
| **Sent:** | Monday, November 1, 2021 2:50 PM |
| **To:** | Donna Overton Loftin (donna.overton@alsenate.gov) |
| **Cc:** | Randolf Hinaman (sharh1@comcast.net) |
| **Subject:** | FW: Coleman plan |

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Monday, November 1, 2021 2:33 PM
**To:** Rep. Chris Pringle (chris.pringle@alhouse.gov) <chris.pringle@alhouse.gov>
**Cc:** Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>
**Subject:** Coleman plan

1. The finger into Jefferson County is a racial gerrymander. It's a lot like what was in the 2010 plan, which also was a racial gerrymander but was protected by the non-retrogression standard of Section 5. Section 5 in no longer in effect, it is necessary to correct the CD7-Jefferson County racial gerrymander. The Committee's plan does that. The Coleman plan does not do that, and I believe that there's a strong risk that a federal Court will look at CD7 in the Coleman plan and say redraw that district.

2. Congressional plans require minimal deviation from ideal population. So do the Guidelines. The Coleman plan does not meet minimum deviation: CD1 has +7 people, CD4 has +42, CD6 has −71, and CD7 has +22. These deviations from ideal population are not constitutional in a Congressional plan.

3. The Black Voting Age Population of CD7 is 61.07, which is more that is needs for that district to perform as a majority Black district. That level of BVCAP will lead to a packing charge in federal court.

**BALCH**
& BINGHAM

Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045538




# THE ALABAMA LEGISLATURE

## STATE OF ALABAMA

## REAPPORTIONMENT COMMITTEE GUIDELINES

## FOR CONGRESSIONAL, LEGISLATIVE, AND STATE BOARD OF EDUCATION REDISTRICTING

## May 2011

Pursuant to the Constitution of the United States and the Constitution of the State of Alabama, the Alabama State Legislature is required to review 2010 Federal Decennial Census data provided by the U.S. Bureau of the Census to determine if it is necessary redistrict Alabama's congressional, legislative, and State Board of Education districts because of population changes since the 2000 Census. Accordingly, the following guidelines for congressional, legislative, and State Board of Education redistricting have been established by the Legislature's Permanent Joint Legislative Committee on Reapportionment, (hereinafter referred to as the "Reapportionment Committee").

### I. POPULATION

The total Alabama resident state population of 4,779,736 persons, and the population of defined subunits thereof, as reported by the 2010 Census, shall be the permissible data base used for the development, evaluation, and analysis of proposed redistricting plans. It is the intention of this provision to exclude from use any census data, for the purpose of determining compliance with the one person, one vote requirement, other than that provided by the United States Census Bureau.

### II. EQUAL POPULATION REQUIREMENT: ONE PERSON-ONE VOTE

The goal of redistricting is equality of population of congressional, legislative, and State Board of Education districts as defined below.

#### 1. Congressional Districts

The Apportionment Clause of Article I, Section 2, of the United States Constitution requires that the population of a state's congressional districts in a state be "as nearly equal in population as practicable." Accordingly, Congressional redistricting plans must be as mathematically equal in population as is possible.



PLAINTIFF'S EXHIBIT
2
J. McClendon

PENGAD 800-831-6989

6/29/2011

SOS002410

## 2. Legislative And State Board of Education Districts

In accordance with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, legislative districts and State Board of Education districts will be drawn to achieve "substantial equality of population among the various districts."

a. Any redistricting plan considered by the Reapportionment Committee will comply with all relevant case law regarding the one person, one vote principle of the equal protection clause of the 14th Amendment of the United States Constitution, including but not limited to the cases of Larios v. Cox, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) aff'd sub nom Cox v. Larios, 542 U.S. 947 (2004), and White v. Regester, 412 U.S. 755 (1973). When presenting plans to the Reapportionment Committee, proponents should justify deviations from the ideal district population either as a result of the limitations of census geography, or as a result of the promotion of a consistently applied rational state policy.

b. In keeping with subpart a, above, a high priority of every legislative and State Board of Education redistricting plan must be minimizing population deviations among districts. In order to ensure compliance with the most recent case law in this area and to eliminate the possibility of an invidious discriminatory effect caused by population deviations in a final legislative or State Board of Education redistricting plan, in every redistricting plan submitted to the Reapportionment Committee, individual district populations should not exceed a 2% overall range of population deviation. The Reapportionment Committee will not approve a redistricting plan that does not comply with this requirement.

## III. VOTING RIGHTS ACT

1. Districts shall be drawn in accordance with the laws of the United States and the State of Alabama, including compliance with protections against the unwarranted retrogression or dilution of racial or ethnic minority voting strength. Nothing in these guidelines shall be construed to require or permit any districting policy or action that is contrary to the United States Constitution or the Voting Rights Act of 1965.

2. Redistricting plans are subject to the preclearance process established in Section 5 of the Voting Rights Act.

## IV. CRITERIA FOR CONGRESSIONAL, LEGISLATIVE, AND STATE BOARD OF EDUCATION DISTRICTS

1. All congressional, legislative, and State Board of Education districts will be single-member districts that comply with the population-equality standards discussed above.

2. A redistricting plan will not have either the purpose or the effect of diluting minority voting strength, shall not be retrogressive, and shall otherwise comply with Sections 2 and 5 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the Constitution.

SOS002411

3. No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations that stereotype voters on the basis of race, color, or membership in a language-minority group.

4. All legislative and congressional districts will be composed of contiguous and reasonably compact geography.

5. The following legislative redistricting requirements prescribed by the Alabama Constitution shall be complied with:

> a. Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

> b. House and Senate districts shall be drawn on the basis of total population.

> c. The number of Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35.

> d. The number of Senate districts shall be not less than one-fourth or more than one-third of the number of House districts.

> e. The number of House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106.

> f. The number of House districts shall not be less than 67.

6. The following redistricting policies contained in the Alabama Constitution shall be observed to the extent that they do not violate or conflict with requirements prescribed by the Constitution and laws of the United States:

a. Each House and Senate district should be composed of as few counties as practicable.

b. Every part of every district shall be contiguous with every other part of the district. Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not.
c. Every district should be compact.

7. The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama:

> a. Contests between incumbent members of Congress, the Legislature, and the State Board of Education will be avoided when ever possible.

> b. The integrity of communities of interest shall be respected. For purposes of these Guidelines, a community of interest is defined as an area with recognized similarities of interests, including but not limited to racial, ethnic, geographic, governmental, regional, social, cultural, partisan, or historic

SOS002412

Case 2:21-cv-01530-AMM   Document 89-3   Filed 12/27/21   Page 69 of 244

interests; county, municipal, or voting precinct boundaries; and commonality of communications. Public comment will be received by the Reapportionment Committee regarding the existence and importance of various communities of interest. The Reapportionment Committee will attempt to accommodate communities of interest identified by people in a specific location. It is inevitable, however, that some interests will be advanced more than others by the choice of particular district configurations. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.

c. Local community and political leaders and organizations and the entire citizenry shall be consulted about new district lines.

d. In establishing congressional and legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling state interests requiring equality of population among districts and the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria.

## V. PLANS PRODUCED BY LEGISLATORS

1. The confidentiality of any Legislator developing plans or portions thereof will be respected. The Reapportionment Office staff will not release any information on any Legislator's work without written permission of the Legislator developing the plan, subject to paragraph two below.

2. A proposed redistricting plan will become public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the Reapportionment Committee.

3. Access to the Legislative Reapportionment Office Computer System, census population data, and redistricting work maps will be available to all members of the Legislature upon request. Reapportionment Office staff will provide technical assistance to all Legislators who wish to develop proposals.

4. In accordance with Rule 23 of the Joint Rules of the Alabama Legislature (2011) all amendments or revisions to redistricting plans, following introduction as a bill, shall be drafted by the Reapportionment Office.

5. Drafts of all redistricting plans which are presented for introduction at any session of the Legislature, and which are not prepared by the Reapportionment Office, must be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data Bank.

## VI. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS

1. All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public.

SOS002413

2. Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public.

3. Transcripts of all public hearings shall be made and maintained as part of the public record, and shall be available to the public.

4. The Reapportionment Committee will hold public hearings at different locations throughout the State in order to actively seek public participation and public input.

5. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding congressional, legislative, and State Board of Education redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established.

6. Notices of all Reapportionment Committee meetings will be posted on the fifth, sixth, seventh, and eighth floors of the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office.

## VII. PUBLIC ACCESS

1. The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment.

2. A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee.

3. Any proposed redistricting plan drafted into legislation must be offered by a member of the Legislature for introduction into the legislative process.

4. A redistricting plan developed outside the Legislature or a redistricting plan developed without Reapportionment Office assistance which is to be presented for consideration by the Reapportionment Committee must:

    a. Be clearly depicted on maps which follow 2010 Census geographic boundaries;

    b. Be accompanied by a statistical sheet listing total population and minority

SOS002414

population for each district and listing the census geography making up each proposed district;

c. Stand as a complete statewide plan for redistricting, or, if presenting a partial plan, fit back into the plan which is being modified, so that the proposal can be evaluated in the context of a statewide plan (i.e., all places of geography must be accounted for in some district);

d. Comply with the guidelines adopted by the Reapportionment Committee.

5. Electronic Submissions

a. Electronic submissions of redistricting plans will be accepted by the Reapportionment Committee.

b. Plans submitted electronically must also be accompanied by the paper materials referenced in this section.

c. See the Appendix for the technical documentation for the electronic submission of redistricting plans.

6. Census Data And Redistricting Materials

a. Census population data and census maps will be made available through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

b. Summary population data at the precinct level and a statewide work maps will be made available to the public through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

c. All such fees shall be deposited in the state treasury to the credit of the general fund and shall be used to cover the expenses of the legislature.

**Appendix.**

**ELECTRONIC SUBMISSION OF REDISTRICTING PLANS
REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA**

The Legislative Reapportionment Computer System supports the electronic submission of redistricting plans. The electronic submission of these plans must be on either a flash drive or CD ROM. The software used by the Reapportionment Office is the Esri Redistricting Online (RO) Solution.

The electronic file should be in DOJ format (Block, district # **or** district #, Block). This should be a two column, comma delimited file containing the FIPS code for each block, and the district number. The Esri RO Solution has an automated plan import that creates a new plan from the block/district assignment list.

SOS002415

Web services that can be accessed directly with a URL and ArcView Shapefiles can be viewed as overlays. A new plan would have to be built using this overlay as a guide to assign units into a blank RO Solution plan. In order to analyze the plans with our attribute data, edit, and report on, a new plan will have to be built in the RO Solution.

In order for plans to be analyzed with our attribute data, to be able to edit, report on, and produce maps in the most efficient, accurate and time saving procedure, electronic submissions are REQUIRED to be in DOJ format.

Example (DOJ FORMAT BLOCK, DISTRICT #)

SSCCCTTTTTTBBBB,D

| | |
|---|---|
| SS | is the 2 digit state FIPS code |
| CCC | is the 3 digit county FIPS code |
| TTTTTT | is the 6 digit census tract code |
| BBBB | is the 4 digit census block code |
| , | a comma goes before the district number |
| DDDD | is the district number |

(The above format is also acceptable with a blank space in place of the comma).

**Contact Information:**

Legislative Reapportionment Office
Room 811, State House
11 South Union Street
Montgomery, Alabama 36130
(334) 242-7941

**For questions relating to reapportionment and redistricting, please contact:**

Ms. Bonnie Shanholtzer
Supervisor
Legislative Reapportionment Office
district@al-legislature.gov

Please Note: The above e-mail address is to be used only for the purposes of obtaining information regarding redistricting. Political messages, including those relative to specific legislation or other political matters, cannot be answered or disseminated to members of the Legislature. Members of the Permanent Legislative Committee On Reapportionment may be contacted through information contained on their Member pages of the Official Website of the Alabama Legislature.

SOS002416

Case 2:21-cv-01530-AMM   Document 89-3   Filed 12/27/21   Page 73 of 244

# montgomeryadvertiser.com

## House approves congressional redistricting plan



Written by

**Brian Lyman**

2:10 AM, Jun. 2, 2011|

The Alabama House of Representatives approved a congressional redistricting plan Wednesday despite protests from the Montgomery County delegation over the map splitting the county among three congressional districts.

The map divides Montgomery County between the 2nd, 3rd and 7th districts. The county is currently split between the 2nd and 3rd districts.

The House approved the map 65-37. The Senate approved a similar plan last week, but a conference committee replaced that version with an older map; the Senate must concur in the changes.

Reps. Joe Hubbard, D-Montgomery; John Knight, D-Montgomery; and Jay Love, R-Montgomery all voted against the proposal. Rep. Greg Wren, R-Montgomery, did not vote.

Members of the Montgomery delegation in the House and Senate have complained

that that dividing the county between three districts would dilute Montgomery's voice in Congress.

"You deal with three different people who are unlikely to agree on different things," said Hubbard.

Wren voiced similar sentiments.

"You wouldn't want to see your county cut into three districts, but that's what's happened here," he said.

Montgomery representatives offered several alternatives that would have split Montgomery County between two districts, but were voted down. Rep. James Buskey, D-Mobile, offered another alternative that, he said, does not "crack" Montgomery and would increase minority represen tation in the 2nd Congressional District. Under the approved plan, the 7th Congressional District would be about 63 percent black, which Buskey objected to.

"That's stacking," he said. "That's stacking

Advertisement



**Protect Your Home with ADT!**

ADT AUTHORIZED DEALER

*Click Here to Learn More!*

Print Powered By **Format Dynamics**



PLAINTIFF'S EXHIBIT

3

J. McClendon

SOS001921

# montgomeryadvertiser.com

blacks in a congressional district, (and) there's no need to do so."

Rep. Jim McClendon, R-Springville, who carried the plan in the House, said the Buskey plan would lead to "retrogression," or a retreat from minority population benchmarks set by the Justice Department.

Under the Voting Rights Act, the DOJ must approve the state's redistricting plan before it can be implemented. If the redistricting plan retreats from Justice Department benchmarks -- such as re ducing minority population in a previously-approved congressional district -- the state must show that it had no discriminatory purpose in the move and did not reduce minority voters' "effective exercise of the electoral franchise."

"This plan, as far as the Justice Department and Voting Rights Act goes, it's a failure," McClendon said.

The Senate plan passed last Thursday was changed late in the day by Senate Rules Chairman Scott Beason, who made alterations to a map sponsored by Rep. Micky Hammon, R-Decatur. Beason's work altered the boundaries of the 6th Con gressional District, where he lives.

A conference committee removed Beason's changes this week, restoring Hammon's version.

Members of the Legislature from other locations have also raised objections to the map. Shoals-area officials are concerned about splitting Lauderdale and Colbert

County in two congressional districts. Tuscaloosa representatives have at tempted to adjust the congressional boundaries embracing their county.

Advertisement



Protect Your Home with ADT!

ADT AUTHORIZED DEALER

Click Here to Learn More!

Print Powered By **FormatDynamics**

| College/Other Location: | Campus Location | Address | Date/Time | Link to Meeting |
|---|---|---|---|---|
| Drake State | Lecture Hall and Cafetorium | 3421 Meridian St North Huntsville, AL 35811 | Wednesday, September 1st - 9 AM | Drake State Meeting |
| Northwest-Shoals | Hospitality House Shoals campus | 800 George Wallace Blvd Muscle Shoals, AL 35662 | Wednesday, September 1st - 11 AM | Northwest-Shoals Meeting |
| Calhoun | Health Sciences Building Room 109 Main Campus | 6250 Highway 31 North Tanner, AL 35671 | Wednesday, September 1st - 2 PM | Calhoun-Ayers Campus Meeting |
| Northeast Alabama | Theater Auditorium | 138 Alabama Highway 35 Rainsville, AL 35986 | Wednesday, September 1st - 4 PM | Northeast Alabama Meeting |
| Snead State | Fielder Auditorium - Administration Building | 102 Elder Street Boaz, AL 35957 | Thursday, September 2nd - 9 AM | Snead State Meeting |
| Wallace-Dothan | Cherry Hall Bencze Theater - Main campus | 1141 Wallace Dr Dothan, AL 36303 | Thursday, September 2nd - 11 AM | Wallace-Dothan Meeting |
| Bevill State | Earl McDonald Auditorium, Bevill Center Fayette campus | 2631 Temple Ave N Fayette, AL 35555 | Thursday, September 2nd - 2 PM | Bevill State Meeting |
| Lawson State | Alabama Center for Advanced Technology and Training - Birmingham campus | 3060 Wilson Road SW Birmingham, AL 35221 | Thursday, September 2nd - 4 PM | Lawson State Meeting |
| Shelton State | Bean-Brown Theater Martin campus | 9500 Old Greensboro Rd Tuscaloosa, AL 35405 | Tuesday, September 7th - 9 AM | Shelton State Meeting |
| Jefferson State | Performing Arts Center Auditorium Chilton Campus | 1850 Lay Dam Road Clanton, AL 35045 | Tuesday, September 7th - 11 AM | Jefferson State Meeting |



PENGAD 800-631-6989

J.McClendon

PLAINTIFF'S
EXHIBIT
4

| Location | Room/Venue | Address | Date/Time | Meeting |
|---|---|---|---|---|
| Jefferson State | Judy Merritt Health Sciences Building, Room 129 A-D (Multipurpose Room) - Shelby-Hoover Campus | 4600 Valleydale Road Hoover, AL 35242 | Tuesday, September 7th - 2 PM | Jefferson State Meeting |
| Wallace State-Selma | Hank Sanders Conference Room | 3000 Earl Goodwin Pkwy Selma, AL 36702 | Tuesday, September 7th - 4 PM | Wallace State-Selma Meeting |
| Bishop State | Delchamps Auditorium - Main Campus | 351 North Broad St Mobile, AL 36603 | Wednesday, September 8th - 9 AM | Bishop State Meeting |
| Coastal Alabama | Nettles Auditorium - Monroeville campus | 2800 South Alabama Ave Monroeville, AL 36460 | Wednesday, September 8th - 11 AM | Coastal Alabama Meeting |
| Demopolis Civic Center | Civic Center | 501 N Commissioners Ave Demopolis, AL 36732 | Wednesday, September 8th - 1 PM | Demopolis Civic Center Meeting |
| Troy University | Trojan Center Ballroom | 321 Veterans Memorial Dr Troy, AL | Wednesday, September 8th - 3 PM | Troy University Meeting |
| Alabama State House | Alabama Statehouse Room 200 | 11 S Union Street Montgomery, AL | Wednesday, September 8th - 6 PM | Alabama State House Meeting |
| Gadsden State | Cheaha Lecture Hall Room 111 Ayers Campus Wendell Mitchell | 1801 Coleman Road Anniston, AL 36202 | Thursday, September 9th - 9 AM | Gadsden State Ayers Meeting |
| Lurleen B. Wallace | Conference Center - Greenville Campus | 750 Greenville Bypass Greenville, AL 36037 | Thursday, September 9th - 11 AM | Lurleen B Wallace Meeting |
| Coastal Alabama | Woodfin Patterson Auditorium Brewton campus | 220 Alco Dr Brewton, AL 36426 | Thursday, September 9th - 2 PM | Coastal Alabama Meeting |
| Southern Union | Southern Room Opelika campus | 301 Lake Condy Road Opelika, AL 36801 | Thursday, September 9th - 4 PM | Southern Union Meeting |
| Coastal Alabama | AL Tombigbee Room Thomasville campus | 30755 US Highway 43 Thomasville, AL 36784 | Wednesday, September 15th - 9 AM | Coastal Alabama Meeting |

| Wallace-Hanceville | Auditorium, main campus | 801 Main Street NW Hanceville, AL 35077 | Wednesday, September 15th - 11 AM | Wallace-Hanceville Meeting |
|---|---|---|---|---|
| Gadsden State | New Science Building Auditorium, Main campus | 101 George Wallace Dr Gadsden, AL 35902 | Wednesday, September 15th - 2 PM | Gadsden State Meeting |
| National Guard Armory | Richard Stone Building | 21578 US Hwy 82 Union Springs, AL 36089 | Wednesday, September 15th - 4 PM | National Guard Meeting |
| University of West Alabama | Webb Hall Room 239 President's Conference Rm | 25 Webb Circle Livingston, AL 36376 | Thursday, September 16th - 11am | Univ of West Alabama Meeting |
| Coastal Alabama | Centennial Hall Fairhope campus | 440 Fairhope Ave Fairhope, AL 36532 | Thursday, September 16th - 2 PM | Coastal Alabama Meeting |
| Southern Union | Lake Room Wadley campus | 750 Roberts Street Wadley, AL 36276 | Thursday, September 16th - 4 PM | Southern Union Meeting |

1    **REAPPORTIONMENT COMMITTEE REDISTRICTING GUIDELINES**

2    May 5, 2021

3    **I. POPULATION**

4    The total Alabama state population, and the population of defined subunits
5    thereof, as reported by the 2020 Census, shall be the permissible data base used
6    for the development, evaluation, and analysis of proposed redistricting plans. It is
7    the intention of this provision to exclude from use any census data, for the purpose
8    of determining compliance with the one person, one vote requirement, other than
9    that provided by the United States Census Bureau.

10   **II. CRITERIA FOR REDISTRICTING**

11   a.      Districts shall comply with the United States Constitution, including the
12   requirement that they equalize total population.

13   b.      Congressional districts shall have minimal population deviation.

14   c.      Legislative and state board of education districts shall be drawn to achieve
15   substantial equality of population among the districts and shall not exceed an
16   overall population deviation range of ±5%.

17   d.      A redistricting plan considered by the Reapportionment Committee shall
18   comply with the one person, one vote principle of the Equal Protection Clause of
19   the 14th Amendment of the United States Constitution.

20   e.      The Reapportionment Committee shall not approve a redistricting plan that
21   does not comply with these population requirements.

22   f.      Districts shall be drawn in compliance with the Voting Rights Act of 1965, as
23   amended. A redistricting plan shall have neither the purpose nor the effect of
24   diluting minority voting strength, and shall comply with Section 2 of the Voting
25   Rights Act and the United States Constitution.

26   g.      No district will be drawn in a manner that subordinates race-neutral
27   districting criteria to considerations of race, color, or membership in a language-
28   minority group, except that race, color, or membership in a language-minority
29   group may predominate over race-neutral districting criteria to comply with
30   Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in
31   support of such a race-based choice. A strong basis in evidence exists when there
32   is good reason to believe that race must be used in order to satisfy the Voting Rights
33   Act.



**PLAINTIFF'S EXHIBIT**
5
J. McClendon

RC 043723

1    h.    Districts will be composed of contiguous and reasonably compact
2    geography.

3    i.    The following requirements of the Alabama Constitution shall be complied
4    with:

5    (i)    Sovereignty resides in the people of Alabama, and all districts should be
6    drawn to reflect the democratic will of all the people concerning how their
7    governments should be restructured.

8    (ii)    Districts shall be drawn on the basis of total population, except that voting
9    age population may be considered, as necessary to comply with Section 2 of the
10    Voting Rights Act or other federal or state law.

11    (iii)    The number of Alabama Senate districts is set by statute at 35 and, under
12    the Alabama Constitution, may not exceed 35.

13    (iv)    The number of Alabama Senate districts shall be not less than one-fourth or
14    more than one-third of the number of House districts.

15    (v)    The number of Alabama House districts is set by statute at 105 and, under
16    the Alabama Constitution, may not exceed 106.

17    (vi)    The number of Alabama House districts shall not be less than 67.

18    (vii)    All districts will be single-member districts.

19    (viii)    Every part of every district shall be contiguous with every other part of the
20    district.

21    j.    The following redistricting policies are embedded in the political values,
22    traditions, customs, and usages of the State of Alabama and shall be observed to
23    the extent that they do not violate or subordinate the foregoing policies prescribed
24    by the Constitution and laws of the United States and of the State of Alabama:

25    (i)    Contests between incumbents will be avoided whenever possible.

26    (ii)    Contiguity by water is allowed, but point-to-point contiguity and long-lasso
27    contiguity is not.

28    (iii)    Districts shall respect communities of interest, neighborhoods, and political
29    subdivisions to the extent practicable and in compliance with paragraphs a
30    through i. A community of interest is defined as an area with recognized
31    similarities of interests, including but not limited to ethnic, racial, economic, tribal,
32    social, geographic, or historical identities. The term communities of interest may,
33    in certain circumstances, include political subdivisions such as counties, voting

2

10213405.2

RC 043724

precincts, municipalities, tribal lands and reservations, or school districts. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.

(iv)    The Legislature shall try to minimize the number of counties in each district.

(v)    The Legislature shall try to preserve the cores of existing districts.

(vi)    In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria.

g.    The criteria identified in paragraphs j(i)-(vi) are not listed in order of precedence, and in each instance where they conflict, the Legislature shall at its discretion determine which takes priority.

## III. PLANS PRODUCED BY LEGISLATORS

1.    The confidentiality of any Legislator developing plans or portions thereof will be respected. The Reapportionment Office staff will not release any information on any Legislator's work without written permission of the Legislator developing the plan, subject to paragraph two below.

2.    A proposed redistricting plan will become public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the Reapportionment Committee.

3.    Access to the Legislative Reapportionment Office Computer System, census population data, and redistricting work maps will be available to all members of the Legislature upon request. Reapportionment Office staff will provide technical assistance to all Legislators who wish to develop proposals.

4.    In accordance with Rule 23 of the Joint Rules of the Alabama Legislature "[a]ll amendments or revisions to redistricting plans, following introduction as a bill, shall be drafted by the Reapportionment Office." Amendments or revisions must be part of a whole plan. Partial plans are not allowed.

5.    In accordance with Rule 24 of the Joint Rules of the Alabama Legislature, "[d]rafts of all redistricting plans which are for introduction at any session of the Legislature, and which are not prepared by the Reapportionment Office, shall be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data System at least ten (10) days prior to introduction."

10213405.2

RC 043725

# IV. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS

1. All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public.

2. Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public.

3. Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public.

4. All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established.

5. Notice of all Reapportionment Committee meetings will be posted on monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office.

# V. PUBLIC ACCESS

1. The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment.

2. A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee.

4

10213405.2

RC 043726

1   3.      Any proposed redistricting plan drafted into legislation must be offered by a
2   member of the Legislature for introduction into the legislative process.

3   4.      A redistricting plan developed outside the Legislature or a redistricting plan
4   developed without Reapportionment Office assistance which is to be presented for
5   consideration by the Reapportionment Committee must:

6   a.      Be clearly depicted on maps which follow 2020 Census geographic
7   boundaries;

8   b.      Be accompanied by a statistical sheet listing total population for each district
9   and listing the census geography making up each proposed district;

10   c.      Stand as a complete statewide plan for redistricting.

11   d.      Comply with the guidelines adopted by the Reapportionment Committee.

12   5.      Electronic Submissions

13   a.      Electronic submissions of redistricting plans will be accepted by the
14   Reapportionment Committee.

15   b.      Plans submitted electronically must also be accompanied by the paper
16   materials referenced in this section.

17   c.      See the Appendix for the technical documentation for the electronic
18   submission of redistricting plans.

19   6.      Census Data and Redistricting Materials

20   a.      Census population data and census maps will be made available through the
21   Reapportionment Office at a cost determined by the Permanent Legislative
22   Committee on Reapportionment.

23   b.      Summary population data at the precinct level and a statewide work maps
24   will be made available to the public through the Reapportionment Office at a cost
25   determined by the Permanent Legislative Committee on Reapportionment.

26   c.      All such fees shall be deposited in the state treasury to the credit of the
27   general fund and shall be used to cover the expenses of the Legislature.

28                          **Appendix.**

29        **ELECTRONIC SUBMISSION OF REDISTRICTING PLANS**

30        **REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA**

10213405.2

RC 043727

1

2   The Legislative Reapportionment Computer System supports the electronic
3   submission of redistricting plans. The electronic submission of these plans must
4   be via email or a flash drive. The software used by the Reapportionment Office is
5   Maptitude.

6   The electronic file should be in DOJ format (Block, district # or district #,
7   Block). This should be a two column, comma delimited file containing the FIPS
8   code for each block, and the district number. Maptitude has an automated plan
9   import that creates a new plan from the block/district assignment list.

10  Web services that can be accessed directly with a URL and ArcView
11  Shapefiles can be viewed as overlays. A new plan would have to be built using this
12  overlay as a guide to assign units into a blank Maptitude plan. In order to analyze
13  the plans with our attribute data, edit, and report on, a new plan will have to be
14  built in Maptitude.

15  In order for plans to be analyzed with our attribute data, to be able to edit,
16  report on, and produce maps in the most efficient, accurate and time saving
17  procedure, electronic submissions are REQUIRED to be in DOJ format.

18  Example: (DOJ FORMAT BLOCK, DISTRICT #)

19  SSCCCTTTTTTBBBBDDDD

20  SS          is the 2 digit state FIPS code

21  CCC         is the 3 digit county FIPS code

22  TTTTTT      is the 6 digit census tract code

23  BBBB        is the 4 digit census block code

24  DDDD            is the district number, right adjusted

25  **Contact Information:**

26  Legislative Reapportionment Office

27  Room 317, State House

28  11 South Union Street

29  Montgomery, Alabama 36130

30  (334) 261-0706

10213405.2

RC 043728

1    For questions relating to reapportionment and redistricting, please contact:

2    Donna Overton Loftin, Supervisor

3    Legislative Reapportionment Office

4    donna.overton@alsenate.gov

5    Please Note: The above e-mail address is to be used only for the purposes of
6    obtaining information regarding redistricting. Political messages, including those
7    relative to specific legislation or other political matters, cannot be answered or
8    disseminated via this email to members of the Legislature. Members of the
9    Permanent Legislative Committee on Reapportionment may be contacted through
10   information contained on their Member pages of the Official Website of the
11   Alabama Legislature, legislature.state.al.us/aliswww/default.aspx.

10213405.2

RC 043729

FILED
2021 Dec-15  PM 10:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# TRANSCRIPT OF REAPPORTIONMENT COMMITTEE MEETING OCTOBER 26, 2021



PLAINTIFF'S
EXHIBIT
6
J. McClendon
PENGAD 800-631-6989

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**FEMALE 1:** Senator Allen? Senator Holley?

**SENATOR HOLLEY:** Yes

**FEMALE 1:** Senator Livingston?

**SENATOR LIVINGSTON:** Here.

**FEMALE 1:** Senator McClendon?

**SENATOR MCCLENDON:** Here.

**FEMALE 1:** Senator Melson?

**SENATOR MELSON:** Here.

**FEMALE 1:** Senator Orr?

**SENATOR ORR:** Here.

**FEMALE 1:** Senator Roberts?

**SENATOR ROBERTS:** Here.

**FEMALE 1:** Senator Scofield?

**SENATOR SCOFIELD:** Here.

**FEMALE 1:** Senator Singleton?

**SENATOR SINGLETON:** Here.

**FEMALE 1:** Ms. Smitherman? Senator Williams?

**SENATOR WILLIAMS:** Here.

**FEMALE 1:** Representative Boyd?

**REPRESENTATIVE BOYD:** Here.

**FEMALE 1:** Representative Clouse? Representative Ellis?

**REPRESENTATIVE ELLIS:** Here.

**FEMALE 1:** Representative England?

1

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**REPRESENTATIVE ENGLAND:** Here.

**FEMALE 1:** Representative Greer?

**REPRESENTATIVE GREER:** Here.

**FEMALE 1:** Representative Hall?

**REPRESENTATIVE HALL:** Here.

**FEMALE 1:** Representative Jones?

**REPRESENTATIVE JONES:** Here.

**FEMALE 1:** Representative Lovvorn?

**MALE 1:** He's on his way. He's in traffic.

**FEMALE 1:** Representative Pringle?

**REPRESENTATIVE CHRIS PRINGLE:** Here.

**FEMALE 1:** Representative South? Representative Wood?

**REPRESENTATIVE WOOD:** Here.

**FEMALE 1:** We have 19 present. We have a quorum.

**MALE 2:** Thank you, members, if you would, please, you will see a copy of the Minutes from the last meeting, May 5th of this year. I would ask you to quickly look over those. We have a motion to approve and let's have a roll call on that please.

**FEMALE 1:** Senator Allen? Senator Holley?

**SENATOR HOLLEY:** Aye.

**FEMALE 1:** Senator Livingston?

**SENATOR LIVINGSTON:** Aye.

**FEMALE 1:** Senator McClendon?

**SENATOR MCCLENDON:** Aye.

**FEMALE 1:** Senator Melson?

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**SENATOR MELSON:** Aye.

**FEMALE 1:** Senator Orr?

**SENATOR ORR:** Aye.

**FEMALE 1:** Senator Roberts?

**SENATOR ROBERTS:** Aye.

**FEMALE 1:** Senator Scofield?

**SENATOR SCOFIELD:** Aye.

**FEMALE 1:** Senator Singleton?

**SENATOR SINGLETON:** Aye.

**FEMALE 1:** Senator Smitherman? Senator Williams?

**SENATOR WILLIAMS:** Aye.

**FEMALE 1:** Representative Boyd?

**REPRESENTATIVE BOYD:** Aye.

**FEMALE 1:** Representative Clouse? Representative Ellis?

**REPRESENTATIVE ELLIS:** Aye.

**FEMALE 1:** Representative England?

**REPRESENTATIVE ENGLAND:** Aye.

**FEMALE 1:** Representative Greer?

**REPRESENTATIVE GREER:** Aye.

**FEMALE 1:** Representative Hall? Representative Jones?

**REPRESENTATIVE JONES:** Aye.

**FEMALE 1:** Representative Lovvorn? Representative Pringle?

**REPRESENTATIVE CHRIS PRINGLE:** Aye.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**FEMALE 1:**  Representative South? Representative Wood?

**REPRESENTATIVE WOOD:**  Aye.

**FEMALE 1:**  We have 17 yes. The motion passed.

**MR. CHAIRMAN:**  Thank you. I'd like to make just a preliminary statement about the workings of this committee. This time around has been rather unique because of the compactness of the time. Federal Law requires Census Bureau to provide the states with the data no later than March and the year after Census is conducted. In 2011, we received it in mid-February, about six weeks before their deadline. This time, the Census Bureau seriously lied. Instead of getting the data in February or March, we did not receive the data until August 12, actually became usable to us closer to the 17th or 18th of August. It took some amount of time to convert that data to match up our software. August 17 was the first time this committee and our staff, who I'm forever grateful for, for all their hard work was the first time that we actually hadn't data that we could work with and dealing with the Congressional plan, State Board plan, the Senate plan and the House plan.

[00:05:06]

Since that time, since August 17, we have met with seven Congressional Representatives, our staff, eight Board of Education members and all the members of the Senate and the House that are running for reelection. In most cases, there was not just one meeting with any particular office holder. There were repeated meetings with individual officeholders and often with groups of officeholders, these meetings continued right up to the close of business last Friday. It took an enormous effort to prepare these plans in the short amount of time available. And unlike after the 2010 census, when we were able to split the redistricting over a two-year period, we did Congressional and State Board in 2011, and then we did the two legislative plans in 2012. This time, not only did we get the data late, but we had to prepare all four plans at the same time. And I will -- you those of us who worked in this room in this office have seen the dedication of our redistricting staff, of our attorney advising us, of our demographer drawing the maps, they have literally worked day and night and over the weekends in order to reach this point. And I think you'll soon see that they have done a heroic job. I am very grateful to their dedication. At this point, we are going to now go into consideration of these four maps I mentioned. We'll do them in this order for committee members. You'll see, you have an agenda in front of you that shows the order. We'll do this and we're going to start off with congressional districts. Representative Pringle will handle that in the House. Then we'll go to State Board districts. I'll handle that for introduction into the Senate. Then we'll go to the state Senate districts that will first be introduced into the Senate. And once it comes out of this committee, and finally, we'll do the committee plan for the State House, which Representative Pringle, of course, will handle and will introduce on Thursday into the House of Representatives. Let me recognize the House Chair for Redistricting Representative Chris Pringle turn your mic go.

**REPRESENTATIVE CHRIS PRINGLE:**  Thank you, Senator. Again, I am Chris Pringle, State Representative from House District 1 of Automobile. The members of the committee

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

would go to the congressional plan and open your folder. You'll see the proposed map that we're going to discuss here from this committee. You'll have it. If you'll note, this is a zero-deviation plan with a minimum number of split counties. There's a one-person difference between all seven districts. Som the deviations on this plan are zero. In developing this plan, all Congressional Representatives were met with in person and then subsequently over the phone our Microsoft teams until their concerns have been addressed. An exception in the Representative Mo Brooks was running for another office. He did not want to meet in person instead of staff member instead. All representatives have had input into this plan. This plan meets the Committee guidelines. It complies a Section 2 the Voting Rights Act and Equal Protection Clause. There's a minimal population deviation between the District 6.

[00:09:59]

Between the District 6 are districts who had ideal population of 717,754 and the second district is one person over. In respects to counties that extend possibly given the requirement for equal population. I'll repeat, it respects counties to the extent possible given the requirements for equal population. It does not require any incumbents to run against each other. All districts are contiguous and reasonably compact. It respects communities of interests. It preserves the cores of existing districts. It splits a minimum number of counties and precincts. Six counties are split and seven are split to get to zero deviation an improvement over the current law which splits seven counties. Splits are, Lauderdale County is split between District 4 and 5. Tuscaloosa County is split between Districts 4 and 7. Jefferson County, between Districts 6 and 7. Chilton County between Districts 3 and 6. Montgomery County between Districts 2 and 7. Escambia County between Districts 1 and 2. This plan contains one majority black district with a black voting age population of 54.22%, thank you.

**MALE 2:** Motion to adopt.

**MALE 3:** Mr. Chairman, I'd like to speak to the motion.

**REPRESENTATIVE ENGLAND:** I would too.

**MR. CHAIRMAN:** Mr. England.

**REPRESENTATIVE ENGLAND:** First of, thank you for recognition. I'm pretty sure Ms. Overton probably would doesn't like me very much right now because I harassed her for days on end. Because as a member of this committee, I did not see these maps until yesterday. I think we're undertaking a pretty massive task to be told to come in here with the amount of information presented to us to come here and say, "I need you to vote today." Personally, I may be just speaking for myself, but I think this is doing a disservice to the process and also to the people that we represent because they haven't seen this map either, unless you were following me on Twitter. So, I think it needs to be said that this process itself, there's got to be a better way to do this. I think it's flawed and I don't really think this is the best way for us to walk into this process without any information and to come in here today look at it and say, "I want you to approve it." With that being said, I'm not diminishing the fact this was probably a very difficult task. It's a lot of information to process, but I think it probably would have been better for all of

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

us have we all seen the whole entire map and not be drawn into short meetings individually where we can only see our district? For me, that's how the process worked. I was only told I could see the district. My district game me immediate area around my district, and I think it would have been better for the public and all of us to digest the information in front of us by just seeing the whole map so we could see how our district worked relative to the districts around us. And with that being said in your initial statement, you mentioned that this map complies with the Voting Rights Act. Several questions that I have about that. First, I'd like to know who drew the map. Was it drawn in-house or did somebody else draw it? Also, I'd like to know how it complies with the Voting Rights Act. Was there a racial polarization study done to figure out exactly how we comply with the Voting Rights Act? And I'd also like to know since I wasn't afforded an opportunity to see the entire map, I would like to know if anybody else was, whether it be staff, whether it be other members, or whether it be someone hired as a consultant to take a look at these maps. Those are my three initial questions. One, who drew it? Two, can you explain to all of us how it satisfies the Voting Rights Act and how this map was drawn? So, I just like to start there, thank you.

**MR. CHAIRMAN:** Senator Singleton?

**SENATOR SINGLETON:** You're not going to answer those question?

**MR. CHAIRMAN:** I've done listened to it, and we're going to get back with him, okay.

**FEMALE 1:** Oh Jesus.

[00:14:59]

**REPRESENTATIVE ENGLAND:** Point of order, so we're not answering questions today?

**MR. CHAIRMAN:** I'm going to answer your questions. We're just trying to get all the questions asked.

**MALE 4:** Ms. Chairman, point of order. The point is that I think that we opened ourselves up for confusion of responses and questions and confusions of focusing in on the specific points. So, we're going to take all these varying questions. And then after we take all the various questions, I think that the questions' point of order are to be in relationship to the questions. The answer should be in relationship to the questions as answered and they should be addressed. Questions that [INDISCERNIBLE 00:15:45] may have over there, I saw his hand, and I have is may be totally relevant, but maybe totally different at the same time in parts. So, I think in order to understand that -- and I'm going to make a special request that we put these maps on the board. We have a big old board up there, put the whole maps. Each one of these things we talk, it relates to a map. It needs to be sitting up there in large, of the map.

[OVERLAY]

**FEMALE 2:** --so we can it.

6

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**MALE 4:**  Yeah, we can see it. Not the small one where we don't know what it's touching and what it's doing, but actually a large one that deals which shows the precincts.

**MR. CHAIRMAN:**  The map is on the board, ladies and gentlemen, I'm hoping the people online can see it. Can they see the map online?

**MALE 5:**  Yes.

**MR. CHAIRMAN:**  These maps are drawn in this room using the staff here and our lawyer that we've hired has done redistricting for 25 years, has worked with us and told us that he thinks these maps comply with section to the Voting Rights Act and the Fourteenth Amendment to the Constitution.

**REPRESENTATIVE ENGLAND:**  Can you explain it now?

**MR. CHAIRMAN:**  I'm not the attorney, but Dorman Walker sat here and went through every one of this our attorney. You know Dorman, he's done this for 25 years.

**[OVERLAY]**

**REPRESENTATIVE ENGLAND:**  Again, can I say that I was appointed to this committee.

**MR. CHAIRMAN:**  Yeah.

**REPRESENTATIVE ENGLAND:**  You stated that it complies with the Voting Rights Act. You also stated that it complies with the Fourteenth Amendment Equal Protection, so I'm asking you how. I just want to make this -- that's obviously –

**[OVERLAY]**

**MR. CHAIRMAN:**  Okay, representative. That's fine, let's do this.

**REPRESENTATIVE ENGLAND:**  That's a very component of this.

**MR. CHAIRMAN:**  I understand that and I see where you're going and let's do this. You tell me where it doesn't, how's that?

**REPRESENTATIVE ENGLAND:**  First and foremost, if we didn't do a racial polarization study you don't know how it applies. I'll ask you this question, you and the attorney that you consulted, have you all done a racial polarization study?

**MR. CHAIRMAN:**  Yeah, the guy in Georgia did one. It was sent to him Friday and he came back.

**REPRESENTATIVE ENGLAND:**  So, who's the guy in Georgia? Can we see the results of that study?

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:** The attorney has hired a consultant out of Georgia and he's looked at it.

**REPRESENTATIVE ENGLAND:** Can we—

**MR. CHAIRMAN:** There's nothing that's going to be hidden. We're getting it to you as fast as we have it of course.

**REPRESENTATIVE ENGLAND:** Okay.

**MR. CHAIRMAN:** We don't have it. You understand, I had to do 28 public hearings. I had to meet with 105 house members, 35 senators, seven members of congress and eight members of the schoolboard and many of these people we met with multiple, multiple times to try and work this out, all in a very short period of time. We didn't have the luxury they had a couple of years ago, having two years to do this. We had about three months.

**REPRESENTATIVE ENGLAND:** I could understand your frustration, but as the Chair, you're in charge with the responsibility of answering these questions.

**MR. CHAIRMAN:** Yeah.

**REPRESENTATIVE ENGLAND:** So, I sympathize with the smaller shortened timeframe, but I do still get as a response -- as part of my responsibility as being a member of this committee is to ask these questions and to get answers because I'm not just asking for me. Because remember, the entire State of Alabama, the first time they lay my eyes on this map was yesterday. I think it's pretty legitimate for us to have these questions since we could not get access to this information before. One of the ways --

**[OVERLAY]**

**MR. CHAIRMAN:** The first time I saw it was yesterday too.

**REPRESENTATIVE ENGLAND:** That makes me feel worse, but to be quite honest with you. So, you ask me, I'll point out just that one thing. I need you to help me understand if a racial polarization study was done. I need to know who did it. I need to know what the results are, so I can tell you if I believe that one that matches up with the standards that have been set by federal courts in the Supreme Court, because very recently we had issues with the Supreme Court. We just lost the lawsuit behind some of this stuff, so I need to have something so I can draw some comparative analysis between the two. So, on record, you're telling me that a racial polarization study has been done?

**MR. CHAIRMAN:** Our attorney looked at it and assured us that we are incompliance with Section 2 of the Voting Rights Act.

**REPRESENTATIVE ENGLAND:** The question I asked you, you're assuring me right now that a racial polarization study has been done?

8

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:** According to my attorney, yes.

**REPRESENTATIVE ENGLAND:** Okay.

**MR. CHAIRMAN:** According to the committee's attorney.

[00:20:00]

It's the attorney that's done reapportionment for 25 years.

**REPRESENTATIVE ENGLAND:** Okay. And you can provide that information to us so we can draw an analysis between the maps, the numbers and the study?

**MR. CHAIRMAN:** I have no problem when you look at all of our reports.

**REPRESENTATIVE ENGLAND:** All right. You said also that this map was prepared here in-house?

**MR. CHAIRMAN:** Yeah, it was drawn right here in this room.

**REPRESENTATIVE ENGLAND:** All right.

**MR. CHAIRMAN:** I mean, you sat here with us, and I know several times why we drew these maps.

**REPRESENTATIVE ENGLAND:** No. Actually, I've only seen my district up until yesterday when I got the maps.

**MR. CHAIRMAN:** No. I sat here when you're on a call.

**REPRESENTATIVE ENGLAND:** No. On that call, we looked at my district.

**MR. CHAIRMAN:** Yeah.

**REPRESENTATIVE ENGLAND:** Period. I haven't seen a map. This is the first time I've actually seen a physical copy of the map since yesterday. Now, that I've answered your question, can you answer mine? What other ways does this map --

**MR. CHAIRMAN:** Let me report. On district seven, there was not a functional analysis done on it simply because it was drawn blind, the race was turned off on the drawing, and after the district was drawn and we looked at the black voting age population, it was determined there was no reason to do an analysis on it.

**REPRESENTATIVE ENGLAND:** So, you have not done analysis on that?

9

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:** I just found out seven because of the BVAP, no analysis was deemed necessary.

**REPRESENTATIVE ENGLAND:** So, we don't know if it complies with the Voting Rights Act just based on an attorney's opinion?

**MR. CHAIRMAN:** Yeah. I mean, it complies.

**REPRESENTATIVE ENGLAND:** We don't know that.

**MR. CHAIRMAN:** Well, the attorney that his committee hired says it does.

**REPRESENTATIVE ENGLAND:** But he also didn't do what's necessary to figure that out. Interestingly enough, the only district –

**MR. CHAIRMAN:** The BVAP of that district is 54.2%.

**REPRESENTATIVE ENGLAND:** But again, the study demonstrates how much of that actual percentage is a voting percentage. So, there's a difference between just throwing out a percentage and actually knowing if that's functional or not. And also, interestingly enough, the Seventh Congressional District is the only district that splits counties. Is there a particular reason for that?

**MR. CHAIRMAN:** That's not true. I just told you, I just run off of the county to split.

**REPRESENTATIVE ENGLAND:** There's one in District One, you have one in the Escambia County?

**MR. CHAIRMAN:** No. Lauderdale is split between four and five, Tuscaloosa is split between four and seven, Jefferson is split between six and seven, Chilton is split between three and six, Montgomery is split between two and seven, Escambia is split between one and two.

**REPRESENTATIVE ENGLAND:** I'm sorry.

**MR. CHAIRMAN:** Every district has at least one split.

**REPRESENTATIVE ENGLAND:** I'll rephrase. Seven has the most splits. That correct?

**MR. CHAIRMAN:** One, two, three. Yes, sir.

**REPRESENTATIVE ENGLAND:** All right. Is there any particular reason why seven has the most splits?

**MR. CHAIRMAN:** No. Because four has got two, two has two, three has one, and one has one.

10

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**REPRESENTATIVE ENGLAND:**  Is there any particular reason why seven has the most split districts? Including in Jefferson --

**MR. CHAIRMAN:**  Trying to get the zero deviation, I'm assuming. We tried to respect -- we had to get to zero deviation.

**REPRESENTATIVE ENGLAND:**  Do you think it has anything to do with making sure that each split holds a particular percentage of African-Americans into it?

**MR. CHAIRMAN:**  I have no knowledge of that now.

**REPRESENTATIVE ENGLAND:**  Okay.

**MALE 3:**  Senator, I was hoping that we wouldn't be so contentious in here today, and I think I've been here with you gentlemen over the period of time trying to ask that we can get to this point. We sit around this table and I know that this is probably one of the most contentious sessions that we can have because everybody's for themselves. Everybody's looking out for what they got and it's all about territory. But I just wanted to ask a question about the map, and I guess go down the same line that Chris was representing England in terms of District Seven. In the last redistributing, we saw and heard from the United States Supreme Court that basically said that District Seven was the most gerrymandered district in the State of Alabama, and when you look at that, it almost looks like a salamander and the way it shaped, I see where you tried to come into your county boundaries to do that this time. But however, the Supreme Court has basically already ruled that, and so I just want this body to know that I will be introducing another map because when you look at the State School Board, it is representative of 26% of the African-American community giving it two districts. The house and the Senate also. The congressional district is the only district, the only map that we would draw as a body that does not represent the 26% of African-Americans. It only represents 13% of those African-American population. We believe that based on whole county, and what you can draw based on zero percentage, we can get two majority districts out of this, and I think that this body or the chairman has not tried to do that, just stay with what they were used to doing, and it's like we just drew over the same lines and didn't even try to come up with anything else different.

[00:25:08]
And that's what you get when you don't get input from everybody else, and when everything is kind of hidden and indoor. And so, with that, I know this is not the proper time to introduce the map, but I would do it officially when we have the next meeting, I will introduce a map even if it gets voted down and we will introduce them again on the floor. It will be on the map to concept, and I just want to let you know that I think that we can get two districts out of here that will show favorably for African-Americans across the state outside of just gerrymandering in this district with the unnecessary splits that we've gotten. Thank you very much.

**MR. CHAIRMAN:**  Thank you, Senator. Did you say you have a map that has two majority black districts in it?

**MALE 3:**  Yes.

11

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:**  Okay. All right. Senator Smithman.

**SENATOR SMITHMAN:**  Thank you very much Mr. Chairman. Chairman's, let me say this first, I noticed the Senator mentioned a level of frustration, a level of uncomfortableness or whatever words you want to use is coming from our leader. Let me say this, that's what you get paid the big bucks for. You asked to be chairman, you asked. Now, you accepted it. So, get all that comes with it, so, relax and take a deep breath because it's coming. Questions coming, they're coming, they're coming. So, just relax and I understand, but you're the leader, so, that what comes with the territory. Let me piggyback first on starting with this map. In whether or not, -- let me just say this; I asked for a map that shows the precincts, I know we got them. And the reason I'm saying that to everybody in here to do that, yes. It's going to take more time. It's going to be detailed, because you're asking questions about this or that. But as a committee, and thank you for putting me on the committee. Whoever appointed me, I know who did; so thank you. But as a committee, we have to go through this mundane process if members have the question. We are in a committee meeting now; and in here, any of those questions that we have. the means of being able to provide, we have a right to get that information. Let's not vote it all up and down by memos, each member has that right to get that particular information. So, with that in mind, that's the first thing because I like to see what Senator was saying about the drawing to see what it brings in and what it doesn't. I can't tell a lick about Jefferson County, where the line cut off from this map. I don't know if it cut off on south side, if it cut off on far apart. I don't know if it cut off above Fire Park above Center Point. I don't know where it cuts off by looking at this, and along with being here, I'm a citizen in that particular district as well. So, I would like to see that number one. Number two, I think if that information is available that the representative requested, I think that it should be provided immediately if we operated off of it and didn't have the actual information here, then I think that needs to be known. But I think that any information in this meeting not a week later, not two days, not a month later, but should be provided in here. If it's on a computer, push a button, push print, print it out, and then give it to whoever else have requested it. So, I said that to say that it may not happen, but to count all these things right here, you might want to pipe in dinner[PH 00:29:00] because we need to go through these and to ask questions, is going to seem whatever you want to call it, but that's why I say get the frustration down because we have questions, I have questions, and I like to get answers as a committee member. Nobody else may not be concerned about these things, and I understand. But if one member is, we need to address that. The other thing I want to say is this is that there's two other things, and I'll move near the mic. Number one is that the Senator mentioned correctly about the 26% African-Americans. But we we're actually talking about 30 something percent of minorities. One third of them as it relates to minority population itself should be represented. We're talking about that it should be two as it relates to African-American population as a minority because it's a super population of minorities.

[00:30:00]

But there are other minorities, Asians, there are Latinos, there are all these people in this State and men of my registered voters that make that percentage goes up to 30 something percent. The third thing is that I've had opportunities to see the map that Senator Singleton is talking about, and that map does not split one count, one county, the congressional map that he's talking about.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

It keeps every county whole for all the congressional districts that exist on that map. So, I would
think that as a committee, whether the committee ultimately votes it up that as he said, I think
that as a committee, that we should consider any of those plans in this meeting if it made those
10 days, I think the requirement that you made that that would be submitted. If they were
submitted there in the committee, should take those up -- that was committee rules, that's
committee adopted and last, but not least, I'll say this is that I think that the process itself has not
addressed the area of compromise, and I'm not talking about somebody's individual districts.
I'm talking about the issues that's before you it relates to minorities. I know nobody sat down
and talked about the concerns that I split and when we get to that area in the [INDISCERNIBLE
00:31:28] plans, I expressed that I had a concern about that area and no other conversation has
been had about it. So, that kind of disappoints me because it's kind of saying that "I don't give a
heck what you think or say. So, take me to court." That's what it says to me. I don't give a rip
what you think, I don't want to talk to you. I don't want to compromise; this is what I'm going to
do. So, take me, so I hope that isn't what it's saying, because I'm not saying anything but
anything. I think past involvement says that that has happened. So, I would hope if we are trying
to get around and work together in this situation, that we'll find some way to compromise with
both sides. I know you've been working hard on your side because I've talked to some of my
colleagues and I know some of those concerns, but I'm talking about all of us as a whole. Thank
you very much.

**CHAIRMAN:**  Thank you, Senator. Ms. Hall?

**REPRESENTATIVE HALL:**  Thank you, Mr. Chairman and Chairman. I want to reiterate the
comment that was made earlier in terms of the response when questions are raised. That we are
all in here because we want to do what is right. So, I would hope that we would be considerate of
that in light of the fact of the response that I've heard with the comments that have been made up
to this point, I'd like to make a motion. I am going to make a motion. My motion is that we
postpone the votes on these proposed maps until members of this committee and the public has
had adequate time to review and consider the details as well as provide the ratio polarization data
study that you said was done.

**FEMALE 2:**  Mr. Chairman, I second the motion.

**MALE 2:**  Mr. Chairman, I think that motion is inappropriate. We have business to tend to at
this meeting. Everyone knows it and if it would be --

**[OVERLAY]**

**MALE 2:**  Would you mind if I get to my comment, please without interrupting? I have not
interrupted you and I don't want to be interrupted.

**FEMALE 2:**  I appreciate that, but when you make a comment like that, I'm sorry. I should have
held my --

**MR. CHAIRMAN:**  Move to table. We have a motion to table. All in favor. Say, aye.

13

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**MALE 2:** Aye.

**FEMALE 2:** I oppose.

**[OVERLAY]**

**FEMALE 2:** Roll call. I will ask that each vote just as you did on the minutes that you would have the roll call vote on each action, thank you. And I would ask that you reconsider at this time.

**MR. CHAIRMAN:** So, you have a motion to reconsider?

**FEMALE 2:** Yes, sir.

**MALE 3:** Second.

**MALE 2:** I second it.

**MR. CHAIRMAN:** All in favor, say, aye.

**[OVERLAY]**

**MR. CHAIRMAN:** Nay?

**[OVERLAY]**

**FEMALE 2:** I did request a roll call on each motion hereon and that you didn't.

**[OVERLAY]**

**FEMALE 2:** No, you didn't, because you'd reconsider.
**MR. CHAIRMAN:** Oh, now we have a motion to give this plan a favorable report in a second.

**MALE 4:** Mr. Chairman.

**MR. CHAIRMAN:** Roll call, please.

**MALE 4:** Mr. Chairman?

**CHAIRMAN:** Yes, sir?

**MALE 4:** I'm ready. I'd like to be recognized.

**CHAIRMAN:** Okay, sure.

**MALE 4:** So, are we saying that, it doesn't matter what we think at all?

14

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**[00:35:00]**

We just come in here to go through the functions. We're not going to consider anything whatsoever that if we have a concern or anything, you're saying it don't matter that we're in here because that's what we're saying. I didn't say what the final vote after we go through the process of consideration. But we're not going to consider anything that we got to say?

**MR. CHAIRMAN:** No.

**MALE 4:** I mean, is this a segregated movement or something? Because you haven't considered nothing we're saying over here. So, I'm just asking you as a chairman, is that where we're going with this?

**MR. CHAIRMAN:** And I'm allowing each of you to speak. Ms. Boyd.

**REPRESENTATIVE BOYD:** Thank you so much, Mr. Chairman. We've sat around this table many times. It's disgusting when you walk into a room for me and somebody approach me. "May I help you?" That was the first thing; but being as old as I am, and I haven't taught school 45 years and 6 months I've been here, I've learned a lot. At our very first meeting, I asked, "Is this one going to be better than any of those in the past that we do it fairly and collectively?" We know the process, we know who has the vote, all we want, Mr. Chairmans, is the opportunity to be heard fairly and from the way we are starting off here, it doesn't seem that way. Only God Almighty can change hearts. We can sit here forever and look at each other and do what we're told to do when it comes to voting. I would hope not. But we're speaking, I have people at home who are very much concerned about the senatorial. What is shown and as it relates to congressional seats. If that shoe was on the other foot, that's all I'm going to ask you to do when I close. Just think about if the shoe was on the other foot and you were sitting in my seat and my place, oh, our places here, would you act in the same manner? Thank you so much for the opportunity.

**MALE 2:** Roll call?

**MR. CHAIRMAN:** Another roll call vote on approving the congressional plan. Mr. Jones, [INDISCERNIBLE 00:38:05]

**REPRESENTATIVE JONES:** Thank you for the recognition, Mr. Chairman. I think on my visit here last week, I mentioned that this would be the way this process would turn out. It is not logical to think that we can digest the data that's here in the period of time that we received it. Nor is it logical to think that we would vote on something that we actually have no knowledge about and can't even talk to anyone in our district about because we don't know. How do you vote and then go back home and explain when someone asks, "Well, why did you vote for this?" and start asking the questions that's being asked here? What do we do with that? I understand the time. I understand how hard people have worked. I've been up here a couple of times, and I've seen the work that's taking place up here, and that's admirable. I've seen a lot of people working hard. The bottom line, though, we cannot disregard transparency based on urgency, especially in

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

this process. I know that there are some time periods we have to meet. To me, the questions that's been asked are logical questions. If someone is really interested in what they're doing and the people they represent, they are logical questions. Now maybe because this is my first time in this process, someone told, I think the attorney mentioned to me, "Well, they've been doing it like this a long time" and let me respond to what I told him. "That does not mean that that's right or fair regardless of whether Democrats did it or Republicans did it, the right way is the right way regardless to who's doing it."

[00:40:00]

And I just think that we ought to give some concern for some of the questions that's being asked here, because those same questions are going to be asked to me as soon as I get back to mobile account and I have no answers. You give me a lot of data here, but it probably takes me a few days to read through it, but it's over then. I've already voted. So that's really my statement and I just want you to consider some of those things as I go forward.

SENATOR MCCLENDON:  Ladies and gentlemen, let me point out. What we have before today is simply a recommendation. It will be put in Bill Form. It will be introduced into both chambers of the house. It will be assigned to committee in both chambers, and then it will be debated fully on the floor of both chambers. We're just trying to get to the point where we've been called into extraordinary session. That deadline is set. We have to have something to put into a bill by 04:00 Thursday afternoon, and we need to get something out of here so LSA can put it into Bill Form so we can give it to everybody because it's not in Bill Form until it comes out of here. You will have the time in both the House Standing Committee and the Senate Standing Committee and the floor of the house and the floor of the senate to fully vet and look at these bills. But there's not a bill yet. I don't have a bill because I can't say anything to LSA until I get something from this committee. This is simply a recommendation to send to LSA for us to begin the full-scale debate on the floor. Senator Smitherman.

SENATOR SMITHERMAN:  Are you saying, I said you go to the chairman and you're speaking. Are you saying that we can't vet it here wherein the committee itself that we denied the opportunity to vet it? I'm just asking a question. I didn't say you said it or not. You answer, we answer that. Are you telling me that what you just see, all that's going to happen out there -- are you saying that we -- but however, in this committee, we are denied that opportunity to do the same thing in our committee work on reapportionment?

SENATOR MCCLENDON:  No.

SENATOR SMITHERMAN:  Well, if we did that like for it to be done. That's all I'm at right now. I like this [INDISCERNIBLE 00:42:09].

SENATOR MCCLENDON:  You got the populations, the deviations of black age voting population in every different. You have all the information that I have.

SENATOR SMITHERMAN:  And I like to vet it in here. Me vet in at, we leave out here means nothing because the vote is going to be taken.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR MCCLENDON:** I don't have a bill before you because I can't get a bill draft until after it comes out to LSA, and I can't see anything to LSA until it comes out of here.

**SENATOR SMITHERMAN:** Unless I'm going to be on what -- we vote now. Whether we vote now today. I would like for it to be vetted the same way that you said that it could be vetted in those committees. Why? One of the main reasons we are supposed to have the experts in here. Our reapportionment director will not be on the floor. If it's not a public hearing, she cannot come on the senate floor. This lawyer cannot come on the senate floor itself. This is where the work has to be done to answer those questions in this committee. Not out there. You all know the rules. I don't have to even speak them. The people can't come out there. They are going to be out there. It's going to be somebody at the mic going to be saying the same thing. Well, they did it. And the answer is goes they did it. I would like to know how you came about it. Whatever the process to get to what you said that they say, "Okay to." And this is the place that it should be done right in here, and that's all that I'm asking. The exposure of the process and information be brought out in here so questions and follow up questions can be addressed to that information.

**SENATOR MCCLENDON:** Yes, Ms. Hall.

**REPRESENTATIVE HALL:** I needed to go back to make sure I have the correct information as relates to what you said about the racially polarized voting study that was done. Did you say it was done?

**SENATOR MCCLENDON:** Because of the black age voting population in Congressional District 7, there was not one needed because it was over 54% black voting age population.

**REPRESENTATIVE HALL:** So you're saying that we don't have a black, we don't have a polarization, racially polarization study?

**SENATOR MCCLENDON:** None. Because the voting age is 54. What is it? I got it right here.

**REPRESENTATIVE HALL:** And you use District 7 as the basis for not having such a study done?

**SENATOR MCCLENDON:** The black voting age population of the district is sufficient enough to where you don't need a study done on it.

**REPRESENTATIVE HALL:** Are you saying that would not be a part or should not have been a part of this process?

**SENATOR MCCLENDON:** Once we drew the process, once we drew the plan with no race on the computer --

[00:45:00]

17

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

-- then after the plan was drawn, we turned on the race and we looked at District 7 and saw that it had a black voting age population that was sufficient enough to not require an analysis. And we put any more African-Americans on the race. We're afraid we'd be sued for packing.

**REPRESENTATIVE HALL:**  So that was just District 7. What about the other districts? If we did those on these, I really would like -- I was trying to get that information. I'd like to have that information. I'm requesting that information.

**SENATOR MCCLENDON:**  The demographics of the district. Yeah. It's right here, it's in your folder.

**REPRESENTATIVE HALL:**  So you're saying the data that we have makes of the --?

**SENATOR MCCLENDON:**  Yeah. Here's the data right here. It's in your folder. It shows you the percentage of African-Americans of whites, the 18 plus populations, everything. It tells you to give you all that information.

**REPRESENTATIVE HALL:**  I just want to make sure what you're saying that the data that we're receiving here today on each one of the districts provides us the data that we would have received or that would be received as a part of a racial polarization voting study.

**SENATOR MCCLENDON:**  I'm being told that at 54 plus percent of the African-American vote, it was high enough not to warrant a polarization study. It was a majority-minority district.

**REPRESENTATIVE HALL:**  And that came from our attorney or the committee's attorney?

**SENATOR MCCLENDON:**  Yes. That came from the committee's attorney. Yes, ma'am.

**REPRESENTATIVE HALL:**  And so, at this point, we do not have that.

**SENATOR MCCLENDON:**  Not on District 7. No, ma'am. Yes. Chris. The representative of England, I'm sorry.

**REPRESENTATIVE ENGLAND:**  All right. You're referring to that -- as if the District 7 was the only district that you did not do that on. So did you do that on other districts?

**SENATOR MCCLENDON:**  We have the breakdown of black and white population.

**REPRESENTATIVE ENGLAND:**  No, not that. I'm talking about you mentioning that racial -- that you didn't do the study on seven. Did you do it on any other district?

**SENATOR MCCLENDON:**  Can I ask something? The question you're asking, the answer is our attorney, mine and your attorney set that data off for districts that it looked like there might possibly be a racial issue. And we did that on all of these maps that we've done today. So he received the information on those districts where it looked like it could possibly be questionable, and wherever it was questionable, if necessary, we made adjustments. So the answer to your

18

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

question would be a general statement that in any districts where it looked like it possibly was an issue, we had those districts analyzed. And if necessary to make changes in those districts to try to stay in compliance with the Voting Rights Act, then we made those moves. So you can ask that question about any one district and I will answer that by saying any district that looked like it needed to be done, we did it.

**REPRESENTATIVE ENGLAND:** It would appear that District 7 would look like that would need to be done if the methodology that you said you used was, we didn't think about race and then we drew the map, and then we said, "Okay, well, this is a result." So it appears to me that if we're doing this in the logical way, that District 7 just -- as it appears on a map, would produce a certain percentage. Now, according to what you've been telling me, that the percentage is not the decision that you made looking at it on the paper and saying that 54% is enough, you actually consulted with an attorney to make sure. So it would appear to me that if you're applying the logic that you just gave me that if we just looked at the district to see if it was in compliance, we would actually do District 7 before we did the others. So I would like to request that study be done on District 7. And what is the relationship between the 54% that you're citing and the actual results or potential results of a racial polarization study? What is the relationship between those two?

[00:50:00]

**SENATOR MCCLENDON:** I got no clue.

**REPRESENTATIVE ENGLAND:** And that's the point.

**SENATOR MCCLENDON:** That's, that's the reason why we have the expert.

**REPRESENTATIVE ENGLAND:** Again, but hold on. That's point. If you can't explain to me why the 54% that you're telling us satisfies the threshold that you have not created or satisfied yet, that would probably make it necessary for you to conduct a study to see if that 54% actually represent, which represents what you think it does. So for -- I would like to request as a member of the committee that that study be done on the Congressional District 7. I would also like to request because the way you keep describing the map itself, is that Districts 1 through 6 may have caused the question or may not have caused the question so there is a situation where that same study may have been done on the other districts. I would also like to see that information as well. Can I get that? First, can I get the study done on Congressional District 7 to make sure that the 54% represents what you think you're saying? And then also, can I get this, the results of the studies that they've been done on other district? Because Senator McClendon, you represented that they had been. So I would like to see that data as well. Is that possible?

**SENATOR MCCLENDON:** Is there a particular percentage you'd be interested in seeing in District 7?

**REPRESENTATIVE ENGLAND:** That's the whole point. I want the study done so I'll know. I'm not going to -- I can't just blindly tell you what are percentage I would need in an area to make sure that it complies with the Voting Rights Act, one, but two, it is a -- I guess what you

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

would consider a safe majority-minority district. That's the whole point of the study. So I would like the study to be done on Congressional District 7 and I would also like for you to give me the results of the other studies on the other districts that you mentioned may or may not have caused to you some consternation.

**SENATOR MCCLENDON:** Okay, Mr. England, here's what I'll do. I'll request a study on District 7 for you, and I'll request the study be done on Senator Singleton's bill that he introduced also. How's that?

**REPRESENTATIVE ENGLAND:** Yes.

**SENATOR MCCLENDON:** It's possible to do it. I mean, we're going to talk about it. Okay. I'll do on both of them.

**REPRESENTATIVE ENGLAND:** To also kind of take a step back, this process isn't result-oriented. Meaning, that we're not collected here to go over the data and the maps just to meet the deadline. We are actually supposed to do some qualitative work on the information that you provided us so we don't send maps or information to LRS to be drawn up into something that can't pass. I mean, and I get it. I mean, we work with deadlines all the time, but this committee structure was set up especially for this component because it's actually a joint committee for the house and the senate that goes over all four maps. So we can actually take a deep dive in that information, in the data and actually produce a map that actually satisfies all the things that you've been mentioning since the very beginning about keeping counties whole, about not splitting precincts, about making sure that equal protection is valid and making sure that the Voting Right Act is complied with. That's what this process is for, is to vet the information that we're getting. Because we may go through this process and discover that some of the is corrupted and it's not reliable or, we may actually if we had done a racial polarization study, we may actually find out that that 54% that you're talking about doesn't actually represent the information that you're giving us, and that you have made an assumption that could jeopardize an entire map. So again, not trying to diminish the effort, the herculean effort that you had to undertake to get us to this point, the point here isn't just to get it done so we can get a bill prepared. The point here is to actually vet the information so we know what we're actually doing in this process.

**SENATOR MCCLENDON:** I understand, and I tell you we're going to spend a lot of time on this differential privacy, and that's going to come up sooner or later. Senator Smitherman?

**SENATOR SMITHERMAN:** I would just -- if you all, I would like to know first on any of the congressional districts, did you all receive a written report regarding the study that he is requesting on 7? We say it that on some of them, it was done. All right. So whatever ones that were done, do we have a written report from that attorney, from whoever it is that we had to do it. We are saying that it was done on A B, C, or D. Do we have anything in writing that was sent to this committee to you all or sent to the community itself that would suggest that that is actually a fact? That's the first question. Do we have anything?

[00:55:13]

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR MCCLENDON:** When we saw that 54% plus in the Seventh District majority-minority, we didn't think it needed a racial polarization analyzation and a lot to be analyzed and we didn't request racial voting polarization study on the majority of white districts.

**SENATOR SMITHERMAN:** Okay. So we don't have that, that's the correct answer. We don't have anything in writing that's been sent to you all regarding that you should --

**SENATOR MCCLENDON:** I have not seen anything.

**SENATOR SMITHERMAN:** Okay. All right. So we can't hold out then that that has been done. Okay. So that's the first thing. The second thing is this. We have an attorney that as you say very capable of being able to do what's necessary. I cannot understand the most important, the most important and really the only opportunity we as a committee member while we are going through these maps. I cannot understand for the love of life why he is not even sitting over there or he is not on Zoom. That doesn't make any sense. We are asking questions and we can't, you all cannot give the detail. I didn't say it to generalization, but you cannot give the detailed answer -- we keep telling them whether attorney need, an attorney and that's fine. Because if that's the answer. But then, that attorney need to be over there to answer what you just said that he did. I mean, that's an attorney for the committee and that is the most important meeting that he could ever be at being able to get him on there to give those responses as to the things that you all don't have first of all, documentation and secondly, that he in fact was the person who created, who suggested it and it was adopted to present to us by you all. So I'm asking to get him on here. I don't care if the phone.

**SENATOR MCCLENDON:** [INDISCERNIBLE 00:57:18]

**SENATOR SMITHERMAN:** Yeah. I don't care if you get the phone or we can't Zoom, we deserve to have those people in here where we can ask those questions to get answers. Thank you.

**SENATOR MCCLENDON:** Yes, Ms. Hall?

**REPRESENTATIVE HALL:** Thank you. You indicated in your report about meeting with all of the members of congress, except for one. Are you able to tell me that once the maps were drawn, did they have an opportunity to view this map? And, what was their impression?

**SENATOR MCCLENDON:** They all saw. The one that we didn't meet was Mo Brooks because he's no longer running. But they've all had the opportunity to look at them and make suggestions, make requests in what they would like to see in their district, yes.

**REPRESENTATIVE HALL:** And did they indicate that they felt that what you've presented is fair and --?

**SENATOR MCCLENDON:** To the best of my knowledge, yes. I was not in the meetings.

21

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**REPRESENTATIVE HALL:** Thank you.

**MALE 1:** Mr. Chairman, our renewed motion for roll call vote.

**M SENATOR MCCLENDON:** We have a motion before us to adopt the congressional plan. Clerk, recall the roll.

**CLERK:** Senator Holley?

**SENATOR HOLLEY:** Aye.

**CLERK:** Senator Allen?

**SENATOR ALLEN:** Aye.

**CLERK:** Senator Levison?

**SENATOR LEVISON:** Aye.

**CLERK:** Senator McClendon?

**SENATOR MCCLENDON:** Aye.

**CLERK:** Senator Melson?

**SENATOR MELSON:** Aye.

**CLERK:** Senator Orr?

**SENATOR ORR:** Aye.

**CLERK:** Senator Roberts?

**SENATOR ROBERTS:** Aye.

**CLERK:** Senator Scofield?

**SENATOR SCOFIELD:** Aye.

**CLERK:** Senator Singleton?

**SENATOR SINGLETON:** No.

**CLERK:** Senator Smitherman?

**SENATOR SMITHERMAN:** No.

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**CLERK:** Senator Williams?

**SENATOR SMITHERMAN:** Yeah.

**CLERK:** Representative Boyd?

**REPRESENTATIVE BOYD:** No.

**CLERK:** Representative Clouse?

**REPRESENTATIVE CLOUSE:** Aye.

**CLERK:** Representative Ellis?

**REPRESENTATIVE ELLIS:** Aye.

**CLERK:** Representative England?

**REPRESENTATIVE ENGLAND:** No.

**CLERK:** Representative Greer?

**REPRESENTATIVE GREER:** Aye.

**CLERK:** Representative Hall?

**REPRESENTATIVE HALL:** No.

**CLERK:** Representative Jones?

**REPRESENTATIVE JONES:** No.

**CLERK:** Representative Lovvorn?

**REPRESENTATIVE LOVVORN:** Aye.

**CLERK:** Representative Pringle?

**REPRESENTATIVE PRINGLE:** Aye.

**CLERK:** Representative South?

**REPRESENTATIVE SOUTH:** Aye.

**CLERK:** Representative Wood?

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**REPRESENTATIVE WOOD:** Aye.

**CLERK:** Fifteen yeses, six nos. The motion passed.

**SENATOR MCCLENDON:** Thank you committee members. Coming forth now is the State Board of Education in development of this plan. All state board members were met with in person or by phone, follow up meetings were held, sometimes by phone, some on Microsoft Team until all of their concerns were addressed. All board members had inputs. This plan meets our committee guidelines, complies with Section 2 of the Voting Rights Act and Equal Protection clause. There is a minimum population deviation between the districts, all population state board is 628,035 plus or minus five.

[01:00:10]

Respects counties to the extent possible of taking into consideration requirements for equal population does not require incumbents to run against each other. District continuous and reasonably compact, respects communities of interest, preserves the course of existing districts, the precinct splits, five counties are splits, five counties with zero splits. It's an improvement over the current law with 12 versus 5 splits. Tuscaloosa County, Jefferson, Talladega, Montgomery and Mobile each have our split. Contains two majority-black, Districts 4 and 5. The BVAP for 4 is 51.2 1%. BVAP for 5 is 51.2 7% and the functionality studies that we've talked about indicate that Section 2 requires no further adjustment to these BVAPs in order to fulfill our obligation under the Voting Rights Act. With that introduction, I move adoption of the plan as you have received. I have a second on that, a motion and adoption and I recognize my good friend Senator Smitherman.

**SENATOR SMITHERMAN:** Thank you Senator. I can't speak for anybody that's in here, but I have no knowledge of which changes had to be made in here. Is that I would like to go through the changes in each district adjustments. What is the adjustment that you had to make in drawing some out? We can start with warning going all the way to the last one there.

**SENATOR MCCLENDON:** The changes are detailed. You've got a folder Senator.

**SENATOR SMITHERMAN:** I would have to read.

**SENATOR MCCLENDON:** That's the changes in it and from -- let me tell you this.

**SENATOR SMITHERMAN:** Mr. Chairman, do you want me to -- if you recognize me, I'll take this folder and then read them out. But tell me I, I got, so Smitherman is that last vote. I don't like them. I am not even seen none of these until I just walked in at one o'clock. So I don't understand. But I'm requesting either that we go over or I'm requesting the opportunity to -- if I got to read it, let me read it out loud and everybody sit here and we read and then we have discussions about it. I don't mind doing whatever you tell me to do. But I do want to go over these. I mean just to ram them down my throat, that is not right. If I can't go over them, then you're ramming it down my throat because I just got this. I mean, I came down here and you

24

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

meet you and nobody said nothing about change, anything, it was about this. Nobody gave me anything. I am not saying nothing until I got this right now. So I'm asking, please tell me whether we change in one? What we change in two, that's reasonable.

**SENATOR MCCLENDON:**  Would you like a little five-minute break to read over that thing Senator?

**SENATOR SMITHERMAN:**  It'd take more than five minutes to read because I still got questions. Reading don't eliminate the questions because I need a big old map up there. I need a map, I need the overlay. Since you all know what I need, I will need to overlay and then I could see where that is and I could say, "Well, what area is that and then what's the result of that? What impact did it have on initial?" So that I've been asking for the maps and I know that they have it because I saw overlay when I came in here. So I know we have the capability and that's all I'm asking.

**SENATOR MCCLENDON:**  I wish you'd let us know ahead of time. Well Senator, if you want to talk about this, this is your opportunity to go ahead and do that. Now, I will tell you as far as asking me a lot of details on the BOA map, I was not involved and I was involved peripherally but not in detail. So if there's things you would like to discuss and ask and talk about on this thing that you have the floor and you're just welcome to do so.

**SENATOR SMITHERMAN:**  I could do a decent job of that if I got the map up there, well I can ask. That doesn't tell me anything. I'm looking at the one, it didn't tell me anything. It just tell me that these are the new lines. They didn't tell me what's the overlay, what we're taking out, what we had to add in anything like that in terms of the precincts.

**[01:05:05]**

**SENATOR MCCLENDON:**  So do you have specific questions about parts of the map and I'll see what I can find out.

**SENATOR SMITHERMAN:**  Yes sir.

**SENATOR MCCLENDON:**  I narrow it down and help me out here and I'll see what I can do.

**SENATOR SMITHERMAN:**  The basic question I like to overlay, like to see the comparison and contrast, either way that it's set up that you got to set up in the machine -- presently and what changes this.

**SENATOR MCCLENDON:**  Okay I'll see what you want. I don't know if we're capable of doing that but why don't you talk about any parts of this that catches your attention and I'll check and see what our IT folks can do as far as complying with your request. We might be able to put them side-by-side with the new one. We might be able to do that. I don't know, but I'll be glad to check on that and see what we can do.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:** Well specific questions, I can't give them to you because I don't know the overlay. That's why I got to have it. I mean, this is the finished product and I'm asking about the contrast between old product and the finished and I don't even have that before me in this where I can do that sitting in, you can think of anything. I don't have it. That's why I'm asking for it and I know we got it because like I said, I was here and I saw that we have overlaying capabilities.

**SENATOR MCCLENDON:** We did have, and I think we put online. I'm not sure, but I think we put online today old map, new map. We'll see.

**SENATOR SMITHERMAN:** I did the first time, I've seen this.

**SENATOR MCCLENDON:** While he makes that request, is anybody else. We'll get back to you Senator.

**REPRESENTATIVE ENGLAND:** I have questions.

**SENATOR MCCLENDON:** Under the current map that we're looking at now, was this drawn based on the 5% deviation plus-minus?

**REPRESENTATIVE ENGLAND:** Yes, sir.

**SENATOR MCCLENDON:** Could you tell me in District 4 and District 5 what was the population gain or population loss for you to be able to -- because in order for you to do the 5% deviation, you had to look at the gain or loss in that. So therefore, you had to move around in precincts.

**REPRESENTATIVE ENGLAND:** I don't have a -- it's 27,686 people under that deal. It's 228,659 whites, 319,828 blacks.

**SENATOR MCCLENDON:** So there's about 27,000 population loss in that district?

**REPRESENTATIVE ENGLAND:** It's under population idea by 27, has a deviation of minus 4.61%. It's 38.9% white, 53.27% black.

**SENATOR MCCLENDON:** Where would you have made that part pull more citizens black there in Jefferson County to make up that deviation?

**REPRESENTATIVE ENGLAND:** I'm not sure where it came from Senator. I'm sorry.

**SENATOR MCCLENDON:** See, that's the kind of stuff we would need to know in order to be able to approve maps when you start making these kinds of adjustments. I definitely would like to know that because it's not detailed on these maps where your adjustments came in terms of making adjustment to make up that. If you look at the next one and which covers most of the black built, I'm certainly there was some loss there.

26

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**REPRESENTATIVE ENGLAND:** District 5?

**SENATOR MCCLENDON:** Yes.

**REPRESENTATIVE ENGLAND:** Which is 621,817 people which is a 6,218.

**SENATOR MCCLENDON:** How many?

**REPRESENTATIVE ENGLAND:** 6,218.

**SENATOR MCCLENDON:** Okay.

**REPRESENTATIVE ENGLAND:** 252,012 whites, 326,931 blacks. That's 40.53% white, 52.58 blacks. In fact, voting age population is 51.27%.

**SENATOR MCCLENDON:** Okay. And again, you can't tell me where the makeup of that population, which direction you went to get the makeup in that population in your precincts?

**REPRESENTATIVE ENGLAND:** I can't tell you right off the top of my head, no sir.

**[01:10:00]**

**SENATOR MCCLENDON:** Thank you.

**MR. CHAIRMAN:** Senator Smitherman rest assured. We're over here chasing some electrons around trying to.

**SENATOR SMITHERMAN:** Thank you Mr. Chairman.

**MR. CHAIRMAN:** Representative Hall, did you have something to say in the event?

**REPRESENTATIVE HALL:** I do. I'd like to ask a question that I asked earlier as it relates to the school board plan. Did we do the ratio polarization polarized voting study on these districts?

**MR. CHAIRMAN:** Okay. My answer would be the same as it was before. Any time there was any suspicion that there might be a racial issue, we did submit these to a political scientist to give us an analysis.

**MALE 1:** Mr. Chairman.

**MR. CHAIRMAN:** Just a minute.

**MALE 1:** Okay.

**MR. CHAIRMAN:** You're still up.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**REPRESENTATIVE HALL:** Okay. Yeah. So you're saying that when you felt that was not a given, that was not part of the process of drawing the maps. So I'm going to get the same response on each one of the --

**MR. CHAIRMAN:** Yes, ma'am we didn't. I'm sorry, I didn't mean to interrupt you, Ms. Hall. We didn't automatically do every district on every map. We only sent the district's offer analysis where it looked like there might be an issue. If there's any suspicion of an issue, we had them analyzed, and then using that data, we tried to make them -- that wouldn't be an issue where we comply with the voting rights there. Does that answer your question?

**REPRESENTATIVE HALL:** Yeah. I'm just trying to make sure I was understanding correctly. So, we didn't do that for congressional and we didn't do it for school boards. I've done it for any of the others.

**MR. CHAIRMAN:** All right. I'm going back if you'll hang on just a minute. Senator Smitherman, have we got the map up done? Okay. There you go.

**SENATOR SMITHERMAN:** Now, what's the overlay? I'm okay side by side or whatever you want to call it.

**MR. CHAIRMAN:** According to my expert, the blue lines are the old and the colors are the new.

**SENATOR SMITHERMAN:** Okay.

**MR. CHAIRMAN:** So he said there's been a good bit of rearranging. But there always is when you have the population changes like we've had in Alabama this past decade.

**SENATOR SMITHERMAN:** My first question would be, why is Jefferson County split three different ways? I mean, we just split Chow for every one of these maps we got. Why come into our county and split it three different ways?

**MR. CHAIRMAN:** You know, these maps were created pretty much in the same style that the senate maps which you participated in and house maps, and that we worked with each of the existing board members, and so many times these changes were made in consultation with the existing board members. Just like you had input into your senate map, they had input into this map.

**SENATOR SMITHERMAN:** I appreciate you giving them input but I will say this, after the input and everything is done. They don't vote for this. We do.

**MR. CHAIRMAN:** Right.

**SENATOR SMITHERMAN:** So, the input all right, but the input are not like ours, because we don't want going to vote. And so that's why it's important for us to understand. They may like something. I got constituents that don't like it. I got a lot of them that don't like the fact that we

28

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

split up three ways in here. I'm talking about seriously. They don't want to be split up like that. That's why I said what I said in that regard. What about the other ones? What was the rationalization for the other changes that exist in the other ones? And this one, too. What was the rationalization? Why was it split three ways?

**MR. CHAIRMAN:** That was probably the biggest part of it is dealing with the existing members. That's where the most input came from.

**SENATOR SMITHERMAN:** Okay. So, we took in consideration what individual people won't, and I'm not saying you didn't take it at all but it seems to me that, and you correct me if it's not right. I don't mind being corrected. Well, we seem that we were focusing more on what they wanted than what the citizens wanted or what the better way to draw that map without splitting those counties.

[01:15:02]

Because I'm telling you what citizens are concerned about, they telling you what individual they want and don't want and that takes us out of the game, because we're represent those same citizens and we vote. So I would ask that you all go back and look at where you don't have to split Jefferson County like that, and then provide a map that does not do that. But now what's the other deviations and the changes? In the other deviations, what did you all have to pick up and what did you lose?

**MR. CHAIRMAN:** Well, the deviations of course are in compliance with the guidelines that this committee adopted and every district within plus or minus 5% of the target. So we've stayed -- this map is inside the deviations that we established really is our own guidelines to how to do this and how to do it in a sense of fairness.

**SENATOR SMITHERMAN:** Okay. In regards to follow up on Senator Sings question, I know he mentioned something about one of those districts. It was 26% population. Can you tell us what population each one of those? On each one of them.

**MR. CHAIRMAN:** I think you've got that data.

**SENATOR SMITHERMAN:** I don't have it all in one though. I got what you say it is in the new district.

**MR. CHAIRMAN:** Well, because we know what the target. So we got that in this folder? Okay. It's in the back of your folder. You got it in writing.

**SENATOR SMITHERMAN:** The old and under?

**MR. CHAIRMAN:** Well, you may have to add or subtract from the target to see what the difference is.

29

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:**  Well in that case, I move a 30 minutes recess. I got to do some math. [INDISCERNIBLE 1:17:03] some math. Give me time to do. The figure is all over that low. I mean, I know they are. You all could tell me about my own district. You know about every district in every plan it is.

**MR. CHAIRMAN:**  All right. I'm looking at the data that you've got in your folder, and I'm looking at district five. It gives the ideal population, gives the actual population then it gives the deviation. So, you've got all of that information in writing in your folder?

**SENATOR SMITHERMAN:**  What's the ideal population? The actual population?

**MR. CHAIRMAN:**  It's at the very back of your

**SENATOR SMITHERMAN:**  I see that part what you're saying right. I see it. Now, the other question there, where did we make of those numbers from? What precincts?

**MR. CHAIRMAN:**  I was moved around to create the district.

**SENATOR SMITHERMAN:**  Yeah.

**MR. CHAIRMAN:**  I don't know the answer to that. Oh, no.

**SENATOR SMITHERMAN:**  Do we have the answer in this room?

**MR. CHAIRMAN:**  A lot of precincts. Well, it doesn't matter. What you know is what the old district is and now, before you, you have what the new district is. So now where some people came from, that is the overlay.

**SENATOR SMITHERMAN:**  You said it don't matter, it does to me. I just wanted to say that it may not to nobody else, but it does. That's why I'm asking the question. I wouldn't ask the question being dealing --

**MR. CHAIRMAN:**  Are you asking me and listen Senator Smitherman, I'm trying to get what you want here, but you want to know where people came from or where they went. That's what your overlay map shows us, where the changes were made, which precincts were in a district before and which ones are in our district now. Does that answer your question?

**SENATOR SMITHERMAN:**  It answers 50%.

**MR. CHAIRMAN:**  Okay.

**SENATOR SMITHERMAN:**  But the other part is that it does not talk about what area. [INDISCERNIBLE 1:18:56] and put it over here. That's what I'm saying. We don't have any writing up there. I wouldn't have to ask, and we do have maps that is that detail. You all know that. I know you do, because you all the chairman's. You know we do, and that's what I was asking. I mean, do we have capabilities of doing that? Yes. And that's all I'm asking. In every

30

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

one of these things, we're going to do -- I would like to see that. So that at the, we can make a better understanding of what we vote on and taking places from people, because people ask us especially up in mayor. They don't want to be over here. They want the county to be whole. And so when you make the moves, and that tells me what people will move and what people will left and that has a basis too of the way I feel about this plan because all of us, we are here to represent the people in our district, and these are concerns of people in the district. Is there any way to know that?

[01:20:02]

**MALE 1:** No, sir.

**SENATOR SMITHERMAN:** It's not? You sure now? I mean, I was here when we did it, when we provided it.

**MALE 1:** Well, it could be that.

**SENATOR SMITHERMAN:** So even in man, I saw precincts. You remember you were in here when I came. I saw precincts. So I'm not making up some, you was in there with me when we saw those precincts.

**SENATOR MCCLENDON:** Now we can bring that down and we can get that to you but as far as it's coming before this committee, what we have presented and this is what we've got before us today.

**SENATOR SMITHERMAN:** And I have no problem with you presented and that's what before us. I just want some answers of what's before us. That's all I'm asking.

**MALE 1:** All right, sir.

**SENATOR SMITHERMAN:** So, can we get that information? Can we break it down? Let me just say this, I understand that we can, all we have to do, even out there is take number one and then put the details in and put it across there. That's all we got to do and then we'll see where it comes from. We should put that old, that blue line or whatever that line over there and that's like it is right there. The old and new and put the detail in there and it's over there in that computer right there. That's all we got to do. It's right there. I ain't asking for the man who ain't that available lawyer we got. I'm asking him about that computer right there.

**SENATOR MCCLENDON:** Okay, where we're examining on the capability of this system that we have now to the extent that we can.

**SENATOR SMITHERMAN:** Okay. There we go. That's what I'm talking about. That's I'm saying pop up there.

**SENATOR MCCLENDON:** Is there any particular area that you would like to look at?

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:** I like to --

**SENATOR MCCLENDON:** Do you want to look at your area and --

**SENATOR SMITHERMAN:** First all [INDISCERNIBLE 01:22:03], I like to look at the one above and I think that's six or whatever that is above that, every part, me particularly every one of those districts that Jefferson County, I like to see that part, that district that touches. It's three of them and I like to be told what I'm looking at, so I'll be sure of what I see. Yeah, you getting it. I was looking over that Tarrant and I'm looking at Inglenook, Brownsville. I'm looking at those.

**SENATOR MCCLENDON:** Senator Smitherman.

**SENATOR SMITHERMAN:** Yes, sir.

**SENATOR MCCLENDON:** We're going to spend, if you want to spend, we're going to spend about 10 minutes with you.

**SENATOR SMITHERMAN:** That's fine, I'll take it here.

**SENATOR MCCLENDON:** [INDISCERNIBLE 01:23:10] on this and then we're going to get you back on business.

**SENATOR SMITHERMAN:** 10 is better than zero. Take the 10.

**SENATOR MCCLENDON:** You're always a 10 Senator Smitherman.

**SENATOR SMITHERMAN:** Thank you, Senator. Sun Valley, so that the blue is the new, right?

**MALE 1:** That's right.

**SENATOR SMITHERMAN:** The blue is old. Blue is old and the colors are new. Okay. What district is that green? What number district? Four? It's number four? Blue, that y 'all call it blue. Okay. All right. So, it's the color is a change? Let me see. And it's four, four is the C5 and what six is the majority of the districts, five and; no, five and what? What number Mr. Chairman? I was just trying to speed up the process. Which one is five and what's the other one you say is a majority? African-American district, [INDISCERNIBLE 01:24:42] voting population? It's five and it's four and five?

**MALE 2:** Five, four is 51.2. Five is 51. [INDISCERNIBLE 01:24:57].

**[01:25:00]**

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:** How can we tighten it up that you don't have already splits in that county? Did y 'all look at that? Did you play with the map and look at it and see what it looked like?

**SENATOR MCCLENDON:** We played with a map and you certainly will have an opportunity if you've got a better plan for us. You'll have an opportunity to like that proposal to the legislator when we meet.

**SENATOR SMITHERMAN:** So, that's four, that all the four right there? I see some more at the bottom, is that part of four? And above four is what, seven? That's at the top of Jefferson County?

**MALE 2:** Yes, sir.

**SENATOR SMITHERMAN:** What percentage of seven is in Jefferson County? Anybody can tell me that? So we got three in Jefferson County and we got four and we got seven. Now, those are three at [INDISCERNIBLE 01:26:13] Jefferson County?

**MALE 2:** Yes.

**SENATOR SMITHERMAN:** Three, four and seven. It's seven, four and three. So in four, we went straight up. We did like the old seven in congressional. We went straight up in the Jefferson County to pull those people out, is that correct? Why we could not make Jefferson County whole or Tuscaloosa whole and keep these whole and satisfy that population? Did y 'all try to do that? And if you did - -

**SENATOR MCCLENDON:** I'm sure that was looked at and considered.

**SENATOR SMITHERMAN:** But you're not sure though. Okay, I was going to ask why. I'm not going to put you on the spot if you don't know, you know. Okay. All right, Mr. Chair, I see what's been done and I know what the people want. Thank you very much on that.

**SENATOR MCCLENDON:** Senator Smitherman, thank you for your participation and your comments. As always, a pleasure. Call a question. Roll call vote. There's no more discussion and let me see, Senator Singleton, do you have a question before we call roll? Call roll, please.

**FEMALE 1:** Senator Allen?

**SENATOR ALLEN:** Aye.

**FEMALE 1:** Senator Holly?

**SENATOR HOLLY:** [INDISCERNIBLE 01:27:59].

**FEMALE 1:** Senator Livingston?

33

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**SENATOR LIVINGSTON:** Aye.

**FEMALE 1:** Senator McCLendon?

**SENATOR MCLENDON:** Aye.

**FEMALE 1:** Senator Melson?

**SENATOR MELSON:** Aye.

**FEMALE 1:** Senator Orr?

**SENATOR ORR:** Aye.

**FEMALE 1:** Senator Roberts?

**SENATOR ROBERTS:** Aye.

**FEMALE 1:** Senator Scofield?

**SENATOR SCOFIELD:** Aye.

**FEMALE 1:** Senator Singleton?

**SENATOR SINGLETON:** No.

**FEMALE 1:** Senator Smitherman?

**SENATOR SMITHERMAN:** No.

**FEMALE 1:** Senator Williams?

**SENATOR WILLIAMS:** [INDISCERNIBLE 01:28:20].

**FEMALE 1:** Representative Boyte?

**REPRESENTATIVE BOYTE:** No.

**FEMALE 1:** Representative Clouse?

**REPRESENTATIVE CLOUSE:** Aye.

**FEMALE 1:** Representative Ellis?

**REPRESENTATIVE ELLIS:** Aye.

34

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**FEMALE 1:**  Representative England?

**REPRESENTATIVE ENGLAND:**  No.

**FEMALE 1:**  Representative Greer?

**REPRESENTATIVE GREER:**  Aye.

**FEMALE 1:**  Representative Hall?

**REPRESENTATIVE HALL:**  No.

**FEMALE 1:**  Representative Jones?

**REPRESENTATIVE JONES:**  No.

**FEMALE 1:**  Representative Lovvorn?

**REPRESENTATIVE l:**  Aye.

**FEMALE 1:**  Representative Pringle?

**REPRESENTATIVE CHRIS PRINGLE:**  Aye.

**FEMALE 1:**  Representative South?

**REPRESENTATIVE SOUTH:**  Aye.

**FEMALE 1:**  Representative Woolett?

**REPRESENTATIVE WOOLETT:**  Aye.

**FEMALE 1:**  16 yes, 6 no. It's passed.

**SENATOR MCCLENDON:**  BOE, bill to favorable report by this committee. We are now moving into the Senate bill. I'm going to take that bill. All senators were met with multiple times. Most of them wanted to. Sometimes we met on the phone, sometimes in person, sometime over Microsoft Team when there was a group. Senator Don, who is not running for re-election. We met with her representative speaking on her behalf. All senators had input into the plan. This plan follows our guidelines, compliance with Section 2. Minimal population deviation. Ideal pop is 143,551. All of the districts that are on this map that you have in your folder and which will get displayed are within plus or minus 5%.

**[01:30:00]**

35

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

We respect County Lowndes to the extent possible, given the requirement of equal population. We are not requiring any incumbents to run against each other; districts are continuous and they're not reasonably compact. We try to respect calamities of interest and we preserve the cores of the existing district. The existing plan, the one we're under right now splits 26 counties under the plan that is being proposed that you have on the Board now. We are split 19 counties. This plan contains eight majority black districts. These districts fulfill the state's obligation under the Voting Rights Act. I have a Motion for a favorable report and a second Senator Melson, are there any -- Senator Smitherman, it's about time you chimed in. Got involved in this.

**SENATOR SMITHERMAN:** This is one that goes even deeper than that what I've been talking about. I got serious concerns about the fact -- let me say this first.

**MR. CHAIRMAN:** Yes sir.

**SENATOR SMITHERMAN:** I'm going to make a personal comment; and then I'm going to get into this. I enjoy very much working with my delegation, let me make sure you understand that. We've done a lot of good things together; so by no means that I have any problem with any individual in my district, I mean, in my delegation. But let me say this to you, there's no reason under the earth why Jefferson County is split among seven senators. We have a population of 670,000 people. When you do the math, just divide it into that, that's 4.7 senators. That's what we should have in terms of our county. Whole county, keeping the county whole. Number one, let me say this; and I think -- that's why I wish the lawyer was here because he wouldn't have a choice but to say you were right. The Constitution in Section 199 and Section 200 states and I state that the counties are to be maintained to be kept whole in terms of drawing these districts. The only deviation that it talks about is simply this; is that where you have to provide a minority district; then you go outside of the counties to succeed to do that. In Jefferson County, that does not apply. All three minority districts are inside of the county. So, as a result of that, there is no reason that county should have those splits, based on the constitution, not based on an opinion or how I feel. I've mentioned that when I was in here, I mentioned that my concern, when I was asked the question that you satisfied, not the word satisfied, but that's with the district, and my comment is that I was concerned about whole counties, and I say that even if the Supreme Court ruled that way that I had to have this district then I will live with it, that's what my comment so I don't want to be misconstrued or what I say it in there. I'm saying it officially here. But in terms of Jefferson County, there's no reason why we should be split seven ways and I mentioned that to it made that known, no effort was made to deal with that issue. No effort was made to deal with that issue based on the constitution. So, I want to make that known that I put it out there, nothing was done about it, so, that is my concern. If you remember, that last time that we went to the Supreme Court, they took up the house issue and they addressed it in the house and said that the house should be a certain way because of dealing with this issue. Now, we're looking at the senate district that the committee has made no changes whatsoever and as a result of that, as I said, we have seven senators who represent one county. So, I'm asking the committee to go back to address section 199 and section 200 of the constitution that talks about whole counties and has laid out the proper legal basis of why we should do that especially as it relates to Jefferson County where all three minority districts encompass inside of the county.

[01:35:00]

36

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**MR. CHAIRMAN:** Okay, anyone else? Seeing no other discussion, I call for the roll call vote. Representative England, I missed you over there, hold that roll call vote. Representative England, you are recognized sir.

**REPRESENTATIVE ENGLAND:** I'm just trying to figure out almost the same lines that Senator Smitherman identified that's Lucy County for whatever reason has three senators and it is carved up. It's going to be 200,000 people total and it has three senators that come from -- don't really represent the same sort of communities of interest and Senator Singleton is my friend. He is my senator, but his district goes from Tuscaloosa County all the way down to Choctaw. Senator Reed who is also a friend, his district goes from Tuscaloosa County all the way to the northern tip of Walker all the way to Lamar. These are not communities of interest. The City of Tuscaloosa proper only has average three-member senate delegation; only one of the senators live actually inside of Tuscaloosa County. So, the people in Tuscaloosa County, there are people who have more influence or just as much influence of his own city in county business that live outside the county as members that who do. Now, we're not talking about the house delegation yet, but the house delegation is worse. So, I am just as many other senators and representatives, where you have a major city, it is often sacrificed in order to make up population for other districts. As a result, it sacrifices the amount of representation that we have. So, I just want to go on record once again to state that Tuscaloosa County is possible to draw a map without splitting it into three different districts, thank you.

**MR. CHAIRMAN:** Thank you Representative England for your remarks. Senator Smitherman, back to you.

**SENATOR SMITHERMAN:** At the proper time, I have a substitute motion.

**MR. CHAIRMAN:** Let's see, anyone else have anything else to say? Yes, sir, Mr. [PH 01:37:24] Myer. Did you want to get in on this?

**MR. MYER:** I'm just concerned about, I guess the Senate District 33 is now in Baldwin County but it's traditionally all in Mobile County and then some of the Baldwin County senators are now in Mobile County; I didn't quite understand that. The Baldwin County is the largest grove county around the state. How did we get a senator from Baldwin County in Mobile and then the senators from Mobile in Baldwin? Who are they coming to cross path like that?

**MR. CHAIRMAN:** Is that a question?

**MR. MYER:** Yes, it is.

**MR. CHAIRMAN:** You know, the answer is pretty easy, isn't it? Just like in the house districts, we had to sit down and work with each of the incumbents to resolve their issues and that appears to be the resolution. Senator Smitherman, are you back?

**SENATOR SMITHERMAN:** Yes sir, I'm back.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:** Yes sir, I recognize you. You're okay?

**MALE 1:** No, I'm not okay but -- Senator Smitherman.

**MR. CHAIRMAN:** Yes sir, Senator Smitherman, you're recognized.

**SENATOR SMITHERMAN:** Thank you, Mr. Chairman. I like to make a substitute motion that we carry over this plan and the motion ask the committee to go back and to look at making the basis for drawing this plan to perseveration of this provision of the constitution which is Section 199, 200 deals with whole counties and that in particular, the counties who have an excess amount of representation as it relates to the population in reference I'm talking to primarily Jefferson County, but all other counties that we would not go forward with this until that issue is addressed and corrected to reflect out of the 678 -- 70 something thousand people that the proper number of representation in the senate honoring whole counties would be five senators, 4.7 or 5 senators, thank you.

**MR. CHAIRMAN:** Thank you Senator Smitherman. Now, my commotion to table, I would ask that you all vote aye all in favor, say aye.

**[01:40:00]**

**SENATOR SMITHERMAN:** That's a rollcall, remember --

**[OVERLAY]**

**MR. CHAIRMAN:** Senator Smitherman, you're recognized.

**SENATOR SMITHERMAN:** A request was made for rollcall on all the votes from --

**[OVERLAY]**

**MR. CHAIRMAN:** Yes, sir, the chairman decided to make that a voice vote.

**SENATOR SMITHERMAN:** So you're not honoring her request for -- she made a formal request.

**MR. CHAIRMAN:** That's okay.

**SENATOR SMITHERMAN:** Okay, what's the rule does a committee regarding? I know on the floor what you had two or three hands up. Is there any rules that we can -- as a committee be recognize so that we can have a roll call vote?

**MR. CHAIRMAN:** That's a discretion of the chairman.

**SENATOR SMITHERMAN:** So they go back to what I say. Okay. All right, thank you.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:**  Senator Singleton, did you decide you want to join in?

**SENATOR SINGLETON:** Obviously not now.

**SENATOR SMITHERMAN:**  You have time later, don't worry, you have time later. You have some time.

**MR. CHAIRMAN:**  Do you want the floor Senator Singleton?

**SENATOR SINGLETON:**  No sir.

**MR. CHAIRMAN:**  Okay. Thank you. Let's roll call vote. Please call the room.

**FEMALE 1:**  [PH 01:41:10] Barry Allen.

**MALE 1:**  Let's make it a voice vote.

**[BACKGROUND CONVERSATION]**

**FEMALE 1:**  Senator Allen.

**SENATOR ALLEN:**  Aye.

**FEMALE 1:**  Senator Holley.

**SENATOR HOLLEY:**  Aye.

**FEMALE 1:**  Senator Livingston.

**SENATOR LIVINGSTON:**  Aye.

**FEMALE:**  Senator McClendon.

**SENATOR MCCLENDON:**  Aye.

**FEMALE 1:**  Senator Melson.

**SENATOR MELSON:**  Aye.

**FEMALE 1:**  Senator Orr?

**SENATOR ORR:**  Aye.

**FEMALE 1:**  Senator Roberts?

**SENATOR MELSON:**  Aye.

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**FEMALE 1:** Senator Scofield.

**SENATOR SCOFIELD:** Aye.

**FEMALE 1:** Senator Singleton.

**SENATOR SINGLETON:** No.

**FEMALE 1:** Senator Smitherman.

**SENATOR SMITHERMAN:** No.

**FEMALE 1:** Senator Williams.

**SENATOR WILLIAMS:** Aye.

**FEMALE 1:** Representative Boyte.

**REPRESENTATIVE BOYTE:** No.

**FEMALE 1:** Representative [PH 01:41:45] Clouse.

**REPRESENTATIVE CLOUSE:** Aye

**FEMALE 1:** Representative Ellis.

**REPRESENTATIVE ELLIS:** Aye

**FEMALE 1:** Representative England.

**REPRESENTATIVE ENGLAND:** No.

**FEMALE 1:** Representative Greer.

**REPRESENTATIVE GREER:** Aye.

**FEMALE 1:** Representative Hall.

**REPRESENTATIVE HALL:** No.

**FEMALE 1:** Representative Jones.

**REPRESENTATIVE JONES:** No.

**FEMALE 1:** Representative Lovvorn.

40

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**REPRESENTATIVE LOVVORN:** Aye.

**FEMALE 1:** Representative Pringle.

**REPRESENTATIVE CHRIS PRINGLE:** Aye.

**FEMALE 1:** Representative South

**REPRESENTATIVE SOUTH:** Aye.

**FEMALE 1:** Representative Wood.

**REPRESENTATIVE WOOD:** Aye.

**FEMALE 1:** 16 yeses, 6 nos. It's passed.

**MALE 1:** Thank you, senator. Ladies and gentlemen, now we move to the House of Representatives plan. In developing this plan, house members were met with in person. And subsequently over the phone on Microsoft teams and told many of their concerns have been addressed. All representatives had input into this plan. The exceptions are a handful of members who are not running for re-election and who chose not to meet with us. This plan meets our committee guidelines. It complies of section two of the Voting Rights Act and the Equal Protection Clause for the Constitution. There is a minimal population deviation between the districts, ideal population for house district is 47,850. All districts are within plus or minus 5% of ideal population. It respects counties to the extent possible, given the requirements for population on the 14th Amendment of the Constitution. It is not required incumbents to run against each other however there are a few members who are not running who are in other districts. All districts are continuous and reasonably compact under the Gingles test. It respects communities of interest and preserves the course of existing districts. It splits a minimum number of counties in voting precincts, 39 counties for split and 57 voting precincts for split to get the deviation. This is improvement of the current law which split 46 counties. This plan contains 27 majority minority black districts including the creation of a new majority black district in Montgomery which is House District 74. In addition, House District 53 held by minority leader Daniels has a black voting population of 48.15% which he said he was comfortable having. Well that ladies and gentlemen, are there any questions?

**MALE 2:** Motion to adopt.

**REPRESENTATIVE ENGLAND:** I have a question.

**MR. CHAIRMAN:** Okay, Representative England.

**REPRESENTATIVE ENGLAND:** Its seems like the whole county constitutional requirement applies everywhere but Tuscaloosa County. Again, there are 200% people inside the Tuscaloosa County and as it stands, there are seven members in that delegation. Of the seven, only four live

41

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

within the county. You mentioned in your discussions, you said we try to keep communities of interest together, representative Ralph Howards, district now draws all the way into Tuscaloosa - - not only Tuscaloosa County but in the city limits. He goes into the west side of Tuscaloosa which is majority minority.

**[01:45:08]**

**MR. CHAIRMAN:** And he is very happy with that by the way because he told me how excited he was.

**REPRESENTATIVE ENGLAND:** I appreciate you offering editorial for me. Secondly, District 71 goes into downtown or to the west side of Tuscaloosa. It also encompasses Pickens, Sumter and Marengo counties. It also goes into the west of Tuscaloosa and it captures the other half of the black population on the west side of Tuscaloosa. I don't think that's by accident. As it stands, the City of Tuscaloosa also now has a seven-member delegation of which three do not live anywhere near the county. The minority majority area of the city is represented by representatives that live an hour and hour and a half away. It is carved up in the City of Tuscaloosa to the point where it is very difficult to say for us to suggest that people that live in the county that the people that live outside the county don't have as much influence on what we do as the people who live inside of the county, especially the city limits. You also mentioned that it [PH 01:46:35] complies with the Voting Rights Act. I would also like to request the same information that I have requested all day long. I would like the same results from the same studies that we're conducting and that there has not been a study done on my District, District 70, 71, 72 or any district within the city of Tuscaloosa, I would like to have the results of those studies but not only that, I would like to also know who conducted the study and I would like to see the results. As far as across the state, I get the whole concept of try to keep counties whole and whatnot. But it does not appear that that was a guiding principle whenever you got to areas that where districts were minority. It seems like you dove into cities just to capture the black population and to pack them into districts to re-establish a population but to make sure that their influence does not spread outside to potentially impact an election in what would be a traditionally white or republican district specifically, in Tuscaloosa. So as I said, I would love to see -- I'm requesting the same information I have requested about the congressional districts and also, if there's any districts out where there are racial polarization studies were done, I would also like to see those as well.

**MR. CHAIRMAN:** Thank you and duly noted, we will get back to you. [PH 01:48:06] Senator Smitherman.

**SENATOR SMITHERMAN:** Two questions, one statement one question. I would request the same thing for all senator districts, okay. That study that they are trying to get, I would like for all senator districts. So I wanted to say that, I'm not saying you would but don't make a judgment [INDISCERNIBLE 01:48:28]. As a member, I am entitled to and I would ask for that. If we don't have it, spend the money and why we [PH 01:48:36] appropriate it. So any savings of money, either is about getting the necessary stuff that we need to get. The other question I would ask because I kind of heard you. Un your statement you said, you went on like you spoke to in your statement but I would like to know how many districts have been combined to where you

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

have now someone who is either waiting for a position that's open, that's obviously right now or who is -- or has been placed where two incumbents are now having to run against each other?

**MR. CHAIRMAN:**  In the house plan, there is zero.

**SENATOR SMITHERMAN:**  What about that [INDISCERNIBLE 01:49:20]?

**MR. CHAIRMAN:**  No.

**SENATOR SMITHERMAN:**  There is not?

**MR. CHAIRMAN:**  No.

**SENATOR SMITHERMAN:**  Okay. So he is not in the district with -- what's the other [PH 01:49:27] sister that's in Montgomery?

**MR. CHAIRMAN:**  He passed away but the candidate -- there are no two candidates that I know off. I don't know if he is going to run but no.

**SENATOR SMITHERMAN:**  Can she run? Ms. [PH 01:49:40] Morris and that's --

**MR. CHAIRMAN:**  I don't know the name of anybody.

**SENATOR SMITHERMAN:**  No, I was just saying Ms. Morris, that's [INDISCERNIBLE 01:49:49] putting Ms. Morris' district. Not understanding. Is that right? Am I wrong or right? Correct me if I'm wrong because I try to make statements that's right.

**[01:50:00]**

**MALE 2:**  Yeah, couple of house district.

**SENATOR SMITHERMAN:**  Right.  So, you know, what are we going to do to correct that? And I'll stop when you said it, I want to make a comment. All I want to say is this and the records speak for itself and if Senator [INDISCERNIBLE 01:50:16] was in here, he would, I think vouch for that. We made sure that no districts when we were in the majority ever, to republicans or to democrats that they had to run against each other. That's traditionally what we've done in here. All the time that I've been had the blessings and opportunity to be on Reapportionment and that since 1994. So now why are we doing that? And why are we doing it in a minority district? I mean, we got 105 seats out there now, why are we picking these minority district? They have two of them run against each other.

**MR. CHAIRMAN:**  Not that I'm aware of in Montgomery County. And I know when I ran in 94, I defeated -- two incumbents were put in the same district and I beat two of them. Not to get two incumbents.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:** There was a 94 run. Remember I said I've been here since 1994, it hasn't happened. He will vouch how much I folded in my [INDISCERNIBLE 01:51:10] and make sure that wouldn't happen.

**MR. CHAIRMAN:** We did not place any incumbents together.

**MALE 2:** Mr. Chairman, why you may say you didn't have any incumbents together, but you did have a candidate that was out there running in 76. That are currently running in 76. You have candidates that are currently running and 76 who would now not be in 76 because if they wanted them, they would not represent 76.

**MR. CHAIRMAN:** I don't believe that's the best the case anymore.

**MALE 2:** That is the case.

**MR. CHAIRMAN:** I don't believe it is anymore.

**MALE 2:** Explain the new district 74 if Represented [INDISCERNIBLE 01:51:50] was living today.

**MR. CHAIRMAN:** He would be in another district but--

**MALE 2:** It will be in another district, so he wouldn't be in 76.

**MR. CHAIRMAN:** Yeah but the person running his district is in that district.

**MALE 2:** In what district in the new district?

**MR. CHAIRMAN:** [INDISCERNIBLE 01:52:01].

**[BACKROUND CONVERSATION]**

**MALE 2:** No but now, they are tagged with another incumbent, who lives in that area now.

**MR. CHAIRMAN:** I'm aware of what you believe, but I promise you the plan has been changed.

**MALE 2:** The plan has been changed?

**MALE 1:** Can you show us a change?

**MALE 2:** Could you explain the changes?

**[OVERLAY]**

**MALE 1:** We can't see it. It doesn't clearly show here. Yeah, help me out with that.

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

**[BACKGROUND CONVERSATION]**

**MALE 1:**  76 is the new 74 that's been fixed.

**[BACKGROUND CONVERSATION]**

**MR. CHAIRMAN:**  While we're doing that, Mr. Clouse is there anything you would like to say? We are going to pull that.

**MALE 2:**  Yeah, well you can be seen.

**MR. CLOUSE:**  I just want to make a clarification on my friend Senator Smitherman. It might have been after 2000 census when the democrats were in the majority there were no republicans put together in the Senate.

**SENATOR SMITHERMAN:**  That's what I'm talking about.

**MR. CLOUSE:**  Right. But in the house, there were two districts, where two republican incumbents were put together.

**SENATOR SMITHERMAN:**  Yeah well let me come down and I'll [PH 01:53:45] refer it.

**MR. CLOUSE:**  Yeah okay.

**SENATOR SMITHERMAN:**  Republican Senate did that they won. See, we'll be fair about this thing. That's what I'm talking about. They'll tell you, I'll hide them for them. There isn't anybody allowing for them right now, but us.

**[BACKGROUND CONVERSATION]**

**SENATOR SMITHERMAN:**  Is that a new district now?

**MR. CHAIRMAN:**  That's a new district.

**SENATOR SMITHERMAN:**  That district?

**MR. CHAIRMAN:**  That is.

**SENATOR SMITHERMAN:**  That has been in the county though but that is?

**MR. CHAIRMAN:**  That is. That's whole precincts. So are there any more questions? Now we have a motion? Move to have a final approval to this.

**FEMALE 1:**  Question.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:** Yeah, I have done that once. Call roll.

**SENATOR SMITHERMAN:** She had a question.

**MR. CHAIRMAN:** All right, let Ms. Hall ask her question.

**REPRESENTATIVE HALL:** I was just trying to follow up with what you were saying in terms of the counties. Are we clear and what you're saying in reference to the county that Singleton and Smitherman mentioned as it relates to the candidates, whether the candidate is alive or not does that --

**[01:55:00]**

**MR. CHAIRMAN:** Where is perfectly thought.

**REPRESENTATIVE HALL:** All right, and so the -- this is the last activity that we are doing, right?

**MR. CHAIRMAN:** Yes, ma'am.

**REPRESENTATIVE HALL:** I would also like to request precincts for each one of these proposals that you provided today. I'd like to have that.

**MR. CHAIRMAN:** I will be more than happy to give you all breakdowns with all this stuff.

**REPRESENTATIVE HALL:** And then as we look at the rules, it says a legislator shall try to minimize the number of counties in each district. It seems like we're being a bit confused here with what we've heard today. We use the word "shall," it says that you must follow, trial indicates that you might not. And so, would you tell me based on what we have today and what instant would you not minimize the number of counties or the process that you've used here today?

**MR. CHAIRMAN:** Ma'am we did our very best to respect voting precincts and county lines and keep as many counties hold as possible but the overriding principle of reapportionment is one man one vote. When we went by whole counties in the State of Alabama -- in 1947 the United Supreme Court said the redistricting was a judicial ticket in which the court should not weighed and declared it non-despicable. Until the State of Alabama came and rentals [PH 01:56:37] via sims and our whole our whole county plan where they ruled that it was so egregious that denied people their constitutional right to fair representation. And that's the lawsuit just started all redistricting and the Fourteenth Amendment requires one man one vote and we respect county lines as much as we could but the overriding principle is to draw districts that each person in this room represents the [PH 01:56:59] apportionment the same number of people as every other person.

**REPRESENTATIVE HALL:** So it still appears that we've still dividing counties and it's just -- and so you're saying that process was necessary.

Reapportionment Committee Meeting
October 26, 2021
Transcript by TransPerfect

**MR. CHAIRMAN:** We split counties and precincts solely for the purpose of population deviations.

**MALE 3:** Mr. Chairman?

**REPRESENTATIVE HALL:** But we did not do the population study on all of these counties?

**MR. CHAIRMAN:** No, well, we're going to do the voting studies on the ones we think are necessary, but you don't need a voting study on my district. It's just not needed.

**REPRESENTATIVE HALL:** But I'm saying if we're being fair, when you do a study, you study all you don't study what you think.

**MR. CHAIRMAN:** No reason.

**REPRESENTATIVE HALL:** So help me to understand what the standard is.

**MR. CHAIRMAN:** Why would you study racial polarized voting in my district?

**REPRESENTATIVE HALL:** I don't know.

**MR. CHAIRMAN:** I mean, you just --

**REPRESENTATIVE HALL:** Other than in fact you want a process --

**[OVERLAY]**

**MR. CHAIRMAN:** I mean the reason we do this to ensure we don't run up against a regression on law suit and violate section two of the Voting Rights Act.

**REPRESENTATIVE HALL:** I shouldn't have said I don't know. I would think you don't do it because you would --

**MR. CHAIRMAN:** We were doing everything we can to prevent a regression problem and violate section two of the Voting Rights Act. I mean we're trying to follow the law and we don't have a retrogression issue and violate section two.

**REPRESENTATIVE HALL:** So would you violate the law if you did all of this information --

**[OVERLAY]**

**MR. CHAIRMAN:** We asked for polarized voting analysis on districts that we were concerned about whether we whether intentionally or unintentionally diminish the ability of a protected class of minority citizens from electing or defeating the candidate of their choice. That's what

**Reapportionment Committee Meeting**
**October 26, 2021**
**Transcript by TransPerfect**

we're looking at. We are making sure a protected class minor and compact and cohesive but minority class is able to elect to defeat the candidates of their choosing.

**REPRESENTATIVE HALL:** And I want to make sure that the record is clear. I'm not asking you to violate the law but I would ask you to be consistent and fair and across the board in the process.

**MR. CHAIRMAN:** We have met with every member trying to make him happy. Yes, senator?

**SENATOR SMITHERMAN:** I would just add that you quoted [INDISCERNIBLE 01:59:12] but if you go further it addresses what I see it. You did say what you said but you see what I see it after they said all that bizarre stuff they said however, counties should be made whole where there's possibility except one of the criteria was when you were trying to create a minority district. Unless you're getting ready to give up four in Jefferson County instead of three then we got out inside the county and that does not apply.

**MR. CHAIRMAN:** I'm a humble contractor and you're a scholared attorney. Well, that we had a question before us, I believe we have a roll call vote, clerk call the roll.

**FEMALE 1:** Senator Allen

**SENATOR ALLEN:** Aye.

**FEMALE:** Senator Holley.

**SENATOR HOLLEY:** Aye.

**FEMALE:** Senator Livingston

**SENATOR LEVISTON:** Aye.

**[02:00:00]**



I, Anders Nelson, hereby certify that the document "Reapportionment committee 10.26.21" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

# Anders Nelson

Digitally signed by Anders
Nelson
Date: 2021.12.14 15:46:45
-05'00'

_____

Anders Nelson
Project Manager

December 14, 2021

# TRANSCRIPT OF
# SENATE FLOOR DEBATE
# NOVEMBER 3, 2021



PLAINTIFF'S
EXHIBIT

7

J. McClendon

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

[00:10:00]

[00:11:09]

**SENATOR SINGLETON:** Mr. Chairman.

**MR. PRESIDENT:** Senator Singleton.

**SENATOR SINGLETON:** While we're waiting on here, can I just get a [INDISCERNIBLE 00:11:16].

**MR. PRESIDENT:** You're recognized.

**SENATOR SINGLETON:** I just want the body to know and I'm going to turn this back over, is that we here today on this congressional plan are going to present a couple of plans today and we just ask for your patience. This is not going to be a lockdown filibuster or anything. We just want to be able to ask pertinent questions about this, be able to take our time to walk through the process. I know I have a map or two that I want to introduce. Senator Smitherman has a map that he's going to introduce. I think also Senator Wagner may even have a map that he's going to introduce. So, we're just going to take our time to go through this process. There's no need to cloture anyone. We're not here to lock down anything. We just want to be able to ask pertinent questions and deal with the Chairman, who has done a great job at this point. So, thank you, Mr. President, for that point of personal privileges.

**MR. PRESIDENT:** Thank you, Senator Singleton.

**CHAIRMAN MCCLENDON:** Mr. President.

**MR. PRESIDENT:** Senator McClendon.

**CHAIRMAN MCCLENDON:** The house plan we have before us today is the plan that came out of the Redistricting Committee earlier last week and it is also the plan as it came out from the House of Representatives. The members were met with in person and sometimes on Microsoft Teams, sometimes on the phone. All their issues have been addressed. We've been made aware of their problems. Everyone that had an interest had input into the plan. There are exceptions for a handful of members who, in fact, are not running again, who chose not to meet with us. The committee guidelines have been met on all aspects of this plan. It complies with Section 2 of the Voting Rights Act and the Equal Protection Clause. There is a minimum population deviation between the districts. Ideal population for a house district is 47,850. All districts are within plus or minus 5% of the ideal. It respects counties to the extent possible, given the requirements for equal population. It does not require incumbents to run against each other. However, there are a few members who are not running, who would be in a different district from the one that they currently represent. All the districts are contiguous and reasonably compact, attempting to respect communities of interest and to try to preserve cores of existing districts. Copies of Pringle House Plan 4 are available to you. This plan splits a minimum number of counties and

precincts. Thirty-nine counties are split under this proposed map and compare that to the 46 counties that are split under the existing maps.

[00:15:12]

Precinct 57 are split in order to get the deviation. This plan contains 27 majority black districts including the creation of a new majority black district in Montgomery County, which would be House District 74. In addition, House District 53 held by Minority Leader Daniels has a BVAP of 48.15% with which he said, he was comfortable. With that being said, if you would like to look over these and see the details, the breakdown of the splits and the population; again, these districts were drawn with race blindness that committed data was removed from the screen when they were created as we're charged to do. You will see that the House Districts all fall within the deviation. The population summaries are attached to the maps that you have with a mean deviation of 3.18 and standard deviation of 1,682.66. The range on the districts on population size went from a low of 45,466 to 50,225. All of that information is presented up here. I will talk about historically how this has worked with the House considering senate maps and the Senate considering house Maps, which is where we are today on this fifth day of our legislative session, special session that in the past the Senate has been essentially hands off of the house maps accepting what is produced by the House and their efforts. And the expectation is the same that the Senate will leave the house maps, House will leave the Senate maps alone. At least that's how we hope it will work. Now, I see my friend Senator Singleton, you have some discussion on these maps, Senator, I would welcome the input.

**MR. PRESIDENT:** All right, Senator McClendon, do you yield the mic?

**CHAIRMAN MCCLENDON:** I yield the mic.

**MR. PRESIDENT:** Okay. Senator Singleton, you're up in the house.

**SENATOR SINGLETON:** Thank you, Mr. President. When I look at this plan, it says Pringle House Plan number 4. Is this a substitute plan that he made down? Because I don't remember a plan number 4 before the committee that we adopted out of the committee.

**CHAIRMAN MCCLENDON:** Yes, it is a substitute plan.

**SENATOR SINGLETON:** Okay. So this is not the committee plan. So this is a substitute plan?

**CHAIRMAN MCCLENDON:** Correct.

**SENATOR SINGLETON:** Okay. I heard you say the committee plan. Because I don't remember seeing a plan number 2 or 3. You know? Now we here, we are looking at a plan 4. What is the difference between the plan that we adopted and this plan?

**CHAIRMAN MCCLENDON:** There was input from the members. As, you know, that's when you got to get their votes and some changes were made. I don't think any of them were drastic

changes, but I was not involved in the drafting process of this map. Since it is a house map, House members were involved in it and Representative Pringle managed that and I was basically hands off that map.

**SENATOR SINGLETON:** I understand. So what you're telling me is that Representative Pringle went back and made changes to get the Bill passed, not necessarily an illegal bounds to make sure that something was legally done to meet the voters' right and to make sure that communities of interest, all of those things that we do to make sure under the legal status of being able to get a map drawn and get it constitutionally passe.

**[00:20:15]**

Those things was -- those changes wasn't there. He changed this specifically to make sure that get some votes. That's what I'm hearing you say.

**CHAIRMAN MCCLELLAN:** No, that's not what I said. What I said was I was not involved in that process.

**SENATOR SINGLETON:** I understand. But you mentioned that he had to get some votes.

**CHAIRMAN MCCLELLAN:** No. What I said was or intended to say was that he worked with members of the House to make changes. Now, what was involved in that whether involved votes or --

**SENATOR SINGLETON:** Do you know whether or not he had met with any African-American members to make any changes or memos of the minority party?

**CHAIRMAN MCCLELLAN:** No, I was not involved in that process so I can't really give you the details of how Representative Pringle and the House came up with the plan.

**SENATOR SINGLETON:** I understand. When I look at this map, I see a lot of splits in less whole counties that we sent out as a committee to try to do as much as whole counties as we possibly could. And when I look at this map and I understand you got 105 members and you got to work through the process so you may not have as many whole counties, and the map would look a little different at the senate and the School Board and Congress that then it does with the House because of 105 members have to be divided within six to seven counties. I understand you're going to get some splits, but in terms of unnecessary splits that are related, I looked at -- there's a district in Haysville which is a minority district that only has about 38% Black. How do you justify maintaining the voter's right with a 38% African-American district in the Haysville area that has been held by a minority already?

**CHAIRMAN MCCLELLAN:** Are you referring to House District 74?

**SENATOR SINGLETON:** I think that's what it is, I think.

3

**CHAIRMAN MCCLELLAN:** The BVA paying for that district is 48.15 and the current holder of that district was okay with that. He did not have a problem with it.

**SENATOR SINGLETON:** Well, I'm sure he did not suggest because of the fact to see exactly what it is that you're going to do with it. Let me ask you this question then. Had he had problems, would you think that Mr. Pringle would have made those adjustments or the demographer would have made the adjustment as you've done with the majority members to get all the way down to a plan forward to make the adjustments that they want to make?

**CHAIRMAN MCCLELLAN:** Your question is would Representative Pringle worked with the House member?

**SENATOR SINGLETON:** And had made those changes to get him a higher number if he possibly could?

**CHAIRMAN MCCLELLAN:** I'm certain he would work with him. He had input and the representative from 74 was placed with this district, assets drawn, assets presented to us today.

**SENATOR SINGLETON:** Well, I'm not certain. When I talked to him, I'm not certain about how pleased he is. He thought that that's all he could get based on what was offered to him and that's the difference in being you got to be just pleased with based on what people say that they - - that's all they can give you which you offer. So, you're pleased, you walk away okay with it, okay? And with the splits that you have gone in the Jefferson County area, again, and I think that you find that the people from Jefferson over my side would still talk about the unnecessary splits and splitting up Jefferson and how Jefferson is being split up and that's the argument we've already made, and I think that argument is consistent with all of the maps, okay? So, we're going to have to continue to beat that horse down the road in terms of the splits in Jefferson. Also, on the whole county provision, it is very few whole counties that you could see in this map. I see Randolph was left whole. Barber was probably left whole, Bulloch was left whole, Butler and after that, when you go across the map just about every other county is split. Were those splits necessary to maintain and to achieve the necessary parameters that we looked at in terms of not gerrymandering, making sure that we have communities of interest, making sure -- because we're supposed to be dealing on a whole county perspective and those were the rules that we adopted in the committee.

[00:24:59]

And when I look at this map, I see less whole counties as -- that possibly could've had some more unnecessary splits and that's what bothers me is that we are way down to a Pringle 4 and you don't understand and know where exactly what Mr. Pringle did to get the Pringle 4 and it is hard for me to ask you those questions, and it's unfair almost for me to stand here to ask you those questions because you may not understand exactly what he did to get down to a Pringle 4. And that's what's troubling is that the committee adopted a plan and then we get here and there's been a two, three and now has changed to a four and so that just kind of puzzling here today.

[OVERLAY]

4

**SENATOR SINGLETON:** I'm sorry, Mr. President, for the silence. I apologize.

**CHAIRMAN MCCLELLAN:** No need to apologize.

**SENATOR SINGLETON:** But that's where I am, Mr. Chairman, and then I noticed that, you know, again, you let the House handle the House and that's what kind of disturbing to me again is that we are down to a plan number 4 that as members of the committee we had never seen before. I'm sure you probably had even vetted this map that much to have seen a plan number 4, you know, and that's why you're standing here trying to do your best and struggle through some answers and the only thing that you can do is based on the information that you give currently in terms of your introduction whether or not you met the standards or not, you know, and that's what you can give. You can't explain to me exactly what the Chairman down there did in terms of his splits and why he made those splits because you have been able to do it on plan number 1 because you're always around each other doing it. But this is a plan number 4. A plan number 4 that we've gone all the way to a 4 that none of the committee members, Republican or Democrats in this body, has ever seen this. Somebody's member don't know -- what the House district even looked like now. They don't know. But as everybody is sitting back all cool and calm and collected, some of these folks problems have been running against them because they probably got what they wanted in the House District to run against them in the Senate Districts. But everybody happy, because everybody's just binding to it but this is a Pringle 4 that nobody knows what's in this Pringle 4. The map is so vague that we can't hardly look into to see exactly what it is that we are looking at in terms of real numbers and split because you can't see everything on these maps, and that bring polls for us to stand here and talk about it and then for you not to be able to answer any questions is even more disturbing, is even more disturbing. So, you know, I'm just as appalled that we went down this road with the House. And let me say to you, Mr. Chairman, I appreciate your steadfastness and at least stand on top of it in maintaining your map to do what you did, okay? I'm going to had to vote against it, I may not like everything, but at least you stood strong and you didn't go through a whole lot of changes based on what we had already seen. But this is a plan 4, that's disturbing to me. That mean you have gone through out the one that we drafted -- we will adopt it in the committee on last week, Tuesday I think it was. He has come along and drafted three more plans that we hadn't seen. Now, if that was going to be the plan, you know, I don't know what all the trickery going on here, you know, and we can keep saying that because he went back and met with folks, yeah I already met these folks already prior to this. So, what's the difference between plan 1 and plan 4 that he had to satisfy somebody about? Because that's all it was about. He wanted by into the legal reasons that we changed because something might have been unconstitutional, we didn't follow an x-trail or map or water or -- you know, we went over here and we took some VIP for someone else that we need to bring it back and bag out over there, none of those reasons that I understand this morning but here we are with a Plan No. 4.

[00:30:02]

And I don't know why we're at a Plan No. 4 and that's pretty disturbing to me as a member of the Permanent Reapportionment Committee that we have to stand up here and see something different than what we drafted. It almost looked like a backdoor job to me, Mr. Chairman and

I'm sorry and it is not at you but this is at the chairman on the house side. This is disturbing that he had to go and change it. I don't know what the minimum change or what it is, major changes I don't know because you weren't in there so you can answer those questions for me. Because I don't know and then plus, I can't see this map as clear to be able to know whether or not there is some major gerrymandering going on or whether he packed or he stacked in folks in areas and that's the problem that I have here today. So, I'm not going to prolong it, Senator Smitherman, do you have any questions on this map that you have to ask. Mr. President, I would like to yield if the gentleman will allow me to yield to Senator Smitherman to ask some questions about this house plan.

**MR. CHAIRMAN:**  Senator Singleton, you got the mic. If you want to yield, that's your choice.

**SENATOR SINGLETON:**  I want to yield.

**MR. CHAIRMAN:**  All right, yeah. All right, Senator Smitherman.

**SENATOR SMITHERMAN:**  Thank you, Mr. President, may I be recognized?

**MR. PRESIDENT:**  You're recognized.

**SENATOR SMITHERMAN:**  Thank you. Hey, my friend, how you doing?

**SENATOR MCCLENDON:**  Senator Smitherman, I recognize you as well.

**SENATOR SMITHERMAN:**  Thank you. I appreciate you.

**SENATOR MCCLENDON:**  I'm glad to have you --

**SENATOR SMITHERMAN:**  Senator [INDISCERNIBLE 00:31:30] was absolutely right. As he stated, what lack of better word, is I appreciate the opportunity to have to dialogue and to be able to discuss the different plans that will be before us. I just want to tell you that because that clearly will allow each person to see and make a determination what they feel would be the advantages or disadvantages for either one of the plans. So, thank you very much. And I did tell what he said about you being steadfast and being strong and set in and in the spirit of which we operate up here and that is we are very open and straightforward with each other and so having said that this -- I noticed in the meetings having the opportunity to be a member of the Reapportionment Committee, I noticed in the meetings that there seem to be some kind of, lack of a better word, friction among the house members themselves being in the meeting and it seems to me that the Chairman from the house kind of got a little irritated about fundamental procedures that were taking place and I think you know what I'm probably making reference to that situation. I said that because I'm concerned that the motivation to alter the plan to Plan No. 4 could have been driven by that friction of animosity. I don't know that and will make sure you understand that I don't have any clue to that effect, nobody came and told me. They're just only from my observation of the situation. I wish he could have provided for the committee because if I had to say it for the Senate, he would have said, "Well, we don't have to provide for the Senate so I will say it at the committee." that he co-chairs members. The updated information as it

6

relates to this -- this is plan on House Plan 4 as it relates to this plan because as it's been previously stated, the first time I actually heard that there were plans for was here in the debate. I mean, in the -- it's not debate. Here in the dialogue that's taking place regarding the plan. So, I am totally taken by the fact that this is truly the first eyes that I have laid up on Plan 4. Now, did he share any notes with you, talking points about their plan that you can share about any changes that may have --

[00:35:07]

I'm not even asking you to go get the map and show me only land, where it is or anything. It's just maybe you can share that with me in a conversation that would in such a manner that it will allow me to kind of get an idea as to why we are in a Plan 4.

SENATOR MCCLENDON: The most definitive information I have is the information that I provided with this body when this plan was first brought up when I talked about compliance with the Voting Rights Act and the equal protection clause and thank you for the opportunity. I mentioned earlier, I talked about a mislabeled district in North Alabama held by the minority leader. That district is 53. I called it by the wrong number, 74. So let me make that correction that I just called a wrong number out but that District 53 held by the minority leader is the one that had the 48.15% [INDISCERNIBLE 00:36:24] and in fact, the current office holder who is a minority member was okay with that. He didn't have a problem with it. But other than that, as far as the information that I have before me here pertains to the map we have before me. What I don't have is what we used to have in House District 1 and where those changes occurred. I've just got the information that we have before us and that, hopefully, eventually, we'll have a vote on and treat the House with the respect. We hope they will treat us and we'll leave the House map unscathed as it came out of the House the way they would like to have their districts drawn and of course, we expect that we get the same treatment in the House. They will have the senate map today. They may have it now. I don't know what their calendar looks like but of course our hope is that the map that this body approved and sent to the lower chamber that they will proceed to accept that and not get involved really in what's our business and my hope is that we don't get involved in their business.

SENATOR SMITHERMAN: Well, I understand what you're saying and I understand that that is a courtesy that you are saying that you hope that they provide for us and as such, that is an approach you would like to take in relationship to how we address what they have sent up here to us. The approach is not in question as to what you know or prefer. What's in question is that what are they asking us to defer on? I mean, at least tell us what deal we are deferring so that at least we can have an understanding of what's before us. That's all that -- I don't mean you personally but I'm just saying the House should have sent that -- the chairman should have had a talking point sheet for everybody in here. It should be 35, let's see, 36, it should 36 because the lieutenant governor should get one as well. It's actually, they have 36 of those talking points and so that we could go -- and 36 of these little maps so that we could go and then at least question that aspect of it. What I've heard from some of the house members is that the same thing took place with them, is that when they got it, they didn't get the information. Instead of getting some responses, they at least understand it. They were put in a position that you know, [INDISCERNIBLE 00:39:42] made a vote and yet to this moment, they still don't know the

answers to these situations so I would think in reference to the point that you shared with me that even if you take that position, if the body takes that position,

[00:40:01]

we should at least return or defer action on this until they get us the information. That's all I'm saying. Yeah, you know. Yes, [INDISCERNIBLE 00:40:16] call the Chair, anything like that to the -- at least until they get the information to us, you know all that, you know, if they trying to get it that if you don't want to carry it over then let's just continue the dialogue. Well, we need to do it. It's not a filibuster but like something essentially saying it's no objected to filibuster. Let me just clear you up again on that aspect, but I'm talking about to get the information. If they could get it to us in 15 minutes, that's fine. If they could get it to us in 5, then it wouldn't be necessary what I'm talking about. If they get it [INDISCERNIBLE 00:40:53] we all got -- we don't have -- we're going to need time to get it. I'm willing to work with them on that time. I just think that it's important that they get us the information so that leaves, as I said earlier, you know, we can understand. You know, what kind of substitute changes are -- changes in general that is in this Plan 4. Do you think that you could [INDISCERNIBLE 00:41:17]. I don't know if y 'all got a bat phone. That's what they call them. Yeah, my whole little bat phone. Can you get the bat phone and when you see that thing beep, beep, beep, beep, then you know who called you and then you just shared with him. You know, as I was spokesman from the Senate that there are senators here, who -- you know, can you provide us some information regarding just those subsequent, even if you don't want to get a little [INDISCERNIBLE 00:41:48], the subsequent adjustment and changes, that's caused us to have a Plan 4. I know you shared a few of them with me and I appreciate that but the other ones, you know, like you were just saying moving in and moving out just because it's obvious that you share with us. And I see you because you our Chair here in the Senate. What you share with us only committed when there was adjustments, then the numbers change, you know how to debate number change. Yeah, and that's all, -- and he should have that. If you want to hold map, you got to know what's in that district and we're not -- that comes out just like that. I said it because I have it here. I have some numbers myself from the house on the other plan, so that's why all about. I don't have this because I didn't get that. So, can you call or say no more, you don't have to, [INDISCERNIBLE 00:42:47]. I know you got staff and stuff, but can you make the hook up for us to get down there so they can get that information up here to us?

**SENATOR MCCLENDON:**  You know, I can certainly check with Representative [PH 00:43:01] Pringle to see if he has any summary or notes.  I don't have a problem doing that. If I get a --

**SENATOR SMITHERMAN:**  What about a reapportionment offer? They may have it too. The numbers, I mean. We don't have to draw them out, nothing stuff like that.

**SENATOR MCCLENDON:**  Now, we do have attached to what you've been provided. The numbers that are associated with this map, you have in front of you and that's really -- of course that's really what the issue is. I know we did take a senate map and did an overlay at the redistricting meeting which was interesting but the fact is what we're voting on today are -- let's hope we vote on today, is the plan we have before. So, we've got all the details of the plan

you've been presented. And the truth of the matter is, we do have maps and proposals that come before this body that nobody has seen before except maybe one person or two people. They come up with not a lot of details behind it. We may in fact, according to Senator Singleton. There may be maps offered today that nobody in this body has seen before except perhaps the sponsor of the bill or maybe someone who is behind them and supporting them out that come up at essentially the last minute and Senator Smitherman. Let's hope it's not only the last minute, but let's hope it's the last day for what we're doing --

[00:45:05]

-- but if I get a chance, I will communicate with my counterpart in the House and see if he's got any information prepared. I don't think that our redistricting office as a comparison sheet [INDISCERNIBLE 00:45:25] have time to put it together. They were here last night, late last night trying to help some legislators with some changes that they might want to propose to this body and maybe to the house. I don't know. So, that information may be available. But I'd be surprised if it's to the extent that you're looking for and would make [INDISCERNIBLE 00:45:58]. What we do have in front of us is what the details on each of these 105 districts. We've got that attached to the document before you and available to anyone in this House that would like to or anyone in this body that would like to go over those details.

**SENATOR SMITHERMAN:**  Well, Mr. Chair, I think that you spoke accurate when you said that that would be maps that we presented before the body, that some of the maps that it may be the first time that they have a chance to see those maps. But now, let me share you the difference and what we are requesting in the relationship to the map they're putting the House Plan 4 versus the maps that are going to be presented in here. The maps that are going to be presented in here, the people who are presenting the maps right here to where the same questions that I'm asking that they can answer them verbatim to every person in this body. So that means that 34 people have the opportunity to literally go to a mic and ask any question they want to. And if any person represents the map as the knowledge, then they get answer on the spot any of those questions that may come before them. In this case, we don't have that luxury because he's not here. Do you see what I mean? That's why we are asking as the only difference. That's why we are asking that. Now, if that's not a situation that can be expedited, then I think it will be nice if we had a brief recess. Well, it's 30 minutes, just 30 minutes. Do you see what I mean? I mean, the lazed, I have to say that because some people may think that. No, it's just 30 minutes to get -- they're not doing nothing. How's not doing anything right now?

**SENATOR MCCLENDON:**  Are they not in?

**SENATOR SMITHERMAN:**  Are they in? I don't think, they're coming in about 1.

**MR. CHAIR:**  I think 1 o'clock is when the House [INDISCERNIBLE 00:48:32].

**SENATOR SMITHERMAN:**  1 o'clock. So, if, but he's here. I mean, because -- where is this district?

**SENATOR MCCLENDON:**  Right in those mobile?

9

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SENATOR SMITHERMAN:** Oh, yeah. He can go back in the mobile yesterday and come back [INDISCERNIBLE 00:48:45] 1 o'clock. So, he's here. I can go back to that bat phone. Remember I said a bat phone? Hit that [INDISCERNIBLE 00:48:51]. Ask him, do you want to [INDISCERNIBLE 00:48:55] with anything they're doing in the House because as we said, they don't go until 1:00 and then we can recess for 30 minutes and go to Star Wars. I just said Star Wars, you know, it could be anywhere the majority want to go, okay? 200. If y 'all got a little extra food in there, you can bring us [INDISCERNIBLE 00:49:15] room. It doesn't make any difference but just get him there so that he could just explain it. Okay? That's all, for 30 minutes, that will be wonderful because then we at least have a clear understanding and really it's the same 30 minutes that we will be trying to struggle through to get out. So, you know what I mean?

**SENATOR MCCLENDON:** Yeah.

**SENATOR SMITHERMAN:** Yeah. Right now, so, it wouldn't be a dilatory use of time or anything like that. So, at least think about it and see if you think that's something that might be feasible. I appreciate that you've given it the attention and I know you will because you did the other day. So, I don't question whether you get it, you know, at least give us some consideration. I do want to talk a little bit about this [PH 00:50:06] Jone plan as a whole that has been presented. But before I go there, I want to take a look at this map and this is the Pringle Plan 4. And I think that that's yeah. Look at Pringle Plan 4 and look at Winston County when you get a chance.

**SENATOR MCCLENDON:** All right. I already found it.

**SENATOR SMITHERMAN:** Okay. Just tell me when you found it.

**SENATOR MCCLENDON:** Tell me where it is.

**SENATOR SMITHERMAN:** A little bit there. Going toward the top on the left hand side, not all the way to the corner. And it's kind of light, what we would call --

**SENATOR MCCLENDON:** Yeah, okay. Is that the free State of Winston that I've heard so much about?

**SENATOR SMITHERMAN:** Yeah. Look. That's why I want you to look at it.

**SENATOR MCCLENDON:** I see it.

**SENATOR SMITHERMAN:** Do you see how that district is -- Winston County, it comes around and then it goes around the county under it and then it comes up underneath and then it goes straight in the Jefferson County. You see that? You see how bizarre and gerrymandering and snake look that this district is. Taken, I mean, I'm not exaggerating by using certain words. You need to look at anybody that think that is exaggerating. Look at this map.

**SENATOR MCCLENDON:** Are you talking about 14?

**SENATOR SMITHERMAN:** Yeah. I think that's it, 14. You see how it hoops around and comes around and circle around and it's come back onto and it comes straight down. Then it sneaks into Jefferson County and pick up some people right there. You know what? That one district alone, that district and when you get a chance, when you get a chance of reapportionment, ask them to send you a copy to your office of the very first district that the course out of North Carolina, I think it was a congressional district that the court ruled that it was bizarre and that it wasn't a good district. It looked just like this one.

**SENATOR MCCLENDON:** Are you talking about -- I believe it was in New Jersey when Governor Gary approved the plan that looked like a salamander?

**SENATOR SMITHERMAN:** Excuse me.

**SENATOR MCCLENDON:** I was asking if you were referring to the original source of the name gerrymandering.

**SENATOR SMITHERMAN:** Am I familiar with -- one more time.

**SENATOR MCCLENDON:** The source of the name gerrymandering.

**SENATOR SMITHERMAN:** Yeah.

**SENATOR MCCLENDON:** That's the district you're talking about now?

**SENATOR SMITHERMAN:** I think that's it. I think that's the one I'm talking about.

**SENATOR MCCLENDON:** I don't think the court threw that out. I just think the opponents pointed out that and in so doing created the new term gerrymandering because it looked like a claim that district -- like a salamander. I think that district survived.

**SENATOR SMITHERMAN:** Well, you know, the ruling, I think that they used it as a visual example of the county district they were talking about. There were no good districts.

**SENATOR MCCLENDON:** We've certainly heard about that district now. That was in the 1800s. So, we've been hearing about that district for a long time.

**SENATOR AIDEN:** Mr. President.

**MR. CHAIR:** Senator Aiden.

**SENATOR AIDEN:** Mr. President, I appreciate my colleague giving me the microphone and I want my members to hear this. We are not going to be comfortable with anyone in another chamber working on senate maps without any engagement from the members of this body. I'm asking for this bill be carried over to the call of the Chair.

**MR. CHAIR:**  All right. All those in favor, say "Aye."

**SENATOR MCCLENDON:**  Aye.

**MR. CHAIR:**  Any -- all right, bill is carried over. All right, secretary, call the next bill.

**[00:55:00]**

**SENATOR SMITHERMAN:**  Mr. President.

**MR. CHAIR:**  On Page 2 of the calendar. House Bill No. 1 by Representative Pringle relating to reapportionment. Senator McClendon?

**SENATOR MCCLENDON:**  Thank you Mr. Chairman. Let's find the -- got everybody. Okay, here we go. I think we'll just put this house map to the side for now. The congressional plan that the Reapportionment Committee sent to the Alabama house was approved intact by the house members and in developing this plan, all of our congressional representatives were met with in person and then subsequently over the phone, our own Microsoft Teams until their current concerns had been addressed, one exception to this would be Congressman Mo Brooks who is running for another office. And he did not meet in person nor did he send a staff member. All representatives had input into the plan. The plan that you have before you now is in compliance with Section 2 of the Voting Rights Act and meets all obligations under the equal protection clause. There is a minimal population deviation between the districts. Six of the districts are ideal at 717,754 and the second congressional district is one over that.

**SENATOR COLEMAN-MADISON:**  Senator McClendon, if you could maybe try to talk into the mic a little bit more. If not, we'll raise the volume, okay?

**SENATOR MCCLENDON:**  Okay. Senator Coleman-Madison, is that any better? I'm talking. I do have some competition. The map that you have before you respects counties to the extent possible given the requirements for equal population. It does not require any incumbents to run against each other. I would remind all of you that this is one of the guidelines for the redistricting committee that we do not put two incumbents in the same district. The districts are contiguous and they are reasonable compact respecting communities of interest and we work at preserving the core. It splits a minimum of counties and precincts. Six counties are split and seven precincts are split to manage to get to the zero deviation. This is over the current law which splits seven counties. Those splits are located in Lauderdale, two splits; Tuscaloosa, two; Jefferson, two, Chilton, two; Montgomery, two. I would point out that's an improvement. Escambia between Districts 1 and 2. This district contains one majority black district or this plan contains one majority black district with a BVAP of 54.22%.

**[01:00:00]**

Now if there are any questions on this, I would be interested in -- in hearing what anyone has to say. Otherwise if you're ready to vote. Senator Singleton!

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SENATOR SINGLETON:** Yes sir. Thank you Mr. President.

**MR. CHAIRMAN:** All right, hold on. So you yelled.

**MR. PRESIDENT:** I do you.

**MR. CHAIRMAN:** All right, Senator Singleton, you're recognized.

**SENATOR SINGLETON:** Thank you Mr. President. Thank you Mr. Chairman. On this Congressional map, you know, ever since the month of probably August, September, you all knew that the League of Women Voters were presenting a map and it was -- it was presented at all of our public hearings that was held around the state that someone was there from the -- from the League of Women Voters to present a map and as you know, in the month of September that myself and Senator Smitherman became plaintiffs, in that case with the League of Women Voters on their behalf to -- on the redistricting. We introduced maps and gave maps to the committee for consideration and I guess my question -- first question was being that that map was sent into reapportionment, it was in the system well, before the 10 days rule that we have and the fact that we got it in -- in time, the question is, was that map was set in by the League of Women Voters. It wasn't just a district, but it was a full Congressional map of the entire state of Alabama. I know as a committed member that it was never given any consideration. So, I guess the question I have is whether or not among the Chairmans and among the attorneys in the democra fur was that map of the League of Women Voters given any consideration to be the official map in the state of Alabama?

**MR. CHAIRMAN:** Well, of course it was, it was I believe you have that map. In fact ---

**SENATOR SINGLETON:** I'm asking the question to you Mr. Hillman, Mr. Dorman Walker, Mr. Pringle whether or not you all looked at that map and whether or not you all ever considered that to bring it before the committee, to be -- to look at us an official map for the state of Alabama.

**MR. HILLMAN:** I'll speak for myself.

**SENATOR SINGLETON:** Okay.

**MR. HILLMAN:** And that -- that map had some serious flaws I thought compared with the other map, the one that you have before you now and as a result of those flaws, it was rejected.

**SENATOR SINGLETON:** Yeah. Do you have a copy of your Congressional map over there? Is -- do we have copies of it like we did the house frame?

**MALE 1:** You got it, I put I can tag it up on an evening.

**SENATOR SINGLETON:** Well –

**[OVERLAY]**

**MR. CHAIRMAN:**  In case anybody is wondering what we're doing we -- we have two Pringle Congressional One Maps here that we have provided an enlargement and I think we've got some small versions. But anyway, yes, sir.

**SENATOR SINGLETON:**  You know that scares me because it says Pringle Congressional One and I guess I don't want it to be like world has a map that Pringle whole is all that information that is here and you know because I do want to ask these questions, that's what scares me there.

**[01:05:02]**

And I guess when I want to go back to the question, you just answered the question about the legal women defense map based on that that you thought that there were flaws, when you said flaws, what kind of flaws were you speaking of? Are you talking about split counties, deviations, what kind of flaws are you -- are you basically speaking of?

**MR. CHAIRMAN:**  Are you ready?

**SENATOR SINGLETON:**  Sir?

**MR. CHAIRMAN:**  Are you ready? Among other things, we have a really severe violation of the guideline to not hit incumbents and this plan puts representative Rogers and representative – or I should say Congressman Rogers and Congressman Palmar have been placed in the same district.

**SENATOR SINGLETON:**  Okay.

**MR. CHAIRMAN:**  This is the issue this violates Section 2(j)(i), which says contest between incumbents will be avoided, whenever possible. So, excuse me just –

**MR. PRESIDENT:**  No, please go ahead.

**MR. CHAIRMAN:**  I'm getting [INDISCERNIBLE 01:06:24] to market. Now okay, senator, I'm back with you again. So right -- right off the bat this proposal, which came from -- this proposal that came from the League of Women Voters immediately violates the concept of taking two existing office holders and placing them in the same district.

**SENATOR SINGLETON:**  Is that a legal argument though or is that just a rule?

**MR. CHAIRMAN:**  Section 2(j)(i) –

**SENATOR SINGLETON:**  That's of our rules but is there a legal argument?

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

MR. CHAIRMAN:  It's the – it's part of our own -- it would be a violation of the guidelines that we adopted.

SENATOR SINGLETON:  Okay I got you.

MR. CHAIRMAN:  So we would be the – and you see the problem with that. That's, that's a problem. So Section 2 of the Voting Rights Act requires the legislature to draw majority black district when it can be done. Generally speaking and Reapportionment Committee's plan demonstrates that it is possible to do that. In the committee's plan, City 7 has a strong black voting-age population of BVAP of 54.22%.

SENATOR SINGLETON:  Would you admit that that district is gerrymandered, no in order to keep that population?

MR. CHAIRMAN:  No, gerrymandering, gerrymandering is in the eye of the beholder.

SENATOR SINGLETON:  No, gerrymandering is legal, it is, that doesn't had a hold. There is a definition, there is a legal concept for gerrymandering, it's not in the eyes of the beholder. It is a legal concept that has been ruled on by the court. It's just not in the eyes of the beholder.

MR. CHAIRMAN:  The League of Women Voters plan does not -- in fact, have a majority Black District. It has only two districts, 6 and 7, with a high BVAP compared to other districts. And therefore the League of Women Voters plan violates -- violates Section 2 of the Voting Rights Act. There is two -- two strikes against it right there, Senator but I could go on if you would like for me to.

SENATOR SINGLETON:  Yeah. Well, I think that once the – once you look at the whole County Provisions, the court has made different rulings based on whole counties that when you're looking at opportunity districts in terms of whether or not you are in violation of the Voters Right Act, I'm not going to get into the legal arguments about that. But I think that the court, I think that you will find that the court will be satisfactory that the Voters Rights Act would be satisfactory when you're looking at opportunity districts and based on whole county provisions, okay, and I think that that's one and I understand that maybe you got some direction from your attorney in that that was in violation of and at least you answered the question and I appreciate that. I have a couple more questions about -- about -- about this, this concept?

[01:10:04]

MR. CHAIRMAN:  Which concept?

SENATOR SINGLETON:  The whole map.

MR. CHAIRMAN:  Okay. Got it.

SENATOR SINGLETON:  Number one, do you know who really participated in the drawing of this map? Was it Mr. Randy Hillman who did this? Heineman I think that's his name.

15

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**MR. CHAIRMAN:** Heinaman.

**SENATOR SINGLETON:** Hienaman. H-I-E-N-A-M-A-N Hienaman. Okay.

**MR. CHAIRMAN:** Hienaman, correct. Yes, he was the demographer, which he said, by the way, I thought that was the correct term for him, and he told me later that's not the correct term. I'm not sure what it is. Let's call him a map drawer.

**SENATOR SINGLETON:** Map drawer. So demographer is not the right term. I've been saying it all my time also.

**MR. CHAIRMAN:** Well, I just learned it, and I've been using it every day when I had a chance, but I found out. But anyway, the answer to your question is, yes. The map drawer drew the map.

**SENATOR SINGLETON:** Okay. Do you know how many sessions that they had with the United States Congresspeople on this map?

**MR. CHAIRMAN:** No, not a total. I'd say they had at least six because –

**SENATOR SINGLETON:** So they did them individually. And there was no -- because he's a session among them all.

**MR. CHAIRMAN:** I don't know. I think that is a correct statement that they didn't all get together at the same place and the same time.

**SENATOR SINGLETON:** I would assume that because this Pringle playing on the top of it, that Mr. Pringle was probably in the room when the drawing was done. Were you in that room when the drawing was done on the map?

**MR. CHAIRMAN:** I was not.

**SENATOR SINGLETON:** Okay. Do you know whether or not Mr. Walker was there?

**MR. CHAIRMAN:** Well, I wasn't there. So I'm just not sure about that. In fact, I think initially Mr. Hienaman went to DC to meet with the congressman or their representative. So I would kind of think that Mr. Walker probably did not accompany him, but I don't know the answer to that question.

**SENATOR SINGLETON:** Let me ask that question. Did we pay for his travel to go to DC to meet with Congresspeople to do this, something that he could possibly could have did over Zoom? Will we the state of Alabama have to pay for that? For his travel?

**MR. CHAIRMAN:** No. But we did pay him. And I don't know how that money. I don't know if it was a separate allocation.

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SENATOR SINGLETON:**  I'm just asking that because he said I didn't that before.

**MR. CHAIRMAN:**  I didn't. Yeah. He went up there. Well, they were in session, and he had to meet with them. That's why he went up there.

**SENATOR SINGLETON:**  Okay. The other question I have. I understood that there was a statement made by Mr. Pringle in the committee meeting that there was a consulting team or someone that you all consulted in the state of Georgia on the Voters Right Act in terms of whether or not these plans actually was meeting the statutory bounds of the Voters Right Act. Do you know who that person was in the state of Georgia that they met with?

**MR. CHAIRMAN:**  I've never met him. His first name is Trey, and I can't recall his last name. I never met him or talked to him but –

**SENATOR SINGLETON:**  But we can get that for Mr. Walker.

**MR. CHAIRMAN:**  Yeah, he would know him. Basically, any time it looked like there might be some racial issue in conflicts. Then he's an expert in that area, and he would do an analysis of that district. And, in fact, there were some instances where he advised us to make some changes to make it what we hope will be more acceptable to the courts.

**SENATOR SINGLETON:**  So Mr. Walker consulted a Georgia firm to talk about the Voters Right Act, whether or not. And that would really be particularly on one district, which was going to be seven because that was the only one that's considered. Would you agree that Congressional District seven really only makes up about 13 point some percent of the African American community when we're represented by 26%?

**MR. CHAIRMAN:**  Are you saying –

**SENATOR SINGLETON:**  Total population of state?

**MR. CHAIRMAN:**  Did one congressperson out of seven is 13% of the congressional delegation?

**SENATOR SINGLETON:**  No other total population of black folk in the state?

**MR. CHAIRMAN:**  Well, yes, I would say that's right. Because they have 1/7 of the population of Alabama.

**[01:15:01]**

An equal amount with every other district. And so I would say that if that's not right on that's pretty close.

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SENATOR SINGLETON:** When you look at the state school board, when you do home counties, you can come up with two, two African American districts out of that, okay? And they basically use just about the same population that a US congressman uses, correct?

**MR. CHAIRMAN:** Not correct. You have to divide the population of Alabama by eight.

**SENATOR SINGLETON:** I understand. But the numbers are almost congruently the same around 600,000.

**MR. CHAIRMAN:** They're in a ballpark there.

**SENATOR SINGLETON:** Yeah. So when we do that, we can come up with two dividing by eight. But we can only come up with one dividing it by seven.

**MR. CHAIRMAN:** There you go.

**SENATOR SINGLETON:** Okay. So that puzzles me, because if you can get two out of the eight, you could have gotten two out of the seven. And I think that that was not an attempt. I know, not by the committee, because we as a committee only met one time, to be able to approve map versus having any input as a committee member, I go on the record to say that. And secondly, when you look at that map, it is really one of the most gerrymandered maps, probably in the United States right now. And I think that the courts even looked at data at in the last real portion and talked about –

**MR. CHAIRMAN:** Which map are you talking about?

**SENATOR SINGLETON:** This salamander that you run around just to pick up black folk all over the places. That's what I'm talking about your map.

**MR. CHAIRMAN:** Right. And as I stated earlier, we do have an obligation. If we can draw a majority minority district, we're obligated to do so that's the result.

**SENATOR SINGLETON:** What we're going to do here in a minute. I'm not going to prolong this. This is your map. What we're going to do. I'm going to let Senator Smitham come on. And I think he's going to want to put a substitute on the table. We're going to show you where whole counties could have been drawn and where we could get two opportunity districts that doesn't violate the Voters Right Act, but still given opportunity for African Americans to be represented in Congress equally to the proportion of the population that we are in the state. And so Senator Smitham will come along now. And I guess when you started looking at whether they pitted folks or the deviations, and I have two other maps that are going to come back and show you down to a .7 deviation and also to a 0. deviation, still using whole counties with less splits and being able to show you how we can achieve this outside of just what you all did with this one district, and I know the body may not adopt it. All we ask for is up and down vote at the time that this up or down vote is needed. Thank you, Mr. Chairman. I really appreciate the work that you're doing. I'm basically about finished with the questions that I wanted to ask. And I'm going to allow Senator Smitham to come to offer his substitute at this time. Thank you.

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**ALBRITTON:** Thanks, Senator Singleton.

**SENATOR SINGLETON:** Right.

**ALBRITTON:** All right, Senator Smithman.

**SMITHMAN:** Thank you, Mr. President. And thank you, Senator McClendon, for allowing me to come before the body to have a brief discussion regarding an alternative plan for consideration and explaining this particular plan to each and every person that's here with us.

**[BACKGROUND CONVERSATION]**

**ALBRITTON:** What's the question?

**[BACKGROUND CONVERSATION]**

**MR. CHAIRMAN:** Is that you over there, Senator?

**[BACKGROUND CONVERSATION]**

**ALBRITTON:** All right, Senator Smithman.

**SMITHMAN:** Thank you, Mr. President. First before at present the substitute and then out given the opportunity, I'll explain it, and then we'll move from that point.

**[01:20:07]**

We have -- let me see -- where is he?  Let me see, wait a minute.

**[BACKGROUND CONVERSATION]**

**SMITHERMAN:** What I've done, I have put the plan that came out of the committee. This is the plan that we present to you initially when the Chair would gather up and welcome you before you. This is the map. This is the map in how that plan looks irregards to is make up, the counties that it takes into consideration, the counties that it goes up into and how it looks in terms of what you're asked to vote on. This particular plan is -- you can tell very obvious that it's [PH 01:21:21] Jared Manning and writing here in that is going up in the Jefferson County, but it's limited purpose to grab a whole to African-Americans, and really this is a big bulk of the population here. And yet you communities of interest, you turn around in this one, and this one has about 24% of African-Americans and you have Macon County right here and they don't bit more have a community of interest with people up here than the man in the Moon. And yet, they are place it over here in this particular area. This is the same concerns that I just mentioned about in that [INDISCERNIBLE 01:22:13] where you're a man then going back up in to a county. We all heard me up here talking about that Jefferson County is one of the most used counties to satisfy. We'll split it up so many different ways that the system that would prefer that that county

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

stayed whole. They've been asking, many are asking have to be whole. Not all of them -- I want to say that not all of them, but they are many of them who said that even if under a scenario [INDISCERNIBLE 01:22:57] that you're looking at coming up in here that day then make them all of just of this, but they want to be whole. Now, that's not the feeling of everybody because we have another plan. I'm just [INDISCERNIBLE 01:23:12] that it's going to come to this, this will move some people from one or the other because some of them want to stay they are, but vast majority of people I talked to, they [INDISCERNIBLE 01:23:23]. That can be done and that can be done on the plan that I'm going to talk to you all in regards to about. So, at this time Mr. Chairman, so that I can get on this plan, I want to offer the substitute so we can have conversation regarding it and it's comparison to the other plan. Mr. Chairman, [INDISCERNIBLE 01:24:00].

**MR. CHAIRMAN:** [INDISCERNIBLE 01:24:03], you may want to pull your mic back around.

**SMITHERMAN:** Thank you very much. Thank you. You know, you a good coach, I see why your sons and your kids are winning this ball game.

**MR. CHAIRMAN:** I had this game and watched you.

**SMITHERMAN:** You can. [INDISCERNIBLE 01:24:22] tomorrow night. Playing my first ball game of the season a bit.

**MR. CHAIRMAN:** What time?

**SMITHERMAN:** At 6:30.

**MR. CHAIRMAN:** Okay. I'm going to come and watch you.

**SMITHERMAN:** An then in Friday night, we come back again and play against Guntersville in the [INDISCERNIBLE 01:24:38] playoffs, so I'm hoping you to allowed me to [INDISCERNIBLE 01:24:40] as well.

**MR. CHAIRMAN:** Good deal.

**SMITHERMAN:** Mr. [PH 01:24:43] Brosman, I'd like to offer the substitute for consideration.

**MR. CHAIRMAN:** All right Senator [INDISCERNIBLE 01:24:48] received the substitute.

**SMITHERMAN:** And as to speak on it but --

**MR. CHAIRMAN:** Substitute for House Bill No. 1 by Senator Smitherman.

**[01:25:00]**

**SMITHERMAN:** Is it okay for them to read what that says on that?

**MR. CHAIRMAN:** Yeah. Could you all I read the substrate please.

**MALE 1:** Substitute for House Bill 1 by Senator Smitherman. To repeal and reenact Section 17-14-70, Code of Alabama 1975. You want just the title read?

**SMITHERMAN:** No, I really wanted them to know what was in it, but I mean if it's some problem, it's not to be dilatory, it's to be informative. But if for some reason that it caused a problem --

**MR. CHAIRMAN:** We're good. Will have him read it.

**SMITHERMAN:** Okay.

**MALE 1:** Substitute for House Bill 1 by Senator Smitherman. To repeal and reenact Section 17-14-70, Code of Alabama 1975 to provide for the reapportionment and redistricting of the states. United States congressional districts based on the 2020 federal census be enacted by the Legislature of Alabama. Section 2 Section 17-14-70, Code of Alabama 1975 relating to the existing congressional districts is repealed. Section 2 Section 17-14-70 is added to the Code of Alabama 1975 to read as follows:  Section 17-40-70, (a) The State of Alabama is divided into seven congressional districts as provided in subsection (b). (b) The numbers and boundaries of the districts are designated and established by the map prepared by the Permanent Legislative Committee on reapportionment and identified and labeled as Singleton Congressional Plan 1, including the corresponding boundary description provided by the census tracts, blocks and counties and are incorporated by reference as part of this section. (c) The legislature shall post for viewing on its public website the map referenced in subsection (b), including the corresponding boundary description provided by the census tracts, blocks and counties and any alternative map including the corresponding boundary description provided by the census track, blocks and counties introduced by any member of the legislature during the legislative session in which this section is added or amended. (d) Upon enactment of this act, adding the section and adapting the map identified in subsection (b), the clerk of the House of Representatives or the secretary of the Senate as appropriate shall transmit the map and the corresponding boundary description provided by the census tracts, blocks and counties identified in subsection (b) for certification and posting on the public website of the Secretary of State. (e) The boundary descriptions provided by the certified map reference in subsection (b) shall prevail over the boundary descriptions provided by the census tracts, blocks and counties generated for the map. Section 3, the provisions of this act are severable. If any part of this act is declared invalid or unconstitutional, that declaration shall not affect the part which remains. Section 4, this act shall become effective immediately upon its passage and approval by the governor or upon its otherwise, becoming a law.

**MR. CHAIRMAN:** Thank you Mr. Secretary. Mr. Smitherman?

**SMITHERMAN:** [INDISCERNIBLE 01:28:05] be recognized to speak to the substitute.

**MR. CHAIRMAN:** Yeah, you're recognized.

**SMITHERMAN:**  All right. Thank you very much. Now, I want to talk a little bit about the comparison of the maps and then I'll go to the maps [INDISCERNIBLE 01:28:25] give a visual. Then I was shipped back to you for any comments, anything that you would like to do. Okay Mr. Chairman?

**MR. CHAIRMAN**:  I'm with you.

**SMITHERMAN:**  Okay. I want everyone to look at the current Alabama congressional map. Well basically not the current, but look at that map and as because I call it current, but that's the map of [PH 01:28:50] fools. As you heard the senator in his presentation, it is looks like a salamander. This type of weird shape is part of where the words gerrymanding comes from. The Seventh District has a long arm reaching from Tuscaloosa into Birmingham, dropping down beyond [INDISCERNIBLE 01:29:13], and a finger reaching back to Montgomery. In other words, it's ugly. This weird shape gerrymandered districts, split seven Alabama counties and even divide Montgomery among three congressional districts. The undisputed purpose of these weird shape is race. District 7 not only had sufficient minorities to have a minority representative from Alabama intended to comply with the Voting Rights Act, but also packed as many minorities as possible into District 7 we can in minority voting influence throughout the state. The U.S. Supreme Court has made clear that under the U.S. constitution, any racial gerrymandering must be based on a compelling state interest and will be strictly scrutinized by the courts.

[01:30:08]

If any fairly drawn alternative exists for minority presentation, courts are highly likely to reject such gerrymandering districts based on race. District lines also must meet another constitutional principle. One person, one vote. In other words, district populations must come as close as practical ability to the same number of people. The current Alabama Congressional map is a modification of a racial gerrymandering first drawn in 19 92. It was adjusted only to meet one person, one vote every decade since then. And if this history is allowed to repeat itself, the congressional map drone with the 2020 C data will have the same ratio of gerrymandering. Now I want to point out about the new map. The whole County map. Look at the proposed Alabama Whole County map. I want you all to look at it. It uses county lines and only county lines for all seven congressional districts. Instead of district boundaries based on racial gerrymandering. The U.S. Supreme Court has said traditional boundaries should be used. Traditional boundaries are usually county, municipal or similar boundaries. We could also be rivers, highways, or whatever else has traditionally been used instead of racial gerrymandering. In Alabama, the traditional boundaries for congressional districts were county lines only. Before the Supreme Court announced that one person, one vote ruled in 1964, Alabama split no counties. From 1964 to 1880, Alabama split only Jefferson County because his population was too large for a single district. In 1981, Alabama split only Jefferson and St. Clair Counties. Since 1992, Alabama has split seven counties to racially gerrymandering Districts. When joining Alabama congressional districts, the issue of Voting Rights Act compliance remains. As to the Voting Rights Act compliance, the proposed Alabama whole County map and that's this map right here makes it easy for citizens to know which congressional district they live in and creates two districts, six and seven that provide black citizens an equal opportunity to elect candidates of their choice. The

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

U.S. Supreme Court has said that one person, one vote principal can be more flexible when using traditional boundaries. The proposed Alabama whole County map has a maximum population deviation of only 2.46. For Alabama, it has the lowest possible population deviation based on whole county districts. It eliminates the racial gerrymandering, and it better complies with the Voting Rights Act. For Alabama congressional districts, the whole county map is the best possible map. Now, I want to share that with each person and then I want to walk you through it again. This district here is district seven. It has a majority or minority population. This district keeping Jefferson County whole and connected to these two counties here provides a swing district. This district is right at about 42% African-American and 58% non-African-American. But this district basically reflects this general area of the state of these counties and of the population. This is a golden opportunity for us to be in compliance. Number one to eliminate gerrymandering. Number two, to be in compliance with the Section 199 of the Constitution, which require us to consider and provide whole counties in drawing our districts so that the citizens once again can have an opportunity to be represented.

[01:35:04]

**SMITHERMAN:** And you keep intact as well. communities of interest. Mr. Chairman, I will shift back to you at this moment.

**MR. CHAIRMAN:** Thank you, Senator. I appreciate that.

**MR. PRESIDENT:** Senator Smitherman, you have the mic.

**SMITHERMAN:** If you have any questions or comments or anything like that, I would.

**MR. PRESIDENT:** Okay.

**MR. CHAIRMAN:** All right. I will point out with this particular map from the legal women voters. There are really big problems here. Really big problems. You put two incumbents. It violates our rules. You eliminate a majority, minority district that violates the Voting Rights Act. And with that and I will make one correction. I believe you stated that the proposed map, the Pringle map splits Montgomery County three ways. It is currently split three ways. The new map that I have proposed splits it in two different. And with that, Mr. President, I moved to table.

**MR. PRESIDENT:** All right. All those in favor say.

[OVERLAY]

**MR. PRESIDENT:** The motion is non-debatable.

**MR. CHAIRMAN:** Mr. President, I said I year for any question or comment. I didn't hear for any motion. I was specific. I think I was.

**MR. PRESIDENT:** The Motion's up, so you can kill it. What do you want? No, you can't speak to the table of motion. There're three hands up. So, you all want to roll call vote?

**MR. CHAIRMAN:** Yes, that's fine. And then I like to be recognized afterwards.

**MR. PRESIDENT:** Sir. Terry. All right. Call the role.

**MR. PRESIDENT:** Mr. Albritton?

**MR. ALBRITTON:** Yes.

**MR. PRESIDENT:** Mr. Allen. Mr. Barfoot. Mr. Beasley, Mr. Butler.

**MR. BUTLER:** Alright.

**MR. PRESIDENT:** Mr. Chambless. Mr. Chestein. Ms. Coleman Madison.

**MS. COLEMAN MADISON:** Yeah.

**MR. PRESIDENT:** Ms. Dunn. Mr. Elliot.

**MR. ELLIOT:** Alright.

**MR. PRESIDENT:** Ms. Figurs.

**MS. FIGURS:** No.

**MR. PRESIDENT:** Mr. Givanne.

**MR. GIVANNE:** Not.

**MR. PRESIDENT:** Mr. Gujar. Mr. Hatcher. Mr. Holly.

**MR. HOLLY:** Alright.

**MR. PRESIDENT:** Mr. Jones. Mr. Livingston. Mr. Marsh. Mr. McClendon.

**MR. MCCLENDON:** Hi.

**MR. PRESIDENT:** Mr. Milson. Mr. Oer. Mr. Price. Mr. Reed. Mr. Roberts. Ms. Sanders 48.

**MS. SANDERS 48:** Hey.

**MR. PRESIDENT:** Mr. Schofield. Mr. Sessions. Mr. Shellnut. Mr. Singleton.

**MR. SINGLETON:** No.

**MR. PRESIDENT:** Mr. Smitherman.

**MR. SMITHERMAN:** No.

**MR. PRESIDENT:** Mr. Stuttz Mr. Wagner. Ms. Weaver. Mr. Watley. Mr. Williams.

**MR. WILLIAMS:** Not.

**MR. PRESIDENT:** Twenty-three us, seven nays. The table in motion passes.

**MALE 1:** Mr. President, can I be recognized?

**MR. PRESIDENT:** You're recognized. Yes.

**MALE 1:** I didn't use at that moment for that purpose. I actually went through talking. I know the vote. Let me just finish. It's not about what the vote would have been. It's about the process to get to that ultimate vote. Now, I don't fault the desk at all because the motion they all right. The motion was made by you to do that, and it's non-debatable. I want them to understand that. But the proper thing for you to do, based on when you saw that I came up and said that because of the way that we are conducting ourselves in this process, which is really not adversarial about the issues, would be to withdraw your motion so that I could finish. And then when I made might give me the opportunity to make my motion. Then you come in with your table in motion, and we still would have voted, and it would have been down.

**[01:40:11]**

**MALE 1:** Okay. That's the second time that whatever reason that we've had these close scrimmages. Yesterday, when we came back, I heard no bail or nothing about one exact time that we supposed to be here. And some of you all didn't either, because you was running down the hall with me. So, I know that, now I'm up here and you kind of pull the trigger real fast, and that was necessary. That's not necessary because you're going to be up here for the rest of these that we're going through, that ain't necessary. You don't have to do that. That's why I gave a mic back to you. I wasn't trying to shield the mic from you doing something like that. You saw how this okay is back to you. I thought you might ask something you want to say. You did. You made some comments, and I thought I was clear. I said for the comments or whatever, because you still going to get your shot to bring your motion to table it. But as we go forward, please, because let me say this, we are in a scrimmages about this. But we're in a war about downstairs. Am I right? Okay. So that's all I'm saying. Don't make this a war up here. We didn't come trying to fight no war. You know, if we were, we will be fighting it. So, you know that. So that ain't a confusion. You know what, I'm being honest. So, all I was saying was just that, please, as we go forward, don't pull the trigger like that. That's all I'm asking you. There's a request.

**SMITHERMAN:** Let me respond.

**MALE 1:** Okay.

**SMITHERMAN:**  my clear intention is clear. Make sure I understand what your intentions are. I have a problem with you having your turn and more at the mic and expressing yourself.

**MALE 1:**  And I know you don't.

**SMITHERMAN:**  I have no problem with that.

**MALE 1:**  I believe that.

**SMITHERMAN:**  I think, in fact, that it's important that it'd be done. So, let's just make sure as we go through this process today and there's going to be more that we're real clear with each other what our intentions are.

**MALE 1:**  Okay.

**SMITHERMAN:**  And you all have been, I think, very cooperative in this process and very civil. And it is my intent to try to return that favor equally, if not more so. But I appreciate your comments, and I'll take them to heart.

**MALE 1:**  Thank you very much. And I appreciate you, too, as well as saying that anyone else come up understand that we will be crystal clear. Okay. We're going to be crystal clear. We're going to respond to what you asked us to do. We're going to be crystal clear. And then I think by being that way, with you being focused on the concern that we may not have to even address anything like that again. Thank you, Senator.

**SMITHERMAN:**  Yes, sir.

**MALE 1:**  I appreciate the body allowing me to present the plan to show you the advantages of it. And at this time, I'll yield to Mr. Chairman [INDISCERNIBLE 01:43:35].

**MR. PRESIDENT:**  Yeah. You got the mic. You can yield who you all right.

**MALE 1:**  I'll yield Senator Singleton.

**MR. PRESIDENT:**  Alright Senator Singleton.

**SENATOR SINGLETON:**  Yes, Mr. President. I think the protein wants to come. And I think at this time, the protein wants to do a recess at this particular time, and then we'll come back because I have a substitute that I want to offer. And he wanted to break at, like, 11:30. I know 10 minutes won't do me. So, it'll be a good time to go on to do that recess now and then come back if we're going to do a time, Sir, North to call at a chair, see what we're going to do. And then we'll start back up with real push again.

**MR. PRESIDENT:**  Thank you, Senator.

**MALE 2:**  Mr. President.

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**MR. PRESIDENT:** [INDISCERNIBLE 01:44:15]

**MALE 2:** Yes, sir. We've had good debate this morning. I appreciate those that have already been engaged, a lot of good information being shared. Thank the chairman again for his constant diligence on listening to everybody and moving through this process. So, I will go ahead and have us in recess. I'm just trying to debate if we come back for, let's say 1:15 back time at 1:15.

**MR. PRESIDENT:** All right. You all heard the motion. All right, all those in favor say Aye.

**ALL:** Aye.

**MR. PRESIDENT:** Any opposed, we send in recess.

**MALE 2:** Thank you, Mr. President.

**[01:45:20]**

**CHAIRMAN MCCLENDON:** Senator Singleton, are you up here to brag on House Bill 1 and talk about what a good bill it is, or did you have something else in mind?

**SENATOR SINGLETON:** I am here to brag on House Bill 1 and just how bad a bill it is.

**CHAIRMAN MCCLENDON:** Senator!

**SENATOR SINGLETON:** But you know, I give you credit for doing what you thought was best, but I think that we could have done better and Mr. President, at a proper time, I'm going to be introducing a substitute, okay and I just want to buy, now I have two substitutes, and I'm not here to talk long on them, because they are basically off the same substitute that Senator Smitherman had. The substitute that Senator Smitherman had was based on a 2.64% deviation, and we know when we draw congressional districts that they wanted to be at basically a 0% deviation. And what -- what I'm going to prove here today is that we have two other maps that can lower those deviations to a 0.7% deviation and to a 0% deviation still utilizing less splits and Mr. McClendon, Mr. Chairman I just want you to know that I heard that your reason for not accepting Senator Smitherman's map plan number one. I just want you to know in 2019, the state of Alabama itself conceded in the current District 7 map was unconstitutional. The state of Alabama at the Supreme Court concluded and they conceded that the District 7 map was unconstitutional because of the way it was drawn. Okay? The defendant does not believe that the law will permit Alabama to draw that District today. I don't believe we can draw it today and if we drew it today, then it would be unconstitutional. And you look at a case called Chestnut v. Merrill, John Merrill, the Reapportionment Committee in 2021 Congressional player perpetuates the current ratio gerrymandering district. It continues that same old map that leaps around, stick a finger up in Birmingham, more of an elbow now because you got rid of the finger, and you put a little elbow up in the Birmingham now and you go in there and then you are coming back across the Black belt. And so with a lot of unnecessary splits there. To justify the ratio gerrymandered district, to reach a 50% Black voting-age population, a state must have a strong basis in evidence

that the Voter Right Bill has been -- requires -- that requires it. Here our congressional district plan does not violate the Voting Rights Act just because it does not have a district with a Black voting-age population of 50%. Your claim is that the reason you all drew the map was based on the fact that there was, you had to reach at least a 50% majority-Black age population and we're continuing that the court says that that does not happen. A congressional district redistricting plan does not violate the Voting Right Act just because it does not have a district with a Black voting-age population majority of 50%. The case in point is Cooper v. Harris in North Carolina. You've mentioned this North Carolina case earlier. North Carolina contended that to avoid a voting age -- the Voting Right Act violation, it had to increase to over 50% of Black voting-age population in the district where 48% and 43% Black voting-age population was. The Supreme Court rejected that argument and held that 50% Black voting-age population was unconstitutional race gerrymandering and because this was enough white -- that was enough white crossover votes in the 48% of the 43% Black voting-age population district to provide Black voters an equal opportunity to elect candidates of their choice and that's what we're doing here is providing opportunity district. The whole county plan eliminates the Alabama congressional ratio gerrymander district and keeps the county whole and that's where Senator Smitherman introduced here today and the two maps that I have here today is slight variations of Senator Smitherman and therefore, my presentations won't be very long, okay.

[00:04:56]

Therefore, what I'm here to say today is to you Senator is that the committee what we adopted based on Congressional District 7 is unconstitutional. Maintaining the ratio gerrymandering of District 7 cannot be justified by claiming it was necessary to draw new district with zero population deviation. Like I said, the first map that that Senator Smitherman brought up was a 2.64 deviation. I have two maps up here and the one I'm dealing with now, I'm going to be dealing with Plan #2 that basically have a .7% deviation and when you look at Plan #3, it still holds with counties and show a 0% deviation. Hold on a second.

[OVERLAY]

**SENATOR SINGLETON:** This is what I am saying. Okay one at a time because I mean introduce two different bills, okay, and what I would like to do right now, Mr. President, is to introduce the Singleton's Plan #2, can I have a pen to sign this, please. All right.

**MR. PRESIDENT:** Substitute? All right, Secretary [INDISCERNIBLE 00:06:33] received the substitute.

**SECRETARY:** Substitute for House Bill 1 Singleton's Congressional Plan #2 by Senator Singleton.

**SENATOR SINGLETON:** Thank you.

**MR. PRESIDENT:** All right Senator Singleton.

**SECRETARY:** 2 is --

**SENATOR SINGLETON:** I think everybody like my coloring you know, as a little boy, you know when you're in grade school, they tell you the color within your lines, so we didn't go all over the place, that's why you don't see a lot of splits, that's why they like it because we color within the lines which makes whole counties, okay. So we kept counties whole so therefore, that's why they're all attracted to this map. Okay, they want to see it and it kept communities of interest together. We were able to keep to meet the voters right of violations to where it's not unconstitutional with the voters right because we're already said to you that, we don't have to have a 50% deviation when we are 50% of voting age population, when we're dealing with whole counties. If the drafters contend as you are, that the 2.47% that Senator Smitherman introduced is too high of a deviation. The whole county plan that's modified to drop the maximum deviation below a 0.79%, which is my Plan 2 that I'm presenting today, which was approved by the Supreme Court in Tennant v. Jefferson County, West Virginia with only splitting three counties, and that's what we are achieving here today. And we want to be able to show that that is a modification of and we want to be able to show that it was reasonable and it could be done and it does not violate the Voters Right Act and we still can draw two opportunity districts that will allow African-Americans and/or democrats to be elected to a congressional seat that is proportional to the population here at the state of Alabama. And so Mr. President, that's basically all I have to say about my substitute. I'm willing to give it an up or down vote at this time on this one, unless he has something he wants to refute to what I said.

**MR. PRESIDENT:** Go have the mic.

**MALE 1:** Oh Senator Singleton, you got the mic, do you want to yield the mic to him?

**SENATOR SINGLETON:** Well I know you got to -- you got to vote to table it. I just want to up or down vote if you would, just let it be up down is the same as your table in motion and now there is no debate with it anyway, it's the same thing.

**MR. PRESIDENT:** Yeah, my preference is to table and -- and the reason for that preference Senator is I'd like to be consistent on how I handle these other documents that come through. So --

**SENATOR SINGLETON:** If you're going to do a table, if you're going to do a table in motion on me at this particular time, then I don't need and it's okay, because at the same thing it really doesn't matter, whether it's a table in motion or whether it's a motions for me to be able to allow up or down vote. It's still an up or down vote on your table in motion. But let me just talk about a little bit more before you table it, okay.

**MR. PRESIDENT:** Sure.

**SENATOR SINGLETON:** And I won't be very long.

**MR. PRESIDENT:** You go right ahead.

[00:09:58]

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SENATOR SINGLETON:** All right. So what I hear to say is that, you know, that, if you modify, we can show that our splits are less than what you have in your map. We can show the opportunity districts are there and that you don't have to draw based on any digression or anything that you don't have to draw a Black majority district to the extent that you all did in your map in terms of gerrymandering it. You don't have to do that. And that is the overall goal here today is to show you where there could be a different plan and that the consideration was not made by this -- by the body in terms of the permanent joint commission, a committee on reapportionment. I know as a member we never considered any other map besides what you did. I think that what you have said here today, if I'm correct that based on putting in commerce together number one, and based on the fact of the other deviation, number two, is the reason why you all didn't consider it. Because you thought it would violate the rules that have been set forth by the committee. I say again, that this does not violate the committee rules. Number one, we had it in before 10 days. Number two, it gives an opportunity district. You know, while we trying to protect incumbents, then the other part of the three is that none of us as the members of this committee was contacted by congressional districts prior to your drawing congressional districts, and we seeing them for the first time when we saw them last week. So at this time -- I'm sorry.

**[BACKGROUND CONVERSATION]**

**SENATOR SINGLETON:** Yes, and when you look at it on the congressional district, you know, I don't know -- could you tell me whether or not congressional members have a permanent residence to where they have to run from? Do they have to say that I live in this particular district just to run from it? Or do I have to live over in this area to be able to run from it? Is that something on the congressional level that has to happen as we do on the Senate school board in the house member level?

**MR. PRESIDENT:** You know, I think that they don't have that same requirement that we do.

**SENATOR SINGLETON:** Well, if they don't have that same requirement, then that refutes the argument of do we put in two people against each other. So therefore the argument that you make whether or not we put two incumbents against each other in the same district is null and void based on your answer. They don't have to be from the same. They don't have to run from the area that they're living in. It refutes your answer. So therefore what you all based you're not dealing with this, this without plan was because of the flaws that you said it had was based on the fact that it put two incumbents together is null and void. Two incumbents being together does not matter here in the State of Alabama on the congressional district. So therefore that was another void issue that you considered before you even looked at displaying. And I'm here to say to you today, that the plan that Senator Smitherman introduced earlier that you did a tabling motion on had been in the bosom of the reapportionment committee well before the 10 days that was required by the rules and therefore under the rules you only consider it based on the fact that they fitted two incumbents together and you thought that maybe the deviations were off. And I think that those are two basic reasoning that does not hold constitutional muster. They don't hold constitutional muster because your answer to my question at the end of the day, they don't have to live in the area by which they run and when you look at it, when you provided a whole county in the court has basically said when there is a whole kind of provision that's being provided that

the voting age population of 50% or above does not matter and it does not violate the Voter's Right Act. And all we are saying that these are two opportunity district. I'm not trying to say that they are minority-majority districts. No, they're not. I appreciate you want to make sure that they're at least was one minority-majority district. But what we're saying here is that we believe and we feel that we can have more representation in Washington based on the maps that we have and that this committee and this body did not make any consideration to that prior to bringing the solution to bringing the map before the permanent committee and before this body.

[00:15:17]

And so, we think that hopefully that this body would look at this and I would offer them to vote yes, on this particular map. Not yes, on your tabling motion, but yes, on this particular map to be able to say what is fair in the State of Alabama. What is fair, not just what is convenient. Because what you did was, you took what was already said again, in 2019 by the State's Attorneys that they believe that the Congressional District 7th was gerrymandered, okay? And the court agreed with them that it was a gerrymandered district even though that is she wasn't before them at that particular time but it was a gerrymandered district. And in other cases across the state, Chestnut v. Merrill basically said that also. So what we want to say is that let's get it right in 2021. We didn't have it right at '19. We didn't have it right in '12. Let's get it right in 2021 and adopt the map that we have before you. If you don't like Senator Smitherman where he has a 2.64 deviation, I have two other maps sitting up here. One has a 0.079% deviation and the other one which is plan 3 that I will introduce next has a 0% deviation with less splits and splits that are unnecessary, that this body could adopt today and call it fairness in the State of Alabama. And call it fairness in the State of Alabama. So I think that we didn't look close enough. We were doing what was expedient because all we did was took that finger that was up in Jefferson County and split Jefferson and put an elbow in it. Widen it out a little bit, picked up some populations, ran over the Black cost of Black belt, went to Montgomery, split Montgomery up to three ways and ran across the Black belt to say because you didn't move away from what was already there. And we already know that that was a gerrymandered district. And so, all we're asking today, and I ask you as a chairman, let's give this some consideration and allow this map to be what needs to be correct. We could do this without going to court and letting the court do it if we go on an adopted today. The State of Alabama will save a whole lot of money, whole lot of money, whole lot of money, you know, from because the Attorney General is not going to argue with himself. He's going to hire an outside firm to do it which we're going to have to pay. Okay? We will have to pay to defend it. Then you have to pay -- if we win, you got to pay our attorneys. From winning it. State of Alabama, will be on a whole lot of money when we could just go on and sell it right here, right now. Then be through with it and everybody would be happy. Governor signs it, we go on a run on it. Everybody be good. You know, the people in Washington, they won't get a vote here. But we gave them consideration to look at it, but they don't get a vote. You and I have that vote here today. You and I have that vote. That's why they give it to the states. If congress were to draw them, we probably wouldn't even have a district up there. But here in the State of Alabama, all I'm saying is that the one district that you did does not represent the full population of African-Americans in this state, school board it does, the Senate, it does. The House of Representative, it does also but at the end of the day, the Congress is the only body that does not represent the 26% of the population of African-American and/or the 30% of the minorities whether they're African-American, Asian, Hispanic, or whatever they

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

are in this state, Native Americans in this state that are minorities, ethnic minorities, that population is not represented under that one congressional district. And I would say that if we are about fairness and not just doing what is expedient and what we think we can get away with legally because what you're going to find is that you haven't won a Supreme Court case in a long time. We won them all. We even won in 2012. It just affected the way the court reverted it back to the states that you ended up drawing the way you did, you didn't win then, we won.

[00:20:01]

And we'll probably win again so, you're going to continue to pay attorneys whom we can go on and adapt these maps and let that be. We're not pitting people together. They may not like it but we're not pitting them together. They're going to run on whether they want to run from in the congressional district. What we are doing now is that if you don't like the 2.64%, if you think that does not meet the constitutional muster, then I'm okay with that. But I have two other maps going to get down to a 0.79% and the other one, plan 3 that I'm going to introduce in a minute goes to 0%, okay? Zero percent which meets all the criterias. All right? So, Mr. President, I'm not going to be labeled this unless one of my colleagues has something to say about this map but I'm not going to be labeled anymore. If you want to run a table motion to go on and do what you need to do to vote it down but I will suggest to this body let's do the right thing and let's do right before the State of Alabama and the minority population here in the State of Alabama, let's do the right thing. And I'll turn it over to you for your motions or anything else that you have at this point in time. I'm good with that.

**MR. PRESIDENT:**  All right. Senator McClendon, you're recognized.

**CHAIRMAN MCCLENDON:**  Thank you Senator Singleton for your comments. Mr. President, I move the table and I believe this is Singleton No. 2. Singleton No. 2 would be correct.

**SENATOR SINGLETON:**  It will be Singleton No. 1. It will be legal women voting number two but it's Singleton No.1.

**MR. PRESIDENT:**  You all want a roll call?

**SENATOR SINGLETON:**  A roll call vote, yes please. Let's sustain it with roll call, yes.

**MR. PRESIDENT:**  Yeah, all right. Secretary, call the roll on the table in motion.

**SECRETARY:**  Mr. Albritton?

**SENATOR ALBRITTON:**  Aye.

**SECRETARY:**  Mr. Allen? Mr. Barfoot?

**SENATOR BARFOOT:**  Aye.

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SECRETARY:** Mr. Beasley?

**SENATOR BEASLEY:** I'll oblige.

**SECRETARY:** Mr. Butler?

**SENATOR BUTLER:** Aye.

**SECRETARY:** Mr. Chambliss? Mr. Chesteen?

**SENATOR CHESTEEN:** Aye.

**SECRETARY:** Ms. Coleman-Madison?

**SENATOR COLEMAN-MADISON:** No.

**SECRETARY:** Ms. Dunn? Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:** No.

**SECRETARY:** Mr. Givan?

**SENATOR GIVAN:** Aye.

**SECRETARY:** Mr. Gudger?

**SENATOR GUDGER:** Aye.

**SECRETARY:** Mr. Hatcher?

**SENATOR HATCHER:** No.

**SECRETARY:** Mr. Holley?

**SENATOR HOLLEY:** Aye.

**SECRETARY:** Mr. Jones?

**SENATOR JONES:** Aye.

**SECRETARY:** Mr. Livingston?

**SENATOR LIVINGSTON:** Aye.

**SECRETARY:** Mr. Marsh? Mr. McClendon?

**CHAIRMAN MCCLENDON:** Aye.

**SECRETARY:** Mr. Melson?

**SENATOR MELSON:** Aye.

**SECRETARY:** Mr. Orr?

**SENATOR ORR:** No.

**SECRETARY:** Mr. Price?

**SENATOR PRICE:** You've got it proxy.

**SECRETARY:** Mr. Reed? Mr. Roberts? Ms. Sanders-Fortier?

**SENATOR SANDERS-FORTIER:** No.

**SECRETARY:** Mr. Scofield?

**SENATOR SCOFIELD:** Aye.

**SECRETARY:** Mr. Sessions.

**SENATOR SESSIONS:** Aye.

**SECRETARY:** Mr. Shelnutt? Mr. Singleton?

**SENATOR SINGLETON:** No.

**SECRETARY:** Mr. Smitherman.

**SENATOR SMITTHERMAN:** No.

**SECRETARY:** Mr. Stutts? Mr. Waggoner? Ms. Weaver?

**SENATOR WEAVER:** Aye.

**SECRETARY:** Mr. Whatley?

**SENATOR WHATLEY:** Aye.

**SECRETARY:** Mr. Williams?

**SENATOR WILLIAMS:** Aye.

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SECRETARY:** Twenty-two ayes, seven nos. The table in motion passes.

**CHAIRMAN MCCLENDON:** Mr. President, I'll be glad to yield the mic to --.

**MR. PRESIDENT:** All right, Senator Singleton.

**SENATOR SINGLETON:** Yes, Mr. President. I would like to introduce Singleton 2 which will be my number three plan.

**MR. PRESIDENT:** All right. Secretary, read and receive the sub sheet.

**SECRETARY:** Substitute for House Bill 1 by Senator Singleton.

**MR. PRESIDENT:** All right, Senator Singleton?

**SENATOR SINGLETON:** Mr. President, I won't belay with this body a long time with this. My argument is basically the same. This map is just dealing with a 0% deviation based on whole counties. It only has a small split in Jefferson County and you have a couple of splits that may be down in the southern part of the region but Jefferson County only takes out about 3,500 people out of Jefferson County totally.

[00:25:03]

And you keep communities with interest together, if you look across the map, across the top of the map, the northern end, it maintains those communities of interest. I think there may be a split. It just had little split there, a little split, yeah on Coosa County. Coosa, Crenshaw and Jefferson and St. Clair which gives us maybe about six splits I think in this whole map. Yes, give us six splits in this whole map which is lower than what the plan is for the State of Alabama that's presented today. It provides whole counties, keep communities of interest together and what it does is a 0% deviation. And what we're here to show you is that we could draw two opportunity districts. Again, we made the argument that pitting two incumbents together is not an issue here and we show that we are able to get a small deviation in Jefferson County. We do a small variation of a split in Jefferson. There's a little split in Crenshaw, small split in St. Clair. The splits are missed out of the Voter Rights Act, there's no violations there. It gives us an opportunity to be able to give minorities an opportunity to have more than one representative in congress. Again, it is not a great deviation for the maps that are already there but we're here to show that we could do a 0% deviation and still achieve the same goal and being able to have opportunity district that this committee, this chairman, the lawyers, not a demographer, gave an opportunity for this to happen or even insisted on it being presented by the committee. As a member of the permanent committee, I was there at all 90% -- let me just say I wasn't there at all of them, but 90% of all the public hearings, I was there. And each and every one where the league of women voters presented a map on their behalf, I made it clear to the body, to the chairmans of both houses, to the attorneys that was in the room that I, Bobby Singleton, was going to be a plaintiff on behalf of the legal women voters to bringing this case. And I went to the chairman and asked them that whether or not we could work this out without having to go to court and hopefully that the map that we presented would have some consideration before the

body. And none of that happened. There was no map considered outside the plan and the chairman today has given us a reason why they did not consider the league of women voters' plan. Number one, because they thought they were pitting incumbents together and number two, they thought the flaws based on the deviation and that it violated the Voters Right Act by not giving a strong minority majority African-American district in the State of Alabama. We contend today once again that 50% of the voter age population in terms of Black voter aged population in the district does not violate the Voters Right Act. We also contend that the argument of whether or not we can make two incumbents together does not hold constitutional muster because incumbents does not have to live within the district that they are running. So, I say to you Mr. President, I'm willing to go on and not belaying the point because they're basically the same maps that only have a small deviation in it and members can see that. Again, we split Jefferson just a little and I would like at least to have an up-down vote on this particular map also.

**MR. PRESIDENT:** All right. Thanks Senator Singleton. Senator McClendon?

**[00:30:00]**

**CHAIRMAN MCCLENDON:** I don't have a prob -- let's do an up or down vote on this.

**MR. PRESIDENT:** Okay, so the motion --

**MALE 1:** Call role.

**MR. PRESIDENT:** All right. Secretary, call the long role.

**SECRETARY:** Mr. Albritton?

**SENATOR ALBRITTON:** It's a no.

**SECRETARY:** Mr. Allen?

**SENATOR ALLEN:** No.

**SECRETARY:** Mr. Barfoot?

**MR. BARFOOT:** No.

**SECRETARY:** Mr. Beasley?

**SENATOR BEASLEY:** Aye.

**SECRETARY:** Mr. Butler?

**SENATOR BUTLER:** No.

**SECRETARY:** Mr. Chambliss?

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SENATOR CHAMBLISS:** No.

**SECRETARY:** Mr. Chesteen?

**SENATOR CHESTEEN:** No.

**SECRETARY:** Ms. Coleman-Madison?

**SENATOR COLEMAN-MADISON:** Aye.

**SECRETARY:** Ms. Dunn?

**SENATOR DUNN:** Aye.

**SECRETARY:** Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:** Aye.

**SECRETARY:** Mr. Givan?

**SENATOR GIVAN:** No.

**SECRETARY:** Mr. Gudger? Mr. Hatcher?

**SENATOR HATCHER:** Aye.

**SECRETARY:** Mr. Holley?

**SENATOR HOLLEY:** No.

**SECRETARY:** Mr. Jones?

**SENATOR JONES:** No.

**SECRETARY:** Mr. Livingston? Mr. Marsh?

**MR. MARSH:** No.

**SECRETARY:** Mr. McClendon?

**CHAIRMAN MCCLENDON:** No.

**SECRETARY:** Mr. Melson? Mr. Orr?

**SENATOR ORR:** [INDISCERNIBLE 00:31:23].

**SECRETARY:** Mr. Price? Mr. Reed? Mr. Roberts? Ms. Sanders-Fortier?

**SENATOR SANDERS-FORTIER:** Aye.

**SECRETARY:** Mr. Scofield? Mr. Sessions?

**SENATOR SESSIONS:** No.

**SECRETARY:** Mr. Shelnutt? Mr. Singleton?

**SENATOR SINGLETON:** Aye.

**SECRETARY:** Mr. Smitherman?

**SENATOR SMITHERMAN:** Aye.

**SECRETARY:** Mr. Stutts? Mr. Waggoner?

**SENATOR WAGGONER:** No.

**SECRETARY:** Ms. Weaver?

**SENATOR WEAVER:** No.

**SECRETARY:** Mr. Whatley?

**SENATOR WHATLEY:** No.

**SECRETARY:** Mr. Williams?

**SENATOR WILLIAMS:** No.

**MR. PRESIDENT:** Seven ayes, 23 nays. The motion to adapt fails.

**SENATOR SINGLETON:** Mr. President?

**MR. PRESIDENT:** Senator Singleton?

**SENATOR SINGLETON:** Just a short [INDISCERNIBLE 00:32:31].

**MR. PRESIDENT:** You're recognized.

**SENATOR SINGLETON:** I would like to thank the body for indulging us in this. I thank you Mr. Chairman for answering the questions to the best of your ability on this. I think that we've missed an opportunity today to stay out of federal court. We may be spending a whole lot of

more money but I at least consider, that we considered to continue to gerrymander an African-American community where we can have two districts that will be opportunity districts. So again, I just want to thank this body for indulging us and I would like to turn it over to Senator Hatcher after my point of person of privilege who has another map that he would like to introduce to you today, Mr. President. Thank you, Mr. Chairman and I appreciate the work that you've done in this body, thank you.

**CHAIRMAN MCCLENDON:** Thank you, Senator Singleton.

**MR. PRESIDENT:** All right, Senator Hatcher.

**SENATOR HATCHER:** Thank you for the recognition, Mr. President. Thank you, Senator Singleton. Chairman McClendon, one of the things that I've learned in a very short span of time being in this body as that obviously this is my first opportunity with reapportionment and good God Almighty, it is complicated and tedious. And so, for those who have been here who've gone through this, my hat's off to you, all of you.

**CHAIRMAN MCCLENDON:** Thank you.

**SENATOR HATCHER:** I would like to offer this substitute in consideration from -- in support --.

**MR. PRESIDENT:** All right. Secretary, read and receive the substitute.

**SECRETARY:** Substitute for House Bill No. 1 by Senator Hatcher.

**[BACKGROUND CONVERSATION]**

**MR. PRESIDENT:** All right, Senator Hatcher.

**SENATOR HATCHER:** The only thing I would like to offer Chairman McClendon is to, obviously in keeping with the same spirit of Senators Singleton and Smitherman is we are offering this one as an example of a map that creates two majority minority opportunity districts here in Alabama and this one is strongly supported by the legal defense fund, ACLU and the greater Birmingham ministries.

**[00:35:11]**

Unless there are some discussions on it, I'd like to -- any questions or move for an up and down vote?

**MR. PRESIDENT:** All right. So, Senator McClendon, we have a motion for an up and down vote, did you want to discuss this?

**CHAIRMAN MCCLENDON:** No, but when the proper time comes, I'd move to table this map.

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**MR. PRESIDENT:** Okay, so you still got the mic right now.

**SENATOR HATCHER:** Well, the one thing I would offer, thank you, Mr. President, is again, what its seeking to do is to make fair the representation that you've heard already. And in out of respect for the things that have been shared already, I do not wish to duplicate that but to simply say that all of us are seeking the best we can to represent all of the people of the State of Alabama. And I think you heard the statistic where it says that nearly 28% of Alabama's residents identified as either Black or multiracial identity. And the idea is to simply represent the interest of all of these different groups and there are clear reasons that I've already been outlined for why that is important to the community. One of the things I would share that is a part of what I want to put in consideration for that substitute, when I mention the fact that according to the 2021 census data, nearly 28% of Alabama's residents identify as Black, either alone or as part of a multiracial identity. It is fair, necessary and logical that all Black Alabamians have an opportunity to elect their preferred congressional representatives. Members of Congress make decisions and influence policies that impact every aspect of American life including but not limited to access to education, economic opportunity, housing, healthcare and the direct and collateral consequences of criminal legal systems. An additional majority minority opportunity district which Section 2 of our constitution likely requires and does would provide Black voters with representation to address the state's pervasive and ongoing record of inequality of opportunity in various aspects of life. And I want to take an opportunity to simply add this piece. As Senator Singleton pointed out just here in Montgomery, we are split in three different ways in this area. So, this is one way to offer some relief and remedy. So, with that being said, Mr. President, unless there are some questions from the Chairman, I would request an up and down vote.

**MR. PRESIDENT:** All right.

**CHAIRMAN MCCLENDON:** I concur. Up or down vote recognized.

**MR. PRESIDENT:** Okay. All right. Secretary, call the role.

**SECRETARY:** Mr. Albritton?

**SENATOR ALBRITTON:** No.

**SECRETARY:** Mr. Allen.

**SENATOR ALLEN:** [INDISCERNIBLE 00:38:21].

**SECRETARY:** Mr. Barfoot?

**SENATOR BARFOOT:** No.

**SECRETARY:** Mr. Beasley?

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SENATOR BEASLEY:** Aye.

**SECRETARY:** Mr. Butler? Mr. Chambliss? Mr. Chesteen?

**SENATOR CHESTEEN:** No.

**SECRETARY:** Ms. Coleman-Madison?

**SENATOR COLEMAN-MADISON:** Aye.

**SECRETARY:** Ms. Dunn?

**SENATOR DUNN:** [INDISCERNIBLE 00:38:46].

**SECRETARY:** Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:** Aye.

**SECRETARY:** Mr. Givan? Mr. Gudger? Mr. Hatcher? Mr. Holley?

**SENATOR HOLLEY:** No.

**SECRETARY:** Mr. Jones?

**SENATOR JONES:** No.

**SECRETARY:** Mr. Livingston?

**SENATOR LIVINGSTON:** No.

**SECRETARY:** Mr. Marsh?

**SENATOR MARSH:** No.

**SECRETARY:** Mr. McClendon?

**CHAIRMAN MCCLENDON:** No.

**SECRETARY:** Mr. Melson? Mr. Orr? Mr. Price? Mr. Reed?

**SENATOR REED:** No.

**SECRETARY:** Mr. Roberts? Ms. Sanders-Fortier? Mr. Scofield?

**SENATOR SCOFIELD:** [PH 00:39:34] No.

**SECRETARY:** Mr. Sessions?

**SENATOR SESSIONS**: No.

**SECRETARY:** Mr. Shelnutt? Mr. Singleton? Mr. Smitherman?

**SENATOR SMITHERMAN:** [PH 00:39:59] No.

**[00:40:00]**

**SECRETARY:** Mr. Stutts? Mr. Waggoner? Ms. Weaver? Mr. Whatley? Mr. Williams?

**SENATOR WILLIAMS:** No.

**MR. PRESIDENT**: All right. Five ayes, 22 nays, the Senator Hatcher substitute fails. Thanks Senator Hatcher.

**SENATOR HATCHER:** Thank you Mr. President.

**CHAIRMAN MCCLENDON:** Thank you Senator Hatcher. I admire you coming forward first time around and getting into this [INDISCERNIBLE 00:40:38].

**MR. PRESIDENT:** All right. Senator McClendon?

**CHAIRMAN MCCLENDON:** I believe my good friend Senator Waggoner.

**MR. PRESIDENT:** All right, Senator Waggoner.

**SENATOR WAGGONER:** Mr. President, I have a substitute.

**MR. PRESIDENT:** All right. Secretary, read and receive the substitute.

**SECRETARY:** Substitute for House Bill 1 by Senator Waggoner.

**SENATOR WAGGONER:** Mr. President.

**MR. PRESIDENT:** Senator Waggoner.

**SENATOR WAGGONER:** Mr. President, this involves two areas in Jefferson County. One area is represented by Congressman Gary Palmer, the other one is represented by Congresswoman Sewell. There are two changes in the present proposal; one involves Center Point, East Lake and Roebuck and Northeast Jefferson County. Those areas are presently served by Congresswoman Sewell. Under this proposal, they would -- under the present proposal, they would be represented by Congressman Palmer. The other one is two areas in Homewood, Alabama. They're served by Congressman Palmer and this would swap those two areas. Ms. Sewell would take the area represented by Congressman Palmer in Homewood, Alabama. There

are two precincts involved. And Congressman Palmer would take over the Center Point, East Lake, and Roebuck area. Some of us from Jefferson County have problems with this area, this proposal. We would like for them to stay as they are. Congressman Palmer would stay in Homewood, Congresswoman Sewell would keep her Center Point, East Lake, Roebuck area. Demographically, Center Point, East Lake and Roebuck favor Ms. Sewell and demographically, Homewood favors Congressman Palmer. So, my substitute would keep Congressman Palmer in Homewood instead of changing him to Ms. Sewell's district. My proposal would keep Congresswoman Sewell in Center Point, East Lake and Roebuck. Under the proposal by Senator McClendon, it would swap those two areas. So, mine would keep them as is. I think it's important to know that these districts as they are today, they met all the requirements of the Voting Rights Act three years ago and received approval from the U.S. Justice Department. There's zero deviation in the proposal. So basically, that's what my substitute does. The mayor of Center Point wants it to stay as is with Ms. Sewell, Congresswoman Sewell remaining their congressman. The mayor of Homewood and a multitude of other people would like Representative Congressman Gary Palmer to remain in Homewood. So, Mr. President basically, that's what this substitute does. I know it's a very controversial issue, I know many of my colleagues have issues with it and I want them to feel very comfortable about what they want to do. This is an important vote, it's an important issue we're dealing with, and I want them to feel comfortable voting their conscience.

[00:45:06]

I know how I feel. I know that I would like my congressman to stay in place in Homewood. I like for Congresswoman to stay where she is in Center Point, East Lake and Roebuck. And I said demographically, their areas favor them as Congresswoman Sewell and Congressman Palmer. And with that, Mr. President, I'd be glad to entertain any questions.

**MR. PRESIDENT:** All right, thank you. Senator Roberts?

**SENATOR ROBERTS:** Mr. President.

**MR. PRESIDENT:** Yeah, Senator Roberts.

**SENATOR ROBERTS:** Senator Waggoner, I have the opportunity to share Homewood together and we have been reached out to non-stop since this became public. Our whole objective is communities of interest, keep them in together which was one of the things we were after and that is why we're very interested in seeing this come to fruition. Thank you.

**MR. PRESIDENT:** Thank you Senator Roberts. All right, Senator McClendon?

**CHAIRMAN MCCLENDON:** Thank you Mr. President. I would like to try to clear up. The first question is how did this district -- why did this change occur? What happened? Well, there were three cases following the 2010 census which is how it has been in the past and the court required that the districts be drawn race blind although our mapping equipment can display races, it changes. You can turn that off and that's exactly what we did. We turned it off. The second factor that was important was that Congressional District 7 was short by 53,000 people

and we had to go somewhere to get those people to get to our deviation. Homewood, adjacent to City 7, is a population-dense area. So, to add an east-west shape which is where we are today to add this shape or the increase to size east and west was far superior over moving in a north-south direction. The reason that was done was to prevent claims that this part of Jefferson County was a racial gerrymander. This is because Section 5 is no longer there and this explains why what could be done in 2010 and was approved by the justice department in 2010 is not okay in 2020. It will not be approved by the justice department today. Consequently, when these changes were made, the tip of the 2010 incursion, the Center Point precincts were not needed and were put into City 6. So, the next question is, so now we know how we got there. We got there because the courts told us what we had to do keeping in mind the whole time this is a racial issue. This is not about splitting counties, this is not about splitting precincts, this is about drawing maps based on race that's not good. The two Homewood precincts are majority White. The four Center Point area precincts are majority Black. Switching Black and White precincts at this point after the plan was drawn race blind would be a race conscious effort and that would violate Section 2 of the Voting Rights Act unless it were done in fulfillment of a compelling state interest. Under the Voting Rights Act, the state has no compelling interest in making the race conscious reassignments that has been proposed by Senator Waggoner.

[00:50:07]

So, the bottom line is the Waggoner, what are we calling this? The Waggoner sub? The Waggoner sub is clearly based on race, clearly, and it will in fact create a storm legally for all of us in this room. With that being said --.

**MR. PRESIDENT:** All right. Senator Smitherman.

**CHAIRMAN MCCLENDON:** Senator Smitherman, go ahead please.

**SENATOR SMITHERMAN:** Thank you Mr. Chairman. Mr. Chairman, I think that the process that everybody in here went through when you went downstairs, I think that that was an attempt for that process by the lawyer and what do they call it, the one that draw the maps?

**MALE 1:** Demographer.

**SENATOR SMITHERMAN:** Demographer to present areas of the district in the language about precincts. Once precincts will put in, then I think that the numbers whatever was in the precincts were reflected on when you got a total back in terms of the population. And I think if everybody win, I guarantee you two thirds of the people will be doing this if I asked them to be honest and say yes or no. I said that to say this is that, I haven't heard one time in any conversation that I had with Senator Waggoner regarding this issue in our county him say the first thing about those African-Americans that stay over there, those Black people that stay over or those White people stay over here. There has been no conversation related to race as it relates to the changing of these people. The only conversation that has come up with him and I'm sitting here because I'm on the juror and I want to see it, was dealing with the community of interest. And other than Senator Waggoner, when it comes to one of those communities, I don't think that anybody else would be aware or have a clear understanding of the concern for community of

interest simply because he and I split the area straight down in line. We represent the same people and so, I said that just to say that may be something that is being mentioned from your responses but it's nothing in the amendment that says that it's switching race. There's nothing I've ever heard of him so I'm sitting up here that that's the case and there's nothing I've heard in any conversation. The last thing I want to add is this, and I'm not trying to be funny when I say this but I'm trying to just speak what I think is a statement of fact. I wouldn't even be worried about the fact that it may change a little bit the way that the district is shaped here versus there because the whole district as I said earlier is bizarre. So that don't change bizarreness. It don't create any more or any less bizarreness. It's just if it's that plan because he goes up in there just because the corner up here is changing and anybody down here decide over here changing, this syllogist is bizarre and gerrymandering going up in there. So in conclusion, I just wanted to say that to the body that no, this doesn't violate any of that whatsoever in my opinion because that is not based on that, it's based on communities of interest. And I just really think that that's -- I know that's an opinion that you spoke but I can say that based on the facts that I have presented and as I know them that that opinion and theory is not applicable at this time. Thank you for allowing me to speak and thank you Mr. President.

**MR. PRESIDENT:**   Thank you Senator Smitherman. Senator Del Marsh?

**SENATOR DEL MARSH:**   Thank you Mr. President. First I want to say, Senator, I want to thank you as this whole body shared for the work you've done on this project. I mean, it's not an easy project to deal with a lot of personalities, a lot going on and same thing with President Pringle in the house.

[00:55:00]

You all worked through countless hours. What I want to try to do is make sure there's clarity here I think and I don't think you meant to do it in any way but the way I see this is, because I know I've had enough discussions with members of the body including Senator Singleton, Senator Waggoner and I truly believe their concerns are community of interest. I really believe that, we've talked about it and the fact that these previous districts were the way they want to go back to, I think Senator and I believe your comments is what you want to make sure happens here as we all do is that we send a plan that is upheld by the federal court, bottom line. And I think I want to bring the clarity in that. I do not think and I don't think you think that race was the issue with these two senators but it could be perceived in your opinion from the justice department that that is the issue and that's why I think it is very important. Now things has been made clear today that the community of interest issue is the issue to us in this chamber and what we would stand behind should this go to court in that form. But I support you for what you've done, I continue to support but I do think it's very critical to this those watching these proceedings understand that what someone may perceive of what reality and reality in this chamber as far as I'm concerned is community of interest. Thank you.

**CHAIRMAN MCCLENDON:**   Thank you. Mr. President, I'd like to make a comment.

**MR. PRESIDENT:**   Thanks Senator Del Marsh. All right.

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**CHAIRMAN MCCLENDON:**  I want to talk just briefly about community of interest. Community of interest is a guideline that we have adopted here in drawing our lines. We said what we want to try to do is keep guidelines together. Our guidelines are trumped by the Voting Rights Act and the justice department. They're interested in race, they're not as interested in guidelines. I will assure you keeping a clarity of interest together is good but that is secondary or tertiary from the federal courts perspective. The racial aspect of this is absolutely primary. And while we drew these things race-blind, the fact is this proposal moves a majority of Black voters out of a white congressional district puts them in a Black congressional district moves a majority of Black voters that are in a white district and puts them in a Black district. And there's no way we don't know what's going on. So, I'm just saying Senator Singleton, I didn't mean to take up any of your time.

[OVERLAY]

**SENATOR SINGLETON:**  Mr. Chairman, you can take as much time as you want because I like your explanation. It helps the case, okay? Because while you say community of interest is just a guideline, community interest is a legal concept. I keep telling you just like you said that gerrymandering was in the eyes of the beholder. It's not in the eyes of the beholder, it is a legal concept. Community of interest is a legal concept that the court has ruled on when you started looking at taking communities of interest. Now, it's just not something that we think of in the State of Alabama that we would own somebody who have thought of this and you're not dealing with racial gerrymandering when you're dealing with under the run versus him to where you can achieve the voting age population by going out and reaching and getting those Black population to create that but you already got a gerrymandering district anyway. So you're not going to hurt the district no more than what you're already doing by switching these people that they want. You're already gerrymandering. Okay? So on the run versus him, one man one vote, you can achieve what you want without saying that it is about race, okay? And what you've done here is that that population was over in that district before you all just went and switch. All you're doing is switching back to people that they already had. Thank you very much.

**MR. PRESIDENT:**  Thanks Senator Singleton. All right. Senator Waggoner?

**SENATOR WAGGONER:**  Mr. President, the bottom line is in this issue, the people in these two communities like it the way it is. They do not want to swap congressman.

[01:00:00]

People in Center Point like their congresswoman, people in Homewood like their congressmen and here, we're violating the wishes of the two congressmen. They like it the way it is. That's the way I like it because I live in one of those communities. I've heard from a number of people in both the communities and here we're swapping congressmen and congresswoman when the communities do not accept that, they do not like it, they do not want it. But we're violating the wishes of the people in those two communities and I don't understand it. And of course I'm going to vote for my substitute which allows these two communities to stay whole. Thank you Mr. President.

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**MR. PRESIDENT:** All right, so we're on your substitute.

**SENATOR WAGGONER:** With that, I move adoption of the substitute.

**MR. PRESIDENT:** All right, we got a motion for adoption of the substitute. You may want to talk on them this motion.

**CHAIRMAN MCCLENDON:** I wouldn't make a comment. Just to make a correction, I want everybody to know that we talked to Congressperson Sewell ahead of time and she was happy with this plan that we've had here. And we attempted to talk with Congressman Palmer and was unsuccessful in doing so. So as far as I'm concerned, are you ready to vote this up or down? What that your motion?

**MR. PRESIDENT:** That was the motion, yes.

**CHAIRMAN MCCLENDON:** I'm sorry. Now for the vote.

**MR. PRESIDENT:** All right. Secretary, call the role.

**SECRETARY:** Mr. Albritton?

**SENATOR ALBRITTON:** No.

**SECRETARY:** Mr. Allen.

**SENATOR ALLEN:** [INDISCERNIBLE 01:01:51].

**SECRETARY:** Mr. Barfoot?

**SENATOR BARFOOT:** Aye.

**SECRETARY:** Mr. Beasley?

**SENATOR BEASLEY:** Okay.

**SECRETARY:** Mr. Butler? Mr. Chambliss? Mr. Chesteen? Ms. Coleman-Madison? Ms. Dunn? Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:** Aye.

**SECRETARY:** Mr. Givan?

**SENATOR GIVAN:** No.

**SECRETARY:** Mr. Gudger? Mr. Hatcher?

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**SENATOR HATCHER:** Aye.

**SECRETARY:** Mr. Holley?

**SENATOR HOLLEY:** No.

**SECRETARY:** Mr. Jones?

**SENATOR JONES:** No.

**SECRETARY:** Mr. Livingston?

**SENATOR LIVINGSTON:** No.

**SECRETARY:** Mr. Marsh? Mr. McClendon?

**CHAIRMAN MCCLENDON:** No.

**SECRETARY:** Mr. Melson?

**SENATOR NELSON:** No.

**SECRETARY:** Mr. Orr?

**SENATOR ORR:** No.

**SECRETARY:** Mr. Price?

**SENATOR PRICE:** No.

**SECRETARY:** Mr. Reed? Mr. Roberts?

**SENATOR ROBERTS:** Aye.

**SECRETARY:** Ms. Sanders-Fortier?

**SENATOR SANDERS-FORTIER:** Aye.

**SECRETARY:** Mr. Scofield? Mr. Sessions? Mr. Shelnutt? Mr. Singleton?

**SENATOR SINGLETON:** [INDISCERNIBLE 01:03:19].

**SECRETARY:** Mr. Smitherman?

**SENATOR SMITHERMAN:** Aye.

**SECRETARY:** Mr. Stutts? Mr. Waggoner? Ms. Weaver? Mr. Whatley? Mr. Williams?

**SENATOR WILLIAMS:** No.

**SECRETARY:** Ten ayes, 18 nos, one abstention.

**MR. PRESIDENT:** Ten ayes, 18 nos, one abstention. The substitute fails. Thank you, Senator Waggoner.

**SENATOR BARFOOT:** Mr. President?

**MR. PRESIDENT:** All right. Senator Barfoot?

**SENATOR BARFOOT:** I could be recognized, I thank you. I also want to thank Senator McClendon, Representative Pringle for all the hard work that has gone into making overall what I think is a fairly accommodating map and work within the guidelines. I do have an amendment or a substitute, excuse me that I will offer to the body that makes --.

**MR. PRESIDENT:** All right. Secretary, read and receive the substitute, please.

**SECRETARY:** Substitute for House Bill 1 by Senator Barfoot.

**MR. PRESIDENT:** All right, Senator Barfoot?

**SENATOR BARFOOT:** Thank you Mr. President. The substitute that I am offering affects basically moves about 700 or so voters.

**[01:05:00]**

Excuse me, persons in the district. And so, with that being said, Escambia County currently under existing congressional plans is whole. It is whole in the first congressional district. The plan that the committee has brought before us has the second congressional district encroaching on Escambia County, a portion of the Escambia County. My plan simply in a nutshell makes Escambia County whole once again. It continues to keep Escambia County whole once again and allows the first congressional district to represent the entirety of Escambia County. It also moves those 700 or so individuals that the first congressional district loses into Montgomery so that the second congressional district would take in an extra 700 and some odd individuals. It furthermore takes the seventh congressional district into Monroe County to make up that 700 and so individuals. I believe that this plan, I know that this plan has a zero deviation. It also, when we talked about communities of interest, it keeps Escambia County whole and it is my understanding and belief that it falls within the guidelines as set forward as far as racial neutrality. With that, I believe -- if there's a question.

**MR. PRESIDENT:** All right, Senator McClendon.

**CHAIRMAN MCCLENDON:** Yes sir. This plan that came from representative from Congressman Moore and carried by my friend, Senator Barfoot, does involve 739 people. Under the committee's plan, the one we had before us, Moore had two split, Sewell had three. Under the Barfoot plan, Moore ends up with only one split, Sewell ends up with four which should be more than any other member of congress. The problem is, Congressperson Sewell is, she's not only a democrat, she's Black and a federal court could very well look at this and say that this has become a racial issue. Same, each new county split will be more work for her and less work for Congressman Moore. And the part of Escambia County that would go to Moore under this plan has no incorporated areas. In fact, most of it is the good part of is the Conecuh National Forest. And of course, when you put the underpopulated or zero populated area in there, it sure makes life easier and less work to do. This will be argued as racially discriminatory by the plaintiffs that are attacking the Moore plan and we can't say if the claim would be successful but it puts an unnecessary lightning rod on CD 7. That is sure to draw attention from the three-judge court or the Supreme Court if we end up there. And that'll give them more reason to say the plan is racially biased. Should that happen, well, we know what should happen if that happens. With that being said, that's my comment on this plan and at the appropriate time when everyone has had their say so, I would move to table. Mr. President.

**MR. PRESIDENT:** All right, Senator Albritton?

**SENATOR ALBRITTON:** Thank you for the recognition, sir. I come to stand. I'm not involved with how this was done or whatever. But I do come here with those counties that's been mentioned, the Escambia and Monroe Counties, that's currently within my district area. I come here to stand to say that this plan or the substitute has not been brought to me or discussed with me prior to today about this. I would suggest that the congressman from District 1 who is affected by this has not given me any direction or has talked to me about it.

**[01:10:00]**

I would suggest my purpose of being here is telling the body that this affects me and my district and I'm going to vote to either table or to vote no on it.

**MR. PRESIDENT:** All right. Thank you, Senator Albritton. Senator McClendon?

**CHAIRMAN MCCLENDON:** Senator Barfoot, I think I got the mic but do you have -- is there something else you would like to say before we make a decision?

**SENATOR BARFOOT:** There is.

**CHAIRMAN MCCLENDON:** I'll yield.

**SENATOR BARFOOT:** And something that I did not accurately or maybe I didn't articulate to the best of my ability. Escambia County has never to my knowledge been in the second congressional district. Your plan does put Escambia County into the second congressional district and this creates no more splits than what your plan has communities of interest are not split and counties are not split. So that, I'd ask the body to vote against your motion to table.

50

Senate Floor Debate
November 3, 2021
Transcript by TransPerfect

**MR. PRESIDENT:**  All right, Senator McClendon?

**CHAIRMAN MCCLENDON:**  Move to table.

**MR. PRESIDENT:**  All right.

**CHAIRMAN MCCLENDON:**  Vote aye please.

**MR. PRESIDENT:**  All those in favor, say aye.

**[OVERLAY]**

**MR. PRESIDENT:**  Any oppose? Table in motion passes.

**CHAIRMAN MCCLENDON:**  And we're back on the bill?

**MR. PRESIDENT:**  We are.

**CHAIRMAN MCCLENDON:**  There's no other discussion on the bill. I ask final passage of HB 1.

**MR. PRESIDENT:**  All right. Secretary, call the long roll.

**SECRETARY:**  Mr. Albritton?

**SENATOR ALBRITTON:**  Aye.

**SECRETARY:**  Mr. Allen? Mr. Barfoot? Mr. Beasley?

**SENATOR BEASLEY:**  Allen's an aye.

**SECRETARY:**  Mr. Butler? Mr. Chambliss? Mr. Chesteen? Ms. Coleman-Madison? Ms. Dunn? Mr. Elliott? Ms. Figures?

**SENATOR FIGURES:**  No.

**SECRETARY:**  Mr. Givan?

**SENATOR GIVAN:**  Aye.

**SECRETARY:**  Mr. Gudger?

**SENATOR GUDGER:**  Chesteen's aye.

**SECRETARY:**  Mr. Hatcher? Mr. Hawley? Mr. Jones?

**SENATOR JONES:** Aye.

**SECRETARY:** Mr. Livingston?

**SENATOR LIVINGSTON:** Aye.

**SECRETARY:** Mr. Marsh?

**SENATOR MARSH:** Aye.

**SECRETARY:** Mr. McClendon?

**CHAIRMAN MCCLENDON:** Aye.

**SECRETARY:** Mr. Melson?

**SENATOR MELSON:** Aye.

**SECRETARY:** Mr. Orr? Mr. Price?

**SENATOR PRICE:** Aye.

**SECRETARY:** Mr. Reed? Mr. Roberts?

**SENATOR ROBERTS:** Aye.

**SECRETARY:** Ms. Sanders-Fortier.

**SENATOR SANDERS-FORTIER:** No.

**MALE 1:** Reed's aye.

**SECRETARY:** Mr. Scofield?

**SENATOR SCOFIELD:** Aye.

**SECRETARY:** Mr. Sessions?

**SENATOR SESSIONS:** Aye.

**SECRETARY:** Mr. Shelnutt? Mr. Singleton?

**SENATOR SINGLETON:** No.

**SECRETARY:** Mr. Smitherman? Mr. Stutts?

**Senate Floor Debate**
**November 3, 2021**
**Transcript by TransPerfect**

**SENATOR STUTTS:**  No.

**SECRETARY:**  Mr. Waggoner?

**SENATOR WAGGONER:**  Aye.

**SECRETARY:**  Ms. Weaver?

**MALE 1:**  Orr is an aye.

**SECRETARY:**  Mr. Whatley? Mr. Williams?

**[BACKGROUND CONVERSATION]**

**MR. PRESIDENT:**  All right, 22 ayes, 7 nays. House Bill 1 passes. Thank you Senator McClendon.

**[01:14:09]**



I, Anders Nelson, hereby certify that the document "Pt. 1 Day 5_11_03_ Senate Chamber" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

# Anders Nelson

Digitally signed by
Anders Nelson
Date: 2021.12.14
15:45:50 -05'00'

_____

Anders Nelson
Project Manager

December 14, 2021



I, Anders Nelson, hereby certify that the document "Pt. 2_Day 5_11_03_Senate Chambers" is, to the best of my knowledge and belief, a true and accurate transcription from English to English.

# Anders Nelson

Digitally signed by Anders
Nelson
Date: 2021.12.14 15:47:06
-05'00'

_____

Anders Nelson
Project Manager

December 14, 2021

Dorman

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Thursday, August 12, 2021 3:40 PM
**To:** Sen. Jim McClendon <jim.mcclendon@alsenate.gov>; Rep. Chris Pringle (chris.pringle@alhouse.gov) <chris.pringle@alhouse.gov>; 'Steve Livingston' <steve.livingston@alsenate.gov>; Donna Overton Loftin (donna.overton@alsenate.gov) <donna.overton@alsenate.gov>; Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>
**Subject:** FW: Census redistricting data is released

Jim and Chris,

As you see below, the redistricting data has finally been released. Now, Maptitude will need about a week to load the data into the system – so say next Friday, Aug. 20 to load the data into the system, and then Donna and her staff will need two days or so to configure the data to Alabama districts and precincts – so assuming all goes well, it should be available by Wednesday, August 25.

Dorman

**BALCH**
& BINGHAM LLP
Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

**From:** Christi Zamarripa <christi.zamarripa@ncsl.org>
**Sent:** Thursday, August 12, 2021 2:53 PM
**To:** Walker, Dorman <DWALKER@balch.com>
**Subject:** [redistrict-l] Census redistricting data is released



**[External Email]** Please use caution.

[If you would like to send information to this distribution list, please send your message to Christi.Zamarripa@NCSL.org, Ben.Williams@NCSL.org and Wendy.Underhill@NCSL.org who can forward it to the list.]

Hello everyone.

The redistricting data is here! The Census Bureau released the Census 2020 P.L. 94-171 redistricting data in the legacy format. This is the format that state officials have received the last two decades.

Data users will be able to access the redistricting data by downloading the complete set of files for each state, the District of Columbia, and Puerto Rico, from the bureau's File Transfer Protocol (FTP) website. The data will be available for a range of geographies, including down to the census block level. Supporting resources for the release can be found at the Decennial Census P.L. 94-171 Redistricting Data Summary Files webpage, including a step-by-step "how-to" guide.

RC 045697

The release will provide the first look at the demographic characteristics of the nation by state, county, city, all the way down to the census block level, including:

- Race and ethnicity.

- Population 18 years and over.

- Occupied and vacant housing units.

- People living in group quarters, such as college dorms, nursing homes, prisons, and military barracks.

The same redistricting data will also be released by Sept. 30 through the Census Bureau's data.census.gov online web tool. The September release will be in format that will make it easier to view and download the tables from the P.L. 94-171 data. Also, governors, state majority and minority legislative leaders, redistricting commissions, as well as state redistricting data program liaisons will all be mailed a DVD and flash drive with their state's data.

Here are some takeaways from today's data release:

- Fewer states, metro areas and counties had rapid population growth.

- Population decline was widespread across the nation, most counties lost population between 2010 and 2020.

- 312 of the 384 metro areas gained population this decade.

- The two or more races population had a 276% increase.

- The Hispanic or Latino population grew 23%, while the population that was not of Hispanic or Latino origin grew 4.3%.

The bureau also released data visualizations and a variety of America Counts stories on population change and distribution, group quarters, the adult population, housing changes, housing vacancy, race and ethnicity and the diversity index to help explain the new 2020 Census data.

In addition, the bureau released the sixth and final demonstration data set. This new set reflects the Disclosure Avoidance System settings used for the 2020 Census Redistricting Data (P.L. 94-171) Summary File. These microdata files apply statistical noise to produce differential privacy-protected metrics using 2010 data.

Lastly, here are three census and redistricting related articles from NCSL's State Legislatures News:

- How to Lower the Temperature During Redistricting by Lisa Ryckman

- Census Delivers Long-Awaited Data by Wendy Underhill

- Redistricting: A Look at State Court Actions and Party Control by Lisa Ryckman

If you have any questions, please feel free to reach out to me.

Thanks,
Christi

Christi Zamarripa, Esq.
National Conference of State Legislatures
Policy Associate – Elections & Redistricting Program
303-856-1419 (o) | 720-296-4352 (c)

RC 045698

**Walker, Dorman**

| | |
|---|---|
| **From:** | Walker, Dorman |
| **Sent:** | Sunday, August 15, 2021 5:49 PM |
| **To:** | Sen. Jim McClendon; Rep. Chris Pringle (chris.pringle@alhouse.gov); 'Steve Livingston'; Donna Overton Loftin (donna.overton@alsenate.gov); Randolf Hinaman (sharh1@comcast.net) |
| **Subject:** | Census information - maps |
| **Attachments:** | Ala. counties gains and losses 2010 to 2020(10560308.1).pdf |

Jim and Chris,

This map shows population gains and losses on a county basis from 2010 to 2020. We can't calculate similar maps for legislative districts until the data are loaded into the Committee's system (because until then we won't have population by precincts). I think they will be available next week.

Dorman



Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

1

RC 045701



Alabama Counties

Total Population Gains and
Losses from 2010 to 2020

Produced by the Dept. of Geography
College of Arts and Sciences
The University of Alabama

**From:** Laura Hall <annihall19@gmail.com>
**Sent:** Thursday, July 29, 2021 7:34 PM
**To:** Donna Overton <donna.overton@alsenate.gov>
**Cc:** Arthur Orr <arthur.orr@alsenate.gov>; Bill Poole <bill.poole@alhouse.gov>; Bobby Singleton <bobby.singleton@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>; Clay Scofield <clay.scofield@alsenate.gov>; Corley Ellis <corley.ellis@alhouse.gov>; Dan Roberts <dan.roberts@alsenate.gov>; Gerald Allen <gerald.allen@alsenate.gov>; Jack Williams <jack.williams@alsenate.gov>; Jim McClendon <jim.mcclendon@alsenate.gov>; Jimmy Holley <jimmy.holley@alsenate.gov>; Joe Lovvorn <joe.lovvorn@alhouse.gov>; Laura Hall <laura.hall@alhouse.gov>; Reapportionment Committee Meeting Notices <reappnotices@ALALeg.onmicrosoft.com>; Rodger Smitherman <roger.smitherman@alsenate.gov>; Sam Jones <sam.jones@alhouse.gov>; Steve Clouse <steve.clouse@alhouse.gov>; Steve Livingston <steve.livingston@alsenate.gov>; Tim Melson <tim.melson@alsenate.gov>; arthur@arthurorr.com <arthur@arthurorr.com>; bpoole@wplawllc.com <bpoole@wplawllc.com>; cjengland1@gmail.com <cjengland1@gmail.com>; clay_scofield@earthlink.net <clay_scofield@earthlink.net>; ghallen62@yahoo.com <ghallen62@yahoo.com>; jackwilliams55@icloud.com <jackwilliams55@icloud.com>; lynngreer15@gmail.com <lynngreer15@gmail.com>; repbarbaraboyd@gmail.com <repbarbaraboyd@gmail.com>; rwoodsr36@cableone.net <rwoodsr36@cableone.net>; senatorroberts15@gmail.com <senatorroberts15@gmail.com>; sljones@ballhealth.com <sljones@ballhealth.com>; smithermanlawoffice@gmail.com <smithermanlawoffice@gmail.com>; steve@troycable.net <steve@troycable.net>; tmelson672@aol.com <tmelson672@aol.com>
**Subject:** Re: Public Hearing Schedule

On Thu, Jul 29, 2021 at 7:31 PM Laura Hall <annihall19@gmail.com> wrote:
Thanks, will the hearings be streamed and will the committee allow virtual questions and comments ?

On Thu, Jul 29, 2021 at 4:02 PM Donna Overton <donna.overton@alsenate.gov> wrote:
Good Afternoon!

I have attached the Committee's Public hearing schedule including the 6 new additional hearings that have been added. This brings the total number of hearings to 28.

I will getting with our IT department today to have it posted on the Legislative website.

**Donna Overton Loftin**
Supervisor, Reapportionment Office
11 S Union Street, Suite 317
Montgomery, AL. 36130
334.261.0395

1

RC 045704

Big new on the census litigation front. The three-judge panel in the U.S. District Court for the Middle District of Alabama rejected Alabama's request to move up the release of the 2020 census data and it will allow the Census Bureau to continue its use of differential privacy. If Alabama and the other plaintiffs wish, they can appeal the ruling straight to the U.S. Supreme Court.

The Bureau plans to release the redistricting data, also referred to as the P.L. 94-171 data, in the legacy format (no tables) by August 16 and the P.L. data in the more friendly format (with tables) is still expected to be released by Sept. 30.

We are still working our way through this opinion and will update you with more news as things progress.

Thanks,
Christi


Christi Zamarripa
National Conference of State Legislatures
Policy Associate – Elections & Redistricting Program
303-856-1419 (o) | 720-296-4352 (c)

_____

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

July 14-16, 2021 seminar in Salt Lake City, Utah! Register now<https://www.ncslcommunities.org/engage/eventapi__router?event=a1U5G0000068dK1>.
Redistricting is right around the corner!<https://www.ncsl.org/research/redistricting/ncsl-redistricting-seminar-salt-lake-city-utah-july-14-16-2021.aspx>
NCSL's redistricting seminar will prepare
you for this once-a-decade task. Join us for
the final redistricting seminar.



Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast Ltd, an innovator in Software as a Service (SaaS) for business. Providing a safer and more useful place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here<http://www.mimecast.com/products/>.

---
To unsubscribe or send questions about this email list, email the list administrator<mailto:%20owner-redistrict-l@lists.ncsl.org>.

RC 045706

**Walker, Dorman**

| | |
|---|---|
| **From:** | Walker, Dorman |
| **Sent:** | Friday, August 20, 2021 11:03 AM |
| **To:** | Sen. Jim McClendon; Rep. Chris Pringle (chris.pringle@alhouse.gov); 'Steve Livingston'; Donna Overton Loftin (donna.overton@alsenate.gov) |
| **Subject:** | Response to Rep. Hall |
| **Attachments:** | Document1.docx |

Jim and Chris,

Please see the draft responses to Rep. Halls' most recent letter. If these are OK, please let Donna know, and she's get a signed letter to Rep. Hall.

Dorman


& BINGHAM LLP

Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

---

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045707

Dear Representative Hall:

Thank you for your email of August 18 asking about procedures for the Redistricting Committee's public hearings, being conducted September 1-16, to which the responses are as follows:

## 1. What is the planned meeting structure?

Hearing are scheduled for three hours and will receive comments on all four plans being redistricted: Congressional, State Board of Education, Senate, and House. The Committee Chairs, the Hearing Officer, and Committee staff will participate from the Redistricting Committee office. Other members of the Committee and other Legislators may participate from their office. Members of the Legislators, members of the public, and government officials from local governments may participate from the announced hearing site for that particular hearing, which in most cases is a community college, or may participate remotely via Team. Court reporters will in most cases appear remotely. Because 2021 will be the first time hearings have been conducted remotely, there may be a learning curve, and it's possible that the first several hearings will go less smoothly than later hearings.

## 2. Is there an agenda?

Each hearing will open with a statement of welcome and a request for Legislators and other elected officials to identify themselves. Participants will be reminded that the purpose of the hearing to gather information that may be useful to Legislators' redistricting efforts, and in particular testimony about communities of interest is sought. For each of the districts under consideration at that hearing, there will be a short explanation of the ideal population, allowable deviation, and the amount by which the district is over our under populated. Maps of the districts and they not exist will be available. Participants will asked how they would like their district boundaries to change.

## 3. Do you have to register to speak at the public hearings? If yes, when and how?

There will be sign-in sheets at every hearing. Persons who want to speak can so indicate on the sign-in sheet by ticking the appropriate block. Persons at the hearing site will be called up in order that they signed in, and then persons who have signed-in via Team will be given an opportunity to speak by raising their hands, and then anyone else will be given an opportunity to speak, *i.e.*, persons who did not originally indicate they wanted to speak, or persons who want to speak again. The hearing will be closed when there are no more speakers, or the two hours scheduled for the hearing have elapsed.

## 4. Will the number of speakers be limited?

No, except by the two-hour limit for hearings.

## 5. Will each speaker be given a specific amount of time to speak?

Yes, speakers will have a 3-minute limit.

**6. If the public has a suggested map will there be a way to display it at the hearing?**

Yes, the speaker can hold up the map to the camera. In addition, maps and other exhibits can be marked and sent to the court reporter for the hearing to be included in the record of that hearing.

RC 045709

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Wednesday, June 2, 2021 2:18 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>; Steve Livingston <steve.livingston@alsenate.gov>; Donna Overton <donna.overton@alsenate.gov>
**Cc:** Jim Davis - Attorney General's Office (jim.davis@alabamaag.gov) <jim.davis@alabamaag.gov>
**Subject:** 2021_Legislative Reapportionment Meetings_SEPT DATES.xlsx

Jim, Chris, and Steve,

Here is Donna's proposed schedule for the redistricting hearings. If this schedule is OK with you, we need to retain a court reporter, let members of the committee and all legislators know the schedule, and prepare public service announcements.

Dorman



Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

---

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045710

| College/Other Location: | Campus Location | Address | Confirmed Date/Time | Contact Person/Info | County Location |
|---|---|---|---|---|---|
| Drake State | Lecture Hall and Cafetorium | 3421 Meridian St North, Huntsville, AL 35811 | Wednesday, September 1 - 9 AM | Bruce Bulluck (256) 551-5210 bruce.bulluck@drakestate.edu | Madison |
| Northwest-Shoals | Hospitality House, Shoals campus | 800 George Wallace Blvd Muscle Shoals, AL 35662 | Wednesday, September 1 - 11 AM | Brittney Humphres (256) 331-6207 bhumphres@nwscc.edu | Colbert |
| Calhoun | Health Sciences Building - Room 109, Main Campus | 6250 Highway 31 North, Tanner, AL 35671 | Wednesday, September 1 - 2 PM | Belinda Noe (256) 306-2582 belinda.noe@calhoun.edu | Limestone/Morgan |
| Northeast Alabama | Theater Auditorium | 138 Alabama Highway 35, Rainsville, AL 35986 | Wednesday, September 1 - 4 PM | Chasley Bellomy Brown (256) 638-2448 bellomyc@nacc.edu | Jackson/DeKalb |
| Snead State | Fielder Auditorium - Administration Building | 102 Elder Street, Boaz, AL 35957 | Thursday, September 2 - 9 AM | Kelli Conley (256) 840-4101 kelli.conley@snead.edu | Marshall |
| Wallace-Dothan | Cherry Hall Bencze Theater - main campus | 1141 Wallace Dr Dothan, AL 36303 | Thursday, September 2 - 11 AM | Greg Clemons (334) 556-2241 gclemons@wallace.edu | Dale/Houston |
| Bevill State | Earl McDonald Auditorium, Bevill Center - Fayette campus | 2631 Temple Ave N, Fayette, AL 35555 | Thursday, September 2 - 1 PM | Sherry Terry (205) 932-3221, Ext. 5103 sherry.terry@bscc.edu | Fayette |
| Lawson State | Alabama Center for Advanced Technology and Training - Birmingham campus | 3060 Wilson Road SW Birmingham, AL 35221 | Thursday, September 2 - 3 PM | Vernona Williams (205) 929-6472 vwilliams@lawsonstate.edu | Jefferson |
| Southern Union | Lake Room - Wadley campus | 750 Roberts Street Wadley, AL 36276 | Thursday, September 2 - 5 PM | Alison Osborn (334) 742-2972 aosborn@suscc.edu | Randolph |
| Shelton State | Bean-Brown Theater - Martin campus | 9500 Old Greensboro Rd Tuscaloosa, AL 35405 | Tuesday, September 7 - 9 AM | Ann Tinsley (205) 391-2251 atinsley@sheltonstate.edu | Tuscaloosa |
| Jefferson State | Performing Arts Center Auditorium - Chilton Campus | 1850 Lay Dam Road, Clanton, AL 35045 | Tuesday, September 7 - 11 AM | Christine Brown (205) 280-8211 lbrown2@jeffersonstate.edu | Chilton |
| Jefferson State | Judy Merritt Health Sciences Building, Room 129 A-D (Multipurpose Room) - Shelby-Hoover Campus | 4600 Valleydale Road, Hoover, AL 35242 | Tuesday, September 7 - 2 PM | Debbie Jackson (205) 983-5214 chi@jeffersonstate.edu | Shelby |
| Wallace State-Selma | Hank Sanders Conference Room | 3000 Earl Goodwin Pkwy, Selma, AL 36702 | Tuesday, September 7 - 4 PM | Virgina Glover (334) 876-9231 virginia.glover@wccs.edu | Dallas |
| Bishop State | Delchamps Auditorium - Main Campus | 351 North Broad St, Mobile, AL 36603 | Wednesday, September 8 - 9 AM | Gloria Sterling (251) 405-7084 gsterling@bishop.edu | Mobile |
| Coastal Alabama | Nettles Auditorium - Monroeville campus | 2800 South Alabama Ave Monroeville, AL 36460 | Wednesday, September 8 - 11 AM | Kay Lett (251) 575-8274 kay.lett@coastalalabama.edu | Monroe |
| Demopolis Civic Center | Civic Center | 501 N Commissioners Ave, Demopolis, AL 36732 | Wednesday, September 8 - 1 PM | Sam Gross (334) 289-0577 sam.gross@demopolisal.gov | Marango |
| Troy University | | Troy, AL | Wednesday, September 8 - 3 PM | | Pike |
| Capitol Auditorium | | Montgomery, AL | Wednesday, September 8 - 6 PM | Donna Overton | Montgomery |
| Gadsden State | Cheaha Lecture Hall, Room 111 - Ayers Campus | 1801 Coleman Road, Anniston, AL 36202 | Thursday, September 9 - 9 AM | Michele Conger (256) 835-5451 mconger@gadsdenstate.edu | Calhoun |
| Lurleen B. Wallace | Wendell Mitchell Conference Center - Greenville Campus | 750 Greenville Bypass, Greenville, AL 36037 | Thursday, September 9 - 11 AM | Peige Josey (334) 881-2213 pjosey@lbwcc.edu | Butler |
| Coastal Alabama | Woodfin Patterson Auditorium - Brewton campus | 220 Alco Dr, Brewton, AL 36426 | Thursday, September 9 - 2 PM | Dennis Fuqua (251) 809-1532 dennis.fuqua@coastalalabama.edu | Escambia |
| Southern Union | Southern Room, Opelika campus | 301 Lake Condy Road Opelika, AL 36801 | Thursday, September 9 - 4 PM | Alison Osborn (334) 742-2972 aosborn@suscc.edu | Lee |

RC 045711

**From:** Laura Hall <annihall19@gmail.com>
**Sent:** Tuesday, June 29, 2021 9:05 PM
**To:** Donna Overton <donna.overton@alsenate.gov>; annihall19@gmail.com <annihall19@gmail.com>
**Cc:** Permanent Legislative Committee on Reapportionment <reapportionmentcommittee@ALALeg.onmicrosoft.com>;
Reapportionment Committee Meeting Notices <reappnotices@ALALeg.onmicrosoft.com>; dwalker@balch.com
<dwalker@balch.com>
**Subject:** Re: REAPPORTIONMENT...Adopted Guidelines and Public Hearing Schedule

On Tue, Jun 29, 2021 at 10:03 PM Laura Hall <annihall19@gmail.com> wrote:

**Please note that I sought input and the following information  is provided as it relates to the Hearing Schedule.**

**Thanks,**

**Laura Hall**

**256.656.2301**


**Alabama Reapportionment Committee's Proposed Public Hearing Schedule**

The proposed public hearing locations are insufficient. While the city/county composition mirror those used in 2011, the proposed locations are not representative of the state's voting demographic and do not provide adequate opportunity for public input.

During the May 5. committee meeting, members agreed to hearing locations that would not require constituents to travel more than one county. However, the proposed location map will require interested parties to travel significant distances – at least an hour each way, in some instances – to participate.

The proposed schedule shows 4 or 5, consecutively scheduled,hearings each day over *four* calendar days. Many of these hearings are scheduled only two hours apart, leaving committee members who would like to attend multiple hearings in a region inadequate time to meaningfully participate in one hearing and then travel to the next. In 2011, the public hearings were spaced over *eight* calendar days, with 3 hearings at most, each day. While it may not be feasible for all committee members to attend every public hearing, the proposed schedule requires members to "pick and choose" hearings and will not have the full benefit of the public hearing testimony and discussion of any alternative maps introduced.

1

RC 045712

In addition, the timing of each hearing is unsatisfactory. Hearings held during working hours cannot be viewed objectively as providing the opportunity for public input. Only one hearing (Randolph County) is scheduled to begin at 5 pm. Whereas, seven of the 2011 hearings were scheduled at 6:30 p.m. (one at 6:45).

Three of the current Senate districts have no public hearing in any county within the district:

- O SD4 (Gudger) – Lawrence, Marion, Winston, and Cullman
- O SD10 (Jones) – Etowah and Cherokee
- O SD28 (Beasley) – Macon, Russell, Bullock, Barbour, and Henry

Two of the current Senate districts have nominal coverage in the proposed locations:

- O SD22 (Albritton) – Clarke, Washington, Baldwin (most), Escambia and Monroe (sliver)
  - ✦ The interests of constituents in Escambia County and the small portion of Monroe contained in this district -- where there are proposed hearings -- are distinctly different from those of constituents in Washington, Clarke, or Baldwin.
- O SD24 (Singleton) – Pickens, Greene, Hale, Choctaw, and Marengo (portion)
  - ✦ This district covers half of Marengo, the only county in this district with a proposed hearing

Of the top 10 counties with the highest Black population, only two are covered in the proposed:

- o Macon (80.7%)
- o Greene (80.1%)
- o Lowndes (72.5%)
- o Sumter (71.8%)
- o Wilcox (71.3%)
- o Bullock (70.5%)
- o **Dallas (70.5%)**
- o Perry (67.9%)
- o **Montgomery (59%)**
- o Hale (51.4%)

Finally, the proposed public hearing locations raise a few accessibility concerns.

We commend the decision to use community colleges as the venue for redistricting public hearings. They are typically well known and welcoming community spaces that residents feel comfortable visiting in addition to being physically accessible to community members with disabilities. However, the desire to use community colleges should not override other important considerations when choosing locations for these hearings. If there is not a suitably located community college in a county, other spaces should be considered. Two examples:

Hoover was chosen as the Shelby County location – this is an affluent area in north Shelby County that is less than 30 minutes from the hearing location in Jefferson County but more than thirty miles from communities in the south of the county location in Calera (where this is

RC 045713

a community college) or Columbiana (the county seat) would be muchmore accessible to other parts of the county

The State House is identified for two public hearings in Montgomery. At least one location should be moved to a space more accessible to community residents.


On Fri, Jun 4, 2021 at 12:12 PM Donna Overton <donna.overton@alsenate.gov> wrote:
Good Morning All,

I have attached the guidelines that were adopted on our meeting May 5, 2021 and a copy of the Public Hearing dates and locations. The hearings will be held in person (at the listed community colleges) and virtually from the  Statehouse in Conference room 317. Any member who wishes to attend the hearing either in person or virtually from the statehouse is welcome to do so.

Look over the schedule and if you would like to add to the list, please, let me know. I will be glad to work with you in setting that up. The plan is to publish the schedule the first of July 2021. I would need your request for any additional hearing locations and dates by June 28 so I can get them finalized.

Thanks and Have a Great Day!

**Donna Overton Loftin**
Supervisor, Reapportionment Office
11 S Union Street, Suite 317
Montgomery, AL. 36130
334.261.0395


You're receiving this message because you're a member of the Permanent Legislative Committee on Reapportionment group from ALALeg. To take part in this conversation, reply all to this message.

View group files  |  Leave group  |  Learn more about Microsoft 365 Groups

RC 045714

**From:** Jim Mcclendon <jimmcc@windstream.net>
**Sent:** Monday, July 12, 2021 5:05 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>
**Subject:** Fwd: Meeting Changes/Additions


Senator Jim McClendon

Begin forwarded message:

> **From:** Donna Overton <donna.overton@alsenate.gov>
> **Date:** July 12, 2021 at 4:35:48 PM CDT
> **To:** Jim McClendon <jimmcc@windstream.net>, chrispringle@southerntimberlands.com
> **Cc:** Dorman Walker <dwalker@balch.com>
> **Subject:** Fw: Meeting Changes/Additions


Here is the latest updated public hearing schedule.  Take a look at it and see what you think.  I also attached a statewide county map and highlighted the counties in which we will be having a public hearing.

I will be in Salt Lake the rest of this week at the NCSL redistricting conference.  Call me on my cell if you need me.
334 380-8799

---

**From:** Boone Kinard <boone.kinard@accs.edu>
**Sent:** Monday, July 12, 2021 11:36 AM
**To:** Donna Overton <donna.overton@alsenate.gov>
**Subject:** RE: Meeting Changes/Additions

Updated to reflect name of location and appropriate contact person at Wallace-Hanceville CC. This should be the final information and confirmation for all colleges. Please let me know what the next steps are. I have told the colleges to be expecting follow-up from your office in the near future.

Thanks,
Boone

RC 045717

**From:** Jim Mcclendon <jimmcc@windstream.net>
**Sent:** Monday, July 12, 2021 5:18 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>
**Subject:** Fwd: Meeting Changes/Additions


Senator Jim McClendon

Begin forwarded message:

> **From:** Jim Mcclendon <jimmcc@windstream.net>
> **Date:** July 12, 2021 at 5:17:18 PM CDT
> **To:** Donna Shanholtzer Overton Loftin <donna.overton@alsenate.gov>
> **Subject: Re: Meeting Changes/Additions**
>
> Thanks Donna. Good work. I'm printing so can see details. If there's an issue I'll let you know, otherwise proceed.
>
> Have a fun trip.
>
> Senator Jim McClendon
>
>
> > On Jul 12, 2021, at 5:05 PM, Jim Mcclendon <jimmcc@windstream.net> wrote:
> >
> >
> > Senator Jim McClendon
> >
> > Begin forwarded message:
> >
> > > **From:** Donna Overton <donna.overton@alsenate.gov>
> > > **Date:** July 12, 2021 at 4:35:48 PM CDT
> > > **To:** Jim McClendon <jimmcc@windstream.net>, chrispringle@southerntimberlands.com
> > > **Cc:** Dorman Walker <dwalker@balch.com>
> > > **Subject: Fw: Meeting Changes/Additions**

1

RC 045720

Here is the latest updated public hearing schedule. Take a look at it and see what you think. I also attached a statewide county map and highlighted the counties in which we will be having a public hearing.

I will be in Salt Lake the rest of this week at the NCSL redistricting conference. Call me on my cell if you need me.
334 380-8799

---

**From:** Boone Kinard <boone.kinard@accs.edu>
**Sent:** Monday, July 12, 2021 11:36 AM
**To:** Donna Overton <donna.overton@alsenate.gov>
**Subject:** RE: Meeting Changes/Additions

Updated to reflect name of location and appropriate contact person at Wallace-Hanceville CC. This should be the final information and confirmation for all colleges. Please let me know what the next steps are. I have told the colleges to be expecting follow-up from your office in the near future.

Thanks,
Boone

**From:** Boone Kinard
**Sent:** Friday, July 9, 2021 5:08 PM
**To:** Donna Overton <donna.overton@alsenate.gov>
**Subject:** RE: Meeting Changes/Additions

Donna,

Hope you had a great week. I have confirmed all additional meetings with the appropriate community colleges. Updated spreadsheet is attached. You will need to make contact at Troy University and University of West Alabama to finalize those meetings, along with the Montgomery and Bullock Co. meetings. All others should be set! Let me know if you need anything else.

Thanks,
Boone

**From:** Donna Overton <donna.overton@alsenate.gov>
**Sent:** Friday, July 2, 2021 11:58 AM
**To:** Boone Kinard <boone.kinard@accs.edu>
**Subject:** Re: Meeting Changes/Additions

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

2

RC 045721

Yes! Thanks!! And you too!

Get Outlook for iOS

---

**From:** Boone Kinard <boone.kinard@accs.edu>
**Sent:** Friday, July 2, 2021 11:23:27 AM
**To:** Donna Overton <donna.overton@alsenate.gov>
**Subject:** Meeting Changes/Additions

Based on our conversation, here are the changes I am proposing to the previous scheduling spreadsheet:

- Move Randolph County meeting at Southern Union-Wadley campus to September 16 at 4 PM.
- Change times for Calhoun Co (Gadsden State) and Jefferson Co (Lawson State) meetings on September 2 to 2 PM and 4 PM, respectively.
- Request additional meetings at various locations on September 15 and 16 below:

| | | | |
|---|---|---|---|
| **Coastal Alabama** | | | Wednesday, Septeml |
| | | | Wednesday, Septeml |
| **Wallace-Hanceville** | | | AM |
| **Gadsden State** | | | Wednesday, Septeml |
| **County Courthouse** | | | Wednesday, Septeml |
| **University of West** | | | |
| **Alabama** | | | Morning of Septembı |
| **Coastal Alabama** | | | Thursday, September |
| **Southern Union** | Lake Room - Wadley campus | 750 Roberts Street Wadley, AL 36276 | Thursday, September |

This allows anytime during the morning of September 16 for you to schedule the University of West Alabama meeting. I have requests out to all applicable community colleges for the proposed dates/times and will let you know once I have these meetings confirmed.

Have a Great 4th!

Thanks,
Boone


Boone Kinard
Executive Director of External Affairs
Alabama Community College System
Office – (334) 293-4718
Cell – (334) 462-0665

3

RC 045722

<image001.png>


<Legislative Reapportionment Meetings.xlsx>
<County Map of Public Hearings.pdf>

RC 045723

**From:** Steve Livingston <steve.livingston@alsenate.gov>
**Sent:** Friday, July 23, 2021 12:12 PM
**To:** Donna Overton <donna.overton@alsenate.gov>; Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>
**Subject:** RE: draft response letter to Sen Smitherman

Questions?

# 7  I assume the 28 meetings will be recorded ?

#11 – the Public allowed to submit maps, should we say complete maps not just there district ?

**From:** Donna Overton <donna.overton@alsenate.gov>
**Sent:** Friday, July 23, 2021 11:36 AM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>; Steve Livingston <steve.livingston@alsenate.gov>
**Subject:** draft response letter to Sen Smitherman

Good Morning!

Here is the final draft response to Sen Smitherman's letter.  Please, look it over and let me know if you would like to add or change anything.
Upon your approval, I will put it on letterhead and send it to his legislative office upstairs.

Thanks!

**Donna Overton Loftin**
Supervisor, Reapportionment Office
11 S Union Street, Suite 317
Montgomery, AL.  36130
334.261.0395

1

RC 045724

**From:** Laura Hall <annihall19@gmail.com>
**Sent:** Tuesday, October 19, 2021 12:49 PM
**To:** sljones@ballhealth.com <sljones@ballhealth.com>; Chris Pringle <chris.pringle@alhouse.gov>; chrispringle@southerntimberlands.com <chrispringle@southerntimberlands.com>; Jim McClendon <jim.mcclendon@alsenate.gov>; Jim Mcclendon <jimmcc@windstream.net>
**Subject:** Re: FW: REAPPORTIONMENT COMMITTEE MEETING

Rep Jones, I agree, that we should receive the information in a timely manner in order to fully grasp the impact.
Laura Hall


On Tue, Oct 19, 2021 at 12:23 PM Samuel L. Jones <sljones@ballhealth.com> wrote:
  FYI

**From:** Samuel L. Jones
**Sent:** Tuesday, October 19, 2021 12:18 PM
**To:** 'Donna Overton' <donna.overton@alsenate.gov>; Permanent Legislative Committee on Reapportionment <reapportionmentcommittee@ALALeg.onmicrosoft.com>
**Subject:** RE: REAPPORTIONMENT COMMITTEE MEETING

Is it possible for the committee members to view the material that is to be discussed at the meeting at least three days before the meeting? This material is critical to the people of the state and should not be handled in a short meeting without the opportunity properly assess the impact of the proposed changes on the states population from several prospectives.

**From:** Donna Overton <donna.overton@alsenate.gov>
**Sent:** Monday, October 18, 2021 5:52 PM
**To:** Permanent Legislative Committee on Reapportionment <reapportionmentcommittee@ALALeg.onmicrosoft.com>
**Subject:** REAPPORTIONMENT COMMITTEE MEETING

The Permanent Legislative Committee on Reapportionment will be meeting on:

                    Date:  Tuesday, October 26
                    Time:  1:00 pm

1

RC 045725

Place:  Conference Room 317

The Purpose of this meeting will be to discuss and adopt a committee plan for each of Congressional, State House and Senate, and State School Board District Plans.

Have a Great Evening!

Donna Overton Loftin
Supervisor, Reapportionment Office
11 S Union Street, Room 317
Montgomery, Al  36130

You're receiving this message because you're a member of the Permanent Legislative Committee on Reapportionment group from ALALeg. To take part in this conversation, reply all to this message.

View group files  |  Leave group  |  Learn more about Microsoft 365 Groups

This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission.

RC 045726

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Wednesday, October 20, 2021 9:23 AM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>; Donna Overton <donna.overton@alsenate.gov>; Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>
**Subject:** Letter to AL Reapportionment Committee 20211019-Final2

The attached letter from the NAACP, et al., includes a map of a Congressional plan with two majority-Black districts, for which data not now is provided, as follows:

|  | Black Only BVAP | Any Part Black BVAP |
|---|---|---|
| NAACP CD2 | 50.05% | 51.19% |
| NAACP CD 7 | 52.55% | 53.58% |

Dorman



Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

---

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045727



 

October 20, 2021

*Sent via email*

Legislative Reapportionment Office
Room 303, State House
11 South Union Street
Montgomery, Alabama 36130
district@al-legislature.gov
cc: donna.overton@alsenate.gov

**Re:   Duty to Comply with the U.S. Constitution and Voting Rights
Act in Alabama's Redistricting Process**

Dear Legislative Reapportionment Committee Members:

The NAACP Legal Defense and Educational Fund, Inc. ("LDF")[1], Alabama State Conference of the NAACP, American Civil Liberties Union ("ACLU"),[2] and ACLU of Alabama[3] write to remind you of your obligation to comply with the U.S. Constitution and Section 2 of the Voting Rights Act ("Section 2") during the post-2020 reapportionment and redistricting cycle. In particular, you must consider whether

---

[1]   Since its founding in 1940, LDF has used litigation, policy advocacy, public education, and community organizing strategies to achieve racial justice and equity in political participation, education, economic justice, and criminal justice. Throughout its history, LDF has worked to enforce and promote laws and policies that increase access to the electoral process and prohibit voter discrimination, intimidation, and suppression. LDF has been fully separate from the National Association for the Advancement of Colored People ("NAACP") since 1957, though LDF was originally founded by the NAACP and shares its commitment to equal rights.

[2]   The ACLU has worked to defend and preserve the individual rights and liberties guaranteed by the Constitution and laws of the United States for over 100 years. The ACLU established its Voting Rights Project in 1965 – the same year that the historic Voting Rights Act was enacted. Its mission is to build and defend an accessible, inclusive, and equitable democracy free from racial discrimination.

[3]   The ACLU of Alabama is freedom's watchdog; working in the courts, legislatures and communities to defend the individual rights and personal freedoms guaranteed by the Constitution and the Bill of Rights.

RC 045728

Section 2 requires the Alabama legislature to enact a map with **two** opportunity districts each comprised of a majority of Black voters ("majority-minority opportunity district"). In so doing, you must conduct a localized analysis of racial bloc voting and effectiveness thresholds and you must avoid drawing congressional or state legislative districts in a manner that places voters of color in districts based on their race at higher thresholds than is necessary for them to elect their candidates of choice.

According to 2020 Census data, nearly 28% of Alabama's residents identify as Black, either alone or as part of a multi-racial identity. It is fair, necessary, and logical that all Black Alabamians have an opportunity to elect their preferred Congressional representatives. Members of Congress make decisions and influence policies that impact every aspect of American life, including access to education, economic opportunity, housing, health care, and the direct and collateral consequences of the criminal legal system. An additional majority-minority opportunity district, which Section 2 likely requires, would provide Black voters with representation to address the state's pervasive and ongoing record of inequality of opportunity in various aspects of life.

I.    **The Reapportionment Committee Must Ensure Alabama's Compliance with Section 2 of the Voting Rights Act and the U.S. Constitution.**

Under Alabama law, the Reapportionment Committee is responsible in the first instance for redrawing district maps for Alabama's seven Congressional districts as well as for all of the state's legislative districts, based on data from the 2020 census.[4] It is critical that the state legislature uses this opportunity to remedy long-standing dilution of Black voting strength in Alabama's congressional map. Nearly 28% of Alabama residents identify as Black people, yet since Reconstruction, Alabama has never had more than one Black member of Congress in its delegation. This is a direct consequence of the configuration of Alabama's congressional districts: Black voters are packed into District 7, the state's only majority-minority opportunity district, and cracked among the state's districts comprised of a majority of white voters ("majority-white districts"). Although District 7 has consistently elected Black candidates over the past 30 years, none of the majority-white districts have elected a Black Congressperson. The Reapportionment Committee must ensure that Black voters have an equal opportunity to elect candidates of their choice, as required by Section 2, while also complying with the Constitution's "One Person, One Vote"

---

4   *See* Ala. Code §§ 29–2–50, 29–2–51.

2

RC 045729

principle. Careful attention to these important constitutional and statutory constraints is particularly important in the upcoming legislative session because this is Alabama's first redistricting cycle without the full protection of Section 5 of the Voting Rights Act ("Section 5").

### A. Section 2 Likely requires the Development of a Second Majority-Black Congressional District.

Section 2 demands that voters of color in Alabama have an equal opportunity "to participate in the political process and elect candidates of their choice."[5] Section 2 is particularly important in Alabama, a state with a well-documented history of racial discrimination in voting. Section 2 imposes an affirmative obligation on the Committee to carefully assess where it must draw districts to provide minority voters with an effective opportunity to elect their preferred candidates. Assessing minority voting opportunities entails attention not only to the demographic composition of districts, but also to other factors such as "participation rates and the degree of cohesion and crossover voting" among minority voters.[6] Our analysis suggests,[7] and other analysts have demonstrated,[8] that drawing two majority-minority Congressional districts in Alabama is possible and in line with constitutional limitations. Attached to this letter is an example of a map that creates two majority-minority opportunity districts in Alabama's U.S. Congressional map (Appendix One). The Legislature must therefore consider whether, in conducting the analysis required by Section 2, a Congressional map creating two majority-minority districts is now required.

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the U.S. Supreme Court set forth three pre-conditions indicating that a districting plan or voting system results in vote dilution. These preconditions, referred to as the *"Gingles* preconditions" are met when: (1) an alternative districting plan can be drawn that includes one or more single-member districts where a minority community is sufficiently large and geographically compact to make up the mathematical majority of the district; (2) the minority group is politically cohesive in its support for preferred candidates; and (3) in the absence of majority-minority districts, candidates preferred by the minority group would usually be defeated because of political cohesion in the voting patterns

---

[5]  *See Thornburg v. Gingles*, 478 U.S. 30, 34 (1986).

[6]  Bernard Grofman, Lisa Handley, David Lublin, *Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence*, 79 N.C. L. Rev. 1383, 1415 (2001).

[7]  See Infra Appendix 1.

[8]  *E.g.*, @Redistrict, Twitter (Sept. 21, 2021, 5:41 PM), https://twitter.com/Redistrict/status/1440431034114318342.

3

RC 045730

of non-minority voters in support of different candidates.[9] Together, the second and third *Gingles* preconditions are commonly referred to as racial bloc voting or racially polarized voting.[10] Racially polarized voting "is the linchpin of a § 2 vote dilution claim."[11]

If these three *Gingles* preconditions are met, a decisionmaker must then evaluate the "totality of circumstances" to determine whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[12] Courts consider several factors—such as the jurisdiction's history of voter discrimination—to determine whether the minority vote has been impermissibly diluted.[13] Importantly, it is "only the very unusual case" where "plaintiffs can establish the existence of the three *Gingles* factors" and fail "to establish a violation of § 2 under the totality of circumstances."[14]

In Alabama, based on present demographics, voting patterns, and other conditions, a Congressional redistricting plan that includes only one majority-minority district likely violates the Voting Rights Act. Each of the three *Gingles* preconditions is likely satisfied in Alabama and there is ample evidence that, under the totality of the circumstances, Black voters have less opportunity than other

---

[9]   *Gingles*, 478 U.S. at 50-51.

[10]   Racially polarized voting occurs when different racial groups vote as a bloc for different candidates. In a racially polarized election, for example, Black people vote together for their preferred (frequently, though not always, Black) candidate, and most non-Black voters vote for the opposing (typically, though not always, white) candidate.

[11]   *Ala. State Conf. of the NAACP v. Alabama*, No. 2:16-CV-731, 2020 WL 583803 (M.D. Ala. Feb. 5, 2020); *City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1550 (11th Cir. 1987) ("The court's new three-part test establishes that racial bloc voting is the hallmark of a vote dilution claim"); *see also Gingles*, 478 U.S. at 48 n.15.

[12]   52 U.S.C. § 10301(b); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006).

[13]   Courts examine the "totality of the circumstances" based on the so-called "Senate Factors," named for the Senate Report accompanying the 1982 Voting Rights Act amendments in which they were first laid out. *Gingles*, 478 U.S. at 43-45. The Senate Factors are: (1) the extent of any history of discrimination related to voting; (2) the extent to which voting is racially polarized; (3) the extent to which the state or political subdivision uses voting practices that may enhance the opportunity for discrimination; (4) whether minority candidates have access to candidate slating processes; (5) the extent to which minority voters bear the effects of discrimination in areas of life like education, housing, and economic opportunity; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which minority people have been elected to public office; (8) whether elected officials are responsive to the needs of minority residents; and (9) whether the policy underlying the voting plan is tenuous. *Id.* at 36-37. However, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45.

[14]   *Clark v. Calhoun Cty.*, 21 F.3d 92, 97 (5th Cir. 1994).

RC 045731

members of the electorate to participate in the political process and elect candidates of their choice.

    *i.*    ***Gingles*** **Precondition One: It is Possible to Draw Alabama's U.S. Congressional Map with Two Majority-Minority Opportunity Districts.**

It is possible to draw a second majority-minority opportunity district in Alabama's seven-district Congressional map. **Appendix One** provides one example of an Alabama Congressional district plan, based on 2020 Census data, in which two of the seven districts are comprised of a majority of Black voters.[15]

In the attached plan, the Black community, measured by the Black voting age population ("BVAP") within each of the majority-minority opportunity districts, are sufficiently large and geographically compact to satisfy the first *Gingles* precondition. The appended map includes one majority-minority opportunity district that contains the core of the current District 7 as well as a second majority-minority opportunity district where the BVAP is over 50%.[16]

Currently, District 7, with over 60% BVAP, is diluting the votes of Black Alabamians. As the state is aware from its experience in previous redistricting cycles, compliance with Section 2 of the Voting Rights Act provides a compelling reason to consider race in redistricting, but it does not provide license to draw districts in ways that apply racial targets without a localized effectiveness analysis over several election cycles. The U.S. Constitution protects against maps that intentionally "pack" Black voters into districts with unnecessarily high Black populations or "crack" them into districts with unnecessarily low ones—both stratagems that can illegitimately elevate race over other considerations and diminish the political power of Black people.[17] Similarly, "if a legislature uses race as a proxy for a legitimate districting

---

[15]  While we believe that these maps are *sufficient* for compliance with Section 2, we make no representations as to whether the demographic percentages in any particular district in these draft maps are *necessary* for Section 2 compliance. An assessment of that question would require a more finely detailed analysis, including of racial polarization patterns, which we are unable to complete before an anticipated deadline for map submissions.

[16]  *See infra* Appendix 1. The Supreme Court has held that a minority community is sufficiently large when it "make[s] up more than 50 percent of the voting-age population in the relevant geographical area." *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009).

[17]  *See, e.g., Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015); *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 180 (E.D. Va. 2018) (three-judge court) (holding that 11 state legislative districts were unconstitutional racial gerrymanders because the legislature decided to make them all meet a 55% BVAP target for which there was no strong basis in evidence); *Smith v. Beasley*, 946 F. Supp. 1174, 1210 (D.S.C. 1996) (holding that districts for which a legislature imposes unnecessarily high BVAP targets will fail constitutional scrutiny, because

5

RC 045732

criterion . . . this consideration of race likewise is subject to strict scrutiny."[18] To overcome that exacting scrutiny, this body would have to show it drew districts to comply with Section 2 – a burden our analysis reflects cannot be met.

### ii.     Other state-wide elected bodies.

Alabama's current State Legislative maps likewise evidence unnecessary packing and cracking of Black voters, including in some of the same areas of the state that are of concern in the congressional plan. With respect to the House plan, Black voters appear to be packed into several districts in the Montgomery and Birmingham areas and other parts of the state in ways that do not respect communities of interest and are likely not necessary for Black voters to elect candidates of choice. This packing artificially dilutes the ability of Black voters to elect candidates of choice in additional districts in those regions. The Committee should also, in compliance with Section 2, determine whether additional majority-minority districts in those regions are required by the Voting Rights Act. Similarly, on preliminary investigation, it appears that Huntsville's Senate districts, and potentially other Senate districts in the state including in the Montgomery area, are cracked in a way that could dilute Black political power, artificially limiting Black voters' ability to elect candidates of choice. Our analysis indicates that ceasing these practices would allow Black voters to elect candidate of choice in at least two additional districts. The Committee must carefully consider whether the *Gingles* preconditions exist with respect to the State Legislative districts and draw its redistricting plans accordingly.

### iii.    Gingles Preconditions Two & Three: Voting in Alabama is Racially Polarized.

There is ample evidence to suggest that the second and third *Gingles* preconditions are satisfied in Alabama. Alabama has a well-documented history and ongoing pattern of racially polarized voting in elections across the state. Over the past three decades, numerous federal courts have found that racially polarized voting pervades Alabama's statewide and local elections. In 2015, in *Alabama Legislative Black Caucus v. Alabama* the Supreme Court acknowledged that "voting … in the

---

Section 2 "does not require super-safe majority-minority districts of at least 55% BVAP," and explaining: "Such districts should be narrowly tailored so. that each district is considered individually and lines are drawn so as to achieve a district where minority citizens have an equal chance of electing the candidate of their choice. Districts in which most minority citizens register and vote will not need 55% BVAP to elect a candidate of choice. To be narrowly tailored, such facts should be considered when district lines are drawn.").

[18]  *Bethune-Hill*, 326 F. Supp. 3d at 142.

RC 045733

State itself, is racially polarized."[19]  The Department of Justice (DOJ) has sued local jurisdictions under Section 2 multiple times; in each case, the DOJ identified racially polarized voting patterns within the county.[20]

Our preliminary analysis of election contests between 2016 and 2020 shows that this stark pattern of racially polarized voting across Alabama, continues. Our analysis indicates that majority-minority districts are likely required to ensure Black voters have an opportunity to elect their candidates of choice on an equal footing with non-Black voters. Our analysis does not, however, reveal a need to draw districts with the present BVAP levels extant in District 7 or in many state legislative districts. For example, our preliminary analysis reveals that BVAP percentages in excess of a bare majority (i.e., 50%+1) are unnecessary in many parts of the state for Black voters to elect their candidates of choice, although effectiveness thresholds vary by locality and require a localized analysis. We continue to conduct those key analyses, and the Committee is obligated to do so as well.

Because of Alabama's stark patterns of voting along racial lines, Alabama's Reapportionment Committee and legislature must be attuned to their obligations under Section 2, not merely as an afterthought after maps are drawn, but affirmatively in the drawing of all statewide electoral maps. As the Supreme Court recently instructed: a "legislature undertaking a redistricting must assess whether the new districts it contemplates (not the old ones it sheds) conform to the [Voting Rights Act]'s requirements."[21] This Committee will not be able to fulfill its legal obligations in the redistricting process if it attempts to ignore patterns of voting along racial lines in the drawing of electoral maps.

### iv.    Totality of Circumstances: Alabama's Voters of Color Have Less Opportunity to Elect Candidates of their Choice.

A consideration of the "totality of circumstances" surrounding voting in Alabama confirms that Black voters have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of

---

[19]  *Ala. Legis. Black Caucus v. Ala.*, 575 U.S. 254, 277 (2015); *see also Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253, 1258 (N.D. Ala. 2018) ("There was racially polarized voting in both the 2008 and 2010 [statewide] elections.") *United States v. McGregor*, 824 F. Supp. 2d 1339, 1346 (M.D. Ala. 2011).

[20]  *See, e.g., United States v. Dallas Cty. Comm'n*, 739 F.2d 1529, 1536 (11th Cir. 1984); *United States v. Tallapoosa County*, No. CV-93-D-1362-E (M.D. Ala. filed Nov. 12, 1993).

[21]  *Cooper v. Harris*, 137 S. Ct. 1455, 1471 (2017).

RC 045734

their choice" in Alabama's Congressional elections.[22] Several of the Senate Factors, which inform Section 2 liability, strongly indicate that vote dilution is occurring, including: the extent of the history of voting discrimination in Alabama (Factor 1); the extent of racially polarized voting in Alabama (Factor 2); the extent to which Alabama has used voting practices that may enhance the opportunity for discrimination against Black voters (Factor 3); the extent to which a candidate slating process has been used to deny Black voters in Alabama access to that process (Factor 4); the extent to which Black voters bear the effects of discrimination in a variety of areas of life (Factor 5); whether political campaigns in Alabama have been characterized by overt or subtle racial appeals (Factor 6); and the extent to which Black candidates have been elected to public office in Alabama (Factor 7). The following are just a few examples of circumstances impacting Black voters' ability to participate equally in Alabama's congressional elections:

- Alabama has a well-documented history of voting discrimination.[23] Among other violations, in 1985, the U.S. Supreme Court struck down Alabama's intentionally discriminatory misdemeanant disfranchisement law.[24]  In 1986, a federal district court found that, from the late 1800s to the 1980s, the State Legislature had purposefully manipulated the method of electing local governments as needed to prevent Black residents from electing their preferred candidates.[25] The court also found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting strength.[26]

- In 2010, as a part of a federal investigation into bribery, State Senators Scott Beason and Benjamin Lewis, and State Representative Barry Mask agreed to wear recording devices. At trial in 2011, these recordings became public and revealed that a cadre of prominent state legislators had plotted to stop a gambling-related referendum from appearing on the November 2010 ballot. These legislators were concerned that the referendum would increase Black voter turnout because, in general, Black Alabamians supported gambling.[27]  While discussing their plot to suppress Black voter turnout, Senators Beason, Lewis, and other top legislators were recorded

---

[22]   *Gingles*, 478 U.S. at 36-37 (quoting 42 U.S.C. § 10301(b)).

[23]   *See* Deuel Ross et al., *Voting Rights in Alabama: 2006 to Present* (Aug. 2021) (on file with author).

[24]   *Id. Hunter v. Underwood*, 471 U.S. 222 (1985).

[25]   *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986).

[26]   *Id.* at 160.

[27]   *McGregor*, 824 F. Supp. 2d at 1339.

RC 045735

deriding Black Alabamians. They called Black voters "Aborigines" and predicted that the referendum's presence would lead "[e]very black, every illiterate" to be "bused [to the polls] on HUD financed buses."[28]

- In fall 2015, just after the state implemented a restrictive photo-ID law for in person voting,[29] the Alabama Governor and Secretary of the Alabama Law Enforcement Agency ("ALEA") announced the closure of 31 driver's license-issuing offices.[30] Eight of the eleven counties that were expected to lose driver's licensing offices were majority Black counties—which not only limited access to license-related services, but also reduced availability of one of the most convenient avenues for registering to vote. In December 2016, the U.S. Department of Transportation concluded that the Alabama driver's license office closures and reductions in hours had a disparate impact on Black people in violation of the Civil Rights Act.[31]

- Although COVID-19 presented risks to the entire population, Black Alabamians were disproportionately more likely to die of COVID-19.[32]

*     *     *

Compliance with the Voting Rights Act is a nuanced, fact-specific inquiry that requires an "intensely local appraisal" based "upon the facts of each case."[33] While Alabama has made progress since 1965, the Reapportionment Committee must not fail to fulfill its affirmative obligations under Section 2 and the U.S. Constitution. As such, the Committee must proactively assess whether electoral lines dilute Black voters' ability to elect candidates of their choice or otherwise intentionally assign Black voters to districts in a way that minimizes their political power.

---

[28]  *Id.* at 1345.

[29]  *Greater Birmingham Ministries v. Merrill*, 284 F.Supp.3d 1253 (N.D. Ala. 2018).

[30]  Memorandum of Agreement Between the U.S. Dep't of Transp. and the Alabama L. Enf't Agency (Dec. 22, 2016), https://www.transportation.gov/sites/dot.gov/files/docs/ALEA US DOT Signed MOA_0.PDF.

[31]  *Id.*

[32]  *People First of Ala. v. Merrill*, 467 F.Supp.3d 1179 (N.D. Ala. 2020); Ramsey Archibald, *Death Rate Due to Coronavirus Highest for Black Alabamians*, AL.com (Apr. 8, 2020), https://www.al.com/news/2020/04/death-rate-due-to-coronavirus-highest-for-black-alabamians.html

[33]  *Gingles*, 478 U.S. at 79.

RC 045736

**B. The U.S. Constitution Requires the Committee Ensure the "One Person, One Vote" Requirement.**

Article I, § 2 of the U.S. Constitution requires "equal representation for equal numbers of people" in the apportionment of Congressional districts.[84] This "One Person, One Vote" principle provides that Congressional maps that weaken the voting power and representation of residents of one Congressional district compared to other residents of another Congressional district in the state are unconstitutional.[85] The standard is 'as nearly as practicable,' to exact equality, which requires that each State make a good-faith effort to achieve precise mathematical equality.[86] "Unless population variances among congressional districts are shown to have resulted despite such [good-faith] effort, the State must justify each variance, no matter how small."[87]

In drawing state legislative districts, population deviations within plus or minus 5% of the mathematical mean are presumptively constitutional.[88] Impermissible deviations from population equality among districts may elicit malapportionment lawsuits, requiring the Legislature to show that an adopted plan legitimately advances a rational state policy formulated "free from any taint of arbitrariness or discrimination."[89]

**II.    The Reapportionment Committee Should Make All Phases of the Redistricting Process Transparent and Accessible to the Public.**

The maps the Reapportionment Committee will draw in the upcoming special legislative session will determine how Alabamians are represented in Congress, the

---

[84]  *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964).

[85]  *See Reynolds v. Sims*, 377 U.S. 533, 567–68 (1964).

[86]  *Id.* at 577.

[87]  *Kirkpatrick v. Preisler*, 394 U.S. 526, 530-31 (1969) (Article I, § 2, "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown.").

[88]  *See Reynolds*, 377 U.S. at 568 ("The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races."); *see also Gaffney v. Cummings*, 412 U.S. 735, 744–45 (1973) (explaining that "minor deviations from mathematical equality among state legislative districts" are not constitutionally suspect, but "larger variations from substantial equality are too great to be justified by any state interest"); *Brown v. Thomson*, 462 U.S. 835, 842 (1983) (holding that apportionment plans with a maximum population deviation among districts of less than 10% are generally permissible, whereas disparities in excess of 10% most likely violate the "one person, one vote" principle).

[89]  *Roman v. Sincock*, 377 U.S. 695, 710 (1964); *see Brown*, 462 U.S. at 847–48 (stating that "substantial deference" should be given to a state's political decisions, provided that "there is no 'taint of arbitrariness or discrimination'"); *see also Brown*, 462 U.S. at 852 (Brennan, J., dissenting) ("Acceptable reasons . . . must be 'free from any taint of arbitrariness or discrimination . . . .'").

10

RC 045737

state legislature, and the Board of Education for the remainder of the decade. These maps will be the foundation of access to electoral power and to the right to vote for candidates of choice for federal and state governing bodies. They will also be vital to municipalities and counties with respect to funding allocations and to their own local redistricting efforts. These maps will also significantly impact how responsive local legislative delegations will be to local concerns. Given Alabama's lack of home rule, whether state legislative maps unnecessarily split counties will heavily determine— far more than in most other states—the fates of county budgets, hospitals, schools, and other intensively local projects. The public should have significant input into whether the Committee's proposed maps allow (or do not allow) communities of interest to have a voice in the process of electing their representatives. Accordingly, the Reapportionment Committee should consider and propose only those maps that adequately represent the diversity of Alabama. We recommend prioritizing public involvement and transparency *throughout* the process so that all Alabamians have the chance to participate.

The public hearings held from September 1 to September 19 took only a first step toward fulfilling this body's obligations to create meaningful opportunities for public engagement in the redistricting process—they were limited in their effectiveness because the hearings occurred before the legislature had proposed electoral maps and most were held during normal working hours rather than in the evenings. The Reapportionment Committee must pledge to hold a second round of public hearings in tandem with the upcoming special legislative redistricting session to solicit and incorporate community feedback when the public has access to proposed maps by the legislature to provide feedback and insight on. In addition, the Reapportionment Committee should ensure that the next public hearings allow for even more robust online engagement given the ongoing COVID-19 pandemic and accommodate the schedules of working Alabamians. When collecting commentary on draft maps, the Committee should allow remote participants to share live testimony and to have their questions answered in real-time.

Without transparency and meaningful opportunities for public participation, informed involvement by all Alabamians is not possible. The upcoming special legislative redistricting session represents a crucial opportunity for the public to ensure that communities of interest in the state are kept intact and that the voting strength of protected minorities is not minimized or diluted. The Reapportionment Committee should also publicize all data used to inform state redistricting plans, publish answers to all questions received, and prohibit backroom negotiations.

*        *        *

11

RC 045738

Ultimately, this body must ensure the efficacy and fairness of all state electoral maps. You have heard and will continue to hear that this is a paramount concern for your constituents. Communities of color in Alabama, and particularly Black Alabamians, are already underrepresented in the political life of the state and have been left behind from many of the economic opportunities of the past decade. The Alabama Permanent Legislative Committee on Reapportionment must make every effort to follow the mandates and spirit of Section 2 of the Voting Rights Act and the One Person, One Vote principal of the U.S. Constitution.

It is also critical that the Reapportionment Committee model best practices because redistricting by the Legislature sets the standard and tone for local redistricting in the state. As with state representative bodies, the Voting Rights Act requires that voters of color have equal opportunities to elect representatives of their choice to city and county councils, school boards, and other local elected bodies.

Please feel free to contact Kathryn Sadasivan at ksadasivan@naacpldf.org, Davin Rosborough at drosborough@aclu.org, or Tish Gotell Faulks at tgfaulks@aclualabama.org with any questions or to discuss these issues in more detail. We also urge you to review ***Power on the Line(s): Making Redistricting Work for Us***,[40] a guide for community partners and policy makers who intend to engage in the redistricting process at all levels of government. The guide provides essential information about the redistricting process, such as examples of recent efforts to dilute the voting power of communities of color and considerations for avoiding such dilution.

Sincerely,

/s/ *Kathryn Sadasivan*
Kathryn Sadasivan
Leah Aden, Deputy Director of Litigation
Stuart Naifeh, Manager of the Redistricting Project
Steven Lance
Clarence Okoh
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Fl.
New York, NY 10006

---

[40] *See* LDF, Mexican American Legal Defense and Educational Fund, and Asian Americans Advancing Justice | AAJC, *Power on the Line(s): Making Redistricting Work for Us*, (2021), https://www.naacpldf.org/press-release/civil-rights-organizations-release-redistricting-guide-to-support-black-latino-and-aapi-communities-participation-in-crucial-process/.

RC 045739

*/s/ Davin Rosborough*
Davin Rosborough
Julie Ebenstein
Ihaab Syed
American Civil Liberties Union Voting Rights Project
125 Broad Street
New York, NY 10004

*/s/ Tish Gotell Faulks*
Tish Gotell Faulks
Kaitlin Wellborn
American Civil Liberties Union of Alabama
P.O. Box 6179
Montgomery, Alabama 36106-0179

cc:   Rep. Artis J. McCampbell
      Chair, Alabama Legislative Black Caucus

13

RC 045740

### APPENDIX ONE

#### Alabama Congressional Illustrative Map with Two Majority-Minority Opportunity Districts



14

RC 045741

*APPENDIX TWO*

*Demographics*

| District | Total Pop. | Total VAP | NH WVAP | %NH WVAP | HVAP | %HVAP | BVAP | %BVAP |
|---|---|---|---|---|---|---|---|---|
| 1 | 717,754 | 556,317 | 419,994 | 75.50% | 22,054 | 3.96% | 81,856 | 14.71% |
| 2 | 717,755 | 559,876 | 236,566 | 42.25% | 16,035 | 2.86% | 280,213 | 50.05% |
| 3 | 717,753 | 563,228 | 395,193 | 70.17% | 20,328 | 3.61% | 118,142 | 20.98% |
| 4 | 717,753 | 555,304 | 461,561 | 83.12% | 28,517 | 5.14% | 39,156 | 7.05% |
| 5 | 717,755 | 562,504 | 394,164 | 70.07% | 30,103 | 5.35% | 100,311 | 17.83% |
| 6 | 717,754 | 553,734 | 433,108 | 78.22% | 26,211 | 4.73% | 64,483 | 11.65% |
| 7 | 717,755 | 566,203 | 223,958 | 39.55% | 23,608 | 4.17% | 297,562 | 52.55% |

| District | AP BVAP | %AP BVAP | AVAP | %AVAP | NA/AN-VAP | %NA/AN-VAP |
|---|---|---|---|---|---|---|
| 1 | 86,013 | 15.46% | 8,088 | 1.45% | 4,597 | 0.83% |
| 2 | 286,576 | 51.19% | 10,235 | 1.83% | 3,482 | 0.62% |
| 3 | 122,240 | 21.70% | 10,313 | 1.83% | 2,798 | 0.50% |
| 4 | 41,887 | 7.54% | 3,406 | 0.61% | 4,966 | 0.89% |
| 5 | 105,967 | 18.84% | 11,052 | 1.96% | 4,052 | 0.72% |
| 6 | 67,621 | 12.21% | 10,677 | 1.93% | 2,164 | 0.39% |
| 7 | 303,347 | 53.58% | 6,737 | 1.19% | 2,493 | 0.44% |

15

RC 045742

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Wednesday, October 20, 2021 1:58 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>; Donna Overton <donna.overton@alsenate.gov>; Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>
**Subject:** FYI

https://www.virginiamercury.com/2021/10/08/va-redistricting-commission-implodes-as-republicans-reject-compromise-and-democrats-walk-out/

**BALCH**
**& BINGHAM LLP**

Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

---

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

1

RC 045743

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Monday, October 25, 2021 9:59 AM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>; Donna Overton <donna.overton@alsenate.gov>; Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>
**Subject:** Reports

Jim and Chris,

Donna is sending to all Committee members today the population summary reports for total population and VAP population. Together, these two reports give each district's deviation and its population – total and VAP – by race (black and white only).  She'll have a packet with more reports (e.g., precincts splits) tomorrow for Committee members. When she can, and probably after the Committee meeting, she'll send individual reports for each district to all Legislators. She also send the maps and reports to be posted on the web page after the Committee meeting.

Dorman

BALCH
& BINGHAM LLP

Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

---

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045744

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Tuesday, October 26, 2021 12:00 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>
**Subject:**

Just to be certain you have this:

The activities and processes of the Committee are also governed by the Joint Rules of Order and Procedure of the Legislature of Alabama (the "Joint Rules"), specifically Rule 23, addressing amendments to redistricting plans after they are introduced as a bill, and Rule 24, addressing the submission of redistricting plans not prepared by the Reapportionment Office. The Guidelines specifically incorporate Rule 23 and Rule 24 of the Joint Rules. The full Joint Rules can be found at the following link: http://www.legislature.state.al.us/aliswww/ISD/legislature/Joint_Rules.aspx.

Other rules also impact the redistricting process. Rule 20 of the Senate General Rules of Order and Procedure (the "Senate Rules") provides two methods by which debate on any measure presented in the Senate must cease and a vote be taken on the measure: (1) by the reporting of a special rule by the Committee on Rules, or (2) by a petition signed by 21 or more senators. Generally, such report or petition must be approved by three-fifths of the Senate. However, when the report or petition relates only to a bill to redistrict the Alabama Legislature, State Board of Education Districts, and/or Alabama Congressional Districts, such report or petition must be approved by only 18 votes. The full Senate Rules can be found at the following link: http://www.legislature.state.al.us/aliswww/ISD/Senate/Rules_General.aspx<http://www.legislature.state.al.us/aliswww/ISD/Senate/Rules_General.aspx>.

Sent from my iPhone

[[image]]

Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987  f: (866) 736-3854  e: dwalker@balch.com
www.balch.com<http://www.balch.com>

---

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected

RC 045745

against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045746

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Wednesday, October 27, 2021 5:27 PM
**To:** Donna Overton <donna.overton@alsenate.gov>
**Cc:** Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>; Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>
**Subject:** TALK POINTS FOR LIKELY ISSUES, NO . 1(11386967.1)

Jim and Chris, Donna will have these and other talking points printed for you before Friday.  Dorman

BALCH
& BINGHAM LLP

Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

---

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045747

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Thursday, November 4, 2021 4:59 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>; Donna Overton <donna.overton@alsenate.gov>; Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>
**Subject:** Singleton.15.Amended Complaint

Jim, Chris, Donna, and Randy,

And here's an amended version of *Singleton v. Merrill*. It adds to that complaint's racial-gerrymandering claim a new claim for race discrimination because the Legislature did not adopt SB10.

Dorman


Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

---

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045751

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Tuesday, November 9, 2021 1:49 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>
**Cc:** Chris Pringle <chris.pringle@alhouse.gov>
**Subject:** Talking Points for Sen. McClendon 11-9-21(11800024.1)

Jim,

Here are the talking points you asked for. My apology that the version I sent last night had multiple typos, which Randy kindly pointed out. I've proofed and reproofed this version, and I think it has no typos, but honestly proofreading is my particular bete noir.

Randy, you were right: I thought I had sent these this morning before going to the scheduling conference , but thy got hung up in the system.

Dorman
**BALCH**
& BINGHAM LLP

Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

---

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

1

RC 045752

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Thursday, November 18, 2021 4:28 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>
**Subject:** Quick talking points

Here are quick talking pints on the pending Congressional lawsuits.

Dorman
**BALCH**
& BINGHAM LLP

Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

---

CONFIDENTIALITY:  This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution.  If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045754

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Thursday, November 19, 2020 4:10 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>
**Cc:** Donna Overton <donna.overton@alsenate.gov>; Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>
**Subject:** Census Bureau delays

Jim and Chris,

The Census Bureau announced this afternoon that it is encountering processing problems, and that it cannot meet the Dec. 31 deadline for reporting reapportionment data to the President. According to the NYT, the new deadline is expected to be somewhere between Jan. 26 and mid-February. I'm guessing, and Randy concurs, that this delay probably tends to move the dial towards 6 congressional seats for Alabama, and will require slippage of the expected April 1 date for reporting redistricting data.

Dorman


Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

RC 045757

**From:** Walker, Dorman <DWALKER@balch.com>
**Sent:** Friday, March 5, 2021 3:06 PM
**To:** Jim McClendon <jim.mcclendon@alsenate.gov>; Chris Pringle <chris.pringle@alhouse.gov>
**Cc:** Donna Overton <donna.overton@alsenate.gov>; Randolf Hinaman (sharh1@comcast.net) <sharh1@comcast.net>;
Jim Davis - Attorney General's Office (jim.davis@alabamaag.gov) <jim.davis@alabamaag.gov>
**Subject:** Message from the NCSL on H.R.1

Jim and Chris,

Below is the text of a message received today from the NCSL re H.R. 1, which passed the
House this week. Please see the highlighted text.

Dorman

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Hello all,
As you may know, this week the U.S. House of Representatives passed H.R. 1, also known as
the For the People Act. While well-intended, if enacted, this bill would make sweeping
reforms in many areas, including elections, campaign finance and redistricting.

**On redistricting, the bill would require states to establish state redistricting commissions to
draw congressional districts and the redistricting provisions would apply to the current
redistricting cycle.**

On behalf of the states, NCSL has sent a memorandum to the U.S. Senate Committee on Rules
and Administration as it takes up the bill expressing concerns and comments about the
current form of H.R. 1. The bill poses potential hurdles, such as:

• **The bill's timing provisions applying to the current redistricting cycle would be difficult,
if not impossible, for compliance.**
• **Each state has its own redistricting criteria, and this bill would mandate that all state
commissions be required to use uniform criteria requirements, including preserving
communities of interest and a prohibition on the use of partisan data.**

1

RC 045759

July 29, 2021
Page 3

indicated on the schedule. It may also be possible for members of the public to participate in hearings via the internet. Committee meetings will be scheduled in the Statehouse as needed, and are open to the public.

7.   *Was the last meeting of the Reapportionment Committee available to the public via video link? Is there a saved version of the video? Will future meetings be broadcast?*

The last meeting held on May 5, 2021 was live streamed on the Legislative website for public viewing. The meeting was not video recorded internally. Anyone viewing the live stream has the option to record it on their personal device. Future meetings will be streamed live on the Legislative website.

8.   *Can members of the public provide oral or written testimony at the meetings of the Reapportionment Committee[?]*

Yes. The Reapportionment Committee has scheduled _28_ public hearings at locations across the State to receive comments and other information in preparation for preparing new district plans for the State's Congressional, Legislative, and State Board of Education Districts. Committee members, including yourself, received a draft schedule for hearings in June and were invited to propose additional locations, times, and dates for hearings. Initially _22_ hearings were scheduled. In response to suggestions from Rep. Hall, a further _6_ hearings were added, making a total of _28_ hearings. A final hearing schedule will be published to the public by the end of the month.

9.   *What is the Reapportionment Office's plan to ensure transparency and public input in the redistricting Process?*

The Reapportionment Committee has scheduled _28_ public hearings at locations across the State to receive comments and other information in preparation for preparing new district plans for the State's Congressional, Legislative, and State Board of Education Districts. Committee members, including yourself, received a draft schedule for hearings in June and were invited to propose additional locations, times, and dates for hearings. Initially _22_ hearings were scheduled. In response to suggestions from Rep. Hall, a further _6_ hearings were added, making a total of _28_ hearings. A final hearing schedule will be published to the public by the end of the month.

10.   *How can the public participate in the redistricting process?*

The Reapportionment Committee has scheduled _28_ public hearings at locations across the State to receive comments and other information in

RC 045763

July 29, 2021
Page 4

preparation for preparing new district plans for the State's Congressional, Legislative, and State Board of Education Districts. Committee members, including yourself, received a draft schedule for hearings in June and were invited to propose additional locations, times, and dates for hearings. Initially _22_ hearings were scheduled. In response to suggestions from Rep. Hall, a further _6_ hearings were added, making a total of _28_ hearings. A final hearing schedule will be published to the public by the end of the month.

11.    *Can members of the public submit proposed maps?*

Yes, members of the public can submit proposed maps at the public hearings. Submitted maps must fit into a complete statewide plan following the guidelines adopted by the committee.

12.    *How long will members of the public have to analyze a map proposed by the Office prior to a public hearing on the map?*

The Reapportionment Office does not itself propose redistricting plans. The Committee assists Legislators in the preparation of redistricting plans. Redistricting plans prepared by a Legislator are confidential until the author of a plan tells the Office to make it public, or until a plan is introduced as a bill. After the Legislature has passed new Congressional, Alabama Senate, Alabama House, and State Board of Education plans, the Office will be available to support local jurisdictions.

13.    *What are the Reapportionment Office's deadlines to provide maps to the Legislature and to local governing bodies?*

The deadline for introducing maps will be determined by when the Governor calls a special session of the Legislature to address redistricting, and by the rules of the Legislature. Plans that are not prepared on the Reapportionment Committee's redistricting system must be submitted to the Office at least 10 days before being introduced as a bill. A Legislator who authors a redistricting plan determines when that plan is introduced as a bill. After the Legislature has passed new Congressional, Alabama Senate, Alabama House, and State Board of Education plans, the Office will be available to support local jurisdiction.

RC 045764

**Walker, Dorman**

| | |
|---|---|
| **From:** | Walker, Dorman |
| **Sent:** | Monday, November 1, 2021 2:41 PM |
| **To:** | Rep. Chris Pringle (chris.pringle@alhouse.gov) |
| **Cc:** | Randolf Hinaman (sharh1@comcast.net) |
| **Subject:** | TALK POINTS FOR LIKELY ISSUES NO. 4(11407205.1) |
| **Attachments:** | TALK POINTS FOR LIKELY ISSUES NO. 4(11407205.1).docx |



Dorman Walker, Partner, Balch & Bingham LLP
105 Tallapoosa Street • Suite 200 • Montgomery, AL 36104-2549
t: (334) 269-3138 c: (334) 868-0987 f: (866) 736-3854 e: dwalker@balch.com
www.balch.com

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

1

RC 045768

## TALK POINTS FOR LIKELY ISSUES, No. 4

- <u>The Faulkner Congressional District Plan No. 1</u>

  o The Faulkner Congressional Plan No. 1 changes the Committee's Plan in Jefferson County only.

  o The Faulkner Plan takes Homewood out of CD7, which is represented by Terri Sewell, and put it in CD6, represented by Gary Palmer.

  o If this plan is passed, it will be sued as violating the Voting Right Act. In response to such a lawsuit, the State might argue that taking Homewood from CD7 and putting it in CD6 is politically motivated, but there is a strong possibility that a court would the change view it as racially motivated. If so, it's a fair conclusion that the court would find that the reassignment of Homewood was a race-conscious change made without the necessary "strong basis in evidence." This would lead to a holding that the plan violates the Voting Rights Act and the Equal Protection Clause.

  o In addition, the Faulkner Plan increases CD7's BVAP from 54.22% to 57.58%. This increase in Black BVAP is likely to draw an allegation that more Black residents have been put into CD7 than are necessary, which is called "packing," and which violates the Voting Rights Act and the Equal Protection Clause.

RC 045769

**Archived:** Wednesday, December 15, 2021 4:31:56 PM
**From:** Representative Chris England
**Mail received time:** Thu, 21 Oct 2021 17:18:55
**Sent:** Thu, 21 Oct 2021 12:18:46
**To:** Donna Overton
**Subject:** Questions concerning Reapportionment
**Importance:** Normal
**Sensitivity:** None
**Attachments:**
Letter to Reapportionment .pdf    redistricting Guidelines 5-5-21_FINAL.pdf

---

Good afternoon! I hope all is well. I want to thank you for all of the hard work you have put into this process. I know it hasn't been easy. I really appreciate you.

With that being said, I do have some questions. Please find attached to this email a letter with questions about Reapportionment. I have also attached a copy of the committee guidelines for reference purposes as well. Thank you for your prompt attention to this letter. I am looking forward to hearing back from you.

If you need any further clarification about the contents of the letter, please do not hesitate to call me. Also, please let me know when you receive this and if the attachments work.

Thank you!

Rep. Chris England

Sent from my iPhone