

FILED

2021 Dec-27  PM 10:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

EVAN MILLIGAN, et al.,

    *Plaintiffs*,

    vs.

JOHN H. MERRILL, et al.,

    *Defendants*.

No. 2:21-cv-01530-AMM

## PLAINTIFFS' REPLY IN SUPPORT
## OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.   DEFENDANTS DO NOT AND CANNOT DISPUTE PLAINTIFFS' SIGNIFICANT PROOF OF A VOTING RIGHTS ACT VIOLATION. .......1

    A.   Plaintiffs' Illustrative Maps Satisfy the Gingles I Requirements. ........1

        i.   Each of Plaintiffs' Maps Constitute a Permissible Section 2 Remedy. ......................................................................................2

        ii.   Plaintiffs' Plans Satisfy the Numerosity Requirement of Gingles I. .....................................................................................3

        iii.   Plaintiffs' Maps Satisfy the Compactness Requirement of Gingles I and Satisfy Recognized Traditional Redistricting Criteria. ....................................................................................4

    B.   The Undisputed Expert Testimony Shows Racially Polarized Voting. 9

    C.   The Totality of Circumstances Support Finding a Section 2 Violation. ..........................................................................................14

    D.   Private Plaintiffs Can Enforce Section 2.............................................19

II.  DEFENDANTS FAIL TO REBUT THE OVERWHELMING PROOF OF RACIAL GERRYMANDERING. ................................................................22

    A.   Defendants Improperly Conflate Purposeful Racial Discrimination Cases with the Racial Gerrymandering Claim Presented Here. .........22

    B.   Defendants' Core-Preservation Arguments do not Undermine Plaintiffs' Racial Predominance Showing. .........................................24

    C.   Defendants' Assertions of "Race-Blind" Districting have Limited Utility and Cannot Undermine Plaintiffs' Compelling Evidence to the Contrary.............................................................................................30

    D.   Defendants Do Not and Cannot Defend HB1 as Narrowly Tailored..32

III. THE EQUITIES WEIGH HEAVILY IN PLAINTIFFS' FAVOR...............34

CONCLUSION .......................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perry*,
138 S. Ct. 2305 (2018) ...............................................................................27, 28

*Abrams v. Johnson*,
521 U.S. 74 (1997).........................................................................................8

*Adkins v. Warden, Holman*,
710 F.3d 1241 (11th Cir. 2013) ...................................................................16

*Ala. Leg. Black Caucus v. Alabama*,
231 F. Supp. 3d 1026 (M.D. Ala. 2017)...................................................14, 25

*Ala. Leg. Black Caucus v. Alabama*,
989 F. Supp. 2d 1227 (M.D. Ala. 2013).........................................................26

*Ala. Legislative Black Caucus v. Alabama*,
575 U.S. 254 (2015).......................................................14, 20, 24, 28

*Ala. State Conf. of NAACP v. Alabama*,
949 F.3d 647 (11th Cir. 2020) ......................................................................20

*Alexander v. Sandoval*,
532 U.S. 275 (2001).......................................................................................19

*Allen v. Ala. State Bd. of Educ.*,
190 F.R.D. 602 (M.D. Ala. 2000)............................................................16, 19

*Allen v. State Board of Elections*,
393 U.S. 544 (1969).......................................................................................19

*Austin v. Hopper*,
15 F. Supp. 2d 1210 (M.D. Ala. 1998) ..........................................................16

*Bethune-Hill*,
137 S. Ct. 788 (2017).....................................................................................23

*Braggs v. Dunn*,
257 F. Supp. 3d 1171 (M.D. Ala. 2017).........................................................16

*Brown v. Ala. Dep't of Transp.*,
  597 F.3d 1160 (11th Cir. 2010) ........................................................................15

*Burton v. City of Belle Glade*,
  178 F.3d 1175 (11th Cir. 1999) ..........................................................................3

*Bush v. Vera*,
  517 U.S. 952 (1996).................................................................................2, 5, 28

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979).........................................................................................19

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) ........................................................................34

*Chestnut v. Merrill*,
  377 F. Supp. 3d 1308 (N.D. Ala. 2019).............................................................35

*Chisom v. Roemer*,
  501 U.S. 380 (1991).........................................................................................20

*Clark v. Marx*,
  No. CIV.A. 11-2149, 2012 WL 4926 (W.D. La. Jan. 9, 2012) ...................29, 37

*Clark v. Putnam County*,
  293 F.3d 1261 (11th Cir. 2002) ........................................................................25

*Cooper v. Harris*,
  137 S. Ct. 1455 (2017)......................................................................................31

*Covington v. N. Carolina*,
  283 F. Supp. 3d 410 (M.D. N.C. 2018) ...........................................................8, 9

*Covington v. N. Carolina*,
  316 F.R.D. 117 (M.D.N.C. 2016).......................................................................4

*Covington v. North Carolina*,
  270 F. Supp. 3d 881 (M.D.N.C. 2017) ..............................................................38

*Covington v. North Carolina*,
  No. 1:15CV399, 2018 WL 604732 (M.D.N.C. Jan. 26, 2018) ..........................27

iii

*Davis v. Chiles*,
  139 F.3d 1414 (11th Cir. 1998) ............................................................2

*Easley v. Cromartie*,
  532 U.S. 234 (2001) (Thomas, J., dissenting) ...................................29

*Favors v. Cuomo*,
  881 F. Supp. 2d 356 (E.D.N.Y. 2012) ............................................36, 37

*Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*,
  118 F.Supp.3d 1338 (N.D. Ga. 2015)...........................................*passim*

*Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d
  1336 (11th Cir. 2015)....................................................................12, 13

*Georgia v. Ashcroft*,
  539 U.S. 461 (2003)............................................................................4

*Gingles v. Edmisten*,
  590 F. Supp. 345 (E.D.N.C. 1984) ....................................................10

*Thornberg v. Gingles*,
  478 U.S. 30 (1986) ......................................................................*passim*

*Graves v. City of Montgomery*,
  807 F. Supp. 2d 1096 (M.D. Ala. 2011)............................................37

*Hall v. Thomas*,
  977 F. Supp. 2d 1129 (S.D. Ala. 2013) .............................................16

*Harris v. McCrory*,
  159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd sub nom. Cooper v.
  Harris*, 137 S. Ct. 1455 (2017) ........................................................23

*Harris v. McCrory*,
  No. 1:13CV949, 2016 WL 6920368 (M.D.N.C. Feb. 9, 2016).........34

*Hereford v. Huntsville Bd. of Educ.*,
  No. 5:63-cv-00109, 2015 WL 13398941 (N.D. Ala. Apr. 21, 2015)...............15

*Hope v. Pelzer*,
  536 U.S. 730 (2002)..........................................................................16

*J.I. Case Co. v. Borak,*
   377 U.S. 426 (1964).......................................................................19, 20

*Johnson v. De Grandy,*
   512 U.S. 997 (1994).............................................................................14

*Johnson v. Mortham,*
   926 F. Supp. 1540 (N.D. Fla. 1996) ...........................................37, 38

*Karcher v. Daggett,*
   462 U.S. 725 (1983)...............................................................................9

*Large v. Fremont Cty.,*
   709 F. Supp. 2d 1176 (D. Wyo. 2010)...............................................10

*Larios v. Cox,*
   314 F. Supp. 2d 1357 (N.D. Ga. 2004).................................................8

*Larios v. Cox,*
   305 F. Supp. 2d 1335 (N.D. Ga. 2004) ...............................................38

*League of Women Voters of the United States v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016)..................................................................15

*LULAC v. Abbott,*
   No. EP-21-cv-259, 2021 WL 5762035 (W.D. Tex. Dec. 3, 2021)....................19

*LULAC v. Perry,*
   548 U.S. 399 (2006)..............................................................3, 4, 8, 29

*Maynor v. Morgan Cnty.,*
   147 F. Supp. 2d 1185 (N.D. Ala. 2001)..............................................16

*McGahee v. Ala. Dep't of Corr.,*
   560 F.3d 1252 (11th Cir. 2009) ...........................................................16

*Meek v. Metro. Dade Cty.,*
   985 F.2d 1471 (11th Cir. 1993) ...........................................................11

*Mi Familia Vota v. Abbott,*
   497 F. Supp. 3d 195 (W.D. Tex. 2020) ...............................................19

*Miller v. Johnson*,
515 U.S. 900 (1995) ................................................................22, 23

*Mo. State Conf. NAACP et al. v. Ferguson-Florissant Sch. Dist.*,
201 F. Supp. 3d 1006 (E.D. Mo. 2016) ...............................................4

*Morse v. Republican Party of Virginia*,
517 U.S. 186 (1996) ................................................................19, 20

*NAACP v. East Ramapo*,
462 F. Supp. 3d 368 (S.D.N.Y. 2020), *aff'd* 984 F.3d 213 (2d Cir.
2021) ................................................................................................10

*Nipper v. Smith*,
39 F.3d 1494 (11th Cir. 1994) (en banc) .......................................3, 11

*North Carolina v. Covington*,
138 S. Ct. 2548 (2018) ....................................................27, 30, 38

*People First of Ala. v. Merrill*,
491 F. Supp. 3d 1076 (N.D. Ala. 2020) ............................................17

*Perry v. Perez*,
565 U.S. 388 (2012) ..........................................................................38

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ..........................................................................22

*Pileggi v. Aichele*,
843 F. Supp. 2d 584 (E.D. Pa. 2012) ...............................................37

*Pope v. County of Albany*,
687 F.3d 565 (2d Cir. 2012) .............................................................12

*Pope v. Cty. of Albany*,
94 F. Supp. 3d 302 (N.D.N.Y. 2015) ...............................................13

*Rogers v. Lodge*,
458 U.S. 613 (1982) ..........................................................................16

*Shaw v. Reno*,
509 U.S. 630 (1993) ..............................................................23, 33, 34

*Shelby Cty. v. Holder*,
    570 U.S. 529 (2013)..................................................................................17

*Smith v. Beasley*,
    946 F. Supp. 1174 (D.S.C. 1996) ...........................................................23

*Stephens v. Haley*,
    823 F. Supp. 2d 1254 (S.D. Ala. 2011) ...................................................16

*Stout v. Jefferson Cty. Bd. of Educ.*,
    882 F.3d 988 (11th Cir. 2018) .................................................................15

*Stout v. Jefferson Cty. Bd. of Educ. (City of Leeds Bd. of Educ.)*,
    No. 2:17-MC-681, 2020 WL 1983331 (N.D. Ala. Apr. 27, 2020)....................15

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ...............................................................34

*United States v. City of Eastpointe*,
    378 F. Supp. 3d 589 (E.D. Mich. 2019) ..................................................10

*United States v. Jefferson Cty.*,
    No. CV-74-S-17-S, 2013 WL 4482970 (N.D. Ala. Aug. 20, 2013) .................15

*United States v. Marengo Cty. Comm'n*,
    731 F. 2d 1546 (11th Cir. 1984) .............................................................18

*United States v. McGregor*,
    824 F. Supp. 2d 1339 (M.D. Ala. 2011) .................................................14

*Upham v. Seamon*,
    456 U.S. 37 (1982)....................................................................................8

*Weatherly v. Ala. State Univ.*,
    728 F.3d 1263 (11th Cir. 2013) ...............................................................16

*Wesch v. Hunt*,
    785 F. Supp. 1491 (S.D. Ala.), *aff'd sub nom. Camp v. Wesch*, 504
    U.S. 902 (1992)......................................................................................32

*In re Wild*,
    994 F.3d 1244 (11th Cir. 2021) ...............................................................21

*Wright v. Sumter Cty. Bd. of Elections*,
    979 F.3d 1282 (11th Cir. 2020) ...........................................................................13

**Statutes**

52 U.S.C. § 10302(a) ..................................................................................................20

52 U.S.C. § 10302(b) ..................................................................................................20

52 U.S.C. § 10302(c) ..................................................................................................20

52 U.S.C. § 10304(a) ..................................................................................................33

House Bill 1 ("HB1") packs a third of all Black Alabamians into a single majority-Black congressional district (District 7) in a way that denies them adequate representation in violation of the Section 2 of the Voting Rights Act ("VRA"). In doing so, the Alabama Legislature relied predominantly on race in a way not permitted by the Constitution. The Legislature further cracked the remaining Black population across Districts 1, 2 and 3, denying them influence in a second majority-Black district. The Legislature's race-based decisions to place certain voters in or outside of Districts 1, 2, 3, and 7 (the "challenged districts") were designed to simply maintain the status quo, in which the electoral strength of Black Alabamians is severely diluted, and they are not narrowly tailored to meet a compelling interest.

## I.    DEFENDANTS DO NOT AND CANNOT DISPUTE PLAINTIFFS' SIGNIFICANT PROOF OF A VOTING RIGHTS ACT VIOLATION.

Defendants do not (and cannot) seriously dispute Plaintiffs' evidence regarding the *Gingles* preconditions, nor can they dispute that Alabama's extensive past and present history of racial discrimination supports finding a Section 2 violation. Instead, Defendants obfuscate the issues by mixing legal doctrines, misreading precedent, or ignoring Plaintiffs' extensive evidence under Section 2.

### A.    Plaintiffs' Illustrative Maps Satisfy the *Gingles I* Requirements.

All four of Plaintiffs' illustrative maps contain two Congressional districts in which the Black population forms a reasonably compact majority as required under the first *Gingles* precondition, while satisfying other traditional redistricting criteria.

1

*See Thornburg v. Gingles*, 478 U.S. 30 (1986). Defendants lodge several objections to Plaintiffs plans, none of which defeat Plaintiffs' showing under *Gingles* precondition 1.

Defendants seek to graft a racial gerrymandering analysis onto the *Gingles I* requirements—this is inappropriate. "[T]he inquiry under the first prong of *Gingles* and the determination of whether a districting plan resulted from an unconstitutional racial gerrymandering are distinct issues." *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F.Supp.3d 1338, 1345 (N.D. Ga. 2015) ("*Fayette II*") (citing *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998)).

   i. *Each of Plaintiffs' Maps Constitute a Permissible Section 2 Remedy.*

Plaintiffs' illustrative plans each contain two districts made up of reasonably compact Black voting-age population ("BVAP") majorities. Each plan would constitute a valid remedy for Plaintiffs' Section 2 claims. Defendants contend that Plaintiffs plans would be improper as remedial plans because race predominated in drawing them. Opp. at 112-13 (Doc. 78). Yet "[s]trict scrutiny does not apply merely because redistricting is performed with consciousness of race." *Bush v. Vera*, 517 U.S. 952, 958 (1996). Race can plainly be used to the extent "reasonably necessary to comply with § 2." *Id*. at 977.

Plaintiffs' illustrative maps do no more than that. And, as explained below at pp. 4-9, Plaintiffs' plans *do* comply with traditional redistricting criteria, are

compact, and contain narrow majorities of Black voting age population—which help to show that they considered race only as much as necessary to satisfy *Gingles I*.

The cases Defendants rely on in support of their argument that Plaintiffs have not proffered a proper remedy are wholly inapposite. For example, in *Burton v. City of Belle Glade*, the court held that Section 2 did not authorize it to order annexation of an unincorporated community. 178 F.3d 1175, 1197 (11th Cir. 1999). In *Nipper v. Smith*, the court rejected a request to alter the state's method of choosing trial judges from multi-member districts based on considerations unique to Section 2 challenges to judicial elections. 39 F.3d 1494, 1546-47 (11th Cir. 1994) (en banc). Plaintiffs seek no such novel remedy here, but merely ask the Court to modify the boundaries of the state's congressional districts to form two rather than one majority-Black districts, a routine remedial order in Section 2 cases. *See LULAC v. Perry*, 548 U.S. 399, 435 (2006) (finding that a similar plan constituted a proper VRA remedy).

ii. *Plaintiffs' Plans Satisfy the Numerosity Requirement of Gingles I.*

Because Defendants concede that Plaintiffs' Plan A satisfies the numerosity requirement no matter how BVAP is counted, this should end the inquiry. Opp. at 52. Nonetheless, Defendants' argument that "Any Part Black" is an inappropriate measure for the *Gingles* numerosity requirement is wrong. In "cases case involv[ing] an examination of only one minority group's effective exercise of the electoral franchise," it is "proper" to rely on Any Part Black, which "look[s] at all individuals

3

who identify themselves as black."[1] *Georgia v. Ashcroft*, 539 U.S. 461, 474 n.1 (2003). Further, even using voter registration data—Defendants' preferred method of determining race in this case—each of Plaintiffs illustrative plans satisfy the numerosity requirement. See Duchin Supp. Report, Doc. 92-1 at 2 (demonstrating that all four illustrative plans contain two districts with self-identified single-race Black registered voter populations between 53% and 56%).

     iii.   *Plaintiffs' Maps Satisfy the Compactness Requirement of Gingles I and Satisfy Traditional Redistricting Criteria.*

The two majority-Black districts in each of Plaintiffs' plans both consist of geographically compact Black populations. District 2 combines the City of Mobile with the geographically concentrated Black population in the eastern Black Belt. District 7 combines the Black population in Birmingham with Montgomery and the western Black Belt. Under *Gingles*, "the compactness inquiry considers the compactness of the minority population, not the compactness of the contested district." *LULAC*, 548 U.S. at 402. Thus, Defendants' argument that the illustrative plans don't satisfy *Gingles I* because of their district-shapes fails. Opp. at 58-59.

---

[1]     Courts often rely on Any Part Black in analyzing voting claims. *See, e.g.*, *Covington v. N. Carolina*, 316 F.R.D. 117, 125 n.2 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017) (mem.); *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015); *Mo. State Conf. NAACP et al. v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006 (E.D. Mo. 2016). The U.S. Department of Justice intends to rely on Any Part BVAP to evaluate 2020 Census data. Bryan Decl., Doc. 66-2, at 10 (quoting U.S. Dep't of Justice, Guidance Under Section 2 of the Voting Rights Act for Redistricting & Methods of Electing Gov't Bodies 12-13 (Sept. 1, 2021)).

In any event, the illustrative districts here are a far cry from the convoluted districts at issue in *Bush v. Vera*, 517 U.S. 952 (1996), on which Defendants rely. Plaintiffs plans do not "reach[] out to grab small and apparently isolated minority communities." *Id.* at 979. Instead, Plaintiffs' plans combine contiguous Black populations. For example, each of Plaintiffs' plans connects all or part of northern Mobile County, including the city of Mobile's concentrated Black population, with neighboring Washington County, which is often considered part of the Black Belt, Doc. 53 ¶ 61, and includes most of the southern and eastern Black Belt.

These are not small pockets of Black voters in isolated and distant areas. They are large, concentrated populations that, contrary to Defendants' assertions, face similar issues. The Legislature's map-drawer Randy Hinaman conceded that the Black Belt is a community of interest. Hinaman 154:14-155:7. The Black Belt counties unquestionably have a long and shared history with one another as well as a shared history with the City of Mobile. Bagley Supp. Report (Doc. 76-2 at 1-4). For example, "[a]ll but one school system in the state that saw a 5 percent or greater continued loss of enrollment [in 2021-2022 due to the COVID-19 pandemic] are in the Black Belt; the other is Chickasaw City, which is an overwhelmingly Black system in greater Mobile" that would be in Plaintiffs' proposed second majority-Black district. Bagley Report (Doc. 68-2 at 18).

Yet, Defendants apply their redistricting criteria like respect for communities of interest selectively, faulting Plaintiffs' plans for failing to satisfy some traditional considerations while ignoring the same defects in their own plan. For example, citing self-serving testimony by former representatives of Districts 1 and 2, Defendants argue that Plaintiffs' plans divide specific communities of interest. Opp. at 67-68. At the same time, they ignore that HB1 fractures other communities of interest. HB1 splits the Black Belt across four districts and splits the city and county of Montgomery across two districts. Doc. 69 at 8. Defendants argue that splitting Mobile County is "unprecedented," but ignores that the Legislature's own plan for the Board of Education has done exactly that for decades. Doc. 53 ¶ 69. In Plaintiffs' plans, Montgomery County is unified, the Black Belt is in the two majority-Black districts, and the Mobile County split follows the State's Board of Education plan. *See* Duchin Report, Doc. 68-5 at § 4.2.2.

Thus, Defendants are wrong when they assert that Plaintiffs' plans fail to respect communities of interest. As Defendants' own demographer recognizes, "because there are so many different communities of interest . . . , no plan is going to respect all of them. So there are trade-offs." Hinaman Depo. at 155:11-14. Defendants chose to preserve one set of communities of interest—most or all of which are majority white—at the expense of respecting majority-Black communities of interest like the Black Belt and Montgomery County. Plaintiffs' plans prove that

6

it is possible to create a second majority-Black district while preserving communities of interest, albeit different communities than those preferred by Defendants.

Defendants further attempt to fault Plaintiffs' plans because District 2 in those plans follows the Black Belt from east to west across the State. Opp. at 21. But Defendants fail to find similar fault in HB1, in which the two northern districts span most or all of the State. *Id.* Likewise, Defendants attack Plaintiffs' plans on the ground that one of their majority-Black districts, District 2, is less compact than District 2 in HB1 based on some accepted statistical measures for scoring compactness. Yet they fail to acknowledge that several of their own districts score similar to or lower than Plaintiffs' District 2 on the same statistical measures of compactness, and that Plaintiffs' other majority-Black district, District 7, is more compact than the enacted District 7 in three of Plaintiffs' four plans. *Id.* at 24-25.

Plaintiffs' illustrative plans also score similarly to the Defendants' plans in respecting county and municipal boundaries. *See* Duchin Report, Doc. 68-5 at § 3.3, Table 1. For example, Plan D splits fewer counties than HB1, while Plan B splits only one more county than HB1 and several fewer municipalities, resulting in fewer locality splits overall than HB1. *Id.* Moreover, all of Plaintiffs' plans split fewer or an equal number of majority-Black cities than HB1. *Id.*

Finally, while "the Section 2 compactness inquiry should take into account traditional districting principles such as maintaining communities of interest and

traditional boundaries," there is no definitive list of such principles. *See Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997). Defendants argue that the choice of which redistricting criteria a Section 2 plaintiff must satisfy is entirely in the hands of the state.  Opp. at 51. But such a standard would effectively allow a state to nullify the VRA merely by declaring a set of "redistricting principles" that preclude the alteration of the state's preferred district boundaries.

Indeed, that is essentially what the State purports to have done here in arguing that protecting "district cores" and unpairing incumbents are the primary criteria on which Plaintiffs' Plans should be judged. The State's policy choices must give way, however, when they violate federal law and cannot "validate the very maneuvers that were a major cause of the unconstitutional districting." *See Abrams*, 521 U.S. at 84, 86 (approving of a remedial plan that "subordinated" unpairing incumbents to "other factors"); *Upham v. Seamon*, 456 U.S. 37, 43 (1982) (courts may "disregard the [state's] political program" where "plan offended either the Constitution or the [VRA]"). Thus, state policies like incumbent protection, are "subordinate" to remedying violations the VRA or Constitution. *See, e.g.*, *LULAC*, 548 U.S. at 441 (observing that a state policy of incumbent protection "cannot justify the effect [of a redistricting plan] on [minority] voters"); *Covington v. N. Carolina*, 283 F. Supp. 3d 410, 421 (M.D. N.C. 2018) (three-judge court); *Larios v. Cox*, 314 F. Supp. 2d 1357, 1360 (N.D. Ga. 2004) (three-judge court).

8

Likewise, no court has held that failure to preserve prior district cores is grounds for finding an illustrative redistricting plan insufficient to satisfy *Gingles I*. *Karcher v. Daggett* discussed core preservation and incumbency pairing in the context of departures from the equal population requirement—where a state need only point to a legitimate state interest. 462 U.S. 725, 740-41 (1983). It is inapposite when assessing whether a state has unlawfully diluted the votes of minority citizens under Section 2 of the VRA. *Cf. Covington*, 283 F. Supp. 3d at 432-33 (reviewing *Karcher* and concluding that the "desire to protect [ ] incumbents must give way to [the] duty to completely remedy the constitutional violation").

Allowing a state to avoid liability by adhering to a principle requiring maximum continuity of district plans would allow a state to perpetuate dilutive districting virtually indefinitely. Only by substantially altering district boundaries that have the purpose or effect of preventing minority voters from participating on an equal footing in the political process can the goals of the VRA can be realized. States cannot justify present non-compliance with Section 2 merely because in the past, the states declined to draw enough majority-minority districts.

Thus, in all of Plaintiffs' plans, the Black population is sufficiently numerous and compact to form a two majority districts in satisfaction of *Gingles I*.

**B.     The Undisputed Expert Testimony Shows Racially Polarized Voting.**

9

Defendants do not and cannot seriously dispute the existence of stark racially polarized voting in Alabama. Defendants' own expert, Dr. M.V. Hood III, concluded that "racially polarized voting is present" in Alabama. Doc. 66-4 at 13. Rather than attempt to rebut the conclusion of their own expert, Defendants instead nitpick at the methodology of Plaintiffs' expert, Dr. Baodong Liu. *See generally* Opp. at 81-84.

First, Defendants argue, without citation, that "racial-polarization analysis typically requires examination of voter-registration data." Opp. at 53. This is untrue. Dr. Liu relied on the ecological inference method for his racial polarization analysis. Liu Report, Doc. 68-1 at 5. This is the same method used by Dr. Hood.[2] Liu Rebuttal Report, Doc. 76-1 at 1-2. Ecological inference analyses often use census data to identify the voting-age populations of precincts by race. *See, e.g.*, *NAACP v. East Ramapo*, 462 F. Supp. 3d 368, 387 (S.D.N.Y. 2020), *aff'd* 984 F.3d 213 (2d Cir. 2021); *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 606 (E.D. Mich. 2019); *Large v. Fremont Cty.*, 709 F. Supp. 2d 1176, 1193 (D. Wyo. 2010). This slight difference in data sources is also irrelevant insofar as Dr. Liu's findings, which used census data, are consistent with Dr. Hood's findings, which used voter registration data. Doc. 76-1 at 3 n.2.

---

[2]     Dr. Hood criticizes Dr. Liu for relying on turnout estimates for his ecological inference analyses. Doc. 74-2 at 3-4. But Dr. Hood's analyses used the same turnout estimates. Doc. 76-1 at 2. In any event, the Supreme Court has accepted the use of turnout estimates in regression analyses of racial polarized voting. *See Gingles v. Edmisten*, 590 F. Supp. 345, 367-68 & n.29 (E.D.N.C. 1984) (three-judge court), *aff'd sub nom. Thornberg v. Gingles*, 478 U.S. 30, 52-53 & n.20 (1986).

Second, Defendants assert that politics, rather than race, explains the existence of racially polarized voting in Alabama. Opp. at 91-94. But the *Gingles* preconditions do not require showing *why* racially polarized voting exists, only that it exists.[3] *See Gingles*, 478 U.S. at 63 ("It is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives."); *Meek v. Metro. Dade Cty.*, 985 F.2d 1471, 1487 (11th Cir. 1993) ("the surest indication of race-conscious politics is a pattern of racially polarized voting") (citation omitted).

Regardless, in modern times, no Black candidate has ever been elected to Congress outside of District 7, regardless of the candidates' respective qualifications or party affiliation. Doc. 53 ¶ 125. Strikingly, for example, white Democrats last won congressional elections in 2008 in the majority-white Districts 2 and 5, but President Barack Obama, a Black Democrat, lost every congressional district in Alabama in both 2008 and 2012 except District 7. *Id*. ¶ 121. Dr. Liu found racial polarization in every congressional district in the 2008 and 2012 elections. Doc. 68-1 at 11-13. Exit polls also showed that most white Democrats in Alabama voted for

---

[3]     The Eleventh Circuit has never held that the subjective "biases" of voters is relevant to the racially polarized voting analysis. In *Nipper*, then-Chief Judge Tjoflat's discussion of racial bias was joined only by one other judge and did not garner a majority or plurality of the court. 39 F.3d at 1524-26; *see id*. at 1547 (Edmondson, J., concurring) (declining with 3 other judges to join this part of Judge Tjoflat's opinion); *id*. at 1547-57 (Hatchett, J., dissenting) (joined by another judge).

white Republicans and against those Black Democrats who ran in the 2008 general elections for U.S. Senate and President. *Id*.

Dr. Liu also found racially polarized voting in Democratic and Republican primaries. Dr. Liu's ecological inference analysis found that white people voted as blocs against Black candidates in both the 2020 Congressional District 1 Democratic Primary, Doc. 68-1 at 9, and the 2016 Republican presidential primary,[4] Doc. 76-1 at 4. In the 2008 Democratic presidential primary, 72% of whites supported Hillary Clinton and 84% of Black Alabamians supported President Obama. Doc. 68-1 at 14.

Third, Defendants claim that Plaintiffs "impermissibly swapped one minority group for another" in analyzing the *Gingles* preconditions. Opp. at 83. This is puzzling since both Dr. Duchin and Dr. Liu relied on "Any Part Black" in their *Gingles* analyses. *See* Doc. 68-1 at 15 n.20; Doc. 68-5 at 7 n.4. Both experts' consistent use of Any Part Black to define the racial group at issue for the *Gingles* precondition is in line with the footnote from *Pope v. County of Albany*, 687 F.3d 565, 577 n.11 (2d Cir. 2012). Plaintiffs are "simply saying that people who identify as both Black and some other race should still be included within the definition of 'Black.'" *Fayette II*, 118 F.Supp.3d at 1343 n.8.

---

[4]     Because only 1.2% of Black voters participated in the Republican primary, Doc. 76-1 at 4, that election "cannot inform us of who the representative of choice of African-American voters were for the office[ ] at issue," but the fact that white Republicans voted "overwhelmingly" against the Black candidate in the Republican primary is significant evidence of polarization. *See Fayette II*, 950 F. Supp. 2d at 1312 n.23 (quoting the plaintiffs' expert), *aff'd in relevant part*, 775 F.3d 1336, 1340 & nn.4-5 (11th Cir. 2015).

Fourth, and finally, Defendants assert that Dr. Liu, failed to review "all Alabama Congressional general and primary elections that involved both black and white candidates." Opp. at 82. But Dr. Liu never claimed to undertake such a difficult task. Doc. 68-1 at 4; *see also Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 331 (N.D.N.Y. 2015) (declining to fault Dr. Liu for failing to identify every-single biracial endogenous election).

To the extent Defendants rely on hearsay evidence to claim that, in some biracial Democratic primaries, the Black preferred candidate was a white person, Opp. at 83, this does not impact Dr. Liu's analysis. The mere existence of races in which Black voters supported white candidates, with no analysis of polarized voting in such elections, is insufficient to defeat the extensive evidentiary showing of RPV that Plaintiffs have put forward. *See Wright v. Sumter Cty. Bd. of Elections*, 979 F.3d 1282, 1308 (11th Cir. 2020) (declining to fault a district court for ignoring certain election results where "[n]o statistical analysis was presented"). Moreover, even if there were competent evidence "that racially polarized voting is not present in one or a few individual elections" that fact alone "does not necessarily negate" a conclusion of "legally significant bloc voting" in Alabama. *Gingles*, 478 U.S. at 57.

In sum, the undisputed facts—that voting is racially polarized and no Black person of any party has ever won a majority-white Alabama congressional district—

both "point[ ] commandingly" in Plaintiffs' favor. *Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1347 n.9 (11th Cir. 2015).

### C.   The Totality of Circumstances Support Finding a Section 2 Violation.

As with the *Gingles* preconditions, Defendants nitpick at each of the Senate Factors, but do not come close to overcoming the weight of Plaintiffs' evidence.

Because the second and third *Gingles* preconditions largely correspond with the second and seventh Senate Factors—the two "most important" factors already require relief for Plaintiffs. *Gingles*, 478 U.S. at 48 n.15. And the current system's striking disproportionality in representation—whereby Black people are about 27% of Alabama voters but control only 14% of congressional districts—also weighs heavily in Plaintiffs' favor. *See Johnson v. De Grandy*, 512 U.S. 997, 1021 (1994).

With respect to the first and fifth Senate Factors, Defendants accept that racial discrimination against Black people is "undoubtedly a part of Alabama's history." Doc. 78 at 87. Still, Defendants attempt to downplay the recency of this history. Yet, in just the last decade, courts have found that Alabama's leaders have engaged in racially discriminatory practices in violation of the Constitution or civil rights laws.

In 2010, state legislative leaders were caught on tape deriding Black voters as "illiterate" and "Aborigines" while plotting to suppress Black voter turnout. *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345 (M.D. Ala. 2011). In 2017, a three-judge federal court found that race was the predominant motive in the Legislature's

14

drawing of 12 unconstitutional state senate and house districts. *See Ala. Leg. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1033 (M.D. Ala. 2017) (three-judge court) ("*ALBC II*"). In 2016, the U.S. Department of Transportation determined that Alabama's closure of driver's license-issuing offices across the Black Belt violated the Civil Rights Act of 1965 in part because of its impact on voting.[5] Bagley Report, Doc. 68-2 at 30. Since 2016, a federal election agency was been enjoined from assisting Alabama's illegal attempt to bypass the National Voter Registration Act to require documentary proof-of-citizenship to vote. *See League of Women Voters of the United States v. Newby*, 838 F.3d 1, 14-15 (D.C. Cir. 2016) (finding that Alabama's enforcement of this requirement would lead to "the abridgment of the right to vote"), *on remand*, No. CV 16-00236, 2021 WL 4206778, at *6-7 (D.D.C. Sept. 16, 2021).

This discrimination in voting parallels Alabama officials' other acts of discrimination. As children, Black people still face discriminatory exclusion from schools, *Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988, 1006-13 (11th Cir. 2018); *Hereford v. Huntsville Bd. of Educ.*, No. 5:63-cv-00109, 2015 WL 13398941, at *3 & n.4 (N.D. Ala. Apr. 21, 2015), and even discrimination in school meal programs, *Stout v. Jefferson Cty. Bd. of Educ. (City of Leeds Bd. of Educ.)*, No. 2:17-MC-681,

---

[5]   Mem. of Agreement Between the U.S. Dep't of Transp. & the Ala. Law Enf't Agency (Dec. 22, 2016), https://www.transportation.gov/sites/dot.gov/files/docs/ALEA_US_DOT_Signed_MOA_0.PDF (Doc. 92-2).

2020 WL 1983331, at *2 (N.D. Ala. Apr. 27, 2020). As adults, Black people encounter further discrimination in government employment. Doc. 68-2 at 19 & n.62. These are not isolated incidents. Opp. at 89. Rather, several recent class actions alleging discrimination by state and local government employers involved thousands of Black workers, *see, e.g.*, *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160 (11th Cir. 2010); *United States v. Jefferson Cty.*, No. CV-74-S-17-S, 2013 WL 4482970 (N.D. Ala. Aug. 20, 2013); *Allen v. Ala. State Bd. of Educ.*, 190 F.R.D. 602 (M.D. Ala. 2000), and discrimination committed by "high-level employees" at a large public institution, *Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1273 (11th Cir. 2013).

Black people face further discrimination and mistreatment on both sides of the criminal legal system. State prosecutors have at times systemically excluded Black people from juries. *See, e.g.*, *Adkins v. Warden, Holman*, 710 F.3d 1241, 1258 (11th Cir. 2013); *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1257-59 (11th Cir. 2009); *Hall v. Thomas*, 977 F. Supp. 2d 1129, 1162-63 (S.D. Ala. 2013); *Stephens v. Haley*, 823 F. Supp. 2d 1254, 1276-78 (S.D. Ala. 2011). And the disproportionate number of Black people, Opp. at 98 n.23, incarcerated in the prisons and jails of Alabama continue to face unconstitutionally cruel and unusual conditions, *see, e.g.*, *Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017), including hitching posts, *Hope v. Pelzer*, 536 U.S. 730, 733-35 (2002), chain gangs, *Austin v. Hopper*, 15 F.

16

Supp. 2d 1210, 1215-25 (M.D. Ala. 1998), and jails akin to the "holding units of slave ships," *Maynor v. Morgan Cnty.*, 147 F. Supp. 2d 1185, 1186 (N.D. Ala. 2001).

This evidence of ongoing or very recent discrimination is particularly relevant where, as here, it is undisputed that "discriminatory practices were commonly utilized" and that such practices were only "abandoned when enjoined by courts or made illegal by civil rights legislation." *Rogers v. Lodge*, 458 U.S. 613, 625 (1982). But, even if Alabama were no longer engaged in discrimination, "[t]he racial bias of Alabama's former leaders and White citizens, while certainly 'outdated,' unfortunately still affects Black Alabamians' health and socioeconomic status today." *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1174 (N.D. Ala. 2020).

According to the Census, in the 2020 election in Alabama, 70.6% of Non-Hispanic white people and 61% of Any Part Black people were registered to vote and 63% of white citizens and 54.9% of Any Part Black citizens turned out to vote. *See* U.S. Census, Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States, Table 4b, *available at* https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html (Doc. 92-3). Similar disparities are present using single-race categories. *Id*. This nearly ten-point racial disparity in turnout and registration has steadily increased in the last fifteen years. *See Shelby Cty. v. Holder*, 570 U.S. 529, 548 (2013) (2004 data showing a 0.9-point disparity).

17

Racial inequalities in financial resources can cause other relevant harms, like Black voters "not be[ing] able to provide the candidates of their choice with the same level of financial support that whites can provide theirs." *Gingles*, 478 U.S. at 70.

With respect to the sixth Senate Factor, Defendants cannot explain away the overt and subtle racial appeals used in recent congressional races. In 2017, while running for U.S. Senate, former State Supreme Court Justice Roy Moore called for eliminating the Reconstruction Amendments and described the antebellum period in Alabama as "great" and a "time when families were united—even though we had slavery. . . . Our country had a direction." Doc. 68-2 at 27. Congressman Mo Brooks of the Fifth District has repeatedly claimed that Democrats are waging a "war on whites" by "claiming that whites hate everybody else." *Id*. at 27. Congressman Barry Moore tweeted about the January 6, 2021 shooting of U.S. Capitol-infiltrator Ashli Babbitt by Capitol Police, saying: "I understand it was a black police officer that shot the white female veteran. You know that doesn't fit the narrative." *Id*. at 28.

With respect to the eighth factor, "[i]f minority needs are not served it is evidence that minorities have insufficient political influence to ensure that their desires are considered by those in power." *United States v. Marengo Cty. Comm'n*, 731 F. 2d 1546, 1572 (11th Cir. 1984). Given racial disparities in socioeconomic status resulting from discrimination, it is no surprise that Black voters tend to support candidates or policies favoring "government-subsidized health and welfare services"

and "major public transportation expenditures." *Gingles*, 478 U.S. at 66. White congressmen's uniform opposition to public programs and civil rights bills backed by Black voters provides significant proof of unresponsiveness. Doc. 68-2 at 30-31.

Defendants attempts to pick at Plaintiffs' evidence of the totality of circumstances fails to rebut a finding that the districts in HB1 violate the VRA.

### D.  Private Plaintiffs Can Enforce Section 2.

Defendants briefly argue that this Court should buck decades of jurisprudence and be the first in the nation to hold that Section 2 does not authorize a private right of action. *See LULAC v. Abbott*, No. EP-21-cv-259, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court) (rejecting this argument); *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 223 (W.D. Tex. 2020). Defendants' argument is meritless.

In *Allen v. State Board of Elections*, 393 U.S. 544, 555-557 (1969), the Supreme Court held that Section 5 of the VRA is privately enforceable. In *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), the Court held that Section 10 of the VRA is likewise privately enforceable. The determination of whether a provision of the VRA authorizes a private right of action "must take into account" the legal context in which the statute was enacted.  *Id.* at 231 (citing *Cannon v. Univ.*

*of Chicago,* 441 U.S. 677, 689-99 (1979)).[6] "[D]uring the 1960's"—when the VRA was enacted—"the Court had consistently found such remedies notwithstanding the absence of an express direction from Congress." *Id.* Indeed, "[t]he Voting Rights Act itself was passed one year after [the] Court's decision in *J.I. Case Co. v. Borak,* 377 U.S. 426, (1964), which applied a highly liberal standard for finding private remedies." *Id.*

The *Morse* Court went on to specifically conclude that "*the existence of the private right of action under Section 2* ... has been clearly intended by Congress since 1965." *Id.* at 232 (emphasis added). The history of the VRA is informative too. In 1975, Congress amended the general enforcement mechanism in Section 3 to make explicit that private parties can sue to enforce the VRA. Section 3 originally gave enforcement authority only to the Attorney General of the United States. But, in 1975, Congress amended Section 3 to set forth the judicial procedures for whenever "the Attorney General *or an aggrieved person*" institutes a proceeding "under any statute to enforce the voting guarantees of the fourteenth and fifteenth amendment." 52 U.S.C. § 10302(a), (b), and (c); *see Morse,* 517 U.S. at 233 (explaining that the 1975 amendments to the VRA recognized that private rights

---

[6]     *Cannon* was discussed in *Alexander v. Sandoval*, 532 U.S. 275 (2001), which Defendants cite, for the "'rights-creating' language" at issue there. Section 2 uses similar rights-creating language and *Cannon* even compared the Title IX provision at issue to the VRA.  441 U.S. at 690 n.13 (citing *Allen*, 393 U.S. at 554–555).

of action were available to enforce the VRA); *see also id.* at 289 (Thomas, J., dissenting) ("As appellants accurately state, § 3 *explicitly* recognizes that private individuals can sue under the [Act].") (internal quotation marks omitted); *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 651-52 (11th Cir. 2020).[7]

Defendants cite no cases in which a court has dismissed a challenge under Section 2 because it was brought by a private party, because no such case exists.  It is telling that Defendants spend most of their argument discussing *In re Wild*, 994 F.3d 1244, 1256 (11th Cir. 2021).  There, the Eleventh Circuit held that the Crime Victim Protection Act ("CVRA") did not create a private right of action for a crime victim to seek judicial enforcement of the CVRA prior to the commencement of legal proceedings by federal prosecutors. That statute provides for a "robust *administrative*-enforcement scheme," articulates a victim's rights with respect to criminal and habeas proceedings involving an offense committed against the victim, provides for a crime victim to file a "motion" in a preexisting criminal action, and specifically articulates that the statute creates no cause of action for damages.

Nothing about the CVRA is comparable to Section 2 of the VRA.

---

[7]    The Eleventh Circuit's decision was vacated by the Supreme Court because the case had become moot, 141 S. Ct. 261 (2021), but the portion discussing private Section 2 enforcement is consistent with the history of the VRA and the fact that private parties have sued States under Section 2 for decades. *See, e.g., ALBC*, 575 U.S. 254 (private challenge against the State of Alabama); *Chisom v. Roemer,* 501 U.S. 380 (1991) (private challenge against state officials).

## II.   DEFENDANTS FAIL TO REBUT THE OVERWHELMING PROOF OF RACIAL GERRYMANDERING.

Plaintiffs accept that race-conscious redistricting in general is constitutional. Here, however, Plaintiffs have shown that Defendants improperly used race to pack District 7 and crack Black voters in Districts 1, 2, and 3 in ways not required by the VRA. As with the Section 2 claim, Defendants mount no substantive opposition to Plaintiffs' evidence of racial gerrymandering. Instead, they attempt to escape liability through a series of sleights of hand. They mis-frame the legal standard. They rely on core preservation without addressing the fact that doing so unnecessarily packs Black voters into a single district while Defendants erroneously ask the Court to ignore the role of race in creating those cores. And they ignore the extensive evidence of racial predominance. By not even offering a defense to racial predominance, Defendants essentially concede that, under strict scrutiny review, the challenged districts were not narrowly tailored to comply with the VRA.

### A.   Defendants Improperly Conflate Purposeful Racial Discrimination Cases with the Racial Gerrymandering Claim Presented Here.

Defendants center much of their racial gerrymandering opposition on the proposition that Plaintiffs have failed to prove "discriminatory intent." Opp. at 30–32, 40–42. They contend that Plaintiffs must prove the State "acted 'at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable

group.'" *Id*. at 40 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

It is true that racial gerrymandering is a type of equal protection claim and so requires proof of intent or motive. But racial gerrymandering claims are "analytically distinct" from discriminatory purpose claims, which allege that "the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (citation and internal quotation marks omitted). Unlike the discriminatory purpose cases Defendants cite, racial gerrymandering claims require only proof that race was the predominant motive in the state's redistricting decisions. In contrast, in discriminatory purpose cases, the plaintiff must prove the state had the goal of disadvantaging voters based on race.

In a racial gerrymandering claim, it is irrelevant whether legislators acted in "good faith," *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016) (three-judge court), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017); *Smith v. Beasley*, 946 F. Supp. 1174, 1208 (D.S.C. 1996) (three-judge court), or for "benign" reasons, *Shaw v. Reno*, 509 U.S. 630, 642-43 (1993). "Just as the State may not, absent extraordinary justification, segregate citizens on the basis of race," so do gerrymandering claims require "that it may not separate its citizens into different voting districts on the basis of race" absent good reason. *Miller*, 515 U.S. at 911.

23

**B.    Defendants' Core-Preservation Arguments do not Undermine Plaintiffs' Racial Predominance Showing.**

Defendants offer two primary justifications for drawing the challenged districts as they did:   first, that the legislature prioritized traditional districting principles, including preservation of existing districts, Opp. at 30–32, and second, that since only the present legislature's purpose matters, past districts cannot be the basis for racial gerrymandering claims. Taken together or separately, Defendants' position is contrary to well-established legal principles and this factual record.

"Race may predominate even when a reapportionment plan respects traditional principles." *Bethune-Hill*, 137 S. Ct. 788, 798 (2017). Defendants claim to have focused on core-preservation as their primary redistricting principle, as well as not paring incumbents and minimizing county splits. Opp. at 32. But even on such "traditional factors," the Court must look holistically at the plans.   And while Defendants lump equalizing population into their discussion of traditional factors, equal population is a "background consideration" and not a factor that can predominate: "the 'predominance' question concerns *which* voters the legislature decides to choose." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 273 (2015) ("*ALBC*").

Defendants' core-preservation argument falls apart under holistic review.   As *ALBC* recognized, core preservation "is not directly relevant to the origin of the *new* district inhabitants." *Id*. at 274. Defendants offer nothing to rebut the

24

specific analysis by Plaintiffs' expert, Dr. Williamson, of the race of individuals who the legislature moved into, out of, and retained in the challenged districts compared to the 2011 districts. His analysis showed that BVAP was a "strong predictor of change across maps," where "largely Black blocks . . . disproportionately moved out of" majority-white Districts 2 and 3 "and replaced with disproportionately White blocks." Doc. 68-3 at 8-9. Further, "areas with larger Black VAP were drawn into [majority-Black] CD 7 and the disproportionately White census blocks within [Tuscaloosa, Jefferson, and Montgomery] counties were drawn" into other districts. *Id*. at 5. Thus, even under Defendants' heads-we-win-tails-you-lose approach to the role of prior districts, the Court has before it unchallenged evidence that race was highly predictive of which voters the 2021 Legislature chose to move into and out of the challenged districts.

Rather than confronting this evidence, Defendants instead suggest that— because they preserved the core of a court-adopted 1992 remedial plan (as drawn by the Legislature's map-maker Mr. Hinaman who also drew HB1)—the State is forever absolved from racial gerrymandering claims. Opp. at 42-44. That is not so.

In *Clark v. Putnam County*, for example, the Eleventh Circuit considered a racial gerrymandering challenge to two majority-Black county commission districts, the cores of which a court drew two decades earlier to resolve VRA litigation. 293 F.3d 1261, 1263 (11th Cir. 2002). The appeals court reversed the district court's

ruling that there was no racial gerrymandering, even though the districts were "relatively compact, adhere to natural boundaries, preserve communities of interest, and protect incumbents." *Id.* at 1270. It instead found that the county's stated goal of "maintain[ing] the core of the existing majority minority districts" was itself direct evidence of race-based redistricting. *Id.* at 1267. The court held that race had predominated even though the map had preserved the core of the previously court-drawn districts that were first adopted to remedy a violation of the VRA. *Id.* at 1270.

Similarly, a court found that race predominated in drawing the 2011 state legislative districts. *ALBC II*, 231 F. Supp. 3d at 1033. This finding occurred even though Alabama had sought to preserve the cores of districts first adopted in a 1993 consent order. *See Ala. Leg. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1242, 1253, 1295-96 (M.D. Ala. 2013) (three-judge court), *rev'd on other grounds* 575 U.S. 254 (2015).

So too here. Defendants cannot hide behind the court-adopted 1992 plan and simultaneously ask the Court to ignore past redistricting cycles when their primary consideration was core preservation. The districts for which the legislature sought to "preserve the core" included District 7, which Secretary Merrill admitted was a racial gerrymander. Doc. 53 ¶ 62. Defendants' map-drawer Randy Hinaman—who drew the 1992 maps that formed the basis of the current "cores" —similarly admits that, in 1992, race played a "major role" over other redistricting criteria in his design

26

of District 7 as a majority-Black district. Hinaman Dep. (Doc. 70-2) at 30–32, 35–36. He worked on the 2001 maps and drew the 2011 and the HB1 maps. *Id.* at 23, 26, 29, 38. Mr. Hinaman testified that HB1 preserve the core of his 1992 plan, *id.* at 222, that he set out to draw a majority-Black District 7, *id*. at 98:17-99:23, 117:2-5, 142:13-20, and that he did not seek to address the racial gerrymandering concern, *id*. at 170:21-173:13.

Rep. Pringle agrees current District 7 "is in large part the same district that was drawn under the [1992 map] just adjusted for population increases." Pringle Dep. at 119–20. Despite Defendants' denials, Opp. at 23, Sen. McClendon admitted that the Legislature sought to ensure that the BVAPs of majority-Black districts, like District 7, were not "too low" but did nothing to ensure that the BVAPs of such districts were not "too high" beyond what was needed.[8] McClendon Dep. at 87-88.

Because the current Legislature *chose* to "rely on redistricting criteria highly correlated with race, like preserving the 'cores' of unconstitutional districts," it cannot pretend that its past predominant use of race has no effect. *Covington v. North Carolina*, No. 1:15CV399, 2018 WL 604732, at *4 (M.D.N.C. Jan. 26, 2018). A challenge to districts that "retain[ ] the core shape" of prior districts will succeed

---

[8]      District 7 in HB1 is more packed than its 54% single race BVAP might suggest. *Cf*. Opp. at 23. Over 59% of the registered voters in District 7 self-identify as Black. Duchin Supp. Report, Doc. 92-1 at 2.

where, as here, the current districts still bear the hallmarks of racial predominance. *North Carolina v. Covington*, 138 S. Ct. 2548, 2551 (2018).

Even in *Abbott v. Perry*, 138 S. Ct. 2305 (2018), the Supreme Court's discriminatory purpose analysis—a different claim than the one at issue here—does not support Defendants' argument against the relevance of "[a]ny consideration of race in past redistricting cycles." Opp. at 32. There, the Supreme Court held that the "intent of the 2011 Legislature" was "*relevant* to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of the 2013 Legislature." *Abbott*, 138 S. Ct. at 2327 (emphasis added). In fact, the Court plainly recognized that, in circumstances like this one, "a law originally enacted with discriminatory intent [and] later reenacted by a different legislature" could "arguably carr[y] forward the effects of any discriminatory intent." *Id.* at 2325.

Moreover, *Abbott* demonstrates the distinction between the discriminatory purpose and racial gerrymandering claims. There, the Court reversed a finding of discriminatory purpose in the enactment of the challenged districts. *Id*. at 2325. But the Court *affirmed* the district court's racial gerrymandering ruling that race was the predominant factor employed in drawing a challenged district. *Id.* at 2334.

The undisputed evidence and caselaw refutes Defendants' request that the Court ignore the proverbial man behind the curtain. Indeed, the same legislature that produced the 2011 maps sought as a "primary redistricting goal" to "maintain

existing racial percentages in each majority-minority district, insofar as feasible" in the state legislative context. *ALBC*, 575 U.S. at 273–74. Alabama took the same approach as to the 2011 congressional districts. Doc. 53 ¶¶ 53-56. It's no wonder then that Defendants urge the Court to ignore how the prior districts inform the current ones (except when it comes to giving weight to their core preservation argument).

Defendants' assertion of other traditional districting considerations, like incumbent protection, fares no better. Defendants can only justify redistricting decisions based on political or other considerations if those considerations are not tainted by racial motives. *See Bush*, 517 U.S. at 968 (using race "as a proxy for political characteristics" is "a racial stereotype requiring strict scrutiny is in operation."). If, for example, Alabama sought to protect incumbents by aiming to maximize, minimize, or maintain the Black population in their districts, that alone is strong evidence that race motivated redistricting. *See LULAC*, 548 U.S. at 440-41 (rejecting "incumbency protection" as a basis for "excluding some [minority] voters from the district simply because they are likely to vote against the officeholder"); *Clark*, 293 F.3d at 1271-72 ("Incumbency protection achieved by using race as a proxy is evidence of racial gerrymandering."). In fact, it is a "questionable proposition" that "the goal of protecting incumbents is legitimate, even where, as here, individuals are incumbents by virtue of their election in an unconstitutional

racially gerrymandered district." *Easley v. Cromartie*, 532 U.S. 234, 263 n.3 (2001) (Thomas, J., dissenting). Here, in "preserving cores" and "protecting incumbents," Alabama sought to change as little as possible about their admittedly racially gerrymandered District 7 while making race-based changes to Districts 1, 2, and 3 to preserve the racial status quo.

Because HB1 sought to preserve the cores of prior indisputably racially gerrymandered districts, the record strongly supports a finding that the State perpetuated a racial gerrymander in the challenged districts.

### C. Defendants' Assertions of "Race-Blind" Districting have Limited Utility and Cannot Undermine Plaintiffs' Compelling Evidence to the Contrary.

Defendants go on to disclaim that race played any role in drawing the challenged districts. Opp. at 33. That position, too, is inconsistent with the factual record before the Court, and misstates the governing law.

First, in addition to his testimony about the race-focused history of District 7, *supra* at 26-27, Mr. Hinaman, the State's map drawer, testified that he had tried from the beginning to maintain District 7 as a majority-Black district, that he *did* look at race after drafting the initial map, and that, had his draft District 7 been under 50% BVAP, he likely would have adjusted the BVAP upwards. Hinaman Dep. at 98, 194–96. The stage at which race was considered means little as to whether the lines were drawn in a way that reflected race as the predominant factor in their boundaries.

Second, even where the "legislature instructed its map drawers not to look at race," this means little when "sufficient circumstantial evidence" shows that "race was the predominant factor governing the shape of" the challenged districts. *See Covington*, 138 S. Ct. at 2553 (holding that "evidence concerning the shape and demographics" of districts proved the "sort[ing] voters on the basis of race" and that the "defendants' insistence" otherwise did "little to undermine" that conclusion).

Third, like in *Covington*, all the evidence other than the State's own say-so points to race predominating in the shape and demographics of the districts. In addition to the direct evidence already addressed above at 26-27, Defendants have no answer for extensive expert analysis showing this same fact. Defendants' only criticism of Dr. Imai's and Dr. Williamson's analyses is that they did not start with the previous districts as Mr. Hinaman claimed to do. But this reasoning is circular and wrong when it comes to Dr. Williamson's analysis. As discussed earlier at 25, Dr. Williamson compared the previous plan to the HB1 plan to determine which voters were moved into and out of the prior districts to balance the population. Moreover, if Plaintiffs' experts did not compare the challenged districts or their cores to hypothetical alternatives, they could not inform the holistic analysis that the Court must perform. *See Cooper v. Harris*, 137 S. Ct. 1455, 1479 (2017) (alternative maps can be "key evidence"). Focusing *only* on the changes from the prior districts would provide limited insight and make little sense given the Legislature's stated

goal of carrying forward the racially predominant districts of past maps. Doc. 53 ¶ 62; Hinaman Dep. at 30–32, 35–36.

Dr. Imai's analysis reveals the predominant role race played in the lines of districts, regardless of whether their source was through alterations made in 2021 or adopting previously drawn lines. Even when incorporating one majority-Black district—which creates a district that looks similar to District 7 in most areas except for Montgomery County—he showed the surrounding districts like District 2 looked very different from the ones adopted by the State. Imai Report (Doc. 68-4) ¶¶ 37–41. And when incorporating the Mobile-area and Black Belt as communities of interest, he shows even greater disparities between the enacted map and what District 2 otherwise would have looked like. Imai Rebuttal (Doc. 76-3) ¶¶ 9–10. Dr. Williamson used several different methods of descriptive analysis to reach the same conclusions: HB1's decisions to split counties and divide various populations across the challenged districts shows a strong correlation with race. *See* Doc. 68-3 at 3–8.

Defendants cannot avoid this evidence by merely saying it isn't so.

### D. Defendants Do Not and Cannot Defend HB1 as Narrowly Tailored.

The predominant use of race in redistricting is constitutional if it is narrowly tailored to comply with the VRA. Indeed, Plaintiffs do not claim that the consideration of race generally is unconstitutional, but rather Plaintiffs challenge the

improper use of race to pack and crack Black voters in ways unnecessary to comply with the VRA. Here, Defendants offer no narrow tailoring defense. Nor could they.

Alabama indisputably created a majority-Black District 7 in 1992 to resolve a lawsuit under the VRA. Doc. 53 ¶¶ 30–33. Mr. Hinaman drew that 1992 map as he did the one in HB1. Hinaman Dep. at 30–32, 35–36. No racial polarization or other analyses were ever conducted by the State or court in 1992 for purposes of appropriately tailoring District 7 to comply with the VRA. Doc. 53 ¶ 33 (citing *Wesch v. Hunt*, 785 F. Supp. 1491, 1498–99 (S.D. Ala.), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992)). And, even assuming the VRA required a 60% BVAP district in 1992, the State has never conducted any subsequent analysis of District 7 to determine whether the VRA continues to require a majority-Black district above or below any particular Black population threshold. *See* Doc. 53 ¶¶ 56, 97.

While the State cites preclearance of the 2002 and 2011 maps by the U.S. Attorney General under Section 5 of the VRA for, Opp. at 43, this is irrelevant to the present inquiry. *See Shaw v. Reno*, 509 U.S. 630, 654 (1993) ("[T]he Voting Rights Act and our case law make clear that a reapportionment plan that satisfies § 5 still may be enjoined as unconstitutional." (citing 52 U.S.C. § 10304(a)).

Dr. Liu's analysis confirms that HB1 is not narrowly tailored to comply with the VRA insofar as Black voters can elect candidates of choice in a majority-Black District 7 with BVAPs several points below the enacted District 7. Liu Report (Doc.

33

68-1) at 16. And, in the debate over HB1, every Black Senator supported congressional districts with BVAPs closer to 50-51%.[9] Doc. 53 ¶¶ 113-14. The State fails to mount any narrow tailoring defense for Districts 1, 2, and 3 either. Nor could VRA compliance suffice as a compelling state interest here, given that packing and cracking are at odds with the VRA.

Defendants fail to mount any factual defense to Plaintiffs' significant evidence proving racial gerrymandering, and their legal arguments miss the mark.

## III.   THE EQUITIES WEIGH HEAVILY IN PLAINTIFFS' FAVOR.

The Alabama legislature chose to adopt maps drawn on suspect grounds— failing to draw a second majority-Black district and packing and cracking Black voters in pursuant of its goal of preserving the cores of racially gerrymandered districts. Defendants cannot claim legitimate equity interests in efficiently conducting elections with unlawful districts. *See United States v. Alabama,* 691 F.3d 1269, 1301 (11th Cir. 2012). Defendants fail to even acknowledge the "odious" injury caused when the public must vote in congressional districts that violate the Constitution and the VRA. *Shaw*, 509 U.S. at 643. Without relief, Plaintiffs face

---

[9]     Defendants' reliance on a single Black activist's public opposition to two majority-Black districts with 51% Black populations (Opp. at 72) is irrelevant where, as here, elected Black Senators were united in their support for such districts. Doc. 53 ¶¶ 113-14. In any event, as explained at 4, each of Plaintiffs' proposed districts have Black registered voter populations ranging from 53% to 56% and, thus, address the purported concerns raised by this lone activist.

another election cycle of voting in racially discriminatory districts—a harm that far outweighs Defendants' largely exaggerated and imagined administrative burdens.

Defendants also claim that the public interest weighs in their favor due to their administrative concerns. But the protection of Plaintiffs' franchise-related rights is "without question, in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005); *Harris v. McCrory*, No. 1:13CV949, 2016 WL 6920368, at *2 (M.D.N.C. Feb. 9, 2016) ("The public has an interest in having congressional representatives elected in accordance with the Constitution"). Defendants primarily invoke "massive disruption to the political process" to argue that the equities weigh in favor of conducting elections with unlawful maps. But lacking from Defendants' brief is any clear evidence that adopting new maps would create the widespread disruption that Defendants fear. *See* Opp. at 120-132. Similarly, absent is any acknowledgment that the State's claimed administrative costs are self-inflicted.

The Reapportionment Committee began developing redistricting plans in May of 2021 and continued to develop the maps after the U.S. Census Bureau released the results of the 2020 Census in August 2021. Doc. 53 ¶ 80. They crafted these maps in secret, without the benefit of public comment, Doc. 53 ¶¶ 90, 92, 94, withholding public access to the proposed maps until October 25, 2021—eight days

before the maps were codified and three months before the January 28 deadline for Alabamians to announce their candidacy.[10]

In addition to curbing public involvement, Defendants chose to adopt maps drawn on suspect grounds—all but guaranteeing post-enactment challenges. The Reapportionment Committee did not provide racial-polarization analysis for any districts to its members, despite developing the proposed maps for months.  Doc. 53 ¶ 98.  And they placed the goal of preserving the congressional districts' racially gerrymandered cores over traditional—and permissible—districting factors.[11]

Defendants kept the public at arms' length, drew maps based on suspect grounds, and then enacted those maps three months before the candidate-filing deadline.  This process was tailor-made to ensure that Defendants could now argue that there is simply not enough time remedy the grievous harm their maps cause. This Court should give little weight to Defendants' feigned exigency.

---

[10]     Defendants make much ado (Opp. at 13-14) about 28 public hearings held during the 2021 redistricting cycle—without accounting for the facts that the Committee provided no draft maps or proposals to the public for review before those hearings and held them during working hours, when the public was least likely to be able to attend. Doc. 53 ¶¶ 84-85, 92, 94.  These hearings did not provide any serious measure of transparency or public involvement.

[11]     That the plaintiffs in *Chestnut v. Merrill*, 377 F. Supp. 3d 1308, 1317 (N.D. Ala. 2019) also raised claims about a second majority-Black district demonstrates that the State had plenty of opportunity to correct the racially gerrymandered districts but declined to do so.  Instead, the legislature proposed maps that retained the same flaws raised by the *Chestnut* plaintiffs.  Plaintiffs filed the instant complaint less than two weeks after the Alabama legislature approved HB1.  *Cf. Chestnut*, 377 F. Supp. 3d at 1317 (denying injunction because of forthcoming 2010 census data).

In any event, Defendants still have time to draw maps that comply with federal law. With respect to the current plans, the Alabama legislature convened in a Special Session only two days after the Committee published the proposed maps, voting in favor of the maps five days after the Session began. The Alabama legislature has sufficient time to consider any proposed remedial map when it reconvenes on January 11, 2022.

Defendants come close to arguing the redistricting process is above the law, repeatedly citing *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012), for the proposition that courts are rarely equipped to handle redistricting litigation. But none of the reasons for which the panel in *Favors* declined to issue a preliminary injunction is part of Defendants' argument before the Court today. The *Favors* court was troubled by claims that rested on "novel, contested legal ground." *Id*. at 370. Furthermore, the *Favors* plaintiffs had introduced little evidence on either their claims, so the *Favors* court expressed little confidence that it could resolve complex legal and factual issues on an expedited schedule and thin record. *Id*. at 370-71. In contrast, here the Court has the benefit of substantial expert testimony and analysis and will be conducting a multi-day hearing to air discussion of the evidence.

Defendants also cite cases where a court declined to grant relief in a redistricting case before an election. However, these cases are distinguishable, either because the state already had "reasonably conceived plans" to reapportion, *Clark v.*

37

*Marx*, No. CIV.A. 11-2149, 2012 WL 4926, at *9 (W.D. La. Jan. 9, 2012); *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 594 (E.D. Pa. 2012); or the candidate qualifying dates had already passed. *Graves v. City of Montgomery*, 807 F. Supp. 2d 1096, 1112 (M.D. Ala. 2011); *Johnson v. Mortham*, 926 F. Supp. 1540, 1543 (N.D. Fla. 1996).

Additionally, this Court has already shown that it is well-equipped to give these issues careful consideration and decide appropriate relief. There is no reason to expect that this Court will not be able to meaningfully consider the evidence presented to it in early January rule on this motion with sufficient time for candidates to be able to assess whether they are eligible and want to run for office in a particular district. Even if the Court needs to delay, by a few weeks, the date for individuals to declare their candidacy, the 2022 primaries and general election will still be many months away.

Plaintiffs agree that the State should still have the opportunity to rectify the flaws in the current maps. But if Defendants fail to do so by a given date, this Court can order an interim redistricting plan. *See Covington*, 138 S. Ct. at 2550 (giving the state 30 days to remedy unconstitutional districts). This Court can limit any administrative impact on the State by treating HB1 as a starting point for an interim map. *Perry v. Perez*, 565 U.S. 388, 394 (2012).  With the primaries over six months away and the general election over eleven months away, filing deadlines can be

shifted to ensure that voters reside in constitutionally valid districts. *Larios v. Cox*, 305 F. Supp. 2d 1335, 1342 (N.D. Ga. 2004) (three-judge court).

The State recites a litany of administrative burdens that could arise from an injunction. But even if state officials and legislators may be somewhat inconvenienced by having to redraft congressional maps, such administrative convenience cannot justify the denial of Plaintiffs' fundamental rights. *Johnson*, 926 F. Supp. at 1542. Candidates for office may also face some inconvenience, but their inconvenience is outweighed by the prospect that they could end up representing districts where voters do not have an equal opportunity to exercise the franchise. *Covington v. North Carolina*, 270 F. Supp. 3d 881, 895 (M.D.N.C. 2017). Moreover, Defendants ignore the enormous burdens they will face if HB1 is later deemed unlawful, and they are forced to conduct special elections after 2022. Additionally, voter confusion is unlikely given that voters have not yet voted using the newly drawn districts, and cannot justify maintaining an unconstitutional districting plan, when those very voters suffer irreparable harm from vote dilution.[12]

Any inequities that flow from Defendants' self-made administrative burdens are far outweighed by the harm Plaintiffs face if they vote in the unlawful districts

---

[12]     Defendants characterize injunctive relief as inappropriate because "decades of political geography" will be upended. Opp. at 129. But "there is no particular magic in the phrase 'status quo'… If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury..." *Fayette II*, 118 F. Supp. 3d at 1349 (citations omitted).

HB1 created.  Furthermore, the public's interest in the protection of voters' rights supersede any administrative inconvenience that Defendants may face.

## CONCLUSION

Accordingly, Plaintiffs respectfully request that the Court grant their motion.

Respectfully submitted,

*/s/ Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org

Shelita M. Stewart*
Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

DATED this 27th day of December 2021.

*/s/ Sidney M. Jackson*
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Julie Ebenstein*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org

*/s/ LaTisha Gotell Faulks*
LaTisha Gotell Faulks (ASB-1279-I63J)
Kaitlin Welborn*
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org
kwelborn@aclualabama.org

Blayne R. Thompson*
HOGAN LOVELLS US LLP

41

Michael Turrill*
Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

*Attorneys for Plaintiffs*

Anthony Ashton*
Anna Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
aashton@naacpnet.org
abarnes@naacpnet.org

*Attorneys for Plaintiff Alabama State
Conference of the NAACP*

*Admitted *Pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record.

This the 27th day of December 2021.


*/s/ Deuel Ross*
COUNSEL FOR PLAINTIFFS