FILED

2022 Jan-14  PM 10:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY SINGLETON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1291-AMM |
| | ) | |
| JOHN H. MERRILL, *in his* | ) | THREE-JUDGE COURT |
| *official capacity as Alabama* | ) | |
| *Secretary of State, et al.* | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| EVAN MILLIGAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1530-AMM |
| | ) | |
| JOHN H. MERRILL, *in his* | ) | THREE-JUDGE COURT |
| *official capacity as Alabama* | ) | |
| *Secretary of State, et al.* | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| MARCUS CASTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No.: |
| v. | ) | 2:21-cv-1536-AMM |
| | ) | |
| JOHN H. MERRILL, *in his* | ) | |
| *official capacity as Alabama* | ) | |
| *Secretary of State,* | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANTS' PROPOSED

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

---

[1] Because of the overlapping issues raised by the motions for preliminary injunction filed in *Singleton*, *Caster*, and *Milligan*, Defendants submit their Proposed Findings of Fact and Conclusions of Law in one consolidated document. Defendants will file an identical copy of this document in each of the three cases.

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................ i

BACKGROUND............................................................................5

    A.  Parties .................................................................................5

        *Singleton, et al. v. Merrill Plaintiffs* ................................6

        *Milligan, et al. v. Merrill Plaintiffs* ...............................7

        *Caster, et al. v. Merrill Plaintiffs*...................................8

    B.  Experts ...............................................................................9

        *Singleton Expert*.............................................................10

        *Milligan Experts* ...........................................................11

        *Caster Experts*...............................................................12

    C.  Continuity in Alabama's Congressional Maps................13

    D.  The 1992 Map..................................................................14

    E.  The 2001 and 2011 Maps ................................................20

    F.  The 2021 Map..................................................................23

        1.  The Committee's Public Hearings and Redistricting Guidelines...............................................23

        2.  The Map-Drawing Process .........................................27

        3.  Enactment of Ala. Act 2021-555................................38

    G.  The *Singleton* Plaintiffs' Equal Protection Claim ...........40

    H.  The Caster Plaintiffs' VRA Claim ..................................42

    I.  The Milligan Plaintiffs' Equal Protection and VRA Claims...........45

    J.  The Impending 2022 Elections........................................49

DISCUSSION ..........................................................................66

  I.  Standard of Review ................................................................66

  II.  The Singleton and Milligan Plaintiffs Have Not Shown That Their Fourteenth Amendment Claims Are Likely to Succeed on the Merits....67

    A.  Plaintiffs Have Not Shown That Racial Considerations Predominated Over Traditional Redistricting Criteria in the 2021 Map. ........................................................................71

B.  Plaintiffs Have Not Shown That the Permissible Consideration of Race in Previous Redistricting Cycles Supports a Finding That Racial Considerations Predominate the 2021 Map. .................82

C.  The Singleton Plaintiffs Have Not Demonstrated Any Legal Entitlement to Whole-County Congressional Districts. ...................90

III. The Milligan and Caster Plaintiffs Have Not Shown That Their Section 2 Claims Are Likely to Succeed on the Merits. ......................................93

A.  The Milligan and Caster Plaintiffs Have Not Satisfied the Necessary *Gingles* Preconditions. ....................................................97

1.  The Minority Population is Not "Compact."..............................97

a.  *Gingles*'s "Compactness" Incorporates Traditional Districting Principles Beyond Geographical Compactness......97

b.  Plaintiffs' Section 2 Experts' Testimony Proves They Subordinated Traditional Redistricting Principles to Race. ...104

Testimony of Dr. Moon Duchin ...............................................105

Testimony of Bill Cooper ........................................................110

c.  Plaintiffs' Proposed Maps Are Not Compact, Prioritizing Race Above Traditional Redistricting Principles. .................112

Geographic Compactness ........................................................112

Preserving the Cores of Districts..............................................116

Maintaining Communities of Interest.......................................125

Minimizing the Number of Counties in Each District: ..........144

Avoiding Contests Between Incumbents: ...............................145

d.  Districting for the State Board of Education Does Not Control U.S. Congressional Districting. .................................148

2.  The Minority Group Is Not "Sufficiently Large."....................152

3.  Plaintiffs Fail to Show the Racial Polarization Necessary to Satisfy *Gingles*'s Second and Third Preconditions. .................154

B.  The "Totality of Circumstances" Confirms That the 2021 Map Does Not Violate Section 2. .........................................................161

1.  The Senate Factors...................................................................163

a.  Senate Factor 1: Alabama Has Overcome Its History...........165

ii

b.  Senate Factor 2: Racial Polarization in Alabama Appears to Be a Product of Political Partisanship, Not Race. ..................173

c.  Senate Factor 3: Alabama Does Not Use Practices or Procedures That Enhance the Potential for Discrimination....179

d.  Senate Factor 4: No Formal Slating Process Exists in Alabama. ...............................................................................180

e.  Senate Factor 5: Plaintiffs Cannot Show That Disparities in Education, Employment, and Health Are Products of Discrimination.........................................................................181

f.  Senate Factor 6: Plaintiffs Have Not Shown That Political Campaigns in Alabama Are Characterized by Overt or Subtle Racial Appeals. ...........................................................186

g.  Senate Factor 7: Minorities Have Achieved Success in Alabama Elections. ...............................................................189

h.  Senate Factor 8: Elected Officials Do Not Lack Responsiveness to Minority Needs........................................191

i.  Senate Factor 9: The State's Districts Are Not "Tenuous." ...194

2.  The Totality of Circumstances Shows That Black Alabamians Enjoy "Equally Open" Political Processes and Suffer No "Abridgement" to Their Rights "On Account of Race or Color." ...................................................................................196

C.  Plaintiffs' Proposed Remedies Are Unconstitutional Racial Gerrymanders. ...................................................................................200

1.  Plaintiffs' Experts Have Demonstrated That It Is Essentially Impossible to Draw Two Majority-Minority Districts Without Subordinating Traditional Redistricting Principles to Race......203

2.  Plaintiffs Cannot Show That Their Proposed Maps Survive Strict Scrutiny. ........................................................................205

3.  Plaintiffs May Not Use Section 2 to Compel the State to Violate the Constitution..........................................................208

D.  Plaintiffs' Interpretation of Section 2 Is Likely Unconstitutional and Thus Warrants Avoidance...........................209

E.  Whether Section 2 Provides Plaintiffs a Private Cause of Action Is Unclear..........................................................................212

F.   Plaintiffs' Section 2 Arguments Jeopardize This Court's Jurisdiction....................................................................215

1.  To the Extent Plaintiffs' Section 2 Claims Attempt to Supplant the Legislature's Authority to Weigh the State's Traditional Redistricting Principles, They Exceed This Court's Jurisdiction..............................................................216

2.  To the Extent Plaintiffs' Section 2 Claims Attempt to Supplant the Legislature's Understanding of "Communities of Interest," They Raise a Nonjusticiable Political Question.......................218

IV.  The Balance of Equities Weighs Heavily Against Abandoning Longstanding Congressional Districts. .................................................220

CONCLUSION...................................................................231

CERTIFICATE OF SERVICE ............................................................233

The Defendants have sought to provide this Court with every Finding of Fact and Conclusion of Law relevant to whether "the facts and law clearly favor" any of the three Plaintiff groups' request for a mandatory preliminary injunction of Alabama's 2021 Congressional Map. *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). This document is thus unavoidably lengthy. Nevertheless, Supreme Court precedent straightforwardly resolves each of Plaintiffs' claims against them.

Plaintiffs' racial-gerrymandering claims fail because they have provided no competent evidence that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 137 S. Ct. 1455, 1463 (2017). Indeed, the "traditional race-neutral districting principles" included in the State's Redistricting Guidelines provide the simplest and best explanation for the 2021 Map. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). And the unrebutted testimony from the Chairs of the State's Redistricting Committee bolsters what is obvious on the face of the plan: the Committee instructed the Legislature's map-drawer to draw a map that followed the Redistricting Guidelines and not take race into account. The map-drawer testified that he followed his instructions, and the race-neutral map he drew was later approved without alteration by the Legislature and signed into law by the Governor.

Plaintiffs thus focus on the court-ordered 1992 Congressional Map, because in subsequent decades, subsequent Legislatures preserved the core of districts in that

1

map. But even if the Plaintiffs could show that the *Wesch* Court ordered the 1992 Map for a predominantly racial purpose, the only purpose that matters in this case "is the intent of the 20[21] Legislature," which had no obligation to "'cure' [any] earlier Legislature's" past purposes. *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). In other words, "the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority." *Easley v. Cromartie*, 532 U.S. 234, 249 (2001). Because the Legislature did not "create [the 2021 map] for predominantly racial, as opposed to political or traditional, districting motivations," *id.*, Plaintiffs' racial gerrymandering claims fail.

Plaintiffs' Section 2 claims fail most clearly because Plaintiffs have not shown it is possible to draw a map with two majority-minority districts without subordinating traditional redistricting principles to race. Indeed, testimony from Plaintiffs' experts demonstrates the impossibility of such a map: one expert generated thirty thousand congressional maps for Alabama based on several traditional race-neutral districting principles, another expert—Dr. Moon Duchin—generated *two million*. But ***not one*** contained two majority-minority districts. Thus, to produce maps with two majority-minority districts, Plaintiffs necessarily prioritized race at the expense of traditional race-neutral districting principles. And because "§ 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact,'" *Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997), the Legislature was not

required to draw a map that—to a mathematical certainty—could not have been drawn without compromising traditional districting principles to race.

Importantly, Plaintiffs' claims fail not merely because they sought to draw majority-minority districts. For example, if half of their two million race-neutral maps included two majority-minority districts and the other half only one, *Abrams* might not have barred them from considering race when picking one "reasonably compact" map over another. The problem for Plaintiffs is that they could not draw *any* map with two majority-minority districts "consistent with traditional districting principles." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998).

This approach follows from the fact that any "assignment of voters on the basis of race" is subject to constitutional law's "strictest scrutiny." *Miller*, 515 U.S. at 915. Section 2 permits race-conscious districting only in a limited context. Specifically, Section 2 *does* permit limited racial preference among maps that honor a State's "traditional districting principles," *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 433 (2006) ("*LULAC*"); that is, a legislature generally may choose a plan with more majority-minority districts rather than fewer so long as (1) the map honors traditional districting principles, and (2) to do otherwise would dilute minority voting power. But Section 2 does *not* permit a legislature (or Plaintiffs) to inject racial preferences into the map-drawing stage—necessarily subordinating traditional redistricting principles to race and racializing the principles themselves—

3

and then choose a plan from the suite of tainted maps. Plaintiffs' contrary view would take Section 2 beyond its promise of "equal[] … opportunity," 52 U.S.C. § 10301(b), and "would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *Bartlett v. Strickland*, 556 U.S. 1, 20 (2009) (plurality op.). Because "Section 2 does not guarantee minority voters an electoral advantage," *id.*, and because Plaintiffs' maps sacrifice traditional districting criteria to race, their claims fail.

Plaintiffs' Section 2 claims fail for additional reasons discussed below, but even if the merits of any claim presented a close call, the equities would be dispositive. There has been but "a few weeks of discovery and an abbreviated trial" over "legally and factually complicated" claims. *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012). And were the Court to require the State to redraw its maps with the 2022 campaign cycle in full swing, chaos would ensue. The State would have insufficient time to reassign voters to new districts; independent candidates would suddenly learn they had been collecting signatures from the wrong people; and districts would likely be left unrepresented with no assurance that qualified candidates would decide—within days—to launch a campaign. Prudence and equity alone, therefore, require that Plaintiffs' motions be denied.

# BACKGROUND[2]

## A.     Parties

1.      Defendant John H. Merrill is the Alabama Secretary of State and the chief elections official in the State of Alabama. Secretary Merrill is sued in his official capacity. *Milligan* DE53:4 ¶ 21.

2.      Senator Jim McClendon and Representative Chris Pringle are the Senate and House Chairs, respectively, of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"). Ala. Code § 29-2-51. In each of the three cases, they are defendants or defendant-intervenors in their official capacities as chairs of the Committee. *Milligan* DE53:5 ¶ 23.

3.      In those capacities, Sen. McClendon and Rep. Pringle led the Committee responsible for preparing and developing redistricting plans for the State

---

[2] "Because the issue of vote dilution in § 2 cases presents intertwined questions of fact and law, to spare the reader repetition, the findings of fact and conclusions of law are not set out in separate sections. They are, though, set out with particularity." *Ala. St. Conf. of NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *7 (M.D. Ala. Feb. 5, 2020).

"DE" refers to docket entries in the relevant case, with the number immediately following DE signaling the specific entry. Where a colon follows "DE," the number following the colon provides a pin cite. Pin cites align with ECF pagination.

"DX", "CX", "MX", and "SX" refer to the Defendants' Exhibits, *Caster* Exhibits, *Milligan* Exhibits, and *Singleton* Exhibits, respectively. Where a colon follows the letters, the number following the colon provides a pin cite. Pin cites align with ECF pagination. For depositions, any parentheticals following the foregoing citation would reference the deposition page number and line numbers.

following the decennial census and presided over the meetings of the Committee. *Milligan* DE53:5 ¶ 24.

4.      The Committee was tasked with making a "continuous study of the re-apportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate, House, State Board of Education, and congressional districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52. *Milligan* DE53:5 ¶ 24.

### *Singleton, et al. v. Merrill Plaintiffs*

5.      Plaintiffs Rodger Smitherman and Eddie Billingsley are black registered voters who reside in Jefferson County and within the boundaries of Congressional District 7 in the 2021 Map. SX1:5 ¶ 24.

6.      Plaintiff Leonette W. Slay is a white registered voter who resides in Jefferson County and within the boundaries of District 6 in the 2021 Map. SX1:5 ¶ 25.

7.      Plaintiff Bobby Singleton is a black registered voter who resides in Hale County and within the boundaries of District 7 in the 2021 Map. He is an Alabama State Senator, and he testified at the preliminary injunction hearing. SX1:5 ¶ 26; PI Tr. 35:15-76:3.

8.    Plaintiffs Darryl Andrews and Andrew Walker are black registered voters who reside in Montgomery County and within the boundaries of District 2 in the 2021 Map. SX1:5 ¶ 27.

***Milligan, et al. v. Merrill Plaintiffs***

9.    Plaintiff Evan Milligan is a black registered voter who resides in Montgomery County and within the boundaries of Congressional District 7 in the 2021 Map. *Milligan* DE53:1-2 ¶¶ 1-3. He testified at the preliminary injunction hearing. PI Tr. 125:9-162:20.

10.    Plaintiff Shalela Dowdy is a black registered voter who resides in Mobile County and within the boundaries of Congressional District 1 in the 2021 Map. *Milligan* DE53:2 ¶¶ 5-7. She testified at the preliminary injunction hearing. PI Tr. 363:22-415:14.

11.    Plaintiff Letetia Jackson is a black registered voter who resides in Houston County and within the boundaries of Congressional District 2 in the 2021 Map. *Milligan* DE53:2 ¶¶ 9-11.

12.    Plaintiff Khadidah Stone is a black registered voters who resides in Montgomery County and within the boundaries of Congressional District 2 in the 2021 Map. *Milligan* DE53:2-3 ¶¶ 12-14.

13.    Plaintiff GBM was founded in 1969 in Birmingham, Alabama and describes itself as a multi-faith, multi-racial, non-profit membership organization that

7

provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people. *Milligan* DE53:3 ¶ 16.

14.    Plaintiff Alabama NAACP is the state conference of the National Association for the Advancement of Colored People, Inc. *Milligan* DE53:4 ¶ 19.

### *Caster, et al. v. Merrill Plaintiffs*

15.    Plaintiff Marcus Caster is a black registered voter who resides in Washington County and within the boundaries of Congressional District 1 in the 2021 Map. *Caster* DE44:1-2 ¶¶ 1-3. He testified at the preliminary injunction hearing. PI Tr. 1618:20-1642:19.

16.    Plaintiff LaKeisha Chestnut is a black registered voter who resides in Mobile County and within the boundaries of Congressional District 1 in the 2021 Map. *Caster* DE44:2 ¶¶ 5-7.

17.    Plaintiff Bobby DuBose is a black registered voter who resides in Jefferson County and within the boundaries of Congressional District 7 in the 2021 Map. *Caster* DE44:2 ¶¶ 10-12.

18.    Plaintiff Benjamin Jones is a black registered voter who resides in Montgomery County and within the boundaries of Congressional District 2 in the 2021 Map. *Caster* DE44:2 ¶¶ 14-16. He testified at the preliminary injunction hearing. PI Tr. 1341:19-1364:9.

19.     Plaintiff Rodney Love is a black registered voter who resides in Jefferson County and within the boundaries of Congressional District 7 in the 2021 Map. *Caster* DE44:2-3 ¶¶ 17-19.

20.     Plaintiff Manasseh Powell is a black registered voter who resides in Montgomery County and within the boundaries of Congressional District 2 in the 2021 Map. *Caster* DE44:3 ¶¶ 20-22.

21.     Plaintiff Ronald Smith is a black registered voter who resides in Bullock County and within the boundaries of Congressional District 2 in the 2021 Map. *Caster* DE44:3 ¶¶ 23-25.

22.     Plaintiff Wendell Thomas is a black registered voter who resides in Montgomery County and within the boundaries of Congressional District 2 in the 2021 Map. *Caster* DE44:3 ¶¶ 26-28.

**B.     Experts**

23.     Thomas Bryan is a professional demographer and political redistricting expert. DX1-4. He holds a Master's in Urban Studies from Portland State University (1996) and a Master's in Management and Information Systems from George Washington University (2002). DX3. Defendants retained Mr. Bryan to provide expert analysis about demographic characteristics of the 2021 Map and Plaintiffs' illustrative maps. DX1-2, 4.

9

24.     Dr. M.V. (Trey) Hood III is a professor at the University of Georgia in the Department of Political Science. DX5. He holds a Ph.D. in Political Science from Texas Tech University (1997) and a Master's in Political Science from Texas A&M University (1993). *Id.* Defendants retained Dr. Hood to provide a functionality analysis of District 7 in the 2021 Map and Districts 6 and 7 in the Singleton Plaintiffs' Whole-County Plan and to assess white Republican voters' support of minority Republican candidates. *Id.*

25.     Both Mr. Bryan and Dr. Hood are experts who offered testimony helpful to the Court in resolving this important litigation. PI Tr. 769:9-1118:11, 1378:25-1497:20. No *Daubert* challenges were filed against them.

### *Singleton Expert*

26.     Dr. Natalie Davis is a professor at Birmingham-Southern College. She holds a Ph.D. in Political Science from the University of North Carolina at Chapel Hill (1991). SX2. The Singleton Plaintiffs retained Dr. Davis to review their Amended Complaint. SX2.

27.     At the preliminary-injunction stage, Defendants did not raise a *Daubert* challenge to Dr. Davis but instead have relied on this Court to give her testimony only the weight that it is due.

### Milligan Experts

28.     Dr. Joseph Bagley is a Professor of History at Georgia State University Perimeter College. MX5. He holds a Ph.D. in History from Georgia State University (2013) and an M.A. in History from Auburn University (2007). *Id.* The Milligan Plaintiffs retained Dr. Bagley to examine historical and contemporary evidence of racial discrimination in Alabama. *Id.*

29.     Dr. Moon Duchin is a Professor of Mathematics and a Senior Fellow in the College of Civic Life at Tufts University. MX3. She holds a Ph.D. (2005) and an M.S. (1999) in Mathematics from the University of Chicago. *Id.* The Milligan Plaintiffs retained Dr. Duchin to draw illustrative plans with two majority-BVAP districts. *Id.*

30.     Dr. Kosuke Imai is a professor in the Department of Government and the Department of Statistics at Harvard University. MX1. He holds a Ph.D. in Political Science (2003) and an A.M. in Statistics (2002) from Harvard University. *Id.* The Milligan Plaintiffs retained Dr. Imai to develop simulated congressional maps and use them to infer the role that race played in drawing the 2021 Map. *Id.*

31.     Dr. Baodong Liu is a professor in the Department of Political Science at the University of Utah. MX4. He has a Ph.D. in Political Science from the University of New Orleans (1999) and an M.A. in Political Science from Oklahoma State University (1995). *Id.* The Milligan Plaintiffs retained Dr. Liu to analyze

whether racially polarized voting exists in Alabama and whether such racially polarized voting prevents black-preferred candidates' success in congressional elections. *Id.*

32.    Dr. Ryan Williamson is a professor in the Department of Political Science at Auburn University. MX2. He holds a Ph.D. in Political Science from the University of Georgia (2017). *Id.* The Milligan Plaintiffs retained Dr. Williamson to analyze the role that race played in drawing congressional districts within Alabama. *Id.*

33.    At the preliminary-injunction stage, Defendants did not raise *Daubert* challenges to these experts but instead have relied on this Court to give their testimony only the weight that it is due.

### *Caster Experts*

34.    Bill Cooper has a B.A. in Economics from Davidson College. CX1. The Caster Plaintiffs retained Mr. Cooper to determine whether the African-American population in Alabama is sufficiently compact to create two majority-BVAP congressional districts. *Id.*

35.    Dr. Bridgett King is a professor in the Department of Political Science at Auburn University. CX80. She holds a Ph.D. in Political Science (2012) and a Master's in Justice Studies (2006) from Kent State University. *Id.* The Caster Plaintiffs retained Dr. King to examine the history of racial discrimination in voting in

Alabama and the impact that racial discrimination has on the ability of black voters in Alabama to elect candidates of their choice. *Id.*

36.    Dr. Maxwell Palmer is a Professor of Political Science at Boston University. CX79. He holds a Ph.D. in Political Science from Harvard University (2014). *Id.* The Caster Plaintiffs retained Dr. Palmer to offer an expert opinion on the extent to which voting is racially polarized in parts of Alabama and to evaluate the performance of majority-BVAP districts in the Caster Plaintiffs' illustrative maps. *Id.*

37.    At the preliminary-injunction stage, Defendants did not raise *Daubert* challenges to these experts but instead have relied on this Court to give their testimony only the weight that it is due.

### C.    Continuity in Alabama's Congressional Maps

38.    Following the 1970 census, Alabama dropped from eight seats in Congress to seven.[3] *See* SX12:36-37.

39.    The congressional maps Alabama has since used have generally maintained certain cores, even as population has shifted over the decades. By way of

---

[3] Throughout this document, the term "Congress" and variations of it to refer to the U.S. House of Representatives. U.S. Senators are elected statewide and are not the focus of this litigation.

example, for each of the congressional plans Alabama has had since the 1970 census—including the plan enacted in 2021—the following districts have included the following counties[4]:

District 1:   Mobile, Baldwin, Escambia, Washington, and Monroe;

District 2:   Conecuh, Butler, Crenshaw, Covington, Montgomery, Pike, Bullock, Barbour, Coffee, Dale, Geneva, Henry, and Houston;

District 3:   Calhoun, Cleburne, Talladega, Clay, Randolph, Tallapoosa, Chambers, Macon, Lee, and Russell;

District 4:   Franklin, Marion, Winston, Lamar, Fayette, Walker, Cullman, Marshall, DeKalb, and Etowah;

District 5:   Jackson, Madison, Morgan, Limestone, and Lauderdale;

District 6:   Jefferson; and,

District 7:   Jefferson, Tuscaloosa, Greene, Hale, Perry, Dallas, Sumter, Marengo, and Choctaw.

*See* SX12:37-43.

### D.   The 1992 Map

40.   Alabama's first majority-black congressional district, District 7, was imposed by court order in 1992. *See* SX1:3 ¶ 14; SX12:40; *see also Wesch v. Hunt*,

---

[4] All of these counties have remained whole in each subsequent districting plan except for Escambia, Montgomery, Jackson, Lauderdale, Morgan, Jefferson, and Tuscaloosa.

785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *Figures v. Hunt*, 507 U.S. 901 (1993).

41.     In 1990, the Alabama Legislature created the Permanent Legislative Committee on Reapportionment to lead redistricting efforts in the 1992 cycle. DX22:2.

42.     The Committee held public meetings and reviewed numerous proposed congressional redistricting plans in September and October 1991, expecting the Alabama Governor to call a special session for redistricting that fall. *Id.* at 3. He did not do so. *Id.* at 4.

43.     Instead, on September 23, 1991, a plaintiff filed suit against the Governor and other State officials, alleging that holding the 1992 elections with the then-existing congressional plan would violate the United States Constitution. *See Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992). Intervenors joined the case "on their own behalf and on behalf of all African-American citizens of the State of Alabama," raising a Section 2 claim. *Id.* at 1493.

44.     The Committee continued its work developing a congressional plan for the 1992 election. *See* DX22:4. "Virtually all" congressional plans submitted to the Committee contained one "solid" majority-black district. *Id.* The Committee considered creating a plan with "two predominantly black districts," *id.* at 9, but no tenable

15

two-majority-black-district plan was submitted to the Committee or introduced in the Legislature, DX23:5.

45.     Similarly, in the *Wesch* litigation, the intervenors submitted a plan that created two districts "with an African-American population of 59.33% and 61.98% respectively," but intervenors informed the court that they doubted African-Americans would have an "opportunity to elect candidates of their choice in these districts." *Wesch*, 785 F. Supp. at 1496.

46.     Alabama's most prominent black political leaders vocally opposed a congressional map with two majority-black districts. *See* DX22:9.

47.     Four of Alabama's most prominent black political leaders testified before the Committee: Joe Reed, Chair of the Alabama Democratic Conference ("ADC")[5]; Jerome Gray, the ADC's Field Director; Albert Turner Sr., a "west Alabama political veteran" affiliated with the Alabama New South Coalition; and Lillian Jackson, President of the Alabama NAACP. *Id.*

48.     Mr. Gray stated he had "serious reservations regarding whether blacks can get elected in either one of the districts" in a plan with two majority-black districts. DX23:2.

---

[5] The ADC refers to itself as "the Black Caucus of the Alabama Democratic Party." Alabama Democratic Conference, Homepage, www.aldemco.org (last visited December 20, 2021).

49.     Mr. Turner Sr. was less circumspect: "I have no intention at all of trying to support a [map with] two black congressional seats in Alabama. I think it's ludicrous, to be honest with you. I don't see no possibility of having two seats that black folks can win in Alabama." *Id.* at 3.

50.     And Ms. Jackson made clear that the Alabama NAACP—a Plaintiff in this litigation—would not support a map with two majority-black districts, stating that such a plan would "lessen our chances of getting a minority or a black elected to [C]ongress. It would weaken our ability to raise funds or the candidate's ability because the resources would be greatly split." *Id.* at 4.

51.     On February 27, 1992, the Alabama Legislature passed a plan containing one majority-black district. DX22:5. After the Legislature overrode a gubernatorial veto on March 5, *id.*, the State submitted the plan to the Department of Justice for preclearance on March 10, 1992, *id.* at 1.

52.     Meanwhile, a two-day trial occurred before a three-judge court. *Wesch v. Hunt*, 785 F. Supp. at 1492.

53.     On January 3, during the trial, the parties stipulated that "the African American population in the State of Alabama is sufficiently compact and contiguous to comprise a single member significant majority (65% or more) African American Congressional district" and that such a district "should be created." DX143.

17

54. On March 6, the State filed a motion for the three-judge court to adopt the plan passed by the Legislature. DX96:7 (*Wesch* App'x Excerpt).

55. On March 9, the court declared unconstitutional the State's then-existing map (enacted in the 1980s) because of the State's failure to timely redraw its congressional map. 785 F. Supp. at 1500-01.

56. The court denied the State's motion to adopt the legislative plan and ordered the State to adopt a court-ordered plan that ensured District 7 would have at least a 65% black majority, while "maintaining the cores of existing Districts 1 and 2," and thus "better preserv[ing] the communities of interests in those two districts" than the only other plan submitted to the court that achieved population equality among the districts. *Wesch*, 785 F. Supp. 1495-97. As a result, if the Department of Justice precleared the State's plan by March 27, it would take effect; otherwise, 1992 elections would occur using the court's plan. *Id.* at 1501.

57. The Legislature's 2021 map-drawer, Randy Hinaman, testified in his deposition for this litigation that he believes that, during the time he worked for Congressman Callahan in the early 1990s, he drew the map that the *Wesch* court ultimately ordered to become the 1992 map. DX144:7-11; *see also* DX145:47. However, the *Wesch* court stated that it adopted the Pierce map with changes to avoid an incumbent conflict and increase compactness, *Wesch*, 785 F. Supp. at 1499. The relationship between Hinaman's map and the Pierce map—if any—is not clear at this

point in the litigation. Hinaman further testified that he probably read the *Wesch* decision in the early 1990s, but doesn't remember the details now. DX144:50.

58.     On March 27, the Department of Justice denied preclearance. It emphasized "at the outset the extreme time constraints imposed by the order of the Court." DX18:1. "For that reason, our review to date necessarily has been limited, and similarly, the short time available has limited the state's ability to meet its burden under Section 5." *Id.*

59.     Despite the testimony of many of Alabama's black political leaders, the Department opined—based on what it conceded was a "limited" review—that Alabama's black population was unnecessarily fragmented and that creating an additional majority-minority district would "enhance the ability of black voters to elect representatives of their choice." *Id.* at 2.

60.     In closing, the Department again emphasized the hurried nature of its review. *Id.* at 2.

61.     Accordingly, the State's plan never took effect.

62.     At this time during the 1990s, the Department of Justice was enforcing a "max-black" policy that the Supreme Court later held to be a misapplication of the VRA. *Milligan*, DE53:9 ¶41; *see also Miller v. Johnson*, 515 U.S. 900, 924-25 (1995).

63.    The State sought to stay the three-judge court's order on March 24, 1992, but the Supreme Court denied the application, *Camp v. Wesch*, 503 U.S. 954 (1992), and summarily affirmed the three-judge court, *Camp v. Wesch*, 504 U.S. 902 (1992).

64.    On April 15, 1992, Alabama Attorney General Jimmy Evans wrote to the Department of Justice to request clarification of the Justice Department's analysis in objecting to the State's plan. DX19:2. He then asked whether "the Justice Department intend[ed] to undertake post-judgment intervention or otherwise seek to modify the judgment in *Wesch*" given the fact the court-ordered plan included only one majority-black congressional district. *Id.*

65.    The Department of Justice never sought to modify the court-ordered plan that went into force after preclearance of the enacted plan was denied.

66.    An illustration of the 1992 Map is reproduced here. *See also Singleton* DE15:26; *Wesch*, 785 F. Supp. at 1582.



**E.    The 2001 and 2011 Maps**

67.    Both the 2001 and 2011 maps maintained the cores of preexisting districts, changing them only to equalize population. *See* DX144:8, 11.

68. In response to 2000 Census data, Alabama adopted new lines for its Congressional Districts in 2002 in Ala. Act No. 2002-57.

69. Ala. Act No. 2002-57 was sponsored by Sen. Hank Sanders, a black Democrat. PI Tr. 63:6-64:1; 1217:17-24.

70. Plaintiff Bobby Singleton—a State Senator—testified that Sen. Sanders was not known for sponsoring legislation intended to harm African-American voters. PI Tr. 64:2-4. Sen. Singleton further testified that, although he viewed the 2002 Map as a gerrymander, he thought that Sen. Sanders "did what they thought was safe, to make sure that we at least had a voice, … whether it was gerrymandering or not." *Id.* at 62:21-63:2, 64:5-13.

71. The Milligan Plaintiffs' political-science expert, Dr. Bagley, likewise testified he was not of the opinion that "Mr. Sanders was not responsive to the needs of black Alabamians in 2000 when he sponsored that map." PI Tr. 1217:17-24.

72. Ala. Act No. 2002-57 was signed into law by Governor Don Siegelman, a Democrat.

73. During the 2002 redistricting process, Randy Hinaman was working for Alabama Congressman Sonny Callahan and offered input on how the Congressman's district was drawn. DX144:8.

74. Hinaman drew Alabama's Congressional map following the 2010 Census. DX144:7.

21

75.     He was hired by the Congressional delegation to draw a map to be submitted to the Alabama Legislature. DX144:11.

76.     That effort "essentially … was updating the 2001 map based on demographic changes that happened over the last ten years and" working with the Congressional delegation. DX144:11. Most officeholders "would not go into a redistricting process looking for wholesale change." *Id. See also id.* at 13 ("[T]he people who were paying me to draw these maps preferred the districts similar to how they were."); *id.* at 14 ("[T]hey preferred to have their districts as close to what they had under that map going forward.").

77.     Rep. Sewell "wanted to maintain her majority black district" in the 2011 Congressional map. DX144:12.

78.     Hinaman used the 2001 Congressional map as a starting point for the 2011 Congressional map. DX144:11.

79.     Hinaman did not seek to achieve any racial target when he drew District 7 of the 2011 congressional map. DX144:12 (44:9-12).

80.     The 2011 Congressional map was never held unlawful.

81.     The 2011 Congressional map was used for the 2012, 2014, 2016, 2018, and 2020 Congressional elections.

82.     The 2011 map largely built off the 2001 map, which itself built off the 1992 map. DX144:11.

83. Both of these maps received preclearance from the Department of Justice. Neither was ever deemed unlawful. They are reproduced below. *See also Singleton* DE15:9, 28.



F.     **The 2021 Map**

      **1.  The Committee's Public Hearings and Redistricting Guidelines**

84. The Alabama Permanent Legislative Committee on Reapportionment (the "Committee") is composed of members from the State Senate and House. *Milligan* DE53:18 ¶ 81 (citing Ala. Code § 29-2-51).

85. The Committee prepares and develops redistricting plans for the State following each decennial census.

86.     Following the 2020 Census, the Census Bureau was statutorily required to release this redistricting data no later than April 1, 2021. 13 U.S.C. § 141. However, in February 2021, the Census Bureau issued a press release stating that it would not release the redistricting data until September 30, 2021. *Singleton*, DE47:7 ¶32.

87.     On March 10, 2021, the State of Alabama sued the Census Bureau to require compliance with the statutory deadline. *See Singleton*, DE47:7 ¶32; *see also Alabama v. Dep't of Commerce*, Case No. 3:21-cv-211, DE1 (M.D. Ala.).

88.     On March 15, 2021, the Census Bureau issued another press release stating it could provide redistricting data in a legacy format by mid-to-late August 2021. *Singleton*, DE47:7 ¶32.

89.     As Rep. Chris Pringle explained, one of the Committee's primary goals was to adopt redistricting guidelines that it could then provide to the map-drawer. *See* MX12:9 (31:1-12).

90.     On May 5, 2021, at its first public meeting of the redistricting cycle, the Committee enacted guidelines for the 2021 redistricting plan. *See* DX72 (the "Redistricting Guidelines").

91.     The Guidelines were approved by a bipartisan vote of the Committee, with Plaintiff Senator Bobby Singleton voting for the Guidelines. DE68-8 at 2.

92.     The Guidelines provide, as relevant here:

a. Districts shall comply with the United States Constitution, including the requirement that they equalize total population.

24

b. Congressional districts shall have minimal population deviation.

…

e. The Reapportionment Committee shall not approve a redistricting plan that does not comply with these population requirements.

f. Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution.

g. No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act.

h. Districts will be composed of contiguous and reasonably compact geography.

i. The following requirements of the Alabama Constitution shall be complied with:

> (i) Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

…

> (viii) Every part of every district shall be contiguous with every other part of the district.

j. The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama:

> (i) Contests between incumbents will be avoided whenever possible.

(ii) Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not.

(iii) Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.

(iv) The Legislature shall try to minimize the number of counties in each district.

(v) The Legislature shall try to preserve the cores of existing districts.

(vi) In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria.

g.[sic] The criteria identified in paragraphs j(i)-(vi) are not listed in order of precedence, and in each instance where they conflict, the Legislature shall at its discretion determine which takes priority.

MX28:1-3.

93.   The Census Bureau provided initial redistricting data to Alabama on August 12, 2021. *See Singleton*, DE47:7 ¶ 32.

94.     In September 2021, the State solicited public input and provided numerous opportunities for citizens to express their opinions about the redistricting process. *See id.* at 8 ¶ 34.

95.     Sen. McClendon testified that the Committee relied on the State's community college system to schedule and facilitate hearings because its campuses are spread throughout the State. *See* MX13:17 (62:4-13).

96.     From September 1 to September 16, the Committee held twenty-eight public hearings across the State. *Milligan* DE53:19 ¶ 84. These hearings could be attended in person or via videoconference. *Singleton* DE47:8 ¶ 34; *see also* LEGISLATIVE REAPPORTIONMENT COMMITTEE PUBLIC HEARINGS SCHEDULE, https://perma.cc/4GFX-Z9TJ (last visited Dec. 20, 2021). The Committee originally scheduled twenty-two hearings but added six more hearings at the last-minute request of Rep. Laura Hall (D). CX89:11.

### 2.  The Map-Drawing Process

97.     Sen. McClendon and Rep. Pringle provided the Legislature's map-drawer, Randy Hinaman, with the Redistricting Guidelines. *See* MX12:28 (107:12-108:18). The Committee directed Hinaman "to follow the guidelines and to draw [the assigned] plans race neutral, without looking at race until after he had developed a plan." *Id.* (107:12-15).

27

98.     Hinaman was retained in the Fall of 2020 to draw Alabama's 2021 Congressional map, as well as the maps for the Alabama Senate, Alabama House of Representatives, and Alabama State Board of Education. DX144:14. All four maps had to be drawn in 2021 because each body has seats up for election in 2022.

99.     In the Fall of 2020, Hinaman was anticipating that the plans would be considered in a Legislative Special Session in June 2021 or July 2021; "we didn't at that time know that COVID was going to delay the census numbers and so forth and so on." DX144:15.

100.    Hinaman began discussions with the Congressional delegation but did not do much more before the Census Bureau informed the State around April 2021 that it would retain its seven Congressional districts. He began working on the map "[i]n earnest" in May 2021, that is "meeting with members and talking substantively about potential changes" and drawing the map. DX144:15-16, 18.

101.    At the outset, Hinaman met (in person or virtually) with six of Alabama's seven sitting members of Congress to discuss the redistricting process; for the same purpose, he met with the chief of staff for Rep. Mo Brooks, who is running for Senate. DX144:18-19, 22.

102.    Before the Census data were released, Hinaman used the 2019 estimates to discuss with the members of Congress which Districts would likely to be over-populated and which were likely to be under-populated, DX144:16, but the estimates

were not "particularly close to the actual numbers," *id.* at 18. *See also id.* at 53 (the estimates properly identified which districts were over-populated and which were under-populated but "didn't really capture the magnitude of it").

103.   In August 2021, the State received the Census data and worked with Maptitude to have it loaded it into the Maptitude software. DX144:20, 22. Doing so took about a week, *id.*, and everything "was loaded … probably the last week of August maybe …." *Id.* at 21.

104.   The map-drawing process took place "[e]ntirely" on "the State's computers and software" in "the reapportionment office at the [S]tate [H]ouse, Room 317." DX144:21.

105.   Hinaman used the 2011 congressional map as the starting point for the 2021 congressional map. DX144:57 (222:13-16).

106.   Throughout this drafting, Hinaman again met individually "with all of the members of congress … or their chief of staff" to discuss the 2020 Census data and potential map adjustments, though "Representative Palmer decided not to take the final call." DX144:22. During these meetings, they talked about changes that needed to be made based on population shifts and Hinaman would "share [his] screen to be able to show [the member of Congress] what the map look[ed] like." *Id.* The conversations were about "[t]heir specific districts and an adjacent district if there was some change there." *Id.*

29

107.   Hinaman did not "officially attend" the public hearings, but sometimes heard parts of them. DX144:23-24. Chair McClendon or Chair Pringle or counsel Walker would sometimes inform Hinaman of significant comments, like the desire for Montgomery to not be split among three Districts. DX144:23-24. Hinaman also understood that "the Shoals area wanted to be kept as intact as possible," and people in Madison and Morgan counties considered themselves a community of interest, and "[p]eople in Baldwin and Mobile wanted to be kept together." *Id.*

108.   Hinaman "worked to get Congressman Rogers to agree to come out of Montgomery County," and the map Hinaman drew closed off a split in Montgomery County between Districts 2 and 3 that had been present in the 2011 map. DX114:24.

109.   Chair McClendon offered unrebutted testimony that he did not instruct Hinaman to include a majority-black district, and that he did not "decide ahead of time that Alabama's plan must include a majority-black district." MX13:29 (112:16-23).

110.   Chair Pringle offered unrebutted testimony that he did not instruct Hinaman to create a majority-black district or to assign "particular demographics" to any district, that he is unaware of anyone who would have provided such instructions, and that he did not "decide in advance that there had to be a majority-black district." MX12:36 (140:11-25).

111.   In revising the Congressional map, Hinaman "started with District 5 because [he] knew it had to spill into 4. And [he] had to do that before [he] could do much else there." DX144:50. After adjusting for the over-population of District 5, Hinaman "moved down the [S]tate." *Id.*

112.   Hinaman followed the Redistricting Guidelines as he drafted a map for the Legislature. DX144:35.

113.   One of the guidelines was "to try to split less precincts and less counties." DX144:24.

114.   The 2021 Congressional map splits "seven precincts down to the census block level to get to zero deviation for six of the districts and plus one for the seventh one." DX144:36.

115.   "Preserving cores of existing districts was a guideline for the 2021 map." DX144:11.

116.   Hinaman "used [the] 2011 congressional map"—or, "the cores of the existing districts"—as his "starting point in drafting the 2021 congressional map." DX144:24-25. "Obviously, incumbents have a preference to not have to add folks they haven't represented when they can continue to keep the folks they have been representing." DX144:41.

31

117.   When asked about the core in each Congressional District, Hinaman generally focused on where the population is and whether the area has been included in the District for some time. DX144:41-42.

118.   Because 2020 Census data showed District 7 was significantly under-populated, Hinaman altered its footprint to increase that district's population. DX144:25.

119.   While adding population to District 7, Hinaman "didn't look at race at all." DX144:25-26.

120.   Indeed, throughout the drawing process, Hinaman "didn't look at race at all on the computer when … adding folks to these districts or subtracting folks from these districts." DX144:25-26. He used "total pop to get the districts back to ideal population." *Id.* at 26. "[T]here was no discussion of race. It was all a discussion of total pop." *Id.*

121.   Upon completing his final draft, and just one "week before the special session" scheduled for the Legislature to vote on the Congressional map, Hinaman for the first time examined the racial composition of the map in order to "comply with the Voting Rights Act." DX144:26.

122.   Hinaman's testimony to this point was as follows:

Q.     Did you look at racial data in including that portion of Montgom-ery County in District 7?

32

A.    I didn't. When we started doing—I didn't initially. When we started filling in this—all these discussions we've had up until now have all been based on total pop. I didn't look at race at all on the computer when we were adding folks to these districts or subtracting folks from these districts.

So at this point, I've basically just been looking at total pop and where do you get the total pop to get the districts back to ideal population. So at that point, there was no discussion of race. It was all discussion of total pop.

Q.    You say "at this point." Where are we talking in the timeline?

A.    Up until—up until we finished the map.

Q.    Finishing the map being the week before the special session?

A.    Correct.

Q.    So is it your testimony that you did not look at race at all in 2021 before submitting the maps to the special session?

A.    No, I did not look at it up until the week before we submitted the maps, when at that point we did turn on race and look at the racial breakdowns in the various maps.

Q.    Why did you look at the racial breakdown that week before the special session?

A.    Well, to—obviously, we wanted to see what the, you know, outcomes of our changes were.

Q.    What do you mean?

A.    We wanted to see what—the changes we had made to get the population balanced among all these districts, if it changed any of the, you know, racial makeup of the districts.

Q.    Why did you want to know that?

33

A.     Well, one of our guidelines is to comply with the Voting Rights Act.

…

Q.     And prior to that week before the special session, it's your testimony that you did not look at any of the racial data at all for any of the districts in drawing the 2021 congressional map?

A.     That's correct.

Q.     What data did you look at?

A.     Just—just total pop and geography.

Q.     Anything else?

A.     That's it.

DX144:25-26.[6]

123.   Prior to evaluating the map for possible VRA issues the only data Hinaman analyzed was "total pop[ulation] and geography," DX144:26; thus, the only factors he considered when making any alteration to the 2011 map were race-neutral, *id*.; *see also id*. at 37-38 ("I made sure that when I added—I used traditional redistricting principles of total pop and geography considerations to add and subtract to these districts, and that that was not based on race.").

---

[6] At the closing argument, counsel for Milligan Plaintiffs stated "Mr. Hinaman drew the majority-black District 7 intentionally to create a majority-black district. He plainly said so in his testimony. He also plainly said that even if that district had not turned out majority black, he himself would have adjusted it so that it would still be a majority-black district." PI Tr. 1908:22-25. Counsel appears to be clearly mistaken, as Hinaman's deposition testimony does not support any such assertion about Hinaman and the 2021 Map.

124.   "[O]nce we turned race on, nobody asked [Hinaman] to make any changes to District 7 or any other district." DX144:45.

125.   Hinaman worked to make District 7 more compact by widening "it as it goes into Jefferson County and eliminate some of the longer, further-away [precincts] at the northern part of the county[,]" all while "picking up whole precincts" and trying not to split any. DX144:34. There are two precinct splits, one to pick up the incumbent's residence and the other to reach ideal population. *Id.* at 34-35. He also made District 7 more compact. *Id.* at 45. Hinaman eliminated District 7's finger-like protrusion into Jefferson County. *Id.*

126.   The Court takes judicial notice that Alabama's incumbent Members of Congress are: Jerry Carl (District 1); Barry Moore (District 2); Mike Rogers (District 3); Robert Aderholt (District 4); Mo Brooks (District 5); Gary Palmer (District 6); and Terri Sewell (District 7). Congressman Brooks is running for U.S. Senate and the other incumbents are running for re-election.

127.   Rep. Sewell "felt strongly about picking up facilities and universities" and the military. DX144:27, 30.

128.   Hinaman had split Alabama State University (in Montgomery) into two different districts, and Rep. Sewell "wanted it all in her district," "[s]o [Hinaman] put it back together." DX144:27, 30.

129.   Rep. Sewell wanted all of the University of Alabama (in Tuscaloosa) in her District. DX144:30.

130.   Rep. Sewell wanted Maxwell Air Force base (in Montgomery) in her District. DX144:30.

131.   Hinaman testified that for Jefferson County, some Homewood precincts were in District 6 and some were in District 7 in the 2011 Congressional Map. Rep. Sewell "thought that maybe it might make sense for all of them to be in one district. She would be happy if they were [put] in hers, which [Hinaman] did." DX144:30.

132.   The Congressional delegation were asked for their home addresses early in the process in order to ensure each Representative was drawn into his or her District.  Rep. Sewell provided both the address where she resides and a second address in Dallas County where she grew up, as she wanted both in her District. DX144:30, 58.  Rep. Sewell lives about a mile from Rep. Palmer, with the former in Jefferson County and the latter having recently moved to Shelby County. *Id.* at 58.

133.   Hinaman did not discuss race with Rep. Sewell, though either they both assumed she would want her District to be majority black or she may have said that she did. Late in the process, Rep. Sewell asked about the black voting age population (BVAP) was. When Hinaman told her it was 54.22%, she did not ask for any change. DX144:30-31.

36

134.   Among other things, Hinaman talked with Rep. Moore "about just geographically making the 7th District a little more compact in Montgomery from where the 2011 lines were versus to where they are now in the 2021 plan." DX144:32. They also talked about moving Maxwell Air Force base to the 7th District while keeping the annex in the 2nd District. "[H]e wasn't too excited about [the change] initially, but at the end was comfortable with" it. *Id.*

135.   While Hinaman was drawing the Congressional map, he was also drawing the other three maps and meeting with officeholders about those maps. DX144:27-28.

136.   In 2021, the Legislature made no change to the map that Hinaman drafted, but in the prior redistricting cycle, the Legislature changed the map that Hinaman drafted with input from the Congressional delegation. DX144:57.

137.   After the final draft was complete, Hinaman's VRA check with the mapmaking software revealed that District 7 contained approximately 54% single-race black[7] voting-age population ("BVAP").

138.   In the 2011 plan, by comparison, District 7 was approximately 60.5% BVAP. *See Milligan* DE53:11 ¶ 52.

139.   Sen. McClendon testified that the 54% BVAP statistic was not generated until after the districts were drawn. MX13:23 (87:15-19).

---

[7] "Single-race black" refers to Alabamians who self-identify only as black and not any other race.

140.   Moreover, Sen. McClendon testified that the Legislature did not seek to effect any BVAP threshold. MX13:23.

141.   What follows are illustrations of (1) the map Hinaman drew (and the Legislature later enacted) in 2021 (*Singleton* DE15:36), and (2) a map (from DX2) showing the changes between the 2011 and 2021 maps:



### 3.  Enactment of Ala. Act 2021-555

142.   Hinaman's map was only a draft. The map he drew lacked any force of law.

143.   Both houses of the Legislature and their respective committees had the opportunity to consider the map and propose alternatives. *See, e.g.*, PI Tr. 71:18-72:11 (Sen. Singleton agreeing that "any member of the Legislature … could have drawn and introduced their own plan," and that he "could have presented another plan to the reapportionment committee").

144.   Governor Ivey called a special legislative session on redistricting to begin on October 28, 2021. *Milligan* DE53:19 ¶ 88.

145.   The Committee released the draft congressional map and draft maps for the State House, Senate, and Board of Education to the public and held a public meeting on October 26, 2021. *Milligan* DE53:19-20 ¶¶ 89, 91.

146.   Sen. McClendon testified that race data was not examined at until after the lines were drawn, and he specifically stated that racial data was unnecessary to ensure core preservation of existing districts. MX13:20 (73:22-23).

147.   All four maps passed out of the Committee along partisan lines. *Milligan* DE53:21 ¶¶ 103-04.

148.   On October 29, 2021, the House State Government Committee discussed the proposed districting plan. *Milligan* DE53:21 ¶ 106. It voted along partisan lines to adopt the map. *Id*. at 21 ¶ 107.

149.   The full House considered the congressional plan on November 1, 2021. *Milligan* DE53:22 ¶ 108. It considered various substitute plans from both Republicans and Democrats, none of which was adopted. *Id.* at 22 ¶¶ 108-16.

150.   The House passed the plan by a vote of 65 to 38. *Milligan* DE53:22 ¶ 109.

151.   While the bill did not garner any Democratic support, it did not strictly pass on racial lines, as Rep. Kenneth Paschal (R), who is black, voted in favor of the bill. *Milligan* DE53:37 ¶ 180.

152.   The Senate General Fund and Appropriations Committee considered the congressional map on November 2, 2021, and approved the map along partisan lines. *Milligan* DE53:22 ¶¶ 110-11.

153.   The full Senate considered the congressional map the next day. *Milligan* DE53:22 ¶ 112. Like the House, the Senate rejected several alternative plans. *Id.* ¶¶ 114-15.

154.   The Senate passed the plan by a vote of 22-7 along partisan lines. *Milligan* DE53:22 ¶ 116-17.

**G.    The *Singleton* Plaintiffs' Equal Protection Claim**

155.   The Singleton Plaintiffs filed suit before the 2021 Map's enactment, alleging that the 2011 plan created a racially gerrymandered congressional map. *See Singleton* DE1:1.

156.   Following passage of the 2021 Map, the Singleton Plaintiffs filed an amended complaint alleging that the 2021 Map violated the Equal Protection Clause for the same reasons. *See Singleton* DE15:2.

157.   The Singleton Plaintiffs' equal protection theory traces back to the 1992 Map. In their view, that map was drawn to create a majority-black District 7, the 2001 and 2011 congressional plans "perpetuated the racially gerrymandered District 7," and the 2021 Legislature "intentionally perpetuated the unconstitutional racial gerrymandering." *Singleton* DE1:1-2.

158.   They also contend that, following *Shelby County v. Holder*, 570 U.S. 529 (2013), "the Voting Rights Act no longer requires maintenance of a majority-black Congressional District in Alabama," and thus that the VRA does not "justify splitting county boundaries when Districts drawn without racial gerrymandering provide black voters constituting less than a majority, combined with reliably supportive white voters, an opportunity to elect candidates of their choice." *Id.* at 2.

159.   In Plaintiffs' view, the 2021 Legislature's decision not to affirmatively "remedy the racial gerrymander inherent in the 2011 plan" is proof of discriminatory intent, and "District 7 will constitute a racial gerrymander until the Legislature or this Court redraws it using traditional districting principles that comply with the Constitution." *Singleton* DE57:23, 25.

160.   They ask the Court to require a "whole county plan" that "accept[s]" what they describe as "slight deviations in population to accommodate Alabama's strong historical preference for not splitting counties." *Id.* at 47.

161.   Alabama has not adopted a whole-county congressional plan since 1964, when the Supreme Court held in *Wesberry v. Sanders* that redistricting based on county lines alone could violate the Fourteenth Amendment's one-person/one-vote principle. 376 U.S. 1 (1964).

162.   The Singleton Plaintiffs' "Whole County Plan" includes no majority-minority districts.

163.   Albert Turner Jr., a black Democrat on the Perry County Commission and son of Albert Turner Sr., addressed this plan at one of the State's 28 public redistricting hearings: "I heard … something about Senator Singleton is going to be supporting a plan. Senator Singleton is not going to be representing any plan that's got 40-something percent voting age black population and think that's going to pass. That's not going to pass, and blacks sure aren't supporting that." DX66:29.

## H.   The Caster Plaintiffs' VRA Claim

164.   The Caster Plaintiffs filed suit on November 4, 2021, alleging the 2021 Map violates Section 2 of the VRA because it includes only one majority-black district instead of two such districts. *Caster* DE3:2. This is a problem, they assert, because even though black Alabamians compose "nearly 26 percent of the state's

voting age population, they have the opportunity to elect a candidate of their choice in just one out of seven districts." *Id.*

165.   To prove their Section 2 claim they must show, among other things, that black Alabamians are sufficiently numerous and "geographically compact to constitute a majority of eligible voters in two congressional districts," *id*. at 30.

166.   The Caster Plaintiffs thus have introduced seven illustrative maps drawn by their expert, Mr. Bill Cooper. *See* CX1; CX59.

167.   Each map fundamentally restructures Districts 1 and 2.

168.   First, Districts 1 and 2 would no longer be districts anchored by the Gulf and the Wiregrass respectively. For the first time since 1972, District 1 would no longer contain all of Washington, Mobile, and Monroe Counties, and the district would stretch along the Florida line from the southwest tip of Alabama to the Georgia border. SX22:37-43. Likewise, District 2 would lose many Wiregrass counties and would stretch back west to the Mississippi border, dipping into Mobile County to grab most of the county's black population, while leaving many white Mobilians in District 1.

169.   Any of these maps would rep-
resent the first time since the 1970s that the
State's two Gulf counties—Mobile and
Baldwin—would be broken up between two
districts. SX22:37-43.

170.   Enactment of these maps
would also represent the first time in Ala-
bama history that Mobile County would be
split. SX22.

171.   Mr. Cooper's first map (CX18)
is included here as a reference.

172.   And, as discussed further below, six of Mr. Cooper's seven maps pair
incumbents in the same district. *See* DX4:16 (Thomas M. Bryan Supplemental Re-
port ("Bryan Supp. Rep.")); *see also Caster* DE84:9-10.

173.   Mr. Cooper initial report included the following any-part black[8] voting
age population percentages for his VRA districts. CX1:23-32.

---

[8] "Any-part black" refers to individuals identifying as either single- or multi-race black.

|  | Plan 1 | Plan 2 | Plan 3 | Plan 4 | Plan 5 | Plan 6 |
|---|---|---|---|---|---|---|
| **District 2 BVAP** | 50.09% | 50.88% | 50.27% | 50.07% | 50.24% | 51.28% |
| **District 7 BVAP** | 53.28% | 53.79% | 50.09% | 50.09% | 50.09% | 51.09% |

For Plan 7, he reported any-part BVAP of 51.88% for District 2 and 50.31% for District 7. CX59:2.

When single-race black is used instead, the numbers drop below 50% in nine of the twelve proposed districts. *See* DX:28-31.

|  | Plan 1 | Plan 2 | Plan 3 | Plan 4 | Plan 5 | Plan 6 |
|---|---|---|---|---|---|---|
| **District 2 BVAP** | 48.7% | 49.5% | 49.0% | 48.7% | 48.9% | 50.0% |
| **District 7 BVAP** | 52.0% | 52.6% | 48.9% | 48.9% | 48.9% | 49.9% |

## I.    The Milligan Plaintiffs' Equal Protection and VRA Claims

174.   The Milligan Plaintiffs filed suit on November 15, 2021, alleging that the 2021 Map is racially discriminatory and violates Section 2 of the VRA. *See Milligan* DE1.

175.   Like the Singleton Plaintiffs, the Milligan Plaintiffs argue that the 2021 Legislature's purportedly discriminatory actions were sins of omission; in their view, the earlier maps were racial gerrymanders, and the Legislature's failure to take "steps to remedy this racial gerrymander in the wake of the 2020 census" resulted in a discriminatory map. *Id.*

176.   The Milligan Plaintiffs also argue that the Legislature used "a racial target of 55% BVAP for all majority-black districts as a safe harbor." *Milligan*

45

DE69:24. They appear to base this 55% racial-target allegation on the fact that District 7 ended up with a BVAP of 54% (down from 60% in 2011), and because Sen. McClendon stated that there was no legal requirement to add more black voters to the district following the race-blind draft by Hinaman. *Id.* (citing MX19:19).

177.   The Milligan Plaintiffs' Section 2 claim is similar to the one raised in *Caster*. That is, they assert that black voters are "packed" into District 7, and that "it is possible to create two majority-black districts with zero population deviation that are reasonably compact, respect political boundaries, and satisfy other traditional districting principles." *Milligan* DE69:12.

178.   To prove up their Section 2 claim, the Milligan Plaintiffs present four maps drawn by their expert, Dr. Moon Duchin. *See* MX3:7.



179.   Like the Caster maps, the Milligan maps would restructure Districts 1 and 2, separate the Gulf counties, and split Mobile County for the first time in Alabama's history. *See* SX22.

180.   Unlike the original six Caster maps, the Milligan maps also restructure many other districts in the State. For example, District 5 no longer runs along most of the Tennessee border with District 4 below it. And District 6, which currently covers all of Shelby County, loses much of that county and crosses east to the Georgia border, taking counties from District 3.

181.   Dr. Duchin's report states that three of her four plans split more counties than the 2021 Map. MX3:8. However, she also asserts that by one metric—the Polsby-Popper test—each of her plans is more compact than the 2021 Map based on the *average* compactness scores of all seven districts.

182.   Dr. Duchin does not, however, provide the compactness score for any of the individual districts she drew, meaning her analysis does not provide a compactness score for her majority-black versions of District 2. *Id.* at 9.

183.   Demographer Thomas Bryan analyzed Dr. Duchin's plans district by district. Mr. Bryan found that "in all four of Dr. Duchin's plans, Districts 1 and 2 … were made far less compact." DX4:18, 57.

184.   The average scores of her plans were higher than the 2021 Map's because she offset low compactness scores for Districts 1 and 2 by significantly redrawing Districts 4 and 5 to make them far more geographically compact. *Id.* at 18, 57.

| District | 2021 Plan | Duchin A | Duchin B | Duchin C | Duchin D |
|---|---|---|---|---|---|
| 1 | 0.20 | 0.13 | 0.16 | 0.16 | 0.13 |
| 2 | 0.26 | 0.16 | 0.19 | 0.15 | 0.15 |
| 3 | 0.25 | 0.26 | 0.23 | 0.28 | 0.26 |
| 4 | 0.19 | 0.37 | 0.40 | 0.32 | 0.36 |
| 5 | 0.32 | 0.38 | 0.53 | 0.53 | 0.38 |
| 6 | 0.15 | 0.22 | 0.25 | 0.18 | 0.19 |
| 7 | 0.19 | 0.28 | 0.23 | 0.18 | 0.27 |
| Sum | 1.55 | 1.80 | 1.98 | 1.80 | 1.75 |
| Average | 0.22 | 0.26 | 0.28 | 0.26 | 0.25 |

185.   Dr. Duchin's report identifies only one community of interest that she considered when drawing her maps—the Black Belt. *Id.* at 9-10.

186.   Although the Legislature followed an express policy of seeking to preserve the cores of preexisting districts, Dr. Duchin did not attempt to do the same. *Id.* at 10; *cf. White v. Weiser*, 412 U.S. 783, 796 (1973) (noting legislature's redistricting "decisions were made by the legislature in pursuit of what were deemed important state interests" and such "decisions should not be unnecessarily put aside," even "in the course of fashioning relief" for malapportionment claim).

48

187.   Dr. Duchin reports the following any-part BVAP rates for her VRA districts. MX3:8.

|  | Plan 1 | Plan 2 | Plan 3 | Plan 4 |
|---|---|---|---|---|
| **District 2 BVAP** | 51.37% | 51.06% | 50.06% | 50.05% |
| **District 7 BVAP** | 51.50% | 50.24% | 53.50% | 51.73% |

188.   When single-race BVAP is used rather than any-part BVAP, the numbers drop below 50% in half of her districts. *See* DX4:25-27.

|  | Plan 1 | Plan 2 | Plan 3 | Plan 4 |
|---|---|---|---|---|
| **District 2 BVAP** | 50.0% | 49.7% | 48.7% | 48.7% |
| **District 7 BVAP** | 50.3% | 49.1% | 52.3% | 50.5% |

## J.   The Impending 2022 Elections

189.   Each set of Plaintiffs seeks a mandatory preliminary injunction that would either require the Legislature to enact a new set of districts or would have this Court draw and impose a map before the upcoming primary elections on May 24, 2022, and the even earlier deadlines preceding election day. *See* Administrative Calendar for 2022 Statewide Elections, DX7:12-14.

190.   Clay S. Helms, the Deputy Chief of Staff and Director of Elections for the Alabama Secretary of State's office, testified via declaration about the

ramifications of such changes for election administration. DX7. Plaintiffs offered no testimony in rebuttal.

191.   Helms is "familiar with both the preparation for and administration of elections in the State of Alabama, including the fact that the Boards of Registrars in all Alabama counties must assign each voter to the various districts in which he or she resides." DX7:2.

192.   Helms attested "[t]here are substantial obstacles to changing the Congressional districts at this late date." DX7:2.

193.   Federal law requires "a decennial census of population as of the first day of April" "in the year 1980 and every 10 years thereafter." 13 U.S.C. § 141(a).

194.   A Census was taken as of April 1, 2020.

195.   Results of the Census are to be reported to the Governor and to "public bodies having responsibility for legislative apportionment or districting" "as expeditiously as possible after the decennial census date" and "within one year after the decennial census date." 13 U.S.C. § 141(c).

196.   Pandemic-related delays caused the Census Bureau to complete and release the 2020 Census data later than usual.

197.   The State of Alabama did not cause the COVID-19 pandemic.

198.    The State of Alabama did not cause delays by the Census Bureau in releasing the 2020 Census data to be used in redistricting.

199.   In March 2021, the State of Alabama filed suit in an effort to force the Census Bureau to release redistricting data sooner than its planned date of September 30, 2021. *Alabama v. United States Dep't of Commerce*, Case No. 3:21-cv-211, DE1 (M.D. Ala.).

200.   Helms testified by declaration in that Census lawsuit, attesting "that Alabama needed redistricting plans in place in early November in order to provide time for local officials to complete" the election task of updating voter records to reflect their new precincts and districts following the redistricting process. Helms Decl., DX7:3, 5. *See also Alabama v. United States Dep't of Commerce*, Case No. 3:21-cv-211, DE3-3 (M.D. Ala.).

201.   House Chair Pringle testified in his deposition in these cases that "the [S]ecretary of [S]tate had given us a deadline of the 1st of November to have our plans passed in order for all the work behind the scenes that has to be done to get ready for the next election to occur." MX12:11 (38:10-14).

202.   Ultimately, "[t]he Census Bureau released redistricting data in mid-August, which is later than usual." Helms Decl., DX7:5.

203.   The Alabama Legislature passed, and, on November 4, 2021, the Governor signed, plans drawing new electoral districts for the U.S. House of Representatives, State Senate, State House, and the State Board of Education. Ala. Act Nos. 2021-555, 2021-558, 2021-556, 2021-559.

204.   The State of Alabama proceeded in a timely manner in enacting a new Congressional plan for the elections to be held in 2022 and thereafter.

205.   The State of Alabama did not delay in enacting a new Congressional plan for the elections to be held in 2022 and thereafter.

206.   The State of Alabama did not delay in enacting a new Congressional plan for the elections to be held in 2022 and thereafter for the purpose of preventing this Court from having time to consider requests for preliminary injunctive relief and to mandate the same, should the Court determine it justified.

207.   Helms testified that, in addition to the new lines for the Congress, State Senate, State House, and the State Board of Education, "[l]ocal governments are also drawing new lines based on the 2020 Census." DX7:3.

208.   "To implement the new district lines for the upcoming elections, each county's Board of Registrars is responsible for reassigning that county's registered voters to the correct precincts and to the correct districts, in conjunction with the county commissions." DX7:3.

209.   "Each of Alabama's more than 3.6 million registered voters must be assigned to the correct Congressional, State Senate, State House, Board of Education, and local districts so that he may receive the correct ballot (to vote for the officials who will represent him as opposed to others) and so the voter will know where to cast his ballot." DX7:3.

210.   The voter reassignment process is essential to make sure each voter receives the correct ballot that includes all the candidates for which the voter is entitled to vote.  DX7:3-4.

211.   The reassignment process had likely begun "in most, if not all, Alabama counties" at the time that Helms signed his declaration on December 21, 2021. DX7:3, 11.

212.   In some Alabama counties, including the largest, the reassignment process is automated and easily managed.  DX7:3-4.

213.   In 45 Alabama counties, however, the reassignment process is a time-consuming, manual process "requiring officials to pore over maps and lengthy lists of voters to ensure that each voter is correctly assigned" and "can take a county's Board of Registrars 3 to 4 months to accomplish." DX7:3-4.

214.   Helms attested that "in 2017, following the *Alabama Legislative Black Caucus* redistricting litigation, the Alabama Legislature drew remedial State and House plans that altered only a portion of the districts in each plan. Even though only some districts were affected, local election officials struggled to complete the district assignment process in up to 4 months."  DX7:4.

215.   The following table, which was compiled by comparing Helms's declaration to Alabama's adopted Congressional plan, shows each congressional district has counties that perform the reassignment task manually. The number

alongside each county represents the total active and inactive registered voters in the county, all of whom are eligible to vote. The data are from the Secretary of State's records on voter registration for October 2021. ALABAMA SECRETARY OF STATE, ELECTIONS DATA DOWNLOADS: VOTER REGISTRATION STATISTICS – 2021, https://www.sos.alabama.gov/alabama-votes/voter/election-data (last visited Jan. 13, 2021).

| Counties Where the Reassignment Process is Manual, Organized by Cong. District | | | | | | |
|---|---|---|---|---|---|---|
| District 1 | District 2 | District 3 | District 4 | District 5 | District 6 | District 7 |
| Escambia (26,329) Monroe (16,010) Washington (13,315) | Barbour (17,020) Bullock (7,108) Butler (14,190) Coffee (35,786) Conecuh (9,742) Covington (27,311) Crenshaw (10,335) Dale (34,297) Elmore (59,388) Geneva (19,443) Henry (13,779) | Chambers (25,353) Chilton (28,916) Clay (10,207) Cleburne (11,158) Coosa (8,074) Macon (16,651) Randolph (17,803) Russell (41,885) Tallapoosa (31,156) | Colbert (42,694) Cullman (61,745) DeKalb (44,574) Etowah (74,062) Fayette (12,440) Franklin (19,193) Lamar (10,647) Lauderdale (65,686) Lawrence (24,812) Marion (21,573) Walker (47,182) Winston (16,837) | Jackson (38,305) Lauderdale (65,686) | Bibb (14,543) Blount (40,961) Chilton (28,916) | Choctaw (10,705) Greene (6,627) Hale (11,890) Perry (7,769) Pickens (13,795) Sumter (9,617) Wilcox (8,559) |

216.  "The Census Bureau's delay has delayed redistricting and shortened the time available for local officials to assign voters to districts and precincts." Helms Decl., DX7:5.

217.   "[L]ocal election officials are already under time pressures created by the fact that the maps were adopted in November, 2021." DX7:2.

218.   "County Board of Registrars and county commissions will have to complete the reassignment process no later than the beginning of absentee voting on March 30, 2022, but realistically, they will need to notify voters of their assigned precincts and districts well before then to allow voters time to know what their choices are and inform themselves about those choices. In addition, printed ballots will need to be available for absentee voting to begin, and printing ballots is not an overnight process." DX7:5.

219.   Ballots cannot be fully and accurately printed until the candidates are known.

220.   "If the Congressional districts change, local officials will have to start over in the process of assigning new Congressional districts, making the already shortened time for the assignment process even shorter." DX7:5.

221.   The Plaintiffs propose maps that would make changes to every Congressional District and move thousands of voters.

222.   Caster expert Mr. Bill Cooper testified that all seven of his illustrative plans made changes to all congressional districts, though, in six of his seven plans, the changes to Districts 4 and 5 were fewer than the changes to other Districts. PI Tr. 456:3-23.

223.    Milligan expert Dr. Moon Duchin testified that she did not include core retention as a criteria in drawing her illustrative plans. PI Tr. 599:24-600:3. Her plans made changes to all of Alabama's Congressional Districts. *See* MX3 at 6-7.

224.    "[C]hanging the Congressional district lines again at this late date is likely to cause confusion, additional costs, and a rushed district assignment process that potentially increases the risk of mistaken assignments." Helms Decl., DX7:2; *see also id.* at 6.

225.    "Completing the reassignment process before the next election provides times for notifying voters of any changes, which both reduces voter confusion and improves turnout. It also provides the county commissions with the information they need to ensure that each voting place has no more than 2,400 voters and, for those that do, adjusting precinct boundaries or designating additional voting places (which may not be changed within three months of an election). *See* Ala. Code § 17-6-4(d)." Helms Decl., DX7:4.

226. According to Helms's unrebutted testimony, "If the Boards of Registrars and county commissions have to redo the reassignment process on an abbreviated schedule the likely result is one or more of the following: (1) thousands of dollars in unexpected costs incurred by the Boards of Registrars to contract with an entity to assist them in the process; (2) a rushed reassignment process, potentially increasing the likelihood of mistaken reassignments; and (3) less time to notify

voters about changes, potentially increasing the likelihood of voter, political party, and candidate confusion." DX7:6.

227.   January 28, 2022 is the deadline for candidates running in the Alabama Republican Party primary and the Alabama Democratic Party primary to file qualification papers with their political parties. Ala. Code § 17-13-5(a); DX7:12.

228.   Absentee voting is scheduled to begin on March 30, 2022, DX7:4, and obviously that requires ballots to be finalized and printed before that date.

229.   Federal law requires that the absentee ballots of voters protected by the Uniformed and Overseas Citizens Absentee Voting Act, as amended, be transmitted no later than 45-days before a federal election, if those ballots have been requested by that time. 52 U.S.C. § 20302(a)(8).

230.   For Alabama's 2022 federal primary elections, the UOCAVA deadline is April 9, 2022. DX7:4-5.

231.   In 2012, the United States filed suit against the State of Alabama and the Secretary of State "for declaratory and injunctive relief to ensure that absent uniformed services voters and overseas voters ('UOCAVA voters') will have the opportunity to vote guaranteed by UOCAVA in Alabama's 2012 elections for Federal office and in future elections for Federal office." *United States v. Alabama*, Case No. 2:12-cv-00179, DE1:1 (M.D. Ala.).

232.   Pertinent here, the parties agreed that the State would be in a better position to meet the 45-day deadline going forward if, among other things, certain changes were made to the State's calendar, including changes to ensure the candidates in a primary election would be known in sufficient time to print and timely transmit the ballots. *United States v. Alabama*, Case No. 2:12-cv-00179, DE110-1:2-5 (M.D. Ala.) (joint proposed order).

233.   One change the parties proposed was that "Notwithstanding the provisions of Ala. Code § 17-13-5, a) candidates must file their declarations with the State or county party chairman no later than 5:00 P.M. on the 116th day before the date of the primary election ...." *United States v. Alabama*, Case No. 2:12-cv-00179, DE110-1:4 (M.D. Ala.) (joint proposed order).

234.   The court "approved and adopted" the parties' proposal. *United States v. Alabama*, Case No. 2:12-cv-00179, DE118 (M.D. Ala.) (order).

235.   Ala. Act No. 2014-006 was enacted "to change certain election deadlines to facilitate compliance with the federal Uniformed and Overseas Citizens Absentee Voting Act" and for other purposes. Ala. Act No. 2014-006 (title). It was signed into law on February 10, 2014.

236.   Among other things, Ala. Act No. 2014-006 amended Ala. Code § 17-13-5 to provide that "All candidates for nomination to public office ... in the primary election ... shall file their declaration of candidacy with the state party chair if they

seek any federal, state, circuit or district office … not later than 5:00 P.M. 116 days before the days of the primary election." The prior requirement had been 60 days.

237.   The State and Secretary of State filed an unopposed motion explaining that the portion of the Remedial Order that changed the State's election calendar was no longer needed because the State had adopted the revised calendar into State law in Ala. Act No. 2014-006. *United States v. Alabama*, Case No. 2:12-cv-00179, DE126 (M.D. Ala.) (unopposed motion).

238.   The court amended its order to vacate the portion thereof that made changes to the State's election calendar. *United States v. Alabama*, Case No. 2:12-cv-00179, DE128 (M.D. Ala.) (order).

239.   Alabama's candidate qualification deadline is thus set to help facilitate the State's compliance with a federal law protecting the voting rights of uniformed and overseas citizens.

240.   Alabama has not set its candidate qualification deadline earlier than necessary in an effort to frustrate this Court's ability to enter injunctive relief in this case.

241.   Candidates seeking to run in major party primaries have expended significant time and money ahead of the January 28, 2022 qualifying deadline. PI Tr. 399:16-400:8 (Plaintiff Dowdy testifying that candidates spend substantial time and money campaigning).

242. According to information provided by the Federal Election Commission, there are at least fifteen candidates actively running for Alabama congressional seats. FEDERAL ELECTION COMMISSION, CANDIDATES, https://www.fec.gov/data/candidates/?election_year=2022&office=H&state=AL&is_active_candidate=true&has_raised_funds=true (last visited Jan. 7, 2022) (limited to the 2022 election for Alabama House who have raised money).[9]

243. Barry Moore is running for re-election in District 2 and spent more than $130,000 between January 1, 2021 and September 30, 2021. FEDERAL ELECTION COMMISSION, CANDIDATE PROFILES: FELIX BARRY MOORE, SPENDING, https://www.fec.gov/data/candidate/H8AL02171/?cycle=2022&election_full=true&tab=spending (last visited Jan. 7, 2022).

244. Terri Sewell, in District 7, has spent about $380,000 in the same time period. FEDERAL ELECTION COMMISSION, CANDIDATE PROFILES: TERRI A. SEWELL, SPENDING, https://www.fec.gov/data/candidate/H0AL07086/?cycle=2022&election_full=true&tab=spending (last visited Jan. 7, 2022).

245. There are multiple candidates competing for the open seat in District 5, and they have collectively raised nearly one million dollars and spent a combined

---

[9] This information is taken from the Federal Election Commission website because the January qualification deadline has not yet passed and candidates have not yet been certified by the parties to the Secretary of State, *see* DX7:12 (Administrative Calendar 2022 Statewide Elections). Courts "routinely take judicial notice of information contained on state and federal government websites." *Broom v. Shoop*, 963 F.3d 500, 509 (6th Cir. 2020).

total of nearly $400,000. Federal Election Commission, Alabama – House District 05, Candidate Financial Totals, https://www.fec.gov/data/elections/house/AL/05/2022/ (last visited Jan. 7, 2022). A primary will be required for voters to choose among them. *See* Ala. Code § 17-13-1.

246.   While these FEC records are from before the new Congressional map was drawn, the Alabama Legislature's decision to adopt a least-change plan suggests that the new map did not render much of this spending wasted.

247.   Former Rep. Byrne testified at the preliminary injunction as follows:

> A.     I would want to say this. I have great respect for the Court and this proceeding, and I know the Court's got some difficult decisions to make. But we're pretty far along into this campaign cycle. And I have seen what it does to congressmen in other states when at the last minute, courts start moving things around. And I think it hurts the effectiveness of congressmen when that happens. I am not saying the Court may not have good reason to do it.
>
> But as I said earlier, we are just a few months away from primaries. And it would be very difficult to start shifting this thing around. It was hard enough as it was when the Legislature pass[ed] these districts. People held back and held back and held back. And now, they're right in the meat of these campaigns. And I just think it would be terrible if we change course on all these candidates running for these various offices, Democrat, Republican, doesn't matter. It's going to have the very same detrimental effect on those candidates and on those congressmen, sitting congressmen if all of a sudden these things are moved around some more.

PI Tr. 1750:10-1751:3.

248.   Organizations seeking ballot access as political parties and individuals seeking to appear on the ballot as independent candidates for Congress must submit

a petition no later than the May 24, 2022 primary date. Ala. Code § 17-6-22; Ala. Code § 17-9-3(a).

249.   The petition must be signed by the number of registered voters equal to at least three percent of voters *in the relevant congressional district* who cast ballots in the 2020 gubernatorial race. Ala. Code § 17-6-22; Ala. Code § 17-9-3(a).

250.   An independent candidate running to represent District 3, Doug Bell, appears to recognize he will need approximately seven thousand signatures. Doug Bell for U.S. Congress, *Get Involved*, https://dbellforuscongress.com/get-involved/ (last visited Jan. 7, 2022); *see also* DX7:7.

251.   The number of voters (and therefore the number of needed signatures) varies by district, and it cannot be precisely determined with certainty until the new district lines are fully input into the electronic voter registration system. DX7:7. Before the 2020 Census, the number of needed signatures ranged from 6,818 in Congressional District 2 to 8,434 in Congressional District 6. *Id.*

252.   Relatedly, "which signatures will be valid for ballot access petition purposes" depends on which Congressional Districts a signer resides in. DX7:7. Thus, which signatures are valid depends on the new district lines being fully input into the electronic voter registration system. *Id.*

253.   Changing the district lines now could hamper petitioning efforts by rendering signatures gathered by a candidate or political organization invalid when voters are drawn out of the district.

254.   The Secretary of State's office "advise[s] individuals and organizations seeking ballot access to submit substantially more than the minimum number of signatures because not all solicited signatures are valid."  DX7:8.

255.   Those petitioning for ballot access "have the option to solicit and obtain signatures from the middle of districts to minimize" problems caused by the changing of the congressional district lines, DX7:8, though drastic changes to the 2021 Map have the potential to undermine that strategy.

256.   Alabama has previously faced litigation alleging an insufficient amount of time was provided for a congressional candidate to petition for ballot access. *See Hall v. Secretary, Alabama*, 902 F.3d 1294 (11th Cir. 2018); *see also* DX7:8. The litigation lasted for about five years.

257.   Alabama is a frequent target of ballot access litigation, *see e.g.*, *Hall v. Secretary, Alabama*, 902 F.3d 1294 (11th Cir. 2018) (special election for Congress); *Stein v. Alabama Secretary of State,* 774 F.3d 689 (11th Cir. 2014) (ballot access for political parties wishing to field presidential candidates); *Swanson v. Worley*, 490 F.3d 894 (11th Cir. 2007) (change in petition deadline); *De La Fuente v. Merrill*, 214 F. Supp. 3d 1241 (M.D. Ala. 2016) (presidential candidate's challenge to sore

loser law), and changing the Congressional District lines at this late date puts the State at risk of additional litigation.

258.   The May 24, 2022 primary election is not just for Congress. Federal, State, and county elections are being held together on that date.  DX7:3.

259.   The Secretary of State's 2022 Voter Guide is available on the Secretary's website at https://www.sos.alabama.gov/sites/default/files/election-2022/2022%20Voter%20Guide.pdf

260.   According to the Secretary of State's 2022 Voter Guide, the following offices are up for election in 2022:

        a.  United States Senate (1 seat)
        b.  United States House of Representatives
        c.  Governor
        d.  Lieutenant Governor
        e.  Attorney General
        f.  Auditor
        g.  Secretary of State
        h.  Treasurer
        i.  Commissioner of Agriculture and Industries
        j.  Alabama Senate
        k.  Alabama House of Representatives
        l.  Alabama Supreme Court (2 places)
       m. Public Service Commission (2 places)
        n.  State Board of Education (4 seats)
        o.  Various trial court judges
        p.  Various county offices

261.   A primary election "is an election held by the qualified voters who are members of any political party, for the purpose of nominating a candidate or candidates for public or party office." Ala. Code § 17-13-1.

262.   Thus, a Republican primary election will be held for each of the above-listed offices to the extent that more than one Republican candidate is vying for the office, and a Democratic primary election will be held for each of the above listed offices to the extent that more than one Democratic candidate is vying for the office.

263.   If the Court were to order that a new congressional map be implemented for the 2022 elections, the chaos resulting from the imposition of a new plan, the uncertainty while appeals are pending, and the ramifications for Alabama's ability to comply with legal requirements that apply to the State but are not at issue in this case, could force a delay in various deadlines for the congressional race. That in turn could require separating the Congressional election from other elections and a delay in the Congressional election.

264.   According to Helms' unrebutted testimony: "If the 2022 Congressional elections were separated from the other federal, State, and county elections with which they are traditionally held, there would be substantial costs for the additional election(s), and the additional election(s) could result in voter confusion and reduced turnout." DX7:8. Each of these consequences is an obvious possibility.

265.   As to the financial consequences of separating the elections, "[i]n 2017, the State held a special statewide election for United States Senator. The cost for that primary election was over $5 million." DX7:8. The cost for a Republican primary runoff election "was over $3 million." *Id.*

65

## DISCUSSION

### I.   Standard of Review

266.   "A preliminary injunction is an 'extraordinary remedy never awarded as of right.'" *Brown v. Sec'y, U.S. Dep't of Health & Human Servs.*, 4 F.4th 1220, 1224 (11th Cir. 2021) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)). "Indeed, the grant of a preliminary injunction is 'the exception rather than the rule.'" *Id.* (quoting *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983)). Thus, "[t]he preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites. The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1286 (11th Cir. 1990) (quotations omitted).

267.   Those four prerequisites that a movant must show to obtain a preliminary injunction are: "(1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable harm without a preliminary injunction; (3) that the threatened injury to the party outweighs any harm that might result to the defendants; and (4) that an injunction is not adverse to the public interest." *Brown*, 4 F.4th at 1224. Where a government entity is involved, "'its interest and harm merge with the public interest,' so [a court] may consider the third and fourth factors together." *Id.* (quoting *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020)).

268.   Where, as here, a preliminary injunction is sought to change the status quo and force another party to act, it becomes a "mandatory or affirmative injunction" and the burden on the moving party increases. *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971). Thus, a mandatory injunction "should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Id.*; *see also Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.").

269.   When evaluating challenges to electoral processes "just weeks before an election," federal courts must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4-5.

## II.   The Singleton and Milligan Plaintiffs Have Not Shown That Their Fourteenth Amendment Claims Are Likely to Succeed on the Merits.

270.   Legislatures often use the preexisting map as the starting point in the non-remedial redistricting process. As Justice Alito explained, "[w]hen a new census requires redistricting, it is a common practice to start with the plan used in the prior

map and to change the boundaries of the prior districts only as needed to comply with the one-person, one-vote mandate and to achieve other desired ends." *Cooper*, 137 S. Ct. at 1492 (Alito, J., concurring in part).[10]

271.   Doing so "honors settled expectations and, if the prior plan survived legal challenge, minimizes the risk that the new plan will be overturned." *Id.; see also* MX13:9 (32:14-21) (Sen. McClendon testifying that, when he served as House Chair of the Reapportionment Committee in 2011, the starting point for that map was the then-existing lines); PI Tr. 778:9-19 (expert Mr. Thomas Bryan explaining that, "more often than not, the starting point for doing redistricting or political redistricting is to begin with the plan that's in place, again, trying to conform with the principle of continuity of representation"); *id.* at 479:11-16 (Plaintiffs' expert Mr. Bill Cooper testifying that he "almost never" begins map-drawing "with a blank slate," and instead "would always see what the so-called benchmark plan, the previous plan[,] looked like").

272.   Alabama's Legislature followed this ordinary and permissible practice when drawing the 2021 Map. Once the State learned it would be keeping all seven of its congressional seats, the Legislature's map-drawer "used the cores of the

---

[10] *See also* Nathaniel Persily, *In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders*, 116 Harv. L. Rev. 649, 671 (2002); *Vieth v. Jubelirer*, 541 U.S. 267, 357-358 (2004) (Breyer, J., dissenting) (collecting sources); *Stenger v. Kellett*, No. 4:11-cv-2230, 2012 WL 601017, at *3 (E.D. Mo. Feb. 23, 2012) ("A frequently used model in reapportioning districts is to begin with the current boundaries and change them as little as possible while making equal the population of the districts.").

existing districts as a starting point," never considered race when making the necessary adjustments to rebalance the districts, and otherwise adhered to traditional redistricting criteria. MX11:24-25, 25-26, 37-38 (93-94, 97-98, 100, 145-46).

273.   The result was a map that was more compact than its immediate predecessor, had fewer county splits, and (incidentally) lowered BVAP in District 7 from about 62% to about 54%. *See* PI Tr. 784:4-7.

274.   The Legislature then enacted Act 2021-555, which adopted the race-blind map without change.

275.   The Singleton and Milligan Plaintiffs contend that Act 2021-555 is a racial gerrymander that violates the Equal Protection Clause.

276.   "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

277.   And for racial gerrymandering claims, "the burden of proof on the plaintiffs … is a demanding one." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). Plaintiffs must prove that "[r]ace must not simply have been *a* motivation for the drawing of a majority-minority district, but the *predominant* factor motivating the legislature's districting decision." *Id* at 241 (citation and internal quotation marks omitted).

278.   Courts assessing a racial gerrymandering claim "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." *Miller*, 515 U.S. at 915-16.

279.   Because of (1) the "evidentiary difficulty" of distinguishing "between being aware of racial considerations and being motivated by them," (2) "the sensitive nature of redistricting," and (3) "the presumption of good faith that must be accorded legislative enactments," courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.* at 916.

280.   As explained in greater detail below, neither set of Plaintiffs can shoulder their heavy evidentiary burden of proving racial predominance, particularly in light of the "obvious alternative explanation" for Act 2021-555—that it retains cores of districts and longstanding communities of interest and protects incumbents. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009).

281.   Both the Singleton and Milligan Plaintiffs look back nearly three decades to the congressional map imposed by the 1992 *Wesch* decision. *See* 785 F. Supp. 1491. But no one alleges that the *Wesch* court violated the Equal Protection Clause or argues that the 1992 Map was unlawful when drawn (nor would such an

argument make much sense, considering that the plan was approved by three federal judges and affirmed by the Supreme Court).

282.   Nor is there support for the notion that any alleged discrimination in the 1992 Map is imputed to each Legislature that subsequently enacted a congressional map resembling its predecessor.

283.   "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful. The ultimate question remains whether a discriminatory intent has been proved in a given case." *Abbott*, 138 S. Ct. at 2324-25 (cleaned up). Thus, "there can be no doubt about what matters: It is the intent of the 20[21] Legislature." *Abbott*, 138 S. Ct. at 2324.

284.   Any consideration of race in past redistricting cycles—which itself would have been done in the light of the State's obligations under the VRA—cannot support a springing Equal Protection claim with respect to the *present* redistricting cycle.

### A.   Plaintiffs Have Not Shown That Racial Considerations Predominated Over Traditional Redistricting Criteria in the 2021 Map.

285.   Plaintiffs have not shown that "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," *Cooper*, 137 S. Ct. at 1463, and their Fourteenth Amendment claims therefore are unlikely to succeed.

71

286.   Comparing the 2021 Map against its 2011 predecessor strongly suggests that the Legislature's predominant purposes were legitimate, normal, and, perhaps most relevant here, race-neutral: preserve cores of districts; preserve the communities of interest within those districts; avoid pairing incumbents; equalize district populations; and, in doing so, make the districts more compact and minimize splits of counties and other political subdivisions. *See* DX2:52; *see also* PI Tr. 660:20-21 (Dr. Duchin "certainly agree[ing] that core retention seems to have been highly prioritized in the creation of the 2021 plan").

287.   Alabama's expert demographer, Mr. Thomas Bryan, has quantified how the 2021 Map performed on many of the traditional districting principles described above. *See* DX2:23 (showing core retention rates between 87.8% and 98.8% for the districts); *id.* at 28 (showing that the districts avoid pairing incumbents); *id.* at 30-31 (showing that the 2021 Map is more compact than the 2011 Plan on at least four different measures of compactness); *id.* at 17-18 (discussing the community of interest kept together in District 1 that Plaintiffs' illustrative plans would divide).

288.   Deposition testimony from Randy Hinaman, drafter of the 2021 Map, further confirms that racial considerations played no role in the map-drawing process itself. *See, e.g.*, DX144:24-26, 37-38. The Legislature's Redistricting Committee,

through the Redistricting Guidelines provided to Hinaman, prioritized traditional districting criteria, and Hinaman followed his instructions.

289.   The Singleton Plaintiffs acknowledge this, noting that "the 2021 plan started with the 2011 plan and added or subtracted population from each district to maintain population equality …." *Singleton* DE57:23. They even assert "that the new redistricting plan was designed largely to preserve existing districts." *Id.* at 24; *see also* PI Tr. 98:24-99:1 (Dr. Davis providing race-neutral explanation for 2021 Map's design); *id.* at 656:5-11.

290.   Preserving existing districts is a valid, race-neutral justification for the latest changes to the congressional map. *See, e.g.*, *Abrams v. Johnson*, 521 U.S. 74, 99-100 (1997) (affirming State interest in "maintaining core districts").

291.   Moreover, "the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority. It simply imposes an obligation not to create such districts for predominantly racial, as opposed to political or traditional, districting motivations." *Easley*, 532 U.S. at 249.

292.   Thus, the Legislature was not required to disregard traditional redistricting criteria simply because District 7's core contained more black voters than Plaintiffs deem optimal. *Cf. Cooper*, 137 S. Ct. at 1464 (explaining racial gerrymandering can be shown by "demonstrating that the legislature 'subordinated'

73

other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations'").

293.   The Singleton Plaintiffs rely heavily (at DE57:9, 25-28) on *Cooper v. Harris* to support their argument that the Legislature was required to do more than employ these traditional redistricting criteria. But *Cooper* does not support their racial-gerrymandering claim.

294.   In *Cooper*, there was no serious question that race was the predominant factor in drawing District 1 because North Carolina sought to achieve an *express racial target* of 50% BVAP. *See Cooper*, 137 S. Ct at 1468. The key question in *Cooper* was whether that specific use of race could be justified by the VRA on the facts of the case, and the Supreme Court answered in the negative.

295.   This case is on altogether different footing. Unlike *Cooper*, the changes Alabama made to its district lines in 2021 were *not* predominantly based on race.

296.   Nevertheless, Plaintiffs seem to argue that, under *Cooper*, the State must engage in a districting process that would move people out of District 7 because of their race. No language in *Cooper* supports Plaintiffs' theory that the Fourteenth Amendment requires Alabama to redraw its congressional map to achieve the racial compositions Plaintiffs propose.

297.   In *Bartlett v. Strickland*, the Supreme Court clarified that States have no obligation to create crossover districts to "maximiz[e] minority voting strength."

556 U.S. 1, 23 (2009) (plurality op.) (citation omitted). And in *Cooper*, the Supreme Court found that a 50% "target" for BVAP could not withstand strict scrutiny.

298.   But the Equal Protection Clause does not require States to consider race in redistricting to ensure a minority population in a district stays below a certain ceiling. Quite the contrary. "[T]he Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority." *Cromartie*, 532 U.S. at 249.

299.   The Singleton Plaintiffs suggested at closing argument that *Bartlett v. Strickland* supports their argument because the Court stated that its "holding … should not be interpreted to entrench majority-minority districts by statutory command." Pl. Tr. 1794:18-20 (quoting *Bartlett*, 556 U.S. at 23).

300.   But in that passage of that Section 2 case, the Court was merely making clear that States are free to meet their Section 2 obligations with "crossover districts … where no other prohibition exists," and that "[m]ajority-minority districts are only required if all three *Gingles* factors are met and if § 2 applies based on a totality of the circumstances." *Bartlett*, 556 U.S. at 24. The Court was not suggesting that States must use racial considerations to avoid drawing majority-minority districts that would otherwise be drawn based on traditional race-neutral districting principles. When such districts are the product of "traditional … districting motivations," they are not racial gerrymanders. *Cromartie*, 532 U.S. at 249.

301.   The Milligan Plaintiffs contend that the "legislature deliberately sought to maintain District 7 as a packed majority-black district with a 55% BVAP floor." *Milligan* DE59:20. But Plaintiffs offer scant evidence supporting their claim that the Alabama Legislature observed a 55% BVAP "floor."

302.   Indeed, the BVAP in the district is 54% single-race black. *Milligan* DE53:12. And though District 7 is 55.3% any-part black (a decrease from 60.11% in 2011), *id.*, the Milligan Plaintiffs appear to rest their claim on the speculation that, because District 7 ended up with 55.3%, the 2021 Legislature must have begun the redistricting process with a floor of 55% in mind. Claims like this require evidence, *see, e.g.*, *Abbott*, 138 S. Ct. at 2325, and Plaintiffs offer none.

303.   The Milligan Plaintiffs note that "[m]ost of the decrease in District 7's BVAP from 60% in the 2011 plan to around 55% in HB1 came from population loss … rather than changes to the district lines." DE69:24. They then find it "telling" that when Hinaman added 53,000 people to District 7, the district was still around 55%.

304.   But because Hinaman was adding population from areas contiguous with the current district without consideration of race, it is unsurprising that the district's racial makeup remained stable. To find otherwise would turn the legislative presumption of good faith on its head. *See Abbott*, 138 S. Ct. at 2325.

305.   Milligan Plaintiffs also attempt to bolster their intentional-racial-floor claim by contending that in 2011 the State "increased the total Black and BVAP in District 7 from the 2002 plan for the purported purpose of avoiding retrogression under Section 5 of the VRA." DE69:21 (citing DE53:11, *Milligan* Stipulations ¶¶ 51-54). The problem with this contention is that the stipulated facts the Milligan Plaintiffs cite say nothing about a *purposeful* increase of black population or BVAP in 2011. Rather, the stipulations simply note an increase in black population and BVAP between the 2001 and 2011 plans, and quote from the State's 2011 preclearance submission letter, which states that such an "increase plainly cannot be regarded as retrogressive." DE53:11 ¶ 54.

306.   Next, the Milligan Plaintiffs fault the Legislature for failing to conduct a racial-polarization analysis of the 54% BVAP district. *Milligan* DE69:24. But all parties in this case seem to agree that District 7 provides adequate opportunity for black Alabamians to elect their candidate of choice, *see, e.g.*, *id.* at 26 (complaining of "packing"). Accordingly, Plaintiffs fail to explain why Sen. McClendon's confidence that a 54% BVAP district would elect a Democrat is proof that the "Legislature pursued a 55% BVAP district[] based on the mistaken belief that such districts offered safe harbors from racial gerrymandering claims." *Milligan* DE69:24.

307.    The Milligan Plaintiffs surmise that because the Legislature's map-drawer "lives in Alabama" and has experience drawing districts in 1992 and 2011, "he likely did not need to view the racial data to draw a map where race predominated." *Id.* at 25. But the Court will not apply a presumption of bad faith to Hinaman. *See Abbott*, 138 S. Ct. at 2325.

308.    In any event, the relevant intent is ultimately that of the *Legislature*, not its map-drawer. *See Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) ("Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools.").

309.    Finally, the Milligan Plaintiffs turn to a pair of experts who purport to show that racial discrimination drove the 2021 Legislature's design of District 7. *Milligan* DE69:26-27. But fundamental flaws in the design of their studies render both reports irrelevant to the issue of the 2021 Legislature's intent.

310.    Dr. Kosuke Imai states that he used algorithms to randomly build from scratch "10,000 simulated plans" that kept "population deviations to a minimum and never above ±0.5%, develop[ed] districts that are reasonably compact, respect[ed] county boundaries where possible, and avoid[ed] incumbent pairings." *Id.* at 26. Because none of these maps produced a District 7 with a BVAP as high as the real

District 7, the Milligan Plaintiffs proclaim that "[t]his alone shows that HB1 used race as a predominant factor." *Id.* at 27.

311.   Likewise, the Milligan Plaintiffs cite Dr. Ryan Williamson's observation that the three counties split between District 7 and other districts have "BVAPs of 41.5%, 56.3%, and 29.5% … as compared to a statewide median county BVAP of 22.5%," and duly conclude that discrimination motivated the 2021 Legislature. *Id.* at 27-28. And they note that "for Districts 2 and 3 black voters were moved out of those districts in much higher percentages than they were moved in." PI Tr. 1844:2-4.

312.   The flaws in these analyses are plain. While professors might draw maps on blank slates, States generally do not, and record evidence shows that Alabama did not in 2021. Rather, the 2021 Map began with the preexisting district lines and then adjusted for population equality while preserving the cores of existing districts. MX11:11 (38:22-40:8).

313.   Both experts could (and should) have taken this into account. Indeed, Dr. Imai himself admitted that he could have started with the existing plan and modified it, but that he declined to do so. He instead used a method that "draw[s] redistricting plans from scratch." MX1:18.

314.   Dr. Imai further admitted that his 10,000 simulations neither sought to preserve cores of districts, respect communities of interest, or minimize the total

number of counties in each district. *See* PI Tr. 230:3-14. But all of these are traditional redistricting principles to which the 2021 Legislature adhered. *See* DX72; DX144:35 (135:14-137:7) (Hinaman testifying that he following the 2021 Redistricting Guidelines in drawing the 2021 Congressional map). Dr. Imai even conceded that had his analysis sought to preserve cores of districts, he would "not be able to isolate the role [that] race played in … drawing the district boundaries under the enacted plan." PI Tr. at 227:13-228:24.

315.    The flawed premise—that Alabama, like Dr. Imai, would have begun its redistricting process on a blank slate and disregarded its traditional redistricting principles—invalidates Dr. Imai's conclusion that race predominated when the Legislature drew the 2021 Map.[11]

316.    Dr. Imai also purported to show that Alabama had cracked black voters because when he tuned his algorithm to generate thousands of maps with one majority-black district, the district with the second highest BVAP proportion in his maps on average was 4.4 percentage points higher than the BVAP proportion for District 2, which was the 2021 Map's district with the second highest BVAP proportion. MX1:4.

---

[11] Moreover, Dr. Imai employed ±0.5% population deviation—*i.e.*, deviation of 3,500 voters—in his analysis, which allows for a total deviation of 1%—or 7,000 voters—in his simulated plans. PI Tr. at 215:16-218:18. Compared to the one-voter-deviation approach employed by the Legislature, this 7,000-voter cushion dramatically eased Dr. Imai's task of creating compact districts that avoid splitting counties. Dr. Imai's plans are unrepresentative of any plan the Legislature may have considered.

317.   But Dr. Imai's majority-black district had an any-part black percentage of "50 to 51 percent"—about 4 to 5 percentage points lower than the percentage in the enacted District 7. PI Tr. 257:4-12. Dr. Imai did not analyze what BVAP percentage one might expect in District 2 if his simulated plans had an any-part BVAP of 55 percent. And, of course, he did not take into account core retention. His analysis thus sheds no light on the intent of the 2021 Legislature.

318.   Similarly, Dr. Williamson's assertion that race predominated in the 2021 Map's district lines largely ignores context that undermines his conclusion. For example, Dr. Williamson did not consider the State's Redistricting Guidelines; instead, he analyzed only the relationship between the district lines and race. PI Tr. at 337:5-338:5.

319.   Moreover, Dr. Williamson concludes that the Legislature intentionally cracked Districts 2 and 3 because the average BVAP of border counties in those districts exceeds that of interior counties. PI Tr. 354:20-23. But the conclusion does not follow the premise; indeed, because the southernmost counties in District 2 have a lower BVAP than those further north, the border counties between District 2 and 3 will *always* have higher BVAP than their interior counterparts unless the districts hug the State line, which would serve neither the Legislature's interest in compactness nor core preservation. Dr. Williamson ultimately offered little more than an observation about "a relationship between two things, in this case, race and

the district lines, as drawn," and did not even attempt to show "intent or anything like that." PI Tr. 342:1-7.

320.   The analysis and testimony from Dr. Imai and Dr. Williamson does not demonstrate that race predominated—or even played a role—in the 2021 Legislature's enactment of the 2021 Map. These experts avoided the simplest (and, based on the record, most accurate) explanation for why the 2021 Map looks the way it does: In the words of the Singleton Plaintiffs, "the new redistricting plan was designed largely to preserve existing districts," *Singleton* DE57:24.

321.   The basic shape of the districts—splits and all—was already there before the State shifted a single precinct. The blank-slate perspectives embraced by these experts reveals nothing about the real-world intentions of the 2021 Legislature.

**B.    Plaintiffs Have Not Shown That the Permissible Consideration of Race in Previous Redistricting Cycles Supports a Finding That Racial Considerations Predominate the 2021 Map.**

322.   The Singleton and Milligan Plaintiffs seek to impute to the current Legislature the alleged intent embodied in past redistricting cycles. For several interrelated reasons, these arguments are not likely to succeed on the merits.

323.   Plaintiffs must show that the 2021 Legislature acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). That is especially

so here, where courts "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Miller*, 515 U.S. at 915-16.

324.    Thus, arguments that the 2021 Legislature made "only minimal changes from the 2011 plan" are insufficient to shoulder the heavy burdens Plaintiffs must bear. *Milligan* DE69:22. Plaintiffs' allegations primarily reduce to the assertion that Alabama acted improperly—indeed, unconstitutionally—by failing to affirmatively create districts with Plaintiffs' preferred racial compositions. *See Singleton* DE15:3-4 ¶ 6 (alleging that Legislature "refus[ed] to adopt plans that replaced the racially gerrymandered majority-black District 7 with two reliable crossover districts drawn with race-neutral traditional districting principles"); *Singleton* DE57:36-37 (asserting that Legislature could have drawn "two opportunity districts" with BVAP of 40-45%).

325.    Even if the Legislature *could* have drawn a new map instead of retaining the core of District 7, Plaintiffs have failed to provide evidence showing that the Legislature's decision to retain district cores was "because of" racial concerns and not merely "in spite of" them. *Feeney*, 442 U.S. at 279.

326.    Plaintiffs also assert that racial considerations predominated in the 2021 Map because it allegedly "[c]arried [f]orward" racial considerations that affected districting plans adopted decades earlier. *See Singleton* DE57:23. But, Plaintiffs' lack of evidence supporting this assertion dooms their theory; courts may not

presume nefarious intent on the part of the Legislature—particularly in the redistricting context. *Abbott*, 138 S. Ct. at 2324-25.

327.   Moreover, even if the "original purpose" motivating a law is problematic, "the passage of time may obscure that sentiment." *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067, 2083 (2019); *see also School Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 264 (1963) (Brennan, J., concurring) ("[The] government may originally have decreed a Sunday day of rest for the impermissible purpose of supporting religion but abandoned that purpose and retained the laws for the permissible purpose of furthering overwhelmingly secular ends"); *see also* PI Tr. 1536:6-26 (Plaintiffs' expert Dr. King agreeing that Alabama's decision not to do away with the secret ballot and revert to voice voting—despite the secret ballot's purportedly racist origins—is not indicative of racial discrimination today).

328.   It follows that the "original purpose" motivating a past law—the 1992 Map—cannot be imputed to the passage of an entirely new bill for this redistricting cycle. More fundamentally, neither the actions of a federal court in 1992 nor those of the Legislature in 2001 or 2011 can "taint" the actions of the 2021 Legislature. "[I]t is not reasonable to assign any impermissible motives held by" one Legislature to another. *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1226 (11th Cir. 2005) (en banc).

329.   This rule makes good sense. "[I]f the court were to accept the plaintiffs' standard, then the more dubious an allegation of past discrimination in a predecessor provision, the more difficult it becomes for a state to extinguish it because it would be unlikely that the present day legislators would be aware of the past discrimination." *Id.* at 1225 n.21. "The result would be to reverse the presumption that a State's laws are constitutional, and plunge federal courts into far-reaching expeditions regarding the sins of the past in order to question the laws of today." *Id.*

330.   Even if racial considerations predominated in the federal court's design of the 1992 Map, and even if any of that intent could be imputed to the Legislature's approval of the 2021 Map, Plaintiffs have not actually argued that the 1992 Map violated the Equal Protection Clause.

331.   Under existing precedent, race-based redistricting has been justified under strict scrutiny if the State had "good reasons" to believe that the VRA required the actions in question. *Cooper*, 137 S. Ct. at 1469. Plaintiffs do not allege that the parties or the *Wesch* court in 1992 lacked "good reasons" to believe that the VRA required that consideration of race. *Cooper*, 137 S. Ct. at 1469.

332.   Nor have Plaintiffs shown that the 2001 or 2011 maps ran afoul of the Equal Protection Clause. During those redistricting cycles, Alabama was covered by Section 5 of the VRA, which blocked any changes to voting laws that would result in "retrogression." *See Beer v. United States*, 425 U.S. 130, 141 (1976) ("the purpose

of §5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise"). And both plans received preclearance under Section 5.

333.   The Singleton Plaintiffs assert that "Secretary Merrill has … conceded that the 2001 and 2011 plans were drawn the way they were because of race." DE57:8. This appears to be overstatement.

334.   All the Secretary "conceded" was that VRA Section 5's anti-retrogression requirement applied to those plans and thus limited the State's options with regard to District 7. *See Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. Oct. 28, 2019), ECF No. 101 at 11-12. That is not a concession that the Legislature adopted the 2001 or 2011 plans for a predominantly racial purpose.

335.   Plaintiffs have failed to impute any unconstitutional intent to the 2021 Map. Alabama's past maps were products of a court order (the 1992 Map) and the VRA's then-existing requirements (the 2001 and 2011 Maps), along with normal changes in population that occur over the course of a decade. No court invalidated those maps, and the 2001 and 2011 Maps both satisfied Section 5's then-extant preclearance requirements. Alabama's decision to retain the cores of its districts was not an unusual one, and does not disturb the presumption of good faith owed the Legislature. *Abbott*, 138 S. Ct. at 2325.

86

336.   At closing argument, the Milligan Plaintiffs contended that "in *North Carolina v. Covington*, [138 S. Ct. 2548 (2018),] the Supreme Court explicitly rejected the argument that one can avoid racial predominance by readopting cores of previous districts and not looking at race when doing so. And it explained that it didn't matter that the claim arose in a challenge to remedial rather than original districts." PI Tr. 1842:21-1843:2. But we have searched *North Carolina v. Covington* in vain for such a pronouncement. The Court merely affirmed certain findings of "a remedial redistricting order entered by the District Court in a racial gerrymandering case." 138 S. Ct. at 2550.

337.   That district court order repeatedly and expressly limited its reasoning to the remedial context. In *Covington v. North Carolina*, 283 F. Supp. 3d 410 (M.D.N.C. 2018), the court had already declared several state legislative districts to be unconstitutional racial gerrymanders, and the court then held that the remedial plan prepared by the legislature failed to remedy the violations. The court could hardly have been clearer that the "remedial posture impacts the nature of our review." *Id.* at 431. The court kept "in mind that we are not confronted with an original racial gerrymandering challenge to the four proposed remedial districts. Rather, we consider these districts after already having found that their preceding versions violated the Constitution." *Id.* at 431. Thus, while "[g]enerally, state legislative enactments—including districting plans—are presumed valid and entitled

to substantial judicial deference," the "court need not defer to a state-proposed *remedial plan*, … if the plan does not *completely remedy* the violation." *Id.* The court "conclude[d] that in the remedial context, a state redistricting body may not rely on an otherwise legitimate redistricting consideration—such as seeking to ensure incumbents will prevail in their remedial districts—if doing so would prevent it from completely remedying the identified constitutional violation." *Id.* at 435. The court then made numerous fact findings in concluding that the remedial districts did not remedy the constitutional violations in those districts.

338.   Later, in denying a stay request, the district court reaffirmed the distinction between evaluating an ordinary plan and a remedial one. The court recognized that "'the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority,'" but stated that "in the remedial context political considerations such as incumbency protection and election data must give way to remedying the constitutional violation." *Covington v. North Carolina*, No. 1:15CV399, 2018 WL 604732, at *5 (M.D.N.C. Jan. 26, 2018) (quoting *Cromartie*, 532 U.S. at 249). The Milligan Plaintiffs' attempt to gloss over this context is troubling.

339.   The Milligan Plaintiffs also asserted at closing that courts "in *Alabama Legislative Black Caucus* and *Clark vs. Putnam County* found racially

88

gerrymander[ed] districts … despite those districts preserving the cores of existing districts." PI Tr.1843:11-14.

340.   Nothing in the Eleventh Circuit's *Clark v. Putnam County* decision suggests that relying on core retention is impermissible or even questionable. 293 F.3d 1261 (11th Cir. 2002). That case involved overwhelming evidence of racial predominance in the county's districting process. The county admitted "that it used race as a basis for assigning voters." *Id.* at 1267. The county was also on record telling its map-drawer to draw "two of the four voting districts" with "black general population and voting age populations as high as possible." *Id.* at 1268. The only reference to core retention in this opinion full of smoking gun evidence of racial predominance is testimony from the map-drawer that "her predominant consideration in crafting the plan was to maintain the core of the existing majority minority districts *and strive toward a 60% black VAP*." *Id.* at 1267 (emphasis added). The decision in no way suggests that States must exercise caution before relying on existing district lines when drawing new ones.

341.   Milligan Plaintiffs' reliance on *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017), is curious, as the court there repeatedly cited Alabama's interest in preserving cores of districts as evidence that many challenged districts were *not* racial gerrymanders. *See e.g.*, *id.* at 1114 (finding that a "contorted, bizarrely-shaped hook" in a district was "not suspicious" because

"the hook has been a fixture [of the district] since at least 1983"); *id.* at 1115 ("The split of Marengo County also provides no evidence that race predominated. The drafters preserved the core of the district by drawing a line in roughly the same place through the middle of the county."); *id.* at 1166 ("District 19 is less compact than it was under the 2001 plan, but it is not facially bizarre and has kept its core.").

342.  Finally, Plaintiffs note (and Alabama's Secretary of State has acknowledged) that the VRA might not have required that the Legislature create District 7 in its current form if the issue arose for the first time *today*. Plaintiffs argue that such a concession shows (or at least suggests) that the 2021 Legislature must have unconstitutionally effected a racial gerrymander in the 2021 Map.

343.  But the question is not whether Alabama, drawing on a blank slate, could have considered race in drawing District 7 in its current configuration. The question is instead whether, after 30 years of history with the current districts, Alabama may adopt a districting plan that largely maintains existing districts consistent with the State's policy of maximizing core retention, continuity of representation, and keeping communities of interest in their existing districts. The answer is "Yes." *See Cromartie*, 532 U.S. at 249.

### C.   The Singleton Plaintiffs Have Not Demonstrated Any Legal Entitlement to Whole-County Congressional Districts.

344.  As Sen. Singleton made clear in his testimony to this Court, the Singleton Plaintiffs are "seeking a requirement that Alabama keep its counties

90

whole." PI Tr. 55:12-17. Even if their racial-gerrymandering argument had merit, the Singleton Plaintiffs do not possess the right to obtain the relief they seek. Indeed, the relief they seek likely exceeds the limits of this Court's jurisdiction.

345.   The Singleton Plaintiffs ask this Court to order the State of Alabama to enact a redistricting plan that primarily attempts to keep counties whole. PI Tr. 55:12-17. Plaintiffs cite no provision of Alabama law for the proposition that congressional districts *must* be drawn with whole counties, rather than by considering county splits as just one factor among several traditional redistricting criteria. *Cf. Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (explaining federal court's "authority to act … is 'grounded in and limited by the necessity of resolving, according to legal principles, a plaintiff's particular claim of legal right'") (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018)).

346.   Instead, Plaintiffs argue (1) that the State's past practice vests them with a legal entitlement, and (2) that Alabama's Constitution requires whole-county districting. PI Tr. 55:7-21.

347.   But Alabama has not drawn whole-county congressional districts in nearly sixty years. *See Singleton* DE47:2 ¶ 9. Plaintiffs cannot sue to enforce that illusory "historical practice," and even assuming such a practice existed it still would not vest Plaintiffs with an enforceable legal right.

348.   However weak or strong this alleged practice might be, "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts." *Growe v. Emison*, 507 U.S. 25 (1993) (citing U.S. CONST. art. I, § 2). How to weigh the retention of whole counties against other traditional redistricting criteria is a choice for the Legislature, not for private plaintiffs or a federal court. *See Upham v. Seamon*, 456 U.S. 37, 43 (1982) (federal courts are "not free … to disregard the political program" of a State's legislature even where a reapportionment plan is found to violate federal law except to the extent "necessary to cure any constitutional or statutory defect").

349.   Granting Plaintiffs' request for whole-county districting would bring the Court perilously close to exceeding its jurisdiction. Plaintiffs argue that the State Legislature violated the State Constitution by splitting counties. PI Tr. 57:7-10. A State's alleged violation of its own laws, however, is decidedly beyond the Court's jurisdiction, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."); *see also, e.g.*, *Balderas v. Texas*, No. 6:01-cv-158, 2001 WL 34104833, at *2 n.9 (E.D. Tex. Nov. 28, 2001) ("To the extent the plaintiffs raise claims that ask that this court enforce state law against the State, they are barred by the Eleventh Amendment, and this court has no jurisdiction to hear them, whether for injunctive

92

or for declaratory relief."); *Waldman v. Conway*, 871 F.3d 1283, 1290 (11th Cir.
2017) (holding that a purported federal challenge based on state prison officials'
failure to follow classification manual "is not a procedural due process challenge—
it is a claim that state officials violated state law in carrying out their official
responsibilities," which *Pennhurst* bars).

### III.   The Milligan and Caster Plaintiffs Have Not Shown That Their Section 2 Claims Are Likely to Succeed on the Merits.

350.   The Milligan and Caster Plaintiffs assert that Section 2 of the Voting
Rights Act requires two majority-minority black districts where there is currently
one. The crux of their argument is that Section 2 requires that Alabama subordinate
traditional districting criteria to racial considerations in order to draw two slightly-
less safe majority-black districts rather than the one slightly safer black-majority
district that resulted from a race-neutral redistricting process.

351.   Section 2, codified at 52 U.S.C. § 10301, provides in full:

(a) No voting qualification or prerequisite to voting or standard, practice, or
procedure shall be imposed or applied by any State or political subdivision in
a manner which results in a denial or abridgement of the right of any citizen
of the United States to vote on account of race or color, or in contravention of
the guarantees set forth in section 10303(f)(2) of this title, as provided in
subsection (b)." 52 U.S.C. § 10301(a).

(b) A violation of subsection (a) is established if, based on the totality of
circumstances, it is shown that the political processes leading to nomination
or election in the State or political subdivision are not equally open to
participation by members of a class of citizens protected by subsection (a) in
that its members have less opportunity than other members of the electorate
to participate in the political process and to elect representatives of their

choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

352.   To show their Section 2 claims are viable, Plaintiffs must first satisfy each of three threshold precondition the Supreme Court set out in *Thornburg v. Gingles*, 478 U.S. 30 (1986), "namely, (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) that the minority group is politically cohesive, and (3) that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Bartlett*, 556 U.S. at 8-9 (internal quotation marks omitted).

353.   If Plaintiffs clear these hurdles, they proceed to Section 2's "totality of circumstances" inquiry, which demands a holistic investigation aimed at one question: "[W]hether members of a racial group have less opportunity than do other members of the electorate." *LULAC*, 548 U.S. at 425-26.

354.   Plaintiffs are unlikely to make this showing. Federal courts at all levels have recognized that "[t]hings have changed in the South," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009), and Alabama is no different, *see Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *38 (M.D. Ala. Feb. 5, 2020) ("*Alabama NAACP*"). Plaintiffs are unlikely to show otherwise.

355.   Nor can Plaintiffs meet the Eleventh Circuit's requirement that they "demonstrate the existence of a proper remedy," *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999), for each of Plaintiffs' proposed maps subordinates traditional districting criteria to racial considerations. Because Section 2 does not permit parties to compel subordination of traditional redistricting principles to race, this Court may end Plaintiffs' VRA claims there.

356.   But even if Section 2 could permit racial gerrymandering, racial gerrymanders meet strict scrutiny only where they satisfy a "compelling state interest" and are narrowly tailored, *Shaw v. Hunt*, 517 U.S. 899, 908 (1996) ("*Shaw II*"), Plaintiffs have not demonstrated that a "strong basis in evidence" justifies their maps, *Cooper*, 137 S. Ct. at 1464, and have thus failed to show that either the requisite compelling interest or narrow tailoring exist.

357.   Instead, the Milligan and Caster Plaintiffs insist that racially gerrymandered maps are permissible under Section 2 because Section 2 requires consideration of race. This argument contravenes Supreme Court precedent and collapses the distinction between permissible race-conscious remedies under Section 2 and unconstitutional racial gerrymanders.

358.   The former permits race-conscious relief only where plaintiffs demonstrate that redistricting has "result[ed] in a denial or abridgement of the right … to vote on account of race or color," 52 U.S.C. §10301(a), and requires a

95

remedy which honors "traditional districting principles." *LULAC*, 548 U.S. at 433. The latter, however, occurs where these traditional principles are "subordinated to racial objectives." *Miller*, 515 U.S. at 919.

359.   As explained below, Plaintiffs undertook "serious gerrymandering" by subordinating traditional redistricting principles to their goal of maximizing black voting power, which is precisely what "[t]he Voting Rights Act does not require." *Gonzalez v. City of Aurora, Ill.*, 535 F.3d 594, 600 (7th Cir. 2008) (Easterbrook, J.). Moreover, Plaintiffs' position puts the cart before the horse; their task in this litigation is to show that Alabama has violated Section 2, and only then may this Court sanction a race-conscious remedy. Plaintiffs may not presume the truth of what they are required to prove.

360.  Moreover, Plaintiffs' claims implicate numerous constitutional concerns that remain unresolved. For starters, Plaintiffs interpret Section 2 to permit plaintiffs to compel racial gerrymanders that States themselves would never have been able to pass. Plaintiffs' interpretation is very likely unconstitutional and thus warrants avoidance.

361.   Nor is it even clear Plaintiffs have a right to bring Section 2 claims in the first place, for whether "the Voting Rights Act of 1965 furnishes an implied cause of action under §2" is an "open question." *Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring).

362.   Finally, the only purportedly non-racial rationales Plaintiffs provide for their proposed plans would require this Court to rebalance the State's traditional redistricting principles and redefine the State's understanding of its relevant "communities of interest." The justiciability of such inherently political questions may not be presumed, and Plaintiffs' arguments thus place the Court at risk of exceeding its Article III jurisdiction.

363.   Plaintiffs have failed to show that "the facts and law are clearly in [their] favor," *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971), and this Court denies their preliminary injunction motions.

### A. The Milligan and Caster Plaintiffs Have Not Satisfied the Necessary *Gingles* Preconditions.

#### 1. The Minority Population is Not "Compact."

##### a. *Gingles*'s "Compactness" Incorporates Traditional Districting Principles Beyond Geographical Compactness.

364.   The first *Gingles* factor requires that Plaintiffs "demonstrate the existence of a proper remedy." *Burton*, 178 F.3d at 1199. And because "[n]othing in the Voting Rights Act suggests an *intent* on the part of Congress to permit the federal judiciary to force on the states a new model of government," that remedy must fall "within the confines" of the State's congressional model. *Nipper*, 39 F.3d at 1525 (plurality opinion).

365.   The Supreme Court has explained that whether a remedy is permissible turns on whether it satisfies *Gingles*'s first precondition, an inquiry that goes well beyond geographical compactness:

> While no precise rule has emerged governing § 2 compactness, the "inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.' " *Abrams,* 521 U.S. at 92, (quoting *Vera*, 517 U.S. at 977 (plurality opinion)); *see also id*., at 979 (A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact). The recognition of nonracial communities of interest reflects the principle that a State may not "assume from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller*, 515 U.S. at 920, (quoting *Shaw I*, 509 U.S. at 647). In the absence of this prohibited assumption, there is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first Gingles condition contemplates. "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *Georgia v. Ashcroft*, 539 U.S. at 490. We do a disservice to these important goals by failing to account for the differences between people of the same race.

*LULAC*, 548 U.S. at 433-34 (cleaned up).

366.   Alabama's "traditional districting principles" are policies "embedded in the political values, traditions, customs, and usages of the State of Alabama." DX72:3. To the extent consistent with federal law, these principles include, among other things, "[p]reservation of the cores of existing districts"; respect for "communities of interest," which the State "define[s] as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal,

social, geographic, or historical identities"; "[m]inimization of the number of counties in each district"; and "[a]voiding contests between incumbents." *Id.*

367.  These principles are not unique to Alabama. The Supreme Court has repeatedly reaffirmed their validity in redistricting cases nationwide. *See, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (noting States' legitimate interests in "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives"); *Abrams*, 521 U.S. at 98 (referring to "traditional districting principles" as, among other things, "maintaining communities of interest and traditional boundaries").

368.  *Miller* likewise confirms there are no race-focused traditional districting criteria a State must employ. 515 U.S. 900. There, the Court explained that to establish a racial gerrymandering claim, "a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations. Where *these or other race-neutral considerations* are the basis for redistricting legislation, and are not subordinated to race, a State can defeat a claim that a district has been gerrymandered on racial lines." *Id.* at 916 (emphasis added; quotation omitted).

369.  Nowhere did the Court suggest that there were legitimate race-focused principles to which States may point as a defense that race predominated. It would

make little sense to allow States to rebut charges of racial gerrymandering through evidence that they were promoting race-focused traditional districting principles.

370.   While compliance with the VRA may, at times, allow a racial gerrymander to survive strict scrutiny, compliance with the VRA is not a traditional districting principle. Rather, like "the requirement that districts have approximately equal populations," compliance with the VRA "is a background rule against which redistricting takes place." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 273 (2015).

371.   Section 2 compliance may not, therefore, be a "traditional districting principle" litigants use to satisfy Section 2's compactness requirement. Contorting racial considerations into a traditional districting principle would subordinate traditional race-neutral districting principles to race when assessing Section 2's compactness inquiry, raising serious constitutional questions. *Miller*, 515 U.S. at 916.

372.   Further, such an interpretation of Section 2 would require—every redistricting cycle—that a legislature ask: "If we compromised our traditional race-neutral principles some, but not too much, for racial reasons, how many majority-minority districts could we draw?" If the legislature guessed wrong, VRA litigation would ensue.

373.   But if federal courts are not equipped to answer the question of "[a]t what point does permissible partisanship become unconstitutional?" *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019), neither are they equipped to answer the question of "How much is too much?" (*id.*) when it comes to compromising traditional race-neutral principles in favor of race for purposes of Section 2's compactness inquiry.

374.   "A requirement to draw election districts on answers to these and like inquiries ought not to be inferred from the text or purpose of § 2." *Bartlett*, 556 U.S. at 17. Instead, the only "workable standard[]" for "sound judicial and legislative administration," *id.* at 17, is one in which Section 2's compactness inquiry focuses on possible "outcome[s] of a race-neutral process in which all districts are compact," *Gonzalez*, 535 F.3d at 598.

375.   Thus, in a case like *Davis v. Chiles*, where evidence showed "that it would have been difficult for [plaintiff's map-drawer] to have drawn subdistricts" in accordance with "traditional redistricting criteria" "*without* creating at least two majority-minority districts," the plaintiff cleared *Gingles I*. 139 F.3d at 1426. Assuming plaintiff could meet Section 2's other requirements, selecting such a plan that could have been drawn race-blind could help ensure equality of opportunity for the minority group.

376.   But where, as here, "it is hard to draw two majority-black districts by accident," PI Tr. 685:23-25, subordinating traditional districting criteria to race to produce such districts does not result districts that are "reasonably compact" for purposes of Section 2. *Abrams*, 521 U.S. at 91-92.

377.   And a map shaped by racial considerations to the detriment of traditional districting principles goes beyond Section 2's mandate of an "equally open" political process, 52 U.S.C. § 10301(b), to one in which a minority groups would be entitled to racial preferences in redistricting. But just as "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions," *Bartlett*, 556 U.S. at 15, nothing in Section 2 grants a minority group that right to representative districts that could only be drawn if race subordinated "traditional districting principles," *LULAC*, 548 U.S. at 433.

378.   The Milligan and Caster Plaintiffs misunderstand Section 2. Both sets of Plaintiffs endorse maps in which race predominates over traditional districting principles.

379.   Indeed, Dr. Duchin conceded that it was statistically impossible to draw two majority-minority districts without subordinating traditional redistricting principles to race—or, in her words, without programming an algorithm in which two majority-minority districts was a "non-negotiable" condition. PI Tr. 577:16-20 ("population balance" and "two majority-black districts" were "non-negotiable");

102

682:3-14 (not one out of two-million race-neutral maps contained two majority-minority districts); 600:10-16 (explaining it is "mathematically impossible to create two majority-black districts without … a significant level of core displacement").

380.   Plaintiffs attempt to justify their racial gerrymanders, however, by arguing that Section 2 requires them. *See Milligan* DE94:17 (defending gerrymandered maps because "state policies … are 'subordinate' to remedying violations [of] the VRA or Constitution."); *Caster* DE84:23-24 (arguing Section 2 compliance is a compelling interest that survives strict scrutiny and justifies gerrymander).

381.   Plaintiffs' position begs the question; their task is to show that federal law requires two majority-minority districts—indeed, proving this point constituted the vast majority of the seven-day preliminary injunction hearing—and they may not defend their districts as "reasonably compact" by presuming the truth of what they are required to prove.

382.   "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush v. Vera*, 517 U.S. 952, 979 (1996). *Gingles*'s compactness inquiry—and with it, the State's traditional redistricting criteria—are therefore critical factors with which Plaintiffs must engage to succeed on their claims. As detailed below, Plaintiffs' proposed maps subordinate

Alabama's longstanding districting principles to race. Plaintiffs thus are unlikely to satisfy *Gingles*'s threshold compactness requirement.

>   **b. Plaintiffs' Section 2 Experts' Testimony Proves They Subordinated Traditional Redistricting Principles to Race.**

383.   A district is racially gerrymandered where "[r]ace was the criterion that … could not be compromised." *Shaw II*, 517 U.S. at 907; *see also, e.g.*, *Miller*, 515 U.S. at 916 (racial gerrymandering where map "subordinate[s] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations").

384.   The Milligan and Caster Plaintiffs' experts, Mr. Bill Cooper and Dr. Moon Duchin, submitted expert reports and testified at the preliminary-injunction hearing. These experts' testimony revealed critical facts about their analytic process, the illustrative maps they proposed, and the possibility of creating a congressional map with two majority-minority districts without "subordinating traditional race-neutral districting principles … to racial considerations." *Miller*, 515 U.S. at 916.

385.   Ultimately, Dr. Imai's report and testimony at the hearing showed that a map-drawer who embraces only "race-neutral districting principles" is statistically certain not to draw an Alabama congressional map with two majority-minority districts. Indeed, Plaintiffs were unable to draw two-majority-minority-district maps until they algorithmically ensured those districts' existence. That is, the racial

104

composition of the maps' majority-minority districts was "the criterion that … could not be compromised," *Shaw II*, 517 U.S. at 907—or, in Dr. Duchin's words, the districts' majority-black racial targets were "non-negotiable." PI Tr. 577:17-20.

### Testimony of Dr. Moon Duchin

386.   Dr. Duchin explained that she "used algorithms developed in [her] lab to create—to generate large numbers of different possibilities that would show [her] if it was possible to find two majority-black districts." PI Tr. 565:11-14. Dr. Duchin explained that her "algorithmic code" allowed her to create "constraints" and "preference[s] for a certain kind of district over another." *Id.* at 625:8-17. In other words, by setting the inputs she could ensure what sorts of outputs the algorithm would produce. Dr. Duchin programmed only four constraints or preferences into her algorithm: (1) hold population deviation between districts to within 1%; (2) produce contiguous districts, (3) prefer more compact districts, and (4) prefer plans that produced two majority-black districts. PI Tr. 680:3-681:5. Ensuring two majority-black districts was "non-negotiable." *Id.* at 577:16-20.

387.   Dr. Duchin's testimony shows that the strength of the algorithm's "preference" for two majority-black districts was extraordinary—indistinguishable from an *ex-ante* constraint. According to Dr. Duchin, she "generated *2 million* districting plans for Alabama" that lacked this "strong preference for two majority-black districts," and not one of these two million maps had two majority-minority

districts. *Id.* at 682:3-14 (emphasis added); *id.* at 682:12-14 ("without taking race into account in any way in the generation process," none of the two million maps had two majority-black districts). Nevertheless, each of Dr. Duchin's illustrative maps includes two majority-black districts. Every one of Dr. Duchin's four illustrative maps thus contains at least one "majority-minority district that would not have existed but for the … use of racial classifications," which in turn means that "traditional race-neutral districting principles are necessarily subordinated (and race necessarily predominates)." *Bush*, 517 U.S. at 1001 (1996) (Scalia, J., concurring).

388.   Dr. Duchin's approach thus goes well beyond the cynical picture of gerrymandering "run amok" Justice Kagan painted in her *Rucho* dissent. 139 S. Ct. at 2520 (Kagan, J., dissenting).

389.   There, Justice Kagan lamented the possibility that "today's mapmakers can generate thousands of possibilities at the touch of a key—and then choose the one giving their party maximum advantage (usually while still meeting traditional districting requirements)." *Rucho,* 139 S. Ct. at 2513. Here, Dr. Duchin generated *millions* of random maps, and none provided her preferred result unless she imposed algorithmic racial requirements to provide black Alabamians maximum advantage.

390.   There, Justice Kagan deemed North Carolina's congressional map an extreme political gerrymander after an "expert produced 3,000 maps, adhering … to the districting criteria that the North Carolina redistricting committee had used, other

than partisan advantage," and every "one of the 3,000 maps would have produced at least one more Democratic House Member than the State's actual map." *Rucho,*139 S. Ct. at 2518. Those 3,000 maps were enough, in Justice Kagan's view, to declare the North Carolina map "an out-out-outlier." *Id.* Here, several more "out's" are warranted, given that generating *two million* maps on grounds other than race failed to generate even one map with two majority-black district.

391.   Aside from programming an algorithm to deliver specific racial quotas, Dr. Duchin also conceded that she incorporated race into more granular components of her map-making. For example, she stated that she looked at race when splitting VTDs, "but really, only to make sure that I was creating two districts over 50 percent." *Id.* at 573:3-5. "Beyond ensuring crossing that 50 percent line," she explained, "there was no further consideration of race in choosing blocks within the split VTDs." *Id.* at 573:6-8. With respect, this is like an archer saying she did not consider the bullseye except to ensure she was aiming at it.

392.   Moreover, testimony shows that Dr. Duchin injected race into non-racial criteria. Dr. Duchin claimed that her plans "respect[ed] communities of interest," for example, not merely by placing Black Belt counties together in districts, but by placing them "in majority-black districts." PI Tr. 598:21-599:1. But this approach turns the communities-of-interest principle into a thinly veiled excuse for racially segregating Alabama's voters. No legislative plan that expressly sought

107

to place a community of interest into a majority-white district would survive judicial scrutiny.

393.   Moreover, equating the Black Belt with black people overlooks that the Black Belt counties are by no means racially homogeneous. *See* CX4 (showing racial breakdown of Alabama counties). While Lowndes County's population, for example, is 80.85% black, the populations of other counties like Butler and Choctaw are majority white. *Id.*

394.   Dr. Duchin further admitted that she subordinated traditional districting criteria including minimizing county splits to the goal of drawing two majority-black districts. PI Tr. 635:1-6; *see also* PI Tr. 647:12-20 ("no question" that "one reason that there are nine splits in counties in this plan as opposed to six splits in counties is … because of the weight [she] gave to the criteria of ensuring two majority-black congressional districts").

395.   And though she claimed that she read the Guidelines to make compactness a State priority that came above core preservation (in the face of the 2021 Map showing a strong preference for core preservation), PI Tr. 600:22-24, she expressly sacrificed compactness to racial segregation as well. *See id.* at 664:17-24 (explaining she "ke[pt] the Black Belt counties in majority-black districts" despite necessarily rendering lower geographic-compactness scores).

396.   Dr. Duchin made no attempt to give any weight to the Legislature's traditional districting criteria of core retention. Though she testified that it was "mathematically impossible to create two majority-black districts without … a significant level of core displacement," PI Tr. 600:10-16, she confirmed she could have generated maps that considered core retention to some degree—she simply chose to abandon the criterion wholesale instead, *id.* at 671:22-672:14.

397.   Ultimately, Dr. Duchin's use of "protecting minority voting strength" as a traditional districting principle equated to bending or discarding race-neutral districting principles as necessary to achieve the preferred racial outcome. *See* PI Tr. 601:17-24 (stating that "protecting minority voting strength" "means to draw districts that have a majority of—in this case, Black Voting Age Population while still being maximally respectful to the other traditional principles").

398.   As expressed through Dr. Duchin, Milligan Plaintiffs thus appears to contend that whenever "it is hard to draw two majority-black districts by accident"— i.e., whenever it is hard to draw two majority-black districts by observing only race-neutral districting criteria—it is especially "important[t]" to "consider race" when sorting voters. PI Tr. 685:23-25. Plaintiffs also apparently believe that when "consider[ing] race," all other districting criteria are secondary. *Id.* at 601:17-24. Further, non-racial criteria like "respecting communities of interest" only entered Dr. Duchin's analysis "after the race-based decision had been made," *Shaw II*, 517

U.S. at 907, and even then Dr. Duchin would continue to racialize these otherwise-non-racial principles, *see* PI Tr. 573:3-8, 598:21-599:1, 635:1-6, 647:12-20, 664:17-24, 671:22-672:14.

399.   "Section 2 does not guarantee minority voters" this sort of "electoral advantage." *Bartlett*, 556 U.S. at 20.

### Testimony of Bill Cooper

400.   As the Caster Plaintiffs explain, "Mr. Cooper was expressly engaged to draw black majority districts." *Caster* DE84:21. Mr. Cooper's testimony reveals that he, like Dr. Duchin, had to subordinate the State's traditional redistricting principles to race to meet the terms of his engagement.

401.   Start with Mr. Cooper's understanding of "traditional districting principles." Asked whether "it is necessary to consider race" when drawing illustrative Section 2 plans, Mr. Cooper confirmed that, for him, "[r]ace in a Section 2 case is always in the background as it really is in most plans one would draw … if you are really following traditional redistricting principles." PI Tr. 478:11-17. Pressed on his understanding of the interaction between traditional redistricting principles and racial considerations, Mr. Cooper admitted that, in his view, race "i[s] a traditional redistricting principle, so like compactness or contiguity, you have to be aware of it as you are drawing a plan." *Id.* at 478:18-479:2.

402.   Furthermore, according to Mr. Cooper, Section 2's requirement that illustrative maps be "sufficiently compact" does not to include maintaining communities of interest. *See* PI Tr. 493:8-12 ("Q: Mr. Cooper, does your definition of sufficiently compact … include in any way whether the voters in your districts are part of the same communities of interest? A: No. I think community of interest and compact can vary. I mean, there's – the two different things."). Again, the Supreme Court disagrees. *See, e.g.*, *LULAC*, 548 U.S. at 433-34 ("While no precise rule has emerged governing § 2 compactness, the 'inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'") (quoting *Abrams,* 521 U.S. at 92).

403.   And just like Dr. Duchin, Mr. Cooper failed to show there was any race-neutral way of producing his illustrative maps. Indeed, when asked whether he could have produced maps like his illustrative plans "if [he] [was] drawing a map without consideration of race," Mr. Cooper could muster only that "[i]t's conceivable for some other reason," but that he "d[id]n't know" and "ha[d] no way of answering that." PI Tr. 510:20-511:13. That Mr. Cooper cannot explain the shape of his maps without racial considerations strongly suggests that, just like Dr. Duchin's, his maps are statistical impossibilities made possible *only* through prioritization of race. This Section 2 does not permit. *See, e.g.*, *Shaw II*, 517 U.S. at 907.

### c. Plaintiffs' Proposed Maps Are Not Compact, Prioritizing Race Above Traditional Redistricting Principles.

404.   As would be expected based on Dr. Imai's and Dr. Duchin's modeling, the illustrative plans Plaintiffs conflict with numerous traditional districting criteria in their attempt to stitch together disparate pockets of black Alabamians across the State.

### Geographic Compactness

405.   Although Section 2's compactness analysis is not limited to the shape of a proposed district, "the geographical shape of any proposed district necessarily directly relates to the geographical compactness and population dispersal of the minority community in question" and thus "is a significant factor that courts can and must consider in a *Gingles* compactness inquiry." *Sensley v. Albritton*, 385 F.3d 591, 596 (5th Cir. 2004).

406.   This factor weighs against the Milligan and Caster Plaintiffs, because, at bottom, each of their plans depends on stretching District 2 across the southern half of the State to pick up discrete pockets of black voters. The resulting districts are not "reasonably compact." *Abrams*, 521 U.S. at 91-92.

407.   While Plaintiffs contend that their sprawling versions of District 2 are about as compact as the least compact district in the 2021 Map, this argument is of little legal salience under *Gingles*. *See, e.g.*, *Diaz v. Silver*, 978 F. Supp. 96, 130 (E.D.N.Y.), *aff'd*, 522 U.S. 801 (1997) ("The fact that New York, in general, is

guilty of having non-compact districts does not abrogate the gross non-compactness of the 12th CD for *Gingles* purposes.").

408.  Plaintiffs' maps are informative. Examining Dr. Duchin's Plan A (MX3:7), for example, District 2 appears to drop into the City of Mobile to pick up black voters, stretch the width of the State, and then pull in many of  Dothan's black voters. While none of Dr. Duchin's other plans include Dothan voters in District 2, each connects Mobile to the Georgia border.

409.  Dr. Duchin states that her "plans are superior to the State's plan on the Polsby-Popper metric" based on her finding that, *on average* across all seven districts, her plans outscored the 2021 Map. MX11:9. But average geographic-compactness scores miss the mark, for geographic compactness must be measured based on the population in the proposed district. *See Abrams*, 521 U.S. at 91 (considering whether a minority population "is sufficiently large and geographically compact to constitute a majority in a single-member district"). Indeed, Dr. Duchin agreed that the individual scores for the majority-black districts drawn in her illustrative plans were relevant to analysis of *Gingles*'s first precondition, but she

113

never explained why she omitted those scores from her expert reports. *Id.* at 656:5-11.

410.   Moreover, Dr. Duchin's new District 2 is far *less* compact than the same district in the 2021 Map. Expert Mr. Thomas Bryan's Supplemental Report highlights what a plan-wide average conceals: "Districts 1 and 2 (one of her purported majority-BVAP districts) were made far less compact." DX4:18, 57.

| District | 2021 Plan | Duchin A | Duchin B | Duchin C | Duchin D |
|---------|-----------|----------|----------|----------|----------|
| 1 | 0.20 | 0.13 | 0.16 | 0.16 | 0.13 |
| 2 | 0.26 | 0.16 | 0.19 | 0.15 | 0.15 |
| 3 | 0.25 | 0.26 | 0.23 | 0.28 | 0.26 |
| 4 | 0.19 | 0.37 | 0.40 | 0.32 | 0.36 |
| 5 | 0.32 | 0.38 | 0.53 | 0.53 | 0.38 |
| 6 | 0.15 | 0.22 | 0.25 | 0.18 | 0.19 |
| 7 | 0.19 | 0.28 | 0.23 | 0.18 | 0.27 |
| Sum | 1.55 | 1.80 | 1.98 | 1.80 | 1.75 |
| Average | 0.22 | 0.26 | 0.28 | 0.26 | 0.25 |

411.   The numbers also explain why, in Dr. Duchin's attempt to draw a new District 2, she so dramatically altered Districts 4 and 5 on the opposite end of the State: Her changes to those districts drove up their compactness scores, in turn offsetting the low scores she produced by gerrymandering Districts 1 and 2.[12] *See* PI Tr. 870:4-7 (describing "sacrific[ing]" compactness in parts of her plan, but then "prioritiz[ing] [compactness] in the drawing of other parts of her plan").

---

[12] Mr. Cooper, the Caster Plaintiffs' expert, seems to have adopted Dr. Duchin's approach in his rebuttal report's "Illustrative Plan 7." *See* CX59:6-8.

412.   Dr. Duchin confirmed these conclusions through testimony, explaining that the First and Second districts in her illustrative maps were the "least compact" because she "elongated" District 2 across the Black Belt with the express goal of "keep[ing] [District 2] as much as possible within majority-black districts." PI Tr. 593:6-24. Dr. Duchin further conceded that the *average* compactness of several districts sheds little light on the compactness of any given district or the compactness of the minority population within a given district in a proposed map. PI Tr. 654:20-655:11.

413.   Mr. Cooper's maps also face obstacles in developing "majority-black electoral districts" due to "the uneven geographical dispersal of the African-American population" in Alabama. *Sensley*, 385 F.3d at 597.



414.   For example, District 2 in Mr. Cooper's Illustrative Plan 6 starts with part of Pickens County, then heads south to scoop down and around part of Mobile County, reaching back into the City of Mobile. *See* CX44; *Milligan* DX4:88. The district also stretches nearly all the way to Georgia. And, despite the

district's poor compactness score, *see* CX1:36, it still barely manages to surpass 50% any-part BVAP, *id.* at 34.

415.   The similar flaws in Mr. Cooper's other maps "constitute[] strong evidence that the black minority populations contained therein are not 'reasonably compact.'" *Sensley*, 385 F.3d at 597.

### **Preserving the Cores of Districts**

416.   Preserving the cores of existing districts is a "longstanding tradition of the Alabama legislature." Pringle Dep., MX12:8 (26:6-7); *see also id.* at 24 (91:22-92:10) (testifying that minimizing "deviations" the most important redistricting factor). There is little doubt that the Legislature sought to preserve the cores of existing districts when it enacted the 2021 Map. *See id.* at 35 (133:1-4) ("We instructed Mr. Hinaman, quoting the guidelines, to protect the core of the existing districts to the extent possible and to draw it to zero deviation."); *id.* (133:22-25) ("Again, those plans are drawn in a race-neutral manner based on the guidelines to preserve the core of the existing congressional districts."); *see also* Hinaman Dep., DX144:11 (39:12-15) (explaining core-preservation criterion explains similarities between 2021, 2011, 2001, and 1992 congressional districting plans).

417.   Among other things, this interest serves to ensure the efficacy of the districts' representatives. As Bradley Byrne, who previously represented District 1, explained in sworn testimony, the continuing relationships between him and his

fellow representatives allowed them to "compl[e]ment one another" and, in turn, help Alabama "punch[] above its weight" in Congress. DX171:6 (684) (Testimony from *Chestnut v. Merrill*, 446 F. Supp. 3d 908 (N.D. Ala. 2020) ("*Chestnut* Tr.")).

418.   Indeed, "[l]ong-term representatives have a chance to learn about and understand the unique problems of their districts and to pursue legislation that remedies those problems." *See* Nathaniel Persily, *In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders*, 116 Harv. L. Rev. 649, 671 (2002). As their tenure progressed and they achieved seniority in Congress, Rep. Byrne explained, Alabama's congressional delegation could "get far more for the buck than most states do." *Chestnut* Tr. at 684; *see also, e.g.*, *White v. Weiser,* 412 U.S. 783, 791-92 (1973) (explaining States have a legitimate interest in "promot[ing] 'constituency-representative relations,' a policy frankly aimed at maintaining existing relationships between incumbent congressmen and their constituents"); *Karcher*, 462 U.S. at 740.

419.   For example, Rep. Byrne explained that the unique geography and resources of District 1 allowed him to advocate for federal projects focused on shipyards, saltwater fishing, and a bridge between Mobile and Baldwin Counties. *Chestnut* Tr. 681, 684; *see also* PI Tr. 1673:3-8 ("Literally, I had the Speaker come up to me on the floor and say, we get it. It's that bridge, it's those ships, and it's those fish. Now, when they know that, they know they have got to make me happy

117

on that to get my votes. If they don't make me happy on that, they are not going to get my votes."). Rep. Byrne further testified then that, had District 1's geography required him to account for interests of Alabamians in the Wiregrass then he necessarily would have "[gotten] less attention to each [district]," jeopardizing his effectiveness. *Chestnut* Tr. 685.

420.   He reaffirmed that testimony at the preliminary injunction hearing:

A. So I am not saying you couldn't do it. It would be extremely difficult to do it, and you would find yourself somewhat diffused in your ability to be an effective advocate for that region.

Q. What do you mean by diffused?

A. Well, there's only so many hours in the day for a congressman and the staff that that congressman has. And there are hundreds if not thousands of issues in Washington. And you have got to figure out what your focus is going to be on. And focus is very important for a member of Congress because there's just not enough bandwidth, and there's only 435 congressmen, and you are one of them.

So you really have to figure out where am I going to put my time? Where am I going to put the resources of my staff? What fights am I going to fight. If you are fighting a whole bunch of different fights because you have to, because you have got that many interests in your district, you are not going to be effective on each one of those. The more you can sort of focus your energies, the more effective you will be.

PI Tr. 1672:5-23.

421.   During the preliminary injunction hearing, even Plaintiffs' experts voiced agreement with this proposition. Dr. Davis agreed that it is "important … that county elected officials have a good relationship with the member of Congress who represents them." PI Tr. 81:17-20. That relationship allows local needs to be

communicated to "that member of Congress," who in turn can "communicate with the rest of the Washington political and administrative government." PI Tr. 81:20-25. And she agreed that "incumbency protection" can "benefit a district's constituents" by helping "promote that interest" because "members of Congress can continue to represent the same counties and more or less the same constituents." PI Tr. 100:12-22; *see also id.* at 101:2-8 (Dr. Davis explaining that more senior members of Congress tend to accrue more influence in Washington, which they may then use to better serve their constituents).

422.  Ever since Alabama has had seven Congressional districts (beginning in the 1970s), these districts have encompassed virtually the same geography of the State after each redistricting cycle, excepting minor changes required to equalize population among the districts. *See Singleton* DE57-7:37-43; M11:11 (38-40); *see also* DX72:4 (2021 Redistricting Guidelines) (specifying that preserving the cores of existing districts is a policy "embedded in the political values, traditions, customs, and usages of the State of Alabama"). This stability evidences the Legislature's enduring interest in preserving the cores of districts.

423.   As discussed above, the 1992 Map led to a substantial change in which District 7 expanded into District 6 to create the State's first majority-black congressional district. But since the 1992 Map took effect, Alabama's Legislature seems to have continued its practice of maintaining the districts' core shapes and populations. The image here (from DX1) demonstrates as much, highlighting the extraordinary similarity between the 2021 Map and the 2011 Map.



424.   The hard data reinforce what this image suggests. As the table below demonstrates, the 2021 Map retains over 90 percent (comfortably over, in most cases) of six of Alabama's seven congressional districts, with District 6 coming in just short of that threshold at 87.8 percent. And black retention mirrors total-population retention, further suggesting that neither the Legislature's map-drawer nor the Legislature itself was concerned

120

about which races would be added to or subtracted from each district. *See* DX1:22-23.



425.   Plaintiffs' proposed maps are a different story entirely. None of Plaintiffs' initial ten proposed maps retains as much of the previous district as the 2021 Map's *least retentive* district. *See* DX4:33-43. Indeed, only two of the Milligan Plaintiffs' proposed maps contain a district cresting 80 percent retention—and in these two maps, only District 7 does so. *See id.* at 34-37. And in every one of the Milligan Plaintiffs' proposed maps, all but one district retains only about half of its population. *Id*.

426.   Plaintiffs' proposed maps render the State's existing congressional districts unrecognizable. Perhaps more jarringly, these maps appear to target black Alabamians for much of their manipulation. *See id.* at 33-43.

427.   Furthermore, Plaintiffs propose to split Mobile and Baldwin Counties between two districts for the first time since Alabama's congressional delegation

dropped to seven representatives in the 1970s. *See* DX4:15. The Gulf Counties comprise some of Alabama's most well-known communities, and splitting them would likely leave half the counties' constituents with a representative unfamiliar with their unique interests.

428.   No traditional redistricting principle compels their split. *See* PI Tr. 874:22-876:16.

429.   Though Plaintiffs refute neither that their proposed plans unprecedentedly split the Gulf Counties nor that this region constitutes a substantial community of interest, they instead argue that their "Illustrative Plans unite the Black Belt, which is currently cracked among *four* districts, together in a single district, honoring a longstanding community of interest." *Caster* DE84:17.

430.   There are several problems with Plaintiffs' rejoinder. First, Plaintiffs' proposed plans do not "unite the Black Belt"—they split it among three different districts. *Compare* CX1:7 n.6 (Caster plaintiffs' expert Cooper listing 13 Black Belt counties), *with id.* at 23-33 (showing Cooper's initial six illustrative plans), *and* CX59:3 (showing Cooper's seventh illustrative plan); *compare also* MX3:13 (Milligan plaintiffs' expert Duchin listing 18 Black Belt counties), *with id.* at 7 (showing Duchin's four alternative plans). And Plaintiffs' claim that the Alabama Legislature's 2021 Map splits the Black Belt "among *four* different districts" is similarly incorrect. *Compare* CX1:7 n.6, *and* MX3:13 (each listing Black Belt

counties), with CX1:11 (Figure 4, enacted 2021 Map). Just like Plaintiffs' proposed maps, the 2021 Map divides the Black Belt counties among three districts. *Id.*

431.   Lastly, Plaintiffs argue that because a successful Section 2 claim necessarily requires states to reshape certain districts, attempting to preserve cores of districts is relatively unimportant—certainly less important than "non-negotiable" factors like creating a second majority-minority district. *See, e.g.*, PI Tr. 577:16-20 (Dr. Duchin testifying that she accounted for "contiguity" and "compactness" only after ensuring "non-negotiable principles of population balance and seeking two majority-black districts").

432.   The Caster Plaintiffs also contend that they should not have to comply with "core preservation" because such a requirement "would render it impossible for any Section claim to succeed." *Caster* DE84:15. But the problem with Plaintiffs' claim is not shared by all Section 2 plaintiffs.

433.   In cases like *LULAC*, for example, core preservation would *favor* the Section 2 plaintiffs, not the State. In that case, "Webb County, which is 94% Latino, had previously rested entirely within District 23; under the new plan, nearly 100,000 people were shifted into neighboring District 28." 548 U.S. at 424. The State in such a case would have a difficult time arguing against compactness of an illustrative plan with a majority-minority District 23, because that district had largely existed before the challenged legislative action.

123

434. The Caster Plaintiffs attempt to bolster their argument by claiming that, "Defendants cannot identify a single case in which a proposed majority-minority district has been rejected under *Gingles* 1 because it inadequately retained the cores of existing districts." DE84:15. But Plaintiffs fail to produce a case in which a State's longstanding single-member districts have been so dramatically altered by a Section 2 plaintiff, and "[c]ases in which the Supreme Court has found a problem under § 2 all involve transparent gerrymandering that boosts one group's chances at the expense of another's." *Gonzalez*, 535 F.3d at 598.

435. In any event, in *Abrams*, the Supreme Court affirmed the district court's plan that resulted in an eleven-district congressional map for Georgia that included only one majority-black district, despite the fact that black Georgia's comprise 27 percent of the State's population. 521 U.S. at 103.

436. That plan "considered Georgia's traditional redistricting principles based on maintaining: district cores, four traditional 'corner districts' in the corners of the State, political subdivisions such as counties and cities, and an urban majority-black district in the Atlanta area. Protecting incumbents from contests with each other was another factor, which the court subordinated to the others because it was 'inherently more political.'" *Id.* at 84 (quoting *Johnson*, 922 F. Supp. 1556). The district court "considered the possibility of creating a second majority-black district but decided doing so would require it to 'subordinate Georgia's traditional districting

policies and consider race predominantly, to the exclusion of both constitutional norms and common sense.'" *Id.* (quoting *Johnson*, 922 F. Supp. at 1566).

437.   The Supreme Court affirmed the district court's decision "that the black population was not sufficiently compact for a second majority-black district." *Id.* at 91 (quoting *Johnson*, 922 F. Supp. at 1567). And it bolstered that conclusion by noting that "§ 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Id.* at 91-92.

### **Maintaining Communities of Interest**

438.   "[T]he § 2 compactness inquiry" expressly mentions "maintaining communities of interest and traditional boundaries." *Abrams*, 521 U.S. at 91-92. "Those communities of interest might be based on location (rural, urban, coastal, or mountain), occupation (industrial or agricultural), political ties, social similarities, or cultural connections." *Ala. NAACP*, 2020 WL 583804, at *19.

439.   While a legislature may be conscious of race when conducting its community-of-interest-analysis, race ought not constitute the "predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. "Legitimate yet differing communities of interest should not be disregarded in the interest of race." *LULAC*, 548 U.S. at 434.

440.   The designs of Districts 1 and 2 in the 2021 Map suggest that the Legislature sought to respect communities of interest. Two former Congressmen from District 1, Bradley Byrne and Jo Bonner (who has also served as Governor Kay Ivey's chief of staff), recently gave sworn testimony about these communities during *Chestnut v. Merrill*, 446 F. Supp. 3d 908 (N.D. Ala. 2020), a case in which plaintiffs brought similar Section 2 claims seeking two majority-minority districts. *See* DX171. Rep. Byrne also offered additional testimony at the preliminary injunction hearing. *See* PI Tr. 1655:16-1754:8. Because the Legislature retained the core of the districts from the 2011 Map in its 2021 Map—including, as particularly relevant here, keeping Alabama's Gulf Coast region unified in District 1—the former Congressmen's 2019 testimony remains relevant.

441.   District 1 comprises Alabama's Gulf Coast region. The Gulf Coast constitutes a discrete community of interest with unique cultural, economic, and historical traits not shared by the rest of the State. As Plaintiff Shalela Dowdy explained, Mobile is "on the water, so we have an industry that other cities wouldn't have." PI Tr. 378:12-16. The communities in District 1 share a highway and river system; Mobile Bay and the Gulf of Mexico; and employers whose work centers around the Port of Mobile. *Chestnut* Tr. at 667-74, 677-81, 764-75 (Rep. Byrne explaining Mobile-centric industries like steel mills, the Austal shipyard, and Airbus); *see also* PI Tr. 60:17-23 (Sen. Singleton explaining that Hale County forms a

126

community of interest with Tuscaloosa and Jefferson Counties because many Hale County residents work in the latter counties).

442. Rural residents of District 1 come to Mobile for entertainment and shopping. *Chestnut* Tr. 771-72. Moreover, the people of District 1 also share a unique history, including heavy Spanish and French influence, the origination of Mardi Gras in the New World, and all the attributes that come from being Alabama's only coastal region. *See Barnhart v. Ingalls*, 275 So. 3d 1112, 1117 n.1 (Ala. 2018) (citing Ala. Code § 1-3-8(c)) ("Mardi Gras is observed as a State holiday only in Mobile and Baldwin Counties, and State offices in those locales are accordingly closed on that holiday."); *Chestnut* Tr. at 671-74, 677-79, 764, 773-74, 778.

443. As Mr. Bonner testified, "There is definitely a chemistry ... that exists in this district that is unique." *Id.* at 765. Mobile and Baldwin Counties are as closely related today as they have ever been. *Id.* at 679-80, 744-48, 770-71. More recently, it is reported that Rep. Adline Clarke, a black Democrat from Mobile, echoed these themes: "I consider Mobile and Baldwin counties one political subdivision and would prefer that these two Gulf Coast counties remain in the same congressional district because government, business and industry in the two counties work well together— with our congressman—for the common good of the two counties." John Sharp, *Redistricting Alabama: How South Alabama could be split up due to Baldwin County's growth*, AL.com (Sep. 20, 2021), https://perma.cc/8PME-JA5W.

444. Because the Port of Mobile facilitates substantial trade, the economic health of District 1 "benefits … virtually every county in the state of Alabama." *Chestnut* Tr. At 673; *see also* PI Tr. 278:14-379:8 (Plaintiff Dowdy explaining Mobile's port is a "particularly important economic driver for the counties that are centered around Mobile" and for the "whole state" of Alabama).

445. The 2021 Map's District 2, like its westerly counterpart, respects communities of interest. Centered on the Wiregrass region and including the Montgomery metropolitan area, District 2 revolves around agricultural and military concerns. *Id.* at 683-84, 687, 780-81. While District 1 also has military interests (a Navy shipyard), these military interests differ from District 2's (Air Force and Army aviation). *Id.* at 683-84, 781. And while both districts share an abstract interest in agriculture, District 1's agricultural interests are different in kind than District 2's; "[c]attle is a very different thing than growing crops," and "when you start looking at the federal agriculture programs and how they apply …, there's a great deal of difference." *Id.* at 687; *see also id.* at 688, 768-69.

446. Moreover, people from the Wiregrass do not commute to Mobile for work, *id.* at 687, 766, and the industries in the Wiregrass do not use the port, *id.* at 687; *see also* PI Tr. 414:17-23 (Plaintiff Dowdy explaining that black Alabamians commute from counties near Mobile like Escambia County and Washington County to the Port of Mobile for work); *cf. id* at 60:17-23.

128

447.    During his deposition in this litigation, Rep. Pringle cast further doubt on the claim that Mobile and the Wiregrass constitute a common community of interest. As Rep. Pringle explained, "[w]e have very little to nothing in common with the people in the Wiregrass. It's not—it's almost a totally different state over there." MX12:22 (84:2-5). So too did Rep. Byrne—someone intimately familiar with these districts from his political history representing CD1 and his work across the State at large—in his testimony.

448.    Byrne stated that the urban parts of Mobile County were not connected to Montgomery, Macon, or Barbour County and that the rural parts were not like the Wiregrass and Dothan. PI Tr. 1748:22-1749:15. He testified that even nearby Covington County is different than the Gulf Coast Counties. *Id.* at 1751:5-10 ("Covington County doesn't fit with the First Congressional District. They're wonderful people over there. I have good friends. I worked with a lot of them when we were replacing the president of the community college. But I don't think they would want to be in a district with Mobile because they look to Dothan. They look to the Wiregrass.").

449.    Put simply, these are different communities; someone from Mobile who was called to represent the Wiregrass would have "a lot to learn about their culture, their way of life, [and] their economic engine." *Chestnut* Tr. at 782.

129

450.   Mr. Cooper obviously was unaware of these differences between the districts. When asked whether he had an opinion about whether the Gulf Coast and the Wiregrass are a community of interest, he responded: "They're very well should be. They live in south Alabama. I suspect maybe -- maybe they're more University of Alabama fans down in Mobile than in the eastern part of the state Auburnland (sic). But other than that, there's probably not a lot of difference." PI Tr. 498:6-14.

451.   For all these reasons, former District 1 Congressmen Bonner and Byrne have credibly stated that representing both these regions adequately would be nearly impossible. Travel throughout the districts would be difficult, limiting a Representative's ability to hold town hall meetings and connect with constituents. *Chestnut* Tr. at 684-86, 775-776. A Representative would also face difficulty finding the budget to staff sufficient offices for such a broad area. *Id.* at 689. Moreover, combining the diverse interests of two distinct communities would result in a smattering of issues that no Representative could effectively address. *Id.* at 685, 782-83.

452.   Testimony from the Singleton Plaintiffs' expert, Dr. Davis, reinforces this point. Dr. Davis highlighted that "constituent service has been a mark of representation in Alabama," and conceded that assigning a member to too many disparate constituencies creates a situation where one constituency "may not get what it needs," PI Tr.83:2-9. It would, for example, be exceedingly challenging to

effectively advocate for constituents' interests in the seafood industry, and in peanut subsidies, and in the port, and in military aviation, and in the shipyard—to say nothing of these constituents' interests in cattle ranching and timber. *Chestnut* Tr. at 687; *see also* DX15:2-3 (7-12) (Rep. Callahan Testimony) (former District 1 Rep. Callahan explaining "the worst vote you can cast on the floor of the House of Representatives is a vote that may help one part of your district but conceivably can harm another"; also noting "Baldwin County and Mobile County … both have interest in legislation that affects the Gulf of Mexico").

453.   Moreover, as Dr. Davis explained, splitting a county between Democrats and Republicans could cause a substantial rift within the county that would hamstring the Congressmen's ability to represent and serve the county. "One of the problems with splitting a county is you may have two members of Congress who are politically at odds," she said, which would make it "very difficult for the county to act in unison, in terms of county needs." PI Tr. 82:7-10. The result would be members less likely to render "constituent service" and deliver "federal funding and federal relief" to their constituents. *Id.* at 82:2-6.

454.   Dr. Davis's statements all the more concerning where, as here, the Gulf Counties are some of Alabama's most economically significant counties, *see id.* at 378:14-20; DX171:672-73 (*Chestnut* testimony of then-sitting Rep. Bradley Byrne); DX171:767-68, 771 (*Chestnut* testimony of former Rep. Jo Bonner), draw substantial

federal funding, and could, under Plaintiffs' proposed plans, be split between Democratic and Republican congressmen.

455.   The Milligan and Caster Plaintiffs nevertheless argue that their maps honor Alabama's communities of interest. Much of this argument turns on Plaintiffs' assertion that their maps protect the Black Belt.

456.   As a threshold matter, whether the Black Belt constitutes a "community of interest" is not beyond debate. As the Redistricting Guidelines explain, "[t]he discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people," DX72:9, and, during his deposition in this litigation, Sen. McClendon stated that he did "not necessarily" consider the Black Belt to be a "community of interest" because the Black Belt contains "multiple counties, multiple communities," MX13:20 (73:5-8). Rep. Pringle echoed these sentiments, disputing that the entire Black Belt constitutes a singular "community of interest" and suggesting the Black Belt contains multiple communities of interest. MX12:22, 23 (83:1-5, 86:10-11).

457.   In any event, Plaintiffs' maps split the Black Belt just as much as the 2021 Map does. *See* PI Tr. 846:9-15 (Q: "[D]o any of [Plaintiffs' illustrative maps] keep the Black Belt counties in a single district?" A: "No.") Plaintiffs' proposed

maps do not, therefore, appear to respect that community of interest any more than the current map.

458.   And integral to Milligan Plaintiffs' community-of-interest argument is their theory that all black voters in the district "are members of communities of interest" because they share "a history of discrimination, and their shared beliefs include a desire for livable wages, quality healthcare, and a second majority-Black district." *Milligan* DE1:22.

459.   At the briefing stage, the Milligan Plaintiffs sought to prove these claims with testimony from one of their named plaintiffs, Captain Shalela Dowdy. In Plaintiff Dowdy's view, Mobile County and the Black Belt constitute one "community of interest" because "many Black people in the Mobile area" share "family ties to the Black Belt," experience "similar struggles," and suffer from "not being able to elect someone who will fight for the things that Black people in the Black Belt and Mobile find important." MX16:2.

460.   An obvious concern with the theory Ms. Dowdy presented in her declaration is that it appears to lack any limiting principle for what does and does not constitute a legally cognizable "community of interest" under Section 2. And to the extent a limiting principle does exist, that principle (viz. family history) necessarily approximates race. 52 U.S.C. §10301(b).

461.   Plaintiff Dowdy's hearing testimony did not dispel this concern. Ms. Dowdy identified Mobile and the Black Belt as part of a community of interest based on her family ties to the Black Belt. *See* PI Tr. 372:11-19 (noting her "great, great, grandparents originally migrated from the Black Belt area to Mobile" and that she still had relatives in the area). But she also noted that she, her "peers, friends, we have family for the most part in the rural parts of the state, along with the other major cities in Alabama"—including Birmingham and Huntsville. PI Tr. 392:4-6; *see also* PI Tr. 391:15-392:6. Thus, by Plaintiffs' standard, essentially every black Alabamian would be part of one statewide community of interest.

462.   Indeed, according to co-Plaintiff Evan Milligan, even Black Mississippians and Georgians and South Carolinians "share some of th[e] same experiences" that, by his reasoning, give rise to a community of interest. *Id.* at 146:11-148:2.

463.   Aside from family ties, Plaintiff Dowdy also offered that the people of Mobile and the rural Black Belt share substantive interests. But the shared interests Ms. Dowdy described were issues that apply to anyone with lower income—healthcare, childcare, and education. PI Tr. 373:1-375:4. As Dowdy put it when describing education, "[i]t is an issue in Mobile and the Black Belt because … living in poverty is an issue in both locations." PI Tr. 375:2-4.

134

464.    Issues of poverty and low socioeconomic status are hardly limited to the Black Belt and Mobile, however; indeed, these issues exist throughout the Nation and beyond. Ms. Dowdy then broadened the generalization, stating that she could not "think of … any major issue that [black people] would have in Mobile that's just uniquely different to just us in the city instead of black people in other areas of our state." PI Tr. 384:3-6. Plaintiff Dowdy's testimony leaves no doubt that the "community of interest" she describes is, as Plaintiffs' briefing suggested, a proxy for race.

465.    Plaintiff Dowdy further stated she did not actually "have a preference over where [a second majority-black congressional district] comes from." PI Tr. 404:11-14. Despite testifying about the merits of uniting the Black Belt with Mobile, Plaintiff Dowdy's ultimate view that "a second district would be the fair thing to do," *id.*, undermines whatever rhyme or reason Plaintiffs otherwise seek to ascribe to their proposed maps and conjoining the Black Belt with Mobile.

466.    Testimony from Mr. Milligan reinforces this conclusion. Throughout his hearing testimony, Mr. Milligan stated that he viewed "communities of interest" as predominantly racial entities. For example, he fought the notion that a "community of interest" in Montgomery could include both white and black Alabamians. *See id.* at 154:9-155:22 (stating "[r]acial experiences are shaping a lot of the features I'm trying to describe").

135

467. When asked directly whether "there are any communities of interest that contain both black and white citizens in Montgomery or in central Alabama," Mr. Milligan posited that perhaps a small sect of predominantly white nuns in predominantly black southern Wilcox County might fit the bill, but he wasn't sure. *Id.* Indeed, Mr. Milligan even refuted that a black Mobilian and her white neighbor could be part of the same community of interest, offering only that they might share things like "blood transfusions" and favorite TV shows. *Id.* at 157:15-18 ("So you're asking me: Can a black person in Mobile share something in common with a white person in Mobile? For sure. Blood transfusions, they might both love a certain show, whatever the case is.").

468. Plaintiff Benjamin Jones's testimony was equally blunt: Jones's "main interest" in a congressional plan is have a Representative "who would serve the interests of the black community." *Id.* at 1361:23-25.

469. Plaintiffs Jones and Dr. Marcus Caster confirm that there is no community of interest between people in the City of Mobile and people in the eastern reaches of the Black Belt. When asked a series of questions about whether Barbour County has any connection to Mobile, Mr. Jones—who was born in Eufaula in Barbour County and is familiar with the area—pointed to none. *Id.* at 1363:4-19.

470. Dr. Caster, a resident of Washington County (which borders Mobile County), echoed that Plaintiffs' alleged community of interest between Mobile and

the Eastern Black Belt is manufactured. When asked if he believes that he shares a community of interest with people "on the eastern border of Alabama in Russell County, Barbour County, and Henry County, he responded: "I'm not – I don't have any – I don't know anything about them, so I can't say that I am in the interest of – that community interest with them or not, so I can't adequately answer that question." *Id.* at 1641:20-1642:3 (stating that he knew nothing about the demographics, industries, or health care providers in the Georgia-border counties). That is hardly surprising, as these "areas are [not] in reasonably close proximity." *LULAC*, 548 U.S. at 435.

471.   To grant the Milligan Plaintiffs' argument would be to sanction a legally cognizable "community of interest" based almost entirely on race, which the Supreme Court has expressly admonished us not to do. *See, e.g.*, *Shaw I*, 509 U.S. at 647. While "[a] State is free to recognize communities that have a particular racial makeup," that recognition must be "directed toward some common thread of relevant interests." *Miller*, 515 U.S. at 920. Plaintiffs' insistence that a black dockworker in Mobile shares more "relevant interests" with a black grad student at Troy or black farmer near the State's eastern border than with white dockworkers in the same shipyard confirms that the Milligan Plaintiffs' new "community of interest" is little more than a blunt proxy for skin color.

137

472.   Addressing similar claims, the Supreme Court observed that such a race-centric conception of a "community of interest" "bears an uncomfortable resemblance to political apartheid." *Shaw I*, 509 U.S. at 647. "If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury," *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630-631 (1991). Accordingly, the Court should reject the Milligan Plaintiffs' race-based conception of "communities of interest."

473.   The Caster Plaintiffs' community-of-interest arguments fare no better. Unlike their counterparts in *Milligan*, the Caster Plaintiffs do not attempt to explain how connecting geographically and culturally dispersed Alabamians constitutes a "community of interest" sufficient to satisfy *Gingles*'s compactness inquiry. Rather, Plaintiffs' expert, Mr. Cooper, asserts that "[a]ll six illustrative plans comply with traditional redistricting principles, including … respect for communities of interest. CX1:21. This cursory analysis is insufficient to satisfy *Gingles*'s first precondition.

474.   Indeed, Mr. Cooper's mistake here is the same mistake the *Alabama NAACP* court chided him for less than two years ago:

> Mr. Cooper did not discuss the regional, cultural, social, economic, or political ties, if any, among the African-American communities in Birmingham, in the Black Belt, or in any other area in District 1 of the AC plans. … Mr. Cooper testified that he joined the substantial African-American population of Jefferson County for the sheer sake of satisfying a numerical threshold. His explanation reveals that maintaining

138

> communities of interest, if considered at all, was subordinated to the ne-cessity of creating an African-American, voting-age population in District 1 of his AC plans with a 50% plus one voting-age population. This feature illustrates the warning of *Shaw v. Reno*. The physical dis-persal of the African-American population in District 1 of the AC plans is an indicator of non-compactness.

2020 WL 583803, at *24 (internal citations, quotations omitted).

475.   As in *Alabama NAACP*, the Caster Plaintiffs have subordinated the State's communities of interest to their desire for "an African-American, voting-age population … with a 50% plus one voting-age population." *Id*. For example, in only two of Mr. Cooper's seven proposed iterations of District 2 does BVAP for any-part-black voting-age Alabamians reach even 51 percent. *See* DX4:28-31. The laser precision with which Plaintiffs attempt to comply with *Gingles*'s 50-percent-plus-one requirement is clearly not coincidental. *Shaw I*, 509 U.S. at 645.

476.   The districts' racial compositions reaffirm this conclusion:



*See* DX4:77-78.[13]

477.   Dr. Duchin and the Milligan Plaintiffs' proposed maps fit this same

mold:

---

[13] To preserve space, this Response includes only the Caster Plaintiffs' first map. Each of their six maps, however, bears similar racial composition.



*See* DX4:68-69.[14]

478.   Mr. Cooper's and Dr. Duchin's Districts 1 and 2 were "obviously drawn for the purpose of separating voters by race," *Shaw I*, 509 U.S. at 645, and subordinate the State's traditional communities of interest Plaintiffs' own "predominant, overriding desire to create [two] majority-black districts," *Abrams*, 521 U.S. at 81 (internal quotation marks omitted); *see also Miller*, 515 U.S. at 917 ("Although by comparison with other districts the geometric shape of the [district at issue] may not seem bizarre on its face, when its shape is considered in conjunction

---

[14] As with the Caster Plaintiffs' maps, each of the Milligan Plaintiffs' four maps features similar racial composition.

with its racial and population densities, the story of racial gerrymandering … becomes much clearer."); *see also* PI Tr. 854:10-21 (expert Mr. Bryan explaining that the Hatcher Plan—which strongly resembles each of Plaintiffs' illustrative maps—compiles in the same districts virtually every county with 40 percent (or more) black population); *id.* at 856:12-23 ("[Y]ou can see easily that [the District 2] line almost precisely exactly follows the contours of the very highest black population VTDs—can literally go from one to the next …. It is literally like the dividing line of black and much-less-black population."); *id.* at 857:9-14 ("Similarly, in District 7, you can see that it … very carefully captures large portions of black populations. And as you go into Birmingham, Jefferson County, you can see that it nearly perfectly outer bounds only the exact black population VTDs in the northeast corner of Birmingham.").

479.  Ultimately, Plaintiffs' District 2, in all its various configurations, is non-compact in the same way as Texas' District 25 at issue in *LULAC*, 548 U.S. at 432-35. Here, Mr. Bryan's analysis of District 2 of the Hatcher Plan is instructive because that version of District 2 shares the fatal flaws of Plaintiffs' illustrative plans. *See* DX2:44-47.

480.   Stretching roughly 250 miles from Mobile to Phenix City, District 2 does not contain one community of interest, but rather several "disparate communities of interest." *LULAC*, 548 U.S. at 432. There are black voters in urban Mobile, with one set of interests; black voters in Montgomery, with their own; and populations in both the eastern Black Belt and western Black Belt. Each is separated from others by areas that are not majority-black. DX2:46.



481.   Plaintiffs lean on race to argue that these "farflung segments of a racial group" are part of a single community of interest, *LULAC*, 548 U.S. at 433, but Defendants showed that Mobile and Montgomery, for example, are part of separate communities with their own needs.

482.   The disparate nature of these interests are also revealed when the distribution of total population is considered. Of the 717,755 people in District 2, over two-thirds comes from Mobile and Montgomery Counties (228,954 from Mobile, DX 82, and 255,781 from Montgomery, CX4). The district is mainly two

143

very different urban areas connected by low-population counties, as shown by DX2 at 45:



483.   Like District 25 in Texas, Plaintiffs' District 2 combines disparate communities of interest based on the prohibited assumption that people think alike and share the same political interests simply because of their race.

484.   "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush*, 517 U.S. at 979. Plaintiffs' proposed congressional map severs communities of interest for the sake of creating two majority-black districts. This racialized districting strategies cannot satisfy *Gingles*'s communities-of-interest inquiry.

### **Minimizing the Number of Counties in Each District:**

485.   The Reapportionment Guidelines provide that the Legislature "shall respect communities of interest," which include counties. DX72:3. The 2021 Map

144

has six county splits (Lauderdale, Jefferson, Tuscaloosa, Chilton, Montgomery, and Escambia), all necessary to equalize population.

486.   With the exception of an illustrative plan that fails to adhere to ±1 population deviation, Mr. Cooper's maps for the Caster Plaintiffs also split six counties, matching the 2021 Map. The Milligan Plaintiffs claim that "most of [their] plans are comparable to HB1 as to the number of split localities," *Milligan* DE69:8, but this is not entirely accurate. Despite agreeing that only six county splits are necessary to equalize population, *see* Duchin Report at 5, all but one of Dr. Duchin's plans split more localities and municipalities than the 2021 Map, *id.*[15]

**Avoiding Contests Between Incumbents:**

487.   Where "the existing relationship between incumbents and constituents would be significantly disturbed," courts have found plaintiffs' illustrative plans insufficiently compact under *Gingles*'s first precondition. *Sensley v. Albritton*, 385 F.3d 591, 598 (5th Cir. 2004).

488.   Protecting incumbents is not, as Plaintiffs would have it, some cynical machination to entrench the powers that be or to covertly effect racist preference. *See, e.g.*, *Milligan* DE94:38-39. Rather, protecting incumbents demonstrably serves

---

[15] Per Dr. Duchin's expert report, MX3:7, 8, her maps show the following splits: Plan A has 9 county splits (Limestone, Jefferson (twice), Shelby, Dallas, Russel, Choctaw, Houston, and Mobile); Plan B has 7 county splits (Madison, Etowah, Jefferson, Shelby, Barbour, Clarke, and Mobile); Plan C has 9 county splits (Madison, Cullman, Etowah, Jefferson, Tuscaloosa, Talladega, Clarke, Washington, and Mobile); and Plan D has 6 county splits (Limestone, Jefferson, Jefferson, Shelby, Russell, and Mobile).

constituents by providing Representatives the opportunity to gain seniority and ascend in Congress, in turn allowing them to deliver more to those they represent. *See, e.g.*, *Chestnut* Tr. 684 (Rep. Byrne explaining that seniority helped Alabama's congressional delegation "get far more for the buck than most states do"); PI Tr. 100:12-22 (Singleton Plaintiffs' expert Dr. Davis agreeing that "incumbency protection" can "benefit a district's constituents" because "members of Congress" can continue to represent the same counties and more or less the same constituents"); *id.* at 957:2-25 (expert Mr. Bryan explaining that "historically there's a lot of evidence to suggest that … representatives over time and only with time have the opportunity to deeply learn, know and understand the geography that they represent, their constituency, the economy, the demographics, the characteristics of the area that they represent"); Persily, *In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders*, 116 Harv. L. Rev. 649, 671 (2002); *Weiser,* 412 U.S. at 791-92.

489.   The 2021 Map does not pair incumbents in the same district, whereas nearly all of the Plaintiffs' proposed maps force contests between incumbents. Each of the Milligan Plaintiffs' maps places four Congressmen in contests against each other, leaving either two or three districts unrepresented. *See* DX4:16. And, of the Caster Plaintiffs' seven proposed maps, only one ensures incumbents won't be pitted against each other. *Id.* Nevertheless, the Caster Plaintiffs' state that their proposed

146

maps "adhere to other traditional redistricting principles, … protection of incumbents." *Caster* DE56:12; *see also* DE84:15-16.

490.  This traditional criterion favors the 2021 Map.

*      *      *

491.  In sum, Plaintiffs' *proposed* remedies demand that the State disregard several important districting principles: preserving the cores of existing districts; maintaining communities of interest; and avoiding contests between incumbents. Their maps also produce more county splits and new districts that are less geographically compact than their predecessors. Most substantially, the Court cannot ignore that Plaintiffs have placed one consideration above all others (save one-person-one-vote): Race.

492.  But "[Section] 2 does *not* require a State to create, on predominantly racial lines, a district that is not 'reasonably compact,'" *Vera*, 517 U.S. at 979, nor will a "State's policy of adhering to other districting principles instead of creating as many majority-minority districts as possible … support an inference that the plan so discriminates on the basis of race or color as to violate the Constitution," *Shaw II*, 517 U.S. at 913 (cleaned up).

493.  Indeed, the Supreme Court has expressly held that a legislature *cannot* satisfy *Gingles*'s compactness requirement if it "subordinate[s] traditional districting principles to race." *Miller*, 515 U.S. at 919. Yet this is just what the *Milligan* and

147

*Caster* Plaintiffs demand. Under *Gingles*'s first precondition, traditional districting principles are a necessary component of a viable Section 2 claim. *LULAC*, 548 U.S. at 433. Because Plaintiffs impermissibly subordinate virtually all of the State's redistricting interests to race, Plaintiffs' Section 2 claims end here.

### d. Districting for the State Board of Education Does Not Control U.S. Congressional Districting.

494.    One of Plaintiffs' primary arguments in favor of their illustrative maps is that, because the State Board of Education ("SBOE") districts bear some resemblance to Plaintiffs' proposals, Alabama must do the same for their congressional districts. *See, e.g.*, PI Tr. 409:9-12 (Plaintiff Dowdy arguing SBOE districts should inform congressional districts because both institutions ""represent[] Alabamians"); *id.* at 410:15-24 ("[SBOE] [is] representing students or our youth of things concerning education, and there's bills that are passed at a national level concerning education, and our kids are represented by the congressional member, as well. So I see some similarities there"). This is not a strong argument.

495.    The differences between Alabama's Board of Education and the United States Congress are substantial. First and most obviously, the tasks facing a member of the State's Board of Education bear little resemblance to those demanded of a congressional representative, and the function of a state education board is distinct from that of Congress. *Chestnut* Tr. 697-99, 825; PI Tr. 1680-81. It is no answer to say that both the federal Congress and the State Board of Education "represent[]

148

Alabamians." PI Tr. 409:9-12; *see also id.* at 410:15-24 (Plaintiff Dowdy testifying that Congress and SBOE are similar: "[SBOE] [is] representing students or our youth of things concerning education, and there's bills that are passed at a national level concerning education, and our kids are represented by the congressional member, as well. So I see some similarities there"). The same can be said of virtually any organ of government.

496.   The history of the SBOE's eight districts further distances its relevance to Congress's seven. Before 2010, SBOE districts did not split Mobile County. DX26.

497.   In 2010, the Decennial Census showed that SBOE District 5—which included most Black Belt counties—had become underpopulated by about 82,000 people. DX27 at 6. To comply with the Supreme Court's one-person-one-vote requirement, the State therefore needed to add about 82,000 people to District 5.

498.   At the time, Alabama was covered by Section 5 of the VRA. According to the State's preclearance submission, Census data showed that, by 2010, then-existing SBOE District 5 had a BVAP of 54.7%. DX 148 at 4. The Legislature thus had to add roughly 82,000 new voters to SBOE District 5 without "retrogression" of minority voting power.

499.   Because the communities opposite SBOE District 5's other borders lacked sufficient black population to meet Section 5's anti-retrogression standard

(that is, expanding SBOE District 5 in any direction but toward Mobile would have lowered the district's BVAP), the Legislature drew SBOE District 5 into Mobile County to ensure it would not diminish minority voting power. CX1 at 17 (Figure 8); see DX27 at 7 (State seeking preclearance and noting that 2011 SBOE map maintained then-existing majority-black districts). The Department of Justice did not object, and the plan received preclearance. DX 89.

500.   Dr. Duchin testified that when she prepared her illustrative maps, she was "particularly interested" in the State's SBOE plan. PI Tr. 569:24. She specifically cited the SBOE plan as a justification for splitting Mobile in her illustrative maps. PI Tr. 570:4-8. When asked whether she could infer communities of interest based on the State's plans, Dr. Duchin responded that "[she] did get some ideas about splittings from the state's earlier plans, and as [she] mentioned, from the state's current board of education plan." PI Tr. 661:12-14. Indeed, Dr. Duchin testified that she found both the State's 2021 SBOE and the State's 2021 Congressional Map "highly informative" "in understanding the state's priorities." TX 673:15-20. Nevertheless, Dr. Duchin testified that she "[did not] know anything directly about any of the process or conditions under which the plan was drawn." TX 695:9-10.

501.   The record shows that Dr. Duchin justified her decision to split Mobile County in part because the current SBOE map also splits Mobile County, which, in

her view, provided insight into the State's respect for Mobile County as a community of interest more generally. But the record demonstrates that she drew this inference without knowledge highly germane to Alabama's tolerance for splitting Mobile County—viz. the State was forced under Section 5 of the VRA and the Supreme Court's one-person-one-vote requirement to do so, and very likely would not have split Mobile County otherwise. Neither Dr. Duchin nor any other witness could point to any traditional districting criteria that required Mobile County to be split in the congressional plan. PI Tr. 494-495; 875-76.

502.   Moreover, even if the Legislature had split Mobile County on its own volition, the inferential value of any SBOE split vis-à-vis congressional districts would be minimal; as discussed in the preceding paragraphs, Congress and Alabama's SBOE share few commonalities, and the Legislature's treatment of the latter bears little relevance to its treatment of the former. In sum, SBOE map's Mobile County split does not undermine the Legislature's determination during the 2021 redistricting cycle that Mobile County is an important community of interest for purposes of congressional representation.

503.   Even assuming it made sense to split Mobile County for purposes of the SBOE plan, that is not evidence that it makes sense to do so in a congressional plan. The role of a member of the SBOE has no similarity to the role of a Congressman. PI Tr. 490-492; 1680-81.

## 2.  The Minority Group Is Not "Sufficiently Large."

504.   The first *Gingles* precondition requires plaintiffs to show "the minority group" is "sufficiently large" to "constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. "[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Strickland*, 556 U.S. at 18. If not, the Section 2 claim fails at the starting gate. *Id*. at 18-20.

505.   The Eleventh Circuit "ha[s] repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy." *Burton*, 178 F.3d at 1199.

506.   The "sufficiently large" minority group that a Section 2 litigant defines in the first *Gingles* precondition must be the same minority group to whom the second and third preconditions apply. *See, e.g.*, *Pope v. County of Albany*, 687 F.3d 565, 577 n.11 (2d Cir. 2012) ("[T]he parties must be consistent. They cannot argue one Gingles factor by reference to a particular minority group, only to recast the minority group in arguing another factor."); *see also* Nathaniel Persily, *The Law of the Census*, 32 Cardozo L. Rev. 755, 772 (2011) (recognizing that while choice of more expansive minority group may assist plaintiffs in satisfying first *Gingles* factor, it may also add to their burden in demonstrating political cohesion). In the same vein, *Gingles* refers to "*the* minority group"—not "*a* minority group"—when

articulating each of its three requirements. *Gingles*, 478 U.S. at 50-51. And this makes sense; otherwise, a viable Section 2 claim could exist without a specific minority group capable of showing injury and receiving redress. Plaintiffs may not, therefore, mix and match the definitions of minority groups to satisfy the threshold *Gingles* factors.

507.   Yet the record reveals that this is what the Caster Plaintiffs have done. The Caster Plaintiffs' map-drawer, Mr. Cooper, drew his maps to include two districts with majorities of Alabamians identifying as any-part black. CX1 (creating districts using "AP Black" population); *see also* DX4:6-9, 24-32 (showing Plaintiffs' proposed maps would fail had they adopted a the single-race black definition of "black"). But the Caster Plaintiffs' racial-polarization expert, Dr. Palmer, testified that his expert report relied on the voting behaviors of "single-race" black Alabamians. *See* PI Tr. 744:16-24, 747:18-748:10, 749:7-14, 749:23-750:3.

508.   Plaintiffs have not proven up their assertion that multiracial voters ("any-part black") cohesively vote with black voters who identify as black alone ("single-race black"). DX6:4; PI Tr. 1414:4-9. Because "the parties must be consistent" and "cannot argue one *Gingles* factor by reference to a particular minority group, only to recast the minority group in arguing another factor," the Caster Plaintiffs' use of single-race black at the other *Gingles* steps means they can satisfy *Gingles I* only if they can prove that single-race black Alabamians constitute

a numerical majority in their proposed districts. *Pope v. County of Albany*, 687 F.3d at 577 n.11.

509.   Not one of the Caster Plaintiffs' proposed plans includes two districts in which single-race black Alabamians constitute a majority; indeed, half his maps have *no* districts where this demographic exceeds 50 percent. *See* DX4:2-3. The Court may therefore end the Caster Plaintiffs' case here.

510.   For their part, the Milligan Plaintiffs' illustrative plans also use the any-part black definition," MX3:7 n.4, and their racial-polarization expert, Dr. Baodong Liu, appears to rely at least in part on single-race black data. PI Tr. 1232:13-1263:1. Only one of the Milligan Plaintiffs' proposed maps appears to include two districts in which Alabamians identifying as single-race black constitute numerical majorities. *See* DX4:2.

### 3. Plaintiffs Fail to Show the Racial Polarization Necessary to Satisfy *Gingles*'s Second and Third Preconditions.

511.   "The purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56. "Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices." *Id.*

154

512.   The minority group Plaintiffs chose to satisfy *Gingles*'s first precondition was any-part-black Alabamians. But in preconditions two and three, it appears Plaintiffs analyzed the voting patterns of single-race black Alabamians.

513.   Plaintiffs have therefore failed to show that "the minority group" they used to satisfy step one has satisfied each *Gingles* requirement, nullifying their Section 2 claim.

514.   It is no answer to presume that racially polarized voting similarly affects single-race black and any-part black Alabamians. Indeed, Plaintiffs' experts neither cited any research suggesting such a conclusion nor testified to its existence. To the contrary, the Milligan Plaintiffs' expert Dr. Liu appeared to testify that proving the cohesiveness of these two voting blocs in Alabama would be "impossible." PI Tr. 1263:15-1264:5. Whether or not such an analysis is possible, it did not occur in this case.

515.   The Supreme Court "ha[s] rejected such perceptions elsewhere as impermissible racial stereotypes," *Shaw I*, 509 U.S. at 647, and, likely for this very reason, "the results test does not assume the existence of racial bloc voting; plaintiffs must prove it." *Gingles*, 478 U.S. at 46; *see also Concerned Citizens of Hardee Cnty. V. Hardee Cnty. Bd. of Comm'rs*, 906 F.2d 524, 527 (11th Cir. 1990) (holding that plaintiffs must prove cohesiveness of different minority groups if plaintiffs use two groups to satisfy first *Gingles* precondition).

516.   Even assuming *Gingles* permitted Plaintiffs to mix and match their preferred minority groups and accepting the assumption that those who identify as any-part black necessarily share the same political goals as those who identify as single-race black, several analytic problems with Plaintiffs' racial-polarization analyses show that they do not "clearly" meet *Gingles*'s second and third requirements. *Mathews*, 544 F.2d at 1243.

517.   First, the Milligan Plaintiffs rely on the expert testimony of Dr. Baodong Liu, but his testimony was questionable for several reasons.

518.   First, Dr. Liu's report improperly focuses—exclusively—on "biracial" elections; that is, elections that include both black and white candidates. Dr. Liu goes as far as claiming that an expert can determine RPV "only by using biracial elections." PI Tr. 1295:23. Dr. Liu's testimony on this point was not clear, but it appears that his opinion is that the only way to empirically establish RPV within the context of a Section 2 claim is by using only biracial elections:

> Q. ... So you don't think that biracial elections are the only way to empirically determine whether RPV exists?
> A. RPV itself, as empirical measure, of course, can have elections, which have uni-racial candidates because different racial groups may choose different candidates even if the candidates share the racial identity. It's just empirical fact. However, the RPV to evaluate the opportunity to elect candidate of choice, that has to be based on the evaluation of elections which allow scholars to measure the choice in the first place.
> Q. And by the choice, what are you referring to exactly?

A. By choice, I mean, whether a racial group prefer a candidate from whatever particular kind of racial group, one has to have a choice between that group and alternative.

*Id.* at 1296:11-25.

519.    Along these lines, Dr. Liu testified that his effectiveness analysis would *only* be relevant in future *biracial* elections; if an election included a white Democrat against a white Republican, Dr. Liu's analysis, according to Dr. Liu, would not be helpful. *Id.* at 1299:9-17. Dr. Liu's reasoning and analysis is directly contrary to *Gingles*. *See, e.g.*, *Gingles*, 478 U.S. at 68 ("Under § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group,* not the race of the candidate, that is important.").

520.    Further, it is inconsistent with the law of this circuit, which does not even require this Court to find that biracial elections are more probative. *Johnson v. Hamrick*, 196 F.3d 1216, 1221-22 (11th Cir. 1999) ("We do not mean to imply district courts *should* give elections involving black candidates more weight; rather, we merely note that in light of existing case law district courts may do so without committing clear error.").

521.    Second, Dr. Liu failed to include relevant elections. Despite the Milligan Plaintiffs representation that Dr. Liu did not purport to do include every endogenous biracial election in his analysis, *see* DE94:22, here's what Dr. Liu said: "[T]here were *only* seven such endogenous biracial elections during the period under

157

study … ." M8:4. And that isn't true. Despite claiming that he engaged in "extensive research" and made his best efforts to identify all such elections, PI Tr. 1268:6-21, Dr. Liu identified two such elections that he omitted from his expert report, PI Tr. at 1268:20-1269:9, and there are other missing elections that he remained unaware of that could have been identified by a quick internet search. *Id.* at 1304:19-1305:7.

522.   It is also worth noting that the ADC supported Kiani Gardner, a non-black woman, in the District 1 Democratic primary. *See* Brandon Moseley, *Alabama Democratic Conference Endorses Michael Bloomberg for President*, Alabama Political Reporter (Feb. 12, 2020), https://perma.cc/89ZG-2LHK ("The ADC liked both Kiani Gardner or James Averhart in Alabama's First Congressional District."). Gardner won the most votes in the Democratic primary before narrowly losing to James Averhart, a black man, in a runoff election with much lower turnout—another biracial Congressional election that Dr. Liu failed to analyze in his report. *See* DX50 (2020 Democratic Primary Runoff Results).

523.   And 2020 was not the first time the ADC endorsed a non-black candidate—in Alabama's 2017 Democratic primary for U.S. Senate, the ADC endorsed Doug Jones, a white man, over a black candidate, Robert Kennedy Jr., even though Kennedy was leading Jones in public polls at the time. *See Alabama Democratic Conference Endorses Doug Jones for U.S. Senate*, CBS42 (Aug. 3, 2017), https://perma.cc/9T7Q-SHBS. This is the same Robert Kennedy who won the

Democratic Party's nomination in the 2018 District 1 election. *See* M8:9-10. Jones went on to win the statewide election.

524.    Though Dr. Liu analyzes elections including Robert Kennedy and another black candidate, Will Boyd, in his report, he leaves out any mention of their participation in the biracial 2017 election, where each candidate lost to Doug Jones. He remained unaware of that election at the preliminary injunction hearing. PI Tr. 1305:19-1306:2.

525.    This is not the first time Dr. Liu has declined to incorporate into his analysis elections and data that may have helped opposing parties' positions. In *Pope v. County of Albany*, for example, the trial court discredited Dr. Liu's testimony and proffered report after recognizing that Dr. Liu had failed to include relevant data that might have weakened his conclusion. *See* 687 F.3d 565, 578 (2d Cir. 2012) ("The factual circumstance that here prompted the district court to conclude that plaintiffs failed to carry their preliminary injunction burden was unexplained omissions from the electoral data provided to their expert witness, Dr. Liu."); *see also League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 284 (Fla. 2015).

526.    History seems to have repeated itself here. At the preliminary injunction hearing, Dr. Liu testified that it was "not [his] job" to handle and process the data he received from the Milligan Plaintiffs' demographer. PI Tr. 1309:15. Instead, he testified that he relied on what he received from Plaintiffs' counsel and checked to

see that it came from a website, 1301:1-25, the same sort of strategy that caused him problems in the past. *See Pope*, 687 F.3d at 579-80 ("At the preliminary injunction hearing before the district court, Dr. Liu seemed generally unaware of these elections, testifying that he had relied on election data provided by [another witness], who submitted his own affidavit in support of plaintiffs' motion for a preliminary injunction. Nothing in the record explains what criteria determined the election data provided to Dr. Liu. Dr. Liu, however, agreed that his analysis would be improved by more data and that the omitted data were relevant.").

527.   The same occurred here and duly discredits the testimony and expert report of Dr. Liu.

528.   The report submitted by Caster Plaintiffs' racial-polarization expert, Dr. Maxwell Palmer, also suffers flaws. Chief among the issues with Dr. Palmer's analysis was his predominant use of Citizen Voting Age Population and American Community Survey ("ACS") data. *See* CX79:2-3. Dr. Palmer used the "ACS 2014-2018 5-year averages" and the "ACS 2015-2019 5-year averages" in his analysis. *Id.* 3 n.3.

529.   But as expert Mr. Bryan explained, it "is widely known in the demographic community" that "the farther and farther that you get away from th[e] base decennial year, the poorer and poorer quality that ACS data is going to be." PI Tr. 921:14-19. Because "the 2015 to 2019 file … is the furthest out from the last

decennial census," its data is the least reliable. *Id.* at 921:20-922:9. Using "ACS CVAP data"—the data Dr. Palmer used—is therefore "very risky," *id.* at 922:10-17, necessarily calling into question Dr. Palmer's conclusions, particularly those relating to the performance of Plaintiffs' majority-minority districts, *see* CX79:9.

530.   The flaws in Plaintiffs' electoral analysis demonstrate that "the facts and law" do not "clearly favor" their position at this early stage of the litigation. *Mathews*, 544 F.2d at 1243.

### B. The "Totality of Circumstances" Confirms That the 2021 Map Does Not Violate Section 2.

531.   Only if Plaintiffs meet *Gingles*'s first three requirements does the Court then "consider[] whether, 'on the totality of circumstances,' minorities have been denied an 'equal opportunity' to 'participate in the political process and to elect representatives of their choice.'" *Abrams*, 521 U.S. at 91 (quoting 42 U.S.C. § 1973(b)); *Johnson v. De Grandy*, 512 U.S. 997, 101 (*Gingles* factors not "sufficient in combination" to "prove a § 2 claim").

532.   "[T]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." *Chisom v. Roemer*, 501 U.S. 380, 397 (1991). "The general terms of the statutory standard 'totality of circumstances' require judicial interpretation. For this purpose, the Court has referred to the Senate Report on the 1982

amendments to the Voting Rights Act, which identifies factors typically relevant to a § 2 claim." *LULAC*, 548 U.S. at 426. These are colloquially known as the "Senate factors," and feature extensively below.

533.   Relevant here, "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates," *Solomon*, 221 F.3d at 1225.

534.   Critically, Plaintiffs bear the "ultimate burden" to prove that, under the totality of circumstances, the political process is not equally open to the minority group. *Askew v. City of Rome*, 127 F.3d 1355, 1375 (11th Cir. 1997). Meeting this burden "demands proof of a statistically significant racial disparity in electoral opportunities (not outcomes) resulting from a law not needed to achieve a government's legitimate goals." *Brnovich*, 141 S. Ct. at 2361 (Kagan, J., dissenting). "That showing," Justice Kagan reminds us, "is hardly insubstantial; and as a result, Section 2 vote denial suits do not often succeed." *Id.*

535.   Because "[e]lectoral losses that are attributable to partisan politics do not implicate the protections of § 2," *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 863 (5th Cir. 1993) (en banc) ("*Clements*"), Section 2's "totality of circumstances" test, with guidance from the Senate factors, ultimately asks whether the "results" established by *Gingles*'s threshold requirements exist "on account of race." 52 U.S.C. § 10301(a).

### 1. The Senate Factors.

536.   The *Gingles* Court listed the Senate factors as follows:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

> whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

> Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

478 U.S. at 36-37 (quoting S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982)).

163

537.   The Senate factors appear nowhere in the text of Section 2, but courts frequently cite them as suitable heuristics to help determine whether the minority vote has been diluted "on account of race or color." 52 U.S.C. §10301(a). The balance of these factors favors the State.

538.   The Caster Plaintiffs lead their "totality of circumstances" argument with the assertion that Section 2 condemns the 2021 Plan because the plan "results in significant disproportionality by giving Black voters—who represent a quarter of the state's electorate—a say in just 14% of Alabama's congressional elections." DE84:29. They rest this claim on *De Grandy*, 512 U.S. 997.

539.   The *De Grandy* Court examined proportionality's relevance to a Section 2 claim, but the Court also cautioned that "the degree of probative value assigned to disproportionality, in a case where it is shown, will vary not only with the degree of disproportionality but with other factors as well." *Id.* at 1021 n.17.

540.   The "degree of disproportionality" in this case—where black Alabamians form a majority in 14.3 percent of Alabama's congressional districts while constituting about "a quarter of the state's electorate," *Caster* DE84:29—is slight, and well below the disproportionality in, for example, *Abrams*, 521 U.S. 74, which provided only one majority-minority congressional district out of 11—that is, about nine percent majority-minority control—despite black Georgians constituting

"about 27 percent of [the] total voting age population." *Id.* at 103 (Breyer, J., dissenting).

541.    The Court also must balance Section 2's express statement that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion of the population," 52 U.SC. §10301(b), against the *De Grandy* Court's limited allowance of proportionality consideration. The text of the statute clearly constricts the weight a court may ascribe to proportionality in a Section 2 claim, which may further explain the *Abrams* Court's unwillingness to find a Section 2 violation despite black Georgians constituting a majority in only one out of 11 congressional districts. 521 U.S. 74.

### a.  Senate Factor 1: Alabama Has Overcome Its History.

542.    "[O]fficial discrimination … touch[ing] the right of [black Alabamians] to register, to vote, or otherwise to participate in the democratic process" is undoubtedly a part of Alabama's history. *Id.* at 36. This sordid history will never change, and it should never be forgotten. When evaluating "the extent" of this history, however, the fact that more than half a century has passed since the State's most shameful actions illustrates this history's limitations in a totality-of-circumstances analysis.

543.    "[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden*, 446 U.S.

55, 74 (1980). Thus "generalized assertion[s] of past discrimination in a particular

… region [are] not adequate" to support Plaintiffs' Section 2 claims. *Shaw II*, 517

U.S. at 909-10. Doubly so where, as here, "[o]vert discriminatory election devices

have long ceased to exist" and "voter registration and turnout rates among blacks

and whites have reached parity." *Ala. NAACP*, 2020 WL 583804, at *41 (citing

*Shelby County*, 570 U.S. at 535, 548).

544.   A recurring problem for Plaintiffs is that they often fail to tie the alleged

official discrimination to black Alabamians' ability to vote. And where they attempt

to connect the two, the link is tenuous. *See, e.g.*, *Milligan* DE69:17-18 (providing no

support for the claim that alleged discrimination produced the disparate

socioeconomic outcomes that exist today). Moreover, Plaintiffs' claims regarding

this first Senate factor are often overstated and missing significant context. Below

are several examples of this pattern.

545.   For example, Dr. Bagley purported to focus his report and testimony on

Alabama's Congressional redistricting history. PI Tr. 1148:4-10; 1192:1-7. And yet,

he omitted decades of history about Alabama's congressional redistricting process

because, in his words, those decades were "not contentious." *Id.* at 1194:8. In *other*

words, the 70s and 80s contained *no* history of discrimination in the Congressional

redistricting context. But as to the 1990 redistricting cycle, Dr. Bagley claimed that

"since the '90s, black leaders in the state have called for the creation of the second

majority-minority congressional district." *Id.* at 1173:2-4. He testified that since the 1990s there were "people challenging at every step of the way the state's plans." *Id.* at 1212:15-16.

546.   But none of that is true. The evidence that Dr. Bagley claimed to have read but omitted from his report shows that Alabama's black leaders uniformly opposed a two-majority-minority district congressional plan in 1992. *See* DX17 (testimony of leaders from ADC, ANSC, and Alabama NAACP opposing two-MMD plan). And the evidence Dr. Bagley *did* cite was misleading—the intervenor in *Wesch* actually conceded that a two-MMD plan would "cast doubt on [black voters'] ability to elect candidates of their choice[.]" *Wesch*, 785 F. Supp. at 1496.

547.   Dr. Bagley's evidence fares no better for the 2000 Congressional Redistricting Cycle. He agreed that there was never any indication that the 2000 Plan was unlawful, and he had no idea that Sen. Hank Sanders—a prominent black Democrat—sponsored that plan. PI Tr. 1217:17-24. Dr. Bagley's characterization of this history as the "redistricting battles of the early 2000s"—even when there were never any DOJ objections or adverse rulings against the State—shows that Dr. Bagley's testimony is far from an objective historical overview of Alabama's redistricting process.

548.   Finally, as to the 2010 Congressional Redistricting Cycle, Dr. Bagley testified that the preclearance of the 2010 Plan indicated, to him, that it would likely

survive any court challenge. *Id.* at 1221:17-19. He confirmed that this plan—which featured one majority-minority district just like the 2021 Map—was not part of the State's lack of responsiveness to the needs of black Alabamians. *Id.* at 1222:2-6. This concession is the exact opposite of what Dr. Bagley contended during his direct testimony: that the existence of just one MMD is "the most important example of a lack of responsiveness with respect to this case." *Id.* at 1173:1-7.

549.   The Milligan Plaintiffs also contend that Alabama employers account for a disproportionate number of racial-discrimination claims. *Milligan*, DE69:12. The expert they cite for support, Dr. Bagley, states: "Alabama's racially based claims accounted for 3.1 percent of national racial claims, although Alabama's population accounts, as of the last Census, for only 1.5 percent of the national population." MX5:18.

550.   Critically, though, Alabama is home to 3.1 percent of black people nationwide. *See* U.S. CENSUS BUREAU, ALABAMA, https://data.census.gov/cedsci/profile?g=0400000US01 (last visited Dec. 22, 2021). Context matters; it is not unusual that Alabama's percentage of the Equal Employment Opportunity Commission's racial-discrimination claims reflects its share of black Americans.

551.   In this same vein, the Milligan Plaintiffs assert that Alabama has a "recent history of discrimination in state public employment." MX5:18. To substantiate the charge, the Milligan Plaintiffs cite "discrimination committed by

'high-level employees' at a large public institution." DE94:25 (quoting *Weatherly v. Ala. State Univ.,* 728 F.3d 1263, 1273 (11th Cir. 2013)).

552. They do not mention, however, that the relevant "high-level employees" in *Weatherly* were both black employees of an HBCU. *Id.* Indeed, one of the plaintiffs in *Weatherly* was biracial and was called a "white bitch," which the district court considered to be evidence of racial discrimination. *Weatherly v. Ala. State Univ.*, No. 2:10CV192-WHA, 2011 WL 6140917, at *12 (M.D. Ala. Dec. 8, 2011). It is hard to see how a racist comment by a black HBCU administrator sheds light on whether the 2021 Map represents "Alabama's latest attempt to use the redistricting process to unfairly constrain the power of Black voters." *Milligan* DE69:6.

553. Dr. Bagley states that there are "numerous instances of racial discrimination in employment on the part of state entities … and also on the part of private employers." MX5:19. To support this claim, Dr. Bagley cites 11 cases dating back to 1970. *Id.* at 19 n.62. But as of 2020, the State of Alabama employs more than 30,000 people, 43 percent of whom are black. *See* DX49:18 (Alabama State Personnel Board 2020 Annual Report). Plaintiffs' purported evidence—a handful of cases spanning over half a century—cannot demonstrate a "recent history of discrimination in state public employment." MX5:18.

554.   The Alabama State Personnel Board 2020 Annual Report further reflects that one of the five members of the State Personnel Board is Mr. Myron Penn, DX49:3-4, who is one of the counsel for the Singleton Plaintiffs.

555.   The Milligan Plaintiffs then allege that "about 50 Alabama school districts remain subject to an injunction originally imposed to combat the State's policy of resistance to desegregation." *Milligan* DE69:17. But retaining an injunction does not show modern-day discrimination, much less "resistance to desegregation."

556.   To dissolve a desegregation injunction, a local school system must, among other requirements, "prove that it has … eliminated the vestiges of prior *de jure* segregation to the extent practicable." *N.A.A.C.P., Jacksonville Branch v. Duval Cnty. Sch.*, 273 F.3d 960, 966 (11th Cir. 2001). As far back as 2007, a majority of Alabama school systems had affirmatively proven this negative, which shows the extraordinary progress Alabama has made in the decades since its shameful past. DX162:2-10 (*Becoming Less Separate*, United States Commission on Civil Rights (Sept. 2007)).

557.   Dr. Bagley specifically condemns Huntsville City Schools for evidence of resistance to desegregation. MX5:23. But the ProPublica source Dr. Bagley cites in his report lists Huntsville as having a "*Voluntary* Desegregation Order"—just the

opposite of what one might expect from a city trying to resist racial progress. *Id.* at 23 n.78.

558.   Indeed, as the court approving Huntsville's voluntary consent decree noted, "[t]here is a light at the end of the tunnel, and it is bright, much like the future of the district and its public school students." *Hereford v. United States*, 2015 WL 13398941, at *11 (N.D. Ala. Apr. 21, 2015). That Huntsville is working to remedy the effects of past discrimination cannot weigh against the State.

559.   The Caster Plaintiffs' assertions are similarly tenuous. As supposed evidence of present-day discrimination in Alabama, they cite two municipal subdivisions that were "bailed-in" to VRA preclearance. *Caster* DE56:17-18. In the first, the defendant City of Evergreen (home to fewer than 4,000 people) agreed to limited preclearance, which covered only local redistricting and municipal voter qualification. *Allen v. City of Evergreen*, 2014 WL 12607819, at *1 (S.D. Ala. Jan. 13, 2014). The Caster Plaintiffs failed to note that the City's order by its own terms extended only to December 2020. *Id.* at *2.

560.   In Plaintiffs' second example, a group of plaintiffs (including Greater Birmingham Ministries, Plaintiffs in this litigation) challenged a 1975 law under Section 2 and the Fourteenth Amendment. They did so even after the defendant Jefferson County Board of Education had agreed to modify its electoral districts. *See*

Joint Mot. for Entry of Consent Order, *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-CV-1821-MHH (N.D. Ala. filed Nov. 8, 2019) (DE9).

561.    These two instances—each of which was resolved by a consenting defendant—say nothing about discrimination in Alabama today, much less evidence defiance against racial progress. Along these lines, the Milligan Plaintiffs' expert was unaware that one such consent decree—one involving one of the Milligan Plaintiffs—was the result of a settlement agreement forbidding the parties from citing the case as evidence of discrimination. PI Tr. 1186:12-23. This sort of agreement, which lacked a finding of any liability, cannot weigh against the State.

562.    The Caster Plaintiffs also submit that *Alabama Legislative Black Caucus v. Alabama*, 231 F.Supp.3d 1026 (M.D. Ala. 2017) (three-judge court) ("*ALBC II*"), shows a "history of discrimination" because, as they argue, "a federal court found that the State had engaged in intentionally discriminatory redistricting," *Caster* DE84:27. Though the *ALBC* court indeed found that racial considerations predominated in "14 of the 36" state districts at issue, 231 F.Supp.3d at 1033, the Caster Plaintiffs omit a critical detail: the Alabama Legislature drew these 14 districts in a race-conscious manner to "avoid retrogressing the ability of black voters to elect candidates of their choice," *ALBC II*, 231 F.Supp.3d at 1032.

563.    Seeking to comply with federal law and preserve minority voting power—though resulting in a racial gerrymander—does not tend to suggest a

"history of official discrimination … that touche[s] the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36.

564.   While nothing can erase Alabama's "history of official discrimination," *Gingles*, 478 U.S. at 36, the past is not the present. Less than two years ago, the *Alabama NAACP* court concluded that "Plaintiffs simply ha[d] not shown that, in present-day Alabama, there [were] any barriers keeping African Americans from participating in the political process as voters." *Ala. NAACP*, 2020 WL 583803, at *41. The Plaintiffs in this case have failed to persuade us to reach the opposite conclusion. Accordingly, this first Senate factor favors the State.

### b.  Senate Factor 2: Racial Polarization in Alabama Appears to Be a Product of Political Partisanship, Not Race.

565.   The second Senate factor only supports a Section 2 claim insofar as racial polarization approximates racism, and because correlation is not causation Plaintiffs need more than ecological inferences to support their claims. *Ala. NAACP*, 2020 WL 583803, at *41 ("There, the inquiry focused solely on 'how' black and white voters voted," whereas "[t]he focus now, at the totality-of-circumstances stage, is on evidence of causation, which looks to 'why' voters cast their ballots for certain candidates").

566.   The inquiry here must, therefore, probe substantially deeper than *Gingles*'s effects-based preconditions. Dr. Palmer and Dr. Liu, Plaintiffs' racial-

polarization experts, both explained that racial-polarization analysis can only explain voting patterns—that is, *how* a group votes—and sheds no light on voters' intentions. *See, e.g.*, PI Tr. 737:19-20, 762:14-763:1, 1266:15-17. Dr. Palmer went so far as to state that racial-polarization analysis "provides *no* evidence about why people vote the way they do." *Id.* at 763:13-16 (emphasis added).

567.   The Milligan Plaintiffs nevertheless insist that racial polarization is one of the "most important" Senate factors and thus "require[s] relief for Plaintiffs." *Milligan* DE94:23. But they mistakenly assume the totality-of-circumstances inquiry (why) "largely correspond[s]" with *Gingles*'s racial-polarization inquiry (how). *Id.* The second Senate factor asks why voters vote the way they do, and testimony from all this litigation's racial-polarization experts proves that evidence of racial polarization, by itself, is all but irrelevant to this inquiry.

568.   "Alabama is indeed a ruby red state—one of the most Republican states in the entire South," and, as the federal court for the Middle District of Alabama recently found, this reality "has made it virtually impossible for Democrats—of any race—to win statewide in Alabama in the past two decades." *Ala. NAACP*, 2020 WL 583803, at *42.

569.   Since 2008, the only Democrat to win a statewide race is Doug Jones. *Id.* Moreover, "white Democratic primary voters appear to give equal support to black Democratic candidates," *id.*, which "suggests that black candidates are not

penalized" solely on account of race. *Id.* at 43 (citing *Clements*, 999 F.2d at 879). These findings (among many others that favored the State) led the *Alabama NAACP* court to conclude that "Senate factor 2 weighs heavily in favor of the State." *Id.* at 53.

570.   And in the less-than-two-year span since the *Alabama NAACP* court published this conclusion, the State's case has not weakened. Though the State argued in *Alabama NAACP* that "white voters would equally support a black Republican and a white Republican candidate," *id.* at 43, the court lacked "empirical evidence supporting or discrediting the theory" because the State could offer no hard data "includ[ing] an election with an African-American Republican." *Id.*

571.  Since *Alabama NAACP*, Kenneth Paschal, a black Republican, won election to represent District 73—anchored by Shelby County—in the Alabama House of Representatives. *See* DX5:16. Rep. Paschal defeated a white Republican in the primary, and then proceeded to defeat a white Democrat—by nearly 50 percentage points—in the general election. *Id.*

572.  District 73's predominantly white constituents were agnostic to Rep. Paschal's race. *See id.*; PI Tr. 1394:11-22.

573.  Alabama Republican Party Chairman John Wahl stated that "[t]he Alabama Republican Party [was] incredibly enthusiastic about the election of Kenneth Paschal to House District 73," a man with "exceptional character whose

'God and Country' campaign resonated with Shelby County residents." *See Kenneth Paschal Wins House District 73 Special Election*, Alabama Political Reporter (Jul. 14, 2021), https://perma.cc/2CEJ-C37B.

574.    Rep. Paschal, while "recogniz[ing] the historical significance" of being the first black Republican elected to the Alabama Legislature since Reconstruction, explained that "[t]he voters of District 73 didn't choose [him] because of the color of [his] skin"; "[t]hey got to know [him]" and "saw a God-fearing man of integrity who values and defends our Constitution." *Id.* This data point is, of course, limited in its weight, but it supports the conclusion that values—not race—explain Alabama's racial polarization.

575.    Empirical evidence supports the assertion that white Republican voters support minority Republican candidates at the same or higher rates when compared to non-Hispanic white Republican nominees. *See* PI Tr. 1393:17-1394:12; DX5:16. Kenneth Paschal's election in District 73 provides evidence of this reality in Alabama because no candidate could win in that district (which is 84.1% white VAP) without majority-white support. *Id.* at 1394:11-22; DX5:16.

576.    The Caster Plaintiffs cite their expert, Dr. King, to discount the importance of Rep. Paschal's election. *See Caster* DE84:37. White Alabamians' support for Rep. Paschal is meaningless, they say, because "political science scholarship" shows that "white voters who harbor racially prejudiced views will

nonetheless support minority candidates under specific circumstances, such as when the candidate makes clear he or she will not 'threaten the racial hierarchy.'" *Id.*

577.   Despite the Caster Plaintiffs' extraordinary claim, at the preliminary injunction hearing Dr. King admitted that "[she] ha[d]n't done research on the racial attitudes of Alabama voters to be in a position to make an assertion about the extent to which racial considerations contribute to their choices," PI Tr. 1561:8-11. Her analysis thus fails to discount the significance of white Alabamians' support for black candidates.

578.   The Caster Plaintiffs' cite Dr. King for the proposition that "modern party alignment … is the direct result of opposing stances the Democratic and Republican parties have taken on issues related to racial justice and civil rights." *Caster* DE84:35. But Dr. King's concession that "[she] ha[d]n't done research on the racial attitudes of Alabama voters," PI Tr. 1561:8-11, not only contradicts Plaintiffs' representation of her research, but further undermines Plaintiffs' theory that Alabamians' partisan voting patterns are attributable to racial considerations.

579.   Further, Dr. King admitted that she never even researched the background of Alabama's party alignment as opposed to national party alignment, *id.* at 1548:12-9, and that, while this was "[not] an intentional omission," her research simply relied on the "scholarship that [she] was familiar with," *id.* at 1551:20-24.

580. Plaintiffs argue that the totality-of-circumstance's racial-polarization inquiry looks only to effects (how) rather than intent (why), and that Alabama bears the burden of showing that racially polarized voting is not the result of racial animus. *Milligan* DE94:23; *Caster* DE84:32-38. Neither contention is correct. This effects-focused argument conflates *Gingles*'s racial-polarization inquiry, which is effects-focused, *see Gingles* 478 U.S. at 74, with the racial-polarization inquiry at the totality-of-circumstances stage, which is not, *see, e.g.*, *Ala. NAACP*, 2020 WL 583803, at *41; *S. Christian Leadership Conf. of Ala. v. Sessions* ("*SCLC*"), 56 F.3d 1281, 1293-94 (11th Cir. 1995) ("[T]here was ample evidence in the record to support the court's conclusion that factors other than race, such as party politics and availability of qualified candidates, were driving the election results and that racially polarized voting did not leave minorities with 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'"); *Solomon*, 221 F.3d at 1225.

581. Plaintiffs then argue that even though "issues unrelated to race may also contribute to the division between Democratic and Republican voters in Alabama," "because those voters are also significantly divided on issues inextricably linked to race, Defendants cannot prove that racial considerations have *no* influence on voting patterns." *Caster* DE84:36. This, of course, turns Plaintiffs' burden of proof on its head. *See, e.g.*, *Askew*, 127 F.3d at 1375. Moreover, Plaintiffs' interpretation

178

necessarily injects a presumption of legal salience into racially polarized voting where their own experts testified that none exists. *See* PI Tr. 762:25-763:1 ("This analysis provides no evidence about why people vote the way they do."). And equally problematically, this undue burden would apply only to States or other jurisdictions that vote Republican. *See id.* at 766:12-22; *see also id.* at 1399:7-1401:1; Hood *Chestnut* Rep. at 14-16 (SX44).

582.   What Plaintiffs refer to as racial bloc voting is more readily explained as the result of politics, not race. *SCLC*, 56 F.3d at 1293-94; *Solomon*, 221 F.3d at 1225. Plaintiffs have failed to show that racially polarized voting in Alabama approximates the racist intent necessary to support their Section 2 claims; indeed, their political-science and racial-polarization experts' testimony demonstrates the opposite. Black Alabamians' "candidates of choice" tend to lose elections in Alabama not because they are black or because they receive black support, but because they are Democrats.

### c. Senate Factor 3: Alabama Does Not Use Practices or Procedures That Enhance the Potential for Discrimination.

583.   The *Milligan* Plaintiffs argue that "Alabama primaries still use majority-vote requirements (factor three)." *Milligan* DE69:18. They do not contend that the State adopted this requirement for nefarious reasons—much less that Alabama actively maintains majority-vote primaries to discriminate against its black population today. And they ignore that this system led to a black candidate defeating

179

a non-black candidate in a primary runoff election after the non-black candidate had garnered the most votes in the original primary election. *See* DX50, DX51.

584.   The Caster Plaintiffs assert that the third Senate factor "strongly counsels in favor of a Section 2 violation" because, for example, Alabama has used "numbered-place requirements … to discriminate against its Black voters." *Caster* DE56:26. But Alabama's "numbered-post law was about giving advantage to incumbents against Klan-backed factions within the Democratic Party, not about racial discrimination." *Ala. NAACP*, 2020 WL 583803, at *54.

585.   The Caster Plaintiffs further claim that Alabama's at-large judicial elections constitute forms of racial discrimination. In a remarkably thorough, 137-page opinion that followed six days of trial, the federal court for the Middle District of Alabama rejected this claim. *Id.* at *55 (finding insufficient evidence that any current procedures were adopted or maintained for discriminatory reasons).

586.   In any event, Alabama's congressional elections (like every other State's) are not at-large elections; a single member is chosen from each district, as required by federal law. 2 U.S.C. §2c.

### d.  Senate Factor 4: No Formal Slating Process Exists in Alabama.

587.   "There is no slating process involved in Alabama's congressional elections," *see Caster* DE44:19, so this factor is irrelevant to the totality of circumstances.

### e. Senate Factor 5: Plaintiffs Cannot Show That Disparities in Education, Employment, and Health Are Products of Discrimination.

588.   The fifth Senate factor analyzes "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37. "Thus the court must find that (1) past discrimination in these areas existed, (2) that those effects are borne by African Americans today, and (3) that these effects hinder African Americans' present ability to participate in the political process." *Ala. NAACP*, 2020 WL 583803, at *39.

589.   The Caster and Milligan Plaintiffs contend that they need not connect the alleged discrimination with current racial disparities and, ultimately, with black Alabamians' ability to vote. *See Caster* DE56:27; *Milligan* DE69:18; *see also* PI Tr. 1600:7-15 (Dr. King testifying that she "d[id] not conduct any analysis that directly connects these disparities to voter registration or casting about among [*sic*] black Alabamians," and "did not conduct any voter registration or turnout analysis").

590.   But the fifth Senate factor seeks evidence of depressed political activity linked to disparities that "bear the effects of discrimination," *Gingles*, 478 U.S. at 37, which requires Plaintiffs to demonstrate that the disparate "education, employment and health" outcomes are attributable to the "discrimination" at issue,

*id.*, and that these disparities impact black Alabamians' "ability to participate in the political process," *Ala. NAACP*, 2020 WL 583803, at *39; *see also, e.g.*, *Askew*, 127 F.3d at 1375.

591.   Indeed, the causal relationship between discrimination and disparate outcomes is what tethers Plaintiffs' evidence to Section 2's inquiry into racial discrimination, which in turn anchors Section 2 to its constitutional authority under the Fifteenth Amendment. *See* U.S. CONST. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State *on account of race, color, or previous condition of servitude*.") (emphasis added). *See also infra* §III.D.

592.   In any event, Plaintiffs' argument fails on its own terms. The Milligan Plaintiffs cite *Wright v. Sumter County Board of Education and Registration*, 979 F.3d 1282 (11th Cir. 2020), to support the claim that they need not connect the alleged discrimination and racial disparities, but, as *Wright* noted, while "disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation," it is "[w]here these conditions are shown, *and where the level of black participation is depressed*, [that] plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation."

*Wright*, 979 F.3d at 1294 (quoting *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1568 (11th Cir. 1984)) (emphasis added).

593.   Conditions for black Alabamians have, however, changed dramatically since the Eleventh Circuit found—in 1984—that "Blacks still register[ed] and vote[d] in *significantly* lower numbers than whites." *Marengo Cnty.*, 731 F.2d at 1568. Today, "[v]oter turnout and registration rates now approach parity," *id.*, and "[t]he level of black participation in the electoral process is not depressed," *Ala. NAACP*, 2020 WL 583804 at *41. With no "depressed level of political participation" to cite for support, *Wright*, 979 F.3d at 1294, Plaintiffs must prove up the third prong of this factor. They fail to do so. Indeed, according to the Milligan Plaintiffs' expert, turnout among black voters is apparently expected to be *higher* than white voter turnout in Plaintiffs' proposed majority-black districts. PI. Tr 1321:20-1322:8; MX4:15-18.

594.   The Caster and Milligan Plaintiffs cite various sources to show that lower socioeconomic status leads to lower participation in the political process. *See Caster* DE56:21-22; *Milligan* DE69:13. But this proposition is not race-specific; it applies to whites and blacks alike. *See, e.g.*, MX5:17 (Bagley Report) ("Education has repeatedly been found to *correlate* with income independently affects citizens' ability to engage politically") (emphasis added); *see also* CX80:71 ¶ 96 (King Report). Even if lower socioeconomic status affected only black participation in the

political process (which it doesn't), Plaintiffs have failed to connect the dots from historical discrimination to those current outcomes.

595.   That socioeconomic differences based on race exist in States that lack Alabama's history of discrimination—and, in many instances, are more severe in those States—seriously undermines the causal nexus Plaintiffs must establish. For example, Mr. Cooper explains that in Alabama the poverty rate for blacks (23.4%) more than doubles that of whites (11.5%), CX1:37; but in Connecticut, the poverty rate for blacks (19.1%) more than triples that of whites (5.9%).[16]

596.   And though the Caster Plaintiffs decry (at DE56:30) the "wildly disparate incarceration rates" in Alabama supposedly documented by their expert, Dr. King, the very source she relies on (at *Caster* DE50:39 ¶ 112 n.127) shows that Alabama has the second *lowest* black-white incarceration differential in the country, behind only Hawaii. *See* DX153:20 (Table 7).

597.   The Caster Plaintiffs attempt to dismiss Alabama's comparisons between its racial disparities and those of other states, claiming these interstate statistics represent "direct contravention of the blackletter rule that the Section 2 analysis is 'an intensely *local* appraisal.'" DE84:39 (citing *Gingles*, 478 U.S. at 78) (emphasis Plaintiffs'). But the *Gingles* Court applied this "intensely local appraisal"

---

[16] *See* U.S. CENSUS BUREAU, AMERICAN COMMUNITY SURVEY DATABASE, https://perma.cc/4LCA -W796 (last visited Dec. 22, 2021).

to "the design and impact of the contested electoral mechanisms," 478 U.S. at 79, not to socioeconomic disparities allegedly attributable to a State's history.

598.   What's more, the Caster Plaintiffs' own expert, Dr. King, "agree[d] wholly" with the proposition that "national points of comparison" "can be helpful or relevant" when attempting to "determin[e] the present effects of discrimination in Alabama." PI Tr. 1584:21-1585:13; *see also* 1225:15-18 (Milligan Plaintiffs' expert using state-to-state comparison and stating it "might be helpful" to compare Alabama to other states).

599.   And their own map-drawer, Mr. Cooper, stated that he "typically" compares States' socioeconomic data, *id.* 508:25-509:4, and "think[s] most states would have [socioeconomic] gaps," *id.* at 509:13-19.

600.   Considering that racial animus remains the lodestar of Section 2's inquiry, *see* 52 U.S.C. §10301 (barring standards, practices, and procedures applied "in a manner which results in a denial or abridgement of the right … to vote *on account of race or color*") (emphasis added), the Court should credit this aspect of Dr. King's testimony and evaluate evidence tending to confound or even delegitimate a causal connection between Section 2's results-oriented language and the unconstitutional actions the statute forbids.

601.   At the preliminary injunction stage, Plaintiffs must clearly show that this factor weighs in their favor. *See Exhibitors Poster Exch.*, 441 F.2d at 561.

185

Plaintiffs' inability to tie Alabama's history to current socioeconomic conditions keeps them from satisfying their burden.

### f. Senate Factor 6: Plaintiffs Have Not Shown That Political Campaigns in Alabama Are Characterized by Overt or Subtle Racial Appeals.

602.   Just last year, the Middle District of Alabama concluded that "[t]here is no evidence that Alabama political campaigns *generally* … are characterized by racial appeals." *Ala. NAACP*, 2020 WL 583803, at *58 (emphasis added). At this early stage of proceedings, we agree.

603.   As an initial matter, Plaintiffs have failed to seriously grapple with Senate factor six's inquiry into whether racial appeals "characterize" Alabama's elections. *Gingles*, 478 U.S. at 37. Plaintiffs cite a few specific vignettes (*Caster* DE56:31-34) and contend that even *one* political advertisement could "characterize" elections because it could be "an ad that airs repeatedly," PI Tr. 1230:18-1231:9. But though much of Plaintiffs' evidence illustrates distasteful politics—and some, particularly from the previous century, reveal express racial appeals—their evidence does not show that racial appeals "characterize" Alabama's elections in 2021.

604.   Plaintiffs argue that the *Alabama NAACP* court "approached this factor with an unnecessarily narrow lens, focusing solely on racial appeals occurring in statewide judicial elections." *Caster* DE84:42 n.12. But Plaintiffs' attempt to expand this Senate factor's "lens" cuts against them for the reasons just discussed. Indeed,

examining all the State's elections, as Plaintiffs allegedly seek to do, would constitute a substantial endeavor requiring analysis of hundreds (if not thousands) of electoral strategies and advertisements from recent decades. This was not the approach Plaintiffs' experts took.

605.   Even on its own terms, Plaintiffs' evidence offers little support for their position. For starters, their invocations of George Wallace and other historic racial appeals "are not probative of current conditions," "no longer ha[ve] any signaling effect to voters," and thus do not assist them in making their showing under this factor. *Ala. NAACP*, 2020 WL 583803, at *58. Plaintiffs' other proffered incidents of racial appeals do not show that such appeals characterize Alabama's elections.

606.   Moreover, Plaintiffs undermine their position by mischaracterizing political advertisements. Emblematic of this pattern is the Caster Plaintiffs' claim that one of Bradley Byrne's campaign ads features congresswomen and Colin Kaepernick "burning in a fire." *Caster* DE56:33. This is a misstatement. In the ad,[17] Former Congressman Byrne sits at a campfire, reminiscing about his deceased brother's military service and lamenting that, in his view, several notable politicians and activists were "cheapening 9/11," "dishonoring our flag," and "attacking America." None of these individuals shown in the commercial is "burning" in the fire—they appear in overlays, just as an image of 9/11 does.

---

[17] Available here: https://www.youtube.com/watch?v=31HHFy8JkoU.

607.   Plaintiffs also seek to sow racism into an inartful but ambiguous statement from then-Senate-candidate Roy Moore. *Caster* DE56:32. The quote in their MSNBC clip is as follows: "By 1962, the United States Supreme Court took prayer out of schools. Bible reading followed in *Abington v. Schempp*. Then they started created new rights in 1965. And today we've got a problem." CX103. Plaintiffs deem "new rights in 1965" to be "an unmistakable reference to civil rights legislation," *Caster* DE:56:32.

608.   But the more likely explanation is that Moore—after referencing the Supreme Court's decisions in *Engel v. Vitale*, 370 U.S. 421 (1962) (enjoining school prayer), and *School District of Abington v. Schempp*, 374 U.S. 203 (1963) (enjoining beginning school day with readings from Bible)—was alluding to a famous 1965 Supreme Court decision that recognized certain "penumbral rights," *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965), rights that would later feature in *Roe v. Wade*, 410 U.S. 113, 129 (1973).

609.   In any event, Plaintiffs acknowledge Moore "is a uniquely controversial figure in Alabama politics." PI Tr. 718:5-6. Almost by definition, a "uniquely controversial figure" provides weak evidence at best of what "characterize[s]" Alabama elections. *Gingles*, 478 U.S. at 37.

### g. Senate Factor 7: Minorities Have Achieved Success in Alabama Elections.

610.  Section 2 explains that "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" in evaluating a Section 2 claim's sufficiency. 52 U.S.C. §10301(b). Cribbing from the statute, the seventh Senate factor examines "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.

611.  While the relevant "minority group" is clear (black Alabamians), the parameters of "the jurisdiction" are less clear. Plaintiffs do not allege that "the minority group" they sought to define at *Gingles*'s first step are all members of one "political subdivision" or "jurisdiction"; indeed, the lack of a majority-minority jurisdiction comprising "the minority group" is precisely the issue in this litigation. That there is no specific "State or political subdivision" at issue where litigants seek to establish a new political district suggests that the relevant language from Section 2(b)—and its corresponding Senate factor—has at best limited applicability to this case.

612.  To the extent the seventh Senate factor applies here, the Court need not constrain its analysis to only those congressional and statewide elections Plaintiffs cite. Given that congressional races are districted rather than statewide, the success of minority candidates in districted races for a State-level office (e.g., the State

189

Legislature) is sufficiently comparable to congressional elections to warrant consideration.

613.   The *Alabama NAACP* court, finding this factor's language ambiguous where, as here, "[t]here [was] no political subdivision at issue," explained that "local, districted elections" within the broader jurisdiction (here, the State) are "entitled to some weight for purposes of the seventh senate factor," and concluded that "Senate factor 7 weighs in favor of Plaintiffs on statewide elections but weighs in favor of the State on elections statewide." 2020 WL 583803, at *62.

614.   The *Alabama NAACP* court's interpretation accords with Section 2's text, asking only whether black Alabamians "have been elected to office *in the* State *or* political subdivision. 52 U.S.C. 10301(b) (emphasis added). An inquiry into districted elections is important in showing this factor and shows that minorities have achieved electoral success in Alabama. *See Ala. NAACP*, 2020 WL 583803, at *58-59; *but see City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1560 (11th Cir. 1987) ("The political jurisdiction in question here is the county, not the cities of Villa Rica, Whitesburg, or Carrollton.").

615.   Minority candidates have achieved a great deal of electoral success in Alabama's districted races for State offices. Looking to the State House of Representatives, 27 of the chamber's 105 members are black—25.7% of Alabama's state representatives. *See* CX80:51 ¶ 146. In the State Senate, 7 of the chamber's 35

Senators are black—making up 20% of that body's members. *See id.* And a quarter of the State Board of Education's members—including the Board's President Pro Tem—are black. *See* ALABAMA STATE DEPARTMENT OF EDUCATION, STATE BOARD OF EDUCATION, https://www.alabamaachieves.org/state-board-of-education/ (last visited Dec. 20, 2021). Accordingly, this factor "weighs in favor of the State on elections statewide." *Ala. NAACP*, 2020 WL 583803, at *62.

616.  To the extent the seventh Senate factor applies to cases like this one, it appears to favor Alabama.

### h.  Senate Factor 8: Elected Officials Do Not Lack Responsiveness to Minority Needs.

617.  The eighth factor asks "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. Alabama has offered evidence showing elected officials have been solicitous to minority needs in several contexts, and Plaintiffs have sufficiently rebutted this conclusion.

618.  Though the Caster Plaintiffs argued that "[t]he State's response to the COVID pandemic has exemplified and exacerbated its historical neglect of its Black residents," DE56:36, this was simply not the case. As the Chief Medical Officer for the Alabama Department of Health ("ADPH"), Dr. Mary McIntyre, M.D., M.P.H., explained in her sworn declaration, *see* DX8 (Declaration of Dr. Mary McIntyre ("McIntyre Decl.")), the State engaged in extensive outreach to all socially

191

vulnerable Alabamians, with particular focus on the black community. McIntyre Decl. 2-4. ADPH "use[s] the Social Vulnerability Index (SVI) as part of [their] data-driven efforts to respond to COVID-19" and focus their efforts where they are most needed. DX8:1-2.

619.  To "reach out to the African American community and help improve vaccine confidence," the State "partnered with various organizations," including "the Alabama Conference of Black Mayors, Historically Black Colleges and Universities like Tuskegee University and Alabama State University, the Alabama State Missionary Baptist Convention, and the Governor's Office of Minority Affairs." *Id.* at 2. The State also "created yard signs promoting vaccination and distributed them to various leaders in communities of color around Alabama," and created "video Public Service Announcements with the Alabama Conference of Black Mayors in an attempt to educate Black Alabamians about COVID-19 symptoms and testing." *Id.* The State even conducted "joint presentations with the Alabama NAACP"—a Plaintiff in this litigation[18]—to "target[] Alabama's African American community." *Id.* at 3.

---

[18] *See also, e.g.*, Josh Gauntt, *Alabama NAACP Hosts Vaccine Roundtable with State and Local Health Leaders*, WBRC (Mar. 4, 2021), https://www.wbrc.com/2021/03/05/alabama-naacp-hosts-vaccine-roundtable-with-state-local-health-leaders/ (documenting "roundtable discussion" between "the state NAACP" and, among others, Dr. McIntyre).

620.   Plaintiffs assert that "the State failed its Black residents" because "[w]hen vaccines were rolled out, white communities received them before Black communities." *Caster* DE56:37. But as Dr. McIntyre explains, "[t]he State's initial selection of vaccine locations was based on which facilities, almost all of which were hospitals, volunteered that they would be able to handle the product from a logistics standpoint." DX8:4. And "[w]hen the Federal Pharmacy vaccine program was rolled out," she continues, "ADPH spent a great deal of time convincing [its] pharmacy partners to place vaccine in high-SVI areas," *id.*; "[t]hey eventually agreed to do so," *id.* The State also activated its National Guard to effect a vaccine-outreach campaign, targeting the most vulnerable counties for COVID-related support. *Id.* at 3.

621.   The State's efforts bore fruit. Today, not only are "vaccines available in every single county health department in Alabama," but "[a] higher percentage of Black Alabamians have received the COVID-19 vaccine than White Alabamians." *Id.* at 4. Indeed, "[t]he county with the highest vaccination rate is Lowndes County, which is a majority-Black county." *Id.* Even Plaintiffs' expert, Dr. Bagley, testified that the Alabama Department of Public Health "ha[s] done a good job of getting people vaccinated," and that "Black people are vaccinated in Alabama at a high rate." PI Tr. 1234:16-1235:1.

622.  Despite all this, the Caster Plaintiffs steadfastly maintain that Alabama's COVID-19 response represents a "disastrous failure to protect Black

Alabamians." DE84:43. But they cite no evidence to rebut Dr. McIntyre's testimony or statistics—all of which point in precisely the opposite direction.

623.   Plaintiffs also argue that the Legislature's failure to enact certain Democratic policy items, such as Medicaid expansion, proves racial bias. But the decision whether to expand the State's participation in a massive federal welfare program is a paradigmatic *political*, rather than racial, decision. Nor is it surprising that a politically conservative State declined the administrative costs and tax increases that Medicaid's expansion would have likely required.

624.   The eighth Senate factor favors Alabama.

### i.   Senate Factor 9: The State's Districts Are Not "Tenuous."

625.   The final Senate factor asks "whether the policy underlying" the "standard, practice or procedure" at issue "is tenuous." *Gingles*, 478 U.S. at 36-37. According to the Senate Report, an electoral practice is "tenuous" if "the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction." S. Rep. 97-417, 29 n.117.

626.   The Alabama Legislature produced the 2021 Map using the same commonplace process previous Legislatures had used: begin with the currently existing maps; evaluate where population had increased and decreased; and then— without incorporating race—add or reduce population to achieve equality. *See supra*

Background §F.[19] The Alabama Legislature also followed its predecessors' substantive traditions, incorporating Alabama's longstanding district cores into the 2021 Map. *See id.* §§C-E.

627.   The "procedure" that produced the districts in the 2021 Map is "the very opposite of tenuous: It is weighty." *Ala. NAACP*, 2020 WL 583804, at *62.

628.   Plaintiffs nevertheless argue that the State's consistency with past practice "is precisely what makes [the 2021 Map] tenuous," and that the Legislature's "failure to include a second majority-Black district lacks any substantial justification." DE84:44. But the Senate Report directly contravenes Plaintiffs' *sui generis* conception of tenuousness. *See* S. Rep. 97-417, 29 n.117 ("tenuous" if "procedure markedly departs from past practices").

629.   At closing arguments, the Caster Plaintiffs suggested that the State's justifications for its policy were tenuous because Defendants' "justifications … flatly ignore the prioritization of criteria in the state's very own guidelines." PI Tr. 1815:4-6. To the extent Plaintiffs mean that the State should have prioritized the "reasonably compact" factor in Section II(h) over the factors in Section II(j) related to core retention and incumbents, Plaintiffs are misreading the Guidelines, which do not subordinate the factors in Section II(j) to "reasonabl[e]

---

[19] Though Plaintiffs complain that the process was "rushed," *see, e.g.*, *Caster* DE56:8, any accel-erated timing was due to the months-long delays in getting Census data, *see Milligan* DE53:35-36 ¶174, which lay well beyond the State's control.

compactness" because compactness is not "prescribed by the Constitution and laws of the United States and of the State of Alabama." MX28:2 (Guidelines § II(j)).

630. To the extent Plaintiffs mean the State should have drawn two majority-black districts to comply with the VRA, the statement is mere question begging.

631. This Senate factor "weighs heavily in favor of the State." *Ala. NAACP*, 2020 WL 583803, at *62.

> **2. The Totality of Circumstances Shows That Black Alabamians Enjoy "Equally Open" Political Processes and Suffer No "Abridgement" to Their Rights "On Account of Race or Color."**

632. A "comprehensive, not limited, canvassing of relevant facts," *Johnson*, 512 U.S. at 1011, strongly suggests that black Alabamians' relative difficulty "elect[ing] representatives of their choice" is not a product of "race or color," 52 U.S.C. §10301. Any such difficulty is instead a predictable result of bloc-voting for Democrat candidates in "one of the most Republican states in the entire South." *Ala. NAACP*, 2020 WL 583803, at *42 (internal quotation marks omitted).

633. According to the Census Bureau, in 2018, Alabama had the second highest black voter registration rate in the entire country, behind only Mississippi.[20] And in 2016, black voter turnout in Alabama surpassed white voter turnout by

---

[20] *See* U.S. CENSUS BUREAU, VOTING AND REGISTRATION IN THE ELECTION OF NOVEMBER 2018, TABLE 4B: REPORTED VOTING AND REGISTRATION BY SEX, RACE AND HISPANIC ORIGIN, FOR STATES: NOVEMBER 2018, https://www2.census.gov/programs-surveys/cps/tables/p20/583/table04b.xlsx. The comparisons are drawn from looking at the "percent registered" of total population for the "black alone" number for each State.

4.6%.[21] Nationally, there was a 2.3% gap going the other way—more white voters than black voters as a percentage of the population. But in Alabama 60.2% of blacks voted compared with 55.6% of whites.

634.   By comparison, in New Jersey (which had not been covered by Section 5 and does not share Alabama's history of discrimination) 56.6% of whites and just 48.7% of blacks voted in the November 2016 election—a racial gap of 7.9%.[22]

635.   In Connecticut—a State whose history also bears little resemblance to Alabama's—the gap was 13.1%.[23]

636.   The 2018 midterm elections tell a similar story. Nationally, the racial gap in voter registration rates was 3.5%, with more whites than blacks voting as a percentage of population. In Alabama, the gap was just 0.8%, with 68% of whites compared to 67.2% of blacks registering to vote.[24]

637.   For comparison, in Colorado the voter-registration gap was 22.8%; in Connecticut, 14.2%; in Michigan, 8.6%; and in New Jersey, 3.8%.[25] Turnout was roughly the same—a national 3.1% gap compared to 0.7% in Alabama. Again, in

---

[21] U.S. CENSUS BUREAU, VOTING AND REGISTRATION IN THE ELECTION OF NOVEMBER 2016, TABLE 4B: REPORTED VOTING AND REGISTRATION BY SEX, RACE AND HISPANIC ORIGIN, FOR STATES: NOVEMBER 2016, https://www2.census.gov/programs-surveys/cps/tables/p20/580/table04b.xlsx
[22] Id.
[23] Id.
[24] U.S. CENSUS BUREAU, VOTING AND REGISTRATION IN THE ELECTION OF NOVEMBER 2018, TABLE 4B: REPORTED VOTING AND REGISTRATION BY SEX, RACE AND HISPANIC ORIGIN, FOR STATES: NOVEMBER 2018, https://www2.census.gov/programs-surveys/cps/tables/p20/583/table04b.xlsx
[25] Id.

Colorado the voter-turnout gap was 28.1%; in Connecticut, 12.3%; in Michigan, 5.3%; and in New Jersey, 4.6%.[26, 27]

638.   Similarly, black Alabamians enjoy substantial representation in public office throughout the State. *See* CX80:51 ¶ 146 (Caster Plaintiffs' expert Dr. King acknowledging that 27 State Representatives and seven State Senators are black); *see also* ALABAMA STATE DEPARTMENT OF EDUCATION, STATE BOARD OF EDUCATION,   https://www.alabamaachieves.org/state-board-of-education/   (last visited Jan. 13, 2021) (showing that two of the eight members of the State Board of Education are black, including the Board's President Pro Tem).

639.   And both major political parties recognize the strength of the black franchise in Alabama and actively court black support. *See, e.g.*, Mike Cason, *Alabama Republican Party Launches New Minority Outreach Effort*, AL.com (Oct. 21, 2021), https://perma.cc/3X2P-FRW4 (describing Alabama Republican Party's

---

[26] *Id.*

[27] Plaintiffs point to evidence of racial disparities in voter-turnout during the 2020 elections, but never engage with the State's data from other years. *Milligan* DE94:26. But 2020 was an aberrational year nationwide, seeing racial turnout gaps widen across the country. *See* U.S. CENSUS BUREAU, VOTING AND REGISTRATION IN THE ELECTION OF NOVEMBER 2020, TABLE 4B: REPORTED VOTING AND REGISTRATION BY SEX, RACE AND HISPANIC ORIGIN, FOR STATES: NOVEMBER 2020, https://www2.census.gov/programs-surveys/cps/tables/p20/585/table04b.xlsx. It's unclear why this was the case, but COVID-19 and the particular candidates up for election may have played a role. Alabama's gap was slightly above average at 7.2% according to the Census data, but still well within national norms: Colorado's was 13.5%, Connecticut's 6.6%, Illinois's 3.5%, Michigan's 4.6%, New Jersey's 11.4%, and New York's 4%. *Id.*

"formation of a minority outreach team to try to increase the number of Black people who are active in the party and run for office").

640. In sum, "things have changed dramatically" in Alabama, *Shelby County*, 570 U.S. at 547, and "Plaintiffs simply have not shown that, in present-day Alabama, there are any barriers keeping African Americans from participating in the political process as voters." *Ala. NAACP*, 2020 WL 583804, at *41. "The level of black participation in the electoral process is not depressed," *id.*, and, in a deeply red State like Alabama, "it is not surprising that black-preferred candidates … are losing because they are campaigning as Democrats," *id.* at *62.

641. Nor does circumstantial evidence militate in Plaintiffs' favor. In *LULAC*, for example, the Court explained there was "a denial of opportunity in the real sense of that term" where a "rise in Latino voting power" and "the near-victory of the Latino candidate of choice" constituted "the very reasons that led the State to redraw the district lines," thus "prevent[ing] the immediate success of the emergent Latino majority." 548 U.S. at 428-29. No evidence suggests a similar fact pattern here.

642. Furthermore, Plaintiffs have offered no evidence to suggest that the Alabama Legislature sought to stymie black Alabamians' political momentum. To the contrary, the Legislature deliberately eliminated consideration of race throughout the map-drawing process, *see* MX11:26, 35, 38 (100, 136, 145-46)—and enacted a

map that adhered to the State's traditional redistricting criteria over the last several decades while making minimal changes to equalize population.

643.   Neither the Senate factors nor any other circumstantial evidence tips the scales in Plaintiffs' favor. The totality of circumstances demonstrates that the 2021 Map does not "den[y] or abridge[] … the right of [black Alabamians] to vote on account of race or color." 52 U.S.C. § 10301(a).

### C. Plaintiffs' Proposed Remedies Are Unconstitutional Racial Gerrymanders.

644.   Plaintiffs' proposed remedies are racial gerrymanders that were "obviously … created solely to effectuate the perceived common interests of one racial group," which is "altogether antithetical to our system of representative democracy." *Shaw I*, 509 U.S. at 648. Plaintiffs' failure to show a permissible remedy is possible (despite over two-million attempts) provides an independent basis to reject their claims.

645.   Indeed, when viewing one of the Caster Plaintiffs' proposed maps, Singleton Plaintiffs' expert Dr. Davis explained that the map represented "an effort to pull and concentrate black voters in the Second [District] and then in the Seventh [District]." PI Tr. 112:6-7. "It's an outcome-based plan," she continued, "[t]here's no question." *Id.* at 112:8-9.

646.   The "[r]acial classifications" that animate Plaintiffs' proposed remedies "are antithetical to the Fourteenth Amendment, whose central purpose was to

eliminate racial discrimination emanating from official sources in the States." *Shaw II*, 517 U.S. at 907. Because Plaintiffs "cannot obtain relief unless [they] can establish … the existence of a permissible remedy," *Nipper*, 39 F.3d at 1524, their proposed remedies' unconstitutionality is dispositive.

647.   Of course, "under certain circumstances, drawing racial distinctions is permissible where a governmental body is pursuing a 'compelling state interest.'" *Id.* at 908. And the Supreme Court has "assume[d], without deciding, that the State's interest in complying with the Voting Rights Act [is] compelling." *Bethune-Hill Virginia State Bd. of Elections*, 137 S. Ct. 788, 801 (2017). But "the purpose of the Voting Rights Act [is] to eliminate the negative effects of past discrimination," *Gingles*, 478 U.S. at 65, and "[a] State's interest in remedying the effects of past or present racial discrimination" will only "rise to the level of a compelling state interest" if the State "satisf[ies] two conditions," *Shaw II*, 517 U.S. at 909.

648.   First, "the discrimination must be identified discrimination." *Id.* (internal quotation marks, citation omitted). This means that "[a] generalized assertion of past discrimination in a particular industry or region is not adequate," and, as a corollary, that "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Id.* at 909-10.

649.   Second, a legislature "must have had a strong basis in evidence to conclude that remedial action was necessary, *before* it" acts based on race. *Id.* at 910 (internal quotation marks, citation omitted; emphasis in original).

650.   Plaintiffs' have not offered sufficient "identified discrimination" to justify their racial gerrymanders. *Id.* at 909-10. Had the Alabama Legislature adopted the maps Plaintiffs propose, such a racial gerrymander would have violated the Constitution—a remedy no plaintiff may compel.

651.   And it cannot be the case that, as Plaintiffs insist, Section 2 opens the door to subordinating traditional districting principles to race just because "[t]he intentional creation of a majority-minority district necessarily requires consideration of race." *Caster* DE84:20 (quoting *Fayette Cnty.*, 118 F. Supp. 3d at 1345). Aside the "uncomfortable resemblance to political apartheid" Section 2 would suddenly demand, *Shaw I*, 509 U.S. at 647, this position ignores the Supreme Court's distinction between merely "being aware of" race and being "motivated by" it, *Miller*, 515 U.S. at 916; *see also id.* at 921 ("[C]ompliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws.").

652.   Plaintiffs offer precious little to show that their illustrative maps survive strict scrutiny. They fail to muster the "strong basis in evidence" they must produce

to "justify race-based districting." *Cooper*, 137 S. Ct. at 1464. Instead, Plaintiffs argue that that their VRA districts are narrowly tailored to serve a compelling State interest because "complying with the [VRA] is a compelling interest." *Caster* DE84:22-23. Plaintiffs' reasoning is circular. Moreover, their argument subordinates the Fourteenth Amendment to Section 2 of the Voting Rights Act, which neither they nor this Court may do.

1. **Plaintiffs' Experts Have Demonstrated That It Is Essentially Impossible to Draw Two Majority-Minority Districts Without Subordinating Traditional Redistricting Principles to Race.**

653.   A map that evinces a "policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote)" constitutes "evidence that race motivated the drawing of particular lines." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 267 (2015) ("*ALBC I*").

654.   Here, Plaintiffs have subordinated all race-neutral, traditional redistricting factors to "racial tinkering." *Miller*, 515 U.S. at 919. As discussed in greater detail above, Plaintiffs' maps break down communities of interest, radically restructure the cores of existing districts, and pit incumbents against each other. *See supra* §III.A.1. As Dr. Duchin explained, she viewed "minority electoral opportunity" as a "nonnegotiable criteria" and, in fact, her "principle goal" when drawing the alternative plans in this case, against which all other criteria would then be balanced "as well as possible." PI Tr. 622:17-623:16. Indeed, Dr. Duchin

confessed that she "regard[ed] minority opportunity to elect as an important traditional principle" and thus didn't "know of a way to talk about the traditional principles that is truly race blind." PI Tr. 682:19-22.

655.   The sacrifice of the traditional principles to Dr. Duchin's race-focused criteria becomes even more evident when looking to Dr. Duchin's own work in which she "generated *2 million* districting plans for Alabama" that lacked this "strong preference for two majority-black districts," and not one of these two million maps had two majority-minority districts. *Id.* at 682:3-14 (emphasis added); *id.* at 682:12-14 ("without taking race into account in any way in the generation process," none of the two million maps had two majority-black districts).

656.   Another of the Milligan Plaintiffs' experts, Dr. Imai, offered conclusions that further underscore Dr. Duchin's concessions. Dr. Imai's expert report reveals that randomly creating a map from a blank slate and ending up with two majority-minority districts is virtually impossible—or, at least stands a less-than-one-in-ten-thousand chance of occurring. MX1:7-9 ¶¶ 18-19, 26. Dr. Duchin's conclusion that a two-majority-minority-district map stands less than a one-in-*two-million* chance of occurring absent racial prioritization is, of course, even more dramatic. PI Tr. 682:3-14. Nevertheless, Dr. Imai offers yet another mathematical approach to reiterate the virtual impossibility of drawing Plaintiffs' two-majority-minority-district maps without ensuring that race is a criterion that "[can]not be

compromised." *Shaw II*, 517 U.S. at 907. *See* PI Tr. 235:12-236:18 ("conclud[ing] that race predominate[s]" where Districts 2 and 7 exceed 50% BVAP); MX1:9-13.

657.   Moreover, even when Dr. Imai instructed his algorithm to ensure that one majority-minority district would be drawn—producing over 20,000 maps that did so—not one included a second majority-minority district. *See* PI Tr. 268:23-269:6; MX1:13-16; MX6:3-6.  There is simply no question that Plaintiffs "expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria." *ALBC I*, 575 U.S. at 267; *see also Shaw II*, 517 U.S. at 907.

658.   Through their experts, Dr. Imai and Dr. Duchin, the Milligan Plaintiffs have amply demonstrated that race was the predominant factor in Dr. Duchin's and Mr. Cooper's illustrative plans. The Equal Protection Clause does not permit maps that subordinate traditional districting criteria to race, meaning Plaintiffs most certainly may not use Section 2 to require such maps. *See, e.g.*, *Miller*, 515 U.S. at 916. But even if Section 2 could possibly justify such a map, Plaintiffs would have to show that their racially gerrymandered, two-majority-minority-district maps could survive strict scrutiny. *See, e.g.*, *Miller*, 515 U.S. at 920. They cannot do so.

## 2.  Plaintiffs Cannot Show That Their Proposed Maps Survive Strict Scrutiny.

659.   Strict scrutiny is the "most rigorous and exacting standard of constitutional review." *Miller*, 515 U.S. at 920; *see also id.* at 921 ("[C]ompliance with federal antidiscrimination laws cannot justify race-based districting where the

challenged district was not reasonably necessary under a constitutional reading and application of those laws."). To show that a racial gerrymander satisfies compelling state interest sufficient to survive strict scrutiny, a party must show "identified discrimination"—a "generalized assertion of past discrimination" will not do—and it must have a "strong basis in evidence" to support the racial gerrymander. *Shaw II*, 517 U.S. at 909 (internal quotation marks omitted).

660.   Rather than specifically identify the discrimination they purportedly seek to remedy through this litigation, Plaintiffs repeatedly allege that generalized past discrimination constitutes the basis of their Section 2 claim. *See, e.g.*, *Caster* DE56:7 (alleging "the State's sordid, persistent, and well documented history of racial discrimination … ensures that Black Alabamians lack equal access to the State's political process"); *Milligan* DE69:6 (alleging that "[s]ince its admission into the union, Alabama's history has been indelibly scarred by efforts to diminish its Black citizens' political power.").

661.   To the extent Plaintiffs had adequately identified the alleged discrimination on which they rely, Plaintiffs have failed to show—indeed, they never once argue—that a "strong basis in evidence" supports the conclusion that remedial action "is necessary." *Shaw II*, 517 U.S. at 909. To the contrary, the totality-of-circumstances analysis above, *see supra* §III.B, shows that congressional elections are "equally open" to all Alabamians.

662.    Furthermore, Plaintiffs' proposed remedies come dangerously close to seeking a non-existent right to proportional (indeed, maximal) racial representation in Congress. Section 2 does not require such relief, explaining "[t]hat nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. §10301(b); *accord, e.g.*, *De Grandy*, 512 U.S. at 1016 ("[R]eading the first *Gingles* condition in effect to define dilution as a failure to maximize in the face of bloc voting … causes its own dangers, and they are not to be courted."); *Gingles*, 478 U.S., at 94-95 (O'Connor, J., concurring in judgment) ("[T]here is no indication that Congress intended to mandate a single, universally applicable standard for measuring undiluted minority voting strength."). Nor can the Constitution support such an endeavor. *See, e.g.*, *Rucho*, 139 S. Ct. at 2499; *City of Mobile v. Bolden*, 446 U.S. 55, 75-76 (1980) (plurality) ("The Equal Protection Clause … does not require proportional representation as an imperative of political organization.").

663.    Plaintiffs have failed to show "identified discrimination" or provide a "strong basis in evidence" that any such discrimination required remedy under Section 2. *Shaw II*, 517 U.S. at 909. Their racially gerrymandered remedies are thus constitutionally impermissible. *Id.* at 909-10.

### 3. Plaintiffs May Not Use Section 2 to Compel the State to Violate the Constitution.

664. Plaintiffs' experts admitted to unmistakable race-predominate districting insisting that it was appropriate, but Plaintiffs may not compel the Alabama Legislature to violate the Constitution. Section 2 is a bulwark against vote dilution, not a ticket to proportional (let alone maximal) representation. *See Bartlett*, 556 U.S. at 20 ("Section 2 does not guarantee minority voters an electoral advantage.").

665. The Supreme Court has continually reiterated that, despite a state's best intentions, mere acquiescence to plaintiffs' redistricting demands will not satisfy the strict scrutiny that racial gerrymandering requires. Noting that "the Justice Department's implicit command that States engage in presumptively unconstitutional race-based districting" brought the VRA "into tension with the Fourteenth Amendment," the *Miller* Court explained that any "exercise of [Congress's] Fifteenth Amendment authority even when otherwise proper still must "consist with the letter and spirit of the Constitution.'" 515 U.S. at 927 (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 421 (1819)).

666. Plaintiffs' demand that the State subordinate its traditional race-neutral redistricting principles to maximize one race's representation offends "the letter and spirit of the Constitution." *Id.* As the Court recently counseled in *Abbott*, plaintiffs desiring "a district with a particular design may come to an overly expansive

understanding of what [Section] 2 demands," 138 S. Ct. at 2334, and "one group's demands alone cannot be enough." *Id.* Just so here.

667.   For all the reasons explained in the preceding subsections, neither Plaintiffs' circular logic nor their "demands alone" justify the racial gerrymander they seek to impose on Alabama. They have therefore failed to provide a remedy adequate to satisfy *Gingles*'s threshold requirement. *Nipper*, 39 F.3d at 1530-31 (plurality opinion).

### D. Plaintiffs' Interpretation of Section 2 Is Likely Unconstitutional and Thus Warrants Avoidance.

668.   The canon of constitutional avoidance further counsels against granting Plaintiffs the relief they seek. Congress derived its authority to enact the VRA pursuant to the Fourteenth and Fifteenth Amendments, which permit Congress to "enforce" those amendments' substantive provisions "by appropriate legislation." U.S. CONST. amend. XIV, § 5; XV, § 2. Congress has the power to enforce the substantive provisions of these Amendments "by creating private remedies against the States for *actual violations* of those provisions." *United States v. Georgia*, 546 U.S. 151, 158 (2006) (emphasis added).

669.   The Supreme Court has invoked constitutional avoidance in interpreting other provisions of the VRA to avoid exacerbating their "federalism costs" and to maintain their constitutionality. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009) (applying avoidance canon in interpreting

209

Section 5); *Bartlett*, 556 U.S. at 21-22 (applying avoidance canon in interpreting Section 2). Under the avoidance canon, "[t]he question is not whether" the saving interpretation of a statute "is the most natural interpretation ... but only whether it is a 'fairly possible' one." *NFIB v. Sebelius*, 567 U.S. 519, 563 (2012).

670.   Plaintiffs' interpretation of Section 2 very likely disproportionately construes the statute, dragging it into unconstitutional waters. *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

671.   Geographic and temporal limitations on the scope of a prophylactic laws "tend to ensure Congress' means are proportionate." *College Savings*, 527 U.S. at 647.

672.   One of the characteristics of Section 5 in the original VRA that contributed to its initial constitutional validity, for example, was that it was "confined to regions of the country where voting discrimination had been most flagrant." *City of Boerne*, 521 U.S. at 532-33. It was to last only for a limited time and thus had to be renewed.

673.   Because Section 2's boundless geographic scope and temporal indeterminacy may "offend[] against this principle" of proportionality, *College Savings*, 527 U.S. at 647—and thus draw the statute's "appropriate[ness]" under the Fourteenth and Fifteenth Amendments further into question—any interpretation of

the statute must properly calibrate Section 2's application to circumstances relevant to Alabama *today*.

674.   Current redistricting doctrine attempts to do this by focusing its ultimate inquiry on whether, considering the State's "traditional redistricting principles" and the "totality of circumstances," the relief Plaintiffs seek under Section 2 would be "appropriate," U.S. CONST. amend. XV, § 2.

675.   But instead of focusing on Alabama today, Plaintiffs attempt to support their claims with evidence of historical conditions that no longer pertain to black Alabamians' ability "to participate in the political process." 52 U.S.C. §10301(b). By ignoring evidence unequivocally demonstrating that, *today*, black Alabamians exercise their voting rights to the same or greater extent than do their white counterparts, Plaintiffs correspondingly ignore the Fourteenth and Fifteenth Amendments' appropriateness requirement and unmoor Section 2 from its constitutional authority. *City of Boerne v. Flores*, 521 U.S. at 520; *see also Shelby County*, 570 U.S. at 547.

676.   Moreover, Plaintiffs' proposal to allow plaintiffs, and require Legislatures, to discard or discount traditional race-neutral redistricting principles when considering whether an illustrative district is "reasonably compact" for purposes of *Gingles I*, "would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *Bartlett*, 556 U.S. at 21

(quoting *LULAC,* 548 U.S. at 446). "That interpretation would result in a substantial increase in the number of mandatory districts drawn with race as 'the predominant factor motivating the legislature's decision.'" *Id.* at 21-22 (quoting *Miller*, 515 U.S. at 916.

677.   Accordingly, insofar as any doubt exists whether Section 2 permits Plaintiffs to propound a reading that broadens the gap between the Voting Rights Act and its constitutional foundation in the Fourteenth and Fifteenth Amendments, the Court should resolve that doubt by rejecting Plaintiffs' interpretation.

### E.  Whether Section 2 Provides Plaintiffs a Private Cause of Action Is Unclear.

678.   While the Supreme Court has often "[a]ssum[ed], for present purposes, that there exists a private right of action to enforce" Section 2, it has never so held. *Bolden*, 446 U.S. at 60 (plurality). So, whether "the Voting Rights Act furnishes an implied cause of action under § 2" is "an open question." *Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring).

679.   Under modern Supreme Court precedent, the answer to this "open question" is very likely "no." Absent clear expression of Congress's intent to provide a private right of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). "Moreover, a reviewing court may not plumb a statute's supposed purposes and policies in

212

search of the requisite intent to create a cause of action; rather, the inquiry both begins and ends with a careful examination of the statute's language." *In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc).

680.   If this careful textual analysis does not reveal a private cause of action, a court should presume none exists; "under *Sandoval* and its progeny, the question isn't whether Congress 'intended to preclude' a private right of action, but rather, whether it intended to provide one." *Id.* at 1259 (citation omitted).[28]

681.   Section 2 does not "clearly and affirmatively manifest its intent—as reflected in the Act's text and structure—to create a private right of action," *id.* at 1256—to say nothing of a private remedy. Simply put, Section 2 contains no "'rights-creating' language." *Sandoval*, 532 U.S. at 288. While the statute refers to "the right … to vote," 52 U.S.C. § 10301(a), that right is based on state law, *see Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982), and the Fifteenth Amendment. And referring to a right does not "clearly and affirmatively manifest [] intent … to create a private right of action," *In re Wild*, 944 F.3d at 1256, and thus does not create any such right "in [the] clear and unambiguous terms" binding precedent requires, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002).

---

[28] Nor is it relevant that courts at one time "assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). The Court has clearly stated that time has passed; since jettisoning the "*ancien regime*," *id.*, the Supreme Court has "not returned to it since," *Sandoval*, 532 U.S. at 287.

682.   Equally significant, other sections of the VRA show that Congress knew how to create private rights yet declined to do so in Section 2.

683.   Section 3, for example, authorizes specific federal actions when other statutes trigger them. 52 U.S.C. §10302. There, Congress thrice contemplates situations in which "proceeding[s] [are] instituted by the Attorney General *or an aggrieved person* under *any statute* to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* (emphasis added). The statute clearly considers other statutes that provide private rights of action allowing "aggrieved individuals" to enforce the Reconstruction Amendments, yet not once refers to any such statutes within the VRA. In fact, Section 2 never invokes the "aggrieved person" language to which its statutory neighbor referred.

684.   "Far from a *Sandoval*-qualifying clear statement of congressional intent to create a private right of action," Section 3's implications "very nearly foreclose[] one." *In re Wild*, 994 F.3d at 1259.

685.   Moreover, a court evaluating whether a statute creates an implied cause of action must analyze separate statutes separately. *See, e.g.*, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576-78 (1979) (rejecting an implied cause of action under Section 17(a) of the Securities Exchange Act of 1934 despite *Borak* earlier inferring one under Section 14(a) of the same Act). Thus, even if one could possibly read Section 3 to establish a private cause of action for the relief granted in that section,

the existence of a private cause of action in Section 3 would not imply the same held for Section 2.

686.   To be sure, fractured opinions have suggested, in dicta, that Section 2 impliedly creates a private cause of action. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 232-33 (1996) (minority opinion of Stevens, J.) (quoting legislative history and discussing "a right to vote"); *id.* at 240 (Breyer, J., concurring in the judgment) (similar). But those opinions are inconsistent with the Supreme Court's later-in-time *majority* opinion in *Sandoval*, which limited its "search for Congress's intent [to] the text and structure of" the statute. 532 U.S. at 288. The Court therefore finds Plaintiffs' total reliance on *Morse* unpersuasive. *See* DE84:44-47.

687.   Because Section 2's text does not "clearly and affirmatively manifest" a private cause of action, there is a serious argument that none exists. *In re Wild*, 944 F.3d at 1256. At the preliminary-injunction stage, Plaintiffs' inability to demonstrate that Section 2 permits them to privately prosecute their claims provides us another, independent grounds on which to resolve this litigation.

### F. Plaintiffs' Section 2 Arguments Jeopardize This Court's Jurisdiction.

688.   A threshold issue of federal jurisdiction, sovereign immunity, must be decided "before requiring a state department and its officers to answer a complaint against them." *Seminole Tribe of Fla. v. Fla. Dep't of Revenue*, 750 F.3d 1238, 1242

(11th Cir. 2014) (quoting *Bouchard Transp. Co. v. Fla. Dep't of Envt'l Prot.*, 91 F.3d 1445, 1448-49 (11th Cir. 1996)).

689.    This immunity from both suit and liability extends to state officials sued in their official capacities. *See Fla. Ass'n of Rehab. Facilities v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1219-20 (11th Cir. 2000). "In *Ex parte Young*, the Supreme Court carved out a narrow exception to the States' sovereign immunity when it held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1308 (11th Cir. 2011). That exception does not apply here.

### 1. To the Extent Plaintiffs' Section 2 Claims Attempt to Supplant the Legislature's Authority to Weigh the State's Traditional Redistricting Principles, They Exceed This Court's Jurisdiction.

690.    *Ex parte Young*'s "narrow exception to the States' sovereign immunity" allows federal courts to "grant[] prospective injunctive relief to prevent a continuing violation of *federal* law," *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1308 (11th Cir. 2011) (emphasis added). And because courts look to the "gravamen" of a complaint to determine its actual substance irrespective of its captions and pleading, *DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997), where the substance of a claim

implicates a "violation of state law," the claim is "barred by the Eleventh Amendment," *Schrenko*, 109 F.3d at 688.

691.   There is no debate that the question of how to balance the State's various districting criteria is primarily reserved for the State. *See, e.g.*, *Miller*, 515 U.S. at 915 ("It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'") (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975). Indeed, because "[e]lectoral districting is a most difficult subject for legislatures," the Supreme Court has unequivocally counseled that "the States must have discretion to exercise the political judgment necessary to balance competing interests." *Id*.

692.   The hearing testimony of Plaintiffs' experts left no doubt that Plaintiffs are seeking to impose, through an order from this Court, their preferred redistricting-criteria prioritization on the State. *See, e.g.*, PI Tr. 575:11-17 (Dr. Duchin stating: "To me, the reading that I took from this, and I think the reasonable reading is that the ones listed before part j. should be regarded to take precedence. And so I did take this document quite seriously in listing the federal requirements first, followed by compactness and contiguity with concepts like incumbency consideration and core preservation clearly lower ranked."). *Pennhurst* and respect for State sovereignty prevent parties from asserting that a legislature failed to follow its own guidelines in

an attempt to override the legislature's "political judgment necessary to balance competing interests." *Miller*, 515 U.S. at 915.

693.   Plaintiffs' Section 2 arguments ultimately seek to supplant the State Legislature's redistricting authority with their preferred policy. *Pennhurst* squarely forecloses Plaintiffs' bid to trump the Legislature's constitutional redistricting prerogative. Insofar as Plaintiffs' prosecution of their Section 2 claims asks this Court to re-balance or re-prioritize the Legislature's districting criteria, Plaintiffs' case exceeds this Court's jurisdiction.

> **2. To the Extent Plaintiffs' Section 2 Claims Attempt to Supplant the Legislature's Understanding of "Communities of Interest," They Raise a Nonjusticiable Political Question.**

694.   In *Baker v. Carr*, 369 U.S. 186 (1962), the Supreme Court articulated six indicia of a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1357-58 (11th Cir. 2007) (quoting *Carr*, 369 U.S. at 217).

695.   If a claim requires a court to decide a political question—that is, a "question possessing one of these six characteristics," *id.* at 1358—then the claim "must be dismissed for lack of jurisdiction," *id.*

696.   Plaintiffs divide a longstanding community of interest but nevertheless assert that they honor Alabama's communities of interest by uniting the Black Belt instead. *See, e.g.*, *Caster* DE84:17. As noted above, Plaintiffs' plans do not actually unite the Black Belt community of interest they describe. *See supra* ¶ 430; PI Tr. 488:17-20 (Caster plaintiffs' expert Cooper admitting that he had not produced a plan that kept the Black Belt counties whole in a single district); *id.* at 665:17-667:10 (Milligan plaintiffs' expert Duchin admitting same); *id.* at 846:9-15, 1063:13-24 (Defendants' expert Bryan confirming).

697.   But more fundamentally, to entertain Plaintiffs' argument would require this Court to determine whether the Black Belt is an equal or stronger "community of interest" compared with numerous other communities that would be broken up by Plaintiffs' plans including Mobile County, the Gulf Counties as a unit, and the Wiregrass Counties.

698.   Such a determination necessarily implicates at least the first four *Carr* indicia: (1) Article I, Section 2 of the U.S. Constitution places the redistricting process squarely within the province of the Legislature, in turn requiring that the States "have discretion to exercise the political judgment necessary to balance

competing interests" in the process, *Miller*, 515 U.S. at 915; (2) there are no "judicially discoverable and manageable standards" for testing the legal validity of "communities of interest" aside from the constitutional requirement that race not predominate the inquiry, which plainly cuts against Plaintiffs' conception of the term, (3) the question whether a State ought to preserve some "communities of interest" at the expense of others is a "policy determination" for the States, not the courts; and (4) supplanting the State's political judgment "express[es] a lack of respect" for federalism and the State's substantially greater familiarity with its people's interests.

699.   Plaintiffs challenge the Legislature's understanding of what (or who) constitutes a valid "community of interest" for purposes of political representation. A more political question is difficult to imagine. Accordingly, the question whether Plaintiffs' proposed maps better honor Alabama's "communities of interest" is nonjusticiable, exceeding this Court's subject-matter jurisdiction

## IV.   The Balance of Equities Weighs Heavily Against Abandoning Longstanding Congressional Districts.

700.   In addition to Plaintiffs' low likelihood of success on the merits, it is far too late in the day to grant the preliminary relief they seek. Plaintiffs request an overhaul of Alabama's congressional map, but the Court cannot grant such relief at this late hour without inflicting grave harm on the public interest.

701.   "When the massive disruption to the political process of the [State] is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that [this Court] deny relief." *Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986) (three-judge court).

702.   Enjoining the State from using the 2021 Map would throw the current election into chaos and leave insufficient time for maps to be redrawn, hundreds of thousands of voters to be reassigned to new districts, and thousands of new signatures to be obtained by candidates and political organizations seeking ballot access.

703.   And those harms would be vastly magnified here given that the State's 2021 Map largely preserves preexisting, decades-old districts while making minimal changes to equalize population, whereas Plaintiffs seek to redraw much of the map.

704.   Former Representative Byrne testified about the problems with drastically changing the congressional lines this late in the day. He stated:

> A. … Once you turn the calendar to the beginning of the year, you have that primary staring you in the face, you have already set your campaign in place. You already have your plan in place. You have already got volunteers set up ready to go. You have got, you know, the campaign ad messaging already worked out. And you are hitting the ground running.
>
> So if you change my district on me with that little time, it's going to put a substantial burden on my ability to refocus my campaign, conduct my campaign, get volunteers, et cetera. And particularly if you

221

give me a new geographic area that I haven't represented before, where I don't have, you know, the natural contacts, et cetera, that's a huge problem for any community. And I don't -- and that's true for any candidate, Democrat, Republican, people that are long-time public office holders, people that are brand new. It could be a tremendous difficulty.

PI Tr. 1693:16-1694:7.

705.   Plaintiff Dowdy too recognized the obvious fact that candidates often spend significant time and money to campaign and meet prospective voters. PI Tr. 399:16-21.

706.   To pull the rug out from these candidates and their voters in the run-up to an election requires extraordinary justification.

707.   Courts often reject requests to preliminarily enjoin the use of redistricting plans in impending elections, and this Court should follow suit here. As those courts have recognized, "elections are complex to administer, and the public interest [is] not … served by a chaotic, last-minute reordering of ... districts. It is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012) (three-judge court) (citing *Diaz v. Silver,* 932 F. Supp. 462, 466-68 (E.D.N.Y. 1996) (three-judge court)).

708.   Thus, "[t]he Supreme Court has held that an injunction may be inappropriate even when a redistricting plan has actually been found unconstitutional because of the great difficulty of unwinding and reworking a state's entire electoral

process." *Id.* (citing *Reynolds v. Sims,* 377 U.S. 533, 585 (1964); *Roman v. Sincock,* 377 U.S. 695, 709-10 (1964)).

709.   Relatedly, there would be precious little time for the State to exercise its sovereign prerogative and craft an appropriate remedy. The Supreme "Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978). When a federal court declares an "apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Id.* at 540.

710.   But drawing new maps takes time. One expert advises courts that are considering map-drawing themselves to budget "one month for the drawing of a plan and an additional month for hearings and potential modifications to it … so that all concerned can proceed in a nonfrenzied fashion." Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1147-48 (2005).

711.   And a legislature—unlike a court—must also be sure to draw a map that can garner sufficient support in two legislative chambers and secure the

governor's signature. The Court should not deprive Alabama's Legislature of that prerogative.

712.   Having new maps ready to implement can reasonably be expected to take a longer time here such that the congressional election could not be held on the current schedule.  After the Legislature draws a new map, some or all of the Plaintiffs may want to challenge it.  The Milligan Plaintiffs said in closing argument that:

> [T]his Court can and should issue a declaratory judgment saying that the current map[] violates Section 2, and then give the Legislature an opportunity to draw districts to cure the violation, obviously working from the illustrative plans.
>
> If the Legislature were to draw one district that looked a lot like District 7 and another district that was 45 percent black, or something else, then this Court would need to decide with evidence or argument from the parties whether or not that completely cured the violation.
>
> And so I think my answer is simply that the Court has to give – find the Section 2 violation, give the Legislature the opportunity to cure it, and whatever the Legislature comes up with, whether it's a 45 percent black district and a 50 percent black district, the parties will need to decide then whether or not that cures the violation that the Court finds.

PI Tr. 1836:20-1837:5.  Moreover, an injunction would require time-consuming work simultaneously executed with expedited appeals.

713.  Finally, redistricting litigation is often "legally and factually complicated," so "[t]he greatest public interest must attach to adjudicating these claims fairly—and correctly." *Favors*, 881 F. Supp. 2d at 371. This case is no exception.

224

714.   Thus, grave risks arise when time pressures leave time only for "a few weeks of discovery and an abbreviated trial." *Id.* Before a State's political destiny is reshaped by a federal court, the prudent course must ensure "enough time for the parties to marshal all the relevant facts and make their best arguments." *Id.*

715.   Accordingly, "[s]ince the *Reynolds* decision, a number of federal courts have withheld the granting of relief, and even dismissed actions, where an election was imminent and the election process had already begun." *Pileggi v. Aichele*, 843 F. Supp. 2d 584, 593 (E.D. Pa. 2012) (three-judge court) (collecting cases).

716.   Those serious concerns about timing and administrability apply with full force here. As Alabama's Director of Elections Clay Helms has attested, "[t]here are substantial obstacles to changing the Congressional districts at this late date." DX7:2. Indeed, pandemic-related delays to census numbers stalled the redistricting process, in turn creating a situation in which "local election officials are already under time pressures created by the fact that the maps were adopted in November, 2021." *Id.*

717.   It is important to recognize that, while the primary election will be held on May 24, 2022, absentee voting starts on March 30, 2022, which is only weeks away. And there are all sorts of activities that must be accomplished in advance of that March 30 deadline, including candidate qualification. As the Singleton Plaintiffs noted, "[t]he clock is already ticking on potential candidates in raising funds. In

addition, candidates should know the District in which they will run weeks before January 28, 2022." DE15:38 ¶ 55.

718.   The harms that would flow from enjoining the 2021 Map are varied and certain. Candidates seeking to run in major party primaries have expended significant time and money ahead of the January 28 qualifying deadline. *See supra* Background §J. A primary will be required for voters to choose among them. *See* Ala. Code § 17-13-1. Much of the time and money spent to engage with potential voters would prove wasted if those voters are later moved to a different district. One of many reasons "[i]t is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors*, 881 F. Supp. 2d at 371.

719.   Moreover, organizations seeking ballot access as political parties and individuals seeking to appear on the ballot as independent candidates for Congress must submit a petition no later than the May 24, 2022 primary date. *See supra* Background §J.

720.   Last-minute changes could have other effects on voters as well, for redrawing district lines means updating voter registration records to reflect the new lines. DX7:2-6. While this is easily done in some counties, it is a tedious, time-consuming, manual process in the other 45 counties, where it can take months as each voter is assigned to her proper precinct to ensure she receives the correct ballot. *Id.* at 3-4; *see also supra* Background §J. And this process is already facing

extraordinary time pressures due the Census Bureau's delay in reporting redistricting data, which delayed drawing on new district lines. DX7:2, 5.

721. "The Census Bureau's delay has delayed redistricting and shortened the time available for local officials to assign voters to districts and precincts." DX7:5. "[L]ocal election officials are already under time pressures created by the fact that the maps were adopted in November, 2021[,]" *id.* at 2, and the process of reassignment has already begun, *id.* at 3.

722. For absentee voting to begin on March 30, 2022, DX7:4, ballots must be finalized and printed in advance.

723. Federal law requires that the ballots of voters protected by the Uniformed and Overseas Citizens Absentee Voting Act be transmitted no later than April 9, 2022, if they have been requested by that time. DX7:4-5; 52 U.S.C. § 20302(a)(8).

724. Where recent experience shows that election officials struggled to complete the district-assignment process within four months following remedial redistricting, DX7:4, Plaintiffs have failed to provide any reason to believe that potentially hundreds of thousands of voters could be swapped among districts in the three months between this opinion's issuance and the April 9, 2022 deadline to have absentee ballots for UOCAVA voters out the door for congressional primary elections.

725.   In short, "the election machinery wheels [are] in full rotation," *Graves v. City of Montgomery,* 807 F.Supp.2d 1096, 1112 (M.D. Ala. 2011), and can't be stopped without grave damage to the public. There is little time for the Legislature to draw a new map, and it would be inequitable for Plaintiffs with no accountability to voters to simply substitute one of their racially gerrymandered plans for a legislatively drawn map.

726.   That is why courts and redistricting experts have recognized that a court that must draw a map, "should have as its goal the imposition of a plan no later than one month before candidates may begin qualifying for the primary ballot,' which 'means that the court should begin drawing its plan about three months before the beginning of ballot qualification in order to build in time for possible hearings and adjustments to the plan.'" *Favors,* 881 F. Supp. 2d at 364 (quoting Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans,* 73 Geo. Wash. L. Rev. at 1147).

727.   We are already well past such timeframes, as candidate qualifying *ends* barely two weeks after the preliminary injunction hearing concluded, around the same time the Court hopes to have an opinion ready.  PI Tr. 1921:19-23.

728.   Any attempt to redo months of legislative work in a matter of weeks is likely to cause massive administrative and practical problems and do more harm than

good. Preliminary injunctive relief would cause grave and irreparable hardship to the State, its political subdivisions, and its citizens.

729. In comparison, Plaintiffs assert irreparable harm from purportedly having to vote in a district that they feel should have a different racial makeup. But this factor does not weigh heavily in their favor; most (if not all) of these Plaintiffs apparently could have lodged nearly identical arguments against the 2011 Map years ago. Plaintiff Dowdy, for example, testified that she was aware "around … 2015 or '16" that Alabama's past map (purportedly) did not provide "fair representation." Tr. 401:4-9. She was content to vote under the 2011 plan for at least two more election cycles rather than bring suit.

730. A couple of the Caster Plaintiffs did challenge the 2011 map in the *Chestnut* litigation—but not until June 2018, seven years after its passage.

731. Moreover, preliminary injunctive relief is especially inappropriate because the 2021 Map largely retains the core of districts that have been in place for decades, while making only minimal changes to equalize population.

732. Plaintiffs are thus seeking an mandatory injunction that would upend decades of political geography based on roughly two months of litigation.

733. The State deserves more than "a few weeks of discovery and an abbreviated trial … to marshal all the relevant facts and make their best arguments"

before forever losing the right to enforce its districting plan in the 2022 election. *Favors*, 881 F. Supp. 2d at 371.

734.   Finally, the Guidelines the Alabama Legislature implemented and the map it enacted are entirely ordinary. The Legislature did not break sharply from the past to enact a brazen partisan gerrymander. *See Rucho*, 139 S. Ct. at 2491 (Republican redistricting committee chair "explain[ing] that the map was drawn with the aim of electing ten Republicans and three Democrats because he did 'not believe it [would be] possible to draw a map with 11 Republicans and 2 Democrats'"). Nor did the Legislature break up an established community of minority voters to take "away [their] opportunity because [they] were about to exercise it." *LULAC*, 548 U.S. at 440.

735.   All Alabama seeks to do is merely implement a map that largely carries forward districts that have existed for half a century and that, since 1992, have been approved by federal courts and Legislatures controlled first by Democrats and more recently by Republicans.

736.   It may be that at the close of full discovery and a full trial, that this Court determines that the 2021 Plan nevertheless contains some legal flaw. But just two months into this litigation, it is not clear that Plaintiffs will prevail. And roughly two months before absentee voting begins, it is clear that a preliminary injunction

would cause irreparable harm to Alabama, its aspiring congressional representatives, and the voters they seek to represent.

737.   Plaintiffs thus have not met the heightened standard required for this Court to enter the fray and issue a mandatory injunction in an area in which deference to a State Legislature should be at its zenith.

738.   Accordingly, the Court denies all of the Plaintiffs' requests for preliminary injunctive relief.

## CONCLUSION

Thirty years ago, District 7 was reshaped into a court-imposed majority-BVAP district to comply with the VRA. But these suits do not challenge past redistricting plans. They invoke the Fourteenth Amendment's guarantees in an attempt to invalidate the State's newly enacted plan, for which race did not predominate and, indeed, played no role. Nor do these suits provide the strong evidentiary record required to permit—much less require—a remedy under Section 2. Alabama has no constitutional or statutory obligation to dismantle the 2021 Map and adopt a plan featuring any of the Plaintiff's preferred racial compositions. It is Plaintiffs' proposed maps, not the State's enacted map, that raise serious constitutional questions. All three motions for preliminary injunction are hereby denied.

Respectfully submitted,

Steve Marshall
  *Attorney General*

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

**Counsel for Sen. McClendon and Rep. Pringle**

*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

A. Barrett Bowdre (ASB-2087-K29V)
Thomas A. Wilson (ASB-1494-D25C)
  *Deputy Solicitors General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
A. Reid Harris (ASB-1624-D29X)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

**Counsel for Secretary Merrill**

232

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF system on January 14, 2021, which will serve all counsel of record.

/s/Edmund G. LaCour Jr.

Edmund G. LaCour

*Counsel for Secretary Merrill*
