

FILED
2022 Jan-14  PM 11:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**BOBBY SINGLETON, *et al.*,**              )
                                            )
    **Plaintiffs,**                         )
                                            )
**v.**                                      )   **Case No.: 2:21-cv-1291-AMM**
                                            )
**JOHN H. MERRILL, *in his official capacity***  )   **THREE-JUDGE COURT**
***as Alabama Secretary of State,* et al.,**  )
                                            )
    **Defendants.**                         )

---

**EVAN MILLIGAN, et al.,**                  )
                                            )
    **Plaintiffs,**                         )
                                            )
**v.**                                      )   **Case No.: 2:21-cv-01530-AMM**
                                            )
**JOHN H. MERRILL, *in his official capacity***  )   **THREE-JUDGE COURT**
***as Alabama Secretary of State,* et al.,**  )
                                            )
    **Defendants.**                         )

## MILLIGAN PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# INDEX

I.    **Findings of Fact Part I: The *Milligan* Plaintiffs** ..................................................4

II.   **Findings of Fact Part II: Secretary of State Merrill, Sen. Jim McClendon and Rep. Chris Pringle** ..................................................................7

III.  **Findings of Fact Part III: The 2020 Census and Alabama's Demographics** .................................................................................................8

IV.   **Findings of Fact Part IV: Alabama's Black Belt** ..................................12

V.    **Findings of Fact Part V: History of the Challenged Districts** .................18

    A.   The History of Congressional District 7 ...............................................18

        i.    The 1992 Plan ..................................................................18

        ii.   The 2002 Plan ..................................................................20

        iii.  The 2011 Plan ..................................................................21

    B.   The History of Congressional Districts 1, 2, and 3 .............................23

        i.    The 2001 Plan ..................................................................23

        ii.   The 2011 Plan ..................................................................23

        iii.  The 2021 Plan ..................................................................24

VI.   **Findings of Fact Part VI: The Enactment of H.B. 1** .............................24

    A.   The Legislative Committee Prepares and Develops its Redistricting Plan ...................................................................................................24

    B.   The Committee Refuses to Conduct a Racial-Polarization Analysis..28

    C.   The Proposed Maps Pass out of the Committee ................................29

    D.   The Alabama Legislature's Special Session ......................................31

        i.    The House Considers and Passes the Proposed Maps .............31

        ii.   The Senate Considers and Passes the Proposed Maps.............32

VII.  **Findings of Fact Part IV: The Voting Rights Act Challenge to HB1** .....34

    A.   The *Gingles* Preconditions .................................................................34

        i.    Gingles Precondition 1: Viability of Majority-Minority District .................................................................................34

        ii.   Gingles Precondition 2: Political Cohesion of Black Voters ...49

        iii.  Gingles Precondition 3: Success of White Bloc Voting...........56

    B.   The Totality of the Circumstances Affecting Electoral Opportunities for Black Alabamians.............................................................................61

        i.    Senate Factor 1: History of Voting-Related Discrimination ....61

        ii.   Senate Factor 3: Majority Vote Rules and Numbered Posts ....69

        iii.     Senate Factor 5: Past Discrimination in Health, Education, and Employment ........................................................................70

        iv.    Senate Factor 6: Racial Appeals in Political Campaigns..........87

        v.     Senate Factor 7: Lack of Black Electoral Success....................90

        vi.    Senate Factor 8: Unresponsiveness of Elected Officials to Minority-Group Needs ................................................................92

        vii.   Senate Factor Nine: Tenuousness of Policy ............................96

   C.    Electoral Opportunity ..........................................................................97

**VIII.** **Findings of Fact Part V: The Racial Gerrymandering Challenge to Congressional Districts 1, 2, 3, and 7 .......................................................99**

   A.    Race Predominated in Drawing District 7 .........................................99

   B.    Race Predominated in Drawing Districts 1, 2, and 3 ......................108

**IX.**   **Conclusions of Law..................................................................................113**

   A.    Section 2 of the Voting Rights Act Creates a Private Right of Action .........................................................................................................113

   B.    The Preliminary Injunction Standards Have Been Satisfied............115

   C.    Plaintiffs Have Established a Likelihood of Success That HB1 Violates Section 2 of the Voting Rights Act. .................................................117

        i.     Plaintiffs have demonstrated a likelihood of success on the first Gingles precondition: Alabama's Black population is sufficiently large and geographically compact to constitute a majority in a single-member district. ......................................118

        ii.    Plaintiffs have demonstrated a likelihood of success on the second and third Gingles preconditions: Black voters are politically cohesive, and the white majority votes sufficiently as a bloc to enable it to usually defeat Black voters' preferred candidate ...............................................................................133

   D.    Looking to the Totality of the Circumstances, Plaintiffs Have Demonstrated a Likelihood of Success That HB1 Violates Section 2 of the Voting Rights Act.......................................................................138

   E.    Districts 1, 2, 3, and 7 are Racially Gerrymandered and Fail Strict Scrutiny..............................................................................................140

        i.     Race Predominated in Drawing Congressional Districts 1, 2, 3, and 7.......................................................................................142

        ii.    The Predominant Use of Race in Drawing Districts 1, 2, 3, and 7 is Not Narrowly Tailored to Comply with the VRA. .............149

F.      Plaintiffs Have Shown a Likelihood of Success on Their Claim That HB 1 violates the Fourteenth Amendment to the U.S. Constitution. 154

G.      Plaintiffs Satisfy *Winter*'s Equitable Factors .................................... 154

     i.      Plaintiffs face irreparable harm absent injunctive relief......... 154

     ii.      A Preliminary Injunction Serves the Public Interest .............. 155

     iii.      The Balance of Equities Weighs Heavily in Favor of Granting Plaintiffs Injunctive Relief ....................................................... 157

H.      Constitutional Avoidance ................................................................. 160

I.      Remedial Relief ............................................................................... 160

## I.      Findings of Fact Part I: The Milligan Plaintiffs

1.      Plaintiffs Evan Milligan, Shalela Dowdy, Letetia Jackson, and Khadidah Stone are residents of Alabama, U.S. citizens, and lawfully registered Black voters. Doc. 53 ¶¶ 1-3, 5-7, 9-14.

2.      Evan Milligan resides and votes in Montgomery County, Alabama, currently located in CD 7. Jan. 4 Tr. 126:8-9, 128:11-12.

3.      Shalela Dowdy resides and votes in Mobile County, Alabama, currently located in CD 1. Jan. 5 Tr. 364:17-18, 367:5-6.

4.      Letetia Jackson resides and votes in the City of Dothan, Alabama, currently located in CD 2. Doc. 53 ¶¶ 10-11.

5.      Khadidah Stone resides and votes in Montgomery County, Alabama, currently located in CD 2. Doc. 53 ¶¶ 13-14.

6.      Under any of Plaintiffs' Illustrative Plans, Evan Milligan, Shalela Dowdy, and Khadidah Stone would reside in a second, new majority-Black district. Exh. M3 ¶¶ 4, 10.

7.      Plaintiffs Greater Birmingham Ministries ("GBM") and the Alabama NAACP are Organizational Plaintiffs in this case. *See* Doc. 53 ¶¶ 16-20.

8.      The Alabama NAACP is a non-profit and non-partisan organization with thousands of members in Jefferson County, the Black Belt, and other counties across the State. Doc. 53 ¶¶ 19-20; Exh. M15 ¶¶ 2, 6.

9.      Founded in 1913 as a state conference of the National Association of the Advancement of Colored People, the Alabama NAACP is one of the oldest civil rights organizations in Alabama. Doc. 53 ¶ 19; Exh. M15 ¶ 2.

10.     The Alabama NAACP works toward its mission of ensuring the political, educational, social, and economic equality of all Alabamians by increasing voter registration and voter turnout; participating in voter registration and "get-out-the-vote" drives; and raising awareness about the adverse effects of racial discrimination in voting. Doc. 53 ¶ 20; Exh. M15 ¶ 3.

11.     Most members of the Alabama NAACP are Black registered voters. This includes Black registered voters who reside and vote within CDs 1, 2, 3, and 7. Exh. M15 ¶ 6. Robert Clopton is a Black registered voter and President of the Mobile County NAACP Branch, currently located in CD 1. *Id.* Bobby Mays is a Black

registered voter and President of the NAACP Elmore County Branch #5026, currently located in CD 2. *Id.* Alozo Bullie is a Black registered voter and President of the Macon County Branch NAACP, currently located in CD 3. *Id.* Lisa Young is a Black registered voter and President of the Tuscaloosa County NAACP Branch, currently located in CD 7. *Id.*

12.     Alabamians founded GBM in 1969 in response to the mid-twentieth century civil rights movement. Doc. 53 ¶ 16; Exh. M14 ¶ 3.

13.     GBM is a multi-faith, multi-racial non-profit membership organization with nearly 5,000 members working to resolve human rights and social justice needs in the greater Birmingham area. Doc. 53 ¶¶ 16-17; Exh. M14 ¶¶ 3, 5.

14.     GBM pursues its mission by promoting political participation throughout Alabama. GBM also opposes state laws, policies, and practices believed to exclude vulnerable groups or individuals from the democratic process. And its members seek to register, educate, and increase voter turnout, particularly among Black, Latinx, and low-income people and people with disabilities. Doc. 53 ¶ 18; Exh. M14 ¶ 4.

15.     Most of GBM's members are Black registered voters. Exh. M14 ¶ 5. GBM's membership includes registered voters who reside and vote in CDs 1, 2, 3, and 7. Exh. M14 ¶ 7. Frank Barragan is a Latino registered voter and GBM member who resides in Mobile County, currently located in CD 1. *Id.* ¶ 11. Presdelane Harris

is a Black registered voter and GBM member who resides in Montgomery County, currently located in CD 2. *Id*. ¶ 8. Alice Paris is a Black registered voter and GBM member who resides in Macon County, currently located in CD 3. *Id*. ¶ 9. Ronald Truss is a Black registered voter and GBM member who resides in Jefferson County, currently located in CD 7. *Id*. ¶ 10.

16.     Both Organizational Plaintiffs have members who would reside in a second, new majority-Black district under the Plaintiffs' illustrative plans. Exh. M14 ¶¶ 5-9, Exh. M15 ¶¶ 6-7, Exh. M3 ¶ 10.

## II.    Findings of Fact Part II: Secretary of State Merrill, Sen. Jim McClendon and Rep. Chris Pringle

17.     Defendant John H. Merrill is sued in his official capacity as Alabama Secretary of State. As Secretary of State, Defendant Merrill is the chief elections official in the State of Alabama. He must provide uniform guidance for election activities in the State and certify the elections of members to the Alabama Legislature and Congress. Ala. Code §§ 17-1-3, 17-12-21. Defendant Merrill also has responsibility for certifying the names of primary and general election candidates for the State Legislature and Congress, as well as issuing Certificates of Election following tabulation of vote results. Ala. Code §§ 17-13-5(b), 17-9-3(b), 17-12-21. Merrill Answer, Doc. 52 ¶ 28, McClendon and Pringle Answer, Doc. 51 ¶ 28.

18.     Defendants Senator Jim McClendon and Representative Chris Pringle are Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment (the "Committee"). Ala. Code § 29-2-51. They are sued in their official capacity as co-chairs of the Committee. Doc. 53 ¶ 23.

19.     In their capacity as Committee Co-Chairs, Sen. McClendon and Rep. Pringle were responsible for the preparation and development of redistricting plans for the State following the decennial census and presided over the meetings of the Committee. Doc. 53 ¶ 24.

## III.    Findings of Fact Part III: The 2020 Census and Alabama's Demographics

20.     Pursuant to its statutory and constitutional obligations, the U.S. Census Bureau conducted the decennial census of the U.S. population in 2020. As part of the decennial census, the Census Bureau collects, *inter alia*, information about the racial and ethnic identity of each person in the United States. In the redistricting dataset produced in accordance with Public Law 94-171, the Census Bureau publishes this and other demographic information for the entire United States, aggregated at a number of geographic levels, including state, county, census tract, census block group, and individual census block. Jan. 6 Tr. 567-68. Census blocks are the smallest unit of census geography, typically containing from zero to a few hundred persons. Congressional Districts in Alabama--and every other state--are

composed of census blocks, with each census block in the state assigned to one of Alabama's seven Congressional Districts. Jan. 6 Tr. 568.

21.     Since the 1990s, the Bureau has reported the racial identity of the U.S. population according to one or more of six racial categories: white, Black or African American, American Indian or Native Alaskan, Asian, Hawaiian or Pacific Islander, or Another Race. When completing the census form, an individual must select at least one category and may select more than one. Jan. 6 Tr. 557-58. With respect to ethnicity, the Bureau reports the U.S. population's ethnic identity as either Hispanic or Non-Hispanic, but not both. Jan. 6 Tr. 557:23-25. There are a total of 63 different possible combinations of the racial categories. Jan. 6 Tr. 557:17-22. Thirty-two of these categories include Black or African American, either alone or in combination with one or more of the other categories. Exh. M3 at 12. Each of these categories can be further broken down by the two possible choices in the ethnicity category. Jan. 6 Tr. 558:23-25.

22.     Among other information, the PL 94-171 dataset reports the total population of each block, and further provides a breakdown according to the various combinations of racial and ethnic categories. Jan. 6 Tr. 568. The population of each block for the 32 different racial categories that include Black regardless of ethnicity can be summed to create a population category known as "Any Part Black." Exh. M3 at 12 (Supplemental Information).

23.      The 2020 PL 94-171 dataset further reports block-level information concerning the voting age population and provides the same racial and ethnic categories for voting age population as it does for total population. Jan. 6 Tr. 567. Again, the 32 racial categories that include Black can be summed to determine the Any Part Black voting age population in the block. Exh. M3 at 12 (Supplemental Information).

24.      The Census Bureau released the 2020 PL 94-171 dataset on August 12, 2021. Doc. 53 ¶ 78; Exh. M11 at 76:2-4. According to the 2020 Decennial Census, Alabama's total population is 5,024,279. Doc. 53 ¶ 26.

25.      The 2020 Census further revealed that between the 2010 census and the 2020 census, Alabama's population had grown by 5.1%. Doc. 53 ¶ 79. About 34% of that population increase was attributable to growth in the Black population. Exh. C1 ¶ 6.

26.      As of the 2020 census, 1,364,736 Alabamians, or 27.16% of the total population identified as Black or African American, either alone or in combination with one or more other races or ethnicities.[1]

27.      As of the 2020 census, 1,014,372 of Alabama's Any-Part Black residents are of voting age, constituting 25.9% of voting-age population. Any-Part

---

[1] Black alone or in combination, also known as "Any part Black," refers to individuals who self-identify as Black on the Census form, regardless of whether the individuals also choose another race or indicated an ethnicity, such as Hispanic. Jan. 6 Tr. 559:1-10.

Black Alabamians make up 26.3% of the state's citizen-voting-age population. Exh. M3 at 7.

28.     As of the 2020 census, the non-Hispanic white population share in Alabama is 63.12% and the corresponding shares of voting-age population and citizen voting-age population are 65.47% and 65.07%, respectively. Exh. M3 at 9.

29.     There are two centers of Alabama's Black population: the cores of many of the state's urban areas, including its largest cities, and the rural Black Belt. Jan. 6 Tr. 561-62; Exh. M3 at 9-10.

30.     The Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox. Doc. 53 ¶ 61. The counties of Clarke, Conecuh, Escambia, Monroe, and Washington are sometimes included within the definition of the Black Belt. *Id.*

31.     About a quarter of Alabama's Black population, or over 300,000 people, live in the 18 core Black Belt counties. Exh. M3 at 10.

32.     The four largest cities in Alabama today are Huntsville (population 215,006), Birmingham (population 200,733), Montgomery (population 200,603), and Mobile (population 187,041). Together, they have over 400,000 Black residents, comprising roughly 1/3 of the Black population in the state. Of these cities, Birmingham, Montgomery, and Mobile are majority-Black, with Black population

shares of 69.9%, 60.8%, and 51.5%, respectively, making them three among Alabama's 52 majority-Black cities. Exh. M3 at 9.

33.     Given Alabama's population as reported in the 2020 decennial census, the ideal size of each of its seven Congressional Districts is 717,754 persons. Exh. M3 at 5.

## IV.    Findings of Fact Part IV: Alabama's Black Belt

34.     The Black Belt is a region that stretches across America's South, which is named for its rich black soil. Though the majority of the American Black Belt's inhabitants are also Black people, the descendants of the enslaved who were forced to work that land before and during the Civil War. Exh. M9 at 1; Jan. 10 Tr. 1161:23-1163:21.

35.     Black people in the Black Belt of Alabama have a shared history dating back to the late 1700s and early 1800s. Americans realized that the Black Belt's soil, and the Deep South's climate, were perfect for growing long-staple cotton. At the same time, the invention of the cotton gin and the beginnings of industrialization increased demand for that crop, and a decline in the tobacco market created a "surplus" of enslaved Black people in the older plantation areas of the Tidewater of Virginia and North Carolina. Exh. M9 at 1; Jan. 10 Tr. 1161:23-1163:21.

36.     White settlers began to flood into the State of Alabama when most of the remaining Creek Indians were forced out via the Indian Removal Act of 1830.

By then, the United States government had banned the importation of slaves from abroad, U.S. Const. Art. I, Sec. 9, so many settlers brought enslaved Black people with them from the older plantation areas of the Upper South. Others purchased them from slave markets in Montgomery, Mobile, Jackson, and other cities. American chattel slavery expanded dramatically between that time and the Civil War, giving rise to the "Cotton Kingdom" of the antebellum era when cotton was America's most valuable export and enslaved Black people were its most valuable commodity. The Black Belt of Alabama became home to not only the wealthiest white plantation owners in the state, but to some of the wealthiest individuals in the young nation. Because of their forced migration and importation, enslaved Black people became (and their descendants remain) the overwhelming majority of the population in most of Alabama's Black Belt counties. Exh. M9 at 1-2; Jan. 10 Tr. 1161:23-1163:21.

37.     When the Thirteenth Amendment brought an end to chattel slavery, land was never systematically redistributed from white landowners and given to newly freed Black people. Formerly enslaved Black people became landless tenant farmers, beholden to their former masters. And when Alabama replaced its constitution in 1875 and again in 1901, it was the "Bourbon redeemers" of the Black Belt region, hyper-wealthy white landowners, who pushed hardest for a document that would protect white supremacy. The Black Belt's white landowners feared that allowing Black people to vote freely would lead to land reform and their political

and financial ruin. Thus, they lobbied for protections against white property tax dollars for Black education and for the total disenfranchisement of Black citizens. Exh. M9 at 1-2; Jan. 10 Tr. 1162:19-1163:21.

38.      The Black Belt was also the site of Black citizens' efforts to organize and to seek access to the franchise and to equal educational opportunity. When the NAACP encouraged local branches to petition school boards to address the Supreme Court's *Brown v. Board of Education*, 347 U.S. 483 (1954) decision, Black people in Butler, Russell, Bullock, and Dallas Counties were among those to answer the call (Black activists in Mobile did the same). The Lowndes County Freedom Association was founded in 1965 and the National Democratic Party of Alabama was formed soon thereafter with both independently focused on running Black candidates in elections in the Black Belt and the city of Mobile. Exh. M9 at 2; Jan. 10 Tr. 1163:22-1164:15.

39.      Black people in the Black Belt migrated at various points following the abolition of slavery to cities outside the South, but also to cities within the state of Alabama itself, particularly Mobile. There was a "massive hemorrhaging of people," mostly Black people, from the Black Belt to the cities of Alabama, in the early twentieth century. This included Black people who left the Black Belt for Mobile in significant numbers during the Great Depression, when white landowners refused to pass down federal aid to their sharecropping tenant farmers. In the second half of the

twentieth century, consolidation of land, mechanization, and the rise of the Sunbelt generated an even more severe "hemorrhaging of people" from the Black Belt than the previous one. Again, Black people left the Black Belt for Mobile. By the end of the century, more Black people in Alabama lived in cities than in rural areas. Many Black families in Mobile are Black Belt migrants or the descendants thereof. Exh. M9 at 2-3; Jan. 10 Tr. 1162:19-1163:21.

40.    While Black Belt public school systems were experiencing similar backlash and white flight, white flight from Mobile city accelerated significantly when the city's long-running school desegregation case finally yielded positive results for Black plaintiffs in the early 1970s. As in the Black Belt, white flight has left most public schools east of I-65 in Mobile overwhelmingly Black. Exh. M9 at 3, Jan. 10 Tr. 1160:19-1161:3, 1237:19-1238:7.

41.    The cities of Montgomery and Mobile and the counties of the Black Belt share significant historic, familial, demographic, and socioeconomic interests. Jan. 4 Tr. 142-44; Jan. 5 Tr. 372-76; Jan. 11 Tr. 1636.

42.    As far back as the 1800s, the cities of Montgomery and Mobile were considered a part of the Black Belt region. For example, in 1868, State Senator Frederick Bromberg called Mobile, Selma, Montgomery and Eufaula the "old large towns in the Black Belt," and recognized that these cities contained an "active, aspiring" class of Black people. *See Brown v. Bd. of Sch. Comm'rs of Mobile Cnty.*,

542 F. Supp. 1078, 1088-89 (S.D. Ala. 1982) (citation omitted), *aff'd*, 706 F.2d 1103 (11th Cir. 1983), *aff'd*, 464 U.S. 1005 (1983).

43.     Today, there remain strong ties between the city of Montgomery with communities in the eastern Black Belt, and between the city of Mobile and communities in the western Black Belt. Jan. 4 Tr. 142-44; Jan. 5 Tr. 372-76; Jan. 11 Tr. 1636.

44.     People who reside in the western Black Belt commute into Mobile County for work. They shop in Mobile County. They travel to and from Mobile to visit family members. They also celebrate Mardi Gras. Jan. 5 Tr. 372; Jan. 11 Tr. 1636:13-1637:24; Jan. 12 Tr. 1660:1661:7.

45.     The Black communities in Montgomery County and the Black Belt share the same socioeconomic challenges. They tend to face similar concerns about isolation from economic opportunities, infectious diseases, and the quality of public education. They also experience a lack of access to job training, public transportation, health care, and quality produce. These communities have a shared cultural identity and familial bonds. They have shared idioms and ways of speaking, and shared, quilting, sewing, storytelling, and music traditions (e.g., blues and four-part harmony Gospel).  Jan. 4 Tr. 142-43.

46.     There are commonalities between the Black communities in Mobile County, particularly the Mobile city and Prichard areas, and the Black Belt. Both

communities sharing rural features such as people riding horseback and raising chickens. Working families in the Black Belt and Mobile share similar socioeconomic concerns like access to childcare. Jan. 4 Tr. 143-44.

47.    Black communities in Mobile County and the Black Belt counties are united through the issues of poverty and health care. In Mobile County, Black people struggle to afford health insurance. In the Black Belt counties, Black people not only struggle to afford health insurance, but also struggle to receive regular medical attention and access to hospitals due to rural hospital closures. Additionally, Lowndes County has sewage issues which also leads to health problems. These, ultimately, become family issues because, when those in the Black Belt struggle, their Mobile-based family members also struggle to provide them with assistance. Jan. 5 Tr. 372-73.

48.    Issues of education are also shared between Mobile County and the Black Belt counties. Many of the pre-Kindergarten programs that once existed in the Black communities no longer exist, leaving families with no options for childcare. Since families cannot afford childcare and, instead, rely on family members to provide childcare, the formal education process begins later in life for many Black people. This lack of access to early education results in students lagging behind in learning as they progress and having less access to well-paying jobs as they get older. Jan. 5 Tr. 373:24-375:4.

49.     Black residents in the Mobile area share more in common with the Black Belt region than they do with Baldwin County. Jan. 11 Tr. 1636:13-1637:24. This is because the cities of Fairhope, Spanish Fort, and Daphne in Baldwin County became white flight destinations when courts required the desegregation of Mobile city schools. The remaining areas of Baldwin County are either sparsely populated or are beach tourist destinations that have little meaningful connection to the city of Mobile save for waterfront access. Exh. M9 at 3-4.

## V.     Findings of Fact Part V: History of the Challenged Districts

A.     <u>The History of Congressional District 7</u>

   i.     *The 1992 Plan*

50.     In 1992, Black voters, among others, invoked the Fourteenth Amendment and Section 2 of the Voting Rights Act to challenge the State Legislature's failure to redistrict congressional seats following the 1990 census. Doc. 53 ¶¶ 29, 31.

51.     While *Wesch* was pending, the State Legislature enacted Act No. 92-65 (1992), a congressional redistricting plan with one majority Black district. Doc. 53 ¶ 34.

52.     On March 9, 1992, upon the stipulation of the parties, a three-judge court ordered the State Legislature to create CD 7 as a majority-Black congressional

district. *See Wesch v. Hunt*, 785 F. Supp. 1491, 1499 (S.D. Ala. 1992), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992); Doc. 53 ¶ 30.

53.     The *Wesch* court adopted its own plan due to a concern that Act No. 92-65 would not obtain the required preclearance under Section 5 of the Voting Rights Act in time for the then-upcoming election deadlines. 785 F. Supp. at 1500. Doc. 53 ¶ 35.

54.     Under the 1992 Plan that *Wesch* established, Black people were 67.69% of the total residents of CD 7 and 63.58% of CD 7's voting age population ("VAP"). 785 F. Supp. at 1496; Doc. 53 ¶ 32.

55.     The Wesch court did not conduct a Section 2 analysis when creating CD 7. *Id.* at 1498-99. It simply cited the parties' stipulation that drawing a majority-Black VAP was possible, *id.*, and adopted a legislative proposal for CD 7. *Id.* at 1495. Doc. 53 ¶ 33.

56.     On March 27, 1992, the U.S. Attorney General objected to Act No. 92-65 under Section 5 of the Voting Rights Act. The Attorney General found that Act No. 92-65 was the product of intentional racial discrimination because it drew only one majority-Black district and "fragmented" the rest of the Black population in the State to dilute the Black vote. In the objection letter, the U.S. Attorney General noted a "concern" of the Black community that "an underlying principle of the

Congressional redistricting was a predisposition on the part of the state political leadership to limit black voting potential to a single district." Doc. 53 ¶ 40.

57.     Because the State did not obtain preclearance for Act No. 92-65 nor enact another plan, the 1992 Plan remained in effect for the remainder of the 1990s. Doc. 53 ¶ 42.

58.     After the establishment of CD 7 as a majority-Black district in the 1992 Plan, Earl Hillard became the first Black Alabamian elected to Congress in the twentieth century. Doc. 53 ¶ 44.

    *ii.    The 2002 Plan*

59.     After the 2000 redistricting cycle, the State Legislature enacted and received preclearance for the 2002 Plan. Doc. 53 ¶¶ 45, 46.

60.     Under the 2002 Plan, Black people constituted 62.389% of the total population and 58.327% of the voting age population under the 2000 census. Doc. 53 ¶ 45.

61.     In the congressional general elections of 2002, 2004, 2006, and 2008, Artur Davis, a Black candidate, was elected in CD 7. Doc. 53 ¶¶ 47-58.

62.     In the November 2010 general congressional election, Terri Sewell, a Black candidate, was elected in CD 7. Doc. 53 ¶¶ 49-50.

63.     By 2010, the BVAP in CD 7 was 60.11%. Doc. 53 ¶ 51.

### iii.   The 2011 Plan

64.     Following the 2010 census, the State Legislature enacted the 2011 Plan, which increased CD 7's BVAP to 60.91% any-part Black and 60.55% single-race Black. Doc. 53 ¶ 52.

65.     In September 2011, the Alabama Attorney General's office sent a letter and related materials to the U.S. Department of Justice, which submitted the 2011 Plan for preclearance review under Section 5 of the Voting Rights Act (hereinafter, the "submission letter"). Doc. 53 ¶ 53.

66.     The submission letter stated that the 2011 Plan "preserves the voting strength of the African-American community" and that the "percentage of total black and black voting age population in the new [2011] plan increased from the benchmark [2002 Plan] figures." Doc. 53 ¶ 54.

67.     The submission letter likened the CD 7 in the 2011 Plan to the CD 7 in the "1992 *Wesch* court plan and the [2002] plan" because "the new [2011] plan has one African-American majority district, District 7, which is located in the west central part of the state." Doc. 53 ¶ 55.

68.     The submission letter did not include a racial polarization analysis or otherwise attempt to demonstrate that maintaining the effectiveness of CD 7 required increasing the total Black or BVAP population in that district. Doc. 53 ¶ 56.

69.     In recent litigation challenging the 2011 Plan, Secretary Merrill stated that CD 7 "appear[ed] to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County. Defendant does not believe that the law would permit Alabama to draw that district today if the finger into Jefferson County was for the predominate purpose of drawing African American voters into the district." Sec. of State Merrill's Pretrial Br., *Chestnut v. Merrill*, No. 2:18-CV-00907 (N.D. Ala. Oct. 28, 2019), Doc. 101 at 11.

70.     In the 2021 redistricting process, the State Legislature sought to maintain the cores of each congressional district as they were drawn in the 2011 Plan. Jan. 7 Tr. 928:9-930:5.

71.     In the 2021 plan enacted in HB1, District 7 remains the sole majority-Black district with a BVAP of 55.3% any-part Black and 54.22% single-race Black under the 2020 census. Doc. 53 ¶ 57. Additionally, 59.8% of the registered voters in District 7 self-identify as single-race Black. Exh. M48 at 2.

72.     HB1 assigns about one-third (30.86%) of all single-race Black Alabamians to District 7. Doc. 53 ¶ 57.

B.   The History of Congressional Districts 1, 2, and 3

   i.   *The 2001 Plan*

73.   Under the 2001 Plan, CD 1 had a BVAP of 26.16%; CD 2 had a BVAP of 29.63%; and CD 3 had a BVAP of 30.73%. *See* Joint List of Agreed & Stipulated Principal Facts ¶ 63, *Chestnut v. Merrill*, Doc. 95 (N.A. Ala. Oct. 21, 2019).

74.   As of 2010, these same districts drawn in 2001 contained a combined single-race Black population of 615,896, which was 90.1% of the ideal total population for a single congressional district. Doc. 53 ¶ 63.

75.   In 2010, CDs 1, 2, and 3 contained a combined any-part Black population of 629,911. This was 92.3% of the ideal total population for a single congressional district as calculated by dividing the total population by the number of congressional districts. Doc. 53 ¶ 63.

76.   The 2001 Plan Split Montgomery County between two districts: CDs 2 and 3. Doc. 53 ¶ 65.

   ii.   *The 2011 Plan*

77.   Under the 2011 Plan, CD 1 had an any-part Black VAP of 25.67%; CD 2 had an APBVAP of 30.6%; and CD 3 had an APBVAP of 25.83% according to the 2010 Census data. Exh. C1 at 15.

78.   CDs 1, 2, and 3 contained a combined any-part Black population of 575,923, which is 84.3% of the total population of an ideal congressional district.

*See* Joint List of Agreed & Stipulated Principal Facts ¶ 71, *Chestnut v. Merrill*, Doc. 95 (N.A. Ala. Oct. 21, 2019).

79.     These same districts contained a combined single-race Black population of 561,978, which is 82.3% of the total population of an ideal congressional district. *Id.*

80.     The 2011 Plan split Montgomery County between three congressional districts: CDs 2, 3, and 7. Doc. 53 ¶ 65.

   *iii.* *The 2021 Plan*

81.     Under the 2021 Plan, CD 1 has an APBVAP of 25.6%; CD 2 has an APBVAP of 30.1%; and CD 3 has an APBVAP of 25.0% according to the 2020 Census data. Exh. M3 at 7 & n.4.

82.     The 2021 Plan splits Montgomery County between two districts: CDs 2 and 7. Exh. M10; Exh. M35.

## VI. Findings of Fact Part VI: The Enactment of H.B. 1

A. <u>The Legislative Committee Prepares and Develops its Redistricting Plan</u>

83.     The Alabama Legislature's Permanent Legislative Committee on Reapportionment is responsible for preparing and developing redistricting plans for the State following each decennial census. *See* Ala. Code §§ 29-2-50, 29-2-51.

84.     The Committee consists of members of both the State House and Senate, with the Speaker of the House appointing one House member from each of

the seven congressional districts and four additional House members and the Lieutenant Governor appointing one Senator from each of the seven congressional districts and four additional Senators. *See* Ala. Code § 29-2-51(c).

85.     The 2021 Reapportionment Committee includes 21 members: 15 white members and six Black members. Exh. M20.

86.     The Committee was tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate, House, and congressional districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52.

87.     In May 2021, the Committee—co-chaired by Sen. McClendon and Rep. Pringle—held its first public meeting of the redistricting cycle. Exh. M13 at 63:7-64:19.

88.     The Committee adopted a set of redistricting guidelines that by their terms apply to congressional redistricting and to redistricting for other offices as well. Exh. M13 at 63:7-64:19; Exh. M28 at 1. The guidelines require adherence to constitutional requirements and the Voting Rights Act, contiguity and reasonable compactness, requirements of the Alabama constitution primarily respecting the number state legislative districts to be drawn, and a set of lower order considerations.

Exh. M28 at 1-3; Exh. M13 at 63:7-64:19. Although the guidelines do not explicitly state that they are listed in order of priority, they are reasonably read that way.

89.     The lower order redistricting considerations include avoiding contests between incumbents, respecting communities of interest, and preserving the cores of existing districts. Exh. M28 at 2-3. These considerations are expressly declared not to be listed in order of precedence with respect to one another, and to be subordinate to the equal population requirement and compliance with the Voting Rights Act. Exh. M28 at 3.

90.     The Committee engaged Randy Hinaman to draw the new congressional district maps. Exh. M11 (Hinaman Dep.) at 51-52. Mr. Hinaman was also engaged to draw Alabama's new State House, State Senate, and Board of Education maps at the same time. *Id.*

91.     Mr. Hinaman began drawing a new congressional district map towards the end of May 2021 using population estimates from the U.S. Census Bureau. *Id.* at 57, 60, 66. Because he did not yet have the official Census results, this preliminary map was just a "rough" sketch, and Mr. Hinaman "kn[ew] that it was all going to change when we got the real numbers." *Id.* at 66, 73-74. Mr. Hinaman then waited for the official Census data to be released before doing anything further. *Id.* at 71.

92.     The official 2020 Census Results were made available to Mr. Hinaman by the end of August 2021. Exh. M11 at 76:2-20. Mr. Hinaman then had a draft of

the map completed by mid-to-late September 2021. *Id*. at 102:23 – 103:2. This draft underwent only a few "minor" changes before it was ultimately enacted in HB 1. *Id*. at 103:2-16; 104:25-105:23; 109:21-110:11.

93.     During this same short period beginning in late August 2021, Mr. Hinaman also drew the new Alabama State House, State Senate, and State Board of Education district maps. M11 at 52:4-12. In doing this, he met individually with "most" of the 140 members of the Alabama state legislature and the 8 school board members, "sometimes more than once." *Id.* Drawing the State House and Senate district maps, which have 105 and 35 districts, respectively, required a significantly greater portion of Mr. Hinaman's time than the congressional district map, which has only 7 districts. *Id.* at 80-81.

94.     Between September 1 and 16, the Legislative Reapportionment Office held 28 hearings across the State. *See, e.g.*, Exh. M13 at 55:16-62:21, 98:10-13; Exh. M20.

95.     Although these hearings were technically open to the public, all but one was held during the typical workday. Exh. M13 at 98:10-103:17. And each of the Legislative Reapportionment Office's hearings occurred before the Committee had released any draft maps or proposals. Exh. M20.

B.     The Committee Refuses to Conduct a Racial-Polarization Analysis

96.     On October 19, 2021, the Alabama NAACP, the Greater Birmingham Ministries, and others sent a letter to the Committee. Exh. M20.

97.     The letter reminded the Committee of its obligations under Section 2 of the Voting Rights Act. It specifically highlighted the Committee's obligation to conduct a racial-polarization analysis to ensure that the redistricting complied with the Voting Rights Act and that the race was used only in a narrowly tailored manner to comply with a compelling state interest. Exh. M20.

98.     When members of the public asked the Committee if it would be conducting a racial polarization analysis, they were not given a firm answer or explanation confirming that a racial polarization analysis was being conducted. Jan. 4 Tr. 131-32.

99.     The Committee did not conduct a racial-polarization analysis for CD 7. M13 at 77:13-87:19; M20.

100.     Sen. McClendon explained that the Committee's lawyer, Mr. Dorman Walker, told him that racial-polarization analysis was only done by Dr. M.V. "Trey" Hood III for state legislative districts where "it looked like there might possibly be a racial issue." M13 at 77:13-87:19; M20.

C.   <u>The Proposed Maps Pass out of the Committee</u>

101.   As a whole, the Committee had little involvement in the drawing of the congressional plan. Jan. 4 Tr. 38-39. Sen. Singleton testified that Sen. McClendon and Rep. Pringle oversaw the drawing of Congressional Districts 1, 2, 3, and 7 by Mr. Hinaman. Jan. 4 Tr. 39; *see also* Exh. M19 at 7. In Sen. Singleton's view, "Everything seemed to have been so secretive." Jan. 4 Tr. 39.

102.   On October 26, 2021, the Committee held its second public meeting of the redistricting cycle. Exh. M19 (Oct. 26, 2021 Reapportionment Committee Meeting Tr.). The Committee released its proposed maps to the public that day. Exh. M19; Exh. M20.

103.   Many Committee members saw the full proposed maps for the first time that day. Exh. M20.

104.   The Committee Co-Chairs did not provide a racial polarization analysis for any congressional district either before or during the Committee meeting. Exh. M11 at 98:17-100:2;  Exh. M13 at 77:13-83:25; Exh. M20.

105.   Indeed, when Rep. England asked Sen. McClendon to explain the relationship between a BVAP of 54% and the actual or potential results of a racial polarization study, Sen. McClendon replied, "I got no clue." Exh. M19 at 19.

106.   Neither Mr. Walker nor Dr. Hood even attended the meeting. Exh. M20.

107.     In view of these circumstances, Rep. Laura Hall, a Black legislator, moved to postpone any vote on the proposed maps until the Committee members and the public had more time to review the maps and accompanying racial-polarization analysis. Exh. M20.

108.     All of the Black Committee members voted in favor of Rep. Hall's motion. Exh. M20.

109.     Rep. Hall's motion nonetheless failed because every white Committee member voted against it. Exh. M20.

110.     And notwithstanding unanimous objection from the Black Committee members, each of the proposed maps passed out of the Committee. Exh. M20.

111.     Senator McClendon did not request a racial polarization analysis for the congressional map because Mr. Hinaman had drawn District 7 with a 55% BVAP and, according to Sen. McClendon, it is "a pretty safe bet here in Alabama" that Black people will vote for Black candidates. Exh. M13 (McClendon Dep.) at 87. Senator McClendon's only effort to ensure that H.B. 1 complied with the Voting Rights Act ("VRA") was to confirm that it contained one majority-Black district. *Id.* at 91-92.

112.     While Sen. McClendon sought to ensure that the BVAPs of majority-Black districts, like District 7, were not "too low" to elect a Black-preferred

candidate, he did nothing to ensure that the BVAPs of such districts were not "too high" or packed. *Id.* at 87-88.

D.    The Alabama Legislature's Special Session

113.    Governor Kay Ivey called the Special Legislative Session on redistricting in Alabama to begin on October 28, 2021—within two days of the Committee first releasing its proposed maps to the public. Doc. 53 ¶¶ 88-89, 91.

    *i.    The House Considers and Passes the Proposed Maps*

114.    On October 29, the Alabama House State Government Committee met to discuss the Reapportionment Committee's proposed districting plan for Alabama's U.S. House delegation. Exh. M17 ¶ 18.

115.    Plaintiff Evan Milligan asked Rep. Pringle whether the Reapportionment Committee conducted racial polarization studies on any of the maps. Rep. Pringle replied that such studies were conducted regarding state legislative districts on "some of the districts that we were concerned about," but that they "were still working on it." Rep. Pringle offered no details or timeline.  *Id.* at ¶ 19.

116.    Rep. Pringle did not answer whether the Committee lacked the necessary data to determine whether the map violated federal law. *Id.* at ¶ 21.

117.    By November 3, 2021, bills redistricting the Alabama U.S. Congressional map, Alabama Senate map and Alabama House of Representatives

map were passed by both houses of the Alabama legislature and sent to Governor Kay Ivey's office for approval and signing. *Id.* at ¶ 22.

### ii.   *The Senate Considers and Passes the Proposed Maps*

118.     The State General Fund and Appropriations Committee considered the State House and congressional maps the next day. Doc. 53 ¶ 110.

119.     Even though Black members of the Senate Committee unanimously opposed the maps, the Senate Committee gave them a favorable report within twenty minutes. Doc. 53 ¶ 111.

120.     On November 3, the full Senate considered the congressional map. Doc. 53 ¶ 112.

121.     Sen. Bobby Singleton, a Black legislator, asked Sen. McClendon whether anyone had considered maps that were proposed at public hearings that had occurred months before. Doc. 80-1 at 14.

122.     Sen. McClendon indicated that he had seen the map proposed by the League of Women Voters but rejected it because of "serious flaws." *Id.*

123.     Sen. Singleton challenged Sen. McClendon on whether CD 7 is a racially gerrymandered district. Sen. McClendon replied: "Gerrymandering is in the eye of the beholder." *Id.* at 16.

124.     The Senate also considered an alternative map offered by Sen. Kirk Hatcher. Doc. 53 ¶ 113.

125.     Sen. Hatcher, a Black legislator, proposed the demonstrative Plan submitted by Plaintiffs Greater Birmingham Ministries and the Alabama NAACP, noting that this map sought to ensure "that all Black Alabamians have an opportunity to elect their preferred congressional representatives." Doc. 53 ¶ 113.

126.     Despite unanimous support from Black Senators, Sen. Hatcher's substitute map failed an up-or-down vote. Doc. 53 ¶ 114.

127.     After tabling several other substitute maps, the Senate passed the congressional map by a vote of 22-7. Doc. 53 ¶ 115-116.

128.     The 2021 Plan enacted in HB 1 contains one majority-Black district with an APBVAP of 55.3% under the 2020 census and assigns about one third of all Black Alabamians to CD 7. Doc. 53 ¶ 57; Exh. M3 at 7.

129.     Of the 18 core Black Belt counties, the 2021 plan excludes most or all of 8 from Congressional District 7, the sole majority-Black district. Exh. M3 at 9. Those 8 counties are divided between Congressional Districts 2 and 3 in the adopted plan. *Id.*

130.     Of Alabama's large majority-Black cities, the 2021 only includes parts of Birmingham and parts of Montgomery in a majority-Black district. Exh. M3 at 9.

131.       According to defendants' demographic expert, Thomas Bryan, the average Reock compactness score of the 2021 Plan is 0.39[2] and the average Polsby-Popper score is 0.22.[3] Exh. D4 at 19.

132.       Every Black Senator voted against the map. Doc. 53 ¶ 117.

## VII.   Findings of Fact Part VII: The Voting Rights Act Challenge to HB1

A.       The *Gingles* Preconditions

    *i.*       *Gingles Precondition 1: Viability of Majority-Minority District*

133.       Plaintiffs' demographic expert, Dr. Moon Duchin,[4] opined that Alabama's Black population is sufficiently numerous and geographically compact to create two majority-Black Congressional Districts in a congressional plan that maintains population balance, reasonable compactness, respect for political boundaries, and other traditional districting principles. Exh. M3 at 2-3; Jan. 6 Tr. 584-85, 602.

---

[2] A Reock compactness score is an area-based measure that compares each district to a circle, considered to be the most compact shape possible.  Jan. 6 Rough Tr. 590:22-25.  For each district the Reock test computes the ratio of the area of the minimum enclosing circle for the district. Id. The measure is always between 0 and 1, with 1 being the most compact.  Doc. 68-5 at 6.

[3] A Polsby-Popper compactness score is the product of a test that computes the ratio of the district area to the area of a circle with the same perimeter. Jan. 6 Rough Tr. 590:16-18, 590:25-591:2. The measure is always between 0 and 1, with 1 being the most compact. Doc. 68-5 at 6.

[4] Dr. Duchin holds a Ph.D. in Mathematics from the University of Chicago and is a Professor of Mathematics and a Senior Fellow in the Jonathan M. Tisch College of Civic Life at Tufts University. M3 at 1. She is also affiliated with the American Studies track within the Department of Race, Colonialism, and Diaspora Studies. Id. Dr. Duchin has been published and completed extensive research in the field of redistricting. Id.  The Court finds Dr. Duchin credible and accepts Dr. Duchin in this case as an expert in redistricting, applied mathematics, quantitative redistricting analysis, and demography and use of census data. Hr'g Tr. Vol. 3 at 554:23-555:14.

134.     In support of her opinion, Dr. Duchin developed four illustrative congressional plans for Alabama demonstrating that Alabama's Black population is sufficiently large and geographically compact to form a majority in two congressional districts. Exh. M3 at 4.

135.     To develop the illustrative plans, Dr. Duchin used (1) data products published by the Census Bureau, especially the PL 94-171 Decennial Census release, (2) the 2015-19 American Community Survey, and (3) the ACS Special Tabulation from 2015-19. Exh. M3 at 1.

136.     Dr. Duchin obtained the Census Places dataset to extract block assignments to cities and towns and used TIGER/Line shapefiles to pair demographics with geography. Block equivalency files for the adopted plan were obtained from the State's website. Exh. M3 at 1.

137.     Dr. Duchin also obtained geographic boundaries and block equivalency files for the State Board of Education redistricting plan adopted in 2021. Exh. M3 at 1.

138.     Consistent with industry standard practice in the development of congressional redistricting plans, Dr. Duchin developed the illustrative plans at the census block level to allow for equalizing the population of each district to within one person. Jan. 6 Tr. 571-72, 624.

　　　　　a)     *Numerosity*

139.     Each of the illustrative plans developed by Dr. Duchin contains two districts in which the Any Part Black voting age population formed a majority of the voting age population in Congressional District 2 and Congressional District 7.[5] Exh. M3 at 4, 7-8; Jan. 6 Tr. 580-81.

140.     In Illustrative Plan A, Dr. Duchin reports that District 2 has an APBVAP of 51.37% and District 7 has an APBVAP of 51.50%. Exh. M3 at 7.

141.     In Illustrative Plan B, Dr. Duchin reports that District 2 has an APBVAP of 51.06% and District 7 has an APBVAP of 50.24%. *Id.*

142.     In Illustrative Plan C, Dr. Duchin reports that District 2 has an APVAP of 50.06% and District 7 has an APBVAP of 53.50%. *Id.*

143.     And in Illustrative Plan D, Dr. Duchin reports that District 2 has an APBVAP of 50.05% and District 7 has an APBVAP of 51.73%. *Id.*

---

[5] Mr. Bryan testified that considering the "Black Alone" or "Single-Race Black" voting population instead of the "Any Part Black" population is "beneficial," Jan. 7 Rough Tr. 840:18-23, and "has been most defensible from the political science Gingles II voting behavior perspective," Id. 889:24-890:2. The Court does not give this testimony any weight, as it was outside the scope of his expertise. By Bryan's own admission, his understanding of the costs and benefits of using a particular voting population category is limited to "secondary passing comment[s]" he has heard throughout the course of his career. Id. 898:6-10. Bryan is not a political scientist, id. 840:18, and he does not cite anyone with the required expertise for his assertion. Id. 896:1-18. To the contrary, Bryan's report cites September 1, 2021 guidance from the United States Department of Justice— guidance that endorses a more inclusive approach to calculating the Black population. Id. 899:25-901:13.

Moreover, on more than one occasion, Bryan commended the "accuracy and clarity" of Dr. Duchin's analysis, and the transparency of her use of census data. Jan. 7 Tr. 913:14-19; see also id. at 1035:17-18, 1036:1-9.

144.     Dr. Duchin also reports that all of her plans are majority-Black under the Citizen Voting Age Population, or CVAP, metric.

145.     In addition, Illustrative Plan A is majority Black even using the most restrictive non-Hispanic single-race Black metric. Specifically, Dr. Duchin reports that in Illustrative Plan A, District 2 has a non-Hispanic SR BVAP of 50.01% and District 7 has a non-Hispanic SR BVAP of 50.3%.

146.     Finally, Dr. Duchin stated that apart from the more standard population metrics, the Illustrative Plans contain two majority-minority districts using the state's voter registration data. Exh. M48 at 2; Jan. 6 Tr. 582-84. Alabama's voter registration system requires voters to identify with a single racial category. Exh. M48 at 2. Whether using all registered voters or only active voters, Dr. Duchin concluded that over 50% of the registered voters in Districts 2 and 7 of the illustrative plans identified with the single racial category of Black. *Id.*; *see also* Jan. 5 Tr. 453-54.

       *b)*   *Compactness*

147.     Dr. Duchin developed the illustrative plans in accordance with traditional redistricting principles, including population balance, contiguity, respect for political subdivisions, the compactness of the districts, and heightened respect for communities of interest. Exh. M3 at 2.

148.     Dr. Duchin's understanding and application of these principles was informed by the Redistricting Guidelines adopted by the Reapportionment Committee. Exh. M3 at 5; Jan. 6 Tr. 569; Exh. M28.

149.     Alabama's redistricting guidelines create a two-tiered hierarchy of redistricting criteria. Exh. M28.

150.     In tier-one, the guidelines instruct that a reapportionment map must: (1) comply with the principle of one-person, one-vote; (2) be contiguous; (3) be reasonably compact (4) comply "with the Voting Rights Act of 1965;" and (5) may not subordinate "race-neutral districting criteria to considerations of race . . . except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act . . . . when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act." Exh. M28 ¶¶ II(a)-(h).

151.     The Guidelines then instruct that the following factors "shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and law of the United States and of the State of Alabama." Exh. M28 ¶ II(j). Those factors include: (1) incumbency protection; (2) respect for communities of interest; (3) preserving the cores of existing districts; and (5) minimization of the number of counties in each district. Exh. M28 ¶ II(j).

152.      As Dr. Duchin explained, these principles can and often do conflict with one another. Thus, the development of a redistricting plan requires making tradeoffs among principles. Jan. 6 Tr. 577-78. For example, "compactness can be [in tension] with communities of interest. If you have a well-identified community with important shared interests that itself is residentially located in [an] elongated configuration, then you have a choice to make" between "keeping that community whole" and the "compactness of your district." Jan 6. Tr. 577-78. In sum, "redistricting is all about . . . trade offs." *Id.* at 576. Mr. Cooper testified to the same, explaining that "each of [his] illustrative plans balances traditional districting principles in different ways." Jan. 5 Tr. 474; *see also id.* at 521 ("The key to drawing a good plan is to balance. . . .").

153.      The Guidelines by their terms recognize this reality, providing that complying with the tier-two criteria is a balancing act: "in each instance where" these criteria "conflict, the Legislature shall at its discretion determine which takes priority." But in no circumstance shall they supersede any criterion listed in tier one. Exh. M28 ¶ II(j).

154.      Defendants' demographic expert, Mr. Bryan agreed that Alabama's redistricting guidelines allowed race, color or membership in a language minority group to predominate over race-neutral districting criteria if needed to comply with Section 2 of the Voting Rights Act. Jan. 7 Tr. 1042. Indeed, he agreed that Alabama's

redistricting guidelines expressly require that their race-neutral districting criteria yield to compliance with the Voting Rights Act. Jan. 7 Tr. 1042.

155.    Mr. Bryan also acknowledged that the criteria set forth in subjection j of the guidelines—including core retention, incumbency protection, and preserving communities of interest—could not subordinate criteria discussed in preceding sections, such as contiguity and compactness. *Id.* 1043-44.

c)    *Racial Predominance*

156.    Although Dr. Duchin considered race as needed to develop plans with two majority-Black districts, race did not predominate in the drawing of the illustrative plans. For example, Dr. Duchin testified that she could have increased the Black voting age population in her two majority-Black districts but doing so would have reduced compactness and resulted in a higher number of split counties. Jan. 6 Tr. 578. When the population balance requirement required splitting individual precincts, or Voting Districts ("VTDs"), Dr. Duchin primarily considered compactness and municipal boundaries, and considered race only if necessary to ensure the district remained above 50% Black. Jan. 6 Tr. 572-73.

Equal Population and Contiguity

157.    After correcting for a small number of initially misallocated census blocks, all the districts in Plaintiffs' illustrative plans were contiguous and contained equal population within the Constitution's one-person standard. Jan. 6 Tr. 587, 590.

Geographic Compactness

158.     The compactness of a redistricting plan is measured using any of as many as 35 different quantitative metrics, some with ancient histories in the field of mathematics. Jan. 6 Tr. 590. The Polsby-Popper score and the Reock score both measure compactness by comparing a district to the most compact geometric shape, the circle. Jan. 6 Tr. 590-91.

159.     There is no dispute that Polsby-Popper and Reock scores are the "two most common methods" for measuring compactness. Jan. 6 Tr. 591-92; Jan. 7 Tr. 813.

160.     Compactness is not an objective measure. As Mr. Bryan explained, compactness is a "relative measure within one set of plans for a specific state for a specific redistricting exercise versus another set of plans for the same state for the same redistricting exercise." Jan. 7 Tr. 1045-46.

161.     Mr. Bryan also agreed with much of Dr. Duchin's compactness analysis. *See, e.g.*, Jan. 7 Tr. 813 (agreeing with Dr. Duchin about the prevalence of the Polsby-Popper and Reock measurements), 817 (agreeing with Dr. Duchin about the imprecision of adapted Schwartzberg scores). And he conceded that, on average, "[Dr. Duchin's] plans outperform the Alabama plan" in terms of compactness. *Id.* 869.

162.      As Mr. Bryan agreed, Plaintiffs' illustrative plans are highly compact overall and are more compact than the adopted plan according to the Polsby-Popper metric of compactness. Exh. M3 at 6; Jan. 7 Tr. 1053-54.

### d)    Communities of Interest

163.      A community of interest in the redistricting context is an area in which a significant portion of the population shares recognized similarities of interests. Doc 53 ¶ 76. Alabama's Redistricting Guidelines define communities of interest broadly as "an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts." Exh. M28 at 2-3.

164.      Communities of interest will frequently overlap, and it may be impossible to preserve one community of interest without dividing another. Jan. 6 Tr. 597-98; *see also* Jan. 7 Tr. 802 (State's demography expert, Mr. Bryan, stating "[t]here is no uniform[ly] . . . right or prevailing community of interest over any other."); Exh. M11 at 155 ("[B]ecause there are so many different communities of interest, they're not – I mean, no plan is going to respect all of them. So there are trade-offs.").

165.     As Dr. Duchin further explained, the principle of protecting communities of interest does not mean that an entire congressional must "form a single community of interest" wherein every person must share a community of interest with every other person in the district. Rather, preserving communities of interest means that communities should be taken into account when you draw" districts "so that either they're kept whole within a district, or if it's appropriate, split among several in a way that amplifies their opportunity to be heard by their representatives." Jan. 6 Tr. 596-97.

166.     In Alabama, there was no sustained effort by any state authority to formally collect community of interest (COI) maps, and the Reapportionment Committee provided no public information on what communities of interest would be or were considered in the redistricting process. Exh. M3 at 6; Jan. 6 Tr. 595.

167.     For purposes of redistricting, Alabama's Black Belt is a community of interest. Exh. M11 at 155:5-7 (State's map drawer Mr. Hinaman agreeing that Black Belt is a community of interest); Jan. 7 Tr. 1063:13-22 (Defendants' demography expert Mr. Bryan acknowledging the Black Belt as a community of interest); Jan 12 Tr. 1675:21-23 (Mr. Byrne testifying that "the Black Belt is kind of its own thing . . . very rural, very agricultural"); Exh. M16 ¶ 8 ("With many Black people in the Mobile area having family ties to the Black Belt, it is a clear indication that both areas are a community of interest"). Likewise, the city of Montgomery constitutes a

community of interest. *See*, *e.g.*, Exh. M17 ¶ 6 ("The Black community dispersed throughout Montgomery is a community of interest.").

168.    Dr. Duchin bore communities of interest "in mind when drawing [Plaintiffs'] illustrative plans." Jan. 6 Tr. 594. In the absence of any guidance from the state on important communities of interest, Dr. Duchin identified and sought to protect "two kinds of communities of interest:" (1) "the cores of cities in Alabama" and (2) "the Black Belt across the State." *Id.* at 595. She explained in her report that the Black Belt counties "have a long-shared history from plantation slavery to sharecropping to Jim Crow and up to the present" and as such "constitute very clear communities of interest by the Guidelines definition." Exh. M3 at 10.

169.    Defendants' expert, Mr. Bryan's only reference to communities of interest in his initial report asserts that "Mobile and Baldwin counties are an inseparable" community of interest. Jan. 7 Tr. 1005-06. To reach this conclusion, Mr. Bryan relies on testimony from former Representatives Jo Bonner and Bradley Byrne from the *Chestnut* proceeding that was selected for him by defense counsel. Exh. D2 at 16-17; Jan. 7 Tr. 1005.

170.    Although Mr. Bryan believes that community organizers, like Plaintiffs Milligan and Dowdy, are among the most reliable and knowledgeable sources of information about where communities of interest might exist, he did not seek out such individuals. Jan. 7 Tr. 1069:13-19. On the contrary, the only other source Mr.

Bryan acknowledged relying on for information about Alabama communities of interest is Wikipedia. *Id.* 1072:5-7.

171.    Nor does Mr. Bryan explain why, if Mobile and Baldwin Counties are "inseparable," the State's 2021 Board of Education Plan mirrors the Illustrative Plans in splitting part of Mobile County away from Baldwin County. Mr. Bryan testified that he "did not assess the legislative, senate, or State Board of Education plan" as part of his expert analysis in this case. Jan. 7 Tr. 1031. And he assumed that all maps drawn by the legislature were drawn in compliance with Alabama's guidelines. Jan. 7 Tr. 1032.

172.    Indeed, the Board of Education plan was drawn pursuant to the same state redistricting guidelines as HB1. Exh. M28. Dr. Duchin also reviewed the Board of Education plan in designing her maps. Exh. M3 at 1. That the State split Mobile County (apparently) to comply with the VRA to draw the two-majority Black Board districts is compelling evidence that Defendants could (and should) draw maps that, consistent with the State's own redistricting criteria, split Mobile County for two majority-Black congressional districts.

Respecting Political Boundaries

173.    Plaintiffs' illustrative plans split a similar number of counties and municipalities as the adopted plan. For example, Plan D splits only 5 counties, in comparison to 6 for the adopted plan, while Plan B splits 7 counties, but only 32

municipalities, fewer than the 36 split by the adopted plan, with the result that it splits fewer localities overall. Exh. M3 at 5.

      *e)*    *Protecting Incumbents*

174.     Dr. Duchin testified that based on her understanding of the Redistricting Committee's Guidelines, protecting against incumbent pairings and preserving the cores of prior districts ranked lower than other principles.

175.      Thus, while her plans pair incumbents, they did so as a result of her respect for higher order considerations in the State's redistricting guidelines such as compactness and county integrity. Jan. 6 Tr. 669-70. She explained that fewer or no incumbency pairings were possible in her plans, but only at the expense of sacrificing compactness and county integrity. *Id.* To put a finer point on the balancing required by conflicting redistricting criteria, Dr. Duchin noted that "two incumbents actually live not only in the same county, but a few highway exits apart," and therefore "to keep those incumbents in different districts," one would have "to split that county." *Id.* 671. In any event, Dr. Duchin stated that it was possible, as Mr. Cooper has shown, to "draw a plan that avoided any incumbent pairings and still contain two majority-minority districts without sacrificing the principle of contiguity." *Id.* 692-93; *see also* Jan. 5 Tr. 468 (Mr. Cooper testified that his Illustrative Plan 5 demonstrated "that you can draw two majority-Black districts for the U.S. House in Alabama and protect all incumbents.").

176.     Mr. Bryan offered an inconsistent critique of the illustrative plans' pairing of incumbents. At one moment, he declared that "incumbency protection is important because the longer that an incumbent has served a district, the better able they are to serve that district." Jan. 7 Tr. 963. Yet when it was pointed out that the two incumbents impacted by the creation of a second majority-minority district had been on the job for less than a year, he reversed course, asserting the duration of an incumbent's tenure "had no bearing" on his incumbency analysis. *Id.* Because Mr. Bryan offered no coherent justifications for incumbency protection as a traditional districting principle, the Court gives little weight to Mr. Bryan's testimony on this issue.

### f)     Preserving Cores of Prior Districts

177.     Dr. Duchin explained that the preservation of district cores refers to the practice of having "new districts . . . resemble the previous districts." Jan. 6 Tr. 599. This metric is measured by either "looking at the area of overlap or the territorial overlap between a new district and its corresponding [district] . . . in the older plan, or by looking at the population that's either retained or displaced" in the districts of the new plan. *Id.*

178.     As explained earlier, Alabama's Redistricting Guidelines consider core retention to be a tier-two redistricting factor that should give way in the case of

conflict with tier-one factors such as contiguity and compliance with the VRA. Exh. M28.

179.    Dr. Duchin explained that under the guidelines "core preservation [is] clearly lower ranked" than compliance with "federal requirements." Jan. 6 Tr. 575.

180.    For this reason, Dr. Duchin stated that her illustrative plans do not "particularly preserv[e] the cores of the prior district." Jan. 6 Tr. 599-600. She explained it is "impossible to have as high of a core preservation as . . . the newly enacted plans, while also having two majority-Black districts" because "it's . . . mathematically impossible to create two majority-Black districts without a significant level of population reassignment from one district to another." Jan. 6 Tr. 600. This was acceptable to Dr. Duchin because she "regard[ed] the protection of minority electoral opportunity to be a nonnegotiable federal requirement that necessitates a significant level of core displacement." *Id.*

181.    Although Mr. Bryan criticized the illustrative plans for their low core retention, Mr. Bryan did not dispute Plaintiffs' experts' understanding of the effect adding a new majority-minority district to a plan would have on core retention. To the contrary, Mr. Bryan testified that it will "often times be the case" that "if a plan adds a majority-minority district that wasn't there before, the core retention of that

plan will be less than a plan that retains the same number of majority-minority districts." Jan. 7 Tr. 947.[6]

182.     Dr. Duchin testified that the low core retention scores featured in the remaining districts of her plans were guided by the "guidelines [which] put core displacement as a priority below compactness." Jan. 6 Tr. 600. In other words, Dr. Duchin reconfigured the non-majority-Black districts in her Illustrative Plans to enhance the compactness of her districts over the 2021 Enacted Plan to respect the Guidelines emphasis on compactness over the preservation of existing district cores. *Id.* She explained that this was just another example of balancing redistricting criteria and that "if core preservation were elevated" over compactness in the Guidelines, "it would be quite easy to reconfigure [her] four" plans "to more resemble the previous enacted plan" but "that you would be doing so expressly at the cost of compactness." *Id.* at 600-01.

ii.     *Gingles Precondition 2: Political Cohesion of Black Voters*

183.     *Milligan* Plaintiffs' expert, Dr. Baodong Liu, analyzed the extent to which, if any, the candidate preferences of Black and white voters in Alabama have

---

[6] Indeed, in his prior work in VRA litigation, Mr. Bryan has acknowledged this reality, and has supported maps to satisfy Gingles 1 that only preserve only 40-60% of districts' cores. Jan. 7 Tr. 1066:19-1067:10 (Stating that Mr. Bryan developed the illustrative plan for the case of *Harding v. Dallas*); see *Harding v. Cty. of Dallas*, 336 F. Supp. 3d 677, 689, 695 (N.D. Tex. 2018) (describing number of people added to and removed from remedial districts in the illustrative map).

differed—that is, the extent to which voting in Alabama is racially polarized.[7] Dr. Liu concluded that Black voters consistently vote cohesively for the same candidates. Exh. M4 at 1, 18; Jan. 10 Tr. 1258.

184.     To reach his conclusions, Dr. Liu performed a statistical analysis of voting patterns in a total of 16 elections. Exh. M4 at 4 (summarizing analysis of 7 endogenous and 6 exogenous elections); Exh. M8 at 3-4 (analyzing two additional exogenous elections); Jan. 10 Tr. 1268-69 (describing analysis of one additional endogenous election).

185.     The selection of elections for this analysis was based on three critical criteria: 1) biracial elections involving at least one Black candidate and one white candidate; 2) endogenous biracial elections supplemented by exogenous biracial elections (*i.e.*, non-congressional biracial elections); and 3) elections during the last 13 years. Exh. M4 at 3-4, 8.

186.     Biracial elections are those in which voters were presented with a choice between or among Black and non-Black candidates. Elections with this type of candidate pool are generally considered the most probative for assessing racially polarized voting ("RPV"), because they allow an analysis of how voters behave

---

[7] Dr. Liu holds a Ph.D. in Political Science from the University of New Orleans and is a Professor of Political Science and Ethnic Studies at the University of Utah. Jan. 10 Tr. 1252-55. Dr. Liu has testified as an expert witness in other cases and has extensively published in the areas of American political behavior and racially polarized voting. Id. The Court finds Dr. Liu credible and accepts Dr. Liu in this case as an expert in racial polarization analysis and American political behavior. *Id*.

when faced with a choice between a candidate from their own racial group and a candidate not from their own racial group. Exh. M4 at 4; Jan. 10 Tr. 1267-68.

187.     An endogenous election—one that is conducted for the office that is at issue in a case—is considered more probative than an exogenous election—one that concerned an electoral office at a different level of government or in a part of the state outside the area of study. Exh. M4 at 3-4.

188.     Dr. Liu explained that he selected elections from 2008-2020 because "while more recent elections are more probative than distant past elections, … a longitudinal analysis for a period long enough to allow the examination of RPV patterns over time" can provide greater confidence in the conclusions. Exh. M4 at 4 & n.3; Jan. 10 Tr. 1269-70.

189.     Further, Dr. Liu supplemented his RPV analysis with an analysis of exit polls in the 2008 and 2012 primary and general elections. Exh. M4 at 4, 14; Jan. 10 Tr. 1277.

190.     Dr. Liu analyzed a total of eight endogenous biracial elections between 2010 and 2020. Exh. M4 at 4; Jan. 10 Tr. 1268-70.

191.     James Averhart was a Black candidate for Congressional District 1 in 2020. In the 2020 Democratic Primary, he received 53.8% of votes cast by Black voters and only 16.7% from white voters. In the general election, Averhart received 93.3% of votes cast by Black voters and 12.6% from white. Exh. M4 at 9.

192.     Phyllis Harvey-Hall, the Black candidate in the 2020 Congressional District 2 general election, received 93.4% of the votes from Black voters and 5.2% from white voters. Exh. M4 at 9-10.

193.     In the 2020 Congressional District 3 general election, Adia Winfrey, the Black candidate, received 92.6% of the votes from Black voters and 6.6% from white voters. Exh. M4 at 9.

194.     In the 2018 Congressional District 1 general election, Robert Kennedy Jr., the Black candidate, received 94.6% of the votes from Black voters and only 8.1% from white voters. Exh. M4 at 9-10.

195.     In 2013 and 2014, Burton LeFlore, a Black candidate, ran for election from District 1, but both times LeFlore was defeated by Bradley Byrne, a white candidate, by wide margins. Doc. 53 ¶ 94. Dr. Liu's ecological inference analysis of the 2014 general election in District 1 found Black and white bloc voting at levels akin to the other endogenous elections. Jan. 10 Tr. 1268-69.

196.     The only Black candidate who was able to win a biracial congressional election in Alabama was Terri Sewell who ran in Congressional District 7 which has been a Black-majority district since the 1990s. Her two contested elections in 2010 and 2012 were both highly racially polarized. In 2010, she won 95.5% of the Black vote but only 19.3% of the white vote. In 2012, running as an incumbent, Sewell won 96.3% of the Black vote and only 26.1% of the white vote. Exh. M4 at 9-10.

197.     Dr. Liu examined six exogenous biracial elections in his initial expert report using ecological inference. Four of these were elections for statewide elected offices: two for Lt. Governor (2018 and 2014), one for State Auditor (2018), and one for Secretary of State (2014). The other two were for the presidential elections in 2008 and 2012 which involved a Black candidate, Barack Obama, as the nominee for a major political party. Exh. M4 at 4.

198.     Will Boyd and Miranda Joseph as the Black candidates in the 2018 Lt. Governor and State Auditor elections received 95.5% and 95.4% of the votes cast by Black voters, respectively, whereas votes from white voters were as low as 11.0% and 12.1% respectively. Exh. M4 at 11.

199.     In the 2014 general election, James Fields, a Black candidate, ran against a white incumbent for Lt. Governor. Fields received 94.0% of the Black vote and 14.9% of the white vote. In the same year, Lula Albert-Kaigler, a Black candidate competed in the Secretary of State election and received 35.6% of the total votes. She was defeated by her white opponent, John Merrill. She received 95.1% of the Black vote and only 12.0% of the white vote in this highly racially polarized state-wide election. Exh. M4 at 10.

200.     The 2008 and 2012 presidential elections in Alabama revealed the same consistent pattern of RPV. In 2008, President Obama received less than 40% of the total votes in Alabama, and thus failed to win Alabama. His Black support was about

92% while his white support was around 15%. Despite running as an incumbent in 2012, his white vote further declined by one percentage point, while his Black support increased by roughly the same margin. Exh. M4 at 11.

201.     Dr. Liu initially analyzed these elections using the Non-Hispanic, Single-Race Black census category to identify the cohesiveness of Black voters.  He subsequently re-ran the same analysis for the endogenous elections using the more inclusive Any-Part Black category. Dr. Liu found that voting was polarized to essentially the same degree regardless of which category was used. Jan. 10 Tr. 1335-36, 1338-39.

202.     Dr. Liu has researched whether Black people who identify as "single-race," "Hispanic," or "multi-racial" vote differently and found that, consistent with his findings in Alabama, these groups are politically cohesive. Jan. 10 Tr. 1317-19.

203.     *Caster* Plaintiffs' expert, Dr. Maxwell Palmer, conducted three ecological inference analyses, one at the precinct level for 2016, 2018, and 2020 general elections and the 2017 special election for U.S. Senate, one at the precinct level for the 2020 general elections, and one at the county level for the 2012 and 2014 general elections. Exh. C79 at 12-16, tbls. 2-9; Jan. 6 Tr. 707.

204.     In every election examined, in each congressional district and the Focus Area (i.e., Districts 1, 2, 3, 6, and 7) as a whole, Black voters had clearly identifiable candidates of choice. Jan. 6 Tr. 701-02; Exh. C79 at 6, fig. 3; 7, fig. 4; 16, tbl. 9.

205.     In the 2016-2020 elections, Black voters supported their candidates of choice with an estimated vote share of 92.3%. Exh. C79 ¶ 16. The 2012-2014 elections exhibited similarly high and cohesive levels of Black voter support for their preferred candidates. Exh. C79 at 7, fig. 4.

206.     Defendant's RPV expert, Dr. Hood, did not conduct a functionality or effectiveness analysis of any of the maps proposed by the *Milligan* or *Caster* plaintiffs because he was not asked to conduct such an analysis. Dr. Hood solely conducted a functionality analysis looking at Districts 6 and 7 of the whole-county map proposed by the *Singleton* plaintiffs. Jan. 11 Tr. 1416-17.

207.     For District 7 of the enacted map, and Districts 6 and 7 of the *Singleton* map, Dr. Hood only conducted an RPV analysis for two elections: the 2020 presidential and 2018 gubernatorial elections. In every analyzed election, Dr. Hood concluded that there was RPV in Alabama. Exh. D5 at 14; Jan. 11 Tr. 1419-21.

208.     In his academic scholarship, Dr. Hood has described the appropriate approach to analyzing RPV as follows: "One must . . . consider the race/ethnicity of the candidates running for election. Of the elections available for analysis, the more relevant are those that feature a minority candidate from the racial/ethnic group suing the jurisdiction in question." Exh. M51 at 546. But neither of the elections Dr. Hood chose to analyze in this case directly feature a minority candidate. Dr. Hood was

aware that such elections had recently occurred in Alabama, but he chose to ignore them in his analyses. Jan. 11 Tr. 1426-27.

209.    Dr. Hood exclusively used single-race Black in his expert analyses, opining that individuals who identify as multi-racial (including the Black identity) do not vote "cohesively" with individuals who solely identify as Black. Jan. 11 Tr. 1413-14, 1422-23. However, Dr. Hood admitted that he did not conduct any empirical research, review any professional studies, or otherwise find any evidence to confirm his hypothesis. Jan. 11 Tr. 1423-24.

     *iii.*    *Gingles Precondition 3: Success of White Bloc Voting*

210.    Black-preferred candidates are unable to win elections in majority-white congressional districts due to white bloc voting. Jan. 6 Tr. 702; Jan. 10 Tr. 1258.

211.    Black preferred candidates do not win in any individual congressional district outside of CD 7—that is, Black-preferred candidates lose in every district except the existing majority-Black CD 7.  Jan. 6 Tr. 702. Of the twenty elections Dr. Palmer examined, the Black-preferred candidates were defeated in 18 of them in the Focus Area. Exh. C79 ¶¶ 24-25.

212.    In the 2016-2020 elections, white voters were highly cohesive in voting in opposition to the Black candidate of choice in every election. On average, Dr. Palmer found that white voters supported Black-preferred candidates with just

15.4% of the vote. Exh. C79 ¶ 17. The 2012-2014 elections exhibited similarly high and cohesive levels of white voting against Black-preferred candidates. Exh. C79 at 7, fig. 4.

213.    Overall, Dr. Palmer found "very strong evidence of racially polarized voting" across the Focus Area as a whole and in each individual congressional district he examined. Jan. 6 Tr. 701-02; Exh. C79 at ¶¶ 18, 19, 21, 22, figs. 3, 5, tbls. 4-9. Each of Dr. Palmer's analyses revealed the same patterns of highly racially polarized voting. Jan. 6 Tr. 715.

214.    Dr. Palmer found that voting was also racially polarized in congressional elections in 2018 in then-existing CD-1, CD-2, and CD-3, and that Black-preferred candidates were defeated by white bloc voting. Jan. 6 Tr. 719-20; Exh. C83; Exh. C84 at 157-59, 169-70.

215.    In the 2020 general election, the three Black candidates running in Congressional Districts 1, 2, and 3 were all defeated by candidates who received cohesive support from white voters, despite receiving well over 90% of the votes of Black voters. The 2018 election in Congressional District 1 saw a similar result. Exh. M4 at 9-10; Jan. 10 Tr. 1275:4-7.

216.    The exogenous elections Dr. Liu examined using ecological inference provide further examples of white bloc voting leading to the defeat of Black preferred candidates. Candidates supported by Black voters in the 2020, 2012, and

2008 presidential races, 2018 and 2014 Lt. Governor's races, 2018 State Auditor race, and 2014 Secretary of State race were defeated, despite receiving Black support of 94% and above. Exh. M4 at 11-12, Exh. M8 at 3 n.2. Looking only at the votes cast in Congressional Districts 1, 2, and 3, President Obama received support from 90-92% of Black voters in 2008 and 2012 but received fewer votes overall in those districts than John McCain and Mitt Romney. Exh. M4 at 13; Jan. 10 Tr. 1277. In the 2016 Republican Primary in Alabama, Ben Carson, a Black man, received less than 9% of the white vote. Exh. M8 at 3.

217.    Dr. Liu also examined exit polling for the 2008 elections for President and U.S. Senate, which confirmed his statistical analysis. According to the exit polls, in the 2008 general election, President Obama won 98% of votes cast by Black voters, while McCain won 88% of the votes of white voters. In the Senate general election, Jeff Sessions won 89% of votes cast by white voters, while Vivian Figures, a Black candidate won 90% of the Black vote. Exh. M4 at 14.

218.    In Alabama, voters do not register with a party, and thus, exit polls are typically used to assess support for candidates by voters of each party. In the 2008 Presidential Election, President Obama received only 47% of the votes of white Democrats, while McCain received a majority of white Democratic support, at 51%. Exh. M4 at 14; Jan. 10 Tr. 1278:22-1279:4. In the Senate race, Sessions won 58% of the white Democratic vote. Exh. M4 at 14; Jan. 10 Tr. 1279:11-16.

219.     In the 2008 Democratic Presidential Primary in Alabama, Senator Hilary Clinton, a white woman, received 72% of the white vote, and President Obama received 84% of the Black vote. Exh. M4 at 14; Jan. 10 Tr. 1278:5-15.

220.     Dr. Liu opined that the exit polls demonstrate that race, rather than party, was a major factor in these outcomes. Exh. M4 at 14; Jan. 10 Tr. 1279:15-16.

221.     Dr. Palmer also analyzed whether Mr. Cooper's illustrative majority-Black districts would elect Black-candidates of choice using actual election returns. He found that Black-preferred candidates were consistently elected in each of the majority-Black districts examined with an average of 57% of the vote in illustrative district 2 and 65% of the vote in illustrative district 7. Jan. 6 Tr. 721; *id.* at 722:15-23; Exh. C79 ¶¶ 26-27.

222.     Dr. Hood agreed that given the high degree of RPV in Alabama, there is a "high probability" that white bloc voting will result in the defeat of Black-preferred candidates in white majority districts. Jan. 11 Tr. 1420-21.

223.     Dr. Hood claims that white conservatives support minority Republican candidates at the same rates or at significantly higher rates than Anglo (non-Hispanic white) GOP nominees. Exh. D5 at 16. Dr. Hood points to the election of Republican state house member Kenneth Paschal (HD 73) as an example of this purported trend, but on cross-examination Dr. Hood admitted that he did not conduct an RPV analysis

on Representative Paschal's election to determine the degree of racial support for his candidacy. Jan. 11 Tr. 1431.

224. Representative Paschal is a Black man who ran in a Shelby County district which is 84.1 percent white VAP. Exh. D5 at 16. Given the significant white VAP in Representative Paschal's district, Dr. Hood assumed that Paschal's electoral success depended on significant white voter support. Jan. 11 Tr. 1431-33.

225. The results of Dr. Liu's RPV analysis undermine Dr. Hood's claim that white conservatives support minority Republican candidates at high rates. Dr. Liu found that the turnout for Representative Paschal's race was low overall at 5.3 percent VAP, and that only 1.7 percent of the white VAP turned out to vote, which suggests that white voters were not high interested in this election featuring a Black Republican candidate. Exh. M8 at 3; Jan. 11 Tr. 1431-33.

226. Additionally, Dr. Hood used the same methodology as Dr. Palmer and arrived at the same conclusions regarding the existence of racially polarized voting for the geographies they both examined. Jan. 11 Tr. 1427, 1448; Jan. 6 Tr. 728-29. Although Dr. Hood raised speculative concerns about Dr. Palmer's data in his second report, Exh. D6, he repeatedly admitted on cross-examination that he did not identify any errors that would affect Dr. Palmer's analysis or conclusions. *See, e.g.*, Jan. 11 Tr. 1449-50, 1456, 1458-59; 1461.

B.   <u>The Totality of the Circumstances Affecting Electoral Opportunities for Black Alabamians</u>

    i.   *Senate Factor 1: History of Voting-Related Discrimination*

227.   Alabama has a long and sordid history of voting-related discrimination that has touched the rights of Black individuals to participate in the political process. Exh. M5 at 4-16, Jan. 12 Tr. 1146-61; Exh. C80 at 6-23.

228.   Alabama's history of discrimination dates to the state's admission to the union. Before the Civil War, Black people were barred from voting in the state. After the passage of the Reconstruction Acts and Amendments, Alabama was forced to allow Black men access to the franchise, and the 1867 Alabama Constitution granted every male person over the age of 21—who satisfied the citizenship and residency requirements—the right to vote. This meant that for the first time in Alabama's history, Black people voted and held public office. Exh. M5 at 4-5.

229.   In response, white leaders reformed the Democratic party with the intent of "redeeming" the State and re-establishing white supremacy. This was accomplished by using violence to deter Black people from political participation and, once the Redeemers returned to political office, to pass racially discriminatory laws to cement their control. Exh. M5 at 4-5; Jan. 10 Tr. 1146.

230.   Violent intimidation of Black voters continued throughout the 1880s and 1890s, and by the twentieth century white leaders in Alabama had declared Black disenfranchisement a policy goal. Exh. M9.

231.     At the 1901 Constitutional Convention, 155 white male delegates gathered in Montgomery with the express intention "to establish white supremacy in the State." Exh. M5 at 5; Jan. 10 Tr. 1146.

232.     The Convention ratified changes to the constitution that required literacy tests as a prerequisite to register to vote and mandated payment of an annual $1.50 poll tax, which was intended to and had the effect of disenfranchising Black voters. *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966) (three-judge court); Exh. C80 at 7.

233.     After the passage of the 1901 Constitution, the number of Black registered voters in Alabama dropped from 180,000 to 3,000. By 1906, just two percent of the Black voting age population was registered to vote. Exh. M5 at 5.

234.     After the United States Supreme Court invalidated white-only primaries in 1944, Alabama passed the "Boswell Amendment" to its Constitution in 1946, adding an "understanding requirement" meant to give registrars broad discretion to deny African Americans the ability to register to vote. Exh. M5 at 6. A federal court ruled that this provision was purposely used to counteract the Supreme Court's invalidation of the white primary. *Davis v. Schnell*, 81 F. Supp. 872, 878-80 (S.D. Ala. 1949), *aff'd*, 336 U.S. 933 (1949).

235.     In response to *Schnell*, Alabama replaced its understanding requirement with a literacy test, again with the purpose of preventing African Americans from registering to vote. Exh. C80 at 10.

236.     After 1944, many Alabama counties also shifted to at-large elections, the intent of which was to prevent African Americans from electing their candidates of choice. Exh. M5 at 6.

237.     In 1951, Alabama enacted a law prohibiting single-shot voting in municipal elections, the intent of which was to prevent African Americans from electing their candidates of choice. Exh. M5 at 6.

238.     In 1957, the Alabama Legislature transformed the boundaries of the city of Tuskegee into a twenty-eight-sided figure designed to fence out African Americans from the city limits and ensure that only white residents could elect city officials. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); Exh. M5 at 8; Jan. 10 Tr. 1149.

239.     Alabama's discriminatory voter registration system, combined with continued violent intimidation, successfully suppressed Black voting in the state for several more generations, with no significant federal intervention until the passage of the VRA in 1965. Exh. M5 at 6-10.

240.     In 1964 and 1965, Alabama's discrimination and brutality against Black voters was on full display in Selma, where Dallas County Sheriff Jim Clark,

Alabama state troopers, and vigilantes violently assaulted peaceful Black protesters attempting to gain access to the franchise. Exh. M5 at 10.

241. On March 7, 1965, in what became known as Bloody Sunday, state troopers viciously attacked and brutally beat unarmed peaceful civil rights activists crossing the Edmund Pettus Bridge in Selma, where less than 5 percent of Black voters were registered to vote. Bloody Sunday helped pave the way for the passage of the VRA in 1965 and Alabama was declared a "covered" state under Section 4(b) of the Act. Exh. M5 at 10.

242. Today, Alabama has a majority-vote requirement in all primary elections. Exh. M5 at 8-12.

243. Alabama has long employed voting practices that impair Black electoral success. In 1986, for instance, a court found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1357-58 (1986). The court also found that from the late 1800s to the 1980s, Alabama had purposefully manipulated the method of electing local governments as needed to prevent Black citizens from electing their preferred candidates. Exh. M5 at 8; Exh. C80 at 29; Jan. 11 Tr. 1151-52.

244.     Ultimately, a defendant class of 17 county commissions, 28 county school boards, and 144 municipalities were sued for employing at-large election systems with a racially discriminatory effect and intent. These cases resulted in settlements with about 180 jurisdictions, which required them to adopt new election systems including single-member districts, limited voting, and cumulative voting systems, in an attempt to purge the state's election systems of intentional discrimination. Exh. M5 at 12; Exh. C80 at 29; Jan. 11 Tr. 1151-52.

245.     Between 1965 and 2021, subdivisions in Alabama continued to use at-large elections with numbered posts. Exh. M5 at 12; Jan. 11 Tr. 1151-52.

246.     Federal courts have recently enjoined municipal at-large voting systems with numbered posts created by the State Legislature. *See, e.g.*, *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-CV-01821-MHH, 2019 WL 7500528, at *4 (N.D. Ala. Dec. 16, 2019) (finding that the at-large multimember district used to elect board members violated Section 2 of the VRA); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019) (ordering changes to the city's at-large voting system to remedy an alleged Section 2 of the VRA violation); Exh. M5 at 12.

247.     Black voters have challenged other discriminatory Alabama voting laws under Section 2 of the VRA and the Constitution in federal court. *See, e.g.*, *People First of Ala. v. Merrill* ("*People First*"), 491 F. Supp. 3d 1076, 1106-07 (N.D.

Ala. 2020) (issuing a declaratory judgement against the State under the VRA); *Harris v. Siegelman*, 695 F. Supp. 517, 530 (M.D. Ala. 1988) (declaratory judgement and injunction against state officials under the VRA). For example, the Supreme Court struck down Alabama's discriminatory misdemeanant disfranchisement law, *Hunter v. Underwood*, 471 U.S. 222 (1985), and a state law permitting certain discriminatory annexations, *Pleasant Grove v. United States*, 479 U.S. 462, 466-67 (1987); Exh. M5 at 5, 12.

248.    In 2011, a federal court found that Alabama state senators attempted to depress Black voter turnout in the 2010 election by keeping a referendum issue popular among Black voters off the ballot. In recorded conversations, the senators referred to Black Alabamians as "illiterates," "Aborigines" and "Indians." The court concluded that these "recordings represent compelling evidence that political exclusion through racism remains a real and enduring problem in this State" and that "racist sentiments" remain "regrettably entrenched in the high echelons of state government." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-47 (M.D. Ala. 2011).

249.    In 2016, a federal court enjoined the U.S. Election Assistance Commission from assisting Secretary Merrill's illegal attempt to bypass the National Voter Registration Act to require documentary proof-of-citizenship to vote in part

because this requirement would lead to "the abridgment of the right to vote". *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 13-15 (D.C. Cir. 2016).

250.     Soon after *Shelby County*, the State began enforcing its strict voter ID law. In retaliation against the Alabama Black Legislative Caucus, Governor Bentley in 2015 closed 31 Motor Vehicle Division offices in disproportionately Black and rural areas, harming those residents' ability to obtain voter ID. Exh. C80 at 17-18. After the U.S. Department of Transportation concluded that these actions adversely impacted Black residents and voters, the State reopened some of the office. Exh. C80 at 18.

251.     Some counties in the Black Belt still provide little to no information about office operation days and hours for their Motor Vehicle Division Offices. Exh. C80 at 18.

252.     Even in the wake of *Shelby County v. Holder*, Alabama is the only state in the nation where federal courts have ordered more than one political subdivision to be re-subjected to preclearance review under Section 3(c) of the VRA. *See Jones*, 2019 WL 7500528, at *4-5; *Allen v. City of Evergreen*, No. 13-0107, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014); Doc. 53 at ¶ 157.

253.     Only 43 of Alabama's 67 counties have websites providing information relating to voting and elections. Exh. C80 at 19.

a)     *Discrimination in Redistricting*

254.     In five of the six decennial redistricting cycles between 1960 to 2010, courts or the U.S. Department of Justice found that Alabama's congressional map or state legislative maps discriminated against Black voters in violation of the Constitution or the VRA. Exh. M5 at 8-16.

255.     Prior to 1960, the Legislature failed to reapportion for 50 years—diluting the votes of residents in rapidly expanding counties. As a result, Alabama's entire legislative apportionment scheme was struck down for violating the principle of one person, one vote. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964).

256.     On remand from the Supreme Court, a three-judge court found that, in devising remedial maps to correct the malapportionment, the Alabama "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108-109 (M.D. Ala. 1965). Doc. 53 ¶ 130; Exh. M5 at 9; Jan. 11 Tr. 1149-50.

257.     Following *Reynolds* and the 1970 Census, the Legislature again failed to redistrict, and a three-judge federal court was forced to draw new district lines. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972). The court rejected the Alabama Secretary of State's proposed map because of its racially "discriminatory effect" on Black voters. *Id.* at 936. Exh. M5 at 10; Jan. 11 Tr. 1150.

258.      In the 1980s, the United States Attorney General denied preclearance under the VRA to maps drawn by the Legislature to redistrict State House and Senate maps because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. Shortly thereafter, a three-judge court rejected Alabama's proposed interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' black districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 237 (M.D. Ala. 1982); Exh. C80 at 22; Exh. M5 at 11; Jan. 11 Tr. 1150-51.

259.      After the 1990 census, Alabama submitted a congressional plan to the DOJ that contained a majority-Black district. Exh. C80 at 23. The DOJ objected to the plan because it fragmented the Black community outside of the majority-Black district, the result of a predisposition on the part of the state political leadership to limit Black voting potential to a single district. Exh. M5 at 13; Jan. 11 Tr. 1153.

260.      Black voters and legislators successfully challenged Alabama's state legislative maps following the 2010 census as unconstitutional racial gerrymanders. *See Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (three-judge court) (M.D. Ala. 2017) ("*ALBC II*"); Exh. M5 at 16; Jan. 11 Tr. 1154-55.

   ii.      *Senate Factor 3: Majority Vote Rules and Numbered Posts*

261.      Alabama primaries still use majority-vote requirements (factor three). Doc. 53 ¶ 135. Alabama has a long and well documented history of using majority

vote requirements and numbered posts to discriminate against Black voters. *See, e.g.*, *Jones*, 2019 WL 7500528, at *4; *Dillard*, 640 F. Supp. at 1357.

     iii.    *Senate Factor 5: Past Discrimination in Health, Education, and Employment*

262.    Alabama has a long and well documented history of official and private discrimination which predates the state's admission to the union and has been well documented by the federal courts since at least the 1960s. As one federal court explained, Alabama's "unrelenting historical agenda, spanning from the late 1800's to [today], to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." *Dillard*, 640 F. Supp. at 1357.

263.    As a result of the history of official and private discrimination in Alabama, Black Alabamians have a lower socioeconomic status and lag behind white residents in many crucial aspects of public life, including employment, income, educational attainment, and access to health care. Black Alabamians also disproportionately bear the brunt of the consequences of the state's criminal legal system. All of this discrimination and its vestiges hinder Black Alabamians' ability to effectively participate in the political process. Exh. M5 at 17; Jan. 10 Tr. 1155-56.

264.    Alabama's history of denying Black people equal access to education persisted long after the Supreme Court's decision in *Brown v. Board of Education*. Alabama was the first state ever to be subjected to a statewide injunction prohibiting

the state from failing to disestablish its racially dual school system. *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458 (M.D. Ala. 1967), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215 (1967). The order resulted from the court's finding that the State Board of Education, through Governor George Wallace, had previously wielded its powers to maintain segregation across the state. Exh. M5 at 22-23.

265.     A trial court found that, for decades, state officials ignored their duties under the statewide desegregation order. *See Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1128-30 (M.D. Ala. 1997). The State did not satisfy its obligations to remedy the vestiges of segregation under this order until as late as 2007. *Lee v. Lee Cnty. Bd. of Educ.*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007). Exh. M5 at 23-24; Exh. C80 at 33.

266.     And desegregation litigation continues in the state today. A December 2014 report found that 54 Alabama school districts remain under desegregation orders today as they still have not satisfied their constitutional obligations to integrate public schools and eliminate the vestiges of racial discrimination. *People First*, 491 F. Supp. 3d at 1108; Exh. M5 at 23-24.

267.     In a 2018, in a case challenging the attempt by the City of Gardendale, which is 85% white, to form a school district separate from Jefferson County's more racially diverse district, the Eleventh Circuit affirmed a finding that "race was a

motivating factor" in the city's effort. *Stout v. Jefferson Cnty. Bd. of Ed.*, 882 F.3d 988, 1000, 1007-09 (11th Cir. 2018); Exh. M5 at 24; Jan. 10 Tr. 1160.

268.     Alabama's constitution still contains language that mandates separate schools for Black and white students after a majority of voters rejected repeal attempts in the last two decades. Although the provision has not been enforceable for decades, its underlying prejudice continues to shape ongoing educational inequality. Exh. M5 at 5, Jan. 10 Tr. 1146-47.

269.     The depressed educational achievement that Black Alabamians experience today is a direct result of the State's history of discrimination. Alabama long suppressed Black education out of a fear that an educated Black citizenry would lead to a "future race war." Exh. C80 at 30. Alabama also refused to fund public schools because doing so would "disproportionately favor" Black children. Exh. C80 at 30-31. In 2007, a court found that the state still had not satisfied its obligations to remedy the vestiges of its maintenance of segregated public schools.

270.     Today, Alabama ranks 39th in per-pupil spending, a disproportionate amount of which goes to white students. Exh. C80 at 31-32. Differences in local property values result in differences in resources available to public schools in Alabama. Exh. C80 at 31-32. Because Black Alabamians are more likely to live in poverty than their white counterparts, this results in Black children attending schools with less adequate funding than white students. Exh. C80 at 32.

271.     In Mobile, Washington, and Montgomery Counties, as well in the Black Belt, Black students disproportionately attend public schools that lack sufficient resources. Exh. C85 at 117-18 (Knight), *id.* at 172-74 (Chestnut).

272.     In school, Black students in Alabama are more likely to face more severe disciplinary action than white students. Exh. C80 at 33. The disproportionate punishment that Black students receive makes them more likely to drop out of school than white students. Exh. C80 at 34. Black students in Alabama are also more likely to receive criminal referrals as a result of school disciplinary issues than white students. Exh. C80 at 34.

273.     The educational disparities discussed above create significant barriers to political participation among the Black community in Alabama. Interactions with the education system and educational attainment affect political participation, resulting in more educated individuals participating more than those with less education. Exh. C80 at 32. For those with less education, it is harder to participate in politics because they are less able to make sense of the political world, can less easily navigate voter registration requirements and other voting-related processes, and are more likely to have the verbal skills that enable effective political participation; meanwhile, the classroom instruction and social networks gained by those with higher education have more opportunity to gain a sense of civic duty and are more exposed to elite recruitment efforts. Exh. C80 at 33.

274.     Former U.S. House member for Alabama Congressional District 1, Bradley Byrne, acknowledged in recent testimony that "the number one Civil Rights issue in Alabama today is the fact that we don't give a quality education to black people like we do the white people. And I really feel strongly about that." Jan. 11 Tr. 1687.

275.     Alabama's institutions of higher education similarly remain plagued by the "vestiges of segregation," decades after Alabama colleges and universities were court-ordered to desegregate. *See generally Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991). Exh. M5 at 25, Jan. 10 Tr. 1161.

276.     In 1991, a trial court in *Knight v. Alabama* found that Alabama remained obligated to eliminate the lingering and continued effects of segregation and discrimination in the University of Alabama and Auburn University, as well as their proposed satellites, to try to recruit Black students to those schools and to recruit white students to the state's Historically Black Colleges and Universities (HBCUs). Exh. M5 at 25

277.     In 1995, the trial court issued a remedial decree analogous to the statewide injunction issued in *Lee v. Macon*, the implementation of which the court would oversee for over a decade. *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995). And Alabama did not satisfy its obligations under the Knight order until as

late as 2006. *Knight v. Alabama*, 469 F. Supp. 2d 1016 (N.D. Ala. 2006); Exh. M5 at 25.

278.     In 2016, all 76 of the schools labeled "failing" by Alabama were majority-Black schools and Black students constituted 91% of those Alabama students who were enrolled in "failing" public schools. Exh. M5 at 24-25; Jan. 11 Tr. 1160-61 (Bagley). Roughly 15% of Black adults in Alabama over the age of 25 have not completed high school, compared to 10.9% of white adults. For the same age group, only 19.4% of Black Alabamians hold a bachelor's degree or a higher qualification, compared to 28.8% of white adults. U.S. Census Bureau, Table S0201, 1-year 2018 American Community Survey 2018. Exh. C1 at 38.

279.     The educational disparities discussed above create significant barriers to political participation among the Black community in Alabama. Interactions with the education system and educational attainment affect political participation, resulting in more educated individuals participating more than those with less education. Exh. C80 at 32. For those with less education, it is harder to participate in politics because they are less able to make sense of the political world, can less easily navigate voter registration requirements and other voting-related processes, and are more likely to have the verbal skills that enable effective political participation; meanwhile, the classroom instruction and social networks gained by

those with higher education have more opportunity to gain a sense of civic duty and are more exposed to elite recruitment efforts. Exh. C80 at 33.

280.     Black youth, many of whom attend segregated schools deemed by the state to be "failing," also face disparities in the state's juvenile justice system. A 2017 report of the bipartisan Alabama Juvenile Justice Task Force found that "Racial disparities exist throughout the juvenile justice system." The Task Force determined that "A larger share of black youth are placed in detention, out-of-home diversion, and DYS [Department of Youth Services] custody than their share of the overall youth population," and that "Black youth also receive a disproportionately high share of dispositions to DYS custody when compared to their share of initial complaints," a disparity that "holds true when comparing complaints and out-of-home placements for youth who commit misdemeanors or felonies." Exh. M5 at 20; Jan. 10 Tr. 1168 (Bagley).

281.     Alabama also has a persistent history of denying its Black residents equal access to employment opportunities. Exh. M5 at 17-22.

282.     More than twice as many Black Alabamians (23.4%) live in poverty compared to white Alabamians (11.5%) Exh. C1 at 37.

283.     The unemployment rate among Black people over the age of 16 in Alabama is more than double the rate among white residents of the same age. And of those adults who are employed, Black Alabamians are more likely to work in

lower paying jobs than white workers: 20.7% of Black employees work in service occupations compared to 14.8% of whites. Exh. C1 at 37.

284.     In Alabama, Black households also have fewer economic resources. The median household income for Black families is $35,900 compared to $59,966 for white households. Exh. C1 at 38.

285.     Individuals with lower household incomes are less likely to vote. Exh. M5 at 17.

286.     In the Greater Mobile area, Dr. Marcus Caster testified that there are several large plants in the area that employ many people, but that Black community members find it difficult to get employment at those plants at the rate of their white community members. Jan. 11 Tr. 1628. He also testified that Black community members tend to work lower-wage jobs than their white counterparts. *Id.*

287.     Black Alabamians lag significantly behind white Alabamians with respect to housing. 77.1% of white households own their homes, compared to just 50.5% of Black households. Exh. C1 at 38-39. And median home value among Black homeowners ($101,800) is just 61.4% of the median value among white homeowners ($165,800). Exh. C1 at 39.

288.     Black Alabamians also uniquely lack access to affordable housing, particularly in Mobile, Montgomery, and the Black Belt. Jan. 10 Tr. 1359; Exh. C84 at 225-26; Exh. C85 at 91-92, 179-80, 226-227 (Tyson).

289.     The proportion of Black Alabamians who lack access to a vehicle (11.7%) is more than triple that among white Alabamians (3.8%). Exh. C1 at 39. This disparate lack of access to a vehicle, combined with poor public transit options, creates an independent barrier to equal employment for Black Alabamians. Jan. 11 Tr. 1629:20-1630:2 (Caster).

290.     Black households are less likely than white households to have a computer or internet access. Exh. M5 at 18. In the southwestern Black Belt and Mobile County, Black residents disproportionately lack high-speed internet access. During the pandemic, this lack of internet access affected Black children's ability to access schoolwork. Jan. 5 Tr. 414-15; Jan. 11 Tr. 1633:20-1634:5.

291.     Income and education are independently important, but both also have a significant impact on political participation rates, which remains persistently lower among Black than among white Alabamians. Exh. M5 at 17.

292.     Racial disparities in income and education work in tandem in Alabama with discrimination against Black people in employment. In 2019, there were 2,108 claims of employment discrimination submitted to the U.S. Equal Employment Opportunity Commission ("EEOC") from Alabama, of which 45.1% were racially based – the highest percentage of any state in the United States. Alabama's race-based claims accounted for 2.9% of the racially based claims received by the EEOC in the entire country and Alabama's color-based claims represented 2.2% of the

EEOC's color-based claims in the country, even though in 2010 Alabama accounted for only 1.7% of the national population. Exh. M5 at 18-19; Jan. 10 Tr. 1157.

293.    Litigation has revealed numerous instances of racial discrimination in employment on the part of public entities – including the State Personnel Board, the State Departments of Public Safety and Transportation, the State Cooperative Extension Service, and the State Board of Education, – as well as discrimination by private employers.[8] Jan. 10 Tr. 1157:22-1158:1.

294.    Recently, leaders in the city of Birmingham, most of them Black, attempted in 2016 to establish a minimum wage in the city higher than that of the federal minimum wage (Alabama has no minimum wage) to the rate of $10.10/hour. The white-controlled state legislature responded by passing a bill preventing local governments from establishing minimum wages, thus invalidating the city's effort. State Sen. Linda Coleman-Madison, a Black Democrat, said at the time, "Alabama is a poor state. But I say we are poor by choice, because of bills like this that keep people poor." Recent studies have demonstrated that Black residents make up 74%

---

[8] See, e.g., Weatherly v. Ala. State Univ., 728 F.3d 1263, 1273 (11th Cir. 2013); Brown v. Ala. Dep't of Transp., 597 F. 3d 1160 (11th Cir. 2010); Ferrill v. The Parker Grp., 168 F.3d 468 (11th Cir. 1999); United States v. Jefferson Cnty., Nos. CV–75–S–666, CV–74–S–17, 2013 WL 4482970 (N.D. Ala. Aug. 20, 2013); Allen v. Ala. State Bd. of Educ., 190 F.R.D. 602 (M.D. Ala. 2000); Reynolds v. Ala. Dep't of Transp., 4 F. Supp. 2d 1068 (M.D. Ala. 1998); Allen v. Ala. State Bd. of Educ., 816 F.2d 575 (11th Cir. 1987); Shuford v. Ala. State Bd. of Education, 897 F. Supp. 1535 (M.D. Ala. 1995); United States by Mitchell v. Frazer, 317 F. Supp. 1079 (M.D. Ala. 1970); NAACP v. Dothard, 373 F. Supp. 504 (M.D. Ala. 1974); Strain v. Philpott, 331 F. Supp. 836 (M.D. Ala. 1971); Ensley Branch, NAACP v. Seibels, 31 F.3d 1548 (11th Cir. 1994);

of Birmingham's population, but only 50% of businesses are Black-owned and that white residents make up 22% of the population, but 47% of businesses are white-owned. Exh. M5 at 19.

295.     Racial discrimination also exists in access to healthcare, both historically and currently, between Black and white Alabamians. *See* Exh. M5, at 17, 18 n.56, 20.

296.     Between Reconstruction and the enactment of the Civil Rights Act of 1964, Black citizens had to fend for themselves. Following the passage of the Civil Rights Act and the enactment of Great Society social welfare programs, Black Alabamians experienced racially discriminatory dispersion of federal aid in, for example, the program now known as Temporary Assistance to Needy Families, for which state dispersion of aid has been twice cited by federal courts for discrimination. Exh. M5 at 21; Jan. 10 Tr. 1157.

297.     Likewise, Black communities in the Black Belt continue to experience severe discrimination in living conditions, lacking some of the most basic services and as a result suffering unusual or rare health conditions. A 2019 United Nations ("U.N.") mission to the United States aimed at examining conditions of "extreme poverty" found conditions in Alabama's that were "very uncommon in the First World." The U.N.'s Special Rapporteur on Extreme Poverty and Human Rights, Philip Alston, reported that Black residents lacked proper sewage and drinking water

systems and had unreliable electricity. Residents had constructed homemade water delivery systems using PVC pipe, did not have consistent access to drinking water that had not been tainted by raw sewage, and often fell ill, entire households at a time, with E. Coli and hookworm. After visiting a Black man's Butler County home, where sewage was bubbling up out of the ground due to a failed septic tank, Alston assessed the situation, saying, "There is a human right for people to live decently, and that means the government has an obligation to provide people with the essentials of life, which include power, water and sewage service." He added, "But if the government says, 'oh no, we're not going to do it,' and leaves you to install very expensive septic tanks, that's not how it should work." Exh. M5 at 21; Jan. 10 Tr. 1164-65.

298.      Dr. Caster also testified about how residents who live near the large industrial plants that disproportionately employ white workers in higher-wage jobs are predominantly Black and suffer from higher rates of cancer and other ailments due to their proximity to these pants. Jan. 11 Tr. 1630:5-1631:22. Yet Rep. Carl of District 1 voted against legislation that included provisions to reduce the effects of this pollution. *Id.* These same communities have faced dangerous levels of mercury in their water. *Id.* at 1632.

299.      Black residents of Uniontown, in Perry County, fought a decision by the state to allow 4 million tons of potentially toxic coal ash to be transferred from

the site of a coal-fired electrical plant accident in Tennessee to a landfill in the town. The coal ash was spilled into a river in Kingston, Tennessee, where years later multiple residents have been diagnosed with various forms of cancer. Then-Congressman Artur Davis protested the coal ash's transfer to Alabama, as did local residents, overwhelmingly Black, but met resistance from the state's Department of Environmental Management. Exh. M5 at 21; Jan. 10 Tr. 1165.

300.    Environmental discrimination also affects the city of Birmingham. The North Birmingham neighborhood in the city of Birmingham is home to much of what remains of the city's heavy industry, including coke plants. At the height of the "Magic City's" rise, it provided company housing for workers. Over time it became an exclusively Black working-class neighborhood. At the apex of the civil rights movement in Birmingham, it was the home of activist minister Fred Shuttlesworth's Bethel Baptist church and a focal point for civil rights organization. Exh. M5 at 21; Jan. 10 Tr. 1165-66.

301.    In 2013 the EPA designated the 35th Avenue area in North Birmingham a "Superfund" site, meaning the EPA can use specially designated funds to remove and replace soil laden with toxic materials from airborne and waterborne pollution emanating from nearby factories. The following year, the EPA moved to place the site on a priority list for cleanup. Exh. M5 at 21; Jan. 10 Tr. 1165-66.

302.     The state of Alabama, via its Department of Environmental Management Office of External Affairs and the Office of the Attorney General, has consistently opposed the move, which would require that the state help pay for the cleanup if the corporations the EPA has deemed responsible do not. Birmingham Mayor Randall Woodfin and Representative Terri Sewell support adding the site to the priority list. Sewell has insisted, "No family should have to live with a contaminated backyard, and no community should be left to clean up decades of industrial waste. Exh. M5 at 21-22.

303.     Black Alabamians interact with the criminal justice system in Alabama in a much different way than white Alabamians. Jan. 10 Tr. 1355-56; Jan. 11 Tr. 1633; Exh. C84 at 221-24 (K. Jones); Exh. C85 at 90, 92, 105 (Knight); *id.* at 175-76 (Chestnut); *id.* at 227-28 (Tyson).

304.     Alabama state prosecutors have at times systemically excluded Black people from juries. *See, e.g.*, *Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1258 (11th Cir. 2013); *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1257-59 (11th Cir. 2009); *Hall v. Thomas*, 977 F. Supp. 2d 1129, 1162-63 (S.D. Ala. 2013); *Stephens v. Haley*, 823 F. Supp. 2d 1254, 1276-78 (S.D. Ala. 2011).

305.     Black Alabamians are incarcerated at a grossly disproportionate rate, accounting for 53.5% of the state's inmate population despite their constituting only 26.8% of the state's population. Exh. C80 at 39.

306.     When this significantly disproportionate number of Black Alabamians leave prison, they have a much harder time re-entering economic, political, and social life. The conditions in Alabama prisons are notoriously awful. Exh. M5 at 19-20; Jan. 10 Tr. 1167.

307.     The disproportionate number of Black people incarcerated in the prisons and jails of Alabama continue to face unconstitutionally cruel and unusual conditions, including "horrendously inadequate" mental healthcare, *Braggs v. Dunn*, 257 F. Supp. 3d 1171 (M.D. Ala. 2017), hitching posts, *Hope v. Pelzer*, 536 U.S. 730, 733-35 (2002), chain gangs, *Austin v. Hopper*, 15 F. Supp. 2d 1210, 1215-25 (M.D. Ala. 1998), and jails akin to the "holding units of slave ships," *Maynor v. Morgan Cnty.*, 147 F. Supp. 2d 1185, 1186 (N.D. Ala. 2001).

308.     And their conviction status makes it extremely difficult to obtain employment. Jan. 10 Tr. 1356; *id.* at 1633.

309.     The dramatically different relationship the Black community has with the criminal justice system creates significant barriers to political participation. After the U.S. Supreme Court invalidated Alabama's existing criminal disenfranchisement law on the ground that it was intended to reduce Black political participation, Alabama voters reinstated another such law. Exh. M5 at 20. As a result of Black Alabamians' disproportionate conviction rate, Black Alabamians are disenfranchised due to a criminal conviction at a rate double that of white

Alabamians (15% among Black Alabamians; 7% among white Alabamians). Exh. M5 at 20; Exh. C80 at 39-40. Alabama's criminal disenfranchise law disenfranchises Black voters at a rate that is double of that of all states in the country. Exh. C80 at 39-40.

310.    The way Alabama has implemented its criminal disenfranchisement law has exacerbated its disparate effects. Until 2017, the state had no prescribed list of disenfranchising crimes, defining the universe only as "crime[s] of moral turpitude." Exh. C80 at 40. This lack of clarity resulted in further disproportionate disenfranchisement of Black voters. *Id.* Despite clarifying the list of disenfranchising crimes in 2017 through legislation, the state has taken no effort to inform the thousands of voters who as of 2017 are no longer disenfranchised. *Id.* at 41.

311.    The disproportionate incarceration of Black Alabamians also dilutes their voting strength. Many counties in Alabama count prisoners as residents of the area in which they are imprisoned as opposed to their actual residential address. Exh. C80 at 42-43. In the 2010 Census, more than 34,000 Alabamians were counted as residents of their prison. *Id. a*t 43. By doing so, voting strength is artificially shifted away from Black communities and towards communities that house prisons.

312.    Alabama's criminal disenfranchisement law exacerbates pre-existing inequalities in political power that disproportionately affect Black Alabamians. Exh. C80 at 42.

313.     All of the socioeconomic disparities discussed above exist at the statewide level as well as in the region where the two majority-Black districts in Dr. Duchin's illustrative plans are located.

314.     According to the Census, in the 2020 election in Alabama, 70.6% of Non-Hispanic white people and 61% of Any Part Black people were registered to vote and 63% of white citizens and 54.8% of Any Part Black citizens turned out to vote. Similar disparities are present using single-race categories. Exh. M50 at 1.

315.     Education is correlated with income and political participation. White Alabamians with more education and higher incomes can afford a car, internet, computers, and time off from work, all of which makes it easier for them to contribute to political campaigns and run for office. Exh. M5 at 17.

316.     The question of the extent to which Black registration and turnout rates in Alabama have improved in recent decades is irrelevant to this factor, which asks whether Black Alabamians suffer the effects of discrimination "which hinder their ability to participate effectively in the political process." *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986). There is no dispute that the socioeconomic disparities discussed above hinder Black political participation in Alabama. To the extent registration and turnout rates among Black Alabamians has improved recently, it has been *despite* the barriers to political participation these significant socioeconomic disparities

create. Jan. 11 Tr. 1604:2-1606:4. If these disparities did not exist, Black registration and turnout would be even higher than it is today. *Id.*

317.     Because Section 2 requires an "intensely local appraisal of the design and impact of the contested electoral mechanisms," *Wright*, 979 F.3d at 1288 (quoting *Gingles*, 478 U.S. at 79), comparisons between Alabama and other states with respect to racial disparities in employment, education, health, and other areas are unhelpful. States like Connecticut, Colorado, and New York, for example, have their own histories of discrimination. Jan. 11 Tr. 1532-33.

    *iv.*     *Senate Factor 6: Racial Appeals in Political Campaigns*

318.     In the last decade, both overt and subtle racial appeals have defined political campaigns in Alabama. Exh. M5 at 26-28; Jan. 10 Tr. 1169:3-1171:10.

319.     In addition to the personal impact that racial appeals have on Black voters, they also reinforce racially polarized voting. Jan. 10 Tr. 1171:6-10.

320.     Former United States Senate candidate Roy Moore, who was twice removed from the state Supreme Court for failure to obey federal court orders, ran for U.S. Senate in 2017. During the campaign, Moore insisted that the United States would be better off without any of the Amendments to the Constitution that follow the 10th. Moore argued, "That would eliminate many problems. You know, people don't understand how some of these amendments have completely tried to wreck the

form of government that our forefathers intended." Exh. M5 at 27; Jan. 10 Tr. 1169:11-15.

321.    This would of course include the 13th Amendment, which ended slavery, and the 15th Amendment, which established voting rights for Freedmen. Moore singled out the 14th Amendment, which was enacted to protect the rights of former enslaved people, insisting that it "allow[s] the federal government to do something which the first 10 amendments prevented them from doing." Moore has also described the antebellum period in the South as follows: "I think it was great at the time when families were united — even though we had slavery. They cared for one another. People were strong in the families. Our families were strong. Our country had a direction." Exh. M5 at 27; Jan. 10 Tr. 1169:11-15.

322.    In the 2018 election for Chief Justice of the Alabama Supreme Court, at least two campaign ads run by Chief Justice Tom Parker were characterized by racial appeals. In one of his campaign ads, Chief Justice Parker, a white candidate, declared that he opposes "the leftist mob tr[ying] to destroy our society" and featured a clip of Congresswoman Maxine Waters.  Exh. M5 at 27; Jan. 10 Tr. 1169. A court recently found that this statement alongside images of Congresswoman Waters, i.e., a Black congresswoman from California who had no reason to appear in an ad for an Alabama judicial election, shows that "one of the motives of the ad was to draw attention to race." *Id. see also* Jan. 10 Tr. 1169-70.

323.     Mo Brooks, U.S. Congressman for Alabama's 5th District, has repeatedly claimed that his political opponents are waging a "war on whites" by "claiming that whites hate everybody else." Brooks has also characterized people who receive assistance through the Supplemental Nutrition Assistance, or SNAP, program as undeserving. In applauding cuts to the program, the beneficiaries of which in Alabama would include tens of thousands of Black people, Brooks said, "It is wrong to let slackers take roughly $70 billion per year from hard-working taxpayers who need that money for their own needs." Exh. M5 at 27; Jan. 10 Tr. 1170:1-3.

324.     Such overt and subtle appeals are a product of half a century of connecting federal welfare and public health programs with racial animosity and deploying coded attacks on the former with appeals to the latter. Exh. M5 at 26-27, Jan. 10 Tr. 1168:23-1169:15. For example, U.S. Rep. Barry Moore downplayed the January 6, 2021, U.S. Capitol insurrection. He Tweeted about the shooting of Capitol-infiltrator Ashli Babbitt by U.S. Capitol Police, "I understand it was a black police officer that shot the white female veteran. You know that doesn't fit the narrative." Congressman Moore has also Tweeted out a meme that suggested people injured by a car driven into an unarmed crowd of protestors in Charlottesville in 2017 "didn't fight back." Exh. M5 at 28.

325.    Representative Bradley Byrne of the First Congressional District aired a campaign ad in which he condemned Black people by placing their images in a fire. The television spot begins with Byrne staring into a wood fire in a backyard and lamenting the loss of his brother in the armed services. He shifts to lamenting the course the country is taking, as the faces of Black and Latino Americans appear in the fire. Former National Football League quarterback Colin Kaepernick appears in the fire, as Byrne calls him an "entitled athlete dishonoring" the American flag. Members of the Congressional caucus known as "The Squad," including Ilhan Omar and Alexandria Ocasio Cortez, appear in the fire and are accused of "attacking America" and "cheapening 9/11." No white people appear in the fire. Exh. M5 at 28. Former Rep. Byrne testified that his campaign video "singl[ed] out Ms. Alexandria Ocasio Cortez and Ms. Omar because of their attacks against America. They attack American values." and "I expect somebody that's making this money as Colin Kaepernick to stand up during the national anthem, and I don't think members of Congress should be attacking the country." Jan. 12 Tr. 1692:23- 1693:4.

   *v.    Senate Factor 7: Lack of Black Electoral Success*

326.    Black people in Alabama remain underrepresented, as a proportion of the population, in public office.  Exh. M5 at 28-29. Indeed, Black Alabamians have been almost entirely unable to succeed in running for office unless a majority of the relevant electorate is Black. *Id.*

327.     Even though Black people comprise approximately 27% of Alabama's population, only one of seven or approximately 14% of Alabama's congressional representatives is Black. *Id.* This number of majority-Black congressional districts has remained constant since 1992, *see* Doc. 53 ¶¶ 29-30, 35, before which there had never been a Black congressional representative from Alabama in the twentieth century. Exh. M5 at 28; Exh. M17 ¶ 9.

328.     None of the current statewide elected officials are Black. Doc. 53 ¶ 167.

329.     The overwhelming majority of African-American representatives in the Alabama Legislature come from majority-minority districts. Doc. 53 ¶ 169.

330.     Only two Black people have ever been elected to statewide office, and both ran as incumbents after first being appointed. No Black person has won statewide office in Alabama since 1996. Doc. 53 ¶ 168.

331.     None of the current statewide elected officials are Black. Only two Black people have ever been elected to statewide office. In both instances, the office was associate justice of the Alabama Supreme Court. In 1982 and 1988, the late Justice Oscar W. Adams, Jr. was elected to two consecutive terms; and, in 1994, Justice Ralph D. Cook won an unopposed statewide election. In 2000, both Justice Cook and the then-recently appointed Justice John England, a Black person, lost elections to white candidates. Doc. 53 ¶ 170.

332.     Kenneth Paschal is a Black Republican who currently represents District 73. in the Alabama House of Representatives.  Doc. 53 ¶ 171, Jan. 11 Tr. 1394:13-15. District 73 includes Shelby County. *Id.* There are currently no Black Republicans in the state Senate or in any statewide elective positions. Doc. 53 ¶ 171.

333.     As of 2015, there were 757 local Black elected officials in Alabama, making up only 16.7% of elected offices.

334.     Alabama has never had a Black governor or Black senator representing the state in the U.S. Senate. Doc. 51 ¶ 157.

> vi.     *Senate Factor 8: Unresponsiveness of Elected Officials to Minority-Group Needs*

335.     Black Alabamians' lack of representation in public office has contributed to the failure of elected officials to respond to the particularized needs of the Black community. The Alabama Legislature rejected requests to expand Medicaid under the Affordable Care Act despite the racial gap in insurance coverage. Expanding Medicaid would have insured an additional 220,000 Alabamians, particularly benefiting Black residents. Exh. M5 at 30-31. This disparity in healthcare and insurance coverage contributed to the vulnerability of Black Alabamians when the novel coronavirus surfaced in early 2020. *See, e.g.*, *People First*, 491 F. Supp. 3d at 1109; Exh. M5 at 29-31.

336.     Black residents in Alabama have the highest rates of COVID-19 cases and deaths in the state. As the pandemic has progressed, racial disparities in COVID-

19 vaccine access have also become clear. This is a result of both inefficiencies in vaccine distribution and deliberate choices by state and local administrators to overlook majority Black communities. Exh. M5 at 17-18, 29-30.

337.    In Birmingham, the Alabama Regional Medical Services (ARMS) reported geographic discrepancies in the government's distribution of COVID-19 vaccines. The state distributed doses of the vaccine to affluent white suburbs as early as January 2021, while the ARMS, a health clinic that primarily serves a lower-income Black community in Birmingham, did not receive its first doses of COVID-19 vaccines until March 8, 2021. Exh. M5 at 29-30.

338.    Black Alabamians' lack of access to vaccinations was also observed in Mobile County, where 14 of the 18 state vaccination sites were located in neighborhoods with a larger white population. *See id.* at 29 n.5.

339.    Alabama's elected officials have also been unresponsive to the needs of Black Alabamians in other areas of government services. In 2014, following the Supreme Court's decision in *Shelby County v. Holder*, Alabama's photo identification law went into effect; and in 2015, the State announced that it was closing 31 of 75 driver license offices throughout Alabama. The planned closures overwhelmingly affected Black Alabamians, as the State specifically concentrated closures in the Black Belt. This decision was ultimately reversed as part of a settlement after the U.S. Department of Transportation determined that the closures

had discriminated against Black people in violation of Title VI of the Civil Rights Act. *See* Exh. 49.

340.     Jerry Carl and Barry Moore also voted against the bipartisan infrastructure bill, which will ameliorate environmental pollution in Black neighborhoods and opposed efforts to expand Medicaid under the Affordable Care Act to cover those 220,000 disproportionately Black individuals who would benefit. Jan. 11 Tr. 1631:15-1633:1; Jan. 10 Tr. 1350:8-1351:5; Jan. 5 Tr. 389:1-9. Again, these actions were adverse to the interests of the Black communities in their districts. Jan. 10 Tr. 1350:24-1351:5; Jan. 11 Tr. 1631:23-1633:1.

341.     The representatives of Congressional Districts 1 and 2—Jerry Carl and Barry Moore, respectively—both voted against the recent infrastructure bill, which provides funds to increase access to public transit and high-speed internet, both of which Black Alabamians uniquely lack. Jan. 10 Tr. 1350:1-3; Jan. 11 Tr. 1630:5-22, 1633:20-1635:4. These representatives' actions were adverse to the interests of the Black communities in their districts. Jan. 10 Tr. 1350:24-1351:5; Jan. 11 Tr. 1634:22-1635:4.

342.     Jerry Carl and Barry Moore also voted against the American Rescue Plan, which contained provisions to assist the disproportionate number of Black individuals who have lost, or had to leave, their jobs during the COVID-19

pandemic. Jan. 10 Tr. 1351:21-1352:22; Jan. 11 Tr. 1628:25-1629:19. Again, these actions were adverse to the interests of the Black communities in their districts. *Id.*

343.    When in office, CD1 Representative Bradley Byrne voted against the First Step Act, which provided relief to the disproportionate number of Black Alabamians charged and convicted of crimes. Jan. 11 Tr. 1633:2-19; C85 at 176:6-19. These actions were adverse to the interests of the Black communities in their district. *Id.*

344.    Representative Byrne took no effort to determine whether his Black constituents supported the First Step Act before he voted against it. Jan. 12 Tr. 1724:24-1725:7.

345.    When in office, Representative Byrne took a leading role in trying to repeal the Affordable Care Act, which disproportionately benefited the Black individuals in his district that he knows have a harder time accessing quality and affordable health care. Exh. C85 at 178:20-179:5; Jan. 12 Tr. 1706:15-24. Yet, Representative Byrne never bothered to try to decide whether the Black communities in his district wanted to keep the Affordable Care Act's policies that disproportionately benefitted them. Jan 12 Tr. 1723:20-1724:14.

346.    While serving in Congress, Representative Byrne assumed that his Black constituents were offended by Alabama's commemoration of a confederate

general in the Capitol's Statutory Hall, yet he did nothing to change that fact. Jan 12 Tr. 1725:24-1727:10.

347.     While serving in the Alabama Legislature, Representative Byrne assumed that his Black constituents were offended by the Monument to Confederate Soldiers and Sailors—which was surrounded by the flags of the Confederate states and which sits at the foot of the State Capitol on Montgomery—yet did nothing to change that fact. Jan 12 Tr. 1727:11-1728:13. Instead, he "was busy doing other things" and did not "pay[] attention to stuff like that." *Id.* 1727:17-1728:5.

*vii.     Senate Factor Nine: Tenuousness of Policy*

348.     There is no substantial justification for Alabama's failure to include a second majority-minority congressional district.

349.     The two justifications on which Defendants primarily rely in defending the enacted plan—core retention and respect for communities of interest—were expressly de-prioritized by the Legislature when it crafted its redistricting principles. Exh. C82 at 2:21-24, 2:28-3:4, 3:6 (explaining that core retention and respect for communities of interest can be observed only "to the extent that they do not violate or subordinate" other principles, including compliance with the Voting Rights Act).

350.     Since the 1990s, Black legislators and voters have sought a congressional plan that contains two majority-Black districts. Exh. M5 at 12-16, 29-31; Jan. 10 Tr. 1171:15-174:6.

351.     A congressional plan containing two majority-Black districts was offered in the Legislature, and several such maps were suggested to the Redistricting Committee. Exh. M19; Exh. M20.

352.     HB 1 was met with resounding opposition from Black voters and legislators across the state. Exh. M14; Exh. M16; Exh. M17; Exh. M18; Exh. M20.

C.     <u>Electoral Opportunity</u>

353.     Dr. Liu and Dr. Palmer both performed effectiveness analyses to determine whether Black-preferred candidates could win in majority-Black districts configured like those in the illustrative plans. An effectiveness examines past elections and models the outcome under a different set of district boundaries. At its simplest, such an analysis simply tallies the votes cast in each precinct that would be contained within a given district under an alternative plan. Jan 10 Tr. 1283:2-11.

354.     Elections for statewide offices offer fruitful subjects for analysis because votes are cast in every precinct in the state, and thus in every precinct in every district no matter how those districts are configured.

355.     Dr. Liu determined that—whether using Any Part or Single Race Black—in the two majority-Black districts in Dr. Duchin's Plans A, B, and D, the Black-preferred candidates in the 2018 Lt. Governor and State Auditor elections would have received a majority of the votes cast, despite significant racial bloc voting. Exh. M4 at 16; Jan. 10 Tr. 1258-59, 1280-87.

356.     Dr. Palmer also performed an effectiveness analysis for the two majority-Black districts in the six plans produced by Mr. William Cooper. After reviewing 12 exogenous and endogenous elections from 2016 to 2020, Dr. Palmer found that the Black-preferred candidates would have won a majority of votes cast in every election in both majority-Black districts in all of Mr. Cooper's illustrative plans. Jan. 6 Tr. 720-22.

357.     Defendants' expert Dr. Hood also conducted an effectiveness analysis. Dr. Hood analyzed the effectiveness of Congressional District 6 and Congressional District 7 in the Singleton Plan, which are approximately 41% BVAP and 46% BVAP respectively. Exh. D5 at 7-14. In the two elections analyzed Dr. Hood found that the Black-preferred candidate received the most votes in Singleton CD6, but by margins that were within the range of uncertainty. *Id.* at 1. In Singleton CD7, even the point estimates suggested that Black-preferred candidates may not usually succeed. *Id.*

358.     Dr. Hood's analysis of proposed districts in Alabama's state house plan, apparently conducted using the same methodology used in his analysis of the *Singleton* Plan, came to similar conclusions. Doc. 53 ¶ 96; Exh. M30. For example, an effectiveness analysis of proposed House District 68, drawn with a BVAP of 48.3%, found that the Black-preferred candidate would likely have lost the 2020 Presidential and 2018 Gubernatorial races in the district—in the former case by a

substantial 5.4% margin. *Id.* at 5-7. House District 68 includes Monroe County and parts of the Black Belt counties of Clarke, Conecuh, Perry, Marengo, and Wilcox, all of which are contained in one or the other of the two majority-minority districts in each of Dr. Duchin's and Mr. Cooper's illustrative plans. Exh. M3 at 7, Exh. C1 at 23-33; *see also* Alabama House of Representatives District Map, https://www.sos.alabama.gov/sites/default/files/State%20Districts/Pringle%20Hou se%20Plan%204_%20Letter%20size%20map.pdf.

## VIII. Findings of Fact Part VIII: The Racial Gerrymandering Challenge to Congressional Districts 1, 2, 3, and 7

A.    Race Predominated in Drawing District 7

359.    District 7 has changed little from how it was initially drawn in 1992. HB1 and all past plans "preserved the core of districts" as drawn in 1992. Doc. 52 ¶ 33; *see also* Doc. 53 ¶¶ 45–46, 51–59.

360.    Randy Hinaman, who drew the 2021 plan in HB1, also drew the 1992 and 2011 Alabama congressional plans and worked on the 2001 plan. Exh. M11 (Hinaman Dep.) at 23, 26, 29-32, 35-36, 38.

361.    Mr. Hinaman also lives in Alabama and has a deep knowledge of the racial and geographic makeup of Alabama. Exh. M11 at 26-27, 35, 154-55, 161-64.

362.    Mr. Hinaman conceded that race was the predominant factor in his design of the 1992 plan. Exh. M11 at 35-36, 171-72.

363.      He also admitted that in 1992 race was a "major factor" over other redistricting criteria in his design of District 7 as a majority-Black district. Exh. M11 at 30–32, 35–36.

364.      In 1992, a court first redrew District 7 for the express purpose of creating a nearly 65% BVAP district to resolve VRA litigation. Doc. 53 ¶¶ 30–35.

365.      Specifically, the parties agreed in that case that a "single member significant majority (65% or more) African American Congressional district. . . . should be created." *Wesch v. Hunt*, 785 F. Supp. 1491, 1498 (S.D. Ala. 1992), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), and *aff'd sub nom. Figures v. Hunt*, 507 U.S. 901 (1993).

366.      In the 1992 plan, District 7 contained all of Sumter, Choctaw, Greene, Hale, Perry, Dallas, Lowndes, Wilcox, and Marengo Counties and parts of Jefferson, Tuscaloosa, Pickens, Clarke, and Montgomery Counties, with a total BVAP of approximately 63.6%. Doc. 53 ¶ **32.**

367.      In drawing HB1 in 2021, Mr. Hinaman admittedly preserved the core of District 7 as drawn in 1992—and corresponding high BVAP—in HB1 and other previous maps. Exh. M11 (Hinaman Dep.) at 222.

368.      In drawing the map in HB1, Mr. Hinaman spoke to Rep. Sewell. Exh. M11 at 114-19. But Rep. Sewell did not request that Mr. Hinaman maintain a particular BVAP in District 7 and she did not discuss race at all with him. *Id*. at 117.

Mr. Hinaman also did not consult election returns, voter turnout, racial polarization data, or socioeconomic data to justify the high BVAP of District 7 as enacted in HB1. *Id*. 167-69, 174-76.

369.     Rep. Pringle agrees current District 7 "is in large part the same district that was drawn under the [1992 map] just adjusted for population increases." Exh. M12 (Pringle Dep.) at 119–20.

370.     In 2002 and 2011, Alabama only slightly changed District 7, preserved most of the district's core, and kept the BVAP in the range of 58–61%. Doc. 53 ¶¶ 45, 52.

371.     In the 2011 plan, the State increased the total Black and BVAP in District 7 from the 2002 plan for the purported purpose of avoiding retrogression under Section 5 of the VRA. *Id.* ¶¶ 51–54.

372.     Alabama packed District 7 in the 2011 plan for the predominant racial motive of maintaining a particular BVAP in District 7 and lower BVAPs in Districts 1, 2, and 3.

373.     Under HB1 as enacted in 2021, the State packs one-third of Black Alabamians into District 7. Doc. 53 ¶ 57. The population of the District 7 is 55% any-part BVAP and 59.8% Black registered voters. Doc. 53 ¶ 57; Exh. M48 at 2.

374.     In 2019, Secretary Merrill admitted that District 7 as drawn in 2011 "appears to be racially gerrymandered, with a finger sticking up from the black belt

for the sole purpose of grabbing the black population of Jefferson County." Doc. 53 ¶ 62.

375.    A court found that race predominated in drawing the 2011 state legislative districts. *See ALBC II*, 231 F. Supp. 3d at 1033.

376.    This finding occurred even though Alabama had sought to preserve the cores of districts first adopted in a 1993 consent order. *See Ala. Legis. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1242, 1253, 1295-96 (M.D. Ala. 2013) (three-judge court), *rev'd on other grounds* 575 U.S. 254 (2015).

377.    HB1 simply retained the core of District 7 as it was racially gerrymandered in the 2011 plan. Doc. 53 ¶ 59.

378.    Compared to the 2011 plan, District 7 in HB1 contains all the same whole counties, continues to split Montgomery, Jefferson, and Tuscaloosa Counties, and now contains all rather than part of Clarke County. *Compare* Exh. M21 *with* Exh. M22.

379.    Mr. Hinaman made no effort to address the concern that race predominated in the packing of District 7 in HB1. Exh. M11 at 170-73.

380.    Senator McClendon was only concerned that the BVAP in District 7 not drop too low, not whether at 55% it was too high and thus not narrowly tailored. Exh. M13 at 88.

381.    According to the 2020 census, the BVAP in District 7 under the 2011 plan had dropped to roughly 55% and District 7 needed to add 53,143 people to satisfy one-person-one-vote. Exh. D54 (2021 Redist. Plans Comparative by Dist. Analysis).

382.    Even after redrawing District 7 to add 53,000 people, Mr. Hinaman ensured that the newly enacted District 7 also kept a BVAP of around 55%. Doc. 53 ¶ 57.

383.    That 55% number is only any-part BVAP measure. Doc. 53 ¶ 57. Over 59% of the registered voters in District 7 self-identify as Black. Exh. M48 at 2.

384.    The Legislature pursued 55% BVAP districts based on the mistaken belief that such districts offered safe harbors from racial gerrymandering claims.

385.    Sen. McClendon admitted that the Legislature sought to ensure that the BVAPs of majority-Black districts, like District 7, were not "too low" (i.e., below 55% BVAP) but did nothing to ensure that the BVAPs of such districts were not "too high" (i.e., packed in a manner not required by the VRA). Exh. M13 at 87-88.

386.    The Legislature conducted no narrow tailoring or pre-enactment analysis of districts that reached the 55% target. Exh. M19 at 19; Exh. M20 ¶¶ 17-18; Exh. M13 (McClendon Dep.) at 87-88.

387.    In the October 26, Reapportionment Committee meeting, Committee Co-Chair Rep. Chris Pringle stated that the Legislature did not conduct a racial

polarization analysis or believe that such an analysis was needed for any districts like District 7 with around 55% BVAPs. Exh. M19 at 19; Exh. M20 ¶¶ 17-18.

388.    Throughout the public hearings and legislative special session, Defendants disclaimed any use of race in the initial construction of congressional districts. M19 at 10 (Sen. McClendon stating that District 7 "was drawn blind, the race was turned off on the drawing"); *see also id*. at 19-20.

389.    Mr. Hinaman admits that he sought to maintain a majority-Black District 7 and he reviewed racial data after initially drafting the map to ensure this outcome. Exh. M11 at 98-99, 117, 142.

390.    Mr. Hinaman further testified that, had his draft District 7 been under 50% BVAP, he likely would have adjusted the BVAP upwards. Exh. M11 at 98, 194–96.

391.    Plaintiffs' experts have employed different methods of quantitative analysis showing that District 7 was drawn in a manner that splintered the Black community using race as the predominant factor.

392.    Dr. Kosuke Imai—a Harvard professor and founding developer of redistricting simulation algorithms—performed several simulation analyses that all identified HB1, specifically Districts 2 and 7, as clear statistical outliers[9] in terms of

---

[9] A statistical outlier represents a result that is highly unlikely given the inputs to the algorithm. Jan. 4 Tr. 234-35. Statistical outliers are not impossible results, but they represent an aberration when compared to such large sets of simulations. Therefore, the negligible proportion of the

their BVP proportion when compared to the ensemble of ten thousand simulated plans. Exh. M1 (Imai Report); Jan. 4 Tr. 185-186. He concluded that race was a significant factor in drawing HB1, Exh. M1 ¶ 5-6, and that Black voters in Montgomery were excluded from District 2 and packed into District 7 rendering the map a statistical outlier when compared to the simulations. *Id.* at ¶¶ 5, 37-40.

393.   First, he created an algorithm that produced 10,000 race-blind simulated plans. This "race-neutral" simulation drew maps that ignored the State's obligation to comply with the VRA but followed the stated guidelines of creating seven contiguous districts, keeping population deviations to a minimum, developing districts that are equally or more compact than HB1, respecting county boundaries to create equal or fewer county splits than HB1, and avoiding incumbent pairings. Exh. M1 ¶¶ 18-19, 26-29. Jan. 4 Tr. 180-81.

394.   For the purpose of his simulations, Dr. Imai used a maximum population deviation of ±0.5%. In his testimony, he explained that this is an appropriate measure for simulation analyses that use VTD building blocks, since only plans using and possibly splitting census blocks could ensure exact population equality. First, he testified that precinct-level population deviation of ±0.5%, is accepted, and in fact conservative, among clinical researchers as an appropriate

---

simulated plans that resemble HB1 are not substantively significant, nor do they change Dr. Imai's conclusions.

metric in simulating congressional redistricting plans. Second, he testified that many of the simulated plans had much smaller deviations, with ±0.5% representing the absolute maximum allowable outer bounds of the allowable deviation. Third, he noted that the potential deviations are spread across districts such that any slight deviations would be diffused among districts and would not have statistical significance and, therefore, would not change his quantitative conclusion. Exh. M1, Appendix ¶ 10; Jan. 5 Tr. 299-301.

395.    Additionally, Dr. Imai used two commonly used but different measures of compactness in his algorithm: the Polsby-Popper score and the fraction of edges kept. The simulated plans he created were on average equally or more compact than HB1 when evaluated by each of these measures. Exh. M1 at 22-23, fig. 7, 8; Jan. 5 Tr. 288-89.

396.    Out of 10,000 generated race-neutral districts corresponding to District 7 based on incumbent location, not a single simulated plan had a BVAP as high as that in HB1's District 7. Exh. M1 ¶¶ 28-29. Jan. 4 Tr. 184.

397.    Dr. Imai's race-neutral simulations also evaluated the likelihood of splitting Jefferson and Montgomery Counties between districts, the likelihood of particular district splits, and the way the counties are divided between districts in terms of race. Jan. 4 Tr. 186-88.

398.     Although HB1 splits Montgomery County into Districts 2 and 7, Montgomery County remains whole in 97% of Dr. Imai's race-neutral simulations. Exh. M1 ¶ 33; Jan. 4 Tr. 187-88.

399.     More than half of Dr. Imai's race-neutral simulations kept Jefferson County whole. Nearly all of the plans that did split the county drew fewer Black voters from Jefferson County into District 7 than the enacted plan draws into District 7 in HB1. Exh. M1 ¶¶ 30-32; Jan. 4 Tr. 187.

400.     Based on his race-neutral simulations, Dr. Imai found that HB1 packs Black voters in the western part of Montgomery city into District 7—beyond what is necessary to comply with the Voting Rights Act—rather than placing those voters in District 2 to create a second Black influence district. Exh. M1 ¶ 33; Jan. 4 Tr. 187-188. In both regards, HB1 is a statistical outlier when compared to the 10,000 race-neutral simulated plans. Exh. M1 ¶¶ 28-29; Jan. 4 Tr. 185.

401.     Different methods of statistical analysis performed by Dr. Ryan Williamson, a political science professor at Auburn University, also establish the predominant role of race in packing District 7. Exh. M2 (Williamson Report).

402.     Dr. Williamson is an expert in quantitative redistricting analysis. Jan. 5 Tr. 311.

403.     Given the limited number of county splits and the majority occurring in District 7, Dr. Williamson analyzed the three counties split between District 7 and other districts to determine any racial patterns. Exh. M2 at 3; Jan. 5 Tr. 315.

404.     The three counties split—Jefferson, Montgomery, and Tuscaloosa—have BVAPs of 41.5%, 56.3%, and 29.5% respectively and three of the five highest BVAP totals in the state, as compared to a statewide median county BVAP of 22.5%, which was suggestive of a relationship between race and district boundaries. Exh. M2 at 3; Jan. 5 Tr. 316-17.

405.     Dr. Williamson then investigated the BVAP on either side of the split and found that "areas with larger Black VAP were drawn into [majority-Black] CD 7 and the disproportionately White census blocks within [Tuscaloosa, Jefferson, and Montgomery] counties were drawn" into other districts, ranging from 25% to 45% disparities in the three counties. Exh. M2 at 5; Jan. 5 Tr. 319-20.

406.     Together, these size and consistency of these racial disparities led Dr. Williamson to conclude that these racial disparities were unlikely to occur due to chance or other factors and that race was likely a predominant factor in the lines of District 7. Jan. 5 Tr. 318-20.

B.     Race Predominated in Drawing Districts 1, 2, and 3

407.     Race also predominated in the construction of Districts 1, 2, and 3, both due to voters being drawn out of District 7 and into Districts 1, 2, and 3

predominately because of race, and due to the cracking of the Black Belt within across these districts.

408.     HB1 maintains the racially based pattern of keeping the BVAP of these districts around or below 30% just as in all of the plans since 1992. Doc. 53 ¶¶ 55, 59; *see also* Exh. D54.

409.     The low BVAPs in these districts do not flow from neutral redistricting rules, but rather race-based choices.

410.     Dr. Imai performed simulations analysis that applied the State's redistricting guidelines of compactness, contiguity, maintaining counties, minimal population deviation, and avoiding incumbent pairings and found that in 97% of his race-neutral simulations Montgomery County remains whole. Exh. M1 ¶ 33; Jan. 4 Tr. 187-88. HB1 is a statistical outlier in splitting Montgomery County. *See* Exh. M1 ¶ 33; Jan. 4 Tr. 187-88.

411.     Dr. Imai performed a second set of 10,000 simulations that created a majority-AP BVAP district between 50% to 51%, and otherwise applied the race-neutral traditional redistricting criteria used in his race-neutral simulations. M1 ¶ 35; Jan. 4 Tr. 190-91.

412.     The algorithm almost always produced the majority-Black district in the area of enacted District 7. Exh. M1 ¶¶ 35-40; Jan 4. Tr. 191.

413.     Montgomery County also remains whole in over 62% of these simulations. Exh. M1 ¶ 37; Jan. 4 Tr. 193.

414.     Even in those 38% of simulations where it is split, less than 4,000 Black adults in Montgomery County are placed in District 7 as compared to 39,000 in HB1. Ex. M1 ¶ 38; Jan. 4 Tr. 193. The inclusion of 39,000 Black adults from Montgomery County in District 7 was a statistical outlier as compared to the ensemble of 10,000 one-MMD plans. Exh. M1 ¶ 33; Jan. 4 Tr. 192-93.

415.     Without the use of race in HB1 to fragment Montgomery and the Black Belt, a race-neutral plan would more naturally place the Black voters in those areas in a second majority-Black or opportunity district, thereby significantly increasing the BVAP of that district. Jan. 4 Tr. 201-03.

416.     After creating District 7 as a majority-Black district, but otherwise running race-blind simulations, Districts 1, 2, and 3 look significantly different from HB1.

417.     Dr. Imai's one-MMD simulations produce BVAPs in District 2 as high as 39.7%, and on average 4.4 percentage points higher than HB1. Exh. M1 ¶ 41; Jan. 4 Tr. 201-02. Just 3.7% of his one-MMD simulations have a BVAP for District 2 less than the 30.1% in the enacted plan. Exh. M1 ¶ 41.

418.     Based on these one-MMD simulations, Dr. Imai found that HB1 packs Black voters in the western part of Montgomery city into District 7 rather than

placing those voters in District 2 to create a second Black influence district. Exh. M1 ¶ 33, 41; Jan. 4 Tr. 171, 195-96. In both regards, HB1 is a statistical outlier when compared to the 10,000 one-MMD simulated plans. *See id.*

419.     Dr. Imai created a third set of 10,000 simulations in which he added two additional constraints to the one-MMD algorithm. He constrained the one-MMD simulations to prefer keeping the Baldwin-Mobile and Black Belt counties together, in reliance on the Defendants' expert's representations and the stipulations of the parties. Exh. M6 ¶¶ 2-3, 6; Jan. 4 Tr. 203-04, 267-68.

420.     In these 10,000 "community of interest" simulations, the average BVAP of District 2 increased more than 6.2 percentage points higher than the BVAP of District 2 in HB1, and usually in the high-30s, and the BVAP in District 2 had a maximum value of 39.9%. Exh. M6 ¶ 9; Jan. 4. Tr. 204-05; *see also* Jan. 5 Tr. 298.

421.     Dr. Williamson's several analyses of Districts 1, 2, and 3 show that Black Alabamians are more likely to be diffused across districts in the portion of the State in which they are geographically concentrated. Exh. M2 at 7; Jan. 5 Tr. 325-26.

422.     The portion of the Black Belt not drawn into District 7 was split across Districts 1, 2, and 3. Exh. M2 at 9–10; Jan. 5 Tr. 330-31.

423.     By comparing the variability of census block BVAP in each of these districts, Dr. Williamson found that the concentration of Black communities in the

Black Belt did not translate to comparable concentrations in Districts 1, 2, and 3. Exh. M2 at 6–7; Jan. 5 Tr. 325-26, 329, 349.

424.     Dr. Williamson also looked at the relationship between racial makeup of counties in Districts 2 and 3 and whether they share any part of their border with another district. Exh. M2 at 7–8; Jan. 5 Tr. 327-28.

425.     Dr. Williamson's analysis showed that a strong relationship exists between race and bordering another district: counties with higher Black populations were more likely to border another district, indicating cracking of the geographically concentrated Black population in the state. Exh. M2 at 7–8; Jan. 5 Tr. 327-28.

426.     Finally, Dr. Williamson performed a visual analysis informed by his quantitative analysis. Exh. M2 at 7–8; Jan. 5 Tr. 327-28.

427.     That analysis confirmed his quantitative findings. In Districts 2 and 3, the Legislature drew Macon and Bullock Counties and most of Montgomery County out of the drawn out of the Black Belt and connected them to the much whiter Autauga and Elmore Counties despite likely lowering the compactness of the district. Exh. M2 at 10; Jan. 5 Tr. 330-31.

428.     Dr. Williamson also isolated the areas which the Legislature in the challenged maps as opposed to the portions of the 2011 districts it chose to readopt by examining which census blocks were moved into and out of each district and

which ones remained from the previous map. He then analyzed the relationship of how these movements translated in terms of BVAP. Exh. M2 at 8–9.

429.     He used census blocks to focus on the BVAP to create a more conservative test: because census blocks are not weighted by population, more populated areas that tend to have higher proportions of BVAP do not play an outsized role in the conclusion. Jan. 5 Tr. 320, 357.

430.     His analysis determined that BVAP was a "strong predictor of change across maps," where "largely Black blocks . . . disproportionately moved out of" majority-white Districts 2 and 3 "and replaced with disproportionately White blocks," Exh. M2 at 8-9, showing the role that race played even in changing district boundaries. Jan. 5 Tr. 333-35.

431.     Dr. Williamson's conclusion that race played a predominant role in constructing the challenged districts did not depend upon any of analysis, but upon the "consistent findings and given the substantially large differences" in BVAP meaning "it is very, very unlikely" to see this consistent racial pattern without the predominant use of race. Jan. 5 Tr. 335.

## IX.   Conclusions of Law

### A.   <u>Section 2 of the Voting Rights Act Creates a Private Right of Action</u>

432.     Section 2 of the Voting Rights Act is privately enforceable by persons such as the plaintiffs in this case. In *Morse v. Republican Party of Virgina*, 517 U.S.

186 (1996), the Supreme Court concluded that "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." *Id.* at 232 (omission in original) (internal quotation omitted).

433.     Furthermore, in 1975, Congress amended the general enforcement mechanism in Section 3 to make explicit that private parties can sue to enforce the VRA. Section 3 originally gave enforcement authority only to the Attorney General of the United States. The 1975 amendments set forth the judicial procedures governing actions by "the Attorney General or an aggrieved person . . . under any statute to enforce the voting guarantees of the fourteenth and fifteenth amendment." 52 U.S.C. §§ 10302(a), (b), and (c); *see Morse*, 517 U.S. at 233 (explaining that the 1975 amendments to the VRA recognized that private rights of action were available to enforce the VRA); *Ala. State Conf. of the NAACP v. Alabama*, 949 F.3d 647, 651-52 (11th Cir. 2020), *vacated*, 141 S. Ct. 2618 (2021).[10] Justice Stevens's opinion for the court, Justice Breyer's concurrence, and Justice Thomas's dissent in *Morse* all recognized that the amended Section 3 gives a right of action under the VRA to private parties. *Morse*, 517 U.S. at 233; *see also id.* at 240 (Breyer, J., concurring) (recognizing that, in amending § 3, Congress gave "a private right of action to

---

[10] The Eleventh Circuit's decision was vacated by the Supreme Court because the case had become moot, 141 S. Ct. 2618 (2021), but the portion discussing private Section 2 enforcement is consistent with the history of the VRA and the fact that private parties have sued States under Section 2 for decades. See, e.g., *ALBC*, 575 U.S. 254 (private challenge against the State of Alabama); *LULAC*, 548 U.S. at 407 (private challenge against state officials); *Chisom v. Roemer*, 501 U.S. 380 (1991) (same).

enforce § 10 [of the VRA], no less than it did to enforce §§ 2 and 5"; *id.* at 289 (Thomas, J., dissenting) ("As appellants accurately state, § 3 explicitly recognizes that private individuals can sue under the Act." (cleaned up)).

434.      In light of this clear guidance from the Supreme Court, and a long history litigation recognizing a private right of action under the VRA that has been ratified repeatedly by Congress as it reauthorized the VRA, Defendants' argument that the VRA does not authorize suits by private parties is meritless.

B.      The Preliminary Injunction Standards Have Been Satisfied.

435.      To obtain a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) that the equities favor Plaintiffs; and (4) that the injunction favors the public interest. *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F. 3d 1349, 1354 (11th Cir. 2005).

436.      Because all criteria are met here, discussing the remedy this Court orders, the Court enjoins the State's use of the map enacted in HB1.

437.      Plaintiffs have established a likelihood of success on the merits of their Section 2 claim.

438.      Plaintiffs have established a likelihood of success on the merits of their racial gerrymandering claim.

439.     The Court concludes that irreparable injury will occur absent an injunction The violation of the Voting Rights Act and the constitutional violation, which we conclude Plaintiffs have demonstrated a likelihood of success that they will prove, "are in the form of lost opportunities, which are difficult, if not impossible, to quantify" and "cannot be undone through monetary remedies." *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005). As such, the injury alleged "is obviously irreparable." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010).

440.     The Court concludes that the equities favor Plaintiffs, who have a strong interest in exercising their right to vote free from a racially discriminatory districting scheme that dilutes their vote. *See, e.g., League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440-41 (2006) ("*LULAC*") (striking down a congressional plan as violative of Section 2).

441.     In comparison, the identified statutory and constitutional violations plainly outweigh the burdens on Defendants. We note that the relief requested does not require the State to cancel or reschedule an election, discard ballots already cast, or prepare new ballots or other election materials. The May primary is four months away, and the general election not until November, affording sufficient time to ameliorate the violations without undue burden. *See, e.g., Perez v. Texas*, No. 11-CA-360, 2012 WL 13124275, at *4 (W.D. Tex. Mar. 19, 2012) (three-judge court);

(adopting a remedial state house map two months before a primary and seven months before a general election) *Perez v. Perry*, No. SA-11-CV-360, 2012 WL 13124278, at *11 (W.D. Tex. Mar. 19, 2012) (three-judge court) (same for a U.S. House map).

442.    The Court concludes that an injunction favors the public interest. The public interest is served by having Congressional districts in Alabama that comply with the VRA and with the Constitution.

C.    Plaintiffs Have Established a Likelihood of Success That HB1 Violates Section 2 of the Voting Rights Act.

443.    A Section 2 claim has two components. First, Plaintiffs must satisfy the three preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), by demonstrating that: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district" (*Gingles* 1); (2) the minority group is "politically cohesive" (*Gingles* 2); and (3) the majority votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" (*Gingles*  3). *LULAC*, 548 U.S. at 425 (quoting *Gingles*, 478 at 50-51). Second, Plaintiffs must, under the totality of circumstances, "demonstrat[e] that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race." *Chisom*, 501 U.S. at 394; *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) ("*Fayette*"); *see* 52 U.S.C. § 10301(b).

444.     We conclude that Plaintiffs have clearly demonstrated their likelihood of meeting these requirements.

  i. *Plaintiffs have demonstrated a likelihood of success on the first Gingles precondition: Alabama's Black population is sufficiently large and geographically compact to constitute a majority in a single-member district.*

445.     *Gingles* 1 requires a plaintiff to show that the minority group is "sufficiently large and geographically compact to constitute a majority" in more than the existing number of districts. *Gingles*, 478 U.S. at 50. Plaintiffs typically satisfy *Gingles* 1 by offering a hypothetical redistricting plan for the jurisdiction at issue that contains one or more majority-minority districts. *Fairley v. Hattiesburg*, 584 F.3d 660, 669 (5th Cir. 2009); *see also Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1406 (5th Cir. 1996) ("*Clark II*"). These proposed districts are "not cast in stone;" they are illustrative only; if Plaintiffs prevail, the Alabama Legislature "will be given the first opportunity to develop a remedial plan." *Clark v. Calhoun Cty.*, 21 F.3d 92, 95 (5th Cir. 1994) ("*Clark I*"); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (noting that the "ultimate end of the first *Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem").The first *Gingles* precondition contains two components: numerosity and compactness.

  a) *Numerosity*

446.     The Supreme Court in *Bartlett* held that that a bright-line 50% plus one rule applies in assessing whether the minority population is "sufficiently large" for purposes of *Gingles* one.   *Bartlett v. Strickland*, 556 U.S. 1, 12 (2009) (internal quotations omitted).

447.     Whether and how Plaintiffs satisfy this test depends on how the Black population is measured. In *Georgia v. Ashcroft*, the Supreme Court held that in cases in which Black voters are the only minority group whose exercise of the franchise is at issue, "it is proper to look at *all* individuals who identify themselves as black." 539 U.S. 461, 473 n.1 (2003) (emphasis in original). In this case, as in *Georgia*, the Plaintiffs allege vote dilution only with respect to Black Alabamians. Based on the foregoing findings of fact, the Court concludes that, in this case, the appropriate measure of the Black population for purposes of assessing Plaintiffs' illustrative plans is the so-called "Any Part Black Voting Age Population" or "APBVAP" measure.

448.     In any case, the most expansive or the most restrictive census category is used for measuring the Black population, the evidence demonstrates that Alabama's Black VAP is sufficiently numerous to form a majority in two Congressional Districts in Alabama's seven-member Congressional Plan.

     *b)*     *Compactness*

449.     Section 2 compactness "refers to the compactness of the minority population, not to the compactness of the contested district." *LULAC*, 548 U.S. at 433. "While no precise rule has emerged go**verning § 2 co**mpactness, the inquiry should take into account traditional redistricting principles such as maintaining communities of interest and traditional boundaries." *Id.* (internal quotations omitted).

450.     Here, the illustrative plans offered by Plaintiffs readily satisfy the traditional principles of geographic compactness, contiguity, equal population, and preservation of communities of interest.

**Equal Population**

451.     The equal population, or one-person-one-vote principle requires, where Congressional districts are at issue, that the population of each district be equal as nearly as practicable. There is no dispute that all the districts in the illustrative plans have their population balanced to within one person.

**Contiguity**

452.     Plaintiffs' illustrative plans also satisfy the principles of contiguity. There is no dispute that all of the plans are composed of contiguous geographic units, whether counties, precincts, or census blocks.

453.     Moreover, unlike the district at issue in *LULAC*, none of the illustrative plans string together distant and isolated pockets of minority voters to form their

districts. *See* 548 U.S. at 424. For example, each of Plaintiffs' plans forms a second majority-Black district by connecting all or part of northern Mobile County, including the city of Mobile's concentrated Black population, with neighboring Washington County, as well as most of the southern and eastern Black Belt.

454.     Based upon the foregoing findings of fact, the Court concludes that the illustrative plans are made up of contiguous districts.

**Geographic Compactness**

455.     In the *Gingles* 1 context, compactness "does not mean that a proposed district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness. An aesthetic norm, by itself, would be . . . an unworkable concept, resulting in arbitrary and capricious results, because it offers no guidance as to when it is met." *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1465-66 (M.D. Ala. 1988). "A [Section] 2 district that is reasonably compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts . . . in endless 'beauty contests.'" *Bush v. Vera*, 517 U.S. 952, 958 (1996) (emphasis omitted); *Askew v. City of Rome*, 127 F.3d 1355, 1376-77 (11th Cir. 1997) (same). "Compliance with federal law must be a higher priority" than "maintaining communities of interest and preserving county boundaries."

*ALBC II*, 231 F. Supp. 3d at 1051; *see also LULAC*, 548 U.S. at 430 ("To be sure, § 2 does not forbid the creation of a noncompact majority-minority district.").

456.     Based upon the foregoing findings of fact, the Court concludes that the illustrative plans comport with the principle of geographical compactness because they are comparable in compactness to the enacted plan. *See Houston v. Lafayette Cnty.*, 56 F.3d 606, 611 (5th Cir. 1995) (district court "clearly erred in finding that the black population . . . was not sufficiently geographically compact," given "the compactness of the district in the . . . proposed plan resembles that of many districts considered constitutionally acceptable by other courts"); *see also Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1393-96 (E.D. Wash. 2014) (holding that the illustrative district was geographically compact by "looking at the maps of the proposed districts" and comparing its Reock scores to those of other districts).

**Communities of Interest**

457.     Courts have recognized that "maintaining communities of interest" is a traditional redistricting principle. *E.g.*, *LULAC*, 548 U.S. at 433 (internal quotations omitted). "A State is free to recognize communities that have a particular racial makeup" so long as there is "some common thread of relevant interests." *Miller v. Johnson*, 515 U.S. 900, 920 (1995).

458.     In *Theriot v. Parish of Jefferson*, 185 F.3d 477 (5th Cir. 1999), the Fifth Circuit found that a majority-Black district for the Jefferson Parish Council included

"low-income residents who are less-educated, more often unemployed, and more poorly-housed" and thus shared "common social and economic needs." *Id.* at 486; *see also id.* at 486 n.20 (noting that political organizations that drew their memberships from "predominantly black neighborhoods" had worked on "issues of housing, education, and poverty" in the majority-Black district, many of which "continue[d] to infect the communities" there). The court held that, "[g]iven the common thread which binds the black voters within [that district], they are entitled to an effective voice in the electoral process and to an influence over the outcome of elections." *Id.* at 487 (internal quotations omitted).

459.     Based upon the foregoing findings of fact, which demonstrate a "common thread which binds" Black voters in the Black Belt, Mobile, and other urban centers, like Montgomery, we conclude that the Illustrative Plan respects communities of interest.

460.     The Court finds it of no moment that plaintiffs' illustrative plans do not respect the communities of interest prioritized by the defendants. All parties agree that a community of interest is frequently in the eye of the beholder, and that the same geographic area—and indeed the same individual—may form part of multiple communities of interest, which can make it impossible to honor one without dividing another. Moreover, plaintiffs' task here was to demonstrate that a majority-minority district is possible while reasonably satisfying traditional redistricting principles. In

the crafting of their illustrative plans, Plaintiffs have plainly made every effort to protect communities of interest that are important to them and many other Alabamians. No more is required.

461.     Likewise, the Court finds it irrelevant that a person in Mobile may not share a community of interest with a person in Russell County, though these individuals reside in the same congressional district. A district need not be coextensive with a single community of interest. Respecting communities of interest does not require identifying a community of interest that binds together the entire district. It simply requires that, when possible, communities of interest are kept intact within a district rather than divided by district lines.

### c)     Racial Predominance

462.     Defendants contend that Plaintiffs do not meet the first *Gingles* precondition because, in their view, Dr. Duchin's exemplar maps do not satisfy traditional districting principles. Particularly, they appear to argue that because Dr. Duchin considered race in drawing the illustrative majority-Black districts, those districts themselves are racial gerrymanders and thus cannot possibly comply with traditional districting principles.

463.     This misstates the facts. Dr. Duchin did not subordinate traditional districting factors to race in drawing the illustrative plans. Rather, she drew her plans

consistent with traditional redistricting principles by, for example, prioritizing increasing compactness and minimizing county splits over race. Jan. 6 Tr. 578.

464.    Defendants' argument also distorts the law by improperly applying racial gerrymandering analysis under *Shaw* to the *Gingles* preconditions.

465.    "Strict scrutiny does not apply merely because redistricting is performed with consciousness of race" or "to all cases of intentional creation of majority-minority districts." *Bush*, 517 U.S. at 958; *Miller*, 515 U.S. at 916 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process."); *Shaw*, 509 U.S. at 646 ("[R]edistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines . . . . That sort of race consciousness does not lead inevitably to impermissible race discrimination." (emphasis omitted)).

466.    Alabama's redistricting guidelines explicitly recognize the traditional redistricting principles of considering race as necessary to satisfy the VRA or identify communities of interest. Exh. M28. The Supreme Court similarly includes "compliance with requirements of the [Voting Rights Act]" as an example of "traditional redistricting criteria." *See Harris v. Arizona Ind. Redistricting Com'n*, 136 S. Ct. 1301, 1306-1397 (2016) (holding that VRA compliance is a "legitimate state consideration that can justify deviation from perfect equality of population").

467.     Defendants' argument would effectively hamstring the ability of any Plaintiff to prove the first *Gingles* precondition unless, in drawing a map completely without regard to race, they happen to form a majority-minority district. But attempts to apply racial gerrymandering "authorities such as *Miller* to [a] Section Two case . . . [are] unpersuasive, because [these two lines of cases] address very different contexts." *Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998); *see also Ga. State Conf. of the NAACP*, 118 F. Supp. 3d at 1345 ("the inquiry under the first prong of *Gingles* and the determination of whether a districting plan resulted from an unconstitutional racial gerrymandering are distinct issues.").

468.     In the VRA context, courts "*require* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." *Davis*, 139 F.3d at 1425 (emphasis in original). If the Court were to "penalize" plaintiffs "for attempting to make the very showing that *Gingles* [] demand[s]," it would be "impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." *Id.*

469.     Even if the remedial district ultimately created in this case matches Dr. Duchin's proposed district exactly (which is not the question at this stage of the case), the narrowly tailored use of race to comply with Section 2 is a compelling interest that defeats any claim that the illustrative districts are racial gerrymanders.

*See Shaw*, 509 U.S. at 656 ("We previously have recognized a significant state interest in eradicating the effects of past racial discrimination."); *King v. Illinois Bd. of Elections*, 979 F. Supp. 619, 622 (N.D. Ill. 1997) (three-judge court), aff'd, 522 U.S. 1087 (1998) ("[R]emedying a potential violation of or achieving compliance with § 2 is a compelling state interest."); *Askew*, 127 F. 3d at 1376 ("[E]liminating violations of Section 2 is a compelling state interest.").

470.    Additionally, even though Dr. Duchin did not use race as the predominant factor in drawing her illustrative districts, if she had done so, this also would not violate *Gingles 1* or the Constitution. Dr. Duchin relied on race solely to the degree necessary to create an illustrative majority-minority district, which is a prerequisite for a Section 2 claim.

471.    Dr. Duchin's testimony shows that her consideration of race in creating that district was narrowly tailored to ensure compliance with Section 2. *See Bethune-Hill v. State Bd. of Elections*, 137 S. Ct. 788, 801 (2017) (upholding a district drawn for a predominately racial purpose where it was narrowly tailored to comply with the VRA); *Askew*, 127 F. 3d at 1376 (holding that, even assuming that "a remedial plan can not be composed in this case that is entirely consistent with traditional race-neutral districting principles," the Court would still have the power to fashion a constitutional and narrowly tailored "remedy to the goal of eliminating a Section 2 violation").

472.     Defendants also attempt to refute Plaintiffs' Section 2 claim by relying on evidence that HB1 was actually tainted by racial gerrymandering, specifically the testimony presented by Dr. Imai. But that argument is a non-sequitur: it is premised on Defendants' mistaken attempt to import *Shaw* into *Gingles* 1. Considering race when necessary to create an illustrative district under *Gingles* 1 to remedy a Section 2 violation, is entirely different than relying on race without any such remedial purpose or to simply pack and crack Black voters, as Defendants did in HB1.

473.     Defendants' theory grossly misrepresents Dr. Imai's testimony and its import.

474.     Dr. Imai did not engage in his "race-neutral" simulation as an effort to replicate the process that the State undertakes in drawing districts. Nor did Dr. Imai incorporate the state's guideline that (consistent with precedent) gives priority to VRA compliance in his simulation. Jan. 5 Tr. 292. Instead, he omitted any consideration of race because it would defeat the purpose of his attempt to isolate the role of race in HB1. Additionally, because the State's criteria and evidence concerning communities of interest were too amorphous when he conducted that race-blind analysis, he also did not incorporate communities of interest into his simulations. *See* Exh. M1 ¶ 18; Jan. 4 Tr. 180.

475.     As discussed above, the Supreme Court has held that it is perfectly permissible and necessary for a state to consider race in redistricting. Allowing the

fact that Dr. Imai's race-blind simulations did not produce majority-Black districts to be used to call majority-Black districts racial gerrymanders would grossly distort his analysis, the State's guidelines, and the principles underlying the VRA.

476.    Moreover, Dr. Imai's analyses did not even attempt to isolate the role of race compared to other factors in a map with two majority-Black districts and, thus, tells the Court nothing about how little or how much race played a role in the design of the illustrative districts. At best, Dr. Imai's simulations *might* show that race was *one* factor that Dr. Duchin considered in drawing the illustrative districts, but his simulations do not (and cannot) show that race was the *predominant* factor. *Cf. Bush*, 517 U.S. at 977 ("A [Section] 2 district that is reasonably compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries, may pass strict scrutiny without having to defeat rival compact districts designed . . . in endless 'beauty contests.'"); *Dillard v. City of Greensboro*, 946 F. Supp. 946, 956 (M.D. Ala. 1996) ("[W]ith the exception of § 2's requirement of compactness, traditional race-neutral principles can be subordinated or even sacrificed in favor of race considerations to the extent necessary to remedy the § 2 violation.").

477.    In any event, Dr. Duchin's use of race to ensure the districts in question were majority-Black is a necessary part of the *Gingles* analysis and does not raise

concerns under *Shaw* and its progeny. *See Bush*, 517 U.S. at 977; *Davis*, 139 F.3d at 1425; *Askew*, 127 F.3d at 1376.

> d)   *Judicial Estoppel: The VRA trumps Traditional Redistricting Principles*

478.     Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position …." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). This doctrine "protect[s] the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* (internal quotations omitted).

479.     In determining whether to apply judicial estoppel courts must evaluate: (1) whether the party's position is "clearly inconsistent" with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 750.

480.     In *Chestnut v. Merrill*, the plaintiffs sought a declaratory judgment that the 2011 congressional districts violated Section 2 of the VRA. 377 F. Supp. 3d 1308, 1317-18 (N.D. Ala. 2019). After trial, Secretary Merrill argued that the case was moot because the post-2020 redistricting process "would not be in any way

controlled by a declaration that the 2011 districts violated the [VRA]" insofar as "[t]he State's interest in applying traditional districting criteria *always must yield* to its duty to comply with the federal Constitution and the Voting Rights Act." Def.'s Post-Trial Brief at 4-5 & n.1, *Chestnut v. Merrill*, Case No. 2:18-CV-00907-KOB (N.D. Ala. Dec. 13, 2019), Doc. 115 (emphasis added).

481.     The *Chestnut* court agreed with Secretary Merrill, and therefore held that the Section 2 challenge was moot because "an interest in core retention cannot trump compliance with the VRA" and Section 2 would apply equally to the post-2020 map regardless of either the State's interest in core retention or a declaratory judgment concerning the 2011 map. *See Chestnut v. Merrill*, 446 F. Supp. 3d 908, 919 (N.D. Ala. 2020).

482.     Therefore, Defendants are judicially estopped from now taking and unfairly benefitting from the contradictory position that compliance with the VRA cannot trump core preservation or any other traditional districting criteria. *See* Doc. 78, Defs.' P.I. Opp'n at 112 ("Section 2 cannot possibly compel this subversion of traditional redistricting criteria."); *see also id*. at 64-65 (claiming that Plaintiffs' illustrative maps do not satisfy *Gingles* because they allegedly do not protect cores).

483.     Even if Alabama were not judicially estopped from raising the issue of core retention, Defendants cannot identify a single case in which a proposed majority-minority district has been rejected under *Gingles* 1 because it inadequately

retained the core of existing districts. Such a finding would turn the law on its head, effectively immunizing from Section 2 liability those states that have the longest standing maps. Contrary to Defendants' suggestion, the State's failure to comply with Section 2 in the past does not absolve it from Section 2 liability in perpetuity. The Illustrative Plans only reconfigure districts to the extent necessary to comply with Section 2 and satisfy Plaintiffs' evidentiary threshold.

484.     In any event, the State's policy choices, like core retention or incumbent protection, are "subordinate" to remedying violations of federal law and cannot "validate the very maneuvers that were a major cause of the unconstitutional districting." *Abrams v. Johnson*, 521 U.S. 74, 84-86 (1997); *id.* at 85, 99 (approving of a remedial plan that "subordinated" unpairing incumbents to "other factors"); *LULAC*, 548 U.S. at 441 (incumbent protection "cannot justify the effect [of a redistricting plan] on [minority] voters"); *Upham v. Seamon*, 456 U.S. 37, 43 (1982) (courts may "disregard the [state's] political program" where "plan offended either the Constitution or the [VRA]"); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 421 (M.D.N.C. 2018) (three-judge court); *Larios v. Cox*, 314 F. Supp. 2d 1357, 1360 (N.D. Ga. 2004) (three-judge court); *Major v. Treen*, 574 F. Supp. 325, 355 (E.D. La. 1983) (three-judge court).

485.     Based upon the foregoing findings of fact, the Court concludes that Plaintiffs established a likelihood of success with respect to the first *Gingles* precondition.

      ii.     *Plaintiffs have demonstrated a likelihood of success on the second and third Gingles preconditions: Black voters are politically cohesive, and the white majority votes sufficiently as a bloc to enable it to usually defeat Black voters' preferred candidate*

486.     In *Gingles*, the Supreme Court explained that "[t]he purpose of inquiring into the existence of [RPV] is twofold: [1] to ascertain whether minority group members constitute a politically cohesive unit and [2] to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." 478 U.S. at 56. "A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim." *Id.* A showing that "in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Id.*

487.     The Supreme Court and the Eleventh Circuit have delineated several guidelines for assessing RPV. First, endogenous elections—those concerning the office at issue, here, Congressional races in Congressional Districts 1, 2, 3, and 7—are generally more probative of RPV than exogenous elections—those for other offices. *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301

(11th Cir. 2020). Nevertheless, exogenous elections may still be probative of RPV. *Id.* .

488.     Second, in examining a jurisdiction's electoral history, "a court may assign more probative value to elections that include minority candidates, than elections with only white candidates" *Id.* (citation omitted). *Davis v. Chiles*, 139 F.3d 1414, 1417 n.5 (11th Cir. 1998) (noting evidence drawn from elections involving Black candidates is more probative) .

489.     Third, "a pattern of [RPV] that extends over a period of time is more probative . . . than are the results of a single election." *Gingles*, 478 U.S. at 57. However, there is no minimum number of elections that must be analyzed. *See id.* at 57 n.25 ("The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances."). In *Gingles*, the Supreme Court affirmed a finding of RPV based on data from "three election years." *Id.* at 61. At the same time, courts may conclude that recent elections are more probative than older elections. *Wright*, 979 F.3d at 1301.

490.     Finally, "in a district where elections are shown usually to be polarized, the fact that [RPV] is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." *Gingles*, 478 U.S. at 57; *see also NAACP by Campbell v. Gadsden Cnty. Sch. Bd.*, 691 F.2d 978, 983 (11th Cir. 1982) (success Black candidate in one out of

fourteen elections did not overcome plaintiff's RPV showing). The question is whether "whites vote sufficiently as a bloc *usually* to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56 (emphasis added).

491.    Applying these principles to the foregoing findings of fact, the Court concludes that Plaintiffs have established a substantial likelihood of success in establishing *Gingles* 2 and 3. Across seven biracial elections held in the relevant Congressional districts over a 13-year period, Black voters cohesively supported Black candidates, with levels of support ranging from 53.8% in a multi-candidate Democratic primary to 96.3%. *See supra*. Across the same seven elections, non-Black voters overwhelmingly declined to support the Black candidates, with levels of support ranging from 5.2% to a maximum 26.1%. In each election in a district that was not majority-Black, the candidate of choice of Black voters was defeated.

492.    Similar results were seen in racially contested statewide elections and in the 2008 and 2012 Presidential Elections. Exit polling indicates that low white support for Black candidates crosses party lines, with white Democratic support for Black Democrats falling below 50%.

493.    The success of a Black Republican in a single race in an exogenous state House election, as urged by Dr. Hood, does not undermine this conclusion. Minority candidate success in jurisdictions smaller than that at issue is "obviously misplaced." *See Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1560

(11th Cir. 1987) (holding that minority success in a town was irrelevant where the Section 2 challenge was to countywide offices).

494.     The statewide and endogenous elections show that racial bloc voting exists in Democratic and Republican primaries. Exh. M4 at 9; Exh. M8 at 3. Even if this one state House election were relevant (and it is not), "that racially polarized voting is not present in one or a few individual elections . . . does not necessarily negate" a finding of "legally significant bloc voting." *Gingles*, 478 U.S. at 57.

495.     The *Gingles* preconditions do not require plaintiffs to show why racially polarized voting exists, only that it exists.[11] Thus, it does not matter if partisanship or racism or another factor motivates racial polarization. What matters is that, under the challenged districting plan, Black voters are not able to translate their cohesive political preferences into electoral success. *See Gingles*, 478 U.S. at 63 ("It is the difference between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives.").

496.     "Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence

---

[11]     The Eleventh Circuit has never held that the subjective "biases" of voters is relevant to the racially polarized voting analysis. In *Nipper v. Smith*, then-Chief Judge Tjoflat's discussion of racial bias was joined only by one other judge and did not garner a majority or plurality of the court. 39 F.3d 1494, 1524-26 (11th Cir. 1994); see id. at 1547 (Edmondson, J., concurring) (declining with three other judges to join this part of Judge Tjoflat's opinion); id. at 1547-57 (Hatchett, J., dissenting) (joined by another judge).

of causation or intent." *Carrollton NAACP*, 829 F.2d at 1557-58 (quoting *Gingles*, 478 U.S. at 74). And Plaintiffs need not "prove racism determines the voting choices of the white electorate in order to succeed in a voting rights case." *Askew*, 127 F.3d at 1382.

497.     Here, no Black candidate, regardless of party affiliation or qualifications, has ever won a majority-white congressional district in Alabama. *See Fayette*, 775 F.3d at 1340 nn. 5 & 9 (finding racial polarization where no Black person had won the relevant office, regardless of their political party). White bloc voting resulted in the defeat of the Black candidates statewide for the last 25 years. "One may suspect vote dilution from political famine," *Johnson v. De Grandy*, 512 U.S. 997, 1017-18 (1994), and "the surest indication of race-conscious politics is a pattern of racially polarized voting." *Meek v. Metro. Dade Cty.*, 985 F.2d 1471, 1487 (11th Cir. 1993) (citation omitted).

498.     To the extent Defendants appear to assert that racial polarization and, thus, Section 2 violations cannot occur outside of jurisdictions, like Alabama, where Black and white people tend to strongly prefer different political parties, Jan. 7 Tr. 1892, the facts here and recent caselaw simply do not bear this out. *See, e.g.*, *Pope v. Cty. of Albany*, 94 F. Supp. 3d 302, 325 (N.D.N.Y. 2015) (finding a Section 2 violation in a place "dominated by the County Democratic Party"); *Black Political*

*Task Force v. Galvin,* 300 F. Supp. 2d 291, 294 (D. Mass. 2004) (three-judge court) (finding that a Massachusetts state redistricting plan violated Section 2 of the VRA).

499.     In sum, the Court concludes that Plaintiffs have established a likelihood of success on *Gingles* 2 and 3.

D.   <u>Looking to the Totality of the Circumstances, Plaintiffs Have Demonstrated a Likelihood of Success That HB1 Violates Section 2 of the Voting Rights Act</u>

500.     Beside the *Gingles* preconditions, Plaintiffs must also demonstrate that "the totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." *Fayette*, 775 F.3d at 1342. Only in "the very unusual case" will plaintiffs be able to "establish the existence of the three *Gingles* factors but still have failed to establish a violation **of § 2 under** the totality of circumstances." *Id.* (internal quotations omitted). This is *not* an unusual case.

501.     To undertake the totality-of-the-circumstances determination, courts use the nine factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the VRA, i.e., the "Senate Factors." *Id*. But courts are not limited to considering these factors, nor is there a requirement that "any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* (internal quotations omitted).

502.     The two "most important" factors are: racially polarized voting and a lack of Black electoral success. *Gingles*, 478 U.S. at 48 n.15; *see also Fayette*, 775 F.3d at 1347 n.9. Here, their undisputed presence alone "point[s] commandingly" in Plaintiffs' favor. *Fayette*, 775 F.3d at 1347 n.9.

503.     The evidence of ongoing or very recent discrimination is particularly relevant where, as here, it is undisputed that "discriminatory practices were commonly utilized" and that such practices were only "abandoned when enjoined by courts or made illegal by civil rights legislation." *Rogers v. Lodge*, 458 U.S. 613, 625 (1982).

504.     But, even if Alabama were no longer engaged in discrimination, "[t]he racial bias of Alabama's former leaders and White citizens, while certainly 'outdated,' unfortunately still affects Black Alabamians' health and socioeconomic status today." *People First*, 491 F. Supp. 3d at 1174.

505.     Racial inequalities in financial resources can cause other relevant harms, like Black voters "not be[ing] able to provide the candidates of their choice with the same level of financial support that whites can provide theirs." *Gingles*, 478 U.S. at 70.

506.     Based on the findings as to Senate Factors One, Two, Three, Five, Six, Seven, Eight and Nine, the totality of the circumstances weigh in Plaintiffs favor.

Plaintiffs have shown a substantial likelihood of success on the merits of their Section 2 claim.

E.      Districts 1, 2, 3, and 7 are Racially Gerrymandered and Fail Strict Scrutiny

507.    Racial gerrymandering occurs when districts "segregate voters into separate voting districts because of their race, and that the separation lacks sufficient justification." *Shaw v. Reno*, 509 U.S. 630, 658 (1993). It "is the segregation of the plaintiffs—not the legislature's line-drawing as such—that gives rise to their claims." *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018).

508.    Racial gerrymandering claims are "analytically distinct" from discriminatory purpose claims, which allege that "the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Miller*, 515 U.S. at 911 (internal quotations omitted). While an intentional vote dilution claim requires evidence that the state has enacted a particular voting scheme to disadvantage voters of a particular race, the "essence" of a racial gerrymandering claim is that "the State has used race as a basis for separating voters into districts." *Id.*

509.    In a racial gerrymandering claim, it is irrelevant whether legislators acted in "good faith," *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016) (three-judge court), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017); *Smith v. Beasley*, 946 F. Supp. 1174, 1208 (D.S.C. 1996) (three-judge court), or for

"benign" reasons, *Shaw*, 509 U.S. at 642-43. Plaintiffs need only show the intent to "segregate voters on the basis of race." *Shaw*, 509 U.S. at 670 (White, J., dissenting).

510.    Racial gerrymandering claims require a two-step inquiry.

511.    First, Plaintiffs must prove that race was the predominant factor in placing "a significant number of voters within or without a particular district." *Cooper*, 137 S. Ct. at 1463-64 (internal quotations omitted). Plaintiffs may rely on "direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both." *Id.* at 1464 (cleaned up) (internal quotations omitted). But racial gerrymandering claims "usually turn upon 'circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing' the lines of legislative districts." *Covington*, 138 S. Ct. at 2553 (quoting *Miller*, 515 U.S. at 913).

512.    Second, if race did predominate, strict scrutiny applies, and Defendants bear the burden of proving that the use of race was "narrowly tailored" to satisfy a "compelling interest." *Cooper*, 137 S. Ct. at 1464 (internal quotations omitted). Compliance with the Voting Rights Act is a compelling interest. *Id.*

513.    Race predominates where the legislature "'subordinate[s] traditional race-neutral districting principles . . . to racial considerations.'" *Bethune-Hill*, 137 S. Ct. at 797 (omission in original). Even where a state's reapportionment plan adheres to traditional redistricting principles, race may predominate. *Id.* at 798; *Clark v.*

*Putnam Cnty.*, 293 F.3d 1261, 1270 (11th Cir. 2002) ("The fact that other considerations may have played a role in the . . . redistricting does not mean that race did not predominate.").

514.    Equal population is a "background consideration" rather than a factor that can predominate: "the 'predominance' question concerns which voters the legislature decides to choose." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 273 (2015) ("*ALBC*") (emphasis omitted).

515.    This "inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 137 S. Ct. at 799.

516.    Even where "traditional factors" may have played a role in the drawing of districts, the consideration of the role race played requires this Court to conduct a "holistic analysis" of the district lines. *Id.* at 800.

517.    Of course, "[s]trict scrutiny does not apply merely because redistricting is performed with consciousness of race." *Bush*, 517 U.S. at 958.

      i.    *Race Predominated in Drawing Congressional Districts 1, 2, 3, and 7.*

518.    Based on the facts found above, Plaintiffs have demonstrated a likelihood of success in proving that race predominated in the drawing of District 1, 2, 3, and 7.

519.    First, as discussed above, the evidence from *Wesch*, statements from the map-drawer Mr. Hinaman, and from Senator McClendon and Representative Pringle show that District 7 was drawn with a racially predominant purpose in 1992. The evidence also shows that Districts 1, 2, 3 have consistently cracked Black voters among these districts such that the BVAP of these districts has not exceeded 30%.

520.    These districts changed minimally from their recent iterations. Defendants even conceded recently that District 7 in the 2011 map was racially gerrymandered. Doc. 53 ¶ 62; Doc. 70-2 (Hinaman Dep.) at 30-32, 35-36; Exh. M12 (Pringle Dep.) at 119-20; Sec. of State Merrill's Pretrial Br., *Chestnut v. Merrill*, No. 2:18-CV-00907 (N.D. Ala. Oct. 28, 2019), Doc. 101 at 11 (Secretary Merrill stated that CD 7 "appear[ed] to be racially gerrymandered, with a finger sticking up from the black belt for the sole purpose of grabbing the black population of Jefferson County.").

521.    Courts have repeatedly relied upon this type of direct evidence of drawing a district to pursue a racial target as compelling evidence of racial predominance. *See, e.g.*, *ALBC*, 575 U.S. at 267 ("That Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote) provides evidence that race motivated the drawing of particular lines in multiple districts in the State."); *Cooper*, 137 S. Ct. at 1468; *Bethune-Hill*, 137 S. Ct. at 799.

522.     Even where those racial targets originated in prior redistricting cycles and were readopted through a preservation of cores strategy, courts have not hesitated to find that race still predominates because the lines continue to separate voters based on race. *See, e.g.*, *Covington*, 138 S. Ct. at 2553 (holding race still predominated even when the "new districts were mere continuations of the old, gerrymandered districts" because "they remained segregated on the basis of race"); *Clark*, 293 F.3d 1261 (holding districts were drawn with predominant use of race where they strove to readopt cores of districts from previous cycle that were drawn with racial predominance); *ALBC II*, 231 F. Supp. 3d at 1065 (holding that "race predominated in the design" of a district even where the "drafters maintained the core of each district").

523.     In addition to direct evidence, Plaintiffs offered compelling expert evidence discussing how the districts cut across and through counties based on race. Courts have relied upon exactly this sort of evidence in finding that a district's lines and demographics divide voters based on race. *See, e.g.*, *Cooper*, 137 S. Ct. at 1477-78 (relying on expert testimony about the race of the voters moved in redistricting); *Covington v. North Carolina*, 316 F.R.D. 117, 137 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) (explaining that "the division of counties, municipalities, and precincts may be evidence of racial predominance"); *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 146-47 (E.D. Va. 2018) (three-judge court)

("*Bethune-Hill II*") (crediting expert analysis showing that "most significant concentrations of black voters were swept into one of the challenged districts" and that there was a racial pattern to how geographic units were split).

524.    Defendants contend that they sought to maintain previous district cores as the predominant factor in 2021, so that race could not be the predominant factor. This does not undermine the Plaintiffs' evidence or legally rebut the claim.

525.    In *Covington*, the Supreme Court approved a district court's decision to enjoin redrawn districts that "retain[ed] the core shape" of previously racially gerrymandered because the redrawn districts continued to bear the hallmarks of racial predominance. 138 S. Ct. at 2551; *see also Clark*, 293 F.3d 1261, 1263 (11th Cir. 2002) (finding districts which preserved previous district cores were racially gerrymandered); *ALBC II*, 231 F. Supp. 3d at 1065 (same). It did not matter that the "legislature instructed its map drawers not to look at race," where this insistence cannot overcome "evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race." *Covington*, 138 S. Ct. at 2553.

526.    This makes good sense given the nature of a racial gerrymandering claim. As the Supreme Court explained, "the basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district." *Bethune-Hill*, 137 S. Ct. at 800. This Court therefore must

"not divorce any portion of the lines—whatever their relationship to traditional principles—from the rest of the district." *Id.*

527.    If the legislature "chooses to rely on redistricting criteria highly correlated with race, like preserving the 'cores' of unconstitutional districts," it cannot leapfrog the predominant use of race. *Covington v. North Carolina*, No. 1:15CV399, 2018 WL 604732, at *4 (M.D.N.C. Jan. 26, 2018). This Court follows the Supreme Court in explicitly rejecting Defendants' argument that preserving the cores of prior districts precludes a finding of racial gerrymandering. *Covington*, 138 S. Ct. at 2553. Plaintiffs "remai[n] segregated on the basis of race" because of the lines the State readopted from its prior plans, and "it is the segregation of the plaintiffs—not the legislature's line-drawing as such—that gives rise to their claims." *Id.*

528.    Moreover, it is a "questionable proposition" that Defendants' purported goals of "core preservation" or "protecting incumbents" are "legitimate, even where, as here, individuals are incumbents by virtue of their election in an unconstitutional racially gerrymandered district." *Easley v. Cromartie*, 532 U.S. 234, 262 n.3 (2001) (Thomas, J., dissenting). Here, in "preserving cores" and "protecting incumbents," Alabama sought to change as little as possible about their admittedly racially gerrymandered District 7 while making race-based changes to Districts 1, 2, and 3 to preserve the racial status quo.

529.     Where, as here, there was little change from the prior District 7 that Defendants admit were drawn predominantly based on race, this evidence points to race predominating.

530.     Defendants' argument that District 7 was drawn "blind," without consideration of race also fails. The "insistence that the [ ] legislature did not look at racial data in drawing [ ] districts does little to undermine [a court's] conclusion— based on evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race." 138 S. Ct. at 2553. Like in *Covington*, here there is "sufficient circumstantial evidence that race was the predominant factor governing" the drawing of District 7 "based on evidence concerning the shape and demographics" of that district. Even if the map drawer, Mr. Hinaman, did not have personal knowledge of the state's racial makeup despite turning the racial data "off," the use of racial data to maintain a floor of 55% BVAP demonstrates that District 7 was not drawn "blind."

531.     Even if we ignored that the Legislature readopted lines of racially gerrymandered districts as Defendants wish, Defendants offered no evidence to rebut Dr. Williamson's opinion that race played a predominant role in determining who the Legislature moved into, out of, and kept in the challenged districts as compared to the 2011 plan. As *ALBC* recognized, core preservation "is not directly

relevant to the origin of the new district inhabitants." 575 U.S. at 274 (emphasis omitted).

532.    Rather than confronting Plaintiffs' expert evidence, Defendants instead suggest that—because they preserved the core of a court-adopted 1992 remedial plan (as drawn by the Legislature's map-maker Mr. Hinaman who also drew HB1)—the State is forever absolved from racial gerrymandering claims. That is not so.

533.    In *Clark v. Putnam County*, for example, the Eleventh Circuit considered a racial gerrymandering challenge to two majority-Black county commission districts, the cores of which a court drew two decades earlier to resolve VRA litigation. 293 F.3d 1261, 1263 (11th Cir. 2002). The appeals court reversed the district court's ruling that there was no racial gerrymandering, even though the districts were "relatively compact, adhere to natural boundaries, preserve communities of interest, and protect incumbents." *Id.* at 1270. It instead found that the county's stated goal of "maintain[ing] the core of the existing majority minority districts" was itself direct evidence of race-based redistricting. *Id.* at 1267. The court held that race had predominated even though the map had preserved the core of the previously court-drawn districts that were first adopted to remedy a violation of the VRA. *Id.* at 1270.

534.    Similarly, a court found that race predominated in drawing the 2011 state legislative districts. *ALBC II*, 231 F. Supp. 3d at 1033. This finding occurred

even though Alabama had sought to preserve the cores of districts first adopted in a 1993 consent order. *See Ala. Leg. Black Caucus*, 989 F. Supp. at 1242, 1253, 1295-96.

535.     Together, Plaintiffs' experts' analyses of demographics, lines, and movement of people demonstrate that Plaintiffs have shown a likelihood of success on their claim that race predominated in drawing Districts 1, 2, 3, and 7.

>    *ii.      The Predominant Use of Race in Drawing Districts 1, 2, 3, and 7 is Not Narrowly Tailored to Comply with the VRA.*

536.     Because Plaintiffs have demonstrated a likelihood of success in whether race predominated in the challenged districts, strict scrutiny applies.  Under strict scrutiny, Defendants bear the burden of proving that the use of race was narrowly tailored to serve a compelling interest. *Cooper*, 137 S. Ct. at 1464. "[O]ne compelling interest is complying with operative provisions of the Voting Rights Act of 1965." *Id*. This is because there is a "significant state interest in eradicating the effects of past racial discrimination." *See Shaw*, 509 U.S. at 656.

537.     However, "race-based" districting is "narrowly tailored" to advance the VRA only when "good reasons" for drawing the specific majority-Black district at issue. *ALBC*, 575 U.S. at 278-79. A state will have "good reasons" if it conducts a "pre-enactment analysis with justifiable conclusions" of what the VRA demands before placing a significant number of minorities into a district. *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

538.     Alabama had good reasons to draw *a* majority-Black District 7. However, Alabama lacked good reason for drawing District 7 as enacted in HB 1 because, rather than satisfying the VRA, Defendants packed Black voters into District 7 at a much higher level than was necessary for the district to perform.

539.     "[A] legislature undertaking a redistricting must assess whether the new districts it contemplates (not the old ones it sheds) conform to the VRA's requirements." *Cooper*, 137 S. Ct. at 1471. To do this, the VRA "d[oes] not require a covered jurisdiction to maintain a particular numerical minority percentage" in a district. *ALBC*, 575 U.S. at 275. Rather, the VRA requires legislatures to ask: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?" *Id.* at 279.

540.     While the Court does "not insist that a legislature guess precisely what percentage" BVAP is needed, a state must have a "strong basis in evidence" for the BVAP of a challenged district. *Id.* at 278. Thus, HB1's use of race to maintain a high BVAP in District 7, which "has long elected to office black voters' preferred candidate," cannot be narrowly tailored absent a pre-enactment effort to explain "just why" HB1 needs to use race to "predominately to maintain" its elevated BVAP. *Id.* at 277.

541.     While Defendants argue that District 7 was drawn to comply with the VRA by maintaining 55% BVAP, they did not conduct a pre-enactment analysis to

determine whether that rigid cut-off was necessary to maintain an effective district for Black voters. They did not conduct a racial polarization analysis, discuss District 7's racial makeup with the incumbent, or review election returns and turnout data. *Cf. Bethune-Hill*, 137 S. Ct. at 801. Rather, the Legislature assumed that so long as a district's BVAP stayed around or over 55%, it would maintain its effectiveness at electing a Black candidate. But this presumption marks a return to "mechanical racial targets" that the Supreme Court has found unconstitutional. *ALBC*, 575 U.S. at 267.

542.      Indeed, courts have repeatedly rejected 55%-BVAP districts drawn without any localized effectiveness analysis. *See, e.g.*, *Bethune-Hill II*, 326 F. Supp. 3d at 178 (finding that 11 districts drawn using a 55% BVAP floor were not narrowly tailored because the state failed to conduct any pre-enactment analysis to justify this floor and where the plaintiffs' expert showed that the districts would remain effective with lower BVAPs); *Page v. Va. State Bd. of Elections*, No. 3:13cv678, 2015 WL 3604029, at *17-18 (E.D. Va. June 5, 2015) (three-judge court) (the state's decision to increase the BVAP in a challenged district from 53% to 56% was not narrowly tailored where the district had always elected Black-preferred candidates); *Smith v. Beasley*, 946 F. Supp. 1174, 1210 (D.S.C. 1996) (three-judge court) (rejecting a state's use of a 55% BVAP safe harbor in the absence of district-specific

"evidence as to registration or voter turnout"). Alabama's use of a 55% BVAP for District 7 does not show narrow tailoring to comply with the VRA.

543.    Furthermore, Plaintiffs have presented evidence demonstrating that, had defendants performed pre-enactment analyses, they would have discovered that Black voters could elect candidates of their choice if District 7 had a BVAP below 55%. Plaintiffs' expert Dr. Liu determined that District 7 would remain effective with a BVAP as low as just over 50%, despite the existence of significant racial bloc voting. Exh. M4 at 16-17. Recent election results also show that a lower BVAP would comply with the VRA: Black preferred candidates have won reelection in District 7 with over 72% of vote in every election from 2002 to 2012 and, after 2012, faced no opposition at all. Doc. 53 ¶¶ 47-50.

544.    Because Defendants did not perform any analysis to determine the percentage of Black voters the VRA requires to be included in District 7, they lacked "good reason" for drawing a district with approximately 55% BVAP and 59% Black registered voters.

545.    "[I]n the absence of any investigation into what § 2 might require," Defendants "lack[ ] any basis to argue that it had good reasons to believe § 2 of the VRA required . . . race-based boundaries." *Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270, 1289 (10th Cir. 2019); *see also Abbott*, 138 S. Ct. at 2334 (the state lacked a "good reason" where it failed to analyze racially polarized voting or conduct more

than cursory reviews of election results); *Cooper*, 137 S. Ct. at 1490 & n.5 (statewide polarization analyses were insufficient to justify the BVAPs of specific districts).

546.     The Court therefore finds that Defendants failed to meet their burden to show that they narrowly tailored their predominant use of race in drawing District 7.

547.     As to Districts 1, 2, and 3, on the other hand, Defendants do not argue that the VRA or any other compelling government interest justified their predominant use of race to crack Black voters in these districts. *Cf. LULAC*, 548 U.S. at 440 (the state's cracking of cohesive minority voters in a manner that prevented the formation of an additional effective minority district violated Section 2 and "could give rise to an equal protection violation").

548.     The consideration of race in drawing district lines does not per se violate the Fourteenth Amendment. *See Bush*, 517 U.S. at 958. Even using race as a predominant factor is not unconstitutional if used in a narrowly tailored manner to comply with Section 2 of the Voting Rights Act. *See Bethune-Hill*, 137 S. Ct. at 801.

549.     It is undisputed that Defendants conducted no analysis whatsoever here to determine whether a 55% BVAP or lower was necessary for District 7. And Defendants offered no justification for the cracking of Black voters among Districts 1, 2, and 3.

550.     Therefore, the Court concludes that Defendants did not meet their burden to show that they narrowly tailored their predominant use of race in drawing Districts 1, 2, and 3.

F.     <u>Plaintiffs Have Shown a Likelihood of Success on Their Claim That HB 1 violates the Fourteenth Amendment to the U.S. Constitution.</u>

551.     Plaintiffs presented strong evidence showing that race predominated in the Alabama Legislature's drawing of Congressional Districts 1, 2, 3, and 7. Defendants have failed to show that their use of race in drawing these districts was narrowly tailored to comply with the VRA or any other compelling state interest. This Court therefore concludes that Plaintiffs have shown a clear likelihood of success on their claim that Districts 1, 2, 3, and 7 as drawn by the 2021 Legislature violate the Fourteenth Amendment to the U.S. Constitution.

G.     <u>Plaintiffs Satisfy *Winter*'s Equitable Factors</u>

    i.     *Plaintiffs face irreparable harm absent injunctive relief*

552.     Upon finding that State's legislative apportionment scheme unconstitutional, a court must "tak[e] appropriate action to [e]nsure that no further elections are conducted under the invalid plan" absent an "unusual case." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). This case is regrettably typical.

553.     So long as HB1 remains in force, it compels Plaintiffs to vote under a plan that violates Section 2. This harm, once realized, "cannot be undone through

monetary remedies." *Dillard*, 640 F. Supp. at 1363; *see also Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010).

554.    Courts have "routinely" found that restrictions on fundamental voting rights threaten irreparable injury. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also Dillard*, 640 F. Supp. at 1363. This reflects the unremarkable principle that "[o]nce an election occurs, there can be no do-over and no redress." *League of Women Voters*, 769 F.3d at 247. That principle is no less true here.

555.    HB1 codifies districts that make Black voters an "excessive majority" in CD 7, *Gingles*, 478 U.S. at 46 n.11, then spreads them throughout CDs 1, 2, and 3 to prevent a Black voting majority from forming anywhere else. The consequence: "An unequal opportunity for minority voters to participate in the political process and elect representatives of their choosing." *Fayette*, 775 F.3d at 1342. If nothing is done to enjoin HB1, "[t]he injury to [] voters is real and completely irreparable." *League of Women Voters*, 769 F.3d at 247 & n.5.

    *ii.    A Preliminary Injunction Serves the Public Interest*

556.    The "protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("*Cox*"). This is true if HB1 violates the VRA, *Ga. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d

1338, 1349-50 (N.D. Ga. 2015), or infringe upon rights that the Constitution confers, *see Jones v. Governor of Fla*., 950 F.3d 795, 806-07 (11th Cir. 2020).

557.     Plaintiffs' requested injunction would protect their franchise-related rights by allowing them to participate in elections where districts are drawn in accordance with the VRA and the Black electorate's vote is not diluted. Because the Voting Rights Act "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination," *Chisom v. Roemer*, 501 U.S. 380, 403 (1991), "many courts have prevented elections from occurring under unconstitutional plans," *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 361 F. Supp. 3d 1296, 1301 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

558.     Withholding an injunction would compromise those same rights. Between these alternatives, the public interest is "best served by ensuring . . . that all citizens . . . have an equal opportunity to elect the representatives of their choice." *Fayette Cnty.*, 118 F. Supp. 3d at 1349-50 (quoting *Cox*, 408 F.3d at 1355); *see also United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest."); *Harris v. McCrory*, No. 1:13CV949, 2016 WL 6920368, at *2 (M.D.N.C. Feb. 9, 2016) ("The public has an interest in having congressional representatives elected in accordance with the Constitution.").

   *iii.*   *The Balance of Equities Weighs Heavily in Favor of Granting Plaintiffs*
           *Injunctive Relief*

559.    The irreparable harm Plaintiffs face absent injunctive relief outweighs any risk of administrative inconvenience and voter confusion.

560.    The harm Plaintiffs face is concrete and, left unremedied, irreparable. By contrast, Defendants' claimed interest in meaningful public involvement is undermined by their own conduct, and the administrative costs they face are primarily self-inflicted. *Cox*, 408 F.3d at 1355 (The harm of impeding upon Plaintiffs' franchise-related rights supports a preliminary injunction when "the harm and costs threatened to the state . . . [are] minimal, if they exist[] at all.")

561.    Until recently, Defendants showed little interest in keeping the public informed as to the redistricting process. The Reapportionment Committee began developing redistricting plans in May of 2021. Doc. 53 ¶ 80. For four months, the Committee developed these maps without any benefit of public comment. Doc. 53 ¶¶ 90, 92, 94.

562.    The Legislative Reapportionment Office held 28 hearings on the redistricting process in a 16-day period in September—all but one during the hours of 9:00 a.m. to 5:00 p.m. Doc. 53 ¶¶ 84-85, 92, 94. This schedule was not chosen with working Alabamians in mind. And by failing to provide draft maps or proposals to attendees, the Committee only strengthened the inference that it was not granting the public meaningful access to the redistricting process.

563.     The timeline for enacting HB1 also supports this conclusion. The Committee released its proposed maps to the public on October 26, 2021. Doc. 53 ¶ 89. The State Legislature convened two days later and passed HB1 less than a week after that. Doc. 53 ¶ 88, 182.

564.     Defendants only claim an interest in transparency and public involvement now that it serves their effort to thwart proposed injunctive relief.

565.     Moreover, the administrative costs of adopting a new congressional map are unproven or self-inflicted and can be minimized. As a preliminary matter, Defendants argue that new maps will displace candidates who have already spent significant time and money toward their campaigns from their current districts. Defendants provide no evidence of this. Even if there is any such evidence, it is within Defendants' control account for these candidates' interests when drawing a new map.

566.     Defendants' remaining administrability concerns, are even less weighty as they involve burdens that the State placed upon itself. The VRA places an obligation on officials charged with drawing district lines to make an effort to ensure redistricting plans do not result in minority vote dilution. In this case, however, the Reapportionment Committee made no effort to assess whether the VRA might affect the structure of Alabama's Congressional districts.

567.     The Reapportionment Committee provided no racial-polarization analysis for any districts to its members, despite having several months to do so. Doc. 53 ¶ 98. And it placed the goal of preserving the congressional districts' racially gerrymandered cores over other traditional—and permissible—districting factors. *See* Doc. 53 ¶ 62.

568.     Defendants chose to adopt maps drawn on suspect grounds less than three months before the deadline for Alabamians to announce their candidacy. In doing so, they all but guaranteed the very post-enactment challenges that they now label "last-minute." The administrative burdens that flow from the exigency Defendants created do not outweigh an irreparable harm to Plaintiffs' franchise-related rights.

569.     Defendants have time to adopt a redistricting plan that contains two effective majority-Black districts. The Committee, the Legislature, and the Governor have all shown themselves capable of evaluating and approving redistricting plans on an abbreviated timeline. Though they could not say with certainty, both Plaintiffs and the map drawer, Mr. Hinaman, have estimated that a new compliant redistricting plan can likely be drawn in a matter of days or weeks. Jan. 12 Tr. 1922:9-1923:22; Exh. M11 at 113:6-19.

H.    Constitutional Avoidance

570.    Although the *Milligan* Plaintiffs have shown a substantial likelihood of success on their statutory and constitutional claims, the doctrine of constitutional avoidance permits courts to "not decide a constitutional question if there is some other ground upon which to dispose of the case." *See Escambia Cnty. v. McMillan*, 466 U.S. 48, 51 (1984) (vacating a finding that an election scheme violated the Constitution and requiring the lower courts to consider the Section 2 claim only).

571.    Because a "finding of liability under section 2 would obviate the necessity to decide the [constitutional] claims," the Court declines to decide or award relief based on the *Singleton* or *Milligan* Plaintiffs' racial gerrymandering claims. *See Lee Cnty. Branch of the NAACP v. City of Opelika*, 748 F.2d 1473, 1478 (11th Cir. 1984) (Section 2 claims should be decided before constitutional claims).

I.    Remedial Relief

572.    The Court hereby enjoins Defendants from qualifying candidates and conducting any forthcoming elections under the congressional map in H.B. 1.

573.    The Court extends the candidate qualifying deadline from January 28 to February 28, 2022. *See Wright*, 979 F.3d at 1286; *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437 (11th Cir. 1988); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004) (three-judge court).

574.     Because the judiciary should not intrude on legislative policy any more than necessary, the Court must give the Legislature the first opportunity to suggest a legally acceptable plan to remedy the Section 2 violation. *See Upham v. Seamon*, 456 U.S. 37, 41 (1982); *White v. Weiser*, 412 U.S. 783, 794-95 (1973); *Tallahassee Branch of NAACP v. Leon Cnty.*, 827 F.2d 1436, 1438 (11th Cir. 1987) ("*Leon Cnty.*").

575.     The Court therefore gives Defendants fourteen days to submit a remedial plan of this opinion. Given the representations of Defendants' counsel, Jan. 12 Tr. 1922-23, this is enough time for the Legislature, which is now in session, to devise a remedy. *See Covington*, 138 S. Ct. at 2550 (giving a legislature one month); *Thomas v. Bryant*, 919 F. 3d 298, 312-13 (5th Cir. 2019) (19 days); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 352 (N.D.N.Y. 2015) (21 days).

576.     The Legislature enjoys broad discretion in devising a remedy for the identified Section 2 violation and may consider a wide range of potential remedies. *Cf. Bartlett*, 556 U.S. at 23 ("Much like § 5, § 2 allows States to choose their own method of complying with the Voting Rights Act . . . ."); *Leon Cnty.*, 827 F.2d at 1441 (noting that a legislative plan can contain multi-member districts, but a court devised plan "must give preference to single-member districts." (Godbold, J., dissenting)).

577.     This includes the discretion to decide whether to devise a map containing two majority-Black districts or two "crossover" districts (or a combination of the two) in which Black voters are less than a majority in the districts but remain "large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the [Black-]preferred candidate." *Bartlett*, 556 U.S. at 13; *see also id.* at 23 ("The option to draw such districts gives legislatures a choice that can lead to less racial isolation, not more."); *Cooper*, 137 S. Ct. at 1470 (Section 2 did not require majority-Black districts in a state where 46% to 48% BVAP districts consistently led to the election of Black-preferred candidates).

578.     Courts have long recognized that Section 2 does not necessarily require the creation of majority-Black districts to remedy a violation. *See, e.g.*, *Branch v. Smith*, 538 U.S. 254, 309-10 (2003) (O'Connor, J., concurring in part); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1560 n.24 (11th Cir. 1984); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056-LSC, 2019 WL 5172371, at *2 (N.D. Ala. Oct. 11, 2019); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 219 F. Supp. 3d 949, 958 (E.D. Mo. 2016); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 449 (S.D.N.Y. 2010); *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 770 (N.D. Ohio 2009); *Dillard v. Chilton Cnty. Bd. of Educ.*, 699 F. Supp. 870, 875 (M.D. Ala. 1988), *aff'd*, 868

F.2d 1274 (11th Cir. 1989) (Table); *Dillard v. Town of Cuba*, 708 F. Supp. 1244, 1245 (M.D. Ala. 1988).

579.    If the Legislature submits a remedial plan that meets constitutional and statutory requirements while preserving state preferences, the Court must accept that remedial plan. *See Edge v. Sumter Cnty. Sch. Dist.*, 775 F.2d 1509, 1512 (11th Cir. 1985).

580.    Nevertheless, while Section 2 does not guarantee electoral success for Black-preferred candidates, *LULAC*, 548 U.S. at 428, the Court "cannot authorize an element of an election proposal that will not with certitude completely remedy the Section 2 violation." *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252 (11th Cir. 1987) (emphasis omitted).

581.    For that reason, the Court cautions the Legislature that the remedial map must contain two districts that provide Black voters with a "realistic opportunity" to consistently elect candidates of their choice. *See Wright*, 979 F.3d at 1299 (internal quotations omitted).

582.    A "realistic opportunity" does not exist in districts where racially polarized voting means that Black-preferred candidates usually suffer defeat. *Cf. Abrams v. Johnson*, 521 U.S. 74, 94 (1997) (finding that reducing a majority-minority district's Black population would violate Section 2 because "the probability of electing a candidate is below 50% when the percentage of black registered voters

is 50%"). Determining the BVAP necessary to ensure that a remedial district meets this standard requires a fact-intensive inquiry into the registration, turnout and other data before this Court. *Cf. ALBC*, 575 U.S. at 278 (requiring a state to inquire into the BVAP necessary for an opportunity district to elect Black-preferred candidates).

583.    The evidence of racially polarized voting in this case shows that a "realistic opportunity" to elect likely requires districts that approach or surpass a majority Black voting-age population. *See Supra* ¶¶ 352-57.

584.    If the Legislature chooses to draw a remedial plan containing two such crossover districts that completely remedy the Section 2 violation by offering Black voters a realistic opportunity to elect their preferred candidates, then this Court must—and will—accept that plan. *See Perry v. Perez*, 565 U.S. 388, 393 (2012).

585.    If the Legislature fails to act within fourteen days or fails to draw two effective remedial districts, however, then the Court must take up the unhappy task of devising a remedy. *See Covington*, 138 S. Ct. at 2554.

586.    To the extent that the "clear evidence" standard applies to any aspect of the injunctive relief in this Court's decision, the Court finds and holds that Plaintiffs have established each of the preliminary injunction factors by clear evidence.

587.    Should Defendants choose to request that the Court alter additional deadlines beyond the candidate declaration date, the Court will accept briefing on this point and consider doing so at the State's request. The Court notes that this

decision is not issuing on the eve of an election—indeed, the primary is still four months away.

588.    "[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). The Court has a "duty to cure" violations of federal law "through an orderly process in advance of elections." *Covington*, 138 S. Ct. at 2553.

589.    The Court is therefore taking appropriate action to ensure that no election is conducted under a plan that Plaintiffs have shown to be statutorily and constitutionally infirm. Again, no election is imminent, and Defendants have not shown that "the mechanics and complexities of state election laws" weigh against this Court taking action to ensure that Alabama's representatives—who will be elected in the November general election—are from districts that are statutorily and constitutionally sound. *Reynolds*, 377 U.S. at 585.

Respectfully submitted,

DATED this 14th day of January 2022.

/s/ Deuel Ross
Deuel Ross*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org

Shelita M. Stewart*
Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*
Harmony A. Gbe*

/s/ Sidney M. Jackson
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Davin M. Rosborough
Davin M. Rosborough*
Julie Ebenstein*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org

/s/ LaTisha Gotell Faulks
LaTisha Gotell Faulks (ASB-1279-I63J)
Kaitlin Welborn*
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org
kwelborn@aclualabama.org

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400

HOGAN LOVELLS US LLP                   blayne.thompson@hoganlovells.com
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com       ***Attorneys for Plaintiffs***
harmony.gbe@hoganlovells.com

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record.

This the 14th day of January 2022.


*/s/ Deuel Ross*
COUNSEL FOR PLAINTIFFS