FILED
2022 Jan-18 PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ALABAMA
 2                       SOUTHERN DIVISION

 3

 4      BOBBY SINGLETON, et al.,          *
                   Plaintiffs,            *   2:21-cv-1291-AMM
 5                                         *   January 4, 2022
        vs.                               *   Birmingham, Alabama
 6                                         *   9:00 a.m.
        JOHN MERRILL, in his official *
 7      capacity as Alabama Secretary *
        of State, et al.,                  *
 8                   Defendants.           *
        *******************************
 9                                         *
        EVAN MILLIGAN, et al.,             *
10                   Plaintiffs,           *   2:21-cv-1530-AMM
                                           *
11      vs.                               *
                                           *
12      JOHN MERRILL, in his official *
        capacity as Alabama Secretary *
13      of State, et al.,                  *
                     Defendants.           *
14      *******************************
                                           *
15      MARCUS CASTER, et al.,            *
                     Plaintiffs,           *   2:21-cv-1536-AMM
16                                         *
        vs.                               *
17                                         *
        JOHN MERRILL, in his official *
18      capacity as Alabama Secretary *
        of State, et al.,                  *
19                   Defendants.           *
        *******************************
20

21

           TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
22                     VIA ZOOM CONFERENCE
                          VOLUME I
23         BEFORE THE HONORABLE ANNA M. MANASCO,
                THE HONORABLE TERRY F. MOORER,
24              THE HONORABLE STANLEY MARCUS

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2 Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
3  and Procedures Vol. VI, Chapter III, D.2.  Transcript
produced by computerized stenotype.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                          APPEARANCES

2
       FOR THE SINGLETON PLAINTIFFS:
3
       James Uriah Blacksher
4      JAMES U. BLACKSHER, ATTORNEY
       825 Linwood Road
5      Birmingham, AL 35222
       205-612-3752
6      Fax: 866-845-4395
       Email: Jublacksher@gmail.com
7
       Myron C Penn
8      PENN & SEABORN LLC
       53 Highway 110
9      PO Box 5335
       Union Springs, AL 36089
10     334-738-4486
       Fax: 334-738-4432
11     Email: Myronpenn28@hotmail.com

12     Joe R Whatley, Jr
       WHATLEY KALLAS LLP
13     2001 Park Place North Suite 1000
       Birmingham, AL 35203
14     205-488-1200
       Fax: 800-922-4851
15     Email: Jwhatley@whatleykallas.com

16     Henry C Quillen
       WHATLEY KALLAS LLP
17     159 Middle Street Suite 2D
       Portsmouth, NH 03801
18     603-294-1591
       Fax: 800-922-4851
19     Email: Hquillen@whatleykallas.com

20     W Tucker Brown
       WHATLEY KALLAS LLC
21     P.O. Box 10968
       Birmingham, AL 35202-0968
22     205-488-1200
       Fax: 800-922-4851
23     Email: Tbrown@whatleykallas.com

24

25
</pre>

```
 1          Diandra "Fu" Debrosse Zimmermann
            DICELLO LEVITT GUTZLER
 2          420 20th Street North
            Suite 2525
 3          Birmingham, AL 35203
            205-855-5700
 4          Fax: 205-855-5784
            Email: Fu@dicellolevitt.com
 5
            Eli Joseph Hare
 6          DICELLO LEVITT GUTZLER LLC
            420 20th Street North, Suite 2525
 7          Birmingham, AL 35203
            205-855-5700
 8          Fax: 205-855-5784
            Email: Ehare@dicellolevitt.com
 9

10          FOR THE MILLIGAN PLAINTIFFS:

11
            Deuel Ross
12          NAACP LEGAL DEFENSE &
            EDUCATIONAL FUND, INC.
13          700 14th Street N.W. Ste. 600
            Washington, DC 20005
14          (202) 682-1300
            Dross@naacpldf.org
15
            Leah Aden
16          Stuart Naifeh
            Kathryn Sadasivan
17          Brittany Carter
            NAACP LEGAL DEFENSE &
18          EDUCATIONAL FUND, INC.
            40 Rector Street, 5th Floor
19          New York, NY 10006
            (212) 965-2200
20          Laden@naacpldf.org
            Snaifeh@naacpldf.org
21
            Davin M. Rosborough
22          Julie Ebenstein
            AMERICAN CIVIL LIBERTIES
23          UNION FOUNDATION
            125 Broad St.
24          New York, NY 10004
            (212) 549-2500
25          Drosborough@aclu.org
            Jebenstein@aclu.org
```

```
1        Kaitlin Welborn
         LaTisha Gotell Faulks
2        AMERICAN CIVIL LIBERTIES UNION
         OF ALABAMA
3        P.O. Box 6179
         Montgomery, AL 36106-0179
4        (334) 265-2754
         Kwelborn@aclualabama.org
5        Tgfaulks@aclualabama.org

6        David Dunn
         HOGAN LOVELLS US LLP
7        390 Madison Avenue
         New York, NY 10017
8        (212) 918-3000
         David.dunn@hoganlovells.com
9
         Michael Turrill
10       Harmony A. Gbe
         HOGAN LOVELLS US LLP
11       1999 Avenue of the Stars
         Suite 1400
12       Los Angeles, CA 90067
         (310) 785-4600
13       Michael.turrill@hoganlovells.com
         Harmony.gbe@hoganlovells.com
14
         Shelita M. Stewart
15       Jessica L. Ellsworth
         HOGAN LOVELLS US LLP
16       555 Thirteenth Street, NW
         Washington, D.C. 20004
17       (202) 637-5600
         Shelita.stewart@hoganlovells.com
18
         Blayne R. Thompson
19       HOGAN LOVELLS US LLP
         609 Main St., Suite 4200
20       Houston, TX 77002
         (713) 632-1400
21       Blayne.thompson@hoganlovells.com

22

23

24

25
```

```
 1      Sidney M. Jackson
        Nicki Lawsen
 2      WIGGINS CHILDS PANTAZIS
        FISHER & GOLDFARB, LLC
 3      301 19th Street North
        Birmingham, AL 35203
 4      Phone: (205) 341-0498
        Sjackson@wigginschilds.com
 5      Nlawsen@wigginschilds.com

 6

 7      FOR THE CASTER PLAINTIFFS:

 8      Abha Khanna
        ELIAS LAW GROUP LLP
 9      1700 Seventh Avenue, Suite 2100
        Seattle, WA 98101
10      206-656-0177
        Email: AKhanna@elias.law

11

12      Aria C Branch
        ELIAS LAW GROUP LLP
13      10 G St NE, Suite 600
        Washington, DC 20002
14      202-968-4490
        Fax: 202-968-4498
        Email: ABranch@elias.law

15

16      Daniel C Osher
        ELIAS LAW GROUP
17      10 G Street NE
        Suite 600
18      Washington, DC 20002
        202-968-4490
19      Email: DOsher@elias.law

20      Joseph N. Posimato
        Elias Law Group LLP
21      10 G Street, NE; Suite 600
        Washington, DC 20002
22      202-968-4518
        Email: Jposimato@elias.law

23      Lalitha D Madduri
        ELIAS LAW GROUP LLP
24      10 G Street NE, Suite 600
        Washington, DC 20002
25      202-968-4490
        Email: Lmadduri@elias.law
```

1    Olivia N. Sedwick
     Elias Law Group LLP
2    10 G Street, NE; Suite 600
     Washington, DC 20002
3    202-968-4518
     Email: Osedwick@elias.law

4

5    Richard P Rouco
     QUINN CONNOR WEAVER DAVIES & ROUCO LLP
6    Two North Twentieth Street
     2 20th Street North
7    Suite 930
     Birmingham, AL 35203
8    205-870-9989
     Fax: 205-803-4143
9    Email: Rrouco@qcwdr.com

10

11

12   <u>FOR THE DEFENDANT</u>:

13   Andrew Reid Harris
     OFFICE OF THE ATTORNEY GENERAL
14   CONSTITUTIONAL DEFENSE DIVISION
     501 Washington Avenue
15   Montgomery, AL 36130
     334-353-8891
16   Email: Reid.Harris@AlabamaAG.gov

17   Benjamin Matthew Seiss
     ALABAMA OFFICE OF THE ATTORNEY GENERAL
18   P.O. Box 300152
     501 Washington Ave (36104)
19   Montgomery, AL 36130
     334-353-8917
20   Fax: 334-353-8400
     Email: Ben.seiss@alabamaag.gov
21
     Brenton Merrill Smith
22   OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
     P.O. Box 300152
23   501 Washington Avenue
     Montgomery, AL 36130
24   334-353-4336
     Fax: 334-353-8400
25   Email: Brenton.Smith@AlabamaAG.gov

Edmund Gerard LaCour, Jr.
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36104
334-242-7300
Fax: 334-242-4891
Email: Edmund.Lacour@AlabamaAG.gov

James W Davis
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152
334-242-7300
Fax: 334-353-8400
Email: Jim.davis@alabamaag.gov

Misty Shawn Fairbanks Messick
OFFICE OF THE ATTORNEY GENERAL
FOR THE STATE OF ALABAMA
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152
334-242-7300
Fax: 334-353-8440
Email: Misty.Messick@AlabamaAG.gov

Alexander Barrett Bowdre
OFFICE OF THE ALABAMA ATTORNEY GENERAL
P.O. Box 300152
Montgomery, AL 36130
334-242-7300
Fax: 334-353-8400
Email: Barrett.Bowdre@alabamaAG.gov

Thomas Alexander Wilson
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Street
Montgomery, AL 36103
334-242-7300
Fax: 334-353-8400
Email: Thomas.wilson@alabamaAG.gov

```
 1        J Dorman Walker
          BALCH & BINGHAM LLP
 2        P O Box 78
          Montgomery, AL 36101
 3        334-834-6500
          Fax: 334-269-3115
 4        Email: Dwalker@balch.com

 5

 6

 7

 8

 9        COURTROOM DEPUTY:  Frankie N. Sherbert

10

11        COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           <u>I N D E X</u>

2

3    BOBBY SINGLETON                              35
     DIRECT EXAMINATION                          35
4    BY MR. PENN
     CROSS-EXAMINATION                           55
5    BY MR. DAVIS
     REDIRECT EXAMINATION                        69
6    BY MR. PENN
     RECROSS-EXAMINATION                         71
7    BY MR. DAVIS
     CROSS-EXAMINATION                           74
8    BY MR. WALKER

9
     DR. NATALIE DAVIS                           77
10   DIRECT EXAMINATION                          77
     BY MR. BLACKSHER
11   CROSS-EXAMINATION                           90
     BY MR. LACOUR
12   CROSS-EXAMINATION                          121
     BY MR. ROSS
13

14   EVAN MILLIGAN                              125
     DIRECT EXAMINATION                         125
15   BY MS. CARTER
     CROSS-EXAMINATION                          145
16   BY MR. WALKER
     REDIRECT EXAMINATION                       159
17   BY MS. CARTER
     RECROSS-EXAMINATION                        161
18   BY MR. BLACKSHER

19
     DR. KOSUKE IMAI                            163
20   DIRECT EXAMINATION                         163
     BY MS. EBENSTEIN
21   CROSS-EXAMINATION                          206
     BY MR. SMITH

22

23

24

25

**P R O C E E D I N G S**

1 (In open court.)

2 JUDGE MARCUS:  Good morning, ladies and gentlemen.  I

3 am not sure we have everyone here.  Judge Manasco, I see you

4 are here.  Judge Moorer?

09:01:07 5

6 JUDGE MOORER:  I'm here.

7 JUDGE MARCUS:  Okay.  Good morning to all of you.  And

8 we are about to commence the three cases, the two consolidated

9 cases Milligan versus Merrill and Singleton v. Merrill, which

09:01:30 10 is before the three-judge panel, and the Caster case, Caster v.

11 Merrill, which is before Judge Manasco.

12 Let me ask you at the outset, counsel, if you would be

13 kind enough to state your appearances on the record.  First for

14 the Singleton plaintiffs.

09:01:55 15 MR. BLACKSHER:  Judge?

16 JUDGE MARCUS:  I'm sorry.  We are having trouble

17 hearing you, Mr. Blacksher.  The sound is kind of

18 reverberating.  Am I the only one?  Judge Manasco, were you

19 having difficulty, as well?

09:02:18 20 JUDGE MANASCO:  I was.  There's a lot of feedback.

21 JUDGE MARCUS:  Yes.  Mr. Blacksher, can you hear us

22 okay?

23 THE COURTROOM DEPUTY CLERK:  When you have multiple

24 people in a room, you want to mute everybody unless you're

09:02:34 25 speaking, and that will help on the reverb.  If you are

1  speaking, then you can unmute.

2          JUDGE MARCUS:  Right.  Mr. Blacksher, you will have to

3  unmute yourself just to state your appearance.  Mr. Blacksher

4  is muted, Frankie.  Is there some way we can communicate with

09:02:56  5  him and ask him to unmute himself?

6          MR. PENN:  This is Myron Penn for the Singleton

7  plaintiffs.

8          JUDGE MARCUS:  Good morning, Mr. Penn.  We hear you

9  just fine.  I just wanted to make sure that all of you,

09:03:14  10  including Mr. Blacksher, are able to hear, as well as see us as

11  we proceed.

12      Mr. Blacksher, can you hear us okay now?

13          MR. BLACKSHER:  I can hear you, Your Honor.

14          JUDGE MARCUS:  The only problem we're having,

09:03:33  15  Mr. Blacksher, is that when you speak, the sound reverberates.

16  It may be that are there other people in the room, or are you

17  perhaps too close to the microphone?  We're not hearing you,

18  Mr. Blacksher, because you're muted.  Let me go through the

19  other counsel in the mean time.

09:04:07  20          MR. BLACKSHER:  Hello.  Can you hear me now?

21          JUDGE MARCUS:  I hear you just fine.

22          MR. BLACKSHER:  Okay.  Apparently we need to be

23  unmuted on at least one microphone in this room and muted in

24  the others, and we're working on it right now.

09:04:24  25          JUDGE MARCUS:  Okay.  And for the Merrill -- we

```
 1  know --

 2          MR. WHATLEY:  Your Honor, also for the Singleton

 3  plaintiffs is Joe Whatley and Henry Quillen from Whatley

 4  Callis.

 5          JUDGE MARCUS:  Okay.

 6          MR. HARE:  Eli Hare, as well for Singleton plaintiffs.

 7          JUDGE MARCUS:  Okay.  And for Milligan?

 8          MR ROSS:  Your Honor, Deuel Ross for the Milligan

 9  plaintiffs.

10          JUDGE MARCUS:  And finally for Caster.

11          MR. ROUCO:  Your Honor, Richard Rouco on behalf of the

12  Caster plaintiffs.  I think there are others on for.

13          JUDGE MARCUS:  Fine.  Ms. Khanna, you can hear us

14  okay, as well?

15          MS. KHANNA:  I can.  Abba Khanna for the Caster

16  plaintiffs, also Lali Madduri and Dan Osher for the Caster

17  plaintiffs, as well.

18          JUDGE MARCUS:  Also I should tell you, Ms. Khanna, at

19  the very end you were kind of reverberating, as well.  So as we

20  proceed throughout the day and in the days ahead, if anyone has

21  any problem seeing or hearing us, please let us know, and we'll

22  take whatever time we need to make sure that everybody is

23  properly tuned in.

24      Mr. Davis, welcome.  Mr. LaCour, welcome.  Mr. Walker?  I

25  don't see Mr. Walker.  There you are.  Good morning, as well,
```

1    Mr. Walker.

2              MR. WALKER:  Good morning, Your Honor.

3              JUDGE MARCUS:  Frankie, is there a reason we're

4    getting this kind of reverberation for counsel?  We have had it

09:06:09 5    now for a variety of the lawyers.

6              THE COURTROOM DEPUTY CLERK:  No, sir.  Not that I know

7    of.  Is everybody on a hard line that's having issues?  Can you

8    check to make sure that if more than one person is in the room

9    that everybody is muted.

09:06:34 10              JUDGE MARCUS:  So you need to stay muted unless you're

11   actually speaking.  That's the key element here, Frankie?

12              THE COURTROOM DEPUTY CLERK:  Yes.  Yes, sir.

13              JUDGE MARCUS:  Okay.  With that, let me begin by --

14              JUDGE MANASCO:  Judge Marcus, I think we still have

09:06:52 15   people in the waiting room who need to be admitted.  There may

16   be additional counsel wishing to state an appearance, so if our

17   courtroom deputy could admit them, please, that would be great.

18              JUDGE MARCUS:  Let me know, Judge Manasco, when we

19   have everyone.

09:07:07 20              JUDGE MANASCO:  I see now that the waiting room is

21   empty.  So as long as whomever just joined us can state their

22   appearance, then I think we are good to go.

23              JUDGE MARCUS:  So we have counsel for Singleton,

24   counsel for Milligan, counsel for the state, counsel for

09:07:24 25   McClendon and Pringle, counsel for Caster.

1    Have I missed anybody?

2    Okay.  With that, one thing that we thought we might do at

3  the outset was to receive those exhibits being offered by each

4  of the parties about which there is no objection.

09:07:48  5    So with that, we thought we would start first with the

6  Milligan exhibits, and we're working off of the second amended

7  exhibit list, the joint pretrial stip.  I know there have been

8  some additional exhibits that were offered, et cetera, that

9  we'll get to.  But working off that list, Milligan exhibits, if

09:08:16 10  I have this -- if I have this right, on the Milligan exhibits

11  -- and, Mr. Ross, you can correct me if I have got this wrong

12  -- Milligan 1 through 46 are being offered without objection.

13  Do I have that right?

14    MR. ROSS:  I believe so, Your Honor.  I'm just double

09:08:45 15  checking.  I'm sorry.

16    JUDGE MARCUS:  That's all right.  I just thought we

17  would cut to the chase and admit the exhibits that everyone had

18  agreed to and were stipulated to.

19    So on the Milligan ones, my records reflect that Milligan

09:09:00 20  1 through 46 were being offered without objection.

21    MR. ROSS:  Yes, Your Honor.  And Milligan 49 and 50

22  are also being offered without objection.

23    JUDGE MARCUS:  And I am going to get -- I will take

24  them piece by piece.  1 to 46 seeing no objection.  Again, I

09:09:17 25  take it there are no objections from Mr. Davis from the state

1  or Mr. Walker?

2          MR. DAVIS:  That's correct, Judge.  We have no

3  objection to 1 through 46.

4          JUDGE MARCUS:  Okay.  They're received in evidence.

09:09:33  5     47 and 8 there were objections to, so we will reserve on

6  those and take them up when they come up.

7      Milligan 49 and Milligan 50 were being offered, as well,

8  without objection, correct?  Mr. Ross?

9          MR. DAVIS:  Correct, Your Honor.

09:09:54 10          JUDGE MARCUS:  And there were objections to 47 and 48

11  -- Milligan 47 and 48.  Does that cover for your exhibits,

12  Mr. Ross?

13          MR. ROSS:  Yes, Your Honor.  I don't know if the Court

14  wanted to wait until later to address the state's objections to

09:10:19 15  those two exhibits or --

16          JUDGE MARCUS:  Yeah.  I thought we would wait until we

17  reach the point in the proceeding when you actually want to

18  offer it.  And at that point, we will be able to hear the

19  objections, and we will probably reserve and give you rulings

09:10:35 20  later with regard to that.

21      But so the record is clear, M-1 through 46 and 49 and 50

22  are received without objection.

23      Let's turn to the Singleton exhibits, if we can.  And

24  should we turn to you, Mr. Blacksher, with regard to these?

09:11:00 25          MR. QUILLEN:  This is Mr. Quillen.  I will handle the

1  Singleton exhibits.

2          JUDGE MARCUS:  Okay.  As I have it, Singleton 1 to 31

3  were offered without objection.  Do I have that right?

4          MR. QUILLEN:  That's correct.

09:11:17 5          JUDGE MARCUS:  All right.  Does anyone have any

6  objection to Singleton 1 to 31?  Seeing none, Singleton 1 to 31

7  all received in evidence.

8      I note that there was an objection to Singleton 32, 33,

9  and 34.  If I have that right, Mr. Quillen?

09:11:39 10          MR. QUILLEN:  Yes.

11          JUDGE MARCUS:  And we will reserve on those.  And when

12  you want to offer them, we will be able to address any

13  arguments with regard to those exhibits.

14      The next group was Singleton 35 to Singleton 41 inclusive.

09:11:56 15  I understand there are no objections to those, as well.  Do I

16  have that right, Mr. Quillen?

17          MR. QUILLEN:  Yes, Your Honor.

18          JUDGE MARCUS:  And then there were objections to

19  Singleton 42 and 43.  So we will reserve on those.

09:12:12 20      Singleton 44 and 45, there were no objections, correct?

21          MR. QUILLEN:  Correct, Your Honor.

22          JUDGE MARCUS:  All right.  Seeing none, we'll receive

23  Singleton 44 and 45 into the record without objections.

24      I understand, as well, that there were no objections to

09:12:30 25  Singleton's 46 to 50 inclusive.  Do I have that right,

1    Mr. Quillen?

2            MR. QUILLEN:  In the second amended exhibit list,

3    there is no Singleton 46 to 50.  We do have some additional

4    exhibits that were objected to and because of the way that the

09:12:57  5    defendant -- the exhibit list got put together, they're not

6    numbered consecutively.  They're numbers 51, 52, 60, and 61.

7            JUDGE MARCUS:  Let me see if I have this right.

8        We've received 1 to 31, 35 to 41.  Are you not offering 46

9    to 50?  Am I working off the wrong list?

09:13:25 10            MR. QUILLEN:  It's -- there are two sets of numbers.

11    There's the -- I was referring to the set of numbers from the

12    second amended exhibit list.

13            JUDGE MARCUS:  Right.

14            MR. QUILLEN:  In the binder that we sent the Court,

09:13:40 15    though, there are additional exhibits, but -- and there's a

16    cross reference between the way they're numbered in the binder.

17    At the beginning of each binder, there's a cross reference

18    between the way they're numbered in the binder and the way that

19    they are numbered on the second amended exhibit list.

09:13:57 20            JUDGE MARCUS:  That's perhaps where my confusion came

21    up.  But if I have it right, you are offering 46 to 50.  That

22    was the Singleton plan 2 population summary.  That was 46.  The

23    Singleton plan 2 population summary AP 47, the Singleton plan 2

24    population summary VAP 48, the Singleton plan 2 district

09:14:32 25    statistics 49, and the Singleton plan 2 communities of interest

1   splits 50.  You were offering those, were you not?

2           MR. QUILLEN:  Yeah.  We are.  And those are the

3   numbers that you'll -- those are the tab numbers where you will

4   find them in our binder.  If the cross-references to those

09:14:53 5   actually refer to some exhibits that have already been

6   received.  For example, Number 46 is actually S-26 on the

7   second amended exhibit list.  47 and 48 are Defendants'

8   Exhibits 121 and 122, which I believe are going to come in

9   without objection when you come to those, and 49 through 50 are

09:15:21 10  S-27 and S-28, which have been already admitted without

11  objection.

12           JUDGE MARCUS:  Okay.  So I have got it.  I just want

13  to make sure that -- does anyone have any objection to these

14  exhibits as they have been numbered by Mr. Quillen?

09:15:36 15      Seeing none, Mr. Quillen, they are received in evidence.

16      Now, as I understand it and help me with the cross

17  references, exhibits Singleton 51, there was an objection to,

18  and 52, there was an objection to, as well.

19      I have those reading off of your exhibit list now, those

09:16:03 20  were D. R. A. Singleton Congressional Plan 2.  That was 51.

21  And 52 was D. R. A. Singleton Congressional Plan 2 statistics.

22  Do I have those right?

23           MR. QUILLEN:  That's correct.

24           JUDGE MARCUS:  And I take it there are objections to

09:16:20 25  those?

```
 1            MR. QUILLEN:  There are objections to those.

 2            JUDGE MARCUS:  And that objection was it wasn't

 3  submitted timely?

 4            MR. QUILLEN:  That was timely submitted.

 5            JUDGE MARCUS:  Okay.  Beyond that, then, I have

 6  reading off your exhibit list, 53 to 59 inclusive.  You're

 7  offering those, or have they already been received?

 8            MR. QUILLEN:  They have already been received or will

 9  be received as defendants' exhibits.

10            JUDGE MARCUS:  Okay.  So we do not have to receive

11  them separately?

12            MR. QUILLEN:  That's right.  Yeah.  You have -- by

13  admitting 1 to 31, 35 to 41, and 44 to 45, you have admitted

14  all of the ones that are on -- that are, you know, have the S

15  prefix that need to be admitted.  And everything else that we

16  need to be admitted is going to be admitted -- has been

17  admitted as a Milligan exhibit or is going to be admitted

18  without objection as a defendants' exhibit.

19            JUDGE MARCUS:  I have got you.  Thank you.

20       Let's turn, if I can, Mr. Davis, Mr. Walker, to your

21  exhibits, most of which did not trigger any objections.

22       As I understand it, Defendants' 1 to 9 are being offered

23  without objection, correct?

24            MR. DAVIS:  That's right, Judge.  Only one set of

25  plaintiffs objected to any of our exhibits, but they did not
```

09:16:27
09:16:47
09:17:08
09:17:25
09:17:49

```
 1   object to 1 through 9.
 2          JUDGE MARCUS:  Okay.  So Defendants' 1 through 9 are
 3   received into evidence.
 4       As I understand it, there were objections by one plaintiff
 5   to Defendants' 10 through 18.  Do I have that right, Mr. Davis?
 6          MR. DAVIS:  Yes, Your Honor.
 7          JUDGE MARCUS:  Okay.  We will wait until to take that
 8   up when you're ready to offer them into evidence, Mr. Davis,
 9   then you could offer it.  We'll hear the objections and proceed
10   accordingly.
11       The next --
12          MR. ROSS:  Your Honor?
13          JUDGE MARCUS:  Yeah.
14          MR. ROSS:  I'm sorry.  If I may, the Milligan
15   plaintiffs would like to drop some of our objections to some of
16   the defendants' exhibits to hopefully speed things along.
17          JUDGE MARCUS:  Let's do that right now so we can
18   receive them.
19          MR. ROSS:  Your Honor, with the understanding that
20   these witnesses will not be testifying at the P.I. hearing, we
21   are dropping our objections to D-10 through 14.  And I believe
22   that we also are dropping an objection to the Hinaman
23   transcript, which is D-144 and 145, as well.
24          JUDGE MARCUS:  All right.  So we're clear then,
25   Mr. Davis, we will receive without objection Defendants' 10
```

through 14 inclusive and Defendants' Exhibit 144 and 145.

So the objections that remain, Mr. Davis, are only Defendants' 15 to 18 inclusive, and you feel free to offer them at the appropriate point in your case.

09:19:32     The next set of exhibits, if I have it right, Defendants' 19, 20, 21, all the way through Defendants' Exhibit 26 are being offered without objection, correct?

MR. DAVIS:  That's what I have as well, Judge.

JUDGE MARCUS:  Okay.  Does anyone have any objection 09:20:03 to those exhibits being offered by the Secretary of State? Seeing none, these are received.  That's Defendants' 19 through 26 inclusive, Mr. Davis.  They are in evidence.

As I understand it, there were objections to Defendants' exhibits 27 to 30.  Do I have that right?

09:20:26     MR. DAVIS:  Yes, Judge.

JUDGE MARCUS:  Okay.  And we can take that up when the objection is interposed at the time that you offer them.

Defendants' 31 through -- by my count, 91 did not trigger any objection.  Do I have that right?

09:20:53     MR. DAVIS:  I don't believe so, Judge.  I have notes that Mr. Ross and his colleagues have objected to 49, 68, and 72, as well.  Mr. Ross?

MR. ROSS:  That's correct, Your Honor.

JUDGE MARCUS:  All right.  So the plaintiffs object to 09:21:12 Defendants' 49.  And give me the other two.

```
 1              MR. DAVIS:  68 and 72.

 2              JUDGE MARCUS:  Okay.  We'll hold those in abeyance.

 3  And other than that, everything else is received right through

 4  Defendants' 91.  Do I have that right, Mr. Davis?

 5              MR. DAVIS:  You do, Judge.

 6              JUDGE MARCUS:  Okay.  Then beyond that, as I

 7  understand it, there were objections to Defendants' 92 to 97.

 8  Do I have that right?

 9              MR. DAVIS:  Yes, Judge.

10              JUDGE MARCUS:  All right.  Again, same thing.  We will

11  wait on those until you offer them.  We'll take up the

12  objections at that point.

13       98 and 99 had no objections, correct?

14              MR. DAVIS:  Correct.

15              JUDGE MARCUS:  We will receive.  Again, if anyone has

16  an objection, please let us know.

17       Hearing none, Defendants' 98 and 99 are received in

18  evidence.

19       As I understand it, Mr. Davis, there were objections to

20  Defendants' 100 to 106 inclusive.

21              MR. DAVIS:  Correct.

22              JUDGE MARCUS:  All right.  We will reserve on them in

23  the same manner.

24       Then 107 through 137, I have no objection interposed.  Do

25  I have that right?
```

09:21:34 (line 5)
09:21:52 (line 10)
09:22:04 (line 15)
09:22:22 (line 20)
09:22:42 (line 25)

|     |                                                            |
| --- | ---------------------------------------------------------- |
| 1   | MR. DAVIS:  You do, Judge.                                  |
| 2   | JUDGE MARCUS:  All right.  We will receive Defendants'     |
| 3   | 107 through 137 inclusive in evidence.                     |
| 4   | Then I have an objection noted for Defendants' 138, 139,   |
| 5   | 140, and 141.                                              |

09:22:55  5

                    MR. DAVIS:  You do, Judge.

                    JUDGE MARCUS:  All right.  We will receive Defendants'

107 through 137 inclusive in evidence.

         Then I have an objection noted for Defendants' 138, 139,

140, and 141.

                    MR. DAVIS:  Correct.

                    JUDGE MARCUS:  Okay.  We will reserve on that.

         There's no objection to Defendants' 142, correct?

                    MR. DAVIS:  Correct.

09:23:07 10        JUDGE MARCUS:  Without objection, Defendants' 142 is

received in evidence.

         Defendants' 143, 44, 45, and 46 inclusive triggered an

objection.  Do I have that right, Mr. Davis?

                    MR. DAVIS:  You do, Judge.

09:23:24 15        JUDGE MARCUS:  All right.  So we will reserve on

those.

         Defendants' 147 to 151 inclusive, no objections, correct?

                    MR. DAVIS:  I believe there is an objection to

Exhibit 150.  Is that what you have, Mr. Ross?

09:23:40 20        MR. ROSS:  That's right.  And, Your Honor, I believe

that just to be clear, we dropped our objection to 144 and 145,

and so those are --

                    JUDGE MARCUS:  Okay.  So Defendants' 144 and 145 are

received.  The only objection in there is 143.  And the other

09:24:00 25 one you were objecting -- to the other two, Mr. Ross, so I have

1  it right?

2          MR. ROSS:  Yes, Your Honor.  As we were going through

3  the list, I think at the end we probably will have a few more

4  we're dropping objections to.  We're just --

09:24:13  5          JUDGE MARCUS:  All right.  So with regard to 147, 148,

6  149, 150, 151, where are we on those, Mr. Davis?

7          MR. DAVIS:  My notes show that the Milligan plaintiffs

8  have objected to 150.  So 147, 148, and 149, there are no

9  objections.

09:24:33 10          JUDGE MARCUS:  147 through 149 are received without

11  objection.  Your objection, Mr. Ross, to 150, will be taken up

12  at the appropriate point.

13      What about 151?  There was no objection to that?  Do I

14  have that right?

09:24:49 15          MR. DAVIS:  You do, Judge.

16          JUDGE MARCUS:  151.  I have that right, Mr. Ross?

17      All right.  We will receive 151.

18      As I understand it, Defendants' 152 to 158 have all

19  triggered objections.  Am I correct about that?

09:25:08 20          MR. DAVIS:  Yes, Judge.

21          JUDGE MARCUS:  All right.  Mr. Ross, same thing, with

22  regard to 152 to 158.  We will reserve until they are offered.

23      159, 160, 161.  I take it there are no objections to

24  those, Mr. Davis?

09:25:24 25          MR. DAVIS:  Correct, Judge.

1          JUDGE MARCUS:  All right.  Then seeing and hearing

2     none, we will receive those into evidence.

3          Then there was Defendants' 162, 163, and 164.

4          I take it those were offered -- those triggers objections,

09:25:46 5     did they not?

6               MR. DAVIS:  They did.

7               JUDGE MARCUS:  All right.  Those were Milligan

8     objections, correct?

9               MR. DAVIS:  Correct.  All the objections were Milligan

09:25:54 10    objections.

11              JUDGE MARCUS:  All right.  After 164, we have 165

12    through 171.  Were there any objections to those?

13              MR. DAVIS:  There was at least initially to 171,

14    although I am not sure if that's still the case.  Mr. Ross?

09:26:15 15             JUDGE MARCUS:  I am not sure.  Mr. Ross, did you

16    object to 171?  That was the transcript or portion of the

17    transcript of the Chestnut trial.  If I have it right, those

18    were the testimonies of former Congressmen Byrne and Bonner?

19              MR. ROSS:  Yes, Your Honor.  We are dropping those

09:26:33 20    objections.  And then we also would like to drop objections to

21    four other exhibits.

22              JUDGE MARCUS:  So I take it then these exhibits, there

23    are no objections to.

24              MR. ROSS:  Yes, Your Honor.

09:26:49 25             JUDGE MARCUS:  Do you want to read these numbers into

1  the record, Mr. Davis, so the record is clear?

2          MR. DAVIS:  Yes, Your Honor.  As I understand it,

3  there no objections to 165 through 171.

4          JUDGE MARCUS:  Without objection, they are received in

09:27:01  5  evidence.

6      Mr. Ross, were there others that you wanted to draw an

7  objection to?

8          MR. ROSS:  Your Honor, we are dropping our objections

9  to D-72, D-138, D-155, and D-164.

09:27:15 10          JUDGE MARCUS:  All right.  So Defendants' 72,

11  Defendants' 138, Defendants' 155, and Defendants' 164,

12  Mr. Davis, are all received in evidence.

13          MR. DAVIS:  Thank you, Judge.

14          JUDGE MARCUS:  I take it just so that I'm clear, 171

09:27:35 15  was the last of your exhibits.

16          MR. DAVIS:  That's correct, Your Honor.

17          JUDGE MARCUS:  Let me make just one other observation

18  to all of you.  It may be in the course of the trial that you

19  will have other exhibits you are going to want to offer.  This

09:27:49 20  is not to preclude you from other pieces of evidence that you

21  may want to offer.  We'll be able to address them should it

22  arise at the time.

23      Having said all of that, I wanted to turn it over to Judge

24  Manasco to address the Caster exhibits.  I only have one

09:28:13 25  preliminary question for Caster counsel.  Perhaps I should

```
 1    address it to you, Ms. Khanna?

 2              MS. KHANNA:  Yes, Your Honor.

 3              JUDGE MARCUS:  Your exhibits, some of them were

 4    offered and received from the Milligan plaintiffs.  Some of

 5    them were not offered or received.  But I only raise this

 6    because when we discussed this earlier, we had asked the

 7    question about your reports.  Were they being offered just in

 8    the Caster case, or are they being offered -- and I guess this

 9    question really goes to Milligan -- Milligan counsel -- in the

10    Milligan case, as well?  I just wasn't sure about that, that

11    question.

12              MS. KHANNA:  Yes, Your Honor.  Our reports and our

13    evidence are being offered solely in our case as far as we are

14    concerned.  I believe in the joint submission that we submitted

15    to the Court, we allowed the different plaintiffs, groups, to

16    adopt pieces of evidence or findings of fact from other --

17    offered by other plaintiffs' groups.  But that would be up to

18    the Milligan plaintiffs if they want to adopt certain portions

19    of our evidence.

20              JUDGE MARCUS:  Sure.  Mr. Ross, did you want to

21    comment about that?  And then I will turn to Judge Manasco.

22              MR. ROSS:  Yes, Your Honor.  That is our understanding

23    is that we were reserving the right to adopt aspects of the

24    Caster plaintiffs' case.

25              JUDGE MARCUS:  My question is a very precise and
```

Timestamps: 09:28:35 (line 5), 09:29:02 (line 10), 09:29:16 (line 15), 09:29:31 (line 20), 09:29:46 (line 25)

```
 1  specific one.  It went to the Caster expert reports and
 2  rebuttals.  You offered and we received in evidence some
 3  exhibits that were appended to some of those reports, but not
 4  like the underlying -- there was a report from Cooper and a
 5  rebuttal from Cooper.  I believe there was a report and a
 6  rebuttal from a Bridgett King.  Those have not been offered in
 7  the Milligan case.  Do I have that right?
 8          MR. ROSS:  Not yet, Your Honor, but we would be happy
 9  to move them into evidence now if there's no objection from the
10  defendants.
11          JUDGE MARCUS:  All right.  Is there any objection to
12  that, Mr. Davis?
13          MR. DAVIS:  No, Judge.  And, you know, the way we see
14  it, this is -- we know there are three different cases, but all
15  of this evidence is going to be heard by all of you.  So even
16  if a Singleton plaintiff says something that the Caster or the
17  Milligan groups of plaintiffs find helpful to their case, we
18  think that they can cite it.  And likewise, if a Caster witness
19  says something we think helps us defend against the Singleton
20  case, we intend to cite it when we get to our proposed findings
21  of fact and conclusions of law.
22          JUDGE MARCUS:  I understand.  That's perfect.  I just
23  so -- I want to zero in very specifically, Mr. Ross and
24  Ms. Khanna, if you would help me.
25          As I understand it, Caster 1 was a declaration that was
```

```
 1   the Cooper report, that's the one dated 10 December 21.  Are
 2   you offering that as well in your case, Mr. Ross?
 3           MR. ROSS:  Yes, Your Honor.  We would like to adopt
 4   their -- all their plaintiffs' expert reports.
09:31:32 5           JUDGE MARCUS:  Okay.  So that was -- the expert
 6   reports, if you could just point them out for me for the help
 7   of us in the Milligan case, Ms. Khanna, I have Caster Exhibit 1
 8   is being offered or really by Mr. Ross, as well, in Milligan.
 9   The second report or the rebuttal report was which one?
09:32:01 10          MS. KHANNA:  That would be Caster Plaintiffs' Exhibit
11   -- give me one second, please -- I think it's 59.
12           JUDGE MARCUS:  Yeah.  That's the rebuttal report dated
13   December 20th.  You are offering that one, as well, Mr. Ross?
14   Right?
09:32:17 15          MR. ROSS:  Yes, Your Honor.
16           JUDGE MARCUS:  Without objection, that is received.
17       And there were two other reports, Ms. Khanna, that you
18   had?
19           MS. KHANNA:  Yes.
09:32:28 20          JUDGE MARCUS:  One from Bridgett King and one from
21   Palmer?
22           MS. KHANNA:  That's right.  Those are exhibits 79 and
23   80 for the Caster plaintiffs.  Mr. Palmer is 79.  Dr. --
24   Dr. Palmer is 79, and Dr. King is 80.
09:32:40 25          JUDGE MARCUS:  You are offering those, as well,
```

1    Mr. Ross?

2             MR. ROSS:  Yes, Your Honor.

3             JUDGE MARCUS:  All right.  Without objection, they are

4    received in evidence.

09:32:52  5             MS. KHANNA:  Your Honor, I forgot to mention Caster

6    Plaintiffs' Exhibit 81 is also Dr. King's rebuttal report.

7             JUDGE MARCUS:  And I take it, Mr. Ross, that's being

8    offered, as well?

9             MR. ROSS:  Yes, Your Honor.

09:33:03 10             JUDGE MARCUS:  Without objection, that's received in

11   evidence.  Thank you.  Let me turn it over, Judge Manasco, to

12   you, with regard to the balance of the Caster exhibits.

13             JUDGE MANASCO:  Great.  Thank you, Judge Marcus.  Good

14   morning, everyone.

09:33:18 15       All right.  It looks like from the amended exhibit list

16   that Caster Plaintiffs' Exhibits 1 through 93 and 94 through

17   104 are offered without objection; is that correct?

18             MS. KHANNA:  I believe that's correct, except that 94

19   is the sole exhibit to which there is an objection.  So it

09:33:42 20   would be 1 to 93 and 95 to 104, which I believe are offered

21   without objection.  And I believe the state is interposing an

22   objection to 94.

23             JUDGE MANASCO:  Got it.  Okay.  Thank you.  Mr. Davis;

24   is that correct?

09:33:54 25             MR. DAVIS:  That's right, Your Honor.

1          JUDGE MANASCO:  Okay.  And, Mr. Walker, is that

2     reflective of any objections from the intervenors, as well?

3          MR. DAVIS:  He responded in the affirmative, Judge.

4     He's with me.  But we're having trouble with two computers in

09:34:15 5     here making sure you can hear both of us.

6          JUDGE MANASCO:  Great.  Understood.  I know how that

7     goes.

8       Okay.  Then hearing no objection, Caster Plaintiffs' 1

9     through 93 and 95 through 104 are received into evidence, and

09:34:31 10     we'll take up the objection to 94 at the appropriate time.

11          MS. KHANNA:  Thank you, Your Honor.

12          JUDGE MANASCO:  Thank you.  And looking at defendants'

13     list, I have 1 through 170 have no objections; is that correct?

14          MS. KHANNA:  No objection from the Caster plaintiffs,

09:34:50 15     correct.

16          JUDGE MANASCO:  Great.  Okay.  Then without objection,

17     1 through 170, Defendants' 1 through 170 are received into

18     evidence.

19       I have a note that Defendants' 171 has an objection from

09:35:05 20     the Milligan plaintiffs; is that correct?

21          MR. DAVIS:  The Milligan plaintiffs did lodge an

22     objection to 171.  I do not believe the Caster plaintiffs did

23     so.  I will let Ms. Khanna speak to that.

24          MS. KHANNA:  The Caster plaintiffs have not lodged any

09:35:25 25     objections to any of the defendants' exhibits.  I believe all

1  of the objections that are there are Milligan or Singleton.

2         JUDGE MANASCO:  The only one I have is 171 for

3  Milligan.  Mr. Ross; is that correct?

4         MR. ROSS:  Yes, Your Honor.  That was one of the ones

09:35:37 5  that we had dropped an objection to.  I believe it was Chestnut

6  testimony.

7         JUDGE MANASCO:  Yes.  Okay.  So with no objection

8  then, Defendants' 1 through 171 are admitted.

9         MR. DAVIS:  Thank you, Judge.

09:35:54 10        JUDGE MANASCO:  Judge Marcus, that's it for Caster.

11        JUDGE MARCUS:  Thank you.  A few other housekeeping

12 matters.

13        In terms of the timing, we expect to generally start each

14 day at 9:00 o'clock Central Standard Time.  That would be 10:00

09:36:12 15 Eastern Standard Time.  And run through noon Central Standard

16 Time.  Break for one hour for lunch from 12:00 to 1:00 Central

17 Standard.  That would be 1:00 to 2:00 Eastern Standard.  Then

18 pick up at 1:00 o'clock and go to about 5:30 Central Standard

19 Time.

09:36:39 20        We have, of course, a court reporter who is taking it all

21 down and providing daily copy.  So we will probably just to

22 make it easier for our court reporter break more or less every

23 90 minutes, every hour and a half, between an hour and a half

24 or two, depending on where you are with your direct and your

09:37:07 25 cross-examinations.

 1          But as we proceed, Christina, if at any point you need to

 2    break, you just let us know if you need to break sooner than

 3    that.  And if for any reason any of you have a problem and need

 4    to take a break, you just let me know, and we will be happy to

09:37:29  5    accommodate each and all of you in that regard.

 6          Finally, as I understood it from the earlier submissions

 7    and discussions, no one was seeking to make an opening

 8    statement in any of the cases, so we would proceed directly

 9    with the presentation of evidence.

09:37:53 10          Do I have that correct?  Okay.  Seeing no objection to

11    that, we will proceed in that manner.

12          I also understand from our discussions that the Singleton

13    plaintiffs were going to go first on the constitutional claim.

14    Milligan was going to follow on the constitutional claim, and

09:38:20 15    then Milligan and Caster were going to proceed with the Section

16    2 claim, and then finally, the defendant was going to present

17    its defense to the whole kit and caboodle.  That would be both

18    for the Secretary of State and for the individual intervening

19    defendants in the case.

09:38:47 20          If I have misunderstood that, please let me know.

21          Okay.  With that, let me turn to counsel for Singleton.

22    And just let us know if you would the witnesses you are going

23    to be calling live and the order in which you're going to be

24    calling them.

09:39:11 25          MR. BLACKSHER:  Your Honor, can you hear me?

1          JUDGE MARCUS:  I hear you just fine.  Thank you.

2          MR. BLACKSHER:  Okay.  I wasn't sure.

3      Yes.  We are going to call two witnesses.  The first

4  witness is Senator Bobby Singleton.  And the second witness

09:39:25  5  will be our expert Dr. Natalie Davis.  That's the sum total of

6  our witnesses.

7          JUDGE MARCUS:  Okay.  With that, then, counsel, are

8  you ready to proceed?

9          MR. PENN:  Yes, Your Honor, I am attorney Myron Penn

09:39:42 10  for the Singleton plaintiffs.  We do have our first witness

11  available, Judge.

12          JUDGE MARCUS:  Terrific.  Let's proceed, then.

13  Mr. Singleton?

14          THE WITNESS:  Yes, sir, Your Honor.

09:39:51 15                      BOBBY SINGLETON,

16  having been first duly sworn, was examined and testified as

17  follows:

18          JUDGE MARCUS:  Thank you.  Welcome, and you may

19  proceed, counsel.

09:40:02 20          MR. PENN:  Thank you, Your Honor, and panel.

21                      DIRECT EXAMINATION

22  BY MR. PENN:

23  Q    Senator Singleton, if you would, please state your name

24  for the record.

09:40:08 25  A    Bobby Singleton.

| | | |
|---|---|---|
| | 1 | Q   And where do you live, Senator Singleton? |
| | 2 | A   Greensboro, Alabama. |
| | 3 | Q   And do you hold an elective office right now? |
| | 4 | A   Yes, I do. |
| 09:40:17 | 5 | Q   And what office do you hold? |
| | 6 | A   Alabama State Senator District 24. |
| | 7 | Q   And what leadership positions, if any, do you have in the |
| | 8 | state Senate of Alabama right now, Senator? |
| | 9 | A   I serve as the Senate minority leader. |
| 09:40:30 | 10 | Q   And for what district again is that? |
| | 11 | A   24. |
| | 12 | Q   And what counties is that comprised of? |
| | 13 | A   It's the western cluster of the state of Alabama.  Parts |
| | 14 | of Tuscaloosa County, Hale, Greene, Sumter, Choctaw, Pickens, |
| 09:40:48 | 15 | Marengo counties. |
| | 16 | Q   And is this your first elected office? |
| | 17 | A   No. |
| | 18 | Q   Please give us some history about your politics, Senator? |
| | 19 | A   Well, I have been involved in politics for a long time, |
| 09:40:59 | 20 | Mr. Penn.  And I started out, you know, as just community |
| | 21 | activist, helping other people get elected.  I ran for city |
| | 22 | council in 1984.  I was unsuccessful.  And I got involved in |
| | 23 | the Dillard vs. Crenshaw case where we then got three |
| | 24 | single-member districts in Hale County at that time.  And I ran |
| 09:41:25 | 25 | again in the year of 2000.  And I won the city council seat in |

2000.  I served until 2002.  After 2002, I ran for the House of
Representatives.  In 2002, and I served there until 2004, when
Senator Charles Steel who served as the 24th district senator
stepped down from his post, and there was a special election in
2005, and I won that seat, and I have been serving the Alabama
Senate since 2005.

Q    And do you live in the same district that you represent
now?

A    Very much, yes.

Q    Have you always lived there all your life?

A    Very much.  For one little stint, I lived in Jefferson
County in the early '90s to the mid '90s.  And then I moved
back home.  And I have been living there ever since.

Q    Is it safe to say you know the temperature or the
sentiment of the people that live in your district, and
actually your hometown and home community?

A    Oh, I am very active with my people.  I know the
temperature.  Not only just in my home community, but across my
district, across the Black Belt area.  I worked many of cases
in the Black Belt managing cases, assisting, volunteering,
getting involved.  So I am very familiar with the Alabama Black
Belt in the state of Alabama politics.

Q    If you would, with your being in the legislature for the
numbers of years you have been there, Senator, can you describe
the racial and the political make up of the Alabama Legislature

```
 1  since you have been there, especially now?
 2  A    Well, in the Alabama Legislature, there's 105 members, as
 3  you know.  35 members are senators and the -- there is the
 4  others -- I'm sorry.  There are 140 members.  105 are House
 5  members and 35 are Senate.  And we look at it, break down, you
 6  have 27 African-Americans in the House.  You have one white.
 7  And you have one black Republican that's elected now.
 8       In the Senate, there are seven black senators and one
 9  white senator, black -- white Democrat, yes.
10  Q    Gotcha.  And in the Legislature with the different
11  leadership positions you have had, have you served on the
12  reapportionment committee in any of those years?
13  A    Yes, I have.
14  Q    Okay.  How many years have you served on the
15  reapportionment committee?
16  A    This is my second term serving in the reapportionment
17  committee.  I served in the 2010 restricting, and I am serving
18  now in the 2020 redistricting process.
19  Q    With your being on the reapportionment committee for 2021,
20  did you have any input in drawing the congressional plan?
21  A    No, not at all.
22  Q    The one that was passed you had no involvement in that --
23  A    Not at all.
24  Q    -- process?
25  A    Not at all.
```

09:43:12
09:43:35
09:43:48
09:44:02
09:44:09

```
 1  Q     Who did?
 2  A     Well, to my understanding, it was only done by the
 3  congressional people delegation themselves, along with possibly
 4  the chairman of the committee, along with the lawyer,
 5  Mr. Walker, Mr. Hinaman, Mr. Pringle, and Mr. McClendon.  Those
 6  are the only people that I know would have been involved in it.
 7  Q     Senator, with your having been serving on the
 8  reapportionment committee, do you have any idea of why you were
 9  not involved in the drawing of the congressional plan?
10  A     Everything seemed to have been so secretive.  We weren't
11  given an opportunity to see maps or even -- they weren't
12  presented to us even when they met with the congressional
13  delegation.  I spoke with none of the congressional people
14  about it.  And so we only got wind of the map on the date it
15  was presented when they called the committee together.  That
16  was the first time we saw the map as a whole.
17  Q     So you are one of the sponsors of what is considered the
18  whole county plan concept; is that right?
19  A     Absolutely.
20  Q     In the Legislature?
21  A     Yes.
22  Q     Okay.  When did you first become aware of the whole county
23  plan, Senator?
24  A     It was late August, early September.  I was presented to
25  it by Jim Blacksher who sent me a copy and asked me just to
```

1  look at it and see what I thought about it.

2  Q    After looking at it, why did you decide to support it?

3  A    You know, really when I looked at the map, looking at the

4  numbers, I call it just a beautiful map.  It was -- it just

09:45:42 5  popped out at you.  When I looked at it, and the first thing I

6  thought about it was wow, you know, we can win this.  This is

7  doable.  And I got back with Mr. Blacksher and asked him to

8  send me more numbers on it.  He sent me numbers on it.

9       When I started looking at the trend of the votes and how

09:46:00 10  we have been electing officials in those areas and I saw how

11  Democrats were performing, and I said, this map can perform.

12  And we can basically win this.  So I was excited about it and

13  was willing to look at it.  And what it does is really get us

14  away from the old gerrymandering piece of what we have right

09:46:20 15  now from the 2011 plan.

16  Q    How so?

17  A    What it does is provide whole counties, put communities of

18  interest together.  It allows us to be in the whole county

19  plan.  And what it does, it stopped the packing.  Because right

09:46:32 20  now you look at the 2011 plan, they're just packing a lot of

21  black folk into one district, and we can only have one voice.

22  But this give us an opportunity for Jefferson County, along

23  with the couple of other counties like Hale, Perry, Bibb to

24  perform and also Tuscaloosa all the way to Montgomery to be

09:46:51 25  able to perform in another opportunity district.  I feel really

1  good about this map.

2  Q    You mentioned opportunity district.  You didn't mention a

3  majority district of minorities.  What is your -- what's the

4  difference between the two, Senator, and why is the opportunity

09:47:06  5  district more appealing to you if that's what you are saying?

6  A    Well, what it is, is that I think that it gives us an

7  opportunity to have a voice in Congress.  The opportunity

8  districts are not necessarily, say, a minority-majority

9  African-American district, but it gives us an opportunity with

09:47:23 10  the number of African-Americans there to make the difference in

11  that district.  And we can easily elect African-Americans along

12  with other white Democrats or other crossover votes that we

13  feel real comfortable about it.  Even without the crossover

14  votes, the numbers in terms of the registered voters of

09:47:42 15  African-American that are in those districts, I feel very

16  confident that we could perform well in those districts.

17  Q    And in comparison to the prior districts, which is from

18  2011, I believe?

19  A    Yes.

09:47:54 20  Q    What is the -- just visually, what is the difference

21  between those two maps, Senator, between the 2011 district, and

22  the 2021 proposed the whole county plan that you sponsored?

23  A    Well, when you look at the 2011, you look at a number of

24  splits in those districts.  Montgomery has about three splits

09:48:14 25  in it.  Jefferson County has a couple of two or three splits in

it.  And it doesn't bring those communities together.  And when
you look at it, the Black Belt is joined in with Jefferson
County, Tuscaloosa, all the way back across.  What this
opportunity district gives us an opportunity for the voice of
the Black Belt to be heard.  We feel very strong about our
representation now.  Congresswoman Sewell does a great job for
us.  But we feel an extra voice in Congress that can
concentrate there on the Black Belt area can give us that other
voice.

And what it does is take away the gerrymandering from the
2011 and put us in the whole counties, allow those communities
of interest to thrive together, people work and flow together.
I just think it's the best for the state of Alabama and the
trends that we're going there.

Q    What is the importance in your opinion, Senator, of what's
called community of interest?

A    Well, communities of interest, when you look at it, I live
in Hale County.  And Tuscaloosa is the largest -- next largest
city to me.  And Tuscaloosa use us in their metro statistical
area.  So they use our data to be able to get grants, to help
along with economic development, and all of that is a part of
their planning when they look at the whole western cluster of
Alabama from Tuscaloosa.

So does Birmingham do the same thing, in terms of Bibb
County and other counties that are there, to using those

```
 1  statistics.  So all of those communities are communities of
 2  interest.  So we work the flow, we shop there, and we all have
 3  interest in those communities and how the tax payers dollars
 4  are being spent in those communities.
```
09:49:53  5  Q    The whole county plan concept that you proposed in
```
 6  support, Senator?
 7  A    Yes.
 8  Q    Proposes two opportunity districts; is that correct?
 9  A    Yes, correct.
```
09:50:01 10  Q    Okay.  What confidence do you have that those two
```
11  opportunity districts will be able to perform as crossover
12  voter community districts?
13  A    Well --
14  Q    When I say crossover, I mean, you know, someone other than
```
09:50:13 15  the minority voters that vote in that district?
```
16  A    Well, when I look at the trend, I look at Jefferson
17  County.  Jefferson County has always gone blue.  I can go
18  back four or five different elections --
19  Q    When you say blue, you mean?
```
09:50:18 20  A    Democrat.
```
21  Q    Gotcha.
22  A    I can go back four or five different election cycles.  I
23  can look at Obama, '08, it went -- I look at all the counties
24  that we have in there.  They all perform democratic, and I look
```
09:50:38 25  at the numbers to where the African-American registered voter,

1  and I know there they have to be some other white folks in
2  there, also.  Because they performed at the 56 to 60 percent
3  percentile in terms of democratic votes.  And when I look at
4  that, these districts perform well in those areas.  So I feel
09:50:58  5  very confident that we can have an opportunity to be able to
6  win in those particular districts.
7  Q    And so when you are talking about opportunity districts,
8  you are not looking at majority districts per se as in a
9  majority-minority district, where it's 50 percent minority
09:51:15 10  versus other races?
11  A    You're looking at.
12  Q    What are you looking at in that term when you are talking
13  about opportunity districts, Senator, if you will elaborate?
14  A    What I am looking at is the opportunity for us to have --
09:51:26 15  because when I looked at the percentage of African-Americans
16  that are in those districts and I look at the voting trend of
17  those African-Americans and how they perform at the boxes
18  they're performing in, we do very, very well in those boxes in
19  those areas.  And with what I have seen in the past with -- and
09:51:46 20  based on the candidates.  You take Doug Jones and how that race
21  went, and he performed at 60 -- the 68 percentile in some of
22  those districts.  Even if you look at James Fields, you go back
23  to his race against Governor Ivey.  He performed at the
24  56 percent level, and his name ID wasn't very well in those
09:52:07 25  areas.

1      So we saw where the performance of African-Americans and

2  those people who would cross over and help him, we performed

3  very well in those areas if we can get our votes turned out.

4  Q    So, in other words, what's that -- I guess the United

09:52:22  5  Negro College statement -- you're not looking a handout, just

6  hand?

7  A    Looking for a hand.

8  Q    For an opportunity?

9  A    Looking for an opportunity.

09:52:29  10  Q    Do others in the black community support the whole county

11  plan, Senator?

12  A    Yes.  You know, I think it's a mixed -- it's a bag of

13  mixed motions there.  There are people who feel that the safe

14  district that what we have right now, that we do have a safe

09:52:42  15  district that has at least a 60 percent, you know,

16  African-American population that gives us that voice that gives

17  us a sustained voice.  But when I look at that and I see that

18  how we have to go and draw that district, that it gerrymands

19  (sic), we want to get away from that, because we have been

09:52:58  20  accusing other folks of gerrymandering all these years.  So I

21  want to be able to get away from that so we can have a

22  performance level to where we can elect other people outside of

23  just one person.  So I believe that the districts that we have

24  today that we are presenting under the Singleton plan gives us

09:53:18  25  the best opportunity for the future to be able to maintain

1  representation in Washington so that we can have a voice.

2  Q    It is my understanding, obviously, that there were public

3  hearings regarding the reapportionment process --

4  A    Yes.

09:53:31 5  Q    -- throughout the state; is that correct?

6  A    There was.

7  Q    And during those hearings, you hear support for your whole

8  county plan concept?

9  A    Yes, I did.  Our -- many of the people who came up to talk

09:53:42 10  about the whole county plan and how they want to support it.

11  And not just only through the hearings.  I was hearing people

12  in the streets and other community activists.  Once they got an

13  opportunity to look at the map, even without looking at the

14  numbers, I am telling you, it is just a beautiful map that it

09:53:58 15  pops out at you that when you look at -- and when people who

16  understands it, and they look at it and they say, wow, we can

17  win that.  We have an opportunity to win that six and seven

18  congressional district.  And so I'm getting a lot of support,

19  people are calling me and saying thank you for filing this

09:54:14 20  lawsuit, thank you for moving forward with it.  We think that

21  we can do a great job.  And we just got to get the vote

22  turnout.

23  Q    I'm sorry to cut you off.  But at those hearings, you saw

24  support from black voters?

09:54:25 25  A    And white voters.

```
 1   Q      And white voters?

 2   A      Yes.  Black and white voters, yes.

 3   Q      And did you have any opposition at any of those hearings

 4   or from what you may have heard?

 5   A      Yes.  Yes, I did.

 6   Q      Okay.  What oppositions did you hear to your whole county

 7   plan?

 8   A      There were people who thought safe districts for

 9   African-Americans to get elected should not be below

10   55 percent.  You know, they look at the percentile and thought

11   that we should have a minority-majority district.  And I just,

12   you know, feel that if we do exactly what they're saying, we

13   just going back to the old gerrymandering.  We can't draw the

14   county districts without gerrymandering again.  I think what

15   gives us the best opportunity is what we presented here today

16   before this Court.

17        And I'm just getting so much overwhelming support out

18   there in the community from -- from the members like Senator

19   Hank Sanders who called me to thank me about it.  House leader,

20   minority leader Anthony Daniels who supports it.  John Zipper

21   (phonetic), who is a member of the Greene County Board of

22   Education over there in Greene County, the head of the hospital

23   board that said that, hey, they thought this was the best thing

24   that they have seen in a long time, in terms of giving us

25   representation, just to name a few people.  You know, Senator
```

```
 1  Rodger Smitherman, one of my cohorts in the Senate who

 2  definitely helped sponsor this bill.  I had at least four

 3  sponsors Senator Smitherman, Senator Beasley, Senator Figures,

 4  and Senator Sanders 48 who believed in this map also.

 5  Q    And with that said, at the hearing, it's my understanding

 6  -- correct me if I am wrong.  But at the hearing is when you

 7  announced that you were interested in actually sponsoring the

 8  whole county plan concept before the people after hearing what

 9  their desires were; is that fair?

10  A    That is absolute.

11  Q    Isn't it true also that Senator Smitherman said the same

12  thing at the hearing?

13  A    Yes.

14  Q    Isn't it also true that you said you would defer to him

15  since he was the senior senator and let him sponsor it and you

16  would cosponsor it?

17  A    Yes.

18  Q    Is it true that he said, hey, we can work together and

19  work hand in hand?

20  A    He did.

21  Q    Sponsoring this bill?

22  A    He did.  He did.  We were both excited about this map.

23  This map just -- it just pops out at you as something that's

24  doable, and we know that the trend shows clearly that we have

25  an opportunity to make this happen.
```

1   Q     There is one gentleman that you know well I am sure named

2   Albert Turner, Jr., who had been a county commissioner in the

3   Black Belt area whose dad was a well-known Civil Rights leader

4   at the time who predicted early on that you would never sponsor

09:57:11 5   or support anything that would be in the low -- or any plan

6   that's got 40 something percent voting age population, black

7   population because he didn't think it would ever pass.  What do

8   you say to that knowing Mr. Turner?

9   A     Well, you know, I understand Mr. Turner when he first said

09:57:30 10   that being the first time that he was hearing it.  He and I had

11   not talked.  And Mr. Turner wanted, you know, he's one of those

12   who wanted to see something safe and know that what we have is

13   there.  But after speaking to Mr. Turner today -- if you ask

14   him today, then Mr. Turner would not have that same feeling,

09:57:48 15   because he and I had the opportunity to sit down.  I was able

16   to show him the trends of the voting from the past elections,

17   show how those --

18          MR. DAVIS:  Your Honor, I want to object to this

19   portion of the testimony.  I am not sure this is responsive.

09:58:00 20   But also I know that the Court has a little more leeway to hear

21   hearsay evidence and preliminary injunction, but I think if

22   they need this evidence in, they need to call Mr. Turner, Jr.,

23   in to talk about his views and how they have changed.  The

24   evidence before the Court is that Mr. Turner, Jr., opposed

09:58:16 25   those plans.

1          JUDGE MARCUS:  Mr. Penn?

2          MR. PENN:  Judge, that's fine.  We will.

3          JUDGE MARCUS:  Why don't we get on with it and just

4     frame the questions sharply, and we will proceed.

09:58:26  5          MR. PENN:  Thank you, Judge.

6     BY MR. PENN:

7     Q     Senator, with your being at the hearings, did you -- after

8     everyone voiced their position on being supportive of the --

9     your whole county plan, the ones who did, do you feel that the

09:58:44 10   reapportionment committee chairman adhered to the request and

11    the desires of the folks who support the whole county plan?

12    A     No.

13    Q     Why is that, Senator?  Why do you feel that way?

14    A     Because we never saw anything on any of those documents

09:58:56 15   that was put into evidence.  There was a court reporter at all

16    of the hearings who was taking down all the information.  None

17    of it ever came back to the committee at all for consideration.

18    So therefore I felt there was never any seriousness taken on

19    behalf of what the people had stated.

09:59:17 20   Q     Let me bring your attention to one thing that I noticed,

21    Senator, and Document 67, which was the defendants' reply and

22    opposition to the preliminary injunction motion that we filed

23    where I think it was footnote 9 on page 33, if I am not

24    mistaken.  My numbers in my --

09:59:38 25          JUDGE MARCUS:  Mr. Penn, let me stop you.  You are

```
 1   talking about the Defendants' Exhibit 67?  Docket entry 67?

 2              MR. PENN:  No, Your Honor.

 3              JUDGE MARCUS:  What exactly are you talking about?

 4              MR. PENN:  Document 67 that was filed.  I am not sure

 5   exactly what the exhibit number is.  But it was the

 6   Document 67.

 7              JUDGE MARCUS:  This was the brief of the defendant?

 8              MR. PENN:  That is correct, Judge.

 9              JUDGE MARCUS:  This is a brief in opposition to your

10   motion for preliminary injunction?

11              MR. PENN:  Correct.

12              JUDGE MARCUS:  And injunctive relief.

13              MR. PENN:  Yes.

14              JUDGE MARCUS:  Thank you.

15              MR. PENN:  Thank you, Judge, for the clarification.

16   BY MR. PENN:

17   Q    And on the footnote 9, they mentioned that you actually

18   voted in favor of the guidelines, the districting guidelines

19   that had been proposed to the reapportionment committee, that

20   you voted in favor of it.  If you would, please tell the -- our

21   distinguished panel why is it that you voted in favor of it

22   even though the reapportionment committee did not adhere to, in

23   your opinion, the wishes of some of the people who support the

24   whole county plan?

25   A    Well, when it was presented to us, I thought that, you
```

```
 1    know, the guidelines were something that we could -- we could
 2    work with.  It was fair.  But in the execution of it, they just
 3    never followed their guidelines.  They continued to follow the
 4    congressional district, the old pattern of 2011.  And so even
 5    though they tried to work with the whole county, but we still
 6    stuck and packed all of the blacks in the district such as the
 7    2011 plan.  So even though there may have been an agreement
 8    with it, but at the end of the day, you know, it forced me to
 9    vote against those plans that they provided even later because
10    they did not follow the guidelines.
11    Q    So, in other words, as far as you are concerned, you
12    followed the guidelines, but they did not?
13    A    Correct.
14    Q    Is that fair to say?
15    A    Correct.
16    Q    Okay.  Let me -- one last thing -- well, a couple of
17    things.
18         One, you mentioned that many of the people in support of
19    the whole county plan voiced their support for it?
20    A    Yes.
21    Q    You mentioned Hank Sanders?
22    A    Yes.
23    Q    Who else -- what other members of -- you mentioned other
24    state senators that were in support of it.  What other
25    community leaders in your district can you recall, Senator,
```

1    that were supportive that voiced it, and really, anyone?  I

2    mean, whether they were senators or public officials, but more

3    importantly, just regular people, regular voters?

4    A    Well, I had a lot of regular voters who was on line

10:02:02 5    looking at it.  And I also had community leaders, mayors.  I

6    have had a couple of mayors.  I know the mayor of my city of

7    Greensboro who thought that it was a good and fair map.  I

8    talked to the probate judge in Greene County who thought that

9    it was a good and fair map.

10:02:21 10        So I was just hearing from across the district that people

11   thought it was a good map and they thought that even though if

12   they didn't know the numbers that absolutely went with it, when

13   they saw the map, they thought it was something that was fair

14   and something that was doable with the committee.

10:02:36 15   Q    Okay.  And with your being from the Black Belt community,

16   Senator, you said you grew up there?

17   A    Yes.

18   Q    You said you grew up there, you were born there, lived

19   there all your life.  You now represent much of it.  Tell me

10:02:47 20   the importance of the community of interest aspect of the Black

21   Belt community and why, if you think they should have its own

22   Congressman for that area, why that's important to you and your

23   people?

24   A    You know, the Black Belt of Alabama is one of the poorest

10:03:03 25   regions in the state of Alabama.  You know, we have some of the

1    lack of hospitals, schools.  We have a lot of land mass.  Taxes
2    are very low.  Tax -- there's no taxable entities there.  Jobs
3    are not there a lot.  We just need a voice to speak up for the
4    Black Belt as a whole.
10:03:25 5        We need to make sure that those communities of interest,
6    you know, have that voice in Congress to be able to say that,
7    you know, we want better amenities in our community.  We want
8    to build assets in our community also, just to make sure that
9    while we are connected to Birmingham and other areas in this
10:03:45 10   plan here now, while we are here, most of the emphasis goes to
11   the largest cities.  And properly so.  Possibly.  But at the
12   end of the day, we need to make sure there's a voice that speak
13   loudly and clear about those things that are going on in the
14   Black Belt and to be able to have an opportunity to vote on
10:04:04 15   those things so that we can be able to have that voice.
16        MR. PENN:  Judge and distinguished panel, I think at
17   this time, I will pass the witness.  Thank you, sir.
18        JUDGE MARCUS:  Thank you, Mr. Penn.
19        Let me turn first to Milligan counsel, Mr. Ross?  Any
10:04:29 20   questions?  Any cross-examination for the Milligan folks?
21        MR. ROSS:  No, Your Honor.
22        JUDGE MARCUS:  All right.  Ms. Khanna, I will ask you,
23   I don't suppose you do have any questions.  But I wanted to
24   just at least give you that opportunity if there was anything
10:04:48 25   you wanted to address with this witness.

```
 1            MS. KHANNA:  Thank you, Your Honor.  No questions from
 2      us.
 3            JUDGE MARCUS:  All right.  Thank you.  Mr. Davis?
 4            MR. DAVIS:  Thank you, Judge.
 5                          CROSS-EXAMINATION
 6      BY MR. DAVIS:
 7      Q    Good morning, Senator Singleton.
 8      A    Good morning, Mr. Davis.
 9      Q    Senator, I am in the Attorney General's Office.  I
10      represent Secretary of State John Merrill in this lawsuit that
11      you filed.
12            I'm getting a little confused about what it is you want
13      out of this case.  One of the last pleadings that was filed on
14      your behalf said you weren't necessarily seeking a whole county
15      plan.  Are you or are you not seeking a requirement that
16      Alabama keeps its counties whole?
17      A    Yes, I am.
18      Q    Okay.  You produced three different maps in this last
19      legislative session, correct?
20      A    Correct.
21      Q    Did you ask any Republicans on the reapportionment
22      committee to help you in drawing those maps?
23      A    No.
24      Q    Did you ask to be involved in drawing the map that was
25      ultimately presented to the reapportionment committee?
```

```
 1   A    Yes.

 2   Q    When?

 3   A    I was -- I was at every hearing except two.  And I -- I

 4   spoke to Mr. Walker and Mr. Hinaman and asked when will the

 5   committee get involved, that we wanted to get involved.  We

 6   wanted to set the record clear.  And my thing to them was let's

 7   all get together and let's draw these maps.  And we may be able

 8   to not be here in court today if we can all get on the same

 9   page.

10   Q    Did you participate in any conversations with any member

11   -- any current member of Alabama's congressional delegation?

12   A    No.

13   Q    Did you ask to be?

14   A    I didn't even know when they was meeting with them.  I

15   wanted to be a part of it, yes.

16   Q    Is it true that any member of the reapportionment

17   committee could participate in the public hearings that were

18   held around the state?

19   A    Yes.

20   Q    Do you know if they did so?

21   A    Yes, they did.  There were other members, yes.

22   Q    And any member who chose to participate in those public

23   hearings was there and could hear witnesses discuss the whole

24   county plan, correct?

25   A    Correct.
```

```
 1  Q    Senator, in your complaint, you say in paragraph 19 that
 2  throughout the state's history, the most important traditional
 3  districting principle for drawing Alabama's congressional
 4  districts has been preserving whole counties.  Do you recall
 5  that being part of your complaint?
 6  A    Yes.
 7  Q    Okay.  What is your basis for alleging that keeping
 8  counties whole is the most important districting principle for
 9  congressional districts?
10  A    Well, number one, it's applied to our state constitution,
11  and number two, it has been a tradition in the past prior to
12  the '90s.  And so when this first district was drawn to give
13  African-Americans a voice was one of the first times that we've
14  seen the big splits that we got, in terms of that gerrymandered
15  peace to be able to give African-Americans a voice.  While we
16  all supported that back in the '90s, but as you go on and you
17  see the trends of voting, it gives us pause to say that we
18  could do better than what we have done now.  And so election
19  cycles go on and you just see where you can do better.  And so
20  being able to have it in a whole counties give us that better
21  opportunity than splitting a lot of counties unnecessarily.
22  Q    Okay.  The question was why whole counties is more
23  important than other traditional criteria.  And if I understood
24  you right, one of the things you mentioned was you said there
25  was a tradition of keeping counties whole before the '90s,
```

1    correct?

2    A    Yes.

3    Q    Okay.  Well, haven't we also in Alabama historically

4    preserved the core of districts in drawing congressional plans?

10:08:44  5    A    Repeat that again.

6    Q    Sure.  I'm talking about other traditional districting

7    criteria that has also been important in drawing congressional

8    plans.  And haven't we traditionally preserved the core of

9    districts?

10:08:58 10    A    You have.  But I just think whole counties is much

11    important to me.  You asked myself, yes.

12    Q    Okay.  And I won't argue with your opinion and what you

13    think is more important at all.  But haven't we also

14    traditionally avoided putting incumbents in the same districts?

10:09:16 15    A    Yes, we tried, yeah.  But we have done it in the past.

16    But we tried, yes.

17    Q    But we've -- that's something that Alabama has tried to do

18    not just in congressional plans, but in its State House and

19    State Senate plans, as well?

10:09:29 20    A    Correct.

21    Q    Yeah.  And haven't we also tried to observe communities of

22    interest in our various plans?

23    A    That's a little iffy here and there, yes.  Depends on who

24    you are talking to about the community of interest, yes.

10:09:47 25    Q    Okay.  Well, let's look at your map.  I am going to share

my screen.  I am going to do my best to do so.  And I am going
to share what is Singleton Exhibit 35.  Now, that's the whole
county map that you have championed, right?

A    Yes, indeed.

Q    Okay.  And this is the plan you want?

A    I would like to have it, yes, sir.

Q    All right.  You live in Hale County, correct?

A    Yes, sir.

Q    And that's here.  That would be in District 6 in your map?

A    Correct.

Q    All right.  That's also part of the district that you
represent in the state Senate?

A    Yes.

Q    Okay.  Is Hale County part of a community of interest with
Jefferson County?

A    It very well could -- it's part of the community interest
with Bibb, and I think Bibb is connected to Jefferson because
what they use as metro statistical area, so, yes, we make that
connection, yes.

Q    Okay.  Well, what is it that makes -- what do voters in
Hale County have in common with voters in Jefferson County that
makes them part of the community of interest?

A    You know, there's a lot.  There are poor folks in
Jefferson County.  You know, there's a lack of health care in
Jefferson County.  There's a lack of health care in Hale

1　County.  There are bad schools in Jefferson County, bad schools

2　in Hale County.  There are bad roads in Jefferson County, bad

3　roads in Hale County.  So all of these have the same interest

4　of voting.  So we basically have some of the same things that

10:11:21 5　we have interest of.

6　Q　Are the voters in Hale County part of a community of

7　interest with voters in Mountain Brook and Vestavia?

8　A　Probably not.

9　Q　Are voters in Hale County part of a community of interest

10:11:37 10　with voters in Mobile County?

11　A　I have not looked at that to that extent being that they

12　were so far -- far distance.

13　Q　Well, you have -- the voters in Hale County wouldn't go to

14　Mobile County for shopping, for example, would they?

10:11:52 15　A　Well, sometimes, depends on whether a good sale going on.

16　Q　Okay.

17　A　But, no.  But we come to Jefferson.  We go to Tuscaloosa.

18　So those are just natural flows back to Birmingham.  Lots of

19　people work in Birmingham from Hale County.  People work in

10:12:07 20　Tuscaloosa from Hale County.  They come back up in Bibb County

21　from Hale County.  So because of the lack of work in some of

22　those areas, we do have to flow back into Jefferson,

23　Tuscaloosa, and other areas for work.

24　Q　Okay.  Now, Senator, I am going to share a current map.

10:12:37 25　　　　That's the map that the Alabama Legislature just passed in

```
 1  November, right?
 2  A    Yes.
 3  Q    Okay.  And this is Defense Exhibit 55.
 4       Do you contend that this map is a racial gerrymander,
 5  Senator?
 6  A    I do.
 7  Q    Well, what makes this a racial gerrymander in your view?
 8  Why are you calling it a racial gerrymander?
 9  A    Because it still takes the core of what the 2011 map --
10  even though you tried to do whole counties, you go into
11  Jefferson, you split into Jefferson.  And I think that it just
12  continues to just pack African-Americans in one area, when it
13  could be divided out to get two districts.
14  Q    Okay.  Let's break that down.  Do you contend that
15  splitting counties makes it a racial gerrymander?
16  A    Well, not just totally splitting counties, because I think
17  the courts allow us to split counties where it's necessary.
18  But in this case, is it necessary to do that in Jefferson?  And
19  just to go in and pull out when you can make Jefferson whole.
20  That's not necessary.
21  Q    All right.  Are you familiar with the map that was passed
22  in the '90s, the congressional map?
23  A    In the '90s?
24  Q    Right.  The '92 map?
25  A    I -- yeah, I kind of -- well, hadn't really -- it didn't
```

1   really change the core of that look from the first map the '90s
2   up until today.  So it basically follows the same trend, yes.
3   Q    Yeah.  Here is exhibit -- this is Singleton Exhibit 67.
4   And this is, oh, probably about the third page of that exhibit.
10:14:25 5   So this is the 99 -- 1992 map, Senator.  Do you have an
6   understanding as to how this map came into being?
7   A    Not a thorough understanding.
8   Q    Okay.  If I told you that this was the result of
9   litigation in the Wesch case and this was a map that ordered by
10:14:46 10   a three-judge court, does that sound familiar to you?
11   A    Yes.
12   Q    Do you contend that this map ordered by a three-judge
13   federal court was a racial gerrymander?
14   A    I think that -- yes.  And I think that once it was
10:14:58 15   rendered, I think the Court looks back on it now and see that
16   it is.
17   Q    Okay.  At the time, do you think they had any intention of
18   harming any voters?
19   A    I don't know -- I don't know what the judges' intentions
10:15:11 20   were.
21   Q    All right.  And I am going to flip up still on Singleton
22   Exhibit 67 to the 2002 map.  Do you contend that this 2002 map
23   was a racial gerrymander?
24   A    Yes.  When you look up at the top of that map that little
10:15:32 25   peace sign, fingers out reaching out over to get -- some people

            1   in one area reaching out to draw -- I think it is a racial

            2   gerrymander, yes.

            3   Q    Who was in the majority in the legislature in 2002,

            4   Senator?

10:15:44    5   A    Probably Democrats.

            6   Q    Do you know who sponsored the 2002 plan?

            7   A    I think that was a Buskey plan, if I'm not mistaken.

            8   Q    I don't know who drew it.  And I may have asked a poor

            9   question.  I want to share now -- this has not been marked as

10:16:07   10   an exhibit.  And I think this is something the Court can take

           11   judicial notice of.  This is a copy of Act 2002-57 by Senator

           12   Sanders.  That's Senator Hank Sanders, correct, Senator

           13   Singleton?

           14   A    Yes.

10:16:24   15   Q    Who was Senator Hank Sanders?

           16   A    Senator Hank Sanders was from Selma, represented the 23rd

           17   District.  And he was the chairman of the education budget

           18   committee at that time.

           19   Q    Do you contend that Senator Sanders -- well, I want to

10:16:42   20   show you so you can see and show for the record when I flip

           21   down to the second page.  Act 2002-57 says it is an act to

           22   repeal and reenact Section 17-20-1 so as to redistrict the

           23   state's congressional districts, and the last page of this act

           24   shows that it was signed by the presiding officer of the

10:17:10   25   Senate, Speaker of the House, and by the Governor on

1    January 31, 2002.

2         Senator, Hank Sanders wasn't exactly known for sponsoring

3    legislation intended to harm African-American voters, was he?

4    A    No.

10:17:25 5    Q    No?  Do you contend that Hank Sanders' bill was a racial

6    gerrymander in 2002?

7    A    I think that what Hank Sanders did was did what they

8    thought was safe, to make sure that we at least had a voice,

9    that whether it was gerrymandering or not because it was first

10:17:44 10   then presented in trying to make -- that we maintain that

11   voice, and that's what they were doing.  I don't know what was

12   -- he was thinking personally, but this is just my observation

13   of what I see.

14   Q    Senator, did you support the plan that Senator Hatcher

10:18:10 15   introduced in the Legislature?

16   A    I think we probably did, yeah.

17   Q    All right.  Let me show you a page from Defense Exhibit 2,

18   which is one of the reports from our experts Tom Bryan, and

19   this is Page 45 of Defense Exhibit 2.  And Senator Singleton, I

10:18:41 20   tell you, this is a map of an outline of the Hatcher plan.  You

21   can see the blue lines there that shows -- that distinguishes

22   District 1 from District 2 from District 7, et cetera?

23   A    Yeah.  It's kind of busy.  There's a lot going on there.

24   Q    Yeah.  And that's one of the things I want to show you.

10:19:01 25   Inside those districts, what this -- what Mr. Bryan did, our

1  expert, he presented a map, and these are outlines of voting

2  precincts that are color coded based on how concentrated the

3  African-American population is within those districts.  So you

4  see these green areas, dark green areas are precincts that have

10:19:23 5  a lot of African-American voters, and the light green have

6  between 40 percent and 60 percent African-American voters, and

7  the red and orange have fewer African-American voters within

8  those precincts.

9      Would you call this Hatcher plan a racial gerrymander?

10:19:38 10      MR. ROSS:  Objection.  Objection, Your Honor.  It

11  calls for a legal conclusion.

12      MR. DAVIS:  Well, Your Honor, he has been calling our

13  plan a racial gerrymander.  I want to test that.

14      JUDGE MARCUS:  The objection is overruled.  We will

10:19:49 15  take it for his state of mind.  Overruled.

16  BY MR. DAVIS:

17  Q    Senator Singleton, does this Hatcher map qualify as a

18  racial gerrymander by your definition?

19  A    I have not looked at the Hatcher map that closely to look

10:20:01 20  at it.  This is really the Hatcher map came up in the Senate on

21  the day we didn't have a chance to even see its map prior to

22  him presenting it on that day.  And it was presented so fast.

23  This is the second time that I possibly have ever seen it.  So

24  without even looking at the numbers and all, I -- I don't have

10:20:19 25  a real conclusion on that.

1  Q    Okay.  I want to focus in a little bit on this area of

2  Jefferson County that's included in District 7.  Do you have

3  any opinion as to whether this map separates voters on the

4  basis of race with the way that Jefferson County is split?

10:20:38 5  A    Without looking at the numbers, I don't know, but if I

6  look at those splits, it possibly could happen.

7  Q    One of the plaintiffs -- and I believe it was the Milligan

8  plaintiffs, Senator -- presented a report from an expert, a

9  Mr. Bagley, I'm sure it's probably Dr. Bagley.  And he quotes

10:21:09 10  you with the comment that he says you made about the 2011 plan.

11  I am going to pull that up so you can see it.  This is Milligan

12  Exhibit 5.

13      And on the bottom of page 15 of Dr. Bagley's report,

14  Milligan Exhibit 5, look at this last line of text, and they're

10:21:34 15  talking about the 2011 plan.  And Dr. Bagley says, quote,

16  Senator Bobby Singleton observed flatly, I think it's political

17  packing, talking about the 2011 plan.  Is that something you

18  said?  Do you recall?

19  A    The 2011 plan?

10:21:53 20  Q    Correct.

21  A    Yes, I think I probably did say that, yes.

22  Q    Okay.

23  A    Political packing.

24  Q    I want to share now your complaint.  And I am going to go

10:22:14 25  -- this is docket entry 15, your amended complaint, Senator.

And I want to go to paragraph 67 of that complaint.  I
apologize for making it easy by scrolling thorough it so fast.
I meant to have it at the right spot.

    I apologize, Senator.  I wrote down the wrong paragraph
number, but I have the quote down here.  Says somewhere in this
complaint you say, District 6 and 7 have more than enough white
crossover voting to prevent meeting the third *Gingles*
precondition, racial crossover voting is sufficient to defeat
the candidate of choice of African-American voters.  Is that
your position, Senator, that District 6 and 7 in your whole
county map have more than enough crossover voting to prevent
meeting the third *Gingles* precondition?

            MR. PENN:  Judge, I object.  That calls for a legal
conclusion.

            JUDGE MARCUS:  Mr. Davis?

            MR. DAVIS:  Well, Your Honor, I mean, that's -- it's
just whether there's enough white crossover -- let me try to
reframe the question to avoid that issue.

            JUDGE MARCUS:  All right.

BY MR. DAVIS:

Q    Do you think there is enough white crossover voting,
Senator, in your District 6 and 7 that African-Americans would
be able to elect their candidate of choice?

A    I believe so.

Q    Okay.  And what is your basis for that?

```
 1  A    When I look at the trend of votes from the past elections.
 2          MR. DAVIS:  Your Honor, I am not going to -- I am
 3  going to go on mute to confer for a moment.
 4          JUDGE MARCUS:  You take your time.  Thank you.
 5          MR. DAVIS:  Thank you for your indulgence, Your Honors
 6  and Senator Singleton.  Senator, a few more questions.
 7  BY MR. DAVIS:
 8  Q    You also presented two other maps that do split counties,
 9  correct?
10  A    I think there may have been one that split a county.
11  Q    Okay.  Do you stand by those, or do you stand by what you
12  said today that you want counties kept whole, period?
13  A    We basically want counties whole where it's possible.  We
14  understand that there may be some necessary splits.  And you
15  may have to get that in some areas.  So.
16  Q    All right.
17  A    Yeah.
18  Q    Now, the transcript will show whether or not I heard this
19  correctly.  So maybe I misunderstood.
20      Did you say in your direct testimony that you cannot draw
21  majority black congressional districts without racial
22  gerrymandering?
23  A    No.  I didn't just say that.  Mr. Miller -- he asked me
24  about Mr. Miller, what Mr. Miller wanted.  And I said that in
25  order to do that, we may find ourselves doing racial
```

1  gerrymandering just to be able to get it, not that we can't.

2  Q     Okay.

3          MR. DAVIS:  Thank you, Senator.

4          And, Your Honor, that's all the questions that we have for

10:26:13  5  Senator Singleton at this time.

6          JUDGE MARCUS:  Thank you, Mr. Davis.

7          Mr. Penn, redirect?

8          MR. PENN:  Thank you, Judge.  Just a couple of

9  follow-up questions, Senator.

10:26:21 10                    REDIRECT EXAMINATION

11  BY MR. PENN:

12  Q     Mr. Davis mentioned something about the 2002 plan

13  legislates that was presented by Senator Hank Sanders, who you

14  mentioned for as a political leader in the west Alabama area?

10:26:33 15          In that regard, does it matter who drew the plan then?

16  A     To my knowledge, it doesn't.

17  Q     Does that change your concept of the whole county plan and

18  what you are trying to accomplish with this proposal that you

19  presented this time?

10:26:47 20  A     No, it doesn't.

21  Q     The other question I have is, as far as Mr. Randy Hinaman,

22  have you heard that name before?

23  A     Yes, I have.

24  Q     Who is Randy Hinaman, Senator?

10:26:56 25  A     He is the demographer for the state of Alabama

 1   reapportionment committee.

 2   Q    So when you met with him, what did you discuss?

 3   A    When I met with him, we didn't discuss anything about the

 4   congressional districts.

10:27:10  5   Q    You didn't have a conversation about the congressional

 6   districts, did you?

 7   A    The only discussion he had with me about my individual

 8   Senate district.

 9   Q    Was not about congressional districts at all; is that

10:27:21 10   right?

11   A    Correct.

12   Q    Who is responsible for drawing congressional districts for

13   the state of Alabama, Senator?

14   A    The Alabama Legislature.

10:27:27 15   Q    Are you aware he did meet with congressional leaders about

16   these maps?

17   A    To my understanding, yes.

18   Q    Do you think there's anything -- do you have a problem

19   with that, that he met with congressional leaders drawing their

10:27:39 20   own districts rather than the people or the folks who are at

21   these hearings who voice their concerns, or even the

22   legislators who are members of the reapportionment committee

23   have no voice?  Do you have a problem with that?

24   A    I have a problem with that.  And I spoke with Mr. Dorman

10:27:51 25   Walker along with the two chairmans, Mr. Hinaman may not have

1  been in the room, and said to them that, you know, as a

2  minorities on this community, we wanted to be a part of the

3  whole process.  When they meet with anyone, talk to anyone, we

4  wanted to be a part of that process, and we weren't.

10:28:10  5      MR. PENN:  Thank you, Senator.

6      Your Honor, that's all I have at this time.  Unless there

7  are other questions.  I pass the witness again.

8      JUDGE MARCUS:  Thank you, Senator Singleton, and you

9  are excused.

10:28:18 10      MR. DAVIS:  Your Honor, I beg your pardon.  I do have

11 follow-up questions to that last line if I may.

12      JUDGE MARCUS:  You may indeed.

13      Senator, if you'll just stick around for another moment.

14      THE WITNESS:  I am here, Your Honor.

10:28:30 15      JUDGE MARCUS:  Question or two.  Thank you very much.

16                      RECROSS-EXAMINATION

17 BY MR. DAVIS:

18 Q    Senator, whoever drafted the plan, all 140 members of the

19 Alabama Legislature got to vote on that plan up or down, right?

10:28:41 20 A    Correct.

21 Q    And any member of the Legislature, including those on the

22 reapportionment committee, could have drawn and introduced

23 their own plan?

24 A    Correct.

10:28:50 25 Q    Okay.  And you could have presented another plan to the

```
 1  reapportionment committee, could you not?
 2  A    Correct.
 3  Q    So every member of the Alabama Legislature had the
 4  opportunity to produce any plan they chose and to vote on any
 5  plan presented?
 6  A    Yeah.  But why serve as a member of the committee when you
 7  are not a part of the whole process?  The only thing we got was
 8  to be able just to vote after they had put it together.
 9  Q    But you could have presented your own plan to the
10  reapportionment committee, could you not?
11  A    Could have, but I wanted to be a part of that process.
12          MR. DAVIS:  Thank you, Senator.
13          THE WITNESS:  Thank you.
14          JUDGE MARCUS:  Any re-redirect Mr. Penn?
15          MR. PENN:  No, Your Honor, that's all we have.
16          JUDGE MARCUS:  All right.  Thank you, Senator.
17      I take it, Mr. Penn, the next witness for --
18          JUDGE MANASCO:  I think somebody might have just --
19  Judge Marcus, I think somebody might have just tried to address
20  the Court.
21          JUDGE MARCUS:  I'm sorry.
22      Judge Moorer, he is on mute.  I was unable to hear you,
23  sir.
24          JUDGE MOORER:  I'm sorry.  Judge Marcus, before
25  Senator Singleton steps down, I have one or two questions.
```

10:29:04  5
10:29:17 10
10:29:27 15
10:29:44 20
10:29:59 25

1          JUDGE MARCUS:  Sure.

2          JUDGE MOORER:  Senator Singleton, this is Judge

3   Moorer.  Can you hear me?

4          THE WITNESS:  Yes, sir.

10:30:10  5          JUDGE MOORER:  Senator Singleton, do you know if

6   Representative Sewell was consulted in the drafting of the

7   ultimate plan that was adopted by the Legislature?

8          THE WITNESS:  To my understanding, she was.

9          JUDGE MOORER:  All right.  The other question that I

10:30:28 10  have is:  Under your whole county plan, it may be that a

11  minority may not be elected in either or both of the districts

12  that you think give a real opportunity for minorities to be

13  elected.  But does your whole county plan also, whether a

14  minority is elected or not, bring the interest of the

10:31:06 15  constituency to the forefront to such an extent that whoever is

16  elected cannot ignore the interest of the minority community?

17          THE WITNESS:  Correct.

18          JUDGE MOORER:  And do you believe that it does that

19  better than the ultimate plan that the Legislature adopted?

10:31:25 20          THE WITNESS:  I think if you look at the one that the

21  Legislature adopts is gives -- what they will think is a safe

22  district.  But the one we have proposed to you give us an

23  opportunity in two districts, so I do think that it brings the

24  interest of those people to the forefront.

10:31:45 25          JUDGE MOORER:  Better than the plan that was

```
 1  ultimately adopted?
 2            THE WITNESS:  Yes.  Yes.
 3            JUDGE MOORER:  From your participation in the process,
 4  did you conclude at the outset that the plan that was
 5  ultimately adopted was in essence a foregone conclusion
 6  regardless of the other alternatives that you offer?
 7            THE WITNESS:  Absolutely.
 8            JUDGE MOORER:  All right.  I don't have anything else.
 9            JUDGE MARCUS:  Thank you, Mr. Penn.  Any follow-up
10  questions?
11            MR. PENN:  No, Your Honor.
12            JUDGE MARCUS:  Mr. Davis, any follow-up questions?
13            MR. DAVIS:  No.  Thank you, Judge.
14            MR. WALKER:  Judge.
15            JUDGE MARCUS:  I'm sorry, Mr. Walker, any follow-up
16  questions?
17            MR. WALKER:  I'm sorry for that disruption, Judge.
18            JUDGE MARCUS:  That's all right.
19                         CROSS-EXAMINATION
20  BY MR. WALKER:
21  Q    Senator Singleton, you acknowledge, don't you, that under
22  the whole county plan that you propose there is a possibility
23  that after an election there could be no black Congress people
24  elected; is that right?
25  A    I don't acknowledge that, no.  I think we can win those
```

```
 1   districts.
 2   Q    I understand you think you can win.  But we all know that
 3   there are always political upsets.  Are you confident that
 4   under the plan that you're proposing, which has no majority
 5   black districts, that black Congress people will be elected
 6   from Alabama -- black candidates will be elected from Alabama
 7   to the Congress?
 8   A    I'm confident that we can win this district, yes.
 9   Q    And that's based on your analysis of the trends in voting?
10   A    Yes.
11   Q    As you see them.  Anything else?
12   A    And just living in the districts, working the district,
13   understanding the people, understanding, you know, the whole
14   process.  This is not about some political analytics or
15   anything.  This is just the gut and being on the ground working
16   with people, yes.
17   Q    So no political analytics undergird your opinion?
18   A    No.
19   Q    Thank you, sir.
20   A    No more than numbers from reelections.
21            MR. WALKER:  Thank you, sir.
22            JUDGE MARCUS:  Thank you.  Mr. Penn, any follow-up
23   questions to Mr. Walker's questions?
24            MR. PENN:  No, Your Honor.  We stand on
25   Mr. Singleton's testimony.
```

```
 1            JUDGE MARCUS:  All right.  Thank you.  Seeing nothing
 2   further for Senator Singleton, Senator, thank you very much for
 3   coming down here today, and you are excused.
 4       Mr. Penn, I take it your next witness is your expert,
 5   Dr. Davis.
 6            MR. PENN:  Dr. Davis, yes, Your Honor.  If you will
 7   give me a second --
 8            THE COURT:  We will take a short break at this point
 9   for everyone and for our reporter.
10       By my count, it's 10:35 or almost 10:35 your time.  We
11   will take a 15-minute break, and we will get started again.
12       Thank you.  We'll take a short break at this point.
13            (Recess.)
14            JUDGE MARCUS:  Good morning.  Do we have everybody?
15   Ready to proceed?
16       Judge Manasco, Judge Moorer, you can hear us okay?
17            JUDGE MOORER:  Yes, sir.
18            JUDGE MANASCO:  I can.  Thank you.
19            JUDGE MARCUS:  Okay.  We're ready, then, I guess --
20   are we ready -- are all the parties ready?  I want to make sure
21   we have counsel for Caster.  Do we have counsel for the state,
22   Mr. Davis?
23            MR. LACOUR:  Judge Marcus, I'll be handling the
24   cross-examination.
25            JUDGE MARCUS:  Mr. LaCour, okay.  So from your end,
```

```
 1  you are ready to proceed?

 2          MR. LACOUR:  Yes, Your Honor.

 3          JUDGE MARCUS:  Thank you.  And I think Mr. Ross, the

 4  Milligan people are ready to proceed as well?

 5          MR. ROSS:  Yes, Your Honor.

 6          JUDGE MARCUS:  Thank you all.  And, Mr. Penn, you may

 7  proceed with your next witness.  Thank you.

 8          MR. BLACKSHER:  Your Honor, it's Jim Blacksher.  I

 9  will be examining Dr. Davis.  We call Dr. Natalie Davis.

10                        DR. NATALIE DAVIS,

11  having been first duly sworn, was examined and testified as

12  follows:

13          JUDGE MARCUS:  If you would state your name for the

14  record, and we will proceed with the examination.

15          THE WITNESS:  Natalie Davis.

16          JUDGE MARCUS:  Thank you.  Mr. Blacksher, thank you.

17                       DIRECT EXAMINATION

18  BY MR. BLACKSHER:

19  Q    Professor Davis, would you give us a brief overview of

20  your professional background?

21  A    I am recently retired from Birmingham-Southern College.  I

22  taught there for 38 years.  I am a political scientist and am

23  -- my title now is emeritus status.  Howell Heflin, professor

24  of political science.  I have earned a Ph.D. in political

25  science in 1976 from the University of North Carolina at Chapel
```

Hill.  I am generally viewed as an expert on southern politics
in general, but Alabama politics in particular.

My expertise has to do with understanding Alabama
politics, and also spending a good deal of my professional time
surveying, polling, analyzing, Alabama elections and process in
the political world.

I also was a candidate once for political office.  And I
understand it from a more pragmatic point of view.

Q    What candidacy was that?

A    Rain in 1996 for the U.S. Senate and was defeated.

Q    In the primary?

A    In the primary, correct.

Q    The Democratic primary?

A    Exactly.  I have been a democratic activist having served
on the state Democratic Executive Committee, the Democratic
National Committee, but all of that ended in 2000, and since
then, I have not played any active role in Alabama politics.

I have been called upon to comment on elections and
provided election night analysis for all of the local TV
stations.  I have also done some national media work, and
annually I usually analyze the State of the State address on
public television.

I own two consulting firms, one a public opinion firm,
where I conduct statewide and local elections.  And the other
firm Voir Dire, Inc., or voir dire, depending on where you

1  live, is a jury consulting firm.  And in that activity and

2  work, I routinely survey venues.  I conduct focus groups and

3  mock trials.

4  Q    Thank you, Dr. Davis.

10:55:38 5           MR. BLACKSHER:  If it please the Court, we move to

6  have professor Davis qualified as an expert in southern history

7  -- southern politics in general and in Alabama politics in

8  particular.

9           JUDGE MARCUS:  Any objection or challenge to her

10:55:55 10 qualifications from the state, Mr. LaCour, or from Pringle and

11 McClendon?

12           MR. LACOUR:  No objection, Your Honor.

13           JUDGE MARCUS:  Does anyone have any objections?

14 Seeing none, Dr. Natalie Davis is qualified in the areas of

10:56:12 15 southern history, politics, and Alabama politics.

16      With that, you may proceed, counsel.  Thank you.

17 BY MR. BLACKSHER:

18 Q    Professor Davis, did you prepare the expert reports that

19 are marked as Singleton Plaintiffs' Exhibits 2 and 3?

10:56:29 20 A    I did.

21 Q    Can you describe the role of counties in Alabama politics

22 and political culture?

23 A    Well, counties are the political unit of analysis, in the

24 sense that they collect for administrative purposes and

10:56:51 25 political purposes the people who live there.  We elect county

judges, county commissioners, county members of the school

board, and, in fact, the elections are reported by county by

the Secretary of State.

We -- not only are counties important administratively --

driver's licenses and so on -- but they also cluster

individuals around a sense of community.  I remember that when

I ran for office in 1996, the advice I received actually from

Howell Heflin first was that my first stop needed to be at the

county courthouse.  It was important that county officials knew

who I was, am, and that's true of all candidates, whether it's

a local jurisdiction issue or a local election or a broader

one, like a congressional district race.

Counties are important.  They put us together.  I mean,

county sheriffs.  Just think of all of the things that we do

because we live in a particular county -- pay different taxes

and all the rest that I just mentioned.

So from my perspective, if you want to understand

politics, you better know what's going on in a county.

Political parties organize by county so that it is -- you

qualify for election at the county level.  All of these things

come together, and I just don't know -- I understood the

argument about that, and we can come back to it -- communities

of interest.  But for all practical purposes, you understand

politics, you better understand the county.

Q    Do the major parties, the Democratic party, Republican

party organize at the county level?

A    They absolutely do.  There are county committeemen.  You actually elect county committeemen and women.  You have fund-raising activities put on by local county political parties.  And so it's a given that organization Get Out the Vote, the stats that go with previous elections with respect to counties, all of those are respected.  And so when you're designing a plan politically, you go county by county, what's possible, what's not possible.

Q    Do ordinary citizens identify themselves by the county that they reside in?

A    Yeah.  I think they tend to first say, well, I live in Birmingham, or I live in Mobile.  But beyond that, in polling, for example, the first question we ask in a statewide poll is, what county do you live in, because then we can begin to put counties together and figure out what's going on statewide.

Q    Is it important that elected officials, county elected officials have a good relationship with the member of Congress who represents them?

A    Well, sure.  You want a direct relationship with your member in Congress.  And you want to be able to say, this is what's going on in our county, this is what we need, please help us.  And that gives that member of Congress a way to communicate with the rest of the Washington political and administrative government.

1      You know, it -- one of the things about Alabama is that
2  historically members of Congress were known more for
3  constituent service than they were for having a national
4  profile.  And if you think about Senator Shelby, for example,
11:01:24 5  what kind of federal funding and federal relief has he been
6  able to bring to Alabama?  This has been true historically, and
7  members of Congress the same way.  One of the problems with
8  splitting a county is you may have two members of Congress who
9  are politically at odds.  Therefore, it's very difficult for
11:01:48 10 the county to act in unison, in terms of county needs.
11 Q    When you say politically at odds?
12 A    Well, sure, one is a Democrat and one is a Republican.  So
13 sometimes they can't come together.
14 Q    What if they're both Democrats or both Republican and have
11:02:09 15 different constituencies outside the county?
16 A    That can be a problem, as well.  To the extent that there
17 are ideological differences between those two persons, then
18 something that touches ideology is going to be hard for to get
19 an agreement on.
11:02:23 20 Q    Professor Davis, in the legislative session in which the
21 current plan was enacted last October, at least one of the
22 Republican members of Congress asked to have a change made
23 between Escambia County and Monroe County.  I think it was
24 Representative Moore.  And one of the arguments that he made as
11:02:55 25 presented in the talking points by Dorman Walker was that he

1    didn't need -- he had too many counties to provide his -- was

2    going to overburden his staff because they had to service these

3    counties.  What is he talking about, servicing these counties?

4    A    Well, again, constituent service has been a mark of

11:03:20 5    representation in Alabama.  But if you trade one constituency

6    for another, then you either jeopardize support in the other

7    counties, or that one county -- in this case Monroe County --

8    is not going to get what it needs.  Or I should say it may not

9    get what it needs.

11:03:48 10   Q    Did you analyze the opportunity districts -- Districts 6

11   and 7?

12   A    I did.

13   Q    In the Singleton whole county plan?

14   A    I did.

11:03:58 15   Q    And how did you analyze, and what did you conclude?

16   A    I went to -- we looked at 12 elections -- statewide

17   elections.  We did not look at the two times that congresswoman

18   Sewell ran and won with big numbers and then from that point on

19   really didn't have opposition.  And so we looked at 12

11:04:29 20   different elections and found that if you applied the Secretary

21   of State's voting results for the counties in the whole county

22   plan, you find that in the whole county plan District 6 and

23   whole county plan District 7, the Democrat would have won the

24   district.

11:04:55 25        Slim margins in a couple.  Large margins in others.  I'm

1    looking for the results so we have to talk about them.

2    Q    Are the election returns that you're referring to appended

3    to your expert report, Exhibit 2?

4    A    Yes.  And you're helping me to find them, I know.

11:05:21 5    Q    It's quite all right.  We don't need to refer to them.

6    A    Great.  All right.  Go ahead.  I'm sorry.

7    Q    I think Senator Singleton referred to the election

8    between -- for lieutenant governor between James Fields and Kay

9    Ivey?

11:05:41 10    A    Right.

11    Q    That had the smallest margin of democratic victory in

12    those counties of any, didn't it?

13    A    Yeah, that was in 2014.  James fields, an

14    African-American, ran statewide.  He had little money, no --

11:05:58 15    virtually no name recognition out of I think Cullman County.

16    Q    Cullman County?

17    A    And while the newly elected Lieutenant Governor Ivey took

18    63 percent of the vote statewide, in the both the Sixth and

19    Seventh Districts, the Sixth in particular, it was a slim

11:06:27 20    margin, but Fields beat Ivey.

21    Q    In the Sixth and Seventh Singleton plan Districts?

22    A    Yes, in the whole county plan.  All of this is whole

23    county.  The interesting thing about trying to revisit these

24    elections is that we have the actual data, again, provided by

11:06:48 25    the Secretary of State's office.

1    And so while one of the defendants' experts has -- uses

2  modeling to develop results, we could actually look at the

3  numbers and see what happened or what would have happened, what

4  did happen.

11:07:05  5  Q    You don't have to estimate what the returns would be?

6  A    That's right.

7  Q    If you have the returns on paper?

8  A    That's exactly right.

9  Q    And to the extent that the state's expert was trying to

11:07:16 10  predict how these districts might perform in the future, he

11  still has reference, doesn't he, to his performance in the

12  past?

13  A    That's correct.

14  Q    Is there any other way to predict the future when it comes

11:07:30 15  to political predictions of how a particular district will

16  perform?

17  A    You know, every election is unique.  There's no question

18  about that.  Every election.  But every election relies upon

19  what happened previously.  And so whether it's targeting or

11:07:47 20  whether it's just kind of understanding politics for that area,

21  you do rely on history.

22    Modeling is a major effort in political science.  And I

23  understand that.  But when you have -- you are not operating in

24  the dark here.  We know what happens.

11:08:12 25  Q    How much confidence do you have that Districts 6 and 7 in

the whole county plan will provide black voters the opportunity

to elect candidates of their choice?

A    I have -- I have very strong confidence.  And let me start

by saying that, you know, you can look at -- you can look at

11:08:39 redistricting in terms of outcomes.  We are -- we want to have

two black members of Congress.  Or you can look at it in terms

of opportunity.  We want a process that assures that black

voters have the opportunity to elect a candidate of their

choice.

11:09:03    And the whole county plan does that.  It does it by first

assuring itself that the democratic nominee is going to be

supported by black voters.  And from what -- from the knowledge

we have and experience we have about the black vote in this

state, we know that that's -- that the primary is going to

11:09:28 result in a candidates that's been selected by black voters.

Q    Would that apply to the primary elections in Districts 6

and 7 in the whole county plan?

A    In the whole county plan, absolutely.  But what we know is

that -- that's probably not enough to assure that outcome.

11:09:50 What has to happen is that there has to be a percentage of the

white vote that crosses over and votes with the democratic

nominee.  History, the statistics tell us that's the case.

    The defendants' experts that predict anywhere from 10 to

19 percent of a crossover vote, that materialized in these

11:10:17 previous elections, and it will materialize in the future.

1      So you combine the black vote with the sufficient number

2  of white vote, and you are going to get 50 percent plus one of

3  the total vote cast in a general election.

4  Q    What about Jefferson County in particular?  Is there a

11:10:35  5  lasting history of white support for democratic candidates in

6  Jefferson County?

7  A    There is.  And in Jefferson County -- Jefferson County is

8  a blue county.  It has been blue for probably since the mid to

9  late '80s, mid '90s.  It -- all the judges are Democrats.  All

11:10:57 10  the county commissioners with -- well, that's not true.  Not

11  all the county commissioners.

12  Q    County commissioners run for districts?

13  A    That's right.  Any county-wide officials are Democrats.

14  So we know what Jefferson County is going to do, because it's

11:11:15 15  done it election after election after election.

16  Q    So in your opinion, what are the main differences between

17  the plan that was enacted by the Legislature in 2021 and the

18  Singleton whole county plan?

19  A    Well, the 2021 plan, the enacted plan, does a couple of

11:11:36 20  things.  One is it does assure that one black person will be

21  elected and that will be in the Seventh District.

22      It splits Jefferson County in a way that is unfair to

23  black voters who live in Jefferson County.

24      Three-fourths of black voters -- black population is moved

11:11:59 25  out of Jefferson -- out of the Sixth, what was the Sixth and

1    moved into the Seventh.  So that splits the county in a way

2    that is unfair to black voters.  There's no question about

3    that.

4         It is a racial gerrymander, the current enacted plan,

5    because it really does pack black voters into one district.

6         Three-quarters of black voters have no say about Jefferson

7    County, except to combine their needs with the needs of other

8    black voters in the Seventh.  And I would argue that they're

9    very different.  Jefferson County is urban.  The other

10   districts -- the other counties tend to be rural.

11        That's an important marker.  What the whole county plan

12   does is just that.  It brings the folks who live in Jefferson

13   County together for political and for cultural purposes.  And

14   it's whole.  It is -- it is -- it serves the interest of

15   parsimony.  It is simple.  It is clear to understand.  And it

16   works.  And it will make it likely -- very likely that two

17   Democrats will be elected rather than one.

18        And I would say one other thing between -- as far as the

19   difference between the 20 -- the bill passed by the -- sorry --

20   the Act passed by the Legislature and this one is that the

21   enacted plan essentially disenfranchises white Democrats.  They

22   really don't have a say in the -- in either the democratic plan

23   in either the Seventh or the Sixth district.  But in the whole

24   county plan, they're important.  And in that sense, it serves

25   the interest of what I would call an important part of the

1  democratic process, and that is political competition.

2  Q    Did you review -- I know you did review the -- because we

3  gave it to you -- the exhibit that shows pictures of all the

4  maps of congressional plans going all the way back to 1822 in

11:14:38  5  Alabama?

6  A    Yeah.  And I'd say I reviewed them carefully, but go

7  ahead.

8  Q    So is there any other -- is there any other feature of

9  those plans other than whole counties that predominates in your

11:14:56  10  opinion?

11  A    Well, I mean, obviously, they have sliced and diced the

12  area that encompasses the Seventh District that -- just look at

13  the map.  All right.  The little finger is gone in the current

14  -- in the enacted plan, but not really.  And, you know,

11:15:19  15  splitting census tracks or precincts, all that kind of stuff,

16  it just seems to be so artificial and so obviously a

17  gerrymander.

18       The value of whole plan -- and they didn't do it for other

19  -- except for the Sixth and Seventh, they didn't do it for

11:15:36  20  other districts.  They may be a little bit here and there.  But

21  there was reason to split Jefferson County when its population

22  exceeded one-eighth or one-seventh of the state.  But really

23  there's no reason to split it now.  It's less than that.

24       And someone who lives in Jefferson County, I'd like it all

11:16:05  25  together.

1          MR. BLACKSHER:  Pass the witness, Your Honor.

2          JUDGE MARCUS:  Thank you.  Let me ask counsel for

3  Milligan, any questions for this witness?

4      All right.  Counsel for Caster?  Any questions for this

11:16:19 5  witness?

6      All right.  Seeing none, let me turn, Mr. LaCour, to you

7  on behalf of the Secretary of State.

8          MR. LACOUR:  Absolutely.  Thank you, Your Honor.

9                       CROSS-EXAMINATION

11:16:31 10 BY MR. LACOUR:

11 Q    Dr. Davis, it's good to see you again.  I am Edmund

12 LaCour.  I represent the Secretary of State in this litigation.

13 And I hope you have been well.

14 A    I hope you are, too.

11:16:42 15 Q    Thank you.  A few questions for you about your testimony

16 today and as well as the statements that you have offered and

17 the two declarations.

18      Starting, first, with your initial report, which I believe

19 is Singleton Exhibit 2 right at the outset in the first

11:16:59 20 paragraph, you've stated that, quote, the whole county plan

21 introduced in SB-10 is an optimal redistricting plan.  What

22 makes it optimal in your view?

23 A    Well, for one thing, it does consolidate the voters in

24 Jefferson County, and I think that's an important part of the

11:17:23 25 plan.  It also represents the tradition of Alabama, which is

1  whole county.  We do things by county.

2      It also consolidates the black vote inside Jefferson

3  County.  And it -- under the enacted plan, black voters in

4  Jefferson County are used to racially gerrymander the Seventh

11:17:52  5  District.  Under the whole county plan, there is more respect

6  for the ability of black voters to choose a candidate of their

7  choice.

8  Q    Okay.  So would the plan still be optimal if it only

9  produced one congressional district where it was likely that

11:18:11 10  black voters would have the opportunity to elect the candidate

11  of their choice?

12  A    I'm not sure I understand.  Are you talking about --

13  Q    Well, I guess I'm trying to figure out is it the fact that

14  counties are kept together what makes it optimal?  Is it the

11:18:29 15  fact that two candidates supported by a large number of black

16  voters are likely to be elected that makes it optimal, or is it

17  some combination of the two?

18  A    Yeah.  I think it's both of those things.  And I would add

19  that it represents a better stake in the democratic process.

11:18:51 20  Q    Okay.  And would the plan be even more optimal if it was

21  likely that three Democrats would be elected to Congress

22  instead of just two?

23  A    That's hard to say, but as -- you know, yeah, I would say

24  so only to the extent that that would mean the congressional

11:19:17 25  delegation would be four to three.  And I think that's better

1  than six to one or five --

2  Q    Would it be more optimal still if that delegation was four

3  Democrats and three Republicans if the plan could produce that?

4  A    I don't want to get to the opposite of what we have now.

11:19:45  5  And so I don't know how to answer that question.  I am for

6  political competition.  And I think that realistically two is

7  about all that Democrats could hope for.  And if -- if blacks

8  represent about 28 percent, 27 percent of the population, that

9  seems like a fair distribution.

11:20:16 10  Q    Okay.  And if there was a plan that allowed black voters

11  to elect a candidate of their choice and white Democrats in

12  another district to elect the candidate of their choice, would

13  that plan be equally optimal to the whole county plan?

14  A    Help me again with the question.  Are you saying if the

11:20:37 15  whole county plan came up with white Democrats being elected as

16  opposed to black Democrats?  Is that the question?

17  Q    If one district was likely to allow for black voters to

18  elect the candidate of their choice, and another district was

19  likely to allow white Democrats to elect the candidate of their

11:20:58 20  choice, would that be as optimal as the whole county plan?

21  A    Again, Mr. LaCour, are you talking about inside the whole

22  county plan as it's -- in SB-10 or just a general question?

23  Q    More generally?

24  A    White Democrat over a black Democrat?

11:21:16 25  Q    I would say more generally.  Would you agree with me

|   | |
|---|---|
| 1 | there's more than one way to draw a whole county plan? |
| 2 | A    Oh, I'm sure there is. |
| 3 | Q    So if there was hypothetically a different whole county |
| 4 | plan where white Democrats were to the most powerful group |
| 11:21:33 5 | within one district and black Democrats had the opportunity to |
| 6 | elect the candidate of their choice in the other district, |
| 7 | would that also be optimal? |
| 8 | A    Not compared to the whole county plan being offered, the |
| 9 | Singleton plan. |
| 11:21:49 10 | Q    Okay.  And why would that be? |
| 11 | A    Because we need to be sure that the voices of black voters |
| 12 | are heard.  If a majority of black voters nominate a white |
| 13 | Democrat, I'd say that's fine.  The odds are they will elect a |
| 14 | candidate of their choice who is black. |
| 11:22:11 15 | Q    All right.  And just more generally, when you say optimal, |
| 16 | you mean like optimal for whom? |
| 17 | A    Political process.  For politics in our state. |
| 18 | Q    And are you aware of any legal requirements, state or |
| 19 | federal law that requires Alabama Legislature to enact a plan |
| 11:22:36 20 | that is optimal in that sense? |
| 21 | A    I don't know. |
| 22 | Q    Would -- |
| 23 | A    I know that racial gerrymandering is unconstitutional. |
| 24 | Q    Now, would a plan that led to the election of seven |
| 11:22:53 25 | Republicans be optimal for the Republican party? |

1  A     Say it again.

2  Q     If there was a plan that led to the likely election of

3  seven Republicans, would that be an optimal plan for the

4  Republican party?

11:23:09  5  A     No.

6  Q     And why not?

7  A     Well, why have elections?  You know, if you want to go

8  back to the old adage of the primary is tantamount to election,

9  well, I guess so.  But I don't subscribe to that.  I think

11:23:31  10  interparty the possibility that everybody has a shot at winning

11  is a good thing.

12  Q     Okay.  We were discussing earlier that there are

13  potentially other ways to draw whole county plans.  Are you

14  aware that there are some whole county plans that can be drawn

11:23:50  15  that are likely to elect only one Democrat?

16  A     I really don't -- I really haven't looked at other plans.

17  Q     If there were such a plan, should Alabama still keep

18  counties whole even if doing so doesn't produce two crossover

19  districts, like the whole county plan does?

11:24:10  20  A     You know, I -- I don't know.  I don't think so.  Because,

21  again, if you assume that the population of Alabama has got

22  room for two African-Americans, two blacks, then I would prefer

23  it.

24  Q     Okay.  And then comparing -- and, again, these are all

11:24:31  25  hypotheticals, but if there was a whole county plan with one

| | |
|---|---|
| 1 | 45 percent Black Voting Age Population district, and no other |
| 2 | district with even 40 percent Black Voting Age Population, |
| 3 | would that be better than a plan that has just one, 54 percent |
| 4 | Black Voting Age district that ends up splitting a few counties |
| 11:24:57  5 | to get there? |
| 6 | A    You know, I really don't think so.  I think that, you |
| 7 | know, my -- my view of politics is that there is room to have |
| 8 | two elected representatives to Congress who are supported by |
| 9 | black voters and you can do it and you should do it because it |
| 11:25:23 10 | does bring together people who would otherwise not have the |
| 11 | chance to come together and elect the candidate of the choice |
| 12 | of black voters. |
| 13 | Q    Okay.  Now, you have referred to Alabama's tradition of |
| 14 | keeping counties whole, correct? |
| 11:25:37 15 | A    Right. |
| 16 | Q    And are you aware of any legal requirement that the state |
| 17 | do so for congressional districts? |
| 18 | A    No, I don't think so. |
| 19 | Q    Okay.  Do you know what the last plan was in which every |
| 11:25:51 20 | county was kept whole? |
| 21 | A    I think you would have to go back to 19 -- well, '60, I |
| 22 | guess.  I'm not sure. |
| 23 | Q    That sounds right to me. |
| 24 | A    It's all about Jefferson County, and that's why it had to |
| 11:26:12 25 | be split.  So for a couple of cycles, a couple of censuses, |

1   Jefferson County was the only county that was split.

2   Q      Uh-huh.

3   A      And then St. Clair came on, and there were two counties

4   that were split.  But for the rest of the state, everything was

11:26:32  5   whole county.

6   Q      And you're familiar with the constitutional principle of

7   one person one vote, correct?

8   A      Yes.

9   Q      Is striving for equal representation among each of the

11:26:44 10   congressional districts traditional districting criterion, as

11   well?

12   A      I think equal population certainly is.

13   Q      Okay.  And the Legislature for several districting cycles

14   now has sought to minimize population deviation among the

11:27:03 15   districts, correct?

16   A      That's correct.

17   Q      So is it your position that the state's interest in

18   keeping counties whole should trump the state's interest in

19   ensuring tighter compliance with one person one vote principle?

11:27:18 20   A      I believe there is room for deviations greater than zero,

21   and I don't know that the line has been set in the -- I guess

22   -- I don't know constitutional law.  But I think I know that

23   the tenet decision suggests that that zero deviation did not

24   need to happen.

11:27:42 25   Q      And because -- so then accepting that the state has the

1  ability to deviate some, it's your position that they should,

2  that they should prioritize keeping the counties together over

3  the other traditional criteria of maintaining one person one

4  vote?

11:28:03  5  A    I think you can serve both of those things.  I don't -- I

6  mean, obviously, a huge deviation would violate that.  But we

7  have to decide what is acceptable in order to both preserve

8  counties and preserve the ability of black voters to elect the

9  candidate of their choice.

11:28:27 10  Q    You'd agree that the enacted map keeps most counties

11  whole, correct?

12  A    Well, it's all about the Sixth and Seventh Districts,

13  isn't it?

14  Q    Well, my question, though, is there are not more than a

11:28:47 15  few county splits, correct?

16  A    Right.

17  Q    So they've struck a balance to say we're going to go as

18  close as we can to one person one vote even though that's going

19  to require us to split a few counties, correct?

11:29:05 20  A    Well, they went to zero, in terms of deviation.  And in my

21  judgment, all of the decisions about redistricting -- I

22  shouldn't say all.  A huge majority of the decisions regarding

23  redistricting had to do with the Seventh District and

24  preserving that district as a majority -- a minority-majority

11:29:35 25  district.  And to do that, you know, you squeezing as many

1  black voters as you can, and that creates all these splits.

2  And so then you have splits for the Sixth District as a result

3  of that.

4      You know, I think the reasons which go back to the Voting

11:29:59  5  Rights Act may have been good reasons for doing what has been

6  done.  But the law changed.  And the process should have

7  changed to accommodate the law.

8  Q    I'd like to touch on that a little bit.

9      So I think you had said in your supplemental report on

11:30:21 10  page 4 that, quote, such concentration may have been justified

11  in the past, referring to the concentration of voters in

12  District 7?

13  A    Right.

14  Q    Correct?

11:30:33 15  A    Correct.

16  Q    Do you know when that concentration was no longer

17  justified?

18  A    I think after the Reno decision.

19  Q    So then by 1993, the Legislature had an obligation to undo

11:30:58 20  that district?

21  A    Well, it certainly had an obligation not to gerry --

22  racially gerrymander it.

23  Q    And --

24  A    I think that there was a consensus that we should keep

11:31:22 25  things as they are, and this idea that you shouldn't have

1   incumbents running against each other dominated all the

2   thinking.  Those two things.  And as a result, they said, well,

3   let's just leave it.  And they left it for two more censuses

4   and now this one, if I have my years correct.

11:31:42  5  Q    When a Legislature generally engages in redistricting

6   process, do they usually start with a blank slate or start with

7   the previously enacted map?

8   A    I'm guessing they use the old map.  But I don't really

9   know that.

11:32:01 10  Q    Okay.  And are you aware that under the current guidelines

11  that governed in the 2021 redistricting process, that retention

12  of the core of districts was one of the guidelines that the

13  Legislature adopted?

14  A    Not directly.  I've been hearing this morning, but...

11:32:29 15  Q    And incumbency protection was also?

16  A    Right.

17  Q    Those guidelines, correct?

18  A    Right.  And I have a problem about that.  But.

19  Q    But I think you have said this is also your supplemental

11:32:46 20  report Singleton Exhibit 3, page 4, quote, one of the

21  guidelines is not to put incumbents in the same district, so in

22  many ways, the current plan is an incumbent protection plan,

23  closed quote.

24       Am I getting that right?

11:33:00 25  A    You got it.

```
 1  Q    So that -- is it your view that incumbency protection
 2  explains why the Legislature enacted the 2021 map?
 3  A    Well, it explains a piece of it, sure.  You know, leave
 4  things as they are.  Don't put incumbents together results in
11:33:26  5  racial gerrymandering.
 6       The -- and I guess if you went to a whole county plan, you
 7  risk having Terri Sewell run against Gary Palmer.  And neither
 8  of them would like to do that, I am sure.  Why have elections
 9  if you're just going to keep things as they are and have
11:33:53 10  incumbents get reelected time after time?  What do you need an
11  election for?
12  Q    Can incumbency protection sometimes benefit a district's
13  constituents?
14  A    It can, yes.
11:34:09 15  Q    I think you touched earlier on the importance of members
16  of Congress having good relationships with county officials,
17  correct?
18  A    Right.
19  Q    So would ensuring that members of Congress continue to
11:34:22 20  represent the same counties and more or less the same
21  constituents help promote that interest?
22  A    I think generally speaking, yes.
23  Q    Okay.  Does -- elected officials generally learn more
24  about their districts its needs the longer they've served,
11:34:40 25  correct?
```

```
 1  A     If they choose to.
 2  Q     And do members of Congress tend to accrue more influence
 3  in Congress the longer they serve?
 4  A     Yes.
```
11:34:51
```
 5  Q     And thus more senior members of Congress might be better
 6  able to serve their districts than a more junior member, would
 7  that be fair?
 8  A     Yes, to some extent.  But let me just add something to
 9  this.
```
11:35:12
```
10        When you have a district which is as split racially in
11  Jefferson County as it is, if you went to the whole county
12  plan, you have a problem in that -- let me go back.
13        Under the current plan, both the previous and the enacted,
14  the member of Congress, a Republican, can totally ignore the
```
11:35:37
```
15  black community.
16        I don't think that's morally right or ethically right.
17  But it doesn't serve the interest of democracy.  It's more
18  stable.  And it certainly can deliver to communities like
19  Mountain Brook and Vestavia and so on.  But it doesn't deliver
```
11:35:58
```
20  to Bessemer or to the city of Birmingham.  And I think that's
21  the problem with -- the old plan up until this current election
22  coming up, and, perhaps the new plan.
23  Q     I think about --
24        MR. LACOUR:  Your Honor, one moment.  I apologize.
```
11:36:32
```
25        JUDGE MARCUS:  Take your time.
```

BY MR. LACOUR:

Q    So if a member of Congress were able to deliver for his district, for example, if the member of Congress in the First District were to deliver something that's very beneficial to the port in Mobile, is that something that would benefit black and white voters?

A    I think so.

Q    Are you aware of any evidence that Republican legislators more specifically Republican members of Congress are ignoring the interest of black voters?

A    I think when it comes to issues of -- you talking about state legislators or members --

Q    Members of Congress.

A    I think when it comes to issues that impinge upon federal spending, on taxes, on some social issues, not all, I would say that Republican members of Congress do not represent the best interests of the black community.

Q    Do you think Representative Sewell represents the interest of white Republicans in District 7?

A    I don't know her voting record.  But I'm guessing that she votes typically with the Republicans probably more than most. And so things like tax cuts for the wealthy folks in her district, probably is not in their interest.

Q    Okay.  Now, coming back to the 2021 map, you say it's a racial gerrymander because it packs black voters.  Is your

opinion based solely on the shape of District 7?

A    No.  I mean, again, going back to Jefferson County,
75 percent of the black population is moved from Jefferson
County -- well, is in the Seventh District.  I mean, that's an
important piece of the puzzle.  Without Jefferson County, the
Seventh District under the current plan would be in terrible
shape for Terri Sewell.  That's why the whole county plan makes
a whole lot more sense.

Q    So that's because there is a split in Jefferson County
that gathers in a substantial majority of the black voters?

A    Yeah.  It's a lot of voters.  It's a lot of people.  It's
not just based on voters.  It's population.  And it really
takes them out of the Jefferson County mix.  I just find it
difficult to understand why that makes sense.

Q    And we talked earlier about the 1992 map.  Is it your
position that was a racial gerrymander, as well?

A    Yeah, but under Section 2 of the Voting Rights Act, it was
justified.

Q    Okay.  And those that followed -- I think in your initial
report Singleton Exhibit 2 page 8, I think you said the 2021
map is, quote, keeping things as they are, closed quote, and
that's what makes a racial gerrymander?

A    Yes.

Q    Okay.  So it's based on the effects of the lines at the
end of the day; is that fair?

```
 1  A    Well, I think you start from -- as you said earlier, you
 2  start from the map you have, and then you play with it because
 3  population shifts, size of the district shifts, and all the
 4  rest.  But you kind of do it the same way.
 5  Q    The 2001 plan was enacted by a Democratic majority in the
 6  Alabama Legislature, correct?
 7  A    That's right.
 8  Q    And is it true that this map in 2008 led to the election
 9  of three Democrats to Congress, I believe Bobby Bright, Parker
10  Griffith, and Artur Davis?
11  A    Bobby Wright, Artur Davis, and who was the third one?
12  Q    And I think Parker Griffith with the Fifth District,
13  Huntsville?
14  A    Oh, in Huntsville?  Yes.
15  Q    Yes.
16  A    And that was in 2001?
17  Q    That was in -- the map would have been enacted 2001.  I
18  believe 2008 was when all three of them were sent to D.C. on
19  behalf of the state of Alabama.  Does that sound about right?
20  A    Yeah.  I think that's right.
21  Q    Did that map provide white Democrats any voting power?
22  A    Sure, it did.
23  Q    Okay.
24  A    Bobby Wright became a Republican as I recall.
25  Q    And was the 2001 plan more optimal than the 2021 plan?
```

Timestamps in left margin: 11:41:24 (line 5), 11:41:43 (line 10), 11:42:00 (line 15), 11:42:16 (line 20), 11:42:32 (line 25)

```
 1  A    I don't -- I have to look at a map, to be honest.
 2  Q    Let me see if I can pull up the 2021 map or the -- and the
 3  2001 map for that matter.
 4  A    You know we went through one-party democratic politics,
 5  one-party state.  And then we had a transition period.  And in
 6  2010, the transition to a one-party Republican state took
 7  place, so we were in that potential for a two-party
 8  competition.
 9  Q    Okay.  So I'm going to -- and hopefully this is --
10  A    And Parker decided to run for statewide, and that was the
11  end.
12  Q    So this is the 2021 map.  We will take a quick look at
13  that.  And then I will turn back the clock.
14  A    Wait.  This is the enacted plan or the?
15  Q    This is the enacted plan here.  I am going to go back as a
16  point of reference.  I will go back to the 2001 plan, which is
17  right here.  So I guess it's hard to -- it's 2002 congressional
18  districts because they would have been running in these
19  districts in 2002.
20  A    Uh-huh.
21       JUDGE MARCUS:  Mr. LaCour, let me interrupt you for a
22  second.  Can you tell us just so the record is clear what
23  exhibits these are, that is to say HB-1 the 2021 plan enacted
24  and the 2002 as enacted?  I think just so the record's clear,
25  we know exactly which district -- which exhibits we're
```

11:43:08 — line 5
11:43:29 — line 10
11:43:43 — line 15
11:44:03 — line 20
11:44:24 — line 25

          1  referring to.

          2          MR. LACOUR:  Yes, Your Honor.  I apologize.  This is

          3  Singleton Exhibit 22.  This is the exhibit that Singleton

          4  plaintiffs have submitted that includes pictures of every one

11:44:41  5  of Alabama's historic map.

          6          JUDGE MARCUS:  Singleton 22 includes the '21 map

          7  adopted and the 2002 plan as it existed?

          8          MR. LACOUR:  That's correct.  We're looking at page 51

          9  right now, which is the 2000 -- the map that -- the map that

11:44:59 10  candidates ran under in 2002.

         11  BY MR. LACOUR:

         12  Q     So is there anything, then, that is?

         13  A     Can you show me 2021 again?

         14  Q     Absolutely.  Scroll --

11:45:17 15  A     Bring it down just a little.  Up.  Sorry.  No, I meant I

         16  want to get to the Fifth District.

         17  Q     We'll go look at the Fifth.

         18  A     Good.

         19  Q     And we'll go back to 2001.  Fairly similarly looking Fifth

11:45:42 20  District, correct?

         21  A     So one county was added, what, south of Madison?  Maybe it

         22  was -- anyway, it doesn't make that much difference.  But in

         23  2002, opportunities for Democrats were much greater.  And if

         24  you again look at the Seventh and look at that little finger

11:46:03 25  that goes up into the sixth, it just seems gerrymandering.

```
 1   Q    Okay.  Stop sharing this for now.
 2        Let's see.  Now, returning to 1992 very briefly.  Is it
 3   fair to say that a plan with two, 50 percent Black Voting Age
 4   Population districts would not have been approved by the
 5   Department of Justice?
 6   A    I think at that time you needed a minority-majority of 65
 7   or maybe 63 or something like that, yeah.
 8   Q    And are you aware of any plan from the early '90s that
 9   would have drawn two districts of at least 65 percent Black
10   Voting Age Population?
11   A    No.
12   Q    Okay.  I want to clarify something that you had stated
13   about I think the 1980 plan.  This is pages 6 and 7 of your
14   initial report.
15        I may just share the screen because it's a longer passage.
16        I think we're now looking at -- there it is.  6 and 7.
17   Starting here -- so the -- hold on.  I want to make sure I'm
18   getting the right -- okay.
19        So you stated in the plan adopted in 1980 only Jefferson,
20   St. Clair counties were split.  What is revealed here was the
21   intention of preserving the whole county tradition except for
22   Jefferson County.  The population size may have dictated the
23   need to split Jefferson then, but the way in which it was split
24   concentrated black voters in such a way as to segregate them
25   moving from the Sixth Congressional District to the Seventh
```

Timestamps in left margin: 11:46:35 (line 5), 11:46:56 (line 10), 11:47:12 (line 15), 11:48:21 (line 20), 11:48:36 (line 25)

```
 1   Congressional District.  The result -- the result was to
 2   concentrate and compact the Black Voting Age Population.  The
 3   goal of electing one black to Congress was accomplished.
 4        Now, to clarify, is it your position that the goal of
 5   electing one black representative to Congress was accomplished
 6   through the map enacted following the 1980 census or following
 7   the 1990 census?
 8   A    Oh, following -- wait a minute.  No.  I think that the --
 9   if I remember what I wrote, that the 1970 plan and 1980 plan
10   was done because of the population issue.
11   Q    Okay.
12   A    But then by the 1992 plan had to do with the Voting Rights
13   Act.
14   Q    Okay.  So you're not suggesting that the 1980 plan
15   succeeded in electing one black to Congress?
16   A    I don't think so.
17   Q    Now, following up, we were talking a little bit about core
18   retention, which I think in your report you state at page 4,
19   quote, the 2011 plan that the most should violate the concept
20   of core retention it was/is an effort to isolate the black vote
21   and concentrated in the Seventh Congressional District.  You
22   also state on page 4 that the enacted plan takes 75 percent of
23   the black population in Jefferson County and allocates it to
24   the Seventh District, and you describe that as, quote,
25   disruption of the core vote of Jefferson County.
```

```
 1            To be clear, when you are talking about core retention
 2    District 7, your baseline is not the previous congressional
 3    district, right?
 4    A    That's correct.
 5    Q    I just wanted to be clear about that.
 6            And okay.  And then we touched on this briefly.  I guess
 7    we have looked at the 2021 map.  And you conclude that one of
 8    the only purposes of the 2021 Act was suppressing the
 9    opportunity for black voters living in Jefferson County but
10    outside the seventh electing the candidate of their choosing,
11    correct?
12    A    That's right.
13    Q    We looked briefly at the 2021 map before.  And is it fair
14    to say perhaps your main concern with it is how Jefferson
15    County was split, right?
16    A    Right.
17    Q    Okay.  I'd like to next pull up a current map and just see
18    if you have similar concerns about this map.  One moment.  And
19    it says Caster Exhibit 18.
20            And can you see this?
21    A    Yeah.  This is -- this is the 2021 plan?
22    Q    This is not the 2021 plan.  This is a plan that has been
23    submitted by plaintiffs in one of the other cases.  It's an
24    alternative plan that Bill Cooper has represented is
25    52.15 percent any part black in District 2 and 55.49 percent
```

Timestamps: 11:50:47 (line 5), 11:51:15 (line 10), 11:51:33 (line 15), 11:51:55 (line 20), 11:52:20 (line 25)

1  any part black in District 7.

2      So if we will zoom in briefly into Jefferson County, based

3  on your opinions about the 2021 map that was enacted, does it

4  appear that this map --

11:52:52  5      MR. ROSS:  Your Honor?

6      JUDGE MARCUS:  Yes, Mr. Ross?

7      MR. ROSS:  Outside the scope of her opinions in the

8  state of her earlier testimony on direct.

9      JUDGE MARCUS:  Mr. LaCour?

11:53:02 10     MR. LACOUR:  Your Honor, we think this is quite

11  important to see if her views are consistent and tell whether

12  she views the enacted map to be a racial gerrymander because it

13  does not elect more than one Democrat or if she would have

14  similar views about any map that splits counties in similar

11:53:31 15 ways.

16     JUDGE MARCUS:  I didn't mean to cut you off,

17  Mr. LaCour.

18     MR. LACOUR:  I think it goes to credibility and also

19  the constitutionality of the map that we have enacted.

11:53:44 20     JUDGE MARCUS:  The objection is overruled.  You may

21  proceed with your question.

22     MR. LACOUR:  Thank you.

23     JUDGE MARCUS:  State it again just so the record is

24  clear.  I think it fairly goes to test this witness's expertise

11:54:00 25 in the field that she's testifying about.  You may proceed, but

```
 1   if you would put the question again clearly to Dr. Davis again.
 2             MR. LACOUR:  Yes, Your Honor.
 3   BY MR. LACOUR:
 4   Q    So, Dr. Davis, let's start with District 7.  In
 5   particular, where District 7 enters Jefferson County, does this
 6   bear some resemblance to enacted District 7 in your view?
 7   A    Does this what?
 8   Q    Would this version of District 7 bear some resemblance to
 9   the enacted version of District 7?
10   A    Yes.  Yes.
11   Q    And does it also appear to include a large percentage of
12   Jefferson County's black population within District 7 and leave
13   other members -- other black Alabamians in Jefferson County in
14   District 6 in a similar way that you have identified for the
15   enacted version?
16   A    Yes.
17   Q    Of District 7?
18   A    Yes.
19   Q    Okay.  And then I want to scroll down a little to another
20   county split.  Looking here at District 2.  You see it ventures
21   down into Mobile County and appears to pick up a good portion
22   of the city of Mobile.
23        In your view, would that be suggestive of racial
24   gerrymandering?
25   A    I'd have to see the stats for this District 2.  But,
```

Timestamps:
11:54:20 (line 5)
11:54:42 (line 10)
11:55:11 (line 15)
11:55:20 (line 20)
11:55:45 (line 25)

1  again, going back to Jefferson County, it pretty much does the

2  same thing and also takes part of Tuscaloosa County, which is

3  black, the city, and I mean, it does the very same thing that

4  the enacted plan does.

11:56:13  5      And going to Montgomery County, where under the whole

6  county plan, Montgomery stays intact.  It -- again, it's an

7  effort to pull and concentrate black voters in the Second and

8  then in the Seventh.  It's an outcome-based plan.  There's no

9  question.  And I am not as both my experience and my research

11:56:43 10  tell me is not the best idea.  I don't -- I am not interested

11  in outcomes.  I'm interested in process.

12  Q    Okay.  Then I will quickly run through a couple other

13  plans with similar questions.  Stop sharing this for the

14  moment.

11:57:07 15      And let me find this other exhibit.  Next we have Caster

16  Exhibit 23.  This is a different plan also submitted by the

17  Caster plaintiffs.

18      Similar question:  It looks somewhat similar to the

19  illustrative plan 1 that you were just talking about, correct?

11:57:54 20  A    Exactly.

21          MR. ROSS:  Your Honor, if I -- I realize.

22          JUDGE MARCUS:  I'm sorry.  I'm trouble hearing you,

23  Mr. Ross.  I'm sorry.

24          MR. ROSS:  Your Honor, I was just raising the same

11:58:10 25  objection that this is outside the scope, and to the extent it

1    goes to her credibility, I understand, but she has no basis for

2    testifying about the Cooper maps or any of the other maps

3    except the whole county plan.

4          JUDGE MARCUS:  You may ask the question, but let's

11:58:32  5    move along on this, Mr. LaCour.

6          MR. LACOUR:  Absolutely.

7          JUDGE MARCUS:  I take it the witness has not before

8    this moment had a chance to review these.  You might ask her

9    that.

11:58:42 10          MR. LACOUR:  Yes, Your Honor.

11    BY MR. LACOUR:

12    Q    Dr. Davis, have you had a chance to review either of the

13    illustrative plan 1 that I showed you a moment ago or

14    illustrative plan 2 that we're looking at right now?

11:58:56 15    A    No, I have not.

16          JUDGE MARCUS:  So you want to ask her a question just

17    about how it looks; is that correct, Mr. LaCour?

18          MR. LACOUR:  Basically, Your Honor, to the extent that

19    I think the look of the 2021 map has featured heavily -- it's a

11:59:22 20    racial gerrymander.

21          JUDGE MARCUS:  You may get right at it if you would

22    like.  Just ask the question directly.

23          MR. LACOUR:  Thank you, Your Honor.

24    BY MR. LACOUR:

11:59:30 25    Q    So, Dr. Davis, if you look here, we have a couple of

1    county splits in District 2; is that correct?  We have got the

2    Mobile split here, Montgomery split there, and a split of

3    Houston County that gets into Dothan right there.  Do you see

4    those?

11:59:48  5    A    I see them, yes.

6    Q    And based on the principle you applied in evaluating the

7    2021 enacted map in which you have opined that it is a racial

8    gerrymander, does anything about these splits here suggest in

9    your mind that this district would also constitute a racial

12:00:17 10    gerrymander?

11    A    I would have to see the numbers for every county, but I

12    continue to think and believe that the whole county plan is

13    preferable to any of these.

14    Q    I'd like to show you what is a map from a -- basically a

12:00:43 15    different illustration of this particular map prepared by Tom

16    Bryan.  This is Defendants' Exhibit 4.  This is Tom Bryan's

17    supplemental report.  And hold on for just one moment.  So I

18    will represent to you that what this illustrates is that same

19    map that we were looking at a moment ago except as you see in

12:01:29 20    the -- in the box towards the bottom.

21    A    I can't see that.

22         JUDGE MARCUS:  I think, Mr. LaCour, you are going to

23    have to move the exhibit up a little bit.  It's cut off in the

24    middle of 7 and 3.

12:01:40 25         MR. LACOUR:  Okay.

|   |   |
|---|---|
| 1 | JUDGE MARCUS:  The screen. |
| 2 | MR. LACOUR:  Let me. |
| 3 | THE WITNESS:  To make it smaller. |
| 4 | BY MR. LACOUR: |
| 12:01:47 5 | Q    Okay.  So is this showing it now? |
| 6 | A    Yes. |
| 7 | Q    Okay.  So the green represents areas that are heavily -- |
| 8 | very high percentage of Black Voting Age Population by voter |
| 9 | district.  If we zoom in here to District 2 where District 2 |
| 12:02:11 10 | comes down into Mobile County, it would appear that District 2 |
| 11 | is picking up a substantial portion of black voters out of |
| 12 | Mobile city; is that correct? |
| 13 | A    Are you asking me? |
| 14 | Q    Yes. |
| 12:02:25 15 | A    Looks like it.  I don't know. |
| 16 | Q    And all right.  Well, I will move a little more quickly on |
| 17 | this now. |
| 18 | I will look at one additional map. |
| 19 | JUDGE MARCUS:  One quick question I have for you, |
| 12:02:50 20 | Mr. LaCour.  We were going to break for lunch about noon.  I'm |
| 21 | not going to cut you off in the middle of a thread, so feel |
| 22 | free to finish it up, but I don't want to get too deep into it. |
| 23 | MR. LACOUR:  Absolutely, Your Honor.  I think that |
| 24 | will be fine.  Close to wrapping it up. |
| 12:03:07 25 | JUDGE MARCUS:  You tell me when is a convenient place |

1  to break for you.

2          MR. LACOUR:  I think I will be done with my

3  cross-examination shortly.

4          JUDGE MARCUS:  Do you want to finish it up, or do you

12:03:16  5  want to break now?

6          MR. LACOUR:  If we could wrap it up, I think that

7  would work for me.

8          JUDGE MARCUS:  Go ahead.  You may proceed.

9          MR. LACOUR:  Thank you.

12:03:24  10  BY MR. LACOUR:

11  Q    Now, pulling up -- this is going to be a set of

12  illustrative maps that were prepared.  We will hone in on one

13  of them.  Plan A here.  Are you able to see that?

14  A    Yes.

12:03:51  15          JUDGE MARCUS:  Do you want to mark, tell us what you

16  are showing her?

17          MR. LACOUR:  Yes, Your Honor.  We're looking here at

18  Milligan Exhibit 3.  ECF page 7.  These are the illustrative

19  plans prepared by Milligan expert Moon Duchin.

12:04:06  20  BY MR. LACOUR:

21  Q    And, again, does it appear to you, Dr. Davis, that there

22  are split counties here that resemble in some ways the splits

23  that are evidence of a racial gerrymander in your view in the

24  2021 enacted map?

12:04:33  25          MR. ROSS:  Objection, Your Honor.

<pre>
 1              JUDGE MARCUS:  The objection is sustained as to the
 2    form of the question.
 3    BY MR. LACOUR:
 4    Q    Dr. Davis, looking at District 7, which the light blue
 5    district here, going into Jefferson County, does that split
 6    look anything to you like the split that is present in the 2021
 7    enacted map in District 7?
 8    A    Well, the difference is the Jefferson County in 2021 plan
 9    is split in half roughly.  This plan looks like it's in three
10    places.  So if you think the whole county plan is the best
11    plan, it's not a good division of Jefferson County.
12    Q    And to the extent that District 7 picks up a substantial
13    portion of black voters and places them into District 7, would
14    it be your view that the voters placed into other districts are
15    -- I'm trying to think of finding the exact language you used
16    in your report.  But I apologize.  I think in your report as
17    Singleton Exhibit 2, page 9 of your report, you said that the
18    current District 7 has the purpose of suppressing the
19    opportunity of black voters living in Jefferson County but
20    outside the Seventh District to elect a candidate of their
21    choosing.  To the extent that District 7 in this plan does
22    something similar, would it also be suppressing the opportunity
23    for black voters living in Jefferson County but outside the
24    Seventh District to elect the candidate of their choosing?
25              MR. ROSS:  Objection, Your Honor.
</pre>

Timestamps in left margin:
12:04:50 (line 5)
12:05:18 (line 10)
12:05:55 (line 15)
12:06:28 (line 20)
12:06:49 (line 25)

1          JUDGE MARCUS:  Yes.  You may be heard, Mr. Ross.

2    Proceed with your argument.

3          MR. ROSS:  Sorry, Your Honor.  So I -- we object again

4    it's outside the scope of her prior testimony, and she's never

12:07:05 5    seen these maps.  She doesn't know the basis for -- you know, I

6    don't know the basis for her testimony.  She doesn't know the

7    racial composition of the maps.  And it calls for legal

8    conclusions.

9          JUDGE MARCUS:  The objection is sustained.  So you

12:07:20 10    understand why, Mr. LaCour.  You're asking her whether or not

11    this plan which is in -- which is one of the illustrative plans

12    offered by one of the sets of plaintiffs had the purpose of

13    suppressing the black vote.  She's never seen it before.  The

14    objection is sustained as to the form of the question.

12:07:43 15          MR. LACOUR:  Thank you, Your Honor.

16       That may change gears briefly.  Let me just confirm that

17    there's nothing else in my outline that I need to address.

18          JUDGE MARCUS:  Take your time.

19          MR. LACOUR:  I think that's all there is for me.

12:08:15 20    Thank you, Dr. Davis.

21          JUDGE MARCUS:  Okay.  We will take a break now.  I

22    have 1:08 Eastern Time.  12:08 Central Standard Time.  So we

23    will reconvene at 1:15 Central Standard Time.  So we will give

24    you a little bit more than an hour.

12:08:36 25       Dr. Davis, thanks for your time, and we will ask you to be

```
 1   back, as well if you could by 1:15 Central Standard Time so we
 2   can proceed with the cross-examination and then any other
 3   cross-examination and the redirect.
 4        Thank you all very much.  We will be in recess until 1:15.
 5   MR. BLACKSHER:  I'm not sure there will be any further
 6   cross-examination I wanted to point out, Your Honor.
 7        JUDGE MARCUS:  I'm sorry.
 8        MR. BLACKSHER:  I don't -- I don't think there's going
 9   to be any further cross-examination of this witness.  I just
10   wanted to suggest that.
11        JUDGE MARCUS:  Oh, okay.  I only said that on the if
12   perhaps counsel for Milligan or counsel for Caster may have
13   some questions.  Since the questions Mr. LaCour asked went into
14   maps that were offered and received in evidence by both
15   Milligan and Caster, I think in fairness if they wanted to, I
16   wanted to give them the opportunity to be heard.  They may
17   choose to say nothing, in which case, we will turn to you with
18   any redirect, and that will be it for Dr. Davis.
19        MR. BLACKSHER:  Thank you, sir.
20        JUDGE MARCUS:  Thank you, all.  Let me just so we know
21   -- Mr. Ross, did you plan to ask any questions of the witness,
22   or does counsel for Caster have any questions for this witness
23   on cross?
24        MR. ROSS:  We may ask a few questions, Your Honor,
25   just to clarify the issues that were raised as you said.
```

 1          JUDGE MARCUS:  I understand.  Ms. Khanna?

 2          MS. KHANNA:  And counsel for Caster does not.  We do

 3   not intend to participate in the Singleton proceedings at all

 4   since -- given our jurisdictional argument.

12:10:24  5          JUDGE MARCUS:  All right.  Thank you so very much.  We

 6   will be in recess until 1:15 Central Standard Time.

 7          (Recess.)

 8          JUDGE MARCUS:  Good afternoon.  I take it the parties

 9   are ready to proceed.

13:14:38 10          Before, Mr. Ross, I take it, we will go forward with your

11   examination, I wanted to bring to the lawyers' attention a note

12   that I received from the court reporter.

13          She had indicated that in some instances, she was having

14   some difficulty because one parties or maybe the witnesses were

13:15:02 15   speaking a little bit too quickly or cutting each other off, so

16   please just take your time since we're doing this remotely, and

17   we want to make sure we get the record exactly correct.

18          The other point that she made that I wanted to bring to

19   your attention as you proceed is that when you are unmuted, all

13:15:30 20   noises are picked up, and so if you're listening, you're

21   unmuted, and you are using your mouse to scroll, that noise

22   apparently is picked up and resonates.

23          So with that, we're ready to proceed.  I take it,

24   Mr. Ross, you wanted to ask the witness some questions?

13:15:56 25          MR. ROSS:  Yes, Your Honor.

1          JUDGE MARCUS:  Good afternoon again, Doctor.  Thanks

2     for staying with us.  Mr. Ross has some questions for you as we

3     proceed.

4          With that, counsel, the floor is yours.

13:16:14  5          MR. ROSS:  Thank you, Your Honor.

6                         CROSS-EXAMINATION

7     BY MR. ROSS:

8     Q    Good afternoon, Dr. Davis.  My name is Deuel Ross.  I am

9     from the NAACP Defense Fund.  I am here on behalf of the

13:16:23 10    Milligan plaintiffs.  I just have a few questions for you.

11         Mr. LaCour showed you several perhaps.  Do you recall?

12    A    Yes.  Yes.

13    Q    Okay.  And before today, you had never seen any of these

14    illustrative maps before, right?

13:16:37 15    A    I -- I don't think so.  They were provided, I think, in

16    some of the materials that were given me, but I really didn't

17    read them.

18    Q    Okay.  And you have no information about what efforts were

19    made in drawing those maps, correct?

13:16:53 20    A    Absolutely not.

21    Q    Okay.  And you have no information about the data upon

22    which those maps relied, correct?

23    A    That's correct.

24    Q    Okay.  And you're not a mapping expert, right?

13:17:04 25    A    Absolutely not.

```
 1   Q    Okay.  And Mr. LaCour asked you a bit about redistricting
 2   and preclearance in the 1990s.  Do you recall that?
 3   A    Yes.
 4   Q    And your report did not cover redistricting or
 5   preclearance in the '90s, right?
 6   A    No, only to the extent that I said I think that the
 7   redistricting in the '90s reflected the need to establish a
 8   minority-majority district.
 9   Q    Okay.  And your report didn't analyze whether it's
10   65 percent Black Voting Age Population district or another 50
11   or some other percentage Black Voting Age Population was
12   required for preclearance; is that right?
13   A    No.  I did mention that in that first map that was drawn
14   in 1992, it was an assumption of 65 percent minority-majority
15   population.
16   Q    But you didn't do any separate analysis to confirm whether
17   65 percent was necessary or not in the '90s, right?
18   A    No, not at all.
19   Q    Okay.  And you didn't do any analysis using racially
20   polarized -- excuse me -- strike that.  You didn't do a
21   racial-polarization analysis to determine whether or not a
22   particular percentage was necessary today, correct?
23   A    No.
24   Q    Okay.  Thank you.
25        MR. ROSS:  No further questions.
```

13:17:18  5
13:17:43 10
13:18:05 15
13:18:20 20
13:18:35 25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

         1              JUDGE MARCUS:  Okay.  If there are no other
         2    cross-examination, we will go back to redirect, Mr. Blacksher.
         3              MR. BLACKSHER:  We have no redirect, Your Honor.
         4              JUDGE MARCUS:  Judge Moorer, Judge Manasco, any
13:18:51 5    questions for Dr. Davis?
         6              JUDGE MANASCO:  None from me.
         7              JUDGE MOORER:  I have none.
         8              JUDGE MARCUS:  I have just one, Dr. Davis.
         9         I was just curious about when you were being asked about
13:19:05 10   incumbency protection, and it was observed that incumbency
        11    protection is actually included within the Alabama
        12    redistricting guidelines, you said, if I heard it right, I have
        13    a problem with that.  Those were, I think, the words you used.
        14    I was curious if you could explain that.
13:19:32 15             THE WITNESS:  What I meant by that is that if you
        16    honor that guideline, I think you do some harm to the
        17    democratic process by making it clear that -- we all know that
        18    incumbency has its advantages.  So I want those advantages to
        19    be less impactful than they are.  And by eliminating even the
13:20:14 20   opportunity for two incumbents to run against each other, I
        21    think you do harm to the process -- to the democratic process.
        22             JUDGE MARCUS:  Thank you very much.
        23        Any follow-up questions, Mr. Blacksher, Mr. Ross, or
        24    Mr. LaCour?
13:20:31 25             MR. BLACKSHER:  None for us, Your Honor.

1          MR. LACOUR:  None from the defendant, Your Honor.

2          JUDGE MARCUS:  Mr. Ross?

3          MR. ROSS:  None from us, Your Honor.

4          JUDGE MARCUS:  Seeing nothing further, Dr. Davis, we

13:20:43 5   thank you much for taking your time in coming down here today.

6    I think we are finished with your testimony, and you are

7    excused.

8          THE WITNESS:  Thank you, Your Honor.

9          JUDGE MARCUS:  With that, let me turn it back to you,

13:21:00 10  Mr. Blacksher.  Did you have any other evidence that you had

11   wanted to adduce at this point?

12         MR. BLACKSHER:  Not that the exhibits are in to the

13   extent possible.  And at this point, we do not intend to try at

14   this point to introduce the few exhibits on the Singleton list

13:21:24 15  that there have been objections to.  That would come later, if

16   at all.  And we have no further witnesses.  So we pass the

17   baton to the next set of plaintiffs.

18         JUDGE MARCUS:  All right.  Thank you so much.

19      Mr. Ross, I take it we will turn to you, then, on behalf

13:21:44 20  of the Milligan plaintiffs dealing with the constitutional

21   equal protection claim.

22         MR. ROSS:  Yes, Your Honor.  But our first witness is

23   our client, Mr. Milligan, and Ms. Carter, my colleague, will

24   begin.

13:22:04 25        JUDGE MARCUS:  Thanks very much.

```
 1                    MS. CARTER:  Good afternoon.  Brittany Carter.
 2                    JUDGE MARCUS:  Do we have --
 3                    MS. CARTER:  Brittany Carter -- hello.  Can you hear
 4        me?
13:22:16  5                    JUDGE MARCUS:  I can hear you just fine and welcome.
 6            Let me just swear the witness.  Let me ask --
 7        Mr. Milligan, if you would be kind enough to raise your right
 8        hand.
 9                               EVAN MILLIGAN,
13:22:27 10       having been first duly sworn, was examined and testified as
11        follows:
12                    JUDGE MARCUS:  We can't hear you.  I think you may be
13        muted.
14                    THE WITNESS:  I do.
13:22:42 15                    JUDGE MARCUS:  Thanks very much.  Welcome.  If you
16        could state your name for the record, please.
17                    THE WITNESS:  Evan William Milligan.
18                    JUDGE MARCUS:  Thank you.  And, Ms. Carter, you may
19        proceed.  Thank you.
13:22:53 20                    BY MS. CARTER:  Thank you, Your Honor.
21                              DIRECT EXAMINATION
22        BY MS. CARTER:
23        Q    Mr. Milligan, where were you born?
24        A    Houston, Texas.
13:23:02 25        Q    What year were you born?
```

```
 1   A     1981.

 2   Q     What race do you identify as?

 3   A     Black African-American.

 4   Q     Where did you grow up?

 5   A     I spent the first five years of my life in Houston, Texas.

 6   Then we moved to Birmingham for about two years.  And then the

 7   rest of my childhood was spent in Montgomery County, Alabama.

 8   Q     And do you currently live in Montgomery, Alabama?

 9   A     I do.

10   Q     How long have you lived there?

11   A     In total, about 29, 30 years, not counting time spent

12   attending college in Birmingham.  About a year and a half

13   studying abroad in South Africa.  And the time I spent

14   attending law school in New York.

15   Q     What schools did you attend while growing up in

16   Montgomery?

17   A     I attended Zelia Stephens Early Childhood Center for

18   pre-K, which is located on the campus of Alabama State

19   University.  Second grade at Dannelly Elementary.  Third

20   through sixth grade at Forest Avenue Magnet Elementary.

21   Seventh Grade at St. Jude Middle School.  Eight and Ninth

22   grades at Baldwin Magnet Junior high School, and 10th through

23   12th grade at the Sydney Lanier Academic Motivational Program.

24   Q     Where did you go to college?

25   A     Birmingham-Southern College.
```

```
 1   Q     And what's your professional background?
 2   A     I've worked primarily in the non-profit sector here in
 3   Alabama.  I mainly with groups that work around Civil Rights
 4   issues, community development, and then in my current capacity,
13:24:45 5   I'm working as executive director of Alabama Forward, which is
 6   a coalition of non-profit groups working to make voting systems
 7   here in Alabama as fair and accessible as possible.
 8   Q     As executive director of Alabama Forward, what do you do?
 9   A     So I am involved in supervising our small staff team and
13:25:06 10   providing sub grants, technical assistance and training,
11   through our membership of about 28 non-profit organizations
12   working around this state.  All of those groups work towards,
13   you know, different primary missions, but the things that
14   brings us into -- brings them into membership is a commitment
13:25:26 15   to making the electorate diverse and/or participating in voter
16   engagement, voter education, voter protection.  So we provide
17   resources to that end.
18   Q     Does your work give you an understanding of black
19   communities -- interests affecting black communities in
13:25:44 20   Alabama?
21   A     I would say it does.  Our memberships spans the state, and
22   it includes organizations working out of policy level at a
23   grass roots level throughout the state.  And then in my career
24   prior to this job, my first full-time job really after college
13:26:02 25   I worked as a community organizer with the Federation of
```

Childcare Centers of Alabama, which is a childcare advocacy and
community development group.  I worked there for three and a
half years, and then spent a total of six years working with
the equal justice initiative in a variety of capacities that
allowed me to provide assistance to incarcerated clients, do
research around the connections between slavery and segregation
and current contemporary issues.  So I have spent most of my
career having a chance to get to know not only advocates,
serving black communities across the state, but also, you know,
the community members themselves.

Q    What congressional district do you live in?

A    I live in District 7.

Q    What congressional districts represent Montgomery County?

A    So under the current map, Districts 2, 3, and 7 represent
the county.  And under the map that was just adopted this past
fall, it would be split between Districts 2 and 7.

Q    As far as you know, what neighborhoods in Montgomery
County are separated into District 2 and away from District 7?

A    It's really interesting.  From what I can tell, there's a
split between 2 and 7 that occurs above interstate 85.  And
then as far as on the -- I guess the vertical axis of the
split, it occurs at some point between Narrow Lane Road and
Zelda Road, so, you know, a little past the intersection of
interstates 85 and 65, maybe five miles east of there.

Q    And what is your understanding of Alabama's redistricting

1  process for congressional districts?

2  A    So what I -- what I witnessed this past cycle was that the

3  apportionment committee, the legislation apportionment

4  committee is comprised of state House representatives and state

13:28:16 5  senators from both parties who are responsible for writing and,

6  you know, publishing the redistricting guidelines that will --

7  that they will be prioritizing during that round of

8  redistricting.

9    And once the census data is released this year, was

13:28:36 10  obviously released this past August, they work with a map

11  making consultant or someone that works on their staff to

12  interpret that census data and begin the process of

13  constructing maps.  As they do that, they're also receiving

14  information from members of the Legislature and also members of

13:28:54 15  the general public.  And that public feedback was collected

16  during a two-week period that they spent holding public

17  hearings, both virtually and at community colleges around the

18  state.  They also have held one at I believe at the state House

19  in one of the offices there.  And during that period, they

13:29:18 20  collected statements in person, as well as via e-mail, proposed

21  maps from citizens and advocates.

22    At the conclusion of that period, they then went and, you

23  know, prepared maps which was released -- the proposed maps

24  that emerged from that committee that the committee voted in

13:29:38 25  favor of were released first to the public to my knowledge

shortly before the beginning of the special session that the
Governor called for redistricting, which began towards the end
of October of last year.

They began that session, I believe, on a Thursday, and it
was concluded by that next Wednesday.  Over the course of that
session, there was some House and Senate subcommittee hearings.
And at the House committee hearings, my colleague Khadidah and
I provided some in-person testimony really asking about how
racial-polarization analysis was incorporated into the maps
that had been proposed by the committee.  And just trying to
make sure that they were aware of our concern about that
information.

Q    So you mentioned it a little bit, but what was the extent
of your participation in the process?

A    So we -- I participated in public forums, education forums
that were organized by a coalition of groups, including the
organization I work with, Alabama Forward, as well as the
NAACP, the Legal Defense -- I'm sorry -- Legal Defense Fund,
Alabama Values, and also the League of Women Voters.

So we -- those events were focused on the general public.
And they allowed us to explain the importance of just general
-- members of the general public becoming as informed as
possible about the importance of redistricting and how it
impacts their daily lives, really understand some of the
principles of our redistricting.

1    I also participated in media briefings and media facing

2  events.  I explained some of the work that we were doing within

3  our network of organizations and some of the public education

4  activities we were supporting.  I helped to manage and

13:31:37 5  facilitate a bi-weekly briefing that was held among members of

6  the network of organizations that worked with us and our former

7  members and also nonmembers.

8    This began on April 30th and took place every two weeks on

9  Friday morning at 10:00.  It was about an hour-long meeting

13:31:56 10 where we would, you know, share information related to people's

11 experiences and needs related to doing redistricting trainings

12 at the local level, if people knew about other speaking --

13 speakers that were providing information, or, you know,

14 whatever we were learning about when the census data would be

13:32:15 15 released.  We were able to help each other stay abreast of that

16 in those settings.

17    Then we also submitted testimony to the apportionment

18 committee on the last Thursday of the public hearings.  I

19 believe that was September the 16th, I think.  That provided

13:32:33 20 two proposed state House and state Senate maps.  And then also

21 spoke about congressional maps that we had seen at that point.

22 Q    So to your knowledge, did the Legislature conduct

23 racial-polarization analysis?

24 A    To my knowledge, no.  When I asked -- when I attended the

13:32:55 25 House subcommittee hearing meeting to ask about that, I

13:33:18

13:33:37

13:33:53

13:34:11

13:34:30

1  received a pretty ambiguous answer.  And I asked in response if

2  there was a timeline for which the public would be provided any

3  of the research that the committee had been doing or was

4  planning to do with regards to racial polarization and also

5  given an ambiguous answer then as something if I remember

6  correctly, we don't know now, but, you know, we'll share what

7  we find, or something to that extent.  But it wasn't a firm

8  answer or an explanation of who was conducting the study or,

9  you know, really if they were actually conducting a

10  racial-polarization analysis.

11  Q    And did anyone, to your knowledge, ever share what they

12  found?

13  A    No.  And that came up when I was watching the -- the

14  deliberation on the floor of the House and the Senate, you

15  know, over the Internet.  I saw representatives have a

16  discussion about that.  And there was no information presented

17  then or reference to a completed study.

18  Q    Okay.  In the testimony that you said you offered, whether

19  by e-mail or in person, did you support any alternative plans

20  in those -- in any of those testimonies?

21  A    I did.  To that point, from the network of organizations

22  that we were working most closely with, the congressional plan

23  that had emerged was the whole county plan that was initially

24  introduced to us by the leaders of the state chapter of the

25  League of Women Voters.

1    Our team had tried to, you know, using Maptitude and

2    Dave's Redistricting -- by our team, I'm talking about my

3    co-worker and some of the -- some of the other folks that had

4    taken map-making training courses, had attempted to make a

13:34:50  5    congressional map that would provide two districts that were

6    majority black or majority non-white, and weren't able to do so

7    successfully.

8    So when -- at that point, during that last day of the

9    public hearing, to my knowledge, the apportionment committee

13:35:12 10    would basically cut off receiving information from the public

11    at that point.  And I didn't know that.  What I later learned

12    was we could continue to provide information up until the

13    beginning of the special session.

14    So operating under the understanding that the reception

13:35:27 15    would be cut off at the end of that business day, our team

16    conferred and said the only map that we've seen that provides a

17    window to two plurality districts is this -- is this whole

18    county plan map, so we spoke favorably of the map in the e-mail

19    and in terms of its relevance to producing those two districts

13:35:49 20    that would allow black residents an opportunity to elect the

21    candidate of their choice.

22  Q    And did you know at the time of submitting that testimony

23    that it was possible to draw two majority black districts?

24  A    No.  As I stated, we had attempted to do so, and were not

13:36:08 25    able to do so.

1  Q    And once you learned that it was -- well, how did you

2  learn that it was possible to draw two majority black

3  districts?

4  A    So I mentioned that we were, you know, participating in

13:36:21  5  public education events with that network of organizations.

6  And there was actually a pretty -- you know, there was a

7  conversation among our advocates and folks that were

8  participating in that around if we would be able to land in one

9  place in terms of supporting one of the maps.  And prior to one

13:36:45 10  of the meetings, I was able to really read a letter that was

11  submitted to the apportionment committee by a group of Civil

12  Rights advocate organizations that featured maps prepared by

13  LDF and also a reference to a racial-polarization study that

14  they had -- they had hired a researcher to conduct.

13:37:09 15       And that was my first time actually seeing that data and

16  being able to look at the maps and have a better understanding

17  of what was really possible with our demographic data.  And

18  that convinced me that that was the -- of the maps that I had

19  seen and the maps that we had attempted to draft, those were

13:37:25 20  the maps that most closely aligned with -- with our

21  organization's concerns with regards to the voting rights of

22  non-white voters, particularly black voters throughout the

23  state.

24  Q    Mr. Milligan, why did you decide to participate in the

13:37:44 25  redistricting process?

A    Well, we're working to really inspire new participants in civic engagement in Alabama.  The state has been, you know, losing a lot of the -- the folks that are born in the state over the last ten years have, you know, for the majority of that decade were leaving the state, and for Georgia, for the surrounding southern neighbors.  And we want to inspire people to stay in the state, to commit to their communities.  Particularly younger Alabamians, non-white Alabamians.  Understanding all of our civic institutions and, you know, democratic processes are important to provide a realistic inspirational message to those folks.  And redistricting is a critical part of that.

I was learning about it a lot myself and was really taken aback just by, you know, how much census data and redistricting shapes everything that I do every day and opportunities that are available to my children.

And so just playing that public education role was very important in making sure that our organizers who are a part of our network who are very concerned about it, making sure that they had resources that they needed to do grass roots engagement, and public education was also important to me.

Q    Why is it important that black voters have a second district?

A    It's important, first and foremost, because based on the racial-polarization data that I was able to review, our state,

1  unfortunately, has not arrived at a point where -- where we

2  have rates of cross-racial voting that can reliably sustain --

3  sustain the election of a non-white candidate in districts

4  where you have, you know, a close -- a close margin between

13:39:49  5  white and non-white voters.

6  And so because we have not arrived at a point where that's

7  a reliable occurrence, then having that second majority-black

8  district ensures that black voters, particularly in central and

9  southwestern Alabama have an opportunity to elect a candidate

13:40:10 10  of their choice, and that their votes, you know, aren't

11  discounted, so to speak.

12  And I'm concerned about this because I've spent all of my

13  career, you know, traveling and spending time in these

14  communities.  I was raised in a multi-generational household,

13:40:33 15  so my great-grandparents that I was raised with were from

16  Lowndes County which is the neighboring county west of Alabama.

17  And that gave me access to the way that they spoke, the way

18  they dressed, their types of clothing and just their whole --

19  just their whole way of life and way of thinking, which has

13:40:54 20  always given me an appreciation for the more rural parts of the

21  state because I guess it connects me to those folks that I grew

22  up with in my household.

23  And I think there is a direct correlation between the lack

24  of agency that black voters feel, you know, in Montgomery and

13:41:10 25  in places where you see the splitting of the districts.  And

what folks feel throughout the Black Belt and throughout the

southwest part of the state in terms of the black communities

located there.  And the black district would provide more

buy-in for those communities and more of an incentive to make,

13:41:28  you know, longer term commitments, and even see themselves as

leaders of those communities to the highest levels.

Q    In your lifetime, do you know of any black person who has

been elected to Congress outside of District 7?

A    I don't.  The Congress members I remember who are black

13:41:46  have been Representative Hilliard, Davis, and Sewell, all black

representatives from District 7.

Q    Mr. Milligan, you tell us where the black community

resides in Montgomery County?

A    Sure.  So currently, all over the county.  Honestly,

13:42:06  there's -- the county -- the city is 60 -- I believe

60.5 percent black African-American.  And so at, you know, in

any of the zip codes, there are pockets of neighborhoods or

entire neighborhoods that are majority black.

     And that's very different from, you know, the Montgomery

13:42:28  where I grew up.  Historically, black communities were

concentrated either immediately south or west of the downtown

area and a little north of there, or in rural pockets on the

rural borders of the county on the northern end that would have

been Madison Park.  On the eastern end, the Mount Meigs area.

13:42:53  On the southern end, you would be looking at Hope Hull,

1  Pintlala.  And on the western end, the Old Selma Road area

2  would be those rural counties.  I'm sorry.  The rural parts of

3  the county.

4      But again, as time as grown on and, you know, as Redlining

13:43:09 5  and -- was challenged and economic opportunities made it more

6  possible for families to move over throughout the county,

7  again, that population has spread throughout the county.

8  Q   As far as you know, what does the black community in

9  Montgomery County share in common?

13:43:28 10  A   I would say there's a central -- there's a commitment to

11  really the center of the city, in terms of downtown and the

12  river front area, and the areas that are immediately just

13  adjacent to there.

14      So for the black community, Alabama State University,

13:43:49 15  which is located just south of downtown, is a central gathering

16  place.

17      I mentioned, you know, I attended Zelia Stephens Early

18  Childhood, for example, in the late '80s, mid '80s.  My mother

19  went there in the '50s.  My daughter attends there now.  And so

13:44:06 20  that's a school where 100 percent of the student body and

21  faculty are African-American.  And that's just one example of

22  ASU's fingerprint within the community at large.

23      The Acadome there is used for, you know, cultural events

24  ranging from funerals to high school graduations for the public

13:44:26 25  schools, all of which are predominantly black schools, with the

1    exception of the magnet schools.

2         And then also concerts, public speaker events.  And then,

3    you know, also the college's role as a source of education and

4    employment for many African-Americans throughout the city.

13:44:46 5    Then north of ASU, you have, you know, downtown proper, so

6    historically black communities like Centennial Hill which were

7    the home of Civil Rights leaders, the King family, the

8    parsonage for Dexter Avenue Church is there.  Significant Civil

9    Rights institutions are located throughout downtown, as well

13:45:11 10   as, you know, employment with the local and the state and the

11   federal government agencies.  Since Montgomery is the capital,

12   those are also sources of employment for many African-Americans

13   throughout the city.

14        The two federal military installations, as well as Alabama

13:45:26 15   National Guard headquarters located just west and east of

16   downtown are also significant because there are black service

17   members some of whom settled in Montgomery after their tenure

18   of service ended when they were introduced to it because of

19   their military service.  But others who grew up in the area who

13:45:45 20   also became service members.  They continue to use the military

21   installations for recreational events or to shop at the grocery

22   store there, you know, and recreational activities.

23        The parks, the river front amphitheater for concerts, as

24   well as downtown being a central place for Thanksgiving

13:46:09 25   activities.  Alabama State has maintained the -- for over

1    80 years I think at this point, has maintained a Thanksgiving

2    football game and parade.  And so there are black families that

3    really come back to the city generations you will see on Dexter

4    Avenue enjoying that parade.

13:46:32  5         And then some of the city's oldest and largest black

6    churches are located in downtown or in the surrounding adjacent

7    areas.

8         So I think wherever black Montgomerians are living, there

9    are ways that they're connecting with that downtown area and

13:46:49 10   those surrounding communities at some point in their life.

11   Q    Do you have ties to the black community in the Black Belt?

12   A    I do.  I mentioned my family's connection to Lowndes

13   County.  So that was my maternal grandmother and

14   great-grandparents who were raised there.  So, you know, it was

13:47:09 15   -- that was something that's connected me to the land and given

16   me a sense of cultural legacy, cultural identity.  We still

17   maintain a cemetery that holds our loved ones on my mother's

18   side of the family there in Lowndesboro.

19        And really throughout my career, that's, you know, that's

13:47:26 20   a personal connection.  Before I get to the career part, I will

21   also mention that connection that I share is something that I

22   noticed among my peers growing up.  I can't count the number of

23   people who have a similar Lowndes County connection or a

24   connection to another more rural part of the Black Belt.  I

13:47:45 25   would offer the unique part about my family is we were smaller,

13:48:05

1    and our connection, you know, is more historic.  There aren't

2    active cousins or grandparents down there now receiving us when

3    we visit.  In contrast, my peers have first cousins, second

4    cousins, or elders in their family that they're still visiting

5    in those counties.

6        And then I will say professionally, a lot of my work, my

7    organizing skills and my training as far as knowing how to

8    listen to clients and listen to community members came from

9    time that I spent working with FOCAL and with EJI in Black Belt

13:48:22

10   counties.  FOCAL had a program called the Southern Rural Black

11   Women's Initiative.  And we -- that is a program that, you

12   know, all of its members or the participants are based in Black

13   Belt counties.  And so I was able to spend time interviewing

14   women in those counties that we honored at hall of fame

13:48:42

15   banquets and really getting to know their stories, stories of

16   their children, as well as while at EJI, we started a project

17   called the Black Belt education project where we went to all of

18   the Black Belt counties, talked to the superintendents and

19   different principals to sponsor high school students coming to

13:49:00

20   Montgomery to spend a day or half day at the EJI office

21   interacting with staff.

22       And that required us to again, you know, go to Perry

23   County, Hale County, and all the places and make sure that they

24   understood what EJI was and why that -- why that trip would be

13:49:16

25   valuable to the students.  Booking the trips, making sure we

1    were able to get funds for the buses.  And just interacting

2    with the students, you know, when they came.  Some of those

3    students went on to go to college and go to law school and

4    credited that trip as being inspirational for their decision to

13:49:34  5   do so.

6         So the Black Belt has been, you know, pretty central to me

7    throughout my life, both personally and professionally.

8    Q    As far as you know, what does Montgomery County share in

9    common with those Black Belt counties?

13:49:48 10   A    I would say the socioeconomic challenges that black

11   communities are facing in Montgomery County are shared

12   throughout the Black Belt at large.  And, you know, to be

13   clear, Montgomery County is a part of the Black Belt.  It's a

14   more urban part.  So our rural neighbors to the east and west,

13:50:10 15   when it comes to concerns about infectious disease or, you

16   know, K through -- the quality of education -- public education

17   at K-12 level, availability of job training, public

18   transportation, access to health care, food deserts and access

19   to quality -- to quality produce, those are conversations and

13:50:34 20   challenges that are shared by community members throughout

21   central Alabama and the southwestern part of the state in the

22   area that we refer to as the Black Belt.

23        So at that level, I would say, you know, the sense of

24   frustration and sometimes isolation from opportunity is a

13:50:51 25   common thread.

1        And also the idioms and ways of speaking, quilting and

2   sewing, traditions, music traditions, whether it's blues or

3   four-part harmony Gospel, different traditions of story

4   telling, family reunions, those are things that, you know, I

13:51:09 5   guess in a more positive way are shared by black communities

6   throughout that part of the state.

7   Q    Do you have any sense of whether that's also true for

8   black people in Mobile County?

9   A    I would say it has been from my experience one of the

13:51:27 10  things that I -- that FOCAL when I was working there after

11  college, you know, other -- aside from going to Mobile for --

12  for as, you know, playing in marching band tournaments while at

13  high school, my time spent in Mobile was really provided to me

14  by FOCAL because I would go down there to work with child care

13:51:49 15  advocates and child care providers.  And particularly in the

16  Prichard area above the city of Mobile proper, and really

17  seeing the pace of life, you know, physically, just in terms of

18  optics, people on horse back, folks raising chickens further

19  out from the city center, that layered directly on to what I

13:52:10 20  was seeing Washington County, Wilcox, Dallas, and more rural

21  parts of Montgomery County that I was describing, also Macon

22  County, east of Montgomery County.

23       So just, you know, the pace of life, the tone of the -- of

24  life and what I experienced was very similar.  But also, again,

13:52:25 25  those socioeconomic concerns, the conversations and the

1   trainings we were doing around, you know, access to child care

2   for working families.  Same -- the same trainings, the same

3   conversations, the same comments raised by participants in

4   those trainings in that Mobile area, as compared to the other

13:52:46  5   parts of the Black Belt and Montgomery County that I covered at

6   the time.

7       And then the last thing I would say is in the way that

8   there are sort of anchor cities throughout the Black Belt.  So

9   Selma can be that for, you know -- or Demopolis or like that

13:53:01 10  whereas the smaller towns, their transition stage might be to

11  do most of their shopping or to move to one of those -- one of

12  those cities as a transition from more rural life.  Montgomery

13  is certainly that for many people throughout the central part

14  of the state.

13:53:18 15  Mobile plays that role, and Prichard plays that role for

16  the southwestern part of the state.  So the same way that I

17  mentioned my peers having that connection to their Black Belt

18  relatives, in Montgomery County, I observed colleagues that I

19  have worked with throughout my life, people that I have met

13:53:36 20  personally through school who had that relationship with rural

21  relatives and throughout the Black Belt when they may have

22  grown up in Mobile County.

23  Q    Thank you, Mr. Milligan.

24       MS. CARTER:  No further questions at this time.  I

13:53:52 25  pass the witness.

1          JUDGE MARCUS:  Thank you.  Cross-examination.  Who is

2     going to conduct the cross for the defendants?

3          MR. WALKER:  Your Honor, this is Dorman Walker.  The

4     video says Jim Davis because we have to use his computer for

13:54:10 5     technical reasons here.  But I am not Jim Davis.  I am Dorman

6     Walker representing the intervenor defendants, Senator

7     McClendon, and Representative Pringle.

8          JUDGE MARCUS:  We are happy to have you.  Fire away.

9          MR. WALKER:  Thank you.

13:54:27 10                    CROSS-EXAMINATION

11     BY MR. WALKER:

12     Q    Mr. Milligan, you just heard my introduction and know who

13     I am.

14          I would like to ask you a few questions.  I don't think we

13:54:34 15     will be long.

16          You were talking about concerns of the black community in

17     Montgomery County and in Mobile County.  And I think also in

18     the Black Belt counties that included -- and correct me if I

19     quote you wrong -- concerns about socioeconomic problems, about

13:54:56 20     health care and health care delivery, food deserts, infection

21     rates, COVID infection rates, child care for working families,

22     and I think you probably listed some other.  But that's -- did

23     I get your testimony correct?

24     A    Yes, sir.  Generally speaking, yes, sir.

13:55:18 25     Q    Okay.  And is there any county in Alabama where those are

1  not issues that people are concerned about?

2  A     I would say I've spent most of my career covering those

3  counties.  And the unique feature that I would see when

4  compared to other counties is the sense of isolation from

13:55:40  5  opportunity.

6       So whereas there may be, you know, part -- other counties

7  where we will see folks as you're suggesting raising those

8  concerns, I've seen a unique sense of almost being islanded off

9  from opportunities in those areas that I feel like is parallel

13:56:00 10  or similar in a unique way.

11  Q     But would you agree with me that in counties all across

12  the state there are concerns about equitable income

13  distribution and other socioeconomic issues, health care, and

14  rates of health care delivery in rural counties everywhere in

13:56:20 15  Alabama, about food deserts in downtown Birmingham as well as

16  in Winston County, about infection rates, and crowded hospitals

17  and the lack of space for people who need it, and a real

18  pressing problem across the state in child care for working

19  families?  Would you agree with me?

13:56:40 20  A     I would say that there's -- there are shared concerns, and

21  then there are also you look at the similarities between the

22  way people are articulating the root causes of those concerns.

23  So that would be another trend that I would say is more

24  consistent in the areas that I'm speaking about today, because

13:57:00 25  if we have a conversation with those families, they start

1    sharing stories about, you know, grandparents who didn't have

2    access to health care because of segregation rules at the time,

3    or they start sharing stories about the sharecropping days of

4    their family members.  So the historical thread that informs

13:57:20  5    their understanding of the root causes of their problems in

6    ways that at times the state government has enabled those

7    problems, or failed to adequately respond to them, I think

8    would be a pretty unique feature for the Black Belt Montgomery

9    County and the part of Mobile County that I'm referring to.

13:57:39 10    Q    Well, would you agree that those concerns that you have

11    talked about for black residents of members of the Black Belt

12    would be concerns that they share also with black residents of

13    Mississippi and of Georgia and of South Carolina?

14    A    Well, the Black Belt actually extends from east Texas all

13:57:59 15    the way to South Carolina, and I guess parts of Virginia.

16        But to the extent that we don't have, you know, federal

17    voting -- multi-state voting districts, but we're kind of

18    talking about commonalities between communities within our

19    state, I would think that the comparison of communities within

13:58:18 20    the borders of Alabama would be the most relevant to the

21    discussion today.

22    Q    Right.  But what I asked you was:  Aren't those issues

23    also shared by black Mississippians and Georgians and South

24    Carolinians?

13:58:32 25    A    Unfortunately, I would -- I would offer that, you know,

numerous communities throughout the country share some of those
same experiences.

Q    Including black -- I'm sorry.  I didn't mean to interrupt
you.

A    No, no.

Q    Including -- my turn?

A    Yes, sir.

Q    All right.  Thank you.  Including black communities and
say Detroit or Chicago; is that correct, same issues?

A    No.  I would -- I would disagree.  I think that when
you're looking at urban poverty in the Midwest and, you know,
and urban centers around the country, we can't just copy and
paste contemporary discussions with -- onto the historical
development of those communities.

What we have uniquely here in Alabama that I think is
actually an opportunity for us to knowledge it, it's as unique
as the types of accents and the types of cultural traditions
that we have in our communities that have been forged over
decades of close continuous relationship of different community
members.  And so we have an opportunity to look at patterns
that have been shaped by conditions that have been unbroken
over time.  And I think it is more unique than just a simple
comparison of this community is poor and has a high rate of
violence or infectious disease, and so do they.

I think when we look at the statistical outcomes over time

1  and the stories that those individual families tell, we see

2  more commonalities there.

3  Q    I want to ask you some questions about the statement that

4  you submitted that's M-17.  I will pull it up if you want to

14:00:13  5  look at it.  But in paragraph 6, you said the black community

6  dispersed throughout Montgomery is a community of interest.  Do

7  you recall that statement?

8  A    Yes, sir.

9  Q    Would you agree that there is also in Montgomery County a

14:00:28 10  black and white community of interest composed of black and

11  white people who do things together?

12  A    I'm not sure I understand how you are defining community

13  of interest.

14  Q    Well, I guess that goes back to how you defined it.  In

14:00:43 15  your statement, you talk about a number of things that seem to

16  be the backbone of your concept of a black community of

17  interest; that is, participation in state government, or

18  participation in the military, or participation in -- you

19  mentioned evening games at Crampton Bowl or participation in

14:01:08 20  ASU, which is an HBCU; is that correct, historically black

21  college or institution?

22  A    Yes, sir.

23  Q    And you talk about participation at Valiant Cross Academy,

24  which is as I understand it an independent school for black

14:01:24 25  males; is that correct?

```
 1   A     Yes, sir.
 2   Q     But there are also things that parallel that, that whites
 3   and blacks together throughout the city do that I would guess
 4   for the same reasons create a community of interest.  For
 5   example, you went through our city's magnet program?
 6   A     Right.
 7   Q     At Forest Avenue and Bellinger Hill and LAMP.  And that --
 8   those would have been communities of interest of black and
 9   white families together, would I be correct?
10   A     Well, I don't know that I understand it in the same way
11   because communities, you know, there's a residential component
12   to a community of interest.  And that was one of the things
13   that was somewhat of a unique experience for me, because when I
14   was a part of that first wave of students who attended the
15   magnet programs, the --
16   Q     Uh-huh.
17   A     -- and at the time there -- some of those programs were
18   housed within traditional neighborhood schools.
19         And I always happened to live in the neighborhood that was
20   like associated with Forest Avenue.  I lived around the street
21   from it or associated with Lanier.  And so I lived in the
22   residence that my non-magnet -- the community where they live,
23   whereas many as of my peers in my actual classes lived in
24   outside of that specific community.  So my cultural proximity
25   and my understanding of what was going on in our neighborhood
```

1    surrounding the school was very different than my peers who

2    lived in a different area or much further east away from those

3    schools.

4         So I think there's a residence part that plays a role, and

14:03:02  5    also a cultural part that plays a role in describing

6    communities of interest, and culture is facilitated by

7    involvement often in institutions in ritual and traditional

8    ceremonies.  I don't think it's only defined by participation

9    in a -- you know, in a job or at a school, for example.

14:03:22 10   Q    Right.  But when you were at Forest Avenue when you were

11   at Bellinger, when you were at LAMP, you were attending school

12   every day with white children as well as black children and

13   children of other ethnicities cities; is that correct, and

14   presumably made friends with them?

14:03:40 15   A    Yes, sir.

16   Q    I am assuming?  And participated on sports teams with

17   them, I am assuming or maybe not?

18   A    Marching band.

19   Q    Or marching band and rooted for sports teams?

14:03:52 20   A    Right.

21   Q    And all across the city, those sports teams would be seen

22   playing at our city's soccer fields and volley ball fields and

23   baseball and softball fields; is that correct?

24   A    I would say it's, you know, there were -- there was

14:04:09 25   competition among those teams.  But let's just look at the

```
 1  rates of demographically speaking the students that are
 2  enrolled in Montgomery public school now compared to when I was
 3  in those schools.  They were much more -- if we're talking
 4  about white and black in the '80s and '90s, that same school
14:04:26 5  system was much more of a biracial sort of experience than it
 6  currently is.
 7      And I think that reflects the very sort of concern that I
 8  am trying to articulate as those schools have, you know, and
 9  the city as a whole has it has become more black and
14:04:43 10 institutions have become more black, you actually have a larger
11  footprint throughout the city of black communities and a shared
12  community of interest that would sort of undermine the
13  rationale national for cutting the city into two and three
14  districts for congressional representation.
14:05:04 15 Q    Let me ask you then about Mobile.  Would you agree that
16  Mobile is a unique city, a unique county, that it has a unique
17  culture and heritage?
18  A    I would.
19  Q    Okay.  And in other words, it's shaped in ways that the
14:05:24 20 rest of the state is not by the Colonial history of the Spanish
21  and the French presence, correct?
22  A    Yes.  I would say that it -- in all of American history,
23  it has a unique story.
24  Q    Yeah.  And it is Mardi Gras in a few of the other Coastal
14:05:42 25 counties, which are not generally celebrated in the rest of
```

1    Alabama but are really very, very important to the people of

2    that area, do you know?

3    A    Sure.

4    Q    Yeah.  And they also have uniquely access to the Gulf and

14:05:55  5    to the Delta and to the hunting, fishing, and sporting

6    opportunities that arise there, correct?

7    A    Sure.

8    Q    And they also have -- they work in the shipyards there,

9    and all of those are activities that do you know blacks and

14:06:12 10    whites do together; is that not correct?

11    A    I would assume so.

12    Q    Okay.  And so would you agree that there is a black and

13    white community of interest in Mobile County?

14    A    Well, again, I would just go back to the way I responded

14:06:30 15    to your question about Montgomery County that there are also

16    shared family and cultural and historical features that bind

17    those black communities in Prichard and Mobile County to their

18    relatives throughout the Black Belt in a way that's unique.

19    And I've tried to explain that about, you know, how I've

14:06:55 20    experienced that professionally and personally, both in Mobile

21    and Montgomery County.

22    Q    Wouldn't that also be true for someone who grew up in

23    Montgomery who has ties in the Black Belt who is white?

24    A    I would -- I think the distinction, though, is if we're

14:07:16 25    thinking about roots of the socioeconomic challenges that I was

```
 1   describing, I don't know that the story of a random white

 2   Montgomerian with Black Belt roots is going to track on to the

 3   story of the random black Montgomerian with Black Belt roots in

 4   the same way.  I'm pretty confident that if we find a black
```
14:07:38
```
 5   Mobile resident with Black Belt roots there would be

 6   similarities in their stories to those of the black

 7   Montgomerian with Black Belt roots in a way that is much

 8   closer.

 9   Q    As you understand communities of interest, are there any
```
14:07:55
```
10   communities of interest -- I'm sorry.  Something just happened

11   here.  Oh, I think -- are there -- as you understand

12   communities of interest, are there any communities of interest

13   that contain both black and white citizens in Montgomery or in

14   central Alabama?
```
14:08:11
```
15   A    I don't -- I don't know that I have studied it and that I

16   can, you know, I can comment on that with any -- with a real

17   sense of confidence right now.

18        I think, for example, there are the nuns in Vendenburg

19   (phonetic) in southern Wilcox County.  There's an order of
```
14:08:34
```
20   Mennonite nuns that's worked there for decades, right?  And

21   there's, I don't know, I think they're sponsored by a parish

22   out in Rochester, New York.  I don't know how many nuns have

23   come through there for training.  They're predominantly white

24   women who have worked there.  They work very intimately and
```
14:08:51
```
25   closely with black families in one of the poorest parts of this
```

1   country, let alone this state.

2        And if we were to say, you know, are they a part of the

3   community of interest when we're talking about the Black Belt?

4   I think we could -- I think -- I don't mean to set up some sort

14:09:09 5   of litmus test that is only open to, you know, according to

6   race.  But I do think that racial experiences are shaping a lot

7   of the features that I'm trying to describe, particularly

8   because of the unique experiences of Alabamians.

9        These black residents that I am describing, they didn't

14:09:28 10   ask for Jim Crow segregation.  They didn't ask for Redlining.

11   They didn't ask for some of the, you know, enforcement of

12   certain laws that has been predominantly -- well,

13   disproportionately impacting their relatives.  These aren't

14   things that people ask for.  They became racialized because of

14:09:46 15   the decisions of policy makers.

16        And so, you know, I think that that is the most salient

17   point because the state has had the most power with respect to

18   shaping some of these communities.  And these are communities

19   that have endured and have continued to add to the population

14:10:03 20   of the state, despite this treatment.

21        And I think the least that we can do is acknowledge the

22   unique qualities they share in common.

23   Q    I am going to share with you the declaration of Dr. Moon

24   Duchin, and that is Exhibit M-3, and ask you to look, if you

14:10:32 25   will, sir, at her four proposed maps.  And we'll just look at

1   the first two right here.  Can you see A and B there?

2   A    Yes, sir.

3   Q    In both of these, they take part of Mobile County in the

4   western part of the state and create a district that runs nine

14:10:55  5   counties over to the Georgia border; is that correct?

6   A    Yes, sir, I think that's what I'm looking at.

7   Q    Okay.  All right.  And also in C and D just, so you can

8   see all of the -- all four of the plans, the same thing.  Start

9   in Mobile County, take part of Mobile County, and run all the

14:11:18 10   way over to Russell County and Barbour County and Henry County

11   and Houston County on the Georgia border; is that correct?

12   A    Yes, sir.

13   Q    Let me ask you:  Does a black resident of Mobile County

14   have more in common with her white neighbor than she does with

14:11:40 15   a black resident of Phenix City in Russell County?

16   A    I don't know that I can answer the question that you're

17   posing to me in a way that would hold any weight because I

18   think it depends on the person.

19        And then let me -- can I just ask for clarification?  Are

14:12:07 20   those maps that -- can you give me some background on where the

21   maps that I am looking at came from?

22   Q    Oh, I'm sorry.  These are alternative maps that are being

23   used by the Milligan plaintiffs to demonstrate ways in which

24   two majority black districts could be drawn, and thereby the

14:12:29 25   Milligan plaintiff Dr. Moon Duchin, and these were four

| | |
|---|---|
| 1 | illustrative maps that she presented. |
| 2 | A    Oh, okay. |
| 3 | Q    I apologize. |
| 4 | A    Okay. |
| 14:12:40  5 | Q    Have you answered my question? |
| 6 | A    Yes, sir.  I just wanted to clarify that before -- so I |
| 7 | was saying that I would say the -- the historical reality of |
| 8 | unique racialized experiences among black Alabamians is a point |
| 9 | that, you know, I wouldn't concede whether we're talking about |
| 14:13:06 10 | -- particularly when we're looking at central Alabama in the |
| 11 | area of the state where the plantation economy and so many of |
| 12 | those experiences that follow that period of time have been so |
| 13 | well-documented and are, you know, continuing to shape the |
| 14 | realities of these families. |
| 14:13:25 15 | So you're asking me:  Can a black person in Mobile share |
| 16 | something in common with a white person in Mobile?  For sure. |
| 17 | Blood transfusions, they might both love a certain show, |
| 18 | whatever the case is. |
| 19 | But I think the other question is:  Can they share |
| 14:13:42 20 | something very deep and relevant and common with their |
| 21 | neighbors throughout the Black Belt with their relatives in |
| 22 | similar living conditions as those Black Belt counties, which |
| 23 | may extend as far as the Georgia line.  And I think that is |
| 24 | also true.  And where we're looking at numbers of people and |
| 14:14:01 25 | communities, I think that that is something that we really need |

1  to take into consideration.

2  Q    I think we're almost done.  I want to ask you one last

3  question.

4  A    Yes, sir.

14:14:13 5  Q    In the statement that you committed, which was M-17, in

6  paragraph 16, I will read it to you.

7          JUDGE MARCUS:  Let me stop you for a second, counsel.

8  I take it you don't need these illustrative maps anymore?

9          MR. WALKER:  I do not.  Thank you, Your Honor.

14:14:33 10          JUDGE MARCUS:  Thanks so much.

11          MR. WALKER:  Okay.  Stop share.

12          JUDGE MARCUS:  Thank you.

13  BY MR. WALKER:

14  Q    Paragraph 16 says, Khadidah Stone and I submitted e-mail

14:14:44 15  testimony to the reapportionment committee on Thursday,

16  September 16, 2021, the last Thursday of the hearings.  Do you

17  recall that statement?

18  A    Yes, sir.

19  Q    And at that time, the e-mail statement that you submitted

14:14:58 20  to the reapportionment committee advocated for the Singleton

21  plan with no majority-black districts.  That's correct?

22  A    Yes, sir.

23  Q    And now you're advocating instead for the creation of two

24  majority black districts; is that correct?

14:15:12 25  A    Yes, sir.  Yes, sir.

1  Q    Okay.  Thank you.

2           MR. WALKER:  That's all I have.

3           JUDGE MARCUS:  Thank you very much, counsel.  Let me

4  ask you:  Did Mr. Davis have any cross-examination on behalf of

14:15:23  5  the Secretary?

6           MR. WALKER:  He does not, Your Honor.

7           JUDGE MARCUS:  Thank you so much, then.  I guess we

8  will go back to redirect examination.  Ms. Carter.

9           MS. CARTER:  Yes.  Your Honor, may I have a few

14:15:36 10  minutes before redirect?

11           JUDGE MARCUS:  You sure may.  Why don't we take a

12  five-minute break, and we will come back.  Thank you.  Does

13  that do it for you?  Does that give you enough time?

14           MS. CARTER:  Yes, sir, I believe so.

14:15:48 15           JUDGE MARCUS:  Thanks.  We will take a five-minute

16  break.  It's 2:15.  We will come back about 2:20 or so.

17  Thanks.

18           (Recess.)

19           JUDGE MARCUS:  Is everybody hooked up and ready to

14:22:41 20  proceed?  I just wanted to make sure Mr. Walker -- Mr. Walker,

21  are we all set?

22           MR. WALKER:  We are all set, Your Honor.  Thank you.

23           JUDGE MARCUS:  Thank you, Mr. Walker.  And thank you,

24  Ms. Carter.  You may proceed with your redirect.

14:22:58 25                    REDIRECT EXAMINATION

```
 1  BY MS. CARTER:
 2  Q    I have a few more questions for you.  You mentioned
 3  earlier it was important for there to be a second district in
 4  order for the black community in the Black Belt to have
 5  representations for their concerns, right?
 6  A    Right.
 7  Q    Was it your testimony that Montgomery County is a
 8  community of interest?
 9  A    No.  I didn't say that.  Not I mean -- I -- well, hold on.
10  I don't think I said that.  I think there was a statement that
11  the gentleman brought out, but I don't think I said that
12  affirmatively today.
13  Q    Was it your --
14  A    I was referring to the black community in Montgomery
15  County.
16  Q    Okay.  Thank you.  Sorry.  Speaking over you for a minute
17  there.  Was it your testimony that the black community in
18  Montgomery County shares things in common?
19  A    Right.
20  Q    Was it your testimony that you want to keep Montgomery
21  County whole?
22  A    My testimony today?
23  Q    Yes, that Montgomery County would be kept whole along with
24  the Black Belt counties?
25  A    Oh.  Yes.
```

Timestamps in left margin:
14:23:09 (line 5)
14:23:25 (line 10)
14:23:39 (line 15)
14:23:49 (line 20)
14:24:07 (line 25)

```
 1   Q    And do you agree that if Montgomery County was kept whole
 2   that black and white communities would be in the same district?
 3   A    Yes.
 4            MS. CARTER:  No further questions, Your Honor.  Thank
 5   you.
 6            JUDGE MARCUS:  All right.  If there's nothing further
 7   for Mr. Milligan -- oh, yes, I'm sorry.  Mr. Blacksher.
 8            MR. BLACKSHER:  I have a couple of quick questions.
 9            JUDGE MARCUS:  Sure.  You take your time.
10                    RECROSS-EXAMINATION
11   BY MR. BLACKSHER:
12   Q    Mr. Milligan, I am Jim Blacksher, one of the lawyers for
13   the Singleton plaintiffs.
14   A    Yes, sir.
15   Q    You said that you attempted to draw some congressional
16   plans as well as House and Senate plans, right?
17   A    Yes, sir.
18   Q    And I heard you mention Dave's Redistricting map.  What is
19   that?
20   A    It's an online tool that takes whatever the most recent
21   census data is and allows people to build maps of voting
22   district maps for free.  So it's a free tool.
23   Q    Whereas Maptitude is not free?
24   A    Right.  Yes, sir.  You have to pay for a Maptitude
25   license.
```

1  Q    Okay.  And were you using Dave's, or were you using

2  Maptitude when you were trying to draw a map?

3  A    So we -- there were in our network of people who were

4  attempting to do this, there were people who were using both.

14:25:41  5  Q    Okay.  Did any of the people that were using it that you

6  were aware of find Dave's Redistricting map to be unreliable in

7  any way?

8  A    There was some discussion about the reliability of its

9  numbers and also reliability with respect to I think at the

14:26:04 10  precinct level, yes, sir.  But the co-worker that I referred to

11  who was submitting the maps to the apportionment committee

12  utilized Maptitude.

13  Q    Okay.  All right.

14         MR. BLACKSHER:  That's all I have, Your Honor.

14:26:22 15         JUDGE MARCUS:  Thank you.  Anything further,

16  Ms. Carter?

17         MS. CARTER:  No, Your Honor.  Nothing further.

18         JUDGE MARCUS:  All right.  Seeing nothing further,

19  Mr. Milligan, we thank you.  You are excused.

14:26:35 20         THE WITNESS:  Thank you.

21         JUDGE MARCUS:  And the Milligan plaintiffs can proceed

22  with their next witness.

23         MS. EBENSTEIN:  Good afternoon, Your Honor.  This is

24  Julie Ebenstein for the Milligan plaintiffs.

14:26:53 25         JUDGE MARCUS:  Good afternoon to you.  Who would be

```
 1   the next witness, Ms. Ebenstein?
 2             MS. EBENSTEIN:  Dr. Kosuke Imai.
 3             JUDGE MARCUS:  Is he on?
 4             THE WITNESS:  Yes, I am here.
 5                         DR. KOSUKE IMAI,
 6   having been first duly sworn, was examined and testified as
 7   follows:
 8             JUDGE MARCUS:  Thank you.  And if you would state your
 9   name for the record and spell it, please.
10             THE WITNESS:  My name is Kosuke Imai, K-O-S-U-K-E,
11   I-M-A-I.
12             JUDGE MARCUS:  Thank you very much.  And you may
13   proceed, counsel.
14                         DIRECT EXAMINATION
15   BY MS. EBENSTEIN:
16   Q    Dr. Imai, where do you work?
17   A    Harvard University.
18   Q    And what's your position at Harvard University?
19   A    I am a professor in the Government Department and also in
20   the Statistics Department of Harvard University.
21   Q    Where did you earn your academic degrees?
22   A    I earned a master's degree in statistics from Harvard, and
23   I also earned a Ph.D. in political science also from Harvard.
24   Q    Could you briefly describe your previously held academic
25   divisions?
```

14:27:06 (line 5)
14:27:21 (line 10)
14:27:32 (line 15)
14:27:44 (line 20)
14:28:06 (line 25)

A    Yes.  After I finished Ph.D. at Harvard, I started
teaching at Princeton University as a lecturer first, and then
assistant professor, associate professor, and eventually as a
professor before moving to Harvard three years ago.

Q    And as a professor, what are your primary areas of
research or scholarship?

A    My primary area of research is intersection of statistics
and political science.  And at Princeton, I was playing a
leading role in building interdisciplinary program of
Statistics and Machinery Learning.  At Harvard, I have a joint
appointment in both political science, the Government
Department, and Statistics Department, which is a first such
appointment in the history of Harvard.  So really my research
is in between these two disciplines.

     And particular I have two areas of research that I focus
on.  The first is causal inference research, which is basically
about developing statistical methods for determining cause and
effect.  And the second area of my research is computational
social science, which is about developing new algorithms to
helping solve complicated problems in today's society and
social sciences.

     In the area of causal inference research, I developed
statistical methods estimating the causal effects of different
policies, public policies, and this is very important for
scientific evaluation of public policy because you have to be

1  able to figure out whether or not the particular policies have

2  intended effects or not.  And so some of the methods that I

3  have been developed, have been used for the program that --

4  variation of -- variety of policies that's in the real world.

14:30:03 5  In the second area of research, which is the computational

6  social science research, this is emerging area of discipline

7  where the availability of data about the society and

8  individuals and citizens have really lead to the explosion of

9  methodologies, but also as a way to utilize data to improve the

14:30:25 10  public policies.

11      So in this area, I developed a set of computational

12  algorithms to help improve the public policy and evaluate the

13  impact on in the real world, decision making, because often

14  times, the decisions are made in the area of public policy by

14:30:42 15  humans.  So you want to know like what type of impact the

16  algorithmic recommendation might have in these areas.  So

17  that's sort of the two areas of research.  One is causal

18  inference, and the other is the computational social science

19  research.

14:30:58 20  Q    Thank you.  In your research related to computational

21  social science, is that research publicly available?

22  A    Yes.  One of the most important missions I have as a

23  academic researcher is to make the methods that I develop

24  widely available for free.  So the reason why I do that is, you

14:31:18 25  know, obviously, any citizens and researchers may not be able

```
 1   to implement the cutting edge methods on their own, and so I
 2   developed open-source software packages that are freely
 3   downloadable, and anyone can basically have access and run them
 4   on their computer, personal computer.
 5         And so this is an important thing for me just also for the
 6   sake of scientific transparency.  You want to make sure that
 7   other researches have access to the code you have written and
 8   the data you used so that research projects that I conducted
 9   can be duplicated by others and also accessible to the public.
10   So I've developed more than 20 open-source software packages,
11   and that's all available on the websites.
12   Q    Dr. Imai, have you published peer-reviewed articles?
13   A    Yes, I have.
14   Q    And could you provide us with a few examples if those
15   relate to redistricting?
16   A    Sure.  So I have published a book, which is came from the
17   Princeton University Press.  It's a textbook to computational
18   social science, Quantitative Social Science in general, and
19   that's been widely adopted or by the many universities across
20   the world.
21         In the three journals, I have more than 60 papers that's
22   being published mostly in political science and statistics
23   journals.  And the most relevant papers for redistricting is
24   concerning the development of new simulation algorithms for
25   generating the redistricting plans, and that's been published
```

The timestamps in the left margin are: 14:31:42 (line 5), 14:32:11 (line 10), 14:32:24 (line 15), 14:32:44 (line 20), 14:33:05 (line 25).

in one -- in the *Journal of Computational and Geographical Statistics*, and others in science advances and statistics and policy in a few other journals.

Q    Thank you.  Is your research and scholarship widely cited in your field?

A    Yes.  I -- I'm actually one of the most highly cited researches in the area of quantitative social science. Clarivate Analytics, which is the premier organization that tracks the citation counts of political sciences, they've named me as one of the highly cited researchers in the cross field, which is basically the interdisciplinary fields for the last four years when such honor has been given.

Q    And do you review the work of other political scientists or statisticians?

A    Yes.  I routinely review the manuscripts that are submitted to peer-reviewed journals for publication.  I probably get, you know, maybe a couple hundred such requests every year.  I can't do them all, so I usually do 50 or 60 a year.  I serve as the co-editor of *Journal of Causal Inference,* which is a interdisciplinary journal that publishes statistical methods and other mathematical methods on cause and effect. And I also serve on the editorial board of several journals in political science and statistics and serve as an associated editor making the direct decisions on acceptance and rejection of these papers.

Q    Thank you.  Have you received awards for your research in political science or statistics?

A    I have received some awards.  Several of them includes best paper, best software awards from academic societies.  I was also the inaugurate recipient of the outstanding research for the young researcher that has received their Ph.D. terminal degree within the ten years.  So a few years back when I was still young, I received that honor.  Yes, so several, you know, awards that's on my CV.

One thing that I wanted to -- I'm very excited about is actually one of my papers was selected for special reading session in the *Royal Statistical Society*.  The *Royal Statistical Society* in England every year selects couple of papers for special reading session where you go and present your work.  And there was a discussion discusses your work, and there's also always some audience.  This year will be a Zoom, but I will be going there virtually and presenting my work there.

Q    Are you a member of any professional associations that relate to political science or statistics?

A    I am a member of American Political Science Association as well as American Statistical Association.  Those are the two premier academic organizations in North America for disciplines.  I am also a member of Society for Political Methodology, which is a reading society that brings people like

myself to develop statistical methods that's applicable to the

programs in political science and politics.  And I served as

the president of that society for two years from 2017 to 2019.

Q     How were you selected for that role?

A     I was selected by the members of the society as the

president.

Q     And have you submitted expert reports in litigation

before?

A     I have submitted two reports to the redistricting cases

that's pending for the Ohio State Supreme Court.

Q     You --

A     In addition to the one I submitted to this one.

Q     Thank you.

          MS. EBENSTEIN:  Your Honor, at this time, we would

proffer Dr. Imai as an expert in computational social science,

causal inference research, and quantitative redistricting

analysis.

          JUDGE MARCUS:  Any objection?

          MR. SMITH:  Your Honor, Brent Smith for the defendant,

no objection from us at this stage of the proceedings.

          JUDGE MARCUS:  All right.  We will -- anyone else want

to interpose any objection?  Hearing none, we will accept

Dr. Imai as an expert in the three fields that Ms. Ebenstein

had listed -- computational social science research,

quantitative redistricting, and causal inference research.

```
 1        With that, you may proceed.  Thank you.

 2             MS. EBENSTEIN:  Thank you, Your Honor.

 3   BY MS. EBENSTEIN:

 4   Q    And, Dr. Imai, I would just remind you to speak slowly so

 5   that the court reporter can capture everything that you are

 6   saying.

 7   A    Okay.  Yes.

 8             JUDGE MARCUS:  I will stop you at that point to

 9   underscore this for everyone.  We're located in a variety of

10   different places, and so it's tougher for the court reporter to

11   take everything down.

12             THE WITNESS:  Yeah.

13             JUDGE MARCUS:  Accurately.  So we'd be much

14   appreciative if something I had really mentioned earlier today

15   for everyone that we speak as slowly as we can so that she can

16   get it all down and get it accurate.

17        Thanks, and you may proceed, Ms. Ebenstein.

18             MS. EBENSTEIN:  Thank you, Your Honor.

19   BY MS. EBENSTEIN:

20   Q    Dr. Imai, briefly, what were you asked to do in this case?

21   A    Thank you for the opportunity to present my analysis.

22        So I was asked to conduct a simulation analysis to

23   determine whether or not race played a role in determining the

24   district boundaries on the enacted plan.

25   Q    How did you go about doing that investigation?
```

14:39:26

1  A    As I just mentioned, I conducted the simulation analysis

2  by generating a large number of alternative redistricting plans

3  that one could have drawn under the specified rules, and then

4  comparing those alternative redistricting plans, we see enacted

5  plan.

6  Q    How many sets of simulations did you perform to undertake

7  your analysis?

8  A    So for each of the three analyses that I have done, I

9  conducted -- I generated 10,000 redistricting maps.

14:39:38 10  Q    And did you form an opinion as a result of your analysis?

11  A    Yes, I did.

12  Q    What is that opinion in general?

13  A    Yes.  So the most important finding that I obtained is

14  that race played a predominant role in determining district

14:39:58 15  boundaries under the enacted plan beyond the creation of one

16  majority-minority district.

17       And the enacted plan does this by packing a

18  disproportionate number of black voters from Montgomery County

19  to into the District 7, which is the one majority-minority

14:40:17 20  district, and then by doing so, reduces the number of black

21  voters in District 2.  Thereby diluting the voting power of

22  black voters.

23  Q    And just to be clear before we get started with your

24  report, could you explain to us your definition of a

14:40:33 25  majority-minority district in this instance?

```
 1  A     Here, I'm defining majority-minority district, which I am
 2  going to call MMD the rest of my testimony.  As defined as the
 3  district that has 50 percent or more of black population of
 4  Black Voting Age Population.  That's important.
14:40:55  5  Q     Thank you.
 6        And did you prepare a report or declaration in this case?
 7  A     Yes, I did.
 8  Q     Just to make sure we're all on the same major page, do you
 9  have copies of your report in front of you marked Plaintiffs'
14:41:08 10  Exhibit M-1, and that's ECF 88-1 and M-6, 88-6?
11  A     Yes.
12  Q     Okay.  Thank you.  You testified a moment ago that you
13  created district map simulations.  What is the purpose of using
14  simulations to assess districting maps?
14:41:26 15  A     Yeah.  So the purpose of the simulation analysis is to
16  generate a set of alternatives -- large set usually.  So in my
17  case 10,000, a large set of alternative plans one could have
18  drawn and their specified set of rules.
19  Q     Have you?
14:41:45 20  A     Sorry.
21  Q     Go ahead?
22  A     Yeah.  Compare the enacted plan -- by comparing the
23  enacted plan with the alternative set of plans, you can analyze
24  what factors played role in determining enacted plan.
14:41:58 25  Q     And in your view, what are the benefits of using
```

1    simulations in comparison to other methods for assessing

2    redistricting plans?

3    A     Yeah.  So there's several advantages of simulation

4    analysis.  I want to list three main benefits:  The first

14:42:18  5    benefit and perhaps, you know, most obvious one is that in the

6    traditional redistricting analysis, one would compare, say,

7    enacted plan from Alabama with other plans from other states.

8    I mean, you might say, well, the Alabama plan are more or less

9    biased compared to these other plans.

14:42:39 10         But as you might imagine, the problem of this comparison

11    is that different states are different.  Like they have very

12    different political geography.  They may have used different

13    redistricting rules.  The number of congressional districts

14    might also be different.  So you are basically comparing apples

14:42:57 15    and oranges, and you can't really isolate the particular

16    factors you're trying to investigate.

17         Now, you could say, okay, what about comparing the enacted

18    plan with the previous plans of the same state?  It's the same

19    state, you know, not New York.  It's Alabama.  But the problem,

14:43:17 20    of course, is that a population change over time.  The

21    redistricting rules could also change.

22         So those changes is going to contaminate the analysis.  In

23    contrast, simulation plan uses the same set of political

24    geography, the current political geography, in my case, the

14:43:37 25    2020 census data and as well as the current set of rules of the

1  same state.

2        So we will be able to hold the old political geography and

3  the rule as constant, and then try to isolate the particular

4  factors at play.

14:43:53  5        Now, this leads to the second advantage of simulation

6  analysis.  The second advantage -- this might be a little

7  intuitive -- but it's transparency, okay?  So you might think,

8  well, the algorithms are a little bit complicated.  That's

9  black box.  You don't know what's happening.  But it's actually

14:44:12 10  -- I would argue it's actually very transparent, right?  The

11  reason why I say it's transparent is that you specify set of

12  rules that goes into the algorithm.  You tell the algorithm to

13  follow these set of rules, which are usually determined by the

14  state.  And then see what type of plans could be drawn.

14:44:30 15        So in that sense, you know, the sense that the -- I

16  specify exact set of rules, and that's been made clear, and any

17  researchers who use simulation analysis should make those

18  inputs clear.  It's very transparent, and output only depends

19  on the inputs.  So what inputs goes in, once input is

14:44:50 20  determined, the algorithm will determine the output.  That's

21  the second advantage of the simulation analysis is the

22  transparency.

23        So compare this with a scenario where you tell humans to

24  draw alternative plans.  And that will be difficult because it

14:45:05 25  could be affected by a variety of factors.  The humans might

1  know something about the neighborhood, or those could live in a

2  particular neighborhood, and even if they're not consciously

3  using those factors, it might still affect the decisions to

4  draw boundaries.

14:45:24  5     So the algorithm provides much more transparent way of

6  drawing or chart of -- set of redistricting plans.

7     The third advantage of the simulation analysis is related

8  to the first two.  So because you can specify exactly what

9  factors should affect the algorithm generation of redistricting

14:45:47  10  plans, you can isolate each factor.  So I could add one factor

11  or take out one, or I could change one factor a little bit to

12  see how those changes will affect the characteristics of the

13  plans that could have been drawn.  And that way you can isolate

14  each factor of interest without -- while controlling all other,

14:46:12  15  you know, rules and factors and the political geography at the

16  same time.  So these three are the key benefits.

17     So the first one is the ability to control for political

18  geography and the rules.  The second one is transparency.  And

19  the third one is the ability to isolate different factors.

14:46:32  20     So those are three key benefits of simulation analysis.

21  Q    And what method did you use to generate the simulated

22  plans?

23  A    So I used algorithm that belongs to a family of so called

24  Monte Carlo methods.

14:46:47  25  Q    What is a Monte Carlo method?

A    Monte Carlo methods has a very important mathematical
property.  And that mathematical properties is that algorithm
that belongs to this family has a mathematical guarantee that
it will generate a new representative sample of redistricting
plans or simulated plans under -- under the specified set of
rules.  Okay, so the key here is that it representativeness.
So the reason why this is very important is that as you might
imagine, the number of ways to draw district boundaries, even
under a set of certain rules is a huge number.  It's not
billion.  It's not trillion.  It's way beyond that.

So it's impossible for me or for any computer to actually
enumerate each single one of possible plans under set of rules
that you are interested in.  So the only way to understand,
okay, what are the characteristics of possible plans under
certain rules is to obtain representative samples.  This is
very similar to survey sampling.  You know, instead of doing
conducting the census, the Census Bureau the decennial every
ten years, Census Bureau would conduct American community
survey every year.  But that sample size is much smaller than
talking to every single person who live in the U.S.

So the -- as long as the sample is representative, we can
still characterize the U.S. population.  And it's a same idea
here.  Even though the population of the possible plans are too
numerous to enumerate, we can obtain a small fraction of
representative sample and analyze the characteristics of the

1  redistricting grounds.

2  Q      Thank you.  And let's discuss the constraints and inputs

3  that you used.  How did you determine which criteria to use in

4  your simulation?

14:48:54  5  A      So I reviewed the guideline provided by the state in the

6  apportionment committee.

7  Q      And how do you isolate a single factor for investigation

8  within those guidelines?

9  A      So the fact that I was most interested in and I was asked

14:49:11  10  to evaluate was race.  So I started a simulation by first

11  looking at the other -- other parts of the guideline, other

12  rules.

13        So there are five sets of rules that I am going to -- I

14  imposed on my algorithm in my simulation analysis.  So there

14:49:36  15  are five rules.  And three of them I am going to describe it as

16  hard constraint.  The hard constraint in a sense that every

17  single simulated plan that I generate satisfy that criteria.

18        Two other ones I am going to call this soft constraint,

19  okay?  So soft constraint is more like a preference.  So the

14:49:56  20  algorithm prefers certain type of plans.

21        So for the three hard constraints I imposed, the first one

22  is quantitating.  So every district that I generate is

23  contiguous.  The second constraint, the hard constraint, I

24  imposed is that no incumbency pairing.  So this means that each

14:50:21  25  district should not have multiple incumbents.  So this is to --

1   this just like the inactive plan.  So the enacted plan doesn't

2   pair incumbance within each district.  So none of my plans,

3   also that's so.

4        The third one is the population equality.  So according to

14:50:39  5   the guideline, you're supposed to minimize the population

6   difference across redistricting plans.

7        Here, I set the maximum population deviation to be

8   .5 percent, okay?  So this is a little bit different from

9   typical congressional plans where they often impose the

14:50:58 10   population difference up to like one person across different

11   districts.

12        Why .5 percent?  So .5 percent is about 3,500 people in

13   the case of Alabama.  Why is that?  Because my dataset is --

14   this is standard sort of practice in redistricting research is

14:51:18 15   that the precinct levels.  It's not at the census bloc level.

16   It is at the precinct level, which is the larger unit.  This is

17   -- the precinct is the smallest unit for which the elector data

18   is available.  Also this is usually in most redistricting

19   research that's what we use.

14:51:35 20        So at the precinct level, the .5 percent is a very good,

21   you know, strict population threshold compared to other type of

22   analysis you might see in literature.

23        So and most importantly, 3,500 people, that's the maximum

24   deviation is now going to hardly any material impact on the

14:52:00 25   congressional analysis.

1        So those are three hard constraints.  They're continuity,

2   no incumbency pairing, and the population equality.

3        And the two soft constraints are compactness and the

4   number of county splits.

14:52:16   5   So here I used a soft constraints because compactness is a

6   continuum measure.  And there are several measures in the

7   literature, but, you know, there's -- it's not a binary

8   dichotomous whether it's compact or not compact.  There's a

9   range of compactness that one can consider.  So what I tried to

14:52:34  10   do is to tell the algorithm to prefer a more compact plan with

11   all else equal.  So all else equal just prefer more compact

12   plan.

13        And I as a result, the most of the simulated plans I have

14   generated, there are 10,000 of them for each set of simulations

14:53:01  15   I am going to describe later, they're a more compact than the

16   enacted plan.  I reach on average in most cases many of my

17   summations are more compact than enacted plan.

18        The second soft constraint is the number of county splits.

19   So here the guideline tells you to minimize the number of

14:53:21  20   county spreads with subject to some other constraint.

21        I did the exact same thing.  So, again, this is a

22   continuum, so the number of county splits could be one, two,

23   three, four, five.  Under the enacted plan, there are six

24   counties being split.  So I made sure that I basically pulled

14:53:39  25   the algorithm to prefer the plans with the fewer county splits

1   all else equal.

2        So and as a result, none of my -- all my simulated 10,000

3   plans have fewer or equal number of county splits than enacted

4   plan.

14:53:59 5        So I know it's going long, but basically, I imposed the

6   five constraints.  One is contiguity, next one is incumbency

7   pairing, third is population equality and compactness, and

8   number of county splits.

9   Q    Thank you.  Did you consider any partisan constraints in

14:54:22 10  your simulations?

11  A    No.  So this is the beauty of the simulation algorithm.  I

12  did not consult any partisan information.  So any partisan

13  information didn't go into the algorithm.  So we know that.

14  That's the beauty of the transparency part of the simulation

14:54:41 15  analysis.

16  Q    And did you impose a constraint to consider the core of

17  existing districts?

18  A    No.  So the main trends of the core of the previous

19  districts I understand is a part of the guideline.  The reason

14:54:58 20  why I did not incorporate that constraint is the following:  So

21  if you basically tell algorithms to keep the core of the

22  previous districts, basically that whatever the submitted plans

23  you get will inherit all the properties that -- all the factors

24  that influence the previous plan.

14:55:19 25       So since I did not analyze the previous plan, I have no

idea what factors went into determining the previous plans.  It
could be party, race, or other factors that could influence the
previous plan.

So I decided not to include the core preservation
constraint in order to isolate.  So if you remember that the --
the strengths of the simulation analysis, the key advantage is
the transparency and the ability to isolate the particular
factors.

If impose the core constraint, then I inherit all the
factors that, you know, impact -- that influenced how the
districts are drawn in the previous plan.  So I have no way of
isolating a particular factor that I am interested in -- in
this case, race, from the -- from my own analysis.

And so for this reason, I decided to not to incorporate
the core preservation criteria.

Q    Okay.  Thank you.

Now, let's turn to your results.  First looking at your
race-blind simulation, why do you run the first set of
simulations without data on race?

A    Yes.  So the first analysis, which as confirmation I call
it race-blind simulation, is the analysis that -- simulation
analysis where race is not used at all.  So the only five
criteria that I described a moment ago were used, but no race,
no party, nothing else is used.

So the reason why used this analysis as a first step, so

1  this is not the main purpose.  But this is a first step is to

2  confirm that race was, indeed, a factor in determining the

3  district boundaries of the enacted plan.  So that's the first

4  step analysis I conducted.

14:57:16 5  Q    Okay.  Thank you.

6          MS. EBENSTEIN:  And if I could ask my colleague Eric

7  to bring up Figure 1, which is docket 88-1 at 10.

8          JUDGE MARCUS:  And this was which exhibit just so the

9  record is clear?

14:57:30 10          MS. EBENSTEIN:  This is Milligan's Exhibit 1.

11          JUDGE MARCUS:  So this is a piece of Milligan 1?

12          MS. EBENSTEIN:  That's correct, Your Honor.

13          JUDGE MARCUS:  Thank you.

14  BY MS. EBENSTEIN:

14:57:40 15  Q    Dr. Imai, could you please explain I guess first what a

16  boxplot is and what this particular boxplot represents?

17  A    So this figure compares the Black Voting Age Population

18  proportions.  So I am going to call this BVAP under the enacted

19  plan and compare that with the same BVAP for each district

14:58:05 20  under the simulated plan.

21          So the enacted plan is indicated by red square that you

22  see on the screen.  And there are seven districts in Alabama as

23  you know.  So on the X axis, you have seven numbers correspond

24  to the district number.

14:58:22 25          So, for example, the District 7, you see that a red dot is

up around 55 percent, which means that under the enacted plan,
District 7 has about 55 percent BVAP proportion, the Black
Voting Age proportion.

14:58:47     So in addition to the enacted plan, I also present here
that the distribution of the simulated plan, 10,000 simulated
plans that I generated using the five criteria that I
mentioned.  So here because I have 10,000 of them, I can't
give, you know, give each plan a dot.  That would be a
disaster.  So what I am going to use is something called the
14:59:09 boxplot, which you see often in statistics.  So let's look at
District 3.

    And so you see a big box.  And that is containing --
that's a range of the BVAP proportion of 50 percent of
simulated plans were contained.  So out of 10,000 plans that I
14:59:33 generated, 5,000 of them have the District 3 BVAP proportion of
the chain about, you know, 12, 13 to 25 percent.  Okay.  So
half of that simulated data is in there.  So you can see that
red dot is right edge of the box, which indicates that, you
know, the simulated plan are reasonably similar in terms of
14:59:56 BVAP percentage for District 3 to the simulated plan.  So
there's nothing strange going on here.

    Now, from the box, there are two lines sticking out.  So
one is going upwards, and the other one is going down.  And
these lines have a cute name whiskers.  And these it presents
15:00:16 the range of the simulated data that known to be normal or

ordinary.  So any dot whether it's enacted or simulated that's

beyond these two lines two sets of lines are considered as

statistical outlier according to the standard definition in

statistics.

15:00:36      So as you can see in the case of District 3, the enacted

plan is right in the middle -- right in the box, and hence it's

not an outlier.

      The horizontal line that was in the box that you see is

basically median.  So that's -- you know, midpoint of the

15:00:58 simulated plan.

      Okay.  Now, let's look at the District 7, where you see

that enacted plan deviates significantly from the simulated

plan.  Simulated you see the little box that's kind of squished

around 40 percent.  So that means that half of the simulated

15:01:17 data is around 40 percent.  Really concentrated.

      Now, there are some other simulated data that's black dots

that's going down all the way to 20 percent, but almost all the

data is around 40 percent.  Compared to that, enacted plan is

much higher, much higher Black Voting Age, you know, BVAP

15:01:37 proportion that's 55 percent.  And none of the simulated plan

comes even close.

      Okay.  So what does that mean?  That means if you remember

that simulated plan are generated, you know, these are the set

of plans one could have drawn, the representative step.  One

15:01:54 could have drawn if you follow the five set of criteria I just

1  mentioned.  But not using the race at all.  Then the District 7

2  should be rounding on the simulated range.  However, what we

3  see is the 7 is right up, you know, way above the simulated

4  plan, which indicates that race was used in drawing the

15:02:20  5  district boundary of District 7.  You can also see this if you

6  go to the District 2.  District 2 enacted plan have about

7  30 percent, the red dots is around the 30 percent, which is

8  significantly lower than most of the simulated plan which is

9  about 37, 38 percent ranging from perhaps 33 to 42.  So that's

15:02:44 10  also outlier.  So in this case for District 2 is an enacted

11  plan that has much lower BVAP percentage than simulated plan

12  that were generated without any consideration of race.

13      If you look at all the other districts 1, 3, 4, 5, 6,

14  they're all within the range.  They're not statistical outlier.

15:03:05 15  So in this analysis, what you can see is that two districts, 2

16  and 7, are statistical outlier.  And this is how simulation

17  analysis can become conducted.  Let's generate a set of

18  redistricting plans without looking at the race, and then see

19  if that's really different from enacted plan in terms of racial

15:03:27 20  composition.  If it is, we know that race is used as a primary

21  factor in determining the district boundaries.

22  Q    And what conclusions do you draw as a result of these

23  findings?

24  A    So this as I mentioned, inactive plan, used the race as a

15:03:50 25  primary factor.  In determining the district boundaries,

1    especially District 2 and 7.  And by the way, I am sure you

2    have already understand this, but this is not a surprising

3    finding.  This is just a confirmatory analysis.  This is my

4    first step of analysis to confirm that race was indeed used in

15:04:13  5    deciding the district boundaries of the enacted plan.  And

6    because if that's not the case then, you know, it will be a

7    totally different story.

8        So that's the first step of analysis I conducted.

9    Q    Was that finding that race was likely used as a factor in

15:04:30 10    drawing District 7 surprising for you?

11    A    No.  Especially in light of the fact that the state, you

12    know, created this District 7 in their own approach to comply

13    with the Voting Rights Act.

14    Q    And did -- we can take down this boxplot.  Thank you,

15:04:50 15    Dr. Imai.  Did you make any localized findings about the lines

16    drawn in the enacted plan?

17    A    Yes.  So another interesting thing about simulation

18    analysis is that not just looking at this overall Black Voting

19    Age Population proportion, you can also look at the ways in

15:05:10 20    which the enacted plan splits the county or takes certain part

21    of the county into a particular district.

22        So I looked at the Jefferson County and the Montgomery

23    County, which are two important counties and have a high large

24    number of black voters.

15:05:35 25    Q    And based on your simulations, what did you find in those

1  two counties?

2  A    Yeah.  So let's start with Jefferson County.  So the

3  enacted plan splits the Jefferson County, as you know, and

4  takes the Birmingham area and include it into District 7.

15:05:54  5  District 7 is the majority-minority district.

6      Now, the simulation plan that one that doesn't use race at

7  all often keeps the Jefferson County as a whole.  So more than

8  half, I think 52 or 53 percent of them keeps the Jefferson

9  County as a whole, and even when it splits, it includes parts

15:06:16  10  of the -- only part of Jefferson County into District 7.  It

11  does so by taking much bigger proportion of Jefferson County,

12  not just the Birmingham area.

13      And as a result, the number of black voters that are

14  included from the Jefferson County into the District 7 is

15:06:39  15  overwhelmingly black under the enacted plan, when compared to

16  the simulated plan.

17      For -- yeah sorry.

18  Q    Go ahead.  Sorry about that.

19  A    So that's sort of -- so, again, you can see the race was

15:06:54  20  used as a way to split the Jefferson County and include part of

21  much of the Birmingham into the District 7.

22      Similarly, I looked at the Montgomery County.  And this is

23  also interesting.  So in case of Montgomery County, almost all

24  the simulation plan kept the Montgomery as a whole.  I think

15:07:21  25  it's like 97 percent.  97 percent of 10,000 simulated plans

```
 1   that comprise the five criteria that I just described.  It kept

 2   Montgomery County as a whole.  And more so the case, it don't

 3   include that into District 7.  In fact, the more so the case,

 4   you assign it to known MMD district.  Most likely in to the

 5   District 2, and that's why you sort of see the District 2 BVAP

 6   proportion is much lower on the enacted plan.  And sometimes to

 7   District 6.

 8        So, again, here, the enacted plan splits the Montgomery

 9   County, particularly the city of Montgomery.  And include the

10   part of Montgomery, city of Montgomery into District 7,

11   simulated plan.  Most of them don't do that.  And assign the

12   Montgomery County to the other -- other district, not the

13   District 7.

14   Q    Thank you.  Based on your analysis that did not use racial

15   data, did you form an opinion on whether race was a predominant

16   factor in drawing the enacted plan?

17   A    Yes.  My analysis provides clear evidence that race was

18   used as a primary factor in determining district boundaries

19   under the enacted plan.

20   Q    Did you then conduct simulations that did consider race

21   data?

22   A    Sure.  Yes, I did.

23   Q    Okay.  Let's discuss that now.

24        Can you describe that simulation for the Court, please?

25   A    So this second analysis is the very important analysis
```

that I conducted.  As I mentioned, the first analysis is the
confirmatory, and so this is just to establish that race was
used.

Now, the question is:  How race was used?

So the second analysis, what I call one-MMD analysis
simulation.  MMD stands for, again, majority-minority district.
And so this simulation generates one MMD, one majority-minority
district using the race as information.

So why did I do that?  I'm simply following the state's
approach to just create the one MMD in order to comply with
Voting Rights Act.  I don't take any opinion or position on
whether that's a good thing to do or whether one could draw a
second MMD, okay.  So I'm simply following here the approach
the state took to create one MMD.  It is in the racial
information.  It is in racial information.

Now, this -- for that rest of the district, so there's one
MMD and six others, I am going to use the same exact approach
that I used in the prior analysis, so that is race-blind.  So I
create one MMD and then set that aside.  And I create the other
six districts without using any race information at all.  Okay?

So this analysis I will now repeat so I have again I have
10,000 redistricting plans.  I have exactly one MMD.  And the
rest of the districts are generated without any information
about race.

So why do I do that?  Well, this analysis allows me to

1  isolate whether or not the race was used in determining the

2  district boundaries beyond the purpose of creating one MMD,

3  okay?

4      So that's why I used race only to create one MMD and then

15:11:08 5  do race-blind simulation for the rest in order to figure out

6  whether or not race was used beyond the purpose of creating one

7  MMD.

8  Q    Dr. Imai, did you put any additional constraints on the

9  use of race in the simulation?

15:11:27 10 A    No.

11 Q    Did you specify a range for the BVAP of this MMD?

12 A    Yeah.  So you have to define MMD.  So what I did is when

13 I'm generating one MMD, I made sure that that MMD has the BVAP

14 range between 50 and 51 percent.

15:11:52 15 Q    Does -- did your simulation include restraints on where to

16 draw that MMD?

17 A    No.  So the algorithm is only told to create one MMD.  I

18 didn't tell the algorithm where it should be or that it's done

19 in the South -- or nothing.  And I just told them that, you

15:12:13 20 know, told the algorithm to create one MMD.  And just to remind

21 you that I also maintain all five other criteria that I

22 described earlier.  So the only difference from the first

23 analysis is that I just added this one MMD creation to the

24 race-blind analysis.

15:12:32 25 Q    Did the simulated method cover any similarities in where

1   the MMD was drawn?

2   A    Yeah.  So this is one of the amazing things that I found

3   in this one-MMD simulation analysis.  When I say amazing, I

4   mean that because I've analyzed for my own research different

15:12:53 5   states using a simulation method for my own identical research.

6   And I have never seen anything like this.  And what I found is

7   that if you tell algorithm to just find one MMD, right, only

8   one, between the range 50, 51 percent, it always find in the

9   same similar place, which is basically corresponding to the

15:13:16 10   District 7 on the enacted plan.

11       So even though I didn't tell the algorithm where that MMD

12   should go, algorithm always, almost always find it in the

13   District 7.  In particular, what was striking to me was that no

14   way the algorithm actually formed the district at one MMD,

15:13:37 15   which caused, you know -- to the District 7 under the enacted

16   plan, and in particular the way that Jefferson County was

17   split.  So under the enacted plan, it takes much of the

18   Birmingham -- City of Birmingham into the District 7.

19   Algorithm does something very similar.  Not exactly the same,

15:13:57 20   but similarly as often -- almost always splits the Jefferson

21   County, and then bring in the Birmingham, much of the

22   Birmingham into District 7.

23       Now, algorithm also does like the enacted plan splits the

24   Tuscaloosa County and then take the southern part of Tuscaloosa

15:14:16 25   and then fold it into the District 7, as well.

1      So those two parts when I generated is one MMD complete

2  independent, right?  Every one is independent.  It always did

3  -- almost always did make those county split choices.

4      Now, the key difference, however, between the enacted plan

15:14:37  5  and simulated plan was the way that the Montgomery County was

6  treated.

7  Q    And let's turn to that now, Dr. Imai.  If we could pull up

8  Figure 4, this is Milligan Plaintiffs' Exhibit 1 docket 88-1 at

9  14.

15:14:57  10     What were some of the key differences between the enacted

11  plan and the simulated plans when it came to the treatment of

12  Montgomery County?

13  A    So the enacted plan takes many more black voters into the

14  District 7, okay?  Whereas the simulated plan takes much less

15:15:18  15  black voters into the District 7.

16     And then this figure shows that.

17     So this figure shows that Black Voting Age Population who

18  live in Montgomery who are included in District 7, that's the

19  MMD, one MMD that I generated and also enacted plan has.

15:15:42  20     Enacted plan has 39,000 people from the Montgomery County

21  and then folded into District 7.  That's indicated by red

22  dashed line, the line on the right.  So about 39,000 people who

23  live in Black Voting Age Population who live in Montgomery

24  County are included in District 7 in order to create one MMD.

15:16:10  25     In contrast, let's look at the simulated plan, which is

1  the gray histogram I have in the graph.  It turns out that more

2  than half, more than 60 percent, I think 62 percent to be more

3  precise, 62 percent of 10,000 simulated plans that I created

4  doesn't use any part of the Montgomery County at all.  So

15:16:38  5  that's indicated by the big spike at zero.  So no black voter

6  or actually nobody from the Montgomery County whether you are

7  black or white are included in the one MMD that I generated.

8  More than 60 percent at the time.

9      Even when simulated plan decides to split the Montgomery

15:17:02 10  County and includes some part of the Montgomery County into the

11  District 7, it takes much fewer number of black voters than

12  enacted plan.  So remember enacted plan has the 39,000 people.

13  The simulated plan as you can see from the histogram most of

14  the simulated plans takes less than 4,000 people.  Some 4,000

15:17:30 15  Black Voting Age Population into the District 7.

16      So this is -- you don't need a statistician to tell you

17  this is a statistically significant difference, but it's a big

18  difference, all right.  So most of the simulated plan only

19  takes a small number of black voters and include it in the

15:17:50 20  District 7, related to the enacted plan which packs the 39,000

21  voters into the District 7.

22  Q    Thank you, Dr. Imai, just to make sure the points are

23  clear.  Do most of the simulations split Montgomery County at

24  all?

15:18:06 25  A    Right.  So most of the simulation -- sorry --

```
 1            JUDGE MARCUS:  As he is proceeding, Ms. Ebenstein, if
 2   you can find a convenient time to take a short break for our
 3   court reporter, you tell me when that time comes.  But I think
 4   we want to take a break pretty soon.
 5            MS. EBENSTEIN:  Of course, Your Honor.  We probably
 6   just need three or four minutes to finish up this session.
 7            JUDGE MARCUS:  Sure.  Sure.
 8            MS. EBENSTEIN:  Thank you.
 9            THE WITNESS:  So what was the question?
10   BY MS. EBENSTEIN:
11   Q    Whether most of the one-MMD simulations split Montgomery
12   County at all?
13   A    So the majority of the simulated plans don't split the
14   Montgomery County at all, and in fact, assigns the whole county
15   to District 2.
16   Q    And in the plans that the simulated plans that do split
17   Montgomery County, what part of the population is included in
18   District 7?
19   A    Very small part of the Montgomery County.  And on the
20   western edge of the Montgomery County.
21   Q    Dr. Imai, based on your analysis, does Montgomery County
22   need to be split at all to comply with the population equality
23   requirements?
24   A    No.  So many of my simulated plans don't have to use any
25   part of Montgomery County at all.
```

1  Q     And does Montgomery County need to be split to avoid

2  incumbent pairing?

3  A     No, because all my simulated plans, 10,000 of them, have

4  no incumbency pairing.

15:19:39  5  Q     Does Montgomery County need to be split to attain the

6  measure of compactness or better that was in the enacted plan?

7  A     No, because my simulated plan are at least as compact as

8  the enacted plan.

9  Q     And does Montgomery County need to be split to create six

15:19:57 10  or fewer county splits?

11  A     It's better not to split a county if you want to minimize

12  the number of county splits.  So if not necessary, you don't

13  want to split.  And I have shown that in order to create one

14  MMD, you don't have to do that.

15:20:12 15  Q     And does Montgomery County need to be split to form one

16  majority-black district?

17  A     No.  So many of my simulated plan don't use any part of

18  Montgomery County at all, and they still create one MMD.

19  Q     And before we take a break, if you could just provide what

15:20:32 20  conclusions you drew from the decision to split Montgomery

21  County in the enacted plan?

22  A     Yes.  So this analysis used the race information only to

23  create one MMD.  But I still found that beyond the purpose of

24  creating one MMD, race was still used as a primary factor in

15:20:54 25  determining the district boundaries of particularly District 2

1  and District 7.

2        And the enacted plan does so by taking the western part of

3  the city of Montgomery and then packing the black voters from

4  there, a disproportionate number of them into District 7.

15:21:14  5  Q     Thank you, Dr. Imai.

6              MS. EBENSTEIN:   If we can take down Figure 4.   And,

7  Your Honor, this might be a good breaking point.

8              JUDGE MARCUS:   Okay.   Why don't we take a 15-minute

9  break.   It's 3:20 or so Central Standard Time.   So we will get

15:21:29  10  together about 3:35 or so.

11        Thank you.   We will take just a short break at this time.

12              (Recess.)

13              JUDGE MARCUS:   Do we have counsel for the Secretary of

14  State and for the intervening defendants?

15:35:32  15              MR. SMITH:   Yes, Your Honor.   Counsel for the

16  Secretary of State is here.

17              MR. WALKER:   For the intervenors.

18              JUDGE MARCUS:   Are the parties ready to proceed?

19  Ms. Ebenstein?

15:35:45  20              MS. EBENSTEIN:   Yes, Your Honor.

21  BY MS. EBENSTEIN:

22  Q     Dr. Imai, if we could turn to Figure 5.   This is a

23  Milligan's Exhibit M-1, Doc 88-1 of 15.

24        Could you explain what Figure 5 represents?

15:36:04  25  A     Yeah.   So the Figure 5 shows in terms of maps which part

1    of the Montgomery County are included in the MMD one

2    majority-minority district under both enacted plan and then the

3    simulated plan.

4         First, look at the map on the right, which has -- I think

15:36:24  5    on the right -- which has the brown color.  This is simply

6    showing the Black Voting Age Population percentage.  So the

7    darker the colors are on each unit is precinct.  So the darker

8    the colors are, the higher the BVAP proportion is, the more

9    black voters lives there.

15:36:45 10        You see the white line in cutting through the Montgomery

11   County, this is the district boundary of under the enacted

12   plan.  So on the left of the white line, that's the part of the

13   Montgomery County the enacted plan includes into one MMD.

14        So one thing you notice is that large portion, many

15:37:16 15   precincts on the western side of the city of Montgomery which

16   has very high percentage of Black Voting Age Population are

17   included in the District 7 under the enacted plan.

18        On the left who is a blue map, it's the same Montgomery

19   County map, except now I'm using the blue to highlight how

15:37:37 20   likely each precinct in the Montgomery County is to be included

21   in District 7 under the simulated plan.

22        So here the darker the color, the darker blue means the

23   higher probability.  Many more simulated plan out of the 10,000

24   simulated plans that I created will include these precincts

15:37:59 25   into the District 7.

1        And one thing you notice immediately is that the color is

2   much lighter.  There's no precinct that has very dark blue.

3   This is consistent with what I showed you before the break

4   where that the District 7 under the simulated plan, the one MMD

15:38:21  5   does not need to use most of the Montgomery County at all.  In

6   fact, 62 percent of the simulated 10,000 simulated plans did

7   not use any part of the Montgomery County at all.  That's why

8   the color is lighter because overall it is lower.  When it does

9   split the Montgomery County, when the simulation algorithm does

15:38:44 10   split Montgomery County and take part of the Montgomery County

11   into District 7, it does so in a very interesting way.

12        So slightly darker blue precincts are the two precincts

13   that are border of Montgomery County.  And these two precincts,

14   if you the compare their color on the right map, the one with

15:39:09 15   the brown color, you see that's also much lighter color.  That

16   means that these two precincts, which are most likely to be

17   included even though the overall probability is still pretty

18   low are likely to be included in District 7 are very low

19   percentage of Black Voting Age Population.  In fact, these

15:39:29 20   precincts are about 30 percent of Black Voting Age Population.

21        In contrast, the -- in fact, these two -- I guess you can

22   also count the third one -- are three precincts are just

23   outside of the city of Montgomery.  Some slight small but

24   really outside the city of Montgomery, very low Black Voting

15:39:53 25   Age Population precincts.

1    In contrast, the enacted plan takes the much bigger part

2  of the Montgomery County.  In fact, it goes inside of the city

3  of Montgomery and takes almost half of it and in particular the

4  precinct that has very high Black Voting Age Population, which

15:40:11  5  is indicated by dark brown color.  Some of these precincts have

6  90 percent or higher Black Voting Age Population proportion.

7    So what this graph -- what this figure shows you is the

8  main finding that I presented earlier that the simulation plan

9  doesn't need this large portion of the Montgomery County, in

15:40:37 10  particular city of Montgomery in order to create one MMD.  Most

11  of the time, 62 percent to be exact, it doesn't use any part of

12  Montgomery County at all.  When it does, 38 percent of the

13  time, it does so by just taking the border -- most of the time

14  taking the border precinct that has -- that's just outside of

15:41:00 15  the city of Montgomery, and it has much lower BVAP proportion.

16  Q    And based on that finding, what conclusions did you draw

17  about the decision in the enacted plan of where to split

18  Montgomery County?

19  A    So based on this, and if you remember that I used the race

15:41:20 20  only in order to create one MMD, so based on my analysis, I

21  conclude -- my analysis provides the evidence that the -- where

22  the decision to split Montgomery County and include part of the

23  Montgomery County into the MMD was not necessary.  And the way

24  it's split, the way that the enacted plan takes the rest of the

15:41:49 25  part of the city of Montgomery and included it in District 7,

1  my analysis provides evidence that race data exist in that

2  decision and obviously in this case beyond the creation of one

3  MMD.

4  Q    And when you say it's not necessary, just to be clear, was

15:42:08 5  it necessary for the enacted plan to take these precincts with

6  high BVAP into District 7 to comply with the population

7  equality requirements?

8  A    No.  All -- you know, compliant in terms of population

9  constraint.

15:42:25 10 Q    And was it necessary to avoid pairing incumbents?

11 A    No.  No.  Because all my plans don't pair incumbent.

12 Q    Was it necessary to obtain the measure of compactness

13 equal to a better than the enacted plan?

14 A    No, because my plans are least as compact as the enacted

15:42:44 15 plan.

16 Q    And was it necessary to create the six or fewer county

17 splits?

18 A    No, because splitting the county is going to increase the

19 number of county splits.

15:42:53 20 Q    And I believe you said a moment ago, but was it necessary

21 in order to create one MMD?

22 A    No, because many of my plans don't need to use Montgomery

23 County at all and not need to split in order to create one MMD.

24 Q    Thank you, Dr. Imai.

15:43:11 25       MS. EBENSTEIN:  If we could take down Figure 5 and

1    turn to Figure 6, which is Milligan Plaintiffs' Exhibit 1,

2    Docket 88-1 at 16.

3    BY MS. EBENSTEIN:

4    Q    Dr. Imai, let's discuss the effect of the difference in

15:43:28 5    Montgomery that it had on district -- on other districts in the

6    plan.

7         Could you please explain what District 6 represents?

8    Sorry.  What Figure 6 represents?

9    A    Sure.  So already I showed you that disproportionate

15:43:42 10   number of black voters from Montgomery County was packed into

11   District 7.  This figure shows the impact of that decision on

12   the other districts, which I generated without using the race.

13        In particular, I am going to look at the impact on

14   District 2, which has for more than 90 percent of my

15:44:02 15   simulations has the second highest voting Black Voting Age

16   Population proportion.

17        So I am going to call it District 2, even though small

18   percentage of them or this different district that had the

19   second highest BVAP proportion.

15:44:18 20        So what you see here is the BVAP proportion of District 2

21   under the enacted plan as well as under the simulated plan.  So

22   under the enacted plan, that's District 2 has about 30 percent

23   of BVAP proportion.

24        In contrast under the simulated plan as you can see is

15:44:42 25   large spikes around 35 percent, the average BVAP for the

1    District 2 is 35 percent.

2        This clearly shows under the summary on 39, close to

3    40 percent you see a small similar spikes there.  And so this

4    clearly shows that by packing the large number of black voters

15:45:06  5    into the District 7, it's lowering the BVAP proportion of the

6    District 2, so taking away those by splitting the city of

7    Montgomery and taking the western part into District 7 because

8    most of the simulated plans would take the same set of black

9    voters and then assign it to District 2.

15:45:26 10        So by taking this least voters into 7, you are lowering --

11    the enacted plan is lowering the BVAP proportion of the

12    District 2 thereby diluting the voting power of black voters

13    there.

14    Q    Thank you.  If we could take that figure down.  And,

15:45:44 15    Dr. Imai, just taking the information in Figure 5 and Figure 6

16    together, what conclusions did you draw about the decision on

17    whether and where to split Montgomery County and the effect

18    that it has in districts other than the MMD?

19    A    Yes.  So the enacted plan splits the Montgomery County in

15:46:08 20    particular the city of Montgomery County into two pieces.

21    Cracking the community of -- the city of Montgomery and takes

22    the western part of the highly, you know, the precincts that

23    has very high percentage of black population into the District

24    7.  This decision was not necessary to create one MMD because

15:46:29 25    most of the simulated plans don't do that.  By doing so, by

1    cracking the city of Montgomery, the enacted plan reduces the

2    BVAP proportion of the District 2 by 4.4 percent, and these

3    differences -- combination of standards of this degree are

4    significant.

15:46:52 5    Q    Thank you.  If we could take down those figures and turn

6    briefly, Dr. Imai, to your rebuttal report.  That's Milligan

7    Plaintiffs' Exhibit 688-6.  What analysis were you asked to do

8    for this report?

9    A    For this report, as asked by the counsel for the

15:47:14 10   plaintiffs, to conduct the same one-MMD simulation so the

11   simulation was exactly one majority-minority district and add

12   additional constraint that two communities of interest are

13   encouraged to be kept together in that same district.  So the

14   difference between one-MMD simulation I just showed you and

15:47:37 15   this one will be just this additional constraint that two sets

16   of counties that were given to be kept together.

17   Q    And what were those two sets of counties?

18   A    I understand from the counsel for the plaintiffs that the

19   one of the experts for the defendants expressed opinion that

15:48:02 20   the Baldwin and Mobile counties to be kept together as one

21   community of interest.  And I also understand from the counsel

22   that the set of counties that constitute the Black Belt,

23   there's opinions that they also may constitute a community of

24   interest.  So those two sets of counties.  I basically told the

15:48:25 25   algorithm to keep them together in the same district whenever

```
 1  possible.
 2  Q     Do you have any -- did you do any additional research, or
 3  do you have any independent opinion on whether those counties
 4  form a community of interest or any other areas form a
 5  community of interest?
 6  A     No.  I do not take any positions on this or no opinion on
 7  this.
 8  Q     Let's briefly turn to Figure 1-88-6 at 5 to review your
 9  results when taking into account those two identified
10  communities of interest.
11  A     Okay.  So here I focus on the last graph that I showed you
12  just moments ago for one-MMD simulation.  So it's the same
13  figure.
14        Looking at how the decision to split the Montgomery and to
15  pack black voters into District 7 affects the District 2, the
16  BVAP proportion of District 2.  And you see similar results
17  again, enacted plan District 2 BVAP is about 30 percent.
18        Now, by taking into account for the communities of
19  interest these two specific communities of interest that I were
20  given, the average BVAP proportion for the District 2 is
21  higher, so it's now 36 percent or so compared to 34 before.  So
22  actually increased under the simulated plan, increased the
23  average proportion of the BVAP for District 2, and you also see
24  many more plans that achieves the higher percentage of BVAP for
25  under the simulated plan.
```

15:48:41
15:48:59
15:49:15
15:49:36
15:50:06

1          As a result, the difference between the simulated plan and

2     the enacted plan is now much larger so previously was

3     4.4 percent, I think.  Now it's exceeding 6 percentage point.

4     And so that this shows that -- again, this is advantage of

15:50:25 5     simulation analysis is to be able to assess what factor how --

6     you know, adding a factor in this case community of interest

7     how that's going to change the conclusion of redistricting

8     evaluation.  And in here, what we see is that adding these two

9     particular definitions of community of interest increases the

15:50:47 10    difference between enacted and simulated plan that is under the

11    simulated plan with people in District 2 could have achieved

12    much higher BVAP proportion than the enacted plan.

13    Q     Thank you very much, Dr. Imai, for your testimony today.

14    One final question:  If you could just please summarize the

15:51:10 15    opinions you formed based on your three sets of simulations and

16    your research for the Court?

17    A     Yes.  So my analysis shows that the race played a

18    predominant role in determining the district boundaries under

19    enacted plan beyond the purpose of creating one

15:51:32 20    majority-minority district.  The enacted plan does so by

21    packing a disproportionate number of black voters from the

22    Montgomery County into the District 7.

23          The consequence of doing that, that particular decision

24    the way that's being -- the county is split and including the

15:51:54 25    District 7 is to reduce the Black Voting Age Population of

```
 1  District 2.  And this conclusion does not change, even if we

 2  account for the community -- particular community of interest

 3  that I was given.

 4  Q    Thank you, Dr. Imai.

 5          MS. EBENSTEIN:  Your Honor, could I have one moment to

 6  confer with co-counsel?

 7          JUDGE MARCUS:  You sure can.

 8          MS. EBENSTEIN:  Thank you.  Your Honor, we have no

 9  further questions for Dr. Imai today.  Thank you.

10          JUDGE MARCUS:  Thanks very much.

11      Who is going to proceed with the cross-examination of

12  Mr. Imai for the Secretary of State?

13          MR. SMITH:  Your Honor, Brenton Smith representing the

14  Secretary of State.  I will be conducting Dr. Imai's cross.

15          JUDGE MARCUS:  All right.  And I take it, Mr. Walker

16  will he have some after you?

17          MR. SMITH:  I'm not sure.  We're in separate rooms.

18  He may, but I will be going first at least.

19          JUDGE MARCUS:  That's okay.  We will proceed in any

20  order you and he would like.  So we will begin with Mr. Smith

21  cross-examination.

22          MR. SMITH:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24  BY MR. SMITH:

25  Q    Good afternoon, Dr. Imai.
```

Timestamps: 15:52:18 (line 5), 15:53:01 (line 10), 15:53:17 (line 15), 15:53:30 (line 20), 15:53:37 (line 25)

```
 1  A     Good afternoon.
 2  Q     Can you hear me okay?
 3  A     Yes.  Yes, I can.
 4  Q     Great.  So, Dr. Imai, I want to start with a few
 5  background questions about this type of analysis.
 6        So you mentioned that you had submitted an expert report
 7  in a case before the Ohio Supreme Court; is that right?
 8  A     That's correct.
 9  Q     Now, is that case a racial gerrymandering case like this
10  one, or is it a partisan gerrymandering case?
11  A     My understanding is it's partisan gerrymandering case.
12  Q     Are you aware of whether the sort of simulation analysis
13  that you have conducted in this case has ever been used in any
14  other cases considering racial gerrymanders?
15  A     Simulation analysis in general, or like what specific
16  analysis you're asking?
17  Q     I'm asking whether the type of methodology you used here,
18  the generating simulations has been used to analyze racial
19  gerrymanders in any other cases that you're aware of?
20  A     I don't recall the specific cases, but I know that -- I
21  don't have the name in front of me, but I know that the
22  simulation analysis has been used for racial gerrymandering
23  case.
24  Q     So for racial gerrymandering, not partisan gerrymandering;
25  is that right?
```

Timestamps in left margin: 15:53:46 (line 5), 15:54:02 (line 10), 15:54:18 (line 15), 15:54:40 (line 20), 15:54:58 (line 25)

```
 1   A     I think so.
 2   Q     All right.  So, Dr. Imai, the methodology used in this
 3   case, it produced 10,000 simulated plans under three slightly
 4   different sets of constraints; is that right?
 5   A     That's correct.
 6   Q     But in your reports, visual representations of those plans
 7   are not included; is that also right?
 8   A     Not in the report.
 9   Q     So when you're comparing your simulated plans to the
10   enacted plan, you are comparing summary data; isn't that right?
11   A     Well, you mean in the report or in the actual analysis?
12   Q     Let me withdraw that question and try with rephrase it.
13   A     Okay.
14   Q     I think that was a poorly asked question.
15         So you haven't produced any visual of maps.  So in
16   comparing the enacted plan to your simulated plans, we are
17   looking at groups of data, but not comparing sort of two maps
18   side by side; is that right?
19   A     Right.  So I am not comparing a particular, you know, one
20   of a 10,000 map with the enacted plan.  I am not doing that,
21   that's correct.
22   Q     Right.  Okay.  So we can't look at your simulated maps and
23   compare them to the enacted plan just to show any differences
24   there might be; is that right?
25   A     Oh, of course you can.
```

1    Q     How so?

2    A     I mean, I generate 10,000 maps, so you can look at any one

3    of them individually if you like.  But the whole point of

4    generating, you know, 10,000 maps is to characterize the

15:56:41 5    population.  So there's, you know, so many ways under the same

6    set of constraints to draws possible maps.  So instead of

7    looking at each one of them, which is virtually impossible, you

8    take a representative sample of the population of the maps and

9    then, you know, compare that characteristics of these maps to

15:57:01 10   the enacted plan.  But you could -- I mean, visually, you know,

11   I do sometimes because just to make sure that plans are, you

12   know, generated properly.  And so I do look at some of the

13   maps.  But the analysis itself is based on a sample of, you

14   know, representative sample plans compared with the enacted

15:57:29 15   plan.

16   Q     Sure.  But you haven't provided the visual maps as part of

17   your report here; isn't that right?

18   A     Right.  Because I won't be able to print out 10,000 of,

19   you know, maps.

15:57:39 20   Q     Sure.

21   A     But I could have included I guess if, you know, one map or

22   two maps, or three maps.  But it's just that because a

23   representative sample, just like when you do survey, you don't

24   care about particular three people you interviewed, you care

15:57:57 25   about, you know, here in my analysis, I'm focused on what's the

```
 1  characteristics of the maps that you might draw under the

 2  different set of constraints.  So for that analysis, I focus on

 3  the sample, you know, analyzing the sample as opposed to taking

 4  a look at each one of them.

 5  Q    Thank you, Dr. Imai.

 6       Dr. Imai, you reference BVAP throughout your reports,

 7  right?

 8  A    Yes.

 9  Q    And are you using census data for that BVAP data?

10  A    Yes.  Based on the census data, yes.

11  Q    And do you know how that census data defines race, whether

12  it includes individuals who identify as black and some other

13  race or only black?

14  A    Yeah.  So this one is any part BVAP.

15  Q    Okay.  And, now, Dr. Imai, turning to your report, at

16  paragraph 15, I'm going to read the second sentence there.

17  Redistricting simulation algorithms generate a representative

18  sample of all possible plans that satisfy a specified set of

19  criteria; is that right?

20  A    That's right.  Well, the set of -- the algorithms that I

21  used, yes.

22  Q    So the plans that you generate are the entire universe of

23  representative plans.  Is that what that means?

24  A    No.  It's a representative sample of the entire universe.

25  Entire universe is too big.  It's actually larger than the
```

Time stamps: 15:58:14 (line 5), 15:58:29 (line 10), 15:58:45 (line 15), 15:59:12 (line 20), 15:59:29 (line 25)

number of atoms in the universe.  So I only take a sample from

that.  But it's a representative sample, so it's not biased in

any way.

Q     And so you say further down in the paragraph that if a

15:59:45 proposed plan treats racial groups in a different way when

compared to that ensemble of simulated plans, quote, this

serves as empirical evidence that the proposed plan was likely

drawn using race as a predominant factor.  Did I read that

correctly?

16:00:02 A     Yes.  Beyond the set of factors that I specified.

Q     And so, Dr. Imai, what do you mean by predominant?

A     What do I mean by predominant?  Do you -- should I give

statistical definition or should I give -- what are you -- I

guess I'm trying to understand the.

16:00:30 Q     Well, the conclusions I think you're drawing are that race

was a predominant factor and that's what you offer here.  So I

am trying to understand how you understand?

A     Okay, okay.

Q     What predominant is?

16:00:43 A     Yeah.  That makes sense.  Thanks.  So by predominant, what

I mean is that if the set of factors were used if that's the

only factors that were used in drawing the enacted plan, right,

so, you know, I listed five different constraints that I

imposed in my simulation algorithm, and then, you know, race

16:01:08 for creating one MMD, if that's the only -- the set of

1  constraints that the map drawer followed, then the set of maps

2  that I generated represents the sample -- sample --

3  representative sample of the plans that one could have drawn

4  under those plans.  But to the extent that enacted plan

16:01:32  5  deviates in the racial dimension from those set of

6  representative sample maps, that means that the race was used

7  to determine district boundaries of the enacted plan.

8  Statistically speaking statistical evidence.  So when I say

9  predominant law, that's summarizing the statistical evidence

16:01:51 10  that I presented that if this was only used for the creation of

11  one MMD, you didn't see that enacted plan the way they split

12  the Montgomery and the way they included the western part of

13  the city of the Montgomery into District 7.  You didn't see

14  that statistically.

16:02:10 15      So my use of predominant law is that is a way to summarize

16  the statistical evidence that I presented.

17  Q    How?

18  A    How race played at all.

19  Q    Thank you, Dr. Imai.  If I heard you correctly, I think

16:02:28 20  you said that that's the case if the factors that you consider

21  are the same factors that the map drawer considered.  Did I

22  understand you correctly?

23  A    Well, yeah.  I shouldn't have said map drawer as a person

24  like I guess map drawing process.  If the factors -- so the

16:02:47 25  whole point of the simulation analysis is to be able to specify

exactly what factors are being considered.  Obviously, if a
human map drawer is doing, it's a little bit difficult to do
that like what exactly the factors and, you know, it might be
difficult.

16:03:03      And so but what I did is that I basically told the
algorithm to consider a set of factors, right?  So on that map,
nothing else matters.  The algorithm, the simulated plans are
not inference anything other than I used as input to the
algorithm.  So that's what I mean.

16:03:26      So if that makes sense.

Q     Thank you, Dr. Imai.

      What if the map drawer considered factors that your
methodology does not?

A     I don't know.  I don't know what factors map drawers
16:03:43 consider.  So, you know, I sort of misspoke.  All I meant was
that algorithm like I told the set of factors to consider by
the algorithm.  And to the extent that, you know, that
determines the simulated plans, and if the enacted plan
deviates from that in the race dimension, then race was used
16:04:07 beyond the purpose of what I specified in my algorithm which
was to create one MMD.

Q     How about if we frame it in terms of redistricting rules?
You opine, I think, in paragraph 17 that simulation methods can
also incorporate each state's redistricting rules; is that
16:04:25 right?

1  A     That's right.

2  Q     And did you incorporate Alabama's redistricting rules in

3  this case?

4  A     Which rule?

16:04:34  5  Q     Well, did you incorporate all of Alabama's redistricting

6  rules?

7  A     If you don't specify which one, I cannot really -- you

8  know, I can tell you which one I incorporated.  And I can

9  answer any questions that you have about other, you know,

16:04:54 10  rules, other constraints that you might be interested in.

11  Q     Sure.  Well, let me back up.

12       You considered Alabama's reapportionment committee

13  redistricting guidelines, didn't you, Dr. Imai?

14  A     I was given -- actually, I have it here -- guidelines, and

16:05:13 15  I have reviewed it, yes.

16  Q     All right.  And, Dr. Imai, in paragraph 18 of your report,

17  I think you list all of the properties that your simulated

18  plans have.  Is that where you list the constraints?

19  A     Paragraph 18.

16:05:30 20  Q     Of your report.  I'm sorry.

21  A     Oh, okay.  I'm getting -- paragraph 18.

22  Q     Yes.  Of page 7?

23  A     Page 7.  Yeah.  I was looking at the index.  Page 7.

24  Okay.  Thank you.  Just to make sure I have it here.

16:05:57 25       Okay.  Yeah.  Okay.  I got it.

```
 1   Q    All right.  Dr. Imai, I am going to try to share my
 2   screen.
 3   A    Okay.
 4   Q    And you should see the redistricting guidelines, I
 5   believe.
 6   A    Yes.
 7             JUDGE MARCUS:  Can you tell us what exhibit number
 8   that is, counsel?
 9             MR. SMITH:  Yes, Your Honor.  This is Milligan
10   Exhibit 28.
11             JUDGE MARCUS:  Thank you.
12   BY MR. SMITH:
13   Q    And, Dr. Imai, these are the reapportionment committee
14   redistricting guidelines that you considered, right?
15   A    That's correct.
16   Q    Okay.  I would like to first direct your attention to 2(a)
17   and (b) here.  So 2(a) says, Districts shall comply with the
18   United States Constitution, including the requirement that they
19   equalize total population.  Did I read that correctly?
20   A    That's correct.
21   Q    And subsection (b) there reads, Congressional districts
22   shall have minimal population deviation.  Did I read that
23   correctly?
24   A    That's correct.
25   Q    Dr. Imai, I think you mentioned in your direct that you're
```

1   aware that some congressional plans try to observe a plus or

2   minus one person threshold in drawing congressional plans; is

3   that right?

4   A    That's right.

16:07:19  5   Q    So you're familiar with that requirement?

6   A    That's right.

7   Q    But you didn't adopt that requirement in this case, right?

8   A    Right.

9   Q    So you used instead a population deviation of plus or

16:07:33 10   minus 0.5 percent?

11   A    Of the target population, yeah.

12   Q    So, Dr. Imai, half a percent deviation in Alabama, you say

13   is about 3,500 voters?

14   A    Right.

16:07:44 15   Q    So if District 7 is plus 0.5 percent over, if it's 3,500

16   voters overpopulated, and if District 2 is 3,500 voters

17   underpopulated, that leads to a total deviation of about 7,000

18   voters, right?

19   A    That's correct.

16:08:02 20   Q    So a plus or minus 0.5 percent deviation is a 1 percent

21   total deviation, wouldn't you agree?

22   A    That's right, yeah.

23   Q    So if you have got a 1 percent population deviation versus

24   a 1 person population deviation, wouldn't it be easier to keep

16:08:20 25   counties whole?

```
 1  A     Repeat -- which way is easier.

 2  Q     I'm sorry?

 3  A     Which way is easier.

 4  Q     If you have more population deviation, wouldn't it be

 5  easier to avoid splitting counties?

 6  A     Why is that?

 7  Q     Well, if you have more population to work with, if you're

 8  not trying to get down to a plus or minus one person, if

 9  instead you are working with about 7,000 voters, wouldn't it be

10  easier to avoid going into another county to equalize to the

11  plus or minus one person level?

12  A     Depends on other criteria.  So it's -- I cannot -- you

13  know, I cannot say that one is easier than other.  It depends

14  on all how the precincts are shaped and how the, you know,

15  county boundaries are located.  So I don't think it's --

16  mathematically I don't think it's easy to say which one is

17  easier.

18  Q     Would you consider a 1 percent total population deviation

19  to be significant?

20  A     What do you mean by significant?  I'm confused.

21  Q     In drawing a plan, would you consider 1 percent deviation

22  in each district to lead to any differences in the district

23  that might be significant to a map drawer?

24  A     Oh, for the official map?  Is that what you're --

25  Q     Yes.  Or for any map drawn.
```

```
 1  A    Well, for the purpose of simulation analysis, as I said
 2  earlier, that .5 percent is not going to change my conclusion
 3  at all.  But if you want to come up with, you know, a map
 4  that's actually going to be used in direction, then obviously
 5  that has to do -- well, I'm not a lawyer, so I am not going to
 6  be able to say what population deviation should be used.  But
 7  it might be a different, you know, .5 percent may not be the
 8  threshold that's used to -- in the actual official map drawing.
 9       But for the sake of simulation analysis, I need you to
10  remember that the purpose of the simulation analysis really
11  characterize -- really understand what law is creating a
12  particular plan or what, you know, what rule is -- how rules
13  impact the type of districts you're drawing.  For that purpose,
14  it's been known that in academic research literature,
15  25 percent is way more sufficient way more stricter standard
16  than necessary.  Actually, I'm being very conservative relative
17  to other analysis you would see in academic research
18  literature.
19  Q    What about 0.5 percent -- I'm sorry.  Withdrawn.
20       Dr. Imai, I would like to move down to subsection J.
21  A    Okay.
22  Q    And you can see here that subsection J lists some
23  redistricting policies that in the words of the guidelines are
24  embedded in the political values, traditions, customs, and
25  usages of the state of Alabama; is that right?
```

```
 1   A      That's correct.
 2   Q      And the guidelines further state that these shall be
 3   observed essentially to the extent that they can legally be
 4   done they legally can be; is that right?
 5   A      Uh-huh.
 6   Q      Dr. Imai, I would like to run through each of these
 7   subsections and ask you whether you considered it in putting
 8   together your simulation?
 9   A      Okay.
10   Q      J subsection (i) states, The contest between incumbents
11   will be avoided whenever possible.  Did you observe this
12   criteria?
13   A      Yes.  I instructed the algorithm not to pair incumbents.
14   Q      All right.  And then j(ii) has to do with contiguity,
15   contiguity by water is allowed, but point to point contiguity
16   and long-lasso contiguity is not.  Did you observe this
17   criteria?
18   A      What do I mean by observe?
19   Q      Your -- are all of the districts in your simulated plans
20   contiguous?
21   A      Yes.  But the contiguity, the definition of contiguity,
22   you know, can be -- I don't know.  How do I say this?  Yeah.
23   Yeah.  I guess to the best of my ability, I guess that's what I
24   have said because the shape file has, you know, I rely on
25   census shape files.  And, yeah, so anyway, yeah.  To the best
```

1   of my ability, I ensured that contiguity is ensured.  All

2   districts are contiguous.

3   Q    Well, let me ask you this, Dr. Imai:  What definition of

4   contiguity did you use?

16:13:40 5   A    The definition of contiguity is, you know, based on --

6   based on the shape file.  So to the extent that shape file is

7   accurate, my -- the districts that I observe, I generated are

8   contiguous.  And I obtained the shape file from the census, so.

9   Q    So but you don't know whether they are contiguous by the

16:14:06 10  point to point contiguity method, for example?

11  A    I have to check that, yeah.

12  Q    Or what about the long-lasso contiguity method?  You're

13  not sure about that, either?

14  A    Yeah, no.  No.  Well, not 100 percent sure.  I think they

16:14:29 15  are, but, yeah, but I'm not 100 percent sure.

16  Q    Okay.  I would like to look at J --

17  A    I guess if I may.

18  Q    Sure.

19  A    You know, the data -- so the reason why I hesitated a

16:14:44 20  little bit was that, you know, data is always complicated

21  geographical data.  And so as academic researcher, I am

22  hesitant to say, you know, every data I analyze has no problem.

23  That's all.  So to my ability, to my best of my ability,

24  district that I generate are contiguous according to these

16:15:10 25  definitions.  That's -- that would be my answer, if that makes

1    sense.

2    Q    Thank you, Dr. Imai.

3         Turning to j(iii), this criteria deals with respecting

4    communities of interest, neighborhoods, and political

16:15:25 5    subdivisions; isn't that right?

6    A    That's right.

7    Q    And other than the two individual communities identified

8    in your rebuttal report, do your simulations provide any

9    constraint for respecting communities of interest?

16:15:38 10   A    No.

11   Q    Why not?

12   A    I am not aware of it.  I am not -- I wasn't given any

13   other definition of community of interest, and I don't study

14   community of interest, so I have no knowledge of deciding what

16:15:55 15   community of interest should be provided -- should be provided

16   to the algorithm.

17   Q    You would agree, would you not, Dr. Imai, that this is a

18   rule that the reapportioning committee follows in conducting

19   redistricting?

16:16:10 20   A    I assume so.  That's a guideline.

21   Q    Could observing a community of interest be sort of a

22   confounding variable on your simulations?  Could it explain

23   something that you have attributed to another factor?

24   A    Can you clarify what you mean by confounding?

16:16:34 25   Q    So you say that -- well, your conclusion depends on race.

```
 1   So you conclude that certain splits, certain compositions of

 2   districts were made on the basis of race?

 3   A    Uh-huh.

 4   Q    But your algorithm hasn't made any -- or your methodology

 5   hasn't made any allowance for communities of interest.  Is it

 6   possible that respecting communities of interest could explain

 7   something that your simulations are attributing to race?

 8   A    Right.  So the -- my conclusion is that, you know, my

 9   finding is that race played a predominant role beyond the set

10   of factors that I considered in the algorithms.  So that

11   includes creation of one MMD, as well as two specifics

12   definitions of community of interest I were given.

13        So beyond those factors, race played a role.

14   Q    So but you would agree, would you not, Dr. Imai, that you

15   did not consider all the factors that the reapportionment

16   committee itself is supposed to consider according to its

17   rules?

18   A    I'm not aware of those factors, and those factors if they

19   exist weren't part of my algorithms, that's correct.

20   Q    So it may be the case that the Legislature knows that

21   certain areas share common interests and are a community of

22   interests, but your method did not consider that, right?

23   A    Well, that -- I didn't consider it because that

24   information wasn't provided to me.  But I could consider it if

25   you give me a specific definition of, you know, other
```

16:16:46 (line 5)
16:17:09 (line 10)
16:17:32 (line 15)
16:17:45 (line 20)
16:18:01 (line 25)

1  communities of interest definitions, then I could consider it

2  and then see if that changes the conclusion.

3  Q   As it stands today, the analysis that you performed did

4  not do that, right?

16:18:19  5  A   Yeah.  So the analysis I included in the rebuttal report

6  only uses those two specific definitions of communities of

7  interest that I was given, yes, that's correct.

8  Q   Right.  Dr. Imai, turning to j(v), Legislature shall try

9  to minimize the number of counties in each district.  Did you

16:18:38 10  observe this criteria?

11  A   Yes.

12  Q   How so?

13  A   So in the algorithm as I explained, this was categorized

14  as soft constraint.  I basically instructed the algorithm to

16:18:53 15  prefer a redistricting plan all else equal that has a fewer

16  number of counties split by the districts.

17  Q   But did you say county splits, Dr. Imai?

18  A   Yes.

19  Q   Is there a difference between minimizing the number of

16:19:13 20  county splits and minimizing the number of counties in each

21  district?

22  A   Well, that a single county can be split multiple times.

23  Q   I think I'm asking a more basic question than that.

24      I understand that you minimize the number of county

16:19:33 25  splits.

```
 1  A    Uh-huh.

 2  Q    But what this criteria says is that it's trying to

 3  minimize the total number of counties in each district.  Do you

 4  understand those to be different things?

16:19:42  5  A    Okay.  How different is that?  I guess?  Can you explain?

 6  Sorry.

 7  Q    Well, okay.  So let's say that District 2 has ten counties

 8  in it in the enacted plan?

 9  A    Uh-huh.

16:20:04 10  Q    And two county splits?

11  A    Uh-huh.

12  Q    Is that different than if your district in your simulated

13  plans on average have 15 counties in them, but only one county

14  split?

16:20:15 15  A    So that -- so, again, I'm not aware.  So I don't want to

16  interpret this statement because, you know, it can be

17  interpreted different ways because what do you mean by in each

18  district, right?  So like which district?  Or is it some of the

19  districts -- like some of the numbers across districts?  Does

16:20:44 20  it -- should we double count -- no double count?  But that

21  difference in the definition, maybe that's what you're trying

22  to get at, doesn't really materially affect my conclusion

23  because the District 7 has three splits, both enacted and

24  simulated plan focusing on District 7 because that's the main

16:21:11 25  finding.  And the only difference if both splits the Jefferson
```

1  County as well as Tuscaloosa County in the very similar way as

2  I stated.  And the only really difference is whether you split

3  Montgomery County or not.  So this definition, which could be

4  perhaps interpreted different ways by different people.  Again,

16:21:34  5  I am not a lawyer, so I am not going to take any particular

6  stance on this.  But it is not going to affect the conclusion

7  of my analysis.

8  Q    Let me reframe like this, Dr. Imai.  Let's assume that the

9  Legislature prefers a district with seven counties to a

16:21:53 10  district that has eight counties.  Does your simulation make

11  any adjustment for that?

12  A    If that was given as a criteria, then I can adjust my

13  simulation analysis and rerun it.

14  Q    But you haven't included that in the simulation as it's

16:22:13 15  been run; isn't that right?

16  A    Well, that wasn't given as a criteria to me, so, yeah, I

17  didn't do that.

18  Q    Well, Dr. Imai, what I read j(iv) here to say is that the

19  Legislature shall try to minimize the number of counties in

16:22:29 20  each district.  Do you understand that to mean something other

21  than the total number of counties?

22  A    Total number of counties.  Can you provide the definition?

23  I want to be careful because I don't know exactly definition of

24  what you're trying to get at.  Sorry.  I may be confused.

16:22:50 25  Q    Well, Dr. Imai, I think --

A    The number of counties in each district, that number is
defined for each district; is that right?  So then the question
is what are you going to do with that, right?  Because you
can't have minimize seven different things.

16:23:08 Q    Okay.  So just to clarify, Dr. Imai, you haven't made any
accommodation that would ensure your districts have as few
counties in them as possible; is that right?

A    I don't understand the question because like, okay, maybe
the way -- maybe I can explain what I did and then that --
16:23:31 because that's what it is.  So if that interpretation is
different from your interpretation, then that, you know, that's
what it is, because I don't quite understand the different
interpretation you are trying to get at.  Sorry.

Q    I think let's just move on.  It's -- let's move past this.
16:23:48 A    If you can clarify, so I used -- these are total number of
counties that are being split by districts as a way to, you
know, measure this number of counties in each district.  So
that may or may not be the same as the definition that you're
trying to provide, but I couldn't really understand the
16:24:08 difference there.  But what I did, though, because it's a total
number of counties that were split by the districts.  And then,
you know, another point I would like to make is that that
decision doesn't really affect the conclusion -- main
conclusion of the analysis.

16:24:28 Q    So your testimony, Dr. Imai, is that not considering some

1  of these redistricting guidelines does not affect your

2  analysis?

3  A    Well, different constraints will not affect the analysis

4  possibly.  You don't know until you do it, right?  So there is,

16:24:50 5  you know, you provide a set of inputs, and then the algorithm

6  will give you based on those inputs.  And if you are asking

7  like what would happen if I changed the inputs, like I don't

8  know because I haven't done that.  All I can tell you is that

9  given the inputs that I provided in my report, this is the

16:25:12 10  results that I got.

11  Q    Dr. Imai, let's move on to j(v).

12  A    Okay.

13  Q    And this criteria says, the Legislature shall try to

14  preserve the cores of existing districts, right?

16:25:25 15  A    Right.

16  Q    And did you observe this criteria in your simulations?

17  A    Yes.  As I mentioned, I did incorporate this particular

18  guideline.

19  Q    So you did not consider this; is that right?

16:25:38 20  A    That's correct.

21  Q    Why not?

22  A    Yeah.  So as I explained, for the purpose of the analysis,

23  okay, so this is like my -- the goal -- I'm trying to analyze

24  whether or not race played a role in creating the districts

16:25:58 25  under the enacted plan.

1        In order to do that, I need to isolate other factors.  So

2   I need to isolate, you know, I want to just look at how the

3   race played a role.  So I need to isolate other factors.

4        If I impose this constraint, all the factors that went

16:26:14 5   into the previous plan is going to be carried over, and it's

6   going to affect my analysis.  As a result, I will not be able

7   to isolate the role the race played in, you know, in drawing

8   the district boundaries under the enacted plan.

9   Q    Dr. Imai?

16:26:35 10  A    That's why -- I haven't analyzed the previous plans, so I

11  have no knowledge of what factors went in there.

12  Q    So, Dr. Imai, is it right that if your methodology

13  considered what the previous plans looked like, the cores of

14  existing districts, that you would not be able to tell what was

16:26:55 15  caused as a result of those existing districts and as a result

16  of race?

17  A    I would have a difficult time isolating the role of the

18  race if I put this constraint.

19        As I said, many factors may have gone into the previous

16:27:14 20  plan, which I haven't analyzed.  And so that will -- you know,

21  I will inherit all of that into my analysis, which basically,

22  you know, basically reduces -- get rid of the whole advantage

23  of simulation analysis is the power to isolate these different

24  factors, so that's why I didn't do this.

16:27:38 25  Q    Dr. Imai, would it be possible to set a limiting

1  constraint so that your simulations preserves 80 percent of the

2  cores of previous districts?

3  A    Yeah.  I could -- I could do that.  I could incorporate

4  that constraint, add that to my simulation algorithm, yes.

16:27:58 5  Q    But that's not something that you have done?

6  A    No.

7  Q    Here?

8  A    No.  If someone provides -- if someone wants to

9  incorporate the specific definition of core, then, yes, the

16:28:12 10  algorithm can handle that.

11  Q    And so instead, though, your algorithm starts from a blank

12  slate; is that fair?

13  A    Yes.  That's -- blank slate meaning like, yeah, from

14  scratch.

16:28:26 15  Q    Right.  Right.

16  A    Yeah.  But if I may add one thing.  Is that okay?  Or is

17  that...

18  Q    Sure.

19  A    So even though I started from the blank slate in my

16:28:44 20  one-MMD analysis, in my testimony, I mentioned that it was

21  remarkable to see that one MMD, you know, overlaps in a great

22  deal with District 7 on the enacted plan, which I assume that

23  also means that overlaps significantly with the District 7 on

24  the previous plan.  So even though I didn't tell the algorithm

16:29:08 25  where to create the MMD, when I told the algorithm to get one

1   MMD, it went there, and in the key difference was the

2   Montgomery.

3   Q   So, Dr. Imai, doesn't ignoring some of these factors,

4   cores of districts, communities of interest, et cetera, doesn't

16:29:28  5   that guarantee that your simulated plans may not capture a true

6   representative sample?

7   A   So the captures -- I have a mathematical theorem that says

8   it captures -- you present a plan under the set of criteria

9   that I specified.  If you change the set of criteria, then, you

16:29:47 10  know, the population of the plans are changed so no longer my

11  sample is guaranteed to be representative of that new

12  population, if that makes sense.

13      So the representativeness is all relative to what factors

14  are used for the simulation.

16:30:05 15  Q   Thank you, Dr. Imai.  I am going to take these guidelines

16  down.

17      And then, Dr. Imai, I am going to direct your attention to

18  page 9 of your report.

19  A   Okay.

16:30:20 20  Q   Milligan Exhibit 1, M-1.

21      You say in paragraph 26 that you show, quote, the way in

22  which the enacted plan deviates from the simulated plan implies

23  that race was a predominant factor in drawing the district

24  boundaries of the enacted plan.  Did I read that correctly?

16:30:48 25  A   Yes.

1    Q      What do you mean by implies, Dr. Imai?

2    A      Presents empirical evidence for that.

3    Q      Okay.  And, Dr. Imai, this conclusion would apply not only

4    to the enacted plan, right, but any comparison plan that was

16:31:11  5    compared to your simulations?

6    A    I don't want to say that because it depends on the purpose

7    of the analysis if that -- I guess I'm not understanding

8    exactly what you're trying to ask.  Sorry.

9    Q    So let's say an enacted plan that's different than the

16:31:35 10   plan that actually is enacted, and you still did the

11   comparison.  You did the comparison exactly the same.  Wouldn't

12   your conclusions apply to that plan, as well?

13   A    I -- I feel uncomfortable speculating that because like on

14   this, I have a plan in front of me.  It's really hard for me to

16:31:54 15   know whether, you know, I don't want to sort of draw conclusion

16   about something like a hypothetical.  I feel uncomfortable

17   doing that.

18   Q    Let me back up.  I think I have asked a poor question.

19   A    Yeah.

16:32:07 20   Q    So what you conclude or what you present here is that if a

21   plan deviates from your simulated plans, that implies race was

22   a predominant factor; is that right?

23   A    In this particular setting.  In this particular, you know,

24   my analysis setting.  I just feel uncomfortable speculating if

16:32:31 25   there is another plan that looks very different, how do I, you

 1  know.

 2  Q    Sure.  Okay.

 3  A    It really depends on, I don't know.  If that makes sense.

 4  Because, you know, and also, yeah, so it depends like you have

16:32:47  5  to carefully select what the inputs you want to use for

 6  simulation in order to -- because simulation analysis is done

 7  for a particular purpose.  And so, you know, I just want to --

 8  yeah, refrain myself from making that conclusion on that, if

 9  that's okay, like a hypothetical question.

16:33:08 10  Q    Sure.  Let's move on, Dr. Imai.  I am going to share my

11  screen again.  And this is M-1.  This is a copy of your report.

12  And I am going to go to page 10 and Figure 1?

13  A    Okay.

14  Q    And I would like to zoom out a little.  I am going to ask

16:33:36 15  you a few questions about this figure.

16  A    Sure.

17  Q    So any of the dots on this figure are an outlier, right?

18  A    Yeah.  That's considered as an outlier under the standard

19  statistical definition.

16:33:50 20  Q    And, Doctor, further down in paragraph 28, you conclude

21  that race was a predominant factor in the enacted plan as a

22  result of its BVAP outlier status as illustrated in this

23  figure; isn't that right?

24  A    That's right.

16:34:07 25  Q    Dr. Imai, what's the highest BVAP in this district in this

```
 1  dataset that isn't an outlier?
 2  A    Oh, I didn't -- I don't have that exact number with me.
 3  I'm sorry.  But -- it's between somewhere 40 and 50.
 4  Q    Well, we can approximate from the graph, right?  So
 5  District 2's top whisker, what would you say that approximately
 6  to the BVAP of that point would be, maybe 43 percent?
 7  A    Yeah, maybe something like that.  Yeah.
 8  Q    And none of the boxes that you talked about that have most
 9  of the data in them, none of those boxes break 40 percent BVAP,
10  right?
11  A    For the District 2, you mean.
12  Q    For any of the districts.
13  A    Box, so, yes, District 7 is slightly on it -- maybe -- but
14  yeah.
15  Q    But even if 7 is on it, it's like right --
16  A    Yeah.  That's correct, yeah.
17  Q    So -- and it looks like even the highest outlier for CD 7
18  is -- I don't know, maybe 47 or 48 percent?  Do you think
19  that's fair?
20  A    That's right.  Yeah, that's probably fair, yeah.
21  Q    So if CD 7 had a BVAP that was above 50 percent, would it
22  be an outlier?
23  A    Again, I -- I'm -- I don't like to speculate hypothetical
24  because, you know, if you change one district, everything else
25  can change, but, yeah.
```

         1   Q    Well, I think your conclusions in this report are anything
         2   that doesn't appear in this graph is an outlier and, therefore,
         3   race predominated; isn't that a fair summary?
         4   A    You are saying if hypothetically you observe something at
16:36:07 5   50 percent?
         6   Q    Let's say that there's a district for CD 7 that's at
         7   50.1 percent.  Would that be an outlier?
         8   A    Oh, if the enacted plan you mean?
         9   Q    No.  I am talking about hypothetical plan for CD 7 that
16:36:22 10  has a BVAP of 50.1 percent, would that be an outlier?
        11   A    Yes, statistical outlier.  So maybe I know what you are
        12   trying to say.  Should I say something there what I mean by
        13   outlier or?
        14   Q    Let me ask a couple of follow-up questions.  So you would
16:36:39 15  agree it's an outlier, right?
        16   A    Now it depends on what you mean by outlier.  So I want to
        17   clarify the definition of the outlier that I mean so that.
        18   Q    Sure.  Go ahead.
        19   A    So statistical outlier doesn't necessarily mean that, you
16:36:54 20  know, because it's all statistical, it's probabilistic.  It
        21   doesn't mean it never happens.  It could happen.  So you can
        22   see even if you simulated from the actual distribution, there
        23   are black dots, those are simulated plans.  So those outliers
        24   do happen.  It doesn't mean it can never happen, right?  But
16:37:18 25  it's very unlikely to happen because there's 10,000 dots there.

1  I am not showing it so that the dots that are showing in the

2  figure there aren't many.  There are very, very few of total

3  10,000.

4      So when I say statistical outlier, I am not saying it's

16:37:39  5  impossible ever to get anything like that.  There is always a

6  chance.  You never know until you actually enumerate every

7  single map in the population.  I'm saying highly, highly

8  unlikely.  So that's what I mean by statistical outlier.  It's

9  highly unlikely result.

16:37:59 10  Q    Let me reframe this way, Dr. Imai.

11  A    Okay.

12  Q    Is any data point that's not in the box or on the whisker

13  considered an outlier?

14  A    Yes.  It's considered a statistical outlier according to

16:38:11 15  the standard definition of statistics.

16  Q    Okay.  Then, Dr. Imai, let's look at District 7.

17  A    Okay.

18  Q    And the upper whisker, we can't see exactly where it ends,

19  but the outlier started about 41 or 42 percent.

16:38:25 20  A    That's right.

21  Q    So we can infer from that that that's where the whisker

22  end; is that fair?

23  A    That's fair.

24  Q    So if there were another outlier dot at 50.1 percent, if

16:38:37 25  there was another data point there, would it be an outlier

1  based on this graph?

2  A    Under this simulation, yes, but, you know, under different

3  simulation, it may not be.

4  Q    Okay.  Dr. Imai, for District 2, it looks like the upper

16:38:53 5  bound of the whisker cuts off like we said about 43 percent; is

6  that right?

7  A    Yeah, that's right.

8  Q    And there is one data point above it that's an outlier at

9  maybe 44; is that right?

16:39:05 10  A    Yeah, that's about right, yeah.

11  Q    If there were another data point that was at

12  50.01 percent, would it be an outlier on this graph?

13  A    That's right.

14  Q    And if those districts had a BVAP of 50.01 percent, would

16:39:28 15  you conclude that race predominated in their drawing based on

16  your simulations?

17  A    Yeah.  To this set of criteria, right?  So beyond this set

18  of criteria that I considered, yes.

19  Q    And, Dr. Imai, I would like to look at -- so Districts 1,

16:39:48 20  3, 4, 5, and 6?

21  A    Uh-huh.

22  Q    These all fall on the box or the whisker, right, of the

23  district?

24  A    Yeah, more or less, yes.

16:40:00 25  Q    So they're not outliers?

1  A    Right.  According to the commission of definition, it's

2  not -- they're not statistical outliers.

3  Q    So your analysis would support that race did not

4  predominant in the drawing of those districts; isn't that

16:40:12  5  right?

6  A    So I want to be a little bit careful here, because even

7  though I presented this graph for each district, as you know,

8  like if you change one district boundary, that changes another

9  district boundary.  So I have -- like I want to always

16:40:31 10  interpret this type of graph, this boxplot type of graph in its

11  entirety, because everything is interconnected.  If you change

12  one district boundary, another district boundary change.

13         And so in this case, I'm more confident of saying race

14  predominated because if you look at the Jefferson County and if

16:40:54 15  you look at the Montgomery County, you see exactly how the

16  district boundaries are drawn under the enacted map and how

17  that compares with the simulated plans.  So you know exactly

18  where these outlier is coming from.  Like, as I explained in my

19  presentation, therefore, this 6, 7, it's coming from both in

16:41:19 20  this case.  In this case, it's both coming from the splitting

21  of the Jefferson County and packing the Birmingham voters in

22  the Birmingham, as well as the splitting of the Montgomery

23  County and then packing into that District 7.

24         And for the District 2, the reason why it's low is because

16:41:36 25  the Montgomery County split and then packed that -- the rest of

1   part of the city of the Montgomery County is packed into the

2   District 7.  So that -- District 2 is right below right south

3   of the, you know, southeast of District 7.  So by taking the

4   Montgomery County, part of the Montgomery County, which is part

16:41:56 5   of -- is part of the District 2, which is under the simulated

6   plan, that's why it's lower.

7       So because I know all of that, like I wouldn't just look

8   at this and say it's an outlier.  It's a predominant -- I would

9   look at these maps making sure I understand where these

16:42:15 10   differences come from.  And then as a totality of evidence,

11   statistical evidence, I concluded that my, you know, evidence

12   shows that race predominated in determining this boundary, if

13   that makes sense.  I still don't like to just mechanically

14   decide whether just because it's about the 9 or -- because it's

16:42:38 15   just -- it's a standard definition, but not like an absolute --

16   you don't want to make the conclusion from a statistical

17   analysis just based on one number or one graph.

18   Q   Thank you, Dr. Imai.  So if I understood you correctly,

19   this graph on its own you would not consider to be evidence of

16:43:00 20   anything without considering the totality of the circumstances;

21   is that right?

22   A   Yeah.  Definitely.  It's part of the evidence, obviously.

23   It's the first place I go to.  Then I want to understand, you

24   know, the reason why this is happening.  And the simulation

16:43:14 25   analysis is powerful because you can actually look at how the

```
 1  simulation algorithm splits certain counties and things like
 2  that.
 3  Q     Thank you, Dr. Imai.  I am going to take that down for at
 4  least a couple of minutes.
 5          So, Dr. Imai, in paragraph 29 you say, quote, as a result
 6  of the high percentage of BVAP in District 7, the BVAP of
 7  District 2 and skip a little is much lower than?
 8  A     Uh-huh.
 9  Q     That under vast majority of simulated plans.  Did I
10  summarize that right?
11  A     Yeah, that's correct.
12  Q     Why is CD 2 -- why is the Second District's BVAP, quote, a
13  result of CD 7's BVAP?
14  A     Because Montgomery County is split by the enacted plan.
15  An the enacted plan includes, you know, big part of the western
16  part of the city of Montgomery, which is -- has a very high
17  percentage of black population.  And in the precinct that the
18  enacted plan includes into the District 7, it's like some of
19  them are above 90 percent.  But under the simulated plan,
20  usually that district is assigned to the District 2.  And so by
21  taking part of the Montgomery and then putting it in District
22  7, it lowers the BVAP population under the -- for the District
23  2.
24  Q     Dr. Imai --
25  A     In this case, there was the direct trade off there.
```

1  Q     Okay.  So, Dr. Imai, there is a trade off in BVAP between

2  District 2 -- District 2 and District 7; is that right?

3  A     Well, I mean, the decision affecting -- I shouldn't have

4  maybe said trade off, but the decision to include the part of

16:45:09 5  the Montgomery into the District 7 has a direct consequence on

6  the BVAP for the District 2.

7  Q     Okay.

8  A     Just the geographically there together, and on the

9  simulated plan, they assign most the Montgomery County to, you

16:45:25 10  know, the simulated plan, it assigns to the District 2.

11  Q     Thank you, Dr. Imai.  So now I want to talk about the

12  Jefferson County split that you talk about in your report.

13  A     Okay.

14  Q     Is there any feature of the methodology that you use that

16:45:43 15  might contribute to the lack of simulated plans that split

16  Jefferson County?

17  A     That's a question to be analyzed.

18        So I would -- if I want to answer that question, I would

19  try, you know, I will -- maybe you have a hypothesis.  Maybe I

16:46:03 20  will come up with a hypothesis.  And then I would take that

21  constraint out, or I would add the constraint and then see if

22  the results change.  One thing I can tell you is what I did is

23  when I did the one-MMD simulation, so this is race-blind, but

24  when I did the one-MMD simulation, it did split the Jefferson

16:46:26 25  County like the very similar in the way that the enacted plan

|  | did.  So now if you want to -- all I did there is to add the |
|---|---|
| 1 | did.  So now if you want to -- all I did there is to add the |
| 2 | constraint that this should be one MMD, and adding that |
| 3 | constraint made the algorithm split the Jefferson County |
| 4 | instead of keeping that as a whole. |

16:46:46  5   Q    So, Dr. Imai, I am only talking about the race-blind --

6   A    Oh, okay, I am sorry.

7   Q    -- portion of the analysis right now and your analysis of

8   how Jefferson County is split based on that analysis.

9        And if I understood you correctly, are you saying you

16:47:00 10  don't know if there's any feature of your methodology that

11   might avoid splitting Jefferson County inherently?

12   A    Inherent.  Well, oh, I see -- okay.  Yeah.  So what I know

13   from this simulation is, you know, beyond the five constraints,

14   right, I imposed to the algorithm, there was another factor

16:47:28 15  that was in play to, you know, to split under the enacted plan,

16   split the Jefferson County, whereas under the simulated plan,

17   it didn't.  And that one factor is race.

18   Q    Dr. Imai, what about as a function of compactness?  In the

19   pursuit of compactness, might your methodology avoid splitting

16:47:56 20  Jefferson County?

21   A    So if I take away the compactness constraint from what I

22   did, it's possible that the Jefferson County will be split.

23   But I haven't done that.  I imposed the compactness constraint

24   so I wouldn't know what would happen if I take away the -- you

16:48:16 25  know, if I tell the algorithm don't worry about compactness.

```
 1  It might split.  And probably you're right.  But I don't know.
 2  Like I want to see how that would work.
 3  Q    So, Dr. Imai, you don't know as a general matter whether
 4  the methodology you have used is or is not less likely to split
 5  urban areas in general?
 6  A    Oh, there's no -- yeah.  Yeah.  Why would that be?  I
 7  don't -- I, you know -- I'm not sure.  Like -- yeah.  I -- I
 8  don't want to make those general statements because, again, it
 9  depends on like what state you are analyzing, what do you mean
10  by -- what factors -- you know, entering, adding to the -- you
11  know, to the algorithm.  So it's very like, you know, given the
12  set of algorithm, I can tell you what I found, but it's hard
13  for me to answer the hypothetical question of what if you add
14  additional constraint or what if I take away a constraint,
15  because I haven't done that analysis, so I can't tell you what
16  I might find.  And I don't want to speculate.
17  Q    Dr. Imai, let me ask you this just to confirm.  Do you
18  primarily in your race-blind section use the Sequential Monte
19  Carlo method?
20  A    Yes, that's correct.
21  Q    Dr. Imai, I would like to share my screen.
22  A    Okay.
23  Q    And show you this document has not been marked as an
24  exhibit yet.  Dr. Imai, do you recognize this document based on
25  the header here?
```

16:48:35   (line 5)
16:48:59   (line 10)
16:49:24   (line 15)
16:49:41   (line 20)
16:49:58   (line 25)

```
 1  A     It's a paper that I have written.
 2  Q     And what's the title of this paper?
 3  A     Sequential Monte Carlo for sampling balanced and compact
 4  redistricting plans.
```
16:50:09
```
 5  Q     And Sequential Monte Carlo is the same method that you
 6  have used here, right?
 7  A     That's right.
 8  Q     Dr. Imai, I would like to go to page 6 of this document,
 9  which is -- actually let me stop at page 5.
```
16:50:30
```
10        The heading of Section 3.3 of this paper talks about
11  compactness, right?
12  A     Okay.  Yes.
13  Q     And it discusses the Polsby-Popper score.  Is that a score
14  you used in your analysis in this case?
```
16:50:49
```
15  A     In my evaluation, I look at both Polsby-Popper and also
16  the edge-removal criteria of compactness.
17  Q     Okay.  So, Dr. Imai, going down to about this point of the
18  article, I am going to read a couple of sentences.
19  Additionally, given the high density of voting units in urban
```
16:51:14
```
20  areas, plans which cut fewer edges will tend to avoid drawing
21  district lines through the heart of these urban areas.  This
22  has the welcome side effect of avoiding splitting cities and
23  towns, and in doing so, helping to preserve communities of
24  interest, another common redistricting consideration.  Did I
```
16:51:33
```
25  read those sentences correctly?
```

```
 1   A     Uh-huh.
 2   Q     Dr. Imai, don't those sentences say that observing these
 3   compactness measures will inherently avoid drawing district
 4   lines or what -- inherently avoid drawing district lines
 5   through urban areas?
 6   A     Well, it's amount of degrees.  It says tend to.  It's all
 7   probabilistic it says, yes, tend to.  Tend to avoid.
 8   Q     So as a feature of the SMC methodology, your methodology
 9   will avoid splitting urban areas in the interest of
10   compactness; isn't that right?
11   A     It's not so much of the feature of methodology per se,
12   it's the feature of this particular measure.  And that's why in
13   the -- in my analysis, I don't just rely on this measure.  I
14   make sure that the districts are compact using Polsby-Popper,
15   which is another standard measure of compactness.  You know, as
16   you know, there are many compactness measures in the literature
17   and relying on, you know, one -- you know, each method may have
18   advantage and disadvantages, so that's why I use two of the
19   most, you know, most widely-used methods to make sure the -- my
20   plans, simulated plans are more compact than the enacted plan.
21   Q     Both of the methods that you used in this case are the
22   same methods discussed in this article; isn't that right?
23   A     Yes.
24   Q     Okay.
25         MR. SMITH:  Your Honor, I would like to move to admit
```

16:51:46  (line 5)
16:52:09  (line 10)
16:52:28  (line 15)
16:52:51  (line 20)
16:53:06  (line 25)

1    this as an impeachment exhibit.  I think it would be D-172.

2              JUDGE MARCUS:  Is there an objection, Ms. Ebenstein?

3              MS. EBENSTEIN:  No, Your Honor.  No objection as long

4    as it's entered in its entirety.

16:53:22  5              MR. SMITH:  That's fine by us.

6              JUDGE MARCUS:  You are offering the entire exhibit of

7    the Sequential Monte Carlo draft dated August 10, '21.  Do I

8    have that right?

9              MR. SMITH:  That is right, Your Honor.

16:53:36 10              JUDGE MARCUS:  This is not the first draft.  This is

11   what's called, this draft, the August 10 draft?

12             MR. SMITH:  That appears to be correct.  This appears

13   to be the August 10, 2021 draft.

14             JUDGE MARCUS:  Without objection, Defendants' 172 is

16:53:48 15   received.

16             MR. SMITH:  Thank you, Your Honor.

17             JUDGE MARCUS:  I'm sorry.  Did you have any other

18   questions for Dr. Imai?

19             MR. SMITH:  I do, Your Honor.  I'm sorry, Your Honor.

16:54:07 20             JUDGE MARCUS:  Sure.

21             MS. EBENSTEIN:  Your Honor, could I clarify that that

22   was admitted for impeachment for the purposes it was used and

23   not for additional unknown purposes?

24             JUDGE MARCUS:  Well, I want to be clear on what's

16:54:17 25   going on here.  Mr. Smith used it to impeach, in which case, he

```
 1  would certainly mark it for identification as Defendants' 172.
 2  But I understood him to be doing something else in addition to
 3  using it for purposes of impeachment.  He was offering it as
 4  substantive evidence I think.  Did I have that right,
 5  Mr. Smith?
 6          MR. SMITH:  Well, Your Honor, I think it's sort of --
 7  by impeaching, it is substantive evidence.
 8          JUDGE MARCUS:  No.  It's not necessarily substantive.
 9  You can impeach him with a box of Wheaties.  It doesn't mean
10  the box of Wheaties is admissible in its own terms.  If you
11  want to use it for purposes of impeachment, then D-172 is
12  marked for identification but not received into evidence.  If
13  you are offering it substantively on its own terms and into
14  evidence, that's something else.  I'm just trying to find out
15  what it is precisely you're seeking to do with 172.  Simply
16  impeach or something more?
17          MR. SMITH:  Simply impeach, Your Honor.
18          JUDGE MARCUS:  All right.  We have marked it,
19  Ms. Ebenstein, as an exhibit for identification.
20          MS. EBENSTEIN:  Thank you, Your Honor.
21          JUDGE MARCUS:  Simply to impeach the witness.
22  BY MR. SMITH:
23  Q    Dr. Imai, you would agree, wouldn't you, that if a
24  methodology avoided splitting urban areas, then any plan that
25  splits an urban area is more likely to look like an outlier
```

```
 1  under that methodology, correct?

 2  A    Not necessarily.

 3  Q    Why not?

 4  A    It's all deductive, and my plans are also as compact as

 5  the enacted plan with a different measure, Polsby-Popper to be

 6  exact.

 7  Q    Okay.  Dr. Imai, in paragraph 32, you draw a conclusion

 8  based on Jefferson County.  But the enacted plan packs many

 9  more black residents of Jefferson County in District 7 than

10  9,992 of the 10,000 simulated plans; is that right?

11  A    Yes.

12  Q    And, Dr. Imai, all of your simulated plans you consider

13  those to be a representative sample of plans that could be

14  passed while following the criteria that you considered; isn't

15  that right?

16  A    That's right.

17  Q    So at least eight of your simulated plans included

18  portions of Jefferson County in District 7 with the BVAP that

19  was as high or higher than the enacted plan, right?

20  A    Out of 10,000 maps?  Yes.

21  Q    Do you know how -- in how many of those simulated plans

22  Jefferson County was split between District 7 and another

23  district?

24  A    How many of the -- sorry.  Can you repeat the question

25  again?  Sorry.
```

```
 1   Q    Sure.  Do you know in your simulated plans in how many of

 2   your simulated plans Jefferson County was split between

 3   District 7 and another district?

 4   A    I think less than 50 percent.

 5   Q    But you don't know a precise number or a more precise

 6   percentage?

 7   A    I -- oh, no.  Yeah.  So -- sorry.  Yeah.  So -- now I

 8   know.  I didn't want to say for sure -- so 53 percent.  So more

 9   than half of the simulated plan did not split counties.  So,

10   yeah, it's like 46, 47 that's split of Jefferson County.

11   Q    Okay.  Dr. Imai, moving to your race-blind analysis of

12   Montgomery County.  You say in paragraph 33, and I believe it's

13   the last sentence, It is clear that the enacted plan packs

14   black voters who live in the western part of the city of the

15   Montgomery into District 7 while leaving District 2 with fewer

16   black voters.  Did I read that correctly?

17   A    Yep.

18   Q    What do you mean by packs?

19   A    I include them into District 7 beyond the purpose of

20   creating one MMD.

21   Q    Okay.  And a couple of lines up in that paragraph, you say

22   that you find that over 97 percent of the simulated plans do

23   not split Montgomery County at all; isn't that right?

24   A    Right.  But this is race -- you are talking about

25   race-blind measurements there, right?
```

16:57:51 (line 5)
16:58:18 (line 10)
16:58:46 (line 15)
16:59:00 (line 20)
16:59:17 (line 25)

```
 1    Q     Yeah.

 2    A     That's right, yeah.

 3    Q     So that means with 3 percent do split Montgomery County,

 4    right?

 5    A     Right.

 6    Q     Dr. Imai, what's 3 percent of 10,000 plans?

 7    A     30.

 8    Q     30?

 9    A     Well, 300.

10    Q     Well, is it 30 or is it 300?

11    A     Wait.  30.  Is that right?

12    Q     I believe, Dr. Imai, that 3 percent of 10,000 plans is

13    300?

14    A     Yeah.  Okay.  Sorry.  It's been a long day.  Sorry about

15    that.

16    Q     Yeah.  So, in other words, 300 of your simulated plans

17    also split Montgomery County; isn't that right?

18    A     That's out of 10,000.

19    Q     You don't provide in this section any population

20    comparison like you do for the Jefferson County split; isn't

21    that right?

22    A     Population comparison.  Can you tell me exactly what

23    you're asking for?

24    Q     So you include some figures for the Jefferson County split

25    when you talk about it.  You don't do anything similar to that
```

1   for the Montgomery County split in the race-blind section,

2   right?

3   A    Oh, just there's because so few statistics.  Again, this

4   is speaking statistically.  You know, 3 percent is small.  I

17:00:44  5   understand, you know, 300 sounds big, but it's out of 10,000.

6   And if you want to draw from that statistical analysis,

7   3 percent is small.  So I didn't include that figure.

8   Q    And, Dr. Imai, in paragraph 34, you conclude that the

9   split of Montgomery, quote, was unnecessary to satisfy the

17:01:04 10  other redistricting criteria, right?

11  A    Yeah.  The other -- redistricting criteria that I

12  incorporated in my analysis.  I just want to make sure that's

13  clear.

14  Q    Right.  But as we talked about before, you didn't consider

17:01:16 15  all the criteria that were in the committee guidelines, right?

16  A    Well, for this race-blind analysis, there's, you know, the

17  five criteria are the ones that I considered.

18  Q    So 300 of your simulated plans split Montgomery without

19  considering that the 2011 plan did the same, right?

17:01:34 20  A    Out of 10,000, yes, that's 3 percent.  As we calculated

21  correctly now.

22  Q    Thank you, Dr. Imai.

23        Now, I would like to move sort of to the one-MMD

24  simulation section of your report.

17:01:50 25        MS. EBENSTEIN:  Your Honor, if we are moving on to a

1  new section, perhaps we could take a quick three to five-minute
2  break if you wouldn't mind?
3          JUDGE MARCUS:  Sure.  We will take a five-minute break
4  at this point.
17:02:01 5     Let me -- before we do though ask Mr. Smith sort of an
6  estimate.  How much more do you think you have on cross?
7          MR. SMITH:  Your Honor, I would guess probably
8  20 minutes to half an hour.
9          JUDGE MARCUS:  Okay.  I ask you that not to limit you
17:02:18 10 in any way, particularly to find out whether we will actually
11 get to redirect today.  It doesn't look like it, and I wanted
12 to ask one additional question.  I wasn't sure whether
13 Mr. Walker was planning to cross-examine, as well.
14         MR. SMITH:  I am not sure.
17:02:38 15        MR. WALKER:  Your Honor, this is Dorman Walker.  I
16 don't have any plans to cross-examine.
17         JUDGE MARCUS:  Okay.  So we have about 20 minutes or
18 so, maybe a little bit more to finish up the cross.  We will go
19 until 5:30.  So I don't think we will get to the redirect
17:02:56 20 unless you think it will be pretty short.
21      Let's do this.  We will take a five-minute break and pick
22 up the thread, Mr. Smith, with your cross.
23      Thank you.
24         (Recess.)
17:09:33 25        JUDGE MARCUS:  Mr. Smith, you may proceed with your

```
 1   cross.
 2           MR. SMITH:   Thank you, Your Honor.
 3   BY MR. SMITH:
 4   Q     Dr. Imai, I think you testified on direct that in doing
 5   the MMD analysis you were following the state's approach to
 6   create one MMD in order to comply with the VRA.  Did I get that
 7   right?
 8   A     That's my understanding, from counsel for the plaintiffs.
 9   Q     So why do you believe that's the state's approach?  Let me
10   withdraw.  Do you have any independent basis to believe that
11   that was the state's approach?
12   A     Oh, okay.  No.
13   Q     Okay.  Dr. Imai, in your MMD section, all of your
14   districts are or -- all of your MMD districts are between 50 to
15   51 percent BVAP, right?
16   A     That's correct.
17   Q     And all of your simulated MMDs split Jefferson County in a
18   similar way like the enacted plan, right?
19   A     Yeah.  It's not exactly the same, but similarly.
20   Q     Similar, right?
21   A     Yeah.
22   Q     And same for Tuscaloosa County?
23   A     Yeah.  So that was all the, you know, surprising findings
24   for me.
25   Q     So where your simulated MMDs differ from the enacted
```

17:09:44 (line 5)
17:10:05 (line 10)
17:10:20 (line 15)
17:10:32 (line 20)
17:10:38 (line 25)

```
 1  District 7 is Montgomery, right?

 2  A    That's correct.

 3  Q    And so, Dr. Imai, in paragraph 37 of your report and,

 4  again, this is M-1, you state that even in 37.8 percent of --

 5  you state that 37.8 percent of plans split Montgomery County,

 6  right?

 7  A    That's correct.

 8  Q    And then, Dr. Imai, I am going to try and pull your report

 9  up again.  Look at Figure 4 on page 14.

10  A    Okay.

11  Q    And so, Dr. Imai, the red dotted line, that's where the

12  BVAP in Montgomery is for District 7, right?

13  A    For the -- yeah, the enacted plan.

14  Q    The enacted plan, right?

15  A    That's correct.

16  Q    And so the bar there at the bottom looks like it's

17  somewhere between 5 and 10 percent, wouldn't you say?

18  A    I think for sure -- I have got the exact number in the

19  report.  Or maybe not.  Yeah.  Not -- I think that on

20  6 percent, but I'm not 100 percent sure.

21  Q    Okay.  Let's say 6 percent?

22  A    Yeah.  More of a chain -- I think you're right, a little

23  bit above 5.

24  Q    So 6 -- approximately 6 percent of your plan of your

25  simulated MMDs include the same Montgomery BVAP as the enacted
```

```
  1  plan, right?

  2  A    That's correct.

  3  Q    And 6 percent of 10,000, that's about 600 of your

  4  simulated plans, right?

17:12:30 5  A    That's right.

  6  Q    No worries.

  7        And, now, Dr. Imai, I would like to scroll down to Figure

  8  5, which is on the next page?

  9  A    Right.

17:12:44 10  Q    And so this is on the left shows out -- shows what

 11  percentage of your plans in your simulated MMD which precinct

 12  they were most likely to pick up, right?

 13  A    Uh-huh, that's correct.

 14  Q    And on the right, it has those precincts color coded based

17:13:02 15  on the BVAP percentage, right?

 16  A    That's correct.

 17  Q    Why do you think your simulated plans avoid picking up the

 18  higher BVAP precincts in Montgomery even when they're already

 19  splitting the county?

17:13:15 20  A    Because I think in order to, you know, you don't need that

 21  many -- well, why -- sorry.  Can you clarify what you mean by

 22  why?

 23  Q    Well, Dr. Imai, I'm not sure if I can.

 24        Do you think there is a particular reason why your

17:13:37 25  simulated plans avoid the precincts further into Montgomery
```

1    County most of which intend to be higher BVAP?

2    A    They might be, but I don't know.  I haven't memorized

3    exactly why, or I can say from this analysis is that enacted

4    plan does in a way that most of the simulated plan doesn't.

17:13:55 5    Q    Do you think your methodology may be avoiding splitting

6    Montgomery County because it's an urban area?

7    A    Oh, I see.  Again, I cannot speculate, right.  So that in

8    terms of the Polsby-Popper measure, if you're, you know, if you

9    are concerned about the edge-removal measure, in terms of the

17:14:23 10   Polsby-Popper, it's also, you know, my simulated plans are more

11   compact than the enacted plan.  But I didn't have anything

12   about how Auburn, like how Auburn is -- I didn't tell

13   simulation that, you know, the Auburn area should be split or

14   not split.

17:14:42 15   Q    Dr. Imai, again, so this MMD plan you have a BVAP target

16   of 50 to 51 percent, right?

17   A    Uh-huh.  That's correct.  Sorry.

18   Q    Do you think, then, your methodology is less likely to

19   pick up these high BVAP precincts in order to comply with the

17:15:03 20   top mark of that range?

21   A    If that part of the population -- that part of city of

22   Montgomery, the black -- that has high BVAP proportion is

23   necessary, in order to create one MMD, then it could have.  But

24   this analysis shows it was not necessary.

17:15:24 25   Q    Okay.  Dr. Imai, in paragraph 40, you conclude that the

1  enacted plan places black voters who live in Montgomery into

2  District 7 in a manner that as you put it suggests race was a

3  predominant factor in drawing district boundaries; is that

4  right?

17:15:41 5  A    That's correct.

6  Q    And like we said, your simulated MMD districts

7  intentionally use a 50 to 51 percent BVAP target, right?

8  A    Intentionally, yes, I use that, too, as well as the input

9  factors in this analysis.

17:16:06 10 Q    So given that you had a particular BVAP target in mind, if

11 the enacted District 7 were similar to your simulated MMDs,

12 wouldn't that be better evidence that race was a predominant

13 factor in the enacted plan?

14 A    Can you repeat that question again?  Sorry.  I just want

17:16:24 15 to make sure I understand that.

16 Q    Sure.  So, Dr. Imai, given that you had a specific racial

17 target in mind, the BVAP of 50 to 51 percent?

18 A    Uh-huh.

19 Q    If the enacted District 7 were similar to your MMDs,

17:16:40 20 wouldn't that be better evidence that race was a predominant

21 factor in the enacted plan?

22 A    If the -- you mean MMD I simulated or --

23 Q    Yes.

24 A    I'm not understanding what evidence -- hypothetical

17:17:03 25 evidence, or is that exact evidence or hypothetical evidence?

```
 1   I'm not just not understanding.

 2   Q    Let me back up a little.

 3   A    Okay.

 4   Q    You had a 50 to 51 percent BVAP target in mind, right?

 5   A    That's right.  That's what I used, yes.

 6   Q    So in drawing your simulated plans, your MMD had a BVAP

 7   target, right?

 8   A    Yeah.  You asking where that target comes from or?

 9   Q    No.

10   A    Okay.

11   Q    I'm asking.

12   A    I used that target, yes.

13   Q    And you used that target intentionally, right?

14   A    Yeah.  Everything is intentional in this simulation, yes.

15   Q    So given that that's the case, given that you

16   intentionally considered race in the drawing of your MMD,

17   wouldn't it be the case that if the enacted District 7 looked

18   like your MMD, that would be better evidence that race

19   predominated?

20   A    Why is that?  Because I'm looking at the beyond the

21   purpose for creating one MMD.  And that's the purpose of the

22   analysis.  So I don't understand why the similarity of the --

23   are you talking about similarity in terms of Jefferson and

24   Tuscaloosa or?

25   Q    I'm just going to move along, Dr. Imai, if that's okay?
```

The time stamps in the left margin are: 17:17:15 (line 5), 17:17:28 (line 10), 17:17:38 (line 15), 17:17:53 (line 20), 17:18:14 (line 25).

```
 1  A     Sorry.
 2  Q     So, Dr. Imai, in paragraph 1, and I'll actually scroll
 3  down to it here.
 4        You are analyzing the second highest district level BVAP,
 5  right?
 6  A     That's right.
 7  Q     And from that drawing conclusions about enacted District
 8  7, right?
 9  A     That's correct.  Well, most District 7 and District 2.
10  The second highest, yeah.
11  Q     Sure.  Excuse me?
12  A     They're connected.
13  Q     And so you conclude here that simulated plans have on
14  average -- your simulated plans on average, the second highest
15  district level BVAP is 4.4 percentage points higher than the
16  enacted plan; is that right.
17  A     That's right.
18  Q     Do you know what the BVAP is in the enacted District 7?
19  A     District 7 was 55 on the enacted plan.  On the enacted
20  plan, right?
21  Q     Right.  Yes.  On the enacted plan.
22  A     On the enacted plan, yeah, that's 55.
23  Q     And as we discussed before, you had a target of between 50
24  to 51 percent?
25  A     Right.
```

1  Q    For your MMD, right?

2  A    Right.

3  Q    Dr. Imai, what's the percentage point difference between

4  55 percent and 51 percent?

17:19:42 5  A    That's 4 percent.

6  Q    And what about between 55 and 50?

7  A    Say that again.

8  Q    What's the percentage point difference between 55 percent

9  and 50 percent?

17:19:57 10  A    Oh, 5.

11  Q    And so if you average those, you would get four-and-a-half

12  percentage points, right?

13  A    Uh-huh.

14  Q    So isn't the difference that you have here just the

17:20:07 15  function of setting a limit for BVAP on your MMDs?

16  A    Again, I don't want to speculate what would happen.  If

17  you are asking what would happen if I set that number

18  differently instead of 50 and 51, which, you know, 50 is

19  obviously that -- you don't have to be majority but 50 at

17:20:28 20  least, and 51 I -- my understanding from the counsel is that

21  for the plaintiff is that that's the percentage that performs.

22  And so I don't want to speculate, you know, because if you

23  increase say 52 or 53, you don't know where that additional

24  black voters have to come from.  It could be Montgomery, or it

17:20:50 25  could be somewhere else.  And.

1  Q    So, Dr. Imai, is it your testimony that you don't know

2  whether the average 4.4 percentage point difference arises as a

3  matter of your MMD's constraints cracking the enacted District

4  7?

17:21:08 5  A    If your question is, is this the consequence of setting 51

6  versus other numbers like 52, 3, 4, I don't know what happened

7  if I change it differently.  Again, the simulation algorithm,

8  you know, I cannot -- I don't want to speculate what would

9  happen if I give different inputs.  I mean, such an analysis is

17:21:32 10  possible to conduct, but I wasn't asked to do that, so...

11  Q    Understood, Dr. Imai.  And I want to kind of move on to a

12  different topic.

13       You stated at the outset that none of your analyses use

14  any partisan information; isn't that right?

17:21:46 15  A    That's correct.

16  Q    And I believe appendix E1 provides all the data you

17  considered in formulating this report; is that right?

18  A    Yeah.  It was the data that was -- part of the dataset I

19  analyzed, yes.

17:22:08 20  Q    So, Dr. Imai, in paragraphs 20 and 21 here, they both

21  reference the use of precinct level election returns received

22  from the Alabama Secretary of State's office.  Did you consider

23  election returns in the preparation of your report?

24  A    I did not use them as part of the simulation algorithm.

17:22:31 25  So all the inputs that were given as simulation were stated in

1  the report.  So the -- sorry.  The party -- partisan

2  information was not used.

3  Q    So, Dr. Imai, it says here that you used precinct level

4  returns as a data source.  Is that not the case?

17:22:53  5  A    It was in the dataset, so that's why I state it here just

6  for the sake of transparency, because when you build the

7  precinct level files, it's often, you know, come from the

8  election data.  So it's part of the dataset, but that viable --

9  whatever the -- is -- was not used in simulation at all, as I

17:23:18 10  stated in that report.

11  Q    Dr. Imai, in paragraph 21, this last sentence that goes

12  between pages 24 and 25, it says, Since absentee and

13  provisional vote is reported at the county level, the county

14  level absentee and provisional votes for each candidate were

17:23:35 15  distributed to the precincts in the county, proportional to the

16  share of the candidate's vote total in the county that was

17  reported from each precinct.

18       Did I read that correctly?

19  A    Uh-huh.

17:23:44 20  Q    Is that something --

21  A    Yes.

22  Q    Is that something that you did?

23  A    You mean I personally did or?

24  Q    Yes.

17:24:00 25  A    Well, so election data comes with the -- the precinct data

1   covers the election data.  So in order to, you know, put

2   together that precinct file data, you have to do something with

3   this election data.  And so this is part of that, you know,

4   standard I guess the work flow data work flow.  When you

17:24:20 5   analyze redistricting plans, it's the standard part of the data

6   ingestion.  You crack them at the precinct level, and then this

7   is a standard way of issuing certain type of votes.

8   Q    Dr. Imai, where did you consider votes in your report?

9   A    So I did not consider anything about the partisan

17:24:50 10   information in my report.

11   Q    Okay.  Dr. Imai, I'd like for you -- let me stop sharing

12   my screen -- I would like to move on to your rebuttal report,

13   which is I believe Exhibit M-6, Milligan 6.  And in this

14   report, you purport to keep two communities of interest whole,

17:25:21 15   right?

16   A    Oh, at the -- yes, two sets of counties, yes.

17   Q    So in addition to the MMD analysis before, you used

18   before, your methodology discourages splitting Mobile County

19   from Baldwin County, right?

17:25:38 20   A    Right.  So it encourages those two counties to be together

21   in the same district.

22   Q    And it discourages splitting the counties that you have

23   identified as the Black Belt, right?

24   A    Well, I didn't -- I didn't identify these counties I was

17:25:49 25   given by the counsel for the plaintiffs.

1    Q    Well, okay.  So it discourages using the counties that you

2    have listed as the Black Belt here based on that premise,

3    right?

4    A    Yes.  Based on the instruction by the Plaintiffs' counsel.

17:26:06  5    Q    Do these constraints come before or after your methodology

6    generates the MMD?

7    A    Can you define what you mean by before or after?

8    Q    Dr. Imai, does your methodology consider keeping these

9    counties together when it is also putting together the MMD, or

17:26:31 10    does that come later?

11    A    Oh, I see.  I see.  It comes later.

12    Q    You said it comes later?

13    A    That's right.

14    Q    So your MMD might split the Black Belt before this

17:26:45 15    constraint ever comes into play, right?

16    A    It's possible, yes.  Yes.  It's possible.

17    Q    So, in other words, your MMD that generated under these

18    plans would look similar if not identical to that generated in

19    your earlier MMD analysis, right?

17:27:11 20    A    So, yeah, so -- yes.  I could have done the analysis --

21    well, to create the one MMD while -- well, encouraging these

22    districts to be together.  I could have done that analysis, but

23    I didn't do that.  I created one MMD, and then, you know, when

24    I did the race-blind for the rest, I incorporated these two

17:27:43 25    communities of interest.

1  Q    So, Dr. Imai, I'm asking what you actually did.  So does

2  the MMD that you generated in this section look similar to the

3  MMDs generated in your initial report that split Jefferson

4  County in a way similar to the enacted plan that split

17:27:58 5  Tuscaloosa?  Is that the case?

6  A    That's correct.

7  Q    Do you know whether that MMD includes any counties that

8  you have used here in the definition of the Black Belt?

9  A    It might.  I -- I don't have that number -- I don't think

17:28:20 10  I have that number in the report nor on the top of my head, so,

11  you know, some of the counties are way outside.  So, for

12  example, like Montgomery sometimes right there's this small

13  percentage that part of the Montgomery is split into MMD.  So

14  in that case, right, so that small percentage that county is

17:28:47 15  split into MMD.  The other counties, I don't know.

16  Q    So, Dr. Imai, in this section, although you intend to keep

17  the Black Belt and -- the Black Belt whole in Mobile County and

18  Baldwin whole, the generation of MMD might itself split the

19  Black Belt; is that fair?

17:29:05 20  A    It's possible, yes.

21  Q    Okay.  Dr. Imai, the counties that you list here as the

22  Black Belt, do you express any opinion as to whether those

23  counties are, in fact, part of the Black Belt?

24  A    No.

17:29:17 25  Q    Do you express any opinion as to whether those counties

```
 1  are, in fact, a community of interest?
 2  A    No.
 3  Q    Did you consider any resources that would support defining
 4  those counties as a community of interest?
 5  A    No.
 6  Q    Did you consider any resources that would support using
 7  that definition of the Black Belt?
 8  A    No.
 9  Q    So if you were presented with a different definition of
10  the Black Belt, that wouldn't be necessarily surprising to you;
11  is that right?
12  A    Right.  I mean, yeah.  I guess.  Depends on what you mean
13  by surprising.  But it's, yeah, I'm not sure -- if you, you
14  know, if you give me the counties on the north, then I can -- I
15  would be surprised.  Right.  So, again, I don't have a special
16  knowledge of particular subject here, so.
17  Q    Well, Dr. Imai, let me share my screen and show you what's
18  been marked.  This is Caster Exhibit 1.
19  A    Okay.
20  Q    There is the report of Bill Cooper.  And I'm going to go
21  to I think page 7.  Dr. Imai, here on page 7 footnote 6,
22  Mr. Cooper uses the term -- he defines, the term Black Belt as
23  referring to the following counties:  Barbour, Bullock, Dallas,
24  Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry,
25  Sumter, and Wilcox.  Did I read that correctly?
```

```
 1  A      Uh-huh.  Yes, you did.

 2  Q      And so that's fewer counties than you considered in the

 3  Black Belt set that you used; is that right?

 4  A      Oh, is that right?  I didn't keep track of the difference.

 5  But, yeah.

 6  Q      Well, Doctor, I will represent to you by my count, your

 7  report defines the Black Belt as including 23 counties, whereas

 8  Mr. Cooper's here includes 13?

 9          MS. EBENSTEIN:  Your Honor, I would like to object to

10  this line of questioning.  The Cooper Report is something

11  Dr. Imai has never seen.  We have a definition of Black Belt in

12  the stipulations.  This is out -- this new definition of Black

13  Belt that Dr. Imai hasn't seen is outside the scope of his

14  report.

15          JUDGE MARCUS:  Mr. Smith?

16          MR. SMITH:  I'm just testing the foundation of his

17  premises and whether he might consider a different definition

18  or how that might play, and that was my last question on this

19  point for what it's worth.

20          JUDGE MARCUS:  Let's move on.

21  BY MR. SMITH:

22  Q      Dr. Imai, I am not going to ask you any questions about

23  Mr. Cooper's map here, but it is sort of handy as a visual aid,

24  and so that's all I am going to use it for at this stage.  You

25  keep Mobile and Baldwin together as one of your constraints in
```

Line timestamps: 17:31:06 (line 5), 17:31:28 (line 10), 17:31:45 (line 15), 17:31:56 (line 20), 17:32:14 (line 25)

1  the rebuttal report, right?

2  A    Yeah.  I was instructed that -- that two counties, you

3  know, along with the experts, and from that counsel for the

4  plaintiffs, and my understanding is that one of the experts for

17:32:32  5  the defendants thought that as a community of interest, those

6  two counties.

7  Q    And, Dr. Imai, you also include as part of your -- as part

8  of your -- well, excuse me.  As part of your definition of the

9  Black Belt or the set of counties that you use as the Black

17:32:50 10 Belt, Dr. Imai, you include each of Washington County, Clarke

11  County, Monroe County, and Escambia County, right?

12  A    Yeah.  I'm just checking to make sure.  But that's

13  correct, yeah.

14  Q    But, Dr. Imai, doesn't that isolate Mobile and Baldwin

17:33:10 15 County by themselves so they're not contiguous to any other

16  Alabama counties?

17  A    If those all four kept together -- well, I guess it could

18  escape from the north on the west.

19  Q    How so?

17:33:26 20 A    If you go -- oh, no, no.  Choctaw, that's also included.

21  So if you are right.  So if you keep all those five counties

22  together.  But this is soft constraint.  So it was discouraged,

23  but obviously it may split once.

24  Q    So under your soft constraint?

17:33:52 25 A    Yeah.

1 Q    It's not that it is impossible to split the Black Belt,

2 it's just discouraged?

3 A    Right.  Try to reduce the number of splits, right.  So

4 fewer splits of those communities as possible.

17:34:03 5 Q    But?

6 A    But if you have to split, you have to split because the

7 population constraint, you know, is 50 percent.  You don't want

8 to create the district who has fewer population than the, you

9 know, the range that I specify.

17:34:22 10 Q    And so in order to include Mobile and Baldwin County in a

11 district, it appears it's necessary to split the Black Belt,

12 right?

13 A    That's correct.  Yeah.  If necessary to split those four,

14 of five, I guess if you reached it.

17:34:38 15 Q    Is that also the case for these southeastern counties that

16 aren't included in your definition of the Black Belt but are

17 isolated as a result of that definition?

18 A    So, yes, those are also -- yeah.  So those are not part of

19 the definition I was given.  And, yeah, those are, you know,

17:35:00 20 have to be -- have to go somewhere.  And often I think the, you

21 know, the District 2 under the -- under the simulated plan.

22 Q    Dr. Imai, I just have a few more questions.

23      So between your initial and rebuttal reports, you

24 generated a total of 30,000 simulated plans, right?

17:35:21 25 A    That's correct.

1  Q    And of those 30,000 simulated plans, 20,000 of them

2  included an MMD by design, right?

3  A    That's right.  One MMD by design.

4  Q    How many of your 30,000 simulated plans included two MMDs?

17:35:39 5  A    None.  Because I didn't tell the algorithm to create a

6  second MMD.

7  Q    Dr. Imai, if none of your 30,000 simulated plans included

8  two MMDs, wouldn't that indicate that race predominated in a

9  comparison plan that did include two MMDs?

17:36:02 10        MS. EBENSTEIN:  I'm sorry.  Objection.

11       If I am understanding the question correctly, it's outside

12  the scope of the one MMDs that Dr. Imai just testified he

13  simulated.

14        JUDGE MARCUS:  I am not sure I understand the

17:36:15 15  question.  So let's begin by having you rephrase it, Mr. Smith,

16  and then we will see whether it's objectionable or not.

17        MR. SMITH:  Sure, Your Honor.

18        JUDGE MARCUS:  I don't understand the question as you

19  put it.

17:36:27 20        MR. SMITH:  Sure.  I will reframe.

21  BY MR. SMITH:

22  Q    Dr. Imai, none of your 30,000 simulated plans included two

23  MMDs, right?

24  A    That's correct.

17:36:37 25  Q    So then a plan that does include two MMDs would be an

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|          | 1  | outlier, right?                                              |
|          | 2  | MS. EBENSTEIN:  Object -- sorry.                             |
|          | 3  | JUDGE MARCUS:  Do we have an objection?                      |
|          | 4  | MS. EBENSTEIN:  I would object.                             |
| 17:36:48 | 5  | JUDGE MARCUS:  There is an objection, and it is             |
|          | 6  | sustained as to the form of the question.                   |
|          | 7  | MR. SMITH:  Your Honor, may I have a moment to consult       |
|          | 8  | with my colleagues?                                         |
|          | 9  | JUDGE MARCUS:  You sure can.                                |
| 17:37:02 | 10 | MR. SMITH:  Thank you.                                      |
|          | 11 | Your Honor, I pass the witness.                             |
|          | 12 | JUDGE MARCUS:  All right.  Thank you.                       |
|          | 13 | We're beyond -- by my count, it's about 5:37 Central        |
|          | 14 | Standard Time.                                              |
| 17:37:59 | 15 | Mr. Walker, I wasn't sure whether you were planning to ask  |
|          | 16 | questions or not.  I know Ms. Ebenstein is planning to have |
|          | 17 | some redirect.                                              |
|          | 18 | Either way, it would be my intention to break at this       |
|          | 19 | point unless you had really only a few.  I will give you    |
| 17:38:18 | 20 | whatever time you need, but we have gone beyond, and it's been |
|          | 21 | a long day.  So you tell me what your pleasure is, and we will |
|          | 22 | proceed.                                                    |
|          | 23 | MR. WALKER:  Your Honor, I do not intend to ask any         |
|          | 24 | questions.                                                  |
| 17:38:28 | 25 | JUDGE MARCUS:  Okay.  So why don't we break at this         |

```
 1  point.  We will adjourn until tomorrow morning at 9:00 o'clock
 2  Central Standard Time.  That would be 10:00 o'clock Eastern
 3  Standard Time.  And, Ms. Ebenstein, you will be able to proceed
 4  with your redirect examination.
 5  Just one question:  In terms of timing, one, how long do
 6  you expect to be; and, two, are there other witnesses that the
 7  Milligan plaintiffs are planning to call in support of the
 8  equal protection claim?  And if so, how many?
 9  MS. EBENSTEIN:  Your Honor, I would want a moment to
10  go through my notes, but I expect my redirect will be half an
11  hour or 45 minutes.  And we do intend to call an additional
12  expert witness in support of our equal protection claim.
13  JUDGE MARCUS:  And which expert would that be tomorrow
14  morning?
15  MS. EBENSTEIN:  That would be Dr. Williamson.
16  JUDGE MARCUS:  Thank you very much.  Thank you all for
17  your patience with us.  We'll see you back here at 9:00 a.m.
18  tomorrow morning.
19  Dr. Imai, I will ask you to remain available so that we
20  can proceed with redirect of you at 9:00 a.m.  That would be
21  Central Standard Time.  I take it you are in Cambridge, so it
22  would be 10:00 a.m. Eastern Standard Time.
23  Thank you all.  We are adjourned.
24  (Whereupon, the above proceedings were concluded at
25  5:39 p.m.)
```

The timestamps in the left margin are: 17:38:49 (line 5), 17:39:13 (line 10), 17:39:29 (line 15), 17:39:43 (line 20).

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Christina K. Decker_                    01-04-2022

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:   255