FILED
2022 Jan-18 PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY SINGLETON, et al., | * | |
| Plaintiffs, | * | 2:21-cv-1291-AMM |
| | * | January 5, 2022 |
| vs. | * | Birmingham, Alabama |
| | * | 9:00 a.m. |
| JOHN MERRILL, in his official capacity as Alabama Secretary of State, et al., | * | |
| Defendants. | * | |
| ****************************** | | |
| | * | |
| EVAN MILLIGAN, et al., | * | |
| Plaintiffs, | * | 2:21-cv-1530-AMM |
| | * | |
| vs. | * | |
| | * | |
| JOHN MERRILL, in his official capacity as Alabama Secretary of State, et al., | * | |
| Defendants. | * | |
| ****************************** | | |
| | * | |
| MARCUS CASTER, et al., | * | |
| Plaintiffs, | * | 2:21-cv-1536-AMM |
| | * | |
| vs. | * | |
| | * | |
| JOHN MERRILL, in his official capacity as Alabama Secretary of State, et al., | * | |
| Defendants. | * | |
| ****************************** | | |

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
VIA ZOOM CONFERENCE
VOLUME II
BEFORE THE HONORABLE ANNA M. MANASCO,
THE HONORABLE TERRY F. MOORER,
THE HONORABLE STANLEY MARCUS

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and Procedures Vol. VI, Chapter III, D.2. Transcript produced by computerized stenotype.

APPEARANCES

FOR THE SINGLETON PLAINTIFFS:

James Uriah Blacksher
JAMES U. BLACKSHER, ATTORNEY
825 Linwood Road
Birmingham, AL 35222
205-612-3752
Fax: 866-845-4395
Email: Jublacksher@gmail.com

Myron C Penn
PENN & SEABORN LLC
53 Highway 110
PO Box 5335
Union Springs, AL 36089
334-738-4486
Fax: 334-738-4432
Email: Myronpenn28@hotmail.com

Joe R Whatley, Jr
WHATLEY KALLAS LLP
2001 Park Place North Suite 1000
Birmingham, AL 35203
205-488-1200
Fax: 800-922-4851
Email: Jwhatley@whatleykallas.com

Henry C Quillen
WHATLEY KALLAS LLP
159 Middle Street Suite 2D
Portsmouth, NH 03801
603-294-1591
Fax: 800-922-4851
Email: Hquillen@whatleykallas.com

W Tucker Brown
WHATLEY KALLAS LLC
P.O. Box 10968
Birmingham, AL 35202-0968
205-488-1200
Fax: 800-922-4851
Email: Tbrown@whatleykallas.com

Diandra "Fu" Debrosse Zimmermann
DICELLO LEVITT GUTZLER
420 20th Street North
Suite 2525
Birmingham, AL 35203
205-855-5700
Fax: 205-855-5784
Email: Fu@dicellolevitt.com

Eli Joseph Hare
DICELLO LEVITT GUTZLER LLC
420 20th Street North, Suite 2525
Birmingham, AL 35203
205-855-5700
Fax: 205-855-5784
Email: Ehare@dicellolevitt.com

FOR THE MILLIGAN PLAINTIFFS:

Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
Dross@naacpldf.org

Leah Aden
Stuart Naifeh
Kathryn Sadasivan
Brittany Carter
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
Laden@naacpldf.org
Snaifeh@naacpldf.org

Davin M. Rosborough
Julie Ebenstein
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
Drosborough@aclu.org
Jebenstein@aclu.org

Kaitlin Welborn
LaTisha Gotell Faulks
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
Kwelborn@aclualabama.org
Tgfaulks@aclualabama.org

David Dunn
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
David.dunn@hoganlovells.com

Michael Turrill
Harmony A. Gbe
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
Michael.turrill@hoganlovells.com
Harmony.gbe@hoganlovells.com

Shelita M. Stewart
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
Shelita.stewart@hoganlovells.com

Blayne R. Thompson
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
Blayne.thompson@hoganlovells.com

Sidney M. Jackson
Nicki Lawsen
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
Sjackson@wigginschilds.com
Nlawsen@wigginschilds.com

FOR THE CASTER PLAINTIFFS:

Abha Khanna
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
206-656-0177
Email: AKhanna@elias.law

Aria C Branch
ELIAS LAW GROUP LLP
10 G St NE, Suite 600
Washington, DC 20002
202-968-4490
Fax: 202-968-4498
Email: ABranch@elias.law

Daniel C Osher
ELIAS LAW GROUP
10 G Street NE
Suite 600
Washington, DC 20002
202-968-4490
Email: DOsher@elias.law

Joseph N. Posimato
Elias Law Group LLP
10 G Street, NE; Suite 600
Washington, DC 20002
202-968-4518
Email: Jposimato@elias.law

Lalitha D Madduri
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, DC 20002
202-968-4490
Email: Lmadduri@elias.law

Olivia N. Sedwick
Elias Law Group LLP
10 G Street, NE; Suite 600
Washington, DC 20002
202-968-4518
Email: Osedwick@elias.law

Richard P Rouco
QUINN CONNOR WEAVER DAVIES & ROUCO LLP
Two North Twentieth Street
2 20th Street North
Suite 930
Birmingham, AL 35203
205-870-9989
Fax: 205-803-4143
Email: Rrouco@qcwdr.com

FOR THE DEFENDANT:

Andrew Reid Harris
OFFICE OF THE ATTORNEY GENERAL
CONSTITUTIONAL DEFENSE DIVISION
501 Washington Avenue
Montgomery, AL 36130
334-353-8891
Email: Reid.Harris@AlabamaAG.gov

Benjamin Matthew Seiss
ALABAMA OFFICE OF THE ATTORNEY GENERAL
P.O. Box 300152
501 Washington Ave (36104)
Montgomery, AL 36130
334-353-8917
Fax: 334-353-8400
Email: Ben.seiss@alabamaag.gov

Brenton Merrill Smith
OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
P.O. Box 300152
501 Washington Avenue
Montgomery, AL 36130
334-353-4336
Fax: 334-353-8400
Email: Brenton.Smith@AlabamaAG.gov

Edmund Gerard LaCour, Jr.
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36104
334-242-7300
Fax: 334-242-4891
Email: Edmund.Lacour@AlabamaAG.gov

James W Davis
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152
334-242-7300
Fax: 334-353-8400
Email: Jim.davis@alabamaag.gov

Misty Shawn Fairbanks Messick
OFFICE OF THE ATTORNEY GENERAL
FOR THE STATE OF ALABAMA
501 Washington Avenue
P O Box 300152
Montgomery, AL 36130-0152
334-242-7300
Fax: 334-353-8440
Email: Misty.Messick@AlabamaAG.gov

Alexander Barrett Bowdre
OFFICE OF THE ALABAMA ATTORNEY GENERAL
P.O. Box 300152
Montgomery, AL 36130
334-242-7300
Fax: 334-353-8400
Email: Barrett.Bowdre@alabamaAG.gov

Thomas Alexander Wilson
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Street
Montgomery, AL 36103
334-242-7300
Fax: 334-353-8400
Email: Thomas.wilson@alabamaAG.gov

281

J Dorman Walker
BALCH & BINGHAM LLP
P O Box 78
Montgomery, AL 36101
334-834-6500
Fax: 334-269-3115
Email: Dwalker@balch.com

COURTROOM DEPUTY: Frankie N. Sherbert

COURT REPORTER: Christina K. Decker, RMR, CRR

***CHRISTINA K. DECKER, RMR, CRR***
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**I N D E X**

| | |
|---|---|
| REDIRECT EXAMINATION OF DR. KOSUKE IMAI | 283 |
| BY MS. EBENSTEIN | |
| RECROSS-EXAMINATION | 301 |
| BY MR. SMITH | |
| FURTHER REDIRECT EXAMINATION | 305 |
| BY MS. EBENSTEIN | |
| | |
| RYAN WILLIAMSON | 306 |
| DIRECT EXAMINATION | 306 |
| BY MR. ROSBOROUGH | |
| CROSS-EXAMINATION | 336 |
| BY MR. DAVIS | |
| REDIRECT EXAMINATION | 362 |
| BY MR. ROSBOROUGH | |
| | |
| SHALELA DOWDY | 363 |
| DIRECT EXAMINATION | 364 |
| BY MS. CARTER | |
| CROSS-EXAMINATION | 376 |
| BY MR. LACOUR | |
| REDIRECT EXAMINATION | 414 |
| BY MS. CARTER | |
| | |
| WILLIAM S. COOPER | 416 |
| DIRECT EXAMINATION | 417 |
| BY MS. KHANNA | |
| CROSS-EXAMINATION | 476 |
| BY MR. DAVIS | |
| REDIRECT EXAMINATION | 514 |
| BY MS. KHANNA | |
| | 527 |
| DIRECT EXAMINATION | |
| BY MR. DAVIS | |
| CROSS-EXAMINATION | 530 |
| BY MR. BLACKSHER | |

                        **P R O C E E D I N G S**

(In open court.)

JUDGE MARCUS: We will go forward with the redirect examination of Milligan's expert, Dr. Imai. Thanks very much.

09:01:54 MS. EBENSTEIN: Thank you, Your Honor.

REDIRECT EXAMINATION OF DR. KOSUKE IMAI

BY MS. EBENSTEIN:

Q Good morning, Dr. Imai.

A Good morning.

09:02:07 Q Do you recall yesterday Mr. Smith asked you whether you appended visual representations of your 30,000 simulated plans to your report?

A So the 37 -- which -- do you have a figure number or?

Q No, just whether you included visual representations of each of your simulated plans? 09:02:26

A Oh. Yeah. Yes, I remember that.

Q And you didn't include those plans; is that correct?

A No. Not in my report.

Q Okay. But do you recall providing counsel with all of the data the VTD files and the code that you used? 09:02:40

A Yes.

Q To generate your simulations?

A Yes, I do.

Q Okay. I will represent to you that we shared that data with defendants on December 13th, a few days after the 09:02:51

submission of your report.

Could your simulations have been reproduced using the VTD files and the code that you provided us?

A Yes. It can be produced exactly. And the instruction has been given in that -- in the file that I shared -- it was shared.

Q And you testified yesterday about the importance of transparency and the value you place on open-source publicly available code that anybody can run; is that right?

A That's correct. So all the packages that are necessary for reproducing the results of my analysis are based on open-source package, which means every package has the code that's open and freely available for download.

Q And had the defendants requested the data in a different format or any other data that you used, I assume that you would have provided that, as well; is that right?

A Yes, of course. But I have never received such a request.

Q Okay. You testified yesterday that you have submitted reports in a case in Ohio; is that right?

A Yes, that's correct.

Q And that that's a political gerrymandering case; is that right?

A That's right.

Q The principles and methods for your simulations analysis, would they be just as reliable when used for racial

09:04:31 09:04:51 09:05:03 09:05:28 09:05:40

gerrymandering as they would be for partisan gerrymandering?

A Yes. There are complex many parts so depending on state and rules and, you know, the context that needs to be taken into account. But the ability to isolate the factor, which is the one of the benefits of simulation analysis I emphasized yesterday still remains the case, so whether it's partisanship or race or some other factor we can always try to isolate a particular factor of interest is in a simulation method, and that's one of the most important strengths.

Q And I assume you would have brought the same specialized skill and rigor to your analysis, whether you are looking at partisan gerrymandering or racial gerrymandering; is that right?

A Yes.

Q Mr. Smith asked you yesterday about some of the guidelines factors and those are included in Milligan Plaintiffs' Exhibit 38, 88-23. I'm going to go through some of the factors that he discussed with you. First on incumbency, I believe you testified that you placed more than one incumbent on each of your congressional districts in your simulated plans?

A Yes. Most one incumbent in each.

Q You testified about the hard constraints, so every single one of your 30,000 simulated plans only had one incumbent in each district, right?

A At most one. So one is -- I think one representative

decided to run for the Senate. So that that -- you know, one person is not included, so one district may have zero incumbent, but at most one, no -- you know, no multiple incumbents.

09:05:58 Q Okay. And turning to the guideline on population deviation, do you recall defendants' counsel asking you about the .5 percent population deviation in your simulations?

A Yes.

Q And could you explain why .5 population deviation is

09:06:19 methodologically sound when you use VTDs as the building blocks for your plans?

A Yes. Pressing so much larger units than the census blocks. So it makes sense to have the tolerance that's larger. And in the academic literature, the precincts are the basic

09:06:35 units of at least the analysis. The analyzation of the redistricting plan is a variation. It's not -- the goal is not to provide official plan that may require lower terms. So in order to understand the characteristics of the population of alternative plan I could have drawn in the set of rules, we

09:06:59 know that the .5 percent the maximum population tolerance is more than enough.

Q And when --

JUDGE MARCUS: One request, counsel, before we proceed. Let me ask you again for our reporter to go really

09:07:16 slowly and take your time.

THE WITNESS: Yes.

JUDGE MARCUS: Thank you, counsel. You may proceed.

MS. EBENSTEIN: Thank you, Your Honor.

BY MS. EBENSTEIN:

09:07:25 Q Dr. Imai, would you expect that population equality or use of census blocks if that was even possible would have changed any of your opinions in your report?

A No. It has no major impact, no substantive impact on the conclusion of my analysis.

09:07:42 Q And your use of population deviation was a hard constraint, so that applied to every single one of the districts in each of the 30,000 plans; is that right?

A That's correct.

Q Okay. Moving on to contiguity. Did you use census data

09:07:59 to generate your simulated maps?

A Yes.

Q And as far as you know, does the state use census data to draw their maps?

A Yes.

09:08:10 Q And, in fact, I will note for you that the guidelines require the use of census data for the state to draw their maps.

So if there were any issues with the census data when it comes to contiguity, would that occur in the state's enacted

09:08:27 map, as well as in your simulated plan?

A It may. You know, it depends on the problem, I suppose. But any map drawing process whether it's simulation or human, if there's a problem in the underlying data, it could affect the resulting map.

09:08:51 Q Okay. Moving on to compactness, if my colleague Eric is online, if he could briefly turn to Defendants' -- sorry -- Plaintiffs' Exhibit M-1, 88-1 at 23, Figure 8, there at the top of the screen. I don't believe we looked at this yesterday, but it's included on page 23 of your initial report. Could you review how you -- what this figure represents, including how you measured compactness? 09:09:16

A Right. So the compactness is a concept that has competing measurements in the academic literature. And, you know, the most commonly used measures are the two I used here. So one is Polsby-Popper score, and one is the fraction of edges kept, and the fraction of edges kept is something that counsel Smith mentioned yesterday from the working paper that I wrote. And each measure has its own advantage and disadvantages. 09:09:37

For example, Polsby-Popper score can be affected greatly by the shape of particular precinct or census block, whatever the building units are. And so if you live in a coastal area, Polsby-Popper score might be higher -- sorry -- much lower less compact even though it's just a coast line that's not very smooth. 09:10:02

09:10:21 So for this reason it's very important to use multiple

measures of compactness score when you are evaluating whether or not your simulated plans or other plans are compact. So based on this figure, what you can see is that two measures essentially give the same answer. So whether you use the Polsby-Popper score or the fraction of edges kept, the -- on average, the simulated plans, which is the dark histogram is more compact than active. So these scores the higher the number is the more compact. So the one on the right, if the numbers are higher, more compact. So you can see that based on the Polsby-Popper score the simulated plan, most of them have higher compactness score than the enacted plan and then same collusion holds in the fraction of edges kept.

From this, I concluded that the simulated plan on average more compact than the enacted plan.

Q Okay. Thank you. We can take that figure down.

Moving on to county boundary splits. Do you recall Mr. Smith asking you about the treatment of counties and county splits?

A Yes.

Q How do you interpret the criteria for county splits when generating your simulation analysis?

A So according to the guideline, it's supposed to minimize number of counties within each district. That's I think what the guideline states.

Q Okay. And did you implement that criterion as you

understood it?

A Well, the way I implemented it in the algorithm is two ways. So one, is to just to -- this is a mechanical part of the algorithm, which tries to make sure that the district boundaries for the county boundaries whenever you can. So this is -- I can describe more details, but basically sequential Monte Carlo algorithm basically imposes that. Then the second step is I added additional constraints just to make sure to reduce the number of county splits that, you know, make sure that the algorithm prefers all else equal the plans that have fewer county splits. And as a result in the appendix of my expert report, I show that county splits is much lower under the simulated plan.

Q Okay. If the map drawer testified that where possible he tried to deal in whole counties and keep counties whole, does that sound similar to what you did when you were accounting for this guideline?

A You know, I think -- I mean, algorithm, so it's -- in a sense, it's a little bit different from the human. Algorithm look at, you know, the sort of entire state and make sure that, you know, other factors are not compromised by doing so. But you know, I -- I try to represent mathematically as much as possible that what the guidelines -- I interpreted what the guideline advised.

Q Okay. Thank you.

And moving on to the core of existing guidelines. You are clear in your report and your direct testimony that you did not consider the cores of existing guidelines; is that right?

A No.

09:13:57 Q And if race predominated in the design of prior plans, would recognizing cores and preserving cores that racial predominance -- sorry. Let me rephrase that. If race predominated in the design of prior plans?

A Uh-huh.

09:14:14 Q And you were to adhere to preserving the cores of prior plans, would that mask the effect of race in the current plan?

A Yes, that's possible because I would note -- I would have no way of separating the race as a factor, like isolating the impact of race from what went into the prior plan.

09:14:35 Q Okay. And Mr. Smith asked you yesterday about whether preserving cores could be operationalized by preserving 80 percent of the previous district. Are you aware of any guideline that requires preserving 80 percent or any other threshold of previous districts?

09:14:55 A No.

Q Okay. Mr. Smith asked you a series of questions about your race-blind simulation. If we could just have on the screen Plaintiffs' Exhibit M-1, 88-1 at 10 which is Figure 1 in the boxplot that we discussed yesterday. Which districts in

09:15:22 this boxplot do you consider outliers?

A The clearest outlier is 7.
Q And are there any other outliers here?
A The 2 is also outlier according to the, you know, standard definition in statistics.
09:15:37 Q Okay. And this is in your race-blind simulation, correct?
A That's correct.
Q Okay. Does this finding in your race-blind simulation reflect any judgment about whether or not it's proper to draw a particular district, a particular way after the map is adjusted to have one MMD?
09:15:54
A No. So this is completely race-blind. So the conclusion on the holds with respect to -- the comparison was race-blind simulation simulated plans.
Q Okay. And your race-blind analysis does not incorporate the state's guideline, which gives priority to compliance with the Voting Rights Act; is that right?
09:16:11
A Right. It doesn't. And that was purpose was, you know, of this race-blind simulation was just to establish as a first step whether race played a predominant factor.
09:16:25 Q And a few questions about your one-MMD simulation before I move back to the race-blind simulation.

Your one-MMD analysis tried to account for the fact that the state draws one MMD to comply with the VRA; is that right?
A That's correct.
09:16:39 Q And your simulation found that even in drawing one MMD

09:16:53 09:17:07 09:17:22 09:17:38 09:17:54

that looked like the state's MMD, District 7 included a BVAP population beyond what was necessary to create a majority-black district; is that right?
A That's right.
Q But I believe you said yesterday your analysis did not consider whether the VRA might require two majority-minority districts; is that right?
A No. No.
Q And you didn't perform any analysis of maps that include two majority-minority districts, right?
A No.
Q So your analysis wouldn't tell us anything about whether or not containing two MMDs is an outlier or not compared to simulations constrained under two MMDs?
A No.
Q Moving back to the race-blind analysis, and we can take that boxplot off the screen.
If you have your report in front of you in case you would like to reference it. Mr. Smith asked you questions about your race-blind analysis with regard to Jefferson County. And he referenced paragraph 32 of your report. That's M-1, 88-1 at 12. And this paragraph is still in your analysis about your race-blind simulations; is that right?
A That's right.
Q Mr. Smith noted that at least eight of the 10,000

race-blind simulated plans included more voters from Jefferson County in District 7 than the enacted plan; is that right?
A Yeah. I think so. I'm not 100 percent sure. I don't recall exact number he cited.
09:18:13 Q Okay. I will refer you to paragraph 32 of your report, where he did accurately cite the number that you gave. Statistically does the inclusion of the Black Voting Age Population from Jefferson in eight of the 10,000 race-blind simulated plans affect whether the enacted plan was an outlier?
09:18:34 A Yes.
Q How does it affect whether the race-blind simulated plan was an outlier?
A So according to the standard, you know, statistical criteria, the .08 percent, the fact that only the .08 percent
09:18:52 of simulated plans packs as many residents of Jefferson County. To this extent, that phenomena is a statistical outlier, that creates a statistical outlier.
Q Okay. So it impacts it in showing that it is, in fact, a statistical outlier.
09:19:05 A Yes, it is -- yeah. Sorry about that.
Q Okay. Moving on to your conclusions about Montgomery County in your race-blind simulation. And this is reflected in the following paragraph, 33 of your report. What is the likelihood that Montgomery County would split at all in a
09:19:25 race-blind simulation?

A Over 97 percent.

Q Over 90 percent that it would stay whole or?

A Stay whole. Sorry. Less than 3 percent would be the property that's being split.

09:19:40 Q And statistically, does Mr. Smith's observation that 300 of the 10,000 race-blind simulations split Montgomery County change your observation that the treatment of Montgomery County was an outlier in the race-blind analysis?

A No.

09:19:58 Q Does this outcome in the race-blind analysis already reported in your report change your overall opinion in this case at all?

A No. According to the standards of statistical criteria, this difference is statistically sound.

09:20:16 Q And just to be clear, in the 97,000 simulated plans in which Montgomery County remained whole -- sorry -- 9,700 simulated plans in which Montgomery County remained whole, in 9,400 of those plans, the whole county was assigned to District 2 or 6; is that right?

09:20:36 A That's correct.

Q Is it accurate to say that in your race-blind simulation and without consideration of race obviously, Montgomery County is highly unlikely to be included in District 7?

A Yes.

09:20:50 Q Okay. Just a few more questions. If you could turn to --

I don't think we need it on the screen. But in your one-MMD analysis, Milligan Plaintiffs' Exhibit 1, Docket 88-1 at 14, this is Figure 4 that we discussed yesterday regarding the district with the second highest BVAP.

09:21:17 Counsel noted that 6 percent of the one-MMD simulated plans included the same number of black voters in CD 2 as the enacted plan; is that right?

A That's correct.

Q And does counsel's observation that 6 percent of the

09:21:33 one-MMD simulated plans include 39,000 black voters in District 2, as you have already reported or already included in your report, does that change your finding at all that the enacted plan's inclusion of those voters is a statistical outlier?

A No.

09:21:51 Q Have your findings with regard to the BVAP in the second highest BVAP district changed at all after Mr. Smith highlighted those for you?

A Excuse me. Sorry. Can you repeat the question?

Q That's all right. My questions are quite long. Have your

09:22:05 opinions in this report changed at all since yesterday?

A Oh. No.

Q Okay. One more line of questions. You selected the 50 to 51 percent BVAP range for your one-MMD simulation. Based on the definition of majority and counsel's representation to you

09:22:24 that such a district would perform, is that what you said

yesterday?

A That's right. So the 50 percent is the, you know, about 50 percent is the definition of majority. And then 51 percent was provided by the counsel as the number that the proportion that would perform that is the black voters' candidate, the candidate of their choice.

Q And you made no judgment about a district of 51 percent BVAP was preferable to a district of 55 percent BVAP; is that right?

A No. I did not conduct any analysis myself, and I don't possess any opinion on this.

Q Mr. Smith asked you whether selecting 51 percent versus 55 percent BVAP accounted for the fact that your one-MMD simulation in District 2 had an average after about five points higher than the BVAP in District 2 of the enacted plan. Do you recall that conversation?

A I recall that. Yeah. I recall that conversation.

Q But in both your initial and your rebuttal reports, the simulations showed that the BVAP in the simulated District 2 was as high as nearly 40 percent; is that right?

A That's correct.

Q And any particular -- sorry. Go ahead?

A Yeah. Just the maximum number -- I assume that's what you are referring to.

Q Yes.

A Yes.

Q And in particular, when you accounted for the communities of interest as defined in the stipulations between the parties in your rebuttal report, many of your simulations were in the 37 to 39 percent BVAP range for the second highest BVAP district usually District 2; is that right?

A Right. 37, 38, you know, there are many more plans in that range than the one-MMD simulation in the initial report.

Q And would the 4 percent difference in the District 7 BVAP between your simulated plans and the enacted plans, so the difference between 51 and 55 percent, would that account for the 9.6 percent difference between the enacted plan and the -- the highest number of BVAP in the simulated plans in the enacted plan?

A No.

Q And would that 4 percent difference account for the 9.8 percent difference between your simulated plans that considered the community of interest and the enacted plan?

A No.

MS. EBENSTEIN: I think those are all the questions I have, Your Honor, if you could just give me one moment to confer with my colleague.

JUDGE MARCUS: Take your time.

MS. EBENSTEIN: Thank you, Your Honor. Those are all the questions that we have for Dr. Imai.

JUDGE MARCUS: Judge Manasco, Judge Moorer, any questions for this witness?

JUDGE MANASCO: None from me.

JUDGE MOORER: None from me.

09:25:31 JUDGE MARCUS: I have just one question for you, Dr. Imai, about something that you just said in response to a question that was put to you this morning. Ms. Ebenstein was asking you about population deviation.

THE WITNESS: Yes.

09:25:54 JUDGE MARCUS: And you explained that you used a deviation of plus or minus .5 percent in your calculus. I have that right, correct?

THE WITNESS: That's correct, Your Honor.

JUDGE MARCUS: And then she asked you in substance 09:26:10 whether that deviation of plus or minus 5 percent would have any effect on your calculus and the conclusions.

I think the way the question was put, she said nothing would change if you used one person deviation rather than plus or minus 5 percent. Do you remember when she asked you that 09:26:41 question?

THE WITNESS: So -- well, I guess --

JUDGE MARCUS: I just want to know -- I guess -- all I want to know is whether using plus or minus .5 percent changes your analysis in any way or your conclusion in any way.

09:27:04 THE WITNESS: It would not affect my conclusion. It

will -- you know, it will change the maps that I would generate if I want to impose that constraint using the much finer grain data census block, or sometimes you would have to even split the census block that just the population. But it will not affect any of my substantive conclusions.

09:27:25

JUDGE MARCUS: Wouldn't affect them in any way? I'm just talking about the conclusions that you recited.

THE WITNESS: Right. Conclusion, no. And I could explain that if that's preferable.

09:27:40

JUDGE MARCUS: Sure. Please. Feel free to.

THE WITNESS: Right. So the reason is that the .5 percent -- plus minus .5 percent is about 3,500 people. That's the maximum deviation. Many of the simulated plans don't go that far. So it's much smaller differences than, than that. In addition, the usual deviation is not concentrated on one part of the districts. So it's usually spread out across. You can think of it like across the edge of the boundary. So any, you know, my conclusion about, for example, Montgomery County, it would be unaffected because, one, the maximum deviation possible, even though many of the simulations are much lower population difference than 3,500 people wouldn't be, you know, enough to change that conclusion that Figure 1 will shift maybe slightly, but it won't change greatly. And it won't certainly change the statistical conclusion.

09:28:00

09:28:21

And also, you know, most of the analysis I have conducted

09:28:43

and many other clinical researchers in the discipline conducted at the precinct level, using a precinct level for congressional redistricting. We -- you know, we have established that that's a small enough unit to draw decisive conclusions on this type of analysis.

09:29:06

JUDGE MARCUS: Thank you. Any follow up based on what I asked either, Mr. Smith or Ms. Ebenstein?

MR. SMITH: Your Honor, not based on what you asked, but I do have a few recross I would like to ask.

09:29:19

JUDGE MARCUS: That's fine so long as it bears directly on what is new or different that was brought out. We don't mean to have re-redirect that covers the same ground unless there's something different or new that she brought out.

With that caveat, fire away.

09:29:35

MR. SMITH: Certainly, Your Honor. Thank you.

RECROSS-EXAMINATION

BY MR. SMITH:

Q Good morning, Dr. Imai.

A Good morning.

09:29:41

Q Dr. Imai, I have just a few questions for you.

Ms. Ebenstein asked you about the core retention factor. Do you recall that?

A Yes.

Q And if I heard your answer correctly, I think you said

09:29:55

that if race -- if you took core retention into account and if

race predominated in prior plans, that would mask the use of race in the current plans; is that right?

A That could.

Q So, in other words, Dr. Imai, because you did not take into account the core retention guideline, you can't say for sure whether core retention might explain the racial makeup of any of the districts in the enacted plan; isn't that right?

MS. EBENSTEIN: Your Honor, I will object that that misstates his testimony.

JUDGE MARCUS: Why don't you just rephrase the question, Mr. Smith?

MR. SMITH: Sure, Your Honor.

BY MR. SMITH:

Q Dr. Imai, if the use of the core retention factor masks -- if using that factor in your analysis would mask the use of race in the current plan, then you can't say for sure based on your simulations whether that factor might explain in fact the BVAP of those districts, right?

A So if I understand the question correctly, whether or not the race affected the previous plan is the reason why I find the race predominance predominates the decision of district boundaries on the enacted plan. Is that the question? Or are you asking whether if I incorporate the core restriction, whatever that might be, whether the results will change?

Q That is what I am asking, Dr. Imai.

A The latter?

Q Yes. The second. The second.

A Okay. So if -- again, I don't know what would happen if I incorporate the core constraint because I have not -- I was not given and I could not find any definition of core, so I was -- I didn't do that analysis. I can't. I don't want to overstate, you know, what would happen. I mean the hypothetical analysis.

But the reason why I didn't include that was as I stated is because if, you know, I incorporated the core constraint, that means that I would not be able to isolate the race.

Q Dr. Imai, can your analysis tell us whether core retention explains the demographics of any of the enacted districts?

A Retention. So in order to do that, I would have to know the definition of core constraint. Like if I want to use a simulation to know whether the core retention explains some of my finding, I would -- I would need the definition of core, and I would incorporate that in my analysis, right, and then see what happens. But the reason why I didn't do that is because I wanted to isolate the effect of race.

Q Dr. Imai, I am not asking whether you could or not. I'm asking: Does your analysis tell us whether core retention actually explains the demographics of the districts?

A Actually explains. No. Because that was not goal of my analysis.

Q Thank you, Dr. Imai.

Dr. Imai, if a plan drawn that purported to observe the same criteria that you observed ended up with two majority-minority districts, wouldn't that strongly suggest that race predominated in the drawing of that plan?

A That plan -- what do you mean by -- sorry. What do you mean by that plan? Like which plan?

Q If a plan was drawn that purported to observe the districting criteria that you observed and that plan that was drawn ended up with two majority-minority districts, wouldn't that strongly suggest that race actually predominated in the drawing of that plan with two majority-minority districts?

A I'm sorry. I don't feel comfortable talking about the hypothetical plan that I don't have in front of me, because in order to evaluate, you know, any plan, I would need to know exactly what the plan is. And I like to refrain from making any speculative claims about what would I do if I have some plan that's -- that -- don't know what it is.

MR. SMITH: Your Honor, may I have one moment to consult with my colleagues?

JUDGE MARCUS: Sure.

MR. SMITH: Your Honor, nothing further.

JUDGE MARCUS: Thank you. Ms. Ebenstein, anything further by way of re-redirect?

MS. EBENSTEIN: Your Honor, if I might ask one

question on re-redirect.

FURTHER REDIRECT EXAMINATION

BY MS. EBENSTEIN:

Q Could I ask that Dr. Imai answer the question from Mr. Smith as he first understood it about core districts, which I believe was: If racial predominance from past plans was carried over into the current plan, would you observe that as racial predominance in the current plan?

A In my analysis?

Q Yes.

A In my analysis that I reported.

Q That you have done so far?

A Yes. Yes, because I did not consider the core constraint. So any -- any -- the -- my analysis would be able to detect, you know, any way in which the race played a role, including potentially from the previous plan.

Q Thank you.

MS. EBENSTEIN: Your Honor, no additional re-redirect questions.

JUDGE MARCUS: All right. If there is nothing further, then, we thank you very much, Dr. Imai, and you are excused.

THE WITNESS: Thank you very much.

JUDGE MARCUS: And I -- I take it we will be going on to the next Milligan witness.

MR. ROSBOROUGH: Yes, Your Honor.

MS. CARTER: Yes, Your Honor.

JUDGE MARCUS: I'm sorry?

MS. EBENSTEIN: And I believe my colleague will be taking direct of that witness.

09:36:28

JUDGE MARCUS: All right. That would be Mr. Rosborough, correct?

MS. EBENSTEIN: Yes, sir.

JUDGE MARCUS: Welcome, Mr. Rosborough, and your witness that you are calling now is whom?

09:36:39

MR. ROSBOROUGH: Good morning, Your Honor, Milligan plaintiffs called Dr. Ryan Williamson.

JUDGE MARCUS: Dr. Williamson, if you would raise your right hand.

09:36:49

RYAN WILLIAMSON,

having been first duly sworn, was examined and testified as follows:

JUDGE MARCUS: Thank you very much. If you would state your name for the record, please.

09:37:02

THE WITNESS: Ryan Williamson.

JUDGE MARCUS: Thank you, and counsel, you may proceed.

MR. ROSBOROUGH: Thank you, Your Honor.

DIRECT EXAMINATION

09:37:09

BY MR. ROSBOROUGH:

Q Good morning, Dr. Williamson. How are you today?
A Good morning. I am doing well. Thank you.
Q Good. Dr. Williamson, can you please tell the Court your current professional position?
09:37:19 A I am currently an assistant professor of political science at Auburn University.
Q And how long have you held that position?
A I have been serving in this role since the fall of 2018, so about three-and-a-half years.
09:37:34 Q Where do you currently live?
A I currently live in Lee County, Alabama.
Q And how long in total have you lived in Alabama?
A Well, I have lived in Lee County since I began in Auburn in 2018. My family moved to Prattville, Alabama, in Autauga 09:37:57 County when I was a small child. I received all of my K-12 education in Autauga County. After that, I went to the University of Alabama at Birmingham, where I received my undergraduate degrees. So I have spent the overwhelming majority of my life in the state of Alabama.
09:38:12 Q And, Dr. Williamson, can you please describe your educational background?
A Sure. As I mentioned, I received my undergraduate degree from the University of Alabama at Birmingham in political science. After that, I went on to the University of Georgia, 09:38:28 where I received my doctorate in political science.

09:38:49 09:39:07 09:39:29 09:39:46 09:40:06

Q And what was the focus of your doctoral studies?
A My doctoral studies focused broadly on American politics, but more specifically my dissertation examined the role that rules, laws, and institutional norms played in shaping things like election outcomes.
Q And what type of course work did you engage in as part of your doctoral studies?
A Substantively, I took a number of courses on things like campaign politics, electoral politics, legislative process, American political development. But I also studied political methodology pretty extensively. I took courses on research design, probability theory, ordinary least squares, maximum likelihood estimation, geospatial data analysis, Bayesian analysis. I also participated in the interuniversity consortium for political and social research where I took courses on advanced regression and multidimensional scaling, so I have also studied Statistical Methods For Social Sciences quite extensively.
Q Do you have any professional experience after your doctoral degree other than your current position at Auburn?
A Yes. Between finishing my doctorate and beginning at Auburn University, I served as a congressional fellow with the American Political Science Association serving in the U.S. Senate committee on rules and administration, which had jurisdiction over things like federal election administration.

                And my portfolio included things like the administration of elections, electoral reforms, and things of that nature.

Q Dr. Williamson, can you describe your teaching experience over the past few years?

09:40:25 A Yes. I have taught a broad range of courses from introductory freshman level courses to master's and Ph.D. level courses focusing on American politics, things like state politics, voting behavior and representation, election administration, policy reform, electoral institutions, but I'm 09:40:49 also responsible for teaching the research methods courses, course for the master's in public administration program at Auburn University.

Q How would you describe the focus of your -- or focuses of your academic research?

09:41:05 A My research broadly, if I had to describe it succinctly, would just be I examine how rules influence outcomes. I focus on things like the role of institutions, different practices across the 50 states, and how they are implemented and how they affect things like the competitiveness of elections, who 09:41:28 decides to run, who ultimately wins, things of that nature.

Q And what, if any, is your quantitative analysis experience?

A I've engaged in a broad range of quantitative analyses. All of my nearly 30 publications include some level of 09:41:48 quantitative analysis, whether that is descriptive or

prediction based, i.e. through regressions, or things of that nature.

Q What experience, if any, do you have regarding redistricting?

09:42:03 A I, as I already mentioned, I -- redistricting was a part of my portfolio while I was serving in the Senate. Redistricting was one component of my dissertation. But beyond that, I have published about six peer-reviewed academic articles in some of the leading outlets in the field like the

09:42:25 *Journal of Politics*, the *Election Law Journal*, *State Politics and Policy Quarterly* that focus on how different redistricting practices influence election outcomes.

Q And as part of these publications, have you performed any quantitative analysis in the redistricting context?

09:42:43 A Yes. As I mentioned, nearly all of my publications have some level of quantitative analysis. I think there's only one that doesn't include some empirical investigation. And that is just descriptively the evolution of redistricting over time.

Q And do any of these analyses touch on Alabama?

09:43:06 A Yes. All of the publications that I have on redistricting, save one, which specifically investigates New York, look at all 50 states, and Alabama is included in that investigation.

Q Dr. Williamson, have you led any trainings regarding

09:43:26 redistricting?

09:43:43

A Yes. As a part of the relationship Auburn has with the National Association of Election Officials also referred to as The Election Center, which has a continuing education program for election professionals, I lead a number of trainings on things like the constitutional law of elections, the evolution of elections. But specifically, I have led an advanced training specifically on redistricting and gerrymandering.

Q And, Dr. Williamson, have you received any awards or grants related to your work?

09:44:03

A Yes. Regarding teaching, I've received multiple teaching awards at both the University of Georgia while I was there, and I was a finalist for a university-wide teaching award at Auburn University. Regarding my research, I have received nearly $90,000 in grants from various organizations to support my research.

09:44:25

MR. ROSBOROUGH: Your Honor, at this time, I'm proffering Dr. Williamson as an expert in quantitative redistricting analysis.

JUDGE MARCUS: Any objection or challenge, Mr. Davis?

09:44:38

MR. DAVIS: No objection and no challenge, Your Honor. Although I would like to make a slight reservation of rights that is not unique to Dr. Williamson at all. For all of the experts for the various groups of plaintiffs, when we stipulate to their qualifications as an expert, we mean it for purposes of the preliminary injunction hearing. As the case progresses,

09:44:54

 we expect there to be -- there may be more expert reports, and we would reserve our rights to challenge any of those experts later in the case. But we're stipulating for purposes of this hearing that he should be admitted as an expert.

09:45:09 JUDGE MARCUS: All right. Anyone else want to be heard on Dr. Williamson's qualifications?

Seeing none, the Court will qualify Dr. Williamson for the purposes of this preliminary injunction hearing as an expert in quantitative redistricting analyses. With that, you may

09:45:30 proceed.

MR. ROSBOROUGH: Thank you, Your Honor.

BY MR. ROSBOROUGH:

Q Dr. Williamson, what were you asked to analyze in this case?

09:45:37 A In this case, I was asked to analyze the extent to which race played a role in the formation of the federal congressional boundaries in Alabama.

Q And what is your opinion in this case?

A After careful analysis, it is my opinion that race served

09:45:57 as a predominant factor in the construction of these district boundaries.

Q And when you say these district boundaries, which districts are you referring to?

A I'm specifically referring to districts 1, 2, 3, and 7.

09:46:13 Q Okay. We'll discuss each of the specific data points you

analyzed in turn, but overall, what type of analyses did you perform in reaching your conclusions?

A Throughout my report, I analyze -- I compare groups across a district line. I descriptively evaluate the racial composition across a boundary, whether that is a district line within a county or a district line that's -- runs between counties.

Q How did the type of analysis you performed differ, if at all, depending on the districts that you analyzed?

A The analysis did not differ, again, except for that distinction between lines that run through counties, individual counties or separating different counties.

Q Why did you find these analyses useful to determine the role race played in the construction of the district lines?

A I felt this was the most useful analysis in order to just depict the differences that may or may not exist across these lines. I wasn't making predictions. I am not offering alternatives. I'm -- my task was to simply describe a relationship that may exist between racial composition and district lines.

Q Dr. Williamson, are you aware of the redistricting guidelines adopted by the joint legislative committee on reapportionment?

A Yes, I am aware.

Q Did these districting guidelines play any role in your

analysis?

A They did not.

Q And why is that?

A These guidelines, though perhaps informative to the construction of the lines, my job was to -- what I set out to do was analyze the relationship between race and those lines. And so my -- the guidelines that were put forth would not change my analysis in any way.

Q Do you believe that considering these guidelines would have changed your conclusions in any way?

A No, I do not believe the guidelines would have changed my conclusions, either.

Q And why is that?

A Again, my analysis would not differ. My -- I sought to investigate the relationship between the lines as presented and the racial composition of districts. And so the guidelines were not informative to that calculation.

Q Dr. Williamson, I will represent to you that the defendants have argued that one of their primary objectives in drawing these maps was preserving the cores of existing districts.

Other than your analysis of the change between the 2011 maps and the current maps, which we'll get to later, why doesn't this principle affect the analysis you performed?

A Whether these lines are drawn from scratch or built around

some existing boundaries, the relationship between race and those district boundaries is going to be the same. And, therefore, that guideline was not informative to the analysis that I was conducting.

09:49:29 Q Okay. Let's turn to the specific analyses that you performed.

Let's discuss District 7 first. What was the first step in your analysis regarding the relationship between race and district lines for District 7?

09:49:45 A The first step was identifying the splits. This map contains very few splits. But most split counties I should say. And so, therefore, I began by looking at the split counties -- Jefferson, Montgomery, and Tuscaloosa, which are in Congressional District 7 and then comparing them to other

09:50:07 counties within the state.

Q Why did you choose to analyze these splits?

A Again, there are very few splits, and the majority of splits are occurring in District 7. And so it's useful to understand our -- is there a relationship between race and the

09:50:27 likelihood of living in a split county?

MR. ROSBOROUGH: I'd like, Mr. Ang, if you could pull up Exhibit M-2, which has been entered into evidence. If we could just go to the first page. Thank you.

BY MR. ROSBOROUGH:

09:50:44 Q Dr. Williamson, do you recognize this document?

A Yes. This is my report.

Q Okay.

MR. ROSBOROUGH: And now, Mr. Ang, could you please pull up Table 1 on page 3?

09:51:00 BY MR. ROSBOROUGH:

Q Dr. Williamson, Table 1 titled County Black VAP, what does this represent?

A This table shows the county-wide Black Voting Age Population, which I may also refer to as the VAP for the 09:51:17 counties that have been split in Congressional District 7. So you see in the first column, I have listed the counties, and in the second column, I have listed the districts that these counties are split between, whether that's District 7, which is being analyzed, or one of the other districts, whether they be 09:51:35 2, 4, or 6.

Q And what does this table show?

A So looking at this table, we are seeing a third column. This is the Black VAP for each of these counties. 41.5 percent for Jefferson, 56.3 for Montgomery County, and 29.5 for 09:51:55 Tuscaloosa. This next column, the median black percentage, this is the median county in Alabama, essentially the middle district, middle county, excuse me, within the state. And that county's Black VAP just to serve as a point of comparison.

And so this last column is the column of interest here. 09:52:15 It includes the percentage deviation, essentially just the

09:52:33 09:52:57 09:53:16 09:53:41 09:53:59

difference between columns 3 and 4. And so a positive deviation denotes that these counties feature a larger Black VAP, and negative deviation would denote that these counties feature a lower Black VAP than the median.

Q What did this analysis -- what does this analysis tell the Court?

A This analysis shows that the counties that are being split are substantively -- have substantively higher levels of Black VAP than the median county within Alabama. So the splits are occurring in predominantly black counties.

Q Why is that meaningful for your analysis?

A Again, this is -- this establishes early on just a suggestive of a relationship between race and district boundaries.

Q Thank you. We can take that document down for the moment.

Dr. Williamson, what additional analysis did you perform relating to the district splits in Jefferson, Tuscaloosa, and Montgomery counties?

A I then look at the Black VAP within the different segments of those counties, essentially comparing the racial compositions of the districts that are contained within a single county.

Q Why did you run this analysis?

A Again, it's useful to understand if these lines are drawn without respect to race, we shouldn't expect to see meaningful

differences on opposite sides of a line bisecting a county. So I wanted to make those comparisons.

Q Dr. Williamson, if you just draw a line bisecting a county, couldn't racial differences just occur by chance?

09:54:17 A Sure. Any one line drawn through a county, a district, the entire state may depict racial differences on opposite sides. But we're not talking about one line. We're talking about a collection of lines. We're not talking about a random line. We're talking about a deliberately constructed line.

09:54:39 And so I wouldn't consider any one of these an isolation. It's about looking at all of them.

Q Okay.

MR. ROSBOROUGH: Mr. Ang, could you please pull up Table 2 on page 4 of Dr. Williamson's report?

09:54:55 BY MR. ROSBOROUGH:

Q Dr. Williamson, what does this table titled Census Block Black VAP Within County represent?

A Again, we're looking at Jefferson, Montgomery, and Tuscaloosa counties and looking at the different districts that

09:55:11 parts of these counties have been drawn into. So that's the first two columns.

Here, I'm looking at the average census block Black Voting Age Population within the county, and then depicting that average here and presented in the third column, and then

09:55:28 describing that difference again with a percentage point

 deviation in that fourth and final column.

Q Let's start with Tuscaloosa. What does this analysis show regarding Tuscaloosa County?

A So this analysis shows that the part of Tuscaloosa that was drawn into Congressional District 4 featured an average Black VAP by census block of less than 10 percent compared to the part of Tuscaloosa that was drawn in Congressional District 7 featured an average Black Voting Age Population of 33.5 percent. And then compared to the county as a whole, we're talking about a nearly 25 percentage point deviation between -- between those two segments.

Q What did this analysis find regarding Montgomery County?

A Regarding Montgomery County, we see a similar relationship where the average Black VAP part of the county that is drawn into the district other than CD 7 is noticeably lower than the part of the county that was drawn into Congressional District 7. So, again, we see 41 percent drawn into CD 2, and then 75 percent drawn into CD 7. And then compared to the county as a whole, we see a 34'ish percentage point deviation between these two groups.

Q And what were your -- what did your analyses show about Jefferson County and how the Black Voting Age Population was split between the two districts?

A Again, we see a similar relationship even greater in magnitude. The part of the county drawn out of Congressional

District 7 features a much lower Black VAP, and the part of the county drawn into Congressional District 7 had a much higher average Black VAP compared to the county as a whole. We're talking about a more than 45 percentage point difference, which is the equivalent of having essentially Cullman County and one part of the county, and say, Barbour County in the other part of the counties split by this congressional district line.

Q Dr. Williamson, for your analysis, why did you choose to focus on average Black Voting Age Population in each census block rather than looking at the county as a whole?

A I focus on this for two reasons. One, I wanted to be consistent and throughout these later analyses. But it's also useful in that the census blocks are not necessarily weighted by population. And so more populace areas, which tend to have higher Black Voting Age Populations are weighted down. So this actually creates a more conservative test when analyzing these differences. And so that gives me greater confidence that any relationship that I do uncover is not an artifact of the -- of how the data are constructed or the estimation strategy. Provides me more confidence in my conclusions.

Q How do these deviations by race -- or rather by Voting Age Population by race between the districts in these three counties inform your opinion about Congressional District 7?

A These -- this analysis leads me to conclude that race was indeed a predominant factor in constructing CD 7.

Q Thank you.

MR. ROSBOROUGH: You can take that down, Mr. Ang. Thank you.

BY MR. ROSBOROUGH:

09:59:09 Q Dr. Williamson, let's turn to your analysis of District 1, 2, and 3.

How did you look at the relationship between district lines and Black Voting Age Population here?

A Here, I began with the acknowledgment that, you know, 09:59:27 Black Voting Age Population is not randomly distributed throughout the state. It is instead concentrated in specific group geographic portions of the state.

MR. ROSBOROUGH: And, Mr. Ang, can you please pull up the map on page 6 of Dr. Williamson's report?

09:59:49 BY MR. ROSBOROUGH:

Q Dr. Williamson, what does this map represent?

A This map shows -- the title here is Black Voting Age Population by county. So here we see each county's Black VAP denoted by the proportion with darker shades of gray 10:00:08 illustrating higher levels of the Black Voting Age Population.

Q How did this map, if at all, inform your analysis?

A Again, this is useful in illustrating, again, how the Black Voting Age Population is not randomly distributed throughout the state. It is indeed concentrated in specific 10:00:28 portions of the state.

Q Thank you.

MR. ROSBOROUGH: You can take that down, Mr. Ang.

BY MR. ROSBOROUGH:

Q Why did you want to learn whether Black Voting Age Population concentrations with -- within the state -- well, strike that.

10:00:38

Dr. Williamson, what was the next step in your analysis here?

A Given this concentration within the state, I wanted to see if a comparable concentration emerged in the construction of congressional districts.

10:00:54

Q Why is learning whether a comparable construction of Black Voting Age Population within the district, why is that something you wanted to learn as part of your analysis?

10:01:11

A If the concentration of Black Voting Age Population is defused across multiple districts, that would provide evidence of race as a factor in the construction of those boundaries.

Q Okay. And how did this analysis, if at all, differ from your District 7 analysis?

10:01:32

A Again, the analysis here was focusing on comparison across district boundaries. And with respect to CD 7, I was making comparisons across district boundaries within the same county. Here, I'm making comparisons across district boundaries in separate counties.

10:01:51

Q Okay. What was the starting point for the analyses you

performed concerning these three districts?

A The starting point was looking at the level of variation in the Black VAP across each of the congressional districts.

Q And what were you looking to analyze there?

10:02:12 A Again, I was looking to examine the variation, trying to ascertain, if at all, there was a -- there might be a relationship between race and the construction of district boundaries based on how variable the Black Voting Age Population was, whether or not, again, that concentration translated into how the districts were drawn.

10:02:34

MR. ROSBOROUGH: Mr. Ang, can you please pull up Table 3 from Dr. Williamson's report?

BY MR. ROSBOROUGH:

Q Dr. Williamson, what does this table, which is titled Congressional District Black VAP by census block, what does this represent?

10:02:51

A As you see on the far left, I have listed all of the districts, seven districts here, include the average Black VAP by census block in the second column to contextualize the, again, the general overall level of the average Black VAP.

10:03:09

Then I also include the standard deviation and interquartile range. These are broadly speaking just measures of variability. Imagine a distribution where, you know, if it's very, you know, very thin and piqued, then there's not a lot of variety. If it's very short and wide, there's a lot of

10:03:31

variables. But, you know, put it, you know, even more simply, a higher standard deviation denotes greater variability, and a lower standard deviation denotes less variability than the average Black VAP. This is one measure of variability.

10:03:52 I employ a second measure of variability, this being the interquartile range. Here, the number to the left of the colon is the 25th percentile. So if you were to rank order all census blocks within a district by their BVAP from smallest to largest, that 0 for Congressional District 1 would be the 25th 10:04:14 percentile. And the number on the right would be the 70th -- 75th percentile. Excuse me. So we are looking at the middle 50 percent in order to kind of eliminate any outliers that may emerge and provide another measure of variation here.

Q And, Dr. Williamson, I think that was a helpful 10:04:33 explanation of the interquartile range. Can you explain a little more about what precisely standard deviation is?

A Again, the -- there's a distribution that kind of centers around an average. The standard deviation kind of denotes again how -- how dispersed the data are. Again, so thinking 10:04:54 about, you know, to what percentage of the county -- the district's Black VAP fits between, the average plus or minus that standard deviation.

Q What is the significance of greater variability of Black Voting Age Population between census blocks in a given 10:05:18 district?

A Again, thinking about the concentration that we saw in that earlier map, greater variation as depicted by the standard deviation in the interquartile range illustrate the connecting predominantly black counties to other predominantly white counties. So just providing evidence of a potential relationship between race and the construction of boundaries.

Q Was there any comparison between these seven districts here that you found useful for your analysis?

A Yes. I think it's useful to compare Districts 1, 2, and 3 to those of 4, 5, and 6. So starting with 4, 5, and 6, we see the average Black VAP is much lower. The standard deviation is also lower. You notice it's only between the -- essentially 21 and 28 percentage point range as compared to Districts 1, 2, and 3 where that range is in the mid 30s.

So right away, we see that, you know, there is a relatively high concentration of predominantly white areas in the northern part of the state. And that is translating into the construction of these districts, and going to be interquartile range illustrates that well where looking at Congressional District 4, for example, 75 percent of all census blocks feature 4.5 percent or less Black VAP. And so we -- that's what a concentrated racial composition would look like within a district.

Then comparing to Districts 1, 2, and 3, again, as I already mentioned, the standard deviation is, you know, 5 to 10

percentage points higher, and the interquartile range is much broader. So 25 percent of all census blocks within all of 1, 2, and 3 feature 0 percent Black VAP. But on the opposite end of the scale, 25 percent of all census blocks feature at least 40 percent, if not more than 50 percent Black VAP. And so, again, the point here is there is a lot more variability in Districts 1, 2, and 3.

MR. ROSBOROUGH: Mr. Ang, you can take that down, please. Thank you.

BY MR. ROSBOROUGH:

Q Dr. Williamson, how does this analysis inform your conclusion?

A This is instructive in that describing that there's a potential for a relationship but based on race, again, thinking about translating the -- essentially splitting the concentration of predominantly black counties across multiple districts.

Q Dr. Williamson, let's move on to your next analysis. What did you next study regarding the defusion of Black Voting Age Population?

A In thinking about this, I created two categories of counties; counties that share a border with another congressional district, and those that are landlocked, for lack of a better word, those that are internal to the district that do not share a border with some adjoining congressional

district.

Q Why did you seek to analyze -- well, let me put it a different way. Why was this comparison of districts that shared a border or -- sorry -- counties that shared a border with another district versus counties that did not useful for your analysis?

A This is useful in that if the lines were drawn without respect to race, if the lines were not drawn in such a way to separate predominantly black counties and adjoin them to predominantly white counties, there shouldn't be a relationship between those that share a border and those that do not share a border.

MR. ROSBOROUGH: Mr. Ang, can you please pull up Table 4 from Dr. Williamson's report?

BY MR. ROSBOROUGH:

Q Dr. Williamson, Table 4 from your report titled Census Block Black VAP Within Districts, what does this table represent?

A This table represents, again, the two categories that I created; no shared border versus those that share a border. I just want to note that my definition of sharing a border was very conservative. If a county touched any part of a neighboring county in a different district, it was counting as sharing a border, even if that was more -- it was potentially a touch point continuity. And so that's why District 1 is not

included in this analysis, because by that definition, there are -- there's no differentiation between shared borders and unshared borders.

With that aside, this depicts the, again, the average census block Black Voting Age Population of the entire county based on these two different bins that I have created for Districts 2 and 3.

Q What did you find here in analyzing District 3, first of all?

A With respect to District 3, we see a more than 4 percentage point difference between counties that are internal to the district and counties that border another district with the border counties featuring a higher Black Voting Age Population.

Q And what did you find regarding District 2?

A Regarding District 2, we see the same relationship of with an even greater magnitude. We see a 13 percentage point difference between counties that share a border with another district and counties within that same district that do not share a border.

Again, with the border counties featuring a higher average Black Voting Age Population.

Q What is the significance of this analysis?

A Again, this illustrates how predominantly black counties served as the cut points for dividing congressional districts

and the construction of these maps -- this map, I should say.

Q Could the different concentrations of Black Voting Age Population within Districts 1, 2, and 3 and this shared border analysis for Districts 2 and 3 just reflect that some parts of the state of Alabama are just more racially diverse than others?

A There are indeed -- there's necessarily going to be some greater variability. But, again, we know that there are concentrations within the state that are not translating to comparable concentrations within the congressional districts.

MR. ROSBOROUGH: Mr. Ang, you can take that down. Thank you.

BY MR. ROSBOROUGH:

Q Dr. Williamson, collectively, what did you conclude based on these analyses?

A Based on these analyses, I again conclude that race was a predominant factor in deciding how to construct the congressional boundaries.

Q Okay. Dr. Williamson, what type of analysis did you perform about the ways -- let me rephrase that.

What type of analyses about the ways in which specific district splits occurred did you -- in this portion of the state did you perform?

A I then look at the -- just compare, again, the racial distribution of Black VAP within the state from the earlier map

with the proposed map, just examining some of the choices made with respect to the districts.

MR. ROSBOROUGH: Mr. Ang, can you please pull up the maps that are side by side from page 8 of Dr. Williamson's report?

10:13:23

BY MR. ROSBOROUGH:

Q Dr. Williamson, what are these two maps represent?

A These two maps, the one on the left is the congressional plan as enacted. And the one on the right is, again, the county Black Voting Age Population with darker shades of gray denoting higher levels of Black VAP.

10:13:40

Q Is there a reason that you place these maps side by side?

A I think it's instructive and serves to well contextualize some of the analysis that preceded this.

10:14:03

Q What did you find as part of this visual analysis? First, let's start with District 3.

A Starting with District 3, I think one of the things that were most striking to me was the inclusion of Macon and Russell County right here that I have highlighted. And so you can see that these feature relatively high levels of county Black Voting Age Population. They are a part of the state that is traditionally referred to as the Black Belt. And so you have predominantly black counties in the same district as a number of predominantly white counties that are some parts more than 150 miles away from each other.

10:14:26

10:14:47

Q Dr. Williamson, what did you find in your visual analysis regarding District 2?
A Regarding District 2, again, the exclusion of Macon and Russell county here, but for Congressional District 2, it's also noticeable the inclusion of Autauga and Elmore here. And so, again, you have excluded parts of the state traditionally referred to as the Black Belt and included parts of the state that are predominantly white. And I don't do any analysis about compactness or anything like that. But just to eyeball it, it is interesting to note that it may make for a more compact district to include Macon and Russell in lieu of Autauga and Elmore -- other necessary stipulations aside.
Q And what did you find in your visual analysis regarding District 7?
A District 7 is particularly striking in that if you were asked to construct a majority-black district, you could well predict where Congressional District 7 was simply by following, you know, this distribution here.
And so you see the concentration translating into a district here. But the comparable concentration in other parts of the state is being diffused across districts 1, 2, and 3.
Q Okay. How was your visual analyses informed, if at all, by your quantitative analysis?
A Again, this serves to contexualize essentially how these -- this empirical analysis presents on a map just like

corroborating that conclusion.

Q Considering all of these analyses together, what did you conclude about the construction of Districts 1, 2, and 3?

A I conclude that race was a predominant factor in deciding how to construct these district boundaries.

10:17:01

Q Is there any reasonable chance that these racial divisions are explained by reasons other than race?

A Any one test or one data point may be attributable to chance. But looking at the visual analysis, looking at all of the individual tests within each analysis, a consistent and substantively large relationship emerges. And so it is extremely unlikely that this relationship would exist again, so consistently and so substantially purely to chance.

10:17:25

Q Dr. Williamson, let's switch gears. What was the final analysis that you performed?

10:17:49

A In my final analysis, I compared the enacted map to the previously enacted map of 2011 looking at the census blocks that were moved in or out of congressional districts.

Q Why did you perform this analysis?

A Yes. This analysis is instructive to understand the role that race played. Again, if race was not a factor, we shouldn't see, you know, an appreciable relationship between, you know, essentially who is being moved in and out of different districts.

10:18:12

MR. ROSBOROUGH: Mr. Ang, can you please pull up Table

10:18:31

5 from Dr. Williamson's report?

BY MR. ROSBOROUGH:

Q Dr. Williamson, Table 5 here is entitled Average Census Block Black VAP. What does this table represent?

10:18:50 A Again, as you see on the far left, these are the different districts that I look at -- 1, 2, 3, 6, and 7. The 1, 2, 3, and 7 being the districts I was asked to analyze. 6 being included here for reasons that I can explain later.

The second column here the total, again, this is the 10:19:11 average census block Black Voting Age Population. Then from there, I create three categories; moved in, moved out, and those that were kept the same. These describe census blocks that were either kept in that district between 2011 and 2021, those that were moved out, so if it was moved out of that 10:19:30 district between the two maps, and those that were kept the same. And then I show the average census block Black VAP for each of those three categories.

Q What did you find regarding these districts, in terms of who was moved in and moved out and kept the same?

10:19:47 A Yeah. So I just want to note up front that there were -- I didn't have any census blocks moved into Congressional District 1. So this test isn't necessarily appropriate for evaluating CD 1. But looking at 2, 3, and 7, we see substantially larger average Black VAPs moved out than those 10:20:13 that were moved in. And so, for example, within Congressional

District 2, the average Black VAP moved in was 31 percent. And the average black VAP for census blocks moved out of 2 was 55.6 percent.

A similar relationship exists between moved in and moved out in CD 3 with, you know, about a 15 percentage point difference between the two. And then again in CD 7 where you see a more than 28 percentage point difference, again, with predominantly black census blocks being moved out of the district. Sorry. And to round that off, thinking about, you know, where -- where those blacks census blocks are potentially being moved, we see the opposite relationship emerging in Congressional District 6.

Again, we see it already has a, you know, relatively -- again, relative to these other districts low Black VAP of 18 percent. Those that were moved out of it were predominantly white areas. Looking at the move out for CD 6, we see about 25 percent. But almost 50 percent Black VAP for census blocks that were moved in to CD 6.

Q Thanks.

MR. ROSBOROUGH: You can take that down, Mr. Ang.

BY MR. ROSBOROUGH:

Q Dr. Williamson, what are -- what is the significance of those findings?

A Again, this is useful in illustrating the defusion of the Black Voting Age Population and the role that race played in

the construction of the district boundaries.

Q How do we know that these racial disparities you have identified are not just occurring by chance or due to some other factor?

A Again, I wouldn't consider any one of these points in isolation as indicative of, you know, a relationship. But the -- all of these corroborate all of the other tests in illustrating the differences between groups illustrating a role of race as a predominant factor. And so, again, given the consistent findings and given the substantially large differences at times between groups, it is very, very unlikely to see such a consistent pattern purely by chance.

Q Based on all of your analyses, what are your opinions about the role of race in the lines of Districts 1, 2, 3, and 7?

A Again, after these analyses, I conclude that race indeed served as a predominant factor in the construction of these district boundaries.

Q Thank you, Dr. Williamson.

MR. ROSBOROUGH: I am ready to pass the witness.

JUDGE MARCUS: Thank you. I take it, Mr. Davis, you will begin your cross?

MR. DAVIS: Yes, Your Honor.

JUDGE MARCUS: I'm sorry. We're picking up something else from someone else.

Okay. Thank you. Mr. Davis, you will be doing it for both the Secretary of State and for the intervening defendants? Or is Mr. Walker going to also be asking questions, or maybe --

MR. DAVIS: Mr. Walker -- he's sitting next to me. He have says he does not expect to have any questions for Dr. Williamson.

JUDGE MARCUS: The only reason I'm asking how long be you be -- maybe this is a convenient time for us to take our first break before you start.

MR. DAVIS: I think it would be. I doubt I would get us to the lunch hour, but it will more than a few minutes.

JUDGE MARCUS: Why don't we do this. Let's take a 15-minute break at this point. And then we will come back, Mr. Davis, and begin with your cross-examination. I have 10:25 your time. So we'll start at about 10:40 or so your time.

MR. DAVIS: Very well.

(Recess.)

JUDGE MARCUS: Is everybody available, and can you all hear me okay?

Thank you so much. We had just a little snafu here. We're ready to begin, then, with the cross-examination. Mr. Davis?

MR. DAVIS: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. DAVIS:

10:42:18
10:42:35
10:42:50
10:43:12
10:43:28

Q Good morning, Dr. Williamson.
A Good morning.
Q My name is Jim Davis. I represent Secretary Merrill in this action.
You did not -- if I understand you correctly, you did not consider Alabama's redistricting guidelines?
A That is correct.
Q So that means you did not consider traditional redistricting criteria such as preserving communities of interest?
A I did not directly assess that, that is correct.
Q And you did not directly assess the traditional redistricting principle of avoiding conflicts among incumbents?
A That was not included in my analysis, that is correct.
Q And is that also true for core preservation and compactness?
A For all redistricting guidelines, my task was to evaluate the relationship between the lines and race. And so, therefore, regardless of the guidelines, the lines as presented are the same. And so, therefore, they were not informative to my calculation.
Q But then you did not test whether the principle of core preservation had any explanation for -- was any explanation for where the lines were drawn?
A I did not directly assess that. Again, whether the maps

were drawn from a completely blank slate or derived from some previous map, the relationship between race and where those lines lay is the same. And so, therefore, it was not necessary to include that in the pursuit of examining the relationship between race and district boundaries.

Q Let's test that.

One -- the first opinion that you went through, if I understood you correctly, was that when you looked at the ways counties were split, your opinion was that if the racial demographics were significantly different on one side of the split than the other, then that led you to conclude that race was a predominant factor. Is that a fair summary of your opinion?

A That -- I would say, yes, that's generally fair.

Q I would like to share my screen and show you -- this is a portion of Defense Exhibit 1, an expert report from Tom Bryan. This is page 68 of that report. It is a map that he has presented. I will represent to you, Dr. Williamson, that in this map, Dr. Bryan has shown before and after Alabama's district.

Do you see, for example, dark lines around District 5 in the state?

A Yes.

Q In the northern part of the state? Those are the old district lines, and the little blue here shows where the new

district lines. You can tell -- and Dr. Bryan -- Mr. Bryan will be able to testify about this when it's his turn to testify, Your Honor -- Dr. Williamson, what I represent to you is this shows that before November, the lines were here where the red is, and after redistricting in November, take this part out of District 5. So you see the before and after.

Now, I say that to preface a couple of questions, Dr. Williamson.

Do you agree that the line Montgomery County was moved a little north?

A It does appear based on this depiction. Thank you. It does appear based on this depiction that the 2021 line is, indeed, north of the 2011 line.

Q Gotcha. Do you agree -- this is the area of Montgomery County. Do you agree that District 3, then, was moved out of Montgomery County, and District 2 absorbed the portions of Montgomery County?

A Yes, I see that.

Q Okay. And here this is Tuscaloosa. Would you agree that it looks like this line in District 7 in Tuscaloosa County moved a little north?

A Yes.

Q Okay. Then you see other lines, too, were changed in Jefferson County.

Dr. Williamson, do you know whether District 7 was

underpopulated or overpopulated after the 2020 census?

A I -- I have no basis to speak to that.

Q Okay. Well, there will be other evidence and other witnesses who can speak to that.

10:46:47 I want you to assume for me that the evidence shows that District 7 was underpopulated by 53,000 people. You know, but before they sat down to draw the new district lines and they looked to see which districts had too many people and too few people based on one person one vote principles, which districts 10:47:11 needed to add population and which needed to take away population, District 7 needed to add 53,000 people.

Now, if you were a legislator, Dr. Williamson, and you cared about core preservation and you needed to find 53,000 people, where do you think the Legislature should have turned?

10:47:35 MR. ROSBOROUGH: Outside the scope of Dr. Williamson's report and direct.

JUDGE MARCUS: Mr. Davis?

MR. DAVIS: I disagree. Dr. Williamson has said that he can discern the legislator's intent from where they drew the 10:47:49 lines. I want to explore whether there aren't other perfectly rational explanations that when they sit down to districting the real world and had to consider real redistricting criteria whether there's not other explanations other than race for the moves.

10:48:05 MR. ROSBOROUGH: Can I respond briefly, Your Honor?

JUDGE MARCUS: Sure.

MR. ROSBOROUGH: That's a complete misrepresentation Dr. Williamson's task. Nowhere in Mr. Williamson's report or testimony does he purport to examine the subjective intent of any individual. He is examining objective circumstantial evidence of this. And what Mr. Davis is getting to is something entirely outside of the scope of his opinions and report.

JUDGE MARCUS: Are you able to answer that question, Dr. Williamson?

THE WITNESS: I am not. At no point, did I investigate anything about a legislator's or anyone else's suggestive intent. I simply sought to analyze again the relationship between race and the district lines as drawn.

JUDGE MARCUS: If you want to reframe your question, Mr. Davis, I will permit you to put it.

BY MR. DAVIS:

Q I will try something else. Okay. So, Dr. Williamson, you are saying you are not offering an opinion of any person's intent?

A That is correct. I am describing a relationship.

Q Okay. You said if I understood your testimony on direct correctly that you -- you formed an opinion that race was a predominant factor in where the lines occurred?

A That is correct.

Q Okay. Well, somebody drew those lines. Was it a predominant factor for whom?

A I make no statements and offer no opinions about whose intent or anything like that. I am -- when I say predominant, I am simply describing a consistent and substantially large relationship between two things, in this case, race and the district lines, as drawn.

Q Okay. But you're not offering an opinion that any legislator voted for or against these plans based on race?

A I am offering nothing about any individual's thoughts or motivations or anything along those lines.

Q And you did not test whether it might be motivated by other criteria such as core preservation?

A Again, whether core preservation entered into the calculation would not have changed my analysis, and, therefore, would not have changed my conclusions. I was purely interested in the lines as presented and their relationship with race.

Q Let's explore the thing, then, that you may not have considered.

This, Dr. Williamson, another portion of Dr. Bryan's expert report, Defense Exhibit 1, and I want to direct you to page -- let's look at page 71.

So I will represent to you, Dr. Williamson, what this map is depicting -- no, I want to go back to page 69. Yes. I will represent to you this is a plan presented by Dr. Duchin. I

 will represent to you, as well, that what Mr. Bryan has done here is he's shown the outlines of one of Dr. Duchin's demonstrative plans, and within the state is color-coded precincts by the concentration of African-American population. See this key down at the bottom. These precincts, which are between 0 and 10 percent black are colored red. The 25 is orange. Yellow, light green, dark green. The dark green is where African-American population is more heavily concentrated, and the red is where it's least concentrated.

10:51:56

Do we understand each other, you think, Dr. Williamson?

10:52:16

A Yes. Red is lower black population and green is higher.

MR. ROSBOROUGH: I am going to object here. There's been no basis.

JUDGE MARCUS: We haven't heard the question. Mr. Rosborough, we haven't heard the question yet. He's showed him the map, and he explained it to him. Let's hear the question, and then you can interpose your objection.

10:52:30

MR. ROSBOROUGH: Thank you, Your Honor.

BY MR. DAVIS:

Q Now, we want to focus in a little bit on Jefferson County. And I know that's made -- Dr. Williamson, first of all, you haven't had a chance to test the accuracy of this map, correct?

10:52:41

MR. ROSBOROUGH: Objection.

THE WITNESS: That is correct.

JUDGE MARCUS: I'm sorry.

10:52:55

MR. ROSBOROUGH: Dr. Williamson -- there's been no foundation to establish that Dr. Williamson knows what he is looking at or who Dr. Duchin even is.

JUDGE MARCUS: Why don't you lay the foundation and simply ask him whether he's ever seen this map before, Mr. Davis.

MR. DAVIS: Yes, sir.

BY MR. DAVIS:

Q Have you seen this before, Dr. Williamson?

A I have never seen this before.

Q Okay. Then I would like to at least ask my question then let them object.

If -- Dr. Williamson, if this map does show that this district was -- as drawn by Dr. Duchin, this split of Jefferson County, that this area inside the line is more heavily African-American, the green precincts, than this area outside the line, which is red and orange, would you form the same opinion that you expressed about Alabama's plan that race was a predominant factor in the drawing of these lines?

MR. ROSBOROUGH: Objection. Calls for speculation.

JUDGE MARCUS: Can you answer that question, Dr. Williamson?

THE WITNESS: No, I don't feel comfortable speculating based on just looking at this one part of this one map that I haven't had any time to do anything with.

BY MR. DAVIS:

Q What more would you need to know -- if you assume, again, that this area on one side of the line is more heavily African-American than the area outside the line, what more 10:54:21 would you need to know to form the same opinion about this plan that you expressed about Alabama's plan?

A My conclusion was not based on any one piece of evidence. I would want to look at the totality of everything in order to ascertain whether or not there was a, you know, substantially 10:54:40 large and consistent relationship between these things that could be empirically validated beyond eyeballing a map.

Q Okay. Did you form any opinion, then, whatsoever about incursion into Mobile County in assuming that this green does, in fact, depict more heavily African-American area than the 10:55:05 area that she did not include in District 2?

A Again, these -- there's just simply not enough information here for me to reliably draw any conclusions that I would feel comfortable espousing in this setting.

Q So it's not the split -- are these circumstances that you 10:55:30 would consider to be evidence that race was a predominant factor?

A Could you tell me what you mean by that? I am not sure I understand the question.

Q Very well. I am not asking you now to draw an ultimate 10:55:46 conclusion about whether race is a predominant factor. But

based on the analysis that you have applied to Alabama's plan, would you looking at this split of Mobile County consider that split to be evidence that race predominated?

A Simply looking at it, no, I would not count it as evidence. Again, I would want to more empirically investigate more substantively the relationship that I see there.

Q Okay. So you cannot look at one county split no matter what the difference is or demographics on either side of the line, that by itself, you are saying is not evidence that race was predominant factor in drawing that line?

A I would not eyeball one map that I have never seen before and draw any conclusions from.

Q You weren't asked to apply your own analysis to the plans that are offered by the Milligan plaintiffs?

A I was asked to analyze the map as enacted.

Q On page 3 of your report, Dr. Williamson, you note that we did not split Madison, Mobile, or Baldwin counties in Alabama's enacted map. Do you know if any of those counties have ever been split in an Alabama congressional plan?

A I have not chronicled the splits of previous counties, no.

Q I am going to look at page 5 of your report, Dr. Williamson. At the bottom where you begin part 2, your analysis of Districts 1, 2, and 3, you say there on the first line that you examined the variability of census block Black VAP within congressional districts to further test for

allegations of cracking.

Remind me. What do you mean by variability of census block Black VAP?

A Again, I was looking at the range of census block Black VAP within congressional districts as depicted by the standard deviation and interquartile range in the table that follows.

Q Is your analysis suggesting that there's too much diversity in Districts 1, 2, and 3?

A That would be a mischaracterization of what I have presented.

Q Well, the more diverse the precincts are, then the higher the variability of census block Black VAP, right?

A I am simply measuring variability. I am not making any assessments about too much, not enough, anything related to diversity, like that's simply identifying the level of variability.

Q Well, don't you use this as part as a basis for your opinion that race was a predominant factor in drawing Alabama's congressional districts?

A This was a piece of evidence that served to inform some of my analysis, yes.

Q So if Alabama had instead gone in and sorted voters by race, and said this is a black area, it goes in one district, this is a white area that goes in another, there would have been less variability of census block Black VAP, wouldn't

there?

A I mean, it's impossible to know without analyzing alternative plans, which I did not do.

Q Is it impossible to know whether we put every district -- every -- excuse me -- every precinct that was more than 50 percent black if we could have put that in one district, you can tell us, right, whether or not that would have less variability than you see in Districts 1, 2, and 3?

A I see. So you're saying if we assumed, we identified all of the predominantly black blocks and lumped them together, that there would be less variability. Am I understanding you correctly?

Q Right.

A Yes. Then, yes.

Q Yes. Okay. Well, and with that, then, would that lower variability, would that be evidence that race predominated in drawing the districts?

A Without those data under that plan to analyze, I can't say one way or another.

Q Well, is there any way to achieve lower variability of census block Black VAP other than sorting voters by race?

A Could you ask that question again, please?

Q Sure. I mean, if -- if you think the high variability is evidence that race predominated, I'm wondering how we lower that number if you think that would result in less evidence

that race predominated. And I can't think of a way to do that other than making race predominant and sorting voters by race?

A I see. I believe what I was depicting here, which I think is a little different than what we are talking about is providing evidence of predominantly black counties in a concentrated part of the state connecting them to predominantly white counties in other parts of the state. Essentially trying to identify essentially are the predominantly black counties serving as cut points across districts. And so, again, I would not draw any conclusions based on just one test or one piece of evidence in my report. I was looking to see if a pattern emerged, and then I based my conclusion based on the overall consistency and magnitude of the effect illustrated by those patterns.

Q Would you agree that if the Legislature had sorted voters strictly by race that the end result would be -- for purposes of say District 2, then there would be lower variability of census blocks in District 2?

A So you're asking if District 2 was drawn to be predominantly black, would there be less variability? Is that your question?

Q Yes.

A Possibly, but I wouldn't definitively state one way or another without looking at the overall construction of the district and how that -- how that relates.

11:03:04

11:03:29

11:03:57

11:04:19

11:04:30

Q But you could get lower variability, could you not, if you ignored everything except race? We don't care about compactness, core preservation, avoiding incumbent conflicts, we are going to look at nothing but race and put black voters in one district and white voters in another, and the end result may be lower variability of census block VAP?

A Maybe, yes.

Q Your analysis of census block variability, it doesn't tell us, does it, whether census block with high Black VAP is actually close enough to other such census blocks to be part of the same district?

A I'm sorry. Could you say that again?

Q Let me see if this helps. I want you to assume, Dr. Duchin, that this is -- excuse me -- Dr. Williamson, this isn't Dr. Duchin's map. This is the Alabama's enacted plan. I want you to assume again this map depicts border precincts that are colored from red to green based on the concentration of the African-American population in that precinct. If you look at this degree, according to this map, would you agree that Anniston, you see there is an area where there are a larger number of African-American voters?

A Yes, I do see that.

Q Yeah.

A Sorry.

Q Same here for Talladega, correct?

11:04:41

11:05:02

11:05:38

11:05:51

11:06:18

A Yes, I see that, that green.

Q Right?

A That smaller green section.

Q The question for you is: You know, you talk about the variability of District 3. But did you actually analyze whether African-American voters in Talladega or Gadsden or Anniston close enough to Macon or even Mobile to be a part of the same district?

A I conducted no analysis based on any sort of geographic distance between census blocks.

Q And -- let's see. Your discussion of border counties, your analysis of which counties appeared on borders of districts, concluded, did you not, that counties on the borders of districts have a higher average Black BVAP than counties that are not on the borders of districts?

A That's correct.

Q Why did you only look at Districts 2 and 3 for that analysis, Dr. Williamson?

A Again, given the strict definition I created of shared border versus no shared border, technically Congressional District 1 all counties border another county even if we're talking about that touch point near the Bay, and so, therefore, I couldn't create two categories based on that -- that definition of shared versus not shared, and so therefore, it was not included.

11:06:35
11:06:57
11:07:16
11:07:36
11:08:08

Q Did you test District 7? That has interior counties and border counties.

A That's correct. For this particular section, I was only looking at allegations that 1, 2 -- allegations regarding Districts 1, 2, and 3 and not District 7.

Q Okay. Now that we have the map up, would it not make a district very compact just to have a district that included counties along the Alabama Georgia line, would it?

A I can't speculate about what compactness would look like under an alternative plan.

Q Okay. Let's imagine a district runs from Cherokee up to Houston counties that just include these counties on the Georgia line. You can't tell me whether you think that would be more or less compact than just District 2?

A I actually can't given the relative uniform width of these things, and the compactness would also depend on which measure you used. And so, for example, a Polsby-Popper would have a pretty low compactness score, I imagine, but a compactness score that only measures the kind of lost space if you placed a rubber band around that would actually produce a relatively compact score. And so empirically, you would have evidence that it was both compact and non compact.

Q I have --

MR. DAVIS: Your Honor, I really must apologize. I have written down the wrong number, and it is going to take me

just a moment to find it.

JUDGE MARCUS: That's okay. You take your time, Mr. Davis. Do you want a break, or do you need a minute or two?

11:08:17 MR. DAVIS: I think I just need a moment.

JUDGE MARCUS: You take your time.

MR. DAVIS: Here we go.

BY MR. DAVIS:

Q I represent to you this is a map from Defense Exhibit 1 of 11:08:33 Mr. Bryan's report, and it's page 71 of that map, page 71 of that report. And this is a map where Mr. Bryan is showing us where people live -- not just black, not just white, just concentrations of total population by county. Would you agree that -- these counties along the Georgia line with the 11:09:03 exception of Lee County has lower population than these interior counties according to this map?

A This is the same scale with red being lower and green being higher?

Q Correct. The red map is showing counties with lower 11:09:19 population, and the most populace -- most populace counties are dark green.

A Okay. Yeah. So looking at three -- yeah, I see six red counties and seven -- seven more -- so the plurality of counties are between about that 6,000 and 25,000 mark.

11:09:44 Q Right. Okay. Now, that's the one I just showed you.

This is by county. This is by precinct. So I think it will serve the purpose. Would you also agree, Dr. Williamson, that these areas along the border -- no, this is switching to African-American population, Dr. Williamson. And it's by precinct and not by county.

Would you agree that this area along the Alabama/Florida line according to this map has a lower concentration of African-American voters than when you move interior in the state?

A Yeah. According to this map, it does appear that the southern-most part of the state has a lower Black VAP.

Q Gotcha. That's true District 3, at least in this northern part of District 3, correct?

A Yes. I see a lot more red in that part of the state.

Q So unless you draw your districts to hug the state line, you are going to have counties on the border with a larger concentration of African-American voters, won't you?

A I'm sorry. Could you repeat that?

Q Sure. Unless you draw your district to hug the state line, you're going to have counties on the border of the districts that have a larger African-American population, would you not?

A Theoretically, I believe that's correct.

Q Do you have any evidence of why the Legislature, in fact, decided to put the lines within certain counties and not in

other counties?

A Again, I did not consider or investigate anything beyond the lines as presented and their relationship with race.

Q Yeah. Now, you assessed who was moved in and out of districts next, correct?

11:12:12

A Yes. Yes.

Q Okay. Does your analysis suggest that the Legislature was moving heavily black census blocks into District 7?

A According to the Table 5, looking at the moved-in category for District 7 that we see an average Black VAP of 30.4 percent, and so this table presents predominantly white census blocks being moved into CD 7.

11:12:33

Q Okay. And you haven't assessed -- your analysis doesn't tell us how many people are moved in and out of these districts, right?

11:12:58

A That is correct. I do not include numbers about individual populations.

Q I want should share -- this, Dr. Williamson, is --

MR. DAVIS: Oh, Your Honors, I have just been informed that I think earlier -- I am not sure which exhibit this was, but I at one point referred to Defense Exhibit 1, when, in fact, I should have said Defense Exhibit 4, with Your Honors' indulgence.

11:13:34

JUDGE MARCUS: Just so I am clear on that, when you originally referred to Defense 1, I thought you were referring

11:13:52

to Mr. Bryan's report that you had offered, right?

MR. DAVIS: Yes. Yes. And Mr. --

JUDGE MARCUS: No, please. Go ahead.

MR. DAVIS: And Mr. Bryan's supplemental report is District 4. I don't want to take up the Court's time. By your leave, I will be prepared maybe later today to state for the record which exhibits were which that we have reviewed.

JUDGE MARCUS: Sure. Sure. But I take it the thrust of what you are telling me when you referred to Defense 1, you really meant to be referring to Defense 4, which was the Bryan rebuttal. Do I have that --

MR. DAVIS: For some of those reports, yes. Any time when --

JUDGE MARCUS: All right. Later you can just straighten that out. We don't have to take the time of your examination of Williamson to do that.

MR. DAVIS: Great.

BY MR. DAVIS:

Q So, Mr. Williamson, I want to represent to you that this is fact Defense Exhibit 1, and it is page 23 of Mr. Bryan's first expert report.

And I will represent to you that here is performed a core retention analysis that he will explain to the Court when he testifies. This tells us -- if you look at this left column, District 1, which based on the 2011 plan, those people who were

        in old District 1 are now divided among three congressional districts.

717,000 of them are still in District 1. 739 of them moved to District 2. 7,783 are now in District 7.

11:15:38 It works the same way for all the districts.

My question to you, Mr. Williamson, is simply this: When you were considering whether movement in and out of districts was evidence that race predominated, did you consider the volume of people, the number -- total number of people who were being moved in and out?

11:15:57

A I did not directly assess the volume of people as I was simply looking at racial composition instead.

Q Gotcha. And so, for example, if you had assessed -- I know you didn't make a deal out of District 7 in this analysis, but if it was only 739 people moving from District 1 to District 2, which would have at least I would argue a de minimus impact on the district as a whole, that, again, was not part of your consideration?

11:16:17

A No. Again, I was looking at census blocks. And so the proportion could have actually been deflated by looking at census blocks instead of looking at total population.

11:16:36

Q Just for the Court's benefit, Mr. Bryan went through all seven districts, and we'll show the same, and he will be able to talk about that.

11:16:54 JUDGE MARCUS: He will testify accordingly, but let's

just proceed with Dr. Williamson.

BY MR. DAVIS:

Q Dr. Williamson, I will represent to you that we had a deposition earlier in this litigation of a gentleman named Randy Hinaman who was hired by legislators to do a draft plan. And he testified that in drawing that plan he wanted to make the area of District 7 in Jefferson County more compact than it was in the District 11 plan. Do you have any criticism of a decision -- of a decision to make a district more or less compact?

MR. ROSBOROUGH: Objection. This is outside the scope of Dr. Williamson's report or testimony.

JUDGE MARCUS: I think that that's true, counsel.

MR. DAVIS: I think I am asking him about a possible alternative explanation for how the District 7 lines were drawn.

JUDGE MARCUS: I understand. I would just rephrase your question if you would.

MR. DAVIS: Okay.

BY MR. DAVIS:

Q Well, then, it's the same question: Did you consider whether the Legislature amended the lines in Jefferson County in order to make District 7 more compact?

A Whether or not the district became more compact, less compact, was the same level of compact, the line still exists,

and the relationship between that line and race is the same. And so, therefore, the -- whatever motivations exist did not enter into my analysis, wouldn't have changed it, and, therefore, my conclusion is the same.

11:18:52 Q You were at least questioning about the fact that Elmore County was included with these other counties in District 2; is that correct?

A That's correct.

Q Okay. Now, you grew up in Prattville, right?

11:19:20 A That's correct.

Q That's where I live now. That's Autauga County next door?

A Right.

Q Can you think of no reason other than race that Autauga and Elmore County might be connected with Montgomery County?

11:19:34 A There are plenty of potential reasons. For growing up there, you and I both know that a number of people work in Montgomery but maybe live in Autauga or Elmore.

Q That's right. I mean, a lot of people live in Wetumpka or Prattville and work either at the Maxwell Air Force Base or for 11:19:56 state government like I do or any of the other employers in Montgomery County. Would you agree?

A Yeah. I'm sure there are a number of people who that describes.

Q Okay. Well, might a desire to preserve a community of 11:20:09 interest among these three counties not be an explanation for

including Elmore County with District 2?

A Again, I don't wade into intent or communities of interest or anything like that. I simply set out to identify a relationship, and that's what I have presented.

11:20:31 Q Did you have available to you any information about what members of the congressional delegation thought about their own districts?

A I did not.

Q So if they had told Alabama officials that in their

11:21:09 opinion certain areas ought to go together in congressional districts, that was not information you had?

A No. I did not have that information as -- again, regardless of the formation of the districts, the guidelines, stipulations, whatever they may be, the lines as presented are

11:21:29 the same, and I only looked at the lines as presented.

Q Did you consider whether there's any actual connection between, say, voters in Mobile County and voters in Russell County on the far end of the state?

A What do you mean by that?

11:21:49 Q Okay. Well, if you think the way we drew it, that race predominated in the way Alabama drew its lines, I presume you mean that you think it should have been drawn some other way where race did not predominate. And one of the ways that's been suggested that we should have done that is to draw

11:22:05 districts that connect the African-American portions of Mobile

County with counties from the far eastern part of the state.

So my question to you is: Did you in expressing your opinions, make any assessment or evaluation as to whether those voters in downtown Mobile and the eastern Black Belt counties have any actual connection to each other?

A I --

MR. ROSBOROUGH: I am going to object again as completely outside the scope of Dr. Williamson's report and testimony.

JUDGE MARCUS: I think he is being asked whether he considered something or did not consider it. I think it's a clear and easy question.

Do you understand the question, Dr. Williamson?

THE WITNESS: As I understand it, I have been asked to make a subjective assessment of any point. I just want to clarify that I do not make a subjective assessment of or offer alternatives. I am not -- I am not the lawyer. I am not saying what could or should be done. I am simply describing a relationship. To that point, no, in describing this relationship, I did not include, you know, this comparison that I have been asked about.

BY MR. DAVIS:

Q Do you express any opinion on whether race predominated in drawing the boundaries of District 6?

A No, I do not offer an opinion on District 6.

Q Do you think --

MR. DAVIS: Your Honor, I think I may be done, but I would like to confer with my colleagues for a moment.

JUDGE MARCUS: Sure. Take your time.

11:24:36 MR. DAVIS: Thank you for your patience, Your Honor. I do not have any additional questions for Dr. Williamson at this time.

JUDGE MARCUS: All right. Thank you. Redirect, Mr. Rosborough.

11:24:46 MR. ROSBOROUGH: Thank you, Your Honor, just a few questions.

REDIRECT EXAMINATION

BY MR. ROSBOROUGH:

Q Dr. Williamson, do you recall a few minutes ago you were

11:24:54 asked by Mr. Davis about other reasons that Autauga and Elmore counties might be connected to Montgomery? Did you recall that?

A Yes, I recall that.

Q And do you recall testifying about individuals who may

11:25:12 live in those communities and commute to city center in Montgomery?

A Yes, I do.

Q Would that also be true for people who live in Macon County but are split into District 3?

11:25:25 A That's entirely possible, yes.

Q And might that also be true for individuals who live in the other part of Montgomery County which has been split into District 7?

A Yes, that is theoretically possible, as well.

11:25:43 MR. ROSBOROUGH: Those are all the questions I have. Thank you, Your Honor. Thank you, Dr. Williamson.

JUDGE MARCUS: Anything further, Judge Manasco, for this witness?

JUDGE MANASCO: Nothing for me.

11:25:54 JUDGE MARCUS: Judge Moorer?

JUDGE MOORER: No, sir.

JUDGE MARCUS: Seeing no other questions, we thank you, Dr. Williamson. And you are excused.

THE WITNESS: Thank you.

11:26:05 JUDGE MARCUS: The next witness for Milligan would be whom?

MS. CARTER: Going to be Shalela Dowdy.

JUDGE MARCUS: Do you want to proceed with her at this point, Ms. Carter?

11:26:26 MS. CARTER: Yes, Your Honor.

JUDGE MARCUS: All right.

SHALELA DOWDY,

having been first duly sworn, was examined and testified as follows:

11:26:30 JUDGE MARCUS: Thank you. If you would be kind enough

to state your name for the record, please.

THE WITNESS: My name is Shalela Dowdy.

JUDGE MARCUS: Thank you. And you may proceed, Ms. Carter.

11:26:47 MS. CARTER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. CARTER:

Q Ms. Dowdy, where were you born?

A I was born in Mobile, Alabama.

11:26:54 Q What year were you born?

A I was born in 1989.

Q What race do you identify as?

A I identify as black or African-American.

Q And where did you grow up?

11:27:10 A I grew up in the city of Prichard, Alabama and Mobile, Alabama.

Q And do you still live in the city of Mobile or Prichard?

A Yes. I currently live in Mobile, Alabama.

Q What schools did you attend while growing up in Mobile?

11:27:29 A I attended Bessie C Fonvielle Elementary School, Nan Gray Davis Elementary School, Ella Grant Elementary School, and Calloway Smith Middle School and Murphy High School.

Q Where did you go to college?

A I attended undergrad at the United States Military Academy

11:27:50 at West Point, and I obtained my graduate degree from the

University of Texas at El Paso.

Q   What is your professional background?

A   I am -- my professional background consists of me commissioning in the United States Army in 2012 as a second lieutenant and matriculated through the ranks to -- I earned the rank of captain which is the rank I currently hold.

I was in air dispense artillery officer on active duty where I was responsible for work centered around defending air space and daily Army operations.  I -- while in the Army, I was stationed at Fort Sill, Oklahoma, Fort Bliss, Texas, deployed to the Middle East to Bahrain, and Shaw Air Force Base in South Carolina, while all the time still being a citizen of Alabama and voting within the state.

And after six years of active duty, I switched to the Individual Ready Reserves, and my first year out of the Army, I worked as a consultant for Deloitte.  And after a year of that, the pandemic hit.  And I worked for the Alabama Democratic Party.  I did work with the 2020 census.  And for a -- for about four months this year, I worked for the city of Mobile.

Q   So Captain Dowdy, what is your current occupation?

A   Currently, I am participating in a fellowship, a CROWD fellowship, which stands for Community Redistricting Organizing Working For Democracy with the Southern Coalition of Social Justice.

Q   And what kind of work does that organization do?

A SCSJ does work centered around voter advocacy work, and right now, they're also focusing on the redistricting efforts going on in the country.

Q What specifically do you do as a CROWD fellow?

11:29:51 A As a CROWD fellow, I am assigned lower Alabama. So counties in the first congressional district and other counties in the Black Belt. And my goal is to -- or my job is to educate local residents on what redistricting is, being that it is something that happens every ten years. A lot of people are 11:30:11 not knowledgeable on redistricting and knowledgeable on how redistricting affects us when we go to the polls and vote.

So we're educating people on the redistricting process, what redistricting entails, and also educating them on how they can play a role in the process as average citizens. So we 11:30:30 provide them with testimony, training, update them on what's going on in the state, and so that was our focus in the fall. Now that these maps have been signed, right now, we're focusing on work preparing them to be involved in the redistricting going on with the local municipalities in the state of Alabama.

11:30:50 Q Does your work give you an understanding of issues affecting black communities in Alabama?

A Yes. The previous work that I have done with the Democratic Party, the work I have done as an organizer with the non-profit. I am president of the Mobile -- called Stand Up 11:31:06 Mobile, and the work that I do now with CROWD provides me with

that background. I'm able to engage with the citizens above Mobile and surrounding counties and in the Black Belt. And gain an understanding on what they need, what their needs are, and how we can progress forward.

11:31:25 Q Captain Dowdy, what congressional district do you live in?

A I reside in Congressional District 1.

Q And what is your understanding of Alabama's redistricting process for congressional districts?

A My understanding is that the state has a reapportionment 11:31:44 committee that consists of members of both the Alabama State Senate and the Alabama House from both political parties. And the reapportionment committee is chaired by Senator McClendon and Senator Chris Pringle. Once the census data was received by the state, the reapportionment process basically started, 11:32:04 and there were 28 public hearings held across Alabama both in person. And which allowed for private citizens in the state to play a role in the process with our elected officials on any issues that we saw with the current maps so that these issued could be rectified with the new maps that would be presented.

11:32:32 There were 28 public hearings across the state. And the citizens of Alabama were allowed to participate both virtually and in person. She just through me off a little bit. And so, anyways, once the public hearings were done, there was about a month break, and then the reapportionment committee presented 11:32:56 maps to Alabama Legislature. And those maps were almost

immediately voted on. So the citizens of Alabama were not able to play a role in talking about or having any discussion on the new maps. It was as if the process was rushed. And there was not a lot of transparency.

11:33:19 So the new maps were presented -- the people were not able to talk about it if any of the communities of interest were split up. If there were any other issues that were identified, they were not able to be spoke about from the actual citizens. And so they -- the reapportionment committee and the elected 11:33:41 officials, they say that, you know, they're aiming for the process to be transparent, but given the actions that took place, the short turnaround and how fast the maps were passed, it was if they were trying to hinder the citizens from playing a role in the process of the reapportionment.

11:33:57 Q Okay. Thank you. Did you participate in that process?

A I did participate in the process. There was a public hearing held in Mobile. I participated in person. I testified about and spoke about all four of the current maps and placed emphasis on the congressional map, and so I spoke about the 11:34:21 packing that is evident in District 7, and that with that packing, the black vote is basically diluted. I spoke about that one district giving black Alabamians one out of seven, which is only 14 percent of representation in Congress when we make up about 27 percent of the population in the state of 11:34:43 Alabama. And so I also advocated that I would think the fair

11:35:05
11:35:18
11:35:38
11:35:58
11:36:15

and equitable thing would have been with the new maps for there to be two majority-minority districts where a second African-American could be elected to Congress.

I gave this testimony in person. And I also submitted a written statement to the representative that was present from the state reapportionment committee.

Q By second majority-minority district, do you mean a second black district?

A Yes. I mean a second black district.

Q Why did you decide to participate in the redistricting process?

A I decided to participate through my work and in engaging with the citizens. I just realized people do not know how important redistricting is and how it impacts us. And so I was -- I was provided the opportunity through the fellowship to be able to participate and utilize my voice. And so I chose to participate because I saw the need. I see the lack of representation of black Alabamians and decided to participate, and I know when we have these public hearings, sometimes it seems as if they're being done just to say they were done.

And so if the legislators see that we are attending and playing a role in the process, it can also put pressure on them to do the right thing. So that it can be known that, hey, we're watching what you do. We know our state has a history of diluting the black votes. So be aware that we are watching and

we are here. So I wanted my presence to be known. I wanted to be the voice for those in my community who were not knowledgeable on the process. And that's basically why I chose to participate.

11:36:29 Q So, Captain Dowdy, why is it important that black voters have a second district?

A It is important for fair and equitable representation. Looking at who currently represents me in Congress, I am not comfortable, and I am not confident that he is adequately

11:36:49 representing me based off of bills that he has chosen not to support the build back, better build, bills centered around nursing mothers. The CARES Act, the other bills, and so these are issues -- we have issues in our community that can be rectified by supporting these bills. And we don't have the

11:37:11 right person in these elected positions who will vote for the things that can help fix the issues we have in our community.

Then it shows that they need to -- they need to not necessarily go, but we need to be able to have the opportunity to elect fair -- what are our issues, because not everybody who

11:37:30 is elected cares about how the issues in their community. So when you're able to elect someone who understands you, who comes from your community, then progress can be made. And so that is why I am advocating for that. It is necessary that we have a second black district.

11:37:49 Q In your lifetime, do you know of any black person who has

been elected to Congress outside of District 7?

A In my lifetime, I am only aware of black representatives being elected in the Seventh Congressional District.

Q So and then additionally, the -- the bills that you mentioned, the CARES Act and the infrastructure bill, those are bipartisan supported bills, correct?

A Right. For the most part, they are.

Q Thank you. Can you tell us where the black community resides in Mobile County?

A In Mobile County, the black community resides in the city, the city of Prichard, the city of Chickasaw, and then we have some black residents in the northern rural areas of the county, as well.

Q As far as you know, what interests do the black community in Mobile County share in common?

A Some of the interests that we share in common unfortunately is the interest of dealing with what we -- what our struggles are. So we have a high poverty -- a high poverty rate. We have issues with being able to afford health care. All the food deserts in the city happen to be in the black community.

So our struggle is what kind of unifies us and what is our interest. The health care -- issues with education. That's what kind of unified, and those are what black people have in common, the things they are struggling with.

Q Captain Dowdy, can you see and hear me?

JUDGE MARCUS: I think the witness has been cut. Ms. Dowdy, can you hear me? I think we have lost.

THE WITNESS: I can hear you.

11:39:45 JUDGE MARCUS: You can hear us okay?

THE WITNESS: I can hear y'all.

JUDGE MARCUS: Okay. Thank you. You may proceed, Ms. Carter.

MS. CARTER: Thank you, Your Honor.

11:39:53 BY MS. CARTER:

Q So, Captain Dowdy, do you specifically have ties to the black community in the Black Belt?

A Yes, I have ties. My great, great, grandparents originally migrated from the Black Belt area to Mobile for 11:40:09 economic and job opportunities. We have the port. We have factories down here. And then outside of that, everybody in the family didn't migrate. So I still have great aunts and uncles and cousins and family members that do reside in the Black Belt.

11:40:23 Q So black people from the Black Belt commute into Mobile to work in the port?

A There are some people from the northern counties that drive down to work at the ports on the coast of Alabama.

Q In your opinion, what do you think that the Black Belt 11:40:45 counties share in common with Mobile County?

A Being that the Black Belt counties have a high black population, what they share in common is the same -- the issues that I mentioned of what unities the black community. So health care issues -- their health care issues are more extreme in the Black Belt due to the closing of hospitals. We have access to Mobile. Our issue is having the ability to afford the health insurance. And so in the Black Belt, they have issues affording the health insurance, but also getting to the hospitals because of the closing of a lot of rural hospitals. So it's not even the hospitals. It's even seeking regular daily medical attention that they have issues with because some of the closest doctors' offices are over 50 miles away -- comparable to the poverty rate in the black community in Mobile.

Health care-wise in the Black Belt, there's a high HIV rate also. And then the issue with sewage in Lowndes County, which leads to health care issues because they don't have adequate infrastructure to provide themselves with adequate sewage. And then the issues with education also. That's what unites the Black Belt with those in Mobile. And when our family in the Black Belt are struggling, we hear about it. We try to assist as we can, because when they hurt, we hurt, and it's a family issue.

Q So you mentioned education issues. How do education issues impact black people in Mobile and the Black Belt more

specifically?

A Those issues -- the issues that we have with education, the child care issues. So a lot of people cannot afford child care. So the start of education is starting later in life. And so some people are behind, and then it also leads the other economic issues later in life because the education is the issue growing up. That means you are possibly going to make less money when you get older, and it continues to -- as poverty, and it's starting early on because we don't have adequate access to education, and one of those issues because of the economy.

Q And how exactly people do people not have adequate access to education?

A Well, it starts young, so the pre-K -- a lot of the pre-K programs that were around previously no longer are not around. Some of that should be coming back with the Build Back Better plan did get approved. And so that will be providing funds for child care and whatnot. But people cannot afford child care. And so you're leaving your kid with family members while you work. So like I said, the education and the learning process for us in the black community is starting later in life because we don't have the professionals. If I am leaving my child with a family member, they are not a professional to start the education process. We are behind basically and playing catch up, and that sometimes puts it in -- contributes to us staying

--
Q And that's an issue in Mobile and the Black Belt?
A It is an issue in Mobile and the Black Belt because the -- living in poverty is an issue in both locations.
11:44:03 Q You mentioned having relatives in the Black Belt. Where exactly are they located in that region?
A I have family in Montgomery, Wilcox County, Monroe, Escambia, the Dallas County where Selma is located. Those regions. Tuskegee.
11:44:24 Q And also you mentioned the CARES Act and the Build Back Better Act as being something that if you had -- that you would like more representation on.
What specifically about those bills are -- have -- what specifically about those bills affects black voters in Mobile 11:44:51 and in the Black Belt?
A The CARES Act or the Build Back Better plan, one of them had tax credit. So that's extra money being pumped into the household. Also the Build Back Better plan has it where the -- things like 7 percent of their income will go to child care. 11:45:12 So an example such as that the Build Back Better plan is going to create more jobs and grow the economy framework wise. And then it is the Build Back Better plan is investing in child care, and also care giving on the back end for those individuals who are elders in our families and in our 11:45:33 community.

11:45:46
11:45:59
11:46:15
11:46:35
11:46:48

And then within Build Back Better, there's also health care expansion.

MS. CARTER: Thank you, Captain Dowdy. No further questions at this time. I pass the witness.

JUDGE MARCUS: All right. Mr. LaCour, will you be doing the examination?

MR. LACOUR: I will, Your Honor.

JUDGE MARCUS: All right. Just a quick question of timing, and you take all the time that you need. Normally, we would break around noon. If you can start now and we will see how we go. Do you have a sense of timing on your examination of Ms. Dowdy?

MR. LACOUR: Your Honor, probably more than 15 minutes.

JUDGE MARCUS: Why don't you start, and then you tell us what would be a convenient time to break.

MR. LACOUR: Okay.

JUDGE MOORER: Also, Ms. Dowdy, you probably are nervous, but please speak a little slower. It is hard for the court reporter to catch everything when you speak quickly.

THE WITNESS: Yes, Your Honor.

JUDGE MARCUS: Thank you, counsel, and you may proceed.

MR. LACOUR: Excellent.

CROSS-EXAMINATION

11:46:58
11:47:10
11:47:28
11:47:44
11:48:08

BY MR. LACOUR:

Q Captain Dowdy, thank you for being with us today. I am Edmund LaCour. I am an attorney for the defendant in this case, Secretary of State. I have a few questions for you about some of the testimony you gave today, as well as these statements you -- and to your declaration that was submitted to the Court.

First, you stated you were born and raised in Mobile, correct?

A Yes, I was born in Mobile and raised in Mobile.

Q And would you agree that Mobile is a particularly unique city not -- within the state of Alabama?

A We have a few things that are not found in other parts of the state, so, yes.

Q What sort of things?

A Mardi Gras.

Q And Mardi Gras from school growing up, wouldn't you?

A Yes.

Q Do you know if that's common outside of Mobile?

A It's a Gulf Coast thing, so from New Orleans to Mobile for the most part.

Q Uh-huh. Have you spent much time in New Orleans?

A I've been there a couple of times.

Q If you were to compare New Orleans to Mobile, and Dothan, Alabama to Mobile, which would you say are more culturally more

similar?

A I definitely -- I would really lean towards a mixture of both.

Q Okay.

11:48:21 A Yeah. We have like rural areas of our city. So that's why I said a mixture of both.

Q Okay. What are some of the other things that you noticed about Mobile that set it apart within the state beyond Mardi Gras?

11:48:41 A There really isn't much. And I have a lot to compare since I was in the military. So there's not much to say besides we are on the water, so we have an industry that other cities wouldn't have.

Q Yeah. And the port, it's a major driver of economic

11:48:56 activity in Mobile, right?

A It is.

Q And not just for the city of Mobile, but for the county of Mobile?

A For the state.

11:49:03 Q For the whole state. Correct.

Would you agree it's particularly important economic driver for the counties that are centered around Mobile?

A I would say so, because I know people that are both from our state to other states or from the northern counties above

11:49:25 us to come down to work in the particular field.

Q So including Baldwin, Washington, Monroe, and Escambia counties?

A Yeah. Those -- those counties.

Q Would you say them in particular?

11:49:42 A Say again.

Q Would you say those particular counties sort of --

A I would say that because they're the -- they're -- they are the closest. And people are not fond of the south, so, yeah.

11:49:59 Q Yeah. Not a lot of folks travel in from where I am in Montgomery down to work at the port on any given day, correct?

A Yeah, no.

Q And when the port is going well, does that benefit Alabamians from all five of those counties?

11:50:20 A When the port is doing well, I would say it benefits the entire -- in particular, the lower half of the state since it's the closest to the port. So the Black Belt and the Mobile area.

Q And that would include benefits for white and black

11:50:37 Alabamians alike, correct?

A Yes, for everyone in the state, no matter their race.

Q Okay. Now, I wanted to turn to something you said in your declaration. This is paragraphs 7 and 8. Do you have that in front of you or would you like me to share it on my screen?

11:50:56 A Can you repeat that?

Q I was going to turn to something, a couple of statements you made in your declaration.

A Okay.

Q In particular, paragraphs 7 and 8. Do you have a copy in front of you, or would it be helpful for me to show that?

A I do not have it in front of me.

Q Okay. Let me pull that up right now.

Okay. So this is Milligan Exhibit 16. And I am going to go down to paragraphs 6 -- or 7 and 8. I think this tracks along with some of the things you were saying earlier.

In particular, you stated, along with other black people in both the city of Mobile and Mobile County, can trace our family roots back to the Black Belt areas of Alabama, and you list some of those counties.

A Right. You don't have to read it. I see it.

Q All right. And then paragraph 8.

A Uh-huh.

Q Closing with, that I guess essentially black people in the city of Mobile and the county of Mobile can trace family roots back to Black Belt areas. And then black people both in the city and the whiter county of Mobile share history and similar struggles when it comes to combating diversity, fighting inequality in the state of Alabama; is that correct?

A That is correct.

Q Okay. I will take this off of screen share.

So then would you agree that black people in the city of Mobile and black people in Mobile County who live outside of the city are part of a community of interest?

A I would say so. Those in the cities that I named earlier, so Prichard, Chickasaw, Mobile -- and the city of Mobile.

Q Okay. And what about black people in any other parts of the county?

A For the most part, the black people are kind of in the same area. Besides the ones that are in the rural part of the county, their numbers are low, but there are African-Americans in the rural parts of Alabama, and I would say they're dealing with the same issues that we are in the urban area of the county.

Q Okay. So you would say there are part of the community of interest with black Mobilians who live in the city?

A I would say so. They're dealing with the same issues, health care issues, poverty, whatnot, so, yes.

Q Okay. Do you think that black people from Mobile city -- I will say Mobile city -- when I refer to people from Mobile County, I will mean Mobile people who are not within the city for this particular question. But do you think people -- black people from Mobile city that have more in common with black people from elsewhere in Mobile County or more in common with black people from Barbour County, which borders the state of Georgia?

A If Barbour County is a Black Belt county?
Q Would you define it as a Black Belt county?
A That's like 17 of them, so I don't know every Black Belt county.
11:54:50 But black people in the Black Belt or black people in the central lower half of Alabama are all dealing with the same issues.
Q Uh-huh.
A With the poverty and health care, so I would say we do
11:55:03 have stuff in common. We do have similar issues in common.
Q Do you think people in Mobile city and the rest of Mobile County, though, might also have other things in common beyond dealing with those particular issues that you were discussing in your testimony?
11:55:16 A What issues would you be talking about? Because I focused on the issues that affect their daily -- day-to-day operations in their daily lifestyles, not anything that is pleasure or whatnot, but anything that prevents them from being to live fair, equitably, and comfortably.
11:55:33 Q Oh, how about economic issues? Those are day-to-day, correct?
A Right.
Q Probably --
A I would say as a whole, the state has a low minimum wage.
11:55:44 A low minimum wage affects being able to afford basic things,

such as health care. And so the people -- you know, their economic issues are prevalent, and people in Mobile have the same economic issues -- especially if we're following these similar.

11:56:11 Q But would a Mobile County resident, black, white, any race, be more likely to work with a Mobile city resident, or with a Barbour County resident?

A Well, given the distance, I would say Mobile, but we are in a state school board district with counties all the way on 11:56:29 the border of Georgia, so we have an interest when it comes to say school board and no one has an issue with that. So I say it shouldn't be an issue when it comes to another map.

Q All right. Would residents of Mobile County versus Mobile city, would they be more likely to shop at the same stores and 11:56:51 get their news from the same sources than through Mobile County and Barbour County residents?

A Given the location, I would say, yes, the city of Mobile and the county of Mobile residents would shop in the same entities.

11:57:05 Q Okay. So, then, residents of the county of Mobile might have -- well, I take your point is that there are certain things that Mobile city residents have in common with Barbour County residents, or black Mobile city residents and black Barbour County residents might have in common. There might be 11:57:27 other things that black Mobile County residents have in common

11:57:44 with black Mobile city residents that are not shared with black Barbour County residents; is that fair?

A Off the top of my head, I really can't necessarily think of anything -- any major issue that we would have in Mobile that's just uniquely different to just us in the city instead of black people in other areas of our state.

11:58:10 Q Well, let's take -- let's go back to the port for a moment. If there's a congressional representative from the Gulf, he might be more interested in making sure that the port is deep end and wide end than a congressional representative from Huntsville area who might be more interested in the Redstone Arsenal, for example; is that fair?

11:58:34 A It would be fair if the current representative in the port area hasn't been supporting a wall, and a wall isn't by the Gulf Coast. So I don't think that could be a good comparison.

Q Could you say that again?

A When I say wall, I'm talking about the wall -- the Texas border wall that has been talked about being built.

11:58:49 So that representative who represents us has supported that wall, and that wall has nothing to do with us. So I don't think the example that you gave would be a fair one for me to -- to converse about.

Q I was speaking more hypothetically, Ms. Dowdy -- or Captain Dowdy. I apologize.

11:59:10 A Miss is fine.

Q Great.

I mean, hypothetically, you would expect any representative black or white from the Gulf area to be perhaps more interested in Gulf issues?

11:59:25 A Right, you would.

Q Than a representative on the border with Tennessee?

A Yeah, you would. But you never know what you will get sometimes when you elect certain individuals, so you would think your elected representative would care about your health care, but that isn't being a thing that we're seeing how things are being voted on in D.C. So I'm real -- I am more of a realistic person and not hypothetical.

11:59:39

Q Do you think there might be any -- some good faith reasons for not supporting the Build Back Better plan?

11:59:56 A Looking at the -- the way it can grow the economy, how it helps the middle class and the working citizens, I don't -- I don't see a reason why you would not support helping Americans when we are battling a pandemic. People have lost their jobs. You should want to help the working citizens, all Americans, so I don't see the issue -- I can't find a reason why someone should not support it.

12:00:16

Q Would it be fair to say some people might be concerned about the rate of inflation that might -- and how it might be affected by a particularly large federal spending bill?

12:00:35 A I think people should come first, you know. You choose to

represent people. When you are an elected official, you need to be focused on whether or not the bill in front of you will help the people who need the help in the district that you are representing.

12:00:53 Q Does inflation affect black people?

A It probably would affect everybody in America.

Q Okay.

A And not just black people.

Q Okay. I would tend to agree it would affect everyone.

12:01:15 MR. LACOUR: This might be a good point to stop, Your Honors.

JUDGE MARCUS: All right. Why don't we do that? We will take a one-hour break for lunch, and we will come back about five minutes after 1:00, and we will get started at that 12:01:28 point. Ms. Dowdy, I would ask you if you would be kind enough to come on back or really just stay communicating with us because we will start back with you at 1:05 with Mr. LaCour and then again with Ms. Carter.

Mr. LaCour, how much more do you think you have with 12:01:49 Ms. Dowdy?

MR. LACOUR: Your Honor, it's a little tough to estimate.

JUDGE MARCUS: Just a rough sense of how the rest of the day is likely to play out.

12:02:02 MR. LACOUR: Probably 20 to 30-minute range.

JUDGE MARCUS: Okay. And then the next witness for the Milligan folks, Ms. Carter, would be whom? Do you know?

MS. CARTER: I'm not exactly sure. I would be able to say after lunch.

12:02:20 JUDGE MARCUS: Okay. We will just take it as we -- as we proceed.

Ms. Khanna, was there anything you wanted to add at this point or?

MS. KHANNA: Yes. Thank you, Your Honor. Just for

12:02:29 the Court's information, I believe the plan is after Ms. -- Captain Dowdy testifies, the Carter plaintiffs will begin with your their Section 2 witnesses with Mr. Cooper -- sorry -- the Caster plaintiffs. Apologies.

JUDGE MARCUS: Milligan. I'm not sure -- are you

12:02:49 putting on your experts at that point, or are we going to hear from the Milligan experts Duchin, Liu, and Bagley?

MS. KHANNA: So the plan right now I think is to proceed after this witness to the Section 2 case, which is both Milligan and Caster. And we are coordinating so that our

12:03:06 witnesses will go not necessarily with just Milligan first, then Caster, but interspersed.

JUDGE MARCUS: I got it. And you are free to put it in any order mixing them however the parties think is most appropriate.

12:03:18 All right. We thank you all. And we will see you back

here let's say at 1:05, and we will pick up the thread with Mr. LaCour.

We are in recess until then. Thank you.

(Recess.)

13:04:44 JUDGE MARCUS: Judge Manasco, Judge Moorer, are we ready to proceed?

JUDGE MOORER: Yes, sir.

JUDGE MANASCO: I am.

JUDGE MARCUS: We broke as I said before in the middle of the cross-examination of the Ms. Dowdy by Mr. LaCour. With that, you may proceed, counsel. Thank you.

BY MR. LACOUR:

Q Your Honor, Captain Dowdy, welcome back.

Just briefly. On your direct testimony, you said that the Build Back Better bill was a bipartisan bill. What was your basis for that?

A I didn't say bipartisan. You asked me, and I said from what I'm tracking, it was passed, and some people from both sides -- I don't know the exact number on how many from each side voted for the bill, but I know -- I'm tracking that it might have been members from both sides. I haven't really looked. All I cared about was whether or not it had been passed.

Q Are you referring to the small infrastructure bill or the larger Build Back Better plan that has not yet been enacted?

A The Build Back Better plan, the one -- the one that was recently signed.
Q Okay. Do you equate opposition to the Build Back Better plan as a lack of responsiveness to the needs of Black Americans?
A Knowing that health care expansion will be a huge part of each aspect of the plan, I would say I don't think the black Americans or those who struggle with being able to afford health care was adequately taken into consideration.
Q Okay. And you -- I think you said earlier you lived in South Carolina for a time; is that right?
A Yes. I was stationed at Shaw Air Force Base from 2017 to 2018.
Q Okay. Are you familiar with who Senator Tim Scott from South Carolina is?
A I've heard the name, but because I have been registered in Alabama to vote my whole life, I kind of -- I paid more attention to the elected officials that I have the ability to elect.
Q Does it sound right that he's someone who identifies as black and also a Republican?
A I do knew that -- I do know -- I know of Tim Scott. So I don't follow him closely or what he votes for because he's not my elected official.
Q Okay.

13:11:04
13:11:34
13:11:54
13:12:16
13:12:31

A Or represent me.
Q Would it surprise you if I told you that he opposed the Build Back Better plan?
A It would not surprise me, because I do know he is a member of the party who majorityly (sic) opposed the plan.
Q Okay. You think a congressional, a Republican Congressman can represent the needs of black Alabamians?
A It depends on being able to examine their voting record. And the current -- my current representative is in his first term, but examining his current voting record in Congress, I do not feel that he -- and I could only speak on my person because he -- he is representing me, so I pay attention to who -- who represents my area right now. I feel like he's not doing an adequate job at representing black Alabamians.
Q Okay. And do you think a black Congressman could represent the needs of white Alabamians?
A I feel like a -- I feel like a black Congressman could represent both demographics. There are white Alabamians in District 7, even though it is majority-black. And I think Terri Sewell does a great job of representing everybody in her district, and I use her because that's the only district we have ever had black representation from.
Q Do you think she adequately represents the needs of Republicans in her district?
A I would say yes.

13:12:50

Q What makes you say yes?

A When it comes to basic necessities and what brings comfort to individuals as a whole, she supports bills that benefit both black and whites. So I would say yes. Black, white, Democrat, Republican.

Q What sort of bills? I'm just curious.

13:13:10

A The opposite -- she's -- my Congressman did not support basically. So Build Back Better, the CARES Act, there was a bill centered around -- it was Pump, centered around nursing mothers. She supported that. My Congressman did not. So bills such as the ones that I mentioned previously. Basically everything my elected official voted against, she voted for. Things don't just help Alabamians. Thankfully they help everybody in our state.

13:13:28

Q All right. So changing gears a little bit. You said earlier that you have family ties to the Black Belt, correct?

A Correct.

Q Do you have any family ties to Birmingham?

13:13:53

A I have an aunt and all of her kids, so my cousins and cousins that live in Birmingham.

Q Okay. Do you have any family ties to Huntsville?

A I do. I have cousins in Huntsville.

Q Okay. And do you know other black people in Mobile who have family ties to Birmingham?

13:14:08

A Yes, I do. A lot of us have relatives who lived in the

Black Belts who migrated -- they didn't just migrate to the port, but also migrated to Birmingham because of the steel industry and Huntsville and Montgomery. So we have family. Myself and my peers, friends, we have family for the most part in the rural parts of the state, along with the other major cities in Alabama.

13:14:27

Q Okay. And earlier, you identified certain interests that were shared by black people in Mobile and black people in the Black Belt related to health care, education, correct?

13:14:51 A Correct.

Q Would those same interests be shared by black people in Birmingham or Huntsville?

A I -- my work -- majority of my work has been done in the lower part of the state, given my -- Montgomery. So I really haven't done much research on Huntsville. Not even research. I haven't had a lot of time in Huntsville and Montgomery. I have had time there, but majority of my organizing work has been in the lower central region of the state, just because of accessibility.

13:15:15

13:15:31 Q Do you have reason to think that -- scratch that.

So returning briefly to your declaration. You stated that black people in Mobile and in the Black Belt, quote, share history and similar struggles when it comes to combating adversity and fighting inequality in the state of Alabama. Do you think there's a similar shared history and similar

13:15:54

struggles for black people in Birmingham or black people in Huntsville?

A Being that they do have relatives -- I feel comfortable saying people have relatives from the Black Belt area. There could be similar struggle. The things I mentioned when it comes to health care and food deserts and education, that's a -- that can go out of other areas. But like I said, I'm more knowledgeable on the central and lower half because I am assigned to do work in the lower half in the First Congressional District and the surrounding counties in the Black Belt.

Q But do your family members in Birmingham or Huntsville share similar interests to you in terms of these political interests?

A Could you elaborate on the political interests you're talking about? Because the health care stuff isn't political. That's a human need or a human right.

Q They have similar interests when it comes to health care, education, other human rights?

A Yes, as I think everybody would, black and white.

Q Okay. And would you say that black people in Mobile form a community of interest with black people in Huntsville, then, based on shared relationships to the Black Belt, shared interests in health care, education, and other poverty-related issues?

A I feel like we would have more family ties to those in the Black Belt. So not necessarily Huntsville. Like the amount of family I have in Huntsville is the smallest. I have the least amount of family in the Huntsville area. So I would say with the issues that are going on in my family in the Black Belt and if it -- it's impacting me in Mobile because they're my family. I wouldn't necessarily say that that is always the same issue with Huntsville. So I'm not knowledgeable of Huntsville because it's almost six hours away. I don't spend that much time in Huntsville, so I haven't adequately engaged the people of Huntsville, including family or organizing work. I have been assigned the areas on the lower part of the state, just because of the distance and the space.

Q Do you have reason to think that black people in Huntsville would not have similar -- to use your language again -- experience combating adversity and fighting inequality in the state of Alabama as -- for black people in Mobile and black people in the Black Belt?

A Are we talking about modern day or just throughout time?

Q Let's just stick to today for now.

A There is -- poverty exists in the black community. So in the black community, they have --

JUDGE MARCUS: I'm sorry. You broke up for a second, Ms. Dowdy. I don't think we heard the last thing that you said.

THE WITNESS: With those in Huntsville. So I don't feel like I can adequately answer the question.

BY MR. LACOUR:

Q And sorry. Could you repeat the -- I think we lost you for a moment.

13:19:29

JUDGE MARCUS: Why don't we start over, Mr. LaCour. Ask the question again, and again, we'll take Ms. Dowdy's answer. The reason we're doing that is for a moment your screen froze up, so we were unable to hear a piece of your answer. With that, why don't you ask the question again.

13:19:46

MR. LACOUR: Sure, Your Honor.

BY MR. LACOUR:

Q The question was basically: Do you have any reason to think that black people in Huntsville would not have a shared history and similar struggles to black people in the Black Belt or black people in Mobile when it comes to --

13:20:01

MS. CARTER: Objection, Your Honor.

JUDGE MARCUS: Let him finish the question.

BY MR. LACOUR:

Q -- fighting inequality in the state of Alabama?

13:20:14

JUDGE MARCUS: Ms. Carter?

THE WITNESS: I will say --

JUDGE MARCUS: No, no, no. Wait one second, Ms. Dowdy. I think there is an objection from Ms. Carter.

13:20:24

MS. CARTER: Yes, Your Honor. The question -- the

question calls for speculation, and it's also asked and answered. He's asked --

JUDGE MARCUS: Well, I think it has been asked and answered a few times. We will give you one more shot at it, Mr. LaCour, and then let's move on.

13:20:37

MR. LACOUR: All right. And am I asking it again because of the lag or?

JUDGE MARCUS: I think the question has been asked in a variety of ways and answered in a variety of ways. I think it has been asked and answered. What I said was I would give you one more stab at it if you want it.

13:20:54

MR. LACOUR: Okay.

BY MR. LACOUR:

Q My question was: Do you have any reason to think that black people in Huntsville would not have shared interests comparable to the shared interests between black people in Mobile and black people in the Black Belt?

13:21:05

A Like previously stated, I haven't engaged on an in-depth level with the people in Huntsville to hear about what their issues are at the level that I have engaged with those in the Black Belt and lower Alabama region.

13:21:26

Q And you said before that one reason is it's six hours away, correct?

A Correct.

13:21:43

Q So that distance makes it a little bit harder for you to

know the facts on the ground in Huntsville, correct?

A It can. It can.

Q Now, you said you worked for the Alabama Democratic Party for a time; is that correct?

13:22:06 A Correct. Correct.

Q Was any of that work on a congressional campaign?

A Outside of that work was centered around Senator Doug Jones. And then outside of that in my personal time, I have worked on a congressional campaign.

13:22:23 Q Was that in the First District?

A It was in the First District.

Q Okay. Was that a recent congressional campaign?

A It was 2020 election cycle.

Q Okay. Were you working with James Averhart?

13:22:41 A Yes. I was working with James Averhart.

Q Okay. And he was the Democratic nominee for the --

A He was.

Q -- in the general election to Representative Carl?

A Yes, he was.

13:22:54 Q What sort of work were you doing on the campaign?

A Engaging with the citizens in the counties assigned to the -- to the district.

So engaging with them on what their issues were that they would want James Averhart, if elected, to advocate for as their

13:23:24 Congressman. So we did that in some of the Black Belt counties

-- Monroe County. Clarke county was in the First Congressional District. A portion was, but it's not anymore. So in those districts that those two counties are considered Black Belt counties and the counties that we have and had now -- Escambia, Washington.

13:23:43

So engaging with them on what their issues were because being that I didn't permanently live -- I didn't always know what their issues. So we engaged with them, had conversations. I relayed that information back to the -- back to the candidate. And then we also assisted those in the communities with voter registration work. I did voter registration work for those who were not registered or who thought they couldn't vote because of previous things that prevented them from voting. So engaging them in that manner on issues and voter registration.

13:24:03 13:24:22

Q Did you find any issues that were common to people within those five counties in particular, that they were people interested in?

A Yeah. It's a repeat narrative, so kind of what I was stating earlier. People having a lot of medical issues, not having access to the food, and then when you don't -- when the food desert -- you tend to eat unhealthy and that leads to other health issues. And then they can't get those health issues fixed. Those are -- it was issues along those lines, things about infrastructure, you know, people complain about

13:24:38 13:24:58

roads. It was kind of like a similar narrative.

Q Okay. And it's easier to get around and actually meet with all these people because they weren't six hours away, correct?

13:25:15 A No. We -- we had to travel almost two hours to Monroe County.

Q Right. But it's a shorter drive from Mobile to Baldwin County, for example, than it is from Mobile to Madison County, correct?

13:25:42 A Yes. But we also have congressional districts that are that are already in effect that cover multiple counties and require a multiple-hour drive to include our school board district. So we are in a school board district with counties that are three, maybe three, three-and-a-half hours away so -- 13:25:59 on the state level, so.

Q And do you spend a lot of time -- do you know did the campaign spend a fair amount of time and money getting to know those particular voters in those particular counties?

A We did because they were not -- they're in the rural parts 13:26:23 of the state, so, yeah, we spent our weekends engaging with them.

Q Okay. Would it have been disruptive to the campaign to learn a few months before the election that 200,000 of those voters were no longer going to be voters for District 1 and 13:26:43 that 200,000 new voters from somewhere else in the state were

going to be part of District 1?

A Not necessarily if you are aware of redistricting and know that it's something that will occur and lives changed. So I wouldn't think it would be that much of an issue.

13:26:58 Q Would it have taken more time and effort to go?

A It would. It would. Because you would have to go engage new people, so it would, but that's a part of being a candidate.

Q Great.

13:27:14 Let me see. Turn to next.

We -- so going back to your declaration. You had stated in paragraph 4, it's a short quote, so I will read it to you, and if you want to see it, I will be happy to pull it up as well. Upon returning to Alabama, I immediately noticed the 13:27:43 lack of representation in many areas of leadership and elected positions in particularly at the congressional level.

When did you return to Alabama?

A Around 2018. But I was always a voting citizen. When you are on active duty, you can keep your state residency. So 13:28:05 since 18, I've always voted at home. But being on active duty, you don't get to see -- you don't really get to engage with the candidate, you know. You see what you can see from afar from what information they put out on their websites and whatnot. So once I returned home and I started organizing, and doing 13:28:24 organizing work, and learning more about the democratic

process, and talking with people in the community and just becoming more aware, you know, being able to be present -- because when you are on active duty, you are not present. Once I was able to come home and realize that what I was looking at wasn't fair representation, once I learned the numbers of how many black people were in the state and the history of us only having District 7, it was -- I was -- my eyes were opened.

Q And so that process began, 2018?

A More so around like 2015 or '16 because I was -- and as a voter officer with my Army unit. So it required me to be knowledgeable because I was encouraging to -- vote because a lot of service members vote absentee ballot because we're not present at home for election. So I became more aware around in 2015-16 when I was assigned VA voting advocate officer.

Q Okay. Any time before 2021, did you think about bringing a lawsuit like this one to address that lack of representation?

A Beforehand, I assumed that with people -- more people paying attention to redistricting and more people advocating for a second congressional district through the public hearings that were held and whatnot, I assumed that the state would possibly give us fair representation. The majority of the public hearings where we had a nice turnout were saying the same thing, came for the same thing. You know, I had faith in the reapportionment committee would provide that fair and equitable representation, and then when the new maps came out,

and it almost looked exactly how it did previously, it's -- I just decided why not play a role in possibly bringing about that change and continuing to advocate and partake in a process of participating in a suit such as this.

13:30:40 Q Okay. So from 2015-2016, when you are -- to become aware of this lack of representation problem that you are alleging, you decided, wait and see a few years until the next census numbers come out and redistricting happens again; is that fair?

A Right. Because at that point, there was no -- I know the 13:31:00 maps got redrawn. But I know that the census data will provide the adequate representation on what the numbers actually look like. So. And then the work that I do through CROWD. So I just became -- being a part of the fellowship really inspired me to be more engaged in the process at the highest level that 13:31:25 I possibly can.

Q Based on your experience, your -- the knowledge you have acquired, how long do you think this lack of representation has been a problem?

A I have not -- I haven't looked at the census numbers from 13:31:43 2010 and 2000. So I don't know what the black population number was in 2010. I was 20 years old at West Point. So it wasn't on my radar, and I haven't went back and looked. So I don't know if I can adequately answer how long I feel as if we have not been represented properly.

13:32:04 Q And is the lack of representation really that you're

             referring to the fact that the black population in Alabama is roughly 27 percent, make up a majority -- a majority in a congressional district and only 14.3 percent of congressional districts?

13:32:24 A Right. We're not properly represented because we -- because there is only one district where a black candidate can be elected.

Q Okay. And if there were two such districts, that would represent 28.6 percent of congressional districts in Alabama, 13:32:45 correct?

A Correct.

Q Do you contend Alabama did something wrong in 1992 when it drew one majority-black congressional district?

A Not knowing when District 7 came about, I would assume it 13:33:01 happened in '92, since you brought it up.

If that was -- I don't know when District 7 came about. So did it come about in '92?

Q Yes, it did.

A Okay. So I would say going from no representation to that 13:33:14 First District, I would not say they did anything wrong because it gave black people some opportunity to elect someone who is a part of their community, understands their issues.

Q Okay. But at some point between 1992 and 20 -- and what date do you think representation was --

13:33:40 A I think it just depends on -- I think that would depend on

what percentage of Alabama -- what the black percentage of Alabama looked like in those years. And I am not aware of what the numbers are, so I can't adequately state what -- when did we need the second district.

13:33:57 I will say we're just pushing for one extra district right now, and it's an issue. So getting that one issue -- getting that one district, and now we are aiming for another one, I think it takes -- you have to take baby steps in processes like that. So we are at the next step where it's time to advocate for that second black district. 13:34:17

Q Does it matter to you how that second majority-black district is composed?

A To me personally, no. I feel like a second district would be the fair thing to do. So to me personally, knowing that 13:34:37 Birmingham is majority-black, or Jefferson County has a high black population, I know another district can come from that region. Because of the work I do, I am aware of the demographics in the state. So at this point, I'm not -- I don't have a preference over where it comes from.

13:34:54 Q Okay. If you could get a second majority-black district by joining parts of Mobile with parts of Birmingham and Huntsville, would that lead to fair and equitable representation?

MS. CARTER: Objection, Your Honor, this exceeds the 13:35:10 scope.

JUDGE MARCUS: One moment. One moment, Ms. Dowdy. We have an objection. Would you state your objection?

MS. CARTER: Yes, sir. This line of questioning exceeds the scope of direct.

13:35:21 JUDGE MARCUS: Well --

MR. LACOUR: Your Honor, I am trying to determine what she means by fair and equitable and if it means simply proportional representation or if there are other factors that might be relevant in determining whether a particular map is fair and equitable when those are pretty --

13:35:34

JUDGE MARCUS: I will allow the question. You may proceed. Just put the question again directly and simply.

BY MR. LACOUR:

Q Captain Dowdy, if a second majority-black district could be drawn by joining parts of Mobile with parts of Birmingham and Huntsville, would that lead to a fair and equitable representation?

13:35:48

A Given the work that I have done with organizations across the state, I haven't seen a map that puts Huntsville in a majority-black district, a map that -- that and adequately talk about how to answer that question because all the maps I have seen proposed and seen people talk about that analysis have been done with that maps have not included Huntsville in it. So I'm aware of the Birmingham population of African-Americans to Tuscaloosa, the Black Belt and Mobile, so I haven't seen a

13:36:11

13:36:37

map with Huntsville produced and showing the stats. And so I don't think I could adequately support a map of the nature that you're talking about.

Q And just to drill down on why it is you couldn't support that map. Is it simply because you haven't seen one that looks that way?

A I haven't seen one. I haven't -- I haven't done analysis or -- I don't know what the -- I don't know if the black population is in the Huntsville area. And so I've seen maps presented by people who are doing the work that have other areas of the state combined. And so there's solutions to the problem that we have, and I think those maps that have been presented that do put -- that does not present Huntsville are maps that we should be focused on and consider. Those are ones that I am knowledgeable on. So because I don't know demographics of northern Alabama, I don't think I can adequately speak on what a map -- what map if I would support a map that had Huntsville in it for a second black congressional district.

MR. LACOUR: Is Judge Moorer still on? I don't see him. I hate to...

JUDGE MARCUS: Yeah. I think that you're right. I do not see Judge Moorer on the screen just this past moment. I am glad that you raised it.

Frankie, are you with us? I guess not.

THE CLERK: Yes, sir. I am here.

MS. ADAMS: Your Honor, this is Kelly Adams. I'm Judge Moorer's clerk. I will give him a call.

JUDGE MARCUS: Thank you, Mr. LaCour. Let's hold up until we get him back on the screen.

MR. LACOUR: Absolutely.

JUDGE MARCUS: Judge Moorer, are you able to hear us okay? Hi there. Can you hear us, Judge Moorer?

JUDGE MOORER: I'm sorry. We had some technical difficulties on our end.

JUDGE MARCUS: No problem at all. We didn't proceed at all without you. So there's been no break. We will proceed with the next question, Mr. LaCour.

MR. LACOUR: Thank you.

BY MR. LACOUR:

Q Captain Dowdy, we talked earlier about some of the shared interests, residents of the Gulf counties. In light of that, if it were possible to create a majority-black congressional district that included all of both Mobile and Baldwin counties, rather than splitting those counties, do you think that would be better for black voters who live and work in the Gulf region than an alternative plan that also creates two majority-black districts, but ends up splitting those counties?

A If a second -- can you -- are you saying that a second black congressional district would be made but Mobile and

13:42:32

13:42:45

13:42:54

13:43:13

13:43:32

Baldwin County would be kept together?

Q Correct. If it were possible to create a second majority-black district while still keeping Mobile and Baldwin counties together, all things being equal, would that be preferable for black voters who live and work in the Gulf region rather than a different map?

MS. CARTER: Objection.

BY MR. LACOUR:

Q In which two majority-black districts are created?

MS. CARTER: Objection, Your Honor.

BY MR. LACOUR:

Q But Mobile and Baldwin are split?

JUDGE MARCUS: Yes. Basis.

MS. CARTER: Speculation.

JUDGE MARCUS: Well, I am not sure it's asking her to speculate as to tell us what her preference would be. But can you sharpen the question a little bit, Mr. LaCour? It's not really -- I think there's a clause or a piece missing from the question. Just put your question again, please.

MR. LACOUR: I will try it again, Your Honor.

BY MR. LACOUR:

Q Captain Dowdy, all things else being equal between two hypothetical plans that both include majority-black congressional districts, would it be better for black voters to live and work in the Gulf region that all of Mobile and Baldwin

counties be kept together versus being split apart?

A I don't think it would matter just because we already have a map that was approved on a state level where Mobile and Baldwin County are in two different districts. And that would be the state education map. So I don't think it would matter either way. We're split on that level, and then we're combined now. So I don't think -- I don't think it would matter just as long as there's a second majority-black district.

Q Do state board -- I mean, you referred a few times to the state board of education, correct? Do members of the board have similar responsibilities as members of Congress?

A They're representing Alabamians. But they're not voting on legislation that impacts the whole country. They're focused on educational issues to those in Alabama.

Q Correct. And typically on statewide basis, correct?

A Correct.

Q So they don't have the same opportunity to sort of secure important federal spending for their district, for example?

A I don't -- I haven't worked on a state school board campaign, so I don't know what the duties are. I'm just going off of maps that have been approved and that a map that looks like what we're fighting for that has already been approved, and so that's why -- if it's fine for citizens to be represented or combined -- if it's fine to combine Mobile and the Black Belt when it comes to education on the state level,

why wouldn't it be fine to combine Mobile and the Black Belt on a congressional level, as well? And that -- that combination was done, so that there could be a black school -- a black -- a district where a black person could be elected. That's really why that district is drawn that way. And so my deal is I don't see the issue on why we can't work to achieve that on a congressional level.

Q But you just said you don't know anything about the duties of a state board of education member, correct?

A I do not because I haven't worked for a campaign, so.

Q So do you know whether that's really a good comparison with --

A I would say yes.

Q -- Congress?

A The maps were drawn by the reapportionment committee, signed by the governor. She's representing -- I guess state school board would be -- I don't know if it's -- if college is a road into that, or if it's just K-12, but legislation, so they're representing students or our youth or things concerning education, and there's bills that are passed at a national level concerning education, and our kids are represented by the congressional member, as well. So I see similarities in there. When it comes down to it, they're representing people in counties that are within our state.

Q And how many members are on the state board of education

from the districts?

A Eight.

Q And how many congressional districts?

A Seven.

13:46:48 Q Okay. Do you know anything about the history of the state board of education map and how it came to be?

A I do not.

Q Okay. You stated -- let's see. There's one other -- at least one other question I had from something you had said in

13:47:12 your declaration. Let me find it. Bear with me for just a moment.

So paragraph 9 of your declaration refers to -- says the issues of education, health care, and the equitable -- distribution of infrastructure have been devastating to the

13:47:55 black communities residing in the Black Belt and Mobile. All of this in addition to not being able to elect someone who will fight for the things the black people of Mobile find important, results in the demographic that I belong to being helpless and disempowered.

13:48:06 So are the members of the demographic you belong to helpless and disempowered in every congressional district except for District 7 right now?

A I can only -- I would say that they're not fairly being represented. I will leave it at that. So when I say like

13:48:29 disempowered, it's like the way the maps are drawn right now.

If I go -- when I go and vote, I know that at this point given the demographics of my congressional district, I will not be able to elect someone for the most part who will advocate for the needs of my community, the black community. And being that we know how incumbency work, the same person will more than likely stay in the seat.

13:48:50

And so given the track record thus far, I don't -- I feel as if I'm going to vote anyway, but I feel as if my vote holds no weight because I'm not able to vote for someone who has shown that they care about legislation that impacts those people within the district, and especially those from my -- right now I'm focused on the black community.

13:49:06

Q Do you think Republican members of the black community are helpless and disempowered in the First Congressional District?

A Given that I work for the Alabama Democratic Party, and the majority of the black people I engage have been Democrats, I really haven't engaged with the black Republicans, and I do know the number is low. So I don't -- given my background, I haven't really engaged with that many black Republicans. It's literally been about two, so... I am not able to speak on that from that I strong knowledge base.

13:49:25

13:49:47

Q Okay. So you don't know whether black Republicans in the first congressional district are helpless and disempowered?

A No. Because the ones I have engaged have happened to have been for the most part Democratic.

13:50:05

Q But you know a couple of Republicans you said, correct?
A I do.
Q In Alabama?
A I do.
13:50:20
Q Are they helpless and disempowered?
A They happen to not be a part of the majority of the population that live -- that are in poverty. They are more so like upper middle class, so.
Q Are they still part of the black community?
13:50:40
A They are. So they would have family members, because some of us make it out, and everybody does not. So they would have family members who may fit the description that you're talking about.

MR. LACOUR: I think that might be it for me. If I
13:51:01
could just confer with my co-counsel for just a moment.

JUDGE MARCUS: Sure.

MR. LACOUR: Ms. Dowdy. I thank you for your time. I pass the witness.

MS. CARTER: Your Honor, may I have about a ten-minute
13:51:30
break.

JUDGE MARCUS: You sure can. We will take a ten-minute break. I have about 2:50, 2:51. We will come back at -- or actually it's 1:51 your time. I'm reading it here on Eastern Standard Time. We'll come back in about ten minutes, a
13:51:46
little past 2:00 o'clock your time in Central Standard Time.

Thank you. We will take a ten-minute break.

(Recess.)

JUDGE MARCUS: All right. I think we are all assembled and everybody here, everybody is tuned in. Judge Moorer, Judge Manasco, you are able to hear me okay?

JUDGE MANASCO: I can.

JUDGE MOORER: Yes, sir, I can.

JUDGE MARCUS: All right. Thank you. Ms. Carter, we are ready for redirect of Ms. Dowdy.

MS. CARTER: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. CARTER:

Q Captain Dowdy, do black people in the Black Belt celebrate Mardi Gras?

A They travel down to Mobile to celebrate with us. Our family members do.

Q Do black people from Clarke County communicate to Mobile to work in the port?

A I don't know exactly from what counties people come down from. And I'm trying to remember where Clarke County is. I know it's -- it was in the First Congressional District. I'm not knowledgeable to say on that county. But counties such as Escambia and Washington County, yes.

Q And is one shared issue for black people in the Black Belt and Mobile access to high speed Internet?

A Yes. And we saw that during the pandemic. We -- I'm aware that that issue in the Black Belt, and then we had that issue here in Mobile when the schools went virtual, and we realized a lot of the black households didn't have access to Internet.

14:03:44

MS. CARTER: Thank you. No further questions, Your Honor.

JUDGE MARCUS: All right. Are there any other questions, Judge Moorer or Judge Manasco?

14:03:57

JUDGE MANASCO: None from me. Thanks.

JUDGE MOORER: No, sir.

JUDGE MARCUS: Seeing none, we thank you, Captain Dowdy, for coming down here today, and you are excused.

THE WITNESS: Thank you, Your Honor.

14:04:11

JUDGE MARCUS: And who would be the next -- I take it at this point, the plaintiffs both Milligan plaintiffs and Caster plaintiffs are turning to the Section 2 presentation although there's undoubtedly overlap. Do I have that right, Ms. Khanna?

14:04:28

MS. KHANNA: Yes, Your Honor. My understanding is from here on out, we are dealing exclusively with the Section 2 case, both ours -- Caster plaintiffs and Milligan plaintiffs.

JUDGE MARCUS: So who will be called first?

MS. KHANNA: Mr. William Cooper. Caster plaintiffs' expert.

14:04:44

JUDGE MARCUS: So you are going to put Mr. Cooper on first, and I take it you will go back and forth between you and the Milligan plaintiffs on the Section 2 case.

MS. KHANNA: Yes, Your Honor. We're trying to present it in as coherent a fashion as possible, but obviously witness availability and issues like that.

JUDGE MARCUS: I understand. So the way we will proceed is we'll proceed in the same manner we have proceeded earlier. If there's something particular to the Caster case and the Caster case alone, you can highlight it, and we can turn it at that point over to Judge Manasco. Otherwise, we will proceed this way. I take it that's agreeable with you.

MS. KHANNA: Thank you, Your Honor. Yes.

JUDGE MARCUS: All right. Let's proceed. We have Mr. Cooper?

MS. KHANNA: He should be here.

JUDGE MARCUS: Mr. Cooper, welcome.

WILLIAM S. COOPER,

having been first duly sworn, was examined and testified as follows:

JUDGE MARCUS: Thank you. Good afternoon. And if you would state your full name for the record, please.

THE WITNESS: My name is William Sexton Cooper.

JUDGE MARCUS: Thank you, sir. And you may proceed, counsel.

MS. KHANNA: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. KHANNA:

Q Good afternoon, Mr. Cooper.

14:06:04 A Good afternoon.

Q You have been retained as an expert for the Caster plaintiffs in this case; is that right?

A That's correct.

Q And you prepared two expert reports in this case?

14:06:16 A I have.

Q Okay. I would like to call up Caster Plaintiffs' Exhibit 1, please. Can you please identify this exhibit?

A Yes. That is the first declaration I filed. I think it was around the 10th of December.

14:06:36 Q Great. And if I can now call up Caster Plaintiffs' Exhibit 59.

A And that would be the second declaration filed ten days later.

Q Thank you. And do you have a printed copy of both of

14:06:57 these exhibits in front of you, as well?

A I do. I have a binder of various documents that you have prepared I guess is a trial exhibit book.

Q I believe -- and if you look through it, is that basically is just your two reports and all of the exhibits attached to

14:07:15 them; is that right?

A Exactly.

Q And just for your awareness and the Court's awareness, I will be periodically looking to an adjacent screen to looking at the exhibits and my own notes, but I understand you might be looking down at your report at times, too?

A Exactly.

Q All right. Let's pull up Plaintiffs' Exhibit -- Caster Plaintiffs' Exhibit 2, please.

This was attached as Exhibit A to your first declaration. Is this your current CV?

A Yes.

Q And does it provide a complete and accurate summary of your background and professional experience?

A I believe it does.

Q Great. Okay. I think we can take this down.

I will just ask a few questions on your background and expertise without combing over that document, which is, of course, in the record.

What is your profession, Mr. Cooper?

A I am a consultant providing demographic analysis and computer mapping analysis.

Q What does that mean?

A Basically, I draw maps, some of them for purposes of elections, others for other kinds of demographic analysis -- poverty, households having issues with public utilities, or

something like that.  It just varies from project to project.
But almost invariably there is a component that involves
mapping.  So that's my key function.

Q    And so do you usually incorporate census data in drawing
those maps?

A    Yes.  Yes.  Almost always.

Q    So is it fair to say that you draw maps for a living?

A    That is fair.  That is basically what I do.  And --

Q    How long have you --

A    -- lawns.

Q    How long have you been doing this?

A    I started using GIS software maybe just a limited amount
in graduate school in the '70s actually, but it was off of a
mainframe, and stuff was printed out on a piece of paper.  With
modern-day technology, I think in late 1989 or maybe early
1990, I obtained a copy of a software program called GIS Plus
that was developed by the Caliper Corporation in Massachusetts,
and they were also the makers of the world-famous Maptitude for
redistricting that I still use to this day.

Q    So about 30 years?

A    30 years, right.

Q    Have you been accepted as an expert witness in cases
involving redistricting before?

A    I have.

Q    And about how many?

A I think approximately 45.
Q 45 federal court cases?
A 45 federal court cases involving -- I believe almost all of them would have been Section 2, not all perhaps, but almost all.
Q And all of those cases are listed in Caster Plaintiffs' Exhibit 2 dating back to the '80s; is that right?
A That's correct.
Q Have any of the Section 2 lawsuits in which you have served as an expert witness resulted in changes to redistricting plans?
A Many have, at least five at the state level, and 25 or more at the local level.
Q And do you -- what state level plans have you testified in Section 2 cases that resulted in changes to those plans?
A The first state level case I testified in would have been in Tennessee in the early '90s. And in that case, the issue was regarding the state House, and the end result was that a year or two later, a new African-American majority House district was drawn in west Tennessee.
Q Any other states?
A I was involved in a case in Montana in the '90s to the early 2000s, Native American Section 2 case. Then later that decade, I also had a case on South Dakota involving the Lakota Sioux and the Cheyenne Sioux. That resulted in the Court

finally ordering a plan that I developed as an illustrative plan as the remedial plan. I think that would have been around 2008 or 2009 when it was finally court ordered.

Q And more recently in Mississippi, as well; is that right?

14:12:03 A That is correct. In Mississippi in 2019, I testified at a Section 2 trial involving the Mississippi state Legislature, the state Senate, and there, as well, the end result has been a new state Senate district in the Mississippi Delta.

Q Have you served as an expert in any other Alabama cases?

14:12:23 A I have. I served as an expert in the Alabama Legislative Black Caucus case which was not a Section 2 case. I also testified in the judicial case in 2018 involving state court, the Supreme Court, and the appellate courts. And I testified also in 2017, I believe, in a school desegregation case involving the city of Gardendale and Jefferson County. The judge relied on some of my maps in her opinion.

So I have testified. I think those are the three times I have testified in federal court in Alabama.

Q In fact, most recently, you actually testified in the Chestnut case, as well, just a couple of years ago; is that right?

A Exactly. Thanks for refreshing my memory.

Q Absolutely.

So have you only done work on behalf of plaintiffs in litigation?

A No. I've worked on behalf of defendants' jurisdictions.

Q Any in particular? Any examples?

A Most recently in the summer of 2020. I think my first Zoom trial I testified on behalf of the city of Quincy, Florida, the Northern District of Florida, in a Section 2 case.

Q All right. Do you also provide map drawing consultation to jurisdictions outside of litigation?

A Yes.

Q And which jurisdictions, for example?

A Well, since the release of the 2020 census data, I have provided assistance to the city of Wenatchee, Washington and also to San Juan County, Utah. In fact, just a couple of weeks ago, the county commission out there adopted the plan that I -- a plan that I drew for them. So there is now a plan in effect for the rest of the decade at the county commission level that I drew.

Q And you have also provided map drawing services for several jurisdictions in Mississippi; is that right?

A That is correct, going back to the late '90s.

Q Thank you.

MS. KHANNA: Your Honor, pursuant to federal rule of evidence 702, I would like to proffer Mr. Cooper as redistricting, demographics, and census data to the Court.

MR. DAVIS: No objection, Judge.

JUDGE MARCUS: I'm sorry. I couldn't hear you.

MR. DAVIS: No objection, Your Honor.

JUDGE MARCUS: We will qualify the witness as an expert in those three fields. You may proceed.

MS. KHANNA: Thank you, Your Honor.

14:15:00 BY MS. KHANNA:

Q Mr. Cooper, can you please tell the Court what you were asked to do in this case?

A Yes. I was asked to do two different things. One, to determine whether or not the minority population, specifically 14:15:16 the African-American population in Alabama was sufficiently large in geographically compacted to create a second majority-black district in central and south Florida, and also to produce some statistics from the Census Bureaus, specifically the American Community Survey examining the 14:15:38 socioeconomic well-being of African-Americans as opposed to non-Hispanic whites in the state.

Q Did you reach any conclusions regarding whether the black population in Alabama is sufficiently large and geographically compact to create an additional majority-black congressional 14:15:55 district?

A Yes, I did.

Q And what was that conclusion?

A It is definitely sufficiently large and sufficiently geographically compact to create a second majority-black 14:16:08 district based on the 2020 census.

Q How did you determine that?

A I took the U.S. census data that was released back in August and developed some illustrative plans combining different counties, different parts of south Alabama, and those plans were ultimately part of my first declaration, where I drew I think six illustrative plans.

Q Great. And did you reach any conclusions regarding whether there were any disparities between black Alabamians and white non-Hispanic white Alabamians on various indicators on socioeconomic well-being?

A Yes. That's just clearly apparent, I think, to most anyone, and data really brings it out. Poverty rates are twice as high for African-Americans versus non-Hispanic whites in the state. College graduation rates are higher for non-Hispanic whites. One could go on and on. It's very difficult to find any data point relating to socioeconomic well-being that results in African-Americans at large in the state outperforming whites.

Q All right. I'd like to turn a little bit to the demographics of the state.

Can you please describe at a high level the population growth patterns among different racial groups in Alabama since between the 2010 census and the 2020 census?

A Well, the population in the state that has increased. And I think I have a table in my declaration. Specifically,

though, the minority population grew. I don't have the percentage right off the top of my head. But I think it's about 5 or 6 percent. And the non-Hispanic white population actually fell by about 1 percent. And so African-Americans, I believe, comprise a significant component of the minority population growth. But the fastest growing minority population in Alabama between 2010 to 2020 is actually the Latino population starting from --

Q I think you are referring to --

A Oh, starting from a much lower population base.

JUDGE MARCUS: I think the point, Mr. Cooper, that our court reporter is making is that she's had some trouble taking down the testimony. She wants to get it exactly correct, so as we proceed, just really proceed very slowly for all of us, and we'd be much appreciative.

Did you want to put your question again, Ms. Khanna?

MS. KHANNA: No, Your Honor. I think we actually have it on record now.

JUDGE MARCUS: Okay.

THE WITNESS: I would like to clarify that actually the fastest growing population in the minority community would have been Asian Americans. Not in terms of absolute numbers, but just in terms of percentages. It nearly tripled by 193 percent.

BY MS. KHANNA:

Q All right. And I think that the figure you're referring to is Figure 1 on page 6 of your report.

MS. KHANNA: Let's call that up. That's Caster Plaintiffs' Exhibit 1, Figure 1.

14:19:43 BY MS. KHANNA:

Q So what does this figure indicate about the white population since 2010?

A Since 2010, it's up by -- it's down by 1 percent, 33,000.

Q And what about the minority population overall?

14:20:01 A Up by 17 percent or 277,594.

Q And what about the single-race black population, including black Hispanics?

A The single-race black population has increased by 44,851 persons or 3.58 percent.

14:20:25 Q And finally, what about the any-part black population?

A It increased by 83,618, or 6.53 percent.

Q Mr. Cooper, what is the difference between single-part black -- the single-race black -- sorry -- and the any-part black metric?

14:20:45 A Well, the single-race black category is just simply -- an enumeration of the number of people when filling out the 2020 census form, there's an option to sign as single-race black or black plus one other race, which could be black and white, black and indigenous, black and Asian. So single race is just

14:21:14 for persons who checked black and nothing else. Any part would

include those who also identified as having some other racial background in addition to being black.

Q So which metric do you typically use in determining whether the black population is sufficiently large and geographically compact to comprise a majority-black district?

A Well, it would vary from place to place, but primarily nowadays in most parts of the South, I would use any-part black, perhaps elsewhere say in south Florida, I might look at non-Hispanic black just because it's a very large Latino community there. But for Alabama, I think the appropriate category to examine is the any-part black population.

Q And why do you choose to look at the any-part black population?

A Because households in the 2020 census and individuals have identified as either single-race black or some other part black, and in addition to that, there is case law out there -- I am not a lawyer, but the definition has been accepted by the Supreme Court going back to Ashcroft vs. Georgia, and so it seems appropriate to use that definition.

Q So it's your understanding that the Supreme Court has required the use of the any-part black metric in cases such as this; is that right?

A I believe so. I believe so. It could vary from place to place, though. I will point that out. But it's not something that would be a factor in Alabama where the Latino population

is still relatively small, and beyond that probably, 40 percent of the Latino population is noncitizen. So the key minority population in Alabama is African-American.

Q So, Mr. Cooper, have any courts in Section 2 cases where you have served as an expert used the any-part black metric in determining whether the first *Gingles* precondition has been met?

A My recollection is at least two have. One in Fayette County, Georgia in 2014 or 2015, NAACP versus Fayette County. And another time in the school board case I was involved in, in Ferguson-Florissant school district outside of St. Louis, Missouri. And I routinely report the any-part definition. In some instances, it doesn't become an issue. But those are two where I think it -- at some level did become an issue when the Court accepted the any-part definition.

Q I'd like to move on to discuss the geographic distribution of the black population in Alabama. Let's pull up Figure 2 of your report, which is on page 8 of Plaintiffs' Exhibit 1.

Can you please describe what this figure shows?

A Yes. This shows the distribution of the black population by percentage black at the county level. So naturally, some of the more rural counties in the so-called Black Belt have high percentages of African-American populations. And, of course, Montgomery County is part of the Black Belt. And it, too, is almost is roughly 50 percent black, I believe. It was a very

large population. But in addition to Montgomery County, there are other counties in the state more urban, including Jefferson, Tuscaloosa, Mobile, and, of course, Huntsville, as we've sort of discussed or was discussed this morning. All of those areas have very large numbers of African-Americans.

Q Okay. I am going to pull this one down and pull up Figure 4 of your report, which is on page 11. I believe this is the current the 2021 enacted congressional plan; is that right?

A Yes.

Q Are any of the districts in this plan majority-black?

A Only one.

Q Which one is that?

A District 7. District 7.

Q Do you know how much of Alabama's black population is in District 7 under this plan?

A I believe that I calculated that it was around 14 percent.

Q Actually, I am going to refer you to paragraph 28 of your report. And I think there -- if that refreshes your recollection, there your report -- the percentage of the statewide black population that resides in District 7?

A I'm sorry. Which paragraph?

Q Paragraph 28.

A Oh. Oh. I'm sorry. Yes. You're right. Of all -- of all of Alabama's black population, about a third does reside -- less than a third in Congressional District 7.

Q Great. Thank you. We can take that down.

In which districts -- so you said less than a third of the black's population resides in majority-black district under the congressional map; is that right?

14:26:48 A Yes.

Q In which districts do the remaining two-thirds of black -- of the black population generally reside?

A In Districts 1, 2, and 3.

Q Okay. Let's pull up -- if we could please pull up Figure 5 of your report on page 12 of Caster Plaintiffs' Exhibit 1.

14:27:06

A Yes.

Q What is the Black Voting Age Population of District 7 under the enacted plan?

A The percentage is 55.26 percent and in District 7.

14:27:28 Q And what is the Black Voting Age Population of Districts 1, 2, and 3 in the enacted plan?

A 1 and 3 are at just about 25 percent. District 2 is just a little bit over 30 percent.

Q So about a quarter to a third of the eligible voters in each of these three districts is black?

14:27:50

A Yes.

Q What is the total black population of those three districts -- Districts 1, 2, and 3 under the enacted plan? And if it helps, I can refer you to paragraph 29 of your report.

14:28:15 A Oh, oh, okay. For -- well, for 1, 2, and 3, the total

14:28:46

population -- the total black population would be 612,759.

Q How does that number compare to the ideal population for an Alabama congressional district?

A It's almost as large as the ideal district size, which is 717,754.

Q So taken together, these three districts have enough black population to form nearly an entire congressional district; is that right?

14:28:59

A That's correct. It's actually -- it would be about 85 percent of the congressional district. And that would mean all the people in that particular 85 percent would be black. So that's a lot of people who are left out.

Q Thank you. I think we could take this exhibit down.

14:29:20

Mr. Cooper, you testified earlier that less than a third of Alabama's black population resides in a majority-black congressional district; is that right?

A Right.

Q How much of Alabama's non-Hispanic white population resides in a majority white district?

14:29:33

A Over 90 percent.

Q 92 percent exactly, right?

A Yes. It sounds right.

Q And that's in paragraph 28 of your report?

14:29:45

A Yes.

Q So according to the 2020 census, what percentage of Alabama's population is black?

A According to the 2020 census, it is -- let me refer back to Table 1. It's 20 -- 27.16 percent is any-part black. Was that your question?

Q Yeah.

A Yeah.

Q So over 27 percent of the population is black in the 2020 census?

A Yes.

Q What percentage of Alabama's congressional districts are majority-black?

A There's a 14 percent number. One out of seven.

Q One out of seven. So if Alabama were to draw a second majority-black district, what percentage of Alabama's congressional districts would be majority-black?

A About 28 percent, roughly in line with the statewide percentage of African-Americans, which is about 28 percent almost, or soon will be if the population continues to grow in the course of a decade.

Q So according to the 2020 census, what percentage of Alabama's population is non-Hispanic white?

A It is 63.12 percent.

Q And what percentage of Alabama's congressional districts are majority white under the enacted plan?

14:31:39
14:31:55
14:32:18
14:32:40
14:32:53

A Six out of seven, or 70 -- well, six out of seven. I am not doing the math right, but it's going to be in the mid 80s. 86 percent, I guess.
Q I am going to do the math myself. Is it about 85.7 percent; is that right?
A Yeah. I rounded it up.
Q If Alabama were to draw a second majority-black congressional district, what percentage of Alabama's congressional districts would remain majority white?
A About 72 percent.
Q Thank you. I will move on to the state board of education plan that you mention in your report; is that right?
A Yes.
Q Why do you reference the 2021 Alabama State Board of Education plan?
A Well, the Alabama State Board of Education plan, the 2021 plan has eight districts, and two of them are majority-black. One is anchored in Jefferson County, and the other in south central, Alabama, and includes both Montgomery County and/or at least part of Montgomery County and part of Mobile County. So.
Q Let's --
A Proceed.
Q Sorry. Let's pull up the map so that we're all looking at the same one. If we could please pull up Plaintiffs' Exhibit 1 Figure 9 on page 19. So, Mr. Cooper, this is the 2021 board of

education map; is that right?

A That's correct.

Q Do you know when this map was enacted by the Alabama Legislature?

14:33:07 A I believe in late October and signed into law in November, along with the congressional plan.

Q So this was at the same time as the 2021 congressional plan; is that right?

A Yes.

14:33:21 Q And so which of the districts under this plan are majority-black?

A District 4, which is the green district, and the kind of purplish color District 5, which is a district that goes from the western Black Belt Macon County then through part of 14:33:41 Montgomery County to Mobile.

Q And is this the first time as far as you're aware that Alabama has had a State Board of Education plan with two majority-black districts?

A No. There's a long tradition of the configuration very 14:33:56 similar to this plan. I have a map in this declaration showing the 2011 plan, if memory serves, the percentages are about the same. And the two districts look very similar between 2011 and -- between 2010 and 2020 census.

Prior to that, there was a plan adopted in the early 2000s 14:34:24 that I reference that had one district that was based on

single-race black slightly below 50 percent. In paragraph 34, I have 47.61 percent. That was District 4 in the north, I think. And then District 5 in the south was almost 52 percent single-race black.

14:34:47 And there was litigation in the 1990s. So I think there was a court ordered plan in 1996. And in that plan, District 4 was about 46.6 percent black and voting age, and District 5 was 51.75 percent. So for 25 years now, there has been two majority-black school board districts out of eight.

14:35:11 Q Can you please describe looking at the 2021 board of education plan, can you describe how District 5 is drawn here?

A Well, yes. It's -- it's drawn from Macon and Bullock County in the east southwest through the Black Belt to Mobile County and the city of Mobile and north along the Mississippi 14:35:43 line up to Sumter County. And then at that point, it borders District 4, which is the second majority-black district that includes the east -- the western part of the Black Belt, including Tuscaloosa and part of Jefferson County.

Q Does District 5 include all of Mobile County?

14:36:08 A No, it does not.

Q Does the 2021 State Board of Education plan combine part of Mobile County with Montgomery County?

A Yes, it does.

Q And does it also combine part of Mobile County with 14:36:28 Baldwin County in District 1?

A Yes, it does.
Q What portion of Alabama's black population resides in these two majority-black board of education districts today?
A I believe that it is very close to half of the black population. I think I have that figure in my declaration.
Q And I can refer you to paragraph 37, if that's easier.
A Yes. There it is. 51.69 percent.
Q So more than half of the state's black population -- sorry.
A No. Statewide population. Black population, right.
Q More than half of the state's black population then resides in a majority-black board of education district; is that right?
A Yes. In either District 4, which is the one in the north, or District 5, which is the one in the central and south part of the state.
Q So what did your review of this plan, the State Board of Education plan, tell you about the possibility of drawing an additional majority-black congressional district?
A Well, it suggests that it would not be at all difficult to get a second black-majority congressional district because there are only -- there are eight districts in the school board plan and seven in the congressional plan. And the state is now on record as proving a configuration much like this. So my assumption -- working assumption at the outset was that it

would be possible to draw an additional district based on the 2020 census data.

Q And that's true even though this is an eight district plan and the congressional map is a seven district plan?

14:38:16 A Right. Right, because it's not including some areas that have significant black populations in those two districts.

Q Great. We can take this down now. Thank you.

I want to turn now to the illustrative plans that you produced in your reports.

14:38:37 Can you first describe to the Court what an illustrative plan is?

A Well, an illustrative plan is basically what it says it is. It's just a plan that makes a demonstrative exhibit showing how one might draw a plan given certain sets of 14:39:00 parameters. And so I've drawn a total of seven illustrative plans, each of which has two majority-black districts.

Q So when you assess whether the black population is sufficiently large and geographically compact to allow for the creation of an additional majority-black district, is it 14:39:21 necessary to consider race?

A Yes. One of the traditional redistricting principles is to be aware that you have -- that you are not diluting minority voting strengths when you are developing a voting plan and the underlying districts. So that is -- it is always a factor that 14:39:42 one must consider no matter where you are, or maybe not

14:39:58 14:40:22 14:40:33 14:40:55 14:41:14

Vermont, but generally speaking, you have to pay attention to it, particularly in the South.

Q And are there other considerations that you take into account when drawing illustrative plans, as well?

A Several. All districts have to be reasonably compact, contiguous, and certainly have to be relatively equal in population for congressional districts. They have to be almost 0. For school board districts, you can be kind of in a plus or minus 5 percent range, probably although some states have more restrictive requirements maybe than Alabama has with respect to the school board.

Q So you reference in your report traditional redistricting principles; is that right?

A Yes.

Q And what are -- without listing them out necessarily, what does that generally refer to? What does it mean that term?

A Well, it's just a set of objectives, goals, that want you to have in mind when putting together an illustrative plan or what would ultimately become a real plan. You have to be aware of the underlying demographics of the communities you're working with, and try to produce a plan that is fair and constitutional. And that's what I believe I have done in the case of the seven illustrative plans that I have drawn for Alabama's congressional plan.

Q And you would consider traditional redistricting

principles whether you are drawing an illustrative plan for litigation or an actual district plan for a jurisdiction; is that right?

A That's right. Yeah. It's the same.

14:41:27 Q So what specific traditional districting principles did you consider in drawing the illustrative plans in this case?

A Well, I took all of them into consideration. I examined the document produced back in May by the Alabama Legislature outlining the guidelines for redistricting. But a lot of that just incorporates the general concept of traditional redistricting principles. So I didn't prioritize any of them. I tried to balance them.

Q And those principles include population equality; is that right?

14:42:01 A Yes.

Q And what else?

A Contiguity. The districts must be contiguous, either by land or water. I think the Alabama redistricting guidelines allow contiguity by water and not necessarily not by land or road.

And then other factors are compactness. They have -- the district has to be reasonably compact. One should also, of course, very important to pay attention to political subdivisions, counties, precinct lines, municipal boundaries, sometimes the latter municipal boundaries can be very difficult

to contend with in Alabama because there are some odd shapes out there. But one should try to keep communities together, jurisdictions together where possible. Obviously, if you start at the county level, which I basically did, so many of the component parts of the congressional plan involve whole counties that you are automatically including political subdivisions in toto cities, except maybe in a few rare instances like in Jefferson County and Hoover, where part of the city of Hoover dips into Shelby County. Most of it's in Jefferson County.

14:42:53

14:43:17

Q I believe you also mentioned in your report the principles of respect for communities of interest and non dilution of minority voting strengths; is that right?

A Yes.

14:43:27

Q So was any one factor of the ones we just mentioned predominant, the predominant factor when you were preparing your illustrative plans in this case?

A Not really. I feel like I gave them equal weighting. It would be possible to prioritize others and come up with different configurations, but perhaps at the expense of one of the key redistricting principles. So you could draw very compact districts, but they might split numerous counties because they're perfect squares. Or you draw a district that is -- two districts that are maybe 60 percent black, but they wouldn't be contiguous. That, you know, so you have to balance

14:43:46

14:44:09

it.

Q And did race predominate in your development of any of the illustrative plans?

A No. It was a consideration. This is a Section 2 lawsuit, after all. But it did not predominate or dominate.

Q And you were balancing all the traditional redistricting principles during your development of these plans?

A I believe so. I believe so. I was thinking about a lot of different things. And all of those things kind of come together in one or more of these illustrative plans.

Q Let's talk through what -- how those principles came to be.

You mentioned population equality. How is this principle reflected in your illustrative plans?

A Well, all of these plans have districts that are for all intents and purposes zero deviation plus or minus one person. One of them is minus two in one instance because I didn't want to split a county. But, you know, there's zero deviation plans. There's no -- no disputing that.

Q I think you also mentioned respect for political subdivision boundaries in drawing illustrative plans?

A Yes.

Q And how did you follow that principle in drawing the plan? What was your approach?

A Well, I felt like it was important to either meet or beat

the county split achievement of the enacted plan.  And I did so
in almost all the plans I drew.  The enacted plan splits six
counties.  And I think four of the plans I draw split six
counties.  One splits five.  And a couple others split seven,
although one of those splits is only 15 people in the one -- in
one of the plans involves seven county splits.  So arguably,
that's not a necessary split and could be left as entirely in
Calhoun County instead of splitting Calhoun County.

Q    Was it possible to keep the counties whole in drawing
these illustrative plans?

A    Yes.  I do split a county here and there often just to
achieve something very close to zero population deviation.  So
it is very easy to draw districts in Alabama for a second
majority-black district that is built off of whole counties.
There are splits.  One split always.  But for the most part,
it's a very reasonable compact shape that you end up with when
you draw a plan that is -- contains two majority-black
districts.

Q    So am I understanding your report correctly when you say
that you have to -- you had to split a few counties in order to
meet population equality; is that right?

A    Oh, yes, you do.  At some point, you have to split a
county.  You could, you know, conceivably draw a plan that
maybe split four counties and had a higher deviation.  I'm not
-- it's very unclear just to how far you can go with a

congressional plan above and below zero.  Certainly, though, as

long as you're in the low teens, that's a zero deviation plan.

Q    And certainly your plans are primarily plus or minus

one person; is that right?

14:47:40  A    Yeah.  There's -- there are two that are minus two in one

of the districts.  And it just did not make any sense at all to

go into another county with a split and move one person.  Of

course, you couldn't do that because the secret ballot.  So you

would end up having to like move 300 people from one county in

14:48:01  one precinct into one county and split the other county so you

could put 302 in that.  I mean, that's just pointless to do

anything other than except a minus two deviation.

Q    Mr. Cooper, when you were forced to split a county to

achieve population equality, what was your approach in

14:48:22  splitting counties?

A    Well, I tried to minimize precinct splits.  Often that was

not possible.  Again, because I was aiming for zero deviation.

So I think one of my plans splits 12 precincts.  And I believe

the state splits seven.  So I didn't quite hit their number in

14:48:44  that particular metric.  But all of them are drawn to minimize

precinct splits.

    I drew a couple of plans that kept the city of Mobile

whole.  And in that case, both of those plans split around 20

or so precincts.  That was partly just to follow the city

14:49:04  boundaries of Mobile.  So it's not going to create any kind of

administrative problem for the city of Mobile because they have city elections there, and they have already got everybody organized by whether they're in the city of Mobile or in the county as a whole for county elections.

14:49:17 Q So when you did have to split precinct boundaries, did you follow other natural geographic boundaries or political boundaries?

A Yes. I would follow either precinct lines or municipal lines, primary roads, waterways, maybe, in a few instances.

14:49:35 Also sometimes in some instances, I followed census block groups, which is an area that has been designated by the Census Bureau as having some commonality. So that's another geographic reference point that I used.

Q Mr. Cooper, you also considered geographic compactness in

14:49:58 drawing your illustrative plans; is that right?

A Yes, I did.

Q What are the most common compactness metrics?

A The most common is just eyeballing it as you draw the plan. But if you are really obsessive about it, you can

14:50:16 constantly get readouts of various compactness scores. The most widely relied upon are probably the Reock score and the Polsby-Popper score. So you can get instant -- virtually instant readouts of what the scores are for any district you're drawing as you're drawing them from within the Maptitude

14:50:39 program that I used.

Q Can you describe in layman's terms what the Reock score is measuring?

A Yeah. It's basically measuring the extent to which a district minimizes the area of the district if you circumscribe that district with a circle. So if you drew a circle, which would be a perfect compact score, the Reock score would be 1.8. Of course, if you drew a circle, you would end up splitting counties, splitting precincts, splitting most cities. There may be a couple in Alabama that are circles. There are in George. But, yeah, that would be the perfect score, though, one.

Q Okay. And how about the Polsby-Popper metric? What is that measuring on the compactness when you are looking at compactness?

A That looks at the perimeter of the district. For example, you could have a Reock score that is very close to one because you have drawn a very concentrated area in the district. But with lots of squiggly lines. So the Reock score could be very high, but that would be somewhat misleading, very misleading if you looked at the perimeter of the district and relied on the Polsby-Popper measure where it would score quite low.

Q Both of these metrics kind of capture different aspects of compactness; is that fair to say?

A Right. You have to pay attention to those. They both tell you a little something.

Q So how did you -- what was your approach to drawing -- what was your approach to incorporating the compactness principle in drawing your illustrative plans?

A Well, I would occasionally glance at the score, and also I was aware of the score that the state had for their plan. And so I wanted to make sure that my score was sort of in the ballpark of the state score. And I think that's generally the case.

Some of my plans are somewhat lower, slightly lower, but still certainly within the normal range if you look at districts around the country. And in one instance, the last plan I drew, illustrative plan 7 is part of my rebuttal declaration, I think my district is actually higher on a mean average score than the state's plan. And just 1/100th of a point lower on the Polsby-Popper score. So in that case, I have met the same standard that the state has. It would be unfair maybe to call it a standard, because they don't specify what a score should be. It just happens that they had a certain score, and so I looked at that as a possible yardstick.

Q You also considered the principle of contiguity; is that right?

A Yes. One good thing about Maptitude is -- and all modern day GIS software, but back in the '90s, not the case. You can get an instant readout as to whether the district is contiguous in its entirety. So I took that into account.

Q And are all the illustrative plans contiguous?
A Yes.
Q You also mentioned in your report communities of interest as one of the principles you took into account; is that right?
14:53:45 A Right.
Q How did you define communities of interest?
A Well, I -- and in basically working with a computerized map, and so I consider communities of interest to include political subdivisions like counties and towns and cities. I'm 14:54:07 also aware that the minority population in and of itself can be a community of interest. I have some knowledge of historical boundaries. For example, one of my -- one of my maps here shows what is kind of generally considered to be the Black Belt of Alabama, the group mainly of rural counties plus Montgomery 14:54:32 County in the central part of the state. So I was aware of that historical feature.

So, you know, communities of interest can cross over into many different features, but I guess the political subdivision and the importance of recognizing communities of interest in 14:54:53 minority populations, those two items were probably top of mind as I was drawing the plan, with respect to communities of interest.
Q Mr. Cooper, you reference the 2021 redistricting guidelines in your report; is that right?
14:55:07 A Yes.

Q Did you refer to those guidelines before developing your plans in this case?
A I did.
Q I'd like to pull those up. If you could pull up please Plaintiffs' Exhibit 82. And are these the reapportionment redistricting guidelines that we were just talking about?
A Yes. And there's a very good written description of communities of interest in the guidelines themselves.
Q And, Mr. Cooper, I think we have it up on the screen. I think that's where you will find it. I don't believe it's in your report.
Okay. If we could turn -- you mentioned the description of communities of interest. If we could scroll down to I think it's page 2 to 3, section --
A I found it.
Q Where are we -- j(iii). You see that?
A Yeah. I got it. Line 28.
Q Can you please read the text starting, community of interest is defined as an area? Could you read that? We will highlight that text there. Can you please read that out loud?
A Yeah. Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs A through I, and then the definition. A community of interest is defined as an area with recognized similarities of interests, including but

not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may in certain circumstances include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts.

Q Thank you. We can take that --

A Oh.

Q Certainly, we can keep reading. If you look at the screen, we have highlighted certain language that I just wanted to focus on for a moment.

A Right.

Q So which of -- when you were -- you said you were -- when you were approaching the communities of interest criterion, you specifically looked at political subdivisions, and such as counties, pre precincts, municipalities; is that right?

A Yes, among other things, that's right. I was balancing things.

Q And there are multiple ways to define various communities of interest across the state; is that right?

A True.

Q We can take this down. Mr. Cooper, in your opinion, as somebody who draws electoral districts for a living, do each of the illustrative plans comply with traditional districting principles as the ones we just discussed?

A Absolutely. I think they are all worthwhile plans that are worth considering as possible remedial plans.

Q And they all balance the various criterion we just discussed?

14:58:11 A Yes. In my opinion. I don't think I went to the extreme in any of them.

Q Mr. Cooper, how many illustrative plans did you draw in this case?

A I drew seven. Six in my initial declaration and seven in

14:58:28 my rebuttal declaration.

Q All right. I want to talk a little bit about the common features we see among all of the illustrative plans. And I can -- we can just pull up Illustrative Plan 1, just as a visual aid. We can pull up Plaintiffs' Exhibit 18. This is attached

14:58:46 as Exhibit G-2 of your report. You can look it on the screen here.

A Yes.

Q Where is District 7 roughly located across your illustrative plans?

14:58:55 A Well, District 7 is to the north. And almost always includes -- it always includes Jefferson County, which I think has the largest black population in the state. And also includes part of Tuscaloosa County and part of the city of Tuscaloosa, as well as the rural counties in the western Black

14:59:20 Belt, including, of course, Dallas County where Selma is

located and Wilcox County. So it's the western and northern district.

Q Where is District 2 generally located in your illustrative plans?

14:59:35 A In the south. Again, also including the western border, but the southern half -- normally I think most of the plans for District 2 extend -- all of them start in Mobile County and I think go as far north as Choctaw. There may be one that splits. I don't recall. And then west to include Montgomery

14:59:59 County all or and in part, or in some instances such as this one, I included districts that go all the way to the Georgia state line, including Russell, Barbour, and Henry. Some of the plans only go as far as Macon and Bullock.

Q Great. And can you specifically discuss the configuration

15:00:27 of Mobile County in your illustrative plans?

A Well, in the illustrative plans, all of the illustrative plans include a significant portion of the city of Mobile, or in the case of District 6 and 7, all of Mobile.

In illustrative plan 1, the only -- the primary area of

15:00:56 Mobile that I excluded from District 2 is the waterfront area of Mobile, which is actually a grouping of precincts that are predominantly African-American and I put into District 1 so that there was a transportation route between District 1 and Mobile County and District 1 in Baldwin County. So you don't

15:01:24 need to drive outside of District 1 to get from one part of

District 1 to the other. You have a straight route going across U.S. 98 and Mobile Bay. And there are a few precincts that are split along that route I-10 area coming in to downtown Mobile. And that actually is a feature of most of my plans, except for illustrative Districts 6 and 7 -- illustrative plans 6 and 7, which keep all of Mobile whole, extending it right up to the waterfront.

Q This feature of dividing Mobile County, is that something that you observed in the board of education plan, as well?

A Well, yes. The board of education splits Mobile County.

Q Are the Black Voting Age Populations of Districts 2 and 7 in each of your illustrative plans over 50 percent?

A Yes.

Q And that is any-part black?

A That is any-part black, although I think there are a couple maybe that are also over single-race black, as well.

Q So in your report, you also report the -- let me take down this figure.

You also report the non-Hispanic single-race Black Citizen Voting Age Population in your report in your illustrative plans, as well; is that right?

A That is true. That's the most restrictive definition one could identify because it requires you not only be non-Hispanic black and over 18, but you also must be a citizen. And it's also four years old. So given that the black population in

Alabama is a little bit younger, it's probably historically inaccurate, too. As those cohorts age, when we see what the non-Hispanic black citizen population is for 2020, it may be a little higher than what I'm reporting because I'm reporting something with a survey midpoint of 2017.

15:03:34

Q So is my understanding -- is my understanding correct that the non-Hispanic single-race Black Citizen Voting Age Population is the most conservative accounting for who -- who is actually a black voter in that district?

15:03:52

A That's correct.

Q And that it's likely even higher than that given there's some time lag between the citizenship data that is available from the Census Bureau?

A Yes. That's now over four years old. The 2015-2020 ACS special tabulation, that's the name given to the citizenship report that the Census Bureau normally publishes every year about this time, it was delayed due to the pandemic, and I think it's going to become available later this year. I don't even think they have set a date yet. So it probably won't be available until late spring.

15:04:10

15:04:30

Q And are there any other ways that you determined whether black voters make up a majority of Districts 2 and 7 in your illustrative plans?

A Yes. At the time I drew Illustrative Plans 1 through 6, I did not have access to a contemporary voter registration file

15:04:46

that I could geocode. But as part of discovery, after December 10th, I received a statewide voter file, which I geocoded and was able to confirm that the active voter registration rate in all districts that I have drawn, 1 through 6 illustrative plans, as well as illustrative 7 in those plans in Districts 2 and 7, the underlying active voter registration rate for African-Americans as a component of the total voter population is over 50 percent.

Q And in filling out their voter registration forms, do Alabama voters indicate whether they are any-part black or single-race black? How do they indicate their race?

A Well, I've seen the voter registration application, and there's just one choice. You either select black or white or Asian. I think those are the three categories. But you also have the option to check Hispanic. But if you are Hispanic black, you have to make a choice. You cannot say I am Hispanic and black and register in that fashion. You only can check one.

Q I am actually going to pull up Plaintiffs' Exhibit 104, which I believe is the voter registration form we have just been discussing. And let's zoom in right there in the middle left where it says race check one?

A Yes.

Q This is what you are referring to; is that right, Mr. Cooper?

A Right. Right. Because Hispanic is actually an ethnicity. It's not a race. But in Alabama at least, you can just check one. So you have -- if you choose your -- if you choose Hispanic, then you are not really identifying the race.

15:06:40 Q So you only have -- you can only choose one box here, and so if somebody checks off black, that's the only you marker that they have checked?

A Right. They have decided they are black, even if they are Hispanic.

15:06:53 Q Okay. Can we -- we can pull this down. If we can pull up your supplemental report, Plaintiffs' Exhibit 59, Figure 4, which is on page 12, what does this figure show?

A That shows the geocoded percentage of African-Americans who reside -- African-American voters -- active registered 15:07:22 voters who reside in District 2 or District 7. And you can see across the board there is a black registered voter majority and all seven plans for both District 2 and District 7.

Q So in each of your illustrative plans, Districts 2 and 7 are majority-black using the any-part BVAP metric; is that 15:07:46 right?

A Using any-part BVAP metric, using a voter registration as you see here on Figure 4, and also of course, based on the American Community Survey estimates, which are older, but also clearly have shown that the non-Hispanic black citizen 15:08:05 population in all seven plans in both Districts 2 and 7 over

50 percent. So there should be no question about that.

Q Okay. Great. We can take this down. Thank you.

We've talked a little bit about how Districts 2 and 7 are configured generally across illustrative plans. What about the remaining congressional districts?

15:08:25

A Well, I drew the other districts to the extent I could in a fashion that was generally following the geographic areas of the state where the enacted plan has a given district. Of course, because I am drawing a new black majority congressional district that there are differences I can't match up completely. But I did by and large keep District 5 in the north part of the state in the first six plans I drew very similar, almost identical to the way the state has drawn it, because it's far removed from the areas that were reconfigured to create the second African-American majority districts. So I was able to keep that one fairly intact.

15:08:52

15:09:12

Others changed, but still in the same general part of the state.

Q And District 4, too, is largely kept in the similar configuration as it is under the enacted plan?

15:09:26

A For the first six districts -- first six plans I drew, I took a different approach with the last one, and so District 4 is more compact in that plan as is District 5.

Q How do the illustrative plans compare to the enacted plan on the measure of county splits?

15:09:46

A About the same. The -- I drew seven plans. Four of them have exactly the same number of county splits -- six. One has just five splits. That's Illustrative Plan 7, and then the other two I think have seven splits, which is the same number the plan had in 2011 enacted plan. As I mentioned, in one instance, one of the illustrative plan does have seven splits, but it only involves 15 people in Calhoun County, so arguably it would not be necessary to make that split for an enacted plan. It -- I did it just to get it down to plus or minus one. But that seems unnecessary.

Q Okay. Let's talk a little bit about the compactness of the illustrative plan that's compared to the enacted plan. I will pull up figure 22 of your initial report. We will pull it up here on the screen, which is on page 36 of Plaintiffs' Exhibit 1?

A Yes.

Q What does this table show?

A It shows compactness scores for various plans that I produced, as well as the enacted plan and also historical congressional plan, the 2011 benchmark plan and the 2011 board of education plan.

When I did this declaration on December 10th, I did not have a block equivalency file for the 2021 congressional plan or for the board of education plan. And so to avoid some sort of minor discrepancy, I didn't report the compactness scores

for the 2021 board of education -- I'm sorry. I had the congressional plan, but not the board of education plan. So that's why I did not report 2021 board of education in this one. But we got the -- we got the updated shape file between December 10 and 20, so that -- and my next declaration, the second declaration, I do report the score for the 2021 board of education plan. It's about the same.

Q And, Mr. Cooper, in your experience, is there a bright line standard for when a district is considered compact?

A No. No. And you really have to go beyond compactness scores and take into account other factors, like odd-shaped counties, odd-shaped cities, odd-shaped precincts. There just really is not a bright line rule, nor should there be.

Q So how do your illustrative plans compare, or on the -- on these metrics of compactness compared the enacted plan?

A Compared to the enacted plan, a little bit lower. But there's nothing out of order here.

And I was able to pay more attention to compactness in the Illustrative Plan 7 as a result of comments by defendants' expert Mr. Bryan. And decided to see if I could draw a plan that was more compact than 2021 plan. And I didn't draw one that was more compact, but it's clearly as compact.

So we've met that objective, as well, in Illustrative Plan 7.

Q Before we get to Illustrative Plan 7, I know that was in

          your supplemental report, I believe you wrote in your report here that your evaluation of these compactness metrics indicated that the illustrative plans were in the comparable range as the other Alabama statewide plans including the enacted congressional plan; is that right?

15:13:42

A That's right. That's right.

Q And you believe that the illustrative plans are comparable in compactness to the enacted plan?

A I think so. I mean, they're not -- they're not scored quite as high, but there is no, you know, you could get a blue ribbon I guess for the best possible plan, in terms of the Reock and Polsby-Popper scores. But that doesn't mean that all the other plans are losers. They place.

15:13:56

Q All right. And you mentioned Illustrative Plan 7. Let's pull that one up. Plaintiffs' Exhibit 59, Figure 3. And so this is the chart that explains the metrics for Illustrative Plan 7 as well as the 2021 board of education plans, Senate plan and House plan, which you have added here, as well, additional statewide plans; is that right?

15:14:16

A Right.

15:14:37

Q So why did you draw Illustrative Plan 7?

A Well, the defendants' expert is really almost obsessed with compactness scores, so I felt like, well, you know, better show that you can do two districts in a seven district plan that have compactness scores that are equal to the 2021 plan

15:14:54

and not just a few hundredths of a point below. So that's what I did with Illustrative Plan 7. A Reock score -- go ahead.
Q I was -- I was going to say the same thing you were. In fact, the Illustrative Plan 7 actually has a higher Reock score than the enacted plan; is that right?
A It does. It does. .41, and the enacted plan is .38.
Q And the Polsby-Popper score is I think 100th of a point different; is that right?
A That's right.
Q And you mentioned the report submitted by Mr. Bryan in this case. That's the defendants' expert; is that right? Is that what you are referring to?
A Yes.
Q Was there anything in Mr. Bryan's report change your opinion on whether or not the illustrative plans achieve compactness?
A No, not at all. He used a methodology really an evaluating plans at least in his initial declaration that was flawed because you can't just add up the numbers. But, no, nothing there would have changed my mind.
Q Great. We can take this down.

MS. KHANNA: Your Honor, I know we have been going for a little over an hour. I am about to start talking about some of the specifics of the illustrative plans. I would say I have about maybe a half hour left. And I didn't know if the Court

wanted to take a break now.

JUDGE MARCUS: If you prefer to break at this point and then pick up?

MS. KHANNA: I think so. I think it's probably more logical stopping point right now.

JUDGE MARCUS: Okay. We will -- I have 3:16 Alabama Central Standard Time. So we will get started a little past 3:30. We will take a 15-minute or so break. Thank you.

MS. KHANNA: Thank you, Your Honor.

(Recess.)

JUDGE MARCUS: Are the parties ready to proceed?

MS. KHANNA: I am. I wanted to make sure Mr. Cooper is back on, on video.

JUDGE MARCUS: I do not see him. We have two lawyers and no witness.

Mr. Cooper?

THE WITNESS: Yes. I am here.

JUDGE MARCUS: We hear you but do not see you.

Now we are all ready to proceed. Ms. Khanna, you may proceed with your direct examination of Mr. Cooper.

MS. KHANNA: Thank you, Your Honor.

BY MS. KHANNA:

Q Mr. Cooper, I now want to discuss each of the individual illustrative plans in some detail. Let's start with Illustrative Plan 1. And we will pull up Plaintiffs'

Exhibit 18, Caster Plaintiffs' Exhibit 18, which is also attached to your initial report.

So can you describe the configuration of District 7 in your Illustrative Plan 1?

15:31:44 A Well, Illustrative Plan 1 places, as do all the plans as all the plans do, Jefferson County in District 7 and then picks up Tuscaloosa County and then several of the rural Black Belt counties starting with Sumter and Perry and Dallas and Wilcox and Hale.

15:32:16 Q And can you describe the configuration of the District 2? Illustrative Plan 1?

A Okay. In Illustrative Plan 1, as in all plans, Mobile is in the -- Mobile County is in District 2, at least part of it, and then the remaining counties of the western and eastern

15:32:37 Black Belt, as well as part of the county of Montgomery. Like the enacted plan in Illustrative Plan 1, a part of Montgomery County is put into District 3.

Q Okay. And let's take a look at the statistics for Illustrative Plan 1. I believe that's at Plaintiffs'

15:33:01 Exhibit 17. Can you see the screen -- see all the numbers on the screen, Mr. Cooper?

A Yes.

Q What is the any-part Black Voting Age Population of District 7 in Illustrative Plan 1?

15:33:15 A 53.28 percent.

Q And what is the any-part Black Voting Age Population of District 2 in Illustrative Plan 1?

A 50.09 percent.

Q What is the non-Hispanic single-race Black CVAP for Illustrative Plan 7 in this plan?

15:33:36

A 54.97 percent.

Q And the same metric for District 2?

A 51.16 percent.

Q Great. If we could zoom out from this close-up exhibit.

15:33:56

Okay. Let's turn to Illustrative Plan 2. That's Plaintiffs' Exhibit 23, which shows the map.

So in what way does Illustrative Plan 2 differ from the other illustrative plans? What's the defining characteristics of this plan?

15:34:16

A Well, Illustrative Plan 2 does one thing that the other plans do not do, and that includes -- that is that I have included predominantly African-American community area of Houston County in the city of Dothan in District 2, and the only other thing that might be different -- actually I guess there is no -- there is no other defining factor. Basically, the same counties are combined perhaps in a different way. But it's still District 2 in the south and District 7 in the north. And District 7 in this instance, and I am not sure if in any other of the plans I've drawn actually goes into Lowndes County, which doesn't show up on the label on this map. It's

15:34:49

15:35:10

sandwiched between Montgomery and Dallas counties. And I think in the enacted plan and most of maybe even in the 2011 plan, District 7 in the enacted plan did go from Jefferson County all the way into Lowndes County and even picked up a little bit of Montgomery. I have not taken it into Montgomery County, but this plan does have Lowndes County in District 7.

Q Let's take a look at the statistics of Illustrative Plan 2, which is Plaintiffs' Exhibit 22, I believe.

What is the any-part Black Voting Age Population of District 7 under Illustrative Plan 2?

A 53.79 percent.

Q What is the any-part Black Voting Age Population for District 2 in this plan?

A 50.88 percent.

Q What is the non-Hispanic single-race Black Citizen Voting Age Population for District 7 in Illustrative Plan 2?

A 55.58 percent.

Q And what about the same metric for District 2 in this plan?

A 51.82 percent.

Q All right. Let's turn to Illustrative Plan 3. That's going to be Plaintiffs' Exhibit 28. Look at the map.

So, Mr. Cooper, how does Illustrative Plan 3 differ from the other plans? What are its defining features?

A Illustrative Plan 3 keeps Montgomery County whole. I

think the first two we looked at did not keep Montgomery County whole.

And, of course, as in all the plans, it includes Mobile County.

15:37:09 So District 7 is a northern district in this case. And includes part of Bibb County and all of Bibb County, part of Tuscaloosa, and the northwestern part of the Black Belt, including Pickens and Sumter county along the Mississippi line.

Q So this map manages to keep Montgomery County whole in

15:37:31 District 2; is that right?

A Right.

Q And the enacted plan actually divides Montgomery County; is that right?

A I believe so.

15:37:38 Q Okay. Let's pull up the statistics for Illustrative Plan 3 Plaintiffs' Exhibit 27. What is the any-part Black Voting Age Population for District 7 in Illustrative Plan 3?

A 50.09 percent.

Q What about the same metric for District 2 in Illustrative

15:38:04 Plan 3?

A 50.27 percent.

Q And what is the non-Hispanic single-race Black Citizen Voting Age Population in District 7 under this plan?

A 51.77 percent.

15:38:18 Q And the same metric for District 2?

A Yes. 51.08 percent.

Q Great. Let's talk about -- let's go to Illustrative Plan 4 that's Plaintiffs' Exhibit 33 to look at that map.

A Yes.

15:38:39 Q So how -- you anticipated my question. But yes. How would you -- what's different about Illustrative Plan 4 compared to the other illustrative plans that you created?

A Well, this plan is different in that I kept Tuscaloosa County whole, as well as the city of Tuscaloosa.

15:38:58 The current plan -- the enacted plan the state produced actually splits Tuscaloosa County, of course, but it also splits the city of Tuscaloosa. So I believe that this is the only plan on the table right now that does not split Tuscaloosa County county or the city of Tuscaloosa. So that was my 15:39:18 variation in this particular plan. And so District 7 is sort of in the -- again, kind of a northwest quadrant. And then District 2, as in all plans, includes Mobile County and extends east to Barbour County on the Georgia line and also does have a split in Montgomery County when shares that with District 3.

15:39:45 Q And that split is also reflected in the enacted plan?

A It's not the exact same split, but same general area, true.

Q Okay. Let's go to statistics Illustrative Plan 4, which I believe is now at Plaintiffs' Exhibit 32. What is the any-part 15:40:08 Black Voting Age Population of District 7 under this plan?

15:40:20
15:40:39
15:41:03
15:41:30
15:41:49

A 50.09 percent.
Q And what is the any-part Black Voting Age Population of District 2?
A 50.07 percent.
Q What is the non-Hispanic single-race Black Citizen Voting Age Population of District in 7 under this plan?
A 52.13 percent.
Q What is that metric for District 2?
A 50.8 percent.
Q Mr. Cooper, I believe in Mr. Bryan's declaration, he notes that some of the numbers that you report population figures when it comes to Illustrative Plans 4, 5, and 6 were transposed in your report. Do you recall reading that?
A I do. Apparently a copy and paste error as I was taking columns from the exhibit and putting it into the declaration, I must have inadvertently copied the wrong plan in the population column. It does not change the percentages at all. The numbers that are reported in my declaration exhibits are accurate. I think that was confirmed by Mr. Bryan. He spent about three pages discussing this issue, and it's really making a mountain out of a mole hill.
Q So there was a typo in your declaration; is that right?
A Yeah. Well, you can call it a typo. It's a copy and paste error. I just copied a column apparently from the wrong election plan and put it into total population for a plan that

15:42:08 15:42:25 15:42:50 15:43:14 15:43:34

should have gone in another one. So that the -- sum of the total population numbers instead of being plus one might be minus one for one district. It's just not a meaningful error.

Q So but just for the Court's clarification, all of the statistics, all of the numbers in the exhibits to your report, including the one we're looking at right now, those are all accurate?

A Yes.

Q Okay. All right. Let's move on to Illustrative Plan 5. That will be Plaintiffs' Exhibit 38 to look at this map.

What are the unique details of Illustrative Plan 5 compared to the other plans that you produced?

A The key distinguishing factor with Illustrative Plan 5 is that I put Coffee County into District 2, and the current incumbent for District 2 lives in Coffee County. So this plan demonstrates that you can draw two majority-black districts for the U.S. House in Alabama and protect all incumbents.

Q And so in extending it to Coffee County to capture the current incumbent, did you have to kind of extend District 2 a little bit more southward than you did in any of the other plans?

A Yeah. At least on the eastern most part of the district, I did. The border instead of just being Macon and Bullock County actually goes through Pike and all the way down to the -- well, all of Coffee County down to the Geneva County line.

So it does extend the eastern border further south.

Q    So with respect for the incumbent in that district in

particular creates that kind of little foot on the southeastern

side of the district?

15:43:47 A    Yes.

Q    Let's go to the statistics for this plan at Plaintiffs'

Exhibit 37.  What is the any-part Black Voting Age Population

under Illustrative Plan 5?

A    50.09 percent.

15:44:04 Q    And the any-part Black Voting Age Population for District

2?

A    50.24 percent.

Q    What is the non-Hispanic single-race Black Citizen Voting

Age Population for District 7 in this plan?

15:44:20 A    51.65 percent.

Q    And what is that metric for District 2 in that -- in this

plan?

A    51.2 percent.

Q    All right.  Let's move on to Illustrative Plan 6.

15:44:41 Mr. Cooper, I know in your report you describe each of these

plans more fully, and I am just asking for kind of a summary of

what the key differences are from one plan to another here.  So

I know you have gone into more detail there.  What would you

describe as the key difference --

15:44:55 JUDGE MARCUS:  Let me stop you for a moment, counsel.

What exhibit number is Plan 6?

MS. KHANNA: Thank you, Your Honor. Apologies for that. This is Plaintiffs' Exhibit 43.

JUDGE MARCUS: Thank you.

15:45:10 BY MS. KHANNA:

Q Mr. Cooper, looking at this map, what would you say are the -- what differentiates this map from some of the other plans you drew?

A Well, this is the first plan that I prepared or presented 15:45:22 that actually keeps all of the city of Mobile in District 2. And it also at the same time keeps all of Montgomery County in District 2. So it does not split Montgomery city or Mobile city. Both are whole. And that is the key feature of this particular plan.

15:45:46 Q And so if you recall back to the compactness chart, I believe that Illustrative Plan 6, this one, scored the lowest on the Polsby-Popper metric. Do you remember that?

A I don't remember exactly, no, but I know that there were lower scores maybe in some of the plans compared to others.

15:46:08 Q Can you explain why this plan would score slightly lower on the Polsby-Popper metric particularly when it comes to District 2?

A Well, I think in the case of keeping Mobile city whole, the city boundary is places kind of irregular shaped. And so 15:46:27 that would have been a factor. It also -- because I wanted to

maintain a way for people to drive from District 1 in Mobile County into Baldwin County without going to District 2, I left that opening there in the north end of the county so that you could cross through on I-65 or one of the state routes without travelling into District 2. And I also wanted to make sure that the incumbent in District 1 stayed in District 1. And in doing that, some of the precincts in the east -- west of Mobile before you get back into District 2 are slightly irregular, so that may have had something to do with the lower score.

15:46:51

Q So those are regular boundaries that we see are explained by certainly the Mobile city line, city boundary, but also various road ways and other traversals as well as the incumbent?

15:47:12

A Right. But I have to emphasize again there's nothing out of line with the Polsby-Popper scores in any of these plans. This one happens to be maybe one of the lower ones. But it matches up fine if you look at districts around the country or even if you look at some of the legislative districts in Alabama.

15:47:29

Q Okay. Let's move on to the statistics for Illustrative Plan 6. That's Plaintiffs' Exhibit 42. And, again, Mr. Cooper, what is the any-part Black Voting Age Population for District 7 under this plan?

15:47:49

A 51.09 percent.

Q What is the any-part Black Voting Age Population for

15:48:09

District 2?

A    51.28 percent.

Q    What is the non-Hispanic single-race Black Citizen Voting

Age Population for District 7?

15:48:27 A    52 -- oh.  52.48 percent.

Q    And what is the non-Hispanic single-race black CVAP for

District 2?

A    52.44 percent.

Q    All right.  Let's move on to Illustrative Plan 7, which is

15:48:44 Plaintiffs' Exhibit 61.  What are the -- what differentiates

Illustrative Plan 7 from the others that you created for this

case?

A    Well, first of all, this plan also keeps the city of

Mobile whole and also keeps Montgomery County whole.  So it's

15:49:04 like District 6 -- and Illustrative Plan 6 in that sense.  And

it also as I've discussed previously has higher compactness

scores than the state's plans.  And it also makes changes to

the districts in the north.  You can see District 6 is perhaps

more compact in this plan than in others.

15:49:27      I did change the configuration of this so that it

basically just includes the city of Huntsville, which is

extends now into Limestone County.  It's not only Madison

County.  So I included all the city of Huntsville and the

Appalachian counties in District 5.  And District 4 runs from

15:49:47 Tuscaloosa north to the Tennessee line.  But it's a more

compact shape than exists in the -- in the existing plan. Because the existing plan if you live in suburban Tuscaloosa, you can end up in the same district as somebody in, you know, northwest Alabama really in the mountains. And so there is a question there from a geographic standpoint whether that's a good match up.

Q Let's pull up the statistics for Illustrative Plan 7 that's Plaintiffs' Exhibit 60. What is the any-part Black Voting Age Population for District 7 under this plan?

A 51.88 percent.

Q Actually, for District 7, I think that's --

A Oh. I'm sorry. 50.31 percent.

Q Any-part Black Voting Age Population for District 2?

A 51.88 percent.

Q What is the non-Hispanic single-race Black Citizen Voting Age Population for District 7?

A 52.12 percent.

Q And for District 2?

A 52.92 percent.

Q And in this exhibit, you also include the percent of black registered voters in the district, as well; is that right?

A That's true because this particular plan was produced after we -- that the discovery request was for voting registration files. So Illustrative Plan 7, which was produced sometime after the 10th of December, I was able to include the

registered voter count in this particular plan for all districts.

Q And I know we have already shown the figure that shows the black active registered voters among all the illustrative plans, but just looking at Illustrative Plan 7 here, this is both District 7 and 2 are well over 50 percent; is that right?

A Yes, exactly.

Q We can take that down.

A This is current information I must emphasize. This is the most recent registered voter files they have. 2021 information, whereas a slightly lower non-Hispanic CVAP is historical dating to 2017.

Q Thank you. We can take down this exhibit. Mr. Cooper, is it fair to say that each of your illustrative plans balances traditional districting principles in different ways?

A Yes.

Q And in your opinion as a map drawer, each of these achieves the goals of population equality, contiguity, compactness, respect for political subdivision boundaries, communities of interest, and non dilution of minority voting strength. Is that fair?

A Yes.

Q Each of them contains two districts that are majority-black under the any-part Black Voting Age Population metric, the majority non-Hispanic single-race Black Citizen

Voting Age Population, and have a majority of black active registered voters; is that right?

A Right. And I believe Illustrative Plan 6 actually has two districts that are single-race Black Voting Age Population over 50 percent.

15:53:06

Q I would like to shift gears right now to the socioeconomic profile in Alabama.

I know all of the figures that we are going to talk about that you have included here are incorporated in your first report, I believe at page 37 onward. What data are these socioeconomic statistics based on?

15:53:20

A They're based on the 2019, one-year American Community Survey. So the survey instrument went out to households in 2019 and the early part of 2020. And then the data was reported in the month of September of 2020. So it's fairly recent socioeconomic information, although it predates the pandemic. So for that reason, the pandemic has resulted in the 2021 American Community Survey being canceled. It is not going to be reported except maybe in some sort of experimental fashion since the bureau's indicated they are going to do something with the data.

15:53:47

15:54:12

So this is the most current data available from the one-year survey, and there won't be any more data available until the 2021 survey is released, which will be in September of '22.

15:54:26

15:54:41

Q And just to clarify, the American Community Survey data is administered and produced by the U.S. Census Bureau, correct?

A Yes.

Q So what are your conclusions generally regarding the socioeconomic profile of blacks and whites in Alabama?

15:55:02

A Well, whites outpace blacks in almost every single category. I'm hard pressed to think of one where there is not a disparity. And I outline that in my declaration and have a set of charts in the exhibits, which illustrate those disparities and is probably a little easier to get through, just looking at bar charts.

Q And those disparities across -- span across education, income, and other metrics, as well; is that right?

A Yes.

15:55:18

Q Employment?

A Unemployment rates, just the whole nine yards, really. It's not -- it's sad in a way that the disparity is that pronounced.

Q Thank you.

15:55:33

MS. KHANNA: Mr. Cooper, I don't have any further questions at this time. Your Honor, I pass the witness.

JUDGE MARCUS: Thank you. Mr. Davis?

MR. DAVIS: Thank you, Your Honor.

CROSS-EXAMINATION

15:55:41

BY MR. DAVIS:

Q Hello, Mr. Cooper.
A Hello. Long time no see.
Q Mr. Cooper, if someone identifies as black in filling out the census, your report does not tell us how that person votes or consider how that person votes, does it?
A No.
Q Are you making any assumptions in your analysis about how that person votes, knowing nothing about him or her except the color of the skin?
A I make no assumptions about voting. That's the job of the *Gingles II and Gingles III* expert.
Q Is that true as well for someone who identifies as white when filling out the census?
A That's true. I cannot make any kind of statement one way or the other about an individual voter, no.
Q And then it would be also true for someone who checks both black and white?
A For the -- for the census form, that's true. Of course, we have the voter registration data, which is limited to only one check, so, that's why I'm confident that all our districts are majority-black. Of the two that are considered, majority-black.
Q Do you have any understanding, Mr. Cooper, about whether Section 2 requires proportional representation for minority populations?

MS. KHANNA: Objection, Your Honor. That calls for a legal conclusion.

JUDGE MARCUS: I will allow it insofar as he's telling us what may have shaped or motivated him in drawing it. We will take it. Overruled.

15:57:20

THE WITNESS: Well, my understanding is it does not require proportional representation.

BY MR. DAVIS:

Q Thank you.

15:57:28

A But I'm not a lawyer.

Q If I understood you correctly, Mr. Cooper, you said that when drawing illustrative plans for a Section 2 case, it is necessary to consider race. Was that your testimony?

A Race in a Section 2 case is always in the background as it really is in most plans one would draw anywhere in the country outside of litigation if you are really following traditional redistricting principles.

15:57:50

Q You say following traditional principals requires you to district on the basis of race?

15:58:04

A You have to make sure that what you are doing is not diluting a subset of the population that is minority in terms of their voting strengths.

Q At some point in the process, but that doesn't mean you have to consider race when drafting a plan, does it?

15:58:19

A Well, it's a traditional redistricting principle, so like

15:58:37 compactness or contiguity, you have to be aware of it as you are drawing a plan.

Q Even if it's necessary to consider race when drawing an illustrative plan, that does not mean that it's okay to make race the most important factor, though, does it?

A No. One should try to balance the various traditional redistricting principles as I believe I have done.

Q You've drawn many plans in many different jurisdictions, correct?

15:58:54 A That is correct.

Q When you're drawing plans for a jurisdiction, and I don't mean in litigation, I mean you're being hired by a state or a county or school board or someone to draw their plans, how often do you just start with a blank slate with no consideration of how the districts looked before?

15:59:13 A Almost never. I would always see what the so-called benchmark plan, the previous plan looked like.

Q Do you most often adjust the benchmark plan as necessary to come within appropriate population deviation?

15:59:34 A Yes. I mean, I'm always looking at things that need to be changed to comply with traditional redistricting principles and, of course, that would definitely include one person one vote.

Q Sure. Now, you said that you considered Alabama's districting guidelines, right?

15:59:53

A I did. I reviewed them.
Q And you say you complied with our traditional districting criteria, correct?
A I believe so.
16:00:04
Q Okay.
A Criteria very general, so I think so.
Q Sure. Does our guideline not -- do our guidelines not include the traditional districting criteria of preserving the core of districts?
16:00:19
A They do. And for the six plans I drew that include District 5 in north Alabama, they're almost identical to the District 5 that was drawn by the state. Because I'm also looking at other factors like the minority population and the reality that a second majority-black district could be drawn,
16:00:50
the so-called core retention numbers on my plan might not match the state's. But that's okay. That's okay. I don't think that's something to be concerned about.
Q Okay. Well, we do. So but our guidelines don't say preserve the core of District 5, does it? It says preserve the
16:01:12
core of existing districts?
A Right. But if you start with a plan that prima facia may be violating the Voting Rights Acts, you are going to change districts. And because of that, when I set about to create a second majority-black district, it was clear that I had to
16:01:30
change other districts. It was not possible just to do a de

minimus change.  It required, you know, significant changes to

some of the adjoining districts, and because Districts 2 and 7

basically line up with the rest of the districts in the state,

all the districts except for District 5 have to change.

16:01:49 Q    Does your report express any opinion or your supplemental

report that Alabama's plan violates the Voting Rights Act?

A    Well, I am not a -- I am not a lawyer or a judge, so I

can't make that statement point blank.  But I do believe that

second majority-black district can be created while adhering to

16:02:08 the traditional redistricting principles.  Once you take that

concept into action, you're going to change the neighboring

districts.  And because five of the districts are neighboring,

that pretty much just leaves you with the only possibility of

protecting core retention in District 5.

16:02:27 Q    So is that a no?

A    No to what?

Q    That your report does not include an opinion that

Alabama's plan violates the Voting Rights Act?

A    Well, it shouldn't because I'm not a -- I'm not a lawyer.

16:02:40 I'm not a judge.  I just drew a plan that demonstrates that in

my opinion you can get a second majority-black district.  And

flowing from that would be perhaps a judicial decision that

would say the enacted plan violates the Voting Rights Act.

Q    Did you or did you not consider the traditional

16:03:02 districting criteria of preserving the core of districts that

is in Alabama's guidelines?

A I believe I did within the constraints of creating second majority-black districts. I didn't radically change where the districts are located. And I -- except in District 7, I did change District 5 in that particular plan just to make the point that the state could have drawn a more compact district. But beyond that, I have done a pretty good job of keeping the general areas served by each district except for District 1 in the same part of the state. You're looking at me like you're appalled.

Q Mr. Cooper I have to apologize. I will say this to the Court, too. I am looking for the right -- I promise you -- I'm trying to share my screen, and I'm making sure that I get the right EF up. I am not meaning to look any way.

A Oh. I thought you were looking at me in a --

Q No, no.

JUDGE MARCUS: You all like fine to me. Let's just proceed with the next question, please.

BY MR. DAVIS:

Q Mr. Cooper, how does this plan preserve the core of existing districts? And this is your Illustrative Plan 7.

A Well --

Q Exhibit C-61.

A That's right. That's one where I did change District 5. I believe it's a more compact district. It keeps Huntsville

whole and does not put a voter in Tuscaloosa in a district that's almost in Chattanooga. So it's a different configuration. I'm not saying it has to be this way. I just thought it would make the point.

16:04:51 You could draw District 5 as the state is drawn. And in all the other plans, I basically have.

Q Mr. Cooper, did you observe traditional redistricting principle of avoiding incumbent conflicts with your peers in Alabama's guidelines?

16:05:09 A I did in Illustrative Plan 5.

Q In your other six, you did not observe that traditional districting criteria, did you?

A However, I would point out those plans could in all cases probably be modified such that the incumbent in district -- in 16:05:32 District 2 could be put in District 2 if not by way of a whole county, all of Coffee County, which is really quite populace, certainly it could be split, and the incumbent could be put in District 2.

Q Is it true --

16:05:46 A There would be many options for that.

Q Is it true --

A I want --

JUDGE MARCUS: Just let him finish, please. You may finish your answer, Mr. Cooper.

16:05:58 THE WITNESS: Oh. I just didn't want to introduce

more than six splits to any plan. So for that reason, I didn't, for example, split Coffee County to put the incumbent in the District 2. But there would be other variations. And there's one on the table now that does that. So I have protected all incumbents.

BY MR. DAVIS:

Q Is it true that in six of your seven illustrative plans, you do not avoid incumbent conflicts?

A In six of the seven? But in any of those, I could have probably protected the incumbent and kept a plan in place with two out of seven majority-black districts. It might have required an extra county split, though.

Q Have you ever lived in Alabama?

A No, I have not.

Q Have you spent any time speaking with Alabama voters or election officials about what local communities of interest may be?

A No. I mean, I have spoken with folks from Alabama. But I have not spoken with election officials.

Q What makes you think that you are better able than 140 legislators who live in Alabama and represent local districts -- what makes you think you are in a better position than them to balance traditional criteria where they conflict?

MS. KHANNA: Objection, Your Honor. That mischaracterizes his testimony. I don't think he's ever said

he's better able than the legislators.

JUDGE MARCUS: I will let him answer the question. You may answer.

THE WITNESS: I think in the final analysis, even if this case is ruled in our favor, the Legislature will get the first opportunity to develop a remedial plan, and more often than not, that's what happens. Sometimes it doesn't happen. Like in say South Dakota, when ultimately the Legislature refused to create a majority Native American district, so the judge just finally had to order. But normally the Legislature will have the opportunity to develop a plan.

In fact, in 2019, in Mississippi in the plan I referenced earlier in my testimony, where I was a consultant, and the plaintiffs' expert in a lawsuit, Section 2 lawsuit that created a new state Senate district in the Delta, initially the judge ordered my plan into place. But then the Legislature came back and said, look, we want to develop a plan. The judge allowed them do that, and the court ordered plan in the end was a plan developed by the Legislature. It included a majority-black district, though.

BY MR. DAVIS:

Q Mr. Cooper, did I understand you correctly when you said you kept the city of Mobile whole that you split precincts in order to do so?

A Some precincts had to be split in order to get to zero

population deviation.

Q Okay. Did you have to split precincts in order to keep the city of Mobile whole?

A In the configuration that you see in Illustrative Plan 6 and 7, I believe I did have to do that in order to meet one person one vote zero deviation.

Q Why couldn't you have made that adjustment somewhere else on the map?

A Well, perhaps I could have, but then that would have introduced another county split. Yeah. There are an infinity of plans out there one can draw. These are just seven illustrative ones. So I am not saying it couldn't be done. I just haven't produced such a plan so far.

Q Why did you not produce any plans that kept Mobile County whole?

A I think that more than likely if you keep Mobile County whole it becomes a little problematic to create two majority-black districts.

Q Does it make it impossible?

A Well, maybe not, but it would require a number of other county splits, I think.

Q Did you testify in direct, Mr. Cooper, that in Florida, you have used the measurement of non-Hispanic black instead of any-part black?

A No. No. I just said that there may be some places in

America where there was a large black Latino population that perhaps could be isolated for voting purposes.

Q Okay.

A But that's not the case in Alabama.

16:10:39 Q Okay. I wasn't asking about Alabama.

A Yeah. Well, I am. I'm telling you any-part black is the definition to use in Alabama.

Q Okay. Did you testify that non-Hispanic single-race citizen black is the most conservative measure that you could use?

16:11:04

A I believe that is the most conservative measure I can use.

Q And you say that number is probably higher now than what you report?

A Yeah. It's always running behind. It's always four years old. So since we're right at the 2020 census, it is somewhat historical.

16:11:15

Q I understand why it's historical. I don't understand why you say that the number would necessarily be higher now?

A Alabama is a younger population. So assuming that the younger cohorts between say 14 and 16 age to 18 over a four-year period, the black VAP is probably going to go up. Black CVAP will probably go up. That's speculative. I can't say for sure.

16:11:30

Q I want to show you -- this is Exhibit C-1, and it's your report. I want to go to page 8 of your report.

16:12:00

Mr. Cooper, do you recognize this map on page 8 of your report?

A Yes.

Q And what are these counties that are outlined in black?

16:12:18 A Those are counties that are identified as part of the historic Black Belt in Alabama. That definition came from the encyclopedia of Alabama.

Q Have you --

A It references that.

16:12:37 Q Have you ever seen any definition of the Black Belt that includes Mobile County?

A I have not, but I am not an historian.

Q Have you --

A And I would add, if you look at a U.S. map of historical Black Belt counties, it is conceivable that Mobile might show up going further back in time.

16:12:59

Q Have you presented any map in this case that keeps these counties that you have identified together in a single district?

16:13:16 A I have not.

Q In fact, isn't it true that these counties are split among three districts in each of your seven maps?

A Not sure about that.

Q Okay. In your report, you give a total number of the black voters in Districts 1, 2, and 3, correct?

16:13:40

16:14:00

16:14:33

16:14:46

16:15:04

16:15:20

A I do.

Q And let's see. It's around 612,000. You say is almost enough to -- to be -- to make up an additional congressional district?

A Right.

Q So the 612,000 voters that includes -- this, for the record, is Defense Exhibit 1, Page 72.

Your 612,000 voters includes these African-American voters in Mobile in District 1, right?

A True.

Q It would include these black voters in Dothan over in Houston County in the southeast portion of the state?

A Right.

Q It would include voters in Auburn and Talladega and Anniston and Gadsden, as well, right?

A True. And I don't think you could get all the way to Gadsden or Huntsville with a majority-black district. You could probably get to Talladega.

Q Are you suggesting that it would be possible to put all of these black voters that you have identified together in a single congressional district?

A Perhaps not in a single plan. But that's certainly -- those are areas excluding Gadsden, excluding Huntsville where one could draw a second majority-black district. I believe I did that in the trial testimony for the Chestnut vs. Merrill

case back in 2019. I think I put Talladega in a majority-black district. But obviously, you couldn't go all the way to Huntsville.

Q Speaking of Chestnut, you were an expert for the plaintiffs in that case, correct?

16:15:37

A Yes.

Q Have you ever seen or read the testimony of Congressman Bradley Byrne from that case?

A I believe I may have read a news account, but I have not read his testimony.

16:15:53

Q Okay. Do you have any knowledge of what Mr. Byrne testified about in that case concerning any differences between the role of a member of the State Board of Education and the role of a member of Congress?

16:16:05

A I did not see his direct testimony on that, but I can understand there would be differences.

Q Okay. What, if any, is your understanding of what those differences might be?

A I would think that a Congress person probably has more responsibility to get out and meet the voters than someone who is on the board of education. But that's just my general thought. I don't have specific knowledge about what the members of the board of education of Alabama do. Many of them may actually visit lots of schools, so.

16:16:25

16:16:40

Q But you don't know?

A No, I don't. I don't.

Q Okay. Do you know when the State Board of Education plan was first split?

That's not what I meant to ask, Mr. Cooper.

16:16:52 Do you know when Mobile County was first split in the Alabama State Board of Education plan?

A I think it may have been in the 1996 court ordered plan. If not, maybe in the 2002 plan. But I could be wrong. Maybe it wasn't split until 2011.

16:17:10 Q If -- I want you to assume it was split in 2011 for the first time. You do know that in the 20 -- in the 2000-decade plan there were two majority-black districts in the State Board of Education plan, correct?

A Well, I -- there were two majority-black districts in the 16:17:38 2011 plan. I believe the plans that were developed and precleared by the Justice Department in 2002 had two districts that were -- one of the districts was not quite majority-black. It was like 48 percent. That's in my declaration.

Q Do you know how communities of interest are different, if 16:18:04 they are, for purposes of a State Board of Education plan versus a congressional plan?

A I don't -- I can't point to something that would be helpful, I don't think. I'm not sure what you mean. One is for focusing solely on education -- students in public schools 16:18:29 in the state. The other is responsible for just about

everything under the sun that has to do with federal issues.

Q Do you know if board of education members keep offices in their districts?

A I don't think they would, but I could be wrong. Again, you are asking me a lot about the board of education. I frankly don't know the responsibilities in full.

Q Do you have an understanding as a demographer and for purposes of instructing you in drawing these illustrative plans, do you have any understanding of what sufficiently compact means, in terms of Section 2? In other words --

A I do. And there's no question that I have met those in all seven plans.

Q What is your understanding of what sufficiently compact means?

A That the population is in an area that has clearly defined boundaries that is reasonably shaped and is basically compact, because I'm building it off of whole counties for the most part. So in my mind, it is reasonably compact. And that's confirmed by the scores. You can always fall back on those. If you look at those compactness scores, they match up with the same kinds of scores for the state Legislature. And if you look at congressional plans around the country, those scores are just fine. Just take a look at Texas. That's in my -- that's in my declaration. That's where Mr. Bryan was advising the state House. And look at the scores in the congressional

districts in Texas. They're down in the low single digits for a congressional district.

So don't complain about the scores in my plans that I formed, the illustrative plans. They are absolutely within a normal range for congressional districts nationwide. And I have referenced a court report written in 2012 based on the 2011 plans that makes that point clear.

Q Mr. Cooper, does your definition of sufficiently compact have any -- does it include in any way whether the voters in your districts are part of the same communities of interest?

A No. I think community of interest and compactness can vary. I mean, there's -- the two different things.

Q Okay. I want to show you your first plan, Exhibit C-18. Now, you say all your plans are consistent with traditional districting criteria, correct?

A In my opinion, yes.

Q Okay. So is it consistent with traditional districting criteria split Jefferson, Tuscaloosa, Montgomery counties in the way you did in this Illustrative Plan 1?

A Well, first of all, my plan in illustrative -- my District 7 in Illustrative Plan 1 is very similar to the way you split Jefferson County in the enacted plan. I've included all of those precincts that go across the southern tier of Jefferson County all the way over to the Walker County line. And that's exactly what your plan does.

So Jefferson County is fine. Your plan splits Tuscaloosa County as does mine in Illustrative Plan 1. But I have shown a way that you haven't done to keep Tuscaloosa County whole and put it all in District 7.

16:22:24 Q Mr. Cooper?

A Illustrative Plan 4, maybe.

Q Mr. Cooper, the question was: In your opinion, is it consistent with traditional districting criteria to split Jefferson, Tuscaloosa, and Montgomery County counties the way

16:22:42 that they're split in your Illustrative Plan 1?

A Yes.

Q And is it consistent with traditional criteria for Mobile County to be split the way that it is in your Illustrative Plan 1?

16:22:58 A Yes.

Q What traditional districting criteria required you to split Mobile County?

A One person one vote.

Q So there's no way to draw a map with equal population

16:23:16 among the seven districts without splitting Mobile County?

A And at the same time adhering to some of the other traditional districting principals, like the non dilution of the minority vote, true, no way. More problematic. Maybe there would be a way, but you would also have to split other

16:23:34 counties. So I think this is the best compromise. Split

Mobile County.

Q Do you need to split Mobile County to avoid incumbent conflicts?

A I don't understand that question exactly.

16:23:49 Q Is it necessary to split Mobile County to observe Alabama's traditional criteria of not putting incumbents together in the same district?

A Well, I mean, I still don't exactly understand the point that -- of your question. Obviously, you could put all of 16:24:14 Mobile County in a district as you have done and leave District 1 as you've done, such that it doesn't go all the way into Coffee County and protect all the incumbents. Incumbency protection is a factor that one has to take into consideration. But it's not exactly a traditional redistricting principle, 16:24:40 partly because incumbents constantly change.

Q Is it necessary to split Mobile County to preserve the core of existing districts?

A Well, as I've said, I don't think core retention really is a particularly significant metric in a *Gingles II* case, *Gingles* 16:24:58 *I* case, because the idea is to create an additional majority-minority district. And once you do that, you are going to be changing all of the other districts that are adjacent to the minority-majority districts that is created. And in this instance, that's basically the whole plan, except 16:25:15 for District 5.

Q Mr. Cooper --
A Except for District 5.
Q Mr. Cooper, the question was: Is it necessary to split Mobile County to preserve the core of districts?
16:25:30 A I don't understand your question, really. I mean, there may be a way to split Mobile County and have a final score on core retention that is higher than your score. I don't know.
Q Let me stop the share and show you know Exhibit C-43. This is Exhibit C-43 for the record. It is your Illustrative 16:26:12 Plan 6. I don't think I'm sharing -- I think -- I'm sorry. I just opened the pdf. Let's see.

Now, I closed it. I will come back to that.

Mr. Cooper, what do voters in Mobile County and say Bullock County the eastern end of the state have in common? Do 16:26:41 you have any opinion about that?
A Voters in Mobile County?
Q Yes.
A And Bullock County?

MS. KHANNA: Objection. Outside the scope of his 16:26:52 report.

JUDGE MARCUS: I am not sure I understand the question. Could you sharpen that question, then and we will see whether there's an objection.

BY MR. DAVIS:
16:26:58 Q You contended, have you not, that your illustrative plans

comply with traditional districting criteria, correct?

A Correct.

Q One of those traditional districting criteria is serving communities of interest, right?

16:27:13 A Right.

Q So you have -- sharing finally your Illustrative Plan 6 is Exhibit C-43.

You have the opinion about whether these voters in downtown Mobile are part of the same community of interest of 16:27:37 voters in say Bullock and Macon County which are part of the same District 2?

A Well, we heard testimony earlier this afternoon from the Milligan plaintiffs that, in fact, there is a community of interest there because of the history of African-Americans from 16:27:57 the Black Belt immigrating to Mobile to look for work or to Birmingham. The ties are there. So, yes, I think there is a community of interest. Bullock County -- those in the Black Belt, and there are lots of folks in Mobile who have relatives and friends in Macon and Bullock. We are not talking about a 16:28:19 foreign country. My goodness. What is the connection between somebody in Tuscaloosa and somebody who lives up around Scottsboro, exactly? Those are really different places.

Q Mr. Cooper, did you have any understanding about the communities of interest in Mobile and Macon and Bullock at the 16:28:37 time you drew these illustrative plans?

16:28:58
A Yes. Because I've learned over time that there are communities of interest, specifically relating to the African-American population and the Diaspora from the Black Belt looking for work in the '30s, '40s, and forward. So, you know, I do think there's a community of interest there.

Q Do you have any opinion about whether there's a community of interest that includes both voters in Houston County and voters in this wider portion of Mobile County that you include in District 1?

16:29:17
A They're very well should be. They live in south Alabama. I suspect maybe -- maybe they're more University of Alabama fans down in Mobile than in the eastern part of the state Auburnland (sic). But other than that, there's probably not a lot of difference.

16:29:37
Q Is there anything else you would have to add about why you think might be a shared community of interest between voters on the extreme ends of this District 1?

A Because they live --

Q What you have just said?

16:29:51
A They live in south Alabama. They are going to the same public school system. The similarities are legion.

Q Thank you.

Why would you have this shape Mobile County?

A Real simple. First of all, I wanted to make sure you could drive from District 1 in Mobile County into Baldwin

16:30:14

County.  So I left a pathway via I-65 and some secondary roads

from Mobile into Mobile County into Baldwin without splitting

the city of Mobile.  And I left an opening there so that I

could keep the current incumbent in District 1, Representative

Byrne in District 1.  I could have just as easily put him in

District 2 and probably made a more even shape at the edge

there of District 2 as it comes into Mobile County.

Q    Is there any reason down in Mobile County -- do you see

this little pink strip down the middle, which is District 1 and

like a fish hook here, why not just go straight across and

close this pink part in?

A    Can't do it, because Mr. Byrne lives way down there in the

south -- southeast, southwest of Mobile almost in Mississippi.

And that's why that line is drawn that way.

Q    Did you draw any plans that score better than Alabama's

plans in either Polsby-Popper -- in Polsby-Popper and Reock?

A    Yes.  Illustrative Plan 7 scores higher on Reock and is

1/100th of a point lower on Polsby-Popper.  But if you take the

methodology that Mr. Bryan has employed, which actually is

flawed and add them up, we are on top.  Because as I have

indicated, you can't do that.  You have to look at the two

results independent of one another.

Q    Let me see if I can find your plan 7.

A    Look at the mean average, and you will see that our plan

is better than yours.

Q Now, this is your plan 7, right?
A Right.
Q This is Exhibit C-59. And that was page 3. And let's go down to 7, where I think has your scores. Did your District 2 or District 7 in Illustrative Plan 7 score better than District 2 or District 7 in the state's plan?
A No. I look at the mean average.
Q Okay. So you did not improve the compactness of either District 2 or District 7 in your Illustrative Plan 7?
A I do think those compactness scores are somewhat higher than in the other plans. .39, .37 for the Reock scores. Except maybe for Illustrative Plan 4 also has high Reock scores, I think. So I can't emphasize enough that the scores you were seeing with all of the plans but especially with the Illustrative Plan 7 as I have drawn them are perfectly okay in terms of compactness.
Q You improved your average in score -- in plan 7, but you did not at least by any significant margin improve the compactness of Districts 2 or 7, which are your majority-black districts; is that correct?
A No. I think I did improve them just a little bit.
Q Okay. Just a little?
A Well, it's -- we can go back and look at the scores, but I think that District 2 and District 7 are maybe 4 or 500 or so points higher in this plan than in the previous plans.

Q Didn't you -- going back up to the map, didn't you improve the overall average by reconfiguring Districts 4 and Districts 5?
A That helped a little bit, too, I believe.
16:34:33 Q Okay.
A Also, this plan actually includes Chilton and Autauga in District 7, so that improved the compactness score a little bit, as well as, for Districts 2 and 7.
Q Did you give any consideration?
16:34:53 A The other plans I have drawn had Chilton and Autauga both in District 7.
Q Did you give any consideration how this would affect communities of interest in the northern part of Alabama?
A I certainly did. I thought about it. Because, you know, 16:35:07 that -- those county lines up there follow the Tennessee River. So one could make the argument that District 5 should basically follow the Tennessee River and go all the way over to Lauderdale County. I am not sure why you split Lauderdale, but that's a separate issue. So that's a point. And the point I 16:35:22 am making here is that there is another community of interest in northwest Alabama that revolves around the mountains and, you know, historical association with Appalachia that doesn't exactly sit with suburbs of Tuscaloosa. So all plans are going to have communities of interest at the congressional level that 16:35:44 vary from one part of the district to another to a certain

16:36:06 16:36:32 16:36:48 16:37:05 16:37:26

extent because it's covering the whole state.

Q Mr. Cooper, I would like to share a page out of Defense Exhibit 4, page 78. Have you had a chance before today to review the report of Tom Bryan?

A I did read it, yes.

Q This is page 78 of his supplemental report, Exhibit 4, and he has loaded your plan number 1, and he has taken the voting precinct the state of Alabama and color coded those by the concentration of African-American population in those precincts.

Do you agree first of all, Mr. Cooper, that that's what Mr. Bryan is representing here?

A That seems to be a report showing the percent black and white in precincts, but I can't say that for a fact. I haven't seen his -- I haven't seen his shape file. I haven't had a chance to analyze it. It doesn't seem to be way off. But I haven't seen the details.

Q Did you split --

A We also play tricks with how you break out the various classifications of race. 0 to 10, 0 to 20. There are different ways that that might change the map.

Q Did you consider race when drawing this district, Mr. Cooper?

A As part of following traditional redistricting principles, I had to be aware of race.

Q Did you sort voters by race when drawing these districts?
A I don't know what you mean by sort.
Q Did you divide -- did you use race to decide which voters went into District 7 and which ones did not?
16:37:44 A Well, first of all, none of these plans were developed using voter registration data. So I, you know, you say voters, so, no, I did not.
Q Okay. Fair enough. Let me rephrase my question.
Did you use race to determine which people went into 16:38:04 District 7 and which ones did not?
A Well, to the extent that I know that the configuration that I ended up with resulted in two majority-black districts. But I did not try to maximize Black Voting Age Population. You know, my plans were intended to balance those. If I had just 16:38:24 wanted to go in there willy-nilly and create two majority-black districts without paying attention to county lines, without paying attention to precinct lines, without paying attention to municipal lines, I could have drawn a fairly compact looking district that would have been higher in Black VAP for both 16:38:41 District 7th and District 2.
I'm balancing things, and I'm not trying to take things to extreme, so I can't give you a really good -- I can't give you a really good example of what extreme I might have been able to hit. But these plans in no way maximize Black Voting Page 16:38:59 Population in District 2 and 7. They're drawn principally at

the precinct level. If you drew these plans at the block level, then the percentages would get significantly higher in you were trying to sort or whatever it is you are talking about.

16:39:12 Q You come down into Mobile County in order to include the African-American voters in Mobile in District 2?

A That's right, because it's a significant community of African-Americans. It's, you know, the second or third largest in the state. Second largest, I guess. Well, third, maybe after Mobile -- after Montgomery and Jefferson County. I would have to double check that. I think it's in the report.

Q I want to show you now -- let's see. Defense Exhibit 4, page 86, and this is your Illustrative Plan 5. Do you agree with that?

16:40:07 A I have no idea. I have not examined the shape files. I don't know what he's produced here. It could well be, but I don't know. I mean, I don't have -- I don't -- I don't have -- I did not have the opportunity to look at any of his work and display it geographically. Just looking at a pdf file, you can't tell much.

Q Mr. Bryan has labeled it as your plan 5, correct?

A Oh, he has, yes.

Q Yes. And generally, does it appear to have two majority-black districts such as you included in your illustrative plants?

A Yeah. To the extent that it's possible to make that assessment, that would appear to be the case. It may well that it's Illustrative Plan 5.

Q Yeah. Isn't this the one where you said -- I don't recall. What did you say was the unique feature of your plan 5, Mr. Cooper?

A The unique feature was that I put the incumbent from District 2 into District 2. I put a county -- Coffee County that's about 19 percent white, I believe, something like that.

Q That's right.

A And has a very significant population, I think it's almost like 100,000, a lot of people -- maybe I'm overstating that -- into District 2 so that there would be no incumbent conflicts in that map.

Q Okay.

A If, in fact, this is District 5. And I believe it is, because it does -- it does include Coffee County. You can see that.

Q Do you consider your District 1 in this map to be compact?

A Absolutely. There is no problem with District 1. It's as straight as an arrow across the Florida line and following counties to the north.

Q When you report registered voters or percentage of registered voters in your illustrative plans, are you using all voters or active voters, Mr. Cooper?

A Active.

MS. KHANNA: Mr. Davis, I'm sorry. I'm sorry. I don't have an objection. I don't mean to interrupt. I was just wondering if maybe Mr. Cooper -- looks like the sun has gone down in at that room. I am wondering if he can turn on a light.

JUDGE MARCUS: What's happened, Mr. Cooper, is that the light is dimmed on your portion of the screen, whether that's because we're in the winter and it's getting dark real soon.

THE WITNESS: Is that better?

JUDGE MARCUS: If you can lighten yourself, the screen up a little bit, that's much better.

THE WITNESS: Okay.

JUDGE MARCUS: Thank you.

THE WITNESS: Yes, sir.

BY MR. DAVIS:

Q Do you have available the raw number of active voters in each district in your illustrative plans?

A Yes, I do.

Q Okay. But you haven't presented those?

A Well, no. I just presented the -- the percentages for simplicity.

Q So the percentage of active black voters is higher than the percentage of black -- no. Let me try to start over. You

first present in your original report the percentage of African-Americans in your illustrative plans in each district, right?

A Right.

16:43:35 Q In the percentage thereof, correct?

A I'm sorry. Yeah, yeah, based on the 2020 census and the Voting Age Population under the 2020 census. Yeah. The registration data has taken into account citizenship.

Q Gotcha. But you say -- all right, there's this many

16:43:53 African-American voters in District 1 of my plan, and African-Americans are X percent of all people in this plan. But as I look at it, the percentage of active registered voters is higher than the percentage of African-Americans in the district?

16:44:14 A And there's no surprise at that because there's a citizenship issue. And the fact that there is a, you know, a fairly large portion of the Latino population is noncitizen, that's where they don't register to vote. And because the number as I mentioned in my declaration, the reason why the

16:44:34 active registered voter count is even a little bit higher than the non-Hispanic Voting Age Population percentage, I believe is probably because the CVAP data is now four-and-a-half years old.

Q All right. You see that data is based on the ACS Survey,

16:44:52 right?

A Right. It's estimates. That's right. And the voter registration file is not an estimate.

Q But turning to your Citizen Voting Age Population numbers based on the ACS, wasn't everybody expecting Alabama to lose a congressional seat based on ACS estimates?

16:45:09

A Based on -- no. No. Nope. Nope. Not ACS. Census Bureau does do a separate survey, cohort survey where they estimate -- they estimated -- I don't remember what the population estimate was -- but because of that estimate for 20189, I think, or 2020, it was suggested that Alabama might lose a congressional seat. I don't think anybody really knew for sure. It was going to be a close all, and I believe it was a close all.

16:45:32

I don't know how much over the population was, but I bet a dollar to a doughnut that if it weren't for the increase in the minority population in Alabama, Alabama would have lost that congressional seat. But I have to admit that I don't have the numbers in front of me, but I think that would be the case because we're talking about something approaching 100,000 people that was contributed by the minority population, in terms of overall population growth in the state between 2010 and 2020.

16:45:49

16:46:10

Q You have answered my question.

A Okay. Good.

Q Turning to the socioeconomic data that you presented, did

16:46:24

you review socioeconomic data from any other state?

A I typically do. I typically do. But not for this -- I don't do it for any specific one. I did not compare and contrast Alabama with Connecticut, for example, or Oregon.

16:46:45 Q But you have in other projects looked at similar socioeconomic data for other states in your career?

A I typically look at socioeconomic data whenever I'm doing an election plan. In fact, I have -- in my -- in my report, I believe I linked to a web address where you can get ACS charts 16:47:11 from the five-year survey for every single county, city, and even unincorporated places in Alabama if you have a specific question about some place in the state.

Q Do -- in looking at data from Alabama and any other states at any time, are you aware of any state where these unfortunate 16:47:31 socioeconomic gaps do not exist?

A I think most states would have gaps. So I'm -- probably -- probably not. Probably not. The gaps exist. I think the gaps are a bit wider in Alabama and in the South in general. But they're still there.

16:47:51 Q What is your basis for saying the gaps are wider in Alabama and in the South in general?

A Just from having looked at a lot of different localities and states. I mean, I have not prepared a report on the matter, but they're wider between blacks and whites in the 16:48:08 South in general, I think.

16:48:23

Q But you don't know, correct?

A I am not -- I am not -- I have not done any kind of analysis that would be something that I would want to testify on here. You asked me the question, so I am giving you the answer. But that's as far as I can go. Just my own gut feeling. And having looked at a lot of data and a lot places, and in almost every place in the South, blacks do tend to lag behind whites on most key variables in socioeconomics.

16:48:52

Q Mr. Cooper, if you're assessing the -- well, if you're assessing whether the *Gingles* requirements are met for your proposed District 2, just say in plan number 1, which is the more relevant compactness score, the compactness of District 2, or the average compactness of all the districts?

16:49:13

A Well, it's all relevant. It's all relevant. And so there's no issue here. The scores for District 2, District 7 are all in the normal range of districts around the country if you just look at the various scores for the various congressional plans. And I would invite to you take a look at Texas for starters.

16:49:33

Q Mr. Cooper, if you were drawing a map without consideration of race and considering only traditional districting criteria, would you ever draw a map like one of your seven illustrative plans?

16:49:56

A It's conceivable for some other reason. I don't know. I mean, that's just -- who knows?

Q Any reason that you know of as you sit here today?
A It could be any. Possibly. How would I know? I mean, a hypothetical, I have no way of answering that.

MR. DAVIS: Your Honor, I am at a stopping point. And I believe if I have any more questions on Mr. Cooper's reports, they will be very few. I also intend to at least make a record of an attempt to ask questions about Mr. Cooper's involvement in the whole county plan. I will represent to you that the parties in the Singleton case have stipulated to the fact that Mr. Cooper drew a first draft of the whole county plan. I would like to ask maybe three minutes' worth of questions about whether that's true and what his involvement was. I assume that will reach an objection. And that will invite an objection. I thought that I might go ahead and introduce --

JUDGE MARCUS: I take it the concern of the objection is it's not responsive directly to the direct examination, and, therefore, you would have to put him on as your own witness in order to be able to do it. Is that the problem?

MS. KHANNA: Yes, Your Honor. We would certainly object on that basis. It's beyond -- it's also well outside the scope.

JUDGE MARCUS: I mean, what Mr. Davis is simply suggesting is this would be a simple and efficient way. If he were calling Cooper in his own right, he would ask Cooper these questions. Admittedly, doing this would be doing it out of

order. You have a right to object, and he has a right to call Cooper on his own to do it as his own witness. Is that what's going on here, Mr. Davis?

16:51:46 MR. DAVIS: Yes, Your Honor. I'm happy to completely conclude this -- the Caster report exam.

JUDGE MARCUS: Gotcha.

MR. DAVIS: It just seems inefficient for me to subpoena Mr. Cooper and call him next week for three minutes.

16:52:00 JUDGE MARCUS: If I hear what you are saying, you have completed your cross-examination of Mr. Cooper concerning the subject matter that was covered on direct, that is to say the plans, and the opinions that he's otherwise rendered. You now have a series of questions that go beyond the four corners of the direct examination, and you're asking for leave to do that 16:52:20 now rather than recall him.

I'm asking you, Ms. Khanna, do you object? You have a right to object, in which case, Mr. Davis will subpoena Mr. Cooper, and we will have him back here Friday in his own case, or Monday, perhaps. I leave that to you. You are 16:52:39 entitled to object to the extent he wants to make him his own witness for his own reasons now.

What is your pleasure?

MS. KHANNA: Your Honor, I believe you accurately described our position when it comes to the separation between 16:52:56 this case and the Singleton case in which he's seeking to have

-- Mr. Davis is seeking to question Mr. Cooper about something entirely separate than the Section 2 case that we're bringing. I do understand that the -- that this -- for logistical reasons that these hearings have been combined to streamline the process, and I don't want to create -- make it any more prolonged or difficult for that reason.

JUDGE MARCUS: The choice is fairly yours, because by law, you have a right to limit him to the four corners of the direct. If that's how you want to proceed, we will proceed that way. Mr. Davis will bring Mr. Cooper back and call him as his own witness vis-a-vis Singleton or anything else he wants to do. That's how you wish to proceed, correct?

MS. KHANNA: Your Honor, I think we actually can do it today as part of this process. I would agree we should close out the Section 2 analysis first.

JUDGE MARCUS: Okay.

MS. KHANNA: And then move on to that. I would also request that I be given a chance to ask him questions about the same topics that Mr. Davis raises in that.

JUDGE MARCUS: So what you want to do -- what she is proposing, Mr. Davis, is to conduct her redirect based on your cross. And then depending on how much time we have left, today, we probably only have a little more than a half hour, you could then call him as your own witness, and it would be taken up separately. Does that work for you?

MR. DAVIS: Of course. I think that's perfectly appropriate. And I appreciate plaintiffs' counsel's accommodation to letting me call a witness out of turn.

JUDGE MARCUS: Okay. So why don't we do this: Why don't you go ahead with your redirect examination. We will complete Mr. Cooper in so far as you're offering him and the Milligan people are offering him in support of the Section 2 claim. And then you can take Mr. Cooper out of order, Mr. Davis, for your own purposes, in which case, he will be subject to cross-examination by Ms. Khanna, perhaps by counsel for Milligan, as well. Do I have that right?

MR. DAVIS: Yes, Your Honor.

JUDGE MARCUS: Okay. That works for you, Ms. Khanna, right?

MS. KHANNA: Yes, Your Honor.

JUDGE MARCUS: Okay. Why don't you proceed, then, with your redirect examination.

MS. KHANNA: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. KHANNA:

Q Good afternoon, Mr. Cooper. I know we talked about how the light seemed to have gone dark in your room. I don't know if you have a lamp or something else. I appreciate that you turned the screen on. Is there something else that you can sue to light up the room just so we can all see you a little

better?

A Maybe. I'll try another light. But I don't have a lot of lights in here.

JUDGE MARCUS: We're looking for all of the illumination that we can get. I assure you.

THE WITNESS: Well, I hate to disappoint you. The light bulb is not working. I can turn on the TV.

BY MS. KHANNA:

Q No. I think that's probably fine. As long as the Court can see him.

A Maybe if I move closer, does that help?

JUDGE MARCUS: No. We can see you just fine, Mr. Cooper. The additional light answers the problem at least as far as I'm concerned. Let me ask my colleagues. Judge Manasco and Judge Moorer, are you able to see Mr. Cooper fine on the screen?

JUDGE MOORER: I am.

JUDGE MANASCO: I am.

JUDGE MARCUS: Okay.

MS. KHANNA: Thank you, Your Honor.

BY MS. KHANNA:

Q You were asked, Mr. Cooper, during this cross-examination about the redistricting guidelines that you consulted in advance of developing your plans; is that right?

A Yes.

16:57:42 16:58:02 16:58:17 16:58:36 16:58:54

Q I want to pull up those guidelines again. That's Plaintiffs' Exhibit 82. If I recall -- if I figure out where exactly where we are going to direct -- if we look on the first page, Roman Numeral II criteria for redistricting, and if you look for that under -- under subheadings A, B, C -- I believe the first five subheadings A, B, C, D, and E have to do with population equality; is that correct?

A That's correct.

Q And if we scroll out of that and go to F and G, we see those two criteria have to do with race and the Voting Rights Act in particular; is that right?

A That's true.

Q Would you mind reading those two criterion out loud?

A Districts shall be drawn in compliance with the Voting Rights Act of 1965 as amended. I think maybe there a little piece there -- a redistricting plan shall have neither the purpose nor the effect of -- I can't see the whole screen. I'm seeing -- diluting minority voting strength and shall comply with Section 2 of the Voting Rights Act and the United States Constitution. Now I can see it.

Q Thank you. Could you also please read subsection G there?

A No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language-minority group, except that race, color, or membership in a language-minority group may

predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act.

16:59:14

Q Okay. Good. So these two criterion that we have on the screen have to do with the Voting Rights Act and the efforts the state must make to -- or must be made to comply with the Voting Rights Act in drawing districts; is that right?

16:59:34

A That's right. I'm convinced that my plans that I developed, seven illustrative plans do comply with the Voting Rights Act. Of course, that's for the judge to decide.

Q So we can scroll -- zoom out of this highlight. And go on to the next page where we see subheading H, and there we see that the criteria discussed contiguity and the district must be reasonably compact; is that right?

16:59:50

A Right.

Q Then we go on to subsection I, and we will see there's several Alabama constitutional requirements that this portion discusses, and those have largely to do with state legislative districts?

17:00:06

A Right.

Q Let's go to sub J, paragraph J. If we could just look at subparagraph J for a second, that would be great. Okay. And

17:00:25

here you see this subsection says, The following redistricting policies are embedded in the political values, traditions, customs, and usages of the state of Alabama, and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and the state of Alabama.

Do you see that?

A Yes.

Q Okay. And I believe you were asked about incumbency and other criterion -- incumbency, communities of interest, and core pros vision. If we could pull this highlight down. You will see that under subparagraph J, little i, that's where it talks about incumbents and not paring them wherever possible?

A Right.

Q We already looked at the paragraph -- subparagraph (ii) talks about contiguity. Subparagraph (iii) we have already discussed on your direct about communities of interest. Subparagraph (iv) talks about the number of counties actually in each district. And then subparagraph (v) is the criterion on preservation of course. Can you read that criterion, please?

A The Legislature shall try to preserve the cores of existing districts.

Q And you were asked a lot on your cross-examination about core preservation; is that right?

A That's right. I was.

Q Okay. And if we could look -- we can un-highlight that now and look at subparagraph j(vi) in establishing legislative districts, the reapportionment committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling state interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria.

17:02:17

Do you see that?

17:02:33

A Yes.

Q Okay. So what was your -- after you read these guidelines, what was your understanding of the -- we can pull this down. What was your understanding of the hierarchy of criteria of -- specifically of core preservation when it comes to understanding what the state's redistricting criteria are?

17:02:46

A It cannot supersede the Voting Rights Act by any stretch of the imagination. From what I understand -- what I understand of redistricting law and traditional redistricting principles.

17:03:06

Q And, again, I'm not asking about your understanding of the law. I really was asking you of your understanding of the guidelines presented by the state of Alabama?

A Well, yeah. The guidelines. They -- the guidelines make it clear, as well. They were written by a lawyer, probably.

17:03:21

17:03:36

Q Mr. Cooper, these guidelines that governed the congressional redistricting in Alabama also governed the State Board of Education redistricting in Alabama; is that right?

A I believe so.

Q We can pull -- oh, they are down, right? Okay.

Actually, let's go back to the guidelines and the paragraph specifically about communities of interest. I know you were asked a lot about communities of interest, as well. We talked about communities of interest during your direct, as well.

17:04:07

But, Mr. Cooper, would you agree that based on this definition, it is -- there are many ways to comprise a community of interest in the state of Alabama; is that right?

A That's true.

17:04:17

Q And, in fact, any individual voter can belong to multiple communities of interest at the same time; is that right?

A Yes.

Q Those communities of interest may conflict with one another at different times; is that right?

17:04:31

A Yes.

Q For instance, one can belong to a one racial community of interest and a different social community of interest. That's possible, right?

A Yes.

17:04:42

Q Or even multiple social communities of interest?

17:04:56
17:05:09
17:05:23
17:05:48
17:06:04

A Yes.

Q One can belong to one cultural community of interest and a different economic community of interest if they have to travel for work to a certain place; is that right?

A Yes.

Q And I think even yesterday there was, you know, we talked about a witness who had attended a magnet school, and that's an example of where one can have one different -- a different neighborhood community of interest and they maybe an educational community of interest; is that right?

A Yes. Yes. I did not hear that testimony, but that's true.

Q Okay. So now more than -- there's more than one way to define communities of interest and certainly more than one community of interest to which one can belong; is that right?

A Yes. And that's almost always the case no matter where you draw out the plan.

Q We can take this down. Thank you. Mr. Cooper, in your experience evaluating maps, drawing maps, looking at jurisdictions maps, are you aware of any plan that maximizes every single traditional districting criteria?

A No. The key to drawing a good plan is to balance without maximizing.

Q And, in fact, all redistricting plans require certain trade off between the multiple various district --

redistricting principles; is that right?

A Absolutely.

Q That includes the enacted plan for the state of Alabama's congressional districts, as well?

17:06:14 A It should.

Q For instance, we can't just comply with counties without also balancing that against one person one vote?

A That's true.

Q And protecting --

17:06:32 A Looking for the golden mean.

Q Now, as you noted in one of your maps, extending a district to protect an incumbent could sacrifice compactness in some instances; is that right?

A That's very true.

17:06:46 Q And all of these plans including your illustrative plans and the enacted plan requires different -- demonstrates different ways to balance these varied interests; is that right?

A Yes. Yes.

17:06:58 Q Mr. Cooper, is it your testimony that any one of the illustrative plans that you drew must replace the enacted plan under -- if the Court were to find a violation of Section 2 of the Voting Rights Act?

A No. It could. But it must -- it's not a must. These are

17:07:25 illustrative plans, demonstrative plans. And different plans

can be drawn for the remedial plan. That's more often the case, as I explained earlier a little bit.

Q So your illustrative plans basically provide an example of how one could draw two majority-minority districts, not how one must draw two majority-minority districts?

A That's very true.

Q And whoever ends up drawing a remedial map in the event that plaintiffs were to succeed in their Section 2 claim could choose to balance the various traditional principles that we discussed in the same or different ways as any of your maps; is that right?

A That's true.

MS. KHANNA: Your Honor, I have no further questions. I pass the witness.

JUDGE MARCUS: Any other questions for Mr. Cooper regarding the subject matter we have covered? Anything from our colleagues? Judge Manasco, or I think you had a question.

JUDGE MANASCO: I do.

Does Judge Moorer have any though? If he does, I'm happy for him to go.

JUDGE MOORER: No. Go ahead.

JUDGE MANASCO: Great. So, Mr. Cooper, I understood you to testify that as much as is possible, you tried not to split counties. And then after that, you tried not to split precincts; is that correct? But that some splits were

inevitable.

THE WITNESS: I think that's true. Yes. I mean, even state splits seven precincts. I think the plan -- one of my plans splits I believe 12 precincts in six counties.

17:09:06 JUDGE MANASCO: So my question is: When you concluded that you had to split precincts, did you have a consistent basis for deciding where to put the line, and if you did, what was it?

THE WITNESS: To the extent that I could, I tried to 17:09:24 follow municipal boundaries, or main thoroughfares or census block groups, which often don't necessarily follow a main thoroughfare, but they are areas that are designated by the Census Bureau as having some commonality. They're smaller than census tracks. But a census track could include as many as 17:09:49 eight or nine block groups. And often times, a block group would only have a couple of hundred people in it.

And they're used for certain kinds of analysis because it's the smallest unit for which the American Community Survey actually presents an estimate. So block groups are used for, 17:10:11 for example, determining the percentage of children who might be eligible for free school lunches or summer food -- the summer food programs. Some of the federal poverty programs actually are designated to identify their areas of service by block groups. So that's where the -- that's where the 17:10:37 commonality might come from. There are socioeconomic features

about those block groups that makes them a unit that can be discerned even if it's not an incorporated entity.

17:10:57 JUDGE MANASCO: Okay. So do you recall any instances when after concluding that you had to split a precinct you decided where to put the line on the basis of race?

THE WITNESS: I don't think so. I mean, I did have to -- I did split some block groups in some places, but it -- more than anything, when that happened, it was just trying to get to zero deviation. Because precincts in Jefferson County, for 17:11:19 example, that are very large, and so they have to be split ultimately to get to zero. Lost my light. It's coming back.

JUDGE MANASCO: Great. Thank you. That answers my questions.

JUDGE MARCUS: Any follow up based on the questions 17:11:35 Judge Manasco has asked, Mr. Davis, or Ms. Khanna? Let me start with you, Mr. Davis.

MR. DAVIS: No further questions from the defendants, Judge.

JUDGE MARCUS: Ms. Khanna?

17:11:47 MS. KHANNA: No further questions here either. Thank you, Your Honor.

JUDGE MARCUS: All right. So this will conclude Mr. Cooper's testimony as your witness and Milligan's witness on Section 2. We will then turn to out of turn taking 17:12:07 Mr. Davis and giving him the opportunity to question Mr. Cooper

about some other matters that related to Singleton but that did not concern Caster at all on Section 2 or Milligan, for that matter, on Section 2. My question, Mr. Davis, is really two fold: How much do you have in terms of timing, and is it your pleasure to begin that now, or would you rather start that when you're fresh in the morning? Because I don't want to break you in the middle. I want to give you a chance to put your thing on whole. So you tell me how you would like to proceed.

MR. DAVIS: I appreciate that, Judge. And this is not hyperbole, but I can finish this in three to four minutes. I only want to establish a couple of points.

JUDGE MARCUS: Let's do it, and then we can have any -- who would be doing the cross of Mr. Cooper on these points? I take it counsel for the Singleton plaintiffs? Do we have them? Mr. Blacksher?

MR. BLACKSHER: I'm trying to wake up the screen, Your Honor. Excuse me.

JUDGE MARCUS: No. That's fine. He has a few questions that bear upon your case. So you would have the opportunity to cross-examine Cooper to the extent he was being called by Mr. Davis on his case in chief, and the opportunity would also be there for the Milligan and the Caster lawyers to do that, as well, if you want. That works for everybody?

MR. BLACKSHER: Yes, Your Honor.

JUDGE MARCUS: Okay. Let's proceed, Mr. Davis. So

the record is clear, Mr. Davis is calling Mr. Cooper in his defense in his case in chief.

MR. DAVIS: Correct. And this, Your Honor, is related to the claims brought by the Singleton plaintiffs.

17:14:12 DIRECT EXAMINATION

BY MR. DAVIS:

Q Good evening, Mr. Cooper.

A Good evening.

Q We are switching to a different topic from your earlier examination in a different case. Mr. Cooper, it's been represented to us that you drew the first draft of a whole county plan for the congressional plan for the state of Alabama; is that correct?

A I don't know if it's correct or not. But I did draw a plan for Jim sometime in the late spring. Not for pay, just he just asked me, so I did one, and sent it to him.

Q I would like to share with you what has been marked as Singleton Exhibit 69. And the Singleton plaintiffs have represented that this is a draft whole county plan that you prepared. Is that correct?

A I don't know exactly. It looks like one I might have produced. I do remember doing a plan and sending it to Jim.

Q Okay.

A I did it just as -- you know, it was just an afternoon project, half of an afternoon. And he asked me to do it, so I

did one for him. Jim and I -- I call Mr. Blacksher Jim because I have become his friend over the years. So I did this. I made it clear to him that I was going to likely be engaged by the Caster plaintiffs, although that was not called the Caster case at that point. So that's the extent of it. I drew the plan.

Q Mr. Cooper, I'm sorry to interrupt, but I do not mean to ask you to disclose any communications that you had with any lawyers in any of these cases. I simply wanted to establish if it's true that you were involved.

So even if you do not know this is the plan you drafted, is it true that you did draft a whole county plan?

A Yes. I did a plan for him one afternoon. I was not a consultant. I did not get paid. He just asked me, and I did it.

Q Okay. It has been represented that you were asked to present a whole county plan that did two things: It kept counties whole and kept the Black Belt together. Is that consistent with any recollection you have about this project?

A No. I just remember doing -- that I should do a whole county plan.

Q Fair enough.

Do you recall when drafting this plan whether you looked for any specific combination of counties based on the Black Voting Age Population in those counties?

A I might have, but I was mainly concerned about just making sure the deviation was as low as possible. But I was also cognizant of the black population. So I don't know the numbers for that plan, but I am sure that in the process of doing it because I was trying to comply with some semblance of traditional redistricting principles that I did pay attention to that.

Q Do you recall whether when drafting a whole county plan you look for any combination of counties that would present a particular likely political outcome?

A I may have received political data from Jim that afternoon. I don't remember the specifics in terms of what the final result was. I think I may have gotten some -- some county level data.

Q Then let me ask this my last question to try to do it more succinctly. Do you recall if you were specifically looking for a plan that had two districts that are likely to elect Democrats?

A No. I mean, I think I just got presidential contest. And I'm -- I would discount that. I am not a political scientist. I would discount that because it's just one election, and also, it did not create two majority-black districts. So for that reason, I do not support the whole county plan.

MR. DAVIS: Thank you, Mr. Cooper. I have no further questions.

17:18:26
17:18:44
17:18:57
17:19:16
17:19:28

JUDGE MARCUS: Mr. Blacksher? Cross-examination, if any?

MR. BLACKSHER: So am I on the air? Yes.

CROSS-EXAMINATION

BY MR. BLACKSHER:

Q Mr. Cooper, I first of all, want to apologize for putting you in a conflict position. I did not mean to do that.

A I understand.

Q But we had no other way to put in evidence of the origins of this plan.

MR. BLACKSHER: And I have no further questions.

JUDGE MARCUS: All right. Thank you. Any questions, Ms. Khanna?

MS. KHANNA: No, Your Honor.

JUDGE MARCUS: Any questions for the Milligan plaintiffs of Mr. Cooper as he's being called by Mr. Davis regarding the Singleton whole county plan?

MR. ROSS: No, Your Honor.

JUDGE MARCUS: All right. Seeing none, is there any redirect that you want from the one comment Mr. Blacksher made?

MR. DAVIS: No, Your Honor.

JUDGE MARCUS: All right. So I take it we are complete with Mr. Cooper, and we can let him go. Do I have that right?

MR. DAVIS: Yes.

JUDGE MARCUS: From everybody's perspective, Ms. Khanna, Mr. Blacksher, the Milligan folks, no one has any need of Mr. Cooper any further?

MR. BLACKSHER: Correct.

17:19:39 JUDGE MARCUS: Mr. Cooper, we thank you for your time and your effort. And you are excused as a witness at this time.

THE WITNESS: Thank you. Thank you.

JUDGE MARCUS: When we come back tomorrow -- I don't 17:19:51 think we should be starting another witness at this point. I have 5:19 Central Standard Time and 6:19 here in south Florida in the Eastern Standard Time. Just so I have -- and my colleagues have a sense of the witnesses as they're coming up on the Section 2 prosecution, can you tell me, Ms. Khanna, who 17:20:21 will be next, and et cetera, just so we have some sense of the ordering this evening?

MS. KHANNA: Your Honor, I am not entirely sure. I will have to coordinate with the Milligan plaintiffs just to make sure who is available when, but I think you can be sure 17:20:35 that tomorrow we will see the Milligan plaintiffs' *Gingles I* expert and probably both sets of plaintiffs, Caster and Milligan's *Gingles II* and *III* experts.

JUDGE MARCUS: Okay. You have given us a very good idea of where we are going. We will break. Before we do, I 17:20:52 want to thank all of you for your time and effort and patience

with us. It's not altogether easy to do it with a split screen, but I think we have been able to hear everybody, and I can say it's been helpful and effective. I have been able to follow fully as we've proceeded in this way.

17:21:11 Mr. Davis, anything further?

MR. DAVIS: Yes, Your Honor. I wanted to bring to the Court's attention and also let other plaintiffs' counsel know that we should probably talk off the air. I previously let plaintiffs' counsel know that our expert Tom Bryan, our 17:21:26 demographer, is not available next week. They have graciously agreed that I would be able to call him out of turn. He will need to finish by like Saturday at noon in order to do a trip. He could start as early as tomorrow afternoon he'll be available, or any time Friday, but he will not be available to 17:21:46 continue his testimony on Monday.

So if the Court or the other parties have any preference, in exchange for their courtesy, we will gladly do it whatever time fits best for all parties involved.

JUDGE MARCUS: I leave that -- and we leave that to 17:22:00 the plaintiffs to work out with you. I only just have one question that may be helpful in this regard.

How long do you think Bryan will be roughly? And I am not holding you to it. But just give me a rough idea, because he is an awfully important witness.

17:22:16 MR. DAVIS: He is, Your Honor. I truly think he's

likely to last longer than half a day, because he's testifying for us about all three cases, and he is likely to be cross-examined by all three sets of plaintiffs. I think my direct examination would be between two and two hours. And I think -- I will be shocked if all three plaintiffs do not have cross-examination.

JUDGE MARCUS: Any idea of how long cross might be, Ms. Khanna, on Mr. Ross, Mr. Blacksher, of Bryan? Not that he said will be a big surprise. You have had a report and a rebuttal from him. I'm just trying to get a sense of when it makes the most efficacious way to fit Bryan in whether it's tomorrow or Friday.

MS. KHANNA: So --

MR. BLACKSHER: Go ahead, Abha.

MS. KHANNA: For the Caster plaintiffs, I think we can get it within 45 minutes.

JUDGE MARCUS: And, Mr. Blacksher?

MR. BLACKSHER: In less than an hour, Your Honor.

JUDGE MARCUS: And, Mr. Ross, for Milligan?

MR. ROSS: Your Honor, I believe about an hour.

JUDGE MARCUS: All right. So I think you're right, Mr. Davis, in your expectations. You are looking at about three hours of cross and about three hours, maybe a little more on direct. He'll be the better part of the day as best we can tell.

Do I have that right?

MR. DAVIS: I think that's probably correct, Judge.

JUDGE MARCUS: Okay. So when do you want to put him on? The choices are either to break it up tomorrow or start with him fresh Friday morning and finish him up on Friday so we can accomplish everyone's interests. I leave that to you, Ms. Khanna, Mr. Ross, and Mr. Blacksher. You tell me. I guess it's really we're breaking up the Section 2 case for Milligan and Caster. So it's your call whether you want him tomorrow or Friday. But I think you want to just let Mr. Davis know so he can have the witness available either tomorrow or Friday. Do you know what your pleasure is, or do you need some time to consult about that?

MS. KHANNA: I think it would be probably most efficient for us to huddle up and figure out the timing and availability, but we will certainly let him know.

JUDGE MARCUS: I will leave that to you, and why don't you let Mr. Davis know.

But we will accommodate Mr. Bryan one way or the other, Mr. Davis. Rest assured, he will get on this week.

MR. DAVIS: We are grateful for everyone's accommodation.

JUDGE MARCUS: All right. Thank you all. Have a good evening. And we will see you all back here tomorrow at 9:00 a.m. Central Standard Time, 10:00 a.m. Eastern Standard Time.

We are adjourned for the day.

(Whereupon, the above proceedings were concluded at 5:25 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Christina K. Decker   01-05-2022

Christina K. Decker, RMR, CRR   Date

Federal Official Court Reporter

ACCR#: 255