```
1                 IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ALABAMA
2                        SOUTHERN DIVISION

3

4       BOBBY SINGLETON, et al.,        *
                  Plaintiffs,           *   2:21-cv-1291-AMM
5                                        *   January 7, 2022
        vs.                              *   Birmingham, Alabama
6                                        *   8:30 a.m.
        JOHN MERRILL, in his official    *
7       capacity as Alabama Secretary    *
        of State, et al.,                *
8                 Defendants.            *
        *******************************  *
9                                        *
        EVAN MILLIGAN, et al.,           *
10                Plaintiffs,            *   2:21-cv-1530-AMM
                                         *
11      vs.                              *
                                         *
12      JOHN MERRILL, in his official    *
        capacity as Alabama Secretary    *
13      of State, et al.,                *
                  Defendants.            *
14      *******************************  *
                                         *
15      MARCUS CASTER, et al.,           *
                  Plaintiffs,            *   2:21-cv-1536-AMM
16                                       *
        vs.                              *
17                                       *
        JOHN MERRILL, in his official    *
18      capacity as Alabama Secretary    *
        of State, et al.,                *
19                Defendants.            *
        *******************************  *
20

21

              TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
22                      VIA ZOOM CONFERENCE
                            VOLUME IV
23            BEFORE THE HONORABLE ANNA M. MANASCO,
                THE HONORABLE TERRY F. MOORER,
24              THE HONORABLE STANLEY MARCUS

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
3   pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
       and Procedures Vol. VI, Chapter III, D.2.  Transcript
4                produced by computerized stenotype.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        APPEARANCES

 2
         FOR THE SINGLETON PLAINTIFFS:
 3
         James Uriah Blacksher
 4       JAMES U. BLACKSHER, ATTORNEY
         825 Linwood Road
 5       Birmingham, AL 35222
         205-612-3752
 6       Fax: 866-845-4395
         Email: Jublacksher@gmail.com
 7
         Myron C Penn
 8       PENN & SEABORN LLC
         53 Highway 110
 9       PO Box 5335
         Union Springs, AL 36089
10       334-738-4486
         Fax: 334-738-4432
11       Email: Myronpenn28@hotmail.com

12       Joe R Whatley, Jr
         WHATLEY KALLAS LLP
13       2001 Park Place North Suite 1000
         Birmingham, AL 35203
14       205-488-1200
         Fax: 800-922-4851
15       Email: Jwhatley@whatleykallas.com

16       Henry C Quillen
         WHATLEY KALLAS LLP
17       159 Middle Street Suite 2D
         Portsmouth, NH 03801
18       603-294-1591
         Fax: 800-922-4851
19       Email: Hquillen@whatleykallas.com

20       W Tucker Brown
         WHATLEY KALLAS LLC
21       P.O. Box 10968
         Birmingham, AL 35202-0968
22       205-488-1200
         Fax: 800-922-4851
23       Email: Tbrown@whatleykallas.com

24

25
```

```
1        Diandra "Fu" Debrosse Zimmermann
         DICELLO LEVITT GUTZLER
2        420 20th Street North
         Suite 2525
3        Birmingham, AL 35203
         205-855-5700
4        Fax: 205-855-5784
         Email: Fu@dicellolevitt.com
5
         Eli Joseph Hare
6        DICELLO LEVITT GUTZLER LLC
         420 20th Street North, Suite 2525
7        Birmingham, AL 35203
         205-855-5700
8        Fax: 205-855-5784
         Email: Ehare@dicellolevitt.com
9

10       FOR THE MILLIGAN PLAINTIFFS:

11
         Deuel Ross
12       NAACP LEGAL DEFENSE &
         EDUCATIONAL FUND, INC.
13       700 14th Street N.W. Ste. 600
         Washington, DC 20005
14       (202) 682-1300
         Dross@naacpldf.org
15
         Leah Aden
16       Stuart Naifeh
         Kathryn Sadasivan
17       Brittany Carter
         NAACP LEGAL DEFENSE &
18       EDUCATIONAL FUND, INC.
         40 Rector Street, 5th Floor
19       New York, NY 10006
         (212) 965-2200
20       Laden@naacpldf.org
         Snaifeh@naacpldf.org
21
         Davin M. Rosborough
22       Julie Ebenstein
         AMERICAN CIVIL LIBERTIES
23       UNION FOUNDATION
         125 Broad St.
24       New York, NY 10004
         (212) 549-2500
25       Drosborough@aclu.org
         Jebenstein@aclu.org
```

```
 1        Kaitlin Welborn
          LaTisha Gotell Faulks
 2        AMERICAN CIVIL LIBERTIES UNION
          OF ALABAMA
 3        P.O. Box 6179
          Montgomery, AL 36106-0179
 4        (334) 265-2754
          Kwelborn@aclualabama.org
 5        Tgfaulks@aclualabama.org

 6        David Dunn
          HOGAN LOVELLS US LLP
 7        390 Madison Avenue
          New York, NY 10017
 8        (212) 918-3000
          David.dunn@hoganlovells.com
 9
          Michael Turrill
10        Harmony A. Gbe
          HOGAN LOVELLS US LLP
11        1999 Avenue of the Stars
          Suite 1400
12        Los Angeles, CA 90067
          (310) 785-4600
13        Michael.turrill@hoganlovells.com
          Harmony.gbe@hoganlovells.com
14
          Shelita M. Stewart
15        Jessica L. Ellsworth
          HOGAN LOVELLS US LLP
16        555 Thirteenth Street, NW
          Washington, D.C. 20004
17        (202) 637-5600
          Shelita.stewart@hoganlovells.com
18
          Blayne R. Thompson
19        HOGAN LOVELLS US LLP
          609 Main St., Suite 4200
20        Houston, TX 77002
          (713) 632-1400
21        Blayne.thompson@hoganlovells.com

22

23

24

25
```

```
1      Sidney M. Jackson
       Nicki Lawsen
2      WIGGINS CHILDS PANTAZIS
       FISHER & GOLDFARB, LLC
3      301 19th Street North
       Birmingham, AL 35203
4      Phone: (205) 341-0498
       Sjackson@wigginschilds.com
5      Nlawsen@wigginschilds.com

6

7      FOR THE CASTER PLAINTIFFS:

8      Abha Khanna
       ELIAS LAW GROUP LLP
9      1700 Seventh Avenue, Suite 2100
       Seattle, WA 98101
10     206-656-0177
       Email: AKhanna@elias.law
11
       Aria C Branch
12     ELIAS LAW GROUP LLP
       10 G St NE, Suite 600
13     Washington, DC 20002
       202-968-4490
14     Fax: 202-968-4498
       Email: ABranch@elias.law
15
       Daniel C Osher
16     ELIAS LAW GROUP
       10 G Street NE
17     Suite 600
       Washington, DC 20002
18     202-968-4490
       Email: DOsher@elias.law
19
       Joseph N. Posimato
20     Elias Law Group LLP
       10 G Street, NE; Suite 600
21     Washington, DC 20002
       202-968-4518
22     Email: Jposimato@elias.law

23     Lalitha D Madduri
       ELIAS LAW GROUP LLP
24     10 G Street NE, Suite 600
       Washington, DC 20002
25     202-968-4490
       Email: Lmadduri@elias.law
```

```
1       Olivia N. Sedwick
        Elias Law Group LLP
2       10 G Street, NE; Suite 600
        Washington, DC 20002
3       202-968-4518
        Email: Osedwick@elias.law
4

5       Richard P Rouco
        QUINN CONNOR WEAVER DAVIES & ROUCO LLP
6       Two North Twentieth Street
        2 20th Street North
7       Suite 930
        Birmingham, AL 35203
8       205-870-9989
        Fax: 205-803-4143
9       Email: Rrouco@qcwdr.com

10

11

12      FOR THE DEFENDANT:

13      Andrew Reid Harris
        OFFICE OF THE ATTORNEY GENERAL
14      CONSTITUTIONAL DEFENSE DIVISION
        501 Washington Avenue
15      Montgomery, AL 36130
        334-353-8891
16      Email: Reid.Harris@AlabamaAG.gov

17      Benjamin Matthew Seiss
        ALABAMA OFFICE OF THE ATTORNEY GENERAL
18      P.O. Box 300152
        501 Washington Ave (36104)
19      Montgomery, AL 36130
        334-353-8917
20      Fax: 334-353-8400
        Email: Ben.seiss@alabamaag.gov
21
        Brenton Merrill Smith
22      OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
        P.O. Box 300152
23      501 Washington Avenue
        Montgomery, AL 36130
24      334-353-4336
        Fax: 334-353-8400
25      Email: Brenton.Smith@AlabamaAG.gov
```

1    Edmund Gerard LaCour, Jr.
     OFFICE OF THE ATTORNEY GENERAL
2    501 Washington Avenue
     P.O. Box 300152
3    Montgomery, AL 36104
     334-242-7300
4    Fax: 334-242-4891
     Email: Edmund.Lacour@AlabamaAG.gov
5
     James W Davis
6    OFFICE OF THE ATTORNEY GENERAL
     501 Washington Avenue
7    P O Box 300152
     Montgomery, AL 36130-0152
8    334-242-7300
     Fax: 334-353-8400
9    Email: Jim.davis@alabamaag.gov

10   Misty Shawn Fairbanks Messick
     OFFICE OF THE ATTORNEY GENERAL
11   FOR THE STATE OF ALABAMA
     501 Washington Avenue
12   P O Box 300152
     Montgomery, AL 36130-0152
13   334-242-7300
     Fax: 334-353-8440
14   Email: Misty.Messick@AlabamaAG.gov

15   Alexander Barrett Bowdre
     OFFICE OF THE ALABAMA ATTORNEY GENERAL
16   P.O. Box 300152
     Montgomery, AL 36130
17   334-242-7300
     Fax: 334-353-8400
18   Email: Barrett.Bowdre@alabamaAG.gov

19   Thomas Alexander Wilson
     STATE OF ALABAMA
20   OFFICE OF THE ATTORNEY GENERAL
     501 Washington Street
21   Montgomery, AL 36103
     334-242-7300
22   Fax: 334-353-8400
     Email: Thomas.wilson@alabamaAG.gov

23

24

25

```
1        J Dorman Walker
         BALCH & BINGHAM LLP
2        P O Box 78
         Montgomery, AL 36101
3        334-834-6500
         Fax: 334-269-3115
4        Email: Dwalker@balch.com

5

6

7

8

9        COURTROOM DEPUTY:  Frankie N. Sherbert

10

11       COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                          **I N D E X**

2

3    DIRECT EXAMINATION OF THOMAS BRYAN CONTINUED        800
     BY MR. DAVIS
4    CROSS-EXAMINATION                                   877
     BY MS. KHANNA
5    CROSS-EXAMINATION                                  1014
     BY MR. DUNN
6    CROSS-EXAMINATION                                  1073
     BY MR. BLACKSHER
7    FURTHER REDIRECT EXAMINATION                       1098
     BY MR. DAVIS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    *Christina K. Decker, RMR, CRR*
                  Federal Official Court Reporter
                      101 Holmes Avenue, NE
                    Huntsville, Alabama 35801
            256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                    **P R O C E E D I N G S**

2                    (In open court.)

3              JUDGE MARCUS:  Good morning to everyone.  I take it

4       counsel are ready to proceed for the Secretary of State.

08:31:19  5   Mr. Davis, you are ready to proceed?

6              MR. DAVIS:  We are, Your Honor.

7              JUDGE MARCUS:  You have your witness, Mr. Bryan, here.

8       And we have Ms. Khanna for the Caster plaintiffs, Mr. Blacksher

9       for Singleton, Mr. Dunn for Milligan.  So we are ready to

08:31:37 10  proceed with the direct examination.

11          Before we did, there's one thing I wanted to raise with

12      you.  Judges Moorer, Manasco and I took a look at scheduling

13      and we wanted to make one brief change in the scheduling order

14      that we have already entered.

08:31:59 15      We had asked the parties to submit proposed findings of

16      fact and conclusions of law within 5 days of the completion of

17      the preliminary injunction hearing, whether the hearing ends on

18      Tuesday or Wednesday, I am not quite sure.  You will take

19      whatever time you need to do it and do it right.

08:32:28 20      But we are going to accelerate the time for filing those

21      proposed findings of fact and conclusions of law, and we would

22      ask you to submit them to the Court no later than the end of

23      next Friday, January 14th.  So we are not talking about the end

24      of business, but really at the end of the day.

08:32:55 25      So by the end of next Friday, we will ask you to submit

```
 1  any proposed findings of fact and conclusions of law.  But we
 2  wanted to give you at least seven or eight days notice of that,
 3  which is why we decided to share that change with you this
 4  morning.
```
08:33:16
```
 5          Having said that, we're ready to proceed, Mr. Davis, with
 6  your witness.  You may proceed on your direct.  Thank you.
 7                  DIRECT EXAMINATION OF THOMAS BRYAN CONTINUED
 8  BY MR. DAVIS:
 9  Q    Thank you, Your Honor.  Good morning, Mr. Bryan.
```
08:33:30
```
10  A    Good morning.
11  Q    Mr. Bryan, did you assess the whole county plan presented
12  by the Singleton plaintiffs?
13  A    I did.
14  Q    I will share with you Defendants' Exhibit 1.  This is
```
08:33:49
```
15  page 53 of your first report.  Is this the whole county plan
16  that you assessed?
17  A    This looks correct, yes.
18          MR. DAVIS:  And I will say for the benefit of the
19  court and the other parties, we will first go through
```
08:34:02
```
20  Mr. Bryan's Singleton report, then his analysis of the Hatcher
21  plan, and third, his supplemental report.
22          It will be a bit slow going through the Singleton plan
23  because for each analysis Mr. Bryan will be explaining what he
24  did.  There will be no need to repeat that for the Hatcher and
```
08:34:20
```
25  the for the other two reports.  Those will go more quickly.
```

```
 1              JUDGE MARCUS:  Thank you, Mr. Davis.  And, again, you
 2   take the time you need.
 3              MR. DAVIS:  Thank you, Your Honor.
 4   BY MR. DAVIS:
 5   Q    What do the Singleton plaintiffs do with counties in this
 6   map that they presented, Mr. Bryan?
 7   A    My assessment is that the plaintiffs used whole county
 8   geography, that is, they did not split counties or conform to
 9   any other piece of administrative geography beside counties.
10              They used the -- can we bring the exhibit up please?
11   Q    Of course.
12   A    Thank you.  They used the 67 counties, and then appears to
13   have built seven different districts by aggregating whole
14   county units in a unique way to generate a plan that I believe
15   ended up -- because of the use of whole counties -- had
16   approximately a 2.5 percent population deviation.
17   Q    Okay.  Are you aware of any requirement in Alabama law
18   that requires Alabama to keep counties whole in this
19   congressional plans?
20   A    I am not aware.
21   Q    Are there any states that keep counties whole in their
22   congressional districts?  And I should say states with more
23   than one congressional districts.
24   A    Yes.  Thank you for that.
25              Our research showed that we are certain that there are
```

two.  We examined the redistricting rules for all of the states

and note for certain that Iowa uses counties, and that West

Virginia uses them.

There are other states that may use counties for other

08:36:21  types of redistricting, but not for the entire state.

Q    So other than Iowa and West Virginia, other states, to the

best of your knowledge, that have more than one congressional

district split at least some counties?

A    That is correct, to the best of my knowledge.  I wouldn't

08:36:39  assume there may not be some other state out of all of them

that we may have missed, but we believe for certain that Iowa

and West Virginia at a minimum have them.  But it's a very

uncommon practice.

Q    Remind us what a community interest is to your way of

08:36:57  thinking.

A    Sure.  Yeah.  It's a group of people, a collection of

people, and they can generally be thought of as being

geographically defined, a universe of people with often times

similar, you know, attitude, beliefs, behaviors, things that

08:37:14  help define them as staying in common.

As Dr. Duchin testified yesterday, a point which I agree,

that those communities of interest can oftentimes work in

conflict with each other.  There is no uniform widely known

right or prevailing community of interest over any other.  It's

08:37:36  a subjective and difficult concept to try and apply to

1    redistricting.

2    Q    Do you have any opinion as a demographer on the relative

3    importance of counties as a community of interest as opposed to

4    say some type of economic bond?

08:37:56  5    A    In different states, different communities of interest can

6    mean different things.  The plaintiffs mentioned in their

7    complaint, they refer to Georgia, and Georgia is a unique state

8    insofar as it has I think 159 counties.  It has many, many more

9    units of county geography.

08:38:24 10        So it's both more relevant and easier to use counties in

11   that case in that state just because that is a more prevailing

12   and easier to use a piece of geography than it may be in a

13   state like Alabama where counties at one point a long time may

14   have been used to define districts in the state, but they are

08:38:44 15   no longer.  And it is, in fact, difficult, it is more difficult

16   to use counties in a state like Alabama because there are

17   relatively fewer counties to use to do redistricting.

18   Q    Are counties as important as -- are these important today

19   as they were 50 or a hundred years ago?

08:39:02 20   A    Yeah.  I would say no.  I wrote at some length about the

21   origins and uses of counties and there's obviously still legacy

22   use of counties in the administration of the state, but there

23   are other prevailing communities of interest today.  We could

24   say such as economic bonds, social bonds, bonds within cities

08:39:26 25   or other pieces of geography that prevail over counties as a

```
 1  community of interest.  I think that's reflected by the long
 2  recent history in Alabama of not using them.  They use other
 3  things instead.
 4  Q    Do the Singleton plaintiffs ever say why they consider
 5  counties so important that you saw in your review of their
 6  complaint?
 7  A    I read the complaint carefully, and I did not see a strong
 8  argument for why.  It just -- the -- my interpretation of the
 9  report is that they said that their defense was that they were
10  used historically and they want to use them now.  But I didn't
11  see a strong defense of why they should be used over other
12  communities of interest.
13  Q    You said review of the report.  Did you mean review of the
14  complaint?
15  A    Yes, that's correct.
16  Q    Thank you.  What does a demographer mean by core
17  retention?
18  A    Yeah.  So core retention for a demographer in the process
19  of redistricting is a quantitative method that we use to
20  measure the degree to which a district is changed in the
21  process of redistricting.
22       Typically, we will begin with a count of the population of
23  the districts that we are going to redistrict, and we will make
24  an assessment of how many people are in those districts
25  currently using the most recent decennial census data.
```

08:39:47 (line 5)
08:40:05 (line 10)
08:40:18 (line 15)
08:40:35 (line 20)
08:40:56 (line 25)

1       The exercise of core retention then goes on to measure how

2  much those districts are changed and how population are moved

3  among them forensically from one district to another to the

4  person to make an assessment of how many people are displaced,

08:41:22 5  and how many people are retained in the what we would call the

6  core district.  That gives us the ability to see how much

7  retention and how much displacement there is in the process of

8  redistricting.

9  Q    In your experience as a demographer working on plans in

08:41:40 10  different jurisdictions, is it common for folks to desire to

11  preserve the core of previous districts?

12  A    It is common.  It is one of the NCSL standards.  It's one

13  of the standards in the Georgia, the reapportionment

14  guidelines.  And they are numbers that we look carefully at, no

08:42:07 15  matter what redistricting plan that we are working on.  It's an

16  important consideration and something that you think hard about

17  for the continuity of representation.

18  Q    Did you assess how well or poorly Alabama did preserving

19  the core that 2011 districts in its new plan?

08:42:31 20  A    Yes, I did.

21  Q    Is that reflected in this Figure 5.1 on page 22 of Defense

22  Exhibit 1?

23  A    Yes, it does.  Figure 5.1 shows the percent of the

24  population that was retained in the original seven districts

08:42:53 25  through the process of redistricting.

1    The blue line shows the percent of the total population

2   that was retained.  And then given the nature of this case,

3   that there is an interest consideration of the black population

4   and the impact to the black population.  We extended this

08:43:14 5   analysis to do a core retention of the black-alone population

6   incremental to the total population.

7    And the purpose of that analysis was to determine whether

8   there was a significant disproportionate impact on the black

9   population through the process of redistricting.  It's -- from

08:43:37 10  a demographer's point of view, you would always want to know if

11  there's been a disproportionate impact on a population that's

12  different from everybody else.

13  Q    Okay.  So would it be a fair interpretation of this map,

14  looking here at District 1 on the left side, that this blue

08:43:54 15  line means that between 2011 and 2021 Alabama retained

16  98.8 percent of the population of old District 1 in new

17  District 1?

18  A    That's correct.

19  Q    And then 98.6 percent of the black population of old

08:44:12 20  District 1 in new District 1?

21  A    That's correct.  Virtually identical.  It would be no --

22  what I would refer to as differential impact to the black

23  population with the core retention of District 1.

24  Q    Okay.  Let's look at the next page, your Table 5.1.

08:44:33 25  A    Yes.

1  Q    This is page 23 of Defense Exhibit 1.

2        Interpret this table for us, Mr. Bryan.  Maybe start with

3  District 1 and show us what you are telling us in this table.

4  A    Sure.  Thank you.

08:44:47 5        In the first column, what we have done is we've made an

6  identifier for the what I will call the base district or the

7  original district that was subjected to the redistricting

8  process.  Then what I've done in the second column is I have

9  identified districts with population that were changed from the

08:45:11 10  first or the original base district that we did redistricting

11  on.

12        So in District 1, as we look and read across the rows, you

13  can see base District 1, new District 1, the total population

14  was 717,754.  When you read the second line, you can see there

08:45:37 15  was a very small number, 739 people, that were moved into

16  District 2.

17        And then lastly, there were approximately 7,800 people who

18  were moved into District 7.

19        We can see here this last line where it says one total

08:45:55 20  where it says 726,276 that was the total population that we

21  started with when we began the redistricting process.  That

22  number at the top, again, 717,754, that is the target

23  population for the districts in the redistricting plan.

24        As you continue to the right, you see the same analysis

08:46:21 25  for the total, except for the black-alone population.  In this

 1   case, there was 185,771 thousand blacks who were originally in

 2   District 1 who remained in District 1.  Again, a small number

 3   were moved into District 2, and also a small number -- a

 4   relatively small number were moved into District 7.

08:46:43 5       This analysis continues down with each district showing

 6   the pieces that were retained and the pieces that were moved

 7   into different districts.

 8       If you look at District 4, for example, District 4 was

 9   moved into five different pieces.  District 5 was split into

08:47:01 10  two different pieces, and so forth.

11       This gives us the forensic ability to see exactly how many

12   of what kind of people were moved between different districts

13   and the redistricting process.

14   Q   Okay, Mr. Bryan, did you assess how well the Singleton

08:47:24 15  plan did with core retention?

16   A   I did.

17   Q   Then we'll refer you to your Figure 5.2 that is on page 24

18   of Defense Exhibit 1.

19   A   Thank you.

08:47:33 20  Q   Tell us what your Figure 5.2 shows, please.

21   A   Sure.  Thank you.

22       In Figure 5.2, we show a chart that is consistent with the

23   state of Alabama chart that we just walked through.  So in this

24   case, if you look at District 1, it would say that 94.1 percent

08:47:58 25  of the total population was retained in District 1 and also

1  92.5 percent of the black population.

2        So consistent with the Alabama plan, this plan has a very

3  high level of core retention in District 1.  This plan also has

4  somewhat high retention in District 5.  We know this already,

08:48:25  5  but when we start looking at the other districts that were

6  changed in the redistricting process, you can see that there

7  was a signi -- two features -- a significantly lower amount of

8  core retention by district, and also a significantly higher

9  impact to the black population separate from the total

08:48:46  10  population.

11  Q    What do you mean by higher impact to the black population?

12  A    Yes.  So, for example, if you examine in this chart

13  District 2, District 2 would show that 66 percent of the total

14  population was retained; that is, their continuity of

08:49:10  15  representation is ensured.

16        By comparison, only 50 percent of the black population in

17  District 2 were retained.  So that is there were approximately

18  16 percentage points more of black population who lose their

19  continuity of representation in this plan for the blacks

08:49:31  20  compared to the total.

21        That same feature plays through if you look at District 4.

22  But in that case, it is even more severe.  There's 63 percent

23  of the total is retained.  Again, much lower than the State of

24  Alabama's plan, but then you look at the black population,

08:49:51  25  33.7 percent, there was, you know, over -- nearly a 70 percent

810

```
 1  displacement of blacks, preventing their continuity of
 2  representation in District 4.
 3  Q    Thank you.
 4       And the next page, page 25, Table 5.2.  What is Table 5.2?
08:50:17  5  A    Yeah.  Table 5.2 is a companion to the earlier table we
 6  just walked through.  This table shows the comparison of the
 7  existing districts with the Singleton plan as opposed to the
 8  distribution that you would have arrived at with the state of
 9  Alabama plan.
08:50:36 10  Q    Thank you.
11       Mr. Bryan, what does a demographer mean by incumbency
12  protection?
13  A    Yeah.  The way we think about incumbency protection is
14  through the lens of generally accepted rules for traditional
08:50:57 15  redistricting principles, which is that, again, part of
16  continuity of representation, you generally want to avoid
17  pitting incumbents that may have a longstanding relationship
18  and a deep knowledge of their constituency from having to run
19  against each other and compete and losing the knowledge or
08:51:17 20  experience that may come with that representation.
21  Q    If the state ignores incumbency protection, would that
22  give the majority party the ability to get rid of political
23  rivals by making their opponents run against each other,
24  putting them in the same districts?
08:51:36 25  A    It is possible.  And we have seen that happen even
```

```
 1  recently.
 2  Q    Did you assess how Alabama's plan did with incumbency
 3  protection?
 4  A    I did.
 5  Q    What did you find?
 6  A    I found that there was no pairing of incumbents.
 7  Q    Did you assess whether the Singleton plan created any
 8  incumbent conflict?
 9  A    Yes.  There was a set of paired incumbents in the
10  Singleton plan.  I don't have the name of the pair in front of
11  me, but it should be in my report.
12  Q    You assess that on page 27 of your report.
13  A    Yeah.  This is correct.  So the plaintiffs plan pairs
14  Palmer/Rogers in a proposed District 3 leaving District 7
15  unrepresented.  I would know that that pairing, which you can
16  see in the very center of the map, those two incumbents are
17  literally right on the edge of the border there between
18  District 3.
19  Q    Thank you.
20       So the Singleton plan does have a district with two
21  incumbents in the same district?
22  A    It does.  Yes.  And it would be very difficult from here
23  to have adapted this plan to avoid that.  You can see that the
24  location of the pairing next to the number 3 on the map is
25  still quite a ways away -- geographically is quite a ways away
```

08:51:47   (line 5)
08:52:05   (line 10)
08:52:24   (line 15)
08:52:46   (line 20)
08:53:05   (line 25)

```
 1  from anywhere in District 7 where another incumbent would have
 2  to be so that you would not pair incumbents.
 3  Q    Thank you.  You present some alternative whole county
 4  plans in your report, do you not?
08:53:27 5  A    I do, yes.
 6  Q    And would those be available for viewing in the map
 7  appendices of Defense Exhibit 1?
 8  A    Yes, they would.
 9  Q    Did you find any combinations of counties in alternative
08:53:41 10 whole county plans that avoids incumbent conflicts?
11  A    Yes, we did.  We did not pursue that as an objective of
12  it, but there were, I believe, at least -- at least two
13  different ways which you could group counties to comply with
14  that tradition of redistricting principle.
08:54:04 15 Q    Okay.  What does it mean to a demographer for a district
16  to be compact?
17  A    Yeah.  As Dr. Duchin discussed yesterday, she shares a
18  point of view with which I agree, is that it features
19  geographic compactness and would not have a necessary or
08:54:30 20 extraneous other pieces of the geography that would perhaps
21  stick out or impose into it that would make it unusual,
22  unwieldy, or have an uncommon geographic feature that may be
23  for some other redistricting purpose.  It's a -- generally a
24  benefit to have geographically compact districts.
08:54:55 25 Q    I want to go to Page 45 of Defense Exhibit 1.
```

```
 1  A    Yeah.
 2  Q    What are some of the ways that demographers measure
 3  compactness of a district?
 4  A    Sure.  It's important to know that compactness is an area
 5  of mathematics.  It's an area of analytics where there is no
 6  agreement.  There's not a right way.  There is a very famous
 7  article, a great paper by Dr. King of Harvard that says
 8  compactness is just -- you'll know it when you see it, right?
 9       So there have been several very prominent, very good
10  mathematicians that have tried to tackle this problem by
11  looking at things such as, you know, the ratio of the area of a
12  district to a circle that circumscribes it or outer bounds it,
13  right?
14       So as Dr. Duchin said yesterday, there's two very
15  common -- and I agree, there are two most common methods.
16  Those would be Polsby-Popper and the Reock scores they use to
17  assess the compactness of a plan.
18  Q    Just briefly in layman's term, how does the Polsby-Popper
19  measurement work?
20  A    Yeah.  So basically it's taking the ratio of the -- I want
21  to get my language exactly right here because there is some
22  precision in the mathematics.  Polsby-Popper is the ratio of
23  the area to the area of the circle whose circumference equals
24  the perimeter of the district.
25  Q    Okay.
```

Timestamps: 08:55:23 (5), 08:55:47 (10), 08:56:03 (15), 08:56:19 (20), 08:56:47 (25)

08:57:07
08:57:26
08:57:49
08:58:03
08:58:27

```
 1   A    It's a lot of words, but it's just a distillation of some
 2   mathematics that say it's the ratio of this area to a circle.
 3   And as Dr. Duchin pointed out, the circle is kind of the
 4   optimal feature, and things that you elongate or go outside of
 5   a circle would be detrimental to its compactness.
 6   Q    And there's a Schwartzberg measure?
 7   A    Yes.  Which this is a close companion measure to the
 8   Polsby-Popper.  The Schwartzberg method that I use is actually
 9   an adaptation of the historic, probably the more well known,
10   the original mathematic derivation of the Schwartzberg method,
11   but we can talk about that if you'd like.
12   Q    Sure.  Well, the plaintiffs have said -- some of the
13   plaintiffs' experts have said that they disagree with the way
14   you presented Schwartzberg measurements.  So what is your
15   response to that?
16   A    They're correct.  The pure mathematics of Schwartzberg are
17   different than what I presented.  What I present for
18   Schwartzberg is what I would call an adaptation, a useful
19   adaptation of that method.
20        The Schwartzberg method will generate results that can go
21   from 1, you know, in theory, to infinity.  And so what we do,
22   in order to make the Schwartzberg number more comparable,
23   compatible, easier to interpret compared to other measures, is
24   we rescale that to a value that's between 0 and 1.  It is not
25   conventional, but I am not the first one who has used it.
```

```
 1          When we did that adaptation of the Schwartzberg method, we

 2     did rigorous statistical tests to see how it compared with its

 3     companion measure, the Polsby-Popper.  And the statistical test

 4     that we ran suggested that it was so consistent with our

08:58:51 5     findings for Polsby-Popper, we probably didn't even need it.

 6          So it's a useful metric, it's an interesting metric.  But

 7     no matter whether you use the original mathematic derivation of

 8     it or our adapted method of it, the outcome is the same.  And

 9     it would be exactly consistent with the statistics we had with

08:59:16 10     Polsby-Popper, which Dr. Duchin, I believe, suggested we match

11     our conclusions there exactly.

12     Q    When we discussed your qualifications yesterday afternoon,

13     you said, did you not, that you have experience in statistical

14     transformation?

08:59:31 15     A    Yes, I do.

16     Q    Okay.  And is that what you were doing here, converting

17     the Schwartzberg scale to use the same scale as other

18     compactness measures?

19     A    Yes.  Yes, it is.

08:59:45 20     Q    Thank you.  That's enough of the measures.

21          Let's look -- you measured compactness of the Alabama plan

22     and the Singleton plans, did you not?

23     A    I did.

24     Q    Let's turn to page 29 of Defense Exhibit 1.  Actually,

09:00:15 25     let's move on to the next page.
```

1      What scores are you showing here in Table 5.4 on page 30

2  of Defense Exhibit 1?

3  A    All right.  Thank you.

4      The table you see here is color coded.  The Christmas tree

09:00:35  5  coloring of red to green shows the red scores being the lowest

6  scores, the green scores being the highest scores.

7      There's two different ways that I summarize the statistics

8  in this table.  The first is by summing each column.  So for

9  Polsby-Popper as you add up these different values we would get

09:00:59 10  a score of 1.55.  You sum up my adapted Schwartzberg, it's

11  3.28.  Reock is 2.67.  The convex hull is 5.01.

12      So these are numbers that you would then take for this

13  plan and then say, ah, let us compare these with the sum of the

14  figures for another plan and then we can come to a useful

09:01:22 15  determination, if in aggregate, one plan is more compact than

16  another plan, right?

17      The other way that I summarize these data is by row.  And

18  the reason that I do this is because it's very difficult to

19  just look at all of these different numbers and say, with all

09:01:45 20  these different fractions, which one in aggregate -- which

21  district in aggregate is better than another.  So I emphasize

22  there is no one right way of doing it.  This is how I've done

23  it.  It has been useful to judges and courts and experts and to

24  informed discussions about in general which plans in which

09:02:09 25  districts perform better than the other.

1       There was criticism of this approach by Dr. Duchin in her

2   rebuttal report saying that this, from a pure mathematics

3   standpoint, is not pure, if you will.  I mean, it's subject to

4   some variation, perhaps different interpretations because of

09:02:29 5   different distributions of numbers within here.

6       So I would like to acknowledge and concede that, yes,

7   there is no one perfect way to aggregate or summarize different

8   methods for individual districts, but I would argue it as one

9   useful way in general to be able to see which ones are better,

09:02:51 10   and in general which ones are worse.

11      The reason that we provide all of the data for all of the

12   districts for all of the methods is so that the readers, the

13   experts, the courts, can look and see for individual methods

14   what those numbers are for each one individually.

09:03:10 15      This prevents us from having the perception that we are

16   trying to hide any information.  We're trying to be fully

17   transparent and share everything we know and fully document how

18   we got there because there is no known or agreed upon way to

19   summarize or tabulate these data.

09:03:29 20   Q    Have you found these totals that you present to be a

21   useful way to judge the compactness of the district or a plan?

22   A    Yes.  In summary, it's a very useful way just to look at a

23   glance and say which ones are higher or which ones are lower.

24   They do not have the mathematic precision that Dr. Duchin

09:03:57 25   points out, but that does not detract from the fact that they

```
 1  have utility in helping a reader quickly see which ones are
 2  higher or which ones are lower.
 3      If you go into the individual methods, the Polsby-Popper,
 4  Schwartzberg, Reock, convex hull, and you look at those
 5  individually, you will find that they will generally follow the
 6  same pattern as this number does in aggregate.  This number
 7  tries to take a lot of different information and put it
 8  together in one summary statistic.  But, again, we leave all of
 9  the information here for the reader.  So if they know, familiar
10  with these different methods, they're more than welcome to look
11  at those and focus on those individually as well.
12  Q    You present measurements for the Singleton plan, do you
13  not?
14  A    Sure.  Yes.
15  Q    And is that in Table 5.5 on the bottom of page 30 of
16  Defense Exhibit 1?
17  A    Yes, that is correct.
18  Q    How does the compactness of the Singleton plan compare to
19  the compactness of Alabama's 2011 plan -- excuse me -- 2021
20  plan?
21  A    Sure.  Yes.  Thank you.
22      So when we -- when we compare tables 5.4 and 5.5, what I
23  would look here to is the sum.  Basically, the row at the
24  bottom of each one of these tables to say is there a difference
25  or not.
```

09:04:15
09:04:33
09:04:45
09:05:04
09:05:23

```
 1          And so when we look at Polsby-Popper and Schwartzberg, as
 2     I said earlier, the adapted Schwartzberg score is very, very
 3     close.  You can look at the rank order of them and the sum, and
 4     you can see that there's basically no difference in
09:05:39  5     Polsby-Popper for the enacted plan compared to the
 6     Polsby-Popper for Singleton.
 7          Similarly, as you would expect, the Schwartzberg score or
 8     adapted Schwartzberg score is within 1/100th as well.  So by
 9     those two measures you would say the Alabama plan and the
09:05:57 10     Singleton plan here would be comparable.
11          Some of these other measures, the Reock, for example,
12     which is the other measure that Dr. Duchin presents in her
13     work, would show -- the Reock score here would show higher for
14     the Alabama plan.  And then a fourth method that I find useful,
09:06:19 15     it's not always used in redistricting, but it's still a very
16     useful measure of compactness, called convex hull.  The convex
17     hull measure here also scores the Alabama plan higher than the
18     Singleton plan.
19     Q    Thank you.  Did you assess the demographics of the
09:06:38 20     Singleton plan?
21     A    Yes, I did.
22     Q    Let's go to page 15 of Defense Exhibit 1.
23     A    Great.
24     Q    Table 4.1.  What, if anything, did you note by reviewing
09:07:00 25     the total population of the districts in the Singleton plan?
```

1  A    Yes.  As we noted earlier, because the plan was built with
2  counties and was not built down to the degree where you had
3  one person of deviation, you see a reflection, a manifestation
4  of that two-and-a-half percent deviation here.

09:07:27 5      So you see a low score here of -- a low population of
6  709,514 in District 2.  And then I think the high -- the high
7  population figure here, the watermark, is 727,206.

8  Q    Okay.  What does it mean for voters if there's population
9  deviation among the districts?

09:07:54 10 A    Sure.  So this is a core tenent that -- related to
11 one person, one vote.  And the idea here, you know, part of the
12 reason we have a census, part of the reason we go and check and
13 see what the population is every 10 years is so that we can
14 balance the population equally in each district.

09:08:18 15      The impact of balancing that population is important
16 because per one person, one vote, you want to have each
17 individual citizen's vote count as closely as possible, if not
18 exactly the same amount as the citizen next to them.  You would
19 seek to have as close to an equitable one person, one vote as
09:08:41 20 possible.

21 Q    If I am in a district with a hundred people, does my vote
22 count the same as -- of somebody in a district with 50 people?

23 A    No.

24 Q    If a plan has 2.5 percent deviation today, does that mean
09:09:01 25 that the deviation will remain at 2.5 percent over the course

1  of the decade that the districts are used?

2  A    Yes.  I would say regardless of what a deviation is now,

3  whether at 0 or 2 or 5, my experience is that no matter what,

4  invariably, that that deviation can and will grow over time,

09:09:22 5  and that is almost a universal truth in demography.

6  Q    And you told us yesterday, did you not, that you have

7  experience in estimating population shifts?

8  A    I do.

9  Q    Did you assess how the deviation of the Singleton plan in

09:09:49 10  Alabama's 2021 plan are likely to change over the course of the

11  coming decade?

12  A    Yes, I did.

13  Q    Tell us what you're showing us in Figure 5.7 of Page 33 of

14  Defense Exhibit 1.

09:10:08 15  A    Thank you.

16      In performing this analysis, I independently ran a series

17  of rigorous population projections at the county level.  I

18  projected the county population by year, out to the year 2030.

19  I then aggregated those county-level projections into the

09:10:40 20  districts that are represented in the Singleton plan.

21      I then compared that with population projections that I

22  built using the exact same methodology for the Alabama plan.

23      The outcome of this is that the Alabama plan, starting

24  obviously at 0.0 percent deviation in 2020, you can see it

09:11:07 25  starts going up almost immediately.  You can see by 2021 the

 1   current number, the Alabama plan would already have 1.4 percent

 2   deviation, but the 2.5 percent deviation in the plaintiffs'

 3   plan, we estimate to already be 2.9 percent.

 4        If you follow those trends of the population projections

09:11:31  5   out over time, our estimate is that the total deviation by the

 6   year 2030, if you stick with the Alabama plan, would only be

 7   7.2 percent.  And that number is a very common amount of

 8   deviation that you would find at a time of redistricting -- 7,

 9   6, 5 percent, those are the kinds of numbers of deviation we

09:11:56 10   commonly find.

11        By comparison, if you start a plan already handicapped

12   with a 2.5 percent deviation to begin with, what will happen is

13   that deviation is going to grow in a -- much more likely to

14   grow higher and higher than a plan that started with zero

09:12:16 15   deviation to begin with.

16        So in this regard, I would strongly advocate this analysis

17   as a way to understand and represent the utility of the

18   district plan over the course of the decade.  Not just the year

19   that it begins, but for all the years that this plan is

09:12:38 20   supposed to support the people of Alabama.

21   Q    So if Alabama -- just to sum this up -- if Alabama were to

22   adopt the Singleton plan today --

23   A    Right.

24   Q    -- what do you estimate the total deviation to be among

09:12:53 25   congressional districts by the end of the decade?

1  A     11.6 percent.

2  Q     Did you form the same analysis, Mr. Bryan, for the

3  alternative plans, the whole county plans that you drew?

4  A     Yes, I did.

09:13:10  5  Q     Tell us what you're showing us in Figure 5.8 on Page 34 of

6  Defense Exhibit 1.

7  A     Sure.  Thank you.

8        So in this map, we just show a variety of lines.  It looks

9  a little messy.  But basically, we're showing the different

09:13:32  10  potential outcomes, given some different combinations of the

11  plans that we came up with built on counties.  And we did

12  not -- we did not design these plans to optimize the forecasts.

13  All the forecasts were done after the plans were designed.

14       As you can see, there's some plans that start high and end

09:13:55  15  even higher.  And there are some plans -- Plan 4, for example,

16  that starts low.  That one even gets better for a time before

17  it goes up.  But the outcome is that if you are starting with

18  a zero percent deviation to begin with, as we see in the green

19  line, that you are going to end up with the lowest deviation

09:14:16  20  over the course of the whole decade compared to any other way

21  you would build this with counties.

22  Q     Gotcha.  This might be a good time to talk about the

23  alternative plans in general.

24       Did you draw any of the alternative whole county plans

09:14:31  25  with any particular goals in mind, other than trying to achieve

1 minimum deviation?

2 A    No, we did not.  There is many, many ways that you could

3 draw the plans based on counties to the point where they

4 became, for example, hopelessly not compact, irregular or

09:14:56 5 perhaps that they may have really large deviations.

6       So my analysis here and my determination to cut this off,

7 whatever, 13 different plans, was subjective.  It was a point

8 where there wasn't any incremental benefit from destroying more

9 and more plans.  It would be inferior to these combinations

09:15:16 10 that we had already come up with.

11 Q    Well, just looking at the left side of Figure 5.8, did you

12 draw some whole county plans that had lower deviation than the

13 Singleton plan at the beginning?

14 A    Yes.

09:15:29 15 Q    And did you draw some that had greater deviation than the

16 Singleton plan at the beginning?

17 A    Yes.  They were both higher and lower than the Singleton

18 plan.

19 Q    From your estimates, Mr. Bryan, did you find any whole

09:15:42 20 county plans that would, by the end of the decade, present

21 lower deviation than Alabama's 2021 plan?

22 A    No.  There was one, Plan 4, that is close, but at the end,

23 the Alabama plan, because of its zero deviation starting point,

24 prevails as having the lowest overall deviation for the entire

09:16:07 25 decade of their utility.

1 Q    Mr. Bryan, Singleton plaintiffs allege, do they not, that

2 if their plan were in use, that two of those districts in past

3 elections would have voted for the Democratic candidate?  Do

4 you understand that to be the case?

09:16:36 5 A    I understand that to be the case, yes.

6 Q    And I want to refer you now to page 37 --

7 A    Great.

8 Q    -- of your report.  What are you showing us in

9 Figure 5.10?  And, again, that is page 37 of Defense Exhibit 1.

09:17:05 10 A    Thank you.

11     What we tried to do here is create a data visualization

12 that enabled the reader to be able to quickly and easily see

13 what the rank order of the political performance would be in

14 each district under each plan.

09:17:24 15     So, for example, if you read this vertically, the number

16 to the highest, this is percent Republican voting.  The number

17 at the highest is the highest percent Republican district in

18 that plan.  The numbers at the bottom represent the lowest

19 Republican performing plans.  And those were plans where

09:17:43 20 consistent with the plaintiffs' assertion of the use of black

21 registered voters in the 40 percent range as being a performing

22 district, we looked for versions of this plan that had either

23 one or two districts that had Democratic performing districts

24 in that range, the 40 to 45 percent range.

09:18:07 25 Q    So this is just a hypothetical plan.  You're just showing

```
 1  us how to read a chart here, correct?
 2  A    Yep.  It's just a -- it's a setup because it's a lot of
 3  information.  Yep.
 4  Q    Now, your alternative plans, do you find that if you keep
 5  counties whole that it's necessarily the case that you will end
 6  up with two districts likely to elect a Democratic candidate?
 7  A    No.  That, in fact, was not the case, and that's not
 8  surprising to me.
 9  Q    Okay.  Let's look at Figure 5.1.
10  A    Okay.
11  Q    On page 38 of Defense Exhibit 1.
12  A    Sure.
13  Q    Explain this chart for us, please.
14  A    Sure.  So on the left, we have the distribution of seven
15  districts for the plaintiff plan.  You can see a seven dots
16  there ranked from lowest to highest.  And, you know, the
17  plaintiffs, I believe it's page 26 of their complaint, talk
18  about the percent black registered voters.  This is a little
19  bit -- little bit different way of looking at the information.
20       Here we're looking at the percent Republican votes in the
21  2018 governor's race, as there's nothing magical about that
22  race.  We looked at some other races and findings were
23  consistent.
24       So what this would say is that if you look to the left,
25  the plaintiff plan would show there would be two strong
```

```
         1   Democrat performing districts and five Republican ones.
         2        As you read across the right, you will see some of my
         3   different alternate plans, that there are some cases where
         4   there are one and some cases where there are two Democrat
09:19:49 5   performing districts.  And then you can see on the far right,
         6   the state of Alabama plan has one very strong performing
         7   Democratic district.
         8   Q    Let's be clear.  You are not a political scientist, are
         9   you, Mr. Bryan?
09:20:09 10  A    No.
         11  Q    And have you prepared any estimates of how these districts
         12  are likely to perform in the future?
         13  A    I have not, and I have no idea.  I wouldn't know how to do
         14  that.
09:20:23 15  Q    Okay.  So let's -- just to make sure we're all on the
         16  page, this one here is one of your alternative plans, correct?
         17  A    That is correct.
         18  Q    And this plan number 1, is it true that what you're
         19  showing -- in this plan there's one district where in the 2018
09:20:45 20  governor's race a majority of voters supported the Democratic
         21  candidate?
         22  A    That's correct.
         23  Q    And there are six districts in that hypothetical -- in
         24  that plan that supported the Republican candidate in the 2018
09:20:59 25  gubernatorial election?
```

```
 1   A    That is correct.
 2   Q    Of the 13 plans that you drew, how many resulted in two
 3   districts that supported the Democratic candidate in that one
 4   election?
09:21:13  5   A    I believe there were two districts that had two Democrat.
 6   Q    Okay.  The Singleton plan had two districts that were over
 7   40 percent African-American Voting Age Population; is that
 8   correct?
 9   A    Can you please say the question again?
09:21:41 10   Q    Sure.  Is it true, Mr. Bryan, that the Singleton plan has
11   two districts that had over 40 percent African-American Voting
12   Age Population?
13   A    Yeah.  There is, I believe, two, or perhaps one more,
14   three.  I'm going off of memory, but, yeah, there were a
09:22:00 15   couple.
16   Q    I understand.  Let's look at your Figure 5.13.
17   A    Sure.
18   Q    Page 39.
19   A    Yep.
09:22:13 20   Q    Defense Exhibit 1.
21   A    Yeah.
22   Q    Tell us what you're showing us in this chart.
23   A    Sure.  So this is a similar data visualization as we just
24   saw with the political performance, except that now what we are
09:22:30 25   doing is looking at the percent black population for each one
```

1  of the plans by district under each one of these different

2  scenarios.

3      So as we start to the left, no surprise.  We can see kind

4  of two dots above the line for the plaintiff plan and then as

09:22:50  5  you read across to the right, then you can see that there's,

6  you know, several districts here where there are one district

7  in my alternative plans that are above 40 percent, and there's

8  a couple instances here where there were two above 40 percent.

9      At the end of this data visualization on the far right,

09:23:12 10  you can see the state of Alabama plan, and that has one black

11  district that's up in 50, mid-50 percent range.

12  Q    Got it.

13      So looking at plaintiffs' plan, is it true that this chart

14  tells us that in the Singleton plan there is a district with

09:23:34 15  approximately -- looks like 48, 49 percent African-American --

16  A    Yeah.

17  Q    -- population?

18  A    48.8.

19  Q    Now, I may have used imprecise language.  Are you telling

09:23:45 20  us what the total black population is in the district, or the

21  total Black Voting Age Population in the district?

22  A    I am going off of memory.  I believe this is the total

23  population.  I want to be cautious.  I don't recall precisely,

24  but I think it's the total population.

09:24:15 25  Q    That will be made clear in the language of your report,

1  would it not have?

2  A    Yeah.

3  Q    Yeah.  Yeah.  We won't dig around for that.

4       Out of the alternative whole county plans you drew, how

09:24:29 5  many plans had two districts that were more than 40 percent

6  single-race black?

7  A    Yeah.

8  Q    Oh, no, no, no.  You said all black.  So how many had more

9  than two districts that were over 40 percent all black?

09:24:44 10  A    Looks like we have three here.

11  Q    Okay.

12  A    I may have said two, but, yeah, I think there is three in

13  here.  But out of -- it's three out of 13.  So the majority of

14  them only have one.

09:24:58 15  Q    Mr. Bryan, if a court were to order that Alabama had to

16  keep counties whole in this congressional plan, would that, in

17  your view, eliminate the possibility of racial gerrymandering?

18  A    No.

19  Q    Why not?

09:25:19 20  A    Because we're able to demonstrate that there are different

21  ways of combining counties to achieve different political and

22  racial outcomes.

23  Q    Okay.  And to go back, to be clear, when you were drawing

24  your alternative plans, were you purposely trying to either be

09:25:40 25  sure to draw the districts with certain minority population or

1  to avoid doing so?

2  A    The characteristics of the districts had no bearing,

3  except that we sought to identify combinations that achieved

4  the lowest population deviations.  And at that point, we

09:25:58 5  stopped until we got to the plaintiff about 5 or 6 percent

6  deviation and then we did no more.  I had no idea what the

7  characteristics were when I drew them.

8  Q    If a state wanted to keep counties whole in its

9  congressional plan --

09:26:15 10  A    Uh-huh.

11  Q    -- could it racially gerrymander by choosing which

12  counties to group with other counties based on the minority

13  population in those counties?

14  A    You could choose to do that.

09:26:27 15  Q    I wanted to go back to Defense Exhibit 1 and have you

16  explain to us some of the maps that you have presented in the

17  appendices of your report.

18  A    Sure.

19  Q    Let's look at Map Appendix 18 on Page 71 of your report.

09:26:57 20     Tell us what you are making in this map, Mr. Bryan.

21  A    Sure.  So this map has two -- what I will refer to as

22  layers.  So we have one layer.  There's an outline that's shown

23  in blue.  And that is the outline of the 2021 plans for

24  Alabama.

09:27:25 25     And then what we see with the different color shading from

```
 1  red to orange, yellow, light green, dark green, are
 2  progressively higher and higher number of population for the
 3  counties.
 4  Q    Thank you.  So we can look at this map and tell
 5  immediately which counties are the most populous in the state,
 6  then; is that right?
 7  A    Sure.  Yes.
 8  Q    And you can spot areas that have low total population?
 9  A    Easily, yes.
10  Q    Okay.  Pick District 7, for example, in the state '21
11  plan.
12  A    Yep.
13  Q    Where is most of the population coming from that's in
14  District 7?
15  A    I am going to refer to my report, if I may.
16  Q    Sure.  Yes.
17       Maybe I could ask a clearer question.
18  A    Sure.
19  Q    Which counties in District 7 are the most populous?
20  A    Yeah.  If I may, I just would like to refer to -- there's
21  another map adjacent to this in my report.
22  Q    Okay.  Do you want me to go to --
23  A    Yeah, can you.
24  Q    This one?
25  A    Yeah.  That -- that's much more helpful.
```

```
 1           So, yeah, in Jefferson, like we'd look up into the central
 2  part of the state, it's -- this is the -- this is obviously
 3  black alone.  Just looking for the district identifiers here.
 4  I didn't put it on the earlier maps.  But, yes, so if you want
09:29:11 5  to go back up, you can see that there's a lot of population
 6  distributed around the west -- the southern and western part.
 7  There's a lot of small population counties that populate the
 8  rest of District 7.
 9  Q    Sure.  But we're looking -- we're looking here on this map
09:29:29 10  on Page 71 of your report, just where -- where there are lots
11  of people --
12  A    Yeah.
13  Q    -- no matter what the race is.
14  A    Yeah.  Around -- obviously, you look at the Birmingham
09:29:41 15  area, right in the center, sort of the majority of all the
16  population is that's driving 7 and the intersection with 6.
17  Q    Gotcha.
18       Now, let's go to the next page at the map we looked at
19  briefly.
09:29:55 20  A    Thank you.
21  Q    Page 72 of your report Defense Exhibit 1.
22  A    Yep.
23  Q    Tell us what this map depicts.
24  A    Sure.  So this is a map.  It's a companion map to what we
09:30:12 25  just saw earlier.  As we discussed yesterday, there is another
```

834

1   layer of geography that can be used to measure and analyze and

2   report population data, and those are called VTDs or voting tab

3   districts.  They are close companion to voting precincts,

4   right?  So it's a very useful way, a smaller level of geography

09:30:33 5   that gives us greater granularity, clearer pictures of where

6   the populations are.

7       In this case, what I have done is calculated the percent

8   black-alone Voting Age Population by VTD.  In this case, the

9   red areas show where there are low percentages of black alone.

09:30:55 10  Orange shows progressively higher and yellow higher yet.  The

11  green areas, the dark green areas show where there are the

12  highest concentrations of black population by VTD in the state.

13  Q    Thank you, Mr. Bryan.

14      What on the map do you show on page 73 of Defense

09:31:21 15  Exhibit 1?  Tell us what's in this map.

16  A    Yeah.  So this map, again, it's a companion to the earlier

17  county-level map showing Voting Age Population by VTD.  And,

18  again, it just shows a more granularity, for example, in

19  District 7, the high concentration of population driving

09:31:41 20  District 7.

21  Q    Thank you.

22      You prepared similar maps for the Singleton plan, did you

23  not?

24  A    I have.

09:31:49 25  Q    Let's look at some of those.  We'll go to page 75 of your

1  report, Map Appendix 21.  Tell us what's in this map.

2  A    No, this -- this map shows the outline of the Singleton

3  plan.  And it shows the percent black population by county

4  relative to the boundaries of the Singleton plan.

09:32:17 5  Q    Okay.  Let's go to the next page, 76 of Defense Exhibit 1.

6       What are you showing us here?

7  A    Yeah.  So this map then would show the Voting Age

8  Population by county relative to the Singleton plan.

9  Q    Okay.  So this map -- this district in the middle, I don't

09:32:49 10  remember which number district this is in the Singleton plan,

11  the one that includes Jefferson County, Bibb, Hale and Perry, I

12  believe.  The vast majority of the total population of this

13  district is coming from Jefferson County, is it not?

14  A    Yeah.  Virtually all of it, yes.

09:33:08 15  Q    Okay.  This other district that includes some of the Black

16  Belt in Tuscaloosa County, looks like a significant amount of

17  the total population of that district comes from Tuscaloosa and

18  Montgomery counties.  Would you agree with that?

19  A    Yes.

09:33:28 20  Q    Okay.

21  A    Yeah.

22  Q    Now, let's go to page 77 of Defense Exhibit 1.  And tell

23  us, Mr. Bryan, what you are showing us in this map, which is

24  Map Appendix 23.

09:33:42 25  A    So yes.  So this map shows the percent black alone of the

1    Voting Age Population by VTD in relationship to the boundaries

2    of the Singleton plan.

3    Q    Thank you, Mr. Bryan.

4         Let's turn now to your next report, Defense Exhibit 2.

09:34:17  5    You prepared a report for the Milligan and Caster cases, did

6    you not?

7    A    I did.

8    Q    Let's -- district -- excuse me.  Defense Exhibit 2 is that

9    report, correct?

09:34:37 10    A    That is correct.  Yes.

11    Q    Yes.  Okay.  Did you assess the Hatcher plan in this

12    report?

13    A    I did.

14    Q    Okay.  And for the Court's benefit, is the Hatcher plan

09:34:54 15    the plan that was presented in the Milligan plaintiffs'

16    complaint?  To the best of your knowledge.  If you need to

17    review something, Mr. Bryan, let me know.  The names may be

18    confusing.

19         I will represent to you that the plan presented the

09:35:25 20    Milligan complaint was also introduced into the legislature by

21    Senator Hatcher?

22    A    Yeah.  That's my understanding, correct.

23    Q    So if it confuses you for me to call it either the Hatcher

24    plan or the Milligan plan, let me know and we will get on the

09:35:43 25    same page with the language.

```
 1   A     I am clear.
 2   Q     I want to share Defense Exhibit 75 and ask you is that the
 3   Hatcher plan that you assess in your report that was submitted
 4   as Defense Exhibit 2?
 5   A     This -- it appears to be.  This is not my map.  But this
 6   appears to be the same map.
 7   Q     Thank you.
 8         Now, this is somewhat different from the various plans
 9   presented by Dr. Duchin and Mr. Cooper as demonstrative plans,
10   is it not?
11   A     It is.
12   Q     Okay.  How does the general structure of this plan compare
13   to the various demonstrative plans you've reviewed?
14   A     Sure.  So the key features of this plan, the first major
15   difference is this is not a county-based plan.  It has
16   geography that builds their districts going all the way down to
17   the block level.  My observation is they generally used -- the
18   authors of these plans used VTDs, but there were cases in order
19   to achieve precise population balance where those VTDs were
20   split and blocks were used.
21         As a more general observation I have here, the most
22   impactful changes are that there are changes to where the
23   boundaries of District 7 are drawn, I have up and around the
24   Birmingham area.  We can look around Birmingham relative to
25   where the existing districts are.
```

09:36:02 (line 5)
09:36:21 (line 10)
09:36:39 (line 15)
09:37:04 (line 20)
09:37:24 (line 25)

1       We can kind of see where these plaintiffs' plans went,

2  with regards -- and relative to and with regards to the

3  existing plan.  But I also think importantly that we can see

4  that there's been a really significant change in District 2,

09:37:43 5  insofar as it now kind of stretches from the far, you know,

6  western to the eastern side of the state.  And then also

7  extends southward dividing Mobile and Baldwin counties.

8  Q    All right.  Let's go back then to your report and look in

9  more detail at your assessment of this Hatcher plan.

09:38:16 10      Did you assess the demographics of the Hatcher plan?

11  A    Yes.

12  Q    I will refer to page 12 of Defense Exhibit 2.  And tell us

13  what you saw in reviewing the demographics of the districts in

14  the Hatcher plan.

09:38:35 15  A    Yes.  Thank you.

16      My first observation, just as I discussed with the last

17  plan, was to look at the total population in Table 4.1.  It

18  appears that the Hatcher plan is able to achieve a plus and

19  minus 1 percent deviation.  That is the low is 717,753, high

09:38:59 20  717,755.

21      As I read across this table, I see that the percent black

22  population of the districts were 51.3 percent -- 51.5 percent

23  for black alone in District 2 and 53.4 all black, or any-part

24  black.  And in District 7, there's a stronger black majority in

09:39:30 25  that district with 54.3 percent black alone, and 55.8 percent

```
 1   all black or any-part black.
 2   Q    Okay.  What do you mean when you say this next to last
 3   column going left to right, black alone?
 4   A    The black-alone population?
 5   Q    Correct.  How -- what do you mean by the term black alone
 6   versus the term you use in the next column, all black?
 7   A    Sure.  So the black-alone population, the way that I
 8   define it and the way I think it's commonly defined in
 9   demography is that, as Dr. Duchin mentioned yesterday, there's
10   the option to check if you are black in the census form, as
11   there is options to check if you are any number of other races,
12   including white, Asian, American Indian, Native Hawaiian,
13   Pacific Islander, and so forth.
14        The way that the Census Bureau then follows up, they ask a
15   question about what they call ethnicity or Hispanic origin.
16   And so Hispanic origin is as a separate construct.  It's a
17   separate concept from race.
18        Hispanic is not race.  So for every race you can pivot
19   that to say whether that race is by Hispanic or not.  So there
20   are Asian Hispanics.  There are Native Hawaiian Hispanics.
21   There are black Hispanics.
22        So when we look at the black-alone population, I think of
23   that as being the most limiting -- that's the smallest possible
24   number, the lowest guardrail.  If you were to say what number
25   can you be really, really sure there is this number of blacks
```

1  at a bare minimum, this is the number you would refer to

2  because this number does not refer to black in combination with

3  anything else, not even Hispanic.

4  Q    Okay.  Some experts have used the language single-race

09:41:42 5  black and any-part black.

6  A    Sure.

7  Q    Is single-race black the same as black alone, as you

8  understand it?  Are you talking about the same thing?

9  A    I -- not knowing their work, but hearing their

09:42:00 10  characterization of the definition, my belief is that we are

11  using the same definition.

12  Q    Gotcha.

13        And any-part black, is that as far as you know, the same

14  as what the term you use, all black?

09:42:13 15  A    That is my understanding.

16  Q    Why do you present both measures in your report,

17  Mr. Bryan?

18  A    Yeah.  So I'm not a political scientist.  But I have

19  worked with political scientists for many years on these

09:42:31 20  projects.  And the input that I have gotten from them is that

21  it is beneficial for them to have these numbers so they are

22  able to understand the size and the characteristics of the

23  black population in context.

24        From a demographic perspective, for me it's beneficial

09:42:52 25  because having reviewed numerous reports from numerous other

experts, it is very common that other experts either do not

know or do not understand the definition of the black

population and will use numbers that they find in reports and

documents or references that they themselves do not know or

09:43:13  understand.

So for the benefit of my reports, personally from my

analytics, it is beneficial for me to have both of these

numbers so we know what the lowest possible number is that

blacks can be, as well as the greatest possible numbers.

09:43:29  When we're talking about a Voting Rights Act case, it is

beneficial to know what both of those are.  Because in

different kinds of cases and in different venues, some of those

numbers will serve different purposes for different parts of

the case.

09:43:44  Q    Okay.  You refer to the use of black alone or single-race

black as being more defensible in Voting Rights Act cases.

A    That's correct.

Q    What do you mean by that?

A    So, again, I am not a political scientist, but I have

09:44:04  worked closely with political scientists for many, many years

in the cases.  And so I refer to my experience with them that

when they ask me for the number, size, location of the

population, that they need to make claims about the political

cohesion or the political performance of that population, the

09:44:25  political scientists that I have worked with have told me that

1    it is easier to defend the political performance, the political

2    voting behavior of the more homogenous, smallest, most cohesive

3    black population.

4        It was notable to me yesterday, I believe I heard a

09:44:46 5    political scientist in this case refer to the fact that he had

6    been using the black-alone population for his political

7    analytics.

8        So it's a common thing to use those.  I have no opinion

9    whether one is right or wrong or better or worse.  I simply

09:45:07 10   refer to my experience and what has been asked of me by

11   political scientists.

12   Q    Let's move on now, Mr. Bryan, to a discussion of

13   communities of interest.

14       Have you ever been hired to draw a plan for a state or

09:45:26 15  geographical area that was unfamiliar to you?

16   A    Frequently I do work across the United States and am

17   oftentimes called upon to participate in cases, either

18   critiquing plans or drawing new plans for areas that I have

19   never been before.

09:45:43 20  Q    When you're put in that position, do you consider it

21   important -- do you consider it important to educate yourself

22   about communities of interest in the area before you draw the

23   plan?

24   A    I'd say it's very important.  It's a leading criteria.

09:46:04 25  The rules that many states use and the NCSL advocates is

```
  1   knowing what those communities of interest are.
  2        It's one criteria that, obviously, if you are going to
  3   serve the people as in this case, the great people of the state
  4   of Alabama, it is in the best interest of me as an expert to
09:46:22  5   know what I can, familiarize myself.
  6   Q    So what are some things you might do to educate yourself
  7   about the communities of interest in an area that is new to
  8   you?
  9   A    Sure.  So, typically, what I would do is I would find
09:46:44 10   people who are experts, people who are residents, maybe people
 11   who used to work as representatives for the areas, used to have
 12   experience with the political system, state and local
 13   officials, or people who I personally know who may be able to
 14   give me valuable insights on what's actually going on in a
09:47:06 15   state like Alabama.  And in the case of Alabama, that's exactly
 16   what I did.
 17   Q    Now, I won't pull this up, but you have a notebook with
 18   our exhibits in it.  I would ask you to look at Defense
 19   Exhibit 171.
09:47:25 20        We provided you with copies of the testimony of Jo Bonner
 21   and Bradley Byrne from the Chestnut litigation, did we not?
 22   A    Yes, you did.
 23   Q    And is that --
 24   A    I am looking at it.
09:47:36 25   Q    Yeah.  Is Defense Exhibit 171 the testimony that we
```

```
 1  provided you with?

 2  A    Yes.

 3  Q    Okay.  Did you review it?

 4  A    Yes.

09:47:45 5  Q    What were your impressions from that testimony in terms of

 6  whether it offered any information of value to you as a

 7  demographer?

 8  A    I mean, I think it was as good of information as you could

 9  possibly get in knowing and understanding social, economic,

09:48:09 10  geographic characteristics of an area.

11       The Byrne/Bonner testimony talked in some detail

12  especially about District 1 and about the details and

13  characteristics of Mobile and Baldwin that were detailed,

14  factual and insightful and very beneficial for my understanding

09:48:31 15  of that area.

16  Q    As a demographer, did you find that testimony persuasive

17  if you were considering whether or not there is a community of

18  interest around the Gulf Coast counties?

19  A    It was very compelling in discussing the socioeconomic

09:48:54 20  political cohesion of the area.  I am hard pressed to think of

21  another document or testimony that I could refer to that would

22  be any more enlightening than what the Byrne and Bonner

23  testimony provided.

24  Q    Okay.  Now, of course, they weren't purporting to be

09:49:14 25  discussing every possible community of interest in the state of
```

```
 1  Alabama, were they?
 2  A    For sure, no.
 3  Q    Yeah.  But in terms of that one community of interest, did
 4  you find that information that would be valuable to you if you
 5  were retained to draw a congressional plan for the state of
 6  Alabama?
 7  A    Yes, definitely.
 8  Q    When you draw plans, Mr. Bryan, do you assume as a
 9  demographer that all the white voters in the jurisdiction have
10  one set of interest and all the black voters in a jurisdiction
11  have a different set of interests?
12  A    I would never consider that.
13  Q    Would you consider that to be an appropriate approach to
14  redistricting?
15  A    Definitely not.
16  Q    Are you aware, Mr. Bryan, that some of the witnesses for
17  the plaintiffs have mentioned the Black Belt in Alabama as a
18  community of interest?
19  A    I am aware.
20  Q    Are you familiar with the general area that most people
21  consider to be the Black Belt?
22  A    I am generally familiar.
23  Q    When a community of interest is identified to you as a
24  demographer, Mr. Bryan, do you understand that to be an
25  argument that the area should be included in one district or
```

1  split among several?

2  A    Again, when you are discussing communities of interest,

3  there can be different competing overlapping communities of

4  interest.  But generally if you have one community of interest

09:51:03 5  that is very important and prevails and especially if you are

6  presenting a competitive plan that advocates for significant

7  deviation from an existing plan, I would be looking for the

8  degree to which a plan kept a community of interest whole.

9  Q    We'll talk more about the plans presented by Mr. Cooper

09:51:23 10  and Dr. Duchin shortly.  But to the best of your knowledge, do

11  any of the plans you've reviewed in this case, whether it is

12  the Hatcher plan, the plans presented by Dr. Duchin or the

13  plans presented by Mr. Cooper; do any of those keep the Black

14  Belt counties in a single district?

09:51:42 15  A    No.

16  Q    I want to share my screen again.

17       Look at a different part of your report that we have

18  submitted as Defense Exhibit 2.

19       I want to go to page 24 of that report.

09:52:11 20       Mr. Bryan, did you do a core retention analysis of the

21  Hatcher plan that is discussed in Defense Exhibit 2?

22  A    I did.

23  Q    Well, let's see.  This is actually --

24  A    I believe that's the existing Alabama map.

09:52:32 25  Q    That's the existing plan.  Yeah.  Look at Figure 5.2 on

1    page 24.  Tell us what we see in that chart, what you're

2    analyzing and what you are showing us.

3    A    So this is the core retention of the Hatcher plan.  We see

4    in this case that there was a -- as we know from the design of

09:53:01 5    the plan and see visually, that Districts 1 and 2 were

6    significantly impacted.

7         We can see that there's relatively low retention,

8    approximately 59 percent in District 1, less than half of that

9    with black retention in District 1.  So in this case, the

09:53:22 10   continuity of representation is significantly detrimental to

11   the black population in District 1.

12        In District 2, District 2 kind of becomes a core, a locus

13   of population where you need to move other population around in

14   order to improve the black performance there.  And that is why

09:53:43 15   in this case, the what -- the non-black or the total population

16   is significantly lower than the black population.  Because

17   white and other non-black populations had to be moved out of it

18   in order to enable its black performance.

19        Some of the other districts -- District 3, for example,

09:54:04 20   has somewhat good and balanced retention.  In Districts 4

21   and 5, I think these are very consistent.  There was not much

22   change made up in those districts, so their core retention is

23   very good.  Again, there was some difference, lower performing

24   core retention in District 6 with a notable differential impact

09:54:27 25   to the black population.

1        And then, again, in District 7, I think there was less

2    impact there, and there was comparable performance of core

3    retention there between black and the total population.

4    Q    Which plan does better with preserving the core of

09:54:47 5    existing districts?  The Hatcher plan or Alabama's 2021 plan?

6    A    It's -- the core retention overall for the Alabama plan is

7    significantly higher.  I don't remember the exact number.  It

8    may have been a million more people perhaps, or retained in

9    their core districts in the Alabama plan than in the Hatcher

09:55:10 10   plan.

11   Q    And which plan shows more distinction between how white

12   and black persons are treated, in terms of core retention?

13   A    Sure.  There's obviously significantly more differential

14   impact of the subpopulations in the Hatcher plan than in the

09:55:33 15   total plan.  There's virtually no differential impact in the

16   Alabama plan between total and black.

17   Q    Table 5.2 appears on page 26 of your report.  And let's

18   just say for the record, I'm referring to the filing page

19   number.  Actually, the page number that originally appeared on

09:56:06 20   Mr. Bryan's report is page 25.  I may have been a little sloppy

21   going through these reports and which one I was referring to.

22   Hopefully by stating which table precisely we're looking at

23   will be clear.

24        In Table 5.2 of Defense Exhibit 2, Mr. Bryan --

09:56:25 25   A    Yes.

1  Q    -- would you tell us what you are showing us here?

2  A    Yes.  So this is a core retention analysis of the existing

3  plan because where we started all of our core retention

4  analysis with the Hatcher plan.  And as you can see looking at

09:56:43 5  District 1, there were 426,386 people from the original

6  existing District 1 who remained there.  And then there was

7  significant displacement, as we know, with the development of

8  District 2.  There was 285,000 people that got moved into

9  District 2.

09:57:05 10  Q    Okay.  So this is similar to a chart that we reviewed when

11  you were analyzing the Singleton plan.

12  A    Yes.  Yes.  This is the exact same analytic technique.

13  Q    Okay.  I am going to move to your discussion of

14  incumbency.

09:57:27 15  A    Sure.

16  Q    What does the Hatcher plan do with avoiding incumbent

17  conflicts?  And I will refer you to page 28 as is shown on the

18  top of the page of Defense Exhibit 2.

19  A    Yes.  Thank you.  So interestingly, there's actually

09:57:53 20  two pairs here.  So the plaintiffs' plan pairs the Moore --

21  Representatives Moore and Carl.  In District 1 you can see that

22  down in the south, that they're not on the edge, they're not on

23  the border of the districts, they're wholly contained inside of

24  District 1, leaving District 2 unrepresented.

09:58:16 25       And then it goes on, as we saw in several plans, that

1  Sewell and Palmer were both in District 6, leaving District 7
2  unrepresented.
3       So the two districts -- Districts 2 and Districts 7 here
4  are left without any incumbent representation at all.
09:58:51 5       MR. DAVIS:  Your Honors, I'm quite content to continue
6  for a little longer.  I am about to move into a slightly
7  different subject, as we're going to discuss compactness.
8            JUDGE MARCUS:  I think this might be a convenient
9  point.  We wanted to give our reporter a break after about an
09:59:04 10  hour and a half, and we are -- we are just about at that point.
11       So this would be a good breaking point.  Let me just ask
12  you a quick question:  What's your sense on the balance of your
13  examination of Mr. Bryan?
14            MR. DAVIS:  My best judgment, Judge Marcus, would be
09:59:25 15  that I have about an hour to go.  It could be a little less.
16            JUDGE MARCUS:  Okay.  Why don't we do this -- I have
17  exactly 10:00 o'clock Central Standard Time or almost 10:00
18  o'clock, 9:59, and almost 11:00 o'clock Eastern Time.  Why
19  don't we take a 15-minute break, and we will pick up, then, at
09:59:49 20  10:15 Central Standard Time?  Thank you all.  We will take a
21  short break.
22            (Recess.)
23            JUDGE MARCUS:  Do you have an order in which the
24  cross-examination is going to proceed?  Have the plaintiffs
10:17:31 25  settled on that?

         1              MS. KHANNA:  Yes, Your Honor.  The Caster plaintiffs
         2    will cross-examine Mr. Bryan first, and I believe then
         3    Milligan.  And then Singleton.
         4              JUDGE MARCUS:  Okay.
10:17:42 5              MR. DUNN:  That's my understanding, as well, Your
         6    Honor.
         7              JUDGE MARCUS:  Mr. Blacksher, that's your
         8    understanding, as well?
         9              MR. BLACKSHER:  Yes, Your Honor.  That's why I was
10:17:50 10   worried about bumping up against Mr. Bryan's timeline since I
        11    am at the tail end.
        12             JUDGE MARCUS:  Don't worry.  You will have all the
        13    time you need.
        14             MR. BLACKSHER:  Thank you.
10:17:58 15             JUDGE MARCUS:  Mr. Davis, let's proceed.  Thank you.
        16    BY MR. DAVIS:
        17    Q    Mr. Bryan, did you assess the compactness of the Hatcher
        18    plan?
        19    A    I did.
10:18:09 20   Q    I will share page 31 of Defense Exhibit 2.
        21             Your scores of the Hatcher plan appear in Table 5.5.
        22    A    That's correct.
        23    Q    Okay.  Tell me -- summarize how the Hatcher plan's
        24    compactness scores compare to Alabama's 2021 plan.  Does it
10:18:38 25   perform better, worse, the same?

A     Yeah.  Sure.  Sure.  So again, there are two different
ways that you can summarize compactness.  You can summarize it
for the plan as a whole, and then you can summarize it by
district.

10:19:03      And as we discussed earlier and as Dr. Duchin has pointed
out, the total metric here is just a layman's simple summary
statistic to help us understand relatively for one plan versus
another plan how a district performs.

     So when we look at the Alabama plan versus the Hatcher
10:19:26 plan, pretty much across the board as we look at the
Polsby-Popper, the adapted Schwartzberg score, the Reock
scores, and the convex hull scores, if you look at all four of
these different measures, you see that the Alabama plan is much
higher.  It performs much, much better.

10:19:52      There's -- in one area, it's around District 4, I believe,
where there is a little bit lower score for the state of
Alabama.  You can see that my total score for the state of
Alabama there, low at 1.6.  Similarly, around District 6, also
at about 1.55, those two relatively low areas.

10:20:22      Those are driven by some physical features at the
intersection of these districts.  I refer to it as the Bankhead
Lake area.  There's a lot of water features, a lot of curvy
lines and things in those districts, just by their physical
features, less compact.  And that is part of the reason that
10:20:39 when you compare those specific districts with the couple of

1  comparable districts in the Hatcher plan, you may see a couple

2  of instances there where the Hatcher plan is not as low, just

3  because it does not have boundaries that exactly follow those

4  physical features.  But in aggregate, across the board, every

10:21:01 5  measure that you would look at would say the Alabama plan is

6  superior, sometimes significantly so to the Hatcher plan.

7  Q    Got it.  But the Court, if it wants to look at Table 5.4

8  and 5.5 and compare the scores for each district in the Hatcher

9  plan and the state's plan; is that right?

10:21:24 10  A    Right.

11  Q    Okay.  Let's look at some of the maps you prepared for the

12  Hatcher plan, Mr. Bryan.  I want to turn now to Page 44 of your

13  report, Page 44 according to the filing information on the top

14  of the page.

10:21:45 15      What do we see in this map, Mr. Bryan?  This Map

16  Appendix 5?

17  A    Sure.

18  Q    Tell us what you are showing us in this map.

19  A    Sure.  So this is a -- this is consistent with some of the

10:22:07 20  other maps that we've produced for different plans.  It's an

21  outline of the Hatcher plan, and it shows the percent black

22  alone by -- let's see -- this is actually mislabeled.  This is

23  a black alone by county map.  So I would disregard the label

24  within the map and refer to the map appendix, the title of the

10:22:33 25  map.  This is black alone by VTD -- by county.

```
 1  Q    Thank you.
 2       Now, this District 2 -- you see my cursor moving, I take
 3  it, on the screen?
 4  A    Yes, I see.
 5  Q    District 2, which takes part of Mobile County and then
 6  goes east, and District 7 which includes this finger into
 7  Jefferson County, those are the two majority-black districts in
 8  the Hatcher plan, are they not?
 9  A    That's correct.
10  Q    Is there any county in the state that is more than
11  40 percent black population that is not included in either
12  District 7 or District 2 in the Hatcher plan?
13  A    There's only two pieces that I see.  There's, again, in
14  Jefferson, there's a little portion of the district that goes
15  outside of 7.  And then, I think similarly, you move your
16  cursor down and over to the right, that county with 79 percent
17  goes just over the edge.  And that's slightly split by
18  district, as well.
19       But other than that, yeah.  And 43 right there.  Other
20  than that, there's no other 40 percent or greater wholly
21  contained counties in any other districts.
22  Q    Let's move to the next map, Map Appendix 6.  What are you
23  showing us here?
24  A    Yeah.  So this would be the Voting Age Population by
25  county overlaid with the Hatcher plan, again showing the high
```

10:22:49  10:23:01  10:23:28  10:23:48  10:24:06

```
 1   concentrations of population in Jefferson County and Mobile and
 2   Baldwin counties.
 3   Q     Where does it appear, according to this map, that
 4   District 7 is getting most of the people that populate this
 5   district?  Most of the people, regardless of race.
 6   A     Yeah.  The biggest piece would be coming from the area in
 7   Jefferson County.
 8   Q     And where would District 2 be getting most of its total
 9   population?
10   A     It's a little less clear here because you've -- it is
11   intersecting the Mobile and the Baldwin counties to the
12   southwest.  But there is another also another populous county
13   in north central -- 177,427, right in there.  So that's a
14   corner, just given that we have 700-and-some thousand
15   population, that county would be contributing
16   disproportionately to the overall plan.
17   Q     Yeah.  This is Montgomery County, correct?
18   A     Yeah.  Correct.  It's not labeled on my map, but, yeah, I
19   believe that's correct.
20   Q     Let's look at Map Appendix 7 on the next page.
21   A     Sure.
22   Q     What do we see here, Mr. Bryan?
23   A     Yeah.  So this is the -- this is the plan that shows the
24   percent black alone by the VTDs overlaid with the Hatcher plan.
25   Q     Okay.  What, if anything, is indicative to you of the map
```

1  drawers' intention when you look at the splits of, say,

2  Jefferson County, here between 7 and 6, and Mobile County

3  between Districts 2 and 1?

4  A     Sure.  I'll be careful to put myself in the mindset or

10:26:10 5  speak for the intention of the map drawer.  I will speak more

6  so to the appearance or the outcome of the map, if that is all

7  right.

8  Q     Assume that's what I asked.  Is this any appearance here

9  that jumps out to as an a demographer?

10:26:29 10  A     Yes.  I would be more precise if I focus on that than

11  intent.

12        As you follow the new District 2 starting kind of over on

13  the eastern edge of the state near the border, near where

14  Columbus is, and you see that the northern edge of District 2

10:26:49 15  starts tracing from east to west across the central part of the

16  state, you can see easily that that line almost precisely

17  exactly follows the contours of the very highest black

18  population VTDs -- can literally go from one to the next and

19  look on the northern edge of that line and see what I call the

10:27:14 20  yellow, red, you know, 10 percent, 20 percent black, and then

21  you go below that line and you immediately see a 60 percent or

22  more black.  It is literally like the dividing line of black

23  and much less black population.

24        As you follow that boundary around to the central part of

10:27:36 25  the state through the Black Belt, District 2 turns south and

10:27:57

1  goes down towards Mobile and Baldwin counties.  You can see

2  that the map -- and the map that District 2, the boundaries of

3  it go down around Mobile.  I think we have another map that may

4  show it in more detail.  But we can illustrate that in this

5  plan the boundaries of District 2 went around Mobile, not

6  following a city boundary or any other administrative

7  boundaries.  It just followed the edge of where black

8  population was and was not.

9       Similarly, in District 7, you can see that it captures

10:28:18 10  large portions, very carefully captures large portions of black

11  populations.  And as you go into Birmingham, Jefferson County,

12  you can see that it nearly perfectly outer bounds only the

13  exact black population VTDs in the northeast corner of

14  Birmingham.

10:28:35 15  Q    Why don't we go ahead and look at some of the close-up

16  maps that you prepared.

17       Let's look at Map Appendix 9?

18  A    Right.

19  Q    What do we see here, Mr. Bryan?

10:28:52 20  A    Sure.  So the dark line, if you can see carefully enough

21  it's kind of dark black and a purple line.  That's the existing

22  district boundaries.

23       The --

24  Q    Let me interrupt you.  By existing, do you mean the 2011

10:29:08 25  plan?

```
 1   A      Yes.

 2   Q      Okay.

 3   A      Thank you.

 4          The existing 2011 district plan.  And what I have done

 5   here is I have overlaid, again, with a blue outline where the

 6   Hatcher plan boundaries are.  And if you look, what the Hatcher

 7   plan does, is it kind of follows closely along where the

 8   existing districts were, but then I have shown with little blue

 9   dots here where the Hatcher plan did what we call an outer

10   bound.  That is it went beyond the existing districts and

11   grabbed just the precincts that had the highest concentrations

12   of black population.

13          You can see that there are plenty of VTDs surrounding

14   Birmingham that are colored yellow and orange, reflecting lower

15   black population concentrations.  And the plan just really

16   prioritized -- appears to have prioritized making sure that it

17   got the highest black concentration VTDs into the plan.

18   Q      Thank you.

19          Let's look at the next map, Map Appendix 10.

20   A      Sure.

21   Q      What are you showing us with this map, Mr. Bryan?

22   A      Yeah.  So one of the -- in just looking at the data for

23   the new Alabama plan, what I suspected we were going to find is

24   that there were some VTDs -- I did not know where, but there

25   would be some VTDs where there was black population that would
```

1  be disgorged, displaced, moved out to other districts.

2       This was the 5 percent of, you know, several thousand

3  blacks that we had talked about earlier today.  And I found

4  this part of Birmingham to be the area where that displacement

10:31:16  5  took place.  I know that was not the intent of the mapmaker.

6  It's an effect of their efforts to draw a more compact plan.

7       MR. DUNN:  Your Honor, could I ask that he not testify

8  or try to testify as to the intent of the mapmaker?  I don't

9  know how he can possibly do so.

10:31:33 10      JUDGE MARCUS:  I think the point is well taken.  I

11  don't think that was the thrust of your question in any event,

12  Mr. Davis.

13      MR. DAVIS:  That's correct.

14      MR. DUNN:  I don't think it was a problem with the

10:31:42 15  question, Your Honor, but I think it's a problem with the

16  answer.

17      JUDGE MARCUS:  I understand, Mr. Dunn.  So Mr. Bryan,

18  focus specifically on the question as it's put by Mr. Davis, if

19  you would.  He's asking about appearance rather than intent.

10:31:57 20  BY MR. DAVIS:

21  Q    Yeah.  Let me rephrase, Mr. Bryan, and ask you what moves

22  do you see were made in this part of Jefferson County between

23  the 2011 and the 2021 plan?

24  A    So there is a black and white line across the middle of

10:32:16 25  the map.  And above that black and white line, there are

1  several squares, as opposed to the circles I mentioned earlier.

2  Those squares identify high black concentration VTDs.  Those

3  high black concentration VTDs have previously been in the

4  existing plan or in, as you can see by the location of the new

10:32:43  5  line, those black VTDs are no longer contained in District 7.

6       The black line has the geometry effect of making the

7  boundaries of the district here more compact and more simple.

8  Q    Thank you.

9       Now, let's look at Map Appendix 11, it will be the last

10:33:08 10  map in the Hatcher plan.

11  A    Yep.

12  Q    Tell us what we see here.

13  A    Right.  So this is a view of the Hatcher plan.  You can

14  see in the northern parts, just a little bit of the existing

10:33:23 15  2011 congressional plan.  And so what we're looking at here is

16  a close-up of where the boundaries of District 2 go down into

17  Mobile County in the population that is added to District 2 in

18  this plan.

19       And what we can see is that in the areas surrounding the

10:33:43 20  intersections of District 1 and District 2, that there is lots

21  of VTDs that have very low black populations.  This is

22  represented by red, orange, and yellow areas.

23       And what we see here is that with this plan, District 2

24  extends down into Mobile, again, not following any other

10:34:07 25  administrative or physical geography and grabs only the pieces

1  of Mobile shown in dark black, which represent the highest

2  concentration of black population in the county.

3  Q    These dark green precincts, you mean?

4  A    Yes.  As you can see, especially in eastern Mobile, the

10:34:38  5  line goes down.  There's very low black population to the right

6  edge of that line.  There's very high black population to the

7  left edge of the line.  And if it was one black VTD, I could

8  pass it off as happenstance.  But there's obviously several of

9  those here illustrating that.

10:35:00  10  Q    Thank you.

11       Now, Mr. Bryan, I want to refer you to page 32 of your

12  report, going by the filing number.

13  A    Yes.

14  Q    What is your conclusion, if any, from your analysis of the

10:35:18  15  Hatcher plan?

16  A    In looking at the changes that were made in the two

17  districts that sought to be black majority districts, they

18  appear to be racial gerrymanders because of the way that the

19  lines were drawn to precisely include just black populations

10:35:52  20  and to precisely exclude non-black populations.

21       MR. DUNN:  Your Honor, again, he is straying over into

22  testifying about intent.  I object to that and move to strike

23  the last answer to the extent it does that.

24       JUDGE MARCUS:  Overruled.  He said there appeared to

10:36:19  25  be racial gerrymandering, including blacks in one way,

1  excluding whites in the other way.

2      I didn't take it as bearing on intent.  Overruled.  You

3  may proceed.

4  BY MR. DAVIS:

10:36:32 5  Q    Mr. Bryan, did you review the reports that were submitted

6  in this case by Mr. Bill Cooper and Dr. Moon Duchin?

7  A    I did.

8  Q    And does your analysis appear in a report supplemental

9  report that's been marked as Defense Exhibit 4?

10:36:51 10 A    Yes.

11 Q    Okay.  Did you review the demographics of the plans that

12 Dr. Duchin submitted?

13 A    I did.

14 Q    And this is a summary of one of her plans on page 27 of

10:37:17 15 Defense Exhibit 4.

16 A    That is correct.

17 Q    Okay.  Do Dr. Duchin's plans include two majority-black

18 districts?

19 A    By both metrics of black alone and all black or any-part

10:37:35 20 black, they do.  I would like to acknowledge that I have done

21 an analysis comparing my all black with the any-part black from

22 her reports, and I believe that our statistics are representing

23 her plans match precisely between both of our analyses insofar

24 as the all black and any-part black.

10:37:55 25 Q    Do Dr. Duchin's plans present majority-black districts

```
 1  when you consider only Voting Age Population?
 2  A    In that case, the answer would be it depends.
 3       In the -- in this particular -- would you like me to speak
 4  to Duchin plan D, what I see on the screen?
 5  Q    That would be fine.  Let's -- for the record and for the
 6  Court's benefit, you present the demographics of all of her
 7  plans, correct?
 8  A    Yes, I do.
 9  Q    And that begins in the appendix of your -- in Defense
10  Exhibit 4, it begins on page 25 of Defense Exhibit 4.  Then you
11  see each of her plans addressed in turn, correct?
12  A    Yes.
13  Q    Why don't we ap dress this plan, her plan A?
14  A    Great.
15  Q    Tell us whether Dr. Duchin's plan A presents
16  majority-black districts of Voting Age Population?
17  A    It does.  By both black alone and any-part black.
18  Q    And what about her plan B?
19  A    In this plan, the black-alone statistics do not rise to
20  meet the majority threshold.  The percent all black, any-part
21  black statistics in this case do rise to the 50 percent or
22  greater majority threshold.
23  Q    Okay.  And C?
24  A    Yes.  So in this particular case, District 2 does not rise
25  to the majority threshold for black alone, but it does rise to
```

Timestamps in left margin: 10:38:22 (line 5), 10:38:42 (line 10), 10:38:57 (line 15), 10:39:22 (line 20), 10:39:46 (line 25)

```
 1  majority threshold for all black or any-part black.
 2        District 7 in her plan would be a majority, whether black
 3  alone or all black.
 4  Q    Okay.  And, now, what about plan D or plan 4?
 5  A    Yeah.  So consistent with plan C, in District 2, there's
 6  by black alone, it would be a minority, would not rise to the
 7  majority threshold.  By all black, it is a fair majority of
 8  50.05 percent.  With District 7, they look solid majorities at
 9  50.55 percent black alone and 51.7 for all black or any-part
10  black.
11  Q    Okay.  And next in your report, on the next page,
12  page 28 --
13  A    Yes, sir.
14  Q    -- you start to present demographics of the plans that
15  Mr. Cooper offered?
16  A    Right.  That's correct.
17  Q    All right.  Let's look at his plan 1?
18  A    Right.
19  Q    Does it contain two majority-black districts when you
20  consider Voting Age Population?
21  A    Yes.  In District 2, by the black-alone measure, it does
22  not, but by all black it does.  In District 7, both by all --
23  by black alone and all black, they are definitive black
24  majority districts.
25  Q    Great.
```

1    District -- excuse me.  What about plan 2, does it have

2    two majority-black districts considering Voting Age Population?

3    A    Yes, sir.  As with one, black alone in District 2 is not a

4    majority, all black is.  And District 7, again, has majority by

10:41:35 5    both black alone and all black or any-part black.

6    Q    What about for plan 3?

7    A    In this particular plan, neither District 2 nor District 7

8    would rise to the 50 percent threshold.  The all black

9    definition would achieve a majority in District 2 of

10:42:00 10    50.3 percent, and would achieve a bare majority, 50.09 percent

11    in District 7.

12    Q    Plan 4?

13    A    Yeah.  In this case as well, by the black-alone measure,

14    Districts 2 and District 7 would not be a majority by black

10:42:22 15    alone, but would be a majority under all black, District 2, a

16    fair majority, 50.07, and District 7 at 50.09.

17    Q    What about Cooper plan 5?

18    A    Yeah.  So, again, in this case, just as with some of the

19    other plans Cooper has presented, the percent black-alone

10:42:49 20    statistic, you would not rise to a majority in Districts 2 or

21    7, but you would rise to a majority -- more definitive majority

22    in this plan with 50.2 percent all black in District 2 and

23    50.09 percent in District 7.

24    Q    Finally, Cooper plan 6.

10:43:10 25    A    Sure.  Again, in this case, similar to the previous plans,

```
 1   neither his District 2 or 7 rise to be a majority.  They're

 2   close, but are not a majority by the black-alone measure, but

 3   both of them are majority districts by the all black or

 4   any-part black measure.

 5   Q    Okay.  By the way, Mr. Bryan, did you find similarities

 6   between the plans presented by Dr. Duchin and Mr. Cooper with

 7   the Hatcher plan that we discussed earlier?

 8   A    There were general similarities, yes.

 9   Q    You assess -- did a core retention analysis of the plans

10   that Dr. Duchin and Mr. Cooper presented, did you not?

11   A    Yes, I did.

12   Q    Just generally -- we will not go through all ten plans.

13   A    Okay.

14   Q    Tell us generally how they performed with core retention.

15   A    Sure.  And thank you for that.

16        The performance of the core retention for the Duchin plans

17   are similar with the Hatcher and with many of the features of

18   the Cooper plans as well.  We see especially in District 1 the

19   total population's core retention is relatively low, 64 percent

20   core retention of the blacks is much lower at 32.5 percent.

21   This is consistent with what we found in District 6 as well.

22   And just reflects the significant rearranging of the black

23   population for the effort to create two black majority

24   districts.

25   Q    Okay.  So your core retention analyses begin appearing on
```

Timestamps: 10:43:31 (line 5), 10:43:59 (line 10), 10:44:13 (line 15), 10:44:34 (line 20), 10:44:54 (line 25)

```
 1   page 34?

 2   A    Yes.

 3   Q    If the Court wishes to find details about your analysis,

 4   could they find parts of this sort for each of the plans

 5   presented by Dr. Duchin and Mr. Cooper?

 6   A    There will be -- there are details of the plans and the

 7   core retention throughout my report, yes.

 8   Q    So is it true for all of the plans presented by Dr. Duchin

 9   and Mr. Cooper that they performed more poorly than Alabama's

10   plan in core retention and in the differential treatment of

11   black voters?

12   A    That is true in both regards.  The core retention of the

13   total population in the different Duchin and Cooper plans

14   were -- for the total population were in the 50 percent to

15   60 percent range, compared with the 90 percent for the state of

16   Alabama plans.

17        And then the performance of the black core retention was

18   lower, obviously, because of the rearranging of the black

19   population.  So those numbers were more commonly in the

20   50 percent and sometimes lower range.

21   Q    Did you assess whether the plan submitted by Dr. Duchin

22   and Mr. Cooper created any incumbent conflicts?

23   A    I did.

24   Q    And what did you find?

25   A    I found that the evidence in the Duchin plans was that
```

```
 1   there was not any regard to incumbency in the drawing of the

 2   plans.  So, for example, in plan A, there is an instance where

 3   Representative Sewell, Representative Palmer, Representative

 4   Rogers are all one district, and Representatives Moore and Carl

 5   are in District 1's, leaving three districts unrepresented.

 6       There were similar pairings in each of her plans.  And

 7   there was also pairings in Cooper's plans, as well.

 8   Q    Thank you.  And can the Court find details of your

 9   analysis on page 16 of Defense Exhibit 4?

10   A    Yes.

11   Q    Before we turn to compactness, Mr. Bryan, the transcript

12   will show us precisely what was said, but I believe yesterday I

13   heard Dr. Duchin say or refer to as minority opportunity to

14   elect as a traditional districting principle.  Perhaps to be

15   more clear, she said protecting or preserving minority

16   opportunity to elect.

17       Would you consider any of those things to be a traditional

18   districting principle?

19   A    I have not ever heard that as a traditional or

20   contemporary redistricting principle and I would not agree with

21   that.

22   Q    Thank you.

23       Did you assess compactness of the plans submitted by

24   Dr. Duchin and Mr. Cooper?

25   A    Yes.
```

Timestamps: 10:47:04 (line 5), 10:47:23 (line 10), 10:47:50 (line 15), 10:48:07 (line 20), 10:48:21 (line 25)

1  Q     Okay.  And in your analyses we found beginning on page 57

2  of Defense Exhibit 4, right?

3  A     Yes.

4  Q     Let's look at Dr. Duchin's plan A.  How does the average

10:48:38  5  score for the entire plan compare to Alabama's plan?

6  A     Generally her plans outperform the Alabama plan across all

7  these metrics.

8  Q     Do each of her districts perform better than Alabama's?

9  Not each plan, but each districts within the plan.

10:48:59  10  A     Right.  Right.  This was something that I noted in her

11  report.  Dr. Duchin presented the summary statistics that you

12  see below in each one of her plans for Polsby-Popper and, I

13  believe, Reock.  She did not in her original report present

14  information on the compactness by district.

10:49:21  15      I understand she may have in a subsequent report, but I

16  did not see that report or those findings.  I refer here only

17  to my own observations and findings from my analysis.

18      My findings and observations in my analysis is that in the

19  districts that were more heavily focused on in order to achieve

10:49:43  20  the two black majority population districts that she said she

21  was seeking to achieve, those districts' compactness suffer

22  tremendously.  They're much lower because they had to be drawn

23  in a very specific way, disregarding other traditional

24  redistricting principles in order to achieve her objective.

10:50:05  25      So you can see here in Districts 1 and 2 in particular,

1  that the compactness scores for her plans in these areas were

2  low.  And it's understandable, given what she was seeking to

3  achieve there.

4       What is notable to me, though, is that compactness was

10:50:26 5  sacrificed in this part of the plan, but compactness was

6  prioritized -- appeared to be prioritized in the drawing of

7  other parts of her plan.

8       So, for example, if you look at Districts 4 and

9  Districts 5, the area that you see in my charts as being

10:50:47 10  highlighted in bright green, those areas were drawn in such a

11  way to significantly improve compactness.  It impacted the core

12  retention of those areas for sure, but it sacrificed core

13  retention for the benefit of compactness.

14       So the overall outcome, the summary statistic of

10:51:10 15  Dr. Duchin's compactness analysis really, I think, masks some

16  important details, which is that compactness took different

17  roles in different parts at different times of the design of

18  her districts.

19  Q    In Districts 1 and 2 in Dr. Duchin's plans, are those the

10:51:30 20  districts that appear in the southernmost part of the state?

21  A    Yes, I believe so.

22  Q    And are 4 and 5 the districts in Dr. Duchin's plan that

23  appear in the northernmost portion of Alabama?

24  A    Yes, I believe so.

10:51:43 25  Q    You present similar analyses of Mr. Cooper's districts, do

1    you not?

2    A    Right.  Yes, I do.

3    Q    And how did the compactness of Mr. Cooper's plans compare

4    to the state of Alabama's?

10:51:57 5    A    Generally, they were poorer performing compactness

6    compared to the state of Alabama.

7    Q    I will represent to you, Mr. Bryan, that Mr. Cooper

8    presented an additional plan in a supplemental report.  Was

9    that available at the time you prepared this report?

10:52:15 10    A    No.

11    Q    So you have not analyzed districts -- Cooper's plan

12    number 7 in this report, correct?

13    A    I am aware of the report.  I have not analyzed the report.

14    Q    Thank you.

10:52:36 15        Let's look now at some of the maps you prepared.

16        Showing you now Map Appendix 5, which appears on page 68

17    of Defense Exhibit 4.  Would you tell us what this map shows

18    us, Mr. Bryan?

19    A    Sure.  So this map shows, again, kind of the dark

10:53:04 20    outlines, the dark contours here.  Those are the outline of

21    existing historic 2011 congressional districts.  And then there

22    is a lighter green outline that shows the outline of Duchin

23    plan A overlaid with the existing historic Alabama plan.

24    Q    Thank you.

10:53:30 25        So you can see the lines here of the 2011 Alabama plan and

1   Dr. Duchin's plan A, correct?

2   A    Yes, that is correct.

3   Q    Then next, in Map Appendix 5A.  What do you present?

4   A    Can we go back to the previous map for a moment?

10:53:51 5   Q    Yes.

6   A    Okay.  And so I want to make an additional comment here on

7   compactness.

8   Q    Yes.

9   A    Districts 4 and 5 in the northern part of the state really

10:54:09 10  have nothing to do with the objective of achieving two black

11  majority districts, which I heard and understand to have been

12  the overriding objective of the plan.

13       So in looking at this map, in looking at the existing

14  Districts 4 and 5 and the new Districts 4 and 5, I do not see

10:54:33 15  any other reason for the new Districts 4 and 5 as being drawn

16  except for potentially for the purposes of compactness.  They

17  were unrelated to the objective of the black majority district

18  drawing.

19       I just wanted to state that as an observation.

10:54:51 20  Q    In the various plans you have reviewed, whether it's the

21  Hatcher plan or Mr. Cooper's plan or Dr. Duchin's plan, have

22  you seen any of them draw African-American population from say

23  the northernmost third of the state in order to populate their

24  majority-minority districts?

10:55:10 25  A    I have not.

```
 1  Q    Okay.  Let's go on now, then, to Map Appendix 5A.
 2  A    Yes, sir.
 3  Q    Tell us what you are showing us in these maps.
 4  A    Sure.  Yeah.  So this -- this map presents Dr. Duchin's --
10:55:29 5  can you please zoom out?  Thank you.
 6       This map shows Dr. Duchin's plan A outlined in black
 7  outline overlaid with the percent black-alone Voting Age
 8  Population by VTD in Alabama.
 9  Q    Okay.  And did you present the same two maps --
10:56:05 10  A    Sure.
11  Q    -- for each of the plans presented by Dr. Duchin and
12  Mr. Cooper?  First the map comparing the 2011 plan with
13  whichever plan plaintiffs' expert is presenting, followed by a
14  map of defendants' experts plans overlaid with VTDs color coded
10:56:25 15  by concentration of African-American population?
16  A    Yes, that's the process.
17  Q    So those will all appear in the map appendices should the
18  Court wish to review them for any plan?
19  A    Yes.
10:56:40 20  Q    I will refer you to page 19, Defense Exhibit 4, Mr. Bryan.
21       Tell us, as a demographer, what is your overall conclusion
22  after analyzing the plans presented by Dr. Duchin and
23  Mr. Cooper?
24  A    I think there's really two key takeaways.
10:57:16 25       The first one is that they use -- they're able to use
```

```
     1  sub-county geography in order to achieve a balanced population,
     2  and more often than not, to achieve a black majority population
     3  in two districts.  Again, it's depending on the definition, the
     4  exact plan.  But generally, that's what they were able to
10:57:42 5  accomplish.
     6       In achieving that, there were other traditional
     7  redistricting principles that were generally sacrificed.  And
     8  by that, I mean there were cases where there is less
     9  compactness, the core retention is sacrificed significantly.
10:58:07 10       So, therefore, the continuity of representation because of
    11  the cracking and packing of the incumbents and then the --
    12  mostly based on the -- mostly based on the incumbents, but also
    13  based on the core retention analysis, there is a significant
    14  impact to the continuity of representation in these plans.
10:58:31 15       And so I would say on the whole, that there were numerous
    16  traditional redistricting principles that were traded off,
    17  sacrificed in the pursuit of these other goals.
    18  Q    I want to go back to the map we were reviewing a moment
    19  ago.  Map Appendix 5A.
10:59:07 20  A    Sure.
    21  Q    In which -- Dr. Duchin's plan A.
    22       Mr. Bryan, as a demographer, as one who is drawn and
    23  critiqued many redistricting plans, are you aware of any
    24  redistricting criteria that would lead a map drawer to draw
10:59:33 25  this congressional map than by Dr. Duchin's plan A?
```

```
 1  A     I'm not aware of a traditional or combination of
 2  traditional redistricting principles that would lead this to be
 3  drawn in this precise way.
 4  Q     Okay.  Are you aware of any need that Mobile County in
 5  order to follow the traditional districting criteria of
 6  compactness triggers?
 7  A     Can you please restate the question?
 8  Q     Yes, of course.
 9        Would a desire to make districts compact lead a map drawer
10  to split Mobile County?
11  A     No.
12  Q     No.  Would a desire to preserve communities of interest
13  preserve -- lead a map drawer to split Mobile County?
14  A     No.  My research would suggest it would not.
15  Q     Do you need to split Mobile County in order to avoid
16  putting incumbents in the same district?
17  A     No.
18  Q     Do you need to split Mobile County to preserve the core of
19  existing districts?
20  A     No.
21  Q     Do you need to split Mobile County to equalize population
22  among the districts?
23  A     No.
24  Q     Your experience as a demographer, Mr. Bryan, do you see
25  anything that would lead a map drawer to draw this map other
```

```
 1  than a desire to divide voters by race in order to draw two
 2  majority-black districts?
 3  A    I do not.
 4  Q    Would you give the same answers if we went through each of
 5  these maps of Dr. Duchin's and Mr. Cooper's plans?
 6  A    Yes.
 7  Q    Mr. Bryan, in your opinion, as a demographer, have the
 8  Caster and Milligan plaintiffs proven that it is possible to
 9  draw two majority-black districts without splitting Jefferson
10  and Mobile counties along racial lines?
11  A    No.
12  Q    In your opinion, as a demographer, have the plaintiffs
13  proven that it is possible to draw two majority-black
14  congressional districts in Alabama without sacrificing
15  traditional districting criteria?
16  A    No.
17            MR. DAVIS:  Your Honor, may I have a moment to consult
18  with my colleagues?
19            JUDGE MARCUS:  You sure can.
20            (Counsel confers with co-counsel.)
21            MR. DAVIS:  We have no further questions for Mr. Bryan
22  at this time, Judge Marcus.  Thank you.
23            JUDGE MARCUS:  All right.  Thank you very much.  We
24  will take a break for lunch now and reconvene at 1:10 Central
25  Standard Time.  It's a little less than an hour and 10 minutes
```

```
 1  from now.  That would be 2:10 eastern time.  Do I have that
 2  right?
 3            MR. DUNN:  No.  I think it's 12 -- 11:00 Central.
 4            JUDGE MARCUS:  I'm sorry.  So we're -- right now you
11:03:12 5  are 11:00 o'clock Central Standard Time.  So we really do have
 6  some time to proceed with cross.  Are you ready to proceed,
 7  Ms. Khanna?
 8            MS. KHANNA:  I am, Your Honor.
 9            JUDGE MARCUS:  All right.  Let's proceed with
11:03:26 10  cross-examination.
11            MS. KHANNA:  If you will give me one moment.
12            JUDGE MARCUS:  Do you want a short break, a 5-minute
13  break?
14            MS. KHANNA:  I think I can jump in.  Just give me
11:03:39 15  two seconds to get my notes in order.
16        All right.  I think I am ready to go.
17            JUDGE MARCUS:  Thank you.  You may proceed.
18                     CROSS-EXAMINATION
19  BY MS. KHANNA:
11:04:29 20  Q    Good morning, Mr. Bryan.
21  A    Good morning.
22  Q    My name is Abha Khanna.  I don't think we have met before,
23  and I met with, I think, the Caster plaintiffs in this case.
24  A    It's a pleasure to meet you.  Thank you.
11:04:38 25  Q    Same here.  So you produced two reports in the cast -- in
```

```
 1  the Caster case; is that right?
 2  A    Yes.
 3  Q    And that was the first one, I believe is marked
 4  Defendants' Exhibit 2 on December 10th, and the second marked
 5  Defendants' Exhibit 4 on December 20th; is that right?
 6  A    That sounds right.
 7  Q    And just to clarify.  You have not seen any of the Caster
 8  plaintiffs' expert reports at the time you submitted your first
 9  report in this Caster case; is that right?
10  A    I don't believe so.
11  Q    And you had not seen any of Mr. Cooper's illustrative
12  plans at the time you first submitted or submitted your first
13  report in this case; is that right?
14  A    No, I did not see either Mr. Cooper or Dr. Duchin's plans
15  until later in the case.
16  Q    So only -- so later in the case is -- during your
17  supplemental report, that's the only time --
18  A    Yeah.
19  Q    -- where you actually analyzed any of Mr. Cooper's plans;
20  is that right?
21  A    Yeah.  Uh-huh.
22  Q    Did you provide any response or analysis regarding
23  Dr. Palmer's expert report on racially polarized voting?
24  A    No.  I have no -- I am not a political scientist.  I offer
25  no opinion on any of the political science related reports.
```

11:04:53 (line 5)
11:05:09 (line 10)
11:05:25 (line 15)
11:05:37 (line 20)
11:05:58 (line 25)

```
 1   Q    And you don't provide anything to refute Dr. Palmer's
 2   conclusions regarding the performance of black-preferred
 3   candidates in any of Mr. Cooper's illustrative plans; is that
 4   right?
 5   A    No.
 6   Q    You also don't dispute any of Mr. Cooper's analyses on
 7   socioeconomic disparities between blacks and whites in Alabama?
 8   A    No.
 9   Q    And nor do you address any of the conclusions in
10   Dr. Bridgett King's report relating to the history of
11   discrimination in Alabama?
12   A    No.
13   Q    So you have been retained as an expert on behalf of the
14   Secretary of State in this case; is that right?
15   A    Yes.
16   Q    When were you first retained?
17   A    I do not know the exact date that I was retained.  Is that
18   something I can consult with my colleagues to get an exact
19   date?  Is that necessary?  It's --
20   Q    I don't need an exact date.
21   A    -- three months this fall, you know.  I apologize.  I
22   don't have the precise date.  It's been probably about three
23   months ago when I was originally contacted on the case.
24   Q    Do you know if it was before or after the congressional
25   plan for Alabama was adopted and enacted on November 4th?
```

```
 1    A    I would have had conversations about the case before the
 2    enacted plan, but I could not have begun the work on the plan
 3    until after that date.
 4    Q    And do you know if it was before or after mid August, when
 5    the census data was released?
 6    A    It would have been after mid August.
 7    Q    Mr. Bryan, this is your first time testifying in a federal
 8    court; is that right?
 9    A    That's correct.
10    Q    Or in any court?
11    A    Yes.
12    Q    So in your report, and I think several times during your
13    testimony as well, you mentioned that we observed this or you
14    referred to our analysis.  Did anyone else assist you in
15    preparing your analysis in this case?
16    A    I have -- I own a company and I have an analyst and a
17    director of analytics that help me execute some of the
18    technical parts of my analytics.
19    Q    So when you refer to we or our conclusions, are you
20    referring to anyone other than your own analyses and
21    conclusions?
22    A    The conclusions, the interpretation of those are mine and
23    mine alone.
24    Q    And I believe you mentioned during your direct examination
25    that you're not a political scientist, but you have often
```

11:07:47  (line 5)
11:07:59  (line 10)
11:08:15  (line 15)
11:08:35  (line 20)
11:08:47  (line 25)

```
    1   worked with political scientists?
    2   A    That's correct.
    3   Q    Consulted --
    4   A    Yeah.
11:08:56 5  Q    Were there any political scientists that you consulted in
    6   preparation for your work in this case?
    7   A    Not that I consulted for my work, no.  There is another
    8   political scientist who is working on the case, but my work was
    9   not done in correspondence with his work in this case.
11:09:19 10 Q    I am going to turn to your census demography analysis.  I
   11   am looking at page 5 of your supplemental report.  Here you
   12   include -- I think we can pull it up as well.
   13   A    Yeah.  Thank you.
   14   Q    I think here you include -- you see at the top?
11:09:46 15 A    Yeah.
   16   Q    The title Census Race Definitions; is that right?
   17   A    Yeah, that's correct.
   18   Q    Okay.  And if I am reading correctly in the first
   19   paragraph of -- on this page, you say here that you were -- you
11:09:59 20 tried to define and document the true black population of the
   21   two black districts in each of plaintiffs' illustrative plans?
   22   A    Yeah, that's correct.  Uh-huh.
   23   Q    And you also note that it was unclear why here plaintiffs
   24   refer to undocumented voting strength statistics rather than
11:10:20 25 census Black Voting Age Population.
```

1        Did I read that correctly?

2    A    Yeah.  That's correct.

3    Q    Can you explain what you mean by undocumented voting

4    strength statistics?

11:10:32 5   A    Yeah.  Typically, in cases like this, when we're measuring

6    the performance, the racial performance and characteristics of

7    a district, we would use the decennial census data that are

8    used by law to define, draw, and characterize a district.

9        I typically would not use, at least for the design and

11:10:54 10  characterization of a plan, would not ever use the voting

11   strength or voting characteristics or voting behavior.  We

12   typically leave that to the political scientists to focus on

13   that.

14       So when the plaintiffs have a chance and they have the

11:11:13 15  opportunity to characterize the plan by the race data that is

16   from the census and use voting data instead, that was

17   inconsistent to me.  I understood it, but it was inconsistent.

18   Q    So was it your position that Mr. Cooper used undocumented

19   voting strengths statistics in creating any of his or

11:11:39 20  evaluating any of his illustrative plans in his report?

21   A    I just -- insofar as it's undocumented, I didn't see where

22   they came from.  I have no -- because we don't use those in our

23   analysis, I have no ability to verify those.  And we did not

24   analyze those, so I can't speak to those statistics or why he

11:11:58 25  used them.

```
 1  Q    Can you explain what specific statistics you are referring
 2  to in Mr. Cooper's report?
 3  A    I cannot.  I would have to go -- pull up a copy of his
 4  report and look at it in some detail to answer that.  But I
 5  would stand by my assertion that we would focus exclusively on
 6  the census data that is the public law data and not on any
 7  voting related data for the design and characterization of a
 8  plan.
 9  Q    But it's your understanding that Mr. Cooper used voting
10  strengths statistics in his illustrative plans or in his
11  reports?
12  A    Yeah.  Among other things, yes.
13  Q    And can you give me an example of what a voting strength
14  statistic would be?
15  A    Yeah.  I would have to pull up his report to make a
16  specific reference to it, but it's generally a characterization
17  of the number or the percent of the population that by race
18  voted in a particular way.
19  Q    So your understanding of voting strength statistics is
20  something that measures the voting behavior of individual
21  voters in the state; is that right?
22  A    Yeah.  I would be very cautious since I am not a political
23  scientist and I do not study those statistics or use those
24  statistics in my analysis, I would not want to represent myself
25  as someone who has deep expertise in voting strength by race
```

11:12:14  (line 5)
11:12:32  (line 10)
11:12:44  (line 15)
11:13:03  (line 20)
11:13:20  (line 25)

1    and recognize it.  I know what it is, but I am not an expert in

2    it and I don't use that in my analysis.

3    Q     Do you dispute that Mr. Cooper used census data in

4    constructing or in evaluating his illustrative plans as

11:13:39   5    reported in his expert reports?

6    A     He did use some census data, yes.

7    Q     Used some census data?

8    A     Beg your pardon?

9    Q     Did you say he used some census data?

11:13:50  10    A     He did, in some cases correctly, and some cases

11    incorrectly, but, yes, he has tables of census data in his

12    report.

13    Q     Do you have an example of a place where he has used census

14    data incorrectly?

11:14:06  15    A     Yeah.  May I refer to a part of my report?

16    Q     Sure.

17    A     Thank you.  I am reading from my report.

18         In his plan 4, he reports the total population

19    incorrectly.

11:14:40  20         In plan 5, he reports total population by district

21    incorrectly.

22         He reports the -- in plan 5 VAP population incorrectly.

23    While those numbers were incorrect, his reported percent VAP

24    black and percent white were reported correctly.  So his tables

11:15:04  25    had internal inconsistencies.

1    Let's see.  In his plan 6, the VAP population 18 plus is

2    reported incorrectly.  And his VAP 18 plus population is also

3    reported incorrectly.  So there were places where there was

4    inconsistencies within and across his different census tables.

11:15:28  5    I was able to identify with my analysis of the census data.

6    Q    I understand.  Thank you for the clarification.

7    A    Thank you.

8    Q    Were you present or were you in trial -- in our Zoom trial

9    when Mr. Cooper testified?

11:15:41 10   A    I was not.  I was not present and I do not know anything

11   about his testimony.

12   Q    So you didn't hear him explain that the figures that you

13   just talked about in his report were actually typographical

14   errors that are accurate in the exhibits attached to his

11:15:59 15   report?

16   A    No.

17   Q    Did you measure the -- did you evaluate the data as

18   reflected in the exhibits, the detailed exhibits attached to

19   Mr. Cooper's report?

11:16:08 20   A    No.  I didn't examine any subsequent exhibits.  And in

21   this business, if it's an error, it's an error.  Whatever the

22   explanation or the root cause of it is, it is either right or

23   it's wrong.  And when I refer to his report, I saw the numbers

24   and they were not correct.

11:16:23 25   Q    So you are familiar, I imagine, that when Mr. Cooper

1  submitted his first report, he included with it a number of

2  detailed exhibits with charts, tables, and maps, correct?

3  A    Yeah.  I recalled that there are those exhibits, yes.

4  Q    Those were not subsequent to his initial reports, those

11:16:41  5  were alongside his report?

6  A    Yeah.  I am recalling.  I believe so.

7  Q    And you did not review those exhibits in evaluating his

8  plans; is that correct?

9  A    I only reviewed the detailed -- the maps and the census

11:16:57 10  data characteristics of his plans.

11  Q    I just want to make sure I am clear.

12  A    Yeah.

13  Q    When you discuss the data in his report, you only looked

14  at his written report, the declaration, not the exhibits

11:17:13 15  detailed, the census data, the maps that were attached to that

16  report?

17  A    Right.

18  Q    And the same would be true of his supplemental report, you

19  reviewed only his report, but not any of the exhibits attached

11:17:29 20  to it?

21  A    I mean, I -- I reviewed the -- all of the pages that were

22  in his supplemental report, but focused on the data.  Again, I

23  did not examine his plan 7.  I didn't have time to when I was

24  preparing here.

11:17:48 25  Q    Okay.

1  A     Thank you.

2  Q     Going back to the quote that you have on page 5 of your

3  report, Defendants' Exhibit 4, where you say it's unclear why

4  the plaintiffs referred to undocumented voting strength

11:18:05  5  statistics rather than census Black Voting Age Population.

6            JUDGE MARCUS:  Let's take our time and read it more

7  slowly if you would, Ms. Khanna.

8            MS. KHANNA:  My apologies.  I certainly will.

9  BY MS. KHANNA:

11:18:21 10  Q     So you see --

11            JUDGE MARCUS:  You want to read from 3, Census Race

12  Definition?

13            MS. KHANNA:  I'm not sure I understand.  I can read

14  the highlighted language again.

11:18:37 15            JUDGE MARCUS:  I thought you were reading some of it.

16  I may have misunderstood.

17            MS. KHANNA:  I probably was.  I will say it again.

18  BY MS. KHANNA:

19  Q     So here, Mr. Bryan, where you say, It is unclear why here

11:18:46 20  plaintiffs refer to undocumented voting strength statistics

21  rather than census Black Voting Age Population.  Did I read

22  that right?

23  A     Yeah.  That seems to be right.

24  Q     You don't dispute that the census reports the any-part

11:19:03 25  Black Voting Age Population, do you?

```
 1  A     Reports it in great detail of course, yes.
 2  Q     So the any-part Black Voting Age Population reported in
 3  Mr. Cooper's plan is, in fact, census Black Voting Age
 4  Population under your definition, correct?
 5  A     It's a definition.
 6  Q     Do you understand that to be census Black Voting Age
 7  Population as you used that term here?
 8  A     When I refer to census Black Voting Age Population, I
 9  refer to it in the context that I discussed earlier, which is a
10  range of values from black alone to any-part black or all
11  black, depending on the analysis and the context, including
12  some internal definitions within that, that the DOJ advocates,
13  such as black alone or black plus white.  I do not refer to any
14  one specific precise Black Voting Age Population here.  I just
15  refer to it in the context of census data that describes Black
16  VAP.
17  Q     Okay.  Thank you for that clarification.
18  A     Yes.  For sure.
19  Q     If we can go to -- turn to page 6 of this report.
20  Defendants' Exhibit 4.
21        Here you observed the different absolute numbers and
22  percentages of the black-alone population and then the black
23  alone in combination population, correct?
24  A     Yeah, that's correct.
25  Q     And I believe you touched on this with Mr. Davis, but do
```

The time annotations in the left margin are: 11:19:21 (line 5), 11:19:44 (line 10), 11:20:09 (line 15), 11:20:22 (line 20), 11:20:35 (line 25).

```
 1   these categories correspond to what we've also talked about as

 2   the single-race black population and the any-part black

 3   population?

 4   A    Yes.  That's correct.  That's consistent.

11:20:49  5   Q    And you note that -- let me see -- you note in the first

 6   paragraph here that the latter category, the any-part black

 7   population is 1,364,736 people.  Did I read that correctly?

 8   A    Yeah, that's correct.

 9   Q    And that comprises 27.2 percent of the population?

11:21:19 10   A    That's correct.

11   Q    And you also say that this represents an additional 68,574

12   blacks, compared to the number of people in the black-alone

13   category?

14   A    That's correct.

11:21:33 15   Q    And those 68,000 people comprise about 5.08 percent of the

16   total Alabama black population?

17   A    Yes, that is correct.

18   Q    Mr. Bryan, you don't dispute, do you, that those 68,574

19   blacks are, in fact, black, do you?

11:21:58 20   A    Black is a measure of self identification.  There are

21   people who identify themselves as being black and black alone.

22   And there's people who can self identify as being black and

23   black in combination with other races.

24        I do not have any experience or knowledge of the

11:22:22 25   identification of people in combination with other races.  What
```

1    they may answer is their prevailing characteristic.  All I know

2    is those people identify as at least being some part black.

3    Q    So all of those 68,574 people identify as black?

4    A    As one of their racial characteristics, yes.

11:22:47 5    Q    And as you state here, the total Alabama black population

6    is 1,364,736, that more inclusive figure, correct?

7    A    That is correct, yes.  And that's a very interesting

8    number in demography a number that has changed dramatically in

9    the last decade, which is why it has it has particular

11:23:13 10    relevance in the redistricting case today.

11    Q    And as in the next paragraph, you also provide that the

12    Alabama Black Voting Age Population is 1,014,372 people

13    correct?

14    A    That looks correct, yes.

11:23:35 15    Q    And that's inclusive of black alone and anyone else who

16    identifies themselves as black?

17    A    That's right.

18    Q    Let's turn to the next paragraph down here, and

19    specifically there is a sentence here where you say, and I will

11:23:51 20    read it out loud, The alone definition is one of the most

21    consistently used history -- one -- sorry -- is the one most

22    consistently used historically in VRA cases?

23    A    Yeah.

24    Q    Because A, a multi-race classification did not exist prior

11:24:08 25    to 2000; and, B, the alone definition has been most defensible

```
 1  from the political science *Gingles II* voting behavior
 2  perspective?
 3  A    Yeah.
 4  Q    Did I read that correctly?
 5  A    That is correct.
 6  Q    Okay.  I want to break this down into its component parts.
 7  A    No problem.
 8  Q    Let's talk first about the subject subheading A here.
 9       In 2000, the U.S. Census Bureau added the option for
10  people to choose more than one race on their census form; is
11  that right?
12  A    That's correct.
13  Q    And before that, an individual had to select one and only
14  one race?
15  A    That's right.
16  Q    So are you suggesting here that because there was no
17  any-part black category before 2000, we should not count the
18  any-part black category in 2021, even though the census now
19  calculates that figure and has for the last two decades?
20  A    I want to be careful and precise with my language here.
21       I'm not advocating that any one measure should or should
22  not be used for the purpose of *Gingles II* or for how a
23  political scientist would use it, and there's nothing in
24  history that would create a precedent for if and how different
25  definitions should be used today.  I base my comment on my
```

1  experience and working with professional political scientists,

2  and when we ask me for demographic data for the purpose of

3  doing their work, their characterization to me is that there is

4  a race group that is race alone, it is easier for them, and it

11:25:50  5  is more defensible for them to try and do their political

6  science work for a homogenous racial population than a more

7  heterogenous more probably defined racial population.  And that

8  is what -- the comment that I make is based on that experience.

9  Q    And, again, was there any particular political scientist

11:26:11 10  who you were directing this information in your report?

11  A    I have worked with multiple political scientists

12  throughout my career.  And I have heard this is a frequent

13  request and frequent feedback to me in their work.

14  Q    Did any particular political scientist request this

11:26:28 15  information for your report in this case?

16  A    The political scientist in this case was Trey Hood.  I did

17  not provide my data to him directly, but I assume that it made

18  its way to him.  I worked with Mr. Trey Hood in the past.

19  Q    You would agree that the Voting Rights Act protects

11:27:01 20  African-American voting strengths -- voting rights; is that

21  right?

22  A    Yes, that's what it does.

23  Q    That was before 2000?

24  A    Yes.  Since its inception.

11:27:12 25  Q    And it's certainly true today?

```
 1   A      Yep.

 2   Q      So let's say we have a black Alabama resident who is both

 3   black and Asian.  Let's say before the 2000 census when they

 4   had to choose one race, they selected black?

 5   A      Right.

 6   Q      You would agree that the person -- that person would be

 7   considered black for purposes of Section 2 of the Voting Rights

 8   Act?

 9   A      At that time, yes.

10   Q      Okay.  So let's say that after the 2000 census, they now

11   have the option to choose more than one race, they choose both

12   black and Asian, which is an accurate representation of their

13   heritage, correct?

14   A      Yep.

15   Q      Is it your position that that person would no longer be

16   considered black for purposes of the Voting Rights Act?

17           MR. DAVIS:  Your Honor, I'd like to pose an objection

18   to this question.  Ms. Khanna is asking how Mr. Bryan would

19   view this one thing, but asking him whether a person is of

20   which race for purpose of the Act, I believe is calling for a

21   legal conclusion from Mr. Bryan.  And he does not purport to be

22   an attorney.

23           JUDGE MARCUS:  Ms. Khanna, are you asking for a legal

24   conclusion?

25           MS. KHANNA:  I am not, Your Honor.  I am really trying
```

```
 1   to understand what Mr. Bryan considers to be black under

 2   this -- under the various classifications before and after

 3   2000.

 4            JUDGE MARCUS:   I think you should rephrase your

 5   question.   The objection is sustained as to the form.

 6            MS. KHANNA:   Thank you, Your Honor.

 7   BY MS. KHANNA:

 8   Q    Is it your position, Mr. Bryan, that this person would --

 9   should -- would no longer be considered black when evaluating

10   whether a -- whether a district that includes this person is

11   majority black?

12   A    Again, I would leave that to an interpretation by the

13   political scientists, and I would also defer an interpretation

14   to the guidance that was recently provided by the Department of

15   Justice.   The Department of Justice's recent guidance -- I

16   don't have it in front of me -- but advocates starting with the

17   race alone, and then expands that definition procedurally to

18   include black and -- black and white.   And then as a next

19   extension to black in combination with any other races.   I'm

20   not an attorney, and I am not a political scientist.   I do not

21   know what the triggers are for each one of those steps in the

22   progression to the different definitions, and I am not in a

23   position to state whether one definition is right or wrong.

24   Q    Thank you.   I appreciate that.

25   A    Thank you.
```

Q    Is it your position, Mr. Bryan, that the effect of adding

the multi-race option to the census in 2000 would be to shut

out individuals from belonging -- multi-race individuals from

belonging to any racial group?

A    Since I worked at the Census Bureau during the development

of that question, I can say that that is not the case.  The

objective of adding race was to -- as part of the question

development program in the 1990s was to try and give people in

a rapidly developing more dynamic more diverse universe that we

live in the United States the opportunity to self identify

whatever they were.

     Now, that did not decide or preclude how that data would

end up being used in law or how that data would end up being

used by political scientists.  At the time, the intent of that

question was to afford people the opportunity to identify

personally as accurately as possible all the different things

that they possibly could self identify that they were.

Q    Understood.

     I want to move to the second -- the part B quote that we

read from your report.

A    Great.

Q    This is where you state that, The alone definition has

been most defensible from a political science/*Gingles II* voting

behavior perspective?

A    Yeah.

Q    As you mentioned several times, you are not a political

scientist, correct?

A    No.  No.

Q    And you are not offering an opinion in this case on the

*Gingles II* voting behavior?

A    Definitely not.

Q    You don't cite any political scientist for this statement

that the black-alone definition is most defensible, correct?

A    No.  There's no literature that I refer to, only my

personal experience with numerous cases and interacting with

political scientists.

It is also grounded in just basic demographic analytic

concept, which is that any time you have a group that is more

homogeneous, uniform in their characteristics, it is easier to

analyze and understand their attitudes, their beliefs, their

behaviors, and the rest of their characteristics.  Yes, it is a

universal demographic truth that the more homogenous population

you have the better job you can do with that.

The more that you add heterogeneity to this homogenous

population, that is people with different characteristics, they

may have part or one characteristics, but then they have parts

of other characteristics, whether it's in political law or

sociology or anthropology, it is harder and harder the more

heterogeneity you add to a group to understand consistently and

reliably their attitudes, beliefs, and behaviors.

```
 1   Q     So the testimony you just provided about attitudes and
 2   behaviors of various voting groups, that's just your opinion;
 3   is that correct?
 4   A     That's correct.
 5   Q     That's not informed by any specific expertise that you
 6   have in voting behavior or political science, correct?
 7   A     Has no grounding in my own personal experience with voting
 8   behavior.  It's only what the expertise provided to me by
 9   political scientists I work with.
10   Q     So when you say in your report that the black alone is
11   most defensible, you were just basing that on your own beliefs
12   and observations?
13   A     No.  I have been in cases where plaintiffs have presented
14   a black-majority population that was 49 percent black, for
15   example, black alone, and only achieved majority status of
16   greater than 50 percent by adding the black in combination with
17   other races.  And some of those cases where you don't quite
18   have a black majority because you only have black alone of less
19   than 50 percent have turned into what I have witnessed to be
20   hard fought battles.
21   Q     You don't cite any of the cases in your report, do you?
22   A     No, that wasn't the point of my report.
23   Q     But when you characterized the use of the black-alone
24   figure as most defensible, you are basing this on some cases,
25   perhaps, some information that you have that you have not
```

1    cited, correct?

2    A    That's correct.

3    Q    You don't point to a single case in your report that has

4    used the black-alone definition in determining whether the

11:34:40 5    first *Gingles* precondition is satisfied, do you?

6    A    No.  And to me, it doesn't matter.  This is the land of

7    the political scientists, and it's a reflection of my

8    experience with them.  I don't advocate one as being right or

9    wrong.  The breadth -- this is a secondary passing comment

11:34:58 10    about the facts of my professional experience in this field.

11    The reason that I present black alone and black in combination

12    is to provide full, complete, context and understanding of the

13    race alone and race in combination to help me better understand

14    plaintiffs' representation of the black population, which is

11:35:20 15    almost always not documented, inaccurate, or incomplete.  That

16    is why we do the complete job that we do.  Not to try and prove

17    a point about *Gingles II*.

18    Q    I really appreciate that clarification.  And I understand.

19    A    Thank you.

11:35:32 20    Q    What you just mentioned, that that was just a passing

21    comment in your report.  I am sure you understand that we

22    have -- I need to ask you:  You wrote in your report that this

23    is the most defensible, and as I understand you saying now, you

24    actually don't mean to be concluding whether one is

11:35:49 25    defensible -- one use of a metric is defensible or better; is

```
 1    that right?
 2    A     That is correct.  I am not -- I am definitely not making a
 3    judgment that one is right or wrong or better or worse.
 4    Q     And you have cited -- or can cite no authority whether
 5    it's legal precedent, demographics, and political science that
 6    the notion that the black-alone definition is the most
 7    defensible, correct?
 8    A     No.  Personal experience.
 9    Q     You mentioned the DOJ guidance, and we can turn to that
10    now.
11    A     Sure.
12    Q     Because you do -- you quote that paragraph on page 6 of
13    your supplemental report.
14    A     Yeah.
15    Q     This is from the DOJ's guidance under Section 2 of the
16    Voting Rights Act for redistricting in method of electing
17    government bodies?
18    A     That's right.
19    Q     And if I am reading it correctly, this guidance provides
20    for two steps in determining who belongs in which racial
21    category for purposes of Section 2 of the Voting Rights Act,
22    correct?
23    A     Yes.  This is -- that's right.  That's their guidance.
24    That's correct.
25    Q     So let's just walk through this.  Can you please read
```

11:36:07 (line 5)
11:36:22 (line 10)
11:36:31 (line 15)
11:36:48 (line 20)
11:37:02 (line 25)

1  aloud the first two sentences of the block quote DOJ guidance

2  that you report?

3  A    Yeah.  The department's initial review based on

4  allocation, any response that includes white and one of the

11:37:21  5  five other race categories identified in the response.

6       I should state that while that is the guidance, the

7  incremental white to black population, for example, is almost

8  always very small and is rarely used.  But this is the

9  guidance, yes.

11:37:49 10  Q    And can you please read the second sentence of that

11  paragraph, as well?

12  A    Sure.  Yeah.  My pleasure.

13       Thus, the total numbers for black, Asian, American Indian,

14  Alaska native, native Hawaiian or some other race reflect

11:38:06 15  single race in combinations with minority and white.

16  Q    I'm sorry.  Were you reading right from the DOJ guidance

17  there?

18  A    I'm sorry?

19  Q    I'm looking specifically at the block quote that you

11:38:26 20  include in your report.

21  A    Yeah.  Uh-huh.  That's what I was reading.

22  Q    Okay.  And it says that the total numbers of black

23  African-American as well as the other minority groups?

24  A    Yep.

11:38:36 25  Q    Reflect the total of the single-race responses and the

multiple responses in which an individual selected a minority

race and white race.  Correct?

A    That's correct.

Q    So just to make sure I'm understanding this first step

11:38:49  correctly under the DOJ's initial review, they count the total

number of black population to mean the number of people who

identified as single-race black, plus those who identified as

both black and white; is that right?

A    That's right.

11:39:08  Q    And that's just step one?

A    Yes.

Q    So already step one, we have the DOJ would count more than

just the black-alone category?

A    I would say in a DOJ VRA case, this is the guidance that

11:39:27  they would use, and my experience many of these cases do not

follow the DOJ guidance.  But in a DOJ VRA case, yes, this is

their road map.

Q    And this is the guidance you thought was important to

provide as authority in your report, correct?

11:39:42  A    Well, it's important context to know what all the

different rules are, provide all the information for how people

think about race.  And that's the purpose of this section of my

report, to provide all the information to give clear ideas of

what the different rules are, depending on what the work is

11:39:58  you're trying to accomplish.

1    Q    Okay.  Great.  Can you read the second part, the last two

2    sentences of that block quote from the DOJ guidance, which I

3    think goes on to the second step?

4    A    Yeah.  So where I see there's significant numbers to such

11:40:14  5    responses, the department will as, as required by OMB allocate

6    those responses on an iterative basis to each of the component

7    single-race categories for analysis.

8    Q    And the sentence before that says that the department will

9    then move to the second step in its application of the census

11:40:31 10    data by reviewing the other multiple-race category?

11    A    Right.

12    Q    Which is comprised of all multiple-race responses

13    consisting of more than one-minority race?

14    A    Yep.

11:40:42 15    Q    So under the second step, where there are significant

16    numbers of people who indicated they belonged to more than one

17    racial group, they will then be allocated to each component

18    racial group; is that right?

19    A    They get allocated.  They didn't get all just allocated

11:41:04 20    just to black.

21    Q    So the person who identifies as both black and Asian, as I

22    understand this guidance, would -- the second step be allocated

23    to the black category and to the Asian category.  Is that your

24    understanding, as well?

11:41:18 25    A    That is my understanding.  I do not know the exact

1  allocation algorithm that the DOJ or the Census Bureau would

2  use to do that.  It's --

3  Q    But based on the guidance that you have quoted in your

4  report, you would agree that the DOJ's guidance provides

11:41:41 5  authority for the use of the any-part black metric?

6  A    There is authority for the use of it for sure.  It's one

7  of many different scenarios that can play out in this type of

8  analysis in these types of cases.

9  Q    And I believe in this -- in the same passage that you just

11:42:05 10  read, the DOJ notes that this calculation of how it determines

11  the black population or any minority population --

12  A    Uh-huh.

13  Q    -- is required by both OMB guidance and judicial opinions;

14  is that right?

11:42:18 15  A    That -- yes, that is true.  That does not mean that all

16  redistricting cases end up relying on these definitions.

17  That's different.

18  Q    But, in fact, the DOJ guidance does cite one judicial

19  opinion in particular; is that right?

11:42:35 20  A    I am in complete agreement with that.  That is one

21  universe, and this is the rules that apply in that universe,

22  and I agree with you enthusiastically.

23  Q    That is *Georgia v. Ashcroft*?

24  A    I beg your pardon?

11:42:48 25  Q    That case it cites is *Georgia vs. Ashcroft*?

```
 1  A    I do not have the cite in front of me.  I'm sorry.  I
 2  can't speak to that.
 3  Q    That's okay.
 4       Well, I am just looking at your report, and at the end of
 5  the DOJ guidance, you have a footnote that cites to Georgia vs.
 6  Ashcroft?
 7  A    Okay.
 8  Q    Am I --
 9  A    I believe you.
10  Q    Am I saying that correctly -- I think it's on the screen.
11       Do you see on the -- in your report on page 6?
12  A    Yes.
13  Q    Footnote 11?
14  A    Yeah.  I see that.  Yep.
15  Q    Actually, can we also -- can also pull up the DOJ guidance
16  itself, just to make sure we're speaking about the same
17  document?  This is the document -- this is the document that
18  you quoted in your report; is that right?
19  A    Yeah, I believe so.  Yes, that's correct.
20  Q    If we can just scroll to page 13 of this document.  I'm
21  sorry.  Maybe it's -- actually, yes.  Starting on page 12.
22  A    Yeah, that's probably where I got that reference from
23  there.
24  Q    Okay.  Great.
25  A    Good.  Yeah.  Thank you.
```

1  Q    So the DOJ specifically cites to *Georgia v. Ashcroft* 539

2  U.S. 461, page 473, footnote 1; is that right?

3  A    Yes.

4  Q    And that's the same cite that you include in your report?

11:44:25 5  A    Yeah.

6         MS. KHANNA:  Your Honor, I don't believe this has

7  actually been marked as an exhibit.  I am happy to mark it as

8  plaintiffs' exhibit.  I believe we are on 105 and offer it into

9  evidence.

11:44:39 10         JUDGE MARCUS:  Just so I have this right, Plaintiff

11  Caster 105 is the Justice Department's guidelines, right?

12         MS. KHANNA:  Yes, Your Honor.

13         JUDGE MARCUS:  Are you offering that?

14         MS. KHANNA:  I am offering that into evidence right

11:44:55 15  now.

16         JUDGE MARCUS:  Any objection?

17         MR. DAVIS:  No objection from the Secretary of State,

18  Your Honor.

19         JUDGE MARCUS:  Anyone else have any objection?

11:45:03 20      Seeing none, we will receive Plaintiffs' Caster 105 in the

21  cases before us.

22         MS. KHANNA:  Thank you, Your Honor.  And we can take

23  this down.

24  BY MS. KHANNA:

11:45:23 25  Q    So have you read the *Georgia v. Ashcroft* opinion that you

```
 1  cite in your report?
 2  A    Have I read what?
 3  Q    The Georgia v. Ashcroft judicial opinion from the U.S.
 4  Supreme Court that you cite in footnote 11 of your report?
11:45:36 5  A    Yeah, not for a long time.  Probably been -- it's been
 6  many years.
 7  Q    Did you read it in preparation for your report?
 8  A    No.
 9  Q    If we could just pull up that case and specifically, if
11:45:57 10 you could go to footnote 1.
11       This is a long footnote.  I won't make you read it all out
12  loud.  But I will represent to you that it's basically about
13  the question about what metric of black to use in a given case
14  where different parties are advocating for different metrics.
11:46:21 15 Here it was the United States and the state of Georgia.
16       Could you please read out loud starting with, Moreover in
17  the beginning of the -- in the middle of the footnote?
18           MR. DAVIS:  Can I request that if Ms. Khanna would
19  like something read into the record that she do so, and then
11:46:36 20 I'm sure Mr. Bryan would be happy to comment on whether or not
21  you read it correctly.  He's been talking an awfully lot this
22  morning.
23           JUDGE MARCUS:  I leave it to you, Ms. Khanna.  Do you
24  want to read it or him?
11:46:45 25          MS. KHANNA:  I would actually prefer that he read it
```

```
 1    just to make sure we're both understanding.
 2              JUDGE MARCUS:  Okay.  Make sure you have underscored
 3    the portion that you want him to read so he can see that and we
 4    can all see that clearly.  You are asking him to read from
11:46:59 5    footnote 1 of Georgia vs. Ashcroft, correct?
 6              MS. KHANNA:  Yes, Your Honor.  Yes.
 7              JUDGE MARCUS:  Mr. Bryan, do you see the highlighted
 8    portion she's asking you to read?
 9              THE WITNESS:  I do.
11:47:12 10              JUDGE MARCUS:  Would you read it aloud for us, please?
11              THE WITNESS:  Yes, sir.  Moreover, the United States
12    does not count all persons who identify themselves as black.
13    BY MS. KHANNA:
14    Q    Can you please keep reading to the end of the footnote, as
11:47:25 15    well?
16    A    It counts those who say they are black, those who say they
17    are black and white, but it does not count those who say they
18    are both black and a member of another minority group.  Using
19    the United States' numbers may have more relevance if the case
11:47:41 20    involves a comparison of different minority groups.
21    References.  Here, however, the case involves an examination of
22    only one minority group's effective exercise of the electoral
23    franchise.  In such circumstances, we believe it is proper to
24    look at all individuals who identify themselves as black.
11:48:02 25    Q    Thanks.  Thank you for reading that.
```

1      So you would agree that the present Section 2 case as you

2  understand it involves an examination of only one minority

3  group's effective exercise of the electoral franchise?

4  A    I'm sorry.  Can you restate the question?

11:48:23 5  Q    Do you understand that the present Section 2 case involves

6  the examination of only one minority group's effective exercise

7  of the electoral franchise?

8  A    That's correct, yes.  That's my understanding.

9  Q    We are not comparing the voting strength of one minority

11:48:40 10  group to another minority group?

11  A    No.  Not that I know of.  But, again, I am not focused in

12  my report, my analysis, or my expertise on voting strength.  So

13  I am a little bit out of my sandbox going there.

14  Q    You didn't see anything in the reports -- Mr. Cooper's

11:48:59 15  report to which you responded that suggests that plaintiffs

16  were trying to build a minority coalition district or compare

17  black voting strength or Hispanic majority district or anything

18  like that, correct?

19  A    I did not.  I found that it was relevant to be able to

11:49:18 20  present both black alone, as well as the black alone in

21  combination to provide useful context for where different

22  plaintiffs' plans fell because there were so many of them that

23  by one measure were just above and by another measure were just

24  below 50 percent.

11:49:33 25      So for the benefit of the Court, I thought it useful for

```
         1   them to see and understand where those numbers fell using

         2   different definitions.  I leave it to the Court and other

         3   experts to decide which definition is most appropriate for this

         4   case.

11:49:48 5   Q    And just to clarify, you know, in these circumstances, as

         6   reflected by the Supreme Court's guidance in the case that you

         7   cite in your report, it is proper to look at all individuals

         8   who identify themselves as black, correct?

         9   A    In this case, that is what that says.  I do not have an

11:50:08 10  opinion of whether that is the appropriate measure for this

         11  case or not.

         12  Q    Okay.

         13          MR. DAVIS:  I will withdraw an objection.

         14          JUDGE MARCUS:  I'm sorry.  Did we get the full answer

11:50:22 15  to the question?

         16          MS. KHANNA:  I believe we did.

         17          JUDGE MARCUS:  All right.  Thank you.

         18          THE WITNESS:  Thank you, Your Honor.  What else?

         19  BY MS. KHANNA:

11:50:31 20  Q    Let's see.  Let's turn back to your report, and if we go

         21  to page 9 of your supplemental report, you -- this is where you

         22  discuss Mr. Cooper's plans; is that right?

         23  A    Yes.  That looks correct.

         24  Q    And you state here that your first order of business was

11:50:56 25  to assess Mr. Cooper's statement that he is able to create two
```

 1  majority-black districts?

 2  A    Yes, that's what he alleged that he was doing, so my goal

 3  was to analyze the degree to which he accomplished that.

 4  Q    And we can zoom out from that.  But for the remainder of

11:51:15  5  that page and to the next page, you then go on to report the

 6  black-alone figure for District 2 in each of his illustrative

 7  plans, correct?

 8  A    I believe in the analysis we provide an analysis of both

 9  black alone and in combination measures.

11:51:34 10  Q    I think you're right when it comes to the tables that you

 11  include in your appendix.  But I'm -- just want to clarify if

 12  we can look at the text on page 9.  For instance, let's start

 13  with the second paragraph.

 14      For Cooper plan 1, I show in Cooper demographic

11:51:57 15  characteristics Table 3.10.  You see that sentence there?

 16  A    Yeah.  I got it.

 17  Q    Am I right that you only report the black-alone figure for

 18  District 2 in Mr. Cooper's illustrative plan here?

 19  A    In that case, yes, that's correct.

11:52:14 20  Q    But for District 7, you report both the black alone and

 21  the black in combination figure, the more inclusive figure?

 22  A    Yeah.  I think that that is an important point because

 23  what this says is that in District 2, it's a minority reported

 24  as black-alone majority as alone in combination, whereas the

11:52:38 25  distinction here is that in District 7 it is a majority by both

1    definitions.  And it's a strong defensible majority by both

2    definitions.  So I think it's important to highlight that.

3        No matter which definition you use, that plan has -- or

4    that district in that plan has a strong defensible black

11:52:58  5    majority population, no matter which population is used.

6    Q    When you say strong and defensible majority-black

7    population, I don't see those terms here.  What does that refer

8    to?

9    A    Yeah.  Typically, there is no hard and fast rule for what

11:53:14 10    a majority defensible strong majority is.  The courts, to my

11    knowledge, the expertise in the field don't have a strong

12    over/under number.  I have done a significant amount of

13    statistical analysis in this area, and when I look at numbers

14    that are 50.01 percent, 50.02 percent, 50.03, so forth, those

11:53:37 15    types of plans, when you do statistical analysis on them, you

16    can find that they ought -- the chances -- the statistical

17    probabilities of them really being a majority, sometimes can be

18    questionable, certainly when you put together multiple

19    districts with those small majority fractional majority

11:53:59 20    populations.  But in my experience, when you have districts

21    that have 52 percent or 53 percent, certainly in a black-alone

22    district, I have never seen anyone argue that those may or may

23    not be a black majority district.  It's a subjective threshold.

24    Q    When you say strong and defensible, you are talking about

11:54:23 25    whether or not the demographic figure is accurate?

```
        1   A     Whether that -- whether that number is representing a

        2   black majority district or not.  And I have seen numbers --

        3   when the number is 50.01 percent, then there is usually lots of

        4   dialogue around that about whether that really is a majority or

11:54:48 5   not.  If it's -- well by the law 50 plus -- 50 percent plus

        6   one person is the law, but those types of numbers very close to

        7   50 percent elicit much more conversation about whether it's a

        8   black majority than a 52 or 53 percent district would.

        9   Q     Just to be --

11:55:06 10  A     I have never heard that debated.

       11   Q     Just to be clear, you provide no opinions, conclusions, or

       12   analysis about whether any of the illustrative plans that you

       13   reviewed in this case provide strong defensible majority-black

       14   populations, do you?

11:55:23 15  A     I'm just explaining that as my opinion and response to

       16   your questioning.  It's not appropriate in this report to

       17   say -- to defend one as being strongly defensible or not.  I

       18   simply state the facts.

       19   Q     So as you noted, you do, in fact, include both the

11:55:52 20  any-part black figure and the black-alone figure in your tables

       21   in the appendix to your report, correct?

       22   A     Yeah, that's correct.

       23   Q     And just to -- and you also have now testified that you

       24   are offering no opinion that use of the any-part black figure

11:56:24 25  is wrong in this case, correct?
```

1  A    No, it is -- it is neither right nor wrong.  It is one of

2  two numbers that gives the Court and the experts useful context

3  for where the numbers that plaintiffs' plans lie.

4  Q    If we can scroll back or go back to your report, page 5,

11:56:44  5  at the top, and, again, at the first paragraph here?

6  A    Right.

7  Q    You note that in this section you will try to define and

8  document the true black population of the two black districts

9  in plaintiffs' alternative plans?

11:57:10 10  A    Yeah.  That's correct.

11  Q    But at no point in your report do you conclude that the

12  true black population in Alabama is defined as only the

13  single-race black population?

14  A    Yeah.  That's correct.  What I'm seeking to do, for

11:57:25 15  example, referring to Dr. Duchin's work, where she does nicely

16  document what her population is, I appreciate the accuracy and

17  the clarity of her analysis.  She is very transparent that her

18  work represents all-part black, and that's great.  Very

19  frequently other plaintiffs don't.  And in reading through the

11:57:47 20  bodies of work that I have looked at as part of this case in

21  Singleton, Caster, and looking at other work, for example, that

22  Cooper has done, there are many instances where it is not clear

23  what the black population is that they're referring to.

24       So part of my exercise is to do the analysis and the

11:58:04 25  research to make sure I know that when I see a number that says

1   this district is 50 percent black or 55 percent black, because

2   those are not oftentimes not documented, I take it as my

3   responsibility as the demographic expert to find out what those

4   true black populations are that they are referring to.  It is

11:58:25 5   much of benefit for clarity and the definition.  It is not a

6   judgment of which is right or wrong.

7   Q    And I just want to make sure that we are talking about

8   this case and the reports in this case.  You mentioned

9   plaintiffs generally maybe even Mr. Cooper's reports in other

11:58:40 10   cases.  Is it your position that Mr. Cooper did not clarify in

11   his report where and when he was using the any-part black

12   calculation?

13   A    No.  In this particular report, it's -- he provides two

14   columns of data that show what his numbers are.  But given my

11:59:02 15   experience with tables that I have reviewed for Mr. Cooper and

16   errors I have found in those tables, I felt it was important to

17   make sure that those numbers were correct.  And as I found out

18   in my analysis, in some cases they were not.  So it was still a

19   worthwhile exercise even though he represented them as being

11:59:21 20   all black or any-part black or black alone.  It's still a

21   useful purposeful exercise because it uncovers things like

22   this.

23   Q    And when you went back to check those figures, you would

24   agree that using the any-part black metric as stated in the --

11:59:39 25   as approved by the Supreme Court and the Department of Justice,

each of Mr. Cooper's maps have two majority-black districts,
correct?

A    I -- in any-part black metric, yes, I agree with that.

MR. DAVIS:  Before you continue, Ms. Khanna, I
apologize for interrupting.  But, Your Honors, our expert has
been going for some time now.  I don't mean to interrupt
Ms. Khanna's flow, but I would ask her and the Court if we
might be able to take a break before too long at the
appropriate time.

JUDGE MARCUS:  Fair enough.  What's your sense,
Ms. Khanna -- I don't want to break you in the middle of a
thread.  But you tell me what would be a convenient time to
break.

MS. KHANNA:  I'm happy to break here, Your Honor.  I
think we've kind of closed out this portion of his report, and
we can move on to the next topic after lunch.

JUDGE MARCUS:  You have closed the loop on this?  On
-- and we will take a break, and then you will come back with
the balance of your cross; is that right?

MS. KHANNA:  Yes, Your Honor.

JUDGE MARCUS:  If I hear you right.  All right.  I
have 12:00 o'clock Central Standard Time.  I want to be sure I
am right.  It's 1:00 o'clock here in south Florida.

We will reconvene in one hour, which will be 1:00 o'clock
Central Standard Time, 2:00 o'clock Eastern Standard Time.

```
 1          Thank you all.  We will be in recess until that time.
 2               (Recess.)
 3               JUDGE MARCUS:  I think we have everybody assembled.
 4     Ms. Khanna, you're in the midst of your cross, and you may
13:02:08  5     proceed with Mr. Bryan.  Thank you.
 6               MS. KHANNA:  Thank you, Your Honor.
 7     BY MS. KHANNA:
 8     Q    Good afternoon, Mr. Bryan.
 9     A    Hi, Abha.
13:02:17 10     Q    Before the break, we spoke about the any-part black metric
11     versus the single-race black metric; is that right?
12     A    That's correct.  Mr. Cooper also.
13     Q    Mr. Cooper also reported in his reports the non-Hispanic
14     single-race black Black Voting Age Population for each of the
13:02:42 15     districts in his illustrative plans.  Do you recall that?
16     A    I did see those statistics, yes.
17     Q    You don't address that metric at all in your discussion of
18     the demographic data?
19     A    That is correct.
13:02:55 20     Q    And you do not contest the use of CVAP, Citizen Voting Age
21     Population data in evaluating whether plaintiffs have satisfied
22     the first *Gingles* precondition, do you?
23     A    I would say that the -- the PL census data would be the
24     data of record for the purposes of establishing *Gingles* I, not
13:03:27 25     CVAP.  The CVAP would be more appropriate for assessing voting
```

```
 1   strength particularly in populations such as Hispanic
 2   populations, which may have lower citizenship rates as a
 3   minority population.
 4   Q    Okay.  If we could go to your first report in the -- in
 5   this case, in the Caster case, Defendants' Exhibit 2.  Let's go
 6   to page 3.
 7   A    Great.  Thank you.
 8   Q    Here, about four lines down?
 9   A    Yeah.
10   Q    Note that in 2015 you served in a leadership role in
11   writing an amicus brief to the U.S. Supreme Court in the
12   Evenwel case; is that right?
13   A    That's correct.  I worked with a team of demographers and
14   Census Bureau experts to write that brief, but I was one of the
15   lead authors.
16   Q    That brief was specifically about the use of CVAP data in
17   redistricting; is that correct?
18   A    That's correct, yes.
19   Q    If we could call up that brief?
20   A    There it is.
21   Q    There it is.  You see your name?
22   A    I remember it real well.
23   Q    That's the brief to which you are referring?
24   A    Yes, ma'am.
25        MS. KHANNA:  And I don't believe this has been marked
```

Line timestamps: 13:03:50 (line 5), 13:04:06 (line 10), 13:04:26 (line 15), 13:04:39 (line 20), 13:04:46 (line 25)

918

1  as an exhibit yet.  I would like to mark this as Plaintiffs'

2  Exhibit -- Caster Plaintiffs' Exhibit 106 and offer it into

3  evidence.

4          JUDGE MARCUS:  Was marked for identification.  You may

13:04:58  5  proceed.

6          MS. KHANNA:  I would also like to offer it into

7  evidence, Your Honor.  Or would you like me to lay the

8  foundation first?

9          JUDGE MARCUS:  Is there an objection?

13:05:06 10          MR. DAVIS:  Your Honor, if it's okay, I would like to

11  hear how Ms. Khanna intends to use this.  I certainly have no

12  objection to it being was marked for identification.  Whether

13  in evidence, I would like to hear how she intends to use it to

14  see if we can assess if it's relevant.

13:05:22 15          JUDGE MARCUS:  Fair enough.  Lay the foundation if you

16  would.

17          MS. KHANNA:  Will do.  Thank you, Your Honor.

18  BY MS. KHANNA:

19  Q    Mr. Bryan, this brief, if you would look -- let's go to

13:05:35 20  page 15 of this brief.

21  A    Great.

22  Q    Toward the bottom of page 15, you write that the U.S.

23  Supreme Court's recent Section 2 cases have accepted CVAP as

24  the yard stick when assessing minority voting strength; is that

13:06:00 25  right?

1    A     In the middle of the census for districting litigation,

2    yes.

3    Q     Okay.

4    A     Not for the purposes of the decennial census based

13:06:17  5    political redistricting exercise.

6    Q     Interesting.  If we could go to page 70.  The very top of

7    page 17, you write, Likewise, in *Bartlett v. Strickland*, the

8    Court and litigants relied on CVAP to evaluate the first

9    *Gingles* requirement.  Did I read that correctly?

13:06:37 10    A     Yeah, that looks right.

11    Q     And you note in the footnote that that case, like this

12    one, involved a Section 2 claim on behalf of black voters,

13    correct?

14    A     Yes, in that litigation it was true.  Yeah.

13:06:55 15    Q     And that was litigation -- it was a Section 2 litigation

16    based on the in 2011; is that right?  I'm sorry.  2009?

17    A     It was not a -- if I recall correctly, it was not part of

18    a state redistricting exercise.  It was post-redistricting

19    litigation.

13:07:18 20    Q     To your understanding?

21    A     Yes, that's correct.

22    Q     Is it your understanding that the *Bartlett v. Strickland*

23    case is the Supreme Court precedent on how to establish the

24    first *Gingles* precondition?

13:07:36 25    A     For Voting Rights Act litigation?  Yes.  I would draw a

1  distinction between that and drawing districts based on the

2  decennial census data.

3  Q    But for Section 2 Voting Rights Act cases, that is the

4  governing case?

13:07:58 5  A    Yes.  I would frequently -- I frequently would use and

6  report both the decennial census data the total population as

7  well as the CVAP data, which is an exercise we actually pursued

8  in the *Evenwel* case.

9  Q    Okay.  You further recognize in this brief that these

13:08:19 10 numbers can make a significant difference sometimes, correct?

11 A    It can for a lot of reasons.  Some based in what they're

12 measuring, and some based in their accuracy.

13 Q    So if we look at the bottom of page 18 of this brief

14 toward the top of page 19, here you say, Every fraction of a

13:08:41 15 percentage point is of intense interest to the political

16 players in this process.

17 A    Yeah.

18 Q    They trust that CVAP is a reliable data source for this

19 sensitive work.

13:08:53 20    Did I read that correctly?

21 A    That's -- yeah.  That's how it is used.  There's obviously

22 always debate and questions about the accuracy of the data

23 every time that it's used, but that -- the number is used as it

24 is.  And for that purpose, yes, every tenth of a percent is of

13:09:09 25 interest to parties in cases like this.  That's true.

1   Q     But in this report, in this case, you don't question or

2   debate the accuracy of the CVAP data reported in Mr. Cooper's

3   plans?

4   A     I will say this about that:  The ACS, which is a survey

13:09:25  5   that I participated in the development of almost 20 years ago

6   is a survey that's called a continuous measurement survey.  And

7   that survey is designed to fill in information that was

8   historically given by the long form, the one-in-six long form

9   sample many years ago.

13:09:47 10         And so that survey is in some sense renewed.  There are

11   many parts of it that are updated and refined and enhanced

12   during the decennial and immediately following the decennial

13   census.

14         It is my experience, having been part of the development

13:10:07 15   of the American Communities Survey, and using it intensively

16   for many years, that the farther and the farther that you get

17   away from that base decennial year, the poorer and poorer

18   quality that ACS data is going to be.  This is widely known in

19   the demographic community.

13:10:27 20         So by the time you get to the ACS file that we are using

21   today, which is what we would call the 2015 to 2019 file, it's

22   a five-year data file, this file is the furthest out from the

23   last decennial census of any ACS data that will be available.

24   And soon, in the next year or two, it will be renewed again and

13:10:52 25   re-grounded in the reality that it's the current census.

1          In my analysis of a recent very large-scale intense

2     redistricting exercise that was the Texas Legislature, I

3     studied the CVAP data for the state, and I studied the

4     decennial census for the state intensively.  And my findings in

13:11:12  5     this very large sample of ACS data, compared to the decennial

6     census data was that there were dramatic numerous significant

7     differences in what the ACS reported was the Citizen Voting Age

8     Population and what the decennial census said was a companion

9     Voting Age Population.

13:11:34 10          The differences were so significant and so vast that it is

11     my professional opinion that using the current ACS CVAP data

12     which is based in 2010 census concurrently with the 2020

13     decennial census is both an unnecessary exercise, and I also

14     think that it's a very risky one because the data from the ACS

13:11:58 15     now, nine years out from the last census, are at a much more

16     perilous state than they were in *Strickland* only one year out

17     from the census.

18     Q    That opinion that you just expressed is not an opinion you

19     expressed anywhere in your reports in this case, correct?

13:12:13 20     A    It's not in this report, but I have written about it.  I

21     have presented on it, and I have discussed it extensively in

22     the professional community.

23     Q    You were presented with Mr. Cooper's illustrative plans

24     and his report?

13:12:28 25     A    Yeah.

```
 1   Q    As well as his calculation of the non-Hispanic single-race
 2   black Citizen Voting Age Population of the districts in those
 3   illustrative plans, correct?
 4   A    I saw that.  I was aware that that was in the report.
 5   That's correct.
 6   Q    You provided an analysis of the racial demographics in
 7   Mr. Cooper's plans, correct?
 8   A    I did.
 9   Q    You had the opportunity to find or dispute or address in
10   any way his assessment of the Citizen Voting Page Population
11   demographics in this plan?
12   A    I did not feel it was appropriate or necessary.  And if I
13   did, I wouldn't have had the time to anyways.
14   Q    You did not include any discussion or response on the
15   Citizen Voting Age Population in your report, correct?
16   A    I did not.
17   Q    If we can go back to the brief shortly, the Evenwel brief
18   that we just mentioned, let's go to the top of page 20.
19        Here you write, in short, CVAP is now an indispensable
20   feature in voting rights litigation under Section 2.  Did I
21   read that correctly?
22   A    Yeah, that's correct for sure.
23   Q    We can take this down.
24   A    I would derive distinction between voting rights
25   litigation and certainly voting rights litigation late in the
```

13:12:45 (line 5)
13:13:00 (line 10)
13:13:20 (line 15)
13:13:44 (line 20)
13:13:56 (line 25)

1    decade versus using decennial census data which are required by

2    law.  ACS data are not required by law for purposes of

3    redistricting.  So I do not know or understand why Mr. Cooper

4    or anyone would choose to use ACS for the development of a

13:14:15  5    redistricting plan.

6    Q    You don't draw that distinction in your brief to the

7    Supreme Court in *Evenwel*, correct?

8    A    The inference when I say the ACS CVAP data is instrumental

9    for litigation, if I had meant that ACS data was critical for

13:14:32 10    redistricting, I would have said so.  And it's not, so I did

11    not.

12    Q    You just said that it's critical for evaluation in a

13    Section 2 Voting Rights Act case?

14    A    Yeah.  Typically, post-redistricting litigation,

13:14:46 15    especially as it pertains to Hispanics, as was the case in

16    *Evenwel*.  It's especially important measuring one person one

17    vote and voting strength.  And I strongly agree with that.  For

18    that purpose, it's absolutely instrumental.  It is not

19    instrumental.  It is not required by law.  Law doesn't say

13:15:03 20    anything about using CVAP data to develop a political

21    redistricting plan.  And I do not ever see it done, and I don't

22    do it.

23    Q    So the distinction you're drawing is that the law does not

24    require the use of CVAP data for a legislature drawing a

13:15:20 25    congressional plan.  Is that what you are saying?

```
 1  A    It's not required that.  That's -- the purpose of the
 2  decennial census is for the purpose of apportionment and for
 3  redistricting.  The purpose of the ACS is not for political
 4  redistricting or for apportionment.
```
13:15:36
```
 5  Q    But the in the Evenwel brief you agree that the use of
 6  CVAP data is relevant, at the very least, in Section 2 Voting
 7  Rights Act lit indication, correct?
 8  A    Yes.  I would agree.  And when this case goes, I am sure
 9  that that will have some role in it.  I don't believe it has a
```
13:15:58
```
10  role now.  I would emphasize that because black citizenship,
11  especially in the state of Alabama, is so high that we would
12  typically as demographers look at black CVAP, Black VAP as
13  being virtually indistinguishable.  In fact, when I am looking
14  at the number of black Hispanics in the state of Alabama, I see
```
13:16:23
```
15  8,000 black Hispanics out of 1.3 million.  So my assertion that
16  they are indistinguishable I think is fair and valid.
17       When you look at Section 2 Voting Rights Act claims with
18  Hispanics, those citizenship rates can and do vary wildly,
19  which is why the ACS CVAP data is so particularly important in
```
13:16:45
```
20  those cases, particularly pertaining to Hispanics.  It's
21  virtually irrelevant for the purposes of assessing blacks.  It
22  adds virtually no incremental value and can be deceiving as
23  what I believe I see in Mr. Cooper's report in representing
24  Black VAP because it is so far antiquated based on the 2010
```
13:17:11
```
25  census data versus data that we literally have right now about
```

```
 1  what's really going on here in the state of Alabama.
 2  Q    Mr. Bryan, you do not dispute in your reports that each of
 3  Mr. Cooper's illustrative plans contain two districts that are
 4  majority-black according to the non-Hispanic single-race black
 5  Citizen Voting Age Population metric, do you?
 6  A    I have no way of knowing because I did not run that
 7  analysis myself.  If his numbers are right, which they have
 8  been in some cases; in this case, been shown not to be, I don't
 9  know.  I can't give an opinion.
10  Q    And you didn't offer an opinion on that?
11  A    And I do not offer an opinion, no.
12  Q    And you certainly didn't dispute it in your report,
13  correct?
14  A    Don't dispute it.  Don't know.  No opinion.
15  Q    Okay.  Let's turn to your supplemental report.  Let's go
16  back now to page 4 of that and your discussion of traditional
17  redistricting principles.
18  A    Yeah.  Great.
19  Q    So here, you quote a passage from the Congressional
20  Research Service listing common redistricting principles; is
21  that right?
22  A    Yeah.  The congressional service here is talking more
23  about the importance of it.  And I use the NCSL more as an
24  inventory of the ones that are most important.
25  Q    But you specifically quote on page 4 a passage from the
```

1    Congressional Research Service regarding traditional
2    redistricting principles, right?
3    A    Yeah.  That's correct.  And as I was asked in direct why
4    there is -- what is important about using traditional
13:19:06 5    redistricting principles, part of my opinion in that exam was
6    elaborating on this, why it's a common set of rules, enhancing
7    fairness, minimizing gerrymandering, and so forth.  That's why
8    this is more of an explanation of why we have the traditional
9    redistricting principles that we do and why we use them.
13:19:27 10   Q    Let's highlight the quote that you include, the block
11   quote that you include in your report, starting with, Many of
12   the rules?
13   A    Yeah.  Great.
14   Q    Will you please read that out loud to the Court?
13:19:45 15   A    Many of the rules or criteria for drawing congressional
16   boundaries are meant to enhance fairness and impact of
17   gerrymandering.  These rules, standards, or criteria include
18   assuring population equality among districts within the same
19   state; protecting racial and language minorities from vote
13:20:15 20   dilution, while at the same time not promoting racial
21   segregation; promoting geographic compactness and contiguity
22   when drawing districts; minimizing the number of split
23   political subdivisions and communities of interest within
24   congressional districts; and preserving the historical
13:20:39 25   stability in the cores of previous congressional districts.

Q    Thank you.  I believe -- I believe you testified on direct
that you have never heard of minority voting rights protection
used as a traditional redistricting principle.  Did I hear that
right?

13:20:57  A    I have not seen the use of minority voting rights as a
principle drawing to a minority voting right target certainly
in subordination of any other traditional redistricting
principle.

Q    The very paragraph that you cite in your report as an
13:21:24  authority in your discussion of traditional redistricting
principles specifically includes as the second criterion
protecting racial and language minorities from vote dilution,
correct?

A    Yes, that's part of the process.  Sure.  That can be a
13:21:50  part of the process.

Q    Okay.  So the redistricting principles listed here in this
paragraph include in the following order:  Population equality,
non-dilution of racial minority voting strength, compactness,
contiguity, minimizing political subdivision splits, minimizing
13:22:15  community of interest splits, and core preservation.

     Am I reading that the same way you are?

A    Yeah.  I would not literally take those in order as most
important to least important.  Population equality is certainly
the most important.  In look at protecting racial and language
13:22:35  minorities, I think it's very easy to fall into a trap of very

  1   detailed subtle nuances in language, what that exactly means.

  2         Protecting race or protecting voting strength is an

  3   extremely broad area.  And exactly how you draw boundaries or

  4   if you draw boundaries towards those is a very murky area.

13:22:57  5   Q    But you would agree with me that I read right, I singled

  6   out the individual criteria listed in this paragraph in the

  7   order listed in this paragraph; is that right?

  8   A    I don't necessarily agree with the order.  It's an

  9   inventory.  This is so often the case.  I would agree with the

13:23:15 10   legal requirement, the population equality is the first,

 11   balancing one person, one vote for sure.

 12   Q    So you may not agree with the order as it's presented here

 13   in the paragraph that you cite in your report, but do you agree

 14   that I accurately represented the individual criteria in the

13:23:37 15   order they are listed in this paragraph?

 16   A    Yeah.  That's true.

 17   Q    If we could turn to page 11 of your second report.  This

 18   is Defendants' Exhibit 4, again, page 11.  Okay.  Here is where

 19   you begin your analysis of Mr. Cooper's illustrative plans?

13:24:02 20   A    Right.

 21   Q    Using just three redistricting principles; is that right?

 22   A    Yeah, that's correct.

 23   Q    And those three principles that you chose to analyze are

 24   in this order:  Core retention, incumbency, and compactness?

13:24:21 25   A    It's because that order or that -- there's no particular

1   meaning to that order, but those three were used subsequent to

2   the establishment that they were legal plans with equally

3   balanced population that would support one person, one vote.

4   So checking that box, I moved on to these other issues.

13:24:42 5   Q    I'm sorry.  Can you explain that one more time?  I am not

6   sure I understood.

7   A    Yes.  I -- there was no need to do an in-depth analysis of

8   the equitable distribution of population because it's factual

9   at face value.  I looked at it.  It is -- there's no need to do

13:25:02 10   a deep dive or a detailed analysis on whether they did a -- the

11   traditional redistricting principle of equally balancing

12   population was met or not.

13        It was at face value, it is evident that it was.  So

14   there's no need to create a section and write in detail about

13:25:24 15   if and how it was.  It was.

16   Q    Okay.  We can take down the exhibit.  Just to make sure --

17   A    Thank you.

18   Q    Just to make sure I understand.  As you just testified,

19   you offer no analysis of Mr. Cooper's plans with respect to

13:25:41 20   population equality, correct?

21   A    No.

22   Q    You offer no conclusion that Mr. Cooper's plans failed to

23   abide by population equality, correct?

24   A    No, the total population numbers that I reviewed in his

13:25:55 25   tables and that I confirmed suggest that he meets that

```
 1  criteria.
 2  Q    Okay.  You also provide no analysis of non-dilution of
 3  racial minorities in either the enacted plan or any of
 4  Mr. Cooper's plan, correct?
 5  A    No.
 6  Q    And you certainly offer no conclusion that Mr. Cooper's
 7  plans failed to abide by the principle of non-dilution of
 8  minority voting strength?
 9  A    No.  I have no opinion.
10  Q    You also provide no analysis of the traditional
11  redistricting principle of contiguity in any of Mr. Cooper's
12  illustrative plans, correct?
13  A    That is correct.
14  Q    And you offer no conclusion that Mr. Cooper's plans failed
15  to abide by the principle of contiguity?
16  A    Yeah.  That, again, is a fact that was self-evident and I
17  found that to be true and not an item to write a detailed
18  analysis on.  The only analysis or time when I did focus on
19  that was on Dr. Duchin's report where there was an instance of
20  non-contiguity.
21       It was immaterial, an easy mistake and trivial.  Had no
22  material impact on the outcome, but it was simply one worth
23  noting.  Because there was no such issue with contiguity in
24  Mr. Cooper's plan, I did not raise it as an issue to analyze.
25  Q    You also provide no analysis of the extent to which
```

13:26:10  (line 5)
13:26:25  (line 10)
13:26:42  (line 15)
13:27:08  (line 20)
13:27:25  (line 25)

```
 1   Mr. Cooper's plan split political subdivisions; is that right?
 2   A    Yes, that's correct.
 3   Q    You offer no conclusion that Mr. Cooper's plans failed to
 4   minimize political subdivision splits?
 5   A    I'm sorry.  You broke up for a moment.  Can you please
 6   repeat?
 7   Q    I can.  Can you hear me now?
 8   A    Yeah, I can hear you.  I got you.  No worries.
 9   Q    And you offer no conclusion that Mr. Cooper's illustrative
10   plans failed to minimize political subdivision splits?
11   A    I did not, no.
12   Q    So in that paragraph from the congressional -- what was
13   it, the Congressional Research Service --
14   A    Right.
15   Q    -- on traditional redistricting principles, that paragraph
16   did not even mention the word incumbents, correct?
17   A    That was does not.  That's why I used that in conjunction
18   with the authoritative list provided by the NCSL.  Some
19   different organizations may provide different lists.
20   Incumbency is a very widely used one for sure.
21   Q    But not used in the list that you quoted first in your
22   analysis of traditional redistricting principles?
23   A    Yeah.  That's why I thought it was important to provide
24   the context, the importance that the Congressional Research
25   Service provided, and then the inventory of NCSL, so we would
```

Timestamps: 13:27:44 (line 5), 13:27:58 (line 10), 13:28:16 (line 15), 13:28:41 (line 20), 13:28:59 (line 25)

```
 1  have a thorough, comprehensive, exhaustive view of what the
 2  authoritative agencies on this would say about the matter.
 3  Q    Okay.  So --
 4  A    It was just the completeness.  I'm sorry.
 5  Q    Okay.  Thank you.
 6         JUDGE MARCUS:  Just slow down.  Allow each of you to
 7  finish your answer and your question so the reporter can get it
 8  down.  And equally important so that Judges Manasco, Moorer and
 9  I can receive it.  So just take your time, please.
10         MS. KHANNA:  Yes, sir.  Thank you, Your Honor.
11         THE WITNESS:  Yes, sir.  Thank you.
12  BY MS. KHANNA:
13  Q    Let's turn to core retention which is the first principle
14  that you analyze in this report.
15  A    It is.  Thank you.
16  Q    Is it fair to say that your analysis prioritizes core
17  retention above other criteria?
18  A    I don't think that's accurate.  The order in which I
19  present my information or the details that I present are not
20  proportionate to their importance.  Core retention is a very
21  complex, detailed, hard analysis to run.  It just is.  And in
22  order to deeply understand it, in order to execute it, you have
23  to do a lot of detailed work.
24         The fact that there is a lot of pages and a lot of charts
25  and a lot of tables only reflects the complexity of the
```

13:29:15 5
13:29:36 10
13:29:47 15
13:30:07 20
13:30:30 25

1    analysis, not necessarily the relative importance of it.

2         The outcome of it, I would say is important, not just

3    because there are significant differences in core retention in

4    the plans, but also because there is a significant differential

13:30:51 5    impact to a minority population.

6         And as an expert, this is something that I am trained to

7    look at because there are cases where minority populations --

8    and I am not suggesting this was the case here -- but it is the

9    risk and certainly the perception that if you are moving

13:31:12 10   populations and breaking their continuity of representation, if

11   you do that disproportionately to a minority population, that

12   you should pay particular care and attention in studying where

13   and why and how that happens to ensure that you are protecting

14   their continuity of representation as much as the rest of the

13:31:34 15   population.

16   Q    So as the map drawer you would want to make sure that you

17   are protecting the voting rights of minority populations in

18   particular?

19   A    I would argue that the motivation is less to ensure that

13:31:55 20   you are protecting them more so to deeply understand and

21   measure them and understand it and know where and why and what

22   the tradeoffs are if you are making significant changes to an

23   existing districting plan.

24        It's not to judge and say that you should do it, or you

13:32:14 25   should not do it.  It's more of an identification, a

```
 1  quantifiable measure to say it is happening so that you can
 2  remediate it and understand it, deal with it and acknowledge
 3  whether it's a necessary tradeoff or not.
 4  Q    Mr. Bryan, are you familiar with the redistricting
13:32:35 5  guidelines adopted by the Alabama reapportionment committee to
 6  govern this redistricting cycle?
 7  A    Yes, ma'am, I am.  I have them available as an exhibit
 8  right next to me.
 9  Q    Okay.  Great.  Let's pull them up so we can all be looking
13:32:51 10  at the same thing?
11  A    Thank you.
12  Q    Caster plaintiffs' Exhibit 82.
13  A    I am just looking to make sure these are the same as what
14  I am looking at.
13:33:02 15  Q    Sure.
16  A    They are.  Yes, ma'am.  The documents -- this is a
17  consistent document with what I have.  Thank you.
18  Q    Okay.  So if we look under Roman Numeral II, we see the
19  criteria for redistricting.
13:33:14 20  A    Yes.
21  Q    Under which the committee lists all the criteria, correct?
22  A    That's right.  Yes, ma'am.
23  Q    I will -- I won't make you sit here and read all the
24  criteria.
13:33:24 25  A    That's all right.  I will.  It's okay.
```

```
 1  Q    I know we've all done it a few times now.
 2  A    It's okay.
 3  Q    But as you review this document, do you agree that the
 4  first five of those criteria, subsections A through E, all have
13:33:40 5  to do with population equality?
 6  A    Let me pause one moment.  Yes, I agree with that.
 7  Q    And then the next two criteria, subsections F and G,
 8  pertain to the Voting Rights Act, correct?
 9  A    That's correct, yeah.
13:34:14 10  Q    Then if we move on to paragraph H, this paragraph provides
11  that districts should be contiguous and reasonably compact?
12  A    Yes, that's correct.
13  Q    Then paragraph I addresses various requirements embedded
14  in the Alabama State Constitution --
13:34:38 15  A    That's right.
16  Q    -- largely for state legislative districts, correct?
17  A    Yes.  Yes.  That's correct.  May I add, on page 3 there
18  was a sentence that says the legislature shall try to preserve
19  the cores of the existing districts.  I would -- what I was
13:35:01 20  looking at earlier was that statement because to me that almost
21  is a -- is a part of the conversation about minimizing
22  population, deviations, balance populations.  It's just -- it's
23  a little bit out of place in this document to me, to me it
24  would also be kind of tied in some sense to those first
13:35:24 25  requirements you brought up.
```

```
 1   Q    Okay.
 2   A    Sorry for interrupting.
 3   Q    No.  I think you actually are anticipating some of my
 4   questions as well.  So let's actually first go to paragraph J.
13:35:34 5  A    Okay, let's do.
 6   Q    And we can highlight that paragraph for your ease of
 7   reference.
 8        This is --
 9   A    21 J.  Yeah.  I may be -- okay.  Yeah, I see.
13:35:52 10  Q    Okay?  And paragraph J appears before the paragraph that
11   you just mentioned about core preservation, correct?
12   A    I believe so, yes.
13   Q    Can you please read paragraph J out loud?
14   A    Yeah.  The following redistricting policies are embedded
13:36:07 15  in the political -- if you don't mind, I am going to read off
16   of mine because your face is actually covering that half of the
17   paragraph.  I apologize.
18        The following redistricting policies are embedded in the
19   political values, traditions, customs, usages of the State of
13:36:24 20  Alabama and shall be observed to the extent they do not violate
21   or thwart any foregoing policies prescribed by the Constitution
22   of the United States and the State of Alabama.
23   Q    Okay.  And the custom --
24   A    There we go.
13:36:40 25  Q    -- and the custom of avoiding contest between incumbents
```

```
 1  and core retention are included as subparagraphs to that

 2  paragraph J; is that right?

 3  A    Yes, that's correct.

 4  Q    So you would agree -- I'm sorry.  Go ahead?

 5  A    No, please, ma'am, after you.

 6  Q    You would agree, wouldn't you, that under Alabama's

 7  redistricting guidelines, compliance with the Voting Rights Act

 8  expressly trumps the criteria that you chose to focus on, core

 9  retention and incumbency.

10       MR. DAVIS:  I object, Mr. Bryan.  Just one second.  I

11  think this is asking for a legal conclusion if you're asking

12  for Mr. Bryan's statement as to whether as a matter of law one

13  has priority over another.

14       JUDGE MARCUS:  No, I don't think the question was

15  asking him to tell us what the law is and he's not equipped to

16  do that.  I think the question was simply asking him to focus

17  on the language used in the Alabama Legislature's guidelines.

18  And asked specifically whether these two interests -- core

19  retention being one and incumbency protection in the plan are

20  listed as subordinated to the Voting Rights Act at least

21  insofar as the legislature has expressed its view on these

22  priorities.

23       He's not here to tell us whether something is more or less

24  importantly as a matter of law so much as she's just asking him

25  to read from the form.  Do I have the essence of the question?
```

1          MS. KHANNA:  That's correct, Your Honor.

2          JUDGE MARCUS:  All right.  Do you understand the

3   question, Mr. Bryan?  Or do you want her to repeat it?

4          THE WITNESS:  No.  I believe I understand the

13:38:31  5   question.  I would like to say two things about this.

6      First, I look at the universe of traditional redistricting

7   principles from the state of Alabama as a refinement.  An

8   improvement, something very specific to the state of Alabama

9   that's a subset of the congressional redistricting service and

13:38:53  10   of the NCSL.  And it adds tremendous value and clarity in the

11   direction of the redistricting exercise for the state.

12      I am reluctant to offer an opinion that says because of

13   the order that these are written or how they are written that

14   one is necessarily more important than another.

13:39:15  15      In assessing the state of Alabama's plan, it is my

16   understanding and was my expectation that any care, any

17   concern, any regard for Voting Rights Act compliance was

18   accommodated and taken care of and considered in the drawing of

19   the plan.

13:39:36  20      I was not asked to and I did not expect to offer an

21   opinion on if or how much the plan did or did not comply with

22   the Voting Rights Act.  I acknowledge it's a high and important

23   criteria.  It is not one that was part of my opinion.

24      The other items that I investigated were areas that I felt

13:40:01  25   were important and areas that I have expertise in, and that I

1   was able to offer an expert opinion in.  I am not in the

2   position to say which of these is more or less important than

3   the other if I understand Ms. Khanna's question.

4   BY MS. KHANNA:

13:40:17  5   Q    Thank you for the clarification.  And to be clear, I am

6   not asking you what you believe to be most important when it

7   comes to evaluating or drawing these plans.

8        But you did evaluate this document --

9   A    Yes.

13:40:29 10   Q    -- in preparation of your report, correct?

11   A    I did, yeah.

12   Q    And you would agree that according to these guidelines as

13   provided by the Alabama reapportionment committee, compliance

14   with the Voting Rights Act expressly trumps the criteria that

13:40:47 15   you chose to focus on?

16   A    I am careful to answer around the word chose to focus on.

17   I did not deliberately choose not to focus on the degree to

18   which this plan complied with the Voting Rights Act.

19   Q    Then maybe I can refine my question.  You would agree that

13:41:12 20   under these guidelines, compliance with the Voting Rights Act

21   expressly trumps compliance with a core retention principle,

22   correct?

23   A    I am not an authority to prioritize or offer an opinion on

24   which traditional redistricting criteria are more important

13:41:41 25   than the other.  I can offer an opinion that compliance with

```
 1  the Voting Rights Act is a big and important criteria and is
 2  one of the highest criteria that we must consider, along with
 3  equalizing population.
 4      I am not in a position to exactly rank order that with
13:42:01  5  other traditional redistricting criteria.
 6  Q   And, again, Mr. Bryan, I am not asking you, again, to tell
 7  me what you believe is most important.  I understand you don't
 8  have -- you are not offering that opinion.
 9      But I'm asking you to -- about the guidelines in front of
13:42:18 10 you right now --
11  A   Right.
12  Q   -- that you reviewed in preparing your report.  Under
13  these guidelines as you read them, the Voting Rights Act --
14  compliance with the Voting Rights Act expressly trumps core
13:42:34 15 retention, correct?
16  A   The requirement for Voting Rights Act compliance, in order
17  of this document, is written before core retention.  I do not
18  take that as a literal interpretation that that means or how
19  much more it means just by its placement in this document, that
13:43:00 20 it is more important or how much more important it is.
21      The Voting Rights Act compliance was not part of my
22  analysis because I took it at face value that a plan that I was
23  presented with to analyze had already taken that into
24  consideration.  I was -- so if that were the case, then -- I'm
13:43:22 25 sorry.  Go ahead.
```

1  Q    So when you evaluated this document in preparing your

2  report in this case --

3  A    Yes.

4  Q    -- you did not understand it to be saying whether the --

13:43:36  5  whether compliance with the Voting Rights Act was more or less

6  important than compliance with a core preservation principle?

7  A    Yeah.  I think that's very fair and helpful.  Thank you.

8        Whether it was or was not, if there was a question or a

9  concern about whether the state's plan was compliant with the

13:44:01 10  Voting Rights Act or not, I was not presented with that

11  question.  I was not presented with that task.  It was not part

12  of my analysis.  But retroactively I can say in looking at the

13  state's plan with the percent black in District 7 that is

14  consistent with the last redistricting exercise, yes, there is

13:44:25 15  at least one district that is a majority-black district.

16        But other than that as a thought exercise, my analysis did

17  not go any farther than that.  I was not asked to go any

18  farther than that and explore the scenarios or dive into the

19  Voting Rights Act.

13:44:44 20  Q    Just to clarify -- the question I am asking you is about

21  your reading of the guidelines in front of you --

22  A    Yeah.

23  Q    Right now.  In preparation for your report, when you read

24  these guidelines --

13:44:58 25  A    Yes.

1  Q    -- you did not understand them to provide any kind of

2  hierarchy of criteria of the ones that they list here; is that

3  right?

4  A    I didn't, except for the very first sentence, which says

13:45:13  5  they must equalize population.  That's common in a list of

6  priorities to cite the legal requirement first.  After that,

7  the prioritization of VRA, core retention, contiguity, these

8  things I found in a variety of sort orders in different

9  documents like this in my experience.  So I am careful not to

13:45:33 10  prioritize -- literally prioritize one over the other just

11  because the order that they're presented in the document.

12       And I apologize.  I am not trying to be obtuse or

13  difficult.  I'm just reflecting on my understanding and

14  interpretation of the document.  I'm trying to answer as best

13:45:51 15  as I can.

16  Q    I completely understand.  And I just want to make sure

17  that we're both reading the guidelines the same way.

18  A    Thank you.  And it may be.  It may be the case that the

19  authors of this and the state's interpretation of this in

13:46:05 20  developing their plan was to do these in rank order and that's

21  how they arrived at the plan they did.  I don't know.

22  Q    We can take the guidelines down.

23  A    Thank you.

24  Q    Mr. Bryan, are you familiar with how plaintiffs in

13:46:22 25  Section 2 cases are required -- or generally show that they can

```
 1  satisfy the Gingles first precondition?
 2  A    Yes.  I have participated in many cases where they do that
 3  and we do that ourselves on both sides of these cases.
 4  Q    So plaintiffs in Section 2 cases have to demonstrate that
 5  a new majority-minority district could be drawn, correct?
 6  A    That's correct, yes.  With other criteria.
 7  Q    One that does not already exist in the map on -- being
 8  challenged?
 9  A    I'm sorry.  I don't understand the question.  Can you
10  please repeat it?
11  Q    Sure.  So you understand that the plaintiffs -- any
12  plaintiffs in any Section 2 case have to demonstrate that a new
13  majority-minority district could be drawn, and that new
14  majority-minority district is a district that does not exist in
15  the plan that they're challenging under Section 2, correct?
16  A    It may or may not be an adaptation of an existing plan or
17  it may be an entirely new plan as is frequently the case in
18  cases changing at-large voting districts to district-based
19  voting districts.
20      So the answer is it would be depend on what kind of case
21  it was.  But, yes, they would have to show a plan had a
22  majority-minority and be -- satisfy the other major criteria.
23  I agree with that, yes.
24  Q    They have to draw a new plan, correct?
25  A    Yes, ma'am.  Yes.
```

1   Q    One that's different than the existing plan that they're

2   challenging?

3   A    Frequently, if it is an adaptation of an existing

4   district-based plan, that would be the case, again, if it's an

13:48:13 5   at-large plan, then it would frequently be drawn from scratch.

6   And that oftentimes happens.

7   Q    So in a case such as this one, where the plaintiffs are

8   challenging an existing district-based plan?

9   A    Yes.

13:48:26 10   Q    You would -- you would agree that by design, the first

11   *Gingles* precondition requires plaintiffs to present plans that

12   look different from the enacted plan in this regard?

13   A    If they were seeking to design a plan to a new standard

14   that required two districts instead of one district, then, yes,

13:48:54 15   they would have -- if that were the objective, setting aside

16   whether that is a legal objective or not, then, yes, the

17   existing plan would need to be adapted and this is my opinion

18   and understanding that so long as that adaptation does not make

19   race prevail in the design of the districts, then that is a

13:49:20 20   reasonable thing to do.

21   Q    Do you know how many majority-minority districts were

22   included in the 2011 Alabama congressional plan?

23   A    The -- there was -- you're asking about congressional?

24   Q    Yes.

13:49:39 25   A    Yeah.  There was -- I believe there was one and there is

1    one again today, the 7th, I believe.

2    Q    Right.  So you -- in fact, you characterized the enacted

3    plan, the 2021 plan, as a least changed plan, correct?

4    A    Yes, I did.  And that's frequently -- a common use

13:50:04  5    language in the design of plans like this, where you see

6    minimum boundary changes necessary to comply with the law.

7    That's a -- one of several strategies to design a map.

8    Q    It looks pretty similar, the 2021 plan to the 2011 plan.

9    A    Yes.  In some regards, I would characterize it as an

13:50:22 10    improvement.  They reduced the -- the degree to which the black

11    population was concentrated in District 7, and, in appearances,

12    they improved compactness and were able to successfully

13    rebalance the population.

14          So there's many traditional redistricting criteria that

13:50:42 15    they appear to have succeeded in fulfilling in the design of

16    that plan.

17    Q    Both the 2021 plan and the 2011 plan included one

18    majority-black district, correct?

19    A    That's my understanding, yes.

13:50:58 20    Q    And you're aware that the Caster plaintiffs in this case

21    are seeking the creation of or an additional majority-black

22    district, correct?

23    A    Yes, that is my understanding throughout all these -- all

24    the plaintiffs, not just the Caster, were all seeking two

13:51:15 25    plans -- two districts.

1   Q    And that additional black district does not exist in the

2   2021 plan, of course?

3   A    Sure, yeah.

4   Q    And it did not exist in the 2011 plan, correct?

13:51:29  5   A    That's correct, yes.

6   Q    You would agree that if a plan adds a majority-minority

7   district that wasn't there before, the core retention of that

8   plan will be less than a plan that retains the same number of

9   majority-minority districts as the previous plan?

13:51:49 10   A    Yes.  That can often times be the case.  And as an expert,

11   when you are analyzing situations like that, we would look for

12   the degree to which core retention is changed as part of that

13   process.

14        If you are able to adapt an existing plan, and, again,

13:52:11 15   this is -- it's subjective, but if you are able to adapt an

16   existing plan and still not create a significant detriment to,

17   for example, compactness or significantly change core retention

18   or significantly change the geographic boundaries in, you know,

19   materially in a different direction to cover areas that just

13:52:34 20   have never been in one district before, those would be areas

21   where I would look at closely because the effort to create the

22   second district significantly impacted the rest of the

23   traditional redistricting principles.

24        And that's within we start looking at whether these other

13:52:54 25   criteria were subordinated or perhaps even ignored for the

 1   singular pursuit of the drawing of those two black districts.

 2   Q    And the traditional districting principle in this part of

 3   the analysis that you focus on is core preservation, correct?

 4   A    Yes.  There were, again, I think three main ones.  It was

13:53:17  5   incumbency, core retention and the compactness analysis.  Those

 6   were the kind of three that we looked carefully at it as a

 7   result of this effort to draw two districts.

 8   Q    Okay.  Let's go back to your report, Defendants'

 9   Exhibit 4, page 15.

13:53:41 10   A    Yes.  Great.  4, 5, 6, yeah.  This is preceded by several

11   other pages of for context core retention of other Cooper plans

12   and Duchin plans.

13   Q    Right.  And I am actually going to focus on the paragraph

14   at the bottom of these tables?

13:54:00 15   A    Great.  Okay.

16   Q    And here you write, This superior record for the state's

17   plan reflects the advantage of a least change approach --

18   A    Yes.

19   Q    -- simply adjusting existing boundaries where necessary,

13:54:17 20   instead of completely redrawing all districts, as plaintiffs

21   did.

22        Did I?

23   A    Yes.

24   Q    Read that correctly?

13:54:23 25   A    That is correct, yes.

```
1   Q    You would agree, Mr. Bryan, wouldn't you, that if the plan

2   under review violates the Voting Rights Act, any advantages of

3   a least change approach, as you call it, would be superseded by

4   the need to comply with federal law?

13:54:45 5   A    I can't offer an opinion on that.

6   Q    You do not offer an opinion on the relative advantages of

7   a least change approach compared to one that includes an

8   additional black -- majority-black district?

9   A    Yeah.  The -- the judgment of that is outside of my scope,

13:55:13 10   and I have no opinion on which one of those is more or less

11   important in the design of a plan.

12   Q    You also --

13        JUDGE MARCUS:  I'm sorry.  You can finish your answer,

14   please.

13:55:26 15        THE WITNESS:  No.  Thank you.  I'm done, sir.

16        JUDGE MARCUS:  All right.  Thank you.

17   BY MS. KHANNA:

18   Q    You also write here that the differences in core retention

19   shows that the significant incremental loss of continuity of

13:55:40 20   representation is borne disproportionally by Alabama's black

21   population; is that right?

22   A    Yes.  That is correct.

23   Q    We can take down the report and so we can see each other

24   better.

13:55:56 25   A    And it is -- factually, it is true.
```

1    Q    Okay.  We can take down the exhibits.  Thanks.

2    A    Okay.  No problem.

3    Q    As I understand that conclusion of yours, your position is

4    that black voters are primarily the ones who suffer from a loss

13:56:14 5    of continuity of representation in the illustrative plans; is

6    that right?

7    A    Suffer is a strong word.  They are disproportionately

8    impacted, sometimes significantly disproportionately impacted.

9    Q    You -- you conclude that they are disadvantaged on this

13:56:40 10   metric of continuity of representation in the illustrative

11   plans, correct?

12   A    Yeah.  It's the concept of continuity of representation,

13   whether it is through paired incumbents or through losses shown

14   by core retention analysis, would say that losing your

13:57:00 15   representation is a disadvantage.  It's just -- I represent

16   that not as a professional political scientist, but as a basic

17   core tenent of redistricting in my layman's knowledge of the

18   idea.

19   Q    So black voters disproportionately bear that loss of

13:57:17 20   continuity of representation.  That's your interpretation,

21   correct?

22   A    That's accurate, yeah.  That would be my assessment.

23   Q    Did you consult any -- did you consult any black voters in

24   forming that conclusion?

13:57:32 25   A    I did not speak to any black Alabama voters and I would

1  believe the impact to black voters of the understanding of the

2  impact to the black voters outside of the simple linear

3  interpretation of less representation is worse than more --

4  continuous representation.

13:58:00  5      I would leave the details of those analyses and the

6  interpretation to our political scientist, Trey Hood.  I think

7  he could speak very nicely to that.

8  Q    So your report shows that Mr. Cooper's illustrative

9  plans 1 through 6 retain less of the core of District 2 than

13:58:23  10  the enacted plan; is that right?

11  A    I believe in virtually all of the districts, the retention

12  is lower by district, as well as an aggregate.

13  Q    So Mr. Cooper's District 2 in his illustrative plans is

14  less similar to the 2011 version of District 2 under the

13:58:45  15  Alabama congressional map, correct?

16  A    You mean insofar as compared to the enacted Alabama map?

17  Yes.

18  Q    Yes.

19  A    Yes.  Yeah.  Okay.  Thank you for the clarity.

13:58:58  20      Yeah.  The statistics would show that the percent

21  retention -- I'm going off the top of my head -- would have

22  been in the 90 percent for both black and total population in

23  the Alabama plan and, again, I don't have Mr. Cooper's chart in

24  front of me, but they were much lower -- 30s, 40, 50 percent.

13:59:19  25  I can't speak to the exact number.  Yes.  Lower.

```
 1  Q     You would agree that under the 2011 plan, black voters
 2  were not a majority of the Voting Age Population in District 2?
 3  A     Sorry.  Could you say the question again, please?
 4  Q     Sure.  Under the 2011 congressional plan, District 2 was
 5  not a majority-black district, correct?
 6  A     I do not know whether it was at the time of enactment.  I
 7  know that as of the 2020 census, the enacted plan, District 2
 8  was not a majority district.  That's correct.
 9  Q     Do you know whether black voters had an opportunity to
10  elect their preferred candidates in District 2 under the
11  previous plan?
12  A     I do not know.
13  Q     Do you believe that the current representative of
14  District 2 is the candidate of choice among black voters?
15  A     I do not know the answer to that.  That would be in the
16  scope of our political scientists and outside my expertise.
17  Q     So is it your position that black voters in District 2 are
18  better off remaining in a district in which they have
19  continuity of representation than in a district where they
20  would form a majority of the Voting Age Population?
21  A     Good question.  I would step back and make my assessment
22  more broadly across all districts, which is to say, in general,
23  unless there is an in-depth detailed analysis of a specific
24  district that shows whether or not a specific minority group is
25  satisfied with their representative and want the continuity of
```

13:59:43 (line 5)
14:00:03 (line 10)
14:00:18 (line 15)
14:00:43 (line 20)
14:01:03 (line 25)

1    representation, in general, unless you do that and you look at

2    this measure of continuity of representation and core retention

3    holistically, the starting position is there is a disadvantage

4    to populations who lose their continuity of representation

14:01:26  5    until and unless it is shown that there is some reason that

6    there needs to be a change in that continuity and the change

7    benefits them more than the continuity that they lose.

8         Did I say that in a clear way?  Does that make sense?

9    Q    I believe so.  I --

14:01:44 10   A    Okay.  Thank you.

11   Q    I just want to make sure -- I am going to go back to the

12   transcript to make sure my question was clear.

13   A    Yeah.  I want to make sure I got it right for you.

14   Q    I am going to restate the question as I'm reading it in

14:02:01 15   the transcript just to make sure we're speaking about the same

16   thing.

17   A    Sure.

18   Q    Is it your position that black voters in District 2 are

19   better off remaining in a district in which they have

14:02:12 20   continuity of representation than in a district where they

21   would form a majority of the Voting Age Population?

22   A    So I cannot answer that question specific to District 2.

23   I can say holistically for all districts, if there is a

24   population that loses their core retention, and particularly if

14:02:39 25   there is a minority population that disproportionately bears

954

 1    the brunt of a loss of their core retention, then there would

 2    be need to be additional in-depth analysis of a specific

 3    district, such as the one you're leading to, District 2, to

 4    deeply understand whether the tradeoff, because of an

14:02:57  5    understanding of whether the representation is representation

 6    they want or not, is real.  And it's something they want.

 7         It's hard to tell without knowing holistically, but the

 8    starting point is until that analysis is done, the assumption

 9    is if you have great loss of representation, you need to be

14:03:17 10    able to go on and show that there is some benefit for the

11    significant loss of representation that we're measuring.

12         I did not do that analysis.  I simply measured how much

13    core retention there is and set the stage for how much of a

14    difference there is for the new plans, the plaintiff plans,

14:03:36 15    compared to the enacted Alabama plan.  And I can quantify that

16    difference.

17    Q    Okay.  Great.  I think you just answered my next question,

18    which is you did not provide any analysis of the tradeoffs

19    between the advantages on one metric and the disadvantages on

14:03:51 20    another?

21    A    No.  I really -- that's outside of my scope and my

22    expertise.

23    Q    Okay.  Great.  Let's go to your incumbency analysis, which

24    is the next --

14:04:00 25    A    Thank you.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1   Q    The next criterion on which you analyze the illustrative

2   plans.  And I think we can turn to page 16 of your report.

3   A    Yes, ma'am.

4   Q    In this top paragraph here at the end of that paragraph,

14:04:20  5   you say that the Duchin and Cooper plans do not -- you're

6   referring to the previous sentence -- you said that they pack

7   incumbents.  Do you see that?  What do you mean by --

8   A    Do not -- that might be -- it says do not unpack -- it

9   should read Duchin and Cooper plans do not unpack incumbents as

14:04:44 10   follows.  It may not say do not and unpack.

11       The crux of the statement is that the Duchin and Cooper

12   plans pack incumbents.

13   Q    Okay.  Great.  Can you explain to me what you mean by

14   packing incumbents?

14:05:02 15   A    Yes.  I use that not as a precise scientific term.  You

16   could also say as pairing incumbents, grouping incumbents.

17   It's the practice of putting more than one incumbent in a

18   different -- in a district and leaving other districts

19   unrepresented.

14:05:26 20   Q    So I think on your direct testimony, you mentioned -- I

21   think you even used the term cracking and packing incumbents.

22   Does that sound right?

23   A    It was convenient language.  It may not have been

24   appropriate to use that redistricting context, but the idea is

14:05:39 25   that in the practice of redistricting, if you put multiple

```
     1   incumbents in one district, you're pairing them, and then in

     2   other districts that you leave abandoned, you can be leaving

     3   them -- you're leaving them essentially without any

     4   representation or certainly no continuity of representation.

14:06:01  5  So I apologize for the confusion in the language.

     6   Q    No.  I appreciate that because as you know in

     7   Section 2 cases, the words packing and cracking do have certain

     8   connotations.

     9   A    Yeah.  Thank you for the critique.

14:06:17 10  Q    So when you talk about packing incumbents, what you mean

    11   is pairing incumbents?

    12   A    Yes, ma'am.

    13   Q    Okay.  And it's your opinion that the Alabama enacted plan

    14   respects incumbents, correct?

14:06:31 15  A    Yes.  We performed an independent analysis.  We put the

    16   incumbents to the best of our ability where we understand their

    17   residences are.  We overlaid the existing Alabama plan.  And

    18   our analysis suggests that none of the incumbents -- there is

    19   not more or less than one incumbent in any given district.

14:06:55 20       We did not find that in our analysis of other plaintiff

    21   plans.

    22   Q    You can take down the exhibit.

    23   A    Great.  Thank you.

    24   Q    Maybe you have already answered this question.  But can

14:07:10 25  you explain why do you believe that protecting incumbents is an
```

1    important redistricting principle?

2    A    Yeah.  That's a great question and an important one.

3        You know, in representation, representation of a

4    population, historically there's a lot of evidence to suggest

14:07:32  5    that a representative, political representative, whether it's

6    local, county, state, or even a U.S. representative, that those

7    representatives over time and only with time have the

8    opportunity to deeply learn, know and understand the geography

9    that they represent, their constituency, the economy, the

14:08:07 10   demographics, the characteristics of the area that they

11   represent.

12       And so if you have a situation where you have a

13   representative and you turned that representative over

14   four years, every time, no matter what, and you don't give an

14:08:29 15   incumbent the time to build that long tenure and relationship

16   with their constituency and the deep knowledge of the geography

17   they represent, you kind of put yourself in an environment

18   where whoever the new freshman representative is, is spending

19   all the time in the first term learning their constituency and

14:08:51 20   learning all these valuable things, that they don't ever have

21   time to go actually leverage that deep penetrating insight and

22   knowledge of their constituency to benefit them.

23       Terms can frequently run out before they have even gotten

24   started.  And it's a generalization, but it's I believe it's a

14:09:09 25   fair one.

1  Q    So if I understood your testimony correctly, you believe

2  that the longer an incumbent has served in their district, the

3  better able they are to know about the needs of their

4  constituents?

14:09:26  5  A    Generally, it is true.  And the decision as to whether or

6  not an incumbent should remain and represent the values,

7  beliefs, and the needs of their people with policy should be in

8  the hands of the people.

9      The decision as to whether an incumbent should or should

14:09:45 10  not continue representation of their constituency should not be

11  decided as part of a redistricting practice that can pit

12  multiple incumbents that may both be doing a very good job

13  against each other and one of them losing all of that

14  experience and representation just because of the design of a

14:10:07 15  plan.

16  Q    And just so I'm clear, the your position in your testimony

17  about the benefits of protecting incumbents, is that -- that's

18  not based on your demographic expertise, is it?

19  A    No, that is not.

14:10:23 20  Q    That's just your personal opinion?

21  A    Again, I would base that on my knowledge and experience in

22  working with the political scientists that I work with on my

23  case and my general knowledge of the Democratic system.

24  Q    All right.  So it's based on your knowledge working with

14:10:40 25  political scientists, but it's not based on any political

1    science expertise that you bring to bear on the issue?

2    A    I certainly agree with that.  It's my responsibility as a

3    demographer and an expert in these cases to at least have some

4    amount of knowledge about each one of these traditional

14:10:57 5    redistricting criteria and I think I have enough of that to be

6    able to represent my knowledge and why it's important.

7    Q    And if I understand --

8    A    Expertise.  Sorry.  Go ahead.

9    Q    And if I understand your testimony correctly, you -- your

14:11:13 10    position is that more senior members of Congress are better

11    able to serve their districts than more junior members; is that

12    fair?

13    A    That would be a general statement.  I would not pick on

14    any particular freshman or tenured Congressman in that at all.

14:11:34 15    I'll tread carefully.

16    Q    I am not trying to trap you in that, don't worry.

17    A    No problem.  Thank you.  But in general, yes, if people

18    have been around longer and they know their constituency and

19    know the halls of Congress, then they are probably going to do

14:11:48 20    a good job for their people.

21    Q    Sounds good.  Let's actually turn to your incumbency

22    analysis of Mr. Cooper's plans.

23    A    Thank you.

24    Q    On page 16 of your supplemental report, Defendants'

14:12:02 25    Exhibit 4.

```
 1  A    Yeah.  There's both Duchin and Cooper on this one.

 2  Q    I am going to leave it to the Milligan plaintiffs' counsel

 3  to discuss Dr. Duchin's plans, but I will focus on just that

 4  last bullet point.

 5  A    Okay, great.

 6  Q    That's the one that addresses Mr. Cooper's plans, correct?

 7  A    Yeah.  Yeah.

 8  Q    And there you conclude that Mr. Cooper's plans 1, 2, 3, 4

 9  and 6 pair incumbents; is that right?

10  A    Yeah, I believe that's the case.  Again, we did our best

11  job to join where we believe the representatives to be with our

12  best, most accurate knowledge of the boundaries of his plans.

13  Q    So you don't make any mention of Mr. Cooper's Illustrative

14  Plan 5 in this analysis, correct?

15  A    Yeah.  I don't believe that plan 5 -- I will be careful

16  here.  Mr. Cooper did not present a boundary file for plan 5.

17  My team had to build it.

18       I don't remember honestly whether when we did our

19  incumbency analysis whether plan 5 is omitted because we did

20  not have a plan 5 for Mr. Cooper or because plan 5 manages to

21  not pair any incumbents.  It is one of those two.  I honestly

22  do not remember which -- in the rapid sequence of events, which

23  one of those two it was that --

24  Q    So --

25  A    -- did not pair.
```

The timestamps in the left margin read: 14:12:19 (line 5), 14:12:36 (line 10), 14:12:56 (line 15), 14:13:21 (line 20), 14:13:38 (line 25).

1  Q    -- your -- so your understanding is that Mr. Cooper did

2  not provide a shapefile for Illustrative Plan 5?

3  A    Yeah, we did not.  I'm sorry for interrupting.

4  Q    But he did provide that -- those shapefiles for the other

14:13:57  5  illustrative plans; is that correct?

6  A    Yes, ma'am.  And to be precise, when we realized we did

7  not have a plan 5 shapefile, my team, who are experts in this,

8  were able to build a plan 5 from what is known as his block

9  correspondence file.  So we did have it.  I just don't know if

14:14:16  10  that's why it's not mentioned in this piece or not.

11  Q    Did you ever request the block shape -- the shapefile or

12  the block equivalency file for Mr. Cooper's Illustrative Plan 5

13  and note that it was missing?

14  A    Yeah.  No.  We actually did not.  There was no time for

14:14:34  15  that.  We were able to build it very quickly and put it into --

16  put it into practice before we would have gotten the file from

17  Mr. Cooper.

18  Q    Do you feel like you had an opportunity to evaluate

19  Mr. Cooper's Illustrative Plan 5 in writing your report in this

14:14:53  20  case?

21  A    Yes, ma'am.  We did.  And I believe that our creation of

22  the plan 5 was accurate because the statistics that we were

23  able to generate that were -- we were able to get those to foot

24  back to some of Mr. Cooper's statistics for plan 5, so I

14:15:12  25  believe we did an accurate job with that.  I just don't know

1  whether we had the incumbencies before or after we drew that.

2  Q    Isn't it true, Mr. Bryan, that Mr. Cooper's Illustrative

3  Plan 5 does not pair any incumbents?

4  A    I don't know the answer to that.  It is possibly true.

14:15:35  5  Q    If we assume for the moment that Mr. Cooper's Illustrative

6  Plan 5 does not pair any incumbents, you would agree that by

7  your definition, it respects incumbents, correct?

8  A    If that is the case, then, yes, I would agree with that

9  statement.

14:15:54 10  Q    Okay.  In your bullet point here, you note that

11  Mr. Cooper's illustrative plans 1, 2, 3, 4, and 6 pair just one

12  set of incumbents; is that right?

13  A    That is correct.  Moore -- they were the same for each

14  plan, Moore and Carl.

14:16:20 15  Q    The incumbents from Districts 1 and 2?

16  A    Yes.  Correct.

17  Q    Okay.  We can take down the exhibit.

18       And I believe you just mentioned this, but do you know who

19  the current representative of District 2 is?

14:16:36 20  A    I think they may have been just in the last exhibit.  I

21  don't know off the top of my head.  I'm sorry.

22  Q    I will represent to you that the current representative of

23  District 2 is Barry Moore.

24  A    Moore.  Okay.  Yeah.  That sounds correct.

14:16:52 25  Q    And Mr. Moore was just newly elected in 2020, correct?

```
 1  A    I don't know the answer to that.
 2           MR. DAVIS:  Pardon me, Ms. Khanna, excuse me, Judges.
 3  If it would be possible sometime in the near future when it's
 4  convenient, Ms. Khanna, to have a brief recess.
 5           JUDGE MARCUS:  Sure.
 6           MR. DAVIS:  It's a little early.
 7           JUDGE MARCUS:  I understand.  We are usually going to
 8  go about 90 minutes per break.  Ms. Khanna, do you want to just
 9  take the next 10 minutes and we will break, or what's your
10  pleasure?
11           MS. KHANNA:  If I could just finish up on this
12  incumbency, please, I will be happy to take a break then.
13           JUDGE MARCUS:  You sure can.
14           MR. DAVIS:  Thank you.
15  BY MS. KHANNA:
16  Q    So you don't know when Mr. Moore was elected to
17  congressional District 2, right?
18  A    No.  No.  And when people were elected had no bearing in
19  my incumbency analysis.  It was they are representative.  They
20  are in or they are out.  It's as black and white as that.
21  Q    But you did -- you did testify that one of the reasons you
22  believe that incumbency protection is important is because the
23  longer that an incumbent has served a district, the better able
24  they are to serve that district; is that right?
25  A    Yeah.  Yes, that's absolutely true, for sure.
```

Timestamps: 14:17:14 (line 5), 14:17:26 (line 10), 14:17:35 (line 15), 14:17:50 (line 20), 14:18:08 (line 25)

```
 1   Q    So it would be relevant to your opinion on that score that
 2   whether or not the incumbent in District 2, which is paired in
 3   Mr. Cooper's Illustrative Plans 1, 2, 3, 4, and 6, has served
 4   for a long time or was newly elected in 2020, correct?
 5   A    Yeah.  I would say it makes -- it would make some
 6   difference, and not one that I can quantify, whether they have
 7   been a long-serving representative or not, but I would say that
 8   certainly if you look at the events of the past two years in
 9   our great nation, that anyone who has been through that
10   experience has learned a lot about their districts, their state
11   and the role that they have on Capitol Hill.
12   Q    So I take it you do not or do you know who represented
13   District 2 before Congressman Moore?
14   A    No.
15   Q    I will represent to you that Representative Martha Roby
16   represented District 2 for over -- for a decade prior to that.
17   A    Great.  Okay.
18   Q    Do you know who the current representative of District 1
19   is?
20   A    No.  The names of the representatives by district were not
21   a relevant part of my analysis.  It was binary.  Are they
22   paired or are they not paired.
23   Q    I'm sorry.  I don't mean to quiz you on it.
24   A    No.  It's okay.  Go ahead.
25   Q    I know I took down the exhibit, but in the last bullet
```

Timestamps: 14:18:27 (line 5), 14:18:47 (line 10), 14:19:06 (line 15), 14:19:23 (line 20), 14:19:40 (line 25)

965

1    point of your incumbency analysis, you note that

2    Representatives Moore and Representatives Carl in Districts 1

3    and 2 are the ones that are paired in Mr. Cooper's plans.

4    A    I believe so.  That's -- I would have just taken those

14:19:58 5    names from the file when I performed the analysis.

6    Q    So the representative of District 1 that you mentioned in

7    your analysis is Representative Jerry Carl; is that right?

8    A    I believe so.

9    Q    And Mr. Carl was also newly elected in 2020, correct?

14:20:15 10    A    I don't know.

11    Q    But you are familiar with who represented District 1

12    before Mr. Carl; is that right?

13    A    I -- I will -- if we want to just go quickly through this,

14    I do not know the election history by district for the state of

14:20:35 15    Alabama.  So we could go one by one, or I can just tell you I

16    don't know who was the preceding U.S. representatives in any of

17    the districts or how long they served for.  It was a binary,

18    black or white exercise.

19    Q    I believe in your report you do refer to the testimony of

14:20:53 20    Representative Bradley Byrne; is that right?

21    A    Yeah.  There was, you know, relevant to the conversation

22    about communities of interest and part of my education on

23    communities of interest, especially in Alabama, and I'm

24    sorry -- in Mobile and Baldwin counties, yeah, there was some

14:21:15 25    pre -- there were two previous representatives there that I

```
 1  relied on, some of their testimony in a previous case to help
 2  me learn better about what the Mobile-Baldwin County
 3  environment was.  That is true.  But, again, how long those two
 4  representatives served for, what the circumstances of their
 5  departure are, I don't -- I don't know the answer to that.
 6  Q    Okay.  I will represent to you that Bradley Byrne was the
 7  representative of CD 1 prior to Mr. Carl.
 8  A    Sounds good.
 9  Q    So, Mr. Bryan, is it your position that it is important
10  for continuity of representation to ensure that both of the
11  incumbents of Districts 1 and 2 remain in their districts?
12  A    I'm sorry.  I may have lost your audio for just a moment
13  at the end of your statement.  Can you please restate so I make
14  sure I get all of it?
15  Q    I sure can.  And I just wanted to make sure.  Can
16  everybody hear me now?
17          JUDGE MARCUS:  We hear you fine.  Just put the
18  question again, please.
19  BY MS. KHANNA:
20  Q    Mr. Bryan, is it your position that it is important for
21  continuity of representation to ensure that both of the
22  incumbents of Districts 1 and 2 remain in their districts, even
23  though they have served less than one year in office?
24  A    My opinion is that any representative who has had any
25  amount of time in office is more seasoned and has more tenure
```

The timestamps on left: 14:21:33 (line 5), 14:21:52 (10), 14:22:11 (15), 14:22:19 (20), 14:22:43 (25).

1  and experience with their constituency than one who has had

2  none.  And I don't differentiate Districts 1 and 2 versus any

3  others.  I say incumbency and continuity of representation is a

4  theme that is important, and any amount of experience is

14:23:05  5  valuable and important.  And certainly pitting even two

6  freshmen representatives against each other will assure that

7  some -- even limited number of years of experience in the House

8  are going to be lost that are going to then be replaced.

9  Q    Okay.

14:23:25  10       MS. KHANNA:  I believe that closed up my questions on

11  the incumbency please, Your Honor.  If this is a good place to

12  break, I'm happy to break now.

13       JUDGE MARCUS:  We will take our 15-minute break at

14  this point.  We will come back and pick up the thread of your

14:23:39  15  cross-examination.  Thank you.

16       (Recess.)

17       JUDGE MARCUS:  Are the parties ready to proceed?

18    Ms. Khanna, you may proceed.

19       MS. KHANNA:  Thank you, Your Honor and actually,

14:38:25  20  before I ask my next line of questions, I just wanted to make

21  sure that I offered into evidence the *Evenwel* brief that we had

22  it marked for identification earlier.  I would offer it as

23  plaintiffs' exhibit -- Caster Plaintiffs' Exhibit 106 into

24  evidence.

14:38:42  25       JUDGE MARCUS:  Any objection?

1          MR. DAVIS:  Judge, obviously no objection to it being

2   marked to an impeachment exhibit to memorialize the

3   conversation, but it's been so long since I have seen it, I

4   don't know what else may be in it that we didn't talk about it

14:38:54 5   before.

6          JUDGE MARCUS:  Why don't you do this:  At your

7   leisure, take a look at it, and then come back Monday and let

8   us know.  We have the opportunity to redact it and just receive

9   those portions that the bore directly on the questions and

14:39:09 10   answers, if you would like, as well.  But we will reserve on

11   that, Mr. Davis and Ms. Khanna, just to give the Secretary of

12   State's counsel a chance to review it because it was a long

13   brief filed with the Supreme Court.  I know it was used

14   fundamentally for the purposes of impeachment.

14:39:30 15       We will leave that issue open and you come back and let us

16   know on Monday your pleasure, Mr. Davis.

17          MR. DAVIS:  Thank you, Judge.

18          JUDGE MARCUS:  Ms. Khanna, you may proceed.

19          MS. KHANNA:  Thank you, Your Honor.

14:39:41 20   BY MS. KHANNA:

21   Q    Mr. Bryan, let's turn to your compactness analysis.

22   A    Thank you.

23   Q    That's the third criteria on which you evaluate

24   Mr. Cooper's plans.

14:39:52 25       Mr. Bryan, when we went over the redistricting

```
 1  guidelines -- I won't pull them up again -- but those provide
 2  that districts should be composed of reasonably compact
 3  geography; is that right?
 4  A    Yes.
 5  Q    Your report does not set out any threshold or standard by
 6  which to judge whether a map is considered reasonably compact;
 7  is that right?
 8  A    There are no such standards.  Dr. Duchin elaborated on
 9  this yesterday.  It can depend on numerous factors and there's
10  no commonly accepted numbers.  It's relative from one plan to
11  another.
12  Q    Great.  So no objective standard about when a district or
13  a map is objectively compact versus non-compact?
14  A    It's typically regarded as a relative comparing those
15  statistics from one plan to another plan, not universally in
16  the business.
17  Q    And you're not aware of any requirement that illustrative
18  plans in a Section 2 case be as compact or more compact than
19  the enacted plan, are you?
20  A    I am not aware.
21  Q    So your compactness analysis with respect to Mr. Cooper's
22  illustrative plans is contained on pages 17 through 19 on your
23  supplemental report and Appendix 5 to that report; is that
24  right?
25  A    Okay.
```

```
 1   Q    In the interest of time, I won't pull that up to show you.
 2   You can peruse that if you have the report in front of you.
 3             JUDGE MARCUS:  If you need it on the board, you just
 4   let us know, Mr. Bryan.
14:41:37 5        MR. DAVIS:  I will stipulate Ms. Khanna gave the
 6   correct page number.
 7             JUDGE MARCUS:  Okay.  Great.
 8             THE WITNESS:  Great.  Sounds good.
 9             JUDGE MARCUS:  My concern, Mr. Davis, was not that she
14:41:48 10  gave the right one, but that he might not recall everything in
11   it without seeing it.
12             THE WITNESS:  Your Honor, I have the compactness
13   scores right here next to me if you would like me to refer to
14   them.
14:41:58 15       JUDGE MARCUS:  I leave it up to you and counsel.  You
16   may proceed, Ms. Khanna.
17             THE WITNESS:  Thank you, sir.
18             MS. KHANNA:  Thank you, Your Honor.
19   BY MS. KHANNA:
14:42:04 20  Q    Mr. Bryan, I will be sure to direct you to any specific
21   portion of that analysis as we go through it.
22        Your analysis contained in your report, your compactness
23   analysis consists entirely of the numerical metrics of
24   compactness on a number of different measures; is that right?
14:42:21 25  A    That is correct.
```

```
 1  Q    Your compactness analysis does not contain any analysis of
 2  the contours of specific districts in Mr. Cooper's illustrative
 3  plans; is that right?
 4  A    I'm sorry.  I do not understand the question.
 5  Q    When you are evaluating the compactness of Mr. Cooper's
 6  illustrative plans --
 7  A    Uh-huh.
 8  Q    -- you evaluate them solely based on their metrics, the
 9  Reock score, the Polsby-Popper score, the Schwartzberg score,
10  and the convex hull score?
11  A    Yes, that's correct.
12  Q    You do not analyze any of the specific contours of the
13  districts actually drawn other than their compactness scores?
14  A    Yes.  As a practice in compactness, except for
15  diagnostics, you would not go analyze any specific contour or
16  detail or part of a district.  There's one number that
17  represents the plan.
18  Q    You provide no analysis to the extent to which county or
19  city or VTD boundaries informs the compactness of a given
20  district in Mr. Cooper's illustrative plans?
21  A    I do not.  But the decision to comply with county
22  boundaries or other boundaries that they create better
23  compactness or poorer compactness, as was the case with some
24  districts in Alabama, is solely at the discretion of the drawer
25  of the plan.
```

14:42:38 (line 5)
14:42:57 (line 10)
14:43:17 (line 15)
14:43:39 (line 20)
14:44:03 (line 25)

```
 1    Q    And you don't provide any analysis of the extent to which
 2    highways and rivers inform the compactness of any given
 3    district in Mr. Cooper's illustrative plans?
 4    A    Not in Mr. Cooper's plan.  I do offer some analysis of
 5    that in other plans where it was relevant, for example, in the
 6    Alabama plan where there was some districts with lower
 7    compactness scores.  Those were a result of some geographic
 8    features.  I found no strong prevailing geographic features
 9    that in particular hindered Mr. Cooper's compactness scores.
10    Q    Well, you don't provide any analysis at all of the
11    geographic or political boundaries of his districts as it
12    relates to their compactness?
13    A    I did not identify any features -- specific features of
14    the plan that were specifically very detrimental, and I defer
15    to Mr. Cooper's expertise and judgment in drawing plans that
16    are either compact or not compact.
17    Q    Toward the end of your direct examination with Mr. Davis,
18    I believe he asked you some questions about whether plaintiffs
19    illustrative plans draw lines that appear to you to be based on
20    race or other traditional districting principles.  Am I
21    recalling that correctly?
22    A    That is correct.
23    Q    But at no point in your report do you provide any analysis
24    of the way in which specific districts in Mr. Cooper's
25    illustrative plans are configured outside of their objective
```

14:44:17 (line 5)
14:44:39 (line 10)
14:44:58 (line 15)
14:45:18 (line 20)
14:45:35 (line 25)

1   compactness scores.

2   A    Except insofar as to acknowledge how they were precisely

3   drawn to exclude white population and include black population

4   to achieve the majority district status that he was seeking.

14:45:54 5   Q    Can you point me to where in your supplemental report you

6   speak about that topic in Mr. Cooper's illustrative plans?

7   A    It may be in the map -- just give me a moment, let me see

8   if I can track it.

9   Q    Sure.

14:46:58 10   A    It appears I may not have written text about that finding.

11   I would refer to the map of the Cooper's plans to support my

12   observation.

13       I cannot quickly find text if I wrote any about the

14   observations because, as I stated earlier on my direct with

14:47:19 15   Mr. Davis, the performance in the outline of these plans were

16   very consistent with the Hatcher plan, which I did document the

17   degree to which it followed these boundaries exactly.  And in

18   looking at the Cooper plans, as I am now, one after the next,

19   the degree to which they follow black populations and exclude

14:47:41 20   white populations around Birmingham and Mobile are consistent

21   with every one of the other plaintiff plans that I reviewed.

22   So I'll stick with that.

23   Q    And that analysis that you just provided, including the

24   analysis in response to Mr. Davis's questions are not

14:47:59 25   actually --

<pre>
 1              JUDGE MARCUS:  I am not sure we heard the whole
 2   question.  I'm sorry.  Ms. Khanna?  Have we frozen up
 3   completely?  Mr. Davis, can you hear me?  Judge Manasco?
 4              MR. DAVIS:  I can hear you, Your Honor.  I just
 5   believe Ms. Khanna's screen has frozen momentarily.
 6              MR. DUNN:  I think it's Ms. Khanna's screen that's
 7   frozen, Your Honor.
 8              MR. DAVIS:  There she is.  She is back.
 9              JUDGE MARCUS:  Ms. Khanna?
10        Hi, Ms. Khanna.  I think we lost you for a moment.
11              MS. KHANNA:  I apologize, Your Honor.
12              JUDGE MARCUS:  That's all right.  Why don't you start
13   over and ask your question again.
14              MS. KHANNA:  Can everybody hear and see me now?
15              JUDGE MARCUS:  We hear you fine.
16              MS. KHANNA:  Thanks.  Give me one second to
17   reconfigure my screen.  It closed out for a second.
18              JUDGE MARCUS:  Sure.
19   BY MS. KHANNA:
20   Q    Okay.  I am not sure where I got cut off, but my question
21   was the analysis that you just provided about --
22   A    Yeah.
23   Q    -- about how the lines were drawn in Mr. Cooper's
24   illustrative plans --
25   A    Yeah.
</pre>

1  Q    -- is not an analysis that we will find anywhere written

2  in your report about Mr. Cooper's illustrative plans, correct?

3  A    No.  I think that part of the report and the analysis was

4  pretty light and I think that I was mostly led by the fact that

14:49:52  5  his plan and Dr. Duchin's plan, all of these plans were

6  following a very similar pattern.  And if you look at the map,

7  you will see that they do the same thing as in other plans that

8  we documented, where we show it follows precisely where black

9  population is and is not -- I concede that that analysis and

14:50:11 10  that finding is not -- does not appear to be written up in my

11  summary of findings.

12  Q    You provide no analysis in any of the text about the

13  configuration of the districts in Mr. Cooper's plans outside of

14  their objective compactness scores, core preservation scores

14:50:28 15  and incumbency protection scores?

16  A    Yes.  My observation about their consistency in

17  performance in including or excluding black populations is as I

18  am reciting to you right now, looking at the maps that I drew.

19  Q    But not an opinion you expressed in your report?

14:50:45 20  A    Yes, ma'am, that's correct.

21  Q    And at no point in your report do you offer any

22  conclusions or opinions as to the apparent basis of any

23  individual line drawing decisions in Mr. Cooper's illustrative

24  plans?

14:50:59 25  A    I did not.  Yep.  That's correct.

1    Q     So your report analyzes Mr. Cooper's Illustrative Plans 1

2    through 6, correct?

3    A     That's correct.

4    Q     And just to clarify, it does not provide any analysis of

14:51:13 5    the compactness of Mr. Cooper's Illustrative Plan 7 since you

6    did not have that plan in front of you when you wrote your

7    supplemental report?

8    A     Yeah, that's correct.

9    Q     So you offer no opinions or conclusions on Illustrative

14:51:29 10   Plan 7, including its compactness, correct?

11   A     I do not.  And if there is significant evidence of a

12   revelatory or new different plan that is a breakthrough in this

13   case, then I probably would have been alerted to that and I was

14   not.

14:51:43 15   Q     Okay.  Have you actually reviewed Illustrative Plan 7?

16   A     No.

17   Q     Before your testimony today?

18   A     No.

19   Q     You have not even seen that plan?

14:51:53 20   A     It's in my e-mail somewhere.  I have not had a chance to

21   review it.  I'm sorry.

22   Q     So among Mr. Cooper's Illustrative Plans 1 through 6, if I

23   am reading your report correctly, and I am referring you to

24   page 18 of your report, you conclude that Illustrative Plan 4

14:52:14 25   has compactness scores that you believe are comparable to the

1   enacted plan; is that right?

2   A     May I refer to my report?

3   Q     Please do.

4   A     Thank you.

14:52:22  5   Q     Page 18 is specifically where I am looking.

6   A     Okay.  Great.  I see on page 18 the enacted plan

7   compactness scores.  Is what you are referring to?  Yeah.

8   That's it.  Yeah.  Terrific.  Yes.  Yes.  I recognize this.

9   Yep.

14:52:50 10   Q     And in the paragraph, the last paragraph on page 18, you

11   note that only Cooper plan 4 has comparable scores to the other

12   plans.  Am I reading that correctly?

13   A     Yes.  That looks like what that says.

14   Q     And there you further conclude that Mr. Cooper's

14:53:11 15   Illustrative Plans 1 to 3 and 5 and 6 have inferior compactness

16   scores to the Duchin plans; is that right?

17   A     Yes.  That is correct.  Dr. Duchin's plans, because of the

18   additional compactness she drew into Districts 4 and 5,

19   outperform in total Mr. Cooper's plans.

14:53:33 20   Q     Okay.  If we go to the next page to your conclusion

21   paragraph on page 19 of your report.

22   A     Yep.

23   Q     There you say, My analysis of compactness shows that

24   Dr. Duchin's plans perform generally better on average than the

14:53:51 25   enacted state of Alabama plans --

1  A     Yes.

2  Q     -- although some districts are significantly less compact

3  than Alabama's and significantly better than Bill Cooper's

4  plans.  Did I read that correctly?

14:54:03 5  A     Yeah.  This would be the -- what I would call the -- when

6  I say in aggregate, that's literally the summary across all

7  districts within the plans.  That is correct, yes.

8  Q     So your conclusion as to the compactness of Mr. Cooper's

9  plans here is how they fare relative to Dr. Duchin's plans; is

14:54:26 10  that right?

11  A     It is and also relative as you see in the top two lines to

12  the 2011 existing and 2021 exact -- enacted.

13  Q     But the statement here about the Duchin plans being

14  significantly better than Mr. Cooper's plans, that does not

14:54:49 15  apply to Mr. Cooper's Illustrative Plan 4, which you said was

16  comparable, correct?

17  A     That is the only plan that was remotely close in

18  compactness, as you can see in this Table 3, to the other

19  plans.  And then, in that regard, in Polsby-Popper and

14:55:10 20  Schwartzberg, it is comparable, and Reock, it was not.  Convex

21  hull, it was.  So there's one plan where three of the four

22  metrics were almost comparable with the enacted plans.

23  Q     And that conclusion, of course, does not apply to

24  Illustrative Plan 7, which you haven't reviewed in this case?

14:55:33 25  A     No, ma'am.  I cannot offer an opinion.

1  Q    Okay.  We can take down the exhibit.  Mr. Bryan, at no

2  point in your report do you offer any opinion or conclusion

3  that any of Mr. Cooper's illustrative plans are not reasonably

4  compact, do you?

14:55:52  5  A    I have no opinion on what is reasonable and what is not

6  reasonable.  There's no such standard in the industry.  I

7  present it in relative terms to other potential options that

8  the state of Alabama could consider for their redistricting

9  solution.

14:56:14 10  Q    Let's move on to your discussion of communities of

11  interest.

12      I believe that the three traditional redistricting

13  principles on which you evaluated Mr. Cooper's plans were the

14  ones we just discussed -- core preservation, incumbency and

14:56:30 15  compactness; is that right?

16  A    Uh-huh.

17  Q    Your supplemental report does not analyze any of

18  Mr. Cooper's illustrative plans based on communities of

19  interest, correct?

14:56:39 20  A    There's only one major finding of communities of interest

21  in the -- the Hatcher, the Duchin and the Cooper plans, which

22  is the disruption of the community of interest in Mobile and

23  Baldwin counties.

24  Q    And that analysis of communities of interest is included

14:57:00 25  in your first report, correct, not your second?

1  A    Yes, ma'am, correct.

2  Q    You had not reviewed any of Mr. Cooper's plans at that

3  time?

4  A    No.  But they are -- given the consistency of those plans

14:57:11 5  with the original plan, I would make the same assessment and

6  generalize my findings on the Mobile community of interest to

7  Cooper and Duchin's plans.

8  Q    So if I am looking at the same conclusion paragraph that

9  we just discussed in your supplemental report, you say that the

14:57:38 10  plans provided by Mr. Cooper have generally similar features

11  and performance as the Hatcher plan; is that right?

12  A    That's correct, yes.

13  Q    What do you mean by performance?

14  A    So I mean performance insofar as the demographic

14:57:59 15  characteristics of it, the compactness of it, the impact to

16  incumbency, the traditional redistricting principles that we

17  assessed Hatcher with were the same ones that we looked at the

18  Cooper and the Duchin plans.

19      Geographically speaking, the performance of the plans were

14:58:16 20  similar geographically insofar as they change the boundaries

21  around Birmingham.  They extend to District 2, all the way to

22  the eastern -- generally to the eastern edge of Alabama and

23  also pushed the district down into Mobile and Baldwin counties.

24  Geographically that's what I -- in a very high level what I

14:58:40 25  would mean in terms of geographic performance.

981

```
       1  Q     So your analysis of the Hatcher plan is entirely included
       2  in your first report; is that right?
       3  A     Yes, ma'am.
       4  Q     And there are a few features of the Hatcher plan that you
14:58:52 5  thought it was important to emphasize in your first report?
       6  A     Yes.
       7  Q     So one of the features that you emphasize in your first
       8  report -- and I am referring specifically to Defendants'
       9  Exhibit 2 at page 6 for your reference.
14:59:12 10  A     Okay.
      11  Q     You note that the Hatcher plan contains numerous county
      12  splits; is that right?
      13  A     Yes.  It was not a county-based plan.
      14  Q     We can take down the exhibit.  I just wanted to make sure
14:59:26 15  we were looking at the right document.
      16        You never mentioned the number of county splits in
      17  Mr. Cooper's plans in either of your reports, correct?
      18  A     No, I did not.
      19  Q     The Hatcher plan, in fact, splits 13 counties; is that
14:59:44 20  right?
      21  A     That sounds right.
      22  Q     Mr. Cooper's plans -- illustrative plans, however, most of
      23  them split only six counties, isn't that right?
      24  A     That sounds right.
14:59:57 25  Q     The same number as the enacted plan?
```

```
 1  A      Could be.

 2  Q      And that number -- and six is, of course, fewer than half

 3  of the number of splits in the Hatcher plan, correct?

 4  A      Based still -- I did not differentiate how many different

 5  counties were split except to say that they were.  There was no

 6  split counties in the Singleton plan.  There were some -- more

 7  number of counties that were split in these other plans.  It's

 8  my understanding Hatcher had more, but they all had some.

 9         Again, to emphasize, I did not do a detailed split

10  geography analysis.  I just saw what I saw while I was doing my

11  York in these other areas.

12  Q      But when you were evaluating the Hatcher plan in your

13  first report, you believed it was important to note that it

14  split numerous counties, correct?

15  A      Yeah.  I think that was a fair observation, given that

16  plan was presented subsequent to a plan that was purported to

17  have no county splits at all.  So in the context of the

18  previous plaintiffs' plan, I thought it was important to note

19  and emphasize that only insofar as the differences from the no

20  county split plan that had been presented earlier.

21  Q      And for Mr. Cooper's plans that split six counties like

22  the enacted plan, you don't contend that those plans include

23  numerous county splits, correct?

24  A      That's an object -- a subjective statement to say whether

25  it's numerous or many.  There are less numerous than there is
```

The timestamps in the left margin: 15:00:17 (line 5), 15:00:58 (line 10), 15:01:19 (line 15), 15:01:41 (line 20), 15:02:00 (line 25).

1  in the other plan.  I am sure there are plans and other ways of

2  doing this where there could be less than six county splits as

3  well.

4      I don't have an opinion as to whether Mr. Cooper, in the

15:02:16 5  development of his plans, optimized not splitting counties or

6  not.  This is the type of thing, again, I look for when I do my

7  compactness analysis and whether you use counties as whole

8  pieces of geography are generally reflected in whether you have

9  good compactness scores or not.

15:02:35 10      In his case, even though he split fewer counties than in

11  Hatcher, he still ended up with poorer compactness scores

12  because of the way his districts are configured.

13  Q    You also note in your evaluation of the Hatcher plan that

14  it does not respect incumbents because it pairs two sets of

15:02:54 15  incumbents; is that right?

16  A    That's correct.  Yes.  I am not looking at the exhibit,

17  but I recall that to be true.

18  Q    And just so you make sure you have all the information in

19  front of you, I am looking specifically at page 27 of

15:03:09 20  Defendants' Exhibit 2, your first report in this case.

21  A    Do you have it?

22  Q    I sure can.  I can pull it up.

23  A    I have it.  Yes.  So, yes, the Alabama enacted plan

24  respects incumbents.  There's really not a mention in the

15:03:39 25  plaintiff plan about incumbents, but I noted that the

```
 1  plaintiffs' plan pairs, like I said, Moore and Carl in 1,
 2  leaves 2 unrepresented.  Pairs Sewell and Palmer in 6,
 3  leaving 7 unrepresented.
 4  Q    So the Hatcher plan pairs four incumbents, two sets of
 5  incumbents, right?
 6  A    Yes, that's correct.  Two pairs, leaving two districts
 7  unrepresented.
 8  Q    Mr. Cooper's plans, however, only pair one set of
 9  incumbents where they pair incumbents, correct?
10  A    That is correct.
11  Q    Mr. Cooper's Illustrative Plan 5 actually pairs no
12  incumbents; is that right?
13  A    Again, I am uncertain.  I -- if -- you are stating that as
14  a known fact, I cannot confirm that right now.  I believe you
15  if you say it's true.
16  Q    If we assume that it's true, you would agree that in that
17  respect Mr. Cooper's plans are not similar to the Hatcher plan?
18  A    I would say that the difference is whether a plan pairs
19  incumbents or does not pair incumbents.  I don't do degrees of
20  measure of how badly they do it.  The fact that Duchin's plans
21  pair them even more is notable, but the differentiating point
22  is whether you do so or if you do not do so, not how badly you
23  do so.
24       But if Mr. Cooper would like credit for having fewer
25  pairs, but still paired incumbents, then I will concede that.
```

1  Q    So it's your understanding that the question for whether
2  or not -- whether or not a plan respects incumbents, is whether
3  it pairs any incumbents or doesn't pair any incumbents, not the
4  number of incumbents?
5  A    If there are competing plans that pair incumbents, if
6  there is, in this case, one pair of incumbents or two pairs of
7  incumbents as the case may be, I would not draw a distinction
8  that that means by inference that one plan is somehow superior
9  in traditional redistricting principles than the other.  It may
10 garner a nod or some small benefit, but the fact that they
11 still split them is the major problem.
12 Q    Mr. Bryan, you recently submitted an expert report in the
13 Wisconsin Supreme Court; is that right?
14 A    I did.
15 Q    And that expert report was in support of a redistricting
16 map put forward by the Wisconsin legislature; is that right?
17 A    That is correct.
18 Q    If we could call up that report.  This is the report that
19 we have been discussing from Wisconsin; is that right?
20 A    Yes.  This is my report.
21 Q    If we could turn to page 6 of that report.
22 A    Great.
23 Q    I believe on page 6 you conclude that the Wisconsin
24 Legislature has proposed assembly plan, was able to conform
25 with numerous traditional redistricting principles including

```
 1  avoiding pairing incumbents; is that right?
 2  A     That is correct.
 3  Q     And, in fact, the assembly plan that you said respects
 4  incumbents or avoids pairing with incumbents in fact did pair
 5  six incumbents; is that right?
 6  A     Yes.  Yes.  That was mathematically impossible not to do
 7  that.  It was not optional in the case of Alabama.  All of
 8  these plans pair incumbents unnecessarily.
 9  Q     But --
10  A     Please.
11  Q     You would agree that the Wisconsin plan that you endorsed
12  pairs incumbents, correct?
13  A     It -- by necessity, by mathematic necessity, it did, yes.
14  Q     You believe that it avoided pairing incumbents in
15  conformance with traditional redistricting principles?
16  A     The plan avoided in every instance except where it was
17  mathematically impossible not to avoid it, it did successfully
18  avoid pairing incumbents.  The PMC plan and now the other
19  plaintiffs' plans submitted in that case have dozens of pairs
20  by comparison and there is strong evidence that there is
21  partisan politics that are playing into those pairings because
22  many of them are Republican pairs in those plans.  So not only
23  were they not necessary, but they also appear to have a
24  partisan bias.
25        The Wisconsin plan from the legislature did not have a
```

15:07:33  (line 5)
15:07:51  (line 10)
15:08:08  (line 15)
15:08:36  (line 20)
15:08:54  (line 25)

1   partisan bias.  In fact, they paired two of their own

2   Republican representatives in this, in one of those plans.

3   And, again, it is by mathematic necessity, not out of choice.

4   Q    So when you evaluate -- we can take down the exhibit.

15:09:15  5        When you evaluated incumbent pairings in Wisconsin, you

6   did look at who, in fact, the incumbents were that were being

7   paired, as well as then provide an analysis?

8   A    We were asked by counsel for the legislature to look at

9   the party affiliations of the representatives that were paired

15:09:38 10  and my team of experts did, in fact, analyze that and present

11  findings that were accepted in that report.

12  Q    And when -- I'm sorry.  When you say accepted in that

13  report, has the Court accepted that report or those findings?

14  A    My belief that they have.  I have been busy with a few

15:09:58 15  other things the last few days.

16  Q    I understand.

17  A    Yeah.

18  Q    And in your analysis in that Wisconsin report, you

19  believed it was important to note that the plan that you were

15:10:13 20  endorsing or that you are supporting in your expert report

21  paired fewer incumbents than other plans?

22  A    The -- there was two points, one was the number of the

23  pairs, and then the other was pointing out the significant

24  partisanship of the pairs that were coming from the plaintiffs

15:10:34 25  in that case.  And, yeah, that was -- in conversations with

```
 1   experts and counsel, that became a decisive point in the
 2   analysis and the reason that I fulfilled that.
 3   Q    All right.  Let's go back to the Hatcher plan that you
 4   discussed in your first report in this case.
```
15:10:55 5   If we look to Defendants' Exhibit 2, page 16.  We can pull
```
 6   that up so that everyone is looking at the same thing.  Here up
 7   in the top paragraph you say --
 8   A    Yes.
 9   Q    -- no effort was made to try and conform the boundaries of
```
15:11:27 10  District 2 to the existing city boundary of Mobile; is that
```
11   correct?
12   A    Yes.  I looked at this carefully.  The municipal
13   boundaries of Mobile are complex, and, nevertheless, the
14   boundaries of the plan slices through them.  I do not have a
```
15:11:45 15  count of how many sometimes it splits the boundaries of Mobile.
```
16   Conventionally, if you were going to make this big of a
17   deviation in a plan to go grab a piece of geography that is out
18   of bounds, such as Mobile, you would do so by trying to include
19   administrative geography such as the city boundaries.
```
15:12:03 20  This -- the boundaries of the Hatcher plan, the Duchin
```
21   plans and the Cooper plans in my analysis do not make appear to
22   make any effort to conform to any other administrative
23   geography, rather only to try and capture the most densely
24   black population of Mobile.
```
15:12:23 25  Q    Just to be clear.  The sentence that's highlighted on the

```
 1  screen right now is from your first report?
 2  A    Yes.
 3  Q    And it refers only to the Hatcher plan, correct?
 4  A    Yes, ma'am.  That is correct.  Yes.
 5  Q    You had not seen any of the Cooper plans at the time you
 6  wrote this report?
 7  A    No.  My statement reflects subsequent observations of the
 8  other plaintiff plans.  I'm sorry.  Retract.
 9  Q    Okay.  Let's pull up Mr. Cooper's Illustrative Plan 6 and
10  let's specifically look at District 2.  That's going to be
11  Plaintiffs' Exhibit 44.  This was included as an exhibit to
12  Mr. Cooper's first report.
13       And if I recall your previous testimony, you did not
14  review any of the exhibits attached to Mr. Cooper's reports; is
15  that right?
16  A    No, my analysis was based on the information that I
17  received -- the electronic information I received that I used
18  in my geographic information system to perform an analysis that
19  would be in essence a replication of this map that I'm seeing
20  now.  I did not use or refer to this exact map.  I referred to
21  my own company's representation of this map in my analysis.
22  Q    Okay.  But looking at Mr. Cooper's illustrative plan, his
23  map right here, you would agree that, in fact, District 2 does
24  keep the city of Mobile whole by conforming to municipal
25  boundaries, correct?
```

Timestamps in left margin: 15:12:34 (line 5), 15:12:53 (line 10), 15:13:14 (line 15), 15:13:33 (line 20), 15:13:56 (line 25)

A     It's difficult to see where that boundaries of the city of
Mobile are in this map.  I can't give an opinion.  It may be
the case, but I can't tell from this map.  But whether the map
contains it is -- would be a misleading statement because you
can have a geography that can outer bound a city and capture
numerous pieces of irregular geography around it.  Because it
contains it does not mean it follows it.  And the benefit of
following administrative geography in redistricting is because
it captures pieces of administrative geography that enable that
district to represent people with similar administrative
geography and policy interests and concerns.

     So stating that this outer bounds, the city of Mobile does
not necessarily mean that that means that it's an accurate
capture of Mobile.

     A visual examination of this plan shows a highly irregular
draw into the county of Mobile anyway.  So some other thing was
happening when Mr. Cooper drew this in this very unusual and
unique way, into the otherwise very geometrical simple
geography of Mobile.

Q     So you don't know sitting here today whether that -- the
drawing of District 2 in Mobile County conforms to the
boundaries of the city of Mobile; is that right?

A     I -- it may -- I want to be precise with my language.
That district may outer bound, that is, fully contain the city
of Mobile.  I do not believe just looking at this map, which is

1   not precise, whether it exactly follows the boundaries of the

2   city of Mobile or not.  I don't believe that it is.  But I

3   cannot say that definitively.

4   Q    You would agree that if it does exactly follow the

15:15:55  5   boundaries of the city of Mobile, that would make a significant

6   difference between its configuration and the Hatcher plan that

7   you criticize; is that right?

8   A    If this exactly followed the city boundaries of Mobile,

9   that would certainly give it some credence, but that does not

15:16:14 10  change the highly irregular features and the draw that was made

11  to go into Mobile County.  There's no way a map drawer could

12  look at this draw and not avoid the highly irregular draws in

13  and out and around the county.

14  Q    So when you were evaluating whether a district looks

15:16:37 15  irregular, you are doing that without respect to whether or not

16  it's following municipal boundaries; is that right?

17  A    In this particular case, Mobile is only a part of Mobile

18  County and so my visual observation of this draw is showing

19  significant irregularities that are clearly outside of the city

15:17:00 20  of Mobile here.

21  Q    So your understanding is this district -- the district

22  lines of CD 2 do not conform with the city of Mobile

23  boundaries; is that right?

24  A    I am not able to say with certainty whether they do or do

15:17:19 25  not.  It does not visually appear to, given my knowledge of the

1  area.  I would have to see something much more detailed to be

2  able to prove that or not.

3       My assessment is that the draw in Mobile County in this

4  case appears, given the geometric simplicity of the county,

15:17:37  5  that there was some motivation to draw a highly irregular

6  boundary within the county.  And not all of that -- not -- it

7  is not possible to that all of those irregularities were

8  determined simply by the municipal administrative unit of

9  geography known as the city of Mobile.

15:17:54 10  Q    And you mentioned there were motivations, but you, of

11  course, have no knowledge, information or opinion about any of

12  the motivations, correct?

13  A    I don't know what the motivations were.  All I know from

14  my own analysis and maps are that the lines that go down into

15:18:10 15  Mobile across all these different plans, I am speaking

16  generally, not to any one particular plan, go down into Mobile

17  and surgically go into and out of white VTDs and black VTDs,

18  including the black ones and excluding the white ones.

19       If that was the motivation, I would believe that a

15:18:29 20  mapmaker would have just gone into Mobile and taken the whole

21  county.  Otherwise there is no reason to have gone in here and

22  so surgically and forensically grabbed just very precise pieces

23  of the city of Mobile, which we know to be the most densely

24  black portion of the county.

15:18:44 25  Q    And, again, your testimony about which pieces of the city

```
 1   of Mobile may or may not be included in District 2 --
 2   A     Right.
 3   Q     -- is not about this district that we're looking at right
 4   now, you're speaking generally about some of the illustrative
 5   plans?
 6   A     Yes, ma'am.
 7   Q     And about the Hatcher plan?
 8   A     That, too.
 9   Q     Let's turn -- let's actually look at your depiction of
10   Mr. Cooper's Illustrative Plan 6.  And I think that's going to
11   be at page 88 of your supplemental report.  Defendants'
12   Exhibit 4.  Does this look familiar to you?
13   A     It does, yes.
14   Q     This is your depiction of Mr. Cooper's Illustrative Plan 6
15   color coded by the concentration of black population; is that
16   right?
17   A     Yep, that is correct.
18   Q     And sitting here today, you can't tell me whether the
19   District 2 boundaries depicted in this map conform to the city
20   of Mobile boundaries; is that right?
21   A     I cannot determine that from this map.  I could in a
22   matter of minutes if it's an important point, but I cannot tell
23   from this whether it definitively is or is not.
24   Q     But you can tell from this map that Mr. Cooper's
25   District 2 includes a lot of those red and orange VTDs on your
```

15:19:02 (line 5)
15:19:10 (line 10)
15:19:31 (line 15)
15:19:45 (line 20)
15:20:08 (line 25)

```
 1  illustration here; is that right?
 2  A    Are you speaking specifically to the area around what
 3  we're going to characterize as the area around Mobile city?
 4  Q    I'm actually -- I'm looking at a southwest corner of this
 5  map.
 6  A    Okay.
 7  Q    Maybe we can zoom in on it.
 8  A    Sure.  Yeah.
 9  Q    If I am understanding your testimony correctly, you
10  criticize the Hatcher plan and apparently some other plans for
11  excluding white VTDs and including black VTDs into District 2;
12  is that right?
13  A    That's correct.  And just -- this is not one of my
14  close-in maps.  I am not sure I have a close-in map of Cooper,
15  but even with this grainy picture, you can see that there was
16  a -- basically a fish hook where the district was run down the
17  western edge of the state, excluding lots of red, orange,
18  yellow, you know, low black concentrated VTDs and then wrapping
19  around very low population areas in the south corner and
20  reaching up to grab, as you can see the line of the boundary of
21  the district, grabs just the green areas exactly around the
22  city of Mobile.
23       If this plane was not motivated by grabbing just that
24  population, I would have expected the drop to go geometrically
25  just simply straight down from the north and just capture one
```

Timestamps (left margin): 15:20:36 (line 5), 15:20:57 (line 10), 15:21:22 (line 15), 15:21:45 (line 20), 15:22:07 (line 25)

irregular geometrically continuous space, rather than this

highly irregular draw, fish hooking around just to grab this

black population in this corner of Mobile.

Q    And when you analyze this plan, you did not know whether

those boundaries of District 2 were decisions that Mr. Cooper

made or the lines of the city of Mobile, correct?

A    Yes.  I -- I looked at the city boundaries of Mobile

compared to many of these plans and I cannot give a forensic

accounting off the top of my head.  Every one that I looked at

of the plaintiffs' plans did not conform to the municipal

boundaries.  If this happens to be one instance where

Mr. Cooper got in one that does in some sense follow the

municipal boundaries, it may be the case.  But it doesn't look

like it from here.

Q    And you would agree looking at Mr. Cooper's District 2 in

Mobile County, along the west side it includes red and orange

VTDs and along the bottom it includes multiple red and orange

VTDs before it goes up in that fish hook; is that right?

A    It's my understanding that these are very -- that is

correct.  It is my understanding those are low population

geographies that were used with the intention of connecting

District 2 around and up into a much higher population and

dense black population around Mobile.

Q    Again, you use the word intention and I just want to

clarify.  You don't opine on the intent behind any of these

996

1    illustrative maps, correct?

2    A    That is correct.  I do not know the intention.  I can see

3    the effects of an effort to maintain the contiguity of

4    District 2.  It was drawn in such a way -- virtual -- you can

15:24:21 5    see it virtually goes down to a one-lane road on the western

6    border before it expands again and circles up to grab that

7    green high dense black population.

8        So the appearance is that the effort was to draw and

9    connect District 2 as efficiently as possible to get access to

15:24:43 10    that black population in Mobile.  The appearance, if I may.

11    Q    You are drawing inferences of an effort based on the

12    appearance of the district; is that right?

13    A    Yes.  The population to the north of Mobile in this map

14    has more population, and, again, this is my independent opinion

15:25:07 15    and observation, that if Mr. Cooper had drawn this district

16    straight down into Mobile with this configuration, that he

17    would not necessarily have been able to achieve the black

18    majority.  He may have only -- again, it's an opinion, may have

19    only been able to achieve this by connecting that area in

15:25:31 20    Mobile with very low population, admittedly low black

21    population VTDs in order to get there.

22    Q    That's not an opinion you express anywhere in your report,

23    correct?

24    A    That's correct.  Yeah.  This is just an observation

15:25:45 25    looking at the map and then studying this with other maps as I

1 observed these draws to go get Mobile.

2 Q    We can take down this exhibit.

3      You mentioned already that you did not look at

4 Mr. Cooper's Illustrative Plan 7 submitted alongside his

15:26:11 5 supplemental report; is that right?

6 A    Yes, that's correct.

7 Q    So you don't know if Illustrative Plan 7 kept the city of

8 Mobile whole in District 2, correct?

9 A    Do not.

15:26:26 10 Q    Turning back to your first report on your analysis of the

11 Hatcher plan.  You criticize the Hatcher plan on page 20 of

12 that report for expanding the existing boundaries around

13 Birmingham in a very nearly exact way to only add heavily black

14 VTDs and to avoid less black VTDs; is that right?

15:27:05 15 A    Yes, ma'am.

16 Q    Birmingham is in the center part of Jefferson County; is

17 that right?

18 A    Yes, that is correct.

19 Q    And you know from your experience in mapping and

15:27:24 20 evaluating these maps that the western portion of Jefferson

21 County is the heavily white portion of Jefferson County; is

22 that right?

23 A    More so, for sure, yes.

24 Q    And the Hatcher plan, as you recall, does not extend to

15:27:39 25 the western boundary, the western border of Jefferson County?

```
 1  A    Yes.  I recall that.  I am going from memory, but I
 2  believe that's true.
 3  Q    Okay.  Let's pull up Mr. Cooper's Illustrative Plan 1, and
 4  specifically District 7 in that plan.
 5      This is plaintiffs' exhibit -- Caster Plaintiffs'
 6  Exhibit 20.  This was included in the exhibits to Mr. Cooper's
 7  report and those again are exhibits that you had not reviewed
 8  in preparing your own report, correct?
 9  A    Yes.  Yes, that's correct.
10  Q    So do you see here how Mr. Cooper's configuration of
11  District 7 includes the western portion of Jefferson County?
12  A    Yes, I do.
13  Q    And in the interest of time, I'm going to represent to you
14  that it does this in at least three other illustrative plans
15  that Mr. Cooper provides.  Does that sound right, based on your
16  memory or your evaluation of these plans?
17  A    It sounds about right.
18  Q    So in that respect you would agree that Mr. Cooper's
19  illustrative plans, including this one, differ from the Hatcher
20  plan, correct?
21  A    There are -- without a doubt there are some similarities
22  and some differences between the plans.  When I talk about them
23  being similar, it is a very high level, again, focusing on some
24  similarities and how adjustments were made in parts of
25  Birmingham, some similarities in how District 2 gets stretched
```

Timestamps in left margin:
15:27:58 (line 5)
15:28:19 (line 10)
15:28:40 (line 15)
15:28:56 (line 20)
15:29:15 (line 25)

1   and some similarities in how Mobile ends up getting wrapped in,

2   seemingly unavoidably, to create a second black

3   majority-minority district.

4       Beyond that, details such as whether we go into the

15:29:33 5   western side of Jefferson County or not to me are smaller

6   details and nuances that, of course, yes, we see that in

7   Duchin's plan as well, but there are details like that that --

8   subtle differentiations between the plans, but I subordinate

9   those in my analysis to the larger ones that actually drive the

15:29:55 10  concentration of black populations in these two districts.

11  Q    When you were evaluating the Hatcher plan you believed it

12  was important to note that in Jefferson County the plan

13  included the heavily black areas of Jefferson County around

14  Birmingham, and excluded the heavily white areas in Jefferson

15:30:16 15  County, correct?

16  A    My analysis showed that to be the case and we provided an

17  exhibit with some detailed maps that illustrate that to be

18  true.

19  Q    In the Hatcher plan?

15:30:28 20  A    Yes, ma'am.

21  Q    You did not similarly assess the extent which Mr. Cooper's

22  plans included the heavily black portions of Jefferson County

23  and excluded the heavily white portions of Jefferson County,

24  correct?

15:30:42 25  A    I did not.  To be precise, I did not include that in my

```
 1   report, but the degree that his plan goes up into and around
 2   Pinson and Gardendale, even though I can't see the exact
 3   boundary compared to my maps, yes, there are places where his
 4   maps draw captures black population in the north east corner of
15:31:05   5   Jefferson County and in some cases there, excludes adjacent
 6   white VTD -- more predominantly white VTDs.  It's not easy to
 7   illustrate that from this map, but it is true.
 8   Q    Let's go to your map, and I don't have that at the ready,
 9   which map we're looking at.
15:31:26  10        But the one that you say would show the BVAP or the black
11   concentration.  Do you know what map we're looking at in your
12   report for that?
13   A    One of the Hatcher.
14   Q    Oh, I'm sorry.  I want to look specifically at
15:31:49  15   Illustrative Plan 1 as depicted in your report.  Mr. Cooper's
16   Illustrative Plan 1.
17   A    Plan 1.
18            MR. DAVIS:  Ms. Khanna, I have that -- turned to that
19   map.  Would you like me to share the page number?
15:32:12  20            MS. KHANNA:  That would be great.  Thank you, Mr.
21   Davis.
22            THE WITNESS:  78.
23   BY MS. KHANNA:
24   Q    Excellent.  Can you --
15:32:16  25   A    78 in my report.
```

1  Q    Let's pull that up, page 78 of Defendants' Exhibit 4.

2  Thank you, Mr. Davis.  Thank you, Mr. Bryan.

3  A    Yeah, that's correct.

4  Q    Okay.  Make sure I'm looking at that.  So you would --

15:32:30 5  sorry.  Go ahead.

6  A    This map shows my point that when you look at the

7  northeast corner of District 7 in Birmingham, you don't really

8  even have to zoom in to see that where the black line is drawn,

9  everything outside the black line is the lower density black

15:32:53 10  population and very carefully everything inside the black line

11  as part of District 7 is green to dark green, high density

12  black population.

13  Q    You can see here that the western portion of Jefferson

14  County, which is the heavily white portion of Jefferson County

15:33:19 15  is included in Mr. Cooper's illustrative District 7 in a way

16  that it was excluded in the Hatcher plan, correct?

17  A    Yes, I believe that to be true.  Each variation of

18  District 7 would need to include some white population,

19  somewhere in order to get up to the exact population threshold,

15:33:44 20  whether Mr. Cooper does it here, Dr. Duchin does it somewhere

21  else, or Hatcher does it somewhere else, isn't really material

22  or as material to me as the fact that each of these plans goes

23  very carefully to get exactly the black population out of

24  Birmingham necessary to create a black majority district.

15:34:03 25  Wherever the white people are after that to balance out the

1    population is less relevant.

2    Q    It's less relevant where the white people are.  Is that

3    what you just said?

4    A    Yeah.  When you are devising a plan for a black majority,

15:34:23 5    the most important thing to ensure that you are going to get

6    your 50 percent black majority is making sure you have an

7    enumerator that has sufficient number of -- with geographically

8    compact black population.  And the only way to do that is to

9    make sure you build an enumerator with this large core

15:34:44 10   concentration of black people in and around Birmingham.

11   Q    But you made a point of criticizing the Hatcher plan for

12   including heavily black VTDs and avoiding less black VTDs,

13   correct?

14   A    Yes.  That's correct.

15:35:00 15   Q    You would agree that where a district includes less black

16   VTDs, under your own analysis of the Hatcher plan, that would

17   be relevant, correct?

18   A    I'm sorry.  Could you restate the question?

19   Q    Sure.  I know that was not clear.  If I understand your

15:35:21 20   testimony correctly, you are now saying it's more important to

21   look at whether a district includes the heavily black VTD s,

22   not the heavily white VTDs, correct?

23   A    Well, it's a comprehensive analysis.  You have to end up

24   looking at all of them.  But if you are looking at a plan to

15:35:36 25   say whether you form an opinion or an assessment of whether a

```
 1  draw was made for the purpose of including or excluding black
 2  population, because you are trying to draw a black majority
 3  district, it is most relevant to look at where and how those
 4  lines were drawn, and if there are highly segregated black and
 5  white populations in different VTDs, such as there are in
 6  northeastern Birmingham, it's relevant to note that when the
 7  map drawer had a choice, she or he drew a line in a very exact
 8  way, just to include -- make sure just to include as
 9  efficiently as possible all the dense black heavily populated
10  VTDs there that they needed to make sure District 7 got over
11  50 percent on the whole.
12  Q    It's also relevant to evaluate the extent to which that
13  map drawer included heavily white VTDs in the same district,
14  correct?
15  A    Yeah.  And they would have to somewhere in the plan.  And
16  I agree that there's probably some differences in where
17  Duchin -- and Dr. Duchin and Mr. Cooper and Hatcher acquired
18  that white population to get to the total, where to me it is
19  less important where they got it.  They all had to somewhere.
20  Mr. Cooper chose to get it here in western Jefferson County and
21  that's fine.
22  Q    So you would agree that in creating a district that is
23  majority black, a map drawer would have to include some
24  portions that are heavily black and some portions that are
25  heavily white?
```

1    A    I would agree with the assessment they would have to get

2    some portions -- the most important is they would have to get

3    half the population black, no matter how you define it, whether

4    the remainder is white, Asian, Native Hawaiians, multi-race is

15:37:31 5    less relevant.  It doesn't necessarily need to be expressly

6    non-Hispanic white population, but it's frequently the case.

7    Q    But some portions would be heavily black, some portions

8    will not be heavily black --

9    A    That's correct.  Yeah.  I like that better.

15:37:47 10    Q    We can take down the exhibit.  Mr. Bryan, in your initial

11    report in this case, pages 16 to 17, you discussed this

12    community of interest that you have spoken about between Mobile

13    and Baldwin counties; is that right?

14    A    Yes, that is correct.

15:38:09 15    Q    And that entire discussion is based on the trial testimony

16    of former Representatives Bonner and Byrne from the Chestnut

17    case; is that right?

18    A    In my report, I rely heavily on that testimony, but I

19    independently spent time looking at some of the history of

15:38:31 20    Mobile and Baldwin, the development of that area and the

21    evolution of their relationship together, just personal history

22    research in background.  So I rely in Byrne and Bonner in my

23    report.  I also did personal learning research on the area as

24    well.

15:38:52 25         MR. DUNN:  Your Honor, I object -- I was trying to let

1    Mr. Bryan finish.

2        I object to everything after the last three words and move

3    to strike.  It's not responsive and it's completely outside of

4    the scope of his report or his expertise.

15:39:05 5        JUDGE MARCUS:  Let's move on.  Denied.  But let's try,

6    Mr. Bryan, to answer the question as it's asked.  If there's

7    something else, it will be brought out on redirect by

8    Mr. Davis, I'm quite sure.

9        You may proceed, counsel.

15:39:25 10       THE WITNESS:  Yes, Your Honor.

11       MS. KHANNA:  Thank you, Your Honor.

12   BY MS. KHANNA:

13   Q    Your analysis of the community of interest between Mobile

14   and Baldwin counties as presented in your report relies

15:39:35 15  exclusively on the trial testimony of former Representatives

16   Bonner and Byrne; is that correct?

17   A    My testimony in the report did rely on that testimony by

18   Byrne and Bonner, yes.

19   Q    And to the extent you looked at anything outside of that

15:39:52 20  testimony, you have not cited any of that information in your

21   report?

22   A    Yes.

23   Q    On page 17 of your report, and we can pull that up -- this

24   is Defendants' Exhibit 2, page 17.  You state toward the

15:40:12 25  bottom, Due to time constraints, I will rely on this history,

1  evidence and testimony as my defense of why Mobile and Baldwin

2  counties are an inseparable COI.  Did I read that correctly?

3  A    Yes, that is correct.

4  Q    You can pull this down.

15:40:29 5      Just to be clear, that history, evidence and testimony

6  that you note there is the Bonner and Byrne trial testimony

7  that you cite in your report, correct?

8  A    That is correct.

9  Q    It's nothing more than that, there's nothing more that you

15:40:47 10 cite in your report, correct?

11  A    I read all of the testimony and selected those as

12  illustrative and valuable examples that I base my

13  conclusions on.

14  Q    When you discuss, quote, My defense of why Mobile and

15:41:07 15 Baldwin counties are an inseparable community of interest, why

16  did you feel it was the need to mount your defense about the

17  community of interest between Mobile and Baldwin counties?

18  A    As with any expert working on a case, trying to deeply

19  know and understand how and why maps are drawn as they are, I

15:41:34 20 felt it was personally important to deeply understand what the

21  environment is and whether there was cause or reason to divide

22  those or if there was any benefits or drawbacks to drawing the

23  map in that way because it deviated significantly from the way

24  that the map has been drawn in that corner of the state for a

15:41:55 25 long time.  I believe the 1970s, if I am not mistaken.

1      So the purpose of that was to ensure that I had an

2 understanding and was able to say that those were or were not a

3 community of interest.

4      If I had found no evidence that Baldwin and Mobile

15:42:14 5 counties were a community of interest, let alone potentially a

6 strong community of interest, then I would not have had as

7 strong of a personal offense, certainly I don't have the

8 expertise to say that it's unreasonable to try and draw a

9 district down into capture that population in Mobile the way it

15:42:36 10 was done in the plaintiffs' plans.

11 Q    Were you instructed by counsel to provide a defense of a

12 community of interest between Mobile and Baldwin counties, or

13 did you arrive at an independent conclusion that this was a

14 community of interest worth protecting?

15:42:57 15 A    I arrived at that conclusion on my own, given the

16 significant change from the existing plan.  I felt it important

17 to go investigate that and determine on my own, independently

18 form an opinion of whether that was a community of interest or

19 not.

15:43:17 20 Q    That was the only community of have you saw fit to

21 investigate?

22 A    Given that that part of the state was the most significant

23 departure from the existing plan and knowing that particular

24 area did have a very strong social and economic tie around that

15:43:40 25 area, that's the one I found to be most compelling and most

1    notable if it was going to be split.

2         There are other counties that were split, particularly

3    around the edges of the Black Belt that were lower population,

4    less social connection, less economic connection, that it did

15:43:57 5    not appear in my expert opinion to make a difference or split a

6    particular community of interest in other parts of the plan the

7    way that it did in Mobile and Baldwin counties.

8    Q    You are not from Alabama, correct?

9    A    Certainly, no.  I am a Virginia boy.

15:44:12 10    Q    You have never lived in either Mobile or Baldwin counties?

11    A    No, ma'am.

12    Q    So your understanding of that community of interest that

13    you discussed between Mobile and Baldwin counties is based on

14    the lay witness testimony of Representatives Bonner and Byrne

15:44:31 15    that you were provided by counsel in this case, correct?

16    A    Primarily, yes.

17    Q    That's the entirety of your expert -- the basis of your

18    expert opinion in this case?

19    A    Yes.

15:44:41 20    Q    Did you also review the trial testimony of anybody else in

21    the Chestnut trial regarding the differences or similarities

22    between Mobile and Baldwin County?

23    A    Not that I recall.

24    Q    So you did not review the testimony of Lakeisha Chestnut

15:45:02 25    regarding her understanding of the differences between Mobile

```
  1  and Baldwin counties; is that right?
  2  A    I did not, no.  That was certainly not a lack of interest.
  3  It was more expediency in trying to get whatever I could as
  4  fast as I could for the preparation of my expert report.
15:45:23  5  Q    You were not provided with that testimony; is that right?
  6  A    I don't recall.
  7  Q    What about this trial and this case?  Did you review
  8  Dr. Bagley's supplemental report on the similarities or
  9  differences between Mobile and Baldwin counties?
15:45:48 10  A    Yeah.  There was a supplemental report by Bagley that was
 11  provided.  I reviewed it briefly.
 12  Q    And did you hear Captain Dowdy testify earlier in trial
 13  about the differences between Mobile and Baldwin counties?
 14  A    I don't recall that I did.
15:46:04 15  Q    Did you review any evidence regarding the differences
 16  between Mobile and Baldwin counties when you were providing
 17  your expert report in this case?
 18  A    Yeah, of course.  In reviewing the history and the
 19  development of the relationship of those counties to each
15:46:38 20  other, I learned a great deal about the evolution at the time
 21  when Mobile County and Baldwin County were, in fact, separate
 22  because of the day there, there was less transportation, less
 23  communication, less connective tissue between those two
 24  geographies, and they have since grown because of development
15:46:59 25  of infrastructure to be much more closely related than they
```

1    were historically.

2        I would characterize my analysis of the community of

3    interest of Mobile and Baldwin, frankly, to be more focused on

4    the excision, extraction of Mobile, the city of Mobile from

5    Mobile County probably more so than, you know, whether or not

6    the corner of Baldwin County is connected in District 2 to

7    Mobile County or not.  It's really the focus on the grab of the

8    city of Mobile, the black population of Mobile that caught my

9    attention.

10   Q    The evidence you reviewed in determining your analysis of

11   this community of interest was the lay witness testimony of two

12   witnesses who believed there was a community of interest

13   between Mobile and Baldwin County, correct?

14   A    Yes.

15   Q    You did not review any evidence, any contrary evidence

16   from any other witnesses on this issue, correct?

17   A    No.

18   Q    My last point, Mr. Bryan, you conclude in the passage we

19   just looked at that Mobile and Baldwin counties are an

20   inseparable community of interest; is that right?

21   A    That is the conclusion I arrived at from my research, yes.

22   Q    So it's your belief that those two counties cannot be

23   separated in a congressional plan, correct?

24   A    That is the conclusion I draw from the evidence that I

25   reviewed, yes.

1  Q    Is it your understanding that the Alabama Legislature

2  believed that those two counties were inseparable?

3  A    I do not know.

4  Q    You would agree there was no mention of Mobile or Baldwin

15:48:59  5  counties in the redistricting guidelines that we have gone

6  over, correct?

7  A    I don't believe there were any specific descriptions of

8  secret communities of interest that could or could not be

9  broken in the guidelines, no.

15:49:15 10  Q    Precisely.  They don't mandate that Mobile -- the Mobile

11  Baldwin community of interest stay together or any other

12  particular community of interest stay together, correct?

13  A    They do not specify, no.

14  Q    And certainly if the reapportionment committee believed

15:49:34 15  that a particular community of interest was so inviable, they

16  could have said as much in their guidelines, correct?

17  A    They could have said so.  My interpretation and analysis

18  says that given that those two counties have been together for

19  some 50 years now through multiple redistricting cycles, if

15:50:01 20  there was a need, an interest, value in separating them, that

21  may have come up in the past and it has not.  And my research

22  suggests that these counties are closer, have grown closer

23  socially and economically throughout that 50-year time period.

24       So with no evidence that any splits have been attempted

15:50:21 25  before for any reason, is my conclusion, especially given the

```
 1  expert testimony that I reviewed that those two districts are
 2  something that historically have been retained and the evidence
 3  I reviewed says there's close consecutive tissue that suggests
 4  suggests that they should remain retained.
```

15:50:42
```
 5  Q    I think you just said based on the expert testimony you
 6  reviewed.  You did not review any expert testimony --
 7  A    Byrne and Bonner.
 8  Q    Correct.
 9  A    Yes.
```

15:50:50
```
10  Q    You would agree that the redistricting community
11  guidelines do, in fact, express certain criteria that are
12  inviable, correct?
13  A    Yes.  That's correct.
14  Q    And what are those?
```

15:51:04
```
15  A    Well, complying with the law, making sure that you've got
16  equitable population for sure.
17  Q    And also complying with the Voting Rights Act, right?
18  A    Yes, ma'am.
19  Q    Thank you, Mr. Bryan, I have no --
```

15:51:23
```
20       JUDGE MARCUS:  I did not hear the answer to that
21  question.  Maybe it was me.  Did you answer that question,
22  Mr. Bryan?
23       THE WITNESS:  Yes, sir.  The answer was in the
24  affirmative, that is correct.  The Voting Rights Act it would
```

15:51:35
```
25  be the other inviable role.
```

1            JUDGE MARCUS:  All right.  Thank you very much.  Did
2     that conclude it for you, Ms. Khanna?
3            MS. KHANNA:  It does, Your Honor.  Thank you,
4     Mr. Bryan.  I pass the witness.
15:51:47 5            JUDGE MARCUS:  All right.  Mr. Dunn, do you need a
6     break or do you want to get started?  What's your pleasure?
7            MR. DUNN:  I know it's late, but I think we could
8     probably --
9            THE WITNESS:  Could I just -- 5 minutes to grab a
15:52:00 10    drink of water and I can --
11            JUDGE MARCUS:  Absolutely.
12            MR. DUNN:  We could use at least five.
13            JUDGE MARCUS:  We will absolutely take a short break
14     for you, Mr. Bryan and for all of us.
15:52:12 15       Quick question:  Just help me as I think through the rest
16     of the afternoon.
17       I ask the question not to cut you off, but just to get
18     some sense, because I know Mr. Blacksher is to use my baseball
19     lingo on deck.  So tell me how long you think you will be as
15:52:32 20    you go forward and you take the time you need.
21            MR. DUNN:  Ms. Khanna covered a lot of things that I
22     intended to cover.  I really have to do this on the fly.  I
23     will be an hour.  I will try not to be more than an hour and a
24     half, but it will be an hour, and we are looking at 5:00
15:52:50 25    o'clock.  I'm sorry.

```
 1              JUDGE MARCUS:  Okay.  And then we will follow with
 2   you, Mr. Blacksher.  Thanks very much and we will take as much
 3   time as you need to examine the witness.  We will take a
 4   five-minute break at this point.  Thank you.
15:53:06  5              (Recess.)
 6              JUDGE MARCUS:  Thank you.  I think we have everybody.
 7   I thought we did.  We are going to begin with the
 8   cross-examination of Mr. Dunn of Mr. Bryan.
 9        Mr. Dunn, you may proceed.  Thank you.
11:03:41 10                    CROSS-EXAMINATION
11   BY MR. DUNN:
12   Q    Thank you, Judge Marcus.
13        Good afternoon, Mr. Bryan.  Can you hear me?
14   A    Yes, sir.  Good afternoon.
15:59:46 15   Q    Okay.  If at any point in my examination my questions
16   aren't clear, you don't understand me, please indicate that.
17   We have a virtual connection.  I know it's been a long day, but
18   I will try and be as clear and succinct as I can.
19        Let me start with your background a little bit.
16:00:10 20        In your reports, you describe yourself as a demographer
21   and a political redistricting expert; is that correct?
22   A    Yes, that is accurate.
23   Q    But then, Mr. Davis, when he qualified you, also talked
24   about statistical transformation?
16:00:31 25   A    Yeah.
```

1  Q    Which of those expertises that you referred to your report

2  includes statistical transformation?

3  A    Yes, sir.  It's -- statistical transformation is an area

4  of data science and analytics.  And in this particular case,

16:00:52 5  because of questions around the calculation of the Schwartzberg

6  compactness measure, I felt it reasonable to qualify myself as

7  having background and experience in a specific area of

8  mathematics that was relevant to my use of the adaptation of

9  the Schwartzberg measure.

16:01:11 10       It's a subset and I believe less relevant part of my

11  background and expertise than the top line demography and

12  political redistricting experience.

13  Q    Okay.  But so that's only related to the reformation of

14  Schwartzberg in connection with compactness, right?

16:01:29 15  A    Yeah.  Yeah.  That really doesn't have applicability

16  anywhere else.

17  Q    And it's in addition to the areas of expertise that are

18  referred to in your report?

19  A    Yes, sir.

16:01:38 20  Q    Okay.  Mr. Davis also mentioned predicting population

21  shifts.

22  A    Yes, sir.

23  Q    Where does that fit?

24  A    Part of my background and experience starting with my work

16:01:55 25  at the Census Bureau was developing population estimates and

population projection techniques.  In this case, in Singleton

in particular, it was important to me that when I saw that the

use of counties was going to introduce some amount of

population deviation, that I help the Court and I help the

16:02:17 experts and I help counsel understand that the impact of having

even a small population deviation at the beginning of the

decade after redistricting is not the end of the consequences.

          The consequences of even a small deviation of population

in a plan starting right now has far-reaching longstanding

16:02:42 significant consequences.

          My experience in developing peer-reviewed professional

population estimates and projections, the relevance is that I

was able to use that expertise to develop those projections to

help the Court and help counsel understand what I would expect

16:03:03 to be the deviation at the end of 10 years compared to a plan

such as the state of Alabama's, which would be starting with

zero deviation.

Q    Okay.  So that area of expertise doesn't have anything to

do with your testimony vis-à-vis the Milligan case or

16:03:21 specifically Dr. Duchin's work, right?

A    Yes, sir, that's correct.  It's relevant to Singleton.

Q    Then I will let Mr. Blacksher worry about it.

          Is there any other expertise you claim or utilized in

connection with this case other than what you have testified

16:03:37 about and we have discussed?

```
        1  A    No, I don't believe so.

        2  Q    Okay.  And you didn't bring to bear any other areas of

        3  expertise in drafting your reports in this case, did you?

        4  A    No, I don't believe so.

16:03:51 5  Q    Now, demography is the statistical study of human

        6  populations; is that right?

        7  A    Yes, sir.

        8  Q    And that's the area you have experience and training in,

        9  right?

16:04:04 10 A    Yes, it is.

       11  Q    And it focuses specifically on issues of size, density,

       12  and distribution of statistical characteristics, is that fair?

       13  A    That is the core of the study.  It can expand into other

       14  areas of sociology, economics, other spaces.  But you have the

16:04:26 15 core correct.

       16  Q    Okay.  And your formal educational training is in that

       17  area; is that correct?

       18  A    It's one part of my training, yes.

       19  Q    And what is the -- can you describe the expertise you have

16:04:41 20 in political redistricting?

       21  A    Sure.  So I have worked --

       22  Q    I don't want to know the experience.  I want to know the

       23  scope of what you think that means.

       24  A    Yeah.  So the scope of that for me and my area of

16:04:57 25 expertise has been the -- what I call in data science terms,
```

```
 1   it's called CMAR -- Collect, Manage, Analyze and Reporting of
 2   Data.  And that's demographic data relevant to redistricting.
 3        I have expertise in collecting demographic data, the
 4   management, the analysis, and the reporting of demographic data
 5   and conclusions of those demographic data to support
 6   districting and political redistricting cases.  I've leveraged
 7   that expertise in both small area and large area, drawing whole
 8   plans and defending plans and critiquing plans in my career.
 9   Q    Okay.  Anything else?
10   A    No, sir.
11   Q    Okay.  You have two master's degrees; is that correct?
12   A    Yes, sir.
13   Q    One is in management and information systems, right?
14   A    That is correct.
15   Q    And the other one is in statistics?
16   A    It is in urban studies and planning with a core of
17   demography in statistics.
18   Q    And that completed your education; is that right?
19   A    I have one other degree, a chief information officer
20   certification from the GSA.  That's the extent of my
21   professional formal higher education and training.
22   Q    And you haven't studied history since you were an
23   undergraduate, right?
24   A    I study history every day, but for my professional
25   training, no, not since my undergrad.
```

```
 1   Q    And not in any formal matter?  I mean, we all read the
 2   papers and keep ourselves informed of all sorts of things.
 3   A    Of course.
 4   Q    And by the same token, you don't consider yourself to be a
 5   political scientist, even though you may keep yourself informed
 6   of developments and government?
 7   A    That is correct and the relationships, professional and
 8   personal, that I maintain with people in redistricting who do
 9   political work for sure.
10   Q    I will come to that.
11        And you never formally studied sociology, anthropology or
12   political science, right?
13   A    I did not study the anthropology or political science.  I
14   have studied sociology as part of my undergraduate and graduate
15   coursework, but I would not characterize myself as a sociology
16   expert.
17   Q    That's exactly what I was going to answer.  I appreciate
18   your anticipating my question.
19        Did you ever study the history of the U.S. census?
20   A    I have some knowledge and experience of the census.  I
21   would not consider myself to be Margo Anderson, the nation's
22   census historian.
23   Q    Do you have knowledge of how the census operated before
24   the time you were first involved with it in the 1990s?
25   A    I have some understanding of it, yes.
```

16:06:41 (line 5)
16:06:57 (line 10)
16:07:16 (line 15)
16:07:31 (line 20)
16:07:46 (line 25)

```
 1  Q    And what was -- where did you get that information?
 2  A    It was experience working as the director of the Oregon
 3  state data center, and that responsibility compelled me to know
 4  and understand the source of the census data statistics that
 5  were used to support the state data center.  It was learning on
 6  the job.
 7  Q    Okay.  Let me shift gears.  Who retained you in this case?
 8  A    The Secretary of State, and I have been working with
 9  Mr. Jim Davis of the Attorney General's Office.
10  Q    So it was Mr. Merrill himself who retained you?  Secretary
11  Merrill actually was involved in your hiring; is that your
12  testimony?
13  A    I would defer to the exact contractual agreement with --
14  and ask Mr. Jim Davis to answer that question what the sequence
15  of retention was.
16  Q    Well, I am not asking about the sequence of retention.  I
17  am asking about who was the person who hired you?
18  A    Jim Davis.
19  Q    Okay.  And he's the counsel who questioned you this
20  morning?
21  A    Yes.  Yes.
22  Q    When did he hire you?  I think you said sometime in the
23  fall, right?
24  A    Yeah.  It was about probably about three months ago.
25  Q    And you have a written retainer agreement?
```

Left margin timestamps: 16:08:08 (5), 16:08:24 (10), 16:08:44 (15), 16:08:58 (20), 16:09:07 (25)

1   A     I do.

2   Q     Does that describe the scope of what you were hired to do?

3   A     There were two retainers.  There was an emergency retainer

4   and then there was an ongoing retainer.  And, yes, both those

16:09:25  5   documents described the scope of my work as being demographic

6   analysis and critique of plans, areas I have written about.

7   Q     Demographic analysis of what?

8   A     Yes.  The characteristics of the original Alabama plan,

9   the enacted Alabama plan.  And at the time, the Singleton plan,

16:09:55 10   anticipating that there were going to be other plaintiff plans.

11   So the anticipation was to be able to understand and

12   characterize the demographic features and performance of those

13   plans.

14   Q     What came to be the Duchin and Cooper plans?

16:10:12 15   A     And, yes, certainly with time.  Then there were Duchin and

16   Cooper plans were introduced as well.  And so I -- even with

17   the compressed timeframe, I did my best to apply the same type

18   of analytics to those plans as I did to the earlier Singleton

19   plan.

16:10:29 20   Q     I understand that and we will get to what you did.  I'm

21   just working on the scope right now, okay?

22   A     Yes, sir.

23   Q     In your reports, did you identify all of the information

24   that you relied upon in order to form the opinions you

16:10:43 25   expressed?

```
 1   A     I believe I did.
 2   Q     Okay.  And you identified the sources that you used to
 3   obtain that information; is that correct?
 4   A     Yes, I did.
```
16:10:54  5   Q     Did you obtain any information at all directly from any
```
 6   legislators in Alabama?
 7   A     No, I did not.
 8   Q     Have you ever met a legislator in Alabama?
 9   A     No, I have not had the pleasure.
```
16:11:13 10   Q     So you are not -- your clients don't include the
```
11   intervenors in this case who are such legislators, right?
12   A     That's right.
13   Q     And you have never met the co-chairs of the legislative
14   reapportionment committee?
```
16:11:27 15   A     No, I have not.
```
16   Q     And what you know about -- what you relied upon in your
17   court in reference about what former Congressman Bonner and
18   former Congressman Byrne said came from reading testimony that
19   Mr. Davis provided to you, right?
```
16:11:44 20   A     That's correct.
```
21   Q     So you have never met any federal legislators or Congress
22   representatives either, in connection with this work, right?
23   A     No, I have not.
24   Q     Have you ever met any legislators in Alabama or
```
16:11:57 25   congressional representatives from Alabama in any other work in

```
 1   your life?
 2   A    No, I have not.
 3   Q    Okay.  Before this case, had you done any work in
 4   connection with Alabama?
 5   A    Yes, I have.
 6   Q    When was that?
 7   A    It was earlier in 2021.  I was connected to Mr. Davis in
 8   the Attorney General's Office with an interest in understanding
 9   the impact of a new innovative Census Bureau system called
10   differential privacy.  It's a new method of disclosure
11   avoidance.  I was asked to provide demographic expertise and
12   assessment of the impact of differential privacy on the census
13   data that would be used by the State of Alabama for the purpose
14   of redistricting.  And that work was completed in March, April,
15   May of 2021.
16   Q    So before 2021, did you have any experience working in
17   Alabama?
18   A    No.
19   Q    Had you ever been to Alabama for professional reasons?
20   A    Just for conferences and other personal relationships.
21   Q    You have friends that live in Alabama?
22   A    Not currently.
23   Q    Okay.  Now, you say at page 5 of your report that the plan
24   at issue in this case was drawn in compliance with the
25   published criteria for redistricting.  Do you remember saying
```

```
 1   that?
 2   A    The plan -- which plan are you referring to?  Is that
 3   the --
 4   Q    Well, I was going to ask you -- I apologize for having cut
 5   you off.  I will try not to do it again.
 6   A    Which is the plan that you are referring to?  I don't
 7   recall the exact language.
 8   Q    Okay.  You referred, I believe, to the plan at issue.
 9   It's on page -- do you have a copy of your report?
10   A    I do.  It's the Singleton report?
11   Q    I think it's the Singleton report, yeah.
12   A    Okay.  The plan at issue could have been the enacted
13   Alabama or it could be the Singleton plan.  There was a lot at
14   issue.
15          JUDGE MARCUS:  The question, counsel, is are we
16   referring to the first report Mr. Bryan did and relates simply
17   to the Singleton plan, or are we referring to the second plan?
18   I think -- I think on the screen --
19          MR. DUNN:  There are three plans.  Hold on a second.
20   BY MR. DUNN:
21   Q    Yep.  I'm actually referring to your report in the Merrill
22   and Caster cases.  It's D-2, I believe.
23   A    All right.
24   Q    And you said -- yes, that's it right there.  If you look
25   at the screen, you will see plans were drawn in compliance with
```

1    the published criteria for redistricting.  Does that refresh

2    your recollection?

3    A    Yes.  Yes.

4    Q    Okay.  And what plans were you referring to when you said

16:15:36 5    that?

6    A    This was the Alabama congressional plan.

7    Q    Okay.  And then yesterday you testified in response to

8    Mr. Davis's question that the Legislature's 2021 plan was legal

9    and compliant.  Do you remember giving that testimony?

16:15:56 10    A    Yes, I do.

11    Q    Okay.  So first of all, when you said that those plans

12    were drawn in compliance with published criteria for

13    redistricting --

14    A    Uh-huh.

16:16:11 15    Q    -- what published criteria did you mean?

16    A    This would have been the reapportionment committee

17    redistricting guidelines.

18    Q    And you consider it within your expertise to be able to

19    form an opinion as to that?

16:16:23 20    A    If these were the guidelines that were used for the

21    drawing of the plan, I have an ability to look at those

22    guidelines and look at certain of them, not all of them, but

23    certain of them, such as minimum population deviation,

24    one person, one vote, compactness, yeah, I have expertise to

16:16:49 25    speak to several, but not all of the criteria that were

1  published and what I understand to be used for the drawing of

2  the plan.

3  Q    But some of them you don't have expertise to opine about?

4  A    Yes, that's correct.

16:17:01  5  Q    Okay.  And then you said the plan was legal and compliant?

6  A    Right.

7  Q    What's your basis to form an opinion about whether the

8  plan was legal?

9  A    Because when I looked at the minimum population deviation

16:17:15  10  and equalizing population, it met that criteria.  That's the

11  legal criteria as I said earlier.  I don't have a basis to form

12  an opinion of whether it was compliant with the Voting Rights

13  Act.  I took that as fact that that plan as it was submitted by

14  the experts who drew the plan that it was.  I am not a Voting

16:17:37  15  Rights Act expert.

16  Q    So in giving that testimony and writing that language, you

17  made an assumption of compliance with the Voting Rights Act; is

18  that what you are saying?

19  A    Yes.  And other things that are outside, I did not make a

16:17:51  20  complete inventory of which of these were in my expertise or

21  outside, but for the areas of my expertise, the plan conformed

22  with those areas with which I am an expert.

23  Q    So we can modify the language that I referred to, to say

24  to the extent of your expertise, that was your conclusion,

16:18:07  25  right?

```
 1   A     That's fair.
 2   Q     Good.  Do you know who drew the plan?
 3   A     I do not.
 4   Q     So you never communicated directly with whoever the drawer
 5   of the plan was?
 6   A     I don't even know their name.
 7   Q     And nobody ever gave you any information on what the
 8   drawers' activities were or qualifications were, or anything
 9   else about him or her or them?
10   A     Literally do not know anything about the -- whoever put
11   the map together.
12   Q     Did you ask for any of that information?
13   A     No, I did not.  I think it would have been inappropriate
14   and would have interfered with my expert assessment of the
15   plan.
16   Q     Now, you also said yesterday that race was not looked at
17   in drawing the legislature's plan.  Do you remember saying
18   that?
19   A     That's what I was told, yes.
20   Q     Oh, so the only way you know that is because somebody told
21   you that?
22   A     Yes.
23   Q     Who told you that?
24   A     Counsel.
25   Q     So you feel comfortable testifying under oath as to things
```

16:18:21 — line 5
16:18:37 — line 10
16:18:55 — line 15
16:19:10 — line 20
16:19:20 — line 25

1028

counsel told you?

A    If counsel tells me that race was not a factor in drawing
it and the mapmaker did not consider that in the drawing of the
maps, I have no reason not to believe that.  I was not part of
16:19:47 the map drawing process, but if things are said about the
drawing of the maps, then, yes I have to take that in faith
that that's what happened.

Q    Are there any other things in your report that you don't
know personally, but you relied on Mr. Davis to tell you?

16:20:05 A    I would say that the testimony, for example, presented by
Byrne and Bonner was an illustrative example of information
that I was looking for to build my expertise that was provided
by Mr. Davis.

Q    Okay.  Anything else?

16:20:25 A    Not off the top of my head.  There may be some things, but
not that I recall.

Q    And the published criteria that you refer to are the
guidelines, I think there are at least two exhibits previously.
I have Exhibit 4.  I think they were Exhibit 82; is that right?

16:20:46 A    The exhibit I have is M-28.

Q    Okay.  I got the numbers reversed.  M-28.  And those are
the May 5th, 2021, guidelines; is that right?

A    Yes, sir, that's correct.

Q    And that document contains criteria for redistricting that
16:21:06 are contained in Section 2; is that correct?

1 A    That is correct.

2 Q    And do you understand that to be the governing document

3 that lays out the requirements for the development of

4 redistricting plans in Alabama?

16:21:20 5 A    It is my understanding, yes.

6 Q    And those criteria apply --

7        JUDGE MANASCO:  Your Honor, can I interrupt.  Just one

8 moment.  I think we may have a technical difficulty.  I can't

9 see Judge Moorer anymore, and it may just be my screen because

16:21:36 10 he's a small -- there he is.  Okay.  I just wanted to make sure

11 he was with us.

12        MR. DUNN:  No point in having this examination if we

13 don't have all the judges present, Judge Manasco, I really

14 appreciate you pointing that --

16:21:52 15        JUDGE MANASCO:  These little tiny blocks and if

16 somebody moves just a few inches, they slip out of their block.

17        MR. DUNN:  Thank you.

18        JUDGE MARCUS:  For the record, I am -- have been

19 monitoring the screens fastidiously, and I have seen Judge

16:22:07 20 Moorer from the corner of the screen, from time to time he's

21 moved over to the left side of the screen.  And you can only

22 just see a portion of his arm.  But I do want this record to be

23 crystal clear that I have observed Judge Moorer at every moment

24 of this testimony.

16:22:27 25        With that, you may proceed, Mr. Dunn.

1030

1        MR. DUNN:  Thank you very much, Judge Marcus.

2   BY MR. DUNN:

3   Q    So we were talking about the criteria for redistricting

4   which are Exhibit M-28 in evidence, Mr. Bryan.  And the

16:22:44 5   question that I started to ask you was whether the criteria

6   that are set forth in Section 2 of that document apply as to

7   all redistricting in Alabama?

8   A    You mean all redistricting insofar as the legislature, the

9   senate and State Board of Education?

16:23:09 10  Q    Yes.

11        MR. DAVIS:  Pardon me.  I have no objection.  I want

12  to make sure Mr. Bryan has a copy of the document we are

13  talking about if he wishes --

14        Thank you.

16:23:20 15       JUDGE MARCUS:  I think he does.

16        THE WITNESS:  Yes, sir.

17        MR. DUNN:  And I want to make sure that he has it,

18  too, Mr. Davis, so I am glad you pointed that out.  Thank you.

19  I would put it up, but I'm just really trying to move along as

16:23:31 20  fast as we can and not burden us with exhibits except to the

21  extent that I have to.  But I am happy to put it up if that

22  would be of assistance.

23  BY MR. DUNN:

24  Q    If I mention any documents, Mr. Bryan, you don't have or

16:23:43 25  you need to refresh yourself with the language, you just let me

```
 1  know and we will put them up, okay?
 2  A    Yes, sir.  That sounds great.
 3  Q    Thank you.  I appreciate that.
 4  A    Thank you, sir.
 5  Q    Okay.
 6  A    In reading the document, it states at the beginning of the
 7  document it's the intention of the provision to include from
 8  use census data, da da da.  The inference of this document is
 9  the criteria for redistricting as it is for all of the plans.
10  I only used this for the purpose of assessing the congressional
11  plans.  I did not assess the legislative, senate, or State
12  Board of Education plan.
13       So I do not have a basis for stating factually whether
14  these criteria were used for the development of those plans or
15  not.
16  Q    Well, you have seen in the course of this case some
17  reference to the State Board of Education districts and the
18  redistricting for that, right?
19  A    I have to be honest.  I have only heard about that work
20  and seen it and noted it peripherally.  I have had no State
21  Board of Education work as part of this case whatsoever.
22  Q    Do you know that the State Board of Education districts
23  were restricted as a result of the 2020 census in Alabama?
24  A    That's the -- about the extent of my awareness.  That's
25  what the legislature and senate -- yes.
```

1    Q    Okay.  So I want to go one step further.  Do you

2    understand that that redistricting that was done was done in

3    accordance with the guidelines that are Exhibit M-28?

4    A    I assume that they were.

16:25:13 5    Q    Okay.  Now, is it a fact that these guidelines require

6    compliance with the Voting Rights Act?

7    A    Yes.

8    Q    And do you understand the fundamental issues that brings

9    us here to this proceeding is the question of whether they do

16:25:38 10    so?

11    A    Yes.

12    Q    So just to be clear.  You have no opinion at all as to

13    whether the congressional plans at issue here, the 2021

14    redistricting plan, does or does not comply with the Voting

16:25:58 15    Rights Act?

16    A    I do not have an opinion, no.

17    Q    Now, in your report at page 8, and this is D-2.  Do you

18    have that?

19    A    Yes, sir.

16:26:17 20    Q    Maybe we should put this up?

21    A    Census --

22         JUDGE MARCUS:  Bear with me.  What you want to do is

23    put up on the screen what you are referring to, Mr. Dunn.

24    Could you tell us -- this is Defendant Exhibit D-2, the report

16:26:38 25    of Mr. Bryan.  Is this just for my help?  Report 1 or report 2?

```
 1  I guess this is the second one, right?
 2          MR. DUNN:  Judge Marcus, there are actually three.
 3          JUDGE MARCUS:  I understand.  But is this the second
 4  or the third of the three?
 5          MR. DUNN:  This is the second.  This is -- this is the
 6  first report in Merrill and Caster.
 7          JUDGE MARCUS:  Gotcha.  Thanks very much.
 8  BY MR. DUNN:
 9  Q    Mr. Bryan, can you confirm that the document we're looking
10  at that's D-2 in evidence is the first one you wrote in the
11  Merrill and Caster cases?
12  A    Yes, sir.
13  Q    Okay.  Good.
14          MR. DUNN:  Mr. Davis, we all agree?
15          MR. DAVIS:  We do.
16          JUDGE MARCUS:  Let's proceed, counsel.
17  BY MR. DUNN:
18  Q    Now, in this report, you refer to criteria that are set
19  forth in by the Congressional Research Service on page 8; is
20  that correct?
21  A    Yes.
22  Q    Given that Alabama had specifically set forth its own
23  criteria in the redistricting guidelines, why did you choose to
24  refer to the more generic Congressional Research Service
25  reports instead of Alabama's own guidelines?
```

```
 1  A    Yes.  My intent in providing this information, as it was
 2  with all the reports, was to provide a complete picture, a
 3  context, a national view of what traditional redistricting
 4  principles are.  It is to ground the reader, ground the Court,
 5  ground the counsel in what traditional redistricting principles
 6  are, and why they are important.
 7        The intent here was to provide this larger scale
 8  background and context of what these things were, and then to
 9  funnel that information down into specifically what the rules
10  in Alabama were.  I was not challenging or changing the rules
11  for Alabama or trying to contravene them in any way.  It was
12  simply background and context of what they generally are and
13  their relevance.
14  Q    So certainly nothing in the Congressional Research Service
15  report would override or modify the specific criteria that
16  Alabama has articulated in its guidelines, right?
17  A    No, sir.
18        THE COURT REPORTER:  Please do not talk over each
19  other.
20  Q    To the extent that I did that, I apologize.  I will try to
21  let you finish your answer before I ask my next question.
22        You had a lot of discussion on Ms. Khanna's
23  cross-examination about the definition of black and what you
24  used as the definition of what you call true black.  Do you
25  recall that discussion?
```

16:28:27 (line 5)
16:28:50 (line 10)
16:29:09 (line 15)
16:29:28 (line 20)
16:29:57 (line 25)

A     The use of the word true in my report refers to my effort
to identify plaintiffs' reported black populations.
Oftentimes, I do not know what the black populations are that
they refer to.  I frequently see plaintiffs and other experts
refer to black populations that are either incorrect or may not
have a proper definition or reference.

      My goal to identify what I refer to as the true black
population is not to pick one that is right or is wrong, but
rather to provide a set of guardrails, an in-depth
understanding of what the definitions are and then to try to
help the experts and the work that I see in the plaintiffs'
reports to know exactly what the black populations are that
they are using in their analysis.

      That is the context of what I refer to as true.

Q     Did you think there was any ambiguity or uncertainty in
the definition of black that Dr. Duchin used in her work?

A     Dr. Duchin is exceptionally attentive to those details and
it's much appreciated.  There's no lack of clarity at all.

Q     So you didn't need to clarify the definition in analyzing
her work, did you?

A     I think specific to her plans, no.  In general, in my
experience in doing this work, this problem comes up
repetitively and it's an effort I make in my work to make sure
that there is clarity no matter what, however well or not well
someone may represent their work.

```
 1        The other reason that I do this, as I mentioned earlier,
 2   is not with the case of Dr. Duchin, but in the case of
 3   Mr. Cooper, errors can and are made in this.  And so my effort
 4   is to define my math and to double-check my math and make sure
 5   that the data in his reports are, in fact, what they say that
 6   they are.  And that was the intent of my effort here.
 7   Q    Okay.  But as to Dr. Duchin, that was not an issue or a
 8   problem, right?
 9   A    No.  Dr. Duchin did a fine job.
10   Q    By the way, did you hear her testimony?
11   A    I heard most of it, yes.
12   Q    Okay.  What other testimony in this case have you been
13   able to observe?
14   A    I heard the testimony earlier today, but yesterday the --
15   my focus was really on Duchin's work.  I did not hear any of
16   Mr. Cooper's testimony.  I had not arrived in Montgomery in
17   time for that.
18   Q    Okay.  So you heard the Milligan expert, but not the
19   Caster expert testify?
20   A    Yes, sir.
21   Q    And you said you heard some other testimony yesterday?
22   A    Yeah.  There was a political scientist that spoke for some
23   time, although that was less relevant, while interesting, it
24   was less relevant to my work.
25   Q    Now, did you rely in your work on information that was
```

```
 1  provided to you by any political scientists?
 2  A    None of my work was informed by a political scientist.  I
 3  performed work, demographic, data science and analytic work
 4  that was subsequently provided to the political scientists for
 5  a small portion of their work.
 6  Q    What political scientist?
 7  A    I believe his name is Dr. Trey Hood.
 8  Q    And how do you know that your work was provided to
 9  Dr. Hood?
10  A    Through conversations with counsel, Jim Davis.  There was
11  a request for some information about the VTD boundaries,
12  location of voters in Washington County, which is an area of
13  expertise on my team.
14  Q    Is it correct that you have not, however, communicated
15  with Dr. Hood in connection with any of the work in your
16  report?
17  A    That's correct -- yeah, that's correct.
18  Q    And you haven't relied on anything that he had previously
19  told you?
20  A    No.
21  Q    And you knew Dr. Hood before; is that correct?
22  A    That's correct.
23  Q    You worked with him before?
24  A    Yeah.  There have been cases, sure.
25  Q    Any other political scientists?
```

```
 1  A     Not on this case.

 2  Q     Let me withdraw that.

 3  A     No.

 4  Q     There are no other political scientists you have

 5  communicated with in connection with the preparation of your

 6  reports, right?

 7  A     No.

 8  Q     And you are not relying on anything that any other

 9  political scientist told you or information they provided to

10  you previously in connection with your report; is that right?

11  A     Only insofar as that I am aware from a political science

12  perspective what the preferences of the political scientists I

13  work with are in terms of defining the race groups for the

14  purpose of their Gingles II analyses.

15      That's the only extent to which I have used any previous

16  knowledge of working with my political scientists in this case.

17  It's just that historic knowledge and relationship.

18  Q     So going back to where we were before, you understand

19  there's a choice in defining the black population that you

20  made, correct?

21  A     I do not make the choice.  I prepare the variety of

22  options that are available.  And I provide that option in my

23  analysis for my own critique of plaintiff plans and I also

24  provide those options to political scientists who may use that

25  information for their analyses.
```

1  Q    So it's your testimony that you did not express a

2  preference for single-race black over any-part black in your

3  report and your work in this case?

4  A    I do not have a preference.  There is not a right or a

16:36:32  5  wrong way.  Both of the ways that you can measure this have

6  significant value and importance in these cases.  I believe my

7  statement with regard to the single-race is my understanding,

8  again, from my experience with political scientists that more

9  homogeneous groups are easier to characterize and to analyze

16:36:53 10  and to defend than more heterogeneous groups.  And that is no

11  way a judgment or ranking of one particular method over the

12  other.

13  Q    And you don't have any expertise to express a preference

14  for which should be used in connection with the analyses that

16:37:16 15  are at issue in this case; is that right?

16  A    I certainly do not.  No, that's correct.

17  Q    And you do understand, I take it, that Dr. Duchin made a

18  choice different from the one you're now talking about, that

19  she used any-part black, right?

16:37:31 20  A    Yeah.  Yeah.  That's correct.  And there's -- there can be

21  reasons individual experts may do that, and I know those and

22  respect those.  It's a fine choice if that's appropriate for

23  them.

24  Q    So when you critiqued her work --

16:37:45 25  A    Uh-huh.

Q     -- in terms of whether the districts that she proffered
were majority black on the basis of your analyses, you didn't
mean to express a judgment as to what definition of black was
appropriate for that?

16:38:03 A     No.  And that's why I do my analyses of these types of
plans consistently, same way every time, is that I present both
of the statistics in my assessment and my summary, just simply
state factually whether they do or do not rise to meet a
majority-minority threshold under one criteria or another.

16:38:26 There is no judgment or assessment of it failing or succeeding
based on one or the other.  It's a simple factual black and
white observation.

Q     And to cut to the chase with Dr. Duchin's work, you found
that even using the sole-race black criteria, one of her plans

16:38:49 qualified as a majority-black plan in both of the districts
that she identified, correct?

A     Yes, that's correct.

Q     And if you use the any-part black test, you confirmed her
analysis that all of her plans did so?

16:39:05 A     Yes, that's correct.

Q     And you understood that her plans, the four plans she
presented were representative plans, right?

A     Yes.

Q     That were designed specifically to cross the majority

16:39:18 threshold and demonstrate the possibility that in Alabama you

```
 1  could design a plan that contained two majority-black
 2  districts, right?
 3  A    Yes.  She was clear that was her intent, the direction and
 4  intention of her efforts, yes.
```
16:39:35 `5  Q    And using her definition, she fully succeeded?`
```
 6  A    She appears to have, yes.
 7  Q    Great.  And by the way, when we talk about majority, do
 8  you understand that the definition of majority is anything
 9  above 50 percent?
```
16:39:49 `10  A    It's as a demographer following the law, it is literally`
```
11  50 percent plus one person.
12  Q    Thank you.  Let me return to the committee guidelines.
13        I take it you did review those in connection with your
14  report?
```
16:40:06 `15  A    Yes, I did.`
```
16  Q    And you relied upon them in your report?
17  A    Yes, I did.
18  Q    Could we put them back up, please?  And I would like to
19  call your attention to Section 2(g)of the guidelines, if I
```
16:40:27 `20  could, Mr. Bryan.  Could we highlight that, please?  Are you`
```
21  familiar with this subsection?
22  A    I am familiar with it, but it was less relevant to my area
23  of expertise and my area of analysis in the case.
24  Q    Well, it says specifically that considerations of race,
```
16:41:01 `25  color, or membership in a language minority group -- I'm sorry.`

1  Let me back up.

2       No district shall be drawn in a manner that subordinates

3  race-neutral districting criteria?

4  A    Right.

16:41:16  5  Q    Those are the criteria that are discussed below in this

6  document, right?

7  A    That is correct.

8  Q    So they should not be subordinated to issues of race or

9  color, except race, color or membership in a language minority

16:41:35 10 group may predominate over race-neutral districting criteria to

11 comply with Section 2 of the Voting Rights Act.  Do you see

12 that?

13 A    Yes, sir.  Correct.

14 Q    So do you understand that if districts need to be reshaped

16:41:49 15 in order to comply with Section 2 of the Voting Rights Act,

16 that other criteria need to yield to those requirements?

17 A    I understand that that is the requirement.  It is outside

18 the scope of my expertise to determine whether one district or

19 two black majority-minority districts were necessary to comply

16:42:15 20 with the requirement.

21 Q    But if two districts were required, the plan the

22 legislature adopted only contained one, right?

23 A    Can you please rephrase the question?

24 Q    You know the plan the legislature adopted in 2021?

16:42:36 25 A    Yes.

1043

1   Q     Only contains one majority-black district?

2   A     Correct.

3   Q     So if two districts are required in order to comply with

4   the Voting Rights Act, then this section would apply and

16:42:52   5   race-neutral criteria would have to yield to whatever is needed

6   to be done to comply with the Voting Rights Act; is that

7   correct?

8   A     Not being an expert in that space, this would be my

9   literal interpretation of this -- that statement would be

16:43:10   10   correct.

11           MR. DAVIS:  I would like to lodge an objection for the

12   sake of completeness of the transcript.  Mr. Dunn only read

13   part of the section.  I just wish to note that there is more to

14   the sentence regarding the guidelines reference to Section 2 of

16:43:31   15   the Voting Rights Act.

16           JUDGE MARCUS:  You will have every opportunity to

17   explore it on redirect.

18       You may proceed, sir.

19   BY MR. DUNN:

16:43:41   20   Q   And then as Ms. Khanna discussed with you, there are

21   certain criteria that are identified in subsection J.  Mr. Ang,

22   can we go down to subsection J?

23       And the -- specifically -- no, let's go back to the whole

24   page, please.  Because what I want to establish is that

16:44:07   25   subsection J is where considerations of contest between

```
 1   incumbents and communities of interest are placed in the
 2   guidelines; is that right?
 3   A    Yes.
 4   Q    And those criteria cannot be used to subordinate or impair
 5   the requirements that are stated above them, can they?
 6   A    Yes, that's correct, that's my understanding.
 7   Q    And minimization of the number of counties is also a
 8   subsection J criteria, right?
 9   A    Yes, it is.
10   Q    And so is core preservation?
11   A    Yes, correct.
12   Q    So the same rules of priority apply with respect to them,
13   correct?
14   A    Yes.
15   Q    And subsection G says specifically that the criteria in
16   paragraph J are not listed in order of importance, right?
17   A    I do not see -- I apologize.  I do not see Section (g).
18   Yes.
19   Q    But the requirement --
20   A    I do.
21   Q    -- the requirements for contiguity and compactness are way
22   up above all of this, and they have priority; is that your
23   understanding?
24   A    That's my understanding.
25   Q    Thank you.
```

1      Now, if we could go back to your report, which is
2  Exhibit D-2 on page 8, you list traditional districting
3  principles.  And you list preservation of communities of
4  interest and continuity of representation above compactness and
16:46:19 5  contiguity.  Do you see that?
6  A    Yeah.  I would be -- caution the reader not to read this
7  literally as a hierarchal prioritization of these rules.  It's
8  more of an inventory.
9  Q    Okay.  Let's talk about compactness for a little bit if we
16:46:43 10  could.
11  A    Okay.
12  Q    You say at page 28, at the top of your discussion on
13  compactness in D-2, that compactness is a measure to ensure
14  that districts do not deviate from being reasonably shaped and
16:47:04 15  is intended as a deterrent to gerrymandering; is that correct?
16  Did I read that right?
17  A    Yeah.  That's the goal, for sure.
18  Q    But as I think you have indicated previously, measuring
19  compactness is a complicated subject?
16:47:22 20  A    Very.
21  Q    And there are no objective criteria for what is a compact
22  district versus a not compact district?
23  A    There are not.  It's typically regarded as a relative
24  measure within one set of plans for a specific state for a
16:47:41 25  specific redistricting exercise versus another set of plans for

1    the same state for the same redistricting exercise.

2    Q    And even though there are no objective standards, there

3    are benchmarks or standard measures that you say are used by

4    demographers regularly to measure and compare compactness; is

16:48:01  5    that a fair characterization?

6    A    Yes, sir, that is correct.

7    Q    And you picked four particular measures of compactness to

8    use; is that right?

9    A    Yes, I do.

16:48:12 10    Q    And two of those measures are measures that were also used

11    and referenced by Dr. Duchin; is that right?

12    A    That is correct.

13    Q    And then she had an additional criteria.  Are you familiar

14    with that criteria?

16:48:33 15    A    Yes.  It's the -- it's an innovative technique she has

16    developed and I believe it is the block edge technique.  I

17    think it reflects how quickly this area is evolving and how

18    much change there is and how we are examining these things

19    right now.  I commend her work to come up with new techniques

16:48:56 20    to do this as well as possible.

21    Q    And then you also used what's referred to as the

22    Schwartzberg score to measure --

23    A    Yes, sir that's correct.

24    Q    -- compactness.  But you modified the Schwartzberg score

16:49:12 25    in your analysis; is that correct?

1   A     Yes, sir.

2   Q     And in adapting the Schwartzberg score, what did you do?

3   A     So the Schwartzberg score is different than many of the

4   other generally accepted techniques.  The scores that you would

16:49:43 5   have for Reock, for example, for Polsby-Popper, for convex

6   hull, I mean, there's dozens of these techniques.  And

7   virtually all of them give you values that rank from zero to 1,

8   right?

9         What's both powerful, but as well difficult about the

16:50:02 10   Schwartzberg score is it's a number that can stretch to

11   infinity, right?  And so if you look at that score, most

12   people, certainly not me, can look at a score of 100,000 or a

13   hundred million or a billion or whatever the number may be and

14   quickly say, oh, there is how much better a million is than a

16:50:25 15   billion.  Our brains are just not wired to be able to do that

16   quickly.

17         So other experts, other analysts adapted a version of

18   Schwartzberg that basically just divided it by 1 and turned it

19   into a fraction and rescaled it between zero and 1.  And

16:50:47 20   largely the purpose of that is to help people look and say, ah,

21   I know what the difference is between .5 and .6 or .5 and .7,

22   right?  It's much easier to do than trying to figure out the

23   difference between million and a billion.

24         So when we did that adaptation of Schwartzberg, one of the

16:51:10 25   ways that we quality controlled it and assessed it was to do

```
 1   what is called a regression analysis.  That is we compared it

 2   with one of the techniques Dr. Duchin advocated, the

 3   Polsby-Popper score, and what we found is that our adaptation

 4   had almost a perfect correlation to the Polsby-Popper score.

 5   That is as conceptually the mathematics, if you knew them, it

 6   would sound, look, feel the same, and the math that we did

 7   proved that it was the same.

 8        So the outcome, or the effect is you're just duplicating

 9   the Polsby-Popper score.  Through this experience, even though

10   we have shared this metric out with other judges and courts in

11   the past and it's beneficial, I have learned something from

12   this, that it doesn't really matter if you add Schwartzberg

13   into this combination of different methods or you don't.  The

14   Polsby-Popper basically serves the same function as the

15   Schwartzberg score does.  The adaptation makes no difference

16   whatsoever in the ranking or the performance overall of the

17   compactness, and would not change any of my conclusions whether

18   you included it or excluded it.

19   Q    And that's demonstrated because if you look at the tables

20   in your appendix, when you present the compactness of various

21   districts, the coloring and measurement in Polsby-Popper and

22   Schwartzberg are absolutely identical.

23   A    That's exactly right, yes.

24   Q    Okay.  So effectively, what you did was to create a

25   benchmark that mirrored Polsby-Popper, so in your tables where
```

1    you are Schwartzberg and Polsby-Popper what you really have is

2    Polsby-Popper and then a proxy that's exactly like

3    Polsby-Popper again?

4    A    Very closely, yes, sir, that's a great analysis.

16:52:59 5    Q    Good.  Then I'll stop there.  Let me ask you one more

6    question.  In Appendix 3, where you talk about compactness

7    measures in D-2, you reference a set of diagrams and discussion

8    of the various benchmarks and you give an Internet site for

9    your source.  Do you see that, this is page 34?

16:53:31 10    A    Yes.  I am familiar.  This is one illustrative.

11    Q    What you referenced is an unpublished student paper; isn't

12    that right?

13    A    Yes, but the map is the same, regardless of wherever you

14    looked.  It could be a high school paper or it could be a

16:53:50 15    Harvard mathematician paper.  The math is the same.

16    Q    The math may be the same, but certainly an unpublished

17    student paper is not something that ordinarily an expert in the

18    field would rely upon, is it?

19    A    I rely on the math no matter what the source is.

16:54:07 20    Q    That wasn't my question.

21    A    I understand.  For the purposes of having a visual

22    illustration of these scores, I am not aware of any site that

23    has a better quick easy visual representation of these, what

24    the impact of these difference compactness measures are.

16:54:30 25        If the purpose was to go into the ancient mathematic roots

of these, I would refer to a different source.  If I want

somebody to be able to look at one of these methods and

understand in 30 seconds how they work, I would send them to

this site.

16:54:45  Q    My question is general isn't it the case that experts

skilled in the area will refer to published professional

peer-reviewed papers, not to student works?

A    They could certainly do that.  I would challenge anyone

going into, for example, a wonderful document such as

16:55:09  Dr. Duchin's 2018 geometry report on these different measures

to figure out how these measures work through that paper in

hours, let alone 30 seconds.  The benefit of this is quick and

intuitive way to understand how they work.

Q    Would you agree that the models and the plans that

16:55:41  Dr. Duchin has proffered score as well or better than the plan

the state adopted for compactness?

A    There are two levels to this answers.  In aggregate, they

do.  By in order to understand compactness, you have to

understand the details that make up that overall score.

16:56:11       In Duchin's original report, and I did not see her

subsequent report, in Duchin's original report all she provided

us was the top line summary statistic.  This is the average

score for Polsby-Popper, the average score for Reock.

       What she did not show in the original report was that if

16:56:29  you look at the individual districts that comprise those

1    scores, the districts that make up her two majority-minority

2    districts perform much worse in terms of compactness because

3    they had to be drawn in a very specific and one might say

4    convoluted way in order to be able to capture just the black

16:56:53  5    populations necessary to make the majority.

6        She made up for that in some sense in other districts that

7    did not need to be adjusted in the north.  Those will be

8    Districts 4, for example, and Districts 5.  So by going into

9    those districts that did not need to be adjusted for the

16:57:10 10   purpose of this case and making them very geometrically

11   compact, which is a great benefit, it belies the fact that

12   underlying that is a couple of districts that are very poor in

13   terms of compactness, and those are her majority-minority

14   districts, and they are in some sense offset or accounted for

16:57:33 15   by making adjustments in areas where it's just not relevant.

16   Q    Aren't all districts in a plan relevant?

17   A    For the purpose of drawing a majority-minority district,

18   you have to draw those in a specific way in order to achieve

19   her objective.

16:57:55 20       If she wanted to go on and make adjustments elsewhere, she

21   could have chosen to or did not choose to.  The fact is when

22   she drew her plan, she selectively used one criteria for one

23   part of her plan and used a different criteria for a different

24   part of her plan.

16:58:16 25   Q    What -- what difference in criteria do you claim she

1  applied?

2  A     So in the northern districts, in 4 and 5, she used

3  compactness and optimized and sought clearly -- she has said in

4  her algorithm that sought to optimize compactness in her

16:58:36  5  northern districts.  You didn't have do that to get, you know,

6  what she said was her primary goal of two majority-minority

7  districts.

8         So in those northern districts, she used compactness.  In

9  her southern districts, where she wanted to optimize for black

16:58:50 10  population, said, well, compactness doesn't matter.  She said

11  as much, all I want to do is make sure that I get two black

12  districts.

13        So what is unconventional that the plan is that while she

14  did achieve her two black majority districts, she did that

16:59:05 15  using one set of criteria there and then tried optimize a

16  different set of criteria somewhere else in the state.  It's

17  the result of those efforts why she achieved an overall better

18  compactness than the state of Alabama plan.

19        Had the state of Alabama sought to generalize and make

16:59:24 20  their northern districts more compact -- they didn't have to,

21  they sought a least change plan -- but if they had sought to do

22  that they could have just as easily met or exceeded the

23  compactness scores of Dr. Duchin.  The state deliberately

24  decided not to sacrifice core retention, not to change any more

16:59:44 25  than necessary just for the sake of compactness.

1    Losing continuity of representation just so you say you

2 made something that looks more like a circle is not a tradeoff

3 the State of Alabama decided to make.

4 Q    No district in any one of Dr. Duchin's plans has a lower

17:00:06 5 compactness score than the lowest score in the state's plan,

6 does it?

7 A    I need to refresh my memory by looking at my report.

8 Q    Going to tell us what you are looking at?

9 A    Yeah.  I am looking at my report, the supplemental Cooper

17:00:26 10 and Duchin report.  This would be Document 76-4.

11    All right.  I am looking at it.

12 Q    This is Exhibit D-4; is that correct?

13 A    There's a compactness Table 2 for the Alabama enacted.

14 And then there's an Appendix 5.1, 4.2, 4.3, and 4.4.

17:01:10 15    So in looking at the Alabama enacted plan for

16 Polsby-Popper, the Polsby-Popper score in District 1 compared

17 to the Polsby-Popper score for Duchin in District 1, the

18 state's Polsby-Popper score is higher.  District 2 is higher,

19 District 3 is the same.  Districts 4 and 5, as I mentioned

17:01:35 20 earlier, are less.  District 6, Duchin is higher, and

21 District 7, Duchin is higher.  So there are some districts from

22 the state plan that are higher by district, and some districts

23 where the Duchin plan are higher.

24    JUDGE MARCUS:  You will have to speak into the machine

17:02:01 25 as you face away and look at the other screen.  Your voice gets

 1  muted and we have some difficulty.

 2       So take your time and speak right into that machine so we

 3  can hear you and our court reporter can get it down accurately.

 4  Thank you.

17:02:16  5            THE WITNESS:  Yes, sir.

 6       I compared the results of Polsby-Popper briefly just now.

 7  And looked at different districts for the state of Alabama

 8  plan, which was what I believe I'm being asked and comparing

 9  those different district scores by Polsby-Popper with one of

17:02:36 10  the Duchin plans, Duchin plan A.  And the results are that

 11  there are some districts where Duchin's plans are better,

 12  notably 4 and 5.  There are some plans where the compactness is

 13  not as good.  That would be in Districts 1 and 2, I believe.  I

 14  can present other findings if you would like me to.

17:02:56 15  BY MR. DUNN:

 16  Q    No, that's fine.

 17       Isn't it the case that Dr. Duchin attempted to optimize

 18  compactness to the extent possible every where while creating a

 19  majority-minority district?  Didn't you hear her testify to

17:03:14 20  that?

 21  A    I heard her concede that in District 2 that it was not

 22  compact because of the need to make it a black district.

 23  That's why it was elongated and was not a compact district.

 24  Q    When you say it was elongated, you mean it stretched from

17:03:31 25  one side of the state to the other?

```
 1  A    That's correct.  And that was her explanation of why it

 2  had an inferior compactness score, because she wanted to

 3  prioritize blackness.

 4  Q    Compared to other districts, you're talking about?

 5  A    That's correct.

 6  Q    There is no such thing, as you told us, of an inferior or

 7  superior compactness score in the objective.

 8  A    Relative to the other districts in her plans, certainly it

 9  had a lower score and she explained why.

10  Q    In the 2021 plan adopted by the legislature, how many

11  districts stretched from state border to state border east to

12  west?

13  A    Just not sure there is one.  Perhaps 5 at the very top,

14  District 5.

15  Q    Yes.

16  A    Yes, at the very top the narrowest part of the state, 5

17  would go from east to west.

18  Q    And District 4, no?

19  A    Yes, diagonally.  Yes, it would.

20  Q    And I was about to say, it not only goes from east to west

21  border to border, it goes diagonally, not straight across?

22  A    Yes, that's correct.

23  Q    And in Dr. Duchin's plan A, she, too, has two districts

24  that stretch from border to border, Districts 1 and District 2,

25  right?
```

Timestamps in left margin: 17:03:43 (line 5), 17:03:55 (line 10), 17:04:18 (line 15), 17:04:30 (line 20), 17:04:48 (line 25)

```
 1  A     Yes.  Yes.  Those are -- are newly created east to west
 2  districts.  So I would concede that the same lower compactness
 3  scores in the Alabama plan for Districts 4 and 5, which Duchin
 4  sought to remedy at the expense of core retention and
 5  incumbency are the same types of scenarios that you see play
 6  out in her Districts 1 and 2.
 7  Q     And in summary, in your rebuttal report you concluded --
 8  this is page 18 -- quote, Dr. Duchin's plans A to D, all four
 9  of them, almost always score better than the enacted Alabama
10  plan on average; is that correct?
11  A     That is correct.  Yes.
12  Q     And, in fact, the only time Dr. Duchin's plans did not
13  outscore the enacted plan was plan C, and only on the
14  calculation under Reock, right?
15  A     I believe that to be the case, yes.
16  Q     So other than that for compactness, each of the Duchin
17  plans had an equal or higher scores when the benchmarks on
18  average were compared to the enacted plan?
19  A     Yes.  Yes, it was clear that was prioritized over other
20  traditional redistricting principles in her address, that's
21  correct.
22  Q     Okay.  I think I would like to move on to another subject.
23        Let's talk about communities of interest, if we could.  On
24  page 14 of D-4, you talk about communities of interest, I
25  think.  I'm sorry.  No.  It's on page 14 of D-2.  I'm sorry.  I
```

1    have the wrong report.

2    A    Yeah.  That looks correct.  Got it.

3    Q    Okay.  Now, you start here with a quotation, but you don't

4    say what source you are quoting from.

17:07:31 5    A    That's from the University of Michigan center for urban

6    study and local policy.  It's on the front page of their

7    website.

8    Q    Why did you quote a University of Michigan definition of

9    communities of interest when the Alabama guidelines themselves

17:07:56 10   contain a definition?

11   A    Yeah.  So, again, I think that this was one of the cases

12   where as an expert in the space I try to provide what I think

13   is the best definition, the best information is in national

14   context.  And then I would supplement that, refine it, and

17:08:16 15   tailor it based on what the Alabama specific or any other state

16   specific guidance is.

17        I think that this definition from CLOSUP is a particularly

18   clear and useful definition and a good starting point to

19   educate anyone who is interested in what is a community of

17:08:36 20   interest is.

21   Q    But the finishing point in terms of Alabama needs to be

22   the Alabama guidelines, Exhibit M-28, and they contain a

23   specific definition of communities of interest, don't they?

24   A    Yeah.

17:08:53 25   Q    Look at J-3 on page 2, please.

1           JUDGE MARCUS:  Let him answer the question.  I'm

2    sorry.  Before you go on, to just refine it.  Had you finished

3    your answer?

4           THE WITNESS:  Yes.

17:09:03 5        JUDGE MARCUS:  Okay.  I'm sorry.

6           THE WITNESS:  Thank you.

7    BY MR. DUNN:

8    Q    So let's look at M-28, if you would.  A community of

9    interest is defined as an area with recognized similarities of

17:09:24 10  interest, including, but not limited to ethnic, racial,

11   economic, tribal, social, geographical, historical identities;

12   is that right?

13   A    That is correct.  Yes.

14   Q    Do consider that to be in any way fundamentally different

17:09:43 15  from the University of Michigan definition you quoted?

16   A    No.  It's specific refinements, specific to Alabama.  It's

17   not in conflict.

18   Q    Now, do you consider yourself to be an expert in

19   identifying communities of interest within a state that meet

17:10:00 20  that definition?

21   A    I would not consider myself a nationally recognized expert

22   in communities of interest.  I'm knowledgeable of them.  I've

23   researched them and used them extensively in my practice.

24   Q    Are there demographics that one looks at to determine

17:10:17 25  communities of interest?

1  A    There certainly would be.  Those can be characterized by

2  specific age groups, income groups, employment groups,

3  different types of family structure.  For example, that those

4  are some of many different communities of interest that combine

17:10:39 5  a group of people together.

6  Q    Racial composition?

7  A    That can be one, although my experience is that there can

8  be racial populations that have significant differences and

9  even conflicts within the same racial groups, so one must be

17:10:59 10  thoughtful and careful about generalizing, just based on race

11  alone.

12  Q    I didn't say race alone.  I said are they demographics

13  about race that are relevant to whether a particular area is a

14  community of interest?

17:11:13 15  A    Sure.  In using race to define -- in using race to define

16  a community of interest, it would be foolhardy just to assume

17  one group defined as a specific race is somehow uniformly a

18  community of interest.  So a similar attitude, beliefs, and

19  behaviors.

17:11:35 20  Q    I wasn't suggesting that it would, but certainly racial

21  characteristics and commonality are specifically within the

22  definition --

23  A    Yes.

24  Q    -- in Alabama and otherwise, right?

17:11:44 25  A    Yes.

1060

```
 1   Q     And there are demographic statistics that could be looked
 2   at to inform you about that?
 3   A     Certainly.
 4   Q     And all the other things you mentioned, right?
17:11:58  5   A     Yes.
 6   Q     Did you look at any of those statistics in connection with
 7   your work in this case?
 8   A     I did.
 9   Q     Did you mention that in your report?
17:12:08  10   A     I did not decompose subtle differences in black
11   populations within the Black Belt, for example, no.
12   Q     Well, you seem to be preoccupied with racial statistics.
13   I'm talking about age, income, employment, social, including
14   racial statistics.  All of those statistical categories, did
17:12:41  15   you look --
16   A     Yes.
17   Q     -- at that group of statistics to determine what
18   communities of interest exist in Alabama?
19   A     Yes.  So I looked at age characteristics, socioeconomic
17:12:56  20   status, income, types of employment and race and found that for
21   sure, there are differences in demographic characteristics in
22   different parts of the state of Alabama, but those being one of
23   many different communities of interest, I did not see an
24   instance, where, for example, differences in age structure, for
17:13:23  25   example, or racial structure prevailed to a degree where they
```

```
 1  would override other communities of interest.
 2      So I is not find it worthwhile to try and contribute
 3  information on demographic communities of interest that would
 4  not have had a material outcome in the findings.
```
17:13:45  5  Q    Well, is there anything at all in any of your reports that
```
 6  talks at all about your use of any statistical analysis in
 7  connection with communities of interest?
 8  A    Not a statistical analysis, no.
 9  Q    Okay.  What nonstatistical analysis did you do?
```
17:14:08 10  A    I think the primary nonstatistical analysis I did was
```
11  covered in my earlier cross in discussing the area around
12  Mobile and Baldwin.
13  Q    And as to the area around Mobile and Baldwin, your due
14  diligence efforts consisted solely of reading the testimony of
```
17:14:31 15  two former congressmen that Mr. Davis provided you; is that
```
16  right?
17  A    That's correct.  Yes.
18  Q    And you didn't even read the testimony of other people in
19  that case?
```
17:14:40 20  A    I would not say that that was an act of negligence.  It
```
21  was an act of not sleeping for three weeks preparing this
22  testimony.
23  Q    So you had plenty of time to read Bonner and Byrne, but
24  you didn't have any time to read Chestnut.  Is that your
```
17:14:57 25  testimony?  Is that your testimony?

1062

1   A    I did not -- yes.

2   Q    Okay.  Did you talk to anybody -- did you talk to anybody

3   about the Mobile Baldwin community of interest that you found

4   so important?  And I will exclude Mr. Davis for the moment.

17:15:23 5   A    No.

6   Q    Okay.  And did you investigate any other communities of

7   interest besides Mobile or Baldwin?

8   A    Yes.  I particularly in places where districts crossed

9   administrative pieces of geography such as counties.  I

17:15:50 10  explored and investigated places where that happened to see if

11  there were any significant communities of interest there.

12  Cities, for example, that were going to get split by the

13  boundaries.  I didn't find any else where that seemed to be

14  relevant.

17:16:08 15      I acknowledged existing splits of Jefferson County and

16  those splits just exist in various degrees and various

17  different ways in the different plans now.  So there was no

18  other additional findings of a significant change in a

19  community of interest that I found besides what I explored in

17:16:27 20  Mobile.

21  Q    I wasn't talking about changes.  I was talking about

22  whether you even identified other communities of interest.

23  A    Yes, I did.

24  Q    Which other communities of interest do you discuss in your

17:16:40 25  report?

1  A    As I just suggested, I explored other communities of

2  interest to find any that may have been material and have an

3  impact on the borders, or the definition of what one of the

4  districts may have been, or why it was different than another

17:16:56  5  district.  And I did not find any other communities of interest

6  that seemed to have had a significant impact on the boundaries

7  that were decided upon.

8      All the plaintiff boundaries and the state boundaries were

9  decided either by least change for the state, or were driven by

17:17:12  10  the need for county boundary changes, or other changes

11  unrelated seemingly to any significant community of interest

12  elsewhere in the state.

13  Q    Did you give any consideration to whether the Black Belt

14  is a community of interest?

17:17:26  15  A    I did.  I looked at that carefully.  And it was notable

16  and interesting to me that in those 18 -- I think there's

17  different definitions, 18 or 19 counties that within the Black

18  Belt many of the plaintiff plans seemed to cut the Black Belt

19  into different pieces.  Two pieces.  I think there were some

17:17:49  20  cases I saw it was cut into three pieces in different plaintiff

21  plans, as well.

22      So I acknowledged it as a community of interest, but it

23  does not seem to be one that prevailed in the development of

24  these plans.

17:17:59  25  Q    Okay.  Mr. Bryan, I know it's getting late, but you have

```
 1   really got to listen to my question.  Do you agree the Black
 2   Belt is a community of interest?
 3   A    Yes.
 4   Q    Okay.  It's a rural area throughout, is it not?
 5   A    Yes, predominantly, yes.
 6   Q    It's heavily agricultural?
 7   A    Yes.
 8   Q    It has lower income levels than other parts of the state?
 9   A    Definitely.
10   Q    Lower education levels?
11   A    Yep.
12   Q    Lower infrastructure?
13   A    My understanding.
14   Q    And a shared history?
15   A    Yes.
16   Q    And it's racially significant because that's where --
17   those counties as you pointed out in your own work have
18   significantly higher percentages of blacks than other counties,
19   right?
20   A    They do.
21   Q    Now, is it -- so -- and one of the things that
22   Dr. Duchin's models perform is to aggregate the Black Belt more
23   than the existing plan or the 2011 plan, isn't that correct?
24   A    It appears so.
25   Q    So you would say on communities of interest with respect
```

```
 1  to the Black Belt community that her plan is better than the
 2  state's plan, right?
 3  A    I don't have enough detailed knowledge of every part of
 4  the Black Belt to say where she split the Black Belt results in
 5  a better performing Black Belt.  They're split and the
 6  precision of where they were split does not give me, with my
 7  knowledge, the ability to assess whether it is a better or
 8  worse combination of a split of the Black Belt than any other
 9  plan.
10  Q    Well --
11  A    Fewer splits are generally better.
12  Q    And she had fewer splits?
13  A    Yep.
14  Q    Okay.  Have you reviewed Dr. Duchin's supplemental report
15  dated December 27th?
16  A    I believe I have.
17       Let me make sure I have got the right one.  Is this the
18  rebuttal report to me.
19  Q    No.  This is the supplemental report that talks about the
20  voter registration data.
21  A    Oh, no, I did not.  I'm sorry for my confusion.  I
22  apologize.
23  Q    Okay.  Are you aware -- did anybody make you aware that
24  Dr. Duchin prepared and submitted a supplemental report that
25  analyzed her plans using voter registration data?
```

17:19:27 5
17:19:44 10
17:19:55 15
17:20:11 20
17:20:25 25

A    Not until very recently.  I would say I became aware of it

perhaps in the last week or two.

Q    Okay.  But you haven't examined her analysis in that

regard?

A    No, I have not.

Q    Are you aware that voter registration data can be used for

the purpose of determining whether a plan contains districts

that are majority black?

A    It could, yes.

Q    Okay.  But as to her -- and would you consider it

reasonable or appropriate as a demographer to use such data?

A    It's a tool that can be used, yes.

Q    But you haven't done any analysis of her use of that data;

is that correct?

A    No, I have not.

Q    So you have no opinion on whether she did a good job, bad

job or whatever else, in that regard?

A    No.

Q    Mr. Bryan, did you provide testimony and expert opinion in

connection with a case called Harding versus County of Dallas?

A    I believe I did.  It's been a number of years.

Q    It's on your CV, I believe, as item 16.  Does that help

refresh your recollection?

A    Nope.  It is.  Yep.  I'm sorry.  I'm deeply focused on

this case right now.  I don't remember the details on that case

1  on the top of my head.  What would you like to know?

2  Q    Do you remember that you sponsored a plan, an alternative

3  plan to comply with the VRA in that case?

4  A    I honestly -- I do not recall the details of that plan

17:22:24  5  right now.  I'm sorry.

6  Q    Do you recall that the plan you sponsored in that case

7  preserved only 40 to 60 percent of the cores in the two

8  districts that were at issue?

9  A    No, I don't recall the circumstances or what the priority

17:22:40  10  of core retention was of that case at that time.  I'm sorry.

11  Q    Would you agree with me generally that when you adjust the

12  districts in a plan in order to create an additional new

13  district to comply with the VRA, that is going to have an

14  adverse effect on core retention by definition?

17:23:00  15  A    It can and sometimes severely for sure.

16  Q    And isn't that the reason that Dr. Duchin's plans suffer

17  in terms of core retention, because she created a new second

18  majority-black plan?

19  A    It appears to be the consequence of her effort to create

17:23:25  20  the second majority plan.  There is a relationship for sure.

21         MR. DUNN:  Your Honor, I think I've reached about the

22  end, but if I could have a 5-minute break to --

23         JUDGE MARCUS:  Sure.  Why don't we --

24         MR. DUNN:  We have been going quite a while.  I know

17:23:43  25  it's late.

```
 1          JUDGE MARCUS:  That's quite all right.  Why don't we
 2   take actually a 15-minute break.  We will finish up with you,
 3   or you may have nothing more, and then, Mr. Blacksher, we will
 4   start with you.  Will that be okay?
17:23:55 5          MR. BLACKSHER:  That will be fine.  Thank you, Your
 6   Honor.
 7          JUDGE MARCUS:  All right.  We will take a 15-minute
 8   break at this point.  Thank you all.
 9          (Recess. )
17:40:08 10         JUDGE MARCUS:  I take it we have everybody assembled.
11      Mr. Dunn, did you have anything further for Mr. Bryan?
12          MR. DUNN:  Yeah.  Just a couple of questions.  I will
13   try and be as brief as possible, Your Honor.
14          JUDGE MARCUS:  Sure.
17:40:21 15  BY MR. DUNN:
16   Q    Okay.  Mr. Bryan, in identifying communities of interest,
17   you said one of the things you would do would be to meet with
18   congressional, state and local elected officials to help you
19   identify communities of interest; is that right?
17:40:35 20  A    As a general practice, I would try to do that.  I didn't
21   have the opportunity to do that this time.
22   Q    Okay.  Elected officials may have different views on the
23   communities of interest than their constituents, though,
24   wouldn't they?
17:40:50 25  A    It's possible, yes, but I try to get and process and
```

1    manage the information that I get from these people in the most

2    objective and fair way possible.

3    Q    Elected officials tend to be focused on the people who

4    they think will vote for them, right?

17:41:09  5    A    Yes.  But I do not necessarily limit my education about

6    communities of interest just to people who are elected

7    officials.  You don't really get a chance to go pick and choose

8    every kind of random person knowledgeable about communities of

9    interest in an area when you go into a case, but I do my best

17:41:27 10   to get what information I can when I can get it.

11   Q    How about community organizers?  Do you think they would

12   be people to talk to?

13   A    They would for sure be community organizations.  The most

14   valuable source of information in Central Virginia where I come

17:41:40 15   from is a community organization known as CARITAS, and they

16   care for drug and alcohol impacted people, homeless people,

17   people who have lost their jobs, and I think they're one of the

18   very best sources of information about what is going on locally

19   and what the community needs are.

17:41:57 20   Q    And did anybody tell you about the testimony in this case

21   of Captain Dowdy in that regard?

22   A    I'm not aware of that testimony.

23   Q    Okay.  Now, you focused in your report with respect to

24   community of interest on the Mobile-Baldwin community, right?

17:42:14 25   A    Primarily, yes, that's correct.

1   Q   And you focused particularly on its coastal nature and the

2   Port of Mobile, correct?

3   A   That's correct.

4   Q   Are you aware that the largest industry in Mobile is

17:42:33  5   health care?

6   A   Yeah.  I understand there's a transportation,

7   manufacturing, aerospace, health care, there's a variety of

8   industries that are down there that flesh out that economy, for

9   sure.

17:42:47 10   Q   Okay.  I know it's late.  But my question was are you

11   aware that the largest industry employer in Mobile is health

12   care?

13   A   I believe it's the largest or one of the largest, yes.

14   Q   That doesn't have anything to do with the port?

17:43:07 15   A   Right.

16   Q   Or the waterways?

17   A   Right.  And certainly the provision of health care in an

18   area such as a peninsula is something that would be very

19   relevant and important.  If you had a health care system and

17:43:21 20   you had a congressional district that cuts straight across the

21   middle of it, it would obviously impact policy decisions for

22   one district opposed to another district, right through the

23   middle of Mobile would impact the provision of health care from

24   an organization like that.

17:43:38 25   Q   Mr. Bryan, it's very late.  The only question I asked was

1  whether health care as an industry has anything to do with the

2  port?

3  A    Yes.  Does the health care have anything to do with the

4  port?  Only insofar as providing health care for port workers

17:43:51  5  and their families.

6  Q    Got it.  The second largest industry is retail.  Did you

7  know that?

8  A    It's one of the major industries, sure, as with any urban

9  area, yes.

17:44:04 10  Q    And retail isn't specifically related to the port or the

11  coastline either, is it?

12  A    Not insofar -- except insofar as it provides economic

13  support for the people who work there.

14  Q    And you also said that -- I'm quoting, the county, meaning

17:44:22 15  Mobile County, is a national leader in training and workforce

16  development.  Do you remember saying that?

17  A    Yes.  I've heard that.  It's a big part of that area,

18  sure.

19  Q    Where did you get that information?

17:44:36 20  A    From the testimony that I told you earlier that I got most

21  of my information about that area from.

22  Q    So the only thing you know about Mobile County as a

23  training and workforce development area is what you read in the

24  testimony of Bonner and Byrne; is that right?

17:44:52 25  A    Uh-huh.  Additionally the information I collected on my

own, knowing about its transportation manufacturing aerospace,

medicine.  Those are the areas.

Q    You collected?  You collected information about training

and workforce development?

A    It's -- in reading the testimony and going on to

Wikipedia, it's not hard to find information about what is the

primary drivers of the economy in Mobile and Baldwin counties.

Q    And what are the largest training and workforce

development programs in Mobile?

A    I'm sorry.  I didn't have the opportunity to go in-depth

and learn every one of those individually.  I'm sorry.  In this

case, it was a matter of learning it was an economic area of

interest, not to do a deep dive economic analysis or what the

drivers were.

Q    Do people from the Black Belt migrate to Mobile for work?

A    My understanding is that there is a majority of the people

that migrate to Mobile for work will come from more likely

Baldwin County.

Q    That wasn't my question.  My question was do people

migrate from the Black Belt to Mobile?

A    It's possible.  I don't know the exact number.

Q    You didn't explore that issue, did you?

A    No.  No.  Doing migrate and intra-Black Belt migrational

analysis in Mobile-Baldwin and Black Belt counties was not in

the scope of the work.

          1          MR. DUNN:  No further questions, Your Honor.

          2          JUDGE MARCUS:  Thank you.  Our next examiner would be

          3   Mr. Blacksher.  Are you ready to go forward at this point?

          4   Would that be fine with you?

17:46:31  5          MR. BLACKSHER:  Yes, Your Honor.

          6          JUDGE MARCUS:  All right.  And as we do, if anyone

          7   needs a break, let me know.  And depending on how long

          8   Mr. Davis's redirect would be, it would be our intention to

          9   take a half hour break after Mr. Blacksher and before you

17:46:49 10   proceed, unless you want to just go right through.  But as we

         11   do this, Mr. Bryan, if at any point you need to take a break,

         12   you just let us know and we will be happy to accommodate you.

         13          THE WITNESS:  Thank you, Your Honor.

         14          JUDGE MARCUS:  Thank you all.

17:47:05 15       And Mr. Blacksher, you may proceed.

         16                        CROSS-EXAMINATION

         17   BY MR. BLACKSHER:

         18   Q    Good evening, Mr. Bryan.  I'm Jim Blacksher, one of the

         19   Singleton plaintiffs.  And I am going to ask you a little bit

17:47:21 20   about your report which causes you to shift gears from

         21   interrogation about Voting Rights Act issues to racial

         22   gerrymander issues in the Singleton case.

         23       I am going to try to share my screen here.  Did that work?

         24   A    I do see a highlighted screen, sir, yes.  Thank you.

17:47:59 25   Q    This is your Singleton report, which is marked as

Exhibit D-1.  And I'm on page 17, where I've highlighted some

language that I want to refer to, to begin the questioning,

where you say, For the purposes of independent comparison and

context, I attempted to develop additional Alabama

17:48:34  5  redistricting plans using the plaintiffs' method of whole

counties.  Our goal was to determine whether the plaintiffs'

plan was the only way to develop Alabama congressional

districts using whole counties.

The only way of knowing whether their exact use of whole

17:48:56 10  counties is the best remedy to a questionable harm, I need to

know the breadth of outcomes possible with plaintiffs' proposed

remedy.  Is it the strategy and methodology of using whole

counties that provides the needed potential relief, or is it

the exact combination of counties they propose?

17:49:19 15  So you're asking the right questions, it seems to us,

Mr. Bryan.  And let me go to three side-by-side maps.

MR. BLACKSHER:  Your Honor, I would like to have this

demonstrative marked as Singleton Exhibit 70.

JUDGE MARCUS:  Singleton 70 is marked for ID.

17:49:47 20  BY MR. BLACKSHER:

Q    On the left, you can see is the 2011 plan.  In the middle

is the 2021 plan that was enacted in the October/November

session.  And on the right is the Singleton whole county plan.

So Mr. Bryan, as you know and as you say in your

17:50:23 25  complaint, the plaintiffs allege that District 7 in the 2011

1  plan, was racially gerrymandered, and that it was -- the

2  gerrymander was accomplished by splitting the county boundaries

3  of Montgomery County, Tuscaloosa County, Jefferson County and

4  Clarke County so as to add black population to District 7 to

17:50:58 5  the extent possible.

6      You are aware that that's the allegation in the

7  complaint -- in the amended complaint as you read it, correct?

8  A   Yes.  Yes, sir.  I'm clear that's the allegation.

9  Q   Okay.  And the allegation further of the amended complaint

17:51:13 10  is that to remedy that racial gerrymander, the legislature

11  should have and the Court may have to go back to traditional

12  districting principles, which in Alabama, the complaint

13  alleges, historically is the use of whole counties.

14      Therefore, the using the allegations of the amended

17:51:47 15  complaint, the first step in eliminating the gerrymander would

16  be to restore whole these four counties.  Do you agree with

17  that?

18  A   That would be one approach, yes.

19  Q   Okay.  Well, that was the approach that is alleged in the

17:52:08 20  complaint.  I am not going to try to argue with you about

21  what's best legally or anything else.  I'm just trying to get

22  into your report about how you examined what we did.

23      All right.

24  A   Yes, sir.

17:52:24 25  Q   So I -- if you make whole Clarke County, Tuscaloosa

1  County, Jefferson, and Montgomery, the first thing you

2  notice -- and I'm sure you have -- is that when you make

3  Jefferson County whole, you've got yourself an almost perfect

4  congressional district with one county.  It's about 43,000

17:52:52 5  persons short of being an ideal district size, correct?

6  A    That's correct.

7  Q    And that pretty much -- that pretty much limits the

8  opportunities for connecting other counties with Jefferson in

9  order to reach 717,754 people, more or less.  And so the plan

17:53:23 10  that the amended complaint settled on was to link it with these

11  rural counties south of Jefferson County, correct?

12  A    That is correct.

13  Q    Bibb, Perry and Hale.

14        Once that is done, once Jefferson County's made whole,

17:53:48 15  obviously, District 7 will need to find additional population

16  elsewhere because that's a whole bunch of folks that are taken

17  out of District 7.  Almost 200,000, right?

18  A    Yes.

19  Q    And so what the plaintiffs proposed was to, first of all,

17:54:10 20  you are get a little bit more, you get about 42,000 out of

21  making Tuscaloosa County whole, and then you go over and you

22  add all of Montgomery County, and Macon and Bullock County, two

23  other Black Belt counties, and then proceeding further south,

24  counties elsewhere in the Black Belt or bordering the Black

17:54:34 25  Belt, that's what this plan does, correct?

1   A    Yes.

2   Q    Okay.  And once that was done, it had little -- it had

3   some effect on Mobile County because in the 2011 plan, Mobile

4   County and Baldwin County in District 1 were connected with

17:55:01 5   Washington and Monroe counties, and to gain population for 7,

6   Washington and Monroe County went into the plaintiffs' proposed

7   whole county plan.  Do you see that?

8   A    Yes.

9   Q    And that meant District 1 had to expand eastward along the

17:55:24 10   Florida border to pick up Covington County.

11        That's going to create a problem for District 2, correct?

12   A    It would, yes.

13   Q    And in fact, it pushed District 2, which was all down here

14   in the southeastern part of the state that we call the

17:55:43 15   Wiregrass, it pushed District 2 and the Wiregrass part farther

16   up the Georgia/Alabama border through Barbour, which is a Black

17   Belt county, Russell, Lee, Chambers, Tallapoosa, Elmore.

18        Well, anyway, I'm just trying to, first of all, set the

19   stage here by examining what the plaintiffs' amended complaint

17:56:14 20   alleged was a proper way to remedy their alleged racial

21   gerrymander of the 2011 plan.  And then I want go and look at

22   the way you have explored the questions you asked.

23        Are there other ways to do this using whole counties,

24   okay?

17:56:34 25   A    Yes.

1   Q    All right.  Let's go down to page 31.  I'm sorry, page 32

2   of your report.

3   A    I'm referring to my report here, so...

4   Q    27, 28, 29, 31, 32.

17:57:08 5   A    There it is.

6   Q    There you go.  There's the table that summarizes the

7   alternative plans using whole counties that you attempted to

8   draw.

9        So they're labeled a little confusingly, but S-1, S-2, 1,

17:57:34 10   2, 3, 4, 5, 1-B, 2-B, 3-B, down to 6-B.

11        The next column is deviation.  Now, when it says

12   deviation, that's maximum deviation, correct?

13   A    That is correct.

14   Q    And remind the Court what maximum deviation means.

17:57:52 15   A    So that would be the number of percentage points above and

16   below zero deviation as represented by what percentage of the

17   population deviates from a perfect deviation both above and

18   below the perfect target of 717,754 people.

19   Q    So to get maximum deviation, you simply take the district

17:58:23 20   that's most overpopulated and add that percentage to the

21   district that's least populated and those two percentage added

22   arithmetically is the maximum deviation?

23   A    That is correct.

24   Q    Excuse me.  The third column, incumbents safe, question

17:58:43 25   mark.  When you mean safe, do you mean are they in a district

1  with some other incumbent or is there some other measure you're

2  using here?

3  A    Yes.  This is an indicator of whether the incumbents are

4  paired or are not.  In District 2, as to District 3, the

17:59:05 5  incumbents are all in their own districts.  In the Alabama plan

6  they're in their own districts.  The remainder have two or more

7  incumbents paired.

8  Q    Okay.  The fourth column says 2018 election, governor.

9  And I remember from your direct examination that you just

17:59:28 10  selected this as one of many election returns over the past

11  decade that you scanned and thought that this was

12  representative of what those other election results look like;

13  is that correct?

14  A    Yes, sir.

17:59:42 15  Q    All right.  This column then says, first of all, the

16  number of and percent of D districts, that means Democratic

17  districts?

18  A    Yes.

19  Q    And you picked Democratic districts because the undisputed

18:00:04 20  testimony, including the testimony of Trey Hood is soon -- soon

21  to be, appears that in Alabama, black voters support -- over

22  90 percent of the black voters, I think you said 92 percent, at

23  some point support Democratic candidates; is that correct?

24  A    I did not listen to the testimony of Trey Hood, but that

18:00:27 25  is a fact that I believe to be true.

```
 1   Q     Okay.  I'm sorry.  Getting ahead.
 2         All right.  So if you go to the first alternative district
 3   that you drew, it says it produces -- it produces one
 4   Democratic district; is that correct?
18:00:57  5   A     That's correct.
 6   Q     And your report says that you computed the -- the
 7   performance data, the election return performance data by going
 8   to the precinct level, getting the election results and then
 9   aggregating them at the county level; is that correct?
18:01:24 10   A     That's correct.
11   Q     And I guess you might have done that because you were also
12   trying to ascertain what the performance -- the election
13   performance results would be in the plans -- the plan enacted
14   by the state, which cuts county boundaries, and, therefore, you
18:01:45 15   have to go to the precinct level.  Is that why you did that?
16   A     Yeah, exactly.
17   Q     Rather than just using the election returns for the whole
18   county that you can get right off the Secretary of State's
19   website?
18:01:56 20   A     That is correct.
21   Q     Okay.  But they should be the same.  These should -- the
22   data you used should correspond with the election returns for
23   each county in Districts 6 and 7 of the proposed whole county
24   plan, right?
18:02:13 25   A     Yes.
```

```
 1  Q    Okay.  And then this percentage here, 41.3, what does that
 2  mean?
 3  A    You know, I think the label here where it says percent D,
 4  this may actually be the percent Republican, which reflects
 5  that the majority, the percent majority Democrat in that
 6  district -- I'm trying to think.  I'm sorry, James.  Let me
 7  just think a minute.
 8  Q    I think it's --
 9  A    It is the percent Democrat.  It is the percent Democrat in
10  those districts.  That's correct.  Percent Democrat.
11  Q    I think somewhere in this report you say it represents the
12  percent of BVAP in that district?
13  A    Yeah.  There's two.  There's one -- the first column is
14  percent Democrat and the second one is percent BVAP.  So the
15  second -- the last column there shows the percent BVAP and what
16  the BVAP percentages are in those districts -- in those
17  different alternative districts.
18  Q    Okay.  And the 41.3 is what?
19  A    That's the percent -- the number of what we would call the
20  number of the at least Democrat influenced districts and the
21  percent Democrat in those districts.  So there would be one
22  Democratic district.  In the plaintiff plan there would be two,
23  41 -- that are over 40 percent.  41.4 and 44 percent.  I
24  believe numbers that closely relate to the percent of
25  registered back voters and also to the Democratic performance
```

1    in those districts.

2    Q    Well, I mean, in order to have one performing Democratic

3    district, the election returns had to show a majority for the

4    Democratic candidate, right?

18:04:21  5    A    Yeah.  I think that that -- the analysis of the number is

6    just my own analysis.

7    Q    So the 41.3 might be percent Republican, you say?

8    A    I really apologize.  I'm flooded with numbers right now.

9    I would have to look at my table.  I apologize.  But I believe

18:04:44 10    that's the case.

11    Q    All right.  And then the last column, the number and

12    percent of black districts greater than 40 percent?

13    A    Yes, sir.

14    Q    How did you land on 40 percent as a metric?

18:05:00 15    A    Yeah.  That was an arbitrary number.  It's a cutoff

16    number.  And I kind of base that on the report that showed the

17    percent black registered voters in the analysis of the

18    complaint, I believe was about 42 or 43 percent.  That was the

19    lower of the two thresholds for BVAP population in the

18:05:29 20    plaintiff districts.

21         So I used that as kind of an arbitrary cutoff to say what

22    would the number have to be in order to be a candidate black

23    influenced district in one of my candidate plans.

24    Q    Yeah.  And if 43.0 percent in your alternative district

18:05:51 25    S-1 --

```
 1   A     Yes.
 2   Q     -- is the BVAP in that district, in that one district that
 3   performs?
 4   A     Right.
 5   Q     Okay?  Excuse me.  That BVAP figure is really sort of
 6   superfluous, isn't it?  Once you determine that the district
 7   went Democrat, it really doesn't matter what the black
 8   percentage was, does it?
 9   A     Yeah.  That's correct.  So the assessment here when you
10   look at the number of Democrat districts and then the black
11   percentage there, it's not a coincidence that those numbers
12   look very similar as you go down through the analysis.
13   Q     The feature of drawing districts using whole counties is
14   that instead of focusing on the race of the voters, the
15   geographic dispersion of the demographics, or anything else,
16   you simply have to look at what the total population is once
17   the districts -- the counties are aggregated.  And if whether
18   or not -- if you are looking at whether or not it conforms with
19   the Voting Rights Act, you would want to know whether or not
20   candidates favored by blacks are able to win in that district,
21   correct?
22   A     That is correct.
23   Q     Okay.
24   A     I want to state for the record that I am not a political
25   scientist.  And my analysis here of the political performance
```

1  of the districts was purely diagnostic and not a reflection of

2  my expertise in that area.

3  Q    That's great.  And I'm not holding you to that.  I just

4  want to understand and let the Court understand what you have

18:07:53 5  found in this experiment that you undertook.

6       I'm going to go down to the maps now.

7  A    Thank you.

8  Q    And since I'm not clever, I can't separate out this table

9  we were just looking at.  We are going to -- I have it in front

18:08:10 10 of me.  Any chance you can get it in front of you?

11 A    I've got a copy of the maps in front of me.

12 Q    I mean a copy of the table.  I am going to have the maps

13 up on the screen.

14 A    Yep.  Hang on a minute.  I've got it.  Okay.  Yeah.  I

18:08:32 15 have the percent black and then the -- also have the percent

16 Democrat --

17 Q    Okay.

18 A    -- tables in front of me.

19 Q    And the table, on the second column where you have maximum

18:08:44 20 deviation, your plans all the way down to Plan Number 5 are

21 supposedly -- are listed as being smaller in deviation than the

22 2.47 percent maximum deviation in the whole county plan, the

23 Singleton whole county plan?

24 A    I think that's right.

18:09:14 25 Q    Okay.

1   A    Yeah.  Found it.

2   Q    Okay.  So if -- if the Singleton map drawer was trying to

3   minimize the maximum deviation when he was aggregating counties

4   into districts, these plans down to Number 5 would indicate

18:09:40  5   options he might have taken to get even a smaller maximum

6   deviation, right?

7   A    Yes.  Those are possible scenarios with lower deviation.

8   Q    Okay.  So let's look at them one at a time.

9        Here is plan S -- well, that's the plaintiffs' plan.

18:09:58  10   A    Yeah.

11   Q    S-1.  Okay.

12   A    Right.

13   Q    S-1 says it's a maximum deviation of 0.6 percent and it's

14   got one performing district.

18:10:14  15        Now, let's stop right now.  That one performing district

16   is a Jefferson County district, right?

17   A    Yes.

18   Q    I mean, there ain't no way you can keep Jefferson County

19   whole and not have one Democratic performing district, right?

18:10:29  20   A    Yes.

21   Q    Okay.  And, in fact, all of your -- all of your

22   alternative plans either connect Jefferson County with -- in

23   this case it's with Greene instead of Perry, but --

24   A    Yeah.

18:10:46  25   Q    -- the rural counties to the south, or you've got two

1   further down we will get to that connect it with Blount.

2         But the Blount ones -- when you connect it with Blount it

3   goes over the 2.47 maximum deviation to the plaintiffs' one.

4         All right.  So let's look at this one.  This is

18:11:05  5   0.6 percent.  And to achieve this, you've got in addition to

6   the Jefferson County district, you have got a district

7   something or other here.  What is the Greene district number?

8   7.  That's the --

9   A     7.  Right.

18:11:25 10   Q     So you had to connect -- you had to take 7 all the way up

11   to Lauderdale County.  You had to take the District 7

12   representative up to Tennessee, right?

13   A     Yes.

14   Q     Okay.  And that's on one end.  And on the other end you've

18:11:46 15   got to take him over to the Georgia border.

16   A     Yes.

17   Q     So tour the whole state.  So you did not provide in your

18   report any core analyses for these alternative plans like you

19   did for all the ones you just testified about; is that right?

18:12:08 20   A     Yeah.  That's correct.  I presented these, you know,

21   really just as scenarios to say was it possible under any

22   circumstance no matter what -- except with regards to the

23   deviation -- was there any way to use the county-based method

24   to combine counties in any other way.  And in some of those

18:12:32 25   ways, those combinations end up with a good mathematic outcome,

```
 1  but are ridiculous looking maps, I will concede.
 2  Q    This one is not compact and it just destroys the core,
 3  right?
 4  A    It would, yes.
 5  Q    Okay.
 6  A    County-based, small deviation is pretty much the two
 7  criteria we used here.
 8  Q    Okay.  Then we go to S-2, plan S-2, and it is a
 9  1.0 percent maximum deviation, again with just one Democratic
10  performing district.  And that is the Jefferson County
11  district.
12  A    Yes.  Yes.
13  Q    Now, this plan is not quite as ridiculous, is it?
14  A    It's -- I will agree.
15  Q    But it does make a hash out of the Black Belt.  I mean,
16  you have got Black Belt counties Wilcox, Lowndes and Montgomery
17  hooked up all the way up north to Cherokee County.  And you
18  have got whatever this purple district is, 4?  District 4?
19  Okay.  It doesn't matter.
20       JUDGE MARCUS:  Let's focus the questions specifically,
21  if you would, Mr. Blacksher.
22       MR. BLACKSHER:  Am I taking too long with the
23  questions?
24       JUDGE MARCUS:  No.  I think if you cut it down and
25  make it shorter, it will be easier to get an answer from him.
```

1088

```
 1              MR. BLACKSHER:  Okay.  Okay.
 2   BY MR. BLACKSHER:
 3   Q    Let me just put it this way:  This -- isn't it true that
 4   this plan also, S-2, violates the traditional districting
18:14:23 5   requirements of preserving the core in compactness?
 6   A    Are you -- it is definitely not optimized for compactness
 7   or for core retention.  It was optimized for balancing
 8   population and maintaining counties as building blocks and
 9   minimizing the deviation.  That's it.
18:14:47 10  Q    Okay.  Alabama plan 1 is next.  And this one is
11   2.1 percent maximum deviation.  Both S-2 and S-1, by the way,
12   prevent any incumbents from being paired.  These are the two --
13              JUDGE MARCUS:  Is that a question, Mr. Blacksher?
14              MR. BLACKSHER:  It's a leading question, Your Honor.
18:15:13 15             JUDGE MARCUS:  All right.  Let's get a question mark
16   at the end of it and let's get an answer.
17              MR. BLACKSHER:  I'm -- I'm trying to speed things up
18   by saying isn't that what it shows.
19              THE WITNESS:  Yes.
18:15:25 20  BY MR. BLACKSHER:
21   Q    Okay.  Once again, isn't it true that this plan has to
22   split up the Black Belt?
23   A    Yes.
24   Q    Isn't it true that this plan has to take District 2 and
18:15:46 25  run it almost the entire eastern boundary of the state of
```

1    Alabama?

2    A    Yes.

3    Q    So this plan 1 is also a failure when it comes to

4    preserving cores or compactness, right?

18:16:01  5    A    On those metrics, yes.

6    Q    Okay.  Plan 2 is 2.1 percent.  It also has only one and

7    it's the Jefferson County district.  And I'm just going to

8    move -- I know the Court is tired and doesn't --

9         JUDGE MARCUS:  I am not tired in the slightest,

18:16:27 10   Mr. Blacksher.  The problem I'm having is that it is a compound

11   question stringing together three concepts.  I think it would

12   be easier if you just crisply refine the question to each issue

13   unless you need a broader explanation for the question.

14   BY MR. BLACKSHER:

18:16:48 15   Q    How about if I ask does this plan work for you, Mr. Bryan?

16   A    I can help this by saying that virtually all of these

17   plans violate core retention and compactness and are simply

18   illustrations of different combinations of counties that can

19   minimize deviation.  Those were the only two objectives for any

18:17:14 20   of them.  And they will all virtually fail if you hold them to

21   any other criteria.

22        They were simply designed to illustrate all the different

23   possible combinations of counties that you could possibly

24   achieve if we use the plaintiffs' proposed methods of building

18:17:28 25   on counties.  Because the building of counties subordinates in

1   the report and the complaint that I saw, it subordinates the

2   other traditional redistricting principles.  And that is why we

3   took the liberty of creating these options.

4   Q    But to go back to the District 7 composite of three maps,

18:17:49 5   it is true, isn't it, that the plaintiffs' proposed plan

6   preserves the core of District 6, which is Jefferson County,

7   and pre serves the core of District 7, which is the Alabama

8   Black Belt?

9   A    Yes, that appears to be so.

18:18:06 10   Q    Okay.  I wanted to go down to -- I will skip down to Plan

11   Number 5, because your -- your chart says that the maximum

12   deviation for this plan is 0.7 percent.  And it's much closer

13   to the plan that the plaintiffs -- it's in the plaintiffs'

14   amended complaint.

18:18:38 15        Can you -- I need you to recheck that 0.7 percent because

16   I tried to check the maximum deviations in your table, but

17   since I -- I don't have Maptitude, I'm using a poor man's

18   Maptitude.  I'm using Dave's redistricting map.  Are you

19   familiar with Dave's?

18:19:01 20   A    Yes, I am very familiar.

21   Q    Okay.  So let me just show you that when I put -- and by

22   the way, excuse me.  That's the wrong thing.  Here we go.

23        This is your plan 5, as I inserted it into Dave's.  And

24   isn't the reapportionment committee through counsel,

18:19:31 25   Mr. Walker, provided everybody with the block equivalency files

1    for most of these plans.  But I did not use any block

2    equivalency files here.  I just built it to look like your

3    plan 5, all right?

4              JUDGE MARCUS:  Mr. Bryan, do you understand what he

18:20:00 5   has done here?

6              THE WITNESS:  Yes.

7              JUDGE MARCUS:  That's the predicate for his next

8    question.

9              THE WITNESS:  It appears as if he has replicated my

18:20:07 10  plan and may have a deviation that's somewhat different than

11   the plan that was reported by my analytic team.  It's possible.

12   We can certainly look at where and why there may be a

13   population deviation that's different.

14             JUDGE MARCUS:  I don't think that was the question.

18:20:25 15  So bear with his questions if you would.

16   BY MR. BLACKSHER:

17   Q    The question is:  Is it possible that your deviation is,

18   in fact, 5.99 percent?

19   A    If -- it's possible.  We created a limit for the deviation

18:20:43 20  in our plans of not more than 6 percent.  So it's possible that

21   the name of one of the plans slipped from -- given that there

22   was 13 of them -- that one slipped from one plan to another

23   plan.  But at no instance were these combinations greater than

24   6 percent total deviation.

18:21:01 25  Q    Let me go to plan 1-B.  Alabama plan 1-B is 2.5 percent

```
 1  maximum deviation and has two performing Democratic
 2  districts -- Jefferson County, of course.  And district --
 3  well, the one that's marked purple here.
 4  A    Be 4, I believe.
18:21:41 5  Q    You have labeled it 4 out of -- I would have thought it
 6  would be more 7.  It's usually where 7 is, right?
 7       So --
 8            JUDGE MARCUS:  Bear with me.  I may be the only one
 9  who missed it, but I did not get your answer, Mr. Bryan.
18:21:58 10           THE WITNESS:  Yes, that is correct.
11            JUDGE MARCUS:  All right.  Thank you.
12  BY MR. BLACKSHER:
13  Q    So when you compare plan -- Alabama plan 1-B with the
14  plaintiffs' proposed whole county plan, the only major
18:22:12 15  difference, isn't it, is that you have substituted Greene
16  County for Perry County?  Or did I miss something?
17  A    It's possible, yeah.
18  Q    Okay.  So this -- this shows that as long as you keep the
19  Black Belt whole and you keep Jefferson County district whole,
18:22:37 20  you are going to come up with something around 2.5 percent,
21  right?
22  A    Yes, that would be my conclusion.
23  Q    Okay.  The other plan that had two performing black
24  districts was District 5-B.  Go down to it.
18:22:58 25       And once again, it comes very close to the plaintiffs'
```

1 plan, except that you have got Clarke County and Washington

2 County in District 1, right?

3 A    Yes.

4 Q    Okay.  But, again, both these plans -- this plan 5-B has a

18:23:16 5 maximum deviation of 6.0 percent, right?  So my question to

6 you, based on your alternative plans, isn't it true that the

7 plan proposed in the plaintiffs' complaint, the whole county

8 plan that they proposed, is, for practical purposes, as low a

9 population deviation you can get with the whole counties and

18:23:46 10 still make some kind of districting sense for Alabama.

11 A    You have the criteria of making some districting sense,

12 yes, that's a fair assessment.

13 Q    Let me go down finally -- I am going to go down to one

14 other place in your report that I need to ask a question about,

18:24:33 15 and it's on page 40.  And this is the page where you are

16 talking about racial composition and where --

17 A    Sure.

18 Q    -- you say that you paused to reflect on the possibility

19 that the Singleton plan is a racial gerrymander.

18:25:05 20     Now, going over these -- what is the evidence you cite

21 here for -- that suggests that it's a racial gerrymander?

22 A    The evidence is that District 6 was extended in the only

23 direction and in the only way to capture as much black

24 population as is possible to get it to a point -- I'm reading

18:25:44 25 here -- of semi-equitability with race and political

1    performance as District 7.

2         It was drawn in such a way, and the only way that it could

3    possibly have achieved the same performance.  There's no other

4    direction or way District 6 could have been extended beyond

18:26:05  5    Birmingham.

6         So the evidence that I submit is that if there's only one

7    way to do it and that was the only way and that was the only

8    way that the plan was drawn to try and get District 6 up to

9    this competitive district, that that could be argued to be a

18:26:24 10    gerrymander as well.

11   Q    Even though it's the only way to achieve population

12   equality, substantial population -- practicable equality?

13   A    There are -- if we -- go ahead.

14   Q    If you are going to make Jefferson County whole, it's got

18:26:48 15   to go in that direction unless it goes up to Blount County and

16   has a bigger deviation, right?

17   A    Yeah.  So there's -- another option, but they are limited,

18   I can see.

19   Q    In fact, the gerrymander in all the maps that the Court

18:27:07 20   has seen, both in the Voting Rights Act case and this case, all

21   have one focal point and that is Jefferson County, isn't that

22   correct?

23   A    It is true, yes.

24   Q    It is Jefferson County that drives redistricting in the

18:27:22 25   state of Alabama when it comes to congressional districts?

```
 1   A    Yes.

 2   Q    To split or not to split.  That is the question, right?

 3   A    Right.

 4   Q    There are several places you say, for example, on page 20,

 5   that in order to -- let me just use this as a way to

 6   demonstrate the argument.

 7        Isn't it true that what your exercise shows is that when

 8   you do employ whole counties to draw congressional districts in

 9   Alabama, it will constrain the ways in which the districts can

10   be gerrymandered?

11             JUDGE MARCUS:  Do you understand the question,

12   Mr. Bryan?

13             THE WITNESS:  I am sorry.  I didn't hear that posed

14   in --

15             JUDGE MARCUS:  All right.

16             THE WITNESS:  -- as a question.  If the argument is

17   does it -- does it limit the ways in which it can be

18   gerrymandered, I would say yes.  Does it prevent gerrymandering

19   as a method and preclude it and stop it, I would say no.

20   BY MR. BLACKSHER:

21   Q    There's probably nothing in the world that can prevent

22   gerrymandering.  My question was whether it definitely

23   constrains the options for either incumbent gerrymandering,

24   racial gerrymandering, or partisan gerrymandering, whatever; is

25   that correct?
```

```
 1  A     It restricts those dimensions of redistricting.
 2  Q     You point in several places -- page 20, page 31,
 3  page 40 -- I have got written right down here on page 40 that
 4  without -- you say the argument is made that the black -- blah
 5  blah blah -- without counties as the determining factor, I
 6  could argue that there are innumerable geographic combinations
 7  besides those constrained by counties that could potentially
 8  meet and even exceed the performance touted by plaintiffs if
 9  that was their objective.
10        What -- first of all, that concedes that until you start
11  cutting the county boundary, you have some constraints on what
12  your options are for gerrymandering, right?
13  A     Well, the constraints are not limited just to
14  gerrymandering, but to other traditional redistricting
15  principles.  They also prevent you from optimizing compactness.
16  It also has an impact on core retention and it certainly has an
17  impact on deviation, the limitations of using county alone are
18  not limited simply to the impact of gerrymandering.
19  Q     My question simply was about gerrymandering, okay?
20  A     It limits the gerrymandering.
21  Q     Okay.  And you have said elsewhere in the report in order
22  to identify other communities of interest as a basis for
23  drawing districts, you have to go to the sub-county level;
24  isn't that correct?
25  A     As we discussed earlier, there are numerous communities of
```

Timestamps (left margin): 18:29:48 (line 5), 18:30:06 (line 10), 18:30:25 (line 15), 18:30:47 (line 20), 18:31:08 (line 25)

1097

1    interest across Alabama.  Some I focused on more than others,

2    but there are many -- if you were to use the Black Belt as an

3    example as a community of interest, it spans across multiple

4    different counties and even when that is the case, the Black

18:31:33 5    Belt and almost every plaintiff plan we have looked at today

6    still ends up getting split by different plaintiff plans.

7    Q    Let me go to page 31.  I have highlighted this language

8    here, the number of alternative plans using sub-county

9    geography such as voting precincts or even census blocks is

18:32:16 10   immeasurable.

11   A    Yes.

12   Q    Okay.  So what we can say about using whole counties is at

13   least those alternatives are relatively measurable?

14   A    I would agree, yes.

18:32:31 15   Q    Okay.  So the question is -- I know you are not a lawyer,

16   but the question that this plan that the plaintiffs drew

17   whether or not it's -- it can be adopted by the legislature or

18   by a court is, A, whether it complies with one person, one

19   vote, and, B, whether it complies with the Voting Rights Act,

18:33:09 20   right?

21   A    Those would be the key questions, yes.

22   Q    Okay.  I think I am about through, Judge, if you will just

23   give me a second.

24          JUDGE MARCUS:  You take your time.  I think something

18:33:37 25   has popped up on the screen here, Mr. Blacksher.  It looks like

1    e-mails I don't think belong on this screen.

2          MR. BLACKSHER:  No, they don't.  I'm chatting with my

3    colleagues to see if they had any more questions for me.

4          JUDGE MARCUS:  No.  I understand.  You take your time.

18:33:54  5    Let me know if you want to take a short break.

6          MR. BLACKSHER:  What I need to do is stop sharing the

7    screen.  There.  That's much better.  I'm sorry, Your Honor.

8          JUDGE MARCUS:  That's all right.

9          MR. BLACKSHER:  I have no further questions.

18:34:10  10          JUDGE MARCUS:  All right.  Mr. Davis, tell me about

11    your pleasure, do you need a break or do you want to roll right

12    through?

13          MR. DAVIS:  I am at the court's pleasure.  Unless

14    Mr. Bryan needs a break, I'm happy to proceed.

18:34:23  15          JUDGE MARCUS:  How are you doing?

16          THE WITNESS:  I am ready to go, Your Honor.

17          JUDGE MARCUS:  How long do you expect that you will be

18    on your redirect?

19          MR. DAVIS:  Between 10 and 15 minutes, Your Honor.

18:34:35  20          JUDGE MARCUS:  Okay.  Fire away.

21                    REDIRECT EXAMINATION

22    BY MR. DAVIS:

23    Q    Mr. Bryan, when we talk about incumbent protection, even

24    if incumbents are not paired, voters still retain the ability

18:34:53  25    to vote out a representative if they're unhappy with the

1    representation, right?

2    A    That is correct.

3    Q    I want to look at the Singleton Report 1 and take care of

4    a couple of issues.  Let's see if we can't clear something up.

18:35:16  5    I am going to look at page 38.

6         Can you see your Figure 5.11?

7    A    Yeah.  Those numbers were percent Republican.

8    Q    I see it.

9    A    They may have been labeled percent Democrat in the other

18:35:34 10    table, but, yeah, that's correct.  Those correspond to percent

11    Republican.  Thank you for the clarification.

12    Q    So if we go back up to page 32, look at Table 5.6.  The

13    numbers we see in the one, two, three, fourth column, for

14    plan 1, 41.3 percent, that's the percent of the Republican vote

18:35:56 15    in that district?

16    A    That's correct.  Yes.

17    Q    And that means that a majority of voters in that district

18    during that 2018 election supported the Democrat?

19    A    That's correct, yes.

18:36:07 20    Q    Mr. Blacksher -- excuse me -- Mr. Bryan, did you receive

21    shapefiles or block allocation files for all of the plans that

22    you have assessed?

23    A    Can you please be specific to which plan or are you

24    referring to all of the plaintiff plans that we worked on?

18:36:30 25    Q    Thank you.  I meant all of the plaintiffs' plans that you

1    look -- that you address in the reports that we've talked about

2    today.

3    A    Yeah.  So I have received shapefiles and/or block

4    allocation files for all of the plans, including the state of

18:36:45 5    Alabama plans.

6    Q    Explain to us what you do with a shapefile or block

7    allocation file.

8    A    Sure.  What I would do with a shapefile is I would use it

9    in two ways.  There's two different layers of geography that we

18:37:01 10   use in our geographic information systems.  One is what we

11   would call a block file.  This is the file that has the most

12   granular units of geography for the state.  They're called

13   census blocks.  They're at the bottom of the spine, as you

14   will, for census geography.

18:37:19 15       Those blocks, the way they come from the Census Bureau do

16   not have any demographic data associated with them at all.  So

17   part of my practice as a demographic expert is to join the

18   demographic data that we have from the census with those

19   blocks.

18:37:36 20       So just because I receive a block assignment file from a

21   plaintiff or from the State of Alabama does not mean that I

22   have all the census data that I need to perform my analysis.

23   Q    Fair enough.  But if you have the block allocation file or

24   shapefile --

18:37:53 25   A    Right.

1    Q    -- does that allow you to load one of the plaintiffs'

2    plans on to your system?

3    A    Indeed it does.  That brings me to the second layer that

4    we use, which are what we call an outline shapefile.  It's just

18:38:06  5    basically whatever the perimeter or the boundary is of that so

6    we can ascertain which blocks belong in which districts to

7    perform our analysis.

8    Q    Okay.  So in all of these tests you have run on the

9    different plaintiffs' plans in your report, did you run those

18:38:24  10   by looking at the plaintiffs' reports and exhibits, or did you

11   run those by loading the plaintiffs' plans on to your system

12   and performing the tests on your demographic software?

13   A    All of those plans were independently run, tested, and

14   quality controlled on my own system, and then compared where

18:38:42  15   possible with the exhibits presented by the plaintiffs.

16   Q    Thank you.

17        In our discussion of the youth of single-race black or

18   any-part black, Mr. Bryan, now, you present both metrics in

19   your report, correct?

18:38:56  20   A    I do, yes.

21   Q    Are you intending to question any person's self-identity?

22   A    I would never.

23   Q    Are you offering an opinion to this Court in this lawsuit

24   as to whether the Court should or should not use any specific

18:39:13  25   measure?

```
 1   A    I do not.

 2   Q    Are you offering opinion as to whether any measurement is

 3   correct or incorrect?

 4   A    I do not.

 5   Q    Okay.  Now, in redistricting cases -- and you have been a

 6   part of many different redistricting cases, correct?

 7   A    Yes, I have.

 8   Q    Including Section 2 cases?

 9   A    Yes, I have.

10   Q    So you understand, do you not, that you demographers do

11   your thing, that's generally related to the Gingles I?

12   A    We did.

13   Q    And that addresses among other things whether you can get

14   to 50 percent plus 1 in a single member district; is that

15   correct?

16   A     In my area of analysis, I prepare and present both of

17   those numbers in support of Section 2 claims.

18   Q    Right.  There are other folks, political scientists, who

19   do other parts of the analysis, is that your understanding?

20   A    That is correct.

21   Q    And they're addressing voting behavior, would you agree?

22   A    I would agree.

23   Q    And that's not what you do?

24   A    It is not.

25   Q    Okay.  So you're looking at whether the minority
```

18:39:21 (line 5)
18:39:33 (line 10)
18:39:52 (line 15)
18:40:10 (line 20)
18:40:19 (line 25)

1  population is a majority and the political scientists are

2  looking at how the minority population votes.  Is that a fair

3  summary -- maybe very generalized, but is that a fair summary

4  of what you experts are doing?

18:40:36 5  A   It is accurate and it characterizes the division of labor

6  between our two professions.

7  Q   And do you consider it important whether -- or relevant to

8  your analysis as to whether when you guys, demographers, are

9  talking about whether the minority populations are majority,

18:40:55 10  whether you are looking at the same minority population as the

11  political scientists guys who are addressing voting behavior?

12  A   Those are -- oftentimes they turn out to be two different

13  numbers and may be used the same way or in different ways by

14  the courts.  I have seen as in testimony in this case that

18:41:16 15  black alone was used as a measure by a political scientist.  I

16  see other cases sometimes where it's used alone in combination.

17      Similarly, for *Gingles I,* different courts, different

18  circumstances will call upon the use of black alone or Hispanic

19  or alone in combination.  They are not necessarily

18:41:38 20  intrinsically intertwined or dependent on each other.

21  Q   Mr. Bryan, would you consider the one person, one vote

22  requirement to be a legal requirement that applies any time a

23  plan is drawn or as a traditional districting criteria?

24  A   I would consider it to be a legal requirement and then

18:42:00 25  conformance with that legal requirement is reflected in the

1  plan drawn by the state of Alabama and most of the other

2  plaintiff plans that were presented.

3  Q    And would you as a demographer consider the laws

4  prohibiting racial discrimination to be a legal requirement

18:42:19 5  that applies whenever a plan is drawn, or a traditional

6  districting criteria that you might balance with other

7  traditional criteria?

8  A    They're laws.  Laws are laws.

9  Q    Is there a traditional districting criteria of a

18:42:34 10  requirement to draw every possible majority-black district no

11  matter how non-compact it might be, or how much it butchers

12  communities of interest?

13  A    There is not a requirement to my knowledge.

14  Q    If non --

18:42:51 15       JUDGE MARCUS:  Just -- will you stop?  I think

16  Mr. Dunn is trying to interpose an objection.  I see him

17  speaking, but he is muted.  So we cannot hear him.  We cannot

18  hear you, Mr. Dunn, because you have your microphone muted.

19       MR. DUNN:  Can you hear me now, Your Honor?

18:43:24 20       JUDGE MARCUS:  I sure can.

21       MR. DUNN:  I am sorry.  I apologize.

22       JUDGE MARCUS:  We did not hear what you were saying.

23       MR. DUNN:  I was trying to object to this line of

24  questioning.  He is asking him to testify to things that are

18:43:37 25  obviously legal conclusions and way beyond the scope of cross.

1    JUDGE MARCUS:  The objection is sustained.  If you

2  would like to refrain your question, you may, Mr. Davis.

3    MR. DAVIS:  Very well.  I do not know to which

4  objections Mr. -- which questions Mr. Dunn's objection apply

18:43:54 5  to.

6    JUDGE MARCUS:  I think the very last one seemed to

7  call for some kind of legal analysis or conclusion.

8    To the extent that was the thrust, Mr. Bryan's opinion

9  might be interesting, but it's of no help to us in this case

18:44:09 10 because he has not been qualified as an expert on the law.

11    MR. DAVIS:  Very well.

12  BY MR. DAVIS:

13  Q    Mr. Bryan, as a demographer, do you understand there to be

14  a traditional districting criteria that requires a jurisdiction

18:44:25 15 to draw any possible majority-black district no matter how

16  non-compact that district might be?

17  A    I'm not aware.

18  Q    I believe you agreed that if a party is required to show

19  that -- or is required to present a plan that includes an

18:44:52 20 additional majority-black district than in the previous plan,

21  that that's going to impact that plan's core retention score.

22  Did you agree with plaintiffs' counsel on that point?

23  A    I agree.

24  Q    Is it not still true that the amount of displaced voters

18:45:11 25 and the larger impact of core retention scores can be

1  instructive as to show you how much the traditional districting

2  criteria policy of core retention must be sacrificed in order

3  to draw that additional majority-black district?

4         MR. DUNN:  Your Honor, I know it's really late, but he

18:45:30 5  is just testifying.  He's leading the witness.  He has got to

6  let the witness testify and not make speeches.  I object.  This

7  is really inappropriate.

8         JUDGE MARCUS:  I will take the answer.  Overruled.

9     Mr. Bryan, do you understand the question?

18:45:47 10        THE WITNESS:  Please state the question again.

11  BY MR. DAVIS:

12  Q   I'll try.  Mr. Bryan, in any -- in assessing any of these

13  plaintiffs' plans, does the amount of -- does the core

14  retention score -- can it be instructive to tell us how much

18:46:12 15  the traditional districting policy of core retention has to be

16  sacrificed in order to draw an additional majority-black

17  district?

18         JUDGE MARCUS:  Do you understand the question,

19  Mr. Bryan?

18:46:22 20        THE WITNESS:  Yes, Your Honor, I do.

21         JUDGE MARCUS:  All right.  You may answer.

22         THE WITNESS:  I would say that the core retention

23  analysis and I think particularly the differential core

24  retention analysis showing how much more a minority population

18:46:36 25  is impacted than the population as a whole would be the metric

1  that one would use to assess what the consequences are to core

2  retention if you are going to seek some other goal besides

3  compactness or core retention as your primary goal.  I agree.

4  BY MR. DAVIS:

18:47:01 5  Q    We've spoken of common features that we might see in the

6  Hatcher plan and in Dr. Duchin's plan and in Mr. Cooper's

7  plans.  So I want to point out some things, and you tell me if

8  those are common features of all of these plans.

9       Do they all split Mobile County?

18:47:20 10  A    Yes.

11  Q    Do they all join the inner city part of Mobile County, the

12  part is more African-American with the counties in the western

13  Black Belt?

14  A    Yes.

18:47:34 15  Q    I misspoke.  I said the county -- I meant the counties in

16  the eastern?

17  A    Eastern.  I understood.  Yes.  It is correct in the

18  eastern.  To some cases not all the way to the eastern border

19  but eastern through the Black Belt for sure.

18:47:48 20  Q    And do all of these plans join the less African-American

21  portions of Mobile County with the Wiregrass counties along the

22  Florida line?

23  A    Yes, they do.

24  Q    Sometimes all the way out to Houston County, correct?

18:48:04 25  A    All the way.

```
 1  Q    In the report that you prepared for the State of
 2  Wisconsin, I believe it was the Wisconsin Legislature,
 3  Mr. Bryan, was it possible in that matter to draw a map that
 4  avoided any incumbent conflicts?
18:48:23 5  A    It was not mathematically possible.
 6  Q    Is it your belief that the plan that you were testifying
 7  about does as good a job as is possible in Wisconsin of
 8  avoiding incumbent conflicts?
 9  A    It did.
18:48:39 10  Q    Have we asked you to express an opinion in this case of
11  the legislature's intent in passing these plans?
12  A    No.
13  Q    Do you have some understandings of what has occurred in
14  depositions in this case?  Just based on information that we
18:49:07 15  shared with you.
16  A    Some, but not all.
17  Q    But we have not asked you to express an opinion as to
18  whether that is correct, would you agree with that?
19  A    Yes.
18:49:20 20  Q    From your review of Dr. Duchin's plans and Mr. Cooper's
21  plans, do you believe as a demographer that it is necessary to
22  sacrifice compactness to some extent to draw two majority-black
23  districts in Alabama?
24  A    Yes.
18:49:47 25  Q    You conceded that you're not some national expert in
```

```
  1  communities of interest, but as a demographer, have you become
  2  familiar over the years with the concept of community of
  3  interest?
  4  A    Yes.
18:50:05  5  Q    And have you gained an ability -- how to assess and weigh
  6  communities of interest against one another?
  7  A    I have some ability.  It is a subjective difficult
  8  exercise that is frequently very specific to the areas that we
  9  are analyzing and can be a changing target.
18:50:28 10  Q    Mr. Bryan, if Dr. Duchin's plans split the Black Belt
 11  three ways, I mean, among three different districts, and if the
 12  Alabama plan splits the black plan three ways among three
 13  different districts, can you say whether one plan does better
 14  than the other, in terms of treating the Black Belt as a
18:50:53 15  community of interest?
 16  A    I cannot.
 17  Q    I believe you recognized, Mr. Bryan, that a community
 18  organizer can be a valuable source of information about
 19  communities of interest?
18:51:10 20  A    I agree.
 21  Q    Would you, nonetheless, need to review any specific
 22  testimony from a community organizer before you can make a
 23  judgment about whether that specific testimony is reliable and
 24  sensible from a demographer's standpoint?
18:51:30 25  A    That would be preferable and the more information a
```

1  demographer or an expert has in understanding the expert

2  opinions that are being provided to help inform them, the

3  better.

4          MR. DAVIS:  One moment, if I may, Your Honor.

18:51:48  5          JUDGE MARCUS:  Sure.

6          MR. DAVIS:  Thank you, Mr. Bryan.  Your Honor, I have

7  no further questions on direct.

8          JUDGE MARCUS:  Thank you, Mr. Davis.  Judge Manasco,

9  do you have questions?

18:52:07 10          JUDGE MANASCO:  I do.  I have two things I would like

11  to ask about.  Mr. Bryan, so I heard you say several times -- I

12  believe it began in your conversation with Ms. Khanna for the

13  Caster plaintiffs, and continued in your examination by

14  Mr. Dunn, the Milligan plaintiffs, that you are reluctant to

18:52:28 15  opine that any one particular redistricting principle ought to

16  be placed in a hierarchy above the others, setting aside

17  one person, one vote, which I understand you regard as a legal

18  requirement, not a traditional redistricting principle.  Did I

19  understand that correctly?

18:52:48 20          THE WITNESS:  Correct.

21          JUDGE MANASCO:  So will you look with me at the last

22  page, please, of your rebuttal report in Milligan and Caster.

23  I think it's Defense Exhibit 4 on page 19.  Just let me know

24  when you're there.

18:53:18 25          THE WITNESS:  Would this be the document, Your Honor?

1111

| | |
|---|---|
| 1 | JUDGE MANASCO:  That's it.  So the next to last |
| 2 | sentence says, My analysis of compactness shows the that |
| 3 | Dr. Duchin's plans perform generally better on average than the |
| 4 | enacted state of Alabama plans. |
| 18:53:41 5 | THE WITNESS:  That's correct. |
| 6 | JUDGE MANASCO:  Although some districts are |
| 7 | significantly less compact than Alabama's and significantly |
| 8 | better than Bill Cooper's plans. |
| 9 | THE WITNESS:  That's correct. |
| 18:53:52 10 | JUDGE MANASCO:  The last sentence says, In the |
| 11 | hierarchy of redistricting criteria priorities, I assess the |
| 12 | benefit of this accomplishment as being more than offset by the |
| 13 | significant detrimental impact to the continuity of |
| 14 | representation. |
| 18:54:12 15 | THE WITNESS:  That is correct. |
| 16 | JUDGE MANASCO:  So what I'm trying to understand is, |
| 17 | do you or don't you put the traditional districting principles |
| 18 | into a hierarchy as part of your analysis, and if you do, help |
| 19 | me understand where the hierarchy comes from; and if you don't, |
| 18:54:32 20 | my question would be do you adhere to the last sentence of your |
| 21 | rebuttal report. |
| 22 | THE WITNESS:  Thank you, Your Honor.  I would answer |
| 23 | this as follows:  I do not follow a rule that says any one in |
| 24 | any given instance higher or lower than any other one.  I |
| 18:54:49 25 | assess all of these redistricting criteria concurrently, |

1    simultaneously watching what for the benefits and the drawbacks

2    are of applying one particular redistricting criteria over or

3    under another.

4         What is unique about the Duchin plan is that compactness

18:55:08 5    is selectively applied only in part of the plan and is not

6    applied in part of the plan where she is seeking to optimize

7    two black populations.  In the area where she significantly

8    changes, manipulates the districts, that being Districts 4

9    and 5, if I recall correctly, there is no other reason for

18:55:27 10   compactness to be changed or for those districts to be changed

11   except solely for the purpose of compactness.

12        And it is my assessment that if a district -- in that

13   case, if a district is significantly changed and the continuity

14   of representation of that district is significantly disrupted

18:55:47 15   just for the sake of saying that the long historic bonds of a

16   group of people that have been represented in the same area by

17   the same representative for a long period of time, that, to me,

18   is not a fair or good tradeoff.

19        You're sacrificing the continuity of representation of

18:56:07 20   these people just to say that your district looks more like a

21   circle so that you can say it looks like a circle.

22        So in that instance, in that tradeoff, my professional

23   assessment is that the fact that it looks more like a circle is

24   not worth the tradeoff due the significant damage to continuity

18:56:23 25   of representation.  That is not a hard and fast rule and

 1  there's no fixed hierarchy that plays universally across all of
 2  those judgments.
 3           JUDGE MANASCO:  Understood.  Okay.  So for my second
 4  question, I want to return to the conversation about the metric
 5  for measuring the Black Voting Age Population and whether it
 6  should be any-part black or black alone.  And I think you and
 7  Ms. Khanna for the Caster plaintiffs discussed the Georgia
 8  versus Ashcroft citation in your first report in Milligan and
 9  Caster.  You don't have to refer to it specifically.  I'm just
10  going to ask you a general question about it.
11           THE WITNESS:  Thank you.
12           JUDGE MANASCO:  No problem.  I know it's been a long
13  day.  And I took your testimony to be that in the course of
14  preparing your analytics and in your report that you might rely
15  on data analysis prepared by team members who worked for and
16  with you in this kind of enterprise.  Is that correct?
17           THE WITNESS:  Yes, I do, and they're my direct
18  supervision.
19           JUDGE MANASCO:  Okay.  And I heard you say that you
20  had reviewed the Ashcroft decision some time ago, but not
21  directly in the course of preparing this report.
22           THE WITNESS:  Yes.
23           JUDGE MANASCO:  And I assume your data analysts would
24  not be doing that kind of work, they would be --
25           THE WITNESS:  They had nothing to do with that.

1          JUDGE MANASCO:  Okay.  Is there any other material

2    that is cited in any expert report you have prepared and filed

3    that you did not personally review or have one of your team

4    members review in connection with the preparation of the

18:58:02  5    report?

6          THE WITNESS:  Nope.

7          JUDGE MANASCO:  Thank you.

8          JUDGE MARCUS:  Judge Moorer?  Any questions?

9          JUDGE MOORER:  Yes, sir.

18:58:14 10    Mr. Bryan, there's no perfect redistricting plan that's

11    possible to be drawn anywhere, is there?

12          THE WITNESS:  No, Your Honor.

13          JUDGE MOORER:  And every ten years, virtually, every

14    state is going to make some changes to their redistricting to

18:58:30 15    take into account population shifts and whatnot, right?

16          THE WITNESS:  Yes, Your Honor.

17          JUDGE MOORER:  And every plan is going to involve

18    tradeoffs of compactness.

19          THE WITNESS:  They always do, Your Honor.

18:58:43 20          JUDGE MOORER:  Incumbency.

21          THE WITNESS:  Yes.

22          JUDGE MOORER:  And incumbency, when two incumbents are

23    pitted in the same district because of redistricting, is

24    something that incumbents can solve themselves if they want to

18:58:58 25    by moving to another district, right?

|  | 1 | THE WITNESS:  If they choose to do so, yes. |

1            THE WITNESS:  If they choose to do so, yes.

2            JUDGE MOORER:  Or staying in a district and running

3  against whomever.

4            THE WITNESS:  That is their choice, yes, Your Honor.

18:59:12  5            JUDGE MOORER:  And no matter the incumbent, there's no

6  rule that other people who are not incumbents cannot run and

7  win against incumbents.

8            THE WITNESS:  That's correct, Your Honor.

9            JUDGE MOORER:  Whether that incumbent is pitted

18:59:29 10  against somebody else who might be an incumbent or not.

11            THE WITNESS:  Yes, Your Honor.

12            JUDGE MOORER:  And sometimes people who were

13  incumbents before run against current incumbents and win, don't

14  they?

18:59:44 15            THE WITNESS:  Yes, Your Honor, they do.

16            JUDGE MOORER:  Do you know if the state looked at

17  whether they could draw two minority districts when they were

18  going through the redistricting process.

19            THE WITNESS:  Allow me to restate the question to make

19:00:15 20  sure I'm clear.  You asked if --

21            JUDGE MOORER:  Let me ask you a more clear question.

22            THE WITNESS:  Thank you, Your Honor.

23            JUDGE MOORER:  Did the state map drawer as far as you

24  know look at and draw potentially districts that would include

19:00:35 25  two minority districts?

1           THE WITNESS:  Your Honor, I have already testified

2  that I have no knowledge of who the map drawer is, what their

3  process was or what the iterations were that they went through

4  and would be inappropriate for me to know so.

19:00:50  5           JUDGE MOORER:  Okay.  That's fine.  I don't think I

6  have any other questions.

7           JUDGE MARCUS:  Thank you.  I have one for you,

8  Mr. Bryan.

9       You testified earlier that one of the areas of expertise

19:01:12 10  that you had was in estimating population shifts.

11           THE WITNESS:  Yes, Your Honor.

12           JUDGE MARCUS:  And you testified about that in a

13  specific context when you were looking at population deviations

14  and how they grew over a ten-year decennial period, right?

19:01:32 15           THE WITNESS:  Yes, Your Honor.

16           JUDGE MARCUS:  Did you review and is there anything in

17  any of your reports that projected population splits based on

18  race going back in time and going forward?  For example, we

19  know from this record what the African-American population was,

19:01:57 20  say, circa 1992, and then we have numbers in the year 2000 from

21  the census and years in 2010 and 2020.

22       And if you look at those, you see a drop in the white

23  population if the numbers I saw in one of these reports is

24  right from roughly 73 percent to 63 percent of the Voting Age

19:02:24 25  Population.  And conversely, the African-American population

1117

1   grew somewhere between three and four from, say, 23 to 27,

2   something roughly like that.  That's in the record, right?

3          THE WITNESS:  We performed no such population

4   projections by race for the purpose of this analytic exercise,

19:02:47  5   Your Honor.

6          JUDGE MARCUS:  Okay.  So you didn't make any

7   projection from '21 to '31?

8          THE WITNESS:  No, Your Honor.

9          JUDGE MARCUS:  That's all I wanted to know.  Thank you

19:02:56 10   very much.

11     Any follow-up questions by any of the lawyers?  Let me

12   start with you, Ms. Khanna, and then turn to Mr. Dunn, and then

13   finally Mr. Blacksher, and Mr. Davis, we will give you the last

14   word because he's your witness.

19:03:12 15     Ms. Khanna?  I'm sorry.  You are muted.  He did not hear

16   you.  Fire away.  Thank you.

17          MS. KHANNA:  Nothing from me, Your Honor.  I would

18   like to thank Mr. Bryan and the Court for its patience today.

19          THE WITNESS:  Thank you, Ms. Khanna.

19:03:31 20          JUDGE MARCUS:  Do you have anything further that you

21   would like to ask, Mr. Dunn?

22          MR. DUNN:  No.  I think we have all had enough for

23   today, Your Honor.

24          JUDGE MARCUS:  Mr. Blacksher, anything further to

19:03:42 25   follow up on anything the judges asked?

1118

1           MR. BLACKSHER:  No, Your Honor.

2           JUDGE MARCUS:  All right.  Thank you much.  Finally,

3    Mr. Davis?

4           MR. DAVIS:  No questions from me, Your Honor.

19:03:51  5           JUDGE MARCUS:  All right.  I thank you all.

6       We will adjourn for the day.  We will reconvene Monday

7    morning at 9:00 o'clock the usual time we had set, Central

8    Standard Time.  That would be 10:00 a.m. Eastern Standard Time.

9       Thank you all.  We are in recess.

19:04:17 10           (Whereupon, the above proceedings were concluded at

11       7:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1       <u>CERTIFICATE</u>

2

3

4       I certify that the foregoing is a correct

5       transcript from the record of proceedings in the

6       above-entitled matter.

7

8

9

10

11                                                      <u>01-07-2022</u>

12      Christina K. Decker, RMR, CRR                Date

13      Federal Official Court Reporter

14      ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25