FILED
2022 Jan-18 PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
1                 IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ALABAMA
2                        SOUTHERN DIVISION

3

4      BOBBY SINGLETON, et al.,        *
                 Plaintiffs,           *   2:21-cv-1291-AMM
5                                       *   January 11, 2022
       vs.                             *   Birmingham, Alabama
6                                       *   9:00 a.m.
       JOHN MERRILL, in his official *
7      capacity as Alabama Secretary *
       of State, et al.,               *
8                Defendants.           *
       ******************************
9                                       *
       EVAN MILLIGAN, et al.,          *
10                Plaintiffs,           *   2:21-cv-1530-AMM
                                        *
11     vs.                             *
                                        *
12     JOHN MERRILL, in his official *
       capacity as Alabama Secretary *
13     of State, et al.,               *
                 Defendants.           *
14     ******************************
                                        *
15     MARCUS CASTER, et al.,          *
                 Plaintiffs,           *   2:21-cv-1536-AMM
16                                      *
       vs.                             *
17                                      *
       JOHN MERRILL, in his official *
18     capacity as Alabama Secretary *
       of State, et al.,               *
19                Defendants.           *
       ******************************
20

21

             TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
22                      VIA ZOOM CONFERENCE
                            VOLUME VI
23          BEFORE THE HONORABLE ANNA M. MANASCO,
                 THE HONORABLE TERRY F. MOORER,
24               THE HONORABLE STANLEY MARCUS

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2        Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
         pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
3           and Procedures Vol. VI, Chapter III, D.2.  Transcript
                    produced by computerized stenotype.
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              APPEARANCES

2

    FOR THE SINGLETON PLAINTIFFS:

3

    James Uriah Blacksher
4   JAMES U. BLACKSHER, ATTORNEY
    825 Linwood Road
5   Birmingham, AL 35222
    205-612-3752
6   Fax: 866-845-4395
    Email: Jublacksher@gmail.com

7

    Myron C Penn
8   PENN & SEABORN LLC
    53 Highway 110
9   PO Box 5335
    Union Springs, AL 36089
10  334-738-4486
    Fax: 334-738-4432
11  Email: Myronpenn28@hotmail.com

12  Joe R Whatley, Jr
    WHATLEY KALLAS LLP
13  2001 Park Place North Suite 1000
    Birmingham, AL 35203
14  205-488-1200
    Fax: 800-922-4851
15  Email: Jwhatley@whatleykallas.com

16  Henry C Quillen
    WHATLEY KALLAS LLP
17  159 Middle Street Suite 2D
    Portsmouth, NH 03801
18  603-294-1591
    Fax: 800-922-4851
19  Email: Hquillen@whatleykallas.com

20  W Tucker Brown
    WHATLEY KALLAS LLC
21  P.O. Box 10968
    Birmingham, AL 35202-0968
22  205-488-1200
    Fax: 800-922-4851
23  Email: Tbrown@whatleykallas.com

24

25

                    *CHRISTINA K. DECKER, RMR, CRR*
                    Federal Official Court Reporter
                         101 Holmes Avenue, NE
                         Huntsville, AL 35801
                256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
1      Diandra "Fu" Debrosse Zimmermann
       DICELLO LEVITT GUTZLER
2      420 20th Street North
       Suite 2525
3      Birmingham, AL 35203
       205-855-5700
4      Fax: 205-855-5784
       Email: Fu@dicellolevitt.com
5
       Eli Joseph Hare
6      DICELLO LEVITT GUTZLER LLC
       420 20th Street North, Suite 2525
7      Birmingham, AL 35203
       205-855-5700
8      Fax: 205-855-5784
       Email: Ehare@dicellolevitt.com
9

10     FOR THE MILLIGAN PLAINTIFFS:

11
       Deuel Ross
12     NAACP LEGAL DEFENSE &
       EDUCATIONAL FUND, INC.
13     700 14th Street N.W. Ste. 600
       Washington, DC 20005
14     (202) 682-1300
       Dross@naacpldf.org
15
       Leah Aden
16     Stuart Naifeh
       Kathryn Sadasivan
17     Brittany Carter
       NAACP LEGAL DEFENSE &
18     EDUCATIONAL FUND, INC.
       40 Rector Street, 5th Floor
19     New York, NY 10006
       (212) 965-2200
20     Laden@naacpldf.org
       Snaifeh@naacpldf.org
21
       Davin M. Rosborough
22     Julie Ebenstein
       AMERICAN CIVIL LIBERTIES
23     UNION FOUNDATION
       125 Broad St.
24     New York, NY 10004
       (212) 549-2500
25     Drosborough@aclu.org
       Jebenstein@aclu.org
```

```
 1          Kaitlin Welborn
            LaTisha Gotell Faulks
 2          AMERICAN CIVIL LIBERTIES UNION
            OF ALABAMA
 3          P.O. Box 6179
            Montgomery, AL 36106-0179
 4          (334) 265-2754
            Kwelborn@aclualabama.org
 5          Tgfaulks@aclualabama.org

 6          David Dunn
            HOGAN LOVELLS US LLP
 7          390 Madison Avenue
            New York, NY 10017
 8          (212) 918-3000
            David.dunn@hoganlovells.com
 9
            Michael Turrill
10          Harmony A. Gbe
            HOGAN LOVELLS US LLP
11          1999 Avenue of the Stars
            Suite 1400
12          Los Angeles, CA 90067
            (310) 785-4600
13          Michael.turrill@hoganlovells.com
            Harmony.gbe@hoganlovells.com
14
            Shelita M. Stewart
15          Jessica L. Ellsworth
            HOGAN LOVELLS US LLP
16          555 Thirteenth Street, NW
            Washington, D.C. 20004
17          (202) 637-5600
            Shelita.stewart@hoganlovells.com
18
            Blayne R. Thompson
19          HOGAN LOVELLS US LLP
            609 Main St., Suite 4200
20          Houston, TX 77002
            (713) 632-1400
21          Blayne.thompson@hoganlovells.com

22

23

24

25
```

```
 1       Sidney M. Jackson
         Nicki Lawsen
 2       WIGGINS CHILDS PANTAZIS
         FISHER & GOLDFARB, LLC
 3       301 19th Street North
         Birmingham, AL 35203
 4       Phone: (205) 341-0498
         Sjackson@wigginschilds.com
 5       Nlawsen@wigginschilds.com

 6

 7       FOR THE CASTER PLAINTIFFS:

 8       Abha Khanna
         ELIAS LAW GROUP LLP
 9       1700 Seventh Avenue, Suite 2100
         Seattle, WA 98101
10       206-656-0177
         Email: AKhanna@elias.law
11
         Aria C Branch
12       ELIAS LAW GROUP LLP
         10 G St NE, Suite 600
13       Washington, DC 20002
         202-968-4490
14       Fax: 202-968-4498
         Email: ABranch@elias.law
15
         Daniel C Osher
16       ELIAS LAW GROUP
         10 G Street NE
17       Suite 600
         Washington, DC 20002
18       202-968-4490
         Email: DOsher@elias.law
19
         Joseph N. Posimato
20       Elias Law Group LLP
         10 G Street, NE; Suite 600
21       Washington, DC 20002
         202-968-4518
22       Email: Jposimato@elias.law

23       Lalitha D Madduri
         ELIAS LAW GROUP LLP
24       10 G Street NE, Suite 600
         Washington, DC 20002
25       202-968-4490
         Email: Lmadduri@elias.law
```

1    Olivia N. Sedwick
     Elias Law Group LLP
2    10 G Street, NE; Suite 600
     Washington, DC 20002
3    202-968-4518
     Email: Osedwick@elias.law

4

5    Richard P Rouco
     QUINN CONNOR WEAVER DAVIES & ROUCO LLP
6    Two North Twentieth Street
     2 20th Street North
7    Suite 930
     Birmingham, AL 35203
8    205-870-9989
     Fax: 205-803-4143
9    Email: Rrouco@qcwdr.com

10

11

12   <u>FOR THE DEFENDANT</u>:

13   Andrew Reid Harris
     OFFICE OF THE ATTORNEY GENERAL
14   CONSTITUTIONAL DEFENSE DIVISION
     501 Washington Avenue
15   Montgomery, AL 36130
     334-353-8891
16   Email: Reid.Harris@AlabamaAG.gov

17   Benjamin Matthew Seiss
     ALABAMA OFFICE OF THE ATTORNEY GENERAL
18   P.O. Box 300152
     501 Washington Ave (36104)
19   Montgomery, AL 36130
     334-353-8917
20   Fax: 334-353-8400
     Email: Ben.seiss@alabamaag.gov

21

     Brenton Merrill Smith
22   OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
     P.O. Box 300152
23   501 Washington Avenue
     Montgomery, AL 36130
24   334-353-4336
     Fax: 334-353-8400
25   Email: Brenton.Smith@AlabamaAG.gov

```
 1       Edmund Gerard LaCour, Jr.
         OFFICE OF THE ATTORNEY GENERAL
 2       501 Washington Avenue
         P.O. Box 300152
 3       Montgomery, AL 36104
         334-242-7300
 4       Fax: 334-242-4891
         Email: Edmund.Lacour@AlabamaAG.gov
 5
         James W Davis
 6       OFFICE OF THE ATTORNEY GENERAL
         501 Washington Avenue
 7       P O Box 300152
         Montgomery, AL 36130-0152
 8       334-242-7300
         Fax: 334-353-8400
 9       Email: Jim.davis@alabamaag.gov

10       Misty Shawn Fairbanks Messick
         OFFICE OF THE ATTORNEY GENERAL
11       FOR THE STATE OF ALABAMA
         501 Washington Avenue
12       P O Box 300152
         Montgomery, AL 36130-0152
13       334-242-7300
         Fax: 334-353-8440
14       Email: Misty.Messick@AlabamaAG.gov

15       Alexander Barrett Bowdre
         OFFICE OF THE ALABAMA ATTORNEY GENERAL
16       P.O. Box 300152
         Montgomery, AL 36130
17       334-242-7300
         Fax: 334-353-8400
18       Email: Barrett.Bowdre@alabamaAG.gov

19       Thomas Alexander Wilson
         STATE OF ALABAMA
20       OFFICE OF THE ATTORNEY GENERAL
         501 Washington Street
21       Montgomery, AL 36103
         334-242-7300
22       Fax: 334-353-8400
         Email: Thomas.wilson@alabamaAG.gov
23

24

25
```

```
1        J Dorman Walker
         BALCH & BINGHAM LLP
2        P O Box 78
         Montgomery, AL 36101
3        334-834-6500
         Fax: 334-269-3115
4        Email: Dwalker@balch.com

5

6

7

8

9        COURTROOM DEPUTY:  Frankie N. Sherbert

10

11       COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **I N D E X**

2

3     DR. M.V. TREY HOOD, III                        1378
       DIRECT EXAMINATION                             1379
4      BY MR. SMITH
       CROSS-EXAMINATION                              1415
5      BY MS. GBE
       CROSS-EXAMINATION                              1444
6      BY MS. MADDURI
       CROSS-EXAMINATION                              1477
7      BY MR. QUILLEN
       REDIRECT EXAMINATION                           1494
8      BY MR. SMITH

9
       BRIDGETT KING                                  1499
10     DIRECT EXAMINATION                             1500
       BY MR. OSHER
11     CROSS-EXAMINATION                              1533
       BY MR. BOWDRE
12     REDIRECT EXAMINATION                           1610
       BY MR. OSHER
13

14     MARCUS E. CASTER                               1618
       DIRECT EXAMINATION                             1619
15     BY MR. OSHER
       CROSS-EXAMINATION                              1638
16     BY MR. WALKER

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**P R O C E E D I N G S**

1           (In open court.)

2           JUDGE MARCUS:  Good morning to everyone.  I hope you

4 didn't have to stay up too late as I did to watch

09:00:47 5 Georgia/Alabama last night.

6     With that, are the parties ready to proceed?  We are in

7 the middle of the presentation of the plaintiffs' case, but we

8 were going to accommodate the defense and take Dr. Hood out of

9 turn, if I had that right.

09:01:06 10    Do I have that right, Mr. Smith?

11           MR. SMITH:  That's right, Your Honor.

12           JUDGE MARCUS:  And the plaintiffs were agreeable to

13 that, and they are ready to proceed, I take it?

14           MR. BLACKSHER:  Yes, Your Honor.

09:01:20 15           JUDGE MARCUS:  All right.  And for Milligan and

16 Caster, I take it there's agreement on this order of

17 proceeding, as well.

18           MS. MADDURI:  Yes, Your Honor.

19           MS. GBE:  Yes, Your Honor.

09:01:31 20           JUDGE MARCUS:  Thank you very much.  And your next

21 witness, Mr. Smith, would be.

22           MR. SMITH:  Your Honor, Secretary of State calls

23 Dr. Trey Hood.

24           JUDGE MARCUS:  All right.

09:01:39 25                DR. M.V. TREY HOOD, III,

```
 1  having been first duly sworn, was examined and testified as
 2  follows:
 3          JUDGE MARCUS:  Thank you very much.  And if you would
 4  state your name, your full name for the record, I would be much
 5  appreciative.
 6          THE WITNESS:  Certainly, Your Honor.  It's M.V. Hood,
 7  III.
 8          JUDGE MARCUS:  Dr. Hood, thanks very much, and
 9  Mr. Smith, you may proceed with your direct.
10          MR. SMITH:  Thank you, Your Honor.
11                      DIRECT EXAMINATION
12  BY MR. SMITH:
13  Q    Good morning, Dr. Hood.
14  A    Good morning.
15  Q    Dr. Hood, have you been retained as an expert in this
16  case?
17  A    Yes.
18  Q    And have you prepared expert reports as part of this case?
19  A    Yes.
20  Q    And do you have copies of those reports handy?
21  A    I have printed copies of the reports in front of me, yes.
22  Q    Great.  I will be referring to those periodically.  And
23  for the Court's benefit, those are Defendants' Exhibit 5 and 6,
24  the initial and rebuttal reports.
25          So, Dr. Hood, your initial report, Exhibit 5, if you turn
```

```
 1  to page 20 of that report based on the ECF header in the top
 2  right corner, is that a copy of your CV?
 3  A    Yes.
 4  Q    And is your CV a complete and accurate summary of your
 5  background and professional experience?
 6  A    Yes.
 7  Q    Dr. Hood, if you would, could you briefly summarize your
 8  educational background for the Court?
 9  A    Certainly.  I've got three degrees in political science, a
10  B.S. from Texas A&M, an M. A. From Baylor University, and a
11  Ph.D. from Texas Tech University.
12  Q    And how are you employed, Dr. Hood?
13  A    I am currently a professor of political science and
14  director of the SPIA Research Center at the University of
15  Georgia.
16        I have been at the University of Georgia since 1999.
17  Q    And what classes do you teach?
18  A    I teach a variety of classes in American politics.  Right
19  now, I'm teaching a class in southern politics.  I teach
20  introductory sections of American government.  I have taught
21  undergraduate methods courses.  I teach a survey research
22  internship course right now, as well.  So I have taught a
23  variety of classes in American politics and policy over the
24  years.
25        I have taught graduate classes in southern politics and
```

09:03:13 5
09:03:28 10
09:03:47 15
09:04:05 20
09:04:23 25

1    election administration, as well.

2    Q    And do you conduct empirical social science search?

3    A    Yes.  Almost all of the research I have conducted in my

4    career as a social scientist has been empirical in nature.

09:04:46 5    Q    And do you have any principal areas of research?

6    A    Generally, American politics and policy; more

7    specifically, southern politics and election administration

8    again.

9         I sort of specialize in voting behavior, public opinion,

09:05:08 10   southern politics, racial politics, and election

11   administration.  Sometimes people call it election sciences

12   today, but the study of how elections are carried out.

13   Q    Thank you, Dr. Hood.

14   A    Sort of the mechanical process for how elections are

09:05:25 15   carried out.

16   Q    Thank you, Dr. Hood.  And have you received any external

17   grants to study issues related to those areas of research?

18   A    I have received grants over the years from the Pew

19   Charitable Trust, from the National Science Foundation.

09:05:40 20   Recently, we received a grant to study absentee by-mail

21   balloting in the 2020 election during the pandemic.  I also for

22   the -- I believe it's the Center For Election Innovation and

23   Research, we received a grant to conduct research on behalf of

24   the Secretary of State's office in Georgia looking at the

09:06:01 25   implementation of a new ballot marking voting system that the

```
 1  state implemented in 2020.
 2  Q    And, Dr. Hood, turning to page 2 based on the ECF header
 3  of your report, do you include a list of the cases in which you
 4  have served as an expert in the last five years?
 5  A    Yes.
 6  Q    And approximately how many cases is that?
 7  A    Looks like 15.
 8  Q    And have you been accepted as an expert witness in cases
 9  involving redistricting before?
10  A    Yes.
11  Q    Have courts previously credited and relied on your
12  analysis?
13  A    Yes.
14  Q    Have you previously served as an expert in the state of
15  Alabama?
16  A    Yes.
17  Q    And did the Court accept you as an expert in that case?
18  A    Yes.
19          MR. SMITH:  Your Honors, at this time, we would tender
20  Dr. Hood as an expert in the fields of political science,
21  empirical social science research, and for the matters
22  discussed in his reports.
23          JUDGE MARCUS:  Is there any challenge to his
24  qualifications from any of the parties, Milligan, Singleton
25  Caster?
```

Time stamps: 09:06:22 (line 5), 09:06:35 (line 10), 09:06:46 (line 15), 09:06:59 (line 20), 09:07:18 (line 25)

```
 1              MR. QUILLEN:  Not from Singleton, Your Honor.
 2              MS. GBE:  Not from Milligan, Your Honor.
 3              JUDGE MARCUS:  And Caster?
 4              MS. MADDURI:  No, Your Honor.
 5              JUDGE MARCUS:  Thank you.  You may proceed.
 6         Dr. Hood is accepted as an expert in the fields you have
 7    delineated, Mr. Smith.
 8              MR. SMITH:  Thank you, Your Honor.
 9    BY MR. SMITH:
10    Q    Now, Dr. Hood, turning on to page 3 of your report.  And
11    just generally, can you describe the scope of what you were
12    asked to do?
13    A    Certainly.  It was fairly narrow.  I was asked to provide
14    in this particular case a functional analysis for District 7,
15    as it was drawn in 2021 and for District 6 and 7 in the
16    Singleton Plan.
17         And I also wrote a short section on conservative white
18    support for minority Republican candidates.  And that was about
19    it.
20    Q    Thank you, Dr. Hood.
21         And could you briefly summarize the steps you took to
22    carry out your functionality analysis?
23    A    So that begins on page 2 of my report, or page 3, as it's
24    stamped.  That's where the district functionality analysis
25    start.  And I went through a number of steps that are outlined
```

1    for each one of these districts as encompassed.  So would you

2    like me to walk through an example, or...

3    Q    Yes.  Let me share my screen.

4         And if I could, this is your report, Exhibit 5.

09:09:27 5    And so does your functionality analysis, the first one

6    starts on page 4 or 5 based on the stamp, right?

7    A    Correct.  Correct.

8    Q    And why don't you walk us through what we're seeing here?

9    A    Okay.  So I guess to back up for just a second, the first

09:09:42 10   thing we have to do is collect some data.  I collected voting

11   data for the 2018 gubernatorial election and the 2020

12   presidential election from the Alabama Secretary of State's

13   office at the precinct level.  And I also collected data from

14   the Alabama Secretary of State's office on registration and

09:10:07 15   turn out by race.  And, again, that can be aggregated at the

16   precinct level, which is what I did.

17        So I combine those sources of data, as well.  What we have

18   to do is come up with an estimate of how the different racial

19   groups are voting for the different candidates, and that's the

09:10:30 20   first part of what we see here in Table 1.  I used a commonly

21   accepted method in the social sciences and in court proceedings

22   called ecological inference to petition the vote by race for

23   these various candidates.  That's what you see.  The results of

24   that are what you see in Table 1.

09:10:53 25        So the confidence intervals are down below that bracket,

1   below the point estimates.

2        So, for instance, it's estimated that 98.6 percent of

3   African-Americans in Alabama in this particular district as is

4   drawn voted for Democrat Joe Biden.

09:11:16 5        So and you can just read across the table here.  So that's

6   the results of my ecological inference estimates for CD 7.  I

7   call it enacted CD 7.  It was the district passed by the

8   Legislature in 2021.

9   Q    And then, Dr. Hood, once we have those estimates, what's

09:11:40 10  the next step in the analysis?

11  A    Well, the next step I undertook was to go back and look at

12  -- so I got this data from the reapportionment office, the

13  legislative reapportionment office in Alabama.  And these are

14  just the VAP or the Voting Age Population numbers for this

09:12:02 15  particular district.  But the percent in the literal number of

16  people over there to the right in Table 2 so we can see that

17  this district, as drawn, was 54.22 percent Black VAP, which

18  equates to 308,006 voters in this case.

19       So I am going to use those data in a subsequent step.  You

09:12:30 20  can see that these numbers of voters in Table 2 to the far

21  right are then inserted down in the left column of Table 3.  So

22  those are the exact same numbers.

23       And then, again, having previously collected the turnout

24  registration data, we can calculate turnout by race using those

09:12:55 25  data to come up with an estimate of how many black, white, and

```
 1  other voters we would have in this district.  So that's what's
 2  going on there.  Those are the turnout percentages that I
 3  calculated in Table 3 in the middle column.  I am multiplying
 4  those by the number, the VAP numbers in the left-hand column to
 5  get the number of voters in the right-hand column.  So that's
 6  just multiplication of that fraction.
 7      So I am trying to get an idea of what the electorate in
 8  this district that's just been drawn might look like.
 9  Q    And, Dr. Hood, could you explain briefly how you got this
10  turnout percentage figure?
11  A    So like most states, Alabama has voter registration
12  database.  Unlike most other states, except for a handful,
13  Alabama does have information on the race of registrants in
14  this database.
15      Like other states, Alabama calculates or puts together a
16  voter history database, which tells you whether someone turned
17  out to vote in the gubernatorial election or not.  So you can
18  combine these two databases together in order to figure out,
19  you know, what -- how many people turned out and who were these
20  people.
21      So, and again, you can't do that in most states, but we
22  can do that in Alabama.  Most states just don't track
23  registrant data by race.
24  Q    Thank you, Dr. Hood.
25      And then once you have the turnout percentage, what's the
```

1    next step after that?

2    A    So then you've got the number of voters that we

3    calculated, and we are going to take the number of voters in

4    Table 2 to the far right-hand column and then multiply those by

09:14:54  5    the breakdown we get in Table 1 for the vote totals.  So we are

6    going to de-aggregate the data based on how these racial groups

7    are voting, and then we are going to reaggregate the data

8    together to figure out what percent Democratic vote there was,

9    what percent Republican vote there was, and what percent other

09:15:19 10    vote there was in this case.

11    Q    And then that reaggregation, is that what we say in Table

12    4?

13    A    Yes.  That's the last step.  So you've put these various

14    data sources and calculations together and add them up, and

09:15:44 15    then, again, divide by the electorate, and the estimate is that

16    in this given district based on the election analysis from the

17    2020 presidential election, the Democratic vote percentage

18    would be 60.75 percent.  The Republican vote percentage would

19    be 37.24 percent.

09:16:07 20         So this gives us some idea, hopefully, of how this

21    district might function in a future election based on these

22    previous election results.

23    Q    So this table shows us how based on your analysis it

24    appears that the enacted District 7 would function in a

09:16:29 25    hypothetical future election?

```
 1  A    Yes.  Yes.  You know, we've never had an election run in
 2  this particular district, obviously.  So we're having to use
 3  previous election results to make an inference about the
 4  future.
 5  Q    And, Dr. Hood, I am not going to run through each of the
 6  steps again, but then you repeat the same analysis, but using
 7  data from the 2018 gubernatorial election?
 8  A    The exact same analysis is repeated except the election is
 9  different.  We use -- I use the 2018 gubernatorial election,
10  and the process is repeated also for the other Districts 6 and
11  7 in the Singleton plan.  And I believe -- so I go through the
12  steps again, the exact same steps for each one of these as
13  outlined in the district that we just talked about.  And I
14  think -- let's see.  To make things easier on myself, there's a
15  summary table on page 14 stamped -- yes.  So that's just a
16  summary of the results, the estimated Democratic vote share
17  that were produced by these analyses that were carried out.
18  Q    And so were there any differences in the methodologies in
19  how you calculated the vote shares for these particular
20  districts?
21  A    No.  The exact same process was repeated again and again
22  for each one of these districts.
23  Q    Can you briefly summarize the results of what you found
24  after performing this functionality analysis?
25  A    Sure.  For enacted CD 7, based on the 2018 gubernatorial
```

data, the estimated vote share for the Democratic candidate
would be 66.86 percent.  Based on the 2020 presidential
election, it would be 60.75 percent.

          Then CD 6 for the Singleton plan, my estimate from the
09:18:48  2018 gubernatorial election would be 52.28.  Then for the 2020
presidential election, it would be 52.03.

          Then for CD 7 in the Singleton plan from the gubernatorial
election, it would be 55.48.  And for the 2020 presidential
election, it would be 49.13.

09:19:09  Q    And, Dr. Hood, I would like to back up just a little bit
based on that last stat, and Table 20, could you summarize what
you see from the vote shares for this particular election?
This is on page 12.

A    Okay.  What's the question?

09:19:46  Q    Can you just summarize the vote shares from this table,
for this hypothetical election?

A    Okay.  For CD 7 and from the Singleton plan, let's see.
That would be based on the presidential vote from 2020, the
Democratic vote share would be 49.13.  Again, the estimated
09:20:09  Democratic vote share.  The estimated Republican vote share
would be 48.92, and the independent candidates or the other
candidate would have received 1.94 percent.

Q    Thank you, Dr. Hood.  So in each of these elections that
you analyzed, the Democratic candidate received more votes than
09:20:31  the Republican candidate?

```
        1  A      Yes.

        2  Q      What is your opinion as to whether Singleton District 6

        3  would function in an actual election?

        4  A      Would it function in terms of producing a Democratic

09:20:54 5  majority?  Is that fair?

        6  Q      Yes.

        7  A      Okay.  Quite possibly.  One of the estimates from the 2020

        8  presidential election was only 52 percent.  The other was

        9  higher at 58 percent.  So it's quite possible it might.  Again,

09:21:13 10  I raised some other questions.  There are some things to think

       11  about at the end of this section that we can talk about, but

       12  it's -- it's more Democratic leaning, I would say, than CD 7

       13  under the Singleton plan certainly, which at least one estimate

       14  fails to produce a Democratic majority.

09:21:38 15  Q      So, Dr. Hood, in your opinion, would the Singleton

       16  District 6 and 7 consistently elect the black candidate of

       17  choice?

       18  A      Well, I have got some questions about 7, whether it would

       19  consistently do so.  There would be a higher probability in 6,

09:21:59 20  but, again, if we are closer to 50 percent, again, there's some

       21  things that we have to consider.  One, you know, using EI

       22  estimates, those estimates or those point estimates come with a

       23  margin of error around them.  If the point estimate is truly

       24  towards the lower end of that margin of error, that will lower

09:22:25 25  the Democratic vote share.  And then also issues with
```

1  differential privacy.  I mean, we are drawing districts to be a

2  certain percentage, or once we draw the district, we can look

3  at the numbers and see what the racial percentage is, but

4  because of differential privacy concerns put in place by the

09:22:46  5  Census Bureau, we're not exactly sure, and there's no way to

6  know exactly what the racial percentage in the district

7  actually is.

8  Q    And, Dr. Hood, could you explain a little bit what you

9  mean by differential privacy?

09:23:02 10  A    Right.  So below the -- so I have got a section in the

11  report, which is on pages 14 and 15 and is stamped, and in

12  order to avoid -- or in order to protect privacy, I guess is

13  the way to put it, the Census Bureau introduces noise into the

14  data at lower levels of geography below the state level,

09:23:33 15  including down to the block level, which is where we usually

16  draw districts.  And so it's very hard to tell exactly what the

17  racial percentage of a district might be because of the

18  differential privacy put in place by the Senate or the

19  disclosure avoidance system is what they might call it, so...

09:23:59 20  Q    And, Dr. Hood, when you say they put noise into it, into

21  the data, what do you mean by that?

22  A    Well, what they have done is they have made it impossible

23  essentially for someone outside the Census Bureau to know what

24  the true racial numbers are down to the block level.  You know,

09:24:24 25  they will aggregate -- these numbers will aggregate and be

1    correct at the state level, but below that level, there is

2    noise that's been introduced into the data that makes it

3    impossible for someone to know with certainty exactly what

4    those numbers are, someone on the outside of the Census Bureau.

09:24:44  5    Q    Thank you, Dr. Hood.  And Dr. Hood, in your opinion, would

6    the enacted District 7 consistently elect the black candidate

7    of choice?

8    A    It should, yes.  It's over 60 percent in both of those

9    elections I looked at.

09:25:02 10   Q    And, Dr. Hood, you mentioned racially-polarized voting at

11   times in this section.  What do you mean by that phrase?

12   A    Well, what we're looking for, again, this sort of gets to

13   prong 2 of the *Gingles* test or the *Gingles* analysis, does the

14   minority group -- in this case, we could just talk about

09:25:30 15   African-Americans in Alabama, did they have a clearly defined

16   candidate of choice, you know, and does that -- if so, does

17   that clearly defined candidate of choice differ from the white

18   majority or the white-voting block?  Whites may or may not be

19   in the majority depending on the district configuration, but do

09:25:52 20   they have -- do whites have a different clearly defined

21   candidate of choice from the black community?  That's another

22   way of talking about if that's the case that there is

23   racially-polarized voting.  You have one group, one racial

24   group voted in one direction, and another racial group voting

09:26:12 25   in another direction.

```
 1   Q    Do you draw any conclusions based on that about the intent
 2   of those voters?
 3   A    Not intent.  It's just is the pattern there or not, the
 4   statistical pattern.
 5   Q    So you don't offer any opinion in your report about the
 6   intent of any voters in voting the way they do?
 7   A    I do not, no.
 8   Q    And, Dr. Hood, did you perform any functionality analyses
 9   of primaries in your report?
10   A    No, I did not.
11        The turnout in registration databases that I was using in
12   my report, I could not get copies of those databases around the
13   time of the primary elections.  So I did look into that, but
14   from the Secretary of State's office, those data were not
15   available to me.
16   Q    Thank you, Dr. Hood.
17        And, Dr. Hood, I want to turn to Section 4 of your report
18   starting on page 16, White Support For Minority Republican
19   Candidates.  Dr. Hood, have you researched white support for
20   minority Republican candidates?
21   A    Yes.  A co-author and myself wrote a peer-reviewed
22   published article on this topic.
23   Q    And what did you find in that research?
24   A    Well, we were looking at general election outcomes, and we
25   were comparing -- so general election outcomes for
```

1    gubernatorial and U.S. Senate elections, and we used survey

2    data to see if white conservatives would support black

3    Republican candidates at the same rate as white Republican

4    candidates.

09:28:07  5         And, in fact, we found that that was the case.  And

6    sometimes white conservatives' support for Republican minority

7    candidates was even higher than for white Republican candidates

8    in these particular elections.

9    Q    And what sorts of elections were you looking at?

09:28:28 10   A    These were general elections for U.S. Senate and Governor.

11   Q    Have you examined any instances of Republican support for

12   minority candidates in Alabama?

13   A    Well, I give an example.  I do have one example here from

14   pretty recent history, where Paschal, a black Republican, was

09:28:52 15   elected from a state House district in Shelby County, Alabama.

16   Q    And what do you find significant about that election?

17   A    Well, you know, given the racial composition of the

18   district, which is -- which was -- was, I guess you could say

19   since it's in the past 84.1 white VAP, no candidate's going to

09:29:16 20   win without majority-white support in that district.  And

21   Paschal does end up winning that seat.  So he obviously had the

22   support of white voters in that particular district.

23   Q    And, Dr. Hood, are you aware of the criticisms of some of

24   the other experts in this case that you should have considered

09:29:39 25   the 2016 GOP primary in this section?

```
 1  A     Yes.
 2  Q     And do those criticisms give you any concern?
 3  A     Well, it doesn't nullify this example or the work that I
 4  did -- the published work I did in this article, certainly.
09:29:54 5  And it's just one example where, of course, the example being
 6  Ben Carson running in the Republican presidential primary race.
 7  He does not win.  That doesn't necessarily give me pause or
 8  nullify the findings in this particular section, as I have laid
 9  them out here.
09:30:16 10  Q    Thank you, Dr. Hood.
11       And, Dr. Hood, I am going to share my screen with you.
12  Can you see this document, Document 68 on the front?
13  A     Yes.
14       MR. SMITH:  For the Court's benefit, this was
09:30:44 15  initially submitted as 68 and was subsequently renumbered as
16  S-44.
17       JUDGE MARCUS:  In the record now, it's S-44, correct?
18       MR. SMITH:  That's right, Your Honor.
19       JUDGE MARCUS:  Thank you.
09:30:57 20  BY MR. SMITH:
21  Q     And, Dr. Hood, do you recognize this document?
22  A     Yes.
23  Q     And do you have a copy of it with you there?
24  A     Yes, I do.
09:31:08 25  Q     And, Dr. Hood, turning to page 14 of that report, page 14,
```

1  as the bottom number gives it.  It's hard to tell from the

2  stamp what page it is.  It's the --

3  A    Okay.  Gotcha.

4  Q    Section 6, black voting patterns?

09:31:39 5  A    Okay.

6  Q    Would you briefly summarize what you're asked to do in

7  this section of the report?

8  A    In this section of the report, I was asked to look at

9  black voting patterns, and I did so using survey data.  And I

09:31:55 10  compared black voting patterns in Alabama to black voting

11  patterns in another 20 states, both in the South and outside of

12  the South that had a black population of at least 10 percent or

13  greater.  So I used a large-scale social science survey that's

14  been going on for a number of years called the -- used to be

09:32:18 15  called the CCES.  Now, it's called the Comparative Election

16  Study.  I also used the exit polls that are produced by the

17  news consortiums after each general election, or during each

18  general election.

19       So I collected data on presidential vote shares,

09:32:41 20  gubernatorial vote shares and U.S. Senate.  And in some cases,

21  I had data on U.S. House races, as well.

22  Q    And, Dr. Hood, let me back up and ask sort of more of a

23  threshold question.  Was this a report that you submitted as

24  part of the *Chestnut v. Merrill* case?

09:32:58 25  A    It was, yes.

1397

```
 1   Q    And that's been -- that was about two years ago, right?
 2   A    At least.  Pre-pandemic.  Pre-pandemic, for sure.
 3   Q    And have you had an opportunity to review this document
 4   recently?
 5   A    I did look back over it, yes.
 6   Q    Thank you, Dr. Hood.
 7        So in this first section, the 20 states you listed, do
 8   they include southern states?
 9   A    Oh, certainly.  Yes.
10   Q    And northern states, as well?
11   A    Yes.
12   Q    And midwestern states?
13   A    Yes.  Again, it's on page 14, Arkansas, Connecticut,
14   Delaware, Florida, Georgia, Illinois, Louisiana, Maryland,
15   Michigan, Mississippi, Missouri, New Jersey, New York, North
16   Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas,
17   and Virginia.
18   Q    Thank you, Dr. Hood.
19        And, Dr. Hood, on page 15, based on the number at the
20   bottom, do you go over the results of what you find based on
21   one of these sets of data?
22   A    Yes.  Are you looking specifically at Table 9 or 10?
23   Q    Well, what are we seeing in Table 9?
24   A    So those are the comparison of black voting patterns in
25   these 20 states.  And it is just sort of summarized there.  So
```

09:33:17
09:33:34
09:33:50
09:34:21
09:34:45

1    across all races on average, the Democratic vote share from

2    black voters was 91.1 percent; specifically for presidential

3    elections, it was 93.6 percent; for gubernatorial elections,

4    89.3; and for U.S. Senate, it was 90.1.

09:35:13  5    Q    So based -- the use of this survey data allow you to make

6    inferences about black voting patterns?

7    A    Certainly, yes.  That -- the inference being and not

8    really a surprise to me that overwhelmingly the black

9    communities supports Democratic candidates at 90-plus percent.

09:35:38 10   Q    And what years did you review in conducting this analysis?

11   A    2008 through 2018.

12   Q    And this 90.1 percent figure, does it include Alabama?

13   A    No.  Alabama's down below in Table 10.

14   Q    And so what figure did you find for Alabama?

09:36:00 15   A    The comparable figure the average of the averages across

16   all these races for Alabama was 94.3 percent.

17   Q    And in your opinion, are those comparable rates of turnout

18   -- or of support?  Excuse me.

19   A    Vote share, yes, certainly.  Again, 90-plus percent in

09:36:19 20   Alabama, 90-plus percent in these other 20 comparison states.

21   Q    And, Dr. Hood, in Tables 11 and 12, did you repeat this

22   analysis, but using the CCES data?

23   A    Yes.  So different data source, again the CCES -- or what

24   was called the CCES, now the CES is a large-scale survey,

09:36:45 25   public opinion survey, so...

1   Q    And what did you find?

2   A    Well, very similar numbers.  91.5 percent to the

3   comparison states and 90.9 percent.  So a little bit lower for

4   Alabama, but not much, a couple of points.  So for Alabama,

09:37:09  5   it's 94 percent with one data set and 91 percent with the

6   other.

7   Q    So did you find any significant differences in black

8   support for Democratic candidates in Alabama and black support

9   for Democratic candidates in other states?

09:37:24 10   A    No.

11   Q    And that includes states outside the South?

12   A    Yes.

13   Q    And throughout the country?

14   A    Yes.  Yeah.

09:37:32 15   Q    So on average, both in Alabama and throughout the country,

16   black voters support Democratic candidates at rates of above

17   90 percent?

18   A    Correct.

19   Q    So, Dr. Hood, given these high levels of support for

09:37:47 20   Democratic candidates among black voters, as far as you are

21   aware, would voting be racially polarized any place in America

22   with both black voters and where white voters tend to vote for

23   Republicans?

24   A    Well, if you had -- I mean, so from these data, we can

09:38:06 25   certainly infer that almost always the preferred candidate of

1  choice for the black community is going to be a Democratic

2  candidate.

3      So if you had on the other side say a majority of white

4  conservatives comprising that electorate, then, yes, that

09:38:26  5  community's preferred candidate of choice is probably going to

6  be a Republican.

7      So from my previous statement about what is

8  racially-polarized voting, yes, that would probably result in

9  racially-polarized voting.

09:38:40 10  Q   Dr. Hood, in the recent era, have you ever heard of racial

11  polarization existing where a majority of white voters

12  supported Democrats?

13  A   Well, in that hypothetical, it wouldn't be possible, I

14  don't think, because if you had a majority of white voters

09:38:59 15  supporting the Democratic candidate, then again, at least from

16  this data, a majority of African-American, more than a majority

17  would support the Democratic candidate, as well.  They would

18  both have the same preferred candidate of choice, both racial

19  groups.  Hence, you wouldn't have racially-polarized voting.

09:39:19 20  Q   Dr. Hood, to the best of your knowledge in the modern era,

21  has racial polarization only been found to exist where whites

22  tend to vote for Republicans?

23  A   Well, I think that would have to be almost a necessary

24  precondition.  Again, if a majority of whites are voting

09:39:42 25  Democratic, you are not going to end up with a situation where

1  you have racially-polarized voting.

2  Q    Thank you, Dr. Hood.

3       And now I am going to turn to Section 7 of your *Chestnut*

4  report on page 17.  And what analysis did you perform here?

09:40:00  5  A    I was asked to do a comparison.  And, again, I am looking

6  at Alabama, and I am using the same 20 states that we just

7  talked about that all had a black population of at least

8  10 percent or greater.

9       And here I am doing just a number of racial comparisons

09:40:21 10  between whites and blacks in these different states on quite a

11  few different metrics.

12       So things like education, poverty rate, home ownership,

13  infant mortality, you know, there are quite a few comparisons

14  between blacks and whites in these 21 states, 21 including

09:40:45 15  Alabama.  And the results of these comparisons --

16            JUDGE MARCUS:  Was there --

17            MS. GBE:  Yes, Your Honor.  This is Harmony Gbe on

18  behalf of the Milligan plaintiffs.  I wanted to object to this

19  line of questioning because it goes beyond the scope of

09:41:02 20  Dr. Hood's report, and it's basically speculation.

21            JUDGE MARCUS:  Mr. Smith, I take it you're proffering

22  Dr. Hood now beyond the issues of racial polarization and

23  offering him as an expert on the Senate Factors 1 to 8 or 1 to

24  9.  Is that where we are going?

09:41:24 25            MR. SMITH:  Well, Your Honor, we have offered him as

an expert in political science and on empirical social science
research, and this is part of a report that he did in a
previous case that employed those methods to find some of those
factors.  But, yes, it would be relevant to the --

09:41:39 5          JUDGE MARCUS:  You are offering him -- I understand
that he has the expertise as a general matter to opine beyond
simply racial polarization, and you are offering this for the
Senate Factors.

          My question -- I have that right, correct?

09:41:59 10          MR. SMITH:  Yes.

          JUDGE MARCUS:  The objection is that in this case, the
report he had offered did not go into *Gingles I* through *VII*,
and they were unaware that you were proffering him to provide
expert opinion on Senate Factors 1 to 8; that you have gone

09:42:22 15 beyond the scope with the oral testimony of what his expert
report covered, that you're introducing a new basic kind of
analysis covering a different area.

          MR. SMITH:  Well, Your Honor, the Singleton --

          JUDGE MARCUS:  Is that a fair statement?  I guess

09:42:41 20 they're saying they simply were unaware, perhaps, that Dr. Hood
would be opining about the Senate Factors here.

          MR. SMITH:  Well, Your Honor, I don't think that can
be the case.  The Singleton plaintiffs put this exhibit in
evidence, and it's already been received.  It was listed on

09:42:59 25 Milligan's own second amended exhibit list to that nature.  And

```
 1  the Caster plaintiffs have offered a transcript of Dr. Hood's
 2  testimony from Chestnut.  I think that if this evidence is
 3  going to be in the record, then Dr. Hood should be allowed to
 4  testify about it on direct.
```
09:43:17 5          JUDGE MARCUS:  Counsel?
```
 6          MS. GBE:  Your Honor.
 7          JUDGE MARCUS:  Is it true that the Singleton put this
 8  into evidence in the first place, and Caster put his testimony
 9  into evidence in the second?
```
09:43:30 10          MS. GBE:  I believe that that's true, Your Honor.  But
```
11  we --
12          JUDGE MARCUS:  Why would it be -- I guess why would it
13  be unfair and why would it go beyond the scope of the
14  plaintiffs' case to allow him to talk about a report that the
```
09:43:47 15  plaintiffs actually put in albeit in another case?
```
16          MS. GBE:  Well, Your Honor, a lot of the facts that
17  Dr. Hood is testifying to are irrelevant to this case.  For
18  example, the exit poll information was not considered in his
19  expert report.  And it's just as we stated earlier, outside of
```
09:44:08 20  the scope of what he provided in his report.  So we think it
```
21  shouldn't be allowed.
22          JUDGE MARCUS:  The objection is overruled.  You may
23  proceed, Mr. Smith.  And you may, of course, cross-examine him
24  on anything that he says, as may the Caster folks, and as may
```
09:44:26 25  Singleton.

1        You may proceed, Mr. Smith.

2            MR. SMITH:   Thank you, Your Honor.

3    BY MR. SMITH:

4    Q    So, Dr. Hood, the comparison states you're using here,

09:44:36 5    they're the same as were in the last set?

6    A    Yes, that's correct.  Alabama and the other 20 states we

7    talked about previously.

8    Q    And, Dr. Hood, just to kind of illustrate, we won't go

9    through each table, but looking at Table 13, can you explain

09:44:57 10   what data you used and how you analyzed it as --

11   A    I used different data sources for different metrics.  In

12   this case, I am using the Census Bureau data from the American

13   Community Survey, which is very commonly used for this kind of

14   thing to look at educational attainment rates by race for these

09:45:20 15   states.

16   Q    And what do you find based on this table?

17   A    This, for instance, looking at the Alabama line up at the

18   top there, this is the percentage of whites and blacks in

19   Alabama over on the left that have received a high school

09:45:43 20   degree or equivalency degree.  So 87.7 percent of whites in

21   Alabama have a high school education or equivalency versus

22   81.6 percent of black Alabamians.  So the difference between

23   those, literally just the difference, the subtraction is

24   6.1 percent.

09:46:02 25       So in this case, a positive difference would indicate that

1 education attainment by the white community is higher than that

2 for the black community.

3      And then you can see I've listed the congruent statistics

4 for each one of these comparison states.  And then the average

09:46:25 5 for the 20 states -- not for Alabama, but the average for the

6 20 states at the bottom there.  And then over on the right-hand

7 columns, it's the same process, except here we're looking at

8 who's obtained at least a college degree or higher by race.

9      So, again, positive differences would mean that the white

09:46:48 10 community had a higher educational attainment rate, at least on

11 this particular metric, than the black community.

12 Q    And, Dr. Hood, are the difference for Alabama and the

13 average, is there any significance as to whether it's larger or

14 smaller?

09:47:08 15 A    Well, one can make that comparison, certainly.  The data

16 are here.  You know, what struck me across all the comparisons

17 I did on these particular metrics is that the disparity rate

18 between whites and blacks in Alabama as well as all these other

19 states was there.  So I don't think there was a single instance

09:47:35 20 where the disparity rate was higher for whites than it was for

21 blacks on any of these metrics that I looked at.

22 Q    So in this table specifically, you find that there's a gap

23 between -- did you find that there is a gap between white and

24 black residents of Alabama in educational attainment?

09:47:54 25 A    Yes, I did.

```
 1   Q    And did you find that a similar gap existed in each of the
 2   other 20 states that you reviewed?
 3   A    Yes, I did.
 4   Q    And, Dr. Hood, I think you mentioned you performed a
 5   similar analysis for several other characteristics?
 6   A    Yes.  Quite a number.  I mean, it's not an exhaustive
 7   list.  I mean, we could keep coming up with different
 8   comparisons, but I compared a number of sort of commonly used
 9   sociodemographic characteristics.
10   Q    And, Dr. Hood, I am not going to have you run through the
11   methodology again.  Would you just flip through this report and
12   tell the Court what those other characteristics you looked at
13   were?
14   A    Certainly.  Table 14 looks at the proportion of the
15   state's population that are receiving food stamps.  Table 15
16   looks at median household income.  Table 16 looks at per capita
17   income.  Table 17 looks at the poverty rate.  Table 18, home
18   ownership.  Table 19, unemployment rates.  And Table 21, infant
19   mortality rates.
20   Q    And, Dr. Hood, was there any characteristic in any state
21   that you reviewed where you did not find a gap?
22   A    I don't believe so.  I believe there was -- there was
23   always this gap present.
24   Q    And, Dr. Hood, is that true both in Alabama and all of the
25   20 comparison states that you reviewed?
```

09:48:05   5
09:48:25  10
09:48:42  15
09:49:10  20
09:49:29  25

1407

1    A      Yes, it is.

2    Q      Is that true both in northern and southern states?

3    A      It is.

4    Q      And is it true in both red states and blue states?

09:49:42 5   A      Yes, it is.

6    Q      All right.  Dr. Hood, I would like to turn to your

7    supplemental report in this case, and this is what's been

8    marked as Defendants' Exhibit 6.

9           Dr. Hood, could you briefly summarize what you were doing

09:50:06 10  in this supplemental report?

11   A      Well, it's pretty brief.  Its looks like it's

12   two-and-a-half pages long.  So it's just -- was a quick

13   response, if you will, to reports that were issued in this case

14   by Professor Liu and Professor Palmer.

09:50:27 15  Q      And, Dr. Hood, starting with number one on page 2 of this

16   report, based on the header, what was your concern with

17   Dr. Palmer's report there?

18   A      Well, Point 1 talks about CVAP or Citizen Voting Age

19   Population data that Professor Palmer at least relied on for

09:50:51 20  part of his report.  I just point out some things, in terms of

21   the fact that CVAP data are from the American Community Survey,

22   which is a survey.  It's not an enumeration.  So there's some

23   degree of error, you know, with these particular data, and it's

24   also impossible to desegregate CVAP data down to the block

09:51:16 25  level.  It's just not available.  You can desegregate it down

1 to the block group level.  So then if you want to desegregate

2 it to the -- at the block level, because you have a districting

3 plan that's at the block level, drawn at the block level, and

4 you are trying to reaggregate around blocks, you have to

09:51:37  5 partition the CVAP data from block groups to blocks.  And in

6 doing so, you have to make some assumptions to partition those

7 data.

8 Q    And, Dr. Hood, what is the significance of that, of having

9 to make assumptions about the data?

09:51:55  10 A    Well, I mean, you are -- any time you make an assumption,

11 you don't know for certain if it's right or wrong for one

12 thing.

13 Q    And, Dr. Hood, how does this data compare with the data

14 that you used in this case for your analysis?

09:52:09  15 A    Well, again, I relied primarily on voting data, you know,

16 voting results data from the Secretary of State's office and

17 registration and turnout data from the Secretary of State's

18 office, as well.  Those are population level data, if you will.

19 Those should be -- you should have the entire count for each

09:52:37  20 precinct and then be able to join those data with the

21 registration and turnout data by a precinct, as well.

22 Q    So in other words, those are actual results as compared to

23 estimates?

24 A    Yes.  They're not estimates, certainly.

09:52:54  25 Q    Okay.  Thank you, Dr. Hood.

```
 1        And then turning to paragraph 2, could you briefly
 2   describe what problems you're outlining here with Dr. Palmer's
 3   report?
 4   A    Well, I just raise some questions here.  Professor Palmer
 5   relied on data from something called the Redistricting Data Hub
 6   website.  And they report themselves this organization, this
 7   group, that they didn't have, you know, complete data to be
 8   able to check every county in Alabama.
 9        And so, again, it just raises questions about whether or
10   not the data from the redistricting web hub -- excuse me -- the
11   Redistricting Data Hub website are correct or not.
12   Q    And did you do any investigation into the VTD versus
13   precinct issue?
14   A    Right.  So they're relying on VTDs, the Redistricting Data
15   Hub website.  So, for instance, in Alabama, in Washington
16   County, you know, from what I understand from talking to
17   election officials there, the map to the right is the precinct
18   map, which is not the map to the left, which is the VTD map.
19        Now, you know, you can run algorithms and convert election
20   data or voting data from precincts to VTDs.  I am not saying
21   you can't do that.  But, again, you are making assumptions when
22   you do that.
23        I just stuck with the precincts in that case because that
24   was the unit -- the geographic unit where these votes were
25   collected and tabulated.
```

1    Q    And, Dr. Hood, these two figures from your report, is this

2    the comparison of the Redistricting Data Hub VTDs and what you

3    found to be the precincts based on confirming with Washington

4    County officials?

09:55:04 5    A    Yes.  That's my -- yes, correct.

6    Q    And, Dr. Hood, just so we're clear, so Dr. Palmer, if he

7    transformed the data, even if he had the data, would that raise

8    any questions for you about the quality of the data?

9    A    Well, to be fair, I don't think Dr. Palmer did the

09:55:24 10   transformations.  I think the -- this group hosting this

11   website made transformations.  But, yes, you are making

12   assumptions, again, when I don't think it's necessary to make

13   assumptions.

14   Q    Thank you, Dr. Hood.

09:55:42 15        And in Point 3, could you summarize what your criticism of

16   Dr. Palmer here is?

17   A    Well, in another part of Professor Palmer's report, he

18   says he relies on data from a private vendor known as L2, which

19   I am familiar with.  I use L2 for survey data for telephone

09:56:03 20   numbers, so I am pretty familiar with L2.

21        And he says he uses L2 racial data.  L2's racial data is

22   modeled.  It's estimated.  And, again, in Alabama, we don't

23   really need to do that because the Secretary of State's office

24   has the registration turnout numbers by race.

09:56:25 25        And so I did a little bit of an investigation here

        1  comparing L2's racial numbers to the state's racial numbers.
        2  And basically, in a nut shell, what I found was at the county
        3  level, L2 consistently underestimated the percentage of white
        4  voters by about 4 percent, overestimated the percentage of
09:56:53 5 other voters by about 4 percent, and then either underestimated
        6  or overestimated, depending on the situation, the county level
        7  for black turnout.
        8       So all that to say L2's numbers, which are estimates,
        9  really are not the same thing as the state's numbers, which are
09:57:13 10 not estimates.
       11  Q   And, Dr. Hood, this is Caster Plaintiffs' Exhibit 79, and
       12  this is Dr. Palmer's report.  And is this paragraph that goes
       13  from page 3 to page 4, is that, Dr. Hood, where you understand
       14  Dr. Palmer to be talking about his use of L2 data?
09:57:38 15 A   Well, that's where he mentions it, yes.
       16  Q   And so you understand, based on this, that he is using L2
       17  data to calculate turnout by race or somehow otherwise using
       18  it?
       19  A   Seems to be using L2 data to make inferences about turnout
09:57:59 20 by race is what I would say, from what's written there.
       21  Q   Thank you, Dr. Hood.
       22       And turning to Point 4, could you describe what issues you
       23  raise about Professor Liu's report?
       24  A   In Point 4, I just have some questions about Professor
09:58:22 25 Liu's estimated turnout percentages.

1       He includes these in his report, and you can estimate

2    turnout by race using ecological inference.  You certainly can

3    do that.  He doesn't explain exactly what he does to get these

4    numbers.  They're just listed in his report.  And I have got

09:58:44 5    questions because consistently, you know, if those are -- if

6    those are his estimated turnout numbers by race in his report,

7    black turnout is consistently higher than white turnout, his

8    estimates are.  And we know from the Secretary of State's

9    office from those data that typically white turnout is just

09:59:12 10    slightly higher than black turnout in Alabama.

11       So I just have questions about that.

12    Q    And approximately, where does Dr. Liu predict that black

13    turnout would be compared to white turnout?

14    A    Well, it's scattered throughout his report in each one of

09:59:33 15    these -- most of these tables in his report from what I

16    remember have a turnout estimate by race.

17       So it's just sort of scattered throughout his report.

18    Q    And, Dr. Hood, turning to Point 5, could you summarize the

19    issue that you raise in Point 5?

09:59:53 20    A    Well, here, I am raising some questions about Professor

21    Liu using any-part Black VAP and his functional analyses.  I

22    don't use any-part black typically.  I certainly don't use -- I

23    just use single-race categories in my academic research.  But

24    if you are going to include, for instance, any-part black with

10:00:22 25    black, you have to make sure that that group of voters, the

1    any-part group of voters, is going to vote cohesively -- or is

2    voting cohesively with the parent racial category, if you will.

3    Q    And, Dr. Hood, you mentioned the racial categories that

4    you use in your academic work.  And I think you mentioned

10:00:48 5    single race.  Why do you use that category?

6    A    Well, I, you know, for one, we have a lot of different

7    racial categories -- could you repeat the question so I can get

8    my mind wrapped back around things?

9    Q    Of course, Dr. Hood.

10:01:28 10    Dr. Hood, I think you mentioned that you use single-race

11    categories in your own academic research, and I was just asking

12    why that is.

13    A    Right.  So, you know, usually we are relying on people to

14    self identify themselves, certainly in the census, for

10:01:42 15    instance, or in a survey as a racial category or an ethic

16    category in the case of Hispanics.

17    And when you have -- but it's certainly possible to

18    identify as more than one racial or ethnic category today, as

19    well.  But, again, if you have a group of people who are just

10:02:02 20    identifying as, say, African-American, or non-Hispanic white or

21    Hispanic or Asian, there's little question there about how you

22    can analyze them as a group.

23    On the other hand, if you start to include people who are

24    say, African-American and then African-American plus Hispanic,

10:02:23 25    or African-American plus white, you have sort of multiple

```
      1  racial or ethnic categories.  Again, it raises questions about
      2  whether those individuals are really cohesive with the parent
      3  racial category there.
      4  Q    And, Dr. Hood, do you know whether there's any empirical
10:02:46  5  research that would show whether the multi-racial category
      6  votes cohesively with the single-race non-Hispanic black
      7  category?
      8  A    I'm not aware of any.  I'm not saying there's not been,
      9  but I am not aware of any.
10:03:01 10  Q    Thank you, Dr. Hood.
     11          MR. SMITH:  Your Honor, may I have just one moment to
     12  confer with my colleagues?
     13          JUDGE MARCUS:  Sure.
     14          MR. SMITH:  Nothing further at this time, Your Honor.
10:03:19 15  We pass the witness.
     16          JUDGE MARCUS:  All right.  Thank you.
     17  Cross-examination.  What order did you want to take them?
     18  Singleton first, and then go on to Milligan and Caster, or did
     19  you have some order?
10:03:32 20          MS. GBE:  Good morning, Your Honor.  This is Harmony
     21  Gbe again on behalf of the Milligan plaintiffs.  Plaintiffs
     22  have agreed on Milligan going first for cross, and then the
     23  Caster plaintiffs, and then the Singleton plaintiffs.
     24          JUDGE MARCUS:  All right.  Thanks very much, and you
10:03:45 25  may proceed.
```

| | |
|---|---|
| 1 | MS. GBE:  Thank you very much. |
| 2 | CROSS-EXAMINATION |
| 3 | BY MS. GBE: |
| 4 | Q    Good morning, Dr. Hood. |
| 10:03:50 5 | A    Good morning. |
| 6 | Q    I'm going to ask you a few questions on behalf of the |
| 7 | Milligan plaintiffs, all right? |
| 8 | A    Yes, ma'am. |
| 9 | Q    So as you testified, this isn't the first time that you |
| 10:04:03 10 | have been retained as an expert to provide testimony in a |
| 11 | voting case, correct? |
| 12 | A    Correct. |
| 13 | Q    In fact, you have served as an expert in several voting |
| 14 | cases, right? |
| 10:04:13 15 | A    Correct. |
| 16 | Q    And in most of those cases, were you retained by the |
| 17 | state? |
| 18 | A    In a majority, yes. |
| 19 | Q    Have you ever been denied permission to offer an expert |
| 10:04:28 20 | opinion in a case? |
| 21 | A    Could you be a little more specific? |
| 22 | Q    In a voting rights case. |
| 23 | A    Has my testimony been excluded in a case?  Is that fair? |
| 24 | Q    Yes.  Sure. |
| 10:04:40 25 | A    Yes.  Once, in the first case I testified in, yes. |

```
 1   Q    And do you remember the name of that case?
 2   A    Billups vs. Common Cause.  I was testifying on behalf of
 3   Common Cause about Georgia's voter ID law.
 4   Q    And do you remember the year of that case?
 5   A    Ooh.  Not specifically, to be honest with you.  Like 2006.
 6   I mean, again, I'm -- that's a guess.
 7   Q    Okay.  So let's -- actually, one more follow-up question.
 8        Do you remember the scope of your expert testimony in that
 9   case?
10   A    Yes.  I was testifying on behalf of Common Cause about
11   implementation of Georgia's photo ID law.
12   Q    I see.
13   A    It may have been 2005.  I -- somewhere around that time
14   period.
15   Q    And why were you excluded in that case?
16   A    I'd have to go back and look.
17   Q    So you don't remember sitting here?
18   A    I haven't looked at that in quite some time.
19   Q    So let's turn to your expert testimony and reports in this
20   case and talk about the functionality analysis that you
21   conducted.
22        So you conducted a district functionality analysis looking
23   at Districts 6 and 7 of the whole county map proposed by the
24   Singleton plaintiffs, correct?
25   A    Correct.
```

10:05:00 (line 5)
10:05:27 (line 10)
10:05:45 (line 15)
10:06:10 (line 20)
10:06:25 (line 25)

1417

```
 1  Q     You didn't conduct a functionality analysis for the maps
 2  proposed by the Milligan plaintiffs, correct?
 3  A     Correct.
 4  Q     And you stated in your report that time didn't permit you
 5  to analyze the Milligan maps; is that right?
 6  A     Well, time, and I wasn't specifically asked to do so.
 7  Q     You weren't specifically asked by defense counsel?
 8  A     Correct.
 9  Q     So your purpose in conducting the functionality analysis
10  was to fulfill the third prong of the Gingles test, right?
11  A     Second and third, to be comprehensive.
12  Q     To fulfill the second and third --
13  A     Yes.
14  Q     -- prongs of the Gingles test?
15  A     Yes.
16  Q     And your goal was to analyze whether black-preferred
17  candidates are likely to win in a majority-white congressional
18  district, correct?
19  A     Well, I would say with the proviso that the white
20  community's not always in the majority in some of these
21  examples we're talking about.  I mean, that is the way the
22  Gingles test describes.
23  Q     Right.  So it is the Gingles test that you are trying to
24  determine whether a black-preferred candidate is likely to win
25  than a majority-white congressional district, correct?
```

Timestamps in left margin:
10:06:38 (line 5)
10:06:56 (line 10)
10:07:10 (line 15)
10:07:29 (line 20)
10:07:49 (line 25)

1418

```
 1  A     Well, again, I would just say would a black-preferred
 2  candidate of choice win in a given election -- a given
 3  district, as drawn?  I mean, again, you know, that includes
 4  what is the white community doing as a voting block.  I'm just
 5  saying the white voting block in some of these examples like in
 6  the enacted plan is not in the majority, though.
 7  Q     Okay.  So in your report, you lay out three steps that you
 8  need to take to conduct functionality analysis, right?
 9  A     Well, there may be more than three.  Are you referring to
10  a specific part of the report that we could look at?
11  Q     Sure.  Do you -- you do have a copy of your report in
12  front of you, correct?
13  A     Yes, I do.
14  Q     So if you can turn to page 3.
15  A     Okay.
16  Q     Starting at page 3.  You explained that when you conduct a
17  functionality analysis, you first need to estimate the manner
18  in which various racial groups are voting, right?
19  A     That's correct.
20  Q     And then you go on to talk about a second step where you
21  calculate turnout by race, correct?
22  A     Well, I didn't -- to be very specific, I didn't make those
23  calculations.  I used data that were available in this case.
24  Sometimes you do have to estimate turnout by race.  But I
25  didn't have to estimate that in the case of Alabama.  But I
```

10:08:14 (line 5)
10:08:39 (line 10)
10:08:51 (line 15)
10:09:03 (line 20)
10:09:26 (line 25)

1  made use of those data.

2  Q    Okay.  So there were no calculations involved with the

3  second step.  You just took the numbers directly from the

4  Secretary of State; is that right?

10:09:42  5  A    Well, I did some data manipulations, but there weren't --

6  beyond simply determining, okay, at the precinct level, what

7  was the number of whites, African-Americans, and other voters

8  that turned out to vote.  I didn't do anything beyond that.

9  Q    So what do you mean exactly by data manipulation?

10:10:07  10  A    Well, these are databases.  And so records are

11  individuals.  And you have to -- I had to aggregate these

12  individuals into the respective voting precincts.

13  Q    So you did -- you didn't manipulate the data by

14  aggregating it?

10:10:29  15  A    That's fair, yes.  I am saying these weren't estimates I

16  produced, though.

17  Q    Understood.  Okay.  The third and final step of your

18  functionality analysis involved calculating the racial

19  breakdown for the Voting Age Population, correct?

10:10:44  20  A    Well, I didn't calculate that step at all.  I mean, those

21  numbers just simply came from Alabama's reapportionment office.

22  Q    Okay.  So, Dr. Hood, you conducted a racially-polarized

23  voting or RPV analysis for each of the elections you looked at,

24  right?

10:11:10  25  A    As part of the functionality test, yes, that's correct.

```
 1  Q    And you concluded that RPV is present in District 7 of the
 2  enacted plan, correct?
 3  A    Yes.
 4  Q    In fact, there was RPV in both of the two elections that
 5  you analyzed in District 7 of the enacted plan, right?
 6  A    Correct.
 7  Q    You also conducted an RPV analysis on the Singleton
 8  plaintiffs' proposed District 6 and 7, correct?
 9  A    Correct.
10  Q    And there you also concluded that RPV is present in the
11  Singleton plaintiffs' proposed District 6 and 7, correct?
12  A    Correct.
13  Q    So in your report, as part of your functionality analysis,
14  you conclude that RPV is present with black voters
15  overwhelmingly supporting the Democratic candidate, and more
16  than a majority of white voters casting a ballot for the
17  Republican candidate, correct?
18  A    Correct.
19  Q    You would agree that if there is a high degree of RPV in
20  Alabama, then white block voting will usually result in the
21  defeat of black-preferred candidates in white majority
22  districts, right?
23  A    I would just say the general principle hypothetically,
24  yes, that's -- there is a high probability of that.  You would
25  have to run the exact numbers to see, but that's usually --
```

```
 1  Q    But it's likely?
 2  A    That's usually the condition that underlies, you know,
 3  prong 3, or the reaching prong 3 of the Gingles test.
 4  Q    Along those same lines, if there is an insufficient number
10:12:51 5  of black voters to constitute a majority in a Democratic
 6  primary, the black community may be unable to elect their
 7  preferred candidate, correct?
 8  A    That's a possibility, yes.
 9  Q    Is it more likely?
10:13:07 10  A    Well, it just depends on, you know, if the white community
11  in a Democratic primary has a different preferred candidate of
12  choice than the African-American community.  Based on that
13  hypothetical, then, yes, that could happen.
14  Q    Have you read Dr. Liu's initial and rebuttal reports in
10:13:31 15  this case?
16  A    Yes.
17  Q    And did you listen to Dr. Liu's testimony yesterday?
18  A    I did not.
19  Q    Okay.  Are you generally familiar with the conclusions
10:13:41 20  reflected in Dr. Liu's reports?
21  A    Well, generally, yes.
22  Q    You and Dr. Liu both agree that RPV exists in Alabama,
23  correct?
24  A    I think we both found evidence of that, yes.
10:13:57 25  Q    And you and Dr. Liu also agree that black-preferred
```

1422

```
          1  candidates are usually defeated in white majority congressional
          2  districts in Alabama, correct?
          3  A    Well, I didn't do that particular analysis.  You know,
          4  again, I did a functional analysis of these districts which had
10:14:17  5  not seen -- none of these districts have ever seen an election
          6  in that district configuration.
          7  Q    So you wouldn't agree that a black-preferred candidate is
          8  likely to be defeated in a white majority congressional
          9  district in Alabama?
10:14:32 10  A    I would say, again, there's certainly a probability of
         11  that.
         12  Q    You and Dr. Liu both agree that the ecological inference
         13  method is an appropriate way to conduct an RPV analysis,
         14  correct?
10:14:47 15  A    I think we both agree on that, yes.
         16  Q    In your supplemental report and you testified a bit about
         17  this, this morning, you questioned Dr. Liu's use of any-part
         18  Black Voting Age Population in his functionality analysis,
         19  right?
10:15:05 20  A    Correct.
         21  Q    So for your functionality analysis, you used single-race
         22  black VAP for the black racial group measurement, correct?
         23  A    Correct.
         24  Q    And it is your view that single-race black is a more
10:15:21 25  appropriate racial group measurement than, for example,
```

1  any-part black, correct?

2  A    That's fair, yes.

3  Q    So earlier today, you testified that there was no

4  empirical evidence that multi-racial people, including -- but

10:15:40  5  also identify as black vote cohesively with a group that is

6  single-race black, correct?  Is that an accurate statement of

7  your testimony?

8  A    I think the statement was I wasn't aware of any research.

9  I am not denying that any exists.

10:15:57 10  Q    So are you aware of any professional studies or research

11  that shows that they -- actually, strike that.  Let me

12  rephrase.

13       Are you aware of any professional studies or analyses that

14  show that voters who report themselves as multi-racial

10:16:13 15  including black vote any differently than those who report

16  themselves as single-race black?

17  A    Well, again, I am not aware of any studies on that topic

18  period, you know, showing one direction or the other.  I'm not

19  saying that they may not exist.  I'm not aware of any.

10:16:31 20  Q    And have you conducted any independent research to verify

21  your understanding of how multi-racial blacks vote versus

22  single-race blacks?

23  A    I have not conducted any research myself on that

24  particular question.

10:16:50 25  Q    And for this particular case, you didn't conduct any

```
         1  analysis along those lines, correct?
         2  A    No.
         3  Q    Do you know defendants' demographer in this case,
         4  Mr. Bryan?
10:17:03 5  A    A little bit, yes.
         6  Q    Have you worked with Mr. Bryan before this case?
         7  A    Not -- we published an article together, an academic
         8  article.  But, no, I have not worked directly with Mr. Bryan in
         9  a legal sense before on a case.
10:17:27 10 Q    Did you speak to Mr. Bryan in connection with this case,
         11 or your expert analysis offered in this case?
         12 A    Not in my analysis.  I did speak to Mr. Bryan, yes.
         13 Q    But it wasn't related to your expert analysis?
         14 A    No.
10:17:45 15 Q    Did Mr. Bryan seek your input at all for his portion of
         16 the analysis?
         17 A    No.
         18 Q    Okay.  So, Dr. Hood, now let's discuss the two elections
         19 that you analyzed in this case.
10:18:04 20      In your functionality analysis, you looked at the 2020
         21 presidential election and the 2018 gubernatorial races,
         22 correct?
         23 A    Correct.
         24 Q    When conducting an RPV analysis, it's important to
10:18:17 25 consider the race or ethnicity of the candidates running for
```

```
 1  election, correct?
 2  A    It can be, yes.
 3  Q    So, Dr. Hood, I am going to show you an article now that
 4  you cite to in your expert report.  I am going to ask my
 5  colleague, Mr. Ang, to pull up the article.  If you could make
 6  it a bit bigger, that would be helpful.  Thank you?
 7          MS. GBE:  Your Honor, permission to mark this article
 8  for ID as Milligan Plaintiffs' 51.
 9          JUDGE MARCUS:  Okay.
10  BY MS. GBE:
11  Q    Dr. Hood, do you recognize this article?
12  A    I do.
13  Q    It's an article that you coauthored entitled From Legal
14  Theory to Practical Application.  And it was published in the
15  Social Science Quarterly, correct?
16  A    Correct.
17  Q    And you currently serve on the editorial board for the
18  Social Science Quarterly, correct?
19  A    I do.
20  Q    And from what you can tell, this is a true copy of the
21  article that you coauthored, correct?
22  A    It looks to be.
23          MS. GBE:  Your Honor, I would like to move for
24  Exhibit 51 to be admitted into evidence.
25          JUDGE MARCUS:  Any objection?
```

Timestamps in left margin:
10:18:31 (line 5)
10:18:56 (line 10)
10:19:11 (line 15)
10:19:19 (line 20)
10:19:34 (line 25)

```
 1              MR. SMITH:  No objection, Your Honor.
 2              JUDGE MARCUS:  Without objection, plaintiff Milligan
 3    51 is received.
 4              MS. GBE:  Thank you, Your Honor.
 5    BY MS. GBE:
 6    Q    So in this article, if we can turn to page 546.  Thank
 7    you.
 8              So, Dr. Hood, in this article, you discuss how to conduct
 9    a Section 2 vote dilution analysis, and you described the
10    appropriate approach to analyzing RPV as follows.  So you say,
11    One must also consider the race/ethnicity of the candidates
12    running for election.  Of the elections available for analysis,
13    the more relevant are those that feature a minority candidate
14    from the racial/ethnic group suing the jurisdiction in
15    question.
16              Did I read that correctly, Mr. Hood?
17    A    Yes.
18    Q    But neither of the elections you chose to analyze for your
19    report in this case directly feature a minority candidate,
20    correct?
21    A    That's correct.
22    Q    And you are aware that there have been elections in
23    Alabama in the recent past that did involve a minority
24    candidate, correct?
25    A    Yes.
```

```
 1   Q     But you chose not to analyze those elections in your work
 2   for this case, right?
 3   A     Well, yes, I did.
 4   Q     Okay.
```
10:20:59 5            MS. GBE:  If we could take that language down,
```
 6   Mr. Ang.  Thank you.
 7   BY MS. GBE:
 8   Q     So moving on to the ecological inference you did or EI,
 9   you used EI to conduct your RPV analysis, correct?
```
10:21:15 10  A     Correct.
```
11   Q     And the EI method is a commonly used method in your field
12   of expertise; isn't that right?
13   A     Yes, it is.
14   Q     And you used census data for your EI calculations, right?
```
10:21:30 15  A     No.
```
16   Q     What kind of data did you use for your EI calculations?
17   A     Again, I used precinct level vote returns from the
18   Secretary of State's office in Alabama and turnout and
19   registration data at the precinct level from the Alabama
```
10:21:47 20  Secretary of State's office.
```
21   Q     Did you use census data in any part of your analysis?
22   A     The only part of my analysis that used census data was the
23   latter part of the functionality analysis that starts out and
24   says, as drawn in 2021, this district is -- this percent BVAP,
```
10:22:11 25  this percent white Voting Age Population percent, other voting

1  age population.  It's not -- I guess you could say it's part of

2  my analysis in a functional sense.  I didn't use those data,

3  the census data for any of my EI estimates, though.

4  Q    Okay.  Did -- you used the EI pack or package to conduct

10:22:37 5  your analysis, correct?

6  A    Yes.

7  Q    And the IE pack is a commonly used software package in

8  your field, correct?

9  A    Yes.

10:22:44 10  Q    It provides reliable and accurate estimates for RPV

11  analysis, correct?

12  A    Yes.

13  Q    You are aware that Dr. Liu also used the EI method for his

14  analysis, correct?

10:22:56 15  A    Correct.

16  Q    The R by C procedure in the EI pack allows someone to

17  estimate racial turnouts, correct?

18  A    You can, yes.

19  Q    And you relied on the EI pack to generate the data you

10:23:11 20  used for your racial estimates in this case, correct?

21  A    For the racial vote estimates, correct, yes.

22  Q    The R by C procedure in the EI pack also allows for racial

23  vote estimates for candidates, correct?

24  A    Well, I thought that's what you had just said.

10:23:33 25  Q    Oh, okay.

```
 1  A     In a slightly different way.

 2  Q     Okay.  We can just move on.

 3        So in the R code in your replication folder, showed that

 4  you ran an R operation, which would have given you an estimated

 5  racial turnout and racial vote total; is that accurate?

 6  A     Yes.

 7  Q     So in Dr. Liu's rebuttal report, Dr. Liu noted that he

 8  requested a detailed explanation for the method you used for

 9  arriving at the racial breakdown and turnout by race you

10  present in Tables 1 and 2 of your report.  But you did not

11  provide Dr. Liu with that detailed explanation of your

12  methodology, did you?

13  A     I believe I did.  I sent quite a number of messages

14  through counsel about what I had done.  And it was explained in

15  my report.

16  Q     So you --

17  A     I don't -- I am not really sure where the disconnect is on

18  this particular point.  Because, again, in terms of racial

19  turnout, I'm not using estimates.  I'm using the actual data.

20  Q     But you recall receiving specific questions from Dr. Liu

21  about your methodology using the voter registration data,

22  correct?

23  A     And I responded to those, yes.  I didn't know who they

24  were from, but I responded.

25  Q     You provided those responses to defense counsel?
```

```
 1  A    Yes.
 2  Q    Now, let's talk about your opinions about Republican
 3  support for minority candidates as explained in your report.
 4       So you claim that white conservatives support minority
10:25:23  5  Republican candidates at the same rates or significantly higher
 6  rates than Anglo GOP nominees, correct?
 7  A    That part is a little more than a claim.  I think I
 8  hopefully substantiated that through social science research.
 9  That's from the published article.
10:25:38 10  Q    Right.  So in support of that claim, you cite to an
11  article titled, True Colors, White Conservative Support For
12  White Republican Candidates, correct?
13  A    Yes, that's fair.
14  Q    And the True Colors article analyzes the success of
10:25:55 15  nonwhite candidates as a group, but does not specifically
16  analyze black candidates, correct?
17  A    Well, there is some African-American candidates in that
18  group of minority Republican candidates.
19  Q    But the article doesn't provide any specific discussion of
10:26:12 20  white Republican willingness to vote for black candidates,
21  right?
22  A    No, only to the extent to which black minority -- black
23  Republican candidates are included in the group of minority
24  Republican candidates, if you will.
10:26:27 25  Q    And the article isn't based on any elections conducted in
```

1  the state of Alabama, correct?

2  A    Correct.

3  Q    The only example of black Republican candidates' success

4  in Alabama that you cite to in your report is that of

10:26:48 5  Representative Paschal, correct?

6  A    Correct.

7  Q    But you didn't conduct an RPV analysis on Representative

8  Paschal's election to determine the degree of racial support

9  for his candidacy, right?

10:26:59 10  A    I did not.  Again, in that case, given the very high rate

11  of white VAP in that district, I don't think it's possible for

12  any candidate to win without majority-white support.

13  Q    But you didn't conduct an RPV analysis to confirm your

14  hypothesis, correct?

10:27:18 15  A    That's correct.

16  Q    In fact, you did not conduct an RPV analysis on a single

17  election involving a black Republican candidate in Alabama,

18  right?

19  A    That's correct.

10:27:28 20  Q    Are you aware that Representative Paschal is the first

21  Republican elected to the Alabama Legislature in 140 years?

22  A    Yes, I read that.

23  Q    And Representative Paschal won the Republican runoff

24  election in 2021 by a very close margin, correct?

10:27:47 25  A    Yes.  I think I documented that.

```
 1   Q    In fact, there were only 63 votes between Representative

 2   Paschal and his opponent Leigh Hulsey, correct?

 3   A    Well, you if you're representing that's what it says in my

 4   report, then I will take your word for it.

 5   Q    Would you like me to pull up the --

 6   A    I can just flip over here real quick and look.

 7              MS. GBE:  Mr. Ang, if you can pull up --

 8              THE WITNESS:  I am not saying you're not correct.

 9   BY MS. GBE:

10   Q    Not a problem.  We can just pull up Defense 5, Dr. Hood's

11   initial report and turn to page 15 I think we -- so the

12   reference is footnote 12, but I don't think -- I think we have

13   just the link to the Secretary of State's website.

14        So let's not go through that part.

15        But you do recall that it was a close election, right,

16   Dr. Hood?

17   A    From my recollection, yes.  I couldn't give you the vote

18   count from my memory.

19   Q    Understood.  And that election took place in Shelby

20   County, right?

21   A    Correct.

22   Q    Okay.  And you testified earlier today that Shelby County

23   has about an 84 percent white Voting Age Population, correct?

24   A    Well, that district itself in Shelby County, yeah.

25   Q    And are you aware that turnout in Representative Paschal's
```

```
         1  race was very low?
         2  A    Well, I don't know that I looked at turnout specifically.
         3  Q    So you don't have any information about which category of
         4  voters turned out to elect Representative Paschal?
10:29:55 5  A    Well, again, as I said, the inference here the assumption
         6  is that no one can win in that district without a majority
         7  support of the white vote.  In reference to your question you
         8  asked about did I run an ecological inference on that
         9  particular race, the answer was no.
10:30:16 10 Q    You would agree, Dr. Hood, that white support of a black
        11  Republican candidate in a statewide election will provide a
        12  relevant basis to analyze white Republican support for black
        13  candidates, right?
        14  A    Well, yeah, that could be one piece of data looked at,
10:30:38 15 certainly.
        16  Q    So, Dr. Hood, as we talked about a bit earlier, you -- you
        17  have served as an expert in several voting cases, correct?
        18  A    Correct.
        19  Q    And some of those cases include redistricting cases?
10:30:56 20 A    Yes.
        21  Q    So you are generally familiar with the traditional
        22  redistricting principles, correct?
        23  A    Correct.
        24  Q    And you would agree that maintaining the core of existing
10:31:10 25 districts is a redistricting guideline in several states,
```

1    including Alabama, correct?

2    A    Yes, from my understanding, yes.

3    Q    You agree, however, that an interest in core preservation

4    as a redistricting consideration does not supersede compliance

10:31:27 5    with Section 2 of the Voting Rights Act, correct?

6    A    Okay.  So this is -- I am going to have to provide some

7    context to this answer.  This is a little complicated, or it

8    can be.

9        Redistricting can be essentially an iterative process some

10:31:47 10    sometimes.  So you start out drawing a district.  You can even

11    draw a district race blind using traditional redistricting

12    criteria.  And then later you might look at the racial

13    composition of the district and do some functional analyses.

14    If it's determined that an adjustment may need to be made based

10:32:08 15    on Section 2 or a potential Section 2 violation, at that point,

16    Section 2 comes into play.

17        Now, you know, again, this is my understanding that the

18    traditional redistricting criteria are somewhat encompassed in

19    prong 1 of the *Gingles* test, right?  So at that point, you

10:32:31 20    know, if you needed to add just hypothetically say Black VAP to

21    the district because of the Section 2 issue, you can do that.

22    So at that very point, that would sort of supersede other

23    criteria, but you can't -- you can't just lay aside the other

24    criteria at that point because, again, those criteria are, from

10:32:54 25    my understanding, encompassed in prong 1.

```
 1          So there may be -- I guess to answer your question -- I am
 2   trying to answer your question, trying to be succinct -- there
 3   may be a case where the Section 2 is invoked to deal with a
 4   particular problem.  And at that point in time, you are going
10:33:15  5   to perhaps have to add or subtract various racial groups from
 6   the district.  But you can't just ignore the other traditional
 7   redistricting criteria.
 8   Q    Right.  So you can't ignore them completely, but you would
 9   agree that Section 2 does trump a lot of those traditional
10:33:35 10   redistricting criteria?
11   A    Well, I wouldn't say completely trump.  I mean, you can't
12   just go from a district that's fairly compact to one that's
13   completely un-compact just because you're trying to remedy a
14   Section 2 issue, is what I would say.
10:33:56 15   Q    So you testified earlier today, and we went through it a
16   bit extensively, that you provided expert opinion in the
17   Chestnut case, correct?
18   A    Correct.
19          MS. GBE:  So if we can pull up some of the language
10:34:14 20   from that opinion, Mr. Ang.
21          So, Your Honor, permission to mark this document for ID as
22   Milligan Plaintiffs' 52.
23          JUDGE MARCUS:  Yes.  That's the opinion by Judge
24   Bowdre in the Chestnut case, correct?
10:34:36 25          MS. GBE:  Correct.
```

```
           1   BY MS. GBE:

           2   Q     So the opinion references some of the statements you made

           3   in that case.  And if you can read the highlighted portions for

           4   us.

10:34:48   5   A     You would like me to read it?

           6   Q     Yes, please.

           7   A     Okay.  A later expert witness for the defendant, Dr. Trey

           8   Hood also stated that, regardless, an interest in core

           9   preservation could not trump compliance with Section 2 of the

10:35:04  10   VRA as a redistricting consideration.

          11   Q     So you would agree that an interest in core preservation

          12   as a redistricting consideration does not trump compliance with

          13   Section 2 of the Voting Rights Act, correct?

          14   A     Correct.  I would say it could be -- it would have to

10:35:23  15   would be subsumed at some point.

          16   Q     So in addition to Chestnut --

          17         MS. GBE:  I am sorry, Mr. Ang, you can take that down.

          18   Thank you.

          19   BY MS. GBE:

10:35:32  20   Q     In addition to Chestnut, you have provided expert opinions

          21   in other voting cases, correct?

          22   A     Correct.

          23   Q     Did any court ever criticize or reject your expert opinion

          24   in a voting case?

10:35:43  25   A     Well, I have been qualified as an expert in, I think, or
```

```
 1   testified in more than 25 cases now.  Certainly, some courts
 2   have given more weight to my testimony than other courts.  I
 3   mean, that's true.
 4   Q    Dr. Hood, you served as an expert in a case called Veasey
 5   v. Perry, correct?
 6   A    Correct.
 7   Q    And that case was pending before a district court in
 8   Texas, correct?
 9   A    Correct.
10   Q    And that case involved allegations that Texas voter ID law
11   was unconstitutional and violated the VRA, correct?
12   A    Correct.
13   Q    And in that case, you analyzed whether that voter ID law
14   would affect voter turnout, correct?
15   A    That was one of the things I did, yes.
16   Q    Isn't it true that the Court afforded, quote, little
17   weight to your opinions in that case?
18   A    I believe so, from what I remember.
19   Q    Okay.  Let me -- let's look at the opinion to refresh your
20   recollection.
21          MS. GBE:  Mr. Ang, if you would pull up Veasey,
22   please?  And we can mark this as --
23        Your Honor, permission to mark this for ID as M-53.
24          JUDGE MARCUS:  Yes.
25          MS. GBE:  Thank you.
```

```
        1   BY MS. GBE:
        2   Q     So, Dr. Hood, there is a portion of the Veasey opinion.
        3   Can you please -- can you please read the highlighted passage
        4   describing the reasons why the Court gave little weight to your
10:37:18 5  opinion in that case?
        6   A     On the cross-examination, plaintiffs pointed out a
        7   multitude of errors, omissions, and inconsistencies in
        8   Dr. Hood's methodology, report, and rebuttal testimony, which
        9   Dr. Hood failed to adequately respond to or explain.  The Court
10:37:33 10 thus finds Dr. Hood's testimony and analysis unconvincing and
       11   gives it little weight.
       12   Q     So the Veasey court did not find your expert opinion in
       13   that case reliable, correct?
       14   A     Well, it gave it little weight, yes.
10:37:49 15 Q     And, Dr. Hood, you served as an expert in another case
       16   called Northeastern Ohio Coalition vs. Husted, correct?
       17   A     Yes.
       18   Q     And that case was before the Southern District of Ohio,
       19   correct?
10:38:02 20 A     Yes.
       21   Q     And in that case, the Court ruled that certain portions of
       22   Ohio's SNT and provisional voting regimes were
       23   unconstitutional, correct?
       24   A     I believe so, from what I remember, yes.
10:38:21 25 Q     Much of your expert report and opinion testimony in that
```

```
 1  case focused on the Senate Factors and your criticism of the
 2  opposing expert, I believe his name was Dr. Timberlake.  You
 3  criticized Dr. Timberlake's regression analysis.  Do you recall
 4  that?
 5  A    Yes.
 6  Q    Again, the Court in that case found your expert opinion
 7  largely unhelpful, correct?
 8  A    From what I recall, yes.
 9  Q    Okay.
10       MS. GBE:  Mr. Ang, can you pull up Husted, please?
11  BY MS. GBE:
12  Q    So this is the language from the Husted opinion, and I
13  will just read that to go through it quickly.
14       The Court gives little weight to Dr. Hood's opinion that
15  the rejection of provisional ballots for trivial errors is
16  unlikely to occur under the new law because the board's review
17  provisional and absentee ballots and screen out trivial errors
18  from substantive errors, which he defines as errors that,
19  quote, preclude the board from being able to identify who the
20  voter is.
21       The Husted court then goes on to say on the next page, In
22  sum, Dr. Hood's testimony and report were in large part
23  irrelevant to the issues before the Court and also reflected
24  methodological errors that undermine his conclusions.  Other
25  courts have found likewise.  As such, the Court finds his
```

Time stamps: 10:38:35 (line 5), 10:38:47 (line 10), 10:39:05 (line 15), 10:39:25 (line 20), 10:39:45 (line 25)

```
 1   contribution of limited value.

 2        Do you recall that, Dr. Hood?

 3   A    Well, now that you have read that, yes.

 4   Q    So the Husted court like the Veasey court found your

 5   expert opinion unreliable, correct?

 6   A    Well, it says limited value, yes.

 7   Q    Just one more case that I would like to go through with

 8   you.

 9        You served as an expert in the case called Florida v.

10   United States, right.  Do you recall that?

11   A    Yes.

12   Q    So that case was also before a three-judge court in the

13   District Court for the District of Columbia, correct?

14   A    Yes, I believe so.

15   Q    And in that case, Florida, the state, sought Section 5

16   preclearance of changes to its election laws, including a

17   change in early person -- early in-person voting, as well as a

18   change in voting procedures for voters who were moving in

19   between counties, correct?

20   A    Correct.

21   Q    Your expert opinion in the Florida case focused primarily

22   on the early voting changes, correct?

23   A    Yes.

24   Q    And the Court in that case also rejected your expert

25   analyses and conclusions, correct?
```

```
 1   A    I think they gave them little weight, yes.

 2   Q    Okay.

 3             MS. GBE:  Mr. Ang, if you could pull up the relevant

 4   language from the Florida case.

 5             MR. SMITH:  Your Honor, I would like to object to

 6   this.  He's already said they gave him little weight.  I'm not

 7   sure that this has any impeachment value.

 8             JUDGE MARCUS:  No.  I will allow it.  Overruled.

 9             MS. GBE:  Thank you, Your Honor.

10             JUDGE MARCUS:  What's the name of the case, counsel?

11             MS. GBE:  The case is Florida vs. U.S.  And if,

12   Mr. Ang, if you could pull up the first page the caption for

13   the Court's reference.  Right there in the bottom, the -- I

14   guess the bottom right of the screen.  There you go.

15             JUDGE MARCUS:  Thank you.

16             MS. GBE:  Okay.  Now, Mr. Ang, if you could go to the

17   relevant sections.  Thank you.

18   BY MS. GBE:

19   Q    So the Florida court, with regards to your expert opinion,

20   Dr. Hood, specifically found, quote, in finding that

21   African-American voters in the covered counties will be

22   disproportionately affected by the reduction in early voting

23   days under the new law, we reject the contrary opinions of

24   Florida's expert witness, Professor Hood.  We do so because the

25   analysis underlying his conclusions suffers from a number of
```

1    methodological flaws.

2         The Court then goes on to say, We reject other

3    calculations in Professor Hood's expert report because we agree

4    with the intervenors' expert that in several instances,

10:42:46 5    Professor Hood inappropriately pools together groups of

6    dissimilar data, which is not methodologically appropriate.

7         Finally, the Court says on again the following page,

8    Professor Hood also frequently lumps African-Americans and

9    Hispanics into a single category of minorities, which

10:43:04 10   misleadingly flattens the data, because unlike

11   African-Americans, Hispanic voters use early voting at about

12   the same rate as whites.

13        Did I read that accurately, Dr. Hood?

14   A    I believe so.

10:43:19 15   Q    So, again, this is another example of a court that did not

16   find your opinion particularly helpful, correct?

17   A    Fair.

18   Q    And there are still other courts that have criticized and

19   rejected your findings in voting cases, correct?

10:43:36 20   A    Yes.

21   Q    Okay.

22        MS. GBE:  Your Honor, if I could have a few minutes

23   before proceeding?  I think I'm pretty much -- I'm wrapping up.

24        JUDGE MARCUS:  We will take just a moment or two,

10:43:49 25   sure.

```
 1              MS. GBE:  Thank you.

 2         Okay.  No further questions, Your Honor.

 3              JUDGE MARCUS:  All right.  Thank you.  Before we

 4    proceed to the next cross-examination, this might be a

 5    convenient point for us to take a 15-minute break.

 6         Who is the next examiner?  That would be for Caster?

 7              MS. MADDURI:  That's right, Your Honor.

 8              JUDGE MARCUS:  Ms. Madduri.  Thanks.  We will take a

 9    15-minute break, Mr. Hood, and we will get started at 11:00

10    o'clock Central Standard Time.

11              (Recess.)

12              JUDGE MARCUS:  I take it the parties are ready to

13    proceed with cross-examination, Ms. Madduri?

14              MS. MADDURI:  I am ready, Your Honor.

15              JUDGE MARCUS:  All right.  Mr. Smith, we are all set?

16              MR. SMITH:  Your Honor, if I could make one quick

17    point before we start.

18         We, again, appreciate the plaintiffs allowing us to call

19    Dr. Hood out of turn, and that's because he is traveling this

20    afternoon.  And so I just wanted to make the Court aware of

21    that.

22         If we could finish Dr. Hood's testimony before we break

23    for lunch, I think that would be preferable from our end.

24              JUDGE MARCUS:  We will do everything we can to do

25    that.
```

```
 1        Dr. Hood, thanks for bearing with us.  We will try and get
 2   you out of here as quickly as we can.  But you take your time,
 3   Ms. Madduri, in your cross-examination.  And, of course,
 4   Mr. Quillen, you will have every opportunity to cross-examine
 5   Dr. Hood, as well.
 6            MR. QUILLEN:  Thank you.
 7            JUDGE MARCUS:  With that, let's proceed, Ms. Madduri.
 8            MS. MADDURI:  Thank you, Your Honor.
 9                        CROSS-EXAMINATION
10   BY MS. MADDURI:
11   Q    Dr. Hood, it's nice to see you again.
12   A    Yes.  Good afternoon.  Well, here, good afternoon.  Sorry.
13   Q    No problem.  Dr. Hood, your second report addresses the
14   reports issued by plaintiffs' expert Dr. Maxwell Palmer and
15   Dr. Liu; is that right?
16   A    Yes.
17   Q    Okay.  You provide no response to the expert reports of
18   Dr. Bridgett King regarding the history of voting related
19   discrimination in Alabama or the other Senate Factors; is that
20   right?
21   A    Correct.
22   Q    And you do not respond to Mr. Cooper's expert report
23   regarding whether plaintiffs are able to satisfy the first
24   *Gingles* precondition; is that correct?
25   A    Correct.
```

```
 1   Q    And you don't respond to Mr. Palmer's -- I'm sorry --
 2   Mr. Cooper's conclusion that there are racial disparities
 3   across key indicators of socioeconomic well-being in Alabama
 4   between white Alabamians and black Alabamians either generally
 5   or in the enacted Congressional Districts 1, 2, 3, 6, and 7,
 6   correct?
 7   A    Correct.
 8   Q    Okay.  Dr. Palmer's report concluded that voting is
 9   racially polarized in Congressional Districts 1, 2, 3, 6, and
10   7, both individually and combined, correct?
11   A    From my memory, that's correct.
12   Q    Okay.  And you don't dispute Dr. Palmer's conclusions that
13   black voters in the areas he examined vote for the same
14   candidates cohesively, correct?
15   A    No.
16   Q    Okay.  And you don't dispute Dr. Palmer's conclusion that
17   black Alabamians and white Alabamians in the areas he examined
18   consistently preferred different candidates, correct?
19   A    Correct.
20   Q    And you don't dispute Dr. Palmer's conclusion that the
21   candidates preferred by white voters in the areas that he
22   looked at regularly defeat the candidates preferred by black
23   voters, correct?
24   A    Correct.
25   Q    Dr. Palmer also conducted a district functionality
```

1    analysis for the majority-black districts in Mr. Cooper's
2    illustrative plans, correct?
3    A     Yes.
4    Q     Dr. Palmer concluded that Mr. Cooper's illustrative
11:03:55 5    majority-black CD 2 and 7 would on average elect
6    black-preferred candidates with 57 percent and 65 percent of
7    the vote respectively.  Do you recall that?
8    A     Not those exact figures, no.
9    Q     Do you recall that to roughly be the case?
11:04:11 10   A     Well, I recall the pattern.  I mean, I just don't remember
11    the exact figures sitting here.
12    Q     Okay.  But you don't offer any -- you don't offer anything
13    to dispute Dr. Palmer's conclusions on the functionality of
14    plaintiffs' illustrative black majority districts, correct?
11:04:31 15   A     Correct.  I didn't do any tests on those districts, so...
16    Q     Okay.  Let's now turn to your discussion of the Citizen
17    Voting Age Population or CVAP data, which you discuss in your
18    second report.  CVAP data is collected from an annual survey
19    conducted by the U.S. Census Bureau, correct?
11:04:56 20   A     Correct.
21    Q     That's called the American Community Survey, correct?
22    A     Correct.
23    Q     And that is commonly referred to as the ACS?
24    A     Yes.
11:05:05 25   Q     Okay.  Experts in political science have regularly used

1  CVAP data attained through the ACS, correct?

2  A    I'm sure they do for a variety of purposes.

3  Q    Okay.  And that same CVAP data is regularly relied upon in

4  peer-reviewed publications, right?

11:05:22  5  A    I am sure it is, yes.

6  Q    Okay.  The decennial census does not collect any

7  citizenship information, correct?

8  A    That is correct.

9  Q    So the data file that's used for redistricting that you

11:05:36 10  mentioned in your report, which was called the PL 94-171 file,

11  that doesn't contain any citizenship information, right?

12  A    That is correct.

13  Q    The ACS is the only Census Bureau source for Citizen

14  Voting Age Population, right?

11:05:56 15  A    Yes.

16  Q    And you and Dr. Palmer both examined racially-polarized

17  voting in enacted CD 7, right?

18  A    Yes.

19  Q    Okay.  I think you testified that you used voter

11:06:07 20  registration and turnout data from the state of Alabama, right?

21  A    That part of it, yes.

22  Q    And Dr. Palmer used CVAP data from the Census Bureau,

23  right?

24  A    From my understanding of his report, yes.

11:06:21 25  Q    At least for part of his analysis, he used CVAP data,

```
      1  right?
      2  A    Right.  Right.  I don't think for all of it, but for part
      3  of it, yes.
      4  Q    Okay.  Thank you.
11:06:31 5       And you and Dr. Palmer found very similar levels of
      6  racially-polarized voting in CD 7 despite using different data,
      7  right?
      8  A    I think the directionality was certainly the same.
      9  Q    Is it your --
11:06:48 10  A    Again, I can't remember his exact numbers sitting here.
     11  Q    Sure.  Sure.  Is it your recollection that there were any
     12  major discrepancies in your findings versus Dr. Palmer's
     13  findings for the level of racially-polarized voting in CD 7?
     14  A    Well, the substantive pattern was there in either
11:07:05 15  analysis.
     16  Q    I couldn't quite hear?
     17  A    The substantive pattern was there in his analysis as well
     18  as my analysis.
     19  Q    The substantive pattern being high levels of
11:07:19 20  racially-polarized voting?
     21  A    Yeah.  The presence of racially-polarized voting, yes.
     22  Q    Okay.  So that was consistent between both of your
     23  findings?
     24  A    Correct.
11:07:27 25  Q    Okay.  Can we pull up your second report, which is
```

```
 1  Defendants' Exhibit 6, and turn to page 2.
 2       Okay.  So in paragraph 1 of that page, you observed that
 3  CVAP data comes from a survey, meaning they are -- you said,
 4  quote, estimates which come with a margin of error, end quote;
 5  is that right?
 6  A    Yes.
 7  Q    Okay.  But you don't calculate or report that margin of
 8  error, do you?
 9  A    The margin of error for the CVAP data?
10  Q    Correct.
11  A    Correct.  I'm just stating that it exists.
12  Q    Okay.  And you don't claim that that alleged margin of
13  error in any way undermines Dr. Palmer's analysis or
14  conclusions regarding racially-polarized voting, correct?
15  A    Not specifically, no.  Again, it just -- that's a
16  statement that these are survey data.  They're not enumeration
17  level data, and so they come with a margin of error.
18  Q    Okay.  But you don't claim that that margin of error
19  affects Dr. Palmer's analysis or conclusion in any meaningful
20  way, correct?
21  A    Well, I couldn't claim that without doing the analysis.
22  I'm just raising a question here.
23  Q    Okay.  And you didn't do that analysis, right?
24  A    That's correct.
25  Q    Okay.  I think later in that paragraph you also note that,
```

The timestamps in the left margin:
11:07:59 (line 5)
11:08:11 (line 10)
11:08:25 (line 15)
11:08:48 (line 20)
11:08:58 (line 25)

1450

1    quote, the CVAP data come from the ACS -- that come from the

2    ACS are only available down to the block group level.

3    Districting plans that are drawn at the block level would

4    require one to disaggregate the CVAP data to that level.

11:09:24  5        Did I read that right?

6    A    Yes.

7    Q    You go on to say, While this can be done, one is required

8    to make a number of assumptions about the manner in which the

9    CVAP block group data should be disaggregated to the respective

11:09:37 10   blocks in the group, and that this process may, in turn, also

11   introduce another source of potential error.  Correct?

12   A    Correct.

13   Q    Okay.  But you didn't identify any such errors in

14   Dr. Palmer's analysis or data, right?

11:09:49 15   A    Well, not specifically, no.  Again, this is just raising a

16   concern.

17   Q    Okay.  And you don't claim that the fact that CVAP data

18   requires disaggregating data undermines Dr. Palmer's conclusion

19   regarding racially-polarized voting, correct?

11:10:08 20   A    Not necessarily, no.

21   Q    Okay.  We can move on, and we can take this exhibit down.

22   Thank you.

23        Okay.  You also comment on data Dr. Palmer obtained from

24   the Redistricting Data Hub; is that right?

11:10:31 25   A    Correct.

```
 1   Q     Okay.  Are you aware that the data Dr. Palmer obtained
 2   from the Redistricting Data Hub was prepared by an organization
 3   called the Voting and Election Science Team?
 4   A     Yes.
 5   Q     Are you familiar with the Voting and Election Science
 6   Team?
 7   A     Just a little.
 8   Q     Okay.  Are you aware of the fact that the Voting and
 9   Election Science Team is a group of scholars that are based at
10   multiple universities, including the University of Florida?
11   A     Yes.
12   Q     Are you aware that among other things they assemble
13   precinct level election data by collecting and matching
14   shapefiles, which contain the geographic boundaries of each
15   precinct with election results at the precinct level?
16   A     Where the shapefiles were available, yes, I understand
17   that.  I am pointing out that there are some counties in
18   Alabama shapefiles apparently were not available according to
19   their own website.
20   Q     Okay.  But you are aware that the VEST Team goes to both
21   states and counties to request the maps of precinct so they can
22   be sure that they have the right precincts, right?
23   A     Right.  I mean, they make requests.  That doesn't mean
24   they're always fulfilled, though, is what I am saying.
25   Q     Are you aware that generally their data is widely used by
```

11:10:45  (line 5)
11:10:58  (line 10)
11:11:13  (line 15)
11:11:30  (line 20)
11:11:50  (line 25)

1452

1  academics and peer-reviewed published work?

2  A    No, I am not.  I am not saying it's not.  I'm just not

3  aware.

4  Q    Okay.  Dr. Hood, what is a VTD?

11:12:08  5  A    Voting Tabulation District.

6  Q    And what is a precinct?

7  A    A precinct is an actual geographic unit where people go

8  and vote.  There's usually a polling place encompassed in the

9  precinct.  Sometimes precincts and VTDs are the same.  And

11:12:26 10  sometimes they're not.

11  Q    And precincts will often change over time while VTDs

12  remain constant; is that right?

13  A    Well, if you make the VTDs stay constant.

14  Q    Are VTDs, as you understand them, the U.S. Census

11:12:46 15  equivalence of precincts?

16  A    I think that -- I think that's fair, yes.  They're

17  equivalent.  They are not necessarily exactly the same.

18  Q    But the boundaries of VTDs and precincts sometimes don't

19  match up, right?

11:13:04 20  A    Yes, that's correct.  Sometimes a VTD, for instance, might

21  be comprised of two or three precincts, for instance.  It

22  varies, you know.

23  Q    Okay.  And you provide I think an example of what we're

24  discussing a mismatch of sorts between precincts and VTD

11:13:25 25  boundaries in your report, right?

1453

```
 1  A     Well, I believe it is, yes.

 2  Q     Okay.  Why don't we look at that?  So that's page 3 of

 3  your second report, which is Defendants' Exhibit 6.

 4        And if you can zoom in on the figures so you can see them

11:13:44  5  a little better.

 6        Okay.  So on the left, Figure 1 is labeled Washington

 7  County, Alabama VTDs, correct?

 8  A     Correct.

 9  Q     Okay.  And on the right, the figure is labeled, Washington

11:13:56 10  County, Alabama precincts, right?

11  A     Correct.

12  Q     Okay.  So the fact that there's a mismatch between the

13  precincts and the boundaries, that's not really surprising or

14  irregular, correct?

11:14:11 15  A     They may not match up, no.

16  Q     And it would be reasonable to expect that, given the fact

17  that precincts and VTDs often don't match up?

18  A     Not always, that's correct.

19  Q     Okay.  Are you familiar with the process by which scholars

11:14:31 20  and others take precinct level data and reallocate it to match

21  VTD boundaries?

22  A     Yes, generally speaking, yes.

23  Q     Okay.  And you would agree that that's something that

24  scholars and experts do pretty regularly, right?

11:14:47 25  A     Scholars do that, yes.  I guess my point with this is if
```

|     |                                                                      |
|-----|----------------------------------------------------------------------|
| 1   | Washington County is using the map on the right with the green       |
| 2   | boundaries, then that's where the original vote data is              |
| 3   | captured, then I'm just going to stick with that.  I am not          |
| 4   | going to make assumptions in de-allocating those data to VTDs.       |

11:15:12 5   Q    But you would agree that that is doable and a process that

6   scholars regularly engage in, right?

7   A    You can do it.  Again, if you have the precinct data,

8   though, that's the most accurate data available.

9   Q    Okay.  Do you have any reason to believe that the process

11:15:31 10   of -- that this process biased Dr. Palmer's data in any way?

11   A    I don't know one way or the other, to be honest.

12   Q    Okay.  You didn't do that analysis?

13   A    Correct.

14   Q    Were you present when Dr. Palmer testified this week?

11:15:49 15   A    Yeah.  Yeah.

16   Q    Okay.  Would it surprise you to hear that Dr. Palmer

17   testified that for Washington County, the VEST Team precinct

18   level map is identical to the precinct level map that you

19   present in your report?

11:16:04 20   A    Well, I took -- I looked at the VEST data, and their map

21   was the VTD map from my -- from what I remember.  You know, I

22   wouldn't present this if I didn't think there had been a

23   mismatch.

24   Q    Okay.  So as I understand it, you're presenting the VEST

11:16:24 25   data for the VTDs in Washington County here on the right in

```
    1  Figure 1, right?

    2  A     Right.

    3  Q     Okay.  Did you review the precinct boundaries in the VEST

    4  data, which is also available on Redistricting Data Hub?

11:16:40  5  A     But they were using the VTD boundaries for their data.

    6  That's my understanding of it, at least.  And I looked at their

    7  map files, and they're using the VTDs, not the precincts.

    8  Maybe they have a precinct-shaped file.  I'm not saying they

    9  don't.

11:16:59 10  Q     So are you describing the process -- are you saying -- are

   11  you describing the process by which I guess the resulting VTD

   12  file would be after that reallocation process happened that we

   13  discussed?

   14  A     Yes.  It must have been.

11:17:15 15  Q     Okay.  And you didn't review the original precinct values

   16  that the VEST used; is that right?

   17  A     I couldn't find those data.  I am not saying they're not

   18  on the website somewhere.  I couldn't find it.

   19  Q     Okay.  I'd like to pull up plaintiffs -- what will be

11:17:37 20  Plaintiffs' Exhibit 107, which I'd like to mark for

   21  identification purposes.  I'd like to show you that along side

   22  Figure 2 in your report, which is Defendants' Exhibit 6, and,

   23  again, this is page 3.

   24        Dr. Hood, it sounds like you were not able to find this

11:18:00 25  map on the Redistricting Data Hub website, correct?
```

```
 1  A    I never ran across that, no.
 2  Q    Okay.  I will represent to you that this is the VEST
 3  Team's precinct level map for Washington County.
 4       Does it appear to match the precinct level map that you
11:18:16  5  obtained from Washington County?
 6  A    Looks like it from what I can tell.
 7  Q    Okay.  And, Dr. Hood, you don't claim the fact that
 8  Washington County VTDs don't match Washington County's precinct
 9  in any way undermines Dr. Palmer's conclusions regarding
11:18:45 10  racially-polarized voting, correct?
11  A    Well, not necessarily.  I didn't conduct that analysis
12  again.  I am questioning or raising questions I think are
13  pertinent about the VEST data.
14  Q    Okay.  But you don't actually make any claims about the
11:19:03 15  facts that Washington County VTDs don't match Washington
16  County's precincts undermine Dr. Palmer's conclusions in any
17  way, correct?
18  A    Well, I didn't perform that analysis, so in fairness, yes.
19  Q    And you are not claiming that the fact that it may be the
11:19:26 20  case that multiple of Alabama's counties VTDs don't match up
21  with precincts in any way undermines Dr. Palmer's conclusions,
22  right?
23  A    It all depends on -- no, not necessarily.  Again, it all
24  depends on the due diligence that this VEST Team undertook to
11:19:40 25  ensure that they had the right precinct geographies for these
```

```
 1  counties which is sometimes not an easy thing.  So...
 2  Q    Okay.  But you haven't identified any mistakes that the
 3  VEST Team made in that regard, correct?
 4  A    No.  I'm just pointing out the fact that even they admit
 5  that they were unable to obtain precinct geography files for
 6  all the counties in Alabama.  I mean, they state that in their
 7  report.
 8  Q    Do you mean that the Redistricting Data Hub states that?
 9  A    Yes.  That's -- yes.
10  Q    So you don't mean that the VEST Team has ever stated that,
11  correct?
12  A    Well, fair enough.  But I mean, you know, from my
13  understanding, the VEST Team puts the data on the Redistricting
14  Data Hub website, right?
15  Q    That's right.
16  A    So that would be -- I think it's fair to say the VEST Team
17  and/or the Redistricting Data Hub website, either one, they
18  seem to be the same entity essentially.  That's just where
19  they're storing or housing their data.
20  Q    Is it your understanding that those entities are the same
21  entity?
22  A    Not the same entity.  What I am saying is that's certainly
23  the VEST Team stores their data on redistricting on that
24  website, right?
25  Q    My understanding is that they distribute it publicly using
```

1458

1    that website because it's -- it provides access to the public.

2    A    Right.  I think we're talking past each other a little bit

3    here at this point.

4         I mean, again, to the extent to which -- whoever it is

11:21:29 5   that's assembling these redistricting data don't have proper

6    precinct-level shapefiles at the county level raises questions,

7    and they specifically state in a report on the Redistricting

8    Data Hub website that they were unable to obtain precinct-

9    level shapefiles for all counties in Alabama.

11:21:50 10  Q    You mean that the Redistricting Data Hub says that they

11   were unable to obtain precinct-level shapefiles for every

12   county, correct?

13   A    Well, right.  But I am assuming that they were unable to

14   obtain that because the VEST Team was unable to obtain that.

11:22:06 15       Again, I don't know if we're talking past each other now

16   or not, but --

17   Q    Okay.  I can ask you a different question.

18        So you have made no claims about whether the VEST Team

19   obtained county-level precinct maps from counties, correct?

11:22:21 20  A    Well, again, I'm not trying to be argumentative or

21   anything.  But I don't know -- if the VEST team is collecting

22   these data, if they're running the data and housing it on this

23   website, then it's not really this Redistricting Data Hub

24   website that's collecting the data.  It's really the VEST Team.

11:22:50 25  Q    Okay.  And you're not aware of what process the VEST Team

1   went through to collect their data, correct?

2   A    Well, I'm sure they went about, you know, using publicly

3   available sources where possible, and then contacting state and

4   local election officials in other cases.  I mean, that's what

11:23:10  5   has to happen for anyone, so...

6   Q    Okay.  Understood.  And the fact that the figure on the

7   right on the screen right now is the VEST precinct data would

8   suggest that they engaged in the same process you did for

9   Washington County and requested the precinct map from that

11:23:25 10   county, correct?

11   A    Well, if that is the map they had for Washington County,

12   then, yes, they have the right precinct map.

13   Q    Okay.  Let's now -- we can go ahead and take this down.

14        Let's next discuss the -- your comments on the L2 data

11:23:48 15   that Dr. Palmer used for one portion of his analysis.

16        And you note that there may be some discrepancies in the

17   L2 data, correct?

18   A    Well, my point is that the L2 racial data are estimates.

19   They're modeled on algorithms.

11:24:08 20   Q    Okay.  And you note that those discrepancies, they're not

21   all that sizeable, correct?

22   A    Well, one group was overestimated, another group was

23   underestimated, and a third group was both under and

24   overestimated.  I guess my point being, again, in Alabama given

11:24:30 25   that the state records racial data in their registration

```
 1  database, we don't have to use estimates.  The most accurate
 2  data are the data that the state has.
 3  Q    Okay.  But you write that the discrepancies that you just
 4  identified are not all that sizeable, right?
11:24:49  5  A    Do I use the words not all that sizeable?
 6  Q    Yeah.  I can point that to you if that would be helpful.
 7  A    Okay.  That's fine.  Thank you.
 8  Q    I'm sorry.  Do you want me to point you to that language?
 9  A    Yeah.  I don't remember using those exact words.
11:25:17 10     Okay.  I see it.  Yeah.  Yes.
11  Q    Okay.  And --
12  A    Thank you.
13  Q    Of course.  I'm sorry to speak over you.  I will make sure
14  not do that.
11:25:28 15     You also go on to speculate that these discrepancies,
16  quote, could make a difference in a district functionality
17  analysis where the racial composition of the district is -- in
18  question is evenly divided, correct?
19  A    Sure.
11:25:45 20  Q    Okay.  And you don't make any claims that these
21  discrepancies affect racially-polarized voting in Alabama,
22  right?
23  A    No.  I am just raising the question there.
24  Q    Okay.  You're aware that Dr. Palmer conducted a district
11:26:00 25  level functionality analysis for Mr. Cooper's illustrative
```

1461

1    majority-black districts, right?

2    A    Yes.

3    Q    You are also aware that Dr. Palmer did not use L2 data for

4    that functionality analysis, right?

11:26:15  5    A    I just -- I honestly don't remember one way or the other.

6    Q    Okay.  If Dr. Palmer did not use the L2 data for his

7    functionality analysis, any minor discrepancies in the L2 data

8    couldn't possibly affect that functionality analysis, correct?

9    A    Well, I agree.  If he was not using those data, then no.

11:26:39 10   You couldn't affect things.

11    Q    Okay.  Okay.  Let's move on to talk about something else

12    now.

13         In your first report, you observed that Representative

14    Paschal who is black was elected to the Alabama State House in

11:26:58 15   2021 as a Republican, right?

16    A    Correct.

17    Q    Okay.  You also noted that he came in second in the first

18    Republican primary contest, right?

19    A    The initial contest, yes.

11:27:09 20   Q    Okay.  Do you know how many people voted in that primary?

21    A    No.

22    Q    Would it surprise you to learn --

23    A    I don't have it in my report, so I don't know the answer

24    to that sitting here.

11:27:24 25   Q    Okay.  Would it surprise you to learn that it was about

1462

1    3,000 people?

2    A    No.  It was a special election, I believe.

3    Q    Okay.  And Representative Paschal got about 27 percent of

4    the vote in that first primary, right?

11:27:42 5    A    Well, I don't have that figure in my report.  I'm not

6    saying that's incorrect.  I just don't have that figure.

7    Q    Okay.  If he had gotten 27 percent of the vote, that would

8    be about 800 people who voted for him, right?

9    A    Correct.

11:28:16 10    Q    Okay.  And then the rest of the voters all voted for

11    somebody else in the primary, then, right?

12    A    If that's accurate, then, yes.

13    Q    Okay.  And one of those candidates that I do think you

14    discussed is Ms. Hulsey.  I'm probably mispronouncing her name.

11:28:35 15    A    I think it's Hulsey.

16    Q    Hulsey.  Okay.  Sorry about that.  She was one of the

17    candidates in that first primary, right?

18    A    Yes.

19    Q    And are you aware that all of the other candidates in that

11:28:50 20    primary were white?

21    A    Yes.

22    Q    Okay.  And since neither Representative Paschal nor Ms.

23    Hulsey got 50 percent of the vote in that first primary, they

24    went into a runoff?

11:29:10 25    A    That's correct.

```
 1   Q    Do you know how many people voted in the runoff?
 2   A    I don't have the figure in my report.
 3   Q    Okay.  Would it surprise you to learn that it was about
 4   2,900 people?
 5   A    No.
 6   Q    Okay.  And in that election, Representative Paschal beat
 7   Ms. Hulsey by I think somewhere around 65 votes, right?
 8   A    It was close.  I mean, I don't know the exact number.
 9   Q    Does that sound about right?
10   A    I mean, he got 51.1 percent of the vote.  I have that.  So
11   it was close.
12   Q    Okay.  So it's about 2 percent of the vote he won by; is
13   that right?
14   A    Yes.
15   Q    Okay.  Are you aware that about 3,700 people voted in that
16   election?
17   A    Not -- I mean, I don't remember that fact sitting here.
18   Q    Okay.  Any reason to disagree?
19   A    No.  I'm not disagreeing.  I just don't have that in my
20   report.
21   Q    That's fine.  And you already testified that you didn't
22   conduct any kind of racially-polarized voting analysis on that
23   election, right?
24   A    Correct.
25   Q    Okay.  So you don't provide us with any information about
```

```
    1  whether voting in that election was actually racially
    2  polarized, right?
    3  A    Well, I didn't do an analysis, no.  But, again, the
    4  district's 84 percent white.
11:30:38 5  Q    The district's 84 percent white, but only about 3,700
    6  people voted in that election, right?
    7  A    Correct.
    8  Q    Okay.  And we don't actually know whether there was a
    9  candidate of choice for either black voters or white voters,
11:30:53 10  right?
   11  A    I didn't run the analysis, so I can't state that, correct.
   12  Q    Okay.  So it's possible that black voters preferred
   13  candidate was Paschal, correct?
   14  A    It's possible, yes.
11:31:09 15  Q    And it's possible white voters didn't have a preferred
   16  candidate at all, right?
   17  A    Well, you can imagine a scenario in which that might be
   18  the case.  They probably did have a preferred voter given the
   19  fact that again 84 percent of the district's white.
11:31:27 20  Q    Is that the only basis that you have for saying that they
   21  probably did have a candidate of choice?
   22  A    Well, again, I can't state that definitively because I
   23  didn't run an analysis to find that out.
   24  Q    Okay.  Since -- you would agree that there are far more
11:31:52 25  than 3,700 black voters in Shelby County, right?
```

```
 1  A    I would assume so, but, again, this is a district in
 2  Shelby County, so it's only part of Shelby County.
 3  Q    Okay.  But you didn't do any analysis to determine whether
 4  there was racially-polarized voting, right?
 5  A    Correct.
 6  Q    Okay.  Are you suggesting we draw conclusions about the
 7  general electorate in Alabama based on this one election?
 8  A    Well, it is just one election, so we would have to base
 9  any kind of conclusion with a note of caution.  I guess what I
10  am stating here based on this example and, again, it's one
11  example, I will grant -- but this example in my academic work
12  is that it appears that black conservatives -- again, there
13  we're talking about white Republicans essentially -- seem to be
14  more than willing to vote for minority Republican candidates.
15  This is an example of it happening in Alabama.
16  Q    Okay.  So you say this is an example of that, but you
17  haven't provided any other examples in Alabama, right?
18  A    This is the only example I have, yes.
19  Q    Okay.  And I will represent to you that only 3,700 people
20  voted in that election.  So that would be a pretty tiny portion
21  of Alabama's population, correct?
22  A    Yes, that's correct.
23  Q    Okay.  In your first report, you also cite an article that
24  you have already discussed a bit, and I just have a few
25  questions about it.
```

```
 1          It's called True Colors, White Conservative Support For
 2   Minority Republican Candidates.  Do you recall that article?
 3   A    Yes.  Yes.
 4   Q    Okay.  Is it right that when you refer to minority
 5   candidates in that article, you're lumping all different
 6   minority groups together, right?
 7   A    Well, that's fair.  Again, I mean, we know the race or
 8   ethnicity of these candidates that we're studying.  But the
 9   group we're studying are just minority candidates as a group.
10   Q    Okay.  And I think -- is it right that you analyzed 11
11   elections in that article?
12   A    Without looking, that sounds about right.
13   Q    Okay.  I think you said that none of those elections were
14   in Alabama, right?
15   A    There were no examples -- I mean, we used the entire set
16   of elections that were available to us to study minority
17   Republican candidates running for Governor or U.S. Senate.  So
18   there wasn't an example to use from Alabama.  It just didn't
19   exist.
20   Q    Okay.  So you didn't analyze any elections from Alabama?
21   A    That's correct.  There weren't any to analyze.
22   Q    Got it.  And of the 11 -- of the 11 elections you did look
23   at, does it sound right to you there were four that involved a
24   black candidate?
25   A    That sounds correct.
```

1  Q    Okay.  And is it also correct that none of those black

2  candidates actually won their general elections?

3  A    I would have to look.  I would have to go back and look.

4       I guess that would mean that perhaps Senator Tim Scott

11:35:39 5  from South Carolina had not had an election at that point when

6  we wrote this article, otherwise, he certainly would have been

7  in the data set and would have been an example of the winning

8  minority Republican candidate.

9       So if it was before Senator Scott, then it may be the case

11:36:00 10 that none of the minority candidates who are black won in this

11 particular study.

12      Again, we weren't looking at winning or losing.  We were

13 looking at levels of support from white conservatives, so...

14 Q    Okay.  Since the article didn't examine any elections in

11:36:29 15 Alabama, is it fair to say that it doesn't provide any direct

16 evidence related to voting behavior in Alabama?

17 A    Well, I guess that's fair at a certain point.  Again, this

18 is -- was a nationwide study used elections that were available

19 to us from a variety of states for different offices.  It

11:36:50 20 doesn't necessarily mean that the pattern we uncovered in the

21 article wouldn't occur in Alabama, though.

22 Q    Okay.  But you haven't offered any evidence that that

23 pattern exists in Alabama, right?

24 A    Well, I think it does, as an expert sitting here today,

11:37:08 25 having conducted research on this topic.

```
 1  Q    Okay.  But --
 2  A    I think it's pretty safe to say that white conservatives,
 3  almost all of whom are Republicans today, would support a
 4  minority Republican candidate even in Alabama.  I mean, that's
 5  my opinion on the matter, having conducted research in this
 6  area.
 7  Q    Okay.  But you don't offer any actual evidence of that to
 8  support that opinion, correct?
 9  A    Well, the evidence I have is from this nationwide study we
10  did.  There wasn't a --
11         JUDGE MARCUS:  Let's stop for a second, Dr. Hood.
12  Ms. Madduri, just to allow the witness to finish his answer
13  before you put the next question.  You may complete your
14  answer.
15         THE WITNESS:  Thank you, Your Honor.
16      Again, there wasn't a case to study in Alabama in the
17  social sciences.  I'm not trying to be flippant, but we're not
18  laboratory sciences.  We have to study what's out there that's
19  occurred.  And they're just had not been a case at that point
20  when we wrote this article of a minority Republican candidate
21  running for U.S. Senate or Governor in Alabama.  So, no, that's
22  not part of the study.  I agree.
23      It doesn't mean that that pattern wouldn't be uncovered in
24  Alabama if we did -- if we were able to study it directly.
25  BY MS. MADDURI:
```

The time stamps in the left margin: 11:37:25 (line 5), 11:37:41 (line 10), 11:37:58 (line 15), 11:38:17 (line 20), 11:38:34 (line 25).

```
 1  Q    Okay.  But you haven't studied that, correct?
 2  A    Correct.
 3  Q    Dr. Hood, is it fair to say that you have studied partisan
 4  change in the South since the enactment of the Voting Rights
 5  Act?
 6  A    Yes.
 7  Q    Okay.  Is one of your publications on that topic called
 8  The Rational Southerner?
 9  A    Yes.
10  Q    And in your work, including in that publication, you
11  specifically discuss the partisan realignments that happened in
12  the South among black and white voters after the Voting Rights
13  Act passed; is that right?
14          MR. SMITH:  Your Honor, I would object.  This is
15  beyond the scope of what Dr. Hood has expressed an opinion on
16  and beyond the scope of his report.
17          JUDGE MARCUS:  We will see where she is going with
18  this.  You may proceed.  But let's get right to the point if we
19  could, Ms. Madduri.
20          THE WITNESS:  So the answer to that --
21          JUDGE MARCUS:  No, no, no.  I'm sorry.  What was the
22  question, Ms. Madduri?  I want to make sure we have it.
23          MS. MADDURI:  Sure.  The question was:  That in
24  Dr. Hood's work, he has specifically discussed the partisan
25  realignments that happened in the South among black and white
```

11:39:09 (line 5)
11:39:24 (line 10)
11:39:39 (line 15)
11:39:52 (line 20)
11:40:10 (line 25)

voters after the passage of the Voting Rights Act.

JUDGE MARCUS:  You may answer.

THE WITNESS:  Yes, that's correct.

BY MS. MADDURI:

11:40:26  Q    Okay.  And is it also correct based on your research that once African-Americans were re-enfranchised after the Voting Rights Act, they fairly quickly realigned to the Democratic Party in the South?

A    Yes, that's fair.

11:40:41  Q    Okay.  And prior to partisan realignment, white southerners had overwhelmingly preferred the Democratic Party, correct?

A    In the South, yes.

Q    Okay.  And after the VRA passed, white southerners 11:40:54 realigned to affiliate with the Republican Party, correct?

A    Conservatives and moderates, yes.  I mean, if you are a white progressive, you didn't realign is what I am saying.

Q    Okay.  But your research shows that generally white southerners overall reaffiliated with the Republican Party 11:41:16 after the VRA was enacted, right?

A    Correct.  Because, you know, there are more white conservatives than moderates and progressive, so, yes.

Q    And you would agree that that realignment is primarily a function of racial and political dynamics, right?

11:41:34  A    Well, that's pretty broad racial and political.

1    Certainly, yes.  I mean, that -- yeah.

2    Q    Specifically, your research has found that the

3    increasingly liberal orientation of the National Democratic

4    Party on the issue of Civil Rights impacted white southerners,

11:42:01 5    correct?

6    A    Correct.

7    Q    Okay.  And you would -- your research I think shows that

8    the VRA was a milestone in the development of the Republican

9    Party in the South, right?

11:42:09 10   A    Yes.

11   Q    Okay.  And at the same time, there was also a transition

12   at the national level where the Democratic Party became more

13   liberal on the issue of Civil Rights for African-Americans, and

14   the Republican Party became more conservative on that same

11:42:27 15   issue, correct?

16   A    Yes.  There was an switch in issue positions at the

17   national level.

18   Q    Okay.  And the Republican Party was increasingly viewed as

19   the party of racial conservatism, right?

11:42:40 20   A    Yes, that's fair.

21   Q    Okay.  And black mobilization in the Democratic Party led

22   directly to the transition of whites to the Republican Party,

23   right?

24   A    Yes.  That's one of the major arguments of the book, yes.

11:42:54 25   Q    Okay.  So you would agree, then, that race is one of the

```
 1  factors that impacts which political party Alabama voters

 2  support, correct?

 3  A    Well -- okay.  So it would be a little more specific.  Or

 4  can you be more specific with that question?

 5  Q    Yeah.  I can -- let me ask again.  So would you agree that

 6  race is one of the factors that impacts which political party

 7  voters in Alabama support?

 8  A    Well, yes.  Now, differentiating between race and racism,

 9  I mean, in the South today included in Alabama, a majority of

10  whites support the Republican Party.  More than a majority of

11  African-Americans support the Democratic Party.

12       So the -- very much so there are racial coalitions that

13  underlie the party structure at the state level in the South.

14  Q    Would you agree, then, that race is one of -- not just

15  speaking about the race of the people who support the party,

16  but the fact that race is an issue is one of the things that is

17  involved in voters selecting which political party they

18  affiliate with?

19  A    It can be, yes.  I mean, that's part of it.  There is, you

20  know, a multitude of things that may go into someone's calculus

21  for which party to join.

22       Position on racial issues, like affirmative action, for

23  instance, might be one of those.

24  Q    Okay.  And would you say that the position of the parties

25  on race-related issues is contributed to that divide that you
```

11:43:13 (line 5)
11:43:38 (line 10)
11:44:14 (line 15)
11:44:34 (line 20)
11:44:53 (line 25)

1    described?

2    A    Well, the parties sort of set the tone at the national

3    level with this switch in issue positions in about 1964.  And

4    so they -- the party elite sent out the signal which, in turn,

11:45:16  5    caused an exodus.  I mean, before the Voting Rights Act, you

6    really just had the Democratic Party in the South.  You had

7    factions within the Democratic Party.  Again, especially in

8    certain states, most African-Americans may have been

9    disenfranchised.  So you are really talking about a white

11:45:38 10    Democratic party.  When they switched issue positions in the

11    '64 Civil Rights Act, and the '65 Voting Rights Act were

12    passed, it did begin a slow exodus of white conservatives and

13    later white moderates to the Republican Party.  Fairly quickly,

14    though, in the mid 1960s, African-Americans who were

11:45:59 15    re-enfranchised moved very quickly to the Democratic Party.

16         So, you know, if you are a white conservative in order to

17    accomplish political goals in a party that's pretty quickly

18    becoming crowded out with issue -- or opinions that don't

19    necessarily mesh with yours, you're going to move to another

11:46:22 20    vehicle for that, and that's what happened with black

21    conservatives.

22    Q    Okay.  And I think you mentioned that the national party

23    switched issue positions.  You mean on issues related to race,

24    correct?

11:46:44 25    A    On Civil Rights, yes.  Yeah.  That's what I am talking

about.

Q    Okay.  Your analysis in this case has not looked at the impact that race-related issues -- how race-related issues contribute to the partisan divide between whites and blacks candidates, right?

A    I didn't analyze that for this case, no.

Q    And I'm sorry.  I think I said candidates, but I meant voters.  I can restate the question if you don't understand what I am asking?

A    Well, I didn't do that analysis period in this case.  I mean, that's fair.

Q    Okay.  And your analysis doesn't in any way suggest that race-related issues don't have an impact on the division between voters, correct?

A    They may have an impact.  I am not saying that they're not.

Q    And would you agree that a complete understanding of southern party politics requires an appreciation of the role that race has played and continues to play in that region?

A    That sounds like what I said yesterday and the first day of class, so, yes.  It's not the only thing, but certainly you have to understand race to understand southern politics.

Q    Okay.  I think I am just about done here, Dr. Hood.  I want to ask you about one thing that you testified about during your discussion with Ms. Gbe.

```
 1        You discussed the concept of the core preservation and the
 2   fact that some states at times list that as a criteria for
 3   redistricting.  Do you recall that?
 4   A    Yes.
 5   Q    Is it your recollection that Alabama did not include core
 6   preservation in its redistricting guidelines in 2010?
 7   A    I just honestly don't remember the answer to that.  Not
 8   sure.
 9   Q    Okay.  I can pull the exhibit to refresh your
10   recollection.
11   A    Okay.  Please do.
12   Q    Okay.  That would be Plaintiffs' Exhibit 87, pages 917 and
13   918.
14        I can represent to you that this is a transcript of your
15   testimony in the Chestnut case in 2019.
16   A    Okay.
17   Q    Okay.  And we can zoom in a little bit on -- first on page
18   917 at line 13, around line 13 to the bottom.  Okay, again,
19   here I will represent to you that you were discussing the 2010
20   guidelines in this section of your testimony.
21        And the last line there says, But nothing in that section
22   mentions core preservation; is that correct?
23   A    Well, okay.  So.
24   Q    We are going to get it arranged for you to be able to see.
25   A    Okay.  All right.
```

1476

```
         1   Q    If you can just hang on one second.  There you are being
         2   asked about the guidelines, and it says at the bottom at line
         3   25 on page 917, But nothing in that section mentions core
         4   preservation; is that correct?  And you say, I don't see it.
11:51:16 5   A    That's correct.
         6   Q    Okay.  Does this -- go ahead?
         7   A    Up above, so I just want to point out up above we're
         8   talking about avoiding incumbent contests.  I mean, core -- you
         9   know, I don't disagree that apparently the document didn't use
11:51:35 10  the word core preservation.  But if you're worried about
        11   incumbent contests in retaining incumbents, by virtue of that
        12   fact, you're thinking about core preservation at least.  You
        13   have to be.  If you draw someone out of their district or you
        14   draw a district where someone has got 10 percent of the -- of
11:52:00 15  the constituents they had in the previous election cycle, you
        16   know, so it has almost no core preservation, you are
        17   endangering that incumbent.
        18        So I'm just pointing that out.
        19        Apparently, I don't disagree.  It didn't use the word core
11:52:17 20  preservation, but if it's talking about incumbency, it's still
        21   a factor to think about.
        22   Q    Okay.  So you agree that the 2010 guidelines did not list
        23   core preservation as a guideline, right?
        24   A    Not according to what I said here, no.  I mean, yes, I
11:52:35 25  agree with you.
```

1  Q    Okay.  So then core preservation as a guideline was only

2  added in 2021; is that right?

3  A    Well, if it wasn't there in 2011 or 2010, then, yes.

4  Q    Okay.

11:53:11  5        MS. MADDURI:  I don't have any further questions for

6  Dr. Hood.

7        JUDGE MARCUS:  Okay.

8        MS. MADDURI:  Thank you for your time.

9        THE WITNESS:  Thank you.

11:53:16 10        JUDGE MARCUS:  All right, Ms. Madduri.  We will turn

11  to counsel for Singleton, Mr. Quillen.

12        MR. QUILLEN:  Thank you, Your Honor.

13                     CROSS-EXAMINATION

14  BY MR. QUILLEN:

11:53:25 15  Q    Good afternoon, Dr. Hood.

16  A    Good afternoon.

17  Q    My name is Henry Quillen, and I represent the Singleton

18  plaintiffs in this case.

19       I'd like to begin by talking about your functionality

11:53:38 20  analysis.  You used the 2018 gubernatorial election and the

21  2020 presidential election as the basis of that analysis,

22  correct?

23  A    Correct.

24  Q    And for both of those elections, your analysis showed that

11:53:54 25  black voters overwhelmingly voted for the Democratic candidate,

1    correct?

2    A    Correct.

3    Q    And for both of those elections, you built a model to

4    estimate the results if those elections had been contested in

11:54:09 5    three different hypothetical congressional districts, right?

6    A    Correct.

7    Q    One of those districts was District 7 in the plan that was

8    enacted by the state of Alabama in 2021, right?

9    A    Correct.

11:54:21 10    Q    And the other two districts were Districts 6 and 7 in the

11    whole county plan proffered by the Singleton plaintiffs,

12    correct?

13    A    Correct.

14    Q    You didn't present this analysis to the Alabama

11:54:36 15    Legislature before it enacted the 2021 plan, did you?

16    A    No.  It was -- I didn't have it done, no.

17    Q    Okay.  For the 2018 gubernatorial election, your analysis

18    estimated that the Democratic candidate would have received

19    more votes than the Republican candidate in Districts 6 and 7

11:55:00 20    in the Singleton whole county plan.  And if you would like me

21    to put that up on the screen for you, I can.

22    A    I have got it in front of me.  That's correct.  That's

23    correct.

24    Q    And the same is true for the 2020 presidential election,

11:55:15 25    correct?

```
 1  A    Yes, I believe so.  It was -- 49 to 49 in District 7.  I

 2  mean, it's very true.  It's 49.13 Democratic in Singleton

 3  District 7 and 48.92 percent Republican in that district.

 4       So I mean, mathematically, yes, that's correct.  It's

 5  almost a virtual tie, though.

 6  Q    But the Democrat had the plurality, correct?

 7  A    That's true.

 8  Q    And in the presidential election in Alabama, plurality is

 9  good enough to win, correct?

10  A    I think that's good enough to win in any state that I am

11  aware of, yes.

12  Q    There's no such thing as a presidential runoff general

13  election?

14  A    No.  Or Georgia would have tried it, so...  We have a

15  runoff for everything else, so...

16  Q    When you're trying to estimate the results of an election,

17  would you agree it's important to use the most accurate data

18  available to you?

19  A    Yes.

20  Q    The ecological inference has an inherent margin of error,

21  too, correct?

22  A    Yes.  I mean, all statistical models do.

23  Q    And the differential privacy rules of the Census Bureau

24  create potential errors, as well, in your ecological inference

25  analysis, correct?
```

```
 1  A    Well, potentially, yes.  They're unknown, though.  We
 2  can't control for those.  We don't know what the answer to that
 3  is.
 4  Q    Okay.  The Singleton whole county plan that you evaluated
11:57:06  5  doesn't split any counties across congressional districts,
 6  correct?
 7  A    That's correct.
 8  Q    And for gubernatorial and presidential elections, the
 9  Alabama Secretary of State reports election results at the
11:57:20 10  county level, correct?
11  A    Correct.
12  Q    And those figures were available to you when you were
13  doing your analysis, correct?
14  A    Certainly.
11:57:33 15  Q    You have the ability to calculate what the actual election
16  results would have been in District 6 and 7 of the Singleton
17  whole county plan in the 2010 gubernatorial election and the
18  2020 presidential election, correct?
19  A    Based on the county numbers, yes.
11:57:50 20  Q    But you didn't include those calculations in your report?
21  A    Well, no, that's not how I ran my functional analysis, so
22  I didn't.
23  Q    Did you look at the actual results in those counties to
24  compare them to the results of your model?
11:58:08 25  A    No.
```

1481

```
 1   Q     Did you review the report of the Singleton plaintiffs'
 2   expert Dr. Natalie Davis?
 3   A     I think I looked at it.
 4   Q     Okay.
 5              MR. QUILLEN:  Ms. York, could you pull up Exhibit S-2,
 6   which is -- this is the report of Dr. Natalie Davis that's been
 7   admitted into evidence?
 8   BY MR. QUILLEN:
 9   Q     You had an opportunity to respond to this report, correct?
10   A     I'm assuming so, yes.
11   Q     But you didn't respond to this report?
12   A     Correct.
13   Q     Can we go to page 24 of this pdf, please?  There we go.
14         Dr. Hood, in this part of Dr. Davis's report, she
15   calculates the actual election results in the counties that
16   encompass District 6 and District 7 in the Singleton whole
17   county plan for 12 elections dating back to 2012.
18         Do you recall seeing this when you reviewed her report?
19   A     I don't recall this, but go ahead.
20   Q     Do you have any reason to believe that she didn't add up
21   these numbers correctly?
22   A     Not sitting here, no.
23   Q     And would you agree that this sort of analysis is not
24   complicated?  If you had to do the same analysis, you would
25   just add up the county level results and divide by the totals?
```

Timestamps: 11:58:28 (line 5), 11:58:51 (line 10), 11:59:20 (line 15), 11:59:45 (line 20), 11:59:57 (line 25)

```
         1   A    Yes.
         2   Q    So in this part of her work -- I will ask you to assume
         3   for purposes of my next few questions that she didn't make any
         4   mathematical errors here.
12:00:17 5        Do you see how that she lists the counties that are in
         6   District 6, and then she lists the counties that are in
         7   District 7.
         8             MR. QUILLEN:  And, Ms. York, could you scroll down a
         9   little bit so we can see, yeah, the totals for both?
12:00:33 10            THE WITNESS:  Okay.
        11   BY MR. QUILLEN:
        12   Q    Yeah.  If we could skip ahead a couple of pages now to the
        13   results for the 2018 gubernatorial election.  There we are.
        14   That's -- these are the county level results on the right side
12:00:57 15  where you see 2018 Maddox-D, Ivey-R.  These are the results for
        16   the 2018 gubernatorial election.  Do you see that?
        17   A    Yes.
        18   Q    In District 6, the Democratic candidate received
        19   59 percent of the vote.  Do you see that?
12:01:22 20  A    Okay.
        21   Q    And in District 7, the Democratic candidate received
        22   56 percent of the vote.  Do you see that?
        23   A    Okay.  Yes.  Yes.
        24   Q    Can we switch back to Exhibit D-5 of your report at page
12:01:51 25  13?  And scrolling down a little bit, we see that for District
```

1   7, actually could you go to the next page, it's page 13 of the

2   report pdf.

3       So for that race, your numbers were close.  You

4   underestimated by a little bit the actual result in District 6,

12:02:38 5   which it was actually 59, and you estimated 58.28, and you

6   slightly underestimated the result in District 7.  It was 56,

7   and you estimated 55.48; is that correct?

8   A    From -- I have been trying to follow.  I think so, yes.

9   Q    Okay.  Bear with me because I'd like to do the same thing

12:03:06 10  for the presidential election.  Maybe before we leave this --

11  can we just take note of what you said -- you estimated the

12  vote shares were in the presidential election in District 6 and

13  7.

14       So you said that in District 6, it was 52.03 percent; and

12:03:29 15  in District 7, it was 49.13 percent, correct?

16  A    Yes.

17  Q    Okay.  Can we go back to Dr. Davis's report now on -- I

18  think it's page 28 of the pdf?

19       Yes.  So here is the presidential election.  The bottom

12:04:06 20  percentage in the top group of numbers is 56 percent.  Now, I

21  will -- I do need to tell you, Dr. Davis did not take into

22  account third-party candidates, which you did.  But your

23  analysis found that third-party candidates received somewhere

24  between 1 and 2 percent of the vote, correct?

12:04:31 25  A    Correct.

1  Q    Okay.  So Dr. Davis found that the Democratic candidate in

2  the 2020 presidential election actually got 56 percent of the

3  vote in Congressional District 6, which is about 4 points

4  higher than you estimate, correct?

12:04:50  5  A    Correct.

6  Q    And scrolling down a little bit to the District 7 numbers,

7  Dr. Davis found that the Democratic candidate actually received

8  54 percent of the two-party vote compared to 49 percent in your

9  estimate, correct?

12:05:09  10  A    Correct.

11  Q    So for each of the four results you got -- two elections

12  in two districts -- you underestimated the actual Democratic

13  vote share, sometimes by a little, sometimes by, you know, at

14  least two or three points, correct?

12:05:28  15  A    Well, again, as we just talked about, for one thing, she's

16  not controlling for third-party candidates.

17      You know, my model starts out by disaggregating and then

18  reaggregating things.  So, you know, it's not exactly the same

19  method as what we're seeing here.

12:05:47  20      I mean, I can agree that in these counties in that

21  election this was the vote percentage.  My model, the

22  functional analysis takes into account how this district's

23  going to look moving out into the future, you know.  I have got

24  the current VAP numbers, for instance, I'm using as a spring

12:06:08  25  board for what the election might look like in the future.

1    Q     The current VAP numbers that you're using came from 2020

2    census, correct?

3    A     Correct.

4    Q     And we're looking at the 2020 presidential election,

12:06:21  5    correct?

6    A     That's one of the ones we're looking at, yes.

7    Q     Were there significant changes in demographics in either

8    of those districts between 2018 and 2020?

9    A     I don't know the answer to that.

12:06:33 10    Q     Do you have any reason to believe there were?

11    A     There were probably some changes.  I don't know if they're

12    significant or not.

13    Q     Okay.  Which would be a more accurate measure of the

14    results of the 2020 presidential election in District 6 and 7

12:06:54 15    of the Singleton whole county plan; your model or the results

16    that were certified by the Governor, Attorney General, and

17    Secretary of State of Alabama?

18    A     Well, I mean, the results are the results.  Right?  I have

19    modeled the results as a part of the *Gingles* test.  I mean, I

12:07:15 20    had to do that.  I can't just start out with the results and

21    say here they are.

22         I'm not disputing these are the vote totals.

23    Q     So based on your analysis and the actual election results,

24    would it be fair to say that in District 6 and 7 of the

12:07:38 25    Singleton whole county plan, black voters have an effective

1    opportunity to elect the candidate of their choice?

2    A    What do you mean by -- define effective.

3    Q    Do they have a substantial opportunity to elect a black

4    candidate?

12:07:58 5    A    That is an opportunity.  Again, unsure, according to my

6    numbers, District 7, especially in the Singleton plan would

7    perform or not as a minority opportunity to elect district, for

8    instance.

9    Q    Right.  But you been looking at the -- looking at using

12:08:19 10    census numbers from the same year the 2020 presidential

11    election was contested, your model underestimated the

12    Democratic share by 5 percentage points?

13    A    Well, again, it's not apples to apples, to be fair.  We

14    would have to have the third-party votes in there.

12:08:37 15    Q    Right.  So well let's look at that.

16    A    And we know that -- something we haven't discussed that no

17    one can control for in Alabama is the fact that the absentee

18    by-mail votes cannot be put back into the proper precinct.

19    Q    So that would have been an additional source of error for

12:09:03 20    your analysis?

21    A    I don't know that it's a source of error.  It's just that

22    that's one of the reasons my numbers might slightly differ from

23    the vote totals, which we have at the county level, but we

24    don't have it that the precinct level, and that's where my

12:09:17 25    analysis took place.

```
 1   Q    Is a precinct-level analysis necessary when a district

 2   only includes whole counties?

 3   A    A precinct-level analysis is certainly necessary when one

 4   is trying to estimate how various racial or ethnic groups are

 5   voting for candidates, yes.

 6   Q    Yeah.  But that wasn't my question.

 7   A    Well, that's part of my analysis.

 8   Q    If we are trying to estimate what the results of the 2020

 9   election would have been, we don't need to know how the

10   absentee ballots were associated with particular precincts, do

11   we, because we already have the Secretary of State's certified

12   election results --

13             JUDGE MARCUS:  Yeah.  Please, if we would just allow

14   the question to be complete before we get the answer and allow

15   the answer to be complete before we go with the next question.

16        With that, you may proceed, Mr. Quillen.

17   BY MR. QUILLEN:

18   Q    If we're trying to estimate how the 2020 presidential

19   election would have come out in Alabama in these districts,

20   which are whole counties, we don't need to associate absentee

21   ballots with particular precincts because the results are

22   reported at the county level, correct?

23   A    Correct.  But you're not estimating anything.  You're just

24   taking the vote totals and adding them up.

25   Q    Right.  And in that way, it's more accurate than what you
```

Timestamps in left margin: 12:09:33 (line 5), 12:09:48 (line 10), 12:10:10 (line 15), 12:10:26 (line 20), 12:10:41 (line 25)

1488

1     did?

2     A     It's more accurate from the standpoint of these were these

3     vote totals in these counties.  It's not necessarily more

4     accurate given all that I was trying to accomplish with my

12:10:57 5     analysis.

6     Q     What is the purpose of trying to build the results from

7     the 2020 presidential election from a precinct-level

8     demographic analysis if you already have the actual results?

9     A     Again, part of what I'm doing relates to prong 2 of the

12:11:20 10     *Gingles* analysis.

11     Q     Okay.  Does -- if what -- if what you -- if you come up

12     with a result that suggests that a Democrat would lose in a

13     district, but the actual results show that the Democrat would

14     have won, which one should you rely on to know whether or not

12:11:44 15     black -- the preferred candidate of black voters would have an

16     opportunity to win?

17     A     Well, for one, I think my model is pretty well thought

18     out, in terms of partitioning votes by race using real turnout

19     and registration data, looking at the demographics of the

12:12:05 20     district as it's going to exist in the future, and putting all

21     those things together to come up with a vote estimate.

22     Q     Which part of this projects demographic results into the

23     future?

24     A     Well, I have the VAP numbers for the new district.

12:12:25 25     Q     Right.  But that -- right.  But as we discussed, those

1   were based on the 2020 census, and one of your elections was

2   the 2020 election.  Does -- you are not projecting past the

3   year 2020, are you?

4   A    Well, even you are making a projection here with these

12:12:40   5   numbers.  These are 2020 presidential election numbers.

6   They're not numbers that we -- that someone's running for

7   Congress in this district, so...

8   Q    The --

9   A    It's not congruent in that regard.

12:12:56  10   Q    Did you run any analysis of races involving people running

11   for Congress in this district?

12   A    No, I did not.

13   Q    Okay.

14   A    I relied on state level elections where I could resort to

12:13:11  15   precincts in this district I needed to, so...

16   Q    If -- if you took your results based on 2020 census data,

17   and it had one -- you know, and it had one vote share for

18   Democrat, and the actual results had different vote share for

19   the Democrat, which of those would be more reliable?

12:13:37  20   A    Well, I mean, again, if you just want to calculate the

21   actual vote share, and you can do that using counties, then,

22   fine.  But, again, I'm doing much more than that for my

23   analysis.

24   Q    Do you -- based on your analysis and the actual results,

12:14:00  25   you wouldn't say that -- that -- that black voters have no

1  opportunity to elect a candidate of their choice, correct?

2  A    I wouldn't say no.  That's correct.

3  Q    Uh-huh.  Okay.  And if I told you that Dr. Davis actually

4  ran her analysis for 12 races, and the Democrat got more votes

12:14:25 5  than Republican in each one, would that surprise you?

6  A    Not necessarily.

7  Q    Okay.

8  A    I mean, this isn't an analysis, though.  These are just

9  numbers that are aggregated together.

12:14:46 10        MR. QUILLEN:  Ms. York, you can take this down now.

11        And, actually, can you please put up Dr. Hood's report,

12  page 15 of the pdf, page 14 of the report?

13        JUDGE MARCUS:  We are talking about the first report

14  now, right?

12:15:06 15        MR. QUILLEN:  Yes.  First report.  Exhibit D-5.  I'm

16  sorry.

17  BY MR. QUILLEN:

18  Q    Okay.  Here you are discussing primary elections.

19  Actually, yeah, if you could scroll down just a little bit.

12:15:29 20  Thank you.

21        In this bottom paragraph here, you wrote, If there is an

22  insufficient number of black voters to constitute a majority in

23  a Democratic primary, the black community may be unable to

24  elect their candidate of choice.

12:15:43 25        Do you see that?

1491

```
          1  A     Yes.
          2  Q     Did you analyze whether black voters would constitute a
          3  majority of the voters in the Democratic primary in Districts 6
          4  and 7 of the Singleton whole county plan?
12:15:55  5  A     No.
          6  Q     Do you have any opinion about whether they would
          7  constitute a majority in those districts?
          8  A     No.  I don't.  Because I didn't look at that.
          9  Q     You don't have any reason to believe that they would not
12:16:09 10  constitute a majority in those districts?
         11  A     I don't have a reason to say anything one way or the other
         12  just sitting here right today.
         13  Q     In your model, though, you did -- you did look at general
         14  election votes broken down by party and race, correct?
12:16:27 15  A     Yes.
         16  Q     If we could go to page 8 of your report, please.  Page 9
         17  of the pdf.
         18        This is -- this is the -- your model of the 2020
         19  presidential election in District 6 in the Singleton whole
12:16:52 20  county plan.
         21        Is that left column the breakdown of the Democratic votes
         22  by race?
         23  A     Yes.
         24  Q     So it appears that black -- black Democratic voters
12:17:11 25  outnumbered white Democratic voters by more than three to one;
```

```
 1  is that right?

 2  A    In this calculations, yes.

 3  Q    Okay.  If we go to the next page --

 4  A    Those aren't necessarily --

 5          JUDGE MARCUS:  I'm sorry.  Let him finish his answer

 6  please, Mr. Quillen.

 7          THE WITNESS:  Those -- I'm just saying those aren't

 8  necessarily primary voters, though.

 9  BY MR. QUILLEN:

10  Q    Understood.

11  A    Okay.

12  Q    And if we could go to the next page where it has the

13  similar result for the 2018 gubernatorial election in District

14  6.  Here towards the bottom of the screen, the black Democratic

15  voters outnumbered the white Democratic numbers by more than

16  two to one, correct?

17  A    Yes, that's correct.

18  Q    Okay.  And if we go to the next page, which is the results

19  that you got for the 2020 presidential election in District 7.

20          I think -- let's see.  Oh, I'm sorry.  One more page.

21          Here, the black Democratic voters outnumbered the white

22  Democratic voters by more than eight to one, correct?

23  A    Yes.

24  Q    Okay.  And last one is on the next page, which is the 2018

25  gubernatorial election in District 7.  The black Democratic
```

```
      1  voters outnumbered the white Democratic voters by more than

      2  four to one?

      3  A    Yes.

      4  Q    You don't have any evidence, do you, that black turnout in

12:19:01  5  primary elections is so low compared to general elections that

      6  black voters would be a minority in a Democratic primary in

      7  these districts, despite being the vast majority of the

      8  Democratic voters in the general election, do you?

      9  A    No, I don't have access to those data.  As I stated

12:19:19 10  earlier in my testimony, I asked for the voter registration and

     11  history databases for some primary elections, and I was unable

     12  to obtain them.

     13  Q    Just as a matter of mathematics, if black Democratic

     14  voters outnumber white Democratic voters by eight to one in a

12:19:40 15  general election, then for them to be the minority in the

     16  primary election, their turnout would have to fall by

     17  seven-eighths while white turnout remained at 100, correct?

     18  A    Yeah, in that hypothetical, yes.

     19  Q    Is that something that you have seen in your political

12:19:59 20  research --

     21  A    I'm not saying that's the case.

     22  Q    Okay.  All right.  If you will just give me one minute.

     23         MR. QUILLEN:  Okay.  I have no further questions.

     24         JUDGE MARCUS:  Thank you.  Mr. Smith, where are we in

12:20:26 25  terms of redirect?  We will be able to give our reporter a
```

```
 1  break, but if you will be short, you may proceed.
 2              MR. SMITH:  Your Honor, I think it will be maybe
 3  five minutes.
 4              JUDGE MARCUS:  Fire away.
 5                    REDIRECT EXAMINATION
 6  BY MR. SMITH:
 7  Q    Dr. Hood, do you recall questions from plaintiffs' counsel
 8  about courts crediting your testimony?
 9  A    Yes.
10  Q    And, Dr. Hood, approximately how many cases have you
11  served as an expert witness in?
12  A    I'm not really sure.  I've testified -- testified in court
13  more than 25 times.
14  Q    And have a number of those courts credited your testimony?
15  A    Yes.
16  Q    And does that include the Northern District of Alabama in
17  the Chestnut case?
18  A    Yes.
19  Q    And, Dr. Hood, did Mr. Bryan assist you with processing
20  any data in this case?
21  A    Yes.  He did some geocoding.
22  Q    But is any opinion in your report that references that
23  data, in fact, your own opinion?
24  A    Yeah.  That's what I was saying earlier.  We did not
25  discuss the merits of my analysis or anything like that.  It
```

Timestamps (left margin): 12:20:36 (line 5), 12:20:48 (line 10), 12:21:08 (line 15), 12:21:24 (line 20), 12:21:40 (line 25)

1  was literally discussion of some data that I needed him to run,

2  that I used in my analysis.

3  Q    And, Dr. Hood, do you recall being asked about the passage

4  of the VRA in partisan realignment?

12:21:59  5  A    Yes.

6  Q    Dr. Hood, even if the passage of the VRA influenced some

7  partisan realignment in the 1960s, does that tell us why anyone

8  is voting for a Republican candidate today?

9  A    Not necessarily.  I mean, you know, there are many --

12:22:19 10  again, there are many different issues that may make someone

11  identify as a Republican or a Democrat today.

12      So I would say it's part of the calculus, but not all of

13  the calculus, I guess is a fair way to put it.

14  Q    And, Dr. Hood, looking to page 15 of your report, where

12:22:42 15  you discuss the election of Representative Paschal, what was

16  the race of the Democratic candidate in the general election?

17  A    From my memory, I think they were white.

18  Q    And can you tell us what the vote shares in that general

19  election were between the Democratic and Republican candidates?

12:23:08 20  A    Well, yes.  So I will just read the sentence.

21      Paschal faced a white Democrat Sheridan Black in the

22  special general election held on July 13th, 2021.  In this

23  contest, Paschal won with 74.7 percent of the vote to

24  25.1 percent of the vote for black.

12:23:32 25  Q    And, Dr. Hood, would you say that's a safe margin that he

1  won by?

2  A    I think most legislative incumbents would think that's a

3  safe margin, yes.

4  Q    Dr. Hood, in performing your functionality analysis or any

12:23:48 5  other -- would -- let me reframe that.  Withdrawn.

6        Dr. Hood, when considering elections in this case on which

7  you based your opinions, how did you go about picking the

8  elections that you picked?

9  A    Well, I picked recent elections that were conducted

12:24:04 10 statewide that were contested, as well.  Again, if you have a

11 statewide election, you can reconfigure it in any district you

12 want to, including districts that may or may not be in

13 existence.

14       So, again, the top of the ticket, most recent, statewide

12:24:22 15 elections in the past two election cycles, Governor and

16 President, if there was time, there could have been more done,

17 certainly.  Other elections could have been analyzed.  But I

18 viewed these as pretty probative in terms of trying to get a

19 fix or an idea of how these districts would perform out in the

12:24:43 20 future.

21 Q    And, Dr. Hood, given more time, would you review more

22 elections?

23 A    Certainly, I could have run more elections with more time,

24 yes.

12:24:57 25       MR. SMITH:  Your Honor, may have just a moment?

```
 1                JUDGE MARCUS:  You sure can.
 2  BY MR. SMITH:
 3  Q    Dr. Hood, one or two more questions.  Do you recall being
 4  asked about whether the core preservation factor was in the
12:26:08  5  redistricting guidelines before 2020, or 2021?
 6  A    Yes.
 7  Q    And have you reviewed the reapportionment redistricting
 8  guidelines from 2000 to know whether they were included in
 9  those guidelines?
12:26:24 10  A    I can't remember having ever looked at that document.
11  Q    Okay.
12                MR. SMITH:  Your Honor, nothing further from us.
13                JUDGE MARCUS:  All right.  Any questions, Judge
14  Manasco or Judge Moorer?
12:26:37 15                JUDGE MANASCO:  None from me.
16                JUDGE MOORER:  None from me.
17                JUDGE MARCUS:  All right.  Anything further for this
18  witness?
19       All right.  Seeing none, we thank you, Dr. Hood, and you
12:26:49 20  are excused.
21                THE WITNESS:  Thank you, Your Honor.
22                JUDGE MARCUS:  I take it we're going to go back to the
23  plaintiffs' case when we come back after lunch.
24       We talked about your expert from Caster would be the next
12:27:07 25  witness?
```

```
 1                 MS. MADDURI:  That's right, Your Honor.

 2                 JUDGE MARCUS:  That would be Dr. King.

 3                 MS. MADDURI:  Correct.

 4                 JUDGE MARCUS:  Do you have any other witnesses that

12:27:17 5  you are planning to call?

 6                 MS. MADDURI:  We have one other witness who is a

 7  plaintiff in the case, Mr. Caster.

 8                 JUDGE MARCUS:  All right.  And does that complete the

 9  presentation by all of the plaintiffs?  There would be nothing

12:27:31 10 further from Milligan or Singleton, I take it?

11                 MR. BLACKSHER:  Nothing further --

12                 JUDGE MARCUS:  Thank you.  Same thing for Milligan,

13  counsel?

14                 MS. GBE:  Yes, nothing further from Milligan.

12:27:44 15                 JUDGE MARCUS:  All right.  So then we will turn to

16  Mr. Davis to the rest of your case.

17            Who do you have lined up, just trying to get of sense of

18  whether we will get it in today or we'll go into tomorrow?

19                 MR. DAVIS:  We intend to call Bradley Byrne, former

12:28:04 20 Congressman Bradley Byrne, Your Honor, again assuming his

21  schedule permits.  We will have to see when we get there.

22                 JUDGE MARCUS:  Gotcha.  That would be the only one?

23                 MR. DAVIS:  Correct.

24                 JUDGE MARCUS:  Just so you're clear, originally, you

12:28:16 25 indicated that you might be calling the map drawer, the
```

```
 1   cartographer Hinaman.  He has been fully deposed.  I take it
 2   you are not planning to call him.
 3              MR. DAVIS:  We do not plan to call him, Your Honor.
 4   His deposition is in the record.
 5              JUDGE MARCUS:  Yes.  Yes, it is.
 6        All right.  With that, it's 12:28 your time.  We will
 7   proceed, then, at 1:30 Central Standard Time, 2:30 Eastern
 8   Standard Time with the Caster -- the rest of the Caster case.
 9        Thank you all.  We will see you in about an hour.
10              (Recess.)
11              JUDGE MARCUS:  I take it the parties are ready to
12   proceed?  Caster I take is next?
13              MR. OSHER:  That's right, Your Honor.
14              JUDGE MARCUS:  All right.  Mr. Osher, you will be
15   calling Bridgett King, correct?
16              MR. OSHER:  Yes, that's right.
17              JUDGE MARCUS:  All right.  Thank you much.
18        Ms. King, if you will raise your right hand.
19                          BRIDGETT KING,
20   having been first duly sworn, was examined and testified as
21   follows:
22              JUDGE MARCUS:  Thank you very much.  If you will state
23   your name for the record, please.
24              THE WITNESS:  Sure.  Bridgett King.
25              JUDGE MARCUS:  Thank you, Ms. King, and you may
```

Timestamps:
12:28:30 (line 5)
12:28:52 (line 10)
13:29:47 (line 15)
13:29:56 (line 20)
13:30:14 (line 25)

```
 1   proceed with your examination.
 2           MR. OSHER:  Thank you, Your Honor.
 3                      DIRECT EXAMINATION
 4   BY MR. OSHER:
 5   Q    Good afternoon, Dr. King.
 6   A    Good afternoon.
 7   Q    Thanks for being with us today.  Can you hear me okay?
 8   A    Yeah.  Can y'all hear me?
 9   Q    I think that works.
10           MR. OSHER:  Your Honor, does that work?
11           JUDGE MARCUS:  Yes.  We hear you fine.
12   BY MR. OSHER:
13   Q    All right.  Dr. King, you have been retained as an expert
14   for the by the Caster plaintiffs; isn't that right?
15   A    That's correct.
16   Q    Okay.  I would like to refer your attention to what's been
17   admitted as Plaintiffs' Exhibit 80, which I believe you have in
18   front of you, which is currently shown on the screen.  Is this
19   the initial report that you submitted for the plaintiffs in
20   this case?
21   A    Yes.
22   Q    Thank you.  And looking at the page after page 56 of that
23   initial report, is that a copy of your current resume?
24   A    Yes.
25   Q    We can go ahead and take that down.  Thank you.
```

13:30:22 — line 5
13:30:33 — line 10
13:30:43 — line 15
13:31:01 — line 20
13:31:12 — line 25

```
 1          Let's start with your background, Dr. King.  Can you
 2     please give us a brief overview of your educational history?
 3     A    Sure.  I have a bachelor's degree in psychology from
 4     Hampton University, which I earned in 2003.  A master's degree
 5     in justice studies, which I earned from Kent State University
 6     in 2006, and a Ph.D. in political science also from Kent State
 7     University, which I earned in 2012.
 8     Q    Can you tell us about your dissertation at Kent State?
 9     A    Sure.  So my dissertation was in analysis that looked at
10     the way state policies impact the voter turnout of
11     African-Americans from 2008 to -- great -- 2008 to -- 2006 to
12     2012.  I haven't looked at it in a while.
13     Q    Fair enough.  What sort of policies did you look at?
14     A    Sure.  My dissertation considers things like election day
15     registration, the severity or strictness of enforcing a voter
16     ID law requirements, variations in felony disenfranchisement
17     statutes that exist in the states, things like the number of
18     days prior to an election that one must register, days for
19     early voting, thing like that.
20     Q    Great.  And just to be clear, that focused on the impact
21     of voters who are black; isn't that right?
22     A    Yes, specifically focused on voter turnout among black
23     Americans, yes.
24     Q    So after you received your dissertation at Kent State,
25     what did you do after that?
```

```
 1  A    After completing my dissertation, I spent a year at the
 2  Brennan Center for Justice at NYU as a voting rights
 3  researcher.
 4  Q    What sort of work did you do at the Brennan Center?
 5  A    So at the Brennan Center, we worked on a variety of
 6  projects that directly related to different issues surrounding
 7  the 2012 election.  So we did a collaborative multi-state
 8  survey with common cause.  I also did some work that looked at
 9  the allocation of resources and how that is connected to
10  demographics in different precincts and polling locations in
11  Florida.  Broadly, though, I along with the other voting rights
12  researchers were there to just support through social science
13  research any of the projects they might have been working on.
14  Q    Great.  And I'm showing this as much a reminder for me as
15  is for you, but if we can try to talk slowly so the court
16  reporter can take it all down, we would appreciate it.
17  A    I will slow down.
18  Q    So after your year at the Brennan Center, where did you go
19  after that?
20  A    I was a visiting instructor at Valdosta State University
21  in Georgia.
22  Q    What did you teach there?
23  A    While at Valdosta, I taught sort of a general American
24  government course.  I also taught public opinion.  And I taught
25  research methods, which I also taught while I was in grad
```

13:33:05 (line 5)
13:33:26 (line 10)
13:33:45 (line 15)
13:33:57 (line 20)
13:34:12 (line 25)

1503

```
 1   school.
 2   Q    Gotcha.  And then after Valdosta State, where did you go
 3   after that?
 4   A    After Valdosta, I accepted my job at Auburn University
13:34:25  5  where I currently work.
 6   Q    How long have you been at Auburn now?
 7   A    I have been at Auburn since the 2014-2015 academic year.
 8   Q    Great.  And what's your current position at Auburn?
 9   A    I am an associate professor with tenure in the department
13:34:39 10  of political science and also the director of the master public
11   administration program.
12   Q    What classes have you taught and teach -- currently teach
13   at Auburn?
14   A    So at the undergraduate level, American government.  I
13:34:56 15  also have taught a class called state and local government that
16   has been revised and now wholly focuses on states.  I taught
17   classes in political participation, the legislative process,
18   which primarily focuses on Congress, but also state
19   legislatures.  I've done independent studies that focus on
13:35:15 20  felony disenfranchisement and election administration.  I think
21   that's it.
22       At the graduate level, I have taught a comparative state
23   politics class.  I also have -- currently teach our seminar in
24   public administration and public service.  I have taught our
13:35:37 25  diversity and public life course.  I taught a policy analysis
```

course.  I also teach some classes that involve both grad

students and undergraduate students around special topics

issues.  So, for example, this past spring, I taught a class

called the politics of pandemics with one of my colleagues.  We

13:35:56  looked at government response, both domestically and

internationally.  And I taught a class also last spring about

black identity and institutions historically in the United

States.

Q    So turning now to your scholarships.  Have you published

13:36:14  literature on the subject of voting?

A    Yes.

Q    And can you tell us a little bit about that?

A    So an example of my scholarship on voting specifically

related to political participation, and I have published an

13:36:28  article that focuses on the effects of felony

disenfranchisement.  So the rate of felony disenfranchisement

in the states and how that impacts the voter turnout of

African-Americans.  I also do some work that looks more

directly at how or how -- what citizens experience when they go

13:36:51  to cast a ballot, how these interactions affect their

confidence in the electoral process.  So disposition of their

ballot, ballots in their community, ballots across the country.

I also have looked at how certain variations and access to

voting and registration information online and the state of

13:37:16  Alabama.  So those are primarily journal articles.

          1    But I have also coedited several books.  And so one that I
          2  edited by myself focuses -- how do I say this -- it's kind of a
          3  history of voting more broadly.  So starting with early America
          4  and then ending in 2016, where I wrote essays over -- I think
13:37:44  5  it was eight time periods that sort of focus on what was
          6  happening in terms of the evolution of voting rights in the
          7  United States, and then those essays are supplemented with some
          8  copies of the original documents that I discuss this these
          9  essays for reference.
13:38:00 10    With some of my colleagues at Auburn, I also have worked
         11  on -- edited books that specifically focus on election
         12  administration, what it looks like now, and what it will look
         13  like in the future.  That includes working with academics
         14  outside of Auburn University and also election administration
13:38:17 15  practitioners from across the United States.
         16    And then lastly, I coedited a book that is about the
         17  causes and consequences of the decision to participate or not
         18  participate in the context of the United States.
         19  Q    And you touched on this before, but that does that
13:38:37 20  scholarship often discuss the influence of race on voting
         21  behavior?
         22  A    Yes.
         23  Q    And has your scholarships specifically touched on the
         24  history of voting in Alabama?
13:38:49 25  A    Both directly and indirectly.  So I would say through a

1506

```
 1   lot -- so when talking about sort of current realities, history

 2   is deeply embedded in that.  And so specifically when talking

 3   about the evolution of voting rights, obviously, there are some

 4   discussion of Alabama.

 5       I would also say in that text that I mentioned earlier,

 6   the edited text that goes from early America to 2016, I would

 7   argue there's a considerable discussion specifically about the

 8   state of Alabama along with the Deep South more general.

 9   Q   And in the process of performing that research, have you

10   become familiar with Alabama's history of voting and

11   discrimination in voting?

12   A   Yeah.  I would say along with the process of performing

13   that research and living here and teaching students who are a

14   lot from Alabama, they ask questions, and I like to be in a

15   position to answer them.

16   Q   All right.

17           MR. OSHER:  Your Honor, at this point, I tender

18   Dr. King as an expert in the fields of political science,

19   research methodology, history of voting, and elections in the

20   United States and Alabama, voting behavior, and the matters

21   discussed in her reports.

22           JUDGE MARCUS:  Is there any challenge to Dr. King's

23   expertise from the state?

24           MR. BOWDRE:  No, Your Honor.

25           JUDGE MARCUS:  All right.  Seeing no challenge, we
```

1    will qualify Dr. King as an expert in each of the fields,

2    Mr. Osher, that you have identified, and you may proceed with

3    her as qualified.

4              MR. OSHER:   Thank you, Your Honor.

13:40:30   5    BY MR. OSHER:

6    Q    Dr. King, we looked at your initial report in this case.

7    Let's now turn to your rebuttal report, which has been admitted

8    as Plaintiffs' Exhibit 81.  And that is, in fact, your rebuttal

9    report that you submitted in this case?

13:40:50   10   A    Yes.

11   Q    Now, as to both of -- both of the reports that we

12   discussed, have you changed your opinions or conclusions in any

13   way since you signed them?

14   A    No.

13:40:58   15   Q    Okay.  Can you please briefly describe the materials you

16   reviewed in creating your expert reports?

17   A    Sure.  So I reviewed academic journal articles, also law

18   articles, and relevant texts, some data from state websites,

19   state organizations, and other relevant non-state entities,

13:41:26   20   non-profit organizations, for example, that would have relevant

21   data.  I looked at some news articles, some exit polls surveys,

22   I think that's about it.

23   Q    Do you use these sources that you have identified

24   routinely in your scholarship?

13:41:47   25   A    Yes.

1   Q     And is it usual for political scientists generally to use

2   these sources in their scholarship?

3   A     I would say yes.

4   Q     Okay.  Could you please explain what the attorneys for the

13:41:59 5   Caster plaintiffs asked you analyze for purposes of creating

6   your initial report?

7   A     Yes.  So I was asked to write a report that was responsive

8   to several of the Senate Factors.

9   Q     And can you tell us what your understanding is regarding

13:42:15 10   what the Senate Factors are and where they come?

11   A     Sure.  So the role of the Senate Factors is to provide a

12   more holistic sort of overview of circumstances and/or

13   conditions in the state that might be discriminatory when

14   trying to make a decision about discrimination related to

13:42:39 15   political participation, or equal access to participation I

16   should say.

17   Q     And it's not your understanding that this is going to show

18   intentional discrimination with respect to the policy being

19   challenged in this case, right?

13:42:52 20   A     That's my understanding.

21   Q     Is it common for political scientists to become familiar

22   with relevant people authority, such as cases, statutes, and

23   legislative history when they are engaging in scholarship like

24   this?

13:43:07 25   A     I would say yes.

```
 1  Q     And do you often incorporate those sort of legal sources

 2  into your work?

 3  A     Yes.  And so as an example, I have an article that looks

 4  at the role that race plays when voters go to cast a ballot in

 5  a foreign location.  So looking at same race interactions in

 6  polling locations, and that article, for example, references

 7  the Graddick case, so I would say, yes, it's fairly reasonable.

 8  Q     And the Graddick case you are referencing there, that is a

 9  federal court decision in Alabama regarding the people who work

10  at the polls?

11  A     Yes.

12  Q     All right.  Dr. King, did you have an opportunity to

13  observe Dr. Bagley's testimony presented by the Milligan

14  plaintiffs?

15  A     I did.

16  Q     And is it your understanding that Dr. Bagley also analyzed

17  the Senate Factors just as you did?

18  A     It is.

19  Q     Okay.  Do you generally -- did you generally agree with

20  the substance of his testimony?

21  A     Generally, yes.

22  Q     And in your independent analyses of each of the Senate

23  Factors, did you ultimately reach the same conclusions that he

24  did?

25  A     Yes.
```

1    Q    So rather than cover the same topics that Dr. Bagley

2    discussed in his testimony, I would like to focus on the areas

3    where your reports do not overlap.

4         So we're going to go ahead and start with Senate Factor 2.

13:44:28  5         So if I can direct your attention to the discussion of

6    Senate Factor 2 in your initial report, which starts on page

7    23.

8             MR. OSHER:  And, Jeff, you can go ahead and take it

9    down.  And I will let you know if we want to pull anything up

13:44:50 10   specifically.  Thank you.

11   BY MR. OSHER:

12   Q    So starting with paragraph 65, am I correct that you were

13   not asked to measure the extent to which black and white voters

14   in Alabama vote in a polarized manner?

13:45:04 15   A    That is correct.

16   Q    Okay.  And in looking at paragraph 65, you write, quote,

17   below, however, I discuss how racial attitudes and racialized

18   politics drive the historical and ongoing polarization among

19   black and white Alabamians.  Did I read that right?

13:45:19 20   A    Yes, that is correct.

21   Q    So what is your opinion as to whether racial attitudes and

22   racialized politics play a role in the polarization among black

23   and white voters in Alabama?

24   A    They do play a role.

13:45:36 25   Q    So based on your work studying voting in Alabama as well

1  as your election administration work in the state, is there a

2  general trend as to whether black and white voters support

3  different political parties today?

4  A    Yes.  Black voters overwhelmingly identify with the

13:45:54 5  Democratic Party and white voters the Republican Party.

6  Q    And I will direct your attention to paragraph 66 through

7  paragraph 75.

8       To what extent is this partisan alignment that you have

9  just identified between black and white voters the result of

13:46:17 10  positions that those parties have taken on issues specifically

11  relating to race?

12  A    Can you repeat that question?

13  Q    Sure.  You stated that it is your understanding that in

14  Alabama, blacks -- black voters overwhelmingly support the

13:46:33 15  Democratic Party and white voters support the Republican Party?

16  A    Uh-huh.

17  Q    Starting at page or paragraph 68 in your report, you begin

18  to outline the history of how that has come to be.  Can you

19  just give us a general overview of what that history is?

13:46:49 20  A    Sure.

21       So if we look to Reconstruction, specifically, and the

22  following Emancipation Proclamation more broadly, what

23  historically you see is African-American s aligning themselves

24  with Republican Party, which we might refer to as the party of

13:47:10 25  Lincoln.

1    What you do, though, see, is specifically surrounding or
2  -- the New Deal as one sort of focusing event, you begin to see
3  a realignment, particularly through the New Deal, black
4  Americans had access to public spaces that they hadn't had
13:47:30  5  access to before.  And they also had opportunities to
6  participate in ways that didn't necessarily exist.  And so even
7  though the New Deal wasn't explicitly about providing redress
8  for some of these racial inequities, it did create
9  opportunities for black Americans to participate in ways that
13:47:52 10  they hadn't participated before.
11    And so basically then you begin to see black Americans
12  aligning themselves with the Democratic Party.  And so we begin
13  to talk about sort of this realignment that occurs over time.
14    If you jump ahead a little bit, which you then see is sort
13:48:14 15  of the next focusing event as we might call it in political
16  science or series of focusing events.  So the signing of the
17  Civil Rights Act in 1964, and the Voting Rights Act in 1965,
18  that also act as a catalyst towards pushing black Americans
19  increasingly towards identifying as Democrats and with the
13:48:37 20  Democratic Party.
21    And that also occurs because the Democratic Party
22  specifically -- particularly northern Democrats, but the
23  Democratic Party begins to take positions that are advantageous
24  and create a more special justice and access in Civil Rights --
13:48:58 25  progressive Civil Rights positions that would improve the

1513

1   living conditions of African-Americans in the United States.

2         At the same time, as those positions are coalescing and

3   forming within the Democratic Party, you see some white voters,

4   particularly those who are white voters in the South who also

13:49:21  5   were affiliated with the Democratic Party beginning to slowly

6   shift their party identification towards the Republican Party

7   as those issues around race sort of coalesce in the ways we

8   understand them today.

9   Q    And at the end there, you described white voters starting

13:49:42 10   to move to the Republican Party.  Can you tell us -- and I am

11   looking specifically at paragraph 72 and 73.  Can you tell us

12   about the -- I'm sorry -- paragraph 73 actions by the

13   Republican Party that were to hasten that realignment among

14   white voters to the Republican Party?

13:50:03 15   A    Sure.  So one of the things that the Republican Party did

16   as a way to attract sort of these potentially new supporters,

17   was to engage what I think and what I called reactionary

18   politics, reactionary racial politics where you -- so let me

19   back up a little bit.

13:50:26 20         So you can kind of think about it as constant battles over

21   sort of who has the right to access power in public spaces.

22   And so what you tended to see is as in this case as

23   African-Americans being more access to public places and spaces

24   in political power, which they had formerly been denied, you

13:50:48 25   see the Republican Party actively working to, I guess create

1514

1  road blocks to limit the capacity of these newly enfranchised

2  -- not newly enfranchised, but these individuals to continually

3  and increasingly have access to power.

4  Q    And when you're referring to these individuals, you are

13:51:10  5  referring to black Americans?

6  A    Sorry.  Yes.  Black Americans.  Apologies.

7  Q    No problem.

8       Okay.  And let's actually flip to paragraph 130, which is

9  on page 46 of your initial report.  And there you identify

13:51:32  10  something called the Southern Strategy.  Can you tell us what

11  that was?

12  A    Yeah.  So the Southern Strategy you could basically

13  articulate it that it was a posture that used racialized

14  messaging to communicate an openness or welcomeness for these

13:51:53  15  disaffected voters who formerly identified with the Democratic

16  Party, or were decreasingly, I should say identifying with the

17  Democratic Party in the South.

18  Q    And, again, just to be clear, there you are referring to

19  white voters in the Democratic Party?

13:52:09  20  A    Yes, I was talking about -- sorry.

21  Q    That's okay.  Who alienated by the Democratic Party's

22  embrace of Civil Rights litigation?

23  A    Yes.  That is the population of individuals I am

24  referencing in that statement.

13:52:24  25  Q    And in paragraph 130, you note, quote, that the strategy

```
 1   -- I'm sorry -- the strategy, quote, dictated a posture of the

 2   denying neglect towards the aspirations of black Americans, end

 3   quote.  Can you explain what you mean by that?

 4   A    Yeah.  So one way to think about benign neglect is sort of

 5   a position of indifference, where one acknowledges that there

 6   are differences in the way people experience government or the

 7   power that they have or their ability to participate

 8   politically or access, you know, government in public spaces.

 9   And basically, not actively working towards doing anything to

10   facilitate or present yourself as being affiliated with efforts

11   that might provide those individuals with a greater ability or

12   enhanced ability to access and realize that right.

13   Q    So sort of an intentional neglect, if that makes sense?

14   A    You could put it that way, yes.

15   Q    But this strategy was a clear direct appeal towards white

16   voters who had been alienated by the Democratic Party based on

17   its stance on racial issues?

18   A    That is correct.

19   Q    Okay.  In paragraph 133, you identified a concept that you

20   called the Long Southern Strategy.  Can you tell us what that

21   is?

22   A    Sure.  So the Long Southern Strategy is very much a

23   rebranding of the original southern strategy that we just

24   talked about previously.  But the Long Southern Strategy takes

25   into consideration the ways in which or how words have to be
```

```
 1  modified or presented in a different way, perhaps a way that is

 2  more subtle because some of the language that was used

 3  historically would not be accepted today.

 4  Q    And the Long Southern Strategy is something that political

 5  scientists today largely affiliate with the Republican Party;

 6  is that right?

 7  A    That is correct.

 8  Q    Okay.  This coded and subtle language that you referred

 9  to, do political scientists sometimes all this language dog

10  whistles?

11  A    Yes.

12  Q    Can you sort of explain what that term means?

13  A    Sure.  So if you think about a dog whistle in the formal

14  sense that you use for an actual dog, it is a whistle that

15  emits a high pitch sound that only a dog can hear.  If we think

16  about dog whistles in the political context, they are words

17  that are communicated, which for people who are not necessarily

18  meant to hear them or embrace them, they might just sound like

19  a phrase.  But for other individuals, they communicate

20  something more specific.

21  Q    Can you give us some examples of dog whistles as they

22  would be recognized by political scientists?

23  A    Sure.  I would probably say one of the oldest examples of

24  a dog whistle is the term welfare queens, which I imagine a lot

25  of people are familiar with.
```

Line timestamps: 13:54:31 (line 5), 13:54:45 (line 10), 13:54:59 (line 15), 13:55:19 (line 20), 13:55:40 (line 25)

1    Some more contemporary dog whistles might be the use of

2  law and order, inner city, those are the only two I can think

3  of right now.

4  Q    Would tough on crime be considered a dog whistle by

13:56:09  5  political scientists?

6  A    Possibly, yes.

7  Q    What about references to people changing the country?

8  A    Possibly, yes.

9  Q    What about references to returning our country to the way

13:56:21 10  it was in the past?

11 A    Possibly, yes.

12 Q    And references to us versus them?

13 A    Yes.

14 Q    In paragraphs 134 through 140 of your report, you refer to

13:56:35 15  a series of statements by candidates and officeholders that you

16 refer to as racial appeals.  Do the statements that you

17 identify there fit within the strategy that we have been

18 discussing?

19 A    Yes.

13:56:51 20 Q    Do you happen to know specifically in Alabama when the

21 realignment that we have been discussing fully solidified?

22 A    2010.

23 Q    I'm sorry.  Was that 2010?

24 A    I'm sorry.  2010.

13:57:08 25 Q    Gotcha.  What was notable about that election?

1518

```
 1  A    The -- there were considerable gains in the Republican
 2  Party in the state Legislature.
 3  Q    And in terms of timing, you know, what happened in the
 4  2008 election that would have been relevant to that -- the
13:57:25  5  completion of that realignment?
 6  A    Oh, Barack Obama was elected President.
 7  Q    And 2010 was the first --
 8  A    It was the first -- yes.  The 2010 election was the first
 9  election, midterm election after he was elected.
13:57:45 10  Q    So I want to take a step back.
11       Just to be clear, your opinion is not asserting that this
12  evidence suggests that anyone who affiliates with the
13  Republican Party is motivated by racial bias.  That's not your
14  testimony, right?
13:58:01 15  A    Absolutely not.
16  Q    You are not asserting -- I'm sorry.  But instead, that
17  race plays a material role in partisan politics today?
18  A    Yes.
19  Q    And that is the case in Alabama?
13:58:14 20  A    Yes.
21  Q    I am now going to ask you to turn to your rebuttal report.
22  And I will direct your attention to paragraph 23, and that
23  starts on page 7 of your rebuttal report.  I am actually going
24  to have you go to page 8 which lists a series of survey
13:58:40 25  results.  Can you tell us what those results indicate?
```

```
 1  A    Sure.  The survey results you just had me turn to indicate
 2  that on issues related to race, there are vast differences
 3  between the opinions of individuals who are Democrats and
 4  Democrat leaders and Republican and Republican leaders.
13:59:02  5  Q    Uh-huh.  And so these survey results indicate a wide gap
 6  in views on issues relating to race between the two major
 7  parties?
 8  A    Yes.
 9  Q    And the surveys that you identify here, are these national
13:59:19 10  surveys?
11  A    Yes.
12  Q    Okay.  Is there any reason why you didn't provide Alabama
13  specific survey results?
14  A    The only reason is I didn't have access to any, and when
13:59:32 15  doing my research, I couldn't find any.  Otherwise, I would
16  have used them.
17  Q    Gotcha.  From a political science perspective, do national
18  politics today drive partisan affiliation at the state level?
19  A    Yeah.  I mean, partisan leads at the national level often
13:59:48 20  regularly -- I would just say consistently signal to
21  individuals where the party stands on a variety of different
22  issues, or where a party, I should say, stands on a variety of
23  issues.
24  Q    Gotcha.  Okay.
14:00:03 25       MR. OSHER:  Jeff, I am going to ask you to pull up
```

1  Caster Plaintiffs' Exhibit 90, and specifically, go to

2  transcript pages 1 -- page 105.

3  BY MR. OSHER:

4  Q    And looking at lines 10 through 23, Dr. King, this is a

14:00:24  5  transcript of the deposition of Senator Jim McClendon, who was

6  a co-chair of the Alabama Permanent Legislative Committee --

7  Legislative Redistricting Committee.  I apologize if I got that

8  wrong.

9        Do you see the text there?

14:00:39 10  A    I do.

11  Q    All right.  I am going to go ahead and just read this into

12  the record.

13        Question:  Based on your 19 years serving in the

14  Legislature, in your view, do the views of the members of the

14:00:49 15  Democratic Party in Alabama generally differ from the members

16  of the Republican Party in Alabama when it comes to the issue

17  of removing Confederate monuments from public spaces?

18        Answer:  You know, I think if you make that broad and say

19  generally, I think I can agree with that statement.  There are

14:01:05 20  definitely exceptions.  But I think with the general in there,

21  I can say I generally agree with your statement.

22        Question:  So the answer to my question was yes?

23        Answer:  Yes.

24        MR. OSHER:  Jeff, if we can now go to page 109,

14:01:19 25  specifically lines 6 through 17.

```
        1   BY MR. OSHER:

        2   Q    And to save time here, I am going to represent to you,

        3   Dr. King, that in this portion of the deposition, Senator

        4   McClendon agrees that there are differing views generally among

14:01:40  5   Democrats and Republicans in Alabama when it comes to criminal

        6   justice reform.  Do you see that there?

        7   A    I do.

        8   Q    And then let's go to transcript page 110.

        9        Looking at lines 14 through 20.  And here again, I will

14:02:02 10   represent to you that Senator McClendon agreed that there were

       11   general differences between Democrats and Republicans on the

       12   issue of whether there is a significant amount of

       13   discrimination against black residents of Alabama.  Do you see

       14   that?

14:02:14 15   A    Yes.

       16   Q    Okay.  Caster Plaintiffs' Exhibit 89 is a transcript of

       17   the deposition of Representative Chris Pringle, who also was

       18   the other co-chair of that committee.  And I will represent to

       19   you -- actually I am sorry.  Let's go to page 124 of that

14:02:33 20   deposition.

       21        And I will read the question.  And just to clarify, you

       22   are saying that there's a difference between the general views

       23   of the Democratic Party -- members of the Democratic Party and

       24   members of the Republican Party when it comes to criminal

14:02:56 25   justice reform.
```

1    Answer:  There could be, yes.

2    Did you see that there?

3 A    Yes.

4 Q    Okay.  And then let's go to page -- the same page starting

14:03:05 5 at line 20 through the end of the page to line 2 of the next

6 page.  And I will represent to you that -- that Representative

7 Pringle also agreed that there were general differences between

8 Democrats and Republicans in Alabama on the issue of whether

9 there is a significant amount of discrimination against black

14:03:33 10 individuals of the state.  Do you see that there?

11 A    Yes.

12 Q    The conversations that I have just shown to you are

13 specific to Alabama.  Are those consistent with what the survey

14 results that you have in your report here, are they consistent

14:03:55 15 with those results?

16 A    Yes.  I would say they align with the national survey

17 results that are reported in my reports.

18 Q    Okay.  Thanks.  So from the perspective of a political

19 scientist, does the fact that black and white voters prefer

14:04:14 20 different parties exclude the possibility that those voters are

21 motivated by considerations relating to race?  I think you

22 might have cut out.  Can you say your answer again?

23 A    Oh.  Sorry.  I said no.

24 Q    And in light of the discussion above, is it your opinion

14:04:31 25 that racial attitudes and racialized politics do, in fact,

1  influence the division and partisan affiliation among black and

2  white voters in Alabama?

3  A    Yes.

4  Q    Okay.  Let's stay with your rebuttal report here.  And I'd

14:04:47  5  like to take a step back starting at page 17 -- I'm sorry --

6  paragraph 17, page 5.

7       And I am looking at the section Roman Numeral II(a)

8  support for black candidates among white Republican voters.  Do

9  you see that?

14:05:06  10  A    I do.

11  Q    Okay.  Can you tell us generally what the plaintiffs'

12  attorneys asked you to do in this section of your rebuttal

13  report?

14  A    Yes.

14:05:16  15       So Dr. Hood made an assertion in his report that ideology

16  trumps race in the case of white Republicans and their support

17  of GOP minority candidates, specifically citing an article he

18  published with Mr. McKee.

19  Q    And in paragraphs 18 and 19, you provide a response to

14:05:41  20  that assertion.  Can you tell us what that response is?

21  A    Yes.  So two things:  First, the report -- not the report

22  -- sorry.  The paper does not explicitly focus on elections in

23  Alabama.  And furthermore, the report in its assessment of

24  white Republican willingness to vote for non-white or minority

14:06:07  25  GOP candidates uses a measure that clusters individuals from

```
 1  three different racial groups into one category of -- I think
 2  it's non-minority -- of minority.  Excuse me.  And so it
 3  doesn't explicitly evaluate the willingness of white
 4  Republicans to vote for a black Republican, nor -- so -- nor
 5  does it articulate any conditions under which such a vote might
 6  occur.
 7  Q    And so in your view, does Dr. Hood's article tell us
 8  anything about whether racial considerations or racialized
 9  politics influence voting behavior among white Republicans?
10  A    In Alabama, no.
11  Q    Or generally?
12  A    Can you ask me that again?
13  Q    Sure.  That's fine.  We will go on.
14       So starting at paragraph 20, if a white voter votes for a
15  black candidate, does that exclude the possibility that that
16  voter is motivated by biased racial attitudes?
17  A    No.  So -- so the thing we have to consider, and, you
18  know, it's very clearly articulated by scholars Jefferson and
19  Tessler (phonetic) is that a white conservative voter or white
20  Republican voter voting for a black or non-minority candidate
21  in itself does not necessarily mean that that individual is not
22  making or does not harbor or is not motivated any racial
23  considerations.
24       So one of the things that they point to is that it's not
25  necessarily a blackness into itself that is the issue.  But it
```

14:06:29  5
14:06:46 10
14:07:08 15
14:07:33 20
14:07:54 25

1  is a specific manifestation or type of blackness that

2  individuals are not willing to support.

3       And so that would be someone who is black and actively

4  advocates for policies that would improve the lives of other

14:08:22  5  African-Americans.  It would be a candidate who -- who -- it

6  would be a candidate who won't engage in policies that will

7  append or work to change sort of the racial hierarchy that has

8  been supported historically by the parties since realignment.

9       So it's not a black candidate, per se, but a specific

14:08:50  10  manifestation of blackness that a candidate might present.

11       Also included in their analysis is an example where they

12  look at white voters for their support for Ben Carson or Jeb

13  Bush and the level of -- I think it's racial resentment -- or

14  belief that -- excuse me -- the belief that black voters have

14:09:17  15  too much influence or U.S. politics.  And what they actually

16  found is there is a relationship between people who are high on

17  that scale and their likelihood of voting for Carson.  And so

18  what that basically means is individuals who had higher support

19  for the assertion that black Americans have too much influence

14:09:38  20  on U.S. politics were actually more likely to vote for Ben

21  Carson, who himself is a black man.

22  Q    And that was also the case for those who harbored the

23  overtly prejudiced view that most African-Americans are more

24  violent than most whites?

14:09:54  25  A    According to the research, yes.

```
 1   Q    Now, this specific example that you are providing, this
 2   was not Alabama specific.  This was --
 3   A    No.  Right.  This is the -- this data come from the
 4   American National Election Study, which is a national study.
 5   It is not specifically about Alabama.
 6   Q    Gotcha.
 7        All right.  Let's turn to Section 2-B of your rebuttal
 8   report which starts on page 9.  Can you explain to us what --
 9   what the Caster plaintiffs' attorneys asked you do here?
10   A    Sure.  Also in Dr. Hood's report following the discussion
11   of his article with Dr. McKee, there was a -- I don't want to
12   call it a note, but there was some information that referred to
13   the election of Kenneth Paschal, whose last name I may not be
14   saying correctly, communicating or suggesting it was evidence
15   of the willingness of white Republicans to vote for a black
16   candidate or black Republican.
17   Q    Gotcha.  I'm sorry to -- stop right there.
18        MR. OSHER:  Frankie or whoever has control, it looks
19   like someone has accidentally turned on their video.  Could I
20   have -- is it possible for someone to just forcibly mute that?
21        Thank you.
22   BY MR. OSHER:
23   Q    Okay.  So your -- so you were looking at Dr. Hood's
24   identification of Mr. Paschal's victory in 2021, and the
25   suggestion that that tells us something about white voters'
```

14:10:10 (line 5)
14:10:29 (line 10)
14:10:57 (line 15)
14:11:13 (line 20)
14:11:33 (line 25)

1527

```
 1  willingness to support black candidates, right?
 2  A    Yes.
 3  Q    Okay.  I am going to have you go --
 4        MR. OSHER:  And, Jeff, if you can pull this up, this
14:11:46 5  is the last page of your rebuttal report, which is Plaintiffs'
 6  Exhibit 81.
 7  BY MR. OSHER:
 8  Q    And the last sentence before the three numeral signs
 9  starting with using this example.  Can you read that last
14:12:07 10  sentence for us?
11  A    Yes.  Using this example to extrapolate any conclusion
12  about white voting behavior in Alabama would be scientifically
13  unsound.
14  Q    So from a political science methodology perspective, if
14:12:21 15  you were analyzing voting patterns at the congressional
16  district or state level in Alabama, would you rely on this
17  single election to reach any conclusion?
18  A    No.
19  Q    Can you tell us why that is?
14:12:34 20  A    Sure.  I mean, I think the scholarship that I just
21  mentioned by Drs. Jefferson and Tessler points to the need to
22  -- if you want to understand sort of what considerations go
23  into -- in this case, the willingness of white conservatives or
24  white Republicans to vote for a black Republican, you need to
14:12:59 25  understand who those voters are so their racial demographics
```

1    and also what sort of ideas they harbor or have about
2    African-Americans.
3        Further, it's one election.  And so that's -- it's one
4    election.  It is a small election.  And so while it -- and
14:13:22 5    because of that, it isn't really necessarily generalizable to
6    what white Republicans across the state might actually do.  And
7    so that is in part why I went about putting together this
8    table.  Because one thing I was interested in better
9    understanding, in terms of sort of a broader landscape of what
14:13:45 10   white Republicans support for black Republican candidates look
11   like was to consider other elections beyond that specific
12   election that we just had.
13   Q    And just -- I'm sorry.  Are you referring to the table on
14   pages 10 and 11 of your rebuttal report?
14:14:03 15   A    Sorry.  Yes.  The tables on pages 10 and 11.
16   Q    I'm sorry.  Go ahead.  I didn't mean to interrupt.
17   A    And so through a review, I would say, of more elections
18   beyond that specific one, and looking at successes of black
19   Republican candidates for a wide variety of races, when they
14:14:24 20   were running in primary elections where there were challengers,
21   my argument would actually be that in the case of the specific
22   election, so the Paschal election, his victory is more an
23   exception than the rule in terms of sort of what we see when we
24   take a more longitudinal sort of over time review of how
14:14:48 25   successful black Republican candidates have been in the state

1    of Alabama.

2    Q    Dr. King, I have a few more questions about your rebuttal

3    report.

4         Let's go to the beginning of the report starting at

14:15:02 5    paragraph 3.  And here you are responding to an assertion by

6    Mr. Bryan.  Can you tell us what that assertion is?

7    A    Sure.  He asserts that using black alone or single-race

8    black has been the most defensible position from a political

9    science perspective.

14:15:25 10   Q    Okay.  And what is your response to that assertion?

11   A    That's it's incorrect.

12   Q    Can you tell us -- what is your view about whether

13   single-race black or any-part black is the superior definition

14   from a political science perspective?

14:15:44 15   A    So -- so I think if you're going to make decisions about

16   people's identity, so in this case, who is black versus who

17   isn't black, I think you need to sort of embed that decision in

18   how we historically have identified black people in the United

19   States, and to this point, how that history has fundamentally

14:16:14 20   been embraced.  So if we think about early definitions of

21   people being black, we know that in the South and in Alabama,

22   individuals were considered black if they had any traceable

23   African or black American ancestry.  And so that definition --

24   so we can think of that as what we might refer to as the

14:16:38 25   one-drop rule.

1      And the one-drop rule has roots in racism where the idea

2  asserted was that to be white you could only be -- you had to

3  be basically pure white blood.  It's also true that

4  historically that one-drop rule was specifically attached to

14:17:07  5  individuals who had racial identities that were both black and

6  white, not necessarily black Hispanic Latino, black and Asian,

7  et cetera.  And if we think about this in the context of when,

8  you know, the black Americans in the United States who have

9  ancestral ties to enslaved populations, obviously, there is

14:17:31 10  some value in counting people who have a drop of black blood as

11  black, because obviously, during slavery that would mean you

12  had more bodies I guess I should say to be engaged in forced

13  labor.

14      Moving forward, though, even if we think about after the

14:17:53 15  end of slavery, the 13th, 14th, and 15th Amendments, and moving

16  into the Voting Rights Act and the Civil Rights Act, that

17  delineation of who was black so still focusing on if you are

18  part black, you are black, also helped to continue the racial

19  hierarchy that had dominated the South for centuries.

14:18:15 20      And so moving forward, again, we have now entered a space

21  where instead of the state assigning an identity to an

22  individual where individuals are effectively able to make a

23  conscious choice to identify with that specific heritage and

24  legacy, if they are of mixed race in heritage, and so, you

14:18:42 25  know, similar to how the state -- not necessarily the state of

1    Alabama, but the state in terms of government assigned

2    identities to individuals for a specific purpose, to strip for

3    lack of a better word, someone of that identity that they have

4    clearly and effectively asserted and chosen to identify with,

14:19:08  5    is in many ways a new manifestation of the same thing.

6        So I mean, if someone says they are black, whether it's

7    black in part, or all black for lack of a, you know, a better

8    term, I mean they are black because they have asserted their

9    blackness.

14:19:27 10   Q    And just to be clear, it's not your position that we

11   should continue the one-drop rule to maintain white supremacy,

12   right?

13   A    No, that is not my position that we should rely on the

14   one-drop rule to continue white supremacy.  My position is that

14:19:47 15   if people who have options -- technically, everyone has an

16   option.  But if people have options in choosing which parts or

17   parts of their multi-racial and multi-faceted identity in race

18   to assert, we should respect that assertion and their decision

19   to identify themselves that way.

14:20:11 20   Q    So given this history and the impact the one-drop rule has

21   had on racial self-identification, do you see the any-part

22   black or single-race black definition as superior in the

23   context of political science?

24   A    I mean, the any-part black is the more accurate definition

14:20:32 25   of blackness.

```
 1  Q    Okay.  Just a few more questions, Dr. King.
 2       I wanted to touch very briefly on Senate Factor 5, which
 3  inquires about socioeconomic disparities resulting from
 4  discrimination and their impact on access to political process.
 5       You said that you observed Dr. Bagley's testimony?
 6  A    I did.
 7  Q    And do you recall during his cross-examination questions
 8  about the fact that black residents of other states might also
 9  suffer from socioeconomic disparities that similarly exist in
10  Alabama?
11  A    Vaguely.
12  Q    Does the fact that such disparities might exist outside of
13  Alabama, such as in states in the North or the Midwest, does
14  the fact that those disparities exist change your opinion as to
15  the effect of those disparities in Alabama and their roots in
16  the history of discrimination here?
17  A    No.  I mean, every state has its own unique historical
18  cultural and political orientation or, you know, origins or
19  foundations.  So the fact that discrimination or
20  disenfranchisement looks different in another place does not
21  mean or negate the disenfranchisement or discrimination that
22  exists in Alabama.
23       I mean, if you, for example, consider like the great
24  migration which went from about 1910 to 1970, you have black
25  people migrating from the Deep South, including, which would
```

include Alabama to places in the West Coast, the Midwest, and

the Northeast, and if we look at sort of what their reaction

was there, you know, major cities, you know, wouldn't allow

black Americans in the North, right?  So I am not talking

14:22:29  about -- but major cities wouldn't allow black Americans access

to public housing.

Places in the Midwest, the East Coast and the West also,

you know, adopted things like restrictive covenants, and even

though there might not have been explicit laws about

14:22:49  segregation, one thing that we can see even now is that cities

continue to be segregated even though the country is

increasingly becoming, you know, more racially and ethnically

diverse.

So their histories are different, but similar to how we

14:23:09  can trace state reaction to the black Americans in the South or

in Alabama getting citizenship rights and voting rights, you

can also see similar manifestations of those reactions as the

black population increased in northern cities.

I mean -- well, personal example, but I will spare y'all.

14:23:37  MR. OSHER:  Thank you, Dr. King.  I don't have any

other questions for you.

JUDGE MARCUS:  Thank you.  Cross-examination,

Mr. Bowdre.

MR. BOWDRE:  Thank you, Your Honor.

14:23:45  CROSS-EXAMINATION

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1534

BY MR. BOWDRE:

Q    Dr. King, my name is Barrett Bowdre, and I am an attorney
who represents Secretary of State John Merrill in this action.

     Can you hear me okay?

14:23:57  A    Yeah, I can hear you.

Q    Great.  You're testifying today as a political scientist;
is that correct?

A    I am a political scientist, yes.

Q    You are not a historian?

14:24:07  A    I am not a historian, no.

Q    And have you published any articles looking at political
behavior in Alabama?

A    Alabama specifically, no.

Q    Yes.  Okay.

14:24:18       I know that you didn't really discuss the Senate -- all
the Senate Factors in your direct, but you did discuss at least
most of them in your -- in your expert reports.  I do want to
ask a few questions about the first Senate Factor and the
history of racial discrimination in Alabama.

14:24:37       Would you agree that race relations have improved since
1965?

A    Absolutely.

Q    And in Alabama, it's been over 50 years since the state
has had an all-white primary; isn't that right?

14:24:54  A    Yes.

1535

```
         1    Q     And I'm not asking --
         2    A     No, I was trying to do math in my head, but, yes.
         3    Q     And the same would be true for poll taxes and literacy
         4    tests and employment or property requirements for voting?
14:25:07 5    A     That is correct.
         6    Q     Okay.  Is there any evidence that you know of to suggest
         7    that a legislator was influenced by that history in Alabama
         8    when he or she voted on their -- on the redistricting plan at
         9    issue in this case?
14:25:25 10   A     Not to my knowledge, no.
         11   Q     Okay.  I want to come back to felon voting laws, which you
         12   discuss at length in your report.
         13         But in the first part of your report, you say -- and this
         14   is in paragraph 23.  I don't know -- do you have your report in
14:25:53 15   front of you?
         16   A     I do.
         17   Q     Okay.  So I am looking at paragraph 23.  And you discuss
         18   Section 182 of the Constitution of Alabama, which as you note,
         19   disqualified voters if they committed certain crimes.  And the
14:26:08 20   original -- Section 182 as you note, included all felonies,
         21   plus crimes of moral turpitude, plus a number of listed crimes
         22   such as vagrancy, which were racially tinged; is that correct?
         23   A     That is correct.
         24   Q     Okay.  And you would agree that that is not the current
14:26:26 25   law in Alabama?
```

1536

```
 1  A    Oh, yes, I would agree, that is correct.

 2  Q    You also mentioned the races origins of secret ballots in

 3  paragraph 25 of your report.  Alabama still has a secret ballot

 4  law, right?

 5  A    Yeah.  Effectively the ballots we use today, yes.

 6  Q    Yeah.  And would you agree that the state's decision not

 7  to do away with the secret ballot and revert back to voice

 8  voting is not indicative of racial discrimination today, even

 9  though it was in the past?

10  A    Can you repeat that?

11  Q    Yeah.  Sorry.  Would you agree that Alabama's decision not

12  to do away with the secret ballot and revert to voice voting,

13  which was in place before Alabama instituted the secret ballot,

14  would you agree that that decision is not indicative of racial

15  discrimination today, even though the secret ballot's origin

16  was racist?

17  A    So just so I understand because that was long.

18  Q    Yes, ma'am.

19  A    Are you asking me if the state's continued use of the

20  secret ballot is not indicative of supporting what I note in

21  your report even though it had racist origins?

22  Q    Yes.

23  A    Yes.

24  Q    Sorry for that question.

25  A    It's fine.
```

14:26:41 (line 5)
14:26:56 (line 10)
14:27:19 (line 15)
14:27:32 (line 20)
14:27:47 (line 25)

```
 1  Q    Okay.  You note in your report that between -- and now I
 2  am looking at paragraph 16 -- you note that between 1965 and
 3  2013, at least 100 voting changes proposed by Alabama state,
 4  county, or city officials were either blocked or altered under
14:28:12  5  the Voting Rights Act?
 6  A    Can you tell me what paragraph that is again?  Is it page
 7  16 or paragraph 16?
 8  Q    You -- yeah.  You're correct.  Sorry.
 9  A    It's okay.
14:28:28 10  Q    I'm sorry.  It's page 16, paragraph 44.  I'm sorry about
11  that.
12  A    No worries.  Okay.  Can you repeat the question again?
13  Q    Yeah.  So you say in your report that between 1965 and
14  2013, Alabama had 100 voting changes that were either blocked
14:28:49 15  or altered under the VRA; is that right?
16  A    That is the quote, yes.
17  Q    Okay.  Isn't it true that the last statewide objection
18  that was either lodged or sustained by the Department of
19  Justice occurred nearly 30 years ago in 1994?
14:29:04 20  A    I mean, the reference I used would say otherwise, but I
21  don't --
22  Q    Okay.  I will share my screen with you real quick if
23  that's okay with you?
24  A    That's fine.
14:29:31 25  Q    Well, I am going to try to share my screen with you.
```

```
 1  Okay.  Can you see this?  It says Department of Justice
 2  determination letters?
 3  A    Yes.
 4  Q    Okay.  And I am going to scroll down until the very last
 5  page.  And my question was between -- the last statewide
 6  objection was -- that occurred in 1994.  And so here the last
 7  statewide objection -- go to 2008, and then we see 1994.  And
 8  so my question is:  Do you see any statewide objections between
 9  1994 and 2008?
10  A    Right.  I was initially confused about your question
11  because my citation talks about state, city, or county.  So,
12  no, I do not see any statewide objections post that date.
13  Q    Okay.  Thank you.
14  A    Uh-huh.
15  Q    Okay.  Looking at paragraph 45 and 46, you discuss *Shelby
16  County vs. Holder*, and you say that one of the first changes
17  that Alabama made to its voting laws in the wake of *Shelby
18  County vs. Holder* was to institute one of the most rigorous
19  voter identification requirements in the nation.
20       So my first question about this is:  By including the
21  voter ID law in your discussion in, Modern Discrimination By
22  the State, do you think the law has the effect of reducing
23  voter -- black voter turnout or registration?
24  A    So I didn't do any analysis about the impacts of the
25  state's voter ID law on black voter registration and turnout.
```

14:30:12
14:30:36
14:30:47
14:31:13
14:31:35

```
 1  Q     So on what basis do you deem it discriminatory or part of
 2  the modern discrimination by Alabama?
 3  A     Sure.  There -- as you will note, there was a report cited
 4  by the U.S. Commission on Civil Rights, and so my inclusion of
14:31:59  5  it in that section is based on the information that I reviewed
 6  in preparing this section.
 7  Q     Okay.  Well, let me ask you about that.
 8  A     Okay.
 9  Q     Did you look at any other resources when -- besides the
14:32:18 10  Alabama Advisory Committee when you were talking about the
11  voter ID law in Alabama?
12  A     That's what I cited, so I am going to assume no.
13  Q     Okay.  So -- are you aware that the Eleventh Circuit -- or
14  are you aware that this issue has been litigated both in the
14:32:39 15  Federal District Court and in the Eleventh Circuit?
16  A     I do know there was a -- there were courses -- not
17  courses, cases, excuse me, challenging Alabama's voter ID laws.
18  I could not cite their names verbatim to you, but I know that,
19  yes.
14:32:56 20  Q     Okay.  Do you know the results of those cases?
21  A     I mean, I live in Alabama, and I vote in Alabama.  And we
22  still have a voter ID law.  And so to a certain extent,
23  obviously, the voter ID law persisted.  But I also know there
24  are multiple forms of ID that people in Alabama can use to
14:33:13 25  vote, and I do not know if those multiple forms were part of
```

1540

1    the original state proposed law, or if they are the result of

2    some of that litigation.

3    Q    Okay.

4    A    That is what I know.

14:33:23 5   Q    Well, let me ask you a few questions.  I am going to pull

6    up the Eleventh Circuit decision in it, and I want to get your

7    take very quickly.

8    A    Keep in mind, I am not a lawyer.

9    Q    Yeah.  I understand that.  I'm just trying to understand

14:33:39 10  your view as a political scientist and what resources you

11   looked at.

12        So, okay.  Do you see this *Greater Birmingham Ministries*

13   *vs. Secretary of State*?  And this is the Westlaw report at 992

14   F.3d 1299, which was released by the Eleventh Circuit in 2021?

14:34:07 15  A    Yes.

16   Q    Okay.  I want to read a couple of the findings by the

17   Eleventh Circuit.  And the first one is here on page 1325 of

18   the reported decision.  Quote, the fact remains that plaintiffs

19   cannot point to evidence -- not a single comment made by any

14:34:40 20  sitting Alabama legislator in reference to HB-19 to support

21   their argument that the voter ID law was intended to

22   discriminate against black and Latino voters, end quote.

23        Did I read that correctly?

24   A    Do you have a question?

14:34:55 25  Q    Yes.  Excuse me.  Did I read that correctly?

```
 1   A     Yes.
 2   Q     Okay.  And then I want to go down to page 1329.  And the
 3   Court says there that, It is undisputed that approximately
 4   99 percent of white voters and 98 percent of black voters
 5   possess a photo ID.
 6         Did I read that right?
 7   A     Yes.
 8   Q     And then one more court quotation.
 9         And then this is at page 1310 of the reported decision.
10   In sum, a voter who lacks an appropriate form of ID may acquire
11   the documents needed to obtain a voter ID for no fee.
12         Did I read that right?
13   A     Yes.
14   Q     Okay.  So my question is:  You did not cite to the
15   Eleventh Circuit's decision, and you also did not cite to the
16   District Court's decision, which had a lot of factual findings.
17   And I was wondering why you did not do that.
18   A     I do note that I did not do that, but I also believe that
19   I noted in my report that the voter ID law was implemented.  So
20   even though -- I mean, I didn't make note of that, it's clearly
21   communicated that the law was into effect.  So I'm not entirely
22   sure what it is explicitly about either of those things that
23   you think I should have -- or am I making sense?
24   Q     Okay.  So sure.  Let's clear up that timeline, then.
25   A     Okay.
```

```
 1   Q     So in paragraph 46, you say that one of the first changes
 2   that Alabama did in response to Shelby County was to enact the
 3   voter ID law, and that --
 4   A     Or to implement.
14:37:02 5   Q     Implement.  And then it went into effect in 2014; is that
 6   correct?
 7   A     Uh-huh.  Uh-huh.
 8   Q     And then this Eleventh Circuit decision that we just
 9   reviewed was from 2021, right?  I can pull that back up.
14:37:21 10   A     Wait.  You said that decision was from 2021?
11   Q     Yeah.  Because the -- the law was enacted, and then it was
12   challenged, and then it went to court, and then the Eleventh
13   Circuit upheld it, right?
14   A     In 2021?
14:37:35 15   Q     In 2021.
16   A     Okay.
17   Q     Okay.  And so you mentioned that instead of relying on
18   that case or looking at the evidence that was presented in that
19   case, you instead relied on the Alabama Advisory Committee's
14:37:50 20   report; is that correct?
21   A     In the assertion of the voter ID law being one of the most
22   rigorous in the nation, yes.
23   Q     Right.  Are you aware if the committee reviewed the
24   evidence in the voter ID litigation?
14:38:13 25   A     I am not aware.
```

```
 1   Q    Am I correct that the only discussion of the -- of the
 2   court case was in one of the statements of dissent and was not
 3   even mentioned by the committee itself; is that correct?
 4   A    I mean, I haven't read it, so I don't know.
14:38:34  5   Q    You did not read the committee report that you --
 6   A    Oh.  No.  I have thought you were saying it was in --
 7   sorry.  I misunderstood the question.  Sorry.
 8   Q    Okay.  I will rephrase.  I'm sorry.
 9   A    No.  You're fine.
14:38:44 10   Q    Am I correct, or do you know if the committee report
11   itself lists or discusses in any way either the district
12   court's or the Eleventh Circuit's decision in the voter ID
13   case?
14   A    I cannot remember sitting here off the top of my head what
14:39:01 15   is explicitly mentioned on all the pages of the report.
16   Q    Okay.  Are you aware how the advisory committee that you
17   cited to obtained its information, how it went about gathering
18   information for the report?
19   A    I know for some sections of the report they actually
14:39:19 20   called and contacted offices.  I mean, there were -- there was
21   a wide variety of activity based on what I remember from what I
22   read.  So I mean, if you could ask me like a more specific
23   question, maybe, I could answer.  I'm not really --
24   Q    Am I correct that one of the major ways that the committee
14:39:40 25   went about gathering evidence was to hear panelists that were
```

```
        1   invited from advocacy organizations, including the ACLU,

        2   Greater Birmingham Ministries, the Southern Poverty Law Center,

        3   NAACP Legal Defense Fund, Equal Justice Initiative, Alabama

        4   NAACP, and the Ordinary People Society?

14:40:00 5  A    I don't have the report in front of me.  But if that's

        6   what's listed as the people that had meetings with, I also know

        7   they had hearings with John Merrill, Secretary of State, so I

        8   will trust that that is part of the report, because, again, I

        9   don't have it in front of me.

14:40:16 10 Q    Okay.  I can pull it up real quick.

        11  A    Okay.

        12  Q    And I am referencing -- this is Defense Exhibit 88, and

        13  it's 88-A because it was broken up into pieces.  And this is

        14  the report to the Alabama Advisory Committee -- excuse me --

14:40:45 15 the report by the Alabama Advisory Committee to the United

        16  States Commission on Civil Rights.

        17       Is this the report you reviewed, Dr. King?

        18  A    Yes.

        19  Q    Okay.  I am going to skip down to page 60.  And this is a

14:41:02 20 news release on one of the -- I think the main public forum,

        21  the main meeting that the committee held.  Do you see this?

        22  A    Yes.

        23  Q    And then we see that John Merrill testified?

        24  A    Uh-huh.

14:41:15 25 Q    As you just mentioned.
```

1  A    Uh-huh.

2  Q    Then we have Congresswoman Sewell.  And then we have

3  Representative from the ALCU, Greater Birmingham Ministries,

4  Southern Poverty Law Center, NAACP Legal Defense Fund, Equal

14:41:33  5  Justice Initiative, Alabama NAACP, and the Ordinary People

6  Society.  Do you see that?

7  A    Yes.

8  Q    Okay.  Thank you.

9       You mention in your report that Alabama closed some of the

14:41:55  10  DMV locations?

11  A    Uh-huh.

12  Q    This is paragraph 48?

13  A    Uh-huh.

14  Q    Am I correct that the closure of the DMV locations would

14:42:06  15  not affect a voter's ability to obtain a free voter ID from a

16  county registrar?

17  A    That is correct.  But I'm also not sure if the registrars

18  were issuing IDs at the time the DMVs closed.  Were they?

19  Q    I think the answer is yes, but I --

14:42:26  20  A    Okay.

21  Q    I won't go into that.

22       But it would also not affect the voter's ability to

23  request a visit from the Secretary of State's mobile unit,

24  would it?

14:42:37  25  A    No, it would not impede their ability to request a visit

1    from the mobile unit, no.

2    Q    Are you aware that the Secretary of State does, in fact,

3    have a mobile voter ID unit that will go to an individual

4    voter's house?

14:42:50  5    A    I am very much aware of the mobile voter unit, yes.

6    Q    The mobile voter unit will provide a free photo ID to that

7    person?

8    A    I am very much aware that the state offers free IDs at

9    multiple points, yes.

14:43:04 10    Q    Okay.  You note in your report that Jenny Carroll, who is

11    the chair of the advisory committee that you relied on said she

12    tried to determine the hours of operation for the DMV in

13    Bullock and Wilcox counties.  Did you yourself perform any

14    research on this question?

14:43:26 15    A    Did I myself call the DMVs?

16    Q    Yes.

17    A    No.

18    Q    All right.  Per your discussion in paragraph 53 of the

19    report on polling closing -- excuse me -- I will start over.

14:43:46 20        In your discussion in paragraph 53 about polling location

21    closures, did you do any investigation to determine why an

22    individual polling location was closed or where those resources

23    were reallocated if that location was closed?

24    A    No.  I did not contact any of the counties that closed

14:44:11 25    their polling locations, nor did I ask about the reallocation

1547

```
      1   of resources.
      2   Q    Okay.  Thank you.
      3   A    Uh-huh.
      4   Q    All right.  So moving on to Senate Factor 2, and I think
14:44:24  5   this picks up on page 23 of your report.  Do you purport to be
      6   an expert on the voting behavior of Alabamians?
      7   A    Not specifically.
      8   Q    Okay.  Have you conducted or reviewed any surveys on why
      9   Alabamians vote the way they do?
14:44:45 10   A    Have I conducted or reviewed?
     11   Q    Any surveys about why Alabamians vote the way they do?
     12   A    Do you mean in terms of the considerations people make in
     13   making their vote decisions, or is that what you mean?
     14   Q    Sure.
14:45:03 15   A    I mean, so I, you know have -- I will say no.
     16   Q    Okay.  Would you agree that voting tends to be racially
     17   polarized in any state with black voters in which there are --
     18   excuse me -- would you agree that voting tends to be racially
     19   polarized in any state with black voters where a majority of
14:45:36 20   white voters tend to vote Republican?
     21   A    I mean, honestly, without actually looking at some actual
     22   data, I don't think I feel comfortable answering that question.
     23   Q    Okay.  So you discussed some of this on your direct.  And
     24   with the party realignment?
14:45:56 25   A    Uh-huh.
```

```
 1   Q    Which is also paragraph 66 through 75 of your report, did
 2   you look at Alabama's history in particular in discussing
 3   political party realignment?
 4   A    You mean did I look at the racial distribution of voters
 5   in Alabama and their party affiliations?  No.
 6   Q    I guess I am asking more about the history.  So you
 7   discuss national trends and the National Republican Party and
 8   you discuss some about the South in general.
 9   A    Uh-huh.
10   Q    And my question is:  Did you examine any resources about
11   Alabama's history in particular?
12   A    No.  Only the extent to which it is the focus in some of
13   the books on southern politics.  For example, there is one of
14   the resources that I used has states that explicitly, you know,
15   dedicated to -- has a chapter, excuse me, explicitly dedicated
16   to each state.  And so there was information about Alabama in
17   there.  But I mean I didn't read a series of texts explicitly
18   about party realignment in Alabama.  If I had come across one,
19   I would have.
20   Q    Okay.  Well, this might be close.  Are you familiar with
21   the recent decision from the Middle District of Alabama called
22   *Alabama State Conference of NAACP vs. Alabama*?
23   A    That's a 2017?
24   Q    Is it a 2020 decision regarding a Section 2 challenge to
25   Alabama's at-large judicial elections?
```

```
 1  A    I would say familiar is a fair term, yes.

 2  Q    I am going to pull that up.

 3  A    Okay.

 4  Q    And get your opinion a little bit on the history of

14:47:40  5  Alabama.

 6       Okay.  Do you see this on my shared screen?

 7  A    Yes.

 8  Q    And this is Alabama State Conference of NAACP vs. The

 9  State of Alabama, and the cite is 2020 WL 583803?

14:48:11 10  A    Yes.

11  Q    You did not discuss or cite to this opinion in your

12  report, did you?

13  A    I do not believe so, no.

14  Q    Okay.  This is looking at page 5 of the Westlaw cite?

14:48:36 15  A    Can you make that a little bigger?

16  Q    Yes.  I'm sorry.

17  A    Thank you.

18  Q    Okay.  Can you see that?

19  A    Yes.

14:48:45 20  Q    All right.  So this -- well, I will just read this first

21  paragraph, and I will ask you a couple of questions as we go

22  on.

23       So as part of the opinion, the Court says, quote,

24  African-Americans in Alabama prefer the Democratic Party by

14:49:04 25  overwhelming margins -- in excess of 90 percent in some recent
```

```
 1   case.

 2        I am going to skip down.

 3        So Alabama voting is racially polarized, that is, there is

 4   significant correlation between race and voting behavior in

 5   Alabama.  The question of this case is why.  Is it on account

 6   of race, as condemned by Section 2 of the VRA, or on account of

 7   some other cause or causes such as partisan politics?

 8        Did I read that right?

 9   A    Yes.  The jump through me off a bit, but yes.

10   Q    In this next paragraph, do you see where the Court talks

11   about some of the national trends that you discuss with regard

12   to the passage of the VRA in 1965, Senator Goldwater voting

13   against that?  Do you see that?

14   A    In the highlighted section?

15   Q    Yes, ma'am.

16   A    Yes.

17   Q    Okay.  And then in this next paragraph, do you see where

18   the Court says, The second partisan shift took its sweet time

19   and is much more complicated.  Do you see that?

20   A    Yes.

21   Q    And in that section, the Court is discussing Alabama's

22   shift in particular, and you can see this as the Court talks

23   about the shift of the Legislature that George Wallace won the

24   Democratic election in, what, 1982 as a Democrat with over 90

25   percent of --
```

```
 1  A     I think you mean '62.
 2  Q     Well -- I'm sorry.  Let me skip down a little bit.
 3        We see here in 1972, Wallace survived the assanation
 4  attempt.  Skipping down a little bit.  The Court goes on to
 5  talk about Alabama's unique political history.  I guess that's
 6  the point.  I don't want to waste your time going through every
 7  single paragraph.
 8        But given this background, would you agree with that first
 9  sentence that we read, that the partisan shift in Alabama is
10  much more complicated and took, quote, its sweet time in a way
11  that the national shift did not?
12  A     I think that's fair, given that we talked about in my
13  direct the legislative shift didn't occur until 2010.  I think
14  that's fair.
15  Q     Okay.  You did not discuss this unique Alabama history in
16  your report, did you?
17  A     Not in the extensive detail that you just presented to me,
18  no.
19  Q     Why not?
20  A     I can't say it was an intentional omission on my part.  I
21  mean, a lot of where I started with my research was with
22  scholarship that I was familiar with, you know, through my
23  instruction, and then added on to that as I, you know,
24  uncovered more evidence.  So it wasn't intentional.
25  Q     Okay.
```

Timestamps: 14:50:57 (5), 14:51:13 (10), 14:51:31 (15), 14:51:47 (20), 14:52:17 (25)

```
          1   A     Whatever.
          2   Q     Moving on a bit.  And you discussed this on your direct.
          3   You discussed that black voters -- you discussed that black
          4   voters tend to support black candidates regardless of ideology
14:52:36  5   or partisan affiliation; is that right?
          6   A     Can you tell me where that is in your report?
          7         MR. OSHER:  Objection, Your Honor.  That
          8   mischaracterizes Dr. King's testimony.
          9   BY MR. BOWDRE:
14:52:45 10   Q     Let me pull up the --
         11         JUDGE MARCUS:  Why don't you just rephrase your
         12   question or cite to the record.
         13         MR. BOWDRE:  Yes, Your Honor.
         14   BY MR. BOWDRE:
14:53:01 15   Q     Let me ask you about paragraph 76.  And here you say,
         16   First, the literature suggests that both black and white voters
         17   prefer to vote for candidates of their own race when the
         18   contest includes a black and white candidate.  And second,
         19   there is no clear relationship between the ideology of black
14:53:21 20   voters and their candidate preferences.  For example, while
         21   90 percent of black voters supported Barack Obama in 2008, only
         22   47 percent of blacks identify as liberal, but 45 percent
         23   identify as conservative.
         24   A     Uh-huh.
14:53:36 25   Q     Did I read that correctly?
```

```
 1  A    Yes, you did.
 2  Q    Okay.  So I guess I'm curious that if party affiliation
 3  does not matter as much as the color of the candidate, do you
 4  know if in 2016 blacks across the country in open primaries
14:53:58  5  voted in high numbers for Ben Carson since there was no major
 6  black candidate in the Democratic Primary?
 7            MR. OSHER:  Objection, Your Honor.  That again
 8  mischaracterizes Dr. King's testimony.
 9            JUDGE MARCUS:  Do you understand the question,
14:54:11 10  Dr. King?
11            THE WITNESS:  Honestly, no.
12            JUDGE MARCUS:  Would you rephrase it, please?
13            MR. BOWDRE:  Yes, Your Honor.
14  BY MR. BOWDRE:
14:54:18 15  Q    So I am trying to understand the relationship that you
16  note between race and partisan affiliation.  And that race
17  according to this paragraph is a stronger indicator than
18  partisan affiliation.  Is that a fair characterization of that
19  paragraph?
14:54:34 20  A    I don't think I would say stronger.  I mean, but I think
21  what it actually says is black and white voters prefer.  That
22  doesn't necessarily mean that preference is stronger than other
23  preferences, just that it exists.
24  Q    Okay.  So thinking in the 2016 primaries, my question is?
14:54:59 25  A    Okay.
```

```
 1  Q     And taking into account my question is about these
 2  preferences?
 3  A     Okay.
 4  Q     Do you know if to express that preference that black
 5  voters may have had for a black candidate?
 6  A     Uh-huh.
 7  Q     Do you know if black voters in open primaries voted in
 8  high numbers in support of Ben Carson, a black Republican,
 9  because there was no major black candidate in the Democratic
10  primary?
11  A     So in states where voters had options to vote across all
12  the primary candidates, am I aware of scholarship that suggests
13  that black voters in those states chose to vote for Ben Carson?
14  Q     Yes.
15  A     I am not aware.
16  Q     Okay.  So in your rebuttal report, you discuss this on
17  your direct, as well, you note that in that 2016 Republican
18  primary, whites harboring racially prejudiced views supported
19  Ben Carson at higher rates than they supported Jeb Bush; is
20  that correct?
21  A     That's correct.  Yes.
22  Q     In that case, the racially prejudiced voters were not
23  supporting the candidate of their own race, correct?
24  A     So that's a mischaracterization of the research.  What it
25  says is voters with higher -- what did it say -- voters who
```

1    have higher overly prejudiced views or voters who believe that

2    blacks have too much influence in U.S. politics are more likely

3    to vote for Carson.  That doesn't mean that there were not

4    voters who had those similar views that did not vote -- sorry.

14:56:47  5    Now I have confused myself.

6        That does not mean that there were not voters who also

7    harbored similar views who voted for Jeb Bush.

8    Q    Okay.  But a higher number of voters who harbored racially

9    prejudiced views voted for a candidate not of their own race;

14:57:09 10    is that correct?

11    A    So, again, this isn't about the number of people who

12    voted.  It was about the relationship between those views and

13    who they voted for.

14        I didn't assert anything about the number of people.  The

14:57:18 15    correlation is between the people's views and who they voted

16    for.  There is no math in here that talks about the number of

17    people who voted for either.  They were -- if that makes sense.

18    Q    Okay.  I think I will move on.

19    A    Okay.

14:57:31 20    Q    Thank you.

21    A    Sorry.  I feel like I'm not being helpful.

22    Q    You also note -- this is in paragraph 20.  The mere fact

23    that white Republicans support a minority candidate tells us

24    quite little about whether any of those voters are motivated by

14:57:57 25    racial considerations.  What does this mean?

```
 1  A     So I think the -- so what it effectively means is that
 2  someone -- so in this case, a white Republican, could vote for
 3  a black Republican, and in that decision still add racial
 4  calculations to that vote choice.  Does that make sense?
 5        And so that's why the paragraph follows with the
 6  discussion of Ben Carson as an example.
 7  Q     Okay.  And I want to get to that.  But one more question
 8  here.  Why are the subjective motivations of the voter
 9  important if they are still voting for a black candidate?
10  A     Well, because so this -- I also think is worth noting that
11  this information is included in response to one of the
12  assertions made by Dr. Hood.  And so he is articulating that,
13  yes, white Republicans will support minority -- sorry -- GOP
14  candidates.  And so while this might happen, if you want to
15  understand if it's ideology or some other consideration that
16  is, you know, which is -- oh, what is the word I'm trying to
17  say -- not driving -- but contributing to that decision, right,
18  so if you are going to argue that it's just -- if you want to
19  say it's just party and there are no racial considerations and
20  you're going to communicate -- that's basically what he is
21  saying, right?  So they're all Republicans.  There are people
22  who are non white.  And they voted for them, anyway.  So,
23  clearly, race was not a consideration.
24        The point I was trying to make in the following paragraphs
25  is that you can be conservative, or in this case Republican,
```

```
 1  and you can support a minority candidate.  And you can do that

 2  while also having -- harboring what we might consider racially

 3  conservative views, so while making racial considerations.

 4  Q    Okay.

 5  A    Does that make sense?  So I'm saying that decision is not

 6  absolved of race, even though you are voting for someone who is

 7  a minority.

 8  Q    All right.  Thank you.

 9  A    I'm sorry.

10  Q    For this conclusion, you rely on the article in 538; is

11  that right, the Jefferson and Tessler article?

12  A    It's a Vox article, but yeah.  I feel like it's on Vox.

13  Q    I'm sorry.  Is it not footnote 16 on page 6?

14  A    It is footnote 16, yes.

15  Q    That is a non peer-reviewed article?

16  A    That is correct.  But I mean I feel like I would be remiss

17  if I don't say that part of the way that political scientists

18  actively try to contribute to discourse around issues is

19  publishing things that are not peer-reviewed, but are relevant

20  and timely.  And so often times, that work will eventually

21  appear, you know, in a peer-reviewed article or publication,

22  but the academic publishing cycle did can take anywhere from

23  18 months to two years, so we will be on to the next thing by

24  then.  So, I mean, yes, it is not a peer-reviewed article, but

25  I think it's still valuable.  I mean, they provide links to all
```

Timestamps in left margin:
15:00:09 (line 5)
15:00:23 (line 10)
15:00:49 (line 15)
15:01:08 (line 20)
15:01:29 (line 25)

```
      1  the data that they use.  You can go retrieve the analysis
      2  yourself.  So it is not unusual for political scientists to
      3  present research prior to peer review and for other political
      4  scientists to cite it.
15:01:49 5  Q    Okay.  Thank you.
      6  A    Uh-huh.
      7  Q    You -- so this is part of the article that you quote on
      8  paragraph 20.  You say that white voters who harbor racial
      9  prejudice will support a black candidate who successfully
15:02:04 10  demonstrates he or she is, quote, not in the business of
     11  carrying water for their own racial group, end quote.
     12       So my question here is, since the 538 article that you
     13  quote from used Ben Carson as an example of a black candidate
     14  that racially prejudiced white voters would support, is it fair
15:02:25 15  to say that the article implies that Ben Carson is, quote, not
     16  in the business of carrying water for his own racial group?
     17  A    So are you asking me if Ben Carson is the type of
     18  candidate that they are describing, or that I quoted from their
     19  description in the previous paragraph?
15:02:46 20  Q    Yes.
     21  A    Yeah.  I mean, I would imagine -- I think if you look at
     22  the things Ben Carson has stated when he was running, that
     23  would be fair.
     24  Q    Sorry.  I did not understand.  Could you repeat that?  I
15:03:02 25  just didn't understand?
```

```
 1  A    I was agreeing with you, yes.
 2  Q    Okay.  Would you say the same thing about Representative
 3  Paschal here in Alabama?
 4  A    I honestly haven't heard him speak, and I can't attest to
 5  where he stands on issues related to African-Americans.
 6  Q    Would you say this about any black Republican candidate
 7  that white voters vote for?
 8  A    No.
 9  Q    So what makes a candidate someone who, quote, does not --
10  is not in the business of carrying water for his own racial
11  group?
12  A    I mean, I think you would have to look at the statements
13  that are made by said candidate while they're on the campaign
14  trail when addressing issues related to race in the United
15  States.
16  Q    Do you have examples of those statements that Ben Carson
17  made?
18  A    I mean, it would just honestly at this point be based on
19  my own personal impression of him when he was running for
20  office.  I don't have his statements memorized, no.
21  Q    Okay.  So I am going to try and understand these two
22  theories together because they seem to me to have a little bit
23  of conflict.  And I just want you to help me get through that.
24       So under the first theory that you discuss in your initial
25  report, in which white voters tend to vote for the white
```

Timestamps: 15:03:19 (line 5), 15:03:37 (line 10), 15:03:50 (line 15), 15:04:14 (line 20), 15:04:41 (line 25)

1  candidate, so if a white voter supports a white Republican,

2  that is, on the whole, indicative of race, because white voters

3  support white candidates.  Is that fair?

4  A    I think what my initial report actually says is that black

15:05:04  5  -- both black and white voters prefer to vote for candidates

6  who share their racial identity, and that exists outside of

7  party.

8  Q    Okay.  And then so acknowledging that and then trying to

9  combine that with the second theory that if a white voter

15:05:21 10  supports a black Republican, it is at least possible that that

11  is also a vote count on -- on either account of race or at

12  least indicative of racial prejudice, does this mean that a

13  white Republican would have to vote for a Democratic candidate

14  for that vote not to be cast on account of race?

15:05:42 15  A    I'm not entirely sure I actually understand what you're

16  asking me.

17  Q    I will rephrase it.

18  A    Okay.

19  Q    So I can make this clear.

15:05:53 20  A    Okay.

21  Q    If all you know about a voter is that he is white and

22  supports Republican candidates, can you tell whether that voter

23  is motivated by racial bias?

24  A    No.  You would only be able to tell in light of there

15:06:10 25  being options for a non-white candidate.  And you would also

```
 1   have to understand where that individual voter stands on issues
 2   regarding race or perceptions of non-white people.
 3   Q    Okay.  Do you have any evidence that any Republican voters
 4   in Alabama are voting Republican in 2022 because of racial
 5   bias?
 6   A    I mean, we haven't had any elections, and, no.
 7   Q    What about in the last election?
 8   A    No.  I haven't done research on the racial attitudes of
 9   Alabama voters to be in a position to make an assertion about
10   the extent to which racial considerations contribute to their
11   choices.
12   Q    Okay.  If a voter is pro life, supports strong protection
13   of Second Amendment rights, and favors smaller government,
14   which party might seem more attractive to that voter?
15   A    Can you repeat that one more time?
16   Q    If a voter is pro life, supports strong protection of
17   Second Amendment rights, and favors smaller government, which
18   party might seem more attractive to that voter?
19   A    I mean, I guess generically the Republican Party.
20   Q    Okay.  If that voter in fact --
21   A    Go ahead.
22   Q    Okay.  If that voter, in fact, voted Republican, would you
23   say that is because of racial bias?
24   A    I mean, I don't think you could make that assertion
25   without, again, like I stated knowing who the candidates were
```

```
      1  in a specific race and/or understanding where the individual
      2  voter stood on some of those issues we have already discussed.
      3  So, no, I wouldn't broadly say if someone is -- to your point,
      4  supports those issues and votes for a Republican that that is
15:08:10 5  the conclusion one could draw.
      6  Q    Okay.
      7          JUDGE MARCUS:  Mr. Bowdre, let me just ask you a
      8  question.  We are looking for an appropriate point to take a
      9  break.  I don't want to interrupt you in the middle of a
15:08:22 10 thread.
     11      You tell me what would be a good breaking point.
     12          MR. BOWDRE:  May I ask maybe four more questions and
     13  then take a break?
     14          JUDGE MARCUS:  Sure.  Absolutely.
15:08:34 15         MR. BOWDRE:  Thank you, Your Honor.
     16  BY MR. BOWDRE:
     17  Q    In your rebuttal report, Dr. King, one of the reasons you
     18  give for rejecting the study Dr. Hood relies on to show that
     19  ideology trumps race for white Republicans is that the report
15:08:54 20 did not consider any elections conducted in the state of
     21  Alabama.
     22      And this is in paragraph 18, and obviously, you discussed
     23  it in your direct.
     24      I just want to be clear.  You did not conduct any surveys
15:09:08 25 of voter motivation in Alabama, did you?
```

```
 1  A    No.  But I also want to clarify that my assertion that
 2  Dr. Hood's report is inappropriate is about his assertion that
 3  we can learn about Alabama through, you know, an article that
 4  doesn't actually directly address Alabama.
```

15:09:30 5  Q    Okay.  And the 538 article that you relied on --

```
 6  A    Uh-huh.
 7  Q    -- also did not directly address Alabama, correct?
 8  A    That is correct.
 9  Q    And you did not talk to any voters in Alabama about why
```

15:09:48 10  they vote the way they do?

```
11  A    No, I did not interview any voters, no.
12          MR. BOWDRE:  Your Honor, at this time, I think a break
13  would be appropriate.
14          JUDGE MARCUS:  All right.  We will take a 15-minute
```

15:10:03 15  break at this point and then come back and pick up the thread.

```
16  Thank you all.
17          (Recess.)
18          JUDGE MARCUS:  Are the parties ready to proceed?  I
19  think I am muted.  Can you hear me okay?
```

15:26:45 20      All right.  And, Mr. Osher, you are ready to proceed?

```
21          MR. OSHER:  I am, Your Honor.
22          JUDGE MARCUS:  All right.  Mr. Bowdre, you may proceed
23  with your examination of Dr. King.
24          MR. BOWDRE:  Thank you, Your Honor.
```

15:26:59 25  BY MR. BOWDRE:

```
 1  Q    Dr. King, I have a few more questions about racial
 2  polarization in Alabama.
 3       And we discussed earlier the Alabama NAACP case, which was
 4  about judicial elections in Alabama.  Do you recall that case?
15:27:19  5  A    Is that the one you just showed me a little while ago?
 6  Q    Yes.
 7  A    Yes.
 8  Q    And is it fair to say that you did not examine the
 9  evidence that was presented in that case?
15:27:30 10  A    I did not, no.
11  Q    Okay.  Am I correct that the Court specifically rejected
12  the plaintiffs' theory in that case that white voters'
13  preference for the Republican party in Alabama was on account
14  of race?
15:27:49 15       MR. OSHER:  Objection, Your Honor.  Dr. King has said
16  she has not reviewed the case.
17       JUDGE MARCUS:  Can you answer the question, Dr. King?
18       THE WITNESS:  I mean, I could read it if -- I mean, if
19  you pull it up.
15:28:03 20       JUDGE MARCUS:  I think --
21       THE WITNESS:  No, no.  I do not know.
22       JUDGE MARCUS:  All right.  Thank you.
23  BY MR. BOWDRE:
24  Q    I will share my screen with you, Dr. King.
15:28:14 25       Okay.  You see the same opinion that we looked at earlier?
```

```
 1  A     Yes.
 2  Q     Okay.  And this is, for the record, Alabama State
 3  Conference of NAACP vs. State of Alabama.
 4        And I am going to skip to Westlaw cite 48.
15:28:38 5  A     Can you zoom in again?
 6  Q     Yes.
 7  A     Thank you.
 8  Q     I am going to read the highlighted part.
 9        Dr. McKee, who is the plaintiffs' expert in that case,
15:28:53 10 Dr. McKee's conclusion that race best explains the present
11  results in Alabama judicial elections has at least two flaws.
12  First, his explanation for voter behavior unpersuasively writes
13  off ideology as a cause of partisan sorting.  And, second,
14  Dr. McKee did not consider facts specific to Alabama judicial
15:29:12 15  elections that speak to the results of those elections.  He did
16  not include any state judicial races in his empirical analysis.
17        And then I am going to skip to -- well, first, did I read
18  that correctly?
19  A     Yes.
15:29:30 20  Q     Okay.  Okay.  And then skipping to Westlaw cite 42, the
21  Court states that there is evidence that black Democrats get
22  more votes in statewide appellate judicial races than white
23  Democrats.  Under a multi-variate regression model in which the
24  two independent variables are the percentage of registered
15:29:57 25  voters who are African-American and whether the losing
```

candidate was African-American, black Democratic candidates
performed an average of 1.4 percentage points better than white
Democratic candidates in general elections.

And skipping down a paragraph, the Court says, from these
results, it reasonably can be inferred that white Democratic
voters give equal or greater support to black Democratic
candidates as they do to white Democratic candidates.

And then the final line I will read appears that --
Westlaw cite 43, The white Democratic primary voters appear to
give equal support to black Democratic candidates suggests that
black candidates are not penalized in appellate judicial
elections by their race alone.

Did I read that correctly?

A    Yeah.  I mean yes.

Q    And then the Court concludes the notion that
African-American candidates lose solely because of their skin
color is not supported by the evidence.  There is a strong case
that party not race is driving election results in Alabama
appellate judicial races.  Did I read that right?

A    Yes.

Q    And you did not discuss this in your report, correct?

A    Did not, no.

Q    Okay.  I have a couple of questions about your rebuttal
reports regarding any-part black versus single-part black or
single-race black responses.  And you recall your testimony on

```
         1  direct about this?
         2  A    Yes.
         3  Q    I want to make sure I'm getting the definitions right.  Is
         4  it your understanding any-part black is -- can be someone who
15:31:41 5  checks more than one racial category versus a single-race black
         6  is someone who just chooses black as the racial category; is
         7  that correct?
         8  A    Generically, yes.
         9  Q    And you contend that any-part black is a proper method of
15:31:59 10 measurement?
        11  A    Yes.
        12  Q    Do you have any evidence to suggest that any-part black
        13  voters vote the same as single black race voters?
        14  A    No.  And I would suggest that based on why I included that
15:32:14 15 discussion in my rebuttal report and being responsive to the
        16  notion that -- what is it, single-part black is the best
        17  position defensible from a political science perspective, there
        18  would also be no reason for me to engage in that analysis.
        19  Q    Sorry.  Why is that?
15:32:33 20 A    So I -- so my discussion of single-part black -- not
        21  single part.  Sorry.  Black alone and black in combination was
        22  in direct response to the notion that that's the defensible
        23  position from my discipline.
        24  Q    Okay.  So you don't know if single-race blacks or any-part
15:32:56 25 blacks vote the same?
```

```
 1  A    No, I did not conduct that analysis.  I do not know.
 2  Q    Okay.  Do you agree that someone -- if we're -- excuse me.
 3  If we're measuring any-part black, you agree that someone can
 4  identify as Hispanic and black?
 5  A    Yes.
 6  Q    Do you know if Hispanic and black voters either
 7  single-race black or the aggregate of all any-part black vote
 8  similarly?
 9  A    Can you say that one more time?
10  Q    Yep.  Do you know if Hispanic and black voters and in the
11  second category of black voters, I am including both or either
12  single-race black or the aggregate of any-part black -- do you
13  know if those two categories would vote similarly?
14  A    So people who are black Hispanic and people who are -- who
15  only check black and people who check black and something else?
16  Q    Yes.
17  A    Is that what you are asking me?
18  Q    Yes.
19  A    Just to clarify.  I do not know.
20  Q    Okay.
21  A    I -- well, go ahead.
22  Q    In your report, you rely on political polling from news
23  organizations such as CNN and ABC, correct?
24  A    Yes.
25  Q    Okay.  Are you aware that according to a recent poll
```

conducted for the Wall Street Journal that Hispanics are evenly

split in their support between Republican and Democratic

parties?

A    No, I did not know that.  But I mean, I think if we look

at the history of black identity, we're talking about black and

white combinations, not black and other.

Q    Okay.  But you would agree that the any-part black would

include someone who identifies as both black and Hispanic,

right?

A    I mean, yes, I would, but I just wanted to, you know, for

the purpose of what I was speaking to specifically, I just

wanted to be clear.

Q    Okay.  I want to pull out Defendants' Exhibit 152.  Where

I do not believe is in evidence.  I think it was one of the

exhibits that was objected to by the Milligan plaintiffs.  I

will share my screen.

     Do you see this, Dr. King?

A    I do.

Q    And this is the Wall Street Journal article entitled,

Hispanic Voters Now Evenly Split Between Parties?

A    Yes.

Q    And I am going to scroll down -- do you see these tables?

A    Yes.

Q    And the first table is -- the tables both are portrait of

the Hispanic voters, and then the first table is which

```
         1  candidate would you support for Congress?
         2  A     Uh-huh.
         3  Q     And we see that Hispanics are evenly split at 37 percent
         4  between a Democratic and a Republican candidate; is that
15:35:59 5  correct?
         6  A     Yes, that's what I --
         7           MR. ROSS:  Your Honor, the Milligan plaintiffs
         8  continue to object to the inclusion of this evidence.  It's
         9  hearsay that no expert has testified about, and it doesn't even
15:36:11 10 breakdown by black people who are also Latino.  So there's no
         11 basis for any of this testimony or for him to introduce it.  We
         12 continue to object to it.
         13          JUDGE MARCUS:  Again, at this point, he hasn't offered
         14 it.  He simply has marked it for identification to
15:36:27 15 cross-examine.  When and if he argues it, we'll be happy to
         16 take up that objection.  You may ask your question.
         17          MR. BOWDRE:  Thank you, Your Honor.
         18 BY MR. BOWDRE:
         19 Q     The next table -- if the 2024 election for President were
15:36:46 20 held today, for whom would you vote, the table shows that
         21 44 percent of Hispanics would vote for Biden versus 43 percent
         22 for Trump.  Do you see that?
         23 A     I do.
         24 Q     Okay.  You say that this polling indicates to you that
15:37:01 25 there may be a difference in how Hispanics, which would include
```

```
 1  black Hispanics may vote as compared to single-race blacks or
 2  the aggregate of all any-part blacks?
 3          MR. OSHER:  Objection, Your Honor.
 4          JUDGE MARCUS:  Sustained as to form.  The objection is
 5  sustained, Mr. Bowdre.
 6          MR. BOWDRE:  Okay.  Sorry.  Why is that?
 7          JUDGE MARCUS:  It was the form of the question.
 8          MR. BOWDRE:  Okay.  Thank you, Your Honor.
 9  BY MR. BOWDRE:
10  Q    Dr. King, in your opinion as a political scientist, would
11  this polling be relevant to you in determining whether
12  Hispanics and black voters might vote differently?
13          MR. OSHER:  Objection, Your Honor.  This goes beyond
14  the scope --
15          JUDGE MARCUS:  I will take the answer to that
16  question.  Do you understand it, Dr. King?
17          THE WITNESS:  Can you repeat it?
18          JUDGE MARCUS:  Sure.
19          THE WITNESS:  Thank you.
20  BY MR. BOWDRE:
21  Q    Dr. King, in your opinion as a political scientist, would
22  this polling be relevant to you in determining whether
23  Hispanics and black voters might vote differently or the same?
24  A    So by relevant, do you mean, would I use it?  Can you sort
25  of clarify what you mean by using relevant?
```

1  Q    Within the context of single-race blacks or any-part

2  blacks, would this polling be relevant to you in determining

3  that there might be a difference in how black Hispanics, for

4  instance, might voting as compared to other blacks?

15:38:39 5  A    I mean, possibly, but I'd say it's hard to tell for a

6  variety -- so first of all, there's a variety of reasons with

7  that categorization Hispanic, but that's a subside

8  conversation.

9        I mean, possibly.  I mean, that's the best answer I can

15:39:10 10  give you right now.

11  Q    Okay.

12        MR. BOWDRE:  Your Honor, at this time, I will move to

13  admit Defendants' Exhibit 152.

14        JUDGE MARCUS:  Your objection, Mr. Ross?  Mr. Ross,

15:39:28 15  did you want to comment about it?

16        MR. ROSS:  Yes, Your Honor.  Sorry.  I was just

17  getting logged back in.

18        We continue to object.  We don't think that it's relevant.

19  As I said, it doesn't even break out by their -- as this Court

15:39:42 20  knows, there are black people who are also Latino.  There are

21  white people who are Latino.  This information is in the

22  aggregate.  It's national.  There's been no expert testimony as

23  to it at all.  It's entirely hearsay.

24        JUDGE MARCUS:  Anything further, Mr. Osher, on that?

15:39:58 25        MR. OSHER:  From just that -- to clarify, defendants

```
 1  have not laid the proper foundation for how this was generated

 2  and what methodology was used.

 3          JUDGE MARCUS:  Okay.  Anything further, Mr. Bowdre, on

 4  that?

 5          MR. BOWDRE:  Yes, Your Honor.  I would say that

 6  Dr. King did testify that she relies on polling.  Specifically,

 7  she said ABC and CNN polling, and this is a similar polling.

 8  So it is the kind of evidence that political scientists like

 9  Dr. King routinely rely on, and she cites similar evidence in

10  her report.

11      Obviously, it's up to Court as to what weight to give the

12  evidence, but I do think it is relevant, at least a little bit

13  in the discussion of single-race votes or single-race black

14  votes versus any-part black votes, which would include

15  Hispanics, which at least this polling does indicate might vote

16  differently than the majority of blacks, who are much more

17  closely aligned to the Democratic Party according to Dr. King.

18          JUDGE MARCUS:  The objection is sustained, counsel.

19  It is one thing to cross-examine her with it and quite another

20  to offer it without any foundation.  She hasn't seen it.  She

21  can't tell us anything about it.  Whether the polling

22  methodology was sound or not, who did it, and how it bears on

23  the issues here all remain open.  The foundation has not been

24  laid.  The objection is sustained.

25  BY MR. BOWDRE:
```

1  Q    Dr. King, I will move on to Senate Factor 5, to that

2  portion of your report.

3       So a few questions about your conclusions regarding racial

4  education disparities.  And you say in your report that Alabama

15:41:59 5  ranks 39th among the 50 states when it comes to per pupil

6  spending on K-12 education.

7  A    Can you tell me what paragraph that is?

8  Q    I'm sorry.  This is paragraph 92.

9  A    Oh, sorry.  So what you're asking me is why I include the

15:42:26 10  information that Alabama ranks 39th of 50?

11  Q    Correct.  Why is that comparison relevant to your

12  determination or your analysis?

13  A    Oh.  So this section was focused explicitly on education

14  and potential disparities that exist.  And I think my general

15:42:57 15  sense is that I included it to position the state in total

16  relative to the United States.  Also PARCA exists in the state

17  of Alabama, and so it seemed relevant to include information

18  about the state -- the organization that is in the state.

19  Obviously, I can't go back in time and, you know, think

15:43:17 20  directly about what I was thinking, but that seems reasonable.

21  Q    Okay.  So would you agree that -- I think you said

22  situated in Alabama within the context of the United States

23  that that is -- or can be a helpful portion of your analysis in

24  determining the present effects of discrimination in Alabama?

15:43:35 25  A    I think that's reasonable.

1  Q    Okay.  So you note that there is a disparity in per pupil

2  funding.

3  A    Uh-huh.

4  Q    And my understanding is that Alabama by federal law

15:43:56 5  releases reports of per pupil funding by individual school.

6  Have you looked at those reports?

7  A    I believe I got this information from the Alabama

8  Department of Education.  So unless that information is housed

9  on that website, probably not.

15:44:15 10  Q    Okay.  So did the information that you reviewed look --

11  did it provide the amount of funding per school in Alabama?

12  A    Per school or per school district?

13  Q    Both.

14  A    I think I was just looking at districts.

15:44:31 15  Q    Okay.

16  A    I believe -- or systems as I think they are actually

17  called.

18  Q    Okay.  Have you been following the reporting that AL.com

19  has been doing over the last couple of years on school funding

15:44:48 20  in Alabama?

21  A    Not closely, no.

22  Q    But you generally rely on AL.com and find it to be a

23  reputable news source?

24  A    Yes.

15:45:01 25  Q    So as part of its reporting, AL.com took all the

```
 1   information that the state issued on -- which comes in a --
 2   like a 500-page pdf broken down by school, and then AL.com put
 3   it into a searchable database so that people can, you know,
 4   search through and manipulate the numbers.  Have you looked at
 5   that database?
 6   A    I know there's a tool on the PARCA website that allows you
 7   to do something similar, but I don't know if that's the same
 8   tool.
 9   Q    Okay.
10   A    So possibly -- so I haven't gone to AL.com to explicitly
11   look at that tool if that's not the same tool as the other one
12   that I am aware of.
13   Q    Okay.  So you pick out Mountain Brook -- in paragraph 92,
14   you pick out Mountain Brook as the one of the example schools
15   and note that it spends $12,000 per student per the system; is
16   that correct?
17   A    According to the Alabama Department of Education, that's
18   what they reported, so I reported that.
19   Q    Okay.  I want to pull out the AL.com article and ask you a
20   few questions about that.
21   A    Okay.
22   Q    Okay.  Do you see this, the article entitled, Here's How
23   Much Each Alabama School Spent on Students?
24   A    Again, can you make it a little bigger?
25   Q    All right.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1   A     Thank you.

2   Q     Skip down to page --

3              JUDGE MARCUS:  Let me stop you for a moment.  Can you

4   just tell me what exhibit this, Mr. Bowdre?

15:46:57  5              MR. BOWDRE:  I'm sorry, Your Honor.  This has not been

6   previously marked.  I think it would be Defense Exhibit 9 for

7   demonstratives.

8              JUDGE MARCUS:  Thank you.

9   BY MR. BOWDRE:

15:47:13  10   Q     So here at the top of page 3, the article note, The

11   average total spending at schools in Alabama not serving

12   specialized populations was 9,374, and that spending ranged

13   from a low of 4,593 per student at Eufaula's Moorer Middle

14   School to a high of $20,020 at Lee County's Loachapoka High

15:47:40  15   School.  And you live in Lee County, correct?

16   A     I do.

17   Q     Are you familiar with Loachapoka High School?

18   A     I know it's in Lee County.

19   Q     Okay.  Are you aware that the majority of students at

15:47:52  20   Loachapoka are black?

21   A     I was aware that Loachapoka is a predominantly black

22   community, so inferring, I would assume that the school would

23   be black.

24   Q     Okay.  I am going to go up to the conclusion of -- at

15:48:09  25   least of this reporter.  One surprising finding in the school

```
 1   level spending numbers was that spending is actually higher in

 2   schools with higher levels of poverty, generally speaking, even

 3   after federal dollars -- which are typically higher at schools

 4   with more students in poverty -- are removed.

 5        Did I read that right?

 6   A    Yes.

 7   Q    Do you agree with that conclusion, or do you have any

 8   thoughts about that conclusion?

 9   A    I mean, we looked at school two data points.

10   Q    Well, I'm sorry.

11   A    I am not sure if --

12   Q    Okay.  I think -- let me scroll up.  I think it's clear

13   that --

14   A    Okay.

15   Q    They're not just talking about two --

16   A    No.  I meant in our conversation here.  Like I have only

17   seen two.

18   Q    Well, I guess -- I'm sorry.

19        I'm asking you presumably -- well, let me take a step

20   back.

21   A    Sure.

22   Q    Why did you include Mountain Brook as the one example in

23   your report?

24   A    I included Mountain Brook to show the range.  That's

25   really the only reason.  And I actually think this is directly
```

```
 1  from an Alabama Department of Education report.  Like so I
 2  wasn't sitting there looking at the entire list.  And then I
 3  was like, oh, let me pick Mountain Brook.  I don't think that's
 4  what actually happened here.
```
15:49:58
```
 5  Q    Okay.  What, if anything -- I guess I am a little still
 6  confused why you chose Mountain Brook as the example in your
 7  report if there are -- if looking at range, there would be
 8  other schools with higher per pupil spending.
 9  A    No.  So I think --
```
15:50:19
```
10           MR. OSHER:  Object, Your Honor.  Sorry.  Objection.
11  Asked and answered.
12           JUDGE MARCUS:  No.  We will take it one more time.
13  Overruled.
14           THE WITNESS:  So if I recall correctly, when I was
```
15:50:29
```
15  looking at the data from the Department of Education -- when I
16  was reading the reference from the Department of Education,
17  they listed Mountain Brook, and they listed Autauga.  And I
18  just included that in the report.
19  BY MR. BOWDRE:
```
15:50:42
```
20  Q    I see.
21  A    So it's probably -- should be an indirect quote with no
22  quotation marks, and I apologize for that.
23  Q    So are you making any larger points about the relationship
24  of school spending and outcomes in Alabama?
```
15:51:00
```
25  A    No.  No.  This -- this paragraph that we're talking about,
```

1  paragraph 92, is literally just about differences in spending

2  across the state.

3      I mean, I do note in the footnote that there are racial

4  differences between those two counties.  But with -- like I

15:51:18 5  just said with this, like you can't make assumptions off of

6  necessarily two data points.  It's descriptive.  It's not

7  correlational, and it's not causal.

8  Q    I see.  Okay.

9  A    I'm sorry.  Does that make sense?

15:51:31 10  Q    Yes, it does.  Thank you.

11  A    Oh, okay.

12  Q    All right.  Skipping ahead to economic disparities.

13      In discussing economic disparities, you note in your note

14  that the unemployment rate for black Alabamians was 4.6 percent

15:52:02 15  and for white Alabamians is 2.5 percent, correct?

16  A    Can you tell me what paragraph we're in?

17  Q    Yes.  I'm sorry.  Paragraph 103 on the first paragraph?

18  A    Okay.

19  Q    Do I have that right?

15:52:14 20  A    So as an example that -- is that what we're talk about?

21  The employment rate for black residents?  Is that what we're

22  talking about?  Can you read the quote again?  I guess that's

23  easier.  Sorry.

24  Q    Yes.  I'm sorry.  This is coming from paragraph 103, and

15:52:31 25  you state, In terms of employment, the unemployment rate for

```
         1   African-American workers, 4.6 percent, is twice that of white
         2   workers, 2.5 percent.
         3        Do you see that?
         4   A    Yes.  Sorry.  Yes.
15:52:47 5   Q    Is it correct or do you know that the nationwide black
         6   unemployment rate is 7.1 percent?
         7   A    I did not know that.
         8   Q    So per this citation you cite to -- I'm sorry.  Just give
         9   me one second.
15:53:22 10  A    You're fine.
        11   Q    Okay.  Yeah.  This is footnote 108.
        12   A    Okay.
        13   Q    Which is the Economic Policy Institute, State Unemployment
        14   By Rate and Ethnicity?
15:53:49 15  A    Uh-huh.
        16   Q    I am going to pull that up for you.  Defendants'
        17   Exhibit 158, and I think it is also an objected to exhibit.
        18   You see this?
        19   A    I do.
15:54:16 20  Q    Is this the report you looked at?
        21   A    It was a website, so it looked a little different, but I
        22   am going to assume yes.
        23   Q    Okay.  Would it help if I scrolled through it?  I did save
        24   it as a pdf, so it might be a little bit different.
15:54:31 25  A    I guess -- if it's not fine, I will let you know.
```

1582

1  Q    Okay.  So my main questions are on this first page.  And
2  we see that the nationwide black unemployment rate is
3  7.1 percent.  Is that what that says?
4  A    Yes, it does.
15:54:49 5  Q    And the DC -- just for comparison, the D.C. unemployment
6  rate, the black unemployment rate is 11.7 percent; is that
7  correct?
8  A    That is correct.
9  Q    Okay.  And that is compared to Alabama's 4.6 percent that
15:55:09 10 you mentioned in your report, right?
11 A    That is true.
12 Q    So previously, you gave us an example of putting Alabama's
13 number in context with the education spending?
14 A    Uh-huh.
15:55:22 15 Q    Why did you not do that when it came to unemployment?
16 A    Again, so like I said earlier, if the comparison was
17 present, I included it, but I didn't go through each point
18 looking for information to compare Alabama to other places.
19      So, for example, when I was doing my research on
15:55:43 20 education, one of the first places I went to was PARCA and the
21 Department of Education.  And so the comparison was present, so
22 I included it.
23      I will say, though, I mean, it's clear that Alabama's
24 black unemployment rate is lower than -- what is that, D.C.?
15:56:00 25 D.C. is also lower than nationwide black unemployment.  But

```
 1  that also doesn't, like, eliminate the fact that there is a

 2  disparity between black unemployment and white unemployment in

 3  the state.

 4  Q    But you also did not note the national comparison, like --

 5  A    I -- sorry.  I didn't mean to cut you off.  I apologize.

 6  Q    No.  Go ahead.

 7  A    No.  I was going to say you are correct.  I did not note

 8  that -- I did not include nationwide unemployment statistics in

 9  the section.  You are correct.

10  Q    Thank you.

11  A    Uh-huh.

12         MR. BOWDRE:  Your Honor, I would move to admit Defense

13  158 since we have offered it before, and this is I think

14  different than the last offer in that this is -- Dr. King has

15  testified that this is the article that she relied on.  She

16  obviously found it relevant and reliable because she relied on

17  it, and it is relevant to this case because it shows

18  unemployment rates not just for Alabama, but for other

19  jurisdictions, as well.

20         JUDGE MARCUS:  Any objection?

21         MR. ROSS:  Your Honor, I believe it was the Milligan

22  plaintiffs that objected.  As you know, the Supreme Court has

23  said that this is an intensely local analysis, and so we object

24  to including any evidence about other states, because as

25  Dr. King testified, the relevant comparison is black Alabamians
```

15:56:26  (line 5)
15:56:45  (line 10)
15:57:07  (line 15)
15:57:24  (line 20)
15:57:39  (line 25)

1  to white Alabamians, not to black people in other states and

2  other cities.

3          JUDGE MARCUS:  So the objection is not one of

4  foundation, but of relevancy.

15:57:54 5          MR. ROSS:  Yes, Your Honor, relevance and hearsay,

6  since this is not a government document, so we don't know the

7  underlaying basis.

8          JUDGE MARCUS:  We will reserve on 158.

9          MR. ROSS:  Thank you.

15:58:08 10 BY MR. BOWDRE:

11 Q    Dr. King, moving on to paragraph 112 of your report, this

12 is about the section of your report entitled, Criminal Justice

13 and Felony Disenfranchisement?

14 A    Yes.

15:58:35 15 Q    So you know -- this is the first sentence of paragraph 113

16 in which you were talking about the incarceration rate in

17 Alabama and the effect that that has on felon voting in

18 Alabama.

19         And you say that these disparities make Alabama an outlier

15:58:59 20 among other states; is that correct?

21 A    Is that in paragraph 112?

22 Q    The beginning of paragraph 113.

23 A    Oh.  Sorry.  Yes.  Proceed.  That is what I wrote.  Yes.

24 Q    So, here again, why is it important or why do you note

15:59:23 25 that Alabama is an outlier as compared to other states?

1   A    Again, I can't say that I was actively trying to exclude

2   or include nationwide comparisons.  I mean, I can't really give

3   you an I did it because of X or Y.  I often, you know -- so I

4   will just say this:  As a, you know, as a social scientist,

16:00:00  5   when talking about and presenting statistics, sometimes you

6   present national points of comparison, and other times you

7   don't.  I can't -- I can't speak for -- me.  I will speak for

8   myself.  But I can't say I sit there and have an active sort of

9   dialogue or discussion about, you know, should I do it here or

16:00:23 10   shouldn't I do it there.  It's not that intentional.

11   Q    Okay.  But you would agree that at times it can be helpful

12   or relevant to have that context?

13   A    Oh, yeah.  I agree wholly, yes.

14   Q    So in the previous paragraph, which is paragraph 112?

16:00:42 15   A    Yes.

16   Q    You say that the incarceration rate in Alabama is 1,132

17   black residents imprisoned per 100,000 black residents in the

18   state, and 421 white residents imprisoned per 100,000 white

19   residents in the state.  Did I read that correctly?

16:01:02 20   A    That is correct, yes.

21   Q    Okay.  And for that, you rely on the sentencing project,

22   The Color of Justice; is that correct?

23   A    I do.

24   Q    In --

16:01:24 25   A    Yes.

```
 1   Q    I am going to pull that up and share that on my screen.
 2   A    Please do.
 3   Q    And this is -- I'm sorry.  Can you see that?
 4   A    Yes.
16:01:39 5   Q    And this is Defense Exhibit 153, which I also think was
 6   objection by the Milligan.  But I assume like the other ones
 7   would be in evidence in the Caster case.
 8        Is this the report that you relied on, Dr. King?
 9   A    It is.
16:02:11 10   Q    I'm sorry.  I missed that.  Okay.  I am going to skip down
11   to page 21.  And this is -- the Table 7 is the black
12   differential high to low.  Do you see that?
13   A    I do.
14   Q    And then I have Alabama highlighted, and I see the numbers
16:02:39 15   that you pulled -- 421 and 1,132 for a disparity of 2.7; is
16   that right?
17   A    Can you zoom in?
18   Q    Yes.  I'm sorry.  Go ahead.  Can you see that?
19   A    I can.
16:02:57 20   Q    And those are the numbers that you pulled for your report?
21   A    Yes.  But I believe I pulled the Alabama numbers from the
22   text and not the table.
23   Q    Okay.  But the numbers are the same?
24   A    Yes, uh-huh.
16:03:09 25   Q    Okay.  And so scrolling out just a little bit.  Would you
```

```
 1   agree that this places Alabama as the 49th state right behind
 2   Hawaii, in terms of the black/white differential looking high
 3   to low?
 4   A    Can you scroll down?
 5        So, yes.
 6   Q    Okay.  But you did not include that context in your
 7   report, did you?
 8   A    I --
 9              MR. ROSS:  Your Honor, the Milligan plaintiffs.
10              JUDGE MARCUS:  One moment.  If you hear an objection,
11   Dr. King, just give me a chance to hear it and rule on it
12   before we rule on the objection, okay?
13              THE WITNESS:  Will do.
14              JUDGE MARCUS:  Thank you.
15        Mr. Ross?
16              MR. ROSS:  Your Honor, the Milligan plaintiffs also
17   objected to this report on the same basis relevance, hearsay,
18   and foundation.  We have the same issues as we have had with
19   the last several exhibits.
20              JUDGE MARCUS:  Let me ask this question just so I'm
21   clear.  Caster, have they offered this?
22              MR. OSHER:  No, Your Honor.
23              JUDGE MARCUS:  Was this among the materials you have
24   offered, Mr. Osher?
25              MR. OSHER:  No, Your Honor.
```

1          JUDGE MARCUS:  Are you objecting as well, or do you

2   have no position on this.

3          MR. OSHER:  In the joint pretrial report or prehearing

4   report, the Caster plaintiffs did not interpose an objection to

16:04:34   5   this exhibit.

6          JUDGE MARCUS:  All right.  Do you want to tell us

7   about relevance, Mr. Bowdre?

8          MR. BOWDRE:  Yes, Your Honor.

9          JUDGE MARCUS:  He said, one, it isn't relevant what

16:04:47  10   the nationwide figures are.  What's relevance is what the

11   Alabama figures are.  And, two, he says that it's hearsay.  It

12   doesn't come from some official government document or report

13   from the Justice Department of Bureau of Prisons or anything

14   like that, and therefore, he is objecting on the grounds of

16:05:10  15   hearsay.

16          MR. BOWDRE:  Yes, Your Honor.  I will address hearsay

17   first.

18      So Dr. King has testified as an expert she has relied on

19   this.  It is cited in her expert report on footnote 127.  And

16:05:32  20   at a preliminary injunction hearing, all the rules of hearsay I

21   don't think apply with full force, and the Court has discretion

22   to consider, you know, just for the speed of things and the

23   quick nature of things -- this is *Levi Strauss & Company vs.*

24   *Sunrise International Trading, Inc.,* 51 F.3d at 985, and --

16:05:58  25   just one sentence quote is:  At the preliminary injunction

1    stage, a district court may rely on affidavits and hearsay

2    materials, which would not be admissible evidence for a

3    permanent injunction if the evidence is appropriate given the

4    character and objectives of the injunctive proceeding.

16:06:16  5        And as for relevance, I think that Dr. King has testified

6    that it can be useful and relevant to situate Alabama's numbers

7    within the context of America and within the context of other

8    states.  Indeed she does so in the immediate next sentence in

9    her report in paragraph 113.

16:06:37  10        JUDGE MARCUS:  We will reserve on the admissibility so

11   I have a chance to counsel with my colleagues.  You may

12   proceed.  So we're clear, we have reserved on 153, as well as

13   on is 158.

14        Did you want to add something, Mr. Ross?  I didn't mean to

16:06:57  15   cut you off.

16        MR. ROSS:  Yes, Your Honor.  I am sorry.  I just want

17   to acknowledge that we also had a foundation objection, which I

18   believe is similar to our other objections.  I just wanted to

19   make sure I have it.

16:07:08  20        JUDGE MARCUS:  Yes, I understand.

21        MR. ROSS:  Thank you, Your Honor.

22        JUDGE MARCUS:  So everyone is clear, we have reserved

23   on 153 and 158.  These are not government reports purporting to

24   summarize statistics nationwide.  You may proceed with your

16:07:23  25   next question.

1          MR. BOWDRE:  Thank you, Your Honor.

2    BY MR. BOWDRE:

3    Q    I apologize if you have already answered this, but you did

4    not provide this context in your report; is that correct?

16:07:33  5    A    I did not state where Alabama falls relative to the other

6    49 states.  You are correct.  But I would again make the same

7    point I made earlier, that even though Alabama's black/white

8    differential is one of the lowest, it still exists within the

9    state.

16:07:57 10   Q    Okay.  Thank you.

11   A    Uh-huh.

12   Q    Okay.  In paragraph 120, you discuss the Census Bureau and

13   policies of counting inmates of where they are imprisoned.  And

14   my question is -- and you note that Alabama does the same

16:08:25 15   thing, right?

16   A    Uh-huh.

17   Q    And my question is:  I just want to be clear that this is

18   a Census Bureau policy of counting inmates at the prison and

19   not something that Alabama uniquely has done; is that correct?

16:08:37 20   A    Right.  When conducting the census and geographically

21   positioning people, the Census Bureau counts incarcerated

22   people where they are housed, correct.

23   Q    And other states, not all other states, but a lot of other

24   states do not reallocate where those people are counted for

16:09:00 25   terms of redistricting?

```
 1  A    There are some states that don't, and there are some
 2  states that do, yes.
 3  Q    In fact, only 13 states relocate their prison populations;
 4  isn't that right?
 5  A    I mean, I don't know the number off the top of my head,
 6  but if that's number you're presenting as fact, I will take
 7  your report.
 8  Q    Okay.  Let's talk about felon disenfranchisement for a
 9  moment.
10  A    Okay.
11  Q    Let me skip some of these questions.  So I am looking at
12  paragraph 115?
13          JUDGE MARCUS:  Again, just so that I am clear,
14  Mr. Bowdre, you're referring to Dr. King's first report,
15  paragraph -- the paragraph you're referencing?
16          MR. BOWDRE:  Yes, Your Honor.  Paragraph 115 of
17  Dr. King's initial report.
18  BY MR. BOWDRE:
19  Q    You discuss the Supreme Court's decision in *Hunter vs.*
20  *Underwood*?
21  A    Uh-huh.
22  Q    Did you read that case?
23  A    In its entirety, no.  And so I think something I should
24  say here is so as a political scientist relative to my work,
25  when I engage in court cases, particularly as part of my
```

16:09:08 (line 5), 16:09:24 (line 10), 16:09:48 (line 15), 16:10:06 (line 20), 16:10:15 (line 25)

1   scholarship, it's fundamentally looking at what the decision

2   was and sort of what the potential impact of that decision was.

3        So I don't regularly in my, you know, academic work as

4   faculty at Auburn University nor as sort of in my academic

16:10:40 5   presentation in response to the Senate Factors, did I -- I

6   didn't change the way I approach research for this is what I

7   guess I'm trying to say to you.

8   Q    Okay.  Thank you.

9        So my question stems from the sentence, Although Section

16:10:54 10   182 was struck down in *Hunter vs. Underwood*, Amendment 579 was

11   added to the Alabama Constitution in 1996?

12   A    Uh-huh.

13   Q    So my question is:  Didn't *Hunter vs. Underwood* only

14   strike down the felon disenfranchisement provision as it --

16:11:13 15   actually related only to misdemeanants not felons?

16             MR. BLACKSHER:  Your Honor, this is Jim Blacksher for

17   the Singleton plaintiffs.

18             JUDGE MARCUS:  Yes, sir.

19             MR. BLACKSHER:  I would remind, Your Honor, that that

16:11:28 20   very issue is pending before the Eleventh Circuit.  There was

21   oral argument in *Thompson vs. Merrill* on the felon

22   disenfranchisement case only about a month ago.  I am

23   co-counsel in the case.

24             JUDGE MARCUS:  Yes.  Mr. Bowdre, what is it you want

16:11:44 25   to ask her?  What the district court ruled?

1              MR. BOWDRE:  No, Your Honor --

2              JUDGE MARCUS:  Or the Eleventh Circuit?  I am not sure

3    I have the import of the question.

4              MR. BOWDRE:  I'm sorry.  I'm asking her about her

16:11:56  5    assertion in paragraph 115 that the U.S. Supreme Court in

6    *Hunter vs. Underwood* struck down Alabama's provision.  And my

7    question --

8    BY MR. BOWDRE:

9    Q    And my question is:  Didn't the Court only strike down the

16:12:10 10    provision as it applied to misdemeanors?

11   A    I think this is just a poor wording on my part, in terms

12   of, you know -- yes, I probably should have been more specific

13   in the way I wrote that one sentence.

14   Q    Okay.  So as Mr. Blacksher pointed out, are you aware that

16:12:39 15   Alabama's felony disenfranchisement law has recently been

16   litigated in federal court?

17   A    The current law?

18   Q    Yes.

19   A    Well, I am now.

16:12:52 20   Q    You were not when you wrote your report?

21   A    Like did I know there were challenges against the Moral

22   Turpitude Act?  Is that what we're talking about?

23   Q    Yes.  The 2017 provision that you discuss in paragraph

24   116.

16:13:09 25   A    No.  Actually, I was not aware that it was currently being

```
 1  litigated in court.
 2  Q    Okay.  And so you were also not aware that the district
 3  court the Middle District of Alabama upheld Alabama's law?
 4  A    You mean the one in place now?
 5  Q    Yes.
 6  A    I mean, I know it's in place.
 7  Q    Okay.  Let me go back --
 8  A    I don't -- I don't understand what you are asking me.
 9              MR. OSHER:  Your Honor, I am going to object to this
10  line of questioning.  Dr. King's not asserting that this law is
11  -- it is unlawful.  She's asserting that it has a
12  discriminatory effect, period.  She's not opining on the
13  legality of the provision.  And the questions about what a
14  court has done or has not done is not relevant to her opinions
15  in this case.
16              JUDGE MARCUS:  You may ask her whether she's familiar
17  with it or not.  To the extent the objection went to that
18  question, it is overruled.  And then let's see if we can move
19  this along, Mr. Bowdre.
20              MR. BOWDRE:  Yes, Your Honor.
21  BY MR. BOWDRE:
22  Q    Just to be clear, Dr. King, it's your testimony that you
23  were not familiar with the Thompson vs. Merrill decision or
24  that litigation when you wrote your report; is that correct?
25  A    Yes, that would be correct.
```

```
 1   Q    Okay.  In paragraph 117 of your report, you state that
 2   despite passage of the 2017 law clarifying which crimes are
 3   disenfranchising, there has been no effort on the part of the
 4   state to inform the thousands of Alabamians who prior to 2017
 5   may have been told that they were ineligible due to their
 6   felony convictions, but for whom the Moral Turpitude Act
 7   clarified that they are indeed eligible to vote; is that
 8   correct?
 9   A    That is what I wrote, yes.
10   Q    And for that assertion, you relied on a student note in
11   the Harvard bar review; is that correct?
12   A    That and my -- I mean, I couldn't cite my own personal
13   knowledge.  I don't believe so.  I didn't.
14   Q    Okay.  What is your personal knowledge about that
15   assertion?
16   A    So as part of my work at Auburn University, one of my
17   colleagues has a grant with the secretary -- no -- not a grant
18   -- a contract -- with the Secretary of State's office to
19   provide training for the voter registrars across the state
20   relative to the work that they do.  And so part of that work
21   focuses on moral turpitude and efforts to notify people that
22   they are eligible.  Not -- so part of that work is about
23   explaining what the act is, what the -- we go through the
24   cases, we present, you know, different potential felonies
25   people could be convicted of.  And so I mean we have
```

1596

```
         1  conversations about what they do or don't do as part of their
         2  jobs.
         3       And so.
         4  Q    So I just want to make sure I understood what you just
16:16:26 5  said.
         6  A    Sorry.
         7  Q    You were discussing a grant either with --
         8  A    It's a contract through the Secretary of State's office
         9  that one of my colleagues has, yes.
16:16:37 10 Q    Okay.  So the Secretary of State's office has contracted
         11 with your colleague?
         12 A    Uh-huh.
         13 Q    To explain?
         14 A    No.
16:16:43 15 Q    To voters what the moral turpitude law is?
         16 A    No.  She's contracted with the registrars to provide
         17 formal training over Alabama's voter registration rules.  And
         18 so part of that training involves discussions of the Moral
         19 Turpitude Act and how they as registrars are supposed to deal
16:17:02 20 with it when someone shows up and says they have a felony
         21 conviction.  So while we're there, oftentimes we regularly have
         22 conversations about sort of what it is or what they don't do as
         23 a part of their jobs, and notifying people is not a part of
         24 their jobs.  And they work for the state, so...
16:17:22 25 Q    I see.  Okay.
```

1    A    I didn't want to -- I mean -- putting that -- sorry.

2    Q    Have you been in contact with anyone at the Secretary of

3    State's office or the Board of Pardon and Paroles about their

4    efforts, if any, to reach voters?

16:17:41 5    A    No, I did not contact the Secretary of State's office or

6    the Board of Pardons and Paroles.  I did not do that.  You are

7    correct.

8    Q    Okay.  And since you are not aware of the *Thompson*

9    litigation, is it safe to say that you did not review any of

16:17:55 10   the evidentiary submissions in that case?

11   A    That would be safe to say, yes.

12   Q    Okay.  Did you check to see if there were any newspaper

13   articles or blog posts for social media posts about the 2017

14   law either from the Secretary of State's office or from anyone

16:18:14 15   else that might inform Alabama voters?

16   A    I know there is a press release on the Secretary of

17   State's website because I have seen it.  And I would imagine at

18   some point in time, I probably read an article on AL.com.

19   Q    Okay.  When you were you were at the Secretary of State's

16:18:35 20   website, did you see the infographic on that website listing

21   felonies that require restoration?

22   A    You mean the CERV?

23   Q    Yes.

24   A    I mean, I -- I'm sure I have seen it.  I can't say I was

16:18:49 25   actively looking for it, but I am sure I have seen it.

```
            1   Q    Okay.  I am going to pull up Defense Exhibit 156.
            2   A    I'm sorry.
            3   Q    Do you see that, Dr. King?
            4   A    I do.  And I do actually believe I have seen this before.
16:19:18    5   Q    Okay.  Did you see it on the Secretary of State's website,
            6   do you think?
            7   A    Probably.
            8   Q    Okay.  You just know that you have seen it before?
            9   A    I know I have seen it, yes.
16:19:32   10   Q    But you would not say that this is an effort to inform
           11   people of the 2017 law?
           12   A    No.  And I think -- no, I don't think -- I know when I
           13   mentioned inform, I meant to actively contact people, not post
           14   information on the Internet as you would for any state
16:19:53   15   statutory change.  I should have worded what I was implying
           16   more specifically.
           17   Q    I see.  So you mean --
           18   A    Like direct.
           19   Q    Okay.  I will move on.  Thank you.
16:20:11   20   A    Uh-huh.
           21   Q    This is looking at paragraph 118 in the CERV process that
           22   you just mentioned.  And you note that there have been 3,493
           23   voting rights restorations from 2016 to 2020?
           24   A    Uh-huh.
16:20:36   25   Q    That is through the CERV process.
```

1       Did you also look to see how many pardons were granted by

2   the Bureau of Pardons and Paroles during that same time period?

3   A    I did not.

4   Q    Would you agree that being pardoned would also restore an

16:20:50 5   individual's right to vote?

6   A    Yes.

7   Q    Okay.  You did not discuss that in your report?

8   A    No, I did not.  And, again, it wasn't some sort of

9   intentional -- let me not include this data point.

16:21:07 10  Q    Continuing on Senate Factor 5, would you say that the

11  factors you have discussed have hindered the ability of black

12  Alabamians to register to vote?

13  A    Can you tell me what page Senate Factor 5 is on?  Would

14  you be able to tell me what page Senate Factor 5 starts on?

16:22:05 15  Q    Yes.  Senate Factor 5 in your report starts on page 30.

16  A    Let's see.  In Senate Factor 5, I discuss education,

17  economic disparities, criminal justice and felony

18  disenfranchisement and --

19          JUDGE MARCUS:  Dr. King, I have to ask you again

16:22:33 20  please just slow down so the reporter can take all of this

21  down.  Thanks very much.

22          THE WITNESS:  My apologies.  I'm sorry.

23          JUDGE MARCUS:  Just take your time.

24          THE WITNESS:  Okay.  So in Senate Factor 5, I discuss

16:22:45 25  education, economic disparities, criminal justice and felony

```
 1    disenfranchisement, and health care, I believe.  Health
 2    insurance and health outcomes.  Okay.
 3         So can you repeat your question?
 4    BY MR. BOWDRE:
 5    Q    Yes.
 6    A    Thank you.
 7    Q    Would you say that the factors that you have discussed
 8    with regard to Senate Factor 5 have hindered the ability of
 9    black Alabamians to register to vote?
10    A    So I would say in my report, I do not conduct any analysis
11    that directly connects these disparities to voter registration
12    or casting about among black Alabamians.  What I do is provide
13    them in the context of the broader social science or political
14    science literature that suggests these things do matter and can
15    impact political participation.
16    Q    Okay.  But you do not look directly at either voter
17    registration rates or voter participation turnout among black
18    Alabamians in recent elections; is that correct?
19    A    I did not conduct any voter registration or turnout
20    analysis, correct.
21    Q    And is that -- would you not consider that to be relevant
22    to your analysis?
23    A    I mean, I -- to a certain extent.  I mean, so my
24    understanding of the Senate Factors as I am as a political
25    science -- as a political scientist, am supposed to contribute
```

1        to is to discuss the extent to which -- I mean, I am reading it

2        now -- that the extent to which there is discrimination in

3        areas such as education, employment, and health, that could

4        hinder the ability of individuals to participate.  Is that

16:24:44  5   correct?  And I think that's correct, right?  So as a political

6        scientist who is not positioned to conduct my own research

7        relative to that answer, I did the best that I could with

8        respect to providing information about Alabama and its

9        disparities and connecting that to what we know in the

16:25:06 10  overarching literature relative to political science.

11            But no, I did not conduct a separate analysis that looks

12       at the impact of each of these factors on individual voter

13       turnout.  No.  I did not do that.

14       Q    Okay.  Would you agree that in recent elections both that

16:25:30 15  black voter registration is on par with white voter

16       registration in Alabama generally speaking?

17       A    I haven't looked at the Alabama voter registration and

18       turnout statistics lately, so --

19       Q    Okay.  So you mentioned --

16:25:47 20  A    I can't --

21       Q    -- I am not trying to belabor this point.

22       A    No, you're fine.

23       Q    I want to make sure I understand.

24            In paragraph 34, for instance, and this is I think part of

16:26:01 25  the first Senate Factor your discussion.  You mentioned that

1602

```
 1  only 23 percent of blacks are registered to vote.  And I guess
 2  my question is --
 3  A    Can you repeat that paragraph again, please?
 4  Q    Yeah.  I think it was paragraph 23.  I'm sorry.  It was
 5  paragraph 34 of your report.
 6  A    Okay.
 7  Q    And my question is:  When we're discussing whether any of
 8  these disparities that you discuss with regard to Senate Factor
 9  5?
10  A    Uh-huh.
11  Q    And whether those disparities would hinder political
12  participation by blacks in Alabama?
13  A    Uh-huh.
14  Q    I guess my question is:  Why did you not look at or
15  consider voter registration or voter turnout data?
16  A    So -- so first thing, the statistics you pointed to about
17  where I looked at voter -- registered voters is from 1965.  So
18  that is old.
19       And so can ask you me your question one more time?  Why
20  did I not look at voter registration and turnout relative to
21  the factors I discuss in response to Senate Factor 5?
22  Q    Yes.
23            MR. OSHER:  Objection, Your Honor.  Asked and
24  answered.  She has been asked this question.
25            JUDGE MARCUS:  Overruled.  You may answer.
```

1          THE WITNESS:  Sure.  So, again, in response to Senate

2     Factor 5, I provided evidence of disparities across a wide

3     variety of public sector areas that through political science

4     scholarship have been demonstrated to impact the ability of --

16:27:47  5     one's ability to participate politically.  In order to conduct

6     the type of analysis you just mentioned where I look at -- you

7     know, I perform a -- you would have to perform a regression

8     analysis that looks at these factors and then individual

9     turnout to determine if there has been in effect, I off the top

16:28:10 10    of my head, cannot think of a data set that would allow me to

11    do that across all of those factors for individual voters in

12    Alabama.

13    BY MR. BOWDRE:

14    Q    Okay.  I think I only have one -- two more questions about

16:28:27 15    this.  But I want to make sure I understand it correctly.

16         So you just said that you look at the factors that have

17    been identified in the political science literature?

18    A    Uh-huh.

19    Q    That are related to negative voter participation?

16:28:41 20    A    Well -- well, no.

21         JUDGE MARCUS:  Let -- Ms. Dr. King, please, let him

22    finish the question.

23         THE WITNESS:  I apologize.

24         JUDGE MARCUS:  And then you can give the answer.

16:28:51 25    THE WITNESS:  I'm sorry.

BY MR. BOWDRE:

Q    So my understanding of what you just said was that you look at the factors that have been identified in the political science literature as having some connection with negative voter participation.  And then you look at whether those factors exist in Alabama without making that further step of connecting, you know, those things with actual voter participation in Alabama.  Is that generally right?

A    Generally.

Q    Okay.  And so my -- would it affect your analysis, or would it give you pause as to your conclusions if white voters and black voters in Alabama participated in voting and in registration at the same rates?

A    No.

Q    Why not?

A    So can I use an example to sort of explain why not?

Q    Sure.

A    Okay.  So one of the examples that we -- so one of the factors that we know matters in political science relative to voter participation is education.  And so we know that as education increases, people are more likely to vote and/or cast a ballot.

      What we also know within that literature is that while there is an effect for both black and white voters, the magnitude of the effect is not the same.

1    So the effect is present, but the size of the effect is

2  present -- excuse me -- is not consistent across those groups.

3    So what the literature tells us about African-American

4  voter turnout, and to a certain extent registration, is that in

16:30:50 5  -- when looking at education as an example specifically, what

6  you actually do see is higher participation among

7  African-Americans than you would expect relative to those

8  disparities that I discussed in my report about education.  And

9  so how we as political scientists whose -- you know, studied

16:31:14 10  these things have, you know, sensed out or tried to understand

11  them is while there is an effect, for example, of education,

12  the magnitude is lesser for African-Americans because

13  African-Americans have, you know, other factors that supersede

14  or reduce what the expected effect of educational turnout might

16:31:39 15  be.

16    So we talk about things like group consciousness and

17  communal activities that mobilize black people to vote more

18  than you would expect them to given what we know about

19  education disparities in the United States.  So just because

16:31:57 20  voter registration is higher or voter turnout is higher for a

21  population that is negatively impacted by those disparities, I

22  mean, it doesn't mean that those disparities don't matter with

23  respect to African-Americans.  What the literature suggests is

24  because of those disparities, African-Americans have found ways

16:32:20 25  to navigate systems that make voter registration and turnout

1 higher.  And so without those disparities, you probably would

2 probably see registration and turnout higher than it is.  So

3 that's why if they were at parity as you noted, I wouldn't

4 necessarily change my opinion.

16:32:35 5 Q    Okay.  Thank you.  Senate Factor 6.  And this starts on

6 page 45 of your report.

7      And Senate Factor 6 concerns political campaigns that have

8 been characterized by overt or subtle racial appeals; is that

9 correct?

16:32:56 10 A    I am a few pages behind you.  Yes.  Go ahead.

11 Q    So in paragraph 135, you discuss some racist comments by a

12 former Alabama legislator that were recorded as part of a

13 federal investigation.  Would you agree that those comments

14 were not part of a political campaign?

16:33:36 15 A    Electoral campaign, I would agree.

16 Q    And --

17 A    Not part of the campaign to secure office, I would agree,

18 yes.

19 Q    Okay.  How did you go about determining which campaign ads

16:34:00 20 to review?

21 A    I will be perfectly honest with you.  It was a struggle to

22 find records of old campaign ads.  I honestly started -- there

23 are repositories of campaign ads that exist.  So I started

24 there.  And then honestly to find ads in Alabama that were

16:34:25 25 still present, I did a lot of googling.  I am going to be

1    perfectly honest with you.

2    Q    Okay.  Do you think your report provides a representative

3    sample of campaign ads in Alabama?

4    A    Representative of those I was able to find.

16:34:38 5    Q    In determining what weight or import -- let me rephrase

6    that.

7         In determining the import of a racial appeal in a

8    campaign, do you think it matters at all whether the candidate

9    won the election or not?

16:34:57 10   A    No.  Because I mean I think there are a wide variety of

11   things that will go into the calculus of, you know, how a

12   campaign shakes out.

13   Q    Okay.  So there would not be a difference between, you

14   know, someone like George Wallace running in the '60s on a --

16:35:19 15   on a platform of segregation and being rewarded for it by being

16   elected into office versus someone running a very similar

17   campaign in 2010 and not getting office; you would not

18   differentiate those?

19   A    I mean, the world is very different between now and when

16:35:36 20   it was in 1965.  And so I can imagine someone running a

21   campaign similar to George Wallace's and not winning because

22   people were overwhelmingly offended.

23   Q    All right.  I think we're in agreement on that.  Okay.  So

24   I will just continue.

16:35:58 25        On -- and I don't have too many questions on this.  The

```
 1   first campaign ad you discussed is Tim James's 2010 ad.  And
 2   Tim James lost that election, correct?
 3   A    Okay.
 4   Q    Is that correct?
 5   A    What page are we on?  Yes, I do believe so.  I believe so.
 6   Q    Okay.  In paragraph 140, you mentioned two other ads, one
 7   by Jeff Sessions?
 8   A    Uh-huh.
 9   Q    And one by Arnold Looney?
10   A    Uh-huh.
11   Q    So a couple of questions about those.  One, would you say
12   that to the extent that these ads make a racial appeal, it is a
13   racial appeal that is not along black/white lines?  And these
14   are -- just to provide the context, these are in relation to
15   illegal immigration, correct?
16   A    I mean, I would say that's accurate.
17   Q    Okay.  And both of those candidates lost those elections,
18   correct?
19   A    Okay.  Correct.
20   Q    Okay.
21   A    I would like to say, though, I mean --
22        JUDGE MARCUS:  Is this in response to a question,
23   Dr. King?
24        THE WITNESS:  I'm sorry.  Go ahead.
25        JUDGE MARCUS:  We proceed by question and answer.  So
```

Timestamps in margin:
16:36:14 (line 5)
16:36:28 (line 10)
16:36:51 (line 15)
16:37:11 (line 20)
16:37:28 (line 25)

1609

1  if you don't understand the question, let us know, and we will

2  have him rephrase it.  And then when you get a question, take

3  all time you need to answer.

4        Next question, Mr. Bowdre.

16:37:41  5        MR. BOWDRE:  Thank you.

6  BY MR. BOWDRE:

7  Q    Moving on to Senate Factor 8, which begins on page 52 of

8  your report.

9        You list Medicaid as one example of the lack of

16:37:55 10  responsiveness by Alabama officials to the needs of black --

11  excuse me -- to the needs of black Alabamians.  Would you agree

12  that the Affordable Care Act which created the Medicaid

13  expansion option was passed largely along party lines?

14  A    I would agree with that, yes.

16:38:14 15  Q    Okay.  Would you also agree that some other Republican

16  states not in the South and without Alabama's history have

17  decided not to opt in to Medicaid expansion?

18  A    I mean, I don't have a list in front of me, but I am

19  assuming you have done the research.  So if you can assert that

16:38:38 20  that is in fact the case, then yes.

21  Q    Okay.  Do you think that there are reasons other than race

22  why a certain state might not wish to opt in to Medicaid

23  expansion?

24  A    Yes.  But I don't think those other reasons negates the

16:38:55 25  fact that choosing not to do so can also be like interpreted as

1  neglecting the needs of a specific population.

2  Q    Okay.

3          MR. BOWDRE:  Your Honor, may I have a moment?

4          JUDGE MARCUS:  You may, indeed.

16:39:34  5          MR. BOWDRE:  Your Honor, at this time, I don't have

6  any further questions.  Thank you.

7          JUDGE MARCUS:  Thank you.  Mr. Osher?

8          MR. OSHER:  Thank you, Your Honor.

9                      REDIRECT EXAMINATION

16:39:45 10  BY MR. OSHER:

11  Q    Dr. King, during cross-examination, do you recall being

12  asked about your response to Dr. Hood's statement about white

13  Republican support for minority candidates?

14  A    Yes.

16:39:59 15  Q    Okay.  And that was in your rebuttal report?

16  A    Yes.

17  Q    Okay.  I want to make sure that the competing opinions

18  here are accurately characterized.

19          So what is your understanding of the assertion that

16:40:11 20  Dr. Hood makes about what white Republican support for minority

21  candidates meets?

22  A    So Dr. Hood's assertion as presented in the article that

23  he wrote with Dr. McKee and in his initial report, his -- my

24  understanding of his assertion is that the evidence presented

16:40:45 25  in that article that black -- sorry -- that white Republicans

```
 1  will vote for minority candidates is evidence that ideology is
 2  more important than race in making candidate election
 3  decisions.
 4  Q    Okay.  And what is your response to that assertion?
 5  A    That the evidence he presents to support that assertion is
 6  insufficient as identified by that specific article.
 7  Q    So it is your response that a white voter's support for a
 8  minority candidate is not evidence that racial bias is not at
 9  play in that voter's behavior; is that right?
10  A    That is correct.
11  Q    Okay.  And you are not asserting that a white voter's
12  support for a minority candidate means that that voter is
13  racially biased?
14  A    That is also correct.
15  Q    And you are not saying that ideology has no impact on
16  partisan preference in Alabama?
17  A    That is also correct.
18  Q    But, instead, that race also influences partisan
19  preference in Alabama?
20  A    That is correct.
21  Q    Okay.  You were asked about the Alabama State Conference
22  case regarding election of judges.
23          MR. OSHER:  And can you pull that case up for us,
24  Jeff?  And can we go to page 46 of the pdf?
25  BY MR. OSHER:
```

16:41:07 (line 5)
16:41:35 (line 10)
16:41:51 (line 15)
16:42:05 (line 20)
16:42:17 (line 25)

1    Q    So I am looking at the second paragraph on this page that

2    starts with, there was evidence that.  And, Dr. King, I believe

3    you were shown this during cross-examination.  And if you could

4    highlight the second to last sentence in that paragraph.  Okay.

16:42:52  5    So that says, But the notion that African-American candidates

6    do solely because of their skin color is not supported by the

7    evidence.  Do you see that?

8    A    I do.

9    Q    Are you offering an opinion that -- strike that.

16:43:08 10         You are not suggesting that black candidates in Alabama

11    lose because of their race, right?

12    A    That's correct.

13    Q    Instead, you are offering an opinion about the impact that

14    racial considerations have on partisan preference?

16:43:21 15    A    That is correct.

16    Q    And it is your opinion that support for minority

17    candidates tells us very little about whether racial

18    considerations are at play?

19    A    That is correct.

16:43:35 20    Q    You were asked about in the context of racial appeals the

21    *McGregor* case, the 2010 case regarding state legislators very

22    clearly saying racist things about black Alabamians.  Do you

23    recall being asked about that?

24    A    I do.

16:44:00 25    Q    And you said that wasn't in the context of a campaign for

```
1    office.  Is that you said?
2    A    Correct.
3    Q    But that was in the context of an attempt to influence
4    black turnout based on what was on the ballot or not on the
5    ballot; isn't that right?
6    A    That is correct.
7    Q    Okay.
8            MR. OSHER:  Your Honor, if I could just have a moment.
9            JUDGE MARCUS:  Sure.
10           MR. OSHER:  That's all.  Thank you, Dr. King.
11           JUDGE MARCUS:  Thank you.  Any questions, Judge
12   Manasco or Judge Moorer for Dr. King?
13           JUDGE MANASCO:  None from me.
14           JUDGE MOORER:  No.  Thank you.
15           JUDGE MARCUS:  Thank you, Dr. King.  You are excused.
16           THE WITNESS:  Thank you.
17           JUDGE MARCUS:  Did we have -- we had another witness
18   for the Caster plaintiffs, did we not?
19           MR. OSHER:  We do.  We do, Your Honor.  Dr. Caster is
20   here to testify.
21           JUDGE MARCUS:  All right.  Do you want to take a short
22   break before we start, or do you want to go right into it?
23           MR. OSHER:  I -- a very short break.  That would.
24           JUDGE MARCUS:  All right.  We will take just
25   five minutes and then get started.
```

16:44:18 (line 5)
16:44:35 (line 10)
16:44:46 (line 15)
16:45:05 (line 20)
16:45:16 (line 25)

1          Quick question:  The extent of your examination of

2     Dr. Caster length-wise would be what?

3               MR. OSHER:  I would guess 30 minutes.

4               JUDGE MARCUS:  And, Mr. Davis, your cross for

16:45:32  5     Dr. Caster?

6               MR. DAVIS:  Actually, I had another question I will

7     pose in a moment, Your Honor.  Mr. Walker is actually crossing.

8     And if he's in the room downstairs, I will let him answer that.

9               JUDGE MARCUS:  Okay.  I -- are you going to

16:45:47  10    cross-examine him?

11              MR. DAVIS:  No, Judge.  Mr. Dorman Walker is going

12    to --

13              JUDGE MARCUS:  The sole examination of it.

14         All right.  Why don't we just in the meantime take --

16:45:59  15    there -- hi, Mr. Walker.  Quick question:  Rough sense of

16    timing on Caster cross-examination?

17              MR. WALKER:  15 minutes, Your Honor.

18              JUDGE MARCUS:  I am just trying to figure out whether

19    we will get it all in today or not.

16:46:13  20         I have 4:46 your time.  Why don't we take a ten-minute

21    break, and we will see where we go from there.  And then we

22    will get started in ten minutes with your next witness,

23    Mr. Osher.  Thank you.

24              (Recess.)

16:54:42  25              MR. DAVIS:  Judge Marcus, before testimony begins

1  again, I had a question for the Court if I may.

2           JUDGE MARCUS:  Of course.

3           MR. DAVIS:  Considering the lateness of the hour, I

4  wondered if the Court thought it was safe for me to let

16:54:55 5  Mr. Byrne know we will begin his testimony in the morning and

6  not this evening.

7           JUDGE MARCUS:  Indeed it is.  I think that's clear

8  because they have about a half hour, 45 minutes for this

9  witness, and we will not go beyond 6:00 o'clock Central

16:55:09 10  Standard Time at the latest today.  But if you can have your

11  witness lined up a little earlier, we would like to get started

12  at 8:30 Central Standard Time.  Is that a problem for anyone?

13           MR. DAVIS:  I do not think it will be a problem for

14  any of the counsel.  And I will confirm with Mr. Byrne.

16:55:28 15           JUDGE MARCUS:  All right.  We will start, then, Byrne

16  tomorrow morning at 8:30.  Is he the last of your witnesses, or

17  were you planning to call someone else?

18           MR. DAVIS:  No.  He will be the last of our witnesses,

19  Judge.

16:55:41 20           JUDGE MARCUS:  Okay.  Is there any additional evidence

21  that, Mr. Walker, you were going to be putting on besides what

22  we have already had presented?

23           MR. WALKER:  No, sir, Your Honor.  I will not.

24           JUDGE MARCUS:  Okay.  So you are not calling

16:55:57 25  Mr. Pringle or Mr. McClendon?

|     |     |
| --- | --- |
| 1 | MR. WALKER:  They will not be called, Your Honor. |
| 2 | JUDGE MARCUS:  Okay.  The only final question I have, |
| 3 | do you expect any rebuttal either from Caster, Singleton, or |
| 4 | Milligan? |
| 16:56:11 5 | MS. KHANNA:  Not from Caster, Your Honor. |
| 6 | MR. ROSS:  Not at this time, Your Honor. |
| 7 | JUDGE MARCUS:  All right.  And for Singleton?  Well, |
| 8 | if there's anything -- I'm sorry, Mr. Blacksher, Mr. Whatley? |
| 9 | MR. WHATLEY:  Not at this time, Your Honor. |
| 16:56:33 10 | JUDGE MARCUS:  I'm sorry? |
| 11 | MR. WHATLEY:  I said we don't expect any rebuttal at |
| 12 | this time, Your Honor. |
| 13 | JUDGE MARCUS:  Thanks very much.  Let's proceed, then, |
| 14 | with the next witness for the Caster plaintiffs.  Ms. Khanna, |
| 16:56:46 15 | you will be conducting that? |
| 16 | MS. KHANNA:  No.  It's actually going to be Mr. Osher. |
| 17 | But I wanted to flag for the Court maybe you can already see |
| 18 | Mr. Caster appears to be having some video troubles and trying |
| 19 | to publish it with him.  Maybe before Mr. Davis lets |
| 16:57:00 20 | representative Byrne go, we should see if we can resolve this. |
| 21 | JUDGE MARCUS:  Okay.  Mr. Davis? |
| 22 | MR. WALKER:  He has left the room, sir.  I think he is |
| 23 | moving -- there he is. |
| 24 | MR. DAVIS:  I am here listening, Judge. |
| 16:57:15 25 | JUDGE MARCUS:  You heard they were having some |

1    mechanical problems getting Mr. Caster hooked up here.  So you

2    might want to keep Byrne on deck just in case we go with him

3    instead.

4            MR. DAVIS:  Very well.

16:57:31 5            JUDGE MARCUS:  Thanks.

6            MS. KHANNA:  Thank you, Your Honor.  I know Mr. Osher

7    is calling him right now to see if they can help troubleshoot.

8            JUDGE MARCUS:  Thank you.  While we are waiting,

9    Ms. Khanna, is that Mr. or Dr. Caster?

16:58:15 10           MS. KHANNA:  I think it's Dr. Caster.

11           JUDGE MARCUS:  Thank you.

12           MS. KHANNA:  Apologies, Your Honor.  Just give us one

13   more moment to see if we can resolve the problem.

14           JUDGE MARCUS:  Okay.

17:00:39 15           MS. KHANNA:  Looking bleak for this moment.  I think

16   maybe it's best rather than wasting the Court's time to jump to

17   Representative Byrne if he is available.  Thank you for your

18   flexibility.

19           JUDGE MARCUS:  All right.  Thank you.  Mr. Davis, does

17:00:52 20  that work for you?

21           MR. DAVIS:  It works for me fine.  It will be just a

22   moment, though.  Mr. Byrne was in another part of the building

23   and is headed back into his office.

24           JUDGE MARCUS:  Thank you.  Do you want us to take a

17:01:02 25  five-minute break to do that?

1        MR. DAVIS:  It will probably take him that long to get

2   back and log in, Judge.

3        JUDGE MARCUS:  Why don't we take a five-minute break,

4   and we will get started with Mr. Byrne.

17:01:12  5        (Recess.)

6        JUDGE MARCUS:  Mr. Walker, any problem if we go

7   forward with Mr. Caster -- Dr. Caster who we have here now?

8        MR. WALKER:  Your Honor, we would be happy to go

9   forward with Dr. Caster now and put Mr. Byrne off until

17:04:19 10  tomorrow.

11       JUDGE MARCUS:  Okay.  Would you be kind enough to tell

12  him that we will start with him at or about 8:30, depending on

13  whether we finish up with Dr. Caster tonight?  We just can't

14  give him any guarantee, but I expect we will get started at

17:04:34 15  8:30.

16       MR. WALKER:  Yes, sir.  I will make sure he knows.

17       MR. DAVIS:  Thank you very much.

18       JUDGE MARCUS:  Thank you very much.  Thank you,

19  Mr. Davis.

17:04:42 20                    MARCUS E. CASTER,

21  having been first duly sworn, was examined and testified as

22  follows:

23       JUDGE MARCUS:  Would you be kind enough to state your

24  name for the record, please.

17:04:54 25       THE WITNESS:  Marcus Ellis Caster.

```
 1              JUDGE MARCUS:  Thank you, sir, and you may proceed,
 2   Mr. Osher.
 3              MR. OSHER:  Thank you, Your Honor.
 4                       DIRECT EXAMINATION
 5   BY MR. OSHER:
 6   Q    Good afternoon/evening, Dr. Caster.
 7   A    Good afternoon.  Good evening to everyone.  Your Honors.
 8   Q    Thank you for being with us.
 9              MR. OSHER:  Your Honor, I apologize for the
10   technicalities difficulties.
11              JUDGE MARCUS:  That's quite all right.
12   BY MR. OSHER:
13   Q    Dr. Caster, are you a plaintiff in this lawsuit?
14   A    Yes.
15   Q    And where do you live?
16   A    I live in McIntosh, Alabama, which is in Washington
17   County.
18   Q    Great.  And do you have family in Alabama?
19   A    Yes.  I have a two brothers that live in Mobile County in
20   the city of Mobile.  My mother also stays in Mobile County and
21   Mount Vernon, Alabama, and me and if I family we reside in
22   McIntosh, which is in Washington County, Alabama.
23   Q    Can you tell us a bit about your childhood, where did you
24   grow up?
25   A    I grew up in Mount Vernon, which is a town north of
```

Timestamps: 17:05:00 (line 5), 17:05:16 (line 10), 17:05:22 (line 15), 17:05:39 (line 20), 17:05:56 (line 25)

```
 1   Mobile, north of Mobile County.  Very small, one red light and
 2   a few stop signs, so it's very small, rural, but the
 3   environment there was -- it was pretty nice and enjoined.  But
 4   Mobile County has a vast outskirts of communities such as Mount
 5   Vernon, Citronelle, those are on the further north end of
 6   Highway 43.
 7   Q    Okay.  And I think you said you went to Citronelle High
 8   School?
 9   A    Yes.  I went to Citronelle High School.
10   Q    What further education did you get after that?
11   A    After Citronelle, I received a basketball scholarship at
12   the University of Mobile where I received my bachelor's degree
13   in sports medicine, pre-physical therapy.  I received my
14   master's degree in business administration from University of
15   Phoenix, and I received my doctor's of business administration
16   from Walden University, and I am now currently at Arkansas
17   State University getting an education specialist degree in
18   education leadership.
19   Q    Thank you.  Dr. Caster, if you could go even slower, that
20   would be great.  The court reporter has to take down every word
21   that we say.  And it's not an easy task.
22   A    Sure.
23   Q    What do you currently do for a living?
24   A    Currently, I am a teacher educator in the Clarke County
25   school system.  I teach kids three through five, and also I am
```

```
 1  an adjunct business professor at Southern New Hampshire
 2  University teaching students getting their master's degree in
 3  business administration.
 4  Q    And where else have you taught in Alabama?
```
17:07:49
```
 5  A    I taught in Mobile -- I taught with the Mobile County
 6  public schools systems when I first came out of college.  I was
 7  assistant basketball coach at Spring Hill College.  I also
 8  taught in Mobile at the drug education council where I was the
 9  youth council coordinator for the city of Mobile and the county
```
17:08:07
```
10  of Mobile.
11  Q    Can you tell us just a little bit more about the drug
12  education council?
13  A    Yes.  At the drug education council, I was -- where I was
14  the youth council coordinator, my job was to serve as the
```
17:08:23
```
15  liaison between the county commissioners of Mobile, the city
16  council of Mobile, and the mayor of Mobile, and the youth of
17  the city and county of Mobile County.  So our job was to try to
18  identify problems that was going on in the city and county of
19  Mobile and present those problems to the mayor of Mobile, to
```
17:08:49
```
20  the county commissioners of Mobile, and to the city council
21  members of Mobile to try to strengthen the youth and -- and
22  bridge the gap between the youth and local and county, city
23  government.
24  Q    In your work with the drug education council, did you get
```
17:09:07
```
25  an opportunity to learn what the communities of interests of
```

1   the residents of Mobile are?

2   A    Yes, we did.  Having to go to Government Plaza every week

3   to attend the county commissioners' meeting and having to

4   attend the city council meetings, you get a brief understanding

17:09:30  5   of what the citizens of Mobile, citizens of Mobile, what were

6   the issues in their districts, and what they are wanting for

7   their district, and also when you attend -- when we attended

8   the county commissioners' meeting, we had an opportunity to

9   find out what was going on in the rural areas, such as

17:09:53 10   Citronelle, Prichard, Alabama, Mount Vernon, and other -- other

11   towns and cities that's on the outskirts of Mobile County.

12   Q    And did you get an opportunity to identify what the

13   particular needs of the black community are in those areas?

14   A    Yes.  I had an opportunity to listen to a lot of the

17:10:16 15   residents to come to the county, the county commissioners'

16   meeting.  They was -- most of their concerns were education,

17   jobs.  They was wanting to get more jobs.  They was also

18   wanting to -- protection for the youth, and high-paying jobs,

19   as well.  So there's a lot -- there's a variety of things that

17:10:42 20   was a concern for a lot of the citizens of the county of

21   Mobile.

22   Q    So we will talk about those issues in a bit.

23        I have a couple of other questions about your background.

24   Have you ever run for political office?

17:10:57 25   A    Yes, sir, I did.  I ran for Alabama House of

1    Representatives District 65 back in 2018.

2    Q    That's in Washington County?

3    A    It covers Washington County, Choctaw County, and a portion

4    of Clarke County.

17:11:13  5    Q    And when running that campaign, did you have a chance also

6    to learn the unique needs of the black community in your area?

7    A    Yes, I did.  And the needs -- and the needs for the black

8    community area was pretty much the same as the ones that was in

9    Mobile, Mobile County.  More jobs, more trades and training,

17:11:38 10    more resources, and just things dealing with trade and the

11    recreation facilities for the youth.

12    Q    Dr. Caster, how do you identify in terms of your race?

13    A    Black, African-American.

14    Q    Okay.  Are you registered to vote in Alabama?

17:11:57 15    A    Yes, I am.

16    Q    Do you vote regularly?

17    A    Yes, I do.  I vote in both primary, local, city, any type

18    of election that we have, I try to voice my opinion by casting

19    a vote.  Voting is very important to me, my family.  It's

17:12:14 20    something that we take very seriously and that I instill that

21    in my children.  And I also try to instill that into other

22    family members and friends, as well.

23    Q    Do you know which congressional district you live in?

24    A    Yes, Congressional District 1.

17:12:30 25    Q    Okay.  And who currently represents that district?

```
 1   A      Jerry Carl.
 2   Q      Do you know who represented that district prior to
 3   Mr. Carl?
 4   A      Priority to Mr. Carl, it was Bradley Byrne.
 5   Q      Did you vote for Jerry Carl in the last election?
 6   A      No, I did not.  I actually voted for James Averhart.
 7   Q      And James Averhart was a -- he's a black man?
 8   A      That's correct.
 9   Q      And Mr. Carl won that campaign, though, right?
10   A      Yes, he did.
11   Q      Did you vote for Bradley Byrne when he was running for
12   Congress?
13   A      No, I did not.
14   Q      Why didn't you support Mr. Byrne in his congressional
15   campaigns?
16   A      Well, just by the values and things that my community
17   need, I felt as though my community, people in Washington
18   County, people that are north of Mobile County, and some people
19   that are also in Mobile County, the things that we want for our
20   community I felt as though the other candidates that were --
21   James Averhart, Robert Kennedy, Jr., those individuals, I felt
22   like those were the ones that were better -- was better
23   representative of what the needs of my community was looking
24   for.  And I felt as though that the other Representative
25   Bradley Byrne and Representative Carl, they didn't represent
```

Timestamps in left margin:
17:12:43 (line 5)
17:13:00 (line 10)
17:13:15 (line 15)
17:13:33 (line 20)
17:13:58 (line 25)

1625

1   the needs of my community.

2   Q    And, Dr. Caster, you made several references to my

3   community there.  Are you specifically referring to the black

4   community?

17:14:10  5   A    Yes, that's correct.

6   Q    Do you know whether the congressional elections in

7   District 1 have been competitive recently?

8   A    No, they have not.

9   Q    In light of that, do you feel like you have a voice in

17:14:27 10   congressional elections in Alabama?

11   A    No, I don't.  I -- we continue -- I continue to vote, but

12   I do not feel as though that my voice is being heard because

13   we're not getting someone that's representing the black

14   community.  I mean, so, no, I don't feel like my vote is being

17:14:47 15   heard -- is being heard at all.

16   Q    Dr. Caster, what result are you trying to achieve in this

17   lawsuit with respect to your congressional district?

18   A    A voice.  A voice.  I was -- I mean, my ancestors fought

19   for us to have a right and opportunity to vote.  And, you know,

17:15:09 20   and it's already difficult from -- it's difficult having to

21   talk to blacks and try to get them out to vote.  And but when

22   they feel like their vote is not counted, it distracts them and

23   discourages them from going back to the polls.  And I try to --

24   I try to be an activist in my community in a positive way.  And

17:15:33 25   then when I'm going out trying to talk to people about

registering to vote and being prepared to vote, they kind of
feel as though it's falling on deaf ears because they don't
feel like their vote don't count when they have someone in
office that doesn't represent them at all.

17:15:52 Q    Now, you don't mean literally not counted, right?  They're
able to cast a vote --

A    Yeah.  They're able to cast a vote, but when I say don't
count, it's by getting someone in office that does not
represent them.

17:16:06 Q    And if you were to live in a -- if you were to succeed in
this lawsuit and the state was ordered to create a second
majority-black district, do you think it's likely that your
current representative would change as a result of that?

A    Could you repeat the question, please?

17:16:26 Q    Would you think the individual who represents your
district would change if you were moved into a second
majority-black congressional district?

A    I'm sorry.  I'm trying my best to hear you on this
computer.  I got my volume turned up, but I am still having
17:16:44 problems.

Q    No problem.  Thank you for letting me know.

     So if you were to succeed in this lawsuit and the state
drew a second majority-black congressional district that you
lived in, do you think the person who currently represents your
17:16:57 district would change as a result of that?

```
 1  A    Would they change?  Would the person that's currently the
 2  representative would they change or the new person?
 3  Q    Would you elect someone else besides Mr. Carl to represent
 4  your congressional district?
 5  A    Oh.  Yes.  I would -- I would elect someone else besides
 6  Representative Carl to represent my district.
 7  Q    And would that change in representation, would it benefit
 8  or harm the black community in your area?
 9  A    I think it would be more beneficial to the black community
10  to have someone in that will be able to listen to the citizens
11  in our community, that would visit the citizens in our
12  community, that would go to Washington to represent us and to
13  vote on bills that represent our community would be very
14  beneficial to the district, our district, and the citizens --
15  the black citizens in the community, as well.
16  Q    And so just to be clear, you talked about feeling like you
17  -- your vote doesn't count in congressional elections based on
18  where you live.  Do you think the black community in your area
19  has even an opportunity to elect their representative of choice
20  right now?
21  A    No.  No, we don't.
22  Q    Are you having issues hearing me right now?  I think --
23  A    I can hear you.  Yeah.  It just kind of -- I have to try
24  to lean in, but I can hear you.
25  Q    Okay.  My apologies if I'm cutting out.
```

1    All right.  Dr. Caster, you identified a few issues that

2  people -- that people in the black community have identified as

3  particular needs that they have in the area that you live in.

4    You talked about employment.  Can you tell us more about

17:18:56  5  what the specific employment-related needs of the black

6  community are in your area?

7  A    Well, in my area, we have -- we have three to four

8  multibillion dollar plants.  And in they generate billions of

9  dollars each year.  And these plants employ a lot of people in

17:19:20 10  our -- in the state.  Unfortunately, a lot of individuals that

11  stay in the community that are black does not work for the

12  plants themselves because they don't have the training -- they

13  don't have the trades in order to get inside of these plants.

14  But our white counterparts are able to get these positions, get

17:19:40 15  positions at these plants, and we are not able to get positions

16  at the plants.

17  Q    Is the result of that, that the black -- members of the

18  black community have to get lower paying and less flexible

19  jobs?

17:19:55 20  A    That's pretty much -- that's pretty much throughout our

21  community, yes.  They -- we work at low-wage organizations and

22  companies where others -- whites get paid more.  And it just --

23  it just the way it is -- that's just where we are right now.

24  Sad to say, but that's the truth.

17:20:19 25  Q    Do you think that the COVID-19 pandemic has made that

```
     1  issue worse for the black community?
     2  A    Definitely, yes.  COVID has impacted our community very
     3  hard.  Deaths and sickness, yes.  It has definitely impacted
     4  our community.
17:20:37 5  Q    And in terms of employment, as well?
     6  A    Yes.
     7  Q    Are you familiar with the American Rescue Plan or the 2021
     8  COVID Relief Bill?
     9  A    Yes, I'm familiar with it.
17:20:49 10 Q    Do you know whether that legislation provided assistance
    11  to people who lost their job during the pandemic?
    12  A    Yes, it did.
    13  Q    And how did Representative Carl vote on that legislation?
    14  A    Against it.
17:21:03 15 Q    Did you want him to support it?
    16  A    Yes.
    17  Q    Did you think that his vote against it served or disserved
    18  the black community?
    19  A    It was a disservice to the black community.
17:21:15 20 Q    What about transportation?  Is that a unique need of the
    21  black community in your area?
    22  A    Yes, it is.  Transportation is a -- we don't have public
    23  transportation.  We don't have cabs.  We don't have Uber.  We
    24  don't have Lyft, anything, to get our people -- even if they
17:21:40 25 didn't have a vehicle to get them to, you know, transportation
```

1630

|   | |
|---|---|
| 1 | to a job even if they did have one.  So, yes, lack of |
| 2 | transportation is really a problem. |
| 3 | MR. OSHER:  Mr. Walker, I think your -- |
| 4 | BY MR. OSHER: |
| 17:22:00  5 | Q    Are you familiar with the infrastructure bill that |
| 6 | President Biden recently signed into law? |
| 7 | A    Yes, I'm familiar with it. |
| 8 | Q    Do you know whether that legislation had any provisions |
| 9 | pertaining to expanding access to public transit? |
| 17:22:17 10 | A    Yes. |
| 11 | Q    Would that be something that your community would benefit |
| 12 | from? |
| 13 | A    Yes.  Yes, definitely. |
| 14 | Q    My apologies.  I didn't mean to talk over you. |
| 17:22:30 15 | Do you know how Representative Carl voted on the |
| 16 | infrastructure bill? |
| 17 | A    Against it. |
| 18 | Q    Did you want him to support it? |
| 19 | A    Yes. |
| 17:22:36 20 | Q    And did his vote serve or disserve the black community in |
| 21 | your area? |
| 22 | A    It was a disservice to the black community. |
| 23 | Q    What about access to quality and affordable health care, |
| 24 | is that an issue for the black community in particular in your |
| 17:22:57 25 | area? |

```
 1   A     Yes, it is.

 2   Q     Can you tell us a little bit more about that?

 3   A     Yes.  We -- our community is -- first of all is -- we need

 4   health care, more affordable health care.  And because our

 5   communities is particularly in an area -- when I mentioned

 6   those four multibillion dollar plants, they -- they also emit

 7   pollution in the area, and a lot of individuals from our

 8   community get sick from it.  Most of -- in fact, just about

 9   everyone that I know stays around these plants, and they're

10   predominantly black that stays in these areas right around

11   these plants, and they get sick easy from cancer, easy from

12   lung disease and different ailments that they might have, and

13   we definitely need health care because, you know, they can't

14   afford to move out from these places.  So it is very important.

15   Q     Are you familiar with the Build Back Better Act?

16   A     Yes, I'm familiar with it.

17   Q     Do you know whether any provisions of that legislation are

18   aimed to reduce pollution in disadvantaged communities?

19   A     Yes.  Yes.  Parts of the bill was for pollution and things

20   like that.  But, you know, once again, the -- our

21   representative votes against all the bills that supposed to

22   serve our community.

23   Q     And so Jerry Carl voted against the Build Back Better Act?

24   A     Yes.

25   Q     And that legislation failed -- or currently is not
```

1    enacted, right?

2    A    Correct.

3    Q    Those provisions would have helped your community when it

4    comes to the pollution that the factories in your area cause

17:25:00  5  for the black community?

6    A    Yes, sir, that's correct.  We have our housing, child

7    care, and everything.

8    Q    Does the proximity of the factories to the black

9    neighborhoods in your area affect the quality of drinking

17:25:18 10  water?

11   A    Yes.  Actually, yes.  There was -- mercury was found in

12   the water I think back in 2013.  And -- and back then, the

13   drinking water was almost compared to that of Michigan.  And a

14   lot of individuals from the community actually received some

17:25:39 15  type of pay behind it, but the water is still not up to par.

16   So right now, people in the community now, they just put a

17   filter on their water faucet and pray for the best.

18   Q    And you referenced Michigan.  You're referring to Flint,

19   Michigan?

17:26:02 20  A    That's correct.

21   Q    Do you know whether the Build Back Better Act has

22   provisions meant to improve the quality of drinking water in

23   disadvantaged communities?

24   A    Yes.

17:26:13 25  Q    And, again, Representative Carl voted against it?

| | |
|---|---|
| 1 | A     That's correct. |
| 2 | Q     You spoke about your work in Mobile with specifically the |
| 3 | younger individuals who live there.  Did you notice any issues |
| 4 | related to criminal justice specifically in the city of Mobile? |
| 17:26:38  5 | A     Yes.  I mean, Mobile -- Mobile has been going through a |
| 6 | lot when it comes to criminal justice right now.  A lot of -- a |
| 7 | lot of blacks being incarcerated more so than the whites. |
| 8 |       And a lot of the bills in the -- the bills that was -- the |
| 9 | first step bill, you know, was supposed to help with some of |
| 17:27:13 10 | these issues.  And, again, our representative just don't |
| 11 | support these bills that is supposed -- you know, that's to |
| 12 | help our community. |
| 13 | Q     And was that a reference to the First Step Act? |
| 14 | A     Yes. |
| 17:27:27 15 | Q     From a few years ago? |
| 16 | A     Yes. |
| 17 | Q     And am I understanding you that Representative Byrne voted |
| 18 | against that? |
| 19 | A     That's correct. |
| 17:27:35 20 | Q     One more, Dr. Caster.  Access to high speed Internet.  Is |
| 21 | that an issue for the black community in your area? |
| 22 | A     Yes.  That's why I -- yes.  Yeah.  I'm at work now, so |
| 23 | high speed Internet at my house is -- is almost like dial up. |
| 24 |       So we definitely need access to high speed Internet, more |
| 17:28:04 25 | broadband connections, things of that nature to try to -- you |

```
 1  know, the more you have that, the more people can seek jobs

 2  online, things that you can just do a lot more by having high

 3  speed Internet.  And like I said, we don't have -- we don't

 4  have access to a lot of that being in the rural area that we're
17:28:22
 5  located in.

 6  Q    And with the COVID pandemic, did that lack of access to

 7  Internet harm students when they had to stay home?

 8  A    Yes.  Yes.  In -- in Mobile County, and Mobile County

 9  actually had to -- they actually put the access on a bus and
17:28:48
10  had parents to if they wanted -- if they didn't have Internet

11  at home, they could pull up by the bus and get the Internet

12  access from the -- from there.

13        And in my area, which is the rural area of Washington

14  County, you know, Washington County and Mobile County, they
17:29:07
15  butt right up against one another, so in the rural Mobile

16  County, like I say the Internet access, we just don't have --

17  we just don't have the resources right now.

18  Q    And I just want to be clear here.

19        You're talking about the black community specifically,
17:29:23
20  blacks' access to high speed Internet?

21  A    Yes.

22  Q    Do you know whether the infrastructure bill we talked

23  about earlier has provisions that would increase access to high

24  speed Internet around the country?
17:29:41
25  A    About $65 billion.
```

|  | |
|---|---|
| 1 | Q    And Representative Carl vote against the bill, did that |
| 2 | serve or disserve the black community with respect to that |
| 3 | issue? |
| 4 | A    Disserve. |

17:29:51  5   Q    And just to be clear, some of these bills passed, some did

6   not?

7   A    Right.

8   Q    Representative Carl consistently voted against them,

9   right?

17:29:59  10   A    That's correct.

11   Q    Do you mean to say that white residents of Alabama don't

12   have needs in the areas that we've been talking about?

13   A    No.  No.  Everyone.  Everyone have a needs, you know, it's

14   black, white, Hispanic, everyone have them.  But when I speak

17:30:17  15   to you, I'm talking about as far as our representative in our

16   congressional district and a disservice to blacks.

17   Q    And is it that the level of need among the black community

18   the just significantly higher than those in the white

19   community?

17:30:33  20   A    No.  No.  It's not that it's higher.  It's just the fact

21   that it's important and it matters.

22   Q    Okay.  And will the issues that we talked about earlier in

23   terms of employment, in terms of education, that desperately

24   impact black residents of your area, does that result in a

17:30:51  25   higher need in these areas for the black community?

1636

```
 1  A    Yes.  It's definitely s higher need because we don't have.
 2  And so if you don't have them, have the resources, then you
 3  know, those who don't have, there's a higher need for -- to try
 4  to get them to catch up with everyone else.  And a lot of, you
 5  know, a lot of people in, you know, neighboring us, they have
 6  access to some of these things, and we just don't.
 7  Q    All right.  Dr. Caster, I just have a few more questions
 8  for you.  I want to talk about where you live and your
 9  understanding of Washington County and Mobile County.
10       Do you understand the Washington, Mobile, and Baldwin
11  counties are all currently in the same congressional district?
12  A    Yes.
13  Q    Based on your work in Washington and Mobile counties,
14  would you say that black residents of those areas have a lot in
15  common with those who live in Baldwin County?
16  A    From what I see, the people from my area, my community,
17  they frequently visit Mobile County for entertainment, the
18  Mardi Gras, things of that nature.  That's where we go for to
19  support Mobile, and in the same time, Mobile comes to our area
20  and support us, as well, so, yes.
21  Q    Would you say that black residents of your area in the
22  city of Mobile have more in common with the Black Belt region
23  and the counties in the Black Belt than they do with Baldwin
24  County?
25  A    Yes.
```

17:31:13  (line 5)
17:31:33  (line 10)
17:31:48  (line 15)
17:32:15  (line 20)
17:32:32  (line 25)

1  Q     In fact, you were very patient with us on Friday when we

2  thought that you were going to testify then.  When you didn't,

3  where did you go after that?

4  A     I was actually in the Black Belt.  My son had two

17:32:46  5  basketball games in the Black Belt last week in Marengo County

6  Tuesday, and then I think it was Friday we was in Camden in

7  Wilcox County.

8  Q     And so just to be clear.  So I'm sorry.

9        What's your view about whether the -- or the economies of

17:33:13  10  the city of Mobile and the economies of Baldwin County in your

11  view, are they similar, independent, how do they compare to one

12  another?

13  A     Well, when you look at the simple fact that Mobile County

14  -- they both on the Gulf Coast, okay, and a bridge separates

17:33:36  15  the two.  Baldwin County is more tourists.  And Mobile County

16  is through the ports and blue collar.  So, therefore, the

17  economies are totally different from one another.  If anything

18  is incumbent, it would be Mobile County and Washington County

19  where I stay, where you talk about blue collar workers when you

17:34:04  20  come to the factories and the plants and also the Black Belt.

21  Q     That was the case that people go from Mobile to Baldwin

22  County and from Baldwin County to Mobile, right, people --

23  people go between those counties all the time, right?

24  A     Yes.  Yes.

17:34:18  25  Q     But you're saying that the nature of the economies are

1638

```
 1  different?
 2  A    Correct.
 3  Q    Do you think that black residents of Washington and Mobile
 4  County would be better served if they were a part of the
 5  congressional district that covered the Black Belt?
 6  A    Yes, I do.
 7  Q    And is that because the representative that would
 8  represent that district would better serve the interests of the
 9  black community?
10  A    That would be correct.
11           MR. OSHER:  Your Honor, just a moment?
12           JUDGE MARCUS:  Sure.
13           MR. OSHER:  Dr. Caster, that's all I have for you.
14  Thank you for your time.
15           JUDGE MARCUS:  Thank you.  Mr. Walker, you may
16  proceed.
17           MR. WALKER:  Thank you, Your Honor.  And I apologize
18  to Mr. Osher and the Court for interrupting his examination.
19                      CROSS-EXAMINATION
20  BY MR. WALKER:
21  Q    Dr. Caster, hello.  I am Dorman Walker.  I represent the
22  chairs of the reapportionment committee.
23  A    Nice to meet you.
24  Q    Nice to meet you, sir.  I will ask you a few questions.
25           You talked about a representative who would represent the
```

17:34:34 on line 5
17:34:45 on line 10
17:35:22 on line 15
17:35:26 on line 20
17:35:41 on line 25

```
 1   interests of the black community.  Could that person be black
 2   or white?
 3   A     Yes, it could be black or white.
 4   Q     And could it --
 5   A     Someone --
 6   Q     I'm sorry?
 7   A     I say, yes, it could be someone black or white, just
 8   someone that's looking out for, you know, that understand the
 9   needs of the black community and is willing to do something
10   about it.
11   Q     And could that person be Republican or Democrat?
12   A     It could.
13   Q     And --
14   A     We have a Republican, and that's not been working.
15   Q     Thank you, sir.  Would it be someone in that area who
16   understands the needs of -- you have talked about the needs of
17   primarily black people in Washington County, so would it be
18   that representative be somebody from that area who could
19   understand those best?
20   A     Yes, it could.
21   Q     Are you familiar with the -- with the alternative
22   districts that have been proposed in this case?  Have you seen
23   any alternative maps?
24   A     I saw some, but I am not totally familiar with them.  I
25   did see some alternative maps.
```

17:35:55 (line 5)
17:36:08 (line 10)
17:36:26 (line 15)
17:36:48 (line 20)
17:37:08 (line 25)

1640

```
 1   Q      Let me just show you something.

 2          Can you see the map that I have put up?

 3   A      Yes, sir, I can.

 4   Q      Figure 10, Alabama U.S. House Illustrative Plan 1 from the

17:37:32 5  Cooper Report.  And you see that -- you see where Washington

 6   County here is where I am moving the cursor?

 7   A      Yes, I do.

 8   Q      And you see that this proposed district, which is typical

 9   of the districts proposed by Mr. Cooper or drawn by Mr. Cooper

17:37:50 10 stretches all the way over to the border of Georgia; is that

11   correct?

12   A      Yes, that's what -- according to this map, yes.

13   Q      How many times in the last several years have you visited

14   Russell or Barbour or Henry County?

17:38:06 15 A      Not -- I visited Russell County I think it was once.

16   Q      And when was that, sir?

17   A      That was a few years ago.

18   Q      Do you know anything about the demographics of those

19   counties?

17:38:28 20 A      No.

21   Q      Do you know anything about the industries of those

22   counties?

23   A      No, I do not.

24   Q      Do you know where those people go to get their health

17:38:43 25 care?
```

1641

```
 1  A     No, I do not.

 2  Q     Do you feel like you are in a community of interest with

 3  those people?

 4         MR. OSHER:  Objection, Your Honor.  Dr. Caster is not

17:38:54 5  a map drawer.  He is not a politician.  We need to lay some

 6  foundation of what community of interest means.

 7         JUDGE MARCUS:  Mr. Walker?

 8         MR. WALKER:  Your Honor, I've asked words -- it's a

 9  plain simple question.  Does he feel like he is in a community

17:39:11 10  of interest for the people who live over in those counties.  I

11  don't think it's a legal term.

12         JUDGE MARCUS:  You are asking it in the common usage

13  of the words; is that correct?

14         MR. WALKER:  I am asking it in the common usage of the

17:39:21 15  words, Your Honor.

16         JUDGE MARCUS:  The objection is overruled.  You may

17  answer the question, Dr. Caster.

18         THE WITNESS:  Can you repeat the question, please?

19  BY MR. WALKER:

17:39:29 20  Q     Yes, sir.  Do you believe that you are in a community of

21  interest with these people on the western -- on the eastern

22  border of Alabama in Russell County, Barbour County, and Henry

23  County, who you have testified basically that you don't know

24  anything about?

17:39:44 25  A     That's correct.  I'm not -- I don't have any -- I don't
```

```
 1  know anything about them, so I can't say that I am in the
 2  interest of -- that community interest with them or not, so I
 3  can't adequately answer that question.
 4  Q    Thank you.
 5          MR. WALKER:  Your Honor, can I have just a second?
 6          JUDGE MARCUS:  You sure can.
 7          MR. WALKER:  Your Honor, thank you, sir.  That's all
 8  we have.
 9          JUDGE MARCUS:  All right.  Any redirect, Mr. Osher?
10          MR. OSHER:  Just a moment, Your Honor, if you would
11  indulge me.
12          JUDGE MARCUS:  Sure.
13          MR. OSHER:  Nothing more.  Thank you, Dr. Caster.
14  Thank you for your patience, and I am glad we were able to get
15  you on tonight.
16          THE WITNESS:  No problem.
17          JUDGE MARCUS:  Thank you, Dr. Caster, and you are
18  excused.
19          THE WITNESS:  Thank you, Your Honor.
20          JUDGE MARCUS:  We will break for the day, folks, and
21  we will get started tomorrow morning at 8:30 Central Standard
22  Time rather than 9:00.
23      And I take it at that point, Mr. Davis, you will be ready
24  to proceed with your next witness.
25          MR. DAVIS:  We certainly expect to.  Mr. Byrne thinks
```

1643

1 he can move something around and be here by 8:30.  If he's not
2 here at 8:30, it won't be long.  And I do think there may be
3 some business to take up with the Court on exhibits at some
4 point.

17:41:20  5        JUDGE MARCUS:  I expect we will take them up before we
6 get to closing.

7        MR. DAVIS:  I believe we can make good use of the
8 court time even if Mr. Byrne is a few minutes late.

9        JUDGE MARCUS:  Okay.  Thank you all.  Anything further
17:41:32 10 from anyone?  If not, have a good evening, ladies and
11 gentlemen.  And we will see you back here 8:30 tomorrow morning
12 Central Standard Time, 9:30 Eastern Time.  Court is adjourned.

13        (Whereupon, the above proceedings were concluded at
14        5:41 p.m.)

15
16
17
18
19
20
21
22
23
24
25

1                    <u>CERTIFICATE</u>

2

3

4         I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11                                           <u>01-11-2022</u>

12   Christina K. Decker, RMR, CRR         Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25