FILED
2022 Jan-18 PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ALABAMA
 2                     SOUTHERN DIVISION


 3


 4    BOBBY SINGLETON, et al.,        *
                Plaintiffs,           *  2:21-cv-1291-AMM
 5                                    *  January 12, 2022
      vs.                             *  Birmingham, Alabama
 6                                    *  8:30 a.m.
      JOHN MERRILL, in his official   *
 7    capacity as Alabama Secretary   *
      of State, et al.,               *
 8              Defendants.           *
      ******************************
 9                                    *
      EVAN MILLIGAN, et al.,          *
10              Plaintiffs,           *  2:21-cv-1530-AMM
                                      *
11    vs.                             *
                                      *
12    JOHN MERRILL, in his official   *
      capacity as Alabama Secretary   *
13    of State, et al.,               *
                Defendants.           *
14    ******************************
                                      *
15    MARCUS CASTER, et al.,          *
                Plaintiffs,           *  2:21-cv-1536-AMM
16                                    *
      vs.                             *
17                                    *
      JOHN MERRILL, in his official   *
18    capacity as Alabama Secretary   *
      of State, et al.,               *
19              Defendants.           *
      ******************************
20


21
            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
22                    VIA ZOOM CONFERENCE
                         VOLUME VII
23        BEFORE THE HONORABLE ANNA M. MANASCO,
              THE HONORABLE TERRY F. MOORER,
24            THE HONORABLE STANLEY MARCUS


25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

2    Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
3       and Procedures Vol. VI, Chapter III, D.2.  Transcript
              produced by computerized stenotype.
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

<pre>
 1                            APPEARANCES

 2
        FOR THE SINGLETON PLAINTIFFS:
 3
        James Uriah Blacksher
 4      JAMES U. BLACKSHER, ATTORNEY
        825 Linwood Road
 5      Birmingham, AL 35222
        205-612-3752
 6      Fax: 866-845-4395
        Email: Jublacksher@gmail.com
 7
        Myron C Penn
 8      PENN & SEABORN LLC
        53 Highway 110
 9      PO Box 5335
        Union Springs, AL 36089
10      334-738-4486
        Fax: 334-738-4432
11      Email: Myronpenn28@hotmail.com

12      Joe R Whatley, Jr
        WHATLEY KALLAS LLP
13      2001 Park Place North Suite 1000
        Birmingham, AL 35203
14      205-488-1200
        Fax: 800-922-4851
15      Email: Jwhatley@whatleykallas.com

16      Henry C Quillen
        WHATLEY KALLAS LLP
17      159 Middle Street Suite 2D
        Portsmouth, NH 03801
18      603-294-1591
        Fax: 800-922-4851
19      Email: Hquillen@whatleykallas.com

20      W Tucker Brown
        WHATLEY KALLAS LLC
21      P.O. Box 10968
        Birmingham, AL 35202-0968
22      205-488-1200
        Fax: 800-922-4851
23      Email: Tbrown@whatleykallas.com

24

25
</pre>

```
 1        Diandra "Fu" Debrosse Zimmermann
          DICELLO LEVITT GUTZLER
 2        420 20th Street North
          Suite 2525
 3        Birmingham, AL 35203
          205-855-5700
 4        Fax: 205-855-5784
          Email: Fu@dicellolevitt.com
 5
          Eli Joseph Hare
 6        DICELLO LEVITT GUTZLER LLC
          420 20th Street North, Suite 2525
 7        Birmingham, AL 35203
          205-855-5700
 8        Fax: 205-855-5784
          Email: Ehare@dicellolevitt.com
 9

10        FOR THE MILLIGAN PLAINTIFFS:

11
          Deuel Ross
12        NAACP LEGAL DEFENSE &
          EDUCATIONAL FUND, INC.
13        700 14th Street N.W. Ste. 600
          Washington, DC 20005
14        (202) 682-1300
          Dross@naacpldf.org
15
          Leah Aden
16        Stuart Naifeh
          Kathryn Sadasivan
17        Brittany Carter
          NAACP LEGAL DEFENSE &
18        EDUCATIONAL FUND, INC.
          40 Rector Street, 5th Floor
19        New York, NY 10006
          (212) 965-2200
20        Laden@naacpldf.org
          Snaifeh@naacpldf.org
21
          Davin M. Rosborough
22        Julie Ebenstein
          AMERICAN CIVIL LIBERTIES
23        UNION FOUNDATION
          125 Broad St.
24        New York, NY 10004
          (212) 549-2500
25        Drosborough@aclu.org
          Jebenstein@aclu.org
```

1    Kaitlin Welborn
     LaTisha Gotell Faulks
2    AMERICAN CIVIL LIBERTIES UNION
     OF ALABAMA
3    P.O. Box 6179
     Montgomery, AL 36106-0179
4    (334) 265-2754
     Kwelborn@aclualabama.org
5    Tgfaulks@aclualabama.org

6    David Dunn
     HOGAN LOVELLS US LLP
7    390 Madison Avenue
     New York, NY 10017
8    (212) 918-3000
     David.dunn@hoganlovells.com

9

     Michael Turrill
10   Harmony A. Gbe
     HOGAN LOVELLS US LLP
11   1999 Avenue of the Stars
     Suite 1400
12   Los Angeles, CA 90067
     (310) 785-4600
13   Michael.turrill@hoganlovells.com
     Harmony.gbe@hoganlovells.com
14

     Shelita M. Stewart
15   Jessica L. Ellsworth
     HOGAN LOVELLS US LLP
16   555 Thirteenth Street, NW
     Washington, D.C. 20004
17   (202) 637-5600
     Shelita.stewart@hoganlovells.com
18

     Blayne R. Thompson
19   HOGAN LOVELLS US LLP
     609 Main St., Suite 4200
20   Houston, TX 77002
     (713) 632-1400
21   Blayne.thompson@hoganlovells.com

22

23

24

25

```
 1      Sidney M. Jackson
        Nicki Lawsen
 2      WIGGINS CHILDS PANTAZIS
        FISHER & GOLDFARB, LLC
 3      301 19th Street North
        Birmingham, AL 35203
 4      Phone: (205) 341-0498
        Sjackson@wigginschilds.com
 5      Nlawsen@wigginschilds.com

 6


 7      FOR THE CASTER PLAINTIFFS:

 8      Abha Khanna
        ELIAS LAW GROUP LLP
 9      1700 Seventh Avenue, Suite 2100
        Seattle, WA 98101
10      206-656-0177
        Email: AKhanna@elias.law

11

12      Aria C Branch
        ELIAS LAW GROUP LLP
13      10 G St NE, Suite 600
        Washington, DC 20002
14      202-968-4490
        Fax: 202-968-4498
15      Email: ABranch@elias.law

16      Daniel C Osher
        ELIAS LAW GROUP
17      10 G Street NE
        Suite 600
18      Washington, DC 20002
        202-968-4490
19      Email: DOsher@elias.law

20      Joseph N. Posimato
        Elias Law Group LLP
21      10 G Street, NE; Suite 600
        Washington, DC 20002
22      202-968-4518
        Email: Jposimato@elias.law

23      Lalitha D Madduri
        ELIAS LAW GROUP LLP
24      10 G Street NE, Suite 600
        Washington, DC 20002
25      202-968-4490
        Email: Lmadduri@elias.law
```

1    Olivia N. Sedwick
     Elias Law Group LLP
2    10 G Street, NE; Suite 600
     Washington, DC 20002
3    202-968-4518
     Email: Osedwick@elias.law
4

5    Richard P Rouco
     QUINN CONNOR WEAVER DAVIES & ROUCO LLP
6    Two North Twentieth Street
     2 20th Street North
7    Suite 930
     Birmingham, AL 35203
8    205-870-9989
     Fax: 205-803-4143
9    Email: Rrouco@qcwdr.com

10

11

12   FOR THE DEFENDANT:

13   Andrew Reid Harris
     OFFICE OF THE ATTORNEY GENERAL
14   CONSTITUTIONAL DEFENSE DIVISION
     501 Washington Avenue
15   Montgomery, AL 36130
     334-353-8891
16   Email: Reid.Harris@AlabamaAG.gov

17   Benjamin Matthew Seiss
     ALABAMA OFFICE OF THE ATTORNEY GENERAL
18   P.O. Box 300152
     501 Washington Ave (36104)
19   Montgomery, AL 36130
     334-353-8917
20   Fax: 334-353-8400
     Email: Ben.seiss@alabamaag.gov
21
     Brenton Merrill Smith
22   OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
     P.O. Box 300152
23   501 Washington Avenue
     Montgomery, AL 36130
24   334-353-4336
     Fax: 334-353-8400
25   Email: Brenton.Smith@AlabamaAG.gov

1        Edmund Gerard LaCour, Jr.
         OFFICE OF THE ATTORNEY GENERAL
2        501 Washington Avenue
         P.O. Box 300152
3        Montgomery, AL 36104
         334-242-7300
4        Fax: 334-242-4891
         Email: Edmund.Lacour@AlabamaAG.gov
5
         James W Davis
6        OFFICE OF THE ATTORNEY GENERAL
         501 Washington Avenue
7        P O Box 300152
         Montgomery, AL 36130-0152
8        334-242-7300
         Fax: 334-353-8400
9        Email: Jim.davis@alabamaag.gov

10       Misty Shawn Fairbanks Messick
         OFFICE OF THE ATTORNEY GENERAL
11       FOR THE STATE OF ALABAMA
         501 Washington Avenue
12       P O Box 300152
         Montgomery, AL 36130-0152
13       334-242-7300
         Fax: 334-353-8440
14       Email: Misty.Messick@AlabamaAG.gov

15       Alexander Barrett Bowdre
         OFFICE OF THE ALABAMA ATTORNEY GENERAL
16       P.O. Box 300152
         Montgomery, AL 36130
17       334-242-7300
         Fax: 334-353-8400
18       Email: Barrett.Bowdre@alabamaAG.gov

19       Thomas Alexander Wilson
         STATE OF ALABAMA
20       OFFICE OF THE ATTORNEY GENERAL
         501 Washington Street
21       Montgomery, AL 36103
         334-242-7300
22       Fax: 334-353-8400
         Email: Thomas.wilson@alabamaAG.gov

23

24

25

1    J Dorman Walker
     BALCH & BINGHAM LLP
2    P O Box 78
     Montgomery, AL 36101
3    334-834-6500
     Fax: 334-269-3115
4    Email: Dwalker@balch.com

5

6

7

8

9    COURTROOM DEPUTY:  Frankie N. Sherbert

10

11   COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>**I N D E X**</u>

2

3    BRADLEY BYRNE                                    1655
     DIRECT EXAMINATION                               1656
4    BY MR. DAVIS
     CROSS-EXAMINATION                                1696
5    BY MS. WELBORN
     CROSS-EXAMINATION                                1711
6    BY MR. OSHER
     CROSS-EXAMINATION                                1733
7    BY MR. WHATLEY
     REDIRECT EXAMINATION                             1747
8    BY MR. DAVIS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1                    P R O C E E D I N G S
 2              (In open court.)
 3         JUDGE MARCUS:  Are the parties ready to proceed?
 4         MR. DAVIS:  Defense is ready, and Mr. Byrne the next
 5  witness is here and ready, Judge.
 6         JUDGE MARCUS:  Okay.  Caster plaintiffs are ready?
 7         MS. KHANNA:  Yes, Your Honor.
 8         JUDGE MARCUS:  And the Milligan and Singleton
 9  plaintiffs?
10         MR. BLACKSHER:  Singleton are.
11         MS. WELBORN:  Milligan are, as well, thank you.
12         JUDGE MARCUS:  We are going to turn now to your next
13  witness, Mr. Davis.
14         MR. DAVIS:  Thank you, Judge.  The defense calls
15  Mr. Bradley Byrne.
16                    BRADLEY BYRNE,
17  having been first duly sworn, was examined and testified as
18  follows:
19         JUDGE MARCUS:  Thanks very much.  And if you would be
20  kind enough to state your name for the record.
21         THE WITNESS:  My name is Bradley Byrne, B-R-A-D-L-E-Y,
22  B-Y-R-N-E.
23         JUDGE MARCUS:  Thank you very much.  And with that,
24  Mr. Davis, you may proceed.
25         MR. DAVIS:  Thank you, Judge.
```

08:29:49  5
08:30:00  10
08:30:12  15
08:30:30  20
08:30:40  25

DIRECT EXAMINATION

BY MR. DAVIS:

Q    Good morning, Mr. Byrne.

A    Good morning.

Q    Where do you live, Mr. Byrne?

A    I live in Fair Hope, Alabama.

Q    How long have you lived in the Gulf Coast region?

A    My entire life.

Q    And what do you do for a living?

A    I am a lawyer.

Q    Have you ever served in public office?

A    I have.

Q    Would you please tell the Court about your experience in public service beginning with your earliest appointed or elected position?

A    Yes.  I was elected to the Alabama State School Board in 1994 and took office in December of that year because my predecessor left to go take another position, so I started that a little bit earlier.

     I served the Alabama State School Board eight years.  I was elected to the Alabama State Senate in 2002, and under Alabama law, you take office immediately after general election.  So I became the state senator in November of 2002. I served there until May of 2007, when I became the chancellor post-secondary education for the state of Alabama.

1       In December of 2013, I was elected in a special election

2  to the United States House of Representatives representing the

3  First District, which is the southwestern part of Alabama.  I

4  served there until January 3rd of last year, when I left

08:32:01  5  office, and my term expired.

6  Q    Thank you, Mr. Byrne.

7       I want to share my screen now and show you a map that has

8  been marked as Defendants' Exhibit 55.  Can you see this map,

9  Mr. Byrne?

08:32:14 10  A    I can.

11  Q    I will represent to you that these are the congressional

12  districts that the Alabama Legislature passed November the last

13  districting cycle.

14       Does the First Congressional District look similar to the

08:32:33 15  district as it existed when you represented the First District?

16  A    It is similar.  It does not include the lower half of

17  Clarke County that I had in my district.  And there's a small

18  sliver of the eastern part of Escambia County that is now part

19  of the Second District, but other than that, it's the same

08:32:51 20  district that I had.

21  Q    To your recollection, does the Second District look

22  similar in structure to the way it was when you were serving in

23  Congress?

24  A    It does.

08:32:58 25  Q    Thank you.  How would you describe Gulf Coast region,

1 Mr. Byrne?  And by that, I mean what is it, if anything, that

2 binds that region together to make it a community of interest?

3 A    Well, we are on the water.  We are on the Gulf of Mexico.

4 We have lots of bodies of water in the district.  Mobile Bay is

08:33:22 5 very prominent, and Perdido Bay is pretty prominent.  A number

6 of rivers, sounds, et cetera.  So water defines the district

7 very much.  It's not just any kind of water.  It's salt water,

8 brackish water, et cetera.

9     What that means is we have a major deep water port.  We

08:33:40 10 have a major ship building industry.  We have major tourism

11 industry that's related to the beaches and the water.  And also

12 a major seafood industry.  And all of those are unique in terms

13 of Alabama unique to this part of the state.

14     And so when you deal with the things that happen in this

08:33:58 15 part of the state, you are dealing with something that's unique

16 in the state of Alabama.

17 Q    Do people throughout the region through the other counties

18 in the First District commute in to Mobile for employment?

19 A    Yeah.  There are major highways that come from the

08:34:16 20 northern part of the district into both Mobile and Baldwin

21 counties.  So people in what I call the collar counties, which

22 are Washington County, Escambia County, Monroe County, and

23 presently that lower part of Clarke County, they'll use those

24 highways to go back and forth.

08:34:29 25     It's not just their jobs.  It may be going to the doctor,

```
 1   the hospital, their shopping, et cetera.  So there's this sort
 2   of larger community involving these four, five counties that
 3   flow into and out of Mobile and Baldwin counties.  It used to
 4   be just Mobile County.  Baldwin County has grown so much.
 5   Baldwin County is now a very big part of that, as well.
 6   Q    What role does the Port of Mobile play, if anything, in
 7   binding that region together?
 8   A     Well, it's huge.  Mobile started out in the 18th Century
 9   as a port.  It was a port for French traders, but it was still
10   a port, and it's been a port for 300-plus years, and the port
11   continues to grow.  In fact, it had amazing growth last year.
12   It's not just the port itself.  The port is at the very center
13   of what is a major logistics hub.  For example, we have one of
14   Walmart's four mega distribution centers here in Mobile County.
15   That's all related to the port.
16        The fact that we have Airbus in Mobile, we have it in part
17   because they can ship directly via the ship channels directly
18   from a port in Europe to a port right outside of their assembly
19   facility here in Mobile.  So that port is the anchor for the
20   economy around here.  And it literally directly and indirectly
21   creates tens of thousands of jobs.  So it's extremely important
22   to this area.
23   Q    Are there industries in the area along the rivers that
24   flow into the port?
25   A    Oh, yeah.  We have major industries, chemical industry
```

08:34:49
08:35:07
08:35:25
08:35:46
08:36:01

1 players, steel industry players up and down the Mobile river

2 and as you get further north of that into the Tombigbee River.

3 So the river, the Tombigbee River, then on the eastern side,

4 the Alabama River, those are very important to the economy and

08:36:25 5 the culture of this area.

6 Q    And do any of those industries rely on the port for

7 distribution of the products?

8 A    Well, for the distribution of their products, but also for

9 stuff that comes in that they have to use to create their

08:36:41 10 product.  Maybe different types of elements that go into the

11 chemical process.  In the case of steel, we actually have steel

12 slabs that come up from Brazil that are then offloaded off the

13 ships and put on barges that come up to a company called AM/NS

14 Calvert.  It's a multinational company that employs well over

08:37:01 15 2,000 people in the production of coal and steel.

16 Q    Is there anything unique about the history of this region,

17 in terms of international influence?

18 A    Yeah.  We were founded by the French in 1702.  We had

19 20 years in there where we were a British colony and then 30 or

08:37:21 20 40 years where we were a Spanish colony.

21     So unlike the rest of the state of Alabama, we have this

22 extensive Colonial history, and it continues to form our

23 culture today.  We're far more likely to have Catholic

24 residents here than in any other part of the state.  We have

08:37:42 25 Mardi Gras, which may sound like just sort of a frivolous fun

thing, but Mardi Gras is big business here.  There are a lot of
businesses that that is what they do.  So it's not unusual to
find Mardi Gras parades not just here in Mobile, but you go
north of here into Washington County, you go over into Baldwin
County, several of the cities in Baldwin County, and even up
into Monroe County, they have Mardi Gras because there is that
cultural connection between the two.

I was reading an interesting article the other day about
Truman Capote.  He used to have relatives in Monroe County that
he would visit.  Mr. Capote wrote that he actually entered into
contests as a child to write stories, and those stories were
part of a contest in the *Mobile Press Register*.  He was in
Monroe County.  This is 100 years ago.

So you can see that there's this long-term connection
between what I call the collar counties in the First
Congressional District and Mobile itself.

Q    Are Baldwin County in Mobile County closely connected?

A    Oh, yeah.  If you look at a map of Mobile and Baldwin
counties, it looks like an inverted U.  And what's in the
interior of that U is Mobile Bay.  And so if you go back
literally centuries, you will see a connection between the two
counties.

So my family is originally from Baldwin County.  The
Byrnes were from Baldwin County.  But if you go back to the
late 18th Century, you will see one of my ancestors was

1  actually baptized in the Roman Catholic Church here in Mobile.

2  So there's this intersection between those two counties that's

3  been going on for a very long time.

4  Q    Would you say those counties are more closely connected

08:39:24  5  today than they were, say, in the '60s and 70s?

6  A    Oh, yeah.  For example, when -- I live in Baldwin County,

7  and I work in Mobile County.

8        If you were in my car with me today, you would have seen

9  thousands of cars crossing from Baldwin County into Mobile

08:39:42  10  County.  So you have lots of people who live in Baldwin County,

11  but work in Mobile County.

12        Not as many people, but there are people who live in

13  Mobile County and work in Baldwin County.

14        So there's really strong interconnection between the two

08:39:56  15  counties.

16  Q    What are -- you mentioned a few of these.  Let's get on

17  the record and say what are some of the major industries and

18  employers in the Mobile region?

19  A    For instance, the Port of Mobile.  That's a big one.  You

08:40:17  20  have AM/NS Calvert, which is the steel company.  There's

21  Outokumpu, which is a stainless steel company; there's SSAB,

22  another coal and steel company; and Earth Pipe, which is a

23  steel pipe company, so those are steel companies.

24        Numerous chemical companies.  I think about it.  Huntsman,

08:40:42  25  there's -- oh, shoot.  There's Shell.  I can't remember all the

1  chemical companies.  It must be 20.

2  Q    Of course.

3  A    We have the University of south Alabama, which is a major

4  employer in this area.  We have Austal USA, which is a

08:41:01  5  ship-building company.  We have Airbus USA, which is major

6  airplane assembly facility here.  We have the Mitchell Cancer

7  Research Center.  We have -- I mentioned the Walmart mega

8  distribution center.  We have a number of other logistic

9  distribution centers because of the port.

08:41:21  10      And then if you go into the southern part of Baldwin

11  County, you have major businesses are there to provide

12  condominium access to tourists that come down here, hotels,

13  restaurants, et cetera.  In Bon Secour, Alabama and Bayou La

14  Batre, Alabama, these are two of the largest seafood

08:41:43  15  distribution places literally in the United States of America.

16      So Nelson Bon Secour Fishery in Bon Secour, huge

17  distributor for seafood.  I can remember eating crab meat in

18  Washington D.C. and finding out during the meal that that crab

19  meat came from Bon Secour, Alabama.

08:42:01  20      So you know, no other part of Alabama has industries like

21  this.  I am not saying it's better or worse than the other

22  parts of the state.  It's just unique.

23  Q    Would you describe the First District as racially diverse?

24  A    Oh, yes.  Very much so.  We have obviously long-time white

08:42:21  25  and black communities, but we have Hispanic communities.  Down

1    in Bayou La Batre, we have a number of southeast Asian

2    communities, people that left those areas in the aftermath of

3    the Vietnam War and settled Bayou La Batre, Alabama and formed

4    these huge fishing communities.  We have other Asian

08:42:40  5    communities here.  This is always been because of the port I

6    guess a very diverse area, going back to the earliest times

7    here.

8        So it's not unusual to find somebody like me who has

9    French ancestors, you know, Scottish ancestors, Irish

08:42:58 10    ancestors, German ancestors.  It's not unusual to find people

11    here that can draw their lines back to various parts of Africa.

12    There are people here that can draw their lines back to the

13    various nations in southeast Asia.  This is a very diverse area

14    and always has been.

08:43:15 15    Q    Are there military interests in the First District?

16    A    Yes, sir.

17    Q    What do you have?

18    A    We have a shipyard here called Austal USA that makes two

19    different ships presently for the United States Navy, combat

08:43:33 20    ship and the expeditionary fast transport vessel.  Those are

21    the only vessels that that shipyard makes.  It employs

22    presently about 3,500 people.  At one point, it had as many as

23    4,500 people.  Ship building has been a major part of Mobile

24    going back to Colonial times.

08:43:50 25        We have all -- you have people here who are like fifth,

sixth generation ship builders.  Making ships is not like any

other manufacturing process because they're so darn big.  It's

just a lot more to it than making a car, or even making the

airplanes that Airbus makes here.

08:44:09    So we -- that ship building for the Navy here is a big

deal.

Q    In the years when you were representing this area in

Congress, Mr. Byrne, were there any particular issues that you

would focus on?

08:44:23  A    Sure.  When you are a Congressman, you're the primary

representative for the people in your district in Washington,

D.C.

So there were a myriad of things that were particular to

this district that I had to focus on.  The shipyard, for

08:44:43  example, very critical that we make sure those ships are

authorized and appropriated year after year after year.

There's nothing automatic about that.  There's a fight over

that every year.

But it may sound mundane.  We had a huge issue here in

08:44:56  involving the Gulf Red Snapper, which is the number one fish

people like to catch out in the Gulf of Mexico.  We have a huge

industry in Orange Beach built up around charter boats, people

that own their own boats.  Think about it.  It is not just the

fact of the boat, it's you have to buy fuel for the boat, you

08:45:14  have to buy ice for the boat, you have to buy bait for the

1  boat, you have to buy beer to go out and have fun in the summer

2  time.  It's a huge industry.  And we have a real problem with

3  those seasons being artificially shortened, and we had to go

4  work on trying to get those seasons back to a reasonable level.

08:45:32  5  For friends of mine that wanted to go fishing on Saturday, it

6  was for that industry.  It was important.

7        We have a program in the federal government called GOMESA.

8  It is an acronym.  But basically, it provides a certain

9  percentage of what the federal government gets in off shore gas

08:45:47 10  leases and oil leases that go to the states that border the

11  Gulf of Mexico.  That's to help them deal with what could be

12  the very negative effect from that like with the BP oil spill

13  that we had back in 2010.  So I was constantly working on that

14  and similar programs.

08:46:03 15        So I actually formed a caucus in Congress called the I-10

16  Caucus because those of us that represented districts in the

17  Gulf Coast had sort of unique problems that we would actually

18  work on together because those same interests weren't shared

19  with our colleagues and our state delegations up in the upper

08:46:21 20  parts of our states.  So we would work together on things like

21  that.

22        And then there would be just the stuff that, you know,

23  every industry faces when you deal with federal government

24  regulations.  Ship building has all sorts of interesting issues

08:46:36 25  with the Coast Guard, et cetera.  So, yeah, I mean, I had to

1  work on those.  And really had to become an expert on those

2  issues along with my staff.

3  Q   Obviously, a longer snapper season would benefit the

4  people who enjoy going out in the Gulf and fishing.  Does it

08:46:54  5  have any benefit to other residents of the First District

6  having a healthy fishing industry?

7  A   Okay.  That's an industry around it.  There are charter

8  boat fleets, people that work on charter boats.  There are

9  people that run marinas.  There are people that sell fuel.

08:47:10 10  There are people that sell ice.  There are people that sell

11  bait.  There are people that, you know, provide condos and

12  hotel rooms that people stay in when they go fishing.

13      I mean, I remember when I was first elected and I had a

14  meeting with the people in Orange Beach that were in that

08:47:24 15  industry, and the room was just crammed full of people.  I

16  never really thought of it that clearly before just how many

17  people were touched by the fact that we do or do not have a

18  good snapper season.  And it was a major motivation to make

19  sure that we got that problem solved because it touched so many

08:47:41 20  different lives and touched so many different jobs.

21  Q   Would issues that you worked on such as is the snapper

22  season or a healthy port or a healthy ship building industry,

23  would they help both the black and the white residents of the

24  First District?

08:47:55 25  A   Oh, yeah.  I mean, people down here, we have people of all

```
 1   races that are working in all of these industries.  And it's a
 2   major source to get good high paying jobs.  So it's a benefit
 3   to everybody that we do that.
 4   Q    Uh-huh.  Are you familiar with the Wiregrass region in the
 5   Second District?
 6   A    I am.  I told you earlier that I was a chancellor of
 7   post-secondary education for the state of Alabama.  And we had
 8   three or four colleges in the Wiregrass region.  We had a
 9   number of vacancies in those colleges, so I had to go through
10   presidential searches.  When you do a presidential search for a
11   community college, you have to involve the community.  You have
12   to get involved with the community.  You have to understand
13   that community.
14        So, for example, Lurleen B. Wallace Community College in
15   Andalusia, Alabama, that's Covington County, I spent a lot of
16   time in Andalusia because we had to build a vacancy there.  So,
17   yes, I have spent a lot of time in the Wiregrass of Alabama
18   because of that position.
19   Q    Tell me how the interest of the Wiregrass would compare to
20   the interest of the counties that are in the First
21   Congressional District.
22   A    Well, what I described to you before is in the First
23   Congressional District southwest Alabama, something's built
24   around the water, okay?  The Wiregrass is built around a couple
25   of things.  Fort Rucker, which an Army helicopter training base
```

1   there in Ozark is a big part of the Wiregrass.  Troy State

2   University is a huge part of the Wiregrass.

3       People in the Wiregrass sort of revolve around Dothan down

4   at the southern end and Montgomery at the northern end.  And

08:49:53  5   they have agricultural interests that are different from the

6   agricultural interests that will be out here in southwest

7   Alabama.  They don't have a nursery industry like we have here.

8   We have major wholesale nursery businesses here.  They don't

9   have major watermelon crops.  They don't have major pecan

08:50:13 10   crops.  They're more built in to peanuts and cotton and cattle.

11       So they face, for example, during -- during in Andalusia,

12   Alabama, you face more towards Troy or Ozark or Dothan.  You

13   don't face down here in southwest Alabama.  In addition, it's

14   kind of hard to get from Mobile to the Wiregrass.  We don't

08:50:36 15   have really good highway connections over there.  So it's not

16   easy for people from there to come here or for people from here

17   to go there.

18       So they sort of face to the southeastern part of the

19   state.  We face to the southwestern part of the state.

08:50:52 20   Q    If you were representing the Second District, would you

21   focus on the same issues that you are focused on when

22   representing the First?

23   A    No, sir.  For example, I was on the Armed Services

24   Committee, and with the Navy shipyard, I am going to be focused

08:51:07 25   on Navy stuff.

1    If I represented the Second Congressional District, I

2  would be focused on the Army and particularly Army helicopters.

3  That's what they do at Fort Rucker.

4    In this district, I was focused for higher education

08:51:21  5  reasons on the University of South Alabama.  If I represented

6  the Second District, I would be focused on Troy.  Now, Troy has

7  a different mission from the University of South Alabama.  They

8  have an international presence.  So working with Troy would be

9  very different from working for the University of South

08:51:36 10  Alabama.  Troy doesn't have a medical school, but it has a

11  whole lot of other stuff that's pretty darn important.  So

12  there would -- and the agricultural interests I just described

13  are very different.

14    So I would think being the congressman from the Second

08:51:51 15  District requires a different level of expertise and level of

16  expertise that I feel like I had to have to represent this

17  district.

18  Q    I want to share another screen now, Mr. Byrne.  And this

19  is Milligan Exhibit 3, page 7 of that exhibit.

08:52:11 20    These are some proposed congressional maps that one of the

21  plaintiffs' experts presented, I will represent to you,

22  Mr. Byrne.

23    Review just say these -- here's Plan A and B, and then I

24  will scroll down to Plan C and Plan D, as well.

08:52:29 25    Focus on any of those, and tell us what's your reaction

1    is.  Do you see any issues with representing these districts?

2    A    Yes.  If you look at Plan A and Plan B, you see it takes

3    in part of Mobile County, all of Baldwin County, and then goes

4    east into the Wiregrass legion.  So you would essential have to

08:52:56    5    become an expert on two different regions altogether, two

6    different communities of interest.  I know that's important for

7    those proceedings.

8         Then if you look at that district just above it, that

9    district is essentially part of the Black Belt and part of

08:53:14   10    southwest Alabama.  So the person representing that district

11    would essentially have to have two very dramatically different

12    sets of expertise.  I think it would be very difficult to be

13    the congressman for either of those districts not just the fact

14    you would have this vast geographic area you would have to

08:53:33   15    cover, but you would be covering two very different communities

16    of interest.

17    Q    Uh-huh.  Why would it make it more difficult to represent

18    a district if it encompassed different communities of interest?

19    A    Well, for example, if you represented that blue district

08:53:50   20    at the very bottom, you would have to be an expert on things

21    involving Navy shipyards and Army helicopter bases.  You would

22    have to be an expert when it comes to agricultural issues like

23    everything from wholesale nurseries, watermelons, pecans, to

24    peanuts, cattle production, and cotton production.  You would

08:54:13   25    have to be focused on two major universities that have very

1  different missions.  You would have to be focused on Dothan.

2  You would have to be focused on Andalusia.  You would have to

3  be focused on Brewton, Mobile, and then all of Baldwin County,

4  which is the fastest growing county in the state.

08:54:30  5      So I am not saying you couldn't do it.  It would be

6  extremely difficult to do it, and you would find yourself

7  somewhat diffused in your ability to be an effective advocate

8  for that region.

9  Q    What do you mean by diffused?

08:54:44  10  A    Well, there's only so many hours in the day for a

11  congressman and the staff that that congressman has.  And there

12  are hundreds if not thousands of issues in Washington.  And you

13  have got to figure out what your focus is going to be on.  And

14  focus is very important for a member of Congress because

08:55:02  15  there's just not enough bandwidth, and there's only 435

16  congressmen, and you are one of them.

17      So you really have to figure out where am I going to put

18  my time?  Where am I going to put the resources of my staff?

19  What fights am I going to fight.  If you are fighting a whole

08:55:21  20  bunch of different fights because you have to, because you have

21  got that many interests in your district, you are not going to

22  be effective on each one of those.  The more you can sort of

23  focus your energies, the more effective you will be.

24      I will give you an example.  Everybody in the House of

08:55:32  25  Representatives and the staff and the leadership, et cetera

knew that I was interested in a bridge across Mobile Bay,

fixing the snapper problem, and gaining the ships authorizing

and appropriated for the shipyard here.  Literally, I had the

Speaker come up to me on the floor and say, we get it.  It's

08:55:50  that bridge, it's those ships, and it's those fish.  Now, when

they know that, they know they have got to make me happy on

that to get my votes.  If they don't make me happy on that,

they are not going to get my votes.

    Now, if I say I have 20 different things I want you to

08:56:03  make me happy on, they will say, look, I am not going to make

you happy on 20 things.  You tell me what your priorities are.

We will help you get those things done, and then you will be a

part of the team.  That's how it works.  Anybody that tries to

be like out there fighting on every fight tends not to win any

08:56:22  fight.

Q    Let's say you represented -- I guess I should show you the

maps again.  If you represented a blue district, do you see any

difficulty in just getting around and visiting your

constituents?

08:56:35  A    Yeah.  It's a long way from Mobile to Dothan.  Actually,

the way you get from Mobile to Dothan is that you get on

Interstate 10, you drive east through the Florida panhandle,

and then you get just north of Panama City you turn north.  So

it's about a three to three-and-a-half hour drive from Mobile

08:56:58  to Dothan.

1      And north of there to Henry County, that's a county just

2  north of Houston County, it's even further than that.  And so

3  in order to represent the people in Abbeville who deserve good

4  representation, even if you just visited there for an hour, you

08:57:13  5  would spend three-and-a-half, maybe four hours just to get

6  there and that much going back, so it's a long haul.

7      And the interests as I said of that southeastern part of

8  the state are very different than the interests in the

9  southwestern part of the state.

08:57:27 10      So when you finish with having your meetings in an area

11  like that, go back to Washington, you have to decide, all

12  right, what I am going to focus on?  What are the priorities

13  for this sort of sprawling district with all these different

14  interests?

08:57:39 15      And somebody is going to lose out.  That's just the way it

16  is.  There's only so much bandwidth for a congressman, and that

17  person has to decide what am I going to focus on?  Am I going

18  to help the shipyard in Mobile, or am I going to help Fort

19  Rucker?

08:57:54 20  Q    Where do you think a congressman or congresswoman who

21  represented the blue district would want to have local offices?

22  A    Well, you clearly want to have your main office Mobile,

23  but you want to have as pretty significant office as you can

24  afford in Dothan.  You are only allotted so much money as a

08:58:13 25  congressman for your office, staff, and your office rent.  So

 1   you have got to spread that over Mobile and Dothan.  And

 2   Baldwin County is the fastest growing county in the state.  You

 3   have to have a presence in Baldwin County for a lot of

 4   different reasons.

08:58:31  5       Then I guess you try to find some way to put something in

 6   Andalusia.  That's kind of more centrally located

 7   geographically.  But as I said, and I can say it's really hard

 8   to get from here to Andalusia.  Andalusia is a pretty hefty

 9   drive from here.  Not as far as Dothan, but it's still a hefty

08:58:51 10   drive because there's no good highway to get there.

11   Q    Look at this yellow district or tan, the one above the

12   blue district.

13       Let's say there was a primary election in that district,

14   and someone was running to be the Democratic candidate, and

08:59:09 15   that someone was from Mobile.  There was another person running

16   in the primary from Montgomery.  Do you have any thoughts on

17   who might have a stronger base of support geographically?

18   A    I would think that if you were from Montgomery, you would

19   have a stronger chance than if you're representing that part

08:59:29 20   that's in Mobile.

21       The Black Belt -- what those counties primarily look like

22   to me, the Black Belt is kind of its own thing.  It's got very

23   rural, very agricultural.  And they look more to Montgomery

24   than they look to Mobile for sure.  So I would think somebody

08:59:50 25   from Montgomery would have a better shot at that district than

 1   somebody from Mobile.

 2   Q     Do you think it possible, Mr. Byrne, if you had a map in

 3   Plan A or Plan B that you could have, say, a congressman for

 4   the blue district from Dothan or Andalusia and a congressman

09:00:10  5   for the yellow district from Montgomery so that you had no one

 6   in Congress from the Mobile region?

 7   A     That could happen, yeah.  It's kind of hard to know

 8   exactly what parts of Mobile County are being taken with those

 9   two plans.  But if you dilute the vote in Mobile County, that

09:00:29 10   obviously is going to make the vote of the rest of that

11   district -- those two districts more important.  So, yeah, you

12   could have a congressman from Dothan under both of those plans

13   and a congressman from Montgomery and not a congressman from

14   Mobile, which would be a tragedy for the people down here.

09:00:45 15   Q     Why would it be a tragedy for the people down there?

16   A     I'm not saying somebody from Dothan or Montgomery wouldn't

17   care about this area.  But as I said before, you wouldn't have

18   somebody that's focused, focused on the port, focused on the

19   shipyard, focused on our fishery in the Gulf of Mexico, focused

09:01:01 20   on the nursery issues we have here.  They just -- they're just

21   not enough bandwidth to be as focused as I was able to be

22   focused.  I could walk in a room and talk about any of those

23   issues and master it.  If I had to represent those other areas,

24   as well, or somebody from the other areas had to represent

09:01:22 25   Mobile, I just don't think that you could master it.

```
 1   Q    Do Mobile and Montgomery ever compete each other, in terms

 2   of trying to recruit businesses, for example?

 3   A    Not that I know of.  Their economic development plan,

 4   their industrial plan is very different from ours.  Montgomery,

 5   for all the right reasons, has really focused on two things --

 6   automotive, obviously with the Hyundai plant there and all the

 7   suppliers of the Hyundai plant, but also because of their Air

 8   Force presence, they really focus on how they can magnify

 9   Maxwell Air Force Base and things that are a part of that.

10        I think they have made a very smart decision to do that,

11   by the way, but that's a different economic plan than what we

12   have done here.  So we're as much trying to help them because

13   of the port.  So as anything else, I don't really think we

14   believe ourselves that we're competing with them.

15   Q    Would you have any concerns with the congressional map

16   that divided the Mobile region along racial lines?

17   A    Yes.

18   Q    What would those be?

19   A    Well, when you are a Congressman, you should be

20   representing everybody and thinking about how I do X is that

21   going to affect everybody in my district?  You shouldn't be

22   thinking about, I am going to do this because it helps black

23   people, or I'm going to do this because it helps white people.

24   I am going to do this because it helps everybody.  And if you

25   help everybody, everybody rises.  That's what you want.
```

Line timestamps: 09:01:45 (line 5), 09:02:05 (line 10), 09:02:23 (line 15), 09:02:39 (line 20), 09:02:55 (line 25)

```
 1          Mobile is a little bit different from the rest of the
 2   state.  We do not have the same history during the Civil Rights
 3   movement that Selma, Montgomery, Birmingham did.  We had a
 4   mayor here named Joe Lang who worked with a Civil Rights leader
 5   down here named John LeFlore.  And so we didn't have some of
 6   the violence, the extent of the violence that you saw in the
 7   other parts of the state.  We tried to work through our issues
 8   because we thought it was more important for us to work through
 9   those issues and work together to try to figure out a way to
10   live together harmoniously.  Were we perfect about it?  No, we
11   did not.  But we didn't have the problems you saw in the rest
12   of the state because we at least made the effort to work
13   together.
14   Q    When you said that you worked -- that you served on the
15   state school board, correct?
16   A    Yeah.
17   Q    I want to share a map now which is Defendants' Exhibit 26.
18        This is the 2001 map, Mr. Byrne.  I know -- I think you
19   were in the State Senate then, weren't you?
20   A    In 2001, I was still on the state school board.
21   Q    Okay.  So which district did you represent in the state
22   school board?
23   A    District number 1.
24   Q    Thank you.  Did you ever get calls from people in, say
25   District 5 when you were on the school board?
```

A     I did.  There was some people in Monroe County, I

remember, and maybe Clarke County who thought I was their state

school board member, and they would call me, and I would always

call the member for that district when they did and ask him or

09:04:42 her because it changed if they wanted me to help those people,

and they would say, please.  And I would go up there and talk

with them and explain to them I was not their school board.

Q     Now, I want to share a newer map.  This is from Caster

Exhibit 1, which for the record, was Mr. Cooper's report.  This

09:05:12 is page 19 of that report.  And I will represent to you,

Mr. Byrne, this is the new state school board map that was

passed by the Legislature this cycle just a couple of months

ago.

    What thoughts if any do you have about this map, in

09:05:26 particular, the way the blue district includes part of Mobile

and Baldwin County is constructed?

A     Well, I testified before the Legislature Redistricting

Committee that I felt like Mobile and Baldwin County should be

kept whole and contiguous.  So to the extent that this map

09:05:47 includes a district that comes from Montgomery all the way into

Mobile County, I didn't much like it.

Q     Why did you not like it?

A     Because Mobile County school system is the largest school

system in the state.  And it has unique issues because it's the

09:06:06 largest in the state.  And I felt like we needed a school board

member who was focused on Mobile County as well as the other

counties.  I had Baldwin and Escambia as well.  But there were

so many issues with the Mobile County school system, a lot of

my time was spent focused on that.  And if you break it up into

two different people, you don't really have that level of

focus.

I'm not saying that the people that represent those two

districts aren't working as hard as they can.  I'm sure they

are.  But it's very difficult to be focused on the Mobile

County school system if you have got almost all the Black Belt,

which that district up in the northern part is and a big chunk

of the Wiregrass, which the lower part of the -- the lower

district is.

Q    Someone who has served both in Congress and on the state

school board, how do the roles of those two offices compare to

each other, Mr. Byrne?

A    They're very different.  You're on the state school board,

you are focused on educational issues.  That's it.

Now, there are some work force development issues that go

with that, et cetera.  But that's pretty much it.  You are just

focused on educational issues.  When you are in the United

States Congress, you are focused on a large number of issues.

I mean, it's almost everything comes within the purview of the

United States Congress from foreign policy, defense policy,

health care, to internal security, and education, as well.  I

```
 1  was on the Education and Labor Committee in the House of
 2  Representatives.  And one of the problems I had as a
 3  congressman is that people expected you to be knowledgeable on
 4  so many different things.
 5        Now, at least you have got a staff in Congress.  When I
 6  was on the state school board, I had no staff.  I had to rely
 7  upon the staff of the State Department of Education, and they
 8  had other things to do.
 9        So it was difficult to me to be on the state school board.
10  But at least I could just focus on one set of issues and try to
11  master them.
12        And so it was very different being in both of those roles.
13  But I enjoyed both of those roles.
14  Q    Considering the different roles between the school board
15  and the congressman, even if you assumed it made sense to split
16  Mobile County in a school board map, does that mean it would
17  make sense to do so in a congressional map?
18  A    No.  It would not make sense.  At least on the school
19  board, you are focused on one set of issues.  So if I'm from
20  Montgomery and I have got half of Mobile County from Mobile and
21  I have part of the Wiregrass, at least, I have got a
22  geographically diverse area.  At least, I'm really only focused
23  on a very set, defined set of issues.
24        Now, they are very important issues.  Don't get me wrong.
25  But at least I could focus on those issues and try to make sure
```

as I go from county to county that I am applying what I know on
these issues to each one of those counties as they are very
different.

Q    When you campaigned for Congress in the different
elections, Mr. Byrne, what parts of your district would you
campaign in?

A    All of them.  I had a -- go ahead.

Q    Would you campaign in areas that were both more -- would
you campaign in neighborhoods or areas that had a large
African-American community?

A    Oh, yeah.  You can't run for Congress in this district --
I will just make sure -- to be clear -- in this district
without touching every part of it.  And I made a concerted
effort to go everywhere.  In fact, if you look at my schedule,
I spent a disproportionate amount of my time in the more rural
areas than I did in more populated areas, because if you want
to go up to Monroeville, you might as well spend some time in
Monroe County.

There are parts of Monroe County that are almost
completely African-American.  There's a little town in north
Monroe county called Beatrice that's 50/50.  I had a town ball
in Beatrice.  Someone said, why in the world would you bother
spending time in Beatrice because it's so small?  I said they
deserve to be represented, too.  So I went to all parts of my
district.

```
 1          Prichard probably didn't give me 5 percent of the vote in
 2    my elections.  I probably lost there by a huge margin.  But I
 3    would go and have town hall meetings and campaign in Prichard
 4    because I believed the people in Prichard deserve to have a
09:10:42 5    good congressman.
 6    Q    When you ran for Congress, Mr. Byrne, did you run as a
 7    candidate of any political party?
 8    A    Yes.  I was a Republican.
 9    Q    Why are you a Republican, Mr. Byrne?
09:10:54 10   A    Because the Republican Party is closer to the conservative
 11   principles that I believe in than the Democratic Party is.  I
 12   started out as a Democrat, but I felt like by 1997 I guess is
 13   when I switched parties, the Democratic Party had migrated away
 14   from what were my principles.  Not putting down the Democratic
09:11:15 15   Party if people are Democrats.  I have friends who are
 16   Democrats and work with a lot of Democrats, but I just felt
 17   like the Republican Party is more closely aligned with where I
 18   stood on issues and principles.
 19   Q    Did you work with Democrats when you were in Congress?
09:11:31 20   A    Oh, yes.  All the time.  I will give you two examples.  I
 21   served on the Armed Services Committee.  Every year, the only
 22   bill the Armed Services Committee works on is the National
 23   Defense Authorization, which we have passed out of the Congress
 24   every year since John Kennedy was president.  Those bills are
09:11:53 25   always bipartisan 100 years ago percent of the time.  We work
```

1  -- from the very beginning of the years, we work on that bill.

2  We consciously work together to make sure that bill, the bill

3  that authorizes the defense of this country is something that

4  we can all vote for.

09:12:08 5      So we work at being bipartisan, very much so.

6      The other example I give you is this:  Shortly after

7  President Trump was elected, this "Me-Too" movement came out.

8  And we discovered that we have "Me-Too" problems in United

9  States Congress.  But we also discovered that members of the

09:12:28 10 United States Congress weren't subject to the same processes

11 that the private sector was subject to under Title VII of the

12 1964 Civil Rights Act.

13     Now, I spent a career as a labor employment attorney

14 telling small, medium-sized businesses in Alabama what they had

09:12:44 15 to do to comply with that law.  And here in Congress, the body

16 that passed that law was not holding itself under the same set

17 of accountability processes.

18     So I worked with a very liberal Democrat congresswoman

19 from California, Jackie Speier, and we put together a bill that

09:13:04 20 made Congress be as accountable, even more accountable than we

21 hold people in the private sector, and that bill that Jackie

22 and I put together passed the United States House unanimously,

23 passed the United States Senate unanimously, and is a law of

24 the United States now.  And those are just two examples.

09:13:20 25     I worked all the time in a bipartisan manner, because I

1    firmly believe that the best legislation in Washington is

2    bipartisan legislation.  The hardest legislation to pass in

3    Washington is partisan legislation.  And it's always a problem,

4    always.

09:13:36    5    So I enjoyed working the bipartisan fashion.  I know you

6    look up there now and think, they're completely divided.  They

7    can't get along.  And there are problems.  Don't get me wrong.

8    But there are still people up there, former colleagues of mine

9    on both sides of the aisle that understand what I say is true,

09:13:53    10    and they're still trying to work together to make things happen

11    and happen in the right way.

12    Q    When you served on the delegation with Congresswoman

13    Sewell for the Seventh District, did you have the opportunity

14    to work with her on any issues?

09:14:09    15    A    Oh, all the time.  All the time.  We shared Clarke County.

16    We actually had joint town halls together.

17    If she had an issue that affected her district, you know

18    uniquely, she would call on the other members of the delegation

19    to help her, and we always did, 100 years ago percent of the

09:14:26    20    time.  And she always helped us.  We all worked together.  It

21    wasn't like it was unique to her.

22    So Terry was a part of a group called Faith and Politics.

23    I assume she is still a part of it.  That's the group that

24    brings the pilgrimage to Alabama every year around the

09:14:47    25    anniversary of the Edmund Pettus Bridge March from 1965.  She

1    wanted to make sure that when that group came here to Alabama,

2    which would bring couple hundred people, people from Congress,

3    people from business and industry, people from foundations, she

4    wanted to make sure that we were all working together, that

09:15:08 5    they saw Alabama, the Alabama delegation working together.

6        So I always participated in that pilgrimage with her.

7    Usually on Saturday mornings when she did her program either at

8    Brown Chapel in Selma or the Dexter Avenue Baptist Church in

9    Montgomery, she would ask me to be sort of her sidekick for it,

09:15:27 10   so that we could get up and tell the people from all the other

11   parties of America here's a Democrat and Republican, black

12   woman and white man working together on issues that matter to

13   the people of Alabama, in particular, matters that revolve

14   around Civil Rights.

09:15:40 15       And I was always honored that she felt comfortable enough

16   to ask me to do that.  And I can tell you, you can sit in that

17   room with some of the people in that room like John Lewis who

18   we lost last year, and you realize what people in this state

19   went through to get us the quality of life we have got today --

09:15:58 20   to get to today.  I feel like a little bitty nothing compared

21   to people like that.  But it was an honor always to be with

22   Terry and to work with her on -- whether it's the pilgrimage or

23   other things that were important to our district.

24   Q    When you were in Congress, Mr. Byrne, were there any

09:16:17 25   issues you worked on to devote your time and your political

1    capital towards that you thought and expected to have a

2    particular benefit to your African-American constituents?

3    A    Just about everything.  If I am doing something that's

4    going to benefit the economy in southwest Alabama, it's going

09:16:36  5    to benefit African-Americans in my district, of course, it is.

6    If you go to the various businesses in this area, and I

7    traveled and met with workers in every one of these industries.

8    It was always black and white.  That's the nature of our work

9    force down here.  I mean, whether you are at a chemical plant,

09:16:56 10    steel plant, ship building plant, airplane, you are going to

11    have a mixed group of people.

12        So every time I was doing something for the economy.  But

13    I particularly felt like I was helping them every time we

14    worked on education issues.  And this goes back to my state

09:17:13 15    school board days.  I think the number one Civil Rights issue

16    in Alabama today is the fact that we don't give a quality

17    education to black people like we do the white people.  And I

18    really feel strongly about that.  We are not going to have the

19    sort of gains and advances and progress we need in this state

09:17:30 20    until we make more improvements to our education system.

21    That's true across the country, but I am more focused on

22    Alabama.

23    Q    Have you spent any time working with HBCUs, Mr. Byrne?

24    A    Yes, sir.  HBCUs are historically black colleges and

09:17:48 25    universities.  We had several of them in the two-year college

```
 1  system in Alabama include Bishop State here in Mobile.  So when
 2  I was on the state school board, I worked with them.  When I
 3  was chancellor of post-secondary education I worked with them.
 4  And by the way, including Tuskegee, and then when I got to
 5  Congress, a congresswoman from North Carolina named Alma Adams
 6  asked me to be a co-chair with her of the HBCU Congressional
 7  Causas.  So for five years I guess it was, I was the co-chair
 8  of the HBCU Congressional Caucus.
 9  Q    Did you spend time working on community health centers?
10  A    Oh, yes.  We have several community health centers here in
11  the district.  I've gotten to know them pretty well.  I am very
12  impressed with the quality of health care that they provide to
13  their patients.  And I was a strong advocate for them and
14  continue to be a strong advocate for them because I think that
15  they provide quality health care close near where people live,
16  so it's community plan, and it's the best way I think to get
17  primary health care to people in those communities.  So I am a
18  strong supporter of community health center.
19  Q    Back to your co-chairmanship on the HBCU caucus, I am not
20  suggesting this was the reason you did it, but did you receive
21  any recognition for your service in that area?
22  A    I did.  The Thurgood Marshall Fund gave me an award
23  three years.  Probably one of the awards that I am the most
24  proud of.  Thurgood Marshall Fund works to provide funding,
25  private funding to HBCUs across America.  And I had no idea
```

1  they were going to give me an award, and it just knocked me out

2  when they did.  I remain in contact with them.  I still

3  continue to work with them even though I am not in Congress

4  because I am a huge believer in HBCUs, and I think what the

09:19:59 5  Thurgood Marshall Fund is doing and the United Negro College

6  Fund, both of them together are doing great work for those

7  colleges, and I think they are important to America.

8  Q    Just a few more questions, Mr. Byrne.  And I will remind

9  you.  We want to make sure the Court understands your testimony

09:20:15 10  that Ms. Decker can take it down.  We will try to slow down

11  just a little.  I want to -- when you were in Congress, did you

12  consider yourself to be the representative of both Republicans

13  and Democrats in your district?

14  A    Yes.

09:20:30 15  Q    Did you consider yourself to be the representative of both

16  the white and African-American constituents in your district?

17  A    Absolutely, yes.

18  Q    I want to share a screen now, Mr. Byrne.  This is Milligan

19  Exhibit 5.  It is the report of one of their experts, Dr. King,

09:20:57 20  and she is offering opinions on certain issues.  I want to read

21  this introduction section into the record so you can get some

22  context.  Dr. King writes, White law makers in Alabama learned

23  long ago to color mask their public statements, just as they

24  have learned to color mask the legislation intended to protect

09:21:22 25  their racial prerogatives.

1       Not since the high tide of brazen white supremacy when

2   George Wallace proclaimed, segregation forever, have public

3   figures been so bold.

4           MS. WELBORN:  Mr. Davis, this is Dr. Bagley's report,

09:21:43 5   not Dr. King's report.

6           MR. DAVIS:  I apologize for that confusion.  Yes.

7   Thank you for the correction.

8   BY MR. DAVIS:

9   Q    Then Mr. Bagley after giving some examples says this.

09:22:03 10          JUDGE MARCUS:  I think you have to just -- as we

11  proceed, Mr. Davis, just take your time and speak right into

12  the speaker.

13          MR. DAVIS:  Thank you, Judge.

14  BY MR. DAVIS:

09:22:16 15  Q    I will read now an excerpt into the record from Milligan

16  Exhibit 5, the Bagley report.

17      Dr. Bagley writes, Representative Bradley Byrne of the

18  State's First Congressional District when he was vying for a

19  Senate seat aired a campaign ad in which he condemned black

09:22:36 20  people by placing their images in a fire.

21      The television spot begins with Byrne staring into a wood

22  fire in a backyard and lamenting the loss of his brother in the

23  armed services.  He shifts to lamenting the course the country

24  is taking as the faces of black and brown people appear in the

09:22:56 25  fire.  Former national football league quarterback Colin

1    Kaepernick appears in the fire as Byrne calls him an entitled

2    athlete dishonoring the American flag.  Members of the

3    congressional caucus known as the Squad, Ilhan Omar and

4    Alexandria Ocasio Cortez appear in the fire and are accused of

09:23:17 5    attacking America and cheapening 9/11.  No white people appear

6    in the fire.

7        My question to you, Mr. Byrne, is:  Is there anything you

8    care to say in response?

9    A    Yes, sir.  That ad was about my brother.  And the fire was

09:23:38 10   a fire in the fire pit at our hunting camp that he and I used

11   to sit around all the time.  So that ad was about my brother.

12       Now, the fact that I'm contrasting a rich, NFL quarterback

13   named Colin Kaepernick who won't stand up during the national

14   anthem with my brother's service who made far less than Colin

09:24:01 15   Kaepernick makes and literally contracted a disease during one

16   of his deployments with the 20th Special Forces group that

17   killed him, I think that's a legitimate thing for me to raise.

18   I have grave disagreements with Representative Alexandria

19   Ocasio Cortez and Representative Omar.  But I can tell you I

09:24:18 20   never had any negative interaction with either one of them.

21       Representative Alexandria Ocasio Cortez, actually, her

22   office was in my office building.  And when she was relatively

23   new, she couldn't find her way to her office and literally

24   stopped me in the hallway and asked me, can you tell me where

09:24:36 25   my office is?  I said, yes, ma'am, and I told her where it was.

And we sort of developed a personal rapport just because she

got to the moment of weakness, which we all have in Congress by

the way.  It's easy to get lost in those buildings.

So we never really had a political conversation, but we

09:24:50 would have these personal sort of, you know, informal social

interactions.  I disagree with her on the issues, but I don't

have any problems with her as a person.

The same is true for Ms. Omar.  Now, Ms. Omar served on

the Education and Labor Committee with me.  So we would have

09:25:07 interactions about education issues, and we had some

disagreements about -- but there was no -- that was really

about my brother.  It was not about those other people.  And

the fact that we used them was to simply contrast them and

their positions with the service that my brother had rendered

09:25:29 to our country.

Q    Was it your intention to single out anyone because of

their race?

A    No.  I singled out Mr. Kaepernick because he won't stand

up during the national anthem, and there are plenty of black

09:25:43 athletes that stand up during the national anthem by the way.

I have noticed that's not as what a lot of people try to

portray it to be.

And I am singling out Ms. Alexandria Ocasio Cortez and

Ms. Omar because of their attacks against America.  They attack

09:25:56 American values.  And I think it's perfectly within the realm

1  of what's appropriate dialogue to say, I expect somebody that's

2  making this money as Colin Kaepernick to stand up during the

3  national anthem, and I don't think members of Congress should

4  be attacking the country.

09:26:12  5  Q    Mr. Byrne, I want you to think of the people who are

6  involved in congressional campaigns, whether it's a candidate

7  or someone considering a run, that person's staff, volunteers,

8  and then I want you to assume that a couple of weeks before the

9  January 28th deadline, the congressional map changes from the

09:26:40  10  way it's usually been and what the Legislature passed to all of

11  a sudden it changes to something like what the plaintiffs are

12  representing excuse me -- what the plaintiffs are proposing.

13        Do you see any issues that would cause with congressional

14  campaigns?

09:26:57  15  A    Yes, sir.  First of all, we have primaries in four months,

16  general election in ten months.  Once you turn the calendar to

17  the beginning of the year, you have that primary staring you in

18  the face, you have already set your campaign in place.  You

19  already have your plan in place.  You have already got

09:27:17  20  volunteers set up ready to go.  You have got, you know, the

21  campaign ad messaging already worked out.  And you are hitting

22  the ground running.

23        So if you change my district on me with that little time,

24  it's going to put a substantial burden on my ability to refocus

09:27:33  25  my campaign, conduct my campaign, get volunteers, et cetera.

1  And particularly if you give me a new geographic area that I

2  haven't represented before, where I don't have, you know, the

3  natural contacts, et cetera, that's a huge problem for any

4  community.  And I don't -- and that's true for any candidate,

09:27:52  5  Democrat, Republican, people that are long-time public office

6  holders, people that are brand new.  It could be a tremendous

7  difficulty.

8  Q    Mr. Byrne, you said you went to a public hearing where

9  some of these districts were at issue.  Why did you go to the

09:28:13  10  public hearing?  Why are you here today to talk to the Court

11  about districts?

12  A    Number one, I am a citizen, so I have -- so I am not just

13  any citizen.  I mean, I served on the state school board, held

14  a district for eight years.  I served in the United States

09:28:33  15  House of Representatives representing one of the districts for

16  seven years.  I have, you know, a unique set of understandings

17  about what it's like to represent these areas.  And I felt like

18  I owed it to the system.  I owed it to the public to stand up

19  and say -- as somebody that's actually done this work, these

09:28:51  20  districts the way I'm proposing them makes sense this way.

21      And the most important thing I was trying to say is keep

22  this particular community together.  Keep these communities

23  together.  Don't pull southwest Alabama apart because we work

24  together down here.  Mobile area Chamber of Commerce doesn't

09:29:13  25  just do economic development for Mobile County.  They also do

1   it for Washington County.

2            JUDGE MARCUS:  Let me stop you for a second,

3   Mr. Byrne.  You cut out.  The sound cut out for a minute.  So

4   take your time and just repeat what you just said if you would,

09:29:29  5   please.

6            THE WITNESS:  Yes, sir.  What I have been the most

7   concerned about is that people that pull apart southwest

8   Alabama and have different parts being represented -- we work

9   together down here in southwest Alabama.  The example I used

09:29:48 10  was the Mobile area Chamber of Commerce, the economic

11  development for both Mobile County and Washington County,

12  because we're so closely connected.

13       We need to stay together down here.  We have a group

14  called CAP, Cultural Alabama partnership, that pulls together

09:30:05 15  these counties so that we have common representation, common

16  advocacy efforts with the Alabama Legislature and the members

17  of Congress.  So keep us together.  Don't pull us apart.  Let

18  us be one group of people that work together for our region of

19  the state and maximize the benefits that we want to get for our

09:30:27 20  people down here.

21            MR. DAVIS:  Thank you, Mr. Byrne.  I have no further

22  questions and pass the witness at this time.

23            JUDGE MARCUS:  Thank you, counsel.  Cross-examination

24  in what order did you propose to proceed on behalf of Milligan

09:30:40 25  and Caster and the Singleton?  And we leave that up to you.

             1       MS. WELBORN:  I will be going first for the Milligan
             2  plaintiffs, Your Honor.
             3       JUDGE MARCUS:  All right.  And, Mr. Whatley, would you
             4  be going second or the Caster folks going second?
09:30:57     5       MR. WHATLEY:  Doesn't matter to me, Your Honor.
             6       JUDGE MARCUS:  I leave that up to you.  So let's
             7  begin --
             8       MR. WHATLEY:  I am happy for the Caster plaintiffs to
             9  go second.
09:31:03    10       JUDGE MARCUS:  All right.  Thanks very much.
            11  Ms. Welborn, you may proceed with your cross-examination.
            12       MS. WELBORN:  Thank you.
            13                        CROSS-EXAMINATION
            14  BY MS. WELBORN:
09:31:10    15  Q    Representative Byrne, my name is Kaitlin Welborn, and I
            16  represent the Milligan plaintiffs.  Good morning.
            17  A    Good morning.
            18  Q    So I'd like to talk about the current redistricting plan
            19  first.  You had no direct role in drawing the current
09:31:25    20  congressional map in Alabama, right?
            21  A    I didn't have any direct role, but I did testify before
            22  the committee.
            23  Q    But other than that, you did not do anything to --
            24  A    That's correct.
09:31:37    25  Q    -- help draw the congressional map?

```
        1  A      That's correct.

        2  Q      And you did not provide any input to Mr. Hinaman, the map

        3  drawer?

        4  A      I did not know Mr. Hinaman.

09:31:49 5  Q      I'm sorry?

        6  A      I don't think I know him.

        7  Q      Okay.  And you did not speak with Representative Pringle

        8  about the 2021 map?

        9  A      I did.

09:31:59 10  Q      You did?

       11  A      Yes.

       12  Q      I'm sorry?

       13  A      He is the chair of the committee, and I testified before

       14  the committee.

09:32:08 15  Q      Okay.  But did you speak to Representative Pringle outside

       16  of the public hearing?

       17  A      I don't believe I did, no.

       18  Q      Okay.  And did you not speak with Senator McClendon

       19  outside of the public hearing?

09:32:22 20  A      I don't believe I did, no.

       21  Q      And you did not speak with Secretary Merrill's expert

       22  Thomas Bryan?

       23  A      No, ma'am.

       24  Q      Okay.  You first ran for Congress in a special election in

09:32:34 25  2013, right?
```

```
 1   A     That's correct.

 2   Q     And at that time, you had already held state office in

 3   Alabama for some time as you had mentioned, right?

 4   A     That's correct.

 5   Q     So you were something of a known quantity to the voters in

 6   your district?

 7   A     Well, I thought I was better known than I found out that I

 8   was, but, yes, to some people, I was a known quantity.

 9   Q     And in the 2013 special election, your opponent,

10   Mr. LeFlore was black, right?

11   A     That's correct.

12   Q     And he lost to you by over 30 percent?

13   A     I don't remember the percent.

14   Q     And then you faced Mr. LeFlore again in the 2014 general

15   election?

16   A     That's right.

17   Q     And at that time, he lost to you by over 35 percent?

18   A     Once again, I don't remember the percent.

19   Q     Okay.  As a congressional representative, don't you have

20   to focus on multiple issues all at once?

21   A     You do.

22   Q     And you have to learn about all of the issues that matter

23   to your constituents?

24   A     You do, but there's some issue you know more about than

25   others to be honest with you.  You can't be an expert on
```

Timestamps in left margin:
09:32:44 (line 5)
09:33:05 (line 10)
09:33:20 (line 15)
09:33:35 (line 20)
09:33:49 (line 25)

1    everything.

2    Q     And some Representatives in Congress represent entire

3    states, right?

4    A     That's true.

09:33:57 5    Q     Is it impossible to be knowledgeable about, for example,

6    both the University of South Alabama and Troy University at the

7    same time?

8    A     Well, you can be knowledgeable about them, but you can be

9    more knowledgeable about one than two.

09:34:15 10   Q     Okay.  Wouldn't having two congressional representatives

11   representing Mobile and Baldwin give the region even greater

12   influence in Congress?

13   A     Well, the truth of the matter is if you have two different

14   ones, you don't have one that's just entirely focused on a

09:34:33 15   particular interest.  So --

16   Q     No.  You have two that are focused on that area?

17   A     Unfortunately, when you have two, you don't have the same

18   amount of focus.  That's just the honest truth about it.  So if

19   I am only concerned about the University of South Alabama, I

09:34:47 20   know I am the congressman for the University of South Alabama,

21   and they don't have anybody but me to go up there and do what

22   needs to be done for them.  And so it really is better to have

23   just one than to have two that are sort of split and paying

24   attention to other things.

09:35:02 25   Q     Representative Sewell and Palmer both live in Birmingham,

1700

```
 1   right?
 2   A    I don't think -- I know Representative Sewell lives in
 3   Birmingham.  I think Representative Palmer lives outside of
 4   Birmingham, but in the metro area.
 5   Q    In Jefferson County?
 6   A    Yeah.
 7   Q    Okay.  Are you aware of any criticisms of either of those
 8   representatives failing to adequately represent the rest of
 9   their districts?
10   A    I've never heard anybody criticize either one of them for
11   what they do for their district.  Each one of them in their own
12   way do an excellent job for their district.
13   Q    Okay.  Are you aware that District 4 stretches across the
14   northern part of the state from Lamar and Tuscaloosa counties
15   all the way east to Etowah and Dekalb counties?
16   A    I am.  I believe that's Congressman Aderholt's district.
17   Q    That's right.  It's Congressman Aderholt.
18        And presumably, Representative Aderholt campaigns
19   everywhere in his district, right?
20   A    I don't know where he campaigns, but Congressman Aderholt
21   like Congresswoman Sewell and Congressman Palmer, does an
22   excellent job in his district.
23   Q    I would like to talk about the economics of the Mobile
24   area.
25        You spoke quite a bit about the port in Mobile.  Does
```

09:35:24 (line 5)
09:35:35 (line 10)
09:35:53 (line 15)
09:36:10 (line 20)
09:36:22 (line 25)

 1   Republican Carl your successor also work to protect ship

 2   building in Congress?

 3   A     Yes, ma'am.  He is doing a good job.

 4   Q     Wouldn't you expect anyone who represented Mobile to work

09:36:39  5   to protect the ship building industry in Congress?

 6   A     Oh, I think that's true.  The question is, once again,

 7   it's bandwidth.  How much time can you devote to that issue if

 8   you have got other competing issues?  So I can't say this about

 9   Congressman Carl because I am not there with him all the time.

09:36:58 10   But for me, every day that I woke up in Congress, I was

11   concerned about that shipyard.  And that's what it took because

12   there were all sorts of people trying to take the money away

13   from those programs that they were building ships for, for

14   other programs.  And it was a fight every day just like the red

09:37:14 15   snapper fight was a fight every day.

16        Now, if I have got to worry about several other issues in

17   addition to those, I am not going to be as effective in that

18   fight as I would be if I'm focused on those.

19   Q     Okay.  But if the port in Mobile were in a different

09:37:30 20   district than CD 1, it would still be true that someone would

21   work to represent, you know, the ship -- protect the ship

22   building industry in Congress?

23   A     I would think so, but I would think it would be a question

24   of how much time, how much effort, and how much priority they

09:37:46 25   put on it.  And if they have got other things they are

```
 1  competing with, it wouldn't be as much.  That's just the nature
 2  of things.
 3  Q    Okay.  And other than the port, you mentioned a few other
 4  industries such as Airbus and fishing, and said that those are
 5  some of the largest industries in the Mobile area, right?
 6  A    Yeah.  I also mentioned tourism and seafood, et cetera.
 7  Q    Okay.  The largest industry in Mobile County is health
 8  care; is that right?
 9  A    I guess if you put all the hospitals together, it might --
10  that might be true, yeah.
11  Q    And the second largest industry is retail sales; is that
12  right?
13  A    In terms of numbers of employees, that may be true.  I
14  don't know about payrolls.
15  Q    Okay.  And the recent economic growth in Mobile County has
16  attracted more people to move to the Mobile area; is that
17  right?
18  A    That's correct.
19  Q    And people go to Mobile County from other counties to
20  work?
21  A    Oh, yes.  A lot of people do.
22  Q    And to live?
23  A    Yes.
24  Q    And to shop?
25  A    Oh, yes.
```

09:38:05 (line 5)
09:38:26 (line 10)
09:38:36 (line 15)
09:38:50 (line 20)
09:38:57 (line 25)

```
 1   Q    And those people may come from Clarke County?

 2   A    Yes.

 3   Q    Conecuh County?

 4   A    Not too many people from Conecuh County.

 5   Q    Okay.  What about Wilcox County?

 6   A    Not very many people from Wilcox County.

 7   Q    And migration from other areas would include people moving

 8   from the area commonly known as the Black Belt, right?

 9   A    There are people that move here from the Black Belt, yes.

10   Q    Okay.  You don't know the level of migration into the

11   Mobile area in the past decade, do you?

12   A    You mean where they came from?

13   Q    The level of migration.

14   A    The level.  Oh, I couldn't quantify it for you, but we

15   have had migration.

16   Q    Or the past 50 years?

17   A    We have had migration the last 50 of years, yes.

18   Q    But you don't know the level?

19   A    No, I can't quantify for you.

20   Q    And you don't have a breakdown of where those migrants

21   have come from?

22   A    No, ma'am.

23   Q    Are you aware of the racial disparities in the poverty

24   level in Mobile?

25   A    You mean the percentage of people who are in poverty who
```

1704

```
 1  are black versus white?
 2  Q    Yes.
 3  A    I know that it's a higher percentage poverty among black
 4  people than white people in Mobile County.
 5  Q    Are you aware that over 51 percent of people living below
 6  the poverty line in Mobile County are black, even though only
 7  36 percent of Mobile County is black?
 8  A    I don't know the figure precisely, but I wouldn't be
 9  surprised if that was the case.
10  Q    Okay.  Are you aware that the Mobile City Council had to
11  be sued in the 1970s and 1980s to ensure black representation?
12  A    I am well aware of that, yes, ma'am.
13  Q    And are you aware that the Mobile County School Board had
14  to be sued in the 1970s and 1980s to ensure black
15  representation?
16  A    I am well aware that, yes, ma'am.
17  Q    You mentioned representative John Lewis and the
18  commemoration of the Selma to Montgomery March?
19  A    Correct.
20  Q    But you did not support the John Lewis Voting Rights
21  Advancement Act while you were in Congress, did you?
22  A    I did not.
23  Q    You are familiar with the area referred to as the Black
24  Belt, right?
25  A    Oh, yes, ma'am.
```

Timestamps:
09:40:26 (line 5)
09:40:43 (line 10)
09:41:01 (line 15)
09:41:13 (line 20)
09:41:29 (line 25)

```
 1  Q    And the Black Belt is generally an area whose counties are
 2  generally majority black, right?
 3  A    It's actually called the Black Belt because of the soil.
 4  The soil is dark and rich there, so it's not called the Black
 5  Belt of race or ethnicity.
 6  Q    That's not what I asked.  Is it an area whose counties are
 7  generally majority black?
 8  A    Yes.  There are some exceptions to that, but yes, as a
 9  region, it's majority black.
10  Q    Okay.  And in general, the Black Belt has lower income
11  levels than other areas of the state, right?
12  A    Yes, ma'am, that's correct.
13  Q    And it has lower education levels than other areas?
14  A    There are exceptions to that, but that's true.
15  Q    And it has worse health care and facilities than other
16  areas?
17  A    I don't know that.  I have toured hospitals in the Black
18  Belt, and there the number of good hospitals in Black Belt, so
19  I can't verify what you just said.
20  Q    Okay.  That's perfect, because I would like to talk about
21  health care now.
22       In December 2020, you were interviewed by al.com about
23  your time after Congress.  Do you recall this interview?
24  A    Well, yeah, I did a lot of interviews when I was a member
25  of Congress, but I do recall generally that interview.
```

1           MS. WELBORN:  Mr. Ang, could you bring up that

2  article?

3  BY MS. WELBORN:

4  Q    Mr. Byrne, do you recognize this article?

09:42:55 5  A    It's been a while since I've read it, but, yes, John

6  Sharp.  I remember the article he wrote, yeah.

7           MS. WELBORN:  Your Honor, we would like to mark this

8  document as Milligan Plaintiffs' Exhibit 55 for identification.

9           JUDGE MARCUS:  Okay.

09:43:12 10          MS. WELBORN:  Mr. Ang, could you flip to page 2,

11  please?

12  BY MS. WELBORN:

13  Q    And, Republican Byrne, could you please read the paragraph

14  starting with, the daily data?

09:43:24 15  A    The daily data that I've got in this -- which really

16  forced me to focus on the fact that there is a problem with the

17  ability of black people to be able to get good, primary health

18  care.  One thing I have worked on in Congress and will continue

19  to be interested in, is how do we get primary health care to

09:43:43 20  black people?  It's clear with the data we have is that black

21  people with underlying health conditions are disproportionately

22  affected by the novel Coronavirus virus.  We should want

23  everyone in our communities to have real access to quality

24  primary health care.

09:44:01 25  Q    Thank you.

1    MS. WELBORN:  And, Mr. Ang, could you flip to the last

2    page, please?

3    BY MS. WELBORN:

4    Q    And, Representative Byrne, could you read the paragraph

09:44:11 5    starting with, many of us have access?

6    A    Many of us have access to primary health care, and we take

7    that for granted, but for a disproportionate number of people

8    in the state, and a disproportionate number of black people,

9    that's not true.  It's not good for our communities, for our

09:44:27 10    state, or our nation.

11    Q    Thank you.

12    MS. WELBORN:  And, Mr. Ang, you can take that down.

13    BY MS. WELBORN:

14    Q    Representative Byrne, do you agree that it is difficult

09:44:37 15    for black people in Mobile County to get primary health care?

16    A    Yes, ma'am.

17    Q    And would you agree that it is difficult for black people

18    in the Black Belt to get primary health care?

19    A    I don't know as much as the Black Belt as I do about

09:44:51 20    Mobile County, but I wouldn't be surprised if that was true.

21    Q    Okay.  Thank you.  You are aware that the Affordable Care

22    Act allows states to opt in to Medicaid expansion, right?

23    A    I am.

24    Q    And you are aware that Governor Bentley convened a task

09:45:07 25    force that recommended that Alabama opt into Medicaid

1  expansion, right?

2  A    I don't know about that.

3  Q    Okay.  But Alabama has not opted into Medicaid expansion?

4  A    That's correct.

09:45:20 5  Q    And if Medicaid were expanded in Alabama about, 220,000

6  more Alabamians would receive health care coverage; is that

7  right?

8  A    No.

9  Q    I'm sorry?

09:45:35 10  A    I said no.

11  Q    Okay.  Do you have a different figure?

12  A    No.  I think what you are saying is they would be covered

13  by Medicaid, but it doesn't mean they would have access to

14  health care because there are not enough health care providers

09:45:51 15  to provide health care to.

16  Q    I'm sorry.  I'm talking about health care coverage, so

17  insurance?

18  A    It's a difference between coverage and gaining health

19  care.

09:45:59 20  Q    Okay.  220,000 more Alabamians would be covered by

21  Medicaid and have Medicaid insurance?

22  A    Yes.  But they wouldn't necessarily be able to get health

23  care because we don't have doctors that will take care of them.

24  We have --

09:46:14 25  Q    Thank you.

1    A    We have one pediatrician in Escambia County, Alabama that

2    will take Medicaid patients because the level of pay is so low

3    for Medicaid.  So you can have Medicaid and not be able to get

4    health care because there's no doctor to give it to you.

09:46:29 5    That's --

6    Q    Okay.  Thank you.

7    A    -- why I support community health centers.

8    Q    But of those 220,000 Alabamians who would be covered under

9    Medicaid in that they have Medicaid insurance, black people

09:46:44 10   would disproportionately be among those at those people, right?

11   A    I don't know that figure.  I couldn't -- I couldn't

12   quantify that.

13   Q    And while you were in office, you opposed Medicaid

14   expansion, right?

09:46:55 15   A    I did because I thought we should have community health

16   centers instead.

17   Q    Okay.  And Representative Sewell supports Medicaid

18   expansion?

19   A    She does.

09:47:04 20   Q    And that Alabama Black Legislative Caucus supports

21   Medicaid expansion?

22   A    I don't know.

23   Q    Okay.  In Congress, you made opposition to the Affordable

24   Care Act a major priority; is that fair?

09:47:19 25   A    I did.

1    Q    And you sponsored a 2015 bill to repeal the Affordable

2    Care Act?

3    A    Repeal and replace.

4    Q    And in 2017, you supported a budget revolution to appeal

09:47:32  5    the Affordable Care Act?

6    A    That's correct.

7    Q    Do you recall the American Health Care Act of 2017?

8    A    I do.

9    Q    And it sought to repeal the Affordable Care Act, as well,

09:47:44 10    right?

11    A    Repeal and replace.

12    Q    And you supported the American Health Care Act, right?

13    A    Yes, because I thought it was going to give a better

14    health care system than the one that the Affordable Care Act

09:47:57 15    provided.

16    Q    Okay.  Thank you.

17         Do you know what percentage of black voters voted for you

18    in the 2014 and 2018 general elections?

19    A    I don't.

09:48:07 20    Q    Would it surprise you that in your 2014 election only

21    15 percent of black voters in District 1 voted for you?

22    A    No.

23    Q    And would it surprise you to know that in 2018 only

24    5.4 percent of black voters in District 1 voted for you?

09:48:29 25    A    That would surprise me, yeah.

```
 1  Q     Okay.
 2             MS. WELBORN:  I believe I have no further questions,
 3  but if I could please confer with my colleagues for a few
 4  minutes.
 5             JUDGE MARCUS:  You may.
 6             MS. WELBORN:  Thank you.
 7       We have no further questions.  Thank you.
 8             JUDGE MARCUS:  All right.  Thank you.  And you may
 9  proceed, Mr. Osher.
10             MR. OSHER:  Thank you, Your Honor.
11                          CROSS-EXAMINATION
12  BY MR. OSHER:
13  Q     Good morning, Representative.  How are you?
14  A     Good morning.  I'm well, thank you.
15  Q     Can you hear me okay?
16  A     I can.
17  Q     Great.  My name is Dan Osher.  I represent the Caster
18  plaintiffs in this lawsuit.  I think we met a few years ago
19  during the Chestnut litigation where you testified.  Do you
20  remember that?
21  A     I do.
22  Q     Great.
23       Representative, how long did you serve in Congress?
24  A     Seven years.
25  Q     And during that time and when you were campaigning, did
```

Timestamps:
09:48:40 (line 5)
09:49:09 (line 10)
09:49:17 (line 15)
09:49:29 (line 20)
09:49:38 (line 25)

```
 1  you reach out to your constituents to try to learn what their
 2  interests and needs were?
 3  A    Constantly.
 4  Q    I'm sorry.  I didn't catch that answer.
 5  A    Constantly.
 6  Q    What about organizations that served your constituents,
 7  did you reach out to meet with any such organizations?
 8  A    Typically, they would reach out to me.  So somebody
 9  reached out to me and said, will you come speak to our group,
10  or can we come meet with you?  I would say, yes.
11  Q    Okay.  You mentioned Airbus during your testimony.  That
12  is a pretty big presence in Mobile; isn't that right?
13  A    Yes, sir.
14  Q    Did you ever seek out a meeting to meet with
15  Representatives from Airbus?
16  A    No.  They sought out meetings with me.
17  Q    So you never reached out to them during your candidacy or
18  serving Congress?
19  A    I didn't have to.  They reached out to me.
20  Q    Fair enough.
21       What about Austal, did you ever reach out to them?
22  A    Yes, sir, but that was part of the back and forth in
23  trying to get ships authorized and appropriated.  So I would
24  initiate conversations with them and tell them this is what
25  just happened or what's about to happen.
```

```
 1  Q    Sure.  And that was a huge project in your district,
 2  right?  I believe you spent a lot of time on that?
 3  A    Yes, sir.  A lot of time.
 4  Q    Any other of the companies that you identified in your
 5  direct examination, did you reach out to any of those while you
 6  were serving or campaigning?
 7  A    I would probably each reach out to the University of South
 8  Alabama because I was on the education committee, and I was
 9  trying to -- but in general, if I spoke with companies, that
10  would have been because they or somebody representing their
11  industry reached out to me.
12  Q    Sure.  Busy guy.  I wouldn't dispute that.  So you
13  testified in the Chestnut trial while you were in office you
14  never had a formal reading with the Alabama State Conference of
15  the NAACP; isn't that right?
16  A    That's correct.  They never reached out to me.
17  Q    And you never reached out to them?
18  A    No.
19  Q    And you didn't know who the president of that organization
20  was when you testified in Chestnut; is that right?
21  A    Yes, sir.
22       JUDGE MARCUS:  Give him a chance to complete his
23  answer.  You may proceed, Mr. Byrne.
24       THE WITNESS:  I still don't know.
25  BY MR. OSHER:
```

09:51:01   5
09:51:22  10
09:51:42  15
09:51:55  20
09:52:09  25

Q      And you testified in *Chestnut* that you never held a

meeting with anyone from the Urban League while you were in

office, right?

A      That's correct.  They never reached out to me.

09:52:21  5  Q      And you never reached out to them?

A      That's right.

Q      And you testified in *Chestnut* you never met with anyone

from the Southern Christian Leadership Conference; isn't that

right?

09:52:31 10  A      Not that I am aware of.

Q      And you testified in *Chestnut* that you never had a meeting

with anyone from the National Coalition of Black Civic

Participation; isn't that right?

A      That's correct.  Now, I think what I said in that trial

09:52:43 15  and I will say again today is I may have met with those people

when I was somewhere else.  Like I may have met with them in

Selma during the pilgrimage, but I didn't meet with them as

members of organizations.  It was part of a bigger meeting.

Q      Of course.  Understood.  And you testified in *Chestnut*

09:53:03 20  that you never met with anyone from LULAC, the League of United

Latin American Citizens; isn't that right?

A      That's correct.

Q      And you testified in *Chestnut* that you didn't even know

what that organization was?

09:53:15 25  A      That's correct.

1    Q    And you further testified that you never paid attention to

2    what extent your black constituents supported or opposed you in

3    your congressional races; isn't that right?

4    A    That's right.  It didn't matter.  I still had to represent

09:53:33 5    them, whether they voted for me or not.

6    Q    Sure.  But you didn't pay attention to whether they

7    actually supported or opposed you?

8    A    No.  Wouldn't matter.

9    Q    So during your seven years in Congress, and I think you

09:53:47 10    already talked about this, you got to know the other members of

11    the Alabama delegation; isn't that right?

12    A    Our delegation worked together very well, very closely.

13    Q    And I -- in Ms. Welborn's cross-examination, you talked

14    about this a little bit, but I'd like to dig down a little

09:54:08 15    more.

16         MR. OSHER:  Jeff, can I have you pull up Caster

17    Plaintiffs' Exhibit 12?  Thanks.

18    BY MR. OSHER:

19    Q    And, Representative, I will represent to you that this is

09:54:26 20    a map of the congressional plan that was in place I believe the

21    whole time that you were in office?

22    A    That's correct.

23    Q    Over a decade between 2012 and this year, or I should say

24    last year.

09:54:41 25         So Robert Aderholt represented District 4, right?

```
 1  A     That's correct.
 2  Q     So looking at his district -- and let's see.
 3           MR. OSHER:  Jeff, could you focus in on the purple
 4  district there?  Yeah.  Perfect.
 5  BY MR. OSHER:
 6  Q     So looking at that district, it spans the width of the
 7  state.  It has corners in Colbert County in northwest down to
 8  Lamar and Tuscaloosa counties, then over east to Etowah,
 9  Marshall, and Dekalb County; isn't that right?
10  A     Yes, sir.
11  Q     Would you say that's an accurate description of that
12  description?
13  A     Yes, sir.
14  Q     Did Representative Aderholt ever express to you that it
15  was too difficult for him to travel to the different parts of
16  his district?
17  A     No.  I actually know that area fairly well because I have
18  campaigned in there twice running for statewide office, and
19  that area, it has an awful lot in common with one another.
20  Q     Sure.  That --
21           JUDGE MARCUS:  Just let him finish his answer.
22           THE WITNESS:  I said they're very similar.
23  BY MR. OSHER:
24  Q     My apologies for -- I didn't mean to talk over you,
25  Representative.
```

```
 1        That wasn't my question.  My question was:  Did
 2   Representative Aderholt ever express to you that it was too
 3   difficult for him to travel to the different parts of his
 4   district when he represented them?
 5   A    No.  When you are in Congress and you are delegated to a
 6   district like that, you do what you have to do, and I am sure
 7   he does an excellent job of it.
 8   Q    And he is an effective representative of his district?
 9   A    Yes.  Very much so.
10   Q    And you testified that you got to know Representative
11   Sewell pretty well during your time in Congress?
12   A    Actually, I knew her before I got to Congress.  But she
13   and I worked very closely together when I was in Congress.
14   Q    She is also a very effective Representative of her
15   district?
16   A    Very effective.
17        MR. OSHER:  Jeff, can we focus on District 7 in the
18   map?
19   BY MR. OSHER:
20   Q    So, again, looking at this district, her district started
21   out in -- well, it goes down to the south in Clarke County,
22   then to Montgomery in the east, up to Birmingham in the
23   northeast in Jefferson County, and then over to Pickens County
24   in the west.  Do you see that?  Did I describe her district
25   accurately?
```

1 A    Yes.

2 Q    In your time in Congress, did Representative Sewell ever

3 express to that you it was too difficult for her to travel to

4 the different parts of her district?

09:57:26 5 A    She never said it was too difficult, but she said it was

6 pretty difficult.

7 Q    When did she say that?

8 A    On several different occasions.  She would talk about what

9 her schedule was and how difficult it was for her to be able to

09:57:39 10 go from Birmingham to Clarke County to Lowndes County to

11 Choctaw County, just the difficulty in travel, and the fact

12 that, you know, she's got parts of Jefferson County an urban

13 county, parts of Montgomery County another urban county

14 together with the rural Black Belt counties.  It's tough, it's

09:58:01 15 real tough on her, but she is very smart and very capable, and

16 she does -- she works hard.

17 Q    And you said she's a very effective representative?

18 A    Oh, yes very effective.

19 Q    And let's look at District 3.

09:58:17 20     As you spoke a bit about earlier, looking at that district

21 -- and I'm sorry.  Who represents District 3?

22 A    It's Mike Rogers.

23 Q    And he did the whole time you were in office; is that

24 right?

09:58:29 25 A    Oh, yes.  Yeah.

1  Q    So looking at his district, it has at least half of the

2  eastern border of the state running all the way up from

3  Cherokee County and all the way down to Russell County; isn't

4  that right?

09:58:41  5  A    That's right.

6  Q    Okay.  Did Representative Rogers ever say to you that it

7  was too difficult for him to travel to the different parts of

8  his district?

9  A    No.  I think he felt like his district had a lot of

09:58:52  10  commonality -- not necessarily easy to get from Cherokee County

11  to Russell County, but the commonality of interests they had

12  made it a little bit easier on him.

13      He does have the Anniston Army Depot, so he is going to be

14  focused on that.  But in Russell County, he has got people that

09:59:11  15  are across the river from a major Army base, so he's got that

16  to contend with, too.  But he's a ranking member of the House

17  Armed Services Committee now, soon to be the chairman, and so

18  he will be in a unique position to help both of those.

19  Q    Sure.  That wasn't my question.  My question was about the

09:59:29  20  difficulty of travel to the different parts of the district.

21  And --

22  A    Yeah.  He would say, I have had a long day or a long

23  couple of three days because I have to go from Cherokee County

24  all the way down to Pike Road in Montgomery.  That's a long

09:59:44  25  way.

1720

```
 1  Q    But he's -- you think he's a very effective representative
 2  in his district?
 3  A    Oh, yeah, yeah.
 4  Q    Okay.
```
09:59:51
```
 5         MR. OSHER:  You can take that down, Jeff, thank you.
 6  BY MR. OSHER:
 7  Q    In your direct examination, do you recall talking to
 8  Mr. Davis about how the illustrative plans that the plaintiffs
 9  have offered in this case may result in no congressional
```
10:00:06
```
10  representative living in Mobile?  Do you remember that?
11  A    Yes.
12  Q    And I think -- I can't remember.  It might have been
13  Mr. Davis or you said that that would be a tragedy?
14  A    It would be a tragedy if we didn't have somebody from
```
10:00:16
```
15  Mobile representing the Mobile area, yeah.
16  Q    Okay.
17         MR. OSHER:  Jeff, could I have you pull up Defendants'
18  Exhibit 2, which I believe is Mr. Bryan's report that was
19  offered by the state in this case?
```
10:00:37
```
20         Can you go to page 27?  Next page, please.  And can you
21  zoom in on the Figure 5.6, Alabama enacted plan.  Any way to
22  zoom in further.
23  BY MR. OSHER:
24  Q    Representative, can you see that map?
```
10:01:08
```
25  A    I can.
```

Q    Okay.  I will represent to you that this is the current
enacted map, and it has dots as to where each of the current
Representatives live.  Do you see that?

A    I do.

Q    Can you tell me which congressional representative
currently lives in Montgomery?

A    I don't think anybody currently lives in Montgomery.

Q    And you would agree that Montgomery is the third biggest
city in Alabama?

A    Actually, now, I think it's the fourth.

Q    Fair enough.  You would say that Montgomery is a very
important city in the state of Alabama?

A    Oh, yes, very important city.

Q    Okay.

        MR. OSHER:  You can take that down, Jeff.  Thank you.
BY MR. OSHER:

Q    You spoke a bit about District 5 in the State Board of
Education plan.  Do you remember that?

A    I can't remember which district it was.

Q    District 5 is the one that connects Montgomery to Mobile
with the Black Belt?

A    Okay.  I remember that one.

Q    And up until a few years ago, Ella Bell represented that
district for a long time; is that right?

A    She did, yes.

```
 1  Q    Did she ever express to you that it was too difficult for
 2  her to represent a district that had both Montgomery and Mobile
 3  in it?
 4  A    Yes.
 5  Q    When did she say that?
 6  A    I think I mentioned earlier that I would get phone calls
 7  from people in her district at -- thinking I was their state
 8  school board member.  And asking me to come to meetings.  And I
 9  would call her and I would say, it's your district, not my
10  district.  I don't want to do anything in your district you
11  don't know about.  I said, do you want me to do something?  She
12  said, would you please, because I cannot get down there.  It's
13  too far me to get from Montgomery to there.  I have other
14  things going on.  And so I said, sure, I will be happy to do
15  it.  So I would do that for her from time to time and for her
16  predecessor.
17  Q    And if she was a member of Congress and you were also a
18  member of Congress and that sort of confusion arose, that would
19  -- the same thing would happen, right, you would talk to the
20  other member of the Congress and try to figure it out?
21  A    Yes.  But I got to be honest with you, that never happened
22  when I was in Congress.  I guess people know who their
23  Congressman is.  So I never got any calls from Terri Sewell's
24  district, for example, saying would you come meet with us
25  except for Clarke County because she and I shared Clarke
```

1723

```
 1  County.
 2  Q    And Clarke County is the only district -- I'm sorry -- the
 3  only county that your district split last redistricting cycle,
 4  right?
```
10:03:43
```
 5  A    That's right.  And we had an understanding we would work
 6  together in Clarke County, and there was never any issue.
 7  Q    Sure.  Ella Bell extremely effectively represented that
 8  district, right?
 9  A    I don't think I would agree with that.
```
10:04:01
```
10  Q    Dr. Tommy Stewart succeeded Ella Bell to represent that
11  district?
12  A    I -- yeah.  I don't know him, but I -- I know the name.
13  Q    Did you ever speak to Dr. Stewart?
14  A    Not that I can recall.
```
10:04:19
```
15  Q    What about Dr. Chestnut, who currently represents that
16  district?
17  A    I don't recall having any interaction with Dr. Chestnut
18  either.  I've been away from the state school board for a
19  while.
```
10:04:30
```
20  Q    You voted to -- in Ms. Welborn's cross-examination, you
21  spoke about your efforts to repeal the Affordable Care Act;
22  isn't that right?
23  A    That's right.
24  Q    You testified in *Chestnut* that you never tried to
```
10:04:48
```
25  determine whether your black constituents wanted the Affordable
```

1   Care Act to be stay in place, right?

2   A    I didn't try to determine anybody's particular views on

3   that.  I just listened to what people were telling me.  And I

4   had a lot of people telling me they wanted to change it.

10:05:02  5   Q    You never sought out the advice from the state conference

6   of the NAACP on that issue?

7   A    I think I testified earlier I never had any interaction

8   with them consciously.  I may have been in a room with some of

9   them and didn't know they were members of that organization.

10:05:16  10   Q    And you never even tried to figure out what their position

11   was on the issue?

12   A    No.  I -- when it came to that issue, I had plenty of

13   people tell me what their positions was.  I didn't have to

14   reach out to people.

10:05:30  15   Q    In *Chestnut*, you testified that while you were in office

16   you never even tried to determine how many black constituents

17   you actually had; isn't that right?

18   A    Well, I knew them in general, but I didn't know precisely.

19   I knew it was about 25 percent.

10:05:44  20   Q    In fact, when you were asked about a percentage of your

21   district that was black during *Chestnut*, you said, it didn't

22   matter to me.  Isn't that right?

23   A    It didn't matter to me.

24   Q    You voted against the First Step Act?

10:05:59  25   A    You have to refresh me.  I don't know what the First Step

1    Act was.

2    Q    The First Step Act was the criminal justice reform?

3    A    Oh, yeah, yeah, yeah.  I'm sorry.  Yes, I did.

4    Q    But you testified in *Chestnut* that you never tried to

10:06:15  5    determine whether your black constituents felt that that bill

6    would improve their lives, right?

7    A    I never heard from anybody about that bill.

8    Q    You didn't attempt to discern the Alabama NAACP's view on

9    the bill?

10:06:30 10    A    I never had any interaction with them.  Consciously

11    knowingly.

12    Q    You spoke a bit about the various factories and plants

13    that are located in Mobile?

14    A    (Nodded head.)

10:06:44 15    Q    Do you recall that?

16    A    That's right.

17    Q    Are you aware that there are higher rates of cancer and

18    asthma among the black community in Mobile due to their

19    proximity to those factories and plants?

10:06:55 20    A    I'm not, but I wouldn't argue with it.  In general, I know

21    that we have an issue with regard to the quality of health care

22    that's been available to black people in Alabama in my

23    district.

24    Q    Do you know who Alabama commemorates in Congress' Statuary

10:07:19 25    Hall?

```
 1  A    Yes.  It's Helen Keller, and it's -- I forgot his name --
 2  a former Civil War general.
 3  Q    Joseph Wheeler?
 4  A    Yeah.
10:07:31  5  Q    And Joseph Wheeler was a calvary general for the
 6  Confederate Army; isn't that right?
 7  A    I know he was a general.  I don't know if it was calvary
 8  or not.
 9  Q    But he was on the Confederate side of the Civil War?
10:07:43 10  A    Right.  I know a lot more about Helen Keller than I know
11  about him.
12  Q    Did you ever try to determine how your black constituents
13  felt about Alabama celebrating a Confederate general in the
14  halls of Congress?
10:07:53 15  A    I never asked them, but I think I can guess.
16  Q    You never reached out to?
17  A    No.
18  Q    And what is your guess as to how they would feel about it?
19  A    I don't think they would like it.  That's a decision by
10:08:08 20  the state, not a decision by Congress.
21  Q    You would agree with me that members of Congress can use
22  their influence to try to change state policy?
23  A    Some do.  I didn't.  I didn't think it was appropriate.
24  Now, when I was in the Legislature, I supported putting Helen
10:08:29 25  Keller's statute in there.  I actually served on the committee
```

```
 1  that raised the money to put the statue there because I think
 2  Helen Keller was a better representative of the state than the
 3  person we had there before.
 4  Q    Oh, you're referring to the Joseph Wheeler statue, or the
 5  one that was replaced by Helen Keller?
 6  A    The one replaced by Helen Keller.
 7  Q    You didn't take any action in the Legislature to remove
 8  the Joseph Wheeler statue or replace it with something else?
 9  A    No.  We were kind of focused on Helen Keller when I was in
10  the Legislature.
11  Q    Speaking of your time in the Legislature, when did you
12  serve in the Senate?
13  A    From November of 2002 to May of 2007.
14  Q    During that time, I imagine you went to the Alabama
15  Capitol pretty often?
16  A    Yes, sir.
17  Q    Did you often walk by the monument to Confederate soldiers
18  and sailors that sits in front of the Capitol?
19  A    If I did, I didn't pay any attention to it.  I didn't know
20  that we had one.
21  Q    So you sort of turned a blind eye to it?
22  A    I was busy doing other things.  I wasn't paying attention
23  to stuff like that.
24  Q    Were you aware that while you were there, the memorial was
25  surrounded by flags of the Confederate states?
```

10:08:44
10:08:57
10:09:15
10:09:30
10:09:40

```
 1  A    I don't remember that, either.
 2  Q    Is it your contention that that shrine to the Confederacy
 3  does not exist in front of the Capitol?
 4  A    Oh, no. I'm not saying they don't.  I just never paid any
10:09:58  5  attention to them.
 6  Q    So you never tried to determine whether your black
 7  constituents had a problem with that sitting at the foot of the
 8  Capitol?
 9  A    I never had a discussion with any constituent about that.
10:10:08 10  Q    And is your assumption that you described earlier the same
11  here that you would think that your black constituents probably
12  did not appreciate that?
13  A    If they even knew about it.
14  Q    Representative, you would agree that the poverty rate
10:10:32 15  among black Alabamians is significantly higher than it is among
16  white Alabamians?
17  A    I know it's higher.  I don't know I can say it's
18  significantly higher.
19  Q    Am I right that when you testified in Chestnut, you
10:10:44 20  actually said you didn't know if that was the case, right?
21  A    No.  But I wouldn't be surprised if it was higher.
22  Q    Understood.  I will represent to you that the poverty rate
23  is more than double among black Alabamians than it is white
24  Alabamians.
10:11:06 25        What about child poverty rates?  Do you know if there's a
```

        1   disparity there?

        2   A    I don't.  I don't know what the child poverty rate is.

        3   Q    Would it surprise you if it was nearly triple among black

        4   Alabamians than it is white Alabamians?

10:11:19  5   A    It would not.

        6   Q    Household average income, do you know if that's lower

        7   among black Alabamians than white Alabamians?

        8   A    I don't know, but I would not be surprised if it were.

        9   Q    Same with unemployment rate, do you know if it's -- if

10:11:35 10   it's higher than among black Alabamians than white Alabamians?

       11   A    I don't know, but I wouldn't be surprised if it were.

       12   Q    I will represent to you that it's more than double among

       13   black Alabamians than white Alabamians.  Does that surprise

       14   you?

10:11:48 15   A    Yeah, that kind of does surprise me.

       16   Q    Okay.  Do you have any reason to dispute that?

       17   A    No.  I am just saying -- I don't have the data in front of

       18   me, so I am not going to try to guess at the data, but as I

       19   come around and looked at this as an industry down in this part

10:12:08 20   of the state, there are plenty of black people that work in

       21   every industry that we have got down here.  And that doesn't

       22   surprise me because 25 percent of the people that live down

       23   here are black and expected to be in the work force, and they

       24   are.

10:12:21 25   Q    Representative you are a little quiet now, if you wouldn't

```
 1  mind speaking up.

 2  A    Okay.

 3  Q    Thank you.

 4  A    I will move a little closer.

 5  Q    I will represent to you that one of the Caster plaintiffs'

 6  experts in this case reported that the black unemployment rate

 7  among -- the black Alabamian unemployment rate is 7.8 percent,

 8  and that for white Alabamians, it's 3.8 percent.  So the -- so

 9  he reports that it's more than double among black Alabamians?

10  A    I don't know.

11  Q    So assuming the figures that I discussed there are true,

12  you would agree that those disparities stem from Alabama's

13  centuries' long discrimination against black people in the

14  state?

15  A    I think the problems that are facing the black community

16  with regard to all these issues is a function of the failure of

17  the state of Alabama to provide a quality education to them.

18  Q    Does that have -- is that rooted in the discrimination

19  that Alabama had against black individuals?

20  A    No.  It's rooted in the overall failure to the Alabama

21  public education system, which -- white people just not as much

22  as it affects black people.  It's the reason I got in public to

23  begin with is because I thought the biggest problem facing

24  Alabama was our inability to provide quality education to all

25  of our citizens, and we're still not doing enough.  And it's
```

10:12:30 (line 5)
10:12:51 (line 10)
10:13:04 (line 15)
10:13:23 (line 20)
10:13:41 (line 25)

having these effects that I think hurt everybody in Alabama,
but particularly the people who are not getting that quality
education.

Q    So is it your testimony that the disparities that I have
described have no roots in the centuries' long discrimination
that Alabama, the entrenched discrimination in Alabama against
black individuals?

A    I don't know that I can say that there's no effect.  But
what I'm saying is, is that the single biggest problem, the
thing that's the biggest cause for them is our failure to
provide quality education to everybody in the state.  We live
in a time when you're going to be valued by what you know and
what you do with what you know.  And if we don't provide
quality education to all of our people, they won't get the
economic value in their lives that they need.  If they don't
have the economic value in their lives, they can't afford
quality health care and all these other stuff.  So I continue
to believe today as I did when I ran for state school board in
1994, if you want to address all the other issues, fix the
education system in the state.

Q    You agree with me that Alabama had for a very long time a
strictly segregated education system?

A    Oh, yes, sir, absolutely.  To our great shame, we did
that.

Q    Just a few more questions, Representative.

```
 1        You testified on direct about the -- the campaign ad.  Do
 2   you recall that?
 3   A    Yes.
 4   Q    Your campaign ad.
 5        I understand your testimony that that ad was intended to
 6   be primarily about your brother; is that right?
 7   A    That's correct.
 8   Q    So regardless of your intent, do you know how that ad was
 9   perceived among your black constituents?
10   A    I don't know that I ever had a discussion with a black
11   person about that ad.
12   Q    You didn't hear any feedback from the black community or
13   the press on this?
14   A    Not that I can recall.
15   Q    You understand, don't you, that images of black people in
16   a fire could trigger a connection in the minds of some to the
17   more horrific eras of racial discrimination in Alabama?
18   A    No.
19   Q    You would agree that in Alabama, there is a horrific
20   history of lynching black Americans?
21   A    Yes, sir.
22   Q    And that history included burning black individuals alive?
23   A    Never heard of that.
24   Q    You would also agree, wouldn't you, that Alabama has had a
25   history of bombing and burning down houses occupied by black
```

Timestamps in left margin:
10:15:17 (line 5)
10:15:29 (line 10)
10:15:44 (line 15)
10:16:03 (line 20)
10:16:17 (line 25)

```
 1    Alabamians?
 2    A    Yes, sir.  To our great shame.
 3    Q    You would also agree that the KKK used burning crosses to
 4    terrorize black individuals in Alabama?
10:16:31  5    A    Yes, sir.  To our great shame, they did that.
 6              MR. OSHER:  Your Honor, if I can just have a minute.
 7              JUDGE MARCUS:  You may.
 8    BY MR. OSHER:
 9    Q    Just one more question, Representative.  Sitting here
10:17:11 10    today, do you understand how the images included in that ad
11    might be viewed negatively by the black community?
12    A    No.
13              MR. OSHER:  That's all I have.  Thank you.
14              JUDGE MARCUS:  All right.  Thank you.  And who will be
10:17:25 15    conducting cross-examination for the Singleton plaintiffs?
16              MR. WHATLEY:  Your Honor, I am Joe Whatley.  I will.
17              JUDGE MARCUS:  All right.  Thank you, Mr. Whatley, and
18    you may proceed.
19              MR. WHATLEY:  Thank you.
10:17:35 20                      CROSS-EXAMINATION
21    BY MR. WHATLEY:
22    Q    Mr. Byrne, it's good to see you again.  I have a few
23    questions.
24         First of all, I, along with other counsel, I represent the
10:17:47 25    Singleton plaintiffs.  Are you familiar with the whole county
```

1734

 1  plan that the Singleton plaintiffs have proposed, Singleton

 2  plan number one?

 3  A    I don't know if it's the Singleton plan, but I have seen a

 4  map that shows whole counties.

10:18:03  5  Q    Okay.  And are you aware that that plan keeps Mobile

 6  County whole?

 7  A    The map that I saw kept Mobile County whole.

 8  Q    And you would agree that's a good thing?

 9  A    That's a good thing.  What I was concerned about was that

10:18:23 10  it added Andalusia and the county that Andalusia is in and took

11  away Washington County and Monroe County.  I don't think that's

12  a community of interest between Covington County which is where

13  Andalusia is and Mobile.

14  Q    Okay.  We will talk about that in a second.

10:18:35 15  A    Okay.

16  Q    But it also kept Mobile and Baldwin counties together, the

17  two Gulf counties?

18  A    It did.

19  Q    And that was something you viewed to be crucial, correct?

10:18:43 20  A    Yes.

21  Q    Okay.  And you know when you are drawing districts you

22  have to keep the population -- you have to have an eye on the

23  population.  What you have -- how equal it has to be is a

24  question the judges will decide.  But you know that you have to

10:18:58 25  look to population of counties when you are drawing districts,

```
 1  correct?

 2  A    That's correct.

 3  Q    And by putting Covington in instead of Washington and

 4  Monroe, they came -- the Singleton plaintiffs came to districts

 5  that had relatively equal population, correct?

 6  A    That's correct.  It has some flaws other than that, but,

 7  yes, it does do that.

 8  Q    And you would also agree that Covington and Escambia

 9  counties have some commonalities, correct?

10  A    Yes.  But Escambia County is not the core of the district.

11  Q    I'm sorry.  I couldn't hear you?

12  A    I'm sorry.  Escambia County is not the core of the

13  district.  And the part of Escambia County that is closest to

14  Covington County, which is Brewton and east Brewton, not really

15  Atmore, which on the other end of Escambia County, clearly much

16  more to Mobile.

17  Q    And the county seat in Escambia County?

18  A    Brewton.

19  Q    Remind me where that is?

20  A    It's Brewton.

21  Q    Okay.  In that eastern end of the county that's closer to

22  Covington?

23  A    That's right.

24  Q    And not far from Andalusia?

25  A    That's right.
```

```
 1   Q     Okay.
 2              MR. WHATLEY:  Let's pull up Caster Exhibit 12.  And go
 3   down so we can see the southern part of that, Suzanne.
 4   BY MR. WHATLEY:
 5   Q     This is the current district -- I think you just testified
 6   the district that -- District 1 is the one you served in this
 7   configuration?
 8   A     That's correct.
 9   Q     Okay.  Now, I will tell you as a preliminary matter both,
10   Mr. Hare and I grew up in Monroeville.  And my mother and his
11   parents still live in Monroeville.  So let's spend a little bit
12   of time talking about your testimony about Monroe County.
13              Now, Monroe County -- in Monroe County, the economy is
14   largely or in many respects built around the tree; isn't that
15   right?  You have paper mills, you have the timber business
16   especially in the northern part of the county.  It's -- that's
17   a huge part of the county -- economy; isn't that right?
18   A     It's a significant part of it, yes.
19   Q     Okay.  And they don't have ship building in Monroe County,
20   for example?
21   A     No.  But you have people from Monroe County that work in
22   the shipyards.
23   Q     True.  People commute.  But they don't do it in Monroe
24   County?
25   A     They don't do it in Monroe County, no.
```

10:20:26  (line 5)
10:20:42  (line 10)
10:21:10  (line 15)
10:21:27  (line 20)
10:21:34  (line 25)

```
 1   Q     And, in fact, between 2010 and 2020, between the two
 2   censuses, Monroe County lost a significant part of its
 3   population, didn't it, what, around 15 percent?
 4   A     I don't know the exact percent, but they did lose a
 5   significant amount of population.
 6   Q     Okay.  And in Monroe County or at least Monroeville also
 7   has a tourist element to its economy, doesn't it?
 8   A     It does.  They try to attract people there because it's
 9   the home of Harper Lee, who you probably knew.
10   Q     Right.  And you brought up Truman Capote in your direct
11   testimony.  Were you aware that Truman was the other boy, To
12   Kill a Mockingbird?
13   A     Yes.
14   Q     Not Harper Lee's brother obviously, but the other boy in
15   To Kill a Mockingbird?
16   A     Yes.
17   Q     And what you're saying -- in Monroeville, especially
18   pre-COVID and we hope post-COVID, a lot of the economy is built
19   around the Mockingbird, it's built around Harper Lee and Truman
20   Capote and attracting tourists to Monroeville based on that?
21   A     They're trying to develop more tourism off of that, yes.
22   I don't know to what extent they have been successful.
23   Q     Well, you know at least pre-COVID and even last year to
24   some extent they have a -- the To Kill a Mockingbird play and
25   attract hundreds -- attract thousands of people into
```

```
 1  Monroeville to see the Mockingbird play?
 2  A    Yes, they do.  In fact, I've seen it three or four times
 3  and got to be on the jury one time.
 4  Q    Okay.  And that -- especially in the spring is a big part
 5  of the economy?
 6  A    In the spring, I would think it would be, yeah.
 7  Q    Okay.  And you mentioned that you attended a town hall
 8  meeting in Beatrice, right?
 9  A    Yeah.  Yeah.
10          MR. WHATLEY:  And, Suzanne, can you make the District
11  1 larger?
12  BY MR. WHATLEY:
13  Q    Is kind of in the northeastern corner of Monroe County?
14  A    I don't know -- yeah, I guess that's northeastern.
15  Q    And one of the things that's important in Beatrice's
16  economy is hunting camps.  You mentioned you were at you a
17  hunting camp, at your hunting camp, but hunting camps are big
18  up there, right?
19  A    Yes.
20  Q    Okay.  And I think you said the northern part of Monroe
21  County is a predominately black area, right?
22  A    Yes.
23  Q    And, in fact, especially the northern half of Monroe
24  County is considered to be part of the Black Belt, right?
25  A    I don't know that.
```

```
 1  Q    You don't know that.

 2       Do you know that both its population and its economy have

 3  a lot of similarities to the rest of the Black Belt, correct?

 4  A    I don't think I would agree with that.  It has some

 5  interesting unique industries there.  You mentioned tourism, in

 6  terms of the Mockingbird, but also there's a plant there that

 7  does pre-manufactured concrete walls.  It's another plant there

 8  that makes the cardboard containers that are used to package

 9  various goods including some of the craft beer that are made in

10  Mobile.  So I don't know other counties in the Black Belt that

11  have those sort of more advanced industries.

12  Q    Yes, sir.  I'm sorry.  Did I cut you off?

13  A    No.  I finished.

14  Q    Okay.  You were talking about the precast concrete.  You

15  were talking about Gate or Gate-Lazenby?

16  A    Yes.

17  Q    Okay.  What I was really focused on is more the part of

18  the county north of Monroeville?

19  A    Okay.

20  Q    And Gate-Lazenby -- I don't mean to make this personal,

21  but I worked my way through college working there.  But north

22  of Gate-Lazenby is also south of Monroeville, right?

23  A    Yes.

24  Q    Okay.  And north of --

25  A    But in Monroe County.
```

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1   Q    North of Monrovia, in the northern part of the county,

2   that is the area where wouldn't you agree with me at least the

3   population is very similar to what you found in the Black Belt?

4   A    I would think in very north Monroe County, it would be

10:26:21  5   very similar to say Wilcox County.

6   Q    Right.  And you talked about the education.  The high

7   school in Beatrice is J. F. Shields, right?

8   A    I don't know the name of it.

9   Q    But you know there is a high school in --

10:26:44 10   A    That's right.  I think I have been there.

11   Q    Yes, sir.  And it is an all-black school?

12   A    I know it's predominantly black.  I don't know if it's all

13   black.

14   Q    And the white children around Beatrice go to the all-white

10:27:03 15   private school, Monroe Academy down in Monroeville, don't they?

16   A    I don't know that.

17   Q    You don't know that?

18   A    No.

19   Q    Well, you mentioned that there were some white folks at

10:27:13 20   your town hall meeting in Beatrice.  Do you know where their

21   children go to school?

22   A    I didn't ask where they children went to school.  People

23   in the town hall meeting were mainly older.

24   Q    Okay.  You do know that there is an all-white private

10:27:29 25   academy in Monroe County where many of the white students go to

1    school?

2    A    I know that there's a private academy.  I don't know the

3    racial mix of it.  I don't think I have ever been to that

4    school.

10:27:41  5    Q    Okay.  Now, let's go over to Clarke County, if we could.

6         You represented -- and, again, I have relatives there, so

7    I am going to focus on some issues.  You are represented the

8    part of Clarke County that includes Grove Hill?

9    A    Part of Grove Little, not all of Grove Hill.

10:28:06 10    Q    And you represented the part that goes out on Highway 84,

11    the road that goes sort of east and west to there, that's

12    Highway 84, right?

13    A    Yeah.

14    Q    And are you aware that there's a town of Whatley about

10:28:23 15    six miles east of Grove Hill?

16    A    I am aware of it.

17    Q    On Highway 84?

18    A    Yes.

19    Q    Okay.  And so as an example, my cousins in Grove Hill or

10:28:42 20    north of Highway 84 in Grove Hill would have been represented

21    by you, right?

22    A    Depending upon exactly where they live, probably so.  But

23    if they were northeast, they wouldn't be represented by me.

24    Q    And if they were northwest, they would be?

10:28:57 25    A    They would be.

```
 1  Q    Okay.  And my cousins in Whatley, Alabama, six miles to

 2  the east in the same county, would have been represented by

 3  Congresswoman Sewell?

 4  A    I think that's right, yes.

 5  Q    Okay.  And I want to be clear.  This question is not meant

 6  to disparage either you or Congresswoman Sewell.  You would

 7  agree, I think you already have, that she is an outstanding

 8  congresswoman?

 9  A    She is an outstanding congresswoman.

10  Q    But wouldn't you agree, sir, and I think this has been

11  your testimony, that if you had combined Clarke County, that my

12  cousins in Whatley and my cousins in Grove Hill would have been

13  better represented regardless of whether it was you or her?

14  A    By having just one congressman?

15  Q    Yes?

16  A    Yeah.  I think that's what I have been saying in previous

17  testimony.  I think it's better for a county to have one

18  congressman and not to be split up.  But what Congresswoman

19  Sewell and I did was from the very beginning we said we will

20  work together, and we did.  We worked together very well.  We

21  used to do joint town halls together for example.  Thomasville

22  was not in my district, but the mayor of Thomasville would come

23  and see me every time he was in Washington.  He is a personal

24  friend, and if Congresswoman Sewell needed help from

25  Thomasville, she got it from me 100 years ago percent of the
```

```
 1  time.  That's just the way we worked things out.
 2  Q    But despite that fact, your testimony is that it would be
 3  better off to keep counties together?
 4  A    Yes.  That's my position.
 5  Q    And you believe that it would be better to keep Tuscaloosa
 6  so it's not split, for example?
 7  A    Yes.
 8  Q    And the same for other counties in Alabama that are split,
 9  such as Montgomery?
10  A    Yes.  Now, I understand that when you're trying to balance
11  out population, sometimes you can't make that happen.  But to
12  the maximum extent possible, counties should be kept whole and
13  contiguous in congressional districts.
14  Q    And you were asked specifically about the -- about
15  Montgomery not having a Congress person.  Do you recall that?
16  A    I don't remember the question just put that way, no.
17  Q    In any event, Montgomery currently does not have a member
18  of Congress living there, correct?
19  A    No one that lives there, yes, that's correct.
20  Q    Yes.  I'm sorry.  I wasn't clear with my question.
21  A    They had Martha Roby previously, and now their present
22  member is from Coffee County.
23  Q    And was it your testimony that by splitting or splitting
24  any county you might make it less likely that a congressperson
25  reside there?
```

Timestamps: 10:30:34 (line 5), 10:30:46 (line 10), 10:31:09 (line 15), 10:31:26 (line 20), 10:31:44 (line 25)

1   A     Yeah.

2   Q     Okay.

3   A     You start splitting counties like that, and that county

4   loses its influence.  That's why I don't want Mobile County to

10:31:55 5   be split.

6   Q     And --

7         MR. DAVIS:  Give me one second.  Sorry to interrupt,

8   Mr. Whatley.  Judge, I just want to check on Mr. Byrne.  We

9   have been going about two hours.

10:32:05 10        JUDGE MARCUS:  We have been going a long time.

11        Let me ask you, Mr. Whatley:  How much longer you have

12   with Mr. Byrne.  Perhaps this would be a convenient time for a

13   short break.

14        MR. WHATLEY:  It's fine for me to take a short break,

10:32:20 15   Your Honor.

16        JUDGE MARCUS:  All right.  We will take a break for

17   15 minutes, and then we will pick up the balance of your

18   examination.

19        Question, though, Mr. Whatley:  How much longer do you

10:32:32 20   think you have with Mr. Byrne?

21        MR. WHATLEY:  I would guess about 10 or 15 minutes.

22   Perhaps the break will make it shorter.

23        JUDGE MARCUS:  I'm sorry.  I didn't mean to cut you

24   off.

10:32:41 25        MR. WHATLEY:  I said perhaps the break will make it

1   shorter and more organized.

2           JUDGE MARCUS:  All right.  We will break for

3   15 minutes and then pick up the thread of the cross by

4   Mr. Whatley and any redirect by Mr. Davis.

10:32:53 5       Thank you.  We will in a 15-minute recess.

6           (Recess.)

7           JUDGE MARCUS:  Mr. Whatley, are you ready to proceed

8   at this point?

9           MR. WHATLEY:  Yes, sir.

10:48:40 10      JUDGE MARCUS:  Mr. Byrne, you all set to go forward?

11          THE WITNESS:  Yes, sir, I am.

12          JUDGE MARCUS:  Thank you very much.  Mr. Whatley, you

13  may complete your cross.

14          MR. WHATLEY:  Thank you, Your Honor.

10:48:51 15      Suzanne, will you put back up for just a minute the 2011

16  plan?  I think it's Caster Exhibit 12, Your Honor.

17          JUDGE MARCUS:  Just so I'm clear, Mr. Whatley, this is

18  the plan that actually was enacted by the state Legislature in

19  2011, correct?

10:49:23 20      MR. WHATLEY:  Yes, sir.  Yes, sir, Your Honor.  And

21  just to put it in context, Mr. Byrne, it's the plan that

22  existed when you served in Congress, correct?

23          THE WITNESS:  Yes, sir.

24  BY MR. WHATLEY:

10:49:34 25  Q    Okay.  I want to focus back on Clarke County for just one

| | |
|---|---|
| 1 | second. |
| 2 | And I don't think I asked you about the economy of Clarke |
| 3 | County.  In Clarke County, a big part of the county also |
| 4 | focuses on the tree, correct? |
| 10:49:52  5 | A    Yes. |
| 6 | Q    And so a paper mill and lumber mill in Jackson? |
| 7 | A    Yes. |
| 8 | Q    In the southern part of the county, correct? |
| 9 | A    That's correct. |
| 10:50:05 10 | Q    And there is a paper mill -- I don't know if you can see |
| 11 | it -- it's in the edge of Wilcox County and Pine Hill, not far |
| 12 | from Thomasville that you mentioned, correct? |
| 13 | A    Yes.  Yes. |
| 14 | Q    And so they make paper, and they produce lumber in Clarke |
| 10:50:28 15 | County, and they don't make ships, correct? |
| 16 | A    They don't make ships in Clarke County. |
| 17 | Q    But they do make paper, and they do produce timber? |
| 18 | A    That's correct. |
| 19 | Q    Okay.  We can take that down. |
| 10:50:39 20 | Mr. Byrne, I think in your -- you have clearly said before |
| 21 | -- I don't remember if it was in your testimony in the previous |
| 22 | case, or in your deposition, that you think it's important that |
| 23 | each of the urban or Metropolitan -- or each of the cities in |
| 24 | Alabama have its own congressional district or be in a separate |
| 10:51:12 25 | congressional district? |

```
 1   A    Yes.  I think that the four metro areas in the state, plus
 2   Dothan, Tuscaloosa, Auburn, all those areas need to have sort
 3   of at the center of their community adequately represented in
 4   the United States Congress.
 5   Q    So there ought to be in separate -- and to be clear, there
 6   ought to be separate congressional districts or Huntsville,
 7   Mobile, Montgomery, and Birmingham should each be located in a
 8   separate congressional district from each other?
 9   A    Yes.
10   Q    Okay.  And going to Congressman Palmer, I think there was
11   some questioning about Congressman Palmer earlier maybe by both
12   counsel.  Isn't it correct that Congressman Palmer currently
13   lives in Shelby County?
14   A    To be honest with you, I don't know exactly where he
15   lives.  He either lives in the southern part of Jefferson
16   County or in Shelby County.  I don't know.
17   Q    Were you aware that at one point he did live in Jefferson
18   County and he moved to Shelby County?
19   A    I am not aware of that.
20   Q    You are not aware of that.  Okay.
21           MR. WHATLEY:  Your Honors, I think that's all I have.
22           JUDGE MARCUS:  Thank you.  Redirect, Mr. Davis?
23           MR. DAVIS:  Yes, Your Honor, briefly.
24                      REDIRECT EXAMINATION
25   BY MR. DAVIS:
```

1  Q     Mr. Byrne, did you turn down any meeting requests from the

2  Alabama NAACP?

3  A     No.

4  Q     Would you have been happy to meet with them had they asked

10:52:38  5  for a meeting?

6  A     Absolutely.  I meet with just about everybody.

7  Q     We talked about the third districts -- and the Third

8  District and the Fourth Congressional District when you were

9  speaking with Mr. Osher.  Do you consider the areas encompassed

10:52:54 10  in Alabama's Third Congressional District to be part of a

11  community of interest?

12  A     I do.  That's east Alabama, and it got a common set of

13  industries and things that they're interested in, and they

14  largely look to Auburn as their university.

10:53:09 15  Q     What about the Fourth Congressional District, do you

16  consider those areas to be part of a community of interest?

17  A     They are.  We have similar industry in all those areas all

18  tied to the automobile industry, for example.  And they have

19  very similar -- when you go from one of those towns to the

10:53:27 20  next, walking from the east side of the state to the west, the

21  towns are very similar to one another.

22  Q     Do you consider the more urban parts of Mobile County to

23  be part of the same community of interest with Montgomery,

24  Macon, and Barbour counties?

10:53:47 25  A     I have been up and down those other places.  They just

1 don't have a connection to Mobile or so.

2 Q    And what about the more rural parts of Mobile County?  Are

3 they part of a community of interest with the Wiregrass in

4 Dothan?

10:54:02 5 A    No, they are not.

6 Q    When you are considering --

7 A    Let me give an example there.  One of the maps I saw of

8 Covington County in the First Congressional District, there's

9 really no connection between Covington County and the main

10:54:20 10 interest that you can see in the First Congressional District.

11 So I don't see that it makes any sense to put a Wiregrass

12 county like Covington in with a district that's primarily

13 centered with Mobile and Baldwin County.  It's hard to get to

14 Andalusia from Mobile, very hard.  And so as the result, very

10:54:38 15 few people go back and forth between Andalusia and Mobile.

16 Q    Which districts would allow a Congressman or congresswoman

17 to more effectively represent the constituents of District 1,

18 whether they're black, whether they're white, Republican,

19 Democrat, rich or poor?  Would that be the districts as passed

10:54:59 20 in Alabama's plan, or the districts that plaintiffs are

21 proposing that we viewed a little while ago?

22 A    The Legislature plan by far.  And as I said before, I

23 testified before that committee, and I listened to other people

24 talk while I was there.  And the Legislature effectively did

10:55:17 25 what we were asked to do, which was to keep our part of the

```
      1  state together.

      2  Q     Uh-huh.  And would your ability as a Congressman to

      3  represent your constituents, would it be negatively impacted if

      4  your district changed at the last minute to a vastly different

10:55:34  5  structure, including different areas of the state?

      6  A     Very definitely so, yes.

      7  Q     We talked about a lot issues, Mr. Byrne.  Is there

      8  anything else you would like to bring to the Court's attention

      9  as they consider these various plans?

10:55:47 10  A     Yes, sir.  I would want to say this.  I have great respect

     11  for the Court and this proceeding, and I know the Court's got

     12  some difficult decisions to make.  But we're pretty far along

     13  into this campaign cycle.  And I have seen what it does to

     14  congressmen in other states when at the last minute, courts

10:56:05 15  start moving things around.  And I think it hurts the

     16  effectiveness of congressmen when that happens.  I am not

     17  saying the Court may not have a good reason to do it.

     18        But as I said earlier, we are just a few months away from

     19  primaries.  And it would be very difficult to start shifting

10:56:22 20  this thing around.  It was hard enough as it was when the

     21  Legislature pass these districts.  People held back and held

     22  back and held back.  And now, they're right in the meat of

     23  these campaigns.  And I just think it would be terrible if we

     24  change course on all these candidates running for these various

10:56:40 25  offices, Democrat, Republican, doesn't matter.  It's going to
```

1  have the very same detrimental effect on those candidates and

2  on those congressmen, sitting congressmen if all of a sudden

3  these things are moved around some more.

4       And the second thing I would say is, I've tried to say a

10:56:55  5  little bit earlier, Covington County doesn't fit with the First

6  Congressional District.  They're wonderful people over there.

7  I have good friends.  I worked with a lot of them when we were

8  replacing the president of the community college.  But I don't

9  think they would want to be in a district with Mobile because

10:57:09 10  they look to Dothan.  They look to the Wiregrass.

11       So that map that has Covington County with Mobile, that

12  just doesn't fit.  And I think the way the Legislature has

13  drawn the First Congressional District makes all the sense in

14  the world, given the needs that they have to try to take a few

10:57:26 15  areas away from that district presently because of the growth

16  in Baldwin County.  I think they did the best they could

17  possibly do.

18            MR. DAVIS:  Thank you, Your Honor.

19            MS. WELBORN:  I'm sorry.  We just objected to that

10:57:38 20  last line of questioning and move to strike it as beyond the

21  scope of Mr. Byrne's direct.  Asking, you know, anything else

22  he wanted to add was not in Mr. Byrne's direct examination.

23            JUDGE MARCUS:  It would have been wiser to object

24  before the question was asked, but while the question I think

10:57:58 25  did go beyond, the answer, I think bore upon the stuff that

```
 1  came up in cross.  So the objection is overruled, and we will
 2  not strike that portion of the testimony.  But thank you.
 3       Any other questions, Mr. Davis, that you have for
 4  Mr. Byrne?
10:58:13  5            MR. DAVIS:  No, Your Honor.  That completes redirect.
 6            JUDGE MARCUS:  Any other questions any of the lawyers
 7  have for Mr. Byrne?
 8       All right.  Judge Moorer, Judge Manasco, did either of you
 9  have a question for Mr. Byrne?
10:58:30 10            JUDGE MANASCO:  None from me.
11            JUDGE MOORER:  No, sir.
12            JUDGE MARCUS:  Mr. Byrne, I have got a question for
13  you.  Perhaps you can help me with this.
14       On your direct examination by Mr. Davis, you were asked
10:58:47 15  about the 2021 map that the Legislature adopted for the State
16  Board of Education.
17            THE WITNESS:  Right.
18            JUDGE MARCUS:  And it was observed that -- you
19  observed that you testified, if I heard you right, with regard
10:59:06 20  to that and urged the Legislature not to split Mobile County.
21  Did I have that right?
22            THE WITNESS:  Yes, sir, that's what I said.
23            JUDGE MARCUS:  And then the testimony came out that,
24  in fact, the Legislature in 2021 split Mobile County in the
10:59:29 25  maps that it drew for the board of education, and it
```

1753

1  specifically split Mobile County between Districts 1 and 5.

2  This is the board of ed map I am talking about.  Do you recall

3  all of that discussion?

4          THE WITNESS:  Yes, sir, I do.

10:59:47  5          JUDGE MARCUS:  I just have one question, if you know

6  the answer.  I was curious, do you know why the Legislature

7  actually split Mobile County between Districts 1 and 5 when

8  they drew the board of education maps?

9          THE WITNESS:  Yes, sir.  They actually did this in

11:00:09 10  2011.  The other district -- District 1 is the one down here.

11  District 5 I guess is the other one.  That district lost a lot

12  of population, and they had to pick it up somewhere.  And they

13  believed that the best way to pick it up was to go south into

14  Mobile County.

11:00:25 15      So while I was sympathetic to the fact the Legislature had

16  to make some significant changes to that district, I didn't

17  like the fact that they were splitting Mobile County because of

18  the fact the Mobile County school system is so big and has so

19  many issues as any big school systems does.

11:00:41 20      I would like to see a school board member that's focused

21  on that primarily as their job.

22          JUDGE MARCUS:  Thank you much.

23      Any follow-up questions from any of the lawyers based on

24  the question that I had asked Mr. Byrne?  Mr. Davis?

11:00:55 25          MR. DAVIS:  No, Your Honor.

<table>
<tr><td>1</td><td>JUDGE MARCUS:  Mr. Whatley?</td></tr>
</table>

1        JUDGE MARCUS:  Mr. Whatley?

2        MR. WHATLEY:  No, Your Honor.

3        JUDGE MARCUS:  Mr. Osher?  Counsel for --

4        MS. WELBORN:  No, Your Honor.

11:01:03 5        JUDGE MARCUS:  -- for Milligan?

6     All right.  We thank you very much for your time and

7 efforts this morning, Mr. Byrne, and you are excused.

8        THE WITNESS:  Thank you, Your Honor.

9        JUDGE MARCUS:  Does that close the presentation of

11:01:20 10 evidence for the state?

11        MR. DAVIS:  It does, Your Honor.

12        JUDGE MARCUS:  And that would be for both the

13 Secretary of State as the party defendant and for the

14 intervening defendants McClendon and Pringle, correct?

11:01:38 15        MR. DAVIS:  That's right, Judge.

16        JUDGE MARCUS:  Okay.  Did -- before we get to

17 exhibits, which I wanted to talk about before we went on to

18 closing arguments, was there anything by way of rebuttal either

19 from the Milligan plaintiffs, the Caster plaintiffs, or the

11:01:55 20 Singleton plaintiffs?

21        MR. BLACKSHER:  Singleton plaintiffs, no, Your Honor.

22        JUDGE MARCUS:  Thank you.  Milligan?

23        MR. ROSS:  No, Your Honor.

24        JUDGE MARCUS:  And for Caster, Ms. Khanna?

11:02:09 25        MS. KHANNA:  No, Your Honor.

| | |
|---|---|
| 1 | JUDGE MARCUS:  Okay.  So, then, we can turn to the |
| 2 | question of the objections on some of the exhibits.  I think |
| 3 | that was one open piece of business that you flagged late |
| 4 | yesterday for us, Mr. Davis, and I think it is -- there are |
| 11:02:29  5 | some open questions.  I wanted to give you all a chance to |
| 6 | address the exhibits to which you are objecting.  We will |
| 7 | generally take it under advisement, and the three judges will |
| 8 | have a chance to discuss it, and we will give you our answer or |
| 9 | answers in any written opinion or opinions that we may present. |
| 11:02:53 10 | But let's talk first about the -- I guess the exhibits |
| 11 | with regard to Milligan.  There was an objection to -- we |
| 12 | received M-1 to 46, 48, 49, 50.  There was an objection to 47, |
| 13 | if I recall that right.  Mr. Ross, that was a transcript of the |
| 14 | Alabama Senate floor debate on November the 3rd, 2021.  And I |
| 11:03:35 15 | think the objection was simply based on authenticity.  Do I |
| 16 | have that right, Mr. Ross? |
| 17 | MR. ROSS:  Yes, Your Honor.  We were waiting to hear |
| 18 | back from Mr. Davis.  He was supposed to, I guess, listen to |
| 19 | the recording and review the transcript. |
| 11:03:52 20 | JUDGE MARCUS:  Gotcha.  Mr. Davis, where are we on |
| 21 | M-47? |
| 22 | MR. DAVIS:  Judge, I haven't had a chance to listen to |
| 23 | the recordings, but I think the cat's out of the bag on this |
| 24 | one, anyway.  I think this same transcript is in the record |
| 11:04:06 25 | elsewhere as an exhibit to a deposition.  So for purposes of |

1  the preliminary injunction, we will withdraw the objection.

2           JUDGE MARCUS:  Okay.  So we -- so the record is clear,

3  Mr. Ross, we will receive M-47, that transcript.

4      I think that was the only objection there were to your

11:04:25  5  exhibits.  Have I got that right, or did I miss something?

6           MR. ROSS:  That's right, Your Honor.

7           JUDGE MARCUS:  Okay.  Let's turn to the Singleton

8  exhibits, if we could.

9      Mr. Quillen, I take it you will be commenting on those as

11:04:41 10  we go along.

11           MR. QUILLEN:  Yes.

12           JUDGE MARCUS:  Okay.  Help me with this.  As I recall

13  this, and I reviewed our original discussion at the beginning

14  of the trial, Singleton 1 to 31 was received.  35 to 41 was

11:04:57 15  received.  44 and 45 were received.  There was no objection to

16  46 to 50 and 53 to 59.  Although some of those overlapped with

17  exhibits that the defendants had already put in.  Do I have

18  that right?

19           MR. QUILLEN:  That's right.

11:05:15 20           JUDGE MARCUS:  Okay.  So the first objection or

21  objections that I saw that were interposed were the Singleton's

22  32, 33, and 34.  And that concerned some mapping software that

23  was used that was the DRA acronym if my recollection has that

24  correct.  And that was data drawn from the DRA created to use

11:05:47 25  the maps and the software.  There were objections to relevance

1    and authenticity.  I think they really -- the arguments were

2    the same on 32, 33, and 34.

3         Did you want to address those three exhibits, Mr. Quillen?

4    And then we will give Mr. Davis a chance to interpose his

11:06:13  5    objections.

6              MR. QUILLEN:  Yes.  And I think I can probably

7    accelerate the discussion.  There were nine exhibits that were

8    objected to, and that was 32, 33, and 34, 42 and 43, 51 and 52,

9    60 and 61.  We don't intend to rely on those in our proposed

11:06:38  10   findings of fact and conclusions of law.  And we did not refer

11   to them in this hearing.  So we are fine with just withdrawing

12   them for purposes of this preliminary injunction hearing.

13             JUDGE MARCUS:  Okay.  So 42, 43, 51, 52, 60, 61, and

14   32 to 34 are not offered and not received.  Do I have that

11:06:58  15   right?

16             MR. QUILLEN:  That's right.  There is one other issue

17   that we wanted to cover, though.

18             JUDGE MARCUS:  Sure.

19             MR. QUILLEN:  On ECF number 70, on the Singleton

11:07:10  20   docket, is a set of stipulations of fact between the Singleton

21   plaintiffs and the state that was not on the exhibit list, but

22   it's been agreed to by the Singleton plaintiffs and the state.

23   So just to make sure that it is, you know, reflected in the

24   record here, we would like to introduce that as Exhibit -- I

11:07:34  25   guess we will call it S-70.

1          JUDGE MARCUS:  That would be Singleton 70, right?

2          MR. QUILLEN:  Yes.  We will call it Singleton 70.  And

3   I think our understanding would be consistent with the other

4   exhibits that have come in, that the other plaintiffs wouldn't

11:07:49  5   be bound by it, but could use it if they saw fit.

6          JUDGE MARCUS:  But it would be coming in to the record

7   in these proceedings?

8          MR. QUILLEN:  Yes, it would.

9          JUDGE MARCUS:  Any objection, Mr. Davis?

11:08:00 10          MR. DAVIS:  Mr. Quillen, is this the second set of

11   stipulations that we entered into?

12          MR. QUILLEN:  That's correct.

13          MR. DAVIS:  No objection from the defendants, Your

14   Honor.

11:08:07 15          JUDGE MARCUS:  Does anyone else have any objection to

16   the receipt of Singleton 70?

17          MR. ROSS:  Your Honor.

18          JUDGE MARCUS:  Yes.

19          MR. ROSS:  The Milligan -- I wanted to be clear that

11:08:18 20   this is -- that those stipulations will not be used in the

21   Milligan case at all.  We just -- we didn't have any part of

22   drawing up those stipulations.

23          JUDGE MARCUS:  I understand.  So you are not relying

24   on them and you are not using them.  I understand the point.

11:08:33 25          MR. ROSS:  Yes.

 1          JUDGE MARCUS:  This is just a piece of evidence that

 2    the Singleton plaintiffs have offered, and the state has no

 3    objection to it.

 4         Anything else on that, Ms. Khanna, for the Caster

11:08:47  5    plaintiffs?

 6          MS. KHANNA:  Only to echo what Mr. Ross said.  This

 7    has no part of the Caster case, and we certainly have not

 8    agreed or stipulated to any of those.

 9          JUDGE MARCUS:  Okay.  With that, let's turn,

11:09:00 10    Mr. Davis, to your exhibits.  Most of them were received, but

11    there were some objections, and I wanted to go briefly to those

12    to see where we were.

13         My record shows we have received following:  Defendants' 1

14    to 14, 19 to 26, 31 to 48, 50 to 67, 69 to 71, Defendants'

11:09:30 15    Exhibits 72 and 73 inclusive to 91, Defendant's Exhibits 98 and

16    99, Defendants' Exhibits 107 to 137 inclusive, Defendant 138,

17    Defendant 142, Defendant 144, Defendant 145, Defendant 147 to

18    149, Defendant 155, Defendants' 159 to Defendants' 161,

19    Defendant 164, 165 inclusive to 71.  There had been an

11:10:18 20    objection to Defendants' 72, but that objection was dropped, if

21    I recall that and have that properly listed.  And so Defendant

22    172 will come in.

23         Do I have all of these of these correct, Mr. Davis?  I'm

24    sorry, Mr. Davis.  You are muted.

11:10:43 25          MR. DAVIS:  Apologies.  Yes, Your Honor.  That's

1  consistent with my notes.

2       JUDGE MARCUS:  Okay.  So let's go to the couple that

3  are -- or appear to still be in dispute.

4       The first one I have was Defendant Exhibit 15.  That was a

11:11:00 5  public hearing transcript of the joint legislative committee on

6  reapportionment going back to the '92 drawings.  This was a

7  hearing that occurred on June the 14th, '91, if I have that

8  right.  Do I have that right, Mr. Davis?

9       MR. DAVIS:  Yes, Judge.

11:11:20 10       JUDGE MARCUS:  And the objection I think the Milligan

11  folks raised was A, it wasn't relevant, at least as far as they

12  could see; and, B, that it was hearsay to the extent you were

13  offering it for the truth of its contents.

14       Do you want to tell me your response to the relevance and

11:11:43 15  hearsay objection, assuming Defendant 15 is still objected to

16  by the Milligan folks.  Mr. Ross?

17       MR. ROSS:  Yes, Your Honor.  We also have foundation

18  objection, as well.

19       JUDGE MARCUS:  Okay.  Mr. Davis?

11:11:59 20       MR. DAVIS:  Well, the foundation objection is new.  It

21  wasn't raised until yesterday.  On the joint status report,

22  it's only relevant hearsay that were addressed.

23       JUDGE MARCUS:  Correct.

24       MR. DAVIS:  I would say this:  All of these historical

11:12:14 25  documents about the congressional records were 15 plus many

1    others.  We think, of course, their relevant when talking about

2    the districts.  We have said many times that Alabama is

3    preserving the core of districts.  Knowing how they got the way

4    they got we think is directly relevant to the considerations

11:12:34  5    before the Court.  And if the Court chooses to put less weight

6    on some of it than others, it certainly can do so.  But, of

7    course, of these records of how the '92 plan got developed, how

8    the 2001 plan got developed and the 2011 and the 2021 are

9    relevant.

11:12:55 10        As far as hearsay, these are official transcripts -- 15,

11    16, and 17 were the public hearings.  And the Court has a great

12    deal of leeway to consider hearsay evidence and preliminary

13    injunction hearing.

14        I would add, too, in terms of foundation, authenticity,

11:13:19 15    pardon me, these are 30-year old documents.  We can give you a

16    declaration that says when we got the request for production

17    from the Milligan plaintiffs, we went as they requested us to

18    do and looked for records related to preclearance of these old

19    congressional plans and any other documents that we had about

11:13:37 20    congressional districting.  We found these in our filing

21    cabinets and our storage records in the office.  We think

22    that's sufficient for -- to consider these 30-year old

23    documents authentic.

24        But also, believe it or not, for 15, 16, and 17, yesterday

11:13:56 25    afternoon, we found the reporter who took down these

1  transcripts and we can give you a declaration from him, as

2  well.  So I don't know why we need to fight over these.  That's

3  --

4       JUDGE MARCUS:  In connection with what Mr. Davis said,

11:14:11 5  does that satisfy you on authenticity, Mr. Ross?

6       MR. ROSS:  I believe so, Your Honor.  We --

7       JUDGE MARCUS:  You still have your objections.  That's

8  not -- your objection still should be addressed regarding

9  relevancy and hearsay, but let me ask you a couple of questions

11:14:29 10  about that.

11       Why wouldn't it be relevant insofar as it bears on the

12  issue of intent for the drawing of the '92 maps since the claim

13  has been made that essentially the successive iterations or

14  maps built on the foundation of the '92 map, and doesn't this

11:14:54 15  bear on the intent of the Legislature back then, the

16  transcript?  And on the equal protection claim you've raised?

17       MR. ROSS:  The racial predominance claim?  Your Honor,

18  my concern is that it appears that Mr. Davis is intending to

19  use this not with respect to the racial gerrymandering claim,

11:15:12 20  but with respect to the Section 2 claim.  We don't think that

21  it has a bearing on our current Section 2 claim, which is

22  solely about discriminatory effects.

23       I understand your point, Your Honor, that it could have

24  some bearing on why they drew the majority-black district that

11:15:32 25  they drew, and that they have -- from our perspective carried

1       forward to today.

2            But as I said, we don't think it has any bearing on our

3       Section 2 claim at all.

4            JUDGE MARCUS:  Are you offering it on both or just on

11:15:45 5       the equal protection claims that have been made?

6            MR. DAVIS:  I do not know, Your Honor, for sure if we

7       will cite to these documents addressing the Section 2 claim.  I

8       think we could.  There could be history of the districts could

9       relate to communities of interest which we think would be very

11:16:08 10      relevant to the Section 2 claim.  But the Court will be able to

11      discern whether it's due any weight for one claim or another.

12           JUDGE MARCUS:  I understand.  I will say in a

13      preliminary injunction hearing, the law is pretty clear that

14      hearsay may be considered and received insofar as the materials

11:16:32 15      are sufficiently relevant and insofar as there is a sufficient

16      indicia of reliability and trustworthiness.

17           We will -- I take it the argument on 15 is the same as the

18      argument on Defendant Exhibit 16, which is the public hearing

19      from the same joint legislative committee, August 21, '91, and

11:17:01 20      the same argument for the public hearing transcript of the

21      joint legislative committee on October 2nd, '91, the same

22      objections -- relevancy, hearsay -- pertain to all three, so

23      there will be nothing more we have to say about those.

24           Do I have that right, or is there something you wanted to

11:17:22 25      add, Mr. Ross?

|    |    |
|----|----|
| 1 | MR. ROSS:  That's right, Your Honor, 15, 16, and 17. |
| 2 | JUDGE MARCUS:  All right.  We will reserve, give the |
| 3 | judges the opportunity to address it, and decide. |
| 4 | I should say parenthetically that you can make use of |
| 11:17:36 5 | whatever exhibits we've reserved on if you deem it appropriate |
| 6 | in the course of your closing argument.  This is a three-judge |
| 7 | panel.  We are the triers of the fact and the law, and we do |
| 8 | not have a jury here. |
| 9 | The next one was Defendants' Exhibit 18.  That was -- |
| 11:18:03 10 | Mr. Davis, but my question is, wasn't that already received in |
| 11 | evidence?  Wasn't this a duplicate of what came in, in one of |
| 12 | your other exhibits? |
| 13 | MR. DAVIS:  I don't know if that's the case or not.  I |
| 14 | have no interest in a duplicate exhibit.  If someone can assure |
| 11:18:21 15 | me... |
| 16 | JUDGE MARCUS:  I just -- what's the objection to that, |
| 17 | Mr. Ross, the DOJ objection letter? |
| 18 | MR. ROSS:  That was the only objection, Your Honor.  I |
| 19 | believe it already came in through one of the Milligan |
| 11:18:31 20 | exhibits.  But if not, our only objection was to flag for them |
| 21 | that it was a duplicate of something we thought had already |
| 22 | been admitted into evidence. |
| 23 | JUDGE MARCUS:  Thanks very much.  So the record is |
| 24 | clear, Mr. Davis, Defendant 18 is received. |
| 11:18:44 25 | MR. DAVIS:  Thank you. |

            1          JUDGE MARCUS:  Whether it's a duplicate or not.  This

            2   way we will make sure we haven't made a mistake in that.

            3          MR. DAVIS:  I appreciate that.

            4          JUDGE MARCUS:  Defendant 27, there was an objection

11:18:54    5   to.  That was the 2011 plan cited in *Alabama v. Holder.*

            6      What were you seeking to put in there, Mr. Davis, and why?

            7   There was an objection on the grounds of relevance, and the

            8   question was what relevance this has to the 2021 map and the

            9   Section 2 claim.

11:19:25   10          MR. DAVIS:  And, Judge, in 2011, Alabama sought

           11   preclearance, both through the administrative process and

           12   through the judicial process.  To our way of thinking, this was

           13   just part of the story of how the maps came to be what they

           14   are.

11:19:38   15          JUDGE MARCUS:  And your objection, Mr. Ross?

           16          MR. ROSS:  Your Honor, we stipulated that the maps

           17   were precleared, and as the Court well knows, Section 5

           18   preclearance doesn't mean anything.  It has no bearing

           19   whatsoever on the current process at all.

11:19:53   20      So we don't think that these -- the fact that the state

           21   filed this lawsuit is relevant at all, particularly because we

           22   have already stipulated that it gained preclearance in 2011.

           23          JUDGE MARCUS:  Help me with this what happened here.

           24      Did the Department of Justice basically give its blessing

11:20:09   25   to the 2011 plan?  And if the answer to the question is yes,

1  wouldn't that bear on the 2021 plan insofar as it basically

2  copied in the main -- the plan from '11?  Just help me

3  understand this.

4          MR. ROSS:  Two points, Your Honor.  One, as I said,

11:20:31 5  and as you know, Section 5 of the Voting Rights Act expressly

6  says that preclearance does not mean that the Justice

7  Department is giving its blessings.  The Section 2 standard is

8  separate from the Section 5 standard, so the Section 5 standard

9  was only essentially retrogression, did you decline to draw a

11:20:49 10  majority-black district.  It doesn't consider whether or not

11  you failed to draw a second majority-black district.  And so

12  that -- that is our the basis of our -- I mean, it's not the

13  basis for our relevance objection, but is why I said we didn't

14  think the prior clearance is relevant at all.

11:21:08 15          JUDGE MARCUS:  I understand.  Mr. Davis, anything

16  further on that?

17          MR. DAVIS:  Judge, whether preclearance or not has any

18  legal significance, the Court can sort out.  These documents

19  related to the preclearance effort contain a lot of helpful

11:21:19 20  information.  Because we told the Department of Justice, here

21  are the districts, here are the demographics of the districts.

22  We think it provides a lot of helpful information within those

23  documents about the plan that was being submitted.

24          MR. ROSS:  Your Honor, if I may.

11:21:34 25          JUDGE MARCUS:  Sure.

```
 1           MR. ROSS:  We -- we can't -- the fact that they filed
 2   a complaint doesn't establish any facts whatsoever.  We filed a
 3   complaint.  That doesn't mean that in ten years someone could
 4   we rely on it and say all the things in our complaint are true,
 5   so we don't think it has any bearing except perhaps to show
 6   they filed a complaint.
 7           JUDGE MARCUS:  I understand.  We will reserve on that.
 8   I take it the same issues obtained for Defendant 28 and 29,
 9   same objection, right?  Mr. Ross?
10           MR. ROSS:  Yes, Your Honor.
11           JUDGE MARCUS:  Okay.  We will reserve on 28 and 29.
12       And I guess 30 falls into the same thing.  That was simply
13   an errata sheet correcting Defendant 27, if I have that right.
14   Do I have that right, Mr. Davis?  You're muted, Mr. Davis.
15           MR. DAVIS:  Yes, Your Honor, that's correct.
16           JUDGE MARCUS:  Okay.  So we will reserve on 27 to 30
17   inclusive.
18       The next one was Defendant 49.  That was the annual report
19   -- 2020 annual report of the state personnel board issued by
20   the Alabama State Personnel Department.
21       If I understood the objection, it was a relevancy object,
22   right?
23           MR. ROSS:  Yes, Your Honor.  And there was a
24   foundation issue.  We don't know where the document came from
25   or who created it.
```

11:21:49 (line 5)
11:22:13 (line 10)
11:22:34 (line 15)
11:22:54 (line 20)
11:23:13 (line 25)

1    JUDGE MARCUS:  Mr. Davis?

2    MR. DAVIS:  Well, as for relevance, Your Honor, the

3 plaintiffs' experts have made various contentions, including

4 whether there's discrimination in state government in the

11:23:25 5 employment of state government.  And this report provides

6 statistics for how many people who work in state government are

7 African-American.  And African-Americans are disproportionately

8 represented in government.

9    As far as foundation, that's not raised until today.  And

11:23:40 10 so we think it's too late to add that objection.  If it had

11 been raised earlier, I might have been able to address it

12 between now and the date that our objections were due.

13    MR. ROSS:  The only additional point on that is that

14 our experts testified about federal court cases finding that

11:24:02 15 Alabama engaged in racial discrimination.  And so this has no

16 bearing whatsoever about how many black people may work for the

17 state if they're being discriminated against as federal courts

18 have found repeatedly.

19    JUDGE MARCUS:  I think we have our objection.  We will

11:24:16 20 reserve on it.

21    The next one is Defendants' 68.  That was the application

22 of a former Secretary of State back in 1992 who was an

23 appellant in the Supreme Court in the *Wesch* litigation.

24    And there was an objection there.

11:24:41 25    Your objection there, Mr. Ross, was?

1           MR. ROSS:  Your Honor --

2           JUDGE MARCUS:  One was --

3           MR. ROSS:  Your Honor, I -- the basis for the hearsay

4    objection was the same concern that I just raised with the

11:24:54  5    complaint.  The fact that you filed a complaint or filed a

6    brief in court doesn't mean that the Court can take anything

7    from the allegations or facts in that brief for complaint.  And

8    so we just have a concern that the state as Mr. Davis said is

9    trying to rely on this for facts and anything else.

11:25:13  10           JUDGE MARCUS:  Mr. Davis?

11           MR. DAVIS:  Judge, we think this is part of the

12    history of the *Wesch* litigation.  It's not just relying on what

13    Secretary Kemp said or what he alleged in his pleadings, but

14    the fact of who was doing what -- who was for the plan, who was

11:25:30  15    opposed to the plan, who was appealing, who was seeking a stay.

16    We think that's part of the story of the '92 plans and ought to

17    be considered for making the record complete.

18           JUDGE MARCUS:  I take it the same issues obtained with

19    regard to Defendants' 92 and Defendants' 93 to 97.  That

11:25:52  20    appears to be an appendix to a brief submitted in the *Wesch*

21    litigation from the appellees in the case.  92 was a letter as

22    best I can tell from the Department of Justice to the Alabama

23    Attorney General regarding the '92 map.  It was a single

24    document.  There the question was really what relevance this

11:26:22  25    has.

```
 1        I know as a general matter it tells a story about what
 2   happened in '92.  But this -- does this letter from the
 3   Department of Justice have any bearing on any issue in this
 4   case?
11:26:37  5        MR. DAVIS:  I'm sorry, Your Honor.
 6        JUDGE MARCUS:  It may, but it just didn't jump off the
 7   page at me when I looked at it.
 8        MR. DAVIS:  Which exhibit are you referring to at the
 9   moment?
11:26:46 10        JUDGE MARCUS:  92.  Defendant 92.
11        I moved on from 68 to the Defendant 92, which, as I
12   understood it, was an appendix to the brief of one of the
13   parties in the Wesch litigation.  And the only thing in that
14   exhibit was a single letter from the Department of Justice to
11:27:15 15   the Alabama Attorney General regarding the '92 map, and in it,
16   there was apparently no objection interposed by the Department
17   of Justice.  It bore on a deadline, the qualifying deadline,
18   and that struck me as having nothing to do with even the story
19   in the broadest sense.
11:27:40 20        MR. DAVIS:  Oh.  I -- 92, I am looking at, Judge,
21   seems to have more to it than that.
22        JUDGE MARCUS:  That was the only thing.  I may have
23   missed it.
24        Now, with regard to 93 to 97, there are other pieces of
11:27:56 25   the appendix to the jurisdictional statement filed by Alabama.
```

1    And I was just talking about 92 appeared to be only a

2  single letter from the Department of Justice regarding a

3  qualifying deadline that didn't seem to me to have any bearing

4  on this case taking the broadest view of relevance that I could

11:28:22 5  think of.  I mean --

6        MR. DAVIS:  I will share if I can, Judge.  I show a

7  motion to dismiss or affirm and who was asking to do so or not.

8        JUDGE MARCUS:  Is this part of 92?

9        MR. DAVIS:  Yes, Judge.  It's part of 92 on the pdf I

11:28:38 10  have.

11        JUDGE MARCUS:  Okay.  So I may have not properly

12  characterized it.

13     What's in Defendant 92?  Why don't you lay that out for

14  me?

11:28:46 15        MR. DAVIS:  It is -- I'm struggling to keep all these

16  separate.

17        JUDGE MARCUS:  Sure.  Take your time.

18        MR. DAVIS:  It's part of -- it is appellee Wesch's

19  motion to dismiss or affirm.  I show it as a 15-page pdf.  The

11:29:06 20  letter you are referring to -- the letter is part of it.

21        JUDGE MARCUS:  Okay.  So it includes the letter, but

22  it was the brief, the whole brief?

23        MR. DAVIS:  Correct, Judge.

24        JUDGE MARCUS:  Is there an objection to that,

11:29:20 25  Mr. Ross?  You can take that down.  Thanks.

1  MR. ROSS:  Your Honor, again, our concern is obviously

2  the Court can take judicial notice of someone having filed a

3  brief.  Our concern is that the state is trying to use it for

4  more than that.  It's trying to say that the things that are in

11:29:35 5  the brief are true or not true, and we don't think that's

6  appropriate at all.

7  JUDGE MARCUS:  Anything further on that?  If not, we

8  will reserve.

9  Okay.  The next grouping was Defendants' 93 to Defendant

11:29:50 10  97 inclusive.  And I saw that as a series of attachments in an

11  appendix to the jurisdictional statement filed in the Supreme

12  Court.  Again, it related to 1992.  Do I at least have an

13  accurate description of what's in 93 to 97?

14  MR. DAVIS:  Yes, Judge.  We think it has helpful

11:30:21 15  information about the procedural history of the *Wesch*

16  litigation.

17  JUDGE MARCUS:  Anything further on the point,

18  Mr. Ross, beyond what's already been said?

19  MR. ROSS:  No, Your Honor.  The same relevancy and

11:30:35 20  hearsay arguments.

21  JUDGE MARCUS:  We will reserve on 93 to 97.

22  The next grouping were Defendants' exhibits 100 to 106

23  inclusive.  Those were the preclearance submissions made by

24  Alabama to the Department of Justice, regarding the 2011 maps.

11:30:57 25  Have I described it accurately?

1                MR. DAVIS:  Judge, these were exhibits to a

2     preclearance submission.

3                JUDGE MARCUS:  Right.

4                MR. DAVIS:  Each is a different map that was proposed.

11:31:08 5                JUDGE MARCUS:  Right.  Right.  Now, as I understood

6     the objection, it was a singular objection by Mr. Ross, maybe

7     fell into the category of the doctrine of completeness.  He

8     didn't object to what you offered.  He objected because you

9     only chose a small piece of it, and you wanted it all in.  Do I

11:31:30 10    have that right, Mr. Ross, or have I mischaracterized that?

11                MR. ROSS:  I think that's generally true, Your Honor.

12    I think it also was that we frankly may not have had the

13    opportunity to confirm or whether or not this was everything

14    that was submitted with the map, and, you know, again these are

11:31:45 15    things that are older.  And so that was the basis of our

16    concern, yes.

17                JUDGE MARCUS:  So if he puts everything in and shows

18    it to you, you will have no objection, if I hear you right?

19                MR. ROSS:  That's right, Your Honor.  We can withdraw

11:32:02 20    the objection, just to make things easier for the Court.

21                JUDGE MARCUS:  Okay.  So let's make sure, Mr. Davis,

22    that you include the whole kit and caboodle, not just picking

23    your way through the preclearance submission.  Does that work

24    for you?

11:32:17 25                MR. DAVIS:  Of course.  I don't know of anything this

1    is missing.  I don't think anything is.  If there is, Mr. Ross
2    has it, and he's welcome to put it in.  Produced.
3         JUDGE MARCUS:  Mr. Ross, is there something missing
4    that you cannot isolate and point out?
11:32:32  5         MR. ROSS:  At this moment -- I'm sorry.  At this
6    moment, Your Honor, I guess I would -- this is more of a -- we
7    were working on this quickly over the holiday, so that may have
8    been the issue.  I'm sorry.
9         JUDGE MARCUS:  All right.  We will receive Defendants'
11:32:45 10   100 to 106.  We will give you the opportunity to speak with
11   Mr. Davis and come back with something else if it has been
12   excluded.  And we will give you until the end of business
13   tomorrow just to let us know if you would be kind enough on
14   that.
11:33:00 15        With that caveat, Mr. Davis, we receive Defendant 100 to
16   106 inclusive.
17        The next item was Defendant 138.  That was the
18   reapportionment committee guidelines from 2011.
19        I think the objection there was relevancy, Mr. Ross?
11:33:22 20        MR. ROSS:  Yes, Your Honor.  Yes.  That was our
21   concern was that if it were relevant or not.
22        JUDGE MARCUS:  I think it came up in the course of an
23   examination of one of the witnesses.
24        Mr. Davis, comment about 138.
11:33:44 25        MR. DAVIS:  Yes.  Trey Hood was -- Dr. Trey Hood was

asked yesterday about the 2011 guidelines and whether it did or
it did not include observing the core of districts as a
guideline.  Right.

      MR. ROSS:  Your Honor -- sorry.  Just to save time, we
will drop the objection.

      JUDGE MARCUS:  All right.  We will receive Defendant
138.

    139 from the defendant related to the *Thompson v. Merrill*
litigation, if I have that right.  And what it was, was an
interrogatory to the Alabama board of pardons.  And I wasn't
sure that I understood what the relevance was in that regard.
And I think the same issue came up with regard to Defendant
140.  Do I have that right, Mr. Ross, the basis of your
objection?

      MR. ROSS:  Yes, Your Honor.

      JUDGE MARCUS:  Mr. Davis?

      MR. DAVIS:  We agree those two should be considered
together.

    The relevance is responding to plaintiffs' experts.  Their
Senate Factor experts talk about the proportionality of people
who have been disenfranchised because of felony convictions.
This is sworn testimony.  I do not know as I'm sitting here if,
in fact, we will cite to it.  But we do think that because this
sworn testimony addresses the felon disenfranchisement and --
that it does relate to what plaintiffs' experts have alleged

1    concerning felon disenfranchisement in Alabama.

2         JUDGE MARCUS:  The heart of the objection was

3    relevancy and hearsay or just relevancy?

4         MR. ROSS:  Relevance and hearsay, Your Honor, but, you

11:35:43 5    know, I think the primary concern was that the state should

6    have someone come and testify about what this is and where it's

7    coming from and shouldn't just be allowed to drop in all these

8    documents which we have never seen before and have not heard

9    anyone testify about today.  And I think, again, there's a

11:36:00 10   relevance concern, because this is from, again, from some other

11   litigation -- actually, this Court -- that the state is trying

12   to bring in.

13        JUDGE MARCUS:  Mr. Davis, how do we know that it is

14   what it purports to be from the Alabama Board of Pardons and

11:36:16 15   Parole?  That is one of the points that he's at least raising.

16        MR. DAVIS:  It's sworn testimony, Judge.  And these

17   are documents from this litigation.  It's --

18        JUDGE MARCUS:  I'm sorry.  Could you help me?  Whose

19   sworn testimony does it embody?

11:36:33 20        MR. DAVIS:  Lee Gwaltney a member of the Alabama Board

21   of Pardons and Paroles.

22        JUDGE MARCUS:  Okay.  We will reserve on 139 and 140.

23       The next one was Defendant 141, which was an article from

24   the BBC News purporting to address or explain why President

11:37:04 25   Trump got support from minorities in 2020.

1    Were you offering that for the truth of its contents,

2  Mr. Davis?

3        MR. DAVIS:  Yes.  And I don't think that's -- I don't

4  think this came up in any exam.  I'm told maybe it did.

11:37:23  5        JUDGE MARCUS:  It did, but only -- if my recollection

6  is right, only very, very briefly.

7    Is there any objection to this, Mr. Ross?

8        MR. ROSS:  Yes, Your Honor.  They said they're trying

9  to use it for anything that's -- we don't think it's relevant.

11:37:39 10  We think it has multiple layers of hearsay.

11        JUDGE MARCUS:  Mr. Davis?  Why should we take the BBC

12  report, news report as telling any -- us anything about why

13  President Trump got support from minorities in 2020?  It all

14  may be absolutely true and easily provable.  His objection is

11:38:05 15  this isn't the way to prove it.

16        MR. DAVIS:  I have nothing to add to what Mr. Barrett

17  may have added yesterday.

18        JUDGE MARCUS:  We will reserve on 141.

19    The next one was Defendant 143, if I have it right.

11:38:20 20  Supplemental stipulation in the *Wesch* litigation in '92.  There

21  was a statement that according to the 1990 data, the district

22  was large enough to create -- or the population was large

23  enough to create a single majority-minority district.  I think

24  the objection there was relevancy.  Do I have that right,

11:38:54 25  Mr. Ross?

1       MR. ROSS:  Your Honor, we could drop the objection to

2  -- I think this is -- the same information is already in the

3  opinion in the case, so we will drop the objection.

4       JUDGE MARCUS:  Without objection, Mr. Davis, 143 is

11:39:05  5  received.

6     144 and 145, those concern the deposition of Mr. Hinaman,

7  which we have.  Is there some reason we shouldn't consider

8  this, Mr. Ross?

9       MR. ROSS:  Your Honor, I believe we included a copy of

11:39:26 10  that yesterday.

11       JUDGE MARCUS:  Okay.  So 144 and 145 are received.

12  Those were the -- Mr. Davis, can you hear me okay?

13       MR. DAVIS:  I can now, Your Honor.  You faded out on

14  my screen.

11:39:54 15       JUDGE MARCUS:  I'm sorry.  144 and 145 are received.

16  Those are the two parts of Mr. Hinaman's deposition.

17     The next item I have to which there was an objection was

18  Defendant 146.  That was the 2000 map of the population

19  regarding the State Board of Education and the state of

11:40:23 20  Alabama, and it was broken down by counties, and there were

21  various statistics that were being offered.  If I understand

22  the objection, that was relevancy, Mr. Ross?

23       MR. ROSS:  Yes, Your Honor.  And it's also -- frankly,

24  looking at the exhibit, it's difficult to even tell what one

11:40:44 25  can take from it since the lines -- it's not -- you can't

1   really tell what the State Board of Education lines were.

2           JUDGE MARCUS:  We're having trouble -- Mr. Ross, we

3   are having trouble hearing you.

4           MR. ROSS:  I'm sorry.  Give me one moment, Your Honor.

11:40:59 5      JUDGE MARCUS:  Sure.  Take your time.

6           MR. ROSS:  Sorry, Your Honor.  Can you hear me now?

7           JUDGE MARCUS:  Hear you perfectly.  Mr. Davis, are you

8   able to hear Mr. Ross?

9           MR. DAVIS:  Yes, Judge.  I can hear.

11:41:29 10     JUDGE MARCUS:   Thank you.

11          MR. ROSS:  Thank you.  So I think our primary concern

12  just looking at the document is that it's difficult to tell

13  what it even purports to represent since there's -- it's not

14  clear what the district lines are that they're showing.  And so

11:41:47 15 the rest of the information also doesn't appear to be

16  particularly helpful or relevant.

17          JUDGE MARCUS:  Mr. Davis?

18          MR. DAVIS:  The maps appear elsewhere in the record,

19  Judge, and just the statistics of the plan.  The plaintiffs are

11:42:03 20 arguing that because Alabama made certain decisions in its

21  board of education map that it would be okay to make those same

22  decisions in the congressional map, and we strenuously disagree

23  with that.  But we want to tell the story of how these board of

24  education maps got to be the way they are.  And Your Honor

11:42:21 25 asked Mr. Byrne about that briefly just today.  And we think we

1  can tell the story that how it didn't split Mobile County in

2  the '90s, it didn't in the 2000, it did for the first time in

3  the 2010s because they needed to add population and because

4  Alabama was subject to Section 5.  This is part of that story.

11:42:41 5           JUDGE MARCUS:  Let me ask one question:  If I heard

6  Mr. Ross right, one of the concerns he had was just it wasn't

7  clear, legibility, the lines weren't clear.  Are they clear in

8  this report?  146?

9           MR. DAVIS:  I would say that the map itself is not

11:42:58 10  very clear.  It's hard to tell the difference between a county

11  line and a district line.  These districts statistics are quite

12  clear, and we believe that the historical map's presented

13  elsewhere in the case, including in Mr. Cooper's report.

14           JUDGE MARCUS:  Thank you.  We will reserve.

11:43:14 15           Defendant 150.  This purported to be a study showing

16  morbidity rates.  This came from the CDC.  I think it was March

17  of '21 that it came from.  I take it you are offering it as a

18  public record.

19           MR. DAVIS:  Yes, Judge.  It was referenced in

11:43:40 20  Dr. McIntosh's declaration that we submitted and that is in

21  evidence.

22           MR. ROSS:  We will drop our objection.

23           JUDGE MARCUS:  No objection?  Without objection,

24  Defendant 150 is received.

11:43:50 25           152, it had been marked for identification.  We have

```
 1  already sustained that objection.  That was the Wall Street

 2  Journal article being offered for its truth, if I have that

 3  right.

 4      Did you want to say anything more about that?

 5          MR. DAVIS:  No, Your Honor.  We consider that issue

 6  resolved.

 7          JUDGE MARCUS:  Okay.  Defendant 153, that was an

 8  article that came from a sentencing project think tank, if I

 9  have that right.

10      Anything further on that one?  Mr. Ross or Mr. Davis?

11          MR. ROSS:  No, Your Honor, just reminding the Court

12  that we don't think anything about other states is relevant.

13          JUDGE MARCUS:  Mr. Davis, any comment you had wanted

14  to make, to make this record complete?

15          MR. DAVIS:  No, nothing to add, Judge.

16          JUDGE MARCUS:  All right.  The next one was 154.  That

17  was another newspaper article.

18      Any comment about that?

19          MR. ROSS:  Just the layers of hearsay, Your Honor.

20          MR. DAVIS:  Judge, I do not think this came up in any

21  -- in any witness examination.  We thought it of import that a

22  congress -- a state representative from Mobile, an

23  African-American Democrat woman was talking about keeping

24  Baldwin and Mobile County together, but we didn't have the

25  opportunity to question any witness about that.
```

Timestamps in left margin: 11:44:07 (line 5), 11:44:24 (line 10), 11:44:41 (line 15), 11:44:59 (line 20), 11:45:21 (line 25)

<pre>
        1              JUDGE MARCUS:  Are you still offering it?
        2              MR. DAVIS:  Sure.  I will offer it for the record.
        3              JUDGE MARCUS:  All right.  We will reserve on it.
        4    Just so the record is clear, this was a newspaper article about
11:45:38 5   what a congressman may have said.
        6         Defendant 155, voter determination letter from the
        7    Department of Justice.  I think the date was May 18, 2020.
        8              MR. ROSS:  I believe we dropped that objection if it's
        9    -- I think it's just the list of Section 5 objections in
11:45:59 10  Alabama.  And if so, we dropped that objection.
       11              JUDGE MARCUS:  He has got that description right, does
       12    he not, Mr. Davis?
       13              MR. DAVIS:  Yes, that is correct.
       14              JUDGE MARCUS:  We will receive Defendant 155.
11:46:11 15       Defendant 156, that was the felony voting rights statement
       16    prepared by the Alabama Secretary of State apparently.  Do we
       17    have an objection to that at this point, Mr. Ross?
       18              MR. ROSS:  Your Honor, it was the same relevance
       19    concern.  I don't think any of our -- anyone on our side
11:46:31 20  testified about that or anyone else from the Secretary of
       21    State.
       22              JUDGE MARCUS:  Is it a public record under 803(8) of
       23    the Federal Rules of Evidence, Mr. Ross?
       24              MR. ROSS:  Yes, Your Honor.  We will drop the
11:46:45 25  objection.
</pre>

1          JUDGE MARCUS:  All right.  156 is received.

2      157 was an article, Mr. Davis, you had offered from the

3  Montgomery Adviser.  It was an Alabama Senate profile, and

4  there was a comment by Robert Kennedy, Jr.  That was in 157.

11:47:08  5  The objection was, I take it, hearsay, Mr. Ross?

6          MR. ROSS:  Hearsay and relevance, Your Honor.

7          JUDGE MARCUS:  Mr. Davis?

8          MR. DAVIS:  Your Honor, this -- Mr. Kennedy was a

9  candidate who -- or the voting rights expert, Dr. Palmer, and

11:47:33 10  Dr. Liu looked at the election, so we wanted the profile in to

11  confirm his race and the opponent in the election and that he

12  also ran in 2017 in an election that I don't think was

13  considered by one or both of plaintiffs' experts.

14          JUDGE MARCUS:  So you're offering it for the truth of

11:47:52 15  its contents as to each of those points?

16          MR. DAVIS:  For the characteristics of Mr. Kennedy and

17  for which elections he was a candidate in, yes.

18          JUDGE MARCUS:  Mr. Ross, objection?  Is that your

19  objection is hearsay?

11:48:04 20          MR. ROSS:  Yes, Your Honor.  And just to be clear that

21  plaintiffs obviously -- not obviously, but we understand that

22  Mr. Kennedy is African-American, and I believe that the

23  Secretary may have already put in evidence of who ran in the

24  2017 primary election.  So we also, again, renew our relevance

11:48:21 25  and hearsay objections for those reasons.

1          JUDGE MARCUS:  Just one question, Mr. Davis:  Does
2     this duplicate what's already in the record?
3          MR. DAVIS:  I'm not sure that the 2017 information is
4     there, but it very well could be, Judge.  There's a lot to keep
11:48:36 5     up.
6          JUDGE MARCUS:  We will reserve on Defendant 157.
7          Defendant 158, that was the article from the economic
8     policy institute.  As I understand it, that's a D.C. think
9     tank, not a public record.  We've reserved on that.
11:48:54 10          Any further comment about that, Mr. Ross, Mr. Davis?
11          MR. ROSS:  No, Your Honor.
12          MR. DAVIS:  Nothing further, Judge.
13          JUDGE MARCUS:  All right.  We will reserve on 158.
14          162, that Mr. Davis offered was a report from the U.S.
11:49:10 15     commission on Civil Rights dated September 2007, if I have that
16     right.  And there was a completeness objection, I believe the
17     defendant put in the front page and only six pages, but
18     apparently the claim is that there was more.  And if you put
19     that in, he suggested you wanted to put the balance of it in,
11:49:37 20     as well, Mr. Davis.  Do I have that accurate?
21          MR. ROSS:  Yes, Your Honor.  Although I am having some
22     computer issues, I can't see -- we'll just drop the objection,
23     Your Honor.  If it's a government document, it's fine.
24          JUDGE MARCUS:  All right.  Without objection,
11:49:57 25     Mr. Davis, Defendant 162 is received.

```
 1          The next one was Defendant 163.  Isn't that already in the
 2   docket sheet, which the Court obviously can take notice of,
 3   Mr. Ross?
 4          MR. ROSS:  Yes --
11:50:17  5          MR. DAVIS:  163 is not needed.  We can withdraw
 6   offering 163.
 7          JUDGE MARCUS:  All right.  163 has been withdrawn.
 8       Same question I have on Defendant 164.  All it is, is the
 9   notice of the Hinaman deposition.  It's noted on the docket.
11:50:32 10   I'm hard pressed to see an objection to that.
11          MR. ROSS:  We had dropped that objection, I believe,
12   Your Honor.
13          JUDGE MARCUS:  164, Mr. Davis, is received.
14       I think that covered your -- your exhibits.  Do I have
11:50:51 15   that right?
16          MR. DAVIS:  I think that's right, Judge.
17          JUDGE MARCUS:  The only thing that was left out from
18   our discussion -- so we have covered Singleton, Milligan.  The
19   defendants' exhibits were the Caster exhibits, Ms. Khanna, and
11:51:10 20   we discussed them at the beginning.  Just so the record is
21   clear, and you tell me if I have misapprehended any of this.
22       Caster Exhibits 1 to 93 have been received, and 95 to 104
23   have been received.  The only objection was to plaintiff Caster
24   Exhibit 94, which was a COVID-tracking project from the
11:51:40 25   Atlantic, if I have that right.
```

1        MS. KHANNA:  Yes, Your Honor.  And we will withdraw

2   Exhibit 94.

3        JUDGE MARCUS:  Okay.  So 94 is not being offered?

4        MS. KHANNA:  That's correct.  Then I think the only

11:51:51  5   other outstanding issues for Caster plaintiffs' exhibits are --

6   Caster Exhibit 105, I believe, was also admitted into the

7   record during the course of testimony.  I believe those were

8   the DOJ guidelines that Mr. Bryan referred to.

9        JUDGE MARCUS:  Yes, I believe that is correct.  Do I

11:52:12 10   have that right, Mr. Davis?

11        MR. DAVIS:  That is my recollection, as well, yes.

12        JUDGE MARCUS:  It's in.

13        MS. KHANNA:  And then Caster 106 is the amicus brief

14   that Mr. Bryan co-authored in the *Evenwel* Supreme Court case,

11:52:25 15   and I believe that Mr. Davis and I were supposed to confer on

16   what redactions would be appropriate.  We sent him a copy just

17   this morning.  I know he was in with Representative Byrne, so

18   happy to work that out over the course --

19        JUDGE MARCUS:  What's your sense of this one,

11:52:41 20   Mr. Davis?

21        MR. DAVIS:  I am confident we will work it out.  I

22   have not had a chance to look at the document yet.

23        JUDGE MARCUS:  If you would let us know in the next

24   day or two, we would be much appreciative.

11:52:51 25        MR. DAVIS:  Gladly.

1        JUDGE MARCUS:  Ms. Khanna, was there another one, 107?

2        MS. KHANNA:  I believe that's it.  I think we have

3   everything resolved for Caster plaintiffs.

4        JUDGE MARCUS:  Okay.  We have covered the exhibits.

11:53:01  5   The ones we have reserved on, as I said, the judges will confer

6   and give you a ruling when we give you written opinion in the

7   -- in the case.

8        Which brings us then I take it we're at the point where

9   we're ready for closing argument.  It may be appropriate to

11:53:20 10   break.  It's just a little bit before 12:00.  I have 11:53

11   Central Standard Time.

12        So perhaps we should take our lunch break now, and then

13   come back in one hour and proceed with closing.  That works for

14   everyone?

11:53:40 15        MR. BLACKSHER:  Yes, Judge.

16        MR. DAVIS:  Yes, Judge.

17        JUDGE MARCUS:  Okay.  Have you for the plaintiffs

18   decided how you're going to break up your argument or

19   arguments?

11:53:52 20        MR. BLACKSHER:  Yes, Your Honor.  The Caster and

21   Milligan plaintiffs have graciously allowed me to proceed

22   first, followed I think by the Caster plaintiffs, and then the

23   Milligan plaintiffs in our closing arguments.

24        JUDGE MARCUS:  And as I said, we gave you a total of

11:54:12 25   an hour and a half to be divided up any way you want.  Have you

1  reached any determination about that?

2          MR. BLACKSHER:  I guess we were thinking it was just

3  30 minutes apiece, and, you know, I'm not sure that I will take

4  30 minutes, but I commit not to do more than that.

11:54:33  5          JUDGE MARCUS:  All right.  We will leave that to you.

6  And who will be making the argument for Caster, and who will be

7  making the closing argument for Milligan?

8          MS. KHANNA:  Your Honor, I will be making the argument

9  for Caster.

11:54:48  10          MR. ROSS:  And, Your Honor, it will be myself and my

11  colleague who will be doing the closing for Milligan.

12          JUDGE MARCUS:  And you are free to split up your

13  arguments between your lawyers any way you see fit.  That's not

14  an issue.

11:54:59  15      One final question before we break for lunch that I have:

16  Did you intend to reserve any of your time for rebuttal?  We

17  have given the hour and a half, Mr. Davis, Mr. LaCour, you have

18  that full 90 minutes to respond to the three closing arguments

19  by each of the three sets of plaintiffs.

11:55:21  20      I just wanted to know whether they intended to reserve any

21  time for rebuttal.

22          MR. BLACKSHER:  Singleton would like to reserve a

23  little time, maybe five minutes or ten minutes at most.

24          JUDGE MARCUS:  Okay.

11:55:34  25          MS. KHANNA:  Same with Caster, Your Honor, about

          1    five minutes, maybe 15 to 20 between all three of us, I would

          2    imagine.

          3              MR. ROSS:  Same, Your Honor.

          4              JUDGE MARCUS:  All right.  We will leave that to you

11:55:44  5    folks.

          6         And with that, it is 11:55, if I have it right.  We will

          7    bring you back in one hour and proceed.  Does that give you

          8    enough time to prepare and proceed with your closings for each

          9    of the plaintiffs and the defendant?

11:56:06 10              MR. BLACKSHER:  Yes, Your Honor.

         11              MS. KHANNA:  Yes, Your Honor.

         12              MR. DAVIS:  Yes, Your Honor.

         13              MR. ROSS:  Yes, Your Honor.

         14              JUDGE MARCUS:  I should say Mr. LaCour.  That works

11:56:15 15    for you?

         16              MR. LACOUR:  Yes, Your Honor.

         17              JUDGE MARCUS:  We will see you folks back here in

         18    one hour, and we will take up closing argument at that point.

         19    Thank you all much.

11:56:26 20              (Recess.)

         21              JUDGE MARCUS:  I take it the parties are ready to

         22    proceed with their closing statements?

         23              MR. BLACKSHER:  Yes.

         24              JUDGE MARCUS:  Mr. LaCour, you are ready, as well, and

13:00:16 25    counsel for Caster and Milligan, as well?

1            MR. LACOUR:  Yes, Your Honor.

2            MS. KHANNA:  Yes, Your Honor.  Although I can't -- for

3    some reason, I can't see the Court, any of the judges on the

4    Court.

13:00:27 5            JUDGE MARCUS:  Can you see me?  Mr. Blacksher?

6            MR. BLACKSHER:  I see you, Your Honor, and I see Judge

7    Moorer, and I see Judge Manasco.

8            JUDGE MARCUS:  All right.  Mr. Ross, are you also

9    ready to proceed?

13:00:29 10            MR. ROSS:  Yes, Your Honor.

11            JUDGE MARCUS:  All right.  We asked Judge Manasco's

12    deputy clerk to give you a five-minute warning when you run up

13    against your 30 minutes.

14         Having said that, Mr. Blacksher, we would be delighted to

13:01:07 15    hear from you.  You may proceed.

16            MR. BLACKSHER:  Thank you, Your Honor.  And first of

17    all, I want to thank the Court, Judge Marcus, Judge Manasco,

18    Judge Moorer, for, first of all, giving us this hearing so

19    promptly.  And secondly, for your patience as we spent, what, a

13:01:31 20    week almost in trial.

21         There is a problem here.  I am getting Joe Bagley on the

22    screen and not Judge Marcus.

23         But can you see me, Judge Marcus?

24            JUDGE MARCUS:  I see you and hear you just fine.  Just

13:01:50 25    tell me whenever you are ready to proceed.

1          MR. BLACKSHER:  I am ready to proceed now.

2          JUDGE MARCUS:  Thanks so very much.

3          MR. BLACKSHER:  So it is important for the Court to

4   keep in mind that the Singleton plaintiffs have sought a

13:02:09  5   preliminary injunction based solely on Count One of their

6   amended complaint, which alleges a racial gerrymander, not

7   Count Two of the complaint, which alleges intentional

8   discrimination.

9          And the difference is important for the purposes of

13:02:29  10  understanding the racial gerrymander claim because unlike

11  intentional discrimination, the injuries suffered or found to

12  be unconstitutional in a racial gerrymander claim is the mere

13  segregation of individual voters based on their race separating

14  one from the other based on their race.

13:03:00  15         It is not an injury of vote dilution or any other

16  practical injury to the voter herself.  Whereas in our second

17  count, we are alleging that the state purposefully

18  intentionally continued to adopted the 2021 plan for the

19  purpose of discriminating against black voters by denying them

13:03:31  20  an opportunity to elect members of Congress in at least two

21  districts.

22         So the issue in the racial gerrymander case resolves

23  around the 1992 decision.  And think Your Honors sort of put it

24  correctly and when we were just before lunch.

13:03:56  25         There's no dispute that the 1992 gerrymander was enacted

1  not for the purpose of discriminating against blacks, but

2  allegedly for the purpose of providing them an opportunity to

3  elect at least one candidate of their choice.  And it did so by

4  splitting four counties -- Clarke, Jefferson, Tuscaloosa, and

13:04:29 5  Montgomery -- for the express purpose of creating a

6  majority-black district.

7       And the issue in this case is whether that district drawn

8  and authorized by the Voting Rights Act allegedly in 1992 can

9  still be justified by the Voting Rights Act in 2021.  Because

13:04:58 10  there's no dispute -- there's no dispute that the 2021 plan

11  carries forward the 1992 racial gerrymander.

12       In their opposition to our motion for preliminary

13  injunction, the defendant said, quote, both the 2001 and 2011

14  maps maintain the cores of districts, changing them only to

13:05:26 15  equalize population.  The 2011 map largely built off the 2001

16  map, which itself, built off the 1992 map.

17            JUDGE MARCUS:  Mr. Blacksher, can I ask you a question

18  about what you are raising?

19            MR. BLACKSHER:  Certainly.

13:05:45 20            JUDGE MARCUS:  If I hear the argument clearly, you

21  seem to be saying that we have to go back to 1992 for the heart

22  of your argument, because that plan was infirm, and it

23  essentially was carried forward in each successive iteration --

24  in 2000, 2011, and 2021.  That much I have right, correct?

13:06:14 25            MR. BLACKSHER:  Not exactly, Your Honor.

1          JUDGE MARCUS:  Okay.  Put it to me exactly.

2          MR. BLACKSHER:  Well, you used the word infirm.  We

3     don't allege that the 1992 *Wesch* plan was constitutionally

4     infirm at that time.  At that time, the parties stipulated and

13:06:33  5     the Court agreed that the gerrymander could be justified by

6     complying with Section 2 of the Voting Rights Act.

7          The three-judge district court in *Wesch* specifically said

8     they were not addressing the merits of that question, but it

9     was going to accept the stipulation of the parties that the

13:06:58 10     Voting Rights Act justified it.

11          But the next year, 1993, the Supreme Court in *Shaw v. Reno*

12     announced the racial gerrymandering cause of action, the racial

13     gerrymandering equal protection violation.  That the state

14     continued to use the Voting Rights Act to justify perpetuating

13:07:30 15     the 1992 intentional gerrymander based on Section 5 of the

16     Voting Rights Act as counsel has said numerous times, the state

17     felt like it could not reduce the size -- could not reduce that

18     black-majority district District 7 because it would cause

19     retrogression in the ability of blacks to elect candidates of

13:08:00 20     their choice, and, therefore, it was -- it was in compliance

21     with Section 5, and the Justice Department signed off on their

22     submissions under Section 5.

23          But the question of whether Section 5 actually required

24     perpetuating their racial gerrymander was never litigated in a

13:08:24 25     court.  It is now before the Court that precise question

 1   whether the intentional separation of voters based on their

 2   race in District 7 today in 2021 still can be justified by the

 3   Voting Rights Act.

 4        Now, to be clear, the state's position in their response

13:08:51  5   to our complaint is not that the -- not that the Voting Rights

 6   Act can justify gerrymander, but that the 2021 plan now is no

 7   longer a gerrymander because the division -- the creation of a

 8   majority black CD 7 in 1992 has over the years developed into

 9   basically a new set of traditional redistricting principles.

13:09:30 10   It is now the core of what are traditional in the congressional

11   redistricting of Alabama districts.  And that -- that is simply

12   wrong as a matter of law.  And if I could -- if the Court would

13   allow me to share my screen for a second.

14             JUDGE MARCUS:  Sure.

13:10:07 15             MR. BLACKSHER:  Share -- I don't want to do that.

16   Sorry.  Okay.  Now I'm ready.  I'm sorry, Judge.

17             JUDGE MARCUS:  You take your time.

18             MR. BLACKSHER:  So this is *Bartlett vs. Strickland*,

19   2009.  And it says, Our holding also should not be interpreted

13:10:42 20   to entrench majority-minority districts by statutory command,

21   for that, too, could pose a constitutional concern.  That is

22   essentially what the state is arguing in this case.  That over

23   the years, that gerrymander, which was carried out under

24   authorization allegedly of the Voting Rights Act in 1992 is now

13:11:09 25   so entrenched that it is -- that it -- that the Voting Rights

1  Act still justifies it.

2        As you can see, the majority-minority districts are only

3  required at all if all three *Gingles* factors are met.

4        In fact, the law now is that before -- well, let me just

13:11:50  5  back up here.  Before we get to strict scrutiny, we want to

6  establish first of all that what we have with the 2021 plan is,

7  in fact, a racial gerrymander.

8        So there's no dispute among the parties that the 2021 plan

9  perpetuates the 1992 majority-black district in CD 7.

13:12:19 10        And the fact that it was drawn color blind allegedly by

11  Mr. Hinaman by not looking at racial figures does not undermine

12  the fact that it's carrying forward the intentional separation

13  of voters based on their race that was started in 1992.  That's

14  *North Carolina vs. Covington* at page 2553.

13:12:48 15        So it is a gerrymander, and the question is based on race,

16  and the question is whether the 2021 plan can survive strict

17  scrutiny.

18            JUDGE MARCUS:  Can I stop you at this point,

19  Mr. Blacksher?

13:13:05 20            MR. BLACKSHER:  Yes, sir.

21            JUDGE MARCUS:  If I heard you right in response to my

22  question, when the plan was adopted in '92, drawing District 7

23  the way it does, adopted by a three-judge district court, and

24  summarily affirmed by the Supreme Court of the United States

13:13:27 25  thereafter, that plan was not unconstitutional, it did not

1       constitute a racial gerrymander.  Do I have that right?

2              MR. BLACKSHER:  Not at that time.  That's correct.

3              JUDGE MARCUS:  So there came a point in time when it

4       became unconstitutional, violated equal protection of laws

13:13:52 5   because it was a racial gerrymander.  My question to you is:

6       When did it come to be unconstitutional -- when the Supreme

7       Court decided *Shaw*, or when they decided *Barlett v. Strickland*,

8       or when the plan was redrawn in 2000, or when the plan was

9       redrawn in 2010, or when the plan was redrawn in 2020?  I'm

13:14:20 10  just trying to get my arms around how what started out

11      constitutional morphed into an unconstitutional racial

12      gerrymander.  Was it the Supreme Court opinion in *Shaw* that did

13      it, or were there additional changes in circumstances on the

14      ground?  When did it become unconstitutional to carry that

13:14:46 15  forward?

16             MR. BLACKSHER:  It should have been or could have been

17      challenged as constitutional after 1993 *Shaw v. Reno*, and

18      *Miller vs. Johnson*.  But it was never examined.  That is, the

19      question of whether the *Shaw* jurisprudence had rendered the

13:15:08 20  racial gerrymander approved in 1992 was still in compliance

21      with the Equal Protection Clause.  That question was not

22      examined in the Section 5 process.

23         The Justice Department preclearances simply looked at the

24      question of retrogression.

13:15:28 25     No one raised the issue of whether the *Shaw* jurisprudence

 1   now placed that plan in constitutional question.

 2              JUDGE MARCUS:  So if I have the answer, your answer to

 3   my question correct, once *Shaw* was decided, and thereafter each

 4   of the iterations in 2000, 2010, and '21 were unconstitutional

13:15:57  5   racial gerrymandering, they just didn't get challenged until

 6   you challenged it in this suit.  Do I have that right?

 7              MR. BLACKSHER:  Almost.  I can't say that they were

 8   unconstitutional without having examined whether they could

 9   have been justified by a narrowly-tailored compelling

13:16:17  10   objective.  That's another -- that's the next step.

11              JUDGE MARCUS:  Okay.  So at least by this point, by

12   the time they drew HB-1 in '21, it was a racially gerrymandered

13   map in violation of equal protection.  That's your position,

14   correct?

13:16:35  15              MR. BLACKSHER:  Yes, Your Honor.

16              JUDGE MARCUS:  Okay.  Thank you.

17              MR. BLACKSHER:  In which event, it should be subjected

18   to strict scrutiny.  And as the Court knows, in *Cooper vs.*

19   *Harris*, and *Abbot vs. Perez*, the Supreme Court held that for

13:16:58  20   compliance with Section 2 to be a compelling state interest,

21   there must be a, quote, meaningful legislative inquiry into

22   whether a district drawn without regard to race would run afoul

23   of Section 2, and that just assuming that Section 2 requires a

24   minority majority district isn't enough.

13:17:21  25          But that is, in fact, what happened.  The state never did

1    a meaningful inquiry into whether Section 2 of the Voting
2    Rights Act still justifies perpetuating the 1992 gerrymander.
3        In fact, counsel for the reapportionment committee advised
4    the leadership that merely because it still contained a
5    54 percent black majority, the Voting Rights Act was complied
6    with.  But as we know under *Cooper v. Harris*, *Abbott vs. Perez*,
7    and earlier cases for that matter in the *Shaw* jurisprudence, it
8    is not enough simply to look at whether or not there's a
9    majority like district.  The question is whether it was
10   necessary, because all three of the *Gingles* conditions were
11   present, not just the ability of a compact majority-black
12   district to be drawn, but whether or not there was
13   racially-polarized voting sufficient so that the white majority
14   usually could be counted on to defeat the choice of black
15   voters.
16       That question was never examined in this case.  Even
17   though even that on September 27th, the Singleton plaintiffs
18   filed their complaint and spelled out this line of cases under
19   the *Shaw* jurisprudence demonstrated that by eliminating the
20   gerrymander, namely, making whole those counties that were
21   split, there appear two districts in which blacks can elect
22   candidates of their choice even though neither of those
23   districts has a black-voter majority.
24       Nevertheless, the leadership under the advice of counsel,
25   I think, simply refused to consider that argument, and that's

1  why we are here.

2       So no one disputes in this case -- we have no evidence

3  that -- and I don't think any of the parties have disputed that

4  District 6 and 7 in the whole county plan that was contained

13:19:58 5  and is still contained in the Singleton complaint performed as

6  opportunity districts for black voters, namely, all you have to

7  do -- this is not a case where you have to examine

8  racially-polarized voting.  You don't have to identify what

9  constituted black person or not a black person.  You don't have

13:20:22 10  to do algorithms.  All you have to do is look at the election

11  returns, which is what Professor Davis did.  And they show

12  clearly 55, 56 percent majorities for the Democratic candidates

13  in those two districts based on the election returns, and

14  there's no dispute in this case that black voters in Alabama,

13:20:55 15  over 90 percent, support the candidates who are Democratic.

16       So it is the Singleton plaintiffs' contention that because

17  there are without -- without having to persist and perpetuate

18  that 1992 racial gerrymander, by going back to whole counties,

19  which is what the state had been using before the 1992

13:21:31 20  gerrymander, it becomes apparent that Section 2 of the Voting

21  Rights Act can be complied with, and, therefore, any effort to

22  violate traditional districting principles by splitting county

23  boundaries in order to reach a black majority is an unjustified

24  and unconstitutional racial gerrymander.

13:22:01 25       For us, the question for this Court is what is the remedy,

```
 1   what should have the Legislature have done, what should this
 2   Court do?  And we think that Abrams vs. Johnson the 1997
 3   decision, provides the best guidance.  It says, of course, that
 4   the remedy should use traditional districting principles.  That
 5   was the case you recall where a three-judge district court in
 6   Georgia had to draw a congressional plan because a Legislature
 7   had failed to do so.
 8        Abrams says that the Court should give no deference to the
 9   gerrymandered plan.  And Abrams says whole counties should be
10   used as building blocks.
11        In fact, in Wesch v. Hunt in 1992, the opinion quoted the
12   guidelines that were in place that were put in place by the
13   1991 reapportionment committee that said that counties -- and I
14   am quoting now -- counties should be used as district building
15   blocks where possible.
16        So the state's expert demographer, Tom Bryan, demonstrated
17   by his examples, first of all, that you can't draw a
18   majority-black district simply using whole counties to -- I
19   think what Mr. Bryan demonstrates is that the Singleton plan
20   comes closest to achieving the smallest practicable equal
21   population among districts using whole counties.  And,
22   therefore, it should be the plan that any remedy should start
23   with.  And I will stop there.
24        JUDGE MARCUS:  Thank you.  And so we're clear, you
25   have reserved five minutes for rebuttal, Mr. Blacksher.
```

1        All right.  We will proceed with -- are we going next with

2    Caster?

3              MS. KHANNA:  Yes, Your Honor.  Thank you.

4              JUDGE MARCUS:  All right.  Thank you.  And you may

13:24:26 5    proceed.

6              MS. KHANNA:  Thank you, Your Honor, and I would also

7    like to reserve five minutes for rebuttal.

8        I wanted to -- the Court has heard a lot of testimony and

9    received a lot of evidence in three different cases on a very

13:24:40 10   condensed time frame.  And I understand that sifting through

11   the record probably feels like a Herculean task at this point.

12   So I want to use my time today to simplify the issues and cut

13   right to the heart of the matter, because at the end of the

14   day, plaintiffs' claim under Section 2 of the Voting Rights Act

13:24:59 15   is straightforward, largely undisputed, and compels just one

16   outcome.

17       Section 2 prohibits congressional maps that dilute

18   minority votes.  It doesn't matter why that dilution occurs,

19   whether it was intentional or inadvertent, only that it does

13:25:18 20   occur.

21       Dilution of black-voting strength might result from

22   limiting black voters opportunity to elect to a single

23   district, or from dispersing black voters across districts,

24   where their voices are drowned out.

13:25:33 25       The question before this Court is whether as a result of

1    the 2021 congressional plan, black-voting strength in Alabama

2    is unlawfully confined to a single district, 14 percent of the

3    state's congressional delegation, in a state where black

4    residents comprise over a quarter of the population.

13:25:53 5        Here, Your Honor, both the law and the evidence make clear

6    that the answer to that question is a resounding yes.

7        In *Thornburg vs. Gingles*, the Supreme Court set out three

8    evidentiary preconditions for claims brought under Section 2.

9    This Court would be hard pressed to find another case that so

13:26:14 10   readily illustrates each one.

11        First, plaintiffs must establish that black voters in

12    Alabama are sufficiently numerous and geographically compact to

13    form a majority of the Voting Age Population in a second

14    congressional district.

13:26:29 15       Here, plaintiffs' expert demographer, William Cooper, has

16    produced not one, but seven such plans.  Defendants suggest

17    that Mr. Cooper's illustrative districts count individuals who

18    did not fit their preferred definition of black.  But that

19    argument is both incorrect and ultimately irrelevant.

13:26:51 20       As a legal matter, the Supreme Court instructed in *Georgia

21    v. Ashcroft* that when examining vote dilution of a single

22    racial group as we are here, courts should look at all

23    individuals who identify themselves as black.

24        The principled matter, when Alabama citizens self identify

13:27:09 25   as black on the census, the state should not be in the business

```
 1    of telling them that they're wrong, or deciding that who is
 2    sufficiently black to warrant the protection of federal law.
 3        But as a practical matter, this debate is immaterial to
 4    plaintiffs' claim.  Whether you count the any-part black
 5    population, the black registered voter population, or even just
 6    the single-race non-Hispanic black citizens of voting age, all
 7    of Mr. Cooper's illustrative plans contain two majority-black
 8    districts.
 9        In short, plaintiffs satisfaction of the numerosity
10    requirement of Gingles I is beyond dispute.
11        The compactness element of Gingles I meanwhile is
12    satisfied when plaintiffs' proposed majority-minority districts
13    are consistent with traditional districting principles.  As
14    Mr. Cooper has testified, each of the Caster plaintiffs'
15    illustrative plans maintains population equality, includes
16    contiguous districts, have compactness scores comparable to the
17    enacted congressional plan and other Alabama statewide plans,
18    splits the same number or fewer political subdivision
19    boundaries as the enacted plan, minimizes pairing of
20    incumbents, and complies with the principles of non-dilution of
21    minority voting strength.
22        Defendants offer very little to dispute these facts.  In
23    fact, Mr. Bryan did not even evaluate Mr. Cooper's plans on the
24    vast majority of these principles because he recognized that
25    they had all been satisfied.
```

1          So instead, he and the state emphasized a handful of them.
2   Core retention.  Mr. -- defendants and Mr. Bryan fault
3   plaintiffs for failing to maintain the status quo in their
4   illustrative plans.  But, of course, that is precisely what
13:29:07 5   this case challenges, the status quo for Alabama's
6   congressional plan that dilutes the voting strength of black
7   voters.

8          Defendants next turn to incumbency protection suggesting
9   that Section 2 cannot interfere with the chosen residences of
13:29:23 10   existing members of Congress, but Mr. Cooper's Illustrative
11   Plan 5 pairs no incumbents at all.  And all of his remaining
12   plans pair only two incumbents, both of whom have served in
13   office for one year, undermining Mr. Bryan's apparent personal
14   preference for continuity of representation above all else.

13:29:47 15          Defendants' last resort in attempting to upend plaintiffs
16   showing under *Gingles I* is to focus on communities of interest.
17   And, in fact, just one community of interest on which the bulk
18   of their case appears to rest, that's between Mobile and
19   Baldwin counties.

13:30:04 20          But as the evidence demonstrates, defendants' argument on
21   this point fails at every level.

22          First, under the reapportionment committee's own
23   guidelines, communities of interest like the other principles
24   the defendants highlight comes toward the end of a long list of
13:30:21 25   factors to be considered in drawing a redistricting plan.

         1        And it certainly comes well after compliance with the

         2   Voting Rights Act.

         3        JUDGE MARCUS:  Wouldn't it be true to say more

         4   accurately, Ms. Khanna, that communities of interest are often

13:30:42 5   discussed, conceptualized, and considered along with

         6   compactness, geographic compactness?

         7        MS. KHANNA:  I do believe --

         8        JUDGE MARCUS:  If one's heads on the coin, and the

         9   other tails on the same coin?

13:30:59 10       MS. KHANNA:  I'm not sure if I would quite

        11   characterize that way, but I completely agree, Your Honor, when

        12   discussing the compactness under *Gingles I*, the Court doesn't

        13   look at the number, the Reock score.  It looks at whether these

        14   districts makes sense, and whether they make sense is a

13:31:15 15  question that involves, well, what are the boundaries of it?

        16   Are they generally keeping together political subdivision

        17   boundaries?  Do they encompass a community of interest, or are

        18   they kind of randomly picking and choosing from disparate

        19   portions of the state.

13:31:28 20      I agree it's part of the inquiry.  But it certainly is on

        21   the Alabama redistricting criteria not something that on its

        22   own can subordinate the very important criteria of complying

        23   with the Voting Rights Act.  So it's a little bit of -- it

        24   certainly is something to be considered, but it is not

13:31:49 25  something that can outweigh the question and --

1           JUDGE MARCUS:  I wasn't so much asking you to put a

2     weight on each -- as I was suggesting that when you ask about

3     the question of reasonable compactness, it's often considered

4     in tandem with communities of interest.  You would agree with

13:32:11 5     that, would you not?

6           MS. KHANNA:  Yes, Your Honor.  Under *Davis v. Chiles*

7     in the Eleventh Circuit, the question of reasonable compactness

8     is whether or not the maps are drawn consistent with

9     traditional districting principles.  And communities of

13:32:23 10     interest is one of those traditional districting principles.

11           JUDGE MARCUS:  I reference it because if you look at

12     Justice Kennedy's opinion, in LULAC, it's clear that when he's

13     talking about reasonable compactness, in the very same

14     discussion, he reviews the problem of community of interest and

13:32:46 15     suggests that part of the problem with how one of those

16     districts was drawn was that not only were they disparate in

17     terms of geography, but communities of interest were equally

18     separated.  I am suggesting the two frequently come together in

19     the analysis.  Is that a fair way to look at this?

13:33:11 20           MS. KHANNA:  Yes, Your Honor.  I think communities of

21     interest like many of the other factors we have discussed are

22     one of the traditional districting criteria that courts look at

23     when evaluating compactness under *Gingles I*, and my

24     understanding of the *LULAC* opinion is it was informative, that

13:33:27 25     there wasn't really any evidence.  That there was a community

1   of interest if this district was trying to encompass other than

2   just sheer -- merely trying to get wrangle up a bunch of

3   minorities in different pockets of the state.  That's certainly

4   not what we have here.

13:33:40 5       And, indeed, the Alabama criteria make clear that -- or

6   rather the guidelines made clear that if there's ever a

7   conflict between complying with the Voting Rights Act and

8   communities of interest, core preservation, incumbency

9   protection, those principles should gave way to the broader

13:33:57 10  principle of complying with minority voter rights.

11       JUDGE MARCUS:  I have it.  You were talking about when

12  I interrupted you the community of interest proffer combining

13  Mobile County and Baldwin County in the same district.

14       MS. KHANNA:  Yes, Your Honor.  And I would also -- in

13:34:17 15  addition to the guidelines on this point, the Caster plaintiffs

16  have offered reams of evidence and testimony about the shared

17  communities of interest between Mobile and Montgomery,

18  particularly for black residents who face many of the same

19  challenges in education, employment, criminal justice reform in

13:34:34 20  both areas.

21       Plaintiffs have offered the *Chestnut* trial testimony of

22  witnesses like former State Senator Hank Sanders and former

23  State Representative John Knight who explain that the urban

24  center of Mobile shares more in common with the urban center of

13:34:50 25  Montgomery with economically and culturally than suburban

Baldwin County.  Community organizer Karen Jones, precisely the sort of person that Mr. Bryan testified is best situated to provide testimony on communities of interest further confirm this fact.

But plaintiffs do not need to disprove that a community of interest exists in the areas that defendants emphasize.  At the very least, the evidence indicate that there are divergent views in Alabama -- how voters in Alabama view their communities, which only exemplify the fact that communities of interest across the state can overlap and sometimes conflict with one another.

There's nothing sacred about the one community of interest that defendants choose to focus on.  Indeed, defendants' suggestion that the Gulf Coast counties comprise an invaluable community of interest is directly undermined by the State's Board of Education plan which splits Mobile County the same way plaintiffs propose here and yet was governed by the very same criteria as the congressional plan.

Defendants may not like plaintiffs' illustrative plans as a policy matter.  But Legislature may choose to prioritize different communities in the map drawing process and will likely have an opportunity to do so if this Court enjoins the current map.

But the state's policy preference as to which communities merit representation and which do not has no bearing on

```
 1    plaintiffs' showing under Gingles I.  Plaintiffs illustrative
 2    maps are just that, illustrative.  We are not asking the Court
 3    to order that one of them be selected or adopted.  The only
 4    question is whether a second majority-black district is
 5    feasible, consistent with traditional districting principles,
 6    and plainly it is.
 7         Plaintiffs have proved there are many ways to draw such a
 8    district in Alabama while balancing a variety of all the
 9    different redistricting principles, including but not limited
10    to avoiding minority vote dilution.
11         The second and third Gingles preconditions are simply
12    beyond dispute.  Defendants have presented no evidence
13    contradicting plaintiffs' racially-polarized voting experts,
14    both Dr. Palmer and Dr. Liu.  Between those two experts, they
15    examined 30 elections between 2008 and 2020.  And they found
16    racially-polarized voting in every single one.
17         That result held whether examining the single-race black
18    population, or the any-part black population.
19         In fact, the state's own expert, Dr. Hood, conducted a
20    racially-polarized voting analysis for some of the same
21    geographical areas and elections as plaintiffs' experts, and
22    found the same extremely high levels of racially-polarized
23    voting.
24         On Gingles III, Dr. Palmer and Dr. Liu provided unrefuted
25    testimony that not only does the white majority usually defeat
```

1  black-preferred candidates in both congressional and statewide

2  elections, it always defeats those candidates in every district

3  except for Congressional District 7, the state's one

4  majority-black district.

13:37:54  5       The evidence thus establishes that each of the three

6  *Gingles* preconditions is easily satisfied.  The Eleventh

7  Circuit has said in Fayette County that it will be only the

8  very unusual case in which the plaintiffs had kind of

9  established the existence of the three *Gingles* preconditions,

13:38:12 10  but still had failed to establish a violation of Section 2

11  under the totality of circumstances.

12       We submit, Your Honor, that this is not an unusual case.

13  To the contrary, it is a textbook case.  All of the relevant

14  Senate Factors weigh in favor of a finding of vote dilution, in

13:38:31 15  many cases, based on undisputed and objective facts.

16       Let's begin with the sheer numbers.  While the state is

17  correct that the Voting Rights Act does not mandate

18  proportionality, the Supreme Court has held this factor is

19  relevant in the totality of circumstances analysis.  And here

13:38:47 20  the disparities between the black and white populations and

21  their share of congressional districts are glaring.

22       Black residents make up over 27 percent of Alabama's

23  population.  But they are a majority of voters in just

24  14 percent of its congressional districts.

13:39:03 25       White residents make up 63 percent of the population.  But

1   they are a majority of voters in over 85 percent of the

2   congressional districts.

3        Just 30 percent of the black population lives in a strict

4   where they have an opportunity to elect their preferred

13:39:20  5   candidates.  By contrast, 92 percent of white residents reside

6   in a district where they can elect their preferred candidates.

7        And if Alabama were to draw an additional black-majority

8   district, black representation would be approximately

9   proportional to the black share of the population.  While

13:39:38 10   whites would still have a greater share of congressional

11   districts than their share of the population by nearly 10

12   percentage points.

13        The Senate Factors tell the compelling story behind these

14   numbers.  Senate Factor 1 examines Alabama's history of

13:39:53 15   official discrimination.  Any student of American history knows

16   that state-sponsored discrimination as denied the franchise to

17   black citizens since the early 20th Century and before.

18        Dr. King surveyed Alabama's history of poll taxes,

19   literacy tests, white primaries, and the brutal violence that

13:40:12 20   confronted black residents who were brave enough to attempt to

21   cast a ballot.

22        And while those specific tools are no longer in place for

23   sure, racial discrimination in voting is unfortunately not just

24   a thing of the past.  Only a few years ago, the U.S. Department

13:40:28 25   of Transportation had to intervene after the Governor made it

1    harder for black voters to comply with the state's voter ID law

2    by closing motor vehicle locations in disproportionately black

3    areas.

4        And just this decade, a federal judge lamented that

13:40:43  5    Alabama remains vulnerable to politicians setting an agenda

6    that exploits racial differences and that political exclusion

7    through racism remains a real and enduring problem in the

8    state.  That was in *U.S. vs. McGregor*.

9        Senate Factor 2 examines the extent to which voting is

13:41:03 10    racially polarized in the region.  Dr. Palmer demonstrated that

11    voting in the region is not only racially polarized, it's

12    significantly so with over 92 percent of blacks voting for

13    their preferred candidates while nearly 85 percent of white

14    voters voting for the opposing candidates.

13:41:19 15        Now, the state contends that this undisputed evidence of

16    racially-polarized voting is merely reflective of partisan

17    interests that just so happened to fall on racial lines.  But

18    both the Supreme Court and the Eleventh Circuit have held that

19    Section 2 plaintiffs do not have to prove that racial

13:41:36 20    polarization is driven by biracial animus.

21        Even if the reasons why black and white voters are

22    polarized were relevant under Section 2, the burden would be on

23    defendants to affirmatively prove under the totality of the

24    circumstances that race is not one of those reasons.

13:41:56 25        The record here cannot support such a conclusion.  The

1   state's own expert, Dr. Hood, has expressly agreed both in his

2   published work and on the witness stand that race remains very

3   much a part of the calculus for voters today, even if it is not

4   the sole factor in voter traces.

13:42:12   5       Senate Factor 3 asks whether Alabama has used voting

6   practices that enhance the opportunity for discrimination such

7   as at-large elections, majority vote requirements, anti-single

8   shot provisions, and Alabama has checked all of those boxes.

9       Senate Factor 5 examines the extent to which

13:42:30 10   African-Americans in Alabama bear the effects of discrimination

11   in areas such as education, employment, and health, which

12   hinder their ability to participate effectively in the

13   political process.

14       It should come as no surprise that the vestiges of

13:42:45 15   discrimination continue to plague blacks in Alabama on

16   virtually every dimension as shown by Mr. Cooper, Mr. Jones,

17   Dr. King, and Dr. Caster, and is echoed in the testimony in

18   *Chestnut* by Dr. McCrary, Senator Sanders, Representative

19   Knight, Commissioner Tyson, Karen Jones, and Lakeisha Chestnut

13:43:04 20   herself.

21       This evidence confirms what we all know:  Because black

22   Alabamians have less flexible work schedules, less access to

23   affordable type child care, fewer educational opportunities,

24   and unstable housing arrangements, it is harder for them to

13:43:19 25   access and navigate the voting process.

1    Senate Factor 6 asks whether Alabama's elections have been

2  characterized by overt or subtle racial appeals, and they have

3  been.  Dr. Bagley noted several examples such as politicians

4  running ads saying that white men are blamed for everyone

13:43:38 5  else's problems.  Dr. King's report similarly surveys the

6  various ways that Alabama politicians have recently used race

7  to negatively stereotype minorities and prey upon the fears of

8  white voters.

9    Senate Factor 7, the extent to which the minority group

13:43:53 10  members have been elected to public office weighs decidedly in

11  favor of plaintiffs' claim.

12    Alabama's congressional delegation has never included more

13  than a single black representative, and then too from the

14  state's one majority-black district.

13:44:09 15    And the absence of a single black statewide elected

16  official in the last quarter of a century is glaring in a state

17  with such a large black population.

18    Senate Factor 8, Alabama's nonresponsiveness to the needs

19  of black voters is readily proved by the number of issues that

13:44:29 20  the state has not addressed.  Refusing to expand Medicaid under

21  the Affordable Care Act, which would disproportionately help

22  uninsured black Alabamians of all ages, ignoring environmental

23  pollution that black Alabamians in Lowndes County and the Gulf

24  Coast experience.  These realities demonstrate the state's

13:44:50 25  disinterest in solving the problems that have a

1  disproportionate and grave effect on black Alabamians.

2         As for Senate Factor 9, the tenuousness of the state's

3  justifications for the enacted map, it is telling that all of

4  the justifications provided by defendants and the witnesses in

13:45:09  5  this case flatly ignore the prioritization of criteria in the

6  state's very own guidelines.

7         Ultimately, in evaluating the totality of the

8  circumstances under the Senate Factors, this Court need not

9  equate racial differences and disparities with racism.

13:45:29  10         Rather, this Court can review the -- former Senator

11  Sanders' testimony in *Chestnut* side by side with former

12  Congressman Byrne's testimony.  And it will see are two very

13  different political realities.  From Senator Sanders'

14  perspective, race has defined not only his childhood growing up

13:45:51  15  in Alabama, but also his present reality, his right to vote,

16  his personal experiences in education, criminal justice, and

17  the sting that he feels from Confederate monuments, and his

18  continued fight for equality in all aspects of his

19  professional, political, and civic life.

13:46:10  20         From Congressman Byrne's perspective, race has not been a

21  salient issue.  He didn't know the black composition of his

22  district when he was in office.  He doesn't notice Confederate

23  flags and monuments in the halls of Alabama's government.  He

24  does not -- he's not confronted on a daily basis with the stark

13:46:28  25  socioeconomic disparities between black and white communities

```
 1  in Alabama.

 2          THE COURTROOM DEPUTY CLERK:  Ms. Khanna, you have

 3  5 minutes of your 25.

 4          MS. KHANNA:  Thank you.

 5      Your Honor, this Court does not have to disbelieve either

 6  of these two gentlemen.  Both of them, long-time, hard-working

 7  representatives of Alabama's residents to see that the reality

 8  in life of life in Alabama for blacks is just different than

 9  the reality of life in Alabama for whites.

10      It should come as no surprise that many well-intentioned

11  white representatives believe that the Voting Rights Act has

12  done its job and solved the problem of racial inequity to

13  access to the franchise, while many black representatives

14  believe that the struggle for racial equality in voting and so

15  many other areas is an ongoing battle they continue to fight

16  every day.

17      Your Honor, I reserve the balance of my time for rebuttal.

18          JUDGE MARCUS:  Let me ask you a question, Ms. Khanna.

19  And you are on our time, not yours.

20          MS. KHANNA:  Okay.

21          JUDGE MARCUS:  One of the arguments the state has

22  made, and it has been explained by some witnesses, including

23  Mr. Byrne, former Congressman Byrne this morning, is that even

24  assuming arguendo you were right about Section 2 and that you

25  could draw two majority-minority districts that were reasonably
```

The timestamps in the left margin: 13:46:38 (line 5), 13:46:55 (line 10), 13:47:12 (line 15), 13:47:26 (line 20), 13:47:53 (line 25).

          1    compact and otherwise complied with *Gingles II* and *III* and that

          2    the Senate Factors in the aggregate tilted in your favor, even

          3    if assuming all of that is true, that it is late in the day and

          4    the Court sitting in equity as this Court is doing would have

13:48:18  5    to and must take into account the timing, the closeness of the

          6    primary, which is scheduled for late May, I think it was the

          7    24th, and the election, which is about ten months off, and the

          8    argument they make, simply put, is it's too late in the day to

          9    be fussing with new maps.  Even if everything you say is true,

13:48:48 10    they dispute that, but they say even assuming it were so, it's

         11    too late in the day.

         12         What's your answer?

         13         MS. KHANNA:  Your Honor, I think that's just wrong.

         14    The fact is this is not the -- we are not in a last minute

13:49:04 15    before the election moment right now.  We are a full four --

         16    more than four months away from the primary election.  There's

         17    a congressional filing deadline coming up.

         18         JUDGE MARCUS:  Let me stop you.  The primary election

         19    is 24 May.  Do I have that right?

13:49:19 20         MS. KHANNA:  I believe that's right.

         21         JUDGE MARCUS:  So we are about four-and-a-half months

         22    from then.

         23         MS. KHANNA:  Exactly.  And while Alabama has imposed a

         24    congressional filing deadline for the end of January, that is

13:49:31 25    perhaps one of the longest spans between a congressional filing

1  deadline and the congressional primary that I am aware of in

2  the country and is certainly not at all necessary.

3      If this Court were to find that plaintiffs have

4  established a sufficient likelihood of success on the merits

13:49:48 5  and that the plan should be enjoined, it would have maximum

6  flexibility to postpone that filing deadline, give the

7  Legislature an opportunity to adopt a remedy, have a

8  court-imposed remedy, whatever the remedial process will be,

9  there will be ample time for candidates to file and to not have

13:50:06 10  to touch the election deadlines at all.  The primary would stay

11  in place.

12      You know, there are a lot of redistricting and voting

13  rights cases litigated across the country in election years.

14  And when people talk about the eve of an election or what's

13:50:21 15  coming at the last minute, they do not mean four months before

16  a relevant election.  They're talking weeks at that point.  And

17  here, the Court has just ample discretion and ample amount of

18  time to not disrupt anything in the election calendar, but

19  still achieve or recognize the Voting Rights Act violation

13:50:42 20  that's in the enacted plan and alleviate plaintiffs of the

21  injury that they're bound to suffer from any election that's

22  going to be held under that map.

23          JUDGE MARCUS:  Let me ask a final question.  It's

24  something you touched on already, and all of the parties have,

13:50:59 25  and that is weighing the various and sometimes competing

1  communities of interest.

2       In this case, we have heard substantial evidence of -- at

3  least two communities of interest, one shaped by the Black Belt

4  and environs, the second shaped by the Gulf Coast -- Baldwin

13:51:21 5  and Mobile counties.  And it's been pointed out to us that

6  those communities of interest in some ways are overlapping, and

7  in some ways are competing with each other.

8       How does a court in your view go about weighing, if we

9  have to weigh at all, the relevant strengths of these competing

13:51:48 10  communities of interest?

11            MS. KHANNA:  I don't think that the Court has to

12  decide that one community of interest trumps another.

13       Communities of interest, the definition provided by

14  Alabama and hosts of other states, is purposefully vague and

13:52:05 15  can mean a lot of different things to a lot of different

16  people.  And I don't think there's any objective standard by

17  which to say this community of interest is more important than

18  this community of interest.  We all belong to different

19  communities, all of which have different importance to

13:52:21 20  different people.

21       I think that the question for the Court is whether or not

22  -- the only question for the Court is whether or not plaintiffs

23  have satisfied their burden to show that a second

24  majority-black district can be drawn consistent with

13:52:34 25  traditional districting principles, including communities of

1    interest.

2        And where plaintiffs have established sensible districts

3    that meet a host of traditional districting criteria and

4    supported those with the testimony from community members

13:52:49 5    explaining how they view their communities to comport with

6    those districts, I believe that's all that is required to

7    satisfy *Gingles I*.

8        If there are policy preferences about, well, I think we

9    want to prioritize community over that community for this

13:53:05 10    reason or that reason, I believe those policy preferences are

11    not for this Court to make and not -- and certainly are up to

12    the Legislature to make in adopting a remedy plan.  But they

13    have to do so consistent with the Voting Rights Act.

14        It cannot be the case that because the people in power

13:53:22 15    have a preference for some communities of interest that they

16    claim is most important and inviable contrary to their own

17    guidelines, contrary to their board of election plan, that

18    everything else falls away.  We cannot have a second

19    majority-black district because these two areas really, really

13:53:41 20    want to stay together.  I think is important to stay together.

21        There are a lot of competing factors here.  But minority

22    voting rights cannot be relegated to the bottom of that

23    consideration, and if anything, need to be weighted at the very

24    top, and as long as we have shown which I believe we have that

13:53:57 25    communities of interest can -- are consistent in -- with those

```
 1   districts, I believe we satisfied Gingles I.

 2              JUDGE MARCUS:  All right.  Thank you.  And you have

 3   reserved your five minutes for rebuttal.  We will turn to

 4   Mr. Ross.

13:54:12  5              JUDGE MANASCO:  Judge Marcus, I have a question for

 6   Ms. Khanna.  Ms. Khanna, I want to make sure that there's one

 7   precise detail that I understand about the Caster plaintiffs'

 8   request for relief.  To the Caster plaintiffs, is there a

 9   difference, and if there is, please comment on it for me,

13:54:31 10   between an injunction that expresses a ruling that there have

11   to be two districts in which black Alabamians have an

12   opportunity to elect a representative of their choice, and an

13   injunction that expresses ruling that there have to be two

14   majority-black districts?

13:54:51 15              MS. KHANNA:  I --

16              JUDGE MANASCO:  Feel free to postpone the answer to

17   the question until the post hearing submissions.  I'm genuinely

18   not trying to put anybody on the spot.  I just need to fully

19   understand the difference, if there is one.

13:55:06 20              MS. KHANNA:  No.  I think it's a very important

21   question, Your Honor, and it really does pinpoint kind of the

22   nub of the issue of the difference between plaintiffs' standard

23   to liability and what exactly is the proper remedy, right?  So

24   there's no question that in order to show liability under

13:55:22 25   Section 2, we need to establish that it's possible to create a
```

 1    majority-minority district over 50 percent, which I believe we

 2    have done in states.

 3         On the question of remedy, I actually it's believe as a

 4    matter of law that there are multiple ways to remedy a Section

13:55:37  5    2 violation, and that they do not have to be hinged to that

 6    *Bartlett* standard for proving liability.  I think we have seen

 7    it in other states like Texas, which in areas where the courts

 8    has fully agreed that there's no question of the Voting Rights

 9    Act applies, no question Section 2 applies where you can draw

13:55:54 10    50-plus districts either for black residents or Latino

11    residents.  But where the ultimate remedy has been a 49 percent

12    district or a 48 percent district, that the Court feels is --

13    has sufficiently provided black voters an opportunity to elect

14    their preferred candidates.  I believe there is a little bit

13:56:11 15    more flexibility on the remedy than there is on the liability.

16         But I do believe that making sure -- making clear that the

17    Voting Rights Act requires two districts in which black voters

18    have an opportunity to elect their preferred candidates is

19    really important to guide whatever remedy that is.  I would

13:56:28 20    also say the evidence here -- I don't have -- I don't have an

21    answer off the cuff about what exactly is the best percentage

22    for such a second district or the right percentage, but I will

23    say that the racially-polarized voting evidence here does

24    indicate that it's very hard for black voters in Alabama to get

13:56:46 25    an opportunity to elect unless and until they are a majority of

 1  the eligible voters.

 2        JUDGE MANASCO:  Thank you.

 3        JUDGE MARCUS:  I am still not sure, Ms. Khanna, that I

 4  understand the answer to that question.  So let me come at it

13:57:02 5  one more time.

 6     You say, and I think it's clear that for purposes of

 7  Section 2 under the Voting Rights Act, you have to establish

 8  first as an evidential matter the circumstances surrounding

 9  *Gingles I.*  That requires you to prove that you can establish

13:57:28 10  on the record two majority-minority districts.  It's not enough

11  simply to say you can create two opportunity districts.  That

12  wouldn't get you to home plate with regard to establishing a

13  *Gingles* Section 2 analysis.  I have that correct.

14        MS. KHANNA:  Absolutely.  Under *Bartlett v.*

13:57:52 15  *Strickland*, we have to pass 50 percent.

16        JUDGE MARCUS:  If I understand what you are asking

17  this Court to do, assuming you otherwise can circumnavigate all

18  of the circumstances in *Gingles*, not just *I* but *II* and *III,* and

19  the Senate Factors, as well, you are asking us one, to say

13:58:14 20  preliminarily that HB-1 violates the Voting Rights Act.  That's

21  the first thing you are asking, correct?

22        MS. KHANNA:  Yes.

23        JUDGE MARCUS:  And then the second -- and this is

24  where I want to be sure I understand you with clarity -- what

13:58:35 25  would you have us say to the Legislature, if we were to

1    otherwise agree?  What is it that they have to do?

2         Do they have to draw two majority-minority districts in

3    order to comply with the Voting Rights Act?  Is that what you

4    would have us tell them?  Or would you have us simply say it's

13:58:57 5  enough for them to draw two opportunity districts?

6         MS. KHANNA:  I will certainly try.  You're right, Your

7    Honor, that the first thing we are requesting is the

8    declaratory relief that says there is a violation of Section 2.

9         The next thing we would request is an injunction that says

13:59:19 10  there cannot -- you cannot use this map in the upcoming

11   election, the enacted map.

12        The next thing after that, frankly, does not require the

13   Legislature to do anything.  It would not be an injunction

14   against the Legislature to then go and come up with a different

13:59:35 15  map.  It would be a chance -- the Court would need a remedy for

16   the violation.  We believe there's ample time to impose a

17   remedy, and the Court could and likely should give the

18   Legislature an opportunity to develop that remedy, to develop a

19   remedy that is consistent with Section 2.

13:59:54 20       JUDGE MARCUS:  All of that is clear.  The question,

21   though, remains open:  If you are otherwise right, and I

22   underscore if, what is it you would have us say to the

23   Legislature?  This map is no good, we'd ask you to go back and

24   draw another map, and what, if anything, would you have us say

14:00:15 25  beyond the fact that this map violates Section 2 because two

1   majority-minority districts could be drawn?  Would we say

2   anything further?  Ought we to in your view?

3          MS. KHANNA:  Yes.  I believe that the instruction

4   should be that the -- that Alabama must adopt a map, that any

14:00:34 5   map that Alabama adopts must comply with Section 2 by

6   containing two congressional districts that provide black

7   voters an opportunity to elect the preferred candidates.

8          I don't -- as a legal matter, I believe that is the --

9   that's the remedy for a Section 2 violation.

14:00:57 10          As an evidentiary matter, and as a localized matter in

11   Alabama, I believe that the evidence shows that in order to

12   have an opportunity to elect the preferred candidate, black

13   voters need to be a majority of the Voting Age Population or

14   somewhere very, very close to that, given the sheer levels of

14:01:19 15   racially-polarized voting.  It would not be sufficient to call

16   a 42 percent or 38 percent district necessarily an opportunity

17   to elect district, given the evidence here.

18          So I think that while there -- while legally I think the

19   answer is Section 2 requires the creation of an additional

14:01:40 20   opportunity to elect district, practically, I think that might

21   -- that that will likely be an additional district in addition

22   to the one that currently exists that is over 50 percent Black

23   Voting Age Population or very close to that.

24          JUDGE MARCUS:  Thank you very much.  We will proceed

14:02:02 25   now with the argument from the Milligan plaintiffs.

1   MR. ROSS:  Thank you, Your Honors.  I will provide the

2   closing for the Milligan plaintiffs on our Section 2 claim.  My

3   colleague Davin Rosborough will address our racial

4   gerrymandering claim.  We reserve five minutes for rebuttal.

14:02:18  5   Your Honors, this lawsuit concerns two of our most

6   fundamental constitutional rights; the right to vote, and the

7   right to be free from racial discrimination.

8   This is not a new fight in Alabama.  The state has an

9   undeniable history of discrimination against black voters,

14:02:30 10   including a decades' long pattern of passing discriminatory

11   redistricting plans.

12   Yet despite black voters' calls for a second

13   majority-black district, last year the Legislature ignored

14   those requests and enacted HB-1 which continues the long

14:02:46 15   pattern of discrimination.  Indeed, no one disputes that black

16   people are about 27 percent of Alabama's population, but

17   because of racially-polarized voting, they can elect their

18   candidates of choice in only one of the state's seven

19   congressional districts.

14:03:02 20   And no one disputes that about one-third of black voters

21   are packed into District 7 which has an unnecessarily high

22   59 percent black registered voter population, and that HB-1

23   cracks the rest of the Black Belt across for another three

24   congressional districts preventing the creation of a second

14:03:19 25   majority-black district.

1    As Ms. Khanna aptly explained, these facts and others
2  plainly show a violation of the Voting Rights Act.
3    Although rights involved are important, the claim is quite
4  simple.  In 1982, a bipartisan Congress passed the amended
14:03:37 5  Voting Rights Act.  And the Supreme Court in *Thornburg vs.*
6  *Gingles* laid out the straightforward framework for proving
7  these claims.
8    As Ms. Khanna already explained, first, black voters must
9  show that they are numerous, sufficient numerous and
14:03:53 10  geographically compact enough to constitute a majority and an
11  additional district.  Second and third, they must show that
12  voting is racially polarized.  Once these preconditions are
13  established, the Court must examine the totality of the
14  circumstances.
14:04:08 15    Majority of the factors do not need to point one way or
16  the other.
17    Your Honors, the overwhelming and undisputed evidence
18  shows that plaintiffs have satisfied both the *Gingles*
19  preconditions, and that under the totality of the
14:04:23 20  circumstances, HB-1 impermissibly dilutes black-voting
21  strength.  With respect to the *Gingles* preconditions, the
22  Milligan plaintiffs' expert Dr. Moon Duchin and the Caster
23  plaintiffs' expert Mr. Bill Cooper offered ten illustrative
24  plans containing two majority-black districts with black
14:04:40 25  registered voter, black single-race voter, black any-part voter

1    populations over 50 percent.

2         All of the plans are geographically compact, and the plans

3    attempt, unlike HB-1 to keep the Black Belt whole.  The plans

4    also were drawn consistent with the state's own traditional

14:05:01  5    redistricting principles.  This alone is sufficient to satisfy

6    *Gingles I* requirements.

7         With respect to *Gingles II* and *III*, the plaintiffs' expert

8    Dr. Baodong Liu showed that across seven congressional primary

9    and general elections from 2008 to today, black people gave an

14:05:17 10    average of 88 percent of their votes to black-preferred

11    candidates.  In contrast in the same seven elections, white

12    people gave an average of 13.5 percent of their votes to the

13    black-preferred candidates.

14         Outside of the majority-black District 7, black-preferred

14:05:33 15    candidates enjoyed no electoral success at all.

16         These same pattern held in ten statewide elections.  Stark

17    racially-polarized voting was apparent in both statewide

18    general and primary elections for President, U.S. Senate,

19    Lieutenant Governor, Secretary of State, and other offices.

14:05:51 20         Dr. Palmer, the Caster expert, found the same pattern of

21    RPV so too did the defendant's expert Dr. Trey Hood.  Indeed,

22    Dr. Hood agreed with Dr. Liu and Dr. Palmer that voting is

23    racially polarized and that black voters cannot consistently

24    elect their candidates of choice in districts below a majority.

14:06:10 25         Your Honors, these statistics are at the heart of the

1   Voting Rights Act case.  And these statistics are unrefuted by

2   the defendants.  No black person, regardless of their party or

3   qualifications, has ever won a majority white congressional

4   district in Alabama.  As the Eleventh Circuit has repeatedly

14:06:30  5   stated, The surest indication of race conscious politics is a

6   pattern of racially-polarized voting.

7       Your Honor, with respect to Senate Factors, plaintiffs'

8   Mr. Evan Milligan and Captain Shalela Dowdy testified Alabama's

9   Legislature has ignored the advocacy of black community calling

14:06:50  10   for two majority-black districts, that the current plan leaves

11   black voters without responsive representation in Congress,

12   that HB-1 ignores the shared history, the shared familial and

13   cultural bonds, the shared experiences, and the shared concerns

14   about racial inequities in education, health, employment, and

14:07:11  15   other areas that establish a shared interest of communities

16   amongst black people in Montgomery County, Mobile County, and

17   across the Black Belt.

18       In addition, Dr. Bagley plaintiffs' historian confirmed

19   that the shared history of the Black Belt exists between Mobile

14:07:28  20   County.

21       He also testified that at least seven of the Senate

22   Factors support a finding of vote dilution, including Senate

23   Factor 1, the state's long and intense history of de jure and

24   de facto racial discrimination, including a 2017 opinion by

14:07:43  25   three-judge court that Alabama state legislative maps were

enacted with racially predominant motive, including racial

discrimination and redistricting in five of the six

redistricting cycles from 1960 to 2010, and several recent

court decisions finding that the state or its local

14:08:00 jurisdictions violated the Voting Rights Act or the

Constitution.

Your Honors, with respect to Senate Factor 5, no one can

dispute there's a history of discrimination in voting -- or

excuse me -- in education and employment, health, and every

14:08:14 other area of Alabama, and that stark socioeconomic disparities

between black and white people continue to exist.

Indeed, Your Honors, in the 2020 elections, black voter

registration and turnout rates were about 10 points below those

of white voters.  That even ignoring this lower level of black

14:08:34 participation in the state, socioeconomic disparities have made

it much more difficult for black voters to financially

contribute to political campaigns or otherwise engage in

politics.

As Ms. Khanna already explained, there's been some

14:08:47 startling examples of racial appeals in just last ten years.

White congressional candidates have accused the political

opponents of conducting a war on whites.  They have called for

the repeal of the Reconstruction amendments, which gave black

people their freedom after the Civil War.  They ran campaigns

14:09:06 with burning images of out-of-state black Congress people, and

 1   other minority members of Congress, and accused them of trying
 2   to tear this country up.  They used other overt and subtle
 3   appealed to call for block voting.  Because of block voting, no
 4   black candidate has ever won an election for Congress outside
14:09:27  5   of District 7.

 6       As of Senate Factor 8, the congressman who were elected
 7   from the majority white districts have been unresponsive to the
 8   specific needs of black voters.  As we heard, these
 9   congressmen, including Congressman Byrne opposed bipartisan
14:09:44 10   infrastructure laws that provided important resources to the
11   Black Belt.  They have opposed the bipartisan effort to restore
12   the Voting Rights Act.  And they have opposed the Medicaid
13   expansion that would allow 220,000 disproportionately black
14   voters to receive health insurance despite the fact that 39
14:10:05 15   other states have agreed to this expansion.

16       Your Honor, despite this overwhelming and largely
17   undisputed evidence, the defendants tried to make a number of
18   arguments which are irrelevant or distractions.  Defendants
19   will claim that the plaintiffs' illustrative plans do not
14:10:26 20   contain true majority-black districts, but, again, under any
21   measure plaintiffs' plans have two compact majority districts
22   even using the most restrictive definition of black.

23       Defendants will claim that plaintiffs' plans do not
24   respect traditional redistricting principles, but this is
14:10:45 25   merely an attempt to graft the standards from the *Shaw* claims

1    on to Section 2.

2        The Eleventh Circuit has specifically rejected this

3    approach in *Davis vs. Chiles*.

4        Even so, Dr. Duchin and Mr. Cooper testified that

14:10:59  5    plaintiffs' plans respect the black community -- Black Belt

6    community of interest unlike HB-4.  The plaintiffs' plans are

7    as compact or more compact than HB-1.  The plaintiffs' plans

8    split the same or fewer counties than the six county split in

9    HB-1, that plaintiffs' plans keep the Black Belt's core in two

14:11:18 10    districts rather than four, that Dr. Duchin's plans split the

11    same or fewer majority black cities in HB-1, and that the plans

12    either do not pair incumbents or can be easily adjusted to not

13    do so.

14        Indeed, as been said many times, plaintiffs' plan looks

14:11:35 15    very similar to the Alabama State Board of Education plan.  And

16    the State Board of Education plan and the congressional plan

17    were both drawn by the same Legislature pursuant to the same

18    traditional redistricting criteria.

19        Your Honors, with respect to *Gingles II* and *III*, Dr. Liu's

14:11:54 20    methodology has been questioned.  Dr. Hood testified on

21    cross-examination that he used the exact same method as Dr. Liu

22    in conducting his racially-polarized voting analysis.  Dr. Liu

23    also found that whether you use any-part black or single-race

24    black, voting is racially polarized, and black people prefer

14:12:15 25    the same candidates.

1      Dr. Liu also testified that the fact that he found that

2  black people, whether he used any-part black or single-race

3  black, voted for the same candidates was consistent with his

4  own research finding that black people, whether you look at

14:12:29 5  black Latinos or other people with varied racial or ethnic

6  identities tend to vote the same.

7      Defendants also allege that partisanship not racism

8  explains white block voting in Alabama.  But no precedent

9  supports the state's theory the plaintiffs are required to

14:12:47 10  prove or disprove why voting is racially polarized.

11      As the Supreme Court said in *Gingles*, the difference

12  between the choices made by black and white voters is not the

13  reason -- it's the difference between the choices made by black

14  and white voters, not the reason for that difference, that

14:13:03 15  results in black voters having less opportunity and violations

16  of the Voting Rights Act.

17      Your Honors, even if this were relevant, Dr. Liu's

18  analysis showed that there was racially-polarized voting in

19  both Democratic and Republican primaries, and that strikingly

14:13:20 20  even in some general elections, majorities of white Democrats

21  voted against black Democratic candidates to support white

22  candidates.

23      Defendants will also knit pick at the totality of the

24  circumstances analysis.  They have asserted that court orders

14:13:37 25  -- certain court orders do not count, but declaratory judgments

 1  and consent orders, particularly those containing liability

 2  findings are binding court orders like any other.

 3      The state has also attempted to argue that Alabama's

 4  racial disparities in employment and education are similar to

 5  other states.  But Section 2 requires an intensely local

 6  analysis of the relevant facts and not a comparison among

 7  states.

 8      This is because as Dr. King testified, each of the states

 9  Alabama references have their own terrible histories of racial

10  discrimination.  And these states past or ongoing instances of

11  discrimination or racial disparities does not absolve Alabama

12  of its own history.

13      Defendants do not come close to over-rebutting any of

14  plaintiffs' evidence going to the totality of the

15  circumstances.

16      Finally, the defendants may argue that it's simply too

17  late for relief to the plaintiffs.  The evidence shows that

18  this is incorrect.  The Court heard how quickly HB-1 was drawn

19  and enacted.  However, no one has ever voted under the maps at

20  issue here.  There is no risk of voter confusion.  As, Your

21  Honor, already said, the primary election is nearly five months

22  away.  The general election is over nearly 11 months away.

23      Your Honor, the plaintiffs have met their four

24  requirements of the preliminary injunction standard.  As our

25  proposed findings of fact and conclusions of law will show, the

1  plaintiffs have shown a substantial likelihood of success on

2  the merits.  They have shown irreparable injury in the form of

3  vote dilution as described by the Supreme Court, the Eleventh

4  Circuit, and district courts across Alabama, the equity

14:15:27  5  strongly favor plaintiffs' interest in exercising their right

6  to vote free from racially discriminatory redistricting, and

7  there is no countervailing weighty concerns the defendants have

8  identified.

9      At this stage, what we are asking the Court to do is

14:15:42  10  extend any upcoming election deadlines and give the state an

11  opportunity to devise new maps that completely cure the

12  constitutional and statutory violations.

13      In sum, this case presents the precise evil the Voting

14  Rights Act was designed to remedy, the dilution of black

14:16:00  15  voters' voting strength.

16      Federal courts, as you know, play a vital role in ensuring

17  that every citizen can participate equally in the political

18  process.  And this Court has the power to order Alabama to

19  remedy the Section 2 violations here by requiring it to draw

14:16:17  20  two black districts.

21      As the Supreme Court has explained, district courts have a

22  duty to cure illegal districts -- excuse me -- districts even

23  through an orderly process in advance of elections.  We simply

24  ask this Court to take up that duty.

14:16:35  25      Thank you, Your Honors.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1836

| | |
|---|---|
| 1 | JUDGE MARCUS:  Thank you very much.  Any questions, |
| 2 | Judge Manasco or Judge Moorer for Mr. Ross? |
| 3 | JUDGE MANASCO:  I have got one.  It's the same one |
| 4 | that I asked counsel for the Caster plaintiffs. |
| 14:16:48  5 | Mr. Ross, do you see a difference, and if you do, please |
| 6 | comment on it for me, between an injunction that directs the |
| 7 | use of a map that contains two districts in which black voters |
| 8 | would have an opportunity to elect a representative of their |
| 9 | choice on the one hand, and, on the other hand, an injunction |
| 14:17:07 10 | which requires the use of a map that includes two |
| 11 | majority-black districts? |
| 12 | MR. ROSS:  Your Honor, we're happy to brief this in |
| 13 | our proposed findings of fact and conclusions of law, but I |
| 14 | will say that I think the answer, as Ms. Khanna said, is |
| 14:17:23 15 | complex.  I think that this Court can and should issue a |
| 16 | declaratory judgment saying that the current maps violates |
| 17 | Section 2, and then give the Legislature an opportunity to draw |
| 18 | districts that cure the violation, obviously working from the |
| 19 | illustrative plans. |
| 14:17:39 20 | If the Legislature were to draw one district that looked a |
| 21 | lot like District 7 and another district that was 45 percent |
| 22 | black, or something else, then this Court would need to decide |
| 23 | with evidence or argument from the parties whether or not that |
| 24 | completely cured the violation. |
| 14:17:57 25 | And so I think my answer is simply that the Court has to |

1 give -- find the Section 2 violation, give the Legislature the

2 opportunity to cure it, and whatever the Legislature comes up

3 with, whether it's a 45 percent black district and a 50 percent

4 black district, the parties will need to decide then whether or

14:18:19 5 not that cures the violation that the Court finds.

6             JUDGE MANASCO:  Thank you.

7             JUDGE MARCUS:  Anything further, Judge Moorer?

8             JUDGE MOORER:  No, sir.

9             JUDGE MARCUS:  All right.  You broke up your argument

14:18:31 10 in half, Mr. Ross, and only devoted your time to Section 2.  I

11 take it your colleague Mr. Rosborough is going to address the

12 constitutional claim?

13             MR. ROSS:  Yes, Your Honor.

14             JUDGE MARCUS:  Thank you.  Mr. Rosborough.

14:18:48 15             THE CLERK:  You have 10 minutes total of the 30 that

16 was given the 25 that was given.

17             MR. ROSBOROUGH:  Thank you.  Understood.  Thank you.

18             THE COURTROOM DEPUTY CLERK:  Thank you.

19             MR. ROSBOROUGH:  Good afternoon, Your Honors.  Davin

14:19:01 20 Rosborough for the Milligan plaintiffs.

21       My colleague, Mr. Ross, has discussed the compelling

22 evidence that HB-1 violates Section 2 of the VRA by failing to

23 create a second congressional district that will allow black

24 voters to elect candidates of their choosing.

14:19:15 25       The same packing of black voters in District 7 in

1   unjustified numbers and simultaneously cracking of many of the

2   state's black voters among Districts 1, 2, and 3, violate the

3   Fourteenth Amendment to the Constitution as a racial

4   gerrymander.

14:19:30  5        Under HB-1, District 7's registered voter population is

6   just under 60 percent black, and the district contains about a

7   third of Alabama's black voters.  In contrast, Districts 1, 2,

8   and 3 systematically fracture much of the remaining black

9   population into separate districts such that the Black Voting

14:19:52 10  Age Population in each is below 30 percent.

11        This irreparably harms voters in those districts like our

12   clients by subjecting them to unfair racial divisions.

13        Of course, we agree with the Supreme Court in *Bush v. Vera*

14   that district scrutiny does not apply merely because

14:20:07 15  redistricting is performed perform with consciousness of race.

16   States can and should draw black-majority districts when doing

17   so serves the state's compelling interest in complying with the

18   VRA, so long as the districts are narrowly tailored to that

19   end.

14:20:22 20        But here the Alabama Legislature took no action whatsoever

21   to narrowly tailor that use of race in District 7 to comply

22   with the VRA or any other compelling governmental interest.

23   The cracking of black voters across Districts 1, 2, and 3 shows

24   the opposite of VRA compliance.  These establish a violation of

14:20:41 25  the Fourteenth Amendment.

1    There's no dispute that the current districts originate

2  from the maps drawn in 1992 arriving out of the *Wesch*

3  litigation.

4    The parties there agreed that, quote, a single member

14:20:53 5  significant majority 65 percent or more African-American

6  congressional district should be created.  That district was

7  District 7.

8    Mr. Randy Hinaman was the individual who drew the

9  challenged map here, and he also drew that map adopted in '92.

14:21:08 10  He worked on the 2000-cycle maps, and he drew the 2011 maps.

11    Mr. Hinaman admitted that race played a major role in the

12  design of District 7 in 1992.  Other than complying with

13  population requirements, race was his top consideration.

14    He drew District 7 in 1992 with the intent to make a

14:21:28 15  majority-black district, which he accomplished by assigning

16  counties in precincts with high concentrations of

17  African-American voters.

18    Mr. Hinaman also admits that the 2021 districts can be

19  traced back to these '92 districts with each successive map

14:21:43 20  preserving most and as much as possible those districts.

21    Representative Pringle agrees concerning District 7.

22    Even as to the 2011 plans, Secretary Merrill has stated

23  that Congressional District 7 appeared to be racially

24  gerrymandered.  Mr. Hinaman agreed with his assessment.

14:22:02 25    But the plaintiffs have also presented extensive expert

1   testimony of racial predominance.  Dr. Imai's one

2   majority-minority district simulation showed that the state's

3   decision to pack a number of black voters from Montgomery

4   County into District 7 made it a racial outline.

14:22:19  5       Now, the state was considered -- entitled to consider race

6   for VRA compliance.  But Dr. Imai's race blind maps rebut the

7   state's argument that race didn't play a role at all and

8   instead shows the predominant role did it play.

9       Dr. Williamson also found compelling evidence of racial

14:22:35 10  predominance with the three counties split in District 7

11  Jefferson, Montgomery, and Tuscaloosa and particularly the

12  manner of those splits.

13      Areas of those counties with higher BVAP were drawn into

14  Congressional District 7 with disproportionately white census

14:22:52 15  blocks within those counties drawn into other districts

16  creating a range of 25 to 45 disparities in those counties.

17      The racial predominance evidence in CD 7 is overwhelming

18  and unrebutted.

19      As to Districts 1, 2, and 3, the defendants correctly

14:23:07 20  contend that they've maintained the cores of these districts

21  since the '92 maps.

22      Yet in '92, the U.S. Attorney General objected to the

23  Alabama Legislature's plan, which they admit was quite similar

24  to the *Wesch* plan because it fragmented the rest of the black

14:23:24 25  population outside of District 7.  The AG noted a

1  predisposition on the part of state political leadership to

2  limit black voting potential to a single district.

3       Since then, despite black voters in these districts making

4  up around 90 percent of the Voting Age Population necessary to

14:23:42 5  form an entire congressional district, have consistently been

6  held at or below 30 percent BVAP since the '92 maps.

7       The racial heat map from defendants' own expert Mr. Bryan

8  demonstrates the way that the district boundaries slice through

9  the middle of black communities at every turn.  As you can see

14:24:02 10  from the added red lines, Districts 1, 2, 3, and 7, cut

11  directly down the middle of black communities in the Black Belt

12  that are excluded from District 7.

13       Dr. Williamson's analysis confirms this racial cracking

14  isn't due to geography or other factors.  He exposed that black

14:24:19 15  Alabamians are more likely to be diffused across districts in

16  the Black Belt than other regions using multiple measures of

17  analysis, and he showed that for Districts 2 and 3, counties

18  with higher black populations were more likely to border

19  another district, a hallmark of cracking.

14:24:35 20       Dr. Imai also showed likely racial predominance in

21  Districts 1, 2, and 3.  Even when drawn a majority-minority

22  district and considering Mobile and Baldwin and the Black Belt

23  as communities of interest, the second highest BVAP district

24  would tend to have a BVAP in the high 30s and up to 40 percent

14:24:55 25  as opposed to the state's cracking of black voters and

1    preventing any district above 30 percent.

2        Now, Dr. Imai's report shows nothing about the validity of

3    any illustrative plans, of course, because he did not take race

4    into account at all except for one-MMD.

14:25:12  5    Even though this is perfectly admissible under the

6    Fourteenth Amendment and necessary for VRA compliance.  What it

7    does show is isolating the extent of the state's use of race in

8    its maps and how it cracked the black community.

9        In response, the defendants rely on a few primary

14:25:30 10    arguments to try to avoid what the evidence shows.

11        First, they conflate the plaintiffs' racial gerrymandering

12    claim under *Shaw* with an intentional vote dilution claim to try

13    to impose a different standard of proof.  But *Shaw* recognized

14    this is an analytically distinct form of claim from a vote

14:25:46 15    dilution claim.  A racial gerrymandering claim doesn't require

16    an intent to disadvantage black voters, but only that the state

17    that has used race as a basis for separating voters into

18    districts as it said in *Miller*.

19        Second, defendants argued that their maps cannot be racial

14:25:57 20    gerrymanders where they prioritize preserving existing district

21    cores and ignored race while drawing the maps.  But in *North*

22    *Carolina vs. Covington*, the Supreme Court explicitly rejected

23    the argument that one can avoid racial predominance by

24    readopting cores of previous districts and not looking at race

14:26:19 25    when doing so.  And it explained that it didn't matter that the

1    claim arose in a challenge to remedial rather than original

2    districts.

3        The Supreme Court rejected the argument that preserving

4    cores prevented their challenge because the plaintiffs remained

14:26:34 5    segregated on the basis of race because of those lines the

6    state readopted.

7        It explained that it is the segregation of the plaintiffs,

8    not the Legislature's line drawing as such that gives rise to

9    the claims.  Just because a Legislature chooses to readopt

14:26:48 10   those lines does not mean those readopted portions are not

11   relevant.  The Courts in Alabama Legislative Black Caucus and

12   Clark vs. Putnam County found racially gerrymander districts as

13   well despite those districts preserving the cores of existing

14   districts.

14:27:03 15       Defendants were well aware of this racial history, and the

16   state even admitted that District 7 under the 2011 plan was a

17   racial gerrymander, yet they chose to di largely readopt these

18   lines in HB-1.

19       Third, defendants argue that Mr. Hinaman didn't look at

14:27:17 20   race while drawing the 2021 maps.  The Supreme Court in

21   Covington rejected the same defense.  As is true here, it did

22   little to undermine the evidence concerning the shape and the

23   demographics of those districts that the districts

24   unconstitutionally sort voters on the basis of race.

14:27:34 25       Even looking only at the new district lines shows racial

disparities.  The only analysis of those changes in the record

comes from Dr. Williamson.  And he showed that for Districts 2

and 3 black voters were moved out of those districts in much

higher percentages than they were moved in.

14:27:50    Finally, defendants cannot rebut plaintiffs' evidence of

racial predominance with any other factor.  Given that they

only changed the lines a little bit, minor changes to make a

district more compact or respond to incumbents would not

predominate.  Mr. Hinaman even testified in his deposition at

14:28:07  page 73 that requests for congressional representatives were

not major.

    Finally, a state's predominant use of race does not mean

the map is unconstitutional.  Instead, the state now carries

the burden to show that its separation of voters based on race

14:28:22  was narrowly tailored to serve the VRA, and it has not met its

burden here.

    In cases where the Court has found the state met this

test, the state made a strong showing of pre-enactment analysis

would justifiable conclusions.  A majority-black district is

14:28:38  constitutional even where race predominates so long as the

state had a good reason to draw it.  But narrow tailoring

District 7 required the state to assess performance in each

redistricting cycle.

    It's undisputed that the state never bothered to ask that

14:28:53  question or conduct any form of tailoring for District 7 here.

1          The parties agree that no racial-polarization analysis was

2    conducted for any congressional districts.  And Senator

3    McClendon testified that the state did nothing to ensure that

4    the BVAPs of such districts were not too high.

14:29:11 5          If defendants had performed a racially-polarized voting

6    analysis, it would have revealed a lack of narrow tailor.

7    Dr. Liu showed the districts just above 50 percent BVAP or

8    around 53 percent of black registered voters, as proposed in

9    Plaintiffs' Exhibit 1 maps, can perform for black voters, and

14:29:30 10   the VRA offers no safe harbor for cracking black voters among

11   Congressional Districts 1, 2, and 3.  Nothing in the VRA

12   requires or could require the state to keep the black

13   populations in those districts below 30 percent.

14          All of the evidence points to district lines in the

14:29:46 15   challenged districts that separate voters based on race and do

16   not do so in a narrowly tailored manner to comply with the

17   Voting Rights Act.

18          Because HB-1 violates Section 2 of the VRA and the

19   Constitution, the Court should order defendants to redraw the

14:30:02 20   congressional map to create two districts that allow black

21   voters to elect candidates of choice in a manner narrowly

22   tailored to comply with the VRA, such this map will satisfy

23   both the VRA and the Constitution.

24          Thank you, Your Honors.

14:30:18 25          JUDGE MARCUS:  Mr. Rosborough, I have two questions

1  for you.

2       You first, the same question I put earlier to

3  Mr. Blacksher.  The plan as adopted in '92 by the district

4  court in *Wesch* and approved by the Supreme Court on a summary

14:30:41 5  calendar, did that plan violate the Equal Protection Clause in

6  your view?

7            MR. ROSBOROUGH:  Your Honor, I don't necessarily -- I

8  don't think that that plan at that time it was enacted in 1992

9  violated the Equal Protection Clause.  I think the plan became

14:30:58 10  problematic because the state was required to assess the

11  districts with each districting cycle.  And over time, over the

12  last few decades, Alabama has changed.  And yet the state has

13  not performed that analysis.  It certainly hasn't done so in

14  this cycle or the last cycle.

14:31:17 15       And so that district very well may have been and likely

16  was narrowly tailored when it was put into place in 1992, but

17  it no longer is.  And that's an obligation the state has in

18  every cycle, and it ceased to do that here.

19            JUDGE MARCUS:  Second question, a different one.

14:31:36 20       You have presented two different theories traveling on two

21  different causes of action; Section 2 claim, which your

22  colleague has argued, and a constitutional claim.  For the

23  purposes of this preliminary injunction hearing, if you are

24  correct on the Section 2 claim, and I underscore if, would

14:32:05 25  there be any reason for this Court by your lights to address

1  the constitutional question during this preliminary injunction
2  proceeding?

3  MR. ROSBOROUGH:  Your Honor, I think the answer is no.
4  Any remedy for a Section 2 violation would have to be
14:32:27  5  constitutionally compliant.  And, you know, we think our two
6  theories are consistent with each other.

7  So to the extent the state -- to the extent the Court
8  finds the Section 2 violation, no, I don't think it needs to
9  address our constitutional theory.

14:32:40  10  JUDGE MARCUS:  The reason I raise the question, again,
11  assuming you are otherwise correct, which remains to be seen,
12  the reason I raise the question is because there is a long
13  standing doctrine in our court's history and the Eleventh
14  Circuit's history, the old Fifth Circuit history, and in the
14:33:02  15  Supreme Court to avoid constitutional questions, when you don't
16  have to answer them, and they might otherwise be resolved
17  through a statutory construction.  Is that the correct
18  application of that principle of constitutional avoidance in
19  this case?

14:33:21  20  MR. ROSBOROUGH:  I think it is, Your Honor.  If the
21  Court rules that the plaintiffs have likely established -- have
22  met their burden and the Court wants to issue a preliminary
23  injunction on the Section 2 claim, I think it would be
24  appropriate and permissible for the Court to avoid a ruling at
14:33:41  25  this time on the constitutional claim under the canon of

1    constitutional avoidance.

2         JUDGE MARCUS:  Conversely, if you were to lose on this

3    preliminary injunction on Section 2, then this Court would be

4    obligated to address the constitutional claim, correct?

14:33:59 5         MR. ROSBOROUGH:  I think that's exactly right, Judge

6    Marcus.

7         JUDGE MARCUS:  All right.  Thank you.  Judge Manasco,

8    any questions?

9         JUDGE MANASCO:  (Shook head.)

14:34:07 10         JUDGE MARCUS:  Judge Moorer?

11         JUDGE MOORER:  No questions.

12         JUDGE MARCUS:  All right.  We thank you.  The Milligan

13    plaintiffs have reserved five minutes for rebuttal, as well.

14         Mr. LaCour, I thought we would take a 15-minute break, and

14:34:21 15    then when we come back, we would be happy to hear your

16    argument.  You have a full 90 minutes toward that purpose.  You

17    can use as much or all of it as you see fit.

18         With that, we will be in recess for 15 minutes.

19         (Recess.)

14:48:43 20         JUDGE MARCUS:  I see Mr. LaCour.  Are counsel for the

21    plaintiffs present?

22         MR. BLACKSHER:  Singleton is here.

23         JUDGE MARCUS:  Thank you, Mr. Blacksher.  I see

24    Mr. Ross and Ms. Khanna, as well.  We are ready to proceed,

14:50:36 25    Mr. LaCour.  Thank you.

1849

1             MR. LACOUR:  Thank you, Your Honors.

2         This case represents an extraordinary attack on an

3     ordinary map.

4         We have here an equal protection claim that lacks any

14:50:52  5     mention of the current Legislature's intent, and we have a

6     Section 2 claim in which the plaintiffs themselves have proven

7     through two of their experts that you could not draw two

8     majority-minority districts if you drew based only on

9     traditional race-neutral districting principles.

14:51:09 10        So plaintiffs' equal protection claim fails because

11     traditional race -- redistricting principles were not

12     subordinated to race in the 2021 Legislature's map.  And

13     plaintiffs' Section 2 claims fail at *Gingles I* because in each

14     of their 11 illustrative plans, traditional redistricting

14:51:28 15     principles are subordinated to race.

16         But before I get into the merits any further, I did want

17     to touch on the fact that the burden is incredibly high here.

18     Not only are they seeking an injunction, which is an

19     extraordinary and drastic remedy in and of itself, they're

14:51:46 20     asking for what essentially would be a mandatory injunction

21     where the burden would need to be even higher on them.

22         Let me move to the other laptop closer.  Is this a little

23     bit clearer?

24             JUDGE MARCUS:  It is.  Thank you.

14:52:10 25             MR. LACOUR:  Thank you.

1    So we are talking a preliminary injunction which in and of

2  itself is an extraordinary and drastic remedy, what would

3  essentially be a mandatory injunction because the Legislature

4  would need to act to put in place new maps on a very expedited

14:52:31  5  time frame.  And then we're adjudicating a redistricting, which

6  the Supreme Court has repeatedly said is a serious intrusion

7  into the most vital of local functions.  There are complex

8  interplays here.  And in addition, you must presume the good

9  faith of the Legislature and exercise extraordinary caution

14:52:48 10  particularly when you are adjudicating racial gerrymandering

11  claims like those brought by the Singleton and by the Milligan

12  plaintiffs.

13    So I will turn first to the equal protection claim because

14  I do think some of the evidence you heard from the Milligan

14:53:04 15  plaintiffs actually benefits us tremendously when it comes to

16  the Section 2 claim.  So I will start with equal protection and

17  move to Section 2 after that.

18    But if the Court has any questions, I am not here to give

19  a monologue.  I would love to hear what is on each of your

14:53:21 20  minds and try to answer any questions you right have.

21    But again, evidentiary burden is particularly heavy for

22  the plaintiffs for a racial gerrymandering claim.  It is not

23  enough to merely prove that the Legislature was aware of race.

24  After all, the Legislature was, of course, aware that District

14:53:37 25  7 was going to contain at least one black woman, Terri Sewell.

 1   They knew that District 6 was going to contain at least one

 2   white man, Gary Palmer.  You have to show that race

 3   predominated, and that means that it subordinated traditional

 4   districting principles.

14:53:52  5       And in addition, keep in mind we are looking at the -- we

 6   are looking at intent of the Legislature, which any time you

 7   are dealing with any law, it's going to be a particularly

 8   difficult inquiry.  We are talking 35 Senators, 105 members of

 9   the House, the Governor, who signed this into being, and the

14:54:15 10  best intent -- the best evidence of intent of any law is to

11   look at the text.

12       Now, of course, the text here is a lot of coordinates.  So

13   I think looking at the map is particularly good evidence.  And

14   I will briefly share I think a map that everyone is well

14:54:32 15  acquainted with at this point.

16       If I can find it.  There we go.

17       So, again, this is the map that Tom Bryan prepared that

18   was part of Defendant's Exhibit 2, and this is page 52.  And as

19   we talked about a lot with a lot of witnesses this past week

14:54:55 20  and a half, this demonstrates some of the changes from the 2011

21   lines to the 2021 lines.

22       As we also establish through many witnesses and is evident

23   in a lot of the case law that we have cited in our PI response

24   that you will see in our findings of fact and conclusions of

14:55:13 25  law we submit Friday, it is a quite common thing for a

1  Legislature when it sits down to draw lines every ten years to

2  start with the previous map.  That's what we have here.  Again,

3  these light blue lines show where the changes were made from

4  the 2011 map to the 2021 map.

14:55:33 5      Now, the unrebutted testimony in this case from the map

6  drawer is that his goal was to start with the guidelines.  He

7  was handed the guidelines by the legislative redistricting

8  committee, which I will note, those were voted on by the

9  Legislature.

14:55:50 10      So it is a brief aside, but you heard some evidence or

11  testimony suggesting that the Legislature didn't have input and

12  that its process of drawing the map was outsourced to the

13  congressional district.  That's -- that's not true.  What

14  happened was you had a redistricting committee that came

14:56:08 15  together, that voted on and approved guidelines by an

16  overwhelming margin.  One of the Democrats who voted in favor

17  of these guidelines was none other than plaintiff Senator Bobby

18  Singleton.

19      So for him to come to this Court and express surprise that

14:56:26 20  we ended up with a map that retained the course of districts

21  that minimized population deviation down to one person one vote

22  and that it tried to minimize county splits and protect

23  incumbents while trying to be compact is -- it's not quite

24  unclean hands, but it's a little bit disingenuous.

14:56:47 25      In any event, turning back, it's clear how we got to where

1 we got in 2021 in district -- between Districts 2 and 3 here on

2 the eastern border of District 2.  You have a line where

3 Montgomery County -- split Montgomery County was taken away.

4 That's consistent with the guidelines to minimize splits of

14:57:09 5 counties.

6      You have -- if you are looking down between Districts 1

7 and District 7, you had the split of Clarke County closed off

8 to return all of Clarke County to District 7 and consistent

9 with that traditional race-neutral districting principle.

14:57:27 10      Then if you look up to District 7 on the north side, as

11 Mr. Hinaman explained is undisputed here, District 7 was lower

12 on population when compared with the other districts by about

13 53,000 people.  We needed to find 50,000 -- 53,000 new people

14 to add to District 7, and he did consistent with the guidelines

14:57:54 15 that says how to draw compact districts was to make this a far

16 more regular district.  By this line here that you are looking

17 at, the former line of District 7 going into Jefferson County

18 was far more narrow, for less regular and instead he broadened

19 that out.

14:58:15 20      Now, that required taking away some of the northern tip of

21 that line, and as a result, there was some population from the

22 Homewood area was moved from District 7 -- District 6, rather,

23 into District 7.  And then finally, to equalize population and

24 to get more population, they had to go to another

14:58:37 25 population-dense county that had already been split.  That was

1   Tuscaloosa County, around here.

2        I will return to this in a moment when we talk about

3   Dr. Williamson, why his analysis really is -- easily has no

4   bearing on the ultimate issue of whether race predominated in

14:58:57 5   this map.

6        But --

7             JUDGE MARCUS:  Can I ask you a question about that

8   map?

9             MR. LACOUR:  Yes, Your Honor.

14:59:05 10             JUDGE MARCUS:  When the map was drawn in '92, it's

11   clear that that thumb sticks all the way into Jefferson County

12   and places it in District 7, and pretty much everybody

13   including the cartographer, Mr. Hinaman, has said that that was

14   done for a predominantly race-based reason, that is to say, to

14:59:31 15   create one majority-minority district.

16        I think I have those facts right on that, right?

17             MR. LACOUR:  Yes, Your Honor.

18             JUDGE MARCUS:  Did race predominate when they drew the

19   map in '92?

14:59:46 20             MR. LACOUR:  Yes, it did.  But that only gets you to

21   the second step of scrutiny.

22             JUDGE MARCUS:  Correct.  So get me to the second step,

23   if you would.

24             MR. LACOUR:  Yes.  And so I do want to be clear.  Our

15:00:00 25   argument here is not that the VRA justifies the drawing of this

1  map in -- drawing of CD 7 currently.  At least, that's not an

2  argument we have developed at this point.  Our argument is that

3  this is not a map in which race predominates, because a law

4  that happens to look a lot like another law from the past could

15:00:22  5  be passed for entirely different reasons.

6      What's relevant is not the intent of the 1992 Legislature,

7  or to be more accurate, the 1992 three-judge court that

8  ultimately ordered this map into effect.  What's relevant is

9  the 2021 Legislature.

15:00:40 10      That's what the Court said -- the Supreme Court said in

11  *Abbott vs. Perez*.  There you have a 2011 map of the Texas

12  Legislature that was deemed unlawful, a new map was put in

13  place by a court, by the three-judge court at issue there for

14  the 2012 elections, and then in 2013, you had the Legislature

15:01:02 15  enact a new map that looked a lot like the court-ordered map.

16  And then when the district court later reconsidered, said,

17  well, you didn't sufficiently purge the discriminatory intent

18  from the map that we had ordered you to conduct your election

19  on, on an interim basis, the Supreme Court said, well, no, the

15:01:22 20  2011 Legislature's intent is not the relevant inquiry here.  It

21  is the 2013 Legislature's intent.

22      And I take the point from the Milligan plaintiffs that --

23  I believe the Singleton plaintiffs, too, that was an

24  intentional vote dilution claim and not a racial gerrymandering

15:01:36 25  claim.  But both of those are products of the Equal Protection

1   Clause.  And to state a claim under the Equal Protection Clause
2   you have to show intent.  Whose intent?  The intent of the
3   actor whose law you are challenging.
4       If I took one of my son's puzzles that had -- alphabet
15:01:54 5   puzzles, and I threw it up in the air, and at random, a couple
6   of words were spelled, I didn't intend to spell the words.
7   That was done at random.
8       Similarly, there could be very different -- but if I
9   purposefully arrange the letters to spell a word, there is
15:02:10 10  intent behind that.
11       And so then we have to ask, well, what was the intent that
12  led to this act, Act 2021-555?  And we have excellent evidence
13  to show the race-neutral reasons that produced this map.  It's
14  there in the guidelines that plaintiff Singleton voted for.
15:02:31 15  It's there.  It just jumps off the face of the map if you look
16  at it.
17       And we are not really getting any sort of -- I mean, there
18  wasn't really any sustained argument against that, other than
19  the statistical analyses that you heard about from Drs.  Imai
15:02:48 20  and Dr. Williamson.  And I am happy and eager to address those
21  in a minute.
22       And then this idea that there is some affirmative
23  obligation for the state to purge a gerrymander.  But that's
24  directly contrary to *Abbott*.  It's also directly contrary to
15:03:05 25  *Cromartie*, which a case we cited right there, page 1 of our PI

```
 1   response.  And I will find the exact quote, if you have just a
 2   moment.  But it's Easley v. Cromartie, 532 U.S. at 249.  And
 3   what the Supreme Court said was, the Constitution does place an
 4   affirmative obligation upon the Legislature to avoid creating
 5   districts that turn out to be heavily even majority-minority.
 6        So if you follow traditional districting principles, you
 7   are fine.  And that's exactly what we have here.  That's black
 8   letter law.  And I have not seen an answer to it from any of
 9   the plaintiffs in the three reply briefs that we got.
10        Similarly, like Miller vs. Johnson said that adhering to
11   traditional districting principles instead of creating as many
12   majority-minority districts as possible does not support an
13   inference that the plan discriminates on race.
14        So it's not enough for them to come here and say that
15   there's more we could have done equal to lower the Black Voting
16   Age Population, because the Equal Protection Clause does not
17   put some sort of racial ceiling on a district.
18        I think Cromartie says quite to the contrary.  And if we
19   were to go about unpacking, I think that would be a much more
20   race-conscious action.  I think what they are -- what the
21   Singleton and Milligan plaintiffs are demanding of us raises
22   far more Equal Protection Clause issues than what the
23   Legislature did here, which was draw lines race neutrally, come
24   up with race-neutral districting guidelines, hand them over to
25   the map drawer, and expressly tell them, draw maps on a
```

race-neutral basis, and all of the testimony is that that is

exactly what he did.  That is how the map appears, as well.

They have not pointed to changes in the map that would

suggest that they were done for some racial purpose.  And if

you look at the White Voting Age Population, the trends there,

1992, I believe it was around 63 percent of Black Voting Age

Population.  Then you move to 2011, we were sitting around

60 percent.  If you move to 2021, we're down to 54 percent.  If

we're trying to pack, we are doing a pretty bad job of it.  But

the answer is, is like there was this intervention in Alabama

political history in 1992 that produced this map.

But there's no equal protection obligation to keep an eye

on racial demographics and make sure that we undo it at just

the right moment.  And that's for the import of the position

that's being pushed by Singleton plaintiffs and by the Milligan

plaintiffs.  But it's, again, directly contradicted by cases

like *Easley vs. Cromartie* and *Abbott vs. Perez*.

JUDGE MARCUS:  I think you have answered my question.

Thank you.

MR. LACOUR:  Excellent.

Then I will turn briefly to Dr. Williamson's analysis and

why it proves nothing in this case.  Really, for a similar

reason to Dr. Imai's, neither of them started with the prior

map.  Their analysis was based on a fanciful premise that there

was a blank slate and said if Alabama were to draw a map

1  starting at year 0, Alabama has a completely blank map other

2  than some county lines, I suppose, and they were to draw a

3  line, and they were to draw lines for the first time ever, you

4  wouldn't expect to see splits in CD 7 and in CD 2 and in CD 3.

15:06:51 5     Well, while professors might draw maps on blank slates,

6  that's not what legislatures do, and that's not what the

7  Legislature did here either.  So that the obvious alternative

8  explanation to borrow language from *Iqbal* for why there are

9  splits in Tuscaloosa County and in Jefferson County and in

15:07:11 10  Montgomery County, is because they were already there.

11     And so unless there is some sort of new affirmative

12  obligation to every ten years try to unpack minority voters

13  through some race focused process, under the Equal Protection

14  Clause, which would be, again, very bizarre, his analysis

15:07:34 15  really shows nothing.

16     And then he talks about the fact that some of the voters

17  who were being added to District 7 were more likely to be black

18  voters than those who are being taken out, and I will pull up

19  the map one more time we were just looking at just to sort of

15:07:53 20  underscore why that is through a flawed way to look at things

21  or give to give the obvious alternative explanation.

22     So you have got some voters here between Districts 7 and

23  4.  This is Tuscaloosa County.  And you see that blue line.

24  Well, the reality is, I mean, District 7 has a population of --

15:08:15 25  a black population percentage of about 54 percent.

1    So most places you go in District 7 are going to have the

2    substantial black population, and most places just across the

3    line into District 4 are going to have a somewhat similar black

4    population percentage.  So we couldn't -- because of

15:08:35 5    contiguity, we couldn't just jump over south Tuscaloosa County

6    and go pick up voters from the more predominantly white part of

7    Tuscaloosa.  And so that's again another obvious alternative

8    explanation there.

9    Similar issue if you look down to Districts 2 and 3, we

15:08:52 10    were closing off Montgomery, and when you do that, like you're

11    going to pick up people based on whoever happens to be in that

12    part of Montgomery.  Going back down to closing the county

13    split at Clarke County between 7 -- District 7 and District 1,

14    and Clarke County is a Black Belt county.  And when they close

15:09:14 15    that split you get down to the minimal number split of six, you

16    heard about when Dr. Duchin was testifying that was an easy and

17    obviously to do that.

18    So, again, I don't think his analysis sheds any light on

19    the real world reasons why the scores of legislators who voted

15:09:36 20    for Act 2021-555 decided to vote for this particular piece of

21    legislation.

22    Now, turning to Dr. Imai, this is where it really gets

23    fun.  Dr. Imai ran 10,000 -- Dr. Imai was the expert if you

24    recall who had his algorithm that could produce thousands and

15:10:07 25    thousands of maps.  And what he testified to was that he

1    programmed in to his algorithm -- and I will try not to read,

2    but I think I want to make sure I really get this -- really get

3    this right.

4        So here's how the Milligan plaintiffs describe what

15:10:29  5  Dr. Imai did.  This is coming from Milligan docket entry 69,

6    page 26, if you look at the ECF pagination.  They said, quote,

7    he created an algorithm that produced 10,000 simulated plans.

8    His race-neutral simulation drew maps that followed the stated

9    guidelines of creating seven contiguous districts keeping

15:10:50 10  population deviations to a minimum and never above .5 percent

11   developing districts that are reasonably compact, respecting

12   county boundaries where possible, and avoiding incumbent

13   pairings.

14       Then what the Milligan plaintiffs describe as their

15:11:05 15  striking finding is that of the 10,000 generated districts, not

16   a single simulated plan had a BVAP as high as District 7.  BVAP

17   being Black Voting Age Population.

18       What I would note for this Court is that it appears that

19   none of the 10,000 maps included even one district of

15:11:24 20  50 percent Black Voting Age Population, and in the Milligan

21   plaintiffs' view, they said, quote, this alone shows that HB-1

22   used race as a predominant factor.

23       Now, I will return to that in just a moment.  Let me first

24   explain why that's wrong as to HB-1.  It's wrong to HB-1 for

15:11:44 25  the reasons Dr. William's analysis is completely flawed, too.

1  Dr. Imai said he could have factored in core retention to his

2  algorithm.  He could have included an additional traditional

3  districting principle.  He decided not to.  Maybe if he had

4  included it, his analysis might have shed a little bit of

15:12:05  5  light.  But I think he said he wouldn't have really been able

6  to tell if race was doing anything if you had included the

7  cores of the previous districts.

8       So, again, if you start with a fanciful premise of the

9  blank slate map draw, you are going to get irrelevant results.

15:12:22 10      But interestingly, even when he's not constrained by core

11  retention, which means he has more discretion, he has more

12  ability to go out and find majority-minority districts,

13  consistent with traditional districting principles except for

14  one that he sort of arbitrarily decided to scrap, he still

15:12:41 15  couldn't find even one 50 percent BVAP district much less two.

16      And that is critical when we move to the *Gingles I*

17  analysis because what plaintiffs have essentially done -- if I

18  was the Caster plaintiffs, I might be a little upset with

19  Milligan plaintiffs at this moment, but what they have done is

15:13:01 20  they have shown to almost a mathematical certainty that if the

21  Alabama Legislature had sat down with Dr. Imai's algorithm and

22  said, let's figure out if it's possible to find a second

23  majority-minority district in Alabama, let's draw 10,000 maps

24  that all comply with our traditional nonracial districting

15:13:22 25  criteria, not one of them would have even one majority-minority

1  district much less two majority-minority districts.

2       It follows -- and then Dr. Duchin does one better.  She

3  said when she ran her algorithms, the algorithms she ran to get

4  her maps here, she made it a non-negotiable factor that there

15:13:46 5  be two minority-majority districts.  So wherever any

6  traditional districting criteria came into conflict with race,

7  race was going to have to predominate.

8       And we heard individual testimony -- testimony from her

9  and Dr. Cooper saying -- not from Dr. Cooper -- from Mr. Cooper

15:14:00 10  rather that there were times when they were looking to split

11  precincts and decided to do it on a racial grounds to make sure

12  that they kept hitting the racial targets to make sure they

13  keep sorting voters based on race.

14       But Dr. Duchin said she ran 2 million maps in Alabama with

15:14:20 15  traditional districting criteria, albeit not core retention,

16  and so, again, she was freer than our Legislature would have

17  been to see what was out there in the world of race neutral but

18  otherwise traditionally drawn maps.  2 million maps, and not

19  one of them had two majority-black districts.

15:14:40 20       What that means is race necessarily has to predominate if

21  you are going to get a second majority-black district in

22  Alabama.  And if that's the case, I ask you to put yourself in

23  the shoes of the Legislature.  They run their 2 million maps.

24  They're trying do their best to comply with Equal Protection

15:15:02 25  Clause and comply with Section 2 of the VRA.  They see that it

1    is -- you can't even get a one in a million map, not even a one

2    in two million map, that has a second majority-black district

3    consistent with the guidelines.

4        So then it would fall to them to decide, okay, which

15:15:21  5    guidelines should we toss in favor of race?  Core retention,

6    out the door.  Incumbency protection, out the door.  Which

7    should we compromise in favor of race?

8        Well, compactness.  We know compactness was compromised

9    because if you look at our District 2 in the 2021 map, and you

15:15:36 10    look at their District 2, their Districts 2 do bizarre things

11    and stretch -- they split Mobile and stretch from Mobile all

12    the way to Russell County on the Georgia border.

13        Compromise at least in three of Dr. Duchin's maps on

14    county splits where she had seven, eight or nine splits instead

15:15:54 15    of six.  And I think you can look at her maps and the racial

16    heat maps and see exactly why she was doing that.

17        So then the question is, like, what is the Legislature

18    supposed to do?  And then second, I mean, how is the

19    Legislature supposed to know which traditional race neutral

15:16:13 20    districting criteria they are supposed to scrap in favor of

21    race, how many of them they are supposed to scrap, and how much

22    should race predominate in the districting process such that

23    they can comply with Section 2, but they're not violating the

24    Equal Protection Clause?

15:16:31 25        And then, I mean it's an unhappy task for you all because

how are you all supposed to decide when the Legislature has
struck that racial balance correctly?  And I don't think -- I
don't think there is a judicially manageable principle that
would allow you to do that.  I mean, look back at *Rucho vs.*
*Common Cause* just from 2019.  That was the end of the long
journey to try to find a judicially manageable principle to
determine how much partisanship was too much in a redistricting
process.

And the Court finally said like, look, we just cannot
figure this out, there is not a good way to do it.  How much
more so when you have got equal protection overlays factored in
here, how much -- how much should race predominate over
traditional districting principles?  And we would contend that
the Court has already answered that and said none.

What Section 2 demands of a plaintiff trying to establish
that there is a reasonably compact district out there is that
they need to show consistent with traditional race-neutral
districting principles, you could draw that additional
majority-minority district.

And I think that's pretty clearly established from the
extensive litigation in the 1990 s over Georgia's maps.  And
excuse me for just a second.

So if you will recall, there was a sort of a trilogy of
cases and I think if you are looking for some of our like --
cases that are really resolve this -- one of the cases that

really resolves this would be that *Miller*, which is the '95

U.S. Supreme Court case, then *Johnson*, which is the remand to

the Southern District of Georgia, followed by *Abrams* which

affirmed -- which affirmed in *Johnson*, which affirmed the

*Johnson* decision.

And -- and it was interesting a moment ago counsel for

Milligan was referencing the 1992 DOJ objection to Alabama's

plan and was saying, like -- I guess it is evidence that

Alabama could have drawn a second majority-black district and

then really should have, and there was something sort of

suspicious that Alabama didn't do that in 1992.

Well, look at the *Miller vs. Johnson* case because what

happened to Alabama there is exactly what happened to Georgia,

where Georgia had just gone from 10 districts to 11 districts

after the 1990 census.  And Georgia, just like Alabama today

had 27 percent black population.  And the Georgia Legislature

looked everywhere to try to find a second majority-black

district.

They had one that was sort of centered around Atlanta.

They were looking around to try to draw a second that was

consistent with their traditional race-neutral principles.

They came up with a map, sent to it DOJ, and DOJ said, no.  We

have a max-black policy.  You need to draw three districts, not

just two, because three will get you to proportional

representation, 27 percent, which if that sounds familiar,

that's essentially what the plaintiffs are asking for here is

proportional representation despite the fact that Section 2

expressly says, nothing herein shall guarantee a right to

proportional representation.

15:19:52   But, anyway, returning back to Miller, Georgia finally got

the message.  They drew their three majority-minority

districts, hit that proportional representation target, but

they had subjugate traditional race-neutral districting

principles to do that.  And then they got sued under Equal

15:20:12 Protection Clause claim, and the Supreme Court in *Miller* said

that they did violate the Equal Protection Clause, and the case

got remanded back to *Johnson* -- or back to the district court,

which then produced the Johnson opinion.

And the three-judge court there ultimately had to draw

15:20:29 maps itself because the Georgia Legislature dead locked and

couldn't pass a map.  And I think what the Court did there

should be very instructive for this Court, too.  They looked at

traditional districting principles of Georgia.  One of them was

that was Georgia had a long tradition of having a district in

15:20:48 each of the four corners of the state.

Of course, here in Alabama, we have a long tradition

dating back to at least the '70s of having a southwestern

district anchored by the Gulf, a southeastern district anchored

by the Wiregrass, and a northern District 5 that runs through

15:21:05 Tennessee Valley.

1    They also looked at the tradition of having a

2  majority-black district -- or anchored by Atlanta -- looked at

3  some of the other traditional districting principles, I believe

4  core retention was mentioned, and then ultimately said as part

15:21:22  5  of its Section 2 compactness analysis, we can not even draw a

6  second compact majority-minority district.

7    Again, despite the fact they had 27 percent just like

8  Alabama today, and they have 11 districts to work with, not

9  just 7, they said, we cannot consistent with Section 2 draw a

15:21:42 10  second majority-minority district.  If you look at -- and this

11  is what they said.  If you look at nonracial factors, it is

12  just not going to be doable.  And that was a ruling.  They

13  approved new map that had only one majority-black district, and

14  that got taken up, and the Supreme Court cited -- had to

15:22:01 15  consider whether the Section 2 analysis was correct, and the

16  Supreme Court affirmed, and that's when the Supreme Court said

17  Section 2 does not required a state to draw a predominantly

18  nonracial lines a map that is not reasonably compact.

19    What that means is you start with traditional race-neutral

15:22:18 20  districting principles.  And race cannot predominate.  That

21  does not mean Section 2 is not going to do anything.  I'm sure

22  you will hear that from Caster plaintiffs and the Milligan

23  plaintiffs when they beam back in, in just a little bit.

24    But I think, Judge Marcus, you referenced *LULAC* a moment

15:22:38 25  ago.  I think *LULAC* is a great example of where Section 2 can

1    really do some work in a vote dilution case without requiring a

2    state to subordinate traditional race-neutral districting

3    principles to race in its redistricting process.  There you had

4    District 23 and District 25 at issue.

15:23:05 5        District 23 is interesting in that it had a -- it had

6    52 percent Latino CVAP there.  They had a sufficiently compact

7    majority-minority population that came up just shy of Alstein

8    (phonetic), an incumbent.

9        When the Texas Republican party took back the House and

15:23:29 10   the Senate, they did a they redrew the lines, and they pulled

11   100,000 Latinos out of District 23, and they plugged 100,000

12   Anglo-Texans into District 23 to try to protect the incumbent.

13   And what the Supreme Court said there was, well, clearly

14   there's a compact district.  And we know it is a compact

15:23:53 15  distract -- that you could draw a compact District 23 that had

16   a majority-minority population because it was already there.

17   It had been there before.

18        And so Section 2 did some work in that instance and -- and

19   what Texas did there was deemed to be violative of -- violative

15:24:12 20  of Section 2.

21        Now, in that same case, you had District 25 at issue.  And

22   the reason District 25 got drawn was because Section 5 was

23   still in effect at the time in Texas.  And Texas sort of undid

24   this Latino opportunity district in 23, in order to satisfy

15:24:31 25  preclearance, they drew a new Latino opportunity District 25.

1  Now, the problem was kind of like plaintiffs' District 2

2  in this case, they were combining disparate minority

3  populations.  They started around the Rio Grande.  They

4  stretched north and kept whole counties.  It's not that

15:24:51 5  terrible of a looking district, but stretched all the way up to

6  Austin to pull in Latino voters from Austin.  And the fact that

7  these voters in Austin and these voters on the Rio Grande both

8  wanted to elect Democrats wasn't enough to make them part of

9  one big community of interest.

15:25:07 10  The -- Justice Kennedy's opinion is clear.  You can't just

11  assume from a group of voters' races they think alike and share

12  the same political interests and prefer the same candidates.

13  JUDGE MARCUS:  Let me ask you about that case, if I

14  can for a moment.

15:25:24 15  MR. LACOUR:  Absolutely.

16  JUDGE MARCUS:  The problem there as you have pointed

17  it out, and the Supreme Court highlighted it in Justice

18  Kennedy's opinion was that the Legislature took a certain

19  portion of the Hispanic population found in Austin, Texas, and

15:25:42 20  combined it with a certain portion of the Hispanic population

21  300 miles away on the Texas/Mexican border.  And there was

22  nothing apparently that tied the interests of the folks they

23  took from Austin to the population they combined it with on the

24  Mexican/Texas border.  That was the problem.  It was a big

15:26:13 25  elongated district, covered a whole lot of geography, and like

```
 1  a bar bell on each end, you had disparate Hispanic communities.
 2  That would be a fair description of what was going on and what
 3  troubled the Court there.  Do I have that right?
 4            MR. LACOUR:  Yes, Your Honor.
 5            JUDGE MARCUS:  I want you to help me with the
 6  comparison to this case.
 7       The plaintiffs say the difference here is, one, the
 8  district isn't as big elongated.  It's nothing like 300 miles;
 9  and, two, that the African-American population is equally
10  distributed throughout that entire rectangular shape; and,
11  three, that there is a recognized community of interests in
12  that district.
13       Are those observations accurate, and do they fairly
14  distinguish LULAC from this case in your view?
15            MR. LACOUR:  I don't think their observations are
16  accurate.  First of all, note, everything is bigger in Texas.
17  It makes sense they will be able to stretch their districts a
18  little bit bigger than we might be here.
19       I think the districts they have draw here are still like
20  incredibly unusual in how they stretch from Mobile all the way
21  to the Georgia border.
22       In fact, if you look back at the Wesch decision from 1992,
23  the Court ultimately was trying to decide between two different
24  plans -- the Reed Plan and the Pierce Plan.  Ultimately,
25  decided against the Reed Plan, in part, because it was going to
```

1    split Mobile and stretch all the bay to Georgia, and the Court

2    said that's not compact.  The Court also said it's going to

3    scuttle the core retention of existing Districts 1 and 2, and

4    that's as a result, it's going to do a poor job at preserving

15:28:12   5    communities of interest.

6        So we don't just make this up yesterday.  This is

7    something a court in Alabama recognized 30 years ago.  But to

8    return more to your question, one, I don't think their plan is

9    really all that focused on that community of interest of the

15:28:31   10   Black Belt.  And this is something I really want to make sure

11   is abundantly clear for the record.  There are just fundamental

12   misstatements about what their plans and our plans do with the

13   Black Belt.  Both Caster and Milligan state that we split the

14   Black Belt counties among four districts.  That's not true.  We

15:28:51   15   split among it three.

16       In the Caster reply, they state they put all the Black

17   Belt counties into one district.  That's flatly false.  They

18   split into three districts just like we did.

19       Similar, the Milligan plaintiffs assert that one of their

15:29:04   20   plans puts all 18 of their Black Belt counties into just two

21   districts.  That's not true either.  That's Plan D.  If you

22   look, part of Pickens County is in a third district.  So I

23   think all the plans in terms of keeping Black Belt counties

24   together do about the same.

15:29:21   25       Most counties of the Black Belt are in just two districts

1  in our plan and in the illustrative plans, but each of the

2  illustrative plans and our plan has at least one if not two

3  that stretch into a third district.

4      So -- and I don't think that was necessarily a conscious

15:29:40  5  misrepresentation by the plaintiffs, but I do think it

6  underscores the risks of trying to adjudicate such complicated

7  factual and legal issues on such a short basis that things like

8  that can be missed.  But I will return to the equities later.

9      Getting back to communities of interest.  I think the way

15:30:00  10  they have tried to define communities of interest is to

11  basically make it synonymous with race.  And I think LULAC

12  talks about the fact that there are nonracial communities of

13  interest.  And if you are allowed to just paper over that and

14  make communities -- define community of interest so broadly as

15:30:20  15  to really be tantamount to race, then you have -- like I think

16  you start to create equal protection violation -- equal

17  protection questions within Section 2.

18      And I mean, think about it this way, as well:  I mean, it

19  would invite legislatures to engage in packing and to bless

15:30:37  20  that packing.  This isn't racial gerrymandering.  We are just

21  putting all the black people who are all part of one big

22  community of interest into one big district.  I mean, that's

23  not racial.  That's just communities of interest, you guys.  I

24  mean, that clearly cannot fly.  The Court should be very

15:30:56  25  cautious before embracing a theory like that.

1    Moreover, Dr. Duchin said her goal wasn't just to pair

2  communities of interest or pair Black Belt counties together

3  within districts.  It was expressly to put them into

4  majority-black districts, and I'm not aware of any traditional

15:31:15  5  districting principle that would say it's vital not only to

6  keep communities of interest together, but to make sure they go

7  into certain racially composed districts.

8    I mean, Mountain Brook is a like famous community in

9  Alabama.  It's predominantly white.  It has its own school

15:31:34 10  system and shops and other things that I am sure people find

11  sort of unique and special about it who live there.  If the

12  Legislature said it's really important that we put Mountain

13  Brook a majority-white district and pair them with suburbs of

14  Huntsville, I mean, that would be an obvious equal protection

15:31:51 15  violation right there.

16    And I don't think there's any -- anything really that's

17  better about the particular proposal being pitched by the

18  plaintiffs in this case.  I mean, certainly I don't think they

19  have done must have much to establish some connection between

15:32:08 20  the Black Belt and Mobile.  And you heard from plaintiff Dowdy,

21  she said, my great, great, grandparents migrated to Mobile from

22  the Black Belt.  But she also has family in Huntsville and

23  family in Birmingham.  And I am sure she has cousins elsewhere

24  in the state and possibly elsewhere.

15:32:22 25    There are plenty of African-Americans who left the Black

1   Belt at some point for Chicago and for Detroit through part of

2   the great migration.

3       I don't think they're part of a community of interest with

4   anybody in Lowndes County or in Barbour County.

15:32:38  5       So and finally, and we have communities of interest that

6   we have proposed that really can be kept --

7           JUDGE MARCUS:  Can I ask you -- before you go on to

8   those communities of interest, I take it you agree that there

9   is fairly defined a community of interest that comprehends the

15:33:05  10  Black Belt, however you define that geographic mass, right?

11  You agree with that?

12          MR. LACOUR:  I think there's certainly evidence that

13  the Black Belt has unique aspects that could constitute a

14  community of interest.

15:33:20  15          JUDGE MARCUS:  The reason I asked is we have said it

16  in opinions that the Black Belt constitutes a community of

17  interest, not the only community, but a community of interest.

18  And I just want to ask you whether you agree with that or you

19  think that's not so?

15:33:39  20          MR. LACOUR:  I would not dispute what this Court has

21  said.

22          JUDGE MARCUS:  And it would be marked by rural

23  agrarian rooted in the soil -- richness of the soil, et cetera,

24  that would constitute a community of interest, right?

15:33:59  25          MR. LACOUR:  Yes.

1  JUDGE MARCUS:  How far would that community of

2  interest extend as you see it?  What would be bounded within

3  that community?  18 counties or something less?

4  MR. LACOUR:  I think we have...

15:34:16  5  JUDGE MARCUS:  Or something more.

6  MR. LACOUR:  Stipulated to 18 counties that go from

7  Pickens over to Barbour and some of those counties in between.

8  JUDGE MARCUS:  Thanks very much.  I didn't mean to cut

9  you off.  And you were about to turn to the Gulf Coast

15:34:34  10  community of interest, I think.

11  MR. LACOUR:  Yes.  I will note that these communities

12  of interest are not new inventions of the state.  I mean, they

13  are -- you can see them if you look back at the maps from the

14  1970s.  You can see them referenced expressly in the

15:34:57  15  three-judge court's decision in *Wesch* in 1992.  And you heard

16  from former Representative Byrne today, and it was also his

17  testimony in the record from *Chestnut* litigation, former

18  Representative Joe Bonner's testimony, as well, about the

19  unique interests there.

15:35:14  20  We have heard as well from plaintiffs, like plaintiff

21  Shalela Dowdy who said, yeah, there are a lot of people from

22  Washington and Monroe County that go down to the port for work

23  and to shop.  And that's not true of people who live almost in

24  Georgia.  And counties themselves -- I mean, Dr. Davis talked

15:35:34  25  about the importance of counties in and of themselves as sort

1  of an organizing principle for people.  All those get blown up

2  by any of the illustrative plans.  There's no plan that's been

3  produced that could keep Mobile County whole, that could avoid

4  dividing it up from Baldwin County, and through combining it

15:35:58 5  nearly all the way across the state.

6      And I mean, when Representative Byrne was talking about

7  the difficulties of presenting a place like -- I mean, really

8  has echoes in the LULAC decision.  I will quote it for you.

9  This is 548 U.S. at 434.  And the practical consequence of

15:36:19 10  drawing a district to cover two different communities is that

11  one or both groups will be unable to achieve their political

12  goals.  Compactness is, therefore, about more than, quote,

13  style points, closed quote.

14      And I think that's exactly what you were hearing about

15:36:36 15  today from the Representative, that -- and he's explained why

16  it's important to have a district sort of anchored by the Gulf

17  and anchored by the port both for everyone who lives within

18  that district, and those now five counties, also for the entire

19  state.  If the port is strong, it is our avenue -- it's

15:37:00 20  Alabama's avenue to the world.  If the port is strong, then

21  that is going to be -- that's going to go down to the benefit

22  of every Alabamian.  I think that's the testimony of

23  defendants' witnesses and many of plaintiffs' witnesses alike.

24      I note -- I know plaintiff Dowdy said multiple times,

15:37:17 25  what's good for the port is good for all of Alabama.  And we

1  would not contest that in any way.

2       I mean, if you look at some of the other problems with

3  their -- with their maps -- and we can -- I am happy to talk

4  more about with the mathematical impossibility of their map.  I

15:37:36 5  think it was briefly referenced by Milligan's counsel after

6  talking about Imai and saying Imai's evidence is somehow

7  striking and proves racial predominance in our maps, but has

8  nothing to say about the illustrative plans.

9       I don't really understand that.  Unless, again, their

15:37:56 10  theory is there is a traditional redistricting principle that

11  basically -- I mean, I think the approach is one that like is

12  fundamentally circular.  They would allow a Section 2 plaintiff

13  to prove that it is possible to compose a district in

14  accordance with traditional districting principles by relaxing

15:38:22 15  or ignoring them, which is what their plaintiffs did to form

16  the maps that they formed in this case.

17       I mean, they, again, they scrapped core retention.  They

18  said, that's too hard.  It's impossible is what Dr. Duchin

19  said.  I think Caster counsel said something to that effect a

15:38:41 20  moment ago.  They -- no mind to incumbency protection except in

21  one of the 11 maps.  Their District 2 is far less compact than

22  our District 2.  And as a result, the District 1 is far less

23  compact.

24       We talked brief about communities of interest and how they

15:38:57 25  dread many long established and many judicially recognized

communities of interest.  And I mean, Dr. Duchin testified

about the extra county splits and how she had a nonnegotiable

principle of making sure she hit her racial targets.

I mean, if a state came and said we had a nonnegotiable

principle of hitting nonnegotiable targets, we know what would

happen.  It would lose equal protection claim.  That's what

happened in the *Cooper* litigation.

So I did want to touch on something.  There was a

suggestion that the *Davis vs. Chiles* case somehow undercuts our

argument.  I think quite the contrary.  *Davis vs. Chiles* --

Chiles is C-H-I-L-E-S, and I apologize for quoting.  139 F.3d

at 425 and then at 426.

What the Eleventh Circuit said was, Our precedents require

plaintiffs to show that it would be possible to design an

electoral district consistent with traditional districting

principles in which minority voters could successfully elect a

minority candidate.

Now, the problem there was that the district court said,

oh, well, the map drawer knew that race was -- he knew what the

race was of these two districts that he drew.  And if a

Legislature did that and picked those maps because of their

racial breakdown, that would be an equal protection problem,

and, therefore, this fails.  But that was not -- what the Court

explained was that's not the way to look at this.

They did explain like, and I will quote this, Certainly

1  race was a factor in various process -- he was a map drawer --

2  of designing the proposed subdistricts.  But he testified that

3  it would have been difficult for him to have drawn some

4  districts for the Second Circuit and the Leon County courts

15:41:01 5  without creating at least two new majority-minority districts.

6      And the Court said, absent some evidence belying Terry's

7  characterization of his design process, Chiles cannot rely

8  solely on criticism of Terry's motivations, blocked Davis'

9  proposed remedies.

15:41:17 10      So I think what this drawing suggests is Mr. Terry here

11  had to compromise traditional nonracial districting principles

12  and subordinate them to race, then plaintiffs' claims would

13  have failed at *Gingles* 1 in *Davis vs. Chiles*, too.

14      And so I think an interesting way to think about it --

15:41:37 15  let's imagine Dr. Imai had done his analysis the right way,

16  which meant including also including core retention in the

17  algorithm, and he produced this 10,000 maps.  5,000 of them had

18  one majority-minority district, 5,000 of them had two

19  majority-minority districts -- well, all consistent with

15:41:57 20  traditional redistricting principles.

21      I am not sure if absent the VRA, the Legislature could

22  say, well, we want the one with two majority-black districts

23  just because of equal protection issues, although perhaps

24  because race might not predominate there.

15:42:15 25      Certainly, a VRA plaintiff could say, we are going to pick

from one of these good maps, instead of from one of those good

maps.  But that's not what we are dealing with here.  We are

dealing only with bad maps.  They didn't produce a single good

map.  And that's the critical difference.

15:42:29      So I mean, to go back to *Chiles*, I mean, again, Terry map

drawer said it would have been difficult for him to draw based

on race-neutral principles without getting at least two

majority-minority districts.

      Dr. Duchin's testimony was exactly the opposite.  She said

15:42:49 -- and this is at transcript page 685, quote, it is hard to

draw two majority-black districts by accident, which in her

view meant it showed the importance of doing so on purpose.

      Like were not criticizing their motivations.  I understand

that he have to keep race in mind when they're putting their

15:43:11 map together, but that doesn't mean race can predominate, and

that's obviously what we have here to a mathematical certainty.

      And again, they -- it means what they had to do was they

have to bend and they had break numerous criteria to produce 11

racial gerrymanders.

15:43:31      And I don't think the Legislature would be able to draw a

map like that consistent with the Equal Protection Clause or

Section 2.

            JUDGE MANASCO:  Let me ask you a question about that.

      So I understand the general contours of the argument.  But

15:43:44 I took at a more granular level what Dr. Duchin to be saying is

1    that because of what she was asked to do as a *Gingles I* expert,

2    she took the 50 percent as a nonnegotiable threshold.  And then

3    she only bent and broke insofar as was necessary not to come

4    under 50 percent.  So, for example, I think -- and I don't have

15:44:13  5    the cite handy, but my memory is that she testified that after

6    50 percent, for example, she took not splitting counties to be

7    of greater priority.

8         Why is that inconsistent with the Section 2 mission?  I

9    completely understand your argument as to why it's inconsistent

15:44:32 10    with the idea that we ought not be separating voters based on

11    race for constitutional purposes.

12         But in the limited universe of a Section 2 claim, why is

13    that hierarchy so long as it respects other traditional

14    districting principles insofar as it can along side the

15:44:57 15    50 percent threshold, why is it inconsistent with Section 2?

16              MR. LACOUR:  Because I don't think that's what the

17    Court was referring to when it said reasonably compact.  Again,

18    reasonable compactness analysis takes into account traditional

19    districting principles.  And drawing a non-compact district to

15:45:16 20    benefit a racial group is not a traditional districting

21    principle.  If it is, it makes their whole two Section 2

22    compactness argument self-referencing and really

23    indecipherable.

24         They're saying, we could draw a reasonably compact map

15:45:30 25    consistent with traditional districting principles if we ignore

1   some of them in favor of race.  But that means it's not

2   reasonably compact.  That's why the Supreme Court has said

3   Section 2 does not require a state to draw based on

4   predominantly on racial lines a district that's not reasonably

15:45:48 5   compact.  What that necessarily means is that reasonable

6   compactness has to be without reference to race.

7        Now, like I said, if she drew two maps consistent with

8   racial -- consistent perfectly with traditional districting

9   principles, and one had two majority-minority districts and one

15:46:09 10   didn't, it would be perfectly fine for her to pick the one that

11   had the two majority-minority districts.

12        But what she testified to was that she drew 2,000 such

13   maps, 2000.  Not 2000.  2 million.  I am sorry.  I was off by

14   the three zeros.  2 million maps where she didn't even plug in

15:46:28 15   all of our traditional districting principles into the

16   algorithm constraints.  She had even more discretion than the

17   Legislature would have had to go out looking for majority

18   population to put within a district.  And not one of them came

19   back above 50 percent.  I mean, not one of them came back with

15:46:47 20   two districts above 50 percent.

21        And I -- so I don't know how it could be even -- how it

22   could be any clearer that race predominated.

23        I mean, it's not even a one in a million map we have in

24   front of us.  These are maps you would never expect to see.

15:47:03 25   And I don't see how it could be that -- to return to the text

of Section 2, we are talking about equal opportunity and
whether anyone has had equal access so political process denied
them based on account of race.  I mean, is the Legislature's
failure to completely scrap several race-neutral traditional
districting principles and bend others in favor of race, like
isn't a refusal to do that somehow denying someone equal
opportunity?  I think the answer is obviously no.

And you look at *Abrams*, again, keep in mind, I think they
hone in a lot on proportional representation.  And you see it
throughout.  But, of course, throughout the briefing -- but, of
course, Section 2 expressly says proportional representation is
not the benchmark.  And we know it can't be the benchmark
because Georgia in the '90s had 27 percent black population
just like Alabama today.  They have 11 districts they can work
with.  We only have seven.

And even then the district court said, Section 2 only
gives me free reign to draw one majority-minority district,
9 percent of the state's black population -- or 9 percent of
the state's congressional districts were majority black, even
though 27 percent of the state's black population -- or blacks
made up 27 percent of the black's population, and the Supreme
Court affirmed that.

I think then in vote dilution itself, you heard about vote
dilution from plaintiffs.  I mean, it diluted against what?
Against what standard?  And proportional representation is not

1    the standard.  It was an interesting discussion with Dr. Duchin

2    talking about Massachusetts and the Republicans there.  And

3    because the Republican population in Massachusetts is so evenly

4    dispersed across the state, I mean, what she testified to was

15:49:02 5    that it is literally impossible to draw even one majority

6    Republican congressional district in Massachusetts, despite the

7    fact that there are nine congressional districts from the state

8    and despite the fact that Republicans regularly register about

9    a third, 35 percent in statewide elections.

15:49:22 10       So proportion representation is not the right baseline.

11   The right baseline is what would you expect from a race-neutral

12   draw of the districts?  And we didn't have time to go out and

13   get an expert with an algorithm to produce 10,000 maps.  But

14   the plaintiffs did.  And we know what came back.  30,000 maps

15:49:44 15   from Dr. Imai, none of which have two majority-black districts,

16   and 2 million maps from Dr. Duchin, none of which have two

17   majority-black districts.

18       So, again, unless you are going to impute race as a

19   traditional districting principle in the Section 2 compactness

15:49:59 20   analysis, which I think the Court pretty expressly rejected in

21   *Abrams* when they found the three-judge court's decision in that

22   case, there is no way they can satisfy *Gingles I*.  It's a

23   mathematical impossibility.

24            JUDGE MANASCO:  Thank you.  I think you answered my

15:50:16 25   question.

1        JUDGE MARCUS:  Let me ask a follow up if I could,

2   Mr. LaCour, on Judge Manasco's question.

3        Does this issue, then, all boil down to whether some or

4   all of the illustrative plans were drawn in a reasonably

15:50:36 5   compact way?  Is that the essential question you're

6   highlighting here?

7        MR. LACOUR:  Yes.

8        JUDGE MARCUS:  Reasonably compact.

9        MR. LACOUR:  Yes.

15:50:46 10       JUDGE MARCUS:  Okay.

11       MR. LACOUR:  That reasonable compactness analysis

12  takes into account traditional districting principles like

13  maintenance of communities of interest and traditional

14  subdivisions and the other guidelines that we have been

15:51:02 15  discussing today.

16       JUDGE MARCUS:  Thank you.

17       MR. LACOUR:  Great.  Let me see if there's anything

18  else I want to say on that point before moving on to another --

19  I think in *Miller vs. Johnson* similarly supports the notion

15:51:31 20  that the traditional districting principles you are looking at

21  in a Section 2 compactness inquiry are not race-focused

22  traditional districting principles.  In *Miller*, the Court was

23  look at a racial gerrymandering claim -- the Court said -- this

24  is 515 U.S. 900 at 916.  So in looking at a racial

15:52:08 25  gerrymandering claim, quote, a plaintiff must prove that the

1  legislature subordinated traditional race-neutral districting

2  principles, including but not limited to compactness,

3  continuity, and respect for political subdivisions or

4  communities defined by actual shared interests to racial

15:52:21 5  considerations.  Where these or other race-neutral

6  considerations are the basis for redistricting legislation and

7  are not subordinated to race, state can defeat a claim.  The

8  district has been gerrymandered on racial lines, close quote.

9      Now, the Court here nowhere suggests that there are

15:52:37 10  legitimate race-focused principles that states could point to

11  as a defense race predominated in their maps.  It would make no

12  sense to allow a state to rebut a charge of racial

13  gerrymandering by showing the state was promoting race-focused

14  districting principles.

15:52:55 15      Now, of course, compliance with the VRA can justify a

16  racial gerrymander, but the need to employ race to comply with

17  the Voting Rights Act does not mean that there was never a

18  racial gerrymander in the first place.  So I think it's similar

19  analysis when we're looking at the compactness inquiry.  Are

15:53:13 20  race-neutral principles been subordinated to race or not?  And

21  here obviously were.

22      Return for a moment on communities of interest.  I did

23  find that I think -- it was not -- it's clearly not something

24  that Mr. Cooper had given a lot of thought to when we asked him

15:53:57 25  about communities of interest between the Gulf and the

Wiregrass.  He suggested, well, it's from transcript 498:  Do

you have an opinion about whether there's a community of

interest that includes both voters in Houston County and voters

in this wider portion of Mobile County that you include in

District 1?  His response:  There very well should be.  They

live in south Alabama.  I suspect maybe there's more University

of Alabama fans down in Mobile than the eastern part of the

state, Auburnland.

And, again, I think we have got communities of interest

here that have been recognized by courts for a long time, ample

testimony from plaintiffs and defendants that our maps preserve

them, and to the extent the Court is being asked to adjudicate

which one should get preference over the other, I think that,

too, potentially raises some justiciability questions.

I'm not sure how the Court is going to sort of decide this

one is more important than the other if there isn't a healthy

dose of deference to the Legislature.  Again, we are not

inventing any nuance in the 2021 map.  Again, it's a map that

looks a lot like the map is looked for 50 years now.  And I

think that is some very strong evidence of what the Legislature

considers to be particularly important.

I will address for a moment the arguments about the State

Board of Education plan, which has gotten some play in the last

couple of days.

If you will recall, I believe this is Defendants'

1  Exhibit 26.  The 2001 version of the State Board of Education

2  plan, which has eight districts just like -- eight districts

3  just like the current plan has eight districts did not split

4  Mobile.  Mobile and Baldwin County and I believe one other

15:56:02 5  county were kept together in that sort of southwestern

6  district.  Then you fast forward to 2011.  And I think the

7  record shows that split came about in 2011.  And the reason for

8  that was Section 5.

9      We had -- need to show that there was not retrogression.

15:56:24 10  But that particular district, there had been a majority-black

11  district north of Mobile or -- not majority black, it was at

12  least heavy percentage black north of Mobile that had lost a

13  substantial percentage of its population.  And so at that --

14  its black population at that.  Its numbers had gone down, and I

15:56:48 15  believe what the preclearance submissions will show is that the

16  state had a felt need to ensure that that number stayed about

17  the same for Section 5 purposes.  The only way that could

18  possibly be done was to break into Mobile and split that county

19  and the State Board of Education plan as far as I am aware for

15:57:08 20  the first time ever.

21      So if anything, that just shows that the -- actually race

22  predominated over traditional districting principles there,

23  because we couldn't consistent with them maintain or really

24  surpass the Section 5 preclearance standard.  And once you sort

15:57:28 25  of understand that, I think the -- whatever you can glean from

the 2021 map is really quite minimal other than the fact that

state followed its guidelines, both for its State Board of

Education map and for its congressional map, because we

retained the cores of that district just like we retained the

15:57:47  cores of our congressional districts.  We did not try to sort

of undo that or affirmatively unpack or satisfy whatever novel

theory of Equal Protection Clause you've been hearing about

from the plaintiffs today.

So turning briefly to *Gingles II* and *III*, just to clear up

15:58:15  something that I think was said somewhat dismissively from the

Caster plaintiffs, we don't have a preferred definition of

black.  That is not our argument that there's one proper

definition and another that's not.

Our only point is that if you are trying to satisfy

15:58:32  *Gingles I*, *II*, and *III*, you are not supposed to mix and match.

So and if they are going to mix and match single-race black

versus any-part black, it's incumbent on them to establish that

there's some strong basis for thinking that those people who

identify as any-part black are going to have -- really going to

15:58:57  be part of that same community or have the same interests as

those who identify as single-race black.

So that's the only point we have there.

I would note that, I mean, this need for them to trod out

for you all multiple different definitions and metrics by which

15:59:13  to measure black population in their illustrative plans just

1    suggests how incredibly thin they are slicing things here and

2    how hard it is for them to find a majority-minority population

3    within the state, which again ties back into what I think are

4    fatal *Gingles I* problems with their case.

15:59:34  5        Now, touching on the totality of the circumstances.  As

6    the Supreme Court has recognized, things have changed in the

7    South.  And as the Alabama and the NAACP court, Judge Watkins'

8    lengthy and well-reasoned opinion from 2020 recognized things

9    have changed in Alabama, as well.  We think that politics and

15:59:58 10   not race is relevant to whether anyone has been denied equal

11   opportunity on account of race, which is the test in Section 2.

12        The Alabama NAACP decision had after a lengthy trial and

13   multiple years of litigation far more time than we had to build

14   a record in this case came away with the conclusion that the

16:00:19 15   reason why black-preferred candidates were not winning in

16   judicial elections in Alabama was not because they were the

17   candidates preferred by blacks, but because blacks preferred

18   Democrats.

19        If you look at the *Clements* decision from the Fifth

16:00:36 20   Circuit -- this is 999 F.2d 831 at 879 -- en banc court there

21   said, To extent the candidates preferred by black voters are

22   consistently defeated because of their substantive political

23   positions, per the casualties of interest group politics, not

24   racial considerations, this is not the harm against which

16:00:56 25   Section 2 protects.  Section 2 protects black voters against

1       defeat on account of race or color, not on account of political

2       platform.  And I submit that we have come forth with evidence

3       to show that to the extent the black-preferred candidates are

4       not prevailing in congressional elections in Alabama is on

16:01:15  5    account of political party platform, not on account of race.

6       We do have evidence that white Republicans support black

7       Republicans.  We have Kenneth Paschal's recent election to the

8       State House.  He's a black Republican from the famous Shelby

9       County.  We have also established that in any state where there

16:01:37 10   is a substantial black population, black voters are going to

11      vote overwhelmingly Democratic, which means that the VRA is

12      only going to kick in if there are white voters who tend to

13      support the Republican Party.  And I don't think the VRA was

14      passed to give Democratic Party interests a second bite at the

16:01:57 15   apple every single redistricting cycle.

16      Touching briefly on some of the other totality of the

17      circumstances evidence, which we will address much more fully

18      to the extent we can in our findings of fact and conclusions of

19      law.  I think we have shown that many of the gaps between white

16:02:16 20   the black Alabamians of our similar or even less severe than

21      what you would see between black and white Americans

22      nationwide.  I know the Milligan plaintiffs think that is

23      totally irrelevant.  But I have a hard time seeing how it could

24      be irrelevant if there was a gap of 1 percent of voter

16:02:38 25   registration in Alabama and 20 percent nationwide, I think that

1  would obviously be relevant on whether Alabama's history was

2  influencing a sort of disparity there.

3      So if you look at what Dr. King said, she -- and I believe

4  it was the -- I believe she was with Caster plaintiffs.  I'm

16:03:00  5  sorry.  I am getting a little mixed up this late in the day.

6  They referred to what they call widely disparate incarceration

7  rates in Alabama.  But when you look at the source she actually

8  cited, it showed Alabama's black/white disparities in

9  incarceration rates were the second lowest in the country out

16:03:19 10  of all 50 states.

11      If you look at voter registration, voter turnout rates

12  from the Census Bureau over the last several years, Alabama is

13  doing far better than many other states that don't have

14  Alabama's regrettable history of racial discrimination.

16:03:37 15      And while the Milligan plaintiffs have said that

16  comparisons are irrelevant, both Drs. Bagley and King have

17  comparisons in their reports and said in their testimony that

18  such comparison could be helpful.

19      So I would leave you with that.

16:03:57 20      Now, one other potential way to look at Section 2 issue

21  would be to look at Brnovich.  There was something from the

22  Supreme Court's most recent Section 2 case that I found

23  interesting.  It's actually from Justice Kagan's dissent where

24  she was putting forward a more plaintiff-friendly reading of

16:04:19 25  Section 2, and in her -- and I will stipulate, of course, it

1   was not a vote dilution case, but it does still involve the

2   exact same statute and the exact same claim.

3        She said Section 2 demands of plaintiffs proof of a

4   statistically racial disparity in electoral opportunities, not

16:04:41 5   outcomes, resulted from a law not needed to achieve a

6   government's legitimate goals.

7        If we were to apply Justice Kagan's view of what Section 2

8   demands here, I think we would easily surpass that.  We have

9   legitimate reasons for core retention.  We have legitimate

16:04:59 10   reasons for incumbency protection.  We legitimate reasons for

11   keeping the counties that have been CD 1 for 50 years in CD 1

12   and for not stretching CD 2 from one border of the state to the

13   other border of the state.

14        And we know that we can't pursue those legitimate goals in

16:05:21 15   compliance with the demands of the Section 2 plaintiffs in this

16   case.

17        So I think even under Justice Kagan's reading of Section

18   2, their claims would necessarily fail.

19        And I don't say that that's a controlling opinion, but I

16:05:36 20   do think it sheds some light on how the Court should be

21   thinking about Section 2 and what it is that it's really

22   supposed to be doing.  And I don't think it is a black

23   maximization statute, rather DOJ thought that was the case in

24   the early '90s, and the Supreme Court disabused them of that

16:05:57 25   motion in *Miller v. Johnson* and the *Abrams* case.

1       So here again, based on maps drawn based solely on

2   race-neutral traditional principles, the most you could hope

3   for would be one majority-black district, and that's what we

4   have.

16:06:16 5       I would like to turn to the equities now unless the Court

6   has further questions about the merits.

7       So first, I think there was some suggestion that the

8   process was -- the redistricting process was rushed, that we

9   had delayed in some way.  I will just simply remind the Court

16:06:43 10  that the state of Alabama did not cause COVID.  The state of

11  Alabama did not cause the Census Bureau's delays in turning

12  over critical data that we needed to redistrict.  We were

13  supposed to know by March 31st, I believe.  We were supposed to

14  get our data by March 31st and as of -- by March 31st.  But mid

16:07:11 15  to late March, the bureau announced they weren't going to give

16  us the data until September 30th.  We didn't sit on our hands

17  and wait.  We actually sued the Census Bureau in part based on

18  that delay and said you have a statutory obligation to give us

19  that data far sooner than September 30th.  And just several

16:07:29 20  days after we brought that lawsuit, the bureau announced

21  actually they could give us to about six weeks earlier than

22  they had initially anticipated.  That's how we ended up getting

23  that data in the middle of August.

24      And we immediately got to work finalizing or -- drawing

16:07:45 25  and finalizing maps.  The Legislature had been told by the

1  Secretary of State the maps were going to be needed by early

2  November in order to do all the different administrative steps

3  needed to get ready for an election.  I will talk about a few

4  of those in a moment.  And so that was for the window the

16:08:04  5  Legislature was working in, and despite it being very tight,

6  they were numerous public hearings held.

7       Also, just keep in mind, while this litigation has really

8  centered on the congressional districts, there were three other

9  sets of maps we have to draw this particular time around.

16:08:21 10       The State House, State Senate, and the State Board of

11  Education maps, that's another 148 districts that needed to be

12  drawn, needed to be debated, needed to be voted on eventually.

13            THE COURTROOM DEPUTY CLERK:  Mr. LaCour, you have

14  ten minutes.

16:08:44 15            MR. LACOUR:  Thank you, Frankie.

16       With all this mind, we have been at this about two months.

17  And the election machinery is well -- is already humming along.

18  As you know, the qualifying deadline is January 28th, we're

19  talking two weeks from when our findings of fact and

16:09:06 20  conclusions of law are due.

21       Now, there was a lot of discussion about May 24th as the

22  primary election date and sort of a suggestion that we have a

23  leisurely four months by which the Legislature could come back

24  together and draw a new map that complies with either like

16:09:26 25  these violations of Section 2 alleged by the plaintiffs or by

1  an equal protection demands that the plaintiffs have we think

2  invented, but May 24th is not the critical deadline.  The

3  critical deadline is Marsh 30th.  And I will tell why it's

4  because that's when you absentee ballots need to be printed and

16:09:45  5  ready to go.  So we're talking seven weeks away from the

6  election beginning, not four months.

7      And April 9th, we have the federal law deadline to send

8  out our UOCAVA ballots.  Those are to servicemen and women

9  overseas and other federal employees overseas.  We have to get

16:10:04  10  those ballots out the door to them.

11      If you are looking for some other dates and deadlines,

12  Defendants' Exhibit 7 is the administrative calendar, the

13  Secretary of State's administrative calendar.  It's included

14  with the declaration of the Director of Elections Clay Helms.

16:10:24  15      And I think his declaration is also incredibly important

16  evidence on this.  And I have not heard anything from the

17  plaintiffs to really rebut it.  He's explained that in -- I

18  believe it's about 40 to 45 of Alabama's 67 counties, the

19  process of assigning voters to the appropriate voting districts

16:10:46  20  is manual.  It's a very time-consuming process.

21      They literally take out maps.  They have their voter

22  registration information, and they say, well, you live at 123

23  Main Street.  Let's look at the map.  123 Main Street is in

24  District 2.  We will assign you to District 2.  You will make

16:11:05  25  sure when you show up to vote you go to the right precinct and

1   you get the right ballot.  So you are voting for the candidates

2   of District 2, not the ones for District 1.

3        That's the process that takes -- in the past, it took I

4   believe three to four months is what he has averred in his

16:11:23 5   declaration.  And I have not heard any to the contrary deadline

6   proposed by the plaintiffs to suggest that he is pulling the

7   wool over on plaintiffs in this case.  And that's consistent

8   with similar testimony he gave by declaration in our litigation

9   against the Census Bureau in the spring of 2021.

16:11:46 10       I think also this Court should take into account what

11  Bradley Byrne and what other people have testified to, which is

12  if you dramatically shift the lines and you move hundreds of

13  thousands of voters out of one district and hundreds of

14  thousands of new ones into the district, that's going to create

16:12:07 15  confusion for those voters.  It will create serious problems

16  for candidates, and you will potentially have several districts

17  with no incumbent and maybe no candidate running in it, which I

18  think is not good for the Democratic process.  It is severe

19  public harm.

16:12:24 20       I mean, if you look at the *Favors v. Cuomo* decision, the

21  Eastern District of New York, that's 881 F. Supp. 2d, 356,

22  there's a really key quote they have from Nate Persily, who is

23  one of the leading experts on election law issues.  They said,

24  quote, A court should have as its goal the imposition of a plan

16:12:48 25  no later than one month before candidates may begin qualifying

1   for the primary ballot, which means that the court should begin

2   drawing its plan about three months before the beginning of

3   ballot -- before the beginning of ballot qualification in order

4   to build in time for possible hearings and adjustments to

16:13:04  5   plans.

6        I think that's wise, and I think we are well past that.  I

7   mean, you have already heard some of the difficulties and

8   potential complications of if this Court were to enter a

9   preliminary injunction, it's not even clear if the Legislature

16:13:17 10   at this moment would need to draw two majority-black districts

11   or just two districts that would perform for -- for black

12   voters even if they weren't at 50 percent.

13        And, of course drawing map isn't the end of the story.  We

14   would have to come back, and it would have to be analyzed by

16:13:35 15   this Court.  We would have more experts coming in to say this

16   does perform or this doesn't perform.  And keep in mind too, we

17   have three sets of plaintiffs here with some competing theories

18   of what the federal law demands.

19        So I don't expect if Singleton wins that the Caster and

16:13:51 20   Milligan plaintiffs will be really thrilled with the product

21   from the Legislature and vice versa.  So we may have more

22   litigation over the remedial map.  So this would not be our

23   last hearing by any means.

24        The complaints about the need for urgent action are

16:14:10 25   tempered a little by the longevity of the alleged harms.  I

think by their theories, there have been some sort of packing
issue for at least a decade.  There's been underrepresentation
or vote dilution claim for at least a decade.  Lakeisha
Chestnut, one of the Caster plaintiffs did sue us, but it
wasn't until 2018.  The Singleton plaintiffs sued over the 2011
map.  They waited ten years to do that.

        So I just think that, in particular, when you are looking
at maps and political geography that has been so settled in the
state for so long, equities would suggest that like courts
should do who courts have done in numerous cases when you have
requests for preliminary injunctive relief this late in the
day, and that would be to say, like if the Court were to make
some new law and deem this map to be unconstitutional, to allow
it to be used one more time, because I don't think if you adopt
the plaintiffs' approach to Section 2 *Gingles I* or if you adopt
this new theory of equal protection by which we have an
affirmative obligation to sort of undo a VRA district years
later, I don't think this Court will be the last word on that.

        So and that's -- I mean something else that was noted as
well as well by the *Favors* court, that these complicated
record-intensive cases, complicated legal issues, and the Court
said, like, we have only will a few weeks to even dig into
this.  I mean, we put together -- we were able to get two
experts together.  We were able to get some good testimony in
front of you all.  I know there's more we could say.  You heard

1  from all the historians.  We haven't had time to get around.

2  We haven't had time to get our own algorithmic math whiz to

3  redo or duplicate some of the stuff the Drs. Imai and Duchin

4  have done.

16:16:05 5      But I do think this claim -- before this Court goes and

6  alters the state's political geography and political destiny,

7  it needs to be very, very sure that we have done something

8  wrong here.

9      And, honestly, I think these are incredibly ordinary maps.

16:16:23 10 It's clear why they were drawn like they were drawn.  It's

11 right there in the guidelines.  These were race-neutral reasons

12 for doing it.  And at the same time, as well, like Section 2

13 does not require anything different from what the Legislature

14 did.

16:16:39 15      As the Court in LULAC said, the purpose of the VRA was to

16 prevent discrimination and the exercise of the electoral

17 franchise and to foster our transformation to a society that's

18 no longer fixated on race.

19      Here, we know thanks to plaintiffs' own experts that if

16:16:55 20 race were not considered, it is virtually impossible to draw a

21 map with two majority-minority districts.  Section 2 does not

22 require separate but equal congressional districts for

23 Alabamians; thus, because Section 2 does not require Alabama to

24 subordinate its traditional race districting principles to

16:17:09 25 race, those Section 2 claims necessarily fail.

1            JUDGE MARCUS:  Thank you very much, Mr. LaCour.  We

2    will take our usual break of 15-minute break and then come back

3    with the rebuttals, and we will finish up this afternoon.

4    Thank you all.  We will be back in 15 minutes.

16:17:48 5            MR. LACOUR:  *Favors* was the longer quote.

6            JUDGE MARCUS:  Why don't you give us the full title of

7    that case that came under the Eastern District of New York.

8            MR. LACOUR:  *Favors v. Cuomo*, 881 F. Supp. 2d 356, 362

9    -- or at 362.  That's Eastern District of New York 2012.

16:18:20 10           JUDGE MARCUS:  Thank you much.  We will take a

11   15-minute break at this point.

12        (Recess.)

13           JUDGE MARCUS:  The parties are ready to begin the

14   reply at this point?  Do I have that right, Mr. Blacksher,

16:29:24 15  Ms. Khanna, and Mr. Ross?

16           MR. BLACKSHER:  Yes.

17           MR. ROSS:  Yes, Your Honor.

18           MS. KHANNA:  Yes, Your Honor.

19           JUDGE MARCUS:  All right.  Thank you.

16:29:34 20      Mr. Blacksher?  We will take it in the same order that the

21   arguments were made by the plaintiffs.

22           MR. ROSS:  Your Honor, if I may, the Caster plaintiffs

23   have allowed the Milligan plaintiffs to go next.

24           JUDGE MARCUS:  I'm sorry.  You mean the Singleton

16:29:55 25  plaintiffs.

```
 1          MR. ROSS:  Oh I'm sorry.  I believe it will go
 2  Singleton, Milligan, and then Caster.  I'm sorry, Your Honor.
 3          JUDGE MARCUS:  Thank much.  Mr. Blacksher, you may
 4  proceed.
 5          MR. BLACKSHER:  Judge, you made -- Judge Marcus, you
 6  made a -- asked an important question.
 7      If the Court rules for the plaintiffs, what should it tell
 8  the Legislature to do?  Because whatever this Court tells the
 9  Legislature -- what it tells the Legislature it did wrong, and
10  what it tells the Legislature it must do right in the future is
11  going to be the benchmark for redrawing congressional districts
12  probably for several more decades.
13      So it seems to us that the choice is between telling the
14  Legislature that it must draw districts by beginning with a
15  racial target, or whether it should draw districts by beginning
16  with traditional districting criteria, we believe that if this
17  Court were to rule for the plaintiffs -- the Milligan and
18  Caster plaintiffs on their Section 2 claims without addressing
19  their Fourteenth Amendment claims, that necessarily says to the
20  Legislature the 2021 enacted plan violated the Voting Rights
21  Act because it did not contain two majority-black districts,
22  per Bartlett vs. Strickland.  Now, that's going to say to the
23  Legislature that they should begin any remedial plan with a
24  racial target.
25      What the Singleton plaintiffs have proposed is that the
```

1    Court say to the Legislature the problem with your 2021 plan is

2    that it perpetuated a gerrymander that violated traditional

3    districting principles by splitting Jefferson, Tuscaloosa, and

4    Montgomery counties for the purpose of reaching a racial

16:32:29  5    target, namely a black-majority district.  And, therefore, you

6    should begin again solely with race-neutral principles which

7    are historically in Alabama, whole counties, and see what kind

8    of plan you can draw, and then to achieve the lowest

9    practicable population deviation, and then look to see whether

16:33:01 10    or not it complies with Section 2 of the Voting Rights Act.

11        If it does not comply Section 2 of the Voting Rights Act

12    by providing blacks the opportunity to elect candidates of

13    their choice that Section 2 guarantees, then your plan must be

14    modified however is necessary to accomplish that statutory

16:33:24 15    objective.

16        So that's critical to us.  We have been interested from

17    the beginning in the Singleton case, our clients are interested

18    in trying not only to win a lawsuit for 2022, but to try to get

19    our redistricting process back on track.  That's something that

16:33:54 20    legislators and ordinary citizens and incumbent members of

21    Congress can understand and apply without having to have a

22    statistician with algorithms next to their elbow.

23        Let me respond to something that Mr. LaCour said.  He's

24    characterized the Singleton plaintiffs' claims as a novel

16:34:31 25    Fourteenth Amendment claim.  It is nothing but novel.  And let

1  me, if the Court would permit, let me share the screen with

2  you.

3      So, Your Honor, what I have on the screen is Section 2G of

4  the redistricting guidelines.  And let me read what it says.

16:34:59 5      No district will be drawn in a manner that subordinates

6  race-neutral districting criteria to considerations of race,

7  color, or membership in a language-minority group, except that

8  race, color, or membership in a language-minority group may

9  predominate over race-neutral districting criteria to comply

16:35:22 10  with Section 2 of the Voting Rights Act, provided there is a

11  strong basis in evidence in support of such a race-based

12  choice.  A strong basis in evidence exists when there is good

13  reason to believe that race must be used in order to satisfy

14  the Voting Rights Act.

16:35:43 15      Now, what the state is saying, that is essentially the

16  statement of law that the Singleton plaintiffs in this action

17  are attempting to enforce.  What the state is saying is that

18  the 1992 racial gerrymander done for good reasons, thinking it

19  was required by Section 2 of the Voting Rights Act, is now a

16:36:19 20  race-neutral districting criteria.

21      And as I pointed out, the Supreme Court has said you

22  cannot entrench -- that is entrenching a racial gerrymander,

23  precisely what the Supreme Court has said the state may not do.

24      But that is the state's defense here.  They are not

16:36:40 25  claiming, as Mr. LaCour emphasized, that perpetuating the 1992

1  racial gerrymander is justified by the Voting Rights Act.  They

2  are saying there was no gerrymander at all because that 1992

3  plan has become race-neutral criteria.

4      Finally, let me just respond to Mr. LaCour's concern about

16:37:19 5  the problems of election officials assigning voters to the

6  correct precincts if the Court orders a remedy in time for use

7  in the May 24th primary.

8      In the case of the congressional districts, if the

9  Legislature adopts, either by enacting a new plan or by a court

16:37:47 10  order, the whole county's plan that the Singleton plaintiffs

11  have provided or one like it, there's very little problem

12  assigning voters to their precincts in each county because they

13  all have the same congressional representative to vote for.

14  There's no precinct split.

16:38:12 15      So what the plaintiffs in the Singleton case have asked

16  this Court to do at the end of their motion for preliminary

17  injunction and amended motion, is if it finds for us that --

18  the plaintiffs, that the 2021 plan perpetuates a racial

19  gerrymander without justification, that it should tell the

16:38:42 20  Legislature that the plan proposed by the plaintiffs -- the

21  whole county plan -- is constitutional, or in that if they

22  thought that the whole county plan has too large a population

23  deviation, then they can lower the population deviation in the

24  way Singleton 2 and 3 plans do, or in some other way that

16:39:10 25  splits just a few thousand people out of a couple of

1  counties -- something that I don't like at all, Your Honor.  I

2  call them deviation orphans.

3      But that is unquestionably what this Court must do,

4  because the Supreme Court time and time again has heard from

16:39:31 5  dissenting members of the Court that we are just encouraging

6  gerrymandering for the sake of mathematical equality.  And so I

7  don't think this Court has any choice but to consider lowering

8  the deviation to a level below -- probably below the 2.46 or

9  2.47 that the Singleton plan itself has unless *Tennant vs.*

16:39:56 10 *Jefferson County* suggests that the Supreme Court is finally

11 backing down enough to provide some fairness and common sense

12 for ordinary citizens.

13     But, in any event, that's not an issue that we can give

14 you any policy guidance on, because you have to look at the

16:40:13 15 cases and decide that that's a decision for the Court, it's a

16 question of law.

17     I think that's the end of my --

18         JUDGE MARCUS:  Thank you, Mr. Blacksher.

19     We will hear now from counsel for Milligan.

16:40:25 20         MR. ROSS:  Yes, Your Honor.  There's a lot to respond

21 to, so --

22         JUDGE MARCUS:  Will you take down from the screen

23 that -- thanks very much.

24         MR. BLACKSHER:  Sorry.

16:40:37 25         JUDGE MARCUS:  Quite all right.

1        Mr. Ross, you may proceed.

2            MR. ROSS:  Thank you, Your Honor.

3        Your Honor, it is the state that presents circular

4    arguments.  First, it's the defense that says that for Section

16:40:47 5    2 -- a Section 2 claim to be viable, plaintiffs must satisfy

6    *Gingles I* without considering race.

7        And then, secondarily, they say that on the racial

8    gerrymandering claim, that race can predominate, even when it's

9    necessary to comply with the Voting Rights Act.

16:41:05 10       But Mr. LaCour's only right as to the second point.  The

11   Supreme Court has repeatedly said that compliance with the

12   Voting Rights Act means that a state can consider, it's not,

13   per se, unconditional to purposefully draw majority-black

14   districts.

16:41:22 15       This is because even if race does predominate, a state

16   will still -- a map can still be constitutional if it's

17   narrowly tailored to comply with the Voting Rights Act.

18       Indeed, the state's own redistricting guidelines and the

19   state's own expert, Mr. Hinaman, considered race, required the

16:41:41 20   consideration of race, and Mr. Hinaman drew the majority-black

21   District 7 intentionally to create a majority-black district.

22   He plainly said so in his testimony.  He also plainly said that

23   even if that district had not turned out majority black, he

24   himself would have adjusted it so that it would still be a

16:42:01 25   majority-black district.

1    So that is very similar to what Dr. Duchin did here.  Like

2    the state, she considered race only to the extent necessary to

3    draw the two majority-black districts and to satisfy *Gingles* 1.

4    Dr. Duchin didn't consider other redistricting principles.  She

16:42:19 5    said that her non-negotiables were compactness, maintaining

6    communities of interest, particularly the Black Belt, and that

7    the reason her maps are cut across the state is because the

8    Black Belt, a community of interest that has existed in Alabama

9    for 200 years, itself cuts across the state.

16:42:35 10    Dr. Duchin also prioritized not cutting -- splitting

11    counties and she did so in one map, and split fewer counties

12    than the state's map.

13    Only after considering all of these other factors did she

14    look at race to satisfy *Gingles I*.  And even if Dr. Duchin

16:42:53 15    didn't draft -- even so, she drafted two majority-black

16    districts with bare majority black populations, even though she

17    testified that it would be possible for her to draw two

18    majority-black districts with higher black populations.  She

19    drew them with lower populations because she was trying to

16:43:09 20    narrowly tailor them, as is required by the Constitution.

21    Moreover, again, nothing is per se constitutional about

22    even setting racial targets.  The Supreme Court said in *Bethune*

23    *Hill* and the *Alabama Legislative Black Caucus* case that the use

24    of racial targets are valid means of complying with the Voting

16:43:31 25    Rights Act.

 1         Indeed, in *Bethune Hill* the Supreme Court upheld the
 2    state's use of a 55 percent BVAP racial target, where the state
 3    had good reason to set that target to comply with the Voting
 4    Rights Act.
16:43:44  5         Here, again, Alabama's own redistricting principles,
 6    consistent with its recent Supreme Court precedent, require the
 7    state to take into consideration Section 2.  And the state's
 8    own guidelines when talking about communities of interest
 9    discuss that race is one thing that can be considered.
16:44:04 10        Second, there's been a lot of talk about communities of
11    interest, but as the state and other -- as many witnesses who
12    testified today have said over the last few weeks, not every
13    district has to contain a single community of interest.  Many
14    of the districts that currently exist have multiple communities
16:44:24 15   of interest in them.
16         Huntsville may have different interests than Franklin
17    County.  Birmingham may have different interests an Selma.  And
18    so there's no requirement, either under the state's
19    redistricting guidelines, or under the considerations that
16:44:38 20   Mr. Hinaman or the Legislature took into consideration that
21    every congressional district must contain a single community of
22    interest.
23         Here, however, the Black Belt, as I said, is a community,
24    a black community that has existed in Alabama for 200 years.
16:44:56 25   Nearly every witness, including Representative Byrne, testified

that the Black Belt is a community of interest.  Every witness,
including Representative Byrne, testified that there is a clear
community of interest that exists between black people and the
community in Mobile and the Black Belt in the northwest of the
state.

But the state split Mobile County to comply with the
Voting Rights Act to draw the two majority black board of
education districts is compelling evidence that, consistent
again with the state's own redistricting criteria, that the
state could and should draw split Mobile County in order to
draw two majority black congressional districts.

Third, I want to talk a little bit about Dr. Imai.  As
Dr. Imai himself testified repeatedly, his analysis tells us
nothing about whether or not drawing two majority-black
districts complies with the traditional redistricting
principles.

Dr. Imai said that he did not consider race in drawing his
district -- even though as again the Supreme Court has said
that you can do so, even though the state itself has said that
you should consider race when doing so to comply with the
Voting Rights Act, when considering communities of interest,
and indeed Dr. Imai said that even he took into consideration
as many redistricting principles as he could, but he didn't
take into consideration all of them.

One important consideration is communities of interest.

1    And Dr. Imai did not -- wasn't able to identify every community

2    of interest in Alabama, because the state does not provide a

3    list of those things.  And those communities may include large

4    places with large black or other racial group populations like

5    the Black Belt.

6        Your Honor, Mr. LaCour also talked about the *Miller* case,

7    which is a Supreme Court case, a series of Supreme Court cases

8    from the 1990s.  First of all, *Miller* involved a Section 5

9    objection for the Supreme Court, where the Department of

10   Justice had repeatedly rejected maps drawn by Georgia because

11   they had failed to draw three majority-black districts.  The

12   Supreme Court said that that was unnecessary.

13       The reason why the Supreme Court said it was unnecessary

14   to comply with the Voting Rights Act to draw three

15   majority-black districts is because in Georgia, unlike in

16   Alabama, black Congressmen had repeatedly won from majority

17   white congressional districts.  In fact, today black

18   Congressmen are elected in Georgia from a majority white

19   congressional districts.

20       That is not and has never been the case in Alabama.

21   Again, no black person in Alabama has ever won a majority white

22   congressional district.  That was not the case in the *Miller*.

23   It is not the case today in Georgia.  And Alabama has a very

24   different history than Georgia.

25       Finally, on the racial gerrymandering claim, Mr. LaCour

1  ignores the fact that in *Alabama Legislative Black Caucus*, the

2  Supreme Court made very clear and said that states, when

3  they're drawing a district to comply with the Voting Rights

4  Act, must ask to what extent must we preserve existing

16:48:08  5  minorities percentages in order to maintain the minority's

6  present ability to elect the candidate of choice.

7      The Supreme Court has required Alabama and other states,

8  when they're drawing majority-black districts, to consider at

9  what percentage they need to draw those districts.  The problem

16:48:21  10  in ALBC was that Alabama chose to draw 60 percent black

11  districts, and didn't consider whether or not a black district

12  would comply with the Voting Rights Act and perform at a level

13  of 50 percent or something else.

14      That's the same issue here.  Alabama has drawn a

16:48:37  15  majority-black district that's 60 percent black registered

16  voter population.  Plaintiffs shown that districts with as low

17  as 51 or 52 percent black registered voter populations could

18  perform in the same way as District 7 today.

19      Alabama, though, never bothered to consider that question.

16:48:57  20  We have testimony from the Legislature, we have stipulations

21  that Alabama didn't conduct any sort of racial polarization

22  analysis or any other analysis to determine whether or not

23  continuing to pack District 7 was necessary to comply with

24  Voting Rights Act.

16:49:10  25      Your Honor, unless you have any other questions, I

1    appreciate your time.

2              JUDGE MARCUS:  Thank you, Mr. Ross.

3         Finally, Ms. Khanna.

4              MS. KHANNA:  Thank you, Your Honor.

16:49:26  5         As I mentioned in my previous argument, Caster plaintiffs

6    have established each of the Section 2 elements step by step,

7    methodically proving a Section 2 violation.

8         To say that there's a strong basis in evidence to believe

9    Section 2 requires a second majority-black district would be a

16:49:45 10  glaring understatement in light of the overwhelming evidence in

11   this case.

12        So instead of addressing the Section 2 standard,

13   defendants pivot straight to a hypothetical claim under the

14   Equal Protection Clause, arguing that plaintiffs' illustrative

16:50:01 15  plans are racial gerrymanders.

16        But the Eleventh Circuit has made clear in *Davis* that the

17   question posed under *Gingles I* in a Section 2 case, whether an

18   illustrative plan was created consistent with traditional

19   districting principles is wholly distinct from the question

16:50:18 20  posed in racial gerrymandering cases of whether or not race

21   predominated in drawing district lines.  You simply cannot

22   conflate the two.  A court adjudicating a state Section 2

23   liability considers only the first question, not the second.

24        Mr. LaCour talked a lot about *Miller v. Johnson*.  *Miller*

16:50:37 25  was a racial gerrymandering case, which is very telling.  Since

the Eleventh Circuit in *Davis* made clear -- and I will direct

quote -- The District Court's attempt to apply authorities such

as *Miller* to this Section 2 case is unpersuasive because the

*Miller* and *Gingles* lines address very different context, end

16:50:58  quote.

Defendants' decision to lean into *Miller* only underscores

their attempt to turn away from the actual Section 2 legal

standard, which we have readily satisfied.

But even if defendants could ignore this find binding

16:51:14  precedent, they point to no evidence that race predominated in

Mr. Cooper's illustrative plans, all of which balance a host of

traditional redistricting criteria in myriad ways in accordance

with the law and Alabama's own redistricting guidelines.

Mr. Cooper testified during the hearing and in his reports

16:51:32  that he drew districts to follow county boundaries.  And where

he had to divide counties to achieve population equality, he

followed municipal boundaries.  That's with the city of Mobile.

Or VTD boundaries, or other objective geographic borders.

Mr. Bryan could not point to a single line in Mr. Cooper's

16:51:53  illustrative maps that was explainable based on race alone.  He

conducted no analysis of the extent to which traditional

boundaries -- counties, municipalities, VTDs, highways,

rivers -- informed those district lines.

Mr. LaCour stated several times that plaintiffs' plans

16:52:12  scrapped traditional districting principles.  But there is zero

1    basis in evidence for that claim.  Mr. Cooper considered and

2    balanced every single principle, and certainly the defendants

3    have not established otherwise.

4        It is true that core retention had to compromise to give

16:52:27  5    way to plaintiffs' obligation to create a new district that

6    didn't exist before.  But even there Mr. Cooper kept Districts

7    4 and 5 as untouched as possible.

8        He didn't cast aside incumbent consideration.  He avoided

9    pairing them in one of his plans, and he paired only two in his

16:52:45 10    other plans.

11        Defendants' complaint is not any of the traditional

12    districting principles were broken or scrapped.  Instead, it is

13    that not every traditional principle was maximized.  And that

14    is just not the standard.

16:53:01 15        Under defendants' theory, the fact that Mr. Cooper was

16    able to draw a plan with fewer political subdivision splits

17    than the enacted plan will be proof enough that the enacted

18    plan is an unconstitutional racial gerrymander.

19        But clearly, they have taken the opposite position.  That

16:53:19 20    is not the law.

21        All defendants have for their claim that racial

22    gerrymandering is what -- is what the plaintiffs' maps provide

23    is that plaintiffs charged with the task of drawing an

24    additional majority-black district in order to advance their

16:53:36 25    claim and be in this court knowingly drew an additional

1    majority-black district.

2        If that not only sounds backwards as an intuitive matter,

3    it is backwards as a legal matter.  The Eleventh Circuit has

4    held in *Davis* to penalize plaintiffs for attempting to make the

16:53:56 5    vert showing that *Gingles* demands would make it impossible as a

6    matter of law for any plaintiffs to bring a successful Section

7    2 claim.

8        Contrary to defendants' suggestion, the consideration of

9    race does not equate to the predominance of race.  And even if

16:54:12 10   the Eleventh Circuit hadn't made this clear, hadn't already

11   addressed this issue, the fact is that race may predominate in

12   redistricting consistent with the Constitution in order to

13   comply the compelling state interests, which is Section 2 of

14   the Voting Rights Act.

16:54:27 15      The state of Alabama is well aware of this fact.  Indeed

16   the Legislature incorporated it verbatim in their redistricting

17   guidelines.  To hold otherwise would mean that states could

18   point to the fact that any one principle could have been

19   better, could have been more compact, could have been more

16:54:46 20   maximized to escape liability under Section 2 of the Voting

21   Rights Act, but that is clearly not the law.

22       Mr. LaCour also brought up the Alabama NAACP judicial

23   redistricting case.  And I think it's important to call out

24   some very important distinctions between that case and this

16:55:06 25   one.

1       Again, back to *Davis*, that was a redistricting case for

2   judges who tried to move from an at-large judicial system to

3   entirely new restructured election system, not move district

4   lines this way or that, but to totally revamp the way that

16:55:22  5   judges are elected.  And with what the Eleventh Circuit said in

6   *Davis*, and I quote, thus, in this circuit, Section 2 of the

7   Voting Rights Act frankly cannot be said to apply in any

8   meaningful way to at-large judicial elections.

9       So right from the outset, we're just dealing with a

16:55:41 10   different, substantively different kind of issue under Section

11   2 as recognized by the Eleventh Circuit.

12       In that case, in the Alabama NAACP case, there was a

13   dramatically different evidence.  The Court criticized the

14   plaintiffs for emphasizing population equality in judicial

16:56:01 15   districts.  But that's required in congressional districts.

16   The Court criticized the plaintiffs' racially-polarized voting

17   expert for only looking at races with black candidates.  But of

18   course, Dr. Palmer looked at all races.

19       In concluding that partisanship -- that partisanship drew

16:56:18 20   or drove some of the voter choices, the Court there relied

21   heavily on evidence that has not been offered in this case.  It

22   pointed to defendants' evidence involving multi-varied analysis

23   controlling for partisan variables, data regarding

24   straight-ticket voting and the impact on judicial elections,

16:56:35 25   and specifically the successes of black-preferred candidates in

 1  judicial races.

 2       Here, defendant offered no such evidence.  And defendants'

 3  own expert agrees that race and party are inextricably

 4  intertwined.

16:56:51  5       And finally, Your Honor, for that case, it's important to

 6  know that case committed a significant legal error in its

 7  totality of the circumstances analysis.  Even if we put aside

 8  all the way that it's factually distinguishable, although it

 9  begins with the correct statement that it is not the law that

16:57:07 10  Section 2 plaintiffs must prove racial bias is driving election

11  results, in evaluating the case, it doesn't completely misapply

12  that legal standard, suggesting that plaintiffs need to present

13  evidence of individual voters, quote, subjective voting

14  motivations.  The Section 2 effects test was meant to rely on

16:57:27 15  objective evidence and results and ultimate results without

16  creating the evidentiary burden, and, frankly, the divisive

17  atmosphere of having to prove discriminatory intent.

18       This Court is well aware, that district court opinion is

19  not binding here, but the Eleventh Circuit legal standard is.

16:57:48 20  And we would invite the Court not to make the same errors that

21  that Court made.

22       The last point, Your Honor, on timing.  Mr. LaCour talked

23  a lot about how a lot of people -- a lot of things might need

24  to get done to allow for a change in the electoral process --

16:58:04 25  in the redistricting maps at this point.  But the fact remains

1    there is absolutely nothing unusual about this redistricting

2    case.  These cases almost always proceed on expedited schedules

3    once plans are passed and before elections are held.

4        And, yes, the state might have to veer from its planned

16:58:23 5    administrative calendar.  But that is not enough to outweigh

6    the fundamental and irreparable harm to plaintiffs' voting

7    rights.  When the Legislature -- from when the Legislature took

8    up redistricting last fall to when it passed the enacted maps,

9    it took nine days.  Nine days to pass the map that we have been

16:58:45 10    litigating.

11        The Legislature now has some 11 examples of how to draw a

12    map that complies with Section 2.  How to draw a map that

13    provides black voters an opportunity to elect in two

14    congressional districts.  It can choose any, it can choose

16:59:00 15    none.  It can base some portions of its remedy on any one of

16    those.

17        But at the end of the day, even if it were too late, even

18    if January before a May primary, two-and-a-half months before a

19    single ballot needs to be printed were too late, defendants

16:59:18 20    cannot deny that if we have established liability, plaintiffs

21    are entitled to relief at some point.  It can't always be too

22    late or too soon.  The Court cannot just shrug at the legal

23    violation sit on its hands so as not to inconvenience election

24    officials people or candidates' campaigns.

16:59:37 25        When will it ultimately be the right time to vindicate

1       this Voting Rights Act violation?  It wasn't before the last
2       election.  That's what they it told us then.  It's not before
3       the next election.  That's what they're telling us now.  But
4       eventually, Your Honor, relief must be granted, and we would
16:59:52 5      submit that it must be granted as soon as possible to avoid the
6       vote dilution that is certain to result from the use of the
7       enacted map in any future elections.

8               Thank you, Your Honors.

9               JUDGE MARCUS:  Thank you very much.  A couple of
17:00:09 10     observations from me, and then I will turn to my colleagues to
11      see if they have anything to add or address.

12              First, I wanted to take a moment to commend all of the
13      lawyers in this case for having done a really outstanding job
14      in preparing and marshalling an enormous body of evidence for
17:00:36 15     this Court to consider in this preliminary injunction hearing.
16      You have presented a very thorough and detailed set of facts,
17      broad and deep that will allow this Court hopefully to reach an
18      appropriate answer.  The record is lengthy and detailed.

19              The second, I hope and expect that we will give you an
17:01:09 20     opinion in this case within two weeks of the date when we get
21      the proposed findings of fact and conclusions of law from the
22      parties, which have been set for the end of the day on January
23      the 14th.  But I did really want to take a moment to commend
24      all of the lawyers for having done a really outstanding job in
17:01:42 25     this case.

1    With that, Judge Manasco, any questions or comments?

2         JUDGE MANASCO:  Thank you.  First, I will echo what

3    you said about the commendation of the lawyers.  I think, you

4    know, what all of you were able to accomplish would have been

17:01:57  5    remarkable under any circumstance in this amount of time.  But

6    I am mindful that there were holidays, and there was pandemic

7    duress, and so I think it was all the more remarkable under the

8    circumstances.

9         The other thing is I still do have one question.  And I

17:02:13 10    will direct it to Mr. Davis, if he's still with us.

11         But, Mr. Davis, you are free to punt it to any other

12    person on your team, if you think appropriate.  And it's really

13    just sort of an evidentiary question about the logistics.  We

14    have heard a lot today about timing.  And I recall you saying

17:02:35 15    at one of our earlier proceedings early on in the life of the

16    case that if any relief were ordered, the Legislature would

17    want the opportunity to take the first cut at another map.  And

18    so my question is:  Is there anything in the record or any

19    argument you want to make about how long that might take if --

17:02:59 20    and I underscore the if -- any relief were ordered?

21         MR. DAVIS:  Your Honor, there is nothing in the record

22    to my knowledge that would address that question.  I can share

23    that you would -- we got the census data -- the day we got the

24    census data is in the record, and the draft congressional plan

17:03:18 25    was completed soon before the reapportionment committee met.

That's not quite apples to apples because the map drawer was
also working on other maps.

     All I can tell you -- I think it would take at least a
couple of weeks to confer to meet with legislators.  The
17:03:36 Legislature will be in session, so we won't have to go through
the Governor to call.  But you have to draft the plan, then it
will take several days to get to the Legislature.

     Mr. Walker, do you have more information that you can
share?  I will give you this seat.

17:03:49          MR. WALKER:  No.  Just saying there will be -- it will
be more difficult because --

          MR. DAVIS:  Oh.  I think -- it may -- I take it
Mr. Walker's point is however long it took last time had he
been doing just the congressional plan, might take longer since
17:04:07 inevitably an order would require drastic changes.  It would
not be a least change.  So there would be more the Legislature
has to weigh because it would blow up the map.  It would be
completely different from the way things were before.

     So I couldn't give you anything more than a guess.  I
17:04:26 don't see how it could possibly be done within less than a
couple of weeks.  But it could be much longer.  It could be a
little quicker.  That's the best I could do, Judge.

          JUDGE MANASCO:  Understood.  Thank you.

          JUDGE MARCUS:  Any other comments or questions about
17:04:45 that from anyone, or, Judge Moorer, any questions?

1        MR. LACOUR:  I am I guess depending on the ruling the

2   legislative redistricting committee could even potentially pass

3   new guidelines and do new things.  One of the guidelines in

4   North Carolina at issue in the *Rucho* case was partisan

17:05:06  5   advantage, for example.  And they used that to draw the present

6   gerrymander.  That's not what we did in this case despite

7   having a supermajority of Republicans in both houses.

8        But in any event, there are multiple considerations that

9   through no fault of the Legislature at that point if we are

17:05:27 10   enjoined from using our current map.

11        JUDGE MANASCO:  Understood.

12        MS. KHANNA:  Your Honor, if I may.

13        JUDGE MARCUS:  Ms. Khanna?

14        MS. KHANNA:  If I may just touch briefly on this.  At

17:05:40 15   the time of the Legislature drew the enacted plan, it also drew

16   a State House plan, a State Senate plan, a State Board of

17   Education plan.  It was drawing a lot of plans at the same

18   time.  I can imagine it would take less time to focus just on

19   the one plan and the violation that this Court would specify if

17:05:56 20   it were to find in favor of plaintiffs.

21        Mr. LaCour also brought up North Carolina.  North Carolina

22   I believe has a statute that says if the Court -- when and if a

23   Court strikes down an enacted redistricting map, the

24   Legislature gets two weeks to provide a remedy.  North Carolina

17:06:12 25   legislatures have done this multiple times and I think well

|  | |
|---|---|
| 1 | under two weeks several times.  So this is -- like I said, the |
| 2 | expedited process here not new.  The need to redraw maps is not |
| 3 | new.  The need to make clear that any new map regardless of |
| 4 | what the state's preferred guidelines are needs to comply with |
| 17:06:29 5 | Section 2 of the Voting Rights Act is certainly not new and is |
| 6 | required by law. |
| 7 | JUDGE MANASCO:  Thank you. |
| 8 | JUDGE MARCUS:  Any other questions or comments?  Judge |
| 9 | Moorer? |
| 17:06:42 10 | JUDGE MOORER:  No.  I just want to echo the comments |
| 11 | of my colleagues about the lawyers' performance in this case. |
| 12 | Your help has been very, very good and very helpful to the |
| 13 | Court. |
| 14 | JUDGE MARCUS:  Anything further from any of the |
| 17:06:57 15 | parties?  If not, we will be adjourned.  Mr. Blacksher for the |
| 16 | Singleton plaintiffs? |
| 17 | MR. BLACKSHER:  No, Your Honor.  Thank you very much. |
| 18 | JUDGE MARCUS:  Mr. Ross for Milligan? |
| 19 | MR. ROSS:  No, Your Honor.  Just thanking the panel |
| 17:07:13 20 | for their time and attention to these issues. |
| 21 | JUDGE MARCUS:  Ms. Khanna? |
| 22 | MS. KHANNA:  No, Your Honor.  Same thing.  I just want |
| 23 | to thank the Court for its flexibility, time, and patience. |
| 24 | JUDGE MARCUS:  Mr. Davis, anything further or |
| 17:07:24 25 | Mr. LaCour? |

1    MR. DAVIS:  Nothing else from the defendants, Judge.

2    JUDGE MARCUS:  Thank you all much.  I am sorry.

3    Mr. LaCour, was there anything further?

4    MR. LACOUR:  Just thanking you all as well.

17:07:35  5    JUDGE MARCUS:  Thank you all again for your

6    considerable efforts.  This Court is adjourned.

7    (Whereupon, the above proceedings were concluded at

8    5:07 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1

<u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5     transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9

10

11                                        <u>01-12-2022</u>

12     Christina K. Decker, RMR, CRR              Date

13     Federal Official Court Reporter

14     ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25