FILED

2022 Jan-26  AM 07:57
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **EVAN MILLIGAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-01530-AMM** |
| | ) | |
| **JOHN H. MERRILL, *in his*** | ) | |
| ***official capacity as Alabama*** | ) | **THREE-JUDGE COURT** |
| ***Secretary of State*, et al.,** | ) | |
| | ) | |
| **Defendants.** | | |

| | | |
|---|---|---|
| **BOBBY SINGLETON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1291-AMM** |
| | ) | |
| **JOHN H. MERRILL, *in his*** | ) | |
| ***official capacity as Alabama*** | ) | **THREE-JUDGE COURT** |
| ***Secretary of State*, et al.,** | ) | |
| | ) | |
| **Defendants.** | | |

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY

In evaluating an application to stay its ruling, the Court considers: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425–26 (2009).  Under each and all these criteria, Defendants' application fails.

Far from making a "strong showing" that they are likely to succeed on the merits or the other factors, *id*. at 426, Defendants ignore the Court's extensive factfinding and recycle legally unsound arguments rejected by the Supreme Court and this Court. As this Court explained, the "task is not to decide whether the majority-Black districts in the [illustrative] plans are 'better than' or "preferable" to a majority-Black district drawn a different way. Rather, the rule is that '[a] § 2 district that is **reasonably** compact and regular, taking into account traditional districting principles,' need not also 'defeat [a] rival compact district[]' in a 'beauty contest[].'" *Bush v. Vera*, 517 U.S. 952, 977–78 (1996) (internal quotation marks omitted). Indeed, the Supreme Court has rejected the "impossibly stringent" view of Defendants that "a district must have the least possible amount of irregularity in shape, making allowances for traditional districting criteria." *Bush*, 517 U.S. at 977.

Defendants ground their argument on the premise that the random application of non-racial redistricting principles would not yield two majority-Black districts in

Alabama. *See* Doc. 110 ("Mot.") at 13. But, as explained further below, Section 2 permits some consideration of race, and Defendants cite no authority for their argument that a plaintiff must show its illustrative districts would result by chance in computer simulations without any consideration of race. That is because there is none. *See Bush*, 517 U.S. at 977 ("A § 2 district . . . may pass strict scrutiny without having to defeat rival compact districts designed by [other] experts in **endless 'beauty contests.'**") (emphasis added).

Moreover, Defendants disregard the fact that the random algorithmic-generated maps Dr. Duchin and Dr. Imai discussed were based on only a subset of geography-based redistricting criteria and do not consider the State's own redistricting criteria.  And Dr. Duchin testified that it is "certainly possible" that two majority-Black districts *would* appear in a randomly generated maps using non-racial traditional redistricting criteria. Tr. 685. As the Court found, her maps prioritized non-racial criteria, Doc. 107 ("PI Order") at 57-58, so that race did not predominate, *id*. at 205. The same is true for Mr. Cooper. *Id*. at 87-89. Dr. Imai did not even attempt to consider the role of race in the illustrative plans. Tr. 293. These facts render Defendants' argument irrelevant.

Falling short of any showing of legal or factual error, Defendants argue that the Court misapplies the Voting Rights Act ("VRA") and that the Court's ordinary interpretation of the VRA would render it unconstitutional. This too, however,

3

misunderstands the Court's opinion and the record, while ignoring the long history of cases finding Section 2 violations on facts analogous to the facts found by this Court.

Defendants also complain about the speed of this litigation, but this Court heard from over a dozen witnesses, admitted hundreds of exhibits, and gave Defendants the opportunity to present whatever evidence they wanted over seven days—including admitting testimony from the similar 2020 trial in *Chestnut v. Merrill*.

In recent redistricting litigation, courts have repeatedly rejected attempts to stay relief pending appeal.[1] Here, because Defendants show little likelihood of success on appeal, let alone a strong one, and none of the other factors favor them, a stay is inappropriate.

## I.   DEFENDANTS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON APPEAL.

For a stay to issue, Defendants must make a "strong showing" that they are likely to succeed on the merits. *Nken*, 556 U.S. at 426. "The clearly-erroneous test

---

[1] *See, e.g., Bethune-Hill v. Va. State Bd. of Elections*, No. 3:14-CV-852, 2018 WL 11393922 (E.D. Va. Aug. 30, 2018), *stay denied Va. House of Delegates v. Golden Bethune-Hill*, 139 S. Ct. 914 (2019); *Covington v. North Carolina*, No. 1:15CV399, 2018 WL 604732 (M.D.N.C. Jan. 26, 2018), *stay denied in part, granted in part North Carolina v. Covington*, 138 S. Ct. 974 (2018); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552 (E.D. Va. 2016), *stay denied Wittman v. Personhuballah*, 577 U.S. 1125 (2016); *Harris v. McCrory*, No. 1:13CV949, 2016 WL 6920368 (M.D.N.C. Feb. 9, 2016), *stay denied McCrory v. Harris*, 577 U.S. 1129 (2016); *Perez v. Texas*, 891 F. Supp. 2d 808 (W.D. Tex. Sept. 7, 2012), *stay denied LULAC v. Perry*, 567 U.S. 966 (2012).

of Rule 52(a) is the appropriate standard for appellate review of a finding of vote dilution." *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986). "If the district court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021) (reinstating a trial court's fact-findings).

Yet, Defendants ignore the Court's extensive credibility determinations, and findings of fact. Failing to show that the Court committed any clear error, Defendants argue that the Court interprets the VRA in a new and unconstitutional manner, yet it is Defendants who ask the Court to adopt a novel and impossible to satisfy standard.

### A. Defendants Ignore Supreme Court Precedent by Failing to Recognize the Difference Between Race Consciousness and Racial Predominance and Conflating *Gingles* I and Remedial Maps.

As Justice Kennedy has explained, "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *Bush*, 517 U.S. at 997 (Kennedy, J., concurring). "Stating the concept in a different way, [a court] must determine whether the affected minority is diffused and thus politically ineffective, not whether the area by which it is bound is geographically dense." *Sanchez v. Colorado*, 97 F.3d 1303, 1312 (10th Cir. 1996).

Here, Defendants' expert conceded that Plaintiffs have drawn at least one illustrative plan with two districts comprised of a majority Black voting age

population even under the most restrictive measurement and several illustrative plans with two majority-Black districts using the broader "any-part Black" definition permitted by the Supreme Court. *Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003).

Faced with this concession, Defendants attempt to graft racial gerrymandering principles onto the first *Gingles* precondition and argue that because Dr. Duchin's illustrative maps subordinated traditional districting criteria to race and therefore cannot satisfy *Gingles* I. Factually, this ignores the Court's findings and all the evidence to the contrary about the construction of the illustrative districts. Legally, it fails to recognize the role of *Gingles* I and illustrative districts, the vast space between race neutrality and racial predominance, and that even racially predominant districts can pass muster if they satisfy if strict scrutiny.

1. Racial Considerations Did Not Predominate in the Drawing of the Illustrative Plans.

Defendants claim that Dr. Duchin looked "first to racial quotas and second to the State's redistricting guidelines." Mot. at 8. This does not comport with the evidence, or this Court's careful factual findings. It was no error at all—let alone clear error—for the Court to find that Dr. Duchin and Mr. Cooper "prioritized race only as necessary to answer the essential question asked of them as *Gingles* I experts," PI Order at 204, and that Dr. Duchin did not try "to maximize the number of majority-Black districts, or the BVAP in any particular majority-Black district, which she would have done if race were her predominant consideration," *id.* at 205.

Moreover, the Court found that Dr. Duchin "carefully considered traditional redistricting criteria when she drew her illustrative plans," that she "acknowledged that tradeoffs between traditional districting criteria are necessary, and she did not ignore any criteria she prioritized some principles over others." *Id.* at 149. This explicit finding alone rebuts Defendants' argument that race predominated in the crafting of the illustrative plans.

The Court also found Dr. Duchin's illustrative plans met traditional districting criteria. She drew districts that were reasonably compact, with her maps meeting or exceeding the State's on at least one metric of compactness, and her least compact districts still meeting or exceeding all of the State's 2011 districts. *Id.* at 158. Similarly, it credited her plans for respecting "existing political subdivisions, such as counties, cities, and towns . . . at least as well as the [State's] Plan." *Id.* at 163. On communities of interest, the Court and the State's own map drawer recognized the Black Belt as a "community of interest of substantial significance," *id.* at 165, and that Dr. Duchin's plans respect this community of interest, *id.* at 168.

### 2. Defendants Mischaracterize Dr. Duchin's and Dr. Imai's Testimony Regarding Their Methodologies

Defendants make much of Dr. Duchin's statement that she considered the goal of including two majority-Black districts in her plans to be "non-negotiable." Mot. At 8. However, under *Gingles*, that was exactly her task. See PI Order at 205. As the Court stated, "a rule that rejects as unconstitutional a remedial plan for attempting

to satisfy *Gingles* I would preclude any plaintiff from ever stating a Section Two claim." *Id.*

Beyond one statement from Dr. Duchin, which Defendants offer devoid of any context, Defendants' sole "evidence" in support of their racial predominance contention, is that "Dr. Duchin generated millions of random race-neutral maps, but none provided" two majority-Black districts, and that Dr. Imai also generated no majority-BVAP districts in his race-neutral simulations. Mot. at 13. Based on this evidence, Defendants assert that it is "impossible" to create redistricting plans that include two majority-Black districts using only race-blind redistricting principles.

Defendants distort the record.

On cross-examination, Dr. Duchin was directly asked "whether it is possible to draw [two majority-Black districts] according to all traditional redistricting criteria minus . . . the race focus[ed] criteria." Tr. at 685. She responded, "it is certainly possible," adding that her maps could have been "arrived at through a random process." Tr. 685. She further explained that her "race-blind" algorithms which resulted in maps without two majority-Black districts did not account for the State's own redistricting principles. Tr. at 684–85.

Defendants never followed up to ask Dr. Duchin which principles her algorithm relied on. Yet the article that was the basis of the Defendant's cross examination reveals that contiguity, population balance, and compactness were the

only criteria considered—not communities of interest, not whole counties, not whole cities or towns, all of which are central components of the criteria Alabama uses in redistricting. Ex. M28, Doc. 88-3. In addition, because the article was written before the release of the 2020 census data, it relies on 2010 data. Given the increase in Alabama's Black population in the last decade and the concentration of Black residents in particular cities, counties, and communities of interest, like the Black Belt, a change in any one of these factors might increase the likelihood of finding two majority Black districts using an algorithmic sample that considered more than the baseline quantitative redistricting principles.[2] Indeed, as this Court found, Dr. Duchin did use another algorithm that "found plans with two majority-[B]lack districts in literally thousands of ways." Tr. 565.

Nor do Dr. Imai's simulations show anything about the illustrative maps, let alone that it is not possible to create two reasonably compact majority-Black districts. Dr. Imai did not engage in his initial simulation as an effort to replicate the process that the State undertakes in drawing districts. Instead, Dr. Imai testified that he did not incorporate the state's guideline that (consistent with precedent) gives priority to VRA compliance in his simulation. Tr. 292. Additionally, because the State's criteria and evidence concerning communities of interest were too

---

[2] See Moon Duchin and Douglas M. Spencer, "Models, Race, and the Law," *The Yale Law Journal Forum* 744, 763 (Mar. 8, 2021), http://www.dougspencer.org/research/models_race_law.pdf.

amorphous when he conducted that "race-blind" analysis, he also did not incorporate communities of interest into his simulations, which would likely increase the chance of generating two majority-Black districts. *See, e.g.*, Tr., at 204; Ex. M6, doc 76-3 (using just two communities of interest increased the BVAPs in simulated districts).

Thus, there is no record to support Defendants' suggestion that a random application of its own non-racial redistricting criteria would not result in two majority-Black districts. Nor do Defendants appear to appreciate the irony of their argument. The HB1 map that the State itself drew, which Defendants have defended before this Court as applying the State's traditional redistricting principles, was not among the ten thousand "race-neutral" simulated maps Dr. Imai created. Ex. M1, Doc. 68-4 at 10.

Even if Defendants were correct that illustrative plans using only race-blind criteria would not have resulted in two majority-Black districts, the corollary of the proposition—i.e., that simulations purportedly failed to randomly generate Plaintiffs' maps—is *not* that it is impossible to draw two reasonably compact majority-Black districts, nor that race predominated in those maps. At best, it leaves open only the unremarkable and perfectly permissible notion that Dr. Duchin and Mr. Cooper accounted for race in drawing their illustrative maps, as Section 2 requires. *Cf. Shaw v. Hunt*, 517 US 899, 905 (1996) (explaining that a map-drawer

"may be conscious of the voters' races without using race as a basis for assigning

voters to districts").

### 3. Defendants Mischaracterize VRA Precedent

As this Court recognized, under Defendants' view, a VRA claim could not

succeed unless maps generated without any consideration of race produce new

majority-minority districts by sheer happenstance. But that is not how the VRA

works. Rather, courts "*require* plaintiffs to show that it would be possible to design

an electoral district, consistent with traditional districting principles, in which

minority voters could successfully elect a minority candidate." *Davis v. Chiles*, 139

F.3d 1414, 1425 (11th Cir. 1998) (emphasis in original). If the Court were to

"penalize" plaintiffs "for attempting to make the very showing that *Gingles* []

demand[s]," it would be "impossible, as a matter of law, for any plaintiff to bring a

successful Section Two action." *Id.*

This points to another fundamental flaw in Defendants' argument. They treat

Plaintiffs' illustrative *Gingles* I plans the same as remedial plans passed by the

Legislature. Yet these proposed districts are "not cast in stone;" they are illustrative

only. *Clark v. Calhoun Cty.*, 21 F.3d 92, 95 (5th Cir. 1994); *see also Bone Shirt v.*

*Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (noting that the "ultimate end of the

first *Gingles* precondition is to prove that a solution is possible, and not necessarily

to present the final solution to the problem"). As appropriate, the Court has provided

11

the Alabama Legislature the opportunity to draw new, VRA-compliant maps. While the Legislature's maps must satisfy constitutional standards, those maps can be drawn with race consciousness or race may even predominate if narrowly tailored to remedy the Section 2 violation. *See Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) ("legislature always is aware of race when it draws district lines") (citation omitted).

Defendants also fail to recognize that even if racial gerrymandering principles were grafted onto the *Gingles* preconditions and even if had Dr. Duchin used race as *the* predominant factor in drawing her illustrative maps—which the evidence shows she did not—that would not necessarily render them constitutionally infirm. Districts drawn with a racially predominant purpose survive if the use of race was "narrowly tailored" to satisfy a "compelling interest" such as compliance with the VRA. *See Bethune-Hill*, 137 S. Ct. at 800-801 (upholding a district drawn for a predominately racial purpose where it was narrowly tailored to comply with the VRA).

This underscores the fallacy of Defendants' argument—it would create a circular standard impossible to meet. But even if such a standard were applicable, which it is not, Dr. Duchin testified that she considered race only to the extent necessary to show that she could draw two majority-Black districts. PI Order at 149. This, in combination with Dr. Liu's effectiveness analysis showing that these illustrative districts meet but do not significantly exceed the BVAP levels necessary

for Black voters to elect candidates of choice, *id.* at 70, provides strong evidence of narrow tailoring.

Finally, Defendants argue that if the Court's interpretation of Section 2 of the VRA is correct, then the VRA is unconstitutional. This rests on the unfounded and unsupported proposition that Plaintiffs' *Gingles* I illustrative maps are unconstitutional racial gerrymanders. Defendants' position defies both logic and precedent. Defendants concede that Section 2 "permits race-conscious relief … where plaintiffs demonstrate that redistricting has 'result[ed] in a denial or abridgement of the right … to vote on account of race or color," Mot. at 12, but they go on to argue that that race-conscious relief must be "consistent with 'traditional redistricting principles,'" which they say means it cannot be race conscious. *Id.* This position is not only self-contradictory; it is inconsistent with decades of Supreme Court precedent holding that race may be lawfully considered in redistricting to comply with the VRA.[3] *See, e.g.*, *Bethune-Hill*, 137 S. Ct. at 800-801; *King v. State Bd. of Elections*, 522 U.S. 1087 (1998), *summarily aff'g* 979 F. Supp. 619, 626 (N.D. Ill. 1997) ("remedying a potential violation of or achieving compliance with § 2

---

[3]     In the recent past, eight Supreme Court Justices have expressed the view that "compliance with federal antidiscrimination laws"—including Section 5 of the VRA—"can be a compelling state interest." *See LULAC v. Perry*, 548 U.S. 399, 518 (2006) (Scalia, J., concurring in judgment in part and dissenting in part, joined in relevant part by Roberts, C.J., Thomas & Alito, JJ.); *id*. at 475, n. 12 (Stevens, J., concurring in part and dissenting in part, joined in relevant part by Breyer, J.); *id*. at 485 n. 2 (Souter, J., concurring in part and dissenting in part, joined by Ginsberg, J.).

constitutes a compelling state interest"). *Shaw v. Reno*, 509 U.S. 630, 656 (1993) ("We previously have recognized a significant state interest in eradicating the effects of past racial discrimination.").

Defendants offer no evidentiary or legal basis to support their unfounded position that the Court erred in ruling that Plaintiffs amply satisfied *Gingles* I.  As such, they fail to show any likelihood of success on appeal, and certainly not the strong likelihood required to support their stay application.

**B. Defendants Conflate the Totality of the Circumstances Inquiry with Intentional Discrimination and Cannot Undermine the Extensive Evidence Linking These Districts to Discriminatory Practices.**

Defendants baldly state that the "totality of the circumstances" inquiry in this case should prohibit relief under Section 2 of the Voting Rights Act. Mot. at 14. But rather than attempt to refute the Court's detailed findings on each of the Senate Factors, Defendants offer a non-sequitur, arguing, in effect, that because of the Legislature used purportedly race-neutral "traditional districting principles and basic political geography and demographics" to draw the challenged districts, it could not have intended to deny or abridge Black Alabamians' "right … to vote on account of race or color." Mot. at 15 (quoting 52 U.S.C. §10301(a)).

Even were this relevant to an analysis of the totality of the circumstances under Section 2, it disregards that the Supreme Court has held for decades that Section 2 "repudiated" the intentional discrimination test when Congress amended

14

it in 1982. *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986). In enacting the VRA, Congress "[i]nvok[ed] the power conferred by § 2 of the Fifteenth Amendment." *Brnovich*, 141 S. Ct. at 2331 (citing *City of Rome v. United States*, 446 U.S. 156, 173 (1980)). And *Gingles* remains the "seminal § 2 vote-dilution case." *Brnovich*, 141 S. Ct. at 2337. Yet, Defendants ignore that both *Gingles* and subsection (b) of Section 2 require an examination of "the totality of circumstances"—i.e., the Senate Factors, *Gingles*, 478 U.S. at 36-37—to show that Black Alabamians "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). That is precisely the inquiry that the Court engaged in here.

The Court analyzed each of the Senate factors and found "that every Senate Factor [it was] able to make a finding about, along with proportionality, weighs in favor of the *Milligan* plaintiffs and the *Caster* plaintiffs, and that no Senate Factors or other circumstances we consider at this stage weigh in favor of Defendants." PI Order at 195. Defendants offer nothing to rebut these findings, let alone provide a basis for clear error. Nor could they. The Court appropriately credited the expert testimony of both Dr. Bagley and Dr. King as to the Senate factors, *see* PI Order at 185, while specifically noting that Defendants offered no expert testimony to rebut their opinions.

## II.   THE EQUITIES DO NOT WEIGH IN FAVOR OF A STAY

To determine whether to grant a stay, the Court must also examine whether "the applicant will be irreparably injured absent a stay," "whether issuance of the stay will substantially injure the other parties interested in the proceeding," and "where the public interest lies." *Nken*, 556 U.S. at 426. Defendants ignore the significant harm to the public interest and irreparable injuries to Plaintiffs if the stay is granted, though the Court, in its ruling as already made significant and specific findings on these subjects. To weigh in the balance, they describe only administrative inconvenience to a handful of candidates and election officials, none of which are irreparable harm, and all of which have already been evaluated by the Court as having less weight than the injury and harm from not issuing (or now staying) an injunction.

This Court's Order found that Plaintiffs "will suffer an irreparable harm if they must vote in the 2022 congressional elections based on a redistricting plan that violates federal law." PI Order at 197. As the Court recognized, Defendants do not dispute the irreparable nature of Plaintiffs' injuries. *Id.* at 198. Consistent with that, Defendants do not argue that the Court's finding of irreparable injury is clearly erroneous. Nor do they even assert that Defendants will be irreparably injured without a stay of the injunction. As a result, the irreparable-injury factor weighs against Defendants' motion to stay the injunction.

The Court's Order also found that the balance of the harms favored granting injunctive relief. Specifically, the Court recognized that without preliminary relief "the *Milligan* plaintiffs will suffer this irreparable injury until 2024, which is nearly halfway through this census cycle," and that this harm is "greater" than "the harm that Defendants assert they will suffer" in the form "the administrative burden of drawing and implementing a new map, and upsetting candidates' campaigns." *Id.* at 198. Defendants do not point to any asserted error in the Court's analysis of the balance of the harms, and do not even argue that the balance of the harms supports a stay of the injunction. As a result, the balance-of-the-harms factor weighs against Defendants' motion to stay the injunction.

Finally, the Court found that "a preliminary injunction is in the public interest." *Id.* at 199. It specifically "reject[ed] Defendants' argument that such relief will harm the public interest because the timing of an injunction will precipitate political and administrative chaos." *Id.* at 199. Among other things, the Court found that "Alabama's 2022 congressional elections are not imminent," and that, even if they were, "it is not necessary that we allow those elections to proceed on the basis of an unlawful plan." *Id.* at 199-200. This is the only equities factor addressed by Defendants, and as to it, Defendants offer nothing new.

Instead, Defendants simply recycle a "sky-is-falling" argument about supposed "chaos" that will result from having to comply with the Court's Order and

redraw the map—without addressing either the Court's detailed fact finding or its careful legal analysis on this issue. Importantly, the Court's remedy provided the Legislature 14 days to redraw the map, which is within the timeframe that both Defendants and their map drawer, Mr. Hinaman, estimated was needed for a new compliant redistricting plan. Tr. 1922:9-1923:22; Exh. M11 at 113:6-19. In addition, the Committee, the Legislature, and the Governor have all shown themselves capable of evaluating and approving redistricting plans on an expedited timeline. *See* PI Order at 202 (the Legislature took "a mere five days" to enact HB1). No record evidence supports Defendants' claims that a short delay of the candidate declaration deadline will inject chaos into an election that remains months away. And the Court has already considered and rejected this argument in its analysis.

In any event, "inconvenience to legislators elected under an [illegal] districting plan resulting from such legislators having to adjust their personal, legislative, or campaign schedules . . . does not rise to the level of a significant sovereign intrusion." *Covington v. North Carolina*, No. 1:15CV399, 2018 WL 604732, at *6 (M.D.N.C. Jan. 26, 2018) (citation omitted), *stay denied in part, granted in part North Carolina v. Covington*, 138 S. Ct. 974 (2018).

Specifically, the Court already found that the election is not "imminent" and that the various steps in the process leading up to the primary in May 2022 and the Congressional election in November 2022 do not substitute for imminence. PI Order

at 199-200. Defendants' motion offers nothing to refute this.  For example, the Court did not err in finding that Mr. Helms never testified compliance with an injunction would make conducting the elections in a timely fashion "undoable." *Id.* at 201. Defendants similarly fail to point to any record evidence that would render clearly erroneous the Court's findings that neither campaign expense nor potential voter confusion make it "necessary" to conduct an election using maps that violate the VRA. *Id.* at 202-203 (discussing record). Indeed, there is no risk of voter confusion since the Legislature only recently enacted HB1 and no one has ever voted under it.

On the law, contrary to the state's argument, "stays are not commonly granted in redistricting, or any other type of litigation." *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (citing cases). Defendants' motion just doubles down on cases like *Favors v. Cuomo*, 881 F. Supp. 2d 356 (E.D.N.Y. 2012), which the Court already specifically and carefully distinguished. PI Order at 201 (explaining that "[i]n *Favors*, the plaintiffs' claims were based on 'novel, contested' legal grounds, and the plaintiffs had adduced 'virtually no' evidence to support them," whereas, here, Plaintiffs' claims are based on "a substantial body of case law" and "an extremely robust evidentiary record"). Courts have issued preliminary injunctions on similar election timelines in Section 2 cases. *See, e.g., Perez v. Texas*, No. 11-CA-360, 2012 WL 13124275, at *4 (W.D. Tex. Mar. 19, 2012) (three-judge court) (ordering a remedial state house map before a May primary and November general

election) *Perez v. Perry*, No. SA-11-CV-360, 2012 WL 13124278, at *11 (W.D.

Tex. Mar. 19, 2012) (three-judge court) (congressional map).

Defendants' citation to *Mac Govern v. Connolly*, is also inapposite. In *Mac Govern*, although the allegedly unconstitutional redistricting plan had been in place for nearly a decade, the plaintiffs waited less than a month before the candidate filing deadline to file the lawsuit and then waited another week before seeking preliminary injunctive relief. 637 F. Supp. 111, 112, 115-16 (D. Mass. 1986) (three-judge court). That is far from the situation here, where the "plaintiffs . . . commenced their lawsuits within hours or days of the enactment of the Plan." PI Order at 202-03.

In the end, Defendants' argument for a stay underscores that their position, which this Court correctly rejected, that "the redistricting process is above the law" and it is "always [ ] too late or too soon" for Plaintiffs. *Id*. at 201 (citations omitted).

Expedited discovery and a seven-day hearing in these cases developed a robust, detailed and substantive record that allowed the Court to make credibility determinations and factual findings undergirding its conclusions of law. As the Court effectively concluded, and as is plainly the situation, Defendants could alleviate their supposed harms by moving expeditiously to comply with their legal obligations. *See* PI Order at 203 ("We have proceeded with all deliberate speed so as not to deprive plaintiffs of an opportunity for a timely remedy, and now the state must do the

same."). Rejecting this approach, Defendants instead seek to further delay relief for Plaintiffs.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' Motion to Stay.

DATED this January 26, 2022.

*/s/ Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC. 700
14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org
Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org

Shelita M. Stewart*
Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com
Michael Turrill*
Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067

Respectfully submitted,

*/s/ Sidney M. Jackson*
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Julie Ebenstein*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org

*/s/ LaTisha Gotell Faulks*
LaTisha Gotell Faulks (ASB-1279-I63J)
Kaitlin Welborn*
AMERICAN CIVIL LIBERTIES UNION OF
ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org
kwelborn@aclualabama.org
Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

**Attorneys for Plaintiffs**

(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

Anthony Ashton*
Anna Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE (NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
aashton@naacpnet.org
abarnes@naacpnet.org
**_Attorneys for Plaintiff Alabama State Conference of the NAACP_**
* Admitted _Pro hac vice_

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record on January 26, 2022.

*/s/* Deuel Ross

Counsel for Plaintiffs