


UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BOBBY SINGLETON, et al., | |
| *Plaintiffs*, | |
| v. | Case No.: 2:21-cv-1291-AMM |
| JOHN H. MERRILL, Secretary of State, et al., | **THREE-JUDGE COURT** |
| *Defendants*. | |

---

| | |
|---|---|
| EVAN MILLIGAN, et al., | |
| Plaintiffs, | |
| v. | Case No.: 2:21-cv-01530-AMM |
| JOHN H. MERRILL, in his Secretary of State of Alabama, et al., | **THREE-JUDGE COURT** |
| *Defendants*. | |

---

| | |
|---|---|
| MARCUS CASTER, et al., | |
| *Plaintiffs*, | |
| v. | Case No.: 2:21-cv-01536-AMM |
| JOHN H. MERRILL, Secretary of State of Alabama, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' RESPONSE TO THE COURT'S APRIL 7, 2022 ORDER REGARDING PLAINTIFFS' REQUEST FOR DISCOVERY, BRIEFING, AND TRIAL**

## INTRODUCTION

There are three challenges pending to Alabama's 2021 congressional redistricting plan. Two of them (*Milligan* and *Caster*) center on whether the State of Alabama's 2021 redistricting plan for its seven seats in the United States House of Representatives violated Section 2 of the Voting Rights Act. That precise question is now pending before the Supreme Court in both *Merrill v. Milligan* and *Merrill v. Caster*. Nos. 21-1086 & 1087. For the third case (*Singleton*), the Supreme Court's answer to that question will necessarily inform plaintiffs' challenge, and even "the *Singleton* plaintiffs acknowledged that the proper interpretation of Section 2 can be determinative of the merits of their constitutional claim." *Singleton* Doc. 114 at 10.

Thus, the parties and this Court must await the Supreme Court's answer before further litigating the legality of Alabama's redistricting plan. Pressing ahead, as Plaintiffs request, would be a waste of this Court's and the parties' resources, at best, and would frustrate the Supreme Court's appellate jurisdiction, at worst. Even for cases that are merely related—let alone the very same case—awaiting "a federal appellate decision that is likely to have a substantial or controlling effect on the claims and issues in the stayed case" is "at least a good [reason], if not an excellent one" for granting a stay of proceedings. *Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.*, 559 F.3d 1191, 1198 (11th Cir. 2009).

Here, the reasons to await the Supreme Court's decision could not be more compelling. The Supreme Court has stayed this Court's preliminary injunction order and will now be giving plenary review to the Voting Rights Act claims made regarding Alabama's congressional districts. Separate opinions issued by Justice Kavanaugh, joined by Justice Alito, and Chief Justice Roberts say expressly that the Court will clarify the metes and bounds of Section 2: "[T]he Court's case law in this area is notoriously unclear and confusing." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). The Chief Justice agreed "that *Gingles* and its progeny have engendered considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim." *Id.* at 882-83 (Roberts, C.J., dissenting). The Supreme Court is poised to "resolve the wide range of uncertainties arising under *Gingles*" in this very case. *Id.* at 883. There is no conceivable reason to press ahead in advance of the Supreme Court's decision.

## BACKGROUND

The *Caster* and *Milligan* Plaintiffs filed their complaints challenging Alabama's 2021 congressional redistricting plan on November 4 and November 16, 2021, respectively. *See Caster* Doc. 3; *Milligan* Doc. 1. Plaintiffs moved for preliminary injunctions on December 15, 2021; this Court conducted hearings from January 4 to January 12, 2022, and issued an order granting the *Milligan* and *Caster* Plaintiffs a preliminary injunction on January 24, 2022. *See Milligan* Docs. 69, 107;

*Caster* Docs. 56, 101. That order turned on the Court's conclusion "that the Plan substantially likely violates Section Two," and that Plaintiffs' approach to Section 2 did not violate the Equal Protection Clause. *See, e.g.*, *Milligan* Doc. 107 at 196, 204-06. The Court declined to opine on the *Milligan* or *Singleton* Plaintiffs' arguments that the plan violates the Equal Protection Clause as an unconstitutional racial gerrymander. *Id.* at 216.

On February 7, 2022, the Supreme Court noted probable jurisdiction in *Milligan* and granted a petition for a writ of certiorari before judgment in *Caster*. *See Merrill*, 142 S. Ct. 879. The Supreme Court has informed the parties that the cases will be argued in the October 2022 Term, likely in the month of October. The Court has ordered the parties to brief and argue the following Question Presented: "Whether the State of Alabama's 2021 redistricting plan for its seven seats in the United States House of Representatives violated section 2 of the Voting Rights Act, 52 U.S.C. §10301." March 21, 2022 Order Amending Question Presented. The Supreme Court will thus be addressing the same question the *Milligan* and *Caster* Plaintiffs seek to litigate in this Court over the same plan all three sets of Plaintiffs have challenged.

**ARGUMENT**

1. The *Milligan* and *Caster* Plaintiffs seek to continue litigating in this Court the exact same question that they are litigating before the Supreme Court—that is,

whether an additional "majority-minority congressional district … is required by the Voting Rights Act and not prohibited by the Equal Protection Clause." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). The Supreme Court's resolution of the question presented—"Whether the State of Alabama's 2021 redistricting plan for its seven seats in the United States House of Representatives violated section 2 of the Voting Rights Act, 52 U.S.C. §10301"—will necessarily determine the next chapter of the proceedings in this Court. Plaintiffs' request that the parties press ahead here, thereby ignoring the Supreme Court's ongoing exercise of its appellate jurisdiction in the same case, is an extraordinary one that should be rejected. *Cf. Miccosukee Tribe*, 559 F.3d at 1198 ("await[ing] a federal appellate decision that is likely to have a substantial or controlling effect on the claims and issues in the stayed case" is "at least a good [reason], if not an excellent one" to stay a case); *Kerotest Mfg. C. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952) (judicial power to stay should be exercised based on "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation"); *see also, e.g.*, *Ferrari v. N. Am. Credit Servs., Inc.*, No. 8:21-CV-2520-KKM-AEP, 2022 WL 462078, at *2 (M.D. Fla. Feb. 15, 2022) (noting 30 cases stayed pending the Eleventh Circuit's consideration of an issue en banc); *Robinson v. Nationstar Mortg., LLC*, 220 F. Supp. 3d 1353, 1355 (S.D. Ga. 2016) (granting stay pending

appellate decision in different case); *Lopez v. Miami-Dade Cty*., 145 F. Supp. 3d 1206, 1208 (S.D. Fla. 2015) (same).

Plaintiffs' request is all the more extraordinary given the separate opinions issued as part of the Supreme Court's stay of this Court's order. Multiple members of the Supreme Court stated in opinions accompanying the stay that the Court would be clarifying the rule of decision that applies in this Section 2 case and every other. As Justice Kavanaugh stated, "the Court's case law" regarding what "is required by the Voting Rights Act and not prohibited by the Equal Protection Clause" "is notoriously unclear and confusing." *Id.* (Kavanaugh, J., concurring). Chief Justice Roberts likewise stated that the Court will "resolve the wide range of uncertainties arising under *Gingles*" when it decides *Milligan* and *Caster*. *Id.* at 883 (Roberts, C.J., dissenting). Moreover, Justice Kagan's dissent portrayed the Court's stay order as being based on the "view that the law needs to change." *Id.* at 889. There is no conceivable reason for pressing ahead now, without that promised clarification for the very standards that govern the Section 2 claims here.

In light of the ongoing Supreme Court proceedings, Plaintiffs' proposed schedule for discovery over the fall and summary judgment motions and motions in limine by December would be prejudicial to Defendants and an obvious waste of litigant and judicial resources. Pressing ahead requires all parties to unnecessarily expend litigation resources. Such costs could all be for naught (if Plaintiffs prevail,

for example) or such costs will need to be repeated in whole or in part after the Supreme Court rules (depending on how the Supreme Court modifies or clarifies the rule of decision). *Cf. Robinson*, 220 F. Supp. 3d at 1355 (noting that "Defendants would have to conduct discovery and trial preparation without any certainty regarding" an important legal issue in the case). While a plaintiff might be willing to take multiple shots trying to prove up multiple versions of a Section 2 case, Defendants should not be forced to waste their resources litigating based on predictions about what the Supreme Court will soon decide. Nor should this Court.

Such concerns led the three-judge court in *Benisek v. Lamone*, 266 F. Supp. 3d 799 (D. Md. 2017), to sua sponte stay proceedings over a partisan gerrymandering claim after the Supreme Court announced it would hear oral arguments in the related partisan gerrymandering case of *Gill v. Whitford*, 138 S.Ct. 1916 (2018). While there were slight differences between the cases (*Gill* involved "an Equal Protection claim relating to statewide redistricting," and *Benisek* "involve[d] a First Amendment claim arising from the line-drawing of a single district," *Benisek*, 266 F. Supp. 3d at 838 (Niemeyer, J., dissenting)), the court still concluded that the Supreme Court's "analysis undoubtedly will shed light on critical questions in this case, and the parties and the panel will be best served by awaiting that guidance." *Id.* at 815. To ensure it could "*correctly* adjudicate" plaintiff's claim, the court needed to "first insure that it is proceeding on the correct legal foundation—that in measuring the legality and

constitutionality of any redistricting plan in Maryland it is measuring that plan according to the proper legal standard." *Id.* Waiting for the Supreme Court's *Whitford* decision would leave the district court "better equipped to make that legal determination and to chart a wise course for further proceedings." *Id.* The same is all the more true here, where the Supreme Court is currently adjudicating Plaintiffs' very claims.

Likewise, the three-judge court in *Thomas v. Merrill*, No. 21-cv-1531 (N.D. Ala.), has stayed that Section 2 and Equal Protection Clause case pending the Supreme Court's forthcoming Section 2 decision in the cases here given the overlapping nature of the legal claims in *Thomas* and the case before the Supreme Court. *See* Order, *Thomas v. Merrill*, No. 2:21-cv-1531 (N.D. Ala. Mar. 21, 2022), ECF No. 61. The same considerations undoubtedly counsel in favor of staying these proceedings until the Supreme Court issues its decision in these very cases.

2. The *Milligan* Plaintiffs note that they also raise "a racial gerrymandering claim, which is analytically distinct from their vote dilution claim under the VRA." Doc. 142 at 5 (quotation marks omitted). They then assert that the Supreme Court's forthcoming *Milligan* decision "will change neither the facts nor law by which this Court decides the racial gerrymandering claim," citing among other cases the Supreme Court's recent decision regarding Wisconsin's state maps. *Id.* at 5-6.

Contrary to Plaintiffs' arguments, the dispute in Wisconsin underscores the connection between Section 2 and the Equal Protection Clause in redistricting cases. In *Wisconsin Legislature v. Wisconsin Elections Commission*, No. 21A471, 2022 WL 851720, at *1 (U.S. Mar. 23, 2022), the Wisconsin Supreme Court had invited the parties to propose for adoption maps that complied with state and federal law. The state court then selected the governor's map, which "intentionally created seven majority-black districts—one more than the current map," after the governor had "argued that the addition of a seventh majority-black district was necessary for compliance with the VRA." *Id.* It was that Section 2 issue that raised Equal Protection Clause questions over whether the governor or the Wisconsin Supreme Court could "shoulder strict scrutiny's burden" to lawfully impose a "race-based" map. *Id.* at *2-3.

Here too, in *Milligan* and *Caster*, the State has argued all along that Plaintiffs' conception of Section 2 is at odds with the Equal Protection Clause. And the Supreme Court will necessarily have to consider what Section 2 can require of a State in light of the Equal Protection Clause's constitutionally prescribed guardrails. As Justice Kavanaugh described it, the Supreme Court will be deciding "whether a second majority-minority congressional district (out of seven total districts in Alabama) is required by the Voting Rights Act *and not prohibited by the Equal Protection Clause*." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring) (emphasis

added). The Supreme Court will address the reach of Section 2 in light of Defendants' argument (among others) that Section 2 cannot be interpreted to require what could otherwise be deemed an unconstitutional racial gerrymander. The pending appeal thus necessarily raises questions about how the Equal Protection Clause limits a legislature's discretion in redistricting. As illustrated by the stay in the *Thomas* litigation, which also raises Equal Protection Clause claims, litigants and the Court ought to have the benefit of the Supreme Court's ruling on that inextricably intertwined Equal Protection Clause issue before pressing ahead with their Equal Protection Clause claims.

Indeed, when the *Singleton* Plaintiffs requested that this Court rule on their constitutional claim after the Supreme Court decided to review *Milligan* and *Caster*, this Court declined. This Court rejected the view that "the *Singleton* plaintiffs' … constitutional claim is simple and their motion for preliminary injunction must be decided now, before the Supreme Court can weigh in on the 'complex and delicately balanced requirements' that are relevant to the merits of the claim and the relief the *Singleton* plaintiffs seek." *Singleton* Doc. 114 at 10 (quoting *Abbott v. Perez*, 138 S.Ct. 2305, 2314 (2018)). It similarly makes sense to wait for the Supreme Court to weigh in before pressing forward with the *Milligan* Plaintiffs' similar constitutional claims.

Additionally, as this Court noted in its preliminary injunction order and order denying the *Singleton* Plaintiffs' recent motions for rulings following the Supreme Court's decision to review *Milligan* and *Caster*, the canon of constitutional avoidance cautions against addressing Plaintiffs' constitutional claims until necessary. If Plaintiffs prevail on their Section 2 claims, there will be no need for this Court to rule on the constitutional claims. *Milligan* Doc. 107 at 216-17; *see also Singleton* Doc. 114 at 11 ("[W]e adhere to our view that we should not decide any constitutional claims before we must.").

3. Finally, after the Supreme Court rules, there will be time for further proceedings in this Court in advance of relevant deadlines for the 2024 elections. Plaintiffs note that the Court is likely to rule between February and June 2023. Closer to February is more probable. Over the past few years, the Supreme Court has decided several redistricting cases promptly, taking around four months from oral argument to final decision, even where Justices have penned concurrences and dissents. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254 (2015) (argued Nov. 12, 2014, and decided four-and-one-half months later on March 25, 2015); *Bethune-Hill v. Va. St. Bd. of Elections*, 137 S. Ct. 788 (2017) (argued Dec. 5, 2016, decided three months later on March 1, 2017); *Cooper v. Harris*, 137 S. Ct. 1455 (2017) (argued Dec. 5, 2016, and decided six months later on May 22, 2017); *Abbott v. Perez*, 138 S. Ct. 2305 (2018) (argued April 24, 2018, and decided two months

June 25, 2018). Meanwhile, the qualifying deadline for the 2024 election is not until November 10, 2023.[1]

There will thus be ample time after the Supreme Court rules, whenever and however the Court rules. Of course, if Plaintiffs prevail, this Court's preliminary injunction would be restored and any litigation between now and then would have proven a waste. And if Defendants prevail, there is time to address any remaining claims as clarified by the Supreme Court. Even a decision in May or June would leave months more time between the Supreme Court's decision and candidate qualifying for the 2024 election than the parties had in the first round of litigation between mid-November 2021 and the January 2022 close of qualifying. Plus, Plaintiffs will have the benefit of having already developed considerable evidence this past January. Thus, any gains from trying to litigate these cases while simultaneously anticipating how the Supreme Court will rule on Section 2's application to Alabama's congressional map "would be greatly outweighed by the efficiency costs of charging ahead only to later learn that Plaintiffs must return to square one (or, perhaps, that their action is no longer viable)." *Benisek*, 266 F. Supp. 3d at 815-16.

[1] In Presidential election years, such as 2024, Alabama holds its primary election on the first Tuesday in March. Ala. Code § 17-13-3(b). In 2024, that will be March 5. The qualifying deadline occurs 116 days before the primary, Ala. Code § 17-13-5(a), which for the next cycle will be November 10, 2023.

One final point: Plaintiffs say that "Defendants have informed Plaintiffs' counsel that, under Defendants' view of *Purcell v. Gonzalez*, 549 U.S. 1 (2006), any potential final order of this Court that grants relief after September 10, 2023, will be too late to affect the November 5, 2024 congressional elections." Doc. 142 at 3. That's not quite right. Defendants certainly do not waive any defense they may have under *Purcell*, and it is true that Defendants agree that "'a court should have as its goal the imposition of a plan no later than one month before candidates may begin qualifying for the primary ballot….'" *Favors v. Cuomo*, 881 F. Supp. 2d 356, 364 (E.D.N.Y. 2012) (quoting Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1147 (2005)). But *Purcell* does not impose a bright-line rule or any particular date beyond which a Court is unable to act. Applying *Purcell* entails balancing case-specific factors. *See, e.g.*, *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Defendants cannot say now how this equitable balance would tilt when they do not know the date or scope of a hypothetical ruling, but Defendants can say that the Supreme Court's ruling is certain to affect the next stage of this case—after all, it is the *same case*. And Defendants can say this Court is virtually certain to have significantly more time between the Supreme Court's ruling and candidate qualifying for 2024 than this Court had between the filing of these suits and candidate qualifying in January 2022.

* * *

*Milligan* and *Caster* are pending before the Supreme Court, which will soon answer the question whether Alabama's congressional districting plan violated Section 2. In doing so, the Court will necessarily opine on the Equal Protection Clause and the limits it places on Section 2 liability. In the face of the Supreme Court's exercise of its appellate jurisdiction, Plaintiffs propose plunging deeper into the uncertainty—with costly discovery, briefing, and even a trial over whether Alabama's map has violated a standard we won't yet know until next Term. Waste of party and judicial resources is a certainty, clearly prejudicing Defendants. There will be sufficient time to continue in the ordinary course: wait for the Supreme Court to decide the appeal of Plaintiffs' Section 2 claims, and then return to this Court with ample time before the 2024 election deadlines. For these reasons, Defendants oppose moving forward on Plaintiffs' claims until the Supreme Court has ruled in *Milligan* and *Caster*.

*Respectfully Submitted,*

Steve Marshall
*Attorney General*

*Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)
*Solicitor General*
Thomas A. Wilson (ASB-1494-D25C)
*Deputy Solicitor General*
James W. Davis (ASB-4063-I58J)
*Deputy Attorney General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov
Thomas.Wilson@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov

***Counsel for Secretary Merrill***

s/ *Dorman Walker* (with permission)

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

***Counsel for Sen. McClendon and Rep. Pringle***

## CERTIFICATE OF SERVICE

I certify that on April 12, 2022, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

/s/ Edmund G. LaCour Jr.
*Counsel for Secretary Merrill*