

FILED
2023 Jul-28  PM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

## SOUTHERN DIVISION

EVAN MILLIGAN, et al.,

    *Plaintiffs*,

    vs.

WES ALLEN,  et al.,

    *Defendants*.

No. 2:21-cv-01530-AMM
(three-judge court)

## MILLIGAN PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REMEDIAL PROPOSAL AND MEMORANDUM OF LAW

# TABLE OF CONTENTS

INTRODUCTION................................................................................................1

FACTUAL BACKGROUND ............................................................................2

   **A.  Alabama's 2021 Congressional Districting Plan.** .........................2

   **B.  This Court Found, and the Supreme Court Affirmed, a Likely VRA Violation.**..........................................................................................3

   **C.  The Legislative Process and Enactment of a New Map.**.............5

LEGAL STANDARD ......................................................................................10

ARGUMENT ...................................................................................................11

   **I.  HB5 FAILS TO REMEDY THE § 2 VIOLATION** ...............................11

   **A.  HB5 Fails to Completely Remedy the §2 Violation Because the Plan Itself Violates § 2 and Unlawfully Dilutes the Black Vote.** .........................11

   **B.  SB5's Legislative "Findings" Serve to Perpetuate the § 2 Violation and Contradict the District Court and Supreme Court's Direct Conclusions and Actual Evidence about Communities of Interest.** ..................................15

   **C.  S.B. 5 Raises Constitutional Concerns as it May be the Product of Intentional Racial Discrimination.**.........................................................18

CONCLUSION................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ..................................................................12

*Abrams v. Johnson*,
    521 U.S. 74 (1997) .......................................................................13

*Allen v. Milligan*,
    143 S. Ct. 1487 (2023) .............................................................*passim*

*Dillard v. Crenshaw Cnty.*,
    831 F.2d 246 (11th Cir. 1987) ................................................10, 15

*Ferrill v. Parker Grp., Inc.*,
    168 F.3d 468 (11th Cir. 1999) ......................................................18

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
    992 F.3d 1299 (11th Cir. 2021) ....................................................18

*Green v. Cnty. Sch. Bd.*,
    391 U.S. 430 (1968) .....................................................................11

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) .....................................................................12

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006) .................................................11, 12, 15, 21

*Perry v. Perez*,
    565 U.S. 388 (2012) (per curiam) ................................................11

*Reno v. Bossier Par. Sch. Bd.*,
    520 U.S. 471 (1997) .....................................................................11

Thornburg v. *Gingles*,
478 U.S. 30 (1986) ..................................................................13, 14

*United States v. Dallas Cnty. Comm'n*,
  850 F.2d 1433 (11th Cir. 1988) ...........................................................10, 11, 12

*Upham v. Seamon*,
  456 U.S. 37 (1982).........................................................................................11

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977).......................................................................................18

*Wright v. Sumter Cnty. Bd. of Elections*,
  979 F.3d 1282 (11th Cir. 2020) ......................................................................13

## Statutes

Voting Rights Act, 52 U.S.C. § 10301(b).........................................................*passim*

## Other Authorities

ALA. DAILY NEWS (July 24, 2023)............................................................................9

Ala. Joint Permanent Leg. Comm. On Reapportionment Mtg., July 11, 2023......................................................................................................................7

Assoc. Press, *The fight over Alabama's congressional redistricting now shifts back to federal court*............................................................................9

Ala. Joint Permanent Leg. Comm. On Reapportionment Mtg., July 7 ...................6

Jane C. Timm, *Alabama Republicans refuse to draw a second Black congressional district in defiance of Supreme Court* (July 21, 2023) ..................................................................................................................19

Jeff Poor, *State Rep. Simpson on redistricting: 'It would not surprise me if we have seven Republican congressmen' after 2024 election*...................10

Mike Cason, *GOP lawmakers pass Alabama congressional map; Democrats say it defies Supreme Court*, AL.com (July 22, 2023)......................7

Population Summary, "Livingston Congressional Plan 3," .......................................1

*Rep. Terri Sewell: Alabama 'Shamelessly' Ignores U.S. Supreme Court*, Birmingham Times (July 22, 2023) .............................................9, 19, 20

*State Rep. Pringle: Proposal to create second Democrat congressional district could help GOP — 'I call it the Republican opportunity plan'*, YELLOWHAMMER NEWS (Oct. 31, 2021) ................................3

Zach Montellaro, *Alabama's redistricting brawl rehashes bitter fight over voting rights*, POLITICO (July 21, 2023)........................................................9

**INTRODUCTION**

Alabama's new congressional map ignores this Court's preliminary injunction order and instead perpetuates the Voting Rights Act violation that was the very reason that the Legislature redrew the map. The new map (known as SB5) fails to address this Court's ruling that the 2021 congressional map likely violates § 2 of the Voting Rights Act (VRA). This Court's order, which the Supreme Court affirmed, found that "the appropriate remedy" in this case "includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." Mem. Op. & Order, ECF No. 107 at 5 ("Op."). Alabama's new map fails to satisfy this requirement. Rather, in what Alabama apparently considers the remedial congressional district, CD2, Black voters comprise neither "a voting-age majority," nor "something quite close to it."[1] *Id*. at 6. That matters not because of any arbitrary BVAP threshold, but because the analyses performed by both Plaintiffs' expert, Dr. Baodong Liu,[2] and Alabama itself[3] confirm that Black-preferred candidates in the new CD2 will continue to lose 100% of biracial elections—that is, elections in which Black voters' preferred candidates are Black and the other candidate is white—by

---

[1] Population Summary, "Livingston Congressional Plan 3," Alabama Permanent Reapportionment Committee (July 20, 2023), Ex. A.
[2] Remedial Expert Report of Boadong Liu (Jul. 28, 2023), Ex. B ("Liu 2023 Report").
[3] Alabama Performance Analysis, Ex. C.

10%-points on average.[4] Defendants' own analyses of several other elections confirm this result.[5]

Because SB5 does not remedy the likely § 2 violation that this Court and the Supreme Court identified, Plaintiffs respectfully ask this Court to enjoin the use of SB5, direct the Special Master to propose a VRA-compliant map, and order that map be implemented to remedy the § 2 violation pending final resolution of this litigation.

## FACTUAL BACKGROUND

### A. Alabama's 2021 Congressional Districting Plan.

The Alabama Legislature adopted the congressional map challenged in this action in a Special Session in Fall 2021. Op. at 32. During that Session, the Legislative Defendants distributed talking points concerning plans submitted by other parties, criticizing one of them as violating the VRA because it had "no majority-Black district," and arguing that a plan featuring a district with a BVAP of 45.82% would make it "unlikely that a Black Democrat candidate without the strength of incumbency will carry [that] district."[6] Defendant Pringle also referred to a plan "[w]ithout . . . a majority-minority district" as "the Republican opportunity

---

[4] Liu 2023 Report, Table 2.
[5] Alabama Performance Analysis, Ex. C.
[6] *Milligan* Trial Ex. M29, ECF No. 88-24.

plan," noting that under a plan without "a majority-minority district, [] Republicans might be able to win all seven congressional districts."[7]

## B. This Court Found, and the Supreme Court Affirmed, a Likely VRA Violation.

After compiling an "extremely extensive record," this Court held that "the *Milligan* plaintiffs are substantially likely to establish that the [2021] Plan violates Section Two of the Voting Rights Act." Op. at 4. It concluded that the "appropriate remedy" is a "plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Id*. at 5-6. The Court emphasized "the practical reality, based on the ample evidence of intensely racially polarized voting adduced during the preliminary injunction proceedings, that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id*.; *see also id*. at 213 (same).

This caution was based on extensive and largely undisputed testimony by two Plaintiffs' experts, Dr. Liu as well the *Caster* plaintiffs' expert Dr. Maxwell Palmer, and Defendants' expert, Dr. M.V. Hood III, that elections in Alabama are characterized by extensive racially polarized voting. *See id.* at 177. For example,

---

[7] Jeff Poor, *State Rep. Pringle: Proposal to create second Democrat congressional district could help GOP — 'I call it the Republican opportunity plan'*, YELLOWHAMMER NEWS (Oct. 31, 2021), Ex. E, *available at* https://yellowhammernews.com/state-rep-pringle-proposal-to-create-second-democrat-congressional-district-could-help-gop-i-call-it-the-republican-opportunity-plan/.

analyzing a plan including a Black Belt-based district with a 46% BVAP, Dr. Hood concluded that it was "not obvious" that such a district would "elect [the] black candidate of choice."[8] In a separate analysis of a State House district anchored in the Black Belt with a BVAP of 48.3%, Dr. Hood found that the Black-preferred candidate would likely have lost the 2020 Presidential and 2018 Gubernatorial races in the district.[9]

In June, the Supreme Court affirmed this Court's opinion in full. *See Allen v. Milligan*, 143 S. Ct. 1487 (2023). As to racially polarized voting, the Supreme Court affirmed this Court's finding of extreme racial polarization in Alabama, including that "on average, Black voters supported their candidates of choice with 92.3% of the vote while white voters supported Black-preferred candidates with 15.4% of the vote." *Id.* at 1505. The Court also held that each of Plaintiffs' "eleven illustrative maps" "comported with traditional districting criteria," meaning they were "reasonably configured." *Id.* at 1504. As to Alabama's argument that "plaintiffs' maps were not reasonably configured because they failed to keep together a traditional community of interest within Alabama. . . . [in] the Gulf Coast region," the Supreme Court did "not find the State's argument persuasive." *Id.* at 1504–05.

---

[8] *See* Hood Expert Report (Trial Ex. D5) at 13, ECF No. 82-5.
[9] *See Milligan* Trial Ex. M30 at 5–7, ECF No. 88-25.

Justice Kavanaugh fully joined in this part of the opinion. *Id*. His concurrence emphasized that Plaintiffs' illustrative districts were reasonably configured and that the plans "respect[] compactness principles and other traditional districting criteria such as county, city, and town lines." *Id.* at 1518 (Kavanaugh, J., concurring). He also agreed that the operative § 2 inquiry "requires in certain circumstances that courts account for the race of voters so as to prevent the cracking or packing . . . of large and geographically compact minority populations." *Id.* The majority also rejected the argument that a § 2 remedy must be race blind. *See id.* at 1513–14. Instead, it held that, "under certain circumstances," the Constitution "authorize[s] race-based redistricting as a remedy for state districting maps that violate § 2." *Id.* at 1517; *see also id.* at 1519 (Kavanaugh, J., concurring) (agreeing with the majority).

### C. The Legislative Process and Enactment of a New Map.

Following the Supreme Court's affirmance, Governor Ivey called a special legislative session and the Permanent Legislative Committee on Reapportionment (the "Committee"), co-chaired by Rep. Pringle and Sen. Livingston, began work on a new map.[10] The *Caster* and *Milligan* Plaintiffs ("VRA Plaintiffs") proposed a map based closely on the illustrative plans previously submitted while maintaining the boundaries of the State's 2021 districts wherever possible—including two districts

---

[10] Press Release, Permanent Legis. Comm. on Reapportionment, June 21, 2023, Ex. F.

configured exactly as they were in the 2021 plan.[11] VRA Plaintiffs reminded Defendants that the "Supreme Court already considered and rejected the argument . . . that nearly identical splits of Mobile and Jefferson Counties in the VRA Plaintiffs' illustrative plans were indicative of an unconstitutional racial gerrymander"[12] or were not otherwise "reasonably configured." The VRA Plaintiffs' plan and several other plans offered by Black legislators were discussed at two public hearings prior to the beginning of the special session. At the pre-session hearings, legislators and the public offered comments and asked questions about the VRA Plaintiffs' plan and the Black legislators' plans. But no other plans were proposed or available for public comment.

At a Committee Meeting on July 7, Rep. Pringle moved to re-adopt the 2021 Committee Redistricting Guidelines.[13] *See* App'x A to Op. After voting down an amendment that offered specific instructions about remedying the VRA violation, the Committee voted along racial lines to readopt the 2021 Guidelines without amendment. In Committee on July 17, the first day of the Special Session, Rep. Pringle introduced for the first time a plan he designated the "Community of Interest" plan. He described it as a plan "that basically maintains the core of existing

---

[11] VRA Pls.' June 26 Ltr., Ex. G.

[12] VRA Pls.' July 11 Ltr., Ex. H. at 2.

[13] Ala. Joint Permanent Leg. Comm. On Reapportionment Mtg., July 7, 2023, available at https://alabamachannel.ompnetwork.org/embed/sessions/273827/alabama-joint-permanent-legislative-committee-on-reapportionment, time stamp 14:00–26:22.

congressional districts," noting that it had a BVAP of 42.45% in its CD 2. The "Community of Interest" plan was voted out of Committee along racial lines.[14] Another plan—the "Opportunity Plan"—which had a BVAP of 38.31% in CD 2 was also introduced for the first time,[15] and it was later revealed to have been sponsored by Sen. Livingston.[16] Ultimately, the Senate passed a version of the Livingston Plan, the House passed the Pringle Plan, and during a six-person Conference Committee, the Co-Chairs introduced a new plan, designated SB5 and known as Livingston Plan 3, that was a hybrid of the two, splitting the difference in BVAP in CD 2. SB5 was passed by both houses of the legislature, almost entirely along racial lines, and signed by the Governor on July 21.[17]

SB5 keeps Mobile and Baldwin together in CD 1, while continuing to combine part of the Black Belt in CD 2 with most of the Wiregrass counties. CD2 added three more Black Belt counties (Macon, Russell, and Lowndes) plus the part of Montgomery that had belonged to CD7 in the 2021 plan. To balance the

---

[14] Ala. Joint Permanent Leg. Comm. On Reapportionment Mtg., July 11, 2023, available at https://alabamachannel.ompnetwork.org/embed/sessions/273898/alabama-joint-permanent-legislative-committee-on-reapportionmenttime, time stamps 29:00–29:20, 1:47:48–1:48:36, 2:07:31–2:08:40.

[15] *Id.* at time stamp 7:30–8:06.

[16] Ex. I, Decl. of Rep. Samuel Jones ¶ 20.

[17] *See, e.g.*, Mike Cason, *GOP lawmakers pass Alabama congressional map; Democrats say it defies Supreme Court*, AL.com (July 22, 2023), Ex. J, *available at* https://www.al.com/news/2023/07/gop-lawmakers-reach-compromise-on-alabama-congressional-map-democrats-say-it-defies-supreme-court.html.

population, CD2 gave up Conecuh County along with all of Autauga and part of Elmore Counties.

SB5 includes "findings" that establish, *ex post facto*, new redistricting considerations that directly contradict the Guidelines readopted with no changes the week before. Specifically, the legislative findings in SB5:

- Remove any reference to VRA compliance, and state that the following are now "non-negotiable" for the plan: (a) it "shall contain no more than six splits of county lines"; it shall "keep together communities of interest"; and it "shall not pair incumbent members of Congress within the same district";

- Redefine "community of interest" to remove from the definition shared "ethnic, racial, tribal, social . . . . identities," and add similarity of "transportation infrastructure, broadcast and print media, educational institutions";

- Explicitly recognize three communities of interest: "the Black Belt, the Gulf Coast, and the Wiregrass"; and

- Provide one sentence defining the Black Belt while offering several pages of findings linking Mobile and Baldwin, including reference to its shared "French and Spanish colonial heritage."

Of course, because these principles had not existed prior to the enactment of SB5, none of the plans proposed by other legislators had attempted to satisfy them.

In support of the plan, the Co-Chairs provided analysis concerning the new districts' performance for Democratic and Republican candidates in seven elections in 2018 and 2020. Ex. C. Prior testimony had identified the Democratic candidates as the Black-preferred candidates. *See Caster* Ex. 79, ECF No. 73-8; Testimony of Dr. Palmer, Preliminary Injunction Hearing, ECF No. 105-2, at 758:19-21 (Jan. 6,

2022). According to Alabama's analysis, Black-preferred candidates lost all seven elections in the new "opportunity district" CD 2, where Black-preferred candidates were defeated on average by a margin of 6.8 percentage points.[18]

Rep. Pringle has said he believes the plan is "an opportunity map" because it allows "minorities to elect a candidate of their choosing, . . . .when you add function on top of that,"[19] and Senate President Pro Tempore Reed believes that it provides "greater opportunity for others to be elected there other than Republicans" compared to the 2021 map.[20] Others were more candid. House Speaker Ledbetter proclaimed that the map gives them "a good shot" in the Supreme Court where the "ruling was 5-4, so there's just one judge that needed to see something different."[21] Rep. Simpson from Baldwin County called the redrawing 'an opportunity' for Republicans, and predicted early in the process that they would "see about drawing

---

[18] *See* Ex. C.

[19] Zach Montellaro, *Alabama's redistricting brawl rehashes bitter fight over voting rights*, POLITICO (July 21, 2023), Ex. K, *available at* https://www.politico.com/news/2023/07/21/alabamas-redistricting-voting-rights-00107573.

[20] Assoc. Press, *The fight over Alabama's congressional redistricting now shifts back to federal court*, ALA. DAILY NEWS (July 24, 2023), Ex. L, *available at* https://aldailynews.com/the-fight-over-alabamas-congressional-redistricting-now-shifts-back-to-federal-court/.

[21] *Rep. Terri Sewell: Alabama 'Shamelessly' Ignores U.S. Supreme Court*, BIRMINGHAM TIMES (July 22, 2023), Ex. M, *available at* https://www.birminghamtimes.com/2023/07/rep-terri-sewell-alabama-shamelessly-ignores-u-s-supreme-court/.

two new districts" where in 2024, "it would not surprise [him] if [the Alabama congressional delegation] ha[s] seven Republican congressmen."[22]

## LEGAL STANDARD

Three factors are relevant to evaluating whether a State's new map remedies a § 2 violation.

*First* and foremost, "[t]his Court cannot authorize an element of an election proposal that will not with certitude completely remedy the Section 2 violation." *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252-53 (11th Cir. 1987). An acceptable remedy then must "completely remed[y] the prior dilution of minority voting strength and fully provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437-38 (11th Cir. 1988) (quoting S.REP. No. 97-417, at 31 (1982)). This requires evaluating a remedial proposal under the *Gingles* standard to determine whether it provides Black voters with an additional opportunity district. *Id*.

*Second*, a § 2 remedial plan "'should be guided by the legislative policies underlying [the challenged] plan—even one that [is] itself unenforceable,'" but only "'to the extent those policies do not lead to violations of the Constitution or the

---

[22] Jeff Poor, *State Rep. Simpson on redistricting: 'It would not surprise me if we have seven Republican congressmen' after 2024 election*, 1819 NEWS (July 16, 2023), Ex. N, *available at* https://1819news.com/news/item/state-rep-simpson-on-redistricting-it-would-not-surprise-me-if-we-have-seven-republican-congressmen-after-2024-election.

Voting Rights Act.'" *Perry v. Perez*, 565 U.S. 388, 399 (2012) (per curiam) (quoting *Abrams v. Johnson*, 521 U.S. 74, 79 (1997)). Thus, a § 2 remedy should disregard policies like partisanship or "incumbency protection," *League of United Latin Am. Citizens v. Perry (LULAC)*, 548 U.S. 399, 440-41 (2006), and core retention, *Milligan*, 143 S. Ct. at 1505, that perpetuate vote dilution.

*Third*, any § 2 remedy itself must "meet the special standards of . . . racial fairness that are applicable to court-ordered plans." *Upham v. Seamon*, 456 U.S. 37, 39 (1982). For example, a state's decision to adopt a dilutive plan—while disregarding "other more promising" alternatives—may indicate its "lack of good faith" and "at the least" requires the state to "explain its preference for an apparently less effective method" of remedying the vote dilution. *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 439 (1968); *cf. Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997) ("a jurisdiction that enacts a plan having a dilutive impact is more likely to have acted with a discriminatory intent").

## ARGUMENT

## I.   HB5 FAILS TO REMEDY THE § 2 VIOLATION

### A. HB5 Fails to Completely Remedy the §2 Violation Because the Plan Itself Violates § 2 and Unlawfully Dilutes the Black Vote.

In evaluating a remedial proposal, the Court applies the same *Gingles* standard applied at the merits stage. *See Dallas Cnty.*, 850 F. 2d at 1440. The Court must reject Alabama's proffered remedy if the Court finds that SB5 continues

11

"fragmenting" politically cohesive Black voters "among several districts where a bloc-voting majority can routinely outvote them." *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Thus, the Court's liability findings are relevant to its review of a remedial plan. *See Dallas Cnty.*, 850 F. 2d at 1438-39. This includes the Supreme Court's recognition that "Black Alabamians enjoy virtually zero success in statewide elections" and that that the Black Belt is a community of interest. *Milligan*, 143 S. Ct. at 1492, 1506 (cleaned up).

The map that Alabama enacted in SB5 fails this § 2 remedial analysis for the same reasons its 2021 Plan did. First, and most importantly, the Supreme Court agreed with this Court that politically cohesive Black voters could form majorities in two reasonably configured districts, *Milligan*, 143 S. Ct. at 1504-06, yet SB5 continues to permit the white majority voting as a bloc in the new CD2 to easily and consistently defeat Black-preferred candidates. *See* Ex. B. A remedy where "the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate" is no remedy at all. *See LULAC*, 548 U.S. at 425, 427 (a state's purported "opportunity" district with a 46% Latino citizen population violated § 2 because the white majority would "often, if not always, prevent Latinos from electing the candidate of their choice in the district"); *cf. also Abbott v. Perez*, 138 S. Ct. 2305, 2332-33 (2018) (rejecting two proposed "opportunity" districts as

12

ineffective remedies because the minority-preferred candidates would have usually lost elections in these districts).

Alabama's analysis shows that the new CD2 denies Black voters "an opportunity to elect a representative of their choice." 52 U.S.C. § 10301(b). As shown below, Alabama found that *not once* in seven elections from 2018 to 2020 would Black voters' candidates overcome white bloc voting to win in CD2. Ex. C.

| Democrat CD | 2018 AG | 2018 GOV | 2018 LTGOV | 2018 AUD | 2018 SOS | 2020 PRES | 2020 SEN | Average |
|---|---|---|---|---|---|---|---|---|
| 2 | 48.5% | 45.3% | 46.0% | 46.8% | 46.0% | 45.6% | 48.0% | **46.6%** |

| Republican CD | 2018 AG | 2018 GOV | 2018 LTGOV | 2018 AUD | 2018 SOS | 2020 PRES | 2020 SEN | Average |
|---|---|---|---|---|---|---|---|---|
| 2 | 51.5% | 54.7% | 54.0% | 53.2% | 54.0% | 54.4% | 52.0% | **53.4%** |

When Black voters' candidates of choice are themselves Black, they lose by even larger margins. Dr. Liu's analysis of 11 biracial elections—some of which overlap with the elections analyzed by Alabama—as well as the 2020 Presidential election, which featured a Black vice-presidential candidate, also shows zero Black electoral successes, with an average margin of defeat of over 10 percentage points. Ex. B, Table 1 (reproduced below), Table 2; *see Wright v. Sumter Cnty. Bd. of Elections*, 979 F.3d 1282, 1292-93 (11th Cir. 2020) (biracial elections are "more probative" than other elections); *accord Abrams*, 521 U.S. at 92 (examining biracial elections); Thornburg v. *Gingles*, 478 U.S. 30, 52-53 (1986) (same).

| Election | Black Pref-Cand | White Pref-Cand | % vote cast for BPC in Livingston Plan | Black Support for Black Cand (95% CI) | White Support for Black Cand (95% CI) | BPC Won in Livingston Plan? | RPV? |
|---|---|---|---|---|---|---|---|
| 2022 Governor | Yolanda Flowers | Kay Ivey | 37.8% | 94.0% (90-96) | 4.9% (4-6) | No | Yes |
| 2022 US Senate | Will Boyd | Katie Britt | 38.8% | 93.5% (89-96) | 6.0% (4-9) | No | Yes |
| 2022 Attorney General | Wendell Major | Steve Marshall | 39.3% | 94.3% (91-97) | 6.3% (5-8) | No | Yes |
| 2022 Secretary of State | Pamela Laffitte | Wes Allen | 39.4% | 94.2% (90-97) | 6.0% (4-9) | No | Yes |
| 2022 Supreme Court, Place 5 | Anita Kelly | Bradley Byrne | 39.9% | 94.2% (91-97) | 6.6% (5-10) | No | Yes |
| 2018 Lt Governor | Will Boyd | Will Ainsworth | 46.0% | 93.6% (91-96) | 6.3% (5-10) | No | Yes |
| 2018 State Auditor | Miranda Joseph | Jim Zigler | 46.9% | 94.2% (90-97) | 8.2 (6-13) | No | Yes |
| 2018 Public Service Commission, Place 1 | Cara McClure | Jeremy Oden | 46.9% | 95.7% (93-97) | 6.5% (5-10) | No | Yes |
| 2014 Secretary of State | Lula Albert-Kaigler | John Merrill | 43.6% | 91.5% (88-94) | 6.2% (5-8) | No | Yes |
| 2014 Lt Governor | James Fields | Kay Ivey | 43.4% | 91.3% (88-93) | 6.3% (4-9) | No | Yes |
| 2014 State Auditor | Miranda Joseph | Jim Zigler | 41.7% | 88.0% (81-91) | 9.1% (6-14) | No | Yes |

In this regard, the new CD2 offers no more opportunity than did the old CD2. In both plans, Black voters are unable to elect their preferred candidates. SB5 continues to violate this Court's order because nothing about the new CD2 meaningfully increases Black voters' electoral opportunities, nor decreases the dilution of their vote. *See Gingles*, 478 U.S. at 76 ("The relative lack of minority electoral success under a challenged plan, . . . can constitute powerful evidence of vote dilution").

14

**B. SB5's Legislative "Findings" Serve to Perpetuate the § 2 Violation and Contradict the District Court and Supreme Court's Direct Conclusions and Actual Evidence about Communities of Interest.**

In assessing a remedy, the Court should also examine the redistricting policies the Legislature relied upon to justify its proposed remedy. *See Dillard*, 831 F. 2d at 250-51. The Court should reject remedies that, as here, are based on legislative redistricting policies that largely serve to perpetuate the VRA violation. *See, e.g.*, *Milligan*, 143 S. Ct. at 1505 (a state policy favoring "core retention" cannot justify a § 2 violation); *LULAC*, 548 U.S. at 440-41 (state redistricting policies favoring incumbent protection and partisan goals do not excuse illegal vote dilution).

Here, the Legislature purported to make after the fact "findings" tailored to disqualify all of the plans proposed by Black legislators and the VRA Plaintiffs' plan, which had been created to comply with the 2021 redistricting guidelines readopted on July 7. These "findings" in SB5 contradict the Committee's own recently readopted guidelines, were never the subject of debate or public scrutiny, ignored input from Black Alabamians and legislators, and simply parroted attorney arguments already rejected by this Court and the Supreme Court. The "findings" purport to enshrine as "non-negotiable" certain supposed "traditional redistricting principles" including that there cannot be "more than six splits of county lines," and that three specified communities of interest shall be kept together "to the fullest extent possible": the Black Belt, the Gulf Coast, and the Wiregrass. *See* Ex. D

(hereinafter "SB5") Sec. 1, Finding 3(d), (e), (g)(4)(d). Yet the Redistricting Committee's own 2021 Guidelines, which it fully readopted on July 13, 2023, prioritize VRA compliance over any of these factors, *Milligan* Doc. 107, at 31 (Subsection (f)), and call for respect for communities of interest without cherry-picking specific communities. While the 2021 guidelines call for minimizing county and other geographic splits, they do not set an arbitrary ceiling. Similarly, under the Guidelines, incumbency protection is a "decidedly lower-level criterion," and there is no absolute prohibition on pairing incumbents. *Id.* at 172. SB5 also emphasizes "core retention" as a goal, even though the Guidelines also assign it a lower weight. *Cf. Milligan*, 143 S. Ct. at 1505 (Alabama cannot defeat a § 2 claim based on its desire to protect prior district cores). SB5 also redefines "community of interest" in economic and infrastructure terms that appear tailored to conform to the evidence placed in the legislative record by the committee chairs themselves in support of a Mobile-Baldwin community of interest. SB5 at (4)(a).

According to the Legislature, the Supreme Court "recently clarified that Section 2 of the Voting Rights act never requires adoption of districts that violate traditional redistricting principles." SB5 at (1) (quoting *Milligan*, 143 S. Ct. at 1510). But it ignores that the Supreme Court recognized that the VRA Plaintiffs' illustrative maps "comported with traditional districting criteria," even though they split Mobile and Baldwin Counties because the Court did "not find the State's argument

persuasive" concerning the purported Gulf Coast community of interest. *Milligan*, 143 S. Ct. at 1504–05. The record evidence continues to support that conclusion.

For example, State Rep. Sam Jones, a nearly lifelong Mobile County resident and the first Black Mayor of the City of Mobile, explains the many economic, cultural, religious, and social ties between much of Mobile and the Black Belt, in contrast to Baldwin County, which shares "little of these cultural or community ties" with Mobile.[23] Plaintiffs' expert Dr. Bagley also contrasts the "intimate historical and socioeconomic ties" that the "City of Mobile and the northern portion of Mobile County, including Prichard, have . . . with the Black Belt," in contrast to the "ahistorical" effort to treat the Wiregrass or "Mobile and Baldwin Counties as an inviolable" community.[24]

Moreover, the Legislature gives away the game when it states it seeks to preserve the three specified communities of interest "to the fullest extent possible." SB5 Sec. 1, Finding 3(d), (e), (g)(4)(d). In reality, the map in SB5 only keeps together the Gulf Coast, citing its "Spanish and French colonial heritage." SB5 at (f)(9). But SB5 splits the Black Belt between two districts in a way that minimizes the voting power of Black voters in CD 2 and splits the Wiregrass between Districts

---

[23] Decl. of Rep. Samuel Jones, Ex. I ("Jones Decl."), ¶ 15.
[24] Remedial Expert Report of Dr. Joseph Bagley, Ex. O, at 1.

1 and 2. In other words, SB5's "findings" are only fully honored where they prevent the City of Mobile from being joined with the Black Belt.

C. **S.B. 5 Raises Constitutional Concerns as it May be the Product of Intentional Racial Discrimination.**

Finally, SB 5 raises serious constitutional concerns due to strong evidence it was drawn with the purpose of discriminating against Black Alabamians, regardless of whether the ultimate purpose is racial, political, or otherwise. *See Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472-73 & n.7 (11th Cir. 1999) ("[I]ll will, enmity, or hostility are not prerequisites of intentional discrimination."). Courts look to the factors from *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977) for guidance when deciding whether a legislature acted with discriminatory intent. The factors are: "(1) The impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators." *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021). Additional factors are also relevant, including "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Id.* The enactment of SB 5 implicates each *Arlington Heights* factor.

First, the new CD 2 in SB5 does not provide Black voters a realistic opportunity to elect their preferred candidates in any but the most extreme situations.

18

Second, this deliberate failure to remedy the identified VRA violations raises the specter of "Alabama's extensive history of repugnant racial and voting-related discrimination," ECF No. 107, at 182; *Milligan*, 143 S. Ct. at 1506.

Third, the events leading to S.B. 5's passage include the Reapportionment Committee rejecting plans that the Supreme Court found "reasonably configured" where Black voters could constitute a majority in a second congressional district. *Id.* at 1504. The Legislature did not incorporate feedback from Black voters or Black legislators, and instead entirely cut out Black members on the Reapportionment Committee from the process of providing input into "Committee" reapportionment plans, which were not made public until after the two public hearings the Committee held prior to the special session.[25] Instead, it focused on pleasing national leaders whose objective is to maintain the Republican Party's slim majority in the U.S. House of Representative,[26] and instead make a play, in the words of Speaker Ledbetter, to convince "one judge [on the Supreme Court] . . . to see something different."[27] State Rep. Matt Simpson even went so far as to call the State's loss at

---

[25] Jones Decl. ¶ 20.

[26] Jane C. Timm, *Alabama Republicans refuse to draw a second Black congressional district in defiance of Supreme Court* (July 21, 2023), *available at* https://www.cnbc.com/2023/07/21/alabama-republicans-refuse-to-draw-a-second-black-congressional-district-in-defiance-of-supreme-court.html.

[27] *Rep. Terri Sewell: Alabama 'Shamelessly' Ignores U.S. Supreme Court*, Birmingham Times (July 22, 2023), Ex. M., *available at* https://www.birminghamtimes.com/2023/07/rep-terri-sewell-alabama-shamelessly-ignores-u-s-supreme-court/.

the Supreme Court an "opportunity" and to predict that SB5 would result in the election of seven Republicans rather than remedy vote dilution of Black voters.[28]

Fourth, as explained above, the Legislature disregarded the 2021 redistricting guidelines it had re-adopted the previous week—and the policy considerations those guidelines reflect—and made legislative "findings" that explicitly favor majority-white communities and are plainly designed to justify the dilutive map it adopted.

Fifth, statements by elected officials suggest discriminatory intent motivated the Legislature in passing S.B. 5. For example, Representative Pringle previously agreed "[w]ithout being a majority-minority district, you can see where Republicans might be able to win all seven congressional districts," and Black-preferred candidates might not win even one.[29] Yet the Legislative Defendants pushed through a plan that they knew would not provide any real opportunities for Black voters in a second district, and which legislative leadership made clear was an attempt to preserve political gains at the expense of Black Alabamians.[30]

Finally, less discriminatory alternative maps exist. Both this Court and the Supreme Court agreed that maps Plaintiffs presented in the preliminary injunction proceedings comply with the VRA and traditional redistricting criteria. *Milligan*, 143 S. Ct. at 1504. The Legislature's adoption of SB5 instead of a plan that would

---

[28] Poor, supra note 7.

[29] *Id*.

[30] *See* supra note 25.

offer Black voters have a new opportunity to elect their preferred candidate indicates that SB5 was passed with an intent to harm Black Alabamians in pursuit of other goals. *See LULAC*, 548 U.S. at 440 (finding that similar political efforts bore the "mark of intentional discrimination" and could violate the Fourteenth Amendment).

## CONCLUSION

Plaintiffs respectfully request that the Court enjoin Alabama's new map on the same grounds that it enjoined the 2021 map and authorize the Special Master to begin devising a complete § 2 remedy.

DATED this 28th day of June 2023.

Respectfully submitted,

*/s/ Deuel Ross*
Deuel Ross*
Tanner Lockhead*
NAACP Legal Defense &
Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Ashley Burrell
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter
NAACP Legal Defense &
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

*/s/ Sidney M. Jackson*
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Julie Ebenstein*
American Civil Liberties
Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org

jebenstein@aclu.org

Shelita M. Stewart*
Jessica L. Ellsworth*
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

David Dunn*
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*
Harmony A. Gbe*
Hogan Lovells US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

*/s/ LaTisha Gotell Faulks*
LaTisha Gotell Faulks (ASB-1279-I63J)
American Civil Liberties Union of Alabama
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org
kwelborn@aclualabama.org

Blayne R. Thompson*
Hogan Lovells US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

*Attorneys for Milligan Plaintiffs*