# MILLIGAN V. ALLEN
## Case No.: 2:21-cv-012921
### SECOND SUPPLEMENTARY DECLARATION OF JOSEPH BAGLEY, PHD., RE: S.B. 5

## I.   UPDATED CREDENTIALS, PURPOSE OF THIS REPORT

I briefly update my credentials here before explaining my inquiry in this second supplemental report. I submitted a report and testified in a deposition, this year, for plaintiffs in *Georgia State Conference of Branches of the NAACP v. the State of Georgia*, No. 1:2021cv05338 (N.D. Ga.), a case challenging the Congressional and state legislative redistricting process in that state,  The previous fall, 2022, I submitted an expert report and rebuttal report and testified at trial in *South Carolina State Conference of Branches of the NAACP v. Alexander*, No. 3:21-cv-03302; the court therein tendered me as an expert in "American political history, southern legal history, political analysis, historical methods, the history of race discrimination and voting . . . and southern race relations and southern politics and law." The court cited to my report in its Findings of Fact and Conclusions of Law.[1] I also submitted a report and rebuttal report in the state House phase of that litigation, *South Carolina NAACP v. McMaster*.[2]

Prior to the South Carolina litigation, I submitted two reports and testified at a preliminary injunction hearing in the case presently before this Court. I am compensated at the rate of $150 per hour for my work in preparing this report. This compensation is not dependent upon my findings, and my opinions stated in this report do not necessarily represent the sum of my opinions in this matter, which are subject to change upon further research or revelations.

Plaintiffs in this case have asked me to examine the Alabama State Legislature's recent passage, during the 2023 Second Special Session, of S.B. 5, representing the body's adoption of the so-called "Livingston 3 Plan" for congressional redistricting. Plaintiffs have asked me, more specifically, to provide an assessment of the Legislature's assertions in the bill regarding communities of interest (COIs). As a historian of Alabama and its politics, I have studied the state's many COIs and rely upon a historical assessment of primary and secondary sources in support of the following overarching opinions, to wit: (1) consistent with my previous testimony, much of the City of Mobile and the northern portion of Mobile County, including Prichard, have intimate historical and socioeconomic ties with the Black Belt; (2) consistent with my previous testimony in the case, treating Mobile and Baldwin Counties as an inviolable COI is ahistorical; and (3) the Wiregrass likewise does not constitute an inviolable COI. For example, the term "Wiregrass" region has declined in value and usage beyond referring to the cities of Dothan, Enterprise, and Ozark, and aspects of the Wiregrass region may overlap with the Black Belt. For example, S.B. 5 includes Barbour, Crenshaw, and Pike Counties in both the Wiregrass and the Black Belt.

## II.   MOBILE AND THE BLACK BELT

The Legislature explains in S.B. 5 that it adheres to traditional redistricting principles in adopting congressional districts, and that these principles are, *inter alia*, "the product of history." Preserving COIs is among those principles. Communities of interest are defined by the Legislature as being "characterized by, among other commonalities, shared economic interests, geographic features, transportation infrastructure, broadcast and print media, educational institutions, and historical and cultural factors."[3] S.B. 5's drafters then assert that there are three COIs in Alabama that deserve special treatment – the Black Belt, the "Gulf Coast" region, and the Wiregrass. Having maintained in the previous paragraph that dividing a COI into

---

[1] *South Carolina State Conf. of the NAACP v. Alexander et al.*, C/A No.: 3:21-cv-03302-MGL-TJH-RMG, Findings of Fact and Conclusions of Law, Jan. 6, 2023, p.8 (D.S.C.).
[2] Consent Decree entered (D.S.C., 2022).
[3] S.B. 5, pp. 2-3.

two districts is preferable to dividing it among 3 or more, the drafters of the bill then insist that the Black Belt must be divided into 2 districts to ensure equality of population in the remaining districts.

The Black Belt in S.B. 5 is defined as a region characterized by "rural geography, fertile soil, and relative poverty, which have shaped its unique history and culture." The bill's drafters list 18 "core counties" as part of the Black Belt along with 5 counties "sometimes considered" part of the region.[4]

The Black Belt region's unique history and culture are, as I explained in my first supplementary report in the case (in response to Mr. Bryan's report), not only related to the fertility of the soil and the current poverty experienced by its residents, but are also characterized by Indian Removal, chattel slavery, cotton production, Reconstruction and Redemption, sharecropping, convict leasing, white supremacy, lynching, disenfranchisement, the birth of Historically Black Colleges and Universities (HBCUs), struggles for civil and voting rights, Black political and economic organization, backlash in the form of violence and economic reprisal, repressive forms of taxation, white flight, prolonged struggle against vote dilution and a war on absentee balloting, blues and jazz music, folklore, quilting, military heroism, hunting, and fishing.

A final enduring characteristic of the Black Belt is profound racial inequality resulting from persistent racial subordination. Historically, much of the land in the region is owned by white people or corporations controlled by white people. And, as I have testified before, state law protects that land from adequate taxation for social services. Such services are so severely lacking that the state of Alabama was very recently found to have discriminated against Black residents by failing to address a chronic lack of access to clean drinking water not tainted by failed septic tank systems, and failing to provide Black residents with equal access to driver's licensing services.[5] Furthermore, white people abandoned public schools for private "segregation academies" rather than accede to desegregation. Schools in the region are thus among the most segregated in the country and, certainly, in the state.

Many of these characteristics could also be applied to metropolitan Mobile, from Prichard to Maysville, and Africatown to Toulminville. The Port of Mobile (a lynchpin of the Legislature's argument that Mobile and Baldwin are inseparable) historically saw the importation and exportation of human chattel, up to the illegal importation of enslaved individuals by the crew of the *Clotilda* in 1860.[6] The port also saw the export of the cotton grown by the enslaved people in the Black Belt that made Alabama planters among the richest individuals in the union prior to their decision to launch the ill-fated Civil War. Mobile was

---

[4] The legislature includes three counties in the "core" definition that it subsequently lists as part of the Wiregrass – Barbour, Crenshaw, and Pike. The newly designated Alabama Black Belt National Heritage Area does not include those counties, nor does it include Russell County, though it does include Bibb, which the bill does not. See https://www.alblackbeltheritage.com/. My definition of the Black Belt in my book dovetails with that of the Legislature. My definition of the Wiregrass does not, as I limit that region to Henry, Houston, Coffee, Dale, Geneva, and Covington Counties; Bagley, *The Politics of White Rights*, p. viii.

[5] Linda Qui, "Alabama Discriminated Against Black Residents Over Sewage, Justice Dept. Says," *New York Times*, May 5, 2023; "Assistant Attorney General Kristen Clarke Delivers Remarks to Announce Agreement in Civil Rights and Environmental Justice Investigation of Alabama Department of Public Health," U.S. Department of Justice, office of Public Affairs, May 4, 2023; U.S. Department of Transportation, Press Release, Dec. 28, 2016, "U.S. Department of Transportation Takes Action to Ensure Equitable Driver License Office Access for Alabama Residents;" United States Attorney's Office, Southern District of Alabama, Press Release, Dec. 28, 2016, "U.S. Department of Transportation Takes Action to Ensure Equitable Driver License Office Access for Alabama Residents."

[6] Allison Keyes, "The 'Clotilda,' the Last Known Slave Ship to Arrive in the U.S., Is Found," *Smithsonian Magazine*, May 22, 2019; the residents of Africatown trace their lineage to the enslaved brought over in the *Clotilda*, see "Clotilda: The Exhibition at the Africatown Heritage House," Press Release of History Museum of Mobile, June 19, 2023, *Sweet Home Alabama*, Alabama Tourism Dept.

subsequently represented by a Black man during Reconstruction – but his district was redrawn into a majority-white district by connecting it with Baldwin County and his supporters were violently turned away from the polls.[7] Black leaders in Mobile were among the first to organize against white supremacy, for example John LeFlore, who organized the city's NAACP chapter in the 1920s, led the unionization of dock workers, and founded the local Nonpartisan Voters League shortly thereafter.[8]

Leaders like LeFlore become leaders in the heart of the struggle for voting rights in subsequent decades, especially when, like LeFlore, they were shielded from economic reprisal like that meted out against Black Belt organizers. Mobile became a hub of white resistance to school desegregation, and schools like Vigor went from all-white to nearly all-Black, just like public schools in the Black Belt. The fight for equitable access to elect candidates of choice was centered in Mobile, as the Supreme Court acknowledged in this case, citing to *Mobile v. Bolden* and the subsequent amendment of the Voting Rights Act. Similarly, the Voting Rights Act as originally conceived was the product of Justice Department cases targeted discrimination in the Alabama Black Belt.[9]

These are not coincidences or accidents of history. As Black state legislators explained during floor debate on S.B. 5, on July 19, 2023, their families and friends came to Mobile from the Black Belt. They still have family in the Black Belt. They experience the connections of migration that I discussed in my previous testimony in the case.[10] Mobile representative Adline Clarke, for example, talked about a specialty bookstore that she operated in Mobile for over a decade. Rep. Clarke explained that she would regularly host book signings and that one of the most successful that she ever hosted was for J.L. Chestnut, a civil rights attorney who wrote the book, *Black in Selma: the Uncommon Life of J.L. Chestnut, Jr.*.[11] Rep. Clarke indicated that many of those who attended the signing were Black Mobilians who had "strong ties" to Selma. She said that many of them wanted to "thank [Mr. Chestnut] for his contributions" to the civil and voting rights movements and to "tell him who their relatives were" in the Black Belt.[12]

To Rep. Clarke, these comments by patrons attending the Chestnut book signing represented examples of "ethnic, social, cultural, and kinship ties, among others" between the Black Belt and Black Mobile. She added, "A large part of Alabama's population is isolated when Mobile's Black population is left out of opportunity districts." This echoed the sentiments of State Sen. Michael Figures, who said, during the 1990s redistricting cycle, that it was "foolish" to leave Mobile out of a potential majority Black or opportunity Black congressional district (none yet existed at that time).[13]

Representative Barbara Drummond made a similar argument during the July 19 floor debate. Rep. Drummond insisted that Black people living in metropolitan Mobile had more in common with people in the Black Belt than with the residents of Baldwin County. She observed that Baldwin was "affluent," while

---

[7] William Warren Rodgers and Robert David Ward, "Part 2: From 1865 through 1920," in *Alabama: The History of a Deep South State*, Rodgers et al, Eds (Tuscaloosa: University of Alabama Press, 1994), pp. 234-409, see pp. 263-64.

[8] Scotty E. Kirkland, "Pink Sheets and Black Ballots: Politics and Civil Rights in Mobile, Alabama, 1945-1985," M.A. thesis, University of South Alabama, 2009.

[9] Brian Landsberg, *Free At Last to Vote: The Alabama Origins of the 1965 Voting Rights Act*, Lawrence: University Press of Kansas, 2007.

[10] Supplementary Declaration of Joseph Bagley, PhD., Rebuttal of Report of Thomas M. Bryan, pp. 2-3.

[11] New York: Farrar, Straus and Giroux, 1990.

[12] Alabama House of Representatives Floor Debate, S.B. 5, July 19, 2023, video available at *The Alabama Project*, League of Women Voters of Alabama - Education Fund, https://alabamachannel.ompnetwork.org/embed/sessions/274070/alabama-house-of-represenataives [hereinafter, "House Floor Debate, Alabama Project Video"].

[13] House Floor Debate, *Alabama Project* Video; *Birmingham Post-Herald*, Jan. 4, 6, 1992.

Mobile had "pockets of poverty." She asked Rep. Pringle, did the Black Belt not also have pockets of poverty? Rep. Pringle said that he could not answer that question, although the description of the Black Belt as a COI in the text of S.B. 5 uses poverty as one of three descriptors. Speaking of residents of Mobile County, Rep. Drummond added to "concentrated poverty" a lack of access to healthcare as commonalities shared by residents of Mobile County and the Black Belt. Drummond asked rhetorically, "Where did those Black folks come from; did they come from Baldwin County?" She noted that her mother was from Dallas County and her father was from Sumter County and that she would be attending family reunions in both places in the fall. She told Rep. Pringle, "Let me give you a little bit of history of the migration of the Black Alabamian from the Black Belt. They usually gravitate towards the hub of economic development," meaning, for many of them, she argued, Mobile.[14]

Rep. Pringle countered that he was aware of people moving from Dallas County to Madison County in north Alabama and asked Rep. Drummond if that made Dallas and Madison a COI. Such argument ignores the strong historical and regional connections that I discussed in my previous supplementary report in this case. I described waves of migration from the Black Belt to Mobile – following the Civil War, in the early 20th century, and again after World War II. I noted that the eminent historian Wayne Flynt has described these migrations as a "hemorrhaging of people" that, along with massive white flight to the suburbs, left behind a "topography of despair" in both the Black Belt and Mobile.[15] I also quoted the political scientist Richard Pride who, in his book on school desegregation in Mobile, explained that the city's "roots followed the rivers north into the heart of the black belt."[16]

### III. MOBILE AND BALDWIN COUNTY

The drafters of S.B. 5 assert that Mobile and Baldwin Counties, "owing to Mobile Bay and the Gulf of Mexico coastline . . . comprise a well-known and well-defined community with a long history and unique interests." They argue that the counties "have grown even more alike as the tourism industry has grown and the development of highways and bay-crossing bridges have made it easier to commute between the two counties."[17] Black legislators during the July 19, 2023 floor debate pushed back on the existence of these alleged connections, however.

Rep. Napoleon Bracy also questioned Rep. Pringle during the July 19 floor debate. He noted that the two Mobile and Baldwin counties were split in the State Board of Education map approved by the committee cochaired by Rep. Pringle in 2021 and, to Rep. Bracy's knowledge, no one had challenged that division as representing the splitting of an inviolable COI. Rep. Bracy indicated, like previous Black legislators, that his parents had migrated to Prichard in Mobile County from Clarke County. He asked rhetorically how Baldwin County was a COI for them.[18]

Rep. Bracy represented that issues such as poverty, history, and economic interests were considerations when determining what constitutes a COI. He then produced what he indicated were figures from the 2020 U.S. Census to underscore a basic argument – Black Mobile is geographically compact and impacted by poverty relative to Baldwin County, which is, by contrast, affluent and white. He also compared Mobile in the same way to the Black Belt. Rep. Bracy pointed to Median Household Income (MHI), which

---

[14] Id.
[15] Wayne Flynt, *Alabama in the Twentieth Century* (Tuscaloosa: University of Alabama Press, 2004), pp. 115, 143, 177.
[16] Richard Pride, *The Political Use of Racial Narratives: School Desegregation in Mobile, Alabama, 1954-1997* (Champaign: University of Illinois Press, 2002), p. 2.
[17] S.B. 5, pp. 4-5.
[18] House Floor Debate, *Alabama Project* Video.

he said ranged in Black Belt Counties from around $27,000 to $35,000. He indicated that the MHI in Prichard was $32,000, whereas in cities of comparable size in Baldwin County, it was nearly three times higher. For example, in Fairhope, the MHI was $83,000. He noted that the MHI for all of Baldwin County was roughly twice that of Prichard, at $64,000.[19]

Rep. Bracy reported racial population statistics in the same vein. He noted that Baldwin County was 83 percent white but that many of its cities, especially those along the water, had much higher white populations than that. He noted that Orange Beach was 98 percent white. He compared that with Prichard, which was 91 percent Black. He noted again that comparable cities in the Black Belt like Selma (80 percent) were also predominantly Black. Rep. Bracy argued that "when you fold them together," meaning the sharply contrasting racial statistics and economic statistics, the conclusion was that Baldwin and Mobile were not a COI at all. Finally, he asked Rep. Pringle how many Black elected officials were currently representing Baldwin County in the state legislature, in any countywide body, or any municipal governing body therein. Rep. Pringle noted that Senator Vivian Figures represented a sliver of the county on the eastern shore of the bay above Spanish Fort[20].

The proponents of S.B. 5 point to "a shared interest in tourism" as a uniting factor for the Mobile-Baldwin COI. But the idea of the region as a whole being a tourist destination is relatively recent phenomenon. Traditionally, the Gulf Coast beaches in Baldwin County have had a separate board of tourism from the City of Mobile. Indeed, if one looks at the Visit Coastal Alabama organization, a creation of the Regional Tourism Council, and the Coastal Alabama Partnership, one sees that this is a consortium comprised of three local tourism boards (Gulf Shores and Orange Beach Tourism, Visit Mobile, South Mobile County Tourism Authority), four chambers of commerce (Coastal Alabama Business Chamber, South Baldwin County Chamber of Commerce, North Baldwin Chamber of Commerce, and the Eastern Shore Chamber of Commerce), and the City of Foley. The organization was founded in 2013 with this stated objective: "*Create* a regional brand that identifies diverse attractions along the Gulf Coast." Furthermore. both the Board of Directors and the Founding Entities Council of the Coastal Alabama Partnership are entirely white (and include former Congressman Bradley Byrne, who has run campaign ads featuring racial appeals), except for Mobile Airport Authority's Chris Curry.[21]

S.B. 5 lists the Port of Mobile as a unifying factor for the Mobile-Baldwin COI. But, as I noted above, the Port also represented the point of entry for enslaved Black people in bondage who passed through to the Black Belt as well as a point of export for cotton and other cash crops which enslaved people, and their progeny who toiled as sharecroppers, produced in the Black Belt. It also represents a seminal site of civil rights struggle. John LeFlore led the organization of Black stevedores at the port in 1940s, years before he became a leading figure in the more widely recognized episodes of the civil rights movement, including school desegregation.[22] Legislators point to the fact that many of those employed at the port reside in Baldwin, though by their own figures, that represents only 13 percent of the people currently employed there.

---

[19] House Floor Debate, *Alabama Project* Video; American Community Survey, 2020 United States Census, https://data.census.gov/table?q=alabama&tid=DECENNIALPL2020.P1.

[20] House Floor Debate, *Alabama Project* Video.

[21] "Leadership," Coastal Alabama Partnership, http://coastalalabama.org/; Milligan v. Merrill, Memorandum Order and Opinion, 2:21-cv-01530-AMM, Document 107, Filed 01/24/22, p. 81, citing my testimony re: Rep. Byrne.

[22] Scotty E. Kirkland, "John LeFlore," *Encyclopedia of Alabama* (Alabama Humanities Alliance, 2010); S.B. 5, p. 5.

Likewise, S.B.5 notes that "Mobile and Baldwin Counties also work together as part of the South Alabama Regional Planning Commission" (SARPC) and have for over 50 years. Indeed, the state's regional commissions were created by the Wallace administration in the 1970s, and the SARPC represents Mobile, Baldwin, and Escambia counties. That said, of the 28 current members of the SARPC board of directors, only three are Black. Also, Alabama has 11 other regional commissions. Using the regional definitions in S.B. 5, the Wiregrass is split between the 5th (South Central Alabama Development Commission) and 7th regions (Southeast Alabama Regional Planning and Development Commission). The Black Belt is split among the 2nd (West Alabama Regional Commission), the 6th (Alabama Tombigbee Regional Commission), the 5th (South Central Alabama Development Commission), the 9th (Central Alabama Regional Planning and Development Commission), and the 7th (Southeast Alabama Regional Planning Commission). Though Pike, Crenshaw, and Barbour all fall within the legislation's definition of both the Wiregrass and the Black Belt, they are not unified in either since, by way of the commissions, Pike and Crenshaw fall with Bullock, Butler, Lowndes, and Macon in the 5th, while Barbour lies with the core six counties of the Wiregrass in the 7th.[23]

Legislators point to the University of South Alabama (USA) as another unifying factor. The institution's main campus is in Mobile, while it maintains a satellite campus in Fairhope. USA is historically and currently a predominantly white institution. As of 2022, its student enrollment was 60 percent white and 22 percent Black. They also point to the need for federal appropriations as uniting the region, though Congressman Jerry Carl voted against the bipartisan Infrastructure Investment and Jobs Act and the Inflation Reduction Act. The only member of Congress to vote for those funding measures was Terri Sewell, who represents the Black Belt.[24]

A demographic snapshot of schools in the two counties, and in two Black Belt counties, underscores the arguments that Black legislators made on July 19 on the House floor. Two formerly all-white schools in Mobile and Prichard – Murphy High and Vigor High – are now overwhelmingly Black and poor. In the 2021-22 school year, Vigor enrolled 530 students, 520 of whom were Black and 4 of whom were white; 457 students qualified for free or reduced lunch under Title I (86 percent). In the same year, Murphy enrolled 1,300 students, 925 Black and 216 white; 880 of those students qualified for free or reduced lunch (68 percent). Williamson High, a formerly all-Black school in the city of Mobile, enrolled 939 students, 863 Black and 10 white, with 887 qualifying for free or reduced lunch (94 percent).[25]

On the Eastern Shore, Spanish Fort enrolled 1,196 students, 940 white and 84 Black, with 179 qualifying (15 percent). Daphne High enrolled 1,623, 1,076 white and 273 Black, with 434 qualifying (27 percent). And Fairhope High enrolled 1,627, 1,277 white and 113 Black, with 281 qualifying (23 percent). Comparing that to two nearby Black Belt counties, we see stark contrast with the Baldwin Schools and similarities with the Mobile schools. Monroe County High school in 2021-22 enrolled 333 students, 298 of whom were Black and 26 white; 273 of those students qualified for free or reduced lunch (82 percent). Bullock County High likewise enrolled 401 students, 341 Black and 7 white, with 331 qualifying (83 percent). The low overall number of students enrolled in the Black Belt schools is not simply the product or a more rural and sparsely disbursed population. In all of Alabama's Black Belt counties, public school

---

[23] S.B. 5, p. 5; "The Councils," Alabama Association of Regional Councils, 2023, https://alarc.org/the-councils/.

[24] University of South Alabama Demographics and Diversity Report, *College Factual*, https://www.collegefactual.com/colleges/university-of-south-alabama/student-life/diversity/; "How Every House Member Voted on the Infrastructure Bill," *New York Times*, Nov. 5, 2021; Inflation Reduction Act, Ballotpedia, https://ballotpedia.org/Inflation_Reduction_Act_of_2022.

[25] National Center for Education Statistics (NCES).

enrollment is depressed by the number of students attending overwhelmingly white private schools, the vast majority of which were established as segregation academies.[26]

A final consideration is that, although Mobile and Baldwin are together in the existing iteration of CD 1, this has not always been the case. Indeed, if we look at the history of congressional redistricting in Alabama, we can see that both the severance of Baldwin and Mobile counties in the 19th century and their unification in the 1970s were substantially motivated by race. Prior to the 1970s redistricting, Mobile and Baldwin Counties were in separate Congressional Districts, going back to 1876, with the exception of a short Interwar period of unification.[27] In 1874 CD 1 was won by a former slave named Jeremiah Haralson, a Republican, who managed to win despite widespread violence and fraud committed by white Democrats. Democrats during the campaign insisted that there were "but two parties" in Alabama at that time – "the negro party and the white man's party. There is no middle ground between the two. … Nigger or no nigger is the question."[28]

Following Haralson's unlikely victory, according to the historians William Warren Rodgers and Robert David Ward, "The Democratic [Alabama] legislature gerrymandered congressional districts to destroy black majorities." Mobile and Baldwin were split between CDs 1 and 2, and Haralson's Dallas County was drawn in with another Black incumbent, James T. Rapier, in CD 4. The Black vote was split, and the white sheriff of Dallas County won the election to Congress.[29]

Baldwin and Mobile were later reunited, in the 1970s, as a way of targeting Republican Bill Dickinson in his reelection bid. National Democratic support for civil rights, namely the passage of the Civil and Voting Rights Acts in 1964 and 1965, had given new life to the GOP in the South. While Democrats still controlled state legislatures and local governing bodies, white voters started to vote Republican in Presidential and in some Congressional elections. Of course, thanks to the Voting Rights Act and the ongoing efforts of Black activists and attorneys, Black people were able to exercise their right to the franchise for the first time since Reconstruction. The posture, then, was something of a mirror image of the Populist moment in the late 19th century, when Black voters were losing, but had not yet fully lost, their ability to vote, and two white parties were trying to use Black voters to their advantage. In the 1970s, some Democrats had begun to accept that limited Black political power was a fait accompli, while at the same time, some in the GOP were coming to the understanding that the whiter the district, the better were their chance of carrying it. Specific to Dickinson, Baldwin was a white flight destination and was considered to lean Republican. So the legislature took it from Dickinson and gave him, instead, counties in the more old-line white Democrat Wiregrass. This is all to say that, when the Democratic state legislature repaired Mobile and Baldwin, it did so not out of an overarching concern for those counties as a Gulf Coast COI, but rather because the politics of race had returned to Alabama.[30]

---

[26] National Center for Education Statistics (NCES); Bagley, *The Politics of White Rights*, pp. 106-7, 188-93, 217, 226-28, 233.
[27] Singleton v. Merrill, 2:21-cv-01291-AMM, Document 57-7, Filed 12/15/21.
[28] William Warren Rodgers and Robert David Ward, "Part 2: From 1865 through 1920," in *Alabama: The History of a Deep South State*, Rodgers et al, Eds (Tuscaloosa: University of Alabama Press, 1994), pp. 234-409, see pp. 263-64.
[29] Id.
[30] *Alabama Journal*, Nov. 23, Dec. 9, 15, 1971, Jan 22, 1972; *Montgomery Advertiser*, Dec. 2, 1971, Jan. 6, 20, 22, 23, 1972; *Anniston Star*, Dec. 8, 1971; *Selma Times-Journal*, Dec. 10, 1971, April 3, 1972; *Birmingham Post-Herald*, Nov. 8, 1972; Merle Black and Earl Black, *The Rise of Southern Republicans* (New York: Belknap Press of Harvard, 2002), pp. 126-28.

IV.     THE WIREGRASS

In a 2009 dissertation completed at Auburn, historian William Byrd writes, "The southeast corner of Alabama is popularly known as the Wiregrass." This term has been applied to neighboring portions of Georgia and Florida as well. Byrd writes, "The name was originally inspired by the native grass that pioneers found growing abundantly in the region's longleaf pine forests. However, by the mid twentieth century the original forest and the region's namesake wiregrass was all but gone from the region." Byrd explains how, between 1880 and 1930, the region was "utterly transformed" such that by mid-century it scarcely resembled the region that begat the name. Today, the region is mostly characterized by the city of Dothan and surrounding cities of Ozark and Enterprise, which form a Combined Statistical Area per the U.S. Census, and Fort Novosel, which lies between Enterprise and Dothan. Dothan, like Mobile, has significant historical and socioeconomic connections to the Black Belt. Indeed, as S.B. 5 itself makes clear, there are areas where the Black Belt and Wiregrass not only connect but even perhaps overlap.[31]

S.B. 5 defines the Wiregrass as a region "characterized by rural geography, agriculture, and a major military base," a rather broad characterization that might just as well apply to the Black Belt and any number of places. S.B. 5 mentions Troy University in Pike County, which has a satellite campus in Dothan. It lists, in addition to the six counties above, Pike, Barbour, and Crenshaw Counties.[32] While Professor Braund included all these counties in her historical discussion of the Wiregrass, as did archivist Marty Oliff, Prof. Byrd lists only the aforementioned six, as I do in my book. Professor Wayne Flynt includes Houston, Geneva, Dale, Pike, and small slivers of Henry, Barbour, Bullock, and Covington. In their book on the career of Big Jim Folsom, Carl Grafton and Anne Permaloff write, "The Wiregrass was characterized by small farms, relatively few blacks, and strong populist traditions."[33] The latter could hardly apply to large swaths of Pike, Barbour, and Crenshaw which, by S.B. 5's own text, also fall within the "core counties" of the Black Belt.[34]

As the ethnographer Jerrilyn McGregory wrote in her seminal 1997 book on the subject, "Inevitably, the phrase 'Wiregrass County' is historical, denoting a region of the South and specific to the past of that region. To establish the borders now entails a twentieth-century judgment of the ways in which nineteenth-century people defined themselves."[35]

Today, Black residents of Dothan and its environs are left with the same socioeconomic connections to the Black Belt. In 2021-22, Dothan High School enrolled 1,380 students, 852 Black and 393 white; 54 percent of students qualified for free or reduced lunch. Meanwhile, Houston Academy, founded in 1970, as

---

[31] William N. Byrd Jr., "Wiregrass: The Transformation of Southeast Alabama, 1880-1930," PhD. Dissertation, Auburn University (2009), pp. v-vi; Kathryn Braund, "'Hog Wild" and 'Nuts: Billy Boll Weevil Comes to the Alabama Wiregrass," *Agricultural History*, Vol. 63, No. 3 (Summer, 1989): pp. 15-39, p. 17-26.

[32] S.B. 5, p. 7.

[33] Braund, "'Hog Wild and 'Nuts," p. 16; Martin T. Oliff, "Wiregrass Region," *Encyclopedia of Alabama* (Alabama Humanities Alliance, 2018); Byrd, "Wiregrass: The Transformation of Southeast Alabama, 1880-1930," p. 1; Bagley, *The Politics of White Rights*, p. viii; Flynt, *Alabama in the Twentieth Century*, p. 293; Carl Grafton and Anne Permaloff, *Big Mules and Branchheads: James E. Folsom and Political Power in Alabama* (Athens: University of Georgia Press, 2008), p. 1.

[34] S.B. 5, p. 4.

[35] Jerrilyn McGregory, *Wiregrass County* (Oxford: University of Mississippi Press, 1997), pp. 8-9.

the county faced compulsory assignment desegregation orders by way of the *Lee v. Macon* litigation, enrolls 684 students, 87 percent of whom are white.[36]

## V.  CONCLUSION

In conclusion, in my opinion, the Legislature goes too far in marking the "Gulf Coast," as defined by Mobile and Baldwin counties, and the Wiregrass, as defined by the nine-county structure, as inviolable COIs, while ignoring the intimate connections between the Black Belt and the cities of Mobile and Dothan in the southern region of the state.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge:

Respectfully Submitted and Executed, this day, July 28, 2023,

_____
JOSEPH BAGLEY, PhD

---

[36] National Center for Education Statistics (NCES); Bagley, *The Politics of White Rights*, pp. 191-92; "Houston Academy," Private School Review (2023), https://www.privateschoolreview.com/houston-academy-profile.