

FILED
2023 Aug-04  PM 09:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **EVAN MILLIGAN**, *et al.*, | |
| **Plaintiffs,** | **Case No. 2:21-cv-01530-AMM** |
| **v.** | **THREE-JUDGE COURT** |
| **WES ALLEN, in his official capacity as Alabama Secretary of State,** | |
| **Defendant.** | |
| **MARCUS CASTER**, *et al.*, | |
| **Plaintiffs,** | **Case No.: 2:21-cv-1536-AMM** |
| **v.** | |
| **WES ALLEN, in his official capacity as Alabama Secretary of State,** | |
| **Defendant.** | |

**DEFENDANTS' JOINT RESPONSE TO *MILLIGAN* AND *CASTER* PLAINTIFFS' OBJECTIONS AND REQUEST FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ....................................................................................1

BACKGROUND ......................................................................................3

    A.    Plaintiffs' Challenges to the 2021 Plan. ...................................3

    B.    The Governor Calls a Special Session Called to Enact New Redistricting Legislation. .........................................................8

    C.    The State Enacts the 2023 Plan.............................................15

    D.    Plaintiffs Object to the 2023 Plan .........................................21

ARGUMENT .........................................................................................22

    I.    The 2023 Plan Remedies the Likely Section 2 Violation Because the New Plan Complies With Section 2. ................................22

    II.    The 2023 Plan Complies with the Voting Rights Act, and Plaintiffs Will Not Be Able to Produce a Reasonably Configured Alternative Map. ...........................................................................30

    III.    Constitutional Avoidance Compels Rejection of Plaintiffs' Understanding of an Equal Opportunity District...................53

    IV.    Plaintiffs' Cursory Equal Protection Argument Should Be Rejected. ..61

CONCLUSION ......................................................................................64

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
 138 S. Ct. 2305 (2018)................................................................ *passim*

*Abrams v. Johnson*,
 521 U.S. 74 (1997)..................................................................... 28, 32

*Adarand Constructors, Inc. v. Pena*,
 515 U.S. 200 (1995).........................................................................53

*Ala. Legis. Black Caucus v. Alabama*,
 231 F. Supp. 3d 1026 (M.D. Ala. 2017)................................... 27, 62, 63

*Allen v. Milligan*,
 143 S. Ct. 1487 (2023)................................................................ *passim*

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009).................................................................... 62, 63

*Askew v. City of Rome*,
 127 F.3d 1355 (11th Cir. 1997) ........................................................28

*Bd. of Educ. v. Dowell*,
 498 U.S. 237 (1991)........................................................................60

*Bethune-Hill v. Va. State Bd. of Elections*,
 580 U.S. 178 (2017).................................................................... 50, 55

*Brown v. Electrolux Home Prod., Inc.*,
 817 F.3d 1225 (11th Cir. 2016) .......................................................57

*Bush v. Vera*,
 517 U.S. 952 (1996)................................................................ 45, 50, 55

*Clark v. Putnam County*,
 293 F.3d 1261 (11th Cir. 2002) .......................................................55

*Cooper v. Harris*,
581 U.S. 285 (2017)............................................................................ 26, 53, 55

*Covington v. North Carolina*,
283 F. Supp. 3d 410 (M.D.N.C.), *aff'd in part, rev'd in part*,
138 S. Ct. 2548 (2018)......................................................................................23

*Dillard v. Crenshaw County*,
831 F.2d 246 (11th Cir. 1987) ................................................... *passim*

*Easley v. Cromartie*,
532 U.S. 234 (2001)..........................................................................................42

*Greater Birmingham Ministries v. Secretary of State*
992 F.3d 1322 (11th Cir. 2021) ................................................. 63, 64

*GRACE, Inc. v. City of Miami*,
No. 1:22-CV-24066-KMM, 2023 WL 4602964 (S.D. Fla. July 18, 2023)........24

*Holder v. Hall*,
512 U.S. 874 (1994)..................................................................... 53, 54

*J.E.B. v. Alabama ex rel. T.B.*,
511 U.S. 127 (1994)..................................................................... 58, 59

*Jacksonville Branch of NAACP v. City of Jacksonville*,
No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416
(M.D. Fla. Dec. 19, 2022)................................................................................24

*Jeffers v. Clinton*,
756 F. Supp. 1195 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991) ...................23

*Johnson v. De Grandy*,
512 U.S. 997 (1994).....................................................................................4, 56

*Lamonte v. City of Hampton, Ga.*,
576 F. Supp. 3d 1314 (N.D. Ga. 2021)............................................................10

*League of United Latin Am. Citizens v. Perry*, *(LULAC)*
548 U.S. 399 (2006)................................................................... *passim*

*League of Women Voters v. Fla. Sec'y of State (League II)*,
    66 F.4th 905 (11th Cir. 2023) ...................................................................63

*League of Women Voters v. Fla. Sec'y of State*,
    32 F.4th 1363 (11th Cir. 2022) .................................................................63

*McGhee v. Granville Cnty.*,
    860 F.2d 110 (4th Cir. 1988) ................................................. 22, 23, 24

*Miller v. Johnson*,
    515 U.S. 900 (1995)................................................................. 42, 49, 58

*Minnesota v. Colver Leaf Creamery Co.*,
    449 U.S. 456 (1981).................................................................................41

*Miss. St. Chapter, Operation Push. v. Mabus*,
    932 F.2d 400 (5th Cir. 1991) .................................................................24

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979).................................................................................62

*Ryzhov v. Mayorkas*,
    634 F. Supp. 3d 1107 (S.D. Fla. 2022).................................................10

*Shelby County v. Holder*,
    570 U.S. 529 (2013).................................................................................60

*Shaw v. Reno (Shaw I)*,
    509 U.S. 630 (1993)................................................................. 54, 56, 58

*Shaw v. Hunt (Shaw II)*,
    517 U.S. 899 (1996)....................................................................... *passim*

*Singleton v. Merrill*,
    582 F. Supp. 3d 924 (N.D. Ala. 2022)....................................... *passim*

*Students for Fair Admissions, Inc. v Pres. & Fellows of Harvard College*,
    143 S. Ct. 2161 (2023).................................................................*passim*

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015)................................................................................53

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)........................................................................ *passim*

*United States v. Dallas Cnty. Comm'n*,
    850 F.2d 1433 (11th Cir. 1988) ...........................................................23

*United States v. Euclid City Sch. Bd.*,
    632 F. Supp. 2d 740 (N.D. Ohio 2009) ...............................................24

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996).............................................................................26

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981).............................................................. 29, 30, 37

*Wesberry v. Sanders*,
    376 U.S. 1 (1964).................................................................................46

*Wesch v. Hunt*,
    785 F. Supp. 1491 (S.D. Ala. 1992) .....................................................39

*Wilson v. Jones*,
    130 F. Supp. 2d 1315 (S.D. Ala. 2000) ...............................................25

*Wisc. Legislature v. Wisc. Elections Comm'n*,
    142 S. Ct. 1245 (2022).................................................................33, 56

*Wise v. Lipscomb*,
    437 U.S. 535 (1978).............................................................................23

## Statutes

52 U.S.C. § 10301 ......................................................................................

52 U.S.C. § 10302 ...................................................................................27

Ala. Code § 11-85-51 ............................................................................................13

Ala. Code §17-14-70.1 ................................................................................... *passim*

**Other Authorities**

Ala. Joint Permanent Leg. Comm. On Reapportionment Mtg., July 13, 2023, THE
    ALABAMA CHANNEL,
    https://alabamachannel.ompnetwork.org/embed/sessions/273827/
    alabama-joint-permanent-legislative-committee-on-reapportionment ................9

Fact Book 2022-2023, Sources of Entering Freshman, Office of Institutional
    Research, University of South Alabama,
    https://www.southalabama.edu/departments/institutionalresearch/
    factbook2223/ (click table 2.4) ..........................................................................38

## INTRODUCTION

This case is about whether Alabama's 2023 Plan for congressional districts complies with Section 2 of the Voting Rights Act. Under the Supreme Court's recent decision in *Allen v. Milligan*, it is clear that the 2023 Plan satisfies § 2.

The Supreme Court reaffirmed that § 2 covers challenges to "racially discriminatory redistricting plan[s]." 143 S. Ct. 1487, 1505 (2023). This Court had conducted "an intensely local appraisal" of Alabama's 2021 Plan for congressional districts and determined that that "electoral mechanism" likely violated § 2. *Id.* at 1503. Critically, for Plaintiffs to make that showing, it was not enough for them to merely note that 25.9% of the voting age population in Alabama is black while only 14.3% of the State's congressional districts are majority-black. As the *Allen* Court made clear, Section 2 does not "demand[] racial proportionality in districting." *Id.* at 1508. "Forcing proportional representation is unlawful and inconsistent with this Court's approach to implementing § 2." *Id.* at 1509. That is why the Court applies the *Gingles* factors in an "exacting" manner: to ensure, as Plaintiffs "themselves emphasize[d]," that "§ 2 'never require[s] adoption of districts that violate traditional redistricting principles.'" *Id.* at 1510 (quoting *Caster* Respondents' Br. 3).

*Allen* focused extensively on the first *Gingles* factor, which requires a § 2 plaintiff to present an alternative map that "comports with traditional districting criteria" while including an additional majority-minority district. *Id.* at 1503. The Court

determined that Plaintiffs had made this showing because they could point to alternative maps that were the 2021 Plan's equal on the legitimate districting principles of compactness, respecting county lines, and maintaining communities of interest. *Id.* at 1504-05. The Court explained that "[d]eviation from" such a "map shows it is *possible* that the State's map has a disparate effect on account of race." *Id.* at 1507.

Under *Allen*, Plaintiffs' challenge to the 2023 Plan fails. The 2023 Plan cures the purported discrimination identified by Plaintiffs. "At the heart of" their case was how the 2021 Plan split "two of the State's principal majority-Black communities of interest—the Black Belt and the City of Montgomery"—while "prioritiz[ing] keeping together White people … in Baldwin and Mobile Counties." *Milligan* Appellees' Br. 1, 5. The 2023 Plan prioritizes the Black Belt to the fullest extent possible—even better than Plaintiffs' alternatives—while still managing to preserve long-recognized communities of interest in the Gulf and Wiregrass. Plaintiffs cannot produce an alternative map with a second majority-black district without splitting at least two of those communities of interest. Their § 2 challenge to the 2023 Plan fails.

Plaintiffs try to sidestep this problem by declaring that the 2023 Plan represents "defiance" of court orders that found a likely § 2 violation in the 2021 Plan. Plaintiffs are wrong. There are many ways for a State to satisfy § 2's demand of "equally open" districts. The 2023 Plan's fair application of the neutral principles of compactness, county lines, and communities of interest is one such way, even if it

2

does not create proportional representation. *Allen*, 143 S. Ct. at 1506 (§ 2 does not "requir[e] racial proportionality in districting"). Plaintiffs now argue that § 2 requires this Court to adopt a plan that divides communities of interest in the Gulf and Wiregrass to advance racial quotas in districting, but *Allen* forecloses that position. Plaintiffs had it right the first time: Section 2 "never require[s] adoption of districts that violate traditional redistricting principles." *Id.* at 1510. Because every one of Plaintiffs' alternative plans would violate the traditional redistricting principles given effect in the 2023 Plan, Plaintiffs' § 2 claims fail.

## BACKGROUND

### A. Plaintiffs' Challenges to the 2021 Plan.

In 2021, Alabama enacted a congressional map that largely retained existing district lines. *See Allen*, 143 S. Ct. at 1501. Because the 2021 Plan prioritized core retention, the eighteen core Black Belt counties that had been split between three districts in the 2011 Plan remained split between those three districts. The *Caster* Plaintiffs challenged the 2021 Plan as violative of § 2 of the Voting Rights Act, and the *Milligan* Plaintiffs brought § 2 and Equal Protection claims. *Id.* at 1502.

"At the heart of" Plaintiffs' cases was "Alabama's treatment of the Black Belt." *Milligan* Appellees' Br. 5. In Plaintiffs' view, the 2021 Plan was discriminatory because it "crack[ed]" "majority-Black communities of interest—the Black Belt and the City of Montgomery," while it "prioritized keeping together White people

3

of 'French and Spanish colonial heritage' in Baldwin and Mobile Counties." *Id.* at 1. Plaintiffs argued that "Defendants chose to preserve one set of communities of interest—most or all of which are majority white—at the expense of respecting majority-Black communities of interest like the Black Belt and Montgomery County," *Milligan* Doc. 94 at 15; *see also Milligan* Appellees' Br. 24 (*Gingles* "bar[s] discrimination without requiring proportionality"). The *Caster* Plaintiffs argued it was "striking … how HB 1 cracks Alabama's Black population in the historic Black Belt" in contrast to how their "Illustrative Plans unite the Black Belt." *Caster* Doc. 56 at 9, Doc. 84 at 17. In Plaintiffs' view, "Alabama's 'inconsistent treatment' of Black and White communities [wa]s 'significant evidence' of a § 2 violation." *Milligan* Appellees' Br. 39 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994)).

As part of the 2021 preliminary injunction proceedings, Plaintiffs introduced eleven illustrative plans to show that an additional majority-minority district could be drawn in a geographically compact and "reasonably configured" manner, as required by the first step of the *Gingles* test. *Allen*, 143 S. Ct. at 1503; *see Thornburg v. Gingles*, 478 U.S. 30 (1986). When Defendants argued that Plaintiffs' proposed second majority-minority district was too sprawling, splitting a community of interest in the Gulf, Plaintiffs responded that their plans "meet or beat" the State's application of traditional districting principles. *See Allen v. Milligan* Oral Argument Tr. 67 (*Milligan* counsel), 83 (*Caster* counsel); PI Tr. 441-42 ("meet or beat the county

split"); *Caster* Doc. 48 at 22; *Caster* Doc. 65 at 5. With respect to splitting the Gulf,
Plaintiffs also countered that while their "plans may prioritize different communities
of interest, … they respect communities of interest generally to at least the same
extent as HB1," because they kept more of the Black Belt together. *Caster* Respond-
ents' Br. 37. In sum, Plaintiffs' view was that their "illustrative plans, containing
two majority-Black districts, comply with objective traditional redistricting criteria
(compactness, contiguity, and respect for political subdivisions and communities of
interest) as well or better than HB1." *Milligan* Appellees' Br. 20.

This Court agreed that Plaintiffs' plans satisfied *Gingles* 1 and, concluding
the other *Gingles* factors and the totality-of-circumstances test were met, preliminar-
ily enjoined the Secretary from implementing the 2021 Plan. *Singleton v. Merrill*,
582 F. Supp. 3d 924, 935 (N.D. Ala. 2022) (three-judge court) (*per curiam*). On
*Gingles* 1, the Court noted that the *Milligan* Plaintiffs' mapdrawer "articulated a
reasonable explanation" for "prioritiz[ing] some principles over others," "based on
the [2021] Legislature's redistricting guidelines." *Id.* at 1005. Similarly, the Court
deemed it important that the *Caster* Plaintiffs' expert "articulated a reasonable basis
for the choices he made when he was forced to choose between competing redistrict-
ing principles—namely, the choices that the [2021] Plan made." *Id.* at 1006.

The Supreme Court affirmed, comparing the application of traditional district-
ing criteria in the 2021 Plan to Plaintiffs' illustrative plans. *Allen*, 143 S. Ct. at 1498.

"With respect to compactness, for example," the Court agreed that the *Milligan* Plaintiffs' maps "'perform[ed] generally better on average than' did HB1," and a map from the *Caster* Plaintiffs "produced districts roughly as compact as the existing plan." *Allen*, 143 S. Ct. at 1504 (quoting *Singleton*, 582 F. Supp. 3d at 1009). And on "political subdivisions, … some of plaintiffs' proposed maps split the same number of county lines as (or even *fewer* county lines than) the State's map." *Id.* (citing *Singleton*, 582 F. Supp. 3d at 1011-12). It was "important that at least some of the plaintiffs' proposed alternative maps respect county lines at least as well as Alabama's redistricting plan." *Id.* at 1518 n.2 (Kavanaugh, J., concurring). Regarding splitting the Gulf or splitting the Black Belt communities of interest, the Court reasoned that Plaintiffs' *Gingles* 1 maps were, "reasonably configured because they joined together a different community of interest called the Black Belt" even though they split the Gulf. *Id.* at 1505. The State, on the other hand, split the Black Belt into more districts. *Id.* Under Plaintiffs' approach and the State's approach, the Court concluded, "[t]here would be a split community of interest in both." *Id.* at 1505 (citing *Singleton*, 582 F. Supp. 3d at 1012-14). The Court explained that when plaintiffs produce a map that meets or beats the State's plan on traditional principles, "[d]eviation from that map shows it is *possible* that the State's map has a disparate effect on account of race." *Id.* at 1507 (emphasis in original).

The Court, however, emphasized that using § 2 to "[f]orc[e] proportional representation is unlawful and inconsistent with this Court's approach to implementing § 2." *Id.* at 1509 & n.4. In "case after case, we have rejected districting plans that would bring States closer to proportionality when those plans violate traditional districting criteria." *Id*. The "exacting requirements" of the *Gingles* factors ensure that "§ 2 'never require[s] adoption of districts that violate traditional redistricting principles.'" *Id.* at 1510 (quoting *Caster* Respondents' Br. 3).

The Supreme Court was divided on the constitutional issues raised by Plaintiffs' *Gingles* 1 plans. The State had argued that if race predominated in Plaintiffs' illustrative plans' splitting of the Gulf along race-based lines, they could not satisfy the first *Gingles* precondition. Eight Justices agreed that race could not predominate. *See id.* at 1511-12; *id.* at 1527 (Thomas, J., dissenting). But the Court divided over whether race predominated in all of Plaintiffs' plans.

The Chief Justice's plurality opinion agreed that, for Mr. Cooper's maps specifically, "evidence of racial predominance …was exceedingly thin" on the preliminary injunction record. *Id.* at 1511; *see also id.* at 1529 (Thomas, J., dissenting) (observing that the plurality's conclusion on racial predominance was "only in part and with regard to Mr. Cooper's plans alone"). Justice Kavanaugh did not join this portion of the Chief Justice's opinion, leaving only a four-Justice plurality. *See id.* at 1497. The plurality opinion explained that race did not predominate "in light of

the evidence before" this Court—specifically that "the relevant community of inter-est here—the Black Belt—was a 'historical feature' of the State, not a demographic one" that "was defined by its 'historical boundaries'" including Montgomery County and other 'rural counties.'" *Id.* at 1511 n.5. According to the Court, "[t]he District Court treated the Black Belt as a community of interest for the same reason." *Id.* The plurality also explained that a plaintiff need not be "entirely 'blind' to race" at *Gingles* 1, consistent with "[t]he line that we have long drawn … between consciousness and predominance." *Id.* at 1511-12.

Justice Thomas, for the four dissenters, agreed that "plaintiffs could not prove the first precondition of their statewide vote-dilution claim … by drawing an illus-trative map in which race was predominant." *Id.* at 1527. In the dissent's view, "the illustrative maps here are palpable racial gerrymanders." *Id.* The dissent noted the "manifest absence of any nonracial justification for the new District 1," while there was a "clear intent to ensure that *both* Districts 2 and 7 hit their preordained racial targets." *Id.* The dissent concluded that, "[i]f the State did this, we would call it a racial gerrymander, and rightly so." *Id.* at 1528.

### B. The Governor Calls a Special Session Called to Enact New Redis-tricting Legislation.

**1.** After the Supreme Court affirmed the preliminary injunction of Alabama's 2021 Plan, the Governor called a special session of the Legislature to enact new congressional redistricting legislation. *See Milligan* doc. 173-1. The Redistricting

Committee held public hearings during which members of the public, the Legislature, and parties to these cases participated. *See* Ex. A (June 27 Reapportionment Comm. Hr'g Tr.); Ex. B (July 13, 2023 Reapportionment Comm. Hr'g Tr.).[1] Witnesses from across the State testified. For example, Mike Schmitz—the former mayor of Dothan and a local business owner—testified about the small communities that typify the Wiregrass region in the southeast of the State and the importance of keeping those communities together.[2] Ex. B at 24:14-27:3; *see also id.* at 25:14-25:21 ("[W]e have created partnerships that have lasted 50 and 100 years that have helped our communities grow."); *accord id.* at 27:20-22 (testimony of Jeff Brandon, CEO of Flowers Hospital in Dothan: "I believe that our economy is strong today because of the things that Mayor Schmitz just mention[ed]."). Mayor Schmitz testified about how important it is to the region that a congressional representative for the region continue to advocate for the Fort Novosel and Maxwell military bases. Ex. B at 26:5-25. He further opined that dividing up Wiregrass counties and pairing them with counties on the opposite side of the State could cause the Wiregrass community of interest and Houston County specifically to "lose our voice and lose our vote." *Id.* at 26:25-27:2.

---

[1] Exhibits C through H and N through P to this Motion were exhibits considered by the Reapportionment Committee at its July 13, 2023 hearing and were attached to that transcript.

[2] *See also* Ala. Joint Permanent Leg. Comm. On Reapportionment Mtg., July 13, 2023, THE ALABAMA CHANNEL, at 36:36-40:04, https://alabamachannel.ompnetwork.org/embed/sessions/273827/alabama-joint-permanent-legislative-committee-on-reapportionment.

Patrick McWilliams from Baldwin County offered a similar perspective from the other side of the State. *See supra* n.1 at 1:41:20-1:44:17.[3] He discussed the needs of the Gulf counties of Mobile and Baldwin, including funding for the University of South Alabama (a large public university with campuses in both Mobile and Baldwin Counties) and the Coast Guard Aviation Training Center in Mobile. *See id.* at 1:43:19-40. He also testified about the counties' shared plans for a bridge that would span the bay between them. *See id.* at 1:42:39-1:43:00. And throughout his testimony on these points, he questioned why such projects might matter to someone in Dothan and raised the point that they must necessarily compete with comparable institutions in the Wiregrass (*e.g.*, Troy University and Fort Novosel). *Id.* at 1:42:39-1:43:40. The Legislature also had before it other evidence about the multi-billion-dollar bridge project. *See* Ex. C (SARPC 5-Year Update) at 30.[4] The Alabama Department of Transportation is aiming to secure more than $2 billion in federal grants and loans for the project. *Id.*

These views were echoed by other evidence that the Legislature had before it. The Legislature received hundreds of pages of materials addressing the community of interest in the Gulf. For example, the Legislature considered a statement

---

[3] The entire hearing has not yet been transcribed, but a recording is available at the link cited *supra* n.2.

[4] Also available at sarpc.org under the "Links" heading. *See Lamonte v. City of Hampton, Ga.*, 576 F. Supp. 3d 1314, 1327 n.12 (N.D. Ga. 2021) ("It is established law that a court may take notice of government websites." (citations omitted); *Ryzhov v. Mayorkas*, 634 F. Supp. 3d 1107, 1111-12 (S.D. Fla. 2022) (same) (collecting cases).

Representative Adline Clarke, a Democrat from Mobile, made to a reporter in 2021: "I consider Mobile and Baldwin counties one political subdivision and would prefer that these two Gulf Coast counties remain in the same congressional district because government, business and industry in the two counties work well together—with our congressman—for the common good of the two counties." Ex. D (AL.com, "How South Alabama could be split up due to Baldwin County's growth"). Those views were confirmed by other reports. For example, recent reports from the Alabama Port Authority showed that the Port of Mobile supported 312,896 direct, induced, indirect, and related jobs in the state of Alabama in fiscal year 2021. Ex. E (Alabama Port Authority 2021 Economic Impact) at 8.[5] The state agency reported that "[t]he total economic value to the state of Alabama resulting from the marine cargo activity at the public and private marine terminals in 2021 is estimated at $85 billion." Ex. E at 10. Economic activity at the Port supports 21,020 direct jobs, where 42% of workers reside in Mobile City, 39% reside in Mobile County (excluding Mobile City), and 13% live in Baldwin County. *See id.* at 23. And the Port's success has spurred the growth of major industry across the bay in Baldwin County, *See* Ex. C at 66.

All of this is made possible by substantial federal funding—critical to the Port's success and jobs for workers from both Mobile and Baldwin. A recent financial report from the Port documents that, in fiscal year 2020, the U.S. Army Corps

---

[5] Also available at https://www.alports.com/economic-impact/.

of Engineers allocated $274.3 million to a recent harbor construction plan; in March 2022, the U.S. Department of Transportation awarded $100 million to the Port Authority and Mobile Airport Authority to increase efficiency of freight movements by air, land, and sea; and later that month, the Port Authority "was awarded another $200 million in federal appropriations. Ex. F (Alabama State Port Authority Annual Comprehensive Financial Report) at 18.[6] In December 2022, another $200 million in federal spending grants were awarded to the Port Authority. *Id.*

The Legislature also considered the unique transportation infrastructure that binds Baldwin and Mobile Counties together. In addition to the bridge project mentioned above, the counties have been providing inter-county public transportation options for years. Ex. G (Baldwin Regional Area Transit System Schedule); Ex. H (Bayline Connects Mobile-Baldwin County Public Transit Systems).

The Legislature also had before it an extensive five-year Comprehensive Economic Development Strategy Plan developed by the South Alabama Regional Planning Commission (SARPC). *See* Ex. C. The local governments of Mobile, Baldwin, and Escambia Counties, as well as twenty-nine municipalities within those counties, work together through the Commission with the congressional representative from District 1 to carry out comprehensive economic development planning for the region in conjunction with the U.S. Economic Development Administration. *Id.* at 4. The

---

[6] Also available at https://www.alports.com/financials/.

SARPC is a regional planning commission that was created under state law more than 50 years ago. Ex. I (SARPC Homepage) at 4. Pursuant to Alabama Code § 11-85-51(b), factors the Governor considered when creating such a regional planning commission included "community of interest and homogeneity; geographic features and natural boundaries; patterns of communication and transportation; patterns of urban development; total population and population density; similarity of social and economic problems." The community of interest that led to the creation of the SARPC fifty years ago remains today. The SARPC is addressing numerous areas of concern unique to the Gulf region, including transportation, industry, environmental, and educational concerns. *See* Ex. C.

**2.** The *Milligan* and *Caster* Plaintiffs also submitted their own proposal to the Redistricting Committee. Their plan would split Mobile County and divide the Gulf between Districts 1 and 2 on race-based lines. It would have split seven counties, including three within District 2 alone—Mobile, Clarke, and Houston Counties. *Milligan* Doc. 200-7 at 4. The splits of those counties show the proposal's particularly stark racial divide between the much more heavily black population scooped up by new District 2 and the majority white population left behind in new District 1. For

13

example, while 49.6% of Mobile
County's overall voting age popula-
tion is drawn into District 2, 72% of
the black voting age population of the
county is added to the district. On the
other end of the District 2, 31% of
Houston County's total voting age
population is added, but that popula-
tion represents 60.8% of black voting
age residents in the county. *See* Ex. J
(Bryan Supplemental Report) at 33.



Plaintiffs' lead argument for
their alternative plan was that it "con-
tains two districts that 'perform' con-
sistently for Black voters in primary and general election." *Milligan* Doc. 200-7 at
2. They also noted that their plan "remedies the cracking of the Black Belt commu-
nity of interest, identified by the courts, by keeping the eighteen 'core' Black Belt
counties together within" two districts. *Id.* The BVAP for Plaintiffs' proposed Dis-
tricts 2 and 7 would be roughly 50% and 54% respectively. Ex. J at 16. Counsel for
the *Singleton* Plaintiffs argued that the § 2 Plaintiffs' plan would likely violate the

14

Equal Protection Clause for being too race-based. Ex. A at 72:14-23 ("I don't believe it's going to be able to pass strict scrutiny … [b]ecause it splits counties along racial lines to achieve a racial target of 50 percent plus one.").

### C. The State Enacts the 2023 Plan.

On July 21, 2023, the Legislature passed and the Governor signed into law new redistricting legislation with Act No. 2023-563. *See* Ex. K. The 2023 Act repeals the 2021 Plan and replaces it with the 2023 Plan. The Act's legislative findings discuss the traditional principles given effect in the 2023 Plan:

> The Legislature's intent is … to promote the following traditional redistricting principles, which are given effect in the plan created by this act:
>
> > a. Districts shall be based on total population as reported by the federal decennial census and shall have minimal population deviation.
> >
> > b. Districts shall be composed of contiguous geography, meaning that every part of every district is contiguous with every other part of the same district.
> >
> > c. Districts shall be composed of reasonably compact geography.
> >
> > d. The congressional districting plan shall contain no more than six splits of county lines, which is the minimum number necessary to achieve minimal population deviation among the districts. Two splits within one county is considered two splits of county lines.
> >
> > e. The congressional districting plan shall keep together communities of interest, as further provided for in subdivision (4).
> >
> > f. The congressional districting plan shall not pair incumbent members of Congress within the same district.

Ala. Code § 17-14-70.1(3).

Subsection 17-14-70.1(4) elaborates on the 2023 Legislature's approach to communities of interest: the redistricting plan will keep together the Black Belt, the Gulf Coast, and the Wiregrass regions to the fullest extent possible. *Id*. § 17-14-70.1(4)(d). The Act states that these regions fit the definition of a community of interest, meaning "a defined area of the state that may be characterized by, among other commonalities, shared economic interests, geographic features, transportation infrastructure, broadcast and print media, educational institutions, and historical or cultural factors." *Id*. § 17-14-70.1(4)(a). The Act stated that these particular regions "shall be kept together to the fullest extent possible"—that is, "[i]f it is necessary to divide a community of interest between congressional districts to promote other traditional districting principles like compactness, contiguity, or equal population, division into two districts is preferable to division into three or more districts." *Id*. § 17-14-70.1(4)(c)-(d).

The Act then details the counties that make up the Black Belt, Gulf, and Wiregrass communities of interest along with legislative findings about each region. First, the Act explains that the Black Belt "shall be placed into two reasonably compact districts," which is "the fewest number of districts in which this community of interest can be placed." Ala. Code § 17.14-70.1(4)(e)(4). Placing the Black Belt into two districts was a change from the 2021 Plan, which followed earlier redistricting plans in placing the Black Belt into three districts.

The 2023 Plan flows from these traditional principles of compactness, county lines, and communities of interest.



*See Milligan* Doc. 200-1. As *Allen* instructed the State, 143 S. Ct. at 1505, core re-

tention takes a back seat to the goal of curing the division of the Black Belt identified

by Plaintiffs. Not a single Black Belt county is split between districts. Montgomery

County is kept whole along with other eastern Black Belt counties in District 2. Sev-

eral of these counties kept together in District 2 are also part of the Wiregrass region

and are combined with other Wiregrass counties to form District 2, consistent with

the Act's requirement that the Wiregrass region be kept together. *Id*. § 17-14-

70.1(4)(d). The western Black Belt counties make up nearly all of District 7. District

7 also includes all but one of the five additional counties that are sometimes included

in the Black Belt (Washington, Clarke, Monroe, Conecuh, and Escambia). Only Es-

cambia is placed in District 1 to meet equal population and contiguity requirements.

The changes between the 2021 and 2023 Plans are shown below with the 2023

lines superimposed on the 2021 Plan:



19

In this way, the 2023 Plan improves on the 2021 Plan and all of Plaintiffs' alternative plans by unifying the Black Belt while also respecting the Gulf and Wiregrass communities of interest. Both Gulf counties are maintained in District 1. Of the nine Wiregrass counties, eight are wholly within District 2, and the ninth (Covington) is necessarily split between Districts 1 and 2 to allow District 1 to meet equal population and contiguity requirements without having to split any "sometimes" Black Belt counties or take any others besides Escambia out of District 7.

On county lines, the Act states that they are to be split no more than six times, and the 2023 Plan meets that requirement. Six county line splits are the minimum number necessary to reach equal population among the districts.

Compactness likewise took priority over core retention in the 2023 Plan. Shown above, the 2023 Plan is overall more compact based on the "eyeball" test. And shown below, the 2023 Plan rates better overall on the Reock and Polsby-Popper tests—two common measures of compactness:

|  | Reock | Polsby-Popper | Cut Edges |
|---|---|---|---|
| 2021 Plan | 0.389 | 0.222 | 3230 |
| 2023 Plan | 0.411 | 0.282 | 3246 |

Ex. L (Trende Expert Report) at 9-11. And the least compact district under the 2023 Plan is more compact than the least compact district in the 2021 Plan.

|  | **Reock** | **Polsby-Popper** |
|---|---|---|
| 2021 Plan | 0.248 (District 1) | 0.154 (District 6) |
| 2023 Plan | 0.285 (District 5) | 0.185 (District 6) |

*Id.* at 9-10.

The 2023 Plan's commitment to simultaneously keeping the Black Belt, Gulf, and Wiregrass communities of interest together to the fullest extent possible resulted not only in increased compactness but also changes in the demographics of Districts 2 and 7 from the 2021 Plan. District 7 had a Black Voting Age Population of 55.26% in the 2021 Plan. District 7 now has a BVAP of 50.65%. The change is the result of the 2023 Plan's unifying of Montgomery County in District 2. District 2 had a BVAP of 30.12% in the 2021 Plan. District 2 now has a BVAP of 39.93%, an increase of nearly 33%. Ex. J at 11, 15.

### C. Plaintiffs Challenge the 2023 Plan.

Plaintiffs now return to this Court to challenge the 2023 Plan. Plaintiffs have framed their challenges as about "[w]hether a remedial district," by which they mean the 2023 Plan, "performs for a minority group." *Caster* Objections 7; *Milligan* Objections 1-2. Their objections target the racial makeup of the 2023 Plan, in particular District 2's. The *Caster* Plaintiffs say that "[t]he demographic statistics" of the plan "speak for themselves." *Caster* Objections 7. The *Milligan* Plaintiffs say that the

new District 2 "offers no more opportunity than did the old CD2" based on election results. *Milligan* Objections 13-14.

## ARGUMENT

### I.   The 2023 Plan Remedies the Likely Section 2 Violation Because the New Plan Complies with Section 2.

**A.** The Court's August 1 order instructs that the forthcoming remedial hearing will be "limited in scope … to the essential question whether the 2023 Plan complies with the order of this Court, affirmed by the Supreme Court, *and with Section Two of the Voting Rights Act*." *Milligan* Doc. 203 at 3-4 (emphasis added). The Court instructs the parties that they "may rely on evidence adduced in the original preliminary injunction proceedings" for assertions that the 2023 Plan is or is not a sufficient remedy, but the Court will not "relitigate the issue of that likely Section Two violation" regarding the 2021 Plan. *Id.* at 4. The Court confirms that "Plaintiffs bear the burden to establish that the 2023 Plan does not remedy the likely Section Two violation that this Court found and the Supreme Court affirmed." *Id.*

Defendants' view, consistent with Supreme Court and Eleventh Circuit precedent, is that Plaintiffs do not successfully bear their burden unless they show at the upcoming hearing that the 2023 Plan likely does not comply with Section 2. That is because precedent establishes that a State completely remedies a Section 2 violation (or here a *likely* Section 2 violation) by enacting *any* new redistricting legislation that complies with Section 2. *See McGhee v. Granville Cnty.*, 860 F.2d 110, 115 (4th

Cir. 1988); *Dillard v. Crenshaw County*, 831 F.2d 246, 250 (11th Cir. 1987); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018); *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (op. of White, J.). As this Court previously recognized, newly enacted redistricting legislation becomes "the governing law," and remains so "unless it … is challenged and found to violate" federal law. *Singleton*, 582 F. Supp. 3d at 1032 (quoting *Wise*, 437 U.S. at 540). After a new redistricting plan has been enacted, the district court "consider[s] whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 424 (M.D.N.C.), *aff'd in part, rev'd in part*, 138 S. Ct. 2548 (2018) (quoting *McGhee*, 860 F.2d at 115). If the new plan "would have been upheld at the liability stage of the case, [it] must be upheld now." *Jeffers v. Clinton*, 756 F. Supp. 1195, 1199 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991). Holding Plaintiffs to that burden regarding the 2023 Plan does not entail re-litigating the 2021 Plan.

That makes these remedial proceedings distinct from those in which there is no new legislation and instead only a court-drawn plan. *Compare, e.g., United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437 (11th Cir. 1988) (remedial hearing for court-selected plan). For when the State enacts a new plan, the "district court is precluded from substituting even what it considers to be an objectively superior plan

for an otherwise constitutionally and legally valid plan that has been proposed and enacted by the appropriate state governmental unit." *Miss. St. Chapter, Operation Push. v. Mabus*, 932 F.2d 400, 407 (5th Cir. 1991). The 2023 Plan "is entitled to 'great deference' and this Court may not inquire whether some other remedy might be better if the Defendant's remedy is 'legally acceptable.'" *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 750 (N.D. Ohio 2009) (quoting *McGhee*, 860 F.2d at 115, and collecting cases); *see also Jacksonville Branch of NAACP v. City of Jacksonville,* No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416, at *11 (M.D. Fla. Dec. 19, 2022) ("[A] court may not ... simply substitute its judgment of a more equitable remedy for that of the legislative body."); *see also GRACE, Inc. v. City of Miami*, No. 1:22-CV-24066-KMM, 2023 WL 4602964, at *5 (S.D. Fla. July 18, 2023) (affording "Remedial Plan … a presumption of good faith").

Applied here, Plaintiffs must prove that the 2023 Plan is not "equally open." 52 U.S.C. § 10301. Whether the 2023 Plan complies with § 2 requires "'an intensely local appraisal' of the electoral mechanism at issue"—the 2023 Plan. *Allen*, 143 S. Ct. at 1503 (quoting *Gingles*, 478 U.S. at 79). That requires arguments and evidence about the 2023 Plan, not only the 2021 Plan. Indeed, the Eleventh Circuit recognized in a Section 2 remedial case that "[t]he evidence showing a violation in an *existing* election scheme may not be completely coextensive with a *proposed* alternative." *Dillard*, 831 F.2d at 250. And the requirement that courts "[]completely assess[] the

24

differences between the new and old proposals," *id.*, applies all the more when the new plan is not just a defendant's proposal, but is newly enacted law. *See Wilson v. Jones*, 130 F. Supp. 2d 1315, 1321 (S.D. Ala. 2000) ("[A] legislative body is entitled to considerable deference in the manner it chooses to remedy problems with its districting scheme."). Because Plaintiffs have not shown that the 2023 Plan likely violates Section 2, they have not shown that the 2023 Plan fails to remedy the repealed plan's likely violation.

That required showing is consistent with this Court's 2022 preliminary injunction order. To be sure, the Court opined that "any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Singleton*, 582 F. Supp. 3d at 936. That assessment, however, was "based on the [2021] Legislature's redistricting guidelines" and "choices that the [2021] Plan made," all of which came *before* the Legislature successfully passed new legislation. *Id.* at 1005-06. Thus, had the 2023 Legislature continued to apply the same principles, including adhering to core retention over recognized communities of interest, *see Milligan* Appellees' Br. 39, perhaps Plaintiffs' alternative plan's majority-black district would have to be drawn against the re-application of those principles in that way. But the 2023 Legislature was not bound by

25

its predecessor to apply the 2021 principles in the same manner.[7] The 2023 Legislature opted instead to more fully and fairly apply traditional principles blessed by the *Allen* Court to address the purportedly "Discriminator[y] Cracking" of "the Black Belt" for the sake of core retention. *Id.* at 5; *see Allen*, 143 S. Ct. at 1505. This Court had "found that HB1 cracks majority-Black communities of interest" in the Black Belt and Montgomery (*Milligan* Appellees' Br. 16) in a way that resulted in discrimination on account of race, and the 2023 Legislature remedied that discrimination by applying its traditional principles as fairly to those communities as to the Gulf and the Wiregrass. Unless there is some way to create an additional majority-black district without violating these "traditional redistricting principles," Section 2 is satisfied, and the past likely violation is remedied. *Allen*, 143 S. Ct. at 1510.

Moreover, in enacting the 2023 Plan, the State did so against the well-trodden "competing hazards of liability," *Abbott*, 138 S. Ct. at 2315, with dueling claims from the *Singleton* Equal Protection Clause Plaintiffs and the *Milligan* and *Caster* § 2 Plaintiffs. As in every State, Alabama could not remedy a likely § 2 violation with a plan that itself violated the Equal Protection Clause or other federal or State law. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 299 (2017) (racial gerrymandering liability after legislators "repeatedly told their colleagues that District 1 had to be

---

[7] Indeed, the 2021 Legislature *could not* bind the 2023 Legislature. *United States v. Winstar Corp.*, 518 U.S. 839, 873 (1996) ("[O]ne legislature cannot abridge the powers of a succeeding legislature.").

majority-minority, so as to comply with the VRA"). Just last redistricting cycle, Alabama was found to have violated the Equal Protection Clause after it had attempted to comply with the VRA. *See Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017).[8] Moreover, States must be particularly wary of "violations of the fourteenth or fifteenth amendment," lest attempts to comply with Section 2 create the risk of bail-in under Section 3. 52 U.S.C. § 10302(c). The safest route then past these "competing hazards of liability," *Abbott*, 138 S. Ct. at 2315, was for the Legislature to satisfy § 2 by answering Plaintiffs' neutral call to "employ[] the same line-drawing standards in minority [communities of interest] as it used elsewhere," *Milligan* Appellees' Br. 29. There was no need to prioritize racial quotas over "nonracial communities of interest." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*). Section 2 "never requires" that. *Allen*, 143 S. Ct. at 1510.

Thus, if Plaintiffs cannot show that the 2023 Plan likely violates § 2, the Court must find, at least as a preliminary matter, that the 2023 Plan "'completely remed[ies] the Section 2 violation,'" *Milligan* Obj. 10; *accord Caster* Obj. 6. As *Dillard* explains, a court cannot merely "t[ake] the findings that made the original electoral system infirm and transcrib[e] them to the new electoral system." 831 F.2d

---

[8] Plaintiffs then used that Equal Protection Clause violation, induced by Section 5 of the VRA, as evidence of a "recent instance[] of official discrimination" warranting Section 2 VRA liability. *Singleton*, 582 F. Supp. 3d at 1020 (citing *ALBC*, 231 F. Supp. 3d at 1348-49).

at 249. "The evidence showing a violation in an *existing* election scheme may not be completely coextensive with a *proposed* alternative." *Id.* at 250. While *Dillard* ultimately concluded that the replacement election scheme was not permissible, that was based on a pages-long appraisal of the new scheme, which required an assessment of "the differences between the new and old proposals." *Id.* at 250-53.

Plaintiffs' 2023 burden is consistent with the nature of § 2. Section 2's "exacting" standard requires "an intensely local appraisal of the electoral mechanism at issue"—that is, the 2023 Plan. *Allen*, 143 S. Ct. at 1503, 1510 (quotation marks omitted). So in *Allen*, the Court assessed Plaintiffs' arguments not in a vacuum but instead against the particulars of the 2021 Plan. *See, e.g.*, 143 S. Ct. at 1504 (observing Plaintiffs' plans' compactness "performed generally better on average than did HB1 [the 2021 Plan]"). Likewise, the § 2 analysis of Georgia's plan in *Abrams* required accounting for "Georgia's traditional districting policies" in the challenged legislation. *Abrams v. Johnson*, 521 U.S. 74, 91 (1997). And the § 2 challenge to the City of Rome's districting plan considered "Rome's … discernable districting principle[s]." *Askew v. City of Rome*, 127 F.3d 1355, 1377 n.7 (11th Cir. 1997). In short, just as the reasonableness of Plaintiffs' plans challenging the 2021 Plan were assessed in light of how the 2021 Plan gave effect to principles of compactness, communities of interest, and others, any § 2 challenge to the 2023 Plan must be assessed in the light of how the 2023 Plan gives effect to those principles.

**B.** A critical fact sets this case apart from other remedial proceedings: the Governor called a special session, during which the Legislature successfully repealed the 2021 Plan and replaced that law with new redistricting legislation. As the caselaw above shows, such legislation is entitled to the presumption of legality and should "be the governing law unless it, too, is challenged and found to violate federal law." *Singleton*, 582 F. Supp. 3d at 1032 (quotation marks omitted). A remedial hearing in such circumstances cannot be limited to only the question whether Democrats are likely to win in two districts under the 2023 Plan. *See, e.g.*, *Allen*, 143 S. Ct. at 1503 ("'intensely local appraisal' of the electoral mechanism at issue"); *Abbott*, 138 S. Ct. at 2325; *LULAC*, 548 U.S. at 433; *Dillard*, 831 F.3d at 249-50.

In particular, the 2023 Plan cannot be judged against only findings of fact and conclusions of law from the earlier proceedings without a full assessment of the legislative record preceding the adoption of the 2023 Plan and evidence Defendants hope to offer in these proceedings and in the attachments to this brief. Plaintiffs cannot simply "t[ake] the findings that made the original electoral system infirm and transcribe[] them to the new electoral system" as a basis for enjoining the 2023 Plan. *Dillard*, 831 F.2d at 249. That is especially so here, where earlier findings were made as part of preliminary injunction proceedings assessing only the "likelihood of success." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981). Preliminary injunctions are often decided on "procedures that are less formal and evidence that is less

complete than in a trial on the merits." *Id.* at 395. A Court's "findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.* at 394. It follows that preliminary findings do not bind the Legislature in enacting new redistricting legislation pursuant to a new legislative record, with extensive testimony and materials about the communities of interest the 2023 Plan prioritizes. That legislation is entitled to the presumption of good faith and remains in place unless it violates federal law. *See Abbott*, 138 S. Ct. at 2325.

## II. The 2023 Plan Complies with the Voting Rights Act, and Plaintiffs Will Not Be Able to Produce a Reasonably Configured Alternative Map.

On the merits, Plaintiffs argue that the 2023 Plan fails to comply with § 2 by failing to create two majority-black districts or something close to it. *Caster* Objections 8; *Milligan* Objections 6. For that argument to succeed, Plaintiffs must show that there is a "reasonably configured" alternative remedy that would also maintain communities of interest in the Black Belt, Gulf, and Wiregrass, on par with the 2023 Plan. *See LULAC*, 548 U.S. at 433.

Plaintiffs disagree, and that disagreement reveals a new post-*Allen* position. When challenging the 2021 Plan, Plaintiffs argued that the 2021 Plan's "cracking" of the Black Belt was "the heart" of their case. *Milligan* Appellees' Br. 5. But now, even though the 2023 Plan unified the Black Belt, Plaintiffs object that the 2023 Plan still does not comply with § 2. Their objections boil down to one thing: the Legislature didn't do enough to prioritize race over neutral principles and thereby ensure

that Democrats can reliably win in at least two congressional districts in Alabama. *Caster* Objections 7. The lesson from *Allen* is that Section 2 requires Alabama to avoid discriminatory effects in how it treats communities of interest, even if that means sacrificing core retention. 143 S. Ct. at 1505. But neither this Court nor the Supreme Court has ever said that § 2 requires the State to subordinate "nonracial communities of interest" in the Gulf and Wiregrass to Plaintiffs' racial goals. *LU-LAC*, 548 U.S. at 433. Just the opposite—the very premise of this Court's earlier conclusion that race did not predominate, which was later relied upon by the Supreme Court, was that the Black Belt community of interest was a nonracial community of interest based on its "'historical boundaries'" as "a 'historical feature' of the State, not a demographic one." *Allen*, 143 S. Ct. at 1511 n.5. Plaintiffs' new argument that uniting the Black Belt is not enough, and that distant areas of the State must be split and attached to the Black Belt based on race, guts that premise. It should be rejected, and the 2023 Plan and its reunification of the historical boundaries of the Black Belt should be accepted.

For Plaintiffs to be entitled to an order enjoining the 2023 Plan, they must show it likely violates Section 2, but Plaintiffs have failed to make their showing at step one of the *Gingles* test. As Plaintiffs have described that requirement, they must show that their plans "meet or beat" the traditional principles of compactness, maintaining communities of interest, and maintaining political subdivisions that are

31

adhered to in the State's plan. *See, e.g.*, *Allen* Oral Argument Tr. 67, 83. Their failure to do so means Plaintiffs have failed to bear their burden of showing that the 2023 Plan does not remedy the likely § 2 violation.

In conducting that "intensely local appraisal" anew for the 2023 Plan, the Supreme Court staked this guidepost: Section 2 "*never* require[s] adoption of districts that violate traditional redistricting principles." *Allen*, 143 S. Ct. at 1510 (emphasis added) (quoting *Caster* Respondents Br. 3). It is a guidepost the Court has emphasized "in case after case." *Id.* at 1509 n.4. Those traditional redistricting principles include keeping together communities of interest, keeping districts compact, keeping counties or municipalities together in districts, and the like, while excluding core retention for purposes of defeating a § 2 claim. *See Abrams*, 521 U.S. at 91; *Allen*, 143 S. Ct. at 1505; *see, e.g.*, Ala. Code § 17-14-70.1(3), (4). Were it otherwise, plaintiffs could prevail with maps that simply maximize majority-minority districts—an approach that the Court has "expressly condemned." *See Wisc. Legislature v. Wisc. Elections Comm'n*, 142 S. Ct. 1245, 1249 (2022).

Accordingly, for the first *Gingles* precondition, the question is whether "the specific illustrative map[] that a plaintiff adduces" "comport[s] with" the traditional redistricting principles in the State's plan, not traditional redistricting principles in the abstract. *Allen*, 143 S. Ct. at 1505, 1507. If it does not, then "[d]eviation from that map" cannot show the "possibility" of the sort of impermissible "effect on

account of race" that § 2 condemns. *Id.* At most, deviation would show effects on account of "traditional redistricting principles," the violation of which § 2 "*never* require[s]." *Id.* at 1510. That's why a proposed map that violates traditional principles like respect for nonracial communities of interest "is not reasonably compact." *See LULAC*, 548 U.S. at 433.

Applied in *Allen*, the majority concluded that Plaintiffs were likely to succeed in their claim that their maps could meet or beat Alabama's 2021 Plan on those traditional redistricting principles—not that Plaintiffs had beat Alabama in hitting a racial target. 143 S. Ct. at 1504-05. And what was critical was not the Redistricting Committee's recitation of traditional principles in its Guidelines, but how those traditional principles were given effect in the 2021 Plan. *See Milligan* Appellees' Br. 20 (noting that this Court "found that Plaintiffs' illustrative plans, containing two majority-Black districts, comply with objective traditional redistricting criteria (compactness, contiguity, and respect for political subdivisions and communities of interest) as well or better than HB1 [the 2021 Plan]").

The focus now is on the 2023 Plan and whether Plaintiffs can produce an alternative map that equals the 2023 Plan on the traditional principles that *Allen* reaffirmed were the basis of the § 2 analysis. *See Singleton*, 542 F. Supp. 3d at 1006 ("testimony that [expert] felt it was important to 'meet or beat' the Plan's performance with respect to some race-neutral redistricting criteria"); *id.* at 979 (same); *id.*

at 1012 (same); *id.* at 1006 (Cooper "articulated a reasonable basis for the choices he made when he was forced to choose between competing redistricting principles— namely, the choices that the Plan made."). Plaintiffs cannot do so with respect to (1) communities of interest, (2) compactness, and (3) county splits. Indeed, the *Milligan* Plaintiffs appear to concede that their maps are "disqualif[ied]" under the districting principles given effect in the 2023 Plan, *Milligan* Obj. 15, and "the essential design features of Mr. Cooper's maps are indistinguishable from Dr. Duchin's," *Allen*, 143 S. Ct. at 1529 (Thomas, J., dissenting).

### 1. Communities of Interest in the 2023 Plan

The 2023 Plan resolves the concerns about communities of interest that Plaintiffs said was "the heart" of their challenge to the 2021 Plan. *See Milligan* Appellees' Br. 5-6. They argued that the 2021 Plan was "'cracking' [the] majority-Black communities" of Montgomery and the Black Belt, while "prioritiz[ing] keeping together White people … in Baldwin and Mobile Counties." *Id.* at 21; *Caster* Respondents' Br. 15 ("The [1970] plan splintered the Black Belt among Districts 1, 2, 3, and 7. Under this plan and its successor, voters elected white candidates to every congressional seat in every election.") (citation omitted). The Supreme Court agreed. The *Allen* Court concluded that the approach Plaintiffs' maps took to communities of interest was on par with the State's 2021 Plan. The majority said it was not persuaded that the Gulf was a community of interest based on the preliminary injunction record.

143 S. Ct. at 1505. That would surprise Alabamians and has been answered by the legislative record for the 2023 Plan. *Supra* pp. 10-13; *accord Allen*, 143 S. Ct. at 1526 (Thomas, J., dissenting) ("It is indisputable that the Gulf Coast region is the sort of community of interest that the Alabama Legislature might reasonably think a congressional district should be built around.").

In *Allen*, the majority went on to explain that even if the Gulf was a community of interest, Plaintiffs' plans were still on par because Plaintiffs' plans, while splitting the Gulf, "joined together a different community of interest called the Black Belt." 143 S. Ct. at 1015. The 2021 Plan, on the other hand, unnecessarily split the Black Belt into more than two districts while keeping the Gulf intact. *Id.* In other words, "[t]here would be a split community of interest in both." *Id.*

Not anymore. The 2023 Plan answers Plaintiffs' call to unify the Black Belt into two districts, without sacrificing indisputable communities of interest in the Gulf and Wiregrass regions. So, contrary to the *Milligan* Plaintiffs' assertion, it is Plaintiffs who are "cherry-picking" a single community of interest at the expense of two others because of a preferred racial outcome. *Milligan* Obj. 16.

**a. Unifying the Black Belt**

The 2023 Plan rectifies what Plaintiffs said was wrong with the 2021 Plan. In the 2021 Plan, "the Black Belt [was] split into four Congressional districts" as it had been in past plans. *See Singleton*, 582 F. Supp. 3d at 1014. Plaintiffs responded with

illustrative plans "contain[ing] the overwhelming majority of the Black Belt in just two districts." *Id.* They argued that "splitting [the Black Belt] into as few districts as possible should be the priority over keeping the Gulf Coast counties together…." *Id.* at 1012. And they faulted the State for splitting Montgomery, one "of the State's principal majority-Black communities of interest." *Milligan* Appellees' Br. 1.

The 2023 Plan is the answer to that challenge. Departing from past redistricting plans, the 2023 Plan puts all 18 counties that make up the Black Belt entirely within Districts 2 and 7. Montgomery is kept whole in District 2, and unlike in Plaintiffs' new remedial map, not a single Black Belt county—core or otherwise—is split between two districts. *Supra* pp. 16-19. Of the additional five counties that are "sometimes" added to the definition of the Black Belt, four are kept whole in District 7. *See id.*; *Singleton*, 582 F. Supp. 3d at 953. Only the fifth, Escambia County, is in District 1, as necessary for contiguity and population equality. *Supra* pp. 17-18.

### b. Keeping the Gulf Coast and Wiregrass regions together

There can be no dispute that the 2023 Plan's stated goal of keeping the Gulf Coast together and the Wiregrass region together is a legitimate one, and § 2 does not (and cannot) require the State to disregard that legitimate race-neutral purpose in redistricting. *Allen*, 143 S. Ct. at 1510. For Plaintiffs' plans to pass muster under the first *Gingles* precondition, it is "important that at least some of [them] respect"

communities of interest "at least as well as Alabama's redistricting plan." *See id.* at 1518 n.2 (Kavanaugh, J., concurring).

**i.** The Gulf Coast is "indisputabl[y] a community of interest" as the principal dissent in *Allen* observed. 143 S. Ct. at 1526. Although the majority opinion was not persuaded that the Gulf was a community of interest on the preliminary injunction record for the 2021 Plan, *id.* at 1505, that doubt cannot bind the State in the creation of a new redistricting plan based on a new legislative record. *See Camenisch*, 451 U.S. at 394-96; *see also supra* pp. 29-30. Both the legislative record before the 2023 Legislature and the evidentiary record before this Court robustly support the Legislature's long-running recognition of the Gulf as a community of interest.

As the 2023 Act explains, the "Gulf Coast community has a shared interest in tourism, which is a multi-billion-dollar industry," "has a distinct culture stemming from its French and Spanish colonial heritage," "is home to major fishing, port, and ship-building industries" and an "economic hub" that delivers "$85,000,000,000[]" in economic value to the state" and "313,000 jobs each year," and depends on federal appropriations and cooperation. *See* Ala. Code § 17-14-70.1(4)(d)(f)(1)-(10).

The community revolves around Mobile Bay, the intercoastal waterway between Mobile and Baldwin Counties. Ex. M (Declaration of Lee Lawson) ¶6. I-10, I-65, and Highway 98 allow 60,000 residents of Baldwin and Mobile Counties to commute to each other's counties for work every single day. *Id*. ¶5. A full quarter of

Baldwin County's workforce is employed in Mobile. *Id*. ¶8. And Mobile businesses train their employees in Baldwin too. *Id*. ¶9. Baldwin residents often go to Mobile for shopping, healthcare, or even Mardi Gras. *Id*. ¶¶11, 13. With all the traffic from tourists and locals, the region hopes for billions in federal funding for a Bayway Bridge project. Ex. N (Lagniappe "ALDOT says new bridge and Bayway are financially viable"); *see* Ex. M ¶5.

Mobile is home to a large university, the University of South Alabama (USA), and it draws its students from the Gulf Coast region. Ex. M ¶12; Ex. O (University of South Alabama: A Brief History). Fourteen of USA's fifteen "top feeder high schools" are located in the city of Mobile, Mobile County, and Baldwin County.[9] Given all this, residents in the Gulf Coast community unsurprisingly watch Mobile news and read Mobile papers. Ex. M ¶10; Ex. P (Lagniappe About Us).

For 50 years, the area has been a "community of interest" for purposes of establishing a regional planning commission. Ex. I at 4. Democratic State Representative Adline Clarke from Mobile couldn't have said it better: "I consider Mobile and Baldwin counties one political subdivision and would prefer that these two Gulf Coast counties remain in the same congressional district because government, business and industry in the two counties work well together—with our congressman—

---

[9] Fact Book 2022-2023, Sources of Entering Freshman, Office of Institutional Research, University of South Alabama, https://www.southalabama.edu/departments/institutionalresearch/factbook2223/ (click table 2.4).

for the common good of the two counties." Ex. D. Likewise, the three-judge district court in 1992 found that a District 1 encompassing the Gulf "preserves … communities of interest in" that district. *Wesch v. Hunt*, 785 F. Supp. 1491, 1497 (S.D. Ala. 1992).

Despite that evidence, the *Milligan* Plaintiffs suggest (though never definitively declare) that the Gulf isn't *really* a community of interest. *Milligan* Obj. 16-17.[10] Instead, they contend that some parts of Mobile County have more in common with the Black Belt than with Baldwin County. Jones Decl. (*Milligan* Doc. 200-9) ¶5. But Plaintiffs' own evidence suggests that there is at least a distinct nonracial community of interest in Mobile that their proposal to the Legislature would have split along race-based lines. *Id.* ¶6; *cf. Milligan* Appellees' Br. 33 (attacking the 2021 Plan for splitting Montgomery County, "an important community of interest"). While the Black Belt is characterized by "limited employment opportunities," Jones Decl. ¶7, "Mobile is the economic hub of South Alabama, in large part because of the Port of Mobile." *Id*. ¶6. With "[t]imber processing, shipbuilding, aerospace engineering, manufacturing, chemical developers, and companies from other … within Mobile County," the Mobile community is defined in part by its economic

---

[10] For their part, the *Caster* Plaintiffs rely almost entirely on the previous record-based findings of this Court. *Caster* Obj. 9-10. In doing so, they fail to account for the evidence before this Court that allowed the Legislature to (1) conclude that the Gulf and Wiregrass regions form communities of interest and (2) give those communities effect in new legislation.

opportunity. *Id.*; *accord* Ala. Code §17-14-70.1(4)(f)(5) ("The Port of Mobile is the economic hub for the Gulf counties."). And *that* nonracial community of interest is divided in Plaintiffs' plans but not the 2023 Plan.

Moreover, the *Milligan* Plaintiffs concede that *both* Gulf counties "celebrate Mardi Gras," Jones Decl. ¶12, evidencing the shared cultural heritage that the Legislature found supported the Gulf community of interest,[11] *see* Ala. Code §17-14-70.1(4)(f)(9); *see id.* ("Mardi Gras is observed as a state holiday only in Mobile and Baldwin Counties (citing Ala. Code §1-3-8(c) (1975)). They concede that the University of South Alabama has campuses in both counties. *See* Ala. Code §17-14-70.1(4)(f)(7); Bagley Decl. 6 (*Milligan* Doc. 200-15) (writing off this fact because "its student enrollment was 60 percent white and 22 percent Black"). They concede that "Mobile and Baldwin Counties also work together as part of the South Alabama Regional Planning Commission, a regional planning commission recognized by the state for more than 50 years." Ala. Code §17-14-70.1(4)(f)(10); Bagley Decl. 6. They concede that thousands of direct jobholders of the Port of Mobile live in Baldwin County. Ala. Code §17-14-70.1(4)(f)(6); Bagley Decl. 5. And they concede that both counties currently have a shared interest in Gulf-related tourism. *Compare* Ala.

---

[11] The declaration deflects the obvious conclusion that the Gulf has a shared culture with the unremarkable observation that some people in Mobile tend to celebrate Mardi Gras in Mobile, and not in Baldwin County. ¶12. *But see* Ex. M ¶ 13 (Baldwin County resident who celebrates Mardi Gras in Baldwin and Mobile Counties).

Code §17-14-70.1(4)(f)(2) ("Over the past half-century, Baldwin and Mobile Counties have grown even more alike as the tourism industry has grown and the development of highways and bay-crossing bridges have made it easier to commute between the two counties."), *with* Bagley Decl. 5 ("But the idea of the region as a whole being a tourist destination is a relatively recent phenomenon.").

As there is no credible claim that the 2023 Plan deserves heightened scrutiny, *see infra* Part IV, this Court should give the Legislature the deference courts ordinarily give to legislative factfinding. *Cf. Minnesota v. Colver Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) (In the Equal Protection Context, "States are not required to convince the courts of the correctness of their legislative judgments. Rather, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based *could not reasonably be conceived* to be true by the governmental decisionmaker.'" (emphasis added)). Doing so comports with the Supreme Court's recognition that the "districting decision is one that ordinarily falls within a legislature's sphere of competence," *Easley v. Cromartie*, 532 U.S. 234, 242 (2001), and that States enjoy broad discretion when making political judgments in districting. *See Miller*, 515 U.S. at 915 ("the States must have discretion to exercise the political judgment necessary to balance competing interests").

A paid expert cannot supersede legislative findings, especially where, as here, the expert's opinions are based on a selective retelling of facts that were before the

Legislature. In any event, as noted above, Dr. Bagley confirms numerous key findings, responding to many of them only with an apparent critique that white people live in the Gulf too. *See* Bagley Decl. 5 (noting that "three local tourism boards (Gulf Shores and Orange Beach Tourism, Visit Mobile, South Mobile County Tourism Authority), four chambers of commerce (Coastal Alabama Business Chamber, South Baldwin County Chamber of Commerce, North Baldwin Chamber of Commerce, and the Eastern Shore Chamber of Commerce), and the City of Foley" have been partnering for a decade, but noting that many of the people on the Board of the joint venture "are … white"); *id.* at 6 (recognizing a regional planning commission through which Mobile, Baldwin, and Escambia Counties "work together," but noting there are "only three … Black" members of the board of directors). The Gulf is a community of interest.

**ii.** Likewise, the 2023 Plan has the stated purpose of keeping the Wiregrass region together to the fullest extent possible. All nine Wiregrass counties are kept whole in District 2, except for Covington County, a portion of which is necessarily split between Districts 1 and 2 to allow District 1 to meet equal population and contiguity requirements without splitting a Black Belt county or moving other Black Belt counties out of the western Black Belt district.

The Wiregrass region is a community of interest. As Dothan's former mayor emphasized during his July 13 testimony, it is critical that the region remains

together to "protect Fort Novosel and Maxwell Air Force Base and to help the communities throughout the Wiregrass continue to thrive economically." Ex. Q (Declaration of Mike Schmitz) ¶¶2, 5.

 "[T]he Wiregrass is a rural area in the southeastern corner of the State[,]" Ex. R (Declaration of Brad Kimbro) ¶5, that "is not served by interstate access or a major airport" and does not have a large city rivaling Birmingham, Huntsville, or Mobile, Ex. S (Declaration of Jeffrey V. Williams) ¶9. "Fort Novosel contributes more than $1 billion to the Wiregrass' economy." Ex. Q ¶6; *see also* Ex. S ¶12; Ex. R ¶13. "[S]oldiers access[] housing, healthcare, retail shopping, and services" in the Wiregrass, and "various industries are located throughout the region to support the Fort and its soldiers." Ex. S ¶12. Agriculture and healthcare are additional major economic drivers in the area. Ex. S ¶¶13-14; Ex. Q ¶9.

Citizens residing in the Wiregrass consume the same media, *see* Ex. R ¶14, and come together for annual festivals like Dothan's Peanut Festival, Slocum's Tomato Festival, and Opp's Rattlesnake Rodeo, *id.* ¶15.

"Essentially, the Wiregrass is a community of small communities." Ex. R ¶5. It has thrived because leaders throughout those communities work together to support each other for the good of everyone. Ex. R ¶¶5-8, 10-12; Ex. Q ¶¶7-8. *See also* Ex. S ¶¶7, 9, 16. Leaders in the Wiregrass are concerned about the possibility of being broken apart and "los[ing] [their] voice" in the process. Ex. Q ¶10.

43

\*

The 2023 Plan applies the communities of interest principle fully and fairly to remedy the "cracking" that Plaintiffs said was "the heart of" their challenge to the 2021 Plan. The Black Belt, Gulf, and Wiregrass communities are maintained to the maximum extent possible. Thus, this is no longer a case in which "[t]here would be a split community of interest in both" the State's plan and Plaintiffs' alternatives. *Allen*, 143 S. Ct. at 1505. Plaintiffs will not be able to show that there is a plan on par with the 2023 Plan that also creates an additional reasonably configured majority-black district.

### c. Plaintiffs' alternatives cannot match the 2023 Plan's commitment to communities of interest.

Plaintiffs have argued all along that "splitting [the Black Belt] into as few districts as possible should be [a] priority," and the 2023 Plan does that. *Singleton*, 582 F. Supp. 3d at 1012. But now that the State has done so, Plaintiffs take a new tack: they contend that the State didn't unify the Black Belt into two congressional districts *the right way*, by joining the historic Black Belt counties with other black voters outside the Black Belt from the Gulf and Wiregrass communities of interest. *Milligan* Obj. 17 ("But SB5 splits the Black Belt between two districts in a way that minimizes the voting power of Black voters in CD 2[.]") The Legislature can split the Gulf and Wiregrass because, in the *Milligan* Plaintiffs' minds, they are "majority-white communities." *Milligan* Obj. 20. That crosses constitutional lines.

For the same reasons, the Court must reject Plaintiffs' new concept of "inviolable" communities of interest. *Milligan* Obj. 17; Bagley Decl. (*Milligan* Doc. 200-15) 1, 9. That novel theory is contrary to settled law that the Legislature is *permitted* to maintain nonracial communities of interest consistent with traditional districting principles, *see Bush v. Vera*, 517 U.S. 963, 977 (1996), so long as that does not come at the cost of unjustifiably splitting another nonracial community of interest in a way that creates discriminatory results on account of race, *Allen*, 143 S. Ct. at 1505-06. Accordingly, the Court ought not ask whether the Gulf should be split to increase the concentration of black voters in District 2, as Plaintiffs would have it. The question is instead whether Plaintiffs have shown that their districts respect nonracial communities of interest "at least as well as Alabama's redistricting plan." *See Allen*, 143 S. Ct. at 1518 n.2 (Kavanaugh, J., concurring); *accord Allen*, 143 S. Ct. at 1505 (observing both plans would split a community of interest).

Applied here, the *Milligan* Plaintiffs (at 17-18) suggest that "the Legislature gives away the game" because "SB5 splits the Black Belt between two districts in a way that minimizes the voting power of Black voters in CD 2 and splits the Wiregrass between Districts 1 and 2," and thus does not "fully honor[]" the Legislature's neutral criteria. And the *Caster* Plaintiffs go a step further (at 9-10), contending the "communities of interest have no bearing on the only relevant question regarding the plan," which is whether it "create[s] two districts in which the state's Black voters

have an opportunity to elect a candidate of their choice." The Court must reject these arguments and put Plaintiffs to their burden of presenting an alternative that is on par with the Legislature's treatment of not just one but three recognized communities of interest. *See Abbott*, 138 S. Ct. at 2324-25.

As an initial matter, with respect to Plaintiffs' critique of the Black Belt, no one contests that the Black Belt must be placed into at least two districts. It is not possible to put all Black Belt counties into one congressional district without violating the federal constitutional requirement of population equality. *Supra* p. 16; *see Wesberry v. Sanders*, 376 U.S. 1 (1964). None of Plaintiffs' illustrative plans in the earlier preliminary injunction proceedings put the Black Belt into fewer than two districts. *See Allen*, 143 S. Ct. at 1528 (Thomas, J., dissenting) (explaining that "the entire black population of the Black Belt … is too small to provide a majority in a *single* congressional district, let alone two").

And to the extent that Plaintiffs mean to suggest that the Black Belt must be defined by more than its historical boundaries—reaching out to grab voters by race alone in counties that lie beyond even the "sometimes" Black Belt—that contradicts this Court's and the Supreme Court's earlier decision. As this Court explained, "the reasons why [the Black Belt] is a community of interest have many, many more dimensions than skin color." *Singleton*, 582 F. Supp. 3d at 1014. Plaintiffs' earlier proposals to keep that "historic feature" of the State together were deemed not to be

46

race predominant because that community of interest was "defined by its 'historical boundaries'—namely, the group of 'rural counties plus Montgomery County in the central part of the state." *Allen*, 143 S. Ct. at 1511 n.5. But fully promoting this nonracial community of interest does not require combining it with some other set of voters beyond those "historical boundaries" based on their skin color. *Id.* Plaintiffs' argument that Black Belt districts must extend beyond those boundaries is not a valid or constitutional basis for rejecting the 2023 Plan.

Next, with respect to the Wiregrass, Plaintiffs offer the overstated and misleading critique that the 2023 Plan "splits the Wiregrass." *Milligan* Objections at 17. The argument is overstated because only one portion of one Wiregrass county (Covington) is not fully within District 2. And the argument is misleading because that split was necessary to balance population in District 1 *without taking additional Black Belt counties out of District 7. See* Ala. Code § 17-14-70.1(4)(g)(3) ("All of the Wiregrass counties are included in District 2, with the exception of Covington County, which is placed in District 1 so that the maximum number of Black Belt counties can be included within just two districts."). It's a surprise that Plaintiffs aren't championing this choice in the Wiregrass as a way of *avoiding* "preserv[ing] one set of communities of interest—most or all of which are majority white—at the expense of respecting majority-Black communities of interest like the Black Belt." *Milligan* Doc. 94 at 15. In the end, if Plaintiffs' claim were about anything other than

47

securing two safe Democratic congressional districts, Plaintiffs would be celebrating that feature of the 2023 Plan, not assailing it.

More fundamentally, Plaintiffs' critique of the Wiregrass ignores how their alternatives would dismantle that community of interest. Plaintiffs' plan proposed to the Legislature would have split the Wiregrass in half. Their alternative placed some or all of five Wiregrass counties (Coffee, Dale, Geneva, Houston, and Covington) into District 1, joining those counties with the predominantly white part of Mobile County that Plaintiffs opted to leave in District 1. *Supra* p. 14. There is no argument that their dismantling of the Wiregrass maintains that community of interest.

What remains of the *Milligan* Plaintiffs' critique about the 2023 Plan's communities of interest approach echoes the *Caster* Plaintiffs: the 2023 Plan "splits the Black Belt between two districts in a way that minimizes the voting power of Black voters in CD 2." *Milligan* Obj. 17; *Caster* Obj. 1. Plaintiffs thus contend that the Legislature was required to adopt legislation that sacrifices the Gulf *and* the Wiregrass to increase the concentration of black voters in districts containing, but not limited to, the historic Black Belt counties. That argument is one not about splitting the "historical boundaries" of the Black Belt. *See Allen*, 143 S. Ct. at 1511 n.5. That again is contrary to the premise in *Allen* about why race did not predominate—treating the Black Belt as "a '*historical* feature' of the State, not a demographic one." *Id*. It is a departure from *Allen* that would require a selective application of the

communities of interest principle based on race. *Allen* said just the opposite was required. *Id.* at 1505. A State need not (because it cannot) break up other "*nonracial communities of interest*" like the Gulf and Wiregrass regions by "combin[ing] … farflung segments of a racial group." *LULAC*, 548 U.S. at 433 (emphasis added). That isn't "the opportunity that § 2 requires or that the first *Gingles* condition contemplates," *id.*, and if it were, § 2 as applied here would be unconstitutional, *see infra* Part III; *e.g.*, *Miller v. Johnson*, 515 U.S. 900, 919-20 (1995).

In sum, the Court must reject Plaintiffs' demands that the State violate its traditional districting principle of keeping not one but three communities of interest together, neutrally applied to voters of all races. Section 2 "'never requires adoption of districts that violate traditional redistricting principles.'" *Allen*, 143 S. Ct. at 1510 (quoting *Caster* Respondents Br. 3). Nor can race be the criterion that "'could not be compromised,'" allowing "race-neutral considerations [to] 'c[o]me into play only after the race-based decision has been made.'" *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017) (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*))). Splitting communities of interest because they are too white unambiguously violates the Constitution. *See infra* Part III.

### 2. Compactness and county splits in the 2023 Plan

Plaintiffs' § 2 challenge to the 2023 Plan also fails because each of Plaintiffs' alternative maps fails to match the 2023 Plan on compactness, county splits, or both.

A State cannot reject a more compact plan in exclusively racial terms, *Bush*, 517 U.S. at 969, lest race become the criterion that cannot be compromised, *Bethune-Hill*, 137 S. Ct. at 189. So too here—a Plaintiff cannot advocate for a less compact plan for exclusively racial reasons.

It is no answer that the Plaintiffs adduced maps that satisfied the 2021 principles. *Contra Milligan* Obj. 15 (complaining that Plaintiffs' maps "had been created to comply with the 2021 redistricting guidelines"). Had their maps satisfied California's principles, but not Alabama's, that would do little to advance this intensely local appraisal. Likewise, evidence about the 2021 Plan based on its 2021 principles does not shine light on whether the 2023 Plan has discriminatory effects.

Turning to the numbers, defense expert Sean Trende assessed the 2023 Plan and each of Plaintiffs' alternative plans based on the three compactness measures Dr. Duchin used in her earlier report. *See Milligan* Doc. 68-5 at 9. Across all three metrics (Reock, Polsby-Popper, and Cut Edges), the 2023 Plan measures as more compact than Duchin Plans A, C, and D and Cooper Plans 1-7. Ex. L at 9-11. On Reock, the 2023 Plan beats every Plaintiff plan. On Cut Edges, the 2023 Plan beats all Plaintiff-proposed plans except the Plaintiffs' Remedial Plan, which it ties, and Duchin Plan B. *Id.* at 11. And on Polsby-Popper, the 2023 Plan beats every Plaintiff-proposed plan except Duchin Plan B, which is essentially a tie. *Id.* at 10. Duchin Plan B's overall compactness doesn't tell the entire story; her restructuring of

Districts 4 and 5 mask her "distended" District 1, which is less compact than the 2023 Plan's least compact district. *Compare id.* at 9-10, *with Singleton*, 582 F. Supp. 3d at 965 (Dr. Duchin "testified that the least compact districts in her plans—Districts 1 and 2—were 'comparable to or better than the least compact districts' in … the [2021] Plan").

The only plans that the 2023 Plan doesn't beat across all three compactness measures still fail under *Allen* because they have more county splits than the 2023 Plan.[12] *See id.* at 16. The 2023 Plan splits only six counties.[13] *Id.* at 16. Duchin Plan B and the Plaintiffs' Remedial Plan both have seven county splits (including three splits in majority-black District 2). *Id.* Duchin Plan C and Cooper Plans 2 and 6 also have more county splits than are necessary. *Id.* Worse, many of the gratuitous county splits occur along racial lines, in service of hitting a racial target. Bryan Rep. at 33-34 (showing how the Plaintiffs' Remedial Plan disproportionately splits Mobile, Jefferson, Tuscaloosa, Houston, and Clarke Counties).These plans thus fail at *Gingles* 1 because they fail to "respect [compactness or] county lines at least as well as [the 2023] plan." *Allen*, 143 S. Ct. at 1518 (Kavanaugh, J., concurring).

---

[12] County splits are distinct from split counties. Ex. L at 16. For example, Duchin Plan D has five split counties (Limestone, Jefferson, Shelby, Russell, and Mobile) but has six county splits because Jefferson is split twice.

[13] Cooper Plan 7 is only able to have five county splits because it does not have minimal population deviation. *Caster* Doc. 65 at 5.

Because several of their plans have gratuitous county splits, the *Milligan* Plaintiffs argue that the "2021 guidelines … do not set an arbitrary ceiling" on splits. *Milligan* Obj. 16. But Alabama's principle isn't arbitrary because "six splits of county lines" "is the minimum number necessary to achieve minimal population deviation among the districts," and that principle is given effect in the 2023 Plan. Ala. Code §17-14-70.1. The only plans from Plaintiffs that meet that standard fall short on compactness. So each of Plaintiffs' plans fails to match the 2023 Plan on county splits, compactness, or both.

*

Plaintiffs cannot substitute an alternative plan in place of the State's enacted 2023 Plan without establishing that the 2023 Plan itself violates the Voting Rights Act. For Plaintiffs to even begin to do so, they must identify an alternative that does at least as well as the 2023 Plan on the traditional redistricting principles blessed in *Allen*. They cannot. Their plans sacrifice communities of interest, compactness, and county splits to hit predetermined racial targets. That "intensely local appraisal" of the 2023 Plan, as compared to Plaintiffs' alternatives, should end this case. If Plaintiffs' underperforming plans could be used to replace a 2023 Plan that more fully and fairly applies legitimate principles across the State, the result will be court-ordered enforcement of a map that violates the 2023 Plan's traditional redistricting principles in favor of race. Such affirmative action in redistricting would be

unconstitutional, *see infra*, which is one reason why "§ 2 'never require[s] adoption of districts that violate traditional redistricting principles.'" *Allen*, 143 S. Ct. at 1510.

## III. Constitutional Avoidance Compels Rejection of Plaintiffs' Understanding of an Equal Opportunity District.

Plaintiffs repeatedly acknowledged at the Supreme Court that a VRA-compliant plan does not have to hit a racial target of 50% BVAP at the remedial stage,[14] and they're correct about that. *See Shaw v. Hunt (Shaw II)*, 517 U.S. 899, 917 n.9 (1996) ("a § 2 plaintiff" does not have "the right to be placed in a majority-minority district once a violation is shown" because "States retain broad discretion in drawing districts to comply with the mandate of § 2"). The very lesson of *Cooper v. Harris*, 581 U.S. 285 (2017), was the peril of targeting 50% BVAP in the creation of districts, even if for the purpose of VRA compliance. Applied here too, any § 2 remedy "must be consistent with the Constitution." *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 544-45 (2015); *see also Wisc. Legislature*, 142 S. Ct. at 1249-50 (rejecting remedial map for failure to satisfy strict scrutiny). A remedy thus must ensure that districts are "equally open" without devolving into "competing racial factions" or assigning Americans to "creditor" and "debtor" races or crafting majority versus minority "political homelands." *Shaw I*, 509 U.S. at 657; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 239 (1995)

---

[14] *See, e.g.*, *Caster* Respondents' Br. at 26, 52-53; *Milligan* Appellees' Br. at 44-45.

(Scalia, J., concurring in part and concurring in judgment); *Holder v. Hall*, 512 U.S. 874, 905 (1994) (Thomas, J., concurring in judgment).

*Allen* did not alter the principle that race cannot predominate in redistricting, and that principle is especially serious here in these proceedings involving a plan that will actually govern all voters of the State. As applied in *Allen*, a four-justice plurality concluded that race did not predominate with respect to Mr. Cooper's illustrative plan based on the shared understanding by this Court and the Supreme Court that Mr. Cooper treated the Black Belt as a historic feature of the State, not an area defined by demographics alone. *Allen*, 143 S. Ct. at 1511 & n.5. And the plurality added that for purposes of *Gingles* 1, Plaintiffs were permitted to be "conscious[]" of whether an illustrative plan's district exceeded 50% BVAP. *Id.* at 1511-12. Justice Kavanaugh did not join that portion of *Allen*, and the dissent concluded that "it is impossible to conceive of *the State* adopting the illustrative maps without pursuing … racially motivated goals." *Id.* at 1527 (Thomas, J., dissenting).

Neither of the *Allen* plurality's rationales, affirming this Court's, could now justify concluding the 2023 Plan is not "equally open" and replacing the 2023 Plan with Plaintiffs' preferred alternatives that elevate the Black Belt's demographics over its historical boundaries. That would impose on Alabama voters a plan in which race predominates. Discussed above (at Part II), Plaintiffs' proposed alternative to the Legislature fares worse on the race-neutral, traditional criteria embodied in the

2023 Plan and described in Ala. Code § 17-14-70.1(3)(g). This shows that respecting traditional principles like "communities of interest … came into play only after the race-based decision had been made." *Shaw II*, 517 U.S. at 907.

A remedial plan like the ones Plaintiffs propose would therefore "'subordinate[]' other factors … to 'racial considerations.'" *See Cooper*, 581 U.S. at 291. That remains true "even if" the remedy "elevate[s] race" over keeping communities of interest together "in order to advance other goals, including political ones" like giving Democrats a better chance of winning in a second district. *See id.* at 291 & n.1. And it remains true even though Plaintiff-style remedial maps do not "*entirely* neglect[]" "[t]raditional districting criteria." *See Bush*, 517 U.S. at 963; *see also Bethune-Hill*, 580 U.S. at 190 (2017) ("a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering"). "The fact that other considerations may have played a role in the [Plaintiffs' maps] does not mean that race did not predominate." *Clark v. Putnam County*, 293 F.3d 1261, 1270 (11th Cir. 2002). "If the line-drawing process is shown to have been infected by such a deliberate racial purpose, strict scrutiny cannot be avoided simply by demonstrating that the shape and location of the districts can rationally be explained by reference to some districting principle other than race," *id.*

Under the Constitution, *all* race-based government action must satisfy strict scrutiny. *Students for Fair Admissions, Inc. v Pres. & Fellows of Harvard College*, 143 S. Ct. 2161-62 (2023). Redistricting is not an exception to the rule. *See Shaw v. Reno (Shaw I)*, 509 U.S. 630, 657 (1993). "Under the Equal Protection Clause, districting maps that sort voters on the basis of race are by their very nature odious." *Wisc. Legislature*, 142 S. Ct. at 1248 (cleaned up). "This is true whether or not the … purpose [is] remedial." *Shaw v. Hunt (Shaw II)*, 517 U.S. 899, 905 (1996). Because "the Equal Protection Clause restricts consideration of race and the VRA demands consideration of race," a remedial order requiring consideration of race must satisfy strict scrutiny. *See Abbott*, 138 S. Ct. at 2315. Accordingly, any remedy here must be narrowly tailored to further compelling governmental interests. *See Harvard*, 143 S. Ct. at 2162.

"Forcing proportional representation is" not a compelling governmental interest, *id.* at 1509, and here, Plaintiffs demand even more, arguing that § 2 requires that 28.5% of the State's districts have majority-black voting age population, though only 25.9% of the State's voting age population is black. *But see De Grandy*, 512 U.S. at 1016 ("substantially proportional" districts generally suggests no § 2 liability). This approach of sacrificing neutral principles to race is "unlawful and inconsistent with th[e] Court's approach to implementing § 2." *Allen*, 143 S. Ct. at 1509.

Plaintiffs thus cannot meet strict scrutiny. There are "only two compelling interests that permit resort to race-based government action": (1) measures necessary to avoid "imminent and serious risks to human safety" or (2) measures necessary to "remediat[e] specific, identified instances of past discrimination." *Harvard*, 143 S. Ct. at 2162. The first is inapplicable in districting. And the kind of race-based remedies Plaintiffs request here are not meant to "remediat[e] specific, identified instances of past discrimination." *See id.* "[G]eneralized assertion[s] of past discrimination in a particular … region" are "not adequate," for "an effort to alleviate the effects of societal discrimination is not a compelling interest" to justify a redistricting plan that sorts voters on the basis of race, as Plaintiffs' alternatives do when compared to the 2023 Plan. *Shaw II*, 517 U.S. at 909.

To be sure, the Supreme Court has assumed without deciding that compliance with § 2 is a compelling interest. *See*, *e.g.*, *Abbott*, 138 S. Ct. at 2315.[15] But if Plaintiffs reading of § 2 were correct, then that assumption would have to be rejected. *See Allen*, 143 S. Ct. at 1538-39 (Thomas, J., dissenting) ("The Constitution is supreme over statutes, not vice versa."). "[C]ompliance with federal antidiscrimination laws cannot justify race-based districting" if, as here, the "application of those laws" is unconstitutional. *See Miller*, 515 U.S. at 921. And, separately, adopting Plaintiffs'

---

[15] "Such assumptions are not holdings." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016).

arguments about what § 2's requires in this challenge to the 2023 Plan would contravene two equal protection principles: the principle that race can never be used as a negative or operate as a stereotype and the principle that race-based action can't extend indefinitely into the future.

**1.** The Constitution prohibits race used "as a stereotype or negative." *Harvard*, 143 S. Ct. at 2166 (emphasis added). Plaintiffs' application of Section 2 would fail "th[ose] twin commands of the Equal Protection Clause." *Id.* at 2168. ***First***, Plaintiffs' alternatives treat black and white Alabamians as communities—inviolable and violable, respectively—based on their race. *See supra* pp. 48-49. And they presume that the 2023 Plan should be rejected because it doesn't make it easy enough to elect a second Democratic congressperson. *See supra* pp. 21-22. Those assumptions impermissibly "reinforce the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and *will prefer the same candidates at the polls*." *Shaw I*, 509 U.S. at 647 (emphasis added). Subordinating two "nonracial communities of interest" to the goal of a second majority-black district indulges that "prohibited assumption" about voters in that district. *See LULAC*, 548 U.S. at 416; *see also Miller*, 515 U.S. at 919-20. "Even if a measure of truth can be found in some of the [racial] stereotypes used to justify [race]-based" districting maps, "that fact alone cannot support discrimination on the basis of" race. *See J.E.B.*

*v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 n.11 (1994). In short, applying § 2 to compel redistricting that "assign[s] voters on the basis of race," where an alternative plan compliant with § 2 does not, requires the State to "engage[] in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Id.* at 911-12. If § 2 requires that result here, then the Constitution forbids it.

**Second**, adopting a map like the ones Plaintiffs propose would require using race as a "negative." Explained above, Plaintiffs' remedies sort voters on the basis of race to hit a predetermined racial target. *See supra* pp. 13-15, 44-49. To hit the target, Plaintiffs would break up communities of interest and expel people from their districts, all because of race. *See supra* 44-49. That's nothing a State could do. *See Harvard*, 143 S. Ct. at 2169; *Shaw II*, 517 U.S. at 907 (State can't elevate race above neutral criteria like "respecting communities of interest and protecting … incumbents"). Maps like the ones Plaintiffs propose would also create majority-minority districts "in greater numbers than they otherwise would have been" if race hadn't been used. *Cf. Harvard*, 143 S. Ct. at 2169. But the Constitution forbids using race "to discriminate *against* those racial groups that were not the beneficiaries of the race-based preference." *Id.* at 2165.

**2.** Plaintiffs' view of required § 2 remedies would also require race-based re-districting indefinitely into the future. The Constitution would not tolerate that

either. In *Harvard*, the Supreme Court affirmed that "race-based" affirmative action in education "[at] some point … must end," *Harvard*, 143 S. Ct. at 2165-66, 2170-73, based on "the equal protection principle that racial classifications, even when otherwise permissible, must be a temporary matter, and must be limited in time," as the concurring opinion described it, *id.* at 2200 (Kavanaugh, J., concurring); *accord Bd. of Educ. v. Dowell*, 498 U.S. 237, 247-48 (1991) (describing supervision as a "temporary measure" that did not "operate in perpetuity"). The principle applies "even if a racial classification is otherwise narrowly tailored to further a compelling governmental interest." *Harvard*, 143 S. Ct. at 2200. (Kavanaugh, J., concurring). Likewise in *Allen*, Justice Kavanaugh observed that "remediating specific, identified instances of past discrimination," *id.* at 2162, may have justified race-based redistricting in 1982. But "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." 143 S. Ct. at 1519 (Kavanaugh, J., concurring) (citing *id.* at 1543-44 (Thomas, J., dissenting)). The alternative would elevate a statutory remedy for old violations of the Constitution above the Constitution itself. *See Shelby County v. Holder*, 570 U.S. 529, 557 (2013) ("[W]hile any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions.").

So too here, if Plaintiffs' view of Section 2 liability and required remedies prevails. Plaintiffs' view of Section 2 liability depends on stereotypes about how minority citizens vote as groups, *see supra* pp. 58-59, and not on identified instances of past discrimination. That approach will "effectively assure that race will always be relevant and that the ultimate goal of eliminating race as a criterion will never be achieved." *See Harvard*, 143 S. Ct. at 2172 (cleaned up). All that's left to justify Plaintiffs' race-based affirmative action in redistricting are arguments about "past societal discrimination," but perpetuating present-day race-based redistricting to re-dress past race-based discrimination violates "both the letter and spirit of a constitu-tional provision whose central command is equality." *Croson*, 488 U.S. at 505-06. If Plaintiffs' view of Section 2 is correct, there's no "logical end point" to Section 2's race-based requirements. *See Harvard*, 143 S. Ct. at 2165, 2170. All the more reason why the Court "must rigorously apply the 'geographically compact' and 'rea-sonably configured' requirements" described above and conclude that Plaintiffs have not shown that the 2023 Plan likely violates Section 2. *Allen*, 143 S. Ct. at 1518 n.2 (Kavanaugh, J., concurring).

## IV.   Plaintiffs' Cursory Equal Protection Argument Should Be Rejected.

Finally, the *Milligan* Plaintiffs implausibly suggest that it violates the Equal Protection Clause. *Milligan* Obj. 18-21. If a plaintiff were to file a complaint against the 2023 Plan, he would have to plausibly allege intentional discrimination to

survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[T]he plaintiff must plead and prove that the defendant acted with discriminatory purpose."). Here, the *Milligan* Plaintiffs don't even do that in their brief. They allege instead that the 2023 Plan "*may* be the product of intentional racial discrimination." *Milligan* Obj. 18 (emphasis added).

What's more, the *Milligan* Plaintiffs' theory—that the 2023 Plan is racially discriminatory "regardless of whether the ultimate purpose is racial, political, or otherwise," *Milligan* Obj. 18—has long since been foreclosed by binding precedent. "[P]urposeful discrimination requires more than" just "awareness of consequences," it instead requires a decisionmaker to take "a course of action 'because of, *not merely in spite of*, the action's adverse effects upon an identifiable group." *Iqbal*, 556 U.S. at 676-77 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (cleaned up) (emphasis added). The *Milligan* Plaintiffs' acknowledgment that the purpose of the 2023 Plan may have been "political[] or otherwise" on its face would fail to even state a claim for intentional discrimination, let alone clear the high bar of proving one.

In any event, Plaintiffs rely on evidence that is plainly insufficient to rule out an "'obvious alternative explanation'" for the 2023 Plan: respect for communities of interest. *See Iqbal*, 556 U.S. at 682; *cf. ALBC v. Alabama*, 231 F. Supp. 3d 1026, 1044 (M.D. Ala. 2017) ("When the plaintiffs proceed with only indirect evidence

that race predominated and the design of a district can be explained by traditional districting criteria, the plaintiffs have not satisfied their burden of proof."). The alleged discriminatory impact in "the new CD 2," *Milligan* Obj. 18, won't cut it. *See Iqbal*, 556 U.S. at 676-77; *Greater Birmingham Ministries v. Secretary of State,* 992 F.3d 1322 (11th Cir. 2021) (*GBM*) (absent an impact that is "'unexplainable on grounds other than race, … the Court must look to other evidence'"). Their passing reference to Alabama's "'history'" of discrimination, *Milligan* Obj. 19, can't overcome "the presumption of legislative good faith," *Abbott*, 138 S. Ct. at 2324-25; *see also League of Women Voters v. Fla. Sec'y of State (League II)*, 66 F.4th 905, 923 (11th Cir. 2023) (The Court "rejected the argument that 'a racist past is evidence of current intent.'"). They rely on the complaints of Democrats in the Legislature, *Milligan* Obj. 19, but that won't do. *See League II*, 66 F.4th at 940 ("[T]he concerns expressed by political opponents [about disparate impact on black voters] during the legislative process are not reliable evidence of legislative intent."). Nor can the handful of ambiguous *political* statements of a handful of legislators, *Milligan* Obj. 19-20, satisfy their burden given "the presumption of good faith." *See League of Women Voters v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022); *see also League II*, 66 F.4th at 931-32 ("the explanatory value of an isolated statement would be limited" because what "'motivates one legislator … is not necessarily what motivates scores of others'"); *id.* at 932 ("That the statement was made by the sponsor

63

adds little to its significance."). All that's left to support the idea that the Legislature "'secretly intended'" to racially discriminate, *GBM*, 992 F.3d at 1324 & n.37, is *Milligan* Plaintiffs' complaint that Alabama chose districting principles to respect communities of interest and that the Legislature instead should have split them up to create a district based on race, *Milligan* Obj. 20-21.[16] For the reasons explained above, that would have been unconstitutional. *See supra* pp. 54-61.

## CONCLUSION

The Court should deny Plaintiffs' request for an injuncticon against enforcement of the 2023 Plan.

Respectfully Submitted,

Steve Marshall
 *Attorney General*

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
 *Solicitor General*

James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
 *Assistant Attorneys General*

---

[16] The Milligan Plaintiffs (at 21) assert that *LULAC* found that similar efforts had the "mark of intentional discrimination." 548 U.S. at 440. But the mark in that case was intentionally moving a minority group *out* of a district and into another after they were "poised to" oust the incumbent. *Id.* at 438-40. Here, Plaintiffs want the State to intentionally move a minority group *into* a district from another to oust the incumbent.

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

**Counsel for Secretary Allen**

s/ *Dorman Walker* (with permission)
Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

**Counsel for Sen. Livingston and Rep. Pringle**

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, I filed the foregoing using the

Court's CM/ECF system, which will serve all counsel of record.

/s/ Edmund G. LaCour Jr.
*Counsel for Secretary Allen*