FILED
2023 Aug-08  PM 04:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BOBBY SINGLETON, et al.,
    Plaintiffs,       \*  2:21-cv-1291-AMM
                        \*  January 12, 2022
vs.                 \*  Birmingham, Alabama
                        \*  8:30 a.m.
JOHN MERRILL, in his official \*
capacity as Alabama Secretary \*
of State, et al.,
    Defendants.     \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EVAN MILLIGAN, et al.,
    Plaintiffs,     \*  2:21-cv-1530-AMM

vs.                 \*

JOHN MERRILL, in his official \*
capacity as Alabama Secretary \*
of State, et al.,
    Defendants.     \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MARCUS CASTER, et al.,
    Plaintiffs,     \*  2:21-cv-1536-AMM

vs.                 \*

JOHN MERRILL, in his official \*
capacity as Alabama Secretary \*
of State, et al.,
    Defendants.     \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
VIA ZOOM CONFERENCE
VOLUME VII
BEFORE THE HONORABLE ANNA M. MANASCO,
THE HONORABLE TERRY F. MOORER,
THE HONORABLE STANLEY MARCUS

EXHIBIT
N

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
and Procedures Vol. VI, Chapter III, D.2.  Transcript
produced by computerized stenotype.

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

## APPEARANCES

FOR THE SINGLETON PLAINTIFFS:

James Uriah Blacksher
JAMES U. BLACKSHER, ATTORNEY
825 Linwood Road
Birmingham, AL 35222
205-612-3752
Fax: 866-845-4395
Email: Jublacksher@gmail.com

Myron C Penn
PENN & SEABORN LLC
53 Highway 110
PO Box 5335
Union Springs, AL 36089
334-738-4486
Fax: 334-738-4432
Email: Myronpenn28@hotmail.com

Joe R Whatley, Jr
WHATLEY KALLAS LLP
2001 Park Place North Suite 1000
Birmingham, AL 35203
205-488-1200
Fax: 800-922-4851
Email: Jwhatley@whatleykallas.com

Henry C Quillen
WHATLEY KALLAS LLP
159 Middle Street Suite 2D
Portsmouth, NH 03801
603-294-1591
Fax: 800-922-4851
Email: Hquillen@whatleykallas.com

W Tucker Brown
WHATLEY KALLAS LLC
P.O. Box 10968
Birmingham, AL 35202-0968
205-488-1200
Fax: 800-922-4851
Email: Tbrown@whatleykallas.com

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

Diandra "Fu" Debrosse Zimmermann
DICELLO LEVITT GUTZLER
420 20th Street North
Suite 2525
Birmingham, AL 35203
205-855-5700
Fax: 205-855-5784
Email: Fu@dicellolevitt.com

Eli Joseph Hare
DICELLO LEVITT GUTZLER LLC
420 20th Street North, Suite 2525
Birmingham, AL 35203
205-855-5700
Fax: 205-855-5784
Email: Ehare@dicellolevitt.com

FOR THE MILLIGAN PLAINTIFFS:

Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
Dross@naacpldf.org

Leah Aden
Stuart Naifeh
Kathryn Sadasivan
Brittany Carter
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
Laden@naacpldf.org
Snaifeh@naacpldf.org

Davin M. Rosborough
Julie Ebenstein
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
Drosborough@aclu.org
Jebenstein@aclu.org

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1  Kaitlin Welborn
2  LaTisha Gotell Faulks
   AMERICAN CIVIL LIBERTIES UNION
3  OF ALABAMA
   P.O. Box 6179
4  Montgomery, AL 36106-0179
   (334) 265-2754
5  Kwelborn@aclualabama.org
   Tgfaulks@aclualabama.org
6
   David Dunn
7  HOGAN LOVELLS US LLP
   390 Madison Avenue
8  New York, NY 10017
   (212) 918-3000
9  David.dunn@hoganlovells.com

10 Michael Turrill
   Harmony A. Gbe
11 HOGAN LOVELLS US LLP
   1999 Avenue of the Stars
12 Suite 1400
   Los Angeles, CA 90067
13 (310) 785-4600
   Michael.turrill@hoganlovells.com
14 Harmony.gbe@hoganlovells.com

15 Shelita M. Stewart
   Jessica L. Ellsworth
16 HOGAN LOVELLS US LLP
   555 Thirteenth Street, NW
17 Washington, D.C. 20004
   (202) 637-5600
18 Shelita.stewart@hoganlovells.com

19 Blayne R. Thompson
   HOGAN LOVELLS US LLP
20 609 Main St., Suite 4200
   Houston, TX 77002
21 (713) 632-1400
   Blayne.thompson@hoganlovells.com
22
23
24
25

---

1  Sidney M. Jackson
2  Nicki Lawsen
   WIGGINS CHILDS PANTAZIS
3  FISHER & GOLDFARB, LLC
   301 19th Street North
4  Birmingham, AL 35203
   Phone: (205) 341-0498
5  Sjackson@wigginschilds.com
   Nlawsen@wigginschilds.com
6
7  FOR THE CASTER PLAINTIFFS:

8  Abha Khanna
   ELIAS LAW GROUP LLP
9  1700 Seventh Avenue, Suite 2100
   Seattle, WA 98101
10 206-656-0177
   Email: AKhanna@elias.law
11
12 Aria C Branch
   ELIAS LAW GROUP LLP
13 10 G St NE, Suite 600
   Washington, DC 20002
14 202-968-4490
   Fax: 202-968-4498
15 Email: ABranch@elias.law

16 Daniel C Osher
   ELIAS LAW GROUP
17 10 G Street NE
   Suite 600
18 Washington, DC 20002
   202-968-4490
19 Email: DOsher@elias.law

20 Joseph N. Posimato
   Elias Law Group LLP
21 10 G Street, NE; Suite 600
   Washington, DC 20002
22 202-968-4518
   Email: Jposimato@elias.law

23 Lalitha D Madduri
24 ELIAS LAW GROUP LLP
   10 G Street NE, Suite 600
25 Washington, DC 20002
   202-968-4490
   Email: Lmadduri@elias.law

---

1  Olivia N. Sedwick
2  Elias Law Group LLP
   10 G Street, NE; Suite 600
3  Washington, DC 20002
   202-968-4518
4  Email: Osedwick@elias.law

5  Richard P Rouco
6  QUINN CONNOR WEAVER DAVIES & ROUCO LLP
   Two North Twentieth Street
7  2 20th Street North
   Suite 930
8  Birmingham, AL 35203
   205-870-9989
9  Fax: 205-803-4143
   Email: Rrouco@qcwdr.com
10
11
12 FOR THE DEFENDANT:

13 Andrew Reid Harris
   OFFICE OF THE ATTORNEY GENERAL
14 CONSTITUTIONAL DEFENSE DIVISION
   501 Washington Avenue
15 Montgomery, AL 36130
   334-353-8891
16 Email: Reid.Harris@AlabamaAG.gov

17 Benjamin Matthew Seiss
18 ALABAMA OFFICE OF THE ATTORNEY GENERAL
   P.O. Box 300152
19 501 Washington Ave (36104)
   Montgomery, AL 36130
20 334-353-8917
   Fax: 334-353-8400
21 Email: Ben.seiss@alabamaag.gov

22 Brenton Merrill Smith
   OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
23 P.O. Box 300152
   501 Washington Avenue
24 Montgomery, AL 36130
   334-353-4336
25 Fax: 334-353-8400
   Email: Brenton.Smith@AlabamaAG.gov

---

1  Edmund Gerard LaCour, Jr.
2  OFFICE OF THE ATTORNEY GENERAL
   501 Washington Avenue
3  P.O. Box 300152
   Montgomery, AL 36104
4  334-242-7300
   Fax: 334-242-4891
5  Email: Edmund.LaCour@AlabamaAG.gov

6  James W Davis
   OFFICE OF THE ATTORNEY GENERAL
7  501 Washington Avenue
   P O Box 300152
8  Montgomery, AL 36130-0152
   334-242-7300
9  Fax: 334-353-8400
   Email: Jim.davis@alabamaag.gov

10 Misty Shawn Fairbanks Messick
11 OFFICE OF THE ATTORNEY GENERAL
   FOR THE STATE OF ALABAMA
12 501 Washington Avenue
   P O Box 300152
13 Montgomery, AL 36130-0152
   334-242-7300
14 Fax: 334-353-8440
   Email: Misty.Messick@AlabamaAG.gov

15 Alexander Barrett Bowdre
16 OFFICE OF THE ALABAMA ATTORNEY GENERAL
   P.O. Box 300152
17 Montgomery, AL 36130
   334-242-7300
18 Fax: 334-353-8400
   Email: Barrett.Bowdre@alabamaAG.gov

19 Thomas Alexander Wilson
20 STATE OF ALABAMA
   OFFICE OF THE ATTORNEY GENERAL
21 501 Washington Street
   Montgomery, AL 36103
22 334-242-7300
   Fax: 334-353-8400
23 Email: Thomas.wilson@alabamaAG.gov
24
25

---

**Page 1653**

```
 1     J Dorman Walker
 2     BALCH & BINGHAM LLP
       P O Box 78
 3     Montgomery, AL 36101
       334-834-6500
 4     Fax: 334-269-3115
       Email: Dwalker@balch.com
 5

 6

 7

 8

 9     COURTROOM DEPUTY:  Frankie N. Sherbert

10

11     COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

**Page 1654**

```
 1                          I N D E X
 2
 3     BRADLEY BYRNE                                    1655
       DIRECT EXAMINATION                               1656
 4     BY MR. DAVIS
       CROSS-EXAMINATION                                1696
 5     BY MS. WELBORN
       CROSS-EXAMINATION                                1711
 6     BY MR. OSHER
       CROSS-EXAMINATION                                1733
 7     BY MR. WHATLEY
       REDIRECT EXAMINATION                             1747
 8     BY MR. DAVIS
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 1655**

```
 1                    P R O C E E D I N G S
 2                    (In open court.)
 3          JUDGE MARCUS:  Are the parties ready to proceed?
 4          MR. DAVIS:  Defense is ready, and Mr. Byrne the next
 5     witness is here and ready, Judge.
 6          JUDGE MARCUS:  Okay.  Caster plaintiffs ready?
 7          MS. KHANNA:  Yes, Your Honor.
 8          JUDGE MARCUS:  And the Milligan and Singleton
 9     plaintiffs?
10          MR. BLACKSHER:  Singleton are.
11          MS. WELBORN:  Milligan are, as well, thank you.
12          JUDGE MARCUS:  We are going to turn now to your next
13     witness, Mr. Davis.
14          MR. DAVIS:  Thank you, Judge.  The defense calls
15     Mr. Bradley Byrne.
16                    BRADLEY BYRNE,
17     having been first duly sworn, was examined and testified as
18     follows:
19          JUDGE MARCUS:  Thanks very much.  And if you would be
20     kind enough to state your name for the record.
21          THE WITNESS:  My name is Bradley Byrne, B-R-A-D-L-E-Y,
22     B-Y-R-N-E.
23          JUDGE MARCUS:  Thank you very much.  And with that,
24     Mr. Davis, you may proceed.
25          MR. DAVIS:  Thank you, Judge.
```

---

**Page 1656**

```
 1                    DIRECT EXAMINATION
 2     BY MR. DAVIS:
 3     Q    Good morning, Mr. Byrne.
 4     A    Good morning.
 5     Q    Where do you live, Mr. Byrne?
 6     A    I live in Fair Hope, Alabama.
 7     Q    How long have you lived in the Gulf Coast region?
 8     A    My entire life.
 9     Q    And what do you do for a living?
10     A    I am a lawyer.
11     Q    Have you ever served in public office?
12     A    I have.
13     Q    Would you please tell the Court about your experience in
14     public service beginning with your earliest appointed or
15     elected position?
16     A    Yes.  I was elected to the Alabama State School Board in
17     1994 and took office in December of that year because my
18     predecessor left to go take another position, so I started that
19     a little bit earlier.
20          I served the Alabama State School Board eight years.  I
21     was elected to the Alabama State Senate in 2002, and under
22     Alabama law, you take office immediately after general
23     election.  So I became the state senator in November of 2002.
24     I served there until May of 2007, when I became the chancellor
25     post-secondary education for the state of Alabama.
```

1657

```
 1    In December of 2013, I was elected in a special election
 2  to the United States House of Representatives representing the
 3  First District, which is the southwestern part of Alabama.  I
 4  served there until January 3rd of last year, when I left
 5  office, and my term expired.
 6  Q    Thank you, Mr. Byrne.
 7       I want to share my screen now and show you a map that has
 8  been marked as Defendants' Exhibit 55.  Can you see this map,
 9  Mr. Byrne?
10  A    I can.
11  Q    I will represent to you that these are the congressional
12  districts that the Alabama Legislature passed November the last
13  districting cycle.
14       Does the First Congressional District look similar to the
15  district as it existed when you represented the First District?
16  A    It is similar.  It does not include the lower half of
17  Clarke County that I had in my district.  And there's a small
18  sliver of the eastern part of Escambia County that is now part
19  of the Second District, but other than that, it's the same
20  district that I had.
21  Q    To your recollection, does the Second District look
22  similar in structure to the way it was when you were serving in
23  Congress?
24  A    It does.
25  Q    Thank you.  How would you describe Gulf Coast region,
```

1658

```
 1  Mr. Byrne?  And by that, I mean what is it, if anything, that
 2  binds that region together to make it a community of interest?
 3  A    Well, we are on the water.  We are on the Gulf of Mexico.
 4  We have lots of bodies of water in the district.  Mobile Bay is
 5  very prominent, and Perdido Bay is pretty prominent.  A number
 6  of rivers, sounds, et cetera.  So water defines the district
 7  very much.  It's not just any kind of water.  It's salt water,
 8  brackish water, et cetera.
 9       What that means is we have a major deep water port.  We
10  have a major ship building industry.  We have major tourism
11  industry that's related to the beaches and the water.  And also
12  a major seafood industry.  And all of those are unique in terms
13  of Alabama unique to this part of the state.
14       And so when you deal with the things that happen in this
15  part of the state, you are dealing with something that's unique
16  in the state of Alabama.
17  Q    Do people throughout the region through the other counties
18  in the First District commute to Mobile for employment?
19  A    Yeah.  There are major highways that come from the
20  northern part of the district into both Mobile and Baldwin
21  counties.  So people in what I call the collar counties, which
22  are Washington County, Escambia County, Monroe County, and
23  presently that lower part of Clarke County, they'll use those
24  highways to go back and forth.
25       It's not just their jobs.  It may be going to the doctor,
```

1659

```
 1  the hospital, their shopping, et cetera.  So there's this sort
 2  of larger community involving these four, five counties that
 3  flow into and out of Mobile and Baldwin counties.  It used to
 4  be just Mobile County.  Baldwin County has grown so much.
 5  Baldwin County is now a very big part of that, as well.
 6  Q    What role does the Port of Mobile play, if anything, in
 7  binding that region together?
 8  A    Well, it's huge.  Mobile started out in the 18th Century
 9  as a port.  It was a port for French traders, but it was still
10  a port, and it's been a port for 300-plus years, and the port
11  continues to grow.  In fact, it had amazing growth last year.
12  It's not just the port itself.  The port is at the very center
13  of what is a major logistics hub.  For example, we have one of
14  Walmart's four mega distribution centers here in Mobile County.
15  That's all related to the port.
16       The fact that we have Airbus in Mobile, we have it in part
17  because they can ship directly via the ship channels directly
18  from a port in Europe to a port right outside of their assembly
19  facility here in Mobile.  So that port is the anchor for the
20  economy around here.  And it literally directly and indirectly
21  creates tens of thousands of jobs.  So it's extremely important
22  to this area.
23  Q    Are there industries in the area along the rivers that
24  flow into the port?
25  A    Oh, yeah.  We have major industries, chemical industry
```

1660

```
 1  players, steel industry players up and down the Mobile river
 2  and as you get further north of that into the Tombigbee River.
 3  So the river, the Tombigbee River, then on the eastern side,
 4  the Alabama River, those are very important to the economy and
 5  the culture of this area.
 6  Q    And do any of those industries rely on the port for
 7  distribution of the products?
 8  A    Well, for the distribution of their products, but also for
 9  stuff that comes in that they have to use to create their
10  product.  Maybe different types of elements that go into the
11  chemical process.  In the case of steel, we actually have steel
12  slabs that come up from Brazil that are then offloaded off the
13  ships and put on barges that come up to a company called AM/NS
14  Calvert.  It's a multinational company that employs well over
15  2,000 people in the production of coal and steel.
16  Q    Is there anything unique about the history of this region,
17  in terms of international influence?
18  A    Yeah.  We were founded by the French in 1702.  We had
19  20 years in there where we were a British colony and then 30 or
20  40 years where we were a Spanish colony.
21       So unlike the rest of the state of Alabama, we have this
22  extensive Colonial history, and it continues to form our
23  culture today.  We're far more likely to have Catholic
24  residents here than in any other part of the state.  We have
25  Mardi Gras, which may sound like just sort of a frivolous fun
```

**Column 1 (Page 18 of 283 / 1661)**

1  thing, but Mardi Gras is big business here. There are a lot of
2  businesses that that is what they do. So it's not unusual to
3  find Mardi Gras parades not just here in Mobile, but you go
4  north of here into Washington County, you go over into Baldwin
5  County, several of the cities in Baldwin County, and even up
6  into Monroe County, they have Mardi Gras because there is there is
7  cultural connection between the two.
8      I was reading an interesting article the other day about
9  Truman Capote. He used to have relatives in Monroe County that
10 he would visit. Mr. Capote wrote that he actually entered into
11 contests as a child to write stories, and those stories were
12 printed in the *Mobile Press Register*. He was in
13 Monroe County. This is 100 years ago.
14     So you can see that there's this long-term connection
15 between what I call the collar counties in the First
16 Congressional District and Mobile itself.
17 Q  Are Baldwin County in Mobile County closely connected?
18 A  Oh, yeah. If you look at a map of Mobile and Baldwin
19 counties, it looks like an inverted U. And what's in the
20 interior of that U is Mobile Bay. And so if you go back
21 literally centuries, you will see a connection between the two
22 counties.
23     So my family is originally from Baldwin County. The
24 Byrnes were from Baldwin County. But if you go back to the
25 late 18th Century, you will see one of my ancestors was

**Column 2 (Page 18? / 1662)**

1  actually baptized in the Roman Catholic Church here in Mobile.
2  So there's this intersection between those two counties that's
3  been going on for a very long time.
4  Q  Would you say those counties are more closely connected
5  today than they were, say, in the '60s and 70s?
6  A  Oh, yeah. For example, when -- I live in Baldwin County,
7  and I work in Mobile County.
8      If you were in my car with me today, you would have seen
9  thousands of cars crossing from Baldwin County into Mobile
10 County. So you have lots of people who live in Baldwin County,
11 but work in Mobile County.
12     Not as many people, but there are people who live in
13 Mobile County and work in Baldwin County.
14     So there's really strong interconnection between the two
15 counties.
16 Q  What are -- you mentioned a few of these. Let's get on
17 the record and say what are some of the major industries and
18 employers in the Mobile region?
19 A  For instance, the Port of Mobile. That's a big one. You
20 have AM/NS Calvert, which is the steel company. There's
21 Outokumpu, which is a stainless steel company; there's SSAB,
22 another coal and steel company; and Earth Pipe, which is a
23 steel pipe company, so those are steel companies.
24     Numerous chemical companies. I think about it. Huntsman,
25 there's -- oh, shoot. There's Shell. I can't remember all the

**Column 3 (Page 19 of 283 / 1663)**

1  chemical companies. It must be 20.
2  Q  Of course.
3  A  We have the University of south Alabama, which is a major
4  employer in this area. We have Austal USA, which is a
5  ship-building company. We have Airbus USA, which is major
6  airplane assembly facility here. We have the Mitchell Cancer
7  Research Center. We have -- I mentioned the Walmart mega
8  distribution center. We have a number of other logistic
9  distribution centers because of the port.
10     And then if you go into the southern part of Baldwin
11 County, you have major businesses are there to provide
12 condominium access to tourists that come down here, hotels,
13 restaurants, et cetera. In Bon Secour, Alabama and Bayou La
14 Batre, Alabama, these are two of the largest seafood
15 distribution places literally in the United States of America.
16     So Nelson Bon Secour Fishery in Bon Secour, huge
17 distributor for seafood. I can remember eating crab meat in
18 Washington D.C. and finding out during the meal that that crab
19 meat came from Bon Secour, Alabama.
20     So you know, no other part of Alabama has industries like
21 this. I am not saying it's better or worse than the other
22 parts of the state. It's just unique.
23 Q  Would you describe the First District as racially diverse?
24 A  Oh, yes. Very much so. We have obviously long-time white
25 and black communities, but we have Hispanic communities. Down

**Column 4 (Page 20 of 283 / 1664)**

1  in Bayou La Batre, we have a number of southeast Asian
2  communities, people that left those areas in the aftermath of
3  the Vietnam War and settled Bayou La Batre, Alabama and formed
4  these huge fishing communities. We have other Asian
5  communities here. This is always been because of the port I
6  guess a very diverse area, going back to the earliest times
7  here.
8      So it's not unusual to find somebody like me who has
9  French ancestors, you know, Scottish ancestors, Irish
10 ancestors, German ancestors. It's not unusual to find people
11 here that can draw their lines back to various parts of Africa.
12 There are people here that can draw their lines back to the
13 various nations in southeast Asia. This is a very diverse area
14 and always has been.
15 Q  Are there military interests in the First District?
16 A  Yes, sir.
17 Q  What do you have?
18 A  We have a shipyard here called Austal USA that makes two
19 different ships for the United States Navy, combat
20 ship and the expeditionary fast transport vessel. Those are
21 the only vessels that shipyard makes. It employs
22 presently about 3,500 people. At one point, it had as many as
23 4,500 people. Ship building has been a major part of Mobile
24 going back to Colonial times.
25     We have all -- you have people here who are like fifth,

1 sixth generation ship builders. Making ships is not like any
2 other manufacturing process because they're so darn big. It's
3 just a lot more to it than making a car, or even making the
4 airplanes that Airbus makes here.
08:44:09 5     So we -- that ship building for the Navy here is a big
6 deal.
7 Q   In the years when you were representing this area in
8 Congress, Mr. Byrne, were there any particular issues that you
9 would focus on?
08:44:23 10 A   Sure. When you are a Congressman, you're the primary
11 representative for the people in your district in Washington,
12 D.C.
13     So there were a myriad of things that were particular to
14 this district that I had to focus on. The shipyard, for
08:44:43 15 example, very critical that we make sure those ships are
16 authorized and appropriated year after year after year.
17 There's nothing automatic about that. There's a fight over
18 that every year.
19     But it may sound mundane. We had a huge issue here in
08:44:56 20 involving the Gulf Red Snapper, which is the number one fish
21 people like to catch out in the Gulf of Mexico. We have a huge
22 industry in Orange Beach built up around charter boats, people
23 that own their own boats. Think about it. It is not just the
24 fact of the boat, it's you have to buy fuel for the boat, you
08:45:14 25 have to buy ice for the boat, you have to buy bait for the

1 boat, you have to buy beer to go out and have fun in the summer
2 time. It's a huge industry. And we have a real problem with
3 those seasons being artificially shortened, and we had to go
4 work on trying to get those seasons back to a reasonable level.
08:45:32 5 For friends of mine that wanted to go fishing on Saturday, it
6 was for that industry. It's important.
7     We have a program in the federal government called GOMESA.
8 It is an acronym. But basically, it provides a certain
9 percentage of what the federal government gets in off shore gas
08:45:47 10 leases and oil leases that go to the states that border the
11 Gulf of Mexico. That's to help them deal with what could be
12 the very negative effect from that like with the BP oil spill
13 that we had back in 2010. So I was constantly working on that
14 and similar programs.
08:46:03 15     So I actually formed a caucus in Congress called the I-10
16 Caucus because those of us that represented districts in the
17 Gulf Coast had sort of unique problems that we would actually
18 work on together because those same interests weren't shared
19 with our colleagues and our state delegations up in the upper
08:46:21 20 parts of our states. So we would work together on things like
21 that.
22     And then there would be just the stuff that, you know,
23 every industry faces when you deal with federal government
24 regulations. Ship building has all sorts of interesting issues
08:46:36 25 with the Coast Guard, et cetera. So, yeah, I mean, I had to

1 work on those. And really had to become an expert on those
2 issues along with my staff.
3 Q   Obviously, a longer snapper season would benefit the
4 people who enjoy going out in the Gulf and fishing. Does it
08:46:54 5 have any benefit to other residents of the First District
6 having a healthy fishing industry?
7 A   Okay. That's an industry around it. There are charter
8 boat fleets, people that work on charter boats. There are
9 people that run marinas. There are people that sell fuel.
08:47:10 10 There are people that sell ice. There are people that sell
11 bait. There are people that, you know, provide condos and
12 hotel rooms that people stay in when they go fishing.
13     I mean, I remember when I was first elected and I had a
14 meeting with the people in Orange Beach that were in that
08:47:24 15 industry, and the issue was just crammed full of people. I
16 never really thought of it that clearly before just how many
17 people were touched by the fact that we do or do not have a
18 good snapper season. And it was a major motivation to make
19 sure that we got that problem solved because it touched so many
08:47:41 20 different lives and touched so many different jobs.
21 Q   Would issues that you worked on such as the snapper
22 season or a healthy port or a healthy ship building industry,
23 would they help both the black and the white residents of the
24 First District?
08:47:55 25 A   Oh, yeah. I mean, people down here, we have people of all

1 races that are working in all of these industries. And it's a
2 major source to get good high paying jobs. So it's a benefit
3 to everybody that we do that.
4 Q   Uh-huh. Are you familiar with the Wiregrass region in the
08:48:15 5 Second District?
6 A   I am. I told you earlier that I was a chancellor of
7 post-secondary education for the state of Alabama. And we had
8 three or four colleges in the Wiregrass region. We had a
9 number of vacancies in those colleges, so I had to go through
08:48:37 10 presidential searches. When you do a presidential search at a
11 community college, you have to involve the community. You have
12 to get involved with the community. You have to understand
13 that community.
14     So, for example, Lurleen B. Wallace Community College in
08:48:55 15 Andalusia, Alabama, that's Covington County, I spent a lot of
16 time in Andalusia because we had to build a vacancy there. So,
17 yes, I have spent a lot of time in the Wiregrass of Alabama
18 because of that position.
19 Q   Tell me how the interest of the Wiregrass would compare to
08:49:13 20 the interest of the counties that are in the First
21 Congressional District.
22 A   Well, what I described to you before is in the First
23 Congressional District southwest Alabama, something's built
24 around the water, okay? The Wiregrass is built around a couple
08:49:26 25 of things. Fort Rucker, which an Army helicopter training base

Case 2:21-cv-01530-AMM Document 227-4 Filed 08/08/23 Page 7 of 28
Case 2:21-cv-01530-AMM Document 105-6 Filed 01/18/22 Page 26 of 283
1669

```
 1  there in Ozark is a big part of the Wiregrass.  Troy State
 2  University is a huge part of the Wiregrass.
 3      People in the Wiregrass sort of revolve around Dothan down
 4  at the southern end and Montgomery at the northern end.  And
 5  they have agricultural interests that are different from the
 6  agricultural interests that will be out here in southwest
 7  Alabama.  They don't have a nursery industry like we have here.
 8  We have major wholesale nursery businesses here.  They don't
 9  have major watermelon crops.  They don't have major pecan
10  crops.  They're more built in to peanuts and cotton and cattle.
11      So they face, for example, during -- during in Andalusia,
12  Alabama, you face more towards Troy or Ozark or Dothan.  You
13  don't face down here in southwest Alabama.  In addition, it's
14  kind of hard to get from Mobile to the Wiregrass.  We don't
15  have really good highway connections over there.  So it's not
16  easy for people from there to come here or for people from here
17  to go there.
18      So they sort of face to the southeastern part of the
19  state.  We face to the southwestern part of the state.
20  Q   If you were representing the Second District, would you
21  focus on the same issues that you focus on when
22  representing the First?
23  A   No, sir.  For example, I was on the Armed Services
24  Committee, and with the Navy shipyard, I am going to be focused
25  on Navy stuff.
```

```
 1      If I represented the Second Congressional District, I
 2  would be focused on the Army and particularly Army helicopters.
 3  That's what they do at Fort Rucker.
 4      In this district, I was focused for higher education
 5  reasons on the University of South Alabama.  If I represented
 6  the Second District, I would be focused on Troy.  Now, Troy has
 7  a different mission from the University of South Alabama.  They
 8  have an international presence.  So working with Troy would be
 9  very different from working for the University of South
10  Alabama.  Troy doesn't have a medical school, but it has a
11  whole lot of other stuff that's pretty darn important.  So
12  there would -- and the agricultural interests I just described
13  are very different.
14      So I would think being the congressman from the Second
15  District requires a different level of expertise and level of
16  expertise that I feel like I had to have to represent this
17  district.
18  Q   I want to share another screen now, Mr. Byrne.  And this
19  is Milligan Exhibit 3, page 7 of that exhibit.
20      These are some proposed congressional maps that one of the
21  plaintiffs' experts presented, I will represent to you,
22  Mr. Byrne.
23      Review just say these -- here's Plan A and B, and then I
24  will scroll down to Plan C and Plan D, as well.
25      Focus on any of those, and tell us what's your reaction
```

```
 1  is.  Do you see any issues with representing these districts?
 2  A   Yes.  If you look at Plan A and Plan B, you see it takes
 3  in part of Mobile County, all of Baldwin County, and then goes
 4  east into the Wiregrass legion.  So you would essential have to
 5  become an expert on two different regions altogether, two
 6  different communities of interest.  I know that's important for
 7  those proceedings.
 8      Then if you look at that district just above it, that
 9  district is essentially part of the Black Belt and part of
10  southwest Alabama.  So the person representing that district
11  would essentially have to have two very dramatically different
12  sets of expertise.  I think it would be very difficult to be
13  the congressman for either of those districts not just the fact
14  you would have this vast geographic area you would have to
15  cover, but you would be covering two very different communities
16  of interest.
17  Q   Uh-huh.  Why would it make it more difficult to represent
18  a district if it encompassed different communities of interest?
19  A   Well, for example, if you represented that blue district
20  at the very bottom, you would have to be an expert on things
21  involving Navy shipyards and Army helicopter bases.  You would
22  have to be an expert when it comes to agricultural issues like
23  everything from wholesale nurseries, watermelons, pecans, to
24  peanuts, cattle production, and cotton production.  You would
25  have to be focused on two major universities that have very
```

```
 1  different missions.  You would have to be focused on Dothan.
 2  You would have to be focused on Andalusia.  You would have to
 3  be focused on Brewton, Mobile, and then all of Baldwin County,
 4  which is the fastest growing county in the state.
 5      So I am not saying you couldn't do it.  It would be
 6  extremely difficult to do it, and you would find yourself
 7  somewhat diffused in your ability to be an effective advocate
 8  for that region.
 9  Q   What do you mean by diffused?
10  A   Well, there's only so many hours in the day for a
11  congressman and the staff that that congressman has.  And there
12  are hundreds if not thousands of issues in Washington.  And you
13  have got to figure out what your focus is going to be on.  And
14  focus is very important for a member of Congress because
15  there's just not enough bandwidth, and there's only 435
16  congressmen, and you are one of them.
17      So you really have to figure out where am I going to put
18  my time?  Where am I going to put the resources of my staff?
19  What fights am I going to fight.  If you are fighting a whole
20  bunch of different fights because you have to, because you have
21  got that many interests in your district, you are not going to
22  be effective on each one of those.  The more you can sort of
23  focus your energies, the more effective you will be.
24      I will give you an example.  Everybody in the House of
25  Representatives and the staff and the leadership, et cetera
```

knew that I was interested in a bridge across Mobile Bay,
fixing the snapper problem, and gaining the ships authorizing
and appropriated for the shipyard here. Literally, I had the
Speaker come up to me on the floor and say, we get it. It's
that bridge, it's those ships, and it's those fish. Now, when
they know that, they know they have got to make me happy on
that to get my votes. If they don't make me happy on that,
they are not going to get my votes.

Now, if I say I have 20 different things I want you to
make me happy on, they will say, look, I am not going to make
you happy on 20 things. You tell me what your priorities are.
We will help you get those things done, and then you will be a
part of the team. That's how it works. Anybody that tries to
be like out there fighting on every fight tends not to win any
fight.

Q    Let's say you represented -- I guess I should show you the
maps again. If you represented a blue district, do you see any
difficulty in just getting around and visiting your
constituents?

A    Yeah. It's a long way from Mobile to Dothan. Actually,
the way you get from Mobile to Dothan is that you get on
Interstate 10, you drive east through the Florida panhandle,
and then you get just north of Panama City you turn north. So
it's about a three to three-and-a-half hour drive from Mobile
to Dothan.

And north of there to Henry County, that's a county just
north of Houston County, it's even further than that. And so
in order to represent the people in Abbeville who deserve good
representation, even if you just visited there for an hour, you
would spend three-and-a-half, maybe four hours just to get
there and that much going back, so it's a long haul.

And the interests as I said of that southeastern part of
the state are very different than the interests in the
southwestern part of the state.

So when you finish with having your meetings in an area
like that, go back to Washington, you have to decide, all
right, what I am going to focus on? What are the priorities
for this sort of sprawling district with all these different
interests?

And somebody is going to lose out. That's just the way it
is. There's only so much bandwidth for a congressman, and that
person has to decide what am I going to focus on? Am I going
to help the shipyard in Mobile, or am I going to help Fort
Rucker?

Q    Where do you think a congressman or congresswoman who
represented the blue district would want to have local offices?
A    Well, you clearly want to have your main office Mobile,
but you want to have as pretty significant office as you can
afford in Dothan. You are only allotted so much money as a
congressman for your office, staff, and your office rent. So

you have got to spread that over Mobile and Dothan. And
Baldwin County is the fastest growing county in the state. You
have to have a presence in Baldwin County for a lot of
different reasons.

Then I guess you try to find some way to put something in
Andalusia. That's kind of more centrally located
geographically. But as I said, and I can say it's really hard
to get from here to Andalusia. Andalusia is a pretty hefty
drive from here. Not as far as Dothan, but it's still a hefty
drive because there's no good highway to get there.

Q    Look at this yellow district or tan, the one above the
blue district.

Let's say there was a primary election in that district,
and someone was running to be the Democratic candidate, and
that someone was from Mobile. There was another person running
in the primary from Montgomery. Do you have any thoughts on
who might have a stronger base of support geographically?
A    I would think that if you were from Montgomery, you would
have a stronger chance than if you're representing that part
that's in Mobile.

The Black Belt -- what those counties primarily look like
to me, the Black Belt is kind of its own thing. It's got very
rural, very agricultural. And they look more to Montgomery
than they look to Mobile for sure. So I would think somebody
from Montgomery would have a better shot at that district than

somebody from Mobile.
Q    Do you think it possible, Mr. Byrne, if you had a map in
Plan A or Plan B that you could have, say, a congressman from
the blue district from Dothan or Andalusia and a congressman
for the yellow district from Montgomery so that you had no one
in Congress from the Mobile region?
A    That could happen, yeah. It's kind of hard to know
exactly what parts of Mobile County are being taken with those
two plans. But if you dilute the vote in Mobile County, that
obviously is going to make the vote of the rest of that
district -- those two districts more important. So, yeah, you
could have a congressman from Dothan under both of those plans
and a congressman from Montgomery and not a congressman from
Mobile, which would be a tragedy for the people down there.
Q    Why would it be a tragedy for the people down there?
A    I'm not saying somebody from Dothan or Montgomery wouldn't
care about this area. But as I said before, you wouldn't have
somebody that's focused, focused on the port, focused on the
shipyard, focused on our fishery in the Gulf of Mexico, focused
on the nursery issues we have here. They just -- they're just
not enough bandwidth to be as focused as I was able to be
focused. I could walk in a room and talk about any of those
issues and master it. If I had to represent those other areas,
as well, or somebody from the other areas had to represent
Mobile, I just don't think that you could master it.

1677

1 Q   Do Mobile and Montgomery ever compete each other, in terms
2 of trying to recruit businesses, for example?
3 A   Not that I know of.  Their economic development plan,
4 their industrial plan is very different from ours.  Montgomery,
5 for all the right reasons, has really focused on two things --
6 automotive, obviously with the Hyundai plant there and all the
7 suppliers of the Hyundai plant, but also because of their Air
8 Force presence, they really focus on how they can magnify
9 Maxwell Air Force Base and things that are a part of that.
10      I think they have made a very smart decision to do that,
11 by the way, but that's a different economic plan than what we
12 have done here.  So we're as much trying to help them because
13 of the port.  So as anything else, I don't really think we
14 believe ourselves that we're competing with them.
15 Q   Would you have any concerns with the congressional map
16 that divided the Mobile region along racial lines?
17 A   Yes.
18 Q   What would those be?
19 A   Well, when you are a Congressman, you should be
20 representing everybody and thinking about how I do X is that
21 going to affect everybody in my district?  You shouldn't be
22 thinking about, I am going to do this because it helps black
23 people, or I'm going to do this because it helps white people.
24 I am going to do this because it helps everybody.  And if you
25 help everybody, everybody rises.  That's what you want.

---

1678

1      Mobile is a little bit different from the rest of the
2 state.  We do not have the same history during the Civil Rights
3 movement that Selma, Montgomery, Birmingham did.  We had a
4 mayor here named Joe Lang who worked with a Civil Rights leader
5 down here named John LeFlore.  And so we didn't have some of
6 the violence, the extent of the violence that you saw in the
7 other parts of the state.  We tried to work through our issues
8 because we thought it was more important for us to work through
9 those issues and work together to try to figure out a way to
10 live together harmoniously.  Were we perfect about it?  No, we
11 did not.  But we didn't have the problems you saw in the rest
12 of the state because we at least made the effort to work
13 together.
14 Q   When you said that you worked -- that you served on the
15 state school board, correct?
16 A   Yeah.
17 Q   I want to share a map now which is Defendants' Exhibit 26.
18      This is the 2001 map, Mr. Byrne.  I know -- I think you
19 were in the State Senate then, weren't you?
20 A   In 2001, I was still on the state school board.
21 Q   Okay.  So which district did you represent in the state
22 school board?
23 A   District number 1.
24 Q   Thank you.  Did you ever get calls from people in, say
25 District 5 when you were on the school board?

---

1679

1 A   I did.  There was some people in Monroe County, I
2 remember, and maybe Clarke County who thought I was their state
3 school board member, and they would call me, and I would always
4 call the member for that district when they did and ask him or
5 her because it changed if they wanted me to help those people,
6 and they would say, please.  And I would go up there and talk
7 with them and explain to them I was not their school board.
8 Q   Now, I want to share a newer map.  This is from Caster
9 Exhibit 1, which for the record, was Mr. Cooper's report.  This
10 is page 19 of that report.  And I will represent to you,
11 Mr. Byrne, this is the new state school board map that was
12 passed by the Legislature this cycle just a couple of months
13 ago.
14      What thoughts if any do you have about this map, in
15 particular, the way the blue district includes part of Mobile
16 and Baldwin County is constructed?
17 A   Well, I testified before the Legislature Redistricting
18 Committee that I felt like Mobile and Baldwin County should be
19 kept whole and contiguous.  So to the extent that this map
20 includes a district that comes from Montgomery all the way into
21 Mobile County, I didn't much like it.
22 Q   Why did you not like it?
23 A   Because Mobile County school system is the largest school
24 system in the state.  And it has unique issues because it's the
25 largest in the state.  And I felt like we needed a school board

---

1680

1 member who was focused on Mobile County as well as the other
2 counties.  I had Baldwin and Escambia as well.  But there were
3 so many issues with the Mobile County school system, a lot of
4 my time was spent focused on that.  And if you break it up into
5 two different people, you don't really have that level of
6 focus.
7      I'm not saying that the people that represent those two
8 districts aren't working as hard as they can.  I'm sure they
9 are.  But it's very difficult to be focused on the Mobile
10 County school system if you have got almost all the Black Belt,
11 which that district up in the northern part is and a big chunk
12 of the Wiregrass, which the lower part of the -- the lower
13 district is.
14 Q   Someone who has served both in Congress and on the state
15 school board, how do the roles of those two offices compare to
16 each other, Mr. Byrne?
17 A   They're very different.  You're on the state school board,
18 you are focused on educational issues.  That's it.
19      Now, there are some work force development issues that go
20 with that, et cetera.  But that's pretty much it.  You are just
21 focused on educational issues.  When you are in the United
22 States Congress, you are focused on a large number of issues.
23 I mean, it's almost everything comes within the purview of the
24 United States Congress from foreign policy, defense policy,
25 health care, to internal security, and education, as well.  I

1681

```
 1   was on the Education and Labor Committee in the House of
 2   Representatives.  And one of the problems I had as a
 3   congressman is that people expected you to be knowledgeable on
 4   so many different things.
 5       Now, at least you have got a staff in Congress.  When I
 6   was on the state school board, I had no staff.  I had to rely
 7   upon the staff of the State Department of Education, and they
 8   had other things to do.
 9       So it was difficult to me to be on the state school board.
10   But at least I could just focus on one set of issues and try to
11   master them.
12       And so it was very different being in both of those roles.
13   But I enjoyed both of those roles.
14   Q    Considering the different roles between the school board
15   and the congressman, even if you assumed it made sense to split
16   Mobile County in a school board map, does that mean it would
17   make sense to do so in a congressional map?
18   A    No.  It would not make sense.  At least on the school
19   board, you are focused on one set of issues.  So if I'm from
20   Montgomery and I have got half of Mobile County from Mobile and
21   I have part of the Wiregrass, at least, I have got a
22   geographically diverse area.  At least, I'm really only focused
23   on a very set, defined set of issues.
24       Now, they are very important issues.  Don't get me wrong.
25   But at least I could focus on those issues and try to make sure
```

09:07:48

09:08:03

09:08:17

09:08:38

09:08:56

---

1682

```
 1   as I go from county to county that I am applying what I know on
 2   these issues to each one of those counties as they are very
 3   different.
 4   Q    When you campaigned for Congress in the different
 5   elections, Mr. Byrne, what parts of your district would you
 6   campaign in?
 7   A    All of them.  I had a -- go ahead.
 8   Q    Would you campaign in areas that were both more -- would
 9   you campaign in neighborhoods or areas that had a large
10   African-American community?
11   A    Oh, yeah.  You can't run for Congress in this district --
12   I will just make sure -- to be clear -- in this district
13   without touching every part of it.  And I made a concerted
14   effort to go everywhere.  In fact, if you look at my schedule,
15   I spent a disproportionate amount of my time in the more rural
16   areas than I did in more populated areas, because if you want
17   to go to Monroeville, you might as well spend some time in
18   Monroe County.
19       There are parts of Monroe County that are almost
20   completely African-American.  There's a little town in north
21   Monroe county called Beatrice that's 50/50.  I had a town ball
22   in Beatrice.  Someone said, why in the world would you bother
23   spending time in Beatrice because it's so small?  I said they
24   deserve to be represented, too.  So I went to all parts of my
25   district.
```

09:09:11

09:09:30

09:09:49

09:10:07

09:10:25

---

1683

```
 1       Prichard probably didn't give me 5 percent of the vote in
 2   my elections.  I probably lost there by a huge margin.  But I
 3   would go and have town hall meetings and campaign in Prichard
 4   because I believed the people in Prichard deserve to have a
 5   good congressman.
 6   Q    When you ran for Congress, Mr. Byrne, did you run as a
 7   candidate of any political party?
 8   A    Yes.  I was a Republican.
 9   Q    Why are you a Republican, Mr. Byrne?
10   A    Because the Republican Party is closer to the conservative
11   principles that I believe in than the Democratic Party is.  I
12   started out as a Democrat, but I felt like by 1997 I guess is
13   when I switched parties, the Democratic Party had migrated away
14   from what were my principles.  Not putting down the Democratic
15   Party if people are Democrats.  I have friends who are
16   Democrats and work with a lot of Democrats, but I just felt
17   like the Republican Party is more closely aligned with where I
18   stood on issues and principles.
19   Q    Did you work with Democrats when you were in Congress?
20   A    Oh, yes.  All the time.  I will give you two examples.  I
21   served on the Armed Services Committee.  Every year, the only
22   bill the Armed Services Committee works on is the National
23   Defense Authorization, which we have passed out of the Congress
24   every year since John Kennedy was president.  Those bills are
25   always bipartisan 100 years ago percent of the time.  We work
```

09:10:42

09:10:58

09:11:15

09:11:30

---

1684

```
 1   -- from the very beginning of the years, we work on that bill.
 2   We consciously work together to make sure that bill, the bill
 3   that authorizes the defense of this country is something that
 4   we can all vote for.
 5       So we work at being bipartisan, very much so.
 6       The other example I give you is this:  Shortly after
 7   President Trump was elected, this "Me-Too" movement came out.
 8   And we discovered that we have "Me-Too" problems in United
 9   States Congress.  But we also discovered that members of the
10   United States Congress weren't subject to the same processes
11   that the private sector was subject to under Title VII of the
12   1964 Civil Rights Act.
13       Now, I spent a career as a labor employment attorney
14   telling small, medium-sized businesses in Alabama what they had
15   to do to comply with that law.  And here in Congress, the body
16   that passed that law was not holding itself under the same set
17   of accountability processes.
18       So I worked with a very liberal Democrat congresswoman
19   from California, Jackie Speier, and we put together a bill that
20   made Congress be as accountable, even more accountable than we
21   hold people in the private sector, and that bill that Jackie
22   and I put together passed the United States House unanimously,
23   passed the United States Senate unanimously, and is a law of
24   the United States now.  And those are just two examples.
25       I worked all the time in a bipartisan manner, because I
```

09:12:08

09:12:26

09:12:44

09:13:02

09:13:25

```
 1    firmly believe that the best legislation in Washington is
 2    bipartisan legislation.  The hardest legislation to pass in
 3    Washington is partisan legislation.  And it's always a problem,
 4    always.
 5         So I enjoyed working the bipartisan fashion.  I know you
 6    look up there now and think, they're completely divided.  They
 7    can't get along.  And there are problems.  Don't get me wrong.
 8    But there are still people up there, former colleagues of mine
 9    on both sides of the aisle that understand what I say is true,
10    and they're still trying to work together to make things happen
11    and happen in the right way.
12    Q    When you served on the delegation with Congresswoman
13    Sewell for the Seventh District, did you have the opportunity
14    to work with her on any issues?
15    A    Oh, all the time.  All the time.  We shared Clarke County.
16    We actually had joint town halls together.
17         If she had an issue that affected her district, you know
18    uniquely, she would call on the other members of the delegation
19    to help her, and we always did, 100 years ago percent of the
20    time.  And she always helped us.  We all worked together.  It
21    wasn't like it was unique to her.
22         So Terry was a part of a group called Faith and Politics.
23    I assume she is still a part of it.  That's the group that
24    brings the pilgrimage to Alabama every year around the
25    anniversary of the Edmund Pettus Bridge March from 1965.  She
```

```
 1    wanted to make sure that when that group came here to Alabama,
 2    which would bring couple hundred people, people from Congress,
 3    people from business and industry, people from foundations, she
 4    wanted to make sure that we were all working together, that
 5    they saw Alabama, the Alabama delegation working together.
 6         So I always participated in that pilgrimage with her.
 7    Usually on Saturday mornings when she did her program either at
 8    Brown Chapel in Selma or the Dexter Avenue Baptist Church in
 9    Montgomery, she would ask me to be sort of her sidekick for it,
10    so that we could get up and tell the people from all the other
11    parties of America here's a Democrat and Republican, black
12    woman and white man working together on issues that matter to
13    the people of Alabama, in particular, matters that revolve
14    around Civil Rights.
15         And I was always honored that she felt comfortable enough
16    to ask me to do that.  And I can tell you, you can sit in that
17    room with some of the people in that room like John Lewis who
18    we lost last year, and you realize what people in this state
19    went through to get us the quality of life we have got today --
20    to get to today.  I feel like a little bitty nothing compared
21    to people like that.  But it was an honor always to be with
22    Terry and to work with her on -- whether it's the pilgrimage or
23    other things that were important to our district.
24    Q    When you were in Congress, Mr. Byrne, were there any
25    issues you worked on to devote your time and your political
```

```
 1    capital towards that you thought and expected to have a
 2    particular benefit to your African-American constituents?
 3    A    Just about everything.  If I am doing something that's
 4    going to benefit the economy in southwest Alabama, it's going
 5    to benefit African-Americans in my district, of course, it is.
 6    If you go to the various businesses in this area, and I
 7    traveled and met with workers in every one of these industries.
 8    It was always black and white.  That's the nature of our work
 9    force down here.  I mean, whether you are at a chemical plant,
10    steel plant, ship building plant, airplane, you are going to
11    have a mixed group of people.
12         So every time I was doing something for the economy.  But
13    I particularly felt like I was helping them every time we
14    worked on education issues.  And this goes back to my state
15    school board days.  I think the number one Civil Rights issue
16    in Alabama today is the fact that we don't give a quality
17    education to black people like we do the white people.  And I
18    really feel strongly about that.  We are not going to have the
19    sort of gains and advances and progress we need in this state
20    until we make more improvements to our education system.
21    That's true across the country, but I am more focused on
22    Alabama.
23    Q    Have you spent any time working with HBCUs, Mr. Byrne?
24    A    Yes, sir.  HBCUs are historically black colleges and
25    universities.  We had several of them in the two-year college
```

```
 1    system in Alabama include Bishop State here in Mobile.  So when
 2    I was on the state school board, I worked with them.  When I
 3    was chancellor of post-secondary education I worked with them.
 4    And by the way, including Tuskegee, and then when I got to
 5    Congress, a congresswoman from North Carolina named Alma Adams
 6    asked me to be a co-chair with her of the HBCU Congressional
 7    Causus.  So for five years I guess it was, I was the co-chair
 8    of the HBCU Congressional Caucus.
 9    Q    Did you spend time working on community health centers?
10    A    Oh, yes.  We have several community health centers here in
11    the district.  I've gotten to know them pretty well.  I am very
12    impressed with the quality of health care that they provide to
13    their patients.  And I was a strong advocate for them and
14    continue to be a strong advocate for them because I think that
15    they provide quality health care close near where people live,
16    so it's community plan, and it's the best way I think to get
17    primary health care to people in those communities.  So I am a
18    strong supporter of community health center.
19    Q    Back to your co-chairmanship on the HBCU caucus, I am not
20    suggesting this was the reason you did it, but did you receive
21    any recognition for your service in that area?
22    A    I did.  The Thurgood Marshall Fund gave me an award
23    three years.  Probably one of the awards that I am the most
24    proud of.  Thurgood Marshall Fund works to provide funding,
25    private funding to HBCUs across America.  And I had no idea
```

1689

1    they were going to give me an award, and it just knocked me out
2    when they did.  I remain in contact with them.  I still
3    continue to work with them even though I am not in Congress
4    because I am a huge believer in HBCUs, and I think what the
09:19:59 5    Thurgood Marshall Fund is doing and the United Negro College
6    Fund, both of them together are doing great work for those
7    colleges, and I think they are important to America.
8    Q    Just a few more questions, Mr. Byrne.  And I will remind
9    you.  We want to make sure the Court understands your testimony
09:20:19 10    that Ms. Decker can take it down.  We will try to slow down
11    just a little.  I want to -- when you were in Congress, did you
12    consider yourself to be the representative of both Republicans
13    and Democrats in your district?
14    A    Yes.
09:20:30 15    Q    Did you consider yourself to be the representative of both
16    the white and African-American constituents in your district?
17    A    Absolutely, yes.
18    Q    I want to share a screen now, Mr. Byrne.  This is Milligan
19    Exhibit 5.  It is the report of one of their experts, Dr. King,
09:20:57 20    and she is offering opinions on certain issues.  I want to read
21    this introduction section into the record so you can get some
22    context.  Dr. King writes, White law makers in Alabama learned
23    long ago to color mask their public statements, just as they
24    have learned to color mask the legislation intended to protect
09:21:21 25    their racial prerogatives.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

1690

1    Not since the high tide of brazen white supremacy when
2    George Wallace proclaimed, segregation forever, have public
3    figures been so bold.
4    MS. WELBORN:  Mr. Davis, this is Dr. Bagley's report,
09:21:43 5    not Dr. King's report.
6    MR. DAVIS:  I apologize for that confusion.  Yes.
7    Thank you for the correction.
8    BY MR. DAVIS:
9    Q    Then Mr. Bagley after giving some examples says this.
09:22:03 10    JUDGE MARCUS:  I think you have to just -- as we
11    proceed, Mr. Davis, just take your time and speak right into
12    the speaker.
13    MR. DAVIS:  Thank you, Judge.
14    BY MR. DAVIS:
09:22:16 15    Q    I will read now an excerpt into the record from Milligan
16    Exhibit 5, the Bagley report.
17    Dr. Bagley writes, Representative Bradley Byrne of the
18    State's First Congressional District when he was vying for a
19    Senate seat aired a campaign ad in which he condemned black
09:22:30 20    people by placing their images in a fire.
21    The television spot begins with Byrne staring into a wood
22    fire in a backyard and lamenting the loss of his brother in the
23    armed services.  He shifts to lamenting the course the country
24    is taking as the faces of black and brown people appear in the
09:22:56 25    fire.  Former national football league quarterback Colin

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

1691

1    Kaepernick appears in the fire as Byrne calls him an entitled
2    athlete dishonoring the American flag.  Members of the
3    congressional caucus known as the Squad, Ilhan Omar and
4    Alexandria Ocasio Cortez appear in the fire and are accused of
09:23:17 5    attacking America and cheapening 9/11.  No white people appear
6    in the fire.
7    My question to you, Mr. Byrne, is:  Is there anything you
8    care to say in response?
9    A    Yes, sir.  That ad was about my brother.  And the fire was
09:23:38 10    a fire in the fire pit at our hunting camp that he and I used
11    to sit around all the time.  So that ad was about my brother.
12    Now, the fact that I'm contrasting a rich, NFL quarterback
13    named Colin Kaepernick who won't stand up during the national
14    anthem with my brother's service who made far less than Colin
09:24:01 15    Kaepernick makes and literally contracted a disease during one
16    of his deployments with the 20th Special Forces group that
17    killed him, I think that's a legitimate thing for me to raise.
18    I have grave disagreements with Representative Alexandria
19    Ocasio Cortez and Representative Omar.  But I can tell you I
09:24:16 20    never had any negative interaction with either one of them.
21    Representative Alexandria Ocasio Cortez, actually, her
22    office was in my office building.  And when she was relatively
23    new, she couldn't find her way to her office and literally
24    stopped me in the hallway and asked me, can you tell me where
09:24:36 25    my office is?  I said, yes, ma'am, and I told her where it was.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

1692

1    And we sort of developed a personal rapport just because she
2    got to the moment of weakness, which we all have in Congress by
3    the way.  It's easy to get lost in those buildings.
4    So we never really had a political conversation, but we
09:24:50 5    would have these personal sort of, you know, informal social
6    interactions.  I disagree with her on the issues, but I don't
7    have any problems with her as a person.
8    The same is true for Ms. Omar.  Now, Ms. Omar served on
9    the Education and Labor Committee with me.  So we would have
09:25:07 10    interactions about education issues, and we had some
11    disagreements about -- but there was no -- that was really
12    about my brother.  It was not about those other people.  And
13    the fact that we used them was to simply contrast them and
14    their positions with the service that my brother had rendered
09:25:29 15    to our country.
16    Q    Was it your intention to single out anyone because of
17    their race?
18    A    No.  I singled out Mr. Kaepernick because he won't stand
19    up during the national anthem, and there are plenty of black
09:25:42 20    athletes that stand up during the national anthem by the way.
21    I have noticed that's not as what a lot of people try to
22    portray it to be.
23    And I am singling out Ms. Alexandria Ocasio Cortez and
24    Ms. Omar because of their attacks against America.  They attack
09:25:55 25    American values.  And I think it's perfectly within the realm

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1  of what's appropriate dialogue to say, I expect somebody that's
2  making this money as Colin Kaepernick to stand up during the
3  national anthem, and I don't think members of Congress should
4  be attacking the country.
5  Q    Mr. Byrne, I want you to think of the people who are
6  involved in congressional campaigns, whether it's a candidate
7  or someone considering a run, that person's staff, volunteers,
8  and then I want you to assume that a couple of weeks before the
9  January 28th deadline, the congressional map passes from the
10 way it's usually been and what the Legislature passed to all of
11 a sudden it changes to something like what the plaintiffs are
12 representing excuse me -- what the plaintiffs are proposing.
13      Do you see any issues that would cause with congressional
14 campaigns?
15 A    Yes, sir.  First of all, we have primaries in four months,
16 general election in ten months.  Once you turn the calendar to
17 the beginning of the year, you have that primary staring you in
18 the face, you have already set your campaign in place.  You
19 already have your plan in place.  You have already got
20 volunteers set up ready to go.  You have got, you know, the
21 campaign ad messaging already worked out.  And you are hitting
22 the ground running.
23      So if you change my district on me with that little time,
24 it's going to put a substantial burden on my ability to refocus
25 my campaign, conduct my campaign, get volunteers, et cetera.

1  And particularly if you give me a new geographic area that I
2  haven't represented before, where I don't have, you know, the
3  natural contacts, et cetera, that's a huge problem for any
4  community.  And I don't -- and that's true for any candidate,
5  Democrat, Republican, people that are long-time public office
6  holders, people that are brand new.  It could be a tremendous
7  difficulty.
8  Q    Mr. Byrne, you said you went to a public hearing where
9  some of these districts were at issue.  Why did you go to the
10 public hearing?  Why are you here today to talk to the Court
11 about districts?
12 A    Number one, I am a citizen, so I have -- so I am not just
13 any citizen.  I mean, I served on the state school board, held
14 a district for eight years.  I served in the United States
15 House of Representatives representing one of the districts for
16 seven years.  I have, you know, a unique set of understandings
17 about what it's like to represent these areas.  And I felt like
18 I owed it to the system.  I owed it to the public to stand up
19 and say -- as somebody that's actually done this work, these
20 districts the way I'm proposing them makes sense this way.
21 And the most important thing I was trying to say is keep
22 this particular community together.  Keep these communities
23 together.  Don't pull southwest Alabama apart because we work
24 together down here.  Mobile area Chamber of Commerce doesn't
25 just do economic development for Mobile County.  They also do

1  it for Washington County.
2       JUDGE MARCUS:  Let me stop you for a second,
3  Mr. Byrne.  You cut out.  The sound cut out for a minute.  So
4  take your time and just repeat what you just said if you would,
5  please.
6       THE WITNESS:  Yes, sir.  What I have been the most
7  concerned about is that people that pull apart southwest
8  Alabama and have different parts being represented -- we work
9  together down here in southwest Alabama.  The example I used
10 was the Mobile area Chamber of Commerce, the economic
11 development for both Mobile County and Washington County,
12 because we're so closely connected.
13      We need to stay together down here.  We have a group
14 called CAP, Cultural Alabama partnership, that pulls together
15 these counties so that we have common representation, common
16 advocacy efforts with the Alabama Legislature and the members
17 of Congress.  So keep us together.  Don't pull us apart.  Let
18 us be one group of people that work together for our region of
19 the state and maximize the benefits that we want to get for our
20 people down here.
21      MR. DAVIS:  Thank you, Mr. Byrne.  I have no further
22 questions and pass the witness at this time.
23      JUDGE MARCUS:  Thank you, counsel.  Cross-examination
24 in what order did you propose to proceed on behalf of Milligan
25 and Caster and the Singleton?  And we leave that up to you.

1       MS. WELBORN:  I will be going first for the Milligan
2  plaintiffs, Your Honor.
3       JUDGE MARCUS:  All right.  And, Mr. Whatley, would you
4  be going second or the Caster folks going second?
5       MR. WHATLEY:  Doesn't matter to me, Your Honor.
6       JUDGE MARCUS:  I leave that up to you.  So let's
7  begin --
8       MR. WHATLEY:  I am happy for the Caster plaintiffs to
9  go second.
10      JUDGE MARCUS:  All right.  Thanks very much.
11 Ms. Welborn, you may proceed with your cross-examination.
12      MS. WELBORN:  Thank you.
13           CROSS-EXAMINATION
14 BY MS. WELBORN:
15 Q    Representative Byrne, my name is Kaitlin Welborn, and I
16 represent the Milligan plaintiffs.  Good morning.
17 A    Good morning.
18 Q    So I'd like to talk about the current redistricting plan
19 first.  You had no direct role in drawing the current
20 congressional map in Alabama, right?
21 A    I didn't have any direct role, but I did testify before
22 the committee.
23 Q    But other than that, you did not do anything to --
24 A    That's correct.
25 Q    -- help draw the congressional map?

```
 1  A    That's correct.
 2  Q    And you did not provide any input to Mr. Hinaman, the map
 3  drawer?
 4  A    I did not know Mr. Hinaman.
 5  Q    I'm sorry?
 6  A    I don't think I know him.
 7  Q    Okay.  And you did not speak with Representative Pringle
 8  about the 2021 map?
 9  A    I did.
10  Q    You did?
11  A    Yes.
12  Q    I'm sorry?
13  A    He is the chair of the committee, and I testified before
14  the committee.
15  Q    Okay.  But did you speak to Representative Pringle outside
16  of the public hearing?
17  A    I don't believe I did, no.
18  Q    Okay.  And did you not speak with Senator McClendon
19  outside of the public hearing?
20  A    I don't believe I did, no.
21  Q    And you did not speak with Secretary Merrill's expert
22  Thomas Bryan?
23  A    No, ma'am.
24  Q    Okay.  You first ran for Congress in a special election in
25  2013, right?
```

```
 1  A    That's correct.
 2  Q    And at that time, you had already held state office in
 3  Alabama for some time as you had mentioned, right?
 4  A    That's correct.
 5  Q    So you were something of a known quantity to the voters in
 6  your district?
 7  A    Well, I thought I was better known than I found out that I
 8  was, but, yes, to some people, I was a known quantity.
 9  Q    And in the 2013 special election, your opponent,
10  Mr. LeFlore was black, right?
11  A    That's correct.
12  Q    And he lost to you by over 30 percent?
13  A    I don't remember the percent.
14  Q    And then you faced Mr. LeFlore again in the 2014 general
15  election?
16  A    That's right.
17  Q    And at that time, he lost to you by over 35 percent?
18  A    Once again, I don't remember the percent.
19  Q    Okay.  As a congressional representative, don't you have
20  to focus on multiple issues all at once?
21  A    You do.
22  Q    And you have to learn about all of the issues that matter
23  to your constituents?
24  A    You do, but there's some issue you know more about than
25  others to be honest with you.  You can't be an expert on
```

```
 1  everything.
 2  Q    And some Representatives in Congress represent entire
 3  states, right?
 4  A    That's true.
 5  Q    Is it impossible to be knowledgeable about, for example,
 6  both the University of South Alabama and Troy University at the
 7  same time?
 8  A    Well, you can be knowledgeable about them, but you can be
 9  more knowledgeable about one than two.
10  Q    Okay.  Wouldn't having two congressional representatives
11  representing Mobile and Baldwin give the region even greater
12  influence in Congress?
13  A    Well, the truth of the matter is if you have two different
14  ones, you don't have one that's just entirely focused on a
15  particular interest.  So --
16  Q    No.  You have two that are focused on that area?
17  A    Unfortunately, when you have two, you don't have the same
18  amount of focus.  That's just the honest truth about it.  So if
19  I am only concerned about the University of South Alabama, I
20  know I am the congressman for the University of South Alabama,
21  and they don't have anybody but me to go up there and do what
22  needs to be done for them.  And so it really is better to have
23  just one than to have two that are sort of split and paying
24  attention to other things.
25  Q    Representative Sewell and Palmer both live in Birmingham,
```

```
 1  right?
 2  A    I don't think -- I know Representative Sewell lives in
 3  Birmingham.  I think Representative Palmer lives outside of
 4  Birmingham, but in the metro area.
 5  Q    In Jefferson County?
 6  A    Yeah.
 7  Q    Okay.  Are you aware of any criticisms of either of those
 8  representatives failing to adequately represent the rest of
 9  their districts?
10  A    I've never heard anybody criticize either one of them for
11  what they do for their district.  Each one of them in their own
12  way do an excellent job for their district.
13  Q    Okay.  Are you aware that District 4 stretches across the
14  northern part of the state from Lamar and Tuscaloosa counties
15  all the way east to Etowah and Dekalb counties?
16  A    I am.  I believe that's Congressman Aderholt's district.
17  Q    That's right.  It's Congressman Aderholt.
18       And presumably, Representative Aderholt campaigns
19  everywhere in his district, right?
20  A    I don't know where he campaigns, but Congressman Aderholt
21  like Congresswoman Sewell and Congressman Palmer, does an
22  excellent job in his district.
23  Q    I would like to talk about the economics of the Mobile
24  area.
25       You spoke quite a bit about the port in Mobile.  Does
```

1701

```
 1    Republican Carl your successor also work to protect ship
 2    building in Congress?
 3    A     Yes, ma'am.  He is doing a good job.
 4    Q     Wouldn't you expect anyone who represented Mobile to work
09:36:39 5    to protect the ship building industry in Congress?
 6    A     Oh, I think that's true.  The question is, once again,
 7    it's bandwidth.  How much time can you devote to that issue if
 8    you have got other competing issues?  So I can't say this about
 9    Congressman Carl because I am not there with him all the time.
09:36:58 10    But for me, every day that I woke up in Congress, I was
11    concerned about that shipyard.  And that's what it took because
12    there were all sorts of people trying to take the money away
13    from those programs that they were building ships for, for
14    other programs.  And it was a fight every day just like the red
09:37:14 15    snapper fight was a fight every day.
16          Now, if I have got to worry about several other issues in
17    addition to those, I am not going to be as effective in that
18    fight as I would be if I'm focused on those.
19    Q     Okay.  But if the port in Mobile were in a different
09:37:30 20    district than CD 1, it would still be true that someone would
21    work to represent, you know, the ship -- protect the ship
22    building industry in Congress?
23    A     I would think so, but I would think it would be a question
24    of how much time, how much effort, and how much priority they
09:37:40 25    put on it.  And if they have got other things they are
```

Christina R. Decker, RMR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

1702

```
 1    competing with, it wouldn't be as much.  That's just the nature
 2    of things.
 3    Q     Okay.  And other than the port, you mentioned a few other
 4    industries such as Airbus and fishing, and said that those are
09:38:05 5    some of the largest industries in the Mobile area, right?
 6    A     Yeah.  I also mentioned tourism and seafood, et cetera.
 7    Q     Okay.  The largest industry in Mobile County is health
 8    care; is that right?
 9    A     I guess if you put all the industry together, it might --
09:38:20 10    that might be true, yeah.
11    Q     And the second largest industry is retail sales; is that
12    right?
13    A     In terms of numbers of employees, that may be true.  I
14    don't know about payrolls.
09:38:36 15    Q     Okay.  And the recent economic growth in Mobile County has
16    attracted more people to move to the Mobile area; is that
17    right?
18    A     That's correct.
19    Q     And people go to Mobile County from other counties to
09:38:50 20    work?
21    A     Oh, yes.  A lot of people do.
22    Q     And to live?
23    A     Yes.
24    Q     And to shop?
09:38:57 25    A     Oh, yes.
```

Christina K. Decker, RMR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

1703

```
 1    Q     And those people may come from Clarke County?
 2    A     Yes.
 3    Q     Conecuh County?
 4    A     Not too many people from Conecuh County.
09:39:10 5    Q     Okay.  What about Wilcox County?
 6    A     Not very many people from Wilcox County.
 7    Q     And migration from other areas would include people moving
 8    from the area commonly known as the Black Belt, right?
 9    A     There are people that move here from the Black Belt, yes.
09:39:26 10    Q     Okay.  You don't know the level of migration into the
11    Mobile area in the past decade, do you?
12    A     You mean where they came from?
13    Q     The level of migration.
14    A     The level.  Oh, I couldn't quantify it for you, but we
09:39:45 15    have had migration.
16    Q     Or the past 50 years?
17    A     We have had migration the last 50 years, yes.
18    Q     But you don't know the level?
19    A     No, I can't quantify for you.
09:39:56 20    Q     And you don't have a breakdown of where those migrants
21    have come from?
22    A     No, ma'am.
23    Q     Are you aware of the racial disparities in the poverty
24    level in Mobile?
09:40:08 25    A     You mean the percentage of people who are in poverty who
```

Christina K. Decker, RMR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

1704

```
 1    are black versus white?
 2    Q     Yes.
 3    A     I know that it's a higher percentage poverty among black
 4    people than white people in Mobile County.
09:40:26 5    Q     Are you aware that over 51 percent of people living below
 6    the poverty line in Mobile County are black, even though only
 7    36 percent of Mobile County is black?
 8    A     I don't know the figure precisely, but I wouldn't be
 9    surprised if that was the case.
09:40:43 10    Q     Okay.  Are you aware that the Mobile City Council had to
11    be sued in the 1970s and 1980s to ensure black representation?
12    A     I am well aware of that, yes, ma'am.
13    Q     And are you aware that the Mobile County School Board had
14    to be sued in the 1970s and 1980s to ensure black
09:41:01 15    representation?
16    A     I am well aware of that, yes, ma'am.
17    Q     You mentioned representative John Lewis and the
18    commemoration of the Selma to Montgomery March?
19    A     Correct.
09:41:13 20    Q     But you did not support the John Lewis Voting Rights
21    Advancement Act while you were in Congress, did you?
22    A     I did not.
23    Q     You are familiar with the area referred to as the Black
24    Belt, right?
09:41:29 25    A     Oh, yes, ma'am.
```

Christina K. Decker, RMR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

**Panel 1 (p. 1705)**

```
 1   Q    And the Black Belt is generally an area whose counties are
 2   generally majority black, right?
 3   A    It's actually called the Black Belt because of the soil.
 4   The soil is dark and rich there, so it's not called the Black
09:41:44 5   Belt of race or ethnicity.
 6   Q    That's not what I asked.  Is it an area whose counties are
 7   generally majority black?
 8   A    Yes.  There are some exceptions to that, but yes, as a
 9   region, it's majority black.
09:42:00 10   Q    Okay.  And in general, the Black Belt has lower income
11   levels than other areas of the state, right?
12   A    Yes, ma'am, that's correct.
13   Q    And it has lower education levels than other areas?
14   A    There are exceptions to that, but that's true.
09:42:17 15   Q    And it has worse health care and facilities than other
16   areas?
17   A    I don't know that.  I have toured hospitals in the Black
18   Belt, and there the number of good hospitals in Black Belt, so
19   I can't verify what you just said.
09:42:28 20   Q    Okay.  That's perfect, because I would like to talk about
21   health care now.
22        In December 2020, you were interviewed by al.com about
23   your time after Congress.  Do you recall this interview?
24   A    Well, yeah, I did a lot of interviews when I was a member
09:42:45 25   of Congress, but I do recall generally that interview.
```

**Panel 2 (p. 1706)**

```
 1        MS. WELBORN:  Mr. Ang, could you bring up that
 2   article?
 3   BY MS. WELBORN:
 4   Q    Mr. Byrne, do you recognize this article?
09:42:55 5   A    It's been a while since I've read it, but, yes, John
 6   Sharp.  I remember the article he wrote, yeah.
 7        MS. WELBORN:  Your Honor, we would like to mark this
 8   document as Milligan Plaintiffs' Exhibit 55 for identification.
 9        JUDGE MARCUS:  Okay.
09:43:12 10        MS. WELBORN:  Mr. Ang, could you flip to page 2,
11   please?
12   BY MS. WELBORN:
13   Q    And, Republican Byrne, could you please read the paragraph
14   starting with, the daily data?
09:43:24 15   A    The daily data that I've got in this -- which really
16   forced me to focus on the fact that there is a problem with the
17   ability of black people to be able to get good, primary health
18   care.  One thing I have worked on in Congress and will continue
19   to be interested in, is how do we get primary health care to
09:43:43 20   black people?  It's clear with the data we have is that black
21   people with underlying health conditions are disproportionately
22   affected by the novel Coronavirus virus.  We should want
23   everyone in our communities to have real access to quality
24   primary health care.
09:44:01 25   Q    Thank you.
```

**Panel 3 (p. 1707)**

```
 1        MS. WELBORN:  And, Mr. Ang, could you flip to the last
 2   page, please?
 3   BY MS. WELBORN:
 4   Q    And, Representative Byrne, could you read the paragraph
09:44:11 5   starting with, many of us have access?
 6   A    Many of us have access to primary health care, and we take
 7   that for granted, but for a disproportionate number of people
 8   in the state, and a disproportionate number of black people,
 9   that's not true.  It's not good for our communities, for our
09:44:27 10   state, or our nation.
11   Q    Thank you.
12        MS. WELBORN:  And, Mr. Ang, you can take that down.
13   BY MS. WELBORN:
14   Q    Representative Byrne, do you agree that it is difficult
09:44:35 15   for black people in Mobile County to get primary health care?
16   A    Yes, ma'am.
17   Q    And would you agree that it is difficult for black people
18   in the Black Belt to get primary health care?
19   A    I don't know as much as the Black Belt as I do about
09:45:01 20   Mobile County, but I wouldn't be surprised if that was true.
21   Q    Okay.  Thank you.  You are aware that the Affordable Care
22   Act allows states to opt in to Medicaid expansion, right?
23   A    I am.
24   Q    And you are aware that Governor Bentley convened a task
09:45:07 25   force that recommended that Alabama opt into Medicaid
```

**Panel 4 (p. 1708)**

```
 1   expansion, right?
 2   A    I don't know about that.
 3   Q    Okay.  But Alabama has not opted into Medicaid expansion?
 4   A    That's correct.
09:45:20 5   Q    And if Medicaid were expanded in Alabama about, 220,000
 6   more Alabamians would receive health care coverage; is that
 7   right?
 8   A    No.
 9   Q    I'm sorry?
09:45:33 10   A    I said no.
11   Q    Okay.  Do you have a different figure?
12   A    No.  I think what you are saying is they would be covered
13   by Medicaid, but it doesn't mean they would have access to
14   health care because there are not enough health care providers
09:45:51 15   to provide health care to.
16   Q    I'm sorry.  I'm talking about health care coverage, so
17   insurance?
18   A    It's a difference between coverage and gaining health
19   care.
09:45:59 20   Q    Okay.  220,000 more Alabamians would be covered by
21   Medicaid and have Medicaid insurance?
22   A    Yes.  But they wouldn't necessarily be able to get health
23   care because we don't have doctors that will take care of them.
24   We have --
09:46:14 25   Q    Thank you.
```

1 A    We have one pediatrician in Escambia County, Alabama that
2 will take Medicaid patients because the level of pay is so low
3 for Medicaid.  So you can have Medicaid and not be able to get
4 health care because there's no doctor to give it to you.
09:46:29 5 That's --
6 Q    Okay.  Thank you.
7 A    -- why I support community health centers.
8 Q    But of those 220,000 Alabamians who would be covered under
9 Medicaid in that they have Medicaid insurance, black people
09:46:44 10 would disproportionately be among those at those people, right?
11 A    I don't know that figure.  I couldn't -- I couldn't
12 quantify that.
13 Q    And while you were in office, you opposed Medicaid
14 expansion, right?
09:46:53 15 A    I did because I thought we should have community health
16 centers instead.
17 Q    Okay.  And Representative Sewell supports Medicaid
18 expansion?
19 A    She does.
09:47:04 20 Q    And that Alabama Black Legislative Caucus supports
21 Medicaid expansion?
22 A    I don't know.
23 Q    In Congress, you made opposition to the Affordable
24 Care Act a major priority; is that fair?
09:47:19 25 A    I did.

---

1 Q    And you sponsored a 2015 bill to repeal the Affordable
2 Care Act?
3 A    Repeal and replace.
4 Q    And in 2017, you supported a budget revolution to appeal
09:47:32 5 the Affordable Care Act?
6 A    That's correct.
7 Q    Do you recall the American Health Care Act of 2017?
8 A    I do.
9 Q    And it sought to repeal the Affordable Care Act, as well,
09:47:44 10 right?
11 A    Repeal and replace.
12 Q    And you supported the American Health Care Act, right?
13 A    Yes, because I thought it was going to give a better
14 health care system than the one that the Affordable Care Act
09:47:57 15 provided.
16 Q    Okay.  Thank you.
17      Do you know what percentage of black voters voted for you
18 in the 2014 and 2018 general elections?
19 A    I don't.
09:48:07 20 Q    Would it surprise you that in your 2014 election only
21 15 percent of black voters in District 1 voted for you?
22 A    No.
23 Q    And would it surprise you to know that in 2018 only
24 5.4 percent of black voters in District 1 voted for you?
09:48:25 25 A    That would surprise me, yeah.

---

1 Q    Okay.
2      MS. WELBORN:  I believe I have no further questions,
3 but if I could please confer with my colleagues for a few
4 minutes.
09:48:48 5      JUDGE MARCUS:  You may.
6      MS. WELBORN:  Thank you.
7      We have no further questions.  Thank you.
8      JUDGE MARCUS:  All right.  Thank you.  And you may
9 proceed, Mr. Osher.
09:49:09 10      MR. OSHER:  Thank you, Your Honor.
11           CROSS-EXAMINATION
12 BY MR. OSHER:
13 Q    Good morning, Representative.  How are you?
14 A    Good morning.  I'm well, thank you.
09:49:17 15 Q    Can you hear me okay?
16 A    I can.
17 Q    Great.  My name is Dan Osher.  I represent the Caster
18 plaintiffs in this lawsuit.  I think we met a few years ago
19 during the Chestnut litigation where you testified.  Do you
09:49:29 20 remember that?
21 A    I do.
22 Q    Great.
23      Representative, how long did you serve in Congress?
24 A    Seven years.
09:49:38 25 Q    And during that time and when you were campaigning, did

---

1 you reach out to your constituents to try to learn what their
2 interests and needs were?
3 A    Constantly.
4 Q    I'm sorry.  I didn't catch that answer.
09:49:52 5 A    Constantly.
6 Q    What about organizations that served your constituents,
7 did you reach out to meet with any such organizations?
8 A    Typically, they would reach out to me.  So somebody
9 reached out to me and said, will you come speak to our group,
09:50:06 10 or can we come meet with you?  I would say, yes.
11 Q    Okay.  You mentioned Airbus during your testimony.  That
12 is a pretty big presence in Mobile; isn't that right?
13 A    Yes, sir.
14 Q    Did you ever seek out a meeting to meet with
09:50:21 15 Representatives from Airbus?
16 A    No.  They sought out meetings with me.
17 Q    So you never reached out to them during your candidacy or
18 serving Congress?
19 A    I didn't have to.  They reached out to me.
09:50:34 20 Q    Fair enough.
21      What about Austal, did you ever reach out to them?
22 A    Yes, sir, but that was part of the back and forth in
23 trying to get ships authorized and appropriated.  So I would
24 initiate conversations with them and tell them this is what
09:50:50 25 just happened or what's about to happen.

1713

```
 1   Q   Sure.  And that was a huge project in your district,
 2   right?  I believe you spent a lot of time on that?
 3   A   Yes, sir.  A lot of time.
 4   Q   Any other of the companies that you identified in your
 5   direct examination, did you reach out to any of those while you
 6   were serving or campaigning?
 7   A   I would probably each reach out to the University of South
 8   Alabama because I was on the education committee, and I was
 9   trying to -- but in general, if I spoke with companies, that
10   would have been because they or somebody representing their
11   industry reached out to me.
12   Q   Sure.  Busy guy.  I wouldn't dispute that.  So you
13   testified in the Chestnut trial while you were in office you
14   never had a formal reading with the Alabama State Conference of
15   the NAACP; isn't that right?
16   A   That's correct.  They never reached out to me.
17   Q   And you never reached out to them?
18   A   No.
19   Q   And you didn't know who the president of that organization
20   was when you testified in Chestnut; is that right?
21   A   Yes, sir.
22           JUDGE MARCUS:  Give him a chance to complete his
23   answer.  You may proceed, Mr. Byrne.
24           THE WITNESS:  I still don't know.
25   BY MR. OSHER:
```

1714

```
 1   Q   And you testified in Chestnut that you never held a
 2   meeting with anyone from the Urban League while you were in
 3   office, right?
 4   A   That's correct.  They never reached out to me.
 5   Q   And you never reached out to them?
 6   A   That's right.
 7   Q   And you testified in Chestnut you never met with anyone
 8   from the Southern Christian Leadership Conference; isn't that
 9   right?
10   A   Not that I am aware of.
11   Q   And you testified in Chestnut that you never had a meeting
12   with anyone from the National Coalition of Black Civic
13   Participation; isn't that right?
14   A   That's correct.  Now, I think what I said in that trial
15   and I will say again today is I may have met with those people
16   when I was somewhere else.  Like I may have met with them in
17   Selma during the pilgrimage, but I didn't meet with them as
18   members of organizations.  It was part of a bigger meeting.
19   Q   Of course.  Understood.  And you testified in Chestnut
20   that you never met with anyone from LULAC, the League of United
21   Latin American Citizens; isn't that right?
22   A   That's correct.
23   Q   And you testified in Chestnut that you didn't even know
24   what that organization was?
25   A   That's correct.
```

1715

```
 1   Q   And you further testified that you never paid attention to
 2   what extent your black constituents supported or opposed you in
 3   your congressional races; isn't that right?
 4   A   That's right.  It didn't matter.  I still had to represent
 5   them, whether they voted for me or not.
 6   Q   Sure.  But you didn't pay attention to whether they
 7   actually supported or opposed you?
 8   A   No.  Wouldn't matter.
 9   Q   So during your seven years in Congress, and I think you
10   already talked about this, you got to know the other members of
11   the Alabama delegation; isn't that right?
12   A   Our delegation worked together very well, very closely.
13   Q   And I -- in Ms. Welborn's cross-examination, you talked
14   about this a little bit, but I'd like to dig down a little
15   more.
16           MR. OSHER:  Jeff, can I have you pull up Caster
17   Plaintiffs' Exhibit 12?  Thanks.
18   BY MR. OSHER:
19   Q   And, Representative, I will represent to you that this is
20   a map of the congressional plan that was in place I believe the
21   whole time that you were in office?
22   A   That's correct.
23   Q   Over a decade between 2012 and this year, or I should say
24   last year.
25           So Robert Aderholt represented District 4, right?
```

1716

```
 1   A   That's correct.
 2   Q   So looking at his district -- and let's see.
 3           MR. OSHER:  Jeff, could you focus in on the purple
 4   district there?  Yeah.  Perfect.
 5   BY MR. OSHER:
 6   Q   So looking at that district, it spans the width of the
 7   state.  It has corners in Colbert County in northwest down to
 8   Lamar and Tuscaloosa counties, then over east to Etowah,
 9   Marshall, and Dekalb County; isn't that right?
10   A   Yes, sir.
11   Q   Would you say that's an accurate description of that
12   description?
13   A   Yes, sir.
14   Q   Did Representative Aderholt ever express to you that it
15   was too difficult for him to travel to the different parts of
16   his district?
17   A   No.  I actually know that area fairly well because I have
18   campaigned in there twice running for statewide office, and
19   that area, it has an awful lot in common with one another.
20   Q   Sure.  That --
21           JUDGE MARCUS:  Just let him finish his answer.
22           THE WITNESS:  I said they're very similar.
23   BY MR. OSHER:
24   Q   My apologies for -- I didn't mean to talk over you,
25   Representative.
```

```
 1    That wasn't my question.  My question was:  Did
 2  Representative Aderholt ever express to you that it was too
 3  difficult for him to travel to the different parts of his
 4  district when he represented them?
 5  A    No.  When you are in Congress and you are delegated to a
 6  district like that, you do what you have to do, and I am sure
 7  he does an excellent job of it.
 8  Q    And he is an effective representative of his district?
 9  A    Yes.  Very much so.
10  Q    And you testified that you got to know Representative
11  Sewell pretty well during your time in Congress?
12  A    Actually, I knew her before I got to Congress.  But she
13  and I worked very closely together when I was in Congress.
14  Q    She is also a very effective Representative of her
15  district?
16  A    Very effective.
17       MR. OSHER:  Jeff, can we focus on District 7 in the
18  map?
19  BY MR. OSHER:
20  Q    So, again, looking at this district, her district started
21  out in -- well, it goes down to the south in Clarke County,
22  then to Montgomery in the east, up to Birmingham in the
23  northeast in Jefferson County, and then over to Pickens County
24  in the west.  Do you see that?  Did I describe her district
25  accurately?
```

```
 1  A    Yes.
 2  Q    In your time in Congress, did Representative Sewell ever
 3  express to you that it was too difficult for her to travel to
 4  the different parts of her district?
 5  A    She never said it was too difficult, but she said it was
 6  pretty difficult.
 7  Q    When did she say that?
 8  A    On several different occasions.  She would talk about what
 9  her schedule was and how difficult it was for her to be able to
10  go from Birmingham to Clarke County to Lowndes County to
11  Choctaw County, just the difficulty in travel, and the fact
12  that, you know, she's got parts of Jefferson County an urban
13  county, parts of Montgomery County another urban county
14  together with the rural Black Belt counties.  It's tough, it's
15  real tough on her, but she is very smart and very capable, and
16  she does -- she works hard.
17  Q    And you said she's a very effective representative?
18  A    Oh, yes very effective.
19  Q    And let's look at District 3.
20       As you spoke a bit about earlier, looking at that district
21  -- and I'm sorry.  Who represents District 3?
22  A    It's Mike Rogers.
23  Q    And he did the whole time you were in office; is that
24  right?
25  A    Oh, yes.  Yeah.
```

```
 1  Q    So looking at his district, it has at least half of the
 2  eastern border of the state running all the way up from
 3  Cherokee County and all the way down to Russell County; isn't
 4  that right?
 5  A    That's right.
 6  Q    Okay.  Did Representative Rogers ever say to you that it
 7  was too difficult for him to travel to the different parts of
 8  his district?
 9  A    No.  I think he felt like his district had a lot of
10  commonality -- not necessarily easy to get from Cherokee County
11  to Russell County, but the commonality of interests they had
12  made it a little bit easier on him.
13       He does have the Anniston Army Depot, so he is going to be
14  focused on that.  But in Russell County, he has got people that
15  are across the river from a major Army base, so he's got that
16  to contend with, too.  But he's a ranking member of the House
17  Armed Services Committee now, soon to be the chairman, and so
18  he will be in a unique position to help both of those.
19  Q    Sure.  That wasn't my question.  My question was about the
20  difficulty of travel to the different parts of the district.
21  And --
22  A    Yeah.  He would say, I have had a long day or a long
23  couple of three days because I have to go from Cherokee County
24  all the way down to Pike Road in Montgomery.  That's a long
25  way.
```

```
 1  Q    But he's -- you think he's a very effective representative
 2  in his district?
 3  A    Oh, yeah, yeah.
 4  Q    Okay.
 5       MR. OSHER:  You can take that down, Jeff, thank you.
 6  BY MR. OSHER:
 7  Q    In your direct examination, do you recall talking to
 8  Mr. Davis about how the illustrative plans that the plaintiffs
 9  have offered in this case may result in no congressional
10  representative living in Mobile?  Do you remember that?
11  A    Yes.
12  Q    And I think -- I can't remember.  It might have been
13  Mr. Davis or you said that that would be a tragedy?
14  A    It would be a tragedy if we didn't have somebody from
15  Mobile representing the Mobile area, yeah.
16  Q    Okay.
17       MR. OSHER:  Jeff, could I have you pull up Defendants'
18  Exhibit 2, which I believe is Mr. Bryan's report that was
19  offered by the state in this case?
20       Can you go to page 27?  Next page, please.  And can you
21  zoom in on the Figure 5.6, Alabama enacted plan.  Any way to
22  zoom in further.
23  BY MR. OSHER:
24  Q    Representative, can you see that map?
25  A    I can.
```

1   Q   Okay. I will represent to you that this is the current

2 enacted map, and it has dots as to where each of the current

3 Representatives live. Do you see that?

4   A   I do.

10:01:19 5   Q   Can you tell me which congressional representative

6 currently lives in Montgomery?

7   A   I don't think anybody currently lives in Montgomery.

8   Q   And you would agree that Montgomery is the third biggest

9 city in Alabama?

10:01:38 10   A   Actually, now, I think it's the fourth.

11   Q   Fair enough. You would say that Montgomery is a very

12 important city in the state of Alabama?

13   A   Oh, yes, very important city.

14   Q   Okay.

10:01:50 15         MR. OSHER: You can take that down, Jeff. Thank you.

16 BY MR. OSHER:

17   Q   You spoke a bit about District 5 in the State Board of

18 Education plan. Do you remember that?

19   A   I can't remember which district it was.

10:02:03 20   Q   District 5 is the one that connects Montgomery to Mobile

21 with the Black Belt?

22   A   Okay. I remember that one.

23   Q   And up until a few years ago, Ella Bell represented that

24 district for a long time; is that right?

10:02:17 25   A   She did, yes.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

1   Q   Did she ever express to you that it was too difficult for

2 her to represent a district that had both Montgomery and Mobile

3 in it?

4   A   Yes.

10:02:27 5   Q   When did she say that?

6   A   I think I mentioned earlier that I would get phone calls

7 from people in her district at -- thinking I was their state

8 school board member. And asking me to come to meetings. And I

9 would call her and I would say, it's your district, not my

10:02:46 10 district. I don't want to do anything in your district you

11 don't know about. I said, do you want me to do something? She

12 said, would you please, because I cannot get down there. It's

13 too far me to get from Montgomery to there. I have other

14 things going on. And so I said, sure, I will be happy to do

10:02:55 15 it. So I would do that for her from time to time and for her

16 predecessor.

17   Q   And if she was a member of Congress and you were also a

18 member of Congress and that sort of confusion arose, that would

19 -- the same thing would happen, right, you would talk to the

10:03:17 20 other member of the Congress and try to figure it out?

21   A   Yes. But I got to be honest with you, that never happened

22 when I was in Congress. I guess people know who their

23 Congressman is. So I never got any calls from Terri Sewell's

24 district, for example, saying would you come meet with us

10:03:31 25 except for Clarke County because she and I shared Clarke

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

1 County.

2   Q   And Clarke County is the only district -- I'm sorry -- the

3 only county that your district split last redistricting cycle,

4 right?

10:03:43 5   A   That's right. And we had an understanding we would work

6 together in Clarke County, and there was never any issue.

7   Q   Sure. Ella Bell extremely effectively represented that

8 district, right?

9   A   I don't think I would agree with that.

10:04:01 10   Q   Dr. Tommy Stewart succeeded Ella Bell to represent that

11 district?

12   A   I -- yeah. I don't know him, but I -- I know the name.

13   Q   Did you ever speak to Dr. Stewart?

14   A   Not that I can recall.

10:04:19 15   Q   What about Dr. Chestnut, who currently represents that

16 district?

17   A   I don't recall having any interaction with Dr. Chestnut

18 either. I've been away from the state school board for a

19 while.

10:04:30 20   Q   You voted to -- in Ms. Welborn's cross-examination, you

21 spoke about your efforts to repeal the Affordable Care Act;

22 isn't that right?

23   A   That's right.

24   Q   You testified in *Chestnut* that you never tried to

10:04:48 25 determine whether your black constituents wanted the Affordable

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

---

1 Care Act to be stay in place, right?

2   A   I didn't try to determine anybody's particular views on

3 that. I just listened to where people were telling me. And I

4 had a lot of people telling me they wanted to change it.

10:05:02 5   Q   You never sought out the advice from the state conference

6 of the NAACP on that issue?

7   A   I think I testified earlier I never had any interaction

8 with them consciously. I may have been in a room with some of

9 them and didn't know they were members of that organization.

10:05:16 10   Q   And you never even tried to figure out what their position

11 was on the issue?

12   A   No. I -- when it came to that issue, I had plenty of

13 people tell me what their positions was. I didn't have to

14 reach out to people.

10:05:33 15   Q   In *Chestnut*, you testified that while you were in office

16 you never even tried to determine how many black constituents

17 you actually had; isn't that right?

18   A   Well, I knew them in general, but I didn't know precisely.

19 I knew it was about 25 percent.

10:05:44 20   Q   In fact, when you were asked about a percentage of your

21 district that was black during *Chestnut*, you said, it didn't

22 matter to me. Isn't that right?

23   A   It didn't matter to me.

24   Q   You voted against the First Step Act?

10:05:59 25   A   You have to refresh me. I don't know what the First Step

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1725

```
 1   Act was.
 2   Q    The First Step Act was the criminal justice reform?
 3   A    Oh, yeah, yeah, yeah.  I'm sorry.  Yes, I did.
 4   Q    But you testified in Chestnut that you never tried to
 5   determine whether your black constituents felt that that bill
 6   would improve their lives, right?
 7   A    I never heard from anybody about that bill.
 8   Q    You didn't attempt to discern the Alabama NAACP's view on
 9   the bill?
10   A    I never had any interaction with them.  Consciously
11   knowingly.
12   Q    You spoke a bit about the various factories and plants
13   that are located in Mobile?
14   A    (Nodded head.)
15   Q    Do you recall that?
16   A    That's right.
17   Q    Are you aware that there are higher rates of cancer and
18   asthma among the black community in Mobile due to their
19   proximity to those factories and plants?
20   A    I'm not, but I wouldn't argue with it.  In general, I know
21   that we have an issue with regard to the quality of health care
22   that's been available to black people in Alabama in my
23   district.
24   Q    Do you know who Alabama commemorates in Congress' Statuary
25   Hall?
```

1726

```
 1   A    Yes.  It's Helen Keller, and it's -- I forgot his name --
 2   a former Civil War general.
 3   Q    Joseph Wheeler?
 4   A    Yeah.
 5   Q    And Joseph Wheeler was a calvary general for the
 6   Confederate Army; isn't that right?
 7   A    I know he was a general.  I don't know if it was calvary
 8   or not.
 9   Q    But he was on the Confederate side of the Civil War?
10   A    Right.  I know a lot more about Helen Keller than I know
11   about him.
12   Q    Did you ever try to determine how your black constituents
13   felt about Alabama celebrating a Confederate general in the
14   halls of Congress?
15   A    I never asked them, but I think I can guess.
16   Q    You never reached out to?
17   A    No.
18   Q    And what is your guess as to how they would feel about it?
19   A    I don't think they would like it.  That's a decision by
20   the state, not a decision by Congress.
21   Q    You would agree with me that members of Congress can use
22   their influence to try to change state policy?
23   A    Some do.  I didn't.  I didn't think it was appropriate.
24   Now, when I was in the Legislature, I supported putting Helen
25   Keller's statue in there.  I actually served on the committee
```

1727

```
 1   that raised the money to put the statue there because I think
 2   Helen Keller was a better representative of the state than the
 3   person we had there before.
 4   Q    Oh, you're referring to the Joseph Wheeler statue, or the
 5   one that was replaced by Helen Keller?
 6   A    The one replaced by Helen Keller.
 7   Q    You didn't take any action in the Legislature to remove
 8   the Joseph Wheeler statue or replace it with something else?
 9   A    No.  We were kind of focused on Helen Keller when I was in
10   the Legislature.
11   Q    Speaking of your time in the Legislature, when did you
12   serve in the Senate?
13   A    From November of 2002 to May of 2007.
14   Q    During that time, I imagine you went to the Alabama
15   Capitol pretty often?
16   A    Yes, sir.
17   Q    Did you often walk by the monument to Confederate soldiers
18   and sailors that sits in front of the Capitol?
19   A    If I did, I didn't pay any attention to it.  I didn't know
20   that we had one.
21   Q    So you sort of turned a blind eye to it?
22   A    I was busy doing other things.  I wasn't paying attention
23   to stuff like that.
24   Q    Were you aware that while you were there, the memorial was
25   surrounded by flags of the Confederate states?
```

1728

```
 1   A    I don't remember that, either.
 2   Q    Is it your contention that that shrine to the Confederacy
 3   does not exist in front of the Capitol?
 4   A    Oh, no. I'm not saying they don't.  I just never paid any
 5   attention to them.
 6   Q    So you never tried to determine whether your black
 7   constituents had a problem with that sitting at the foot of the
 8   Capitol?
 9   A    I never had a discussion with any constituent about that.
10   Q    And is your assumption that you described earlier the same
11   here that you would think that your black constituents probably
12   did not appreciate that?
13   A    If they even knew about it.
14   Q    Representative, you would agree that the poverty rate
15   among black Alabamians is significantly higher than it is among
16   white Alabamians?
17   A    I know it's higher.  I don't know I can say it's
18   significantly higher.
19   Q    Am I right that when you testified in Chestnut, you
20   actually said you didn't know if that was the case, right?
21   A    No.  But I wouldn't be surprised if it was higher.
22   Q    Understood.  I will represent to you that the poverty rate
23   is more than double among black Alabamians than it is white
24   Alabamians.
25        What about child poverty rates?  Do you know if there's a
```

1  disparity there?

2  A    I don't.  I don't know what the child poverty rate is.

3  Q    Would it surprise you if it was nearly triple among black

4  Alabamians than it is white Alabamians?

10:11:19  5  A    It would not.

6  Q    Household average income, do you know if that's lower

7  among black Alabamians than white Alabamians?

8  A    I don't know, but I would not be surprised if it were.

9  Q    Same with unemployment rate, do you know if it's -- if

10:11:35  10  it's higher than among black Alabamians than white Alabamians?

11  A    I don't know, but I wouldn't be surprised if it were.

12  Q    I will represent to you that it's more than double among

13  black Alabamians than white Alabamians.  Does that surprise

14  you?

10:11:48  15  A    Yeah, that kind of does surprise me.

16  Q    Okay.  Do you have any reason to dispute that?

17  A    No.  I am just saying -- I don't have the data in front of

18  me, so I am not going to try to guess at the data, but as I

19  come around and looked at this as an industry down in this part

10:12:08  20  of the state, there are plenty of black people that work in

21  every industry that we have got down here.  And that doesn't

22  surprise me because 25 percent of the people that live down

23  here are black and expected to be in the work force, and they

24  are.

10:12:21  25  Q    Representative you are a little quiet now, if you wouldn't

1  mind speaking up.

2  A    Okay.

3  Q    Thank you.

4  A    I will move a little closer.

10:12:35  5  Q    I will represent to you that one of the Caster plaintiffs'

6  experts in this case reported that the black unemployment rate

7  among -- the black Alabamian unemployment rate is 7.8 percent,

8  and that for white Alabamians, it's 3.8 percent.  So the -- so

9  he reports that it's more than double among black Alabamians?

10:12:51  10  A    I don't know.

11  Q    So assuming the figures that I discussed are true,

12  you would agree that those disparities stem from Alabama's

13  centuries' long discrimination against black people in the

14  state?

10:13:04  15  A    I think the problems that are facing the black community

16  with regard to all these issues is a function of the failure of

17  the state of Alabama to provide a quality education to them.

18  Q    Does that have -- is that rooted in the discrimination

19  that Alabama had against black individuals?

10:13:23  20  A    No.  It's rooted in the overall failure to the Alabama

21  public education system, which -- white people just not as much

22  as it affects black people.  It's the reason I got in public to

23  begin with is because I thought the biggest problem facing

24  Alabama was our inability to provide quality education to all

10:13:41  25  of our citizens, and we're still not doing enough.  And it's

1  having these effects that I think hurt everybody in Alabama,

2  but particularly the people who are not getting that quality

3  education.

4  Q    So is it your testimony that the disparities that I have

10:13:56  5  described have no roots in the centuries' long discrimination

6  that Alabama, the entrenched discrimination in Alabama against

7  black individuals?

8  A    I don't know that I can say that there's no effect.  But

9  what I'm saying is, is that the single biggest problem, the

10:14:15  10  thing that's the biggest cause for them is our failure to

11  provide quality education to everybody in the state.  We live

12  in a time where you're going to be valued by what you know and

13  what you do with what you know.  And if we don't provide

14  quality education to all of our people, they won't get the

10:14:32  15  economic value in their lives that they need.  If they don't

16  have the economic value in their lives, they can't afford

17  quality health care and all these other stuff.  So I continue

18  to believe today as I did when I ran for state school board in

19  1994, if you want to address all the other issues, fix the

10:14:48  20  education system in the state.

21  Q    You agree with me that Alabama had for a very long time a

22  strictly segregated education system?

23  A    Oh, yes, sir, absolutely.  To our great shame, we did

24  that.

10:15:03  25  Q    Just a few more questions, Representative.

1      You testified on direct about the -- the campaign ad.  Do

2  you recall that?

3  A    Yes.

4  Q    Your campaign ad.

10:15:17  5      I understand your testimony that that ad was intended to

6  be primarily about your brother; is that right?

7  A    That's correct.

8  Q    So regardless of your intent, do you know how that ad was

9  perceived among your black constituents?

10:15:29  10  A    I don't know that I ever had a discussion with a black

11  person about that ad.

12  Q    You didn't hear any feedback from the black community or

13  the press on this?

14  A    Not that I can recall.

10:15:44  15  Q    You understand, don't you, that images of black people in

16  a fire could trigger a connection in the minds of some to the

17  more horrific eras of racial discrimination in Alabama?

18  A    No.

19  Q    You would agree that in Alabama, there is a horrific

10:16:03  20  history of lynching black Americans?

21  A    Yes, sir.

22  Q    And that history included burning black individuals alive?

23  A    Never heard of that.

24  Q    You would also agree, wouldn't you, that Alabama has had a

10:16:17  25  history of bombing and burning down houses occupied by black

1 Alabamians?

2 A   Yes, sir.  To our great shame.

3 Q   You would also agree that the KKK used burning crosses to

4 terrorize black individuals in Alabama?

10:16:31 5 A   Yes, sir.  To our great shame, they did that.

6          MR. OSHER:  Your Honor, if I can just have a minute.

7          JUDGE MARCUS:  You may.

8 BY MR. OSHER:

9 Q   Just one more question, Representative.  Sitting here

10:17:11 10 today, do you understand how the images included in that ad

11 might be viewed negatively by the black community?

12 A   No.

13          MR. OSHER:  That's all I have.  Thank you.

14          JUDGE MARCUS:  All right.  Thank you.  And who will be

10:17:25 15 conducting cross-examination for the Singleton plaintiffs?

16          MR. WHATLEY:  Your Honor, I am Joe Whatley.  I will.

17          JUDGE MARCUS:  All right.  Thank you, Mr. Whatley, and

18 you may proceed.

19          MR. WHATLEY:  Thank you.

10:17:35 20               CROSS-EXAMINATION

21 BY MR. WHATLEY:

22 Q   Mr. Byrne, it's good to see you again.  I have a few

23 questions.

24     First of all, I, along with other counsel, I represent the

10:17:47 25 Singleton plaintiffs.  Are you familiar with the whole county

---

1 plan that the Singleton plaintiffs have proposed, Singleton

2 plan number one?

3 A   I don't know if it's the Singleton plan, but I have seen a

4 map that shows whole counties.

10:18:03 5 Q   Okay.  And are you aware that that plan keeps Mobile

6 County whole?

7 A   The map that I saw kept Mobile County whole.

8 Q   And you would agree that's a good thing?

9 A   That's a good thing.  What I was concerned about was that

10:18:22 10 it added Andalusia and the county that Andalusia is in and took

11 away Washington County and Monroe County.  I don't think that's

12 a community of interest between Covington County which is where

13 Andalusia is and Mobile.

14 Q   Okay.  We will talk about that in a second.

10:18:36 15 A   Okay.

16 Q   But it also kept Mobile and Baldwin counties together, the

17 two Gulf counties?

18 A   It did.

19 Q   And that was something you viewed to be crucial, correct?

10:18:43 20 A   Yes.

21 Q   Okay.  And you know when you are drawing districts you

22 have to keep the population -- you have to have an eye on the

23 population.  What you have -- how equal it has to be is a

24 question the judges will decide.  But you know that you have to

10:18:58 25 look to population of counties when you are drawing districts,

---

1 correct?

2 A   That's correct.

3 Q   And by putting Covington in instead of Washington and

4 Monroe, they came -- the Singleton plaintiffs came to districts

10:19:14 5 that had relatively equal population, correct?

6 A   That's correct.  It has some flaws other than that, but,

7 yes, it does do that.

8 Q   And you would also agree that Covington and Escambia

9 counties have some commonalities, correct?

10:19:29 10 A   Yes.  But Escambia County is not the core of the district.

11 Q   I'm sorry.  I couldn't hear you?

12 A   I'm sorry.  Escambia County is not the core of the

13 district.  And the part of Escambia County that is closest to

14 Covington County, which is Brewton and east Brewton, not really

10:19:48 15 Atmore, which on the other end of Escambia County, clearly much

16 more to Mobile.

17 Q   And the county seat in Escambia County?

18 A   Brewton.

19 Q   Remind me where that is?

10:19:58 20 A   It's Brewton.

21 Q   Okay.  In that eastern end of the county that's closer to

22 Covington?

23 A   That's right.

24 Q   And not far from Andalusia?

10:20:04 25 A   That's right.

---

1 Q   Okay.

2          MR. WHATLEY:  Let's pull up Caster Exhibit 12.  And go

3 down so we can see the southern part of that, Suzanne.

4 BY MR. WHATLEY:

10:20:26 5 Q   This is the current district -- I think you just testified

6 the district that -- District 1 is the one you served in this

7 configuration?

8 A   That's correct.

9 Q   Okay.  Now, I will tell you as a preliminary matter both,

10:20:42 10 Mr. Hare and I grew up in Monroeville.  And my mother and his

11 parents still live in Monroeville.  So let's spend a little bit

12 of time talking about your testimony about Monroe County.

13     Now, Monroe County -- in Monroe County, the economy is

14 largely or in many respects built around the tree; isn't that

10:21:15 15 right?  You have paper mills, you have the timber business

16 especially in the northern part of the county.  It's -- that's

17 a huge part of the county -- economy; isn't that right?

18 A   It's a significant part of it, yes.

19 Q   Okay.  And they don't have ship building in Monroe County,

10:21:27 20 for example?

21 A   No.  But you have people from Monroe County that work in

22 the shipyards.

23 Q   True.  People commute.  But they don't do it in Monroe

24 County?

10:21:34 25 A   They don't do it in Monroe County, no.

Case 2:21-cv-01530-AMM Document 227-4 Filed 08/08/23 Page 24 of 28
Case 2:21-cv-01530-AMM Document 105-6 Filed 01/18/22 Page 94 of 283
1737

1 Q    And, in fact, between 2010 and 2020, between the two
2 censuses, Monroe County lost a significant part of its
3 population, didn't it, what, around 15 percent?
4 A    I don't know the exact percent, but they did lose a
10:21:52 5 significant amount of population.
6 Q    Okay.  And in Monroe County or at least Monroeville also
7 has a tourist element to its economy, doesn't it?
8 A    It does.  They try to attract people there because it's
9 the home of Harper Lee, who you probably knew.
10:22:10 10 Q    Right.  And you brought up Truman Capote in your direct
11 testimony.  Were you aware that Truman was the other boy, To
12 Kill a Mockingbird?
13 A    Yes.
14 Q    Not Harper Lee's brother obviously, but the other boy in
10:22:30 15 To Kill a Mockingbird?
16 A    Yes.
17 Q    And what you're saying -- in Monroeville, especially
18 pre-COVID and we hope post-COVID, a lot of the economy is built
19 around the Mockingbird, it's built around Harper Lee and Truman
10:22:48 20 Capote and attracting tourists to Monroeville based on that?
21 A    They're trying to develop more tourism off of that, yes.
22 I don't know to what extent they have been successful.
23 Q    Well, you know at least pre-COVID and even last year to
24 some extent they have a -- the To Kill a Mockingbird play and
10:23:05 25 attract hundreds -- attract thousands of people into

---

1 Monroeville to see the Mockingbird play?
2 A    Yes, they do.  In fact, I've seen it three or four times
3 and got to be on the jury one time.
4 Q    Okay.  And that -- especially in the spring is a big part
10:23:22 5 of the economy?
6 A    In the spring, I would think it would be, yeah.
7 Q    Okay.  And you mentioned that you attended a town hall
8 meeting in Beatrice, right?
9 A    Yeah.  Yeah.
10:23:37 10    MR. WHATLEY:  And, Suzanne, can you make the District
11 1 larger?
12 BY MR. WHATLEY:
13 Q    Is kind of in the northeastern corner of Monroe County?
14 A    I don't know -- yeah, I guess that's northeastern.
10:24:03 15 Q    And one of the things that's important in Beatrice's
16 economy is hunting camps.  You mentioned you were at you a
17 hunting camp, at your hunting camp, but hunting camps are big
18 up there, right?
19 A    Yes.
10:24:19 20 Q    Okay.  And I think you said the northern part of Monroe
21 County is a predominately black area, right?
22 A    Yes.
23 Q    And, in fact, especially the northern half of Monroe
24 County is considered to be part of the Black Belt, right?
10:24:32 25 A    I don't know that.

---

1 Q    You don't know that.
2    Do you know that both its population and its economy have
3 a lot of similarities to the rest of the Black Belt, correct?
4 A    I don't think I would agree with that.  It has some
10:24:52 5 interesting unique industries there.  You mentioned tourism, in
6 terms of the Mockingbird, but also there's a plant there that
7 does pre-manufactured concrete walls.  It's another plant there
8 that makes the cardboard containers that are used to package
9 various goods including some of the craft beer that are made in
10:25:21 10 Mobile.  So I don't know other counties in the Black Belt that
11 have those sort of more advanced industries.
12 Q    Yes, sir.  I'm sorry.  Did I cut you off?
13 A    No.  I finished.
14 Q    Okay.  You were talking about the precast concrete.  You
10:25:40 15 were talking about Gate or Gate-Lazenby?
16 A    Yes.
17 Q    Okay.  What I was really focused on is more the part of
18 the county north of Monroeville?
19 A    Okay.
10:25:49 20 Q    And Gate-Lazenby -- I don't mean to make this personal,
21 but I worked my way through college working there.  But north
22 of Gate-Lazenby is also south of Monroeville, right?
23 A    Yes.
24 Q    Okay.  And north of --
10:26:06 25 A    But in Monroe County.

---

1 Q    North of Monrovia, in the northern part of the county,
2 that is the area where wouldn't you agree with me at least the
3 population is very similar to what you found in the Black Belt?
4 A    I would think in very north Monroe County, it would be
10:26:21 5 very similar to say Wilcox County.
6 Q    Right.  And you talked about the education.  The high
7 school in Beatrice is J. F. Shields, right?
8 A    I don't know the name of it.
9 Q    But you know there is a high school in --
10:26:44 10 A    That's right.  I think I have been there.
11 Q    Yes, sir.  And it is an all-black school?
12 A    I know it's predominantly black.  I don't know if it's all
13 black.
14 Q    And the white children around Beatrice go to the all-white
10:27:03 15 private school, Monroe Academy down in Monroeville, don't they?
16 A    I don't know that.
17 Q    You don't know that?
18 A    No.
19 Q    Well, you mentioned that there were some white folks at
10:27:13 20 your town hall meeting in Beatrice.  Do you know where their
21 children go to school?
22 A    I didn't ask where they children went to school.  People
23 in the town hall meeting were mainly older.
24 Q    Okay.  You do know that there is an all-white private
10:27:28 25 academy in Monroe County where many of the white students go to

1741

```
 1    school?
 2    A    I know that there's a private academy. I don't know the
 3    racial mix of it. I don't think I have ever been to that
 4    school.
 5    Q    Okay. Now, let's go over to Clarke County, if we could.
 6    You represented -- and, again, I have relatives there, so
 7    I am going to focus on some issues. You are represented the
 8    part of Clarke County that includes Grove Hill?
 9    A    Part of Grove Little, not all of Grove Hill.
10    Q    And you represented the part that goes out on Highway 84,
11    the road that goes sort of east and west to there, that's
12    Highway 84, right?
13    A    Yeah.
14    Q    And are you aware that there's a town of Whatley about
15    six miles east of Grove Hill?
16    A    I am aware of it.
17    Q    On Highway 84?
18    A    Yes.
19    Q    Okay. And so as an example, my cousins in Grove Hill or
20    north of Highway 84 in Grove Hill would have been represented
21    by you, right?
22    A    Depending upon exactly where they live, probably so. But
23    if they were northeast, they wouldn't be represented by me.
24    Q    And if they were northwest, they would be?
25    A    They would be.
```

1742

```
 1    Q    Okay. And my cousins in Whatley, Alabama, six miles to
 2    the east in the same county, would have been represented by
 3    Congresswoman Sewell?
 4    A    I think that's right, yes.
 5    Q    Okay. And I want to be clear. This question is not meant
 6    to disparage either you or Congresswoman Sewell. You would
 7    agree, I think you already have, that she is an outstanding
 8    congresswoman?
 9    A    She is an outstanding congresswoman.
10    Q    But wouldn't you agree, sir, and I think this has been
11    your testimony, that if you had combined Clarke County, that my
12    cousins in Whatley and my cousins in Grove Hill would have been
13    better represented regardless of whether it was you or her?
14    A    By having just one congressman?
15    Q    Yes?
16    A    Yeah. I think that's what I have been saying in previous
17    testimony. I think it's better for a county to have one
18    congressman and not to be split up. But what Congresswoman
19    Sewell and I did was from the very beginning we said we will
20    work together, and we did. We worked together very well. We
21    used to do joint town halls together for example. Thomasville
22    was not in my district, but the mayor of Thomasville would come
23    and see me every time he was in Washington. He is a personal
24    friend, and if Congresswoman Sewell needed help from
25    Thomasville, she got it from me 100 years ago percent of the
```

1743

```
 1    time. That's just the way we worked things out.
 2    Q    But despite that fact, your testimony is that it would be
 3    better off to keep counties together?
 4    A    Yes. That's my position.
 5    Q    And you believe that it would be better to keep Tuscaloosa
 6    so it's not split, for example?
 7    A    Yes.
 8    Q    And the same for other counties in Alabama that are split,
 9    such as Montgomery?
10    A    Yes. Now, I understand that when you're trying to balance
11    out population, sometimes you can't make that happen. But to
12    the maximum extent possible, counties should be kept whole and
13    contiguous in congressional districts.
14    Q    And you were asked specifically about the -- about
15    Montgomery not having a Congress person. Do you recall that?
16    A    I don't remember the question just put that way, no.
17    Q    In any event, Montgomery currently does not have a member
18    of Congress living there, correct?
19    A    No one that lives there, yes, that's correct.
20    Q    Yes. I'm sorry. I wasn't clear with my question.
21    A    They had Martha Roby previously, and now their present
22    member is from Coffee County.
23    Q    And was it your testimony that by splitting or splitting
24    any county you might make it less likely that a congressperson
25    reside there?
```

1744

```
 1    A    Yeah.
 2    Q    Okay.
 3    A    You start splitting counties like that, and that county
 4    loses its influence. That's why I don't want Mobile County to
 5    be split.
 6    Q    And --
 7              MR. DAVIS: Give me one second. Sorry to interrupt,
 8    Mr. Whatley. Judge, I just want to check on Mr. Byrne. We
 9    have been going about two hours.
10              JUDGE MARCUS: We have been going a long time.
11    Let me ask you, Mr. Whatley: How much longer you have
12    with Mr. Byrne. Perhaps this would be a convenient time for a
13    short break.
14              MR. WHATLEY: It's fine for me to take a short break,
15    Your Honor.
16              JUDGE MARCUS: All right. We will take a break for
17    15 minutes, and then we will pick up the balance of your
18    examination.
19    Question, though, Mr. Whatley: How much longer do you
20    think you have with Mr. Byrne?
21              MR. WHATLEY: I would guess about 10 or 15 minutes.
22    Perhaps the break will make it shorter.
23              JUDGE MARCUS: I'm sorry. I didn't mean to cut you
24    off.
25              MR. WHATLEY: I said perhaps the break will make it
```

1 shorter and more organized.

2 　　　　JUDGE MARCUS: All right. We will break for

3 15 minutes and then pick up the thread of the cross by

4 Mr. Whatley and any redirect by Mr. Davis.

10:32:53 5 　　　　Thank you. We will in a 15-minute recess.

6 　　　　(Recess.)

7 　　　　JUDGE MARCUS: Mr. Whatley, are you ready to proceed

8 at this point?

9 　　　　MR. WHATLEY: Yes, sir.

10:48:40 10 　　　　JUDGE MARCUS: Mr. Byrne, you all set to go forward?

11 　　　　THE WITNESS: Yes, sir, I am.

12 　　　　JUDGE MARCUS: Thank you very much. Mr. Whatley, you

13 may complete your cross.

14 　　　　MR. WHATLEY: Thank you, Your Honor.

10:48:51 15 　　　　Suzanne, will you put back up for just a minute the 2011

16 plan? I think it's Caster Exhibit 12, Your Honor.

17 　　　　MR. WHATLEY: Just so I'm clear, Mr. Whatley, this is

18 the plan that actually was enacted by the state Legislature in

19 2011, correct?

10:49:23 20 　　　　MR. WHATLEY: Yes, sir. Yes, sir, Your Honor. And

21 just to put it in context, Mr. Byrne, it's the plan that

22 existed when you served in Congress, correct?

23 　　　　THE WITNESS: Yes, sir.

24 BY MR. WHATLEY:

10:49:34 25 Q　　Okay. I want to focus back on Clarke County for just one

---

1 second.

2 　　　　And I don't think I asked you about the economy of Clarke

3 County. In Clarke County, a big part of the county also

4 focuses on the tree, correct?

10:49:52 5 A　　Yes.

6 Q　　And so a paper mill and lumber mill in Jackson?

7 A　　Yes.

8 Q　　In the southern part of the county, correct?

9 A　　That's correct.

10:50:05 10 Q　　And there is a paper mill -- I don't know if you can see

11 it -- it's in the edge of Wilcox County and Pine Hill, not far

12 from Thomasville that you mentioned, correct?

13 A　　Yes. Yes.

14 Q　　And so they make paper, and they produce lumber in Clarke

10:50:28 15 County, and they don't make ships, correct?

.16 A　　They don't make ships in Clarke County.

17 Q　　But they do make paper, and they do produce timber?

18 A　　That's correct.

19 Q　　Okay. We can take that down.

10:50:39 20 　　　　Mr. Byrne, I think in your -- you have clearly said before

21 -- I don't remember if it was in your testimony in the previous

22 case, or in your deposition, that you think it's important that

23 each of the urban or Metropolitan -- or each of the cities in

24 Alabama have its own congressional district or be in a separate

10:51:12 25 congressional district?

---

1 A　　Yes. I think that the four metro areas in the state, plus

2 Dothan, Tuscaloosa, Auburn, all those areas need to have sort

3 of at the center of their community adequately represented in

4 the United States Congress.

10:51:26 5 Q　　So there ought to be in separate -- and to be clear, there

6 ought to be separate congressional districts or Huntsville,

7 Mobile, Montgomery, and Birmingham should each be located in a

8 separate congressional district from each other?

9 A　　Yes.

10:51:45 10 Q　　Okay. And going to Congressman Palmer, I think there was

11 some questioning about Congressman Palmer earlier maybe by both

12 counsel. Isn't it correct that Congressman Palmer currently

13 lives in Shelby County?

14 A　　To be honest with you, I don't know exactly where he

10:52:05 15 lives. He either lives in the southern part of Jefferson

16 County or in Shelby County. I don't know.

17 Q　　Were you aware that on one point he did live in Jefferson

18 County and he moved to Shelby County?

19 A　　I am not aware of that.

10:52:18 20 Q　　You are not aware of that. Okay.

21 　　　　MR. WHATLEY: Your Honors, I think that's all I have.

22 　　　　JUDGE MARCUS: Thank you. Redirect, Mr. Davis?

23 　　　　MR. DAVIS: Yes, Your Honor, briefly.

24 　　　　　　　　REDIRECT EXAMINATION

10:52:35 25 BY MR. DAVIS:

---

1 Q　　Mr. Byrne, did you turn down any meeting requests from the

2 Alabama NAACP?

3 A　　No.

4 Q　　Would you have been happy to meet with them had they asked

10:52:58 5 for a meeting?

6 A　　Absolutely. I meet with just about everybody.

7 Q　　We talked about the third districts -- and the Third

8 District and the Fourth Congressional District when you were

9 speaking with Mr. Osher. Do you consider the areas encompassed

10:52:54 10 in Alabama's Third Congressional District to be part of a

11 community of interest?

12 A　　I do. That's east Alabama, and it got a common set of

13 industries and things that they're interested in, and they

14 largely look to Auburn as their university.

10:53:09 15 Q　　What about the Fourth Congressional District, do you

16 consider those areas to be part of a community of interest?

17 A　　They are. We have similar industry in all those areas all

18 tied to the automobile industry, for example. And they have

19 very similar -- when you go from one of those towns to the

10:53:27 20 next, walking from the east side of the state to the west, the

21 towns are very similar to one another.

22 Q　　Do you consider the more urban parts of Mobile County to

23 be part of the same community of interest with Montgomery,

24 Macon, and Barbour counties?

10:53:47 25 A　　I have been up and down those other places. They just

1  don't have a connection to Mobile or so.

2  Q     And what about the more rural parts of Mobile County?  Are

3  they part of a community of interest with the Wiregrass in

4  Dothan?

10:54:02  5  A     No, they are not.

6  Q     When you are considering --

7  A     Let me give an example there.  One of the maps I saw of

8  Covington County in the First Congressional District, there's

9  really no connection between Covington County and the main

10:54:20 10  interest that you can see in the First Congressional District.

11  So I don't see that it makes any sense to put a Wiregrass

12  county like Covington in with a district that's primarily

13  centered with Mobile and Baldwin County.  It's hard to get to

14  Andalusia from Mobile, very hard.  And so as the result, very

10:54:38 15  few people go back and forth between Andalusia and Mobile.

16  Q     Which districts would allow a Congressman or congresswoman

17  to more effectively represent the constituents of District 1,

18  whether they're black, whether they're white, Republican,

19  Democrat, rich or poor?  Would that be the districts as passed

10:54:59 20  in Alabama's plan, or the districts that plaintiffs are

21  proposing that we viewed a little while ago?

22  A     The Legislature plan by far.  And as I said before, I

23  testified before that committee, and I listened to other people

24  talk while I was there.  And the Legislature effectively did

10:55:13 25  what we were asked to do, which was to keep our part of the

1  state together.

2  Q     Uh-huh.  And would your ability as a Congressman to

3  represent your constituents, would it be negatively impacted if

4  your district changed at the last minute to a vastly different

10:55:34  5  structure, including different areas of the state?

6  A     Very definitely so, yes.

7  Q     We talked about a lot of issues, Mr. Byrne.  Is there

8  anything else you would like to bring to the Court's attention

9  as they consider these various plans?

10:55:47 10  A     Yes, sir.  I would want to say this.  I have great respect

11  for the Court and this proceeding, and I know the Court's got

12  some difficult decisions to make.  But we're pretty far along

13  into this campaign cycle.  And I have seen what it does to

14  congressmen in other states when at the last minute, courts

10:56:05 15  start moving things around.  And I think it hurts the

16  effectiveness of congressmen when that happens.  I am not

17  saying the Court may not have a good reason to do it.

18        But as I said earlier, we are just a few months away from

19  primaries.  And it would be very difficult to start shifting

10:56:22 20  this thing around.  It was hard enough as it was when the

21  Legislature pass these districts.  People held back and held

22  back and held back.  And now, they're right in the meat of

23  these campaigns.  And I just think it would be terrible if we

24  change course on all these candidates running for these various

10:56:40 25  offices, Democrat, Republican, doesn't matter.  It's going to

1  have the very same detrimental effect on those candidates and

2  on those congressmen, sitting congressmen if all of a sudden

3  these things are moved around some more.

4        And the second thing I would say is, I've tried to say a

10:56:55  5  little bit earlier, Covington County doesn't fit with the First

6  Congressional District.  They're wonderful people over there.

7  I have good friends.  I worked with a lot of them when we were

8  replacing the president of the community college.  But I don't

9  think they would want to be in a district with Mobile because

10:57:09 10  they look to Dothan.  They look to the Wiregrass.

11        So that map that has Covington County with Mobile, that

12  just doesn't fit.  And I think the way the Legislature has

13  drawn the First Congressional District makes all the sense in

14  the world, given the needs that they have to try to take a few

10:57:24 15  areas away from that district presently because of the growth

16  in Baldwin County.  I think they did the best they could

17  possibly do.

18              MR. DAVIS:  Thank you, Your Honor.

19              MS. WELBORN:  I'm sorry.  We just objected to that

10:57:38 20  last line of questioning and move to strike it as beyond the

21  scope of Mr. Byrne's direct.  Asking, you know, anything else

22  he wanted to add was not in Mr. Byrne's direct examination.

23              JUDGE MARCUS:  It would have been wiser to object

24  before the question was asked, but while the question I think

10:57:56 25  did go beyond, the answer, I think bore upon the stuff that

1  came up in cross.  So the objection is overruled, and we will

2  not strike that portion of the testimony.  But thank you.

3        Any other questions, Mr. Davis, that you have for

4  Mr. Byrne?

10:58:13  5              MR. DAVIS:  No, Your Honor.  That completes redirect.

6              JUDGE MARCUS:  Any other questions any of the lawyers

7  have for Mr. Byrne?

8        All right.  Judge Moorer, Judge Manasco, did either of you

9  have a question for Mr. Byrne?

10:58:30 10              JUDGE MANASCO:  None from me.

11              JUDGE MOORER:  No, sir.

12              JUDGE MARCUS:  Mr. Byrne, I have got a question for

13  you.  Perhaps you can help me with this.

14        On your direct examination by Mr. Davis, you were asked

10:58:47 15  about the 2021 map that the Legislature adopted for the State

16  Board of Education.

17              THE WITNESS:  Right.

18              JUDGE MARCUS:  And it was observed that -- you

19  observed that you testified, if I heard you right, with regard

10:59:08 20  to that and urged the Legislature not to split Mobile County.

21  Did I have that right?

22              THE WITNESS:  Yes, sir, that's what I said.

23              JUDGE MARCUS:  And then the testimony came out that,

24  in fact, the Legislature in 2021 split Mobile County in the

10:59:23 25  maps that it drew for the board of education, and it

specifically split Mobile County between Districts 1 and 5.
This is the board of ed map I am talking about.  Do you recall
all of that discussion?

    THE WITNESS:  Yes, sir, I do.

    JUDGE MARCUS:  I just have one question, if you know
the answer.  I was curious, do you know why the Legislature
actually split Mobile County between Districts 1 and 5 when
they drew the board of education maps?

    THE WITNESS:  Yes, sir.  They actually did this in
2011.  The other district -- District 1 is the one down here.
District 5 I guess is the other one.  That district lost a lot
of population, and they had to pick it up somewhere.  And they
believed that the best way to pick it up was to go south into
Mobile County.

    So while I was sympathetic to the fact the Legislature had
to make some significant changes to that district, I didn't
like the fact that they were splitting Mobile County because of
the fact the Mobile County school system is so big and has so
many issues as any big school systems does.

    I would like to see a school board member that's focused
on that primarily as their job.

    JUDGE MARCUS:  Thank you much.

    Any follow-up questions from any of the lawyers based on
the question that I had asked Mr. Byrne?  Mr. Davis?

    MR. DAVIS:  No, Your Honor.

    JUDGE MARCUS:  Mr. Whatley?

    MR. WHATLEY:  No, Your Honor.

    JUDGE MARCUS:  Mr. Osher?  Counsel for --

    MS. WELBORN:  No, Your Honor.

    JUDGE MARCUS:  -- for Milligan?

    All right.  We thank you very much for your time and
efforts this morning, Mr. Byrne, and you are excused.

    THE WITNESS:  Thank you, Your Honor.

    JUDGE MARCUS:  Does that close the presentation of
evidence for the state?

    MR. DAVIS:  It does, Your Honor.

    JUDGE MARCUS:  And that would be for both the
Secretary of State as the party defendant and for the
intervening defendants McClendon and Pringle, correct?

    MR. DAVIS:  That's right, Judge.

    JUDGE MARCUS:  Okay.  Did -- before we get to
closing arguments, was there anything by way of rebuttal either
from the Milligan plaintiffs, the Caster plaintiffs, or the
Singleton plaintiffs?

    MR. BLACKSHER:  Singleton plaintiffs, no, Your Honor.

    JUDGE MARCUS:  Thank you.  Milligan?

    MR. ROSS:  No, Your Honor.

    JUDGE MARCUS:  And for Caster, Ms. Khanna?

    MS. KHANNA:  No, Your Honor.

CERTIFICATE

    I certify that the foregoing is a correct
transcript from the record of proceedings in the
above-entitled matter.

*Christina K Decker*                    01-12-2022

Christina K. Decker, RMR, CRR                    Date
Federal Official Court Reporter
ACCR#:  255