7/30/2019          Chestnut, et al., v. John H. Merrill          Josiah Bonner

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

LAKEISHA CHESTNUT, et al.,

          Plaintiffs,

     vs.                    CASE NO. 2:18-cv-907-KOB

JOHN H. MERRILL, in his official capacity as
Alabama Secretary of State,

          Defendant.

     *     *     *     *     *     *     *     *

     The videotaped deposition of JOSIAH

BONNER was taken before Bethany Whaley,

Certified Court Reporter, ACCR 661, as

Commissioner, on Tuesday, July 30, 2019,

commencing at approximately 9:00 a.m., at the

Office of Attorney General, 501 Washington

Avenue, Montgomery, Alabama, pursuant to the

stipulations set forth herein.

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646



| | |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | Representing the Plaintiff: |
| 4 | Ms. Lalitha Madduri |
| 5 | Perkins Coie |
| 6 | 700 13th Street, NW |
| 7 | Suite 600 |
| 8 | Washington, DC 20005-3960 |
| 9 | 202.654.6203 |
| 10 | Lmadduri@perkinscoie.com |
| 11 | |
| 12 | Representing the Defendant: |
| 13 | Mr. James W. Davis |
| 14 | Ms. Laura E. Howell |
| 15 | Office of the Attorney General |
| 16 | 501 Washington Avenue |
| 17 | Montgomery, Alabama 36130-0152 |
| 18 | 334.353.1018 |
| 19 | jimdavis@ago.state.al.us |
| 20 | |
| 21 | |
| 22 | |

Page 2

| | INDEX | |
|---|---|---|
| 1 | | |
| 2 | WITNESS                    PAGE | |
| 3 | JOSIAH BONNER | |
| 4 | EXAMINATION BY MS. MADDURI | 7 |
| 5 | | |
| 6 | | |
| 7 | INDEX OF EXHIBITS | |
| 8 | Bonner Exhibit 1 - Map of Congressional | 31 |
| 9 | District Plan | |
| 10 | Bonner Exhibit 2 - Map of Congressional | 53 |
| 11 | Districts from 1950 | |
| 12 | Bonner Exhibit 3 - 2011 State Board of | 58 |
| 13 | Education Map | |
| 14 | Bonner Exhibit 4 - Revised Plan 1 | 62 |
| 15 | Bonner Exhibit 5 - Revised Plan 2 | 62 |
| 16 | Bonner Exhibit 6 - Revised Plan 3 | 63 |
| 17 | Bonner Exhibit 7 - Illustrative Plan 4 | 63 |
| 18 | Bonner Exhibit 8 - Hypothetical 2020 Plan | 82 |
| 19 | Map | |
| 20 | Bonner Exhibit 9 - News article | 120 |
| 21 | | |
| 22 | | |

Page 4

| | |
|---|---|
| 1 | APPEARANCES |
| 2 | (Continued) |
| 3 | |
| 4 | Representing the Defendant: |
| 5 | Mr. Dorman Walker |
| 6 | Balch & Bingham |
| 7 | 105 Tallapoosa Street |
| 8 | Suite 200 |
| 9 | Montgomery, Alabama 36104 |
| 10 | 334.2693138 |
| 11 | dwalker@balch.com |
| 12 | |
| 13 | |
| 14 | Also Present: |
| 15 | Erika McKay, Governor's office |
| 16 | Bryan Taylor, Governor's office |
| 17 | Skip Warren, videographer |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

Page 3

| | |
|---|---|
| 1 | *  *  *  *  *  *  *  * |
| 2 | STIPULATIONS |
| 3 | It is hereby stipulated and agreed by |
| | and between counsel representing the parties |
| 4 | that the videotaped deposition of JOSIAH |
| | BONNER is taken pursuant to the Rules of Civil |
| 5 | Procedure, and that said deposition may be |
| | taken before Bethany Whaley, Certified Court |
| 6 | Reporter, as Commissioner, without the |
| | formality of a commission; that objections to |
| 7 | questions, other than objections as to the |
| | form of the questions, need not be made at |
| 8 | this time, but may be reserved for a ruling at |
| | such time as the deposition may be offered |
| 9 | into evidence, or used for any other purpose |
| | by either party hereto, provided by the |
| 10 | Statute. |
| 11 | It is further stipulated and agreed |
| | by and between counsel representing the |
| 12 | parties in this case, that the filing of the |
| 13 | |
| 14 | deposition of JOSIAH BONNER is hereby waived, |
| | and that said deposition may be introduced at |
| 15 | the trial of this case or used in any other |
| | manner by either party hereto provided for by |
| 16 | the Statute, regardless of the waiving of the |
| 17 | filing of same. |
| 18 | It is further stipulated and |
| 19 | agreed by and between counsel and the witness |
| 20 | that the reading and signing of the deposition |
| 21 | by the witness is waived. |
| 22 | *  *  *  *  *  *  *  * |

Page 5

7/30/2019                 Chestnut, et al., v. John H. Merrill                 Josiah Bonner

| | |
|---|---|
| 1    THE VIDEOGRAPHER: The marks the | 1    A.   My name is Josiah Robins Bonner, |
| 2   beginning of MPEG one, volume one in the | 2   Jr. |
| 3   videotape deposition of Josiah Bonner. We are | 3    Q.   And what is your address? |
| 4   on the record. Today is Tuesday, July 30th, | 4    A.   1163 Wellesley, W-E-L-L-E-S-L-E-Y, |
| 5   2019, and the time is 9:01 a.m. | 5   Green, Tuscaloosa, Alabama 35406, but I am in |
| 6    My name is Skip Warren. I'm the | 6   the process of moving. And so my new address |
| 7   videographer. The court reporter is Bethany | 7   is 7216 Sibley, S-I-B-L-E-Y, Montrose, |
| 8   Whaley. We're at the offices of the Alabama | 8   Alabama, M-O-N-T-R-O-S-E, 36559. And that |
| 9   Attorney General in Montgomery, Alabama. The | 9   will be effective September 1st. |
| 10   matter is Chestnut, et al. versus Merrill, | 10    Q.   And have you ever been deposed |
| 11   et al. The Civil Action Number is | 11   before, sir? |
| 12   218-CV-907-KOB. | 12    A.   I was asked that question, and I |
| 13    Would counsel and all present | 13   was not able to give a definitive answer. So |
| 14   please introduce themselves after which the | 14   I don't believe I have, but I have |
| 15   court reporter will swear in the witness? | 15   participated in depositions when I was in |
| 16    MS. MADDURI: Lalitha Madduri for | 16   Congress. |
| 17   the plaintiffs. | 17    Q.   In what capacity did you |
| 18    MR. DAVIS: Jim Davis for | 18   participate? |
| 19   Secretary of State John Merrill. | 19    A.   I was chairman and then ranking |
| 20    MS. HOWELL: Laura Howell for | 20   member of the House Ethics Committee. So we |
| 21   Secretary of State Merrill. | 21   deposed witnesses when we were doing |
| 22    MR. WALKER: Dorman Walker for | 22   investigations. I have been called as a |
| Page 6 | Page 8 |

| | |
|---|---|
| 1   Secretary of State John Merrill. | 1   witness -- or I was told I would be called as |
| 2    MS. MCKAY: Erica McKay, | 2   a witness in civil disputes, child custody |
| 3   Governor's Legal Office. | 3   cases and all, but I never actually testified. |
| 4    MR. TAYLOR: Bryan Taylor -- Bryan | 4    Q.   Okay. So you've never testified |
| 5   with a Y -- Governor's Legal Office. | 5   in a court of law or any other -- |
| 6    JOSIAH BONNER, | 6    A.   Not that I'm aware of. |
| 7   being first duly sworn, was examined and | 7    Q.   So I'll just go over a couple |
| 8   testified as follows: | 8   ground rules then. |
| 9 | 9    A.   Okay. |
| 10   EXAMINATION BY MS. MADDURI: | 10    Q.   So we're going to try to make a |
| 11    Q.   Good morning -- | 11   clear record, and for the sake of the court |
| 12    A.   Good morning. | 12   reporter, I'll ask you questions, and I just |
| 13    Q.   -- Mr. Bonner. Thank you for | 13   ask that you wait until I'm finished asking |
| 14   being here. | 14   the question before you respond, and I will |
| 15    A.   Thank you. | 15   similarly try not to speak over you to make |
| 16    Q.   Like I said, I think we'll wrap up | 16   her job a little bit easier. |
| 17   in about ten minutes, but we do appreciate | 17    And it's also important just to |
| 18   your time and taking the morning out for us, | 18   give audible answers, either yes or no, as |
| 19   so thank you. | 19   opposed to shaking your head or nodding your |
| 20    A.   It's my pleasure. Absolutely. | 20   head or saying uh-huh or um-hmm just because |
| 21    Q.   Can you please state your full | 21   it's hard to understand what that means when |
| 22   name for the record? | 22   it's on paper. Does that all make sense? |
| Page 7 | Page 9 |

7/30/2019                Chestnut, et al., v. John H. Merrill                Josiah Bonner

1  A.   Yes, ma'am.
2  Q.   And if you don't understand a
3  question that I ask, please just let me know,
4  and I'll try to clarify.
5  A.   Okay.
6  Q.   If you don't tell me that you
7  don't understand --
8  A.   (Witness nods head.)
9  Q.   -- I'll assume that you have
10  understood.  Does that make sense?
11  A.   It makes sense.
12  Q.   Okay.  And if you need a break at
13  any time, just please let me know.
14  A.   (Witness nods head.)  Okay.
15  Q.   I just only ask that if there's a
16  question pending we just finish that question
17  before we take the break.
18  A.   That sounds fair.
19  Q.   Okay.  Is there any reason today
20  that you can't give your full and honest
21  testimony?
22  A.   No, ma'am.

                                        Page 10

1  Q.   Any medication or anything like
2  that?
3  A.   No, ma'am.
4  Q.   Okay.  Great.  So how did -- how
5  did you learn about this case?
6  A.   I was told, I believe, by a member
7  of our legal staff that there was a case and
8  that the Secretary of State's office and the
9  Attorney General's office and the plaintiffs
10  may all have some interest in talking with me
11  given that I had worked on Capitol Hill for
12  18 years and then served in Congress for six
13  terms.
14  Q.   Okay.  And do you remember when
15  you learned about the case?
16  A.   It would have been within the last
17  six months.  I've been with Governor Ivey for
18  seven and a half months.  I've been her Chief
19  of Staff since January 15th, and so it was
20  after I moved into the Chief of Staff's
21  office, but I don't keep a daily calendar -- I
22  keep a daily calendar, but I -- I don't recall

                                        Page 11

1  the phone call or exactly who called me.
2  I believe it was the -- the chief
3  counsel, Mr. Taylor, who called just to make
4  me aware of this, but I wouldn't want to swear
5  under oath about that because it could have
6  been someone else.  But it was someone in
7  that -- in that legal office.
8  Q.   Okay.  And what did they tell you
9  about the case?
10  MR. DAVIS:  I would object to that
11  on grounds of privilege.  Mr. Taylor and the
12  Attorney General's office represent
13  Mr. Bonner.  So don't go into details about
14  what the legal office has told you about the
15  case.
16  Q.   (By Ms. Madduri)  What is your
17  general understanding of the case?
18  A.   Well, my general understanding is,
19  is that there was a challenge to the current
20  district lines and that the judge determined
21  that there was not enough time to order -- to
22  rule on that and to order new district lines

                                        Page 12

1  and that that matter would be set aside.
2  And that -- the remaining question
3  was whether or not the plaintiffs' contention
4  that there be two minority districts would be
5  heard at a later time.
6  Q.   And I'm not asking you for any
7  privileged information here, but who else have
8  you spoken with about the case other than the
9  lawyers that --
10  A.   No one else.
11  Q.   Were you provided with any
12  documents or records regarding the case?
13  A.   I -- I was -- I met with one of
14  the attorneys in the Governor's office who
15  advised that I did not need to read any
16  documents or ask for any documents to prepare
17  for this.  And therefore, I did not ask for
18  any documents, and I did not read any
19  documents.
20  Q.   How did you prepare for today's
21  deposition, if you did?
22  A.   I got up, put on a nice suit, and

                                        Page 13

                                    Pages 10 to 13

1  I -- I really came prepared to discuss my
2  experiences of having worked on Capitol Hill
3  in the federal delegation, Alabama
4  Congressional Delegation for about 28 years.
5      Q.  Understood.  So we can dig into
6  that.  So you were the congressional
7  representative for Alabama's 1st district --
8      A.  Yes, ma'am.
9      Q.  -- starting in 2003; is that
10 right?
11     A.  Yes, ma'am.
12     Q.  Okay.  Until 2013?
13     A.  Yes, ma'am.
14     Q.  Can you just describe for me your
15 district generally?
16     A.  It is a -- it's a very special
17 part of Alabama.  If you -- every member of
18 congress would think their district is the
19 most special, but ours is unique in the sense
20 that it's the only coastal district.  So we
21 have mountains in north Alabama, and in south
22 Alabama, we have beautiful Gulf Coast beaches.

1      So Mobile and Baldwin Counties are
2  the two largest counties in the district.
3  They anchor, and they have for the last 40 to
4  50 years, the contiguous counties surrounding
5  it.  There's a lot of continuity in that
6  district in terms of its economy, in terms of
7  its history, and in terms of its -- its DNA.
8  A lot of it revolves around the water, around
9  the river system.
10     And when I was elected in 2002, I
11 became the fifth member of Congress to
12 represent that district since -- in -- in
13 90 years.  So there's not been a lot of
14 turnover.  I worked for my immediate
15 predecessor.  I was his press secretary and
16 then later his Chief of Staff.
17     And I actually interned for his
18 predecessor when I was in college.  So it's my
19 home, and as a result, I know that area of the
20 state fairly well.
21     Q.  Which part of the district did you
22 grow up in?

1      A.  Well, at the time I grew up in
2  Camden, which is no longer in the district.
3  It's in Congresswoman Sewell's district, in
4  the 7th district.  But the -- the districts in
5  Alabama have changed over the last 40 to
6  50 years based on the population changes.
7      The Black Belt of Alabama, which
8  is predominantly the 7th congressional
9  district, has lost population, and therefore
10 they've had to go into Jefferson County which
11 is the most populated county in the state and
12 some even into Montgomery County as well just
13 to find enough people.
14     The county I grew up in had
15 probably 14,000 people in it when I was a
16 child, and it probably has 14,000 people in it
17 today if you're lucky.  But I grew up in the
18 northern part of the district.  But then in
19 1984, I moved to help my predecessor Sonny
20 Callahan get elected to Congress.  I was his
21 campaign press secretary, and then after he
22 was successful with his election, he asked me

1  to go to Washington with him.
2      Q.  Can you describe -- you talked a
3  little bit about geography, a little bit about
4  other aspects of the district.  Can you talk a
5  little bit about the demographics of your
6  district when you represented it?
7      A.  So Mobile is the largest city in
8  the district, and it's the port of Alabama.
9  So we have one of the largest intrastate water
10 systems in the nation.  The Mobile Delta is
11 the second largest body of -- of water of its
12 kind in the nation.  Second only to the
13 Florida Everglades.
14     So the district's livelihood feeds
15 off of the bay and of the delta and of the
16 river system.  As a port city, we have a lot
17 of cargo that comes in and out of Mobile every
18 day.  And a lot of that cargo that goes out
19 come from the surrounding areas.
20     It comes from the timber-producing
21 companies in Clarke County and in Monroe
22 County and in Escambia County.  It comes from

7/30/2019                    Chestnut, et al., v. John H. Merrill                    Josiah Bonner

Page 18

1   the poultry-producing counties.  I mean, it's
2   a state port.  It's, I think, the 13th largest
3   in the nation.
4           But in some areas like in -- in
5   timber, we're the largest.  In coal, we've
6   been number one or two in the nation.  So the
7   district's compactness has been largely
8   because the legislature and the federal
9   courts, when the legislature couldn't agree on
10  a legislative plan, recognized that there was
11  a community of interest in the 1st
12  congressional district that was unique.
13          And that community of interest, it
14  involves banking, it involves education, it
15  involves health care.  If you're in
16  Monroeville, Alabama and you're -- you've been
17  diagnosed with an illness that needs a
18  specialty hospital, you go to Mobile.
19          If you are in -- working along
20  highway -- U.S. Highway 43, which runs from
21  Mobile all the way up to Thomasville, working
22  at one of the chemical companies that have

Page 20

1   in Mobile and Baldwin Counties.  It's just --
2   it's one of the oldest parts of the country
3   quite frankly.  And -- and that area's
4   political geography matches well with its
5   economic and social geography as well.
6       Q.   I think you talked a little bit
7   about the economic part of that.  Can you talk
8   a little bit about the political part that you
9   just mentioned, the political --
10      A.   Well, as I say, Congressman Frank
11  Boykin was -- John McDuffie was elected in the
12  19 teens.  He became a federal judge when he
13  left Congress.  Frank Boykin was in for
14  28 years.  He was the last Democrat member
15  elected.  Jack Edwards was elected in 1964,
16  served for 20 years.  Sonny Callahan was
17  elected in 1984, served for 18 years.
18          And then when I was elected in
19  2002, I served -- I did not complete my term,
20  but I was elected to my sixth term and later
21  resigned.  But the -- the district has, since
22  1964, elected Republican members of Congress,

Page 19

1   located there or a steel mill that's located
2   there, it's very likely that you live
3   somewhere in Mobile or Baldwin Counties
4   because Washington County is not a very
5   populated county.  They couldn't supply all
6   the workers for those industrial needs.
7           So the -- the district truly is a
8   cohesive area that has been that way since
9   the -- the early 1960s in the -- in the --
10  when we had eight members of Congress, Mobile
11  and Baldwin Counties were separated.  But
12  after that time, the -- the leadership of
13  Alabama legislature and the Courts recognize
14  that it was impossible to separate Mobile and
15  Baldwin Counties because they were connected
16  by the bay and they truly -- they have
17  something in common that very few other parts
18  of the state have.
19          This year is Alabama's 200th year
20  as a state, but Mobile was founded in 1702.
21  Alabama was -- became a state in 1819.  So
22  even the oak trees talk a different language

Page 21

1   but we have had a diverse political history
2   throughout the district as well.  For
3   instance, Mobile elected an African-American
4   mayor, Sam Jones, when it was still a majority
5   white city.
6           Unlike other cities in Alabama and
7   in the deep south, Mobile avoided some of the
8   racial -- racially charged issues that
9   Birmingham, Selma, and Montgomery had.  We had
10  a mayor, long before I lived there, that
11  worked hard to make sure that Mobile avoided
12  that.
13          And Mobile being a port city has
14  so much more international influence than,
15  quite frankly, some of the other cities as
16  well.  Plus, we're a much older city than
17  Birmingham, for instance.
18      Q.   Okay.  So you mentioned sort of
19  the unique economic features and political
20  features.  And I think you also said social
21  features.  Can you talk a little bit about
22  those?

7/30/2019            Chestnut, et al., v. John H. Merrill            Josiah Bonner

**Page 22**

1  A.  We're not bragging, but we're the
2  mother of Mardi Gras.  So most Americans think
3  of Mardi Gras, they think of New Orleans, but
4  they would be mistaken because it started in
5  Mobile.  And it is spread throughout our area
6  of the state, Fairhope, Gulf Shores, Orange
7  Beach, Dauphin Island.
8  It -- it is a part of the
9  religious life of the district because it's
10  actually connected to the Catholic church, but
11  it's also something that -- other cities today
12  might start a Mardi Gras society, but none
13  have some as old as 150, 160 years of age.  So
14  it -- it is something that people in south
15  Alabama take part in throughout our district.
16  It's not uncommon during the
17  season for there to be 150 to 350,000 people
18  that have come in from all the surrounding
19  towns.  And some rent motel rooms and some
20  bring their RVs, but it's a family
21  celebration.
22  Q.  Is that in Mobile?

**Page 23**

1  A.  It is.
2  Q.  It is?
3  A.  That's where it originated, but
4  it's also in Fairhope, and it's in all of the
5  other veteran communities as well.  But it's
6  also -- I would -- I would expand the social
7  beyond just a celebration.  Mardi Gras, too,
8  connects heavily to Mother Nature.  We have
9  sailing.  We have fishing on the rivers, in
10  the gulf, in the bay.
11  Hunting is a popular sport.  It's
12  a very social sport.  It's a big -- big
13  economic driver too.  And so -- so, you know,
14  many instances you choose to live close to
15  where you work or close to where the schools
16  are that you want your children to go to, but
17  a lot of people choose to live in south
18  Alabama because of the plethora of
19  opportunities they've got to socialize, to
20  enjoy nature, and to enjoy getting out of the
21  woods and getting in the water.  And -- and
22  it's -- it's a common thread that connects a

**Page 24**

1  lot of people in that part of the state
2  together.
3  Q.  So I think we're getting there
4  already, but I think you're describing some
5  communities of interest that exist in your
6  district.  Can you just in your own words tell
7  me what a community of interest means?
8  A.  Well, I think a community of
9  interest is an area that complements each
10  other, that -- that supports each other, that
11  connects to each other, and it does it in
12  business and commerce.  It does this in
13  education.  It does it in law.
14  I mean, the attorneys in the small
15  towns around Mobile practice law at the
16  federal courthouse in -- in Mobile.  They
17  wouldn't go to the Middle District or to the
18  Northern District, with rare exception.
19  And then certainly that community
20  of interest has a political overtone as well.
21  When you are fortunate to be elected to
22  represent your district in Congress, you then

**Page 25**

1  quickly realize that you have an obligation to
2  serve the people in that district.
3  And so compactness, ease of
4  travel, going from one end of the district to
5  the other, either north, south, east, or west
6  is important, how you locate your district
7  offices.
8  Every congressional office has a
9  budget that's roughly the same amount.  There
10  is a slight adjustment for a major
11  metropolitan area like New York City or Los
12  Angeles or Dallas.  But you have basically a
13  million dollars -- it may be a little bit more
14  than that now -- to pay your staff, to rent
15  your office, to provide services to your
16  constituents.
17  And so that -- that community of
18  interest and that compactness is helpful to
19  you to be a better representative, to make
20  sure that you can do town hall meetings, that
21  you can go to your constituents and that they
22  don't have the burden of coming to Washington

Pages 22 to 25

7/30/2019                    Chestnut, et al., v. John H. Merrill                    Josiah Bonner

**Page 26**

1  to see you.
2      Q.   I think very helpfully Alabama's
3  legislature has created a -- a definition sort
4  of for communities of interest, and I think
5  we've talked -- you know, it's pretty broad.
6  And I can -- I can read it to you.
7          It's from the legislature's
8  Reapportionment Committee Guidelines for
9  Congressional, Legislative, and Board of
10 Education Redistricting.
11         So it says that a community of
12 interest is defined as an area with recognized
13 similarities of interest including, but not
14 limited to, racial, ethnic, geographic,
15 governmental, regional, social, cultural,
16 partisan, or historic interest; county,
17 municipal, or voting precinct boundaries; and
18 commonality of communication.
19         So I think you've touched on a lot
20 of these already.
21     A.   (Witness nods head.)
22     Q.   A couple that I don't know if

**Page 27**

1  we've talked about are the racial and ethnic
2  ones.
3      A.   (Witness nods head.)
4      Q.   Can you talk a little bit about
5  communities of interest from that aspect in
6  your district?
7      A.   Well, the first history has a very
8  diverse ethnic population.  Bayou La Batre is
9  a small costal community down in the southern
10 the part of Mobile County.  It's the seafood
11 capital of Alabama.
12         If you enjoy eating shrimp or crab
13 meat or oysters or fish in Washington, DC, at
14 some of the finest restaurants, it's very
15 likely that the product came through Bayou La
16 Batre.  It's a -- it's a shipbuilding
17 community.  And it is also where one of our
18 famous native sons, Forrest Gump, called home.
19 He is fictional.
20         But we have people from Cambodia,
21 from Vietnam, from Thailand, from Taiwan, from
22 China, from Mexico, probably 17, maybe 20 or

**Page 28**

1  25 different countries that live in that part
2  of south Mobile County.  A smaller population,
3  but nonetheless a diverse population, lives in
4  the fishing village of Bon Secour, which is
5  over in Baldwin County, near Gulf Shores and
6  Orange Beach.
7          So, for instance, when we've had a
8  hurricane or when we had the oil spill --
9  hurricane that was most devastating to our are
10 was Hurricane Ivan in 2004.  Hurricane Katrina
11 hit in 2005.  It was equally -- it was worse
12 for the Gulf Coast, but Hurricane Ivan was
13 really more damaging to south Alabama than
14 Hurricane Katrina.
15         Or when we had the oil spill in
16 2010 off the coast of Louisiana, my office,
17 our staff, we worked to make sure that the
18 entire community of interest got the messages
19 of evacuation, of safety, of shelter, of -- of
20 help from FEMA, of -- of -- of help from the
21 organization that was set up by the Obama
22 administration help after the oil spill that

**Page 29**

1  Mr. Feinberg oversaw.
2          So you do that by going -- by
3  having translators.  You do that by -- by
4  actually doing flyers and mailings in
5  different languages.  You do it by working
6  with the Red Cross and other groups that
7  actually specialize -- especially a lot of
8  faith-based groups that specialize in
9  contacting those different communities.
10         So it would be one of the most, if
11 not the most, diverse congressional districts
12 in the state.  We have a large
13 African-American population that is spread
14 throughout the district, but there is a city
15 in the district, Prichard, Alabama, that
16 has -- it's one of the -- it would be one of
17 the ten largest cities in the state probably.
18         And it's today a majority
19 African-American population, but it wasn't
20 that long ago when it was majority Caucasian
21 population.  They elected their first
22 African-American mayor when it was majority

Pages 26 to 29

7/30/2019          Chestnut, et al., v. John H. Merrill          Josiah Bonner

1   white town. And then after that, they elected
2   a white lady mayor when it was a majority
3   African-American town.
4          So there's been -- as I said
5   earlier, unlike some cities in the state and
6   throughout the nation, we have had a more
7   harmonious relationship with the different
8   racial backgrounds and ethnic backgrounds than
9   a lot of other parts of the country.
10      Q.    So you mentioned Prichard as a
11   place that's majority African-American. Are
12   there other places in the district where
13   African-Americans are more concentrated?
14      A.    There -- there are parts of Mobile
15   that are. Africatown, the plateau community,
16   is part in Mobile and part in Prichard.
17   Trinity Gardens -- there are sections of
18   town -- of the city of Mobile that are.
19          But I'm -- I -- I don't know the
20   numbers, but you could look at Bay Minette
21   which is the county seat of Baldwin County.
22   You can look at Chatom which is the county

Page 30

1   seat of Washington County. You could look at
2   Monroeville which is the county seat of Monroe
3   County. And you would see a -- a -- a healthy
4   balance in terms of the racial makeup. I just
5   can't tell you what those are.
6      Q.    And I'm not -- I'm not trying to
7   ask you for facts or figures, so thank you.
8   That's helpful.
9          One -- I think it would be helpful
10   if I gave you a map to look at instead of --
11   so I can -- this is the current Congressional
12   District Plan which we can mark as Exhibit 1.
13          (Bonner Exhibit 1 was
14           marked for identification.)
15      MR. DAVIS: Here, hand this down
16   to Bryan, and I will share -- I'll look on
17   with Jo. Just make sure you can see it.
18      A.    I've seen this before.
19      Q.    (By Ms. Madduri) Yes. I'm sure
20   you're familiar with this. I wanted to ask
21   you in Clarke County, what is that area that
22   is encompassed in congressional district 1

Page 31

1   that splits Clarke County?
2      A.    Clarke County, this area is
3   predominantly the area that leads into
4   Jackson, Alabama. So Clarke County has three
5   large cities. The county seat is Grove Hill.
6   And then the northernmost city is Thomasville,
7   and then Jackson is the southernmost city.
8          And so I will tell you that when
9   the decision was made in the redrawing prior
10   to this current map to split Clarke County,
11   there were a lot of local people, local
12   leaders, the editor of the newspaper, the --
13   some of the mayors, some of the other
14   prominent citizens in the community, both
15   African-American and white who were not
16   excited about having the split county.
17          But when -- when the legislature
18   made the decision and before that in the
19   previous redistricting effort to split Clarke
20   County, the members of the congressional
21   delegation made a commitment to the people of
22   Clarke County that rather than being concerned

Page 32

1   about having their county split, they would
2   find it beneficial. And we worked our hearts
3   out to make that happen.
4          So when I was elected in 2002,
5   Congressman Artur Davis was elected the same
6   year from the 7th congressional district, and
7   Artur and I agreed to do joint town hall
8   meetings. When Congressman Davis left
9   Congress and Congresswoman Terri Sewell came
10   in, she and I agreed to do joint town hall
11   meetings.
12          The ironic and, quite frankly, sad
13   thing was that we asked C-SPAN. We asked the
14   national media if they would like to see a
15   black Democrat from Birmingham and a white
16   Republican from Mobile do a joint town hall
17   meeting, and because it wasn't crossfire, it
18   wasn't controversial, and we weren't putting
19   boxing gloves on and -- and fighting each
20   other politically, it didn't make a lot of
21   news. But we did that every year.
22          And we did it. It's now

Page 33

Pages 30 to 33

1　continued. Congressman Byrne, I believe,
2　continues to have these meetings with
3　Congresswoman Sewell. And so the concerns
4　that the people in Clarke County had was that
5　they felt, if I can speak for them, what they
6　told me was they felt -- they were concerned
7　that if they had a split county that they
8　would not be served by either member of
9　Congress.
10　　　　And in fact, you'd probably add up
11　that we spent as much time in Clarke County as
12　we did in any of the other counties, but that
13　area goes north of Jackson, but it does not
14　go -- as I recall, it doesn't go all the way
15　into Grove Hill, and it certainly doesn't go
16　to Thomasville. And yet when someone from
17　Thomasville would call our office needing
18　help, or when someone from Jackson would call
19　Congresswoman Sewell's office needing help,
20　help was there.
21　　　Q.　And just so I'm clear, when --
22　when was -- you mentioned it happened in a

1　Congress sent their Chiefs of Staff or a
2　designee to come down to work with the
3　legislature to -- to -- obviously the
4　legislature made the decision on drawing for
5　the federal races, for the state races, for
6　the state school board.
7　　　　So our role was to come down to
8　answer questions, to work with them to help
9　understand communities of interest,
10　compactness of district, and offer whatever
11　help we could to help them do their
12　constitutionally mandated job of redrawing the
13　districts every ten years.
14　　　Q.　Were you ever involved in actually
15　drawing the map?
16　　　A.　I -- I saw others who knew how to
17　work the computer, but I never actually did
18　that, no, ma'am.
19　　　Q.　And what did you think about -- I
20　guess, first, what did you think about the
21　removal of Wilcox County from --
22　　　A.　Well, it was personally

1　previous redistricting cycle. When did
2　this --
3　　　A.　So the --
4　　　Q.　-- change happen to add Clarke
5　County or this part of Clarke County into --
6　　　A.　So when -- when Congressman
7　Callahan was elected in 1984, Wilcox County
8　was in there, my home, and all of Clarke
9　County. So the district actually, instead of
10　having six counties, had seven counties.
11　　　　But because of the adjustments in
12　population, the -- Wilcox County left in the
13　1990 redrawing and Clarke County became split
14　as I recall in the 2000 and then again in
15　2010. And so it was split in 2000. It was
16　split further in 2010.
17　　　Q.　And what was -- what was your
18　involvement, if any, in that --
19　　　A.　Well, I was a member --
20　　　Q.　-- in those decisions?
21　　　A.　-- of Congressman Callahan's
22　staff, and so therefore, all of the members of

1　disappointing because it was my home county,
2　but it was not a surprise. The population --
3　there was a desire at that time made to create
4　a minority district.
5　　　　And at that time, they needed a
6　certain percentage of minority vote in that
7　district to give the best chance of creating
8　that district. So there's a higher percentage
9　of African-Americans in Wilcox County even
10　though it's a small county, 14, 15,000 people.
11　　　　And so the legislature at that
12　time made that decision, and so that's why
13　there's -- they call it the finger. But
14　that's why there's a finger that goes up into
15　Jefferson County that's going after the
16　largest population of primarily
17　African-American voters that can also connect
18　into the other Black Belt counties to create
19　that minority district.
20　　　Q.　In your view, did Wilcox County
21　share all of those same sorts of communities
22　of interest that you described with the rest

Page 38

1    of what was formerly congressional district 1,
2    I think, in 1990, it sounds like?
3        A.   Actually, it probably was the
4    outlier. Camden is 30 miles from Selma. And
5    so if you are a child growing up in Wilcox
6    County and you need to go to the doctor or you
7    need to go to the grocery store or you needed
8    to go get a new pair of -- new set of tires,
9    you would go to Selma more than you would go
10   to Mobile.
11       So Wilcox County politically was
12   not as connected other than the fact it had
13   been in the district, and Congressman Edwards
14   served that district and Congressman Callahan
15   served that district including Wilcox County.
16       But I never had the privilege of
17   representing my home county, but my home also
18   shifted to Mobile when I moved there in 1984.
19   I was just -- I was actually born in Selma
20   because we didn't have a hospital in Camden.
21   And I didn't like it, so I moved away about
22   three days later to Camden.

Page 39

1        Q.   And then Clarke County, are there
2    any communities of interest that you think are
3    split up by this, the way that this is
4    divided?
5        A.   No. If you're in Thomasville,
6    which is the northernmost city in -- in that
7    county, you're still going to gravitate toward
8    Mobile. There's a major four-lane highway
9    that runs north and south.
10       You can look at the football
11   schedule this time of year, and you'll see
12   Thomasville plays Jackson, Grove Hill, and
13   Monroeville, Chatom, played Butler in Choctaw
14   County. There's no political overtones to
15   developing a football schedule, but the
16   communities are connected even though
17   Thomasville is technically in the 7th
18   district -- politically in the 7th
19   congressional district.
20       Nobody who lives in that county --
21   few people who live in that county would be
22   able to tell you whether they live in the

Page 40

1    6th -- in the 7th district or the 1st district
2    because they have been well served by
3    Congresswoman Sewell and Congressman Byrne and
4    before him, me.
5        Q.   Generally when redistricting, do
6    you believe that it's preferable to keep
7    counties whole?
8        A.   It was the legislature's goal to
9    keep them whole. That's what they told us.
10   At the time, Gerald Dial in the last
11   redistricting was, I believe, the head of the
12   Senate Reapportionment Committee, and Jim
13   McClendon was, I believe, head of the House
14   Reapportionment Committee.
15       And I think their -- they would
16   have preferred to have keep counties whole,
17   but they also were trying to get to zero
18   deviation. They were trying to get to a -- a
19   map this the Justice Department would approve,
20   meeting all the other goals and objectives
21   that they had.
22       So I have a good friend who was

Page 41

1    the publisher of the local paper in -- in
2    Jackson -- actually was the publisher of the
3    local paper in Grove Hill which is the county
4    seat in Clarke County, but going back to
5    the -- to the map that was drawn that first
6    separated Clarke County -- Jim Cox is the
7    publisher's name.
8        He now owns the papers in Jackson
9    as well as in Thomasville, but I remember
10   specifically him telling me that he couldn't
11   see how it could be beneficial to having a
12   split county. And years later he told me when
13   I assured him that we would make certain that
14   Clarke County was not underserved or ignored
15   in any way, he said, I should have trusted
16   you. Y'all have done everything you promised
17   and then some.
18       So -- but yes, I think most people
19   would prefer to have their counties kept
20   whole, but it's easier said than done. But
21   even so, if you look at this map, there really
22   are not that many split counties in Alabama

Pages 38 to 41

1  compared to a lot of districts around the
2  country.
3      Q.    Do you -- what do you think about
4  the splitting of Montgomery County the way
5  it's split?
6      A.    Well, it -- it was split that way
7  to achieve the population goals, but I will
8  also tell you that being the capital city,
9  there are -- there were other members of
10  delegation that wanted to be -- wanted a part
11  of Montgomery County.
12        They wanted the -- some of it is
13  service oriented, and quite frankly, some of
14  it is -- is politically valuable to -- you
15  know, it's very expensive to run for office.
16  And so when you have a large city, the capital
17  city gives you an added reason to come here
18  not only to serve your district but also when
19  it's time to run for reelection to -- to meet
20  your political friends as well.
21      Q.    And what about for the
22  constituents in Montgomery County, do you

Page 42

1  think there are any issues with them being
2  split up this way?
3      A.    No, ma'am. I don't personally
4  have any reason to believe there are any
5  issues. Montgomery is also -- and I'm not an
6  expert on the 2nd district, but Montgomery's
7  economy has also been more closely tied to the
8  Wiregrass economy.
9        The Wiregrass of Alabama is a
10  geographic region like the Black Belt is.
11  It's made up of -- in Houston, Dale, Henry,
12  Coffee, Geneva, Barbour, Pike. So if you were
13  to ask people in Dothan, in Houston County, if
14  they needed to go to -- go to a bigger city to
15  go shopping, to go to the hospital, to go to
16  do business, they would choose Montgomery over
17  Mobile in a heartbeat.
18      Q.    What are some -- you mentioned
19  economic interests in the Wiregrass region in
20  CD 2, what are some of those interests that
21  exist there?
22      A.    Well, one that easily comes to

Page 43

1  mind is -- is agriculture. Alabama is a big
2  agriculture state. For years it was our
3  leading industry statewide, but for many, many
4  years, for decades, the federal government had
5  a federal peanut program that the counties in
6  the 2nd district actively participated in
7  along with neighboring counties in Georgia and
8  in Florida.
9        And until they changed that
10  program, people in the 3rd district, people in
11  the 7th district, people in the 1st district
12  didn't grow peanuts. It was -- it was based
13  on soil. It was also based on the
14  historical -- if you were in that program, you
15  didn't want to get out of it because there
16  were years -- if there had been a surplus the
17  previous year, they would actually pay you to
18  not grow peanuts. So it was a -- it was a
19  very lucrative program for those who were in
20  it.
21        But -- but there are other more
22  obvious differences as well. We have Fort

Page 44

1  Rucker, and we have Maxwell and Gunter Air
2  Force Base. So you've got Army Aviation down
3  in the Wiregrass, down in Enterprise area.
4  You've got the F-35s coming to Montgomery.
5  You've got Air University training all the
6  air -- the Air Force officers that will go on
7  to lead the Air Force in Montgomery.
8        We had an Air Force base in
9  Mobile. It closed in the 1960s. We build
10  ships for the Navy, so we have a much
11  different -- we're all pro military in the
12  state. But you can be pro military, but you
13  can also see a -- a -- a stark difference in
14  terms of where you're going to put your
15  efforts.
16        Like in Huntsville with the
17  administration calling for the creation of
18  Space Force, that's something of real interest
19  to the folks in Madison County and Marshall
20  County. Doesn't really have a lot of interest
21  to us on the coast unless we're going to ship
22  those rockets up the river system, and we may.

Page 45

Pages 42 to 45

**Page 46**

```
 1        But -- but our focus, if you were
 2   in Congress from the 2nd congressional
 3   district, you would want to be on the Armed
 4   Services Committee.  You'd have a vested
 5   interest in protecting the federal
 6   government's installations at Fort Rucker and
 7   at Dannelly and at Maxwell Gunter.
 8        And -- and that's borne out by
 9   evidence that Congressman Dickinson who was in
10   office for 20-plus years, maybe 28 -- 24 was
11   on Armed Services.  Congressman Everett was on
12   Armed Services.  Congressman Bright was Armed
13   Services, and congressman -- Congresswoman
14   Roby was on it until she got on the
15   Appropriations Committee that was created when
16   the congressman from the 1st district
17   resigned.  That would be me, but her goal was
18   to get on defense appropriations and she did.
19        Likewise, if you're from the 1st
20   district, you know, I -- I didn't have near as
21   much interest in helicopters as I did ships.
22   When I was in Congress, we got the contract
```

**Page 47**

```
 1   for Austal which is an Australian shipyard to
 2   build a new generation of warship for the
 3   Navy, the littoral combat ship.
 4        We got the contract for them to
 5   build -- it was a 2-plus billion dollar
 6   contract.  And today 4,500 people work in that
 7   shipyard.  So that's -- that's an important
 8   part of our economy, but it's also something
 9   that you can't build ships in Dothan or
10   Montgomery.  You've got to be in a deep water
11   port.
12        Q.   Is there a -- an Airbus plant in
13   Mobile now?
14        A.   There is.  So we grew -- DNA has
15   long been in -- aerospace has long been in
16   Alabama's DNA.  The Wright brothers actually
17   opened an aviation training center in
18   Montgomery in 1910, I believe.  But we started
19   recruiting Airbus in my early years in
20   Congress, and then we landed them in 2012.
21        They made the decision to come.
22   They broke ground.  They had the grand opening
```

**Page 48**

```
 1   a year later, and today, they are building the
 2   A-320 which is the most popular single-aisle
 3   plane in the world with 9,000 planes on back
 4   order.
 5        And they have just started work on
 6   an A-220 smaller jet that's based on a
 7   Canadian jet, Bombardier, and so in less than
 8   a decade, they will -- Mobile will become the
 9   fourth largest city for commercial air --
10   aircraft manufacturing in the world, which is
11   pretty good.
12        Q.   That's very impressive.
13        MR. DAVIS:  Lali, would this be a
14   good time for --
15        MS. MADDURI:  Sure.
16        MR. DAVIS:  -- a break?
17        MS. MADDURI:  Yeah.
18        THE VIDEOGRAPHER:  This ends MPEG
19   one in the continued deposition of Josiah
20   Bonner.  We are off the record at 9:52.
21        (A recess was taken.)
22        THE VIDEOGRAPHER:  This begins
```

**Page 49**

```
 1   MPEG two in the continued deposition of Josiah
 2   Bonner.  We're on the record at 10:02.
 3        Q.   (By Ms. Madduri) Mr. Bonner, can
 4   you tell me -- you were mentioning there's
 5   some particular agricultural interest in CD 2.
 6   Is there any agricultural in CD 1?
 7        A.   There is.  It's -- it's a
 8   different type of agriculture.  We -- a lot of
 9   timber and soybeans, cotton, and other row
10   crops like that.
11        Q.   And where in the district are
12   those located?
13        A.   Washington, Clarke, Monroe,
14   Escambia, Baldwin.  Although Baldwin is one of
15   the fastest growing counties, and so a lot of
16   their farmland is being squeezed for
17   development.
18        Q.   Understood.  And I think you were
19   talking about this a little bit before, but
20   can you tell me a bit about the split of
21   Jefferson County in the current plan?
22        A.   Well, Jefferson County is the
```

Pages 46 to 49

**Page 50**

1    largest county in the state.  And as such,
2    the -- when you've got counties that are
3    losing population like Wilcox and Choctaw and
4    Lowndes, and you've got counties that are
5    growing in population like Jefferson and
6    Madison and Morgan, when the legislature --
7    not during this last redistricting but in the
8    previous ones, Congressman Claude Harris
9    represented the 7th congressional district.
10    And when he did not seek
11    reelection, Congressman Earl Hilliard who was
12    the state legislator at the time, state
13    senator, ran and was elected to that seat as
14    the first African-American to serve in the
15    delegation since reconstruction or for a long,
16    long time.
17    And then Congressman Hilliard was
18    defeated by Congressman Davis, and then
19    Congressman Davis chose to run for governor
20    and Congresswoman Sewell ran.  So I believe
21    that's my history, but the area in Jefferson
22    County was drawn as we understood it to create

**Page 51**

1    the best opportunity for an African-American
2    to be elected to Congress with -- I believe it
3    was a 65 percent was the number that they
4    used, but that's a few years ago.
5    Q.   And do you think -- do you think
6    it's harmful at all for Jefferson County to be
7    split this way?
8    A.   I would have no reason to believe
9    it is harmful to Jefferson County.
10    Q.   And my understanding is that
11    basically the city of Birmingham is captured
12    in congressional district 7; is that right?
13    A.   Yes, ma'am.
14    Q.   Okay.  And then it's mostly
15    suburbs or non city areas of Jefferson County
16    that are in congressional district 6; is that
17    right?
18    A.   That would be correct.  Jefferson
19    County is also one county away from being the
20    geographic center of Alabama.  Montevallo is
21    actually the geographic center.  It's in
22    Shelby County.

**Page 52**

1    And so Jefferson County being the
2    largest county, their -- their radius of
3    service and connectivity to Tuscaloosa, to
4    Walker County, to Blount County, to the other
5    counties that are contiguous.  A lot of people
6    go to Birmingham to shop, for medical reasons,
7    for banking reasons, and for other reasons,
8    but I -- I don't know that you would -- I
9    don't know that it would be easy to identify
10    when you were in the 7th congressional
11    district or the 6th congressional district
12    unless you were thinking with a political
13    mind.
14    Q.   That makes sense, but generally
15    there's no -- you don't think -- you're not
16    aware of any issues that arise by pulling the
17    city of Birmingham out of Jefferson County
18    this way?
19    A.   I am not.
20    Q.   You touched on this before, but
21    I'm just going to show you a map of 1950 --
22    A.   Okay.

**Page 53**

1    Q.   -- of the way the districts are
2    drawn.  This we can mark as Exhibit 2.  It's
3    the congressional districts as of 1950.
4    (Bonner Exhibit 2 was
5    marked for identification.)
6    Q.   (By Ms. Madduri)  So I realize
7    it's a little hard to see, but I think you
8    mentioned before that back then Mobile --
9    Mobile and Baldwin County were separate.
10    A.   Uh-huh.
11    Q.   Can you talk a little bit more
12    about -- I believe you said that you thought
13    it was best when they put those back together.
14    Can you talk a little bit about what issues
15    you think exist by having them separate like
16    this?
17    A.   Well, in -- in this map, you would
18    have to go back to a time when the Baldwin
19    County economy was primarily agriculture.
20    Today it is a much more diverse economy driven
21    largely by tourism.
22    And so Gulf Shores -- Orange Beach

Pages 50 to 53

**Page 54**

1  didn't even exist as a community.  Gulf Shores
2  was a small summertime vacation community,
3  mostly for locals to go about three months out
4  of the year.  It's now -- Gulf Shores, Orange
5  Beach, and Fort Morgan, which is
6  unincorporated in Baldwin County, it's a
7  year-round economy.  People come from the
8  north during the winter to escape cold
9  weather.
10          And so in the 1950s compared to
11  today, the economies of Mobile and Baldwin
12  County have grown closer and more alike in
13  shipbuilding, in seafood production, in
14  tourism.  And there's a strong connectivity
15  between those two counties today that are
16  unique to Alabama.  They are no two counties
17  like Mobile and Baldwin Counties because of
18  their geographic location.
19      Q.    And then also at this time Mobile
20  County was combined with some of the Black
21  Belt counties to the north --
22      A.    Uh-huh.

**Page 55**

1      Q.    -- of it?
2          Do you think that configuration
3  makes sense, or are there problems that you
4  see with that sort of thing?
5      A.    Well, it -- it -- it is still
6  connected in the current map to the Black Belt
7  counties.  It's just because of population
8  shifts.
9          As we've discussed previously,
10  you -- you lose population in one county.  You
11  gain in another faster growing county, and
12  those adjustments have been made.  But you'll
13  see, this would have been Wilcox County, which
14  as I mentioned, was in the district when I
15  first went to work with Congressman Callahan.
16  All of Clarke County, Washington County, and
17  Monroe County.
18          So it is hard to see, but it looks
19  like Choctaw County and Marengo were the two
20  counties in the 1950s, but they were taken out
21  in the 1960s remap as I recall.
22      Q.    In terms of communities of

**Page 56**

1  interest, do you think Mobile County shares
2  communities of interest with, I think, you
3  mentioned Choctaw and Marengo?
4      A.    To a much less degree than they do
5  with the counties that they currently -- I
6  mean, the alignment that we're looking at in
7  today's map for all practical purposes has
8  been in place for the last 30 to 40 years.
9          And -- and the economies of that
10  area have grown more aligned during that
11  period of time.  The continuity and the
12  communities of interest have grown more
13  aligned during that time.
14      Q.    What are some of the -- I guess
15  the lack of continuity between Mobile and
16  Choctaw and Marengo in your view?
17      A.    Well, Choctaw and Marengo would
18  probably go to Meridian, Mississippi to go
19  shopping, to go to the hospital, to go buy an
20  automobile.  They are currently in the 7th
21  congressional district.  Congresswoman Sewell
22  has field offices.

**Page 57**

1          You know, one of the challenges of
2  serving a district is you got to make sure
3  you've got staff that can get out and serve
4  those districts.  She does a great job.  She's
5  from Selma originally.  Her mother was on the
6  city council there.  And so she has a very
7  active constituent services program in these
8  rural areas.
9          They would go to Selma.  They
10  would certainly go -- Marengo County would go
11  to Selma to go shopping or for the hospital.
12  I saw Meridian, but they would have a closer
13  proximity to go to Selma and a more -- a
14  higher likelihood than they probably would to
15  come to Mobile.
16      Q.    And then also at this time,
17  Baldwin County, Escambia County, and Covington
18  County are in the same district.  Do you --
19  and I realize Baldwin and Escambia are
20  currently still in the same district.  So I
21  guess the question is:  Do you feel that
22  Covington County has --

Pages 54 to 57

**Page 58**

1    A.   Cov --
2    Q.   -- communities of interest in
3  common with Escambia and Baldwin and this sort
4  of grouping?
5    A.   Covington has a -- a strong
6  identity with Geneva County and Coffee County
7  in the Wiregrass.  And that's not only where
8  it is in the political map, but it's also
9  where it is in the economic map as well.  It's
10  hard to get from Andalusia to Mobile.  There's
11  no four-lane highway.
12    Q.   Yeah, they are not too close
13  together.  I'm going to hand you the State
14  Board of Education District's Map from 2011,
15  and we can mark that as Exhibit 3.
16              (Bonner Exhibit 3 was
17              marked for identification.)
18    Q.   (By Ms. Madduri)  Are you familiar
19  with this map?
20    A.   I'm -- I'm -- I'm looking at it
21  really for the first time in a long time.
22  I've --

**Page 59**

1    Q.   Yeah.
2    A.   I've never really studied the
3  State Board of Education maps that closely.
4    Q.   Have you ever been involved in any
5  way in either giving input or --
6    A.   No, ma'am.
7    Q.   -- consulted in drawing these
8  maps?
9    A.   No, ma'am.
10    Q.   Okay.  Were you familiar with them
11  at all when you were in Congress?
12    A.   I -- I was familiar that the
13  legislature was redrawing the -- I mean, there
14  are eight districts as opposed to seven.  They
15  have a totally different responsibility.  They
16  are not federal representatives or state
17  representatives.
18              So I would say that I -- I had
19  little to no interest in where the State Board
20  of Education maps were in this redraw or in
21  any previous redraw.
22    Q.   I think you would have been Chief

**Page 60**

1  of Staff for Congressman Callahan probably
2  when these were drawn; is that right?  It was
3  probably drawn -- let's say it was drawn 2011.
4    A.   No.  I was a member of Congress in
5  2011.
6    Q.   Oh, sorry.
7    A.   In --
8    Q.   Yeah.  Of course.
9    A.   -- 2001, I was Chief of Staff, but
10  Congressman Callahan would not have sent me to
11  Montgomery to focus on the State Board of
12  Education.
13    Q.   Okay.  Looking at just where we
14  have District 1 on this map, do you have any
15  issues with the way this is configured?
16    A.   I don't have an opinion --
17    Q.   No opinion.
18    A.   -- about it.
19    Q.   Understood.
20              No opinion on any -- any of this
21  configuration at all?
22    A.   No.

**Page 61**

1    Q.   Okay.
2    A.   Because a State Board of Education
3  member has a different responsibility.  A
4  member of Congress is not only representing
5  their constituents with votes that they cast,
6  but also with services that they provide.
7              So when someone who lives in
8  Washington County has a problem with Social
9  Security or with the Veteran's Administration
10  or they're in the military and they're trying
11  to get a different assignment, they're not
12  going to contact their state school board
13  member.  They're going to contact their U.S.
14  Congressman.
15              And so I've never really studied
16  maps for state legislators or school board
17  members or anyone else because my focus has
18  always been on how to put the best team
19  together to serve the people of the 1st
20  congressional district.
21              I had over 450 town hall meetings
22  during my ten and a half years.  I don't

Pages 58 to 61

1  recall there ever being a state school board
2  member having a town hall meeting.  I'm not
3  saying they don't or they didn't.  But -- but
4  you serve -- if -- if you're a -- you just
5  have a different way of serving people when
6  you have a different job.
7        Q.    Yeah.  That makes sense.  Let's
8  move on.
9             I'm going to show you the -- I
10  want to get your thoughts on the maps that
11  plaintiffs are proposing in this case.
12        A.    Okay.
13        Q.    So I'm going to give you four
14  maps, and we'll just mark them all at the same
15  time for ease.  So this is -- it will be
16  Exhibit 4.
17             (Bonner Exhibit 4 was
18             marked for identification.)
19        Q.    (By Ms. Madduri)  Exhibit 4 is
20  called -- you'll see it's called Revised
21  Plan 1.
22             (Bonner Exhibit 5 was

Page 62

1        A.    No.  This is the first time I'm
2  seeing these.
3        Q.    And please take as much time as
4  you need because I realize there's a lot of
5  maps, and you haven't seen them before.  But I
6  just generally want to get your thoughts on if
7  you see issues or if you have criticisms of
8  these maps.
9             I'm sure as you'll see, District 1
10  is different than it is in the current plan.
11        A.    Well, they all have a unique
12  characteristic, and that is that they would
13  destroy the opportunity for the
14  representatives from the 1st district and the
15  2nd district to serve their constituents in a
16  way that they have been served previously.
17             It would -- I mentioned that
18  it's -- there's no easy way to get from
19  Andalusia in Covington County to Mobile.
20             If you are the representative in
21  the 1st district in any of these maps and you
22  live in Mobile and you need to go to Houston

Page 64

1             marked for identification.)
2        Q.    (By Ms. Madduri)  Then we have
3  what will be Exhibit 5, which is called
4  Revised Plan 2.
5             (Bonner Exhibit 6 was
6             marked for identification.)
7        Q.    (By Ms. Madduri)  And then
8  Exhibit 6 will be Revised Plan 3.
9             (Bonner Exhibit 7 was
10             marked for identification.)
11        Q.    (By Ms. Madduri)  The last one is
12  called Illustrative Plan 4, and that will be
13  Exhibit 7.
14             Have you seen any of these plans
15  before?
16        A.    I don't know that I've ever seen
17  these plans, but I've seen different maps
18  during the previous redistricting efforts that
19  were equally as ugly.
20        Q.    Okay.  So then I assume you
21  haven't had any conversations about these
22  or --

Page 63

1  County in Dothan, you're going to spend more
2  time in Florida than you will in Alabama.
3             Or if you're the representative
4  from -- and you live in Dothan but you've got
5  a meeting in Mobile, you're going to spend
6  more time in Florida than you will in Alabama.
7             If you live in the 2nd district
8  and you have been elected out of Mobile as
9  your base and you're trying to go to a town
10  hall meeting in Macon County or Bullock
11  County, you're going to spend half a day
12  getting there.
13             There -- there is no real
14  community of interest in these maps.  And as
15  someone who's had the privilege of serving in
16  Congress and -- and doing his best to
17  represent all of the people in his district,
18  this would be a difficult challenge to
19  represent because there's so very little in
20  common with the proposals either of District 1
21  or District 2.
22        Q.    Can you talk a little bit more

Page 65

1  about what you think is not in common and we
2  can -- we can take each in turn.  So how about
3  starting with congressional district 2 in
4  these proposed maps, which is -- which are
5  roughly similar.
6        You don't need to necessarily
7  understand exactly what is different between
8  each one, but of course if you have specific
9  concerns on any of them, please do let me
10  know.  But we can just start by talking about
11  congressional district 2 the way it's
12  proposed.
13        What are the -- what are the lack
14  of commonalities of interest in your view?
15     A.   Well, the -- the Washington and
16  Clarke and Monroe County in Exhibit 4 and
17  Exhibit 6 and Exhibit 7 have nothing in common
18  with Macon and Bullock Counties except that
19  they are counties in the state of Alabama.
20        They don't share any history.
21  They don't share any geographical alignment.
22  They don't share any social or political

Page 66

1  You might as well just go into Mississippi or
2  Georgia, if the law allowed you to but it
3  doesn't, to pick up constituents.
4        But it -- it is -- it's -- this
5  would be foreign, I believe, to any of the
6  people who have been elected to office, and
7  quite frankly, I think it would be foreign to
8  any of the people who run for office over the
9  last 30 years to try to serve -- try to be
10  elected to much less serve districts that are
11  configured like this.
12     Q.   I think you mentioned economics,
13  specifically the economy --
14     A.   Uh-huh.
15     Q.   -- being different or just
16  unknown.  Are there any other considerations
17  that you think would be difficult here?
18     A.   Well, so Houston County, Henry
19  County, Dale County, Geneva County, when the
20  people of those communities want to go to the
21  beach, they go to Florida.  They go to Destin.
22  They go to Navarre.  They go to Panama City.

Page 68

1  alignment.  If -- if you -- you could name a
2  town that the congressman or congresswoman was
3  from, and it doesn't really matter where on
4  these maps you're looking at, it's going to be
5  difficult to serve them based on my experience
6  of service.
7     Q.   In what ways would it be difficult
8  to serve --
9     A.   Being accessible, of being aware
10  of -- of -- of the -- you know, there --
11  there's a value in -- in understanding an
12  area's historical relationship with each
13  other.  And so you'd have to learn a whole new
14  set of political leaders, mayors, county
15  commissioners, probate judges.
16        You have to learn a whole new set
17  of issues.  The challenges that someone in
18  Macon and Bullock County -- I -- I don't even
19  know what their economy is derived from quite
20  frankly.  Anymore than someone from Macon or
21  Bullock County would know what the economy of
22  Clarke or Washington or Monroe County was.

Page 67

1  They don't go to Gulf Shores or Orange Beach.
2        When they want to export products,
3  the -- the river system doesn't provide access
4  from the Wiregrass over to here (indicating).
5  You can come by rail, or you can come by
6  interstate in Florida, but there is -- so
7  there's just no continuity of our -- of our --
8  the things we've talked about previously, our
9  social life, our business life, our education
10  life.  For all practical purposes, this is in
11  a different part of the world.
12     Q.   You mentioned -- just right now
13  you mention educational life.
14     A.   Uh-huh.
15     Q.   In 2011 when that Board of
16  Education map was created, Alabama decided --
17  the Alabama legislature decided to put part of
18  Mobile County into sort of a similar --
19  similar configuration to this actually.
20        Do you see any issues with them
21  having done that?
22     A.   Again, State Board of Education

Page 69

Pages  66  to  69

**Page 70**

1  and the United States Congress to me are night
2  and day. And since that time, I believe I'm
3  correct, they also changed the Board of
4  Education to where now there's a separate
5  board for two-year colleges as opposed to K
6  through 12. I don't know what that map looks
7  like.
8           And those are not elected
9  positions. They are appointed positions
10  confirmed by the state legislature. But
11  students in Houston, Dale, Henry, Geneva,
12  Coffee Counties are more than likely to go to
13  Troy University in Pike County or to Wallace
14  Community College in Dothan than they are to
15  Spring Hill College, University of South
16  Alabama, or University of Mobile or Bishop
17  State or Coastal Alabama, which are the two
18  two-year systems here.
19           And so conversely, I'm talking
20  about two-year and four-year schools, you look
21  at the student bodies of the University of
22  South Alabama, you're going to see a much

**Page 71**

1  larger concentration of students who are from
2  what is in Exhibit 1, the traditional 1st
3  congressional district.
4      Q.   I think we've kind of talked about
5  both districts, but let's just focus on the
6  proposed congressional district 1. Can you
7  talk a little bit about what communities of
8  interest you think are broken up here?
9           Yeah. We can start with that.
10  What communities of interest are broken up by
11  having District 1 configured this way?
12      A.   Economic and business, cultural.
13  I -- I mentioned earlier that if you were in
14  Congress from the current 2nd district
15  (indicating), you would probably want to be on
16  the Armed Services Committee supporting the
17  U.S. Army post Fort Rucker or the Air Force
18  bases at Maxwell Gunter.
19           If you are under the current maps
20  that you're proposing, it -- I'm not aware of
21  anyone who's ever been on Navy Seapower
22  Committee and Army and Air Force. I mean, I'm

**Page 72**

1  not saying it's not ever happened in the
2  history of the Congress, but it's -- it's hard
3  to be -- it's hard to serve that many
4  different constituencies that would be
5  important to your -- to your district, to the
6  constituents that live there.
7      Q.   Which -- which congressional
8  committees were you on when you served?
9      A.   Appropriations.
10      Q.   Any other?
11      A.   And ethics.
12      Q.   And ethics. Any other?
13      A.   My early committees, I was on
14  agriculture and science and budget. But those
15  were just to get me to appropriations. The
16  1st congressional district has long had a seat
17  on appropriations, and that was a goal of mine
18  early on.
19      Q.   I think you've started to talk
20  about this, but can you help me understand if
21  you were representing the congressional
22  district 1 the way it's drawn in the -- in the

**Page 73**

1  proposed maps, in your opinion, are there
2  issues where there would have been conflicts
3  of interests between the communities you
4  were -- you would be representing?
5      A.   I -- I think the conflict would be
6  you would be serving multiple masters, not
7  really two masters. But you would be -- the
8  economy in Mobile and Baldwin Counties is
9  totally a different focus than the economy of
10  the Wiregrass area.
11           So in addition to the challenge of
12  getting from point A to point B, there would
13  be an additional expense. I mean, I -- when I
14  was working with Congressman Callahan, we had
15  one district office. I expanded it to two.
16           You would have to have at least
17  three. Your budget's not going to up in a
18  rural area just because you have three
19  offices. So you're going to have to have
20  fewer staff or more offices, but it's -- you
21  can't have both.
22           Just the -- the -- the challenge

**Pages 70 to 73**

7/30/2019                    Chestnut, et al., v. John H. Merrill                    Josiah Bonner

| | |
|---|---|
| 1  of getting into -- I mean, if -- if you have a | 1  programs that were unique to this area that |
| 2  town hall meeting in Houston County, you -- | 2  were also unique to Georgia and Florida. |
| 3  your best bet may be to fly to Panama City, | 3          But no one else in delegation even |
| 4  Florida to drive up.  They do have an airport | 4  knew what -- what those programs were because |
| 5  in Dothan, but it has very limited air | 5  they were so unique to that area.  And -- and |
| 6  service. | 6  likewise, when you represent Mobile and |
| 7          And there -- so you would only -- | 7  Baldwin Counties and you've got the |
| 8  you'd have an airport in Mobile, and then | 8  shipbuilding industry and the aerospace |
| 9  you'd have to get in the car and drive four | 9  industry, chemical industry and the steel |
| 10  and a half to five hours to get to Dothan. | 10  industry, you become -- you become affiliated |
| 11      Q.    Other than economic interests, are | 11  with the steel caucus, you become affiliated |
| 12  there any other issues where you see conflicts | 12  with the shipbuilding caucus. |
| 13  of interest arising between the communities | 13          I mean, that becomes a part of |
| 14  that are in the proposed congressional | 14  your network when you get to Washington to try |
| 15  district 1? | 15  to better serve your constituents and the |
| 16      A.    I think it would be fair to say | 16  companies and the individuals that work there. |
| 17  that there is -- there's just so little in | 17  So it really is a very strong economic |
| 18  common between being in Tillman's Corner in | 18  overture there. |
| 19  Mobile County and going up to Luverne in | 19      Q.    Is that peanut program still in |
| 20  Crenshaw County. | 20  effect? |
| 21          The -- the only way you would do | 21      A.    It -- it -- it is, but it changed |
| 22  that today would be if you had a relative who | 22  during a rewrite of the ag bill probably |
|  Page 74 |  Page 76 |

| | |
|---|---|
| 1  lived up there and you were going to a family | 1  12 years ago or so.  It was when I was in |
| 2  reunion.  I mean, there's -- there's no social | 2  Congress. |
| 3  interaction.  There's no athletic interaction | 3          One of the things that I worked on |
| 4  to speak of.  There's -- so I -- I don't see | 4  and it continues -- that Congressman Byrne |
| 5  this being a map that if I were interested in | 5  continues to work on is deepening of the port |
| 6  running for office, I would consider running | 6  of Mobile.  And so your focus is on working |
| 7  in because I -- not because I don't think I | 7  with the Army Corps of Engineers, not Army |
| 8  could win it, but because I don't know why | 8  helicopters.  I mean, you -- you -- you have a |
| 9  anybody would want to serve in a district that | 9  vested interest in supporting the -- the |
| 10  is this different from the -- the maps that | 10  programs that support the economy of that area |
| 11  have historically served these two districts | 11  of the state that you live in.  Just like |
| 12  and served them well. | 12  Congressman Brooks is focused on supporting |
| 13      Q.    Can you think of any issues that | 13  Redstone Arsenal up in Madison County. |
| 14  exist where if you were representing this | 14          And Congresswoman Sewell and |
| 15  district, where you would vote differently as | 15  Congresswoman Roby have worked to support |
| 16  opposed to if you were representing the | 16  Maxwell and Congressman Rogers Maxwell and |
| 17  district as it currently is? | 17  Gunter in Montgomery. |
| 18      A.    Well, I -- I mentioned the peanut | 18      Q.    And did you say it's the -- |
| 19  program.  I mean, when you were the | 19  there's an interest in the Army Corps of |
| 20  representative of the 2nd congressional | 20  Engineers in and around Mobile? |
| 21  district, you became the -- you became the | 21      A.    The Army Corps of Engineers |
| 22  expert, subject matter expert of agricultural | 22  headquarters from -- all the way from |
|  Page 75 |  Page 77 |

Pages 74 to 77

1  Brownsville, Texas to Miami, Florida is
2  located in Mobile.  So it's a large
3  headquarters for the entire Gulf of Mexico.
4  And it comes in handy when you're dealing with
5  a hurricane or an oil spill or trying to
6  dredge the water system to get the port to be
7  a -- a top ten port.
8      Q.    And do you have any thoughts or
9  comments about the splitting of Mobile County?
10  In all -- in all four of the maps, that county
11  is split.
12      A.    I -- I -- my thought would be that
13  it's -- Mobile County is different than Clarke
14  County.  Mobile is one of the largest counties
15  in the state.  It is the economic hub for this
16  area of the state.
17          Remove the political maps, it's
18  the economic hub, and as such, splitting it
19  just for the political purposes of what I
20  assume would be the plaintiffs' motives, I
21  don't think is going to serve Mobile well or
22  the 1st congressional district well.  But

Page 78

1  that's my personal opinion.
2      Q.    And in -- in what ways do you
3  think it wouldn't serve the city of Mobile or
4  the county of Mobile?
5      A.    Because of the things we've talked
6  about, the community of interest, the
7  continuity, the historical connections between
8  Mobile.  And, you know, it -- it's like a -- a
9  spoken hub.  I mean, this is the hub of
10  economic life in this whole region of the
11  state.
12          And it is directly tied to
13  Washington County and to Clarke County and
14  Monroe County and Escambia County.  It -- and
15  it does not have that connection or tie,
16  historic or otherwise, to the counties in
17  central Alabama or the counties in the
18  Wiregrass.
19      Q.    If you were representing the new
20  proposed congressional district 1, do you
21  imagine that you would hold those same types
22  of joint town halls that you were doing for

Page 79

1  Clarke County?
2      A.    Well -- well, I think if you're
3  going to be successful, you're going to --
4  you're going to make every effort to serve
5  your district obviously.  But it would just be
6  a much harder thing to do.  If you're in
7  Washington 40 to 45 weeks out of the year and
8  you come home for a recess week or a recess
9  month like August, it is much more challenging
10  when you're -- I mean, we were able to get
11  sometimes five town hall meetings a day
12  scheduled.
13          It would be hard to do with --
14  with any of the four maps that you've got in
15  front of me.  It's not just town halls.  It's
16  also other ways.  I mean, I had a field rep
17  who went on a monthly basis throughout the
18  district, every month went to all of the
19  counties in my district.  Sometimes several
20  times.
21          So you're either going to -- as I
22  say, you're going to increase your staff.

Page 80

1  You're going to increase your number of
2  offices, but you can't do both because your
3  budget doesn't increase.
4      Q.    Do you think it would be
5  beneficial potentially to a district like
6  District 7 right now, which is very large in
7  the current map, in the 2011 plan, but would
8  be significantly reduced in size in some of
9  the proposed maps, for some of these same
10  reasons that you're talking about?  For
11  example, the geography, the distance, the
12  number of offices you have to have?
13      A.    Because of the way Congresswoman
14  Sewell serves her district and Congressman
15  Davis served his district, I believe that
16  they -- the people who live in those counties
17  have been very pleased with the service that
18  they've gotten.  And they've done a -- a -- a
19  good job because those have been
20  historically -- the -- the adjustments have
21  been made based on population and getting to
22  zero deviation from this map to the one that

Page 81

Pages 78 to 81

7/30/2019          Chestnut, et al., v. John H. Merrill          Josiah Bonner

**Page 82**

1   was ten years earlier.  And the one that was
2   ten years earlier.
3           You showed a map in the 1950s.
4   But if you look really in the 1970s, 1980s,
5   1990s, 2000s, 2010s, those maps that were
6   approved and that were also approved by the
7   Justice Department are very similar in terms
8   of the area of service.
9       Q.    I'm going to give you one more
10  map.  The last one, I promise.  And this will
11  be, I think, Exhibit 8.  I apologize if it's
12  smaller.
13              (Bonner Exhibit 8 was
14              marked for identification.)
15      Q.    (By Ms. Madduri)  And I can just
16  tell you this is a plan that our expert drew
17  because there's some speculation that in the
18  next redistricting cycle, Alabama may lose one
19  of its seats and go down to six congressional
20  districts instead of the current seven.
21          So I just want to get your general
22  thoughts on the same thing.  Same issues we've

**Page 83**

1   been discussing, whether there are communities
2   of interest that are at issue here.  Just your
3   general views on this plan.
4       A.    Well, unfortunately, I -- I don't
5   really have an opinion about this because I'm
6   working for the Governor of Alabama, and our
7   goal is to keep all seven districts.  So we're
8   going to work to get as robust a census as
9   possible.  So we haven't even begun looking at
10  hypotheticals of six districts.  Our goal is
11  to keep seven or maybe get eight.
12      Q.    Understood.  If this situation
13  does arise, just looking at this map, are
14  there any specific issues that you see that
15  you find concerning?
16      A.    Well, I -- I -- I would say and I
17  think anyone who has ever served in office or
18  who ever aspires to serve in office that there
19  is a value to -- as compact a district that
20  has as much community of interest and
21  continuity of interest as possible.
22          And if we lose a seat, then --

**Page 84**

1   then that changes the scenario totally for
2   everybody, but -- but that will be because we
3   didn't do our job to make sure that every
4   person counts in our census.  And we're going
5   to do everything we can to -- to do that.
6       Q.    Okay.  Understood.  So no -- no
7   thoughts or comments on this map?
8       A.    No.
9       Q.    Okay.  That's fine.
10      A.    No, ma'am.
11      Q.    If you are called as a witness in
12  this case, what -- what do you expect to
13  testify about?
14      A.    Well, I would expect that if I
15  were called, it would be to give my experience
16  as someone who worked in the federal
17  delegation for about 28 years.
18      Q.    Are there any specific issues that
19  you believe you would testify about?
20      A.    No, ma'am.  I -- I could testify
21  on what it was like being a congressman and
22  working as a member of a congressional staff.

**Page 85**

1   I'm comfortable with that.
2       Q.    Understood.  Did you
3   participate -- we -- we talked about this a
4   little bit, but I want to just get more
5   information.
6           Did you participate in any
7   capacity in Alabama's redistricting plan
8   following the 2010 census so to create that
9   2011 plan?
10      A.    I participated in the sense that
11  all of the members of Congress from Alabama,
12  Democrat and Republican, agreed to work with
13  the legislature as had been done in previous
14  redistricting efforts.  And we agreed to work
15  to support keeping the districts as close to
16  what they had been historically.
17          And we all did that knowing that
18  we would have to ultimately get a slightly
19  different district than what might be ideal
20  for us but because it was for the benefit of
21  the state as a whole and for our respective
22  seven congressional districts.

                                    Pages 82 to 85

7/30/2019          Chestnut, et al., v. John H. Merrill          Josiah Bonner

1    Q.    And to -- to the best of your
2    recollection, who or what types of people did
3    you have conversations with or communications
4    with about creating that sort of plan?
5    A.    Congresswoman Sewell, Congressman
6    Bachus, Congressman Brooks, Congressman
7    Rogers, Congresswoman Roby.
8    Q.    It sounds like the Alabama
9    delegation.  You don't have to -- it's not a
10   memory test.
11   A.    It's not a real interest to our
12   senate colleagues because they didn't have to
13   run in distract maps.
14   Q.    Right.
15   A.    So, but the seven members of
16   Congress from Alabama worked closely together
17   and supported each other and -- and -- and --
18   and were willing to work with the legislature
19   in a bipartisan way to produce a map that we
20   believed would be constitutional, would meet
21   the criteria, that would pass muster by the
22   Department of Justice.  This map did.  And

Page 86

1    we -- we worked and our staffs worked to
2    support that effort.
3    Q.    So outside of the Alabama
4    Congressional Delegation, outside of your
5    staff, were there other individuals or
6    entities that you worked with in the --
7    A.    We worked with the Reapportionment
8    Committee of the Alabama Senate and House.
9    Q.    Uh-huh.
10   A.    And we worked with -- I'm sure --
11   I -- I -- I -- I don't know who the other
12   members worked with, but we -- we worked as a
13   cohesive group starting with us.
14        We had meetings.  And we would
15   come to Montgomery, and we would have lunch
16   with members of the legislature, but we did
17   that not just every ten years.  We did that to
18   maintain relationships.
19        Some of them actually had served
20   in the legislature prior to being elected to
21   Congress, so they had pre-existing
22   relationships there.  I did not.  I had never

Page 87

1    served in the legislature.
2    Q.    Do you remember any of the -- the
3    specific legislators that you met with or had
4    conversations with about this?
5    A.    (Witness nods head.)  Well, I got
6    to know the Reapportionment Committee very
7    well.  We had Senator Vivian Davis Figures
8    from Mobile.  We had Representative Jamie Ison
9    from Mobile.  We had -- Senator Gerald Dial
10   was the chairman in the Senate or the
11   co-chairman, Representative Jim McClendon
12   who's now in the Senate was the co-chairman in
13   the House.
14        We -- when -- when the map and
15   therefore the political lines that are going
16   to be determined by that are in the hand of
17   the legislature, you work with the leadership
18   of the legislature, the bipartisan way.  You
19   work with the -- you work with the committee,
20   and that -- that's primarily who we spent most
21   of our time with because they were the ones
22   who -- in whose responsibility this fell.

Page 88

1        Congresswoman Sewell also worked
2    with the Justice Department.  The Attorney
3    General married a young lady from Mobile, and
4    so she and Attorney General Holder were good
5    friends.  She and President Obama and
6    Mrs. Obama were in school together, law school
7    and undergraduate.  I think she and Mrs. Obama
8    were in the same social sorority.
9        So we all did what we could to
10   help get it through the legislative process
11   and then get it approved with the stamp of
12   approval from the Justice Department.
13   Q.    Are you aware of any efforts to
14   create a second majority-minority district
15   during that redistricting cycle?
16   A.    There have been conversations
17   about that during that cycle and also
18   previously as well.  There was a general
19   consensus that if you were going to maintain
20   the threshold of what some believe that you
21   needed to have to guarantee a minority
22   district, then you would lower it such to try

Page 89

Pages 86 to 89

**Page 90**

1  to create a second district that you may well
2  risk having a minority representative in
3  Congress.
4        I believe it was 65 percent. And
5  I think you were going to lower it to create
6  two, and it would be closer to 50 percent.
7      Q.   What about instead of an actual
8  majority-minority second district, what about
9  like an influence district just where, you
10 know, the population -- the African-American
11 population would be higher but maybe not
12 actually up to whatever threshold the
13 legislature considered necessary to be a
14 effective majority-minority district?
15     A.   I was aware of -- look, you have
16 35 state senators, and you have 105 state
17 house members. Many of whom their motivation
18 for drawing district lines are their own
19 political interests.
20        So you would be talking to
21 Representative A or Senator B, and you may
22 well be talking to someone who was trying to

**Page 91**

1  draw a district for their political
2  aspirations as well. So there were a lot of
3  different dynamics at play here.
4        But -- and I don't -- and I'm not
5  speaking for anyone else in the delegation,
6  but I don't believe that anyone in the
7  delegation believed that the creation of a
8  second minority district or a -- a significant
9  influence district was something that -- that
10 was given any real encouragement by any
11 members of our delegation, Democrat or
12 Republican.
13     Q.   When you say "the delegation," you
14 mean the -- the seven --
15     A.   Federal. Uh-huh.
16     Q.   -- congressman -- congressmen and
17 women?
18        Why -- why do you think that
19 wasn't --
20     A.   Well, you'd have to ask the other
21 six members who were in at the time, but I
22 think everyone believed that there were

**Page 92**

1  historic benefits to the service of the
2  constituents to keep the districts as they
3  have been for several decades.
4      Q.   Were you supportive of creating a
5  second majority-minority or a significant
6  influence district?
7      A.   I saw no value in it because I was
8  very confident that I was serving the people
9  of my district regardless of their racial
10 background, their socioeconomic background,
11 their political views, their -- or -- or other
12 issues that -- that were at play.
13     Q.   To the -- to the best of your
14 recollection, were there any plans that you
15 remember that did propose having a second
16 majority-minority or a significant influence
17 district?
18     A.   I -- I remember seeing -- and I
19 can't tell you whether it was the 2010 or the
20 2000 redistricting, but I remember seeing a
21 plan similar to this that would have gone
22 under Mobile Bay.

**Page 93**

1        There was actually a question
2  about whether that would make that contiguous
3  or not. We'd go all the way over to Dothan.
4  I saw one that even went all the way up to
5  Auburn in Lee County. And then the other part
6  of Mobile that would go all the way up to
7  Pickens and Tuscaloosa.
8        And having been a student at the
9  University of Alabama and having had children
10 who attended the University of Alabama --
11     Q.   Uh-huh.
12     A.   -- I knew how hard it was to get
13 to Tuscaloosa. There's no four-lane road
14 there anymore than there's a four-lane road
15 from Mobile to Dothan.
16        So I -- I heard that there were
17 legislators that were talking about that, but
18 I didn't spend a lot of time encouraging that,
19 and therefore, I didn't spend any time with
20 those legislators. But -- but keep in mind,
21 other legislators, other members of Congress
22 from the delegation were similarly looking

Pages 90 to 93

1   after what was the district that they knew
2   best, and the one that they had worked in and
3   had run in and been successful in.
4       Q.   Do you recall having any
5   conversations or discussions or other
6   communications about why you didn't
7   encourage -- I think you said encourage -- a
8   second majority-minority or a significant
9   influence district?
10      A.   I -- I had no reason to encourage
11  creating a second minority district that would
12  have, in my view, been detrimental to my
13  district and to the service that my staff and
14  I were rendering.
15           We had an outstanding reputation
16  for serving people without regard to their
17  political views, their -- I mean, we did not
18  have a litmus test.  If you called my office
19  and you needed help, you got help.
20           And the proof of that is, is that
21  I won -- I -- I won five of the six counties
22  in my first race, and I won all six counties

                                        Page 94

1   in every subsequent race and with a couple
2   times running unopposed.  If I were not doing
3   a good job, I would have drawn an opponent.
4       Q.   Uh-huh.  Did you ever speak with
5   any constituents or anyone in your district
6   about the potential to have a second
7   majority-minority district or --
8       A.   No one ever contacted me that I
9   can recall saying that they felt that they
10  needed a second minority district to be better
11  represented.  I'm not saying that there were
12  not people who might have thought that.
13           But when I went to town hall
14  meetings in Prichard or in Trinity Gardens or
15  in other communities throughout the district,
16  I -- I can't recall -- and again, I said I had
17  450, so I'm not saying they were all
18  lovefests, but I can't recall anyone ever
19  coming and saying that they wished that they
20  were in a different district and had a
21  different congressman.
22      Q.   In your view, why -- why was a

                                        Page 95

1   second majority-minority or influence district
2   not created in the last plan in 2011?
3       A.   Well, I can't really speak for the
4   mindset of 140 legislators.
5       Q.   Of course.  In -- in your -- in
6   your view.
7       A.   I -- I -- I really don't know that
8   I'm qualified to answer that.
9       Q.   That -- that's perfectly fine.
10           And can you -- can you recall any
11  communications that you had with anybody,
12  conversations or written or in some of the,
13  you know, your delegation meetings --
14      A.   Well --
15      Q.   -- any conversations about
16  creating that or why it shouldn't be created
17  or should be?
18      A.   I -- I really and truly can't
19  recall that the delegation -- when we met to
20  talk about the redistricting process, I really
21  can't recall that we spent a lot of time
22  talking about all the different scenarios that

                                        Page 96

1   were out there.
2           Our goal was to work cohesively to
3   represent the state, to keep as much
4   disruption to a minimum as possible, and to
5   show, as we tried to show with our daily
6   service, that regardless of -- of which party
7   we represented, that we represent the same
8   state.  And that we work together for the good
9   of the people of Alabama.
10      Q.   So it sounds like you don't recall
11  any conversations then within the delegation
12  about the potential for creating a second
13  majority-minority or influence district?
14      A.   I -- I -- I can't say
15  categorically there were none -- there were
16  not any.  I don't recall any at this moment,
17  no.
18      Q.   What about conversations or
19  communications outside of the delegation?  Do
20  you recall any of those?
21      A.   No, because we didn't come to
22  Montgomery to work with the state legislature

                                        Page 97

1   with the goal of looking at options and
2   creating a different map. We all believed
3   that we were serving -- I said with confidence
4   that I felt like I was serving the people of
5   my district.
6       I -- I think that every member of
7   the delegation would have said the same thing.
8   Without being cocky, just with -- just
9   confidence that we were doing the best we
10   could to represent the people of our
11   districts.
12     Q.   Understood.
13       Did -- in terms of the delegation,
14   did you -- was it your position then that you
15   should keep the districts the way that they
16   were, or did you have a plan that you
17   proposed --
18     A.   We --
19     Q.   -- a physical plan that you
20   proposed?
21     A.   We knew we would have to make
22   adjustments based on population.

Page 98

1     Q.   Uh-huh.
2     A.   And -- and we agreed that we would
3   make adjustments based on that. And quite
4   frankly, some members ended up getting -- in
5   the final plan, some members ended up getting
6   counties that they had not sought. But that
7   was what, in the wisdom of the legislature,
8   needed to be done to accomplish the goal of
9   the map.
10     Q.   So did the delegation present a
11   map that they wanted, or was there a
12   physical -- you know, like a proposed map from
13   the delegation?
14     A.   I -- I believe we had an agreed
15   upon. I can't tell you that we produced a map
16   or that a map was submitted. It could have
17   been. I really don't recall. We -- we ended
18   up agreeing that we would take what the
19   legislature did and not challenge that.
20       But, for instance, the northern
21   part of Tuscaloosa County in the previous
22   redistricting was represented by Congressman

Page 99

1   Bachus. And it was adjusted to where it would
2   be Congressman Aderholt. And -- but -- but
3   for the greater good of serving the state,
4   there was -- it -- it -- it was not that big
5   of an adjustment to where it created any
6   tension within the delegation.
7     Q.   So to the -- the best of your
8   recollection, were there any, I guess,
9   disagreements between what the legislature had
10   proposed and what the Alabama delegation had
11   wanted?
12     A.   Once the legislature made its map
13   final, we all got on board trying to support
14   getting it cleared by the Justice Department
15   and put into place so that we could know what
16   districts we would be running in and begin
17   that process.
18       Ten years earlier, it was a much
19   more challenging effort. The governor
20   actually called, I think, two or three special
21   sessions to deal with redistricting. A
22   federal court had gotten involved.

Page 100

1       And I was working as a staffer at
2   the time, but there was a concern that we may
3   not even have maps in place for the members to
4   run in. So contrast that experience with this
5   where we were working with the legislature
6   that was trying to keep the districts as close
7   as to what they had been historically in
8   recent history, we -- we -- we chose not to
9   disagree over little things.
10     Q.   Understood.
11       Ms. MADDURI: I think -- do you --
12   would you want to take a break? We've been
13   going for a little while. I have some -- I do
14   have some questions about the previous
15   redistricting too.
16       MR. DAVIS: Sure. This is a fine
17   time.
18       MS. MADDURI: This might be a good
19   time to --
20       THE WITNESS: Sure.
21       THE VIDEOGRAPHER: This ends MPEG
22   two in the continued deposition of Josiah

Page 101

Pages 98 to 101

1    Bonner. We are off the record at 11:08.
2         (A recess was taken.)
3         THE VIDEOGRAPHER: This begins
4    MPEG three in the continued deposition of
5    Josiah Bonner. We are on the record at 11:22.
6         Q.   (By Ms. Madduri) So before the
7    break, I think we were going to start talking
8    about the previous cycle of redistricting.
9    What was your -- what was your role in that?
10        A.   I was Chief of Staff for
11   Congressman Callahan. And just as when I was
12   in Congress and sent my staff down, I went
13   down on behalf of Congressman Callahan, and I
14   was there with the other Chiefs of Staff from
15   the other members of Congress.
16        And it was basically the same
17   thing, to work with the legislature to try to
18   get a plan that was as close to what we had
19   knowing that there would have to be some
20   adjustments made for population shift.
21        Q.   Do you remember, just roughly, how
22   many times did you meet or have conversations

Page 102

1    about this with the other Chiefs of Staff and
2    the delegation?
3         A.   Frequently. And by that, I would
4    say that leading up to the redistricting year,
5    you know, we would meet probably -- it's been
6    20 years. It's been longer than that, but
7    we -- we would've met between five and ten
8    times.
9         Q.   And that's the delegation?
10        A.   Uh-huh. Yes, ma'am.
11        Q.   Okay. And what about
12   representatives of the legislature?
13        A.   So Congressman Callahan had served
14   in the legislature, and Congressman Bevill was
15   the senior member of Congress at the time.
16   No. That would have been in the '90.
17        So in the 2000, Sonny may have
18   been the only -- and -- and Spencer Bachus, I
19   think were the only two members that had
20   previously served in legislature.
21        So the advantage of working for a
22   member who's been in the legislature or the

Page 103

1    advantage of being a member who came from the
2    legislature like Congressman Rogers did is, is
3    that you have those preexisting friendships.
4    You have those preexisting relationships. But
5    -- but -- but we worked closely.
6         Walter Braswell was Congressman
7    Harris' Chief of Staff. Tom Bevill was
8    represented by Don Smith. You have to
9    understand a small delegation like ours has a
10   very special relationship. The chiefs of
11   staffs meet every month and have lunch as do
12   the members.
13        I can tell you of very few
14   congressional delegations that meet monthly,
15   Democrat and Republican, House and Senate, and
16   talk about what we can do to -- to serve
17   Alabama as well as the Alabama delegation
18   does. And that has historically been the
19   case, and it continues to be the case. And
20   it's one of the hallmarks of what makes this
21   delegation so effective.
22        You look at Alabama's nine person

Page 104

1    delegation compared to Texas or California or
2    New York or Florida, and they can't sometimes
3    agree on what the state colors are much less
4    on how they can work together for the good of
5    the state.
6         Q.   So you all met maybe five to ten
7    times, you said, prior to that redistricting.
8    What about with the legislature or legislature
9    representatives?
10        A.   We -- we -- we would come -- of
11   those -- and five or ten is certainly a guess,
12   but of the times that we met, most of those
13   meetings were in Washington. And then once
14   the legislature started coming into session
15   and they started to focus on that, we worked
16   closely with the governor who is a Democrat.
17        We worked closely with the Speaker
18   of the House who was a Democrat. We worked
19   closely with the Lieutenant Governor and the
20   Senate and the House leadership. And back in
21   the 2000 census as opposed to the 2000 -- or
22   the redistricting as opposed to the 2010, it

Page 105

Pages 102 to 105

1    was a Democrat majority in the legislature.
2         Q.    Within the congressional
3    delegation, were there -- did you all have
4    sort of a unified view on what should be done
5    with the redistricting?  Were there any
6    conflicting views or disagreements within the
7    delegation?
8         A.    We were consistent as we were ten
9    years later.  We -- we tried to work
10   cohesively to help the legislature draw a map
11   that would not disrupt the service to the
12   state but would, in fact, allow its continuity
13   to continue.
14        Q.    And were there any conflicts or
15   disagreement between what the legislature
16   wanted to do with the map versus what the
17   congressional delegation wanted to do?
18        A.    I believe that it was about that
19   time that some in the legislature wanted to
20   create a minority-majority district, and that
21   was creating some tension within the Democrat
22   members of the delegation, but it was not

1    something that we felt -- that Congressman
2    Callahan felt that he needed to get involved
3    in because he was going to work with the
4    delegation regardless.
5         Q.    And was that the creation -- what
6    ultimately was the creation of congressional
7    district 7?
8         A.    Yes, ma'am.
9         Q.    Okay.  Did you or you on behalf of
10   congressional -- Congressman Callahan have any
11   views about whether that district should or
12   shouldn't be created?
13        A.    Not that I recall.
14        Q.    Do you remember any conversations
15   about --
16        A.    (Witness shakes head.)
17        Q.    -- the creation of that --
18        A.    No, ma'am, I really don't.
19        Q.    Do you recall if you were
20   supportive of creating that district?
21        A.    Well, my role was really to focus
22   on the 1st congressional district, and it

1    didn't really have as much of an impact
2    because this is where you get parochial.
3         You -- you focus on your district,
4    and then it's like putting a puzzle together.
5    You see how your district's going to fit with
6    this district and that district.  So our focus
7    was on trying to preserve the integrity of the
8    1st congressional district, which is what we
9    did.
10        Q.    Were any changes made to the 1st
11   congressional district in order to create that
12   majority-minority district?
13        A.    Well, in the 1990 census, we lost
14   Wilcox County, and then in the 2000 census, we
15   lost a part of Clarke County.
16        Q.    Was that something that you -- I
17   guess, first with Wilcox County, the loss of
18   Wilcox County, was that something that you
19   opposed or supported or how -- how was that?
20        A.    Well, I was a relatively young
21   staffer, and so I didn't really have a -- a
22   vote, if you will.  They needed to make the

1    adjustments.  As I recall, the -- the map that
2    was drawn that resulted in the loss from
3    Wilcox County I think was actually drawn by a
4    three-judge panel, I believe.
5         So we -- we were not -- my ties to
6    Wilcox County were personal.  They were not
7    the congressman's ties.  He was from Mobile,
8    and he wanted to make certain that the
9    district remained as intact from Mobile and
10   Baldwin Counties as possible, and therefore
11   that was my objective too.
12        Q.    Do you recall any conversations or
13   communications about the drawing of the map by
14   that three-judge panel in relation to the 1990
15   redistricting?
16        A.    I remember that the legislature
17   was not able to draw a map, and we needed a
18   map.  And it went to a three-judge panel, and
19   the map they produced was one that the members
20   of Congress all -- I mean, if a three-judge
21   panel makes the decision, it -- it's hard to
22   go back in and ask them if they'll make some

1  changes to it to make you a little bit
2  happier. So we -- we took it, and we were --
3  we did the best we could to serve it.
4        Q.    But do you remember having any
5  conversations or communications about just the
6  views on what they had done?
7        A.    So now we're going back to --
8        Q.    We're going back to 1990.
9        A.    -- '90. I -- I don't recall any
10  conversations.
11        Q.    And when that map was redrawn,
12  the -- the majority-minority district was not
13  created, correct?
14        A.    I -- I believe that's correct.
15  I'd have to look at the map to see, but I
16  believe that that's correct.
17        Q.    Okay. I think you mentioned that
18  the redistricting process in relation to the
19  2000 census was contentious. Can you talk a
20  little bit about what you mean -- meant by
21  that?
22        A.    Well, Congressman Harris believed

Page 110

1  that he served the people of the 7th district
2  well. And he -- I think most of the members
3  of -- of the delegation believed that he did
4  and most of the people in his district did
5  because he was re-elected several times.
6        But when the decision was made to
7  create the district, President Clinton was in
8  office, and I guess to soften the blow, if you
9  will, Congressman Harris was made U.S.
10  Attorney.
11        So he was no longer going to be
12  afforded the opportunity to be -- I mean, I'm
13  not saying he couldn't have gotten elected.
14  He was very popular. But the district was
15  created to create a majority-minority
16  district.
17        And I don't -- I don't know that
18  many people could have gotten elected in that
19  district other than a minority member who was
20  Congressman Earl Hilliard -- then State
21  Senator Earl Hilliard.
22        I mean, he had a primary, but the

Page 111

1  primary for all practical purposes served as
2  tantamount to the general election because if
3  you got the Democrat nomination, as was true
4  in Alabama for many years, you basically had
5  been elected. The general election was just a
6  formality.
7        Q.    So I think I might have asked you
8  this, but I'm misremembering, so I want to
9  make sure I understood what you said.
10        Do you -- were you supportive of
11  creating that majority-minority district?
12        A.    As a young Hill staffer, no one
13  really asked me whether I supported it or not.
14  The -- the members of the delegation, though,
15  agreed to work with -- through the differences
16  of opinion.
17        Congressman Harris is deceased.
18  He died of cancer, so he would not be here to
19  speak for himself. And I'm certainly not
20  qualified to speak for him, but my
21  recollection -- his Chief of Staff and I were
22  good friends. It was Walter Braswell. He has

Page 112

1  passed away as well. So there's no one who
2  can dispute what I'm about to say.
3        But I think that they personally
4  believed -- they were Democrats, conservative
5  Democrats, but they served that district with
6  integrity and with professionalism and to the
7  best of their ability. And I think in their
8  view, they -- they believed they could have
9  continued to serve the district.
10        But the political decision of
11  creating the majority-minority district was
12  made, and the reality was that that district
13  was not drawn with the intent to keep a white
14  Democrat in that seat. That's not unusual
15  with other districts around the country where
16  those decisions are made by their legislators
17  as well.
18        Q.    Right. So when you say the
19  decision was made, you're referring to the
20  Alabama legislature's decision?
21        A.    (Witness nods head.)
22        Q.    And --

Page 113

| | |
|---|---|
| 1   A.   Yes, ma'am. | 1   subsequent meetings with the legislature? |
| 2   Q.   Oh, thank you. | 2   A.   Yes. And when I answered the |
| 3   And I -- I realize -- I realize | 3   question about five to ten meetings, I could |
| 4   that -- I believe you were Chief of Staff at | 4   not swear under oath that there were five or |
| 5   that point, correct? | 5   ten. |
| 6   A.   In 1990, I was, yes. | 6   Q.   Absolutely. |
| 7   Q.   Right. Okay. Or sorry -- in | 7   A.   All I know is, is that we |
| 8   2000. | 8   worked -- as I said, we -- we had monthly |
| 9   A.   2000. | 9   meetings as the Chiefs of Staff. The |
| 10   Q.   In the -- in the -- in the cycle | 10   delegation had monthly meetings. And so I |
| 11   where the majority-minority was -- district | 11   don't know how many meetings we had, but how |
| 12   was created which is in 2000, correct? | 12   ever many meetings we had that were focused on |
| 13   A.   Well, I was Chief of Staff in 1990 | 13   redistricting, the goal was to try to work |
| 14   and Chief of Staff in 2000. If you've got the | 14   together for the good of the state. |
| 15   maps, we can look at and I can show you. | 15   Q.   Understood. |
| 16   Q.   I actually don't think I have that | 16   To the best of your recollection, |
| 17   map, but I just want to clarify. | 17   was there any -- anyone that you were aware of |
| 18   A.   I -- I was Chief of Staff in 1990, | 18   related to the Alabama Congressional |
| 19   and I was Chief of Staff in 2000. | 19   Delegation that was opposed to creating that |
| 20   Q.   Correct. And I might be | 20   majority-minority district? |
| 21   misunderstanding, but I thought the -- I | 21   A.   I don't believe there was anyone |
| 22   thought you said that the majority-minority | 22   who was opposed to that I can recall. |
| Page 114 | Page 116 |
| 1   district, CD 7, was created in the 2000 -- | 1   Congressman Harris didn't see the need for it. |
| 2   following the 2000 census? | 2   But -- but that was -- but that was his view, |
| 3   A.   No. It would have been created in | 3   and it was not shared by the people who made |
| 4   1990 -- | 4   that decision. |
| 5   Q.   Okay. | 5   Q.   Did you have any concerns with the |
| 6   A.   -- following that because | 6   creation of that district -- |
| 7   President Clinton was in office during the | 7   A.   I -- |
| 8   time that Congressman Harris became U.S. | 8   Q.   -- the majority-minority district? |
| 9   Attorney. And he was in office -- he was | 9   A.   I -- I really did not have any |
| 10   elected in the '92 election and served until | 10   concerns because my focus was on the 1st |
| 11   2000. | 11   congressional district. |
| 12   So it would have been in the 1990 | 12   Q.   Do you recall if Representative |
| 13   census that resulted in the redraw of the maps | 13   Callahan had any -- |
| 14   that created the minority -- majority-minority | 14   A.   No. |
| 15   district. | 15   Q.   -- concerns with creating that |
| 16   Q.   Understood. Understood. | 16   district? |
| 17   A.   I was a young Chief of Staff. 12. | 17   A.   None that I can recall. |
| 18   Q.   Understood. | 18   Q.   Do you recall any communications |
| 19   And just to make sure I have this | 19   with anyone that you had where they were |
| 20   straight, so then was that the cycle where you | 20   concerned or opposed to creating that |
| 21   said there were five to ten meetings of the | 21   majority-minority district? |
| 22   Alabama Congressional Delegation and | 22   A.   I -- I really don't remember that |
| Page 115 | Page 117 |

Pages 114 to 117

1   it was a -- a -- an issue for the delegation
2   other than Congressman Harris. And I don't
3   recall that it was even that controversial in
4   the legislature. But again, that's been
5   37 years ago, 39 years ago. It's been a few
6   years.
7       Q.   Understood.
8            And just so I'm clear though.
9   There was a -- some kind of litigation that
10  followed that map being created with the
11  three-judge panel that you mentioned?
12      A.   In the 1990?
13      Q.   Right. So I believe that map was
14  adopted in around 1992 because --
15      A.   I --
16      Q.   -- Clinton was in office?
17      A.   That -- that would sound about
18  right.
19      Q.   Okay. So was there litigation
20  that you're aware of relating to that map
21  after that, so sometime in the early or
22  mid-1990s?

1       A.   I really don't recall whether
2   there was litigation. As a result of the map,
3   I remember that the legislature failed to do
4   its job, and the federal courts made the
5   decision to draw the map.
6       Q.   When you say failed to do their
7   job, what do you mean?
8       A.   The legislature in Alabama, as I
9   think in most states, is charged the
10  responsibility of redrawing every ten years
11  based on a new census.
12           And as I recall, the legislature
13  was unable to agree on a plan, and if they
14  couldn't do it, the federal courts made the
15  decision that they could. Someone had to.
16      Q.   Okay. So the legislature was
17  unable to create a map at all?
18      A.   That -- that's my recollection.
19      Q.   Okay. Do you recall what were the
20  main --
21      A.   I don't.
22      Q.   -- disagreements or what issues

1   led to that?
2       A.   I'm sorry. I don't.
3       Q.   No, that's fine. What is the --
4   the Alabama Fair Reapportionment Fund?
5       A.   Can you tell me a little bit more
6   about it?
7       Q.   Well, I actually don't know that
8   much about it.
9       A.   Okay.
10      Q.   So I was hoping that you would
11  tell me about it.
12           MR. DAVIS: Did you say Alabama
13  Fair Reapportionment Fund?
14           MS. MADDURI: Correct.
15      A.   I'm -- I'm sorry. I -- I don't
16  recognize that name.
17      Q.   (By Ms. Madduri) Let me see. I
18  do have an article that mentions it, so I can
19  give you that in case it helps trigger.
20           MS. MADDURI: We can mark it. I
21  think we'll be at Exhibit 9.
22           (Bonner Exhibit 9 was

1            marked for identification.)
2            MR. WALKER: Are we going to mark
3   this?
4            MS. MADDURI: Yes. It's going to
5   be Exhibit 9.
6       Q.   (By Ms. Madduri) And feel free to
7   review the article. I believe you're quoted
8   on the first page of that document.
9       A.   I am. I have not seen this in a
10  long time so...
11      Q.   And I know it's been a long time,
12  so I apologize for asking you to think back so
13  far.
14      A.   Okay. So this fund, based on this
15  newspaper article, and now jogging my memory,
16  was established by the seven members of the
17  congressional delegation. And it appears that
18  all seven of them supported it.
19           I cannot answer whether all seven
20  of them financially contributed to it, but it
21  addresses something we talked about earlier.
22  So this was dealing with the 2001

www.DigitalEvidenceGroup.com          Digital Evidence Group C'rt 2019          202-232-0646

1  redistricting effort, but ten years earlier
2  when the federal courts drew this, the -- each
3  congressional office has what is called a
4  members representational account, an MRA.
5      That's the money -- it's like your
6  budget -- that you have to hire your staff, to
7  set up a district office, to pay for telephone
8  services, newspaper subscription services, and
9  things like that.  The law is clear that you
10  cannot use your congressional budget for
11  reapportionment purposes.
12      So as is noted in this article,
13  which has been entered as an exhibit, this
14  article states -- and I would have no reason
15  to dispute -- that Congressman Callahan
16  actually had to spend $250,000 from his
17  campaign fund ten years earlier to -- in
18  federal court in legal fees to support getting
19  a plan, a map, a redistricting plan that would
20  in fact allow him to continue to work, run in
21  a district that is close to what it looks like
22  today.

Page 122

1      So the members, proactively trying
2  to avoid a repeat of what happened ten years
3  ago, agreed to support a plan that we went to
4  the legislature and encouraged them to
5  consider.  And it was a plan that called for
6  keeping the districts as opposed to the plan
7  that at that time Dr. Joe Reed, who is
8  chairman of the Alabama Democratic Conference,
9  was pushing, which was to create a second
10  minority district.
11      But in this article, it says, it
12  quotes Congressman Hilliard who was the first
13  African-American member of the delegation
14  since reconstruction to say that -- Hilliard
15  says he knows of no plans to try to create the
16  second majority black district because the
17  changes that would require like -- because the
18  changes that would require likely wouldn't be
19  approved by the courts.
20      So you have to keep in mind it was
21  a different Justice Department.  It was a
22  different time, and at that time, while it

Page 123

1  appears Dr. Reed wanted two minority
2  districts, Congressman Hilliard as the
3  Democrat -- he was not the only Democrat -- he
4  was not the only Democrat in delegation, but
5  he was the only minority Democrat in the
6  delegation -- was not supportive of that
7  effort to create two minority districts
8  because he didn't think the courts would
9  actually support that.
10      That's what I -- that's my
11  interpretation of this.  And I'm sorry but
12  when you asked about the account, it -- it was
13  not a name I was familiar with.  But I do
14  recall it now.
15      Q.    Okay.  So you mentioned, as this
16  article says, that Representative Callahan had
17  to spend $250,000 from his campaign fund ten
18  years ago to challenge Reed's plan?
19      A.    Right.
20      Q.    Okay.  So in Reed's plan that this
21  is referring to, it's your understanding that
22  that had two majority-minority districts?

Page 124

1      A.    I didn't really recall that he was
2  pushing that in 1990, but I don't dispute if
3  that's the case.  We would certainly be able
4  to -- to factually determine that.  I do
5  recall that there has been discussion for some
6  time about creating two minority -- two
7  majority-minority districts, but the challenge
8  was always going to be whether it would
9  actually pass muster with the Civil Rights
10  Division and the Department of Justice.
11      Q.    Do you recall what Representative
12  Callahan was unsupportive of in Reed's plan?
13      A.    Well, it would have created --
14  it -- it would have divided Mobile and Baldwin
15  Counties, and it would have destroyed the 1st
16  congressional district as it had existed and
17  as he served.
18      I don't recall the specifics from
19  that.  I would have to go back, but the court
20  records would show the different maps that
21  were introduced at that time as evidence.
22      Q.    Do you recall this letter that

Page 125

Pages 122 to 125

1    this article was referencing which was
2    signed -- the article says was signed by
3    Representative Callahan?
4        A.    I -- I recall it now.
5        Q.    Well, no.  That's fine.  I mean,
6    it was a long time ago.  I'm --
7        A.    I don't recall the verbiage of the
8    letter.  I don't recall the ask, but I'm sure
9    it was raising money.  I mean, it says it was
10   a fund raising fund to try to raise money in a
11   legal way to try to get the legislature to
12   deal with the redistricting effort that the
13   legislature ten years earlier had failed to be
14   able to do.
15       Q.    So in connection with the 2000
16   census in that redistricting, is it correct
17   that Congressman Callahan did not support a
18   second majority-minority district being drawn
19   at that time?
20       A.    I -- I would respectfully dispute
21   that description.  I don't recall Congressman
22   Callahan ever sharing with me his opinion

Page 126

1    about the pros or cons of creating a second
2    majority-minority district.
3             His focus was self-serving.  It
4    was to keep the congressional district that he
5    had.  And quite frankly, so was the view of
6    the other six members of Congress.  If you've
7    got something that works, why would you lead
8    the effort to change it?
9        Q.    Do you recall who was involved
10   with managing that fund, the Alabama Fair
11   Reapportionment Fund?
12       A.    Well, this article says -- and so
13   therefore I will have to take it on face
14   value; I guess this is before fake news was
15   created -- that it was -- that the money was
16   raised and the address was the Alabama
17   Republican Party.
18            But keep in mind, we did not have
19   the ability to use congressional money for
20   this.  We had already -- ten years earlier,
21   we -- the Callahan campaign had spent
22   $250,000, which was a lot more money then.

Page 127

1    It's a lot of money today.
2             But today, that would -- back
3    then, that was a significant amount of money
4    that was used from the campaign, which was a
5    legal use of the money, but I think
6    Congressman Callahan was not alone in
7    believing that -- other members of Congress
8    were spending money as well in that court
9    defending their districts.
10            So he believed it was better to
11   raise the money through this account than to
12   have to take money out of your campaign
13   account.
14       Q.    Have you ever been involved in
15   raising money for that fund to the best of
16   your recollection?
17       A.    As a congressional staffer, I
18   would have been restricted in raising money
19   for any type of political activity.  Each
20   House member has the opportunity to name one
21   staff member as their political liaison, if
22   you will, who can be a spokesman or who can

Page 128

1    coordinate with the campaign activities.
2             I had that role when I was his
3    Chief of Staff.  So I had that in 1990 and I
4    had it in 2000.  I did not have it when he was
5    first elected in 1984.
6        Q.    So in that role or otherwise, had
7    you ever been involved in fundraising for that
8    fund?
9        A.    Not that I recall.
10       Q.    Do you recall who the primary
11   sources of funding for that -- for the fund
12   were?
13       A.    Probably the same companies and
14   individuals.  I don't know whether they could
15   take company -- the corporate money or not.
16   I -- so I shouldn't say companies.  But we --
17   look, in Alabama and probably in most states,
18   it's the same people that get asked to write
19   the campaign contributions to both parties, to
20   both candidates.
21            So my guess is, is that if you
22   look at an FEC report today and you look at

Page 129

Pages 126 to 129

1   one in -- in 2000 when this fund was created,
2   you would see the same type of groups and
3   entities and people who were involved in the
4   political process.
5       It may be a different person, but
6   it would be who -- the person who was in
7   charge of -- the president of the Farmers
8   Federation, the president of the power
9   company, or the president of the -- this group
10  or that group, the business community.
11      They all have been -- they've --
12  they've grown exponentially over the years,
13  but they are the ones who traditionally
14  support both Democrats and Republicans.
15      Q.   And what was your understanding of
16  the purpose or the goal of that fund?
17      A.   To try to get the legislature to
18  approve a map that would avoid us going to
19  another lengthy and expensive federal court
20  proceeding and to try to keep the district
21  maps as closely aligned as they had been
22  during the previous decade for the upcoming

Page 130

1   decade.
2       Q.   And did you work with this same
3   fund when you became the congressman?
4       A.   I don't think we called it that.
5   I don't even know that we -- I don't know what
6   the name of that fund was, but we all chipped
7   in and raised -- we -- we all -- when I --
8   Congressman Bonner followed the leadership of
9   Congressman Callahan.
10      And when it was time for us to
11  work with the legislature in 2010, we all, all
12  seven members, Democrat and Republican,
13  donated money to try to help the legislature
14  draw a map that was as close to the one as the
15  one we had.  We did not to my -- I don't
16  recall whether we actually introduced a map,
17  but Congresswoman Sewell, Congressman Bachus,
18  Congressman Rogers, Congresswoman -- now I'm
19  talking about the 2010.
20      We -- we all agreed to try to work
21  together as we had previously for the last --
22  as long as I've been around.  The map you

Page 131

1   showed in 1950, I was born in 1959.  So that
2   predates my knowledge.
3       Q.   To the best of your recollection,
4   were funds -- was that fund ever used to --
5   whether it's lobby against or argue against --
6       A.   No.
7       Q.   -- the creation of a second
8   majority-minority district?
9       A.   That was never the goal.  The goal
10  was to keep the districts as close to what
11  they were.  And it really was not -- I mean,
12  look, we -- we had -- in the 2010
13  redistricting effort, we had the first
14  African-American president.
15      We had, I believe, the first
16  African-American Attorney General, and I had a
17  very good working relationship with General
18  Holder.  And to the extent any congressman has
19  a good working relationship with the White
20  House, I had a good working relationship with
21  White House.
22      On my last day in office, General

Page 132

1   Holder called to tell me what -- he was very
2   complimentary and said that it would -- he was
3   sad to see me leave, but he was wishing me
4   best wishes.
5       But it was his Justice Department
6   that stamped approved when this map came down.
7   And when we were working in the 2010
8   redistricting effort to get the map we
9   currently have as we had previously, we were
10  working in the same spirit that it existed for
11  the last 40 years.
12      And it -- it -- it's hard to
13  describe that in a transcript, but it was a
14  spirit of collegiality.  It was a spirit of
15  common service to the state.  It was a spirit
16  of -- of making sure that the 4.8 million
17  people that lived in our state, regardless of
18  the skin tone that they had or the accent that
19  they had or the conditions that they grew up
20  in, that -- that they were well served and
21  served well and with integrity.
22      Q.   Is it your general understanding

Page 133

Pages 130 to 133

1  that to -- if a second majority-minority
2  district was to be created, that would
3  necessarily require changing sort of these
4  historical districts that you've been
5  describing all morning?
6      A.   Well, I've never seen a map that I
7  can recall that could create a second
8  majority-minority map that would not
9  substantially alter the integrity of the 1st
10 congressional district.  None of the maps that
11 you introduced as exhibits today do that.
12      And as I said, I remember seeing
13 maps that legislators were talking about in
14 previous efforts that would take part of
15 Mobile and run it up to -- there -- there is
16 no four-lane highway from Mobile to -- to
17 Sumter County or to Greene County or to
18 Pickens County.  You're going to be going on
19 two-lane farm-to-market roads in a lot of
20 that.
21      Or that would take it under the
22 bay.  And one of the maps in this 2000

Page 134

1      Q.   Do you think there are any people
2  in Alabama, your constituents, whether in the
3  overall state or in congressional district 1
4  who would have benefited from having a second
5  majority-minority district in Alabama?
6      A.   I -- I don't know how they could
7  have.  When I received the NAACP award as the
8  champion in 2009, they didn't put an asterisk
9  on it.  When I got the very first earmark,
10 back when we could do earmarks, was for
11 Pritchard, Alabama because the mayor and the
12 council had had such a long-running dispute
13 that they wouldn't even agree to pay the
14 firefighters.
15      And they didn't even have enough
16 money to put gas in the fire trucks.  And so I
17 got a grant -- a -- an earmark for Pritchard
18 to get an expanded water service so that the
19 fire hydrants could actually work, and we
20 could put money in the fire trucks so that if
21 someone's house caught on fire that it would
22 be put out.

Page 136

1  redistrict that Dr. Reed pushed actually
2  circled Congressman Callahan's home on Dog
3  River.  It circled it.  The house across the
4  street wasn't -- it was going to be in the
5  Mobile district.
6      Congressman Callahan's house was
7  drawn to Dog River underneath Mobile Bay all
8  the way over to Dothan, and I think it -- it
9  may not have gone to Auburn in Lee County.  It
10 went up to Russell County.
11      And so that offended the census
12 that -- you talk about gerrymandering.  That
13 was the ultimate where someone was going to
14 take him -- he would have not even been able
15 to drive out of his driveway, he would have
16 been in another congressional district.
17      So you can't expect that he was
18 excited about that.  But we have never
19 supported doing anything that would destroy
20 the integrity of -- of not only our district,
21 but really of the -- of the districts that
22 have well served this state.

Page 135

1      I didn't carry Prichard in the
2  ballot boxes.  I don't know that I ever
3  carried Prichard in the ballot boxes.  I got
4  more and more votes each time.  Prichard was a
5  majority-minority city, but I served the
6  people of Prichard with all my heart.
7      And that's why I can't imagine why
8  anybody would have ever wanted -- someone
9  might have wanted a Democrat because there
10 were Democrats that didn't vote for me.  But I
11 never gave anyone reason to believe that they
12 were not being well served because I was
13 Caucasian and they were not.
14      Q.   Were there any issues or needs
15 that you saw or were told about from your
16 African-American constituents that were
17 different than other white constituents in
18 your district?
19      A.   Well, sure.  The African-American
20 constituents asked for me to help them get
21 recognition for Africatown, which I did.  That
22 was probably not something that other -- I

Page 137

7/30/2019                    Chestnut, et al., v. John H. Merrill                    Josiah Bonner

1    mean, that wasn't even something that
2    residents in any other counties were
3    interested in. Africatown was the site of the
4    last slave ship to actually land, the
5    Clotilda. They just recently found it.
6            But -- but -- but that's somewhat
7    of a -- I mean, I think you can go to any
8    demographic group. You can go to a -- a group
9    of soccer players and their focus is on soccer
10   fields. You can go to a group that focuses on
11   ballet or on some other activity, and they're
12   interested in that.
13           And so -- but -- but when the
14   African-American constituents that I worked
15   for and represented asked for my help, to the
16   best of my ability, we helped them.
17   Q.   Do you recall any examples of what
18   African-American constituents asked you for
19   that you were able to help them on aside from
20   the --
21   A.   No.
22   Q.   -- Africatown?

                                        Page 138

1    A.   They needed help with the water
2    pressure and the firehoses in Prichard, and --
3    and we helped. There would have been times
4    where there -- there were applications for
5    public transportation grants. We -- we
6    provided those letters of support.
7            There are other examples of where
8    the particular neighborhood -- or a -- a good
9    friend of mine who I served with in the
10   leadership Mobile class was from the Trinity
11   Gardens area. Trinity Gardens is a majority
12   African-American section of Mobile.
13           She -- there had been some
14   shootings. Her son had been murdered, and she
15   asked if I would come have a town hall meeting
16   to meet with the young people to try to
17   encourage them to put the guns down and to
18   start loving and -- and -- and not hating.
19   And I went.
20           I went to 26 funerals of soldiers
21   that died in Afghanistan and Iraq. Probably
22   18 were African-American. I preached at one

                                        Page 139

1    of the services. When I was standing in
2    Howard Johnson, Jr.'s bedroom with his three
3    sisters and his mother and father -- he was
4    the first soldier killed from Alabama -- I
5    wasn't standing in a black man's bedroom.
6            I was standing in an American
7    hero's bedroom. And when the father asked me
8    to preach -- he's a minister -- asked me to
9    moderate, to MC the funeral that was on
10   national TV, it was after I had said, Reverend
11   Johnson, whatever you need me to do, I will
12   do.
13           And until the day he died several
14   years later, we remained extremely close. And
15   I would be heartsick to think that anyone in
16   his family believed that I wasn't doing
17   everything in my power as a human being to
18   serve them well in their time of grief.
19   Q.   That's really sad, but it sounds
20   like you did a --
21   A.   Well, it's just -- it's just the
22   way we did things.

                                        Page 140

1    Q.   Uh-huh.
2    A.   And we did it with the -- with the
3    25 other families as well. Thank goodness
4    they didn't all ask me to lead a funeral
5    service, but -- but, you know, when you're
6    standing there and you're looking at the
7    trophies and the blue ribbons -- I mean, he
8    was an all-star athlete, and he answered his
9    country's service. And he was killed in the
10   early days of the war in Iraq.
11           And my wife baked a pound cake,
12   and I went into to see the family whom I had
13   never met before. But that's the kind of
14   bonding experience that I tried to have with
15   all of my constituents.
16           Whether it was the bad times -- I
17   mean, same thing with the oil spill. We're
18   talking about minorities as though we're just
19   talking about African-Americans, but you go to
20   Bayou La Batre, the little fishing village,
21   and when the oil spill -- when the explosion
22   occurred at Deepwater Horizon, you have to

                                        Page 141

                                Pages 138 to 141

**Page 142**

1  understand that initially -- people forget --
2  initially, we were told that -- that there was
3  no leakage. And then they said, Well, there's
4  been a breach. There is some leakage.
5          We knew that the explosion
6  occurred. We knew people had been killed, but
7  then, once we started seeing that plume of oil
8  coming up, and it was such a helpless feeling.
9  And my staff and I went door-to-door to
10  businesses whose owners couldn't even speak
11  English to let them know that we were going to
12  stand by them in Mobile and Baldwin Counties.
13          I didn't go to Washington to work
14  to take some of those meetings. And when
15  you're hugging someone whose livelihood -- and
16  if you fish for a living, if you shrimp for a
17  living, and you can't get your boat out in the
18  water because it's filled with oil, you can
19  have -- don't have any money to buy bread and
20  milk for your kids.
21          And so we pressed the people at
22  BP, and we pressed the organization what was

**Page 143**

1  set up to provide help to those families as
2  hard as anyone could have pressed. And I did
3  that because that was my job.
4      Q.  I'm sure it meant a lot to your
5  constituents to see you come door-to-door.
6      A.  It meant a lot to me --
7      Q.  Yeah.
8      A.  -- to be able to help them.
9      Q.  Yeah. In terms of civil rights
10  issues, were there any specific issues that
11  came up a lot in your district or that you
12  thought -- you understood that your
13  African-American constituents cared
14  specifically about?
15      A.  Not off the top of my head. If
16  you can give me some examples, I can -- I'd be
17  happy to -- it's kind of like this article, it
18  may jog my memory. But Mobile, as I mentioned
19  earlier, had a very progressive Mayor Joe
20  Langan --
21      Q.  Uh-huh.
22      A.  -- who worked with the

**Page 144**

1  African-American community back in the '50s
2  and '60s during the Civil Rights Movement.
3          And Mobile was fortunate to avoid
4  not all, but most of the battle scars, if you
5  will, that some Alabama cities have. And --
6  and so we -- we did not have some of the
7  issues that other places had to deal with.
8      Q.  Uh-huh. What about things like,
9  for example, educational outcomes? There are
10  generally pretty large disparities between
11  educational outcomes for African-Americans and
12  white people within Alabama, within lots of
13  different parts of the country. Was that ever
14  an issue that came up for you?
15      A.  Not in a -- not in a negative way.
16  As I said when I went to Trinity Gardens
17  with -- with my friend after her son had been
18  murdered, I mean, I -- I visited -- my goal
19  was to visit every high school in my district.
20  I did not complete that goal, but I visited
21  most of them.
22          And I -- I -- I went to the

**Page 145**

1  schools that were majority-minority schools, I
2  went to the private schools. I went to the
3  Catholic schools. I went to the schools that
4  had a more even balance. I mean, I -- I went
5  wherever. I sponsored an art contest every
6  year for the kids of the 1st congressional
7  district.
8          I nominated probably 145, maybe
9  200 young men and women to go to the military
10  academies. We did not have a quota. We
11  nominated the best students that could be
12  competitive. We nominated a lot of students
13  from different racial and ethnic backgrounds.
14          And so I don't recall that it
15  was -- there was a real time during my
16  ten-and-a-half years where there was an issue
17  that -- that arose specifically with regard to
18  it being a Civil Rights issue.
19          For instance, Senator Figures and
20  I -- as she was on the redistricting committee
21  in the 2010 redistricting and maybe even on in
22  2000, I'm not sure when she -- I think she was

1  in -- on the city council at that time.

2          But anyway, you know, we used

3  to -- we -- we used to laugh at how -- we were

4  ringing a bell for the Salvation Army one time

5  at Christmastime and got very competitive

6  that -- who got the most money in their

7  kettle, but we used to laugh at how some --

8  how hard it was for some people to imagine

9  that a -- a black Democrat and a white

10  Republican could be such close friends.

11          And she had a son that got in

12  trouble and I did everything I could to help

13  him, not because she was a state senator or

14  because she was black or because she was a

15  female, but it was the right thing to do.

16          So I don't recall that there was

17  a -- a real time or issue where the -- the

18  people in my district, regardless of their

19  political views or their racial makeup, would

20  have -- would have had -- that I would have

21  given them reason to believe that I was

22  insensitive to their views even when there

Page 146

1  were times when we disagreed.

2          And that was every time I went and

3  had dinner with my mother-in-law, I would have

4  disagreements, but -- but they were usually

5  friendly.

6      Q.   Yeah.  That's just part of the --

7  that's just part of the job.

8      A.   Yeah.

9      Q.   It sounds like you really made it

10  around your district --

11      A.   I did.

12      Q.   -- a lot.

13          Did you observe anything that, you

14  know, you recall where there were more

15  differences maybe socioeconomically -- just

16  socioeconomically between more minority

17  communities and more white communities?

18      A.   Well, I observed that there were

19  differences between -- within the minority

20  communities.  In Washington County, there's

21  a -- a -- the -- the Mobile Washington Band of

22  Choctaw Indians that was recognized by the

Page 147

1  state under Governor James' administration but

2  was never recognized by the Federal Bureau of

3  Indian Affairs.

4          Two counties over, the Poarch Band

5  of Creek Indians got a state recognition, and

6  they also got a federal recognition.  The

7  Poarch Band of Creek Indians built a casino.

8  They're -- by all accounts, are making a lot

9  of money.

10          You've got four major Indian

11  tribes in Alabama:  Creek, Choctaw, Cherokee,

12  and Chickasaw.  And two within 60 miles of

13  each are as opposite as night is from day.

14          Both really good groups of people

15  that work really hard, but one with that

16  federal recognition got a certain benefit that

17  the others who sought that recognition, they

18  never got.  I actually sponsored the

19  legislation for the MOWAS to get federal

20  recognition, but I was not able to get it

21  through the House and the Senate.

22      Q.   Uh-huh.

Page 148

1      A.   So I think that in this country

2  and quite frankly in the world, you're going

3  to always see examples of where some people

4  are -- have a -- have more advantage because

5  of education or more advantage because of

6  genetics.  You know, some people are just born

7  healthier than other people.

8          But -- but I really don't -- I

9  can't give you a specific example of where --

10  I mean, look, I'm -- in my spare time, I'm

11  head of the -- I'm -- I'm a volunteer chairman

12  of the board for the Alabama School of Math

13  and Science.

14          It's the only -- there's 17 STEM

15  schools in the nation.  Alabama has one of

16  them.  I don't know what the racial makeup is

17  of our student body.  They take students from

18  all 67 counties.  It's a free public

19  education.  But I would say probably 40

20  percent, maybe 45 percent are

21  African-American.

22          And you're taking young people who

Page 149

Pages 146 to 149

1 are gifted in the math and science area that
2 might live in a rural area like Wilcox County
3 and it's giving them a chance to go to a world
4 class education -- get a great education and
5 go on and get a great scholarship to go off to
6 college. So I've -- I've always prided myself
7 in looking for opportunities to help all
8 people.
9     Q.    Uh-huh. Did -- do you believe
10 that African-Americans in your district
11 supported Obamacare or the Affordable Care
12 Act?
13     A.    I think that they probably did.
14     Q.    Did you support the Affordable
15 Care Act?
16     A.    I did not.
17     Q.    Do you think African-Americans in
18 your district supported the repeal of
19 Obamacare?
20     A.    It's a broad generalization but
21 probably not.
22     Q.    Did you support repealing?

1 And it was not an easy vote for me
2 to cast. There were only about 35 or 36 who
3 voted against it. So I knew that I wasn't
4 voting to get something passed, but I believed
5 with all of my heart that we had seen with the
6 presidential election of 2000 and with other
7 examples as well -- that if -- it -- and it
8 worked and we needed it in the '60s for sure.
9 But -- but why didn't we apply it to the whole
10 country?
11     That was my logic behind that, but
12 I really did not have that much mail or phone
13 calls from -- I'm not saying I didn't have
14 any, but it was not a -- it was not a -- a
15 red-button issue that we heard a lot about.
16     The health care bill was. And I
17 will tell you why I voted against it. I can't
18 tell you why -- the entire Alabama delegation
19 voted against it, including Congressman Davis,
20 who was in office at the time.
21     But I kept a copy of that bill on
22 my desk. And people would come to see me, and

1     A.    I did.
2     Q.    Do you believe that
3 African-Americans in your district supported
4 the reauthorization of the Voting Rights
5 Act --
6     A.    I -- I did not --
7     Q.    -- from 2006?
8     A.    I did not hear from that many
9 African-Americans about that, but I took that
10 vote very seriously. In the -- in the 2000
11 presidential election, Bush v. Gore, we saw a
12 moment in time where the disputed ballots in
13 that presidential election were not in the
14 voting right states.
15     South Florida was not covered
16 under that. The disputed ballots in Ohio and
17 in Michigan and other states, and so I
18 consulted with Congressman Edwards who had
19 actually been in Congress when the first
20 Voting Rights Act passed and with subsequent
21 reauthorizations as well as Congressman
22 Callahan who had been in.

1 they didn't want a picture with me. They
2 wanted a picture of that bill because it was
3 this tall (indicating). But I believed with
4 all of my heart that social security was
5 created with bipartisan support.
6     Medicare was created with
7 bipartisan support. Medicaid was created with
8 bipartisan support, and I did vote to expand
9 Medicaid to include prescription drugs -- I'm
10 sorry -- Medicare.
11     We're early in my time in Congress
12 which was not popular with some of my
13 Republican constituents, but I thought it was
14 the right thing to do. But for the life of
15 me, I actually -- at a Republican retreat
16 where the president came, begged the president
17 to not force -- he had the votes to do it, and
18 he did it. But I didn't believe that it was
19 right for the country on something that
20 touched everyone because health care's
21 universal.
22     I just didn't think it was right

1  for us to have a partisan vote on something
2  that was bipartisan, as bipartisan as health
3  care. So I did vote against it. I think it
4  is safe to your premise that the majority of
5  the African-American constituents that
6  contacted me were supportive of it.
7        But some could argue that they
8  were supportive of it because the first
9  African-American president was proposing it.
10  President Clinton tried it with his wife
11  leading the effort, and Congress couldn't get
12  it passed.
13        And there are some who would say
14  today that people are opposed to it because it
15  was President Obama's bill. Just as there are
16  some people would believe today that if
17  President Trump had proposed it, there are
18  some who would support it even if it were the
19  same bill.
20        I just thought it was a bad piece
21  of legislation, that we needed to do
22  something, but I thought to do it on a

Page 154

1  back and she said, To my surprise, my family
2  understood why you did it.
3        That was personally rewarding to
4  me because my goal was never to be divisive in
5  that. I just felt that if we were going to do
6  it in 20 -- when was it? 2007?
7    Q.   2006.
8    A.   2006?
9    Q.   Yeah.
10   A.   -- then it should apply to
11  everyone.
12   Q.   Did you meet with or consult with
13  any African-American leaders --
14   A.   I did.
15   Q.   -- on this issue?
16   A.   I -- I talked with -- before big
17  boats, TARP, the voting rights extension, the
18  Affordable Care Act, there were -- I would
19  oftentimes seek advice even though, as a
20  congressman, you don't need to seek it because
21  you're going to get it anyway. But -- but I
22  oftentimes would seek the advice of -- of

Page 156

1  partisan vote would divide the country.
2    Q.   With regards to the Voting Rights
3  Act, did you hold any town halls --
4    A.   I did.
5    Q.   -- on that issue?
6    A.   Well, I didn't hold any town halls
7  on that issue. I --
8    Q.   Or did it came up at town halls?
9    A.   It came up at some. I defended my
10  vote. And even with people that disagreed
11  with me -- and there were some, but I think
12  they respected the fact that the -- the -- the
13  logic that I used. But yes, I mean, there
14  were people -- my executive assistant is --
15  was African-American.
16   Q.   Uh-huh.
17   A.   She was conservative. She was a
18  Republican. And she said, Jo, this is hard
19  for me to explain when I go home at
20  Thanksgiving.
21        And when I told her my reasoning,
22  she went home at Thanksgiving. And she came

Page 155

1  friends in a very unofficial way.
2        And yes, I -- I talked with a
3  number of my African-American friends about
4  it, about my logic behind it. One is a very
5  good friend of mine. He was a colonel in the
6  Air Force, and he said actually -- and he
7  lived in south Florida at the time. He said,
8  I think you make a pretty good point.
9    Q.   So would you be --
10   MR. DAVIS: How -- how we doing?
11  Governor's going to need our Chief of Staff
12  back before too terribly long.
13   MS. MADDURI: Understood. I don't
14  have too much more. Just a page.
15   Q.   (By Ms. Madduri) So would you be
16  supportive -- I'm -- I'm sure you know that
17  now the Supreme Court has overturned the part
18  of the Voting Rights Act that I believe were
19  discussed in Section 4 and Section 5, the
20  preclearance requirement, that only applied
21  to, you know, specific states as you
22  mentioned.

Page 157

Pages 154 to 157

1        Would you be supportive of
2  reinstating those sections if it applied to
3  all states, all jurisdictions equally?
4      A.   Well, I -- I don't have a vote
5  anymore.
6      Q.   Understood.  But your view on
7  that?
8      A.   But look, I -- my view -- I would
9  be consistent with my view.  I thought it
10  should apply to all states.
11      Q.   Do you think there's any kind of
12  partisanship divide between African-American
13  and white voters in your district or Alabama
14  as a whole?
15      A.   Define "partisanship divide."
16      Q.   Do you think one race, whether
17  white or black, votes more for Democrats or
18  Republicans?
19      A.   Sadly, I think that the evidence
20  would suggest that more African-Americans vote
21  Democrat than Republican, and that's
22  frustrating to Republicans like me who want to

Page 158

1  make -- in -- in the words of a former party
2  chairman, who want to build a big tent.
3        And we want to give people who
4  have the same values and the same goals and
5  the same aspirations a room in our party.
6      Q.   In your view, why -- why do you
7  think African-Americans tend to vote for
8  Democrats more?
9      A.   That's like asking me to read the
10  minds of the legislature.  I -- I don't know.
11  I was very proud of my many, many
12  African-American friends and supporters from
13  all walks of life.  And I was equally proud to
14  represent those that did not support me, but I
15  did everything I knew to do to serve all
16  people well and with integrity.
17        And I can't really look back on --
18  on that chapter and think well, if I had done
19  things differently, I might have gotten a few
20  more votes here or a few more votes there.
21      Q.   Just in -- and just in your
22  opinion, do you think -- what reasons do you

Page 159

1  think, if any, exist that African-Americans
2  don't tend to support Republicans?
3      A.   I -- I really don't have an
4  informed opinion about that.
5      MR. TAYLOR:  Make sure I
6  understand the extent of the question.  His
7  personal opinion about why African-Americans
8  support Republicans or Democrats?
9      MS. MADDURI:  Okay.
10      Q.   (By Ms. Madduri)  Do you think the
11  same is true on the other side?  Do you think
12  white voters tend to support Republicans more
13  often?
14      A.   Well -- well, are you talking
15  about Alabama or you --
16      Q.   Yeah --
17      A.   -- talking about nationally?
18      Q.   -- Alabama.  Alabama.  Your
19  district, your -- within your experience
20  personally.
21      A.   In -- in the last 35 years, but it
22  wasn't that long ago when Alabama was a

Page 160

1  one-party state.
2      Q.   Uh-huh.  Do you have --
3      A.   It was a Democrat state.
4      Q.   And you've -- you've been -- I
5  mean, you've watched that transformation, I'm
6  sure.  Do you have any views on why that
7  transformation happened?
8      A.   I -- I think many former Democrats
9  who became Republicans would tell you that the
10  party that they knew and grew up in changed
11  and no longer reflected their views and
12  values.
13        And, I mean, President Reagan
14  switched parties and --
15      Q.   Uh-huh.
16      A.   So there are a lot of examples of
17  people.  George Wallace, Jr --
18      Q.   Uh-huh.
19      A.   -- the son of former Democrat
20  Governor George Wallace, switched parties.
21      A lot of people switched parties,
22  but I think that the national party, as

Page 161

Pages 158 to 161

Page 162

```
 1    evidenced by what's going on today, that the
 2    Democrats continue to move further and further
 3    to the left.  And I think that for a lot of
 4    people who grew up in Alabama being a
 5    Democrat, they just don't recognize that party
 6    anymore.
 7         Q.    Are there any specific issues that
 8    jump out to you in terms of this leftward
 9    movement --
10         A.    Well --
11         Q.    -- that you think they --
12         A.    I --
13         Q.    -- disagree with?
14         A.    I think everything from today's
15    run up to the presidential campaign is about,
16    you know, universal free health care.  Well,
17    we passed the Affordable Care Act.  It's not
18    free.  And there's no way it will ever be
19    free.  You got to pay for it if you're going
20    to have a quality health care service.
21              So I -- I just think that even my
22    Democrat friends in Alabama today, and I've
```

Page 164

```
 1    congressional district.
 2         A.    Well, clearly the -- the continued
 3    development of the port of Alabama is unique
 4    to Mobile.  It is a port that serves the whole
 5    state, but we are -- as I say, I think we're
 6    the 13th largest port.
 7              We're -- we're in a position with
 8    what the state is doing with the new
 9    infrastructure bill.  We're in a position to
10    invest a sizable amount of resources to make
11    Mobile one of the top five port cities in the
12    nation.  That's going to great a whole new
13    economy of jobs and opportunities.
14              You won't need a four-year degree
15    or even a two-year degree, but you'll be able
16    to make 85 or 90 or $100,000 a year, which is
17    more than double the average family of four
18    income.  That's big time.  That's a big-time
19    opportunity.
20              The continued growth of the
21    aerospace industry in Mobile with Airbus and
22    the continued growth of the shipbuilding
```

Page 163

```
 1    got many of them, have a hard time defending
 2    some of the socialistic policies and -- and
 3    views of the -- of the national Democrat
 4    party.
 5         Q.    And I'm -- just to make sure
 6    you're not too worried, I'm at pretty much the
 7    end of everything.  Just a couple more
 8    questions for you.
 9         A.    I feel like I've been a political
10    commentator.
11         Q.    Well, I mean, your perspective is
12    interesting.
13         A.    Sure.
14         Q.    You've been involved in space.
15         A.    Not complaining.
16         Q.    Yeah.
17         A.    Not complaining.
18         Q.    You can -- you can become a pundit
19    after this.
20              I'm curious if you think there are
21    any unique needs in the -- in the City of
22    Mobile as opposed to the rest of the
```

Page 165

```
 1    industry, I mentioned the shipbuilder Austal,
 2    they're the ones building the Navy ships.  But
 3    they are competing now with a -- for a
 4    contract to get a frigate that would add
 5    another 2500 people.
 6              So you take 4500 people that work
 7    there now and you add another 2500 people,
 8    that's a game changer to your economy.  So the
 9    Mobile economy is also -- I mean, it -- it
10    takes a special skill set to be a pipe fitter
11    on a ship or to -- to be a welder on an
12    airplane.  You don't want someone who's not
13    trained to do that.
14              So one of our challenges is to
15    continue to grow our economy, to continue to
16    grow our workforce so that young people who
17    are born in that wonderful town today have a
18    chance to get a good education, get a job, and
19    raise their family in a place that they love
20    and call home.
21         Q.    Uh-huh.  Do most people that work
22    in Mobile, do they all live in that same
```

Pages 162 to 165

1    space, or are they also coming from other
2    counties?
3         A.   They live in other counties, but a
4    large percentage of them live in the Mobile,
5    Baldwin County area. Goes back to that
6    continuity and community of -- of interest.
7         Q.   Do you see any benefits to
8    African-Americans in Mobile if they were
9    included in a district that also included
10   counties from the Black Belt area?
11        A.   They are.
12        Q.   I guess more counties from the
13   Black Belt area as opposed to where they are
14   now?
15        A.   Well, the -- the district that --
16   if -- if the legislature had the ability to
17   create a new district that would be ideal in
18   every setting, in my view, it would be as
19   close to what we've got now as we have,
20   because of the historical similarities,
21   because of the recent convergence.
22            It's like we were talking about

Page 166

1    earlier with Baldwin County, the Baldwin
2    County in 1950 and the Baldwin County of today
3    are two different places.
4            I -- I can't personally see that
5    there's going to be any real benefit to
6    splitting Mobile up or to even splitting
7    Mobile and Baldwin Counties apart just for
8    the -- the political benefit of the
9    plaintiffs. I -- I think that you've got to
10   think about the 780,000 people who live there
11   and who currently are interconnected in so
12   many different ways as we've discussed.
13        Q.   What do you mean when you say "the
14   political benefits of the plaintiffs"?
15        A.   Well, the -- the plaintiffs are
16   the ones who are advocating for the second
17   district, I believe.
18        Q.   (Attorney nods head.)
19        A.   And I believe I'm right that one
20   of the -- correct me if I'm wrong, that one of
21   the people at the national level that is
22   advocating for this is the former Attorney

Page 167

1    General.
2         Q.   I actually don't know exactly, so
3    I can't -- I can't comment on --
4         A.   I believe --
5         Q.   -- that one way or the other.
6         A.   I believe that's true.
7         Q.   Okay.
8         A.   And I do find it interesting
9    personally that his Justice Department
10   approved this map. And that it was good when
11   he was Attorney General, and that now there's
12   a desire to change it, I -- I don't understand
13   the logic behind that.
14        Q.   Okay.
15            MS. MADDURI:  Well, I think -- I
16   think that's all my questions.
17            THE WITNESS:  Okay.
18            MR. DAVIS:  Before we go off the
19   record, do we need to talk? Let's step out in
20   the hall.
21            THE VIDEOGRAPHER:  We are off the
22   record at 12:44.

Page 168

1            (A recess was taken.)
2            THE VIDEOGRAPHER:  We are on the
3    record at 12:46.
4            MR. DAVIS:  Defendant has no
5    questions. Thank you, Mr. Bonner.
6            MS. MADDURI:  Thank you, sir.
7            THE VIDEOGRAPHER:  This ends MPEG
8    three and concludes the deposition of Josiah
9    Bonner. We are off the record July 30th,
10   2019, and the time is 12:46 p.m.
11
12            (The deposition of JOSIAH BONNER
13             was concluded at 12:46 p.m.)
14
15
16
17
18
19
20
21
22

Page 169

Pages 166 to 169

```
1     *  *  *  *  *  *  *  *  *  *  *
2            REPORTER'S CERTIFICATE
3     *  *  *  *  *  *  *  *  *  *  *
      STATE OF ALABAMA)
4     COUNTY OF ST. CLAIR)
5           I, Bethany Whaley, Certified Court
6     Reporter and Notary Public in and for the
      State of Alabama at Large, do hereby certify
7     that on July 30, 2019, I reported the
8     aforementioned proceedings, and that the pages
9     herein contain a true and accurate
10    transcription of the said proceedings.
11          I further certify that I am
12    neither of kin nor of counsel to the parties
13    to said cause, nor in any manner interested in
      the results thereof.
14
15
16          This the 12th day of August, 2019.
17          s/s Bethany Whaley
18          Bethany Whaley, ACCR 661
19          Certified Court Reporter and
20          Notary Public for the
21          State of Alabama
22          My commission expires 3/27/22.

                                        Page  170
```

```
1     Digital Evidence Group, L.L.C.
      1730 M Street, NW, Suite 812
2     Washington, D.C. 20036
      (202) 232-0646
3
4     SIGNATURE PAGE
      Case: Lakeisha Chestnut, et al., v. John H. Merrill
5     Witness Name: Josiah Bonner
      Deposition Date: July 30, 2019
6
7     I do hereby acknowledge that I have read
      and examined the foregoing pages
8     of the transcript of my deposition and that:
9
10    (Check appropriate box):
      ( ) The same is a true, correct and
11    complete transcription of the answers given by
      me to the questions therein recorded.
12    ( ) Except for the changes noted in the
      attached Errata Sheet, the same is a true,
13    correct and complete transcription of the
      answers given by me to the questions therein
14    recorded.
15
16
17    _____     _____
      DATE              WITNESS SIGNATURE
18
19
20
21
22    _____     _____
      DATE              NOTARY

                                        Page  172
```

```
1     Josiah Bonner, c/o
      Office of the Attorney General
2     501 Washington Avenue
      Montgomery, Alabama 36130-0152
3
4     Case: Lakeisha Chestnut, et al., v. John H. Merrill
4     Date of deposition: July 30, 2019
5     Deponent: Josiah Bonner
6
7     Please be advised that the transcript in the above
8     referenced matter is now complete and ready for signature.
9     The deponent may come to this office to sign the transcript,
10    a copy may be purchased for the witness to review and sign,
11    or the deponent and/or counsel may waive the option of
12    signing. Please advise us of the option selected.
13    Please forward the errata sheet and the original signed
14    signature page to counsel noticing the deposition, noting the
15    applicable time period allowed for such by the governing
16    Rules of Procedure. If you have any questions, please do
17    not hesitate to call our office at (202)-232-0646.
18
19
20    Sincerely,
      Digital Evidence Group
21    Copyright 2019 Digital Evidence Group
      Copying is forbidden, including electronically, absent
22    express written consent.

                                        Page  171
```

```
1     Digital Evidence Group, LLC
2     1730 M Street, NW, Suite 812
3     Washington, D.C.  20036
4     (202)232-0646
5
6            ERRATA SHEET
7
8     Case: Lakeisha Chestnut, et al., v. John H. Merrill
9     Witness Name: Josiah Bonner
10    Deposition Date: July 30, 2019
11    Page No.   Line No.   Change
12
13
14
15
16
17
18
19
20    _____          _____
21
22    Signature              Date

                                        Page  173
```

                                        Pages  170  to  173

Made in USA



Alabama -- U.S. House

Interstate

0       30       60       90

Miles

2011 Plan

BONNER
EXHIBIT 1

Josiah Bonner

7/30/2019

Made In USA



ALABAMA'S
CONGRESSIONAL DISTRICTS



Chestnut Defense 1292



# 2011 State Board of Education Districts



BONNER
EXHIBIT 3
Josiah Bonner
7/30/2019
Reported by
Bethany Whaley, CCR



Made in USA



Alabama -- U.S. House

Interstate

0    30    60    90

Miles

Revised Plan 1



Made in USA



Alabama -- U.S. House

0    30    60    90

Miles

Revised Plan 2



Alabama -- U.S. House

| 0 | 30 | 60 | 90 |

Miles

Revised Plan 3

Made in USA



Alabama -- U.S. House

0        30        60        90

Miles

Illustrative Plan 4

Made In USA

## VI. Hypothetical 2020 Plan

### (a) Geographic Area

41.     The map in **Figure 2** (on the next page) depicts a 6-district hypothetical 2020 plan ("Hypothetical Plan"), with a realistic possibility that two of the six districts will be majority-Black CVAP by 2020.

**Figure 2**

### Alabama U.S. House –Hypothetical 2020 6-District Plan



42.     The Hypothetical Plan is drawn using 2010 VTDs (and 2010 population), with a projected 2020 statewide population of 4.9 million (slightly

15



BONNER
EXHIBIT 8
Josiah Bonner
7/30/2019