FILED

2023 Aug-09  PM 02:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| EVAN MILLIGAN, et al.,<br><br>      *Plaintiffs,*<br><br>    v.<br><br>WES ALLEN, in his official capacity as Alabama Secretary of State,<br><br>      *Defendant.* | Civil Action No.: 2:21-cv-01530-AMM<br><br>THREE-JUDGE COURT |
| MARCUS CASTER, et al.,<br><br>      *Plaintiffs,*<br><br>    v.<br><br>WES ALLEN, in his official capacity as Alabama Secretary of State,<br><br>      *Defendant.* | Civil Action No.: 2:21-cv-01536-AMM |

**BRIEF FOR THE NATIONAL REPUBLICAN REDISTRICTING TRUST AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS (*MILLIGAN* ECF NO. 220)**

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................. ii

Interest of *Amicus Curiae* ........................................................................1

Introduction ...............................................................................................3

Argument....................................................................................................5

  I.   *Allen* does not authorize novel, unlawful remedies........................5

    A.   Section 2 does not require proportional or super-proportional
    representation. ....................................................................................6

    B.   Section 2 does not require the creation of opportunity districts. .............12

  II.   Alabama's 2023 Plan follows *Allen*. ..........................................14

Conclusion ...............................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Abrams v. Johnson*,
  521 U.S. 74 (1997) ........................................................................................ 9

*Allen v. Milligan*,
  143 S. Ct. 1487 (2023) .......................................................................... *passim*

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  140 S. Ct. 2335 (2020) ................................................................................ 19

*Bartlett v. Strickland*
  556 U.S. 1 (2009) ................................................................................. 12, 13

*Brnovich v. Democratic Nat'l Comm.*,
  141 S. Ct. 2321 (2021) ................................................................................. 6

*Cooper Indus.*, Inc. *v. Aviall Servs.*, Inc.
  543 U.S. 157 (2004) ................................................................................... 18

*Doran v. Salem Inn, Inc.*,
  422 U.S. 922 (1975) ................................................................................... 16

*Growe v. Emison*,
  507 U.S. 25 (1993) ....................................................................................... 1

*Johnson v. De Grandy*,
  512 U.S. 997 (1994) ............................................................................... 6, 11

*Miller v. Johnson*
  515 U.S. 900 (1995) ................................................................................. 7, 9

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ................................................................................... 19

*North Carolina v. Covington*
  138 S. Ct. 2548 (2018) ............................................................................... 19

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
  140 S. Ct. 1525 ......................................................................................... 20

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019) .......................................................................... 6, 13

*Seminole Tribe* of *Fla. v. Florida*
    Fla., 517 U.S. 44 (1996) ................................................................... 18

*Singleton v. Merrill*,
    582 F. Supp. 3d 924 (N.D. Ala. 2022) ................................. 10, 16, 19

*Sole v. Wyner*,
    551 U.S. 74 (2007) ........................................................................ 15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    143 S. Ct. 214 (2023) .......................................................................... 10

*States v. L.A. Tucker Truck Lines, Inc.*,
    344 U.S. 33 (1952) ........................................................................ 18

*United Jewish Orgs. of Williamsburgh, Inc. v. Carey*,
    430 U.S. 144 (1977) ........................................................................ 10

*United States v. Richardson*,
    418 U.S. 166 (1974) ........................................................................ 20

*United States v. Rutherford*,
    442 U.S. 544 (1979) ........................................................................ 20

*Univ. of Texas v. Camenisch*,
    451 U.S. 390 (1981) ................................................................. 15, 16

*Wisconsin Legislature v. Wisconsin Elections Comm'n*,
    142 S. Ct. 1245 (2022) ....................................................................... 7

## U.S. Constitution and Statutes

U.S. Const., art I, § 4............................................................................. 1

52 U.S.C. § 10301 (Voting Rights Act § 2) ................................... *passim*

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae*, the National Republican Redistricting Trust ("NRRT"), is the central Republican organization tasked with coordinating and collaborating with national, state, and local groups on the fifty-state congressional and state legislative redistricting effort. NRRT's mission is threefold.

First, it aims to ensure that redistricting faithfully follows all federal constitutional and statutory mandates. Under Article I, § 4 of the U.S. Constitution, the State Legislatures are primarily entrusted with the responsibility of redrawing the States' congressional districts. *See Growe v. Emison*, 507 U.S. 25, 34 (1993). Every citizen should have an equal voice, and laws must be followed to protect the constitutional rights of individual voters, not political parties or other groups.

Second, NRRT believes redistricting should be conducted primarily by applying the traditional redistricting criteria States have applied for centuries. This means districts should be sufficiently compact and preserve communities of interest by respecting municipal and county boundaries, avoiding the forced combination of disparate populations as much as possible. Such sensible districts follow the principle that legislators represent individuals living within identifiable communities. Legislators do not represent political parties, and we do not have a system of statewide proportional representation in any State. Article I, § 4 of the U.S. Constitution tells courts that any change in our community-based system of

districts is exclusively a matter for deliberation and decision by our political branches—the State Legislatures and Congress.

Third, NRRT believes redistricting should make sense to voters. Each American should be able to look at their district and understand why it was drawn the way it was.

To advance these principles, NRRT regularly files *amicus* briefs in redistricting cases, including two briefs during the Supreme Court's prior consideration of this case.

## **INTRODUCTION**

"Forcing proportional representation is unlawful and inconsistent with this Court's approach to implementing § 2." *Allen v. Milligan*, 143 S. Ct. 1487, 1509 (2023). That was the "simple" "point" emphasized by the Supreme Court a few months ago. *Id.* That point—and the corollary point that "§ 2 never requires adoption of districts that violate traditional redistricting principles" (*id.* at 1510 (cleaned up))—is "ma[d]e clear" by "the Court's precedents." *Id.* at 1518 (Kavanaugh, J., concurring in part).

Yet the Plaintiffs are demanding exactly what the Supreme Court said is "never require[d]": proportional representation via remedial plans that subordinate traditional redistricting criteria to race. The Voting Rights Act ("VRA") does not require proportionality, much less super-proportionality—which is exactly what two majority-minority districts here would entail. Nor does the Voting Rights Act require districts that contain less than a majority of a minority group on some sort of crossover opportunity voting theory. The Supreme Court has repeatedly rejected reading § 2 to require such remedies. The State's 2023 Plan adheres to traditional districting principles better than any of the Plaintiffs' plans, maintaining communities of interest that the 2021 Plan did not. To reject this new Plan—without even considering its merits, as the Plaintiffs demand—would turn the Supreme Court's VRA precedents on their head.

For that reason, any suggestion that the State is "defying" the Supreme Court's opinion in *Allen* by passing a law that follows traditional districting principles rather than racial proportionality makes no sense. To the contrary, the Plaintiffs' plans, which "[f]orc[e] proportional representation," defy that opinion and a long line of precedents. *Allen*, 143 S. Ct. at 1509. And the notion that a State "defies" an appellate affirmance of a preliminary injunction by passing a new law misunderstands: (1) the tentative nature of every preliminary injunction, (2) the parameters of the preliminary injunction here (which merely enjoined enforcement of the old plan), (3) the limited scope of an appellate holding that a preliminary injunction was not an abuse of discretion, and (4) *Allen*'s limitation to Section 2 liability standards. Nothing about the prior proceedings here establish any "law of the case"; every preliminary injunction ruling is tentative, pending a trial on the merits. That never happened. And now there is a different law. Faced with a new law, the Plaintiffs must prove their case anew. They cannot do so, since Supreme Court precedent forecloses their forced proportional or "opportunity district" remedies. The Court should overrule the Plaintiffs' objections and deny a preliminary injunction.

## ARGUMENT

**I.**   *Allen* **does not authorize novel, unlawful remedies.**

As Justice Kavanaugh explained in *Allen*, Supreme Court decisions "have flatly rejected" requiring states to enact "a proportional number of majority-minority districts" by "group[ing] together geographically dispersed minority voters into unusually shaped districts, without concern for traditional districting criteria." 143 S. Ct. at 1518 (opinion concurring in part). Analyzing these precedents, the majority in *Allen* agreed that § 2 "never require[s] adoption of districts that violate traditional redistricting principles" *Id.* at 1510; *see id.* at 1508–10 (collecting cases showing that "the *Gingles* framework itself imposes meaningful constraints on proportionality, as our decisions have frequently demonstrated").

Here, given the nature of Alabama's population and geographic dispersion—only 11 of 67 counties are majority black—it would be surprising to see proportional representation *without* a violation of traditional districting principles. It is therefore unsurprising that the Plaintiffs' proposed remedial plans significantly underperform the State's 2023 Plan when it comes to traditional districting principles, particularly with regard to keeping communities of interest together. Under the Supreme Court's precedents, reiterated in *Allen*, this Court should not impose one of the Plaintiffs' super-proportional remedial plans as a substitute for a state plan that adheres to traditional districting principles.

### A.   Section 2 does not require proportional or super-proportional representation.

The Plaintiffs' proposed remedial plans cannot be substituted for the State's 2023 Plan because Section 2 does not guarantee equality through proportional representation. "[T]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority candidates." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994). Section 2 is violated only if "the political processes leading to nomination or election . . . are not equally open to participation by members of a class of citizens." 52 U.S.C. § 10301(b). Section 2 specifically disclaims that it "establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*; *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2342 n.14 (2021) (noting this disclaimer as "a signal that § 2 imposes something other than a pure disparate-impact regime"); *Rucho v. Common Cause*, 139 S. Ct. 2484, 2502 (2019) ("[A] racial gerrymandering claim does not ask for a fair share of political power and influence . . . .  It asks instead for the elimination of a racial classification.").

Thus, "[f]ailure to maximize [minority representation] cannot be the measure of § 2." *De Grandy*, 512 U.S. at 1017. In *De Grandy*, the Supreme Court examined proportionality only as potentially relevant in the "totality of circumstances" analysis. *Id.* at 1011. But the Court cautioned that "the degree of probative value assigned to disproportionality, in a case where it is shown, will vary not only with

the degree of disproportionality but with other factors as well." *Id.* at 1021 n.17. "[L]ocal conditions" matter. *Id.* (cleaned up). And even purported proportionality is not "a safe harbor for any districting scheme." *Id.* at 1018. The "totality-of-circumstances analysis" cannot be "reduced" to the "single factor" of "proportionality." *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 142 S. Ct. 1245, 1250 (2022). In particular, as *Allen* reiterated, proportionality cannot be substituted for traditional districting principles.

*Miller v. Johnson* provides a good example of how this works in practice. There, the Supreme Court explained that to establish a racial gerrymandering claim, "a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." 515 U.S. 900, 916 (1995) (cleaned up). "Where these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a State can defeat a claim that a district has been gerrymandered on racial lines." *Id.* (cleaned up).

In *Miller*, the Court invalidated congressional maps drawn in Georgia that sought proportional representation. At the insistence of the U.S. Department of Justice, the state legislature had drawn three of 11 districts as majority-minority to mirror the State's black population (27%). *Id.* at 906–07, 927–28. The Court rejected those maps because, as the State had all but conceded, "race was the predominant factor in drawing" the new majority-minority district. *Id.* at 918. "[E]very objective

districting factor that could realistically be subordinated to racial tinkering in fact suffered that fate." *Id.* at 919 (cleaned up). Even where "the boundaries" of the new district "follow[ed]" existing divisions like precinct lines, those choices were themselves the product of "design[] . . . along racial lines." *Id.* (cleaned up).

The Court rejected this racial gerrymander, specifically holding that "there was no reasonable basis to believe that Georgia's earlier [non-proportional] plans violated" the VRA. *Id.* at 923. "The State's policy of adhering to other districting principles instead of creating as many majority-minority districts as possible does not support an inference that the plan . . . discriminates on the basis of race or color." *Id.* at 924. Because engaging in "presumptively unconstitutional race-based districting" would have brought the VRA "into tension with the Fourteenth Amendment," the Court rejected the State's maps, even though those maps provided proportional representation. *Id.* at 927. As the Court explained, "It takes a shortsighted and unauthorized view of the Voting Rights Act to invoke that statute, which has played a decisive role in redressing some of our worst forms of discrimination, to demand the very racial stereotyping the Fourteenth Amendment forbids." *Id.* at 927–28.

The Court thus remanded the case, and after the state legislature failed to act, the district court drew maps with only one majority-minority district (9%)—meaning representation that fell far below black Georgians' 27% share of the population.

8

*Abrams v. Johnson*, 521 U.S. 74, 78 (1997); *see id.* at 103 (Breyer, J., dissenting). "The absence of a second, if not a third, majority-black district" was "the principal point of contention" in the second appeal to the Supreme Court. *Id.* at 78 (majority opinion). Yet the Court upheld the district court's maps, which focused on "Georgia's traditional redistricting principles." *Id.* at 84. The district court had "considered the possibility of creating a second majority-black district but decided doing so would require it to subordinate Georgia's traditional districting policies and consider race predominantly, to the exclusion of both constitutional norms and common sense." *Id.* (cleaned up).

The Supreme Court agreed with that conclusion, explaining "that the black population was not sufficiently compact" for even "a *second* majority-black district." *Id.* at 91 (emphasis added)). Thus, even getting to two majority-minority districts (18%) by focusing on race would have violated the Equal Protection Clause, and the Supreme Court rejected the use of DOJ's proposed "plan as the basis for a remedy [that] would validate the very maneuvers that were a major cause of the unconstitutional districting" at issue in *Miller*. *Id.* at 86; *see id.* at 109 (Breyer, J., dissenting) ("The majority means that a two-district plan would be unlawful—that it would violate the Constitution").

The Supreme Court in *Allen* highlighted *Miller* along with several other precedents, including *Shaw v. Reno* and *Bush v. Vera*, in explaining that "traditional

districting criteria limit[s] any tendency of the VRA to compel proportionality." 143 S. Ct. at 1509. Here, nearly every county in Alabama is majority white; only 11 of 67 are majority black. The share of any black voting-age population in Alabama (the most Plaintiff-favorable metric) is 25.9%—lower than the Plaintiffs' and this Court's rounded 27% figure (which the Court used to justify its conclusion at the preliminary injunction stage that 28.57% representation would be proportional). *See Singleton v. Merrill*, 582 F. Supp. 3d 924, 1025 (N.D. Ala. 2022). This corrected BVAP shows that the Plaintiffs are seeking super-proportional representation. *Amicus* is unaware of any case since the enactment of the Voting Rights Act in which a federal court's mandate of a maximization plan providing for super-proportional representation was affirmed by the Supreme Court.[1]

---

[1] *See United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 165 (1977) (suggesting that super-proportional plans would exclude the majority "from participation in the political processes" and amount to "discrimination violative of the Fourteenth Amendment"); *see also id.* at 173 (Brennan, J., concurring in part) ("[W]hat is presented as an instance of benign race assignment in fact may prove to be otherwise," which "suggest[s] the need for careful consideration of the operation of any racial device, even one cloaked in preferential garb. And if judicial detection of truly benign policies proves impossible or excessively crude, that alone might warrant invalidating any race-drawn line."). As the Supreme Court recently reiterated: "Eliminating racial discrimination means eliminating all of it. And the Equal Protection Clause, we have accordingly held, applies without regard to any differences of race, of color, or of nationality—it is universal in its application." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2161–62 (2023) (cleaned up).

In any event, under *Allen* and the established precedents discussed above, a federal court may not mandate even a proportional representation plan in derogation of traditional districting principles. The Supreme Court has warned that if a state uses different "line-drawing standards in minority neighborhoods as it used elsewhere in the jurisdiction, the inconsistent treatment might be significant evidence of a § 2 violation, even in the face of proportionality." *De Grandy*, 512 U.S. at 1015. As to the 2021 Plan here, the Plaintiffs repeatedly argued that the neutral districting principle was keeping communities together, and "HB1 fragments two significant majority-Black communities of interest—the Black Belt and the City of Montgomery—while maintaining in a single district the majority-White, 'French and Spanish'-ethnic population of Baldwin and Mobile Counties." Brief for *Milligan* Appellees 20–21, *Allen*, No. 21-1086 (U.S. July 11, 2022), https://tinyurl.com/2x45zehh. Yet now, faced with the 2023 Plan that keeps the Black Belt together better than the Plaintiffs' plans *and* maintains communities in the Gulf Coast and Wiregrass, the Plaintiffs demand the inconsistent treatment they had decried by calling for a split of the latter communities. Using the myopic goal of proportionality to excuse this violation of traditional districting principles "would be in derogation of the statutory text and its considered purpose, . . . and of the ideal that the Voting Rights Act of 1965 attempts to foster": "equal political and electoral opportunity." *De Grandy*, 512 U.S. at 1018, 1020.

11

In short, Plaintiffs' remedial submission splits communities of interest, divides cities and counties along racial lines, and connects disparate minority populations to achieve a race-based outcome not required by the Voting Rights Act. Under *Allen* and the Supreme Court's longstanding precedents, the Plaintiffs' super-proportionality-focused plans may not be substituted for the State's Plan that satisfies traditional districting principles.

### B. Section 2 does not require the creation of opportunity districts.

The Plaintiffs have also demanded plans that supposedly would give black Alabamians an opportunity to elect the candidate of their choice in a district less than majority black. Under established precedent, this remedy is also unavailable. In *Bartlett v. Strickland*, the Supreme Court held "that § 2 does not require crossover districts"—*i.e.*, "one in which minority voters make up less than a majority of the voting-age population." 556 U.S. 1, 13, 23 (2009) (plurality opinion). That is because § 2 "requires a showing that minorities 'have less opportunity than other members of the electorate to . . . elect representatives of their choice,'" and in crossover districts, minorities "have no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength." *Id.* at 14. If such districts could be judicially imposed, courts would be placed "in the untenable position of predicting many political variables and tying them to race-based assumptions." *Id.* at 17. But courts are inherently ill-equipped to

"make decisions based on highly political judgments of th[ese] sort[s]." *Id.* at 17 (cleaned up); *accord Rucho*, 139 S. Ct. at 2501 (explaining that "how close does the split need to be for the district to be considered competitive" is an unanswerable political question). Plus, "[i]f § 2 were interpreted to require crossover districts," "it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions." *Bartlett*, 556 U.S. at 21 (cleaned up).

Of course, "§ 2 allows States to choose their own method of complying with the Voting Rights Act," and "that may include drawing crossover districts." *Id.* at 23. But "there is no support for the claim that § 2 can require the creation of crossover districts in the first instance" by a federal court. *Id.* at 24; *accord Caster* ECF No. 179, at 7 ("Plaintiffs are not aware of any case in which a court has approved a Section 2 remedial district with less than a majority-minority voting-age population."). Nor may a state attempt compliance with § 2 of the Voting Rights Act by using a crossover district when a crossover district violates the state's own criteria. Just as the Supreme Court rejected this approach in North Carolina in *Bartlett*, this Court should reject it here.

Any suggestion that this Court should impose some sort of greater opportunity district runs afoul of Supreme Court precedent. None of the Plaintiffs' plans provides an appropriate § 2 remedy against the State's superior 2023 Plan.

II.   **Alabama's 2023 Plan follows *Allen*.**

Plaintiffs and their *amici* repeatedly proclaim that Alabama is somehow "defying" the Supreme Court's opinion by declining to adopt a proportional representation plan. *See Caster* ECF No. 179, at 1 ("Alabama is in open defiance of the federal courts."); *Milligan* ECF No. 208-1, at 6 (Rep. Sewell and Congressional Black Caucus *amicus* brief: "Alabama is directly defying the Supreme Court's decision in *Allen v. Milligan*." (capitalization omitted)).

This is nonsense. Far from being contrary to the Supreme Court's ruling, Alabama's 2023 Plan faithfully follows it—and the Plaintiffs' plans disregard it. As just shown, Alabama's 2023 Plan is consistent with a long line of Supreme Court precedents holding that states must not subordinate traditional districting principles to race. The Plaintiffs' remedial plans, on the other hand, perform worse when it comes to those traditional principles because they prioritize super-proportional racial representation. As discussed, the State's Plan and the Plaintiffs' plans no longer involve equally "split communit[ies] of interest." *Allen*, 143 S. Ct. at 1505. The Plaintiffs' plans alone depend on splitting up communities of interest. It is their prioritization of proportional representation over neutral districting principles that defies the Supreme Court.

More fundamentally, neither this Court nor the Supreme Court have held that Alabama's 2021 Plan violated Section 2. That is because the prior proceedings

merely involved a preliminary injunction. As the Supreme Court explained its holding, "the District Court concluded that plaintiffs' § 2 claim was likely to succeed under *Gingles*," and "[b]ased on our review of the record, we agree." *Allen*, 143 S. Ct. at 1504. This holding does not establish that the 2021 Plan was unlawful. *Contra Caster* ECF No. 190, at 1 ("the question of Alabama's liability is not an open one"). And the entirely different 2023 Plan could not somehow "defy" a non-existent holding.

"At the preliminary injunction stage, the court is called upon to assess the probability of the plaintiff's ultimate success on the merits." *Sole v. Wyner*, 551 U.S. 74, 84 (2007). It is "only the parties' opening engagement," and any "provisional relief granted" is "tentative" "in view of the continuation of the litigation to definitively resolve the controversy." *Id.* Contrary to the Plaintiffs' claims about "law of the case," *e.g.*, *Milligan* ECF No. 210, at 10, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see Caster* ECF No. 190, at 13 (admitting that there has been no "trial on the merits").

The scope of an appellate affirmance of a preliminary injunction—like *Allen*—is similarly circumscribed. The issue before an appellate court considering a preliminary injunction is merely "whether the District Court had abused its discretion in issuing a preliminary injunction," an inquiry that is "significantly

different" from "a final resolution of the merits." *Camenisch*, 451 U.S. at 393. Because of the limited "extent of [the] appellate inquiry," the Supreme Court in *Allen* necessarily "intimate[d] no view as to the ultimate merits of [the Plaintiffs'] contentions." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 934 (1975) (cleaned up). To read the Court's decision otherwise is to assign it authority it does not have.

The Supreme Court's decision in *Allen* was even narrower than a typical decision of a preliminary injunction appeal. That is because the Court limited its consideration to one preliminary injunction factor: the likelihood of success. And the Court merely "affirmed" this Court's determination "that plaintiffs demonstrated a reasonable likelihood of success on their claim that HB1 violates § 2" and thus its preliminary injunction prohibiting "Alabama from using HB1 in forthcoming elections." 143 S. Ct. at 1502.

*Allen* decided nothing more. It certainly did not decide that the State *must* draw two majority-minority districts. The Plaintiffs and their *amici* repeatedly note this Court's statement that "as a practical reality, the evidence of racially polarized voting adduced during the preliminary injunction proceedings suggests that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Singleton*, 582 F. Supp. 3d at 1033. But, as shown above, the Supreme Court's opinion is to the opposite effect. In any event, the question of an appropriate remedy was simply not before the Supreme

Court. *Allen* focused on the *Gingles* factors and Section 2 standards for liability, not any remedial question.

The State's briefs in the Supreme Court did not address this Court's "suggestion" of a remedial majority-minority district. The *Milligan* Plaintiffs affirmatively told the Supreme Court that this Court "did not order Alabama to enact Plaintiffs' plans or even to create a second majority-Black district." Brief for *Milligan* Appellees, *supra*, at 2. Likewise, the *Caster* Plaintiffs told the Supreme Court that "Alabama offers no reason to conclude that a remedy in this case would compel . . . a fixed racial percentage," that "no racial target applies to remedial districts," and that "states retain broad discretion in drawing districts to comply with the mandate of § 2 [t]hat will not necessarily require the creation of a majority-minority district." Brief for *Caster* Respondents 26, 55, 53, *Allen*, Nos. 21-1086, 21-1087 (U.S. July 11, 2022) (cleaned up), https://tinyurl.com/yc526b26; *see also* Oral Arg. Trans. 70:14–16, *Allen*, Nos. 21-1086, 21-1087 (U.S. Oct. 4, 2022) (*Milligan* attorney: "[W]hat plaintiffs are really looking for is not any sort of guarantee of a second majority-minority district."), https://tinyurl.com/j6bmnk8w.

In light of these statements, it beggars belief for the Plaintiffs to now claim that anything short of two majority-minority district is "defying" the Supreme Court. The Court did not consider that issue, and the Plaintiffs told the Court that the State need *not* draw two majority-minority districts. No one could pretend that the

17

Supreme Court somehow held—either in its "result" or in "those portions of the opinion necessary to that result"—that the State had to do what the Plaintiffs told the Supreme Court it did not have to do. *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 67 (1996); *cf. Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (cleaned up));*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) (where an issue was neither "raised in briefs or argument nor discussed in the opinion of the [c]ourt," there is no "binding precedent on th[e] point"); *contra* ECF No. 210, at 3–4 (*Milligan* Plaintiffs implying that the Supreme Court "affirmed" this Court's remedial suggestion).

Thus, neither the State nor this Court is "bound" to require two majority-minority districts. *Seminole Tribe*, 517 U.S. at 67. The Supreme Court made no such holding (as the issue was not raised), it made no final determination on the merits of *any* issue here, and it *rejected* the proposition that Section 2 requires proportionality. The State is not "defying" the Supreme Court; those who insist on two majority-minority districts are.

A related point of confusion deserves clarification. Plaintiffs' entire argument about whether S.B.5 "satisf[ies] the preliminary injunction" (*Milligan* ECF No. 210, at 2–3) is misdirected. *See also Milligan* ECF No. 200, at 1 ("Alabama's new

congressional map ignores this Court's preliminary injunction order"). Under the order, this Court "PRELIMINARILY ENJOIN[ED] Secretary Merrill from conducting any congressional elections according to the [2021] Plan." *Singleton*, 582 F. Supp. 3d at 936. That injunction was stayed by the Supreme Court, and since the stay was lifted, no one contends that a congressional election has been held under the 2021 Plan. The preliminary injunction contained no other *order* requiring the State to do anything about a new plan. The State chose to enact a new map.

There is simply nothing in the preliminary injunction for the new law to "satisfy," as the Plaintiffs say. Nor should this new law be characterized as a "remedy" for a non-existent order.[2] The judicial authority under Article III "amounts to little more than the negative power to disregard an [unlawful] enactment." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 n.8 (2020) (plurality opinion) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)); *contra Caster* ECF No. 179, at 2 ("The Court struck down Alabama's congressional plan"). Now that the 2021 Plan has been repealed, any injunction as to that Plan's enforcement is simply inoperative.

---

[2] The Caster Plaintiffs' reliance on *North Carolina v. Covington* to rebut this point (ECF No. 190, at 8) is misplaced, as that case involved a court *order* for "the General Assembly to draw remedial maps for the State House and State Senate within a month." 138 S. Ct. 2548, 2550 (2018).

The Plaintiffs' objection to this conclusion underscores their confusion about the nature of Article III's judicial power. According to the *Milligan* Plaintiffs, requiring them to show that a new law is unlawful "would afford states endless opportunities to remedy likely [legal] violations, pressing restart on a case every time a legislature enacts a new [law] that purports to comply with a preliminary injunction order." ECF No. 210, at 6. Yes: that is why challenges to an "old rule" are often "moot." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1526 (2020). "[W]here the plaintiff may have some residual claim under the new framework," any prior judgment should be vacated and "the parties may, if necessary, amend their pleadings or develop the record more fully." *Id.* Here, of course, there was no final judgment to vacate. And if a state passes a new law that is unlawful, federal courts may intervene in a proper case or controversy if the plaintiff proves his case. If a state "simply re-enacted the same district lines," *Caster* ECF No. 190, at 8, a preliminary injunction would likely not be long in issuing. But federal courts do not sit as permanent "councils of revision." *United States v. Rutherford*, 442 U.S. 544, 555 (1979); *see United States v. Richardson*, 418 U.S. 166, 189 (1974) (Powell, J., concurring) (explaining that under the Council of Revision, "every law passed by the legislature automatically would have been previewed by the Judiciary before the law could take effect"). They decide cases or controversies, and the 2023 Plan presents a new controversy.

In sum, the Plaintiffs have the burden anew of proving their entitlement to what they once disclaimed: the judicial creation of more majority-minority districts to achieve purported proportionality. It is *that* theory that defies the Supreme Court's repeated precedents.

## **<u>CONCLUSION</u>**

For these reasons, the Court should reject the Plaintiffs' remedial plans and deny a preliminary injunction.

Respectfully submitted,                           DATE: August 9, 2023

*s/ Mateo Forero-Norena*
Mateo Forero-Norena                              Christopher E. Mills*
  Bar No. 1319A00G                      SPERO LAW LLC
HOLTZMAN VOGEL BARAN                              557 East Bay St. #22251
  TORCHINSKY & JOSEFIAK PLLC             Charleston, SC 29413
2300 N Street NW, Suite 643                       (843) 606-0640
Washington, DC 20037                              cmills@spero.law
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)                        *Pro hac vice* admission pending
mforero@holtzmanvogel.com

Counsel for *Amicus Curiae*