**FILED**

2023 Aug-13  PM 12:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5            NO. 2:21-CV-01530-AMM

6

7    EVAN MILLIGAN, et al.,

8           Plaintiffs,

9    vs.

10   WES ALLEN, et al.,

11          Defendants.

12

13

14      VIDEOTAPED REMOTE DEPOSITION OF:

15               RANDY HINAMAN

16               August 9, 2023

17                 9:08 A.M.

18

19

20

21   REPORTED BY:

22        Cindy C. Jenkins, CCR

23

24

25
```

**Page 2**

```
1            S T I P U L A T I O N S

2

3        IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of Randy Hinaman

6    may be taken before Cindy C. Jenkins,

7    Commissioner, via Zoom Video Conference, on

8    the 9th day of August, 2023.

9

10       IT IS FURTHER STIPULATED AND AGREED

11   that the signature to and the reading of the

12   deposition by the witness is waived, the

13   deposition to have the same force and effect

14   as if full compliance had been had with all

15   laws and rules of Court relating to the taking

16   of depositions.

17

18

19

20

21

22

23

24

25
```

**Page 3**

```
1            S T I P U L A T I O N S

2               (continued)

3

4        IT IS FURTHER STIPULATED AND AGREED

5    that it shall not be necessary for any

6    objections except as to form or leading

7    questions, and that counsel for the parties

8    may make objections and assign grounds at the

9    time of the trial, or at the time said

10   deposition is offered in evidence or prior

11   thereto.

12

13       IT IS FURTHER STIPULATED AND AGREED

14   that the notice of filing of the deposition by

15   the Commissioner is waived.

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
1            A P P E A R A N C E S

2

3    APPEARING ON BEHALF OF THE MILLIGAN
     PLAINTIFFS:
4        HOGAN LOVELLS US LLP
         Mr. Blayne R. Thompson
5        609 Main Street
         Suite 4200
6        Houston, Texas 77002
         blayne.thompson@hoganlovells.com
7        NAACP LEGAL DEFENSE & EDUCATIONAL FUND
         Mr. Deuel Ross
8        Mr. Tanner Lockhead
         700 14th Street, Northwest
9        Suite 600
         Washington, DC 20005
10       dross@naacpldf.org
11       NAACP LEGAL DEFENSE
         & EDUCATIONAL FUND, INC.
12       Ms. Brittany Carter
         40 Rector Street, 5th Floor
13       New York, New York 10006
         212-965-2200
14
         AMERICAN CIVIL LIBERTIES UNION FOUNDATION
15       Mr. Davin M. Rosborough
         125 Broad Street
16       New York, New York 10004
         drosborough@aclu.org
17
         NAACP
18       Mr. Anthony Ashton
         4805 Mount Hope Drive
19       Baltimore, Maryland 21215
         aashton@naacpnet.org
20
     APPEARING ON BEHALF OF THE CASTER PLAINTIFFS:
21       ELIAS LAW GROUP LLP
         Ms. Jyoti Jasrasaria
22       250 Massachusetts Avenue, Northwest
         Suite 400
23       Washington, D.C. 20001
         jjasrasaria@elias.law
24
25
```



M43

RANDY HINAMAN
EVAN MILLIGAN, et al. vs WES ALLEN, et al.
August 09, 2023

Page 5

```
 1           APPEARANCES
                (continued)
 2
 3   APPEARING ON BEHALF OF THE COCHAIRS; RANDY
     HINAMAN, STEVE LIVINGSTON, and CHRIS PRINGLE:
 4        BALCH & BINGHAM
          Mr. Dorman Walker
 5        105 Tallapoosa Street
          Suite 200
 6        Montgomery, Alabama 36104
          dwalker@balch.com
 7
     APPEARING ON BEHALF OF THE SECRETARY OF STATE,
 8   WES ALLEN:
          OFFICE OF THE ATTORNEY GENERAL
 9        Mr. Jim Davis
          Assistant Attorney General
10        501 Washington Avenue
          Montgomery, Alabama 36130
11        jim.davis@alabamaag.gov
12
13   VIDEOGRAPHER:
14        Mr. Bailey Diaz
15
16   ALSO PRESENT:
17        Ms. Joelle Miller
18        Ms. Donna Loftin
19        Mr. Chris Pringle
20
21
22
23
24
25
```

Page 6

```
 1            I N D E X
 2   WITNESS                          PAGE
 3   RANDY HINAMAN
 4   Examination by Mr. Thompson         9
 5   Examination by Ms. Jasrasaria      96
 6
 7           INDEX OF EXHIBITS
 8   NUMBER                           PAGE
 9   Exhibit 1                          23
10   Exhibit 2                          26
11   Exhibit 3                          34
12   Exhibit 4                          38
13   Exhibit 5                          61
14   Exhibit 6                          62
15   Exhibit 7                          76
16   Exhibit 8                          84
17   Exhibit 9                          86
18   Exhibit 10                         88
19   Exhibit 11                         91
20
21
22
23
24
25
```

Page 7

```
 1              PROCEEDINGS
 2   AUGUST 9, 2023            9:08 A.M.
 3        THE VIDEOGRAPHER:  Good morning.
 4   We're now on the record.  The time is now
 5   9:08 a.m. on Wednesday, August 8, 2023.  This
 6   begins the videotaped deposition of -- I
 7   apologize -- August 9th, 2023.  This begins
 8   the videotaped deposition of Randy Hinaman
 9   taken in the matter of Evan Milligan, et al.,
10   vs. Wes Allen, et al., the case number of
11   which is 2:21-CV-0153-AMM.
12        The videographer today is Bailey
13   Diaz.  Our court reporter is Cindy Jenkins,
14   both representing Esquire Deposition
15   Solutions.
16        Counsel, would you please announce
17   your name for the record and whom you
18   represent, after which the court reporter will
19   swear in the witness.
20        MR. THOMPSON:  This is Blayne
21   Thompson from Hogan Lovells on behalf of the
22   Milligan plaintiffs.
23        MR. ROSS:  Deuel Ross also on
24   behalf of the Milligan plaintiffs.
25        MR. ROSBOROUGH:  Davin Rosborough
```

Page 8

```
 1   on behalf of the Milligan plaintiffs.
 2        MR. LOCKHEAD:  Tanner Lockhead
 3   also on behalf of the Milligan plaintiffs.
 4        MS. CARTER:  Brittany Carter also
 5   on behalf of the Milligan plaintiffs.
 6        MR. WALKER:  Dorman Walker on
 7   behalf on behalf of the Reapportionment
 8   Committee Chairs.  I'm in the room with
 9   Mr. Hinaman.  Also in the room with us is
10   Senator Livingston.  And there's nobody else
11   in the room.
12        MS. JASRASARIA:  Hi.  This is
13   Jyoti Jasrasaria from Elias Law Group, and I'm
14   here on behalf of the Caster plaintiffs.
15        MR. DAVIS:  Jim Davis with the
16   Alabama -- excuse me, the Alabama Attorney
17   General's Office representing the Alabama
18   Secretary of State, Wes Allen.
19        MR. ASHTON:  Anthony Ashton with
20   the NAACP representing, Milligan plaintiffs.
21        MR. THOMPSON:  I also just want to
22   note for the record Joelle Miller is an intern
23   with my office.  Anyone else?
24        COURT REPORTER:  I see a Donna
25   Loftin.  I don't know what we identified her.
```



RANDY HINAMAN                                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 9

1          MR. WALKER:  Donna Loftin is the
2  head of the Reapportionment Office.
3          MR. ROSS:  Dorman, what's her role
4  in participating?  Is she a client?  Is she a
5  witness?
6          MR. WALKER:  No, she's just
7  listening.
8          RANDY HINAMAN,
9  being first duly sworn, was examined and
10  testified as follows:
11  EXAMINATION BY MR. THOMPSON:
12      Q.    Good morning, sir.
13      A.    Good morning.
14      Q.    Can you please state your full
15  name for the record?
16      A.    Yes.  Randy Hinaman.
17      Q.    And Mr. Hinaman, you understand
18  that you're testifying under oath right now?
19      A.    I do.
20      Q.    Is there anything that might
21  prevent you from understanding my questions or
22  answering truthfully today?
23      A.    No.
24      Q.    Are you being represented by a
25  lawyer today?

Page 10

1      A.    Dorman Walker.
2      Q.    Mr. Walker is the same lawyer who
3  represents the plaintiffs in this lawsuit;
4  correct?
5      A.    Correct.
6          MR. WALKER:  Not the plaintiffs,
7  Blayne.
8          MR. THOMPSON:  Excuse me.  Excuse
9  me.  Yes, the Defendants.
10      Q.    Are you paying Mr. Walker to be
11  your lawyer today?
12      A.    I am not.
13      Q.    Do you assume that plaintiffs or
14  the State of Alabama is paying Mr. Walker to
15  be your lawyering today?
16      A.    I do.
17      Q.    Now, you were deposed by me in
18  December of 2021.  Do you recall that?
19      A.    I do.
20      Q.    So a quick refresher of the ground
21  rules for today.  And before I do that, I may
22  have misspoke.  Obviously the Defendants is
23  what I meant when I said when I said that.  Do
24  you assume that the defendants or the State of
25  Alabama is paying Mr. Walker to be your lawyer

Page 11

1  today?
2      A.    Correct.
3      Q.    A quick refresher of a few ground
4  rules.  I'll be asking questions.  If you
5  don't understand any question, please let me
6  know.  If you do answer my question, I will
7  assume that you understood it; is that fair?
8      A.    Yes, sir.
9      Q.    Also, as you know, we have
10  Ms. Jenkins here who is a court reporter.
11  Just like when we were in person, she's going
12  to be typing everything that you and I are
13  saying.  So it's really important that only
14  one person speaks at a time.  So if you can
15  allow me to finish my questions and sentences
16  before you answer, and I'll do my best to do
17  the same thing for your answers; is that fair?
18      A.    Yes, sir.
19      Q.    All right.  Without disclosing the
20  content of any discussions with Mr. Walker,
21  what did you do to prepare for your deposition
22  today?
23      A.    I met with Mr. Walker to talk
24  about it and briefly reviewed the community
25  of interest map.

Page 12

1      Q.    And when did you meet with
2  Mr. Walker to prepare?
3      A.    Yesterday afternoon.
4      Q.    Was that the only time?
5      A.    Yes.
6      Q.    About how long did you guys meet?
7      A.    An hour and a half.
8      Q.    Did you meet with anyone who was
9  not an attorney?
10      A.    No.
11      Q.    Did you review any documents
12  preparing for the deposition today?
13      A.    I did look at the community of
14  interest map, but that was it.
15      Q.    Did you do anything else to
16  prepare for your deposition today?
17      A.    No, sir.
18      Q.    Are you being compensated by
19  anyone for being here today?
20      A.    Yes.
21      Q.    By whom?
22      A.    The reapportionment committee.
23      Q.    And how much are you being
24  compensated?
25      A.    $400 an hour.

RANDY HINAMAN                                            August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 13

1      Q.     Is your compensation contingent on
2   the content of your testimony in any way?
3      A.     No.
4      Q.     All right.  Mr. Hinaman, you
5   drafted the prior enacted 2021 congressional
6   map for Alabama; correct?
7      A.     Yes, sir.
8      Q.     Since your prior deposition in
9   December 2021, have you been involved in any
10  further redistricting work for the State of
11  Alabama?
12     A.     I'm having trouble remembering
13  the exact timing of 2021.  But we did
14  legislative maps at some point in 2021.  I
15  can't remember which ones went first to be
16  honest with you.
17     Q.     And you're referring to the state
18  legislative maps?
19     A.     Yes, I drafted -- I worked on
20  drafting those state senate and state house
21  maps.
22     Q.     Outside of drafting the state
23  legislative maps for Alabama, have you been
24  involved in any further redistricting work for
25  the State of Alabama since December of 2021?

Page 14

1      A.     None other than this lawsuit.
2      Q.     And what involvement did you have
3   with respect to this lawsuit?
4      A.     Well, obviously we had a special
5   session where we worked on it where the
6   legislature passed another map.
7      Q.     And what was your involvement with
8   that?
9      A.     I worked with the chairs, the
10  house chair and senate chair of the
11  reapportionment committee to draft an initial
12  map that they sponsored.
13     Q.     How many maps did you draft?
14     A.     I worked on a number of them,
15  but -- but the only one that was sponsored
16  was community of interest.
17     Q.     Do you have an estimate about how
18  many maps you drafted?
19     A.     Not really.  I mean, a number of
20  them would be -- you know, you would change
21  one county.  So you would have, you know, map
22  6A, and then you would have map 6B and map
23  6C, all of this just changing a county.  So,
24  you know, all in told maybe with those
25  alliterations, maybe, you know, 20.  I'm

Page 15

1   making up that number honestly.
2      Q.     Did you save any of those drafts
3   or any of those other maps?
4      A.     I -- I specifically didn't.  But
5   they -- they were all drawn on the state's
6   computer.  So some of them are -- I assume
7   are still there.
8      Q.     Did you print out any copies of
9   those?
10     A.     No.
11     Q.     Do you have any notes that you
12  took or used while drafting any of those maps?
13     A.     No.
14     Q.     Outside of drawing these maps,
15  which included the community of interest plan,
16  did you have any other role in the
17  redistricting efforts since December 2021 for
18  Alabama?
19     A.     No.
20     Q.     Okay.  Well, then focusing on your
21  role with drafting the maps for the State of
22  Alabama, when were you first contacted about
23  doing that work?
24     A.     Shortly after the Supreme Court
25  ruled.  I think that was on June 8th and was

Page 16

1   contacted shortly thereafter.
2      Q.     Were there any discussions with
3   you prior to the Supreme Court's ruling about
4   drawing any maps?
5      A.     No.
6      Q.     Were you formally retained to do
7   the map drawing?
8      A.     Well, how is that --
9         MR. WALKER:  Objection to form.
10  I'm not sure what "formally retained" means.
11     Q.     (By Mr. Thompson) Did you sign any
12  sort of contract regarding your role for
13  drawing maps for the State of Alabama?
14     A.     I did not.
15     Q.     Okay.  Did you enter into any sort
16  of formal agreement with anyone about your
17  role with drafting the maps?
18        MR. WALKER:  Same objection.
19        THE WITNESS:  I had a discussion
20  with Dorman Walker, but I don't know what a
21  formal -- I don't have a written formal
22  agreement, if that's what you're asking.
23     Q.     (By Mr. Thompson) Who was it that
24  first contacted you about your work after the
25  Supreme Court ruling?



RANDY HINAMAN                                      August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 17

1    A.   Dorman Walker.
2    Q.   Anyone else?
3    A.   I think shortly thereafter, I
4   talked to the -- to the reapportionment
5   chairs, Senator Livingston and Representative
6   Pringle.
7    Q.   Do you have an estimate about when
8   that conversation would have taken place with
9   Senator Livingston and Representative Pringle?
10    A.   Within a week of the Supreme
11   Court ruling probably, but I don't have an
12   exact date.
13    Q.   And at the time that you spoke
14   with Mr. Walker after the Supreme Court
15   ruling, did you understand him to be your
16   lawyer at that time?
17    A.   I understood him to be the
18   lawyer for the reapportionment committee.
19    MR. THOMPSON:  Mr. Walker, will
20   you be asserting privilege over any
21   discussions that you had with Mr. Hinaman?
22    MR. WALKER:  Yes.
23    Q.   (By Mr. Thompson) Then I'll note
24   for the record that I will not be asking any
25   further questions about the content of your

Page 18

1   discussions with Mr. Walker given that he has
2   represented that he will be asserting
3   privilege over those.
4    Can you tell me about your
5   discussions with Senator Livingston and
6   Representative Pringle?
7    A.   Well, I think my initial
8   discussion is they were just saying that
9   obviously subsequent to the Supreme Court
10   ruling that we would have a -- at some
11   point -- I don't know that we knew the timing
12   quite yet -- would have a special session and
13   would be looking at drawing a new
14   congressional map.
15    Q.   Do you recall anything else from
16   that discussion?
17    A.   That was the initial discussion.
18   Obviously, subsequent to that, we had
19   numerous discussions.  But...
20    MR. THOMPSON:  And setting this
21   aside, just for the record, regarding the
22   assertion of privilege, obviously plaintiffs
23   reserve the right to challenge that privilege.
24    Q.   But sticking with the discussions
25   with Senator Livingston and Representative

Page 19

1   Pringle, you said that was what you recall
2   from the initial discussion.  You had further
3   discussions with them after that?
4    A.   Yes.  Once the legislature --
5   the governor called a special session, and we
6   had the timing of when the special session
7   would be.  Then we had follow-up discussions.
8   And I was asked to draw some -- a number of
9   maps for them to look at.
10    Q.   What specifically were you asked
11   to draw?
12    A.   I was asked to draw a new
13   congressional map that took the Court's
14   ruling into account and followed the
15   guidelines of the reapportionment committee.
16    COURT REPORTER:  Mr. Thompson, I
17   think we lost our videographer.
18    MR. THOMPSON:  We'll pause for a
19   minute.  We can go off the record for just a
20   second, Ms. Jenkins.
21    (A short discussion was held.)
22    Q.   (By Mr. Thompson) Mr. Hinaman,
23   before we paused there, you were discussing
24   your role.  Just to regroup, can you explain
25   to me what you understood your role to be with

Page 20

1   respect to the redistricting process?
2    A.   My role was to draw a number
3   of -- a number of maps for the chairs of the
4   reapportionment committee to look at in terms
5   of providing a new congressional map for the
6   State of Alabama.
7    Q.   Were you given any instructions
8   about how to draw those maps?
9    A.   Yeah.  In a general sense, to
10   address the Court's concerns of our previous
11   map and to obviously follow the guidelines of
12   the reapportionment committee as well.
13    Q.   You mentioned to address the
14   Court's concerns.  What was your understanding
15   about the Court's concerns with the prior map?
16    A.   Well, I had obviously legal
17   advice from Mr. Walker and others on what --
18   their interpretation of the Court.  But my
19   understanding of it was that our initial map
20   was ruled to violate the -- well, was
21   perceived to maybe be ruled to violate the
22   Voting Rights Act and that we needed to draw
23   two districts that would give African
24   Americans an opportunity to elect a candidate
25   of their choice.



RANDY HINAMAN                                        August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 21

1    Q.    Did you understand that you were
2  developing a new map in response a Court
3  order?
4    A.    Yes, sir.
5    Q.    And beyond -- you mentioned that
6  it was your understanding of the Court's
7  concerns and the Court order.  Beyond
8  discussions with Mr. Walker, was there any
9  other source of that understanding?
10    A.    Eddie LaCour.
11    Q.    And what did Mr. LaCour tell you?
12    MR. WALKER:  Objection.  Blayne,
13  Mr. LaCour is an attorney in the attorney
14  general's office.
15    Q.    (By Mr. Thompson) Sir, is
16  Mr. LaCour your lawyer?  Is that your
17  understanding, that he represents you?
18    MR. WALKER:  We assert a joint
19  defense.  He represents the Secretary of
20  State.
21    MR. THOMPSON:  Okay.  So Dorman,
22  are you going to be asserting privilege as to
23  any discussions from Mr. LaCour with
24  Mr. Hinaman?
25    MR. WALKER:  Yes, Blayne, I will

Page 22

1  be.
2    Q.    (By Mr. Thompson) Okay.  Then
3  under that understanding, I will not be asking
4  any further questions about the content of any
5  discussions you had with Mr. LaCour.  But
6  obviously plaintiffs, again, reserve the right
7  to challenge that privilege.
8    MR. WALKER:  I understand that.
9  Thank you.
10    Q.    (By Mr. Thompson) Outside of
11  Mr. Walker and Mr. LaCour, did you discuss the
12  Court's order with anyone else?
13    A.    Obviously, the two chairs.
14    Q.    What did you discuss with them?
15    A.    Just essentially what I said
16  earlier, that we needed to address the
17  Court's concerns and work to draw a map that
18  was -- provided an opportunity for African
19  Americans to elect the candidate of their
20  choice in two districts.
21    Q.    Do you remember any other
22  specifics from your discussions with
23  Representative Pringle or Senator Livingston
24  about the Court order other than what you just
25  stated?

Page 23

1    A.    No.
2    Q.    Taking a step back, I just wanted
3  to make sure that the record is clear here.
4  And I mentioned that I would be sharing some
5  exhibits.  So right now I'm going to show on
6  my screen what's being marked as Exhibit 1.
7  Can you see that map, Mr. Hinaman?
8    A.    Yes, sir.
9    (Whereupon, Exhibit 1 was marked
10    for identification.)
11    Q.    (By Mr. Thompson) You see this map
12  is labeled at the top community of interest
13  plan; correct?
14    A.    Yes, sir.
15    Q.    Did you draw this map?
16    A.    I did.
17    Q.    Okay.  And this is the single map
18  that you mentioned earlier that you drew that
19  was ultimately adopted by at least one or more
20  of Representative Pringle and Senator
21  Livingston; correct?
22    A.    I think initially they both
23  filed it as a bill in their respective
24  bodies.
25    Q.    And you did not draw any of the

Page 24

1  other maps that were sponsored before the
2  redistricting committee; correct?
3    A.    I'm not sure what I know -- I'm
4  not sure what I know what sponsored means --
5  sponsored by other members you mean?
6    Q.    Did you draw any other maps that
7  were submitted to the redistricting committee?
8    A.    Well, the Friday before the
9  special session, a number of maps were
10  released publicly, and I did draw a couple of
11  those.  But in terms of what was sponsored by
12  a member in either body, I think this is the
13  only map.
14    Q.    We'll go over a few of those.  But
15  before we do so, you said that you did draw a
16  few of the maps that were released publicly on
17  the Friday before the special session;
18  correct?
19    A.    Yes, sir.
20    Q.    Okay.  Are you able to identify
21  what those maps were?
22    A.    I believe so.  There was --
23  there was obviously the community of interest
24  plan.  There was also, I think, a plan that
25  was called Russell split which split Russell



RANDY HINAMAN                                              August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 25

1  County, obviously.  There was a plan that was
2  called extended Black Belt, which took the
3  second district further into the -- I guess
4  it would be the western part of Alabama's
5  Black Belt.  There was also a map that I
6  worked on called whole -- Jefferson whole,
7  which I didn't have the concept of, but I
8  zeroed out the numbers on.
9      Q.    What does that mean?
10     A.    That means somebody else had the
11 concept for the map, gave it to me, and I
12 zeroed out the numbers to get the zero
13 deviation.
14     Q.    Any other maps that you drew that
15 were released publicly on the Friday prior to
16 the special session?
17     A.    I believe those were it, sir.
18     Q.    Okay.  We'll come back to those
19 specific maps in a little bit.  Before we do
20 that, I want to talk about the maps that were
21 sponsored.
22           First off, I'm showing you what is
23 being marked as Exhibit 2.  This is labeled at
24 the top the opportunity.  And my understanding
25 is that this was referred to as the

Page 26

1  opportunity plan.  Do you see that?
2           (Whereupon, Exhibit 2 was marked
3           for identification.)
4           THE WITNESS:  Yes, sir.
5      Q.    (By Mr. Thompson) Okay.
6           This plan was also referred to in
7  the legislature to my understanding as the
8  Livingston 1 plan.  Are you aware of that
9  check?
10     A.    I don't know -- well, I thought
11 Livingston 1 was actually community of
12 interest, but maybe I'm wrong in my
13 alliteration of senate plans.
14     Q.    Okay.  Now, speaking of Senator
15 Livingston, my understanding is that he is in
16 the room with you currently; correct?
17     A.    He is.
18     Q.    Have you met Senator Livingston
19 before today?
20     A.    I have.
21     Q.    Okay.  What's your relationship
22 with Senator Livingston?
23     A.    He's the senate chair.  And, so,
24 I essentially worked for he and
25 Representative Pringle.

Page 27

1      Q.    And how far back does your
2  relationship with Senator Livingston go?
3      A.    He started working on the
4  redistricting when he -- he was going to take
5  over the senate chair in our last round in
6  2021.  So he was in the -- you know, he was
7  in that process, although, I don't think he
8  became chair until after -- after that
9  session.
10     Q.    Did you work with Senator
11 Livingston with respect to the 2021
12 congressional map?
13     A.    He was in the room for a number
14 of those discussions.  He wasn't the chair at
15 the time.  But...
16     Q.    Looking at this map, which has
17 been labeled as Exhibit 2, the opportunity
18 plan, have you seen this map before?
19     A.    I have.
20     Q.    When did you see it?
21     A.    Probably shortly before it was
22 released to the public on that Friday before
23 the special session.  I may have seen it on,
24 you know, Friday morning or Thursday, I can't
25 remember which.

Page 28

1      Q.    Do you recall who showed it to
2  you?
3      A.    It was in the -- it was on the
4  computer in the reapportionment office.
5      Q.    Do you recall who showed it to
6  you, or was it just uploaded to the computer?
7  Can you explain that a little bit more?
8      A.    Yeah, it was uploaded -- I think
9  either Senator Livingston or Senator Roberts
10 said I could look at that map.  So I looked
11 at it probably a day before it was released.
12     Q.    Were you provided other maps at
13 the same time to review?
14     A.    I don't think so.
15     Q.    Any reason why the opportunity
16 plan in specific was shown to you at that
17 time?
18     A.    I can't answer that.  I don't
19 know what anybody's motivation was.
20     Q.    What were you told when you were
21 shown this map?
22     A.    I was asked to take a look at
23 it.
24     Q.    Were you asked to look at it for
25 any purpose?



RANDY HINAMAN                                          August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 29

1      A.    I guess they wanted me to look
2  at it to see if I thought it was a
3  possibility.
4      Q.    A possibility for what?
5      A.    As a map for the congressional
6  districts.
7      Q.    And what were your thoughts on
8  that?
9      A.    Excuse me one second.  Well, as
10 I say, I didn't really -- I didn't really
11 evaluate it that much at the time because I
12 knew we had community of interest which I
13 thought was -- what -- what was going to be
14 sponsored at that time.
15     Q.    So they showed you the opportunity
16 plan and asked you to review it, but did you
17 provide --
18     A.    Reviewing it -- reviewing it is
19 a pretty strong -- reviewing it is a strong
20 word.  I was shown -- I was shown the map.
21     Q.    Okay.  So walk -- walk me through
22 this then.  You were shown the map.  And who
23 showed it to you?
24     A.    Well, I think it was on the
25 reapportionment committee computer.  And

Page 30

1  either Senator Livingston or Senator Roberts
2  said I should look -- I could take a look at
3  it.
4      Q.    And what --
5      A.    As you may know, that -- that a
6  little background.  As you may know, when
7  various legislators put maps onto the
8  computer, they're embargoed by out -- other
9  sources, me included, until the principle
10 sponsor of the map or whatever says, you
11 know, you may look at this.  So either
12 Senator Roberts or Senator Livingston said I
13 was able to look at this at that point.
14     Q.    Okay.  Did they ask you to look --
15 did they say anything else to you other than,
16 here, you can look at this if you'd like?
17     A.    That was essentially the
18 discussion, yeah.
19     Q.    And then did you review it?
20     A.    I looked at it.  But, again, I
21 was assuming and thought that the community
22 of interest plan is what both chairs were
23 going to sponsor in their legislative bodies.
24 So I didn't give it much thought to be honest
25 with you.

Page 31

1      Q.    And why did you think that?
2      A.    Well, that's what I was told.
3      Q.    Who told you that?
4      A.    The two chairs told me that they
5  would -- on -- after -- on Monday would be
6  sponsoring those two plans.
7      Q.    Did they tell you why -- sorry.  I
8  didn't mean to cut you off.  Go ahead.
9      A.    No, that's okay.  No, they did
10 not.
11     Q.    And to be clear, did they tell you
12 why they would be sponsoring your plan over
13 any others?
14     A.    They did not.
15     Q.    Did you discuss the opportunity
16 plan, which is being shown as Exhibit 2, with
17 anyone else?
18     A.    I did not.
19     Q.    Do you know who drew the
20 opportunity plan?
21     A.    I do not.
22     Q.    Do you have any idea or guess
23 about who may have drawn it?
24     A.    We're guessing?
25     Q.    If you have any sort of

Page 32

1  understanding.  If you're thinking about it
2  and think it could have been this person or
3  that person.  Do you have any sort of idea
4  about who may have drawn it?
5          MR. WALKER:  Objection to form.
6          THE WITNESS:  All I know is I
7  believe it was given to Donna Loftin, who is
8  head of -- supervisor of the reapportionment
9  office, on a thumb drive.  But I don't know
10 who drew it.
11     Q.    (By Mr. Thompson) And prior -- so
12 trying to go back over your prior history.
13 And before I do that, you said it was given to
14 Donna Loftin.  Do you know who would have
15 given it to Donna Loftin?
16     A.    I'm assuming Senator -- again,
17 I'm assuming a lot.  Either Senator Roberts,
18 Senator Livingston.
19     Q.    Going back over some of your prior
20 history working with the State of Alabama,
21 you've been the map drawer for the State of
22 Alabama's congressional maps in the past, at
23 least in 2021; correct?
24     A.    Yes, sir.
25     Q.    And also prior to that; correct?



RANDY HINAMAN                                      August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 33

1    A.    Yes, sir.  I mean, I drew a map
2  that the Court adopted in 1992.
3    Q.    And in either -- in either of the
4  process of drafting the 1992 map or the 2021
5  map, was there ever anyone else who was also
6  drawing maps at that time?
7    A.    Oh, I'm sure there were.  I'm
8  sure there were maps offered in those --
9  those processes that I didn't draw.  So
10  obviously somebody other than me drew them.
11    Q.    Okay.  Focusing on the opportunity
12  plan, do you recall saying anything to either
13  Senator Livingston or Roberts after you looked
14  at the opportunity plan?
15    A.    No.
16    Q.    Do you have an understanding of
17  what the purpose of the opportunity plan was?
18    A.    I don't.
19    Q.    Do you have any understanding
20  about how this map was drawn?
21    A.    I do not.
22    Q.    Do you have any understanding
23  about why, given your role as a map drawer for
24  the legislature here, you did not draw the
25  opportunity plan?

Page 34

1    A.    I do not.
2    Q.    Taking a look at the opportunity
3  plan, which is Exhibit 2, do you think that a
4  black preferred candidate can win the
5  district 2 as it's drawn here?
6    A.    I'm not familiar enough with the
7  map to have -- offer an opinion on that.
8    Q.    Let's move to another exhibit
9  here.  This is being marked as Exhibit 3.
10  This titled at the top Livingston
11  congressional plan 2.  Do you see that?
12        (Whereupon, Exhibit 3 was marked
13        for identification.)
14        THE WITNESS:  Yes, sir.
15    Q.    (By Mr. Thompson) Is it okay if I
16  refer to this as the Livingston 2 plan?
17    A.    Yes, sir.
18    Q.    Have you seen this map before?
19    A.    I have.  I think it was -- I
20  think Senator Livingston offered this in
21  committee at some point during the
22  legislative session.
23    Q.    And when did you first see it?
24    A.    I believe when he offered it in
25  committee during the legislative session.

Page 35

1    Q.    You don't recall seeing it before
2  that time?
3    A.    I honestly don't think I did,
4  no.
5    Q.    So what was the context of when
6  you saw it?  Was it when it was presented to
7  the rest of the committee members?
8    A.    Yes, sir.
9    Q.    Did anyone in particular show you
10  the map?
11    A.    No.  Obviously at that point,
12  then it was on the computer.  So, I mean, I
13  could have looked at it in the
14  reapportionment office.
15    Q.    But you did not do that?
16    A.    Not before it was introduced.
17    Q.    After it was introduced, did you
18  take a look at it?
19    A.    I did look at it, yes, briefly.
20    Q.    And when was that?
21    A.    Probably would have been Tuesday
22  afternoon because I believe this plan was
23  offered in committee on Tuesday.  Maybe it
24  was Wednesday.  I'm trying to remember the
25  days here.  But...

Page 36

1    Q.    Why did you look at the map at
2  that time?
3    A.    Well, that was the plan -- it
4  became the operative plan, I guess, in the
5  senate at that point after committee.  And I
6  guess it was eventually voted on by the -- I
7  believe it was passed by the senate on
8  Wednesday maybe.  So I looked at it at that
9  point.
10    Q.    And what was the purpose of your
11  review of that map?
12    A.    Because it was the plan that the
13  senate passed on Wednesday.
14    Q.    Were you asked to review it by
15  anyone?
16    A.    I wasn't asked to review it.  I
17  just looked at it to see -- see what it was
18  honestly.
19    Q.    And what were your thoughts on it
20  when you reviewed it?
21    A.    I didn't have any definitive
22  thoughts.  I was just trying to figure out
23  what it -- what it was to be honest with you.
24    Q.    Did you discuss the Livingston 2
25  map with anyone?



RANDY HINAMAN                                          August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 37

1      A.    I probably discussed it with
2   Dorman Walker.  But I -- that's probably it.
3      Q.    Do you know who drew the
4   Livingston 2 map?
5      A.    I do not.
6      Q.    Similar to before, it's okay to
7   guess.
8           Do you have any idea or guess
9   about who may have drawn it?
10     A.    I think it was, again, given to
11  Donna Loftin on a thumb drive by Senator
12  Livingston, and that's about as far as I can
13  tell you.
14     Q.    Do you have an understanding about
15  what the purpose of this particular map was?
16     A.    I do not.
17     Q.    Do you have any understanding
18  about how this map was drawn?
19     A.    I do not.
20     Q.    I'm going to switch to another
21  exhibit here, which is being marked as
22  Exhibit 4.
23          This is the -- it's labeled at the
24  top as Livingston congressional plan 3.  Do
25  you see that?

Page 38

1           (Whereupon, Exhibit 4 was marked
2           for identification.)
3      THE WITNESS: Yes, sir.
4      Q.    (By Mr. Thompson) And it's my
5   understanding that this was the final enacted
6   map.  Does that match up with your
7   understanding?
8      A.    Yes, sir.
9      Q.    And is it okay if I refer to this
10  as either the Livingston 3 map or the final
11  enacted map?
12     A.    Yes, sir.
13     Q.    Have you seen this map before?
14     A.    I have.
15     Q.    And when did you first see it?
16     A.    I actually ran the computer when
17  this map was drawn.  The -- I believe it was
18  Thursday night before the Friday session.
19     Q.    Just one second here.  Can you
20  still see the exhibit there?
21     A.    I can.
22     Q.    And you said -- I'm sorry.  Can
23  you say that again, specifically when you saw
24  this map?
25     A.    As a way of background, again,

Page 39

1   Donna Loftin, who is the supervisor of
2   reapportionment committee office, would have
3   normally been the person who would have drawn
4   this map, I would imagine.  But she was out
5   with COVID, and I was the person in the --
6   who happened to be in the office who was most
7   familiar with Maptitude.  So Senator
8   Livingston asked me if I would help him
9   change a few counties in this map the night
10  before it was introduced.
11     Q.    And you said that was the night
12  before it was introduced?
13     A.    Thursday evening, I believe,
14  yes, sir.
15     Q.    What specifically did Senator
16  Livingston ask you to do?
17     A.    As I remember, we -- we were
18  working off a version of Livingston 2,
19  which -- and he asked that we move a few
20  counties in the second district.  And then
21  subsequent, I think, we put Etowah back
22  together.  It was split, I think, in
23  Livingston 2.  And then corresponding changes
24  that needed to be rippled through the map
25  from there.

Page 40

1           As a way of clarification, I
2   didn't -- I was not -- I was functioning
3   solely as a computer operator, not as a --
4   not even as a map drawer or not as a
5   consultant.  I was a computer operator.
6      Q.    Other than you and Senator
7   Livingston, did anyone else participate in
8   making the adjustments from Livingston plan 2
9   to what ultimately became Livingston plan 3?
10     A.    Yeah, Senator Scofield was also
11  in the room.
12     Q.    And what was Senator Scofield's
13  role?
14     A.    He -- he was working with
15  Senator Livingston.
16     Q.    Was there anyone else in the room
17  with you?
18     A.    No.
19     Q.    Did anyone else participate in the
20  modifications to this map that ultimately
21  became Livingston plan 3?
22     A.    Not during the half an hour that
23  I worked on it.
24     Q.    Do you know if anyone else made
25  any further modifications to the map after you

RANDY HINAMAN                                                   August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 41

1  finished?
2      A.    I don't believe they did, no.
3      Q.    What instructions, if any, were
4  you given by Senator Scofield?
5          MR. WALKER:  Blayne, I'm going to
6  assert legislative privilege on behalf of
7  Senator Scofield at this point.  I think it's
8  fair to ask Mr. Hinaman what he may have said
9  to Senator Scofield.  But what Senator
10  Scofield said to him would be covered by
11  legislative privilege, which Senator Scofield
12  has not -- has not waived.
13          MR. THOMPSON:  To be clear,
14  Mr. Walker, are you asserting that only as to
15  statements by Senator Scofield?
16          MR. WALKER:  I would assert
17  legislative immunity and legislative privilege
18  on behalf of any legislator who has not waived
19  that privilege.  My understanding is that -- I
20  mean, the only two of whom I know have waived
21  the privilege are Senator Livingston and
22  Representative Pringle.
23          MR. THOMPSON:  And Mr. Walker, do
24  you represent Senator Scofield?
25          MR. WALKER:  Yes, in that I

Page 42

1  represent the reapportionment committee of
2  which he is a member.
3          MR. THOMPSON:  And are you going
4  to assert these privileges and immunities as
5  to any conversations or discussions from
6  Senator Scofield?
7          MR. WALKER:  To the extent that I
8  mentioned earlier.  I don't think it's
9  improper to ask Mr. Hinaman what he may have
10  said to Senator Scofield.  But with regard to
11  what Senator Scofield said to him, I believe
12  the privilege and immunity applies.
13      Q.    (By Mr. Thompson) Mr. Hinaman, do
14  you recall anything that you said to Senator
15  Scofield?
16      A.    I do not.
17      Q.    And just for the sake of the
18  record, do you recall anything that Senator
19  Scofield said to you during this time?
20      A.    I do not.
21      Q.    Do you recall anything that
22  Senator Livingston said to you during this
23  time?
24      A.    Yeah.  He -- he -- he was asking
25  me on the map to make some changes to a

Page 43

1  couple of counties in the second district and
2  in the subsequent -- the effects that that
3  would have throughout the rest of the map.
4  And as I said earlier, to put Etowah County
5  and north Alabama back -- back whole.  It
6  was, I think, split in Livingston 2, I
7  believe, and he wanted -- we were looking to
8  put that -- he wanted to look to put that
9  whole.
10      Q.    Do you recall -- or were you told
11  why any of those instructions were given to
12  you?
13      A.    I was not.
14      Q.    Do you recall any other specific
15  instructions you were given by Senator
16  Livingston?
17      A.    Just those.  And then we
18  obviously had to get to -- you know, split
19  a -- split some -- split a precinct to get
20  the zero deviation in the various districts
21  that we changed, but that -- that was it.  I
22  guess I'm using the royal "we."  That he
23  changed.  I was just running the computer.
24      Q.    Do you have an understanding
25  whether these instruction were just coming

Page 44

1  from Senator Livingston himself or whether
2  they were coming from a larger group that he
3  was relaying them?
4      A.    I have no idea.
5      Q.    Did he have these steps written
6  down that he was reading to you, or was he
7  just telling them you them as you went?
8      A.    He was just telling me them as
9  we went.
10      Q.    Did you have any other discussions
11  with Senator Livingston during this time
12  period?
13      A.    I did not.
14      Q.    Did you have any other discussions
15  with Senator Scofield during this time period?
16      A.    I did not.
17      Q.    Did you have any discussions with
18  any other senators or representatives
19  regarding Livingston congressional plan 3?
20      A.    I did not.
21      Q.    Did you have any discussions with
22  any other staff members of any senators or
23  representatives regarding Livingston
24  congressional plan 3?
25      A.    No.



RANDY HINAMAN                                          August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 45

1     Q.    Did you have any discussions with
2  anyone else regarding Livingston congressional
3  plan 3?
4     A.    Well, maybe after it was offered
5  the next day.  I probably had a discussion
6  with Dorman Walker.
7     Q.    Anyone other than Mr. Walker?
8     A.    I don't believe so.
9     Q.    Did you have any discussions with
10  any members of congress or their staff
11  regarding Livingston congressional plan 3?
12     A.    I had numerous discussions with
13  members of congress that week.  I don't know
14  that I talked to -- I may have talked to --
15  it sort of all runs together.  So it's hard
16  to separate Friday from Thursday from
17  Wednesday.  But I may have talked to, Friday
18  morning, a couple of members of Congress.  I
19  don't have a firm recollection of it.  The
20  conversations would have been more
21  informational of, this is a map that the
22  senate is likely to come out with today.
23     Q.    Do you recall who you had
24  discussions with?
25     A.    Again, I don't -- I'm having

Page 46

1  trouble separating the days.  But the
2  likely -- likely candidates would have been
3  Congressman Aderholt, Congressman Rogers,
4  Congressman Sewell -- Congresswoman Sewell.
5     Q.    Did you have any discussions
6  during that week of the special session with
7  any of those congressmen or women's staff
8  members?
9     A.    I did a couple of their -- I
10  talked to their chiefs of staff, yes, sir.
11     Q.    Who specifically?
12     A.    I talked to Chris Brinson, who
13  is Mike Roger's chief of staff.  I talked to
14  Hillary Beard, who's Congresswoman Sewell's
15  chief of staff.
16     Q.    Anyone else?
17     A.    I believe those are the only
18  chiefs of staff that I talked to.
19     Q.    I want to walk through those just
20  to see what you can recall from these
21  discussions.  So you mentioned Representative
22  Aderholt.  What do you recall from any
23  discussions you had with Representative
24  Aderholt?
25     A.    At the beginning of the week, we

Page 47

1  had -- he was hopeful that his district
2  wouldn't change in the process because
3  obviously he was in north Alabama and didn't
4  think he was that close to the potential
5  two -- two black districts.  So he was
6  hopeful at the initial beginning of the week
7  that his district wouldn't change.  And in
8  the community of interest plan, it didn't --
9  didn't change.  And then as the week went on,
10  there was more informational of, you know,
11  this map changed this county or this map --
12  in the final map, he lost Etowah County to
13  Congressman Rogers and picked up, I believe,
14  more of Tuscaloosa and maybe Blount.  So
15  conversations similar to that.
16     Q.    Do you recall any other specifics
17  of any discussions you had with Representative
18  Aderholt?
19     A.    That was about it.
20     Q.    Do you recall anything
21  specifically that Representative Aderholt
22  relayed to you other than what you just
23  stated?
24     A.    That was the gist of it.
25     Q.    What about Representative Rogers,

Page 48

1  what do you recall from your discussions with
2  Representative Rogers?
3     A.    He was interested in obviously
4  what counties he might lose and what counties
5  he might have to pick up.  He was not
6  inclined to want to pick up a lot of Shelby
7  County.  So that was one of his concerns,
8  which some maps, I think, had him picking up
9  some of Shelby County.
10     Q.    Do you recall anything else
11  specific from your discussions with
12  representative Rogers?
13     A.    That was about it.
14     Q.    What about with Representative
15  Sewell, what do you recall from your
16  discussions with her?
17     A.    She was concerned about losing
18  Dallas County, which is where she grew up or
19  her childhood home is.  She was hopeful that
20  the map would have Dallas and her current
21  residence in Jefferson together.  She was
22  also hopeful that her district would continue
23  to have a substantial BVAP.  And she was also
24  hopeful that a second majority black district
25  to be drawn.



M43

RANDY HINAMAN                                                August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 49

1    Q.   Did you share any thoughts with
2  her about any of those hopes that she relayed
3  to you?
4    A.   It updated her on where things
5  were on the various maps as the week went
6  along.
7    Q.   And what specifically did you tell
8  her?
9    A.   Well, I told her, for example,
10  the community of interest plan she was
11  concerned about losing Dallas County, and I
12  allowed that in my -- the reason it was that
13  way in the community of interest plan was
14  that that population was needed to make the
15  second district perform as an opportunity
16  district for an African American candidate
17  and while I understood she was unhappy losing
18  Dallas County, that was the point -- the
19  reason for it.
20    Q.   Do you recall anything else
21  specific from your discussions with
22  Representative Sewell?
23    A.   No.  Obviously, I think, the
24  final map did have Dallas and Jefferson
25  together -- her part of Jefferson together.

Page 50

1  So she was probably happier with that.
2    Q.   You also mentioned you had
3  discussions with some of the chiefs of staff,
4  one of which was Chris Brinson, who you said
5  was chief of staff for Representative
6  Aderholt; is that correct?
7    A.   Mike Rogers.  Chief of staff to
8  Congressman Rogers.
9    Q.   Got it.  Okay.
10    A.   And that was -- that was just a
11  subset of the same conversation I had with --
12  with Congressman Rogers.
13    Q.   And you stated that you also had
14  discussions with chief of staff for
15  Representative Sewell, which is Hillary Beard;
16  is that correct?
17    A.   Yes, sir.
18    Q.   Okay.  Before we discuss that --
19  go ahead.
20    A.   No.  I'm sorry.
21    Q.   Before we discuss that, I just
22  want to tie off one piece you mentioned with
23  your discussions with Representative Sewell.
24  Why did you think that the second district
25  needed Dallas County to perform for black

Page 51

1  voters?
2    A.   Well, we had election analysis
3  that were run on the second district.  And
4  without Dallas County, I don't -- I don't --
5  the democratic candidates that won a couple
6  of those races would probably not have won.
7    Q.   Who ran those election analysis?
8    A.   Trey Hood.
9    Q.   Do you know which plans he ran
10  those election analyses on?
11    A.   I know he did that for community
12  of interest.  And I -- I think a few of the
13  others.  Probably Livingston 2, I think I
14  remember seeing numbers for.
15    Q.   Do you know if Dr. Hood ran
16  election analysis on each of the plans?
17    A.   I don't know.  He was asked by
18  Dorman Walker to run analysis on a number of
19  plans.  But I can't answer which -- which
20  ones they were other than what I've already
21  just said.
22    Q.   And the election analysis, would
23  that be the same as what I've also heard
24  referred to as a performance analysis?
25    A.   Yeah, I think so.  I mean,

Page 52

1  although people have different views of what
2  that is.  I -- how I view it is basically
3  taking the election results and apportion
4  them as to how the new district is drawn.  So
5  that's how I view it.
6    Q.   So what is your understanding of
7  what the election analysis that Dr. Hood
8  performed involved?
9    A.   Well, again, I -- my
10  understanding of it took -- whatever election
11  you were -- we were discussing, it took those
12  results and apportioned them to the new
13  geography of the district, and especially, if
14  counties were split, you know, it tried to,
15  by precinct, account for those splits.
16    Q.   Did you review any of those
17  election analyses in the process of drawing
18  the community of interest map?
19    A.   I reviewed them after the
20  community of interest map was drawn, yes,
21  sir.
22    Q.   And what did that analysis show
23  you?
24    A.   I looked at the four top races
25  that -- that were in the group of races he



RANDY HINAMAN                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 53

1  looked at, and I believe those were the race
2  for president in 2020, governor's race in
3  2018, the attorney's general's race in 2018,
4  and the senate race in 2020, I believe.  And
5  I looked at those.  And republicans had won
6  two of them.  Democrats had won two of them.
7  So I thought that that was a fair
8  representation of what an opportunity
9  district would look like.
10     Q.    And what do you mean when you say
11  that was a fair representation of what an
12  opportunity district should look like?
13     A.    Well, obviously, when a
14  democratic candidate was either well enough
15  known or well enough funded to have a
16  reasonable campaign, they had a reasonable
17  chance of winning that district.
18     Q.    Which district are you referring
19  to there?
20     A.    The second -- I'm sorry, the
21  second district.
22     Q.    You mentioned that you look at
23  what you considered to be the top four races.
24  Did you look at any other election results?
25     A.    There were results for like

Page 54

1  state auditor and Secretary of State and
2  lesser known races.  And I put less credence
3  one those ones.  They were candidates usually
4  running against republicans, the incumbent
5  republicans were reasonably well funded.  The
6  democrats running against them were unknown
7  and unfunded basically.  Also, you know,
8  there's quite a bit of drop-off from a
9  governor's race to an auditor's race or a
10  secretary of the state race.  So I thought it
11  was more reasonable to look at the races that
12  would drive turnout rather than some down
13  ticket race that no one has ever heard of.
14     Q.    Did you make any modifications to
15  the community of interest plan based on your
16  review of the analysis Dr. Hood performed?
17     A.    I did not.
18     Q.    You also mentioned that Dr. Hood
19  may have performed an election analysis on
20  other maps; correct?
21     A.    I know he was asked to, yes, by
22  Dorman Walker.
23     Q.    Do you know which maps he was
24  asked to perform that analysis on?
25     A.    I don't.  I assume Livingston 2,

Page 55

1  probably the final -- final map,
2  Livingston 3.
3     Q.    Did you review any of those
4  election analyses?
5     A.    I remember looking at
6  Livingston 2 and just thinking that it did
7  not perform as well as community of interest.
8     Q.    What specifically do you recall
9  about the election analysis for Livingston 2?
10     A.    If I remember right -- and,
11  again, if I remember correctly, that maybe
12  the democrats won one of those races instead
13  of, you know -- maybe they actually -- I
14  think they didn't even win a -- I thought
15  they won a race -- the senate race where
16  Jones ran against Moore.  But they didn't --
17  it didn't perform as well in terms of the
18  four races that I had looked at as community
19  of interest.
20     Q.    Did you have a view as to whether
21  that complied with the Court's order in this
22  case?
23     A.    Well, that's a lawyer's
24  answer -- question.  I'm not a lawyer.
25     Q.    I'm not asking for your legal

Page 56

1  opinion.  I'm just asking based on your
2  understanding of what the Alabama legislature
3  was asked to do by the Court, did you have any
4  opinion on whether that complied with the
5  Court's order or not?
6     A.    I thought you could make a
7  better argument the community of interest
8  plan was an opportunity district.
9     Q.    Did you have an opinion as to
10  whether Livingston 2 complied with the Court's
11  order based on the results of the election
12  analysis?
13     A.    Yeah, I did not.  Again, that's
14  a decision above my pay grade.
15     Q.    Did you discuss your opinions or
16  thoughts on the performance of Livingston
17  plan 2 with anyone?
18     A.    I probably discussed them with
19  Dorman Walker who is probably the one who
20  gave me the results.
21     Q.    Did you discuss the -- your
22  thoughts on the performance of Livingston 2
23  with any of the congressmen or women or chiefs
24  of staff that we discussed a minute ago?
25     A.    I did not.



RANDY HINAMAN                                          August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 57

1    Q.    Did you discuss your thoughts on
2  the performance of any maps with any can
3  congressperson or their chiefs of staff?
4    A.    I did not.
5    Q.    Or with anyone else?
6    A.    Well, obviously, I talk to
7  Senator Livingston, Representative Pringle
8  about the performance numbers for community
9  of interest.
10   Q.    And what did you discuss with
11 Senator Pringle (sic) on that front?
12   A.    I said I thought since the four
13 races we looked at, two were won by democrats
14 and two were won by republicans, that that
15 was what my definition -- or what a
16 definition of what an opportunity district
17 would look like.
18   Q.    And what is your understanding of
19 what an opportunity district should look like?
20   A.    My understanding of it, again,
21 that -- if you're looking for an African
22 American candidate to be the candidate of
23 choice, they would need to be able to be win
24 the democratic primary, which I had no reason
25 to think that that wouldn't happen in the

Page 58

1  second district and district -- in the
2  community of interest.  And then once the
3  nominee of the party, would they have a
4  chance to win?  And since democrats won two
5  of those four races and republicans won two,
6  that -- that would be my understanding of an
7  opportunity district.
8    Q.    If the election analysis on your
9  community of interest plan would have
10 shown the black preferred candidate winning
11 one out of those four races, would you have
12 been satisfied with that in terms of complying
13 with the Court's order?
14   A.    That's not for me to decide.  As
15 you know, I don't vote on these plans.  I'm
16 just a map drawer.
17   Q.    If that had been the results of
18 the election analysis on the community of
19 interest plan, would you have made any
20 modifications to it, or would you have
21 submitted it as is?
22   A.    I don't know because that was --
23 those weren't the results of the community of
24 interest plan.
25   Q.    Correct.  But if they had been.

Page 59

1    A.    I'm sure I may have discussed
2  with Dorman Walker and the chairs if they
3  wanted to make any changes.  But, again, I
4  don't know that there's a threshold.  You're
5  asking a hypothetical that I don't really
6  have an answer to.
7    Q.    Well, so, your understanding you
8  said was that you were asked to draw a map
9  that would -- well, tell me again.  What was
10 your understanding of what your role was in
11 drawing this map?
12   A.    Initially to draw a map that
13 complies with the Court's order and follows
14 the guidelines of the reapportionment
15 committee.
16   Q.    And do you understand the Court's
17 order to involve the creation of an additional
18 opportunity district in Alabama?
19   A.    Yes, sir.
20   Q.    And if the performance -- and that
21 involves looking at performance analysis, I
22 assume, correct, to assess whether you created
23 an opportunity district?
24   A.    Yes, sir.
25   Q.    So that was part of your role, was

Page 60

1  to assess the results of the performance
2  analysis to see if you were, in fact, creating
3  a second opportunity district?
4    A.    Yes.  And as -- and I -- a
5  little background.  As you know, some maps
6  that were submitted in this lawsuit while
7  their BVAPs may have been low, they may --
8  like Singleton maps for a certain district,
9  if they performed in a way that a candidate
10 of choice could be elected, it seemed like
11 the plaintiffs in your case were happy with
12 that outcome, and that's what we thought made
13 sense in terms of reviewing the second
14 district in the community of interest plan.
15   Q.    Okay.  Clarify for me what you're
16 saying then specifically you were looking for
17 in assessing whether you had, in fact, create
18 a second opportunity district.
19   A.    Right.  You asked me
20 hypothetically whether one out of four would
21 have been enough or if you needed two out of
22 four.  I don't know.  I'm just saying that I
23 could make a better argument probably for two
24 out of four rather than one out of four.  But
25 I don't know what the threshold is.  And,

RANDY HINAMAN                                          August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 61

1  again, that's not really my decision.  That's
2  more of a legislative decision.
3      Q.    Okay.  You also mentioned in your
4  answer their BVAP, which that stands for black
5  voting age population; correct?
6      A.    Yes, sir.
7      Q.    Did you assess the BVAP numbers
8  for the community of interest plan?
9      A.    I took note of them.  Did we
10  lose him?  Are we still here?
11      Q.    We are still here.  I'm pulling
12  something up.
13      A.    I'm sorry.
14      Q.    For the record, I'm going to show
15  another exhibit here.
16          MR. THOMPSON:  I believe this is
17  Exhibit 5, is that correct, Ms. Jenkins?
18          COURT REPORTER:  Yes, sir.
19          (Whereupon, Exhibit 5 was marked
20          for identification.)
21      Q.    (By Mr. Thompson) This is being
22  marked as Exhibit 5.  And this is titled at
23  the top, somewhat confusingly, Exhibit 7,
24  Livingston deposition.  Please ignore that.
25  But it's also titled community of interest

Page 62

1  plan.  Do you see that?
2      A.    Yes, sir.
3      Q.    Okay.  Have you seen this document
4  before?
5      A.    Yeah.  Those are the four races
6  I was referencing in our earlier discussion
7  of the community of interest plan.
8      Q.    Is it your understanding that this
9  is the results of the election analysis that
10  Dr. Trey Hood performed on the community of
11  interest plan?
12      A.    Yeah.  It's a sub -- it's a
13  subset of it, but, yes.
14      Q.    Now, you also mentioned the BVAP
15  numbers.  So I want to discuss those briefly.
16  I'm showing you now what's being
17  marked as Exhibit 6.  It's titled at the top
18  population summary.  And it says, plan name,
19  community of interest.  It's dated Thursday,
20  July 13, 2023.  Do you see that?
21          (Whereupon, Exhibit 6 was marked
22          for identification.)
23          THE WITNESS:  Yes, sir.
24      Q.    (By Mr. Thompson) Have you seen
25  this document before?

Page 63

1      A.    I have.
2      Q.    What is your understanding of what
3  this document shows?
4      A.    It shows a black voting age
5  population percentage in the second
6  congressional district of 42.45 and black
7  voting age population in the seventh
8  congressional district of -- my eyesight is
9  bad here.  It's 51.55, I believe.
10      Q.    Did you look at this analysis in
11  the process of drawing the community of
12  interest plan?
13      A.    I did.
14      Q.    Did this analysis impact your map
15  in any way?
16      A.    Not really.  I mean, I think the
17  more relevant numbers to the opportunity
18  district, as I think you -- the plaintiffs
19  shown in the Singleton plans, for example,
20  that the performance is probably more
21  relevant than the raw BVAP number percentage.
22      Q.    When you were drawing the
23  community of interest plan, did you have any
24  target BVAP levels that you were aiming for?
25      A.    I did not.

Page 64

1      Q.    Were you given any instructions
2  about a range of BVAP levels you were to
3  trying to achieve in drawing your map?
4      A.    I was not.
5      Q.    Were you given any information or
6  instructions about a minimum BVAP level that
7  you were to achieve?
8      A.    No, sir.
9      Q.    The same question for a maximum
10  BVAP level?
11      A.    No, sir.
12      Q.    Did you try to reach any certain
13  BVAP levels in drawing your community of
14  interest plan?
15      A.    I did not.
16      Q.    How did you choose District 2 to
17  be the level -- excuse me -- to be the
18  district -- let me just start that question
19  over for clarity.
20          How does choose District 2 to be
21  the district in which you would aim to create
22  a second opportunity district?
23      A.    It was an area of geography that
24  had a compact enough African American
25  population in the relevant counties to draw a



RANDY HINAMAN                                              August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 65

1  district that could perform as an opportunity
2  district.
3      Q.    Were you instructed to choose
4  District 2 as the district that would be an
5  additional opportunity district in your map?
6      A.    I was not.
7      Q.    Looking at this map, you have a --
8  one district, District 7, that has a majority
9  of black voting age population at 51.55
10 percent.  Do you see that?
11     A.    Yes, sir.
12     Q.    But there are not two districts in
13 which there is a black voting age population
14 majority; correct?
15     A.    That's correct.
16     Q.    The closest is District 2, which
17 has 42.45 percent; correct?
18     A.    Yes, sir.
19     Q.    Were you satisfied with that 42.45
20 percent BVAP number in District 2?
21     A.    I was satisfied that the
22 performance numbers were such that I think it
23 could perform as an opportunity district.
24     Q.    So to clarify -- and I know you
25 mentioned this earlier.  But just to clarify,

Page 66

1  your focus was more on the performance
2  analysis rather than the BVAP levels; is that
3  correct?
4      A.    Yes.  And I think -- I mean, not
5  all 42 or 43 or 41 or 39 percent districts
6  perform the same obviously.  So, yes, I was
7  more interested in performance than the raw
8  BVAP number.
9      Q.    Did you try to make the BVAP
10 number in 40 -- excuse me.  Let me start over.
11         Did you try to make the BVAP level
12 in District 2 any higher than 42.45 percent?
13     A.    No.  I mean, I was looking at,
14 you know, traditional redistricting
15 principles in whole counties to the extent
16 possible and not pairing incumbents, which,
17 obviously, we had incumbents that could have
18 been paired there in terms of Barry Moore in
19 Coffee County and Jerry Carl in Mobile and
20 taking those things into consideration.  The
21 BVAP number, you know, came out to what it
22 came out to.
23     Q.    Just to clarify, you did not try
24 to make the BVAP number of District 2 any
25 higher than 42.45 percent; correct?

Page 67

1      A.    That's correct.  I mean, we had
2  other maps that -- I mean, the extended Black
3  Belt map, I think, was slightly higher than
4  that.  And there were a couple of other maps
5  that were slightly higher BVAPs than this.
6  But -- but I did not try to modify this map.
7      Q.    In drawing your new maps, were you
8  instructed to try to add a second majority
9  black congressional district?
10     A.    I was instructed to add an
11 opportunity -- a district where an African
12 American candidate would have -- African
13 Americans would have an opportunity to elect
14 the candidate of their choice.
15     Q.    Were you instructed to try to add
16 a second majority black congressional
17 district?
18     A.    I was instructed to add an
19 opportunity district.
20     Q.    I appreciate that.  And I'm going
21 to object to nonresponsive and just ask -- I'm
22 trying to be fair here.  If I'm not, let me
23 know.  But I would like to were you instructed
24 to try to add a second majority black
25 congressional district?

Page 68

1      A.    I was not instructed to do that.
2      Q.    Did you make any attempt to draw a
3  map that adds a second majority black
4  congressional district?
5      A.    I did not draw such a map.
6      Q.    Did you make any attempt to draw
7  such a map?
8      A.    I'm sure I looked at maps at
9  some point.  You know, there were maps
10 presented that were those majority -- had two
11 majority black districts, but I did not draw
12 them.
13     Q.    Did you make any attempt to draw a
14 map that had a second majority black district?
15     A.    No.
16     Q.    You said that you were instructed
17 to draw a map that included a second district
18 in which black voters have an opportunity to
19 elect a representative of their choice;
20 correct?
21     A.    Yes, sir.
22     Q.    And I know we've discussed that a
23 little bit.  But what specific instructions
24 were you given in that regard?
25     A.    Just that.  I mean, obviously,



RANDY HINAMAN                                      August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 69

1  following guidelines of the reapportionment
2  committee, not pairing incumbents and so
3  forth and so on.  Draw a -- draw a district
4  that provides the opportunity for African
5  American voters to have -- to elect a
6  candidate of their choice.
7      Q.    Who gave you those instructions?
8      A.    The two chairs.
9      Q.    Anyone else?
10     A.    I'm sure Dorman Walker.
11     Q.    Anyone else?
12     A.    No.
13     Q.    When were those instructions given
14  to you?
15     A.    At the beginning of the drawing
16  process.
17     Q.    Were you asked to evaluate any of
18  the other maps for compliance with that
19  instruction?
20     A.    I was not.
21     Q.    Did anyone that you spoke to at
22  the legislature have a different understanding
23  from you about what it means for black voters
24  to have an opportunity to elect a
25  representative of their choice in a district?

Page 70

1      A.    Anyone I spoke to?  That's a
2  rather large group.  I don't know.  I don't
3  remember any specific conversation.
4      Q.    Well, let's just take a step back.
5         You mentioned that, from your
6  perspective, an opportunity district is one in
7  which black voters have an opportunity to
8  elect a representative of their choice;
9  correct?
10     A.    Yes, sir.
11     Q.    And you mentioned that a big
12  indicator of that is shown in a performance
13  analysis, so an election analysis; correct?
14     A.    Yes, sir.
15     Q.    And you stated that, in your
16  opinion, a plan that, for example, has an
17  election analysis showing that a candidate
18  that black voters prefer that wins two out of
19  four elections has a stronger argument of
20  being an opportunity district than one in
21  which one out of four elections that occurs;
22  correct?
23     A.    Again, I don't know that there's
24  a threshold.  But I think you can make a
25  stronger argument with two out of four than

Page 71

1  one out of four.
2      Q.    So, for example, then, your belief
3  is that a district that performed for black
4  preferred candidates half of the time would be
5  an opportunity district; is that fair to say?
6      A.    That is fair to say.
7      Q.    And what is that understanding
8  based on?
9      A.    Conversations with lawyers and I
10  guess -- primarily conversations with
11  lawyers.
12     Q.    Which lawyers?
13     A.    Dorman Walker and Eddie LaCour.
14     Q.    And when did those conversations
15  take place?
16     A.    Throughout the drawing process
17  of these maps.
18     Q.    What did Mr. Walker say to you?
19         MR. WALKER:  Objection.
20         MR. THOMPSON:  Is there an
21  objection there made, Mr. Walker?
22         MR. WALKER:  Yes.  Yes.  I'm
23  sorry.  Did you not hear me?  I asserted
24  privilege.
25         MR. THOMPSON:  Are you instructing

Page 72

1  your witness not to answer that question on
2  the basis of privilege?
3         MR. WALKER:  I am, Mr. Thompson.
4      Q.    (By Mr. Thompson) Mr. Hinaman, are
5  you -- do you intend to follow your counsel's
6  instruction?
7      A.    I do.
8      Q.    The same question as to
9  Mr. LaCour.  Do you recall what Mr. LaCour
10  told you?
11         MR. WALKER:  Same objection.
12         MR. THOMPSON:  And by objecting,
13  Mr. Walker, are you instructing your witness
14  not to answer on the basis of privilege?
15         MR. WALKER:  I am, Mr. Thompson.
16     Q.    (By Mr. Thompson) Mr. Hinaman, do
17  you intend to follow your counsel's
18  instruction?
19     A.    I do.
20     Q.    Outside of Mr. Dorman (sic) and
21  Mr. LaCour, did you have any discussions with
22  anyone else at the Alabama
23  legislature, the reapportionment committee, or
24  U.S. Congress members, or anyone else,
25  regarding what it means to have an opportunity



M43

Page 73

1  district?
2      A.    I did not.
3      Q.    Is it your opinion that the
4  community of interest map that you drew
5  provides black voters an opportunity to elect
6  a candidate of their choice in a second
7  district?
8      A.    It is.
9      Q.    Did you draw any other maps that
10  involve an opportunity district, a second
11  opportunity district?
12      A.    Yeah.  As I mentioned earlier,
13  the Russell split and the black -- extended
14  Black Belt maps that were released on that
15  Friday before the session.
16      Q.    I want to turn back to those maps.
17  One of the other maps that you stated that you
18  drew was a map you referred to as Russell
19  split; is that correct?
20      A.    Yes, sir.  Yes, sir.
21      Q.    I think I have a copy of that
22  here.  If you'll give me just one second.
23          THE WITNESS:  I'm going to have a
24  drink while you do that.
25          MR. THOMPSON:  Sure.

Page 74

1          MR. WALKER:  Blayne, is there any
2  opportunity for us to take a quick break at
3  some time convenient to you?
4          MR. THOMPSON:  Sure.  We can do
5  that now.  Take a ten-minute break?
6          THE WITNESS:  Unless you're
7  minutes from wrapping up.
8          MR. THOMPSON:  I don't think it
9  will be too much longer.  But let's take a
10  ten-minute break, and I'll get this exhibit
11  ready.  And then we can reconvene, we'll say,
12  at 11:35 central.
13          MR. WALKER:  Thank you very much.
14          MR. THOMPSON:  Thank you, Guys.
15          THE WITNESS:  You mean 10 --
16  11:35.
17          MR. THOMPSON:  Sorry.  That would
18  have been eastern.  10:35 central.  Excuse me.
19  Let's be clear here.  We will reconvene at
20  10:45 central, 11:45 eastern.
21          THE WITNESS:  Thank you.
22          MR. THOMPSON:  Thank you.
23          THE VIDEOGRAPHER:  The time is
24  10:35 a.m.  We're going off the record.
25          (A short break was taken.)

Page 75

1          THE VIDEOGRAPHER:  The time is
2  10:48 a.m.  We're back on the record.
3      Q.    (By Mr. Thompson) Mr. Hinaman,
4  going back to the community of interest plan
5  that you drew, aside from anything that you
6  looked at involving the BVAP levels or the
7  performance of the plans, what other factors
8  did you consider in drawing your plan?
9      A.    Obviously I followed the
10  guidelines of the reapportionment committee.
11  So that was not -- not pairing incumbents and
12  keeping communities of interest, where --
13  where possible, together such as Mobile and
14  Baldwin and other community -- and Black Belt
15  to the extent possible and so forth.
16      Q.    When you say that you followed the
17  redistricting -- or the reapportionment
18  committee redistricting guidelines, were those
19  the same guidelines that you followed in
20  drafting the 2021 congressional map?
21      A.    Yes, sir.  And just for the
22  record, I'm showing you what's being marked
23  as Exhibit 7.  These are the -- this is the
24  same exhibit that I showed you in your prior
25  deposition representing the May 5th, 2021

Page 76

1  Alabama reapportionment committee
2  redistricting guidelines.  Do you see that?
3          (Whereupon, Exhibit 7 was marked
4          for identification.)
5          THE WITNESS:  I do.   Redacted



13      Q.    Of course.  So just so that you
14  can see here that -- the entire document, it
15  looks like it's seven pages.  And I will flip
16  through it briefly here to page 2, page 3,
17  page 4, page 5, page 6, and page 7.  Do you
18  see that?
19      A.    Yes, sir.
20      Q.    You can see in the bottom right
21  corner there is also a Bates label.  It's
22  labeled RC043723 through RC043729.  Do you see
23  that?
24      A.    I don't.  But that's okay.
25          MR. WALKER:  Mr. Thompson, I don't



RANDY HINAMAN                                            August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 77

1  believe 28 and 29 are part of the guidelines.
2  It looks like they're an agenda and minutes.
3  Am I wrong?
4          MR. THOMPSON:  It looks like
5  it's an appendix to the document.
6          MR. WALKER:  Okay.  I think, for
7  the record, that the guideline is RC049221
8  through RC049227.
9          MR. THOMPSON:  Okay.  We may
10  have -- this may have been produced twice
11  then.  The version that I have, I think, the
12  page numbers you're referring to correlate to
13  RC043723 through RC043727.
14          MR. WALKER:  Okay.  I'm sorry.  I
15  didn't realize we had different Bates numbers.
16      Q.    (By Mr. Thompson) And this is the
17  same exhibit that I showed you during your
18  prior deposition in December 2021 when we
19  discussed the reapportionment guidelines.
20          Are these the same reapportionment
21  guidelines that you used in drafting the
22  community of interest plan in this case?
23      A.    Yes, sir.  Well, yes.  I was
24  just looking at -- yes.  Obviously parts of
25  it don't apply because there was a part in

Page 78

1  there about legislative districts and
2  deviations of plus or minus 5 percent.  And
3  obviously these maps are drawn to zero
4  deviation.  But -- but, again, that was for
5  legislative.  So, yeah, they're the
6  guidelines.
7      Q.    Aside from the redistricting
8  guidelines -- well, first off, was there
9  anything in particular from the redistricting
10  guidelines that impacted your map in any
11  specific ways?
12      A.    Well, keeping incumbents in
13  their own -- not pairing incumbents obviously
14  impacted the map.  And obviously going to
15  zero deviation impacts the map because you've
16  got to split counties.  And preserving
17  community of interest, you know, impacts the
18  map.
19      Q.    Did you have to split Jefferson
20  County to protect incumbents?
21      A.    Not technically because there
22  aren't two incumbents who live in Jefferson
23  County.  But as a practical matter,
24  Representative Palmer lives right on the
25  border between Jefferson and Shelby.  So it

Page 79

1  was helpful to split Jefferson County to not
2  pair incumbents.
3      Q.    Did you have any understanding
4  whether the legislature had modified the 2021
5  criteria in any way?
6      A.    My understanding is they did
7  not.  They voted to renew them as is.  The
8  reapportionment committee voted to renew them
9  as is.
10      Q.    Were you told to keep any specific
11  counties or regions together in drawing your
12  map?
13      A.    Yeah.  I mean, we were trying to
14  protect community of interest.  So keeping
15  the Mobile and Baldwin, the Gulf Coast
16  together, keeping the Wiregrass together,
17  having the Black Belt in two districts
18  preferably rather than split among three.
19  Keeping -- I mean, I wasn't really focusing
20  on north Alabama.  But obviously keeping
21  Madison and Morgan together.  Keeping the
22  Shoals together as much as possible.
23      Q.    Were there any other communities
24  of interest that you considered in drawing
25  your map?

Page 80

1      A.    Those are the main ones.
2      Q.    Were you specifically instructed
3  to keep Mobile and Baldwin Counties together?
4      A.    Yes.
5      Q.    By whom?
6      A.    From -- by Representative
7  Pringle and, I believe, by Senator
8  Livingston.  But certainly Representative
9  Pringle.
10      Q.    When did they tell you that?
11      A.    When we started the drawing
12  process.
13      Q.    Did they tell you why?
14      A.    It's protecting a community of
15  interest to keep them together.
16      Q.    Was this a nonnegotiable
17  requirement?
18      A.    I don't know.  That's not --
19  again, legislatures pass plans.  I just draw
20  maps.
21      Q.    Did that instruction impact your
22  map in any way?  I guess --
23      A.    No -- I mean --
24      Q.    I should rephrase that.
25          How did that instruction, if at



RANDY HINAMAN                                        August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 81

1  all, impact your map?
2      A.    I prefer to keep communities of
3  interest together.  So keeping Baldwin and
4  Mobile together would have been my preference
5  in any initial drawing in any case.
6      Q.    Were you told there were any other
7  specific aspects of the map that you shouldn't
8  touch?
9      A.    No.  Again, we were hopefully to
10 have the Black Belt in two districts instead
11 of three, to keep the Wiregrasses together as
12 together.  And I'm focusing on south Alabama
13 because obviously that's where the -- at
14 least I thought, the majority of the changes
15 would be.
16     Q.    Did someone instruct you to keep
17 the Black Belt in two districts rather than
18 three?
19     A.    Instruct maybe isn't the right
20 word.  But we talked about the desirability
21 of doing that, yes.
22     Q.    Who did you discuss that with?
23         MR. WALKER:  Don't -- don't
24 discuss anything you discussed with me.
25         THE WITNESS:  Mostly with lawyers,

Page 82

1  but I'm sure we had a discussion among the
2  chairs as well.
3      Q.    (By Mr. Thompson) Anyone else?
4      A.    No.
5      Q.    What about Madison and Morgan,
6  were you instructed to keep those counties
7  together?
8      A.    I wasn't instructed.  But I
9  was -- I was trying to -- community of
10 interest to make as few changes to
11 districts 4 and 5 as possible.
12     Q.    Did you have any discussions with
13 anyone about keeping Madison and Morgan
14 Counties together?
15     A.    Not specifically.
16     Q.    Were you instructed to keep any
17 other alleged communities of interest
18 together?
19     A.    No.  You keep using the word
20 "instructed."  I was -- it more a discussion
21 than instructed.
22     Q.    Did you have any discussion with
23 anyone else about keeping any alleged
24 communities of interest together?
25     A.    No.

Page 83

1      Q.    Were you given any instructions on
2  which factors or policies should take priority
3  over any others in drawing your map?
4      A.    No.
5      Q.    Did you consider any other factors
6  when drawing your community of interest plan?
7      A.    Other than what's in the
8  guidelines?
9      Q.    Correct.
10     A.    Well, applying to -- I mean, you
11 know, complying with the Court order.
12     Q.    Anything else?
13     A.    That would be it.
14     Q.    Did you place any factors --
15 scratch that.
16         Did you place a higher priority on
17 any factors other than -- I'm sorry.  I'm
18 having trouble wording my question.
19         Did you place any higher priority
20 on any factor over compliance with the Court's
21 order?
22     A.    No.
23     Q.    I'm going to go to the other three
24 maps that you said you drew.  This is being
25 marked as Exhibit 8.

Page 84

1          MR. THOMPSON:  Do I have that
2  correct?
3          COURT REPORTER:  Yes, sir.
4      Q.    (By Mr. Thompson) Perfect.  This
5  is being marked as Exhibit 8.  It is a map.
6  At the top of it, it is titled Russell split
7  plan.  Do you see that?
8          (Whereupon, Exhibit 8 was marked
9          for identification.)
10         THE WITNESS:  Yes, sir.
11     Q.    (By Mr. Thompson) Is this one of
12 the maps that you drew in the 2023
13 redistricting cycle?
14     A.    It is.
15     Q.    And tell me about this map.  Why
16 did you draw this map?
17     A.    It was just another option of
18 creating an opportunity district in the
19 second district.
20     Q.    Who asked you to draw this map?
21     A.    Nobody specifically asked me to
22 draw it.  But, again, the cochairs asked for
23 a couple of different maps to look at.
24     Q.    What did you do differently with
25 this map versus the community of interest



RANDY HINAMAN                                     August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 85

1  plan?
2       A.    It -- it splits Russell County,
3  which -- and then that means you added, I
4  guess Wilcox and the rest of Conecuh -- the
5  rest of Conecuh was added to the second
6  district.
7       Q.    Do you know if any performance
8  analysis was done on this map?
9       A.    I don't think so.  I don't
10  remember to tell you the truth, but I don't
11  think there was.
12      Q.    Do you know why this map was not
13  ultimately sponsored or selected by the
14  redistricting committee?
15      A.    I do not.
16      Q.    Did you discuss this particular
17  map with anyone?
18      A.    Discussed it with lawyers and
19  the two chairs.
20      Q.    What were those discussions
21  entailing?
22           MR. WALKER:  Asserting the
23  privilege again as to my communications.
24      Q.    (By Mr. Thompson) You can answer.
25      A.    We just discussed it as, you

Page 86

1  know, another option to look at in the --
2       Q.    Do you remember any specifics from
3  the conversation?
4       A.    No.  I mean, I don't think
5  splitting Russell County was probably a great
6  idea.
7           So that was probably the reason
8  it was -- but, again, I need to stop
9  speculating.
10      Q.    All right.  Can you see the new
11  map I've changed on your screen?
12      A.    I can.
13      Q.    This is being marked as Exhibit 9.
14  It's titled at the top expanded Black Belt
15  plan.  Is this another one of the plans that
16  you drew?
17      A.    It is.
18           (Whereupon, Exhibit 9 was marked
19           for identification.)
20      Q.    (By Mr. Thompson) And what was the
21  purpose of drawing this map?
22      A.    It was another option to comply
23  with the Court order.
24      Q.    Did someone specifically ask you
25  to draw the map?

Page 87

1       A.    No.
2       Q.    What was this map from the
3  community of interest plan?
4       A.    It extends further into the
5  western part of the Black Belt.
6       Q.    And why did you do that?
7       A.    It's just another way of --
8  another way of grouping Black Belt counties
9  to create an opportunity district.
10      Q.    Was any performance analysis done
11  on this map?
12      A.    I don't believe so.  Maybe there
13  was.  I don't -- I don't remember it.
14      Q.    Do you see any reason why this map
15  would not be an acceptable option?
16      A.    Again, I'm a map drawer --
17  drawer.  The legislature picks maps.
18      Q.    But as to you, do you see any
19  reason why this would not be an acceptable
20  option for the enacted plan?
21      A.    I don't think it's as compact
22  as -- as the other maps.  So that's not a
23  positive.
24      Q.    Any other reasons that you see why
25  this map would not be acceptable?

Page 88

1       A.    No.
2       Q.    And the same question going back
3  to Exhibit 8, the Russell split plan, do you
4  see any reasons why this plan would not be an
5  acceptable option?
6       A.    No.  I think it could have been.
7  Although, again, I'm not sure that splitting
8  of Russell, which some consider a Black Belt
9  county was a good -- was a good -- a good
10  thing to do.  But I think it could have been
11  an option.
12      Q.    And then going back to your
13  community of interest plan, do you see any
14  reason why the community of interest plan
15  would not be an acceptable option?
16      A.    I do not.
17      Q.    I'm going to show you one last
18  map.  This is being marked as Exhibit 10.
19  This is the whole Jefferson County plan
20  according to the label at the top.  Do you see
21  that?
22           (Whereupon, Exhibit 10 was marked
23           for identification.)
24           THE WITNESS:  I do.
25      Q.    (By Mr. Thompson) Is this another

RANDY HINAMAN                                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 89

1   map that you drew?
2       A.   This a map that I zeroed out
3   meaning I got it to zero deviation.  I didn't
4   come up with the concept of it.
5       Q.   Do you know who drew this map
6   other than you?
7       A.   I do.
8       Q.   Who was that?
9       A.   The concept of the map came from
10  Eddie LaCour.
11      Q.   And you are having a discussion
12  with someone right now.  But I can't see
13  because I'm not in the room with you.  Who
14  were you just talking to?
15      A.   I was asking Dorman if I could
16  answer that question.
17      Q.   Okay.  So your understanding was
18  that Exhibit 10 was drawn by Eddie LaCour, is
19  that what I heard?
20      A.   The concept of the map was drawn
21  by Eddie LaCour, yes.
22      Q.   What does that mean, the concept
23  of the map was drawn?
24      A.   It means he showed me a map that
25  tied Shelby County into the other Black Belt

Page 90

1   counties that are in the 7th district there
2   and then moved the 2nd district into Chilton,
3   for example.  And -- but -- but when he
4   showed me the map, it was not to zero
5   deviation.  So I took his concept and put it
6   to zero deviation.
7       Q.   So when you say the concept, you
8   mean a rough drawing that's not drawn out to
9   zero deviation?
10      A.   Yes, sir.
11      Q.   Do you know if any performance
12  analysis was done on the whole county to --
13  excuse me -- the whole Jefferson County plan?
14      A.   I don't know.  I don't remember
15  seeing it.  But that doesn't mean that
16  somebody didn't have it.
17      Q.   Do you have any knowledge about
18  whether this plan performed to create an
19  opportunity district?
20      A.   I do not.
21      Q.   Do you see any reason why the
22  whole Jefferson County plan would not be an
23  acceptable option?
24      A.   No.  Again, you're -- you're
25  pairing Shelby County with Black Belt

Page 91

1   counties, and I don't think they have a lot
2   in common.  Shelby's, obviously, I think, the
3   second fastest growing county in the state,
4   and a lot of Black Belt counties are losing
5   population.  So I'm not -- I'm not sure they
6   pair up that well.  But other than that, I
7   suppose it's an option.
8            (Whereupon, Exhibit 11 was marked
9            for identification.)
10      Q.   I'll bring up one more exhibit for
11  you.  This is being marked as Exhibit 11.  And
12  this is the text of SB-5 as it was finally
13  enacted and signed by Governor Ivey.  It is 12
14  pages long.  This was pulled from the Alabama
15  Legislature's website.  You can see at the top
16  it says, SB-5 enrolled.  Under that, it says
17  Act No. 2023-563.  Do you see that?
18      A.   Yes, sir.
19      Q.   Can you see the stamp on here that
20  says July 21, 2023, received, governor's
21  office?
22      A.   Yes, sir.
23      Q.   I'm going to just scroll down for
24  you briefly so that you can see the entirety
25  of this document.  Obviously you can read it

Page 92

1   in a moment if you would like.  But just
2   showing you here each page.  Do you see here
3   on page 11, there's a signature by the
4   president presiding officer of the senate and
5   by the speaker of the house of
6   representatives.  Do you see that?
7       A.   Yes, sir.
8       Q.   And then you see at the bottom
9   here it says, approved, July 21, 2023, time
10  5:28 p.m., Kay Ivey, Governor, with her
11  signature.  Do you see that?
12      A.   Yes, sir.
13      Q.   Have you seen this document
14  before?
15      A.   I have not.
16      Q.   I want -- if you can read this.
17  Can you read this?  Is it big enough for you
18  to see?
19      A.   Not -- not very easily.  But...
20      Q.   Let's see.  Does that help?
21      A.   That's better.  Yes.
22      Q.   Okay.  What I'd like you to do, if
23  you can, is to read section 1, paragraph 3,
24  this section is 1 right here.  You see it
25  says, The legislature finds and declares the



RANDY HINAMAN                                        August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 93

1   following.  There's section 1 here.
2   Section -- excuse me, paragraph 1, paragraph
3   2, and then paragraph 3 starts here.  So I'm
4   going to scroll down a bit.  If you can review
5   this and then just tell me when you're ready
6   for me to scroll down.
7          MR. WALKER:  Mr. Thompson, I have
8   a copy of the same exhibit here.  Would you
9   like for me to show it to him?
10         MR. THOMPSON:  That would be
11  perfect if preferable.
12         MR. WALKER:  Okay.  Hang on one
13  second, please.
14         MR. THOMPSON:  Sure.  And, again,
15  it's section 1, paragraph 3.  And it is a --
16  it is a couple of pages long, so take your
17  time to read it.
18         MR. WALKER:  Wait.  It's not the
19  same document.  I apologize.
20         MR. THOMPSON:  Okay.  Well, then
21  we'll try this route.
22     Q.   So, again --
23     A.   I'm starting where it says, the
24  legislature's intent; is that correct?
25     Q.   Correct.

Page 94

1      A.   Okay.  Can we move down?  Okay.
2   Thank you.
3      Q.   Okay.
4      A.   Can you go back just one tick
5   there?  Thank you.  Okay.
6      Q.   And it ends here with line 57.
7      A.   All right.
8      Q.   Have you had a chance to review
9   section 1, paragraph 3?
10     A.   I did.
11     Q.   Have you seen these provisions of
12  SB-5 before?
13     A.   I have not.
14     Q.   Has anyone ever told you about
15  these provisions of SB-5 before?
16     A.   No.
17     Q.   Specifically, were you ever given
18  any instruction that the redistricting plan
19  shall contain no more than six splits of
20  county lines?
21     A.   I was not given that
22  instruction.  Although, obviously, that is
23  the minimum needed to split to get seven
24  districts to deviation.
25     Q.   That's the minimum.  But you were

Page 95

1   never instructed that it was the maximum; is
2   that correct?
3      A.   That's correct.
4      Q.   Were you ever made aware of any of
5   these redistricting criteria prior to drawing
6   your map?
7      A.   Well, certainly some of them, I
8   was.  I mean, not pairing incumbents,
9   district shall be as reasonably compact.
10  Yeah, you know, a lot of them are in the --
11  are overlaps of the guidelines of the
12  reapportionment committee.
13     Q.   So to the extent that these are
14  already contained within the 2021
15  redistricting guidelines, you were obviously
16  aware of those prior to drawing your map;
17  correct?
18     A.   Correct.
19     Q.   But to the extent that there are
20  any new or different requirements in this
21  SB-5, you were not made aware of those prior
22  to drawing your map; is that correct?
23     A.   That is correct.
24         MR. THOMPSON:  All right.
25  Mr. Hinaman, I think those are all of my

Page 96

1   questions at this time.  So I'm going to pass
2   the witness.
3   EXAMINATION BY MS. JASRASARIA:
4      Q.   Hi, good morning, Mr. Hinaman, my
5   name is Jyoti Jasrasaria, and I represent the
6   Caster plaintiffs this case.
7      A.   Good morning.
8      Q.   I don't think we've met before,
9   but I really appreciate your time today in
10  answering all of our questions.  I will be
11  short.  I just wanted to follow up on a few
12  things that Mr. Thompson asked you about.
13         So you spoke to Mr. Thompson
14  earlier this morning about being contacted by
15  Mr. Dorman Walker shortly after the June 8th
16  U.S. Supreme Court decision; is that correct?
17     A.   Yes, ma'am.
18     Q.   And what did Mr. Walker tell you
19  at that time?
20     A.   He told me --
21         MR. WALKER:  Objection.
22  Objection.  I'm asserting attorney -- I mean,
23  privilege over that conversation.
24         MS. JASRASARIA:  Mr. Walker, are
25  you instructing the witness not to answer?



RANDY HINAMAN                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 97

1          MR. WALKER:  I am.
2      Q.     (By Ms. Jasrasaria) Okay.  And
3  Mr. Hinaman, are you intending to follow your
4  counsel's instruction?
5      A.     I am.
6      Q.     In that initial conversation, was
7  anyone else present besides yourself and
8  Mr. Walker?
9      A.     No.
10     Q.     And did Mr. Walker can give any
11 instructions or guidance about drawing a map
12 at that time?
13         MR. WALKER:  Counsel, I'm having a
14 hard time hearing you.
15         MS. JASRASARIA:  Oh.
16         MR. WALKER:  But I think I assert
17 the privilege to that question that you asked,
18 but I'm not sure I heard it clearly.
19         MS. JASRASARIA:  Sure.  Can you
20 hear me better now?
21         MR. WALKER:  I can.  Thank you so
22 much.
23         MS. JASRASARIA:  Okay.  Excellent.
24 I just changed my microphone.
25     Q.     So I just asked whether Mr. Walker

Page 98

1  gave the witness any instructions or guidance
2  about drawing a map during the initial
3  conversation after the June 8th decision?
4          MR. WALKER:  And I'll assert the
5  same privilege and instruct the witness not to
6  answer.
7      Q.     (By Ms. Jasrasaria) Okay.
8          And Mr. Hinaman, are you following
9  your counsel's instruction?
10     A.     I am.
11     Q.     When was the next time that you
12 spoke to Mr. Walker after your initial
13 conversation?
14     A.     I believe we had a meeting in
15 Montgomery the following week or a few days
16 later.  I can't remember the exact dates,
17 but...
18     Q.     And was anyone else present at
19 that meeting in Montgomery?
20     A.     I believe that two chairs were
21 present at that meeting.
22     Q.     Anyone else?
23     A.     Donna Loftin probably.  There
24 are probably, you know, a segment of
25 different meetings.

Page 99

1      Q.     About how many times did you meet
2  with Mr. Walker over the course -- from June
3  8th to the present?
4      A.     Probably about once a week.  And
5  then obviously when I was in -- you know, in
6  Montgomery to draw maps.  And then obviously
7  I was here for the entire special session and
8  saw him every day, I believe.
9      Q.     Was anyone else involved in those
10 conversations and meetings that you had with
11 Mr. Walker?
12     A.     Sometimes the cochairs and
13 sometimes Eddie LaCour.
14     Q.     Anyone else?
15     A.     Donna Loftin possibly.  Of
16 course, she was out -- she missed most of the
17 special session with COVID.
18     Q.     When was the first time that you
19 spoke to Mr. LaCour?
20     A.     I believe it was our initial
21 meeting in Montgomery.
22     Q.     And was that the same meeting that
23 you mentioned was about a week after the
24 Supreme Court decision?
25     A.     Yeah.  A week to ten days,

Page 100

1  something like that.
2      Q.     And that meeting included
3  Mr. Walker and the cochairs?
4      A.     I'm sorry.  Dorman was stealing
5  my water.  I was somewhat distracted there,
6  Ma'am.  I'm sorry.
7      Q.     No problem.  That meeting that you
8  mentioned in Montgomery, did that include
9  Mr. LaCour, Mr. Walker, and the cochairs?
10     A.     Yes, ma'am.
11     Q.     And what did Mr. LaCour tell you
12 in that conversation?
13         MR. WALKER:  Counsel, I'm going to
14 assert the privilege again and instruct the
15 witness not to answer.
16     Q.     (By Ms. Jasrasaria) Mr. Hinaman,
17 do you intend to follow your counsel's
18 instruction?
19     A.     I do.
20     Q.     When was the next time that you
21 spoke to Mr. LaCour after the initial meeting?
22     A.     Probably another week later when
23 I was back in Montgomery.
24     Q.     And about how many times did you
25 meet with Mr. LaCour over the course of the



RANDY HINAMAN                                          August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 101

1  special session?
2      A.    Over the course of the special
3  session?  Are you talking about those five
4  days?
5      Q.    Oh, sorry.  Over the course of the
6  June and July period.
7      A.    Half a dozen times probably.
8      Q.    Was anyone else involved in those
9  meetings and conversations?
10     A.    Dorman Walker and occasionally
11 the chairs.
12     Q.    Did you ever meet with or speak
13 with Mr. LaCour one on one?
14     A.    I did not.  I mean, I'm sure I
15 said hello passing him in the hall, but I did
16 not meet with him.
17     Q.    You mentioned that Mr. LaCour was
18 involved in the drawing of the whole Jefferson
19 County plan; correct?
20     A.    I said that was his concept,
21 yes.
22     Q.    Were there any other plans that
23 Mr. LaCour was involved in the concept of?
24     A.    Not with me.
25     Q.    Are you aware of any that did not

Page 102

1  involve you?
2      A.    If it didn't involve me, it's
3  sort of hard for me to know.
4      Q.    So, just to clarify, are you aware
5  of any plans that Mr. LaCour was involved in
6  developing the concept for besides the whole
7  Jefferson County plan?
8      A.    I don't know.  I'm not aware.
9      Q.    Did you speak with Mr. LaCour
10 about the communities of interest map that you
11 drew?
12     A.    Yes, ma'am.
13     Q.    Did you speak with Mr. LaCour
14 about the Livingston 2 plan?
15     A.    I don't believe so.  I don't
16 remember.  I don't recollect it, no.
17     Q.    But you mentioned that did you
18 speak to -- I'm sorry.  Let me rephrase that.
19         Did you speak to Mr. LaCour about
20 the Livingston 3 plan?
21     A.    I don't believe so, no.
22     Q.    Did you speak to Mr. LaCour about
23 any other plan?
24     A.    I don't -- I mean, I don't have
25 an exact recollection.  Obviously, we talked

Page 103

1  about community of interest.  We talked about
2  the Jefferson whole plan.  I'm sure we
3  discussed maybe a couple of the other ones --
4  you know, Russell split, for example.  I
5  don't have a direct recollection of it, but
6  I'm sure we probably discussed it.
7      Q.    Did you speak with Mr. Walker
8  about the communities of interest plan?
9      A.    Yes.
10     Q.    And did you speak to Mr. Walker
11 about the Livingston 2 plan?
12     A.    I did.
13     Q.    What did you discuss with
14 Mr. Walker about the Livingston 2 plan?
15         MR. WALKER:  Counsel, I'm going to
16 assert privilege again and instruct the
17 witness not to answer.
18     Q.    (By Ms. Jasrasaria) Mr. Hinaman,
19 do you intend to follow your counsel's
20 instruction?
21     A.    I do.
22     Q.    Mr. Hinaman, did you speak to
23 Mr. Walker about the Livingston 3 plan that
24 was ultimately passed?
25     A.    Yes.

Page 104

1      Q.    And what did you discuss?
2          MR. WALKER:  I'll assert the
3  privilege again and instruct the witness not
4  to answer.
5      Q.    (By Ms. Jasrasaria) Mr. Hinaman,
6  do you intend to follow your counsel's
7  instruction?
8      A.    I do.
9      Q.    Did you speak to Mr. Walker about
10 any other plans?
11     A.    I'm sure I spoke to him about
12 the Russell -- the other plans that were
13 released, Russell split, extended Black Belt.
14     Q.    Okay.  Turning to your role with
15 the Livingston 3 plan, which you discussed
16 with Mr. Thompson earlier, you mentioned that
17 you were involved in zeroing out the
18 population of that plan; is that correct?
19     A.    Yes.
20     Q.    And was the population zeroing out
21 something that you were doing solely based on
22 someone else's instructions, or were you
23 exercising your own judgment to zero out the
24 population deviations?
25     A.    I was instructed on what county



RANDY HINAMAN                                              August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 105

1  and precinct to zero out.  But then when
2  we're picking selected census blocks, I --
3  you know, if we needed a census block of ten,
4  I would hunt for a census block of ten.
5      Q.    And can you just remind me, who
6  was giving those instructions to you?
7      A.    Senator Livingston.
8      Q.    And are you aware of whether he
9  was -- he had developed those instructions on
10  his own?
11      A.    I have no idea.
12      Q.    When you were asked to evaluate or
13  look at other maps that you did not draw in
14  this processes, were you given any criteria on
15  which to evaluate those plans?
16      A.    Other than the guidelines, no --
17  and the Court, no.
18      Q.    And who gave you instructions to
19  evaluate those plans on the Court and the
20  guidelines?
21      A.    Well, I'm not sure.  Which plans
22  are you referring to?
23      Q.    So let's take them in turn.  So
24  with respect to the -- I think you mentioned
25  that you looked at the opportunity plan; is

Page 106

1  that right?
2      A.    Yeah.  I wouldn't say I
3  evaluated it.  I looked at it.
4      Q.    Okay.  Which plans did -- were you
5  asked to evaluate?
6      A.    I didn't really evaluate any.
7  Other than the plans that I drew, I didn't
8  really evaluate any of the plans.
9      Q.    So you evaluated only the
10  community of interest plan and the Russell
11  split plan and the expanded Black Belt plan;
12  is that fair?
13      A.    That's fair.
14      Q.    And then other iterations of those
15  plans that may have been drafts?
16      A.    Yes, ma'am.
17      Q.    And who gave you -- who asked you
18  to evaluate your own plans?
19      A.    Well, Dorman Walker and, I
20  guess, the chairs.
21      Q.    And how did you share your
22  evaluation of your maps with them?
23      A.    Verbally.
24      Q.    Did you produce any reports or
25  written analysis?

Page 107

1      A.    I did not.
2      Q.    Did you produce any reports or
3  written analysis of any other plans that you
4  did not draw?
5      A.    I did not.
6          MS. JASRASARIA:  Okay.  No further
7  questions for me.  Thank you very much.  I'm
8  going to hold this deposition open due to some
9  of the objections and directions not to
10  answer.  And if we have to go to the Court to
11  continue this, we will.  But, for now, I just
12  wanted to state that on the record.  Thank you
13  for your time.  I'll pass the within.
14          MR. WALKER:  Thank you, counsel.
15          COURT REPORTER:  Any other
16  questions, Counsel?
17          MR. DAVIS:  No questions from the
18  Secretary of State.
19          COURT REPORTER:  Okay.
20  Mr. Thompson, are you ready to go off the
21  record?
22          MR. THOMPSON:  I am.
23          COURT REPORTER:  Thank you,
24  Mr. Hinaman.
25          THE VIDEOGRAPHER:  Counsel, I

Page 108

1  apologize.  Before we go off, does anyone need
2  transcript or video orders?
3          MR. THOMPSON:  Yes, we do.
4          THE VIDEOGRAPHER:  Mr. Thompson,
5  do you need -- as to your video, do you need
6  that synced or unsynced?
7          MR. THOMPSON:  I'll defer to the
8  rest of the group on that.  But let's do
9  synced.
10          MR. ROSS:  I have a question.  So
11  we probably need this as soon as possible.
12  I'm not sure that was conveyed to you.  Is
13  there a way to get this -- I assume synced
14  takes longer.  So --
15          COURT REPORTER:  That's Mr. Ross;
16  right?
17          MR. ROSS:  Yes.
18          COURT REPORTER:  Okay.  I am aware
19  of the rush transcript order for you guys --
20  for the Milligan plaintiffs.  The Caster
21  plaintiffs, do you need to order a copy of the
22  transcript as well?
23          MS. JASRASARIA:  Yes.  But if I
24  could just get back to you.  Do you mind
25  dropping your e-mail in the chat, and I can



RANDY HINAMAN                                                August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

Page 109

1   get back to you with the timeline?  Thank you.
2            COURT REPORTER:  Yes, ma'am.
3   Okay.  Any other transcript orders while we're
4   here.
5            MR. ROSS:  Just to be clear, we
6   only need electronic.  We don't need paper
7   copies or anything else.  Just the -- just the
8   PDF is fine.
9            COURT REPORTER:  Yes, sir.
10  Mr. Walker, do you need a copy of the
11  transcript?
12           MR. WALKER:  Yes, we do, please.
13           COURT REPORTER:  Okay.  Are you --
14  do you need it rush as well?
15           MR. WALKER:  Did you say do I need
16  it rush as well?
17           COURT REPORTER:  Yes, sir.
18           MR. WALKER:  Yes, please.
19           COURT REPORTER:  Okay.  They're
20  receiving it tomorrow.  Are you with that same
21  timeline?
22           MR. WALKER:  Yes, please.
23           THE VIDEOGRAPHER:  Mr. Walker, do
24  you need video?
25           MR. WALKER:  Jim, do you want to

Page 110

1   weigh in on that.
2            MR. DAVIS:  I do not think we need
3   video.
4            THE VIDEOGRAPHER:  Okay.
5            COURT REPORTER:  Okay.  If that's
6   all, you can take us off the record, Bailey.
7            THE VIDEOGRAPHER:  Of course.
8   With no further questions the time is
9   currently 11:31 a.m. on August 9th, 2023, and
10  we are going off the record.
11    (The deposition concluded at 11:31 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 111

1            C E R T I F I C A T E
2
3   STATE OF ALABAMA)
4   CALHOUN COUNTY)
5
6            I hereby certify that the above
7   proceedings were taken down by me and
8   transcribed by me using computer-aided
9   transcription, and that the above is a true
10  and correct transcript of the said proceedings
11  given by said witness.
12           I further certify that I am neither
13  of counsel nor of kin to the parties to the
14  action, nor am I in anywise interested in the
15  result of said cause.
16           I further certify that I am duly
17  licensed by the Alabama Board of Court
18  Reporting as a Certified Court Reporter as
19  evidenced by the ACCR number found below.
20
21        COMMISSIONER - NOTARY PUBLIC
22
23           _Cindy C. Jenkins, CCR_
24           CINDY C. JENKINS, CSR
25           ACCR #470 - Exp. 9/30/2023