Page 1

```
 1            UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF ALABAMA
 3                  SOUTHERN DIVISION
 4
 5   EVAN MILLIGAN, et al.,   )
 6        Plaintiffs,         )
 7                            )   CASE NO:
 8   VS.               )2:21-CV-01530-AMM:
 9   WES ALLEN, in his official)
10   capacity as Alabama       )
11   Secretary of State.       )
12        Defendant.           )
13   MARCUS CASTER, et al.,    )
14        Plaintiffs,          )
15                             )   CASE NO:
16   VS.                )2:21-CV-1536-AMM
17   WES ALLEN, in his official)
18   capacity as Alabama       )
19   Secretary of State.       ) DEPOSITION OF:
20        Defendant.           ) BRAD KIMBRO
21
22           S T I P U L A T I O N S
23
24            IT IS STIPULATED AND AGREED, by and
25   between the parties through their respective counsel,
```

Page 2

```
 1   that the deposition of:
 2               BRAD KIMBRO,
 3   may be taken before Merit Gilley, Commissioner and
 4   Notary Public, State at Large, with all parties
 5   appearing remotely, on the 11th day of August, 2023,
 6   commencing at approximately 11:35 a.m.
 7
 8            IT IS FURTHER STIPULATED AND AGREED that
 9   the signature to and reading of the deposition by the
10   witness is waived, the deposition to have the same
11   force and effect as if full compliance had been had
12   with all laws and rules of Court relating to the
13   taking of depositions.
14
15            IT IS FURTHER STIPULATED AND AGREED that
16   it shall not be necessary for any objections to be
17   made by counsel to any questions, except as to form or
18   leading questions, and that counsel for the parties
19   may make objections and assign grounds at the time of
20   the trial, or at the time said deposition is offered
21   in evidence, or prior thereto.
22                    ***
23
24
25
```

Page 3

```
 1
 2              A P P E A R A N C E S
 3
 4   FOR THE MILLIGAN PLAINTIFFS:
 5        AMANDA NECOLE ALLEN
 6        Attorney at Law
 7        Hogan Lovells US, LLP
 8        Columbia Square
 9        555 Thirteenth Street NW
10        Washington, DC  20004
11        202-637-2521
12        amanda.n.allen@hoganlovells.com
13
14
15        BLAYNE R. THOMPSON
16        Attorney at Law
17        Hogan Lovells US , LLP
18        609 Main Street
19        Suite 4200
20        Houston, Texas  77002
21        713-632-1429
22        blayne.thompson@hoganlovells.com
23
24
25
```

Page 4

```
 1        DEUEL ROSS
 2        Attorney at Law
 3        NAACP Legal Defense & Educational Fund, Inc.
 4        700 14th Street N.W.
 5        Suite 600
 6        Washington, DC  20005
 7        202-682-1300
 8        dross@naacpldf.org
 9
10
11   FOR THE CASTER PLAINTIFFS:
12        JOSEPH POSIMATO
13        Attorney at Law
14        Elias Law Group
15        250 Massachusetts Avenue NW
16        Suite 400
17        Washington DC  20001
18        202-968-4591
19        Jposimato@Elias.law
20
21
22
23
24
25
```



Page 5

```
 1  FOR THE DEFENDANT SECRETARY WES ALLEN:
 2          MISTY S. FAIRBANKS MESSICK
 3          Constitutional Defense Division
 4          Office of the Attorney General
 5          State of Alabama
 6          501 Washington Avenue
 7          P.O. Box 300152
 8          Montgomery, Alabama  36130
 9          334-353-8674
10          misty.messick@alabamaag.gov
11
12
13  FOR THE DEFENDANT ALABAMA PERMANENT COMMITTEE ON
14  REAPPORTIONMENT AND REDISTRICTING CHAIRMAN STEVE
15  LIVINGSTON AND CHAIRMAN CHRIS PRINGLE:
16          DORMAN WALKER
17          Attorney at Law
18          Balch & Bingham, LLP
19          445 Dexter Avenue
20          Suite 8000
21          Montgomery, Alabama  36104
22          334-269-3138
23          dwalker@balch.com
24
25
```

Page 7

```
 1
 2                  EXAMINATION INDEX
 3
 4  Brad Kimbro
 5  BY MS. ALLEN . . . . . . . . . . . . . . . . . 10
 6  BY MS. FAIRBANKS MESSICK . . . . . . . . . .  42
 7
 8
 9
10
11
12
13                    EXHIBIT INDEX
14
15  Plaintiffs' Exhibit                           MAR
16   1     Defendants' Joint Response to Milligan   35
           and Caster Plaintiffs' Objections and
17         Request for Preliminary Injunction
18   2     Declaration of Brad Kimbro               36
19
20
21
22
23
24
25
```

Page 6

```
 1  ALSO PRESENT:
 2          Austin King - Esquire Video Specialist
 3          Richard Mink
 4
 5
 ...
25
```

Page 8

 1      I, Merit Gilley, a Court Reporter of
 2  Birmingham, Alabama, and a Notary Public for the State
 3  of Alabama at Large, acting as Commissioner, certify
 4  that on this date, as provided by the Federal Rules of
 5  Civil Procedure and the foregoing stipulation of
 6  counsel, there came before me on the 11th day of
 7  August, 2023, with all parties appearing remotely,
 8  commencing at approximately 11:35 a.m., BRAD KIMBRO,
 9  witness in the above cause, for oral examination,
10  whereupon the following proceedings were had:
11      THE VIDEOGRAPHER:  Good morning.  We are
12  now on the record.  The time is now 11:35 a.m. Central
13  standard time on Friday, August 11th, 2023.  This
14  begins the videotaped deposition of Brad Kimbro taken
15  in the matter of Evan -- Evan Milligan, et al. V
16  Secretary of State Allen, et al. Filed in the United
17  States District Court for the Northern District of
18  Alabama Southern Division.  Case Number of which is
19  2:21-CV-01530-AMM.
20      The videographer today is Austin King.
21  The court reporter is Merit Gilley.  We are both
22  representing Esquire Deposition Solutions.  Counsel,
23  will you please announce your name and whom you
24  represent; afterwards, the court reporter will swear
25  in the witness.



Page 9

1   MS. ALLEN:  Amanda Allen of Hogan
2  Lovells for the Milligan plaintiffs.
3   MR. THOMPSON:  Blayne Thompson of Hogan
4  Lovells also on behalf of the Milligan plaintiffs.
5   MR. WALKER:  Dorman Walker for --
6   MS. FAIRBANKS MESSICK:  Joe, do you
7  want --
8   MR. WALKER:  -- Balch & --
9   MS. FAIRBANKS MESSICK:  -- to go next?
10   MR. WALKER:  -- Bingham -- I'm sorry.
11  Did someone else start?
12   MS. FAIRBANKS MESSICK:  I'm sorry.  I
13  was encouraging Joe to go next.
14   Of course, go ahead, Dorman.
15   MR. WALKER:  Dorman Walker at Balch &
16  Bingham on behalf of the Committee Chairs.
17   MS. FAIRBANKS MESSICK:  Misty S.
18  Fairbanks Messick on behalf of Secretary of State
19  Allen.
20   MR. WALKER:  Thanks, Misty.
21   MR. POSIMATO:  Joseph Posimato on behalf
22  of the Caster plaintiffs.
23   BRAD KIMBRO
24  being first duly sworn, was examined and testified as
25  follows:

Page 10

1   THE COURT REPORTER:  All right.  Usual
2  stipulations?
3   MS. ALLEN:  Yes, please.
4   MS. FAIRBANKS MESSICK:  Yes.
5   THE COURT REPORTER:  Go ahead.
6   EXAMINATION
7  BY MS. ALLEN:
8  Q  Good morning, Mr. Kimbro.
9   How are you?
10  A  I'm well.
11  Q  My name is Amanda Allen, and I represent
12  the Milligan plaintiffs in this matter along with my
13  colleague Blayne Thompson.
14   Will you please state your full name for
15  the record.
16  A  Yes.  It's Bradley Max Kimbro.
17  Q  Mr. Kimbro, have you been deposed
18  before?
19  A  Well, I guess what -- with Ms. Messick,
20  it -- that's the only time I suppose.
21  Q  And when was that?
22  A  Let's see.  Week and a half ago maybe.
23  Something like that.
24  Q  And what did that pertain to?
25  A  They asked if I would be willing to

Page 11

1  answer a few questions based on my experiences with
2  growing up in the wiregrass area and working in -- in
3  this community.
4  Q  So when you were referring to your
5  deposition experience, you're talking about when you
6  were asked to participate in a deposition for today?
7  A  Yes.
8  Q  So you haven't been deposed any other
9  times?
10   MS. FAIRBANKS MESSICK:  Object to the
11  form.
12   THE WITNESS:  Pardon?
13   MS. FAIRBANKS MESSICK:  I just needed to
14  state an objection for the record.  You're free to
15  answer the question.
16  A  Yeah.  I -- not -- not that I can
17  recall.  I -- I don't ever recall having anything like
18  this before.
19  Q  (By Ms. Allen)  Okay.
20  A  No.
21  Q  Do you understand that you're testifying
22  under oath today?
23  A  Yes, I do.
24  Q  Is there anything that might prevent you
25  from understanding my questions or answering

Page 12

1  truthfully this morning?
2  A  No.
3  Q  Are you represented by counsel today?
4  A  I am not.
5  Q  So I want the go over some key rules of
6  the road for a deposition so that we're both on the
7  same page about how the deposition will work.  I will
8  be asking you a series of questions, and you're going
9  to answer them to the best of your ability.
10   Do you understand that?
11  A  Yes, I do.
12  Q  Please provide verbal answers to my
13  questions so that our court reporter can make -- help
14  us make a clear record.  For example, instead of
15  giving a head nod or saying "uh-huh," provide a verbal
16  response, which is what you're doing already.  And
17  you're doing a great job at it, so just continue to do
18  that.
19  A  Okay.
20  Q  Relatedly, we should strive not to talk
21  over one each.  There are challenges per -- you know,
22  posed by remote setup.  But I ask you to listen to my
23  question, and I will listen to your answer.
24   And we'll try to speak over each other;
25  okay?



Page 13

1  A     Okay.  Very well.
2  Q     Do you understand that we're gathered
3  here virtually for the purposes of taking your
4  deposition testimony?
5  A     Yes, I do.
6  Q     And you understand that the re -- court
7  reporter will transcribe my questions and your answers
8  to them?
9  A     Yes, I do.
10 Q     And you understand that you should give
11 the same seriousness and truthfulness in answering my
12 questions here today that you would if you were
13 testifying in court before a judge or a jury; correct?
14 A     Yes.
15 Q     If you don't understand a question,
16 please feel free to tell me.  I will rephrase or try
17 to do something to help you understand the question
18 that I am asking; otherwise, I will assume that you
19 understand the question.
20       Is that fair?
21 A     Absolutely.  Yes.
22 Q     If an attorney makes an objection, you
23 must still answer the question, just much like the
24 objection that just happened.
25       Do you understand that?

Page 14

1  A     I do.  Yes.
2  Q     Please let us know if you need a break
3  at any point.  If there's a question pending, I ask
4  that you please answer the question before we take a
5  break.
6        Is that fair?
7  A     It is.
8  Q     As we go through the questions, you may
9  realize a prior answer was not entirely accurate.
10       If you do realize that, will you let me
11 know that so that -- so that we can correct the
12 record?
13 A     I sure will.
14 Q     Do you understand all of these
15 instructions that we just discussed?
16 A     Yes, I do.
17 Q     With that out -- with that out of the
18 way; do you understand, Mr. Kimbro, that you're here
19 testifying as a witness in the case of Milligan v
20 Secretary Allen?
21 A     I understand that now.  Yes.
22 Q     Where are you right now?
23 A     I'm in Hartford, Alabama at our -- where
24 I -- I work, Wiregrass Electric Cooperative's
25 headquarters, in my office with the door shut with a

Page 15

1  do not disturb sign.
2  Q     Is there anyone in the room with you
3  right now?
4  A     No.  Just me.
5  Q     Do you have any email, chat, text, or
6  instant messaging functions currently open on the
7  device that you're using?
8  A     No, I don't.  All I have is the
9  deposition from the other day.  That's all I have
10 open, other than the Zoom.
11 Q     What do you mean that you have "the
12 deposition from the other day" open?
13 A     My record from the previous time --
14 conversation that I guess you guys have a copy of too;
15 right?
16 Q     Are you referring to your declaration?
17 A     Yeah.  Did I say that wrong?  Whatever
18 that is officially called.  Yes.
19 Q     Okay.  I just want to make sure that
20 we're on the same page about what document you're
21 talking about.
22 A     Yes.
23 Q     That makes sense.
24 A     I can close it if I need to.
25 Q     We will be talking about it a little

Page 16

1  later, so we -- so why don't you close it for now.
2  A     Okay.  (Witness complies.)  Okay.
3  Q     I want to talk a little bit about what
4  you did to prepare for today.  You started talking a
5  little bit about that earlier, so why don't you go
6  ahead and just talk about what you did to prepare.
7  A     Nothing really.  Just made sure that my
8  Zoom was working and that technically wouldn't be any
9  problems there.  And everything seems to be fine from
10 a technology standpoint, and just tried to clear my
11 head and gather my thoughts or be ready to answer any
12 question.  So that's it really.
13 Q     Did you meet with anybody to prepare for
14 today?
15 A     No.  Now -- now, when you say "meet with
16 anybody," I did -- Misty let me know about today.  So,
17 I mean, that's, you know -- she told me that we would
18 have -- when -- when could I do -- what -- when would
19 be a good time on my schedule to do what we're doing
20 today.  So that's -- that's the only conversation
21 about, you know.
22 Q     So a week and a half ago, to make sure I
23 understand, Ms. Messick asked you about the dep --
24 participating in the deposition today?
25 A     No.



Page 17

1     MS. FAIRBANKS MESSICK:  Object to the
2 form.
3 Q     (By Ms. Allen)  Can you explain to me
4 what you mean by Ms. Messick letting you know about
5 the deposition.
6 A     Well, a week and a half ago is when they
7 took my official -- they asked questions and -- and
8 took officially down my answers.  And then she let me
9 know about -- you know, sometime after that about
10 today that -- that you guys wanted to talk to me.  And
11 that's what I mean by answering your question about
12 meeting with anyone else about today.  Just when we
13 first talked, I didn't know about today.
14 Q     Let's talk about the week and a half ago
15 discussion.
16     Was Ms. Messick the only person that you
17 spoke with?
18 A     No.  The -- I believe his name is Ed
19 LaCour; is that right?  Solicitor General, I believe,
20 is his official title.
21 Q     I -- and was this conversation on the
22 phone?
23 A     It was on the phone.  Yes.
24 Q     How long was the conversation?
25     MS. FAIRBANKS MESSICK:  Object to the

Page 18

1 form.
2 A     I would -- I would say 45 minutes to an
3 hour, I would say, best of my recollection.
4 Q     (By Ms. Allen)  And during the 45-minute
5 conversation, what did you all discuss?
6 A     Well, I -- really everything that's in
7 there; just, again, back to wanted to hear about my
8 experiences growing up in the wiregrass community, my
9 experiences working in the wiregrass community, my
10 experiences being educated in the wiregrass community.
11 Q     And what happened after that 45-minute
12 conversation?
13 A     We hung up.  Noth -- nothing.  Then a
14 couple of days later, they provided me a transcript
15 and -- and, again, if I'm pronouncing the official
16 title of these words, forgive me; but I'm calling it,
17 you know, my -- the -- the transcript of what we
18 discussed.  And they sent that to me email and asked
19 me to make sure that was accurate.  And I replied,
20 Yeah, you know, and -- and then they said, Please sign
21 it, and it would be your, I guess, sworn testimony or
22 -- or admiss ble to court.  You know, that it would be
23 an official document, and which I didn't object.  I
24 said, Sure.
25 Q     Okay.  So I want to come back to that.

Page 19

1     Did you speak with anyone else other
2 than Mr. LaCour and Ms. Messick before -- in
3 preparation for today?
4 A     In preparation for today?
5     MS. FAIRBANKS MESSICK:  Object to the
6 form.
7 A     No.
8 Q     (By Ms. Allen)  Did you have any
9 conversations with anyone else at all relating to the
10 case?
11 A     Well, about today, I certainly told my
12 wife what was going on; certainly allowed our CEO here
13 to know what was going on; some of my staff because I
14 was going to be out of pocket, you know, for a few
15 hours or however long this takes.  Shared with my
16 pastor, you know, just offer prayers, you know, make
17 sure that I was clear-headed, you know, and remembered
18 things correctly; and that was it.
19 Q     Have you spoken with anyone affiliated
20 with the State of Alabama aside from Mr. LaCour or
21 Ms. Messick?
22     MS. FAIRBANKS MESSICK:  I'll object to
23 the form.
24 A     Pardon?  Someone said something I didn't
25 understand.

Page 20

1     MS. FAIRBANKS MESSICK:  Amanda, I was
2 objecting, and you might have been adding something at
3 the same time.
4     Would you mind restating the question or
5 the court reporter could.
6     MS. ALLEN:  Yes.
7 Q     (By Ms. Allen)  Have you spoken with
8 anyone affiliated with the State of Alabama other than
9 Mr. LaCour and Ms. Messick related to this matter?
10 A     I did ask Matt Parker, Dothan area
11 Chamber of Commerce, and Senator Donnie Chesteen if
12 this was, I guess, initially legit; you know, that it
13 wasn't some, you know, spam or whatever.  And they
14 both told me that it was and that, you know, feel free
15 to continue.  It's -- it's -- you know, that -- that's
16 all they -- they said.  Basically, I just wanted to
17 make sure that this was something that was legit
18 because, you know, there's all kind of things that
19 aren't that -- these days.
20 Q     Have you spoken with anyone affiliated
21 with the Alabama state legislature?
22 A     Well --
23     MS. FAIRBANKS MESSICK:  Object to the
24 form.
25 A     -- again, Senator Donnie Chesteen is who



Page 21
1  I asked to confirm this being legit or not.  Yes.
2  Q         (By Ms. Allen)  Have you ever seen a
3  transcript from any other deposition that has occurred
4  in this case?
5  A         No, I have not.
6  Q         Did you visit any website to prepare for
7  your deposition today?
8  A         No, I did not.
9  Q         Did you review any documents to prepare
10  for the deposition?
11  A         No.
12  Q         Are you being compensated by anyone for
13  being here today?
14  A         No, ma'am.

Redacted

Page 23
Redacted

14  Q         Have you ever been involved in any other
15  lawsuits?
16  A         No.
17  Q         What is the highest level of education
18  that you've completed?
19  A         BS degree.
20  Q         And where did you get your BS?
21  A         Troy University, which was Troy State
22  University at the time.
23  Q         And by "BS," you're referring to a
24  bachelor of science; correct?
25  A         Yes.  I'm sorry.  Yes.  Bachelor of

Redacted

Page 24
1  science.  Yes.  Business major.
2  Q         And when did you graduate from Troy?
3  A         June of 1991.
4  Q         Where did you live after you finished
5  school?
6  A         First in Dothan, Alabama for 11 months.
7  Q         Anywhere else after that?
8  A         Yeah.  From there I went to Mobile; from
9  there to Pensacola; and then back to Mobile; and then
10  Baldwin County.
11  Q         You mentioned earlier that you are
12  currently at your place of work.
13            What do you do for a living?
14  A         I work for an electric cooperative,
15  Wiregrass Electric Cooperative.
16  Q         And what do -- what do you do at
17  Wiregrass Electric Cooperative?
18  A         I am the chief operating officer.
19            Do you need my responsibilities?
20            Is that what you're asking?
21  Q         Yes, sir.
22  A         Okay.  In -- in -- over the member
23  services, communication, customer-service-type
24  activities, community development, economic
25  development, and let's see.  I guess that's getting it



Page 25

1  all.  Yeah.
2  Q        What do you know about the lawsuit at
3  issue today?
4  A        Just what I hear in the news.  I --
5  nothing that -- that I've -- you know, just that
6  there's a redistricting issue that's -- that's at
7  stake or -- or being looked at and has to do with
8  redrawing the -- the district lines as I understand
9  it.
10 Q        And when you say "redistricting issue at
11 stake" -- at stake, what do you mean?
12 A        That -- that's what I understand the --
13 these issues are about now.  I mean, I wasn't really
14 following that closely before.  I did hear, again,
15 some things about it in the news, of course.  But just
16 that lines are existing a certain way, and they're
17 reviewed periodically and either redrawn or -- or not.
18 And that makes up the -- the -- the boundaries of --
19 of political lines, I guess, or -- or -- or
20 Congressional districts or -- or whatever.
21 Q        When you say that you weren't following
22 it before, before what?
23 A        Well, really before the phone call.  I
24 -- with Ms. Messick and -- and Mr. LaCour.  I mean, I
25 was aware, of course.  I mean, I'm not -- you know, I

Page 26

1  hear things.  But, I mean, there's a lot of -- lot of
2  things that you can hear and see in the news.  So I --
3  you know, wasn't something I was necessarily following
4  closely.
5  Q        When you say "before the phone call,"
6  are you referring to the phone call that we were
7  talking about from a week and a half ago?
8  A        That's right.
9  Q        You earlier mentioned that you
10 understood the lawsuit to be about redrawing the
11 district lines?
12           What do you mean by redrawing them?
13 A        There's a boundary, I guess, that's
14 current.  And looking at an alteration to that
15 boundary, I guess; the size, if I understand it, or
16 possible alteration to it.
17 Q        What boundaries?
18 A        Back to the, I guess, the Congressional
19 districts as I understand it.
20 Q        How did you get involved in this matter?
21           MS. FAIRBANKS MESSICK:  Object.  Asked
22 and answered.
23 A        Well, I mean, it just -- again, from a
24 phone call with Mr. LaCour.
25 Q        (By Ms. Allen)  The phone call from a

Page 27

1  week and a half ago?
2  A        Well, yeah.  It was an email earlier,
3  maybe a day or two before that phone call.  That was
4  my first knowledge of it.
5  Q        An email from whom?
6  A        Mr. LaCour.
7  Q        Do you happen to know who is looking at
8  the possible boundary line changes?
9  A        When you say looking at them, I -- I
10 don't -- I'm not understanding what you mean.
11 Q        Do you happen to know the individual or
12 entity that would be examining any potential boundary
13 line changes -- Congressional line changes?
14           MS. FAIRBANKS MESSICK:  Object to the
15 form.
16 A        No.  I'm really not -- not privy to the
17 -- whatever -- I guess, the legislature, I guess,
18 would be looking at it to -- to try to -- to look at
19 -- at redrawing them or -- or altering them.  And I --
20 I -- that's about all I know.  And, I mean, I'm not
21 sure that's -- that's the correct ones, but I don't
22 know.  I know there's someone that's looking at it,
23 and I guess someone will make the decision that it's
24 right or wrong or accepted or denied.
25 Q        (By Ms. Allen)  So I want to walk

Page 28

1  through some of the communications that you had with
2  -- starting with Mr. LaCour.
3           You said, as I understand it, you
4  received an email recently; is that right?
5  A        That's my first knowledge of Mr. LaCour
6  and my first, I guess, initial meeting or -- or
7  knowledge of who he was.  Never heard of him before
8  that email.
9  Q        What did the email say?
10 A        I -- let's see.  Basically, who he was,
11 that he stated that -- let's see -- would like to,
12 again -- that -- that I would be someone he would like
13 to speak with to talk more about my experiences; my
14 growing up in the wiregrass, educated in the
15 wiregrass, working in the wiregrass.  And it -- it --
16 some -- somewhere did reference at that point the --
17 I'm not sure if he said district lines or how he
18 phrased it, but -- but something about this, you know,
19 the -- you know, the matter or whatever that the State
20 was involved in and would I be willing to speak with
21 him.  And he left a phone number for me that -- to
22 call him.
23 Q        Would you be able to provide us a copy
24 of that email?
25 A        Sure.



Page 29

1  Q       So what did you do when you received the
2  email from Mr. LaCour?
3  A       I read it.  Kind of initially blew it
4  off, again, because I wasn't -- you know, my first
5  thought was, you know, is this some type of spam
6  because I did not know who this was and it wasn't a
7  cyber-security hack or something like that, you know,
8  or click bait.  That's what I'm trying to say to --
9  then I sat on it a couple of days and -- and went back
10 and -- and read it again.  And, again, that's --
11 that's when I -- just repeating what I shared earlier:
12 That's when I reached out to Matt Parker and Senator
13 Chesteen to see, you know, if this guy -- if this was
14 a real person, if it was legitimate.  I didn't do any
15 research on my own of who he was or anything.  And
16 they confirmed it was a legitimate thing and certainly
17 gave their blessings to call him if I wanted to.
18 Q       Do you know how Mr. LaCour got your
19 email address?
20 A       No, I -- I don't.
21 Q       So how long was it after that you
22 reached out to Senator Chesteen and, I believe you
23 said, Matt Parker?
24 A       Yeah.  You know, couple or three days,
25 something like that if I recall correctly.

Page 30

1  Q       Did you talk to them both on the phone?
2  A       Well, I sent a -- a text and -- you
3  know, initially.  And then Senator Chesteen called me,
4  and Matt Parker responded in either an email or a
5  text.  I can't remember.
6  Q       Who is Matt Parker?
7  A       He's the president of the Dothan area
8  Chamber of Commerce.
9  Q       And how do you know Senator Chesteen?
10 A       Just through work relationships.  He's
11 the senator representing most of the area that
12 Wiregrass Electric is -- provides service to.
13 Q       And how do you know Mr. Parker?
14 A       He -- Wiregrass Electric has been a -- a
15 participant or -- or supporter of the Chamber for many
16 years.  And through the Chamber connections with my
17 company is how we first met.  And I have been a member
18 of the -- a member of the board for the Dothan area
19 Chamber of Commerce.  And I know Matt's involved with
20 a lot of things, you know, from an economic
21 development standpoint to political.  And he knows a
22 lot of people; and I -- I just felt comfortable that
23 he would, you know, tell me if this was legit or not,
24 which was my question to him.
25 Q       When you talked to Senator Chesteen on

Page 31

1  the phone, how long was that conversation?
2  A       Five minutes maybe, something like that.
3  Q       And in that five-minute conversation,
4  you all discussed the legitimacy of the email that you
5  received from Mr. LaCour?
6  A       Yes.
7  Q       Did you discuss anything else?
8  A       No.
9  Q       So after that conversation , who else
10 did you get into contact with or contacted you?
11         MS. FAIRBANKS MESSICK:  Object to the
12 form.
13 A       Let's see.  Well, other than Misty and
14 LaCour -- Mr. LaCour; you know, again, I made my CEO
15 aware, my -- my boss, what, you know, had happened.
16 And he's like, Yeah, you know, I think you should
17 speak with them.  And, you know, again, my wife.
18 Q       (By Ms. Allen)  After you contacted Matt
19 Parker and Senator Chesteen, did the interview that
20 you referenced earlier occur?
21         MS. FAIRBANKS MESSICK:  Object to the
22 form.  Get -- could I have the court reporter to read
23 that back.  I couldn't actually understand everything
24 she said.  It was kind of garbled.  I'm sorry.
25         MS. ALLEN:  and I'll try to speak up as

Page 32

1  well and see if that helps.
2         (Record read.)
3  A       Okay.  So --
4         MS. FAIRBANKS MESSICK:  Object to the
5  form.
6  A       The -- the -- so I -- the -- let me --
7  help me make sure I understood your question.  You're
8  -- you're saying when did the interview occur with
9  Mr. LaCour and -- and Ms. Messick before?
10 Q       (By Ms. Allen)  Right.
11         I am just trying to understand when --
12 when things happened.
13 A       Yeah.  Okay.  Yeah.  After the phone
14 call with Senator Chesteen, after that is when I made
15 contact with Mr. LaCour, again, and I said, yeah, you
16 know.  I'll answer your questions.  Yes.  I did not
17 have any contact with Mr. LaCour; email, text, phone;
18 until after I confirmed that it was, you know, like I
19 said, a legitimate thing.  And that was after Matt
20 Parker and -- and Senator Chesteen, our conversation.
21 Q       Can you describe in detail your first
22 conversation with Mr. LaCour.
23 A       Yeah.  Let's see.  I called him and said
24 who I was and that I would be willing to answer
25 questions or, you know, whatever, you know; again,



Page 33
1  tell him what I knew.  And he said, Great.  Good.  And
2  that's when we set up a time.  And I don't recall if
3  it was the same day or the next day or I -- I -- but
4  that's when the call with he and Ms. Messick occurred.
5  Q        How long after -- or let me rephrase.
6           When after the first initial phone call
7  with Mr. LaCour did your conversation with Mr. LaCour
8  and Ms. Messick happen?
9           MS. FAIRBANKS MESSICK:  Objection.
10 Asked and answered.
11 A        Again, I talked to Mr. LaCour.  And I
12 said, Hey, I got your email.  I'll -- I'll be happy to
13 answer any questions you have.  And we hung up, you
14 know.  And then after that, I -- I -- I -- I'm not
15 sure if that same day or the next day.  I just can't
16 remember.  But it was, you know, a relatively short
17 period of time that then we had the call with
18 Ms. Messick and Mr. LaCour.
19 Q        (By Ms. Allen)  During your call with
20 Ms. Messick and Mr. LaCour, can you describe what
21 happened during that call?
22 A        Sure.  They, again, asked me questions
23 about my experiences growing up in the wiregrass,
24 working in the wiregrass, being educated in the
25 wiregrass.  And I -- I gave them answers.  You know,

Page 34
1  they wanted to know about the -- the culture -- or not
2  culture, but the collaboration of the wiregrass and
3  how everyone is -- you know, whether in Geneva County
4  or Houston County or Dale County, it's -- it's all
5  kind of the same people and how my experiences through
6  those things.  Again, being involved in -- in a
7  cooperative and a company that -- that serves all
8  walks of life within that region, the wiregrass
9  region; and, you know, things l ke that; my
10 involvement in helping with economic development and
11 -- and other things that -- you know, just an overall
12 feel of what it's like to live and work in -- in the
13 wiregrass community.
14 Q        Did Mr. LaCour and Ms. Messick provide
15 the list of counties?
16 A        No.
17          MS. FAIRBANKS MESSICK:  Object to form.
18 A        No.  No.  I don't recall that at all.
19 No.  I did state counties; and, you know, that's
20 because that's -- that's the counties we served.  And
21 I -- i shared that and how my experiences of how those
22 counties are working together.  I did volunteer those
23 type things.  Yes.
24 Q        (By Ms. Allen)  Do you know what
25 Mr. LaCour and Ms. Manic did with the information that

Page 35
1  you provided during that phone call?
2  A        Yes.  That's when they put it in a -- in
3  a transcript or -- or whatever the official legal
4  document is that -- that I signed as a, I guess, sworn
5  statement.
6  Q        I'm going to mark and publish Exhibit 1.
7           (Plaintiff's Exhibit 1 was
8           marked for identification.)
9  Q        Which is Defendants' Joint Response to
10 Milligan and Caster Plaintiffs' Objections and Request
11 for Preliminary Injunction.
12          Just give me a minute to pull it up on
13 the screen.  It's also in the chat so if that's easier
14 for everybody.
15          Is everybody able to see my screen?
16          MS. FAIRBANKS MESSICK:  I can't see your
17 screen -- okay.  I see it now.
18 A        I see it.
19 Q        (By Ms. Allen)  Okay.  So we can see it
20 now?
21 A        I can.  Yes.
22 Q        Okay.  Mr. Kimbro, have you seen this
23 document before?
24          And I can scroll through it so you have
25 time to look at it.

Page 36
1  A        Yeah.  Please scroll through it.  I --
2  so far I -- yeah.  If you're scrolling, I'm not seeing
3  it scroll.
4  Q        Oh, let's see.  Let me try this again.
5           Can you see it scrolling?
6           MS. FAIRBANKS MESSICK:  No.
7           THE WITNESS:  It's still blank.  Now --
8  now it's up.  Okay.  So --
9           MS. FAIRBANKS MESSICK:  We're on page
10 nine.  Can you go back to the beginning, please,
11 Amanda, so that he can see what this document is.  The
12 document's gone.
13 Q        (By Ms. Allen)  Seems my technology has
14 malfunctioned because it just exited out of Zoom for
15 me.
16          Perfect.  Can you see it now?
17 A        Yes.  It is scrolling now.  Yes.
18          I have not seen that.
19 Q        Okay.  I'm going to mark and publish as
20 Exhibit 2 your declaration.  So we can get that up on
21 the screen.
22          (Plaintiff's Exhibit 2 was
23          marked for identification.)
24 Q        I just added it to the chat so everyone
25 can see it as well.



Page 37

1  Mr. Kimbro, have you seen this document
2  before?
3        MS. FAIRBANKS MESSICK:  Object to the
4  form.
5  A    Yes, I have.  That's -- yes.  That's the
6  document I -- yes.
7  Q    (By Ms. Allen)  Do you recognize this
8  exhibit as your declaration?
9  A    Yes.  Yeah.
10 Q    You signed this declaration; correct?
11 A    I did.  That's my signature.  Yes.
12 Q    And you signed the declaration under
13 penalty of perjury?
14 A    Yes.
15 Q    Who drafted this declaration?
16 A    It was --
17       MS. FAIRBANKS MESSICK:  Object to the
18 form.
19 A    It was -- I'm sorry.  Somebody said
20 something I didn't understand.
21       MS. FAIRBANKS MESSICK:  I just objected.
22 You can answer the question.
23       THE WITNESS:  Okay.
24 A    It's the -- when Misty -- Ms. Messick
25 and Mr. LaCour, when we talked that day; she was, I

Page 38

1  assume, taking notes.  And she formed my answers in
2  this, I guess, a draft first of what I said.  And --
3  and so she was able to put down on paper what I said
4  that day.
5  Q    (By Ms. Allen)  Did you receive this
6  document after that conversation?
7  A    Yes.
8  Q    What did you do --
9        MS. FAIRBANKS MESSICK:  Objection.
10 Q    (By Ms. Allen)  -- when you received it?
11 A    Well, I read it and checked for its, you
12 know, accuracy or whatever; that it was saying what I
13 said.  And so that's what I did.
14 Q    When did you first see the draft
15 declaration?
16 A    Maybe a day after our conversation with,
17 again, Ms. Messick and Mr. LaCour.
18 Q    Did you propose any edits to the
19 declaration?
20 A    I did.  I -- I -- I think I added the --
21 that I was -- they were asking me, you know, some
22 different things that I -- I had been involved in in
23 my working career here.  And I added the -- I was the
24 chairman of the Dothan-Houston County Library.  I also
25 added language about -- or -- or cleared up language

Page 39

1  about the SPEC building and the Geneva Industrial
2  Park; not that it was wrong.  It's just, you know,
3  again, making sure it was more accurate.
4  Q    Anything else?
5  A    I -- maybe I added something, it seems
6  like, around Highway 167, that feasibility study for a
7  four-lane highway.  I think that's all that I can
8  recall.  And those things were in there except for the
9  library.  It's just, you know, us adding or
10 clarifying.  The only addition was the Dothan-Houston
11 County Library chairmanship.
12 Q    And what did you do after you reviewed
13 the document and had edits?
14 A    Well, I replied back to Ms. Messick with
15 those; and -- and she accepted them and sent it back
16 for my signature.
17 Q    Were you ever told what the purpose of
18 your declaration would be?
19 A    No.  Not -- not specifically, other than
20 this would just be a matter of record and -- and
21 possible evidence or whatever for -- for court and
22 that I might be asked to come testify to it.
23 Q    Why did you agree to submit a
24 declaration?
25 A    Well, it's the -- it's the State of

Page 40

1  Alabama that was asking and; they were asking my
2  experiences, again, of growing up, working, being
3  educated in the wiregrass.  And, you know, nothing to
4  hide.  Sure.  I'll -- I'll answer those questions.
5  Q    Are you a member of the Republican
6  party?
7  A    No.  I do -- I guess I'm registered as a
8  Republican for voting, but I'm not an official --
9  well, I -- I guess that would make me in their --
10 yeah, as a registered Republican for voting.
11       So does that answer your question?  I'm
12 not -- I'm not a member of any Republican group here
13 is what I'm trying to say.
14 Q    So have you held any positions in the
15 Republican party?
16 A    No.
17 Q    Do you identify as a Republican?
18 A    Yes.
19 Q    Did you attend the Alabama Permanent
20 Committee on Reapportionment and Redistricting public
21 hearing on July 13th, 2013?
22 A    No.
23 Q    Were you ever invited to attend the
24 hearing?
25 A    Not to my knowledge.  No.



Page 41

1  Q        Did you review the enacted 2023
2  Congressional map for Alabama?
3  A        No.
4  Q        Did you review any other -- or any maps
5  for the redistricting committee or the legislature?
6  A        No.
7           MS. FAIRBANKS MESSICK:  Object to the
8  form.
9  Q        (By Ms. Allen)  Did you review any
10 performance analysis of the enacted 2023 plan?
11 A        No.
12 Q        What is your race?
13 A        White male -- Caucasian male.
14          MS. ALLEN:  I want to take a quick
15 five-minute break to confer with my colleagues, and we
16 can go off the record for that time.
17          THE VIDEOGRAPHER:  We are off the record
18 at 12:24 p.m.
19          (Short recess.)
20          THE VIDEOGRAPHER:  We are back on the
21 record at 12:31 p.m.
22 Q        (By Ms. Allen)  Mr. Kimbro, thank you so
23 much for your time today.  I know depositions can be a
24 little nerve wracking, so I just appreciate your time
25 and taking the time to answer my questions.

Page 42

1           With that, I don't have any more
2  questions.
3           EXAMINATION
4  BY MS. FAIRBANKS MESSICK:
5  Q        Mr. Kimbro, I really appreciate you
6  being here today.
7           I do have a few questions to follow up
8  if that's all right.
9  A        Yes, ma'am.
10 Q        Thank you, sir.
11          You were asked earlier if you had ever
12 been deposed, and you said that you had not; with the
13 deposition being like what we're -- what we're doing
14 here today, you've not done this sort of thing before.
15          Have you ever testified in any way that
16 you can think of as you sit here today?
17 A        Let's see.  Yeah.  There was one time
18 with the Wiregrass Electric with a -- a member
19 disputing a bill, and I can't recall all the details.
20 But did -- did do that.
21 Q        Was -- do you remember if you were in
22 court or --
23 A        I did --
24 Q        -- in a conference room?
25 A        I did go to the local courthouse, a

Page 43

1  local court, and didn't have to --
2  Q        Do you remember --
3  A        -- appear in the case.  There was a
4  question.
5  Q        Did you get on the witness stand and
6  raise your right hand and testify at that hearing as
7  best as you -- or was that as best as you can recall
8  at this time?
9  A        Yeah.  That's been a few years.  Best I
10 can recall I think I did come up to the stand, but I
11 didn't have to because it was either the witness
12 didn't show or something.  I -- it -- it -- I never
13 went through that process.
14 Q        Okay.
15 A        And then, of course, you know, I -- I've
16 been working for a company that has had lawsuits
17 before, you know.  But, you know -- but the company,
18 you know; not -- not necessarily me as an individual.
19 Q        As you sit here at this time, do you
20 remember being a witness in any of those lawsuits,
21 whether in terms of preparing a written statement like
22 you have for this case or actually giving spoken
23 testimony like you're doing here today or in a
24 courtroom?
25 A        You know, I -- you're talking about 30

Page 44

1  years now of being in this business.  I -- I don't
2  recall anything like this.  I -- I just don't.  There
3  was -- again, I've been the company's -- you know,
4  Baldwin EMC and Wiregrass and all the cooperatives,
5  you know, that I've been a part of; obviously, there's
6  -- there's discrepancies, lawsuits, you know, from
7  time to time, you know; cars hitting poles, things
8  like that.  I -- I don't -- I'm trying to remember if
9  I've ever -- I just don't recall ever doing anything
10 like a written deposition.  I -- I don't recall ever
11 doing that.
12 Q        Thank you.
13 A        I'm sure -- just to follow:  I'm sure I
14 have added comments and -- and factual information
15 that was part of the company's testimony or -- or
16 deposition or whatever the legal word is.  But nothing
17 just individually on me.
18 Q        I want you to take a minute and think
19 about the conversations that you and I had this week
20 after we knew that you were going to be given --
21 giving this deposition.  And I'll ask you to tell me a
22 little bit about what you remember about that
23 conversation, if there was anything other than you are
24 willing and logistics.
25 A        You're talking about the conversation



Page 45

1  you and I had about this particular -- yeah.  Well,
2  you just went through and shared with me -- similar to
3  what Ms. Allen did, you know, that you were under
4  oath -- would be under oath; be sure and understand
5  the question before you answer; I guess, you know,
6  things to be mindful of as far as accurately and --
7  and -- truthfully stating what you remember and -- and
8  remember -- you know, state what you know, you know,
9  not necessarily what you think you know or heard or
10  whatever, you know; things like that.
11        You asked, again, the question have I
12  ever been deposed or anything like think.  I think I
13  gave an example of nothing like this.  But there was
14  a -- at Baldwin EMC, there was an opportunity to --
15  with -- with a company transaction with a DirecTV
16  franchise where I did answer, you know -- there was a
17  lawsuit there; and, again, answered questions and
18  provided comment to that case.  I -- that's pretty
19  much the gist of what I can remember you and I have
20  talked about.
21  Q        Thank you.
22        You and Amanda talked about the
23  declaration that you signed.  It's Exhibit 2 and that
24  you signed on August 3rd.  Do you remember that
25  declaration?

Page 46

1        Not have you memorized it, but you know
2  what I'm referring to; right?
3  A        Yes, ma'am.  I --
4  Q        You remember it?
5        Did you review that declaration before
6  -- in preparation for this deposition here today?
7  A        I re-read it.  Yes.
8  Q        Okay.  And the -- is there anything in
9  that declaration that you think is wrong?
10  A        No.  I -- I -- not that -- no.  I think
11  it's all accurate.
12  Q        Did our -- did I or Ms. LaCour make you
13  put anything in that declaration that you did not
14  agree with?
15  A        No.  Not at all.
16  Q        And did -- do you stand by the testimony
17  in that declaration?
18  A        Yeah.  It's accurate.  Yes.
19  Q        And you did read it before you signed
20  it?
21  A        I did.  Yes.
22  Q        I don't have any further questions for
23  you.
24        Amanda might want to follow up on my
25  questions.

Page 47

1  A        Okay.
2        MS. ALLEN:  All right.  I don't have any
3  questions for you.  Again, thank you for your time.
4        THE WITNESS:  Thank you.
5        MS. FAIRBANKS MESSICK:  Thank you.
6        THE VIDEOGRAPHER:  Ms. Allen -- I
7  apologize, Ms. Messick -- did I understand that
8  everything's expedited?
9        Does that include the video synced?
10        MS. ALLEN:  Yes.  What we did -- same
11  thing we did yesterday:  Expedited video and
12  transcript.
13        THE VIDEOGRAPHER:  Okay.  Is that the
14  same from everyone?  The same video and transcript
15  orders for everyone?
16        MS. FAIRBANKS MESSICK:  If you're asking
17  about other parties, no.  The -- the Secretary only
18  wants expedited transcripts.  They're not ordering
19  video.
20        THE VIDEOGRAPHER:  Okay.  And before I
21  take us off, does anyone else need a transcript or
22  video separate from Ms. Allen and Ms. Messick?
23        MR. POSIMATO:  Yes.  The
24  counter-plaintiffs would like an expedited transcript.
25  We don't need video.

Page 48

1        THE VIDEOGRAPHER:  Perfect.  All right.
2        That concludes the deposition of Brad
3  Kimbro.  We're off the record at 12:40 p.m.
4     (THE DEPOSITION WAS CONCLUDED AT 12:40 p.m.)



Page 49

```
 1
 2          C E R T I F I C A T E
 3
 4   STATE OF ALABAMA )
 5   JEFFERSON COUNTY )
 6
 7            I hereby certify that the above
 8   and foregoing deposition was taken down
 9   by me in stenotype, and the questions and
10   answers thereto were reduced to computer
11   print under my supervision, and that the
12   foregoing represents a true and correct
13   transcript of the deposition given by
14   said witness upon said hearing.
15
16            I further certify that I am
17   neither of counsel nor of kin to the
18   parties to the action, nor am I in
19   anywise interested in the result of said
20   cause.
21
22      _Merit Gilley_
23
24        /s/Merit Gilley
          Merit Gilley, Commissioner
25        ACCR NO. 67
```