Page 1

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF ALABAMA
 3                    SOUTHERN DIVISION
 4
 5    EVAN MILLIGAN, et al.,    )
 6         Plaintiffs,          )
 7                              )    CASE NO:
 8    VS.                       )2:21-CV-01530-AMM:
 9    WES ALLEN, in his official)
10    capacity as Alabama       )
11    Secretary of State.       )
12         Defendant.           )
13    MARCUS CASTER, et al.,    )
14         Plaintiffs,          )
15                              )    CASE NO:
16    VS.                       )2:21-CV-1536-AMM
17    WES ALLEN, in his official)
18    capacity as Alabama       )
19    Secretary of State.       ) DEPOSITION OF:
20         Defendant.           )   MIKE SCHMITZ
21
22               S T I P U L A T I O N S
23
24             IT IS STIPULATED AND AGREED, by and
25    between the parties through their respective counsel,
```

Page 2

```
 1    that the deposition of:
 2                 MIKE SCHMITZ,
 3    may be taken before Merit Gilley, Commissioner and
 4    Notary Public, State at Large, with all parties
 5    appearing remotely, on the 10th day of August, 2023,
 6    commencing at approximately 10:10 a.m.
 7
 8             IT IS FURTHER STIPULATED AND AGREED that
 9    the signature to and reading of the deposition by the
10    witness is waived, the deposition to have the same
11    force and effect as if full compliance had been had
12    with all laws and rules of Court relating to the
13    taking of depositions.
14
15             IT IS FURTHER STIPULATED AND AGREED that
16    it shall not be necessary for any objections to be
17    made by counsel to any questions, except as to form or
18    leading questions, and that counsel for the parties
19    may make objections and assign grounds at the time of
20    the trial, or at the time said deposition is offered
21    in evidence, or prior thereto.
22                        ***
23
24
25
```

Page 3

```
 1                  A P P E A R A N C E S
 2
 3    FOR THE MILLIGAN PLAINTIFFS:
 4         HARMONY A. GBE
 5         Attorney at Law
 6         Hogan Lovells US, LLP
 7         1999 Avenue of the Stars
 8         Suite 1400
 9         Los Angeles, California  90067
10         310-785-4600
11         harmony.gbe@hoganlovells.com
12
13         BRITTANY CARTER
14         TANNER LOCKHEAD
15         Attorneys at Law
16         NAACP Legal Defense & Educational Fund, Inc.
17         40 Rector Street
18         5th Floor
19         New York, New York  10006
20         212-965-2200
21         bcarter@naacpldf.org
22         tlockhead@naacpldf.org
23
24
25
```

Page 4

```
 1    DEUEL ROSS
 2    Attorney at Law
 3    NAACP Legal Defense & Educational Fund, Inc.
 4    700 14th Street N.W.
 5    Suite 600
 6    Washington, DC  20005
 7    202-682-1300
 8    dross@naacpldf.org
 9
10    LATISHA GOTELL FAULKS
11    Attorney at Law
12    American Civil Liberties Union of Alabama
13    P.O. Box 6179
14    Montgomery, Alabama  36106-0179
15    334-265-2754
16    tgfaulks@aclualabama.org
17
18    AMANDA NECOLE ALLEN
19    Attorney at Law
20    Hogan Lovells US, LLP
21    Columbia Square
22    555 Thirteenth Street NW
23    Washington, DC  20004
24    202-637-2521
25    amanda.n.allen@hoganlovells.com
```



Page 5

```
 1  FOR THE CASTER PLAINTIFFS:
 2          JOSEPH POSIMATO
 3          Attorney at Law
 4          Elias Law Group
 5          250 Massachusetts Avenue NW
 6          Suite 400
 7          Washington DC  20001
 8          202-968-4591
 9          Jposimato@Elias.law
10
11
12  FOR THE DEFENDANT SECRETARY WES ALLEN:
13          MISTY S. FAIRBANKS MESSICK
14          Constitutional Defense Division
15          Office of the Attorney General
16          State of Alabama
17          501 Washington Avenue
18          P.O. Box 300152
19          Montgomery, Alabama  36130
20          334-353-8674
21          misty.messick@alabamaag.gov
22
23
24  ALSO PRESENT:
25          Robert Pacheco - Esquire Video Specialist
```

Page 6

```
 1
 2              EXAMINATION INDEX
 3
 4  Mike Schmitz
 5  BY MS. GBE . . . . . . . . . . . . . . . . . 8
 6  BY MS. FAIRBANKS MESSICK . . . . . . . . . . 35
 7
 8
 9
10
11
12              EXHIBIT INDEX
13
14  Plaintiffs' Exhibit                        MAR
15  1    Defendants' Joint Response to Milligan  21
         and Caster Plaintiffs' Objections and
16       Request for Preliminary Injunction
17  2    Declaration of Mike Schmitz             22
18  3    Redistricting Map of Alabama            30
19
20
21
22
23
24
25
```

Page 7

```
 1          I, Merit Gilley, a Court Reporter of
 2  Birmingham, Alabama, and a Notary Public for the State
 3  of Alabama at Large, acting as Commissioner, certify
 4  that on this date, as provided by the Federal Rules of
 5  Civil Procedure and the foregoing stipulation of
 6  counsel, there came before me on the 10th day of
 7  August, 2023, with all parties appearing remotely,
 8  commencing at approximately 10:10 a.m., MIKE SCHMITZ,
 9  witness in the above cause, for oral examination,
10  whereupon the following proceedings were had:
11          THE VIDEOGRAPHER:  We are now on the
12  video record.  Today's date is August the 10th, 2023.
13  The time is 10:10 a.m. Central standard time.  This
14  begins the videoconference deposition of Mr. Michael
15  Schmitz in the matter of Evan Milligan, et al. versus
16  Wes Allen, et al.
17          My name is Robert Pacheco.  I am the
18  remote videographer.  Your court reporter today is
19  going to be Ms. Merit Gilley; both representing
20  Esquire Deposition Solutions.  Would counsel please
21  introduce yourselves and your affiliation, and the
22  witness will be sworn in.
23          MS. GBE:  Good morning.  My name is
24  Harmony Gbe of Hogan Lovells; and I'm here on behalf
25  of the Milligan plaintiffs.
```

Page 8

```
 1          MS. FAIRBANKS MESSICK:  Good morning.
 2  I'm Misty S. Fairbanks Messick, and I am counsel for
 3  Secretary of State Wes Allen.
 4          MR. ROSBOROUGH:  Deuel Ross also for the
 5  Milligan plaintiffs.
 6          MR. POSIMATO:  This is Joe Posimato on
 7  behalf of the Caster plaintiffs.
 8          MR. CARTER:  Brittany Carter for the
 9  Milligan plaintiffs.
10          MS. ALLEN:  Amanda Allen for the
11  Milligan plaintiffs.
12              MIKE SCHMITZ
13  being first duly sworn, was examined and testified as
14  follows:
15          THE COURT REPORTER:  Usual stipulations?
16          MS. GBE:  Agreed.
17          MS. FAIRBANKS MESSICK:  Yes, please.
18          THE COURT REPORTER:  Go ahead.
19              EXAMINATION
20  BY MS. GBE:
21  Q       All right.  Good morning, Mr. Schmitz.
22          How are you?
23  A       Morning.  Fine.  Thank you.
24  Q       As I mentioned, my name is Harmony; and
25  I am counsel for the Milligan plaintiffs in this case.
```



M48

Page 9

1  Have you been deposed before?
2  A  Yes, I have.
3  Q  How -- how many times have you been
4  deposed?
5  A  I was deposed back in the '90's for an
6  automotive thing. And then I don't know if this is a
7  -- was a deposition, but I was asked to go to Mike
8  Hubbard. They had a -- my mind just went blank. I
9  went to a -- oh, my goodness what's it called? Grand
10  jury.
11  Q  I see.
12  A  I apologize.
13  Q  No worries at all.
14  A  Those are the two things I've done.
15  Q  Understood.
16      And the grand jury appearance, when was
17  that if you remember?
18  A  Probably five years ago, six year ago.
19  Q  Okay.
20  A  I don't have an exact -- I don't
21  remember the exact date, but it's been a few year.
22  Q  And did you testify in that case?
23  A  I did not -- wait. I did. I did. I
24  did.
25  Q  And -- and what was your testimony

Page 10

1  about?
2      MS. FAIRBANKS MESSICK: Object to the
3  form.
4      Can I just be clear: Are you asking him
5  about his testimony in the courtroom in public; or are
6  you asking about grand jury testimony, which is
7  protected by secrecy laws of this state?
8      MS. GBE: I'm asking about his testimony
9  in the courtroom, but let me rephrase.
10  Q  (By Ms. Gbe) So, Mr. Schmitz, did you
11  testify in the courtroom?
12  A  Yes.
13  Q  And -- and what was your testimony
14  about?
15  A  As mayor of Dothan, I was working with
16  Mike Hubbard when he was speaker of the house to
17  recruit a company to create 500 jobs; and they asked
18  me about that. That was mostly the issue of -- of
19  what we discussed.
20  Q  Understood.
21      And that -- that testimony was five or
22  six years ago?
23      Is that correct?
24  A  Correct.
25  Q  Have you been deposed in any other cases

Page 11

1  or testified in any other cases?
2  A  No, ma'am.
3  Q  And you understand that you're
4  testifying under oath today; correct?
5  A  Yes.
6  Q  Is there anything that might prevent you
7  from understanding my questions or answering
8  truthfully?
9  A  No, I don't think so.
10  Q  Are you represented by counsel today?
11  A  I am not.
12  Q  Okay. So you've -- since you've been
13  deposed before, I'll try to keep this brief; but I'll
14  go over some ground rules for the deposition so that
15  we're on the same page.
16      As you're probably familiar with the
17  process, I'll be asking you a series of questions; and
18  you are going to answer them to the best of your
19  ability.
20      Do you understand that?
21  A  Yes.
22  Q  So we have a court reporter with us
23  today, and she is going to be transcribing our
24  conversation. So I ask that you speak slowly and
25  clearly and provide verbal answers only; so no head

Page 12

1  nods or "uh-huhs" or those types of responses.
2      Do you understand?
3  A  I do.
4  Q  On a similar note, we are going to try
5  not to speak over each other. So please wait until
6  the end of my questions before you respond; and,
7  similarly, I will try to wait until you are finished
8  responding before asking the next question.
9      Is that all right?
10  A  Yes.
11  Q  And you understand that we're here to
12  take your deposition in this case; correct?
13  A  Yes.
14  Q  And you understand that you should give
15  the same seriousness in answering my questions here
16  today as if you were testifying in court before a
17  judge or a jury; correct?
18  A  Absolutely. Yes.
19  Q  And if you don't understand a question I
20  ask you, please tell me so that I can rephrase or help
21  you with -- with understanding the question; all
22  right?
23  A  I will.
24  Q  If any attorney on the call makes an
25  objection, I ask that you still answer the question



Case 2:21-cv-01530-AMM   Document 261-6   Filed 08/13/23   Page 4 of 11

MIKE SCHMITZ                                                                August 10, 2023
MILLIGAN, ET.AL. V. ALLEN, ET.AL.

Page 13
1  unless you are instructed specifically not to do so.
2       Do you understand?
3  A     I do.
4  Q     And if you need a break at any point,
5  just let me know.  The only thing I ask is that if
6  there's a question pending, please answer that
7  question before we take the break.
8  A     Okay.
9  Q     And as we go through the process, you
10 may realize that a prior answer wasn't necessarily
11 accurate or that you would like to add to it.
12      So please let me know if that's the case
13 so that we can correct the record.
14 A     Okay.
15 Q     So do you understand all those questions
16 that we just discussed?
17 A     I believe so.  Yes.
18 Q     Okay.  So where are you right now?
19 A     I'm in my office at my dealership in
20 Dothan, Alabama.
21 Q     And is there anyone else in the room
22 with you right now?
23 A     There is not.
24 Q     Do you have any email or chat or text
25 devices currently open?

Page 14
1  A     I do not.
2  Q     Okay.  So let's discuss what you did to
3  prepare for today's deposition; all right?
4  A     Okay.
5  Q     So what did you do to prepare for today?
6  A     I -- I don't know that I did anything.
7  I'm speaking from my heart from 30 years of living in
8  this community, so I -- I'm just going to answer your
9  questions the best of my ability.
10 Q     Did you meet with anyone before -- to
11 prepare for today's deposition?
12 A     I have not met with anybody.  You know,
13 Misty called and -- or emailed me and asked me to do
14 this.  And, of course, I responded and -- and then she
15 went over a deposition and what it is.  And other than
16 that; of course, the number one thing she kept saying
17 was, Tell the truth, which I will.  And other than
18 that, except for my normal life; I haven't met with
19 anything specific on this -- on this.
20 Q     And when did Misty call you?
21 A     Well, she called me yesterday about the
22 deposition.  I think she contacted me a few days ago
23 in an email.
24 Q     So she -- just to clarify: So you
25 received a call yesterday about today's deposition;

Page 15
1  correct?
2  A     Correct.
3  Q     And she contacted you a few days ago as
4  well; correct?
5  A     Correct.
6  Q     And what was that in regards to?
7  A     About whether I would give the testimony
8  and whether I would -- when I would be available to --
9  to do this.  Basically, that's it.
10 Q     And by "this," are you referring to
11 today's deposition?
12 A     Yes, ma'am.  I'm sorry.
13 Q     No problem.
14      Okay.  Did you speak to anyone besides
15 Misty about today's deposition?
16 A     Well, I told my wife I was being
17 deposed.  I mean, not anybody in an official
18 situation.
19 Q     Did you speak to anyone for -- from the
20 State of Alabama or affiliated with the state
21 legislature?
22 A     Not about this deposition.  No.
23 Q     But you have spoken to them in the past;
24 correct?
25 A     Oh, yes.

Page 16
1  Q     Okay.  About this case?
2  A     About the map that -- before they
3  designed it or -- or were drawing it, I -- I called
4  them and told them my concerns about us staying
5  together in southeast Alabama.
6  Q     Understood.
7  A     So I -- I did that.
8  Q     Okay.  So we're going to speak a little
9  bit about that a little later.
10      But just in terms of preparing for this
11 deposition, did you speak to anyone from the state
12 legislature?
13 A     I did not.
14 Q     Have you ever seen any transcripts from
15 depositions in this case?
16 A     I have not.
17 Q     Did you review any websites to prepare
18 for today's deposition?
19 A     I have not.
20 Q     Did you review any documents at all to
21 prepare for today?
22 A     I guess just the statement that I gave.
23 I made sure I read it this morning.
24 Q     Okay.  Did you do anything else to
25 prepare for today's deposition?



Page 17
1  A         I have not.
2  Q         And are you being compensated by anyone
3  for being here today?
4  A         No.

Redacted

Page 18

Redacted

24  Q         What is the highest level of education
25  you've completed?

Page 19
1  A         High school.
2  Q         And where did you attend high school?
3  A         Monroe High School; Monroe, Wisconsin.
4  Q         And did you graduate?
5  A         Yes.
6  Q         And what do you do for a living?
7  A         I'm in the automobile business.  I have
8  new car franchises, a body shop.  We also sell boats.
9  I'm in the retail business.
10 Q         And you -- you served at -- as mayor of
11 Dothan previously; correct?
12 A         I did.
13 Q         And what were the dates of your term?
14 A         October 2009 to October 2017.
15 Q         Okay.  So now I'm going to ask you a few
16 questions about this case in particular.
17            Can you tell me a little bit about what
18 you know about the lawsuit at issue today.
19 A         What I know is the Supreme Court said
20 that Alabama needed to draw a district where an
21 African-American has the ability to win and serve.
22 And -- and then I didn't really pay much attention to
23 it.  Then a map came out that showed -- and I don't
24 know who came up with the map.  But the map basically
25 showed separating Dothan and Houston County and

Page 20
1  putting us out -- putting us with the west of Alabama,
2  which is Mobile and Baldwin County, and that concerned
3  me.  So that's how I'm -- I got involved.
4  Q         And okay.  So let's talk a little -- a
5  little bit how you got involved.
6            Did anyone contact you about getting
7  involved in the lawsuit or -- or how did that process
8  work?
9  A         Yeah.  I -- I never meant to get
10 involved in a lawsuit.  But what I -- what I meant to
11 do:  I called Senator Chesteen -- he's our state
12 senator -- and I called Steve Clouse -- he's a state
13 representative that represents my district -- and just
14 told them my concerns about us moving out west in
15 Alabama.  And although they're good people, they just
16 have different needs.  And -- and what they would
17 focus on are different than what we do in southeast
18 Alabama.  So I talked to both of them.  And -- and
19 then Senator Chesteen basically said, There's a public
20 hearing.  Why don't you come up and talk.  And that's
21 what I did.
22 Q         So prior to your calls to Senator
23 Chesteen, did -- did -- had anyone contacted you about
24 the lawsuit?
25 A         No.



Page 21

1  Q      Do you know any of the plaintiffs in the
2  lawsuit?
3  A      I don't.  No.  I don't think so.  I
4  don't -- I don't even know who they are.
5  Q      Do you -- all right.
6         Do you know anyone named Latisha
7  Jackson?
8  A      I'm sure I did.  It's -- she's from
9  Dothan I think.  I don't -- I'm sure I do.  I don't --
10 not on a personal level.  No.
11 Q      Okay.  So, Mr. Schmitz, did you produce
12 a declaration as part of Alabama's response to
13 Plaintiffs' objections in this case?
14 A      I did.
15 Q      Okay.  So I'm going to show you a
16 document that you may or may not have seen before.
17 Give me a second.
18        Mr. Schmitz, do you see a document on
19 your screen?
20 A      I do.
21 Q      It is -- so I'm going to mark and
22 publish this as Exhibit Number 1.
23            (Plaintiffs' Exhibit 1 was
24             marked for identification.)
25 Q      The document is 73 pages.  I'm going to

Page 22

1  scroll through it fairly slowly for you.  The title of
2  the document is "Defendants' Joint Response to
3  Milligan and Caster Objections and Request for
4  Preliminary Injunction."
5         Do you see that?
6  A      I do.
7  Q      Have you seen this document before?
8  A      I have not.
9  Q      Okay.  So I will then take it down, and
10 I will show you another document.
11        Do you see another document on your
12 screen?
13 A      I do.
14 Q      Okay.  So I'm going to mark and publish
15 this document as Exhibit Number 2 and scroll down to
16 the title.
17            (Plaintiffs' Exhibit 2 was
18             marked for identification.)
19 Q      This document is four pages, and it is
20 titled "Declaration of Mike Schmitz."
21        Do you see that?
22 A      I do.
23 Q      Have you seen this document before?
24 A      Yes.
25 Q      And do you recognize this document as

Page 23

1  the declaration you submitted in support of
2  defendants' response?
3  A      Yes.
4  Q      And turning to -- or going to the
5  signature page -- or let's look at that.  There we go.
6         Do you recognize that as your
7  signature --
8  A      It is.
9  Q      -- on page four?
10 A      Yes.
11 Q      Great.
12        So who drafted this declaration?
13        MS. FAIRBANKS MESSICK:  Object to the
14 form.
15 A      The -- Misty, the Attorney General
16 folks.
17 Q      (By Ms. Gbe)  And who contacted you
18 about submitting a declaration?
19 A      Well, I think the first contact I had
20 was a little over a week ago.  Mr. LaCour called me --
21 I was in San Francisco -- and asked me if I would
22 consider doing something like this.  And I said, Yes.
23 And then Misty emailed me, and that's how we ended up
24 with this.
25 Q      And when you say "doing something like

Page 24

1  this," what do you mean?
2  A      Oh, I'm sorry.  The statement.
3  Q      The declaration?
4  A      The declaration.  Yes, ma'am.
5  Q      And what did Mr. LaCour say to you
6  during that conversation?
7  A      He apparently heard what I said when I
8  was -- spoke at the public hearing and wanted to know
9  if I would say the same thing in a document, I guess,
10 or testify.
11 Q      And what were you told was the purpose
12 of your declaration?
13 A      Well, I hope my purpose was to have
14 people understand how I feel that whatever map they
15 draw up; southeast Alabama, we need to stick together
16 and work together like we have for many years.
17 Q      And what were you told to say in the
18 declaration?
19 A      I was --
20        MS. FAIRBANKS MESSICK:  Object to form.
21 A      I wasn't told to say anything.
22 Q      (By Ms. Gbe)  And why did you agree to
23 submit a declaration?
24 A      Because I'm -- even though at my age it
25 won't matter, but I really love this community.  And I



Page 25

1  truly feel the map they had, that puts us -- isolates
2  us with -- you know, will hurt all the citizens in our
3  area and, truthfully, will take away our voice and --
4  and our vote.  I -- I just feel passionately that our
5  community, which is the wiregrass and southeast
6  Alabama, we've been working together for years.  So
7  whatever map they draw up, I simply would prefer us
8  staying together in some way.
9  Q        Mr. Schmitz, are you a member of the
10 Republican party?
11 A        I am.
12 Q        How long have you been a member?
13 A        25 years.
14 Q        Have you held any positions in the
15 party?
16 A        No.
17 Q        Okay.  Do you identify as a Republican?
18 A        I do.  Now, when I ran for mayor, you
19 didn't have to declare a party; so I did not do that.
20 Because I really felt the position as mayor and the
21 council, there are -- we're neighbors.  It's not about
22 a party; it's about working together.  So I did not do
23 that as mayor.
24 Q        A few follow-up questions on your -- the
25 declaration that you submitted.

Page 26

1         Did you type up the declaration?
2  A        I did not.
3  Q        Did you see a draft and provide edits?
4  A        I saw a draft and -- I don't know if
5  edits.  Basically, they sent what I asked them to --
6  to put in there.
7  Q        And when you say "them," who are you
8  referring to?
9  A        Misty and their office.
10 Q        Did you propose any edits to the
11 declaration before signing it?
12 A        I -- I think probably the day before, I
13 sent a bunch of information and -- and this is -- this
14 is where -- I did call the Chamber of Commerce and ask
15 them, like the 40 percent peanuts grown in -- in --
16 within 100 miles; we are the peanut capital of the
17 world.  I just wanted to make sure all that was true,
18 and so I did that.  And -- and sent just some ideas, I
19 guess, to Misty about that.
20 Q        Did you speak -- so you spoke to Misty
21 before she drafted the declaration?
22 A        I did.
23 Q        Okay.  So what did you say to her?
24 A        Pretty much what's in the document.  I
25 mean, again, what I just said:  My -- the reason I'm

Page 27

1  doing this is not about the map.  It's about where we
2  are going to end up.  And so -- so I just believe all
3  the partnerships we've built up over these years, we
4  need to continue that.
5  Q        Did Misty ask you to include anything
6  specific in your declaration?
7  A        No.  I don't -- I don't remember
8  anything like that.
9  Q        And, I'm sorry, I don't think I actually
10 got this answer.  But did you -- so you received the
11 draft.
12        Did you suggest any changes in terms of
13 phrasing or anything, or did you just sign the
14 declaration that you received?
15 A        Yeah.  It pretty much was what I said
16 and what I wanted; so I just signed it.
17 Q        Okay.  So let's talk about the hearing
18 that I think you referenced a few times during this,
19 the hearing on July 13th.
20        So did you attend the Alabama Permanent
21 Committee on Reapportionment and Redistricting public
22 hearing on July 13th?
23 A        I did.
24 Q        And how did you find out about that
25 hearing?

Page 28

1  A        When I called Senator Chesteen, he -- he
2  told me there will be a public hearing and asked me if
3  I would speak.
4  Q        Did he tell you anything else?
5  A        No.  Just he gave me where it was and
6  the time.
7  Q        And how do you know Senator Chesteen?
8  A        Well, he's from our area; and I've known
9  him a long time.  He was a football coach in Geneva.
10 And he was always involved with, like I was and have
11 been, with creating workforce development; trying to
12 in our high schools train our kids and help them get
13 some skills.  He would -- he was always involved in
14 that, and so was I.  So I've just -- I've known him a
15 long time.
16 Q        And did he ask you to address anything
17 specific at the hearing?
18 A        No.  When I -- when I called and I --
19 basically, what I said in the declaration; I told -- I
20 told him.  And he said, Well, you know, here's a
21 public hearing.  Why don't you come and say that.  So
22 that's what I did.
23 Q        Did anyone else ask you to address
24 anything at the hearing?
25 A        No.



Page 29

1 Q       Okay.  So I'm going to ask you about the
2 enacted plan -- the plan that was enacted in 2023 that
3 you've referenced earlier in this deposition.
4         Did you -- have you seen that plan
5 before?
6         MS. FAIRBANKS MESSICK:  Object to the
7 form.
8 A       I'm not sure what you're ask -- I'm not
9 sure what plan you're --
10 Q      (By Ms. Gbe) Let me just make this
11 easier.
12        I'll just show you the document, and
13 then you can let me know if you -- if it looks
14 familiar.
15        MS. FAIRBANKS MESSICK:  Beverly, we can
16 see your deposition outline.  I'm sorry, Harmony.
17 A      It went away.
18 Q      (By Ms. Gbe) Can you see the map now?
19 A      No.  Whatever you sent is not showing
20 up.  Here we go.  There.
21 Q      So sorry.
22 A      Right.  Apologies for that.  Okay.
23        So this is the map that I was referring
24 to that was enacted in 2023.
25        Does it look familiar to you?

Page 30

1 A       I don't know.  I need to see the bottom
2 of the map.  I can't see that.
3 Q       Can you see the bottom now?
4 A       So what you're saying is, if I'm
5 correct, this is the map that the state legislature
6 approved; right?
7 Q       Yes.
8 A       Okay.  Yeah.  They put it in the Dothan
9 Eagle.  I saw it.
10 Q      Okay.  So I'm going to mark and publish
11 this document as Exhibit 3.
12            (Plaintiffs' Exhibit 3 was
13            marked for identification.)
14 Q      So did you -- did you look at this map
15 before you agreed to testify at the hearing,
16 Mr. Schmitz?
17 A      No.  When I -- well, let me understand
18 the question.
19        Before I agreed to testify today?
20 Q      At the hearing on July 13th --
21 A      Oh.
22 Q      -- had you seen this map before?
23 A      No.  At that time they hadn't passed
24 this map.
25 Q      Great.

Page 31

1 A       Right.  So, no, the map that I -- the
2 map that I saw -- and a lot of folks from Dothan were
3 wearing T-shirts were showing us over -- just
4 isolating us, moving us over to the west coast of
5 Alabama up to Mobile and Mobile County.  That's what I
6 remember.
7 Q       And what -- where did you see this map
8 that you're referring to?
9 A       Probably the Dothan Eagle.
10 Q      And you mentioned just now that folks
11 were wearing T-shirts with this map?
12        So where were these people with the
13 T-shirts?
14 A      Well, when I went up to the state house;
15 a bus pulled up.  And a lot of folks that I know from
16 Dothan got off with all these T-shirts, and that's
17 when I saw that map with what they were wearing.  And
18 that's -- I guess that's what I really saw the
19 T-shirts.
20 Q      And was that different than the map that
21 you saw in the Dothan Eagle?
22 A      I didn't get really close to them to
23 look at their -- the map.  But it -- it looked just
24 like a -- it -- it -- again, it had us -- it had us
25 and then going over west and up to Mobile.

Page 32

1 (Indicating throughout.)  And so, yes, I assumed it's
2 the same map.
3 Q       Have -- so based on your -- give me a
4 second.
5         So based on your understanding, these
6 people from Dothan with the T-shirts; they supported
7 the map that included Dothan with the black belt?
8 A       Is Mobile part of the black belt?
9         I don't know that.
10 Q      Yeah.
11 A      So okay, then yes.  It included Mobile.
12 That's what it included.
13 Q      I see.
14 A      And the west side of Alabama.  I didn't
15 really look at all the towns and stuff.  I just looked
16 what we were going away from the area of folks that I
17 know and people we've been working together for 25
18 years to over to the west side.
19 Q      And were these people with the T-shirts,
20 were they black?
21 A      Yes.
22 Q      How many people were wearing the
23 T-shirts if you can estimate for me?
24 A      Yeah.  A bunch; probably 25, 30 people
25 got off the bus.  I've known a lot of them for many



Case 2:21-cv-01530-AMM   Document 261-6   Filed 08/13/23   Page 9 of 11

MIKE SCHMITZ                                                                August 10, 2023
MILLIGAN, ET.AL. V. ALLEN, ET.AL.

Page 33

1  years, so -- anyway.  Yes.
2  Q       What do you mean by "you've known a lot
3  of them for many years"?
4  A       Well, the folks that got off the bus
5  live in Dothan or live in our community; which could
6  be a small town.  But I -- I've been involved --
7  heavily involved in this community for a long, long
8  time.  And we all try to work together on issues,
9  so -- and as mayor I definitely did that, so that's
10 how I got to know them.
11 Q       Did you recognize anyone in particular?
12 A       You know, I -- I recognize faces; names
13 I'm not so good at.  So, I mean, I can't think of any
14 of the names.
15 Q       But your -- your understanding is that
16 these people with the T-shirts were also familiar with
17 the Dothan community?
18 A       Oh, yeah.
19         MS. FAIRBANKS MESSICK:  Object to the
20 form.
21 Q       (By Ms. Gbe)  Have you reviewed any
22 other maps, Mr. Schmitz, besides the one that we spoke
23 -- the ones that we've spoken about in terms of the
24 T-shirt, the news article; have you seen any other
25 maps in any other places?

Page 34

1  A       I have not.
2  Q       Have you been shown any maps by either
3  someone from the legislature -- actually, let me
4  rephrase.
5          Were you shown any maps by anyone from
6  the legislature?
7  A       No.
8  Q       Were you shown any maps by anyone from
9  the Attorney General's office?
10 A       No.
11 Q       I think that's all I have, but let me
12 take a few minutes just to confirm with my cocounsel
13 that that's all we have for you.
14 A       Okay.
15         THE VIDEOGRAPHER:  Going off video
16 record; 10:49 a.m.
17         (Short recess.)
18         THE VIDEOGRAPHER:  We are now back on
19 video record; 11:05 a.m.
20 Q       (By Ms. Gbe)  Mr. Schmitz, I understand
21 that during the break you had a computer issue?
22 A       I did.
23 Q       Did you speak to anyone during the break
24 about your deposition testimony?
25 A       Oh, no.  No.  I just got my office

Page 35

1  manager to get my computer back up.  That's all.
2  Q       I just have a few more questions for
3  you.  It shouldn't take very long.
4  A       Okay.
5  Q       Did you review any performance analysis
6  for the 2023 plan?
7  A       I did not.
8  Q       Okay.  That is all I have.
9          EXAMINATION
10 BY MS. FAIRBANKS MESSICK:
11 Q       All right.  I do have some questions for
12 you, Mr. Schmitz, if you don't mind sticking around
13 with us a little bit longer.
14 A       I'm here.  Let's go.
15 Q       All right.  Thank you.
16         Since Eddie LaCour first reached out to
17 you approximately two weeks ago, have there been a
18 number of conversations and emails that you have had
19 with people at this office?
20 A       Yes.
21 Q       And is it possible that it's hard to
22 remember exactly what happened when and what came
23 first and what came next and what was next?
24 A       Well, for me that's challenging every
25 day.  But, yeah, I mean, I was in San Francisco.  I

Page 36

1  was traveling.  I came back to Dothan.  I have
2  businesses I run.  Yeah.
3  Q       Do you remember speaking with me and
4  Richard Mink after you got back from San Francisco?
5  A       I do.
6  Q       And do you remember if it was after we
7  spoke that we sent you a draft declaration?
8  A       Yes.
9  Q       Okay.  And do you remember asking to be
10 able to think about it overnight?
11 A       I did.
12 Q       And did you -- what do you remember
13 about what you did with that time overnight with
14 respect to your declaration?
15 A       Well, it's like I said earlier.  I
16 wanted to make sure some of the facts that I gave in
17 -- in the declaration were still true.  I -- I -- you
18 know, as mayor, I went to a lot of economic
19 development meetings and agricultural meetings.  And
20 just -- so I -- I called the Chamber and talked to the
21 president of the Chamber.
22 Q       And did you propose to include
23 information in your declaration that you got from
24 other people that was not your own knowledge?
25 A       Yes.  From him --

Page 37

1        MS. GBE: Objection. Leading.
2  A     Yes.
3  Q     (By Ms. Fairbanks Messick) And was that
4  information ultimately included in your declaration?
5  A     I don't believe --
6  Q     Take a few minutes and look -- I'm
7  sorry. I didn't mean to speak over you. I was going
8  to say if you want to look at it, you're certainly
9  welcome to take the time to do that.
10 A     I don't -- I don't -- I can't think of
11 anything that they told me that I put in this. I -- I
12 mean, I -- I may have, but I don't think so.
13 Q     Can you take a minute and look at your
14 deposition -- I'm sorry -- your declaration --
15 A     Right.
16 Q     -- and let us know if there's anything
17 in there that you do not believe to be your firsthand
18 knowledge.
19 A     (Witness complies.) I definitely have
20 years of experience in all that -- all these
21 statements.
22 Q     And did you review your declaration
23 before you signed it?
24 A     I did.
25 Q     And did you understand when you signed

Page 38

1  it it was like giving testimony in court; it was sworn
2  testimony?
3  A     I did.
4  Q     Okay. And do you remember receiving a
5  second draft of the declaration after we talked
6  further and you sent us additional information?
7  A     Yes.
8  Q     Can you look at paragraph one of your
9  declaration and read it to yourself silently, please.
10 A     (Witness complies.) Okay.
11 Q     Do you remember adding anything to that
12 paragraph?
13 A     No, ma'am; I don't remember adding
14 anything. I remember we had conversations. But I --
15 I --
16 Q     Okay. Do you remember if we made any --
17 if any changes were made to paragraph four after we
18 spoke?
19 A     Yes. You put in the website -- website
20 from the Army about the CASA and explained basically
21 what the website says in paragraph four.
22 Q     So as you sit here today, it's your
23 recollection that that was added in the second draft?
24 A     Yes.
25 Q     In paragraph six; would you read that to

Page 39

1  yourself, please. And then I'm going to ask you if
2  anything was added to that paragraph after we spoke.
3  A     (Witness complies.) Well, I remember
4  talking to you about flying with Senator Tuberville
5  over Fort Novosel. That may have been added. I don't
6  know if I said that the first time or not. And while
7  I was doing that, I definitely impressed, you know, my
8  opinion on how important Fort Novosel is to -- to us
9  and to our nation.
10 Q     Harmony asked you when I contacted you
11 or when the office contacted you about sitting for
12 this deposition.
13 A     Right.
14 Q     And I believe your testimony was that
15 you thought that that happened on Wednesday.
16        Is -- is that accurate to the best of
17 your recollection at this time?
18 A     I don't remember what day. I -- I just
19 don't.
20 Q     It was some time this week though;
21 right?
22 A     Yes. Yes.
23 Q     You mentioned earlier that Senator
24 Chesteen used to be a football coach in Geneva?
25 A     Yes.

Page 40

1  Q     Is Geneva a city? A county?
2        What is your reference to?
3  A     Well, city -- it's a city and a county.
4  Q     Okay.
5  A     And I -- I don't remember where he was a
6  coach, which one of those because I didn't follow
7  Geneva High School football.
8  Q     You spoke with Harmony about seeing 25
9  to 30 people, approximately, get off the bus at the
10 legislative hearing in mid July.
11       Were all of those people from Dothan so
12 far as you know?
13 A     Yes. When I say "Dothan," they -- the
14 area. Because we have a lot of small towns, so I
15 don't know where they actually live. I know them from
16 Dothan. Yes.
17 Q     Were there other people at the hearing
18 wearing those T-shirts who were not from Dothan?
19 A     I didn't notice it. There -- there may
20 have been. I did -- I was -- they actually sat me
21 right next to the folks with the T-shirts, so that's
22 how I was focused on that.
23 Q     Okay. Do you stand by your --
24 everything that's in your declaration?
25 A     I do.



Page 41

1  Q       All right.  I don't have any further
2  questioning -- questions.  Harmony might have
3  additional questions for you.
4           MS. GBE:  I don't have anything further.
5           MS. FAIRBANKS MESSICK:  Thank you so
6  much for your time, Mr. Schmitz.  We really appreciate
7  it.
8           MS. GBE:  Yes.  Thank you.  It was nice
9  meeting you.
10          THE WITNESS:  Thank you.
11          THE VIDEOGRAPHER:  This concludes
12 today's videotaped deposition.  The time is 11:16 a.m.
13 Going off the record now.
14    (THE DEPOSITION WAS CONCLUDED AT 11:16 A.M.)

Page 42

2            C E R T I F I C A T E

4  STATE OF ALABAMA )
5  JEFFERSON COUNTY )

7            I hereby certify that the above
8  and foregoing deposition was taken down
9  by me in stenotype, and the questions and
10 answers thereto were reduced to computer
11 print under my supervision, and that the
12 foregoing represents a true and correct
13 transcript of the deposition given by
14 said witness upon said hearing.

16           I further certify that I am
17 neither of counsel nor of kin to the
18 parties to the action, nor am I in
19 anywise interested in the result of said
20 cause.

23        _Merit Gilley_
24           /s/Merit Gilley
             Merit Gilley, Commissioner
25           ACCR NO. 67