**Page 1**

```
             UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ALABAMA
                    SOUTHERN DIVISION

EVAN MILLIGAN, et al.,     )
       Plaintiffs,         )
                           )   CASE NO:
VS.                        )2:21-CV-01530-AMM:
WES ALLEN, in his official )
capacity as Alabama        )
Secretary of State.        )
       Defendant.          )
MARCUS CASTER, et al.,     )
       Plaintiffs,         )
                           )   CASE NO:
VS.                        )2:21-CV-1536-AMM
WES ALLEN, in his official )
capacity as Alabama        )
Secretary of State.        ) DEPOSITION OF:
       Defendant.          ) JEFF WILLIAMS

               S T I P U L A T I O N S

            IT IS STIPULATED AND AGREED, by and
between the parties through their respective counsel,
```

**Page 2**

that the deposition of:

JEFF WILLIAMS,

may be taken before Merit Gilley, Commissioner and Notary Public, State at Large, with all parties appearing remotely, on the 10th day of August, 2023, commencing at approximately 12:01 p.m.

            IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

            IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

                        ***

**Page 3**

                    A P P E A R A N C E S

FOR THE MILLIGAN PLAINTIFFS:
       HARMONY A. GBE
       Attorney at Law
       Hogan Lovells US, LLP
       1999 Avenue of the Stars
       Suite 1400
       Los Angeles, California  90067
       310-785-4600
       harmony.gbe@hoganlovells.com

       DAYTON CAMPBELL-HARRIS
       Attorney at Law
       American Civil Liberties Union
       Voting Rights Project
       125 Broad Street
       18th Floor
       New York, New York  10004
       425-516-8400
       dcampbell-harris@aclu.org

**Page 4**

       JOELLE MILLER
       Attorney at Law
       NAACP Legal Defense & Educational Fund, Inc.
       40 Rector Street
       5th Floor
       New York, New York  10006
       212-965-2200
       Jmiller@naacpldf.org

       AMANDA NECOLE ALLEN
       Attorney at Law
       Hogan Lovells US, LLP
       Columbia Square
       555 Thirteenth Street NW
       Washington, DC  20004
       202-637-2521
       amanda.n.allen@hoganlovells.com



M49

Case 2:21-cv-01530-AMM   Document 261-7   Filed 08/13/23   Page 2 of 12

JEFF WILLIAMS                                                August 10, 2023
MILLIGAN, ET.AL. V. ALLEN, ET.AL.

Page 5

```
 1    DEUEL ROSS
 2         Attorney at Law
 3         NAACP Legal Defense & Educational Fund, Inc.
 4         700 14th Street N.W.
 5         Suite 600
 6         Washington, DC  20005
 7         202-682-1300
 8         dross@naacpldf.org
 9
10
11  FOR THE CASTER PLAINTIFFS:
12         MAKEBA RUTAHINDURWA
13         Attorney at Law
14         Elias Law Group
15         250 Massachusetts Avenue NW
16         Suite 400
17         Washington DC  20001
18         202-968-459
19         mrutahindurwa@Elias.law
20
21
22
23
24
25
```

Page 6

```
 1  FOR THE DEFENDANT SECRETARY WES ALLEN:
 2         MISTY S. FAIRBANKS MESSICK
 3         Constitutional Defense Division
 4         Office of the Attorney General
 5         State of Alabama
 6         501 Washington Avenue
 7         P.O. Box 300152
 8         Montgomery, Alabama  36130
 9         334-353-8674
10         misty.messick@alabamaag.gov
11
12
13  ALSO PRESENT:
14         Robert Pacheco - Esquire Video Specialist
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1
 2                    EXAMINATION INDEX
 3
 4  Jeff Williams
 5  BY MS. GBE  . . . . . . . . . . . . . . . . . .  9
 6  BY MS. FAIRBANKS MESSICK . . . . . . . . . . . 41
 7
 8
 9
10
11
12                     EXHIBIT INDEX
13
14  Plaintiffs' Exhibit                          MAR
15  1     Declaration of Jeffrey V. Williams      32
16  2     Redistricting Map of Alabama            39
17
```

Page 8

```
 1         I, Merit Gilley, a Court Reporter of
 2  Birmingham, Alabama, and a Notary Public for the State
 3  of Alabama at Large, acting as Commissioner, certify
 4  that on this date, as provided by the Federal Rules of
 5  Civil Procedure and the foregoing stipulation of
 6  counsel, there came before me on the 10th day of
 7  August, 2023, with all parties appearing remotely,
 8  commencing at approximately 12:01 p.m., JEFF WILLIAMS,
 9  witness in the above cause, for oral examination,
10  whereupon the following proceedings were had:
11         THE VIDEOGRAPHER:  We are now on the
12  video record.  Today's date is August the 10th, 2023.
13  The time is 12:01 p.m. Central standard time.  This
14  begins the videoconference deposition of Jeff Williams
15  in the matter of Evan Milligan, et al. versus Wes
16  Allen, et al.
17         My name is Robert Pacheco.  I am the
18  remote videographer.  The court reporter today is
19  going to be Ms. Merit Gilley, both representing
20  Esquire Deposition Solutions.  Would counsel please
21  introduce yourselves and your affiliation, and the
22  witness will be sworn in.
23         MS. GBE:  Hi.  This is Harmony Gbe of
24  Hogan Lovells.  I am counsel on behalf of the Milligan
25  plaintiffs.
```



Page 9

1  MS. RUTAHINDURWA:  Hi.  Makeba
2  Rutahindurwa on behalf of the Caster plaintiffs.
3  MS. ALLEN:  Amanda Allen of Hogan
4  Lovells on behalf of the Milligan plaintiffs.
5  THE COURT REPORTER:  Ms. Messick?
6  MS. FAIRBANKS MESSICK:  Misty
7  S. Fairbanks Messick for Secretary of State Wes Allen.
8  JEFF WILLIAMS
9  being first duly sworn, was examined and testified as
10 follows:
11 THE COURT REPORTER:  All right.  Usual
12 stipulations?
13 MS. GBE:  Agreed.
14 MS. FAIRBANKS MESSICK:  Yes, please.
15 THE COURT REPORTER:  Go ahead.
16 EXAMINATION
17 BY MS. GBE:
18 Q      All right.  Hi, Mr. Williams.  As I
19 mentioned, my name is Harmony Gbe; and I'm counsel for
20 the plaintiffs in this case.
21       Have you ever been deposed?
22 A      I have.
23 Q      How many times have you been deposed?
24 A      One time, and it was maybe 25 years ago.
25 Q      And do you remember what that case was

Page 10

1  about?
2  A      I do not.  It had -- had something to do
3  with and -- with the bank I was working for and a --
4  and a client, but I do not remember the -- the
5  specifics of it.
6  Q      And have you ever testified at trial?
7  A      I have not.
8  Q      You understand that you are testifying
9  under oath today?
10 A      Yes, ma'am.
11 Q      Is there anything that might prevent you
12 from understanding my questions or answering
13 truthfully?
14 A      No.
15 Q      Are you represented by counsel today?
16 A      I am not.
17 Q      So since it's been a while since you've
18 been deposed, I'm just going to go over a few ground
19 rules so we're on the same page.
20       Is that okay?
21 A      Of course.
22 Q      Okay.  So I'll be asking you a series of
23 questions, and you're going to answer them to the best
24 of your ability.
25       Do you understand?

Page 11

1  A      Yes, ma'am.
2  Q      As you know, we have a court reporter
3  with us here today; and she will be making a written
4  record of our conversation.  So I ask that you provide
5  clear and concise answers and speak slowly so that she
6  can get everything.  And please make sure to provide
7  verbal answers only, so no head nods or responses like
8  uh-huh.
9  A      Sure.
10 Q      Does that make sense?
11 A      Yes, ma'am.
12 Q      Relatedly, we should strive not to ta k
13 over each other.  I ask that you please wait until I
14 finish my question before responding, just as you're
15 doing now.  And also I will wait until you've provided
16 your response before asking the next question; okay?
17 A      Yes.
18 Q      And you understand that you should give
19 the same seriousness in answering my questions here
20 today as you would if you were testifying in court
21 before a judge or a jury; correct?
22 A      Of course.
23 Q      If I ask you a question that you do not
24 understand, please let me know.
25       Otherwise, I will assume that you

Page 12

1  understand my question; okay?
2  A      Yes, ma'am.
3  Q      If any attorney makes an objection
4  during the deposition, you still have to answer the
5  question unless you are specifically instructed not to
6  do so.
7        Do you understand?
8  A      I do.
9  Q      Please let us know if you need a break
10 at any point.
11       The only thing I ask is that if there's
12 a question pending that you answer that question
13 before we take the break; okay?
14 A      Yes.  Okay.
15 Q      And as we go through the questions
16 during the deposition, you may realize that a prior
17 answer wasn't entirely accurate.  If you do realize
18 that, please let me know so that we can correct the
19 record.
20       Do you understand?
21 A      I do.
22 Q      So do you understand all the
23 instructions that we just discussed?
24 A      I do.
25 Q      Okay.  So with that out of the way; you



Case 2:21-cv-01530-AMM   Document 261-7   Filed 08/13/23   Page 4 of 12

JEFF WILLIAMS                                                  August 10, 2023
MILLIGAN, ET.AL. V. ALLEN, ET.AL.

Page 13

1  understand, Mr. Williams, that you're here testifying
2  today as a witness in the case of Milligan versus
3  Allen?
4   A       Yes, ma'am.
5   Q       And we're conducting this deposition
6  remotely.
7           So where are you physically right now?
8   A       I'm in my office at 170 East Main
9  Street, Dothan. I am -- I will tell you I am downtown
10 on main street where there's a lot of traffic, sirens,
11 and so forth. So there may be interruptions
12 occasionally.
13  Q       Understood.
14          Is there anyone in the room with you
15 right now?
16  A       No, ma'am.
17  Q       And do you have access to any email,
18 chat, or text message functions currently on your
19 computer?
20  A       Yes, I do.
21          Should I shut those down?
22  Q       Which ones do you have open?
23  A       I have Outlook is currently open. I can
24 close that. And I can turn off my phone completely.
25  Q       That isn't necessary, but it -- it is

Page 14

1  helpful to know. Thank you.
2   A       Yes, ma'am.
3   Q       So let's talk about a little bit what
4  you did to prepare for today's deposition.
5           So tell me: What did you do to prepare?
6   A       Well, I -- I just thought about the case
7  and how it might affect the wiregrass area. I thought
8  about how we work together in this -- this --
9  specifically, this five-county area in the very
10 southeast of Alabama; how, from an economic
11 standpoint, that it -- it -- dividing this area from a
12 Congressional representation standpoint might affect
13 us negatively. So it -- a lot of thought about all
14 the -- the work together that the counties around here
15 do. So make, you know -- you know, made mental notes
16 and hopefully prepared myself to discuss it.
17  Q       Okay. I'm sorry. Just to go back to
18 what we just discussed a few moments ago.
19          Actually, do you -- could you please
20 close your email and --
21  A       I did.
22  Q       -- turn off your phone.
23  A       I did. I did both.
24  Q       Thank you. Very much appreciated.
25          But now talking back about what you did

Page 15

1  to prepare, did you --
2           MS. GBE: Sorry -- was there -- I got
3  some feedback. I wasn't sure.
4           Can you all hear me?
5           THE WITNESS: I can.
6           MS. FAIRBANKS MESSICK: I can hear you.
7   Q       (By Ms. Gbe) Thank you.
8           So going back to what you did
9  specifically to prepare for today's deposition.
10          Did you meet with anyone?
11  A       I -- I had phone calls with the Attorney
12 General's office asking me to -- to testify and what
13 that would mean; giving me the -- sort of the rules
14 about the deposition; how the -- the -- how I should
15 conduct myself and so forth; and asking me, you know,
16 to prepare a written testimony about -- I should --
17 why I have maybe some unique perspective to represent
18 the wire -- the wiregrass in -- in this case.
19  Q       How many phone calls did you have?
20          MS. FAIRBANKS MESSICK: Object to the
21 form.
22  Q       (By Ms. Gbe) With the attorney -- how
23 many phone calls did you have with the Attorney
24 General's office to prepare for today's deposition?
25  A       I would estimate four.

Page 16

1   Q       I'm sorry.
2   A       One --
3   Q       Did you say "four"?
4   A       I would estimate four. One initially
5  asking me if I'd be willing; and then two or three
6  follow up to -- to -- about the written testimony and,
7  you know, the parameters around that, what was needed;
8  and then the final one to review what was required of
9  me in a -- in a video deposition.
10  Q       And do you -- when were these phone
11 calls?
12  A       I would say the initial one was maybe
13 two weeks ago, and the -- and the others were two
14 or -- maybe last week, and one yesterday.
15  Q       And how long, approximately, were each
16 of these calls?
17  A       Fairly short --
18          MS. FAIRBANKS MESSICK: Object to the
19 form.
20  A       -- with the exception of the last one.
21 The last one was reviewing all the rules around, you
22 know, the video deposition and just kind of the
23 standard, hopefully common sense, rules around video
24 depositions. That was maybe 40 minutes long. The
25 others were, I would say, no more than five to, say,



Case 2:21-cv-01530-AMM   Document 261-7   Filed 08/13/23   Page 5 of 12

JEFF WILLIAMS                                                                August 10, 2023
MILLIGAN, ET.AL. V. ALLEN, ET.AL.

Page 17

1  ten minutes.
2  Q       (By Ms. Gbe) What rules are you
3  referring to --
4  A       Just --
5  Q       -- in terms of the -- sorry. Go ahead.
6  A       -- essentially what you reviewed with me
7  initially as far as how -- how depositions are
8  conducted; not to -- you know, be respectful; not to
9  use humor; you know, always be truthful; and, you
10 know, don't talk over the attorney; so forth. Just I
11 think it was just common deposition practices.
12 Q       Did you discuss anything else?
13         MS. FAIRBANKS MESSICK: Object to the
14 form.
15 A       On just --
16 Q       (By Ms. Gbe) On -- on -- on the -- the
17 most recent call when you discussed the rules with
18 someone from the Attorney General's office?
19 A       I believe it was pretty much all my --
20 you know, what questions I had about the process and,
21 you know, how -- how the process will work. And it
22 reviewed -- they reviewed with me what I should expect
23 and then, of course, the questions that I had around,
24 you know, the process. So I think it was more of a
25 procedural-type discussion.

Page 18

1  Q       And what questions did you have about
2  the process?
3  A       Well, how -- how it would be conducted;
4  you know, the -- what to expect. And, you know, I had
5  -- my only question is I did -- I'm not a -- I try not
6  to get political. And -- and -- in any respect. But
7  I have friends on both sides of the aisle, and I --
8  and I wanted to make sure that I would not be drawn
9  into the politics of this case. I wanted to keep my
10 interaction and -- and my -- my deposition to just the
11 facts as I know them about how the wiregrass is one
12 cohesive unit, one cohesive area that works together.
13 Q       And what were the -- actually, let me
14 strike that.
15         Who were you speaking to specifically in
16 this most recent conversation with the Attorney
17 General's office?
18 A       Misty Messick.
19 Q       And what did Misty tell you in response
20 to those questions that you had?
21 A       To be truthful and -- just be truthful,
22 and if I don't -- if I'm not an expert on something or
23 I don't know something, just say that I don't know it
24 or I'm not able to answer that. I'm not an expert in
25 that area.

Page 19

1  Q       And did Misty tell you anything else?
2  A       Nothing more than to be -- to be
3  truthful and to not try to -- if I'm not an expert on
4  something, just let -- let you know that I'm not.
5  And, you know, I came here today to -- to testify on
6  the items in my written testimony; which I do think
7  I'm uniquely qualified to discuss. But I -- but
8  outside of that, I did not -- did not want to get into
9  the politics of the matter.
10 Q       And just to clarify: When you say "your
11 written testimony," are you referring to the
12 declaration you submitted in support of defendants'
13 response in this case?
14 A       Yes, ma'am.
15 Q       Okay.
16         MS. FAIRBANKS MESSICK: Object to the
17 form.
18 Q       (By Ms. Gbe) Going back to the four or
19 so conversations you had to prepare for this
20 deposition; we discussed in more detail the most
21 recent one that you had with Misty.
22         Did you speak to anyone else in the
23 Attorney General's office?
24 A       Yes. There was one other gentlemen. I
25 believe he was a supervisor. But I do not recall his

Page 20

1  name. He was on the call for maybe three or four
2  minutes --
3  Q       What's --
4  A       -- just to help answer -- answer my
5  question that I just -- my main question that I just
6  reiterated. And, essentially, his response was, as
7  Misty would say, just to be truthful and if I'm not --
8  don't know the answer to -- or not an expert in that
9  area, just let you know that.
10 Q       Was his name Mr. LaCour?
11 A       No, it was not.
12 Q       And you do not remember this gentleman's
13 name?
14 A       I'm sorry. I do not. He was brought
15 into the call for just a few -- couple of minutes;
16 three or four at most.
17 Q       Was his name Jim Davis?
18 A       That sounds correct. Yes, ma'am.
19 Q       Okay. Did you discuss anything else
20 with anyone from the Attorney General's office to
21 prepare for today's deposition?
22 A       I would say I did -- have not. I did
23 nothing other than what I have described.
24 Q       Did you speak to anyone outside of the
25 Attorney General's office to prepare for today's

Page 21
1  deposition?
2  A         I did not.
3  Q         Did you speak to anyone from the
4  legislature --
5  A         Not --
6  Q         -- to prepare for --
7            MS. FAIRBANKS MESSICK:  Object to the
8  form.
9  A         No.  In no way.  I've not -- I've not --
10 Q         (By Ms. Gbe)  Okay.
11 A         I've kept this just between me and the
12 Attorney General's office.
13 Q         Have you seen any transcripts from other
14 depositions in this case?
15 A         I have not.
16 Q         Did you visit any websites to prepare
17 for your testimony today?
18 A         I have not.
19 Q         Did you review any documents to prepare
20 for your testimony today?
21 A         Nothing other than my written testimony,
22 my declaration I guess it was.
23 Q         And do you have a copy of your
24 declaration in front of you?
25 A         I -- it's on my desk over to the side,

Page 22
1  but I do not -- I'm not reading it or reviewing it at
2  this time.
3  Q         Understood.
4            Did you do anything else to prepare for
5  this deposition today?
6  A         I did not.  Other than -- well, what I
7  described earlier was, you know, a lot of
8  consideration about how the area works together and --
9  and all the factors that go into play about an area
10 working together for economic development; whether it
11 health care, you know, Fort Novosel, the -- the
12 HudsonAlpha center that's being built; the similar
13 geography; those kind of things.  Just really tried to
14 understand, put in my -- my -- my own thoughts as to
15 around what would -- how would this affect us if we
16 were to -- we were divided from a Congressional
17 representation standpoint.
18 Q         Are you being compensated by anyone for
19 being here today?
20 A         I am not.
             Redacted

Page 23
Redacted

Page 24
Redacted



M49

Page 25

Redacted

7  Have you ever been involved in any other
8  lawsuits?
9  A     I've -- nothing that's went to trial.  I
10 was sued by a former employee that was terminated.
11 This was back in the, I would say, early 2000's.  The
12 -- it never went to trial; it was settled.  That's the
13 only -- and I've been a -- a juror on -- on a trial.
14 That -- that would be my extent of my experience.
15 Q     Do you recall what the -- the case that
16 you were a juror on, what it related to?
17 A     Yes.  It was a rape case.
18 Q     Okay.  So what is the highest level of
19 your education?
20 A     Bachelor of arts.  Bachelor of arts.
21 Q     And where did you attend school?
22 A     University of Alabama.
23 Q     And when did you graduate?
24 A     1992.
25 Q     What do you do for a living?

Page 26

1  A     I'm the regional president for
2  SmartBank.
3  Q     When did you start in that position as
4  regional president for SmartBank?
5  A     September of 2021.
6  Q     And what was your position just prior to
7  that one?
8  A     Market president for BBVA bank.  BBVA.
9  Q     And how long were you market president
10 for BBVA?
11 A     May 2013 through September of 2021.
12 Q     All right.  So I'm going to pivot a
13 little bit to your involvement in this specific case.
14       Tell me what you know about the lawsuit
15 at issue.
16 A     I understand that there are -- you know,
17 the Supreme Court has -- has stated that the -- or --
18 or ruled that Alabama is not properly representing
19 minorities.  There's not a -- we have only one
20 district that's primarily minorities.  And they're
21 ruling that we should have two.  And they've asked
22 Alabama to go back to redraw the district -- district
23 lines.
24 Q     And how did you get involved in this
25 lawsuit?

Page 27

1  A     I was called by the Assistant General
2  Mr. LaCour and asked if I would be a witness.
3  Q     When was that phone call from
4  Mr. LaCour?
5  A     I would say two weeks ago.  But it -- I
6  couldn't tell you an exact date -- I'm sorry -- unless
7  I looked it up.
8  Q     Do you know why Mr. LaCour called you?
9  A     He didn't say for sure.  He said that I
10 was -- my name was given to him as -- as potentially
11 someone that would a -- a -- a good perspective on why
12 the wiregrass should be considered as one -- one
13 cohesive district.
14 Q     And why do you say that?
15       I mean --
16       MS. FAIRBANKS MESSICK:  Object to the
17 form of the question.
18 Q     I'm meaning why -- why -- why do you
19 believe that -- that that is one of -- why he called
20 you?
21       MS. FAIRBANKS MESSICK:  Object to the
22 form.
23 A     I believe I have a unique perspective in
24 that -- in my role as -- in commercial banking.  I see
25 a lot of different types of industry.  I bank some of

Page 28

1  the largest companies in this area.  I have a unique
2  perspective in that I'm -- I'm prior military.  So I
3  understand the issues that are involved all around
4  Fort Novosel.  I have a unique health care background.
5  And I bank the largest health care practices and
6  hospitals in the area.  I'm -- I bank some
7  agricultural-related industries which are -- is a big
8  -- it's a big industry down here in agriculture.  I --
9  in my perspective coming from other markets, I've
10 lived in Tennessee; I've lived in a good many cities
11 in Alabama.  I think I have a unique perspective on
12 the geography and the industries here and how they're
13 different than a Mobile or Montgomery or Auburn or
14 Birmingham.
15       And I'm very involved with the Chamber,
16 as the incoming chairman and vice -- I'll be vice
17 chairman and incoming chairman in October.  So I have
18 that Chamber of Commerce perspective.  I'm also vice
19 chairman of the Housing Authority.  We're a regional
20 housing authority, so I have a unique perspective on
21 housing and what -- the need for affordable housing.
22 So I have been very involved in community service, so
23 I think I do bring a unique perspective to this case.
24       MS. GBE:  I'd like to object to
25 Mr. Williams' answer as nonresponsive.



M49

Case 2:21-cv-01530-AMM   Document 261-7   Filed 08/13/23   Page 8 of 12

JEFF WILLIAMS                                              August 10, 2023
MILLIGAN, ET.AL. V. ALLEN, ET.AL.

Page 29
1  Q      (By Ms. Gbe) Let me rephrase my
2  question.
3          You said that at -- Mr. -- you believe
4  Mr. LaCour called you because of your familiarity with
5  the wiregrass community.
6          Did anyone tell you that specifically?
7  A      Yes. I believe that was the reason for
8  the -- for the call is that --
9  Q      Did he say that -- oh, I'm sorry. Go
10 ahead.
11 A      I don't know if he said those exact
12 words. But asked if I would be a witness, felt like I
13 am -- I would -- my name was given to him as someone
14 who had a good perspective on why and how we work
15 together. So -- I do -- I don't know any more than
16 that that I can tell you.
17 Q      And had you spoken to Mr. LaCour before
18 this phone call two weeks ago?
19 A      I have not. It was the -- may have --
20 no. I -- first of all, no. I've not talked to him
21 prior to that. And if I talked to him again, it was
22 -- it was very brief in that so and so would be
23 contacting me or something like that. So if I talked
24 to him, it -- it was no more than maybe twice. I know
25 I earlier said once. That would have been the primary

Page 30
1  call. There may have been even an email or a phone
2  call follow up and saying so and so would be
3  contacting me to discuss a -- a written testimony.
4  No. I didn't even know him prior to -- to my call two
5  weeks ago.
6  Q      Do you know how Mr. LaCour received your
7  name as someone who would be willing to submit this
8  testimony?
9  A      I -- I do not. I assumed it was some of
10 our representatives or -- or business leaders down
11 here that gave him -- so I sent him several names to
12 review.
13 Q      And why do you assume so?
14 A      Who -- I was -- he asked me if I would
15 -- if I knew of anyone else that would have a similar
16 perspective and -- and would -- would I be willing to
17 give him their name -- give them his -- give him their
18 names. Excuse me.
19 Q      Did you provide any names to Mr. LaCour?
20 A      I did. Yes, ma'am.
21 Q      And which names did you give him?
22 A      Brad Kimbro, COO of Wiregrss Electric
23 Co-Operative.
24 Q      Any other names?
25 A      No, ma'am.

Page 31
1  Q      Okay. So as you've indicated here today
2  during your testimony, you've submitted written
3  testimony -- you've submitted a declaration in this
4  case; correct?
5  A      Yes, ma'am.
6  Q      And you produced this declaration as
7  part of Alabama's response to plaintiffs' objection in
8  -- in this case; correct?
9  A      Correct.
10 Q      Have you seen Alabama's actual response,
11 so not your declaration, but the -- the response that
12 the State submitted?
13 A      No, ma'am.
14 Q      So I'm going to pull up your actual
15 declaration and ask you a few questions about that if
16 that's all right.
17 A      Yes, ma'am.
18 Q      So do you see a document on your screen?
19 A      Not yet. It says it -- it's started
20 sharing. There it goes. I see it now.
21 Q      Do you see the document now?
22 A      Yes, ma'am.
23 Q      Let's scroll through so that you can get
24 a better look.
25         So this document is eight pages. And on

Page 32
1  the first page -- on the second page -- I'm sorry --
2  it's titled "Declaration of Jeffrey Williams."
3          Do you see that?
4  A      Yes, ma'am.
5  Q      Does this document look familiar?
6  A      It does.
7  Q      Is this the declaration that you
8  submitted in this case?
9  A      Yes, ma'am.
10 Q      So I'm going to scroll -- I'm sorry.
11         So I'm going to mark and publish this
12 document as Exhibit 1.
13         (Plaintiff's Exhibit 1 was
14         marked for identification.)
15 Q      And now I'm going to the scroll to the
16 last page, page eight.
17         Do you see the signature page on your
18 screen, Mr. Williams?
19 A      Yes, ma'am.
20 Q      Is that your signature?
21 A      It is.
22 Q      Who drafted this declaration?
23 A      I did. It was -- I -- I sent it in a
24 Word document, and the Attorney General's office
25 placed it into this format.



Case 2:21-cv-01530-AMM   Document 261-7   Filed 08/13/23   Page 9 of 12

JEFF WILLIAMS                                                August 10, 2023
MILLIGAN, ET.AL. V. ALLEN, ET.AL.

Page 33

1  Q     So you typed up this -- this declaration
2  yourself?
3  A     Yes, ma'am.  Certainly did.
4  Q     Okay.  I'm going to shop sharing my
5  screen.
6        Did anyone make edits to the declaration
7  that you typed up before you signed it?
8  A     Not edits, but suggest -- suggested
9  changes to tweak up -- just really minor -- minor
10 things.  Maybe to bring out a certain point, maybe
11 more about my military service or something like that.
12 But the -- there was not -- they did not make edits,
13 but suggested that I, you know, go a little bit more
14 about my background, give a little bit more about my
15 military service and so forth.  But did not -- I don't
16 believe, I think, anything they mentioned were not
17 true edits as much as they were just suggestions that
18 I incorporate a little bit more information.
19 Q     So you mentioned some suggestions about
20 bringing up your military background.
21       Were there any other suggestions made to
22 you about what should be included in the declaration?
23 A     I believe more about my background and
24 commercial banking.  I believe those two items were
25 the areas they wanted me to bring out a little bit

Page 34

1  more about my background.
2  Q     Did you receive any other suggestions on
3  the substance of the declaration?
4  A     I don't -- I do not recall anything else
5  other than just adding -- adding to it.  Maybe there
6  was a -- I believe there was a couple of items, couple
7  of sentences in there, that really didn't read very
8  clear.  And they suggested a -- that I, you know,
9  rethink that sentence.  So -- but -- but nothing of
10 substance.
11 Q     And when you say "they," who are you
12 referring to specifically?
13 A     Primarily Misty Messick.  There was --
14 Q     Do you --
15 A     -- also a Richard Mink, I believe it is,
16 that was copied on everything.  But I don't know if he
17 was giving suggestions or not, but he was copied on
18 email that I sent in.
19 Q     And did you take the suggestions you
20 received from Misty?
21 A     I did.  Yes, ma'am.
22 Q     So just to make sure I understand the
23 process of how your declaration was put together:  You
24 -- you received a call from Ms. LaCour roughly two
25 weeks ago suggesting that you submit written

Page 35

1  testimony?
2        Is that right?
3  A     Asked if I'd be willing to --
4        MS. FAIRBANKS MESSICK:  Object to the
5  form.
6  A     Asked if I'd be willing --
7        MS. FAIRBANKS MESSICK:  I'm sorry.
8  A     Asked if I'd be willing to testify and
9  -- and asked if I'd be willing to come to Birmingham
10 to -- to testify in person.  And I said I'd be -- be
11 happy to.  Gave him a bit -- and gave him my
12 background and why I thought I would have a unique
13 perspective on this -- on the redistricting.
14       Did I answer your question?
15 Q     (By Ms. Gbe)  Yes.
16       A follow-up question:  Did you -- so you
17 were asked whether you would submit written testimony
18 and also if you would testify in person?
19       Did you agree to testify in person?
20 A     I did.
21       MS. FAIRBANKS MESSICK:  Object to the
22 form.
23 Q     (By Ms. Gbe)  So going back to your
24 declaration:  You received the call.
25       Then what happened in terms of putting

Page 36

1  together the actual declaration?
2        MS. FAIRBANKS MESSICK:  Objection.
3  Asked and answered.
4        THE WITNESS:  Do I need to answer?
5  Q     (By Ms. Gbe)  Yes.
6  A     Sorry.  Just not -- the process is just
7  a little unfamiliar for me.
8        I was asked to -- if I would do -- be
9  willing to do it in person.  I started putting my
10 thoughts together about, you know, my reasoning for
11 having the view that I have.  And then maybe a few
12 days after that, I was asked to submit written
13 testimony.  And I stated that I would -- you know,
14 they asked if I wanted to kind of do an interview with
15 them and -- and let them know my thoughts or if I'd
16 rather just submit a written testimony myself.  I said
17 I definitely want to prepare it myself, put my
18 thoughts into it, and -- and everything was prepared
19 by me and my -- it was my -- my thoughts.
20 Q     So you -- you prepared a draft of your
21 written testimony and sent it to the AG's office for
22 feedback?
23       Is that right?
24 A     Yes, ma'am.
25 Q     And then they -- they made suggestions,

Page 37
1  which you accepted and revised the declaration?
2        Is that right?
3  A      Again, the --
4              MS. FAIRBANKS MESSICK:  Object to the
5  form.
6  A      -- suggestions were only to add more
7  background or to clarify a sentence or two.  It was
8  nothing that I -- that I believe was of substance.
9  They didn't -- they didn't ask me to -- to add --
10 bring out a point that I wasn't bringing out already,
11 so forth.
12 Q      (By Ms. Gbe)  And how many drafts were
13 there to your declaration?
14 A      I would say maybe three total, with the
15 third being the final.
16 Q      And did you receive suggestions on each
17 draft from Misty or anyone else in the Attorney
18 General's office?
19 A      Yes, ma'am.
20 Q      And did you review your declaration
21 before signing it?
22 A      Yes, ma'am.
23 Q      Are you a member of the Republican
24 party?
25 A      I -- I do vote Republican.  But I'm not

Page 38
1  actively involved in the Republican party, but I do
2  vote Republican.  Yes.
3  Q      Do you identify as a Republican?
4  A      I do.
5  Q      Have you held any positions in the
6  party?
7  A      No, ma'am.
8  Q      In the Republican party?  I'm sorry.
9  A      No, ma'am.
10 Q      Did you attend the Alabama Permanent
11 Committee on Reapportionment and Redistricting public
12 hearing on July 13th?
13 A      No, ma'am.
14 Q      Have you reviewed the enacted 2023
15 Congressional map for Alabama?
16 A      I've seen -- you know, I'm -- I -- I do
17 read the news quite a bit, so I've seen versions of
18 the map.  But I do not -- I do not know if I recall --
19 if I know exactly which version -- that I've seen the
20 version you're discussing.  I only -- my only
21 interaction with this would have been reading the
22 news.
23 Q      Okay.  So I'm going to show you a map.
24 And you can let me know if you've -- if it looks
25 familiar.

Page 39
1  A      Okay.
2  Q      So do you see a document on your screen,
3  Mr. Williams?
4  A      Yes, I do.
5  Q      And it's titled "Livingston
6  Congressional Plan 3."
7         Do you see that?
8  A      I do.
9  Q      Okay.  So I'm going to mark and publish
10 this document as Exhibit 2.  And I'm going to scroll
11 down so that you can see the full map.
12            (Plaintiff's Exhibit 2 was
13             marked for identification.)
14 Q      And just can you let me know if you've
15 seen this doc -- this map before.
16 A      I cannot say that this is the exact map
17 that I -- that I've seen before.  No.  I certainly may
18 have in reading the news or articles about the case.
19 But I can't say for sure that I've seen this version.
20 Q      Okay.  And you've indicated that you've
21 seen several different versions of maps for Alabama;
22 is that right?
23 A      I --
24             MS. FAIRBANKS MESSICK:  Object to the
25 form.

Page 40
1  A      I would say there's -- I've seen other
2  versions.  Yes.  But I can -- you know, again, I'm not
3  -- it's not something I've been spending a lot of time
4  reviewing.  So I -- I can't say how many maps or
5  versions I've seen.
6  Q      (By Ms. Gbe)  Can you tell me how some
7  of the other maps you've seen differ from this one?
8  A      Well, one that I believe I have seen had
9  us included with Mobile.  And that was what really
10 concerned me is that I believe Mobile would -- is a
11 completely different geography and culture and -- and
12 different types of industries and so forth.  So
13 that -- that's one that very much concerned me.
14 Q      And have you reviewed any performance
15 analyses for any of the maps that you've seen?
16 A      No, ma'am.
17 Q      So I'm going to take this document down.
18        I think that's all the questions I have,
19 but just give me a few minute to confer with my
20 cocounsel.  If we can go off the record for a minute
21 or two.
22             MS. FAIRBANKS MESSICK:  Of course.
23             MS. GBE:  Thank you.
24             THE VIDEOGRAPHER:  We are off the video
25 record; 12:40 p.m.



Case 2:21-cv-01530-AMM   Document 261-7   Filed 08/13/23   Page 11 of 12

JEFF WILLIAMS                                                August 10, 2023
MILLIGAN, ET.AL. V. ALLEN, ET.AL.

Page 41

1    (Short recess.)
2  Q    (By Ms. Gbe) That's all the questions I
3  have for you, Mr. Williams. Thank you.
4  A    Thank you.
5         MS. FAIRBANKS MESSICK: Mr. Williams, if
6  you don't mind, I'd like to ask you just a few
7  questions.
8         THE VIDEOGRAPHER: Just a second, folks.
9  We were off the video record. Stand by.
10        We're now back on video record;
11 12:40 p.m.
12        MS. GBE: I have no further questions
13 for -- for Mr. Williams. Sorry.
14        MS. FAIRBANKS MESSICK: Mr. Williams --
15        MS. GBE: Did not mean to speak over
16 you.
17        MS. FAIRBANKS MESSICK: Not at all.
18           EXAMINATION
19 BY MS. FAIRBANKS MESSICK:
20 Q    Mr. Williams, I wanted to just ask you
21 about just three questions.
22        But first: Did you shut down your
23 email, chats, any kind of communication devices at the
24 beginning of this deposition?
25 A    Not at the very beginning. But once it

Page 42

1  was brought to my attention when they asked the
2  question did I have email or Out -- or any type of
3  chat open, I did have my Outlook going on my computer
4  and my -- my cell phone was on but on silent. So I
5  shut both of those down at that time.
6  Q    During the time that your cell phone and
7  your Outlook were open while this deposition was
8  ongoing, were you sending or receiving any
9  communications about this deposition?
10 A    Not at all. It's just typically my
11 Outlook is always open on my computer when my computer
12 is running. And my phone is always on but silenced.
13 So just -- no. The answer is absolutely not. Was not
14 communicating with anyone.
15 Q    Thank you.
16        You were asked when we talked about you
17 sitting for this deposition and preparing you for this
18 deposition.
19        Do you remember with certainty when that
20 was?
21 A    No. No. I -- I don't think that's --
22 most of the -- the discussions were last week; other
23 than, you know, the discussion to prepare for the
24 deposition.
25 Q    And I'm sorry. I was asking you

Page 43

1  specifically about the depositions, not the written
2  testimony.
3         Do you remember when we spoke this week
4  about your willingness to sit for a deposition and
5  what would be involved in that?
6  A     I would say it's either -- it was either
7  Tuesday or -- or -- or yesterday. I -- you know, my
8  -- my weeks stay pretty -- pretty full with a -- a lot
9  going on. So my -- my calendar is my -- my guide
10 typically. But I'm -- but, no, I don't recall
11 specifically. No.
12 Q     Thank you.
13        And is -- is everything in your
14 declaration your sworn testimony that you agree with
15 and stand by to this day?
16 A     Yes, ma'am. Absolutely.
17 Q     All right. I don't have any further
18 questions. Harmony might have follow-up questions.
19        MS. GBE: I do not.
20        MS. FAIRBANKS MESSICK: Thank you so
21 much for your time, Mr. Williams. We really
22 appreciate it.
23        MS. GBE: Yes. Thank you.
24        THE WITNESS: Glad to. Thank you.
25        THE VIDEOGRAPHER: This concludes

Page 44

1  today's videotaped deposition. The time is 12:44 p.m.
2  Going off the record now.
3     (THE DEPOSITION WAS CONCLUDED AT 12:44 P.M.)

```
                              Page 45
 1
 2            C E R T I F I C A T E
 3
 4   STATE OF ALABAMA )
 5   JEFFERSON COUNTY )
 6
 7            I hereby certify that the above
 8   and foregoing deposition was taken down
 9   by me in stenotype, and the questions and
10   answers thereto were reduced to computer
11   print under my supervision, and that the
12   foregoing represents a true and correct
13   transcript of the deposition given by
14   said witness upon said hearing.
15
16            I further certify that I am
17   neither of counsel nor of kin to the
18   parties to the action, nor am I in
19   anywise interested in the result of said
20   cause.
21
22
23            _____
24            /s/Merit Gilley
              Merit Gilley, Commissioner
25            ACCR NO. 67
```