FILED
2023 Aug-18  PM 04:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

7/24/2019          Chestnut, et al., v. John H. Merrill          Congressman Bradley Byrne

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION


- - - - - - - - - - - - - - - +

LAKEISHA CHESTNUT, et al.          |

          Plaintiffs,          |

          | Case No.

     vs.          | 2:18-CV-00907-KOB

          |

JOHN H. MERRILL, Secretary          |

of State,          |

          Defendant.          |

- - - - - - - - - - - - - - - +



          Washington, D.C.

          Wednesday, July 24, 2019

Deposition of CONGRESSMAN BRADLEY BYRNE, a

witness herein, called for examination by counsel for

Plaintiffs in the above-entitled matter, pursuant to

notice, the witness being duly sworn by MICHELE E.

EDDY, RPR, CRR, a Notary Public in and for the

District of Columbia, taken at the Rayburn House

Office Building, 45 Independence Avenue, Southwest,

Washington, D.C., at 9:58 a.m.

---

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646



EXHIBIT
tabbies
M.1

7/24/2019          Chestnut, et al., v. John H. Merrill          Congressman Bradley Byrne

A P P E A R A N C E S
ON BEHALF OF THE PLAINTIFFS:
    BRUCE V. SPIVA, ESQUIRE
    LALITHA D. MADDURI, ESQUIRE
    Perkins Coie
    700 13th Street, Northwest
    Suite 600
    Washington, D.C. 20005
    (202) 654-6203
    BSpiva@perkinscoie.com
    LMadduri@perkinscoie.com

ON BEHALF OF THE DEFENDANT:
    JIM DAVIS, ESQUIRE
    Deputy Attorney General
    Division Chief, Constitutional Defense
    Office of the Attorney General
    501 Washington Avenue
    Montgomery, Alabama 36130
    (334) 353-1356
    jim.davis@ago.state.al.us

ALSO PRESENT:
    Mitch Relfe, Legislative Director for
    Congressman Bradley Byrne
    Daniel Holmstock, Videographer

Page 2

EXAMINATION INDEX
                                    PAGE
EXAMINATION BY MR. SPIVA              5


E X H I B I T S
DEPOSITION EXHIBIT                    PAGE
Exhibit 1  Revised Plan 1, Alabama -- U.S. House   14
Exhibit 2  Alabama -- U.S. House, Revised Plan 2   16
Exhibit 3  Alabama -- U.S. House, Revised Plan 3   16
Exhibit 4  Alabama -- U.S. House, Illustrative     17
           Plan 4
Exhibit 5  2011 State Board of Education Districts  25
Exhibit 6  Current map of the U.S. House Districts  46
           in Alabama

Page 3

PROCEEDINGS
Washington, D.C.
July 24, 2019
- - -
        THE VIDEOGRAPHER:  This is Video No. 1
in the video-recorded deposition of Congressman
Bradley Byrne taken in the matter of Lakeisha
Chestnut, et al. versus John H. Merrill in his
official capacity as Alabama Secretary of State.
It is pending before the United States District
Court for the Northern District of Alabama,
Southern Division, Case Number 2:18-CV-00907.
        This deposition is being held at the
Rayburn Office -- House Office Building at 45
Independence Avenue, Southwest, in Washington,
D.C., on July 24th, 2019.  The time on the video
screen is 9:59 a.m.
        My name is Daniel Holmstock, and I'm the
legal videographer from Digital Evidence Group.
Our court reporter is Michele Eddy, in association
with Digital Evidence Group.
        For the record now, will counsel please

Page 4

introduce themselves and whom they represent.
        MR. SPIVA:  My name is Bruce Spiva.  I
represent the plaintiffs in the action.
        MS. MADDURI:  Lali Madduri, also for the
plaintiffs.
        MR. RELFE:  Mitch Relfe.  I'm counsel
for the office of Congressman Byrne.
        MR. DAVIS:  Jim Davis representing
Secretary of State John Merrill.
        THE VIDEOGRAPHER:  Will the court
reporter please administer the oath.
- - -
        CONGRESSMAN BRADLEY BYRNE,
having been duly sworn, testified as follows:
        EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SPIVA:
    Q   Good morning, Congressman Byrne.
    A   Good morning.
    Q   Thank you very much for taking your time
out.  I know you have a busy schedule.  We
appreciate that.
    A   Sure.

Page 5

1  Q   We'll try to keep the encroachment on
2  your time to a minimum.
3       If you can just state your full name for
4  the record.
5  A   My name is Bradley Byrne, B-Y-R-N-E.
6  Q   What is your address, Congressman Byrne?
7  A   22489 Sea Cliff Drive, Fairhope,
8  Alabama, 36532.
9  Q   Have you ever been deposed before?
10  A   I have.
11  Q   In what capacity?
12  A   When I was a member of the State School
13  Board, there was a lawsuit against the State
14  School Board in our official capacity, and I
15  believe when I was Chancellor of Postsecondary
16  Education, there was a lawsuit against the
17  Department of Postsecondary Education, and in my
18  capacity as CEO of the system, I think I was
19  deposed a couple of times.
20  Q   Okay.  Other than those times, can you
21  recall any other times that you were deposed?
22  A   I can't.

Page 6

1  A   No.
2  Q   Was it more recent than that?
3  A   It was more recent than that, but I
4  can't remember exactly when it was.
5  Q   Okay.  And do you recall what you
6  testified about in that redistricting case before
7  the Board of Education?
8  A   There was some sort of a proposal, and I
9  don't know if it was a legislative proposal or
10  not, regarding the makeup of the districts and the
11  State School Board.  There are eight districts.
12  And I was asked about my opinion about how my
13  district -- my State School Board district would
14  be put together.
15  Q   Okay.  And so I take it at that time you
16  were a member of the State Board of Education?
17  A   I think I was.  I can't remember, to be
18  sure.
19  Q   All right.  And do you recall whether
20  the districts changed as a result of that lawsuit?
21  A   I don't know what became of that
22  lawsuit.  I was just a witness.

Page 8

1  Q   Have you ever testified -- we've got a
2  little --
3  A   Doesn't mean anything.
4  Q   Okay.  Have you ever testified in trial
5  before?
6  A   Yes, I believe there was a trial
7  regarding the redistricting of the State School
8  Board in the Federal District Court of the
9  Southern District of Alabama, and I think I and
10  perhaps other members of the State School Board
11  were required to come and testify at that trial.
12       There was also a trial in the Montgomery
13  County Circuit Court that I was a very brief
14  witness in, and I think it was another one of
15  those redistricting cases.
16  Q   Okay.  And were you deposed in either of
17  those cases?
18  A   I don't believe I was.
19  Q   Okay.  In connection with the school
20  board redistricting case, about what time period
21  was that?  Maybe I'll try to refresh your memory.
22  Was it mid '90s?

Page 7

1  Q   Okay.  So let me just -- I'll briefly --
2  you've been deposed before, but I'll just briefly
3  go over kind of some of the, you know, usual
4  ground rules.  We're doing great so far.  Usually
5  because the court reporter has got to take
6  everything down, I will try to wait until you've
7  completed your answer before asking you the next
8  question or jumping in.  I would just ask if you
9  would do the same, just wait for the whole
10  question to come out before you answer, just so
11  she can get everything down.
12       If I ask a question and it doesn't make
13  sense to you, please ask me and I will do my best
14  to rephrase it.  If you answer it, I'll assume
15  that you understand it as asked.  If you want to
16  take a break at any time, you know, just let me or
17  your counsel know and we can -- we can do that.
18  Just -- we just ask that while a question is
19  pending, if you can -- if you can answer the
20  question and then we can take a break at that
21  point.
22       I don't think there's anything else.

Page 9

Pages 6 to 9

1     And there's no reason why you can't
2 testify completely and truthfully today? You're
3 not on any medications or anything like that? I
4 have to ask everybody that.
5     A   No, I'm not.
6     THE VIDEOGRAPHER: Your microphone fell,
7 counsel.
8     MR. SPIVA: Oh, thank you. The question
9 is where did it fall to.
10    Q   And I will try to not gesticulate with
11 my hands so that I don't knock the microphone off.
12    And how did you -- how did you learn
13 about this case, Congressman Byrne?
14    A   I believe I received notification of it
15 from the Attorney General's office, State Attorney
16 General's office. I may have read about it in the
17 news before, but I can't be certain about that.
18    Q   Do you recall who you first talked about
19 this case with?
20    A   There was a call in which there was a
21 member of the Attorney General staff on the call,
22 and there was a lawyer from a law firm in

Page 10

1 Montgomery, maybe two lawyers from that law firm
2 in Montgomery that were on the call.
3     Q   And do you recall who from the AG's
4 staff was on that call?
5     A   No.
6     Q   Do you recall the names of the lawyers?
7     A   Not really.
8     Q   Was one of them Dorman? I'm forgetting
9 Dorman's last name.
10    MR. DAVIS: Walker.
11    Q   Was one of them Dorman Walker?
12    A   I think Dorman may have been on the
13 call.
14    Q   You're familiar with Dorman Walker?
15    A   Oh, I've known Dorman a long time. His
16 wife used to practice law with me.
17    Q   Okay. And about when was that that you
18 received that call?
19    A   This year, but I can't remember when.
20    Q   Can you tell me what was discussed on
21 the call?
22    A   That the case was pending, that there

Page 11

1 may be a need for me to give testimony and so sort
2 of in general what my understanding of the case
3 was, what my understanding of the proposed new
4 districts would be, and what my attitude and
5 concerns would be about that.
6     Q   Okay. And what did you say in response
7 to those -- to those inquiries?
8     A   Well, somebody showed me at that time
9 the actual proposed districts, and I told them I
10 had great concerns about it.
11    Q   Okay. And we'll get into that in a
12 minute. Did they show you anything else other
13 than the proposed maps?
14    A   I may have seen a copy of the complaint,
15 but if I did, I didn't read it very carefully.
16    Q   Okay. I guess that's probably one of
17 the benefits of being a member of Congress and not
18 a practicing lawyer anymore.
19    A   That is one of the benefits, and I
20 greatly appreciate that benefit.
21    Q   I don't blame you at all.
22    And do you recall anything else about

Page 12

1 that conversation?
2     A   I really don't.
3     Q   Have you had any other conversations
4 about the case since then?
5     A   Yes, just one to get us set up for this
6 deposition today.
7     Q   Okay. Who did you talk to to get this
8 set up for the depo?
9     A   I think, once again, there was somebody
10 from the Attorney General's office. Mr. Walker
11 may have been on that one, too.
12    Q   All right. Did you do anything to
13 prepare for the deposition today?
14    A   Just to make sure I remembered some
15 things about the district and some of the things
16 that we had done in the district, particularly my
17 town halls. I've done a lot of town halls. I
18 wanted to go back and make sure that I was certain
19 about what we had done.
20    Q   Did you look at any documents to
21 prepare?
22    A   Not any documents per se, no, just where

Page 13

Pages 10 to 13

1 did we have town halls, how often, et cetera.
2     Q  All right.  To refresh your recollection
3 about that, did you talk to staff or --
4     A  Yes, my staff would give me this
5 information.
6     Q  Got you.
7        And any other conversations or meetings
8 to prepare for today's deposition?
9     A  No.
10    Q  Let me -- I'm not going into detail just
11 yet, but let me -- just so I know what you -- what
12 you looked at in preparing for today's deposition,
13 let me hand you -- I'm going to have marked a few
14 exhibits and then we'll -- I'll ask you whether
15 these are the documents that you looked at.
16        MR. SPIVA:  Give us just a second.
17 We're just going to gather them up here.
18        Let me give these out one at a time so
19 we don't get confused.  If we could -- if we could
20 have this one marked as Exhibit 1, please.
21        (Exhibit 1 was marked for identification
22 and attached to the deposition transcript.)

Page 14

1 BY MR. SPIVA:
2     Q  And, Congressman Byrne, if you could
3 just take a look at that.  Like I said, we'll get
4 into detail in a little bit, but is that one of
5 the proposed maps that you looked at?
6        And just for the record, this one is
7 labeled "Revised Plan 1, Alabama -- U.S. House."
8     A  I saw several.  They were -- some of
9 them were pretty similar so I can't tell you for
10 sure that this is one that I saw, but it looks
11 like it might have been.
12    Q  Okay.  Do you know -- did anybody tell
13 you that the plans -- that the maps that you saw,
14 or the proposed maps that you saw, came from an
15 expert report of the plaintiffs?
16    A  They may have, but I don't remember
17 that.
18    Q  Okay.  All right.  I'll tell you what,
19 let me -- just as a matter of housekeeping, I'm
20 going to give you all four of these and then we'll
21 -- we'll come back to them in a minute.
22        MR. SPIVA:  So if we could mark this as

Page 15

1 Exhibit 2, please.
2        (Exhibit 2 was marked for identification
3 and attached to the deposition transcript.)
4 BY MR. SPIVA:
5     Q  Congressman Byrne, Exhibit 2 is a
6 document that's labeled at the bottom "Alabama --
7 U.S. House, Revised Plan 2."  Does this appear to
8 be one of the maps that you reviewed?
9     A  The same answer on this one.  They're --
10 they're all sort of different, but they're also
11 sort of the same, so it looks like it's one I may
12 have looked at.
13    Q  Pretty similar to the ones you looked --
14 you probably looked at?
15    A  Right.
16        MR. SPIVA:  Okay.  And I'll give you
17 what will be marked as Exhibit 3.
18        (Exhibit 3 was marked for identification
19 and attached to the deposition transcript.)
20 BY MR. SPIVA:
21    Q  Congressman Byrne, this is -- this
22 Exhibit 3 is labeled "Alabama -- U.S. House,

Page 16

1 Revised Plan 3."  And really the same question,
2 does this appear to be one of the ones you may
3 have looked at?
4     A  The same answer.
5     Q  Okay, got you.
6        MR. SPIVA:  Just so we have them all out
7 on the table, if this could be marked as Exhibit
8 4.
9        (Exhibit 4 was marked for identification
10 and attached to the deposition transcript.)
11 BY MR. SPIVA:
12    Q  Congressman Byrne, this one is labeled
13 "Alabama -- U.S. House, Illustrative Plan 4."
14 Does that -- does that appear to be one that you
15 reviewed in preparation?
16    A  The same answer.
17    Q  We'll come back to those in a minute.
18 Let me just ask you a few questions just kind of
19 about your background and the current -- and the
20 current map.
21        You're currently the congressional
22 representative for Alabama's First Congressional

Page 17

Pages 14 to 17

1  District?
2    A   I am.
3    Q   Okay.  And can you describe your
4  district geographically?
5    A   Uh-hmm.  It's all of Mobile and Baldwin
6  Counties, all of Escambia County, all of
7  Washington County, and all of Monroe County and a
8  part of Clarke County.
9    Q   And can you describe your constituents?
10    A   Well, I have over 700,000 people that
11  live in my district.  Some people live in urban
12  areas.  Some people live in suburban areas.  Some
13  people live in rural areas.  Some people are
14  working in one type of work.  Some people are
15  working in different types of work.  So it's a
16  fairly diverse district.  I like that, by the way.
17  And we try to make sure we stay in touch with
18  everybody in our district, wherever they live.
19    Q   What are the racial demographics of your
20  district?
21    A   Well, I don't know precisely.
22    Q   Sure.  I'm not asking for precise

Page  18

1  numbers, but -- sorry to interrupt, but if you
2  could give kind of a general description, that
3  would be helpful.
4    A   Well, the majority would be white.
5  There would be a substantial African-American
6  population and much smaller numbers of Hispanic
7  Americans.  And we do have Asian-Americans
8  particularly in the southern part of Mobile
9  County.
10    Q   And you gave a little bit of that in the
11  last part of your answer, but can you describe how
12  the various racial groups, you know, how they're
13  kind of spread over the district in terms of
14  geographically?  Are they segregated?  Are they --
15  is it pretty spread evenly over the district?
16    A   Well, the district's got so many
17  counties in it that you have white and
18  African-American people in every county.  The
19  Asian-American population tends to said, be, not
20  exclusively, but the vast majority of them are in
21  Mobile County.  And you do have a fairly sizable
22  Hispanic population in the southern part of

Page  19

1  Baldwin County.  That's not to say there aren't
2  Asian-Americans --
3    Q   Sure.
4    A   -- and Hispanic-Americans in other
5  places, but that's where you tend to find them.
6    Q   Okay.  How about African-American
7  residents and white residents of the district, are
8  there -- can you describe kind of patterns of
9  residential -- residential patterns among those
10  two groups?
11    A   Well, if you get into the four rural
12  counties, Monroe, Clarke, Escambia, and
13  Washington, I don't -- I don't know that there is
14  any sort of pattern.  If there is, I haven't been
15  aware of it.  In Baldwin County, there's a smaller
16  African-American population, smaller percentage,
17  but it's not like they're just in one part of the
18  county.  You'll find pockets, I guess, of
19  African-Americans in different parts of Baldwin
20  County.
21        In Mobile County, it used to be that
22  African-Americans were only -- the majority were

Page  20

1  found in the eastern part of the City of Mobile,
2  Prichard, southern part of the City of Mobile, et
3  cetera, but there has been in the last, at least
4  several years, since I've been in Congress, a
5  growing number of African-Americans that are
6  moving out and they're locating in other areas.
7  So they're actually dispersing more, from my
8  experience.  Some of that comes from the fact that
9  when I campaign, I go door to door, so I'm
10  literally seeing people when they come to the
11  door.  And some of it is when I go out and do my
12  town halls, I'm seeing people in different parts
13  of my district.  I know when people come to the
14  district, well, they come from this community.  So
15  that's been a change in the last several maybe
16  more years.
17    Q   In the City of Mobile, are there racial
18  patterns in terms of where people live?
19    A   Well, as I said, you find a
20  disproportionately high number of
21  African-Americans in what I call the eastern part
22  of Mobile, east of where I-65 bisects the city.

Page  21

1  And also in the southern part of Mobile, we call
2  that area Down the Bay, Maysville, et cetera.
3      But, in my experience, in the last
4  several years, I'm seeing more African-Americans
5  moving west of I-65, and there's a more integrated
6  population out west than there used to be, and
7  that seems to be something that is evolving and
8  getting stronger.
9      Q.  Okay.  How long have you seen that
10  pattern that you just described occurring?
11      A.  You know, I didn't notice it until I ran
12  for Congress in 2013.  I think it was occurring
13  before I noticed it, but I certainly noticed it
14  when I ran for Congress the first time in 2013
15  because I went to so many different neighbors
16  knocking on doors.  So you begin to see, you know,
17  there are a lot of African-Americans that are
18  living in Sims, for example, and so you see that
19  pattern begin to emerge.  Since I was elected in
20  2013, I'm seeing it occur more and more
21  frequently.
22      Q.  Got you.

Page 22

1      Did you grow up in Alabama, Congressman?
2      A.  I did.
3      Q.  Where did you grow up in Alabama?
4      A.  I grew up in Mobile.
5      Q.  Did you grow up in the City of Mobile?
6      A.  I did.
7      Q.  And you previously served as a State
8  Senator from Alabama's 32nd State Senate District;
9  is that right?
10      A.  I did.
11      Q.  And what time period did you serve as
12  State Senator?
13      A.  I was elected in 2002.  You assume the
14  office the moment of your election, so November of
15  2002 until I resigned to become Chancellor of
16  Postsecondary Education in May of 2007, I believe.
17      Q.  Okay.  Were you ever involved in any
18  redistricting in any capacity in that role?
19      A.  Other than being a witness that I told
20  you about previously, but I wasn't on the
21  reapportionment committee, no.
22      Q.  I assume from the time period, too, it

Page 23

1  was probably either after the last redistricting
2  or before the next one.
3      A.  Yes, I don't remember when I was in the
4  legislature that I as a legislator ever actually
5  dealt with any reapportioning.
6      Q.  Okay.  And you also previously served as
7  a member, as we briefly discussed earlier, as a
8  member of Alabama's Board of Education.
9      A.  Right.
10      Q.  And let me actually give you another
11  exhibit.  Actually before I do that, what -- about
12  what time period were you on the Board of
13  Education?
14      A.  I was elected in 1994 in November.  My
15  predecessor was appointed to be the DA of Mobile
16  County, and the Governor appointed me to serve out
17  the remainder of his term.  So I actually assumed
18  my office in December of 1994 and left that office
19  when I was elected to the State Senate in November
20  of 2002, so eight years.
21      Q.  All right.  I'm going to give you
22  another exhibit, which will be, I think, Exhibit

Page 24

1  5.
2      A.  I'll move these up here.
3      Q.  Sure, yes.
4      (Exhibit 5 was marked for identification
5  and attached to the deposition transcript.)
6  BY MR. SPIVA:
7      Q.  Congressman Byrne, this one is labeled
8  at the top "2011 State Board of Education
9  Districts."  I realize that was well after the
10  time that you served on the BOE, but does -- does
11  this map appear to be pretty similar to the way
12  the districts were drawn when you were on the
13  board?
14      A.  It is not.
15      Q.  It's not, okay.
16      What are the major differences that you
17  see?
18      A.  Well, I can't speak to the other
19  districts, but my district, which is District 1,
20  was all of Mobile County, all of Baldwin County,
21  and all of Escambia County.  No part of Mobile
22  County was a part of District, I guess that's --

Page 25

Pages 22 to 25

7/24/2019                Chestnut, et al., v. John H. Merrill          Congressman Bradley Byrne

1    Q   Five?
2    A   Five?  And I did not represent
3    Covington, Butler, Conecuh, or Crenshaw.
4    Q   Okay.  And when you were on the Board,
5    was there ever a court ordered change to the Board
6    of Education districts?
7    A   No, I don't think so.
8    Q   Okay.  You don't recall like in 1996
9    there wasn't any kind of a change to the
10   districts?
11   A   Not that I can recall.  It certainly
12   didn't affect my district.
13   Q   Okay.  So during the time that you were
14   on there, as you recall, you didn't -- you
15   represented, as you said, Mobile, the whole county
16   of Mobile?
17   A   Yes.  My district from the moment I was
18   on the Board to the moment I left was all of
19   Mobile County, all of Baldwin County, all of
20   Escambia County.
21   Q   What district did you represent?  I
22   realize this is not the same configuration --

                                        Page 26

1    Q   '98.  Or I guess I should say election
2    because you had been appointed.  Did you serve
3    through '98?
4    A   I was actually elected in '94.  My
5    predecessor, John Tyson, was appointed by Governor
6    Folsom to be the DA in Mobile County.  So he had
7    two months left on his term, and so the Governor
8    appointed me to serve out those two months before
9    I assumed my full four-year term in January of
10   1995.
11   Q   I see, okay.
12       So when you first ran, you ran as a
13   Democrat.
14   A   I did.
15   Q   Okay.  And you later -- you're currently
16   a member of the Republican party.
17   A   Right.
18   Q   And you at some point changed from the
19   Democratic party to the Republican party.
20   A   In January of 1997.
21   Q   Okay.  Why did you switch parties?
22   A   Because the Democratic party no longer

                                        Page 28

1    A   It was called District 1.
2    Q   And it included, I think you said,
3    Mobile; did it also include Baldwin?
4    A   All of Mobile, all of Baldwin, all of
5    Escambia.
6    Q   Any other counties?
7    A   No.
8    Q   Were you aware that at some point after
9    you were on the Board that the map for the Board
10   of Education districts had changed?
11   A   I was.
12   Q   Okay.  And what was your understanding
13   of what brought about that change?
14   A   Well, I don't know what brought about
15   that change.
16   Q   What -- strike that.
17       When you first got on the Board, you
18   were a Democrat at that point.
19   A   I was.
20   Q   When you ran for reelection, what year
21   was that?
22   A   1998.

                                        Page 27

1    represented the principles that I stood for
2    politically.  And I was regularly told by
3    Democratic leaders that I was not a Democrat, that
4    I was really a Republican.  I was regularly told
5    by Republican leaders that I was not a Democrat, I
6    was really a Republican.  And I sat down with
7    myself one day and said, you know what, you're not
8    really a Democrat, you're really a Republican.
9    And I think I was being honest with myself and my
10   constituents.  I think it was the right thing to
11   do.
12   Q   I know these things can be complicated,
13   but is there a way to describe in general terms
14   what principles you felt made you fit more with
15   the Republican party than with the Democratic
16   party?
17   A   There were a bunch.  And some of them
18   really came to focus for me being on the State
19   School Board.  I was very much an education
20   reformer.  I believed that our education system
21   should be there to serve the children, their
22   parents, not other things.  And I found that the

                                        Page 29

                                        Pages 26 to 29

1  Democratic party stood for taking care of adults
2  first. And I found that to be totally contrary to
3  my view of things. I was not familiar before I
4  became on the State School Board with a two-year
5  college system. At that time we go to a two-year
6  college system, and I was not in agreement with
7  the way that the Democratic party approached the
8  two-year college system. I had great
9  disagreements with them about that. I also
10 disagreed with the Democratic party on basic
11 issues like abortion, gaming, Second Amendment
12 rights. And I was already at odds with the
13 National Democratic Party. What really startled
14 me was how much at odds I was with the State
15 Democratic Party. And that made it very clear to
16 me that I should change parties because, once
17 again, I was being honest with myself and with the
18 people I represent about where I stand on issues.
19     Q   And on abortion, what -- how did you
20 differ from the Democratic party on the issue?
21     A   I'm ardently pro life.
22     Q   And on the Second Amendment, how did you

Page 30

1  of the Alabama Department of Postsecondary
2  Education?
3      A   Uh-hmm.
4      Q   When was that?
5      A   That was May of 2007.
6      Q   Okay. So that was after your time as a
7  State Senator?
8      A   I was a State Senator and then Governor
9  Bob Riley called me and wanted me to leave the
10 State Senate, leave my private practice of law and
11 take on the role of Chancellor with a two-year
12 college system, a full-time job. When he
13 initially asked me to do it, I turned him down.
14 But he came back to me, and some other people came
15 back to me and persuaded me to do it, and I did
16 it.
17     Q   And what were your -- what was the time
18 period that you did that role?
19     A   I was the Chancellor from May of 2007
20 until I think May or June of 2009.
21     Q   And what did you do after you were the
22 Chancellor of the Alabama Department of

Page 32

1  differ from the Democratic party?
2      A   I'm ardently pro Second Amendment.
3      Q   Okay. Are you antigun control?
4      A   Yes, I'm antigun control. I think we
5  have a right to bear arms under the Second
6  Amendment.
7      Q   And there was another issue other than
8  education that you mentioned.
9      A   Gaming.
10     Q   Gaming. What was -- what was your
11 difference with the Democratic party on gaming?
12     A   Well, again, the Democratic party was
13 very pro gaming and I was not. You remember in
14 1999, Governor Siegelman pushed a so-called
15 education lottery. And he expected the State
16 School Board to be supportive of his education
17 lottery. And I remember calling him on the phone
18 and telling him, because I wanted him to hear it
19 from me, that I was not supportive of his lottery.
20 I did not think his lottery was good for the
21 education system in the State of Alabama.
22     Q   You became at some point the Chancellor

Page 31

1  Postsecondary Education?
2      A   I ran for Governor and lost.
3      Q   Sounds like that was probably the only
4  election you ever lost, though.
5      A   It's the only election I ever lost, but
6  I'll never forget it.
7      Q   Yeah. I've heard from people that
8  that's the case, right, that's the -- you never
9  forget that one.
10     A   That's true.
11     Q   Yes.
12         So -- and what were your
13 responsibilities generally as the Chancellor?
14     A   The Chancellor is the Chief Executive
15 Officer of Alabama's two-year college system. At
16 that time, the governing board was the State Board
17 of Education so I was formally appointed by the
18 State Board of Education. That's who I answered
19 to. They were like my Board of Directors. Since
20 then they've created a separate board to govern
21 that system. That's the way it was then.
22         So I was responsible for making sure

Page 33

Pages 30 to 33

1  that we carried out the laws, that we carried out
2  the directives and policies of the State Board of
3  Education, and that the system was delivering on
4  our mission.  At the time I took over, the
5  two-year college system was in a true crisis.
6  There were two Grand Jury investigations going on.
7  The Birmingham News had just won the Pulitzer
8  Prize reporting on corruption in the system.
9      Q   It's never -- when you get the Pulitzer
10  Prize for a system that is corrupt, right --
11     A   Yes.  I mean, when the biggest newspaper
12  in your state gets the Pulitzer Prize, reporting
13  about the corruption of the system you've just
14  been appointed to take over -- and we were
15  attracting a lot of new jobs to Alabama.  The
16  two-year college system is a critical, if not the
17  critical component to providing the workforce
18  education the people need to be able to be
19  prepared for those jobs.  And so the Governor
20  said, look, I need for you to first and foremost
21  clean up the corruption in the system.  And the
22  corruption was endemic in the system.  Secondly,

Page 34

1  you've got to turn this system to be a much more
2  effective provider of this education as we
3  continue to develop Alabama economically.  And
4  then later on, after I became Chancellor, because
5  of the recession, I had to do all of that while we
6  were cutting tens of millions of dollars out of
7  the system, but it was a daunting task.  But I
8  understood how important it was to the state and,
9  despite the fact I did not want to do it -- and
10  Governor Riley can tell you how much I did not
11  want to do it -- I did it.  I'm glad I did, and
12  I'm proud of the work that we did.
13     Q   That's great.
14         And you also practiced law, I know, over
15  a long period of time.  What kind of law did you
16  practice?
17     A   I tell everybody I started out my career
18  as a commercial litigator who did labor and
19  employment law on the side and at the end of my
20  career I was a labor and employment lawyer who did
21  commercial litigation on the side.  Both sides of
22  law, obviously, and doing a lot of litigation.

Page 35

1      Q   And where did you practice when you were
2  practicing law?
3      A   I started out -- well, all of my
4  practice was in Mobile -- geographically I was
5  headquartered in Mobile.  Obviously I had cases
6  all over the State of Alabama, some in the
7  panhandle of Florida, a couple in the Gulf Coast
8  of Mississippi.
9      Q   Okay.  Let me ask you, I know you've --
10  it sounds like you've only had brief conversations
11  kind of about this case, but you understand, I
12  take it, Congressman, that you've been listed as a
13  potential witness for the Secretary.
14     A   Yes, I have.
15     Q   And what topics do you expect to testify
16  about at trial?
17     A   About the proposals that would
18  significantly change District 1.
19     Q   Okay.  Anything else?
20     A   No, sir.
21     Q   And what do you expect to testify about
22  concerning that topic?

Page 36

1      A   I would be testifying, I assume, about
2  the significant concerns I have about the
3  proposals in each of Exhibits 1, 2, 3, and 4, for
4  the redrawing of District 1.
5      Q   We'll dive into that in just a minute.
6          And let me just ask you before we do
7  that, did you participate in any capacity in
8  Alabama's redistricting process in the 2011
9  redistricting cycle?
10     A   No, I was not in the legislature.
11     Q   Okay.  Did you provide any input, have
12  any conversations, anything like that?
13     A   Not about congressional districts.  I
14  think after the fact I had a discussion with Randy
15  Davis who was the House Member somewhat -- in some
16  way involved in doing this about the School Board
17  District (indicating).
18     Q   And you're pointing to what I believe
19  was marked as Exhibit 5?
20     A   Exhibit 5, yes.  He and I had a
21  discussion about that.  It may have been after the
22  fact.  I'm not certain.

Page 37

Pages 34 to 37

1  Q   After it had changed to this current
2  configuration?
3  A   It was either as it was being proposed
4  in this configuration or after it had been
5  adopted.
6  Q   Okay.  And can you tell me, Congressman
7  Byrne, about that conversation with Mr. Davis?
8  A   Yes, I was concerned about taking away
9  any part of Mobile County and putting it into
10 another district.  He and I had a discussion about
11 why they decided to do that.
12 Q   And why were you concerned?
13 A   Because I think it's important to keep
14 counties whole.  I think it's problematic for a
15 State School Board member from Montgomery to be
16 able to understand the problems with the school
17 system in Mobile County.
18 Q   Okay.  And what was your understanding,
19 if any, of why the current configuration was being
20 proposed?
21 A   Well, because the population changes
22 within District 5, they needed to grow it, and so

1  they were looking for ways to grow it.  And they
2  decided to put part of it, as you can see from
3  Exhibit 5, in the northeastern quadrant of Mobile
4  County.  And so I was expressing concerns about
5  having two school board members dealing with the
6  Mobile County School System.  That was my primary
7  concern.
8  Q   Did you have any understanding of
9  whether -- of what the change to the current
10 configuration of the Board of Education districts
11 did in terms of majority-minority districts,
12 either in District 5 or District 4?
13 A   We didn't get into that while I was more
14 concerned about the problem of a person from
15 Montgomery trying to understand all of the issues
16 regarding the Mobile County School System.
17 Q   Did you -- did you have an understanding
18 that District 5 is now in the State Board of
19 Education district -- State Board of Education
20 map, that that is not a majority-minority
21 district?
22 A   Well, it was when I was on board.  It

1  just wasn't configured this way.  But it was a
2  majority-minority district then.
3  Q   Okay.  And was that true the whole time
4  that you were on the school board?
5  A   Yes, there were -- there were two
6  different members.  I have forgotten the man that
7  was the member on it when I first was elected.
8  But he was retired and was replaced by Ms. Ella
9  Bell.  So I worked with both of them and actually
10 spent a little bit of time in various places in
11 that district with them because they were
12 different school board members.  And particularly
13 because I had a contiguous district to work with
14 them, there were times when there were people in
15 some of the counties just to the north of my State
16 School Board district would call me for help on
17 things, and I would tell them, I'm not your school
18 board member, but I'm happy to help.
19 Q   Right.
20 A   And I would always inform the member
21 from that district, hey, I've had this request
22 from people in your district.  I don't want to do

1  anything in your district unless you're okay with
2  it.  In every case they would say, no, fine, I
3  appreciate you doing it.  Sometimes that was true
4  because of the geographic proximity.  It's a lot
5  easier for somebody from Mobile to deal with
6  Washington, Clarke, and Monroe, for example, than
7  it is for somebody from Montgomery.  So I could
8  physically be present where it was very difficult
9  for somebody from Montgomery to physically be
10 present.
11 Q   I take it from kind of the beginning of
12 your answer, it sounds like there were two
13 majority-minority districts in the plan while --
14 during the time that you were on the school board?
15 A   Yes, there was this district, District
16 5, and I can't remember the number of the
17 district, but it was Dr. Hall -- Dr. Hall's
18 district.  That was mainly Birmingham.  I know it
19 was more than that.  Dr. Hall was the vice chair
20 of the Board when I was on the Board.  Vice chair
21 is elected by the Board.  The governor's formally
22 the chair of the Board, but the vice chair really

7/24/2019          Chestnut, et al., v. John H. Merrill          Congressman Bradley Byrne

**Page 42**

1  functions as the chair of the Board.  So Dr. Hall
2  was our vice chair chair the whole time I was on
3  the Board, and I certainly had a lot of
4  interaction with Dr. Hall and sometimes in her
5  district.
6      Q   Okay.  Just looking at Exhibit 5, do you
7  recall if Dr. Hall represented what's labeled as
8  District 4 which kind of goes up into Jefferson
9  County and Birmingham?
10     A   Yes, I think she did, but I don't know
11  that it was configured this way.  I can't tell you
12  for sure.
13     Q   Sure.
14     A   Mainly when I was interacting with
15  Dr. Hall in her district, I was in the Birmingham
16  area.
17     Q   What kinds of interactions did you have
18  with Dr. Hall concerning her district?
19     A   We would have State School Board
20  meetings in her district.  She would have other
21  meetings in her district pertaining to education,
22  and she would invite some or all of us to come to

**Page 43**

1  these meetings.
2      Q   Sure.
3      A   I tried to accommodate Dr. Hall every
4  chance I could.  I had tremendous respect for her.
5  She was our leader.  And if she asked me to do
6  something, if I could do it, and I was a
7  practicing attorney so I -- lawyer duties, but if
8  I could do it, I tried to make my schedule
9  available for her.
10     Q   How about in District 5, it sounds like
11  you had some interactions with the representative
12  from -- school board member, I should say, from
13  District 5 as well?
14     A   Oh, yes, yes.  We had not just those
15  three counties, just above District 1, which would
16  be Washington, Clarke, and Monroe, but we had
17  meetings in Selma, Tuskegee.  Lots of things
18  around Montgomery.  Of course, when we met
19  formally, usually we were meeting in Montgomery,
20  but we had other things around Montgomery like the
21  Trenholm State Technical College there in
22  Montgomery.  So I had a fair amount of meetings in

**Page 44**

1  District 5.
2      Q   Okay.  And who represented District 5
3  when you were on the Board?
4      A   I think the gentleman's name when I was
5  first elected was Dr. Willie Paul, and then he
6  retired and he was replaced by Ella Bell, who I
7  think is still on.
8      Q   Okay.  Did you work with either Dr. Paul
9  or Ms. Bell?
10     A   A lot.
11     Q   What kinds of things did you work with
12  them on?
13     A   Just about everything you can imagine
14  that was within the jurisdiction of the State
15  School Board.  So it could be K-12 matters.  It
16  could be postsecondary matters.  There was a lot
17  of that.  A lot of the good things about the Board
18  when I was on it was we all interacted with one
19  another about one another's districts a lot, and I
20  really appreciated, when I was first on the Board
21  and not as familiar with that district, Dr. Paul
22  was really good about explaining things to us,

**Page 45**

1  taking us there.  I remember we had a State School
2  Board meeting in Tuskegee and we got there the day
3  before, spent the night.  We got to tour, learned
4  all about Tuskegee.  So I think Dr. Paul did a
5  really good job of making sure we knew about his
6  district, in each of his district, and I really
7  enjoyed doing that.
8      Q   So let me shift gears again here and
9  just ask you if you're familiar with the term
10  "communities of interest" as it applies to
11  redistricting.
12     A   I couldn't define it for you.
13     Q   Okay.  Not a formal definition, but do
14  you have a sense of kind of what that means or --
15     A   No, you would have to tell me.
16     Q   Okay.  In your view, are there
17  communities of interest in your district?
18     A   Of course.
19     Q   Your congressional district?
20     A   Yes.
21     Q   Is there a way you can describe those?
22     A   Yes.

**Pages 42 to 45**

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2019    202-232-0646

1  Q   I can -- I can give you a current -- I
2  know you know it very well, but if it's easier to
3  talk about, looking at the current map, I can --
4  why don't we mark one just so we all have it in
5  front of us while you're -- while you're
6  discussing.  So this will be Exhibit 6.
7  (Exhibit 6 was marked for identification
8  and attached to the deposition transcript.)
9  BY MR. SPIVA:
10  Q   If you want to do it in connection with
11  Exhibit 6, which is the current map of the U.S.
12  House Districts in Alabama, or if you want to just
13  do it, you know, without referencing it, however
14  is, you know, easiest for you, but if you could
15  kind of describe the communities of interest in
16  your district.
17  A   Sure.  And I'll start with Exhibit 6
18  because it is helpful.  If you look at this map of
19  those counties, everything feeds into Mobile
20  Baldwin, okay?  First of all, you have two major
21  river systems that come together, and those two
22  river systems help define both the economy and the

1  culture and the communities of that area, going
2  back hundreds of years.  Many of the jobs for the
3  district are there in Mobile and Baldwin Counties,
4  and so you have people from Washington, Clarke,
5  Monroe, and Escambia, who travel into those
6  counties for their work and then go home at the
7  end of the day.  So just sort of center of
8  everything is here in Mobile and Baldwin Counties
9  just because of what they do economically.  A lot
10  of what the people in that area also get in terms
11  of information comes from the three television
12  stations there because people all get those
13  television stations, and they obviously get their
14  news from that.  It used to be we had a common big
15  urban newspaper, the Mobile Register, we still do,
16  but it only prints three days a week so it's not
17  quite as strong as it used to be.
18  Q   It's kind of a common thing around the
19  country, the local papers going online or just
20  going out of business.
21  A   Well, in Alabama, the three biggest
22  newspapers have gone to I think three days a week.

1  They have this online presence called AL.com.  So
2  -- but it used to be that even people in Monroe
3  would get the Mobile Press-Register.  That's where
4  they got a lot of their news.  But certainly today
5  they get a lot of their news from those three
6  local television stations.
7  Also because of the fact that you've got
8  an urban area there in Mobile, a lot of people are
9  pulled into that for cultural activities, civic
10  activities, entertainment and things.  So Mobile
11  and now -- now that Baldwin County has grown so
12  much, they're kind of a magnet for those four
13  counties north of there and pull people in, both
14  for work and for the other things I mentioned.
15  Q   Okay.  Now, I notice that Clarke County
16  is only partially in your -- in your district.  Is
17  there -- to your knowledge, is there a reason why
18  that piece of Clarke County is included in
19  District 1 but not the rest of Clarke County?
20  A   Well, I wasn't a congressman when this
21  --
22  Q   Sure.

1  A   -- map was done so I'm not sure what
2  their motives were, but if you followed U.S. 43
3  north out of Washington County, it would go
4  basically through the middle of what you see there
5  as part of District 1.  So that includes two key
6  communities, Jackson and Grove Hill.  That's not
7  all of the city limits of Jackson or all the city
8  limits of Grove Hill, but a big part of each of
9  those run right where U.S. 3 goes through there.
10  And so the people in Grove Hill and Jackson will
11  drive down to U.S. 43 to get to Mobile both for
12  work and those other things that I mentioned.
13  Q   Right.  Okay.  Any other things that you
14  would describe as communities of interest in your
15  district?
16  A   Well, everything keys off of what I said
17  before.  Obviously jobs, economics pull people in.
18  You've got that river system.  A lot of us like to
19  hunt and fish and so the Mobile-Tensaw River Delta
20  is a very rich place in terms of habitat.  We're
21  all interested in that.  This is the oldest part
22  of the state of Alabama, founded by the French in

**Page 50**

1701, but you had other people that came in there
to form that area. So you have this sort of
historical tradition there. Mobile was a French
city where Mardi Gras started in the United
States. So Mobile -- used to be Mobile had Mardi
Gras parades, nobody else did. Now these other
places all have Mardi Gras parades. And so Mardi
Gras has become something that pulls people
together. We have a major university, University
of South Alabama. It not only pulls people in
from those areas, it does things out into these
counties. So everything comes back to that for
those four counties outside of Mobile and Baldwin
County, everything comes back to that.

Now, the fastest growing county in the
State of Alabama, and, therefore, in my district,
is Baldwin County on the eastern side of Mobile
Bay. And so you used to just talk about Mobile,
but my answer previously included Baldwin County
because increasingly you've got Baldwin County
pulling people in, whether it's to the eastern
shore of Baldwin County or down there on the

**Page 51**

beaches, Orange Beach and Gulf Shores, which are
tremendous hubs for tourism activity -- people
play and have fun. Also as part of our sort of
shared culture down there is we love seafood. And
the seafood industry is very important to that
district. Lots of restaurants, not just in Mobile
and Baldwin Counties, but even these other places,
lots of restaurants specialize in seafood. So
that's another part of it. Gosh. While the
economy is diverse in that area, there are certain
things about the economy of that area that are
unique. For example, you've got a port. No other
part of Alabama has a port on the ocean or the
Gulf of Mexico. As I said, seafood is a big part
of it. And recreational fishing is a big part.
So you have -- if you just think about that part
of Alabama, and every part of Alabama is unique
and has its own good attributes, but those --
those are unique attributes, good attributes for
that part that pull people together.
     Q  Okay. Do you believe that communities
of interest under the current Alabama map -- but

**Page 52**

here I'm not just focusing on your district but
the whole state -- do you think they're generally
kept together under the current map?
     A  Well, I haven't thought about it for
other districts, and I can't claim that I have the
same level of knowledge about the other districts.
     Q  Sure.
     A  But knowing what I know about them, I
think there are common interests in each of these
districts. You can look at the map and tell that
there are some districts that are geographically
larger than others. And the larger they are, the
more geographic area you cover, the less you have
communities of interest. So that might be the
case. But when you look at like the District 5,
which I call it the Tennessee Valley. My daughter
actually lives up there so I'm familiar with it
through her, but I've also spent a lot of time
working up there. That is clearly a community of
interest because of the fact that they share the
Tennessee River. The Tennessee Valley Authority
provides their power. They have their own unique

**Page 53**

history up there. Huntsville, which is right near
Madison County, is where they made the rocket for
Apollo 11. So there's a lot of pride around that
for obvious reasons. It's a more mountainous
area. Where I live, it's more of a flat, coastal
plain going down to the beaches area. So those
two areas are pretty distinct. You can tell that.
     District 2 is mainly -- we know it
mainly as the wiregrass, plus Montgomery and some
suburban counties. Wiregrass is a pretty
well-defined region that has its own separate
economy, special features, culture. Their
agriculture is somewhat different from the
agriculture that I have in my district. So
they're more common that way.
     District 7 is largely what we would know
as the Black Belt in Alabama, not because of
people's race but because of the soil.
     Q  Right. Yes.
     A  And so those counties have a lot in
common with one another. And it's contiguous to
my county, and obviously I have a part of Clarke

**Pages 50 to 53**

7/24/2019          Chestnut, et al., v. John H. Merrill          Congressman Bradley Byrne

**Page 54**

1    County that is considered to be a part of it. So
2    Representative Sewell, who represents District 7,
3    and I work together a lot because we have a lot of
4    things that we have in common.
5        Q    I went to law school with Representative
6    Sewell.
7        A    Well, she and I -- she was, by the way,
8    the bond lawyer -- one of the bond lawyers --
9    outside bond lawyers when I was Chancellor of the
10   Postsecondary system. This is before she was in
11   Congress.
12       Q    Right, yes, sure.
13       A    So before she and I were colleagues, she
14   was my lawyer.
15       Q    Oh, okay.
16       A    So she and I have a good working
17   relationship. I knew some from my time before
18   being in Congress about that district, Dr. Paul
19   obviously introduced me to a lot, but I think
20   Representative Sewell does a good job of that as
21   well. So I see her district as having a community
22   of interest.

**Page 56**

1    have a lot in common and that sort of grouping
2    makes sense to me.
3        Q    Okay. Does it make sense to, with
4    respect to kind of what you just said, District 6
5    and District 7, to separate the suburban areas of
6    Birmingham from the -- from the city itself?
7        A    Well, I would prefer -- this is not with
8    regard to that district -- with all districts -- I
9    prefer to keep counties whole. But -- and I don't
10   know why they chose to do it this way. It may be
11   that they thought putting Birmingham together with
12   the Black Belt districts made more of a community
13   of interest than the suburban counties for
14   Birmingham. I don't know. But I just -- just
15   knowing those counties, I think that they have a
16   lot in common.
17       Q    Okay. Do you think the City of Mobile
18   has anything in common with the Black Belt
19   counties?
20       A    Not as much. Mobile historically --
21       Q    I keep mispronouncing it. I tried to
22   get it right, but I keep -- I keep saying it

**Page 55**

1        East of Alabama, District 3, that's Mike
2    Roger's district. It's a little bit
3    geographically bigger, but we kind of tend to see
4    east Alabama as its own geographic region within
5    the state. It goes from Russell all the way up to
6    Cherokee, but you've got Opelika and Auburn where
7    Auburn University is, an extremely important asset
8    to the State of Alabama.
9        And then District 4, which is Robert
10   Aderholt's district, is over there just below the
11   Tennessee Valley. You have Cullman. You have
12   Jasper. These are -- they tend to be kind of the
13   same area. And that area right in the center,
14   District 6, that's Gary Palmer's district. That's
15   mainly the suburban areas to the City of
16   Birmingham. The part of District 6 that gets up
17   into Jefferson County is mainly -- mainly the City
18   of Birmingham. So all of this area of District 6
19   is the suburban areas to Birmingham.
20       So when I look at those, with not having
21   the same level of knowledge about each of those
22   districts as I do about my own, I do see that they

**Page 57**

1    wrong.
2        A    It's real simple. It's Mobile.
3        Q    Mobile, yes.
4        A    Mobile historically was the port through
5    which timber and agricultural products moved from
6    the interior of the state of Alabama and then out
7    to the world.
8        Q    Right.
9        A    And so back in those days, when that was
10   a very important part of the economy of the
11   interior of the state, then there probably was
12   more contact between Mobile and the Black Belt.
13   That's not nearly as important anymore. So I
14   don't see as much contact and have not in my life
15   have seen as much contact between those Black Belt
16   counties and the southwestern part of the state.
17   They just don't have that connection as much as
18   they used to. I wish we had more of a connection,
19   to be honest with you, but it's just the
20   practicalities of the economy that they have
21   there. Mobile is not as important to them because
22   they're not moving things through the port as much

1  as they used to.
2      Q   Right.  Okay.
3      Let me ask you, if you would, can we
4  flip back to the current Board of Education map,
5  which I think is Exhibit 5.
6      A   Five.
7      Q   Five, yes.  I apologize.  There are a
8  couple questions I think I neglected to ask you
9  when we were talking about that.  Do you -- do you
10  view the 2011 Board of Education plan as --
11  respecting communities of interest?  And in
12  particular, kind of focusing on your area of the
13  state and the area above it, so kind of what are
14  now labeled District 1 and District 5.  I mean, do
15  you -- do you view that as respecting communities
16  of interest, or not really?
17      A   Not really.
18      Q   How come?  I apologize, I know you
19  covered some of this before.
20      A   That's fine.
21      I don't think that Conecuh, Butler,
22  Crenshaw, and Covington look to Mobile very much,

1  whereas obviously the people in the northeast
2  quadrant of Mobile County that are in District 5,
3  they look to Mobile all the time.  So they've been
4  essentially for purposes of the State School Board
5  taken out and put into a district that looks more
6  to Montgomery.
7      Q   Okay.  When you say "looks to," I think
8  I kind of like intuitively understand what you
9  mean, but can you explain a little bit more what
10  you mean by "looks to"?
11      A   Where do you get your news from.  Where
12  is the big city that you go shopping.  Where are
13  the commonalities of the economy.  Where is the
14  commonality in your traditions.  You think of
15  Conecuh, Butler, Crenshaw, and Covington being
16  more a part of what we call the wiregrass.  And,
17  like I say, they look to Dothan and Montgomery.
18  They don't look to Mobile as much.
19      Q   Okay.  Has -- I think you -- you said or
20  named the current representative as Ms. Bell, I
21  believe?
22      A   Ella Bell.

1      Q   Ella Bell, yes.
2      Has she ever expressed to you any
3  concerns about the current configuration of the
4  district -- of her district?
5      A   I don't think I've talked to Ms. Bell
6  since the current configuration of this district
7  was made.
8      Q   Okay.  Have you -- have you heard from
9  anybody concerns about the current configuration,
10  especially with respect to District 5?
11      A   Well, I referenced earlier the
12  conversations I had with Mr. Davis, who was the
13  representative who was in charge of putting
14  together the State School Board districts.  I
15  certainly registered to him my concerns.  I don't
16  know that I remember hearing anybody else have the
17  same concerns or at least voice them.
18      Q   Okay.  So let's maybe now turn back to
19  what we've been calling the proposed plans or
20  revised plans.  Why don't -- why don't we start
21  with what was Exhibit 1, which is labeled "Revised
22  Plan 1, Alabama -- U.S. House, Revised Plan 1."

1      A   Uh-hmm.
2      Q   As soon as I can get it in front of me,
3  let me just ask you, what is your view of revised
4  plan 1, which is Exhibit 1?
5      A   I don't think it's good for the counties
6  that are presently in District 1 that would remain
7  in this district, which would be Mobile, Baldwin,
8  and Escambia.  And I don't think it's good for the
9  counties that are presently in District 2, which
10  are Covington, Coffee, Dale, Henry, Houston, and
11  Geneva.
12      Q   Why not?
13      A   Well, they are two different regions of
14  the state, and they don't have the commonality
15  that you see presently existing within present
16  Districts 1 and 2.  It's a long way from West
17  Mobile to the eastern part of Houston County.  So
18  a congressman has to cover that whole area if
19  they're doing their job right.  So it is -- if you
20  look at the present composition of District 1,
21  it's not easy, but it's not as hard to get around
22  that district and cover all those different

1  communities.  Whereas if you had to go all the way
2  from West Mobile County to Houston County, it
3  would be far more difficult to cover all of those
4  communities.  I mentioned earlier, I do a lot of
5  town halls.  I do them in every community you can
6  imagine, big, small, rural, doesn't matter.
7      Q   Yes.
8      A   It would be very difficult for me to be
9  able to cover what's here in District 1 and have
10  the same level of town halls and certainly get to
11  the variety of places I try to get to.  Plus
12  there's such a difference in the economies, et
13  cetera, and what you're an advocate for in
14  Congress, that you would still be an advocate for
15  the entire district, but it would dilute your
16  ability to be the advocate for the district.  A
17  Senator and a Governor represent the whole state,
18  and they have to look out for the whole state.  A
19  congressman looks out for their district.
20      Q   Right.
21      A   They're the ones totally focused on the
22  district.  So right now as a congressman from

Page  62

1      A   I think it would be to the detriment of
2  the people to the City of Mobile.  I've been very
3  involved in economic development efforts in that
4  area for a long time.  And splitting up our
5  congressional representation would hurt those
6  economic development efforts which have, frankly,
7  done an amazing -- we have gotten an amazing
8  result these last several years.  Airbus has a
9  plant there, for example.  That Airbus plant just
10  didn't show up there.  There was substantial
11  effort to make it happen.  We have a Navy shipyard
12  there in Mobile.  That Navy shipyard didn't just
13  show up there and still remain there.  There's
14  substantial effort for that to happen.  I'm
15  picking out some big examples.
16      Q   Sure.
17      A   I would -- I would think it would hurt
18  those efforts based upon my experience going
19  forward for there to be two congressmen
20  representing that area rather than one.
21      Q   Something you mentioned a minute ago or
22  kind of at the beginning of the answer you gave

Page  64

1  District 1, I can totally focus on what I
2  described to you earlier as the economy and the
3  other needs for the present composition of
4  District 1.  What you would be asking a
5  congressman to do under Exhibit 1 is to take that
6  same level of effort and spread it out over a much
7  broader array of interests.  I wouldn't say that a
8  congressman wouldn't try to do it, but I don't
9  think even somebody working as hard as they
10  possibly could, could do it as well or with the
11  same level of attention and focus that there needs
12  to be, plus you're splitting Mobile County up
13  between District 2 and District 1, and I do not
14  think it's in the district -- in the interest of
15  the people of Mobile County to be split up like
16  that.  I think they need to have a whole county
17  working with one congressman.  I think they need
18  to be conjoined with the whole county of Baldwin
19  County.
20      Q   Okay.  Do you think there would be any
21  benefits to the people of the City of Mobile to a
22  configuration such as this?

Page  63

1  about the map, you said that it would be
2  difficult, I think, to kind of represent --
3  effectively represent the whole area because --
4  was that in terms of the wiregrass counties in the
5  eastern part of the proposed District 1, is that
6  mainly because of the distance or because of other
7  factors?
8      A   Other factors as well.  Distance,
9  certainly, is a big part of it.  It's a larger
10  geographic area, therefore, more difficult to
11  cover.  But there's a big difference in the
12  Covington and Geneva, Coffee, Dale, Henry, Houston
13  economy, what they focus on, than there is in the
14  Escambia, Baldwin and Mobile, of the counties
15  presently in there.  One of the big things about
16  those eastern counties is you've got right in the
17  middle of that Fort Rucker.
18      Fort Rucker is a major focus for any
19  congressman representing that area.  It represents
20  an enormous number of jobs, not just at the Fort
21  but private sector businesses that do business
22  with the Fort.  You've got a lot of military

Page  65

Pages  62 to 65

1   retirees around in the -- in the communities
2   around the Fort.
3       Houston County and Dothan, they have two
4   or three different very important businesses going
5   on there, but one of their newest things, they've
6   got an osteopath college, a medical school,
7   osteopath school.  That's very different from a
8   medical school like you have at the University of
9   South Alabama in Mobile.  Not worse or better,
10  just different.
11      Q   Right.
12      A   You have a major university in Mobile
13  County.  They do not have a major university in
14  the eastern counties in District 1, but they look
15  just north to Pike where Troy University is.  Troy
16  University is a very different university from the
17  University of South Alabama.  Not better or worse.
18  Different.
19      Q   Right.
20      A   So the interest that you would be trying
21  to represent in these eastern counties are
22  fundamentally different from the interests over

Page 66

1   a given issue?  I understand that they're
2   different, they're kind of different issues, but
3   where you would say, well, gosh, I got to vote
4   for, you know, some water issue over here but I've
5   got -- I've got to vote contrary to that because,
6   you know, it's a more land-based area.  Can you
7   think of anything like that?
8       A   You know, I'll give you an example.  We
9   had a water bill that moved through Congress a
10  couple years ago, and because I represent these
11  seafood areas, some of the seafood interests came
12  to me and said we want to include in the bill the
13  authorization of a study about oyster production.
14  Okay?  Very important to that area.  The Georgia
15  members saw that language and thought that it was
16  there to try to protect the flow of water that
17  ultimately gets down to Appalachia Cola because
18  they have their own oysters.  And that's where the
19  Chattahoochee flows out of Georgia along the line
20  with Alabama, and then through Florida.
21      And so I was able to tell them, no, this
22  has to do with my district, which is over here.

Page 68

1   here in the western part, Mobile, Baldwin, and
2   Escambia.  Even though there's some commonality in
3   agriculture, the agriculture is different.
4   They've got more poultry and cattle over there
5   than we do on our side.  We have more row crops
6   than they do.  So even though the agriculture may
7   be similar, there's still some significant
8   differences.  So, for example, in Mobile and
9   Baldwin Counties where I focus on things like
10  fixing the red snapper season, which is a federal
11  thing, believe it or not, making sure that we have
12  the proper funding for the Navy shipyard in
13  Mobile.  I can really focus on things like that.
14  But if you throw into the mix Fort Rucker, Troy,
15  these other agricultural interests that are
16  different from mine, then, once again, not just
17  from the geography, but from the diversity of
18  interest, I'm spreading my focus.  I'm spreading
19  my efforts over a much broader array of interests.
20      Q   Okay.  Are there any issues like that
21  that you can think of where it would present kind
22  of a conflict in the way you would need to vote on

Page 67

1       Q   Right.
2       A   It doesn't have to do with this side
3   over there, and I'm not getting into your water
4   wars because there's a water war between Alabama,
5   Georgia, and Florida --
6       Q   Right.
7       A   -- with regard to the Chattahoochee and
8   water coming out of the Atlanta.  So that was -- I
9   was able to escape what would have been a blocking
10  vote from the Georgia delegation over that.  But,
11  in large part, it's not necessarily how you vote.
12  It's how much time -- there's only so many hours
13  in the day.
14      Q   Right.
15      A   I only have so many people on my staff.
16  Okay?  If you make me take my time, my staff and
17  divide it along a much greater geographic area, a
18  much wider area of interest, each one of those is
19  going to get less attention, less effort.
20  Something is going to suffer.  That's just the
21  nature of the world that we live in.
22      Q   Right.

Page 69

Pages 66 to 69

1    A   So, once again, that's the difference
2   between being a congressman and a Senator.
3    Q   Right.
4    A   A Senator looks after the entire state.
5    Q   Right.
6    A   The congressman is focused on his or her
7   district. I focus on my district. Congresswoman
8   Roby who presently represents District 3 -- is
9   that what it is?
10   Q   I think so, yes.
11   A   Yes. Is it 2?
12   Q   Two.
13   MR. DAVIS: Roby is 2.
14   A   She really focuses on her district. She
15  knows that stuff about Fort Rucker. And she got
16  it. And if she needs my help, she'll call me and
17  I'll give it to her, but I recognize her as the
18  expert on Fort Rucker. If she needs some help
19  with Troy, even though I don't represent Troy, she
20  calls me and I'm going to help her, but I
21  recognize that she's got the expertise on that.
22  All of us in the Alabama delegation have that

Page 70

1   understanding. If Congresswoman Sewell tells me
2   "I need some help with something in the Black
3   Belt," you tell me where you want to go, I'm going
4   to get behind you and help you. We do that for
5   one another. It's one of the strengths of our
6   delegation, is that we do that. But we have to
7   have that focus and expertise by the member from
8   that district to lead the rest of us and, frankly,
9   to lead the state as to where we need to go.
10   Q   Right. I understand you are -- you are
11  seeking to be the next Senator from Alabama.
12   A   I am. I am.
13   Q   You're going to have a change of focus.
14   A   I am. I am. And that's why right now I
15  can sort of see the difference.
16   Q   Right.
17   A   There is -- there is a fundamental
18  difference between being a Senator, for that
19  matter a Governor, and being a congressman.
20  Congressmen or congresswomen focus on their
21  district. They're the advocate for their
22  district. And that's true not just in legislation

Page 71

1   but in federal programs, federal grants, and even
2   in economic development. Believe it or not,
3   they'll take a congresswoman or congressman when
4   they're doing -- pitching somebody to come to an
5   area and bring them in the room and say this is
6   why this area is so important. This is why you
7   should bring your business or factory and locate
8   it here. I play that role. I know everybody else
9   in delegation plays that role as well.
10   Q   Sure, okay.
11   MR. DAVIS: Before you go to the next
12  question, Congressman, do you need a break or a
13  cup of water?
14   THE WITNESS: I would love a cup of
15  water.
16   MR. SPIVA: I'm sorry. I apologize.
17  I've been sitting here drinking this.
18   THE WITNESS: Are we taking a break?
19   MR. SPIVA: Yes, why don't we take a
20  few-minute break.
21   MR. DAVIS: Just a couple minutes.
22   THE WITNESS: Yes, that would be great.

Page 72

1   THE VIDEOGRAPHER: The time is 11:06
2   a.m. and we're going off the record.
3   (A brief recess was taken.)
4   THE VIDEOGRAPHER: The time is 11:11
5   a.m. and we're back on the record.
6   MR. DAVIS: Before we continue, Bruce,
7   am I correct that we have an understanding that
8   this deposition be used only for purposes of this
9   litigation?
10   MR. SPIVA: Yes.
11   MR. DAVIS: Including the video, the
12  deposition transcript, all of that.
13   MR. SPIVA: Yes, yes. It's not under
14  seal, obviously, but we have no intent of like,
15  you know, displaying this on the evening news or
16  anything, you know -- anything like that, yes,
17  right, exactly. I mean, I just -- I just want to
18  be careful that I'm not like agreeing to keep it
19  under seal because then it creates all kinds of
20  problems when you have, as you know, Congressman,
21  when you have to file, you have to file with a
22  motion, and, you know, if there's anything that's

Page 73

7/24/2019          Chestnut, et al., v. John H. Merrill          Congressman Bradley Byrne

**Page 74**

1    referenced or anything like that --
2        MR. DAVIS:  No, no, I'm not suggesting
3    it should be under seal.  I just want the typical
4    understanding that with most depositions, it would
5    be used for purposes of the litigation.
6        MR. SPIVA:  Yes, that is -- that is -- I
7    will agree to that, yes.
8    BY MR. SPIVA:
9        Q   So, Congressman Byrne, was there
10   anything else that was of concern to you regarding
11   revised plan 1, which is 1 think labeled as
12   Exhibit 1?
13       A   Well, at least in general I've covered
14   all of it, but there's -- there are a lot more
15   details I could go into with regard to the
16   different economies, et cetera.  But, in general,
17   I think I've told you about the spread of time,
18   spread of resources and advocate over a greater,
19   not only geographic area, but greater different
20   types of interests.
21       Q   And then maybe just focusing on, for a
22   minute, the CD 2 under the revised plan 1, and if

**Page 75**

1    it's helpful to look at the current plan.
2        A   Yes.
3        Q   In looking at that --
4        A   Yes, here.
5        Q   -- do you have any further concerns
6    other than the ones you've already articulated
7    concerning the proposed CD 2 under revised plan 1?
8        A   Well, I think I said this earlier, but
9    I'll make sure I say it again.  I think putting
10   that part of Mobile or any part of Mobile County
11   in the same district with the county that's
12   basically centered on Montgomery is going to
13   dilute the efforts that we're making there to
14   build our economy, and also it's asking somebody
15   who is basically focused on Montgomery to try to
16   learn completely different, you know, economic
17   setting, cultural setting, civic setting.  And I
18   think that's asking a whole lot from the person
19   that represents District 2.  I don't think they
20   could do it as well.  I'm not saying that they
21   wouldn't put their effort forth.  For example, if
22   that was Terri Sewell, I think she would put all

**Page 76**

1    of her effort into it, but as smart and capable
2    and hardworking as she is, I don't think she could
3    do it as well.
4        Q   And you noted -- well, I'll note, and
5    tell me if you agree, the proposed District 7
6    under revised plan 1, that actually is a lot more
7    kind of compact than the District 7 and
8    Representative Sewell's district in the current
9    plan.
10       A   Yes.
11       Q   Would you agree with that?
12       A   I would.  I do have concerns about
13   splitting Tuscaloosa County.  I think that split
14   into Jefferson County, but it's presently split
15   into Tuscaloosa County.  And I think Congressman
16   Aderholt or Congressman Sewell will handle it very
17   well, but I think Tuscaloosa will be better off
18   with one congressman.
19       Q   Right.  And Jefferson is currently split
20   as well.
21       A   Yes.
22       Q   So any other concerns about any of this,

**Page 77**

1    you know, District 7, District 2, District 1 under
2    revised plan 1?
3        A   I have focused just on what it does to
4    District 1.  I haven't really looked that much at
5    Exhibit 1 as to what it would do to the other
6    districts.  It does make some changes, but I think
7    from my perspective, the biggest problem is what
8    it does to District 1 and District 2 and -- let's
9    see, District 1 and District 2.
10       Q   Okay.  As you know from, you know, at
11   least briefly reviewing the complaint and, you
12   know, you understand kind of the basic allegations
13   in this complaint, that the plaintiffs are seeking
14   to create a second majority African-American
15   district.  Do you think there would be a benefit
16   to the African-American community to having a
17   second majority African-American district?
18       A   I don't really have an opinion about
19   that.  I'm more concerned about the people where I
20   live.  I don't think it's a benefit to the people
21   of Mobile County, whether they're
22   African-American, white, Hispanic, or

Pages 74 to 77

7/24/2019                Chestnut, et al., v. John H. Merrill        Congressman Bradley Byrne

1  Asian-American, to have a congressman from
2  Montgomery.  I don't care what the race of the
3  congressman is.  I don't -- if Martha Roby is
4  going to be the congressman that would come in
5  there, I don't think it's good for the people in
6  my district to have a congressman who is mainly
7  focused on Montgomery.
8      Q   Okay.  Now, would you agree that the
9  voting in your district in the current
10 configuration is fairly racially polarized?  When
11 I -- just to get a little definition, I mean, you
12 know, the vast majority of African-Americans in
13 your district tend to vote, you know, for your
14 opponent, for the Democratic candidate, and the
15 vast majority of whites tend to vote for yourself.
16     MR. DAVIS:  Object to the form.
17     A   I don't -- I don't know the numbers.
18 Frankly, I don't pay that close attention to that.
19 In general I know that more African-American's
20 vote Democrat.  More whites vote Republican.
21 There has been more -- some shifting going on
22 there, as a matter of fact.  You're seeing, like

Page 78

1  in Mobile, the City of Mobile, you're seeing more
2  whites voting Democrat.  And in Baldwin County
3  where I live, you're seeing more African-Americans
4  vote Republican.  So even that's shifting around.
5      Q   Okay.  You haven't actually seen the
6  plaintiff's expert reports in this case, have you?
7      A   No.
8      Q   Would it surprise you that an estimated
9  97 percent of African-Americans in your district
10 voted -- sorry, it sounds impolite -- but voted
11 against you, voted for your opponent in the last
12 election?
13     MR. DAVIS:  Object to form.
14     A   I don't know the numbers and so I can't
15 say I'm surprised.  Like I say, when I look at the
16 results of an election, I'm really not paying that
17 close attention to it or concerned about that.
18     Q   Okay.  Do you know whether -- what the
19 African-American candidate of choice was in the
20 last congressional election?
21     A   Well, my opponent -- are you talking
22 about my election?

Page 79

1      Q   Yes.
2      A   My opponent, the Democrat, was Robert
3  Kennedy.  But I don't know -- as I said, I didn't
4  go back and look at the results after the fact.  I
5  don't know exactly how the vote split out.  I know
6  generally how many votes I got, generally how many
7  votes he got, but I can't tell you where they came
8  from.
9      Q   Okay.  How about the City of Mobile, do
10 you know how the votes split out in the City of
11 Mobile in the --
12     A   In my election?
13     Q   Yes.
14     A   I didn't look that closely.  I think I
15 carried Mobile, but I don't know.
16     Q   Okay.  And I think you acknowledged a
17 minute ago that, you know, most African-Americans
18 in your district tend to vote Democratic as
19 opposed to the majority of whites voting
20 Republican.  Why do you think that's the case?
21     MR. DAVIS:  Object to form.
22     A   That is a great question, and it's

Page 80

1  something that I not only have thought a lot
2  about, I've worried over because I don't think
3  it's healthy.  I think there's some traditional
4  things going on.  African-Americans look to the
5  Democratic party as the party that primarily
6  ushered through the civil rights legislation in
7  the '60s.  Although, if you go back and look at
8  the history, it would not have happened without
9  Republican votes in both the House and the Senate,
10 and there were key opponents to that legislation
11 that were southern Democrats, but I think
12 African-Americans look to that and look to that
13 history.  But more and more I think what's
14 happening in my district is really reflective of
15 what's happening in the country.  People are
16 finding differences -- I don't want to use the
17 word polarization.  I don't like it.  People find
18 differences among one another because they have a
19 different view of what American -- what the
20 federal government should do for America, so it's
21 more ideological in my mind than it is racial.
22     Q   Why do you think that -- well, first let

Page 81

Pages 78 to 81

1  me ask you, would you agree, though, that that --
2  that ideological difference closely tracks with
3  race, corresponds to race?
4      A   I don't know because I've never actually
5  seen a study on that, but I know from talking to
6  people, be they white or African-American or
7  Hispanic or Asian-American, it really starts with
8  their role of the federal government or what's the
9  role that should be of the federal government.
10  So, clearly you've got people in my district of
11  different races who see that in completely
12  different ways.
13      And so I think it's more of what's
14  happening across the country, that is that we have
15  difference -- those of us who view the federal
16  government as something that should be far more
17  active than some of the rest of us do.
18      Q   Do you think African-Americans tend to
19  view the role of the federal government more
20  robustly as one that should be more active than
21  white Alabamans tend to view it?
22      A   I think that -- I don't know about more

Page 82

1  white Alabamans, but the African-Americans that I
2  have talked to about this express their desire to
3  have the federal government do more.
4      Q   Would you say that's because those
5  African-Americans that you talked to view that as
6  in their interest?
7      A   I'm not sure we drilled down that far to
8  know. Sometimes people will take an ideological
9  point of view that's not congruent with their
10  interests. So I can't say that for sure.
11      Q   Okay. Do you believe that the needs of
12  African-Americans in your district differ from the
13  needs of other constituents in your district?
14      A   No.
15      Q   Why not?
16      A   Because I think what people need is the
17  same. What they need from their families is the
18  same. What they need from their communities is
19  the same. What they need from their nation is the
20  same.
21      Q   Do you have a sense of whether there are
22  certain -- let me strike that.

Page 83

1      What issues, if any, do you believe are
2  important to the African-American community in
3  your district?
4      A   The same issues that are important to
5  the white people in my district. Their jobs, the
6  education of their children, the safety of their
7  homes and their community, the continuation of the
8  opportunities that have been afforded to them.
9  They want more opportunities for their children
10  and their grandchildren. I just don't see a
11  difference there. When you really sit down and
12  talk with them, as I do in my town hall
13  meetings -- I had one in Prichard on Friday, for
14  example. The main issue in my town hall meeting
15  on Friday was tolls for the new bridge coming
16  across I-10. And there were white and
17  African-American people there who had the same
18  type of disagreement with the tolls, same
19  intensity of disagreement with the tolls. It
20  didn't make any difference.
21      Q   That was a green disagreement, right,
22  about how much green they're going to have to

Page 84

1  spend.
2      A   Most things are like that. In my
3  experience, most things are like that. People are
4  people are people are people. They
5  have the same concerns. You might find like, for
6  example, Friday, that one concern there is,
7  there's a community in Mobile County called
8  Africatown. And it's a very important community.
9  It's where the last group of slaves who were
10  illegally brought here, by the way, in 1860 or
11  1861, it's where they congregated and formed a
12  community. We just recently found the ship that
13  they came over on. It's a big deal.
14      Q   I read about that.
15      A   We've got some ideas on trying to build
16  on that and build that community. One concern
17  that they have that's specific to them, but this
18  is -- it's more geographic -- it's one of the
19  routes that people might take to get around the
20  bridge would come right through Africatown and
21  would harm, potentially, the activities a lot of
22  us are interested in looking at to try to build up

Page 85

Pages 82 to 85

1  Africatown.  But I can tell you from talking to
2  the Mayor of Mobile, who happens to be white, that
3  that is not something that is white or
4  African-American.  That is, hey, this is a major
5  opportunity for Mobile.  Let's not let this bridge
6  thing mess up what could be a major opportunity.
7  But the -- but the concerns that people have were
8  the same.
9      Q   What about in terms of socioeconomic
10  needs?  I mean, does the African-American or at
11  least on average -- obviously all of these things
12  you can't -- you can't talk about everybody
13  because there are people of different
14  socioeconomic needs of all races -- but on
15  average, are the socioeconomic needs of
16  African-Americans in your district greater than
17  the socioeconomic needs of whites?
18      A   Well, in general the answer is no, but
19  there are some specifics, I think, that are
20  important.  This is not just true in Mobile
21  County.  It's true in other places in Alabama.
22  Unfortunately a disproportionate number of

Page 86

1  African-American children are going to some of our
2  worse schools.  If you want to give everybody an
3  opportunity in America, they got to get a good
4  quality education.  So the one of the reasons why
5  I got so involved in education reform prior to
6  going to the school board was -- in my view was
7  the next real fight in the civil rights movement
8  is over education.  How do we get quality
9  education to every child in Alabama, be they
10  white, be they African-American, be they Asian, be
11  they Hispanic.  That should be something that we
12  should all be concerned about.  But in terms of
13  the actual need, it's the same.  It's just that
14  we've got a specific manifestation of it
15  disproportionately affecting young
16  African-Americans.
17      Q   Would you say that the income level, the
18  average income level of African-Americans in your
19  district is lower than the average income of
20  whites in your district?
21      A   I've not seen any data on that so I
22  can't give you an answer.

Page 87

1      Q   Okay.  What about educational
2  attainment, do you know whether there's a lower
3  level of educational attainment on average among
4  black -- blacks in your district than whites?
5      A   Well, as I said earlier, I think some of
6  them got lower quality education, a
7  disproportionate number of them got lower quality
8  education.  So I don't know the actual data, but I
9  would not be surprised to see -- if you don't get
10  education early, it tends to have a going-on
11  effect.  You may not be able to get into college
12  or you may not think about going to college.  So I
13  think it's one of the most important, if not the
14  most important thing we need to be working on is
15  how do we give everybody, wherever they come from,
16  whoever their parents are, the best possible
17  education we can give them.
18      Q   That's right.  You did speak to that.
19  Sorry to repeat, but what -- what about
20  healthcare, are there -- and health outcomes, have
21  you seen any data on whether African-Americans on
22  average in your district have kind of lower

Page 88

1  healthcare outcomes, greater healthcare needs than
2  whites on average in your district?
3      A   I've not seen any data, but I've been
4  very involved with community health centers in my
5  district.  In fact, I got an award for that.
6  Community health centers tend to be more prevalent
7  in African-American districts.  They're not only
8  in African-American communities.  So I do try to
9  work with community health centers because I think
10  that they're the best way to provide healthcare to
11  people that are in poor communities.  And so I do
12  see that there's a need for us to do more with
13  those community health centers.  I am glad to see
14  the University of South Alabama Medical Center
15  providing really good, quality healthcare to
16  everybody in our area.  And it just happens to be
17  located in an African-American community.  So the
18  people in that community are like right there,
19  easy for them to access.  So I can't give you
20  anything from the data, but I do think that
21  there's a need for us to work harder at that.
22      Q   Am I right that you supported the repeal

Page 89

Pages  86  to  89

1  of ObamaCare?

2      A  I did.

3      Q  Do you believe that most -- the majority

4  of African-Americans in your district supported

5  the repeal of ObamaCare?

6      A  I don't know.

7      Q  And from the people you've talked to,

8  the African-Americans you talked to in your

9  district, do you get the sense that they support

10  the repeal of ObamaCare?

11      A  Some have told me that they do.  Some

12  have told me that they don't.  I can't quantify

13  that, though, because it's not like we

14  scientifically polled it or even tried to go out

15  and figure out the race of people who are

16  responding on the telephone or by email to the

17  office.  But I have had African-Americans say that

18  they didn't like ObamaCare.  They wanted us to do

19  something different.

20      Q  Right.

21      A  And I've had -- I have had

22  African-Americans say that they supported it.  One

Page 90

1  of the things that -- going back to community

2  health centers.  100 percent of African-Americans

3  that I've talked to about community health centers

4  like community health centers.  That's one of the

5  reasons I'm so focused on community health

6  centers.  The reason they are, as these community

7  health centers are located in their communities,

8  in their neighbors.  It's easy -- it's easy for

9  them to physically access these centers.  And the

10  centers are really set up to focus primarily on

11  the person.  And so you can see where people would

12  say "I really like going there because they really

13  care about me."  And so I do think that community

14  health centers are in my mind a big part of what

15  should be a solution to the healthcare problem

16  throughout America, particularly in my district,

17  and I think we could put more resources into that

18  by putting less resources into ObamaCare.

19      Q  Are those community health centers

20  supported by the expansion of Medicaid under

21  ObamaCare?

22      A  No, they're supported by direct money

Page 91

1  that comes from the federal government community

2  health centers.  I've forgotten the name of the

3  program.  But in a community health center, you go

4  and they take care of you and have a sliding scale

5  of what you pay based on your income.  It may be

6  that some people go into community health centers

7  have Medicaid.  Some of them may be on Medicare.

8  Some of them I know, because I've talked to them,

9  are on private insurance and they prefer to use

10  their private insurance at a community health

11  center for all the reasons I said earlier.  So I

12  don't know that it -- that they're benefiting any

13  more than any other healthcare institution is from

14  any expansion of Medicaid.

15      Q  Has Alabama accepted the expansion of

16  Medicaid under ObamaCare?

17      A  No.

18      Q  That's not really an option, I guess,

19  for people who wouldn't otherwise qualify for

20  Medicaid, to take advantage of the expansion of

21  Medicaid under ObamaCare in Alabama.

22      A  A lot of people who don't qualify for

Page 92

1  Medicaid are accessing healthcare through these

2  community health centers.  And, as I say, they

3  take you regardless of your circumstances and

4  figure on the sliding scale how much you will

5  contribute.

6      Q  Okay.  Have you seen any polling either

7  in Alabama or nationwide about whether

8  African-Americans support the repeal of ObamaCare?

9      A  I haven't.

10      Q  Do you believe that African-Americans in

11  your district supported the Tax Cuts and Jobs Act?

12      A  I'm not sure I've ever heard from an

13  African-American one way or the other.  Let me

14  think about that for a second.  I can't -- they

15  may have, but I can't recall any particular

16  conversation at this point in time.

17      Q  Okay.  About whether an African-American

18  or the African-American community at large

19  supports -- supported the Tax Cuts and Jobs Act?

20      A  I don't remember any conversation about

21  that.

22      Q  Okay.  You were supportive of the Tax

Page 93

1   Cuts and Jobs Act.
2       A   Oh, I absolutely was, yes, sir.
3       Q   And have you -- since you've been a
4   congressman, have you taken a vote on the
5   reinstatement of kind of Section 4, Section 5 of
6   the Voting Rights Act?
7       A   I don't believe I have. I don't think
8   we have. Yeah.
9       Q   Are you familiar with HR 1, the For The
10  People Act which expands voter registration,
11  voting access that was passed this year?
12      A   Yes.
13      Q   It was passed by the House this year.
14      A   Yes.
15      Q   Were you in support of that?
16      A   I was not.
17      Q   And --
18      A   But not because it did the things you
19  mentioned, but because of other things.
20      Q   Why were you against it?
21      A   Because they put a bunch of other stuff
22  in there that I thought was not germane to what it

1   was supposed to be about and I did not think would
2   be helpful to what we're trying to do in America.
3   I want everybody to vote, and I'm actually
4   encouraged by the number and percentage of people
5   that have been voting, particularly in Alabama,
6   these last two or three or four election cycles.
7   I'm pretty passionate about that. But I don't
8   think -- I think that bill, while it pretended to
9   be for that, I don't think it actually was going
10  to accomplish that. I think it did some other
11  things that I didn't think were pertinent to that
12  effort.
13      Q   Do you recall what it was that you
14  didn't like about the bill?
15      A   We can give a full breakdown. We had --
16  I think we put out a statement at the time or we
17  can give you something. But that bill was pretty
18  vague and complex. It would take me a while to
19  take you through everything that was a problem
20  with it.
21      Q   Okay. I just didn't know if there was
22  any like major thing that stood out.

1       A   No, there was a ton of stuff. One of
2   the things that disappointed me about that was, it
3   was a bill that was just loaded up. And a lot of
4   mistakes we make around here are when we take a
5   good idea, if this is a good idea, we start
6   loading other things on there. Then we destroy
7   the good idea. That's not a Republican or
8   Democrat thing, but everybody does that around
9   here from time to time.
10      Q   Right.
11      A   And I was disappointed in a bill that
12  could have been such a good bill that could have
13  gotten a lot of bipartisan support I think was put
14  together in such a way to where we were guaranteed
15  it was only going to be partisan.
16      Q   Do you think that African-Americans in
17  your district on average support the measures that
18  were in HR 1?
19      A   I've never had anybody in an
20  African-American community talk to me about HR 1.
21      Q   What about -- would you support the
22  reinstatement of Section 5 of the Voting Rights

1   Act? This is the portion that was struck down by
2   the --
3       A   The formula?
4       Q   Yes. Yes.
5       A   The formula? No. I think there's a
6   better way to do that.
7       Q   And what's that?
8       A   I think we should have it apply to
9   everybody in America.
10      Q   You would support something that would
11  apply essentially to the preclearance review to
12  all states?
13      A   Yes, what I keep saying is, if it's good
14  enough for Alabama, why isn't it good enough for
15  California? Are we saying Alabama is more racist
16  than California? Are we saying Alabama is more
17  racist than Missouri? Are we saying Alabama is
18  more racist than Maryland? Because if you look at
19  what's happened in the last several years, you'll
20  find more racial incidences in places like that
21  than you will in Alabama, yet we're going to take
22  a law and formula and use it to only focus on a

www.DigitalEvidenceGroup.com     Digital Evidence Group C'rt 2019          202-232-0646

1  few parts of America. If it's good for Alabama,
2  it's good enough for everybody.
3      Q   Right. And I'm not -- I'm not
4  disagreeing with that at all. But there was like
5  a coverage formula that, you know, involved
6  looking at registration rates and --
7      A   Which I think was prejudicial to
8  Alabama, and I'm afraid a new one would be equally
9  prejudicial. That's why I said the easiest way to
10  do this is, if we're going to do this at all,
11  apply it to everybody.
12      Q   Would you support that? Would you
13  support reinstating a preclearance regime if it
14  applied to all states?
15      MR. DAVIS: Object to form.
16      Q   Go ahead.
17      A   When that is conjoined with some other
18  things, I might. For example, I don't think you
19  should have preclearance. I think maybe the best
20  way to do it is tell everybody in America, every
21  local, state, et cetera, jurisdiction, you submit
22  to the Justice Department before you implemented

Page 98

1  the things that preclearance states you used to
2  have to do. And that gives a heads-up to the
3  Justice Department. If they want to bring an
4  action in Federal Court, they can because they
5  have that power to do that today, the Justice
6  Department does today. Private individuals have
7  the right to do that today. That wasn't taken
8  away by the Supreme Court ruling. I just don't
9  want Alabama to be singled out, and I think we
10  have been. I think in the last couple, three
11  decades that's been unfair, and I don't want that
12  -- I'm not going to vote for something that
13  singles out Alabama in a negative way like that.
14      Q   I mean, you would agree with me, though,
15  that there was -- there was quite a history in
16  Alabama of suppressing black voting rights.
17      A   Oh, yes. I mean, prior to the civil
18  rights laws in the 1960s, sure there were. But
19  we're 50-plus years past that. And there's been a
20  dramatic change in Alabama. I was a kid in the
21  '60s so I wasn't an adult when all of that was
22  going on, but I know the difference between the

Page 99

1  way things were in the '60s and the way they are
2  today, and they're dramatically different.
3      Q   Do you -- do you know whether your
4  African-American constituents agree with you that
5  that preclearance regime shouldn't be
6  reimplemented, whether it's implemented just for
7  Alabama or for the whole country?
8      A   Never had an African-American
9  constituent talk about that with me.
10      Q   Do you know what position the state
11  NAACP in Alabama has taken on that issue?
12      A   I don't.
13      Q   Do you know the current president of the
14  state NAACP?
15      A   I don't think I do.
16      Q   I assume you haven't met with the
17  president of the NAACP of the State of Alabama?
18      A   I don't think we've had a request from
19  the state or local NAACP for a meeting. We take a
20  lot of meetings with groups. We can't always give
21  it to them exactly when they want them, but when
22  they make a request, we try to figure out a way to

Page 100

1  set up the meeting. And I just can't recall ever
2  getting a request for a meeting from them.
3      Q   Okay. I take it from your answer, then,
4  it sounds like you haven't met with the local
5  NAACP?
6      A   I don't -- well, not formally. There
7  may be some members of that group that have met
8  with me in other ways.
9      Q   Yes.
10      A   But -- and we have people that come to
11  my town hall meetings. I have no idea whether
12  they are or they aren't.
13      Q   Right.
14      A   There are times where they identify
15  themselves, but it's not unusual for them to come
16  and not identify themselves as being a member of
17  this group or that group. So I could have had a
18  large number of members --
19      Q   Sure, right.
20      A   -- of the local NAACP be at a town hall
21  meeting and I wouldn't know it.
22      Q   Right. But it's not like you -- you

Page 101

Pages 98 to 101

1  haven't had a meeting with, say, the president of
2  the City of Mobile's NAACP chapter?
3       A   I don't think I have.  I don't think
4  they have requested one.
5       Q   Have you ever requested one of them?
6       A   No.  I mean, I typically don't request
7  meetings with people.  They request meetings with
8  me.  I was telling you earlier, there's only so
9  many hours in the day.
10      Q   Sure.
11      A   I try to respond to other -- my
12 constituents' request.  There are times when I
13 reach out to a group, but there's usually a
14 particular reason for that, some event has
15 occurred or something that does involve my job
16 where I feel like, hey, I need to go out and reach
17 out to them.
18      Q   Sure.
19      A   But in 90-plus percent of the cases,
20 people are calling up and say we want to meet with
21 our congressman, and my staff tries to figure out
22 how to fit it into my schedule.

Page 102

1       Q   Is there an Urban League Chapter in
2  Mobile?
3       A   I don't know of one if there is.
4       Q   I assume you haven't met with the head
5  of the Urban League in the City of Mobile?
6       A   I don't think I've ever had a request
7  from them for a meeting.
8       Q   Are you familiar with an organization
9  called LULAC?  It's the League of United Latin
10 American Citizens.
11      A   I'm not familiar with them.
12      Q   I think I got -- I think I probably got
13 the acronym a little bit wrong.  It's Swedish
14 LULAC, but I got the -- I think I mixed up the
15 words.  But you never met with LULAC, I take it,
16 either?
17      A   Not that I know of.
18      Q   Are there any other African-American or
19 Latino or Hispanic-focused organizations like the
20 NAACP, like the urban league, that you have taken
21 a meeting with since you've been congressman?
22      A   I've met with so many groups.  I would

Page 103

1  have to go back through my calendar going back to
2  when I started.  I meet with a lot of
3  African-Americans.  I don't always know, as I said
4  --
5       Q   Who they're affiliated with?
6       A   -- who they're affiliated with because
7  they tend to come to me because of a concern about
8  a particular issue.  So we're being responsive to
9  a particular issue.
10      Q   Sure.
11      A   They may be there as part of a group and
12 I just don't know it.
13      Q   Yes, totally understand.  I know a lot
14 of -- the job of a Congress person, you're mainly
15 doing a lot of what is constituent services,
16 right?
17      A   Right.
18      Q   It's not a Republican or Democratic
19 issue.
20      A   Oh, yeah, and sometimes it may be a
21 concern -- a specific concern for a community.
22      Q   Right.

Page 104

1       A   And you may have a group of people come
2  to see you because of that concern for that
3  community, but you don't necessarily know what
4  organizations they're with or not.  They're just
5  there because they all agree about this one issue.
6  And so we try to take -- if somebody asks for a
7  meeting, we try to figure out a way to make that
8  meeting happen.  We try to figure out a way to
9  make it happen as close to where they live as we
10 can because I know it's difficult for people to
11 come to places.  So I frequently try to go out to
12 people.  So if a group in a community says we need
13 to meet with you about X, if it's possible, I try
14 to go out to them.  It's not always possible
15 because of my schedule having to be up here voting
16 so much.  So sometimes they have to come to my
17 office, but I prefer to go to them.
18      Q   You mentioned town halls.  Have you had
19 town halls in the City of Mobile?
20      A   Oh, yes.  Lots of them.
21      Q   Have you had town halls in kind of
22 African-American residential sections of Mobile?

Page 105

Pages 102 to 105

1  A   I have.

2  Q   Tell me about that.

3  A   Well, it's more than once.  It goes back
4  several years from now.  We just pick places -- we
5  try -- we don't stay in the same place.

6  Q   Right.

7  A   So I've had them downtown.  Downtown is
8  -- tends to be more African-American than not.
9  We've had them in -- there's a high school in what
10  I was calling the southern part of Mobile.
11  There's a high school there that we had a town
12  hall in, which was more memorable for me because
13  we had a lot of planned parenthood people there.
14  We didn't know that we were going to have that.
15  Instead of being focused on that community, which
16  is what I like my town halls to be on, we had a
17  lot of planned parenthood people that showed up
18  for some reason.

19      We've had lots of meetings in -- this is
20  just outside the city limits of Mobile in
21  Prichard, like we just had one last week.  I think
22  we -- some of the data I told you, I think we

Page 106

1  found out that almost half of my town halls are in
2  African-American communities, but that's spread
3  out all over the district, not just the City of
4  Mobile.

5  Q   Have any people at those town halls, any
6  African-Americans expressed any disagreement with
7  your stances on any particular bill or issues?

8  A   Yes.  I have -- in my town halls it's
9  not unusual for people of all races to disagree
10  with me.  That's why I have my town halls.

11  Q   It comes with the territory.

12  A   Yes, that's why I have my town halls.  I
13  think people deserve to have their representative
14  come to their communities and listen to them.  And
15  so it's not infrequent that I go to a town hall
16  and have people stand up and disagree with me.
17  I've had African-Americans disagree with me.  I've
18  had white people disagree with me, some of them my
19  friends.  But that's the essence of being a
20  congressman.  If you only hear what you want to
21  hear, you're not going to be a very good
22  congressman.

Page 107

1  Q   What about on issues of civil rights?  I
2  know that's kind of a broad term.  Have you
3  had African-Americans at any of these town halls
4  or elsewhere express to you that they disagreed
5  with your position on civil rights?

6  A   Not civil rights per se.  It may be a
7  particular issue that someone might associate with
8  civil rights.

9  Q   Can you give me an example?

10  A   Well, I'm trying to think of one because
11  I said might.

12  Q   Right.  Right.

13  A   I do remember one of the times that I
14  ran, I ran against a Democrat by the name of
15  Burton LaFlore.  I think Burton raised something
16  in that race, but it's been several years ago and
17  I don't recall now exactly what it was.

18  Q   Right.

19      I forgot to ask you about one -- when we
20  were talking about the various bills, the First
21  Step Act involving federal sentencing and prison
22  laws.

Page 108

1  A   Oh, yes.

2  Q   Did you --

3  A   The one that the President supported?

4  Q   Yes.

5  A   I did not support that.

6  Q   Okay.  Why didn't you?

7  A   Because I thought that it had the
8  potential for releasing people too early who had
9  committed some pretty serious crimes, not just
10  possession, but people were actually actively
11  involved in the distribution of very dangerous
12  drugs.  I'm much more concerned about the people
13  that are involved in distributing the drugs than I
14  am the people that are using the drugs.  The
15  people that use the drugs need help.  The people
16  who are distributing the drugs need to be put in
17  jail and stay in jail.

18  Q   Do you remember whether
19  African-Americans in your district supported the
20  First Step Act?

21  A   Never heard anything from any of them
22  about that.

Page 109

Pages 106 to 109

1    Q   Let me just take a quick look at my
2  notes.  I think we're getting close to the end
3  here.
4    A   Sure.
5       (Discussion off the record.)
6    Q   Just one more.  Are you familiar with
7  the Southern Christian Leadership Conference, the
8  SCLC?
9    A   Oh, yes.
10    Q   Do you know who the Alabama chapter
11  president is of that now?
12    A   I do not.
13    Q   Have you met with them?
14    A   I don't believe they've ever requested a
15  meeting, but I'm obviously familiar with that
16  group.
17    Q   Famous -- has a famous founder, right?
18    A   Absolutely.  Representative Sewell
19  brings a group down, we call it The Pilgrimage
20  every year.  It's really sponsored by a group
21  called Faith In Politics.  So I've tried to
22  participate in that every year.  I've been very

Page 110

1  interested in the civil rights movement going back
2  several years.  I've got a lot of books about it.
3  And my wife's family was sort of around it.  She
4  lived in Montgomery.  Her parents -- her mother in
5  particular were friends with some of the people
6  who were very active in the civil rights movement
7  in the Montgomery area.  So I've always been
8  interested in it.  I'm very familiar with the
9  history of it.
10       I don't know who's in charge of it in
11  Alabama right now, but if anybody in any of those
12  groups wants a meeting with them, they're going to
13  get it.  And I'm probably seeing them at The
14  Pilgrimage every year, but I don't always know
15  who's who.
16    Q   Right.
17    A   And there's a lot of people there.  But
18  I love going to The Pilgrimage.  I love the time
19  we get to spend together talking about what
20  happened in the '60s and '70s and what we can do
21  to work together today.
22    Q   And tell me what that is again.  You

Page 111

1  mentioned it briefly, what is The Pilgrimage?
2    A   There's a group here called Faith In
3  Politics here in Washington.  And they started
4  working some years ago with Representative John
5  Lewis from Georgia.  And they bring people to
6  Birmingham, Montgomery, and Selma.  They call it
7  The Pilgrimage because it's like coming back.  Not
8  only do they go -- we go to the main sites of
9  civil rights actions in Birmingham and Montgomery
10  and Selma, but we have programs as part of it.
11  People make presentations.  When Representative
12  Sewell was elected, because she's from Selma,
13  she's a daughter of Selma.
14    Q   Right.  Yes.
15    A   She became a lot more active in it.
16  After I was elected, she said -- knowing me like
17  she did, she said, "Bradley, you need to be
18  involved in The Pilgrimage.  I said, "What is it?"
19  She told me.  I said, "Wow, that's really cool."
20  So we participated at least in some part of it
21  every year since my first year.  I couldn't do it
22  my first year because I had a conflict.  So we

Page 112

1  were actually there with John Lewis and all of
2  them for the 50th Anniversary of the Selma to
3  Montgomery march, which was one of my sort of top
4  10 experiences in my life to be with John Lewis at
5  that very important -- President Obama spoke, as
6  you probably know, in Selma.  That was a really
7  cool experience.
8       What I'm saying is, I'm probably talking
9  to some of the people you're talking about when
10  I'm at The Pilgrimage every year, but I don't
11  always know who's an officer of what because --
12    Q   Sure.
13    A   -- I know it's important, but we're so
14  caught up in what's going on with the event of
15  that day.
16    Q   Sure.
17       Give me just one second to confer with
18  my co-counsel --
19    A   Sure.
20    Q   -- the real brain here, and then --
21    A   I used to have one of those.
22       MR. SPIVA:  Thank you so much,

Page 113

Pages 110 to 113

7/24/2019          Chestnut, et al., v. John H. Merrill          Congressman Bradley Byrne

| | |
|---|---|
| 1   Congressman Byrne. It's been a pleasure. I | 1   Congressman Bradley Byrne, c/o |
| 2   appreciate you taking the time to do it. | Office of the Attorney General |
| 3          THE WITNESS:  Good to see you. | 2   501 Washington Avenue |
| 4          MR. SPIVA:  We can go off the record. | Montgomery, Alabama 36130-0152 |
| 5          Oh, sorry.  You -- I'm sorry, Jim. | 3 |
| 6          MR. DAVIS:  It's okay.  For the record, | 4   Case: Lakeisha Chestnut, et al., v. John H. Merrill |
| 7   I do not have any questions. | 4   Date of deposition: July 24, 2019 |
| 8          THE VIDEOGRAPHER:  That's what I was | 5   Deponent: Congressman Bradley Byrne |
| 9   waiting for.  Okay.  The time is 11:49 a.m., July | 6 |
| 10   24th, 2019.  We are going off the record, | 7   Please be advised that the transcript in the above |
| 11   completing the videotaped deposition. | 8   referenced matter is now complete and ready for signature. |
| 12 | 9   The deponent may come to this office to sign the transcript, |
| 13          (Signature having not been waived, the | 10   a copy may be purchased for the witness to review and sign, |
| 14   deposition of Congressman Bradley Byrne was concluded | 11   or the deponent and/or counsel may waive the option of |
| 15   at 11:48 a.m.) | 12   signing. Please advise us of the option selected. |
| 16 | 13   Please forward the errata sheet and the original signed |
| 17 | 14   signature page to counsel noticing the deposition, noting the |
| 18 | 15   applicable time period allowed for such by the governing |
| 19 | 16   Rules of Procedure. If you have any questions, please do |
| 20 | 17   not hesitate to call our office at (202)-232-0646. |
| 21 | 18 |
| 22 | 19 |
| | 20   Sincerely, |
| | Digital Evidence Group |
| | 21   Copyright 2019 Digital Evidence Group |
| | Copying is forbidden, including electronically, absent |
| | 22   express written consent. |
| Page 114 | Page 116 |

| | |
|---|---|
| 1          CERTIFICATE OF SHORTHAND REPORTER | 1   Digital Evidence Group, L.L.C. |
| 2 | 1730 M Street, NW, Suite 812 |
| 3          I, Michele E. Eddy, Registered Professional | 2   Washington, D.C. 20036 |
| 4   Reporter and Certified Realtime Reporter, the court | (202) 232-0646 |
| 5   reporter before whom the foregoing deposition was | 3 |
| 6   taken, do hereby certify that the foregoing transcript | 4   SIGNATURE PAGE |
| 7   is a true and correct record of the testimony given; | Case: Lakeisha Chestnut, et al., v. John H. Merrill |
| 8   that said testimony was taken by me stenographically | 5   Witness Name: Congressman Bradley Byrne |
| 9   and thereafter reduced to typewriting under my | Deposition Date: July 24, 2019 |
| 10   supervision; and that I am neither counsel for, | 6 |
| 11   related to, nor employed by any of the parties to this | 7   I do hereby acknowledge that I have read |
| 12   case and have no interest, financial or otherwise, in | and examined the foregoing pages |
| 13   its outcome. | 8   of the transcript of my deposition and that: |
| 14          IN WITNESS WHEREOF, I have hereunto set my | 9 |
| 15   hand and affixed my notarial seal this 28th day of | 10   (Check appropriate box): |
| 16   July, 2019. | ( ) The same is a true, correct and |
| 17 | 11   complete transcription of the answers given by |
| 18   My commission expires July 14, 2022 | me to the questions therein recorded. |
| 19 | 12   ( ) Except for the changes noted in the |
| | attached Errata Sheet, the same is a true, |
| | 13   correct and complete transcription of the |
| 20   MICHELE E. EDDY | answers given by me to the questions therein |
| 21   NOTARY PUBLIC IN AND FOR | 14   recorded. |
| 22   THE DISTRICT OF COLUMBIA | 15 |
| | 16 |
| | 17   _____   _____ |
| | DATE          WITNESS SIGNATURE |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22   _____   _____ |
| | DATE          NOTARY |
| Page 115 | Page 117 |

Pages 114 to 117

7/24/2019              Chestnut, et al., v. John H. Merrill        Congressman Bradley Byrne

1    Digital Evidence Group, LLC
2    1730 M Street, NW, Suite 812
3    Washington, D.C.  20036
4    (202)232-0646
5
6         ERRATA SHEET
7
8    Case: Lakeisha Chestnut, et al., v. John H. Merrill
9    Witness Name: Congressman Bradley Byrne
10   Deposition Date: July 24, 2019
11   Page No.   Line No.   Change
12
13
14
15
16
17
18
19
20
21   _____     _____
22   Signature            Date

                    Page 118

Made in USA

## 2011 State Board of Education Districts



EXHIBIT

5

Made in USA



Alabama -- U.S. House
Interstate

0    30    60    90
Miles
2011 Plan

©2015 CALIPER

EXHIBIT