FILED
2023 Aug-19  AM 07:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **EVAN MILLIGAN**, *et al.*, | |
| **Plaintiffs**, | **Case No. 2:21-cv-01530-AMM** |
| **v.** | **THREE-JUDGE COURT** |
| **WES ALLEN, in his official capacity as Alabama Secretary of State,** | |
| **Defendant.** | |
| **MARCUS CASTER**, *et al.*, | |
| **Plaintiffs**, | **Case No.: 2:21-cv-1536-AMM** |
| **v.** | |
| **WES ALLEN, in his official capacity as Alabama Secretary of State,** | |
| **Defendant.** | |

### DEFENDANTS' JOINT PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

Pursuant to this Court's Orders, Secretary of State Allen, Senator Livingston, and Representative Pringle respectfully submit their proposed findings of fact and conclusions of law.

PROPOSED FINDINGS OF FACTS

## I. Parties

1.     Plaintiffs in the *Milligan* case are Evan Milligan, Shalela Dowdy, Letetia Jackson, Khadidah Stone, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP.

2.     Defendants in the *Milligan* case are Hon. Wes Allen, in his official capacity as Alabama Secretary of State; Senator Steve Livingston, in his official capacity as Co-Chair of the Alabama Permanent Legislative Committee on Reapportionment; and, Representative Chris Pringle, in his official capacity as Co-Chair of the Alabama Permanent Legislative Committee on Reapportionment.

3.     Plaintiffs in the *Caster* case are Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBouse, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, and Wendell Thomas.

4.     Plaintiffs in the *Singleton* case, *Singleton v. Allen,* Case No. 2:21-cv-1291 (N.D. Ala., pending), are Senator Bobby Singleton, Senator Rodger Smitherman, Eddie Billingsley, Leonette W. Slay, Darryl Andrews and Andrew Walker.

5.     The *Caster* and *Singleton* cases were originally filed against the Secretary of State, an office which Hon. Wes Allen now holds. The co-chairs of the Alabama Permanent Legislative Committee on Reapportionment intervened in both

cases, and those offices are now held by Senator Steve Livingston and Representative Chris Pringle.

## II.   The 2021 Plan for Congressional Districts

6.     In 2021, Alabama enacted a congressional map that largely retained existing district lines. *See Allen v. Milligan*, 143 S. Ct. 1487, 1501 (2023).

7.     Because the 2021 Plan prioritized core retention, the eighteen core Black Belt counties that had been split between three districts in the 2011 Plan remained split between those three districts. Montgomery County was also split between Districts 2 and 7.

8.     The *Milligan* Plaintiffs challenged the 2021 Plan as a violation of Section 2 of the Voting Rights Act and the Equal Protection Clause. *Milligan* Doc. 1.

9.     The *Caster* Plaintiffs challenged the 2021 Plan as a violation of Section 2 of the Voting Rights Act. *Caster* Doc. 3.

10.     The *Singleton* Plaintiffs challenged the 2021 Plan as a violation of the Equal Protection Clause. *Singleton* Doc. 15.

11.     "At the heart of" the *Milligan* Plaintiffs' case was how the 2021 Plan "crack[ed]" "two of the State's principal majority-Black communities of interest— the Black Belt and the City of Montgomery." *Milligan* Appellees' Br. 1. They explained that "'[c]racking' occurs where 'a State has split minority neighborhoods

that would have been grouped into a single district if the State had employed the same line-drawing standards in minority neighborhoods as it used elsewhere.'" *Id.* at 29 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994)) (cleaned up). And this purportedly discriminatory "cracking" was present in the 2021 Plan because that plan continued "a pattern of splitting two majority-Black communities of interest— the Black Belt and the City of Montgomery," while it "prioritized keeping together White people of 'French and Spanish colonial heritage' in Baldwin and Mobile Counties." *Id.* at 1.

12.     Plaintiffs agreed that the problem was not that the 2021 Plan lacked proportional representation, for "the statutorily derived *Gingles* framework imposes objective criteria that bar discrimination without requiring proportionality." *Id.* at 24 (capitalization altered). The problem was instead that "Defendants chose to preserve one set of communities of interest—most or all of which are majority white—at the expense of respecting majority-Black communities of interest like the Black Belt and Montgomery County," *Milligan* Doc. 94 at 15. According to the *Milligan* Plaintiffs that "'inconsistent treatment' of Black and White communities [wa]s 'significant evidence' of a § 2 violation." *Milligan* Appellees' Br. 39 (quoting *De Grandy*, 512 U.S. at 1015).

13.   The *Caster* Plaintiffs similarly challenged "how HB 1 cracks Alabama's Black population in the historic Black Belt" in contrast to how their "Illustrative Plans unite the Black Belt." *Caster* Doc. 56 at 9, Doc. 84 at 17.

14.   As part of the 2021 preliminary injunction proceedings, Plaintiffs introduced eleven illustrative plans to show that an additional majority-minority district could be drawn in a geographically compact and "reasonably configured" manner, as required by the first step of the *Gingles* test. *Allen*, 143 S. Ct. at 1503; *see Thornburg v. Gingles*, 478 U.S. 30 (1986).

15.   Moon Duchin, Ph.D., drew the *Milligan* Plaintiffs' illustrative maps. *Milligan* Docs.88-3 & 88-7.

16.   Bill Cooper drew the *Caster* Plaintiffs' illustrative maps. *Caster* Docs. 48 & 65.

17.   Defendants argued that Plaintiffs' proposed second majority-minority district in their illustrative plans was not reasonably configured because it was too sprawling and split a community of interest in the Gulf.

18.   Plaintiffs defended their illustrative plans as reasonably configured because, in their words, the plans "meet or beat" the State's application of traditional districting principles. *See Allen v. Milligan* Oral Argument Tr. 67 (*Milligan* counsel), 83 (*Caster* counsel); PI Tr. 441-42 ("meet or beat the county split"); *Caster* Doc. 48 at 22; *Caster* Doc. 65 at 5. For example, with respect to splitting the Gulf, Plaintiffs

countered that while their "plans may prioritize different communities of interest, …

they respect communities of interest generally to at least the same extent as HB1,"

because they kept more of the Black Belt together. *Caster* Respondents' Br. 37.

Plaintiffs argued that their illustrative plans "compl[ied] with objective traditional

redistricting criteria (compactness, contiguity, and respect for political subdivisions

and communities of interest) as well or better than HB1." *Milligan* Appellees' Br.

20.

19.    With respect to *Milligan* Plaintiffs' illustrative plans, this Court

observed that their expert "articulated a reasonable explanation" for "prioritiz[ing]

some principles over others," "based on the [2021] Legislature's redistricting

guidelines." *Singleton*, 582 F. Supp. 3d at 1005.

20.    With respect to *Caster* Plaintiffs' illustrative plans, the Court observed

that their expert "articulated a reasonable basis for the choices he made when he was

forced to choose between competing redistricting principles—namely, the choices

that the [2021] Plan made." *Id.* at 1006.

21.    This Court agreed that Plaintiffs' illustrative plans satisfied *Gingles* 1

and, concluding that the other *Gingles* factors and the totality-of-circumstances test

were met, preliminarily enjoined the Secretary of State from implementing the 2021

Plan. *Singleton v. Merrill*, 582 F. Supp. 3d 924, 936 (N.D. Ala. 2022) (three-judge

court) (per curiam) ("[W]e **PRELIMINARILY ENJOIN** Secretary Merrill from

conducting any congressional elections according to the Plan."); *Caster v. Merrill*, No. 2:21-cv-1536-AMM, 2022 WL 264819, *2 (N.D. Ala. Jan. 24, 2022) ("[T]he court **PRELIMINARILY ENJOINS** Secretary Merrill from conducting any congressional elections according to the Plan.").

22.    The Court also ordered the co-chairs of the Alabama Permanent Legislative Committee on Reapportionment "to advise the court" as to whether or not the Legislature would draw a new plan in early February 2022 "so that[, if needed] the court may retain (at the expense of the Defendants) an eminently qualified expert to draw on an expedited basis a map that complies with federal law for use in Alabama's 2022 congressional elections." *Singleton v. Merrill*, 582 F. Supp. 3d at 937; *Caster*, 2022 WL 264819, *3.

23.    Finally, the Court said it was staying the candidate qualification deadline, and it ordered the Secretary of State "to advise the political parties participating in the 2022 congressional elections of this order." *Singleton v. Merrill*, 582 F. Supp. 3d at 936-37; *Caster*, 2022 WL 264819, *3.

24.    While the Court provided the State the opportunity to enact a new plan, it did not order the State to enact a plan.

25.    This Court "reserve[d] ruling" on the *Singleton* Plaintiffs' Equal Protection claims. *Singleton*, 582 F. Supp. 3d at 937.

### III.   *Allen v. Milligan*

26.   The Supreme Court affirmed in an opinion that focused extensively on the *Gingles* 1 inquiry, which requires plaintiffs to show that the minority group is "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Allen*, 143 S. Ct. at 1503 (cleaned up). For a district to be "reasonably configured," it must "comport[] with traditional districting criteria." *Id.*

27.   The Court further explained that "application of the *Gingles* factors is peculiarly dependent upon the facts of each case," and thus, "[b]efore courts can find a violation of § 2, … they must conduct an intensely local appraisal of the electoral mechanism at issue …." *Id.* (internal quotation marks omitted).

28.    In *Allen*, the electoral mechanism at issue was the 2021 Plan, and the Supreme Court thus analyzed Plaintiffs' illustrative plans as compared to the traditional districting criteria given effect in the 2021 Plan.

29.   On compactness, the Court agreed that the *Milligan* Plaintiffs' maps "'perform[ed] generally better on average than' did HB1" and a map from the *Caster* Plaintiffs "produced districts roughly as compact as the existing plan." *Id*. at 1504 (quoting *Singleton*, 582 F. Supp. 3d at 1009).

30.   On political subdivisions, the Court agreed that "some of plaintiffs' proposed maps split the same number of county lines as (or even fewer county lines

8

than) the State's map." *Id.* (citing *Singleton*, 582 F. Supp. 3d at 1011-12). Justice Kavanaugh's concurring opinion likewise observed it was "important that at least some of the plaintiffs' proposed alternative maps respect county lines at least as well as Alabama's redistricting plan." *Id.* at 1518 n.2.

31.     On communities of interest, the Court reasoned that even though Plaintiffs' plans split the Gulf, Plaintiffs' *Gingles* 1 maps were "reasonably configured because they joined together a different community of interest called the Black Belt." *Id.* at 1505. The State, on the other hand, split the Black Belt into more districts. *Id.* Thus, under either Plaintiffs' approach or the State's approach, "[t]here would be a split community of interest in both." *Id.* at 1505 (citing *Singleton*, 582 F. Supp. 3d at 1012-14).

32.     On core retention, the Court explained that Plaintiffs' *Gingles* 1 maps could still be reasonably configured even if they did not adhere to existing district lines as well as the 2021 Plan: "[T]his Court has never held that a State's adherence to a previously used districting plan can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Id.*

33.     Plaintiffs thus satisfied *Gingles* 1. Because Plaintiffs produced a properly constructed map, "[d]eviation from that map shows it is *possible* that the State's map has a disparate effect on account of race." *Id.* at 1507. Conversely, if a

plaintiff's map does not comport with traditional districting criteria, the enacted map's failure to line up with the illustrative map shows at most a disparate effect on account of traditional criteria.

34.     The *Allen* Court explained how that exacting approach to *Gingles* 1 is required by constitutional concerns. The Court reaffirmed that it is unconstitutional for race to predominate in a redistricting plan, even for purposes of complying with the Voting Rights Act. *Id.* at 1508-09 (discussing *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*), *Miller v. Johnson*, 515 U.S. 900 (1995), *Bush v. Vera*, 517 U.S. 952 (1996)). Based on the Court's discussion of *Shaw I*, *Miller*, and *Vera*, *Allen* repeated that "[f]orcing proportional representation" is not only "inconsistent with this Court's approach to implementing § 2," it "is unlawful." *Id.* at 1509.

35.     The Court explained that "in case after case, we have rejected districting plans that would bring States closer to proportionality when those plans violate traditional districting criteria." *Id.* at 1509 n.4. Thus, "proportional representation of minority voters is absent from nearly every corner of this country despite § 2 being in effect for over 40 years." *Id.*

36.     The "exacting requirements" of the *Gingles* factors ensure that "§ 2 'never require[s] adoption of districts that violate traditional redistricting principles.'" *Id.* at 1510 (quoting *Caster* Respondents' Br. 3).

37.     *Allen* reaffirmed that, even when attempting to comply with the Voting Rights Act, race "may not be 'the predominant factor in drawing district lines unless [there is] a compelling reason'" and that "[r]ace predominates … when 'race-neutral considerations [come] into play only after the race-based decision had been made.'" *Id.* at 1510 (quoting *Cooper*, 581 U.S. 285, 291 (2017); *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189 (2017)). "[T]he Court d[id] not contend that" strict scrutiny was "satisfied" in *Allen*. *Id.* at 1552 n.2 (Alito, J., dissenting).

38.     The Court divided over whether race predominated in Plaintiffs' illustrative plans.

39.     A four-Justice plurality concluded that at least some of the plans drawn by Bill Cooper did not "breach[]" the "line" between racial "consciousness" and "racial predominance." *Id.* at 1510-11 (plurality).

40.     The plurality did not address the *Milligan* Plaintiffs' illustrative plans. *See Allen*, 143 S. Ct. at 1529-30 (Thomas, J., dissenting).

41.     With respect to Mr. Cooper's illustrative plan, the *Allen* plurality affirmed this Court's finding that Mr. Cooper's illustrative plans gave "equal weighting" to race, compactness, contiguity, and population equality. *Id.* at 1511 (plurality).

42.     The plurality concluded that this Court "did not err in finding that race did not predominate in Cooper's maps in light of the evidence before it" and

emphasized this particular *nonracial* feature of Mr. Cooper's illustrative plans' treatment of the Black Belt:

> The dissent claims that Cooper "treated 'the minority population in and of itself' as the paramount community of interest in his plans." But Cooper testified that he was "aware that the minority population in and of itself can be a community of interest." Cooper then explained that the relevant community of interest here—the Black Belt—was a "historical feature" of the State, *not a demographic one*. The Black Belt, he emphasized, was defined by its "*historical boundaries*"— namely, the group of "rural counties plus Montgomery County in the central part of the state." The District Court treated the Black Belt as a community of interest for the same reason.

*Id.* at 1511 & n.5 (citations omitted and emphasis added).

43.   Justice Thomas, for the four dissenters, agreed that "plaintiffs could not prove the first precondition of their statewide vote-dilution claim … by drawing an illustrative map in which race was predominant." *Id.* at 1527. In the dissent's view, "the illustrative maps here are palpable racial gerrymanders." *Id.* The dissent noted the "manifest absence of any nonracial justification for the new District 1," while there was a "clear intent to ensure that *both* Districts 2 and 7 hit their preordained racial targets." *Id.* The dissent concluded that, "[i]f the State did this, we would call it a racial gerrymander, and rightly so." *Id.* at 1528.

**The Legislature Enacts the 2023 Plan**

44.   On June 15, 2023, one week after the Supreme Court's decision, Defendants informed the Court of their understanding "that the Alabama Legislature intend[ed] to enact a new congressional redistricting plan that w[ould] repeal and

replace the 2021 Plan, which would obviate the need for a trial" on the legality of the 2021 Plan. *Milligan* Doc. 166 at 2. Defendants explained their understanding of the effect of repealing and replacing the 2021 Plan. If the Legislature succeeded:

> Then, as this Court previously recognized, "'[t]he new legislative plan, if forthcoming, will … be the governing law unless it, too, is challenged and found to violate' federal law." *Milligan* Doc. 107 at 210-11 (quoting *Wise v. Lipscomb,* 437 U.S. 535, 540 (1978) (opinion of White, J.)).

*Milligan* Doc. 166 at 3.

45.     The following day, the Court held a status conference. *Caster* Plaintiffs argued that even if the Legislature enacted a new redistricting law, the only issue for the Court to consider would be whether the new plan included two districts that are "effective for black voters," because "[w]e know what Section 2 entitles plaintiffs to." *Caster* Doc. 180-1 at 42. In their view, all the Court should hold is "a remedial kind of evaluation" of the new law to measure its "effectiveness." *Id.* at 41, 42. The *Milligan* Plaintiffs too suggested that a hearing on a potential 2023 Plan would focus on whether the "proposed map was effective or ineffective." *Id.* at 44.

46.     Defendants, however, explained that whether the Legislature succeeded in enacting a new redistricting law would affect the next steps in Plaintiffs' redistricting challenges and that a newly enacted law would not be a mere "proposed plan." If the Legislature enacted a new law, "there are numerous decisions saying that the question for the Court when a new map is passed, is whether it violates anew constitutional or statutory voting rights. And that is where it fails to meet the same

standards applicable to an original challenge of a legislative plan in place." *Caster*

Doc. 180-1 at 45. Defendants pointed to *McGee vs. Granville County*, 860 F.2d 110

(4th Cir. 1988), as one such decision setting out this standard. *Caster* Doc. 180-1 at

45. The question would be whether there is "likely a Section 2 violation." *Id.* at 44.

Defendants stated their view that "a lot of the evidence that was already submitted

in the case would likely be relevant to that determination, but not necessarily all of

it." *Id.* at 44-45. And "there could be additional evidence that could shed light on

whether the 2023 plan is likely to be in violation of federal law or in compliance

with federal law." *Id.* at 45.

47.    If the Legislature failed to enact a new redistricting law, however,

Defendants agreed the parties would proceed with a remedial "process that looks a

lot more like Ms. Khanna [for the *Caster* Plaintiffs] was laying out where"

Defendants could offer "a proposal" to the Court "to be considered as one among

many plans" before the Court. *Id.* at 46.

48.    Following this discussion, Judge Marcus "summarize[d] what" he

thought was "agreed upon by the parties," including that "if a new plan was drawn,

we would have the opportunity, and the parties would be able to present to us

whatever evidence went to the question of the new map. We would hear it on the

14th of August." *Id.* at 48. Following up on a statement by *Milligan* counsel, Judge

Marcus further said that if "the State is unable to agree on a plan, the Legislature,

then we would go forward on a remedial basis." *Id.* at 48. The parties agreed. *Id.* at 49-50.

49.     After a brief recess, the panel summarized how the challenges would proceed if the Legislature enacted a new map versus if it failed:

> We will basically continue the trial date that we have set for the 31st of July, and set it down instead for August the 14th, that Monday, should there be a new map, and should there be a challenge to the new map, at which time we will afford the parties, of course, every opportunity to present whatever data, evidence, witnesses, you may deem appropriate going to any challenge that may be launched as to a new map that the legislature will draw.

*Id.* at 52. And if "the Legislature is otherwise unable to agree to a new map by the 21st of July, that we would be going forward with a remedial portion of what otherwise remains, which would be and is as we speak today, the injunction, the preliminary injunction that we adopted in January." *Id.* at 53.

50.     During the course of the hearing, Judge Manasco recognized "the Legislature really doesn't need the Court's permission to draw a map on any timetable or by any deadline." *Id.* at 38.

51.     The following week, Defendants reiterated that the 2023 Plan should govern unless Plaintiffs show "that the new legislation violates § 2 'anew'" and at least a new preliminary injunction issues. *See Milligan* Doc. 169 at 2-3 (quoting *McGhee*, 860 F.2d at 115).

IV.    **The 2023 Legislative Proceedings**

     A.    **Overview**

52.    On June 27, 2023, the Governor called a special session of the Legislature to enact new congressional redistricting legislation. *See Milligan* Doc. 173-1.

53.    The Reapportionment Committee held public hearings during which members of the public, the Legislature, and parties to these cases participated. *See Milligan* Doc. 220-1 (June 27 Reapportionment Comm. Hr'g Tr.); *Milligan* Doc. 259-1 (July 13, 2023 Reapportionment Comm. Hr'g Tr.).

54.    On July 17, 2023, the Legislature began a Special Session. *See Milligan* Doc. 173-1.

55.    On July 21, 2023, the Legislature passed, and the Governor signed into law, new redistricting legislation with Act No. 2023-563. *See Milligan* Doc. 220-11. The 2023 Act repeals the 2021 Plan and replaces it with the 2023 Plan.

     B.    **The Involvement of Plaintiffs and their Counsel**

56.    The *Milligan* and *Caster* Plaintiffs submitted their own proposal to the Redistricting Committee, the VRA Plaintiffs' Remedial Map.

57.    The VRA Plaintiffs' Remedial Map would have split Mobile County and divided the Gulf between Districts 1 and 2 on race-based lines. It would have split seven counties, including three within District 2 alone—Mobile, Clarke, and Houston Counties. *Milligan* Doc. 200-7 at 4. The splits of those counties show the

proposal's particularly stark racial divide between the much more heavily black population placed in new District 2 and the majority white population left in new District 1. For example, while 49.6% of Mobile County's overall voting age population is drawn into District 2, 72% of the black voting age population of the county is added to the district. On the other end of the District 2, 31% of Houston County's total voting age population is added, but that population represents 60.8% of black voting age residents in the county. *See Milligan* Doc. 220-10 (Bryan Supplemental Report) at 33.



58. The VRA Plaintiffs' lead argument for their alternative plan was that it "contains two districts that 'perform' consistently for Black voters in primary and general election." *Milligan* Doc. 200-7 at 2. They also noted that their plan "remedies the cracking of the Black Belt community of interest, identified by the courts, by keeping the eighteen 'core' Black Belt counties together within" two districts. *Id.*

The BVAP for Plaintiffs' proposed Districts 2 and 7 would be roughly 50% and 54% respectively. *Milligan* Doc. 220-10.

59.  Evan Milligan, Letetia Jackson, and Bernand Simelton (of *Milligan* Plaintiff Alabama NAACP) spoke at the Reapportionment Committee's June 27 hearing. *See Milligan* Doc. 220-1 at 32:16-45:11.

60.  At the Reapportionment Committee's July 13 hearing, *Milligan* counsel Davin Rosborough signed up to speak but then requested to give his time to Bernard Simelton, Shalela Dowdy, Khadidah Stone, Latetia Daniels Stone, and Evan Milligan, each of whom spoke. *Milligan* Doc. 259-1 at 45-59.

61.  *Milligan* counsel Deuel Ross next introduced himself as lead counsel for the *Milligan* Plaintiffs and said he "was asked by the attorney for the cochairs to read from a letter than we sent to him on behalf of the *Milligan* and *Caster* plaintiffs." He summarized the letter as emphasizing that only the *Milligan* and *Caster* Plaintiffs have won in court, that their plan performs better at electing the candidates of choice of black voters than the plans offered by the *Singleton* Plaintiffs, and that the "Black Belt is a significant community of interest" which "deserves representation, just like every other community in Alabama." *Id.* at 59-61.

62.  Mr. Rosborough then spoke, saying that the guidelines call for compliance with the VRA over respecting communities of interest and he contended

that "[r]ace still infuses the political system here" such that "the race-conscious remedy that's presented ... is a proper remedy." *Id.* at 61-63.

63.     The Committee had before them various letters from Plaintiffs' counsel. *Caster* and *Milligan* counsel signed a letter dated June 26, 2023, that they submitted to the Committee detailing their support for the VRA Plaintiffs' Remedial Plan. *Singleton* Doc. 169-11. They sent another letter on July 11, 2023, where they attempted to rebut the *Singleton* Plaintiffs' involvement at the remedial stage, specifically responding to counsel for the *Singleton* Plaintiffs' testimony at the June 27 hearing. *Singleton* Doc. 169-12. Mr. Blacksher—counsel for the *Singleton* Plaintiffs—responded with his own letter on July 12, 2023, advocating for two plans that Senator Smitherman and Senator Singleton supported in the Special Session. *Singleton* Doc. 169-13.

64.     At the June 27 hearing, Mr. Blacksher reminded the Committee that the *Singleton* constitutional claim was still pending before the three-judge court. *Milligan* Doc. 220-1 at 64:10-12. Mr. Blacksher explained that any map must satisfy the Constitution along with § 2. *E.g.*, *id.* at 65:6-8. In response to questioning from Representative England, Mr. Blacksher warned the Legislature that he "ha[d] [his] doubts about whether [the *Milligan* and *Caster* Plaintiffs' map] could satisfy strict scrutiny under the Constitution because of the way it splits Mobile and Jefferson County along racial lines." *Id.* at 71:22-72:3.

### C.    Information on the Gulf Coast

65.    Mike Bunn, an author and historian from Baldwin County who directs the Historic Blakeley State Park in the Mobile-Tensaw River Delta, testified at the June 27 public hearing about how Mobile and Baldwin counties have been united as far back as the Colonial era. *Milligan* Doc. 220-1 at 80:17-81:19. He also noted the history of ferries running between the counties before the Cochrane-Africatown Bridge was opened in the 1930s, which increased the counties' links. *Id.* at 81:20-82:6.

66.    The Reapportionment Committee heard similar testimony about the Gulf Coast community of interest at the July 13 hearing. Patrick McWilliams from Baldwin County discussed the needs of the Gulf counties of Mobile and Baldwin, including funding for the University of South Alabama (a large public university with campuses in both Mobile and Baldwin Counties) and the Coast Guard Aviation Training Center in Mobile. *Milligan* Doc. 259-1 at 71:11-73:16. He also testified about the counties' shared plans for a bridge that would span the bay between them. *Id.* at 72:16-17. And throughout his testimony on these points, he questioned why such projects might matter to someone in Dothan and raised the point that they must necessarily compete with comparable institutions in the Wiregrass (*e.g.*, Troy University and Fort Novosel). *Id.* at 72:11-20.

67.    The Legislature had before it a statement that Representative Adline Clarke, a Democrat from Mobile, made to a reporter in 2021: "I consider Mobile and Baldwin counties one political subdivision and would prefer that these two Gulf Coast counties remain in the same congressional district because government, business and industry in the two counties work well together—with our congressman—for the common good of the two counties." *Milligan* Doc. 220-4.

68.    The Legislature also received hundreds of pages of material from government websites that addressed the community of interest in the Gulf. The Court "takes judicial notice of these reliable sources of information from" the government websites discussed below. *Lowe v. Pettway*, No. 2:20-CV-01806-MHH, 2023 WL 2671353, at *13 n.13 (N.D. Ala. Mar. 28, 2023) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278-79 (11th Cir. 1999).[1]

69.    For example, the Legislature also had before it an extensive five-year Comprehensive Economic Development Strategy Plan developed by the South Alabama Regional Planning Commission (SARPC). *See Milligan* Doc. 220-3.[2] The local governments of Mobile, Baldwin, and Escambia Counties, as well as twenty-

---

[1] *See also R.S.B. Ventures, Inc. v. F.D.I.C.*, 514 F. App'x 853, 857 (11th Cir. 2013) ("[W]e take judicial notice of the information found on the FDIC's website."); *Lamonte v. City of Hampton, Ga.*, 576 F. Supp. 3d 1314, 1327 n.12 (N.D. Ga. 2021) ("It is established law that a court may take notice of government websites.") (citations omitted); *Ryzhov v. Mayorkas*, 634 F. Supp. 3d 1107, 1111-12 (S.D. Fla. 2022) (same) (collecting cases).
[2] Also available at sarpc.org under the "Links" heading at "2022 CEDS – 5 Year" or at https://tinyurl.com/2kkzsz5a.

nine municipalities within those counties, work together through the Commission with the congressional representative from District 1 to carry out comprehensive economic development planning for the region in conjunction with the U.S. Economic Development Administration. *Id.* at 4.

70.     The SARPC is a regional planning commission that was created under State law more than 50 years ago. *Milligan* Doc. 220-9 at 4;[3] *see also* Ala. Op. Att'y Gen. No. 91-00331 (July 30, 1991) ("regional planning and development commissions are public agencies created by statute"); Ala. Op. Att'y Gen. No. 92-00304 (June 11, 1992) (describing regional planning commission as "a public statutory agency composed of municipalities and counties"). Pursuant to Alabama Code § 11-85-51(b), factors the Governor considered when creating such a regional planning commission included "community of interest and homogeneity; geographic features and natural boundaries; patterns of communication and transportation; patterns of urban development; total population and population density; similarity of social and economic problems."

71.     The SARPC is addressing numerous areas of concern unique to the Gulf region, including transportation, industry, environmental, and educational concerns. *See Milligan* Doc. 220-3; *see also Milligan* Doc. 200-15 at 6 (Bagley Decl.) (not

---

[3] Also available at https://sarpc.org/.

disputing that "'Mobile and Baldwin Counties … work together as part of the South Alabama Regional Planning Commission' (SARPC) and have for over 50 years").

72.   The SARPC report noted the multi-billion-dollar bridge project critical to the Gulf. *See Milligan* Doc. 220-3 at 30. The Alabama Department of Transportation is aiming to secure more than $2 billion in federal grants and loans for the project. *Id.*

73.   The "Alabama State Port Authority" is another "state agency" (Ala. Code § 33-1-2) whose reports showed unique ties between Mobile and Baldwin Counties.

74.   The Port Authority's 2021 Economic Impact Study Report showed that the Port of Mobile supported 312,896 direct, induced, indirect, and related jobs in the State of Alabama in fiscal year 2021. *Milligan* Doc. 220-5 (Alabama Port Authority 2021 Economic Impact) at 8.[4] The state agency reported that "[t]he total economic value to the state of Alabama resulting from the marine cargo activity at the public and private marine terminals in 2021 is estimated at $85 billion." *Milligan* Doc. 220-5 at 10. Economic activity at the Port supports 21,020 direct jobs, where 42% of workers reside in Mobile City, 39% reside in Mobile County (excluding Mobile City), and 13% live in Baldwin County. *See id.* at 23. And, as SARPC reports,

---

[4]   Also available at https://www.alports.com/wp-content/uploads/2022/10/Alabama-Port-Authority_2021-Economic-Impact_FullReport.pdf.

the Port's success has spurred the growth of major industry across the bay in Baldwin County, *See Milligan* Doc. 220-3 at 66.

75.    Substantial federal funding is critical to the Port's success and jobs for workers from both Mobile and Baldwin. A recent financial report from the Port Authority documents that, in fiscal year 2020, the U.S. Army Corps of Engineers allocated $274.3 million to a recent harbor construction plan; in March 2022, the U.S. Department of Transportation awarded $100 million to the Port Authority and Mobile Airport Authority to increase efficiency of freight movements by air, land, and sea; and later that month, the Port Authority "was awarded another $200 million in federal appropriations. *Milligan* Doc. 220-6 (Alabama State Port Authority Annual Comprehensive Financial Report) at 18.[5] In December 2022, another $200 million in federal spending grants were awarded to the Port Authority. *Id.*

76.    The Legislature also considered that Baldwin and Mobile Counties provide inter-county public transportation options for their residents. *See Milligan* Doc. 220-7[6]; *Milligan* Doc. 220-8.[7]

---

[5] Also available at https://www.alports.com/wp-content/uploads/2023/04/Alabama-State-Port-Authority-Annual-Comprehensive-Financial-Report-September-302022_compressed.pdf.

[6] Also available at Baldwin County, AL; BRATS Public Bus Transportation; Fares, Routes, & Scheduling at Baylinc Route at https://baldwincountyal.gov/departments/brats-public-bus-transportation/fares-routes-scheduling.

[7] Also available at Mobile, Alabama; *Baylinc Connects Mobile-Baldwin County Public Transit Systems* (Nov. 5, 2007), at https://www.cityofmobile.org/news/baylinc-connects-mobile-baldwin-county-public-transit-systems/.

### D.    Information on the Wiregrass

77.    There was also testimony at the July 13 hearing about the Wiregrass community of interest. The Committee first heard from Mike Schmitz who was the Mayor of Dothan from 2009 to 2017 and is currently the civilian aid to the Secretary of the Army. *Milligan* Doc. 259-1 at 24:2-12. He explained how important it was that the mainly small communities in the Wiregrass be kept together and how partnerships between Wiregrass communities lasting 50-100 years have allowed the region to grow. *Id.* at 25:8-21. He specifically noted Southeast Alabama Gas, which is a partnership between fourteen municipalities from Dothan to Greeneville where the mayors sit down every month and work together to help each other because they are unable to rely on anyone else for support. *Id.* at 25:22-26:4. Mayor Schmitz also commented on how Troy University and Dothan's medical school and Fort Novosel and Maxwell Air Force Base linked the region. *Id.* at 26:5-22. He concluded by saying that he believes that Houston County and Dothan will lose their voices and vote if their congressional district moves west. *Id.* at 27:1-3.

78.    Jeff Brannon, the CEO of Flowers Hospital in Dothan and lifetime resident of Congressional District 2, spoke next. *Id.* at 27:6-10. He echoed Mayor Schmitz's testimony about the benefit of Wiregrass communities working together and specifically discussed the Southeast Alabama Hospital Council, which is a group

composed of representatives from five counties in the region working together to ensure quality healthcare access. *Id.* at 27:15-28:4.

## V. Additional Evidence Addressing Communities of Interest

### A. The Black Belt

79.    It is undisputed in this litigation that the Black Belt is a community of interest.

80.    It is a community interest because it is a "'historical feature' of the State, not a demographic one" and "is defined by its 'historical boundaries'— namely, the group of "rural counties plus Montgomery County in the central part of the state." *Allen*, 143 S. Ct. at 1511 n.5 (quoting report of Bill Cooper).

81.    The Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox. *Milligan* Doc. 53 at 12-13.

82.    Clarke, Conecuh, Escambia, Monroe, and Washington Counties are sometimes included within the definition of the Black Belt. *Milligan* Doc. 53 at 13. Like several of the core Black Belt counties, the five "sometimes" Black Belt counties are all majority white. QuickFacts Washington, Conecuh, Monroe, Clarke, and Escambia Counties, U.S. CENSUS BUREAU, https://tinyurl.com/2765j75f (last visited Aug. 16, 2023).

83.     The Alabama Legislature used this same definition of the Black Belt,
recognizing the 18 core counties and the five "sometimes" counties. Ala. Act No.
2023-563.

84.     Mobile County is not one of the "'rural counties plus Montgomery
County in the central part of the state'" that falls within the "'historical boundaries'"
of the Black Belt. *Allen*, 143 S. Ct. at 1511 n.5. Rather, the "sometimes" Black Belt
counties of Washington, Clarke, and Monroe separate Mobile from any "core" Black
Belt county.

85.     Jefferson County is not one of the core Black Belt counties or one of
the "sometimes" Black Belt counties. One cannot drive from the Black Belt to
Jefferson County without leaving the Black Belt before entering Jefferson County.

### B.     The Gulf

86.     Lee Lawson, President of the Baldwin County Economic Development
Alliance, testified via deposition that he provided a declaration to explain "why
Mobile and Baldwin County are uniquely tied together." *Milligan* Doc. 261-3 at
29:2. He testified that he provided the information for the declaration. *Id*. at 26:15–
17.

87.     Lawson grew up in Montgomery, went to Troy University, and has lived
eleven consecutive years in Baldwin County. *Milligan* Doc. 220-13 ¶2. Lawson has

worked for BCEDA for a total of fourteen years and given thousands of presentations about economic development. *Id*. ¶4.

88.     Baldwin and Mobile Counties are uniquely interdependent. *Id*. ¶3. For every major economic development presentation, the Mobile and Baldwin County economic development teams present together. *Id*.

89.     Two interstate highway systems connect Baldwin County with Mobile. *Id*. ¶5. 60,000 people use that infrastructure on a daily basis to commute between Baldwin County and Mobile for work. *Id*. To reduce congestion, the Bayway Project will expand the lanes of the existing bridge (I-10) that runs across Mobile Bay. *Id*.

90.     The Port of Mobile is a major shipping thoroughfare. *Id*. ¶6. Like Mobile, Baldwin County economically depends on the Port of Mobile. *Id*. The Port is currently undergoing a $400 million expansion. *Id*.

91.     The Mobile Regional Airport is also undergoing expansion, which will lead more Baldwin County residents to use Mobile for air travel. *Id*. ¶7. Two recently appointed board members for the Mobile Airport Authority reside in Baldwin County. *Id*.

92.     Business operations connect Baldwin and Mobile Counties. *Id*. ¶8. One quarter of Baldwin County's workforce works in Mobile. *Id*. The Airbus manufacturing facility, Austal's shipyard, and the Mobile Infirmary each depend on Baldwin County's workforce. *Id*. Mobile businesses train their employees in

Baldwin County. *Id*. ¶9. The two Counties are also the biggest trading partners in the Gulf. *Id*. As one example, component parts manufactured at Collins Aerospace in Foley are sold to Airbus for use in its final assembly line in Mobile. *Id*.

93.     "Baldwin County residents consume the same media as their neighbors across the Bay." *Id*. ¶10. Local news affiliates broadcast in Mobile and Baldwin, and *Lagniappe* is the newspaper "for the Mobile-Baldwin region." *Id*. Baldwin County residents go to Mobile to receive healthcare, shop, and pursue higher education. *Id*. ¶¶11, 12.Culturally, both Mobile and Baldwin Counties celebrate Mardi Gras, and the residents "collaborate during the Mardi Gras season." *Id*. ¶13.

94.     Lawson explained "that tourism, entertainment, and recreation industries are vital to Baldwin County and benefit Mobile" but have "very little effect on Wiregrass cities like Dothan." *Id*. ¶14. Based on Lawson's experience, "[p]utting the Wiregrass in the same district as the Gulf Coast would force a representative to divide their political capital between two different regions with different needs." *Id*.

95.     Representative Pringle testified at his deposition about the Gulf Coast community of interest. He explained how the region is "squeezed into just one little geographic area" which makes it "inextricably linked together through history and culture." *Milligan* Doc. 261-5 at 54:15-24. He commented on how Mardi Gras was only celebrated in Alabama in the Gulf region, about the major bridge that will

eventually connect the counties, and the Mobile Ballet being located in Baldwin County. *Id.* at 54:24-55:26. Lastly, he noted how about forty percent of the employees at Austal USA and Airbus in Mobile lived in Baldwin County. *Id.* at 55:8-14.

96.     *Milligan* Plaintiffs' expert Dr. Joseph Bagley also confirmed several key facts about Mobile and Baldwin Counties in the declaration included with the Plaintiffs' objections to the 2023 Plan and request for preliminary injunction. *Milligan* Doc. 200-15 (Bagley 2d Supp. Decl.). Consistent with his recognition of the "region" of "Metropolitan Mobile" as comprising Mobile and Baldwin Counties, *see* Joseph Bagley, *The Politics of White Rights* p. viii (2018), Dr. Bagley never claims that Mobile and Baldwin Counties are not a community of interest. Rather, he opines only that they are not an "inviolable" community of interest. *Milligan* Doc. 200-15 at 1. He does not, however, identify the criteria that would make a community of interest "inviolable" versus merely violable.

97.     And his report recognizes several facts showing that Mobile and Baldwin Counties do indeed comprise a community of interest. For example, he recognizes that "a consortium comprised of three local tourism boards (Gulf Shores and Orange Beach Tourism, Visit Mobile, South Mobile County Tourism Authority), four chambers of commerce (Coastal Alabama Business Chamber, South Baldwin County Chamber of Commerce, North Baldwin Chamber of Commerce, and the

Eastern Shore Chamber of Commerce), and the City of Foley" founded an organization a decade ago to promote tourism in the region and "identif[y] diverse attractions along the Gulf Coast." *Id*. at 5.

98.    Similarly, Dr. Bagley does not dispute that the Port of Mobile is "a unifying factor for the Mobile-Baldwin COI." *Id.* He merely notes that the Port's history includes the slave trade and civil rights history. *Id.*

99.    Dr. Bagley likewise recognizes that the University of South Alabama's "main campus is in Mobile, while it maintains a satellite campus in Fairhope," which is in Baldwin County. *Id.* at 6. He recounts that "[a]s of 2022, its student enrollment was 60 percent white and 22 percent Black." *Id.*

### C.    The Wiregrass

100.    Mike Schmitz, Brad Kimbro, and Jeff Williams provided information about the Wiregrass community of interest. *Milligan* Doc. 220-17 (Schmitz Decl.); *Milligan* Doc. 220-18 (Kimbro Decl.); *Milligan* Doc. 227-1 (Williams Decl.). Each of the witnesses testified via deposition that they stand by the information that they provided in their respective declarations. *Milligan* Doc. 261-6 at 40:23–25; *Milligan* Doc. 261-2 at 46:5–18; *Milligan* Doc. 261-7 at 43:13–16.

101.    The Wiregrass is a rural "community of small communities" in the southeastern corner of Alabama, *Milligan* Doc. 220-18 (Kimbro Decl.) ¶5, that stretches north to Montgomery, *Milligan* Doc. 220-17 ¶2. Dothan "is the heart of the

Wiregrass," *Milligan* Doc. 227-1 ¶2, and there is not a larger city within 100 miles of Dothan, *id*. ¶13.

102.   Mike Schmitz, Mayor of Dothan from 2009 until 2007, explained that the Wiregrass depends on Fort Novosel (formerly known as Fort Rucker) and Maxwell Air Force Base. *Milligan* Doc. 220-17 ¶¶3, 5. Fort Novosel, alone, brings $1 billion to the Wiregrass economy. *Id*. ¶6. The Chief Operating Officer for the Wiregrass Electric Cooperative, which serves Houston, Geneva, Coffee, Dale, and Covington Counties, also emphasized the importance of Fort Novosel to the Wiregrass region. *Milligan* Doc. 220-18 ¶13.

103.   The Dothan Area Chamber of Commerce has members from Geneva County, Henry County, Houston County, as well as the City of Dothan. *Milligan* Doc. 220-18 ¶4. The Geneva County Commission, Dothan Area Chamber of Commerce, Houston County Commission, and the Industrial Board Association coordinate to bring industrial investment to the Wiregrass. *Id*. ¶6. Spanning from Dothan to Greenville, officials from the 14 municipalities that own the Southeast Alabama Gas District meet every month to collaborate on projects in the Wiregrass. *Milligan* Doc. 220-17 ¶8.

104.   In addition to shared military and industrial interests, the Wiregrass has a common interest in agriculture. *Id*. ¶9. For instance, the 100-mile-radius

surrounding the City of Dothan produces 40% of all peanuts grown in the United States. *Id*.

105.   Troy University draws many of its students from the Wiregrass, educates the region's workforce, and participates in quarterly meetings with the Wiregrass Electric Cooperative. *Milligan* Doc. 220-18 ¶¶9, 10. Elected officials in Houston and Geneva Counties, U.S. representatives, and career counselors from local high schools attend the meetings. *Id*. ¶10.

106.   Wiregrass residents are further connected by media and cultural events. WTVY, WDHN, Dothan Eagle, and NPR Troy's affiliate broadcast throughout the Wiregrass region. *Id*. ¶14. Wiregrass residents attend the same annual festivals, such as the Tomato Festival in Slocum, the Rattlesnake Rodeo in Opp, and Dothan's Peanut Festival. *Id*. ¶15.

107.   Unlike Alabama's major population centers, the Wiregrass region lacks access to the interstate or a major airport. *Milligan* Doc. 227-1 ¶9.

108.   Dr. Bagley's latest declaration also provides evidence supporting the conclusion that the Wiregrass is a community of interest. While Dr. Bagley opines that the Wiregrass "does not constitute an inviolable COI," *Milligan* Doc. 200-15 at 1, he does not explain what would make a community of interest "inviolable."

109.   Dr. Bagley does recount, however, how historian William Byrd wrote in 2009 that, "The southeast corner of Alabama is popularly known as the

Wiregrass." *Id*. at 8. He also notes that multiple historians have defined the Wiregrass to include Barbour, Coffee, Covington, Crenshaw, Dale, Geneva, Henry, Houston, and Pike, the same nine counties included in the Legislature's definition of the Wiregrass in Act 2023-563. *See id*. ("Professor Braund included all these counties in her historical discussion of the Wiregrass, as did archivist Marty Oliff"); *see also* Ala. Code. § 17-14-70.1(4)(g)(1) (listing Wiregrass counties). Dr. Bagley states too that in his book, *The Politics of White Rights*, he recognizes the region of the Wiregrass, though he includes only six of the nine counties listed above in his definition. *See Milligan* Doc. 200-15 at 8 & n.33.

## VI.   The 2023 Plan

110.   The 2023 Plan departs from the State's past district lines—a direct response to the *Allen* decision's statement "that a State's adherence to a previously used districting plan can[not] defeat a § 2 claim." *Allen*, 143 S. Ct. at 1505.

111.   The 2023 Plan prioritizes keeping the Black Belt together to the fullest extent possible while still complying with the constitutionally compelled requirement of population equality.

112.   Not only does the 2023 Plan keep the Black Belt together to the fullest extent possible, but the 2023 Plan also preserves long-recognized communities of interest in the Gulf and Wiregrass.

113.   The Act includes legislative findings that describe the features of the map, such as the number of county splits and the communities of interest preserved.

114.   The Act states [t]he Legislature's intent in adopting the congressional plan … to comply with federal law, including the U.S. Constitution and the Voting Rights Act of 1965, as amended." *Id*. § 17-14-70.1(2).

115.   The Act's legislative findings discuss the traditional principles given effect in the 2023 Plan including "minimal population deviation," contiguity, districts "composed of reasonably compact geography," minimizing splits of county lines, maintaining communities of interest, and avoiding pairing of incumbents. *Id*. § 17-14-70.1(3).

116.   Subsection 17-14-70.1(4) elaborates on the 2023 Legislature's approach to communities of interest, specifying that the 2023 Plan keeps together the Black Belt, the Gulf Coast, and the Wiregrass regions to the fullest extent possible. *Id*. § 17-14-70.1(4)(d).

117.   The Act states that these regions fit the definition of a community of interest, meaning "a defined area of the state that may be characterized by, among other commonalities, shared economic interests, geographic features, transportation infrastructure, broadcast and print media, educational institutions, and historical or cultural factors." *Id*. § 17-14-70.1(4)(a).

118.   Keeping each community "together to the fullest extent possible" means that "[i]f it is necessary to divide a community of interest between congressional districts to promote other traditional districting principles like compactness, contiguity, or equal population, division into two districts is preferable to division into three or more districts." *Id*. § 17-14-70.1(4)(c)-(d).

119.   The Act then details the counties that make up the Black Belt, Gulf, and Wiregrass communities of interest along with legislative findings about each region.

120.   First, the Act explains that the Black Belt "shall be placed into two reasonably compact districts," which is "the fewest number of districts in which this community of interest can be placed." *Id.* § 17.14-70.1(4)(e)(4).

121.   Placing the Black Belt into two districts was a change from the 2021 Plan, which followed earlier redistricting plans in placing the 18 Black Belt counties into three or more districts.

122.   The Black Belt counties could not be placed into just one district without violating either principles of contiguity or minimal population deviation because the part of the State south of the Black Belt has too much population for a single congressional district and too little population for two congressional districts.

123.   The 2023 Plan flows from these traditional principles of compactness, county lines, and communities of interest.



*See Milligan* Doc. 200-1.

124.   In the 2023 Plan, core retention takes a back seat to the goal of curing the division of the Black Belt identified by Plaintiffs.

125.    Not a single Black Belt county is split between districts.

126.    Montgomery County is kept whole along with other eastern Black Belt counties in District 2. Several of these counties kept together in District 2 are also part of the Wiregrass region and are combined with other Wiregrass counties to form District 2, consistent with the Act's requirement that the Wiregrass region be kept together. *Id*. § 17-14-70.1(4)(d).

127.    The western Black Belt counties make up nearly all of District 7. District 7 also includes all but one of the five additional counties that are sometimes included in the Black Belt (Washington, Clarke, Monroe, Conecuh, and Escambia).

128.    Only Escambia is placed in District 1 to meet equal population and contiguity requirements.

129.    The changes between the 2021 and 2023 Plans significantly affected every district on the map and are shown below with the 2023 lines superimposed on the 2021 Plan:

2021 Congressional Plan

Map layers
Districts
Livingston_Congressional_Plan_3

©2021 CALIPER

130.   The 2023 Plan improves on the 2021 Plan and all of Plaintiffs' alternative plans by unifying the 18 core Black Belt counties into just two districts, while each of Plaintiffs' eleven plans would have placed these counties into three or more districts. The 2023 Plan also respects the Gulf and Wiregrass communities of interest, unlike Plaintiffs' plans.

131.   Both Gulf counties are maintained in District 1.

132.   Of the nine Wiregrass counties, eight are wholly within District 2, and the ninth (Covington) is necessarily split between Districts 1 and 2 to allow District 1 to meet equal population and contiguity requirements without having to split any "sometimes" Black Belt counties or take any others besides Escambia out of District 7.

133.   The 2023 Plan respects county lines by splitting them only six times, the minimum number necessary to reach equal population among the districts.

134.   Compactness likewise took priority over core retention in the 2023 Plan.

135.   The 2023 Plan is overall more compact based on the "eyeball" test.

136.   The 2023 Plan also rates better overall on the Reock and Polsby-Popper tests—two common measures of compactness:

|  | **Reock** | **Polsby-Popper** | **Cut Edges** |
|---|---|---|---|
| **2021 Plan** | 0.389 | 0.222 | 3230 |
| **2023 Plan** | 0.411 | 0.282 | 3246 |

*Milligan* Doc. 220-12 (Trende Expert Report) at 9-11.

137.   In addition, the least compact district under the 2023 Plan is more compact than the least compact district in the 2021 Plan.

|  | **Reock** | **Polsby-Popper** |
|---|---|---|
| **2021 Plan** | 0.248 (District 1) | 0.154 (District 6) |
| **2023 Plan** | 0.285 (District 5) | 0.185 (District 6) |

*Id.* at 9-10.

138.   The 2023 Plan's commitment to simultaneously keeping the Black Belt, Gulf, and Wiregrass communities of interest together to the fullest extent possible resulted not only in increased compactness but also changes in the demographics of Districts 2 and 7 from the 2021 Plan.

139.   District 7 had a Black Voting Age Population of 55.26% in the 2021 Plan. District 7 now has a BVAP of 50.65%. The change is the result of the 2023 Plan's unifying of Montgomery County in District 2.

140.   District 2 had a BVAP of 30.12% in the 2021 Plan. District 2 now has a BVAP of 39.93%, an increase of nearly 33%. *Milligan* Doc. 220-10 at 11, 15.

42

### VII.   Plaintiffs' Responses to the 2023 Map

141.   The *Singleton* Plaintiffs filed objections to the 2023 Plan and moved for a preliminary injunction. *Singleton* Doc. 147.

142.   The *Milligan* Plaintiffs filed objections and also sought to have the 2023 Plan enjoined. They argued that "HB5 Fails to Completely Remedy the §2 Violation Because the Plan Itself Violates § 2 and Unlawfully Dilutes the Black Vote." *Milligan* doc. 200 at 16. They explained that, "[i]n evaluating a remedial proposal, the Court applies the same *Gingles* standard applied at the merits stage." *Id.* And they contended that "[i]n assessing a remedy, the Court should also examine the redistricting policies the Legislature relied upon to justify its" new plan. *Id.* at 20 (citing *Dillard*, 831 F.2d at 250-51). The *Milligan* Plaintiffs then presented new evidence purporting to diminish the ties between Mobile and Baldwin Counties, *id.* at 21-23, in response to the 2023 Plan's new approach to communities of interest, which unifies the Black Belt while also maintaining communities of interest in the Gulf and Wiregrass. They also objected to the 2023 Plan on constitutional grounds. *Id.* at 23-26. They concluded by "request[ing] that the Court enjoin Alabama's new map[.]" *Id.* at 26.

143.   The *Caster* Plaintiffs filed objections as well related to the "performance" of the 2023 Plan. *Caster* Doc. 179.

## PROPOSED EVIDENTIARY RULINGS

144. In advance of the August 14 hearing, Plaintiffs filed a motion *in limine* that sought to exclude essentially all of Defendants' evidence on relevance grounds, and further sought to exclude the expert testimony of demographer Thomas Bryan as unreliable. *Milligan* Doc. 233; *Caster* Doc. 201. The Defendants responded in opposition the next day. *Milligan* Doc. 245; *Caster* Doc. 210.

145. At the August 14 hearing, Plaintiffs objected to most of Defendants' evidence on the same relevance grounds, and targeted additional objections at specific evidence. *Milligan* Doc. 265 at 105-44.

146. "[T]he general policy of the Federal Rules [is] liberal admission of evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993).

147. Evidence is relevant as long as it "has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Daubert*, 509 U.S. at 587 (quoting FED. R. EVID. 401).

148. While expert testimony is sometimes held to "more stringent standards," such standards are only "necessary because of the potential impact on the *jury* of expert testimony." *Allison*, 184 F.3d at 1310 (emphasis added). There is no justification to apply any heightened standard where judges are the factfinders.

149.   The inquiry for experts merely considers whether there is a "fit" between the opinion and the case at hand—*i.e.*, whether the opinion is "helpful[] to the factfinder in understanding the evidence or determining a fact, by a preponderance of the evidence." *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009). Accordingly, the standards governing Plaintiffs' challenges to both the expert materials and Defendants' other evidence are materially the same.

150.   Moreover, the August 14 hearing is effectively a preliminary injunction hearing, and at such a hearing, a district court may rely on materials which would not be admissible evidence for a permanent injunction, if the evidence is "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Here, the parties opted to present all evidence, including expert opinion evidence, on paper instead of live at the hearing, *Milligan* Docs. 233 at 1 & 245 at 1; *Caster* Docs. 201 at 1 & 210 at 1.

151.   The parties dispute about the relevance of evidence springs from their dispute about whether the task before this Court is—as the Plaintiffs argue—to determine solely whether the 2023 Plan has two "performing" districts, or—as the Defendants argue—to determine whether the 2023 Plan complies with the Voting Rights Act. For reasons discussed below, the Defendants have the better argument.

152.    None of Plaintiffs' cases is to the contrary. In *Coalition for Equity &
Excellence in Maryland Higher Education v. Maryland Higher Education
Commission*, 295 F. Supp. 3d 540 (D. Md. 2017), there was no new law under
consideration. Rather, after a final liability finding and unsuccessful mediation
regarding possible remedies, the court held an evidentiary hearing on court-ordered
remedies. *Id.* at 548. Likewise, in *Terrebonne Parish Branch NAACP v. Edwards*,
plaintiffs secured a final judgment declaring that a Louisiana judicial district's at-
large method of electing judges violated § 2. 399 F. Supp. 3d 608, 611 (M.D. La.
2019). The Louisiana Legislature failed to enact a new electoral scheme, and thus
the court proceeded to a purely remedial phase. *Id.* There was no new legislative
plan to consider "anew." *McGhee v. Granville Cnty*, 860 F.2d 110, 115 (4th Cir.
1988).[8]

153.    Here, "the state t[ook] the opportunity to cure a [likely] Section 2
violation and enact[ed] a new election plan," and "that legislative remedy is owed
substantial deference." *Whitest v. Crisp Cnty. Sch. Dist.*, 601 F. Supp. 3d 1338, 1344
(M.D. Ga. 2022). Unless the record shows that the 2023 Plan "violates the
Constitution or the Voting Rights Act," it "is an appropriate remedy for the [likely]
Section 2 violation" in the 2021 Plan. *Id.* at 1348.

---

[8] *Carr v. Montgomery Cnty.*, No. CIV.A. H-13-2795, 2015 WL 5838862, at *9 (S.D. Tex. Oct. 7,
2015), is a § 1983 suit that is, if anything, even less relevant.

154.   Because the challenged evidence is relevant to the question whether the 2023 Plan complies with federal law, we deny Plaintiffs' motion *in limine* to the extent it is based on relevance and we overrule all of Plaintiffs' relevance objections at the August 14 hearing.   We will consider the evidence in assessing Plaintiffs' challenges to the 2023 Plan.

155.   We note Defendants presented declarations from Mike Schmitz, Brad Kimbro, and Jeffrey Williams about the Wiregrass community of interest and from Lee Lawson on the Gulf Coast community of interest. *See Milligan* Docs. 220-13, 220-17, 220-18 & 227-1.   Plaintiffs made only relevance objections to these declarations, *Milligan* Doc. 265 at , 126-27, 129-32, and we have now rejected that argument.   Because these declarations shed light on the 2023 Legislature's decision to maintain communities of interest in the Gulf and Wiregrass, the evidence is clearly relevant to whether the 2023 Plan complies with § 2.

156.   Plaintiffs' motion *in limine* also challenged expert demographer Thomas Bryan's report, *Milligan* Doc. 220-10; *Caster* Doc. 191-10, as unreliable. *Milligan* Doc. 233 at 5-7; *Caster* Doc. 201 at 5-7.   Bryan analyzed various alternative plans Plaintiffs have proposed, including the plan they recently proposed to the Legislature. He assessed how county "splits differ by demographic characteristics when it comes to the division of counties" in Plaintiffs' alternatives. *Milligan* Doc. 220-10 at 22. He "created tables showing … the size and population characteristics

of the pieces that results from each county split" by showing "the total VAP (and share), the white, non-Hispanic VAP (and share) and APB VAP (and share) for each county piece split, by plan." *Id.* Then, by comparing the racial demographics of the counties that were split compared to the racial demographics of the pieces of those split counties in District 2 and 7 respectively, he concluded that "there is evidence that all of the counties that were split between District 7 and some other district and District 2 and some other district were both split in such a way that moved significant and disproportionate numbers of APB VAP into D2 and D7." *E.g.*, *id.* at 22-23.

157.   There is no basis for excluding Thomas Bryan's expert analysis.

158.   In *Allen v. Milligan*, the plurality explained that a plaintiff's *Gingles I* alternative map that crosses the "line" "between consciousness [of race] and predominance," cannot "satisfy the first step of *Gingles*." 143 S. Ct. 1487, 1512 (2023) (plurality op.). It necessarily follows that alternative maps that cross the line between racial consciousness and racial predominance are not appropriate remedies. Mr. Bryan's analysis goes to that question—in particular whether Plaintiffs' alternatives that they contend the Legislature should have adopted instead of the 2023 Plan were in fact alternatives that the Legislature could have constitutionally adopted. His analysis assesses Plaintiffs' alternatives and whether race was employed in a way that violates traditional districting principles. *See Cooper v. Harris*, 581 U.S. 285, 291 (2017). Mr. Bryan's assessment of how counties were

split along racial lines shines light on that inquiry, particularly where keeping counties whole is a traditional districting principle.

159.   Courts elsewhere have looked at whether a split in a county "plac[es] a disproportionately large number of black voters into" one district "while assigning relatively few voters to" another. *See, e.g.*, *S.C. State Conf. of NAACP v. Alexander*, No. 3:21-cv-03302, 2023 WL 118775, at *8 (D.S.C. Jan. 6, 2023), *probable jurisdiction noted* 143 S. Ct. 2456.

160.   Before this Court, the *Milligan* Plaintiffs' expert Dr. Ryan Williamson purported to "find strong evidence that race was a predominant factor" in the 2021 Plan by "examin[ing] county splits within the state with specific attention between these splits and the [BVAP] in Congressional District 7." *Milligan* Doc. 68-3 at 2-3. Dr. Williamson explained that he examined county splits for "multiple reasons," including that "county lines may be ignored in the pursuit of other legal requirements, which necessitates investigation into which other requirement is being pursued." *Id.* at 3. Bryan conducted a similar analysis.

161.   The disparities Bryan found in the demographics of voters in split counties who were swept into District 2 and 7 versus those placed in other districts is reliable evidence relevant to the remedial question of whether Plaintiffs' alternatives were alternatives the Legislature could have adopted or whether race unconstitutionally predominated.

162.    The Defendants offered multiple categories of evidence supporting the conclusion that the Gulf Coast and Wiregrass are communities of interest. Plaintiffs at the August 14 hearing sought to exclude much of Defendants' evidence on relevance grounds, which we have rejected, and on additional grounds, most often hearsay and lack of foundation. For the reasons explained below, we admit the evidence and we will consider it, giving it the weight we believe it to be due.

163.    Defendants offered certified transcripts of the June 27 and July 13 public hearings held by the Alabama Legislature's Reapportionment Committee. *Milligan* doc. 265 at 105-08.[9]  Plaintiffs objected on two grounds.  *Id.* at 105-06. They argued that the transcripts were not relevant on the theory that they went to legislative intent.  *Id.* at 106.  But Defendants explained that the evidence demonstrates that the communities of interest kept together by the 2023 Plan "were not made up by the Legislature in 2023."  *Id.*  Plaintiffs also objected on hearsay grounds because the witnesses before the Legislature were not sworn.  *Id.* at 105. But the transcripts do demonstrate what evidence was in front of the Legislature as it was considering how to draw the 2023 Plan, which is presumably why the *Milligan*

---

[9] Defendants' Exhibit B was a partial transcript of the July 13 public hearing.  *Milligan* Doc. 220-2.  Exhibit B-2 was the complete transcript, but without an index or exhibits.  *Milligan* Doc. 259-1.  At the August 14 hearing, Defendants' counsel numbered as Exhibit B-3 the July 13 transcript with exhibits. *Milligan* Doc. 265 at 141. Exhibit B-3 has now been filed as *Milligan* Doc. 266. Because a number of the exhibits are separately offered and have been objected to, and because Exhibit B-3 includes exhibits which have not been separately offered, citations are to the stand-alone transcript, namely Exhibit B-2.

Plaintiffs' objections pointed this Court to video of the same July 13 hearing, which is available online, *see, e.g.*, *Milligan* Doc. 200 at 6 n.13.

164.   The Alabama Legislature, like the United States Congress, is not bound by the federal rules of evidence, and its consideration of evidence not otherwise admissible in federal court can rationally support its legislative judgments.  In other words, the Legislature is free to rely on the information provided at these hearings to the degree that it sees fit and irrespective of whether the witnesses have been sworn.  This Court admits the transcripts. They were transcribed by a certified court reporter who certified that the transcripts accurately reflect the statements of the hearing. Moreover, Plaintiffs and their counsel were present at the public hearings.

165.   The Defendants offered various pieces of evidence that had been tendered to the Reapportionment Committee at the July 13 Hearing as evidence related to communities of interest in the State. *See Milligan* Docs. 220-4 through 9, 14-16 (Exhibits D-I, N-P), Doc. 231-1 (Exhibit C-2), Doc. 231-2 (Exhibit F-2). *Milligan* Doc. 265 at 110-17, 127-29, 139, Mr. Walker—counsel for the Committee—introduced these pieces of evidence, among others, into the record—as noted in the certified hearing transcript. *See Milligan* Doc. 259-1 at 140:10-143:25. Mr. Walker also stated that four copies of the set of exhibits would be available for Reapportionment Committee members to review in the Reapportionment Office. *Id.* at 147:9-11. The transcript of the July 13 hearing

includes a certificate from the court reporter that it "represents a true and correct transcript of the said proceeding." *Id.* at 157.

166.   Like the transcripts, these documents reflect evidence that was in front of the Legislature as it was considering how to draw the 2023 Plan.  Again, the Alabama Legislature is not bound by the federal rules of evidence, and its consideration of evidence not otherwise admissible in federal court can rationally support its legislative judgments. Plaintiffs do not argue that the documents were not offered, and they do not present evidence that the documents were not received by the court reporter into the record. The documents are admitted for the purpose of showing what information was provided to the Legislature.

167.   Additionally, a significant subset of this evidence, namely Defendants' Exhibits C-2, E, F, G, H, I, and O, are judicially noticeable government documents. *Lowe v. Pettway*, No. 2:20-CV-01806-MHH, 2023 WL 2671353, at *13 n.13 (N.D. Ala. Mar. 28, 2023) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278-79 (11th Cir. 1999).[10]

168.   Exhibits C-2 and I are from the South Alabama Regional Planning Commission (SARPC). The SARPC was created under State law more than 50 years

---

[10] *See also R.S.B. Ventures, Inc. v. F.D.I.C.*, 514 F. App'x 853, 857 (11th Cir. 2013) ("[W]e take judicial notice of the information found on the FDIC's website."); *Lamonte v. City of Hampton, Ga.*, 576 F. Supp. 3d 1314, 1327 n.12 (N.D. Ga. 2021) ("It is established law that a court may take notice of government websites.") (citations omitted); *Ryzhov v. Mayorkas*, 634 F. Supp. 3d 1107, 1111-12 (S.D. Fla. 2022) (same) (collecting cases).

ago. *Milligan* Doc. 220-9 at 4;[11] *see also* Ala. Op. Att'y Gen. No. 91-00331 (July 30, 1991) ("regional planning and development commissions are public agencies created by statute"); Ala. Op. Att'y Gen. No. 92-00304 (June 11, 1992) (describing regional planning commission as "a public statutory agency composed of municipalities and counties").

169.   Exhibits E and F are from the Alabama State Port Authority which is a "state agency." Ala. Code § 33-1-2.

170.   Exhibit G, the Baldwin Regional Area Transit System Baylinc schedule, is also available on Baldwin County's website. *See* Baldwin County, AL; BRATS Public Bus Transportation; Fares, Routes, & Scheduling at Baylinc Route at   https://baldwincountyal.gov/departments/brats-public-bus-transportation/fares-routes-scheduling.

171.   Exhibit H, Baylinc Connects Mobile-Baldwin County Public Transit Systems, is printed from the City of Mobile website, as indicated by the internet address at the bottom of the Exhibit. *See* Mobile, Alabama; *Baylinc Connects Mobile-Baldwin County Public Transit Systems* (Nov. 5, 2007), at https://www.cityofmobile.org/news/baylinc-connects-mobile-baldwin-county-public-transit-systems/.

---

[11] Also available at https://sarpc.org/.

172.   Exhibit O, USA: A Brief History, is printed from the University of South Alabama's website, again as evidenced by the internet address at the bottom of the Exhibit.  The University was created by the State.  Ala. Code § 16-55-1.  And, in any event, the exhibit is offered only to prove that the University has campuses in both Mobile County and Baldwin County, which is judicially noticeable as an independent matter, Fed. R. Evid. 201, and has been recognized by Plaintiffs' expert Dr. Bagley, *see Milligan* Doc. 200-15 at 6 ("The institution's main campus is in Mobile, while it maintains a satellite campus in Fairhope.").

173.   It is not in serious dispute that the facts in these documents "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. We thus take judicial notice of these government documents.

## PROPOSED CONCLUSIONS OF LAW

## I.   Plaintiffs' Burden Was to Show the 2023 Plan Likely Violated Federal Law.

174.   The Supreme Court has said of redistricting that it "is primarily the duty and responsibility of the State," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (cleaned up), and that it "is never easy," *id.* at 2314. "Since the Equal Protection Clause restricts consideration of race and the VRA demands consideration of race, a legislature attempting to produce a lawful districting plan is vulnerable to

'competing hazards of liability.'" *Id*. at 2135 (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality opinion)).

175.   The State's 2021 Plan faced allegations of both sorts of liability, and this Court found it likely the 2021 Plan violated § 2. After the Supreme Court affirmed that ruling, the 2021 Plan was repealed by the Alabama Legislature and replaced by the 2023 Plan.

176.   That new plan is now "the governing law," and remains so "unless it … is challenged and found to violate" federal law. *Singleton*, 582 F. Supp. 3d at 1032 (quoting *Wise*, 437 U.S. at 540). Thus, the question before this Court is whether the 2023 Plan complies with § 2 and the Equal Protection Clause. Unless Plaintiffs show that the Plan likely violates federal law, they have failed to show that the 2023 Plan does not remedy the likely § 2 violation this Court found in the 2021 Plan. *See McGhee v. Granville Cnty.*, 860 F.2d 110, 115 (4th Cir. 1988); *Dillard v. Crenshaw County*, 831 F.2d 246, 250 (11th Cir. 1987); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018); *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (op. of White, J.). Because Plaintiffs have failed to make that showing, the Court rejects their objections and their request for a new injunction against the 2023 Plan.

177.   When a new redistricting plan has been enacted, even following a finding that the plan it replaced violated federal law, the district court "consider[s] whether the proffered remedial plan is legally unacceptable because it violates anew

constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place." *Covington v. North Carolina*, 283 F. Supp. 3d 410, 424 (M.D.N.C.), *aff'd in part, rev'd in part*, 138 S. Ct. 2548 (2018) (quoting *McGhee*, 860 F.2d at 115).

178.   If the new plan "would have been upheld at the liability stage of the case, [it] must be upheld now." *Jeffers v. Clinton*, 756 F. Supp. 1195, 1199 (E.D. Ark. 1990), *aff'd*, 498 U.S. 1019 (1991).

179.   Thus, these proceedings are distinct from those in which there is no new legislation and instead only a court-drawn plan. *Compare*, *e.g.*, *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437 (11th Cir. 1988) (remedial hearing for court-selected plan). There are many ways for a plan to comply with federal law. And when the State enacts a new plan, the "district court is precluded from substituting even what it considers to be an objectively superior plan for an otherwise constitutionally and legally valid plan that has been proposed and enacted by the appropriate state governmental unit." *Miss. St. Chapter, Operation Push. v. Mabus*, 932 F.2d 400, 407 (5th Cir. 1991).

180.   The 2023 Plan "is entitled to 'great deference' and this Court may not inquire whether some other remedy might be better if the Defendant's remedy is 'legally acceptable.'" *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 750 (N.D. Ohio 2009) (quoting *McGhee*, 860 F.2d at 115, and collecting cases); *see also*

*Jacksonville Branch of NAACP v. City of Jacksonville,* No. 3:22-CV-493-MMH-LLL, 2022 WL 17751416, at *11 (M.D. Fla. Dec. 19, 2022) ("[A] court may not ... simply substitute its judgment of a more equitable remedy for that of the legislative body."); *see also GRACE, Inc. v. City of Miami*, No. 1:22-CV-24066-KMM, 2023 WL 4602964, at *5 (S.D. Fla. July 18, 2023) (affording "Remedial Plan … a presumption of good faith").

181.   Thus, courts must "completely assess[] the differences between the new and old proposals," *Dillard*, 831 F.2d at 250, a principle that applies all the more when the new plan is not just a defendant's proposal, but is newly enacted law. *See Wilson v. Jones*, 130 F. Supp. 2d 1315, 1321 (S.D. Ala. 2000) ("[A] legislative body is entitled to considerable deference in the manner it chooses to remedy problems with its districting scheme.").

182.   A court cannot merely "t[ake] the findings that made the original electoral system infirm and transcrib[e] them to the new electoral system." *Dillard,* 831 F.2d at 249. "The evidence showing a violation in an *existing* election scheme may not be completely coextensive with a *proposed* alternative." *Id.* at 250. While *Dillard* ultimately concluded that the replacement election scheme was not permissible, that was based on a pages-long appraisal of the new scheme, which required an assessment of "the differences between the new and old proposals." *Id.* at 250-53.

183.   This Court's earlier findings were made as part of preliminary injunction proceedings assessing only the "likelihood of success." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981). Preliminary injunctions are often decided on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* at 395.

184.   Plaintiffs' 2023 burden is consistent with the nature of § 2. Section 2's "exacting" standard requires "an intensely local appraisal of the electoral mechanism at issue"—that is, the 2023 Plan. *Allen*, 143 S. Ct. at 1503, 1510 (quotation marks omitted). So in *Allen*, the Court assessed Plaintiffs' arguments not in a vacuum but instead against the particulars of the 2021 Plan. *See, e.g.*, 143 S. Ct. at 1504 (observing Plaintiffs' plans' compactness "performed generally better on average than did HB1 [the 2021 Plan]"). Likewise, the § 2 analysis of Georgia's plan in *Abrams* required accounting for "Georgia's traditional districting policies" in the challenged legislation. *Abrams v. Johnson*, 521 U.S. 74, 91 (1997). And the § 2 challenge to the City of Rome's districting plan considered "Rome's … discernable districting principle[s]." *Askew v. City of Rome*, 127 F.3d 1355, 1377 n.7 (11th Cir. 1997). In short, just as the reasonableness of Plaintiffs' plans challenging the 2021 Plan were assessed in light of how the 2021 Plan gave effect to principles of compactness, communities of interest, and others, any § 2 challenge to the 2023 Plan must be assessed in the light of how the 2023 Plan gives effect to those principles.

185.   The Court previously opined that "any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Singleton*, 582 F. Supp. 3d at 936. That assessment, however, was "based on the [2021] Legislature's redistricting guidelines" and "choices that the [2021] Plan made"—including the 2021 Legislature's prioritization of core retention over the Black Belt—all of which came *before* the Legislature successfully passed new legislation departing from those past district lines in the 2023 special session. *Id.* at 1005-06.

186.   This Court has a duty to consider the lawfulness of the 2023 Plan, in light of the challenges raised by the Plaintiffs, and Plaintiffs bear the burden to demonstrate that the 2023 Plan likely does not comply with § 2 if they want this Court to enjoin the 2023 Plan. In evaluating the Plaintiffs' challenges to the 2023 Plan, the Court is not revisiting the State's liability under the 2021 Plan or starting at square one. It is simply doing what any court does when a plaintiff seeks to enlist a federal court to enjoin a law by putting these Plaintiffs to their burden of proof. That requires "evidence that the new plan denies equal access to the political process." *Dillard*, 831 F.2d at 250.

187.   The Defendants accepted, and the Court finds, that the *Milligan* and *Caster* Plaintiffs' objections to the 2023 Plan are essentially motions for preliminary injunction. *See Milligan* Doc. 220 & *Caster* Doc. 191 ("Defendants' Joint Response

to *Milligan* and *Caster* Plaintiffs' Objections and Request for Preliminary Injunction"); *Milligan* Doc. 207 at 15 (Mr. LaCour: "But we do think that a new P.I. motion is essentially what everyone has filed as of Friday night, and that we are moving forward towards a new preliminary injunction motion as to a new law.").

## II.   "Competing Hazards of Liability"

188.   In enacting the 2023 Plan, the State did so against the well-trodden "competing hazards of liability," *Abbott*, 138 S. Ct. at 2315, with dueling claims from the *Singleton* Equal Protection Clause Plaintiffs and the *Milligan* and *Caster* § 2 Plaintiffs (as well as the threat of additional litigation).

189.   As in every State, Alabama could not remedy a likely § 2 violation with a plan that itself violated the Equal Protection Clause or other federal or State law. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 299 (2017) (racial gerrymandering liability after legislators "repeatedly told their colleagues that District 1 had to be majority-minority, so as to comply with the VRA").

190.   Last redistricting cycle, Alabama was found to have violated the Equal Protection Clause after it had attempted to comply with the preclearance requirement found in § 5 of the VRA. *See Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017).

191.   Plaintiffs here then used that Equal Protection Clause violation, induced by § 5 of the VRA, as evidence of a "recent instance[] of official discrimination"

warranting § 2 VRA liability. *Singleton*, 582 F. Supp. 3d at 1020 (citing *ALBC*, 231 F. Supp. 3d at 1348-49).

192.   States must be particularly wary of "violations of the fourteenth or fifteenth amendment," lest attempts to comply with § 2 create the risk of bail-in under § 3. 52 U.S.C. § 10302(c).

193.   The safest route then past these "competing hazards of liability," *Abbott*, 138 S. Ct. at 2315, was for the Legislature to satisfy § 2 by answering Plaintiffs' neutral call to "employ[] the same line-drawing standards in minority [communities of interest] as it used elsewhere," *Milligan* Appellees' Br. 29. There was no need to prioritize racial quotas over "nonracial communities of interest." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*). Section 2 "never requires" that. *Allen*, 143 S. Ct. at 1510.

### III.   Presumptions of Regularity and Good Faith

194.   Alabama's 2023 Plan is entitled to the presumption of good faith, and the new law remains in effect unless it violates federal law. *See Abbott*, 138 S. Ct. at 2325.

195.   "The factfinding process of legislative bodies is generally entitled to a presumption of regularity and deferential review by the judiciary." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989). Courts are "not at liberty to substitute our judgment for the reasonable conclusion of a legislative body." *Turner Broad.*

*Sys., Inc. v. F.C.C.*, 520 U.S. 180, 212 (1997). Because "[u]nder our form of government, legislators have a duty to exercise their judgment and to represent their constituents," proof about a legislature's purpose must go to "the legislature as a whole." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021). "The best evidence of [such] purpose is the statutory text adopted by both Houses and submitted to the [Governor]." *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991).

196.   The "districting decision is one that ordinarily falls within a legislature's sphere of competence," *Easley v. Cromartie*, 532 U.S. 234, 242 (2001), and States enjoy broad discretion when making political judgments in districting. *See Miller*, 515 U.S. at 915 ("the States must have discretion to exercise the political judgment necessary to balance competing interests").

197.   Federal courts must "'follow the policies and preferences of the State, as expressed in [the] statut[e]." *Upham v. Seamon*, 456 U.S. 37, 41 (1982). "The only limits on judicial deference to state apportionment policy" are "the substantive constitutional and statutory standards to which such state plans are subject." *Id.*

198.   "When the state takes the opportunity to cure a Section 2 violation and enacts a new election plan, that legislative remedy is owed substantial deference." *Whitest v. Crisp Cnty. Sch. Dist.*, 601 F. Supp. 3d 1338, 1344 (M.D. Ga. 2022).

199.    That remains true even if lawyers advised lawmakers on how to comply with the law. Indeed, it is common for legislators to get advice from lawyers about bills that they submit to the Legislature. *See, e.g.*, *Abbott*, 138 S. Ct. at 2329 ("The attorney general advised the Legislature to adopt the interim plans because he thought that was the 'best way to remedy the violations found by the D.C. court.'"); *Anderson v. CBS, Inc.*, 31 B.R. 161, 162 n.1 (Bankr. N.D. Ga. 1982) ("reports of the hearings indicate that the Attorney General representatives advised the members of the congressional committees"); *United States v. Taylor*, 178 F. Supp. 352, 355 (E.D. Wis. 1959) ("It is clear that the Executive Department and the Attorney General who drew the bill advised Congress of the intent to cover all stolen property."); *Singleton* Hearing Tr. at 51:14-52:23. Indeed, because "public officials are duty-bound to understand and respect constitutional, judicial and statutory limitations on their authority[,] … their access to candid legal advice directly and significantly serves the public interest." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007).

## IV.    Assessing the 2023 Plan under § 2

200.    Plaintiffs must prove that the 2023 Plan is not "equally open." 52 U.S.C. § 10301.

201.    There are many ways for a State to satisfy § 2's demand of "equally open" districts.

202.   Section 2 prohibits "racially discriminatory redistricting plan[s]." *Allen*, 143 S. Ct. at 1505.

203.   Adjudicating an alleged Section 2 violation requires "an intensely local appraisal" of the "electoral mechanism"—here, the 2023 redistricting plan. *Allen*, 143 S. Ct. at 1503 (quoting *Gingles*, 478 U.S. at 79).

204.   At this stage of the proceedings, the dispute is at step one of the *Gingles* test. The Defendants do not dispute, for present purposes, our earlier findings about the *Gingles* II and III preconditions. *Milligan* and *Caster* Hr'g at 64:1-65:4. And Defendants do not ask us to revisit our totality of the circumstances analysis. *Id.* at 65:5-18.

205.   Plaintiffs argue that the 2023 Plan fails to comply with § 2 by failing to create two majority-black districts or something close to it. *Caster* Doc. 179 at 8; *Milligan* Doc. 200 at 6. To succeed, Plaintiffs must make their showing at step one of the *Gingles* test. As Plaintiffs have described that requirement, they did before by showing their alternative plans "meet or beat" the traditional principles of compactness, maintaining communities of interest, and maintaining political subdivisions embodied in the 2021 Plan. *See, e.g.*, *Allen* Oral Argument Tr. 67, 83; *see also Singleton*, 542 F. Supp. 3d at 1006 ("testimony that [expert] felt it was important to 'meet or beat' the Plan's performance with respect to some race-neutral redistricting criteria"); *id.* at 979 (same); *id.* at 1012 (same); *id.* at 1006 (Cooper

"articulated a reasonable basis for the choices he made when he was forced to choose between competing redistricting principles—namely, the choices that the Plan made.").

206.    Section 2 "'*never* require[s] adoption of districts that violate traditional redistricting principles.'" *Allen*, 143 S. Ct. at 1510 (emphasis added) (quoting *Caster* Respondents Br. 3). It is a guidepost the Supreme Court has emphasized "in case after case." *Id.* at 1509 n.4. Those traditional redistricting principles include keeping together communities of interest, keeping districts compact, keeping counties or municipalities together in districts, and the like, while excluding core retention for purposes of defeating a § 2 claim. *See Abrams*, 521 U.S. at 91; *Allen*, 143 S. Ct. at 1505; *see, e.g.*, Ala. Code § 17-14-70.1(3), (4). Were it otherwise, plaintiffs could prevail with maps that simply maximize majority-minority districts—an approach that the Court has "expressly condemned." *See Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1249 (2022).

207.    "Forcing proportional representation is unlawful and inconsistent with this Court's approach to implementing § 2." *Allen*, 143 S. Ct. at 1509.

208.    For the first *Gingles* precondition, the question is whether "the specific illustrative map[] that a plaintiff adduces" "comport[s] with" the traditional redistricting principles in the State's plan, not traditional redistricting principles in the abstract. *Allen*, 143 S. Ct. at 1505, 1507. If it does not, then "[d]eviation from

that map" cannot show the "possibility" of the sort of impermissible "effect on account of race" that § 2 condemns. *Id.* At most, deviation would show effects on account of "traditional redistricting principles," the violation of which § 2 "*never* require[s]." *Id.* at 1510. That's why a proposed map that violates traditional principles like respect for nonracial communities of interest "is not reasonably compact." *See LULAC*, 548 U.S. at 433.

209.   Applied in *Allen*, the majority concluded that Plaintiffs were likely to succeed in their claim that their maps could meet or beat Alabama's 2021 Plan on those traditional redistricting principles—not that Plaintiffs had beat Alabama in hitting a racial target. 143 S. Ct. at 1504-05.

210.   In *Allen,* what was critical was not the Redistricting Committee's recitation of traditional principles in its Guidelines, but how those traditional principles were given effect in the 2021 Plan. *See Milligan* Appellees' Br. 20 (noting that this Court "found that Plaintiffs' illustrative plans, containing two majority-Black districts, comply with objective traditional redistricting criteria (compactness, contiguity, and respect for political subdivisions and communities of interest) as well or better than HB1 [the 2021 Plan]").

211.   The 2023 Plan is accompanied by legislative findings. While Plaintiffs have argued that State lawyers wrote the findings, they have not shown that it is unusual for State lawyers to advise State officials regarding State laws. *See Abbott,*

138 S. Ct. at 2329 ("The attorney general advised the Legislature to adopt the interim plans because he thought that was the 'best way to remedy the violations found by the D.C. court.'"). Indeed, the Alabama Legislature has a Legislative Services Agency whose Legal Division "is the principal bill drafting and legal research office serving the Legislature of the State of Alabama." *See* Legislative Services Agency Legal Division, *available at* https://alison.legislature.state.al.us/lsa-legal-division (last visited Aug. 16, 2023).

212.   In any event, the Legislature approved and the Governor signed into law Ala. Act No. 2023-563. The Act's findings describe the principles clearly given effect in the 2023 Plan.

213.   Thus, the Court deems the legislative findings helpful in resolving this case. *Cf. Minnesota v. Colver Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) (In the Equal Protection context, "States are not required to convince the courts of the correctness of their legislative judgments. Rather, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based *could not reasonably be conceived* to be true by the governmental decisionmaker.'" (emphasis added)). But even without the legislative findings, the traditional districting principles given effect in the 2023 Plan are clear on the face of the Plan and are confirmed by ample evidence presented by Defendants.

214.   The focus is on the 2023 Plan and whether Plaintiffs can produce an alternative map that includes an additional majority-minority district without requiring the State to sacrifice the traditional principles reaffirmed in *Allen* that are embodied in the 2023 Plan. Each Plaintiff plan sacrifices numerous communities of interest, including the Black Belt. And each Plaintiff plan sacrifices compactness, county lines, or both. Thus, the *Milligan* Plaintiffs appear to concede that their maps are "disqualif[ied]" under the districting principles given effect in the 2023 Plan, *Milligan* Doc. 200 at 20, and "the essential design features of Mr. Cooper's maps are indistinguishable from Dr. Duchin's," *Allen*, 143 S. Ct. at 1529 (Thomas, J., dissenting).

### A.    Communities of Interest

215.   The lesson from *Allen* is that Section 2 requires Alabama to avoid discriminatory effects in how it treats communities of interest, even if that means sacrificing core retention. 143 S. Ct. at 1505.

216.   Neither this Court nor the Supreme Court has ever said that § 2 requires the State to subordinate "nonracial communities of interest" in the Gulf and Wiregrass to Plaintiffs' racial goals. *LULAC*, 548 U.S. at 433.

217.   This Court previously "found that HB1 cracks majority-Black communities of interest" in the Black Belt and Montgomery (*Milligan* Appellees' Br. 16) in a way that resulted in discriminatory effects on account of race. The 2023

Legislature remedied that discrimination by applying its traditional principles as fairly to those communities as to the Gulf and the Wiregrass. Unless there is some way to create an additional majority-black district without violating these "traditional redistricting principles," Section 2 is satisfied, and the past likely violation is remedied. *Allen*, 143 S. Ct. at 1510.

218.  The premise of this Court's earlier conclusion that race did not predominate, which was later relied upon by the Supreme Court, was that the Black Belt community of interest was a nonracial community of interest based on its "'historical boundaries'" as "a 'historical feature' of the State, not a demographic one." *Allen*, 143 S. Ct. at 1511 n.5. Plaintiffs' new argument that uniting the Black Belt is not enough, and that distant areas of the State must be split and attached to the Black Belt based on race, guts that premise, and this Court rejects it.

219.  The 2023 Plan resolves the concerns about communities of interest that Plaintiffs said was "the heart" of their challenge to the 2021 Plan. *See Milligan* Appellees' Br. 5-6. They argued that the 2021 Plan was "'cracking' [the] majority-Black communities" of Montgomery and the Black Belt, while "prioritiz[ing] keeping together White people … in Baldwin and Mobile Counties." *Id.* at 21; *Caster* Respondents' Br. 15 ("The [1970] plan splintered the Black Belt among Districts 1, 2, 3, and 7. Under this plan and its successor, voters elected white candidates to every congressional seat in every election.") (citation omitted). The

Supreme Court agreed. The *Allen* Court concluded that the approach Plaintiffs' maps took to communities of interest was on par with the State's 2021 Plan. The majority said it was not persuaded that the Gulf was a community of interest based on the preliminary injunction record. 143 S. Ct. at 1505.

220.  Plaintiffs offered illustrative plans "contain[ing] the overwhelming majority of the Black Belt in just two districts." *Singleton*, 582 F. Supp. 3d at 1014. They argued that "splitting [the Black Belt] into as few districts as possible should be the priority over keeping the Gulf Coast counties together…." *Id.* at 1012. And they faulted the State for splitting Montgomery, one "of the State's principal majority-Black communities of interest." *Milligan* Appellees' Br. 1.

221.  Departing from Alabama's past redistricting plans, the 2023 Plan puts all 18 counties that make up the Black Belt entirely within Districts 2 and 7. Montgomery is kept whole in District 2, and not a single Black Belt county—core or otherwise—is split between two districts.

222.  Of the additional five counties that are "sometimes" added to the definition of the Black Belt, four are kept whole in District 7. Only the fifth, Escambia County, is in District 1, as necessary for contiguity and population equality.

223.  There can be no dispute that the 2023 Plan's stated goal of keeping the Gulf Coast together and the Wiregrass region together is a legitimate one, and § 2

does not (and cannot) require the State to disregard that legitimate race-neutral purpose in redistricting. *Allen*, 143 S. Ct. at 1510.

224.   Following the 2021-2022 preliminary injunction proceedings, this Court did not find that the Gulf was not a community of interest. Rather, the Court found only that "compared to the record about the Black Belt, the record about the Gulf Coast community of interest is less compelling." *Singleton*, 582 F. Supp. 3d at 1015. That finding supported Plaintiffs' argument that "splitting [the Black Belt] into as few districts as possible should be the priority over keeping the Gulf Coast counties together." *Id.* at 1012. Their plans thus offered "one way to split the Black Belt less," which was "to split the Gulf Coast counties and include some of the population of Mobile County with a district that also includes part of the Black Belt." *Id.* This was the "legitimate reason to split Mobile and Baldwin Counties consistent with traditional redistricting criteria." *Id.* at 1015.

225.   But that reason no longer exists. Even if the evidence of the Black Belt as a community of interest remains more compelling than the evidence for the Gulf, there is also substantial, unrebutted evidence detailed both above and below that supports the Gulf as a community of interest. And there is no longer any need to split the Gulf counties in order to split Black Belt counties into as few districts as possible. Indeed, each of Plaintiffs' eleven illustrative plans splits the Black Belt counties into *more* districts than the 2023 Plan while splitting the Gulf as well. There is no

legitimate reason to split both of these communities of interest like Plaintiffs do when the communities are both better united in the 2023 Plan.

226.   Both the record before the 2023 Legislature and the evidentiary record before this Court robustly support the Legislature's long-running recognition of the Gulf counties of Mobile and Baldwin being a community of interest.

227.   The "Gulf Coast community has a shared interest in tourism, which is a multi-billion-dollar industry," "has a distinct culture stemming from its French and Spanish colonial heritage," "is home to major fishing, port, and ship-building industries" and an "economic hub" that delivers "$85,000,000,000[] in economic value to the state" and "313,000 jobs each year," and depends on federal appropriations and cooperation. *See* Ala. Code § 17-14-70.1(4)(d)(f)(1)-(10).

228.   The community revolves around Mobile Bay, the intercoastal waterway between Mobile and Baldwin Counties. *Milligan* Doc. 220-13 (Declaration of Lee Lawson) ¶6. The major thoroughfares of I-10, I-65, and Highway 98 allow 60,000 residents of Baldwin and Mobile Counties to commute to each other's counties for work every single day. *Id*. ¶5. A full quarter of Baldwin County's workforce is employed in Mobile. *Id*.¶8. And Mobile businesses train their employees in Baldwin too. *Id*. ¶9. Baldwin residents often go to Mobile for shopping, healthcare, or even Mardi Gras. *Id*. ¶¶11, 13. With all the traffic from tourists and locals, the region

hopes for billions in federal funding for a Bayway Bridge project. *Milligan* Doc. 220-14; *see Milligan* Doc. 220-13 ¶5.

229.   Mobile is home to a large university, the University of South Alabama (USA), and it draws its students from the Gulf Coast region. *Id.* ¶12; *Milligan* Doc. 220-15. Fourteen of USA's fifteen "top feeder high schools" are located in the city of Mobile, Mobile County, and Baldwin County.[12] Given all this, residents in the Gulf Coast community unsurprisingly watch Mobile news and read Mobile papers. *Milligan* Doc. 220-13 ¶10; *Milligan* Doc. 220-16 (Lagniappe About Us).

230.   The Legislature had before it a statement from Democratic State Representative Adline Clarke of Mobile: "I consider Mobile and Baldwin counties one political subdivision and would prefer that these two Gulf Coast counties remain in the same congressional district because government, business and industry in the two counties work well together—with our congressman—for the common good of the two counties." *Milligan* Doc. 220-4.

231.   The three-judge district court in 1992 found that a District 1 encompassing the Gulf "preserves … communities of interest in" that district. *Wesch v. Hunt*, 785 F. Supp. 1491, 1497 (S.D. Ala. 1992).

---

[12] Fact Book 2022-2023, Sources of Entering Freshman, Office of Institutional Research, University of South Alabama, https://www.southalabama.edu/departments/institutionalresearch/factbook2223/ (click table 2.4).

232.    The *Milligan* Plaintiffs contend that some parts of Mobile County have more in common with the Black Belt than with Baldwin County. Jones Decl. (*Milligan* Doc. 200-9) ¶5. But Plaintiffs' own evidence suggests that there is at least a distinct nonracial community of interest in Mobile that their proposal to the Legislature would have split along race-based lines. *Id.* ¶6; *cf. Milligan* Appellees' Br. 33 (attacking the 2021 Plan for splitting Montgomery County, "an important community of interest"). While the Black Belt is characterized by "limited employment opportunities," Jones Decl. ¶7, "Mobile is the economic hub of South Alabama, in large part because of the Port of Mobile." *Id.* ¶6. With "[t]imber processing, shipbuilding, aerospace engineering, manufacturing, chemical developers, and companies from other … within Mobile County," the Mobile community is defined in part by its economic opportunity. *Id.*; *accord* Ala. Code §17-14-70.1(4)(f)(5) ("The Port of Mobile is the economic hub for the Gulf counties."). And *that* nonracial community of interest is divided in Plaintiffs' plans but not the 2023 Plan.[13]

---

[13] We also note that several counsel for the *Milligan* Plaintiffs also represent the South Carolina State Conference of the NAACP in its racial gerrymandering challenge to South Carolina's congressional plan. *See Alexander v. S.C. NAACP*, No. 22-807 (U.S.). There, plaintiffs recently attacked South Carolina's plan because its split of Charleston County purportedly "exil[es] many … residents—particularly in heavily Black North Charleston—from their economically integrated coastal community," placing "thousands more Black Charlestonians" in "a district anchored more than 100 miles away in Columbia." S.C. NAACP Br. Respondents' Br. at 16-17. Here, the Alabama State Conference of the NAACP demands that Alabama divide the economically integrated coastal community of Mobile County to place thousands of Black Mobilians in a district anchored more than 160 miles away in Montgomery.

233.   The *Milligan* Plaintiffs concede that *both* Gulf counties "celebrate Mardi Gras," Jones Decl. ¶12, evidencing the shared cultural heritage that the Legislature found supported the Gulf community of interest, *see* Ala. Code §17-14-70.1(4)(f)(9); *see id.* ("Mardi Gras is observed as a state holiday only in Mobile and Baldwin Counties (citing Ala. Code §1-3-8(c) (1975)).

234.   The *Milligan* Plaintiffs concede that the University of South Alabama has campuses in both Mobile County and Baldwin County. *See* Ala. Code §17-14-70.1(4)(f)(7); Bagley Decl. 6 (*Milligan* Doc. 200-15) (writing off this fact because "its student enrollment was 60 percent white and 22 percent Black").

235.   For 50 years, the Gulf has been a "community of interest" for purposes of establishing a regional planning commission. *Milligan* Doc. 220-9 at 4. The *Milligan* Plaintiffs concede that "Mobile and Baldwin Counties also work together as part of the South Alabama Regional Planning Commission, a regional planning commission recognized by the state for more than 50 years." Ala. Code §17-14-70.1(4)(f)(10); Bagley Decl. 6.

236.   The *Milligan* Plaintiffs concede that thousands of direct jobholders of the Port of Mobile live in Baldwin County. Ala. Code §17-14-70.1(4)(f)(6); Bagley Decl. 5.

237.   The *Milligan* Plaintiffs concede that Mobile County and Baldwin County currently have a shared interest in Gulf-related tourism. *Compare* Ala. Code

§17-14-70.1(4)(f)(2) ("Over the past half-century, Baldwin and Mobile Counties have grown even more alike as the tourism industry has grown and the development of highways and bay-crossing bridges have made it easier to commute between the two counties."), *with* Bagley Decl. 5 ("But the idea of the region as a whole being a tourist destination is a relatively recent phenomenon.").

238.   While the *Milligan* Plaintiffs' offer expert testimony about the Gulf, an expert cannot supersede legislative findings, especially where, as here, the expert's opinions are based on a selective retelling of facts that were before the Legislature. In any event, Dr. Bagley does not actually dispute the Mobile and Baldwin Counties form a community of interest. He opines only that the Gulf is not an "inviolable" community of interest, a concept he does not define, and which implicitly recognizes that Mobile and Baldwin Counties *are* a community of interest—violable or not. Doc. 200-15 at 1.

239.   Thus, the Gulf is a community of interest.

240.   The 2023 Plan has the stated purpose of keeping the Wiregrass region together to the fullest extent possible. All nine Wiregrass counties are kept whole in District 2, except for Covington County, a portion of which is necessarily split between Districts 1 and 2 to allow District 1 to meet equal population and contiguity requirements without splitting a Black Belt county or moving other Black Belt counties out of the western Black Belt district.

241.   As Dothan's former mayor emphasized, it is critical that the region remains together to "protect Fort Novosel and Maxwell Air Force Base and to help the communities throughout the Wiregrass continue to thrive economically." *Milligan* Doc. 220-17 (Declaration of Mike Schmitz) ¶¶2, 5.

242.   "[T]he Wiregrass is a rural area in the southeastern corner of the State[,]" *Milligan* Doc. 220-18 (Declaration of Brad Kimbro) ¶5, that "is not served by interstate access or a major airport" and does not have a large city rivaling Birmingham, Huntsville, or Mobile, *Milligan* Doc. 227-1 (Declaration of Jeffrey V. Williams) ¶9. "Fort Novosel contributes more than $1 billion to the Wiregrass' economy." *Milligan* Doc. 220-17 ¶6; *see also Milligan* Doc. 227-1 ¶12; *Milligan* Doc. 220-18 ¶13. "[S]oldiers access[] housing, healthcare, retail shopping, and services" in the Wiregrass, and "various industries are located throughout the region to support the Fort and its soldiers." *Milligan* Doc. 227-1 ¶12. Agriculture and healthcare are additional major economic drivers in the area. *Milligan* Doc. 227-1 ¶¶13-14; *Milligan* Doc. 220-17 Q ¶9.

243.   Citizens residing in the Wiregrass consume the same media, *see Milligan* Doc. 220-18 ¶14, and come together for annual festivals like Dothan's Peanut Festival, Slocum's Tomato Festival, and Opp's Rattlesnake Rodeo, *id.* ¶15.

244.   "Essentially, the Wiregrass is a community of small communities." *Id.* ¶5. It has thrived because leaders throughout those communities work together

to support each other for the good of everyone. *Id.* ¶¶5-8, 10-12; *Milligan* Doc. 220-17 ¶¶7-8. *See also Milligan* Doc. 227-1 ¶¶7, 9, 16. Leaders in the Wiregrass are concerned about the possibility of being broken apart and "los[ing] [their] voice" in the process. *Milligan* Doc. 220-17 ¶10.

245.   As Dr. Bagley notes in his declaration supporting the *Milligan* Plaintiffs, multiple historians have recognized the Wiregrass as comprising the same nine counties identified by the Legislature. Doc. 200-15 at 8. And Dr. Bagley himself recognizes the Wiregrass, while constraining his definition to just six of those counties. *Id.* To be sure, he says the Wiregrass is not an "inviolable" community of interest. *Id.* at 1. But, again, that simply confirms that it is a community of interest.

246.   We thus conclude that the Wiregrass region is a community of interest.

247.   The 2023 Plan applies the communities of interest principle fully and fairly to remedy the "cracking" that Plaintiffs said was "the heart of" their challenge to the 2021 Plan. The Black Belt, Gulf, and Wiregrass communities are maintained to the maximum extent possible. Thus, this is no longer a case in which "[t]here would be a split community of interest in both" the State's plan and Plaintiffs' alternatives. *Allen*, 143 S. Ct. at 1505. Plaintiffs have not shown that there is a plan on par with the 2023 Plan that also creates an additional reasonably configured majority-black district.

248.   Plaintiffs contend that the State didn't unify the Black Belt into two congressional districts *the right way*, by joining the historic Black Belt counties with other black voters outside the Black Belt from the Gulf and Wiregrass communities of interest. *Milligan* Obj. 17 ("But SB5 splits the Black Belt between two districts in a way that minimizes the voting power of Black voters in CD 2[.]"). The Legislature can split the Gulf and Wiregrass because, in the *Milligan* Plaintiffs' minds, they are "majority-white communities." *Milligan* Doc. 200 at 25. That crosses constitutional lines.

249.   For the same reasons, the Court rejects Plaintiffs' new concept of "inviolable" communities of interest. *Id.* at 22; Bagley Decl. (*Milligan* Doc. 200-15) 1, 9. That novel theory is contrary to settled law that the Legislature is *permitted* to maintain nonracial communities of interest consistent with traditional districting principles, *see Bush v. Vera*, 517 U.S. 963, 977 (1996), so long as that does not come at the cost of unjustifiably splitting another nonracial community of interest in a way that creates discriminatory results on account of race, *Allen*, 143 S. Ct. at 1505-06. Accordingly, the Court does not ask whether the Gulf should be split to increase the concentration of black voters in District 2, as Plaintiffs would have it. The question is instead whether Plaintiffs have shown that their districts respect nonracial communities of interest "at least as well as Alabama's redistricting plan." *See Allen*,

143 S. Ct. at 1518 n.2 (Kavanaugh, J., concurring); *accord Allen*, 143 S. Ct. at 1505 (observing both plans would split a community of interest).

250.   No one contests that the Black Belt must be placed into at least two districts. It is not possible to put all Black Belt counties into one congressional district without violating the federal constitutional requirement of population equality. *See Wesberry v. Sanders*, 376 U.S. 1 (1964).

251.   None of Plaintiffs' illustrative plans in the earlier preliminary injunction proceedings put the Black Belt into fewer than two districts. *See Allen*, 143 S. Ct. at 1528 (Thomas, J., dissenting) (explaining that "the entire black population of the Black Belt … is too small to provide a majority in a *single* congressional district, let alone two"). Rather, each plan put the 18 Black Belt counties into at least *three* districts.

252.   To the extent that Plaintiffs mean to suggest that the Black Belt must be defined by more than its historical boundaries—reaching out to grab voters by race alone in counties that lie beyond even the "sometimes" Black Belt—that contradicts this Court's and the Supreme Court's earlier decision. As this Court explained, "the reasons why [the Black Belt] is a community of interest have many, many more dimensions than skin color." *Singleton*, 582 F. Supp. 3d at 1014. Plaintiffs' earlier proposals to keep that "historic feature" of the State together were deemed not to be race predominant because that community of interest was "defined by its 'historical

boundaries'—namely, the group of 'rural counties plus Montgomery County in the central part of the state." *Allen*, 143 S. Ct. at 1511 n.5. But fully promoting this nonracial community of interest does not require combining it with some other set of voters beyond those "historical boundaries" based on voters' skin color. *Id.* Plaintiffs' argument that Black Belt districts must extend beyond those boundaries is not a valid or constitutional basis for rejecting the 2023 Plan.

253.   With respect to the Wiregrass, Plaintiffs say the 2023 Plan "splits the Wiregrass." *Milligan* Doc. 200 at 17. However, only one portion of one Wiregrass county (Covington) is not fully within District 2, and that split was necessary to balance population in District 1 *without taking additional Black Belt counties out of District 7. See* Ala. Code § 17-14-70.1(4)(g)(3) ("All of the Wiregrass counties are included in District 2, with the exception of Covington County, which is placed in District 1 so that the maximum number of Black Belt counties can be included within just two districts.").

254.   Plaintiffs' illustrative plans all take at least two full Wiregrass counties out of District 2.

255.   The *Milligan* Plaintiffs and the *Caster* Plaintiffs argue that the 2023 Plan "splits the Black Belt between two districts in a way that minimizes the voting power of Black voters in CD 2." *Milligan* Obj. 17; *Caster* Obj. 1. Plaintiffs thus contend that the Legislature was required to adopt legislation that sacrifices the Gulf

*and* the Wiregrass to increase the concentration of black voters in districts containing, but not limited to, the historic Black Belt counties. That argument is one not about splitting the "historical boundaries" of the Black Belt. *See Allen*, 143 S. Ct. at 1511 n.5. Instead, it is contrary to the premise in *Allen* about why race did not predominate—treating the Black Belt as "a '*historical* feature' of the State, not a demographic one." *Id*. It is a departure from *Allen* that would require a selective application of the communities of interest principle based on race. *Allen* said just the opposite was required. *Id.* at 1505. A State need not (because it cannot) break up other "*nonracial* communities of interest" like the Gulf and Wiregrass regions by "combin[ing] … farflung segments of a racial group." *LULAC*, 548 U.S. at 433 (emphasis added). That isn't "the opportunity that § 2 requires or that the first *Gingles* condition contemplates," *id.*, and if it were, § 2 as applied here would be unconstitutional, *see infra*; *e.g.*, *Miller v. Johnson*, 515 U.S. 900, 919-20 (1995).

256.   Finally, although the Black Belt is "quite clearly a community of interest of substantial significance," *Singleton*, 582 F. Supp. 3d at 1012, each of Plaintiffs' illustrative plans splits the Black Belt into one or even two more congressional districts than the 2023 Plan that Plaintiffs are challenging. They certainly give no legitimate reason for their newfound demand to split the Black Belt into *more* districts. They have gone from demanding the greater unification of the

Black Belt to demanding its dispersal in the name of "[f]orcing proportional representation." *Allen*, 143 S. Ct. at 1509. That is "unlawful." *Id.*

### B. Compactness and County Splits

257.   Plaintiffs' § 2 challenge to the 2023 Plan also fails because each of Plaintiffs' alternative maps fails to match the 2023 Plan on compactness, county splits, or both.

258.   A State cannot reject a more compact plan in exclusively racial terms, *Bush*, 517 U.S. at 969, lest race become the criterion that cannot be compromised, *Bethune-Hill*, 137 S. Ct. at 189. So too here—a Plaintiff cannot advocate for a less compact plan for exclusively racial reasons.

259.   Plaintiffs declined to offer new illustrative maps in response to the Legislature's adoption of the 2023 Plan and concomitant findings.

260.   Defendants' expert Sean Trende assessed the 2023 Plan and each of Plaintiffs' alternative plans based on the three compactness measures Dr. Duchin used in her earlier report. *See Milligan* Doc. 68-5 at 9. Across all three metrics (Reock, Polsby-Popper, and Cut Edges), the 2023 Plan measures as more compact than Duchin Plans A, C, and D and Cooper Plans 1-7. *Milligan* Doc. 220-12 at 9-11. On Reock, the 2023 Plan beats every Plaintiff plan. On Cut Edges, the 2023 Plan

beats all Plaintiff-proposed plans except the Plaintiffs' Remedial Plan,[14] which it ties, and Duchin Plan B. *Id.* at 11. And on Polsby-Popper, the 2023 Plan beats every Plaintiff-proposed plan except Duchin Plan B, which is essentially a tie. *Id.* at 10. Duchin Plan B's overall compactness doesn't tell the entire story; her restructuring of Districts 4 and 5 mask her "distended" District 1, which is less compact than the 2023 Plan's least compact district. *Compare id.* at 9-10, *with Singleton*, 582 F. Supp. 3d at 965 (Dr. Duchin "testified that the least compact districts in her plans— Districts 1 and 2—were 'comparable to or better than the least compact districts' in … the [2021] Plan").

261.    Thus, across all three compactness measures, every Plaintiff plan is less compact than the 2023 Plan with just two exceptions. And those two plans still fail under *Allen* because they have more county splits than the 2023 Plan. *See id.* at 16.

262.    County splits are distinct from split counties. *Milligan* Doc. 220-12 at 16. For example, Duchin Plan D has five split counties (Limestone, Jefferson, Shelby, Russell, and Mobile) but has six county splits because Jefferson is split twice.

263.    The 2023 Plan splits only six counties. *Id.* at 16.

---

[14] At the August 14, 2023 hearing, Plaintiffs made clear that they were not treating the "remedial plan" they proposed to the 2023 Legislature as a 12th illustrative plan for *Gingles* 1 purposes. *Milligan* Hr'g Tr. at 123:14-17 (Mr. Ross "Mr. LaCour keeps referencing the remedial plans that plaintiffs -- that my client put in front of the Legislature. That plan is not in front of this Court. We have never offered it as an illustrative plan.").

264.    Duchin Plan B and the Plaintiffs' Remedial Plan both have seven county splits (including three splits in majority-black District 2). *Id.* Duchin Plan C and Cooper Plans 2 and 6 also have more county splits than are necessary. *Id.* Worse, many of the gratuitous county splits occur along racial lines, in service of hitting a racial target. Bryan Rep. at 33-34 (showing how the Plaintiffs' Remedial Plan disproportionately splits Mobile, Jefferson, Tuscaloosa, Houston, and Clarke Counties). These plans thus fail at *Gingles* 1 because they fail to "respect [compactness or] county lines at least as well as [the 2023] plan." *Allen*, 143 S. Ct. at 1518 (Kavanaugh, J., concurring).

265.    Cooper Plan 7 is only able to have five county splits because it does not have minimal population deviation. *Caster* Doc. 65 at 5.

266.    The *Milligan* Plaintiffs argue that the "2021 guidelines … do not set an arbitrary ceiling" on splits. *Milligan* Obj. 16. But Alabama's principle isn't arbitrary because "six splits of county lines" "is the minimum number necessary to achieve minimal population deviation among the districts," and that principle is given effect in the 2023 Plan. Ala. Code §17-14-70.1. The only plans from Plaintiffs that meet that standard fall short on compactness. So each of Plaintiffs' plans fails to match the 2023 Plan on county splits, compactness, or both.

## C.   Constitutional Avoidance

267.   A VRA-compliant plan does not require a magic number of majority-minority districts, nor does it require hitting a racial target of 50% BVAP in any one district. *See Shaw v. Hunt (Shaw II)*, 517 U.S. 899, 917 n.9 (1996) ("a § 2 plaintiff" does not have "the right to be placed in a majority-minority district once a violation is shown" because "States retain broad discretion in drawing districts to comply with the mandate of § 2"); *see also e.g.*, *Caster* Respondents' Br. at 26, 52-53; *Milligan* Appellees' Br. at 44-45.

268.   For example, in *Cooper v. Harris*, 581 U.S. 285 (2017), the Supreme Court held that the Constitution prohibited the North Carolina legislature from targeting 50% BVAP in the creation of districts, even if for the purpose of VRA compliance.

269.   Applied here, any § 2 remedy "must be consistent with the Constitution." *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 544-45 (2015); *see also Wis. Legislature*, 142 S. Ct. at 1249-50 (rejecting remedial map that maximized creation of majority-black districts after court failed to apply sufficiently strict ).

270.   A remedy thus must ensure that districts are "equally open" without devolving into "competing racial factions" or assigning Americans to "creditor" and "debtor" races or crafting majority versus minority "political homelands." *Shaw I*,

509 U.S. at 657; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 239 (1995) (Scalia, J., concurring in part and concurring in judgment); *Holder v. Hall*, 512 U.S. 874, 905 (1994) (Thomas, J., concurring in judgment).

271. *Allen* did not alter the principle that race cannot predominate in redistricting. As applied in *Allen*, a four-justice plurality concluded that race did not predominate with respect to Mr. Cooper's illustrative plan based on the shared understanding by this Court and the Supreme Court that Mr. Cooper treated the Black Belt as a historic feature of the State, not an area defined by demographics alone. *Allen*, 143 S. Ct. at 1511 & n.5. And the plurality added that Plaintiffs were permitted to be "conscious[]" of whether an illustrative plan's district exceeded 50% BVAP for the specific purpose of satisfying *Gingles* 1. *Id.* at 1511-12. Justice Kavanaugh did not join that portion of *Allen*, and the dissent concluded that "it is impossible to conceive of *the State* adopting the illustrative maps without pursuing … racially motivated goals." *Id.* at 1527 (Thomas, J., dissenting).

272. Neither of the *Allen* plurality's rationales, affirming this Court's, could now justify concluding the 2023 Plan is not "equally open" and replacing the 2023 Plan with Plaintiffs' preferred alternatives that elevate the Black Belt's demographics over (and indeed sacrifice) its historical boundaries. That would impose on Alabama voters a plan in which race predominates.

273.  An order requiring the State to abandon the 2023 Plan in favor of any one of the alternatives that Plaintiffs proposed earlier in this litigation or in the Legislature would be an order imposing a redistricting plan that sacrifices traditional principles for the pursuit of a racial goal.

274.  A comparison of the 2023 Plan to any one of Plaintiffs' alternatives shows that traditional redistricting principles in Plaintiffs' alternatives "came into play only after the race-based decision had been made." *Shaw II*, 517 U.S. at 907.

275.  As compared to the 2023 Plan, Plaintiffs' proposed alternatives fare worse on the race-neutral, traditional criteria including county splits, compactness, and communities of interest.

276.  Plaintiffs' illustrative plans from earlier in this litigation no longer represent a "permissible remedy in the particular context of the challenged system." *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994).

277.  As compared to the 2023 Plan, the only criterion that Plaintiffs' do better on is race. They are the manifestation of a plan in which race was the criterion that could not be compromised, even if county splits, compactness, and communities of interest could be. Substituting one of Plaintiffs' maps for the 2023 Plan would therefore "'subordinate[]' other factors … to 'racial considerations.'" *See Cooper*, 581 U.S. at 291. That remains true "even if" the remedy "elevate[s] race" over keeping communities of interest together "in order to advance other goals, including

political ones" like giving Democrats a better chance of winning in a second district. *See id.* at 291 & n.1.

278.   It remains true even though Plaintiff-style remedial maps do not "*entirely* neglect[]" "[t]raditional districting criteria." *See Bush*, 517 U.S. at 963; *see also Bethune-Hill*, 580 U.S. at 190 (2017) ("a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering"). "The fact that other considerations may have played a role in the [Plaintiffs' maps] does not mean that race did not predominate." *Clark v. Putnam County*, 293 F.3d 1261, 1270 (11th Cir. 2002). An order to replace the State's Plan with a map that does not similarly promote the legitimate traditional principles advanced by the Plan would be an order "infected by … a deliberate racial purpose," and "strict scrutiny cannot be avoided simply by demonstrating that the shape and location of the districts can rationally be explained by reference to some districting principle other than race." *Id.*

279.   Under the Constitution, *all* race-based government action must satisfy strict scrutiny. *Students for Fair Admissions, Inc. v Pres. & Fellows of Harvard College*, 143 S. Ct. 2161-62 (2023).

280.   Redistricting is not an exception to the rule. *See Shaw v. Reno (Shaw I)*, 509 U.S. 630, 657 (1993).

281.   *Allen* addressed Equal Protection Clause arguments for purposes of Plaintiffs' *Gingles 1* illustrative plans and found that Plaintiffs' "consciousness" of whether an illustrative plan district surpassed 50% BVAP was permissible because "[t]hat is the whole point of the [*Gingles* 1] enterprise." *Allen*, 143 S. Ct. at 1512. *Allen*, in addressing whether the there was a VRA violation in the 2021 Plan, did not decide any Equal Protection Clause claims regarding the constitutionality of any proposed remedy that will now govern every voter in the State of Alabama. Any such remedy must be consistent with the Supreme Court's Equal Protection Clause cases, including most recently *Harvard*.

282.   "Under the Equal Protection Clause, districting maps that sort voters on the basis of race are by their very nature odious." *Wis. Legislature*, 142 S. Ct. at 1248 (cleaned up). "This is true whether or not the … purpose [is] remedial." *Shaw v. Hunt (Shaw II)*, 517 U.S. 899, 905 (1996).

283.  Because "the Equal Protection Clause restricts consideration of race and the VRA demands consideration of race," a remedial order requiring consideration of race must satisfy strict scrutiny. *See Abbott*, 138 S. Ct. at 2315. Accordingly, any remedy must be narrowly tailored to further compelling governmental interests. *See Harvard*, 143 S. Ct. at 2162; *see also Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 544-45 (2015) ("Remedial orders in disparate-impact cases should concentrate on the

elimination of the offending practice that arbitrarily operates invidiously to discriminate on the basis of race…. Remedial orders that impose racial targets or quotas might raise more difficult constitutional questions.") (cleaned up).

284. "Forcing proportional representation is" not a compelling governmental interest. *Allen*, 143 S. Ct. at 1509. *But see De Grandy*, 512 U.S. at 1016 ("substantially proportional" districts generally suggests no § 2 liability). This approach of sacrificing neutral principles to race is "unlawful and inconsistent with th[e] Court's approach to implementing § 2." *Allen*, 143 S. Ct. at 1509.

285. Maps like the ones the *Caster* and *Milligan* Plaintiffs proposed cannot survive strict scrutiny.

286. There are "only two compelling interests that permit resort to race-based government action": (1) measures necessary to avoid "imminent and serious risks to human safety" or (2) measures necessary to "remediat[e] specific, identified instances of past discrimination." *Harvard*, 143 S. Ct. at 2162. The first is inapplicable in districting. And the kind of race-based remedies Plaintiffs request here are not meant to "remediat[e] specific, identified instances of past discrimination." *See id.*

287. "[G]eneralized assertion[s] of past discrimination in a particular … region" are "not adequate," for "an effort to alleviate the effects of societal discrimination is not a compelling interest" to justify a redistricting plan that sorts

voters on the basis of race, as Plaintiffs' alternatives do when compared to the 2023 Plan. *Shaw II*, 517 U.S. at 909.

288.   The Supreme Court has assumed without deciding that compliance with § 2 is a compelling interest. *See*, *e.g.*, *Abbott*, 138 S. Ct. at 2315.

289.   "Such assumptions are not holdings." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016).

290.   If Plaintiffs reading of § 2 were correct, then the Supreme Court's assumption would have to be rejected. *See Allen*, 143 S. Ct. at 1538-39 (Thomas, J., dissenting) ("The Constitution is supreme over statutes, not vice versa.").

291.   "[C]ompliance with federal antidiscrimination laws cannot justify race-based districting" if, as here, the "application of those laws" is unconstitutional. *See Miller*, 515 U.S. at 921.

292.   Separately, adopting Plaintiffs' arguments about what § 2's requires in this challenge to the 2023 Plan would contravene two equal protection principles: the principle that race can never be used as a negative or operate as a stereotype and the principle that race-based action can't extend indefinitely into the future.

293.   The Constitution prohibits race used "as a stereotype or negative." *Harvard*, 143 S. Ct. at 2166 (emphasis added). Plaintiffs' application of Section 2 fails "th[ose] twin commands of the Equal Protection Clause." *Id.* at 2168.

294.  *First*, Plaintiffs' alternatives treat black and white Alabamians as communities—inviolable and violable, respectively—based on their race. And they presume that the 2023 Plan should be rejected because it doesn't make it easy enough to elect a second Democratic congressperson. Those assumptions impermissibly "reinforce the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and *will prefer the same candidates at the polls*." *Shaw I*, 509 U.S. at 647 (emphasis added). Subordinating two "nonracial communities of interest" to the goal of a second majority-black district indulges that "prohibited assumption" about voters in that district. *See LULAC*, 548 U.S. at 416; *see also Miller*, 515 U.S. at 919-20. "Even if a measure of truth can be found in some of the [racial] stereotypes used to justify [race]-based" districting maps, "that fact alone cannot support discrimination on the basis of" race. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 n.11 (1994). In short, applying § 2 to compel redistricting that "assign[s] voters on the basis of race," where an alternative plan compliant with § 2 does not, requires the State to "engage[] in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Id.* at 911-12. If § 2 requires that result here, then the Constitution forbids it.

295.   **Second**, adopting a map like the ones Plaintiffs propose would require using race as a "negative." Plaintiffs' remedies sort voters on the basis of race to hit a predetermined racial target. To hit the target, Plaintiffs would break up communities of interest and expel people from their districts, all because of race. That's nothing a State could do. *See Harvard*, 143 S. Ct. at 2169; *Shaw II*, 517 U.S. at 907 (State can't elevate race above neutral criteria like "respecting communities of interest and protecting … incumbents"). Maps like the ones Plaintiffs propose would also create majority-minority districts "in greater numbers than they otherwise would have been" if race hadn't been used. *Cf. Harvard*, 143 S. Ct. at 2169. But the Constitution forbids using race "to discriminate *against* those racial groups that were not the beneficiaries of the race-based preference." *Id.* at 2165.

296.   Plaintiffs' view of required § 2 remedies would also require race-based redistricting indefinitely into the future. The Constitution would not tolerate that either.

297.   In *Harvard*, the Supreme Court affirmed that "race-based" affirmative action in education "[at] some point … must end," *Harvard*, 143 S. Ct. at 2165-66, 2170-73, based on "the equal protection principle that racial classifications, even when otherwise permissible, must be a temporary matter, and must be limited in time," as the concurring opinion described it, *id.* at 2200 (Kavanaugh, J., concurring); *accord Bd. of Educ. v. Dowell*, 498 U.S. 237, 247-48 (1991) (describing

supervision as a "temporary measure" that did not "operate in perpetuity"). The principle applies "even if a racial classification is otherwise narrowly tailored to further a compelling governmental interest." *Harvard*, 143 S. Ct. at 2200. (Kavanaugh, J., concurring).

298.   Likewise in *Allen*, Justice Kavanaugh observed that "remediating specific, identified instances of past discrimination," *id.* at 2162, may have justified race-based redistricting in 1982. But "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." 143 S. Ct. at 1519 (Kavanaugh, J., concurring) (citing *id.* at 1543-44 (Thomas, J., dissenting)).

299.   The alternative would elevate a statutory remedy for old violations of the Constitution above the Constitution itself. *See Shelby County v. Holder*, 570 U.S. 529, 557 (2013) ("[W]hile any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions.").

300.   Plaintiffs' view of Section 2 liability depends on stereotypes about how minority citizens vote as groups, and not on identified instances of past discrimination. That approach will "effectively assure that race will always be relevant and that the ultimate goal of eliminating race as a criterion will never be

achieved." *See Harvard*, 143 S. Ct. at 2172 (cleaned up). All that's left to justify Plaintiffs' race-based affirmative action in redistricting are arguments about "past societal discrimination," but perpetuating present-day race-based redistricting to redress past race-based discrimination violates "both the letter and spirit of a constitutional provision whose central command is equality." *Croson*, 488 U.S. at 505-06. If Plaintiffs' view of Section 2 is correct, there's no "logical end point" to Section 2's race-based requirements. *See Harvard*, 143 S. Ct. at 2165, 2170.

301.   To avoid these constitutional problems, the Court has "rigorously appl[ied] the 'geographically compact' and 'reasonably configured' requirements" which results in the conclusion that Plaintiffs have not shown that the 2023 Plan likely violates Section 2. *Allen*, 143 S. Ct. at 1518 n.2 (Kavanaugh, J., concurring).

### V.   *Milligan* Plaintiffs' Equal Protection Argument

302.   If a plaintiff were to file a complaint against the 2023 Plan, he would have to plausibly allege intentional discrimination to survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[T]he plaintiff must plead and prove that the defendant acted with discriminatory purpose.").

303. The *Milligan* Plaintiffs do not plausibly allege intentional discrimination in their objections. Instead, they allege that the 2023 Plan "*may* be the product of intentional racial discrimination." *Milligan* Doc. 200 at 23 (capitalization altered; emphasis added).

304.   The *Milligan* Plaintiffs' theory—that the 2023 Plan is racially discriminatory "regardless of whether the ultimate purpose is racial, political, or otherwise," *id.*—is foreclosed by binding precedent. "[P]urposeful discrimination requires more than" just "awareness of consequences," it instead requires a decisionmaker to take "a course of action 'because of, *not merely in spite of*, the action's adverse effects upon an identifiable group." *Iqbal*, 556 U.S. at 676-77 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (cleaned up) (emphasis added). The *Milligan* Plaintiffs' acknowledgment that the purpose of the 2023 Plan may have been "political[] or otherwise" on its face would fail to state a claim for intentional discrimination, and does not clear the high bar of proving one.

305.   Plaintiffs rely on evidence that is plainly insufficient to rule out an "'obvious alternative explanation'" for the 2023 Plan: respect for communities of interest. *See Iqbal*, 556 U.S. at 682; *cf. ALBC v. Alabama*, 231 F. Supp. 3d 1026, 1044 (M.D. Ala. 2017) ("When the plaintiffs proceed with only indirect evidence that race predominated and the design of a district can be explained by traditional districting criteria, the plaintiffs have not satisfied their burden of proof.").

306.   The alleged discriminatory impact in "the new CD 2," *Milligan* Doc. 200 at 23, won't cut it. *See Iqbal*, 556 U.S. at 676-77; *Greater Birmingham Ministries v. Secretary of State,* 992 F.3d 1322 (11th Cir. 2021) (*GBM*) (absent an

impact that is "'unexplainable on grounds other than race, … the Court must look to other evidence'").

307. Plaintiffs' passing reference to Alabama's "'history'" of discrimination, *Milligan* Doc. 200 at 24, can't overcome "the presumption of legislative good faith," *Abbott*, 138 S. Ct. at 2324-25; *see also League of Women Voters v. Fla. Sec'y of State (League II)*, 66 F.4th 905, 923 (11th Cir. 2023) (The Court "rejected the argument that 'a racist past is evidence of current intent.'").

308. Plaintiffs' reliance on the complaints of Democrats in the Legislature, *Milligan* Doc. 200 at 24, is insufficient to prove an Equal Protection claim. *See League II*, 66 F.4th at 940 ("[T]he concerns expressed by political opponents [about disparate impact on black voters] during the legislative process are not reliable evidence of legislative intent.").

309. A handful of ambiguous *political* statements by a handful of legislators, *Milligan* Doc. 200 at 24-25, cannot satisfy Plaintiffs' burden given "the presumption of good faith." *See League of Women Voters v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022); *see also League II*, 66 F.4th at 931-32 ("the explanatory value of an isolated statement would be limited" because what "'motivates one legislator … is not necessarily what motivates scores of others'"); *id.* at 932 ("That the statement was made by the sponsor adds little to its significance.").

310.  All that's left to support the idea that the Legislature "'secretly intended'" to racially discriminate, *GBM*, 992 F.3d at 1324 & n.37, is *Milligan* Plaintiffs' complaint that Alabama chose districting principles to respect communities of interest and that the Legislature instead should have split these communities up to create a district based on race, *Milligan* Doc. 200 at 25-26. But putting race before traditional districting principles would have violated the Constitution. Declining to violate the Constitution does not violate the Constitution.

311.  The *Milligan* Plaintiffs (Doc. 200 at 26) assert that *LULAC* found that similar efforts had the "mark of intentional discrimination." 548 U.S. at 440. But the mark in that case was intentionally moving a minority group *out* of a district and into another after they were "poised to" oust the incumbent. *Id.* at 438-40. Here, Plaintiffs want the State to intentionally move a minority group *into* a district from another to oust the incumbent.

312.  We therefore reject the *Milligan* Plaintiffs' Equal Protection Clause claim.

Respectfully Submitted,

Steve Marshall
 *Attorney General*

/s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
 *Solicitor General*

James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
 *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

***Counsel for Secretary Allen***
s/ *Dorman Walker* (with permission)
Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

***Counsel for Sen. Livingston and Rep. Pringle***