FILED

2023 Oct-05  AM 09:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BOBBY SINGLETON**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| **WES ALLEN,** *in his official* | ) | **Case No.: 2:21-cv-1291-AMM** |
| *capacity as Secretary of State of* | ) | |
| *Alabama, et al.*, | ) | |
| | ) | **THREE-JUDGE COURT** |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **EVAN MILLIGAN,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No.: 2:21-cv-1530-AMM** |
| **WES ALLEN,** *in his official* | ) | |
| *capacity as Secretary of State of* | ) | **THREE-JUDGE COURT** |
| *Alabama, et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

Before MARCUS, Circuit Judge, MANASCO and MOORER, District Judges.

BY THE COURT:

### INJUNCTION, ORDER, AND COURT-ORDERED REMEDIAL MAP

These congressional redistricting cases are before this Court for us to order the Secretary of State ("the Secretary") to conduct Alabama's congressional elections according to a districting plan that remedies racially discriminatory vote dilution that we found and the Supreme Court of the United States affirmed in

1

Alabama's previous plan. *See Allen v. Milligan*, 143 S. Ct. 1487, 1498, 1502 (2023).

These cases allege that Alabama's previous plan ("the 2021 Plan") was racially gerrymandered in violation of the United States Constitution and/or diluted the votes of Black Alabamians in violation of Section Two of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section Two"). *See Singleton v. Allen*, No. 2:21-cv-1291-AMM (asserting only constitutional challenges); *Milligan v. Allen*, No. 2:21-cv-1530-AMM (asserting both constitutional and statutory challenges); *Caster v. Allen*, No. 2:21-cv-1536-AMM (asserting only statutory challenges).

The 2021 Plan included one majority-Black district: District 7, which became majority-Black in 1992 when a federal court drew it that way in a ruling that was summarily affirmed by the Supreme Court. *Wesch v. Hunt*, 785 F. Supp. 1491, 1497–1500 (S.D. Ala. 1992) (three-judge court), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), *and aff'd sub nom. Figures v. Hunt*, 507 U.S. 901 (1993).

After an extensive seven-day hearing in January 2022, we concluded that the 2021 Plan likely violated Section Two and enjoined the State from using that plan. *See Milligan* Doc. 107.[1] Based on controlling precedent, we held that "the appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which

---

[1] When we cite a filing that appears in multiple cases, we cite the *Milligan* filing.

Black voters otherwise have an opportunity to elect a representative of their choice." *Id.* at 5.[2] We observed that "[a]s the Legislature consider[ed remedial] plans, it should be mindful of the practical reality, based on the ample evidence of intensely racially polarized voting adduced during the preliminary injunction proceedings, that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* at 6. The Secretary and legislative defendants ("the Legislators") appealed. *Milligan* Doc. 108; *Allen*, 143 S. Ct. at 1502.

On June 8, 2023, the Supreme Court affirmed the preliminary injunction in all respects. *Allen*, 143 S. Ct. at 1502. The Supreme Court "s[aw] no reason to disturb th[is] Court's careful factual findings, which are subject to clear error review and have gone unchallenged by Alabama in any event." *Id.* at 1506. Likewise, the Supreme Court concluded there was no "basis to upset th[is] Court's legal conclusions" because we "faithfully applied [Supreme Court] precedents and correctly determined that, under existing law, [the 2021 Plan] violated" Section Two. *Id.*

On return from the Supreme Court, *Milligan* came before this three-judge

---

[2] Page number pincites in this order are to the CM/ECF page number that appears in the top right-hand corner of each page, if such a page number is available.

Court, and *Caster* before Judge Manasco alone, for remedial proceedings.[3] The State requested that we allow the Legislature approximately five weeks — until July 21, 2023 — to enact a new plan. *Milligan* Doc. 166.

All parties understood the urgency of remedial proceedings. The Secretary previously advised this Court that because of pressing state-law deadlines, he needs a final congressional map by "early October" for the 2024 election. *Milligan* Doc. 147 at 3. (In April 2022, mindful that under Alabama law, the last date candidates may qualify with major political parties to participate in the 2024 primary election is November 10, 2023, Ala. Code § 17-13-5(a), we directed the State to identify the latest date by which the Secretary must have a final map to hold the 2024 election, *Milligan* Doc. 145. The Secretary advised that he needs the map "by early October" 2023. *Milligan* Doc. 147 at 3. He later advised that he needs the map "by around October 1, 2023." *Milligan* Doc. 162 at 7.) In the light of that urgency, and to balance the deference given to the Legislature with the considerations outlined by the Supreme Court in *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), we delayed proceedings, entered a scheduling order, and told the parties to expect a remedial hearing on the date they proposed: August 14, 2023. *Milligan* Doc. 168.

On July 21, 2023, the Legislature enacted and Governor Ivey signed into law

---

[3] *Singleton* remains before this three-judge Court, but was not a part of the Section Two remedial proceedings.

a new congressional map ("the 2023 Plan"). *Milligan* Doc. 186. Just like the 2021 Plan, the 2023 Plan includes only one majority-Black district: District 7. *Milligan* Doc. 186-1 at 2.

All Plaintiffs timely objected to the 2023 Plan and requested another preliminary injunction. *See Singleton* Doc. 147; *Milligan* Doc. 200; *Caster* Doc. 179. In relevant part, the *Milligan* and *Caster* Plaintiffs argued that the 2023 Plan did not cure the unlawful vote dilution we found because it did not create a second district in which Black voters have an opportunity to elect a candidate of their choice (an "opportunity district"). *Milligan* Doc. 200 at 16–23; *Caster* Doc. 179 at 8–11. On August 14, 2023, we conducted a remedial hearing on the *Milligan* and *Caster* Plaintiffs' Section Two objections to the 2023 Plan. *Milligan* Doc. 265. On August 15, 2023, we conducted a separate preliminary injunction hearing on the *Singleton* Plaintiffs' constitutional claims. *Singleton* Doc. 185. We evaluated the objections with the benefit of an extensive record, which included not only the evidence drawn from the previous preliminary injunction proceedings, but also new expert reports, deposition transcripts, and other evidence submitted during the remedial phase. *See Singleton* Docs. 147, 162, 165; *Milligan* Docs. 200, 220, 225; *Caster* Docs. 179, 191, 195; Aug. 14 Tr. 92–93; Aug. 15 Tr. 24–25. We also had the benefit of the parties' briefs, three *amicus* briefs, and a statement of interest filed by the Attorney General of the United States. *Milligan* Docs. 199, 234, 236, 260.

5

The State conceded that the 2023 Plan does not include an additional opportunity district. Indeed, the State asserted that notwithstanding our preliminary injunction order and the Supreme Court's affirmance, the Legislature was not required to include an additional opportunity district in the 2023 Plan. Aug. 14 Tr. 159–64. The State's conduct and concession put this case in an unusual posture. We are not aware of any other case in which a state legislature — faced with a federal court order declaring that its electoral plan unlawfully dilutes minority votes and requiring a plan that provides an additional opportunity district — responded with a plan that the state concedes does not provide that district.

Based on that concession and the evidentiary record, on September 5, 2023, we issued a second preliminary injunction. *Milligan* Doc. 272. We enjoined the Secretary from using the 2023 Plan because it does not remedy the likely Section Two violation that we found and the Supreme Court affirmed, and in the alternative, because the *Milligan* Plaintiffs are substantially likely to establish anew that the 2023 Plan violates Section Two. *See generally id.*

Under the Voting Rights Act and binding precedent, the appropriate remedy for racially discriminatory vote dilution is, as we already said, a congressional districting plan that includes either an additional majority-Black district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice. *See*, *e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009)

6

(plurality opinion); *Cooper v. Harris*, 581 U.S. 285, 306 (2017).

"Redistricting is primarily the duty and responsibility of the State," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (internal quotation marks omitted), but this Court "ha[s] its own duty to cure" districts drawn in violation of federal law, *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018). Accordingly, in our second preliminary injunction we instructed the Special Master, cartographer, and Special Master's counsel we previously appointed ("the Special Master Team") to commence work on drawing a remedial map. *Milligan* Doc. 272 at 7. We set a deadline of September 25, 2023, for the Special Master Team to recommend three remedial maps, and we issued detailed instructions for their work. *See Milligan* Doc. 273.

The Special Master solicited proposed plans and comments from the parties and the public. *See generally In re Redistricting 2023*, No. 2:23-mc-01181-AMM (N.D. Ala.) ("*Redistricting*"). The Special Master recommended three remedial plans. *Milligan* Doc. 295–96. We received objections and held a hearing on October 3, 2023. *See Milligan* Docs. 301, 302, 303, 304, 305; *Caster* Doc. 248; *Redistricting* Docs. 48, 49.

For the reasons we explain below, under Federal Rule of Civil Procedure 65(d) the Secretary is **ORDERED** to administer Alabama's upcoming congressional elections using the plan the Special Master recommended called "Remedial Plan 3,"

which is appended to this Order. As we explain, this plan satisfies all constitutional and statutory requirements while hewing as closely as reasonably possible to the Alabama Legislature's 2023 Plan.

The Court appreciates the thorough and expeditious work of the Special Master Team. The Court has previously ordered that their fees and expenses will be paid by the State of Alabama. *Milligan* Docs. 130 at 7, 273 at 12. The Special Master Team is **INSTRUCTED** to file a Fee Statement within 30 days of the date of this Order. The Fee Statement must set forth expenses incurred (with supporting documentation), hours worked and work performed, hourly rate, and any additional information necessary for the Court to assess the reasonableness of the expenses and fees claimed, for the Special Master, his counsel, and the cartographer. Each Defendant is **ORDERED** to respond to the Fee Statement within 14 days of the date it is filed.

## I.   BACKGROUND

### A.   Procedural Posture

After these cases returned from the Supreme Court, the Secretary and the Legislators advised us that "the . . . Legislature intend[ed] to enact a new congressional redistricting plan" and requested that we delay remedial proceedings until July 21, 2023. *Milligan* Doc. 166 at 2. We delayed remedial proceedings, and a special session of the Legislature commenced on July 17, 2023. *Milligan* Doc. 173-

1. On July 20, 2023, the Alabama House of Representatives passed a congressional districting plan titled the "Community of Interest Plan." *Milligan* Doc. 251 ¶¶ 16, 22. That same day, the Alabama Senate passed a different plan, the "Opportunity Plan." *Id.* ¶¶ 19, 22. The next day, a bicameral Conference Committee passed the 2023 Plan, which was a modified version of the Opportunity Plan. *Id.* ¶ 23. Later that day, the Legislature enacted the 2023 Plan and Governor Ivey signed it into law. *Milligan* Doc. 186; *Milligan* Doc. 251 ¶ 26; Ala. Code § 17-14-70.

The 2023 Plan, like the 2021 Plan, has only one district that is majority-Black or Black-opportunity. *Compare Milligan* Doc. 186-1 at 2, *with Milligan* Doc. 107 at 2–3. The 2023 Plan includes both a districting plan (which appears below) and legislative findings. *See* Ala. Code § 17-14-70.



The legislative findings state that the Legislature "f[ound] and declare[d]" that its "intent" when it adopted the 2023 Plan was to comply with federal law and "promote" certain "redistricting principles." *Id.*; *Milligan* Doc. 272 at 199–200.[4] The legislative findings are appended to our second preliminary injunction. *See Milligan* Doc. 272, app. A.

For present purposes, two provisions of the legislative findings are particularly relevant. *First*, the legislative findings provide that the "principle[]" that "[t]he congressional districting plan shall contain no more than six splits of county lines" is "non-negotiable." *Id.* at 200. *Second*, the legislative findings identify three communities of interest that "shall be kept together to the fullest extent possible" — the Black Belt, the Gulf Coast, and the Wiregrass. *Id.* at 201.

The parties previously stipulated that the Black Belt is an area of Alabama that "is named for the region's fertile black soil. The region has a substantial Black population because of the many enslaved people brought there to work in the antebellum period. All the counties in the Black Belt are majority- or near majority-BVAP." *Milligan* Doc. 53 ¶ 60; *see also Allen*, 143 S. Ct. at 1505 (defining the Black Belt similarly: "Named for its fertile soil, the Black Belt contains a high proportion

---

[4] During remedial proceedings, the *Milligan* and *Caster* Plaintiffs developed evidence that the legislative findings were not the result of the deliberative process and urged us to ignore them. *See Milligan* Doc. 272 at 66–70, 98–100, 154, 162–64. For present purposes, we consider the findings without considering that evidence.

of black voters, who 'share a rural geography, concentrated poverty, unequal access to government services, . . . lack of adequate healthcare,' and a lineal connection to 'the many enslaved people brought there to work in the antebellum period.'"). They further stipulated that the Black Belt includes eighteen "core counties" (Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox), and that five other counties (Clarke, Conecuh, Escambia, Monroe, and Washington) are "sometimes included." *Id.* ¶ 61. When the State refers to the "Gulf Coast," it refers to Mobile and Baldwin counties. *See Milligan* Doc. 220-11 at 5. When the State refers to the "Wiregrass," it refers to an area in the southeast part of the state that includes Barbour, Coffee, Covington, Crenshaw, Dale, Geneva, Henry, Houston, and Pike counties. *See id.* at 8.

We enjoined the use of the 2023 Plan on September 5, 2023. *Milligan* Doc. 272. Later that day, the Secretary — but not the Legislators — appealed our preliminary injunction order and sought an emergency stay. *Milligan* Docs. 274, 275, 276. We denied a stay, the Secretary moved the Supreme Court for a stay, and the Supreme Court summarily denied a stay with no noted dissents. *Milligan* Doc. 281; *Allen v. Milligan*, Emergency Application for Stay, No. 23A231 (Sept. 11,

2023); *Allen v. Milligan*, Order Denying Stay, No. 23A231 (Sept. 26, 2023).[5] After

that summary denial, the Secretary stipulated the dismissal of his appeal to the

Supreme Court and his appeal of the *Caster* preliminary injunction to the Eleventh

Circuit. *Milligan* Doc. 307; *Caster* Doc. 251.

### B.    Instructions to the Special Master Team

Also on September 5, 2023, we issued detailed instructions to the Special

Master Team. *See Milligan* Doc. 273. The Special Master Team is led by the Special

Master, Mr. Richard Allen. *See Milligan* Doc. 130 at 3–4. Mr. Allen is an "esteemed

public servant with eminent knowledge of Alabama state government." *Id.* at 3. Mr.

Allen served as Chief Deputy Attorney General under four Alabama Attorneys

General, served as the Commissioner of the Alabama Department of Corrections,

practiced law for many years in Montgomery, and retired from military service with

the rank of Brigadier General. *See id.* at 4. The Special Master was assisted by his

counsel, Mr. Michael Scodro and the Mayer Brown LLP law firm; and the Court's

cartographer, Mr. David Ely. *See Milligan* Docs. 226 at 5, 264.

Although all parties had an opportunity to object to these appointments, no

party objected. *See id.* Pursuant to Federal Rule of Civil Procedure 53(a)(2), Mr.

Allen, Mr. Ely, and Mr. Scodro filed affidavits attesting that they were aware of no

---

[5] The Secretary also moved the Eleventh Circuit for a stay in *Caster.  See Allen v. Caster,*
Emergency Application for Stay, No. 23-12923 (Sept. 11, 2023)

grounds for their disqualification under 28 U.S.C. § 455. *Milligan* Docs. 239, 240, 241.

In our detailed instructions, we directed the Special Master to file three proposed plans to remedy the likely Section Two violation we found in the 2023 Plan; to include color maps and demographic data with each map; and to file a Report and Recommendation with the maps to explain "in some detail the choices made" in each plan and why each proposed remedial plan remedies the likely vote dilution we found. *See Milligan* Doc. 273 at 6. We directed the Special Master to discuss "the facts and legal analysis supporting the proposed districts' compliance with the U.S. Constitution, the Voting Rights Act, traditional redistricting criteria, and the other criteria" that we listed. *See id.* at 6–7.

We directed that each recommended plan must "[c]ompletely remedy the likely Section 2 violation," which required each plan to "include[] either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Id.* at 7 (second alteration in original).[6]

---

[6] We have explained that when we say "opportunity district," we mean a district in which a "meaningful number" of non-Black voters often "join[] a politically cohesive black community to elect" the Black-preferred candidate. *Cooper*, 581 U.S. at 303. We distinguish an opportunity district from a majority-Black district, in which Black people comprise "50 percent or more of the voting population" in the district. *Bartlett*, 556 U.S. at 19 (plurality opinion).

We further directed that each recommended plan must comply with the U.S. Constitution and the Voting Rights Act, and must comply "with the one-person, one-vote principle guaranteed by the Equal Protection Clause of the Fourteenth Amendment, based on data from the 2020 Census." *Id.* at 7.

We directed that each recommended plan must "[r]espect traditional redistricting principles to the extent reasonably practicable," and we observed that "[o]rdinarily, these principles [i]nclud[e] compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation." *Id.* at 8–9 (quoting *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (quotation marks and citations omitted)). But because we are "'forbidden to take into account the purely political considerations that might be appropriate for legislative bodies,'" such as incumbency protection and political affiliation, *id.* at 9 (quoting *Larios v. Cox*, 306 F. Supp. 2d 1214, 1218 (N.D. Ga. 2004) (three-judge court)), we limited the Special Master's consideration of traditional districting criteria to compactness, contiguity, respect for political subdivisions, and communities of interest. *Id.*

We expressly allowed the Special Master Team to consider "as background, among other things, the eleven illustrative plans submitted by the *Milligan* and *Caster* Plaintiffs; the remedial maps submitted by the *Singleton* Plaintiffs . . . ; and the 2021 Plan and the 2023 Plan, which were both found to likely violate Section 2,"

as well as the Alabama Legislature's Reapportionment Committee Redistricting Guidelines ("the guidelines") and the legislative findings enacted with the 2023 Plan. *Id.* at 10. We also said the Special Master could consider "all the record evidence received in the first preliminary injunction hearing conducted by this Court in January 2022, as well as the record evidence received by this Court at the remedial hearing conducted on August 14, 2023, and the record evidence received by this Court at the preliminary injunction hearing conducted on August 15, 2023." *Id.* We also allowed the Special Master Team to consider proposals from the general public and additional submissions by the parties.

Although we allowed the Special Master Team to engage in *ex parte* communications with the Court as the need arose in their work, we disallowed *ex parte* communications with the parties or their counsel. *Id.*

We authorized the Special Master to issue appropriate orders "as may be reasonably necessary for him to accomplish his task within the time constraints imposed by this Order, and the time exigencies surrounding these proceedings." *Id.* And we directed him to "invite submissions and comments from the parties and other interested persons," and to hold a hearing and take testimony as he deemed necessary. *Id.* at 11. We required the Special Master Team to "maintain orderly files consisting of all documents submitted to them by the parties and any written orders, findings, and recommendations" and to preserve all materials and datasets relating

16

to their work until we relieve them of that obligation. *Id.* To facilitate the work of the Special Master, we ordered the parties to provide him data relating to the Plaintiffs' illustrative maps and the 2021 Plan and 2023 Plan, as well as other relevant data. *Id.* at 11–12.

We ordered that all reasonable expenses incurred by the Special Master Team, as well as their reasonable compensation, would be (subject to our approval) paid by the State of Alabama. *Id.* at 12. We instructed the Special Master Team to protect against unreasonable expenses. *Id.*

Finally, we ordered that after the Special Master filed his Recommendation, "the parties and all interested persons shall have three (3) days" to file objections. *Id.* at 13. We told the parties that we reserved October 3, 2023, for a hearing. *Id.*

## C.    Submissions to the Special Master

On September 7, 2023, the Special Master set deadlines for parties and interested non-parties to submit proposed plans or comments. *Redistricting* Doc. 2. The Special Master reviewed eleven proposed remedial plans. *Redistricting* Doc. 44 at 12. The *Milligan* and *Caster* Plaintiffs jointly proposed a plan, the *Singleton* Plaintiffs proposed a plan, Representative Pringle proposed the Community of Interest Plan passed by the Alabama House of Representatives, and several non-parties proposed plans. *See id.* The Special Master also received six sets of comments. *See id.* at 13. And the Special Master had the eleven illustrative maps

17

that the *Milligan* and *Caster* Plaintiffs submitted in the preliminary injunction proceedings. *Id.* at 12.

During the comment period, Alabama's lone Black member of Congress, Terri Sewell, who represents District 7, objected to the *Singleton* Plaintiffs' proposed plan on the ground that it would "eliminate a district in which Black-preferred candidates are likely to be elected" (District 7). *Redistricting* Doc. 21 at 3. And the *Caster* Plaintiffs filed objections to Representative Pringle's Community of Interest proposed plan, the *Singleton* Plaintiffs' proposed plan, and other proposed plans. *Redistricting* Doc. 23. The *Caster* Plaintiffs and the *Milligan* Plaintiffs filed a joint opposition to the proposed plans filed by non-party Michael Moriarty. *Redistricting* Doc. 35.

The Special Master observed that the proposals and comments were "necessarily done on an expedited basis but were nonetheless of extremely high quality and were clearly the product of extensive work and thoughtful analysis." *Id.* at 13. The Special Master "reviewed and carefully considered" each submission. *Id.*

### D.     The Special Master's Recommendation

The Special Master filed a 43-page Report and Recommendation on September 25, 2023. *See Milligan* Doc. 295. The Special Master explained in his Recommendation that he limited his analysis exactly as we directed. *See id.* at 13– 15. The Special Master ensured that each recommended plan (1) complies with the

18

primary criteria set out in our instructions (*i.e.*, it completely remedies the likely Section Two violation, complies with one-person, one-vote requirements, and otherwise complies with the Constitution and the Voting Rights Act), and (2) respects traditional districting criteria ("compactness, contiguity, respect for political subdivisions, and maintenance of communities of interest"). *Id.* at 13. The Special Master (3) carefully minimized changes to the 2023 Plan by "preserv[ing] boundaries from the 2023 Plan except where modifications are needed to remedy the Section Two violation," *id.* at 27, and "maintaining most district boundaries and retaining the vast majority of people within the same districts they were in under the 2023 Plan," *id.* at 14. And (4) the Special Master did not "'target' any particular Black population percentage in any district," but instead "prioritized following county, voting district (precinct), and municipal boundaries." *Id.* "After preparing each draft plan, Mr. Ely performed an election analysis . . . to determine how frequently the Black-preferred candidate would have won past election contests in each district." *Id.* at 15.

The Special Master left Districts 3, 4, and 5 entirely unchanged from the 2023 Plan in each recommended plan. *Id.* at 27. Districts 6 and 7 are modified only minimally as explained below. *Id.* The Special Master recommended plans with a population deviation of only one person, and his plans "have only contiguous districts." *Id.* at 35, 39. The Special Master confirmed that his recommended plans

are not racial gerrymanders or intentionally discriminatory in violation of the Equal Protection Clause and the Fifteenth Amendment. *See id.* at 36. Notably, Mr. Ely "did not display racial demographic data while drawing districts or examining others' proposed remedial plans within the mapping software, Maptitude. Instead, Mr. Ely relied on other characteristics and criteria" related to communities of interest and political subdivisions. *Id.*

For each recommended plan, the Special Master provided core retention metrics, a performance analysis, compactness scores, and information about respect for political subdivisions and communities of interest. *See id.* at 27–28 tbl.2; *id.* at 32 tbl.4; *id.* at 38 tbl.6; *id.* at 41–43. We discuss in turn each category of information.

The Special Master provided core retention metrics to indicate (1) the percentage of the population of each district in the 2023 Plan that was retained in that district in each recommended plan, and (2) that statistic on a statewide basis. *Id.* at 27–28 tbl.2. The recommended plans retain between 86.9% and 88.9% of Alabama's population in the same districts they were in under the 2023 Plan. *See id.*

The Special Master explained that a "performance analysis assesses whether, using recent election results, a candidate preferred by a particular group would be elected from a proposed opportunity district." *Id.* at 30. The Special Master reasoned that for a proposed remedial district to perform as an opportunity district, a performance analysis "should demonstrate that the Black-preferred candidate often

20

would win an election in the subject district." *Id.*

As the Special Master explained, the parties "used a variety of different elections for their performance analyses of the 2023 Plan." *Id.* The *Milligan* Plaintiffs' expert, Dr. Baodong Liu, considered eleven biracial statewide elections between 2014 and 2022. *See id.* The *Caster* Plaintiffs' expert, Dr. Maxwell Palmer, considered seventeen contested statewide elections between 2016 and 2022. *See id.* The Legislature considered seven statewide elections. *See id.* Mr. Ely prepared a performance analysis by using election data provided by the Legislature (prepared by their expert, Dr. M.V. Hood) for twelve election contests, and election data provided by the *Milligan* Plaintiffs (prepared by their expert, Dr. Liu) for twelve election contests. *See id.* at 31. Seven of these contests overlap, so Mr. Ely considered seventeen distinct contests. *See id.* From this data, the Special Master determined that each of his recommended plans includes two opportunity districts, Districts 2 and 7. *Id.*

The Special Master provided four compactness scores for each recommended plan, including the metrics we previously considered (Polsby-Popper, Reock, and Cut-Edges scores). *See id.* at 38 tbl.6. The Special Master also considered the Population Polygon metric, which is a "statistical measure that examines the shape of a district and the location of where people live in and around the district." *Id.* at 37. The Special Master concluded that all his recommended plans are "reasonably

compact." *Id.* at 38.

The Special Master provided data to establish that his plans respect political subdivisions, including information about county splits, municipality splits, and precinct splits. *Id.* at 39–41. The Special Master explained that when he was required to shift residents from District 6 to District 7 to equalize population, the boundaries of the City of Birmingham guided his decisions. *Id.* at 40. Likewise, he relied on the boundaries of the City of Mobile to determine where to split Mobile County. *Id.*

Finally, the Special Master explained how his plans respect communities of interest. *See id.* at 41–43. The Special Master focused on the three communities the Legislature identified: the Black Belt, the Gulf Coast, and the Wiregrass. *See id.* The Special Master preserved unsplit every core Black Belt county in his plans, and his plans situate every core Black Belt county in one of two districts. *See id.* at 42.

### 1. Remedial Plan 1

Remedial Plan 1 is a "modest variation" of a plan that the *Milligan* and *Caster* Plaintiffs proposed to the Legislature before the 2023 Plan was enacted ("the VRA Plan"). *Id.* at 15. The VRA Plan was based on one of the illustrative plans prepared by Mr. Cooper in 2021, "Cooper Plan 2." *Id.* The VRA Plan modified Cooper Plan 2 to "keep all 18 core Black Belt counties intact and within Districts 2 and 7 and to enhance population overlap with the 2021 Plan." *Id.* at 15–16. The Special Master modified the VRA Plan because it was designed as an alternative to the 2021 Plan,

and the Special Master worked off the 2023 Plan. *Id.* at 16.

Remedial Plan 1 makes no changes from the 2023 Plan to Districts 3, 4, and 5, and "only minimal changes" to Districts 6 and 7. *Id.* The Special Master explained that minimal changes were necessary because Districts 6 and 7 sit in the middle of the state, adjacent to District 2. *Id.* at 17–21. Remedial Plan 1 splits seven counties and retains 88.9% of Alabamians in their district under the 2023 Plan. *Id.* at 28.

### 2. Remedial Plan 2

Like Remedial Plan 1, Remedial Plan 2 is a modified version of Cooper Plan 2 and makes no changes from the 2023 Plan to Districts 3, 4, and 5, and only minimal changes to Districts 6 and 7. *See id.* at 22–23. Remedial Plan 2 splits only six counties. *Id.* The Special Master explained that this was in service to the six-split cap in the legislative findings and respected the Black Belt and the Wiregrass. *See id.* (explaining that in Remedial Plan 2, all of the Wiregrass counties that are not in the Black Belt are entirely in District 1, and reflecting that all eighteen core Black Belt counties are in two districts, either District 2 or District 7). Remedial Plan 2 includes 71.9% of the population of the City of Mobile in a single district, and it retains 87.5% of Alabamians in their district under the 2023 Plan. *Id.* at 22, 28.

### 3. Remedial Plan 3

"Mr. Ely prepared Remedial Plan 3 without reference to any other illustrative" or proposed plan. *Id.* at 23. To prepare Remedial Plan 3, Mr. Ely left Districts 3, 4,

23

and 5 unchanged from the 2023 Plan; preserved all eighteen core counties in the Black Belt within Districts 2 and 7 without splitting any of those counties; and minimized changes to Districts 6 and 7. *Id.* at 23–24. Remedial Plan 3 splits only six counties. *Id.* Although Remedial Plan 2 placed Henry County (part of the Wiregrass) in District 2, Remedial Plan 3 placed it with the majority of the Wiregrass counties (Houston, Dale, Coffee, Geneva, and Covington) in District 1. *Id.* at 24.

In Remedial Plan 3, Mr. Ely sought to "better preserve the cities of Mobile and Birmingham within single districts and to follow municipal boundaries where possible. He also sought to minimize splitting voting districts (precincts) except where needed to equalize population." *Id.* Remedial Plan 3 preserves 93.3% of the City of Birmingham in a single district and 90.4% of the City of Mobile in a single district. *Id.* tbl.1. Neither of the Special Master's other plans preserve more than 72% of the City of Mobile in a single district. *See id.* And neither of the Special Master's other plans preserve more than 89.6% of the City of Birmingham in a single district. *See id.* "Mr. Ely accessed median income data from the U.S. Census Bureau's American Community Survey, which is relevant to the social and economic factors identified in the Legislature's guidelines and findings, to confirm an appropriate bifurcation of Mobile County outside the city of Mobile." *Id.* Remedial Plan 3 retains 86.9% of Alabamians in their district under the 2023 Plan. *Id.* at 28.

24

### 4. Proposed Plans that the Special Master Did Not Recommend

The Special Master explained why he rejected the other proposed plans. *See id.* at 28–29. The critical reason common to all rejected plans is that they proposed significant changes "beyond the minimum" changes to the 2023 Plan "needed to remedy the Section Two violation." *Id.* at 29.

Eight of the eleven proposals the Special Master rejected would have changed every district in the state when compared to the 2023 Plan: the VRA Plan submitted by the *Milligan* and *Caster* Plaintiffs, the *Singleton* Plaintiffs' Plan, the Community of Interest Plan proposed by Representative Pringle, the plans proposed by non-parties the Alabama Democratic Conference, Quin Hillyer, and Michael Moriarty, and one of the plans proposed by non-party Professor Bernard Grofman. *See id.* tbl.3.

Two of the remaining three proposals would have changed nearly every district in the state: both plans proposed by non-parties Zac McCrary and Stephen Wolf redrew six of Alabama's seven districts. *See id.*

In contrast, the three plans the Special Master recommended, and one of the Grofman Plans, changed only four congressional districts from the 2023 Plan. *See id.*

### E. Objections

The Secretary objected to the Special Master's Remedial Plans as "unconstitutional racial gerrymanders that harm Alabama voters by subjecting them

to racial classifications." *Milligan* Doc. 301 at 2. The Secretary asserted that even if Mr. Ely performed his work "race blind," his "starting point was a plan where race predominates over traditional criteria, and the changes were too modest to undo the race-based decisions." *Id.* The Secretary further objected that Section Two does not require a remedial plan to "sacrifice compactness, county integrity, communities of interest, or other traditional criteria." *Id.* at 3.

The Secretary asserted that Remedial Plan 1 was the "most objectionable" of the Special Master's plans "because of its unnecessary split of Houston County." *Id.* The Secretary asserted that Remedial Plan 2 splits the Wiregrass "more than necessary to remedy the likely § 2 violation" by including Henry County in District 2 rather than District 1. *Id.* at 5. The Secretary "note[d]" that Remedial Plan 3 would make it "more difficult for election officials in Mobile County to reassign voters accurately by the applicable deadlines." *Id.* Notably, however, the Secretary did not argue that it would be too difficult to fully implement any of the three Remedial Plans in advance of the 2024 congressional election deadlines, or otherwise raise any *Purcell* argument. *See generally id.*

The Legislators' objections tracked the Secretary's. *Compare Milligan* Doc. 302, *with Milligan* Doc. 301.

The *Milligan* Plaintiffs urge us to adopt either the Special Master's Remedial Plan 1 or Remedial Plan 3, and they "oppose" Remedial Plan 2 on the ground that it

will not "with certitude completely remedy the Section 2 violation." *Milligan* Doc. 304 at 4 n.2, 5, 6 (quoting *Dillard v. Crenshaw County*, 831 F.2d 246, 252 (11th Cir. 1987)). The *Milligan* Plaintiffs base their opposition to Remedial Plan 2 on a view of Mr. Ely's performance analysis restricted to the 2022 elections, in which that analysis predicts that the Black-preferred candidate would have lost four out of five contests analyzed in District 2. *See id.* at 6.

The *Caster* Plaintiffs made the same points that the *Milligan* Plaintiffs made, but they did not formally object in writing to the Special Master's Remedial Plan 2. *See Caster* Doc. 248. The *Caster* Plaintiffs asserted that the 2022 elections in Mr. Ely's performance analysis "cast[] significant doubt on whether Remedial Plan's CD-2 would provide a meaningful opportunity district for Black voters in future elections." *Id.* at 4. "By contrast," the *Caster* Plaintiffs observed, in Mr. Ely's analysis District 2 in Remedial Plans 1 and 3 "performed for Black-preferred candidates in 2022 elections 60% or 80% of the time." *Id.* Because "Remedial Plan 2 serves no interest not already captured in the [Special Master's] other proposals," the *Caster* Plaintiffs urged us to adopt Remedial Plan 1 or 3. *Id.*

The *Singleton* Plaintiffs did not object to any of the three Remedial Plans either. *Redistricting* Doc. 49 at 1. Among the plans recommended by the Special Master, the *Singleton* Plaintiffs state that Remedial Plan 3 is best. *Id.* Not only does that Plan "perform[] as well or better than Remedial Plans 1 and 2 on every criterion

27

the Court has laid out," *id.*, the *Singleton* Plaintiffs point out that Remedial Plan 3 "goes [the] farthest" in "work[ing] to reduce the gerrymander of Birmingham" they contend was present in the 2023 Plan by keeping the largest portion of Birmingham in one congressional district, *id.* at 4. The *Singleton* Plaintiffs also favor Remedial Plan 3 for its similar respect for the City of Mobile. *Id.* at 5.

Several non-parties filed objections to the Special Master's Remedial Plans. The Alabama Democratic Conference ("ADC") asserted that "none of [the Special Master's plans] provides a complete remedy to the likely Section 2 violation" and that the Court should adopt the plan the ADC proposed because in that plan, "White voters wouldn't have veto power" over Black voters' choices in District 2. *Milligan* Doc. 305 at 1, 8. The ADC did not supply a performance analysis to contravene the analysis Mr. Ely performed. *See id.* Quin Hillyer objected to the Special Master's Plans on the ground that they "split[] Mobile County." *Redistricting* Doc. 48 at 1.

We directed the Special Master to file a written response to the question whether his Remedial Plan 2 "provides an opportunity for Black voters in CD2 to elect their preferred candidate." *See Redistricting* Docs. 55, 56. The Special Master's response explained in detail why District 2 in Remedial Plan 2 performs as an opportunity district. *See Redistricting* Doc. 56. More particularly, the Special Master set forth data and analysis to demonstrate that the average margin of victory for a Black-preferred candidate in District 2 was 8.2% in Remedial Plan 2, but 10.3% in

Remedial Plans 1 and 3, and that those two percentage points "would have changed the outcome of several 2022 elections in District 2 in Remedial Plan 2, but not in Remedial Plans 1 and 3" because "[a] less competitive slate of Democratic nominees for statewide office in 2022, who were dramatically underfunded, contributed to depressed voter turnout, particularly among Democrats" in the 2022 elections. *Id.* at 4, 8, 9.

### F.    Our Hearing

On October 3, 2023, we heard the objections raised to the Special Master's recommendations. All parties and interested non-parties had an opportunity to be heard, and we received argument from the *Milligan* Plaintiffs, the *Caster* Plaintiffs, the *Singleton* Plaintiffs, the Secretary of State, the Legislators, the Alabama Democratic Conference, and Mr. Hillyer.

Ultimately, a consensus among the Plaintiffs developed around Remedial Plan 3 recommended by the Special Master. Oct. 3, 2023. Tr. 54. Remedial Plan 1 splits seven counties instead of six, and the *Milligan* and *Caster* Plaintiffs object to Remedial Plan 2 out of a concern that it may not perform as an opportunity district so as to completely remedy the vote dilution we found. *See, e.g.*, Oct. 3, 2023 Tr. 19, 22 (*Caster* Plaintiffs' formal oral objection). Notably, the *Singleton* Plaintiffs did not object to Remedial Plan 3 as a racial gerrymander, they urged us that Remedial Plan 3 "keeps counties together" better than Remedial Plan 1, and they pointed out

that Remedial Plan 3 "does a much better job [than Remedial Plan 1] at preserving two of the State's largest municipalities – Birmingham and Mobile." Oct. 3, 2023 Tr. 33–34.

The *Caster* Plaintiffs suggested that Remedial Plan 1 "has the benefit of having been vetted by the Court in the course of this litigation" because it is a variant of one of the illustrative maps the *Caster* Plaintiffs submitted in the first preliminary injunction proceedings, Cooper Plan 2. Oct. 3, 2023 Tr. 20–21. But on questioning about the substantial similarities between Remedial Plans 1 and 3, counsel for the *Caster* Plaintiffs agreed that Remedial Plans 1 and 3 are sufficiently similar that it is not "accurate to say that as between [Remedial Plan] 1 and [Remedial Plan] 3, only [Remedial Plan] 1 has the benefit of all of that vetting." Oct. 3, 2023 Tr. 21.

The Secretary and the Legislators object to all the Special Master's recommended plans as racial gerrymanders, but they do not raise any specific objection to Remedial Plan 3. Oct. 3, 2023 Tr. 40–41. At the hearing, although the Secretary argued that Remedial Plan 3 is less compact than the 2023 Plan, by his own admission the Secretary did not develop any evidence that the mathematical compactness scores of Remedial Plan 3 suggest that it is not reasonably compact. Oct. 3, 2023 Tr. 37–39.

The Alabama Democratic Conference assailed the Special Master's work as "back-of-the-napkin" analysis, but could not identify a single legal precedent that

suggested that the Special Master failed to consider information that he should have considered or precedent that enabled this Court to "disregard the Special Master's analysis." Oct. 3, 2023 Tr. 44–46. Mr. Hillyer urged us to consider a possibility that District 2 in Remedial Plan 2 might not be contiguous because it includes a bridge across Mobile Bay, but he could not identify any controlling precedent that suggests that a bridge could present a contiguity problem.[7] Oct. 3, 2023 Tr. 49–51. In any event, each set of Plaintiffs, the Secretary, and the Legislators confirmed that they do not have any contiguity objections. Oct. 3, 2023 Tr. 52–54.

## II.   STANDARD OF REVIEW

Controlling Supreme Court precedent dictates rules that we must follow in ordering a remedial districting plan. We do not have the authority to simply select the plan that outperforms all other proposed plans on any particular metric and order the Secretary to use that plan. We must give the Alabama Legislature as much deference as possible, and we may not disturb the policy choices it made in the 2023 Plan any more than is necessary to remedy the likely Section Two violation we found. *See, e.g.*, *Upham v. Seamon*, 456 U.S. 37, 43 (1982) (per curiam); *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971).

This is a robust rule. A district court errs "when, in choosing between two

---

[7]   In his submission before the Court, Mr. Hillyer argued that this bridge destroyed contiguity for District 2 in Remedial Plan 1.

possible court-ordered plans, it failed to choose that plan which most closely approximated the state-proposed plan." *Upham*, 456 U.S. at 42. Put differently, "[t]he **only** limits on judicial deference to state apportionment policy . . . [a]re the substantive constitutional and statutory standards to which such state plans are subject." *Id.* (emphasis added). So we must select the plan that "most clearly approximated the reapportionment of the state legislature," while also satisfying federal constitutional and statutory requirements. *White v. Weiser*, 412 U.S. 783, 798 (1973).

This rule is consistent with the judiciary's limited role. "From the beginning, [the Supreme Court] ha[s] recognized that 'reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.'" *White*, 412 U.S. at 794–95 (quoting *Reynolds v. Sims*, 377 U.S. 533, 586 (1964)). Indeed, the Supreme Court "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (opinion of White, J.).

We have repeatedly explained that we understand our limited role. *See Milligan* Docs. 272 at 7, 168 at 2, 130 at 9. We reiterate our understanding that the

Court acts within the bounds of its authority only "if [our] modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." *Upham*, 456 U.S. at 43. We must not "pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" *White*, 412 U.S. at 795 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971)).

And we reiterate that we regard this task — "to devise and impose a reapportionment plan" for Alabama to conduct its upcoming congressional elections without the taint of racially discriminatory vote dilution — as an "unwelcome obligation." *Wise*, 437 U.S. at 540; *Milligan* Doc. 107 at 52. We held, and the Supreme Court agreed, that the required remedy is the creation of a second district where Black Alabamians, like everyone else, have a fair and reasonable opportunity to elect their preferred candidates. It did not have to be this way. And it would not have been this way if the Legislature had created a second opportunity district or majority-minority district. They did not do so in 2021, and as the State conceded at the remedial hearing, they failed again to do so in 2023.

Notably, "[i]n discharging this duty, [we] will be held to stricter standards" than would have applied to the Legislature had it enacted a lawful remedial map. *Wise*, 437 U.S. at 540 (internal quotation marks omitted). Although the Legislature had the discretion to redraw every district in the state when it enacted the 2023 Plan, we do not have the discretion to redraw every district now. We limit our changes to

districts that were challenged and found unlawful, and to those changes to adjacent districts that are necessary to satisfy applicable constitutional and statutory requirements. *See, e.g.*, *Covington*, 138 S. Ct. at 2554.

Additionally, although the Legislature had the discretion to consider various political factors when it enacted the 2023 Plan (for example, such as whether any redrawn district paired incumbents), we may not consider such factors now. *See, e.g.*, *Larios v. Cox*, 306 F. Supp. 2d 1214, 1218 (N.D. Ga. 2004) (per curiam) (three-judge court) (explaining that "in the process of adopting reapportionment plans, the courts are forbidden to take into account the purely political considerations that might be appropriate for legislative bodies," and that "many factors, such as the protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts") (quoting *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1160 (5th Cir. Unit A Feb. 1981),[8] and *Wyche v. Madison Parish Police Jury*, 769 F.2d 265, 268 (5th Cir. 1985) (per curiam)) (internal quotation marks omitted).

Finally, we underscore that Section Two of the Voting Right Act ensures only equal opportunity, not a guaranteed result for any group. *See United States v. Dall.*

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Cnty. Comm'n*, 850 F.2d 1433, 1438 n.6 (11th Cir. 1998). As we have previously explained, Section Two does not provide a leg up for Black voters — it merely prevents them from being kept down with regard to what is arguably the most "fundamental political right," in that it is "preservative of all rights" — the right to vote. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019).

"[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (internal quotation marks omitted). "A party seeking a preliminary injunction must establish that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290–91 (11th Cir. 2022) (internal quotation marks and citation omitted). Ordinarily, a preliminary injunction is "prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." *Tom Doherty Assocs. v. Saban Ent. Inc.,* 60 F.3d 27, 34 (2d Cir. 1995).

When a party seeks an injunction that "goes beyond the status quo and seeks to force one party to act, it becomes a mandatory or affirmative injunction and the burden placed on the moving party is increased." *Mercedes-Benz U.S. Int'l, Inc. v.*

*Cobasys*, *LLC*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009) (citing *Exhibitors Poster Exch., Inc. v. Nat'l Screen Service Corp.,* 441 F.2d 560, 561 (5th Cir. 1971)). An affirmative injunction "should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Exhibitors Poster Exch., Inc.*, 441 F.2d at 561 (per curiam) (quoting *Miami Beach Fed. Sav. & Loan Ass'n. v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) and collecting cases).

## III.   ANALYSIS

We have carefully reviewed each proposed plan, all comments submitted to the Special Master, the Special Master's Report and Recommendation (and all supporting documents), and each objection raised or comment filed to that Recommendation. We also heard from the parties and other interested persons at the hearing we held on October 3, 2023. Like the Special Master Team, we find that although the proposals and comments were necessarily prepared on an expedited basis, they are clearly the product of thoughtful analysis by the parties and interested members of the public. We do not discuss all of them in detail in this Order, but we found all of them helpful.

### A.   Remedial Plan 3 Completely Remedies the Vote Dilution We Found While Best Preserving the State's Legislative Preferences Expressed Through the 2023 Plan.

We begin by limiting our analysis to the proposed plans that do not exceed our authority. *See Covington*, 138 S. Ct. at 2554. Districts 3, 4, and 5 are not

36

challenged in this litigation, and it is not necessary to redraw the boundaries the 2023 Plan assigned to them to remedy the vote dilution we found. So we will not redraw those districts at all. This eliminates all proposals other than the Special Master's plans and the Grofman 2023 Plan. *See Milligan* Doc. 295 at 29 tbl.3.

We next limit our analysis to the proposed plans that satisfy the Legislature's limit of six county splits. We do not find that we are required to defer to that cap, but we can completely remedy the vote dilution we found without exceeding it, *see infra*, so we will not exceed it. This eliminates one of the Special Master's plans as well: Remedial Plan 1, which splits seven counties.

Three plans remain: Remedial Plans 2 and 3 recommended by the Special Master, and the Grofman 2023 Plan. We next consider the extent to which those plans respect political subdivisions other than counties. The 2023 Plan split eleven voting districts (out of a total of 1,837), Remedial Plan 2 splits thirteen voting districts, and Remedial Plan 3 splits fourteen voting districts. *Id.* at 41. The Grofman 2023 Plan splits thirty-eight voting districts, well more than double the number split by either Remedial Plan 2 or 3. *Id.* Accordingly, the Grofman 2023 Plan splits substantially more voting districts than is necessary to remedy the vote dilution we found. Further, the Grofman 2023 Plan is very similar to Remedial Plan 2, which we do not adopt for the reasons explained below. *See infra*. And the Grofman 2023 Plan has not been subjected to the same rigorous examination, performance analysis, and

opportunity for written and oral objection as Remedial Plans 2 and 3. Accordingly, we do not adopt that plan.

The two remaining proposals — Remedial Plan 2 and Remedial Plan 3 — are quite similar. Districts 3, 4, 5, 6, and 7 are identical or very nearly identical in both plans. *Compare Milligan* Doc. 295 at 23, *with id.* at 25. They both retain 100% of Districts 3, 4, and 5 from the 2023 Plan, and both retain 94.1% of District 6 and 92.7% of District 7. *See id.* at 29 tbl.2. Districts 1 and 2 differ based on how they treat Henry County and where they split Mobile County.

Remedial Plan 3 better respects municipal boundaries and the communities of interest that the Legislature identified.  Both plans keep the eighteen "core" Black Belt counties together in two districts, with eight counties placed in District 2 and ten counties placed in District 7. *Id.* at 40–42. Both plans also split the Gulf Coast, in line with our finding that such a split is necessary to remedy the likely dilution of Black voting power that we have found, *see Milligan* Doc. 272 at 166, but Remedial Plan 3 keeps 90.4% of the City of Mobile in a single district, whereas Remedial Plan 2 keeps only 71.9% of that city in a single district. *Milligan* Doc. 295 at 24 tbl.1. Remedial Plan 3 also keeps 93.3% of the City of Birmingham in a single district, whereas Remedial Plan 2 keeps only 89.6%. *Id.* And more broadly, Remedial Plan 3 splits only thirty-one municipalities (out of a total of 462), whereas Remedial Plan 2 splits thirty-four. *Id.* at 41. Further, although the State has introduced precious little

38

evidence to establish the existence of the Wiregrass community of interest, to the extent the Legislature has expressed a preference to keep the Wiregrass counties together in District 1, Remedial Plan 3 keeps six such counties together by including Henry County with the other Wiregrass counties in District 1. *Id.* at 24. Remedial Plan 2, in contrast, keeps only five of the Wiregrass counties together, instead joining Henry County with the Black Belt in District 2.

Accordingly, we find that of all the proposed remedial plans before us, Remedial Plan 3 "most closely approximate[s]" the plan that the Legislature enacted and we enjoined. *See Upham*, 456 U.S. at 42.

Although the Secretary's only "relevant duties are to administer elections," *Singleton* Doc. 25 at 5; *Caster* Doc. 60 at 5, counsel for the Secretary asserts that the Special Master's recommended plans are an "absurd disfigurement" of the 2023 Plan that "cast aside" Alabama's "communities, local economies, and basic geography . . . in the radical pursuit of racial quotas,"[9] "court-ordered racial gerrymander[s]",[10] and in service of "separate but equal" congressional districts.[11] The Legislators did not join these statements, and the evidence we have just described plainly refutes

---

[9] Attorney General Marshall Issues Statement on Redistricting to the People of Alabama (Sept. 26, 2023), https://www.alabamaag.gov/attorney-general-marshall-issues-statement-on-redistricting-to-the-people-of-alabama/ (Sept. 26, 2023) [hereinafter "Attorney General's Statement"].

[10] *Allen v. Milligan*, Emergency Application for Stay, No. 23A231 (Sept. 11, 2023).

[11] *See* Attorney General Marshall's Statement, *supra* n.9.

them. There can be no genuine argument that meaningfully changing only two districts out of seven, and perfectly tracking county boundaries in nineteen of the twenty-one counties in those two districts, is a "disfigurement." Likewise, there can be no earnest argument that departing from the 2023 Plan in this way to remedy racially discriminatory vote dilution — while leaving 86.9% of Alabamians in precisely the same district they were in under the 2023 Plan — remotely approaches the abhorrent practice of racially segregating public schools for children.

We well understand the legitimate concern about the role that considerations of race have in redistricting, but as we have found and the Supreme Court has affirmed, the record simply does not bear out that concern in this case. *Allen*, 143 S. Ct. at 1517. Nor can one fairly assert that the Special Master conducted his work in a way that runs afoul of the Equal Protection Clause.

Remedial Plan 3 also performs better than Remedial Plan 2 on the various compactness metrics to which the parties and nonparties have directed our attention. Remedial Plans 2 and 3 tie on the Reock Score (0.35) and the Polsby-Popper score (0.24), but Remedial Plan 3 has the better Cut Edges score (3,597) and Population Polygon score (0.69). *Milligan* Doc. 295 at 36. Based on these metrics, the Special Master's opinion, and our own "eyeball test," we conclude that Remedial Plan 3 is reasonably compact. *See id.* at 37–38; *see also Allen*, 143 S. Ct. at 1517–18 (Kavanaugh, J., concurring). We see no "tentacles, appendages, bizarre shapes, or

other obvious irregularities," *Allen*, 143 S. Ct. at 1504, and the boundaries of District 2 track county lines perfectly except insofar as they split Clarke and Mobile Counties to satisfy other requirements of federal law, *see Milligan* Doc. 295 at 25.

Separately, we find that Remedial Plan 3 completely remedies the vote dilution we found. Compared to the 2023 Plan, Remedial Plan 3 contains an additional district (District 2) in which Black voters have an opportunity to elect a candidate of their choice. In that District, the Black-preferred candidate would have won sixteen of the seventeen elections that Mr. Ely analyzed to evaluate the performance of District 2 as an opportunity district. *See id.* at 32 tbl.4. Mr. Ely's performance analysis underscores what we have explained and the Supreme Court has found: that voting in Alabama is extremely racially polarized. *See Milligan* Doc. 295 at 32 & tbl.4 (predicting that in all districts other than Districts 2 and 7, the Black-preferred candidate will never win a single election, and that every loss is by more than 29%). We also note that District 2 in Remedial Plan 3 is not majority-Black; the Black voting-age population is 48.7%. *Id.* at 34 tbl.5. District 7 in Remedial Plan 3 remains majority-Black, with a Black voting-age population of 51.9%. *Id.*

Finally, we find that Remedial Plan 3 complies with the one-person, one-vote requirement of the Fourteenth Amendment. The "rounded ideal" of voting-age population per district in Alabama is 717,754. *Milligan* Doc. 68-5 at 8. Remedial

Plan 3 (like the other remedial plans recommended by the Special Master), contains a population deviation of one person. *Milligan* Doc. 295 at 34. Because no proposed remedial plan contained a lower deviation while also remedying the likely Section Two violation, we find that a deviation of one person is mathematically necessary and, therefore, that Remedial Plan 3 satisfies one-person, one-vote. *See id.*

Accordingly, we find that Remedial Plan 3 completely remedies the vote dilution we found and satisfies all applicable federal constitutional and statutory requirements while most closely approximating the policy choices the Alabama Legislature made in the 2023 Plan. Put differently, we find that Remedial Plan 3 limits our modifications of the 2023 Plan only to those necessary to cure the statutory defect that we identified, and that Remedial Plan 3 does not intrude on Alabama policy any more than is necessary to bring the 2023 Plan into compliance with Section Two of the Voting Rights Act.

### B.     None of the Objections to the Special Master's Report and Recommendation Alter this Conclusion.

Remedial Plan 3 enjoyed broad support among those who filed responses to the Special Master's Report & Recommendation. The *Milligan*, *Caster*, and *Singleton* Plaintiffs all support the adoption of Remedial Plan 3, and the Secretary and the Legislators have indicated that it is less objectionable than Remedial Plan 1.

Some non-parties have objected to Remedial Plan 3, but we do not find their

objections persuasive. The ADC objected on the ground that District 2 in Remedial Plan 3 is not an opportunity district. *Milligan* Doc. 305 at 1, 8. But the ADC does not identify any legal precedent demonstrating that the Special Master's performance analysis of District 2 is in any way deficient. *See generally id.* Nor could the ADC identify any such precedent in response to direct questioning at the October 3 Hearing. Oct. 3, 2023 Tr. 45–47. More fundamentally, the ADC's objection fails because it would have us reject Remedial Plan 3 on the ground that it fails to guarantee victory for the Black-preferred candidate in District 2. The ADC's objection makes clear that the ADC objects to any plan that does not contain two majority-Black districts, because white voters could theoretically still retain an "effective veto" over Black voters' choices. *See Milligan* Doc. 305 at 7-8 & n.2. But Section Two ensures only equal opportunity, not a guaranteed result for any group. *See Dall. Cnty.*, 850 F.2d at 1438 n.6. Sustaining the ADC's objection would cause us to run afoul of controlling precedent and the text of Section Two itself. *See* 52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.").

The Secretary and the Legislators object generally to all the Special Master's Remedial Plans on the ground that the Special Master allowed race to predominate over traditional districting principles. *Milligan* Doc. 301 at 2–3. In essence, this is the same argument that we and the Supreme Court have rejected at each successive

43

stage of this litigation — that any map that fails to "meet or beat" the 2023 Plan on traditional districting criteria favored by the State necessarily allows race to predominate in its creation. *See Milligan* Doc. 272 at 147–150. We reject that argument again for the same reasons we set forth in our second injunction. *See id.*; *see also supra* at 19–20 (explaining that Mr. Ely did not display race data while drawing districts or examining proposed plans).

Finally, Mr. Hillyer objects to Remedial Plan 3 on the ground that it splits Mobile County. *Redistricting* Doc. 48 at 1. But as we previously explained, splitting the Gulf Coast is necessary to remedy the vote dilution we identified. *Milligan* Doc. 272 at 166. Mr. Hillyer has not produced or pointed us to any plan that fully remediates the likely Section Two violation without doing so, while also complying with the Constitution's one-person, one-vote requirement. *See Milligan* Doc. 295 at 34 (explaining that Mr. Hillyer's proposed plan violates one-person, one-vote because it contains a maximum population deviation of 1,193 people).

In the light of the submissions received by the Special Master, the comments and submissions in response to his Report & Recommendation, and after extensive analysis, we conclude that Remedial Plan 3 completely remedies the likely Section Two violation we identified while best preserving the State's legislative preferences, as expressed through the 2023 Plan, and otherwise complies with the requirements of the Constitution and the Voting Rights Act of 1965.

44

### C.     The Requirements for Injunctive Relief Are Satisfied.

We further find that all the requirements for injunctive relief are satisfied for us to order the Secretary to conduct Alabama's congressional elections according to Remedial Plan 3. For all the reasons we discussed in our second preliminary injunction (which the Secretary no longer appeals), *see Milligan* Doc. 272, we repeat our finding that the Plaintiffs are substantially likely to succeed on the merits of their claims that the 2023 Plan (1) does not completely remedy the likely Section Two violation that we found and the Supreme Court affirmed in the 2021 Plan (indeed, it made no effort to do so), and (2) likely violates Section Two because it continues to dilute the votes of Black Alabamians.

We further find that the Plaintiffs will suffer irreparable harm if they must vote in the 2024 elections based on a likely unlawful redistricting plan. "Courts routinely deem restrictions on fundamental voting rights irreparable injury. And discriminatory voting procedures in particular are the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (internal quotation marks omitted) (citing *Obama for Am. v. Husted,* 697 F.3d 423, 436 (6th Cir. 2012); *Alternative Political Parties v. Hooks,* 121 F.3d 876 (3d Cir. 1997); and *Williams v. Salerno,* 792 F.2d 323, 326 (2d Cir. 1986)) (quoting *United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986)).

45

"Voting is the beating heart of democracy," and a "fundamental political right, because it is preservative of all rights." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1315 (internal quotation marks omitted) (alterations accepted). And "once the election occurs, there can be no do-over and no redress" for voters whose rights were violated and whose votes were diluted. *League of Women Voters of N.C.*, 769 F.3d at 247. The Plaintiffs already suffered this irreparable injury once in this census cycle, when they voted in 2022 under the unlawful 2021 Plan. Accordingly, we find that the Plaintiffs will suffer an irreparable harm absent injunctive relief.

We also find that the entry of a preliminary injunction is decidedly in the public interest. We have enjoined the 2023 Plan as likely unlawful, and Alabama's public interest is in the conduct of lawful elections. Accordingly, an affirmative injunction ordering the State to use a plan that we have imposed to remedy the vote dilution we found is in the public interest.

The timing of our Order does not weaken our finding. In *Upham*, the Supreme Court explained that when it has "authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements," "[n]ecessity has been the motivating factor." 456 U.S. at 44 (internal citations omitted). Alabama's next general congressional election is more than thirteen months away. The qualifying deadline to participate in the primary elections for the major political parties is approximately one month

away. Ala. Code § 17-13-5(a). Considering the exigencies of time, we have conducted remedial proceedings on precisely the schedule the parties proposed, and we issue this Order in time for the "early October" deadline by which the Secretary of State told us he needs a final electoral map. *See Milligan* Doc. 147 at 3; *Milligan* Doc. 162 at 7.

Finally, we find — as we must, to issue an affirmative injunction — that this case presents a "rare instance[] in which the facts and law are clearly in favor of the moving party." *Exhibitors Poster Exch., Inc.*, 441 F.2d at 561 (quoting *Miami Beach Fed. Sav. & Loan Ass'n,* 256 F.2d at 415). We have the benefit of **four** extensive evidentiary records (the *Milligan* and *Caster* records in connection with both injunctions); numerous hearings (including a preliminary injunction hearing that was longer than many bench trials); an interlocutory affirmance (in all respects) by the Supreme Court; and able assistance from the dozens of lawyers who have appeared for the parties and their *amici* in this litigation. Indeed, we thank able counsel for their expeditious work to prepare these robust records, particularly on the tight timeframe that this litigation demanded. In the plainest terms, we have no doubt that the facts and the law support the entry of this preliminary injunction.

Accordingly, the Alabama Secretary of State is **ORDERED** to administer Alabama's upcoming congressional elections according to the Special Master's Remedial Plan 3, which is appended to this order as Appendix A.

**DONE** and **ORDERED** this 5th day of October, 2023.

_____
**STANLEY MARCUS**
UNITED STATES CIRCUIT JUDGE

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

_____
**TERRY F. MOORER**
UNITED STATES DISTRICT JUDGE

48

# APPENDIX A

## Remedial Plan 3

