FILED
2024 Jan-31  PM 09:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| EVAN MILLIGAN, SHALELA DOWDY, LETETIA JACKSON, KHADIDAH STONE, GREATER BIRMINGHAM MINISTRIES, and the ALABAMA STATE CONFERENCE OF THE NAACP, <br><br> *Plaintiffs,* <br><br> vs. <br><br> WES ALLEN, in his official capacity as Secretary of State of Alabama, and STEVE LINGSTON and CHRIS PRINGLE, in their official capacities as Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment, <br><br> *Defendants.* | **Case No.: 2:21-cv-1530-AMM** <br><br> **THREE-JUDGE COURT** |

## FIRST AMENDED COMPLAINT

1.     Plaintiffs Evan Milligan, Shalela Dowdy, Letetia Jackson, Khadidah Stone, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP bring this action to prohibit Defendants Secretary of State Wes Allen and the Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment, Steve Livingston and Chris Pringle, from conducting elections

under Senate Bill 5 (2023 Special Session) ("SB5" or "the 2023 Plan"). S.B. 5, 2d. Spec. Sess. (Ala. 2023).

2.     The 2023 Plan is the latest installment in the State of Alabama's decades-long pattern of denying its Black citizens equal access to the State's political process and equal opportunity to elect their candidates of choice. The 2023 Plan represents Alabama's latest discriminatory scheme, designed with the intent to crack Black voters into congressional districts in a manner that prevents the creation of two congressional districts in which Black voters have an equal opportunity to elect candidates of their choice.

3.     Alabama enacted the 2023 Plan as its response to this Court's determination in a preliminary injunction proceeding that Alabama's 2021 congressional redistricting plan (the "2021 Plan") likely violated Section 2 of the Voting Rights Act of 1965 ("VRA"). This Court's injunction instructed the Legislature that, "as a practical reality, the evidence of racially polarized voting adduced during the preliminary injunction proceedings suggests that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Milligan v. Merrill*, 582 F. Supp. 3d 924, 1033 (N.D. Ala. 2022) (three-judge court) ("*Milligan I*"). The Supreme Court affirmed that injunction in *Allen v. Milligan*, 599 U.S. 1 (2023).

4.      Despite this Court's instruction, however, the Alabama Legislature intentionally drew the 2023 Plan to include only one of seven districts in which Black voters would have an opportunity to elect their candidate of choice. Congressional District 7 ("CD7") has an any-part Black voting-age population ("BVAP") of 50.65%. The next highest BVAP is 39.93% in congressional district 2 ("CD2")—insufficient for Black voters to usually have an equal opportunity to elect their preferred candidates. In passing the 2023 Plan, the Legislature was fully aware that CD2 provided no real additional opportunity district for Black voters. The Legislature's own analysis of how the 2023 Plan would perform for Black-preferred candidates showed that Black candidates and the candidates preferred by Black voters lost in the new CD2 in all seven elections the Legislature's expert analyzed. Thus, before passing the 2023 Plan, the Legislature knew that it offered no more electoral opportunities for Black voters than the enjoined 2021 Plan. This fact was a motivating factor for the Legislature's enactment of the 2023 Plan.

5.      Like the 2021 Plan, the 2023 Plan continues to deny Black Alabamians an equal opportunity to participate in the political process by cracking the Black population's electoral strength across three congressional districts (in particular, CD1, CD2, and CD7). Black voters in the Black Belt[1] are cracked or fragmented

---

[1] The Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell,

among CD1, CD2, and CD7 in a manner that permits the white majority to vote as a bloc and routinely outvote them. *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Additionally, despite the demonstrated and well-known shared socioeconomic, cultural, and historical connections linking the City of Mobile and the Black Belt as overlapping communities of interest, the 2023 Plan needlessly separates the City of Mobile from the rest of the Black Belt. This Court has already correctly concluded that the Legislature's decision to ignore the Court's order and its refusal to include two opportunity districts for Black voters in the 2023 Plan illustrates the Legislature's "lack of political will" and "unwillingness to respond to the well-documented needs of Black Alabamians." *Milligan v. Allen*, No. 2:21-CV-1530-AMM, 2023 WL 5691156, at *70 (N.D. Ala. Sept. 5, 2023) ("*Milligan II*"). The Legislature's defiance of court orders and unresponsiveness further demonstrate its intention to deny Black voters the opportunity to elect a representative of choice in a second district.

6.     Indeed, although the Legislature purported in SB5 to enshrine as "non-negotiable" several supposed "principles," upon information and belief, no redistricting bill in Alabama history has ever contained similar legislative findings

---

Sumter, and Wilcox, as well as Clarke, Conecuh, Escambia, Monroe, and Washington counties. The Black Belt is named for its residents and the region's fertile black soil. The region has a substantial Black population because of the many enslaved people brought there to work in the antebellum period. It has been a hotbed of racial discrimination and civil rights activism from the 1860s to today.

on communities of interest, county splits, or other redistricting guidelines. Moreover, in acknowledgment that the Legislature's intent to prioritize the interests of white voters at the expense of diluting the vote of Black people, SB5's stated goal was to keep white voters in Baldwin and Mobile counties together "to the fullest extent possible" based on their shared "Spanish and French colonial heritage." The 2023 Plan succeeds in the Legislature's goal of keeping Baldwin and Mobile counties together to protect the voting strength of the identified white European ethnic groups in that area, while it continues to crack and dilute the votes of the Black community by splitting the Black Belt between two districts and separating the Black Belt from the City of Mobile. SB5 also splits the alleged "Wiregrass" community between two districts. SB5's legislative findings also contradict the Redistricting Guidelines passed by the Reapportionment Committee the prior week, downgrade the importance of VRA compliance, and redefine "community of interest" in economic and infrastructure terms that appear designed to conform to the evidence placed in the record by Defendants in this case and to justify an alleged Mobile-Baldwin community of interest. While several pages of findings are devoted to linking Mobile and Baldwin, only five lines concern the Black Belt and none of it mentions the shared racial and historical connection within the Black Belt. There is also no mention in SB5 of the connections between the Black Belt and the City of Mobile,

even though the Legislature itself connects the Black Belt and City of Mobile in the State Board of Education map enacted in 2021.

7.     The Legislature intentionally placed Black voters from the Black Belt and the City of Mobile into majority-white congressional districts in small enough numbers that Black voters have no electoral influence. Moreover, the Legislature enacted SB5 even though it could have more naturally drawn a second majority-Black congressional district that complies with this Court's order and traditional redistricting principles, like maintaining whole counties, and respects the contiguity and communities of actual interest in the Black Belt and the City of Mobile. The Legislature had available to it no fewer than twelve illustrative maps demonstrating this possibility.

8.     The 2023 Plan dilutes Black voting strength in violation of Section 2 of the VRA and the Fourteenth Amendment to the U.S. Constitution even though (1) Black Alabamians[2] are sufficiently numerous and geographically compact enough to be a majority of the voting-age population in two reasonably configured congressional districts; (2) Black voters are politically cohesive in congressional and other elections in Alabama; and (3) white voters in Alabama vote sufficiently as a

---

[2] Unless otherwise noted, "African American" or "Black" includes people who also identify as Black Hispanic as well as persons who identify as Black and another race on the Census (i.e., "Any Part Black"). Unless noted, the BVAP also includes all individuals who are 18 years old or older and who identify as Any Part Black. *See Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003).

bloc to typically defeat the candidates preferred by Black voters. Voting in Alabama remains extremely racially polarized across the state—a fact of which numerous federal courts have recently and consistently found.

9.      In the areas where a second congressional district in which Black voters have equal opportunity to elect preferred candidates can and should be drawn, the white majority typically votes as a bloc to defeat Black voters' preferred candidates. No Black person has ever been elected from a majority-white congressional district in Alabama. In the twentieth century, no Black person had been elected from any congressional district in Alabama until the creation of the majority-Black CD7 in 1992 in response to Section 2 litigation. As a result, white Alabamians are always able to elect the candidates of their choice in 86% of congressional districts (6 of 7), despite being less than 64% of Alabama's voting age population; whereas Black voters (who are 27% of the state's voting age population) can elect their candidates of choice in only 14% (1 of 7) of Alabama's congressional districts.

10.      Alabama's willful refusal to provide Black voters with adequate representation in Congress is a product of intentional discrimination and a direct continuation of the State's past and present history of discrimination against Black people. The State's intentional policy of disempowerment and discrimination has resulted in the denial of equal opportunity for Black people to participate in the

political process in violation of the Fourteenth Amendment to the U.S. Constitution and Section 2 of the VRA. *See* 42 U.S.C. § 1983; 52 U.S.C. § 10301.

11.    Even in the absence of this intentional discrimination, the 2023 Plan results in discrimination in violation of Section 2 of the VRA. *See* 42 U.S.C. § 1983; 52 U.S.C. § 10301. Under the totality of circumstances—including, *inter alia*, the availability of nondiscriminatory alternative maps; the persistence of extreme racially polarized voting and the 2023 Plan's use of it in a manner that denies equal opportunities; Alabama's ongoing history of racial discrimination in voting and other areas; politicians' continued use of racial appeals; the lack of electoral success for Black-preferred candidates in majority-white districts; the Legislature's lack of responsiveness to the Black community; and the tenuous policy justifications for enacting the 2023 Plan in defiance of court orders and the VRA—Black voters are being denied the right to participate equally in the political process and elect candidates of their choice.

12.    Accordingly, Plaintiffs respectfully request that the Court enjoin the use of SB5 for all future elections; declare that SB5 violates the Fourteenth Amendment to the U.S. Constitution and Section 2 of the VRA; adopt a remedy that completely cures the illegal vote dilution and establishes two congressional districts in which Black voters have a realistic and fair opportunity to elect candidates of their choice; require Alabama to seek preclearance review under 52 U.S.C. § 10302(c); award

attorneys' fees and costs to Plaintiffs and their counsel; and provide all other relief the Court deems necessary.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343, and 1357 because the matters in controversy arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

14.     The Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and 52 U.S.C. §§ 10302 and 10308(f).

15.     The Court has personal jurisdiction over the Defendants, who are all residents of Alabama.

16.     A three-judge panel is requested pursuant to 28 U.S.C. § 2284(a), as this action challenges "the constitutionality of the apportionment of congressional districts."

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and/or because at least one Defendant resides in this district and all Defendants are Alabama residents.

## PARTIES

18.     Plaintiff Evan Milligan resides in Montgomery County, Alabama. He is Black, a U.S. citizen, and a lawfully registered voter who resides in CD2 under

the 2023 Plan. As enacted in SB5, CD2 is a majority-white district. SB5 dilutes the votes of Mr. Milligan and other Black voters in Alabama in a manner that prevents them from electing candidates of their choice in a second congressional district in violation of the VRA and the Constitution. Under a reasonably configured alternative map, Mr. Milligan would reside in a second majority-Black district or Black opportunity district.

19.    Plaintiff Shalela Dowdy resides in Mobile County, Alabama. She is Black, a U.S. citizen, and a lawfully registered voter who resides in CD1 under the 2023 Plan. As enacted in SB5, CD1 is a majority-white district. SB5 dilutes the votes of Ms. Dowdy and other Black voters in Alabama in a manner that prevents them from electing candidates of their choice in a second congressional district in violation of the VRA and the Constitution. Under a reasonably configured alternative map, Ms. Dowdy would reside in a second majority-Black district or Black opportunity district.

20.    Plaintiff Letetia Jackson resides in the City of Dothan, Alabama. She is Black, a U.S. citizen, and a lawfully registered voter who resides in CD2 under the 2023 Plan. As enacted in SB5, CD2 is a majority-white district. SB5 dilutes the votes of Ms. Jackson and other Black voters in Alabama in a manner that prevents them from electing candidates of their choice in a second congressional district in violation of the VRA and the Constitution. Under a reasonably configured

alternative map, Ms. Jackson would reside in a second majority-Black district or Black opportunity district.

21.     Plaintiff Khadidah Stone resides in Montgomery County, Alabama. She is Black, a U.S. citizen, and a lawfully registered voter in CD2. As enacted in SB5, CD2 is a majority-white district. SB5 dilutes the votes of Ms. Stone and other Black voters in Alabama in a manner that prevents them from electing candidates of their choice in a second congressional district in violation of the VRA and the Constitution. Under a reasonably configured alternative map, Ms. Stone would reside in a second majority-Black district or Black opportunity district.

22.     Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement and its transformative impact in Birmingham, Alabama, and across the United States. GBM seeks to address urgent human rights and social justice needs in the greater Birmingham area. GBM is a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people.

23.     GBM is dedicated to advancing social justice through political participation across Alabama. GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the

democratic process. Toward that end, GBM regularly communicates with its members and works to register, educate, and increase voter turnout and efficacy, particularly among Black, Latinx, and low-income people and people with disabilities.

24.   GBM has around 5,000 individual members located primarily throughout the greater Birmingham, Alabama area. GBM also has members in other areas of Alabama including Mobile and Montgomery Counties. Many GBM members are Black registered voters. GBM has members who are registered voters who live and vote in CDs 1, 2, and 7 under the 2023 Plan. These members have been and, if SB5 is not enjoined, will continue to be harmed by SB5's assignment of them to unconstitutional and illegal districts where their votes are unlawfully diluted by the cracking of Black voters across CDs 1, 2, and 7 in violation of the VRA and the Constitution. Under a reasonably configured alternative map, Black voters who are members of GBM would reside in a remedial second majority-Black district or Black opportunity district.

25.   The Alabama State Conference of the National Association for the Advancement of Colored People ("Alabama NAACP") is the state conference of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic

equality of Black Americans and all other Americans. Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Alabama NAACP has participated in lawsuits to protect the right to vote, regularly engages in efforts to register and educate voters, and encourages Black people to engage in the political process by turning out to vote on Election Day.

26.     The Alabama NAACP has thousands of members in Jefferson County, the Black Belt, the City of Mobile, and other places across the state. Most of the members of the Alabama NAACP are Black lawfully registered voters. The Alabama NAACP's members include registered voters who reside and vote in CDs 1, 2, and 7 as well as every other district. These members have been and, if SB5 is not enjoined, will continue to be harmed by SB5's assignment of them to unconstitutional and illegal districts. The Alabama NAACP's members include Black registered voters whose votes are unlawfully diluted by the cracking of Black voters across CDs 1, 2, and 7 in violation of the VRA and the Constitution. Under a reasonably configured alternative map, Black registered voters who are Alabama NAACP members would reside in a second majority-Black district or Black opportunity district.

27.   Defendant Wes Allen is sued in his official capacity as Alabama Secretary of State. As Secretary of State, Defendant Allen is the chief elections official in the State of Alabama. He must provide uniform guidance for election activities in the State and certify the elections of members to the Alabama Legislature and Congress. Ala. Code §§ 17-1-3, 17-12-21. Defendant Allen also has responsibility for certifying the names of primary and general election candidates for the State Legislature and Congress, as well as issuing Certificates of Election following tabulation of vote results. Ala. Code §§ 17-13-5(b), 17-9-3(b), Ala. Code § 17-12-21.

28.   Defendants Steve Livingston and Chris Pringle are sued in their official capacities as the Senate and House Chairs, respectively, of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"). Ala. Code § 29-2-51. In that capacity, Defendants' Committee prepared and developed redistricting plans for the State following the decennial census and presided over the meetings of the Committee. The Committee was tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate, House, and congressional districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52. Defendants Livingston and Pringle led the process leading to the enactment of the

2023 Plan. Defendants Livingston and Pringle will lead the Legislature's efforts to re-draw and remedy the congressional districts' illegality if ordered to do so by this Court.

29.     Defendant Chairs of the Committee intervened in their official capacities in the related lawsuits of *Singleton v. Allen*, no. 2:21-cv-1291, and *Caster v. Allen*, no. 2:21-CV-1536, based on the alleged injury to themselves and the Legislature if the 2023 Plan is enjoined by the Court. According to the Committee Chairs, "[t]he relief sought by Plaintiffs . . . would necessarily impair and impede the [Legislators'] ability to protect the Reapportionment Committee's interest in conducting Congressional redistricting[,]" Secretary Allen "has no authority to conduct redistricting," "[t]he Reapportionment Committee . . . [is] the real party in interest" in the case, and "[n]o other party adequately represents the [Legislators'] interest." *Singleton*, Doc. 25 at 5. The Committee Chairs also asserted that they should be permitted to intervene "to assert both factual and legal defenses in support of the constitutionality and lawfulness" of the congressional plan and that they are "uniquely positioned to present such . . . defenses because of their leadership of the Reapportionment Committee." *Id*. at 6. "Without intervention," the Committee Chairs argued, they would "not be able to protect their interests as Chairs of the Committee and state legislators." *Id*. at 8. The Court granted intervention to the

Committee Chairs in their official capacities in both *Singleton* and *Caster*. The *Milligan* Court has held that the Chairs have waived legislative immunity. Doc. 59.

## STATEMENT OF FACTS

### The History of Majority-Black Congressional District 7

30.    The establishment of CD7 as a majority-Black district in the 1990s redistricting cycle was the first time in the twentieth century that Black Alabamians had the opportunity to elect a candidate of their choice to Congress.

31.    In 1992, Black voters challenged the failure of the Legislature to redistrict after the release of the 1990 census and the lack of a majority-Black congressional district under Section 2 of the VRA. Upon the stipulation of the parties, a court ordered the creation of CD7 as a majority-Black congressional district to comply with the VRA. *See Wesch v. Hunt*, 785 F. Supp. 1491, 1498 (S.D. Ala.), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992).

32.    Because the Legislature failed to enact and preclear its own map, the court's plan remained in effect for the rest of the 1990s. After the 2000 and 2010 redistricting cycles, the Legislature continued to enact this version of CD7 with changes only to address population shifts.

33.    Following the release of the decennial census in 2021, the Alabama legislature passed HB1 ("the 2021 plan") to redistrict the state's congressional delegation until 2030. The Plan included one majority-Black congressional district,

CD7. CD7 has been represented by a Black person since its inception as a majority-Black district in 1992: first Congressman Earl Hilliard, then Congressman Artur Davis, and now Congresswoman Terri Sewell.

34.   Alabamians were kept in the dark throughout the secretive map drawing process leading up to the introduction of HB1. Only after the end of the public hearings and, at the eleventh hour, did the Legislature unveil congressional maps aimed to prevent Black voters from having a fair opportunity to elect candidates of choice. The white majority in the Legislature, including Rep. Pringle and Sen. McClendon who led the Permanent Legislative Committee on Reapportionment (the "Committee")—the Committee responsible for preparing and developing redistricting plans for the State following each decennial census—admitted that no racial-polarization (or more comprehensive) analysis was conducted to determine what was required to satisfy the VRA. The Legislature also flatly rejected the requests from the Black community to conduct such an analysis or draw a second Black opportunity district. Indeed, the Legislature declined to share the map with Black legislators or the public until just before its introduction in the Committee.

35.   On November 16, 2021, the *Milligan* plaintiffs filed the instant lawsuit. The *Milligan* plaintiffs asserted a claim of vote dilution under Section 2 of the VRA and intentional discrimination and racial gerrymandering under the Fourteenth Amendment to the U.S. Constitution.

**The Proceedings and Process Leading to the Enactment of SB5**

36.     After an extensive seven-day hearing in January 2022, this Court concluded that the 2021 Plan likely violated Section 2 and enjoined the State from using that plan, holding that "the appropriate remedy is a congressional redistricting plan that includes either an additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." *Milligan I*, 582 F. Supp. 3d at 936. The Secretary and Defendant Chairs of the Reapportionment Committee ("the Legislators") appealed.

37.     On June 8, 2023, the Supreme Court affirmed the preliminary injunction in all respects.  *Allen v. Milligan*, 599 U.S. 1 (2023). The Court "s[aw] no reason to disturb th[is] Courts careful factual findings." *Id.* at 23. The Court also concluded there was no "basis to upset th[is] Court's legal conclusions" because the Court "faithfully applied [] precedents and correctly determined that, under existing law, [the 2021 Plan] violated" Section 2. *Id.*

<u>Court Proceedings Leading to the 2023 Special Session</u>

38.     On return from the Supreme Court, this Court began remedial proceedings. The State requested that the Court allow the Legislature approximately five weeks — until July 21, 2023 — to enact a new plan. All parties understood the urgency of the remedial proceedings. The Secretary previously advised the Court

18

that because of pressing state-law deadlines, he needed a final congressional map by "early October" for the 2024 election.

39.     On July 21, 2023, the Legislature enacted and Governor Ivey signed into law SB5, a new congressional map ("the 2023 Plan"). Just like the 2021 Plan, the 2023 Plan includes only one majority-Black district in CD7 and no other district that provides a fair opportunity for Black voters to elect their preferred candidate.

<u>2023 Redistricting Criteria</u>

40.     At the beginning of the 2023 Special Session, the Committee readopted in full the 2021 Redistricting Guidelines as the 2023 Guidelines. Yet the following week and at the eleventh hour right before passage, the Legislature enacted approximately six pages of legislative "findings" for the 2023 Special Session that were inserted into the bill. These findings mention the VRA only to say that it is the "intent" of the Legislature to comply with it, and that the VRA never requires districts that violate traditional districting principles.

41.     This contrasts with the Committee's own 2023 Guidelines, which stated that "Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended" and a "redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength."

42.     SB5's "findings" declare several principles that are "non-negotiable for the Legislature," which do not include VRA compliance: minimal population

deviation, contiguity, reasonable compactness, no more than six county splits, keeping together communities of interest as specifically described in the findings, and not pairing incumbents. This contrasts from the Guidelines, which state that "priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria."

43.     Representative Pringle testified he "does not know" why these "findings" were included in the bill, and that the "first time I saw that was Friday morning on the floor of the House when the Senate bill was brought up." Representative Pringle agreed that "some of them look like they are" in conflict with the 2023 Guidelines adopted the week before.

44.     Senator Livingston likewise does not know why the findings were included in the bill, and testified that the findings were drafted by Alabama Solicitor General Edmond LaCour, Jr.

45.     Representative Pringle testified that the findings attached to the bill that became the 2023 Plan were not debated by the Legislature and were not revealed until the members were asked to vote on the bill.

46.     Mr. LaCour described these findings as "essentially . . . describing the map" enacted in SB5.

47.     Representative Pringle testified that he has never seen another redistricting bill with similar types of legislative findings concerning communities of interest.

<u>The 2023 Legislative Process</u>

48.     Both Co-Chairs Representative Pringle and Senator Livingston were aware of this Court's remedial order in this case.

49.     After the Supreme Court's decision affirming the Court's preliminary injunction, the Co-Chairs turned to Randy Hinaman, the Legislature's longtime map drawer (and drawer of the enjoined 2021 Plan) and instructed him to develop new potential congressional plans.

50.     Mr. Hinaman testified that he was asked to draw a map that added a second opportunity district. Specifically, he was instructed by the Chairs to "draw a district that provides the opportunity for African American voters to [ ] elect a candidate of their choice."

51.     No one instructed Hinaman to try to add a second majority Black district and he did not attempt to do so, but the Chairs did instruct him to keep Mobile and Baldwin counties together.

52.     Representative Pringle instructed Mr. Hinaman "to follow the [Committee's 2021 Redistricting] Guidelines and the ruling in *Milligan* . . . . He was

given instruction to consider the Black Belt, Gulf, and Wire Grass communities of interest and to minimize county splits."

53.        Mr. Hinaman drew three maps on his own for the Committee to consider: the "Community of Interest" Plan (the "COI plan"), the "Russell Split" plan, and the "Expanded Black Belt" plan.

54.        All three of these plans kept Mobile and Baldwin counties together, kept the counties defined by Defendants as the Wiregrass together except for Covington County, kept the Black Belt in two districts except for the split of Russell County in the "Russell Split" plan, and did not pair incumbents.

55.        All three of the plans-maintained CD7 as a majority-BVAP district, and CD2 had BVAPs of 42.5% for the COI plan, 43.38% in the Russell Split plan, and 44.01% in the Expanded Black Belt plan.

56.        While Hinaman drew the Russell Split and Expanded Black Belt plans as options for the Committee to consider, he understood that his COI plan was the preferred plan of the Chairs and that each would sponsor it in their respective legislative bodies.

57.        On June 27, 2023, Governor Kay Ivey called a special legislative session to begin on July 17, 2023, for the purpose of enacting a remedial districting plan.

58.     The Committee held two pre-special session hearings on June 27 and July 13 to receive input from the public on redistricting plans.

59.     For the June 29 meeting, Representative Pringle asked a historian to come and testify at that hearing regarding the historical connection between Mobile and Baldwin that allegedly makes them a community of interest. He did not ask anyone to speak on behalf of the need for two districts in which Black voters could elect candidates of their choice.

60.     At the July 13 hearing, Representative England (who is Black) proposed an amendment to the Committee's guidelines that offered specific instructions on remedying the likely VRA violation found by the Court.

61.     At the hearing on July 13, the Committee voted (along racial lines) to reject the amendment and re-adopt the State's 2021 Legislative Redistricting Guidelines ("the 2023 Guidelines").

62.     Representative Pringle testified that "the public hearings made perfectly clear that people wanted a district they thought that Blacks could elect a candidate of their choosing."

63.     The only plans proposed and available for public comment during the pre-session hearings were the "VRA Plaintiffs' Remedial Plan," submitted by the Milligan and Caster Plaintiffs, and two different plans put forward by Senator Singleton and Senator Hatcher.

64.     The Committee Co-Chairs failed to present any of their plans for input at these public hearings, as Representative Pringle said the COI plan was not yet done.

65.     On July 17, the first day of the Special Session, Representative Pringle introduced the COI plan with a BVAP of 42.45% in CD2.

66.     The COI Plan passed out of Committee on July 17 along racial lines, with all Black members of the Committee voting against it. Under the COI Plan, the Committee's performance analysis showed that Black-preferred candidates would have won two of the four statewide races in 2020 and 2022 that were analyzed by the Legislature.

67.     Senator Livingston agreed that the COI Plan kept Mobile and Baldwin together, the Black Belt in two districts, and all of the Wiregrass in one district, except part of Covington County, which satisfied SB5's legislative findings.

68.     The COI Plan passed the full House on July 19 along racial lines (except for one Black member of the House elected from a majority-white district).

69.     At some point soon after the Committee passed Representative Pringle's COI Plan, the Senate Republican contingent of the Committee moved from supporting that plan to looking at other plans, and Senator Livingston testified he had to move with them, or he would "be left behind."

70.       Senator Livingston understood that other Committee members moved on because they had "received some additional information they thought they should go in the direction of compactness, communities of interest, and making sure that congressmen are not paired against each other," but he did not know where or who this information came from or who received it other than "other committee members."

71.       The Senate majority began working on a plan introduced in Committee on July 17 as the Opportunity Plan, which turned out to have been drafted by outside political consultant and head of Red State Strategies, Chris Brown, and dropped off on a thumb drive to the Reapportionment Office by Senator Dan Roberts.

72.       The Opportunity Plan (or "Livingston 1") had a BVAP of 52.59% in CD7, and 38.31% in CD2.

73.       From this plan, Senator Livingston and a number of other Republican Senators made minor changes and introduced a revised version as Livingston 2, which passed the Senate on July 19.

74.       Senator Livingston admitted that the Livingston 2 plan appeared to include a version of CD2 identical to the one in the Livingston 1 plan, and that the main differences between the two plans were tweaks to improve compactness.

75.     Representative Pringle testified that Livingston 2 and the 2023 plan, ultimately enacted in SB5, advanced through the Senate because he rejected Senator Livingston's request to substitute the COI Plan for Livingston 2 in the House. Representative Pringle insisted that if Livingston wants to "pass a senate plan, you're going to pass the senate on the senate bill number, and you're not going to put my name on it." Representative Pringle testified he didn't want his name on the Senate plan because he thought his COI Plan "was a better plan" in terms of VRA compliance.

76.     On July 20, the House passed the COI Plan. That same day, the Senate passed the Opportunity Plan with all Black Senators voting against it.

77.     After the differing bills passed the House and Senate, Senator Livingston testified they "started making sausage"—"we had two different bills, and we had to come to some compromise in between them to pass one" and that resulted in the Livingston 3 plan, which was passed out of Conference Committee and ultimately enacted.

78.     Representative Pringle was largely unaware of how SB5 came together or the prior Senate plans, noting that the map appears to have been drawn by Alabama's Solicitor General Edmund LaCour and several senators: Mr. LaCour "was upstairs meeting with the senators in a different room working with them to draw what ultimately became the Livingston plans."

79.        The major changes from Livingston 2 to the final 2023 Plan were adding Lowndes and Butler to CD2, making Etowah County whole and putting it in CD3, putting the remainder of Blount into CD4, and adding Lawrence to CD5.

80.        Senator Livingston testified that even though CD2 in the Plan had only about 40% BVAP, it was the Committee's decision that this constituted "something quite close to a majority of black voting age population," and when asked how the Committee made that decision, he said: "this is the plan that was brought forward in the end and was compromised upon."

81.        Representative Pringle testified that the BVAP of just under 40% in the 2023 Plan enacted in SB5 was basically splitting the difference of the BVAPs between the Livingston 2 and the COI plans. Regarding any significance of that BVAP number, Representative Pringle testified that "[y]ou're going to have to talk to Senator Livingston and [Alabama Solicitor General] Eddie LaCour"—"[t]hat's what the senate came up with, and they were not going to allow us to pass the house plan."

82.        On July 21, a bicameral Conference Committee adopted the 2023 Plan as Senate Bill 5 ("SB5"). The image below shows the 2023 Plan:



83.      Dr. Trey Hood, the Legislature's racial polarization expert, analyzed how the 2023 Plan would perform for Black-preferred candidates in seven statewide contests in 2018 and 2020. Black-preferred candidates lost in the new CD2 in all seven elections, representing no change in opportunity for Black voters from the 2021 Plan.

84.      Representative Pringle saw this analysis on the Friday morning before the final vote on SB5 and this analysis was available to all members of the Conference Committee as well.

85.        On July 21, the final day of the Special Session, SB5 was passed by both houses of the Legislature, along racial lines (with the exception of one Black House member).

86.        Governor Ivey signed the bill that same day on July 21. SB5 contains the State's 2023 Plan.

87.        Representative Pringle testified that "[w]hat I could get passed at the house, I could not get passed at the Senate. The Senate made it perfectly clear they were not going to pass my plan, they were going to pass their plan. And we made the decision that it was more important – we had to pass something and not just go to Montgomery and completely fail and not pass a plan."

88.        Throughout the special legislative sessions, Black legislators objected to the delay in introduction of the white majority's preferred plans, the speed with which the 2023 Plan was passed, and the lack of input from Black legislators in the process. Black legislators attempted to introduce and pass the VRA Plaintiffs' Plan, which contained two performing majority-Black districts, before the Committee and in the special session. But the white majority repeatedly voted along racial lines to reject this plan. Black legislators, including Senator Vivian Figures and Representative Sam Jones who are elected from districts in Mobile County, also objected to the separation of the City of Mobile from the Black Belt. Black legislators testified to the historical, cultural, and socioeconomic relationship

between the City of Mobile and the Black Belt. For example, Representative Adline Clarke and Representative Barbara Drummond discussed the shared history and culture, familial ties, shared experiences of poverty, shared lack of access to healthcare, and the migration of Black people from the Black Belt to Mobile as examples of commonalities between the Black Belt and Mobile. The Legislature did not include this testimony in SB5's legislative findings on communities of interest.

89.      In a declaration accompanying Plaintiffs' Objections to Alabama's Remedial Plan, Representative Jones, who was also previously the first Black Mayor of the City of Mobile, a Mobile County Commission, and Chair of the South Alabama Regional Planning Commission, testified about how the City of Mobile and nearby communities such as Prichard, Chickasaw, and Mount Vernon have more similarities and closer ties to much of the Black Belt than they do with Baldwin County. *See* Doc. 200-9. The Black Belt not only has deep economic, healthcare, educational, religious, and cultural ties with Mobile, but the areas are linked through extensive migration and continuing family ties, manifest through shared cultural celebrations, church connections, and other symbols of community. *Id.* Unlike the City of Mobile and the Black Belt, Mobile and Baldwin County share very few cultural ties and have sharply divergent histories and development. *Id.*

Court Proceedings Leading to Second Preliminary Injunction

90.        Plaintiffs timely objected to the 2023 Plan, arguing that it did not cure the unlawful vote dilution this Court found because it did not create a second district in which Black voters have an opportunity to elect a candidate of their choice and requested another preliminary injunction.

91.        On August 14, 2023, this Court conducted a remedial hearing on Plaintiffs' Section 2 objections to the 2023 Plan. The Court evaluated the objections with the benefit of an extensive record, which included not only the evidence drawn from the previous preliminary injunction proceedings, but also new expert reports, deposition transcripts, and other evidence submitted during the remedial phase including three amicus briefs and a statement of interest filed by the Attorney General of the United States.

92.        During this remedial process, Defendants conceded that the 2023 Plan does not include an additional opportunity district. Indeed, Defendants asserted that notwithstanding this Court's preliminary injunction order and the Supreme Court's affirmance, the Legislature was not required to include an additional opportunity district in the 2023 Plan. Defendants' conduct and concession put this case in an unusual posture: there has been no other "case in which a state legislature — faced with a federal court order declaring that its electoral plan unlawfully dilutes minority votes and requiring a plan that provides an additional opportunity district

— responded with a plan that the state concedes does not provide that district." Based on that concession and the overall evidentiary record, on September 5, 2023, this Court issued a second preliminary injunction. The second preliminary injunction enjoined the Secretary from using the 2023 Plan because it does not remedy the likely Section 2 violation that the Court found and the Supreme Court affirmed, and in the alternative, because the Plaintiffs were substantially likely to establish anew that the 2023 Plan violates Section 2.

93.      On October 5, 2023, this Court ordered the Secretary to administer upcoming congressional elections in Alabama using the Special Master-recommended "Remedial Plan 3." Remedial Plan 3 is reasonably configured and fully respects traditional redistricting criteria. Among other things, it was not drawn based on racial targets; connects the Black Belt and City of Mobile; preserves over 93% of the City of Birmingham and over 90% of the City of Mobile in a single district; only splits six counties, 31 municipalities, and 14 voting districts; places all 18 core Black Belt counties in two districts; places the majority of the purported "Wiregrass community" in one district; and leaves about 87% of Alabamians in the same district as under the 2023 Plan.

94.     Remedial Plan 3 contains two reasonably configured majority-Black districts (CD2 at 55.64% Black registered voter and CD7 at 50.97% Black registered

voter) based on Alabama's own registered voter database. Remedial Plan 3 is shown in the image below:



**Plaintiffs Satisfy the Three *Gingles* Preconditions for Proving a
Vote Dilution Claim Under Section 2 of the Voting Rights Act**

<u>*Gingles* I: The State Could Have Drawn a Second Majority-Black Congressional
District with a Reasonably Compact Black Population of Overlapping or Nearby
Communities of Shared Interest.</u>

95.     Alabama's Black population is sufficiently large and geographically compact enough to constitute majorities of the voting age population in two reasonably configured congressional districts.

96.     The eleven illustrative maps presented by Dr. Moon Duchin and Mr. Bill Cooper in the *Milligan* and *Caster* cases, *see Milligan*, 582 F. Supp. 3d at 964, 1004-16, *Milligan II*, 2023 WL 5691156, at *53-68, the three remedial plans

drawn by the special master (which each have two majority-Black districts based on BVAP or self-identified Black registered voters), and the VRA Plaintiffs' Remedial Plan introduced in the Legislature, *see Milligan v. Allen*, No. 2:21-CV-1530, 2023 WL 6567895, at *17 (N.D. Ala. Oct. 5, 2023), all demonstrate that two reasonably configured majority-Black districts that respect traditional redistricting criteria can be drawn. Each of these maps contain two districts with a majority Black voting age, Black citizen voting age, and/or self-identified Black registered voter populations.

97.     Black voters in these districts are members of shared, overlapping, or nearby communities of interests with a shared history, political beliefs, cultural values, transportation, media, and economic interests. *See Milligan II*, 2023 WL 5691156, at *64. The shared experiences of the communities in these illustrative districts include a history of discrimination, shared beliefs, and a desire for livable wages, quality healthcare, and a second opportunity Black district.

### *Gingles* II: Voting Remains Racially Polarized in Alabama Across the State

98.     Voting is racially polarized across the state. "The surest indication of race-conscious politics is a pattern of racially polarized voting." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984).

99.     Numerous federal courts in Alabama have found that the state's elections are racially polarized. *See, e.g., Milligan*, 599 U.S. at 22 (accepting this Court's findings that, "Black voters supported their candidates of choice with 92.3%

of the vote" while "white voters supported Black-preferred candidates with 15.4% of the vote" and plaintiffs' experts description of racially polarized voting in Alabama as "intens[e]," "very strong," and "very clear"); *Ala. Legis. Black Caucus v. Alabama* ("*ALBC I*")*,* 575 U.S. 254, 277 (2015) (noting the existence of racially polarized voting in Alabama elections); *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-01821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019) ("[V]oting is racially polarized in the multimember district [of the Jefferson County school board] insofar as Black voters are politically cohesive and White people vote sufficiently as a bloc to enable them to defeat Black voters' preferred candidates."); *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-46 & n.3 (M.D. Ala. 2011) (finding that voting is racially polarized in Alabama). Plaintiffs incorporate this Court's prior findings and the testimony of Dr. Baodong Liu and other experts on racially polarized voting across Alabama. *See, e.g.*, *Milligan*, F. Supp. 3d at 968, 1017-20; *Milligan II*, 2023 WL 5691156, at *68. "In an environment characterized by racially polarized voting, politicians can predictably manipulate elections—either by drawing districts or setting an issue for a referendum—to minimize or cancel out minority voters' ability to elect their preferred candidates." *McGregor*, 824 F. Supp. 2d at 1346 (internal citation, quotation marks, and alterations omitted).

100.   There is a causal relationship between racial bloc voting and the state's history of racial discrimination. "Racial bloc voting by whites is attributable in part

to past discrimination, and the past history of segregation and discrimination affects the choices of voters at the polls." *Brown v. Bd. of School Comm'rs of Mobile Cnty.*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd* 702 F.2d 1103 (11th Cir. 1983), *aff'd* 464 U.S. 1005 (1983).

101.   In 2013 and 2014, Burton LeFlore, a Black Democrat, sought election to the U.S. House from CD1, but both times—as the candidate of choice for Black voters—LeFlore was defeated by Bradley Byrne, a white Republican, by wide margins that reflect the significant racially polarized voting in Alabama.

102.   In 2020, Black candidates ran in CD1, CD2, and CD3 and lost while receiving over 92% of the Black vote, and no more than 12.6% of the white vote in each of the races.

103.   In the 2008 U.S. Senate race, 90% of Black voters supported State Senator Vivian Figures, the Democratic candidate, while 89% of white voters voted for Republican U.S. Senator Jeff Sessions. In that race, Senator Sessions won the support of a majority of white voters regardless of party affiliation: 58% of white Democrats, 88% of white Independents, and 96% of white Republicans. By contrast, Senator Figures won the support of 84% of non-white voters of any party.

104.   In 2018, Black candidates for Lieutenant Governor, State Auditor, and the Public Service Commission lost statewide general elections to white candidates

wherein the Black candidates received upwards of 95% of Black voter support, and the white candidates received upwards of 85% of white voter support.

105.   In the 2022 elections, Black and Black-preferred statewide candidates would have lost every election in every congressional district under the 2023 Plan, except majority-Black CD7.

106.   Voting in primary elections in Alabama is also racially polarized. That is, even when voters are choosing among candidates from the same party race still influences their vote. For example, in the 2018 Democratic Primary for CD1, voting was racially polarized with a majority of Black voters voting for the Black candidate and over 84% of white Democratic voters voting for the white candidate. In the 2016 Republican Presidential Primary, the lone Black candidate received far less support from white voters than their support for white candidates. In the 2008 Democratic presidential primary, Black people overwhelmingly voted for Barack Obama, whereas the majority of white voters supported Hillary Clinton or other white candidates.

_Gingles_ III: White Block Voting Typically Defeats Black Candidates of Choice

107.   In the areas where a second majority-minority congressional district can and should be drawn, the white majority votes as a bloc typically resulting in the defeat of Black voters' candidates of choice. In the twentieth century, Black Alabamians have never elected a congressional representative of choice outside of

the majority-Black CD7, and only since 1992. Thus, the lack of a second majority-Black district restricts Black Alabamians influence to only approximately 14% of the congressional delegation, despite accounting for 27% of the state's population.

108.   In congressional races in the current majority-white CDs 1, 2, 3, 4, and 6, Black candidates who are the preferred candidates of Black voters have never won election to Congress. According to the State's own expert, those Black candidates who are Black voters' preferred candidates will continue to lose in these districts.

109.   For example, in 2020 in CD1, white and white-preferred candidate Rep. Bradley Byrne defeated Black and Black-preferred candidate James Averhart by approximately 29 percentage points in a district that was approximately 25.7% BVAP. The same was true in 2018, with Rep. Byrne defeating Black and Black-preferred candidate Robert Kennedy Jr. by over 26 percentage points.

110.   In 2020 in CD2, which is 30.6% BVAP, white and white-preferred candidate Rep. Barry Moore defeated Black and Black-preferred candidate Phyllis Harvey-Hall by over 30 percentage points. In 2018, white and white-preferred candidate Rep. Martha Roby defeated Black-preferred candidate Tabitha Isner by 23 percentage points.

111.   In 2020 in CD3, which is 25.8% BVAP, white and white-preferred candidate Rep. Mike Rogers defeated Black and Black-preferred candidate Adia

Winfrey by 35 percentage points. Similarly, in 2018, Rep. Rogers defeated Black-preferred candidate Mallory Hagan by over 27 percentage points.

**The Totality of Circumstances, Including Senate Factors Demonstrate that HB1 Prevents Black Voters in Alabama from Participating in the Political Process on Equal Terms and Electing Representatives of Choice**

112.   The three *Gingles* requirements are necessary preconditions, but, to establish liability, Plaintiffs must also demonstrate that "the totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other members of the electorate." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015).

113.   To undertake the totality-of-the-circumstances determination, courts use nine factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the VRA, i.e., the "Senate Factors." *Id*. But courts are not limited to solely considering these factors, nor is there a requirement that "any particular number of factors be proved, or that a majority of them point one way or the other." *Id*. (internal citations and quotation marks omitted).

<u>Senate Factor 1: Alabama Has an Extensive and Ongoing History of Racial Discrimination in Voting</u>

114.   In five of the six decennial redistricting cycles between 1960 to 2010, courts or the U.S. Department of Justice found that Alabama's congressional map or

its state legislative maps discriminated against Black voters in violation of the Constitution or the VRA.

115.   Prior to 1960, the Legislature failed to reapportion for 50 years—diluting the votes of residents in rapidly expanding counties. As a result, Alabama's entire legislative apportionment scheme was struck down for violating the principle of one person, one vote. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108-09 (M.D. Ala. 1965).

116.   Following *Reynolds* and the 1970 Census, the Legislature again failed to reapportion and a three-judge federal court was forced to draw new district lines. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972). The court rejected the Alabama Secretary of State's proposed map because of its racially "discriminatory effect" on Black voters. *Id*. at 936. In the 1980s, the United States Attorney General denied preclearance under the VRA to 1981 maps drawn by the Legislature to redistrict State House and Senate maps because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. *See* Letter from Reynolds, Asst. Atty. Gen., U.S. Dep't of Just. to Ala. Att'y Gen. Graddick, May 6, 1982,

https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf.

Shortly thereafter, a three-judge court rejected Alabama's proposed interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' black districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 237 (M.D. Ala.), *aff'd mem*. 459 U.S. 961 (1982). The U.S. Department of Justice again objected under Section 5 to the Legislature's 1982 maps for the State Senate and House because those maps continued to crack the Black Belt. *See* Letter from Reynolds, Asst. Atty. Gen., U.S. Dep't of Just. to Ala. Att'y Gen. Graddick, Aug. 2, 1982, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1560.pdf. When the Court finally conducted an "examination of the merits," it agreed with the Attorney General's "determination that the configuration of certain Black Belt districts caused retrogression of black voting strength (particularly in districts 45 and 88) and that there was unnecessary fragmentation of minority communities and insufficient adherence to county boundaries" in violation of the VRA. *Burton v. Hobbie*, 561 F. Supp. 1029 (M.D. Ala. 1983) (three-judge court).

117.   After the 1990 census, the State entered a consent decree to resolve a VRA lawsuit filed on behalf of Black voters. *See Brooks v. Hobbie*, 631 So.2d 883, 884 (Ala. 1993). The U.S. Department of Justice also issued a Section 5 objection against the Alabama Legislature's 1992 congressional redistricting plan because it cracked Black communities and diluted their votes in violation of Section 5 of the

VRA. *See* U.S. Dep't of Just. to Ala. Att'y Gen. Evans, Mar. 27, 1992, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1880.pdf.

118.   After the 2010 census, Black voters and legislators successfully challenged state legislative districts as unconstitutional racial gerrymanders. *See Ala. Legis. Black Caucus v. Alabama* ("*ALBC II*"), 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017).

119.   Most recently, after the 2020 census, the 2021 Plan for congressional districts was enjoined by this Court in an order affirmed by the Supreme Court because it likely violated Section 2. *Allen v. Milligan*, 599 U.S. 1 (2023). The 2023 Plan was also preliminary enjoined by this Court because this Court found that the 2023 Plan likely also violated Section 2. *Milligan II*, 2023 WL 5691156, at *1.

120.   Alabama's history of discrimination dates to the state's admission to the union. Before the Civil War, Black people were barred from voting in the state. The passage of the Reconstruction Acts and Amendments forced Alabama to allow Black men access to the franchise, and the 1867 Alabama Constitution granted every male person over the age of 21—who satisfied the citizenship and residency requirements—the right to vote. This meant that for the first time in Alabama's history, Black people voted and held public office.

121.   In response, white leaders reformed the Democratic party with the intent of "redeeming" the State and re-establishing white supremacy. This was

accomplished by using violence to deter Black people from political participation and, once the Redeemers returned to political office, to pass racially discriminatory laws to cement their control.

122.   Between 1868 and 1872, the Ku Klux Klan maintained an active membership in Alabama's rural areas and suppressed the Black vote by beating and killing Republican leaders, burning their homes, lynching Black Americans, and sending bands of armed white men on horseback to break up Republican political rallies and intimidate voters.

123.   In 1874, Democratic candidates were elected to public office in large numbers, mainly due to the party's use of violence against and intimidation of Black voters. On election day, in Eufaula, Alabama, members of a white paramilitary group known as the White League, killed several unarmed Black Republican voters and turned away thousands of voters from the polls.

124.   The following year, in 1875, the Alabama legislature adopted a new state constitution and passed a series of local laws and ordinances designed to strip Black Americans of the civil rights they briefly enjoyed during Reconstruction.

125.   Violent intimidation of Black voters continued throughout the 1880s and 1890s, and by the twentieth century white leaders in Alabama had declared Black disenfranchisement a policy goal. At the 1901 Constitutional Convention, 155

white male delegates gathered in Montgomery with the express intention "to establish white supremacy in the State."

126.   The Convention ratified changes to the constitution that required literacy tests as a prerequisite to register to vote and mandated payment of an annual $1.50 poll tax, which was intended to and had the effect of disenfranchising Black voters. *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966).

127.   After the passage of the 1901 Constitution, the number of Black registered voters in Alabama dropped from 180,000 to 3,000.

128.   Alabama's discriminatory voter registration system, combined with continued violent intimidation, successfully suppressed Black voting in the state for several more generations, with no significant federal intervention until the passage of the VRA in 1965.

129.   In 1964 and 1965, Alabama's discrimination and brutality against Black voters was on full display in Selma, where Dallas County Sheriff Jim Clark, Alabama state troopers, and vigilantes violently assaulted peaceful Black protesters attempting to gain access to the franchise.

130.   On March 7, 1965, in what became known as Bloody Sunday, state troopers viciously attacked and brutally beat unarmed peaceful civil-rights activists crossing the Edmund Pettus Bridge in Selma, where less than 5 percent of Black voters were registered to vote. Bloody Sunday helped pave the way for the passage

of the VRA in 1965, and Alabama was declared a "covered" state under Section 4(b) of the Act.

131.   Between 1965 and 2013, at least 100 voting changes proposed by Alabama state, county or city officials were either blocked or altered pursuant to Section 5 of the Voting Rights Act. U.S. Dep't of Just., C.R. Div., Voting Section, *Voting Determination Letters for Alabama*, https://www.justice.gov/crt/voting-determination-letters-alabama (last updated May 18, 2020). This includes at least 16 objections between 1969 and 2008 in cases where a proposed state or local redistricting plan had the purpose, or would have the effect, of diminishing the ability of Black voters to elect their candidates of choice. *Id.*; *see* 52 U.S.C. § 10304(b).

132.   Beyond redistricting, Alabama has employed voting practices that impair Black electoral success. In 1986, for instance, a court found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986). The court also found that from the late 1800s to the 1980s, Alabama had purposefully manipulated the method of electing local governments to prevent Black citizens from electing their preferred candidates. *Id*.

133.   Ultimately, a defendant class of 17 county commissions, 28 county school boards, and 144 municipalities were found to be employing at-large election systems designed and motivated by racial discrimination. These cases resulted in settlement agreements with about 180 Alabama jurisdictions that were required to adopt new election systems including single-member districts, limited voting, and cumulative voting systems, in an attempt to purge the state's election systems of intentional discrimination. *See* James Blacksher, et. al., *Voting Rights in Alabama: 1982-2006*, 17 S. Cal. Rev. L. & Soc. Just. 249, 260, 264 (2008).

134.   Federal courts have continued to rule that certain at-large municipal voting systems created by the State Legislature violate the VRA and/or the Constitution. *See, e.g.*, *Jones*, 2019 WL 7500528, at *4 (finding that the State Legislature intentionally discriminated in the creation of an at-large multimember district used to elect county school board members in violation of the VRA and Constitution); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056-LSC, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019) (ordering changes to the city's at-large voting system to remedy an alleged VRA violation).

135. Black voters have successfully challenged other discriminatory Alabama voting laws under Section 2 of the VRA and the Constitution in federal court. *See, e.g.*, *People First of Ala. v. Merrill* ("*People First*"), 491 F. Supp. 3d 1076, 1106-1107 (N.D. Ala. 2020); *Harris v. Siegelman*, 695 F. Supp. 517, 530

(M.D. Ala. 1988). For example, the Supreme Court struck down Alabama's discriminatory misdemeanant disfranchisement law, *Hunter v. Underwood*, 471 U.S. 222 (1985), and a state law permitting certain discriminatory annexations, *Pleasant Grove v. United States*, 479 U.S. 462, 466-67 (1987).

136.   Even in the wake of *Shelby County v. Holder*, Alabama is the only state in the nation where federal courts have ordered more than one political subdivision to be re-subjected to preclearance review under Section 3(c) of the VRA. *See Jones*, 2019 WL 7500528, at *4-5 (Jefferson County); *Allen v. City of Evergreen*, No. 13-0107, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014) (the City of Evergreen).

Senate Factors 3: Alabama employs practices that have the potential to enhance the discriminatory effect of the 2023 Plan

137.   Alabama has majority-vote requirements in primary elections. If a candidate fails to receive a majority of the vote in a primary election, the top two highest vote getters must face one another in a runoff. This policy and others may enhance the 2023 Plan's discriminatory effects. *See Gingles*, 478 U.S. at 39-40.

Senate Factor 5: Black Alabamians Continue to Bear the Effects of Past Socioeconomic Discrimination Which Hinders Their Ability to Participate Effectively in the Political Process

138.   Alabama has a long and well-documented history of official and private discrimination which predates the state's admission to the union and has been acknowledged by the federal courts since at least the 1960s. As one federal court explained, Alabama's "unrelenting historical agenda, spanning from the late 1800s

to [today], to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." *Dillard*, 640 F. Supp. at 1357.

139.    As a result of the history of official and private discrimination in Alabama, Black Alabamians have a lower socioeconomic status and lag behind white residents in many crucial aspects of public life, including employment, income, educational attainment, and access to health care. Black Alabamians also disproportionately bear the brunt of the consequences of the state's criminal legal system. All this discrimination and its vestiges hinder Black Alabamians' ability to effectively participate in the political process.

140.    Alabama's history of denying Black people equal access to education persisted long after the Supreme Court's decision in *Brown v. Board of Education*. In 1956, after a federal court ordered the segregated University of Alabama to admit a Black woman named Autherine Lucy, white people gathered on campus, burned a cross, and marched through town chanting, "Hey, hey, ho, ho, Autherine has got to go!" Frye Gaillard, *Cradle of Freedom: Alabama and the Movement That Changed America,* 40 (Tuscaloosa: Univ. of Ala. Press, 2004).

141.    Desegregation litigation continues in Alabama today. A December 2014 report found that 54 Alabama school districts remain under desegregation orders today as they still have not satisfied their constitutional obligations to integrate public schools and eliminate the vestiges of racial discrimination. *See*

*People First*, 491 F. Supp. 3d at 1108. For example, in 2018, in a case challenging the attempt by the City of Gardendale, which is 85% white, to form a school district separate from Jefferson County's more racially diverse district, the Eleventh Circuit affirmed a finding that "race was a motivating factor" in the city's effort. *Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1000, 1007-1009 (11th Cir. 2018).

142.   Until recently, Alabama's constitution still contained language that mandated separate schools for Black and white students after a majority of voters rejected attempts to repeal these provisions in 2004 and 2012. Although this constitutional provision mandating school segregation has not been enforceable for decades, its underlying prejudice continues to shape ongoing educational inequality.

143.   Alabama was the first state ever to be subjected to a statewide injunction prohibiting the state from failing to disestablish its racially dual school system. *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458 (M.D. Ala. 1967), *aff'd* 389 U.S. 215 (1967).  The order resulted from the court's finding that the State Board of Education, through Governor George Wallace, had previously wielded its powers to maintain segregation across the state. *Id.* For decades, state officials ignored their duties under the statewide desegregation order. *See Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1128-30 (M.D. Ala. 1997). The state did not satisfy its obligations to remedy the vestiges of segregation under this order until as late as 2007. *Lee v. Lee Cnty. Bd. of Educ.*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007).

144.   Alabama's institutions of higher education similarly remain plagued by the "vestiges of segregation," decades after Alabama colleges and universities were ordered by courts to desegregate. *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991). In 1991, a trial court in *Knight v. Alabama* found that Alabama remained obligated to eliminate the lingering and continued effects of segregation and discrimination in the University of Alabama and Auburn University, as well as their proposed satellites. The trial court also found that Alabama must try to recruit Black students to those schools and to recruit white students to the state's Historically Black Colleges and Universities (HBCUs). In 1995, the trial court issued a remedial decree analogous to the statewide injunction issued in *Lee v. Macon*, the implementation of which the court would oversee for over a decade. *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995). Alabama did not satisfy its obligations under the *Knight* order until as late as 2006. *Knight v. Alabama*, 469 F. Supp. 2d 1016 (N.D. Ala. 2006).

145.   Today, after increasing for many years, Black student enrollment in the state's institutions of higher education has drastically declined. For example, Black enrollment at Auburn University peaked 14 years ago with Black students making up 8.7 percent of the student body. In 2020, the number of Black students in the freshman class at Auburn was a mere 3.2%.  Drake Pooley, *Why Has Black Enrollment Fallen at an Elite Southern University*, N.Y. Times (Sept. 17, 2021),

https://www.nytimes.com/2021/09/17/opinion/auburn-university-black-

students.html#:~:text=One%20possible%20explanation%20for%20the,in%20state

%20funding%20per%20student.

146.   In 2016, all 76 of the schools labeled "failing" by Alabama were

majority-Black schools, and Black students constituted 91% of those Alabama

students who were enrolled in "failing" public schools.

147.   According to the 2018 ACS, more than 16% of Black adults in Alabama

over the age of 25 have not completed high school, compared to 11.4% of white

adults. For the same age group, only 17.3% of Black Alabamians hold a bachelor's

degree or a higher qualification, compared to 28.3% of white adults. U.S. Census

Bureau, Table S0201, 1-year 2018 Am. Cmty. Surv. 2018.

148.   Alabama also has a persistent history of denying its Black residents

equal access to employment opportunities. More than one quarter (27.8%) of Black

Alabamians live in poverty compared to only 11.8% of white Alabamians. *Id.*

149.   The unemployment rate among Black people over the age of 16 in

Alabama is more than double the rate among white residents of the same age. And

of those adults who are employed, Black Alabamians are more likely to work in

lower paying jobs than white workers: 20.7% of Black employees work in service

occupations compared to 14% of whites. *Id.*

150.   In Alabama, Black households also have fewer economic resources. The median household income for Black families is $33,542 compared to $57,661 for white households. *Id*.

151.   Black Alabamians are significantly more likely to rent their home and to lack a vehicle than white Alabamians. About one in eight Black households (12.6%) lack access to a vehicle, while only 3.9% of white households lack a vehicle. *Id*. While 75.6% of white Alabamians are homeowners, only 49.8% of Black Alabamians own their homes. *Id*.

152.   About 19% of Black households lack a computer, smartphone, or tablet versus only about 11% of white households. *Id*. Black families are also more likely to lack broadband internet access—29.3% compared to 17.8% of white households. *Id*.

153.   Rampant and overt discrimination in education works in tandem in Alabama with discrimination against Black people in employment. In 2019, there were 2,108 claims of employment discrimination submitted to the U.S. Equal Employment Opportunity Commission ("EEOC") from Alabama, of which 45.1% were racially based – the highest percentage of any state in the United States. Alabama's race-based claims accounted for 2.9% of the racially based claims received by the EEOC in the entire country and Alabama's color-based claims

represented 2.2% of the EEOC's color-based claims in the country, even though in 2010 Alabama accounted for only 1.7% of the national population.

154.   Income and education are independently important, but both also have a significant impact on political participation rates, which remains persistently lower among Black Alabamians than among white Alabamians.

155.   Racial discrimination also finds expression in the healthcare system. Alabama has one of the highest maternal mortality rates in the country. In 2019, the infant mortality rate for Black infants was 12.0 deaths per 1,000 live births, which is more than twice the white infant mortality rate of 5.6 deaths. Press Release, Ala. Pub. Health, *Alabama Infant Mortality Rate Shows Slight Uptick in 2019*, Dec. 16, 2020,   http://media.alabama.gov/pr/pr.aspx?id=14238&t=1   As   a   gynecologic oncologist in Mobile recently stated, "It is more lethal to be Black and pregnant in Alabama than in some poor countries." Eyal Press, *A Preventable Cancer Is on the Rise   in   Alabama*,   The   New   Yorker   (Mar.   30,   2020), https://www.newyorker.com/magazine/2020/04/06/a-preventable-cancer-is-on-the-rise-in-alabama.

156.   The life-expectancy of Black Alabamians (72.9 years) is significantly shorter than that of whites (76 years). In Alabama's Black Belt, researchers have found that Black women, compared to white women, are almost twice as likely to die from cervical cancer. *Id.*

157.   In Lowndes County, scientists at the National School of Tropical Medicine at Baylor College of Medicine documented higher rates of hookworm infections among residents from exposure to raw sewage and inadequate wastewater management. A disease long thought to have been eradicated in the United States, hookworm infections cause anemia, iron deficiencies, cognitive delay, and stunted growth in children. A peer-reviewed study published in the *American Journal of Tropical Medicine and Hygiene* found that more than one in three Lowndes County residents tested positive for traces of hookworm. Equal Just. Initiative, *Researchers Find Hookworm Infection Linked to Extreme Poverty in Rural Alabama,* Sept. 5, 2017, https://eji.org/news/researchers-find-hookworm-infection-linked-extreme-poverty-rural-alabama/.

158.   On November 9, 2021, the U.S. Department of Justice announced an investigation into the wastewater disposal and infectious disease and outbreaks programs of the Alabama Department of Public Health and the Lowndes County Health Department. The investigation is examining whether the Alabama and Lowndes County Health Departments operate their onsite wastewater disposal program and infectious diseases and outbreaks program in a manner that discriminates against Black residents in violation of Title VI of the Civil Rights Act of 1964. *See* Press Release, U.S. Dep't of Just. Off. of Pub. Affs., *Justice Department Announces Environmental Justice Investigation into Alabama Department of Public*

*Health and Lowndes County Health Department*, Nov. 9, 2021, (last updated June 21, 2023), https://www.justice.gov/opa/pr/justice-department-announces-environmental-justice-investigation-alabama-department-public. In 2023, the U.S. Environmental Protection Agency (EPA) accepted a complaint that the Alabama Department of Environmental Management "discriminates against the Black residents of Alabama, particularly residents of the Black Belt region of Alabama, on the basis of race, through its implementation of the Alabama Clean Water State Revolving Fund (SRF)." Letter from EPA to Lance LeFleur, Dir. Ala. Dept. Env't Mgmt., Oct. 3, 2023, https://www.epa.gov/system/files/documents/2023-10/2023.10.03_rec_acc_ltr_03r-23-r4_adem.pdf.

159.   The COVID-19 public health crisis and the deaths associated with the novel and deadly respiratory virus have fallen most heavily on Black Alabamians as a result of centuries of discrimination against Black people in all manners of life in Alabama, including in health, income, and employment. The continued effects of discrimination in Alabama are further evidenced by Black Alabamians having the highest rates of COVID-19 cases and disproportionately accounting for COVID-19 deaths.

Senate Factor 6: Overt and Subtle Racial Appeals Continue in Political Campaigns

160.   In the last decade, both overt and subtle racial appeals have defined political campaigns in Alabama. In 2011, at a town hall meeting, Alabama

Congressman Mo Brooks stated that "[he] will do anything short of shooting them [undocumented immigrants]" to remove them from the United States.

161.   In the 2017 special election for the U.S. Senate seat vacated by Jeff Sessions, then-candidate Roy Moore told a group of people in Jackson, Alabama that the VRA created new rights and "today we've got a problem." When asked to speak about a time when America was great, Moore replied, "I think it was great at the time when families were united—even though we had slavery—they cared for one another . . . Our families were strong, our country had direction."

162.   In the 2018 election for Chief Justice of the Alabama Supreme Court, at least two campaign ads run by Chief Justice Tom Parker were characterized by racial appeals.  In one of his campaign ads, Chief Justice Parker, a white Republican, declared that he opposes "the leftist mob tr[ying] to destroy our society" and featured a clip of Congresswoman Maxine Waters. *Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1309. A court recently found that this statement alongside images of Congresswoman Waters, i.e., a Black congresswoman from California who had no reason to appear in an ad for an Alabama judicial election, shows that "one of the motives of the ad was to draw attention to race." *Id*. In another of Justice Parker's ads, he targeted immigrant communities: "It's an invasion. What happens if they make it to Alabama?"  *Id*. The ad then showed what appeared to be people of color trying to cross the southern border and concluded with a declaration that Justice

Parker "stand[s] up for what *we* believe" and "stand[s] with *us*." *Id*.; *see also Milligan*, 582 F. Supp. 3d at 1023-24 (finding evidence of recent racial appeals).

<u>Senate Factor 7: Black Alabamians Remain Woefully Underrepresented in Public Office</u>

163.   Black people in Alabama remain underrepresented, as a proportion of the population, in public office.

164.   Even though Black people comprise approximately 27% of Alabama's population, only one of seven or approximately 14% of Alabama's congressional representatives is Black. This number of majority-Black congressional districts has remained constant since 1992 (other than via this Court's preliminary injunction for 2024), before which there had never been a Black congressional representative from Alabama in the twentieth century.

165.   None of the current statewide elected officials in Alabama are Black. Only two Black people have ever been elected to statewide office. In both instances, the office was Associate Justice of the Alabama Supreme Court. In 1982 and 1988, the late Justice Oscar W. Adams, Jr. was elected to two consecutive terms; and, in 1994, Justice Ralph D. Cook won an unopposed statewide election. In 2000, both Justice Cook and the then-recently appointed Justice John England, a Black person, lost elections to white candidates.

166.   As of 2015, there were 757 local Black elected officials in Alabama, making up only 16.7% of elected offices.

167.   Alabama has never had a Black governor or a Black senator representing the state in the U.S. Senate.

<u>Senate Factor 8: Elected Officials are Unresponsive to the Needs of Black Alabamians</u>

168.   Black Alabamians' lack of representation in public office has contributed to the failure of elected officials to respond to the particularized needs of the Black community. The Alabama Legislature rejected requests to expand Medicaid under the Affordable Care Act despite the racial gap in insurance coverage. Expanding Medicaid would have insured an additional 220,000 Alabamians, particularly benefiting Black residents. This disparity in healthcare and insurance coverage contributed to the vulnerability of Black Alabamians when the novel coronavirus surfaced in early 2020. *People First*, 491 F. Supp. 3d at 1109.

169.   Black residents in Alabama have the highest rates of COVID-19 cases and deaths in the state. As the pandemic has progressed, racial disparities in COVID-19 vaccine access have also become clear. This is a result of both inefficiencies in vaccine distribution and deliberate choices by state and local administrators to overlook majority Black communities. Kesha Moore, *COVID-19 Vaccinations In Alabama: Protecting And Perpetuating A Racial Divide*, NAACP Legal Def. Fund (Apr. 2, 2021), https://www.naacpldf.org/naacp-publications/ldf-blog/covid-19-vaccinations-in-alabama-protecting-and-perpetuating-a-racial-divide/.

170.   In Birmingham, the Alabama Regional Medical Services (ARMS) reported geographic discrepancies in the government's distribution of COVID-19 vaccines. The state distributed doses of the vaccine to affluent white suburbs as early as January 2021, while the ARMS, a health clinic that primarily serves a lower-income Black community in Birmingham, did not receive its first doses of COVID-19 vaccines until March 8, 2021.

171.   Black Alabamians' lack of access to vaccinations was also observed in Mobile County, where 14 of the 18 state vaccination sites were located in neighborhoods with a larger white population.

172.   Alabama's elected officials have also been unresponsive to the needs of Black Alabamians in other areas of government services. In 2014, following the Supreme Court's decision in *Shelby County v. Holder*, Alabama's photo identification law went into effect; and in 2015, the State announced that it was closing 31 of 75 driver-license offices throughout Alabama. The planned closures overwhelmingly affected Black Alabamians, as the State specifically concentrated closures in the Black Belt. This decision was ultimately reversed as part of a settlement after the U.S. Department of Transportation determined that the closures had discriminated against Black people in violation of Title VI of the Civil Rights Act. *See* Mem. Agreement Between the U.S. Dep't of Transp. and the Ala. Law Enf't Agency                    (Dec.                    22,                    2016),

https://www.transportation.gov/sites/dot.gov/files/docs/ALEA   US   DOT   Signed

MOA_0.PDF.

173.   Particularly relevant is this Court's finding that based on its "review of

undisputed evidence," it could not "help but find that the circumstances surrounding

the enactment of the 2023 Plan reflect "a significant lack of responsiveness on the

part of elected officials to the particularized needs" of Black voters in Alabama.

*Milligan II,* 2023 WL 5691156, at *68-69.

174.   The Court based those findings on overwhelming evidence that

Defendants: (a) were aware that the Black community and Black legislators wanted

them to draw a second majority-minority district or something close to it; (b) knew

that Black legislators disagreed that Mobile and Baldwin counties could never be

split; (c) knew well that the Court's finding of intense racial polarization required

such a district to provide Black voters with an opportunity to elect; and (d) knew

from their own expert's analysis and analysis from Plaintiffs' experts which they did

not dispute, that Black voters' preferred candidates would lose just as many races

under their new map as the old one. Moreover, the Court found that Defendants

manipulated the Redistricting Guidelines at the last minute by inserting Legislative

Findings drafted by the Alabama Solicitor General that eliminated the "requirement

of nondilution," while "they prioritized as 'non-negotiable' the principles that the

2023 Plan would 'keep together communities of interest' and 'not pair incumbent[s].'" *Milligan II,* 2023 WL 5691156, at *69.

Senate Factor 9: The Legislature's Justifications for Enacting SB5 are Tenuous

175.   The sequence of events leading to SB5's enactment highlight the Legislature's tenuous rationale for refusing to draw a second Black opportunity district in compliance with the Court's order. *Before* voting on SB5, legislators were aware that Black-preferred candidates would almost never win elections in CD2 under the 2023 Plan. The Legislature also had before it 12 plans with two majority-Black districts that would completely remedy the likely Section 2 violations identified by the federal court. Defendants' attempt to use legislative "findings" as the basis for defining communities of interest when the Alabama Solicitor General admitted that these findings were "essentially . . . describing the map" enacted in SB5, are also circular and pretextual. And Defendants' assertion that the Legislature enacted SB5 to avoid racial gerrymandering also lacks any substantive basis because the Supreme Court had already held that the illustrative maps were reasonably configured and did not run afoul of the Constitution. *Milligan*, 599 U.S. at 19.

**The 2023 Plan in SB5 is the Product of Intentional Racial Discrimination**

176.   The factors from *Village of Arlington Heights v. Metropolitan Housing Development Corporation* offer guidance on identifying the Alabama Legislature's discriminatory intent. 429 U.S. 252, 266–68 (1977). "Determining whether

invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. Relevant factors include "the racial 'impact of the official action,' the 'historical background of the decision,' the 'specific sequence of events leading up to the challenged decision,' procedural or substantive 'departures from the normal' sequence, and 'legislative or administrative history.'" *Stout v. Jefferson County Bd. of Educ.*, 882 F. 3d 988, 1006 (11th Cir. 2018) (quoting *Arlington Heights*, 429 U.S. at 266-68). Additional factors are also relevant, including the foreseeability of the disparate impact; the legislature's knowledge of that impact; and the availability of less discriminatory alternatives. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983).

177.   First, SB5 perpetuates the discriminatory effect of the 2021 Plan, which this Court previously found likely violates Section 2. Under the 2023 Plan, Black voters continue to lack any realistic opportunity to elect their candidate of choice and participate equally in the political process in a second congressional district.

178.   Second, the historical background provides context to the discriminatory intent at play. From the 1870s until the 1990 census, Alabama lacked a congressional district that allowed Black Alabamians any ability to elect their candidates of choice until litigation. As noted above, VRA litigation brought by Black voters in the 1990 cycle resulted in the drawing of CD7 as a majority-Black

district. But the court that drew this majority-Black district did not conduct a Section 2 analysis. *Wesch*, 785 F. Supp. at 1498-99. Rather the court cited the parties' stipulation that it was possible to draw a Black district, *id*., and, thereafter, adopted a legislative proposal for CD7 drawn by State Sen. Larry Dixon. *Id*. at 1495.

179.    The Legislature did enact a congressional redistricting plan with one majority-Black congressional district in 1992 during the *Wesch* litigation. But the *Wesch* court resolved to adopt its own plan and create a majority-Black CD7 out of a concern that the state's plan would not be able to obtain the necessary VRA preclearance in time for the then-upcoming election deadlines. *Id*. at 1500. The court was correct to worry about this timing. The U.S. Attorney General did in fact object under Section 5 of the VRA to the Legislature's 1992 Congressional plan. The Attorney General found that the legislative plan was the product of intentional racial discrimination because it drew only one majority-Black district and "fragmented" the rest of the Black population across the state to dilute the Black vote. Letter from U.S. Dep't of Just. to Ala. Att'y Gen. Evans, Mar. 27, 1992, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1880.pdf.    In the objection letter, the U.S. Attorney General noted a "concern" of the Black community that "an underlying principle of the Congressional redistricting was a predisposition on the part of the state political leadership to limit black voting

potential to a single district." *Id*. Thus, because the state did not enact or obtain preclearance for an alternate plan, the *Wesch* court's plan remained in effect.

180.   Troublingly, however, the *Wesch* court's plan creating a majority-Black CD7 was also potentially infected by the Legislature's discriminatory motive. This is because the court plan was based on a CD7 map drawn by Sen. Dixon. *Wesch*, 785 F. Supp. at 1495. And Sen. Dixon had a contemporaneous history of hostility towards Black voters. *See Greater Birmingham Ministries v. Sec'y of State of Ala*., 992 F.3d 1299, 1306 (11th Cir. 2021) (quoting statements made by Sen. Dixon about Black voters in 1995, 2001, and 2010); *People First*, 491 F. Supp. 3d at 1106 (noting that, in the 1990s, Sen. Dixon had "insisted that only Black voters engaged in voter fraud").

181.   Following the Justice Department's objection under Section 5 of the VRA to the discriminatory purpose embodied in the Legislature's 1992 congressional plan, neither Alabama, nor any federal court ever acted to correct this discrimination. *See Wesch*, 6 F. 3d at 1468-69. Rather, in the subsequent 2000 and 2010 redistricting cycles, the Legislature simply continued to reenact the same core district for CD7 with only slight modifications to address population shifts. The Legislature did so with the same discriminatory motive of limiting Black electoral success to CD7, while fragmenting the remainder of the BVAP in Alabama in a manner designed to protect white candidates. For instance, the 2010 congressional

plan, which HB1 is based on, was drawn by State Sen. Scott Beason who, like Sen. Dixon, has a history of racial discrimination in voting. *See McGregor*, 824 F. Supp. 2d at 1344-48. Regardless of the party in power, race—not partisanship—has primarily driven Alabama's congressional redistricting decisions. The Legislature made these decisions despite requests from Black legislators and voters in each redistricting cycle since 1990 to draw two Black-majority congressional districts.

182.   In the 2021 cycle, the Legislature in drawing HB1 likewise disregarded public input which supported the creation of a second Black opportunity district. The maps were introduced a mere day before they were passed out of committee on a vote that fell along racial lines. In the State House, the majority party cut the floor debate on the congressional maps short and prevented the Legislative Black Caucus members from formally introducing Plaintiffs' letter and demonstrative plan containing two majority-Black districts into the House record for a formal vote. Nonetheless, the Black Caucus members were able to submit Plaintiffs' plan and letter containing a racial-polarization analysis into the clerk's official legislative record for the day. In the Senate, Sen. Smitherman, Sen. Singleton, and Sen. Hatcher each presented three maps—including Plaintiffs' demonstrative map—that complied with the state's redistricting criteria and included either two majority-Black districts or two "opportunity" districts with BVAPs over 40%. Racial-polarization analyses showed that these maps would improve the opportunity of

Black voters to elect candidates of choice as compared to the prior 2011 plan. But the Legislature rejected these maps along racial lines.

183.   Indeed, despite the submission of three maps proving otherwise, Sen. McClendon claimed that "It's impossible to draw two congressional districts that are majority minority people. You can't do it, try how you may, and so that's the problem. If you go for two districts, the way folks are just distributed in Alabama, you put the one pretty certain district at risk." Mike Cason, *Alabama lawmakers give final approval to new congressional districts*, Ala. Media Group, Nov. 3, 2021, https://www.al.com/news/2021/11/alabama-senate-rejects-plan-for-new-swing-congressional-district.html. Sen. McClendon conducted no racial-polarization analysis, nor any other publicly released analysis to determine whether creating two majority-Black or Black opportunity districts might "put the one pretty certain [CD7] at risk." Even with the efforts of the Black Caucus, the congressional maps in HB1 were passed out of the Legislature and then signed by the Governor a week afterwards with minimal debate, votes, or opportunity for public input on alternative maps containing two Black districts.

184.   Similarly, as recounted above, during the 2023 legislative session, on the final day of the Special Session, both houses of the legislature passed SB5 largely along racial lines over the vehement objections of Black legislators in both houses and in direct defiance of this Court's order. Despite its options, the Legislature

simply continued to crack the Black Belt in a manner that diluted the votes of Black Alabamians; refused to consider plans that connected the Black Belt and the City of Mobile, despite its prior adoption of the 2021 Board of Education plan, which connected the Black Belt and Mobile; the Legislature refused to consider alternative plans that improved Black voters' opportunities as compared to the 2023 Plan, but kept Mobile and Baldwin Counties together; and explicitly prioritized protecting white incumbents and the voting strength of white people based on their shared European "colonial heritage" over the voting strength of Black voters. The Legislature took these steps for the discriminatory purpose of limiting Black voters' influence and maintaining the discriminatory effects of the 2021 Plan.

185.   Moreover, the Legislature enacted SB5 despite multiple court orders directing the state to respond to the needs of its Black citizens by enacting a congressional districting plan that creates two majority-Black districts or something quite close to it, further evidencing the Legislature's intent to severely limit the political influence of Black Alabamians. The Legislature's deliberate failure to remedy the identified VRA violation perpetuates "Alabama's extensive history of repugnant racial and voting-related discrimination," *Milligan*, 599 U.S. at 22.

186.   Third, the specific sequence of events leading to SB5's enactment and substantive departures from past policies and priorities demonstrate the Legislature's discriminatory intent.   Among other facts, the Legislature disregarded the

redistricting guidelines that the Redistricting Committee had re-adopted from the 2021 guidelines the previous week—and the policy considerations those guidelines reflect—and adopted legislative "findings" written by the Alabama Solicitor General that explicitly favor white communities and are plainly designed to justify the perpetuation of the dilution in the prior 2021 Plan. Upon information and belief, no prior redistricting bill contained similar "findings," and the "findings" do not discuss the communities of interest outside of southern Alabama. Moreover, the findings provide few details about the Black Belt and Wiregrass communities but provide significant details and information about the alleged Gulf Coast community, which SB5 prioritizes above all other communities and is the only community that is not split between more than one district. The Legislature also did not incorporate feedback from the Plaintiffs in the *Milligan* or *Caster* litigation, or the Black members on the Reapportionment Committee. Instead, the Committee's white majority completely cut its Black members out from the process of providing input into "Committee" reapportionment plans, which were not made public until after the two public hearings the Committee held prior to the special session. During the 2023 legislative session, on the final day of the Special Session, both houses of the legislature passed SB5 along racial lines over the vehement objections of all Black legislators, except one, and in direct defiance of this Court's order.

187.   Fourth, statements by key legislators demonstrate the Legislature's discriminatory intent to maintain and perpetuate the discriminatory effect of the 2021 Plan. Again, SB5's legislative findings, which the entire Legislature enacted, explicitly prioritize keeping Baldwin and Mobile counties together based on race— with a preference for protecting white communities with "French and Spanish colonial heritage" over protecting the Black Belt or remedying the identified likely Section 2 violation. House Speaker Ledbetter proclaimed that the map gives the Legislature's white majority "a good shot" in the Supreme Court where the *Milligan* "ruling was 5-4, so there's just one judge that needed to see something different," that is, he hoped that the Court would reverse its prior finding that Alabama's lack of two opportunity districts for Black voters likely violates Section 2. Representative Simpson from Baldwin County called the 2023 special session "an opportunity" for the white majority to eliminate the existing majority-Black district, rather than a chance to create two opportunity districts for Black voters to remedy the likely Section 2 violation. He predicted that the Legislature would "see about drawing two new districts" where, in 2024, "it would not surprise [him] if [the Alabama congressional delegation] ha[s] seven Republican congressmen." All current Republican congressmen are white, are elected from districts with substantial white majorities, and none of them have been the preferred candidates of Black voters in highly racially polarized elections. Representative Pringle echoed this sentiment,

69

stating that, "[w]ithout being a majority-minority district, you can see where Republicans might be able to win all seven congressional districts," and Black-preferred candidates might not win even one district.

188.   Fifth, the Legislature fully foresaw the discriminatory impact of cracking the Black Belt and the Legislature knew that the 2023 Plan would perpetuate the likely Section 2 violation identified by the Court in the 2021 Plan. Just like the 2021 Plan, the 2023 Plan includes only one majority-Black district in CD7. When the Legislature's expert analyzed how the 2023 Plan would perform for Black-preferred candidates in seven statewide contests in 2018 and 2020, Black-preferred candidates lost in the new CD2 in all seven elections.

189.   Sixth, and finally, the Legislature was aware that less discriminatory alternatives are available. The Supreme Court affirmed this Court's ruling that none of the eleven illustrative plans, which were also presented to the Legislature, constituted illegal racial gerrymanders. The Legislature also had before it alternative plans developed by the *Singleton* Plaintiffs that, while not a complete Section 2 remedy, would have kept Mobile and Baldwin counties together, and provided Black voters with more opportunity to elect their candidates of choice than either the 2021 Plan or 2023 Plan enacted by the Legislature.

## CLAIMS FOR RELIEF

**Count One: Section 2 of the VRA, Racial Vote Dilution**
**SB5 violates Section 2 of the Voting Rights Act of 1965**
**52 U.S.C. §§ 10301; 42 U.S.C. § 1983**
**(Racial Vote Dilution)**

190.   The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

191.   Voting in Alabama is racially polarized. Black voters in Alabama are politically cohesive and overwhelmingly support the same candidates in congressional and statewide elections. By contrast, the white majority usually votes as a bloc in congressional and statewide elections with the usual result of defeating Black voters' candidates of choice.

192.   Black voters in Alabama are sufficiently numerous and geographically compact enough to form two reasonably configured majority-BVAP Congressional districts that satisfy the objective traditional redistricting criteria of compactness, contiguity, respect for municipal boundaries, and communities of shared interest.

193.   Moreover, considering the totality of circumstances in Alabama, Plaintiffs, Black Alabamians, including Plaintiffs and the members of GBM and Alabama NAACP, have less opportunity than other members of the Alabama electorate to participate in the political process and to elect representatives of their choice to Congress.

194.   Among other factors, there is a long history and ongoing pattern of discrimination in voting, education, employment, health, and other areas in Alabama that affect Black voters' ability to participate equally in the political process, Black candidates have never been elected in any majority-white congressional district, recent congressional and other political campaigns have been characterized by overt and subtle racial appeals, the Legislature and white Congressmembers have been unresponsive to the particular concerns of Black voters, and the state's justifications for decades of cracking Black voters across districts are tenuous, as made particularly clear when the state in 2023 flouted two court orders and the Supreme Court to enact another congressional map with only a single majority-Black congressional district.

195.   These facts, as well as the particular circumstances surrounding the adoption of SB5 by the Alabama legislature, demonstrate that the Legislature adopted the 2021 and the 2023 congressional redistricting plans with the result of improperly diluting Black voter strength in violation of Section 2 of the VRA, 52 U.S.C. § 10301; 42 U.S.C. § 1983.

196.   Plaintiffs have no adequate remedy at law and thus rely on the equitable relief sought in this case. If the Court fails to permanently enjoin Defendants from conducting elections under SB5 and fails to order the creation of two Black opportunity districts, Plaintiffs and other Black voters will be irreparably harmed by Defendants' actions in subjecting Plaintiffs to racial vote dilution. Plaintiffs seek

relief and all available remedies under 42 U.S.C. § 1983, 52 U.S.C. § 10301 and 52 U.S.C. § 10302.

**Count Two: Intentional Racial Discrimination**
**The State enacted SB5 with the intent to dilute the vote of Black Alabamians in violation of the Fourteenth Amendment to the U.S. Constitution (U.S. Const. amend. XIV; 42 U.S.C §1983) and Section 2 of the Voting Rights Act (52 U.S.C. § 10301; 42 U.S.C. § 1983)**

197.   The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

198.   The equal protection clause of the Fourteenth Amendment to the U.S. Constitution forbids states from enacting laws for which a racially discriminatory intent or purpose is a motivating factor and which produce discriminatory results. This includes laws that use race as a means to gain political or partisan advantage.

199.   One of the motivating factors in the drawing and passage of SB5 was a racially discriminatory purpose. Specifically, SB5 was drafted and passed at least in part to minimize the political power of Black Alabamians by limiting their ability to influence congressional elections to a single district out of seven.

200.   SB5 will also produce discriminatory results for Black Alabamians—a fact Defendants were well aware of when drafting, passing, and beginning to implement the new congressional maps. Indeed, although Black Alabamians make up over 27% of the State's voting-age population, SB5 provides them political influence in only one out of seven congressional districts, or approximately 14% of

the districts in the State. It will also limit their influence to the specific region of the State containing CD7 despite substantial clusters of Black Alabamians living in concentrated areas of the State outside of CD7. Defendants were aware that Black Alabamians could elect candidates of their choice in two congressional districts in the state in a manner that complies with the U.S. Constitution and federal law, yet purposefully drew the congressional maps to prevent this.

201.   Moreover, other circumstantial evidence, including the Senate Factors outline above, supports a finding that the Legislature had a discriminatory purpose in enacting SB5. For instance, Alabama has a well-documented and recent history of discriminating against Black Alabamians in districting, especially in congressional and state-legislative redistricting.

202.   Even after the Justice Department objected to the 1990 congressional redistricting as the product of intentional racial discrimination, Alabama never acted to correct this discrimination. Rather, the Alabama Legislature continued to reenact plans containing a single Black opportunity district, CD7, in the 2000, 2010, and 2020 and 2023 plans but refused to draw a second district where Black voters could elect their candidates of choice.

203.   In 2021, the Legislature ignored the repeated requests from Black legislators and voters to unpack CD7 and draw two majority-Black, or opportunity, districts. Accordingly, HB1's congressional plan disregarded public input from the

Black community, which supported the creation of a second Black district; instead the plan protects white incumbents from running in a majority-Black, or Black opportunity, district while limiting Black voters' influence to CD7; the plan was introduced a mere day before it was passed out of committee on a vote that fell along racial lines; and then was passed out of the Legislature and signed by the Governor the following week after minimal debate and opportunity for public input as to the alternative plans put forward by Black legislators and voters.

204.   In the 2023 Legislative session, the Legislature ignored this Court's orders and the repeated requests from Black legislators to draw two majority-Black, or opportunity, districts, passing SB5 along racial lines with minimal public input. This time, as Defendants conceded, the discriminatory map was enacted despite this Court's preliminary injunction order and the Supreme Court's affirmance. There has been no other "case in which a state legislature — faced with a federal court order declaring that its electoral plan unlawfully dilutes minority votes and requiring a plan that provides an additional opportunity district — responded with a plan that the state concedes does not provide that district."

205.   Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to temporarily and permanently enjoin the conduct of elections under SB5 and order a remedial map will irreparably harm Plaintiffs by subjecting them to racially discriminatory districts for the next decade.

## PRAYER FOR RELIEF

206.   WHEREFORE, Plaintiffs respectfully request that the Court:

A.   Declare the challenged congressional districts adopted in SB5 to be unconstitutional as violating the Fourteenth Amendment of the United States Constitution and Section 2 of the Voting Rights Act as passed with discriminatory intent as a motivating factor;

B.   Declare the congressional districting plan adopted in SB5 a violation of Section 2 of the Voting Rights Act of 1965;

C.   Permanently enjoin the Defendants and their agents from holding elections in the congressional districts adopted in SB5 including, if necessary, delaying elections and/or holding special elections;

D.   Order expedited hearings and briefing, consider evidence, and take any other action necessary for the Court to order a VRA-compliant plan for new congressional districts in Alabama.

E.   Set an immediate and reasonable deadline for the State of Alabama to adopt and enact a congressional redistricting plan that (1) includes two districts in which Black voters have a fair opportunity to elect preferred candidates, (2) does not dilute, cancel out, or minimize the voting strength of Black Alabamian voters or subject them to

intentionally discriminatory districts, and (3) does not violate the VRA, federal and state constitutions, and other applicable laws;

F. Award Plaintiffs' their costs, expenses, and disbursements, and reasonable attorneys' fees incurred in bringing and litigating this case in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988;

G. Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court;

H. Retain jurisdiction over this matter and require all Defendants to subject future congressional redistricting plans for preclearance review from this Court or the U.S. Attorney General under Section 3(c) of the VRA, 52 U.S.C. § 10302(c);

I. Grant such other and further relief as the Court may deem just and proper.

DATED this 31st day of January 2023.   Respectfully submitted,

*/s/ Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Stuart Naifeh*
Ashley Burrell*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
snaifeh@naacpldf.org

Shelita M. Stewart*
Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*
Harmony A. Gbe*
HOGAN LOVELLS US LLP

*/s/ Sidney M. Jackson*
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 $19$th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
Fax: (205) 254-1500
sjackson@wigginschilds.com

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Julie Ebenstein*
Dayton Campbell-Harris*+
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

*/s/ Alison Mollman*
Alison Mollman (ASB-8397-A33C)
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200

1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

**Attorneys for all Plaintiffs**

Janette Louard*
Anthony Ashton*
Anna Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

**Attorneys for Plaintiff Alabama State Conference of the NAACP**

* Admitted *Pro hac vice*
+ Practice limited to federal court