FILED

2024 Feb-14  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| EVAN MILLIGAN, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-1530-AMM |
| | ) | |
| Hon. WES ALLEN, in his official | ) | **THREE-JUDGE COURT** |
| capacity as Secretary of State, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................3

LEGAL STANDARD.........................................................................5

ARGUMENT ....................................................................................6

    I.    Plaintiffs Fail To State Claim Of Vote Dilution Under Section 2. ...............6

        A.    Section 2 Is Not Privately Enforceable. ................................................6

        B.    Plaintiffs Fail to Plead Facts Showing an Unequal Opportunity "to Participate in the Political Process." .............................................13

    II.    Plaintiffs Fail To State A Claim Of Intentional Discrimination Under The Equal Protection Clause.........................................................................21

        A.    Plaintiffs' Allegations of Past Discrimination Do Not Show Intentional Discrimination Today. ......................................................24

        B.    Plaintiffs Have Alleged No Facts Plausibly Showing That the Legislature Intentionally Discriminated Against Black Voters. .........28

CONCLUSION ..................................................................................35

CERTIFICATE OF SERVICE ..............................................................38

# TABLE OF AUTHORITIES

**Cases**

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003) .............................................................................2

*Abbott v. Perez*,
138 S. Ct. 2305 (2018)........................................................ 10, 18, 22, 24-27, 31

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)........................................................................................35

*Ala. Leg. Black Caucus v. Alabama*,
989 F. Supp. 1227 (M.D. Ala. 2013) ......................................................... 18, 19

*ALBC v. Alabama*,
231 F. Supp. 3d 1026 (M.D. Ala. 2017)...............................................................30

*Alexander v. Sandoval*,
532 U.S. 275 (2001)................................................................................ 6, 7, 13

*Allen v. City of Evergreen*,
2014 WL 12607819 (S.D. Ala. Jan. 13, 2014) ...................................................19

*Allen v. Milligan*,
599 U.S. 1 (2023) ........................................................................................6, 32

*Allen v. Milligan*,
143 S. Ct. 1487 (2023)...................................................................................3

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
86 F.4th 1204 (8th Cir. 2023) .......................................................... 6, 10, 12, 13

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)................................................................... 5, 30, 31, 34

*Baird v. Consol. City of Indianapolis*,
No. IP87-111C, 1991 WL 557613 (S.D. Ind. Apr. 25, 1991) ...........................21

*Barnhart v. Ingalls,*
    275 So.3d 1112 (Ala. 2018) .................................................................29

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..............................................................................5

*Bourdon v. U.S. Dep't of Homeland Sec.,*
    940 F.3d 537 (11th Cir. 2019) ...........................................................10

*Brnovich v. Democratic National Committee,*
    141 S. Ct. 2321 (2021) .................................................... 11, 23, 24, 28

*Bush v. Vera,*
    517 U.S. 952 (1996) .............................................................................29

*Callais v. Landry,*
    No. 3:24-cv-00122 (W.D. La. Jan. 31, 2024) ....................................34

*Carey v. Throwe,*
    957 F.3d 468 (4th Cir. 2020) ..............................................................10

*Caster v. Allen,*
    No. 2:21-cv-1536-AMM ......................................................................4

*Chapman v. Houston Welfare Rights Org.,*
    441 U.S. 600 (1979) ...........................................................................11

*Chavis v. Whitcomb,*
    305 F. Supp. 1364 (S.D. Ind. 1969) ...................................................18

*Chelentis v. Luckenbach S.S. Co.,*
    247 U.S. 372 (1918) .............................................................................8

*Chisom v. Roemer,*
    501 U.S. 380 (1991) .................................................................. 3, 9, 14

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ....................................................................... 7-10

*City of Mobile v. Bolden*,
   446 U.S. 55 (1980)...................................................................................9, 11

*Civil Rights Cases*,
   109 U.S. 3 (1883).........................................................................................8

*Cooper v. Harris*,
   581 U.S. 285 (2017)............................................................................... 23, 35

*Easley v. Cromartie*,
   532 U.S. 234 (2001)....................................................................................23

*Georgia State Conf. of NAACP v. Georgia*,
   2022 WL 18780945 (N.D. Ga. Sept. 26, 2022).................................................12

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002)........................................................................ 2, 6, 7, 10

*Greater Birmingham Ministries v. Sec'y of State for Ala.*,
   992 F.3d 1299 (11th Cir. 2021) .......................................22-25, 31, 34

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)....................................................................................11

*Hunter v. Underwood*,
   471 U.S. 222 (1985)....................................................................................23

*Jefferson Cnty. v. Acker*,
   210 F.3d 1317 (11th Cir. 2000) ................................................................ 10, 13

*Johnson v. Governor of State of Fla.*,
   405 F.3d 1214, 1226 (11th Cir. 2005) ............................................................27

*Jones v. City of Lubbock*,
   727 F.2d 364 (5th Cir. 1984) .........................................................................9

*Jones v. Jefferson County Board of Education*,
   2019 WL 7500528 (N.D. Ala. 2019).................................................................19

*Kimble v. Marvel Ent., LLC,*
    576 U.S. 446 (2015)....................................................................................13

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,*
    32 F.4th 1363 (11th Cir. 2022) ...............................................................22

*League of Women Voters v. Fla. Sec'y of State,*
    66 F.4th 905 (11th Cir. 2023) .......................................................... 26, 30

*LULAC v. Clements,*
    999 F.2d 831 (5th Cir. 1993) ...................................................................21

*McDonald v. S. Farm Bureau Life Ins. Co.,*
    291 F.3d 718 (11th Cir. 2002) ...................................................................7

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022)........................................................................ 19, 28

*Merrill v. People First of Alabama,*
    141 S. Ct. 25 (2020)..................................................................................19

*Miller v. Johnson,*
    515 U.S. 900 (1995)......................................................................22, 27, 28

*Morse v. Republican Party of Virginia,*
    517 U.S. 186 (1996)........................................................................... 11-13

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982).......................................................................................7

*Nev. Dep't of Hum. Res. v. Hibbs,*
    538 U.S. 721 (2003).....................................................................................9

*People First of Alabama v. Merrill,*
    491 F. Supp. 3d 1076 (N.D. Ala. 2020)...................................................19

*Permian Basin Area Rate Cases,*
    390 U.S. 747 (1968)..................................................................................12

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)................................................................ 22, 27, 29

*Plessy v. Ferguson*,
    163 U.S. 537 (1896)...........................................................................33

*Reno v. Bossier Par. Sch. Bd.*,
    520 U.S. 471 (1997).............................................................................9

*Resnick v. AvMed, Inc.*,
    693 F.3d 1317 (11th Cir. 2012) ..........................................................5

*Rucho v. Common Cause*,
    139 S. Ct. 2484 (2019)......................................................................31

*Schwab v. Crosby*,
    451 F.3d 1308 (11th Cir. 2006) ........................................................12

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ........................................................10

*SFFA v. President and Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)...........................................................................33

*Shaw v. Hunt*,
    517 U.S. 1894 (1996).........................................................................29

*Shaw v. Reno*,
    509 U.S. 630 (1993)...........................................................................29

*Simpson v. Hutchinson*,
    636 F. Supp. 3d 951 (E.D. Ark. 2022)..............................................29

*Singleton v. Allen*,
    2023 WL 5691156 (N.D. Ala. 2023)........................... 1, 4, 26, 33, 34

*Singleton v. Allen*,
    No. 2:21-cv-1291-AMM .....................................................................4

*Singleton v. Merrill*,
    582 F. Supp. 3d 924 (N.D. Ala. 2022) .................................................................12

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ......................................................................................... 7-9

*Stone v. Allen*,
    No. 2:21-cv-1531 (N.D. Ala. Feb. 13, 2024) .................................................. 13, 20

*Suter v. Artist M.*,
    503 U.S. 347 (1992) ..............................................................................................5

*Taggart v. Lorenzen*,
    139 S. Ct. 1795 (2019) ........................................................................................14

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015) ............................................................................................32

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ............................................................. 14, 15, 17, 20, 21, 32

*United States v. Cruikshank*,
    92 U.S. 542 (1875) ................................................................................................8

*United States v. Marengo Cnty. Comm'n*,
    731 F.3d 1546 (11th Cir. 1984) .........................................................................20

*United States v. Mississippi*,
    380 U.S. 128 (1965) ............................................................................................10

*United States v. Reese*,
    92 U.S. 214 (1875) ................................................................................................8

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ..............................................................................................6

*Vital Pharms., Inc. v. Alfieri*,
    23 F.4th 1282 (11th Cir. 2022) ............................................................................6

*Webster v. Fall*,
266 U.S. 507 (1925)...........................................................................12

*Wesch v. Hunt*,
785 F. Supp. 1491 (S.D. Ala. 1992) ...............................................26

*Whitcomb v. Chavis*,
403 U.S. 124 (1971)...........................................3, 14-18, 20, 21

*White v. Regester*,
412 U.S. 755 (1973)............................................... 14, 16, 17

**Statutes**

42 U.S.C. §1983 .................................................................2, 5, 6, 9-11

42 U.S.C. §2000a-3(a) .......................................................................6

52 U.S.C. §10101(a)(2)(B) ..............................................................10

52 U.S.C. §10301(b) .........................................................................14

79 Stat. 437 ........................................................................................2

Ala. Code §1-3-8(c) ........................................................................29

Ala. Code §17-14-70.1(3) ...................................................... 3, 4, 29

Ala. Code §17-14-70.1(4)(f) ..........................................................29

**Acts**

Ala. Act No. 2023-563.......................................................................3

Civil Rights Act of 1964...............................................................6, 10

Voting Rights Act of 1965...................... 1, 2, 4, 6, 7, 9, 11, 12, 18, 19, 24

**Other Authorities**

Erwin Chemerisnky, *The Assumptions of Federalism*,
   58 STAN. L. REV. 1763 (2006) ...............................................................................7

Michael W. McConnell, *Institutions and Interpretation: A Critique of City of Boerne v. Flores*,
   111 HARV. L. REV. 153 (1997) ............................................................................7

Tracy A. Thomas, *Congress' Section 5 Power and Remedial Rights*,
   34 U.C. DAVIS L. REV. 673 (2001) ....................................................................7

## INTRODUCTION

The *Milligan* Plaintiffs challenge the congressional plan enacted by the Alabama Legislature in 2023. They claim the 2023 Plan illegally dilutes the voting strength of black voters in violation of Section 2 of the Voting Rights Act. They also claim the plan is the product of intentional racial discrimination against black voters in violation of the Equal Protection Clause. These claims should be dismissed.

When moving to enjoin Alabama's 2021 Plan on Equal Protection grounds, Plaintiffs described three features a "race-neutral plan" would exhibit, thereby curing the purported constitutional infirmities in the 2021 Plan: (1) District 7's black-voting-age population (BVAP) would need to decrease to "around 50%"; (2) District 2's BVAP would need to increase to "almost 40%"; and (3) Montgomery County would need to be kept whole. Doc. 69 at 36. Plaintiffs requested a map with those features if this Court ordered relief on only their constitutional claim. They said such a map would ensure "that Black voters are no longer artificially denied electoral influence in a second district." *Id.* But after the 2023 Legislature enacted a plan with those *exact same features*,[1] Plaintiffs accused the Legislature of discriminating against black voters. That position is meritless, divisive, and borderline frivolous.

---

[1] *See Singleton v. Allen*, 2023 WL 5691156, at *7 (N.D. Ala. Sept. 5, 2023) (BVAP "in District 7 is 50.65% (it was 55.3% in the 2021 Plan)" and BVAP in District 2 is "39.93% … (it was 30.6% in the 2021 Plan)."); *id.* at *36 ("The 2023 Plan keeps Montgomery County whole in District 2."); *accord* doc. 329 ¶4.

There is nothing racially discriminatory about the Legislature adopting the sort of plan that Plaintiffs said would cure racial gerrymandering.

Plaintiffs' primary claim, brought under §2 of the VRA, should be dismissed as well. First, §2 is not privately enforceable. That's so for the fundamental reason that §2 does not create "new individual rights" "in clear and unambiguous terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286, 290 (2002). Thus, "there is no basis for a private suit" under §2 directly via an implied right of action or under §1983. *Id.* at 286. With any question of statutory interpretation, the inquiry requires careful analysis of "the text and structure." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1270 (11th Cir. 2003). "If they provide some indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite 'clear voice.'" *Id.* Here, the text and structure of the VRA provide more than "some indication" that §2 created no new federal right. The VRA was enacted not to create new rights but rather, in the words of the Act's preamble, "to enforce" the preexisting rights guaranteed by "the fifteenth amendment to the Constitution." 79 Stat. 437.

Finally, assuming that private persons may bring §2 claims, Plaintiffs have not plausibly alleged that black voters in the challenged areas have less opportunity than others to (1) participate in the political process, and (2) elect the candidates of their choice. Both showings are required, *see Chisom v. Roemer*, 501 U.S. 380

(1991), and the Supreme Court's decision in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), sets forth what the first entails. The *Whitcomb* plaintiffs' vote dilution claims failed because they did not show that black voters in 1960s Marion County, Indiana, were not "allowed to register [and] vote, to choose the political party they desired to support, to participate in its affairs [and] to be equally represented on those occasions when legislative candidates were chosen." 403 U.S. at 149. Plaintiffs here have similarly failed to allege such barriers to political participation in 2023 Alabama.

## BACKGROUND

In 2021, Alabama enacted a congressional plan that largely retained existing district lines. *See Allen v. Milligan*, 143 S. Ct. 1487, 1501 (2023). This Court determined that the plan likely violated §2, and the Supreme Court affirmed. *Id.* at 1498.

On July 21, 2023, the Legislature passed, and the Governor signed into law, new redistricting legislation. *See* Ala. Act No. 2023-563; *Milligan* doc. 173-1.[2] The 2023 Act repeals the 2021 Plan and replaces it with the 2023 Plan. The Act's legislative findings outline the traditional principles given effect in the 2023 Plan, which prioritizes equal population, contiguity, reasonably compact geography, minimizing splits of county lines, maintaining communities of interest, and avoiding the pairing of incumbents. Ala. Code §17-14-70.1(3)(a)-(f). The redistricting statute then states that the following secondary principles shall be given effect to the extent it can be

---

[2] All citations to the record are to the *Milligan* record unless otherwise stated.

done consistent with the primary principles above: "1. Preserve the cores of existing districts. 2. Minimize the number of counties in each district. 3. Minimize splits of neighborhoods and other political subdivisions in addition to minimizing the splits of counties and communities of interest." *Id.* §17-14-70.1(3)(g).

The 2023 Plan flows from these principles of compactness, county lines, and communities of interest. Because uniting the Black Belt took precedence over core retention, Districts 1, 2, and 7 saw substantial changes. *See* doc. 329 ¶82. The Legislature, however, did not completely reshuffle the deck, so the cores of each district were not entirely abandoned, and incumbents were not paired against each other.

The *Milligan* Plaintiffs objected and sought a new preliminary injunction, arguing that the "2023 Plan [did] not remedy the Section 2 violation because it fail[ed] to create an additional district in which Black voters have an opportunity to elect a candidate of their choice." *Singleton v. Allen*, 2023 WL 5691156, at *8 (N.D. Ala. Sept. 5, 2023). They also contended that the Legislature "intentionally discriminated against Black Alabamians in drawing the 2023 Plan." *Id.* at *2.  Meanwhile, plaintiffs in *Caster v. Allen*, No. 2:21-cv-1536-AMM, challenged the 2023 Plan under §2, and plaintiffs in *Singleton v. Allen*, No. 2:21-cv-1291-AMM, brought an equal protection challenge. *Singleton*, 2023 WL 5691156, at *1. The Court granted the *Caster* and *Milligan* Plaintiffs relief "on statutory grounds" and reserved ruling on the *Sin-*

*gleton* Plaintiffs' constitutional issues. *Id.* at *3. Remedial proceedings before a special master ensued, a remedial plan was chosen, and the Secretary of State was ordered to administer the State's upcoming congressional election according to that plan. *See* doc. 311 at 7.

Plaintiffs amended their complaint to challenge the 2023 Plan. Doc. 329.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A plaintiff fails to state a plausible claim of discrimination when an "obvious alternative explanation" exists for the defendant's conduct. *Id.* at 682. "Plaintiffs must plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

If a plaintiff has no statutory authority to seek judicial relief in federal court, his suit must be dismissed. *See Suter v. Artist M.*, 503 U.S. 347, 363-64 (1992) (reversing denial of motion to dismiss on ground that Adoption Act neither confers an enforceable right under §1983 nor contains an implied right of action).

## ARGUMENT

I. **Plaintiffs Fail To State Claim Of Vote Dilution Under Section 2.**

   A. **Section 2 Is Not Privately Enforceable.[3]**

Congress has not *expressly* authorized private persons to sue under §2 of the Voting Rights Act of 1965, as it did one year earlier in the Civil Rights Act of 1964, 42 U.S.C. §2000a-3(a). Nevertheless, sometimes "a private right of action can be implied" from the text, so long as "the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga*, 536 U.S. at 283 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). And sometimes Plaintiffs can enforce statutory rights under 42 U.S.C. §1983. *Id.* Those two "inquiries overlap in one meaningful respect"—"whether Congress *intended to create a federal right.*" *Id.* If a federal statute does not create "new individual rights" "in clear and unambiguous terms," then "there is no basis for a private suit, whether under §1983 or under an implied right of action." *Id.* at 286, 290; *accord Sandoval*, 532 U.S. at 289. "The bar for showing legislative intent is high," and intent "will not be presumed." *McDonald*

---

[3] The Secretary is mindful that this Court, when enjoining his use of the 2021 plan, rejected his truncated argument that §2 contains no implied right of action. *Milligan* doc. 107 at 207-09. That "conclusion of law made" at the "preliminary injunction" stage is "not binding at" later stages. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *accord Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1289 (11th Cir. 2022). The Supreme Court in *Allen v. Milligan* did "not address whether §2 contains a private right of action." 599 U.S. 1, 90 (2023) (Thomas, J., dissenting). And in this brief, the Secretary makes new and expanded arguments not presented before. Also, this Court previously emphasized that "no federal court anywhere has held that Section Two does not provide a private right of action." *Milligan* doc. 107 at 208. Since then, the Eastern District of Arkansas and the Eighth Circuit have held that §2 does not provide a private right of action. *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1207 (8th Cir. 2023), *reh'g en banc denied*, 2024 WL 340686 (8th Cir. Jan. 30, 2024).

*v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 723 (11th Cir. 2002). The VRA's text and structure reveal that Congress intended to create in §2 new remedies enforceable by the Attorney General, not new rights enforceable by private plaintiffs.

**1.** Unless a federal statute creates new "substantive private rights," *Sandoval*, 532 U.S. at 290, it does not secure privately enforceable rights, *see Gonzaga*, 536 U.S. at 285. Congress does not create substantive rights when enforcing the provisions of the Fourteenth and Fifteenth Amendments. *City of Boerne v. Flores*, 521 U.S. 507, 527 (1997) ("Any suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case law.").[4] The VRA is Fifteenth Amendment enforcement legislation. *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). As such, it created only "new remedies," not new rights. *Id.* at 308, 315, 329-31. Therefore, §2—one of its "remedial portions"—is not privately enforceable. *Id.* at 316.

Congress's "parallel" enforcement powers under §5 of the Fourteenth Amendment and §2 of the Fifteenth Amendment are "corrective or preventive, not definitional." *City of Boerne*, 521 U.S. at 518, 525. As the Supreme Court explained long

---

[4] *See also* Erwin Chemerisnky, *The Assumptions of Federalism*, 58 STAN. L. REV. 1763, 1770 (2006) (recognizing that "Congress may not use its Section 5 powers to expand the scope of rights or to create new rights"); Michael W. McConnell, *Institutions and Interpretation: A Critique of City of Boerne v. Flores*, 111 HARV. L. REV. 153, 189 (1997) (Congress "cannot create new rights" when enforcing the Fourteenth Amendment.); Tracy A. Thomas, *Congress' Section 5 Power and Remedial Rights*, 34 U.C. DAVIS L. REV. 673, 701 (2001); *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 83-84 (1982) (plurality opinion).

ago, the Fourteenth Amendment invests Congress with the power only "to provide modes of relief against State legislation[] or State action" "when these are subversive of the fundamental rights specified in the amendment." *Civil Rights Cases*, 109 U.S. 3, 11 (1883); *see also City of Boerne*, 521 U.S. at 524-25.

One such right is the right to vote free from discrimination. "The right to vote in the States comes from the States; but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the Constitution of the United States; but the last has been." *United States v. Cruikshank*, 92 U.S. 542, 556 (1875); *see also United States v. Reese*, 92 U.S. 214, 217-18 (1875). To further protect this right, Congress passed in 1965 a "complex scheme" of "stringent new remedies" necessary to "banish the blight of racial discrimination in voting." *Katzenbach*, 383 U.S. at 308, 315. With these "new, unprecedented remedies," Congress enforced the provisions of the Fifteenth Amendment without making "a *substantive* change in the governing law." *City of Boerne*, 521 U.S. at 519, 526.

The "fundamental" "distinction between rights and remedies" is on full display in §2. *Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372, 384 (1918). As originally enacted, "the coverage provided by § 2 was unquestionably coextensive with the coverage provided by the Fifteenth Amendment." *Chisom v. Roemer*, 501 U.S. 380,

392 (1991); *accord City of Mobile v. Bolden*, 446 U.S. 55, 61 (1980). Section 2 obviously made no "substantive change in the governing law" because the remedy corresponded directly to the underlying constitutional right. *City of Boerne*, 521 U.S. at 519. As such, §2's inclusion in the VRA, by itself, would have done nothing to redress violations of the right to vote free from discrimination that wasn't already being done through §1983 actions to enforce the Fifteenth Amendment. But §2 paired with §12 did a new thing: grant the federal government the power to bring civil and criminal actions to secure Fifteenth Amendment rights. *Katzenbach*, 383 U.S. at 316.

In 1982, Congress amended §2 by replacing the language "to deny or abridge" with the language "in a manner which results in a denial or abridgement" to reflect its determination "that a 'results' test was necessary to enforce the fourteenth and fifteenth amendments." *Jones v. City of Lubbock*, 727 F.2d 364, 375 (5th Cir. 1984). Consequently, "a violation of §2 is no longer *a fortiori* a violation of the Constitution." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 482 (1997). As such, §2's prophylactic remedy changed the evidentiary bar for proving a §2 claim. *See City of Boerne*, 521 U.S. at 518 (collecting examples of similar remedies promulgated to protect voting rights). But §2 did not and could not create new substantive rights, because even prophylactic remedies cannot "substantively redefine the States' legal obligations." *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 728 (2003). If the legal duty remains unaltered, so does the corresponding legal right. This must be so,

because the corresponding right here is a constitutional right, which Congress has no power to change. *See City of Boerne*, 521 U.S. at 519. The only conclusion is that Congress created no new rights in §2.[5]

If unmistakable clarity and unambiguity is the standard for conferring privately enforceable rights, §2 does not meet it. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1209-10 (8th Cir. 2023) (considering it "unclear whether § 2 creates an individual right"). "Basic federalism principles confirm" this. *Carey v. Throwe*, 957 F.3d 468, 481, 483 (4th Cir. 2020) ("To the extent [the *Gonzaga*] standard permits a gradation, we think it sound to apply its most exacting lens when inferring a private remedy [that] would upset the usual balance of state and federal power."). "Redistricting is primarily the duty and responsibility of the State, and federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (cleaned up). To scrutinize §2 with anything less than the "most exacting lens," *Carey*, 957 F.3d at 483, for the presence of a privately enforceable federal right

---

[5] In *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003), the Eleventh Circuit read a different statute, 52 U.S.C. §10101(a)(2)(B), as creating rights enforceable under §1983. This statute is found in Title I of the Civil Rights Act of 1964, passed pursuant to Congress's Fifteenth Amendment enforcement power. *See United States v. Mississippi*, 380 U.S. 128, 138 (1965). The *Schwier* court neither heard nor considered the argument that Congress creates new remedies, not new rights, when enforcing the Reconstruction Amendments. That case concerned a different statute, different text, and different arguments. Because it does not "directly control," this Court is "not obligated to extend" its reach "by even a micron." *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000); *see also Bourdon v. U.S. Dep't of Homeland Sec.*, 940 F.3d 537, 548 (11th Cir. 2019).

would potentially "subject to judicial oversight" every state redistricting map "at the behest of a single citizen," *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 645 (1979) (Powell, J., concurring). Section 2's text does not make unmistakably clear Congress's intent to "upset the usual constitutional balance of federal and state powers" in that way. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Section 2 thus does not give rise to private enforcement under §1983 or an implied right of action.

**2.** The Supreme Court has never held that §2 is privately enforceable. *See Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring, joined by Thomas, J.) ("Our cases have assumed—without deciding—that the Voting Rights Act of 1965 furnishes an implied cause of action under § 2. Lower courts have treated this as an open question."); *see also City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality opinion) ("Assuming, for present purposes, that there exists a private right of action to enforce [Section 2]."). The Supreme Court did not answer this question in *Morse v. Republican Party of Virginia*, 517 U.S. 186, 232-33 (1996), or anywhere else.

In *Morse*, Justice Stevens (announcing the judgment of the Court and joined by Justice Ginsburg) and Justice Breyer (concurring and joined by Justices O'Connor and Souter) mentioned §2 on the way to finding §10 privately enforceable. *See* 517 U.S. at 232, 240. Both opinions *assumed* "the existence of a private right of action under Section 2," and sought to avoid the "anomalous" result of permitting

11

private suits under §2 and §5 but not §10. *Id.* at 232; *id.* at 240. These "background assumptions" are not binding holdings, and for three reasons are owed no deference. *Arkansas NAACP*, 86 F.4th at 1215.

First, questions "neither brought to the attention of the court nor ruled upon[] are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925); *see also Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968). The "Supreme Court's holding in *Morse* concerned only Section 10 of the VRA and did not concern Section 2." *Georgia State Conf. of NAACP v. Georgia*, 2022 WL 18780945, at *7 n.6 (N.D. Ga. Sept. 26, 2022) (three-judge court). No binding precedent requires this Court to do anything other than to "start with the text, apply first principles, and use the interpretive tools the Supreme Court has provided." *Ark. NAACP*, 86 F.4th at 1216 n.7.

Second, the statements in *Morse* about §2 were "devoid-of-analysis," *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006), making them "the least valuable kind" of dicta. *Ark. NAACP*, 86 F.4th at 1216. While this Court has stated that "[e]ven if the Supreme Court's statements in *Morse* about Section Two are technically dicta, they deserve greater respect than Defendants would have us give," *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1032 (N.D. Ala. 2022), Defendants submit that these statements are not the kind of dicta the *Schwab* court touted as particularly persuasive. 451 F.3d at 1325 ("well thought out, thoroughly reasoned, and carefully

articulated analysis by the Supreme Court describing the scope of one of its own decisions" that comprised "more than five hundred words").

Third, *Morse* itself is a "gravely wounded" decision. *Jefferson Cnty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). Just "five years after *Morse*, the Supreme Court made clear that 'text and structure' are the guideposts, not 'contemporary legal context.'" *Ark. NAACP*, 86 F.4th at 1216 (quoting *Sandoval*, 532 U.S. at 287-88 and noting that *Morse* relied upon the latter). *Morse* has not answered the question.

And while this Court in *Stone v. Allen* held that statutory stare decisis would need to be overcome to conclude that §2 does not create privately enforceable rights, *Stone v. Allen*, No. 2:21-cv-1531 (N.D. Ala. Feb. 13, 2024), ECF 143 at 20, Defendants submit that the doctrine is not applicable here because the question has not been decided by binding precedent. While "stare decisis carries enhanced force when a decision … interprets a statute," *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015), courts adjudicating §2 claims without passing on whether there is a private right of action have not yet interpreted that aspect of the statute. The issue must be decided before getting stare decisis treatment.

## B.   Plaintiffs Fail to Plead Facts Showing an Unequal Opportunity "to Participate in the Political Process."

Assuming that private plaintiffs have authority to bring a §2 claim, Plaintiffs here failed to allege sufficiently that Alabama's electoral systems are not "equally open" to minority voters. Returning to the text, Plaintiffs must allege that members

13

of a minority group "have less opportunity than other members of the electorate [1] to participate in the political process *and* [2] to elect representatives of their choice." 52 U.S.C. §10301(b) (emphasis added). In *Chisom v. Roemer*, the Supreme Court clarified that §2 did "not create two separate and distinct rights." 501 U.S. 380, 397 (1991). Rather, "the opportunity to participate and the opportunity to elect" form a "unitary claim." *Id.* at 397-98. Thus, proving only the second prong—less opportunity to elect—"is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." *Id.* at 397.

To determine if Plaintiffs have sufficiently alleged that black voters in Alabama in the 2020s have "less opportunity than other members of the electorate to participate in the political process," it is of first importance to determine what that phrase means. *Chisom* points to the answer. The 1982 amendments to "§ 2 [were] intended to 'codify' the results test employed in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and *White v. Regester*, 412 U.S. 755 (1973)." *Chisom*, 501 U.S. at 394 n.21 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 83 (1986) (O'Connor, J., concurring in the judgment)). Those two decisions supplied §2's key language. And because the phrase "is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019). Thus, "it is to *Whitcomb* and *White* that [courts] should look in the first instance in determining how great an

14

impairment of minority voting strength is required to establish vote dilution in violation of § 2." *Gingles*, 478 U.S. at 97 (O'Connor, J., concurring in the judgment).

*Whitcomb* makes clear what is *not* enough to establish a "vote dilution" claim. The plaintiffs in *Whitcomb* challenged the use of a multimember districting scheme in Marion County, Indiana, to elect the county's "eight senators and 15 members of the house," alleging the system illegally "diluted the force and effect of" a heavily black and poor part of Marion County "termed 'the ghetto area.'" 403 U.S. at 128-29. For "the period 1960 through 1968," that area made up "17.8% of the population" of Marion County, but was home to only "4.75% of the senators and 5.97% of the representatives." *Id.* at 133. Part of the disproportionality arose because the voters in that part of the county "voted heavily Democratic," while "the Republican Party won four of the five elections from 1960 to 1968" and did not slate anyone from the area in several of those elections. *Id.* at 150-52. The district court found vote dilution and ordered single-member districting, under which voters from plaintiffs' area "would elect three members of the house and one senator." *Id.* at 129.

Despite these disparities, the Supreme Court reversed the finding of vote dilution. Critical to the Court's holding was the lack of "evidence and findings that ghetto residents had less" "opportunity to participate in and influence the selection of candidates and legislators." *Id.* at 149, 153. The Court made clear that "participate

in the political process" meant those activities most common to voters: being "al-lowed [1] to register [and] vote, [2] to choose the political party they desire[] to sup-port, [3] to participate in its affairs[,]," and [4] "to be equally represented on those occasions when legislative candidates [ar]e chosen." *Id.* at 149.

It made *no* difference that the Democratic Party had lost all 23 legislative seats in "four of the five elections from 1960 to 1968." *Id.* The record suggested that "had the Democrats won all of the elections or even most of them, the ghetto would have had no justifiable complaints about representation." *Id.* at 152. That the area did not "have legislative seats in proportion to its populations emerge[d] more as a function of losing elections," not built-in racial bias. *Id.* at 153. The plaintiffs' alleged denial of equal opportunity was "a mere euphemism for political defeat at the polls." *Id.*

*White v. Regester* provides a helpful contrast. There, black voters of Dallas County, Texas, favored the Democratic Party, but at-large elections and "a white-dominated organization that [was] in effective control of Democratic Party candidate slating in Dallas County" combined to deny black voters equal opportunity to par-ticipate in the political process. 412 U.S. at 766-67. The Supreme Court found "no reason to disturb" the district court's "findings and conclusions." *Id.* at 767.

The point of this historical study is straightforward: unequal opportunity "to participate in the political process," as it appears in §2, carries a particular meaning. *Whitcomb* and *White* supply that meaning: a plaintiff must show that members of the

minority group are excluded "from effective participation in political life," *White*, 412 U.S. at 769; *i.e.*, they are "denied access to the political system," *Whitcomb*, 403 U.S. at 155. Access to the "political system" means access to those tangible and traditional methods of participation like registering to vote, voting, and participating in the political party of one's choosing. *Id.* at 149-50. The Senate Factors may help show that there is a sufficiently "great … impairment" to find an unequal opportunity to participate in the political system, *Gingles*, 478 U.S. at 97 (O'Connor, J., concurring in the judgment), but Plaintiffs must still allege that, based on the totality of the circumstances, black Alabamians today face *more inequality* in terms of those traditional methods of participation than did black Indianians in 1960s Marion County.[6] Here, the allegations come nowhere close.

The complaint alleges that socioeconomic disparities exist between black and white Alabamians, including: a 4.6% gap in adults lacking a high school diploma; a 6.7% gap in adults working in service occupations; an 8.7% gap in vehicle access; an 8% gap in computer, smartphone, or tablet ownership; and, an 11.5% gap in adults who lack broadband internet access. *See generally* doc. 329 ¶¶147-56.  But that does

---

[6] Defendants recognize that Senate Factor 5 calls for an examination into "the extent to which members of the minority group … bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37. And Defendants are mindful that this Court found their Senate 5 arguments with respect to the 2021 Plan "too formulaic." *Milligan* doc. 107 at 188. In this brief, Defendants do not make a Senate Factor 5 argument, but rather one of statutory interpretation aided by the Supreme Court's decisions supplying §2's operative text.

not prove §2 vote dilution because the same or worse could undoubtedly be said for poor black residents of Marion County in the 1960s compared to residents of the "upper middle-class and wealthy suburban area" one township over. *Chavis v. Whitcomb*, 305 F. Supp. 1364, 1385 (S.D. Ind. 1969). After all, the *Whitcomb* Court heard similar evidence, such as "[s]trong differences … in terms of housing conditions, income and education levels, rates of unemployment, juvenile crime, and welfare assistance," along with historical data showing "gross inequity of representation" in the general assembly. 403 U.S. at 132-33.

Like the *Whitcomb* plaintiffs, Plaintiffs here plead facts about socioeconomic disparities, but not about disparities when it comes to voting rights. The *Whitcomb* plaintiffs couldn't show that they "were not allowed" to register, vote, or participate with the party of their choosing, *Whitcomb*, 403 U.S. at 149, and neither can the Plaintiffs here. Plaintiffs' allegations about Alabama's "extensive and ongoing history of racial discrimination in voting" do not show an inability of black Alabamians in 2024 to participate in the political process. *See* doc. 329 ¶¶114-36. Plaintiffs cite no modern example of statewide "intentional" discrimination other than the Legislature's failure to navigate flawlessly the unpredictable "competing hazards of liability" of the Equal Protection Clause and the Voting Rights Act. *Abbott*, 138 S. Ct. at 2315; *see* doc. 329 ¶118 (citing *Ala. Leg. Black Caucus v. Alabama ("ALBC")*, 989 F. Supp. 1227 (M.D. Ala. 2013), *vacated*, 575 U.S. 254 (2015)). Even in that

case, the allegations were from 2011, the court made no finding of "invidious discriminatory purpose," and it took the Supreme Court to step in and clarify the correct interaction between the VRA and Equal Protection Clause. *See ALBC*, 989 F. Supp. at 1288. The *ALBC* saga says more about redistricting jurisprudence than it does about the Alabama's "ongoing history of racial discrimination."[7]

The other cases Plaintiffs cite are inapposite. *Jones v. Jefferson County Board of Education* was about a law enacted in 1975 establishing an at-large multimember system of electing the county board of education, which *the parties stipulated* when settling the dispute "was enacted [in 1975] at least in part for the purpose of limiting the influence of Black voters in Board elections." 2019 WL 7500528, at *3 (N.D. Ala. 2019). And *People First of Alabama v. Merrill* concerned a discriminatory effects, not intent, challenge against valid voting laws *as applied* to the 2020 elections during the COVID-19 pandemic. 491 F. Supp. 3d 1076 (N.D. Ala. 2020). The injunction the plaintiffs secured was stayed by the Supreme Court and then the case became moot following the 2020 election,  so the decision was never tested on appeal. *See Merrill v. People First of Alabama*, 141 S. Ct. 25 (2020). The only other recent case Plaintiffs cite is *Allen v. City of Evergreen*, 2014 WL 12607819 (S.D. Ala. Jan. 13, 2014). A ten-year-old case about a §3 challenge to a city council map,

---

[7] *See Merrill v. Milligan*, 142 S. Ct. 879, 883 (2022) (Roberts, J., dissenting); *see also id.* at 881 (Kavanaugh, concurring).

*Evergreen* cannot plausibly show that the State Legislature has engaged in "pervasive purposeful discrimination." *United States v. Marengo Cnty. Comm'n*, 731 F.3d 1546, 1567 (11th Cir. 1984).

Plaintiffs' allegations do not show "an impairment of minority voting strength" sufficient "to establish vote dilution in violation of § 2." *Gingles*, 478 U.S. at 97 (O'Connor, J., concurring in the judgment). Plaintiffs have not alleged that black voters in Alabama are "not allowed to register [or] vote, to choose the political party they desire[] to support, to participate in its affairs or to be equally represented on those occasions when legislative candidates were chosen." *Whitcomb*, 503 U.S. at 149. Thus, Plaintiffs have not alleged that black voters have an unequal "opportunity … to participate in the political process." *Id.* at 155.

Defendants recognize this Court's order yesterday in *Stone*, which ruled that plaintiffs there stated a plausible §2 claim by "plead[ing] factual allegations about the Senate Factors to assert that the political process in Alabama is not equally open to Black voters." *Stone*, No. 2:21-cv-1531, ECF 143 at 23. Defendants respectfully submit that while the types of evidence discussed in the Senate Factors are likely to be present where there is sufficiently "great an impairment of minority voting strength … to establish vote dilution in violation of § 2," *Gingles*, 478 U.S. at 97 (O'Connor, J., concurring in the judgment), presence of such evidence is not sufficient where unequal opportunity to participate in the political process is not shown.

And based solely on the Amended Complaint, there is every reason to believe that, "had the Democrats won all of the elections or even most of them" in Alabama, black voters "would have had no justifiable complaints about representation." *Id.* at 152. Thus, "the failure of [black voters] to have legislative seats in proportion to [their] populations emerge more as a function of losing elections," not built-in racial bias. *Id.* at 153. And losing in the political process is not the same as being excluded from it. Plaintiffs' contrary approach of alleging a history of discrimination (which surely existed in 1960s Indiana too[8]), socioeconomic disparities (which *defined* the plaintiff group in *Whitcomb*), and elections that didn't go the "right" way, alleges nothing about whether black Alabamians have an equal opportunity to "participate in the political process." The bottom line is that Plaintiffs' allegations might plausibly show an unequal opportunity to participate "only if *Whitcomb* is purged from … voting rights jurisprudence." *LULAC v. Clements*, 999 F.2d 831, 862 (5th Cir. 1993) (en banc) (discussing *Whitcomb* at length).

## II. Plaintiffs Fail To State A Claim Of Intentional Discrimination Under The Equal Protection Clause.

Any "successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect."

---

[8] *See, e.g.*, *Baird v. Consol. City of Indianapolis*, No. IP87-111C, 1991 WL 557613, at *6 (S.D. Ind. Apr. 25, 1991) ("Dr. Moore testified about the history of race discrimination in Indiana generally and in Marion County in particular.").

21

*Greater Birmingham Ministries v. Sec'y of State for Ala. ("GBM")*, 992 F.3d 1299, 1321 (11th Cir. 2021). The facts alleged, if true, must show that "the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Crucially, "when a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam) (quoting *Abbott*, 138 S. Ct. at 2324). This principle applies at every stage of litigation. *Miller v. Johnson*, 515 U.S. 900, 917 (1995). The presumption that a legislature acts for legitimate rather than discriminatory reasons serves important ends: it reminds courts to exercise caution before intruding "on the most vital of local functions"; it rightly recognizes that redistricting is a "complex" and "difficult subject for legislatures"; it is sensitive to the fact that legislators are "almost always … aware of racial demographics"; and it keeps the burden of proof where it should be—squarely on the plaintiff's shoulders. *Miller*, 515 U.S. at 915-16. Without this safeguard, federal courts are more easily "transformed into weapons of political warfare" by "the losers in the redistricting process"—an "often-unstated

danger" that invites "illegitimate invasions" into "a traditional domain of state authority." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). (Alito, J., concurring in part) (cleaned up).

Compounding the "demanding" "burden of proof," *Easley v. Cromartie*, 532 U.S. 234, 241 (2001), is the fact that even when dealing with a small number of decisionmakers, "[p]roving the motivation behind official action is often a problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). In trying to prove the intent of a body the size of the Legislature, "the difficulties in determining the actual motivations of the various legislators that produced a given decision increase." *Id.* It is not enough to prove the motives of only a handful of the bill's backers, for "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Brnovich*, 141 S. Ct. at 2350. Instead, a plaintiff must show "that the legislature as a whole was imbued with racial motives." *Id.* Making that showing is not merely difficult, it's "near-impossible." *GBM*, 992 F.3d at 1324.

Here, when trying to overcome the "near-impossible," Plaintiffs ignore, if not decry, the presumption of good faith due legislative bodies. Their theory of discriminatory intent, as exposed by their allegations, is fairly simple: (1) the Alabama Legislature has previously discriminated against black Alabamians in districting, doc. 329 ¶¶114-36, 178, 201; (2) Alabama's 1992 congressional map was "potentially infected by the Legislature's discriminatory motive," *id.* ¶180; *see also* ¶178-79,

23

202; and (3) subsequent Legislatures, including the 2023 Legislature, necessarily intended to discriminate against black voters because they failed to add a second majority-black or opportunity district, *id.* ¶¶181-83. Thus, according to Plaintiffs, the 2023 Legislature was constitutionally required either "to expiate its predecessor's bad intent," *Abbott*, 138 S. Ct. at 2325, or to sacrifice traditional "districting principles" to create "as many majority-minority districts as possible." *Miller*, 515 U.S. at 924. Equal Protection Clause precedent forecloses both arguments.

### A.    Plaintiffs' Allegations of Past Discrimination Do Not Show Intentional Discrimination Today.

Plaintiffs' posit a time-traveling "cat's paw" theory. *See Brnovich*, 141 S. Ct. at 2350. It begins in 1990, when "VRA litigation brought by Black voters … resulted in the drawing of CD7 as a majority-Black district." Doc. 329 ¶178. That district, although drawn by a federal court, was purportedly "the product of intentional racial discrimination," *id.* ¶202, because the court allegedly based its plan on a map drawn by Senator Larry Dixon, who "had a contemporaneous history of hostility towards black voters," *id.* ¶180.[9] Also, no "Section 2 analysis" was conducted. *Id.* ¶178. Then, by "reenact[ing] the same core district for CD7 with only slight modifications

---

[9] *See GBM*, 992 F.3d at 1323 (finding that Sen. Dixon's statements were no indication of the Legislature's alleged discriminatory intent when passing the 2011 Photo Voter Identification Law). The same goes for Sen. Scott Beason's ability to infect the 2011 Map with his own alleged racial discrimination. Doc. 329 ¶181; *see also GBM*, 992 F.3d at 1323 (discussing Sen. Beason).

to address population shifts," the 2001, 2011, 2021, and 2023 Legislatures necessarily "did so with the same discriminatory motive of limiting Black electoral success to CD7." *Id.* ¶¶181, 202. Thus, in Plaintiffs' view, the 2023 Plan is "unexplainable on grounds other than race" because it has one majority-black district, just like the 1992 Plan, which was allegedly infected by one senator's racism—laundered through a federal court order. *GBM*, 992 F.3d at 1322. If it is "near-impossible" to determine the intent of a legislature, then these allegations do not cut it. *Id.* at 1324.

Beyond the facial tenuousness of their theory, it rests upon a fundamental legal error that served as grounds for reversal in *Abbott v. Perez.* There, the district court "referred repeatedly to the 2013 Legislature's duty to expiate its predecessor's bad intent." 138 S. Ct. at 2325. The district court reasoned that discriminatory effects persisted "because the Legislature engaged in no deliberative process to remove any such taint, and in fact intended any such taint to be maintained but be safe from remedy." *Id.* at 2325-26. This "approach," declared the Court, "was fundamentally flawed and demands reversal." *Id.* at 2326. Why? Because it "disregarded the presumption of legislative good faith and improperly reversed the burden of proof." *Id.* at 2326-27. Neither of those "basic principles" are "changed by a finding of past discrimination" because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324-25; *see also GBM*, 992 F.3d at 1325; *League of Women Voters v. Fla. Sec'y of State*,

66 F.4th 905, 923 (11th Cir. 2023) ("*League II*") (The Court "rejected the argument that 'a racist past is evidence of current intent.'"). Here, Plaintiffs would place the burden on the Legislature to "'cure' the earlier Legislature's 'taint.'" *Abbott*, 138 S. Ct. at 2325. That is reason enough to dismiss this discrimination claim.

Even pretending *Abbott* was never decided, the Complaint contains no allegations plausibly showing that "the 1990 congressional redistricting [was] the product of intentional racial discrimination," or was intentionally maintained "with the same discriminatory motive" following the 2000, 2010, and 2020 censuses. Doc. 329 ¶¶181, 202. The 1992 Map was approved by a federal court and has never been held to be the product of intentional discrimination. *See Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992). In fact, in *Wesch*, one proposed plan included two majority-black districts with black populations of 59% and 62%, but even the party who submitted the plan doubted black Alabamians would have an "opportunity to elect candidates of their choice in these districts." 785 F. Supp. at 1496. Similarly, no court invalidated the 2002 and 2011 Plans. The 2021 Plan was enjoined solely on statutory grounds. *Singleton v. Allen*, 2023 WL 5691156, at *2 (N.D. Ala. Sept. 5, 2023). To declare as a settled fact (without alleging how) that the 1992 Plan was intended to discriminate against black people and then to posit as a matter of law that the 2023 Legislature had an affirmative duty to fix it fails on multiple fronts.

Finally, putting aside *Abbott* and assuming *arguendo* a federal court enshrined invidious discrimination into the 1992 Plan, Plaintiffs have still not sufficiently alleged the 2023 Legislature intentionally discriminated against black voters. "[I]ntent as volition or intent as awareness of consequences" does not rise to the level of discriminatory purpose. *Feeney*, 442 U.S. at 279. Nonetheless, the most Plaintiffs have alleged is that the Legislature chose to enact District 7 while "aware" of the district's "racial demographics." *Miller*, 515 U.S. at 916. That's not enough.

In sum, actions by a federal court in 1992 or by the 2001 Legislature, the 2011 Legislature, or the 2021 Legislature do not taint the actions of the 2023 Legislature. Even if there were a finding of past discrimination, the "burden of proof" would not change. *Abbott*, 138 S. Ct. at 2324. The ultimate question remains whether a discriminatory intent has been proved in a given case," meaning that "what matters" in this case is the intent of the Legislature that enacted the 2023 Plan. *Id.* That intent cannot be shown by the 2023 Legislature's "failure" to meet its non-existing obligation to "purge" subjective intent, if it existed, from previous redistricting plans. *Id.* at 2324, 2326. Giving credence to Plaintiffs' repudiated theory would "reverse the presumption that a State's laws are constitutional and plunge federal courts into far-reaching expeditions regarding the sins of the past in order to question the laws of today"—which is precisely what Plaintiffs demand of this Court. *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1226 (11th Cir. 2005) (en banc).

27

**B.  Plaintiffs Have Alleged No Facts Plausibly Showing That the Legislature Intentionally Discriminated Against Black Voters.**

Because Plaintiffs cannot impose on the 2023 Legislature the burden of curing any previous legislature's alleged ill motives, Plaintiffs are left with the naked position that the Legislature must create "as many majority-minority districts as possible," or else it "violate[s] the Constitution." *Miller*, 515 U.S. at 924. Plaintiffs nod to the *Arlington Heights* factors but come nowhere close to showing "that the legislature as a whole was imbued with racial motives." *Brnovich*, 141 S. Ct. at 2350.

The heart of Plaintiffs' claim is that the 2023 Plan must be the product of discrimination because it does not comport with their understanding of §2 and the Equal Protection Clause, which the Court accepted in the 2023 preliminary proceedings. Of course, Plaintiffs in 2022 told this Court that a map with effectively *the same* BVAP numbers for Districts 2 and 7 (and Montgomery in one district) would make the 2021 Plan "race-neutral." Doc. 69 at 36. So their argument cannot be that a map like the 2023 Plan is inherently discriminatory. No, at its core, Plaintiffs' position is that disagreement with them over an area of the law that "is notoriously unclear and confusing," *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring), and has "engendered considerable disagreement and uncertainty," *id.* at 883 (Roberts, C.J., dissenting), is so beyond that pale that only racial discrimination can explain it. That poisonous presumption of bad faith must not be permitted to seep deeper into

our politics and courts, lest it carry us even "further from the goal of a political system in which race no longer matters." *Shaw v. Reno*, 509 U.S. 630, 657 (1993).

**1.** Plaintiffs allege that when Republican-majority Legislatures in 2021 and 2023 chose not to adopt other plans with a second reliably Democratic district, they did so to harm black people. Doc. 329 ¶¶182, 184, 189. These allegations are insufficient. At most, they reveal "an awareness that alternatives were available. But mere awareness is not enough." *Simpson v. Hutchinson*, 636 F. Supp. 3d 951, 956 (E.D. Ark. 2022) (The Legislature's "rejection of the two other maps" did not show "a discriminatory purpose.") (citing *Feeney*, 442 U.S. at 279).

Plaintiffs then fault the Legislature for allegedly "prioritiz[ing] white incumbents and the voting strength of white people based on their shared European 'colonial heritage' over the voting strength of Black voters." ¶¶184, 187. The 2023 Plan protected *all* incumbents, white and black alike, and it recognized the Gulf's unique cultural heritage, shared by both white and black residents. *See* Ala. Code §§17-14-70.1(3)(f), 17-14-70.1(4)(f); *Barnhart v. Ingalls*, 275 So.3d 1112, 1117 n.1 (Ala. 2018) (citing Ala. Code §1-3-8(c)) ("Mardis Gras is observed as a State holiday only in Mobile and Baldwin Counties, and State offices in those locales are accordingly closed on that holiday."). Avoiding "contests between incumbents" is "a legitimate state goal," *Bush v. Vera*, 517 U.S. 952, 964 (1996) (collecting cases), as is the preservation of communities of interest, *Shaw v. Hunt*, 517 U.S. 1894, 1901 (1996).

29

The presumption of legislative good faith mandates that intentional discrimination should not be presumed in the face of these "obvious alternative explanation[s]." *Iqbal*, 556 U.S. at 682. "When the plaintiffs proceed with only indirect evidence that race predominated and the design of a district can be explained by traditional districting criteria, the plaintiffs have not satisfied their burden of proof." *ALBC v. Alabama*, 231 F. Supp. 3d 1026, 1044 (M.D. Ala. 2017).

Plaintiffs' remaining allegations merely describe party politics, not invidious discrimination. Plaintiffs state the 2023 Plan passed "along racial lines over the vehement objections of all Black legislators, except one." Doc. 329 ¶186. In other words, Republicans (black and white) passed a map to which Democrats (black and white) objected. *See League II*, 66 F.4th at 940 ("[T]he concerns expressed by political opponents [about disparate impact on black voters] during the legislative process are not reliable evidence of legislative intent.").

Of course, allegations that white legislators opposed a bill favored by black legislators (or vice versa) might be "consistent with" legislators acting based on racial motives, but "they do not plausibly establish this purpose." *Iqbal*, 556 U.S. at 681. Refusing to adopt a map that would likely swing an additional congressional district to Democrats is a reasonable, non-racial goal for Republican legislators to pursue. And Plaintiffs' allegations about statements by various legislators that the

2023 Plan gives Republicans "'a good shot' in the Supreme Court" and the possibility of gaining a Republican seat in Congress, doc. 329 ¶186, show (particularly given the presumption of good faith) the Legislature was concerned with political, not racial power. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019). A Republican Legislature advancing Republican interests does not raise an inference or presumption of racial discrimination any more than Democrats advancing Democratic interests, no matter the race of the legislators.

To embellish the idea that the Legislature "secretly intended" to racially discriminate, *GBM*, 992 F.3d at 1324 & n.37, Plaintiffs saturate their Complaint with legal conclusions. The fifteen instances of "intentional discrimination," eleven of "cracking," six of "discriminatory motive," *etc.*, are not factual allegations, but merely a "formulaic recitation of the elements of a constitutional discrimination claim," which are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681.

**2.** All that's left of Plaintiffs' claim is the incredible and divisive accusation that the Legislature intentionally discriminated against black voters because Plaintiffs convinced this Court that the 2023 Plan likely violates §2. *See* Doc.329 ¶¶5, 11, 177, 184, 185, 186, 188. In their view, navigating the "competing hazards of liability" of the race-neutral Constitution and §2 (*Abbott*, 138 S. Ct. at 2315) was so easy and adopting one of their maps so obvious, only discrimination explains the decision to take another route.

But "[r]edistricting is never easy," *id.* at 2314, and *Allen* is subject to more than one fair reading. Plaintiffs had said the 2021 Plan violated §2 because it kept together majority-white communities in the Gulf and Mobile while "cracking" "majority-Black communities of interest" in the Black Belt and Montgomery.[10] The Supreme Court has said that remedying violations in "disparate-impact cases should concentrate on the elimination of the offending practice," *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 544 (2015), and there is a colorable argument that the 2023 Plan did just that by uniting Black Belt counties into two compact districts and keeping Montgomery whole—*i.e.*, treating them as well as other communities of interest focused on in the 2021 Plan. Moreover, at least eight Justices in *Allen* agreed that race cannot predominate in an illustrative map,[11] while only four expressly held that race did not predominate in some of the *Caster* Plaintiffs' maps.[12] Plus, five Justices questioned the constitutionality of continued race-based districting under §2.[13]

And, of course, the *Milligan* Plaintiffs themselves in 2022 had described what a "race-neutral plan" would look like, in which "Black voters are no longer artificially denied electoral influence in a second district." Doc. 69 at 36. In that plan,

---

[10] *See Milligan* Br. 5, 16, 39.

[11] *See Allen*, 599 U.S. at 33 (plurality) ("The line that we have long drawn is between consciousness and predominance."); *id.* at 59 (Thomas, J., dissenting) (A plaintiff cannot satisfy *Gingles* 1 "by drawing an illustrative map in which race was predominant.").

[12] *See id.* at 32-33 (plurality).

[13] *See id.* at 45 (Kavanaugh, J., concurring) (citing *id.* at 88 (Thomas, J., dissenting).

District 7's BVAP would decrease to "around 50%"; District 2's BVAP would increase to "almost 40%"; and Montgomery County would be kept whole. *Id.* The 2023 Plan has those "race-neutral" features.

Now Plaintiffs' cry foul and accuse the Legislature, as a whole, of unconstitutional and intentional discrimination against black voters. But a "race-neutral" plan praised by the Plaintiffs in 2022 did not become racist in 2023 when adopted by the Legislature.[14] Plaintiffs' only response is to contend that §2 requires a different map. The discrimination theory then is that Plaintiffs have a certain view of what §2 requires, and this Court preliminarily agreed with them, so embracing a different view *must* be for the purpose of discriminating against black Alabamians.

But hashing out differences over difficult and consequential issues is routine in law and politics. It would be deeply troubling, then, for both endeavors if one party to a disagreement could get to the next round by simply charging racism. The disagreement here is over the meaning of a statute demanding consideration of race—the notoriously unclear §2—and its interplay with a "color-blind" Constitution. *SFFA v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)).

---

[14] *Contra* doc. 329 ¶5, the 2023 Plan does not split the Black Belt across three districts. The Black Belt's eighteen core counties lie in two districts, the fewest possible. *Singleton*, 2023 WL 5691156, at *7.

Courts may ultimately decide that Plaintiffs have the better view, but surely it's not unconstitutional to disagree with them.

That very disagreement points to an additional obvious alternative explanation—other than race—for the Legislature's actions: the fear that it would be engaging in unconstitutional race-based sorting by adopting one of Plaintiffs' preferred plans. That fear is well-founded. The 2021 Plan, which contained one majority-black district, drew *two* racial gerrymandering claims, one from the *Singleton* Plaintiffs and one from the *Milligan* Plaintiffs. *See Singleton v. Allen*, 2023 WL 5691156, at *1 (N.D. Ala. 2023). And the 2023 Plan, containing one district near 50% BVAP and another near 40% BVAP, still drew a racial gerrymandering claim. *Singleton* doc. 229 (Second Amended Complaint). Just days ago, Louisiana was hit with a racial gerrymandering claim after, following §2 litigation, it adopted a new congressional map containing an additional majority-black district. *See* Complaint, *Callais v. Landry*, No. 3:24-cv-00122 (W.D. La. Jan. 31, 2024). There's a "damned if you do, damned if you don't" nature to this endeavor. The desire to avoid gerrymandering claims is an "obvious alternative" to discrimination. *Iqbal*, 556 U.S. at 682.

There's one more problem with Plaintiffs' constitutional claim—they don't allege an "actual discriminatory effect." *GBM*, 992 F.3d at 1321. To be sure, they allege "that Black Alabamians could elect candidates of their choice in two congressional districts in the state in a manner that complies with the U.S. Constitution and

federal law," and that the 2023 Plan does not bring about that aim. Doc. 329 ¶200. But that does not mean that failing to draw the plan produced a discriminatory effect under the Equal Protection Clause. That follows because, in Plaintiffs' view, §2 can require more than a "race-neutral" plan, while the Equal Protection Clause requires only equal treatment. Because Plaintiffs' allegations are consistent with a plan that simply did not use race-based districting, they have failed to allege a discriminatory effect under the Equal Protection Clause.

"[U]nder our Constitution, there can be no such thing as either a creditor or a debtor race." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 239 (1995) (Scalia, J., concurring in part). Plaintiffs' allegations would suggest the contrary, that if a "white majority" Republican Legislature enacts a plan that advances Republican interests and rejects plans preferred by Democrats, then the Legislature must have done so *because* many Democrats are black. Doc. 329 ¶187. That tactic, if allowed to persist, threatens to "transform[]" "the federal courts … into" especially divisive "weapons of political warfare," *Cooper*, 581 U.S. at 335 (Alito, J., concurring in part), waged with baseless accusations of racism. The presumption of legislative good faith protects our politics and our courts from such maneuvers by requiring far more to state an intentional discrimination claim.

## CONCLUSION

The Amended Complaint should be dismissed.

35

Steve Marshall
  *Attorney General*

*s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Soren Geiger (ASB-0336-T31L)
  *Assistant Solicitor General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama  36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov


***Counsel for Secretary of State Allen***

*s/ Dorman Walker*
Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

36

Michael P. Taunton (ASB-6853-H00S)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203
Telephone: (205) 226-3451
Email: mtaunton@balch.com

***Counsel for Sen. Livingston and Rep. Pringle***

## CERTIFICATE OF SERVICE

I certify that on February 14, 2024, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

*s/      Edmund G. LaCour Jr.*
Counsel for Secretary Allen