FILED
2024 May-20  PM 04:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **EVAN MILLIGAN,** *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:21-cv1530-AMM** |
| | ) | |
| **WES ALLEN,** *et al.* | ) | **THREE-JUDGE PANEL** |
| | ) | |
| *Defendants.* | ) | |

## NONPARTY LEGISLATORS' REPLY TO PLAINTIFFS' OPPOSITION TO REDSTATE STRATEGIES' MOTION TO QUASH (DOC. 354)

The Nonparty Legislators, by and through their counsel, submit their Reply to Plaintiffs' Opposition to RedState Strategies' Motion to Quash (hereinafter, the "Response"), (doc. 354), and again urge the Court to quash the subpoena directed to RedState Strategies, LLC ("RSS") pursuant to Rule 45(d)(3)(A)(iii) of the Federal Rules of Civil Procedure because it inquires into legislative acts and the motivation for the performance of those acts otherwise shielded from discovery by the legislative privilege.

## I.    INTRODUCTION

In their Response, Plaintiffs argue that the legislative privilege does not apply despite the fact that (1) their First Amended Complaint alleges

1

discriminatory motive as an underlying purpose of SB5; (2) their subpoena seeks private/non-public communications regarding the alleged discriminatory purpose or motive of SB5; and (3) their Response unambiguously states that the "subpoena seeks evidence directly relevant to their allegation of discriminatory purpose or motive in enacting SB5." (Doc. 354 at 16). Allowing a direct inquiry into legislative acts (*i.e.*, the formulation and enactment of SB5 (the 2023 plan)) and the Nonparty Legislators' motives in passing the law, however, "strikes at the heart of the legislative privilege," and is contrary to well-settled Supreme Court and Eleventh Circuit precedent. *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015) (citations omitted). Discovery requests that reveal such private communications, even if served on non-legislators, burden and deter the uninhibited discharge of legislative duties. To hold otherwise would ignore a routine and legitimate part of the modern-day legislative process through which legislators receive information bearing on the legislation they consider. Accordingly, for the additional reasons set forth below, this Court should quash the RSS subpoena.

## II.   ARGUMENT

### A.   THE LEGISLATIVE PRIVILEGE PROHIBITS PLAINTIFFS' INQUIRIES.

The legislative privilege prohibits Plaintiffs' inquiries into the Nonparty Legislators' motives in enacting SB5. The Eleventh Circuit recently put this matter to rest in *Pernell v. Florida Board of Governors of State University*, 84 F.4th 1339

(11th Cir. 2023). In *Pernell*, the Court explained that the legislative privilege shields parties to the legislative process from "'inquir[ies] into legislative acts or the motivation for actual performance of legislative acts.'" *Id.* at 1343 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1304 (11th Cir. 2009)). In other words, the legislative privilege extends to "'[a]ny material, documents, or information that . . . go[es] to legislative motive.'" *Id.* (quoting *Hubbard*, 803 F.3d at 1311). When determining the applicability of the legislative privilege to a particular subpoena, a court must "consider the *purpose* of [the] subpoena, not what the subpoena seeks." *Id.* (citing *Hubbard*, 803 F.3d at 1311). Where the "'only purpose'" of a subpoena is "to support [a] lawsuit's inquiry into the motivation behind [a statute]," the subpoena seeks "information for an impermissible purpose." *Id.* (quoting *Hubbard*, 803 F.3d at 1310). And where a court does find that a subpoena was propounded "for an impermissible purpose, *the inquiry is over.*" *Id.* (emphasis added).

The *Pernell* plaintiffs served subpoenas on nonparty legislators seeking documents and communications regarding the "creation and drafting," the "enactment," and the "implementation" of the subject legislation.[1] *Id.* at 1342. In their response to the motion to quash, the plaintiffs stated that they "served the subpoenas on the legislators to 'determin[e] whether there was a discriminatory

---

[1] As set forth in RedState's Response and Partial Objection to, and Motion to Quash, Subpoena, RedState provided the Nonparty Legislators advice regarding the redrawing of Congressional district lines. (Doc. 347 ¶ 1).

3

motive behind'" the subject legislation. *Id.* at 1343–44. Thus, "[b]y the plaintiffs' own admission, the subpoenas' purpose was to uncover the legislators' motives in passing the law." *Id.* at 1344. Therefore, because the plaintiffs' subpoenas were plainly for an impermissible purpose, the Eleventh Circuit concluded that the legislative privilege inquiry was "over." *Id.* at 1343, 1344.

Here, the Court need look no further than the face of Plaintiffs' subpoena to properly conclude that the legislative privilege applies here. The subpoena expressly seeks documents and communications between RSS and the Nonparty Legislators regarding research, analyses, promotion, publicizing, briefing, reports generated, creation, *intent*, *purpose*, planning, passage, implementation, debate, discussions, negotiations, drafting, or enactment of the 2023 Plan (SB5). (*See* Doc. 346-1).

Second, Plaintiffs' First Amended Complaint alleges that "[o]ne of the *motivating factors* in the drawing and passage of SB5 was a *racially discriminatory purpose* . . . ." (Doc. 329 ¶ 199 (emphasis added). *See also id.* ¶¶ 2, 4–7, 10, 176–89, 195, 197–205). This claim, "'at its core,'" necessarily requires "'an inquiry into the subjective motivation' of the legislators." *Pernell*, 84 F.4th at 1343 (quoting *Hubbard*, 803 F.3d at 1311). In light of Plaintiffs' allegations, the subject subpoena's "'only purpose [is] to support the lawsuit's inquiry into the motivation behind'" SB5. *Id.* (quoting *Hubbard*, 803 F.3d at 1310). To be sure,

4

Plaintiffs' subpoena expressly states as much: "All documents or communications between [RSS] and Defendants, or other members to the Alabama Legislature . . . regarding the researching, creation, *intent*, *purpose*, planning, passage, or implementation of the 2023 Plan." (Doc. 346-1) (emphasis added).

Third, to the extent that there is any ambiguity regarding the purpose of the subpoena, Plaintiffs removed all doubt with their Response wherein they repeatedly state that the purpose of the subpoena is to seek evidence of discriminatory purpose or motive in enacting SB5, *i.e.*, an "impermissible purpose." In what can only be described as a striking case of *Pernell* déjà vu, *see* 84 F.4th at 1343–44, Plaintiffs' Response states:

- "First, Plaintiffs' subpoena seeks evidence directly relevant to their allegations of discriminatory purpose or motive in enacting SB 5. . . . Understanding why and how the legislature chose to pass SB5 will provide further support for [Plaintiffs' arguments]." (Doc. 354 at 16).

- "What motivated adoption of a plan the State knew did not comply with the Court's order is critically important to demonstrate discriminatory purpose–that the State was in this instance specifically unresponsive to the needs of Black voters, and that justifications for SB5 were pretextual." (*Id.* at 17–18).

As in *Pernell*, those unqualified admissions sound the death knell for Plaintiffs' arguments. 84 F.4th at 1344.

In sum, the content of the subpoena, the allegations of the First Amended Complaint, and Plaintiffs' explicit admissions in their Response unequivocally

establish the impermissible purpose of their subpoena—seeking evidence of discriminatory motive in enacting SB5. That impermissible purpose ends the legislative privilege inquiry.[2] *Id.* at 1343. Accordingly, the Court should quash Plaintiffs' subpoena.

**B.   THE LEGISLATIVE PRIVILEGE EXTENDS TO COMMUNICATIONS BETWEEN ALL PARTIES TO THE LEGISLATIVE PROCESS.**

**1.   Both parties to the legislative communications properly and independently invoked the legislative privilege.**

The Supreme Court and Courts of Appeals *uniforml*y agree that the legislative privilege extends to the exchange of information or communications between all parties to the legislative process including state legislators and their staff, consultants or other third-parties, for the purpose of exploring and formulating legislation. *See, e.g., Gravel v. United States,* 408 U.S. 606, 660 (1972) (Brennan, J., dissenting) ("As we held in *United States v. Johnson,* 383 U.S. 169 (1966), neither a Congressman, nor his aides, nor third parties may be made to testify concerning privileged acts or their motives."); *Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d 1185, 1192 (11th Cir. 1993) ("[T]he Supreme Court has extended this [legislative] privilege to the chief counsel of a congressional subcommittee, committee staff, consultants, investigators, and congressional aides, insofar as they are engaged in legislative functions. . . . To the extent that a

---

[2] Plaintiffs do not dispute that their subpoena directly implicates the legislative privilege. Instead, they improperly seek to pierce the privilege for reasons discussed below.

legislator is cloaked with legislative immunity, an adjunct to that legislative body possesses the same immunity.") (citations omitted); *In re N.D. Leg. Assembly,* 70 F.4th 460, 463–64 (8th Cir. 2023) ("The legislative privilege . . . is not limited to a bar on inquiry into the communications among legislators and their aides" but instead extends to "[c]ommunications with constituents, advocacy groups, and others outside the legislature"); *La Union Del Pueblo Entero v. Abbott,* 93 F.4th 310, 323 (5th Cir. 2024) ("The legislative privilege applies to documents shared, and communications made, between [] legislators and . . . a third party who was brought into the legislative process."); *Almonte v. City of Long Beach,* 478 F.3d 100, 107 (2d Cir. 2007) ("Meeting with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation . . . assist legislators in the discharge of their legislative duty. These activities are also a routine and legitimate part of the modern-day legislative process."); *Gov't of V.I. v. Lee,* 775 F.2d 514, 521 (3d Cir. 1985) ("[F]act-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over pro-posed legislation."); *Bruce v. Riddle,* 631 F.2d 272, 280 (4th Cir. 1980) ("Meeting with 'interest' groups, professional or amateur, . . . is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider."). Accordingly, the Court

should decline Plaintiffs' invitation to adopt the contrary holding of a district court outside the Eleventh Circuit.

The recent Fifth Circuit decision in the *La Union del Pubelo Entero v. Abbott* line of cases compellingly illustrates this sound principle that the privilege extends to all parties to the legislative process. 93 F.4th 310 (5th Cir. 2024) (hereinafter, "*La Union II*"). In *La Union II*, a Fourteenth Amendment and Voting Rights Act case, the plaintiffs "sought documents and communications that [defendant-intervenor Harris County Republican Party ("HCRP")] exchanged with the Texas Legislature and various members of the Texas executive branch regarding" the challenged legislation. *Id.* at 314. During the deposition of Alan Vera ("Vera"), the nonparty chair of the HCRP Ballot Security Committee, the parties learned that Vera "held potentially privileged documents on his personal email and personal computer." *Id.* Consequently, the plaintiffs filed a motion to compel HCRP to produce all relevant documents contained within Vera's personal email and computer. *Id.* at 315. The district court denied Vera's invocation of legislative privilege on behalf of certain nonparty legislators and the nonparty legislators appealed. *Id.*

Turning first to Vera's invocation of the privilege, the Fifth Circuit emphatically held that "when a legislator brings third parties into the legislative process, those third parties may invoke the privilege on that legislator's behalf for

acts done at the direction of, instruction of, or for the legislator." *Id.* at 322. In so

holding, the court stated that "there is no reasoned basis to draw the line [for

invocation of the privilege] at aides and assistants" because:

> 'communications outside the legislature' such as 'private communications with advocacy groups' is 'part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider.' 68 F.4th at 236 (cleaned up). Those acts—even if performed by third parties brought into the legislative process—'occur[] within "the sphere of legitimate legislative activity."' *Id.* at 235 (quoting *Tenney*, 341 U.S. at 376, 71 S.Ct. 783).

*Id.* at 321–22. Holding that Vera could properly invoke the legislative privilege on

behalf of the nonparty legislators, the court observed:

> Vera is a third party brought into the legislative process itself. [*La Union I*, 68 F.4th at 236]. The legislators sought his comments on draft language for bills that eventually became S.B. 1. Vera also provided feedback on proposed provisions on bills that eventually became S.B. 1. He also emailed senators with suggested language to include in S.B. 1. Much like the services of a legislative aide or assistant conducting legislative acts at the behest of a legislator, Vera's acts 'occurred within "the sphere of legitimate legislative activity,"' *id.* at 235 (quoting *Tenney*, 341 U.S. at 376, 71 S.Ct. 783), and are part of 'the modern legislative process,' *Gravel*, 408 U.S. at 616, 92 S.Ct. 2614.

*Id.* at 322.

Turning to the scope of the legislative privilege, the Fifth Circuit stated that

the privilege is "'necessarily broad'" and "covers 'all aspects of the legislative

process,' including material prepared for a legislator's understanding of legislation and materials the legislator possesses related to potential legislation." *Id.* (quoting *La Union I*, 68 F.4th at 235–36). Importantly, "the privilege extends to material provided by or to third parties involved in the legislative process . . . because all of those actions occur 'within the regular course of the legislative process.'" *Id.* (quoting *La Union I*, 68 F.4th at 235, 237). Holding that the documents and communications in Vera's possession were within the scope of the privilege, the court noted:

> The legislative privilege applies to documents shared, and communications made, between the legislators and Vera. That includes Vera's emails, which contain the legislators' communications with a third party who was brought into the legislative process. [*La Union I*, 68 F.4th at 235, 237]. Vera's emails are 'part and parcel of the modern legislative process through which legislators receive information possibly bearing on the legislation they are to consider.' *Id.* at 236 (quoting *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980)). Because they were created, transmitted, and considered *within* the legislative process itself, they are protected by legislative privilege.

*Id.* at 323.

The Fifth Circuit also provided a compelling explanation of the practical and policy concerns underlying the privilege:

> [The plaintiff] identifies only one of the two purposes served by the legislative privilege. True, one purpose is to protect legislators from the cost, burden, and inconvenience of trial. But that's not all. Equally important is the privilege's function to guard against

'judicial interference' by protecting legislators from courts' seeking to 'inquire into the motives of legislators' and 'uncover a legislator's subjective intent in drafting, supporting, or opposing proposed or enacted legislation.' [*La Union I*, 68 F.4th] at 238 (citations omitted).

While [the plaintiff's] discovery request may be directed at HCRP, the materials it seeks go to the content of the legislators' communications. Discovery requests that reveal such communications, even if served on non-legislators, nonetheless burden—and therefore deter—legislators from 'the uninhibited discharge of their legislative duty.' *Id.* (quoting *Tenney*, 341 U.S. at 377, 71 S.Ct. 783). It is therefore no less burdensome to the privilege's purpose of protecting 'the exercise of legislative discretion . . . [from] judicial interference.' *Id.* (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 52, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998)).

\* \* \* \*

[The plaintiff's] . . . contentions yield an understanding of legislative privilege that protects communications with third parties in name only. And that cannot be [because] the legislative privilege's scope extends to legislators' communications with third parties. *See id.* at 236. We reject what is, in essence, 'an indirect attack on the privilege's scope.' *Id.*

*Id.* at 317–18.

In the instant case, Plaintiffs rely on the unfounded assertion of an absence of a formal "invitation" or "consulting agreement" between the Nonparty Legislators and RSS for the proposition that RSS was not "brought into the deliberative process." (Doc. 354 at 4–5). Yet, in the same breath, Plaintiffs concede that they "simply do not know . . . the manner or extent to which [RSS] was

involved in the [legislative] process."[3] (*Id.* at 8–9). Regardless, the Court should reject Plaintiffs' invitation to elevate form over substance because it ignores RSS's direct involvement in the legislative process with respect to the formulation and passage of SB5.[4] That involvement is the direct target of Plaintiffs' subpoena seeking private/non-public communications between RSS and the Nonparty Legislators regarding research, analyses, promotion, publicizing, briefing, reports generated, creation, intent, purpose, planning, passage, implementation, debate, discussions, negotiations, drafting, or enactment of SB5. (*See* Doc. 346-1). Thus,

---

[3] Contrary to Plaintiffs' assertion, a privilege log is not required for the Court's analysis. "Where a claim is 'at its core and in its entirety an inquiry into the subjective motivation' of the legislators," neither the court nor the legislators need "take a 'document-by document' approach" . . . because there is "'no need for [] lawmakers to peruse the subpoenaed documents, to specifically designate and describe which documents [are] covered by the legislative privilege, or to explain why the privilege applie[s] to those documents." *Pernell*, 84 F.4th at 1343 (quoting *Hubbard*, 803 F.3d at 1311). Thus, rather than require the legislators to prepare a privilege log and the court to engage in a lengthy "document-by-document" assessment of the documents described therein, the Eleventh Circuit simplifies the approach by focusing on the purpose of the subpoena, to wit: "If the document is sought for an impermissible purpose, ***the inquiry is over***." *Id.* (emphasis added). Even prior to *Pernell*, the Eleventh Circuit held that when making a claim of legislative privilege, "Rule 45 requires only enough description and precision to 'enable the parties to assess the claim.'" *Hubbard*, 803 F.3d at 1309 (citing Fed. R. Civ. P. 45(e)(2)(A)(iii)). *See also Mississippi State Conf. of NAACP v. State Bd. of Election Comm'rs*, No. 3:22-CV-734-DPJ-HSO-LHS, 2023 WL 8360075, at *4 (S.D. Miss. Dec. 1, 2023) ("a description of the withheld documents . . . satisfies the requirements of Rule 45(e)(2)(A)[] and no purpose would be served by compelling a detailed and time-consuming privilege log").

[4] The subpoena itself is an acknowledgment by Plaintiffs that they know, or at least suspect, that RSS was involved in the deliberative process in connection with or in aid of the Alabama Legislature's passage of SB5. Specifically, the subpoena requires RSS to produce documents or communications relating to its involvement with: "efforts to research, analyze, promote, publicize, or support the enactment of the 2023 Plan"; "the researching, creation, intent, purpose, planning, passage, or implementation of the 2023 Plan"; "studies, analyses, briefings, research, or reports" about the 2023 Plan; and "the debate, discussion, negotiations, drafting, or enactment of the 2023 Plan." (Doc. 346-1). Thus, by seeking documents, communications, or other materials created or exchanged between RSS and the Nonparty Legislators that fall within the scope of the deliberative process, the subpoena obviously contemplates RSS's participation in that process.

12

any reliance on the formalities of the RSS-Nonparty Legislators' relationship is misplaced.

Much like Vera in *La Union II*, RSS was "a third party brought into the legislative process itself." 93 F.4th at 322. RSS "engage[d] with" the Nonparty Legislators "in furtherance of [their] legislative-related activities" with respect to SB5. (Doc. 346-2 at 3, 6, 10, 13, 15, 18, 21, 26, 28). Specifically, RSS provided "individualized advice" to the Nonparty Legislators regarding the legislation and "the redrawing of Congressional district lines" to aid the Nonparty Legislators "in the performance of their legislative duties." (Doc. 347 ¶ 1). Accordingly, like Vera's acts in *La Union II*, RSS's acts "occurred within the sphere of legitimate legislative activity . . . and are part of the modern legislative process." 93 F.4th at 322 (cleaned up). As part of this collaborative, legislative process, RSS and the Nonparty Legislators exchanged "communications, conversations, work product, documents, and records." (Doc. 346-2 at 3, 6, 10, 13, 15, 18, 21, 26, 28. *See also* Doc. 347 ¶ 1). Because the legislative privilege is "necessarily broad" in scope, the "privilege applies to documents shared, and communications made, between the legislators and [RSS]." *La Union II*, 93 F.4th at 322, 323. Importantly, this "includes [RSS's own documents], which contain the legislators' communications with a third party who was brought into the legislative process," because "they

were created, transmitted, and considered *within* the legislative process itself." *Id.* at 323.

Accordingly, because both the Nonparty Legislators and RSS properly invoked the legislative privilege, (*see* docs. 346, 347), contrary to Plaintiffs' contentions, the privilege extends to all private/non-public communications between the Nonparty Legislators and RSS, a third party brought into the legislative process. Plaintiffs' subpoena seeks disclosure of those communications. Therefore, the Court should quash Plaintiffs' subpoena.

**2.    Plaintiffs' "waiver" argument fails because RSS participated in the legislative process.**

RSS participated in the legislative process. *See* Section B.1., *supra*. Therefore, there can be no waiver of the legislative privilege with respect to the private/non-public information and communications created by and exchanged between RSS and the Nonparty Legislators while engaging in that process together.

In *La Union II*, the Fifth Circuit expressly rejected the plaintiff's contrary argument which, according to the court, "relie[d] on a faulty premise." 93 F.4th at 323. There, "the legislators did not willingly relinquish control over [the third-party's] emails . . . because the legislators brought [the third-party] into the legislative process to conduct legitimate legislative acts." *Id.* The third-party's "emails were created, transmitted, and considered *within* the legislative process

14

itself, so the legislators [did] not waive[] their claims of privilege." *Id.* Stated differently, waiver did not occur because the information and correspondence were not "publicly released *outside* of the legislative process." *Id. See also La Union I,* 68 F.4th at 237 ("where [] documents have been shared with some third parties— but haven't been shared publicly—the waiver argument fails."). Closer to home, both this Court and the Middle District have applied the legislative privilege to the exchange of communications with third parties. *See, e.g., Greater Birmingham Ministries v. Merrill,* 2:15-CV-2193, Doc. 133-3 at 22, (N.D. Ala. 2017) ("the [legislative] privilege should be applied to protect legislators from having to produce documents shared with third parties or communications between themselves and third parties where they engaged in such sharing or communications for the purpose of exploring and formulating legislation."); *Thompson v. Merrill,* No. 2:16-CV-783-ECM, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020) ("activity engaged in by legislators is still protected by the legislative privilege even if there are communications with non-legislators, so long as the communications were pursuant to the proposal, formulation, and passage of legislation.").

In the instant case, Plaintiffs' waiver argument "relies on a faulty premise." Because RSS was involved in the legislative process in connection with or in aid of the passage of SB5, there can be no waiver of the privilege by virtue of the

Nonparty Legislators' exchange of information with RSS while they collaboratively engaged in that process. Accordingly, Plaintiffs' waiver argument fails, and the Court should quash Plaintiffs' subpoena.

## C.   THE COURT SHOULD QUASH THE SUBPOENA BECAUSE THE LEGISLATIVE PRIVILEGE IS ABSOLUTE IN CIVIL CASES.

### 1.   Under *Pernell*, the legislative privilege is *unqualified* in civil cases.

Plaintiffs' reliance on district court decisions outside the Eleventh Circuit for the proposition that the privilege should yield in this civil action is misplaced. Under binding United States Supreme Court and Eleventh Circuit precedent, the legislative privilege is absolute in civil cases.

The United States Supreme Court's decision in *United States v. Gillock* marks the *only* time the Court has *ever* found the legislative privilege to be qualified, holding that the legislative privilege may yield "where important federal interests are at stake, as in the enforcement of federal criminal statutes."[5] 445 U.S. 360, 373 (1980). In *Pernell*, the Eleventh Circuit recently revisited the absolute nature of the legislative privilege in civil cases. There, Chief Judge Pryor observed that "[t]he Supreme Court has *never* expanded the *Gillock* exception beyond criminal cases." *Pernell*, 84 F.4th at 1344 (emphasis added). Relying on *Gillock*'s

---

[5] In *Gillock*, a case arising in the *criminal* context, where the federal government sought discovery from a state senator accused of violating federal bribery laws, the Court noted that the privilege could be qualified because the *criminal accusations* touched on "important federal interests." *Gillock*, 445 U.S. at 373.

16

narrow holding and the strong notions of comity that underlie it, the court concluded that the legislative privilege "*is insurmountable in private civil actions*." *Id.* (emphasis added). Although Plaintiffs are correct that the *Pernell* Court recognized that "*Gillock* left open the possibility of further extension," they ignore that the Eleventh Circuit expressly declined to extend *Gillock*'s holding "absent the Supreme Court's imprimatur." *Id.* at 1344. In fact, the *Pernell* Court specifically held that, "we cannot create an 'exception whenever a constitutional claim directly implicates the government's intent' because "that exception would render the privilege 'of little value.'" *Id.* at 1345 (quoting *Lee v. City of L.A.*, 908 F.3d 1175, 1187 (9th Cir. 2018)) (cleaned up). This Court should similarly decline Plaintiffs' invitation to do so.

Plaintiffs' reliance on *Florida v. Byrd*—the only district court case within the Eleventh Circuit that Plaintiffs cite in support of a qualified legislative privilege—is similarly misplaced. 674 F. Supp. 3d 1097 (N.D. Fla. 2023). Not only does *Byrd* predate the controlling *Pernell* opinion, but more importantly, *Byrd* rejected the argument Plaintiffs now make. As the *Byrd* court observed, the plaintiffs' claim was, "essentially, that legislative privilege cannot stand up in the face of race-based-redistricting allegations." *Id.* at 1104. While the court "certainly acknowledge[d] that allegations of racial gerrymandering are serious matters," it observed that "the matter in *Village of Arlington Heights* was serious too" as it

"'also involved an equal protection claim alleging racial discrimination—putting the government's intent directly at issue.'" *Id.* (quoting *Lee*, 908 F.3d at 1188). Accordingly, the court concluded that the plaintiffs had not shown "extraordinary [circumstances] [under] which legislative privilege must yield to federal interests." *Id.*

In sum, the *Pernell* Court held that the legislative privilege is unqualified in civil actions. For this reason, the Court should quash Plaintiffs' subpoena.

## 2. *Pernell* expressly rejected the balancing test Plaintiffs urge the Court to adopt.

Finally, the Court should reject Plaintiffs' invitation to adopt the five-factor balancing test first articulated in the legislative privilege arena by the United States District Court for the Southern District of New York in *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 100–01 (S.D.N.Y. 2003). (Doc. 354 at 15–19). *No* Circuit Court of Appeals has adopted the balancing test approach. *See Pernell*, 84 F.4th at 1345. But more importantly, the Eleventh Circuit became the fifth Court of Appeals to expressly reject a balancing test to determine the applicability of the legislative privilege. *Id.* The *Pernell* Court found that the balancing test was "'not persuasive on its own terms,'" and concluded that "absent the Supreme Court's imprimatur," the Eleventh Circuit would not "adopt [the] manipulable balancing test . . . that links the derogation of the legislative privilege to a subjective judgment of the case's importance." *Id.* at 1344, 1345.

Thus, the Eleventh Circuit has spoken and has roundly rejected application of a balancing test in determining the applicability the legislative privilege. For this additional reason, the Court should quash Plaintiffs' subpoena.

### III.   CONCLUSION

Based on the foregoing, as well as the reasons set forth in the Nonparty Legislators' Motion to Quash, the Court should quash the RSS subpoena pursuant to Rule 45(d)(3)(A)(iii) of the Federal Rules of Civil Procedure because it inquires into legislative acts and/or the motivation for the actual performance of legislative acts shielded from discovery by the legislative privilege.

Respectfully submitted,

/s/ Christopher W. Weller
CHRISTOPHER W. WELLER ASB-6640-W81C
J. MITCHELL SIKES ASB-1631-L00G

As Attorneys for Members of the State of Alabama Senate Dan Roberts, Will Barfoot, and Former Senator Clay Scofield, and Members of the Alabama House of Representatives Jim Carns, Jamie Kiel, Arnold Mooney, Earnie Yarbrough, Mack Butler, and Rick Rehm

OF COUNSEL:
**CAPELL & HOWARD, P.C.**
150 South Perry Street (36104)
P.O. Box 2069
Montgomery, AL 36102-2069
Telephone: (334) 241-8000
Facsimile: (334) 323-8888
Email:       Chris.Weller@chlaw.com
Email:       Mitchell.Sikes@chlaw.com

## CERTIFICATE OF SERVICE

I certify that on the 20th day of May, 2024 I electronically filed the foregoing with the Clerk of the Court using the CM/CF system which will send notification of such filing to all counsel of record.

/s/Christopher W. Weller
Of Counsel