## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| BOBBY SINGLETON, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-1291-AMM |
| | ) | |
| Hon. WES ALLEN, in his official | ) | **THREE-JUDGE COURT** |
| capacity as Secretary of State, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

| | | |
|---|---|---|
| EVAN MILLIGAN, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-1530-AMM |
| | ) | |
| Hon. WES ALLEN, in his official | ) | **THREE-JUDGE COURT** |
| capacity as Secretary of State, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants alert this Court to the Supreme Court's recent decision in *Alexander v. South Carolina State Conference of the NAACP*, 144 S. Ct. 1221 (2024), which reversed the district court's judgment that race predominated in the design of District 1 in South Carolina's 2022 congressional plan. The decision provides further support for Defendants' arguments that the constitutional claims raised by the *Singleton* and *Milligan* Plaintiffs should be dismissed.

1

Following the 2020 Census, the South Carolina General Assembly sought "to create a stronger Republican tilt in District 1" of the State's congressional redistricting plan. *Id.* at 1237. Using partisan data, the map drawer accomplished this goal by moving "roughly 193,000 residents between the districts …." *Id.* at 1238. The Enacted Map increased "District 1's projected Republican vote share by 1.36% to 54.39%." *Id.* Enacted District 1 "also had a slightly higher BVAP, rising from 16.56% to 16.72%." *Id.* Even so, "[t]he Enacted Plan retain[ed] 83% of District 1's core" from the predecessor plan. *Id.* at 1245.

The NAACP and an individual voter challenged the 2022 Plan in federal court on the ground "that Districts 1, 2, and 5 were racially gerrymandered and that these districts diluted the electoral power of the State's black voters" in violation of the Equal Protection Clause. *Id.* at 1238. The three-judge District Court agreed with respect to District 1 and enjoined the State's use of the 2022 Plan. *Id.* South Carolina appealed. Last week, the Supreme Court reversed the racial gerrymandering judgment and remanded for the district court to conduct a proper intentional vote dilution analysis.

The Supreme Court provided additional guidance regarding how the presumption of good faith should be given effect in cases alleging race-based action by a legislature. The Court explained that at least three "constitutional interests" "justify this presumption": (1) "due respect for the judgment of state legislators";

(2) reluctance in "declaring that the legislature engaged in offensive and demeaning conduct"; and (3) wariness toward "plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Id.* at 1236 (cleaned up). And, in the redistricting context in particular, the presumption "ensures that 'race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 913 (1995)).

The Supreme Court held that the presumption "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Id.* at 1235-36 (citing *Abbott v. Perez*, 585 U.S. 578, 610-12 (2018)). Thus, "the presumption of legislative good faith" requires that courts give "dispositive" weight to any "possibility" that a racial outcome "was simply a side effect of the legislature's" non-racial goals, rather than the goal itself. *Id.* at 1241; *see also id.* at 1269 (Kagan, J., dissenting).

Moreover, courts should not "infer[] bad faith based on the racial effects of a political gerrymander in a jurisdiction in which race and partisan preference are very closely correlated." *Id.* at 1241-42. Otherwise, "future litigants and lower courts" could easily "sidestep [the Court's] holding in *Rucho*[1] that partisan-gerrymandering claims are not justiciable in federal court." *Id.* at 1242.

---

[1] *Rucho v. Common Cause*, 588 U.S. 684 (2019).

3

In light of these principles, the Supreme Court held that the district court "critically erred by failing to draw an adverse inference against the Challengers for not providing a substitute map that shows how the State could have achieved its legitimate political objectives in District 1 while producing significantly greater racial balance." *Id.* at 1249 (internal quotation marks omitted). This "adverse inference may be dispositive in many, if not most, cases where the plaintiff lacks direct evidence or some extraordinarily powerful circumstantial evidence such as the 'strangely irregular twenty-eight-sided' district lines in *Gomillion v. Lightfoot*, 364 U. S. 339, 341 (1960), which betrayed the State's aim of segregating voters on the basis of race with 'mathematical' precision, *ibid*." *Id*. at 1250. "Without an alternative map, it is difficult for plaintiffs" alleging race-based districting to "rul[e] out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Id.* at 1235; *see also id.* at 1241 ("And the Challengers cannot point to even one map in the record that would have satisfied the legislature's political aim and had a BVAP above 17%."); *id.* at 1244 (Dr. Imai failed to "generat[e] maps" "matching or exceeding the Benchmark Plan's Republican tilt."); *id.* at 1249 ("When all plaintiffs can muster is meager direct evidence of a racial gerrymander only an alternative map of that kind can carry the day." (quoting *Cooper v. Harris*, 581 U.S. 285, 322 (2017) (cleaned up)); *cf.* at 1273-74 (Kagan, J., dissenting). Thus, the plaintiffs' failure to "contro[l] for politics" when generating "tens of thousands

of other maps" constituted "a fatal omission." *Id.* at 1244, 1250, 1251. The absence

from the record of such "highly probative evidence" "should be interpreted by dis-

trict courts as an implicit concession that the plaintiff cannot draw a map that under-

mines the legislature's defense that the districting lines were 'based on a permissible,

rather than a prohibited, ground.'" *Id.* at 1250 (quoting *Cooper*, 581 U.S. at 317).

The district court's failure to follow "this basic logic" was clearly erroneous. *Id.*[2]

The Supreme Court's *Alexander* decision confirms that the constitutional

claims of the *Singleton* and *Milligan* Plaintiffs fail because Plaintiffs have not

pleaded facts sufficient to overcome the "presumption that the" Alabama Legislature

"acted in good faith" when it enacted the 2023 Plan for Alabama's congressional

districts. *Id.* at 1233. Neither set of Plaintiffs alleges "[d]irect evidence" such as "a

relevant state actor's express acknowledgment that race played a role in the drawing

of district lines." *Id.* at 1234. They thus rely on circumstantial evidence. But even on

the face of the complaints, it is clear the alleged "evidence … could plausibly support

multiple conclusions" besides racial discrimination. *Id.* at 1236. "None of the facts

on which the" Plaintiffs rely "to infer a racial motive is sufficient to support an in-

ference that can overcome the presumption of legislative good faith." *Id.* at 1241.

---

[2] Just as a district court "must rule out the possibility that politics drove the district-ing process" "in a case such as this," *id.* at 1243, a court must also "rule out core retention as another plausible explanation for the difference between the Enacted Plan" and an alternative plan, *id.* at 1245, 1249. The same goes for other "key map-making factors" like "contiguity and compactness." *Id.* at 1245, 1248.

Starting with the *Milligan* Plaintiffs, their complaint contains allegations "that could plausibly support multiple" legitimate reasons for the 2023 Plan. *Id.* at 1236. For example, they allege that a Republican representative from Baldwin County "called the 2023 special session 'an opportunity'" to enact a map that would result in "seven Republican congressmen" in 2024. *Milligan* Doc. 329 ¶ 187. The *Milligan* Plaintiffs then allege that "[w]hen the Legislature's expert analyzed how the 2023 Plan would perform for Black-preferred candidates in seven statewide contests in 2018 and 2020, Black-preferred candidates"—all Democrats—"lost in the new CD2 in all seven elections." *Id.* ¶ 188. But "because of the tight correlation between race and partisan preferences, this fact does little to show that race, not politics, drove the legislature's choice." *Alexander*, 144 S. Ct. at 1242. These allegations are "strong evidence that the district's" performance for "Black-preferred candidates" "was simply a side effect of the legislature's partisan goal" of sending six Republicans to Congress. *Id.* at 1241. Or perhaps, as the *Milligan* Plaintiffs allege, the Legislature wanted to avoid "pairing incumbents." *Milligan* Doc. 329 ¶ 42. "[C]ertainly nothing rules out" these constitutionally permissible "possibilit[ies]," and that fact is "dispositive." *Alexander*, 144 S. Ct. at 1241. It would be clear error to "credit[] the less charitable conclusion that the legislature's real aim was racial." *Id.* at 1242.

The *Singleton* Plaintiffs' constitutional claims fail for similar reasons. They allege that the 2023 Legislature rejected their preferred alternative plans because

6

"they would have provided two districts in which Black voters would have an equal opportunity to elect candidates of their choice." *Singleton* Doc. 229 ¶ 77. Their alternative plans contain two reliably Democratic "crossover districts." *Id.* ¶¶3, 10-12, 40, 64, 74. But these allegations raise partisanship as a plausible alternative for the Legislature's decision. And the failure of these maps to "match[] or exceed[] the Benchmark Plan's Republican tilt" means they cannot undermine a partisanship defense. *Alexander*, 144 S. Ct. at 1244. None of them contain just *one* reliably Democrat district (thereby "achieving the legislature's political goals") with "significantly greater racial balance." *Id.* at 1249, 1251.

Further, the *Singleton* Plaintiffs admit that the Singleton Plan is "less compact than the 2023 enacted plan," Doc. 229 ¶ 59, so it is plausible the Legislature simply preferred a more compact plan. And the *Singleton* Plaintiffs also admit that the 2023 Plan preserves the core of District 7 from preceding plans. *Id.* ¶ 68. Thus, "we cannot rule out core retention as another plausible explanation for the difference between the Enacted Plan and the" *Singleton* Plaintiffs' preferred plans. *Alexander*, 144 S. Ct. at 1245. The same is true when it comes to "preventing any incumbent conflict." *Singleton* Doc. 229 ¶ 56.

While *Alexander* resolved only the plaintiffs' racial gerrymandering challenge, the Supreme Court's clarification of how the presumption of legislative faith functions in redistricting challenges confirms that all the constitutional challenges

leveled by the *Milligan* and *Singleton* Plaintiffs should be dismissed. The presumption of good faith applies to both racial gerrymandering and vote dilution claims. Indeed, in *Abbott v. Perez*, 585 U.S. 579, 610-12 (2018) (relied on in *Alexander*, 144 S. Ct. at 1236), the Supreme Court reversed a finding of intentional discrimination made in a challenge to Texas's districting plan because the district court failed to give effect to the presumption. The district court had "look[ed] to the Supreme Court's decision in *Arlington Heights* for guidance in analyzing whether invidious discriminatory purpose was a motivating factor in a government body's decisionmaking." *Perez v. Abbott*, 274 F. Supp. 3d 624, 643 (W.D. Tex. 2017). The district court devoted several pages of analysis to walking through evidence of "intentional vote dilution claims," *id.* at 645; *see also generally id.* at 645-52, including evidence that the predecessor plan bore "the taint of discriminatory intent," *id.* at 648, discriminatory "effects continu[ed]" from the old plan to the new, *id.* at 649 (cleaned up), and "the Legislature pushed the redistricting bills through quickly in a special session" without "consider[ing]" certain alternatives, *id.* Even so, the Supreme Court held that this evidence was not "strong enough to overcome the presumption of legislative good faith." *Abbott*, 585 U.S. at 610. It is thus clear that the numerous "constitutional interests" (*Alexander*, 144 S. Ct at 1236) advanced by the presumption are implicated whether a plaintiff is alleging that a legislature's secret motives for a facially neutral law are racial vote dilution or racial gerrymandering.

In sum, for the reasons given in Defendants' motions to dismiss and in *Alexander*, Plaintiffs' constitutional claims fail at the pleadings stage. "[N]othing" in either complaint "rules out th[e] possibility" the 2023 Plan was enacted to advance traditional districting principles or partisan goals. *Id*. at 1241. "In light of the presumption of legislative good faith, that possibility is dispositive." *Id.*

Steve Marshall
  *Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Soren Geiger (ASB-0336-T31L)
  *Assistant Solicitor General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama  36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

9

Charles.McKay@AlabamaAG.gov

***Counsel for Secretary of State Allen***

*s/ Dorman Walker*
Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

Michael P. Taunton (ASB-6853-H00S)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203
Telephone: (205) 226-3451
Email: mtaunton@balch.com

***Counsel for Sen. Livingston and Rep. Pringle***

10

## CERTIFICATE OF SERVICE

I certify that on May 31, 2024, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

s/    Edmund G. LaCour Jr.
Counsel for Secretary Allen