# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **EVAN MILLIGAN, *et al.*,**<br>**Plaintiffs,**<br><br>v.<br><br>**WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*,**<br>        **Defendants.** | Case No. 2:21-cv-01530-AMM<br><br>THREE-JUDGE COURT |

Before MARCUS, Circuit Judge, MANASCO and MOORER, District Judges.

BY THE COURT:

## ORDER

This congressional redistricting case is before the Court on fully briefed Motions to Quash filed by nine Nonparty Legislators, Doc. 346, and RedState Strategies, LLC ("RedState"), Doc. 347. *See also* Docs. 353, 354, 356 (responses and reply). The Nonparty Legislators are Alabama Senators Dan Roberts and Will Barfoot, former Alabama Senator Clay Scofield, and Alabama Representatives Jim Carns, Jamie Kiel, Arnold Mooney, Ernie Yarbrough, Mack Butler, and Rick Rehm. Doc. 346. RedState is a full-service political consulting firm, and its president is

Christopher Brown. *Id.*; *see* Doc. 364-2 at 10–11, 207.[1]

The Nonparty Legislators and RedState ask us to quash a subpoena the Plaintiffs directed to RedState seeking the production of documents and information about RedState's work for and communications with the Nonparty Legislators in connection with the Alabama Legislature's adoption of a congressional redistricting plan in the summer of 2023 ("SB5"). Docs. 346, 347; *see* Doc. 346-1 (subpoena). Plaintiffs' subpoena broadly sought five categories of documents from RedState concerning documents or communications between RedState and the Nonparty Legislators. Doc. 346-1. These requests are:

> **DOCUMENT REQUEST NO. 1:** All communications between [RedState] and Defendants, including, but not limited to, correspondence, memoranda, electronically stored information, and documents, in your custody, possession, or control, that relate to any of [RedState's] or Defendants' efforts to research, analyze, promote, publicize, or support the enactment of the 2023 Plan or any alternative or predecessor plan developed in June or July of 2023.
>
> **DOCUMENT REQUEST NO. 2:** All documents or communications between [RedState] and Defendants, or other members of the Alabama Legislature, or any staff in the offices of the Secretary of State, the Governor of Alabama, or the Attorney General, or their predecessors in

---

[1] Pincites are to the CM/ECF page number in the top right-hand corner of the page, if such a number is available.

office, that relate to this litigation without limitation on time.

**DOCUMENT REQUEST NO. 3:** All documents or communications between [RedState] and Defendants, or other members of the Alabama Legislature, or any staff in the offices of the Secretary of State, the Governor of Alabama, or the Attorney General, or their predecessors in office, regarding the researching, creation, intent, purpose, planning, passage, or implementation of the 2023 Plan or any alternative or predecessor plan developed in June or July of 2023.

**DOCUMENT REQUEST NO. 4:** All documents that relate to any studies, analyses, briefings, research, or reports generated or undertaken by [RedState] on the subject of the 2023 Plan, or any alternative or predecessor plan developed in June or July of 2023.

**DOCUMENT REQUEST NO. 5:** All documents or communications relating to [RedState's] position in support or opposition to, or role in the debate, discussions, negotiations, drafting, or enactment of the 2023 Plan or any alternative or predecessor plan developed in June or July of 2023.

Doc. 346-1 at 8.

The Nonparty Legislators and RedState assert that the subpoena seeks information protected by legislative privilege—namely, information about legislative acts by the Nonparty Legislators and their motivations for the performance of those acts. Doc. 346 at 1–2; Doc. 347 at 1. The Nonparty Legislators assert that their legislative privilege "extends to the exchange of information or

3

communications between state legislators and . . . consultants or other third-parties for the purpose of exploring and formulating legislation." Doc. 346 at 10. The Nonparty Legislators rely on *Pernell v. Florida Board of Governors of State University*, 84 F.4th 1339 (11th Cir. 2023), and they argue that no federal circuit court has "abrogated the legislative privilege in a redistricting case." Doc. 346 at 14–18.

RedState adopted the Nonparty Legislators' arguments and alerted us that it had produced electronic communications between Brown and Senator Steve Livingston, who is a party to the action and who had previously waived legislative privilege. *See* Doc. 347 at 2; *see also* Doc. 71.

We set the motions for a public hearing to occur on June 20, 2024, and ordered the Nonparty Legislators and RedState to "be prepared to offer evidence necessary to support their claims of privilege." Doc. 361 at 1.

The day before the hearing, the Nonparty Legislators filed a substantial body of evidence in support of their claimed privilege. Doc. 364. The submission included sworn declarations from each of the Nonparty Legislators concerning their relationships and communications with Brown, *see* Doc. 364-1; a transcript of a deposition of Brown, together with exhibits, *see* Doc. 364-2; certified Fair Campaign Practices Act expenditure reports demonstrating that the Nonparty Legislators paid

4

Brown using campaign funds, *see* Doc. 364-3; and a privilege log setting forth the date, sender, recipient(s), and nature of each communication for which legislative privilege protection is claimed, *see* Doc. 364-4.

At the hearing, we heard arguments from able counsel and live testimony from Brown, who was made available by RedState and was called by the Plaintiffs. *See* Doc. 367 at 39. Brown was examined by all parties and questioned directly by the Court as well. *See* Doc. 367 at 39–67. Brown was a credible witness.

It is by now well established that state legislators, like members of Congress, enjoy an evidentiary privilege from subpoenas seeking information about legislative acts or the motivation behind legislative acts. *See Pernell*, 84 F.4th at 1344–45. This state legislative privilege is a federal common-law creation based on the Speech or Debate Clause of the Federal Constitution, U.S. CONST. art. I, § 6, cl. 1, which, in turn, protects members of Congress "against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Gillock*, 445 U.S. 360, 366–67 (1980) (quoting *United States v. Brewster*, 408 U.S. 501, 525 (1972)). The Speech or Debate Clause itself does not apply directly to state legislators. *See id.* at 366 & n.5.

The application of a Speech-or-Debate-type privilege to state legislators is generally justified by the rationale that federal courts should not unduly disrupt the

state legislative process. *See id.* at 371 (recognizing "the potential for disruption of the state legislative process" when state legislators are sued in federal court (citing *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951))); *Pernell*, 84 F.4th at 1343 (explaining that the legislative "'privilege extends to discovery requests' because 'complying with such requests detracts from the performance of official duties'" (quoting *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015))). The federal courts also afford state legislators a privilege out of respect for "principles of comity." *Gillock*, 445 U.S. at 371; *see also Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 87 (1st Cir. 2021) (observing that "principles of comity" and "the interests in legislative independence" support legislative immunity for state legislators (citation omitted)).

Legislative privilege affords legislators two kinds of protections. It confers "immunity from civil suit for acts related to legislative proceedings." *Pernell*, 84 F.4th at 1343. And it confers an evidentiary privilege that protects legislators from discovery requests. *Id.* The Supreme Court has recognized that state legislators enjoy immunity from civil suit but has not yet decided whether state legislators also enjoy the corresponding evidentiary privilege. *See Tenney*, 341 U.S. at 376–77 (holding that state legislators have legislative immunity from civil suit); *Gillock*, 445 U.S. at 372–73 (concluding that, "though principles of comity command careful

consideration," state legislators do not have an evidentiary privilege in federal criminal cases—but leaving for another day whether such a privilege might apply in civil cases). The Eleventh Circuit, however, like several other circuit courts of appeals, has recognized an evidentiary privilege based on the Speech or Debate Clause for state legislators. *See Pernell*, 84 F.4th at 1344; *Am. Trucking Ass'ns*, 14 F.4th at 87–90; *La Union del Pueblo Entero v. Abbott*, 93 F.4th 310, 323–25 (5th Cir. 2024); *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018); *see also In re N.D. Legis. Assembly*, 70 F.4th 460, 465 (8th Cir. 2023), *vacated on other grounds sub nom. Turtle Mountain Band v. N.D. Legis. Assembly*, No. 23-847, 2024 WL 3259672 (U.S. July 2, 2024).

In *Pernell*, the Eleventh Circuit recently explained that "[a]lthough the core of [legislative] privilege is a state legislator's immunity from civil suit for acts related to legislative proceedings, . . . this 'privilege extends to discovery requests' because 'complying with such requests detracts from the performance of official duties.'" 84 F.4th at 1343 (quoting *In re Hubbard*, 803 F.3d at 1310). "So, where a discovery request 'inquir[es] into legislative acts or the motivation for actual performance of legislative acts,' state legislators can 'protect the integrity of the legislative process' by invoking the privilege to quash the request." *Id.* (quoting *Bryant v. Jones*, 575 F.3d 1281, 1304–05 (11th Cir. 2009)). The Eleventh Circuit

7

held that legislative privilege is unqualified in the civil context for subpoenas issued to state legislators seeking to probe their legislative conduct. *See id.* at 1344 (declining to "except civil-rights actions from the application of the legislative privilege").

Neither the Supreme Court nor the Eleventh Circuit, however, has decided whether the legislative privilege may be invoked by a third party acting on behalf of a legislator. Still, logic, common sense, and precedent counsel in favor of finding that third parties may invoke the legislative privilege in appropriate circumstances.

At its core, the legislative privilege "is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d 1185, 1193 (11th Cir. 1993) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)) (discussing legislative immunity). We are therefore called upon to determine whether a person may assert the privilege based on the "nature of the act" being performed, rather than the job title the person may hold. *Id.* (quoting *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062 (11th Cir. 1992)).

It is settled law that the legislative privilege may be invoked by legislators, their aides, or assistants. The Supreme Court has observed that "it is literally impossible, in view of the complexities of the modern legislative process, . . . for Members of Congress to perform their legislative tasks without the help of aides and

assistants" and so the legislative privilege "prohibits inquiry into things done by [a legislator's] agent or assistant which would have been legislative acts, and therefore privileged, if performed by the [legislator] personally." *Gravel*, 408 U.S. at 616 (citation omitted).

The same can be said of third parties: "[m]uch like the services of a legislative aide or assistant conducting legislative acts at the behest of a legislator," consultants and other third parties may also assist legislators in conducting quintessentially legislative acts. *See La Union del Pueblo Entero*, 93 F.4th at 322. These third parties, no less than a legislator's aides and assistants, sometimes perform acts that fall "within 'the sphere of legitimate legislative activity'" and as a part of "'the modern legislative process.'" *Id.* (first quoting *Tenney*, 341 U.S. at 376, then quoting *Gravel*, 408 U.S. at 616). The scope of the privilege is defined by the nature of the act performed, again, not by the privilege-seeker's title. Thus, third parties who perform classic legislative work on behalf of the state legislature or its members may assert a legislative privilege just as clearly as a legislative aide on the payroll of the legislator could. This conclusion is consistent with the Eleventh Circuit's recognition, in the immunity context, that a "derivative legislative immunity" may be asserted by third parties who are "engaged in legislative functions." *Ellis*, 981 F.2d at 1192.

Only one Circuit appears to have considered whether the state legislative privilege also protects a third party from complying with a subpoena seeking communications between the third party and state legislators about the performance of legislative acts—and it reached the same conclusion we do. The Fifth Circuit in *La Union del Pueblo Entero v. Abbott*, 93 F.4th 310 (5th Cir. 2024), recently concluded that any third party brought into the legislative process by a state legislator "may invoke the privilege on that legislator's behalf for acts done at the direction of, instruction of, or for the legislator." *Id.* at 322. The Eighth Circuit has reached the distinct, but related, conclusion that state legislators may assert legislative privilege over their communications with third parties. *In re N.D. Legis. Assembly*, 70 F.4th at 464 (vacated on other grounds).

Plainly, it is the burden of the movant invoking the privilege to establish that the privilege applies—whether the privilege is sought by the legislator, his aide, or a third party. *See In re Grand Jury Investigation*, 842 F.2d 1223, 1225 (11th Cir. 1987) (the party invoking a privilege bears the burden to prove its existence); *see also Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 524 (3d Cir. 1985) (the party asserting legislative privilege bears "the burden of establishing the applicability of legislative immunity, by a preponderance of the evidence").

If the legislative privilege applies, it is a broad one. "[W]here a claim is 'at its

10

core and in its entirety an inquiry into the subjective motivation' of the legislators," the Eleventh Circuit has rejected "a 'document-by-document' approach," by which the person asserting privilege must provide a privilege log explaining, as to each document, why the document is covered by the privilege. *Pernell*, 84 F.4th at 1343 (quoting *In re Hubbard*, 803 F.3d at 1311).

As we see it, then, a third party who is acting "at the direction of, instruction of, or for a legislator," *La Union del Pueblo Entero*, 93 F.4th at 322, may assert legislative privilege to the same extent that a legislator could if he were performing those acts, *see Gravel*, 408 U.S. at 616.

RedState has properly asserted legislative privilege over the work it has performed for each of the Nonparty Legislators—and therefore enjoys protection from the disclosure of these documents and communications—because it has demonstrated that (1) the Plaintiffs' subpoena to RedState inquires into RedState's knowledge of and communications about legislative acts and the performance of those acts, and (2) RedState was acting at the direction of each of the Nonparty Legislators on matters falling squarely within the legislative sphere.

First, RedState has established that the subpoena inquires into legislative acts or the motivation behind such acts, which is an "impermissible purpose." *Pernell*, 84 F.4th at 1343. The subpoena's language is sweeping. It includes, among other

11

things, requests for "[a]ll communications" relating to RedState's "efforts to research, analyze, promote, publicize, or support the enactment of the 2023 Plan"; "[a]ll documents or communications . . . regarding the researching, creation, intent, purpose, planning, passage, or implementation of the 2023 Plan"; and "[a]ll documents or communications relating to [RedState's] position in support or opposition to, or role in the debate, discussions, negotiations, drafting, or enactment of the 2023 Plan." Doc. 346-1 at 8. These requests plainly "inquir[e] into legislative acts" *and* inquire into "the motivation for actual performance of legislative acts," *Pernell*, 84 F.4th at 1343 (quoting *Bryant*, 575 F.3d at 1304), by seeking documents relating not only to RedState's efforts to assist the named legislators in the study and enactment of the 2023 Plan, but also as to their "intent" and "purpose." *See* Doc. 346-1 at 8. "If the document is sought for an impermissible purpose," as this one is, "the inquiry is over," *Pernell*, 84 F.4th at 1343—so long as RedState can show that it was entitled to assert the legislative privilege in the first place.

The record further shows that RedState was acting "at the direction of, instruction of, or for" the Nonparty Legislators, *La Union del Pueblo Entero*, 93 F.4th at 322, and performing acts "which would have been legislative acts, and therefore privileged, if performed by the [legislator] personally," *Gravel*, 408 U.S. at 616 (citation omitted).

12

In each of the nine Nonparty Legislators' declarations, the declarant unambiguously averred that he had brought Brown into the legislative process. *See* Doc. 364-1 at 3–4 (declaration of Sen. Will Barfoot); *id.* at 6–7 (declaration of Rep. Mack Butler); *id.* at 9–10 (declaration of Rep. Jim Carns); *id.* at 12–13 (declaration of Rep. Jamie Kiel); *id.* at 15–16 (declaration of Rep. Arnold Mooney); *id.* at 18–19 (declaration of Rep. Rick Rehm); *id.* at 22 (declaration of Sen. Dan Roberts); *id.* at 25–26 (declaration of former Sen. Clay Scofield); *id.* at 28–29 (declaration of Rep. Ernie Yarbrough). Each Nonparty Legislator declared that he had engaged Brown's services concerning fundamental legislative issues, specifically including the codification of SB5. *See id.* at 3, 6–7, 9–10, 12–13, 15–16, 18–19, 21–22, 25–26, 28–29. During Brown's June 18 deposition, he testified that the Nonparty Legislators themselves engaged the services of RedState. *See* Doc. 364-2 at 12 ("Q. Okay. Who initiates these engagements between RedState and the clients that you serve? A. The candidate, elected official, what have you. Q. Is that always the case? A. Yes.").

Brown also testified at the evidentiary hearing about the scope of RedState's services, explaining that RedState "offer[ed] advice during the legislative session on bills that [the legislators are] considering," which "include[d] bills that relate to redistricting." *See* Doc. 367 at 53–54; *see also id.* at 56–58. Additionally, he confirmed to the Court that he provided "advice and counsel" for the development

13

of SB5 to each of the Nonparty Legislators. *See* Doc. 367 at 62. Among other things, Brown used Maptitude during the 2023 special session to assist in the development of Alabama's congressional redistricting plans. *See* Doc. 364-2 at 17, 20–21.

This body of evidence establishes that the Nonparty Legislators sought Brown's advice and counsel about the passage of SB5. It is hard to imagine a more basic legislative function than drawing districting maps. *See Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1233 (2024) ("Redistricting constitutes a traditional domain of state legislative authority."); *see also* U.S. CONST. art. I, § 4, cl. 1. The Nonparty Legislators therefore brought RedState into the legislative process and directed Brown to assist them in the performance of their legislative work. *See La Union del Pueblo Entero*, 93 F.4th at 322.

It is also clear from the substantial evidentiary record that RedState was paid by the legislators. At the evidentiary hearing, Brown testified that RedState always receives monetary compensation for its services, *see* Doc. 367 at 54–55; that his services were offered "[o]nly [to his] clients," not "to just any legislator," *see* Doc. 367 at 54; and that his clients sought his "advice about the congressional districting bill," *see* Doc. 367 at 56. Brown testified that he was "paid by these legislators from time to time," upon submission of an invoice for his services. *See* Doc. 367 at 54.

In response to questions posed by the Court during the June 20 hearing, Brown

also said that no one else apart from his legislative clients compensated him in any way for his work concerning the drafting and codification of SB5. *See* Doc. 367 at 61, 64 (affirming that "no one else paid the freight for [him] to provide . . . advice and counsel to [the Nonparty Legislators] about SB5"). He explained that he was paid by these legislators "from their campaign accounts." Doc. 367 at 54. The evidentiary documents support his testimony about the payment procedures he employed. *See* Doc. 364-3 (certified Fair Campaign Practices Act expenditure reports produced by the Nonparty Legislators demonstrating that each of the nine Nonparty Legislators paid RedState using campaign funds); Doc. 364-1 at 3 (declaration of Senator Barfoot articulating that he paid Brown for RedState's consulting services from his "campaign account").

There is no evidence in the record that any other person or entity paid RedState for its consulting work concerning the development and adoption of SB5. In short, the evidence establishes that RedState worked at the direction of the nine legislators, and for no one else, in this respect.

The long and short of it is that each of the Nonparty Legislators engaged RedState and its president, Christopher Brown, to perform a basic legislative function. It seems indisputable to us that the development of SB5 was "an integral part of the deliberative and communicative processes by which [the legislators]

15

participate[d] in [legislative] proceedings with respect to the consideration and passage or rejection of proposed legislation." *Gravel*, 408 U.S. at 625. The Nonparty Legislators retained RedState to perform acts that were well "within the 'sphere of legitimate legislative activity,'" *id.* at 624 (quoting *Tenney*, 341 U.S. at 376), and so RedState was entitled to invoke the privilege.

\* \* \*

Accordingly, legislative privilege shields the discovery sought, and we **GRANT** the motions to quash.

**DONE** and **ORDERED** this 12th day of July, 2024.

_____
**STANLEY MARCUS**
UNITED STATES CIRCUIT JUDGE

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

_____
**TERRY F. MOORER**
UNITED STATES DISTRICT JUDGE