# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| EVAN MILLIGAN, *et al.*, | |
| Plaintiffs, | Case No. 2:21-cv-01530-AMM |
| v. | THREE-JUDGE COURT |
| WES ALLEN, *et al.*, | |
| Defendants. | |
| MARCUS CASTER, *et al.*, | |
| Plaintiffs, | Case No.: 2:21-cv-1536-AMM |
| v. | |
| WES ALLEN, in his official capacity as Alabama Secretary of State, | |
| Defendant. | |

### *MILLIGAN* AND *CASTER* PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE IN PART THE TESTIMONY OF DEFEDANTS' EXPERT DR. WILFRED REILLY

Plaintiffs respectfully request that the Court exclude the testimony of Defendants' expert Dr. Wilfred Reilly about communities of interest, specifically as to "shared commonalities" among Mobile, the Black Belt, and Baldwin County, as well as the strength of "the historical ties between Mobile and the Black Belt." Reilly

1

Expert Report at 5 (Ex. A) ("Reilly Report"). Dr. Reilly lacks the requisite qualifications and expertise to opine as to these areas, which require an "intensely local appraisal of the design and impact" of the 2023 congressional redistricting plan. *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) (quoting *Rogers v. Lodge*, 458 U.S. 613, 621–22 (1982)).

Dr. Reilly is "not a historian," Deposition Transcript of Wilfred Reilly, Aug. 30, 2024 at 25:6-23 (Ex. B) ("Milligan Dep."), and "not a professional expert on Southern politics," Deposition Transcript of Wilfred Reilly, May 2, 2024 at 52:2-6 ("Stone Dep.") (Ex. C). None of his academic research has focused on Alabama or even discussed communities of interest. Milligan Dep. at 78:13-15, 79:10-19, 84:2-5. Instead, Dr. Reilly seeks to opine on these highly localized and historical factors on the asserted basis that he understands the "the general idea of a comparable community" that would be used by "many political scientists" (though none whom he actually identifies), as well as by "anyone who's a professional seller or frequent buyer of real estate." *Id.* at 89:19-25. Rather than academic or historical sources, Dr. Reilly cites Wikipedia to identify and define communities of interest in Alabama. Reilly Report at 2 n.7. But this generic assessment resembles the same "partial, selectively informed, and poorly supported" testimony of Defendants' former expert Thomas Bryan, which this Court previously (and correctly) declined to credit. *Allen*

*v. Milligan,* 599 U.S. 1, 21 (2023) (quoting *Milligan v. Merrill* ("*Milligan I*"), 582 F. Supp. 3d 924, 1015 (N.D. Ala. 2022) (three-judge court)).

Because Dr. Reilly lacks the expertise to opine on the history, identity, and culture of Alabama communities, or on the specific relationships among such communities, the Court should exclude those opinions.

## LEGAL STANDARD

Expert testimony must be offered by a qualified witness and be reliable and relevant to be admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); Fed. R. Evid. 702. Federal Rule of Evidence 702 "militates against [the] general policy" of "liberal admission of evidence" by "giving courts discretion to preclude expert testimony unless it passes more stringent standards of reliability and relevance." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999). Relevant here, the Court's gatekeeping function involves "rigorous" inquiry into whether "the expert is qualified to testify competently regarding the matters he intends to address," and whether "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (citation omitted). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Id*.

3

# ARGUMENT

## I. DR. REILLY IS NOT QUALIFIED TO OPINE ON COMMUNITIES OF INTEREST.

An expert must be "qualified by background, training, and expertise to testify competently regarding the matters he intends to address." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1027 (11th Cir. 2014). Rule 702's use of the word "knowledge" to describe an expert's qualifications "connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. An expert's qualification "is assessed in reference to the matter to which the expert seeks to testify—i.e., 'to the task at hand.'" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (citing *Daubert*, 509 U.S. at 597).

To prove a violation of Section 2 of the Voting Rights Act ("VRA"), Plaintiffs must, among other things, demonstrate that Black Alabamians are "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Milligan*, 599 U.S. at 18 (cleaned up). The extent to which an illustrative plan "reasonably" respects "communities of interest" is one traditional redistricting criterion relevant to this assessment. *Id.* at 19-21. A community of interest is manifested by "shared broadcast and print media, public transport infrastructure, and institutions such as schools and churches," *Bush v. Vera*, 517 U.S. 952, 964 (1996) (plurality), as well as evidence that individuals in an area "regard themselves as a

community" and share "economic condition[s] and interests that reflect it," *Lawyer v. Dep't of Justice*, 521 U.S. 567, 581 (1997) (cleaned up).

An expert with expertise or knowledge of the history, economics, or other features of the relevant area or expertise in redistricting more broadly can offer potentially helpful testimony about communities of interest. *See, e.g.*, *Alpha Phi Alpha Fraternity Inc. v. Raffensberger*, 700 F. Supp. 3d 1136, 1206-1208 (N.D. Ga. 2023) (crediting experts on communities of interest and other redistricting criteria who had either extensive expertise in redistricting cases, "particularly in Georgia," or had published academic work on redistricting); *Milligan I*, 582 F. Supp. 3d at 1005 (crediting experts who either had published peer-reviewed work or had practical experience in redistricting, "particularly in Alabama"). Dr. Reilly's unsupported testimony, however, fails to provide the type of "well-supported and factually dense" historical analysis that this Court has previously credited regarding communities of interest. *Milligan v. Allen* ("*Milligan II*"), 690 F. Supp. 3d 1226, 1306 (N.D. Ala. 2023) (three-judge court) (crediting Plaintiffs' expert's testimony about communities of interest).

Indeed, Dr. Reilly lacks any qualifications, expertise, or experience opining on the manner of identifying communities of interest in general. Nor has he ever written about, studied, or even visited any of the specific communities at issue here. While Dr. Reilly may have expertise in some areas of political science, he has never

5

discussed the concept of communities of interest in any of his scholarly work, Milligan Dep. at 84:2-5, and none of his academic research has focused on defining communities of interest, *id.* at 79:10-19. He points to his research focus as a statistician in "examining the effect of multivariate regression analyses which incorporate large-N datasets on the outcome gaps between American racial groups" as his qualification to conduct this analysis. Reilly Report at 1. But such expertise has little utility when Dr. Reilly operates off an undefined concept of "the general idea of a comparable community that would not only be used by many political scientists, but would also be used by anyone who's a professional seller or frequent buyer of real estate." Milligan Dep. at 89:19-25. Similarly, he points to his experience in examining outcome gaps between American racial and ethnic groups across the United States, Reilly Report at 1, but he did not analyze common racial or ethnic identities in his report, Milligan Dep. at 87:22-24. He was neither aware of, nor did he consult, Alabama's redistricting guidelines, which define communities of interest, *id.* at 93:16-20.

  Moreover, Dr. Reilly has no expertise in identifying particular Alabama communities. Milligan Dep. at 81:1-6. None of his academic research has focused on Alabama's Black Belt. *Id.* at 81:15-17. Prior to his involvement with this case, Dr. Reilly had never researched Alabama and admits that "[he] is not a professional expert on Southern politics." Stone Dep. at 52:2-6. None of his academic research

6

has focused on politics in Alabama. Milligan Dep. at 78:16-19; *see Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1298-99 (M.D. Ala. 2020) (declining to credit an expert's testimony on Alabama voting behavior because, among other things, he did not consider facts specific to Alabama's politics and history). In fact, none of his academic research has focused on Alabama at all. Milligan Dep. at 78:13-15. Dr. Reilly is simply not qualified to offer the necessary "intensely local appraisal," nor did he attempt to conduct the required intensely local analysis. *See Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1399 (5th Cir. 1996) (rejecting, in a VRA case, an expert's conclusions that were based on "political science literature, not an intensely local appraisal of the social and political climate" of the relevant area) (cleaned up).

Several examples help illustrate how Dr. Reilly is outside of his academic and professional depth. In his report, Dr. Reilly says counties like Clarke, Conecuh, Escambia, Monroe, and Washington are rarely included in the Black Belt. Reilly Report at 12; *see* Milligan Dep. at 154:18-24. But, again, he cites Wikipedia in support of this claim, Milligan Dep. at 154:25-155:16, despite knowing that anyone can edit a Wikipedia page, *id.* at 156:13-24. When Dr. Reilly was shown the Wikipedia page in his deposition, no citation supported his opinion that these five counties are rarely included in the Black Belt. *Id.* at 156:13-20.

When opining that "the jobs most prevalent for workers in Mobile and Mobile County also seem to be very different from those worked in the Black Belt," he admitted to not examining the Black Belt counties. Milligan Dep. at 138:5-8, 139:4-24. Dr. Reilly purports to compare "jobs most prevalent for workers" within the City of Mobile, Mobile County, and Black Belt Counties, but he fails to cite to authority, *id.* at 138:3-139:1, and only compares Mobile County to one Black Belt County: Barbour, *id*. at 139:4-24. When asked why he failed to cite any sources, Dr. Reilly responded he "wouldn't require a citation for" his opinions. *Id.* at 138:3-139:1. Dr. Reilly had no meaningful explanation for saying Mobile is known for certain industries, and he did not report any sources. *Id*. at 136:13-138:2; *see, e.g.*, *Milligan I*, 582 F. Supp. 3d at 1008 (declining to credit an expert testifying who "offer[ed] opinions without a sufficient basis," including by using Wikipedia to identify Alabama communities).

Likewise, Dr. Reilly offered unsupported opinions about the strength of "historical ties between Mobile and the Black Belt—i.e., are many or most Mobile city residents former residents of the Black Belt." Reilly Report at 5. He is not a historian, did not analyze historical ties beyond his selective and partial review of historical interstate migration, and admits that historical ties are "the least of the questions for him." Reilly Report at 5; *see also* Milligan Dep. at 24:14-18, 25:3-26:3, 27:25-28:1; Stone Dep. at 51:11-20, 256:21-22.

8

Dr. Reilly testified that he was asked to analyze historical ties despite not being a historian because he is a "pretty good data analyst" and "recently went to a fascinating panel on historiography." Milligan Dep. at 26:4-7; 26:25-27:1. But his lack of expertise in history and cursory method of analysis are insufficient to qualify him to opine about the highly localized patterns of a profound southern historical phenomenon like the Great Migration. He disputes "the idea that Mobile has a natural link to the Black belt region of Alabama" despite not having written any scholarly works on the Great Migration, nor anything on the Great Migration in Alabama. Reilly Report at 14; Milligan Dep. at 160:23-161:6. Indeed, he could not cite any scholarly sources, historical or otherwise, about the effects of the Great Migration on southern states. Milligan Dep. at 161:7-14. And he did not analyze the role of historical migration patterns in identifying or establishing communities. *Id.* at 90:25-91:11. *See, e.g.*, *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1305 (N.D. Ga. 2022) (declining to credit an expert in a Section 2 case who had "never published a paper" or "any peer-reviewed articles" on the subject of his testimony and holding that his conclusions were "speculative and unreliable"); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1102 n.35 (N.D. Ala. 2020) (disqualifying an expert in a Section 2 case where his "expertise d[id] not qualify him to reach the areas he offers opinions on," and he provided only a "simplistic and straightforward look" at the relevant data, which "offer[ed] no real

benefit from an expertise point of view to aid the court in its understanding of the underlying data").

Accordingly, the Court should reject Dr. Reilly's uninformed testimony on communities of interest.

## II.    DR. REILLY'S METHODOLOGY IS INHERENTLY UNRELIABLE.

In addition to Dr. Reilly's insufficient qualifications, his methodology is unreliable. To be admissible, "evidence must have a valid scientific connection to the disputed facts in the case." *Allison v. McGhan Med. Corp.*, 184 F. 3d 1300, 1312 (11th Cir. 1999). Four "noninclusive factors" guide the reliability analysis: "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Id.* The "primary focus" should "be solely on principles and methodology, not on the conclusions that they generate," so "the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *Id.* (citing *Daubert* at 595). Dr. Reilly's reporting is neither scientifically correct nor reliable.

Dr. Reilly's opinion is that the Black Belt is "far less connected to the city of Mobile … than neighboring counties are." Reilly Report at 16; Milligan Dep. at 115:20-24. His opinion rests on what Dr. Reilly calls an "analysis across the

commonly used metrics of population, population density, per capita income, and . . . crime." Reilly Report at 3. But Dr. Reilly does not explain why an evaluation of any relationship between Mobile County, the Black Belt, and Baldwin County might ordinarily be based on his chosen metrics, nor does he explain why or in what manner he chose these metrics.

For example, Dr. Reilly compares homicide rates in Mobile County to various counties in the Black Belt. Reilly Report at 9-11. He does not explain why he looked at homicide rates to evaluate a community of interest. *Id*. at 10-11. And he does not provide any citations to scholarly articles, testable methodologies, caselaw, or any other source that looks to homicide rates to identify communities of interest. *See generally* Reilly Report at 9-11.

Worse, Dr. Reilly expected the Black Belt to "have a higher crime rate than most tiny agrarian counties" because it is "heavily minority." Milligan Dep. at 144:23-145:13. His methodology thus appears to rely in part on the "powerful racial stereotype" that Black people are "violence prone." *Buck v. Davis*, 580 U.S. 100, 121 (2017) (citation omitted). This type of expert testimony is inherently "bizarre and objectionable." *Id.* at 119 (rejecting expert testimony reflecting the view that an individual's "race disproportionately predisposed him to violent conduct") (citation omitted); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 587 (S.D.N.Y. 2013)

11

(rejecting expert testimony that "echoe[d] the stereotype that black men are more likely to engage in criminal conduct").

Moreover, Dr. Reilly admits that his homicide data is incomplete and selective. He cites the figures as evidence of differences between the Black Belt, the City of Mobile, Mobile County, and Baldwin County, but then admits that his figures "may be due to limited reporting" in a new FBI database. *Id*. at 9. His data is also selective in that he records Montgomery County as only having had one homicide in 2022, but in a footnote admits that the City of Montgomery reported 10 homicides. *Id*. at 10 & n.21. He similarly reports the homicide rates for the City of Mobile and Mobile County separately. *See id*. at 9-10 & Fig. 3. But he does not explain why he separated out cities from their surrounding counties, nor whether he is consistent in this sorting. Indeed, he reports Macon County as having one homicide and Dallas County as having three homicides in 2022. *Id.* at 10. But both the City of Tuskegee, which is the seat of Macon County, and the City of Selma, which is the seat of Dallas County, each had at least seven homicides that year.[1] Further, Dr. Reilly used murder rates as a proxy for violent crime rates in general because "of time" constraints. Milligan Dep. at 145:14-25. His limited analysis accordingly says nothing about comparative crime rates in the region. *See Nairne v. Ardoin*, No. CV 22-178, 2023

---

[1] Data were obtained from the same source Dr. Reilly cites. Reilly Report at p. 9 n.20 (citing Federal Bureau of Investigation, FBI Crime Data Explorer, *available at* https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/crime-trend).

WL 7388850, at *6 (M.D. La. Nov. 8, 2023) (excluding an expert who "disclosed no scientific method for his data selection" or "for limiting his data set"); *Milligan I*, 582 F. Supp. 3d at 1008 (rejecting expert testimony due to "internal inconsistencies and vacillations").

Finally, Dr. Reilly concludes his report with a section entitled the "Great Migration Effects on Black Population." Reilly Report at 14-16. His report looks at changes in Black population within Huntsville, Mobile, Montgomery, and Birmingham, compared to cities outside Alabama, over the twentieth century. *Id.* However, he analyzed this data in an "internally inconsistent" fashion. *See Milligan I*, 582 F. Supp. 3d at 1008. In lieu of historical analysis, he "look[ed] at census data about population data trends over time." Milligan Dep. at 161:19-21. Critically, Dr. Reilly analyzed figures for *out-of-state* migration but failed to provide any *in-state* migration metrics of Black Alabamians for the Great Migration. *Id.* at 163:17-22. He fails to cite any scholarly or other sources that *solely* examine the interstate migration without reference to intrastate migration to identify communities of interest, or the relationship between areas in a single state. *Id.* at 161:22-162:1. This selective and incomplete reporting, like the rest of Dr. Reilly's comparison of Mobile County to other areas, is based on an untested, deeply flawed, and unreliable methodology.

## CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court enter an order excluding the testimony of Dr. Wilfred Reilly on communities of interest.

Respectfully submitted this 20th day of December 2024.

/s/ *Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Colin Burke*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
cburke@naacpldf.org

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*

/s/ Sidney M. Jackson
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
 FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
(205) 341-0498
sjackson@wigginschilds.com

Davin M. Rosborough*
Theresa J. Lee*
Dayton Campbell-Harris*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
tlee@aclu.org
dcampbell-harris@aclu.org

Allison Mollman (ASB-8397-A33C)
Laurel Haddix (ASB-4592-E20I)
AMERICAN CIVIL LIBERTIES
UNION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org

Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

Shelita M. Stewart*
Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

*Counsel for Milligan Plaintiffs*
*Admitted Pro Hac Vice*

s/ Abha Khanna
Abha Khanna*
Makeba Rutahindurwa*
**Elias Law Group LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
(206) 656-0177
AKhanna@elias.law
MRutahindurwa@elias.law

Lalitha D. Madduri*
Jyoti Jasrasaria*
**Elias Law Group LLP**
250 Massachusetts Ave, Suite 400
Washington, D.C. 20001
(202) 968-4490
LMadduri@elias.law
JJasrasaria@elias.law

Richard P. Rouco
(AL Bar. No. 6182-R76R)
**Quinn, Connor, Weaver, Davies & Rouco LLP**
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
rrouco@qcwdr.com

*Attorneys for Caster Plaintiffs*
*Admitted Pro Hac Vice*