1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ALABAMA
2                      SOUTHERN DIVISION

3

4    ALABAMA STATE CONFERENCE        *
     OF THE NAACP, et al.,           *
5              Plaintiffs,           *   2:21-cv-1531-AMM
                                     *   November 15, 2024
6    vs.                             *   Birmingham, Alabama
                                     *   8:30 a.m.
7    WES ALLEN, in his official      *
     capacity as Alabama Secretary   *
8    of State, et al.,               *
               Defendant.            *
9    *******************************

10

11

12                TRANSCRIPT OF BENCH TRIAL
                         VOLUME IV
13         BEFORE THE HONORABLE ANNA M. MANASCO
                UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21   Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
22    and Procedures Vol. VI, Chapter III, D.2.  Transcript
                produced by computerized stenotype.

23

24

25

                    *CHRISTINA K. DECKER, RMR, CRR*
                   Federal Official Court Reporter
                      101 Holmes Avenue, NE
                       Huntsville, AL 35801
                256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                          APPEARANCES

2

         FOR THE PLAINTIFFS:
3
         Amanda N Allen
4        HOGAN LOVELLS US LLP
         555 13th Street NW
5        Washington, DC 20004
         202-637-2521
6        Amanda.n.allen@hoganlovells.com

7        Brittany Carter
         NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC
8        40 Rector Street, 5th Floor
         New York, NY 10006
9        646-761-0596
         Bcarter@naacpldf.org
10
         Colin Burke
11       NAACP Legal Defense and Educational Fund Inc
         40 Rector Street
12       New York, NY 10006
         646-531-3485
13       Cburke@naacpldf.org

14       Davin Rosborough
         AMERICAN CIVIL LIBERTIES UNION
15       125 Broad Street
         New York, NY 10004
16       212-549-2613
         Drosborough@aclu.org
17
         Dayton Campbell-Harris
18       AMERICAN CIVIL LIBERTIES UNION FOUNDATION
         125 Broad Street, 18th Floor
19       New York, NY 10004
         425-516-8400
20       Dcampbell-Harris@aclu.org

21       Deuel Ross
         NAACP LEGAL DEFENSE AND EDUCATIONAL FUND INC
22       700 14th Street NW
         6th Floor
23       Washington, DC 20005
         202-682-1300
24       Dross@naacpldf.org

25

```
 1        Jack Genberg
          SOUTHERN POVERTY LAW CENTER
 2        P O Box 1287
          Decatur, GA 30031
 3        404-708-0554
          Jack.genberg@splcenter.org
 4
          Jacob Van Leer
 5        American Civil Liberties Union Foundation
          915 15th St NW
 6        Washington, DC 20005
          603-277-0314
 7        Jvanleer@aclu.org

 8        James W Ettinger
          HOGAN LOVELLS US LLP
 9        1999 Avenue of the Stars
          Suite 1400
10        Los Angeles, CA 90067
          310-785-4608
11        Jay.ettinger@hoganlovells.com

12        Jess Unger
          SOUTHERN POVERTY LAW CENTER
13        1101 17th Street NW
          Suite 550
14        Washington, DC 20036
          771-200-8943
15        Jess.unger@splcenter.org

16        Kathryn Carden Sadasivan
          NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC
17        40 Rector Street, 5th Floor
          New York, NY 10006
18        332-600-9546
          Ksadasivan@naacpldf.org
19
          Laurel Ann Hattix
20        ACLU of Alabama
          P.O. Box 6179
21        Montgomery, AL 36106
          703-342-9729
22        Lhattix@aclualabama.org

23

24

25
```

```
1     Nicki Leili Lawsen
      WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC
2     301 19th Street North
      Birmingham, AL 35203
3     205-314-0535
      Nlawsen@wigginschilds.com
4
      Shelita M Stewart
5     HOGAN LOVELLS US LLP
      555 13th Street NW
6     Washington, DC 20004
      202-637-6960
7     Shelita.stewart@hoganlovells.com

8     Sidney Monroe Jackson
      WIGGINS CHILDS PANTAZIS FISHER & GOLDFARB
9     301 19th Street North
      Birmingham, AL 35203
10    205-314-0500
      Sjackson@wigginschilds.com
11

12


13
      FOR THE DEFENDANT:
14
      Benjamin Matthew Seiss
15    ALABAMA OFFICE OF THE ATTORNEY GENERAL
      P.O. Box 300152
16    501 Washington Ave (36104)
      Montgomery, AL 36130
17    334-353-8917
      Ben.seiss@alabamaag.gov
18
      Brenton Merrill Smith
19    OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
      P.O. Box 300152
20    501 Washington Avenue
      Montgomery, AL 36130
21    334-353-4336
      Brenton.Smith@AlabamaAG.gov
22
      James W Davis
23    OFFICE OF THE ATTORNEY GENERAL
      501 Washington Avenue
24    P O Box 300152
      Montgomery, AL 36130-0152
25    334-242-7300
      Jim.davis@alabamaag.gov
```

1    Misty Shawn Fairbanks Messick
     OFFICE OF THE ATTORNEY GENERAL
2    FOR THE STATE OF ALABAMA
     501 Washington Avenue
3    P O Box 300152
     Montgomery, AL 36130-0152
4    334-242-7300
     Misty.Messick@AlabamaAG.gov
5
     Michael P. Taunton
6    Riley Kate Lancaster
     BALCH & BINGHAM LLP
7    1901 Sixth Avenue North, Suite 1500
     Birmingham, Alabama 35203
8    (205) 251-8100
9    J. Dorman Walker
     BALCH & BINGHAM LLP
10   445 Dexter Avenue, Suite 8000
     Montgomery, Alabama 35203
11   (334) 269-3138

12

13   COURTROOM DEPUTY:  Sarah Carmichael

14

15   COURT REPORTER:  Christina K. Decker, RMR, CRR

16

17

18

19

20

21

22

23

24

25

1                        **I N D E X**

2

3    TRACI BURCH                                      752
     CROSS-EXAMINATION CONTINUED
4    BY MR. SMITH
     REDIRECT EXAMINATION                             770
5    BY MS. CARTER
     RECROSS-EXAMINATION                              771
6    BY MR. SMITH

7    WILFRED REILLY                                   774
     DIRECT EXAMINATION                               775
8    BY MR. DAVIS
     CROSS-EXAMINATION                                816
9    BY MR. CAMPBELL-HARRIS
     REDIRECT EXAMINATION                             843
10   BY MR. DAVIS

11   VALERIE BRANYON                                  848
     DIRECT EXAMINATION                               848
12   BY MS. MESSICK                                   848
     CROSS-EXAMINATION                                871
13   BY MS. CARTER
     REDIRECT EXAMINATION                             886
14   BY MS. MESSICK

15   COLONEL JONATHAN ARCHER                          889
     DIRECT EXAMINATION                               889
16   BY MS. MESSICK
     CROSS-EXAMINATION                                907
17   BY MS. ALLEN                                     907
     REDIRECT EXAMINATION                             920
18   BY MS. MESSICK:

19

     Defense Exhibit 128                              900
20   Defense Exhibit 131                              903
     Defense Exhibit 256                              904
21

22

23

24

25

                    *Christina K. Decker, RMR, CRR*
                  Federal Official Court Reporter
                     101 Holmes Avenue, NE
                   Huntsville, Alabama 35801
            256-506-0085/ChristinaDecker.rmr.crr@aol.com

```
 1   stand, please.
 2                   COLONEL JONATHAN ARCHER
 3   having been first duly sworn by the Courtroom Deputy Clerk, was
 4   examined and testified as follows:
 5           THE COURTROOM DEPUTY CLERK:  If you will be seated.
 6   You can adjust the microphone as needed.
 7        State your name and spell it for the Court record, please.
 8           THE WITNESS:  Sure.  Jonathan, J-O-N-A-T-H-A-N, middle
 9   initial W., last name Archer, A-R-C-H-E-R.
10                   DIRECT EXAMINATION
11   BY MS. MESSICK:
12   Q    Thank you, Colonel Archer.  Do you have any degrees after
13   high school?
14   A    Yes, ma'am.  I have a master's in public administration
15   and a bachelor's of arts in criminal justice.
16   Q    And where are those degrees from?
17   A    University of South Alabama.
18   Q    What year did you get your master's?
19   A    2002.
20   Q    What do you do for a living?
21   A    I am the director of the Department of Public Safety at
22   the Alabama Law Enforcement Agency.
23   Q    And is it all right if I call the Alabama Law Enforcement
24   Agency ALEA?
25   A    Yes.
```

1    Q    How long have you been the director of Public Safety at

2    ALEA?

3    A    Since March of 2023.

4    Q    And what is ALEA?

5    A    ALEA is the state law enforcement agency for Alabama.

6    It's made up of two parts -- the Department of Public Safety

7    and the State Bureau of Investigations.

8    Q    And you're the director of the public safety component?

9    A    Yes, ma'am.

10   Q    How long have you been at ALEA?

11   A    Since its creation on January 1, 2015.

12   Q    What were you doing just before ALEA's creation?

13   A    I was a lieutenant with the Alabama marine police at the

14   Department of Conservation and Natural Resources.

15   Q    And in the months leading up to the creation of ALEA, what

16   were you doing?

17   A    I was transferred to ALEA's secretary's office to assist

18   as the special response unit commander to assist with special

19   projects as the agency was beginning.

20   Q    And when about was that?

21   A    November of '14.

22   Q    You've told us your first job at ALEA after it came into

23   being in 2015.

24        Can you tell me just briefly the positions you have held

25   since then?

1   A      Since then, in March of 2016, I was assigned the marine

2   parole division as the central district commander.  I remained

3   there until August 2017, where I was assigned to the driver's

4   license division as a captain.  And then I served there until

5   March of '23, when I was appointed director.

6   Q      Did you remain a captain the entire time you were in the

7   driver's license division?

8   A      No, ma'am.  During the course of that time, I was promoted

9   to chief of the driver's license division.

10  Q      As the director of public safety, do you have any

11  continuing involvement with the driver's license division?

12  A      I oversee that division as a part of my duties.  It has a

13  driver's license director that handles the day-to-day

14  operations, so that director reports to my office.

15  Q      And that director, is that the job that you had when you

16  were chief?

17  A      Correct.  It was formerly chief but was reclassified to a

18  director's position.

19  Q      Thank you.

20         What does ALEA's driver's license division do?

21  A      The driver's license division is tasked with credentialing

22  and examining applicants for Alabama driving privileges.

23  Q      Is that everybody on the roads?

24  A      That is everybody on the roads, if they are driving a

25  commercial vehicle, noncommercial vehicle, they're operating a

1    motorcycle, they're operating a vessel on Alabama waterways.

2    The driver's license division responsible for offering

3    examination and issuing the credentials to those Alabamians.

4    Q    Plaintiffs have offered Joseph Bagley as an expert in this

5    case.  And in his expert report and in his testimony yesterday,

6    he's made some statements about suspending driver's license

7    offices in 2015.

8         Did you have any role in that change of driver's license

9    hours?

10   A    Yes, ma'am.

11   Q    And what role did you have?

12   A    During my time in the ALEA secretary's office, I was

13   advising on a number of special projects, and one of those was

14   related to the suspension of operations in driver's licenses

15   offices.

16   Q    Let's talk about the driver's license services that ALEA

17   offered --

18   A    Uh-huh.

19   Q    -- in early 2015.

20        Well, first of all, about how many credentials were issued

21   by the driver's license division in 2015?

22   A    On average, it's about 1.2 million per year.

23   Q    And is that both driver's licenses and nondriver's IDs?

24   A    Yes, ma'am.

25   Q    Okay.  What kinds of driver license offices did ALEA have?

1   A     We have district offices.  We have 12 of those, plus a

2   headquarters.  And we had 63 field officers.

3   Q     And that's in 2015?

4   A     That is in 2015.

5   Q     Were there ways that a citizen could conduct a driver's

6   license transaction without going to an ALEA office?

7   A     Yes.  There were, in 2015, 122 county partner offices.

8   Those would be operated by probate judges or license

9   commissioners, revenue commissioners or revenue directors,

10  depending on the county in Alabama and who handles the

11  licensing services in that county.

12  Q     Were there other ways in 2015 that a citizen could get a

13  driver's license or do a driver's license transaction?

14  A     Yes.  We had also launched an online services that would

15  have allowed customers to renew their Alabama driver's license

16  or nondriver ID card or order a duplicate in the event they had

17  lost their credential.

18  Q     And were there any other ways that a citizen could conduct

19  a driver's license transaction in 2015?

20  A     No, ma'am.

21  Q     What about the kiosks?

22  A     The self-service kiosks were still in play in a few

23  locations throughout the state in our offices where a customer

24  could go up to the kiosk and complete a renewal, yes.

25  Q     Okay.  I want to talk a little bit more about the

1  services.

2      So you said the online services you could do renewals or

3  duplicates of driver's licenses and nondriver IDs, correct?

4  A    Yes, ma'am.

5  Q    Was the online function available 24 hours a day, 7 days a

6  week?

7  A    Yes.

8  Q    The county partners, you said there were 122 locations in

9  2015?

10  A    Yes, ma'am.

11  Q    What services could they offer?

12  A    They could offer renewal and replacement of both nondriver

13  and driver's licenses.  They could change addresses, and they

14  would take a new credential photo.

15  Q    Could they change names?

16  A    They could in 2015.

17  Q    What services could the ALEA field offices provide in

18  2015?

19  A    They could also renew and do -- issue duplicates.  They

20  also could transfer in out-of-state licenses.  They could

21  complete first-time issuances of new drivers in Alabama.  They

22  conducted all knowledge tests, skills tests for Class D

23  drivers, but we could not do CDL skills tests at the field

24  offices.

25  Q    What is a STAR ID?

1  A    A STAR ID is Alabama's version of the real ID.  And it is

2  a -- it is a credential process that came out of the federal

3  real ID act of 2005, where a customer is required to bring

4  proof of authorized presence, proof of social, and proof of

5  principle residence to an ALEA exam office, where we review and

6  add those to their record and we add the star to their license.

7  Q    And in 2015, could a citizen get a STAR ID at an ALEA

8  field office?

9  A    Yes, ma'am.

10  Q    When were the field offices open?  Were they like Monday

11  through Friday 8:00 to 5:00?

12  A    No.  Field offices had usually one to two days service

13  days.  They were not open usually 8:00 to 5:00 because we had

14  to account for examiner travel so that they could drive to the

15  field office from the district office, set up the equipment,

16  power everything on, and then begin servicing customers.

17      And then at the end of the day, they would have to close

18  early than 5 o'clock to allow shut down and then travel back to

19  the district office.

20  Q    And you said they were generally open one or two days a

21  week?

22  A    Yes, ma'am.

23  Q    And then for fewer than eight hours depending on how much

24  time was needed for the travel and the setup and the breakdown

25  and the further travel?

1    A    Yes, ma'am.

2    Q    Were the field offices like buildings owned by ALEA?

3    A    No, ma'am.  They were spaces provided to ALEA by our

4    county partners free of lease.  We simply came into a provided

5    room, and we set up the equipment and issued credentials on

6    that day.

7    Q    I want to talk about the ALEA district offices in 2015.

8    What services could they provide?

9    A    They, as well, could handle all of the transactions that

10   the field offices could.  Your first-time issuances, your

11   out-of-state transfers, as well as all the knowledge testing,

12   be it Class D, M, V.  You could also complete all your CDL

13   knowledge testing, as well as your skills testing there.

14        And we also processed foreign national customers at our

15   district offices.  We also had reinstatement offices

16   co-inhabitated in those district offices where customers in

17   need of reinstatement service could also obtain service.

18   Q    What is Class D?

19   A    Class D is your basic driver's license in Alabama.  That

20   is referred to as a non-commercial license.

21   Q    And Class M?

22   A    That is required to operate a motorcycle or motor-driven

23   cycle in the state of Alabama.

24   Q    And Class V?

25   A    "V" is for "vessel."  That is to operate a motorized

```
 1  vessel on Alabama waterways.
 2  Q    Were the district offices' buildings owned by ALEA?
 3  A    Yes.
 4  Q    And were they open generally Monday through Friday?
 5  A    Generally open Monday through Friday 8:00 to 5:00.
 6  Q    And then you said there were 12 district offices and that
 7  included headquarters; is that right?
 8  A    Yes, ma'am.
 9  Q    And were the services at headquarters the same as at the
10  other district offices?
11  A    In 2015, no, ma'am.  They were -- we did not do issuances
12  at headquarters.  Headquarters was strictly back office and
13  records management.
14  Q    What about reinstatements?
15  A    We did do reinstatements there and processed mailing
16  reinstatements as well there.
17  Q    What is your understanding of the fiscal shape that the
18  driver's license division was in when ALEA was formed?
19  A    It was in dire straits that there was a deficit run -- it
20  was costing the agency a tremendous amount of money to continue
21  to operate driver's license at a -- we were operating at a
22  loss.
23  Q    Don't you charge people for driver's licenses?
24  A    Yes, ma'am.  But the price of the license is set forth in
25  statute, and all of the money from the driver's license fees
```

1   does not return to driver's license for production of the

2   license.  So it was costing us more to produce the license than

3   we were able to charge in fees.

4   Q    What was the staffing like at the driver's license

5   division when ALEA was formed in January 2015?

6   A    We had double digit vacancies in our examining staff, in

7   the field offices, and the district offices.  We were

8   significantly short-handed.

9   Q    Did that have any impact on the experience of your

10  customers?

11  A    Yes, ma'am.  We were unable to service customers in a

12  timely manner and were faced daily with long wait times and

13  customers being turned away who couldn't receive service.

14  Q    The offices that had changes in 2015, broad category, what

15  offices were those?

16  A    Field offices.

17  Q    And how would suspending office hours in field offices

18  address the situation that you have described?

19  A    Field offices were staffed out of the district offices.

20  We sent examiners out to those locations.  And when we were

21  experiencing such short staff, it was decided that there was --

22  it would be better to suspend operations in those offices so

23  those examiners could remain at the district offices to service

24  more customers.

25  Q    So you were not firing anybody.  You didn't have savings

1  from reducing staff when the field offices had their hours

2  changed?

3  A    No, ma'am.  We did not fire anyone.

4  Q    And instead, you were bringing the staff from the field to

5  the district offices where the lines were?

6  A    Yes, ma'am.

7  Q    Were all of the field offices closed?

8  A    No, ma'am.

9  Q    Do you know if there was any kind of line drawn as to

10 which offices would be closed?

11 A    The line was based on the number of transactions in an

12 office over a period of a year, and that was the line.

13 Q    And do you know what the line was?

14 A    Any office with less than 2,000 customer transactions in a

15 year.

16 Q    Are you aware of whether there were any exceptions to that

17 2,000 transaction?

18 A    No, ma'am.

19 Q    Guide?

20 A    No, ma'am.

21 Q    How many field offices had their office hours suspended?

22 A    31.

23 Q    Did you ever hear any ALEA employee from the secretary of

24 ALEA on down say that the decision as to which offices would

25 have changes was being made on the basis of race, color, or

1    national origin?

2    A    No, ma'am.

3    Q    I'd like to show you Exhibit 128.

4        Colonel Archer, I can't see it.  Can you see it?

5    A    Yes, ma'am.

6    Q    Do you recognize this document?

7    A    Yes, ma'am.

8    Q    Can you tell me what it is?

9    A    Yes.  This is a document explaining during the year of

10   2014 all of our driver's license transactions.

11   Q    Did you have a role in the creation of this document?

12   A    Yes.  I would have had a role.

13        MS. MESSICK:  I move to introduce Defendant's

14   Exhibit 128.

15        THE COURT:  Any objection?

16        MS. ALLEN:  No objection.

17        THE COURT:  All right.  Admitted.

18        (Defense Exhibit 128 admitted in evidence.)

19   BY MS. MESSICK:

20   Q    Colonel Archer -- I'm sorry.  I have got some sort of

21   warning on mine.

22        Looking up at the top in the section with the green

23   highlight where it says, "Transactions," what is that top piece

24   telling us?

25   A    This is showing the total statewide transactions, which

1  would have included every driver's listen or identification

2  card-related interaction with a person performed by any

3  government office in Alabama.

4  Q    And when it's talking about where it says "Total local

5  office transactions," is that the community partners?

6  A    That would be the county partner.

7  Q    I'm sorry.  County partners.

8      So the county partners are actually doing more

9  transactions than ALEA is by a little bit?

10  A    Yes, ma'am.

11  Q    And then where it says "total ALEA suspended offices"?

12  A    Yes, ma'am.

13  Q    What is that telling me?

14  A    That would have -- that shows you the number of -- if, in

15  2014, using the transaction numbers from 2014, the number of

16  transactions that would have been impacted if those offices

17  were suspended operations.

18  Q    So in 2014, there were just over 33,000 transactions at

19  the offices that had their hours suspended?

20  A    Yes, ma'am.

21  Q    Okay.  How much is that in the context of the overall

22  transactions being done in the state?

23  A    2.1 percent.

24  Q    And how much -- what -- what does the 4.43 percent mean?

25  A    That would have been the percentage against ALEA-only

1   transactions, so when comparing just our transactions.

2   Q    So the field offices that were suspended in 2015

3   represented 4.43 percent of ALEA's transactions and 2.1 percent

4   of the total transactions in 2014?

5   A    Yes, ma'am.

6   Q    I want you to look further down on that page.

7        The potential online transactions with the red.  Do you

8   see that?

9   A    I do.

10  Q    What is that section telling us?

11  A    So this data is based on -- is from 2014.  We began online

12  transactions in 2015.  So looking back at '14, we are looking

13  at transactions that now would be able to be completed online.

14  Q    Okay.  So in 2014, there were 5,423 transactions at an

15  office that would be suspended in 2015 that, in 2015, could

16  have been done online?

17  A    Yes.  You are correct.

18  Q    Okay.  Thank you.

19       I'd now like to move to Exhibit 131.

20       Do you recognize this document?

21  A    Yes.

22  Q    What is it?

23  A    It is a list of field offices and their locations and days

24  of week and hour of operations of the 31 that were suspended

25  operations.

1   Q     Did you have a role in this document's creation?

2   A     Yes.

3         MS. MESSICK:  I move to introduce State's Defendant's

4   Exhibit 131.

5         THE COURT:  131, any objection?

6         MS. ALLEN:  No objection, Your Honor.

7         THE COURT:  Admitted.

8         (Defense Exhibit 131 admitted in evidence.)

9   BY MS. MESSICK:

10  Q     What does Exhibit 131 tell us about how often the offices

11  to be suspended were opened?

12  A     In the column Days of the Week, it shows the number of

13  days that each of these offices were open per week.  And then

14  next to that column would be the -- I can't make out the header

15  on this, but I know that's the hours that they were open

16  allowing time for them to -- that would be the time that they

17  could serve as customers.

18  Q     Okay.  And so how many days a week were most of these

19  offices open?

20  A     One day a week.

21  Q     And can you summarize for us what kind of office hours

22  they had?

23  A     Mostly around seven hours, so it would have been -- it

24  varied based on how far the examiner had to travel from.  So,

25  but most of them were around six to six and a half hours.

1   Q    Okay.  When -- and this is the list of the offices that

2   were actually suspended?

3   A    Yes, ma'am.

4   Q    When these offices were suspended, what options remained

5   available to Alabama citizens to conduct driver's license

6   transactions?

7   A    The -- they would still be able to go to ALEA district

8   offices, other field offices.  They could have gone to a county

9   partner office, or they could have gone online.

10  Q    And how long did the office suspensions last?

11  A    Approximately 30 days.

12  Q    I'd like to show you know State Defendant's Exhibit 256.

13       Sir, do you recognize this document?

14  A    Yes.

15  Q    And what is it?

16  A    The memorandum of agreement between the U.S. Department of

17  Transportation and the Alabama Law Enforcement Agency.

18       MS. MESSICK:  Your Honor, I move to introduce State

19  Defendant's Exhibit 256.

20       THE COURT:  256.  Any objection?

21       MS. ALLEN:  No objection, Your Honor.

22       THE COURT:  Admitted.

23       (Defense Exhibit 256 admitted in evidence.)

24  BY MS. MESSICK:

25  Q    When did you first become aware of this memorandum?

1  A    In 2017, when I was transferred to the driver's license

2  division.

3  Q    Do you remember seeing the memorandum at that time?

4  A    I -- I was working for a chief who told me about the

5  memorandum of agreement and the expectations that we were to

6  required to carry out as a part of the terms of the agreement.

7  Q    Were you responsible for helping to ensure ALEA's

8  compliance with this agreement?

9  A    Yes, ma'am.

10  Q    And were you shown this memorandum of agreement at a

11  deposition this summer?

12  A    Yes, ma'am.

13  Q    Have you read it again this week?

14  A    Yes, ma'am.

15  Q    Dr. Bagley's report, which is Amended Plaintiffs'

16  Exhibit 19, at page 29, in the second full -- or the second

17  full paragraph, third sentence, says:  The USDOT found that the

18  Alabama Department of Transportation and the Alabama Law

19  Enforcement Agency were violating Title VI of the Civil Rights

20  Act, and he continues.

21      Do you see that?

22  A    Yes, ma'am.

23  Q    What does this memorandum of agreement say about the

24  Alabama Department of Transportation?

25  A    Nothing.

1          MS. ALLEN:  Objection, Your Honor.  The document
2    speaks for itself.
3          THE COURT:  He answered.
4          MS. MESSICK:  Thank you.
5    BY MS. MESSICK:
6    Q    Looking at page 1 of the memorandum of agreement, did ALEA
7    agree with any findings made by the Department of
8    Transportation?
9    A    No, ma'am.
10   Q    Looking at page 8 of the memorandum of agreement, did ALEA
11   admit liability?
12   A    No, ma'am.
13   Q    In broad strokes, what did the memorandum of agreement
14   require?
15   A    It required that we maintained existing office hours and
16   days of operations in our field offices.  It also added -- we
17   also added additional service hours in some field offices.  It
18   required ALEA to appoint a Title VI coordinator.  And it also
19   required that we enact a community engagement plan any time
20   that there was plan changes in the operations of the driver's
21   license division to allow community stakeholders to provide
22   input.
23   Q    Is this memorandum of agreement still in effect today?
24   A    No, ma'am.
25   Q    Thinking about ALEA's district offices and field offices

1    today, is ALEA providing services in terms of locations and

2    hours that are at least at the level that was required by the

3    memorandum of agreement?

4    A    Yes, ma'am.

5    Q    Dr. Bagley's report at page 15, in the third paragraph

6    begins:  In 2015, the U.S. Department of Transportation found

7    that the State's selective closure of driver's license offices

8    disproportionately affected black people's ability to register

9    to vote and, thus, violated the Civil Rights Act.

10        What does the memorandum of agreement say about voting?

11   A    Nothing.

12   Q    Thank you.

13            THE COURT:  All right.

14            MS. ALLEN:  May I proceed, Your Honor?

15            THE COURT:  You may.

16            MS. ALLEN:  Amanda Allen for the plaintiffs.

17                         CROSS-EXAMINATION

18   BY MS. ALLEN:

19   Q    Good afternoon, Colonel Archer.  You may remember that we

20   met before, not too long ago, but I will be asking you a few

21   yes or no questions on behalf of the plaintiffs today.

22   A    Okay.

23   Q    The special projects that you worked on for ALEA around

24   2014, 2015, included addressing the driver's license office

25   closures, correct?

1  A    Yes.

2  Q    You became aware around early 2015 of a plan being

3  assembled to close driver's license offices, right?

4  A    Yes.

5  Q    You were included in communications about the decision to

6  close some of the driver's licenses offices, right?

7  A    Yes.

8  Q    You don't recall whether you were asked for your input on

9  what metrics should be used to determine what offices should be

10 closed, correct?

11 A    Yes.

12 Q    You don't recall at what point the decision was made to

13 use low customer volume as a metric for determining what

14 offices to close?

15 A    No, ma'am.

16 Q    Your role was just to assemble documentation to educate

17 State officials at the Legislature as to the reason why ALEA

18 was closing offices, right?

19 A    Yes.

20 Q    ALEA staff member, John Thomas Jenkins, directed you to

21 assemble the documentation, correct?

22 A    Yes.

23 Q    You aren't familiar with the standard practice of budget

24 discussions with the executive branch, right?

25 A    At that time, no.

1  Q    You reviewed the list of driver's license offices that

2  were going to be closed at that time?

3  A    Yes.

4  Q    You didn't create the list of driver's license offices to

5  close, right?

6  A    No, ma'am.

7  Q    You weren't a part of any decisions to remove any driver's

8  license offices from the list, correct?

9  A    Correct.

10  Q    You never met with Governor Bentley about the driver's

11  license office closures, right?

12  A    Correct.

13  Q    You never met with any member of Governor Bentley's staff

14  about the office closures, correct?

15  A    Correct.

16  Q    You don't recall how Governor Bentley spoke about the

17  decision to close driver's license offices, correct?

18  A    Correct.

19  Q    You don't recall whether the driver's license office that

20  was in State Senator Gerald Dial's district was on the list,

21  correct?

22  A    I do not.  Correct.

23  Q    You met with Secretary Spencer Collier less than three

24  times during the time that discussions of closing driver's

25  license offices occurred, right?

```
 1   A    Correct.

 2   Q    So you weren't aware that Secretary Collier testified that

 3   a plan to --

 4        MS. MESSICK:  Objection.  She's -- her question is

 5   going to introduce hearsay.  She's -- Secretary Collier is not

 6   here.  She's -- there's a deposition that he gave in another

 7   case, many years ago, that -- based on the deposition of

 8   Colonel Archer that was taken in the Congressional cases.

 9        I am assuming she is about to start telling us what he

10   testified to in that separate deposition and that's hearsay.

11        MS. ALLEN:  Your Honor, may I respond?

12        THE COURT:  You may.

13        MS. ALLEN:  This information is not being offered for

14   the truth of the matter asserted.

15        On direct examination, Colonel Archer testified to his

16   involvement in the decision-making process behind how to and

17   what metrics were going to be used to close the offices and

18   this line of questioning is just being used to explore the

19   extent of his knowledge and involvement.

20        MS. MESSICK:  But she's -- what he testified about is

21   which offices were closed and the minimal impact that that had

22   the state and I don't think that it is relevant.  But even if

23   it were, she's trying introduce testimony that is made by

24   somebody who's not here today.

25        If they want to know what Spencer Collier thought, they
```

1  can bring him.

2          THE COURT:  Well, I think she's not offering it for

3  what Spencer Collier thought.  I think it's being offered to

4  probe the extent of this witness's knowledge, so not for the

5  truth of its content about what --

6          MS. MESSICK:  Well, but it assumes that Spencer

7  Collier is right and this witness is wrong is what --

8          THE COURT:  Well, I don't have to make that

9  assumption --

10         MS. MESSICK:  Okay.

11         THE COURT:  -- if it's not being offered for its

12  truth.

13         MS. MESSICK:  Well, with that understanding, I've got

14  no problem with it.

15         THE COURT:  All right.

16  BY MS. ALLEN:

17  Q    You, Colonel Archer, had just testified that you met with

18  Secretary Spencer Collier less than three times during this

19  time period that driver's license offices were in discussion to

20  be closed, right?

21  A    Correct.

22  Q    So you weren't aware that Secretary Collier testified that

23  the plan to close driver's license offices came from

24  Governor Bentley's advisor, Rebekah Mason, correct?

25  A    I am not familiar with it, no.

1  Q    And you are not aware that Secretary Collier's testimony

2  that Ms. Mason requested that ALEA close driver's license

3  offices in districts of members who opposed the Governor's

4  budget, correct?

5             MS. MESSICK:  Objection.

6       May I have a standing objection and understanding that

7  this is not being offered for the truth of the matter asserted?

8             THE COURT:  You may.

9             MS. MESSICK:  Thank you.

10            THE WITNESS:  Could I ask you to repeat the question,

11 please.

12 BY MS. ALLEN:

13 Q    Yes.  Colonel Archer.  Yes.

14      You were not aware of Secretary Collier's testimony that

15 Ms. Mason requested that ALEA close driver's license offices in

16 districts of members who opposed the Governor's budget,

17 correct?

18 A    No, I was not familiar.

19 Q    And you aren't aware that Secretary Collier told ALEA to

20 find -- and you aren't aware that Secretary Collier told ALEA

21 to find some post hoc, facially neutral and arbitrary basis to

22 close these offices, right?

23 A    I am not aware of it, no.

24 Q    You also aren't aware that Secretary Collier testified

25 that when he presented this purportedly neutral plan to the

1   Governor's staff, the Governor ordered ALEA to retract the

2   closure of the driver's license office in the Governor's ally,

3   Senator Jim Dial's district, correct?

4   A    I'm not familiar with that.

5   Q    You agree that no one at ALEA ever looked at whether the

6   closures would affect some Alabamians more than others,

7   correct?

8   A    I know that I didn't look at that particularly.  I can't

9   say no one at all at ALEA.

10  Q    Is it your testimony today that you don't know whether --

11  or is it your testimony today that you don't know whether no

12  one at ALEA ever looked at whether closures would affect some

13  Alabamians more than others?

14  A    Correct.

15  Q    Colonel Archer, do you recall participating in a

16  deposition in this case?

17  A    Yes, ma'am.

18        MS. MESSICK:  Objection.  The deposition was not in

19  this case.

20  BY MS. ALLEN:

21  Q    I'm sorry.  Let me rephrase.

22        Do you recall participating in a deposition in the case

23  *Milligan v. Allen*, correct?

24  A    Yes.

25  Q    And do you recall that deposition being about August 5th,

1   2024?

2   A    I believe, yes.

3   Q    And you swore to tell the truth in that deposition?

4   A    Yes, ma'am.

5        MS. ALLEN:  Can we pull up Colonel Archer's deposition

6   in *Milligan v. Allen* from August 5th, 2024?

7        Can we turn to page 29?

8   BY MS. ALLEN:

9   Q    Colonel Archer, do you see on page 29, lines 17 through

10  21?

11  A    Yes.

12  Q    Do you see where I asked you:  Did anyone ever discuss

13  whether closures would affect some Alabamians more than others?

14       And then you answered:  No, ma'am.

15  A    Yes.

16  Q    No one at ALEA ever looked at whether the closures would

17  have a disparate effect on black Alabamians, right?

18  A    Correct.

19  Q    Governor Bentley resigned, correct?

20  A    I believe so.

21  Q    He resigned during the House investigation into his affair

22  with Ms. Mason, correct?

23  A    I don't recall the exact circumstances of his resignation.

24  Q    There was a State House investigation, correct, into

25  Governor Bentley?

1  A    I don't -- I don't recall the exact course of his

2  resignation and what was the catalyst of that.

3  Q    So you are not aware that Secretary Collier reported

4  Ms. Mason to the Alabama Attorney General because he was

5  concerned that the closures violated the Voting Rights Act?

6  A    No, I am not familiar.

7          MS. MESSICK:  Object to the form.

8      I mean, I'm sorry.  Objection.  She's got no foundation

9  for that.  I don't know where that's coming from.

10         MS. ALLEN:  Your Honor, I'm simply asking, if I may

11 respond, about his knowledge or lack thereof surrounding the

12 circumstances of the closure of these driver's license offices.

13         MS. MESSICK:  Again, she is assuming that what she is

14 saying is right and asking if he knows about they matters that

15 she's asserting as factual.  And I am not aware of any evidence

16 in this case that supports that statement.  And she certainly

17 hasn't established it here today.

18         THE COURT:  I will give it the weight that it

19 deserves, but it's a question about his awareness, so if he is

20 not aware of it, then he can say that.

21         MS. MESSICK:  Okay.  But he's also not asserting -- he

22 is not agreeing that it's true either, right?  It's the same as

23 before.  You're not assuming the truth of the statement.

24         THE COURT:  Well, the -- her question isn't evidence.

25 So she's not offering her question as evidence.  It's just his

1    answers that are evidence.  So if he says he's not aware of it,

2    then there's no basis for me to assume the truth of it.

3            MS. MESSICK:  Thank you, Your Honor.

4    BY MS. ALLEN:

5    Q    Colonel Archer, the savings for ALEA surrounding the

6    circumstances of the closure of these driver's license offices

7    was just $200,000, right?

8    A    Correct.

9    Q    I want to turn your attention to the discussion that you

10   had on direct examination about the U.S. Department of

11   Transportation investigation and agreement.

12           If I say DOT, would you understand me to mean the U.S.

13   Department of Transportation?

14   A    I -- yes.

15   Q    In 2016, the U.S. Department of Transportation found that

16   the State of Alabama violated Title VI of the Civil Rights Act

17   for the closures of the driver's license offices in the Black

18   Belt, correct?

19   A    I know there was an investigation into that, but I

20   don't -- I don't have my -- there was a -- the findings I -- I

21   think the agency and the U.S. Department of Transportation

22   agreed to enter the MOA to settle all these matters.

23   Q    Is that a yes to my question?

24   A    Yes.

25   Q    You're aware that the DOT asked that the driver's license

1   offices be reopened because they believed that the closures

2   discriminated against black people in the Black Belt, right?

3   A    The offices were already reopened.

4   Q    So is that a yes to my question?

5   A    The offices were already reopened.

6   Q    Let me ask this:  You know that the DOT asked that these

7   offices remain open because they believed that the closures

8   discriminated against black people in the Black Belt?

9   A    Yes.  They asked that they remain open, yes.

10  Q    And that's because they believe that the closures were

11  discriminating against the black people in the Black Belt,

12  right?

13  A    Yes.

14  Q    You are not aware of any information that contradicts the

15  DOT's finding that the driver's license office hours reductions

16  had a disparate impact on black people, correct?

17  A    Correct.

18  Q    The DOT memorandum of agreement with ALEA represents

19  ALEA's official position on the issue, correct?

20  A    Correct.

21  Q    And the memo states that the Department of Transportation

22  has concluded that African-Americans residing in the Black Belt

23  region of Alabama are disproportionately underserved by ALEA's

24  driver's licensing services causing a disparate and adverse

25  impact on the basis of race, correct?

918

1    A    Yes.

2         MS. ALLEN:   Your Honor, if I can have a moment to

3    confer with co-counsel.

4         THE COURT:   You may.

5    BY MS. ALLEN:

6    Q    Colonel Archer, just a few more questions.

7         ALEA offices offer voters an opportunity to register to

8    vote, correct?

9    A    Correct.

10   Q    Are you aware of a 2016 agreement between ALEA and the

11   U.S. Department of Justice that requires ALEA to comply with

12   the federal motor voter law of 1993?

13   A    I do.

14   Q    If we could pull up the 2016 agreement.   Turning your

15   attention to paragraphs 1 through 4 of the agreement.

16        Do you see that on your screen?

17   A    Yes, ma'am.

18   Q    And will you read paragraphs 1 through 4 for us, please?

19   A    By letter dated September 8, 2015, the United States

20   notified the State of Alabama that the principal Deputy

21   Assistant Attorney General for the Civil Rights Division of the

22   U.S. Department of Justice had authorized litigation against

23   the State and appropriate State officials to enforce the Motor

24   Voter provision of the National Voter Registration Act of 1993,

25   NVRA 52 U.S.C. 20504.

1        Two, the principal Deputy Assistant Attorney General

2   authorized litigation following an investigation in which the

3   United States gathered evidence that established noncompliance

4   with the Motor Voter provision of the NVRA.

5        Number 3, the United States and the State of Alabama share

6   the goals of ensuring that the requirements of the Motor Voter

7   provision of the NVRA are met and ensuring that Alabama's

8   citizens enjoy the benefits envisioned by that provision.

9        4, the United States and the State of Alabama have

10  negotiated in good faith and hereby agree to this M.O.U. as an

11  appropriate means to further their shared goals.

12       MS. MESSICK:  Your Honor, before she continues, may I

13  bring the witness some water?

14       THE COURT:  Certainly.

15  BY MS. ALLEN:

16  Q    Colonel Archer, this is the 2016 agreement that we were

17  just discussing, correct?

18       The 2016 agreement between ALEA and the U.S. Department of

19  Justice?

20  A    Yes.

21  Q    And is this your understanding of how that agreement

22  operated?

23  A    Yes, ma'am.

24       MS. ALLEN:  No further questions, Your Honor.

25       THE COURT:  All right.  Thank you.

```
1              MS. MESSICK:  Is that M.O.U. in evidence?
2              MS. ALLEN:  It is not, Your Honor.  And we didn't move
3    to enter it into evidence.
4              THE COURT:  Okay.
5              MS. MESSICK:  May we have just one minute?
6              THE COURT:  You may.
7                       REDIRECT EXAMINATION
8    BY MS. MESSICK:
9    Q    Colonel Archer, that language that you just read, did the
10   State of Alabama admit that it was in violation of any federal
11   law?
12   A    No, ma'am.
13   Q    Are you aware of any litigation related to that memorandum
14   of understanding?
15   A    No, ma'am.
16   Q    Are you aware of any litigation related to the memorandum
17   of agreement that we have been discussing with the Department
18   of Transportation and the change in driver's license offices?
19   A    No, ma'am.
20   Q    Is the M.O.U. with the Department of Justice concerning
21   the Motor Voter provision of the National Voter Registration
22   Act still in effect?  Is that M.O.U. still active?
23   A    I believe so, yes, ma'am.
24             MS. MESSICK:  Would you guys mind bringing up the
25   termination date of that document?  Page 14.
```

1    BY MS. MESSICK:

2    Q    Colonel Archer, when does this document say it will

3    terminate?

4    A    This M.O.U. shall terminate three years from its effective

5    date, unless extended by consent of parties.

6    Q    And looking above that, when was its effective date?

7    A    Shall be effective immediately upon the execution of the

8    last signatory.

9         MS. MESSICK:  And, John, would you do me the favor of

10   please showing him when the signatures are?

11   BY MS. MESSICK:

12   Q    When is the signature for the United States?

13   A    November 12th, 2015.

14   Q    And I think there are -- that's page 16 and we have got

15   several more pages.

16        The Northern District U.S. attorney signed when?

17   A    November 12th, 2015.

18   Q    The Middle District U.S. attorney signed when?

19   A    November 12th, 2015.

20   Q    And the Southern District U.S. attorney signed when?

21   A    November 12th, 2015.

22   Q    And when did the State sign?

23   A    November 13th, 2015.

24   Q    And another signature for the State?

25   A    November 12th, 2015.

1  Q    And Secretary Collier?

2  A    November 12th, 2015.

3  Q    Is this M.O.U. still in effect?

4  A    No, ma'am.

5  Q    Thank you.

6        THE COURT:  All right.  Is there any reason I may not

7  excuse Colonel Archer?

8           MS. ALLEN:  None from us, Your Honor.

9           MS. MESSICK:  None, Your Honor.

10        THE COURT:  All right.  Colonel Archer, thank you for

11  being with us today.  You are excused.

12     Mr. Davis, I think you may have told me earlier that

13  that's the State's last witness for the day, but I confess that

14  I can't recall.

15        MR. DAVIS:  You are correct, Judge.  I don't think

16  anybody should listen to me on guesses of how long things are

17  going to last.  Things went quicker than I expected.  We have

18  no more witnesses today.

19        THE COURT:  Well, you will never meet opposition from

20  me for things going quicker than any lawyer in the room ever

21  expected.

22     We will recess early today then unless there are matters

23  we need to take up.

24        MR. DAVIS:  I don't think so.  I am prepared to tell

25  the Court how I see the next week unfolding.  Again, I don't

926

```
 1                          CERTIFICATE

 2

 3

 4        I certify that the foregoing is a correct

 5   transcript from the record of proceedings in the

 6   above-entitled matter.

 7

 8

 9

10

11                                        11-15-2024

12   Christina K. Decker, RMR, CRR            Date

13   Federal Official Court Reporter

14   ACCR#:  255

15

16

17

18

19

20

21

22

23

24

25
```