FILED
2025 Jan-30 PM 02:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ALABAMA
2                    SOUTHERN DIVISION

3

4    ALABAMA STATE CONFERENCE        *
     OF THE NAACP, et al.,           *
5              Plaintiffs,           *  2:21-cv-1531-AMM
                                     *  November 14, 2024
6    vs.                             *  Birmingham, Alabama
                                     *  8:30 a.m.
7    WES ALLEN, in his official      *
     capacity as Alabama Secretary   *
8    of State, et al.,               *
               Defendant.            *
9    *******************************
```

```
12              TRANSCRIPT OF BENCH TRIAL
                      VOLUME III
13        BEFORE THE HONORABLE ANNA M. MANASCO
              UNITED STATES DISTRICT JUDGE
```

```
21   Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
22   and Procedures Vol. VI, Chapter III, D.2.  Transcript
                produced by computerized stenotype.
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

APPEARANCES

FOR THE PLAINTIFFS:

Amanda N Allen
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
202-637-2521
Amanda.n.allen@hoganlovells.com

Brittany Carter
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC
40 Rector Street, 5th Floor
New York, NY 10006
646-761-0596
Bcarter@naacpldf.org

Colin Burke
NAACP Legal Defense and Educational Fund Inc
40 Rector Street
New York, NY 10006
646-531-3485
Cburke@naacpldf.org

Davin Rosborough
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
212-549-2613
Drosborough@aclu.org

Dayton Campbell-Harris
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
425-516-8400
Dcampbell-harris@aclu.org

Deuel Ross
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND INC
700 14th Street NW
6th Floor
Washington, DC 20005
202-682-1300
Dross@naacpldf.org

1    Jack Genberg
     SOUTHERN POVERTY LAW CENTER
2    P O Box 1287
     Decatur, GA 30031
3    404-708-0554
     Jack.genberg@splcenter.org

4
     Jacob Van Leer
5    American Civil Liberties Union Foundation
     915 15th St NW
6    Washington, DC 20005
     603-277-0314
7    Jvanleer@aclu.org

8    James W Ettinger
     HOGAN LOVELLS US LLP
9    1999 Avenue of the Stars
     Suite 1400
10   Los Angeles, CA 90067
     310-785-4608
11   Jay.ettinger@hoganlovells.com

12   Jess Unger
     SOUTHERN POVERTY LAW CENTER
13   1101 17th Street NW
     Suite 550
14   Washington, DC 20036
     771-200-8943
15   Jess.unger@splcenter.org

16   Kathryn Carden Sadasivan
     NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC
17   40 Rector Street, 5th Floor
     New York, NY 10006
18   332-600-9546
     Ksadasivan@naacpldf.org

19
     Laurel Ann Hattix
20   ACLU of Alabama
     ACLU of Alabama
21   P.O. Box 6179
     Montgomery, AL 36106
22   703-342-9729
     Lhattix@aclualabama.org

23

24

25

```
 1       Nicki Leili Lawsen
         WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC
 2       301 19th Street North
         Birmingham, AL 35203
 3       205-314-0535
         Nlawsen@wigginschilds.com
 4
         Shelita M Stewart
 5       HOGAN LOVELLS US LLP
         555 13th Street NW
 6       Washinton, DC 20004
         202-637-6960
 7       Shelita.stewart@hoganlovells.com
 8       Sidney Monroe Jackson
         WIGGINS CHILDS PANTAZIS FISHER & GOLDFARB
 9       301 19th Street North
         Birmingham, AL 35203
10       205-314-0500
         Sjackson@wigginschilds.com
11

12
         FOR THE DEFENDANT:
13
         Benjamin Matthew Seiss
14       ALABAMA OFFICE OF THE ATTORNEY GENERAL
         P.O. Box 300152
15       501 Washington Ave (36104)
         Montgomery, AL 36130
16       334-353-8917
         Ben.seiss@alabamaag.gov
17
         Brenton Merrill Smith
18       OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
         P.O. Box 300152
19       501 Washington Avenue
         Montgomery, AL 36130
20       334-353-4336
         Brenton.Smith@AlabamaAG.gov
21
         James W Davis
22       OFFICE OF THE ATTORNEY GENERAL
         501 Washington Avenue
23       P O Box 300152
         Montgomery, AL 36130-0152
24       334-242-7300
         Jim.davis@alabamaag.gov
25
```

```
 1        Michael P. Taunton
          Riley Kate Lancaster
 2        BALCH & BINGHAM LLP
          1901 Sixth Avenue North, Suite 1500
 3        Birmingham, Alabama 35203
          (205) 251-8100
 4
          J. Dorman Walker
 5        BALCH & BINGHAM LLP
          445 Dexter Avenue, Suite 8000
 6        Montgomery, Alabama 35203
          (334) 269-3138
 7

 8

 9        COURTROOM DEPUTY:  Sarah Carmichael

10

11        COURT REPORTER:  Christina K. Decker, RMR, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                           **I N D E X**

2

3    SCOTT DOUGLAS                                    484
     DIRECT EXAMINATION                              484
4    BY MR. ROSBOROUGH                               484
     CROSS-EXAMINATION                               502
5    BY MR. WALKER                                   502
     REDIRECT EXAMINATION                            518
6    BY MR. ROSBOROUGH
     RECROSS-EXAMINATION                             519
7    BY MR. WALKER

8    JOSEPH BAGLEY                                    522
     DIRECT EXAMINATION                              523
9    BY MS. SADASIVAN                                523
     CROSS-EXAMINATION                               570
10   BY MR. DAVIS                                    570
     REDIRECT EXAMINATION                            630
11   BY MS. SADASIVAN

12   TARI WILLIAMS                                    636
     DIRECT EXAMINATION                              637
13   BY MR. CAMPBELL-HARRIS                          637
     CROSS-EXAMINATION                               651
14   BY MR. WALKER                                   651

15   TRACI BURCH                                      659
     DIRECT EXAMINATION                              660
16   BY MS. CARTER                                   660
     CROSS-EXAMINATION                               711
17   BY MR. SMITH                                    711

18

     Plaintiffs' Exhibit 19                          568
19   Plaintiffs' Exhibit 21                          568
     Defense Exhibit 3                               569
20   Defense Exhibit 4                               569
     Defense Exhibit 6                               569
21   Plaintiffs' Exhibit 11                          662
     Plaintiffs' Exhibit 12                          662
22   Plaintiffs' Exhibit 13                          662
     Defense Exhibit 407                             743
23   Defense Exhibit 408                             743
     Defense Exhibit 409                             743
24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                        **P R O C E E D I N G S**

2                         (In open court.)

3              THE COURT:  Good morning, everybody.

4          Next witness for the plaintiffs.

5              MR. ROSBOROUGH:  Good morning, Your Honor.  Plaintiffs

6     call Scott Douglas.

7              THE COURT:  All right.  If you'll come to the witness

8     stand, sir.

9                              SCOTT DOUGLAS

10    having been first duly sworn by the Courtroom Deputy Clerk, was

11    examined and testified as follows:

12             THE COURTROOM DEPUTY CLERK:  If you will be seated.

13    Please speak loudly and clearly into the microphone.  State

14    your name and spell it for the court record.

15             THE WITNESS:  My name is Scott Douglas; S-C-O-T-T,

16    D-O-U-G-L-A-S.

17             THE COURT:  You may proceed.

18                          DIRECT EXAMINATION

19    BY MR. ROSBOROUGH:

20    Q    Good morning, Mr. Douglas.  How are you today?

21    A    Good morning.  Fine.  Thank you.

22    Q    Can you please tell the Court your current employment?

23    A    Yes.  I'm currently employed at Greater Birmingham

24    Ministries.

25    Q    When did you start at Greater Birmingham Ministries?

1  A    I became executive director of Greater Birmingham
2  Ministries in 1993.
3  Q    And how did you first become involved with Greater
4  Birmingham Ministries?
5  A    My family and I, my wife and our 2-year old son moved from
6  Nashville to Birmingham in 1976.  She was a grad student at
7  UAB, and I was currently unemployed.  And we needed diapers for
8  our kid, and someone told me about Greater Birmingham
9  Ministries, and we went there and got free diapers for our son.
10 Q    Did you continue your involvement after that initial
11 interaction?
12 A    Yes.  After that, I found out something about what they
13 did in the community, and I became a volunteer.
14 Q    And what did that volunteering role entail?
15 A    Oh, it was everything from door knocking around Get Out
16 the Vote to organizing food drives at my local church, to
17 helping attorney, incarcerated people settle into new homes in
18 communities, to -- a lot of things.
19 Q    At a certain point, did you join the board of directors of
20 Greater Birmingham Ministries?
21 A    Yes.  In 1982, I became a member of the board of
22 directors.
23 Q    Where did you grow up, Mr. Douglas?
24 A    I grew up in Nashville, Tennessee.
25 Q    And did you attend segregated schools there?

1  A    Yes.  My entire public school was segregated.

2  Q    And I believe you testified to this, but just to be clear,

3  when did you move to Alabama?

4  A    I moved to Alabama in 1976.

5  Q    Before you became executive director of Greater Birmingham

6  Ministries, and if I refer to it as GBM, will you understand

7  what I mean?

8  A    Yes.  That's much easier.

9  Q    Before you became executive director of GBM in 1993, what

10  were your previous jobs in Alabama?

11  A    Oh, in Alabama.  In Alabama, I was unemployed when I first

12  arrived here, March '76, but soon I got employment as

13  delivering ice, like the ice you get at the quick market sell

14  off the back of the truck to being a small metals assembler, to

15  being a janitor and others, steam vacuum cleaner service.

16  Q    After that point, did you hold any other jobs?

17  A    Oh, yes.  Within three years, I was able to get a job with

18  the Southern Organizer Committee for economic and social

19  justice.

20  Q    And what was your role at that organization?

21  A    My role at what we call SOC, S-O-C, was to travel the

22  Southeast learning about stories of struggles of low income

23  people, people of color, black, poor, and white poor and

24  others, Vietnamese in the Bayou La Batre area.

25  Q    What sort of issues did you work on in your role there?

1  A    Yes.  I covered more than just Alabama.  In Mississippi,

2  we covered -- we uncovered the stories of black men being

3  lynched while in jail.  And we also worked with -- mostly a lot

4  with the emerging environmental injustice movement among people

5  of color in the Deep South.  At times, gave them resources to

6  help them adjust their pollution and poison issues.

7  Q    After you left your position with S-O-C or SOC?

8  A    Yes.

9  Q    Where did you?

10  A    I went to the partnership for the Marketing Foundation.

11  It was a national foundation that literally kind of funded the

12  work I did for SOC.  So because I knew a lot of the groups on

13  the ground, I was able to give some reasonable assessments.

14  But why more funded should you go, these grass roots

15  organizations who didn't have a big presence, but would do an

16  effective work.

17  Q    Finally, after that position, did you hold any other roles

18  before you took over as executive director of GBM?

19  A    Yes.  My final position before I became director of GBM

20  was I was -- the same strand, the first regional organizer for

21  environmental injustice for the Sierra club.

22  Q    Let's talk a little bit more about Greater Birmingham

23  Ministries.  Can you describe GBM's organizational mission?

24  A    Yes.  GBM's mission is to serve people, build community,

25  and pursue justice.

1  Q    And I want to come back and talk about that a little more.

2  But first, what type of organization is GBM in terms of its

3  corporate structure?

4  A    Yeah.  GBM is a faith-based 501(c)(3) non-profit, and it's

5  governed by a board of directors.

6  Q    What is GBM's membership structure, if any?

7  A    Yes.  We have two forms of membership; one is

8  organizational membership.  Our term for it is sponsoring faith

9  communities.  And they are predominantly denominations that

10  have signed on to becoming members of GBM, such as North

11  Alabama Conference United Methodist Church, the African

12  Methodist Episcopal Church -- the African-American Episcopal

13  Church, the Christian Methodist Episcopal Church, the African

14  Methodist Episcopal Church, Zion, the Roman Catholic Diocese,

15  and the Presbytery Sheppards Lapsley.

16  Q    Do you have any other types of membership?

17  A    Yes.  In the local GBM area, we have our only direct

18  congregational members, like 16th Street Baptist Church.

19  Q    Can you speak to whether GBM has individual members?

20  A    Oh, yeah.  Since 2015, GBM has had individual members.

21  Q    And in terms of organizational members, which if any, are

22  elected in the Huntsville or Decatur areas?

23  A    Of our denominational members are the Episcopal Diocese of

24  Alabama, the Christian Methodist Episcopal Church, the African

25  American Methodist Episcopal Church, African Methodist Church,

1  Zion, and the Presbytery Sheppards and Lapsley.

2  Q    Do you have any understanding of the racial demographics

3  of those congregations?

4  A    Yes.

5  Q    And what is your understanding?

6  A    Of those denominations, the Presbyterian Episcopal Diocese

7  are predominantly white, but they're multi-racial, and the

8  African Methodist Episcopal Church, the CME, Christian

9  Methodist Episcopal Church and African Methodist Episcopal

10 Church of Zion are African-American.

11 Q    And which, if any, of GBM's organizational members are

12 located in the Montgomery area?

13 A    The same ones I mentioned earlier.

14 Q    Okay.  Do you know of any African-American member church

15 leaders in the Huntsville area?

16 A    Yes.

17 Q    And who is that?

18 A    Reverend Randy Kelley.

19 Q    Okay.  How does a faith community become an organizational

20 member of GBM?

21 A    Yeah, sure.  A faith community becomes, a member

22 sponsoring member of GBM by submitting a letter of inquiry,

23 which then presents in the dialogue about the mutual

24 responsibilities of incoming community and Greater Birmingham

25 Ministries.

1  Q    And how, if at all, do organizational members participate

2  in GBM's governance?

3  A    They participate -- by participating, they have

4  representatives on GBM's board of directors and also

5  contributing to the financial and volunteer base of Greater

6  Birmingham Ministries.

7  Q    What is the structure of GBM's board of directors?

8  A    The structure of the board of directors?  Yes.  It is

9  facilitated by -- well, the officers -- president,

10 vice-president, treasurer, and secretary.  And this is the --

11 the managing core is the executive committee.

12 Q    Approximately how big is the board of directors of GBM?

13 A    Our board of directors is 42 people.

14 Q    How, if at all, is that split between individual and

15 organizational members?

16 A    Organizational members are about 32 and individual are 1.

17 Q    And speaking of individual members, approximately how many

18 individual members does GBM have?

19 A    Approximately 2,700.

20 Q    Where are they located within Alabama?

21 A    Individual members are located across the state of

22 Alabama, primarily in the Birmingham area, but from the north

23 to the south.

24 Q    How does someone become an individual member of GBM?

25 A    An individual becomes a member of GBM by a financial

1  donation and a commitment to the principles or values of

2  Greater Birmingham Ministries.

3  Q    Do you know of any individual African-American members of

4  GBM in the Montgomery County area?

5  A    Yes, I do.

6  Q    And who is that or are they?

7  A    Presdelane Harris for one -- Presdelane,

8  P-R-E-S-D-E-L-A-N-E.  That's one word.  Harris.

9  Q    And do you have any awareness of whether Ms. Harris is a

10  registered voter?

11  A    Yes, she is.

12  Q    Okay.  What is, to the best of your knowledge, the racial

13  and economic profile of the people Greater Birmingham

14  Ministries serves?

15  A    Of our clients, the people we serve, I would say about 75,

16  80 percent African-American, 10 percent white, 5 percent

17  Latino.

18  Q    What are GBM's programmatic areas?

19  A    GBM's program areas shadow the -- our mission statement --

20  serving people, building community, pursuing justice.  And

21  those relevant programs are direct services, providing

22  financial, food, and clothing and utilities assistance to low

23  income families.

24        Build the community.

25        Sustain interfaith dialogue and communications.  Because

1  of the multiple faith communities in the state of Alabama, you

2  know, there are a lot of differences between he religions.

3  What we all have in common is love your neighbor as yourself.

4  And that's the band that holds us together.

5      Pursuing justice is our program of addressing issues and

6  policies that affect the poor and people of color unjustly.

7  Q    Of the three programmatic areas, what parts of the state

8  do you pursue them in?

9  A    Our direct services program is primarily the five-county

10 region around Jefferson County.  The interfaith work and our

11 build a community work with faith communities is statewide.

12 Many of our sponsoring denominations are also statewide.  Our

13 systems change work of pursuing justice is of necessity

14 statewide, yeah.

15 Q    And in terms of systems change and pursuing justice, can

16 you discuss the types of examples of the types of policies GBM

17 works on that affect Alabamians statewide?

18 A    There are a variety ranging from criminal justice to

19 environmental justice to education funding, to public

20 transportation, and, of course, voting rights.

21 Q    I'd like to -- we will come back a little more to that,

22 but I would like to switch gears for a moment.

23     What is your understanding of the areas of the state of

24 Alabama at issue in this lawsuit?

25 A    My understanding of the areas in this lawsuit is north

1   Alabama in the Huntsville Madison area and Montgomery.

2   Q    What is GBM seeking to achieve by participating in this

3   lawsuit?

4   A    GBM is seeking to achieve in this lawsuit a more

5   responsive -- yeah, a more responsive State Senate.

6   Q    Can you say a little bit more about what you mean by more

7   responsive State Senate?

8   A    Sure.  For many African-Americans in north Alabama -- and

9   there are a few, more than a few -- to not have a reasonable

10  African-American representation means -- out of sight, out of

11  mind, unheard, not on anybody's agenda.  There's no, you know,

12  person who represents them with shared lived experiences of the

13  conditions they face and obstacles they face.

14  Q    Based on your experience, do you have any views of the

15  interaction between race and politics in Alabama?

16  A    Based on my experience, race is politics in Alabama.

17  Q    What do you mean by that?

18  A    What I mean is that in my experience, from representation

19  in elected bodies to implementation of public policies, race

20  has been entrenched as a factor in decisions that leaders often

21  make.

22  Q    Are you thinking of anything specific when you talk about

23  that?

24  A    Specifically, I'm speaking of the absence of home rule.

25  And since -- in Alabama's counties and municipalities, where

 1  the Legislature can overturn, nullify what was a legal action

 2  by a municipality.

 3  Q    Why does that matter, if at all, particularly for the

 4  communities you serve?

 5  A    It matters in my opinion to the communities that we serve

 6  that if local elected officials take actions to benefit low

 7  income people, black and white, and it's legal when they do it,

 8  and then the Legislature convenes after that and nullifies, and

 9  that creates a new law outlaws helping lower income people, in

10  this case, minimum wage increase.

11  Q    Okay.  You mentioned minimum wage increase.  Can you tell

12  the Court a little bit more about that?

13  A    Yeah.  I'm sorry.  In 2017, GBM was part of a coalition to

14  raise the minimum wage in the state of Alabama.  Alabama wasn't

15  making a move towards it.  So it began in Birmingham, was

16  moving towards convincing the city council to pass an ordinance

17  to raise the minimum wage from $7 and a quarter to $10.10 an

18  hour.  After several months, they conceded, and the mayor

19  signed it into ordinance.

20       Within weeks, the Legislature convened and met and passed

21  a new law that nullifies, that nullified the GBM minimum wage

22  ordinance and preempted any other municipality in the state

23  anywhere else in the state from doing the same.

24  Q    What effect did this have in your experience, if at all,

25  in other areas of the state, including the Huntsville and

1  Montgomery areas?

2  A    Sure.  Birmingham was the first, but before we succeeded

3  in winning Birmingham, there were already efforts in

4  Huntsville, Tuscaloosa, Montgomery, and Mobile.

5  Q    Do you have any experience with whether this minimum wage

6  issue disproportionately affected any racial groups?

7  A    The minimum wage issue disproportionately affected

8  particularly -- it affected all the poor people, but it

9  impacted African-American disproportionately based on the

10  distribution by race among the poor in Alabama where

11  African-Americans are only represented.

12  Q    Does this -- how does this prohibition on raising the

13  minimum wage affect the political participation of black

14  Alabamians, if at all, in your view, your experience?

15  A    Yeah.  In my lived experience, experience of class I've

16  known, having to work more than one job to make basic ends meet

17  denies you the possibility of the civic -- civic and political

18  participation, everything from adult learning classes to PTA to

19  attending civil council meetings, to being able to regularly --

20  anyway -- as well as an absence of public transportation even

21  to vote.

22      When you work multiple part-time jobs, you make -- why

23  don't they vote absentee?  Well, they're not planning to vote

24  absentee.  They're planning to vote, Walk the Vote, for

25  instance, but your shift gets changed.  That happens to shift

1    workers without their approval.

2    Q    You just mentioned transportation.  Are there any areas in

3    particular where you've observed deficiencies in transportation

4    concerning black Alabamians disproportionately?

5    A    In Alabama, public transportation ridership is

6    disproportionately African-American because we're poor in

7    particularly urban areas.  And so that means minimum access to

8    jobs, education, recreation, and health care without -- if you

9    don't have a car or can't afford a car.

10   Q    And what does that have to do, if at all, with political

11   participation in your experience?

12   A    It's almost like minimum wage.  Lack of available adequate

13   accessible, affordable public transportation is a hindrance to

14   participation in a civic life of community, including voting

15   and participating, you know, participating in public meetings,

16   access to information by attending public hearings and others

17   as well as voting.

18       You could have well intended to vote if you have a car.

19   If you have to work overtime, you can get to the polls.  But if

20   you have public transportation, ain't no way it's going to

21   happen.

22   Q    Now, Mr. Douglas, can -- let's talk about health care.

23   Are there any particular areas where in your experience you've

24   observed the Alabama Legislature fail to respond to the health

25   care needs of black Alabamians disproportionately?

1  A    Yes.

2  Q    And can you speak to those?

3  A    Particularly the refusal to expand Medicaid expansion to

4  the working poor of Alabama, some 300,000 families,

5  disproportionately African-Americans have been denied the

6  benefit of Medicaid expansion, which would be able to really

7  help increase the health care outcomes of those impacted

8  families.

9  Q    Do you have any experience working with adults with low

10  literacy?

11  A    Yes.

12  Q    What is your experience?

13  A    Our experience as -- at Greater Birmingham Ministries is

14  being able to help less literate adults be able to get the

15  assistance they need for the agencies that provide them.

16  There's a shyness there in adults seeking help with literacy

17  and a kind of embarrassment, but the latest organizations have

18  stopped doing literacy training in schools as much.  They do it

19  in churches.  Because as one counselor told us, schools is

20  where they thought they failed, yeah.

21  Q    Have you experienced any racial disparities in literacy

22  deficiencies?

23  A    I don't have statistics, but from my knowledge, my own

24  knowledge, I have, yes, in terms of the -- especially in urban

25  areas like Birmingham is, there are higher percentage

1  proportionately of African-Americans that didn't finish the

2  high school or get a GED.

3  Q    I'd like to -- well, let me ask one more question there.

4       How, if at all, does lower literacy affect the ability to

5  participate politically?

6  A    Lower literacy dispro -- lower literacy really hurts

7  participate in the civil discourse the civic education

8  discourse communications because what -- not a clear

9  understanding of which office -- elected office performs what

10 function and what relationship to you.  We've gotten calls --

11 not calls -- at public hearings in public meetings even at GBM

12 where the question, who makes the decisions about what, you

13 know?  Then you have to name them.

14      The city council does this, the county commission does

15 that, the Legislature does that.  And that is not very well

16 known by a lot of adults, low income and low literacy.

17 Q    Do you have any experience about whether lower literacy

18 adults face any challenges in the voting process particularly?

19 A    Yes.

20 Q    What's your experience?

21 A    Our experience is -- with low literacy in adults in the

22 voting process is we're still part of this as being able to let

23 people -- we and other groups have to inform people about what

24 an amendment means on a ballot, what does it actually mean on a

25 ballot to where you can get voter ID, or where you can get a

1  non-driver's ID.  At one point, we had grants to provide IDs,

2  but the funding ran out for that kind of work, yes.

3  Q    And do you have any experience working to assist people

4  with lower literacy with voting forms?

5  A    Yes.

6  Q    What's that experience?

7  A    We have done -- since 2012, produced a guide to voter

8  forms, voter registration forms as well as the voting process

9  itself that uses graphics, simpler language, big print so that

10 it is not so much fine print tech language that show people how

11 to register to vote, how to update their relatives so that you

12 vote where you live rather than going to the home house they

13 call it to vote where you were born across town and stuff, yes.

14 Q    Do you have any experience -- in your experience, what are

15 the racial demographics of the people that are primarily taking

16 advantage -- need to take advantage of those resources around

17 voter forms?

18 A    In our experience, based on where we are in Birmingham,

19 our experience is the highest proportion is African-American.

20 Q    Do you have any reason one way or the other to doubt if

21 that's the case beyond Birmingham?

22 A    I don't have that reason to doubt beyond Birmingham.  For

23 instance, I do know it's pretty similar in Montgomery and

24 Mobile, in particular, and Huntsville.  And but I don't know

25 how well spread -- widespread it is in the rural areas.

1    Q    Mr. Douglas, have you previously run for elected office in

2    Alabama?

3    A    Yes.

4    Q    And what office was that?

5    A    The mayor of Birmingham.

6    Q    Did you run under a party banner?

7    A    No.  The municipal elections in Alabama are non-partisan.

8    Q    When did you run for mayor?

9    A    2009.

10   Q    And how closely do you follow State Senate races and other

11   political races in Alabama?

12   A    I have followed them pretty closely since the 1980s.

13   Q    Based on your experience with that and as a candidate, do

14   you have any observations about black candidates' ability to

15   fund raise in comparison to white candidates in Alabama?

16   A    Yes.

17   Q    What is your experience on that?

18   A    My experience is that it is very difficult for first-time

19   black candidates to raise funds for political office,

20   sufficient funds for political office.

21   Q    Do you have any understanding in your experience why that

22   is?

23   A    Yes.  It's because that -- well, it's because they're

24   first timers.  But two is because the communities they come

25   from does not have the material wealth base to support them as

1  opposed to first timers say, for Mountain Brook.

2  Q    Before we close, I would like to come back to your

3  discussion of public transportation.

4  A    Yes.

5  Q    And I think you were talking a little bit about the lack

6  of public transportation affecting black Alabamians.

7       Do you have any understanding or experience more

8  relevantly about why there are public transportation

9  deficiencies for black Alabamians?

10 A    Number one, historically, and currently, more so

11 currently, African-Americans are proportionately --

12 disproportionately reliant on public transportation for

13 mobility.

14      But the reason our public transportation across the state

15 including Birmingham and Huntsville and Montgomery and Mobile

16 and the rural areas are so deficient is because in 1950s prior

17 to the Rosa Parks sitting on the back of the bus, the Alabama

18 passed a -- Legislature passed a constitutional amendment

19 forbidding the use of gas taxes and road taxes to pay for

20 public transportation.

21      As it is interpreted, it's because that the public

22 transportation desegregation movement had already begun across

23 the nation.  And they decided to defund public transportation

24 through an amendment.

25 Q    Thank you, Mr. Douglas.  I have no further questions at

1    this time.

2    A    Oh, thank you.

3                            CROSS-EXAMINATION

4    BY MR. WALKER:

5    Q    Good morning, Mr. Douglas.  How are you?

6    A    Good morning.  Thank you.

7    Q    Mr. Douglas, Greater Birmingham Ministries has not

8    identified any individual members in the Huntsville area, has

9    it?

10   A    In the Huntsville area?

11   Q    Yes, sir.

12   A    Not to my knowledge.

13   Q    And just to be clear, you mentioned Randy Kelly as someone

14   who was a member of an organization in Huntsville?

15   A    Yes.

16   Q    But he's not an individual member?

17   A    No, he's -- he's a leader of an organizational member.

18   Q    Yeah.  And not an individual member; is that correct?

19   A    To my knowledge, yes.

20   Q    What programs does Greater Birmingham Ministries provide

21   in Huntsville?

22   A    The programs that Greater Birmingham Ministries provides

23   in Huntsville are several; two in particular.  We are a leading

24   partner with the Interfaith Mission Service of Huntsville.

25   Think of it as GBM's cohort of interfaith collaboration work in

1    Huntsville Madison County area.

2         We started in the same year, 1969, and been partners ever

3    since.  Among those things are food drives, especially

4    overseas.

5    Q    Could you ask you to speak up, please?

6    A    Oh.

7              THE COURT:  Feel free to adjust that microphone.

8              THE WITNESS:  Thank you, ma'am.  I appreciate it.

9              THE COURT:  Absolutely.

10             THE WITNESS:  Say it again.  I'm sorry.

11   BY MR. WALKER:

12   Q    Well, the general question I had asked you was to describe

13   whatever programs GBM has in Huntsville.

14   A    We have collaborative programs in Huntsville, not just

15   with congregations and denominations in Huntsville, but

16   Interfaith Mission Service, which was created the same year

17   that GBM was, without knowledge of each other at that time.

18        But since then, we've been partners on global missions

19   work, for instance, clothing for children and adults overseas

20   and such.

21        We still maintain that partnership with them.

22   Q    So clothing for children overseas.  Are you saying that

23   GBM participates in collecting clothing for children?

24   A    Yes.  Yes.

25   Q    Okay.

1 A    And not only that, we also -- these -- some of these

2 clothes more recently have been brand new clothes donated by

3 retailers.

4 Q    And GBM does not have an office in Huntsville, does it?

5 A    No, it does not.

6 Q    Okay.  Does it have any staff members in Huntsville?

7 A    Not residing in Huntsville, right, living in Huntsville,

8 no.

9 Q    Well, the people who are collecting clothing in Huntsville

10 and doing other activities in Huntsville, are they GBM

11 personnel, or are they personnel from other agencies?

12 A    They are not GBM person -- paid personnel, sure, no.  But

13 they are from -- not just of agencies, but also from our

14 participating denominational membership churches.

15 Q    Sure.  Churches.  And in Montgomery, what programs does

16 GBM have?

17 A    In Montgomery, some of our collaboration work has been

18 around voter education and civic education with GBM's work.

19 Q    And GBM, sir, does not have an office in Montgomery, does

20 it?

21 A    No, but we do have volunteers.

22 Q    Right.

23 A    Yeah.

24 Q    You don't have any staff, paid staff members in Montgomery

25 either?

1  A    We had, but not now.

2  Q    Okay.  And what voter education and civic education does

3  GBM do in Montgomery?

4  A    Well, in Montgomery, we are part of the Alabama Poor

5  People's Campaign, we are the sponsors of that.  And we have

6  several volunteers who lead in that work.  In addition, we have

7  a civic education course called the Power of Participation that

8  we have used across the state and also inside state prisons.

9  Q    You mentioned -- I couldn't quite understand you -- that

10  you were -- that GBM, I'm sorry, sir, was a sponsor of the

11  Alabama -- I couldn't understand what you said.

12  A    Poor People's Campaign.

13  Q    Alabama Poor People's Campaign.  What does it mean to say

14  that GBM is a sponsor of the Alabama Poor People's Campaign?

15  A    As part of a national campaign, Poor People's Campaign; A

16  Fight for Moral Survival, the whole title, we are the Alabama

17  affiliate.

18  Q    And what does that mean?

19  A    It means that we are -- have the responsibility of

20  carrying out the program of the Poor People's Campaign

21  statewide across Alabama.

22  Q    When the Alabama Poor People's Campaign conducts

23  operations -- does it conduct any operations in Montgomery

24  county?

25  A    Yes.  Get Out the Vote and voter registration activities,

1  as well as civic education activities.

2  Q    And when those activities occur, are they conducted by GBM

3  personnel?

4  A    They're conducted by unpaid volunteers.

5  Q    Are the volunteers of GBM or the Alabama Poor People's

6  Campaign or first -- I mean, Dexter Avenue Baptist Church or

7  Hall Street -- or who?

8  A    Repeat the question.

9  Q    Yeah.  Who are the volunteers?  I understand they're

10  volunteers.  Who are they from?

11  A    Some of them attend Dexter, some of them attend Greater

12  Bethel A.M.E. Church, but they are -- maybe I can explain it

13  this way.  They are organized by GBM staff people.

14  Q    Are they members of GBM, to your knowledge?

15  A    At least one I know is, is a paid member.

16  Q    That would be Ms. Presdelane?

17  A    No.  That's an addition -- this is a newer person named

18  Valdoria Johnson.

19  Q    Would you spell that name, please?

20  A    V-A-L-D-O-R-I-A.

21  Q    Johnson?

22  A    Yeah.

23  Q    And does -- is it Mr. or Ms.?

24  A    Ms.

25  Q    Does Ms. Johnson live in Montgomery County?

1    A    Yes.

2    Q    Do you know her address?

3    A    I don't know it by heart.

4    Q    Okay.  Do you know if she's registered to vote?

5    A    Yes.

6    Q    How do you know that?

7    A    Well, she voted.

8    Q    How do you know that?

9    A    She said so.

10   Q    Okay.  Other than individuals who have been convicted of a

11   crime of moral turpitude, are you aware of any legal

12   impediments that hinder people from voting?

13   A    Other than crimes of moral turpitude?

14   Q    Yes, sir.

15   A    Yes.

16   Q    Okay.

17        MR. WALKER:  Could we see page 115, lines 6 through 13

18   of Mr. Douglas's deposition?

19   BY MR. WALKER:

20   Q    Do you remember, Mr. Douglas, being deposed on April 23,

21   2024?

22   A    Yes.

23   Q    And do you remember that you were under oath at that time?

24   A    Yes.

25   Q    And that you testified that there were not any reasons why

1  you could not testify truthfully?

2          MR. ROSBOROUGH:  Objection.  Improper impeachment.

3  This answer does not contradict what Mr. Douglas just said.  He

4  asked about moral turpitude, and he said no.  And the answer

5  shows that he spoke to an additional issue.

6          THE COURT:  Well, he can testify to that.

7          MR. ROSBOROUGH:  Okay.  Thank you, Your Honor.

8  BY MR. WALKER:

9  Q    If you will look at the question you were asked, I will

10 read it to you, Mr. Douglas.

11     Other than voter identification, which I had not mentioned

12 in my question earlier, are there any other legal impediments

13 that you would point to that hinder people from participating

14 in the political process?

15     And your answer was:  Other than identification and the

16 moral turpitude condition, you can't think of any; is that

17 correct?

18 A    That's what I said at the time.

19 Q    Okay.  And is that still your answer?

20 A    No.

21 Q    Okay.  What's your answer now?

22 A    We've had cases which didn't come to mind of people who

23 have been denied the right to vote or told by the officials

24 they didn't have the right to vote that was outside of moral

25 turpitude that didn't qualify as moral turpitude.  They were

1  lied to or misled.

2  Q    When did that happen?

3  A    It was happening before the change in moral turpitude law

4  and afterwards.

5  Q    How do you know that?

6  A    From clients we have talked to.  Let me explain.

7          MR. WALKER:  Your Honor, I object to the answer as

8  hearsay and move to strike.

9          MR. ROSBOROUGH:  I -- he's responding to the way that

10  Mr. Walker phrased the question.  I think we are entitled to at

11  least hear his full answer first.

12          MR. WALKER:  It doesn't mean -- I'm sorry, Your Honor.

13          THE COURT:  Well, I want to hear the answer.  I mean,

14  I will say it's unclear to me whether it's going to be offered

15  for the truth or offered for some other purpose in response to

16  your question.  So I want to hear the answer.

17          THE WITNESS:  Repeat the question.

18  BY MR. WALKER:

19  Q    I will repeat the question.

20          As I understood your testimony just now, and correct me if

21  I'm wrong, GBM has been contacted, you're aware, by some people

22  who were told they could not vote.  Did I understand you?

23  A    Correct.

24  Q    And why were they told they could not vote?

25  A    They were told -- when they tried to register to vote and

1   they asked had they committed any crimes, and they said they

2   did.  And the officials would tell them, well, you are not

3   qualified to vote.

4        This is before the new moral turpitude.

5   Q    This was before 2017?

6   A    Before 2017.

7   Q    And how many of these people were there, do you know?

8   A    I didn't talk to every one of them, but we processed

9   dozens of individuals.

10  Q    And were any of these people from Montgomery or Madison

11  County?

12  A    Montgomery for sure.

13  Q    Okay.

14  A    And Birmingham.

15  Q    And do you know if there was any legal impediment to their

16  voting?

17  A    They thought there was a legal impediment to their voting,

18  and they did not know of the CERV process, the certificate of

19  eligibility to register to vote.  No one had told them.

20       In fact, the Secretary of State has said it is not his job

21  to inform people how to get their voting rights restored.

22  Q    Uh-huh.  And was GBM able to help them get their voting

23  rights restored?

24  A    Yes.

25  Q    Okay.  Are you aware of any such incidents after 2017?

```
1   A     Yes.

2   Q     Okay.  When were those?

3   A     Up until today.

4   Q     Okay.  How many?

5   A     Some 200 individuals this year.

6   Q     200 this year?

7   A     Yes.

8   Q     200 persons this year that you say came to GBM because

9   they had been told they could not vote or register to vote?

10  A     Let's just say there have some who have been told they

11  could not and others who did not know they could.

12  Q     What do you mean others who did not know that they could

13  vote?

14  A     For instance, former incarcerated persons would tell us

15  that on exiting incarceration they were told they could never

16  vote again, which is untrue.

17  Q     Was GBM able to help these people become eligible to vote?

18  A     Yes.  That number, yes.

19  Q     Mr. Douglas, you have surprised me by talking about

20  numbers of people both before and after the moral turpitude,

21  the law relating to moral turpitude was passed in 2017, who you

22  say had been told they could not vote.  Why did you not mention

23  these people in your deposition?

24  A     I didn't think about both before and after.  And the

25  stream is still going on.
```

1  Q    You were well prepared for your deposition; isn't that

2  true?

3  A    I thought so.

4  Q    Okay.  In fact, you met with your counsel five times in

5  preparation for your meeting; is that correct?  We can check

6  your deposition if you want to.

7  A    Yeah.  Please check it.

8  Q    I beg your pardon?

9  A    I didn't count.

10  Q    Okay.  Do you have any reason to think I'm wrong?

11  A    No.

12  Q    Okay.  And you read over the complaint and you read over

13  GBM's discovery responses also in preparation for your

14  deposition?

15  A    Yes.

16  Q    Okay.  But despite all of that preparation -- and you knew

17  that you were being deposed as a 30(b)(6) member, too; is that

18  correct?

19  A    Yeah.

20  Q    Okay.  Despite all that, you didn't mention these people

21  at your deposition, correct?

22  A    Are you referring to my answer -- I can't think of any

23  other legal ones other than identification and the failure of

24  moral turpitude conditions?

25  Q    That?

1  A    Uh-huh.

2  Q    And also that you just did not tell us about this issue at

3  all?

4  A    What issue?

5        MR. ROSBOROUGH:  Objection, Your Honor.  Mr. Douglas

6  responds to questions at a deposition.  He has -- it would --

7  it's improper impeachment.  He has no duty to affirmatively

8  provide testimony that's not asked in response to questions,

9  and Mr. Walker has not pointed to any other question than the

10 particular one up on the screen right now.

11       MR. WALKER:  The question is:  Other than voter

12 identification, are there any other legal impediments that you

13 would point to that hinder people from participating in the

14 political process.  He's testified that people were told or not

15 told that they could not vote or not told that they could vote.

16       THE COURT:  I will allow the answer in response to

17 that.

18       MR. WALKER:  Okay.  Thank you, Your Honor.

19       MR. ROSBOROUGH:  I'm sorry.  Is there a question

20 pending?

21       THE COURT:  I can read it back.

22       THE WITNESS:  Thank you.

23       MR. WALKER:  Your Honor, if I may have just a second.

24       THE COURT:  Mr. Walker, would you like me to read back

25 the question that you had pending, or are you moving on to

1  another one?

2          MR. WALKER:  Yes, ma'am, if you would.

3          THE COURT:  Okay.  It says:  The question was:

4  Despite all that, you didn't mention these people at your

5  deposition, correct?  The answer was:  Are you referring to my

6  answer?  I can't think of any other legal ones other than

7  identification and moral turpitude.  That?  And you said yes.

8  BY MR. WALKER:

9  Q    And now you're testifying to people other than moral

10  turpitude, right?

11  A    Yes.

12  Q    Okay.  Are you aware of black Alabamians who are

13  registered to vote and who don't?

14  A    Say it again.

15  Q    Are you aware of black Alabamians who are registered to

16  vote but who do not vote?

17  A    I am aware, yes.

18  Q    And that includes your personal neighbor?

19  A    My who?

20  Q    Your neighbor?

21  A    My next door neighbor, one of my next door neighbors, yes.

22  Q    And that person does not vote because he says he has a

23  lack of confidence in the voting system?

24  A    Yes.

25  Q    Is frustration about the effectiveness of our voting

1   system something that's shared with white voters, Latinx

2   voters, Asian voters, so far as you know?

3   A    Repeat the question.  Frustration about what?

4   Q    Frustration about the effectiveness of our democracy is

5   not unique to black people, is it?

6   A    It's disproportionately unique to black people.

7   Q    When you say disproportionately, what's your basis for

8   saying that?  Have you surveyed other people?

9   A    I have not done any surveys on trusting government.  I

10  have not done any.

11  Q    Since January 1 of 2016, have you had any communication

12  with a GBM client or donor who wanted to become more involved

13  in politics in Alabama, but could not because they could not

14  engage with the Alabama Democratic party?

15          MR. ROSBOROUGH:  Objection.  Calls for hearsay.

16          THE COURT:  That's asking if he's had any

17  communication.  We don't know if it's going to be offered for

18  the truth of not.  It's just about the fact of communication.

19          THE WITNESS:  No.

20  BY MR. WALKER:

21  Q    Have you had any communication with a GBM client or donor

22  who wanted to be more involved in politics in Alabama, but

23  could not because they could not engage with the Alabama

24  Republican party?

25  A    No.

1  Q    If GBM believes that an additional minority district can

2  be drawn -- excuse me.  Does GBM believe that if an additional

3  minority district can be drawn, it must be drawn?

4  A    Could you repeat the question?  You cut off.

5  Q    Sure.  Does Greater Birmingham Ministries believe that if

6  an additional minority district can be drawn, it must be drawn?

7  A    Yes, according to the Voting Rights Act.

8          MR. WALKER:  Thank you.  Your Honor, may I have a

9  moment?

10          THE COURT:  You may.

11  BY MR. WALKER:

12  Q    Sir, you testified earlier that black individuals were

13  disproportionately affected by Alabama not expanding Medicaid,

14  right?

15  A    Correct.

16  Q    Do you know what reasons the Governor and the Legislature

17  have for not expanding Medicaid?

18  A    No.

19  Q    They may be legitimate reasons; is that possible?

20  A    Since I don't know, I have not heard a reason not to.

21  Q    And the state's failure to expand Medicaid coverage

22  affects all lower income people, regardless of race; is that

23  correct?

24  A    Yes.

25  Q    And I think you said that it affected 300,000 people in

1  Alabama, over 300,000.

2  A    The last count was 300,000.

3  Q    Was that 300,000 people or 300,000 black people?  I'm not

4  certain.

5  A    300,000 individuals.

6  Q    Individuals.  Thank you, sir.

7  A    Uh-huh.

8  Q    What's your source for that number?

9  A    The -- I forgot the name of the agency, but it's -- it's a

10  health care officials -- the state of Alabama -- the question

11  was asked how many people lived in the notch of making too

12  little to afford private health care and too much for Medicaid.

13  It's a gap estimate.

14  Q    What's the document you're referring to?

15  A    I just seen it repeatedly from -- it's an agreed-on

16  statistics between those that support Medicaid expansion and

17  those opposed, but I can't quote the cite or source.

18  Q    In the GBM --

19  A    No.  From the state of Alabama.

20  Q    -- agreed upon --

21  A    The --

22  Q    -- by whom?

23  A    I would say the state -- you can get it from the Alabama

24  State Department of Health.  The numbers have not been

25  disputed.  The money has been disputed, I guess.

```
 1              MR. WALKER:  Your Honor, if I could just a second.
 2              THE COURT:  You may.
 3              MR. WALKER:  Thank you, Mr. Douglas.  That's all we
 4   have for you.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  Is there any redirect?
 7              MR. ROSBOROUGH:  Just a few, Your Honor.  Thank you.
 8                      REDIRECT EXAMINATION
 9   BY MR. ROSBOROUGH:
10   Q    Mr. Douglas, Mr. Walker asked you a question about legal
11   impediments to voter registration a little while ago.
12        Can you think of any non-legal impediments that black
13   Alabamians disproportionately face regarding voter
14   registration?
15   A    Yeah.  Other than legal requirements, there's
16   misinformation or disinformation and lack of information.  For
17   instance, other than legal, there's misinformation,
18   disinformation, and no information.  The Secretary of State has
19   said that he would not -- it's not his job to tell people if
20   they're qualified to register to vote or not, particularly
21   people who are exiting incarceration.
22   Q    And in your experience, has GBM participated in other
23   voting rights cases litigation?
24   A    Yes.  In 2010.
25   Q    Has any of that litigation been successful?
```

1  A    Yes.

2  Q    What can you think of that has been successful in terms of

3  voting litigation that GBM has participated in?

4  A    A key one was we were clients in the case that established

5  the Second Congressional Black District as a black opportunity

6  district in the state of Alabama, the second one.

7  Q    Have you been involved -- has GBM been involved in any

8  cases involving the absentee voting process in the last year or

9  two?

10  A    Yes.  Particularly last year, too, yes.

11  Q    And what is your understanding of the results of that so

12  far?

13  A    The result of that so far is that the latest legislation

14  by the Legislature was not allowed to be enforced in time for

15  this current election, yeah, the SB-1.

16  Q    And I'm sorry.  What did you say?

17  A    SB-1.  I'm sorry.  It wasn't in time --

18  Q    Thank you, Mr. Douglas.  I have no further questions.

19  A    Thank you.

20        MR. WALKER:  If I may follow up.

21                RECROSS-EXAMINATION

22  BY MR. WALKER:

23  Q    Mr. Douglas, in response to a question by Mr. Rosborough,

24  he asked you about non-legal impediments, and you mentioned

25  misinformation, disinformation, and no information.  Do I have

1    that correct?

2    A    Correct.  That was not legal impediments.

3    Q    Yes.  Yes.  And you mentioned the Secretary of State.  Are

4    you saying that the Secretary of State has provided

5    misinformation or disinformation to black Alabamians?

6    A    No.  I said he has -- well, black Alabamians is Alabamians

7    too, so all Alabamians, he's provided misinformation to.  Not

8    misinformation.  I'm sorry.  No information to.

9    Q    No information?

10   A    That's right.  The people are coming from exiting

11   incarceration are black, white, and brown.

12   Q    I'm sorry, sir, I couldn't understand you.

13   A    The people exiting incarcerations are all races -- black,

14   white, brown.  And he made a public statement it is not his job

15   as Secretary of State to inform people of their voting rights

16   on exiting prison.

17   Q    So if I understand you correctly, there may be people who

18   were convicted of felonies, have served their time, and may be

19   eligible to have their voting rights restored, and your

20   complaint is that the Secretary of State does not tell them

21   that?

22   A    My complaint is Secretary of State nor the Department of

23   Corrections.

24   Q    Okay.  Is it the Secretary of State's job?  Can you point

25   me to any case law or any statutory provision that says it's

1  the Secretary of State's job to do what you want him to do?

2  A    I can't point to a single provision that cites it is the

3  Secretary of State's job to inform the public of what rules

4  exist and how they apply to the daily lives, no, I can't.

5  Q    The Secretary of State is not responsible for registering

6  voters, is that office?

7  A    The Secretary, that's a big position.

8          MR. ROSBOROUGH:  Objection.

9          THE COURT:  What's the objection?

10          MR. ROSBOROUGH:  The objection is it seems to be

11  calling for a legal conclusion unless he's asking him in his

12  own personal experience, which I didn't hear.

13          THE COURT:  I assume the question is about his

14  understanding, because that's the nature of his testimony is

15  just what his understanding is.

16          MR. WALKER:  Yes, ma'am.

17  BY MR. WALKER:

18  Q    Do you have an understanding whether the Secretary of

19  State is responsible for registering voters in the state of

20  Alabama?

21  A    The -- I understand that he is not directly responsible.

22  The registrar's responsible and probate judges are responsible.

23  Q    Which Secretary of State made the statement that he is not

24  responsible for informing people when they come from prison

25  that they can have their votes -- voting rights restored?

```
 1  A    The current -- I don't know if the current one or one
 2  before Wes Allen.
 3  Q    You don't know?
 4  A    Huh-uh.  But it was published in the papers.
 5  Q    Okay.  Thank you, sir.
 6           MR. ROSBOROUGH:  Nothing further, Your Honor.
 7           THE COURT:  All right.  Is there any reason I may not
 8  excuse Mr. Douglas?
 9       All right.  Mr. Douglas, thank you for being with us this
10  morning.
11           THE WITNESS:  Thank you.
12           THE COURT:  You're excused.
13           (Witness excused.)
14           MS. SADASIVAN:  Good morning, Your Honor.  Plaintiffs
15  call Joseph Bagley.
16           THE COURT:  All right.  Good morning.
17           THE WITNESS:  Your Honor, may I bring this with me?
18           THE COURT:  You may.  You may.  I do not put people to
19  trial caffeine free.  That will not be good for any of us.
20           THE WITNESS:  No, Your Honor.
21                           JOSEPH BAGLEY
22  having been first duly sworn by the Courtroom Deputy Clerk, was
23  examined and testified as follows:
24           THE COURTROOM DEPUTY CLERK:  Speak loudly and clearly
25  into the microphone stating your name and spell it for the
```

1                                    <u>CERTIFICATE</u>

2

3

4          I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11                                                    <u>11-14-2024</u>

12    Christina K. Decker, RMR, CRR              Date

13    Federal Official Court Reporter

14    ACCR#:   255

15

16

17

18

19

20

21

22

23

24

25