IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


ALABAMA STATE CONFERENCE          *
OF THE NAACP,                     *
          Plaintiffs,             *   2:21-cv-1531-AMM
                                  *   November 12, 2024
vs.                               *   Birmingham, Alabama
                                  *   9:00 a.m.
WES ALLEN, in his official        *
capacity as Alabama Secretary     *
of State, et al.,                 *
          Defendant.              *
*******************************   *


TRANSCRIPT OF BENCH TRIAL
VOLUME I
BEFORE THE HONORABLE ANNA M. MANASCO
UNITED STATES DISTRICT JUDGE


Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
and Procedures Vol. VI, Chapter III, D.2.  Transcript
produced by computerized stenotype.


*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1                          <u>APPEARANCES</u>

2

          <u>FOR THE PLAINTIFF:</u>
3
          Amanda N Allen
4         HOGAN LOVELLS US LLP
          555 13th Street NW
5         Washington, DC 20004
          202-637-2521
6         Amanda.n.allen@hoganlovells.com

7         Avner Shapiro
          SOUTHERN POVERTY LAW CENTER
8         1101 17th Street NW
          Suite 510
9         Washington, DC 20036
          240-890-1735
10        Avner.shapiro@splcenter.org

11        Brittany Carter
          NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC
12        40 Rector Street, 5th Floor
          New York, NY 10006
13        646-761-0596
          Bcarter@naacpldf.org
14
          Colin Burke
15        NAACP Legal Defense and Educational Fund Inc
          40 Rector Street
16        New York, NY 10006
          646-531-3485
17        Cburke@naacpldf.org

18        Davin Rosborough
          AMERICAN CIVIL LIBERTIES UNION
19        125 Broad Street
          New York, NY 10004
20        212-549-2613
          Drosborough@aclu.org
21
          Dayton Campbell-Harris
22        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
          125 Broad Street, 18th Floor
23        New York, NY 10004
          425-516-8400
24        Dcampbell-harris@aclu.org

25

1    Deuel Ross
     NAACP LEGAL DEFENSE AND EDUCATIONAL FUND INC
2    700 14th Street NW
     6th Floor
3    Washington, DC 20005
     202-682-1300
4    Dross@naacpldf.org

5    Jack Genberg
     SOUTHERN POVERTY LAW CENTER
6    P O Box 1287
     Decatur, GA 30031
7    404-708-0554
     Jack.genberg@splcenter.org
8
     Jacob Van Leer
9    American Civil Liberties Union Foundation
     915 15th St NW
10   Washington, DC 20005
     603-277-0314
11   Jvanleer@aclu.org

12   James W Ettinger
     HOGAN LOVELLS US LLP
13   1999 Avenue of the Stars
     Suite 1400
14   Los Angeles, CA 90067
     310-785-4608
15   Jay.ettinger@hoganlovells.com

16   Jess Unger
     SOUTHERN POVERTY LAW CENTER
17   1101 17th Street NW
     Suite 550
18   Washington, DC 20036
     771-200-8943
19   Jess.unger@splcenter.org

20   Kathryn Carden Sadasivan
     NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC
21   40 Rector Street, 5th Floor
     New York, NY 10006
22   332-600-9546
     Ksadasivan@naacpldf.org

23

24

25

```
 1          Laurel Ann Hattix
            ACLU of Alabama
 2          ACLU of Alabama
            P.O. Box 6179
 3          Montgomery, AL 36106
            703-342-9729
 4          Lhattix@aclualabama.org

 5          Nicki Leili Lawsen
            WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, LLC
 6          301 19th Street North
            Birmingham, AL 35203
 7          205-314-0535
            Nlawsen@wigginschilds.com
 8
            Shelita M Stewart
 9          HOGAN LOVELLS US LLP
            555 13th Street NW
10          Washinton, DC 20004
            202-637-6960
11          Shelita.stewart@hoganlovells.com

12          Sidney Monroe Jackson
            WIGGINS CHILDS PANTAZIS FISHER & GOLDFARB
13          301 19th Street North
            Birmingham, AL 35203
14          205-314-0500
            Sjackson@wigginschilds.com

15

16

17

            FOR THE DEFENDANT:
18
            Benjamin Matthew Seiss
19          ALABAMA OFFICE OF THE ATTORNEY GENERAL
            P.O. Box 300152
20          501 Washington Ave (36104)
            Montgomery, AL 36130
21          334-353-8917
            Ben.seiss@alabamaag.gov
22
            Brenton Merrill Smith
23          OFFICE OF THE ATTORNEY GENERAL OF ALABAMA
            P.O. Box 300152
24          501 Washington Avenue
            Montgomery, AL 36130
25          334-353-4336
            Brenton.Smith@AlabamaAG.gov
```

```
 1       James W Davis
         OFFICE OF THE ATTORNEY GENERAL
 2       501 Washington Avenue
         P O Box 300152
 3       Montgomery, AL 36130-0152
         334-242-7300
 4       Jim.davis@alabamaag.gov

 5       Michael P. Taunton
         Riley Kate Lancaster
 6       BALCH & BINGHAM LLP
         1901 Sixth Avenue North, Suite 1500
 7       Birmingham, Alabama 35203
         (205) 251-8100
 8
         J. Dorman Walker
 9       BALCH & BINGHAM LLP
         445 Dexter Avenue, Suite 8000
10       Montgomery, Alabama 35203
         (334) 269-3138
11

12

13

14
         COURTROOM DEPUTY:  Sarah A. Carmichael
15

16

17       COURT REPORTER:  Christina K. Decker, RMR, CRR

18

19

20

21

22

23

24

25
```

1                                **I N D E X**

2

3    BADONG LIU, PH.D.                                      14
     DIRECT EXAMINATION                                    14
4    BY MR. ROSBOROUGH                                     14
     CROSS-EXAMINATION                                     58
5    BY MR. TAUNTON                                        58
     EXAMINATION BY THE COURT                             112
6    REDIRECT EXAMINATION                                 116
     BY MR. ROSBOROUGH
7    RECROSS-EXAMINATION                                  117
     BY MR. TAUNTON
8
     MARY PEOPLES                                         119
9    DIRECT EXAMINATION                                   119
     BY MR. BURKE                                         119
10   CROSS-EXAMINATION                                    137
     BY MS. LANCASTER                                     137
11   REDIRECT EXAMINATION                                 150
     BY MR. BURKE
12
     BENARD SIMELTON                                      151
13   DIRECT EXAMINATION                                   152
     BY MR. ROSS
14   CROSS-EXAMINATION                                    182
     BY MR. TAUNTON                                       182
15   REDIRECT EXAMINATION                                 214
     BY MR. ROSS
16

17

18   Plaintiff Exhibit 17                                  16
     Plaintiff Exhibit 16                                  20
19   Plaintiff Exhibit 18                                  22

20   Defense Exhibit 5                                     95
     Defense Exhibit 9                                     95
21   Defense Exhibit 1                                     95
     Defense Exhibit 7                                     95

22

23

24

25

1            THE COURT:  You may.

2            MR. BURKE:  No more questions from us.  Thank you so

3  much, Ms. Peoples.

4            THE COURT:  All right.  Is there any reason why I may

5  not excuse Ms. Peoples?

6            MS. LANCASTER:  None from us, Your Honor.

7            MR. BURKE:  None from us.

8            THE COURT:  All right.  Ms. Peoples, thank you for

9  being with us today.  And you're excused from the witness

10  stand.

11      Thank you.

12            (Witness excused.)

13            THE COURT:  Plaintiffs, you may call your next

14  witness.

15            MR. ROSS:  One moment, Your Honor.  Plaintiffs call

16  Benard Simelton.

17                        BENARD SIMELTON

18  having been first duly sworn by the Courtroom Deputy Clerk, was

19  examined and testified as follows:

20            THE COURTROOM DEPUTY CLERK:  Please speak loudly and

21  clearly into the make phone.  State your name and spell it for

22  the Court record.

23            THE WITNESS:  Sure.  Benard Simelton, B-E-N-A-R-D,

24  Simelton, S-I-M-E-L-T-O-N.

25

                            DIRECT EXAMINATION

BY MR. ROSS:

Q    Good afternoon, Mr. Simelton.

A    Good afternoon.

Q    What race do you identify as?

A    African-American.

Q    When were you born?

A    ████████████, 1954.

Q    Where were you born?

A    A little town called Cooperville, Mississippi.

Q    When did you graduate from high school?

A    1972.

Q    Where did you go to high school?

A    There are two different high schools.  I went to Lions
Consolidated High School, then Faulkner High School.

Q    Okay.  Before you went to Faulkner, were your schools
segregated?

A    Yes.

Q    And when did you go to Faulkner?

A    1969.

Q    Where do you live now?

A    Harvest, Alabama.

Q    What county is that in?

A    Limestone -- I live in Limestone County side of Harvest.

Q    How far is Harvest from Huntsville?

1  A    It's about two or three miles from the Huntsville city

2  limits.

3  Q    And how long have you lived in Huntsville, Alabama?

4  A    Since -- Harvest --

5  Q    Excuse me.  Sorry.  How long have you lived in Harvest?

6  A    Since 2002.

7  Q    Okay.  And how long have you lived in Alabama?

8  A    Since 2001.

9  Q    Are you registered to vote?

10  A    Yes.

11  Q    Are you retired?

12  A    Yes.

13  Q    What was your career before you retired?

14  A    I served my country 23 years United States Air Force.  And

15  then I worked for 16 years as a defense -- with a defense

16  contractor in Huntsville, Alabama.

17  Q    Thank you for your service.

18      Are you affiliated with the Alabama State Conference of

19  the NAACP?

20  A    Yes.

21  Q    If I call the Alabama State Conference of the NAACP either

22  the Alabama NAACP or just the NAACP, will you understand what I

23  mean?

24  A    Yes.

25  Q    Thank you.

1        What is your affiliation with the Alabama NAACP?

2   A    I am the president.

3   Q    How long have you served as president?

4   A    Since 2009.

5   Q    How did you become president of the Alabama NAACP?

6   A    I was elected to the position.

7   Q    Who elected you?

8   A    Delegates to the 2009 state convention.

9   Q    Okay.  And were those delegates members of the Alabama

10  NAACP?

11  A    Yes.

12  Q    Okay.  What are your duties as president of the NAACP?

13  A    Well, my duties are to ensure that our units are carrying

14  out the mission and goals and directives of the NAACP, and also

15  we work to ensure the political, educational, economic rights

16  of those who are being underserved and particular people of

17  color, African-Americans.

18  Q    Okay.  And how do you go about carrying out the mission of

19  the NAACP?  What kind of activities or projects do y'all

20  undertake?

21  A    Yeah.  We engage in protests.  We engage in rallies.  We

22  engage in press conferences.  And also we work with

23  organizations or companies that may be discriminated against

24  individual.  And also we work with law enforcement agencies, as

25  well.

1  Q    What kind of work do you do with law enforcement agencies?

2  A    Well, kind of two things.  If someone comes to us and

3  complain about a law enforcement -- unfair treatment, you know,

4  we work with the agency to try and find out the truth and also

5  try to find the person an attorney that would represent them if

6  we feel they have been unfairly treated by a law enforcement

7  agency.

8       And also we ask the law enforcement -- law enforcement

9  agency to participate in -- one of our programs in particular

10 we call SWAG -- Stronger Without a Gun.  We ask them to

11 participate in that and come and talk to our audience about,

12 you know, the need for them to, you know, not have guns.

13 Q    For the police not to have guns?

14 A    Yeah.  No.  Not for the police.

15 Q    For the people?

16 A    Yeah.  The individuals.

17 Q    Sorry.  Okay.  I think I asked you how the NAACP carries

18 out its mission, but I didn't ask you what is the NAACP's

19 mission?

20 A    Well, I mean, basically, to protect the civil and human

21 rights of individuals in the community.

22 Q    Okay.  Are you paid for your work with the Alabama NAACP?

23 A    No, I'm not.

24 Q    Okay.  Can you please describe the organizational

25 structure of the Alabama NAACP?

1  A    Sure.  We are a subcomponent, suborganization of the

2  national NAACP.  And we are a -- the state conference and

3  within the state conference, we have college chapters.  We have

4  branches.  And we have youth councils.

5        And on the state level, we have an executive committee

6  that's similar to a board of directors.  And in that, we have a

7  president, three vice-presidents, secretary, assistant

8  secretary, a treasurer, an assistant treasurer, and we also

9  have what we call executive committee members at large who are

10 elected at large.  And then we have people on the executive

11 committee who are appointed to the executive committee by their

12 volunteering to serve a chair person of our standing

13 committees.

14 Q    About how many people are a part of the state executive

15 committee?

16 A    We have about 35 members.

17 Q    I think you mentioned a unit.  What is a NAACP unit?

18 A    A unit is a -- again, a suborganization of the national

19 organization.  And sometimes when we refer to units, we're

20 talking about the collectively -- collective state conference

21 college chapter, branches, and youth council when we say the

22 units of the Alabama NAACP, and then we talk about all those

23 collectively.  We're not talking about a specific one.

24 Q    Okay.  How many active units are there in the Alabama

25 NAACP?

1   A     There's about 40 -- somewhere, 40, 43, somewhere in there.

2   Q     About how many active adult branches are there?

3   A     We've got about 35 branches, active branches.

4   Q     And about how many units are college or youth chapters?

5   A     Youth chapter we have about seven, eight, that are active.

6   And then we have a couple -- three youth councils that are

7   active.

8   Q     I'm sorry.

9   A     Three youth council that are active.

10  Q     And how many college chapters, did you say?

11  A     I said seven or eight.

12  Q     Okay.  Do each of the units have a president?

13  A     Yes.

14  Q     How often do you meet with the unit presidents?

15  A     We meet once a month -- I mean, once a week.  And then

16  quarterly, we meet in person.

17  Q     Does the Alabama NAACP have an active branch in Madison

18  County?

19  A     Yes.

20  Q     What area does the Huntsville Madison County branch cover?

21  A     The entire county of Madison.

22  Q     Okay.  Does that include the cities of Huntsville and the

23  city of Madison and all the cities within Madison County?

24  A     Yes.

25  Q     Okay.  Does the Alabama NAACP have an active unit in

1    Morgan County?

2    A    Yes.

3    Q    Okay.  What areas or cities does the Morgan County branch

4    cover?

5    A    It covers the entire county of Morgan.

6    Q    Does it include the city of Decatur?

7    A    Yes.

8    Q    Is the Alabama NAACP a membership organization?

9    A    Yes.

10   Q    How does an individual become a member of the Alabama

11   NAACP?

12   A    The person generally fills out an application and pay a

13   membership fee depending on the type of membership they want,

14   whether it's just regular adult or a life membership.

15   Q    Okay.  And how are the dues distributed when someone pays

16   a fee?  What happens to that money?

17   A    Well, it's -- if you pay it to a branch, then the branch

18   retains -- no.  The branch retains 40 percent.  They send

19   60 percent to the national.  And then the national sends a

20   portion of that back to us -- back to the state conference.

21   Q    Okay.  What, if any, difference is there between being a

22   member of the Alabama NAACP and being a member of a local

23   Alabama unit?

24   A    In order for a person to be a member of the -- well,

25   everyone that's a member of a unit within the state of Alabama

1    is a member of the Alabama state conference.

2    Q    Okay.  Thank you.

3    A    By association.

4    Q    What information does the application form collect?

5    A    It generally collects, of course, your name, your phone

6    number, address, e-mail address, and it also asks if you are a

7    registered voter.

8    Q    Okay.  And is collecting those records part of the Alabama

9    NAACP's regular business practice?

10   A    Repeat the question.

11   Q    Sure.  The Alabama NAACP collects information about

12   whether their members are registered to vote as a part of its

13   regular business practices, correct?

14   A    Our units collect that information and then will share it

15   with us.

16   Q    Okay.  Thank you.

17        Did you review any records today to prepare for your

18   testimony?

19   A    Yes.

20   Q    What did you review?

21   A    I reviewed the -- my statement.  I reviewed the complaint.

22   I reviewed the map, proposed map.

23   Q    I think maybe I was unclear.

24        What Alabama NAACP records did you review for your

25   testimony?

1  A     Oh, okay.

2         Yeah.  The membership unit reports and the -- some of the

3  information about the status of our units.

4  Q     Okay.  Thank you.

5         About how many members does the Alabama NAACP have?

6  A     About 5,000.

7  Q     About what percentage of the Alabama NAACP members are

8  registered to vote?

9  A     We would say probably somewhere between 85 and 90 percent.

10 And because our youth council members are not old enough to

11 register -- at least the majority -- majority of those are not

12 old enough to register.  So and we have some members that are

13 previously incarcerated that are not eligible to register, so,

14 but about 90 -- somewhere between 90 and 95 percent, I would

15 say.

16 Q     Okay.

17 A     That are really eligible.

18 Q     Okay.  And how do you know that about 90, 95 percent of

19 your members are registered to vote?

20 A     Yeah.  We -- discussion during our meetings, quarterly

21 meeting or a weekly meeting that we have we talk about, you

22 know, our members being registered to vote and making sure that

23 they are registered to vote.

24 Q     Okay.  About what percentage of the Alabama NAACP's

25 membership is African-American?

1  A    I would say probably 95 percent.

2  Q    And how do you know that?

3  A    Again, by attendance at meetings and on our conference

4  calls, as well as just discussion about that during our

5  meetings, you know, how many people we have that are of

6  Hispanic, Asian, and whites, you know, other nationalities.

7  Q    How many NAACP members are there in the Huntsville branch?

8  A    Approximately 350.

9  Q    Okay.  And about what percentage of those members are

10  black registered voters?

11  A    I would say the same percentage as, you know, that

12  95 percent to 90, 95 percent.

13  Q    What are the names of some of the roles of some of the

14  members in Huntsville?

15  A    Yes.  Mary Jones Moore, she's the president.  Kesha L.

16  Hendrix, she's the vice-president.  And Randy Kelly, he's the

17  political action chair.

18  Q    Does Ms. Hendrix have a role within the state conference

19  of the NAACP?

20  A    Yes, she does.

21  Q    What is her role?

22  A    She's economic chair, and she -- and by her being the

23  economic chair, she serves on our executive committee.

24  Q    Thank you.

25       About how many NAACP members are there in the Decatur

1  branch?

2  A    About 75.

3  Q    About what percentage of those members are black

4  registered voters?

5  A    I would say probably about 90 percent.  They had an

6  increase in white voters in -- voters other than black

7  recently, so I would say probably about 90 percent.

8  Q    What's your understanding of why that Decatur branch has

9  had an increase in white membership recently?

10  A    Well, it was because of the murder of Steve Perkins by a

11  Decatur police officer.  Let me strike that.

12       There was -- the shooting of a -- Steve Perkins by a

13  Decatur police officer.

14  Q    Who shot Mr. Perkins?

15  A    A police officer.

16  Q    Okay.  And why, in your estimation, did that result in an

17  uptick in membership there?

18  A    Well, it brought a lot of people out in protest and

19  because it was -- they felt that it was an unlawful shooting,

20  because Mr. Perkins was on his property defending his property

21  and he was shot.  And so there was a lot of protests, and a lot

22  of people from all nationality or races that joined in, in the

23  protests.

24  Q    Were they protesting anything in particular?

25  A    Well, they was protesting the shooting of Mr. Perkins.

1  Q    Okay.  Did members feel that the shooting was racially

2  discriminatory?

3  A    Yes.

4  Q    Okay.  What is the name of the Decatur branch president?

5  A    Rodney Gordon.

6  Q    Where does Mr. Gordon live?

7  A    In Decatur.

8  Q    In the city of Decatur?

9  A    Yes.  In the city limits.

10  Q    What's the race of Mr. Gordon?

11  A    African-American.

12  Q    Do you know whether he's registered to vote?

13  A    Yes.

14  Q    Yes, he is?

15  A    Yes, he is.

16  Q    Okay.  Do the Huntsville and Decatur branches hold any

17  events?

18  A    Yes, they hold events.

19  Q    What kind of events do the Huntsville and Decatur branch

20  of the NAACP hold?

21  A    Of course, they hold galas or banquets.  They do hold

22  rallies, protests, and those things.

23  Q    Okay.  About how far are the city of Huntsville and

24  Decatur?

25  A    Probably about 15 miles or so.

1    Q    Okay.  So we're talking about events -- Huntsville NAACP

2    when they have events, do they invite members of the Decatur

3    NAACP?

4    A    Yes, they do.

5    Q    Do they invite them to rallies and protests and things?

6    A    Yes, they do.  And banquets and things like that.

7    Q    Okay.  And vice versa, does the Decatur branch invite the

8    Huntsville branch to attend its events?

9    A    Yes.

10   Q    Okay.  What's your understanding of why the two units may

11   invite one another to participate in events?

12   A    Well, one, is that we share the common interest of, you

13   know, ensuring our political and economic and social rights are

14   protected.  And so when we come together as an organization, we

15   are stronger.  And additionally, you know, we learn from each

16   other because what's happening in Decatur, what's happening in

17   Huntsville could affect, you know, each other's cities or, you

18   know, communities.

19   Q    In your role as president, do you attend events for the

20   Huntsville NAACP?

21   A    Yes.

22   Q    About how often?

23   A    Probably about four, five a year, somewhere in there.

24   Q    Okay.  What about for the Decatur NAACP?

25   A    About what now?

1   Q     What about for the Decatur NAACP, do you attend events for

2   them?

3   A     Yes.  A couple events over in Decatur.

4   Q     Sure.  How often?

5   A     About two or three a year.

6   Q     Okay.  Do local state legislators ever come to these

7   events?

8   A     You say do legislators local?

9   Q     Yes.

10  A     Yes.

11  Q     Okay.  Who?

12  A     Primarily Representatives Daniels and Hall.

13  Q     Okay.  Of the Huntsville Decatur events that you have

14  attended, which of any white legislators have you seen there?

15  A     I have not seen any white legislators at any of the

16  Decatur events that I have attended.  And I don't think I've

17  seen any at the Huntsville Madison County branch events either.

18  Q     Do you ever travel to Decatur for non-NAACP activities?

19  A     Yes.

20  Q     What kind of activities do you go to Decatur for?

21  A     Well, my wife's a realtor, so she goes over there for

22  business.  And sometimes, I travel with her.  Occasionally go

23  over there to get something to eat, or occasionally I will meet

24  with a city council member over there.

25  Q     About how often do you do that?

1    A     Probably total of about three, four times a year,

2    somewhere in there.

3    Q     Okay.  What church do you attend?

4    A     Indian Creek Primitive Baptist Church.

5    Q     And where is that located?  Where is that church located?

6    A     What's what?

7    Q     Where is that church located?

8    A     380 Indian Creek Road.

9    Q     In Huntsville?

10   A     Huntsville, yes.

11   Q     Okay.  What, if any, role do you have at your church?

12   A     Deacon at the church.

13   Q     What are your responsibilities as deacon?

14   A     Just the spiritual care of the people that are assigned to

15   my particular ward.

16   Q     What is a ward?

17   A     A ward is a group of people based on -- just based on

18   their last names that are assigned to the different deacons for

19   the deacons to help with their, you know, spiritual care.

20   We're not preachers, so don't get me wrong on that.  But if

21   they need something, we are there to support them, pray with

22   them during, you know, the time of need and things like that.

23   Q     Do any of your ward members live in Decatur?

24   A     Yes.  I have one that lives in Decatur.

25   Q     What's the racial makeup of your church?

1   A     Probably 98 percent African-American.

2   Q     Okay.  Have you attended other churches in Huntsville?

3   A     Yes.

4   Q     About how many Huntsville churches have you attended?

5   A     Since I've been there?

6   Q     Yes, sir.

7   A     Probably about 30, 30 or more churches, you know.

8   Q     In your experience, are the churches that you visited

9   mostly one race or another?

10  A     Yes.

11  Q     Okay.  Have you ever been to a predominantly white church?

12  A     Yes.

13  Q     On what occasion have you had to go to a white church --

14  predominantly white church?

15  A     A funeral, and also our church has kind of a relationship

16  with a predominantly white church where we -- on Thanksgiving

17  -- well, around Thanksgiving, they come to our church one year,

18  and then we go to their church, you know, the following year,

19  and our pastor preach at their service, and their pastor preach

20  at our service.

21  Q     Other than that experience -- that annual experience, your

22  church is 98 percent black, though, correct?

23  A     Yes.

24  Q     Okay.  What highway do you travel when you go from

25  Huntsville to Decatur?

1    A    Interstate 65, which turns into Highway 20, but -- 565.

2    I'm sorry.   Interstate 565, which turns into Highway 20.

3    Q    Okay.   Are there certain hours you try to avoid 565?

4    A    Yes.

5    Q    What hours are those?

6    A    Rush hours in the morning, and from I would say probably

7    6:30 to 8:30, 9:00 o'clock, and then in the evening from about

8    3:30 until about 5:30, 6:00 o'clock, somewhere in there.

9    Q    Why do you avoid those hours?

10   A    Well, it's rush hour, and traffic is backed up, you know,

11   and it's almost -- it is bumper to bumper.   No almost.   It is

12   bumper to bumper.

13   Q    What's your understanding of why traffic is backed up on

14   that particular highway?

15   A    Well, in the morning, a lot of people trying to get into

16   Huntsville, you know.   And in the afternoons, lot of people

17   trying to get out of Huntsville to go back to their homes, you

18   know, Decatur and other communities.

19   Q    Okay.   To your knowledge, what's being done to address

20   that traffic on the highway there?

21   A    Well, recently, they've announced that the -- they're

22   adding another lane to 565 in each direction.

23   Q    What's your understanding of why that lane is being added?

24   A    Well, to help eliminate some of the traffic -- well,

25   actually help people get in to Huntsville quicker and out of

1    Huntsville quicker so traffic won't be backed up.  And also it

2    reduces accidents especially in the winter time when --

3    Q    When that lane's been added?

4    A    It's being added.

5    Q    Between Huntsville and Decatur?

6    A    Yeah.  It's not completely between Huntsville and Decatur,

7    but it's a certain stretch of 565.

8    Q    Okay.  What's your understanding of why there's been an

9    increase in traffic between Decatur and Huntsville?

10   A    It's primarily the growth in the Huntsville area.  There's

11   a lot of growth that is taking place.

12   Q    Okay.  What kind of growth have you seen in the

13   Huntsville?

14   A    Well, there's, like the Huntsville -- the Toyota Mazda

15   factory.  There's Amazon.  There's new defense industries that

16   are located in Huntsville to really meet the demand of the

17   workforce there.

18   Q    What, if any, economic ties are there between Huntsville

19   and Decatur?

20   A    Well, certainly the job industry that's there in

21   Huntsville.  And I will say that there's some in Decatur, as

22   well.  They have an increase in industry in Decatur.  But most

23   of it, of course, is moving into the Huntsville area.  So --

24   and they have, you know, the convention center where a lot of

25   concerts occur.  Also the -- the Huntsville has a -- well,

```
 1   actually, it's in Madison, but Madison and Huntsville almost
 2   together.
 3        But Madison has the semi-pro baseball team, and they do
 4   have a hockey team there, as well as a -- a -- I guess you
 5   would call it a semi-pro soccer team opened in Huntsville, as
 6   well.  It attracts people, you know, across the north Alabama.
 7   Q    Is there a part of Huntsville that is in your experience
 8   that's predominantly black and a part of Huntsville that's
 9   predominantly white?
10   A    Yes.  Northwest Huntsville is referred to as the
11   African-American area, and south Huntsville is mostly where
12   whites.
13   Q    Are there hospitals in Huntsville?
14   A    Yes.
15   Q    Are there any hospitals in north Huntsville?
16   A    Well, no.
17   Q    Okay.  What industries do Huntsville and Decatur share?
18   A    Really anything to do with the defense industry.  Again,
19   whether that's something to do with missile defense or space
20   development, the Army has several, you know, contract --
21   several -- I guess a lot of industry there.
22   Q    Yeah.  Okay.  Is there an airport in Huntsville?
23   A    Yes.
24   Q    Okay.  About how far is the Huntsville airport from the
25   city of Decatur?
```

```
1   A    It's about 15 miles.

2   Q    Okay.  If someone was traveling from -- to Decatur, what

3   airport would you recommend they fly into?

4   A    The Huntsville International Airport.

5   Q    Why would you recommend that airport?

6   A    Well, it's the closest airport to -- closest, you know,

7   major airport to those cities.

8   Q    Okay.  Do you watch the local TV news?

9   A    Yes.

10  Q    Does your local news report on what's happening in

11  Decatur?

12  A    Yes, it does.

13  Q    Does it also report on things that are happening in

14  Huntsville?

15  A    Yes.

16  Q    Do you read any newspapers?

17  A    Yes, I do.

18  Q    What newspapers do you read?

19  A    Athens News Carrier, Decatur Daily occasionally, Speakin'

20  Out News, and sometimes Huntsville Times, mainly Huntsville

21  Times online.

22  Q    Does the Athens News Carrier report on events happening in

23  Huntsville and Decatur?

24  A    Yes, it does.

25  Q    What is Speakin' Out News?
```

1   A     It's a black newspaper in Huntsville.

2   Q     Okay.  Does Speakin' Out News report on news events in

3   Huntsville and Decatur?

4   A     Yes, it does.

5   Q     Okay.  Does the NAACP ever issue press releases?

6   A     Yes.

7   Q     Okay.  If the NAACP wants to inform people in Huntsville

8   about something that's going on, what news outlets do you all

9   contact?

10  A     Well, we contact the four major TV stations, the radio

11  stations, and, of course, send it to newspapers.

12  Q     What newspapers?

13  A     Speakin' Out News, Huntsville Times, and occasionally,

14  we'll send it to the Athens News Courier, as well.

15  Q     What about the Decatur Daily?

16  A     Yes.  Decatur Daily.

17  Q     Okay.  And what if the NAACP is trying to notify people in

18  Decatur?  What news -- excuse me -- what news outlets do you

19  send a press release to?

20  A     Well, again, the TV stations, the black-owned radio

21  stations, as well as, Decatur Daily Newspaper.

22  Q     Okay.  You mentioned --

23  A     Athens Courier.

24  Q     You mentioned some sports teams earlier, the minor league

25  team in Huntsville area.  In your experience, who attends the

1   -- those games, those minor league team games?

2   A    People all over north Alabama.

3   Q    People from Decatur?

4   A    Yes.

5   Q    People from Huntsville and Madison?

6   A    Yes.  And Athens.

7   Q    Are there any colleges or universities in Madison County?

8   A    Yes, there are.

9   Q    What colleges and universities?

10  A    There's Oakwood, Alabama A&M, Faulkner University has a

11  small campus there, University of Alabama Huntsville, and

12  there's -- Calhoun Community College has a campus in

13  Huntsville.

14  Q    What, if any, Alabama NAACP college chapters have branches

15  at those schools?

16  A    Well, we have -- Oakwood College has a chapter, as well as

17  Alabama A&M has a chapter, college chapter.

18  Q    Based on your experience with your membership, what --

19  from where do those schools tend to draw their students?

20  A    I don't know the specific demographics, but they draw from

21  all -- certainly all over north Alabama.

22  Q    From Decatur and Huntsville?

23  A    Yeah, Decatur, yeah, and Huntsville.

24  Q    Does Alabama NAACP have members in Montgomery County?

25  A    Yes.

1    Q    What are the names of some of the members in Montgomery

2    county?

3    A    Lillian Jefferson.  She's the current president of the

4    metro Montgomery branch, and James Lovejoy, he's a member of

5    the branch there.  And he also serves on our executive

6    committee as a veteran affairs chair for the Alabama State

7    Conference.

8    Q    Mr. Simelton, who is Jerry Burnett?

9    A    Jerry Burnett is a member of the Huntsville Madison County

10   branch.  And he has previously served as president of the

11   Huntsville Madison branch and also served on the executive

12   committee for the Alabama State Conference.

13   Q    Okay.  Who's Bobby Diggs?

14   A    Bobby Diggs is -- he was previous president of the

15   Lawrence County branch.  And he served for -- as our security

16   chair for a while for the Alabama State Conference.

17   Q    Okay.  And, to your knowledge, are the folks that you just

18   named black registered voters?

19   A    Yes.

20   Q    Okay.  Mr. Simelton, has the Alabama NAACP been involved

21   in voting rights lawsuits?

22   A    Voting rights lawsuits?

23   Q    Yes, sir.

24   A    Yes.

25   Q    In your experience, have any of those lawsuits ever

1  resulted in a settlement?

2  A    Yes.

3  Q    Okay.  What, if any, of those lawsuits that settled had to

4  do with voter registration?

5  A    There was back in -- I think it's probably 2012, '13, we

6  were involved in a lawsuit against the State of Alabama for

7  noncompliance with the National Voter Registration Act.  And we

8  worked with the Department of Human Resources and the Medicaid

9  office to get them to become compliance with the National Voter

10  Registration Act by offering their customers, if you will, that

11  came to see them the opportunity to register to vote or to if

12  they, you know, needed something along that line, to make sure

13  that they were registered to vote.  And also to put signage up

14  in their facility informing the clients that they -- when they

15  came there, that they could, you know, ask and get voter

16  registration information.

17  Q    Is your understanding -- why was the Alabama NAACP

18  involved in that settlement?

19  A    Well, I mean, we were involved in the settlement because

20  we were a party to the --

21  Q    Why was the NAACP interested in sort of having Alabama

22  comply with the National Voter Registration Act?

23  A    Well, it's part of our mission to make sure our citizens

24  there are eligible to vote, that they are registered to vote,

25  and that they have opportunity to, you know, register to vote

1    anytime, anywhere they can, you know.  We offer voter

2    registration at our churches and place like that, so, you know,

3    the National Voter Registration Act requires the states to be

4    in compliance, that they offer that, so...

5    Q    And is it -- prior to that settlement, what's your

6    understanding of Alabama's compliance with the National Voter

7    Registration Act?

8    A    They were not compliant.

9    Q    Okay.  Could the settlement have been as recent as 2015 --

10   the settlement that you mentioned, could have been as recent as

11   2015?

12   A    It could have been, yeah.

13   Q    Okay.  Was the Alabama NAACP involved in any other voting

14   rights lawsuits this past year?

15   A    Yes.

16   Q    Okay.  What lawsuits has the Alabama NAACP been involved

17   in this year?

18   A    Well, the absentee voting on SB-1 as well as the voter

19   purge.

20   Q    What is SB-1?

21   A    SB-1 was a legislation passed by the Legislature that

22   prevented organizations like the NAACP from assisting

23   individuals with their absentee ballot application unless we

24   were next of kin.  And so that's kind of it in a nutshell.

25   Q    Okay.  What's your understanding of what happened with

1  that lawsuit?

2  A     Well, there was an injunction -- well, I mean -- yes,

3  there was injunction issued, and we were able to assist those

4  individuals with the applications.

5  Q     Which individuals were you -- are you able to assist?

6  A     Really anyone that asked, but, specifically, you know,

7  some people that, you know, in nursing homes and places like

8  that, that could not -- that need assistance with their

9  absentee application.

10  Q     People who asked who have disabilities or have trouble

11  reading; is that right?

12  A     Oh, yes.

13  Q     Okay.

14  A     Yeah.

15  Q     And why was the Alabama -- do you believe that SB-1 had a

16  racially disparate impact?

17  A     Yes.

18  Q     Why do you believe that?

19  A     Because through our work, we find that it seemed to be

20  more significant number of African-Americans that will need

21  assistance with helping them to not only read, but also

22  understand the -- what is required on the application and how

23  to get it submitted to the proper authorities.

24  Q     Okay.  So you mentioned another lawsuit, I think.  What

25  was the other lawsuit that the Alabama NAACP was involved in

1   this year?

2   A    The purging of voters from voter rolls.

3   Q    What's your understanding of how many voters were purged

4   from the voter rolls?

5   A    Well, the number that was reported I think was 3,200 --

6   3,250, somewhere in that number.

7   Q    Do you believe that the voter purge had racially disparate

8   impact?

9   A    Well, if we had the names, I could probably give you more

10  definitive answer.  But I don't know who they are.

11  Q    Let me ask a different question.  Why was the Alabama

12  NAACP involved in the voter purge lawsuit?

13  A    Well, because we believe that there may be a disparate

14  impact to African-Americans being purged.

15  Q    Why did you believe that there may have been a racially

16  disparate impact on African-Americans?

17  A    Because it seems that any time, anything to do with voting

18  rights, it typically have a more significant impact on black

19  voters.  So we requested a list of names so that we could reach

20  out to those individuals to help them either comply with the

21  law or find out if they, in fact, were, you know, noncitizen s.

22  Q    Did anyone reach out to you about the voter purge or --

23  reach out to the Alabama NAACP, I should say?

24  A    Yeah.  We received several phone calls about people who's

25  -- who had previously been registered to vote, and their names

1  had all of a sudden come up.  And they had to fill out a new

2  registration form, whether they were part of the list or not, I

3  don't know.  We don't know.  But they did reach out to us.

4  Q     In your understanding, the people who reached out to you,

5  were they -- what race were they?

6  A     They were African-Americans.

7  Q     And to your understanding, were those individuals citizens

8  or not?

9  A     Yes.  Yes.

10  Q     Yes, they were citizens?

11  A     Yes.  They were citizens.

12  Q     Okay.  What's your understanding of what happened with the

13  voter purge lawsuit?

14  A     Well, they were -- the Secretary of State was ordered to

15  notify all those that received these notifications and to

16  restore their names to the voter rolls.

17  Q     Okay.  What are some of the major Civil Rights issues that

18  the Alabama NAACP works on at the state level?

19  A     Well, you just mentioned several of them -- voting rights

20  issues.  We also work on criminal justice -- unfair sentencing

21  of particular people of color to, you know, incarceration.  We

22  also work on education, ensuring that our -- particularly our

23  students of color are not being really harmed by the punishment

24  that they're receiving, because it's certainly a disparate

25  impact to African-Americans that are receiving the harshest

1    punishment from our school system.  And also to ensure that our

2    schools, particular public schools, are providing adequate

3    education and that the dollars -- public dollars are not going

4    to private schools.

5    Q    Okay.  What, if any, issues around healthcare does the

6    Alabama NAACP work on?

7    A    We work on AIDS, we worked on expansion of Medicaid in the

8    state of Alabama, and just access to adequate medical care,

9    because so many of our hospitals are closing.  And a lot of our

10   people are having to drive longer distance to get to, you know,

11   hospitals or medical care.

12   Q    When you say our people, do you mean African-Americans?

13   A    African-American people, yeah.

14   Q    What, if any, Huntsville-based legislators have you met

15   with about those Civil Rights issues that you have just

16   discussed?

17   A    I met with Anthony Daniels again and Laura Hall to talk

18   about -- especially Representative Hall talking about

19   healthcare issues.

20   Q    Have any Huntsville-based white legislators ever reached

21   out to you to discuss those Civil Rights issues?

22   A    No.

23   Q    Mr. Simelton, why is the NAACP a plaintiff in this

24   lawsuit?

25   A    We are a plaintiff because we want to ensure that

1  African-American votes are being heard and that we are not

2  being either packed into a particular district where we can't

3  have a voting strength -- I mean, where we can't have voting

4  power, and at the same thing with cracking, where they are

5  spread out so much that we won't have a voting power.

6      And on the packing, they tend to pack people in so that we

7  can only elect one person to represent us and not have more

8  than one person, you know, to represent us -- represent blacks,

9  African-Americans.

10 Q    Thank you.

11     MR. ROSS:  Your Honor, I have the addresses of the

12 members that he just listed.  I don't know if they're willing

13 to stipulate or how we want to handle it, if we want to close

14 the courtroom to go over it or --

15     THE COURT:  I tell you what, this is a great time for

16 our afternoon break.  It's 3:26.  Why don't we come back at

17 3:45, and that will give y'all long enough to break and

18 hopefully long enough to discuss.

19     (Recess.)

20     THE COURT:  Please be seated.

21     All right.

22     Mr. Ross, what can you report on the addresses?

23     MR. ROSS:  We conferred with the defendants, and

24 they're willing to stipulate to the addresses of the members

25 that were named in Mr. Simelton's testimony.

```
 1              THE COURT:  Excellent.  Thank you.  Can I ask y'all to
 2   please file just an updated statement of undisputed facts, and
 3   you can redact what you need to redact and then submit an
 4   unredacted one separately.
 5              MR. ROSS:  Thank you.
 6              THE COURT:  If someone will remind me, I just need a
 7   joint motion to file it under seal, the unredacted ones, and I
 8   can sign off on that quickly.
 9              MR. ROSS:  Thank you, Your Honor.
10              THE COURT:  Great.  Thank you.
11              MR. ROSS:  Passing the witness.
12              THE COURT:  Excellent.  Thank you.
13                         CROSS-EXAMINATION
14   BY MR. TAUNTON:
15   Q    Good afternoon, Mr. Simelton.
16   A    Good afternoon.
17   Q    Coming back to -- you testified a little bit to your
18   background.  You didn't grow up in Alabama, right?
19   A    Okay.  I can't hear you.
20   Q    I'm sorry.
21              THE COURT:  I was going to say, Mr. Taunton, if you
22   will just get it in your line of sight.
23   BY MR. TAUNTON:
24   Q    I said you didn't grow up in Alabama, right?
25   A    Grow up?
```

```
1   Q    Grow up.

2   A    No.

3   Q    Okay.  And you moved to Harvest, Alabama around 2001; is

4   that correct?

5   A    Yeah.  2002 was actually when moved to Harvest, but I

6   moved to Alabama in 2001.

7   Q    Okay.  Did you move to the Huntsville area in 2001 maybe

8   or?

9   A    Yes.

10  Q    Okay.  So you were in Huntsville area in 2001, moved to

11  Harvest in 2002?

12  A    Yes.

13  Q    Now, you got involved in the NAACP -- real quick on that,

14  in depositions, we were call it the NAACP, and I think today we

15  have been calling it the NAACP.  Is there a preference?

16  A    Well, the NAACP is the preference, but either way.  We

17  don't get upset one way or the other.

18  Q    I will use the preferred names.

19       So you got involved in the NAACP prior to moving to

20  Harvest, Alabama, right?

21  A    Yes.

22  Q    And when was that?  When did you get involved with the

23  NAACP?

24  A    Now, you talking about in Alabama or NAACP in general?

25  Q    In general.
```

1  A    That was in '96, '97 time frame in Albuquerque, New

2  Mexico.

3  Q    And you hadn't lived in Alabama at that time; is that

4  right?

5  A    You say I had not?

6  Q    Had not.

7  A    No, I had not lived in Alabama.

8  Q    So your reasons for becoming involved with NAACP were not

9  tied to your experiences in north Alabama; is that right?

10 A    No.

11 Q    Okay.  You testified a little bit about the structure of

12 the state conference and the Alabama NAACP, right?

13 A    Yes.

14 Q    So does joining a local unit -- does becoming a member of

15 a local unit also make you a member of the state conference?

16 A    It makes you a member by association of the state

17 conference.

18 Q    And what do you mean by that?

19 A    The same way with the national organization.  The

20 individual membership card states that unit they belong to, but

21 because you are in the state of Alabama by association with the

22 NAACP, you are a member of the state conference, and you are a

23 member of the national organization.

24 Q    Okay.  So maybe just two follow-up questions.  I think we

25 talked about this a little bit in your deposition.  But there's

1   no way for a person to join just the state conference of the

2   NAACP, right?

3          MR. ROSS:  Objection.  Objection.  Misconstruing his

4   testimony.

5          THE COURT:  Okay.  Well, he can tell him if he is.

6          MR. ROSS:  Sure.

7          THE WITNESS:  Repeat the question again.

8   BY MR. TAUNTON:

9   Q    Ignore what your prior testimony was.  I'm asking you the

10   question now.  Is there a way -- is there a way for a person to

11   join just the state conference of the NAACP without being

12   involved in a local unit?

13   A    No.  There's not.

14   Q    Okay.  So but the state conference considers -- does it

15   consider all people who have joined local units and are in good

16   standing with local units to be members of the state

17   conference?

18   A    Yes.

19   Q    Okay.  Yes which -- I'm sorry.  I asked a compound

20   question.  That was my fault.  Let me ask it differently.

21      Does the state conference consider all members in good

22   standing of local units in the state of Alabama to also be

23   members of the state conference?

24   A    You said of the state conference?

25   Q    Yes, sir.

1  A    Yes.

2  Q    Okay.  Thank you.

3       You testified a little bit earlier about the Decatur and

4  Huntsville branches of the NAACP and some of the events they

5  held, right?

6  A    Yes.

7  Q    Do those branches hold events together, like are they

8  jointly sponsored?

9  A    No.  Typically, one organization will hold the event and

10  invite the other.

11      Now, there are occasions when they may held a common

12  interest of an item issue that they come together to jointly

13  speak out on that particular issue.

14  Q    Okay.  Would that be with an event or with a press

15  release, or when you say speak out, what do you mean?

16  A    Yeah.  A press conference.

17  Q    Okay.  When is the last example you can think of that

18  happening?

19  A    Last -- was it last year?  I think it was last year, maybe

20  year before last we came together to speak out on Congressman

21  Mo Brooks.

22  Q    Okay.

23  A    Issue.  And this year -- this year we came out to speak

24  about Senator Tuberville position on the veterans not -- not

25  veterans, but not promoting military officers.

1  Q    The -- you mentioned that the Decatur branch might hold an

2  event and invite the Huntsville branch or vice versa, right?

3  A    Okay.  I'm still having difficulty understanding.

4  Q    I'm sorry.

5      You said that the Decatur branch might hold an event and

6  invite the Huntsville chapter or maybe vice versa, right?

7  A    Yes.

8  Q    Does the Decatur branch always invite the Huntsville

9  chapter to its events?

10  A    No.

11  Q    Does the Huntsville chapter always invite the Decatur

12  branch to its events?

13  A    And let me back up.  When I say no, it's not a formal

14  invitation.  There are some things they send a formal

15  invitation.  Other things if they wanted to attend, then, you

16  know, they contact the president and say, well, we'd like to

17  attend.  But they don't always send a formal invitation to

18  them.

19  Q    So I guess maybe two follow-up questions to that, if the

20  Decatur branch were hosting an event, could somebody from --

21  I'm trying to think where else y'all have branches.  Do y'all

22  have a branch in Cullman County?

23  A    What county?

24  Q    Do you have a branch in Cullman County?

25  A    Cullman, no.

1    Q    Or Marshall County?

2    A    Yes.

3    Q    Okay.  So could somebody from the Marshall County unit of

4    the NAACP attend an event that's sponsored by the Decatur

5    branch?

6    A    If it was, you know, open to the public.  I mean, if it's

7    not a closed meeting or something like that, but typically

8    events are open.  They could buy a ticket to -- if it's a gala

9    or something like that, or if it's a press conference, you

10   know, they can attend.  But they may not be able to speak.  But

11   they can attend for support.

12   Q    So when you were speaking with counsel about invitations,

13   you know, Morgan County inviting -- or Decatur inviting

14   Huntsville or Huntsville inviting Decatur, were those formal

15   invitations or informal invitations that you were talking

16   about?

17   A    I was talking about formal invitation.

18   Q    Okay.  And how often does the Decatur branch send a formal

19   invitation to the Huntsville branch, would you estimate?

20   A    I would say, you know, a couple of times a year.

21   Q    Okay.  And how often would you estimate that the

22   Huntsville branch sends a formal invitation to the Decatur

23   branch?

24   A    Probably similar.

25   Q    Okay.  You testified briefly about being a deacon in your

1  church, right?  Being a deacon in your church, correct?

2  A    Yes.

3  Q    Okay.  And you mentioned that as part of your duties as

4  part of your service there, you have a ward of -- a group of

5  individuals that you help shepherd, right?

6  A    Yes.

7  Q    And one of those individuals you said lives in Decatur,

8  correct?

9  A    Yes.

10  Q    How large is your ward?

11  A    We have about I would say about 50 -- about 50 people.

12  Q    Okay.  To your knowledge, do -- does anybody else in your

13  ward live in Decatur?

14  A    No.  No.

15  Q    Okay.  You were talking a little bit about the ethic

16  makeup of the Huntsville region, right?

17  A    Yes.

18  Q    And I think you said that south Huntsville was

19  predominantly white; is that right?

20  A    Well, again, that's kind of what people kind of referred

21  to the southern part of Huntsville as the white area, you know.

22  I haven't done any analysis to see if the numbers are correct,

23  but that's generally what people refer to, and it appears that

24  way.

25  Q    And is Decatur north or south of Huntsville?

```
1   A    Is Decatur --

2   Q    Is Decatur south of Huntsville?

3   A    It's more west.

4   Q    Southwest?

5   A    Yes.

6   Q    Okay.

7   A    Yeah.

8   Q    You testified a little bit about the NAACP's involvement

9   in a ballot harvesting lawsuit fairly recently, correct?

10          MR. ROSS:  Objection.  There's no testimony about

11  ballot harvesting.

12  BY MR. TAUNTON:

13  Q    SB-1.  You testified about a lawsuit to enjoin SB-1, which

14  was targeted at what I guess the State characterized as ballot

15  harvesting; is that fair?

16  A    Yes.  We were involved in SB-1.

17  Q    Okay.  I'm just talking about that lawsuit.  I'm trying to

18  identify the lawsuit so we're talking about the same thing,

19  okay?

20  A    Yes.

21  Q    Were -- now, you said that an injunction was eventually

22  issued in that case, right?

23  A    Yes.

24  Q    Now, weren't a lot of the claims in that case, though,

25  dismissed?
```

1    A    Yes -- well, yes.

2    Q    And the injunction applied specifically to individuals who

3    were handicapped, such as blind or illiterate; is that right?

4    A    Yes.  And those who could not read.

5    Q    Correct.  Okay.  Thank you.

6         The NAACP conducts frequent voter registration drives,

7    right?

8    A    Correct.

9    Q    And the state conference expects its local branches to

10   conduct voter registration drives, right?

11   A    Yes.

12   Q    Do you consider -- do you consider voter registration

13   process a difficult process?

14        MR. ROSS:  Objection.  I'm not sure what he means by

15   difficult.

16        THE COURT:  If the witness is confused, he can say.

17        THE WITNESS:  Beg your pardon?

18        THE COURT:  If you understand the question, you may

19   answer.  And if you are confused, you may ask that it be

20   clarified.

21        THE WITNESS:  Okay.

22        Repeat the question.

23   BY MR. TAUNTON:

24   Q    Do you consider the process of registering to vote, do you

25   consider that a difficult process?

1    A    For a person that is capable of understanding and who has

2    access and who can write and not visually impaired or anything,

3    it's fairly straightforward process.

4    Q    Okay.  Have members of the NAACP ever run for office?

5    A    Yes.

6    Q    And so if you had -- have you had an opportunity to

7    observe their campaigns in your position with the NAACP?

8    A    When you say opportunity, the opportunity's there, but we

9    are nonpartisan, so I do not participate in their campaigns or,

10   you know, what their records are or anything.

11   Q    I understand.  I'm not asking whether the NAACP has ever

12   endorsed a candidate or anything like that.  But if you had an

13   opportunity generally in that position to observe the process?

14   A    Again, the opportunity's there.  Do I do it?  The answer

15   is no.

16   Q    So you don't know whether it takes, for instance, funding

17   or infrastructure to run an effective campaign?

18   A    I assume it takes funding, but I don't quite understand

19   the question.

20   Q    Well, in a contested election, would simply announcing

21   your candidacy for office but otherwise doing very little to

22   raise campaign funding or build campaign infrastructure likely

23   result in a successful campaign?

24   A    It probably would not.  Again, it depends on who you're

25   running against and if you're running against anyone.  So there

 1  are a lot of factors involved in really responding to your

 2  question, so...

 3  Q    In the last five years, have you had any communications

 4  with any members of the NAACP that have said they wanted to be

 5  more politically engaged but could not be because they couldn't

 6  engage with the Democratic party?

 7         MR. ROSS:  Objection, Your Honor.  It's beyond the

 8  scope of the cross -- excuse me -- the direct.

 9         MR. TAUNTON:  Your Honor, I mean, it's cross.  It's

10  not redirect.  I don't know that my scope is entirely limited

11  by -- entirely by his direct.

12         MR. ROSS:  Yeah.  It's not impeachment either, Your

13  Honor.  There's no reason for him to ask him questions about a

14  political party when we didn't ask him anything about that on

15  direct.

16         MR. TAUNTON:  Your Honor, the case is about the -- the

17  allegation is that the members of the NAACP have not been able

18  to fully engage with the political processes in the state of

19  Alabama.  I'm asking him questions related to that.

20         THE COURT:  The question was:  In the last five years,

21  have you had any communications with any members of the NAACP

22  that have said they wanted to be more politically engaged but

23  could not because they could not engage with the Democratic

24  party.

25         MR. TAUNTON:  Correct, Your Honor.

1          THE COURT:  I think to the extent you're asking

2     questions about whether members of the organization feel

3     they're unable to participate equally in the political process,

4     I think that's allowed.  But if it's going somewhere else, it

5     may not be.

6          MR. TAUNTON:  Your Honor, it is I think entirely

7     limited to that.  There's not really a follow-up question.

8          THE COURT:  Okay.  You may answer that one.

9          THE WITNESS:  Okay.  I'm still a little confused here.

10    So help me out with what am I answering.

11    BY MR. TAUNTON:

12    Q    I can repeat the question.  In the last five years, have

13    you had any communications with any members of the NAACP that

14    said they wanted to be more politically engaged but could not

15    be because they could not engage with the Democratic party?

16    A    The Democratic party?

17    Q    Yes, sir.

18    A    Okay.  No.

19    Q    Okay.  In the last five years, have you had any

20    communications with any members of the NAACP that said they

21    wanted to be more politically engaged but could not be because

22    they couldn't engage with the Republican party?

23    A    No.

24    Q    Let me ask you a little bit about the reapportionment

25    process and the NAACP's participation in it.

 1        Did a representative -- well, representative of the state

 2   conference attended public hearings for the reapportionment

 3   committee concerning the 2021 Senate district map, right?

 4   A    You said did members of the NAACP attend the hearing?

 5   Q    Yes, sir.

 6   A    Yes.

 7   Q    Okay.  But that representative didn't speak at the

 8   hearing, did he?

 9   A    No.

10   Q    Did the state conference provide any comments on the 2021

11   Senate district map that was enacted by the Legislature?

12   A    I don't recall on that one whether we provided any or not.

13   Q    If I were to -- you gave a deposition in this case,

14   correct?

15   A    I did what now?

16   Q    Did you give a deposition in this case?

17   A    Yes.

18   Q    In April?

19   A    Yes or whenever it was.  I don't remember the date.

20   Q    If I were to show you your deposition, could that reflect

21   --

22   A    Yes.

23   Q    Refresh your recollection?

24   A    Yes.

25   Q    So we turn to page 207 of that deposition.

1    And I -- if we -- I can't see it.  Can you see the

2  deposition?

3  A    Yes.

4  Q    Okay.  So beginning at line 7, I asked you:  Did anybody

5  from the NAACP state conference examine the 2021 Senate

6  district map before it was passed and provide any comments?

7  And do you see your answer in line 10?

8  A    Yes.  I see the answer.

9  Q    So I will ask you again:  Did the state conference provide

10 any comments on the 2021 Senate district map before it was

11 passed by the Legislature?

12 A    No.

13 Q    Okay.  Is it the state conference's position that the

14 Alabama State Legislature should consider race as a key factor

15 when drawing district lines in the state of Alabama?

16       MR. ROSS:  Objection.  Beyond the scope.  It's

17 ambiguous.  I'm not sure what he's asking.

18       MR. TAUNTON:  This goes directly to the heart of the

19 claims of this case.

20       MR. ROSS:  There's no intentional discrimination claim

21 or claim about the use of race in the districting anymore.

22       MR. TAUNTON:  If nothing else, it goes to the totality

23 of the circumstances.

24       THE COURT:  Why?

25       MR. TAUNTON:  Well, certainly, if there were --

1          THE COURT:  I think the answer would be different if

2     there were -- to be clear, if there were an intentional

3     discrimination claim in the case.  But...

4          MR. TAUNTON:  Your Honor, he provided testimony that

5     the state -- State of Alabama should actually have in its

6     guidelines -- or what we were discussing the guidelines that

7     one of the guidelines should be the consideration of race and

8     as we'll see in follow-up how that should be considered.

9          THE COURT:  He did that in the deposition.  I'm asking

10    why it's admissible now.

11         MR. TAUNTON:  I think it goes to the question of what

12    guidelines were actually used, whether -- what the criteria

13    were for considering the map and what constitutes a reasonably

14    configured district ultimately.

15         MR. ROSS:  Which, Your Honor, are --

16         THE COURT:  Go ahead, Mr. Ross.  I'm sorry.

17         MR. ROSS:  Mr. Simelton didn't testify about what a

18    reasonably reconfigured district was or what -- or anything

19    about the illustrative map here.  And, again, we don't have an

20    intent claim or a racial gerrymandering claim anymore.

21    Mr. Simelton also didn't testify about redistricting

22    guidelines, so it's --

23         THE COURT:  To be clear, I'm less concerned about what

24    occurred in the deposition.  What I'm concerned about is what

25    is admissible now.  And as I understand it, reasonably

1   configured district is for the Court to determine as the fact

2   finder.  And I still haven't heard anything that makes relevant

3   the NAACP's belief about what the role of the race should be in

4   Alabama's redistricting process.  That's what I'm looking for.

5           MR. TAUNTON:  Your Honor, it affected their decision

6   about when to bring a claim, what kind of claim to bring, and

7   ultimately, it -- he did testify concerning what he thought the

8   shape the district could or should be.

9           THE COURT:  Well, that he testified about it doesn't

10  make it relevant.

11          MR. TAUNTON:  I understand, Your Honor.  But obviously

12  --

13          THE COURT:  And the same for the decision about what

14  claim to be bring.  I mean, I have got a claim sitting here I

15  have got to adjudicate.  The strategic decision about what to

16  plead is not relevant to the fate of what was pled.

17      I guess I will put it this way:  I understand why you want

18  to ask the question.  Why do you need to ask the question?

19          MR. TAUNTON:  Your Honor, I think that this Court is

20  going to consider lots of evidence about what a reasonably

21  configured district would be.  I think evidence about what the

22  plaintiffs consider a reasonably configured district to be

23  could be probative to that.  Traditional districting principles

24  and these types of things are certainly before the Court as it

25  considers what a reasonably configured district is.

1          THE COURT:  Are the plaintiffs offering this witness

2     to prove anything about reasonably configured districts?

3          MR. ROSS:  No, Your Honor, nothing beyond his

4     testimony about the relationship between Huntsville and

5     Decatur, but nothing specific to redistricting guidelines, what

6     redistricting guidelines were considered, the motivation of

7     legislators.  He didn't -- none of his testimony goes to that,

8     Your Honor.

9          MR. TAUNTON:  Your Honor, it also goes to communities

10    of interest and what communities of interest they thought

11    should and should not be considered as the NAACP was

12    considering what communities of interest could be drawn into a

13    reasonable district.

14         MR. ROSS:  And there was no testimony from him about

15    what a reasonably configured district is or -- you know, beyond

16    his general testimony about factors that may be relevant to

17    communities of interest.  He didn't testify about what are or

18    are not communities of interest.

19         THE COURT:  I still don't see why it matters for my

20    limited task what the NAACP thinks the Alabama Legislature

21    ought to do with race as a consideration.

22         MR. TAUNTON:  Your Honor, really this is a foundation

23    question that will go to actually specific maps before this

24    Court.

25         THE COURT:  Well, he's not testifying about those.

1          MR. TAUNTON:  Well, I had like to ask him questions
2     related to at least one of them.
3          THE COURT:  Why does the NAACP's position on the role
4     that race should play relate to that?  Why is it foundational?
5          MR. TAUNTON:  Well --
6          THE COURT:  I mean, I assume the lawyers are going to
7     make all kinds of arguments about reasonably configured, and
8     you are going to do it on the basis of different bodies of
9     evidence.  The plaintiffs have just stipulated that their
10    evidence about reasonably configured is not going to be this
11    witness.
12         MR. TAUNTON:  Well, Your Honor, that's not entirely
13    true.  He certainly has offered evidence concerning communities
14    of interest, and in particular tying -- or seeking to tie
15    together Huntsville and Decatur if not other areas.  That is
16    one of the things this Court will consider in the context of
17    reasonably configured.
18         THE COURT:  But why does that open the door to what
19    the Legislature ought to do with race?  I mean, it opens the
20    door to impeaching, seeking to impeach what he said about
21    Huntsville and Decatur.  You can ask questions about that for
22    sure.  But why does that open the door to writ large what the
23    Legislature ought to be doing?  I mean, I think the question is
24    whether the map the NAACP has challenged violates Section 2 or
25    doesn't.

1             MR. TAUNTON:  Correct.  And the NAACP had a view about

2    when it did and when it did not.

3             MR. ROSS:  Your Honor.  Sorry.  To the extent, he's

4    going to ask my client about when he decided to sue and why he

5    decided to sue, that obviously potentially implicates the

6    privilege and attorney work product, so it's even more far

7    afield from anything Mr. Simelton testified to or anything that

8    would be relevant to this Court's analysis.

9        Again, this is not an intent case.  Plaintiffs are not

10   questioning or trying to question the motive of the

11   Legislature.  Mr. Simelton simply testified to a few relevant

12   facts, which the Court may or -- which plaintiffs or the Court

13   or defendants may or may not use about communities of interest.

14       And so to the extent he wants to ask him about communities

15   of interest, we understand that he may open the door to that,

16   but we -- I didn't show him maps.  He didn't testify to maps.

17   And I think it's far beyond the scope and irrelevant.

18            MR. TAUNTON:  Your Honor, he testified that he -- he

19   did look at maps.  He did testify to that.  And also I'm

20   primarily interested not in what the Legislature should or

21   should not do which ultimately this Court will determine, but

22   instead what the NAACP's understanding of those things is.

23       Ultimately, why the NAACP believes that a suit like this

24   is due to be brought, why they ultimately decided to bring

25   that, and I don't think that we will not touch on issues of

1   privilege, at least anymore than privilege was waived within

2   the deposition itself.

3        THE COURT:  Well, I mean, Mr. Ross asked why the NAACP

4   is a plaintiff in the case.  So you can certainly ask that

5   question and engage with him about his answer there.  But I

6   don't think that opens the door to what the Legislature should

7   or should not have considered about race as an input for this

8   map.

9        MR. TAUNTON:  Your Honor, as far as it concerns that

10   specific issue, I will say I don't have any follow-up questions

11   to the one that I asked.  I mean, I asked him if he has a

12   position on that.  But that -- I really don't have any

13   additional questions for him concerning the legislative

14   guidelines.

15        THE COURT:  All right.  The question that drew the

16   objection is:  Is it the state conference's position that the

17   Alabama State Legislature should consider race as a key factor

18   when drawing district lines in the state of Alabama?

19        MR. TAUNTON:  Correct, Your Honor.

20        THE COURT:  I still don't have a relevance hook for

21   that.

22        MR. TAUNTON:  Your Honor, if -- I'm happy to ask my

23   next question, and if the Court is satisfied that it -- if it

24   doesn't draw the objection and the Court is satisfied that I

25   can proceed on that, then I'm happy to proceed.

```
 1              THE COURT:  Let me hear the next question.
 2   BY MR. TAUNTON:
 3   Q    Mr. Simelton, is it the NAACP's position that if a
 4   majority-black district can be created, it should be created?
 5   A    That's the question to proceed to answer?
 6              MR. ROSS:  Objection, Your Honor.  I'm not sure -- it
 7   seems to ask for a legal conclusion, and I'm not quite sure
 8   what his question was, in fact, asking.  So apparently he needs
 9   to rephrase it.
10              MR. TAUNTON:  I am not asking him for a legal
11   conclusion.  I'm asking for him -- I'm asking for his
12   understanding and what the -- again, the understanding and
13   position of the NAACP is on that.
14         The Court ultimately decides the law.
15              THE COURT:  You may answer that question.
16   BY MR. TAUNTON:
17   Q    Would you like for me to repeat it, Mr. Simelton?
18   A    Yes, sir.
19   Q    Is it the NAACP's position that if a majority-black
20   district can be created, it should be created?
21   A    That -- the answer is we believe that's what Section 2 of
22   the voting rights allows.
23   Q    Is that the same as yes?
24   A    The Section 2 of voting rights allow that?  The answer is
25   --
```

1   Q    Now, I --

2   A    If that is allowed under Section 2 of the Voting Rights

3   Act, which we believe it is, then the answer is yes.

4   Q    Okay.  Now, the state conference had evaluated bringing a

5   lawsuit like this one for several years, hadn't it?

6            MR. ROSS:  Objection.  Excuse me.  This is calling for

7   attorney-client privilege and work product.

8            MR. TAUNTON:  Without -- I'm happy to stipulate that

9   you should not reveal any conversations with counsel.

10           MR. ROSS:  He's asking him about what the -- what the

11  NAACP considered and what lawsuits it considered bringing.  Of

12  course, that's entirely within the privilege.  I don't know

13  what would be a non-privilege answer.

14  BY MR. TAUNTON:

15  Q    I'm happy to rephrase the question.

16           Had the NAACP state conference for several years had

17  discussions about the possibility of creating another district

18  in north Alabama for African-Americans to get elected to the

19  Senate?

20           THE COURT:  Mr. Simelton, I am going to instruct you

21  that in answering the question, you can't reveal anything about

22  conversations with attorneys.

23           MR. ROSS:  Including with the NAACP's internal

24  attorneys at the general counsel's office of the NAACP

25  attorneys.

1          THE WITNESS:  The response would be based on

2    discussions that we have had with attorneys.  I mean, I haven't

3    -- we didn't come up with this ourselves.

4          MR. ROSS:  Your Honor, I --

5          THE COURT:  All right.  Then the objection based on

6    the privilege is sustained if he can't answer it without

7    revealing conversations with attorneys.

8          MR. TAUNTON:  Your Honor, I -- I just read his answer

9    in a deposition.  So I mean, I'm not asking him for anymore

10   than he already has revealed.  And there was no objection on

11   the basis of privilege at the time that the question was asked.

12   BY MR. TAUNTON:

13   Q    So I am not asking you to go beyond what has already been

14   stated.  I'm only asking you if that question -- if that

15   question is true.

16         THE COURT:  What was the question from -- I don't have

17   the question.  What was the question from the deposition?

18   BY MR. TAUNTON:

19   Q    Mr. Simelton, if we could maybe refresh your recollection,

20   we'd go to your deposition on page 67 beginning at line 17 and

21   then through line 6.  And at some point, you did reference

22   conversations with counsel.  And I think both myself and your

23   counsel instructed you not to provide any further testimony

24   concerning that.

25         Mr. Simelton, based on your review --

1          MR. ROSS:  Your Honor, there was an objection to
2    privilege in the middle of this deposition.  So it's not clear
3    to me.
4          THE COURT:  Well, but Mr. Naifeh it says at line 13,
5    you can say that.  So I think the answer that begins at line 22
6    on 67 through page 68, line 6 is in, but nothing beyond that.
7          MR. TAUNTON:  Your Honor, that's -- I am not asking
8    him anything beyond that.
9          THE COURT:  All right.  Well, if you want that in the
10   record, I think you need to refresh his recollection.
11   BY MR. TAUNTON:
12   Q    Mr. Simelton, based on your review of the deposition
13   there, had the state conference been evaluating bringing a
14   lawsuit like this for several years?
15   A    And I hate to ask the question with the question because I
16   don't want -- I want to make sure I answer your question
17   correctly.
18         MR. ROSS:  Your Honor, there is also an objection to
19   form.  I'm not sure this is proper refreshing recollection.  I
20   also, again, raise my objection to relevance.  He asked a
21   confusing and improper question and then got an objection to
22   attorney-client privilege.  So obviously, whatever he said in
23   the deposition that came out before the objection, we
24   understand is in.  But asking him to testify beyond that seems
25   improper to the plaintiffs.

1          THE COURT:  All right.  I think the answer that he

2   gave before the privilege objection is fairly in.  I think

3   anything beyond that or any characterization of that is subject

4   to the privilege objection.  I think the privilege objection

5   was waived as to the answer in the deposition that came before

6   the privilege objection.

7          MR. TAUNTON:  Understood, Your Honor.  I'm not trying

8   to probe any -- any further past that.

9          THE COURT:  All right.

10          THE WITNESS:  Start again?

11   BY MR. TAUNTON:

12   Q    Yeah.  I am a little lost as to where we are with the

13   question.  But I think it was this:  Had the state conference

14   before bringing this lawsuit evaluated bringing a lawsuit like

15   this for several years?

16   A    Again, depends on what you mean by evaluated.

17          We have not done -- we did not do any evaluation, but we

18   did --

19   Q    Don't tell me about evaluations of counsel.

20   A    Beg your pardon?

21   Q    Don't tell me about evaluation of counsels.

22   A    That's what you said is evaluation.

23          MR. ROSS:  Your Honor, it seems -- if he can just read

24   this answer into the record, that seems --

25          THE COURT:  Why don't you read the answer into the

 1  record and ask him if he wants to change it.

 2  BY MR. TAUNTON:

 3  Q    Yeah.  I tried that earlier and drew the objection, but I

 4  will do that now.

 5          THE COURT:  Well, I mean, to be fair, it doesn't say

 6  evaluating bringing a lawsuit.  What it says is there have been

 7  discussion for several years that it may be possible to create

 8  another district.

 9          MR. TAUNTON:  Okay.

10  BY MR. TAUNTON:

11  Q    So, Mr. Simelton, I think I asked you this question:  I'd

12  asked you:  How did the Stone matter come to your attention?

13      I believe your answer was:  There had been discussion for

14  several years that it may be possible to create another

15  district in north Alabama for an African-American to get

16  elected to the Senate.  And this is probably three or

17  four years ago.  You know, just casual conversation; is that

18  correct?

19  A    That is correct.

20  Q    Do you stand by that answer?

21  A    Stand by the answer?

22  Q    Yes, sir.

23  A    Casual conversation, yes.

24  Q    Then the NAACP, of course, brought this lawsuit following

25  the reapportionment process after the 2020 census, right?

1  A    Yes.

2  Q    Is one of the reasons that the state conference did not

3  bring this lawsuit prior to the 2020 census because the state

4  conference did not believe that a valid majority-black district

5  could be drawn?

6        MR. ROSS:  Objection.  Not sure what valid means.

7  BY MR. TAUNTON:

8  Q    I believe it is the word that you used.  But did the state

9  conference believe that it could succeed in a lawsuit prior to

10  the 2020 census?  And let me -- that's phrase is confusing.

11  Let me ask this:  Did the state conference decline to bring

12  this lawsuit in the north Alabama area prior to the 2020 census

13  because the state conference did not believe it could succeed

14  in that lawsuit?

15        MR. ROSS:  Which again, Your Honor, likely involved

16  conversations with counsel.  So to the extent he's asking for

17  any information which Mr. Simelton testified about with --

18  excuse me -- spoke with counsel about the viability of any

19  claim, plaintiffs would object.

20        MR. TAUNTON:  I could try rephrasing the question,

21  Your Honor.

22  BY MR. TAUNTON:

23  Q    Would the population shifts following the 2020 census in

24  the Huntsville area have an impact on the state conference's

25  decision to participate in the Stone lawsuit?

1  A    Yes.

2  Q    How so?

3  A    We believed that there were increase in African-Americans

4  in the Huntsville area after looking at the numbers that the

5  increase in the number of African-Americans in the area that

6  there would be an increased possibility of creating a district.

7  Q    And how did that in particular impact the state

8  conference's decision to participate in the Stone lawsuit?

9  A    It was a -- kind of a combination of the time was right,

10  and let's proceed.

11  Q    Was there a shift in population that made you believe that

12  there was a way to create a majority-black district in the

13  Huntsville area?

14         MR. ROSS:  Objection.  Asked and answered.

15         MR. TAUNTON:  Your Honor, I don't know if that was.

16         MR. ROSS:  Well, he answered.

17         THE WITNESS:  I mean, we did not do an analysis or

18  anything like that.  We just knew that there were more people

19  moving into that area -- into the Huntsville Madison County

20  area.

21  BY MR. TAUNTON:

22  Q    Do you know if majority of black district could have been

23  drawn before the 2020 census?

24  A    We don't -- again, we didn't do an analysis, so we don't

25  know if there could have been or not.

1  Q     Did the NAACP believe that a majority-black district could

2  be drawn prior to the 2020 census but only by splitting four

3  counties?

4          MR. ROSS:  Your Honor, I renew my prior objections

5  about relevance and beyond the scope.  Again, there was no

6  testimony from Mr. Simelton at all about whether he thought it

7  was possible to draw a majority-black district beyond his

8  general statement that he doesn't believe cracking and packing.

9  And there's no testimony from him about any map, you know, what

10  population changes in Huntsville.

11     So, again, this is not what Mr. Simelton was put up by the

12  plaintiffs to testify about.  That's beyond the scope of his

13  knowledge or his direct testimony.

14          MR. TAUNTON:  Your Honor, I believe, if I can get an

15  answer to it, this is probably my last question in this line.

16          Second, he was asked about the NAACP's decision to

17  participate in the lawsuit, why they're participating in the

18  lawsuit, and the NAACP is a plaintiff requesting the power of

19  this Court to do these things.

20     They're -- why they have invoked the power of the Court

21  and why they have invoked the power of the Court now as opposed

22  to some other time I think is relevant.

23          THE COURT:  So I think I need to know answers to

24  questions about why the NAACP believes it's entitled to relief.

25     I do not think I need to know answers to questions about

why they did not previously believe they were entitled to

relief.

So if you can frame the question in a way that is relevant

to what I need to know or have to decide, then I think the fact

that it was not specifically asked in the direct is not a

sustainable objection.

But why the NAACP changed its mind about whether to bring

a lawsuit or not bring a lawsuit is not material to whether it

is now entitled to relief.  Questions about its position as to

why it is now entitled to relief are relevant.

BY MR. TAUNTON:

Q    When the NAACP brought this lawsuit, did it believe that a

majority-black district could be drawn without splitting four

counties?

A    Yes.

Q    Okay.  And did it believe that that was true after the

2020 census?

A    Let me back up and answer that question.  I'm -- I should

have stated this upfront.

But it was only after we -- I mean, we had in our minds

that it could be done, but --

MR. ROSS:  Your Honor, I guess I'm concerned that he

may testify about --

THE COURT:  I'll reissue my warning.  Okay, so

Mr. Simelton, you may answer the question, but you may not

 1  reveal conversations with counsel.

 2      So make sure that you limit yourself in your answers to

 3  things that were not derived from conversations with counsel.

 4          MR. ROSS:  I think that, Your Honor, that he can't

 5  testify --

 6          THE COURT:  I think he's about to tell us that if he

 7  can't, but --

 8          THE WITNESS:  I can only --

 9  BY MR. TAUNTON:

10  Q    Would it help if I refresh your recollection?

11  A    Well, if you rephrase the question.  I mean, I think --

12  again, we didn't do an analysis -- well, I don't want to get

13  into the client -- attorney-client privilege.

14          THE COURT:  All right.  I'm going to stop you right

15  there.  If you have something from the deposition, you can use

16  it.

17          MR. TAUNTON:  Can we put up page 201 beginning at line

18  10, the full page?  Your Honor, this was phrased in the context

19  of what the NAACP thought prior to the 2020 census.

20          THE COURT:  Well, I already said that wasn't relevant,

21  so, I mean, that's not the question.

22          MR. TAUNTON:  But it was -- he discusses in his

23  answer, Your Honor, without raising a privilege objection why

24  the NAACP believed it was entitled to relief afterwards --

25  without raising a privilege objection.

```
 1              THE COURT:  Well, but that's all before.

 2              MR. ROSS:  Your Honor --

 3              THE COURT:  What I limited you to was on relevance

 4   grounds was now or after --

 5              MR. TAUNTON:  Your Honor, I was trying to phrase it in

 6   the context of now.  I do think that his answer goes to the

 7   question of now.

 8        I'm happy to move on.

 9              THE COURT:  I think that sounds like the wiser course.

10              MR. TAUNTON:  Your Honor, I will take a minute to

11   confer with counsel.

12              THE COURT:  Sure.

13              MR. TAUNTON:  Your Honor, I don't think I have any

14   further questions.

15              THE COURT:  Okay.  Is there any redirect?

16              MR. ROSS:  Your Honor, could I have just have a few

17   minutes?

18              THE COURT:  You may.

19              MR. ROSS:  Thank you.

20        Thank you, Your Honor.

21                        REDIRECT EXAMINATION

22   BY MR. ROSS:

23   Q    Just a couple of questions, Mr. Simelton.  You mentioned

24   you had about 50 people in your ward at your church, correct?

25   A    Yes.
```

1  Q    Do you know where all 50 of them live?

2  A    No.

3  Q    Okay.  In your experience, are black people more likely to

4  need help with registering to vote?

5  A    Yes.

6  Q    And are black people more likely to need help with

7  applying to vote absentee?

8  A    Yes.

9        MR. ROSS:  Thank you, Your Honor.  No further

10  questions.

11        THE COURT:  All right.  Is there any reason I may not

12  excuse Mr. Simelton?

13      All right.  Mr. Simelton, thank you for being with us

14  today.  You are excused.

15        THE WITNESS:  Thank you.

16        (Witness excused.)

17        THE COURT:  All right.  Would plaintiffs' counsel

18  predict for me the chances that the next witness can testify in

19  fewer than 22 minutes.

20        MR. ROSBOROUGH:  Zero.

21        THE COURT:  Zero.  Okay.  All right.  I thought that

22  was the case, but I just wanted to be sure.

23      All right.  Then we will plan to recess now for the day.

24      Is there any objection to starting at 8:30 tomorrow?

25  Y'all are so well prepared, and everything has gone so

CERTIFICATE


I certify that the foregoing is a correct
transcript from the record of proceedings in the
above-entitled matter.




_Christina K. Decker_                    11-12-2024

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:   255