FILED
2025 Feb-24 PM 04:41
U.S. DISTRICT COURT
N.D. OF ALABAMA



# Voting Determination Letters for Alabama

The Civil Rights Division has prepared this site to make Civil Rights Division documents more available to the public.

To the extent that any documents do not currently comply with Section 508 of the Rehabilitation Act because of the poor quality of the original documents used to prepare this site, the Division is applying its available resources in an effort to create alternative records that are readable.

Determination Letters for Alabama, by date.

| Jurisdiction and date | Description and submission numbers | Notes |
|---|---|---|
| State of Alabama 08/01/1969 (pdf) | Act No. 243 (1969), Garrett Act--Independent Candidate qualification deadline (T6864) | |
| Morgan County 11/13/1969 (pdf) | Act No. 221 (1965)--poll list signature requirement (T6813) | |
| Escambia County 11/13/1969 (pdf) | Act No. 479 (1967)--poll list signature requirement (T6819) | |
| Mobile County 11/13/1969 (pdf) | Act No. 812 (1965)--poll list signature requirement (T6814) | |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| | | |
|---|---|---|
| Baldwin County 11/13/1969 (pdf) | Act No. 60 (1966)--poll list signature requirement (T6815) | Withdrawal 10-21-75 (V8804-8808) |
| Russell County 11/13/1969 (pdf) | Act No. 119 (1967)--poll list signature requirement (T6817) | |
| Montgomery County 11/13/1969 (pdf) | Act No. 112 (1966)--poll list signature requirement (T6816) | |
| Dale County 11/13/1969 (pdf) | Act No. 126 (1967)--poll list signature requirement (T6818) | |
| Lee County 11/13/1969 (pdf) | Act No. 552 (1965)--poll list signature requirement (T6820) | |
| Mobile County 12/16/1969 (pdf) | Act No. 1052 (1969)--poll list signature requirement (T6833) | |
| State of Alabama 03/13/1970 (pdf) | Act No. 604 (1970)--absentee registration literacy requirement (T6812) | |
| Birmingham (Jefferson Cty.) 07/09/1971 (pdf) | Act No. 507 (1969)--numbered posts (T7933) | |
| Talladega (Talladega Cty.) 07/23/1971 (pdf) | Act No. 91 (1971)--anti-single shot (V3059) | |
| Autauga County School District 03/20/1972 (pdf) | Act No. 2268 (1971)--at-large elections; residency requirement (V3928) | |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| | |
|---|---|
| Autauga County 03/20/1972 ([pdf](#)) | Act No. 1451 (1971) at-large elections; majority vote requirement; residency requirement (V4078-79) |
| State of Alabama 04/04/1972 ([pdf](#)) | Act Nos. 2229 and 2230 (1972)--assistance to illiterates restricted (V3871-72) |
| State of Alabama 08/14/1972 ([pdf](#)) | Act No. 2324 (1971)--two independent candidate petition signature requirements (V4074) |
| State of Alabama 12/26/1972 ([pdf](#)) | Act No. 2445 (1971)--elected to appointed justices (V4105) |
| Mobile (Mobile Cty.) 08/03/1973 ([pdf](#)) | Act No. 1483 (1971)--candidate qualification procedures (V5607) |
| Pike County 08/12/1974 ([pdf](#)) | Reapportionment of Democratic Party Executive Committee (V6511) |
| Sumter Cty. Democratic Executive Committee 10/29/1974 ([pdf](#)) | Anti-single shot (V6901) |
| Talladega (Talladega Cty.) 03/14/1975 ([pdf](#)) | Ordinance No. 997--numbered posts (V7125) |
| Fairfield (Jefferson Cty.) 04/10/1975 ([pdf](#)) | Annexation (V6603) |

Withdrawn 10-8-76

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| | | |
|---|---|---|
| Alabaster (Shelby Cty.) 07/07/1975 (pdf) | Six annexations (V8168-69) | Withdrawn 5-3-83 upon change in method of election |
| Bessemer (Jefferson Cty.) 09/12/1975 (pdf) | Seven Annexations (V7007; X0910-16) | Withdrawn 7-7-86 upon change in method of election |
| Phenix City (Russell Cty.) 12/12/1975 (pdf) | Act No. 698 (1975)--staggered terms (V9991) | |
| State of Alabama 01/16/1976 (pdf) | Act No. 1196, Sections 5, 43, 44-primary date (X0521) | |
| Pickens County 02/18/1976 (pdf) | Reapportionment of Democratic Party Executive Committee (V6511) | |
| State of Alabama 02/20/1976 (pdf) | Act No. 1205 (1975)--combines Bibb and Hale Counties for judicial district (X1121) | |
| Mobile (Mobile Cty.) 03/02/1976 (pdf) | Act No. 823 (1965), Sections 2 and 12--form of city government and specified duties for commissioners (V9335) | |
| Pickens County School District 03/05/1976 (pdf) | Act No. 72 (1975)--redistricting (X2669) | |
| Chambers County 03/08/1976 (pdf) | Act No. 475 (1973)--at-large nomination of county commissioners; Act No. 2001 (1971) (V9127; X1782B) | |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| | | |
|---|---|---|
| Chambers County School District 03/10/1976 (pdf) | Act No. 843 (1975)--at-large elections; numbered posts; majority vote requirement (X1840) | |
| Hale County 04/23/1976 (pdf) | Act No. 1092 (1969)--at-large elections (V6804) | |
| Sheffield (Colbert Cty.) 07/06/1976 (pdf) | At-large method of election (V8341) | |
| Hale County 12/29/1976 (pdf) | Act Nos. 320 (1965), 2022 (1971) and 620 (1973)--at-large elections (X8956) | Declaratory judgment denied in Hale County v. United States, 496 F. Supp. 1206 (D.D.C. 1980) |
| Alabaster (Shelby Cty.) 12/27/1977 (pdf) | Two annexations (A3009; A2991) | Withdrawn 5-3-83 upon change in method of election |
| Barbour County 07/28/1978 (pdf) | Act Nos. 10 (1965) and 171 (1967)--method of election--at-large elections; residency requirements; reduction in number of commissioners from seven to five; numbered posts for dual-member residency district (A3381) | |
| Hayneville (Lowndes Cty.) 12/29/1978 (pdf) | Incorporation (A6405) | |
| Clarke County 02/26/1979 (pdf) | Act No. 2446 (1971)--at-large election of county commission (C0017) | |
| Pleasant Grove (Jefferson Cty.) 02/01/1980 (pdf) | Act No. 79-419 (1979)--annexation (80-1197) | Declaratory judgment denied in City of Pleasant Grove v. United States, 623 F. Supp. 782 (D.D.C. |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

1985), aff'd, 479 U.S. 462
(1987)

| | | |
|---|---|---|
| Selma (Dallas Cty.) 04/28/1980 (pdf) | Redistricting (80-1168) | |
| Sumter County 10/17/1980 (pdf) | Act No. 79-729 (1979)--voting machines; number of beats; polling places (7X-0062) | |
| Barbour County 07/21/1981 (pdf) | Redistricting (81-1085) | |
| Conecuh County 09/14/1981 (pdf) | Act No. 2284 (1971)--method of election (two multi-member districts) (80-1151) | |
| Perry County 09/25/1981 (pdf) | Act No. 81-226--purge and reidentification of voters (81-1191) | |
| Sumter County 10/02/1981 (pdf) | Act No. 81-224--reidentification of voters (81-1211) | |
| Wilcox County 10/26/1981 (pdf) | Act No. 81-383--purge and reidentification of voters (81-1224) | |
| Perry County 10/26/1981 (pdf) | Act No. 81-635--voting machines (81-1192) | Withdrawn 4-19-82 |
| Barbour County 11/16/1981 (pdf) | Redistricting (81-1089) | |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

Montgomery (Montgomery Cty.)
01/05/1982
([pdf](#))

Redistricting
(81-1180)

Withdrawn 2-23-82

Conecuh Cty. Democratic Executive Committee
04/23/1982
([pdf](#))

Method of election (two multi-member districts); size of committee
(82-1336)

State of Alabama
05/06/1982
([pdf](#))

Act No. 81-1049--House and Senate reapportionment
(82-1363)

State of Alabama
07/19/1982
([pdf](#))

Act Nos. 572 (H.B. No. 278) and 611 (H.B. No. 10) (1982)--candidate qualifying and nominating procedures for minor parties
(82-1365)

Butler County
07/19/1982
([pdf](#))

Act No. 136 (1969)--method of electing county commissioners
(7X-0049)

Conecuh County
07/26/1982
([pdf](#))

Redistricting
(82-1339)

State of Alabama
08/02/1982
([pdf](#))

Act No. 82-629 (H.B. No. 19)--House and Senate reapportionment
(82-1366)

Mobile County
10/19/1982
([pdf](#))

Act No. 81-740 and No. 82-377--voter registration procedures
(81-1171; 82-1447)

Tallapoosa County
05/10/1983
([pdf](#))

Method of electing county commissioners from single-member districts to at-large
(83-1374)

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| Monroe County 02/17/1984 (pdf) | Method of electing county commissioners from single-member districts to at-large election (7X-0058) | |
|---|---|---|
| Adamsville (Jefferson Cty.) 03/26/1984 (pdf) | 1981 and 1982 annexations (totaling 34) (84-1517) | Withdrawn 7-27-84 upon change in method of election |
| Selma (Dallas Cty.) 04/20/1984 (pdf) | Ordinance No. 83-05--redistricting (Councilmanic wards) (83-1242) | |
| Greene County 06/18/1984 (pdf) | Act No. 507, H.B. No. 830 (1983)--changes the method of appointing the members of the county racing commission (84-1505) | Withdrawn 10-31-84--determined not to be a change affecting voting; subsequently enjoined under Section 5 from being implemented in Hardy v.Wallace, 603 F. Supp. 174 (N.D. Ala. 1 |
| Eutaw (Greene Cty.) 08/21/1984 (pdf) | Districting plan (84-1502) | |
| Baldwin County 12/11/1984 (pdf) | Act No. 84-734--purge and reidentification of voters (84-1416) | |
| Houston County 10/15/1985 (pdf) | At-large elections with numbered posts and Act No. 84-571--at-large elections with four candidate residency districts; numbered positions (80-1180; 84-1513) | |
| Greensboro (Hale Cty.) 10/21/1985 (pdf) | Deannexation (85-1532) | |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| | | |
|---|---|---|
| Marengo County 02/10/1986 (pdf) | Increase in number of members from five to six; method of election--from at-large to mixed; districting plan (county commission districts and board of education) (86-2012; 86-2013) | |
| Dallas County 06/02/1986 (pdf) | Method of election--from at-large to single-member districts; districting plan (commissioners) (86-1882) | |
| Bay Minette (Baldwin Cty.) 10/06/1986 (pdf) | Three annexations (85-1442; 85-1443; 85-1445) | Withdrawn 6-22-87, upon change in method of election |
| Alexander City (Tallapoosa Cty.) 12/01/1986 (pdf) | 1986 annexation (86-2116) | Withdrawn 12-7-87 |
| Prichard (Mobile Cty.) 02/03/1987 (pdf) | Act No. 58 (1971) and the 1971 deannexation (86-2037) | |
| Leeds (Jefferson, St. Clair, and Shelby Ctys.) 05/04/1987 (pdf) | Twenty-nine annexations (85-1578; 85-1579; 86-1960; 87-1615) | Withdrawn 5-23-88, upon change in method of election |
| Marion (Perry Cty.) 05/05/1987 (pdf) | Implementation of the January 7, 1965, resolution creating the separate city school district (87-1706) | |
| Dallas County School District 06/01/1987 (pdf) | Districting plan (87-1555) | |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| | | |
|---|---|---|
| Roanoke (Randolph Cty.) 03/15/1988 ([pdf](#)) | Multimember district method of election; districting plan; two annexations; two referenda (87-1722) | Objection to annexations and referendaWithdrawn upon change in method of election |
| Tallassee (Elmore and Tallapoosa Ctys.) 12/19/1988 ([pdf](#)) | Ordinance No. 86-213--revised annexation requirements (88-1891) | |
| State (89-1469) and Dothan (Dale, Henry, & HoustonCtys.) 06/12/1989 ([pdf](#)) | Act No. 88-445, as amended by Act No. 88-331--insofar as it provides that a Class 5 municipality (such as Dothan) that adopts the mayor-commissioner-city manager form of government is required to utilize a four single-member district method of election and the districting plans (adopted by Dothan) which sought to implement that requirement (89-1285; 89-4040) | |
| Foley (Baldwin Cty.) 11/06/1989 ([pdf](#)) | Three annexations (86-1811) | Withdrawn 7-1-96 |
| State Democratic Party 12/01/1989 ([pdf](#)) | Amendment of the rules of the Alabama Democratic Party, which changes the method of selecting members of the State Democratic Executive Committee (SDEC); alters the method of selecting the Vice Chairman for Minority Affairs; and changes the method of selecting minority members of the Executive Board of the SDEC (89-1264) | |
| Dallas County 06/22/1990 ([pdf](#)) | Additional procedures for the 1990 implementation of the voter reidentification and purge program under Act No. 84-389, including the schedule and voter update program (90-1693) | |
| Valley (Chambers Cty.) 10/12/1990 ([pdf](#)) | Creation of the Valley School System (89-1242) | Withdrawn 7-27-92 |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| | | |
|---|---|---|
| Democratic Party (Perry Cty.) 12/03/1990 (pdf) | 1989 Bylaws concerning the fair representation principle and the rule for equal division by gender (Article II, Section 2, fourth through seventh sentences) to elect executive committee members (90-1837) | |
| Valley (Chambers Cty.) 12/31/1990 (pdf) | Annexation (90-1663) | Withdrawn 12-9-91 upon change in method of election |
| Democratic Party (Lamar Cty.) 01/25/1991 (pdf) | Increase in number of members from 23 to 49; change in the method of election from single-member districts to a mix of single-member districts and multimember districts with designated posts; a March 8, 1990, organizational plan, which provides, inter alia, for a decrease in the number of popularly elected members from 49 to 40, a change in the method of election from electing members from mixed single- and multi-member districts to four 10-member districts with plurality vote, a rule for equal division by gender by district, a districting plan, a change from an elective to an elective-appointive system with the priciple of fair representation, and the procedures for the appointment of additional members (90-1769) | |
| Democratic Party (Limestone Cty.) 01/28/1991 (pdf) | Increase in number of members from 25 to 32; the 1970 increase in number of members from 32 to 45, a change in method of election from single-member districts to 43 single-member districts and 1 two-member district, a redistricting plan, and adoption of numbered posts in the multi-member district; the 1982, 1983, and 1985 redistrictings; the 1985 increase in number of members from 45 to 48, the change in method of election to 9 single-member districts, 11 two-member districts, 3 three-member districts, and 2 four-member districts; and the September 7, 1989, Rules, as amended on March 1, 1990, which provide for a decrease in number of members from 48 to 40, a change in method of election to 4 ten-member districts by plurality vote, a redistricting, and a change from an elective to an elective-appointive system with the principle of fair representation and the procedures therefor to appoint additional members (90-1769) | |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| | | |
|---|---|---|
| State of Alabama 11/08/1991 ([pdf](#)) | Act No. 90-539, which creates a fourth circuit judgeship in the 20th Judicial Circuit and the implementation schedule for that change (91-0518) | Withdrawn 3-18-96 |
| State of Alabama 12/23/1991 ([pdf](#)) | Act No. 91-640, which creates a 25th circuit judgeship in the Tenth Circuit for the Bessemer Division, and eighth circuit judgeship in the 15th Circuit, and the implementation schedule for those changes (91-4215) | |
| State of Alabama 03/27/1992 ([pdf](#)) | Act No. 92-63, which provides the redistricting plan for congressional districts (92-1176) | |
| Dallas County 05/01/1992 ([pdf](#)) | Redistricting plan for the board of education (92-1001) | |
| Dallas County 07/21/1992 ([pdf](#)) | Redistricting plan for the board of education (92-2503) | |
| Selma (Dallas Cty.) 11/12/1992 ([pdf](#)) | Redistricting plan for the city council (92-4187) | |
| Greensboro (Hale Cty.) 12/04/1992 ([pdf](#)) | Districting plan for the city council (92-3376) | |
| Dallas County 12/24/1992 ([pdf](#)) | Redistricting plan for the board of education (92-4848) | |
| Selma (Dallas Cty.) 03/15/1993 ([pdf](#)) | Redistricting plan for the city council (93-0110) | |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

| | | |
|---|---|---|
| Foley (Baldwin Cty.) 08/30/1993 (pdf) | Ordinance No. 472-93-residential annexation (93-1106) | Withdrawn 7-1-96 |
| State of Alabama 11/16/1993 (pdf) | Act No. 93-882: Establishment of sixth position for the sixth Judicial Circuit (93-3476) | Withdrawn 3-18-96 |
| Greensboro (Hale Cty.) 01/03/1994 (pdf) | Districting plan for the city council (93-4223) | |
| State of Alabama 01/31/1994 (pdf) | Amendment 425 to the Alabama Constitution, insofar as it provides that a referendum on a local constitutional amendment may not be held unless it is first approved by the Local Constitutional Amendment Commission (89-1439) | |
| State of Alabama 04/14/1994 (pdf) | The changes for the courts of criminal and civil appeals and the supreme court occasioned by Act Nos. 602 and 987 (1969), 75 (1971), and 346 (1993) in the context of the at-large method of electing these courts (93-2322; 93-3195-96) | Withdrawn 3-18-96 |
| Tallapoosa County 02/06/1998 (html | pdf) | Redistricting plan (97-1021) | |
| Alabaster (Shelby Cty.) 08/16/2000 (html | pdf) | Annexations (Ordinance Nos. 94-338 and 96-410) (2000-2230) | |
| Mobile County 01/08/2007 (html | pdf) | Change in method of election for filling vacancies occurring on the Mobile County Commission from special election to gubernatorial appointment (2006-6792) | 01/08/2007 |
| City of Calera | One hundred and seventy seven annexations and a | |

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

8/25/2008          (2008-1621)
([html](#) | [pdf](#))

*Updated May 18, 2020*

---

✉ **Civil Rights Division**

U.S. Department of Justice

950 Pennsylvania Avenue NW

Office of the Assistant Attorney General,

Main

Washington DC 20530

📞 Civil Rights Division

202-514-3847

TTY/TDD: 711

21-cv-01530
2/10/2024 Trial
Milligan Plaintiffs' Exhibit No. 114

AUG 1  1969

Honorable MacDonald Gallion
Attorney General of Alabama
State Capitol
Montgomery, Alabama

Dear Mr. Attorney General:

This is in reference to Act No. 243, enacted on
May 11, 1967 by the Alabama Legislature at the 1967 Special
Session.  In the case of Hadnott v. Amos, 394 U.S. 358
the Supreme Court of the United States held that this act
was within the purview of Section 5 of the Voting Rights
Act of 1965.  Following this decision, copies of the act
were submitted to the Attorney General pursuant to Section
5.

We have carefully examined and considered this law.
The Garrett Act prevents newly organized political groups
from trying first to have their candidates elected in a
party primary before determining to run as independents.
A newly organized group, such as the National Democratic
Party of Alabama, which directs a major effort at Negro
voters newly registered under the Voting Rights Act, cannot,
under this system, first attempt to prevail in the Demo-
cratic Party primary before turning to independent candidates.
Nor could it wait until the day of the primary before de-
ciding whether to run independently.  Because of these
factors and because of the experience of the NDPA prior to
the general election of 1968, I have concluded that the
Garrett Act will have the effect of discriminating against
Negro voters on account of their race, and of denying them
an effective voice in general elections held in Alabama.

In the absence of information showing the contrary, I must,
on behalf of the Attorney General, interpose objections to
the implementation of this act.

Should you wish to present justification for the
changes in election procedures provided for by the Garrett
Act, the Attorney General will gladly reconsider his posi-
tion. Of course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting an
action in the United States District Court for the District
of Columbia for a declaratory judgment that such changes
in election and voting procedures do not have the purpose
and will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3                    NOV 1 3 1969

Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Attorney General:

    This is in reference to your letter of September
18, 1969, with which you submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act
of 1965 20 Alabama Acts relating to election procedures
and voting.

    I have examined and considered the submitted
Acts.  The Attorney General will not at this time inter-
pose any objection to the Act authorizing boards of
registrars to meet additional days for the purpose of
registering voters, the Acts relating to absentee
voters and the Acts providing for the reidentification
of voters in order to purge from voting lists the names
of persons who are now deceased or who no longer reside
in the county or the state.  However, as provided by
Section 5 of the Voting Rights Act of 1965, the failure
to object does not bar any subsequent action to enjoin
enforcement of these Acts.

    With regard to Acts Nos. 221 (1965), 812 (1965),
60 (1966), 112 (1966), 119 (1967), 126 (1967), 479
(1967), and 552 (1967) I must on behalf of the Attorney
General interpose objections to the provisions in those
Acts requiring a voter to sign, at the voting machine,
a poll list before he is allowed to enter the machine

- 2 -

to vote.  It is our view that these provisions in the
Acts, if enforced, would have the effect of discrimi-
nating against Negro voters and would violate the
provisions of Section 4 of the Voting Rights Act of
1965.

Should you wish to present justification for
the provisions objected to or evidence that their
enforcement would not violate Section 4 of the Voting
Rights Act of 1965, we will consider the matter further.
Of course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting
an action in the United States District Court for the
District of Columbia for a declaratory judgment that
the provisions objected to do not have the purpose and
will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3                     NOV 13 1969

Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama   36104

Dear Mr. Attorney General:

This is in reference to your letter of September
18, 1969, with which you submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act
of 1965 20 Alabama Acts relating to election procedures
and voting.

I have examined and considered the submitted
Acts.  The Attorney General will not at this time inter-
pose any objection to the Act authorizing boards of
registrars to meet additional days for the purpose of
registering voters, the Acts relating to absentee
voters and the Acts providing for the reidentification
of voters in order to purge from voting lists the names
of persons who are now deceased or who no longer reside
in the county or the state.  However, as provided by
Section 5 of the Voting Rights Act of 1965, the failure
to object does not bar any subsequent action to enjoin
enforcement of these Acts.

With regard to Acts Nos. 221 (1965), 812 (1965),
60 (1966), 112 (1966), 119 (1967), 126 (1967), 479
(1967), and 552 (1967) I must on behalf of the Attorney
General interpose objections to the provisions in those
Acts requiring a voter to sign, at the voting machine,
a poll list before he is allowed to enter the machine

- 2 -

to vote. It is our view that these provisions in the
Acts, if enforced, would have the effect of discrimi-
nating against Negro voters and would violate the
provisions of Section 4 of the Voting Rights Act of
1965.

Should you wish to present justification for
the provisions objected to or evidence that their
enforcement would not violate Section 4 of the Voting
Rights Act of 1965, we will consider the matter further.
Of course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting
an action in the United States District Court for the
District of Columbia for a declaratory judgment that
the provisions objected to do not have the purpose and
will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3                              NOV 1 3 1969

Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama   36104

Dear Mr. Attorney General:

 This is in reference to your letter of September 18, 1969, with which you submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965 20 Alabama Acts relating to election procedures and voting.

 I have examined and considered the submitted Acts.  The Attorney General will not at this time interpose any objection to the Act authorizing boards of registrars to meet additional days for the purpose of registering voters, the Acts relating to absentee voters and the Acts providing for the reidentification of voters in order to purge from voting lists the names of persons who are now deceased or who no longer reside in the county or the state.  However, as provided by Section 5 of the Voting Rights Act of 1965, the failure to object does not bar any subsequent action to enjoin enforcement of these Acts.

 With regard to Acts Nos. 221 (1965), 812 (1965), 60 (1966), 112 (1966), 119 (1967), 126 (1967), 479 (1967), and 552 (1967) I must on behalf of the Attorney General interpose objections to the provisions in those Acts requiring a voter to sign, at the voting machine, a poll list before he is allowed to enter the machine

- 2 -

to vote. It is our view that these provisions in the
Acts, if enforced, would have the effect of discrimi-
nating against Negro voters and would violate the
provisions of Section 4 of the Voting Rights Act of
1965.

Should you wish to present justification for
the provisions objected to or evidence that their
enforcement would not violate Section 4 of the Voting
Rights Act of 1965, we will consider the matter further.
Of course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting
an action in the United States District Court for the
District of Columbia for a declaratory judgment that
the provisions objected to do not have the purpose and
will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3

NOV 1 3 1969

Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama   36104

Dear Mr. Attorney General:

This is in reference to your letter of September
18, 1969, with which you submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act
of 1965 20 Alabama Acts relating to election procedures
and voting.

I have examined and considered the submitted
Acts.  The Attorney General will not at this time inter-
pose any objection to the Act authorizing boards of
registrars to meet additional days for the purpose of
registering voters, the Acts relating to absentee
voters and the Acts providing for the reidentification
of voters in order to purge from voting lists the names
of persons who are now deceased or who no longer reside
in the county or the state.  However, as provided by
Section 5 of the Voting Rights Act of 1965, the failure
to object does not bar any subsequent action to enjoin
enforcement of these Acts.

With regard to Acts Nos. 221 (1965), 812 (1965),
60 (1966), 112 (1966), 119 (1967), 126 (1967), 479
(1967), and 552 (1967) I must on behalf of the Attorney
General interpose objections to the provisions in those
Acts requiring a voter to sign, at the voting machine,
a poll list before he is allowed to enter the machine

- 2 -

to vote.  It is our view that these provisions in the
Acts, if enforced, would have the effect of discrimi-
nating against Negro voters and would violate the
provisions of Section 4 of the Voting Rights Act of
1965.

Should you wish to present justification for
the provisions objected to or evidence that their
enforcement would not violate Section 4 of the Voting
Rights Act of 1965, we will consider the matter further.
Of course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting
an action in the United States District Court for the
District of Columbia for a declaratory judgment that
the provisions objected to do not have the purpose and
will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3

NOV 1 3 1969

Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Attorney General:

This is in reference to your letter of September
18, 1969, with which you submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act
of 1965 20 Alabama Acts relating to election procedures
and voting.

I have examined and considered the submitted
Acts.  The Attorney General will not at this time inter-
pose any objection to the Act authorizing boards of
registrars to meet additional days for the purpose of
registering voters, the Acts relating to absentee
voters and the Acts providing for the reidentification
of voters in order to purge from voting lists the names
of persons who are now deceased or who no longer reside
in the county or the state.  However, as provided by
Section 5 of the Voting Rights Act of 1965, the failure
to object does not bar any subsequent action to enjoin
enforcement of these Acts.

With regard to Acts Nos. 221 (1965), 812 (1965),
60 (1966), 112 (1966), 119 (1967), 126 (1967), 479
(1967), and 552 (1967) I must on behalf of the Attorney
General interpose objections to the provisions in those
Acts requiring a voter to sign, at the voting machine,
a poll list before he is allowed to enter the machine

- 2 -

to vote.  It is our view that these provisions in the
Acts, if enforced, would have the effect of discrimi-
nating against Negro voters and would violate the
provisions of Section 4 of the Voting Rights Act of
1965.

Should you wish to present justification for
the provisions objected to or evidence that their
enforcement would not violate Section 4 of the Voting
Rights Act of 1965, we will consider the matter further.
Of course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting
an action in the United States District Court for the
District of Columbia for a declaratory judgment that
the provisions objected to do not have the purpose and
will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3

NOV 1 3 1969

Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Attorney General:

This is in reference to your letter of September 18, 1969, with which you submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965 20 Alabama Acts relating to election procedures and voting.

I have examined and considered the submitted Acts. The Attorney General will not at this time interpose any objection to the Act authorizing boards of registrars to meet additional days for the purpose of registering voters, the Acts relating to absentee voters and the Acts providing for the reidentification of voters in order to purge from voting lists the names of persons who are now deceased or who no longer reside in the county or the state. However, as provided by Section 5 of the Voting Rights Act of 1965, the failure to object does not bar any subsequent action to enjoin enforcement of these Acts.

With regard to Acts Nos. 221 (1965), 812 (1965), 60 (1966), 112 (1966), 119 (1967), 126 (1967), 479 (1967), and 552 (1967) I must on behalf of the Attorney General interpose objections to the provisions in those Acts requiring a voter to sign, at the voting machine, a poll list before he is allowed to enter the machine

- 2 -

to vote.  It is our view that these provisions in the
Acts, if enforced, would have the effect of discrimi-
nating against Negro voters and would violate the
provisions of Section 4 of the Voting Rights Act of
1965.

Should you wish to present justification for
the provisions objected to or evidence that their
enforcement would not violate Section 4 of the Voting
Rights Act of 1965, we will consider the matter further.
Of course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting
an action in the United States District Court for the
District of Columbia for a declaratory judgment that
the provisions objected to do not have the purpose and
will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3                    NOV 1 3 1969


Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Attorney General:

        This is in reference to your letter of September
18, 1969, with which you submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act
of 1965 20 Alabama Acts relating to election procedures
and voting.

        I have examined and considered the submitted
Acts.  The Attorney General will not at this time inter-
pose any objection to the Act authorizing boards of
registrars to meet additional days for the purpose of
registering voters, the Acts relating to absentee
voters and the Acts providing for the reidentification
of voters in order to purge from voting lists the names
of persons who are now deceased or who no longer reside
in the county or the state.  However, as provided by
Section 5 of the Voting Rights Act of 1965, the failure
to object does not bar any subsequent action to enjoin
enforcement of these Acts.

        With regard to Acts Nos. 221 (1965), 812 (1965),
60 (1966), 112 (1966), 119 (1967), 126 (1967), 479
(1967), and 552 (1967) I must on behalf of the Attorney
General interpose objections to the provisions in those
Acts requiring a voter to sign, at the voting machine,
a poll list before he is allowed to enter the machine

- 2 -

to vote.  It is our view that these provisions in the
Acts, if enforced, would have the effect of discrimi-
nating against Negro voters and would violate the
provisions of Section 4 of the Voting Rights Act of
1965.

Should you wish to present justification for
the provisions objected to or evidence that their
enforcement would not violate Section 4 of the Voting
Rights Act of 1965, we will consider the matter further.
Of course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting
an action in the United States District Court for the
District of Columbia for a declaratory judgment that
the provisions objected to do not have the purpose and
will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3

NOV 1 3 1969

Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Attorney General:

This is in reference to your letter of September 18, 1969, with which you submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965 20 Alabama Acts relating to election procedures and voting.

I have examined and considered the submitted Acts. The Attorney General will not at this time interpose any objection to the Act authorizing boards of registrars to meet additional days for the purpose of registering voters, the Acts relating to absentee voters and the Acts providing for the reidentification of voters in order to purge from voting lists the names of persons who are now deceased or who no longer reside in the county or the state. However, as provided by Section 5 of the Voting Rights Act of 1965, the failure to object does not bar any subsequent action to enjoin enforcement of these Acts.

With regard to Acts Nos. 221 (1965), 812 (1965), 60 (1966), 112 (1966), 119 (1967), 126 (1967), 479 (1967), and 552 (1967) I must on behalf of the Attorney General interpose objections to the provisions in those Acts requiring a voter to sign, at the voting machine, a poll list before he is allowed to enter the machine

- 2 -

to vote.  It is our view that these provisions in the
Acts, if enforced, would have the effect of discrimi-
nating against Negro voters and would violate the
provisions of Section 4 of the Voting Rights Act of
1965.

Should you wish to present justification for
the provisions objected to or evidence that their
enforcement would not violate Section 4 of the Voting
Rights Act of 1965, we will consider the matter further.
Of course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting
an action in the United States District Court for the
District of Columbia for a declaratory judgment that
the provisions objected to do not have the purpose and
will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division



JL:SHR:gra

DJ 166-012-3      DEC 1 0 1969
#68-1-VRA5-2

Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama   36104

Dear Mr. Attorney General:

This is in reference to your letter of October 22,
1969, with which you submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965
a certified copy of Act No. 1057 passed in the 1969
Regular Session of the Legislature of Alabama and
approved by the Governor on September 12, 1969.

On behalf of the Attorney General I must interpose
an objection to the provision in that Act requiring a voter
to sign, at the voting machine, a poll list before he is
allowed to enter the machine to vote.  As I stated in my
letter of November 13, 1969, to you concerning similar
statutory provisions previously submitted, it is my view
that this provision of the Act, if enforced, would have
the effect of discriminating against Negro voters and
would violate the provisions of Section 4 of the Voting
Rights Act of 1965.

Should you wish to present justification of the
provision objected to or evidence that its enforcement
would not violate Section 4 of the Voting Rights Act of
1965, I will consider the matter further.  Of course, as
provided by Section 5 of the Voting Rights Act of 1965,
you have the alternative of instituting an action in the
United States District Court for the District of Columbia

for a declaratory judgement that the provision objected
to does not have the purpose and will not have the effect
of denying or abridging the right to vote on account of
race or color.

Sincerely,


JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

MAR 13 1970

Honorable MacDonald Gallion
Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Attorney General:

This is in reference to Act Number 604 of
the Legislature of the State of Alabama authorizing
and providing for registration by mail of qualified
electors who are members of the Armed Forces of the
United States or who are employed outside the United
States which was submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965.

Act Number 604, inter alia, requires the
applicant for absentee registration to complete a
written questionnaire without assistance. It is our
view that this provision in effect imposes a literacy
requirement for registration and that such a require-
ment, if enforced, would violate the provisions of
Section 4 of the Voting Rights Act of 1965. Therefore,
I must on behalf of the Attorney General interpose an
objection to Act Number 604.

Should you wish to present justification for
the Act objected to or evidence that its enforcement
would not violate Section 4 of the Voting Rights Act
of 1965, we will consider the matter further. Of
course, as provided for by Section 5 of the Voting
Rights Act, you have the alternative of instituting
an action in the United States District Court for the
District of Columbia for a declaratory judgment that
the Act objected to does not have the purpose and
will not have the effect of denying or abridging the
right to vote on account of race or color.

Sincerely,

JERRIS LEONARD
Assistant Attorney General
Civil Rights Division

JUL 9 1971

Mr. John M. Breckenridge
City Attorney
Department of Law
600 City Hall
Birmingham, Alabama  35203

Dear Mr. Breckenridge:

This is in response to your submission under
Section 5 of the Voting Rights Act of 1965, of several
acts of the Alabama Legislature passed in 1965 and 1969.

The Attorney General will not interpose an ob-
jection to 1965 Acts No. 123, 131, or 133 at this time.
I am constrained to inform you, however, that he does
object to the implementation of 1969 Act No. 507 because
the information we have leads us to conclude that the
change will have a discriminatory effect.

We are also advised that the voting machines
currently used in Birmingham automatically prevent
"double-voting" (voting for more candidates than the num-
ber of seats to be filled) and can prevent "single-shot"
voting, so that the potential existence of such problems
would not appear to provide a substantial basis for the
new enactment.

Section 5 provides that should you wish to pursue
this matter further, you may seek a declaratory judgment
from the District Court for the District of Columbia
that this statute neither has the purpose nor will have

the effect of denying or abridging the right to vote
on account of race or color. Until such a judgment is
issued by that Court, however, the legal effect of this
objection is to render unenforceable 1969 Act No. 507.

Sincerely,


DAVID L. NORMAN
Acting Assistant Attorney General
Civil Rights Division

SEP 1 4 1971

Mr. John M. Breckenridge
City Attorney
Department of Law
600 City Hall
Birmingham, Alabama  35203

Dear Mr. Breckenridge:

        This is in response to your resubmission under
Section 5 of the Voting Rights Act of 1965, 42 U.S.C.
§1973c, of 1969 Act No. 507, to which the Attorney
General interposed an objection by letter dated
July 9, 1971.

        We have carefully considered the information
supplied in your letter of July 19, 1971 resubmitting
the statute, as well as the information previously
gathered in connection with the prior submission of
this legislation.  Your letter apparently raises two
points, the merits of the submission under Section 5
and the timeliness of our objection of July 9.  With
respect to the second point, it is our position that
the sixty-day time period Section 5 establishes for
consideration does not begin to toll until after the
state or political subdivision has supplied the Attorney
General with sufficient information to determine the
merits of a submitted change.  This interpretation was
supported by four district judges in related reappor-
tionment cases in Virginia.  See attached Order on
First Hearing  Howell v. Mahan, C.A. No. 105-71-N
(E.D. Va., filed May 24, 1971).  Under this inter-
pretation of the statute, the sixty days began to
toll on May 10, 1971, when your letter of May 5 was
received by the Department, and did not expire until
after our July 9, 1971 letter was mailed to you.

With regard to the merits of Act No. 507, your letter does not include sufficient additional information to warrant a change in our position and we feel constrained to inform you that the Attorney General still objects to the statute on the basis that it will have the effect of abridging the right to vote on account of race. This conclusion was reached only after a search of the legislative history of the Act, review of past returns for Birmingham's municipal elections since 1963, and study of the mechanics of vote tallying in local elections.

Your letter of July 19 indicates a belief on your part that the relevant facts are different from those indicated by our investigation. Since we apparently do not share your views on the underlying facts, it may be that a judicial forum may be necessary to resolve these differences. As you know, Section 5 provides that should you wish to obtain an adjudication from such a forum, our objection does not foreclose your seeking a declaratory judgment from the District Court for the District of Columbia that this statute neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. Until such a judgment is issued by that Court, however, the legal effect of our continuing objection is to render unenforceable 1969 Act No. 507.

Sincerely,


DAVID L. NORMAN
Assistant Attorney General
Civil Rights Division

July 23, 1971


Honorable William J. Baxley
Attorney General
State of Alabama
Montgomery, Alabama    36104

Dear Mr. Attorney General:

This is in reference to your letter of May 20,
1971, with which you submitted Act No. 91 Special
Session of the Alabama Legislature 1971 for considera-
tion by the Attorney General pursuant to Section 5
of the Voting Rights Act.o

The Attorney General will not at this time
interpose any objection to the Act except with respect
to the provision against single shot voting for
alderman.

I note that Representative Smith in his letter
to you dated May 19, 1971, stated that the Act was
to change certain election procedures in the City of
Talladega to make them uniform with election proce-
dures in other mayor-council cities and that everything
else in the Act including the prohibition of single
shot voting is present Alabama law and included in
the Act merely for clarification purposes.  However,
as we read the Code of Alabama (Municipal Corporations),
Title 37, single shot voting was prohibited by
Section 33(1), enacted September 4, 1951.  Section 33(1)
of Title 37 was repealed by Acts, 1,61, enacted
September 15, 1961.  Therefore, it would appear that
there is no general prohibition against single shot
voting in Alabama and that the imposition of that

- 2 -

prohibition by Act No. 91 is a substantive change
rather than a mere clarification of Alabama law.

If our analysis is correct, I must on
behalf of the Attorney General interpose an objec-
tion to the provision of the Act prohibiting
"single shot" voting for alderman.  We are unable
to conclude that this proposed change will not have
an adverse racial effect prohibited by the Voting
Rights Act.

Should you wish to present justification for
the provision objected to or evidence that its
enforcement does not have the purpose and will not
have the effect of denying or abridging the right
to vote on account of race or color, we will con-
sider the matter further.  Of course as provided
by Section 5 of the Voting Rights Act, you have the
alternative of instituting an action in the United
States District Court for the District of Columbia
for a declaratory judgment that the provisions
objected to do not have the purpose and will not
have the effect of denying or abridging the right
to vote on account of race or color.

Sincerely,


DAVID L. NORMAN
Acting Assistant Attorney General
Civil Rights Division

[FACSIMILE]

DLN:JEK:clk
DJ 166-012-3


Mr. Leslie Hall                          MAR 20 1972
Assistant Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Hall:

      This is in reference to your submissions under
Section 5 of the Voting Rights Act of 1965 to the
Attorney General of Act No. 528, Acts of Alabama, 1967,
Act No. 1451, Acts of Alabama, 1971, and Act No. 2268,
Acts of Alabama, 1971.  These submissions were received
on January 20, 1972, November 1, 1971, and January 21,
1972, respectively.  Supplemental information pertaining
to Act No. 1451 was received December 11, 1971.

      As I explained in my letter of February 14, the
submission of Act No. 528 was necessary before the
Attorney General could evaluate its successor, Act
No. 1451.  Thus, the sixty-day period of Section 5
began to run on Acts Nos. 1451 and 528 on January 20,
1972.

      After considering the acts submitted, I cannot
conclude that certain changes will not have the effect
of abridging voting rights on account of race.

      Section 6 of Act No. 1451 changes the procedure
for electing County Commissioners from election by
districts to election at-large within the county, and
from requiring election by a plurality to requiring
election by a majority of the voters.  Where, as here,
a county with a majority white population has within

- 2 -

it an election district within which a majority of the
population is black, the change from election by
districts to an at-large method of election necessarily
has the effect of diluting that black voting strength,
especially when a majority of the votes cast is required
for election to an office.  See Whitcomb v. Chavis, 403
U.S. 124 (1971); Allen v. State Board of Elections, 395
U.S. 644 (1969); Burns v. Richardson, 384 U.S. 73 (1966);
Fortson v. Dorsey, 379 U.S. 433 (1965); Graves v. Barnes,
W.D. Tex., No. A-17-CA-142, Slip Op. at 37-38; Sims v.
Amos, No. 1744-N (M.D. Ala., Jan. 1972).  I must, there-
fore, on behalf of the Attorney General, interpose an
objection to the implementation of this section.

Act No. 2268 provides for the at-large election
of members of the Board of Education and would supersede
a system of election by districts.  As with the at-large
procedure for electing County Commissioners, this pro-
vision would have the effect of diluting black voting
strength because it would substantially reduce the
ability of the black population majority in one of the
districts to elect a candidate of their choice to the
Board of Education.  I must, therefore, on behalf of
the Attorney General, also object to implementation of
this Act.  In addition, with respect to Act No. 2268 as
well as Act No. 1451, in fashioning a new plan for the
election of the officers involved you may wish to give
particular consideration to what the courts say about
the majority requirement in the Barnes and Amos cases
cited above.

Section 9 of Act No. 528 and Section 7 of Act
No. 1451 appear to allow only those persons who have
been nominated by a political party to become candidates
for the office of County Commissioner, thereby precluding
such candidacy to persons who could have gained nomination
by petition and election by write-in votes as provided by
Alabama law prior to the enactment of these provisions.
You have indicated, however, that these provisions should

be interpreted only to prohibit persons who are not authorized to participate in a party nomination proceeding from so doing. On the basis of your interpretation and on the basis of the assurances of Probate Judge E. A. Grouby that this provision does not constitute a change in prior law or practice and does not preclude nomination by petition or voting by electors for write-in candidates, I will not object to its implementation. From the reasons for our lack of objection to this provision, it necessarily follows that the administration of any different interpretation of this provision will constitute a change in practice or procedure which must be submitted to the Attorney General or to the District Court for the District of Columbia pursuant to Section 5 of the Voting Rights Act.

Should you wish to pursue this matter further, the Attorney General will reconsider his objections upon your request within 10 days for an opportunity to present further substantiating or explanatory information not previously available. This information may be submitted in writing or at a conference convened pursuant to Sections 51.21 and 51.23 of the Section 5 guidelines, published September 10, 1971, in the Federal Register, Vol. 34, No. 174.

In addition, Section 5 provides that you may seek a declaratory judgment from the District Court for the District of Columbia that these provisions neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race. Until such a judgment is rendered by that court, however, the legal effect of the objections of the Attorney General is to render unenforceable the specified provisions.

Sincerely,


DAVID L. NORMAN
Assistant Attorney General
Civil Rights Division

cc: Honorable E. A. Grouby
    Judge of Probate
    Autauga County
    Prattvile, Alabama  36067

[FACSIMILE]

DLN:JEK:clk
DJ 166-012-3

Mr. Leslie Hall                                    MAR 20 1972
Assistant Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Hall:

 This is in reference to your submissions under
Section 5 of the Voting Rights Act of 1965 to the
Attorney General of Act No. 528, Acts of Alabama, 1967,
Act No. 1451, Acts of Alabama, 1971, and Act No. 2268,
Acts of Alabama, 1971.  These submissions were received
on January 20, 1972, November 1, 1971, and January 21,
1972, respectively.  Supplemental information pertaining
to Act No. 1451 was received December 11, 1971.

 As I explained in my letter of February 14, the
submission of Act No. 528 was necessary before the
Attorney General could evaluate its successor, Act
No. 1451.  Thus, the sixty-day period of Section 5
began to run on Acts Nos. 1451 and 528 on January 20,
1972.

 After considering the acts submitted, I cannot
conclude that certain changes will not have the effect
of abridging voting rights on account of race.

 Section 6 of Act No. 1451 changes the procedure
for electing County Commissioners from election by
districts to election at-large within the county, and
from requiring election by a plurality to requiring
election by a majority of the voters.  Where, as here,
a county with a majority white population has within

- 2 -

it an election district within which a majority of the
population is black, the change from election by
districts to an at-large method of election necessarily
has the effect of diluting that black voting strength,
especially when a majority of the votes cast is required
for election to an office.  See Whitcomb v. Chavis, 403
U.S. 124 (1971); Allen v. State Board of Elections, 395
U.S. 644 (1969); Burns v. Richardson, 384 U.S. 73 (1966);
Fortson v. Dorsey, 379 U.S. 433 (1965); Graves v. Barnes,
W.D. Tex., No. A-17-CA-142, Slip Op. at 37-38; Sims v.
Amos, No. 1744-N (M.D. Ala., Jan. 1972).  I must, there-
fore, on behalf of the Attorney General, interpose an
objection to the implementation of this section.

        Act No. 2268 provides for the at-large election
of members of the Board of Education and would supersede
a system of election by districts.  As with the at-large
procedure for electing County Commissioners, this pro-
vision would have the effect of diluting black voting
strength because it would substantially reduce the
ability of the black population majority in one of the
districts to elect a candidate of their choice to the
Board of Education.  I must, therefore, on behalf of
the Attorney General, also object to implementation of
this Act.  In addition, with respect to Act No. 2268 as
well as Act No. 1451, in fashioning a new plan for the
election of the officers involved you may wish to give
particular consideration to what the courts say about
the majority requirement in the Barnes and Amos cases
cited above.

        Section 9 of Act No. 528 and Section 7 of Act
No. 1451 appear to allow only those persons who have
been nominated by a political party to become candidates
for the office of County Commissioner, thereby precluding
such candidacy to persons who could have gained nomination
by petition and election by write-in votes as provided by
Alabama law prior to the enactment of these provisions.
You have indicated, however, that these provisions should

be interpreted only to prohibit persons who are not authorized to participate in a party nomination proceeding from so doing. On the basis of your interpretation and on the basis of the assurances of Probate Judge E. A. Grouby that this provision does not constitute a change in prior law or practice and does not preclude nomination by petition or voting by electors for write-in candidates, I will not object to its implementation. From the reasons for our lack of objection to this provision, it necessarily follows that the administration of any different interpretation of this provision will constitute a change in practice or procedure which must be submitted to the Attorney General or to the District Court for the District of Columbia pursuant to Section 5 of the Voting Rights Act.

Should you wish to pursue this matter further, the Attorney General will reconsider his objections upon your request within 10 days for an opportunity to present further substantiating or explanatory information not previously available. This information may be submitted in writing or at a conference convened pursuant to Sections 51.21 and 51.23 of the Section 5 guidelines, published September 10, 1971, in the Federal Register, Vol. 34, No. 174.

In addition, Section 5 provides that you may seek a declaratory judgment from the District Court for the District of Columbia that these provisions neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race. Until such a judgment is rendered by that court, however, the legal effect of the objections of the Attorney General is to render unenforceable the specified provisions.

Sincerely,


DAVID L. NORMAN
Assistant Attorney General
Civil Rights Division

cc:  Honorable E. A. Grouby
     Judge of Probate
     Autauga County
     Prattvile, Alabama  36067

[FACSIMILE]

DLN:JIS:clk
DJ 166-012-3


Mr. Leslie Hall                                    APR 4 1972
Assistant Attorney General
State of Alabama
Montgomery, Alabama    36104

Dear Mr. Hall:

This is in reference to your submission under
the Voting Rights Act of Acts Nos. 2229 and 2230 deal-
ing with assistance to voters.  The submission was
completed upon our receipt on February 5, 1972, of the
additional information that was requested by my staff.

It is my understanding from your letter dated
February 1, 1972, and your telephone conversation of
January 31, 1972, with Mr. Jeremy Schwartz, an attorney
on my staff, that notwithstanding the provisions of
Title 37, §§34(50) and 34(103) of the Alabama Code it
is the opinion of your office that voters in municipal
elections who are unable adequately to read or write
may receive the assistance of the person of their choice
and that persons giving such assistance are not limited
as to the number of such voters they may assist.

The submitted Acts, while providing for the
assistance to such voters by persons who are not
election officials, would restrict such assistants
to persons who have not so acted for any other person
during the election.  Such restriction could have the
effect of severely limiting the availability of persons
who might be willing and able to provide assistance to
voters as entitled.  Furthermore, no corresponding
limitation is imposed by Title 37 in municipal elections
where paper ballots are used.  See Title 37, §§34(39)
and 34(92).

- 2 -

On the basis of our investigation, we are unable to conclude that the implementation of Acts 2229 and 2230 will not have the effect of impeding the ability of persons entitled to vote under the Voting Rights Act to cast effective ballots. I must, therefore, on behalf of the Attorney General of the United States, interpose an objection to the implementation of the submitted Acts.

Should you wish to pursue this matter further, the Attorney General will reconsider his objection upon your request within 10 days for an opportunity to present substantiating or explanatory information not previously available. This information may be submitted in writing or at a conference convened pursuant to Sections 51.21 and 51.23 of the Section 5 guidelines, published September 10, 1971, in the Federal Register, Vol. 36, No. 176.

In addition, despite this objection, the Voting Rights Act provides you the alternative of instituting an action in the United States District Court for the District of Columbia for a declaratory judgment that these enactments do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color.

Sincerely,


DAVID L. NORMAN
Assistant Attorney General
Civil Rights Division

AUG 14 1972

Honorable William J. Baxley
Attorney General
State of Alabama
Montgomery, Alabama    36104

Dear Mr. Attorney General:

This is in reference to your submission to the
Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965 of Act No. 2324, Acts of Alabama,
Regular Session 1971, which we received March 27, 1972.
Additional information pertinent to Act No. 2324 was
received June 14, 1972.

We have considered the submitted changes and
supporting information as well as data compiled by
the Bureau of the Census and information and comments
from interested parties. On the basis of this informa-
tion the Attorney General will not object to the require-
ment that independent candidates for statewide offices
submit qualifying petitions signed by 10,000 voters,
to the provisions relating to political parties in the
State of Alabama, or to the elimination of independent
candidacies for municipal elections.

However, with respect to the provisions which
increase the number of signatures required on petitions
of independent candidates for county offices from 25 to
1,000 signatures and from 300 signatures to 10,000 for
those offices for which persons are elected from political
subdivisions larger than a county but less than statewide, i.e.
judicial circuits, state and federal legislatures and regional
offices, we are unable to conclude as we must under Voting
Rights Act, that these increases will not have the purpose
of effect of abridging the voting rights of racial minorities
by substantially increasing the signature requirements.

While we recognize the state's legitimate interest in eliminating frivolous candidacies, to require such a large number of signatures especially in many small rural counties, may well discourage, or prohibit minority candidates from seeking nomination.

While we realize the difficulties caused by conclusions here, we are persuaded that the Voting Rights Act requires this result.  Of course, Section 5 permits you to seek a declaratory judgment from the District Court for the District of Columbia that the changes herein found objectionable neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race.

Sincerely,


DAVID L. NORMAN
Assistant Attorney General
Civil Rights Division

DEC 26 1972

DJ 166-012-3

Honorable William J. Baxley
Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Attorney General:

This letter is in reference to your submission
to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965 of Act Numbers 1585 and 2445,
Acts of Alabama, Regular Session 1971, which we received
May 30, 1972.  Additional information pertinent to Act
Numbers 1585 and 2445 was received from July 5, 1972,
through August 24, 1972.  Further information relevant
to your submission was requested on October 20, 1972,
and received October 24, 1972.

We have considered the submitted changes and
supporting information as well as data compiled by the
Bureau of the Census and information and comments from
interested parties, including local and state officials
of Alabama.  On the basis of this information the
Attorney General will not object to the provisions in
Act Number 1585 abolishing Justice of the Peace Courts
or to the changes in Act Number 2445 which establish
Justice Courts for each county.

However we are unable to conclude as we must
under the Voting Rights Act, that the provision in
Act Number 2445 making the office of judge for the
Justice Courts appointive will not have the purpose or
effect of abridging the voting rights of racial minorities
Therefore, on behalf of the Attorney General, I must
interpose an objection to that provision.

We recognize the state's legitimate interest
in reforming its court system to conform to constitu-
tional mandates.  Our decision to object, however, is
based on information indicating that in many counties
in which Justice of the Peace Courts existed prior to
Act Number 1585, Negroes have sought and won election
to that office and our belief, based on relevant
accumulated data, that the opportunity similarly to
win election as judge of the newly created Justice
Courts is effectively negated by the appointive
provisions of Act Number 2445.

While we realize the difficulties caused by
these conclusions, we are persuaded that the Voting
Rights Act requires this result.  Of course, Section 5
permits you to seek a declaratory judgment from the
District Court for the District of Columbia that the
changes herein found objectionable neither have the
purpose nor will have the effect of denying or abridging
the right to vote on account of race.

Sincerely,


DAVID L. NORMAN
Assistant Attorney General
Civil Rights Division

AUG 3 1973

Honorable William J. Baxley
Attorney General
State of Alabama
Montgomery, Alabama  36104

Dear Mr. Attorney General:

This is in reference to your submission to the
Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965 of Act No. 1483, Acts of Alabama,
Regular Session 1971, which we received June 4, 1973.

We have considered the submitted changes and
supporting information, data compiled by the
Bureau of the Census as well as the opinion and
decree in Thomas v. Mims, 317 F. Supp. 179 (S.D. Ala.,
1970).  On the basis of this information we cannot
conclude, as we must under the Voting Rights Act of
1965, that these changes will not have a racially
discriminatory effect on the voting rights of racial
minorities.  Consequently, on behalf of the Attorney
General I must interpose an objection to the candidate
qualification provisions outlined in Act 1483.  While
we recognize the state's legitimate interest in
eliminating frivolous candidacies, it is our judgment
that to require such a large number of signatures or
the filing of a "paupers oath", in view of the
population, registration and economic statistics of
the City of Mobile may well discourage or prohibit
minority candidates from seeking election.

- 2 -

While we realize the difficulties caused by conclusions here, we are persuaded that the Voting Rights Act requires this result.  Of course, Section 3 permits you to seek a declaratory judgment from the District Court for the District of Columbia that the changes herein found objectionable neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race.

Sincerely,


J. STANLEY POTTINGER
Assistant Attorney General
Civil Rights Division

AUG 1 2 1974

Mr. Oliver W. Brantley
County Attorney
Post Office Box 334
Troy, Alabama  36081

Dear Mr. Brantley:

This is in reference to your submission pursuant
to Section 5 of the Voting Rights Act of 1965 of
Act No. 156 of 1969 which provides that candidates for
the Court of County Commissioners in Pike County be
elected in an at-large election system.  Your submission
was completed on June 11, 1974.

We have considered the submitted plan along with
Census Bureau data and information and comments from
interested parties.  Our analysis reveals that even
though blacks constitute over 34% of the population
(1970 Census) in Pike County no black has ever been
elected to the Court of County Commissioners in modern
times.  We further note the existence of the majority
vote requirement in primary elections, that commissioners
are elected on a staggered basis and Act No. 156 requires
a candidate to reside in and seek election from one of
the four commissioner districts.

Recent court decisions suggest that if an at-
large voting system is employed under circumstances
such as those existing in Pike County, the utilization
of residency and majority vote requirements in conjunction
with members being elected on a staggered basis would
operate to minimize or dilute the voting strength of
the minority and, thus, have an invidious discriminatory
effect.  See White v. Regester, 412 U.S. 755 (1973);
Whitcomb v. Chavis, 403 U.S. 124 (1971); Zimmer v. McKeithen,

- 2 -

485 F. 2d 1297 (5th Cir. 1973); Beer v. United States,
Civ. No. 1495-73 (D.D.C. March 14, 1974).

In view of these court decisions and on the basis
of all the available facts and circumstances, the
Attorney General is unable to conclude, as he must under
the Voting Rights Act, that Act No. 156 will not have a
discriminatory racial effect on voting rights.  Therefore,
while not objecting to at-large elections, on behalf of
the Attorney General, I must interpose an objection to
the implementation of the change insofar as it requires
residency in particular districts, a majority vote, and
staggered terms.

Of course, Section 5 permits you to seek a
declaratory judgment from the United States District
Court for the District of Columbia that this plan
neither has the purpose nor will have the effect of
denying or abridging the right to vote on account of
race or color.  However, until such a judgment is
rendered by that Court, the legal effect of the objec-
tion by the Attorney General is to render unenforceable
the residency requirement plan.

Sincerely,


J. STANLEY POTTINGER
Assistant Attorney General
Civil Rights Division

OCT 2 9 1974

Mr. B. G. Hines
Chairman
Sumter County Democratic
  Executive Committee
Epes, Alabama  35460

Dear Mr. Hines:

This is in reference to your submission to the
Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965 of the 1970 enlargement of the
Sumter County Democratic Executive Committee.  Your
submission was received on August 27, 1974.

We have considered the change in question and
supporting information furnished by you as well as
data compiled by the Bureau of the Census and infor-
mation and comments from interested parties.  This
information shows that the enlargement was made
immediately after the qualification of ten black
citizens for positions on the Sumter County Democratic
Executive Committee (hereinafter referred to as the
Committee) and after the close of the qualifying period
for Committee candidacy, but prior to the election date
for Committee membership.  The information also shows
that all the individuals appointed to the Committee
pursuant to the enlargement were white, with the result
that the otherwise projected 10 to 9 black majority on
the Committee was changed by expansion to a 25 to 19
black minority.

USA, Birmingham, Ala.
Probate Judge Wilbur E. Dearman

- 2 -

Our information shows further that in 1974 elections were held for all positions on the enlarged Committee and that 16 blacks and 18 whites were elected as new members, replacing the old Committee created partially by appointments in 1970. Thus, it would appear that the effect on black voting strength of the enlargement of the Committee in 1970 and appointment of whites to the vacancies created has been substantially corrected and the Attorney General, therefore, at this point in time, does not interpose an objection to the increase in the number of Committee members.

However, during the course of our evaluation of your submission, it came to our attention that the method adopted for electing the enlarged Committee, and the method used in this year's election, utilizes a number of multi-member districts (or beats) and disallows single-shot voting in those districts. In this connection, we note that the use of multi-member districts and anti-single shot requirements in areas with substantial populations of racial minorities has been found to dilute minorities' voting strength. See, e.g., Georgia v. United States, 411 U.S. 526 (1973), and Stevenson v. West, C.A. No. 72-45 (D.S.C. April 7, 1972). Our analysis in the instant matter indicates that such a racially dilutive effect may well have obtained in this year's elections for Committee members in Sumter County.

In view of these factors, the Attorney General is unable to conclude, as he must under the Voting Rights Act, that the use of the anti-single shot requirement in several of the beats will not have a racially discriminatory effect. For that reason, on behalf of the Attorney General I must interpose an objection to that feature of the method of electing members to the Sumter County Democratic Executive Committee in multi-member Beats 6, 7, and 18 in future elections.

- 3 -

Of course, as is provided by Section 5 of the
Voting Rights Act, you have the right to seek a
declaratory judgment from the District Court for the
District of Columbia that the enlargement neither has
the purpose nor will have the effect of denying or
abridging the right to vote on account of race.

Sincerely,


J. STANLEY POTTINGER
Assistant Attorney General
Civil Rights Division

MAR 1 4 1975

Mr. George F. Wooten
Attorney, City of Talladega
Dixon, Wooten, Boyett & McCrary
223 W. North Street
Talladega, Alabama    35160

Dear Mr. Wooten:

This is in reference to Ordinance No. 997 adopting
a numbered post system for the election of aldermen in the
City of Talladega which was submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965.  The submission was completed on January 13, 1975.
Although we have been aware of your request for expedited
consideration of this submission pursuant to procedural
guidelines for the administration of Section 5 (28 C.F.R.
§51.22), we have been unable to reach a determination in
the matter until the present time.

In examining a numbered post requirement under
Section 5 of the Voting Rights Act, it is incumbent upon
the Attorney General to determine whether that requirement --
either in purpose or effect -- results in the minimization
or dilution of minority voting strength.  In this instance,
we have concluded that the numbered post requirement for
the election of aldermen in the City of Talladega would
have that effect.

Our analysis took into consideration a number of
factors which can be summarized as follows.  The population
of the city, according to the 1970 Census, is 17,662, 32%
of which is black.  The city's five-member governing body

- 2 -

is elected on an at large, *i.e.*, multi-member, majority
vote basis.  Prior to and since the adoption of the city's
mayor-council form of government in 1971, the possibility
of electing the council from single-member districts was
discussed but ultimately rejected.  No black persons have
been elected to the city council.  The history of black
participation in the electoral process of the city sug-
gests a pattern of racial bloc voting.

The numbered post requirement, which is consistent
with state law, creates separate offices out of seats in
a multi-member district, requires that all candidates
qualify for a specific numbered place and permits each
voter to vote for only one candidate in each place.  Our
concern is with the changes in voting which would proceed
from a numbered post requirement, given the city's present
multi-member electoral system.  In this context, black
voters would have little opportunity to elect a repre-
sentative of their choice to the city council.  As one
recent court decision indicates:

> In a true at large election, if
> the majority spreads its votes around
> and the minority single shot votes,
> the minority strength is concentrated,
> thus increasing their chance of electing.
> However, if the minority candidate is
> forced to run against a specific candi-
> date for a specific seat, the majority
> can readily identify for whom they must
> vote in order to defeat the minority
> candidate.

Dunston v. Scott, 336 F. Supp. 206, 213, n. 9 (E.D. N.C.,
1972).

For that reason, the Attorney General has inter-
posed objections under Section 5 of the Voting Rights Act

- 3 -

to numbered post systems in a number of other similar
jurisdictions and we are unable to conclude, as we must
under the Voting Rights Act, that implementation of the
numbered post requirement in Talladega will not have a
racially discriminatory effect. Therefore, on behalf of
the Attorney General, I must interpose an objection under
Section 5. However, as the law provides, a declaratory
judgment that this change does not have the proscribed
purpose or effect may be sought in the United States Dis-
trict Court for the District of Columbia notwithstanding
this objection.

In view of our instant objection and our objec-
tion of July 23, 1971, to the anti-single shot provision
of Act No. 91, 1971 Special Session of the Alabama
Legislature, neither numbered posts nor a prohibition
against single shot voting may be used in the Talladega,
Alabama, municipal elections. See, e.g., United States v.
Cohan, 358 F. Supp. 1217 (S.D. Ga. 1973); United States v.
Garner, 349 F. Supp. 1054 (N.D. Ga. 1972).

Because the Attorney General is charged under the
Voting Rights Act with the responsibility for taking
necessary legal action to insure compliance with the Act,
he therefore requests that you advise this Department
within 30 days of the date of this letter as to the steps
the City of Talladega intends to take to comply with the
Act and this letter of objection.

Sincerely,

J. STANLEY POTTINGER
Assistant Attorney General
Civil Rights Division

APR 1 0 1975

Mr. Frank B. Parsons
City Attorney
City of Fairfield
Post Office Drawer 437
Fairfield, Alabama   35064

Dear Mr. Parsons:

This is in reference to the six annexations which were submitted to the Attorney General by the City of Fairfield pursuant to Section 5 of the Voting Rights Act of 1965. Your submission was completed on February 13, 1975.

The Attorney General does not interpose an objection to five annexations, i.e., those accomplished pursuant to Ordinance Numbers 460 (1965), 461 (1965), 484 (1966), 512 (1969) and 514 (1969). However, we feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such provisions.

We have given careful consideration to the annexation accomplished pursuant to Ordinance Number 563 (1973) and the supporting information obtained from the city and other interested parties. On the basis of our analysis we have concluded that the City of Fairfield has failed to satisfy its burden of proving that the subject annexation does not have the effect of abridging the right to vote on account of race or color.

Our analysis took into consideration a number of factors which can be summarized as follows: The City of

- 2 -

Fairfield presently elects 12 councilmen on an at-large,
majority vote basis with numbered post and residency
requirements.  The annexed area in question contains an
apartment complex of 230 units, the great majority of
which are or are likely to be inhabited by white persons.
Based upon 1970 census data, the subject annexation
decreased the total black population of the city from
approximately 48% to 46%.  The issue is whether this re-
duction has a discriminatory effect on voting within the
meaning of the Voting Rights Act of 1965.  Where, as here,
voter registration is fairly evenly divided between the
races, there is a pattern of racial bloc voting and the
election statistics for the most recent municipal elections
in 1972 demonstrate relatively narrow margins of victory
by white over black candidates, the addition of a few
hundred white voters can have a significant diluting impact
on black voting strength.  In view of such circumstances,
I am unable to find, as I must under Section 5, that the
change in question does not have a racially discriminatory
effect and therefore I must, on behalf of the Attorney
General, interpose an objection to its implementation.

    We are aware of the order by United States District
Court Judge Sam C. Pointer to reapportion the city into
single-member districts. Nevett v. Sides, C.A. No. 73-529
(N.D. Ala.).  A reapportionment plan of this nature which
satisfies the requirements of the Fourteenth and Fifteenth
Amendments would effectively eliminate the adverse racial
effect occasioned by the subject annexation under an at-
large electoral system.  For that reason, the Attorney
General will consider the withdrawal of his objection once
a constitutionally satisfactory reapportionment plan has
been approved by the federal court.

    I wish to stress that this ruling relates only to
the voting changes occasioned by the annexation.  The

- 3 -

objection to the implementation of the annexation does not
affect the validity of the annexation itself.

Of course, as provided by Section 5, you have an
alternative of instituting an action in the United States
District Court for the District of Columbia for a declar-
atory judgment that the changes do not have the purpose or
will not have the effect of denying or abridging the right
to vote on account of race or color.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3
V3168; V3169

JUL ·   1975

Honorable Harold L. Davenport
Mayor, City of Alabaster
P. O. Box 177
Alabaster, Alabama  35007

Dear Mayor Davenport:

This is in reference to the 11 annexations to the City of Alabaster, Shelby County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965.  Your submission was completed on May 8, 1975.

In examining annexations under Section 5 of the Voting Rights Act, it is incumbent on the Attorney General to determine whether the annexations, either in purpose or effect, result in racial discrimination in voting.  In making this evaluation we apply the legal principles which the courts have developed in the same or analogous situations.  Moreover, it is also significant that Section 5 only prohibits implementation of changes affecting voting and provides that such changes may not be enforced without receiving prior approval by the Attorney General or by the District Court for the District of Columbia.  Our proper concern then is not with the validity of the annexations but with the changes in voting which proceed from them.

Based on the 1970 Census data regarding the City of Alabaster, and the data regarding the annexations included in your submission and the information which you supplied, the Attorney General will interpose no objection to those annexations of areas which are not

- 2 -

populated (annexation numbers 2, 7, 9 and 11) since the
addition of those areas do not affect voting within
the City of Alabaster. Nor will objection be interposed
to annexation number 10, since the effect of that
annexation on voting in the City of Alabaster appears
not to adversely affect blacks' voting rights.

The remaining 6 of the 11 annexations were con-
sidered to be of major importance in the context of all
the submitted annexations, and were carefully examined
in the light of federal court decisions which have
involved questions of annexations' racially dilutive
effect where political subdivisions conduct elections
on an at-large basis. City of Richmond v. United States,
43 U.S.L.W. 4555 (June 24, 1975); City of Petersburg
v. United States, 354 F. Supp. 1021 (D.D.C. 1972) aff'd
410 U.S. 962 (1973). Under the procedural guidelines
for the administration of Section 5 the burden of
proving that changes affecting voting have no racial
purpose and have had or will have no racial effect lies
with the submitting authority. Georgia v. United States,
411 U.S. 526 (1973); City of Richmond v. United States,
supra; City of Petersburg v. United States, supra.

According to the data we examined the major
annexations under consideration now include 1170 white
people and no black people to the City of Alabaster,
and there is no possibility of future annexation of
areas with commensurate black population. Our infor-
mation regarding elections in the city demonstrates
that the city elects its councilmen at-large with a
majority requirement and a numbered post system, and
that there is a pattern of racial bloc voting in city
elections. Moreover, the information we examined
indicates that blacks are located within the City of
Alabaster in a recognizable residential area.

- 3 -

Under these circumstances, commensurate with the decisions cited above we cannot conclude that the major annexations taken together will not have a dilutive effect on voting in Alabaster. Accordingly, I must on behalf of the Attorney General interpose an objection to the submitted annexation numbers 1, 3, 4, 5, 6 and 8.

In City of Petersburg v. United States, supra, the court stated at page 1031:

> The Court concludes then . . . in accordance with the Attorney General's findings, that this annexation can be approved only on the condition that modifications calculated to neutralize to the extent possible any adverse effect upon the political participation of black voters are adopted, i.e., that the plaintiff shift from an at-large to a ward system of electing its city councilmen.

In City of Richmond v. United States, supra, at 4868, the court said:

> Petersburg was correctly decided. On the facts there presented, the annexation of an area with a white majority, combined with at-large councilmanic elections and racial voting, created or enhanced the power of the white majority to exclude Negroes totally from participation in the governing of the city through membership on the city council. We agreed, however, that that consequence would be satisfactorily

- 4 -

obviated if at-large elections were
replaced by a ward system of choosing
councilmen.  It is our view that a
fairly designed ward plan in such
circumstances would not only prevent
the total exclusion of Negroes from
membership on the council but would
afford them representation reasonably
equivalent to their political strength
in the enlarged community.

In this connection, should the city undertake to elect
its councilmen from single-member districts the Attorney
General will reconsider his determination in this matter.
We note that it is our understanding that the establish-
ment of single-member districts in Alabaster was a topic
of discussion in the city prior to the most recent city
elections, and that the use of such districts continues
to be a matter of interest to present city officials.

As you know, the city's 11 annexations were submit-
ted simultaneously under Section 5 despite the fact that
the individual annexations were accomplished throughout
the years 1971, 1972 and 1973.  I am not unmindful of
the fact that our consideration under Section 5 regarding
the individual annexations may have resulted in a judg-
ment different from that announced above, had each
annexation been submitted promptly upon its completion.
However, once confronted with the simultaneous submission
of 11 annexations, and faced with the question of whether
an impermissible dilution under the law has occurred in
Alabaster as the result of annexation, we have no alterna-
tive but to examine the population of the annexed terri-
tory as of the time of submission and to collectively
consider the annexations to determine their effect under
judicially enunciated standards.

- 5 -

As set out in the Section 5 guidelines, 28 C.F.R. 51.23 and 51.24, we will examine any information not previously available to you, or any facts which we may not have considered, in support of a request to reconsider the objection interposed above, including such information as the results of any studies or other documentation regarding the feasibility of creating councilmanic districts in the City of Alabaster.

Of course, as provided by Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these annexations have neither the purpose nor effect of denying or abridging the right to vote on account of race or color. However, until such a judgment is rendered by that court, or until the objection has been withdrawn by the Attorney General, the legal effect of the objection by the Attorney General is to render the annexations in question legally unenforceable insofar as they affect voting in the City of Alabaster.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3
V7007

SEP 12 1975

Mr. J. Howard McEniry, Jr.
City Attorney
City of Bessemer
Post Office Box 236
Bessemer, Alabama  35020

Dear Mr. McEniry:

This is in reference to the 45 annexations to the
City of Bessemer which were submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act
of 1965 as amended.  Your submission was completed on
July 14, 1975.

In examining annexations under Section 5 of the
Voting Rights Act, it is incumbent on the Attorney
General to determine whether the annexations, either in
purpose or effect, result in racial discrimination in
voting.  In making this evaluation we apply the legal
principles which the courts have developed in the same
or analogous situations.  It is also significant that
Section 5 only prohibits implementation of changes
affecting voting and provides that such changes may not
be enforced without receiving prior approval by the
Attorney General or by the District Court for the
District of Columbia.  Our proper concern then is not
with the validity of the annexations as such but with
the changes in voting which proceed from them.

With this understanding of the Attorney General's
role under Section 5 in mind, I can advise you that the
Attorney General does not interpose an objection to 38
of the annexations submitted.  Our analysis reveals that

- 2 -

those 38 annexations, set forth in Appendix A to this
letter, involve either areas that are not populated or
areas the population of which have at most a de minimus
effect on minority voting strength.

With regard to the other 7 annexations under sub-
mission, listed in Appendix B attached, we cannot reach
a like conclusion.   We have given careful consideration
to those annexations, the supporting information afford-
ed by the city and other interested parties, and recent
federal court decisions which have involved the question
of the racially dilutive effect of annexations where
political subdivisions conduct elections on an at-large
basis.   City of Richmond v. United States, 43 U.S.L.W.
4865 (U.S. June 24, 1975); City of Petersburg v.
United States, 354 F. Supp. 1021 (D.D.C. 1972) aff'd
410 U.S. 962 (1973).  On the basis of our analysis, we
have concluded that the City of Bessemer has failed to
satisfy its burden of proving that the 7 annexations
listed in Appendix B do not have the effect of abridging
the right to vote on account of race or color.

Our evaluation took into consideration a number
of factors which can be summarized as follows.  The
City of Bessemer has a three-member commission form of
government which is elected at-large with numbered posts
and majority vote requirements.   In 1960, black persons
represented 57.4% of the city's total population and
52.4% of the voting age population, according to the
1960 Census.

From 1964 to 1970 there was a total of 18 annexa-
tions to the City of Bessemer, one of which has not
been submitted for Section 5 preclearance.  Of the
twelve submitted annexations which actually involved
population increases, only two contained black persons

- 3 -

and those represented a negligible increase in the black
population. Based upon household data provided by the
city and using the average number of persons per house-
hold according to the 1970 Census, we find that approxi-
mately 4,791 whites and approximately 74 blacks were
added to the population during this period.

Our analysis shows that the cumulative effect of
the 4 pre-1970 submitted annexations, along with the
unsubmitted annexation accomplished by Act No. 245 of
the 1964 Alabama Legislature, was to contribute signifi-
cantly toward a decrease in black population percentages.
According to Census statistics blacks represented 57.4%
of the city's population in 1960 but only 52.7% in 1970.
The black voting age population dropped from 52.4% in
1960 to 47.1% in 1970. We find further that this
reduction in black percentage was exacerbated by the
relatively substantial all-white population additions
occasioned by the 3 post-1970 submitted annexations
listed in Appendix B.

I am mindful of your view that the annexation
resulting from 1964 Act No. 245 is not a change re-
quired to be submitted under Section 5 and that no
such submission of that annexation is intended. While
we do not agree with your view on the coverage question,
we have not considered Act 245 as having been submitted.
Nevertheless, since the annexation there involved con-
tained the largest of all the post-1964 additions to
the city's population, that factor of necessity forms
a significant portion of the context in which we must
analyze the dilution issue in this case.

Another factor which we must consider in review-
ing serial annexations, particularly where there is a
number of all-white or majority-white annexations, is

- 4 -

whether there are minority communities outside the city
limits which have sought, or are interested in, but have
been unsuccessful in being annexed to the city.  In the
course of our review, it has come to our attention that
there are indeed several such areas, e.g., Carver-
Robertstown, Pipe Shop, Hillside Homes, "Northside"
(identified as an area between the city limits and the
Braswell housing project), Pauls Hill, Muscoda and
Old Jonesboro, which are either immediately adjacent to
the city's corporate limits or nearby.

The City of Bessemer has represented that none of
the black areas has satisfied the legal requirements
necessary for annexation to the city.  Black persons with
whom we have spoken have made allegations, which we are
presently unable to conclusively prove or disprove, that
these areas have been treated in a racially discrimina-
tory manner over the past years and that they have been
denied annexation to the city because of the race and/or
economic status of the areas.  However, we believe it is
of some consequence that the great majority of annexa-
tions of white areas have been achieved apparently with
a minimum of, if any, difficulty.

In view of the foregoing considerations, we can-
not conclude, as we must under the Voting Rights Act,
that the 7 annexations reflected on Appendix B do not
have a significant dilutive effect on black voting
strength.  I must, therefore, on behalf of the Attorney
General, interpose an objection to those 7 annexations.

I am not unmindful that our consideration under
Section 5 regarding the individual annexations may have
resulted in a different conclusion had each annexation
been submitted promptly upon its completion.  However,

- 3 -

once confronted with the simultaneous submission of multiple annexations, and faced with the question of whether an impermissible dilution under the law has occurred as the result of those annexations, it is incumbent upon us to examine the population of the annexed territory as of the time of submission and to consider collectively the annexations to determine their total effect under judicially enunciated standards.

In connection with this determination, however, we note that the Supreme Court has recently ruled that annexations which otherwise impermissibly reduce a racial group's political strength in a community do not necessarily violate Section 5 if the post-annexation electoral system fairly recognizes the minority's political potential or steps are taken to neutralize the adverse racial effects occasioned by the annexations. City of Richmond v. United States, 43 U.S.L.W. 4865 (U.S. June 24, 1975). The litigation there, as well as that involved in City of Petersburg v. United States, supra, considered that one such remedy might be the adoption of a fairly drawn system of single-member wards for the election of the representative governing body.

I note that there is now pending a lawsuit in the United States District Court for the Northern District of Alabama which challenges the at-large method of electing the Bessemer City Commission. Pursuant to our policy where the substance of objections under Section 5 bears an apparent relationship to issues or questions of relief in pending cases, I am taking the liberty of sending a copy of this letter to that Court.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3
V9991

DEC 12 1975

Mr. Kent Brunson
Assistant Attorney General
State of Alabama
Montgomery, Alabama 36130

Dear Mr. Brunson:

This is in reference to Act No. 698, 1975 Alabama
Legislature, dealing with changes in the manner of elect-
ing city commissioners in Phenix City, Alabama, which was
submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965 as amended. Your submis-
sion was received on October 13, 1975. Although we have
noted your request for expedited consideration of this
submission pursuant to 28 C.F.R. §51.22, we have been
unable to reach a determination in this matter until the
present time.

In examining, under Section 5 of the Voting
Rights Act, changes in the method by which members of
a city commission are elected, it is incumbent upon
the Attorney General to determine whether the changes,
either in purpose or effect, result in a minimization
or dilution of minority voting strength. In this
instance, we have concluded that the staggered term
requirement for the election of the Phenix City Commis-
sion which would result from Act No. 698 would have
such an effect.

We have examined this matter carefully, including
a consideration of the following factors. The population
of Phenix City, according to the 1970 Census, is 25,281,
37% of which is black. The city's three-member governing
body is elected on an at-large, majority vote basis, and
single-shot voting is permissible. No black person has

- 2 -

ever been elected to the Phenix City Commission. It is
our understanding that, recently, a coalition of black
and white leaders in the city urged the adoption of a
more representative electoral system which would give
the city's sizeable minority group an opportunity to
elect some representation of their own choice.

We also took into consideration the changes in
the method of electing the City Commission which have
occurred since the effective date of the Voting Rights
Act of 1965. Significant to that consideration is the
fact that the adoption of the numbered post system
authorized pursuant to Act No. 1173, 1971 Alabama
Legislature, is unenforceable since the changes incor-
porated into that legislation has never met the
preclearance requirements of Section 5. Thus the only
presently enforceable method of electing the three
city commissioners is on an at-large basis as result-
ing from the changes contained in Act No. 52, 1971
Alabama Legislature, which has met Section 5 require-
ments.

In our view, the reduction of the field of
candidates which would result from the imposition of
staggered terms would have the effect of limiting the
potential for black voters to elect a candidate of
their choice and thus would constitute an impermis-
sible dilution of black voting strength. See Dunston
v. Scott, 336 F. Supp. 206, 213, n. 9 (E.D. N.C. 1972).
Under such circumstances, the Attorney General cannot
conclude, as he must under Section 5, that the imple-
mentation of staggered terms for the Phenix City
Commission will not have the effect of abridging or
denying the right to vote on account of race or color.
I must, therefore, on behalf of the Attorney General
interpose an objection to the implementation of Act
No. 698.

- 3 -

Of course, Section 5 permits you to seek a declaratory judgment from the United States District Court for the District of Columbia that this plan has neither the purpose nor the effect of denying or abridging the right to vote on account of race or color. However, until such a judgment is rendered by that Court, the legal effect of the objection by the Attorney General is to render Act No. 693 unenforceable.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

JAN 16 1976

Mr. William T. Stephens
Assistant Attorney General
State of Alabama
Montgomery, Alabama   36104

Dear Mr. Stephens:

   This is in reply to your submission of revisions
in the state primary election law, Act No. 1196 (S. 1018)
of the 1975 Session of the Alabama Legislature, to the
Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965.  Your submission was received on
November 17, 1975.

   We have considered carefully the submitted changes
and supporting materials as well as information and com-
ments received from other interested parties.  On the
basis of our review and analysis, the Attorney General
does not interpose any objection to the changes involved,
except insofar as set forth below.  However, we feel a
responsibility to point out that Section 5 of the Voting
Rights Act expressly provides that the failure of the
Attorney General to object does not bar any subsequent
judicial action to enjoin the enforcement of such
changes.

   With respect to the changes contained in Sections
5 and 43 of the submitted legislation, the primary elec-
tion day would be moved from May to the first Tuesday in
September (after 1976) and political organizations not
using primaries would have to submit the names of their

cc:  Public File (Rm. 920)✓
     X0521

- 2 -

nominees by 5:00 PM on primary election day. However, other provisions of Alabama law require that such organizations hold their mass meetings, including those held for the purpose of selecting delegates to a nominating convention, on the same day the primary election is held (Sections 39 and 40). Also, Section 145 of Title 17 requires that nominees for the general election must be certified no later than 60 days prior to the general election. It would seem virtually impossible for organizations utilizing the mass meeting-convention method of nomination to comply with these requirements in selecting their candidates. In addition, in an instance such as 1976 (even though the new primary date would not be effective in 1976) nominees resulting from a mass meeting held on the date of the primary could not be certified to appropriate officials in compliance with Section 145 inasmuch as the primary election would be held less than 60 days from the date of the general election.

Since, according to our information, the National Democratic Party of Alabama, a virtually all-black political party, is the prime political party in Alabama which presently relies solely on the convention method of nomination, and in view of this confusing state of the law, we cannot conclude that these proposed changes will not have the effect of denying or abridging the right to vote on account of race or color.

In addition, our analysis shows that the repealer clause, Section 44, as it applies to the repeal of former Sections 373-394 of Title 17 of the Alabama Code, dealing with contested elections, creates a potential for adverse treatment of blacks. We understand that a bill concerning contested elections was being considered in the legislature simultaneously with the primary law

- 3 -

revisions, but that it did not come to passage, and will
be considered again early in the 1976 session. Never-
theless, the net effect of the repeal provisions of
Section 44 is to leave the state with no effective rules
governing contested elections and, irrespective of
whether inadvertence was the cause of this situation,
the absence of such rules, so long as it continues, is
a factor that must be considered by the Attorney General
upon a submission under Section 5. In view of Alabama's
history of racial problems in the voting area, particu-
larly with respect to some county democratic executive
committees, we cannot conclude that the deletion of
rules and guidelines concerning contested elections
will not have the effect of denying or abridging the
right to vote on account of race or color.

For the foregoing reasons, therefore, I must,
on behalf of the Attorney General, interpose an objec-
tion to Sections 5, 43 and 44 of Act No. 1196. Of
course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment
from the United States District Court for the District
of Columbia that these provisions neither have the
purpose nor will have the effect of denying or abridging
the right to vote on account of race. However, until
and unless such a judgment is obtained, the provisions
objected to are unenforceable.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

FEB 18 1976

Mr. O. W. Hancock
Chairman
Pickens County Democratic
  Executive Committee
Carrollton, Alabama  35447

Dear Mr. Hancock:

This is in reference to the reapportionment
of the Pickens County Democratic Executive Committee,
which was submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965.  Your
submission was received on December 20, 1975.

After a careful examination of the submitted
change, including consideration of demographic and
geographic data, and comments from interested parties,
we cannot conclude as we must under the Voting Rights
Act, that the use of four multi-member districts
combined with numbered posts utilized to elect members
to the Pickens County Democratic Executive Committee,
will not have a racially discriminatory effect.
Recent Supreme Court decisions, to which we feel
obligated to give great weight, indicate that the
combination of the above features may have the effect
of abridging minority voting rights in Pickens County.
E.g., White v. Regester, 412 U.S. 755 (1973); Whitcomb
v. Chavis, 403 U.S. 124 (1971).  We note that the use
of either single member districts or voting precincts
(used previously to elect committee members), if
fairly drawn and properly apportioned, might eliminate
any racially discriminatory effect.

- 2 -

For the foregoing reasons, I must on behalf of the Attorney General interpose an objection to the combination of the multi-member districts and numbered post requirements. We have reached this conclusion reluctantly because we fully understand the complexities involved in devising a plan of this nature so as to satisfy the needs of the county and its citizens and simultaneously, to comply with mandates of the Federal Constitution and laws. We are persuaded, however, that the Voting Rights Act compels this result.

Because issues relating to this matter are presently pending before the United States District Court for the Northern District of Alabama in Corder v. Kirksey, Civil Action No. 73-M-1086 (N.D. Ala.), I am taking the liberty of providing the Court with a copy of this response. Of course, Section 5 permits seeking approval of all changes affecting voting by the United States District Court for the District of Columbia irrespective of whether the changes have previously been submitted to the Attorney General.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

FEB 2 0 1976

Mr. William T. Stephens
Assistant Attorney General
State of Alabama
Montgomery, Alabama   36104

Dear Mr. Stephens:

This is in reply to your submission of the
Judicial Article Implementation Act (Act No. 1205,
S.400) of the 1975 session of the Alabama legislature,
to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965.  Your submission was
received on December 22, 1975.

We have considered the submitted changes and
supporting materials as well as information and
comments received from other interested parties.
On the basis of our review and analysis, the Attorney
General does not interpose any objection to the
changes involved except Sections 4-113(b)(5) and
4-131(b).  However, we feel a responsibility to
point out that Section 5 of the Voting Rights Act
expressly provides that the failure of the Attorney
General to object does not bar any subsequent
judicial action to enjoin the enforcement of
such changes.

With respect to the change contained in
Section 4-113(b)(5), Bibb and Hale Counties would
be consolidated for the purpose of electing one
district court judge.  The result of such a
consolidation would produce an electorate which
would be approximately 49% black and therefore

- 2 -

dilute the voting strength of blacks in Hale County,
which according to the 1970 Census, is 66.4% black
(Bibb County is 27.9% black).  Furthermore, the
proposed combination of these counties into one
district does not appear to be warranted by any
compelling state interest, inasmuch as both of
these two counties is larger than Bullock, Crenshaw,
Greene, Henry and Lowndes Counties, each of which
has a district court and Hale County is larger than
four other counties, Cherokee, Conecuh, Lamar and
Perry, each of which also has a district court.
Thus, we cannot conclude that this change will not
have the effect of denying or abridging the right
to vote on account of race or color.  Accordingly,
I must interpose an objection to the implementation
of the change provided for by Section 4-113(b)(5) of
the Judicial Implementation Act.  Of course as
provided by Section 5 of the Voting Rights Act,
you have the right to seek a declaratory judgment
from the United States District Court for the
District of Columbia that this provision neither
has the purpose nor will have the effect of denying
or abridging the right to vote on account of race.
However, until and unless such a judgment is
obtained, the provision objected to is unenforceable.

With respect to Section 4-131(b) which pro-
vides for the abolition of the position of county
solicitor, the Department has determined that the
data sent to the Attorney General are insufficient
to properly enable this Department to fulfill its
responsibilities under Section 5.  Accordingly,
would you please assist us by providing the
following information:

- 3 -

1. The names of those counties which have elected county solicitors.

2. The number of district attorneys and assistant district attorneys, by race.

3. The number of assistant district attorneys appointed, by race, since January 1, 1970, and by whom each was appointed.

4. The names of counties, if any, which have black district attorneys or assistant district attorneys.

5. The qualifications and criteria for appointment as a district attorney.

As you know, the Attorney General has a 60-day period to consider submissions pursuant to Section 5. This period will begin to run upon receipt of the additional information necessary to evaluate Section 4-131(b) of the Judicial Implementation Act.

If you have any questions, please do not hesitate to call James M. Fallon (202-739-3872), the attorney to whom this matter is assigned. When forwarding additional information relating to the above request, please refer to file number X1121.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

MAR 2  1976

Mr. C. B. Arendall, Jr.
Hand, Arendall, Bedsole,
    Greaves & Johnston
Attorneys at Law
P. O. Drawer C
Mobile, Alabama  36601

Dear Mr. Arendall:

  This is in reply to your letter of December 30,
1975, in which you submitted to the Attorney General
Act No. 823 (S. 138) of the 1965 Regular Session of
the Alabama Legislature, pursuant to Section 5 of the
Voting Rights Act of 1965.  Your letter and the
attached materials were received by this Department
on January 2, 1976.

  We have considered the submitted changes and
supporting materials as well as information and
comments received from other interested parties.
On the basis of our review and analysis, the Attorney
General does not interpose any objection to the
changes involved, except insofar as set out below.
However, we feel a responsibility to point out
that Section 5 of the Voting Rights Act expressly
provides that the failure of the Attorney General
to object does not bar any subsequent judicial
action to enjoin the enforcement of such changes.

cc:  Public File (Rm. 920)

- 2 -

With respect to the change contained in Section 2 of Act 823, the assignment of specific administrative functions is a change from the prior system of collective responsibility of all three commissioners for all administrative functions and as such constitutes a change affecting voting within the meaning of Section 5 of the Voting Rights Act. We understand that the method of electing Commissioners both before and after Act No. 823 contained at large, numbered posts, and majority vote requirement features.

According to 1970 Census data Mobile has a population which is over 35% black. We understand that this substantial minority population is concentrated mainly in one area of the City. In addition, Mobile has a history of racial discrimination in general and our information suggests that a pattern of racial bloc voting exists.

Recent court decisions, to which we feel obligated to give great weight, suggest that an at large voting system in the context of such features as numbered posts and majority vote, has the potential for diluting the voting strength of cognizable racial minority groups. See Whitcomb v. Chavis, 405 U.S. 124 (1971); White v. Regester, 412 U.S. 755 (1973). We understand it to be the City's position that the change in Section 2 assigning specific administrative functions to each commissioner locks the city into use of the at large system of electing those commissioners since it would not be appropriate to permit a particular area of the City (as under a ward system of election) to have the exclusive right to elect a commissioner who would be responsible for administering functions for the whole city, for example, public safety.

- 3 -

In view of this interpretation that Section 2 rigidifies use of the at large system, incorporating as it does the numbered post and majority vote features, and in view of history of racial discrimination and evidence of racial bloc voting in Mobile, we are unable to conclude, as we must under the Voting Rights Act, that Section 2 of Act No. 823 will not have the effect of denying or abridging the right to vote on account of race or color.

Likewise, we are unable to reach such a conclusion with respect to Section 12 of Act No. 823. That section provides that, upon acceptance in a referendum, the form of government for Mobile will be a mayor and seven member council, elected at large to numbered posts. While we understand that two referenda have been held unsuccessfully on the adoption of this form of government, we also understand that Section 12 is still extant and would be implementable, from the City's standpoint, if a referendum were successful in the future. Under those circumstances, and in view of our foregoing discussion of the potential effect on black voting strength that the use of such an at large voting system would have in the context of Mobile, we similarly are unable to conclude that the change embodied in Section 12 will not have the proscribed effect.

Accordingly, I must, on behalf of the Attorney General interpose an objection to Sections 2 and 12 of Act No. 823. Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the features of this submission here objected to neither have the

- 4 -

purpose nor will have the effect of denying or
abridging the right to vote on account of race.
However, until and unless such a judgment is obtained,
Sections 2 and 12 are legally unenforceable.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

MAR 5   1976

Mr. Martin Ray
McQueen, Ray & Allison
Attorneys at Law
P. O. Box 65
Tuscaloosa, Alabama   35401

Dear Mr. Ray:

This is in reference to the reapportionment
of the Pickens County Board of Education (effected
by Act No. 72 of the 1975 Alabama Legislature),
which was submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965.
Your submission was received on February 16, 1976.

First, we note that Act No. 41 of the 1966
Alabama Legislature, under which legislation the
Pickens County Board of Education was previously
apportioned, has never met the preclearance require-
ments of Section 5.  We further note that prior to
1966, the Pickens County Board of Education elected
five members from five single member districts.

Turning to the merits of this submission,
on the basis of our consideration of the relevant
demographic and geographic data, and comments
from interested parties, we cannot conclude as we
must under the Voting Rights Act, that the election
of the Pickens County Board of Education on an at-
large basis combined with a majority vote require-
ment, numbered posts, and staggered terms, will not
have a racially discriminatory effect.  Recent
Supreme Court decisions, to which we feel obligated

- 2 -

to give weight, indicate that the combination of the
above features may have the effect of abridging
minority voting rights in Pickens County. E.g., White
v. Regester, 412 U.S. 755 (1973); Whitcomb v. Chavis,
403 U.S. 124 (1971). We note that the use of single
member districts (used previously to elect school board
members), if fairly drawn and properly apportioned,
might eliminate any racially discriminatory effect.

For the foregoing reasons, I must on behalf of
the Attorney General interpose an objection to the
combination of at-large election system, majority vote,
numbered post and staggered term requirements. We have
reached this conclusion reluctantly because we fully
understand the complexities involved in devising a plan
of this nature so as to satisfy the needs of the county
and its citizens and simultaneously, to comply with
the mandates of the Federal Constitution and laws.
We are persuaded, however, that the Voting Rights Act
compels this result.

Because issues relating to this matter are
presently pending before the United States District
Court for the Northern District of Alabama in Corder
v. Kirksey, Civil Action No. 73-M-1066 (N.D. Ala.),
I am taking the liberty of providing the Court with
a copy of this response. Of course, Section 5 permits
seeking approval of all changes affecting voting by
the United States District Court for the District of
Columbia irrespective of whether the changes have
previously been submitted to the Attorney General.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

Mr. John W. Johnson, Jr.
Johnson and Avary
Attorneys at Law
201 Johnson Building
P. O. Drawer 409
Lanett, Alabama   36863

Dear Mr. Johnson:

This is in response to your letter of
December 18, 1975, in which you completed the
submission to the Attorney General of Act No.
475 (H. 304) of the 1973 regular session of the
Alabama Legislature pursuant to Section 5 of
the Voting Rights Act of 1965.  Your letter and
the attached materials were received on January 8,
1976.

The Attorney General does not interpose any
objection to the reapportionment of Chambers County
nor to the creation of a fifth commissioner's
district.

However, after carefully considering the
proposed change, the supporting material and
information obtained from interested citizens, we
are unable to conclude, as we must under the Voting
Rights Act, that the at-large feature of the method
of nominating and electing commissioners will not
have the effect of denying or abridging the right
to vote on account of race or color.  I must, therefore,
on behalf of the Attorney General, interpose an
objection to this aspect of the plan.

- 2 -

Prior to the change, it is our understanding
that pursuant to Act No. 271 (H. 1049) of the 1915
session of the legislature, Local Laws of Alabama,
1915, p. 133, county commissioners were nominated
by means of a primary held on a district basis, but
elected at-large.  It is our further understanding
that nomination in the primary is tantamount to election
but that under the change in Act No. 475 nomination by
the district primary is eliminated and all elections
will be at-large.

Under the circumstances involved, we conclude
that the deletion of district contests in the primary
is dilutive of minority voting strength.  We reach this
conclusion because that two of the proposed districts,
namely, Districts 1 and 2, constitute or approximate
black majorities, and thus not allowing these districts
to select candidates for the county commission but
having all candidates selected at-large, reduces the
minority voting strength in these districts from 57%
in District 1 and 49% in District 2 to 34%, which is
the county-wide percentage of blacks according to
the 1970 census.  We are constrained by judicial
precedent to conclude that such a dilution violates
the voting rights of minorities in Chambers County,
Graves v. Barnes, 343 F. Supp. 704 (W.D. Tex., 1972),
aff'd. sub. nom. White v. Regester, 412 U.S. 755

Of course, as provided by Section 5 of the
Voting Rights Act, you have the right to seek a
declaratory judgment from the United States District
Court for the District of Columbia that the at-large
nomination provision of Act No. 475 neither has the
effect nor the purpose of denying or abridging the
right to vote on account of race.  However, until and
unless such a judgment is obtained, the at-large
provision of Act No. 475 remains unenforceable.

- 3 -

Finally, in reviewing this submission, we note that the 1971 regular session of the Alabama legislature passed Act No. 2001 (H. 2308), Acts 1971, p. 3241. While a copy of this statute was attached to your letter of December 18, 1975, our records do not reflect that this change has been submitted to the United States District Court for the District of Columbia for judicial review or to the Attorney General for administrative review as required by Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973. Inasmuch as Act No. 2001 provides for the same changes as Act No. 475, the objection noted above also applies to Act No. 2001.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3
X1839-41

MAR 1 0 1976

Mr. John W. Johnson, Jr.
Johnson and Avery
Attorneys at Law
P. O. Drawer 409
Lanett, Alabama  36963

Dear Mr. Johnson:

This is in response to your letters of December 31,
1975 and January 16, 1976, in which you submitted to the
Attorney General Acts Nos. 118, 414 and 843 of the 1975
Regular Session of the Alabama Legislature pursuant to
Section 5 of the Voting Rights Act of 1965.  Your letters
and the attached materials were received on January 17,
1976.

We have considered carefully the submitted changes
and supporting materials as well as Census data and infor-
mation and comments received from other interested parties.
On the basis of our review and analysis, the Attorney
General does not interpose any objection to Act No. 118,
which provides for a reidentification of voters in Beat
7 of Chambers County, and Act No. 414, which provides for
the appointment of clerks in the probate office of
Chambers County to assist the board of registrars by
taking applications for voter registration.  However, we
feel a responsibility to point out that Section 5 of the
Voting Rights Act expressly provides that the failure of
the Attorney General to object does not bar any subse-
quent judicial action to enjoin the enforcement of the
submitted changes.

- 2 -

We are not able to reach a like conclusion with
respect to Act No. 843. That legislation creates two
districts from which members of the County Board of
Education are to be elected. District 1 is to have
three members resident therein and District 2 is to
have two resident members, all to be elected at-large
from the county, with the use of numbered posts, a
majority vote requirement, and staggered terms. It
is our understanding that the former (pre-1975) method
of electing school board members consisted of four
single-member districts and one at-large seat, with
staggered terms. It is our further understanding that
as a result of population growth in the southeastern
corner of the county, known as "the valley," these
former districts were malapportioned.

According to the 1970 Census, Chambers County
is approximately 34.8% black. However, the area which
constitutes District 2 in the submitted plan is approxi-
mately 54% black, while District 1 (Beats 7 and 13) is
approximately 25% black. Thus, to require candidates
to run at-large county-wide decreases, from a 54%
majority in proposed District 2 to a 34.8% minority
in the county, the potential of blacks to elect a
candidate of their choice. In our view such minimiza-
tion is dilutive of black voting strength. The numbered
posts, staggered terms, and majority vote requirement
tend further to highlight the dilutive effect of the
at-large proposal. In a county such as Chambers, which
we understand has a history of racial discrimination
and a pattern of racial bloc voting, such a dilution
denies blacks a realistic opportunity to participate in
the political process. White v. Regester, 412 U.S. 755
(1973). Accordingly, we cannot conclude, as we must
under the Voting Rights Act, that the at-large, numbered
post, majority vote and staggered terms requirements
will not have the effect of denying or abriding the
right to vote on account of race or color.

- 3 -

For the foregoing reasons, therefore, I must on behalf of the Attorney General, interpose an objection to the at-large, numbered posts, majority vote, and staggered term features of Act No. 843 of 1975. The Attorney General, however, does not interpose any objection to the reapportionment (two districts) or residency requirement features of this submission. Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these provisions neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race. However, until and unless such a judgment is obtained, the provisions objected to are unenforceable.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

D.J. 166-012-3
V6804

APR 23 1976

Mrs. Sue W. Seale
Hale County Board of Registrars
Hale County Courthouse
Greensboro, Alabama 36744

Dear Mrs. Seale:

This is in reference to the change in the method
of electing members of the "board of revenue, court of
county commissioners, or other like governing body" in
Hale County as provided for in Act No. 1092 of the 1969
Alabama Legislature, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act.

Your request for review was received initially
on July 25, 1974. By letter dated September 20, 1974,
we advised you that the information received to that
point was not sufficient to complete your submission
and requested additional information to enable us to
properly evaluate the change. Our request sought,
among other data, a description of the prior method
of electing each group of county officials affected
by the change and a breakdown of the population of
each commissioner district by race. The information
we requested was never received and on October 21,
1975, you informed agents of the Federal Bureau of
Investigation that you had provided all information
available to you. On March 25, 1976, during a
telephone conversation with Departmental attorney
Michael Scadron, you advised that prior to January
1965 the Hale County commissioners were elected
from single-member districts but that now such
districts are used only for residency requirements

- 2 -

and commissioners are elected by the voters in the
county at-large.  Also during that conversation,
Mr. Scadron represented that we would attempt to
evaluate your submission with the information now
provided.

During the course of our review of the submission
Mr. James Fallon of this Division spoke with you again
on April 21, 1976.  At that time you advised Mr. Fallon
that the Board of Revenue (predecessor to the county
commission) minutes of a January 1966 meeting reflect
that that body voted at that time to have at-large
elections instead of the former single member districts
and that such at-large elections were in fact held
beginning in May 1966.

In view of this additional information we are now
able to consider your submission complete insofar as the
change from district elections to at-large elections is
concerned.  Thus, we turn to a consideration of the merits
of that change.

In examining changes in voting procedures
under Section 5 of the Voting Rights Act, it is
incumbent on the Attorney General to determine
whether the changes, either in purpose or effect,
result in racial discrimination in voting.  Under
Section 5 the burden of proving that changes affect-
ing voting have no racial purpose and have had or
will have no racial effect lies with the submitting
authority.  Georgia v. United States, 411 U.S. 526
(1973); 28 C.F.R. 51.19.

- 3 -

According to the data we examined, the southern portion of Hale County is more heavily black than the northern portion and voting beats in Commissioner District 3 to the south are predominantly black. Our information further demonstrates that there is a pattern of racial bloc voting in Hale County and that no black has ever been elected to county-wide office.

Based on our evaluation of the change from single-member districts to at-large election of commissioners, which included examination of geographic and demographic data and comments from interested parties, we cannot conclude as we must under the Voting Rights Act that that change has neither the purpose nor the effect of diluting the voting strength of the black community in Hale County. Accordingly, I must on behalf of the Attorney General interpose an objection to the submitted change to at-large election of members of the Hale County Commission.

During the course of your conversation with Mr. Fallon you also indicated that it had been your intent to submit the redistricting of the four commissioner districts used since 1966 for residency purposes. You further mentioned that those districts were enacted into law by Act 620, H1717, 1973 Alabama Legislature, and that this redistricting was done by Western Alabama Planning (Mr. Lewis McRae).

As indicated in our prior correspondence on this matter, the information you have furnished on this aspect of your submission is insufficient for the Attorney General to make a determination. While these districts now become ineffective as residency districts under the at-large election system which

- 4 -

is unenforceable because of the Attorney General's
objection, upon a completed submission of those districts
we will evaluate them should the county decide to
utilize them as single member districts from which
commissioners are to be elected in the future.  To
complete the submission in that regard, we will need
the following information:

1.  A copy of Act 620 (H.1717) (p. 925 Regular
    and Special Session of Alabama Legislature,
    Volume II, 1973).

2.  Copies of any written instructions, a
    statement of oral instructions given to
    Western Alabama Planning, Inc. with respect
    to the county's goals or guidelines to be
    used in redistricting.

3.  Copies of all materials, including maps,
    charts, and other data provided to the county
    by Western Alabama Planning, Inc.

4.  Whether there was input from minorities or
    minority groups in adopting the 1973
    redistricting, and if so, the minority person's
    name(s).

5.  A map indicating the commissioner district
    lines prior to 1973.

    Irrespective of the action that may be taken with
respect to the redistricting, however, unless and until
a declaratory judgment from the United States District
Court for the District of Columbia that the change
from district to at-large election has neither the
purpose nor effect of denying or abridging the right

- 5 -

to vote on account of race or color is obtained, the
legal effect of the objection by the Attorney General
to the change to at-large elections is to render that
change legally unenforceable.  Accordingly, and
since elections are scheduled for some of the
commission positions during the May 4 primary, we
request that you advise us by April 28, 1976, of the
steps the county will take with respect to the conduct
of that election.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

JSP:AJK:rjs
DJ 166-012-3
YO341

JUL  6 1976

Mr. Vincent McAlister
Alsen, McAlister & Ashe
Attorneys at Law
Post Office Drawer M
Sheffield, Alabama  35660

Dear Mr. McAlister,

      This is in reference to the change in form of
government for the City of Sheffield, Alabama, submitted
to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended.  Your submission
was received on May 5, 1976.

      The Attorney General does not interpose any objec-
tion to the change to a mayor-council form of government.
We feel a responsibility to point out, however, that the
failure of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement of
such change.

      In reference to the proposed method of electing
councilmen under the new form of government, the Attorney
General has no objection to the proposed district lines
or to the at-large election of the mayor and the president
of the council.  We are, however, unable to conclude that
the at-large election of councilmen required to reside
in districts will not have a racially discriminatory effect.
Recent court decisions, to which we feel obligated to give
great weight, indicate that the use of residency requirements,
numbered posts, and a majority vote requirement in the context
of at-large elections has the potential for abridging
minority voting rights.  See White v. Regester, 412 U.S.
755 (1973), Whitcomb v. Chavis  403 U.S. 124 (1971).

- 2 -

Accordingly, on behalf of the Attorney General, I must interpose an objection to the implementation of the proposed at-large method of electing city councilmen.

Please be advised that you may request the Attorney General to reconsider his objection on the basis of information not previously available that shows that the new method of election does not have the effect of denying or abridging the right to vote on account of race or color. In addition, sections 51.21(b), 51.24 and 51.25, 28 C.F.R., as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this method of election has neither the purpose nor the effect of denying or abridging the right to vote on account of race or color.

Sincerely,

J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

DEC 29 1976

DJ 166-012-3
V7804; X8956-58

Mr. W. McLean Pitts
Pitts, Pitts & Thompson
Attorneys at Law
P. O. Drawer 537
Selma, Alabama  36701

Dear Mr. Pitts:

This is in reference to Act 320 (1965),
Act 2022 (1971), and Act 620 (1973) which provide
for the method of electing the governing body of
Hale County, Alabama. These acts were submitted
to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended. Your
submission was received on November 4, 1976.

In making a determination under the Voting
Rights Act, we apply the legal principles developed
by the courts in the same or analogous situations.
We are aware that 66% of the population in Hale County
is black and that the black population therefore
constitutes a numerical majority. As the court stated
in Graves v. Barnes, 343 F. Supp. 704, 730 (1972):

> In the context of the Constitution's
> guarantee of equal protection "minority"
> does not have a merely numerical denotation;
> rather it refers to an identifiable and
> specially disadvantaged group.

In affirming the District Court's decision the
Supreme Court stated in White v. Regester, 412 U.S. 755
(1973) that the test to be applied was whether such a
minority had been excluded from effective participation

- 2 -

in political life. The Court held that such a finding
was sufficient to sustain the District Court's decision
that single-member districts were required.

Each of the submitted Acts provides for the
governing body to be elected on an at-large basis as
opposed to the previous method of electing by single-
member districts. Our investigation has resulted in
the conclusion that the black population of Hale County
has been prevented from entering the political process
in a reliable and meaningful manner. This is evidenced
by the fact that in Hale County no black has ever been
elected to county-wide office.

Under these circumstances, I am unable to conclude,
as I must under the Voting Rights Act, that the use of an
at-large election system in Hale County will not have the
effect of discriminating on account of race. I must,
therefore, on behalf of the Attorney General, interpose
an objection to the implementation of Act 320 (1965),
Act 2022 (1971), and Act 620 (1973). Of course, as
provided by Section 5, you have the right to seek a
declaratory judgment from the United States District
Court for the District of Columbia that these Acts have
neither the purpose nor the effect of denying or abridging
the right to vote on account of race or color.

Finally, in our April 23, 1976, letter of objection
we suggested that should the county decide to use the
present residency districts as single-member districts
from which to elect its commissioners in the future we
would evaluate them as such upon being furnished the
additional information requested therein. While we note
that you have responded to the request for additional
information, there is no indication that the county
has decided to use these districts as single-member
districts. Consequently we have made no determination
in that regard.

- 3 -

Pursuant to the court order in <u>United States</u>
v. <u>County Commission, Hale County, Alabama, et al.</u>
(Civ. Action No. 76-403-P), I am sending a copy of
this letter to that court.

Sincerely,


J. Stanley Pottinger
Assistant Attorney General
Civil Rights Division

DJ 166-012-3
A3009
A2991

DEC 27 1977

Mr. William T. Harrison
Harrison and Conwill
Attorneys at Law
Post Office Box 557
Columbiana, Alabama  35051

Dear Mr. Harrison:

This is in reference to Ordinance Nos. 132
and 133, which annex areas of land to the City of
Alabaster, Alabama, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended.  Both submissions were
received on October 25, 1977.

By letter of December 20, 1977, we informed
you that the Attorney General would not interpose
an objection to Ordinance No. 133.  Since that time
we have considered Ordinance No. 132 and, because
both submissions involved annexations, we have found
it necessary to reconsider our initial determination
with respect to Ordinance No. 133.

You will recall that on July 7, 1975, an
objection was interposed on behalf of the Attorney
General to six annexations to the City of Alabaster,
on the ground that these annexations impermissibly
diluted minority voting strength.  On May 3, 1976,
we declined to withdraw this objection.

Ordinance No. 132 brings into the city
approximately 20 acres of land.  We understand
that houses are under construction at this time
on part of the land, that these houses are in a
fairly expensive price range, and that the area
is located next to a white residential area in the
city.  Ordinance No. 133 brings into the city

- 2 -

approximately 100 acres of land. We understand that it is expected to be developed residentially and that it is also adjacent to a white residential area of the city. Our information regarding elections in the City of Alabaster continues to demonstrate that the city elects its councilmen at-large with a majority requirement and a numbered post system, that there is a pattern of racial bloc voting in city elections, and that blacks are located within the city in a cognizable residential area. Under these circumstances, the annexations of potentially white residential areas may further dilute the vote of Alabaster's black population.

As we stated to you in our July 7, 1975, letter of objection and in subsequent letters in which the Attorney General refused to withdraw that objection, should the city undertake to elect its councilmen from single-member districts the Attorney General will reconsider his objections to this and previous annexations by the City of Alabaster.

In the meantime, however, the factors that led to our objection of July 7, 1975, prevent us from determining, as we must under the Voting Rights Act, that the instant annexations will not abridge the right to vote on account of race or color. Therefore, on behalf of the Attorney General, I must interpose objections to Ordinance Nos. 132 and 133. In regard to Ordinance No. 133, we have reconsidered our prior response to this submission under the provision of Section 5 of the Voting Rights Act, as amended in 1975, which provides that when the Attorney General affirmatively indicates that no objection will be made within the sixty day period following receipt of a submission, the Attorney General may reexamine the submission if additional information comes to his attention during the remainder of the sixty day period which would otherwise require objection in accordance with this section.

- 3 -

Of course, as provided by Section 5 you have
the right to seek a declaratory judgment from the
United States District Court for the District of
Columbia that these annexations have neither the
purpose nor the effect of denying or abridging the
right to vote on account of race or color. However,
until such a judgment is rendered by that Court, or
until the objections have been withdrawn by the Attorney
General, the legal effect of the objections is to render
the annexations in question legally unenforceable insofar
as they affect voting in the City of Alabaster.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

DSD:DHH:JAS:gml
DJ 166-012-3
A3381

JUL 28 1978

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. J. Gorman Houston, Jr.
Houston & Martin, P.C.
Attorneys at Law
Post Office Box 31
201 East Broad Street
Eufaula, Alabama 36027

Dear Mr. Houston:

This is in reference to Act No. 10, Acts of Alabama, 1965,
and Act No. 171, Acts of Alabama, 1967, changing the method of
electing members of the Barbour County Commission, submitted
to the Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended. Your submission was received on
May 30, 1978.

Prior to the 1965 legislation, six of the seven members of
the governing body of Barbour County were elected from single-
member districts and the seventh member was elected at-large.
Under the 1965 legislation all members of the governing body were
elected at-large and the districts were retained as residency districts
only. The 1967 legislation reduced the size of the governing body
from seven to five members and divided the county into four districts,
with two members required to reside in districts one and one member
in each of the other three districts. The positions for the first district
were numbered. We have given careful consideration to these changes
as well as to the supporting information you have provided, demographic
data, comments from interested parties, and relevant court decisions.

We note that according to the 1970 census blacks constitute
46 percent of the population of Barbour County but that no blacks
have been elected to the governing body under the at-large system
of election. Our analysis indicates that some of the districts in
use prior to the 1965 legislation and some of the districts adopted

- 2 -

In 1967 have black population majorities and that under a system
of fairly-drawn districts satisfying one person, one vote requirements
some districts with black population majorities could be expected
to result. We also note that the at-large election system was adopted
soon after the Voting Rights Act of 1965 enabled substantial numbers
of blacks to participate in the electoral process for the first time.
In this regard see Smith v. Paris, 257 F. Supp. 901 (M.D. Ala. 1966),
affirmed, 386 F. 2d 797 (5th Cir. 1967), and United States v.
Executive Committee of Barbour County, Alabama, 283 F. Supp.
943 (S.D. Ala. 1968). We also note that a majority vote is required
for nomination, that numbered posts are used, and that terms are
staggered, and our analysis indicates that voting in Barbour County
is along racial lines. See White v. Regester, 412 U.S. 755 (1973),
and Nevett v. Sides, 571 F. 2d 209 (5th Cir. 1978).

Under these circumstances, and guided by the applicable
legal standards—see Beer v. United States, 425 U.S. 130 (1976) City
of Richmond v. United States, 422 U. S. 358 (1975), and Wilkes County,
Georgia v. United States, C.A. No. 76-1045 (D.D.C. April 20, 1978)—
the Attorney General is unable to conclude that the adoption of
at-large elections effected by Act No. 10 (1965) and the modification
of that at-large system effected by Act. No. 171 (1967) do not have
the purpose and have not had the effect of denying or abridging
the right to vote on account of race or color. Accordingly, on behalf
of the Attorney General, I must interpose an objection to Act No.
10 (1965) and Act No. 171 (1967).

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that these
changes have neither the purpose nor the effect of denying or abridging
the right to vote on account of race or color. However, until such
a judgment is obtained, the effect of the objection by the Attorney
General is to make these acts legally unenforceable. This
includes, specifically, the holding of any primary or general election
pursuant to them this year. Please notify me within ten days of
your receipt of this letter of the steps that will be taken to comply
with the requirements of Section 5. If you have any questions concerning
this matter, please telephone Voting Section Attorney Sheila Delaney,
at 202-739-4492.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

DJ 166-012-3
A6605

DEC 2 9 1978

Mr. Frank H. Hawthorne
Batch, Bingham, Baker
  Hawthorne, Williams & Ward
First Alabama Bank Building
Post Office Box 751
Montgomery, Alabama  36102

Dear Mr. Hawthorne:

        This is in reference to the incorporation of the Town of Hayneville,
Alabama, submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended.  Your submission was completed
on November 3, 1978.

        In our review of changes in electoral systems we are guided
by relevant judicial decisions.  See Beer v. United States, 425 U.S. 130
(1976); City of Richmond v. United States, 422 U.S. 358 (1975); Gomillion
v. Lightfoot, 364 U.S. 339 (1960).  Under Section 5 the submitting jurisdiction
has the burden of proving both that the change in question was not adopted
with a discriminatory purpose and that its effect will not be discriminatory.
Procedures for the Administration of Section 5 of the Voting Rights
Act of 1965, 28 C.F.R. 51.19; Georgia v. United States, 411 U.S. 526, 538
(1973); City of Richmond, supra at 330-51 (Brennan, J., dissenting).

        In our review of the Hayneville incorporation we have carefully
considered the information you have provided as well as information
provided by other interested persons.  The relevant information before
us can be briefly summarized as follows:  According to the 1970 census,
blacks constitute 77 percent of the population of Lowndes County, in
which Hayneville is located.  Prior to the passage of the Voting Rights
Act in August 1965 few blacks in Lowndes County were registered to
vote, but at the time of the incorporation, in 1967 and 1968, black political
strength in the county was growing.  Immediately prior to the incorporation,
a substantial majority of the residents of the unincorporated community

known as Hayneville were black. Section 11-41-1 of the Alabama Code (1975) specifies the requirements and procedures by which "the inhabitants of an unincorporated community which has a population of not less than 75, constituting a body of citizens whose residences are contiguous to and all of which form a homogeneous settlement or community" may form a municipal corporation. The Incorporated Town of Hayneville, however, includes only a portion of the contiguous, homogeneous community that existed. Not included within the boundaries of the Town were the residences of a substantial number of blacks, with the result that whites instead of blacks constitute a majority of the Town's electorate. We have been informed, moreover, that the boundaries of the Town were purposefully drawn to assure political control by whites of the Town.

Section 11-41-1 also provides that a quarter quarter section (or a portion thereof) can only be included in an incorporation if four qualified electors and the owners of 60 percent of the land sign a petition in support of inclusion. The information before us indicates that this requirement could have been met with respect to much of the land that was excluded from the Town.

Thus it appears that the purpose of the incorporation was to reduce the influence over Hayneville of the majority black Lowndes County electorate and to prevent the possibility of control of the Town of Hayneville by blacks residing within the Town. From the information before us it appears that this has been the effect of the incorporation. Under these circumstances, I am unable to conclude, as I must under the Voting Rights Act, that the incorporation of the Town of Hayneville has neither a discriminatory purpose nor a discriminatory effect. Accordingly, on behalf of the Attorney General, I must interpose an objection pursuant to Section 5 to the incorporation.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the incorporation of the Town of Hayneville did not have the purpose and has not had the effect of denying or abridging the right to vote on account of race or color. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request reconsideration of this objection by the Attorney General. However, until the judgment from the District Court is obtained or the objection withdrawn, the effect of the objection by the Attorney General is to make the incorporation legally unenforceable.

- 2 -

We note in this connection, that an expansion of the boundaries of the Town of Hayneville to include the entire contiguous, homogeneous community could provide the basis for the withdrawal of the objection by the Attorney General.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action the Town of Hayneville plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Voting Section Attorney David Hunter at 202—633-3849.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division



cc: Congressman Bill Nichols
James Opp Smith, Esquire

DSD:DHH:LH:gml
DJ 166-012-3
C00kl7

FEB 26 1979

Honorable Fred L. Huggins
Judge of Probate, Clarke County
Courthouse
Grove Hill, Alabama 36451

Dear Judge Huggins

    This is in reference to Act No. 2446, Alabama Laws, 1971,
page 3512, which provides for the at-large method of election for
the county commission of Clarke County, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended. Your submission was completed on December 27, 1978.

    Under Section 5 Clarke County has the burden of proving
that the at-large electoral system was not adopted with a discriminatory
purpose and that the operation of the at-large system does not have
a racially discriminatory effect. See Beer v. United States, 425
U.S. 130 (1976); Wilkes County v. United States, 450 F. Supp. 1171
(D.D.C. 1978), affirmed, 47 U.S.L.W. 3351 (Dec. 4, 1978) (No. 78-70).
See also 28 C.F.R. 51.19.

    The county commission of Clarke County consists of four
commissioners and the judge of probate, who serve four-year terms.
A majority vote is required for nomination in the Democratic primary.
Although blacks constitute 44 percent of the population of the county
(according to the 1970 census), blacks have not been elected to the
commission. Prior to the adoption of Act No. 2446 the four
commissioners were elected from single-member districts. Our
analysis indicates that one of these districts, Number 3, likely has
a black population majority, and that a system of fairly-drawn single-
member districts of equal population would probably contain at
least one district in which blacks are in a substantial majority.

The county has presented an explanation of why it chose to adopt the at-large system as a means of complying with the one person, one vote requirement rather than reapportionment of its districts. Finally, our analysis of precinct election returns for the 1972 and 1976 primary elections and the 1976 run-off primary indicates that voting in Clarke County follows racial lines.

Under these circumstances I am unable to conclude, as I must under the Voting Rights Act, that the at-large method of election established by Act No. 2446 has neither a discriminatory purpose nor a discriminatory effect. Accordingly, on behalf of the Attorney General, I must interpose an objection pursuant to Section 5 to the submitted method of election.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the at-large election system established by Act No. 2446 does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21 (b) and (c), 51.23, and 51.24) permit you to request reconsideration of this objection by the Attorney General. However, until the judgment from the District Court is obtained or the objection withdrawn, the effect of the objection by the Attorney General is to make the at-large method of electing members of the county commission of Clarke County legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action Clarke County plans to take with respect to this letter. If you have any questions concerning this letter, please feel free to call Voting Section Attorney Sheila Delaney at (202) 633-4052.

Sincerely,

Drew S. Days III
Assistant Attorney General
Civil Rights Division

Thomas H. Crawford, Jr., Esq.
Cooper, Mitch & Crawford
Suite 201 - 409 North 21st Street           1 FEB 1980
Birmingham, Alabama  35203

Dear Mr. Crawford:

This is in reference to the annexation of land to
the City of Pleasant Grove, Jefferson County, Alabama, by
Act No. 79-419 (1979) of the Alabama Legislature, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended.  Your submission was completed
on December 3, 1979.

We have given careful consideration to the materials
you have submitted, as well as information and comments of
other interested parties.  We note that the City of Pleasant
Grove today contains some 6,500 persons, all of whom are
white; that areas adjacent to the annexed area have been
developed for exclusively white residential use; that similar
development is planned for the annexed area, and that several
identifiably black areas have petitioned for annexation to
the City of Pleasant Grove, but that the city has taken no
steps to annex those areas, despite the passage of a consider-
able length of time.  We have also noted reports of activities
indicating the presence of considerable antagonism toward
black persons in the vicinity of Pleasant Grove.

Under Section 5 of the Voting Rights Act the submitting
authority has the burden of proving that a submitted change
has no discriminatory purpose or effect.  See, e.g., Georgia v.
United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.  See also
Gomillion v. Lightfoot, 364 U.S. 339 (1960).  In light of the
considerations discussed above, I cannot conclude, as I must
under the Voting Rights Act, that that burden has been sustained
in this instance.  Therefore, on behalf of the Attorney General,
I must object to the annexation to the City of Pleasant Grove
embodied in Act No. 79-419 (1979) of the Alabama Legislature.

~ 2 ~

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.21(b) and (c), 51.23, and 51.24) permit you to request the Attorney General to reconsider the objection; such a reconsideration would be appropriate if and when the City of Pleasant Grove demonstrates that its annexation policy is free of racial selectivity.  However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the annexation legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter what course of action the City of Pleasant Grove plans to take with respect to this matter.  If you have any questions concerning this letter, please feel free to call Mr. John K. Tanner (202-- 724-7399) of our staff, who has been assigned to handle this submission.

Sincerely,

DREW S. DAYS III
Assistant Attorney General
Civil Rights Division

cc:  Lynda Knight, Esq.
Assistant Attorney General

2 8 APR 1980

E. McLean Pitts, Esq.
Pitts, Pitts & Thompson
Post Office Drawer 537
Selma, Alabama  36701

Dear Mr. Pitts:

This is in reference to the realignment of ward
boundaries by the City of Selma in Dallas County, Alabama,
submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended.  Your submission
was received on February 26, 1980.

Under Section 5, the City of Selma has the burden
of proving that the submitted change does not have the effect
of producing a retrogression in the position of black voters
in the City of Selma and that it does not transgress cons-
titutional limits with respect to black voters.  See Beer
v. United States, 425 U.S. 130 (1976).  See, also, 28 C.F.R.
§51.39.

We have considered information provided by the City
of Selma and the Bureau of the Census as well as by other inter-
ested parties.  Our analysis reveals that in addition to evidence
of a general pattern of racially polarized voting in the City
of Selma, a black candidate lost election from Ward Three by a slim
margin under the existing plan and that one effect of the proposed
plan is to reduce the black population percentage of Ward Three.
Our analysis has also shown that it is not difficult to devise a
plan which remedies the malapportionment of the existing wards
without decreasing the black population percentage in Ward
Three.  The adoption by the City of Selma of an electoral scheme
that would maintain minority voting strength at a minimum

- 2 -

level, where alternate options would provide a fair chance
for minority participation, is relevant to the question
of an impermissible racial purpose in its adoption. See
Wilkes County v. United States, 450 F. Supp. 1171 (D. D.C.
1978).

Under the circumstances, we are unable to conclude,
as we must, under Section 5 that the submitted change does
not have a racially discriminatory purpose or effect.
Accordingly, I must, on behalf of the Attorney General,
interpose an objection to the implementation of the proposed
redistricting for the City of Selma.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judg-
ment from the United States District Court for the
District of Columbia that this change has neither the
purpose nor will have the effect of denying or abridging
the right to vote on account of race, color, or mem-
bership in a language minority group.  In addition, the
Procedures for the Administration of Section 5 (18 C.F.R.
51.21(b) and (c), 51.23, and 51.24) permit you to request
the Attorney General to reconsider the objection.  However,
until the objection is withdrawn or the judgment from the
District of Columbia Court obtained, the effect of the
objection by the Attorney General is to make the proposed
redistricting plan for the City of Selma, Alabama legally
unenforceable.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us within
twenty days of your receipt of this letter the course
of action the City of Selma, Alabama plans to take with
respect to this matter.  If you have any questions con-
cerning this letter, please feel free to call Elda Gordon
(202-724-6575), of our staff, who has been assigned to
handle this submission.

Sincerely,


Drew S. Days III
Assistant Attorney General
Civil Rights Division

U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

I. Drayton Pruitt, Jr., Esq.                    OCT 17 1980
Pruitt and Pruitt
Post Office Drawer PP
Livingston, Alabama  35470

Dear Mr. Pruitt:

        This is in reference to Act No. 79-729 of the 1979 Regular
Session of the Alabama Legislature which provides for the use of
electronic voting systems in Sumter County, Alabama, and to the
changes adopted by Sumter County pursuant to the provisions of
this Act.

        As you know, the Attorney General has sixty days in
which to consider a submission pursuant to Section 5 of the
Voting Rights Act of 1965, as amended.  This sixty-day period
begins when the Department has received all the information
necessary for the proper evaluation of the change submitted.
Further, the Attorney General may object to the proposed change
consistent with the burden of proof placed upon the submitting
authority (in this case the State of Alabama, with respect to
the Act itself and Sumter County, with respect to changes adopted
pursuant to the Act in question) to show that the submitted change
has no discriminatory purpose or effect.  See, e.g., Georgia v.
United States, 411 U.S. 526 (1973); 28 C.F.R. 51.19.  If the
submitting authority fails to provide the Attorney General with
the information necessary for the proper evaluation of the sub-
mission it fails to sustain its burden of proof.  For the reasons
set forth below, I have concluded that your burden has not been
carried with respect to the instant submission.  Thus, on behalf
of the Attorney General, I must object to the submitted changes.

        Our records indicate that this submission has had an
unfortunate and confusing history which has prevented the
normal flow of information that would enable the Attorney
General to make a determination as to whether or not this
change has the purpose or the effect of denying or abridging
the right to vote on account of race, color, or membership
in a language minority group.  Because of this, we will
continue our consideration of this matter upon your providing
the information necessary for the completion of our review
of the merits of the changes that appear to be involved.

To aid you in gathering the information necessary for our review, we here set out our understanding of the submitted Act; our understanding of the changes adopted by Sumter County pursuant to the provisions of the Act; the questions asked in our letter of October 23, 1979; the questions reiterated in our letter of January 1, 1980; and the confusion arising from the information you have provided, along with the information requested but which has not been provided to us:

1.  Our understanding of Section 11 of Act No. 79-729 (1979) is that it provides, among other things, the following:

   A.  that Sumter County is exempt from the limitations (not enumerated) prescribed by law to other counties that undertake to use electronic voting systems;

   B.  that there shall be one polling place located within each beat;

   C.  that Sumter County is authorized to:

      (1)  abolish existing beats and discontinue the use of the polling sites located therein; or

      (2)  extend or redistrict a beat and retain a polling site therein; or

      (3)  subdivide a beat, thus creating an additional beat, and designate an additional polling site therein.

2.  Our understanding is that Sumter County, as authorized above, chose to extend or redistrict beats, thus reducing the number of beats, and retained certain polling sites, one in each restructured beat.

3.  On October 23, 1979 (copy of our letter enclosed), we requested that you provide us with information relating to how the procedures specified by the Act differ from those required by the general Alabama Election Law in counties using voting machines; how the procedures specified in the Act differ from those previously followed in Sumter County; whether or not the county had implemented the change to voting machines; a description of the county's plan to familiarize voters with the voting machines; and, specifically, an explanation of other changes that had been vaguely referred to or otherwise implied.  Our letter stated as follows:

- 3 -

In addition, your submission refers to the
reduction of beats from 16 to 9 (source of
these numbers is unknown). Please explain
the reduction as it relates to the use of
voting machines and how this change will
affect county officials presently elected,
along with a map of the previous boundary
lines and the population and registered
voters, by race, of each beat before and
after the change.

If any polling places will be abolished,
please indicate the locations of and the
distances between the old and new polling
places as well as how voters will be
notified of the change.

4.  In your response (letter dated November 26, 1979,
a copy of which is also enclosed), you stated that the Act
itself provided for a reduction in the number of beats; that
"(p)reviously there were more beats in Sumter County and
voting was by written ballot without use of machines;" that
Sumter County has never used voting machines; that you were
enclosing a map indicating the existing 16 beats and the reduc-
tion to 9 beats and the boundaries of each; that the only
county officials who are elected by beats are the Constables,
but that because the bonds of the individuals currently holding
office had expired and had not been renewed, the offices were
presently vacant, and you indicated, accordingly, "no-one will
be affected;" that no plans had been initiated to notify voters
"but we would be happy to take suggestions of the Justice
Department...;" that you would be unable to provide us with "a
percentage of black and white voters in each beat" but that you
were enclosing "Exhibit 'A'" which would indicate the percentage
of votes received by the black and the white candidates in each
beat during the Democratic Primary of 1978; and that "(i)f this
Legislation is approved and enacted by the Alabama Legislature,
then these voting machines will be used for the first time in
the next Presidential general election."  However, your response
failed to provide information that we previously requested
concerning the following:

A.  How the procedures specified by the Act differ
from those required by the general Election law in counties
using voting machines;

- 4 -

B.  How the procedures specified by the Act differ from those previously followed in Sumter County (i.e., changes in the number of voting boxes, changes in the method of assigning voters to their voting sites, etc.);

C.  An explanation of the relationship between the number of beats and the method of electing county officials (i.e., do members of the county commission run from districts that are changed by a reduction in the number of beats; if and when individuals seeking to apply for or to renew "bonds" in order to run for the office of Constable, how will they be affected by a reduction in the number of beats; what other state, district, county or political party offices are voted on by voters in Sumter County that are affected by a reduction in the number of beats and how are they affected?);

D.  The number of registered voters of each beat before and after the change even if racial breakdowns are unavailable; and

E.  If any polling places would be abolished, the locations of and the distances between the old and new polling places.

Further, your response raised several additional questions:  The letter states that the map enclosed indicates the existing 16 beats and the reduction to 9 beats while the lines on the map appear to delineate 18 previous beats now reduced to 10.  In fact, the numbers on the map suggest that there used to be 20 beats.  Were two beats deleted -- was this change subject to the preclearance requirements of Section 5 and, if so, was such preclearance sought?  How are voting boxes affected?  How can the proposed changes not affect the offices of at least seven Constables?  Which constables are deleted?  Where, in the cities circled on the map, are the polling places located?  Are these entirely new polling places or are they "remaining" polling places?  Where were the other eight polling places?  Does your letter mean that Sumter County will not notify voters without our suggestions on how notice should be given, and is Sumter County not required by State law to take all necessary steps to notify voters of the changes?  With respect to "Exhibit 'A'." who are the black candidates, who opposed them, why does the heading say November, 1976 (your letter described "Exhibit A" as pertaining to the 1978 Democratic Primary)?

- 5 -

5.   In our letter of January 18, 1980 (copy enclosed),
to Ms. Lynda F. Knight, Assistant Attorney General for the
State of Alabama, we noted your comment that the Act was not
yet approved and that, therefore, it was not ripe for review.
We also asked that (when the Act was resubmitted) the submission
include the information requested in our letter of October 23,
1979, because "the change cannot be reviewed until the Depart-
ment has received the specific information requested."  With
respect to our request that you provide the number of registered
voters by race, we stated: "If exact figures are not available,
give your best estimate and the basis for them."  However,
subsequent correspondence, some of which was not received
by this Department's Civil Rights Division until October, 1980,
indicates that the Act is indeed ripe for review by the Attorney
General.  On the other hand, no response was made to the
outstanding questions addressed to you in our letters of
October 23, 1979, and January 18, 1980.

6.   On October 9, 1980, during a telephone conversation
with Elda Gordon, of our staff, you provided the following
information:

A.   The total number of registered voters in Sumter
County, noting that the number exceeded the county's voting age
population and estimating the percentage of blacks at around
forty percent;

B.   The number of registered voters in the eighteen
previous beats and in the ten new beats;

C.   The names of the old and of the remaining
voting centers;

D.   The names, beat numbers, race and daytime
telephone numbers of the eight persons who last held the
office of Constable in Sumter County;

E.   A description of the duties of a Constable;

F.   An interpretation of the provisions of Sections
5(2), 11(b), 14(d) and 15(a) of the Act dealing with the mechanical
aspects of the conduct of elections in counties using voting
machines.

This conversation did not cover items or information that could not satisfactorily be addressed telephonically but for which we had previously requested written responses or that would, more properly, be included in a complete submission of all the changes effected by the implementation of the Act involved.

7.   Further, it has now come to our attention that members of the Sumter County Democratic Executive Committee may be affected by the proposed changes.  (You had stated, during your telephone conversation on October 9, 1980, with Ms. Gordon, that you were not sure that these offices would be affected.)   It seems that committee members are elected by voting box and that the number of voting boxes may be changed upon implementation of the provisions of this Act. This development, too, addresses the effect of the proposed change and must be reviewed before a decision can be reached on the merits of Act No. 79-729 (1979).

In summary, while it now appears that the Act is ripe for review, Sumter County has not completed its submission by providing all the information necessary for the proper evaluation of the changes it seeks to implement.  While the Attorney General does not usually object to changes from paper ballots to voting machines, because of the incompleteness of the submission in this case, it is not clear what other changes are effectuated by the submitted Act.  Consequently, the Attorney General is unable to conclude, as he must under Section 5, that Act No. 79-729 (1979) and the implementation of the Act by Sumter County will not have the proscribed discriminatory purpose or effect.  Therefore the Attorney General must interpose an objection consistent with the burden of proof placed on the submitting authority.  However, we iterate our willingness to evaluate the changes on the merits pursuant to a request for reconsideration that responds to the questions found at No. 4, above (except item found at No. 4(D)), including the questions that arose from your November 26, 1979, response, and at No. 7, above.  However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the implementation of Act 79-729 (1979) legally unenforceable.

-- 7 --

If you have any questions concerning the matters discussed in this letter or if we can aid you in any way to obtain the information requested, please do not hesitate to call Ms. Elda Gordon (202--724-6675) who has been assigned to handle this submission. Please refer to File No. C6237 in any written response to this letter and address all correspondence to the Assistant Attorney General, Civil Rights Division, Department of Justice, Washington, D. C. 20530. The envelope and first page should be marked "Submission Under Section 5, Voting Rights Act". Your cooperation will insure that your correspondence will be properly channeled.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

cc:  Lynda F. Knight, Esq.



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                              *Washington, D.C. 20530*

T.W. Thagard, Jr., Esq.
Smith, Bowman, Thagard,
  Crook and Culpepper
Post Office Box 78
Montgomery, Alabama   36101



Dear Mr. Thagard:

        This is in reference to the change in the method of
election for members of the Barbour County Commission from
six single-member districts and one county-wide district to
election from seven single-member districts and to the
redistricting plan for those seven districts for Barbour
County, Alabama, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c.  Your submission was received on May 27, 1981.

        The Attorney General does not interpose any objection
to the change to a plan that provides that all seven members
of the County Commmission be elected from single-member
districts.  However, we feel a responsibility to point out
that Section 5 of the Voting Rights Act expressly provides
that the failure of the Attorney General to object does
not bar any subsequent judicial action to enjoin the enforce-
ment of such change.

        With regard to the redistricting plan, we have given
careful consideration to the information you have provided
as well as to that available from the Bureau of the Census
and from other interested parties.  Our analysis shows that
most districts are not compact, do not follow natural and
recognizable boundaries in many instances and, with respect
to Districts 1 and 4, are noncontiguous.  In addition,
District 3 merges the 83.5 percent black Springhill/Comer
area with a 72 percent white portion of the City of Eufaula
resulting in a district which appears to have a majority
white voting age population.

        Our analysis also reveals that the county's submitted
plan divides the predominantly black population concentrations
in the northern and western portions of the county among
three districts (Districts 3, 5, and 6) and the areas of

-2-

black population concentration within the City of Eufaula
among three districts (Districts 1, 2 and 4).  This fragmen-
tation of black population concentrations results in a
plan that contains no district in which a majority of the
voters are black, even though the County is 44 percent
black, according to the 1980 Census.  Specifically, although
the plan provides for districts with nominal black population
majorities of 55.7, 55.8 and 57.6 percent (Districts 1, 3
and 6), the County has not provided any information regarding
voting age population.  Unless the ratio of black to white
voting age population has radically changed since 1970, two
of the above districts have a white majority voting age
population and the third is only slightly over 50 percent
black.  Even in that district, whites constitute a majority
of registered voters.  In addition, apparent racial bloc
voting and the majority vote requirement further impinge
on black voting strength.

Since the prior plan is unconstitutionally malappor-
tioned, Forte v. Barbour County Commission, Civil Action No.
79-537-N (M. D. Ala., Dec. 17, 1979), our standard of
comparison under Beer v. United States, 374 F. Supp. 363,
rev'd, 425 U.S. 130 (1976), is "options for properly appor-
tioned single-member district plans."  Wilkes County v.
United States, 450 F. Supp. 1171, 1178, Conclusion 10
(D. D.C. 1978), aff'd, 439 U.S. 999 (1978).  In this
regard, our analysis reveals that readily apparent alterna-
tives would provide at least two viable majority black
districts, one in the northwestern portion of the county
and one in the City of Eufaula, with black populations of
well over 60 percent each.  Such districts would be natural,
compact and contiguous, would satisfy the Fourteenth
Amendment requirement of one person, one vote and most
likely such a plan could include a third district of nearly
a 60 percent black population.  The county has not provided
any information to show that its choice of the submitted
redistricting plan, in preference to the available alterna-
tives, does not have the purpose or effect of discriminating
against black voters.

-3-

In addition, there is evidence pertinent to the question of an impermissible racial purpose. Barbour County has a long history of failing to comply with the preclearance provisions of the Voting Rights Act. This submission itself is the result of court action stemming from such a failure. While the white community was consulted regarding this plan, it is our understanding that leaders of the black community were not consulted concerning the placement of the new district lines, and the County has provided no evidence of any systematic effort to involve blacks in its deliberations. As noted above, racially polarized voting appears to exist in Barbour County, the proposed districts are not natural, compact or contiguous and the electoral scheme would maintain black voting strength at a minimum level, although readily available alternatives would provide a fair chance for meaningful minority participation. These facts all bear on the question of an impermissible racial purpose in the adoption of the plan. See Wilkes County v. United States, supra.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of proving that a submitted change has no discriminatory purpose or effect. See, e.g., Georgia v. United States, 411 U.S. 526 (1973); see also Section 51.39(e) of the Procedures for the Administration of Section 5 (46 Fed. Reg. 878). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the redistricting plan for election of the Barbour County Commissioners.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the redistricting plan legally unenforceable.

-4-

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter what course of action Barbour County plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-7439), Director of the Section 5 Unit of the Voting Section.

We are sending a copy of this letter to the Honorable Robert E. Varner, Judge, United States District Court, Middle District of Alabama.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division



Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

SEP 1 4 1981

J. B. Nix, Jr., Esq.
P. O. Box 167
Evergreen, Alabama  36401

Dear Mr. Nix:

This is in reference to Act No. 2284 (1971) which
provides for a change in the method of electing members of
the Conecuh County, Alabama, Board of Directors from four
single-member districts to two multi-member districts, sub-
mitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
Your submission was completed on July 16, 1981.

We have given careful consideration to the informa-
tion you have provided as well as to comments from interested
parties.  Our review shows that, at the time the change was
enacted, minorities who were becoming active politically as
a result of increased voter registration following the enactment
of the Voting Rights Act of 1965 constituted a majority in
one of the single-member districts.  In addition, our analysis
has revealed nothing to indicate that the change was made to
alter in any way the administrative functions of the board members.
Further, it does not appear that the change to multi-member
districts was based on, nor does it appear to have addressed,
any significant governmental interest except the need to comply
with the one-person, one-vote principle, a need that could have
been responded to in other ways, such as a realignment of the
previously existing single-member districts.

The change has submerged into larger multi-member districts
sizeable black concentrations so as to dilute the minority
voting strength that those voters would have enjoyed under a
continued single-member district plan.  These circumstances,
in the context of the racially polarized voting patterns that
seem to exist in Conecuh County, raise at least an inference
of a proscribed racially discriminatory purpose in the adoption
and implementation of such a system and clearly results in a
prohibited effect under the Act.  See Wilkes County, Georgia v.
United States, 450 F. Supp. 1171 (D. D.C. 1978), aff'd, 439 U.S.
999.

- 2 -

Under Section 5 of the Voting Rights Act the submitting authority has the burden of proving that a submitted change has no discriminatory purpose or effect. See, e.g., Georgia v. United States, 411 U.S. 526 (1973); see also Section 51.39(e) of the Procedures for the Administration of Section 5 (46 Fed. Reg. 878). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the implementation of the submitted Act.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.55, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the implementation of Act No. 2284 (1971) legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action Conecuh County, Alabama, plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-7439), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

SEP 2 5 1981

Honorable Floyd R. Cook
Chairman, Perry County Commission
Perry County Courthouse
Marion, Alabama  36756

Dear Judge Cook:

This is in reference to Act No. 81-226, which
requires a purge and reidentification of voters in Perry
County, Alabama, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c.  Your submission was completed on July 27,
1981.

We have considered carefully the information
provided by you, relevant Census data, and information
and comments from other interested parties.  At the
outset, we note that, in our consideration of changes
such as this under Section 5 of the Voting Rights Act,
the submitting authority has the burden of showing that
the change has neither the purpose nor the effect of
discriminating on the basis of race or color.  See South
Carolina v. Katzenbach, 363 U.S. 301 (1966); United States
v. Georgia, 411 U.S. 526 (1973); 28 C.F.R. 51.19.  Also,
relevant to our analysis are the history of Perry County
as it pertains to racial discrimination in the voting
process and the present status of black voting activity
in the county.

In this context, then, we have noted the history
of resistance to black voting in Perry County and the
resulting litigation in the 1960's, as well as the
continuing racial polarization of voting patterns that
seem to exist.  Our analysis shows that the likely effect
of this reidentification and purge will be to effectively
dilute the voting strength of the black electorate in
Perry County.  Because of the continuing effects of the

- 2 -

past resistance to black voting participation, the lower
economic status of the black population, the limited
hours and locations at which reidentification can be
accomplished, and the generally restrictive manner in
which one would have to go about perfecting his or her
reidentification, our analysis shows that the burden cast
by this process upon blacks would be much greater than on
whites and would make it much more difficult for blacks to
preserve their voting status.  This would appear to be so
even though our analysis also shows that the county was
not limited in the procedures it could have adopted to
accomplish a legitimate reidentification nor has it been
demonstrated why current state law providing for the
purging of registered voter lists is not adequate for the
maintenance of accurate registered voter rolls.

        Finally, I note that the county may not be intending
to comply with the provisions of 42 C.F.R. Part 801, Subpart
D, which describes the method for removing the names of
persons whose names are contained on the registration
lists of Perry County as a result of their having been listed
as voters by federal examiners, under the provisions set
forth in 45 C.F.R. Part 801, Subpart C.  There were a total
of 2,790 black and 87 white persons listed by the examiners;
thus, failure to comply with the provisions of Subpart D of
45 C.F.R. Part 801, in addition to being a violation of the
Regulations, would have a disparate impact on black voters.

        Under these circumstances, therefore, I am unable to
conclude, as I must under the Voting Rights Act, that the
conduct of this purge and reidentification as presently
authorized does not have the purpose or effect of denying
or abridging the right to vote on account of race or color.
Accordingly, on behalf of the Attorney General, I must
interpose an objection to the implementation of the purge and
reidentification of voters set forth in State Act No. 81-226.

- 3 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection. In this regard, should the county take steps to extend the reidentification period until the end of 1982 and allow reidentification at the polls for the primary and general elections in 1982; use additional days and hours for reidentification including additional time to reidentify in the beats; use deputy registrars to assist in the reidentification at times and places convenient to the voters; and provide effective notice to the persons whose names are removed for failure to reidentify, we will reconsider our objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make Act No. 81-226 legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us within twenty days of your receipt of this letter of the course of action Perry County plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-7439), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

## 2 OCT 1981

I. Drayton Pruitt, Jr., Esquire
Pruitt and Pruitt
Post Office Drawer PP
Livingston, Alabama   35470

Dear Mr. Pruitt:

This is in reference to the submission pursuant to
Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c, of Alabama Act No. 81-224 and to the
reidentification of registered voters that Sumter County,
Alabama intends to conduct.

Based on your letters of July 24 and 28, 1981, which
we received on August 3, 1981, your representations to Voting
Section Attorney David H. Hunter in Livingston, Alabama on
September 23 and 24, 1981, and your representations to
Mr. Hunter by telephone on September 29, 1981, it is our
understanding that the reidentification of registered voters
of Sumter County will include the following features, in
addition to those required by Act No. 81-224:

1.   Under §§2 and 6 of Act No. 81-224 as
presently drafted the board of registrars is
to meet beginning on January 4, 1982 to purge
from the list of registered voters the names
of those persons who have not reidentified by
January 1, 1982.   It is now the intention of
the county that the board will meet beginning
on May 3, 1982 to purge the names of those
voters who have not reidentified by May 2, 1982.
This change in procedure will require an amend-
ment of Act No. 81-224, and it is the expectation
of Sumter County that such an amendment will be
enacted by the Alabama legislature during its
current special session or as soon thereafter as
possible.

- 2 -

2.  Under Act No. 81-224 a voter whose name
is purged from the registration list for failure
to reidentify by the specified date may neverthe-
less, pursuant to §7, vote in any subsequent
election if he reidentifies at least ten days
prior to that election.  It is now the intention
of the county to permit a voter who has not
previously reidentified to vote in the primary
election to be held on Tuesday, September 7, 1982,
if he reidentifies on or before that date.  This
change in procedure will require an amendment to
Act No. 81-244, and it is the expectation of
Sumter County that such an amendment will be
enacted by the Alabama legislature during its
current special session or as soon thereafter as
possible.

3.  Under §3 of Act No. 81-224 the board is
required to visit each beat in the county once
between the hours of 9 a.m. and 5 p.m. to enable
registered voters of that beat to reidentify
themselves.  The board now plans to visit each of
the county's eighteen beats three times between
July 1, 1981 and December 31, 1981.  During the
first and third visits the board will be present
between the hours of 9 a.m. and 5 p.m.; during
the second the board will be present between the
hours of 1 p.m. and 7 p.m.  The board now plans
further to visit each beat on two consecutive days
during the period between January 1, 1982 and
May 2, 1982; during these visits the board will
be present between the hours of noon and 6 p.m.

4.  Registered voters will also be able to
reidentify at the county courthouse according to
the following schedule:

a.  On any day Monday through Friday
(excepting holidays) between the hours of
9 a.m. and 5 p.m.  At any time that the
office of the board is closed voters will
be able to reidentify at the office of the
probate judge.

- 3 -

b.   From October 1981 through April 1982 on Thursdays between the hours of 5 p.m. and 7 p.m.

c.   From October 1981 through May 1982 on one Saturday each month, including Saturday, May 1, between the hours of 9 a.m. and 1 p.m.

d.   From May 1982 through August 1982 on Tuesdays between 5 p.m. and 7 p.m.

e.   On Friday, September 3 and Saturday, September 4, 1982, between the hours of 8 a.m. and midnight.

f.   On Tuesday, September 7, 1982, between the hours of 8 a.m. and 6 p.m.

5.   To assist in the reidentification of voters on September 3, 4 and 7, 1982, the board will appoint such deputy registrars as are needed to enable all voters who apply to be processed without delay.  Such deputy registrars will be appointed without regard to race.  It is anticipated that approximately twelve deputy registrars will be appointed to serve in this capacity and that approximately half of these will be blacks and approximately half will be whites.

6.   Registered voters who are so disabled that they are unable to travel by automobile may write or telephone the board and request that they be reidentified at their place of residence.

7.   Registered voters who do not possess a social security card, driver's license, birth certificate, or voter registration card will be reidentified if their identity and residence can be established by other means.

8.   Registered voters who are residents of the county but who are temporarily out of the county will be permitted to reidentify on the same terms and according to the same procedures by which they would be permitted to register to vote pursuant to Alabama

- 4 -

Code §17-4-134 (1979).  It is understood, however,
as specified in §7 of Act No. 81-224, that it is not
necessary for members of the armed forces stationed
outside of Sumter County or their spouses to reidentify.
(It is further understood that a primary purpose of the
reidentification is to remove from the registration
list of the county the names of those persons who have
ceased to be residents of the county.)

9.  According to the most recent report of the
Office of Personnel Management, 25 residents of Sumter
County are eligible to vote pursuant to Sections 6 and
7 of the Voting Rights Act of 1965.  The names of these
persons will not be removed from the registration list
except pursuant to the procedures of Section 7(d)(2)
of the Act and 45 C.F.R. Part 801.

10.  The names of persons purged from the list of
registered voters for failure to reidentify will be
published in newspapers of general circulation published
in Sumter County.

11.  The county's program of reidentification will
be extensively publicized in the county's newspapers
and radio stations.

Based on our understanding of the program of
reidentification that Sumter County intends to carry
out, the information the county has provided to us, and
our own research, it is our tentative conclusion that
the proposed reidentification has a legitimate governmental
purpose and that the proposed reidentification as modified
will not deny the right to vote of any resident of the
county on account of race or color.  Accordingly, if the
reidentification is carried out as you have represented,
it is our view that a version of Act No. 81-224 amended
as described above would meet the requirements of Section 5.
However, it will be our duty within sixty days of the
submission of the amended Act No. 81-224 to determine,
based on the information available to us at that time,
whether that program satisfies the standards of Section
5.

- 5 -

On the other hand, with respect to the submission
of Act No. 81-224 in its present form, consistent with
the Procedures for the Administration of Section 5 of
the Voting Rights Act, 28 C.F.R. 51.8(a) and 51.35(a),
46 Fed. Reg. 870 (Jan. 5, 1981), and with United States
v. Uvalde County, 455 F. Supp. 101 (W.D. Tex. 1978),
affirmed, 439 U.S. 1059 (1979), the sixty-day statutory
period requires us to render a decision at this time.
In reaching such a decision, we are guided by relevant
court decisions, which indicate that a submitted voting
practice or procedure may not be precleared under Section
5 unless the Attorney General is persuaded that the
practice or procedure does not have the purpose of
denying or abridging the right to vote on account of
race, color, or membership in a language minority group
and will not have that effect. See Beer v. United States,
425 U.S. 130 (1976); State of Mississippi v. United
States, 490 F. Supp. 569, 581 (D.D.C. 1979), affirmed
444 U.S. 1050 (1980); City of Port Arthur, Texas v.
United States, C.A. No. 80-0648 (D.D.C. June 12, 1981)
and Procedures, supra, 28 C.F.R. 51.39. Thus, even
though, as suggested above, we feel that a modified
procedure for reidentification would satisfy Section 5
requirements, in the present circumstances and under the
controlling standard it is my duty, on behalf of the
Attorney General, to interpose an objection to the voting
changes occasioned by Alabama Act No. 81-224 as it presently
exists.

Finally, based on the understandings and expecta-
tions explained above, we would consider it inappropriate
to pursue relief further at this time in United States
v. Board of Registrars of Sumter County, Alabama, C.A.
No. CV81P1085W (N.D. Ala., filed July 14, 1981) seeking
to enjoin the board's processing of applicants for
reidentification. (You should understand, nevertheless,
that private parties have standing to seek enforcement
of the requirements of Section 5. See Allen v. State
Board of Elections, 393 U.S. 544 (1969)). We assume,
moreover, that if the contemplated amendment to Act No.
81-224 cannot be enacted by the Alabama legislature
prior to the end of 1981 the county will consent to the
entry of a preliminary injunction to postpone the purge
pursuant to §§2 and 6 of Act No. 81-224 of the names of
registered voters who have not reidentified by January 1,
1982. Because of the litigation with respect to the
status of Act No. 81-224 under Section 5 I am taking
the liberty of providing a copy of this letter to the
court and to counsel for the prospective intervenors.

- 6 -

Of course under Section 5 and our Procedures, it is my duty to inform you that you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group or to request the Attorney General to reconsider this objection.

If you have any questions concerning this letter, please feel free to call Voting Section Attorney David H. Hunter, at 202/724-7189.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

cc:  Honorable Sam C. Pointer
     United States District Judge
     United States District Court
     Northern District of Alabama
     Western Division
     1800 Fifth Avenue North
     Birmingham, Alabama  35203

     Lynda F. Knight, Esquire
     Assistant Attorney General
     State of Alabama
     250 State Administrative Building
     64 North Union Street
     Montgomery, Alabama  36130

     Edward Ashworth, Esquire
     William A. Eagles, Esquire
     Morgan Associates, Chartered
     1899 L Street, Northwest
     Washington, D. C. 20036

     Abigail Turner, Esquire
     Legal Services Corporation of Alabama
     Post Office Box 2963
     Mobile, Alabama  36601

U.S. Department of    tice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

**2 6** OCT 1981


Honorable F. R. Albritton, Jr.
Probate Judge, Wilcox County
Post Office Box 660
Camden, Alabama  36726

Dear Judge Albritton:

This is in reference to Act No. 81-383, which requires
a purge and reidentification of voters in Wilcox County,
Alabama, submitted to the Attorney General pursuant to Section
5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  Your submission was completed on August 26, 1981.

As a backdrop to our analysis, we note that a submitted
voting practice or procedure may not be precleared under
Section 5 unless the Attorney General is persuaded that the
practice or procedure does not have the purpose of denying
or abridging the right to vote on account of race, color, or
membership in a language minority group and will not have that
effect.  See Beer v. United States, 425 U.S. 130 (1976);
State of Mississippi v. United States, 490 F. Supp. 569, 581
(D.D.C. 1979), aff'd, 444 U.S. 1050 (1980).  The burden of
proof, "by a preponderance of the evidence," is on the submitting
authority.  City of Port Arthur, Texas v. United States, 517
F. Supp. 987, 1011 (D. D.C. 1981).  It is in this context we
have considered the information provided by you, relevant
Census data, and the information and comments from other
interested parties.  We also have found pertinent to our
analysis the history of Wilcox County as it pertains to
racial discrimination in the voting process, the 1980 purge
and resulting litigation, the present status of black voting
activity in the county, as well as the likely effect this
reidentification and purge will have on the voting strength
of the black population as compared with its effect on the
white population.


cc:  Public File

- 2 -

At the outset, our analysis shows that the right to vote in Wilcox County and in the State of Alabama historically has been denied or abridged on account of race or color and that the State of Alabama and Wilcox County have adopted and seek to implement the submitted practices over the strong opposition of black residents, who constitute 69 percent of the county's population. Our analysis further shows that because of the continuing effects of past resistance to black voting participation, the lower socio-economic status of the black population, the limited hours and locations at which reidentification can be accomplished, and the generally restrictive manner in which one would have to go about perfecting his or her reidentification, the burden cast by this process upon blacks would be much greater than on whites and would make it much more difficult for registered blacks to preserve their voting status. This becomes particularly significant to the determination we must make, since our analysis also shows that the county was not limited in the procedures it could have adopted to accomplish a legitimate reidentification.

In addition, the county has not demonstrated why current state law providing for the purging of registered voter lists is not adequate for the maintenance of accurate registered voter rolls. We further call your attention to the provisions of 45 C.F.R. Part 801, Subpart D, which prescribes the method for removing the names of persons whose names are contained on the registration lists of Wilcox County as a result of their having been listed as voters by federal examiners, under the provisions set forth in 45 C.F.R. Part 801, Subpart C. According to our information, a total of 3,667 black and 11 white persons have been listed by federal examiners. Failure to comply with the provisions of Subpart D of 45 C.F.R. Part 801, in addition to being a violation of the regulations, would have a disparate impact on black voters.

Under these circumstances, therefore, I am unable to conclude, as I must under the Voting Rights Act, that the conduct of this purge and reidentification as presently authorized does not have the purpose or effect of denying or abridging the right to vote on account of race or color. Accordingly, on behalf of the Attorney General, I must interpose an objection to the implementation of the purge and re-identification of voters set forth in Act No. 81-383.

- 3 -

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek declaratory judgment
from the United States District Court for the District of
Columbia that this change has neither the purpose nor will
have the effect of denying or abridging the right to vote on
account of race, color or membership in a language minority
group. In addition, the Procedures for the Administration
of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you
to request the Attorney General to reconsider the objection.
In this regard, should the county take steps to extend the
reidentification period until the end of 1982 and allow
reidentification at the polls for the primary and general
elections in 1982; use additional days and hours for re-
identification including additional time to reidentify in
the beats; use deputy registrars, including minorities, to
assist in the reidentification in a meaningful way at times
and places convenient to the voters; provide effective notice
to the persons whose names are removed for failure to reidentify,
we will reconsider our objection. However, until the objection
is withdrawn or the judgment from the District of Columbia
Court is obtained, the effect of the objection by the Attorney
General is to make Act No. 81-383 legally unenforceable.

To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us within twenty
days of your receipt of this letter of the course of action
Wilcox County plans to take with respect to this matter. If
you have any questions concerning this letter, please feel
free to call Carl Gabel (202-724-7439), Director of the Section
5 Unit of the Voting Rights Section.

                                    Sincerely,




                        Wm. Bradford Reynolds
                     Assistant Attorney General
                         Civil Rights Division

U.S. Department of Justice

Civil Rights Division

_____

*Office of the Assistant Attorney General*            *Washington, D.C. 20530*

OCT 2 6 1981

Honorable Floyd R. Cook
Judge of Probate
Perry County Courthouse
Marion, Alabama  36756

Dear Judge Cook:

This is in reference to Alabama Act No. 81-635 (H.B. No. 1055), which provides for the use of voting machines in Perry County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. Supplemental information was received with respect to this submission on August 25, 1981.

In our letter of October 13, 1981, we informed you of our reasons for not being able to conclude at that time that the change from the use of paper ballots to the use of voting machines would not have the effect of denying the right to vote on account of race or color. We explained--

First, we have not been told how many machines the county intends to purchase or how these machines will be allocated among the county's beats and boxes. Second, we have not been advised of the kind of program the county intends to conduct to familiarize its registered voters with the use of machines. Third, we have been given no information on the procedure the county intends to follow in providing assistance at the polls to illiterate voters.

- 2 -

On October 16, 1981 you met with David H. Hunter, an attorney in our Voting Section, to discuss these questions. You explained, with respect to the first question, that at each of the county's polling places one voting machine would be provided for every 400 registered voters, and that two extra machines would be required. Thus 9 machines will be provided for beat 1, boxes 1-10; 2 for beat 1, boxes 11-12; 7 for beat 3; 2 for beat 7, and 1 apiece for the remaining 8 beats, for a total of 30 machines (including 2 extras). It is our view that this allocation of machines will enable Perry County voters to vote without delay on a racially neutral basis.

With respect to the second question, you agreed to place one voting machine on display at the courthouse in Marion and one voting machine on display at the city hall in Uniontown as soon as the machines are acquired, to have a machine on display for one day at each of the county's four high schools, and to make machines available for meetings of organizations and civic groups in Perry County. It is our view that this program, publicized and supplemented by local radio announcements, local newspaper announcements, and explanatory flyers and combined with instruction at the polls pursuant to §17-9-25(a) of the Alabama Code (1979), will enable Perry County to introduce the use of voting machines without denying the right to vote to any resident of Perry County on account of race or color.

With respect to the third question, you agreed that assistance at the polls to illiterate voters would be provided as specified in §17-9-25(a) of the Alabama Code (1979), under which a voter can receive assistance from two inspectors of his choice or any other person of his choice. It is our view that such provision of assistance will enable illiterate voters in Perry County to participate in the county's elections on a basis that does not deny their right to vote on account of race or color.

It is our view, therefore, based on the above understandings, that we will be in a position to preclear Act No. 81-635 once the County Commission has adopted appropriate resolutions incorporating these understandings. Once such resolutions are received, it will be our duty to determine, based on the information available to us at that time, whether the county's program for the introduction of the use of voting machines satisfies the standards of Section 5.

- 3 -

On the other hand, with respect to Act No. 81-635 as presently submitted, consistent with the Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. 51.8(a) and 51.35(a), 46 Fed. Reg. 870 (Jan. 5, 1981), and with United States v. Uvalde County, 455 F. Supp. 101 (W.D. Tex. 1978), affirmed 439 U.S. 1059 (1979), the sixty-day statutory period requires us to render a decision at this time. In reaching such a decision, we are guided by relevant court decisions, which indicate that a submitted voting practice or procedure may not be precleared under Section 5 unless the Attorney General is persuaded that the practice or procedure does not have the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group and will not have that effect. See Beer v. United States, 425 U.S. 130 (1976); State of Mississippi v. United States, 490 F. Supp. 569, 581 (D.D.C. 1979), affirmed 444 U.S. 1050 (1980); City of Port Arthur, Texas v. United States, 517 F. Supp. 987 (D. D.C. 1981), and Procedures, supra, 28 C.F.R. 51.39. Thus, even though, as suggested above, we feel that the program for the introduction of voting machines that you now propose would satisfy Section 5 requirements, in the present circumstances and under the controlling standard it is my duty, on behalf of the Attorney General, to interpose an objection to the voting changes occasioned by Alabama Act No. 81-635 absent such supplementing resoulutons.

Once resolutions embodying the program described above have been adopted by the County Commission you should feel free to submit them to us for Section 5 review and simultaneously request reconsideration, pursuant to 28 C.F.R. 51.44, of the objection to Act No. 81-635. We will give your submission and reconsideration request expedited consideration pursuant to 28 C.F.R. 51.32.

If you have any questions concerning this letter, please feel free to call Mr. David H. Hunter, at 202/724-7189.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

1 6 NOV 1981

T. W. Thagard, Jr., Esq.
Smith, Bowman, Thagard,
  Crook & Culpepper
Post Office Box 78
Montgomery, Alabama  36101

Dear Mr. Thagard:

    This is in reference to the redistricting plan for the seven single-member districts for members of the Barbour County Commission of Barbour County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  Your submission was received on September 16, 1981.

    At the outset we note that on July 21, 1981, an objection was interposed on behalf of the Attorney General to the plan previously submitted.  We found that the districts in that plan were "not compact, do not follow natural and recognizable boundaries . . . and . . . are noncontiguous."  We further found that the plan evidenced dilution of black voting strength in Barbour County by drawing new district lines in such a way as to cause needless fragmentation of black population concentrations.  In the context of Barbour County, including as it does racial bloc voting, a majority vote requirement, and a substantially lower voting age population and voter registration rate among blacks than among whites, we were unable to conclude that black voting strength had been maintained at a level that would have allowed blacks to participate fully and fairly in the electoral process.  Accordingly, we advised the county that it had failed to sustain its burden under the Voting Rights Act and an objection was interposed.

    As noted in our July 21 letter of objection, since the pre-existing plan was found to be unconstitutionally malapportioned, <u>Forte</u> v. <u>Barbour County Commission</u>, Civil Action No. 79-537-N (M.D. Ala., Dec. 17, 1979), the proper standard of comparison under <u>Beer</u> v. <u>United States</u>, 425 U. S. 130 (1976), is to compare the submitted plan with "options for properly apportioned single-member

- 2 -

district plans." <u>Wilkes County</u> v. <u>United States</u>, 450 F. Supp. 1171,
1178, Conclusion 19 (D. D.C. 1978), aff'd, 439 U.S. 999 (1978).
Such a comparison necessarily must take into account the existence
of racially polarized voting in Barbour County. Also important to
our analysis is the wide discrepancy in voting age population between
blacks and whites in Barbour County. Weighing in the balance these
and other considerations we must in the end determine whether your
submitted plan was designed "to minimize . . . the voting strength
of racial . . . elements of the voting population." <u>Fortson</u> v.
<u>Dorsey</u>, 379 U.S. 433, 439.

    With this background in mind we have given careful consider-
ation to the information you have supplied as well as that available
from our files, the Bureau of the Census and other interested parties.
Our analysis shows that even though the districts in the new propos-
al appear to be contiguous, some continue to be drawn in a manner
designed to fragment black population concentrations.  This is
particularly the case in the City of Eufaula where the boundaries
of District 3 are drawn in a convoluted and distorted fashion that
"carves out" of the district three virtually all-black areas while
drawing into the district elsewhere two all-white areas.  The
information that you have supplied does not indicate any govern-
mental interest served by this configuration and we have received
no explanation to suggest a reason other than to minimize black
voting strength in District 3 over what one would naturally expect
had a more evenly drawn, unfragmented plan been adopted.

    In addition, with respect to the boundary line between
Districts 1 and 2, predominantly black voting Precinct 10, which
has the second highest percentage of black registered voters in the
county, seems to be split unnecessarily between Districts 1 and 2.
This fragmentation also results in what seems to be an unnecessary
splitting of a Census Enumeration District and the attending
unreliability of statistics that such splitting engenders.  In fact,
our analysis shows that the unreliability of the data resulting
from the split in this instance may be exacerbated by the methodol-
ogy used, which assumed equal distribution of population by race
throughout the ED and which made no distinction in the number of
persons per household whether white or black.  Census experience
has shown that these are not realistic assumptions.

    Under Section 5 of the Voting Rights Act the submitting
authority has the burden of proving that a submitted change has no
discriminatory purpose or effect.  See, <u>e.g.</u>, <u>Georgia</u> v. <u>United</u>
<u>States</u>, 411 U.S. 526 (1973); see also Section 51.39(e) of the
Procedures for the Administration of Section 5 (46 Fed. Reg. 878).
In light of the considerations discussed above, I cannot conclude,
as I must under the Voting Rights Act, that the county has carried

- 3 -

its burden of showing that the plan here under submission is free of any purpose to abridge the right to vote on account of race or color. Accordingly, on behalf of the Attorney General, I must interpose an objection to the redistricting plan contained in the instant submission.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the redistricting plan for Barbour County legally unenforceable.

Since this matter is related to the litigation pending in the federal district court, I am taking the liberty of forwarding a copy of this letter to Judge Varner. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-7439), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

cc: Chief Judge Robert E. Varner



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_          Washington, D.C. 20530

January 5, 1982

Dennis Nabors, Esquire
City Attorney
P.O. Box 1111
Montgomery, Alabama  36192

Dear Mr. Nabors:

This is in reference to the redistricting plan adopted
on July 28, 1981, for the City of Montgomery in Montgomery
County, Alabama, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c.  Your submission was completed on
November 6, 1981.  Although we noted your request for
expedited consideration, we have been unable to respond
until this time.

As you will recall from our letter of October 20,
1981, and our meeting of December 22, 1981, we have been
exploring certain issues that have been raised with respect
to the purpose and effect of this redistricting plan.  In
so doing, we have continued to receive information relating
to the issues.  The latest information was received so
recently that we have not been able to complete our assess-
ment of this matter at this time.  Accordingly, and consistent
with the Attorney General's Procedures for the Administration
of Section 5 of the Voting Rights Act (46 Fed. Reg. 878,
Sub-section 5139), I must interpose an objection to the
implementation of the plan as submitted.  We are, however,
continuing our consideration of the plan in light of the
information recently received and my telephone conversation
with you today.  It is my hope and expectation that a prompt
resolution of this matter can be achieved.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*            *Washington, D.C. 20530*

APR 23 1982

Mr. J. H. Robison
Chairman, Conecuh County Democratic
  Executive Committee
P. O. Box 106
Evergreen, Alabama  36401

Dear Mr. Robison:

    This is in reference to the changes in filing fees
and the change in method of election and size of the Conecuh
County Democratic Executive Committee in Conecuh County,
Alabama, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42
U.S.C. 1973c.  Your submission was received on February 23,
1982.

    The Attorney General does not interpose any objections
with respect to the changes in filing fees.  However, we
feel a responsibility to point out that Section 5 of the
Voting Rights Act expressly provides that the failure of
the Attorney General to object does not bar any subsequent
judicial action to enjoin the enforcement of such changes.

    With respect to the change in method of election and
reduction in size of the executive committee, we have given
careful consideration to the materials provided by you and
other interested parties in Conecuh County as well as
information derived from our observation of elections in
the county.  We note that prior to 1971, members of the
County Democratic Executive Committee were elected from 16
two-member districts, a number of which are predominantly
black.  Under the submitted change, executive committee
members are elected from two 15-member districts, both of
which contain large white majorities.  The change was first
enacted shortly after the first black candidacies in the
county and since enactment of the change, no more than one
member of the thirty-member committee has been a black person.
The absence of black representation, moreover, appears to be
a significant contributing factor in the racial disparities
found to exist in the Conecuh County election process which
we have previously brought to your attention.

- 2 -

Under Section 5 of the Voting Rights Act the submitting authority has the burden of proving that a submitted change has no discriminatory purpose or effect. See, e.g., Georgia v. United States, 411 U.S. 526 (1973); see also Section 51.39(e) of the Procedures for the Administration of Section 5 (46 Fed. Reg. 878). Under the circumstances involved here, however, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Accordingly, on behalf of the Attorney General I must interpose an objection to the change in method of electing the Conecuh County Democratic Executive Committee.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the change in size and election method legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Conecuh County Alabama Democratic Executive Committee plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**Civil Rights Division**

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

## 6  MAY 1982

Honorable Charles A. Graddick
Attorney General
State of Alabama
Montgomery, Alabama  36130

Dear Mr. Attorney General:

This is in reference to the reapportionment of
the Alabama Legislature by Act 81-1049 of the Second
Special Session of the 1981 Alabama Legislature,
submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  Your submission was completed on April 2, 1982.

We have given careful consideration to the
materials you have submitted, as well as comments and
information provided by a number of other interested
parties, and relevant decisions of the federal courts.
Under Section 5, the submitting authority must show
that a change does not have a discriminatory purpose
and would not "lead to a retrogression in the position
of racial minorities with respect to their effective
exercise of the electoral franchise." Beer v. United
States, 425 U.S. 130, 141 (1976); see also, City of
Richmond v. United States, 422 U.S. 358 (1975).

Applying these principles to Act 81-1049, we note
first that the proposed redistricting plan clearly would
lead to a retrogression in the position of black voters.
For instance, the plan reduces the number of Jefferson
County house districts with black majorities from seven
to six and also reduces black influence in one of the
six remaining districts through the unnecessary reconfigu-
ration of existing district 49; the number of house
districts in the western "black belt" with black voting
age majorities would decrease from five to one (and in
the remaining one the majority declines); the black

- 2 -

majority in house district 46 (Tuscaloosa) would be reduced
significantly; the black proportion in house district 65
would decline substantially; and the plan would reduce the
black proportion in all of the ten urban house districts
with current black populations of over 25 percent, thus
systematically reducing the influence which black voters
in these districts now enjoy.  Because of the peculiar
affinity between house and senate districts in the plan,
these reductions within house districts concomitantly reduce
black majorities or influence in their respective senate
districts.  Since these reductions do not appear to have
been necessary to any legitimate governmental interest,
we are unable to conclude that they are free of the racial
purpose and effect proscribed by Section 5.

In addition, it appears that senate districts in
Mobile were reconfigured so as to "pack" black pop-
ulation into district 33 with a resulting reduction of
black influence in district 35.  At the same time, and
in a seemingly inconsistent approach, the plan neglects
to combine black areas within Montgomery so as to
allow a black majority senate district there.  Accordingly,
without any offsetting increase in black influence or
opportunities elsewhere, as in Montgomery, for example,
we are unable to conclude that the reconfiguration of
Mobile senate districts would not have a retrogressive
effect.

We note further that the proposed reapportionment
divides what appears to be an unnecessarily large number
of counties along census enumeration district lines with
the effect of fragmenting a large number of existing
voting precincts or beats.  The existing plan, ordered
in 1972 by Sims v. Amos, 336 F. Supp. 924 (M.D. Ala.
1972), necessitated similar divisions and the concomitant
reassignment of large numbers of voters.  Based on the
significant difficulties involved in the two year effort
to implement the Sims plan, the absence of any effective
corrective measures adopted since that time, and factors
noted in the course of our observation of elections in
Alabama, we are unable to conclude that Act 81-1049 can
be implemented without serious danger of discriminating
against black voters in counties and districts with
substantial black populations.  A final barrier to imple-
mentation is the failure of the Act to assign Montgomery
census tract 6 with 3,764 persons, 91% of whom are black,
to any district.

- 3 -

Under all of these circumstances, therefore, we are unable to conclude that the proposed plan meets the Section 5 burden. Accordingly, I must, on behalf of the Attorney General, interpose an objection to the reapportionment of the Alabama Legislature by Act 81-1049, Second Special Session of 1981.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the reapportionment of the Alabama Legislature by Act 81-1049 legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the State of Alabama plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-7439), Director of the Section 5 Unit of the Voting Section.

We are aware that there is now pending litigation concerning the state legislative redistricting. Burton v. Hobbie, C.A. No. 81-617-N (M.D. Ala.) I am taking the liberty of providing a copy of this letter to the Court in light of our desire to be of any assistance we can.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

**19 JUL 1982**

Honorable Calvin Steindorff
Probate Judge and Chairman,
  Butler County Commission
P.O. Box 756
Greenville, Alabama  36037

Dear Judge Steindorff:

    This is in reference to Act No. 136 (1969), which
changes the method of electing commissioners from district
to at-large elections in Butler County, Alabama, submitted
to the Attorney General pursuant to Section 5 of the Voting
Rights Act of 1965, as amended, 42 U.S.C. 1973c.  Your
submission was completed on May 20, 1982.

    We have given careful consideration to the information
you have submitted, comments from interested parties, and
relevant decisions of the federal courts.  See, e.g., Wilkes
County, Georgia v. United States, 450 F. Supp. 1171 (D. D.C.
1978), aff'd, 439 U.S. 999.  We note that the black population
of Butler County is concentrated in the northwestern portion
of the county and in an adjacent area of the City of Greenville.
Accordingly, under the single-member district method of election,
which existed prior to the submitted change to at-large with
residency districts, properly apportioned districts would result
in one district with a substantial black majority of population
and voter registration.  Our analysis has also revealed evidence
of racially polarized voting, non-responsiveness on the part of
commission members to the particularized needs of the black
community, and other factors which, in the context of a history
of racial discrimination in the county, indicate that the at-large
election system enacted by Act No. 136 (1969) denies black voters
equal access to the county government.  Rogers v. Lodge,
_____ U.S. _____ (July 1, 1982).

    Under Section 5 of the Voting Rights Act the submitting
authority has burden of proving that a submitted change has
no discriminatory purpose or effect.  See, e.g., Georgia v.
United States, 411 U.S. 526 (1973); 28 C.F.R. 51.39(e).  In
light of the considerations dicussed above, I cannot conclude,
as I must under the Voting Rights Act, that that burden has
been sustained in this instance.  Accordingly, I must, on behalf
of the Attorney General, interpose an objection to the change
to at-large elections for the Butler County Commission provided
by Act No. 136 (1969).

-2-

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.44) permit you to request the Attorney General to reconsider the objection.  However, until the objection is withdrawn or the judgment from the District of Columbia Court obtained, the effect of the objection by the Attorney General is to make the change to at-large elections legally unenforceable.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action Butler County plans to take with respect to this matter.  If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

Office of the Assistant Attorney General                    Washington, D.C. 20530

Lynda F. Knight, Esq.                          **19 JUL 1982**
Assistant Attorney General
250 Administrative Building
64 North Union Street
Montgomery, Alabama   36130

Dear Ms. Knight:

        This is in reference to Acts Nos. 572 (H. 278) and
611 (H. 10) of the 1982 Regular Session of the Alabama
Legislature, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42
U.S.C. 1973c.  Your submissions were received on May 21 and
May 18, 1982, respectively.

        We have given careful consideration to the informa-
tion you have provided as well as that provided by interested
parties.  We note that, currently, in order for a minor party
to be included on a general election ballot, the party must
hold its appropriate assembly within 90 days of the first
primary election date and file nomination papers for its can-
didates with the appropriate officials by 5:00 P.M. on the
day of the first primary election.  Act No. 611 (1982)
changes this method so that beginning with the 1982 elections,
a party that does not hold primaries, regardless of the
number of votes it received at the last general election,
must file its nominating papers with the appropriate officials
60 days prior to the first primary election.  Section 2 of
this Act further requires that these parties hold their appro-
priate assemblies also at least 60 days prior to the first
primary election.  Act No. 572 (1982) requires a party seeking
inclusion on the general election ballot, whether or not it
holds primaries and when it did not garner more than 20 percent
of the total votes cast in the last general election in a
jurisdiction, to file its nominating papers and list of the
signatures of at least one percent of the qualified electors
who cast ballots for the office of Governor in each such juris-

- 2 -

diction.  These papers must be filed with the secretary of
state or appropriate local officials at the time that parties
which hold primaries must certify the names of their primary
candidates, i.e., 50 days prior to the first primary.

We have been informed that Act No. 572 (1982) was
publicized beginning late May and mid-June of 1982 and that
little, if any, publicity was provided for Act No. 611 (1982).
It is our understanding that the predominantly black National
Democratic Party of Alabama is still one of the largest
active minor parties in the State and that it, along with
other minor parties available to minority voters, is subject
to the provisions of both of the submitted Acts.

Under Section 5 of the Voting Rights Act the submitting
authority has the burden of showing that a submitted change
has no discriminatory purpose and effect.  See, e.g., Georgia
v. United States, 411 U.S. 526 (1973); see also the Procedures
for the Administration of Section 5 (28 C.F.R. 51.39(e)).
Our analysis indicates that the State of Alabama has not met
its burden of showing that provisions of the submitted Acts
will not have the effect proscribed by the Voting Rights
Act.  Our conclusion is based, in part, on the inadequacy and
untimeliness of the publicity which has made it virtually
impossible for the non-major parties, including the NDPA, to
field their conadidates for the 1982 elections.  In light of
these considerations, I cannot conclude, as I must under the
Voting Rights Act, that that burden has been sustained in
this instance.  Therefore, on behalf of the Attorney General,
I must object to the submitted changes.

Of course, as provided by Section 5 of the Voting
Rights Act you have the right to seek a declaratory
judgment from the United States District Court for the
District of Columbia that these changes neither have the
purpose nor will have the effect of denying or abridging
the right to vote on account of race, color or membership
in a language minority group.  In addition, the Procedures
for the Administration of Section 5 (28 C.F.R. 51.44)
permit you to request the Attorney General to reconsider
the objection.  Such a request for reconsideration may be
appropriate at a time when those affected by the Acts have
been appropriately apprised of their provisions and will have
an opportunity to comply with their requirements in sufficient
time prior to the subsequent election.  However, until the
objection is withdrawn or the judgment from the District of
Columbia Court is obtained, the effect of the objection by
the Attorney General is to make the implementation of Acts
No. 572 (1982) and No. 611 (1982) legally unenforceable.

- 3 -

        To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action the State of Alabama plans to take with respect
to this matter.  If you have any questions concerning this
letter, please feel free to call Carl W. Gabel (202-724-8388),
Director of the Section 5 Unit of the Voting Section.

                        Sincerely,

                        Wm. Bradford Reynolds
                        Assistant Attorney General
                        Civil Rights Division


cc:   Honorable Don Siegelman
      Secretary of State



**U.S. Department of Justice**

**Civil Rights Division**

---

Office of the Assistant Attorney General                    Washington, D.C. 20530

JUL 26 1982

Robert G. Kendall, Esq.
Johnston, Johnston & Kendall
P.O. Box 550
Mobile, Alabama  36601

Dear Mr. Kendall:

, This is in reference to the proposed redistricting
plan for electing members of the Board of Directors in
Conecuh County, Alabama, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  Your submission was received on
July 21, 1982.  Pursuant to the request of the Court in
Fluker v. Conecuh County, Alabama (S.D. Ala.), we have
reviewed your submission on an expedited basis.

    We have given careful consideration to the materials
you have provided in this and previous submissions, as
well as to comments and information of other interested
parties, and information obtained during the course of our
observation of elections in Conecuh County. We note that
a high level of racial bloc voting obtains in county elections,
and that even though much of the black population in Conecuh
County is concentrated in the southeastern portion of the
City of Evergreen (Beat 11-3) and the adjacent southeastern
portion of the County (Beats 7 and 16), none of the proposed
districts has a black majority.

    The previously existing single-member district election
plan is now severely malapportioned and has not been utilized
in over ten years.  In these circumstances we believe that, in
order to satisfy the Section 5 effect standard, the County
must demonstrate that the proposed plan "fairly reflects the
strength of black voting power as it exists." State of
Mississippi v. United States, 490 F. Supp. 569, 581 (D. D.C.
1981).

- 2 -

Based on 1980 Census data, 36.63 percent of the County's voting age population is black.  By far the largest concentration of minority population is located in the southeastern quadrant of the county, particularly the southeastern part of the City of Evergreen.  A fairly drawn plan should, in our view, include at least one district in that area that has a black majority voting age population.  Our analysis suggests that several alternatives are available to the County that would accomplish such a result consistent with the constitutional "one person, one vote" requirement.  The County has offered no satisfactory explanation for adopting, instead, a plan that needlessly fragments black communities in the southeast, leaving the minority population with no district in which its actual voting strength can be realized.

We note that the plaintiffs in the <u>Fluker</u> litigation have prepared a single-member district plan under which black voters would constitute a majority in one district and a sizable minority in another.  We have not fully analyzed that proposal under Section 5, since it falls outside the jurisdictional bounds of our statutory review responsibility.  As a preliminary matter, we can say, however, that it appears to address our principal concerns with the County's proposal.  Nonetheless, it is but one of several options available for further consideration.

Without specific reference to any of the plans under discussion, we would generally caution against any configuration of districts designed to maximize black voting strength.  A racially discriminatory effect can be found as readily under Section 5 for unnecessarily "packing" large numbers of minorities into one district as it can for needlessly "cracking" (or fragmenting) minority communities so that the black vote is dispersed among two or more districts.  A fairly drawn plan follows natural or logical boundary lines and suffers from neither "packing" nor "cracking" minority communities.

- 3 -

For the reasons stated, I must on behalf of the Attorney General, interpose an objection to the proposed redistricting plan, since it has not been shown, as the County must under Section 5, that the submitted plan has neither a racially discriminatory purpose nor effect.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (28 C.F.R. 51.44) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the proposed redistricting plan legally unenforceable. See also 28 C.F.R. 51.9.

We recognize the time constraints under which the County has operated in devising this plan and we also recognize that the task of devising an acceptable plan is a responsibility of elected officials which should be pre-empted by the court only as a last resort. Reynolds v. Sims, 377 U.S. 533, 587 (1964); Chapman v. Meier, 420 U.S. 1, 27 (1975). Thus, if the County officials desire to revise the plan to fairly reflect black voting strength as it exists, this Department stands ready to conduct the necessary Section 5 review on an expedited basis.

A copy of this letter is being provided to the Court in Fluker v. Conecuh County, Alabama (S.D. Ala.).

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

August 2, 1982

Honorable Charles A. Graddick
Attorney General
250 Administrative Building
64 North Union Street
Montgomery, Alabama  36130

Dear Mr. Attorney General:

This is in reference to the reapportionment of
the Alabama Legislature by Act No. 82-629 (H.B. No. 19),
submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
Your submission was received on June 2, 1982.

After a thorough analysis of all the information
available to us, we are unable to conclude that the proposed
plan as it affects the areas outlined in our June 8, 1982,
letter is free of the proscribed purpose or effect.  In
reaching this conclusion, we have carefully examined the
possibility of developing a nonretrogressive reconfiguration
of districts in the "Black Belt" area in question (Districts
83, 85, 86, 87, 88 and 90) that is more faithful to the
State's articulated criteria of adherence to county bound-
aries and minimal fragmentation of minority communities.
Our analysis demonstrates that several such alternatives
are available without causing an undue "ripple effect" on
the adjacent districts.  The State has failed to explain
satisfactorily why it adopted, instead, a configuration for the
"Black Belt" area that departs measurably from the stated
criteria and offers less prospect for the black voters in
those districts to participate fully in the electoral process.
Accordingly, I must, on behalf of the Attorney General,
interpose an objection to Act No. 82-629.

In reaching this conclusion, I am mindful of your
letter of July 28, 1982, requesting that the 60-day period
for review of the State's submission be extended.  Under
the statute, the review period can only be altered on a
request by the Attorney General for additional information
necessary to our analysis of the submission or when we have
received from the submitting authority documents and

-2-

information materially supplementing a submission. Such a
request would be inappropriate in this situation where a
full exchange of all pertinent information has already
occurred.

Since the Procedures for the Administration of
Section 5 (28 C.F.R. 51.44) permit you to request the
Attorney General to reconsider the objection, you may, of
course, submit any comments on our analysis in the course
of seeking reconsideration.  In addition, as provided by
Section 5 of the Voting Rights Act, you have the right to
seek a declaratory judgment from the United States District
Court for the District of Columbia that these changes have
neither the purpose nor will have the effect of denying or
abridging the right to vote on account of race, color or
membership in a language minority group.  However, until
the objection is withdrawn or the judgment from the District
of Columbia Court is obtained, the effect of the objection
by the Attorney General is to make the proposed reapportionment
legally unenforceable.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division