FILED
2025 Feb-24 PM 04:41
U.S. DISTRICT COURT
N.D. OF ALABAMA



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

October 19, 1982

Lynda F. Knight, Esq.
Assistant Attorney General
250 Administrative Building
64 North Union Street
Montgomery, Alabama  36130

Dear Ms. Knight:

     This is in reference to five acts of the Legislature of
the State of Alabama relating to the conduct of voter registration
in Mobile County, Alabama, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  These five acts are:  Act No. 122
(1972), Act No. 884 (1978), Act No. 81-740, Act No. 82-374, and
Act No. 82-377.  The submission of Act No. 122 (1972) and Act
No. 884 (1978) was received on July 26, 1982.  As our letter of
September 24, 1982, indicated, information enabling us to review
these acts was received on August 20, 1982.  See the Procedures
for the Administration of Section 5 (28 C.F.R. 51.37).  A partial
response to our requests for additional information with respect
to Act No. 81-740, Act No. 82-374, and Act No. 82-377 was
received on August 20, 1982.

     The Attorney General does not interpose any objections
to the voting changes contained in Act No. 122 (1972), Act No.
884 (1978), and Act No. 82-374.  However, we feel a responsibility
to point out that Section 5 of the Voting Rights Act expressly
provides that the failure of the Attorney General to object
does not bar any subsequent judicial action to enjoin the
enforcement of these changes.  See also 28 C.F.R. 51.48.

     With regard to the changes involved in Act No. 81-740 and
Act No. 82-377, we note at the outset that under <u>Beer</u> v. <u>United
States</u>, 425 U.S. 130, 141 (1976), preclearance must be denied

- 2 -

to a voting procedure change "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." Our analysis shows that the changes in voter registration procedures contained in these two acts cumulatively may have such a retrogressive effect in the context of current voter registration practices in Mobile County.

Section 1 of Act No. 81-740 prohibits the Board of Registrars of Mobile County from registering any voters during the fifteen-day period prior to an election. Under prior law such registration was permitted up until ten days prior to an election. Because the board does not register voters on Sunday and usually does not register voters on Saturday, the practical effect of this provision will be to implement a deadline for registration prior to an election that is one week earlier than it has been in the past.

We have received no information to justify the need for the five extra working days to prepare for an election beyond what has been required in the past and beyond what most Alabama counties use. On the other hand, it appears that the registration rate for blacks in Mobile County is lower than that for whites, that registration opportunities in Mobile County are relatively limited, and that interest in voter registration among blacks is greatest shortly before an election. Thus, the expansion of the cut-off period for registration would likely impact most heavily upon black potential voters.

The final sentence of Section 2(a) of Act No. 82-377 states that a person who requests the board of registrars to conduct voter registration outside the courthouse "shall be responsible for furnishing an appropriate facility and notice and publicity announcing the visit." This would appear to place a burden on persons requesting voter registration at locations other than the county courthouse that did not previously exist and which does not exist in other Alabama counties. Given the large land area of Mobile County, the county's large voting age population, the failure of the county to provide deputy registrars, and the requirement of decennial reidentification, it would appear that a registration program that does not offer a continuing reasonable opportunity for county residents to register on a decentralized basis imposes a serious burden on persons not registered. Because the registration percentage of blacks in Mobile County appears to be substantially lower than that of whites, the burden of a change that will have the effect of reducing voter registration opportunities on

- 3 -

a decentralized basis likely would fall more heavily on blacks
than on whites.

Section 2(c) of Act No. 82-377 states: "In the last
month immediately preceding an election, all registration
shall be at Mobile County courthouse." This provision likewise
places a limitation on decentralized registration that did not
previously exist and which does not exist in other Alabama
counties. While such a restriction may be reasonable in the
context of a registration system that permits ample opportunities
for voter registration at other times, i.e., retention of the
ten-day deadline and provision for decentralized registration at
the initiative and expense of the registration board, in the
context of the limited registration opportunities now provided by
Mobile County this requirement would appear to add cumulatively
to an unreasonable limitation on the registration process in
Mobile County.

In these circumstances, I cannot conclude under the
Voting Rights Act, that the changes involved in Act No. 81-740,
and Act No. 82-377 will not have a retrogressive effect on the
ability of blacks to register to vote. Therefore I must, on
behalf of the Attorney General, interpose an objection to these
changes.

Of course, as provided by Section 5 of the Voting Rights
Act you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the effect
of denying or abridging the right to vote on account of race,
color or membership in a language minority group. In addition,
the Procedures for the Administration of Section 5 (28 C.F.R.
51.44) permits you to request the Attorney General to reconsider
the objection. However, until the objection is withdrawn or
the judgment from the District of Columbia Court is obtained,
the effect of the objection by the Attorney General is to make
the implementation of Act No. 81-740 and Act No. 82-377 legally
unenforceable. 28 C.F.R. 51.9.

- 4 -

    To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the State of Alabama plans to take with respect to this matter.  If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

                Sincerely,

                Wm. Bradford Reynolds
            Assistant Attorney General
             Civil Rights Division


cc:  Ms. Euber R. Collins
     Chairperson, Mobile County
       Board of Registrars

     Mr. Bay Haas
     Chairman, Mobile County Commission



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

May 10, 1983

E. Paul Jones, Esq.
P.O. Box 448
Alexander City, Alabama   35010

Dear Mr. Jones:

This is in reference to the change in the method of
electing county commissioners from single-member districts
to at-large in Tallapoosa County, Alabama, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended, 42 U.S.C. 1973c. We received the
information to complete your submission on March 11, 1983.
Although we noted your request for expedited consideration,
we have been unable to respond until this time.

We have given careful consideration to the information
you have provided, along with Bureau of the Census data and
information and comments from other interested parties. At
the outset, we note that this change initially resulted from
litigation in 1969 to redress a one-person, one-vote issue
and that the at-large system has been implemented by the
county from that time until ordered by the court in <u>Holley</u> v.
<u>Sharpe</u>, Civ. Action No. 82-17-E (M.D. Ala.), on September 9,
1982, to seek this preclearance. Thus, we have before us a
history of elections under the at-large system which reflects
that although blacks constitute 27 percent of the population
of the county their influence on the outcome of county-wide
elections is significantly less than it would be under a
system in which officials are elected from single-member
districts, as formerly existed.

In addition, our analysis of election returns for county
commissioner and school board elections, as well as other infor-
mation showing a racial consciousness in Tallapoosa County
elections, indicates a pattern of racially polarized voting.
Where such a phenomenon exists under an at-large system, coupled
with a majority vote requirement as it is in Alabama elections,
minorities have little chance of electing a candidate of their
choice or significantly influencing the outcome of elections.

cc:   Public File

- 2 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)).  Changes in voting procedures, such as the instant one, have the prohibited effect if they result in a retrogression of black voting strength.  See Beer v. United States, 425 U.S. 130 (1976).  Because the court in Reynolds v. Gallion, 308 F. Supp. 803 (M.D. Ala. 1969), declared the pre-1970 districts to be uncon- stitutional under the Fourteenth Amendment, the benchmark for measuring retrogression in this situation would be a "properly apportioned single-member district [plan]."  Wilkes County, Georgia v. United States, 450 F. Supp. 1171, 1178 (D. D.C. 1978).  When so viewed, the at-large method of election does not "fairly [reflect] the strength of black voting power as it exists."  Mississippi v. United States, 490 F. Supp. 569, 581 (D. D.C. 1979).  Our analysis reveals that a fairly drawn single-member district plan would result in at least one district in which blacks would have substantially more influence in electing a candidate of their choice than under the at-large system.

In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the county has sustained its burden of showing the absence of the proscribed purpose and effect.  Therefore, on behalf of the Attorney General, I must object to the at-large method of electing county commis- sioners in Tallapoosa County.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the at-large method of election legally unenforceable.  28 C.F.R. 51.9.

- 3 -

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action Tallapoosa County plans to take with respect to this matter.  If you have any questions, feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**Civil Rights Division**

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

FEB 17 1984

David F. Steele, Esq.
Hare and Hare
P. O. Box 833
Monroeville, Alabama  36461

Dear Mr. Steele:

        This is in reference to the 1970 change in the method of
electing members of the county commission from four single-member
districts to at-large election from double-member residency
wards in Monroe County, Alabama, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c.  We received the information to
complete your submission on December 19, 1983.

        We have considered carefully the information you have
provided along with that provided by other interested parties
and relevant Census data.  At the outset, we note that under
both the 1970 and 1980 Censuses, blacks constituted more than
42 percent of the population of Monroe County; yet no black has
ever been successful in winning a seat on the council.  On the
other hand, our analysis indicates that blacks are concentrated
in the northern part of the county and appear to have constituted
a significant majority in two of the four previously existing
single-member districts.  While we are aware that that plan was
declared to be malapportioned and thus unconstitutional under
the Fourteenth Amendment in Bowden v. Stacey, 309 F. Supp. 510
(S.D. Ala. 1970), our analysis also shows that, under a fairly
drawn single-member district plan using 1980 Census data, blacks
likely would still constitute significant majorities in two of
the four districts.

        Under Section 5 of the Voting Rights Act, the submit-
ting authority has the burden of showing that a submitted
change has no discriminatory purpose or effect.  See Georgia v.
United States, 411 U.S. 526 (1973); see also the Procedures for
the Administration of Section 5 (28 C.F.R. 51.39(e)).  Under
Beer v. United States, 425 U.S. 130 (1976), the absence of
such an effect is shown only when it is demonstrated that there
has been no retrogression in the political strength that the
minority group has already attained.  In the context of racially

- 2 -

polarized voting which appears to exist in the county, and
the considerations discussed above, I cannot conclude, as I
must under the Voting Rights Act, that the county's burden
has been sustained in this instance.  Therefore, on behalf of
the Attorney General, I must object to the change from single-
member districts to the at-large election of members of the
Monroe County Commission.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judgment
from the United States District Court for the District of
Columbia that this change has neither the purpose nor will
have the effect of denying or abridging the right to vote on
account of race or color.  In addition, Section 51.44 of the
guidelines permits you to request that the Attorney General
reconsider the objection.  However, until the objection is
withdrawn or a judgment from the District of Columbia Court
is obtained, the effect of the objection by the Attorney General
is to make the change to at-large elections in Monroe County
legally unenforceable.  28 C.F.R. 51.9.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action Monroe County plans to take with respect to
this matter.  If you have any questions, feel free to call
Carl W. Gabel (202-724-8388), Director of the Section 5 Unit
of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

March 26, 1984

J. Thomas King, Esq.
Adamsville City Attorney
9131 Parkway East
Birmingham, Alabama  35206

Dear Mr. King:

This refers to the fifty-eight annexations to, and the deannexation from, the City of Adamsville in Jefferson County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received the information to complete your submission on January 26, 1984.

To determine that a change in the composition of the city's population resulting from these annexations and the deannexation does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, the Attorney General must be satisfied either that the black population percentage has not been reduced appreciably and that voting is not racially polarized or that, nevertheless, the city's electoral system will afford black citizens representation reasonably equivalent to their political strength in the enlarged community.  See City of Richmond v. United States, 422 U.S. 358 (1975), and City of Rome v. United States, 466 U.S. 156 (1980).  See also the Procedures for the Administration of Section 5 (28 C.F.R. 51.12(e)).

We have considered carefully the information you have provided, as well as comments and information provided by other interested parties.  Our analysis shows that those annexations occurring in 1980 and earlier years, as well as the deannexation, do not have a significant effect on minority voting

-2-

strength.  Accordingly, the Attorney General does not inter-
pose any objections to those changes.  However, we feel a
responsibility to point out that Section 5 of the Voting Rights
Act expressly provides that the failure of the Attorney General
to object does not bar any subsequent judicial action to enjoin
the enforcement of such changes.  28 C.F.R. 51.48.

On the other hand, the 1981 and 1982 annexations virtually
doubled the population of the city by adding 2,439 whites but
only seven blacks.  This has resulted in a 13.7 percent reduction
in the voting strength of the black community, a reduction
which, in the context of the city's at-large and numbered post
election system, constitutes a retrogression in the voting
strength of the minority community.  See City of Rome v. United
States, supra.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
no discriminatory purpose or effect.  See Georgia v. United
States, 411 U.S. 526 (1973), and 28 C.F.R. 51.39(e).  In view
of the circumstances discussed above, I am unable to conclude,
as I must under Section 5, that that burden has been sustained
with respect to the post-1980 annexations.  Accordingly, I
must, on behalf of the Attorney General, interpose an objection
to the 1981 and 1982 annexations.  However, should the City of
Adamsville adopt an electoral system that would afford black
voters a fair opportunity to realize their voting strength in
the enlarged city, the Attorney General would reconsider the
objection.  Our analysis has shown that the adoption of a
fairly drawn single-member district plan likely would afford
black voters such an opportunity.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the effect
of denying or abridging the right to vote on account of race or
color.  In addition, Section 51.44 of the guidelines permits
you to request that the Attorney General reconsider the objection.
However, until the objection is withdrawn or a judgment from
the District of Columbia Court is obtained, the effect of the
objection by the Attorney General is to make the 1981 and 1982
annexations legally unenforceable.  28 C.F.R. 51.9.

- 3 -

      To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of
the course of action the City of Adamsville plans to take
with respect to this matter.  If you have any questions,
feel free to call Carl W. Gabel (202-724-8388), Director of
the Section 5 Unit of the Voting Section.

                Sincerely,

                Wm. Bradford Reynolds
             Assistant Attorney General
              Civil Rights Division


cc:  Ms. Leslie Satterwhite
     City Clerk



**U.S. Department of Justice**

_Washington, D.C. 20530_

JUL 27 1984

J. Thomas King, Esq.
King, King & King
9131 Parkway East
Birmingham, Alabama  35206

Dear Mr. King:

This refers to the change in the method of election
from at large to single-member districts; the districting
plan; the establishment of five polling places; Act No. 84-
740 (H.B. 25), which amends Sections 11-43-2 and 11-43-80,
Code of Alabama 1975, to provide that the six-month deadline
for establishing wards prior to an election be waived to comply
with the Voting Rights Act; and the postponement of the July
10, 1984, election for the City of Adamsville in Jefferson
County, Alabama, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c.  We received your submission on July 3, 1984;
supplemental information was received on July 17, 1984.

The Attorney General does not interpose any objections
to the changes in question.  However, we feel a responsibility
to point out that Section 5 of the Voting Rights Act expressly
provides that the failure of the Attorney General to object
does not bar any subsequent judicial action to enjoin the
enforcement of such changes.  In addition, as authorized by
Section 5, the Attorney General reserves the right to reexamine
this submission if additional information that would otherwise
require an objection comes to his attention during the remainder
of the sixty-day review period.  See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.42 and 51.48).

The City of Adamsville has also requested that the
Attorney General reconsider his March 26, 1984, objection under
Section 5 to the 1981 and 1982 annexations.  In this regard,
we note that the redistricting plan and related changes con-
tained in your submission of July 3, 1984, now provide a method

-2-

election which affords the black population "representation reasonably equivalent to their political strength in the enlarged community." <u>City of Richmond v. United States</u>, 422 U.S. 358, 370 (1975).  As such, these recently submitted changes provide the basis for the withdrawal of the objection to the 1981 and 1982 annexations.  Thus, pursuant to the reconsideration guidelines (28 C.F.R. 51.47), the objection interposed to these annexations to the City of Adamsville is hereby withdrawn.  However, we feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such changes.  28 C.F.R. 51.48.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

By:

Gerald W. Jones
Chief, Voting Section

cc:  Honorable Leand C. Adams, Jr.
     Mayor

cc:  Mr. O. L. Salterwhite
     City Clerk



**Civil Rights Division**

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

**2 0 APR 1984**

Philip Henry Pitts, Esq.
Pitts, Pitts & Thompson
P. O. Drawer 537
Selma, Alabama    36701

Dear Mr. Pitts:

     This refers to the redistricting of councilmanic
wards (Ordinance No. 83-05) for the City of Selma in Dallas
County, Alabama, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c.  We received the information to complete
your submission on April 4, 1984.  In accordance with your
request, expedited consideration has been given this submis-
sion pursuant to the Procedures for the Administration of
Section 5 (28 C.F.R. 51.32).

     We have reviewed carefully the information you have
provided along with that provided by interested third parties.
According to 1980 Census data, blacks constitute 52.6 percent
of the city's population and 48.5 percent of the city's voting
age population.  It is conceded that racially polarized voting
prevails in Selma elections.

     Under the interim single-member district plan, black
citizens represent significant majorities in five of the
ten districts and, in fact, appear to have elected representa-
tives of their choice in each of those five districts, thus
filling five of the eleven council seats.  Under the proposed
plan black voters would constitute a majority in two of the
five double-member wards and thus would have a realistic
prospect of electing candidates of their choice to only four
of the eleven seats.

     Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
no discriminatory purpose or effect.  See Georgia v. United
States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.39(e).  A

-2-

prohibited "effect" is one that leads to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.  See Beer v. United States, 425 U.S. 130 (1975).  Usually, such a determination is made on a comparison of the proposed plan with the "existing" plan.  Here, however, the only lawful plan in existence is the court-ordered, interim plan that temporarily permits a ten single-member district configuration that cannot be legislatively continued under the city charter.  In such circumstances, we cannot turn to the court-ordered plan as the benchmark for purposes of the retrogression analysis but must view the proposal in light of what reasonably can be regarded as a "fairly drawn" plan that is fully responsive to minority voting interests in the community.  See Wilkes Cty., Ga. v. United States, 450 F. Supp. 1171 (D. D.C. 1978), aff'd, 439 U.S. 999 (1978).

Application of that standard here provides no clear-cut answers.  Because the city charter demands five two-member districts, and given the racial housing patterns, bloc voting, and the demographics of Selma, there appears to be little practical chance of developing a configuration that will allow blacks and whites each to control five of the council's district seats.  Given that reality, a "fairly drawn" plan might well be one that has two majority-white districts, two majority-black districts, and a fifth district that reflects as nearly as possible the city's voting age population.  Whether such a redistricting would result in an even split of the district seats along racial lines, or favor one or the other race (6-4) would, of course, be irrelevant to the analysis, since the standard under the Voting Rights Act is, in these circumstances, a "fairly drawn" plan, not racially proportional representation.

The difficulty with the city's instant submission is that there appears to have been no real effort to develop the five districts in the manner outlined above.  While two districts are majority white and another two are majority black, District 3 does not accurately reflect citywide voting age population.  An alternative plan that was rejected by the council does a better job in this regard, although it, too, might require some additional modification to satisfy the Section 5 standard.

-3-

In light of the above considerations, I am unable to conclude that the city has met its burden of showing that the submitted plan is free of discriminatory effect. In addition, there is some suggestion that the council's selection of this proposed redistricting may not have been wholly without a prohibited purpose. Therefore, on behalf of the Attorney General, I must object to the proposed redistricting of councilmanic wards for the City of Selma, Alabama.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the proposed redistricting legally unenforceable. 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Selma plans to take with respect to this matter. If you have any questions, feel free to call Sandra S. Coleman (202-724-6718), Deputy Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General                    Washington, D.C. 20530

Honorable Charles A. Graddick                    **18 JUN 1984**
Attorney General
250 Administrative Building
64 North Union Street
Montgomery, Alabama  36130

Dear Mr. Attorney General:

This refers to Act No. 376, H.B. No. 1040 (1975),
and Act No. 507, H.B. No. 830 (1983), which create and
specify the methods by which elected officials appoint
members of the racing commission in Greene County, Alabama,
submitted to the Attorney General pursuant to Section 5 of
the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received your submissions on April 19, 1984.

The Attorney General does not interpose any objection
to the change embodied in Act No. 376 (1975).  However, we
feel a responsibility to point out that Section 5 of the
Voting Rights Act expressly provides that the failure of
the Attorney General to object does not bar any subsequent
judicial action to enjoin the enforcement of such change.
See the Procedures for the Administration of Section 5
(28 C.F.R. 51.48).

We have carefully considered the information you
have provided concerning Act No. 507 (1983), as well as
Census data and information provided by other interested
parties.  According to the 1980 Census, Greene County is
78-percent black.  We note that, as a result of the latest
reapportionment of the Alabama representative and senatorial
districts in 1983 (Act No. 83-154), a unified Greene County
has elected two blacks as its local delegation.  Prior to
that election, a divided Greene County had been represented
by an all-white local delegation.  We note further that
Act No. 507 (1983) was proposed and first advertised in the
Greene County Democrat, a local newspaper, on April 14, 1983,
three days after the court in Burton v. Hobbie, 561 F. Supp.
1029 (D. Ala. 1983), confirmed its order requiring the
special elections which brought the black representatives
into office.

- 2 -

Our analysis shows that Act No. 507 (1983) removes
the authority to appoint county racing commission members
from the county's legislative delegation and places it with
the governor.  Thus, as the result of Act No. 507, the local
delegation from Greene County, now consisting of two blacks,
has lost its authority to appoint the members of the Greene
County racing commission.

The question of whether a change in the powers of
elected officials is a change subject to the preclearance
provisions of Section 5 is one which has been addressed and
resolved by the United States District Court for the District
of Columbia in Horry County v. United States, 449 F. Supp. 990
(1978).  That court, in concluding that a change such as that
embodied in Act No. 507 (1983) is subject to the preclearance
provisions of the 1965 Act, stated (449 F. Supp. at 995):

> An alternate reason for subjecting the
> new method of selecting the Horry County
> governing body to Section 5 preclearance
> is that the change involved reallocates
> governmental powers among elected offi-
> cials voted upon by different constituen-
> cies.  Such changes necessarily affect
> the voting rights of the citizens of
> Horry County, and must be subjected to
> Section 5 requirements. Cf. Perkins v.
> Matthews, supra; Allen v. State Board of
> Elections, supra.

Under Section 5 of the Voting Rights Act the submit-
ting authority has the burden of showing that the submitted
change has no discriminatory purpose or effect.  See Georgia v.
United States, 411 U.S. 526 (1983); see also 28 C.F.R. 51.39(e).
Our analysis shows that the change will have the proscribed
effect because it is retrogressive with respect to minority
voting strength within the constituency of the electorate
which will elect the appointing authority after the change as
compared to the minority strength in the constituency which
would elect the appointing authority absent the change. Beer v.
United States, 425 U.S. 130 (1976).  In addition, the facts

- 3 -

surrounding the enactment of Act No. 507 (1983) strongly suggest that it was enacted with the purpose of reducing the voting strength of the black electorate in Greene County with regard to this particular governmental function previously exercised by the delegation to the state legislature.

In light of the circumstances discussed above, I am unable to conclude that the State has met its burden of showing that the change is free of the prohibited racial purpose or effect. Accordingly, on behalf of the Attorney General, I must object to the provision in Act No. 507, H.B. No. 830 (1983), which changes the method of appointing the members of the county racing commission.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the implementation of Act No. 507 (1983) legally unenforceable. 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the State of Alabama plans to take with respect to this matter. If you have any questions, feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

**Civil Rights Division**

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

August 21, 1984

Michael D. Smith, Esq.
Hall, Clark & Smith
P. O. Box 790
Eutaw, Alabama  35462

Dear Mr. Smith:

This refers to the change in the method of electing
councilmembers from at-large to single-member districts,
the districting plan, and the additional polling place for the
City of Eutaw in Greene County, Alabama, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c. We received your initial
submission on June 3, 1984; supplemental information was received
on June 18 and 22, 1984.

We have carefully considered the information you have
provided, as well as that provided by other interested parties,
and information available from the Bureau of the Census. The
Attorney General does not interpose any objection to the change
from at-large elections to election from five single-member
districts or to the additional polling place for the City of
Eutaw. However, we feel a responsibility to point out that
Section 5 of the Voting Rights Act expressly provides that the
failure of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement of such
changes. See the Procedures for the Administration of Section 5
(28 C.F.R. 51.48).

In considering the districting plan, we note that,
according to the 1980 Census, blacks constitute 53.7 percent
of the city's population. However, on the basis of informa-
tion coming to our attention subsequent to your submission
and confirmed by statements made during your visit on June 22,
1984, blacks constitute approximately 92.3 percent of the
population in District No. 1 and approximately 100 percent of
the population in District No. 2. As a result of these
configurations, proposed District No. 3 is 27.7 percent black
instead of 54.1 percent as indicated by your submission. Al-
though we have contacted you repeatedly to confirm or clarify

- 2 -

the statistics that appear to result from our information, the city has failed to provide accurate information in support of the submitted plan or, in the alternative, to redefine the district boundaries so as more nearly to conform minority voting strength to the levels portrayed in your submission.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.39(e).  In failing to provide the Attorney General with the information necessary for the proper evaluation of this change, you have failed to sustain your burden of proof.  Therefore, on behalf of the Attorney General, I must object to the implementation of the proposed districting plan for the City of Eutaw.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the implementation of the proposed districting plan legally unenforceable.  28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Eutaw plans to take with respect to this matter.  If you have any questions, feel free to call Sandra S. Coleman (202-724-6718), Deputy Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

DEC 11 1984

Lynda K. Oswald, Esq.
Assistant Attorney General
250 Administrative Building
64 North Union Street
Montgomery, Alabama  36130-1601

Dear Ms. Oswald:

This refers to Act No. 84-734 which provides for a
purge and reidentification of voters in Baldwin County, Alabama,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received the information to complete your submission on
October 12, 1984.

We have reviewed carefully the information you have
provided to us, as well as comments and information received
from other parties.  At the outset, we note that, while the
concept of voter reidentification is not, per se, racially
discriminatory, Congress has cautioned us to grant close scru-
tiny to "reregistration procedures not shown to be necessary
and administered in ways that make it difficult for blacks to
register."  S. Rep. No. 97-417, 97th Cong., 2d Sess., 14 n.22.
Thus, in reviewing Section 5 submissions of voter reidentifi-
cation programs, we have examined the reasons underlying the
program, and have paid particular attention to the procedures
which are established to carry out the reidentification.  In
that regard, we have found in other Alabama counties that the
potential discriminatory impact of reidentification can be
avoided by allowing a substantial period of time for reiden-
tification (e.g., Sumter and Perry Counties allowed more than
one year); by giving substantial publicity to the requirement
of, and procedure for, reidentification; by utilizing deputy
registrars and reidentifying voters at the place at which they
vote; by allowing reidentification by mail; by providing

-2-

reidentification opportunities during evening hours or on weekends; and by allowing voters the opportunity to reidentify at the polling place on election day.

We find that the reidentification proposed by Baldwin County contains few of these kind of safeguards to assure that the program does not impose an unnecessary burden on voters in general and on black voters in particular. The program was designed to be completed within only a three-month period, little publicity was built into it, deputy registrars are not intended to be utilized in it, and it appears that even those voters who voted as recently as in the November 6, 1984, election would be required to make a special appearance at the office of the probate judge to reidentify. In addition to these readily perceived deficiencies, we have been advised by the chair of the Baldwin County Board of Registrars that as of December 7, 1984, the county had not finalized its plans for implementing the reidentification process because of the press of other business. Thus, while the submitted statute requires the probate judge to visit each precinct between October 1, 1984, and December 31, 1984, to reidentify voters, no such visits have taken place and none have been planned.

In these circumstances it would appear that implementation of the reidentification procedures prescribed by the submitted statute will have an adverse impact on all voters of Baldwin County. However, black voters, who have suffered from a long history of racial discrimination in the electoral process in Alabama, may be particularly affected by the reidentification process and the resulting voter purge.

Under Section 5 of the Voting Rights Act the submitting authority has the burden of showing that the submitted change has neither the purpose nor will have the effect of denying the right to vote on account of race or color. Georgia v. United States, 411 U.S. 526, 538-539 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)). On the basis of the facts before us we cannot conclude that the state has satisfied its burden in this instance. Therefore, on behalf of the Attorney General, I must interpose an objection to the implementation of Act No. 84-734.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of

-3-

Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the purge and reidentification of voters in Baldwin County as mandated by Act No. 84-734 legally unenforceable. 28 C.F.R. 51.9.

Although I am compelled to enter this objection, we note that the county is not precluded from continuing to purge voters pursuant to preexisting and precleared provisions of Alabama law.  If implementation of such purge provisions is deemed to be inadequate, however, we are willing to give further consideration to this matter should the state or county devise a reidentification program to be administered in a manner which does not make it difficult for black citizens to reidentify.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the State of Alabama plans to take with respect to this matter.  If you have any questions, feel free to call Robert S. Berman (202-724-3100), Attorney/Supervisor of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

cc:   Mr. David C. Wood
      Administrator, Baldwin County
         Commission

SW Obj. #2
T. 8/30/85 Re.T. 9/25    Re.T. 10/10
  Re.T. 10/11  Re.T. 10/15
WBR:JKT:CGL:sw:mmw
DJ 166-02-3
D0725
J9603

October 15, 1985

Lynda Knight Oswald, Esq.
Assistant Attorney General
250 Administrative Building
64 North Union Street
Montgomery, Alabama  36130

Richard H. Ramsey, III, Esq.
Houston County Attorney
P. O. Box 1825
Dothan, Alabama  36302

Dear Ms. Oswald and Mr. Ramsey:

        This refers to the permanent adoption of an at-large
election system with numbered positions for the Houston County
Commission and to Act No. 84-571 of the 1984 Alabama Legisla-
ture, prescribing four candidate residency districts and an
at-large chair for the County Commission of Houston County,
Alabama, submitted pursuant to Section 5 of the Voting Rights
Act of 1965, as amended, 42 U.S.C. 1973c.  The submission of
the adoption of an at-large system initially was received on
June 9, 1980; we requested additional information on July 24,
1980.  The submission of Act No. 84-571 was received on
June 29, 1984; additional information was received on July 25
and August 22, 1985, and we received notification that the
information was intended to pertain to both changes on
September 11, 1985.

        To obtain the requested Section 5 preclearance the
submitting authority has the burden of showing that the submitted
voting changes do not have the purpose and will not have the
effect of denying or abridging the right to vote on account of
race or color.  See, e.g., Georgia v. United States, 411 U.S.
526 (1973); Beer v. United States, 425 U.S. 130, 141 (1976);
28 C.F.R. 51.39(c).

- 2 -

In carrying out our analysis, we have given careful consideration to the materials you have submitted, as well as information and comments from other interested parties.  We note that over 22 percent of Houston County's population is black and that black citizens began to register to vote in substantial numbers shortly before the county decided to adopt the at-large election structure.  Under the at-large structure no black candidate has been elected to the county commission and a strong pattern of racial bloc voting in local contests seems to exist.  At the same time, the county's black population is highly concentrated, so that under a neutrally apportioned single-member district election plan it is likely that in one district black citizens would constitute a substantial majority of the population.

Under these circumstances, the at-large system, whether with numbered positions as originally implemented, or with candidate residency requirements, as provided for in Act No. 84-571, does not offer black voters an opportunity to participate in the electoral process comparable to that which would be afforded if the county were to utilize a neutrally apportioned single-member district election system.

In addition, the information submitted reveals that both the county's determination to use the at-large system on a permanent basis and the adoption of the 1984 provision for candidate residency districts occurred with no opportunity for effective black participation.  We also understand that the 1984 enactment actually resulted from an aborted effort to return to a single-member district election plan which, for unexplained reasons, was converted to an at-large election plan during the legislative process.

- 3 -

In light of the considerations discussed above I cannot conclude that the Section 5 burden has been sustained in this instance. Accordingly, I must, on behalf of the Attorney General, object to the permanent adoption of the at-large election system with numbered positions, and to Act No. 84-571 which continues at-large elections with four candidate residency districts.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the changes in the method of election legally unenforceable. 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action Houston County and the State of Alabama plans to take with respect to this matter. If you have any questions, feel free to call Sandra S. Coleman (202-724-6718), Director of the Section 5 Unit of the Voting Section.

Sincerely,


Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

October 21, 1985

Honorable John C. Jay, Jr.
Mayor
P. O. Drawer 1
Greensboro, Alabama  36744-0573

Dear Mayor Jay:

This refers to the January 22, 1985, deannexation from the City of Greensboro in Hale County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received the information to complete your submission on August 21, 1985.

We have considered carefully the materials you have submitted, as well as information and comments from other interested parties.  Information available to us indicates that there is a long history of discrimination against black citizens in Greensboro, that racial bloc voting in local elections exists, and that there is an absence of black elected officials in the municipality.  With respect to the instant change, we note that the city voted to deannex the property shortly after it became known that subsidized public housing would be built on the property and that there was a strong perception in both the white and black communities that such housing would be occupied largely or exclusively by black persons, most of whom likely would come from other areas within the city.  At the same time, we note the city's contemporaneous refusal to change its electoral system so as to allow greater opportunities for effective black participation in the city's electoral process.

These circumstances suggest that the deannexation involved here likely would result in the ultimate removal of a significant number of potential black voters from the city.  Moreover, the city's decision apparently was made in direct response to resistance on the part of white voters to having

- 2 -

the area rezoned for subsidized public housing and such
racially motivated action is unacceptable.  You have not
provided additional information which might establish a
nonracial basis for the city's actions.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change
has no discriminatory purpose or effect.  See Georgia v.
United States, 411 U.S. 526 (1973); see also the Procedures
for the Administration of Section 5 (28 C.F.R. 51.39(e)).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that that
burden has been sustained in this instance.  Therefore, on
behalf of the Attorney General, I must object to the deannex-
ation.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judgment
from the United States District Court for the District of
Columbia that this change has neither the purpose nor will
have the effect of denying or abridging the right to vote on
account of race or color.  In addition, Section 51.44 of the
guidelines permits you to request that the Attorney General
reconsider the objection.  However, until the objection is
withdrawn or a judgment from the District of Columbia Court
is obtained, the effect of the objection by the Attorney
General is to make the deannexation legally unenforceable as
it would affect the voting rights of persons anticipated to
become residents of that area.  28 C.F.R. 51.9.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action the City of Greensboro plans to take with
respect to this matter.  If you have any questions, feel free
to call John K. Tanner (202-724-8388), Attorney-Reviewer of
the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    Washington, D.C. 20530

February 10, 1986

Cartledge W. Blackwell, Jr., Esq.
Hugh A. Lloyd, Esq.
Blackwell & Keith
P. O. Box 592
Selma, Alabama  36702

Dear Messrs. Blackwell and Lloyd:

This refers to the increase in the number of members
from five to six, the election of members from five single-
member districts with one at-large position, and the districting
plan for the county commission and the county board of
education in Marengo County, Alabama, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of
1965, as amended, 42 U.S.C. 1973c.  We received your initial
submission on January 13, 1986; supplemental information was
received on January 22, 1986.

We have considered carefully the information you have
provided, as well as comments and information from other
sources and interested parties.  We recognize, of course,
that the submitted voting changes had their genesis in findings
and conclusions by federal courts that the existing at-large
election structure is violative of Section 2 of the Voting
Rights Act, 42 U.S.C. 1973, in that it denies black citizens
an opportunity equal to that afforded white citizens to
participate in the political process and to elect candidates
of their choice to office.  United States v. Marengo County
Commission, 731 F.2d 1546 (11th Cir. 1984), on remand, Civ.
Nos. 78-455-H and 78-474-H (S.D. Ala. Sept. 5, 1985).  In
order to obtain preclearance pursuant to Section 5, the
county must demonstrate that the submitted voting changes
"[do] not have the purpose and will not have the effect of
denying or abridging the right to vote on account of race or
color."  42 U.S.C. 1973c.  See also, Georgia v. United States,
411 U.S. 526 (1973); Procedures for the Administration of
Section 5 (28 C.F.R. 51.39(e)).

The submitted voting procedures, when compared to the
at-large election structure, obviously will enhance the

- 2 -

opportunity for effective black political participation and
thus will not have a discriminatory effect within the meaning
of Section 5. Beer v. United States, 425 U.S. 130, 141 (1976).
At the same time, however, "[i]n a case where lines are drawn
to establish discrete electoral units and to distribute
racial ... populations among districts, the ways in which
these lines are drawn may become independent indicia of
discriminatory intent" (Ketchum v. Byrne, 740 F.2d 1398, 1405
(7th Cir. 1984)), and we have received allegations that a
primary purpose of the submitted voting procedures was to
minimize, to the extent possible in light of the established
Section 2 violation, the opportunity for effective political
participation by black citizens.

Information provided by the submitting authority alleges
that the configuration of the proposed single-member districts
results from an effort to balance population and to avoid, to
the extent possible, splitting census enumeration districts.
Our own analysis, however, reveals that the proposed plan
splits 10 of the 25 census enumeration districts within Marengo
County and yet the boundaries of the districts remain contorted.
Moreover the contorted shapes of the districts needlessly frag-
ment black residential concentrations in Demopolis and in the
southern portion of the county, thereby insuring that the
redistricting will not fairly reflect black voting strength.
Cf. Ketchum v. Byrne, supra, 740 F.2d at 1409. Finally, the
proposal insists on retaining an at-large position, notwith-
standing the conclusion that black citizens in Marengo County
do not have a fair opportunity to participate effectively in
the at-large structure (see City of Port Arthur v. United
States, 459 U.S. 157, 168 (1982)).

An alternative plan submitted on behalf of black
citizens for the county's consideration contained more compact
districts, and also demonstrated that it is necessary to
split few, if any, census enumeration districts to obtain
population equality.  That plan, which projected a substantial
black voting age majority in two districts and a slight black
voting age majority in another district, apparently received
little consideration from county officials.  In that regard,
we are aware that black citizens of the county repeatedly
have requested the opportunity for input in the plan-drawing
process but the submitted plan was devised without input from
representatives of the black community.  .

In these circumstances, the county has not shown and
I cannot conclude that the submitted voting procedures were
devised without the purpose of denying or abridging the right

- 3 -

to vote on account of race.  See, e.g., Busbee v. Smith,
549 F. Supp. 494 (D. D.C. 1982), aff'd, 459 U.S. 1166 (1983).
Therefore, on behalf of the Attorney General, I must object
to the changes submitted.

Of course, as provided by Section 5 of the Voting
Rights Act, you have the right to seek a declaratory judgment
from the United States District Court for the District of
Columbia that these changes have neither the purpose nor will
have the effect of denying or abridging the right to vote on
account of race or color.  In addition, Section 51.44 of the
guidelines permits you to request that the Attorney General
reconsider the objection.  However, until the objection is
withdrawn or a judgment from the District of Columbia Court
is obtained, the effect of the objection by the Attorney
General is to make the increase in the number of members
and the submitted election and districting plan for the
Marengo County Commission and Board of Education legally
unenforceable.  28 C.F.R. 51.9.

In view of the pending vote dilution litigation, we
are forwarding a copy of this letter to the Honorable W. B.
Hand.  If you have any questions, feel free to call Sandra S.
Coleman (202-724-6718), Director of the Section 5 Unit of the
Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

June 2, 1986


Cartledge E. Blackwell, Jr., Esq.
Blackwell and Keith
P. O. Box 592
Selma, Alabama    36702

Dear Mr. Blackwell:

        This refers to the election of members from four
single-member districts and the districting plan for the
county commission in Dallas County, Alabama, submitted
to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received your submission on April 1, 1986.

        We have considered carefully the information you
have provided, as well as comments and information from
other sources and interested parties.  We are aware, of
course, that the submitted voting changes were developed
in response to the order of the federal district court
which found that the county's existing at-large structure
for electing county commissioners violates Section 2 of
the Voting Rights Act, as amended.  In order to obtain
preclearance pursuant to Section 5, the county must demon-
strate that the submitted voting changes "[do] not have
the purpose and will not have the effect of denying or
abridging the right to vote on account of race or color."
42 U.S.C. 1973c.  See also _Georgia_ v. _United States_,
411 U.S. 526 (1973); Procedures for the Administration of
Section 5 (28 C.F.R. 51.39(e)).

        The submitted plan changes the method of electing
the four commissioners from an at-large election system
with residency districts to a single-member district system.
This plan, when compared to the existing at-large election
system, will enhance the opportunity for black political
participation, and therefore is not retrogressive within
the meaning of Section 5.  _Beer_ v. _United States_, 425 U.S.
130, 141 (1976).  The county must, however, also demonstrate
the absence of discriminatory purpose in the enactment of

- 2 -

the proposed election plan.  City of Richmond v. United
States 422 U.S. 358, 378-379 (1975); see also Busbee v.
Smith, 549 F. Supp. 494 (D. D.C. 1982), aff'd, 459 U.S.
1166 (1983).

At the outset, we note that the county commission
did not present the proposed districting plan for public
consideration and comment, but limited public hearings to
general redistricting considerations.  The black community
thus had no input into or opportunity to comment on this
proposed plan prior to its adoption by the commission.

In addition, as we earlier advised you, the proposed
plan fragments the black community in the Craig Field area
by splitting the existing precinct (5-1) and placing the
boundary line for Districts 1 and 4 between two predominantly
black low-income housing projects.  We have received allega-
tions that this fragmentation was designed to aid the white
incumbent in that area by excluding from District 1 an
announced black candidate, who resides at Craig Field, along
with a sizeable, politically active, black population concen-.
tration that has developed there since the compilation of the
1980 Census.  No nonracial explanation for the seemingly
illogical exclusion of this area from District 1 has been
offered.  While efforts to protect incumbency do not conclus-
ively evidence discriminatory purpose, the circumstances here
suggest that the county commission's actions were motivated,
at least in significant part, by racial considerations.
See, e.g., Ketchum v.  Byrne, 740 F.2d 1398, 1405 (7th Cir.
1984).

For these reasons, I cannot conclude that the county
has met its burden of showing that the submitted election plan
was not enacted with the intent to deny or abridge the right
to vote of black citizens of Dallas County.  Accordingly, on
behalf of the Attorney General, I must interpose an objection
to the plan.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the effect
of denying or abridging the right to vote on account of race or
color.  In addition, Section 51.44 of the guidelines permits
you to request that the Attorney General reconsider the objec-
tion.  However, until the objection is withdrawn or a judgment

- 3 -

from the District of Columbia Court is obtained, the effect
of the objection by the Attorney General is to make the
election of members of the Dallas County Commission from
four single-member districts as proposed in the submitted
districting plan legally unenforceable.  28 C.F.R. 51.9.

In view of the pending litigation, we are forwarding a
copy of this letter to the Honorable W. B. Hand.  If you have
any questions, feel free to call Steven H. Rosenbaum (202-
724-6718), Acting Director of the Section 5 Unit of the
Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

AUG 1    1986

Cartledge W. Blackwell, Jr., Esq.
Blackwell and Keith
P. O. Box 592
Selma, Alabama  36702

Dear Mr. Blackwell:

This refers to your request that the Attorney General reconsider the June 2, 1986, objection under Section 5 of the Voting Rights Act of 1965, as amended, to the districting plan adopted by the county for the election of the county commission in Dallas County, Alabama. We received your letter on June 23, 1986.

We have reviewed carefully all of the information and arguments provided by you, as well as information received from other interested parties and that obtained through observations made by our own staff. We remain unpersuaded, however, that the submitted districting plan is entitled to preclearance.

At the outset, we note that the arguments set forth in your letter are not materially different from those provided previously. We pointed out in our objection that your proposal unnecessarily fragmented the black community at Craig Field by splitting the existing precinct (5-1)--thereby fracturing the black residential concentration in that area between Districts 1 and 4. While you have asserted in your reconsideration request that the black community residing in the Craig Field/NBF Homes area is not significant either in population or in its concentration and contiguity, the geographic and demographic information before us belies such an assertion. Nor did we find any support for your position among those persons who reside in the area.

-2-

Even more disturbing with regard to the proposed
plan were assertions that a central purpose for the boundary
between Districts 1 and 4 was the protection of a white
incumbent from the prospect of running against a viable,
competitive black candidate in circumstances where the
black candidate would have had a realistic opportunity to
win. While other explanations were offered on reconsideration,
the county failed to meet its burden of showing that the
incumbency considerations were not in fact intertwined
with racial motivations. Where, as here, the county has
implicated a racially discriminatory purpose in the
districting process, we cannot grant Section 5 preclearance
to the proposed election plan. Accordingly, the considerations
leading to the June 2, 1986 objection remain and, on
behalf of the Attorney General, I must decline to withdraw
the objection.

Of course, as noted in our earlier letter, Section 5
permits you to seek a declaratory judgment from the United
States District Court for the District of Columbia that
these changes have neither the purpose nor will have the
effect of denying or abridging the right to vote on
account of race or color, irrespective of whether an
objection has been interposed by the Attorney General.
However, until such a judgment is rendered by that court,
the legal effect of the objection by the Attorney General
is to render the districting plan in question unenforceable.
See also 28 C.F.R. 51.9.

To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action Dallas County plans to take with respect
to this matter. In view of the pending litigation, we
are forwarding a copy of this letter to the Honorable W.B.
Hand. If you have any questions, feel free to call Sandra S.
Coleman (202-724-6719), Director of the Section 5 Unit of
the Voting Section.

Sincerely,


Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

OCT 6 1986

Robert A. Wills, Esq.
City Attorney
P. O. Box 547
Bay Minette, Alabama  36507

Dear Mr. Wills:

        This refers to the three annexations (Act No. 85-594,
Act No. 298 (1973), and Act No. 744 (1965)) to the City of Bay
Minette in Baldwin County, Alabama, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c. We received the information to
complete your submissions on August 7, 1986.

        We have considered carefully the information you have
provided along with information and comments received from
other interested parties and relevant Bureau of the Census
data. In reviewing annexations, we are required to analyze
their effect from the perspective of the "most current available
population data." City of Rome v. United States, 446 U.S. 156,
186 (1980). Our analysis of the information received concerning
Bay Minette indicates that almost all of the persons living
within the three annexed areas are white, and from all that we
can determine, it would appear that the annexations decrease the
black population percentage in the city by approximately five
percent. This decrease is significant because it occurs in the
context of a city whose council is chosen through an at-large
election system characterized by racially polarized voting. In
that regard, we note that since 1965 there have been nine black
candidacies for municipal office but none have been successful.

- 2 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that submitted changes do not have a discriminatory purpose or effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)). Under <u>City of Richmond</u> v. <u>United States</u>, 422 U.S. 358, 371 (1975), annexations that result, as here, in a significant decrease in the minority proportion of a city's population have such an effect and may pass Section 5 muster only if the method utilized for electing the city's governing body "fairly reflects the strength of the minority community as it exists after the annexation." In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the city has carried its burden in this instance. Therefore, on behalf of the Attorney General, I must object to the voting changes occasioned by the three annexations submitted by the City of Bay Minette.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the annexations legally unenforceable insofar as they have an effect on voting in Bay Minette. 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Bay Minette plans to take with respect to this matter. If you have any questions, feel free to call Mark A. Posner (202-724-8388), Attorney/Reviewer in the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

Honorable Charles E. Bailey                    DEC1  1986
Mayor
P. O. Box 552
Alexander City, Alabama  35010

Dear Mayor Bailey:

        This refers to the two annexations (Act No. 208 (1969)
and Act No. 86-21) to the City of Alexander City in Tallapoosa
County, Alabama, submitted to the Attorney General for the
required review pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received the informa-
tion to complete your submissions on October 3, 1986.

        We have considered carefully the information you have
submitted, data from the 1970 and 1980 Censuses, and information
from other interested parties.  At the outset, we note that
black voters have been unable, until 1984, to elect a candidate
of their choice to the city council even though a number of
such candidates have sought council positions over the years.
This appears in substantial part to be the result of a general
pattern of racially polarized voting occurring in the context
of the city's electoral system which is characterized by at-large
voting, numbered posts, and a majority vote requirement.

        Even so, our analysis shows that the 1969 annexation,
adding as it does, only about 210 persons to the city, does
not have a significant effect on minority voting strength,
particularly when viewed against the later annexation precleared
by the Attorney General in 1979 which added some 500 or more
persons, 60 percent of whom were black.  Accordingly, the Attorney
General does not interpose any objection to the voting changes
occasioned by that annexation.  However, we feel a responsibility
to point out that Section 5 of the Voting Rights Act expressly
provides that the failure of the Attorney General to object
does not bar any subsequent judicial action to enjoin the
enforcement of such changes.  See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.48).

-2-

On the other hand, the effect of the 1986 annexation is to reduce the total black population of the city from 27.4 percent to 25.5 percent, a reduction which serves to make it even more difficult for blacks to elect a candidate of their choice and to enhance the ability of the white majority to exclude blacks totally from participation in the governing of the city through membership on the council. Absent an electoral system, not here existent, which fairly reflects the strength of the minority community as it exists after the annexation, such an effect is not permissible under the Voting Rights Act. See Beer v. United States, 425 U.S. 130 (1976); City of Richmond v. United States, 422 U.S. 358, 370 (1975).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.39(e). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the city's burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the 1986 annexation insofar as it affects voting rights.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that none of these changes has either the purpose or will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the annexation accomplished by Act No. 86-21 legally unenforceable with regard to voting. 28 C.F.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Alexander City plans to take with respect to this matter. If you have any questions, feel free to call Ms. Lora Tredway (202-724-8388), attorney reviewer in the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

**Civil Rights Division**

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*


Larry T. Menefee, Esq.                          FEB 3  1987
Blacksher, Menefee & Stein
Fifth Floor Title Building
300 21st Street, North
Birmingham, Alabama  35203

Dear Mr. Menefee:

          This refers to the August 2, 1967, annexation; the two
1971 deannexations (Act No. 58, H.B. No. 450 and Act No. 793,
H.B. No. 1401 (1971)); the two 1972 annexations (Act No. 826,
H.B. No. 1402 and Act No. 303, H.B. No. 231 (1972)); and other
voting changes effected by State Act No. 58 (1971) for the City
of Prichard in Mobile County, Alabama, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c.  We initially received information
relating to your submissions on September 2, 1986; supplemental
information was received on October 8, November 13, November 17,
December 2, and December 5, 1986.

          With regard to the 1967 annexation; the two annexations
accomplished by Act No. 826, H.B. 1402, and Act No. 303, H.B.
No. 231 (1972); and the deannexation accomplished by Act No. 793,
H.B. No. 1401 (1971), the Attorney General does not interpose
any objections.  However, we feel a responsibility to point out
that Section 5 of the Voting Rights Act expressly provides that
the failure of the Attorney General to object does not bar any
subsequent judicial action to enjoin the enforcement of such
changes.  See the Procedures for the Administration of Section 5
(28 C.F.R. 51.48).

          With regard to Act No. 58 and the 1971 deannexation that
resulted from that act, we have been unable to reach the same
conclusions.  In that respect we note that, according to
information provided by you and other interested parties, the
impetus behind this deannexation effort was in large part

- 2 -

racially based and this information remains unrebutted. While an ordinary deannexation completed pursuant to applicable state law which increases the proportion of municipal black voters would not likely run afoul of Section 5 of the Voting Rights Act (even if voters considered the racial composition of the city), that is not all that is involved in these submissions. Act No. 58 was specially designed to restrict participation in the electoral phase of the deannexation to white voters desiring to leave Prichard, thus eliminating participation of the increasingly active black electorate as regularly allowed by Alabama law. This special election procedure has not been demonstrated to be free of racially discriminatory purpose or effect as required by Section 5. Obviously, a deannexation conducted pursuant to a procedure that has not been cleared is itself not entitled to preclearance.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.39(e)). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to State Act No. 58 and the resulting deannexation.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.44 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make State Act No. 58 and the 1971 deannexation legally unenforceable. 28 C.R.R. 51.9.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Prichard plans to take with respect to this matter. If you have any questions, feel free to call Sandra S. Coleman (202/724-6718), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

Ms. Gladys D. Prentice
City Clerk
P. O. Box 126
Leeds, Alabama  35094

MAY 4  1987

Dear Ms. Prentice:

This refers to the 29 annexations (November 5, 1985;
January 14, 1986; Ordinance Nos. 501-510, 512, 516, 517, 522
(1985); 523-529, 533, 535-536, 540, 542, 544 (1986)); the
deannexation (Ordinance No. 539 (1986)); and the procedures for
conducting the November 5, 1985, and January 14, 1986, referendum
elections for the City of Leeds in Jefferson, St. Clair, and
Shelby Counties, Alabama, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as
amended, 42 U.S.C. 1973c.  We received your initial submissions
on February 26, 1987; supplemental information was received on
March 3, 1987.

With regard to the deannexation and the procedures
for conducting the two specified elections, the Attorney General
does not interpose any objections.  However, we feel a responsi-
bility to point out that Section 5 of the Voting Rights Act
expressly provides that the failure of the Attorney General to
object does not bar any subsequent judicial action to enjoin
the enforcement of such changes.  See Section 51.41 of the
Procedures for the Administration of Section 5 (52 Fed. Reg.
496 (1987)).

With regard to the 29 annexations, we have considered
carefully the information you have provided, data from the
1970 and 1980 Censuses, and information from other interested
parties.  At the outset, we note that black voters appear to
support black candidates but have been unable, with one excep-
tion, to elect a candidate of their choice to the city council
even though a number of such candidates have sought council
positions over the years.  This appears in substantial part to
be the result of a general pattern of racially polarized voting
occurring in the context of the city's electoral system which
is characterized by at-large voting, numbered positions, and a

-2-

majority vote requirement.  With regard to the one successful
black candidate, we note that, apparently as a result of that
same bloc voting phenomenon, he was defeated for reelection in
1980 but that he was again successful in the 1984 election
which, we understand, occurred after black residents indicated
that they were considering a court challenge to the city's
at-large election system.  Thus, the success of candidates
preferred by black voters appears to be completely at the
sufferance of the white majority.

The effect of the 29 annexations is to reduce the total
black population of the city from 18.5 to 15.2 percent, a
reduction that serves to make it even more difficult for blacks
to elect a candidate of their choice and to enhance the
ability of the white majority to exclude blacks totally from
participation in the governing of the city through membership
on the council.  Absent an electoral system, not here existent,
which fairly reflects the strength of the minority community as
it exists after the annexations, such an effect is not permissible
under the Voting Rights Act.  See Beer v. United States, 425 U.S.
130 (1976); City of Richmond v. United States, 422 U.S. 358, 370
(1975).

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change
has no discriminatory purpose or effect.  See Georgia v.
United States, 411 U.S. 526 (1973); see also Section 51.52(a)
(52 Fed. Reg. 497-498 (1987)).  In light of the considerations
discussed above, I cannot conclude, as I must under the Voting
Rights Act, that the city's burden has been sustained in this
instance.  Therefore, on behalf of the Attorney General, I must
object to the 29 annexations insofar as they affect voting
rights.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
none of these changes has either the purpose or will have the
effect of denying or abridging the right to vote on account of
race or color.  In addition, Section 51.45 of the guidelines
(52 Fed. Reg. 496-497 (1987)) permits you to request that the
Attorney General reconsider the objection.  However, until the
objection is withdrawn or a judgment from the District of
Columbia Court is obtained, the effect of the objection by the
Attorney General is to make the 29 annexations legally unenforceable
with regard to voting.  See Section 51.10 (52 Fed. Reg. 492 (1987)).

-3-

    To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Leeds plans to take with respect to this matter. If you have any questions, feel free to call Mark A. Posner (202-724-8388), Deputy Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_        _Washington, D.C. 20530_

May 23, 1988

Ms. Gladys D. Prentice
City Clerk
P. O. Box 126
Leeds, Alabama  35094

Dear Ms. Prentice:

This refers to the change in the method of election from at large to single-member districts, the districting plan, and the implementation schedule, adopted pursuant to the consent decree in <u>Dillard</u> v. <u>Crenshaw County</u>, C.A. No. 85-T-1332-N (M.D. Ala.), and the reconsideration of the May 4, 1987, objection to twenty-nine annexations to the City of Leeds in Jefferson, St. Clair, and Shelby Counties, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received your initial submission on March 4, 1988; supplemental information was received on March 24, 1988.

The Attorney General does not interpose any objections to the change in the method of election, the districting plan, or the implementation schedule.  In addition, because the changes being precleared at this time provide a method of election which affords the minority group "representation reasonably equivalent to their political strength in the enlarged community" (<u>City of Richmond</u> v. <u>United States</u>, 422 U.S. 358, 370 (1975)), the objection interposed on May 4, 1987, to twenty-nine annexations to the city is hereby withdrawn.  See the Procedures for the Administration of Section 5 (28 C.F.R. 51.46).  However, we feel a responsibility to point out that Section 5 of the Voting Rights Act expressly provides that the failure of the Attorney General to object does not bar any subsequent judicial action to enjoin the enforcement of such changes.  See also 28 C.F.R. 51.41.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_                    Washington, D.C. 20530

May 5, 1987

George Azar, Esq.
City Attorney
P. O. Box 2028
Montgomery, Alabama  36197-1101

Dear Mr. Azar:

This refers to the January 7, 1965, city council resolu-
tion which establishes a city school system and its governing
board of education for the City of Marion in Perry County,
Alabama, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received your submission on January 5, 1987; supplemental
information was received on March 6, 1987.

We have considered carefully the information you have
provided as well as Census data and information provided by
other interested parties.  We note, at the outset, that prior
to the city council's action by resolution on January 7, 1965,
the Perry County school district operated all public schools in
the county, including those within the City of Marion.  By
virtue of the changes occasioned by the 1965 resolution, the
governance of schools located within the City of Marion was
removed from the county school board and placed under a city
school board.  County school board members were then and still
are elected by the entire county whose population is 60 percent
black.  Members of the city school board are appointed by the
city council, whose members are elected by the city which is
48 percent black.

A review of voting changes that occurs over twenty years
after the fact presents complex issues.  At the time of this
change in 1965, jurisdictions in this part of Alabama were
frequently involved in taking steps to avoid school desegregation
and to delay effective black political participation, and there
are some historical indications that the establishment of the
Marion city school system and the method selected for choosing
its board members were motivated in part by such considerations.

-2-

It is also true, however, that since that time black residents in Marion and Perry County have significantly expanded their participation in local political affairs. In fact, we are advised that there is presently an effort to reconsolidate the city and county school systems to improve efficiency and education that has broad-based support by both black and white groups. Such a restoration would, of course, cure any lingering impact on voting occasioned by the original establishment of the city school system.

Under Section 5 of the Voting Rights Act, submitted changes must be reviewed for racial purpose and effect with the submitting authority having the burden of satisfying the Attorney General that the change--even one this old--is free of discrimination. See Georgia v. United States, 411 U.S. 526 (1973); see also Subpart F of the Procedures for the Admin- istration of Section 5 (52 Fed. Reg. 497-499 (1987)). We note that the recent change to a single-member district method of election for the city council (the selecting authority for the city school board), precleared by the Attorney General on April 29, 1987, incorporates the approach presently available to ameliorate to some degree the present racial effect of the method of choosing city school board members adopted and in use since 1965. Nevertheless, it appears that this method of selecting the school board is still less advantageous to blacks than the county-wide elections it replaced and the allegations of racial purpose in adoption have not been adequately rebutted.

In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that in this instance the city has sustained its burden under Section 5. See City of Richmond v. United States, 422 U.S. 358, 378-79 (1975) (jurisdiction must establish lack of purpose and effect under Section 5). Therefore, on behalf of the Attorney General, I must object to the implementation of the January 7, 1965, resolution creating the separate school district in the City of Marion.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court

-3-

is obtained, the effect of the objection by the Attorney
General is to make further implementation of the city school
system legally unenforceable.  Section 51.10 (52 Fed. Reg.
492 (1987)).

        To enable this Department to meet its responsibility
to enforce the Voting Rights Act, please inform us of the
course of action the City of Marion plans to take with respect
to this matter.  If you have any questions, feel free to call
Ms. Lora Tredway (202-724-8290), Attorney Reviewer of the
Section 5 Unit of the Voting Section.

        Because this matter is in issue in Robinson v. Alabama
State Department of Education, No. 86-T-569N ( M.D. Ala), we
are providing a copy of this letter to the court in that
case.

                        Sincerely,

                        Wm. Bradford Reynolds
                        Assistant Attorney General
                        Civil Rights Division

cc:  Honorable Myron Thompson
     United States District Court Judge



**U.S. Department of Justice**

**Civil Rights Division**

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

June 1, 1987

John E. Pilcher, Esq.
Pilcher & Pilcher
P. O. Box 1346
Selma, Alabama  36702-1346

Dear Mr. Pilcher:

        This refers to the election of board of education members
from five single-member districts and the districting plan for the
board in Dallas County, Alabama, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c.  We received your submission
on March 31, 1987.

        We have considered carefully the information you have
provided, as well as comments and information from other sources
and interested parties.  We are aware, of course, that the
submitted voting changes were developed in response to the order
of the federal district court which found that the board of
education's existing at-large structure for electing board
members violates Section 2 of the Voting Rights Act, as amended.
In that context, we find nothing to suggest that the adoption
of the single-member district method of election was driven by
any racially discriminatory purpose and, if fairly implemented,
that method of election would enhance the potential for blacks
to participate equally in the electoral process.  Consequently,
the Attorney General does not interpose any objection to the
change in the method of election.  However, we feel a responsibility
to point out that Section 5 of the Voting Rights Act expressly
provides that the failure of the Attorney General to object
does not bar any subsequent judicial action to enjoin the
enforcement of such change.  See Section 51.41 of the Procedures
for the Administration of Section 5 (52 Fed. Reg. 496 (1987)).

        With regard to the districting plan adopted by the board
to implement the changed method of election, we do not reach a
similar conclusion.  At the outset, we note that the board of
education held several hearings at which blacks were allowed
to express their concerns to the board regarding the proposed
districting plan.  Unfortunately, these hearings appear to have
served no purpose, since we understand that the districting
plan was adopted as initially proposed with no apparent
consideration or accommodation being given to the comments made

-2-

by blacks in attendance.  Indeed, our information is that the
demographer who drafted the plan was not even informed of the
suggestions raised by black residents of the school district.
Yet, as we understand it, the board was not only aware of these
concerns but, in light of them, agreed repeatedly at the hearings
that a fair five-district plan should provide for two predominantly
black districts and a third constituting an effective swing
district.  In spite of this, the plan submitted by the board
overly concentrates blacks into District 4 and fragments the
remaining black population in Selma between Districts 2 and 5
resulting in a plan that minimizes the opportunity for blacks
to participate equally in the electoral process.  Even so, you
have declined to provide any nonracial justification for the
submitted configuration.

Finally, we understand that these districts were drawn
to protect incumbent board members.  While efforts to protect
incumbency do not, <u>per se</u>, evidence discriminatory purpose, the
circumstances here suggest that the county school district's
actions were motivated, at least in significant part, by racial
considerations.  See, <u>e.g.</u>, <u>Ketchum</u> v. <u>Byrne</u>, 740 F.2d 1398,
1405 (7th Cir. 1984).

In order to obtain the required preclearance pursuant to
Section 5, the board of education must demonstrate that the
submitted voting changes "[do] not have the purpose and will
not have the effect of denying or abridging the right to vote
on account of race or color." 42 U.S.C. 1973c.  See also
<u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); Section 51.52
of the guidelines (52 Fed. Reg. 497-498 (1987)).  In view of
the considerations discussed above, I cannot conclude that the
board of education has met its burden of showing that the
submitted plan was not enacted for the purpose of denying or
abridging the right to vote of the black citizens of the Dallas
County School District.  Accordingly, on behalf of the Attorney
General, I must interpose an objection to the districting plan
as drawn.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from
the United States District Court for the District of Columbia
that this change has neither the purpose nor will have the effect
of denying or abridging the right to vote on account of race or
color.  In addition, Section 51.45 of the guidelines (52 Fed.
Reg. 496 (1987)) permits you to request that the Attorney
General reconsider the objection.  However, until the objection
is withdrawn or a judgment from the District of Columbia Court
is obtained, the effect of the objection by the Attorney General

-3-

is to make the election of members of the Dallas County Board
of Education from the five single-member districts as proposed
in the submitted districting plan legally unenforceable.  See
Section 51.10 (52 Fed. Reg. 492 (1987)).

    In view of the pending litigation, we are forwarding a
copy of this letter to the Honorable W. B. Hand.  If you have any
questions, feel free to call Sandra S. Coleman (202-724-6718),
Director of the Section 5 Unit of the Voting Section.

                    Sincerely,

                    Wm. Bradford Reynolds
                 Assistant Attorney General
                    Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

Office of the Assistant Attorney General          Washington, D.C. 20530

March 15, 1988

David R. Boyd, Esq.
Balch & Bingham
P. O. Box 78
Montgomery, Alabama  36101

Dear Mr. Boyd:

        This refers to the adoption of a multimember district method
of election for the city council, the proposed districting plan,
the September 22, 1987, annexation referendum and annexation
pursuant to Act No. 87-772, the January 12, 1988, special election
and the February 8, 1988, annexation (Ordinance No. 641) to the
City of Roanoke in Randolph County, Alabama, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act of
1965, as amended, 42 U.S.C. 1973c.  We received the information to
complete your submission on February 22, 1988.

        We have given careful consideration to the information you
have provided, as well as information and comments from other
interested parties.  At the outset, we note that the proposed
election system and districting plan apparently are the outgrowth
of the consent decree entered by the court in <u>United States</u> v. <u>City
of Roanoke</u>, C.A. No. 87-V-97-E (M.D. Ala.) last July.  That decree
required the city to abandon the existing at-large election system
and to adopt a districting system which was to be devised through a
public process.  We note further that prior to adopting the
proposed election system, city officials in fact did conduct a
series of meetings with members of the local black community on the
structure and configuration of such a plan, that the focus at all
times was on a plan of five single-member districts, and that a
consensus actually was reached on a specific single-member plan
denoted as Plan 6.

        Despite these negotiations and public statements by a
majority of the council favoring a single-member plan, the city
unexplainedly adopted the instant multimember plan which
essentially segregates the city into two parts by creating an
overwhelmingly white three-member district, and a heavily black
two-member district.  Even though it creates a majority black
district, the plan seems calculated to limit the effectiveness of
the sizeable black constituency in that, while it "allows for
minority representation, the nature of the plan places them in a
special category which would make it inherently difficult to

- 2 -

effectively represent their constituency." <u>League of United Latin American Citizens</u> v. <u>Midland Independent School District</u>, 648 F. Supp. 596, 608 (W.D. Tex. 1986). Thus, the 3-2 plan seems calculated to operate to minimize the political influence of the growing black population in Roanoke by limiting it to the election of representatives whose effectiveness on the council would necessarily be nullified by the cohesive white majority which the plan itself assures.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that submitted voting changes have no discriminatory purpose or effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52(a)). In view of the observations noted above, the long history of purposeful discrimination in Roanoke, the unusual procedural departures in adopting the system now under review, and the absence of an adequate explanation, I cannot conclude that the city has carried its burden with respect to the proposed method of election or the districting plan. Accordingly, I must, on behalf of the Attorney General, interpose objections to the adoption of the multimember system and the specific plan.

I also must interpose an objection to the proposed annexations. Based on the information available to us, it appears that areas with a substantial black population were excluded from the annexations even though they fully met the annexation criteria established by the city. At the same time, white-populated areas were annexed even though they appear significantly less desirable according to the stated criteria. Under the totality of circumstances, then, I cannot find that the city has met its burden of showing that Roanoke did not "annex adjacent white areas while applying a wholly different standard to black areas and failing to annex them based on that discriminatory standard." See <u>City of Pleasant Grove</u> v. <u>United States</u>, 55 U.S.L.W. 4133, 4135 (U.S. Jan. 21, 1987).

Finally, both the September 22, 1987, annexation referendum, which was limited to the racially restricted constituency, and the January 12, 1988, special election, in which residents of the annexed area were allowed to participate in violation of the Voting Rights Act, necessarily are infected by the discriminatory purpose on which the annexation itself appears to have been based. Accordingly, an objection under Section 5 must be interposed to those changes as well.

- 3 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objections. However, until the objections are withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objections by the Attorney General is to make the proposed election system, annexations and referenda legally unenforceable. 28 C.F.R. 51.10.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Roanoke plans to take with respect to this matter. If you have any questions, feel free to call Sandra S. Coleman (202-724-6718), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division

DJ 166-012-3
WO121

December 19, 1988

Michael S. Harper, Esq.
Hornsby & Schmitt
P. O. Box 606
Tallassee, Alabama   36078

Dear Mr. Harper:

This refers to Ordinance No. 86-213 which revises the
procedures for annexation to the City of Tallassee in Elmore and
Tallapoosa Counties, Alabama, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c.  We received the information to complete your
submission on October 20, 1988.

We have reviewed carefully the information you have provided,
as well as Census data and comments from other interested parties.
At the outset, we note that the proposed procedures require
petitioners for annexation to hire both a licensed attorney and a
professional engineer or land surveyor and, thus, would entail
substantially higher costs than the existing procedures.  We note
further, from 1980 Census data, that black and white residents of
Elmore and Tallapoosa Counties are not similarly situated socio-
economically, with blacks lagging significantly behind whites in
income, education, and occupational status.

In our view, these factors are of particular relevance here
since the proposed procedures appear to have been adopted at a time
when an annexation petition by residents of the predominantly black
East Tallassee area had been pending before the city council for
several months and despite the fact that this largely black group of
petitioners had experienced difficulty complying even with existing
procedures.  In fact, it is our understanding that, when the city
eventually responded to the petitioners, they were given only 30
days in which to meet the existing requirements even though that
included getting detailed information relative to an estimated 124
households.  In the process, we understand that the city declined to
provide to the petitioners specific property owner information in
its possession that formed the basis for rejecting the petition--and

-2-

was informed that any subsequent petition would be subject to the new procedures. Moreover, even though the city has been fully aware for some time of the interest in this area to be annexed, the city apparently has declined to exercise its option under state law to annex, of its own motion, persons, such as the rejected group of predominantly black applicants from East Tallassee, who wish to become citizens of Tallassee but who have difficulty satisfying the petition requirements.

In this setting, then, we cannot ignore the fact that the proposed procedures make no provision for economically disadvantaged applicants and that the city has declined to consider reasonable alternative procedures that would appear to satisfy the city's stated legitimate goals regarding annexations without imposing undue hardship upon the less affluent. In that regard, we note that, in comparable circumstances, the City of Northport, Alabama, which initially proposed an annexation ordinance similar to Ordinance No. 86-213, later amended it to eliminate requirements such as those that are of particular concern here.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52(c)). In light of the circumstances discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to Ordinance No. 86-213 insofar as it imposes annexation requirements which would appear unnecessarily to hinder the ability of black citizens in the Tallassee area to annex themselves to the city.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make Ordinance No. 86-213 legally unenforceable. 28 C.F.R. 51.10.

-3-


　　　To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action the City of Tallassee plans to take with respect to this
matter.  If you have any questions, feel free to call Ms. Lora
Tredway (202-724-8290), Attorney-Reviewer in the Voting Section.

　　　　　　　　　　　　Sincerely,




　　　　　　　　　　　　James P. Turner
　　　　　　　　Acting Assistant Attorney General
　　　　　　　　　　　Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

December 19, 1988

Michael S. Harper, Esq.
Hornsby & Schmitt
P. O. Box 606
Tallassee, Alabama  36078

Dear Mr. Harper:

This refers to Ordinance No. 86-213 which revises the
procedures for annexation to the City of Tallassee in Elmore and
Tallapoosa Counties, Alabama, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c. We received the information to complete your
submission on October 20, 1988.

We have reviewed carefully the information you have provided,
as well as Census data and comments from other interested parties.
At the outset, we note that the proposed procedures require
petitioners for annexation to hire both a licensed attorney and a
professional engineer or land surveyor and, thus, would entail
substantially higher costs than the existing procedures. We note
further, from 1980 Census data, that black and white residents of
Elmore and Tallapoosa Counties are not similarly situated socio-
economically, with blacks lagging significantly behind whites in
income, education, and occupational status.

In our view, these factors are of particular relevance here
since the proposed procedures appear to have been adopted at a time
when an annexation petition by residents of the predominantly black
East Tallassee area had been pending before the city council for
several months and despite the fact that this largely black group of
petitioners had experienced difficulty complying even with existing
procedures. In fact, it is our understanding that, when the city
eventually responded to the petitioners, they were given only 30
days in which to meet the existing requirements even though that
included getting detailed information relative to an estimated 124
households. In the process, we understand that the city declined to
provide to the petitioners specific property owner information in
its possession that formed the basis for rejecting the petition--and

- 2 -

was informed that any subsequent petition would be subject to the more demanding new procedures. Moreover, even though the city has been fully aware of the annexation interest in this area since 1985, the city apparently has declined to exercise its option under state law to annex, of its own motion, persons, such as the rejected group of predominantly black applicants from East Tallassee, who wish to become citizens of Tallassee but who have difficulty satisfying the petition requirements.

In this setting, then, it becomes relevant that the proposed procedures make no provision for economically disadvantaged applicants and that the city has declined to consider reasonable alternative procedures that would appear to satisfy the city's stated legitimate goals regarding annexations without imposing undue hardship upon the less affluent. In that regard, we note that, in comparable circumstances, the City of Northport, Alabama, which initially proposed an annexation ordinance similar to Ordinance No. 86-213, later amended it to eliminate requirements such as those that are of particular concern here. We are advised that only Tallassee among Alabama cities now requires annexation petitioners to retain attorneys and surveyors or engineers.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52(c)). In light of the circumstances discussed above, I cannot conclude, as I must under the Voting Rights Act, that that burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to Ordinance No. 86-213 insofar as it imposes annexation requirements which would appear unnecessarily to hinder the ability of black citizens in the Tallassee area to annex themselves to the city.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make Ordinance No. 86-213 legally unenforceable. 28 C.F.R. 51.10.

-3-

     To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Tallassee plans to take with respect to this matter.  If you have any questions, feel free to call Ms. Lora Tredway (202-724-8290), Attorney-Reviewer in the Voting Section.

                    Sincerely,

                    James P. Turner
            Acting Assistant Attorney General
               Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

**JUN 12 1989**

Larry Anderson, Esq.
City Attorney
P. O. Box 2128
Dothan, Alabama  36302

Dear Mr. Anderson:

This refers to the following matters submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, as amended, 42 U.S.C. 1973c:

1. Act No. 88-445, as amended by Act No. 88-331, which enables Class 5 municipalities to adopt the mayor-commissioner-city manager form of government to be governed by a mayor elected at large and commissioners elected from single-member districts; provides that there shall be four single-member districts with the districting plan to be enacted by local ordinance; specifies the powers and duties of the mayor (including a full vote on the commission); provides that officials are to be elected to four-year, staggered terms in nonpartisan elections with a majority vote requirement; specifies the date for general and runoff elections; provides an initial implementation schedule; provides for candidate qualification procedures and eligibility provisions, the method of filling vacancies, and recall procedures; and specifies the procedure for abandoning the mayor-commission-city manager form of government in the State of Alabama.

2. Ordinance No. 89-1 which adopts the mayor-commissioner-city manager form of government and associated election provisions provided in Act No. 88-445, as amended by Act No. 88-331; Ordinance No. 89-2 which adopts the districting plan; Ordinance No. 89-107 which establishes a new districting plan (superseding the district lines established by Ordinance No. 89-2); and three annexations (Ordinance Nos. 89-88, 89-116, and 89-117) for the City of Dothan in Houston County, Alabama. We received the information to complete your submission of all matters except the annexations on April 12, 1989, and the information regarding the annexations on April 27, 1989.

- 2 -

We have considered carefully the extensive information you have provided, as well as information received from other interested parties.  At the outset, we note that in 1974, the district court in Yelverton v. Driggers, 370 F. Supp. 612 (M.D. Ala.) found that the city's at-large method of election did not provide blacks an equal opportunity to participate in the electoral process.  For reasons explained in its opinion, the court determined that the city should be permitted to continue to use the at-large system on a trial basis.

In the latter part of 1987 and into 1988, various black citizen groups urged that the city change the method of electing the associate commissioners from at large to single-member districts, and provided the city with a six-district plan which would allow blacks the opportunity to elect two of the seven commission members.  Though there was some divergence of views in the black community about the appropriate method of election, there apparently was little or no support for a four-district approach while, among the districting options, the six-district approach was overwhelmingly favored.

According to the records provided by the city, the commissioners initially raised certain procedural concerns about implementing the six-district plan but did not oppose, on its merits, the proposal to change the number of commissioners.  In fact, the mayor, in his original draft of the state legislation, included a proposal for three, four, and six district alternatives.  Subsequently, certain white city officials met privately and resolved to have enacted the changes now submitted for Section 5 preclearance, including the four-district plan. When the commission endorsed these changes at its April 7, 1988, meeting, the mayor explained that there was "a strong feeling in the white community" that the six-district approach would allow blacks too much of an electoral opportunity (though blacks constitute at least 26 percent of the city's population, and the six-district proposal would give blacks the opportunity to elect 28 percent of the commission).

A city, of course, has no obligation to accept an electoral system because it is supported by minority groups or is perceived to be beneficial to such groups' interests.  In order to satisfy Section 5 of the Voting Rights Act, however, a jurisdiction such as Dothan, must show that the change it has selected is not motivated by racial considerations.  Aside from the Mayor's candid explanation, our review of the circumstances leading to the enactment of the proposed changes reveals no substantial, nonracial explanation for the selection of the four-district alternative districting proposal.  In that regard, we note that Dothan has used the current four (residency) district system for a relatively short period of time and that, for about 70 years,

- 3 -

the city had a government with six elected officials.  Thus, any
policy underlying the current commission size and the choice
of a four-district plan would appear to be tenuous.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); see also the
Procedures for the Administration of Section 5 (28 C.F.R. 51.52).
In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act that that burden
has been sustained in this instance.  Therefore, on behalf of the
Attorney General, I must object to the requirement in Act No. 88-
445, as amended, that a Class 5 municipality (such as Dothan)
that adopts the mayor-commissioner-city manager form of
government be required to utilize a four single-member district
method of election and to the districting plans which purport to
implement that requirement.

The Attorney General is unable to make a determination
concerning the implementation schedule specified in Act No. 88-
445, as amended, since it is directly related to the
objectionable four-district requirement and districting plans.
See also 28 C.F.R. 51.35.

The Attorney General does not interpose any objections to
the other specified changes occasioned by Act No. 88-445, as
amended (including the change from at-large to single-member
districts), the changes occasioned by Ordinance No. 89-1 (insofar
as the ordinance adopts election provisions allowed by the state
legislation which now have received Section 5 preclearance), or
the three annexations.  However, we feel a responsibility to
point out that Section 5 of the Voting Rights Act expressly
provides that the failure of the Attorney General to object does
not bar any subsequent judicial action to enjoin the enforcement
of such changes.  See 28 C.F.R. 51.41.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
the changes to which an objection now has been interposed has
neither the purpose nor will have the effect of denying or
abridging the right to vote on account of race or color.  In
addition, Section 51.45 of the guidelines permits you to request
that the Attorney General reconsider the objection.  However,
until the objection is withdrawn or the judgment from the
District of Columbia Court is obtained, the requirement that
districting plans consist of four single-member districts and the
proposed districting plans remain legally unenforceable.
28 C.F.R. 51.10.

- 4 -

    To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the City of Dothan plans to take with respect to this matter.  If you have any questions, feel free to call Mark A. Posner (202-724-8388), an attorney in the Voting Section.

                  Sincerely,

                  James P. Turner
          Acting Assistant Attorney General
               Civil Rights Division

cc:    Lynda K. Oswald, Esq.



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    Washington, D.C. 20530

November 6, 1989

Mr. Fred G. Mott
City Administrator/Clerk
Drawer 400
Foley, Alabama  36536

Dear Mr. Mott:

This refers to the twelve annexations, the change in the
method of election from at large to single-member districts, and
the districting plan for the City of Foley in Baldwin County,
Alabama, submitted to the Attorney General pursuant
to Section 5 of the Voting Rights Act of 1965, as amended,
42 U.S.C. 1973c. We received the information to complete your
submissions on September 5, 1989.

The Attorney General does not interpose any objections to
the nine annexations set forth in Attachment A to this letter,
which we understand are unpopulated and are not contemplated to
include any future residential development. The Attorney General
also does not interpose any objections to the change in method of
election and the districting plan. However, we feel a
responsibility to point out that Section 5 of the Voting Rights
Act expressly provides that the failure of the Attorney General
to object does not bar any subsequent judicial action to enjoin
the enforcement of such changes. See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

After carefully considering the information provided by the
city as well as information provided by other interested parties,
we cannot reach a similar conclusion with respect to the
residential annexations listed in Attachment B. At the outset,
we note that these annexations do not effectuate a discriminatory
dilution of black voting strength since the precleared method of
election would appear to fairly reflect black voting strength in
the city as it would be enlarged by the residential annexations.

- 2 -

City of Richmond v. United States, 422 U.S. 358 (1975).  However,
an annexation also affects voting "by including certain voters
within the city and leaving others outside, [thereby]
determin[ing] who may vote in the municipal election and who may
not," Perkins v. Matthews, 400 U.S. 379, 388 (1971), and a
covered jurisdiction is required to show that this decision has
not been made in a discriminatory manner.

     The submitted residential annexations were adopted in 1983,
1984, and 1986, and include white residential areas contiguous to
the city limits.  It appears that the city took an active role in
obtaining these annexations, by encouraging property owners to
petition for annexation and by obtaining local legislation to
adopt one of the annexations, and also obtained at least one
federal grant to improve one of the annexed areas.

     In its initial response to our request for additional
information regarding this matter the city informed us that, 1)
at the same time these white areas were being welcomed into the
city, a black residential area known as Mills Quarters likewise
was requesting annexation, and 2) the city turned aside this
request and, in doing so, used the same informal annexation
criteria which were applied to the areas annexed and also to two
white residential areas which unsuccessfully requested annexation
in the 1980s.  However, the information furnished later by the
city, after a protracted effort to obtain a complete and accurate
response to our request for additional information, reveals no
nonracial explanation for the rejection of the Mills Quarters
petition.

     In that regard, the city apparently advised the Mills
Quarters petitioners that annexation was not feasible because the
area is not contiguous to the city, and this representation also
was made to this Department for over a year.  Yet, the city
ultimately provided a map to us from the local tax assessor's
office which clearly shows Mills Quarters to be contiguous to the
city limits (i.e., contiguous to the area annexed in 1982 which
previously was precleared).  The city also has claimed that there
was "considerable opposition" to annexation within the Mills
Quarters area, but has been unable to provide us with any
specific information in that regard.  Lastly, the city has

- 3 -

argued that it would be unreasonably costly to annex this area, though the city already is providing fire and police services to the Mills Quarters residents.  The city initially provided us with its estimate of the cost of installing water and sewer lines, but subsequently advised us that the cost of the water lines is not a substantial problem, and provided us with a county planning study which states that sewer lines appear not to be needed.  We also understand that federal block grants are available to the city for such community development and that the Mills Quarters area would be a logical recipient.  In sum, all of the nonracial reasons advanced by the city for failing to annex the Mills Quarters area have been contradicted by the city's own information.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that the submitted change has neither a discriminatory purpose nor a discriminatory effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52(a).  In that regard, a jurisdiction does not have an affirmative duty to annex any particular area but, once it decides to undertake annexations, it must do so in a nondiscriminatory manner.  In light of the circumstances discussed above, I cannot conclude, as I must under the Voting Rights Act, that the city's burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the residential annexations set forth in Attachment B.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the objected-to changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the three referenced annexations legally unenforceable to the extent they affect voting.  <u>Dotson</u> v. <u>City of Indianola</u>, 514 F. Supp. 397, 403 (N.D. Miss. 1981) (three-judge court) (municipal

- 4 -

residents of areas annexed after the Section 5 coverage date may
not participate in municipal elections unless and until the
annexations receive Section 5 preclearance); see also 28 C.F.R.
51.10.

Because the proposed method of election and districting plan
are the result of a consent order in Dillard v. City of Foley,
C.A. No. 87-T-1213-N (M.D. Ala.), we are providing a copy of this
letter to the court and the attorneys in that case.

To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action the City of Foley plans to take with respect to this
matter.  If you have any questions, feel free to call Mark A.
Posner, an attorney in the Voting Section, at
(202) 724-8388.

                              Sincerely,

                              James P. Turner
                        Acting Assistant Attorney General
                              Civil Rights Division


cc:  Honorable Myron Thompson
     United States District Judge

     David R. Boyd, Esq.

     James U. Blacksher, Esq.

## Attachment A

**Ordinance No. 220 (1975)**

**Ordinance No. 263 (1980)**

**Ordinance No. 278 (1981)**

**Ordinance No. 352-85**

**Ordinance No. 357-85**

**Ordinance No. 364-85**

**Ordinance No. 376-86**

**Ordinance No. 393-87**

**Ordinance No. 393A-87**

## Attachment B

Ordinance No. 324-83, as amended by Ordinance No. 331-84

Ordinance No. 344-84

Act Nos. 86-489 and 86-549



**U.S. Department of Justice**

**Civil Rights Division**

_____

*Office of the Assistant Attorney General*          Washington, D.C. 20530

December 1, 1989


Mr. Albert W. LaPierre
Alabama Democratic Party
4120 - 3rd Avenue South
Birmingham, Alabama  35222

Dear Mr. LaPierre:

    This refers to the amendment of the rules of the Alabama
Democratic Party, which changes the method of selecting members
of the State Democratic Executive Committee (SDEC); alters the
method of selecting the Vice Chairman for Minority Affairs; and
changes the method of selecting minority members of the Executive
Board of the SDEC in the State of Alabama, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received the
information to complete your submission on October 2, 1989.

    Organizational changes made by political parties require
preclearance under Section 5 of the Voting Rights Act if a state
has delegated public electoral functions to political parties and
the changes relate to such delegated functions.  Party political
activities such as those related to campaigning, recruiting
members and drafting platforms, are private associational
activities not reached by Section 5.  See generally Guidelines
for the Administration of Section 5 of the Voting Rights Act.
28 C.F.R. 51.7.  In Alabama, the state has delegated significant
authority over the conduct of primary elections and the selection
of candidates in state elections to the political parties.  See
e.g. Ala. Code § 17-16-1, et seq.  The Democratic Party of
Alabama, in turn, has vested the SDEC with authority to conduct
these state authorized functions.  Accordingly, the changes in
the selection of officers and members of the SDEC in this
submission may not be implemented without meeting the
preclearance requirements of Section 5.

    The relevant existing procedures were adopted in 1974 and
1983 as part of an affirmative action plan negotiated between
party leaders and the Alabama Democratic Conference (ADC), an
organization of black Democrats.  The plan was designed to remedy
a long history of exclusion of and discrimination against blacks

- 2 -

in all aspects of party affairs.  At the time it was negotiated,
the ADC was accepted by the Party as the exclusive representative
of black Democrats.  The plan was drawn explicitly to assure
black participation at all levels of party affairs.  Thus, the
ADC was awarded three seats on the SDEC executive board, the
president of ADC was to serve as Vice Chairman for Minority
Affairs and, beginning in 1983, the ADC was to appoint 23
additional members of the SDEC.  Following this latter
development, the appointed black members were to elect three of
their number to fill the three positions on the SDEC's Executive
Board.  These provisions received the requisite preclearance
under Section 5.

     The negotiated figure of 23 appointed members, when combined
with elected blacks, produced a total black membership on the
SDEC that approximately equalled the state's black population
percentage of 25.6 percent.  Thus, the Party's affirmative action
goal was to appoint 23 extra members to assure that black
membership on the SDEC would, at a minimum, reflect statewide
black population.  While we have some concern whether the record
justifies the indefinite use of such race conscious selection of
public officials (see J.A. Croson v. City of Richmond, 109 S.Ct.
706 (1989)), the affirmative action plan as originally conceived
otherwise appears to be rational and not facially invalid.

     Now, after several elections and a number of years
experience under this system, the Party proposes certain changes
to this plan.  The Party recognizes a continuing need to enhance
the number of blacks on the SDEC by appointment, but proposes to
change from a flat requirement of 23 appointees to a formula
number needed to produce population parity.  And, instead of
allowing the ADC to fill the appointed slots from among all black
Democrats as in the past, it is proposed that the appointees be
from among the unsuccessful black SDEC candidates in descending
order according to the number of votes received.  The Party also
proposes to elect the Vice Chairman for Minority Affairs, rather
than fill that position with the president of ADC, and to
eliminate the three Executive Board members previously selected
by the ADC.  If needed to achieve population parity, additional
positions on the Board would be elected by the entire SDEC.

     Under Section 5, we are required to review changes such as
this to determine whether the submitting authority has shown them
to be free of racial purpose or retrogressive effect.  In the
context of a race conscious affirmative action plan we believe
that the law likely requires, but at the least permits, periodic
review and adjustment of racially preferential goals and/or
quotas.  Here, because it is projected that more blacks will be
elected to the SDEC, the number of appointees necessary to
achieve the minimum goal of population parity will be somewhat
less than the previously agreed upon 23 seats.  The adjustment

- 3 -

of this number to a formula amount, under these circumstances, seems consistent with the remedial purpose of the plan and is unobjectionable.

The other changes are more problematic. First, the additional black members will no longer be selected by a constituent black organization (ADC). Rather, they will qualify, automatically, in accordance with the number of votes received in unsuccessful campaigns for SDEC election. This change seems unrelated to improving the affirmative action plan and, in fact, could result in selection of persons in majority black districts who had failed to attract local black support. Second, we have received a number of allegations that withdrawing from the ADC the authority to select the Vice Chairman for Minority Affairs and three members of the Executive Board, is a calculated effort to decrease black influence and participation in Party affairs, not an effort to adjust its affirmative action plan to meet changed circumstances. The authority taken away from the ADC, a black constituent organization, is transferred to the entire SDEC, a body which foreseeably will, by Party rule, continue to be about 75 percent white. Nor has it been demonstrated that this change is related to giving greater recognition to the existence of other black political organizations which may now be competing with the ADC. In these circumstances, we are unable to certify that the Party has carried its burden under Section 5 with regard to the manner of selecting extra black members to the SDEC nor with respect to the change in method of choosing the Vice Chair for Minority Affairs and minority members of the Executive Board. On behalf of the Attorney General, I therefore interpose an objection to these features of the submitted plan.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the Party rule changes concerning the method of selecting members to the State Democratic Executive Committee (SDEC) and the changes in the manner of selecting the Vice Chair for Minority Affairs and the minority members of the Executive Board continue to be legally unenforceable. 28 C.F.R. 51.10.

- 4 -

    To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Alabama Democratic Party plans to take with respect to this matter.  If you have any questions, feel free to call Sandra S. Coleman (202/724-6718), Deputy Chief of the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_        _Washington, D.C. 20530_

June 22, 1990

Ms. Debbie Barnes
Chairperson, Dallas County
    Board of Registrars
P.O. Box 997
Selma, Alabama  36701

Dear Ms. Barnes:

     This refers to the additional procedures for the 1990
implementation of the voter reidentification and purge program
pursuant to Act No. 84-389, including the schedule and voter
update program, for Dallas County, Alabama, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received your
submission on April 23, 1990.

     At the outset we note that on September 12, 1984, we
precleared, pursuant to Section 5, State of Alabama Act No.
84-389, which mandates annual purge and reidentification of
voters in each county and the appointment of deputy registrars in
each county precinct, and the procedures for implementing the
provisions of Act No. 84-389 as outlined in the Alabama Secretary
of State's August 7, 1984, letter.  Under the precleared
procedures for Act No. 84-389, the county board of registrars is
to identify deceased electors and other electors who are believed
to be no longer qualified to vote in the county, and, under
certain conditions, to purge the active voter registration list
of the names of these electors and to place the names of these
electors on a list of inactive voters.  The statute and the
Secretary of State's letter set forth the timetable and the
specific procedures that are to be followed in carrying out these
actions.

     It is our understanding that the precleared statute and
implementation procedures do not address a countywide re-
identification of voters or general re-registration program nor
do they provide any procedures for completely re-constituting

- 2 -

the county's voter registration list.   Act No. 84-389 seems
designed simply to remove from the existing registered voters
list the names of those persons who are no longer qualified to
vote because of death, conviction of certain crimes, or taking up
residence in another county.

On September 18, 1989, we precleared a submission by the
county of its implementation of Act No. 84-389.  As you know, the
county's implementation plan received the requisite Section 5
preclearance only after the county withdrew provisions of the
program that involved procedures for using a voter update form
which would have been mailed to all registered voters.  The
remaining portions of the county's program, which was precleared,
merely tracked the precleared state law.

Based on the information available to us, it appears that
the 1990 implementation of the voter reidentification and purge
program pursuant to Act No. 84-389 deviates in several ways from
the precleared procedures under Act No. 84-389, and, thus, from
the county program precleared September 18, 1989.  The proposed
changes, implemented without benefit of Section 5 preclearance,
include the use of voter update forms, which the county
apparently had printed and distributed notwithstanding that the
September 18, 1989, preclearance occurred only after the county
withdrew its proposal for a voter update form that would be
mailed to each registered voter.  We note that while the
distribution of these forms apparently did not include any mail-
out procedure, the county implemented the voter update program
without the requisite Section 5 preclearance, and relied on the
information provided by the forms to disqualify electors from
voting or re-qualify electors for voting in the June 5, 1990,
primary election.

We understand that the voter update program has been
implemented in such a way that many black voters believed they
were not qualified to vote in the June 5, 1990, primary election
if they had not returned a voter update form.  Further, it
appears that this misapprehension was exacerbated during the
election because the voter registration list prepared by the
board of registrars used the same designation for voters who did
not return a voter update form or whose form was not yet
processed by the county, as the designation for voters who are
required to reidentify under Act No. 84-389.  Thus, the voter
update program has resulted in a voter registration list that
actually includes many voters who have been and continue to

- 3 -

be qualified to vote, but may not have been permitted to vote on
June 5 and may be purged and thus disqualified from voting in
subsequent elections simply because they failed to pick up or
return a voter update form, when there was no valid requirement
that they do so.

The proposed schedule apparently did not permit time for
completing the voter update program prior to the election, but
the county proceeded to implement the incomplete, and in some
cases erroneous, results for the June 5, 1990, primary election.
The outcome was that many voters who had returned the voter
update form were required to reidentify a second time, at the
polls or elsewhere, prior to being permitted to cast a ballot.
The proposed schedule also apparently did not permit sufficient
time for adequate training of poll officials, with the result
that the re-registration and reidentification procedures were
applied inconsistently.  Some voters were made to travel to the
probate judge's office to reidentify, while other voters were
required to complete reidentification forms prior to voting, and
still other voters were permitted to cast regular ballots prior
to completing reidentification forms.  It appears that there was
little if any reasonable evidence to believe that most of the
voters who were designated by a "P" listing and who were made to
reidentify or re-register in fact were not qualified to vote in
the June 5, 1990, primary election.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
no discriminatory purpose or effect.  See Georgia v. United
States, 411 U.S. 526 (1973); see also the Procedures for the
Administration of Section 5 (28 C.F.R. 51.52).  In satisfying its
burden, the submitting authority must demonstrate that the
proposed change is not tainted, even in part, by an invidious
racial purpose; it is insufficient simply to establish that there
are some legitimate, nondiscriminatory reasons for the voting
change.  See Village of Arlington Heights v. Metropolitan Housing
Development Corp., 429 U.S. 252, 265-66 (1977); City of Rome v.
United States, 422 U.S. 156, 172 (1980); Busbee v. Smith, 549 F.
Supp. 494, 516-17 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983).  In
light of these principles, and under the circumstances discussed
above, I cannot conclude, as I must under the Voting Rights Act,
that the county has sustained its burden in this instance.
Therefore, on behalf of the Attorney General, I must object to
the proposed 1990 implementation of Act No. 84-389 and the
proposed voter update program.  We note that this objection does
not otherwise affect any precleared procedures for conducting the
June 26, 1990, election.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the

- 4 -

effect of denying or abridging the right to vote on account of
race or color.  In addition, Section 51.45 of the guidelines
permits you to request that the Attorney General reconsider the
objection.  However, until the objection is withdrawn or a
judgment from the District of Columbia Court is obtained, the
additional procedures for the 1990 implementation of Act No.
84-389 and the voter update program continue to be legally
unenforceable, and, therefore, may not be enforced in any manner
in the June 26, 1990, run-off election or subsequently.  See also
28 C.F.R. 51.10.

        To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action Dallas County plans to take with respect to these matters.
In order to avoid further voter confusion, we stand ready to work
with local and appropriate state officials.  In that regard, we
will be contacting you soon to discuss these matters.

        If you have any questions, feel free to call Ms. Lora L.
Tredway (202-307-2290), an attorney in the Voting Section.

                            Sincerely,

                            John R. Dunne
                    Assistant Attorney General
                        Civil Rights Division



U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

June 22, 1990

Ms. Debbie Barnes
Chairperson, Dallas County
   Board of Registrars
P.O. Box 997
Selma, Alabama  36701

Dear Ms. Barnes:

     This refers to the additional procedures for the 1990
implementation of the voter reidentification and purge program
pursuant to Act No. 84-389, including the schedule and voter
update program, for Dallas County, Alabama, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received your
submission on April 23, 1990.

     At the outset we note that on September 12, 1984, we
precleared, pursuant to Section 5, State of Alabama Act No.
84-389, which mandates annual purge and reidentification of
voters in each county and the appointment of deputy registrars in
each county precinct, and the procedures for implementing the
provisions of Act No. 84-389 as outlined in the Alabama Secretary
of State's August 7, 1984, letter.  Under the precleared
procedures for Act No. 84-389, the county board of registrars is
to identify deceased electors and other electors who are believed
to be no longer qualified to vote in the county, and, under
certain conditions, to purge the active voter registration list
of the names of these electors and to place the names of these
electors on a list of inactive voters.  The statute and the
Secretary of State's letter set forth the timetable and the
specific procedures that are to be followed in carrying out these
actions.

     It is our understanding that the precleared statute and
implementation procedures do not address a countywide re-
identification of voters or general re-registration program nor
do they provide any procedures for completely re-constituting

- 2 -

the county's voter registration list.   Act No. 84-389 seems
designed simply to remove from the existing registered voters
list the names of those persons who are no longer qualified to
vote because of death, conviction of certain crimes, or taking up
residence in another county.

On September 18, 1989, we precleared a submission by the
county of its implementation of Act No. 84-389.  As you know, the
county's implementation plan received the requisite Section 5
preclearance only after the county withdrew provisions of the
program that involved procedures for using a voter update form
which would have been mailed to all registered voters.  The
remaining portions of the county's program, which was precleared,
merely tracked the precleared state law.

Based on the information available to us, it appears that
the 1990 implementation of the voter reidentification and purge
program pursuant to Act No. 84-389 deviates in several ways from
the precleared procedures under Act No. 84-389, and, thus, from
the county program precleared September 18, 1989.  The proposed
changes, implemented without benefit of Section 5 preclearance,
include the use of voter update forms, which the county
apparently had printed and distributed notwithstanding that the
September 18, 1989, preclearance occurred only after the county
withdrew its proposal for a voter update form that would be
mailed to each registered voter.  We note that while the
distribution of these forms apparently did not include any mail-
out procedure, the county implemented the voter update program
without the requisite Section 5 preclearance, and relied on the
information provided by the forms to disqualify electors from
voting or re-qualify electors for voting in the June 5, 1990,
primary election.

We understand that the voter update program has been
implemented in such a way that many black voters believed they
were not qualified to vote in the June 5, 1990, primary election
if they had not returned a voter update form.  Further, it
appears that this misapprehension was exacerbated during the
election because the voter registration list prepared by the
board of registrars used the same designation for voters who did
not return a voter update form or whose form was not yet
processed by the county, as the designation for voters who are
required to reidentify under Act No. 84-389.  Thus, the voter
update program has resulted in a voter registration list that
actually includes many voters who have been and continue to

- 3 -

be qualified to vote, but may not have been permitted to vote on
June 5 and may be purged and thus disqualified from voting in
subsequent elections simply because they failed to pick up or
return a voter update form, when there was no valid requirement
that they do so.

The proposed schedule apparently did not permit time for
completing the voter update program prior to the election, but
the county proceeded to implement the incomplete, and in some
cases erroneous, results for the June 5, 1990, primary election.
The outcome was that many voters who had returned the voter
update form were required to reidentify a second time, at the
polls or elsewhere, prior to being permitted to cast a ballot.
The proposed schedule also apparently did not permit sufficient
time for adequate training of poll officials, with the result
that the re-registration and reidentification procedures were
applied inconsistently.  Some voters were made to travel to the
probate judge's office to reidentify, while other voters were
required to complete reidentification forms prior to voting, and
still other voters were permitted to cast regular ballots prior
to completing reidentification forms.  It appears that there was
little if any reasonable evidence to believe that most of the
voters who were designated by a "P" listing and who were made to
reidentify or re-register in fact were not qualified to vote in
the June 5, 1990, primary election.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
no discriminatory purpose or effect.  See Georgia v. United
States, 411 U.S. 526 (1973); see also the Procedures for the
Administration of Section 5 (28 C.F.R. 51.52).  In satisfying its
burden, the submitting authority must demonstrate that the
proposed change is not tainted, even in part, by an invidious
racial purpose; it is insufficient simply to establish that there
are some legitimate, nondiscriminatory reasons for the voting
change.  See Village of Arlington Heights v. Metropolitan Housing
Development Corp., 429 U.S. 252, 265-66 (1977); City of Rome v.
United States, 422 U.S. 156, 172 (1980); Busbee v. Smith, 549 F.
Supp. 494, 516-17 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983).  In
light of these principles, and under the circumstances discussed
above, I cannot conclude, as I must under the Voting Rights Act,
that the county has sustained its burden in this instance.
Therefore, on behalf of the Attorney General, I must object to
the proposed 1990 implementation of Act No. 84-389 and the
proposed voter update program.  We note that this objection does
not otherwise affect any precleared procedures for conducting the
June 26, 1990, election.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgment from the
United States District Court for the District of Columbia that
these changes have neither the purpose nor will have the

- 4 -

effect of denying or abridging the right to vote on account of
race or color.  In addition, Section 51.45 of the guidelines
permits you to request that the Attorney General reconsider the
objection.  However, until the objection is withdrawn or a
judgment from the District of Columbia Court is obtained, the
additional procedures for the 1990 implementation of Act No.
84-389 and the voter update program continue to be legally
unenforceable, and, therefore, may not be enforced in any manner
in the June 26, 1990, run-off election or subsequently.  See also
28 C.F.R. 51.10.

        To enable this Department to meet its responsibility to
enforce the Voting Rights Act, please inform us of the course of
action Dallas County plans to take with respect to these matters.
In order to avoid further voter confusion, we stand ready to work
with local and appropriate state officials.  In that regard, we
will be contacting you soon to discuss these matters.

        If you have any questions, feel free to call Ms. Lora L.
Tredway (202-307-2290), an attorney in the Voting Section.

                            Sincerely,

                            John R. Dunne
                     Assistant Attorney General
                        Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20035_

December 3, 1990

Dorman Walker, Esq.
Balch & Bingham
P.O. Box 78
Montgomery, Alabama  36101

Dear Mr. Walker:

This refers to the 1981 elimination of District 10, the
resulting decrease in number of members from 15 to 14 and in the
number of single-member election districts from 8 to 7, and a
redistricting plan; the 1986 change in District 7 from a two-
member to a single-member district and change in District 1 from
a three-member to a four-member district; the 1988 redistricting
plan; and the September 13, 1989, Bylaws, which provide for an
increase in the number of members from 14 to 30; a change from an
elective to an elective-appointive system with the principle of
fair representation and the rule for equal division by gender by
district and the procedures therefor to select certain members,
including racial quotas by district, a loser eligibility
requirement, and the change from certifying as elected the
highest votegetter for each CDEC position to permitting losing
candidates to be certified as elected; procedures for
implementing the fair representation and equal gender division
rules when there are an insufficient number of losing candidates;
method of election changes to 5 six-member districts, from
majority to plurality vote, and elimination of numbered posts in
multimember districts; a redistricting plan; procedures for
redistricting and implementation thereof; candidate
qualifications; procedures for filling vacancies; and the change
in authority for conducting party primary elections from
committeewide to a special five-member Election Committee, for
the County Democratic Executive Committee (CDEC) of the
Democratic Party in Perry County, Alabama, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c. We received supplemental
information on October 4, 1990.

At the outset, we note that the CDEC adopted and implemented
the instant voting changes, but failed to comply with the
preclearance requirements of Section 5 regarding these changes
until sued by minority citizens in <u>Hawthorne</u> v. <u>Baker</u>, No. CA 89-
T-381-S (M.D. Ala.). We also note that the CDEC has been unable

- 2 -

to provide certain items of information regarding the proposed
changes, in part because of the hiatus between adoption and
implementation of the changes and the Section 5 submission of
those changes.

With regard to the voting changes effected by the 1989
Bylaws, we have carefully considered the information you have
provided, as well as information from the Census, previous
Section 5 submissions involving the county, and other interested
parties.  Our investigation has revealed that elections where
black candidates and white candidates oppose each other in the
county and in Democratic Party primary elections are
characterized by a pattern of racially polarized voting, a fact
that is relevant in the Section 5 analysis, particularly given
that black persons constitute a significant majority of
registered voters in Perry County and, based on the information
provided, a majority of Democratic voters.

We begin our analysis with the changes in the method of
election for the CDEC.  Based on the information available to us,
it appears that the increase in the number of members and the
adoption of the county commission districting plan as a
redistricting plan for multimember districts and the concomitant
1989 changes in the CDEC election method (e.g., the change to a
plurality vote requirement and the elimination of numbered
places) afford black voters in the Democratic electorate of Perry
County an opportunity equal to that of white voters to elect
candidates of their choice to the CDEC.  Indeed, the 1990
implementation of the 1989 election method changes seems to bear
out such a conclusion, given that twenty of the thirty candidates
who won the election outright are black persons who appear to be
the choice of black voters.  Thus, the Attorney General
interposes no objection to these changes and all the changes
effected by the 1989 Bylaws other than those provisions
concerning the fair representation principle and the rule for
equal division by gender.  However, we note that the failure of
the Attorney General to object does not bar subsequent litigation
to enjoin the enforcement of the changes.  See the Procedures for
the Administration of Section 5 (28 C.F.R. 51.41).

We are unable to reach a similar conclusion, however, with
regard to the change from a purely elective system to an
elective-appointive system, including the provisions for
selecting certain members as adopted under the "principle of fair
representation" and the rule for equal division by gender, both
applied to each individual multimember district.  These
provisions are apparently intended to insure that the Perry
County Democratic Executive Committee will consist of a broad
cross section of the community.  Yet, the districting scheme
adopted in 1989 for the multimember districts seems to have
accomplished such a result without resort to the race conscious
and gender conscious requirements prescribed by the Bylaws.

3

Thus, for example, in the June 5, 1990, primary election for the CDEC, voters from across the county participated in a primary election, and twenty black and ten white candidates were elected. However, to conform the CDEC to the Bylaws requirements for racial representation, these election results were then adjusted. Consequently, subsequent to the June 5th CDEC election, three black persons who won the election outright were not certified as CDEC members, and, instead, the committee substituted and certified white persons with fewer votes as the winners over black candidates.

As a result of this "ceiling" being imposed on the number of blacks who can serve on the CDEC from each of the districts, the black representation on that body has been limited. In addition, the current proposal for implementing the equal division by gender rule could require in future elections that a black candidate who actually wins the election be replaced by a white candidate of the opposite gender. Thus, an adjustment in the composition of the CDEC in accordance with the gender preferences required by the By-laws has the same potential for discrimination that the racial preferences have already had in Perry County.

In some circumstances, race and gender conscious affirmative action plans may be necessary to remedy the effects of identified past discrimination. Racial and gender classifications such as those prescribed by the By-laws should be reserved for remedial settings since, outside such settings, "they may in fact promote notions of racial inferiority and lead to a politics of racial hostility." City of Richmond v. Croson, 109 S.Ct. 706 (1989). The record before us, however, does not disclose the requisite specificity of the injury that the "principle of fair representation" is supposed to correct. Indeed, the CDEC proposes a plan that seems to be designed and has been implemented to suppress the will of the Democratic voters in a predominantly black electorate and to minimize black participation on the CDEC.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In

satisfying its burden, the submitting authority must demonstrate that the proposed change is not tainted, even in part, by an invidious racial purpose; it is insufficient simply to establish that there are some legitimate, nondiscriminatory reasons for the voting change. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977); see also City of Rome v. United States, 422 U.S. 156, 172 (1980); Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983). In light of these principles, and under the circumstances discussed above, I cannot conclude, as I must

4

under the Voting Rights Act, that the Perry County Democratic Party has sustained its burden in this instance. Therefore, on behalf of the Attorney General, I must object to the provisions of the 1989 Bylaws concerning the fair representation principle and the rule for equal division by gender (Article II, Section 2, fourth through seventh sentences).

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the 1989 Bylaws continue to be legally unenforceable only insofar as they incorporate the principle of fair representation and the rule for equal division by gender. Accordingly, the 1990 implementation of those provisions under which three white CDEC members were certified as elected as substitutes for properly elected black members also continues to be legally unenforceable. See also 28 C.F.R. 51.10.

With regard to the 1981 and 1986 changes and the 1988 redistricting plan, the information you have provided indicates that these changes have been superseded in their entirety by the election method and redistricting plan in the 1989 Bylaws. Accordingly, no further determination by the Attorney General is required or appropriate under Section 5 concerning the 1981 and 1986 changes and the 1988 redistricting plan. See 28 C.F.R. 51.35.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Perry County Democratic Party plans to take with respect to these matters. In particular, please advise us of the steps the party plans to take with regard to the unenforceable implementation of the objected-to provisions in the 1989 Bylaws. If you have any questions, feel free to call Lora L. Tredway (202-307-2290), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

DEC 3 1 1990

David R. Boyd, Esq.
Balch & Bingham
P. O. Box 78
Montgomery, Alabama    36101

Dear Mr. Boyd:

This refers to the annexation (adopted by an October 23,
1990, referendum) to the City of Valley in Chambers County,
Alabama, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received your initial submission on November 1, 1990,
supplemental information was received on November 21, 1990.

We have considered carefully the materials furnished by you,
as well as comments and information from other interested
parties.  According to information you have provided, the
population of the area proposed for annexation consists of 243
persons, only two of whom are black.  Thus, the addition of this
area to the city will necessarily have the effect of diluting
minority voting strength in the existing city.  However, because
the city was incorporated after the 1980 Census was conducted,
our ability to determine the degree of this dilution has been
hampered substantially by the absence of detailed census data for
the city.  Estimates we have received vary significantly, but
there appears to be no information currently available which
would support a conclusion that the actual dilution of minority
voting strength effected by the submitted annexation is
insignificant.

In your submission you represent that the impact of this
annexation on minority voting strength in the City of Valley is
not a matter of concern because of the city's obligation,
stemming from a consent decree in <u>Dillard</u> v. <u>Crenshaw County
(City of Valley)</u>, No. 85-T-1332-N (M.D. Ala. Dec. 12, 1988), to
convert, following the availability of 1990 Census data, from the
existing at-large system to a single-member districting plan
incorporating, if possible, at least one district with a black
voting majority.

- 2 -

Furthermore, we note that while city representatives have expressed confidence that Valley will be able to satisfy the Dillard consent decree with a plan that includes at least one black voting majority district, the absence of current census information leaves this assertion unsupported.  Of course, we recognize that the city must await the release of the 1990 Census before it undertakes the development of a districting plan but, in those circumstances, the only system under which we can analyze the submitted annexation is that of at-large elections which we understand continues in existence until replaced by a single-member district plan.  In that context, a racially dilutive annexation, such as appears to be involved here, can be precleared only if the election system is modified in such a way as to afford the affected minority group representation "reasonably equivalent to their political strength in the enlarged community."  City of Richmond v. United States, 422 U.S. 358, 370 (1975).  Here, the city not only has failed to show that black voting strength would be fairly recognized in the enlarged city under the existing at-large system, but the city has failed also to demonstrate that blacks would be represented fairly under a single-member districting plan.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the annexation adopted by the October 23, 1990, referendum.

Of course, under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed annexation has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  See 28 C.F.R. 51.44.

- 3 -

In addition, you may request that the Attorney General reconsider the objection.  See 28 C.F.R. 51.45.  In this regard, we again note <u>City of Richmond</u> where the Supreme Court observed that a dilution such as that involved here may nevertheless pass Section 5 muster "as long as the post-annexation electoral system fairly recognizes the minority's political potential."  <u>City of Richmond</u> v. <u>United States</u>, <u>supra</u>, 422 U.S. at 478.  We agree that compliance with the requirements of the <u>Dillard</u> consent decree presents the city with the opportunity to achieve the goal identified in <u>Richmond</u>. Therefore, we would be willing to reconsider this objection at the time Section 5 preclearance is sought for the single-member districting plan to be developed by the city after the 1990 Census is released.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the proposed annexation continues to be legally unenforceable insofar as it affects voting.  See 28 C.F.R. 51.10.

     To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Valley plans to take concerning this matter.  If you have any questions, you should call George Schneider (202-307-3153), Attorney in the Voting Section.

                              Sincerely,

                              John R. Dunne
                         Assistant Attorney General
                            Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

January 25, 1991

Dorman Walker, Esq.
Balch & Bingham
P.O. Box 78
Montgomery, Alabama   36101

Dear Mr. Walker:

     This refers to the increase in number of members from 23 to
49; change in the method of election from single-member districts
to a mix of single-member districts and multimember districts
with designated posts; a March 8, 1990, organizational plan,
which provides, <u>inter alia,</u>  for a decrease in the number of
popularly elected members from 49 to 40, a change in the method
of election from electing members from mixed single- and multi-
member districts to four 10-member districts with plurality vote,
a rule for equal division by gender by district, a districting
plan, a change from an elective to an elective-appointive system
with the principle of fair representation, and the procedures for
the appointment of additional members, for the County Democratic
Executive Committee (CDEC) of the Democratic Party in Lamar
County, Alabama, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received the information to complete your submission
on November 26, 1990.

     We have considered carefully the information you have
provided, as well as information from the Census, previous
Section 5 submissions involving the county, and other interested
parties.  At the outset, we note that this submission contains a
number of voting changes, adopted by the CDEC over the years, for
which the CDEC has been unable to provide certain items of
information due, in part, to the lapse of time between adoption
and implementation of the changes and their submission for
Section 5 review.  However, in conducting our Section 5 analysis,
we must view these changes as best we can in the context of the
system that was in effect on November 1, 1964.

cc:  Public File

- 2 -

Because the 23-single-member district plan for electing CDEC members which was in effect in 1964 appears now to be severely malapportioned, it is appropriate to compare the proposed methods of election and districting plans to a fairly drawn and properly apportioned single-member districting plan. Wilkes County v. United States, 450 F. Supp. 1171 (D.D.C. 1978). Our information reveals that minorities in the county are concentrated in such a way that a fairly drawn 23-single-member district plan would result in some districts which would have black majorities. By contrast, the highest black percentage of registered voters in any of the proposed districts in the CDEC's most recent proposal is 15 percent. It is thus apparent that any chances of electing a candidate of their choice by black voters in any of those multimember districts rest upon the fortuitous circumstances of single-shot voting and, accordingly, that the proposed change in the method of election is likely to have a retrogressive effect. In the context of the racially polarized voting patterns that seem to exist in Lamar County, it appears that the adoption of the county commission districts to serve as multimember districts for the CDEC will not afford black voters in the Lamar County Democratic electorate an opportunity equal to that of white voters to elect candidates of their choice to the CDEC.

We turn then to the change from a purely elective system to an elective-appointive system, including the provisions for appointing members under the "principle of fair representation." In some circumstances, race conscious affirmative action plans may be necessary to remedy the effects of identified past discrimination. Racial classification such as those prescribed by the 1990 organizational plan should be reserved for remedial settings since, outside such settings, "they may in fact promote notions of racial inferiority and lead to a politics of racial hostility." City of Richmond v. Croson, 109 S.Ct. 706 (1989). The record before us, however, does not disclose the requisite specificity of the injury that the "principle of fair representation" is supposed to correct.

Moreover, the principle of fair representation in Lamar County limits the level of black representation on the CDEC to 12 percent, which corresponds to the black percentage of the population. Although the CDEC has not yet implemented this provision, it appears that, if implemented in accord with the CDEC's interpretation, it would in fact reduce minority participation in the CDEC. Thus, while blacks have been able to achieve a greater than 12 percent level of CDEC representation in recent years and already have elected more than that percentage of the elected members of the proposed plan, the so-called principle of fair

- 3 -

representation would require the CDEC to diminish the level of black representation by adding whites to match the racial makeup of the county.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In satisfying its burden, the submitting authority must demonstrate that the proposed change is not tainted, even in part, by an invidious racial purpose; it is insufficient simply to establish that there are some legitimate, nondiscriminatory reasons for the voting change. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977); see also City of Rome v. United States, 422 U.S. 156, 172 (1980); Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983). In light of these principles, and under the circumstances discussed above, I cannot conclude, as I must under the Voting Rights Act, that the county has sustained its burden in this instance and I find no basis for preclearing any of the changes before us. Therefore, on behalf of the Attorney General, I must object to the changes in the method of selecting the Lamar County Democratic Executive Committee.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, all of the submitted changes continue to be legally unenforceable. See also 28 C.F.R. 51.10.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Lamar County Democratic Party plans to take with respect to these matters. In particular, please advise us of the steps the party plans to take with regard to the unenforceable implementation of the objected-to provisions in the 1990 organizational plan. If you have any questions, please call Richard Jerome (202-514-8696), an attorney in the Voting Section.

- 4 -

Because the instant voting changes are at issue in
<u>Hawthorne</u> v. <u>Baker</u>, CV-89-T-381-S (M.D. Ala.), we are providing a
copy of this letter to the court in that case.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

cc:  Honorable Myron H. Thompson
     United States District Judge



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

JAN 28 1991

Dorman Walker, Esq.
Balch & Bingham
P.O. Box 78
Montgomery, Alabama   36101

Dear Mr. Walker:

     This refers to the increase in number of members from 25 to
32; the 1970 increase in number of members from 32 to 45, a
change in method of election from single-member districts to 43
single-member districts and 1 two-member district, a
redistricting plan, and adoption of numbered posts in the multi-
member district; the 1982, 1983, and 1985 redistrictings; the
1985 increase in number of members from 45 to 48, the change in
method of election to 9 single-member districts, 11 two-member
districts, 3 three-member districts, and 2 four-member districts;
and the September 7, 1989, Rules, as amended on March 1, 1990,
which provide for a decrease in number of members from 48 to 40,
a change in method of election to 4 ten-member districts by
plurality vote, a redistricting, and a change from an elective to
an elective-appointive system with the principle of fair
representation and the procedures therefor to appoint additional
members, for the County Democratic Executive Committee (CDEC) of
the Democratic Party in Limestone County, Alabama, submitted to
the Attorney General pursuant to Section 5 of the Voting Rights
Act of 1965, as amended, 42 U.S.C. 1973c.  We received the
information to complete your submission on November 29, 1990.

     We have considered carefully the information you have
provided, as well as information from the Census, previous
Section 5 submissions involving the county, and other interested
parties.  At the outset, we note that this submission contains a
number of voting changes, adopted by the CDEC over the years, for
which the CDEC has been unable to provide certain items of
information due, in part, to the lapse of time between adoption
and implementation of the changes and their submission for
Section 5 review.  However, in conducting our Section 5 analysis,
we must view these changes as best we can in the context of the
system that was in effect on November 1, 1964.

2

Because the 25-single-member district plan for electing CDEC members which was in effect in 1964 appears now to be severely malapportioned, it is appropriate to compare the proposed methods of election and districting plans to a fairly drawn and properly apportioned single-member districting plan. <u>Wilkes County</u> v. <u>United States</u>, 450 F. Supp. 1171 (D.D.C. 1978). Our information reveals that minorities in the county are concentrated in such a way that a fairly drawn plan of 25 single-member districts would result in some districts that would have black majorities or that a combination of the existing single-member districts now used to elect county school board members and Athens city councilmembers as CDEC districts would result in a plan including some black-majority multimember CDEC districts. By contrast, the highest black percentage of registered voters in any of the proposed multimember districts in the CDEC's most recent proposal is 18 percent. It is thus apparent that any chances for black voters to elect candidates of their choice in any of the proposed multimember districts rest upon the fortuitous circumstance of single-shot voting and, accordingly, that the proposed change in the method of election is likely to have a retrogressive effect. In the context of the racially polarized voting patterns that seem to exist in Limestone County, it appears that the adoption of the county commission districts to serve as multimember districts for the CDEC will not afford black voters in the Limestone County Democratic electorate an opportunity equal to that of white voters to elect candidates of their choice to the CDEC.

We turn then to the change from a purely elective system to an elective-appointive system, including the provisions for appointing members under the "principle of fair representation." In some circumstances, race conscious affirmative action plans may be necessary to remedy the effects of identified past discrimination. Racial classification such as those prescribed by the 1989 Rules, as amended in 1990, should be reserved for remedial settings since, outside such settings, "they may in fact promote notions of racial inferiority and lead to a politics of racial hostility." <u>City of Richmond</u> v. <u>Croson</u>, 109 S.Ct. 706 (1989). The record before us, however, does not disclose the requisite specificity of the injury that the "principle of fair representation" is supposed to correct.

Moreover, the principle of fair representation in Limestone County limits the level of black representation on the CDEC to 14 percent, which corresponds to the black percentage of the population. Although the CDEC has not yet implemented this provision, it appears that, if implemented in accord with the CDEC's interpretation, it could in fact reduce minority participation in the CDEC. Thus, if black Democratic voters are able to achieve a greater than 14 percent level of CDEC representation, the so-called principle of fair representation would require the CDEC to diminish the level of black

3

representation by adding whites to match the racial makeup of the county.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In satisfying its burden, the submitting authority must demonstrate that the proposed change is not tainted, even in part, by an invidious racial purpose; it is insufficient simply to establish that there are some legitimate, nondiscriminatory reasons for the voting change. See <u>Village of Arlington Heights</u> v. <u>Metropolitan Housing Development Corp.</u>, 429 U.S. 252, 265-66 (1977); see also <u>City of Rome</u> v. <u>United States</u>, 422 U.S. 156, 172 (1980); <u>Busbee</u> v. <u>Smith</u>, 549 F. Supp. 494, 516-17 (D.D.C. 1982), <u>aff'd</u>, 459 U.S. 1166 (1983). In light of these principles, and under the circumstances discussed above, I cannot conclude, as I must under the Voting Rights Act, that the county has sustained its burden in this instance and I find no basis for preclearing any of the changes before us. Therefore, on behalf of the Attorney General, I must object to the proposed changes in the method of selecting the Limestone County Democratic Executive Committee.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that these changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, all of the submitted changes continue to be legally unenforceable. See also 28 C.F.R. 51.10.

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Limestone County Democratic Party plans to take with respect to these matters. In particular, please advise us of the steps the party plans to take with regard to the unenforceable implementation of the objected-to provisions in the 1989 Rules, as amended in 1990. If you have any questions, please call Lora L. Tredway (202-307-2290), an attorney in the Voting Section.

4

Because the instant voting changes are at issue in
Hawthorne v. Baker, CV-89-T-381-S (M.D. Ala.), we are providing a
copy of this letter to the court in that case.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

cc:  Honorable Myron H. Thompson
     United States District Judge



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

David R. Boyd, Esq.                                NOV 08 1991
Balch & Bingham
P. O. Box 78
Montgomery, Alabama   36101

Dear Mr. Boyd:

    This refers to Act No. 90-294, which creates the 40th
Judicial Circuit and redistricts the existing 18th Judicial
Circuit, reassigns the circuit judges of the 18th Circuit to
either the 18th or the 40th Circuits, provides for a district
attorney in the new 40th Circuit, and provides the implementation
schedule for those changes; Act No. 90-474, which creates a
second circuit judgeship in the 39th Judicial Circuit and the
implementation schedule for that change; and Act No. 90-539,
which creates a fourth circuit judgeship in the 20th Judicial
Circuit and the implementation schedule for that change for the
State of Alabama, submitted to the Attorney General pursuant to
Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.
1973c.  We received your response to our request for additional
information on September 9, 1991.

    With regard to the changes occasioned by Act Nos. 90-294
and 90-474, the Attorney General does not interpose any
objection.  However, we note that the failure of the Attorney
General to object does not bar subsequent judicial action to
enjoin enforcement of the changes.  See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

    With regard to the changes occasioned by Act No. 90-539, we
are unable to reach a similar conclusion.  As a matter of
background, we note that on April 27, 1987, the State of Alabama
obtained preclearance under Section 5 for more than fifty voting
changes affecting the expansion of the state's judicial system
since November 1, 1964, including certain changes affecting the
20th Judicial Circuit that is comprised of Henry and Houston

- 2 -

Counties.  The state also obtained preclearance of additional
changes affecting the expansion of the state's judicial system
on January 15, 1988, and September 11, 1989.  Thus, while we are
mindful of these earlier preclearances of other changes similar
to the one now before us relating to the 20th Circuit, we
undertake our present analysis in the light of additional
information that has come to our attention since the time of
our earlier analyses.

     As you are aware, private plaintiffs have alleged that the
system for electing judges in some judicial circuits and
districts in Alabama, including the 20th Circuit, violates
Section 2 of the Voting Rights Act, 42 U.S.C. 1973, and that the
state has continued to maintain the at-large, numbered post
electoral system with the knowledge that this election method
minimizes minority electoral opportunities.  SCLC v. Evans, Civ.
Action No. 88-D-462-N (M.D. Ala.).  In the upcoming trial of that
case, the United States, which is participating as amicus curiae,
will present expert testimony to show that the state has
maintained the at-large, numbered post system, at least in part,
for racially discriminatory reasons.

     Our analysis of the at-large, numbered post electoral system
and the context in which it has operated in the 20th Circuit is
further informed by a number of factors.  For example, we note
that in the 20th Circuit, which has a 25 percent black
population, no black persons have served as circuit court or
district court judges.  In addition, an expert retained by the
plaintiffs in SCLC has found that voting in the 20th Circuit has
been characterized by extreme racial bloc voting.
Notwithstanding the evidence of racially polarized voting, black
voters in Henry and Houston Counties have been able to elect
candidates of their choice to county governing bodies when, as
the result of litigation, alternatives to the at-large electoral
system were implemented.  See, e.g., Diggs v. Henry County,
C.A. No.85-V-1331-S (M.D. Ala. Nov. 12, 1985); United States v.
Houston County Commission, C.A. No. 85-H-946-S (S.D. Ala. 1985);
Dillard v. Crenshaw County et al., C.A. No. 87-T-1234-N (M.D.
Ala.).  Thus, there would appear to be alternatives for electing
the four circuit judges in this circuit that would afford black
voters with an equal opportunity to participate in the electoral
process and to elect judicial candidates of their choice,
although single-member districts may not necessarily be the only
remedial alternative available to the State.

- 3 -

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
no discriminatory purpose or effect.  See <u>Georgia</u> v. <u>United
States</u>, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52.  In
satisfying its burden, the submitting authority must demonstrate
that the choices underlying the proposed change are not tainted,
even in part, by an invidious racial purpose; it is insufficient
simply to establish that there are some legitimate,
nondiscriminatory reasons for the voting change.  See <u>Village of
Arlington Heights</u> v. <u>Metropolitan Housing Development Corp.</u>, 429
U.S. 252, 265-66 (1977); <u>City of Rome</u> v. <u>United States</u>, 446 U.S.
156, 172 (1980); <u>Busbee</u> v. <u>Smith</u>, 549 F. Supp. 494, 516-17
(D.D.C. 1982), <u>aff'd</u>, 459 U.S. 1166 (1983).  While we do not in
any way question the State's need for creating a new judgeship
position for the 20th Circuit, we do find ourselves unable to
conclude that the State has carried its burden of showing the
absence of the proscribed purpose in creating that position
through expansion of an existing system for electing candidates
to the circuit court which our analysis shows to be violative of
Section 2 of the Voting Rights Act.  See <u>e.g.</u>, 28 C.F.R.
51.55(b).  Therefore, on behalf of the Attorney General, I must
interpose an objection to the electoral changes occasioned by Act
No. 90-539.

Of course, as provided by Section 5 of the Voting Rights
Act, you have the right to seek a declaratory judgement from the
United States District Court for the District of Columbia that
the proposed changes have neither the purpose nor will have the
effect of denying or abridging the right to vote on account of
race or color.  In addition, you may request that the Attorney
General reconsider the objection.  However, until the objection
is withdrawn or a judgment from the District of Columbia Court is
obtained, the proposed changes continue to be legally unenforce-
able.  <u>Clark</u> v. <u>Roemer</u>, 59 U.S.L.W. 4583 (U.S. June 3, 1991);
28 C.F.R. 51.10 and 51.45.

Because the submitted changes occasioned by Act No. 90-539
are at issue in <u>SCLC</u> v. <u>Evans</u>, <u>supra</u>, we are providing a copy of
this letter to the court in that case.

- 4 -

    To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Alabama plans to take concerning this matter.  If you have any questions, you should call Mark Posner (202-307-1388), an attorney in the Voting Section.

                    Sincerely,

                    John R. Dunne
            Assistant Attorney General
              Civil Rights Division

cc:  Honorable Truman Hobbs
      United States District Judge



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

December 23, 1991

David R. Boyd, Esq.
Balch & Bingham
P. O. Box 78
Montgomery, Alabama  36101

Dear Mr. Boyd:

This refers to Act No. 91-558, which creates a second
district court judgeship in Marshall County, and the
implementation schedule for that change; and Act No. 91-640,
which creates a 25th circuit judgeship in the Tenth Circuit for
the Bessemer Division, an eighth circuit judgeship in the 15th
Circuit, and a third circuit judgeship in the 19th Circuit, and
the implementation schedule for those changes for the State of
Alabama, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received your initial submission on October 24, 1991;
supplemental information was received on November 4 and 5, 1991.

With regard to the changes occasioned by Act No. 91-558 and
91-640, to the extent that the latter statute provides for the
creation of a third circuit court judgeship in the 19th Circuit,
the Attorney General does not interpose any objection.  However,
we note that the failure of the Attorney General to object does
not bar subsequent judicial action to enjoin enforcement of the
changes.  See the Procedures for the Administration of Section 5
(28 C.F.R. 51.41).

We are unable to reach a similar conclusion with regard to
the changes occasioned by Act No. 91-640 pertaining to the
creation of an additional circuit judgeship in the 10th Circuit
and in the 15th Circuit.  As you are aware, private plaintiffs in
pending litigation have alleged that the system for electing

- 2 -

judges in some judicial circuits and districts in Alabama, including the 10th and the 15th Circuits, violates Section 2 of the Voting Rights Act, 42 U.S.C. 1973, and that the state has continued to maintain the at-large, numbered post electoral system with the knowledge that this election method minimizes minority electoral opportunities. SCLC v. Evans, Civ. Action No. 88-D-462-N (M.D. Ala.). The trial in that case, in which the United States is participating as amicus curiae, was conducted on December 2-11, 1991, and the court has requested that post-trial briefs be filed by January 15, 1992.

Our analysis of the at-large, numbered post electoral system and the context in which it has operated in the 10th and 15th Circuits is based upon a number of factors, including evidence at trial. For example, expert testimony was presented to show that the state has maintained the at-large, numbered post system, at least in part, for racially discriminatory reasons. Expert testimony also was presented concerning the presence of racially polarized voting in both the 10th and 15th Circuits. We note that in the 10th Circuit (Jefferson County), which has a 35 percent black population based upon the 1990 Census, only three of the twenty four circuit judges are black, the third having been only recently appointed by the governor. None of the eleven district court judges are black. Similarly, in the 15th Circuit (Montgomery County), which has a 41.6 percent black population, only one of the seven circuit judges is black and none of the three district court judges is black.

Notwithstanding the evidence of racially polarized voting, black voters in both Jefferson and Montgomery Counties have been able to elect candidates of their choice to local governing bodies when alternatives to the at-large electoral system have been implemented. See, e.g., Taylor v. Jefferson County, CA-84-C-1730-S (N.D. Ala. Oct. 31, 1985) (consent decree requiring 5 single-member districts); Hendrix v. McKinney, 460 F. Supp. 626 (M.D. Ala. 1978). Furthermore, evidence presented at the trial demonstrates that the black population in both the 10th and 15th Circuits is sufficiently large and geographically compact to permit the creation of single-member districts, subdistricts or smaller multimember districts, some of which would have effective black voting age majorities. Thus, there appear to be readily discernible alternative methods of electing the twenty four circuit judges in the 10th Circuit and the seven circuit judges in the 15th Circuit that would afford black voters with an equal opportunity to participate in the electoral process and to elect judicial candidates of their choice.

- 3 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has no discriminatory purpose or effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In satisfying its burden, the submitting authority must demonstrate that the choices underlying the proposed change are not tainted, even in part, by an invidious racial purpose; it is insufficient simply to establish that there are some legitimate, nondiscriminatory reasons for the voting change. See <u>Village of Arlington Heights</u> v. <u>Metropolitan Housing Development Corp.</u>, 429 U.S. 252, 265-66 (1977); <u>City of Rome</u> v. <u>United States</u>, 446 U.S. 156, 172 (1980); <u>Busbee</u> v. <u>Smith</u>, 549 F. Supp. 494, 516-17 (D.D.C. 1982), <u>aff'd</u>, 459 U.S. 1166 (1983). While we do not in any way question the state's need for creating the new judgeship positions for the 10th and 15th Circuits, we do find ourselves unable to conclude that the state has carried its burden of showing the absence of the proscribed purpose in creating those positions through expansion of an existing system for electing candidates to the circuit court which our analysis shows to be violative of Section 2 of the Voting Rights Act. See <u>e.g.</u>, 28 C.F.R. 51.55(b). Therefore, on behalf of the Attorney General, I must interpose an objection to the electoral changes occasioned by Act No. 91-640 insofar as they pertain to the 10th and the 15th Circuits.

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgement from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the proposed changes continue to be legally unenforceable. <u>Clark</u> v. <u>Roemer</u>, 59 U.S.L.W. 4583 (U.S. June 3, 1991); 28 C.F.R. 51.10 and 51.45.

Because some of the submitted changes occasioned by Act No. 91-640 pertain to judicial circuits at issue in <u>SCLC</u> v. <u>Evans</u>, <u>supra</u>, we are providing a copy of this letter to the court in that case.

- 4 -

    To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the State of
Alabama plans to take concerning this matter.  If you have any
questions, you should call Sandra S. Coleman (202-307-3718), a
Deputy Section Chief in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division


cc:  Honorable Truman Hobbs
     United States District Judge



U.S. Department of Justice

Civil Rights Division

_____

*Office of the Assistant Attorney General*          *Washington, D.C. 20530*

March 27, 1992

Honorable Jimmy Evans
Attorney General -
Alabama State House
11 South Union Street
Montgomery, Alabama  36130

Dear Mr. Attorney General:

This refers to Act No. 92-63 (1992), which provides the redistricting plan for Congressional districts and Act No. 92-152 (1992), which provides for a change in the qualifying deadline for the June 2, 1992, primary election for members of Congress for the State of Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received the Congressional redistricting submission on March 11, 1992; supplemental information was received on March 12, 17, 18, 23, 24, 25, and 26, 1992.  The submission of the change in qualifying deadline was received on March 26, 1992.

With respect to the change in qualifying deadline, the Attorney General does not interpose any objection to the change. However, we note that the failure of the Attorney General to object does not bar subsequent litigation to enjoin enforcement of the change.  In addition, as authorized by Section 5, we reserve the right to reexamine this submission if additional information that would otherwise require an objection comes to our attention during the remainder of the sixty-day review period.  See the Procedures for the Administration of Section 5, 28 C.F.R. 51.41 and 51.43.

With respect to the far more complex Congressional redistricting, we note at the outset the extreme time constraints imposed by the order of the Court in <u>Wesch</u> v. <u>Hunt</u>, No. 91-0787 (S.D. Ala. March 9, 1992), which allowed the state until noon today to obtain preclearance of its proposed plan under Section 5.  For that reason, our review to date necessarily has been limited, and similarly, the short time available has limited the state's ability to meet its burden under Section 5.  To the extent possible, however, we have given careful consideration to the materials and information you have so diligently made available to us.

As you are aware, a concern has been raised that an underlying principle of the Congressional redistricting was a predisposition on the part of the state political leadership to limit black voting potential to a single district.  The proposed

- 2 -

plan provides for one such district based on black population concentrations in Jefferson County, Montgomery County and intervening areas.  The remainder of the state's concentrated black population, however, is fragmented under the submitted plan among a number of districts none of which has a black population of as much as 30 percent.  In light of the prevailing pattern of racially polarized voting throughout the state, it does not appear that black voters are likely to have a realistic opportunity to elect a candidate of their choice in any of the districts.

Our analysis further indicates that the fragmentation of black population concentrations outside of the one district with a black voting age population majority was unnecessary.  Indeed, it is clear that at least the outlines of alternative plans that avoided such fragmentation were available or readily discernable by state officials and that such alternatives would provide for two Congressional districts with black voting age population majorities.  These included plans with one district based on the black communities of Montgomery and Mobile Counties and the intervening and adjacent black-populated areas, and the other based upon the black population of Jefferson County and southern Tuscaloosa County, together with black-populated areas to the south and west.  Moreover, it appears that the elimination of this identified fragmentation would enhance the ability of black voters to elect representatives of their choice.

The fragmentation of black population in areas of the state outside of the proposed black majority district, under these circumstances, has not been adequately explained.  The reasons for this fragmentation appear to be related to the desire to protect incumbent members or to serve parochial political interests.  While such considerations in themselves are not inappropriate, they may not be accomplished at the expense of the rights of black voters.  Garza v. City of Los Angeles, 918 F.2d 763 (9th Cir. 1990); Ketchum v. Byrne, 740 F.2d 1398, 1408-09 (7th Cir. 1984), cert. denied, 471 U.S. 1135 (1985).

Under Section 5, as noted above, the state has the burden of demonstrating that a proposed change was not adopted with a racially discriminatory purpose and that it will not have a racially discriminatory effect.  In addition, a redistricting plan may not be precleared if the plan clearly violates Section 2 of the Act, 42 U.S.C. 1973.  See the Section 5 Procedures, 28 C.F.R. 51.55(b)(2).

Under the circumstances discussed above, and particularly in light of the time constraints which the legislative and court schedules have imposed, I cannot conclude, as I must under the Voting Rights Act, that the proposed districts are entitled to Section 5 preclearance.  Accordingly, I must, on behalf of the Attorney General, interpose an objection to the proposed redistricting plan for Congressional districts for the State of Alabama.

- 3 -

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed Alabama Congressional redistricting plan has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, Section 51.45 of the guidelines permits you to request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the proposed Alabama Congressional redistricting plan continues to be legally unenforceable. <u>Clark</u> v. <u>Roemer</u>, 59 U.S.L.W. 4583 (U.S. June 3, 1991); 28 C.F.R. 51.10 and 51.45.

If you have any questions, feel free to call Voting Section attorney John Tanner (202-307-2897), who has been assigned to handle this matter.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

MAY 0 1 1992

John E. Pilcher, Esq.
Pilcher and Pilcher
P. O. Box 1346
Selma, Alabama 36702-1346

Dear Mr. Pilcher:

This refers to the 1992 redistricting plan for the board of education in Dallas County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your submission on March 2, 1992

We have considered carefully the information you have provided, as well as Census data and information received from other interested parties. Between 1980 and 1990, the black share of Dallas County's population increased from 54.5 percent to 57.8 percent. Under the existing plan, blacks constitute a significant majority of the population in Districts 1, 2 and 3 (83%, 65% and 71% black, respectively). Despite the increase in the county's black population proportion, the proposed plan reduces the black percentage in District 2 from 65.3 percent to 57.6 percent. In the context of the electoral history and the pattern of racially polarized voting in Dallas County, this reduction appears to minimize the opportunity afforded black voters to elect a candidate of their choice in this district. See <u>United States</u> v. <u>Dallas County Commission,</u> 850 F.2d 1433 (11th Cir. 1988).

The Supreme Court, in <u>Beer</u> v. <u>United States</u>, 425 U.S. 130, 141 (1976), explained that "the purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."

- 2 -

While we recognize that District 2 in the existing plan is underpopulated, our review of the county's demography reveals that an eight percentage point reduction in the black percentage in District 2 was not necessary to comply with the one person, one vote requirement of the United States Constitution.  In fact, during the redistricting process, the school board considered and rejected an alternative plan that balanced the county's population among the districts without reducing the black percentage in District 2.  The proposed plan also appears to overconcentrate black residents in Districts 1 and 3 (84% and 76% black, respectively), and fragments contiguous black populations in the Selma area between Districts 3 and 5.

In addition, our information suggests that the school board's redistricting decisions were motivated, in part, by a desire to protect the incumbent board member from District 2. While we recognize that the desire to protect incumbents may not in and of itself be an inappropriate consideration, it may not be accomplished at the expense of minority voting potential.  Garza v. Los Angeles County, 918 F.2d 763, 771 (9th Cir. 1990), cert. denied, 111 S. Ct. 681 (1991); Ketchum v. Byrne, 740 F.2d 1398, 1408-09, (7th Cir. 1984), cert. denied, 471 U.S. 1135 (1985). Where, as here, the protection afforded an incumbent is provided at the expense of black voters, the school board bears a heavy burden of demonstrating that its choices are not tainted, at least in part, by an invidious racial purpose.

In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the county's burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the 1991 redistricting plan for the Dallas County Board of Public Education.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed redistricting plan has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the 1992 redistricting plan continues to be legally unenforceable. Clark v. Roemer, 111 S.Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

- 3 -

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Dallas County Board of Public Education plans to take concerning this matter.  If you have any questions, you should call Richard Jerome (202-514-8696), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

July 21, 1992

John E. Pilcher, Esq.
Pilcher and Pilcher
P. O. Box 1346
Selma, Alabama 36702-1346

Dear Mr. Pilcher:

This refers to the 1992 redistricting plan for the board of education in Dallas County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your submission on May 22, 1992.

We have considered carefully the information you have provided, as well as Census data and information received from other interested parties. Between 1980 and 1990, the black share of Dallas County's population increased from 54.5 percent to 57.8 percent. Under the existing plan, blacks constitute a significant majority of the population in Districts 1, 2 and 3 (83%, 65% and 71% black, respectively). On May 1, 1992, the Attorney General interposed a Section 5 objection to an earlier plan drawn by the school board. Our objection was based on that plan's reduction of the black share of the population in District 2 from 65.3 percent to 57.6 percent. This reduction appeared to minimize the opportunity afforded black voters to elect a candidate of their choice in this district. Moreover, the school board's redistricting decisions appeared to be motivated, in part, by a desire to protect the incumbent board member from District 2. In addition, the objected-to plan overconcentrated black residents in Districts 1 and 3 (84% and 76% black, respectively), and fragmented contiguous black populations in the Selma area between Districts 3 and 5.

- 2 -

Analysis of the plan now under submission reveals that it, too, reduces the black share of the population in District 2 (from 65.3 percent to 61.6 percent) and fails to address the overconcentration and fragmentation of black population identified in our previous objection. As we noted in our May 1, 1992, objection letter, this kind of reduction in black population in District 2 is not necessary to comply with the one person, one vote requirement of the United States Constitution. Moreover, the school board has continued to reject alternative plans that balanced the county's population among the districts without reducing the black percentage in District 2. The board suggests that the changes from the existing plan are motivated by a desire on the part of the board's majority to create a "swing" district, i.e., a district in which the white incumbent in District 2 will have a greater chance of reelection. This result may not be accomplished at the expense of minority voting potential. Garza v. Los Angeles County, 918 F.2d 763, 771 (9th Cir. 1990), cert. denied, 111 S. Ct. 681 (1991); Ketchum v. Byrne, 740 F.2d 1398, 1408-09, (7th Cir. 1984), cert. denied, 471 U.S. 1135 (1985).

In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the school board's burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the 1992 redistricting plan for the Dallas County Board of Education.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed redistricting plan has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the 1992 redistricting plan continues to be legally unenforceable. Clark v. Roemer, 111 S.Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

We also note that the 1992 redistricting plan for the Dallas County Commission was implemented for the June 2, 1992, primary election for the board of education. While the county has obtained Section 5 preclearance for the use of that redistricting plan for county commission elections, Section 5 preclearance is necessary but has not been obtained for use of that plan for county board of education elections.

- 3 -

    To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the Dallas
County Board of Education plans to take concerning this matter.
If you have any questions, you should call Richard Jerome
(202-514-8696), an attorney in the Voting Section.

                              Sincerely,

                              John R. Dunne
                        Assistant Attorney General
                           Civil Rights Division



U.S. Departm    of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

November 12, 1992

Philip Henry Pitts, Esq.
Pitts, Pitts & Thompson
P.O. Drawer 537
Selma, Alabama  36702-0537

Dear Mr. Pitts:

This refers to the 1992 redistricting plan for city council districts for the City of Selma in Dallas County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We received your initial submission on September 14, 1992; supplemental information was received on October 29, 1992.

We have considered carefully the information you have provided, as well as Census data and information received from other interested parties.  According to the 1990 Census, between 1980 and 1990, the black share of Selma's population increased from 52.1 percent to 58.4 percent.  There are eight members of the Selma city council elected from single-member districts, with a ninth councilmember, the council president, elected at large. Under the existing plan, blacks constitute a significant majority of the population in Districts 5, 6, 7, and 8 (83, 96, 98, and 93 percent black, respectively).

Despite the increase in the city's black population proportion, the proposed plan continues to concentrate black population in four districts at percentages that are 78, 95, 92, and 92 percent black while fragmenting black populations in other districts.  In the context of the electoral history and the pattern of racially polarized voting in the City of Selma, it appears that this plan will limit black voters to an opportunity to elect no more than four members of council, as black voters repeatedly have been unable to elect candidates of their choice in citywide elections.

cc:  Public File

- 2 -

Moreover, our review indicates that the extremely heavy concentration of blacks in each of Districts 5 through 8 is not necessary in order to assure that black voters will have an opportunity to elect their candidates of choice in these districts. While some of this overconcentration may be attributable to segregated residential patterns, it appears that there were other redistricting options available that satisfy the City's legitimate redistricting criteria without limiting unfairly the ability of black voters in the city as a whole to elect councilmembers.

In fact, during the redistricting process, an alternative plan, supported by the black community, that balanced the city's black population among the districts and created five in which black voters would be able to elect their chosen candidates was considered and rejected by the white councilmembers. While the Selma city council was not required to adopt a particular plan advocated by the black community, the city is required to show that the proposed plan was not adopted, at least in part, by a desire to deny or abridge the right to vote on account of race or color. In this regard, the reasons presented to us for rejecting this alternative plan appear to be pretextual, motivated by the desire to confine black population concentrations into a predetermined number of districts, and thus ensure a continuation of the current white majority on the council.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the 1992 redistricting plan for the Selma city council.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed redistricting plan has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the 1992 redistricting plan continues to be legally unenforceable. See Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

- 3 -

    To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Selma plans to take concerning this matter.  If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

    Since the Section 5 status of the redistricting plan is a matter before the court in <u>Hines</u> v. <u>Smitherman</u>, No. 92-0641-BH-M (S.D. Ala.), we are providing a copy of this letter to the court in that case.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

cc:  Honorable William Brevard Hand
     U. S. District Judge



**U.S. Department of Justice**

**Civil Rights Division**

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

December 4, 1992

Nicholas H. Cobbs, Jr., Esq.
1110 Main Street
Greensboro, Alabama  36744

Dear Mr. Cobbs:

     This refers to the change in method of election from five
councilmembers elected at large to five councilmembers elected
from single-member districts and the districting plan for the
City of Greensboro in Hale County, Alabama, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received your response
to' our request for additional information on October 5 and
November 19 and 20, 1992.

     We have considered carefully the information you have
provided, as well as comments and information from other
interested persons.  The 1990 Census reports that black residents
constitute 62 percent of the total population and 56 percent of
the total voting age population in Greensboro.  Our analysis
reveals that elections in Greensboro and Hale County are
characterized by racially polarized voting and that no black
candidates were elected to office under the city's at-large
election system.  Moreover, in 1987, the city conceded in a
consent decree that its present at-large method of election
violates Section 2 of the Voting Rights Act, 42 U.S.C. 1973.

     With regard to the change from at-large elections to single-
member districts, the Attorney General does not interpose any
objection.  However, we note that the failure of the Attorney

- 2 -

General to object does not bar subsequent litigation to enjoin
the enforcement of this change.  See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).

With respect to the proposed districting plan, however, we
cannot reach the same conclusion.  Although the city council had
no black members at the time, the city proceeded to develop its
proposed plan without public participation.  The plan provides
for two districts (Districts 1 and 3) in which the black voting
age population percentage is in excess of 75 percent, and for
another district (District 2) in which the black voting age
population percentage is 58 percent.  The remaining two districts
have white voting age population majorities.  The city reports
that it decided to configure District 2 with a predetermined
black population percentage, so as to reflect the black
population percentage in the city as a whole.  In doing so,
however, it appears to have fragmented black population
concentrations in order to lower the black percentage in
District 2 to produce the city's desired result.

Our analysis of the proposed plan indicates that it would
provide black voters the opportunity to elect candidates of their
choice in District 1 and District 3 but that the same cannot be
said for District 2.  This analysis is supported by the August
1992 election using the proposed plan as a court-ordered interim
plan.  While black-supported candidates were elected to the city
council from Districts 1 and 3, a black-supported candidate in
District 2 was defeated.  Your submission has identified no
special circumstances that distinguish the 1992 election from the
pattern of minority vote dilution that occasioned the at-large
system's violation of Section 2.  It appears therefore that the
proposed districting plan, particularly the goal of limiting the
number of black potential voters in District 2, would restrict
black voters to an opportunity to elect no more than two members
of the city council, of which the mayor is a sixth voting member,
in future elections.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R.
51.52.  In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance with regard to the proposed
districting plan.  Therefore, on behalf of the Attorney General,
I must object to the proposed city council districting plan.

- 3 -

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change has neither the
purpose nor will have the effect of denying or abridging the
right to vote on account of race or color.  In addition, you may
request that the Attorney General reconsider the objection.
However, until the objection is withdrawn or a judgment from the
District of Columbia Court is obtained, the districting plan
continues to be legally unenforceable.  Clark v. Roemer,
111 S.Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the City of
Greensboro plans to take concerning this matter.  If you have any
questions, you should call Robert Kengle (202-514-6196), an
attorney in the Voting Section.

Because the objected-to plan is the subject of ongoing
litigation, Dillard v. City of Greensboro, No. 87-T-1223-N (M.D.
Ala) (Thompson, J), we are providing a copy of this letter to the
Court and to plaintiffs' counsel.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division

cc:  Honorable Myron H. Thompson
     United States District Judge



U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

DEC 24 1992

John E. Pilcher, Esq.
Pilcher and Pilcher
P.O. Box 1346
Selma, Alabama 36702-1346

Dear Mr. Pilcher:

This refers to the October 26, 1992 redistricting plan for the board of education in Dallas County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your submission on November 2, 1992.

We have considered carefully the information you have provided, as well as Census data, information contained in your submissions of two earlier redistricting plans following the 1990 Census, and information and comments received from other interested parties. As you know, we interposed Section 5 objections to the school board's two previous redistricting plans because of the unjustified and unnecessary retrogression in minority voting strength in proposed District 2. Moreover, the school board's redistricting decisions as to both plans appeared to be motivated, in part, by a desire to protect the incumbent board member from District 2.

Analysis of the plan now under submission reveals that it, too, reduces the black share of the population in District 2 (from 65.3 percent to 63.0 percent). As we noted in our previous letters, no reduction in black population percentage in District 2 is necessary to comply with the one person, one vote requirement of the United States Constitution. Moreover, the school board has continued to reject alternative plans that balanced the county's population among the districts without any reduction in the black percentage of District 2. The school board has articulated no legitimate nonracial justification for its latest choice of a plan which, like its predecessors, effects a retrogression in the position of minority voters given the county's electoral history and pattern of polarized voting. See <u>Beer</u> v. <u>United States</u>, 425 U.S. 130 (1976).

- 2 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the October 26, 1992 redistricting plan.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed redistricting plan has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the redistricting plan continues to be legally unenforceable. See Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the Dallas County Board of Education plans to take concerning this matter. If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

John R. Dunne
Assistant Attorney General
Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*　　　　*Washington, D.C. 20035*

March 15, 1993

Philip Henry Pitts, Esq.
Pitts, Pitts & Thompson
P.O. Drawer 537
Selma, Alabama  36702-0537

Dear Mr. Pitts:

This refers to the December 28, 1992, redistricting plan for
city council districts for the City of Selma in Dallas County,
Alabama, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.
We received your submission on January 14, 1993.

We have considered carefully the information you have
provided, as well as Census data and information received from
other interested parties.  According to the 1990 Census, between
1980 and 1990, the black share of Selma's population increased
from 52.1 percent to 58.4 percent.  There are eight members of
the Selma city council elected from single-member districts, with
a ninth councilmember, the council president, elected at large.

As you know, on November 12, 1992, the Attorney General
interposed an objection under Section 5 to the first council
redistricting plan adopted by the city following the 1990 Census.
Our objection was based on that plan's overconcentration of black
residents into four districts that were, respectively, 78, 95,
92, and 92 percent black in total population.  The district with
the next highest black population percentage was District 4, at
44 percent.  In addition, the objected-to plan fragmented
contiguous black population concentrations among the remaining
districts.  We also noted that the city considered and rejected
an alternative plan, supported by the black community, that
balanced the city's black population among the districts and
created five districts in which black voters would be able to

- 2 -

elect their chosen candidates.  Moreover, the city's
redistricting decisions appeared to have been motivated, in part,
by a desire to confine black population concentrations into a
predetermined number of districts, and thus ensure a continuation
of the current white majority on the council.

The redistricting plan now before us has four districts with
black population percentages over 70 percent (71, 74, 93, and 97
percent, respectively), and a fifth district with a black
population majority of 60 percent (55.8 percent black in voting
age population).  We recognize that this redistricting plan
partially addresses our concerns about the objected-to
redistricting plan by decreasing the concentration of black
population in two districts and creating a fifth district with a
black voting age population majority.  But against the backdrop
of the history of racial discrimination and racially polarized
voting in the city, the new plan still exhibits some of the same
pattern of fragmenting black population concentrations, as that
identified previously, in an apparent effort to limit the
opportunity for black voters to elect more than four
councilmembers.

Indeed, the latest redistricting proposal tends only to
underscore the absence of legitimate nonracial reasons for the
city's failure to adopt available or easily discernible
alternative redistricting plans or approaches that would address
the concerns about the fragmentation of black population
concentrations.  The minutes of the December 28, 1992, council
meeting reveal that the vote to adopt the submitted plan was
along racial lines.  For one councilmember the identity of the
author of the plan preferred by the black members of the council
was sufficient reason to reject it.  Another councilmember noted
that the alternative plan was unacceptable because it places him
in a district with another incumbent.  But our review of the
rejected alternative plan indicates that it was readily
discernible that incumbents could have been placed in separate
districts without decreasing the black population percentage in
the fifth black majority district.  While the city was not
required to adopt a particular redistricting plan or approach
advocated by the black community, the city's proffered reasons
for rejecting such alternative proposals appear to be pretextual.

- 3 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the December 28, 1992, redistricting plan for the Selma city council.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed redistricting plan has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, you may request that the Attorney General reconsider the objection.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the proposed redistricting plan continues to be legally unenforceable.  See Clark v. Roemer, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

Finally, we address your response to the court's December 2, 1992, order in Hines v. Smitherman, No. 92-0641-BH-M (S.D. Ala.), that both plans presented to the court, one proposed by the plaintiff-intervenors and one proposed by the original parties were to be "transmitted by the City of Selma, Alabama to the Attorney General of the United States for approval or rejection under Section 5 of the Voting Rights Act, as amended."  While you have transmitted a copy of the plan proposed by the plaintiff-intervenors, you have advised us that the plan was not adopted by the city council, as reflected by the city council minutes of December 28, 1992.  Accordingly, because the City of Selma did not enact and does not seek to administer that plan and it does not appear to reflect the policy choices of the City of Selma, no determination under Section 5 by the Attorney General was required or appropriate.  See 28 C.F.R. 51.18(a) and 51.35.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Selma plans to take concerning this matter.  If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

- 4-

Because the Section 5 status of the submitted redistricting plan is a matter before the court in <u>Hines</u> v. <u>Smitherman</u>, we are providing a copy of this letter to the court and counsel of record in that case.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

cc:   Honorable William Brevard Hand
      U.S. District Judge

      Counsel of Record



U.S. Department    Justice

Civil Rights Division

---

*Office of the Assistant Attorney General.*                    *Washington, D.C. 20035*

Mr. A. Perry Wilbourne                    **AUG 3 0 1993**
Clerk/Administrator
Drawer 400
Foley, Alabama 36536

Dear Mr. Wilbourne:

This refers to the annexation (Ordinance No. 472-93) to the
City of Foley in Baldwin County, Alabama, submitted to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c.  We received your response
to our May 17, 1993, request for additional information on
June 29, 1993.

We have considered carefully the information you have
provided, as well as Census data, information contained in your
submissions of earlier annexations, and information and comments
from other interested persons.  As you know, on November 6, 1989,
the Attorney General interposed a Section 5 objection to the
city's proposal to annex three predominantly white residential
areas.  Our analysis of the information available at that time
indicated that the city's annexation policy was not being applied
in a nondiscriminatory manner towards predominantly black and
predominantly white residential areas whose residents desired
annexation to the city.  The city offered no legitimate nonracial
explanation for its willingness to encourage the petitions for
annexation of majority white residential areas while discouraging
and rejecting petition efforts by a majority black residential
area known as Mills Quarters.

Our analysis of the submitted annexation reveals that it,
like the annexations objected to in 1989, reflects a continuation
of the city's previously noted practice of annexing areas that
can be expected to contain predominantly white population, while
discouraging the annexation of areas of predominantly black
population.  The city has provided no new information since our
1989 objection that suggests that its continued failure to annex
majority black areas, such as Mills Quarters or the area of
Beulah Heights not already within the city limits, is based on
legitimate, nonracial criteria.

- 2 -

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See <u>City of Pleasant Grove</u> v. <u>United States</u>, 479 U.S. 462, 469 (1987); <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to Ordinance No. 472-93.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed annexation has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the proposed annexation continues to be legally unenforceable insofar as it affects voting. See <u>Clark</u> v. <u>Roemer</u>, 111 S. Ct. 2096 (1991); <u>Dotson</u> v. <u>City of Indianola</u>, 514 F. Supp. 397, 403 (N.D. Miss. 1981); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Foley plans to take concerning this matter. If you have any questions, you should call George Schneider (202-307-3153), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*           Washington, D.C. 20035

November 16, 1993

Lynda K. Oswald, Esq.
Assistant Attorney General
Alabama State House
11 South Union Street
Montgomery, Alabama  36130

Dear Ms. Oswald:

This refers to Act No. 93-882 (1993), which creates a sixth judicial position in the Sixth Judicial Circuit to be elected at large by numbered post with a majority vote requirement and provides an implementation schedule therefor for the State of Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your submission on September 17, 1993; supplemental information was received on September 20, 1993.

We have considered carefully the information you have provided, as well as 1990 Census data, comments received from interested parties, and information contained in the state's earlier submissions of the creation of additional judicial positions in other judicial circuits and the record and decision in SCLC v. Evans, 785 F. Supp. 1469 (M.D. Ala. 1992), appeal docketed, No. 92-6257 (11th Cir.).  In the Sixth Judicial Circuit, which is coterminous with Tuscaloosa County, black persons constitute 26 percent of the population and 23 percent of the voting age population.  Our review of the election analyses and other evidence in the SCLC case leads us to conclude that voting in interracial contests in Tuscaloosa County is characterized by racial polarization.  In addition, it appears that potential candidates of choice of black voters may have been deterred from running for the circuit court due in part to this polarization and the existing at-large election system.  Indeed, prior to a recent appointment to the bench, no black person had served as a circuit court judge in the Sixth Circuit.

- 2 -

In contrast, black voters in Tuscaloosa County have been able to elect candidates of their choice to county governing bodies when, as the result of voting rights litigation, the county has implemented alternatives to an at-large electoral system. See, e.g., Thomas v. Tuscaloosa County, C.A. CV 84-P-1041-W (N.D. Ala. March 14, 1985) (consent decree); Dillard v. Crenshaw County, C.A. No. 87-T-1234-N (M.D. Ala.). Thus, there are available alternatives for electing circuit judges that would afford black voters an equal opportunity to participate in the electoral process and to elect judicial candidates of their choice.

We have analyzed the state's decision to expand the at-large election system in the Sixth Judicial Circuit against this backdrop. We recognize that the state has asserted that it has an interest in adding a sixth judgeship to the Sixth Circuit in order to relieve an overcrowded court docket. However, serving that interest need not be tied to expanding the at-large method of electing Sixth Circuit judges, which has not provided black voters an equal opportunity to participate in the process and to elect judges, as opposed to an alternative election system that would fairly recognize black voting strength. Under Section 5, the submitting authority must demonstrate that the choices underlying the proposed change are not tainted, even in part, by an invidious racial purpose; it is insufficient simply to establish that there are some legitimate, nondiscriminatory reasons for the voting change. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977); City of Rome v. United States, 446 U.S. 156, 172 (1980); Busbee v. Smith, 549 F. Supp. 494, 516-17 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983).

Prior to the state's adoption of the change at issue here, the Attorney General had interposed Section 5 objections to similar expansions of the at-large systems in other judicial circuits in the state. On November 8 and December 23, 1991, the Attorney General interposed objections to the creation of additional judicial positions, to be elected at large by numbered post and majority vote, in the Tenth (Jefferson County), Fifteenth (Montgomery County), and Twentieth (Henry and Houston Counties) Judicial Circuits. On May 26, 1992, after considering the state's request for reconsideration based, in part, upon an examination of the SCLC case, the Attorney General declined to withdraw either of the earlier objections.

- 3 -

The SCLC case involves a challenge brought under Section 2 of the Voting Rights Act, 42 U.S.C. 1973, by private plaintiffs to Alabama's system for electing circuit court and district court judges in certain areas of the state, including the Sixth Circuit, at issue here, as well as the Tenth, Fifteenth and Twentieth Circuits, at issue in our prior Section 5 determinations noted above.  The district court's ruling that the challenged at-large system does not violate Section 2 is currently on appeal before the United States Court of Appeals for the Eleventh Circuit.  As an initial matter, the United States is not a party in the SCLC litigation and is not bound by decisions in private Section 2 litigation in determining whether Section 5 preclearance requirements have been met.  See, e.g., City of Richmond v. United States, 422 U.S. 358, 373-374 n.6. (1975).

Moreover, the reasoning of the district court's opinion in the SCLC decision appears to be at odds with the Eleventh Circuit's recent opinion in Nipper v. Smith, 1 F.3d 1171 (11th Cir. 1993).  For example, the district court in SCLC found that voting in the Sixth Circuit was not racially polarized, relying primarily on elections involving only white candidates.  By contrast, the Eleventh Circuit held in Nipper that such reliance is misplaced when elections involving interracial contests show "pervasive polarization."  1 F.3d at 1180.  In addition, the Nipper decision holds that using the percentage of black lawyers as a basis for determining minority electoral success, as the district court did in SCLC, improperly discounts the "history of racial discrimination and the exclusion of black citizens from access to legal education."  1 F.3d at 1183.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect.  See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52).  In addition, a submitted change may not be precleared if its implementation would lead to a clear violation of Section 2.  See 28 C.F.R. 51.55(b).  In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the proposed expansion of the existing at-large, numbered-post, majority-vote system for electing candidates to the Sixth Judicial Circuit meets the preclearance requirements.  Therefore, on behalf of the Attorney General, I must object to the submitted changes.

- 4 -

    We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the additional judicial position for the Sixth Circuit continues to be legally unenforceable.  <u>Clark</u> v. <u>Roemer</u>, 111 S. Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

    Because the proposed implementation schedule is directly related to the objected-to change, the Attorney General will make no determination with respect to that change at this time. 28 C.F.R. 51.22(b).

    To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Alabama plans to take concerning this matter.  If you have any questions, you should call Donna M. Murphy (202-514-6153), an attorney in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

January 3, 1994

Nicholas H. Cobbs, Jr., Esq.
City Attorney
1110 Main Street
Greensboro, Alabama  36744

Dear Mr. Cobbs:

This refers to the 1993 districting plan for the City of
Greensboro in Hale County, Alabama, submitted to the Attorney
General pursuant to Section 5 of the Voting Rights Act of 1965,
as amended, 42 U.S.C. 1973c.  We received your submission on
November 2, 1993; supplemental information was received on
December 21, 1993.

We have considered carefully the information you have
provided, as well as comments and information from other
interested persons.  According to the 1990 Census, black
residents constitute 62 percent of the total population and 56
percent of the voting age population in Greensboro.  On
December 4, 1992, the Attorney General interposed a Section 5
objection to the initial districting plan adopted by the city
following the 1990 Census.

Our analysis of the 1992 districting plan showed unnecessary
fragmentation of black population concentrations in several areas
of the city.  Information made available to us indicated that the
city configured its boundary lines with the express purpose of
keeping District 2 under the objected-to plan to a predetermined
black population percentage designed to reflect the black
population percentage in the city as a whole.  Within the context
of the polarized voting patterns that appear to be prevalent in
Greensboro city elections, and virtually a closed districting
process, the objected-to plan appeared unnecessarily to limit
black voters to an opportunity to elect only two of the five
councilmembers.  On June 15, 1993, we declined to withdraw our
objection based upon the city's failure to provide new factual
information or legal arguments in support of its reconsideration
request.

- 2 -

The 1993 districting plan makes minimal changes to the
objected-to plan.  With regard to District 2, which had been the
focus of our concern, the 1993 plan adds one block to the
district and removes another block from the district.  While the
plan provides for slight increases in the black population
percentages in District 2, the opportunity for black voters to
elect a representative of their choice in that district appears
to have been constrained deliberately, taking into account the
continued fragmentation of black population concentrations, the
pattern of racially polarized voting and the reduced electoral
participation by black persons, which is traceable to a history
of discrimination.

The city has provided no satisfactory explanation for
limiting black electoral opportunities in this manner.  Indeed,
the city was aware of several alternative plans that created
three districts in which black voters constituted a greater
majority of the voting age population in a third district than in
proposed District 2.  While the city was not required under the
Voting Rights Act to adopt any specific alternative plan, it is
not free to adopt a districting plan which, as would appear here,
is calculated to limit black voting strength.

Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R.
51.52.  In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance with regard to the proposed
districting plan.  Therefore, on behalf of the Attorney General,
I must object to the 1993 city council districting plan.

We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change has neither the
purpose nor will have the effect of denying or abridging the
right to vote on account of race or color.  In addition, you may
request that the Attorney General reconsider the objection.
However, until the objection is withdrawn or a judgment from the
District of Columbia Court is obtained, the districting plan
continues to be legally unenforceable.  Clark v. Roemer,
111 S.Ct. 2096 (1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the City of
Greensboro plans to take concerning this matter.  If you have any
questions, you should call Delora L. Kennebrew (202-307-3718), a
Deputy Chief in the Voting Section.

- 3 -

Because the objected-to plan is the subject of ongoing litigation, Dillard v. City of Greensboro, No. 87-T-1223-N (M.D. Ala) (Thompson, J), we are providing a copy of this letter to the Court and to plaintiffs' counsel.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division

cc:  Honorable Myron H. Thompson
     United States District Judge

     Edward Still, Esq.



U.S. Department of Justice

Civil Rights Division

_Office of the Assistant Attorney General_                     _Washington, D.C. 20035_

January 31, 1994

Lynda K. Oswald, Esq.
Assistant Attorney General
Alabama State House
11 South Union Street
Montgomery, Alabama  36130

Dear Ms. Oswald:

    This refers to Amendment 425 to the Alabama Constitution,
insofar as it provides in the State of Alabama that a referendum
on a local constitutional amendment may not be held unless it is
first approved by the Local Constitutional Amendment Commission,
submitted to the Attorney General pursuant to Section 5 of the
Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c.  We
received your most recent response to our November 27, 1990,
request for additional information on December 2, 1993.

    We have considered carefully the information you have
provided, as well as information from other interested persons.
According to the 1990 Census, the State of Alabama has a total
population of 4,040,587, of whom 25 percent are black.  Amendment
425, adopted in 1982, provided for a change in the procedure for
ratifying local amendments to the state constitution (_i.e._,
amendments that affect only one county).  Previously, local
amendments and amendments of general statewide application were
ratified in the same manner -- the proposed amendment initially
would need to be approved by a three-fifths vote of each house of
the legislature, and then be approved in a statewide referendum.
Amendment 425 worked two principal changes in this procedure.
First, it provides that after the legislature approves a local
amendment, a referendum may not be held unless a commission known
as the Local Constitutional Amendment Commission (created by
Amendment 425) "unanimously approve[s]" the amendment.  This
Commission is composed of five state officials, the governor,
lieutenant governor, attorney general, secretary of state, and
speaker of the House of Representatives.  Second, if the
amendment proceeds to a referendum, the referendum is held only
in the affected county.

- 2 -

In 1982, the state made a limited Section 5 submission with respect to then-proposed Amendment 425 (which was awaiting approval in the statewide referendum). The state's submission letter specified that the only change that would be occasioned by the amendment would be the change in the constituency that votes on local constitutional amendments. The submission letter made no mention of the creation of the Commission and the role that it would play in determining whether local amendment referenda are held. Accordingly, this latter change was not submitted for preclearance in 1982, and was not precleared when the Attorney General responded to the 1982 submission by granting preclearance. Clark v. Roemer, 111 S.Ct. 2096 (1991); McCain v. Lybrand, 465 U.S. 236 (1984). Nevertheless, the state proceeded to implement the Commission review procedure.

The state did not seek Section 5 preclearance for the Commission review procedure until it made the instant submission in 1990, following a 1989 request by this office that the change be submitted. The state's submission letter described the scope of the Commission's review function as follows:

> the . . . Commission may (1) approve a vote by the people of the affected county and political subdivision on a proposed constitutional amendment affecting only one county, (2) approve a statewide vote on a proposed constitutional amendment affecting only one county or (3) fail to submit the proposed constitutional amendment to the vote of the people when one or more members of the Commission do not vote in favor of the proposed amendment.

Subsequently, the Alabama Supreme Court ruled that the Commission does not possess the authority to redirect a proposed amendment to the statewide ballot, and that the sole authority of the Commission is either to approve or veto proposed local amendments. Hunt v. Decatur City School District, No. 1911844 (Aug. 27, 1993). With regard to this veto authority, the state has identified no limitation on the reasons why a single Commission member may decide to veto an amendment, and there is no indication that the Commission's review authority is limited to the relatively neutral question of whether an amendment complies with the other procedural requirements of Amendment 425 (e.g., the requirement that the amendment affect only one county).

After reviewing the state's 1990 submission, we determined that the information that had been provided was insufficient to enable us to make the requisite Section 5 determination and accordingly we wrote the state in November 1990 requesting that certain items of additional information be provided. Procedures for the Administration of Section 5 (28 C.F.R. 51.37). Since then, we have sought, with only limited success, to obtain the

- 3 -

requested information.  The state now has asked that we proceed
to make a final determination, although significant items of
requested information still have not been provided (e.g., a
detailed description of the process leading to the creation of
the Commission, the reasons for its creation, and information as
to all the local amendments that have been vetoed by the
Commission).

    According to the available information, a number of vetoes
have been cast by the Commission against proposed local
amendments that would have changed the procedure for filling
vacancies in certain local offices in several majority-black
counties.  The state has not provided any information as to why
these vetoes were cast but it does not appear that these
amendments were blocked for failure to comply with other
requirements of Amendment 425.  On the other hand, we have
received allegations that, at least in part, the vetoes were
racially motivated.

    Our analysis indicates that the addition of the Commission
procedure to the amendment process may diminish the opportunity
of black voters to obtain referenda on issues of importance to
them.  Without the Commission procedure, a proposed amendment
proceeds to a referendum vote if the amendment is approved by the
legislature.  In the House and Senate, we understand that local
amendments generally are approved if they meet with the approval
of the local legislative delegation.  The members of these
delegations in turn often are legislators with respect to whom
black voters have substantial influence.  The Commission, on the
other hand, is principally composed of officials elected in
statewide elections where black voters exert less influence.

    Under Section 5 of the Voting Rights Act, the submitting
authority has the burden of showing that a submitted change has
neither a discriminatory purpose nor a discriminatory effect.
See Georgia v. United States, 411 U.S. 526 (1973); 28 C.F.R.
51.52.  In light of the considerations discussed above, I cannot
conclude, as I must under the Voting Rights Act, that your burden
has been sustained in this instance.  Therefore, on behalf of the
Attorney General, I must object to Amendment 425 insofar as it
provides that a referendum on a local constitutional amendment
may not be held unless it is first approved by the Local
Constitutional Amendment Commission.

    We note that under Section 5 you have the right to seek a
declaratory judgment from the United States District Court for
the District of Columbia that the proposed change has neither the
purpose nor will have the effect of denying or abridging the
right to vote on account of race or color.  In addition, you may

- 4 -

request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the objected-to change continues to be legally unenforceable.  Clark v. Roemer, supra; 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Alabama plans to take concerning this matter.  If you have any questions, you should call Mark A. Posner (202-307-1388), Special Section 5 Counsel in the Voting Section.

Sincerely,

James P. Turner
Acting Assistant Attorney General
Civil Rights Division



U.S. Department of Justice

Civil Rights Division

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20035*

APR 1 4 1994


The Honorable Jimmy Evans
Attorney General
State of Alabama
Alabama State House
11 South Union Street
Montgomery, Alabama  36130

Dear Mr. Attorney General:

     This refers to the State of Alabama's submission to the
Attorney General pursuant to Section 5 of the Voting Rights Act
of 1965, as amended, 42 U.S.C. 1973c, of the following voting
changes:

     1.  Act No. 602 (1969), which provided for two additional
associate justice positions on the supreme court, the initial
appointment of persons to the new positions, and a change in the
method of staggering terms; Act No. 987 (1969), which provided
for the creation of the court of civil appeals and the court of
criminal appeals each with three members elected at large (in
partisan elections, with a majority vote requirement in the
primary, and with numbered positions), six-year terms of office,
staggered terms for the court of civil appeals and concurrent
terms for the court of criminal appeals, and the appointment of
the initial judges for the courts; Act No. 75 (1971), which
provided for two additional positions on the court of criminal
appeals, the initial appointment of persons to the new positions,
and a change to staggered terms; and Act No. 346 (1993), which
provides for two additional positions on the court of civil
appeals and a change in the method of staggering terms;

     2.  The provisions of the initial proposed consent judgment
in <u>White</u> v. <u>State of Alabama</u>, CV 94-T-94-N (M.D. Ala.); and

- 2 -

3.   The revised proposed consent judgment in <u>White</u> v. <u>State of Alabama</u>, as amended on April 14, 1994, which provides for two additional positions on the court of criminal appeals and the court of civil appeals, the method for initially filling those positions by appointment, a conditional change in the method of selecting supreme court associate justices in certain years from election to appointment and the appointment method, a conditional increase in the number of supreme court associate justices (up to two) and the method of initially filling those positions by appointment, the procedure for eliminating any additional associate justice positions created pursuant to the judgment, and the appointment method of filling vacancies on the appellate courts in certain circumstances.

We received your submission of the revised proposed consent judgment, as amended, on April 14, 1994, and the submission of that proposal is directly related to, and recommences the 60-day review period for, the previously pending changes enacted by the legislative acts enumerated in paragraph 1.  Procedures for the Administration of Section 5 (28 C.F.R. 51.39).  In addition, by a letter of April 7, 1994, the state withdrew its Section 5 submission of the changes accomplished by the initial proposed consent judgment in <u>White</u>.  Accordingly, no determination by the Attorney General is required concerning that matter.  28 C.F.R. 51.25(a).

We have considered carefully the information you have provided, as well as information from other interested persons. Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52.  In addition, the Section 5 Procedures (28 C.F.R. 51.55(b)(2)) require that preclearance be withheld where a change presents a clear violation of the results standard incorporated in Section 2 of the Voting Rights Act, 42 U.S.C. 1973.  Where the submitted changes involve additional elective positions, those changes must be reviewed in light of the method by which the positions will be elected.

According to the 1990 Census, Alabama has a total population of 4,040,587 persons, of whom 25 percent are black.  Black persons constitute 23 percent of the state's voting age population.  The black population is concentrated in the state's three largest cities -- Birmingham, Mobile, and Montgomery -- and in a region known as the Black Belt which extends horizontally across the south-central portion of the state.

- 3 -

As of November 1, 1964, when the state became covered under
Section 5, the state supreme court was composed of an elected
chief justice and six elected associate justices. We now are
called upon to review the state's establishment in 1969 of two
additional associate justice positions in the context of an at-
large method of election, which includes a majority vote
requirement in the partisan primary and numbered positions when
more than one position for the court is on the ballot.

On November 1, 1964, the state appellate system included one
elected intermediate court of appeals. Before us for Section 5
review is the abolishment of that court in 1969 and its
replacement by the court of civil appeals and the court of
criminal appeals, each elected at large, with the majority vote
requirement in the primary, numbered positions, and staggered
terms.

The voting changes occasioned by the proposed revised
consent judgment in White v. State of Alabama also are before us
for Section 5 review. In White, plaintiffs challenge under
Section 2 of the Voting Rights Act, 42 U.S.C. 1973, the at-large
method of electing the three appellate courts. The goal of the
settlement's remedial provisions

 is to serve the compelling state interest in remedying the
 past and present effects of racial discrimination and
 current electoral conditions, which inhibit members of the
 plaintiff class [of all black resident citizens and
 electors] in electing candidates of their choice to the
 appellate courts of the State of Alabama. The provisions
 are intended as a flexible means of providing class members
 a meaningful and equal opportunity to elect candidates of
 their choice to judgeships on the Alabama Courts of Civil
 and Criminal Appeals and the Alabama Supreme Court. In
 addition, the provisions are intended to serve the
 beneficial goal of enhancing racial diversity in the
 membership of those courts.

Proposed Final Judgment, ¶ 4.

The proposed consent judgment does not make a permanent
change in the at-large method of electing the state's appellate
courts. Instead, its goals are to be accomplished through the
establishment of an alternative appointment process for the
appellate courts which is to be invoked in certain specific
circumstances. The appointments are to made by the governor,
which is the current practice when vacancies occur (and which is
the practice when new appellate court judgeships are filled
before the first election). However, under the proposed
judgment, the governor would select the appointees from a list of

- 4 -

candidates proposed by a nominating commission created by the judgment.  The commission is to be composed of two members selected to represent the plaintiff class, one selected by the Alabama Lawyers Association, one selected by the Alabama State Bar Association, and one selected by the other four (if they are unable to agree then the fifth is selected by the black caucus in the state legislature).  Any qualified attorney in the State of Alabama may apply to the nominating commission.

Each intermediate appellate court is to be expanded to seven members with the initial judges to be appointed in 1996 pursuant to the procedure outlined above, and the positions thereafter would be elected pursuant to the existing system.  In addition, vacancies thereafter would be subject to the special appointment procedure in certain defined circumstances.  For associate justice positions on the supreme court, the special appointment procedure would be invoked in certain circumstances if a vacancy arises, if an associate justice decides not to seek re-election in the years 1996, 1998, and/or 2000, or if an additional associate justice position is established in 1998 and/or 2000. The overall goal of the proposed judgment is that, by the year 2001, at least two members of the plaintiff class or persons appointed through the special appointment procedure will be serving on each appellate court.  Thereafter, if a vacancy arises on an appellate court and there are fewer than two such persons serving on that court, the governor's existing authority to appoint an interim justice or judge would be modified to require that the appointee be selected from a list proposed by the special nominating commission.  The special appointment procedures provided for in the proposed judgment would terminate upon the completion of four, six-year judicial election cycles following the 1994 election, unless extended by the court in White.  In addition, during the term of the judgment, plaintiffs may seek further relief or the state may seek to terminate the judgment based upon circumstances specified in the judgment.

In analyzing these matters, we begin by reviewing the legislatively enacted changes without reference to the provisions of the revised consent judgment.  The consent judgment is provisional in that it still awaits review by the court in White. In addition, our conclusions with respect to the legislative changes will then inform our judgment as to the necessity and adequacy of the proposed consent judgment changes.

There currently is one black person, the Honorable Ralph Cook, serving on the nine-member supreme court.  He was appointed by the governor in 1993 after the first black person to serve on that court, the Honorable Oscar Adams, retired in mid-term. Justice Cook is up for election for the first time this year. Justice Adams also gained his position initially by appointment

- 5 -

(in 1980) and was elected in 1982 and 1988.  No other black persons have run for positions on the supreme court.  No black persons have been appointed to either the court of civil appeals (which currently has three members) or the court of criminal appeals (which currently has five members), and no black persons have run for these courts without the benefit of being an appointed incumbent.

Elections at all levels in the state generally are characterized by racially polarized voting.  We have repeatedly found this to be the case in past Section 5 reviews, most recently on a statewide basis in interposing an objection, on March 27, 1992, to the state's 1992 congressional redistricting plan.  As reflected in the stipulations filed by the plaintiffs and defendants in <u>White</u> as an attachment to the proposed consent judgment, courts also have found polarized voting in numerous Section 2 and Fourteenth Amendment dilution lawsuits.  Most black elected officials in the state are elected from black majority districts.

Our analysis indicates that polarized voting extends to judicial elections.  In 1991 and 1993, the Attorney General interposed Section 5 objections to the establishment of additional circuit court judgeships in four circuits based on the conclusion that the at-large method of electing these judgeships, in the context of polarized voting and other electoral factors, denied black voters an equal opportunity to elect candidates of their choice.  In <u>SCLC</u> v. <u>Evans</u>, 785 F. Supp. 1469 (M.D. Ala. 1992), <u>vacated</u>, No. 92-6257 (11th Cir. Feb. 28, 1994), <u>reh'g en banc granted</u>, 1994 Westlaw 93271 (11th Cir. Mar. 23, 1994), a Section 2 challenge to the at-large system for Alabama trial court judges, plaintiffs' expert presented convincing evidence of polarized voting in black-white election contests in the challenged circuits.

As noted, only one black person has faced election for the appellate courts, the Honorable Oscar Adams.  Our analysis indicates that, in the 1982 runoff, he narrowly defeated a white opponent in a racially polarized election that was marked by racial campaign appeals.  In 1988, he faced opposition only in the general election, and, like all other Democratic appellate court candidates in modern history, he was elected.  Our analysis indicates that black candidates have not run for the courts of appeals, and no other black candidate has run for the supreme court, because of the perception among potential black candidates and black political leaders that running as a nonincumbent would be a futile exercise under the existing at-large system.  <u>See</u> <u>Westwego Citizens for Better Govern.</u> v. <u>Westwego</u>, 872 F.2d 1201, 1208-1209 & n.9 (5th Cir. 1989) (courts should consider the possibility that black candidates "'don't run because they can't win'" in evaluating dilution evidence).

- 6 -

There are a number of other electoral factors relevant to an evaluation of the existing at-large election system.  Black voters suffer from a history of discrimination in education, employment, and other areas which has created a significant disparity between the socioeconomic status of the state's black and white citizens.  This disparity in turn inhibits the ability of black voters to participate on an equal basis in state elections.  Black voters also have been the victims of a history of discrimination in voting, which has continued past the adoption of the Voting Rights Act to the present day.  The use of a majority vote requirement and numbered positions enhances the discriminatory nature of the at-large system.

Also relevant are the circumstances that have inhibited or burdened potential black appellate court candidates.  The state has a recent history of racial discrimination in legal education.  In addition, campaigns for an appellate court position require the financial means to campaign on a statewide basis and, we understand, potentially may cost hundreds of thousands of dollars.

Alternative election systems exist that would fairly reflect black voting strength in the state.  For example, with respect to the proposed five-member courts of appeals, the black population is sufficiently large and geographically concentrated that, in a fairly drawn single-member district plan, blacks would constitute a majority of the voting age population in one district.  Similarly, with respect to the supreme court, a fairly drawn districting plan would include two associate justice districts in which blacks would constitute a majority of the voting age population.

Accordingly, without the proposed consent judgment, the voting changes enacted by the submitted legislative acts are not entitled to Section 5 preclearance.

The settlement is predicated on the view that, in appellate court elections, incumbency (through election or appointment) provides substantial benefits to candidates.  In that regard, seven of the 17 present members of the appellate courts initially obtained their positions through a gubernatorial appointment.  Since 1968 there have been 26 appointments to the appellate courts but only two have been of black lawyers.  Thus, it is asserted that black voters (who historically have favored black candidates as their candidates of choice) will gain an equal opportunity to elect candidates of their choice by temporarily establishing the above-described structured appointment system.  Once the appointments occur, it further is asserted that the electoral factors that render the at-large election system discriminatory will be diminished such that, in future elections, black voters will be able to elect candidates of their choice in a manner reflective of their voting strength in the state.

- 7 -

        Our analysis leads us to conclude that the state has met its
burden of demonstrating that the changes occasioned by the
revised proposed consent judgment (as amended on April 14, 1994)
do not have the purpose or effect of minimizing black voting
strength.  Nor do they present a clear violation of Section 2 of
the Act.  Accordingly, the Attorney General does not interpose
any objection to the changes occasioned by the revised proposed
consent judgment.  However, we note that Section 5 expressly
provides that the failure of the Attorney General to object does
not bar any litigation to enjoin the enforcement of the changes.
In addition, as authorized by Section 5, we reserve the right to
reexamine these changes if additional information that would
otherwise require an objection comes to our attention during the
remainder of the sixty-day review period.  28 C.F.R. 51.41 and
51.43.

        However, although the consent judgment changes are ripe for
review under Section 5, McDaniel v. Sanchez, 452 U.S. 130 (1981),
28 C.F.R. 51.22, the contingent nature of these changes precludes
them from providing a basis for preclearing the legislatively
enacted changes at this time.  Accordingly, on the behalf of the
Attorney General, I must interpose an objection to the changes
for the supreme court occasioned by Act No. 602 (1969) in the
context of the existing at-large method of electing the court,
and I must interpose an objection to the changes for the courts
of criminal and civil appeals occasioned by Act Nos. 987 (1969),
75 (1971), and 346 (1993) in the context of the at-large method
of electing these courts.  Should the court in White grant final
approval to the proposed judgment, the state at that time should
seek reconsideration of this objection and the Attorney General
would be prepared to grant the requisite preclearance.  28 C.F.R.
51.45.  Of course, under Section 5 the state also has the right
to seek a declaratory judgment from the United States District
Court for the District of Columbia that the legislative changes
have neither the purpose nor will have the effect of denying or
abridging the right to vote on account of race or color.

        Finally, we note that the Section 5 court in White is poised
to address the question whether injunctive relief should be
granted based on the unprecleared status of appellate court
judgeships that are up for election this year.  See Clark v.
Roemer, 111 S. Ct. 2096 (1991).  The proposed consent judgment
contemplates that elections will go forward this year under the
at-large election system.  We understand that the court will seek
to conduct its review of the proposed judgment at the earliest
possible time.  In these exceptional circumstances, where the
Attorney General has precleared the changes occasioned by the
proposed judgment and is prepared to preclear the legislative
changes if the court grants its approval to the judgment, we
believe that it would be appropriate to defer granting injunctive
relief and thus allow the primary election for the unprecleared

- 8 -

positions to be conducted.  Should the court not approve the
judgment before this year's general election, the issue of
granting injunctive relief should be revisited.  We will be
present at the oral argument to be held tomorrow, April 15, in
<u>White</u> to respond to any questions the court may have in this
regard.

    To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action the State of
Alabama plans to take concerning this matter.  If you have any
questions, you should call Mark A. Posner (202-307-1388), Special
Section 5 Counsel in the Voting Section.  Because of the pendency
of this matter before the court in <u>White</u>, we are sending by
facsimile transmission copies of this letter to the court and
counsel of record.

                              Sincerely,


                              Deval L. Patrick
                         Assistant Attorney General
                            Civil Rights Division



U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General                Washington, D.C. 20035

DEC 13 1994

Marc Givhan, Esq.
Deputy Attorney General
State of Alabama
Alabama State House
11 South Union Street
Montgomery, Alabama 36130

Dear Mr. Givhan:

This refers to the State of Alabama's request that the
Attorney General reconsider and withdraw the April 14, 1994,
objection interposed under Section 5 of the Voting Rights Act of
1965, as amended, 42 U.S.C. 1973c, to the voting changes for the
state supreme court and the courts of criminal and civil appeals
occasioned by Act Nos. 602 (1969), 987 (1969), 75 (1971), and 346
(1993).  We received your request for reconsideration on
October 14, 1994.

As you are aware, in the April 14 determination letter, the
Attorney General granted Section 5 preclearance to the changes
affecting the state appellate courts occasioned by the proposed
consent judgment (as revised on April 14, 1994) in <u>White</u> v. <u>State
of Alabama</u>, CV 94-T-94-N (M.D. Ala.) (preclearance was granted to
subsequent revisions to the consent agreement on September 20,
1994).  The Attorney General further indicated in the April 14
letter that the proposed consent judgment would remedy the
concerns with the legislatively enacted changes but since
implementation of the consent judgment was contingent on judicial
approval, it did not provide a basis for preclearing the
legislatively enacted changes at that time.  Finally, the state
was advised that "[s]hould the court in <u>White</u> grant final
approval to the proposed judgment, the state at that time should
seek reconsideration of this objection and the Attorney General
would be prepared to grant the requisite preclearance."

On October 6, 1994, the district court in <u>White</u> approved the
consent judgment.  The district court's ruling has been appealed
to the Eleventh Circuit.

- 2 -

    The state's reconsideration request is based solely on the
approval of the consent judgment by the district court.  However,
the fact that the judgment now has been appealed means that the
judicial approval process is not yet final.  In these
circumstances, it would not be appropriate to withdraw the
objection and, accordingly, on behalf of the Attorney General, I
must decline to do so at this time.

    We recognize the paramount interest of the state and the
United States in avoiding disruption of the administration of
justice in Alabama.  By declining to withdraw the objection at
this stage in the judicial process, we do nothing to affect the
status of the consent judgment or the status of the legislatively
enacted changes.  In light of the district court's approval of
the consent judgment and the Attorney General's continuing
commitment to preclear the legislatively enacted changes at such
time as the judgment obtains final judicial approval, there
has been no change to the "extreme circumstance" cited by the
Section 5 court in <u>White</u> as the basis for denying injunctive
relief, in its order of April 15, 1994.

    Should you have any questions about this matter, please
telephone Special Section 5 Counsel Mark Posner of the Voting
Section, at (202) 307-1388.

                                    Sincerely,


                                    Deval L. Patrick
                             Assistant Attorney General
                                Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

---

Office of the Assistant Attorney General          Washington, D.C. 20035

February 6, 1998

E. Paul Jones, Esq.
P.O. Box 448
Alexander City, Alabama  35011-0448

Dear Mr. Jones:

This refers to the reduction in the number of county commissioners from six to five and the redistricting plan for Tallapoosa County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your most recent response to our May 23, 1997, request for additional information on November 20, 1997. On December 8, 1997, we received information responsive to our May 23, 1997, request from the Alabama Reapportionment Office in Montgomery, Alabama, which was prepared for the Tallapoosa County Commission during its redistricting process.

We have given careful consideration to the information you have provided, along with Census data and information and comments from other interested persons. Our review of the submitted changes is also informed by a history of noncompliance on the part of the county with legal requirements (constitutional, statutory, and court mandated) designed to protect the right to vote and to ensure minority voters, in particular, an equal electoral opportunity.

For example, during most of the 1970's the county implemented an unprecleared at-large method of election, in the absence of a fairly apportioned redistricting plan for its five single-member districts. In response to a Section 5 enforcement action brought by minority residents, the county in 1983 submitted for Section 5 review the change to an at-large method of election. Holly v. Sharpe, C.A. No. 82-17-E (M.D. Ala. 1982). We interposed an objection due largely to the retrogressive effect the change would have on minority electoral opportunity.

- 2 -

Following our 1983 objection, the county obtained
preclearance for a fairly apportioned redistricting plan in 1985.
However, despite significant malapportionment in this plan
revealed by 1990 Census data and the failure of minority voters
to elect a candidate of choice in the sole district with a bare
black population majority, the county did not adopt a properly
apportioned plan that fairly recognized minority voting strength
until we brought suit under Section 2 of the Voting Rights Act,
42 U.S.C. 1973.  United States v. Tallapoosa County, No. CV-93-D-
1362-E (M.D. Ala. filed November 12, 1993).

In an effort to resolve this lawsuit, we negotiated to
develop a remedial five-member redistricting plan for the county
commission.  In addition, representatives of the minority
community, notably the Alabama Democratic Conference and its
local affiliate, were involved in discussions with the county
over a suitable remedy.  In the course of these discussions,
redistricting plans were developed which indicated that a five-
member plan could be drawn containing reasonably compact
districts, including one with a black voting age percentage in
the high 50's.

The parties were unable to agree on a five-member
redistricting plan to remedy the Section 2 violation.  The county
proposed a temporary expansion of the commission to six members,
and we agreed.  Increasing the size of the commission permitted
the county to fashion a plan in which no white incumbent would
have to oppose another white incumbent or would have to run in a
majority black district.  The parties agreed to a consent decree
which the court approved on April 22, 1994, directing that the
1994 election be held under a plan containing six districts.  The
six-member plan developed by the county for use in the 1994
election contained a district with a 62.4 percent black voting
age population (District 6).  The election that followed produced
the first black Tallapoosa County Commissioner this century.

The consent decree entered by the court also included the
following joint representations by the parties regarding the
factors that exist in the county that establish a prima facie
violation of Section 2: (a) the county's black population is
sufficiently numerous and geographically compact such that black
persons can constitute a majority of the voting age population
and registered voters in one out of five single-member districts;
(b) voting in the county is racially polarized; and (c) white
voters vote sufficiently as a bloc to usually defeat candidates
of black voters' choice except in districts where blacks are a
substantial majority of the electorate.

- 3 -

For the 1998 election and thereafter, the consent decree required that the county adopt a fairly apportioned five-member plan with one district with a majority black voting age population.  At the time the consent decree was agreed to Commissioner John Neighbors had made known that, if elected in 1994, he would not seek reelection in 1998.  Thus, the development of a five-member plan would likely not require any white incumbents seeking reelection in 1998 to run in the majority black district or against another incumbent.

The redistricting process for the plan to be used in 1998 began in 1995 and culminated in the adoption of the proposed plan in March 1997.  It appears that the process on the whole proceeded in a manner calculated to minimize participation by the public in general, and the black community in particular.  In contrast to the contacts and discussions in the period leading to the development of the 1994 plan, the county appears to have made no meaningful effort after 1994 to obtain the views of members of the minority community other than District 6 Commissioner Garland Gamble.  Further, prior to the two occasions when the commission formally voted on the adoption of a plan, it appears that the commission held no public hearings to seek the public's views on redistricting for 1998 and failed to provide adequate public notice, as apparently required by Alabama Code § 11-3-1.1.

In 1995 Commissioner Gamble proposed a five-member plan containing reasonably compact districts, including one with a 57.5 percent black voting age population.  His plan only paired two incumbents in the same district, himself and John Neighbors, the District 1 incumbent who had said that he would not be a candidate for reelection in 1998.  For over a year, it appears, Mr. Gamble's proposal was not opposed by any other member of the county commission.  However, in September 1996 the county resumed its redistricting efforts; this occurred shortly after Commissioner Neighbors reversed his prior statement and announced his intention to run for reelection.  Stating that Commissioner Gamble's plan was unacceptable to him, Commissioner Neighbors proposed a plan in which the black population in the majority black district was reduced in order to improve his chances for reelection.  In the plan proposed by Commissioner Neighbors he and Commissioner Gamble would be paired in a district having a black voting age population of 49.2 percent.  No other district would have a black voting age population exceeding 30 percent.

- 4 -

The first formal vote on a 1998 redistricting plan took place in October 1996. Choosing between the two plans, the commission, voting along racial lines, adopted Commissioner Neighbors's plan over Commissioner Gamble's plan, despite the former plan's failure to meet the consent decree's requirement that one district have a black voting age population majority. A copy of the plan was provided to the District Court and to us as a party to the litigation, but it was not submitted for Section 5 review. Subsequently, the county rescinded its adoption of that plan. In its stead, the county adopted a similar plan in which the black voting age population of the minority district was increased by 2.5 percentage points, apparently in order to achieve a marginal majority in black voting age population. It is this plan that the county has submitted for Section 5 review.

According to 1990 Census data, black persons represent 26.2 percent of the county's total population, and 23.2 percent of its voting age population. Both the existing six-member plan and the proposed five-member plan contain only one district with a majority black population. In the existing plan this district has a 62.4 percent black voting age population based on 1990 Census data. In the proposed plan this district has a 51.7 percent black voting age population. The latter figure is likely to be even lower given the inclusion of an area with white, post-1990 population growth located south of Alexander City and west of Highway 63. Thus, the proposed plan reduces the black voting age population in the majority black district by at least 10.7 percentage points. The proposed majority black district is also very similar in configuration and population to the "minority" district in the plan in effect in 1990 in which the candidate of choice of minority voters lost the election by a significant margin.

Our analysis of the proposed plan indicates that the reduction in the black voting age population in the majority black district, in the context of the county's electoral history and pattern of racially polarized voting, is likely to affect adversely the ability of black voters to elect a candidate of their choice to the county commission. Furthermore, alternative five-member plans prepared before and after the adoption of the existing six-member plan demonstrate that such a large reduction in black population percentage is not necessary in order to achieve a fairly apportioned, constitutional five-member plan. The county has provided no information that would support a conclusion that the county's minority voters would have a fair opportunity to elect a candidate of choice under the proposed plan.

- 5 -

Taken together, the history of the instant redistricting process and its results raise serious concerns that the county, in reducing the black voting age population in the proposed majority black district, purposely impaired the ability of black voters to elect a candidate of choice in order to protect the reelection opportunities of a white incumbent.  While we recognize that the desire to protect incumbents is not in and of itself an inappropriate consideration, it may not be accomplished at the expense of minority voting potential.  See Garza v. County of Los Angeles, 918 F.2d 763, 771 (9th Cir. 1990), cert. denied, 498 U.S. 1028 (1991) (supervisors who "acted primarily on the political interest of self-preservation" held to have intentionally discriminated when "they chose fragmentation of the Hispanic voting population as the avenue by which to achieve this self-preservation"); id. at 778-79 & n.1 (Kozinski, J., concurring in part and dissenting in part); Ketchum v. Byrne, 740 F.2d 1398, 1408 (7th Cir. 1984), cert. denied, 471 U.S. 1185 (1985); Rybicki v. State Board of Elections, 574 F. Supp. 1082, 1109 (N.D. Ill. 1982) (three-judge court).  It is clear that the county in devising the proposed plan impermissibly gave greater weight to protecting the electoral opportunity of a white incumbent than it did to complying with Section 5's mandate to avoid retrogression of minority voting strength.  See Beer v. United States, 425 U.S. 130 (1976).

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance.  Therefore, on behalf of the Attorney General, I must object to the proposed redistricting plan.

We note that under Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group.  See 28 C.F.R. 51.44.  In addition, you may request that the Attorney General reconsider the objection.  See 28 C.F.R. 51.45.  However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the proposed redistricting plan continues to be legally unenforceable.  Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

- 6 -

        Because the change to a five-member commission is directly
related to the proposed redistricting plan and cannot be
implemented absent a precleared plan, the Attorney General will
make no determination with regard to the reduction in size of the
county commission.  See 28 C.F.R. 51.22(b).

        To enable us to meet our responsibility to enforce the
Voting Rights Act, please inform us of the action Tallapoosa
County plans to take concerning this matter.  If you have any
questions, you should call Thomas A. Reed (202-514-5682), an
attorney in the Voting Section.  Refer to File No. 97-1021 in any
response to this letter so that your correspondence will be
channeled properly.

                                Sincerely,


                                Bill Lann Lee
                        Acting Assistant Attorney General
                            Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

Office of the Assistant Attorney General                    *Washington, D.C. 20035*

August 16, 2000

J. Frank Head, Esq.
Wallace, Ellis, Fowler & Head
P.O. Box 587
Columbiana, Alabama 35051

Dear Mr. Head:

This refers to 42 annexations (adopted between March 19,
1992, and March 16, 2000) and their designation to council wards
of the City of Alabaster in Shelby County, Alabama, submitted
pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.
We received your partial responses to our July 10, 2000, request
for additional information on numerous dates between July 13 and
August 16, 2000.

We have considered carefully the information you have
provided, as well as Census data, and comments and information
from other interested parties. As discussed later in this
letter, the City of Alabaster has not yet provided a complete
response to our request for additional information, and has
provided information which the city subsequently has acknowledged
to be inaccurate. Under these circumstances, the Attorney
General would normally postpone a decision on the merits of your
submission until the city has responded fully and accurately to
our July 10, 2000, letter. However, the city has asked us to
issue a substantive Section 5 determination regarding the
submitted changes based on the current incomplete record because
of the city's fast approaching August 22, 2000, election.

The Attorney General does not interpose any objection to 40
annexations designated to majority white wards adopted between
March 1992 and March 2000, nor to annexation Ordinances 94-338
and 96-410. Additionally, the Attorney General does not object
to the designation of 40 annexations to Council Wards 5, 6,

-2-

and 7.  However, we note that the failure of the Attorney General
to object does not bar subsequent litigation to enjoin the
enforcement of the changes.  See the Procedures for the
Administration of Section 5 (28 C.F.R. 51.41).  In addition, as
authorized by Section 5, we reserve the right to reexamine this
submission if additional information that would otherwise require
an objection to these changes comes to our attention during the
remainder of the sixty-day review period.  See 28 C.F.R. 51.41
and 51.43.

However, we cannot reach the same conclusion with respect to
the designation of the annexations in Ordinance Nos. 94-338 and
96-410 (hereafter referred to as the "Ward 1 annexations").
According to the 1990 Census and figures provided by the city at
the time of its 1991 redistricting submission, minority residents
constitute 11.0 percent of the city's population and 68.2 percent
of Ward 1.

It is difficult to assess with precision the current
population of the city within the existing wards.  The city has
provided incomplete and inconsistent data and inaccurate maps in
response to our July 10, 2000, request for additional
information.  Each map provided by the city has subsequently been
represented to contain several mistakes.  Moreover, the
demographic statistics provided are out of date given the city's
growth in the decade and it is unclear to which precise
boundaries the statistics relate.  While the 2000 Census data
will provide a clearer picture of the current demographics in the
city, we are only able to utilize the data provided to make
population estimates.  The city has acknowledged that it has had
exponential growth, yet has provided no response to our request
for information to quantify or assess this growth.

You provided an estimate that there are 155 housing units in
the proposed Ward 1 annexations.  The city secretary has provided
data showing that the Ward 1 annexations would add 179 white
registered voters and two black registered voters, thereby
decreasing the minority percentage of registered voters in this
ward from 51.2 to 45.7 percent.  This significant decrease in the
minority voter percentage in Ward 1 appears retrogressive.

In 1975, the Attorney General found "a pattern of racial
bloc voting [to be present] in city elections" in Alabaster when
he objected to annexations which diluted minority voting strength
under the city's then at-large election system.  In our July 10,
2000, letter, we asked the city to provide state,
county, school district, and municipal election returns, and
related voter registration information in order to assess whether
elections in Alabaster continue to be characterized by racially
polarized voting.  As of this time, we have not received

-3-

all of the requested election returns or complete voter
registration data, although you informed us on August 15, 2000,
that we would be receiving them shortly.  As a result, a current
racial bloc voting analysis could not be completed at this time
as we have not had the opportunity to review and analyze the
documents.  Based on our review of the records submitted, we have
no basis to believe that racial bloc voting does not continue to
exist in the city.  Therefore, it appears that the retrogression
caused by the proposed Ward 1 annexations would seriously
threaten, if not eliminate, the only opportunity minority voters
currently have to elect candidates of their choice to city
office.

     Where an annexation significantly decreases minority voting
strength, the reasons for the annexations must be objectively
verifiable, and legitimate, and the post-annexation election
system must fairly reflect the post-annexation voting strength of
the minority community.  City of Richmond v. United States, 422
U.S. 358 at 371-373 (1975).  Here, the designation of these
annexations to Ward 1 is likely to result in the elimination of
representation for a minority community which the submitted data
suggest comprises 9 to 10 percent of the expanded city.  Thus,
the city has not carried its burden of showing that the post-
annexation system will fairly reflect the post-annexation
strength of the minority community.

     Our analysis indicates that there were options available to
and considered by the city which would have avoided the
retrogressive effects of the proposed Ward 1 annexations, such as
a limited redistricting that would make the annexations
contiguous to and a part of Wards 2 or 6.  We understand that
these options had been under discussion among city council
members since at least June 2000, and that concerns about the
potential retrogressive impact of the proposed Ward 1 annexations
had been discussed in the city council as early as 1996.

     The city has proffered few reasons for its refusal to
ameliorate the retrogressive impact of the proposed Ward 1
annexations, asserting that Ward 1 has a lower population than
other wards and that the annexations therefore should be
designated to that ward.  Yet we understand that the city had
recently considered a limited redistricting, which would link
these annexations to Ward 6, a ward with fewer registered voters
than Ward 1.  The city also asserts that these annexations were
designated to Ward 1 because they were not directly contiguous to
any other wards.  However, the city's consideration and rejection
of alternatives to this designation in order to cure this
retrogression demonstrates that the city did not consider its
options limited by the location of the annexations.

     The city asserts that this land was vacant when annexed and
therefore could not have had any negative impact on minority
voting strength and is therefore unobjectionable.  The law is

-4-

clear, however, that the effect of an annexation is to be determined by the most currently available population data when an annexation is submitted for preclearance. City of Rome v. United States, 446 U.S. 156, 186 (1979); 28 C.F.R. 51.54(b)(2). Here, the city waited several years before it sought preclearance of the Ward 1 annexations. Additionally, it was clear that the city was aware at the time of the annexations that they were slated for significant residential development in the near future with homes that were beyond the financial means of minorities in the area.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In light of the considerations discussed above, I am unable at this time to conclude that the City of Alabaster has carried its burden of showing that the designation of Ward 1 annexations has neither a discriminatory purpose nor a discriminatory effect. Therefore, on behalf of the Attorney General, I must object to the designation of the annexations (Ordinance Nos. 94-338 and 96-410) to Ward 1. We will continue our review of the information most recently submitted to assess whether this information would affect our determination and we will notify you of the results of this review as soon as possible.

We note under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the objection by the Attorney General remains in effect and the designation of Ordinance Nos. 94-338 and 96-410 to Council Ward 1 continue to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10, 51.11, 51.45, and 51.48(c) and (d). Therefore, residents of the areas annexed by Ordinance Nos. 94-338 and 96-410 may vote for the mayoral position in the upcoming election but may not vote in the Ward 1 city council race.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Alabaster plans to take concerning this matter. If you have any

-5-

questions, you should call Judybeth Greene (202-616-2350), an
attorney in the Voting Section.  Please refer to File No. 2000-
2230 in any response to this letter so that your correspondence
will be channeled properly.

                              Sincerely,

                              *Bill Lann Lee* SJT

                              Bill Lann Lee
                         Assistant Attorney General
                           Civil Rights Division



**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

Mr. Troy King                                        **JAN - 8 2007**
Attorney General

Mr. John J. Park, Jr.
Assistant Attorney General
State of Alabama
Alabama State House
11 South Union Street
Montgomery, Alabama 36130

Dear Messrs. King and Park:

This letter refers to the change in method of selection for filling vacancies on the Mobile County Commission from special election to gubernatorial appointment in Mobile County, Alabama, pursuant to decisions of the Alabama Supreme Court in *Stokes v. Noonan*, 534 So. 2d 237 (Ala. 1988), and *Riley v. Kennedy*, 928 So. 2d 1013 (Ala. 2005), submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, as amended. This matter arises from an order entered on August 18, 2006, by a three-judge panel in *Kennedy v. Riley*, 445 F. Supp. 2d 1333 (M.D. Ala. 2006), ruling that the State of Alabama submit the two decisions for preclearance under Section 5. We received your submission on November 9, 2006.

We have carefully considered the information you have provided, as well as census data, comments, and information from other interested parties. Under Section 5, the Attorney General must determine whether the submitting authority has met its burden of showing that the proposed change "neither has the purpose nor will have the effect" of denying or abridging the right to vote on account of race. *Georgia v. United States*, 411 U.S. 526 (1973). *See also* Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. § 51.52. "A change affecting voting is considered to have a discriminatory effect under Section 5 if it will lead to a retrogression in the position of members of a racial or language minority group (*i.e.*, will make members of such a group worse off than they had been before the change) with respect to their opportunity to exercise the electoral franchise effectively." 28 C.F.R. § 51.54(a) (citing *Beer v. United States*, 425 U.S. 130, 140-42 (1976)).

Pursuant to Act No. 85-237, a vacancy on the Mobile County Commission is to be filled through popular election by the voters within the relevant single-member district. That statute was precleared by the Attorney General under Section 5 on June 17, 1985 (File No. 1985-1645),

-2-

and was first implemented in a 1987 District 1 special election. Pursuant to decision of the Alabama Supreme Court in *Stokes v. Noonan*, that method of filling vacancies was changed from election by the voters of the district to appointment by the Governor of Alabama in 1988, and reaffirmed by *Riley v. Kennedy* in 2005.

Pursuant to the decision of the three-judge federal panel in *Kennedy v. Riley*, the State has submitted the changes effected by *Stokes v. Noonan* and *Riley v. Kennedy* for review under Section 5 of the Voting Rights Act. Additionally, we understand that Alabama law has changed, legislatively reversing the decision in these cases and restoring the authority to fill vacancies to the voters themselves for future elections. This is the effect of Act No. 2006-342, which was signed by the Governor on April 12, 2006, and which would govern all future vacancies. The question before us, therefore, is limited to whether the change effected by *Stokes v. Noonan* and *Riley v. Kennedy* will lead to impermissible retrogression, caused by the appointment, rather than election, of an individual to fill a vacancy on the Mobile County Commission for a term expiring in 2008.

In evaluating whether a change affecting voting will lead to impermissible retrogression, the Attorney General compares the submitted change to the practice or procedure in effect at the time of the submission. 28 C.F.R. § 51.54(a). In light of your submission, we note that a change brought about by a state court decision is subject to Section 5. *Branch v. Smith*, 538 U.S. 254, 262 (2003). A practice or procedure that is not legally enforceable under Section 5 cannot serve as a benchmark; the comparison is with the last legally enforceable practice or procedure used by the jurisdiction. *Id.* Changes that are not precleared are not enforceable. 42 U.S.C. § 1973c; *Hathorn v. Lovorn*, 457 U.S. 255, 269 (1982); *Clark v. Roemer*, 500 U.S. 646, 652 (1991). Because the changes pursuant to *Stokes* and *Riley* were never precleared, they cannot serve as the benchmark. *See Kennedy*, 445 F. Supp. 2d at 1336, (citing *Abrams v. Johnson*, 521 U.S. 74, 96-97 (1997)); *Gresham v. Harris,* 695 F.Supp. 1179, 1183 (N.D. Ga. 1988) (three-judge court), *aff'd sub nom. Poole v. Gresham*, 495 U.S. 954 (1990). The benchmark is determined without regard to its legality under state law. *Kennedy,* 445 F. Supp. 2d at 1336 (citing *City of Lockhart v. United States*, 460 U.S. 125, 132-133 (1983)); *Perkins v. Matthews*, 400 U.S. 379, 394-95 (1971).

Thus, the last precleared procedure for filling vacancies in the Mobile County Commission that was in force or effect was the special election method set forth in Act No. 85-237. *Kennedy*, 445 F. Supp. 2d at 1336. This Act remains in full force and effect, as it affects voting, was precleared, and was implemented in the 1987 special election cycle. *See Young v. Fordice*, 520 U.S. 273, 282-83 (1997); *Lockhart*, 460 U.S. at 132-33. It is therefore the benchmark against which we measure the proposed change to fill vacancies by appointment of the Governor of Alabama.

The measurement is straightforward. As a result of litigation under the Voting Rights Act, Mobile County is governed by the three-member Mobile County Commission, the members of which are elected from single-member districts. *Brown v. Moore*, Civ. Act. No. 75-298-P

-3-

(S.D. Ala. 1976) (unpublished opinion). One of the single-member districts, District 1, is over sixty-three percent African-American in population and registered voters. The African-American voters of District 1 enjoy the opportunity to elect minority candidates of their choice to the County Commission; indeed, they enjoyed it in the 1987 special election in which Act 85-237 was first implemented. There is no dispute that the change would transfer this electoral power to a state official elected by a statewide constituency whose racial make-up and electoral choices regularly differ from those of the voters of District 1. Attorneys General have on at least ten occasions previously interposed objections to changes in method of selection from election to appointment in Alabama and elsewhere. For instance, in 1971, the Attorney General objected to Act No. 2445 of the Alabama Legislature, which changed the method of selection of judges of Justice of the Peace Courts in Alabama from election to appointment. Letter of David L. Norman, Assistant Attorney General, Civil Rights Division, to Hon. William J. Baxley, Attorney General, State of Alabama, Dec. 26, 1973.

The transfer of electoral power effected by *Stokes v. Noonan* and *Riley v. Kennedy* appears to diminish the opportunity of minority voters to elect a representative of their choice to the Mobile County Commission. We have received no indication that the voters of District 1 would have selected the particular individual selected by the Governor. Under these circumstances, the State has failed to carry its burden of proof that the change is not retrogressive. On behalf of the Attorney General, therefore, I must interpose an objection to the change in method of selection for vacancies occurring on the Mobile County Commission from special election to gubernatorial appointment.

We note that under Section 5, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. *See* 28 C.F.R. § 51.44. In addition, you may request that the Attorney General reconsider the objection. *See* 28 C.F.R. § 51.45. However, until the objection is withdrawn or a judgment from the United States District Court for the District of Columbia is obtained, the method of selection for vacancies on the Mobile County Commission by gubernatorial appointment will continue to be legally unenforceable as a matter of federal law. *Clark v. Roemer*, 500 U.S. 646 (1991); 28 C.F.R. § 51.10.

We also have been advised, as suggested above, that the State has, in essence, re-enacted the provisions of Act No. 85-237 in Act No. 2006-342, which similarly provides that future vacancies on the Mobile County Commission will be filled by special election. To the extent that Act No. 2006-342 does not change the voting practices and procedures set forth in Act No. 85-237, it need not be submitted for Section 5 review. We respectfully request your advice as to whether changes covered by Section 5 are contained in the 2006 law. In the meantime, special elections may be held pursuant to Act No. 85-237.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the State of Alabama plans to take concerning this matter. If you have any

-4-

questions, please call Robert Lowell (202-514-3539), an attorney in the Voting Section. Because this matter has been the subject of pending litigation in *Kennedy v. Riley*, we are serving copies of this letter by facsimile transmission to the Court and counsel of record.

Sincerely,

Wan J. Kim
Assistant Attorney General



**U.S. Department of Justice**

Civil Rights Division

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

August 25, 2008

Dan Head, Esq.
Wallace, Ellis, Fowler & Head
P.O. Box 587
Columbiana, Alabama 35051

Dear Mr. Head:

This refers to 177 annexations, their designations to districts, and the 2008 redistricting plan for the City of Calera in Shelby County, Alabama, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your response to our May 7, 2008, request for additional information on June 24, 2008; additional information was received through August 18, 2008.

According to the 2000 Census, the City of Calera has a total population of 3,158 persons, of whom 628 (19.9%) were identified as African American. We understand that the city has experienced sizeable growth since that time, due primarily to residential development on the 177 annexations now under review. The city has provided estimates that its population is at 10,806 persons as of December 2006, of whom 20 percent are identified as African American.

The submitted annexations and redistricting plan would eliminate the city's sole majority African-American district. This district and the single-member district method of election were adopted pursuant to a consent decree approved 18 years ago by the court in Dillard v. City of Calera, Civil Action No. 2:87cv1167-MHT. Under this arrangement, the district has elected an African-American candidate for the last 20 years.

We have carefully considered the information you have provided, as well as information and materials from other interested parties. Under Section 5 of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Public Law 109-246, 120 Stat. 577 (2006) ("Voting Rights Act"), the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See also Georgia v. Ashcroft, 123 U.S. 2498 (2003); Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. 51.52 (c). As discussed further below, I cannot conclude that the city has sustained its burden of showing that the proposed change does not have a discriminatory purpose or effect. Therefore, based on the information available to us, I object to the voting changes on behalf of the Attorney General.

The United States Supreme Court has held that where annexations decrease minority voting strength, the reasons for the annexations must be objectively verifiable and legitimate,

-2-

and the post-annexation election system must fairly reflect the post-annexation voting strength of the minority community in the expanded city. City of Richmond v. United States, 422 U.S. 358, 370-3 (1975); see also, City of Pleasant Grove v. United States, 479 U.S. 462 (1987); City of Port Arthur v. United States, 459 U.S. 159 (1982); City of Rome v. United States, 446 U.S. 156 (1980).

For 13 years, the city has failed to submit their adopted annexations for Section 5 review. Our Department has not received an annexation submission from the city since 1993, and the city admits that it is at fault for not submitting the 177 annexations. The only submission in the last 13 years was a proposed redistricting plan based on the 2000 Census which included no mention of the missing annexations.

In a similar situation, the United States Supreme Court in City of Rome v. United States, 446 U.S. at 186, made it clear that the current population of the annexations needs to be included for Section 5 review:

> Because Rome's failure to preclear any of these annexations caused a delay in federal review and placed the annexations before the District Court as a group, the court was correct in concluding that the cumulative effect of the 13 annexations must be examined from the perspective of the most current available population data.

The Supreme Court found that the City of Rome failed to provide the necessary information about total population, voting age population, and a racial composition for each. *Id.* Likewise, the City of Calera also has failed to provide any reliable current population information about the 177 annexations here.

The demographic data provided by the city regarding total population and voting age population in the city as a whole is also unreliable. Beginning with total population, the city used certificate of occupancy data to estimate total population in December 2006 of 10,806. The city arrived at this number by decreasing the persons per household multiplier of 2.3 significantly from the 2000 Census without explanation. Had the city used the 2000 Census number, the population estimate would have been approximately 12,000 persons. The United States Census Bureau estimated the population in July 2006 at 8,329 and in July 2007 at 9,398. The city has not explained why its population estimate is substantially higher than the Census estimate. Likewise, the city fails to provide reliable voting age population.

The estimate of racial composition in the city has no basis. The city has claimed that the population is 20 percent black throughout the newly annexed areas, but no attempt has been made to determine their composition. Simply because black population in the city was 20 percent of the population in 2000, does not mean that would be the percentage of black population in the newly annexed areas. In fact, both city-wide voter registration and school data in recent years appear to show growth in the black population. In failing to provide adequate numbers to evaluate the annexations and concomitant redistricting plan, the city fails to meet its burden of proof.

-3-

The City of Calera also appears to have failed to consider how the African-American population would be fairly reflected in the post-annexation election system moving forward. In March 2007, three months prior to the adoption of the proposed redistricting plan, the State of Alabama and plaintiffs filed a Joint Motion to Show Cause asking why the case should not be dismissed. In that order to show cause, they stated that the Alabama legislature in Act No. 2006-252 provide that the Calera City Council can increase the size of the city council under the single-member district method of election by general or local law in the future. The court dissolved the consent decree on May 9, 2007. According to the geographer hired by the city, he was willing to provide information for the city to consider alternative methods of election that would have provided black voters a better opportunity to elect a candidate of choice, but the city council expressed no interest in these alternatives.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District Court for the District of Columbia is obtained, the annexations and concomitant redistricting plan will continue to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Calera plans to take concerning this matter. If you have any questions, you should call Eric Rich (202-305-0107), an attorney in the Voting Section.

Sincerely,

Grace Chung Becker
Acting Assistant Attorney General