FILED
2025 Feb-24 PM 10:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

ACR

ALABAMA
COURT REPORTING

www.alabamareporting.com * 877.478.3376

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION
2:21-CV-1530-AMM
2:21-CV-1536-AMM
2:21-CV-1291-AMM

CERTIFIED COPY

EVAN MILLIGAN, et al.,
Plaintiffs,
vs.
WES ALLEN, in his official capacity as Alabama Secretary of State,
Defendants.

______________________________

Deposition of REPRESENTATIVE SAM JONES, taken at the law offices of Helmsing, Leach, Herlong, Newman & Rouse, PC, 150 Government Street, Suite 2000, Mobile, Alabama, on August 29, 2024, commencing at approximately 9:08 a.m.

MARCUS CASTER, et al.,
Plaintiffs,
vs.
WES ALLEN, in his official capacity as Alabama Secretary of State,
Defendant.

______________________________

BOBBY SINGLETON, et al.,
Plaintiffs,
vs.
WES ALLEN, in his official capacity as Alabama Secretary of State,
Defendant.

______________________________

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
KATHRYN SADASIVAN, ESQUIRE
LEGAL DEFENSE FUND
REDISTRICTING COUNSEL
ksadasivan@naacpldf.org
40 RECTOR STREET, 5TH FLOOR
NEW YORK, NY 10006-1738
212-226-7592

ON BEHALF OF REP. SAM JONES:
J. MITCH MCGUIRE, ESQUIRE
MCGUIRE & ASSOCIATES
31 CLAYTON STREET
MONTGOMERY, AL 36104
334-651-8891

APPEARING VIRTUALLY ON BEHALF OF THE PLAINTIFFS:
MAKEBA RUTAHINDURWA, ESQUIRE
mrutahindurwa@elias.law
ELIAS LAW GROUP LLP
1700 7TH AVENUE, SUITE 2100
SEATTLE, WA 98101
202-968-4599

APPEARING VIRTUALLY ON BEHALF OF THE PLAINTIFFS:
MYRON PENN, ESQUIRE
PENN & SEABORN
1971 BERRY CHASE PLACE
MONTGOMERY, AL 36117
334-500-3276

A P P E A R A N C E S

ON BEHALF OF THE DEFENDANTS:
DORMAN WALKER, ESQUIRE
dwalker@balch.com
BALCH & BINGHAM LLP
445 DEXTER AVENUE, SUITE 800
P.O. BOX 78 (36101)
MONTGOMERY, AL 36104
334-269-3138

- AND -

MICHAEL P. TAUNTON, ESQUIRE
mtaunton@balch.com
BALCH & BINGHAM LLP
1901 SIXTH AVENUE NORTH, SUITE 1500
P.O. BOX 306 (35201)
BIRMINGHAM, AL 35203-4642
205-226-3451

KELLY WAGNER:
ACR TECHNICIAN

COURT REPORTER:
DELIA G. CAMP, CCR - ACCR #299
ALABAMA COURT REPORTING
251-303-8533
alabamareporting.com



INDEX

DEPOSITION OF REPRESENTATIVE SAM JONES - 8/29/2024

EXAMINATION INDEX

BY MR. WALKER . . . . . . . . . . . . . . 10

EXHIBIT INDEX

DEFENDANTS' EXHIBIT

1 Representative Sam Jones - Subpoena to Testify at a Deposition in a Civil Action 19

2 Declaration of Representative Samuel Jones 21

3 Plaintiffs' First Supplement to their Disclosures 22

4 Livingston Congressional Plan 3 - Map 25

5 2021 Alabama Congressional Plan - Map 26

6 Court-Ordered Congressional Plan - Map 26

7 2021 Alabama House Plan - Map 27

STIPULATION

It is stipulated and agreed by and between the parties hereto, through their respective counsel, that the deposition of REPRESENTATIVE SAM JONES may be taken before Delia G. Camp, Notary Public for the State at Large, at the law offices of Helmsing, Leach, Herlong, Newman & Rouse, PC, 150 Government Street, Suite 2000, Mobile, Alabama, on August 29, 2024.

It is further stipulated and agreed that this deposition is taken pursuant to the Federal Rules of Civil Procedure. The provisions of Rule 32(d)(3) dealing with waiver of errors and irregularities as to the taking of the deposition apply fully to this deposition.

Notice of the deposition and any errors or irregularities therein [Rule 32(d)(1)] and any objections to the qualifications of the officer before whom this deposition is taken [Rule 32(d)(2)] are waived.

The submission of the deposition to the

witness for reading to or by him and the signing of the deposition by him [Rule 30(e)] is NOT waived.

Filing of the original of the transcript of this deposition [Rule 30(f)(1)] is waived.

Any other technicality or defect in the taking of this deposition not otherwise covered by the terms of this stipulation is waived.

* * * * * * * * * *

I, Delia G. Camp, Commissioner and Court Reporter, certify that on this date, as provided by the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me at the law offices of Helmsing, Leach, Herlong, Newman & Rouse, PC, 150 Government Street, Suite 2000, Mobile, Alabama, on August 29, 2024, Mobile, Alabama, commencing at 9:08 a.m., REPRESENTATIVE SAM JONES, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE COURT REPORTER: Stipulation, please.

MR. WALKER: Usual stipulations okay?

MR. MCGUIRE: Read and sign for us.

MR. WALKER: And read and sign.

MR. MCGUIRE: Yes.

And from the outset, Dorman, if it's okay, we want to invoke legislative privilege, particularly to questions that may apply.

MR. WALKER: I would be hard pressed to oppose that.

MR. MCGUIRE: Okay.

MR. TAUNTON: One other thing. I don't know if anybody from the Attorney General's office is on the Zoom or not, but we -- well, it's not going to be relevant at this time. I guess it would be relevant for your side. We've had a general

ALABAMA
COURT REPORTING

stipulation that a objection for one defendant applies to all, or in this case, objection for one plaintiff applies for all.

MS. SADASIVAN: We have counsel from the Caster Plaintiffs online. They're able to make their objections too but the same would apply to plaintiffs.

And we have Myron Penn from the Singleton Plaintiffs.

MR. PENN: Correct.

MS. SADASIVAN: We have a representative for the Caster Plaintiffs, Makeba --

MR. WALKER: I can't think of Makeba's last name.

MS. SADASIVAN: It starts with an R. And then Myron Penn from the Singleton Plaintiffs.

REPRESENTATIVE SAM JONES,

having been first duly sworn to speak the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. WALKER:

**Q. Good morning, Representative Jones.**

A. Morning.

**Q. I'm Dorman Walker. We've met before, of course, but I'll introduce myself for the record. And with me is Michael Taunton and we, as you know, represent the chairs of the Reapportionment Committee in this Congressional Redistricting lawsuit.**

**And have you been deposed before?**

A. Not in this matter.

**Q. Not in this matter? Let's go over the rules of the deposition just very briefly, if you will.**

**Because it's a deposition and the court reporter is taking down everything that we say, we have to wait until one of us finishes speaking before the other one answers, otherwise**

**the transcript will be a mess.**

**And for the same reason, when we're talking to each other, we have to answer each other orally with a yes, no, or a narrative response, but not a shake of the head or something like that.**

**If I ask you a question that you don't understand, just let me know. And in the same vein, if I ask you a question and, for example, I'm summarizing your testimony and you think maybe I've misquoted it or missummarized it or if I described it in a way you would not do, or if you're uncomfortable with the way I've asked a question, let me know and I'll try to rephrase it. Okay?**

A. Okay.

**Q. My goal today is to find out everything you have to tell us about this case or what your thoughts are about it. And so I want to make sure that the questions that I ask you are clear and that you understand them. Okay?**

A. Okay.

**Q. And if you answer a question, I will assume that you understood it. Okay?**

A. Okay.

**Q. If, during the course of your deposition -- and this happens a lot, or sometimes, at any rate -- you think back over an answer you gave earlier and realize that maybe you need to add to it or you need to change it because we're refreshing your memory about stuff, that's perfectly okay. Just let me know and we can go back and revisit that.**

A. Okay.

**Q. Your counsel may object from time to time, typically saying objection to form. If he does, you can go ahead and answer the question.**

**He's asserted legislative privilege on your part, and he may, otherwise -- I don't intend to get into attorney-client communication. He may assert the privilege. And if he does, we'll deal with those at the time they come up. He may instruct you not to answer.**

A. Okay.

**Q. We'll take breaks occasionally. I would say we take one every hour but I tend to forget until someone says can we take a break.**
**If you need to take a break, just let me know. The only rule is if there's a question pending, we need to answer the question before we take a break. Okay?**
A. Okay.
**Q. Thank you, sir. Is there any reason today, including any medical reasons or medications you've taken, why you can't answer the questions that I will ask you truthfully and accurately?**
A. No.
**Q. Do you have any questions about the process before we begin?**
A. No.
**Q. Are you represented by counsel today?**
A. Yes.
**Q. Okay. And who is your counsel?**
A. My counsel that I'm being represented by today?
**Q. Yes, sir.**

A. Mr. McGuire.
**Q. Thank you. How did you first learn about this case?**
A. I learned about the case actually during the time I was on the Reapportionment Committee.
**Q. I figured that would be your answer.**
**And a little bit more explicitly, if you can, about what you learned and when you learned it, if you can recall.**
MS. SADASIVAN: Objection to form.
A. Just about all that I learned about the case had to do with the Reapportionment Committee, presented to that committee, and some of the discussions that took place on the committee about the various proposals that were actually submitted to the committee.
**Q. In other words, what you participated in as a member of the committee is what you learned about the case?**
A. Yes.
**Q. More or less? When were you first**

**contacted to be a witness in this case?**
A. I can't remember the exact date. It was --
**Q. An approximation would be fine.**
A. To be perfectly honest with you, I just don't remember when that was.
**Q. Do you know if it was much before July of 2024?**
A. In this particular --
**Q. In this particular case. Yes, sir.**
A. No. It was before then.
**Q. Who contacted you and asked you to be a witness in this case?**
MS. SADASIVAN: Objection to form.
A. I can't recall his name.
**Q. Was it one of the attorneys in this case or someone else?**
A. It was.
**Q. Okay. Did you sign any documents with your attorney formalizing your attorney-client relationship with him?**
A. No.

**Q. Did you have any conversations with your attorney before you had an attorney-client relationship with him?**
A. No.
**Q. Did you talk with anyone else about this litigation? Have you spoken about this litigation with anyone else?**
A. No. This particular?
**Q. Yes, sir, this particular one.**
A. No.
**Q. Before this case, what litigation have you been involved with in -- let's use involved in a broad sense -- whether you were a named party or whether you were a witness or participated behind the scenes.**
MS. SADASIVAN: Objection to form.
A. Are you talking about recently or way back?
**Q. Let's talk about recently first, then we'll go way back. How about that?**
A. Recently, I have not been involved.
**Q. Is this case now, your involvement as**

**a witness today in the Milligan case, your first involvement in redistricting litigation since the 2020 census was released?**
A. Yes.
**Q. Okay. Have you previously been involved in any other litigation?**
A. As a witness, I have.
**Q. Okay. Would you tell me about that, please?**
A. It was a case before Judge Hobbs when -- several years ago when the districting judgeships case came up.
**Q. Oh, in that case. Okay.**
A. Yes, sir.
**Q. If you can give me the gist in one or two sentences of your testimony, if you recall.**
A. My testimony was without districting judges it'll be almost impossible to elect a Black judge.
**Q. Thank you. Have you had any conversations with, not your counsel, but with plaintiffs' counsel, with any of the plaintiffs' counsel in this case?**

A. Sometime back, yes.
**Q. When you say sometime back, if you could be a little more precise without --**
A. I was asked if I would participate in a deposition and I said yes. And that was about the gist of it. The declaration that I signed said that you might have to do a deposition based on that and would you participate. My response was yes.
**Q. And is that the declaration you have right there before you?**
A. Yes.
**Q. May I look at that, please, sir?**
A. Can I give you this copy?
**Q. You can.**
A. I have personal notes on the back of that.
**Q. That don't involve this case?**
A. No, they don't involve this case.
**Q. Any other litigation that you've been involved in, sir, that you can recall?**
A. No.
**Q. Have you ever been deposed before**

**today; sat for a deposition like this one?**
A. I'm trying to remember. It would be way back if --
**Q. Possibly in the case before Judge Hobbs?**
A. Yeah.
**Q. And that would have been 20 years ago, at least?**
A. Yes.
**Q. Okay.**
MR. WALKER: Let me show you what I'm going to mark as Defendant's Exhibit 1.
(DEFENDANT'S EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)
BY MR. WALKER:
**Q. And that is a copy of the subpoena for you to testify today. Have you seen that before, Representative Jones?**
A. I have not.
**Q. Okay. But you knew, obviously, that you were going to come here and testify today?**
A. Yes.

**Q. Okay. That's fine. It wasn't necessary for you to see it.**
**Let's talk about what you did to prepare for your deposition today. Will you tell me how you found out that you were going to be deposed today?**
A. I found out from a call from my attorney. He gave me the date and time and place, and generally said that --
MS. SADASIVAN: Objection. Calls for attorney-client privilege.
BY MR. WALKER:
**Q. What you've told me is okay. But if you and your attorney had any substantive conversation, I don't want to ask about that.**
A. Yes.
**Q. And I'm going to ask you some other questions about what you did to prepare.**
A. Okay.
**Q. And your attorney may want -- I'm not intending to go into the attorney-client privilege but I just want to give your attorney a second to see if he wants to object. Okay?**



After you were contacted about your deposition today, did you meet with anyone for the purpose of preparing to give your deposition?
A. No.
Q. Okay. Did you review any documents in preparation for today?
A. Just my declaration.
Q. Your declaration. Okay.
MR. WALKER: Let's go ahead and mark that as Defendant's Exhibit 2. And you've got a copy right there.
(DEFENDANT'S EXHIBIT 2 WAS MARKED FOR IDENTIFICATION.)
BY MR. WALKER:
Q. I'll ask you: Is that a copy of the declaration that you signed on July 27, 2023?
A. It is.
Q. On the last page there, that's your signature?
A. It is.
Q. Okay. Thank you.

MR. WALKER: And then I'll show you what I'll mark as Defendant's Exhibit 3.
(DEFENDANT'S EXHIBIT 3 WAS MARKED FOR IDENTIFICATION.)
BY MR. WALKER:
Q. And if you will -- and I'll represent to you that this is a document that was served on us by the Plaintiffs' attorneys, Plaintiffs' first supplement to their disclosures.
If you'll look at page 2, please, Representative Jones, and read what it says there in paragraph 4, about you. And let me know after you've had a chance to do that, please, sir.
Do you see it right here?
A. Yes. You want me to read that?
Q. Just read it because I want to ask you a few questions about it.
A. Yes.
Q. And are these the things -- the topics in this paragraph that you're prepared to testify about today? I think principally it

says: Information regarding the 2021 and '23 redistricting processes and relevant communities of interest.
Is that what you're prepared to testify about today?
A. Yes.
Q. Do you have any other information outside of this that you can testify about, please?
A. Yes.
MS. SADASIVAN: Objection to form.
MR. WALKER: Was that objection to form?
MS. SADASIVAN: Yes, to the question.
BY MR. WALKER:
Q. Did you speak with anyone about the description in this Defendant's Exhibit 3, of what your testimony would be today?
A. No.
Q. Do you know how they knew what you would be able to testify about today?

MS. SADASIVAN: Objection to form.
A. I just took it that it was part of the declaration.
Q. Because of the declaration?
A. Because of the declaration.
Q. Okay. Did you review any maps in preparation for your deposition today?
A. No.
Q. Did you look at any documents other than the declaration that you signed in 2023?
A. No.
Q. What year were you born, sir?
A. 1947.
Q. Can I ask what your address is?
A. 2069 Tucker Street, Mobile.
Q. And which Congressional District is that under the Court-Ordered Plan?
A. Under the Court-Ordered Plan, it's District 2.
Q. And which Congressional District was that under the 2023 Plan passed by the legislature?



A. District 1.

**Q. And which Congressional District was that under the plan passed by the legislature in 2021?**

A. Let me go back. It was '23. '23 would have been the --

**Q. That was Livingston 3?**

A. I'm not sure what it was called initially.

MR. WALKER: Let me show you what I'll mark as Defendant's Exhibit 4 and ask you if we can agree that you were in CD 1 under the Livingston 3 Congressional Plan.

MS. SADASIVAN: Objection to form.

(DEFENDANTS' EXHIBIT 4 WAS MARKED FOR IDENTIFICATION.)

A. Yeah, that's -- yes.

MR. WALKER: And then let's just, for good measure, since I've got them out, I'll show you what I've marked as Defendant's Exhibit 5.

(DEFENDANT'S EXHIBIT 5 WAS MARKED FOR IDENTIFICATION.)

BY MR. WALKER:

**Q. Look at that, and can you confirm that you're in CD 1 under the 2021 Congressional Plan?**

A. It's difficult to read your map but --

**Q. I'm sorry, sir. I can't hear you.**

A. It's difficult to read your map.

**Q. Sorry. You're looking at the 2021 Alabama Congressional Plan. Is that the one you're looking at? And you lived in Mobile County then?**

A. Yes.

**Q. And I'll represent to you that all of Mobile County was in CD 1.**

A. Yes.

(DEFENDANT'S EXHIBIT 6 WAS MARKED FOR IDENTIFICATION.)

BY MR. WALKER:

**Q. And then this one is a little bit different. This is the Court-Ordered Congressional Plan. And did I mark that**

**Defendant's Exhibit 6, sir?**

MS. SADASIVAN: Yes.

A. Yes, this is 6.

**Q. Okay. Thank you. And can you confirm which district you lived in that -- looking at the map?**

MS. SADASIVAN: Objection to form.

A. I was in District 1.

**Q. Okay. Thank you.**

(DEFENDANT'S EXHIBIT 7 WAS MARKED FOR IDENTIFICATION.)

BY MR. WALKER:

**Q. And finally, since we're doing maps -- this may be a little bit out of order but let me show you what I've marked as Defendant's Exhibit 7, and which I'll represent to you is the 2021 Alabama House Plan.**

**And can you find your House District on that map?**

A. Yes.

**Q. And what, for the record, is that House District? Those numbers are hard to read.**

**99 is --**

A. Yeah. It's right up there.

**Q. Do you see it there?**

A. Yeah.

**Q. Would you take your pen and circle 99 on that?**

A. Okay.

**Q. I previously asked you, sir, what your House District was -- I mean, what your residential address is. And just for the record, that's in Mobile County?**

A. It is.

**Q. How long have you resided there?**

A. 23, 24 years.

**Q. Okay. Were you raised in Mobile County?**

A. I was.

**Q. In Mobile itself or out some other place?**

A. In Mobile.

**Q. Have you ever lived anywhere else in Alabama?**

A. No.



**Q. Have you ever lived outside of Alabama?**
A. Yes.
**Q. Can you tell me when and where?**
A. Jacksonville, Florida; from 1967 until 1976.
**Q. Was that for school?**
A. That was military.
**Q. Oh, military. Okay. Can I ask what service you were in?**
A. U.S. Navy.
**Q. Other than your service in the military in Jacksonville, Florida, from -- did you say 1967 to 1976?**
A. Yes.
**Q. Have you otherwise lived outside of the State of Alabama?**
A. No.
**Q. Let's talk about your educational background. Would you start with high school and come up to the highest degree or level of education you've had?**
A. Associates.

**Q. Well, go back to high school. Which high school did you go to, sir?**
A. Central High School.
**Q. Here in Mobile?**
A. Here in Mobile.
**Q. What year did you graduate from that?**
A. '67.
**Q. Were Mobile schools segregated in 1967?**
A. For the most part. They started some integration but not in Central High School.
**Q. Was that freedom of choice at that time, or --**
A. No, it wasn't freedom of choice.
MS. SADASIVAN: Objection to form.
BY MR. WALKER:
**Q. So you graduated Central in 1967 and then you said, sir, you had an associate degree?**
A. Yes.
**Q. And when did you get that degree?**
A. In Jacksonville, Florida, in '71.
**Q. And was there a focus or major for that degree?**
A. Yes. Real estate.

**Q. Have you had any other school, training, or education since then?**
MS. SADASIVAN: Objection to form.
A. Yes.
**Q. Would you tell me about that?**
A. I've been to the University of South Alabama Grantsmanship Institute; Bishop State Community College Interdenominational Seminary. That's it.
**Q. And for the Grantsmanship Institute, what was the purpose of that?**
MS. SADASIVAN: Objection to form.
A. It was, I think, to enhance my job at that time.
**Q. What was your job at that time?**
A. Director of the Community Action Agency in Mobile.
**Q. I'm just going to infer a little bit. Did the Grantsmanship Institute focus on becoming a more successful grant writer?**
A. Yes.
MS. SADASIVAN: Objection to form.
I'm sorry. I'm just going to object before you answer if you don't mind.
A. Would you repeat your question?
**Q. The question I asked was something like: Was the purpose of the Grantsmanship Institute to become more successful as a grant writer?**
A. Yes, it was.
**Q. And then I asked you: What was your job at that time?**
A. The Executive Director of Mobile Community Action, Antipoverty Agency of Mobile.
**Q. And in that capacity were you responsible, at least in part, for raising funds that could be used for the purpose of the agency?**
A. Yes.
**Q. When did you go to the Grantsmanship**



Institute?
A. Let's see. That would have been -- I don't recall the exact dates but it would have been some time between '75 and '85.
Q. And you mentioned Bishop State?
A. Interdenominational Seminary.
Q. Ecumenical was the word in my head and I knew you hadn't said that. Interdenominational Seminary.
When did you attend the Bishop State Interdenominational Seminary?
A. It would have been in the '90s.
Q. Was that a course that you -- scratch that.
Explain what that program was and what you learned, please.
MS. SADASIVAN: Objection to form.
A. It really was a seminary and the seminary really prepared ministers. And I was the director of Christian education in my church, so that's why I attended.
Q. How long of a course was that?

A. It's about a year.
Q. And did you graduate from that?
A. Yes.
Q. Any other education or training that you've received from a college or university that you haven't told me about?
A. No.
Q. Is there any education or training that you've received from -- for example, you mentioned realtor. So any other follow-up training in being a realtor, provided by the realtors, a professional association, or anything like that?
MS. SADASIVAN: Objection to form.
A. No.
Q. Thank you. Are you married, sir?
A. No.
Q. Do you have any children?
A. Yes.
Q. May I ask where they live?
A. Here in Mobile.
Q. May I ask their names?

A. Charlee, C-H-A-R-L-E-E Sanders.
Q. Okay.
A. And Tamika, T-A-M-I-K-A McCall.
Q. Let's talk about your employment history. And why don't we start with -- you went into the Navy after you graduated from high school?
A. Correct.
Q. And then you were in the Navy till 1971. So let's pick up with 1971 and bring us up to date, if you will, please.
A. I was in the Navy till 1976.
Q. I wrote this down wrong here. Thank you so much for correcting me.
Why did you get out of the Navy in 1976?
A. Because the Vietnam War ended.
Q. And they had a huge RIF, reduction in force?
A. Yeah.
Q. And so after you left the Navy in 1976, is that when you returned to Mobile?
A. I did.

Q. Okay. And what was your first job after you returned to Mobile, sir?
A. Equal Opportunity Officer for Mobile Community Action.
Q. How long did you stay in that position?
A. About two years.
Q. Was that two years in the position of EEO at the Mobile Community Action or two years at the Mobile Community Action?
A. Two years as EEO.
Q. And first of all, what is the purpose or was, at that time, the purpose of Mobile Community Action?
A. Mobile Community Action is the antipoverty agency for the county. Actually, for two counties, Mobile and Washington. And, also, we operated the Head Start Program and several senior citizen programs.
Q. And were those Head Start program and senior citizen programs in both Mobile and Washington County?
A. Yes. They both were.



**Q. Was the Mobile Community Action, is that a governmental agency or was it a governmental agency?**
A. It's a nonprofit that's funded by government grants and private grants.
**Q. Does it still exist?**
A. Yes.
**Q. Does it still have the same service area?**
MS. SADASIVAN: Objection to form.
A. To my knowledge.
**Q. Does it still have the same mission?**
MS. SADASIVAN: Objection to form.
A. Yes.
**Q. What was your job as the EEO officer at the Mobile Community Action?**
A. I handled all the human resources, complaints, discrimination complaints, making sure that our agency was open to all the people in the community and fair with all the people in the community.

**Q. Thank you, sir. You indicated that you held that position for two years?**
A. Yes.
**Q. So that would be from 1976 to 1978?**
A. Yes.
**Q. And what happened after that?**
A. In 1978, the director of the program left and I was hired as the director of the entire program.
**Q. Director of the Mobile Community --**
A. Action.
**Q. -- Action. Well, congratulations.**
**How long were you the director of Mobile Community Action?**
A. Till 1987.
**Q. Why did you leave your position as director of Mobile Community Action?**
A. I got elected to the Mobile County Commission.
**Q. When you ran for Mobile County Commission, did you run -- is that a partisan election? Was that a partisan election?**
A. Yes.

**Q. Did you run as a Republican, a Democrat, or some other?**
A. Democrat.
**Q. What position on the Mobile County Commission did you run for?**
A. District 1.
**Q. And can you generally describe where District 1, at that time, was located?**
A. From the south part of the city all the way to the Washington County line.
**Q. That's a pretty big district.**
A. There are only three districts in Mobile.
**Q. Oh, okay. how long did you serve as commissioner?**
A. 18 years.
**Q. So don't make me do the math. When did you --**
A. 2005.
**Q. Thank you. And why did you leave your position as member of the Mobile County Commission?**
A. Got elected mayor in 2005.

**Q. Were you on the commission when they built that building over there, the big county building over there?**
A. Yes. I built it.
**Q. That's a good building. And from 2005 to when you were mayor?**
A. 2013.
**Q. And what did you do after you stopped being the mayor of Mobile in 2013, sir?**
A. I worked for Ball HealthCare.
**Q. B-A-L-L?**
A. Right.
**Q. I'm pretty sure I know the answer to this, but when you ran for mayor, did you run as a Democrat?**
A. No.
**Q. That's the one that's nonpartisan. That's right. I forgot. Thank you.**
**That's a nonpartisan election, correct?**
A. It is.
**Q. Did you have support from the Democratic Party when you ran for mayor?**

Page 41

A. I had support from both parties.
**Q. Okay. Well, that's good.**
**What did you do at Ball HealthCare?**
A. The Director of Community Outreach and Programs for the company.
**Q. What does that involve?**
A. It involves -- we have 12 nursing homes throughout the State of Alabama and all of the programs that we operate in those nursing homes, all of the projects we operate in those nursing homes, I generally managed those, as well as dealing with community issues in all of the nursing homes throughout the state.
**Q. Can you give me some example of programs and projects that you're talking about?**
A. Expansions.
**Q. As in -- of the real structure of the building?**
A. Of the structure of the building; also additions of services, like vent units, replacing our partial generators that -- generators that completely run the operation. I was involved in all of those.

Page 42

**Q. And are you still at Ball HealthCare?**
A. I am.
**Q. And are you still the Director of Community Outreach?**
A. Yes.
**Q. Thank you, sir. Are you a member of any professional organizations?**
A. I wouldn't say professional. I would say community organizations.
**Q. Okay. That's fine. Are you a member of any community organizations?**
A. Yes.
**Q. Would you tell me what those are, please, sir?**
A. Utopia Social Club.
**Q. Utopia?**
A. Yeah. I'm vice president of that.
**Q. Is that a social savings club?**
A. It is. And 100 Black Men of Mobile, the CORE Group. That's a group of men who work in the community with young people.
**Q. C-O-R-E?**
A. Right.

Page 43

**Q. Is that all capital letters or not?**
A. Yes.
**Q. Any others, sir?**
A. There are a lot of them. I've just got to try to get them -- there are several religious organizations that I participate in.
**Q. Well, since we're there, let's just -- it's a little bit ahead of where I was going to go. Are you a member of a church or do you participate in a church?**
A. Yes.
MS. SADASIVAN: Objection to form.
BY MR. WALKER:
**Q. May I ask what church that is?**
A. Macedonia Baptist Church.
**Q. And that's here in Mobile?**
A. It is. No, it's in Prichard. Mobile County.
**Q. Is that the church you grew up in?**
A. No.
**Q. And you said there were several other religious, I think, organizations that you participated in. So what might be other ones?**

Page 44

A. The National Baptist Convention.
**Q. Yes, sir.**
A. The Interdenominational Sunday School Knights.
**Q. Any others?**
A. The chairman of the deacon board in church.
**Q. Choir?**
A. No, I missed that one.
**Q. They wouldn't let me join.**
**We were talking about your employment a little while ago. And just to close a loop on that, we missed one thing, which is your service in the Legislature, which may not be employment.**
**But for what years have you served in the Legislature?**
A. Started in 2018.
**Q. And, at that time, did you run from District 99? What district did you run from --**
A. District 1 -- I'm sorry. District 99.
**Q. And you have continued to serve District 99 until the present day?**



A. Right.
**Q. And what committees are you currently on in the Alabama House of Representatives?**
A. Military Affairs, County and Municipal Government, Rural Development, and I served on the Gaming Committee.
**Q. And you previously served on the Reapportionment Committee.**
A. And Reapportionment Committee.
**Q. What years were you in the Reapportionment Committee?**
A. I was appointed in 2018 and then reappointed during the special session.
**Q. The 2021 special session?**
A. Right.
**Q. And you're still serving on the committee?**
A. I am.
**Q. Do you have any social media accounts, sir?**
A. Yes.
**Q. Would you tell me which ones they are, which platforms; Facebook, Instagram, et cetera?**

A. I have Facebook that I don't post on. More of a monitoring than post.
**Q. Any others? Instagram or -- gosh, I don't know. I don't do social media so I don't know.**
A. No.
**Q. Okay. Just to be clear, have you ever posted anything about this litigation or about redistricting on your Facebook account?**
A. I don't ever recall posting anything on my Facebook account.
**Q. Would you tell me, sir, in your own words, what you understand this lawsuit to be about?**
A. In my own words, it is a lawsuit that was really -- came about as a result of what appeared to me to be the impossibility of Black people being represented in the Congressional District. And it had to do with -- in this state, it's almost impossible for any Black person to get elected in all but one Congressional District.
**Q. And that one would be CD 7?**

MS. SADASIVAN: Objection to form.
A. Yes.
**Q. Were you asked to be a plaintiff in this lawsuit at any time?**
A. No.
**Q. Have you read the complaint or any of the complaints that were filed in this case?**
A. I have generally, not -- I couldn't actually point to you the portions that I read, but overall it kind of established, I think, the same thing I just said.
**Q. And you understand that as relief, the Plaintiffs are seeking for the Court to order a Congressional Plan that has two majority Black districts?**
MS. SADASIVAN: Objection to form.
A. My opinion of that was the Court ruled to make it possible to have a Black district -- another Black district.
**Q. Well, you understand the Court actually ordered the entry of a specific plan at**

**least for -- for the time being?**
MS. SADASIVAN: Objection to form.
A. My understanding is that the Court selected a specific plan, yeah.
**Q. What's your understanding, Representative Jones, of the -- what do you prefer, Representative or Mayor?**
A. I tell people here, it doesn't matter. I answer to all of them.
**Q. I just want to get it right. What's your understanding of the purpose of redistricting?**
A. Well, redistricting actually is supposed to be connected to the census and the movement within the census and supposed to provide a fair representation for everyone.
**Q. And what is fair representation?**
A. Fair representation, in my opinion, is that all the people in the state are fairly represented.
**Q. That's sort of a tautological explanation. What's fairly represented?**



A. Fairly represented, in my opinion, is that all of the people in the state have representatives that they can identify with and people who understand and communicate with them to represent their position in Congress.

**Q. What does it mean people -- what do you mean when you say people they can identify with?**

A. Well, it's highly possible, and it happens in a lot of areas, that we -- in communities I've lived in, there is very little contact, communication, or even consideration from Congress people.

**Q. I don't believe I've ever spoken to my Congress person.**

A. He's representing you.

**Q. Don't be too sure. Well, I take that back. Martha Roby was a neighbor, so I did know Martha.**

A. Well, let me say this, since you said that. I knew all of them, every one of them. It's not that I didn't know them.

**Q. Is race a factor in who voters can identify with, as you use that term?**

A. I think it is. I think that depending on who that representative might be, race appears always to be a factor, from my experience in this state.

**Q. Do you think that's something that's unique to Alabama and our history or is it something that you would feel the same way, do you imagine, if you lived in New York or Massachusetts or California?**

MS. SADASIVAN: Objection to form.

MR. MCGUIRE: Object to the form.

A. I really think that it's more prevalent in Alabama. I think that's clear, nationally or locally.

**Q. Identification with race?**

A. Yes.

**Q. What about party membership? Is that a factor that when you refer to as -- when you refer to a candidate that people can identify with, is that one of the factors that makes someone, someone that voters can identify with?**

A. I don't think the original intent was for it to be a factor, but it has developed in being a factor.

**Q. Could a white Democrat represent a predominantly Black community in the way that you believe that community should be represented?**

A. Sure. I think it's possible for that to happen. Rarely, but possible.

**Q. Would Jones be an example of that, Doug Jones? Of course, he was a senator.**

A. Yeah. I think Doug Jones tried to fairly represent everyone in his Senate District -- in the Senate, let me put it that way.

**Q. Do you understand that one of the requirements of redistricting is, particularly in the Congressional cases is to re-equalize the population of the districts after the census comes out?**

A. Yes, that's my understanding. I don't think that's the question. The question is how you do it.

**Q. Sure. How did you become interested in redistricting? When did you become interested in redistricting?**

A. When I got elected to office.

**Q. Okay. That'll do it.**

**So the first district office you were elected to, I think, would have been County Commission?**

A. County Commission, yes.

**Q. Did you-all redistrict while you were on the County Commission?**

A. Yes.

**Q. What was the partisan and racial makeup of the County Commission during the time that you served on it?**

MS. SADASIVAN: Objection to form.

A. Two Republicans, one Democrat.

**Q. Would that also be two whites and one Black?**

A. Yes.

**Q. Describe the process of redistricting that the County Commission went through -- I**



guess that would have been the 2000 census?

A. Yes.

Q. What was the process you-all went through?

A. Well, it was -- I think it would have been -- the first one would have been the 1990 census.

Q. Okay.

A. I was elected in '87.

Q. Oh, that's right. Yes.

A. It was a process in which our staff, being the county administrator, the attorneys put together some plans and brought them to the commission for the commission to really discuss and see if we could reach an agreement on the plans. And during my time there, we did.

And, you know, there were some moving back and forth but it wasn't a big issue at that time. So that --

Q. What were the matters that, let's say, had to be discussed among members in order to reach an agreement of what the new lines would be?

MS. SADASIVAN: Objection to form.

A. I think that when you look at Mobile County, it's a little different from all the other counties in the state. You know, in one direction in Mobile, you can only go in the water. Nobody's living out there. You've just got to match the land that you've got to break into three districts.

And the northern part of the county, for the most part, was District 1. And the northern part of the county just happened to be the part of the county where the largest number of Black residents live.

So it's part of the downtown -- I believe mostly all of downtown and north. Then there are two other areas. You've actually got west and south.

Q. Okay.

A. The eastern part is really not affected because that's in the river. So that's what you have to work with. So it wasn't real difficult to district during that time.

Q. When you were redistricting, what level of Black voting-age population did you seek to have for your district?

MS. SADASIVAN: I'm going to object because this also calls for legislative privilege while he was a member of the County Commission.

A. I don't --

MS. SADASIVAN: Just wait to answer until we're done objecting if you don't mind.

MR. MCGUIRE: I'm going to instruct you not to answer the question.

BY MR. WALKER:

Q. You have been instructed not to answer that question. Are you going to honor your instruction from your counsel?

A. Yes.

Q. Okay. Given your experience in redistricting, starting in the 1990 census at the County Commission level and your experience in the legislature, do you have a belief as to

the level of Black voting-age population a Legislative District should have or a Congressional District should have in order to allow the people who -- minority members who live in that district, an opportunity to fully participate in the political process?

MR. MCGUIRE: I'm going to object; legislative privileges grounds there. I also object to the form, but definitely legislative privilege.

I'm going to instruct you not to answer that question.

BY MR. WALKER:

Q. Let's talk about the 2020 census. As you recall -- or do you recall, rather, that the census data came out very late that year. In previous years Alabama, as I recall, in 2010 Alabama got the census data towards the end of February. And I think in 2020 we did not get the census data until some time in mid August, as I recall.

Do you recall that?



A. Yes.
MS. SADASIVAN: Objection to form. I think it's 2021.
BY MR. WALKER:
**Q. Oh, I'm sorry. Thank you. 2021, yes.**
**We did not get the census data until mid August 2021.**
**Do you recall that?**
A. I do recall that the census data was late coming in based on expectations.
**Q. Do you have any recollection of how that -- that is, receiving the census data several months late, affected the redistricting process?**
A. I think the redistricting process was a rushed process. And I think that the information to the members was limited.
**Q. Did you attend all of the redistricting committee meetings that were held in 2021?**
A. Yes.
**Q. When you say that the information to the members was limited, would you explain that,**

**please, sir?**
A. I think I answered that question with the committee. But I'll explain it.
There were almost 100 plans that was received. I think we only got a chance to look at 23, as a committee. And if you remember, my specific question was how did we get to 23? Who made that decision? The committee did.
So, yeah, I think that that was one of the things that I was talking about when I said that it was a rushed process.
**Q. Did you ever talk to anyone about how you -- how it got to be 23 plans?**
MR. MCGUIRE: I'm going to object on privilege grounds but I'm going to let you go ahead and answer that question.
MR. WALKER: Let's take a break.
I'm going to withdraw the question, and let's take a break.
(A RECESS WAS HELD FROM 10:06 A.M. TO 10:15 A.M.)

MR. WALKER: Okay. So we need to have a conversation about legislative privilege, because you-all have indicated that Representative Jones is going to be a witness with information regarding the 2021 and '23 redistricting processes. And he's also talked about that in his statement.
MR. MCGUIRE: Well, you missed a couple of critical words right before. You started at information but the two words before that says: May have.
MS. SADASIVAN: I think when he's talking about his declaration, he's waived privilege. And I think everything in the declaration, you're welcome to ask about.
My understanding was that you were asking about specific communications, which I didn't see anywhere discussed in his

declaration. And so I think to the extent that you're asking about things that imply privilege where there's been no waiver, then that would be privilege. Right?
MR. WALKER: I think you're taking a position that is not the same position the Milligan Plaintiffs took when the chairs asserted waiver. And I don't think that something --
MS. SADASIVAN: So they intervened as defendant, which is just a little bit different than somebody submitting a declaration as a witness.
MR. WALKER: Well, he is coming voluntarily forward as a witness, which is --
MS. SADASIVAN: Not the same as litigation conduct, which I think you-all have argued. Litigation conduct is where waiver really occurs. And that's short of that,



like really public litigation conduct that there hasn't really been a waiver. And so it's my understanding, just based on your position, that waiver would only occur to the extent he's put it into the declaration, not broadly for everything that happened in the 2021 and 2023 Legislative process. It wasn't our intention by listing the information that he may have to disclose anything beyond what was in his declaration, which he has.

MR. WALKER: Let me ask you this: He may have information regarding the 2021 and '23 redistricting processes. And you've said that he is -- he's waived that as to what's in his declaration but you sort of said, if I can paraphrase, that I can't ask about things beyond the declaration.

MS. SADASIVAN: To the

extent it's related to information in the declaration where there has been a waiver. But, I mean, your position that you-all have taken consistently is that there's not any waiver. Legislative privilege is extremely broad. So, for example, you know, in red state, when they -- so any kind of communication that he had, there's been no waiver.

So, of course, we're willing to be generous and say, you know, to the extent it's related to that declaration that's public, but not further.

MR. WALKER: Here's what I want to know. I want to be able to ask him about whatever he's going to testify at trial. And I assume that will be the 2021 and '23 redistricting processes.

MS. SADASIVAN: So that disclosure was meant to disclose

information that he has disclosed in his declaration, which includes stuff from the 2021 and 2023 redistricting process.

So, again, that is not broader than his declaration, and so you're welcome, again, to ask about those -- may have information related to what was in his declaration.

MR. WALKER: So here's -- just to put a fine point on it. Is he going to talk about stuff -- is he going to talk about the 2021 and '23, redistricting processes in any materially different way than what he has said in his declaration?

MS. SADASIVAN: I think you can ask him what he intends to testify about at trial and what he believes he's going to testify about but if he doesn't believe he's going to -- you know, as he sits here today, then that --

MR. WALKER: Yes, but I need -- I don't want to be surprised by you-all saying later on well, you didn't ask him about this when my understanding is you -- I mean, I'm trying to figure out what you think the parameters are so that I can fairly depose the witness but not go into privileged areas.

MR. TAUNTON: There's a separate point here too, which is yes, at some point the legislators try to take the position that, you know, they have privilege left. But the Court said that you can't go halfway down the rabbit hole. And so I think that --

MS. SADASIVAN: Well, those are -- again, those are people who intervened as defendants to defend on the merits that they had not actively discriminatory intent. And it wasn't waived for the entire Legislature, if



you remember.
MR. WALKER: I've heard --
(SIMULTANEOUS SPEAKERS.)
MS. SADASIVAN: We can't waive, you know, for example, the privilege of other members of the Black Caucus.
MR. WALKER: No one has suggested that. I'm not suggesting it.
MS. SADASIVAN: Communications and his meetings, those kind of things -- I mean, again, I --
MR. TAUNTON: But he can waive his own. And I think that -- I'm not aware of a position which says you halfway waive your own. It's sort of you're either in or you're out on that. And that would be true, not just by the way of legislative privilege. That's just true of privileges. If you waive a

privilege, it is waived. It isn't halfway waived.
MS. SADASIVAN: Right. Well, we took that position again, but you-all took the position that privilege protects the process, not the person. And so the process --
MR. TAUNTON: The privilege is individual but to the degree that we took that position, we lost.
MS. SADASIVAN: I don't know that you did. I wouldn't consider that a loss. I think that you did not lose that.
MR. TAUNTON: The Court took the position that --
(SIMULTANEOUS SPEAKERS.)
MR. WALKER: I tell you what, let's see what we can do.
MS. SADASIVAN: I want you to have a fair deposition. You know, ask -- it doesn't have to be just stated specifically in the

declaration. You know, you should feel free to ask about information that is relevant to the information stated in the declaration.
MR. TAUNTON: I think I see your point. To the degree that our question would require him to disclose the privilege of another member, we can agree that that is not waived.
MS. SADASIVAN: Okay. And to the degree that involves communications that he might have had, he chooses not to waive that are relevant to the law-making process.
MR. WALKER: I think they're waived here.
MR. TAUNTON: His statements are waived.
MS. SADASIVAN: What is waived is what is in that declaration.
And we're happy for you to ask

questions relevant to the information in that declaration, but if it goes beyond, we'll object on privilege grounds.
MR. WALKER: Now, if you're going to take the position literally, at what is waived and what's in his declaration, then my position is going to be that when he testifies in court, if he testifies, what he can basically do is read his declaration but not vary from it.
MS. SADASIVAN: I don't know. I think we should go along and see. And if there's an issue where you think you really need some information that we're objecting and he's deciding not to answer, then we can take it from there.
MR. WALKER: Well, that's practical. Let's do that.
BY MR. WALKER:
**Q. Sir, if I recall your testimony**



correctly, and let me know if I don't, we were talking about the first redistricting effort in 2021. And my recollection is you said there were in the vicinity of 100 plans submitted and that members of the committee got to see only 23 of those plans.

A. Yeah.

Q. And you said: How was that decided? Who decided that for us?

And what I would like to ask is: Who did you talk to in trying to find out how that was decided? And I believe in your statement you indicated that you spoke with the House Chair, Representative Pringle.

And if I can read from your statement: I asked who selected the 20 -- excuse me -- start over.

Quote: I asked who selected the 15-20 plans chosen by the committee. Co-Chair, Representative Pringle responded: "We did."

When I asked him to define, quote, "we," Representative Pringle said, quote, "Me and my co-chair."

That would be -- at the time, that was Senator McClendon?

A. Yes.

Q. Did you ever speak with Senator McClendon about the matter?

A. If you recall, when I asked that question, we were in the meeting.

Q. That's right, you were.

A. Everyone was sitting there in the meeting. And since McClendon was sitting there and the question was asked, and I was trying to find out how did we get from 100 to 23 and what criteria was used to do that. And eventually -- I didn't get an answer initially and then I think out of frustration Representative Pringle said: We did. And I said, well, who is "we"? He said me and my co-chair.

Q. Do you know who Donna Overton is?

A. If she's the one who works in the office, yes, sir.

Q. Runs the Reapportionment Office?

A. Yes, I know her.

Q. Did you ever talk to her about the

fact that only 23 or 15 to 20 plans were presented to the committee?

A. I thought I was talking to the people who directed her, the committee chairs.

Q. So that would be a no?

A. Yeah.

Q. You did not ever speak to her?

A. No, I didn't.

Q. Have you ever had any conversations with her?

A. Oh, yes. For copies.

Q. Did you believe that there was anything -- scratch that.

Do you believe that there was a racial motivation in presenting only, let's just say, 23 plans to the committee in 2021 as opposed to the full 100?

MR. MCGUIRE: Object to the form.

A. I don't know why that was done. That's the question I was trying to get an answer to. And as of today I haven't gotten one.

Q. Do you have a belief, as we sit here now, as to whether or not there was anything racially motivated about the fact that only 23 plans you say were presented to the committee?

A. It's difficult to say since we never saw them.

Q. Do you have an opinion as to whether or not there was a partisan motivation in the fact that 23 plans out of 100 were presented to the committee?

A. Yeah, I always have that opinion.

Q. In other words --

A. Based on my experience, I'm sure there's always a political agenda in Montgomery.

Q. Did you present any plans in 2021?

A. No, I didn't.

Q. Did you present a plan or any plans in 2023?

A. No, I didn't.

Q. Did you sponsor a plan in 2023?

A. No.

Q. Did you sponsor a plan in 2021?

A. No.

**Q. Where do Black citizens reside? Where is the -- where are the Black population centers in Alabama?**
A. I would think they would be in the metropolitan areas. Mostly, the numbers would be in metropolitan areas.
**Q. Which metropolitan areas?**
A. Which would be Mobile, Montgomery, Birmingham, Huntsville, Tuscaloosa.
**Q. What about Lee County, do you know?**
A. And Lee County.
**Q. Do you know what the term "Black Belt" means?**
A. I do.
**Q. What is the Black Belt?**
A. They are the group of counties that's considered the Black Belt in Alabama. Generally, they are counties where -- they were rural counties where -- a lot of Black residents dwelled in those counties, live in those counties because they were big agricultural counties.
**Q. Are most of the Black Belt counties --**

**let's exclude Montgomery from the Black Belt counties for this conversation.**
**And I can recite what the parties have stipulated as to the Black Belt counties if you want me to.**
A. Do that.
**Q. Would that be helpful to you?**
A. Yes.
**Q. Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox.**
**With those in mind, and I know that's a lot, are those -- is the population of -- are those all counties with relative low populations or mostly counties with relatively low populations?**
MS. SADASIVAN: Objection to form.
A. If you exclude Montgomery, yes. In terms of numbers, yes.
**Q. Are those counties -- let's just keep Montgomery out because it's uniquely different**

**from the others.**
MS. SADASIVAN: Objection to form.
MR. WALKER: That was a comment.
MS. SADASIVAN: Objection to the comment.
MR. WALKER: She can't object to my comments.
BY MR. WALKER:
**Q. Would you agree that the Black Belt counties -- and for all of this conversation exclude Montgomery unless we say otherwise -- are relatively high in Black population?**
A. Generally.
**Q. Compared to other Alabama counties.**
A. Yes.
**Q. Non Black Belt counties. Did the Black Belt counties, on average, gain or lose population as a result -- in the 2020 census?**
A. They lost. A number of them lost.
**Q. And have you looked at any of the census estimates since then or any other sources**

**of information to enable you to form a belief as to what has happened to those counties' population since the 2020 census was released?**
A. No, not since the -- I haven't seen any document concerning that.
**Q. Do you have an opinion as to whether or not they have continued to lose population since the 2020 census was released?**
A. I don't have an opinion. I don't have the numbers.
**Q. Do you know what percentage of Alabama's population is, I guess, any part Black or Black?**
A. What percentage of the total population?
**Q. Yes, sir.**
A. About 27, 28 percent.
**Q. Did you review all of the 23 maps that were made available to the committee in 2021?**
A. I looked at them, but doing a specific analysis of every map, no. There were some that I did but some I didn't.
**Q. Did you speak at the meetings of the**



**committee -- excuse me. Did you speak at the meetings of the Reapportionment Committee that were held during the 2021 redistricting process?**
A. Did I speak or did I ask a question? Which one are you --
**Q. I mean speak as in verbally make sounds?**
A. I asked a question.
**Q. Which was -- you've testified and it's also in your statement, you asked where the other plans, so to speak. Did you ask anything else that you recall?**
MR. MCGUIRE: I'm going to object on legislative privilege, to the extent it's in his declaration. He's waived it. You can answer it to the extent --
MS. SADASIVAN: Or as a matter of public record. I think some of these are public record.
MR. MCGUIRE: Right.
BY MR. WALKER:
**Q. Did anyone prevent you from going back**

**into the redistricting office and asking to see the other plans that were not shown to the committee?**
A. The other 75?
**Q. Yes, sir.**
A. No.
**Q. So as far as you know, you could have gone and asked Ms. Overton to see those?**
A. Well, it took me three weeks to get a map for one plan. So, you know, I didn't think I'd get 75 other maps.
**Q. You know, as a member of the committee, that all plans have to be introduced into the state redistricting system, correct?**
A. Yes.
**Q. And did you ever go back and ask Ms. Donna if you could look on her computer to see those plans?**
A. I think I testified earlier that I didn't have a conversation with Ms. Donna for anything other than getting a copy of --
**Q. You did. Thank you.**
**Did you speak with any consultants or**

**advisors about the proposals for the -- the proposals for redistricting, Congressional Redistricting that were made in 2021?**
MR. MCGUIRE: I'm going to object on legislative privilege grounds.
A. Not for Congressional Redistricting.
**Q. Did you attend any Alabama Legislative Black Caucus meetings at which the 2021 Congressional Plans were discussed?**
A. I attended all the Black Caucus meetings but I don't know specifically if a specific plan was discussed.
**Q. Do you have any recollection of a discussion of the 2021 -- in 2021, of Congressional Redistricting at the Alabama Legislative Black Caucus meetings?**
MR. MCGUIRE: I'm going to object on legislative privilege. Don't answer that.
BY MR. WALKER:
**Q. Do you recall anything you said at meetings of the Alabama Legislative Black Caucus**

**in 2021, about Congressional Redistricting?**
MR. MCGUIRE: I'm going to object on legislative privileges.
A. I don't recall.
**Q. Was there a plan that you supported -- let me back up.**
**The plan that was passed by the legislature in 2021, did you vote against it?**
A. Yes.
**Q. Why did you vote against it?**
A. I voted against it because of the structure of a lot of districts in the state, not just the Congressional District but a number of House Districts, including my own.
**Q. I don't think I asked my question very well.**
**When the Congressional Plan that was passed by the House came up for a vote, did you vote against it?**
A. I'm trying to -- which plan are we talking about?
**Q. I'm limiting it to the Congressional Plan that was passed by the state, DX 5. When**

**this came up for a vote, do you recall if you voted against it?**

A. I'm not sure but I think I did.

**Q. Okay. And I'm really just using that as a springboard to my next question.**

A. Okay.

**Q. Was there a plan other than the plan that was passed by the House that you favored?**

**Do I need to repeat my question? You were looking at that.**

A. That was a plan that would have been more acceptable than this one.

**Q. Do you recall the name of that plan?**

A. I don't. There were a lot of names.

**Q. Did that plan have two majority Black Congressional Districts or do you know?**

A. I really don't recall. There were so many plans that were floating at that time. I don't know specifically which one.

**Q. Look at what I previously marked, sir, as DX 5.**

A. Okay.

**Q. And look at, if you will -- do you**



**know, sir, if you favored any Congressional Plan in 2021 or in 2023, that created a toss-up district around Jefferson County? Around Birmingham?**

A. No.

**Q. Did you, in 2021 or in 2023, submit anything into the legislative record that you recall relating to redistricting?**

A. No.

**Q. Look at DX 5, please, sir, which is the 2021 Alabama Congressional Plan.**

A. Yeah.

**Q. I think you testified earlier that you did not favor this plan?**

A. Right.

**Q. And do you mind if I ask you again why you don't favor this plan or you do not favor this plan?**

A. I don't think the plan would achieve the purpose.

**Q. And the purpose would be what?**

A. The purpose, in my opinion, would be another seat in the Congress that represents the



Black community of the State of Alabama.

**Q. What level of Black voting-age population do you believe would be necessary for a plan to achieve that purpose, if you have an opinion?**

MS. SADASIVAN: Objection to form.

A. You know, I have not done any research to ascertain that.

**Q. Fair to say you have no opinion on that?**

A. No. I mean, if you're asking me about the plans that were presented.

**Q. Yes.**

A. No, I don't. I think that all of the plans that were presented, some of them would absolutely not give an opportunity to a Black seat. Some were very borderline and so most of those I didn't agree with.

**Q. Is it fair to say you wanted a plan that you thought would give Blacks in Alabama the opportunity to elect two people to Congress?**

A. Yes.



**Q. Okay. Do you have an opinion about what role, if any, race played in drawing the 2021 Alabama Congressional Plan, DX 5?**

A. Do I have an opinion whether race was a factor?

**Q. Yes, sir.**

A. I think it was.

**Q. And can you tell me the basis for that opinion?**

A. Well, based on my experience in this area.

**Q. Redistricting?**

A. Not redistricting but Mobile, Baldwin, the area here.

**Q. Yes, sir.**

A. I'm pretty familiar with voting patterns and voting population. And based on what I saw here, I didn't think that that provided a real opportunity for it. I think you've got Baldwin, Escambia, Monroe, Washington, and then Mobile County. Anything that was, I think, done in Mobile County would be nullified by the other three.



**Q. And implicit in that is that the Black population in Mobile County would be nullified by including, in the same Congressional District, Washington, Monroe, Escambia and Baldwin Counties?**

A. Yes. I was basically talking about Baldwin, Escambia and Monroeville rather than Washington. I think, last I knew, Washington had like about 16,000 residents in the whole county.

**Q. Do people in Washington County come to work in the industries in Mobile County?**

A. Sure.

**Q. Do people in Baldwin County come to work in Mobile County?**

A. Probably the majority of them. Probably the majority.

**Q. Do people in Escambia County come to work in Mobile County?**

A. Yes, some do.

**Q. Do people in Monroe County come to work in Mobile County?**

A. I think some do. Mobile County is the

economic hub for the whole region.

**Q. How do you define the region?**

A. The region would actually be the entire Gulf Coastal region, not necessarily just Mobile and Baldwin County or Escambia but also Jackson County, Mississippi and other areas, where people come to work here, especially to the shipyards, various things around the port.

**Q. They come to work at Austal?**

A. They come to work at Austal, they come to work at several other shipyards, as well as now Airbus, cruise industry, and the largest part of it is stevedoring on the port.

**Q. I didn't realize there was much of that left with container ships.**

A. There's a lot left. This is one of the largest container ports in the country now.

**Q. But I thought the purpose of containers was to get rid of stevedores.**

A. Well, they don't hook themselves up when they go on ships.

**Q. Who knows where we're going.**

A. Yeah.

**Q. I may have asked my question not well earlier. Let me -- I asked you: Do you have an opinion on what role, if any, race played in the drawing of this map.**

**Let me re-ask that question.**

**Do you have an opinion as to whether the people who drew this map, sponsored this map and voted for this map, were motivated to discriminate on the basis of race?**

A. I'm not sure who drew this map. I really don't know who are the authors of this map but the information I shared with you earlier lets me know that whoever drew it understands the voting patterns in this region.

You know, if you look at places like, for instance, Baldwin County, I might be mistaken but I don't think Baldwin County has a Black elected official. Not one.

And in area, it's probably one of the largest counties in the State of Alabama. And Escambia, not much difference. Maybe a little different. Monroe County is a little different. And Washington County is probably in the same

boat as Baldwin.

**Q. If I wanted to draw a Congressional District for the Gulf Region and I wanted to look only at partisan membership, not race, is it possible that I would have drawn a Congressional District 1 very much like the one that's in the 2021 Alabama Congressional Plan?**

A. This particular map?

**Q. Yes, sir.**

A. Well, unfortunately in our state, partisanship is related to race in our state; not all over the country but in our state. So another way to make sure that Blacks don't get elected, you just draw a partisan district and you don't get elected. So that's how the two relate to each other today.

I mean, years ago it was a little different. But today, that's really kind of the way it is. All you need to do is look at the number of legislators in the Legislature that are Black. 24 out of 105.

**Q. Right.**

A. So I think that kind of speaks for

itself.

**Q. So if you're looking at a map like this, would you have any way of knowing if partisanship or race predominated or played a role in the drawing of Congressional District 1?**

A. You would if you believe they're one and the same.

**Q. And do you believe that?**

A. I believe that's true to an extent in several areas of the state.

**Q. And those areas?**

A. I mean, by -- I'm talking about by counties, now. That's what I'm talking about. And the big difference, in my judgment, is that people who serve at the county level, even though they are partisan seats, the operation is not partisan. Difference in Alabama Legislature. It's kind of driven by partisanship and race.

And so I think there are some different scenarios as it relates to elected officials and how they function in those positions.

**Q. Have you had any experiences in the Alabama Legislature that made you think that someone was doing something with the intent or purpose of discriminating on the basis of race as opposed to partisanship?**

MS. SADASIVAN: Objection to form.

A. Well, strange you should ask that. We just finished passing DEI in the State of Alabama.

**Q. And do you want to define DEI for the record?**

A. It's race based.

**Q. Why don't you explain a little bit what you're talking about?**

A. Alabama is one of three states in the United States that has actually passed a law eliminating DEI in universities and any government-funding agencies and, you know -- maybe I shouldn't say this.

My general thought is that they had project 2025 before it even existed.

**Q. And by DEI, you mean diversity,**

**equity, and inclusion initiatives?**

A. I mean, not just that, but banning books on Black history -- you know, we -- I know you watch CNN, all those places. We get credit for that. In Alabama we get credit for being the first state -- or second or third state in the nation to adopt something like that, as well as a lot of other things.

So if I think -- if your question to me is whether I think some of those things have racial intent, sure, I think that.

**Q. Could it be that recent legislation that you referred to on DEI has a partisan motivation as opposed to a racial motivation?**

MS. SADASIVAN: Objection to form.

A. Well, I'm not talking about just the motivation. I'm talking about the intent of the legislation itself.

**Q. I'll ask the question. Could it be that it had a partisan intent as opposed to, or in addition to --**

A. I think I just established, in a lot

of instances they're one and the same.

**Q. Are you aware that Allen v. Milligan reached the Supreme Court -- went up to Supreme Court?**

A. Yes.

**Q. Did you attend the oral argument?**

A. Not at the Supreme Court, no.

**Q. Did you make any public statements about the case at the time the Supreme Court issued its opinion or before that?**

A. A public statement? You mean on media or something like that?

**Q. Well, you're a legislator. You're an important person down here in Mobile. Almost anything you say is a public statement, unless you're at a cocktail party. So yes.**

A. I was pleased with the Supreme Court ruling because I thought it was a better opportunity than anything else I saw that passed the Alabama Legislature.

**Q. And what did you understand the Supreme Court to have ruled?**

A. I think they upheld what the appellate



court --
**Q. The Three-Judge Court?**
A. Yeah. I think they upheld that, which I thought was appropriate.
**Q. And what was your understanding of what the Three-Judge Court held?**
A. I think they held that the map that we're operating under right now was the fairest method to achieve the purpose.
**Q. You participated, as a member of the Reapportionment Committee, in the '23 Legislative proceedings, did you not?**
A. I did.
**Q. And those were the proceedings that the legislature held after the Supreme Court ruled in Allen versus Milligan, to draw a new Congressional map?**
A. Yes.
**Q. Did you review any of the maps that were submitted to the committee or to the legislature in the 2023 process?**
**And let me say: There was the VRA Plaintiffs' Remedial Map, there was the**

**Community-of-Interest Plan, the Opportunity Plan, the Livingston 2 Plan, Livingston 3 Plan. There may have been other plans but I think those were the primary ones.**
**Did you look at any of those?**
A. Yes.
**Q. Do you recall which ones you looked at?**
A. You know, the names of them, no.
**Q. When you looked at them, where were you and who was with you?**
MS. SADASIVAN: Objection to form.
A. I actually looked at them in my office.
**Q. Online?**
A. No.
**Q. You got maps?**
A. Yeah.
**Q. When you say your office, you mean your legislative office?**
A. Right.
**Q. Where did you get the maps from?**

A. Ms. Givens.
**Q. Ms. who?**
A. Donna Givens.
**Q. The Reapportionment Office?**
A. Yeah.
**Q. Okay. Do you recall which ones you favored? I may have just asked you that.**
A. I don't.
**Q. Did you speak at any of the legislative hearings?**
A. On reapportionment?
**Q. Actually, let me go back. There were a number, if you recall, of legislative hearings that were held as a part of the 2021 redistricting. Did you speak at any of those?**
A. If I did, it was asking a question of the Chair. No, I didn't speak at the mic on it.
**Q. There were also some hearings -- not nearly as many -- that were held as part of the 2023 Congressional Redistricting process. Did you speak at any of those?**
A. No.
**Q. Do you recall if you spoke at the**

**committee meetings that were held in 2023?**
A. I know I spoke a couple of times, as a member of the committee, trying to get some clarifications on a couple of issues.
**Q. Did you get clarification?**
A. Some on some; on others, I didn't.
**Q. Do you recall what you were not able to get clarification on?**
A. I think I mentioned earlier, I still never got clarifications on what happened to the rest of the maps and why they weren't before the committee.
**Q. In 2021?**
A. Yes.
**Q. Did you have that same complaint or a similar complaint in 2023? Were you aware of any other plans that were submitted that were not before the committee?**
A. I think we were given all of those plans at a committee level. I'm going to say that some of those plans I already had because committee members got copies of those plans at one of the meetings in 2023.



**Q. Do you recall a plan that provided two districts that were crossover districts, they didn't have majority Black population but they were districts from which it was said Black populations working with crossover white voters could elect a candidate of choice?**
MR. MCGUIRE: Object to the form.
BY MR. WALKER:
**Q. Do you recall any plan like that?**
A. No.
**Q. Would you support --**
A. I recall a discussion on that. I don't recall seeing the plan.
**Q. Would you support a plan like that?**
A. Would I support a plan that would hope that somebody crossed over?
**Q. Yes.**
A. No.
**Q. Okay. Why not?**
A. Because -- probably just in my limited experience. In my limited experience I've never seen that happen.

**Q. Look at, sir, if you would, DX 4, which is the plan that the legislature passed in 2023.**
**Do you remember seeing that plan? I'll tell you, it had a short life span.**
A. I'm sure at some point I did. I don't know a lot of details about it but I'm sure at some point.
**Q. Do you have an opinion of that plan?**
A. Oh, yeah. I didn't support that plan.
**Q. You did not vote for that plan when it came up for vote in the House?**
A. No.
**Q. Do you have an opinion of what role, if any, race played in drawing the 2023 Plan that was passed by the legislature?**
A. I don't.
**Q. Do you have an opinion what role, if any, politics played in drawing the 2023 Congressional Plan passed by the legislature?**
A. I could probably say that about every plan. Politics had something to do with all of them.

**Q. Can you be more specific about what role politics may have played in that plan?**
A. Well, I think that as we go through reapportionment, one of the major considerations is political advantage in many areas of that process. So, you know, that's why I say politics is played in all of them.
**Q. Is that a legitimate consideration for politicians to have when they're drawing a plan?**
MS. SADASIVAN: Objection to form.
A. It's a normal consideration if it's not legitimate.
**Q. What factors do you think Alabama should consider when it decides how to draw lines in a Congressional Redistricting Plan?**
A. I think that -- I think we need to try to limit gerrymandering for political purposes, one of the things that I think. I also think that every group of people in this state, all the citizens in this state ought to have a fair opportunity to be represented in the Congress or in any other seat that we have in the state,

based on the makeup of the population of the state.
So that's how I think we need to look at those plans, whether they can serve the interests of the areas that's a part of that particular district.
**Q. Do you believe that Congressional seats should be assigned or drawn with reference to proportional representation?**
MS. SADASIVAN: Objection to form.
A. I think that's a requirement.
**Q. Okay. Explain that a little bit more.**
A. The requirement has to do with the number of -- the population in each one of the districts. And so, you know, I think you have to -- that has to be a prime consideration when you're drawing a plan.
**Q. I was actually asking a different question. So I think the requirement you're referring to is equal population.**
A. Yes.
**Q. As Alabama interprets the law, all the**



**Congressional Districts have to have equal population except one is allowed to have one person more.**

A. Right.

**Q. Because that's just the way the numbers work out, correct?**

A. That's correct.

**Q. What I asked you was about proportional representation. If 27 percent of the Alabama population is Black, for example, should approximately 27 percent of the Congressional seats be held by Black persons?**

**Is that your position?**

A. Yes.

MS. SADASIVAN: Objection to form.

BY MR. WALKER:

**Q. What about when the state is redistricting, should it consider where the incumbents live? Is that a legitimate consideration?**

MS. SADASIVAN: Objection to form.

A. It is something that has been a practice over the years, and I think the consideration is already given by the committee every time they redistrict.

**Q. Every time you've redistricted, have you looked to make sure that your house was in your district?**

A. No, because my district is such it would be impossible to take it out. But, you know -- keep in mind, as I said earlier, when you're trying to capture Black voters, a lot of -- I'll say most Black voters live in a certain area. So that's -- you know --

**Q. Let me ask you this question: Is there a value to democracy for having a legislator represent a district over an extended period of time that allows her or him to build relationships with people and interest groups in that district?**

MS. SADASIVAN: Objection to form.

A. To build --

**Q. Let's shorten it. Do you, as an**

**experienced politician and somebody who's run from districts, believe that your constituents are served better or less if you have a longer or shorter tenure in that office?**

MS. SADASIVAN: Objection to form.

A. I don't really have an opinion. That just depends on who the individual might be, who's serving. You know, I think that in Alabama Legislature, when you first come into the legislature, you probably will have to have some time to understand how it works in order for you to be -- in order for you to benefit your constituents.

**Q. Assuming that one is a good legislator, someone tries to do a good job, is it -- is there any advantage to the people in that district for that person to have a longer as opposed to a shorter tenure?**

A. I think, based on my experience in the Alabama Legislature, it would probably be best for them to have more time in it than less in terms of getting the thing done for that

particular district.

**Q. Thank you, sir. I was asking you about things Alabama should consider.**

**Can we agree that Alabama contiguity, when it's drawing plans; that is, that every part of a plan must be in contact with another part of a plan? There should be no gaps left out?**

A. I mean, if that's possible, to draw a plan fairly that way.

**Q. What about when districts are redrawn? How important to you is preserving the core of the previous district?**

MS. SADASIVAN: Objection to form.

BY MR. WALKER:

**Q. Do you understand the question?**

A. It really depends on what's trying to be achieved with redistricting. People -- you have different motives for redistricting. One of them being, trying to preserve the status quo; the other being, trying to make the district more progressive for the people who



live in the district.
For instance, economic development purposes and development purposes and growth purposes, job purposes. A lot of those things come into play during that process.
**Q. How does that come into play if the issue is whether or not to preserve the cores of the existing districts?**
MS. SADASIVAN: Objection to form.
A. You need to explain to me what you mean by core.
**Q. Okay. Let me rephrase it differently.**
**Would a least change philosophy be a legitimate way to approach redistricting?**
MS. SADASIVAN: Objection to form.
BY MR. WALKER:
**Q. Given the goal of achieving population equality?**
MS. SADASIVAN: Objection to form.
A. You know, I don't really have an

opinion on that because it depends on the circumstances.
**Q. What factors would favor a least change policy?**
A. Well, the way that districts are being drawn now compared to how they were drawn in the past, there are substantial changes that take place in districts, and a number of them are necessary.
**Q. How much did your district change when you were a member of the County Commission and redistricting occurred?**
A. Not a whole lot. Not a whole lot. As I said, it's kind of unique here. There are only three districts and there are only three directions you can go in.
**Q. How much did your House District change in 2021?**
A. Oh, it changed.
**Q. Had your district lost population?**
A. My district did, per se, had a loss of population as a result of redistricting; meaning that some of my district was shifted in someone

else's district because they had a loss of population.
**Q. Let me go back and ask my question again.**
**When the 2020 census data were released, those numbers -- your HD99 was populated with those numbers.**
A. Right.
**Q. And I'm guessing you met with Mr. Henneman to discuss that?**
A. Yes.
**Q. And he would have told you under the new 2020 census, the ideal population of our district is such-and-such and your district is either above or below that and, therefore, we're going to have to either move some people into your district or move some people out.**
**Do you recall that?**
A. Yeah.
**Q. What did Mr. Henneman and you say to each other?**
A. He moved some out of mine.
**Q. Did he move some out in order to**

**populate underpopulated districts; is that what you just said?**
A. Yes. And -- well, I'd have to say he moved some out of the one side and brought some in on the other side.
**Q. Right. He had to shift some over?**
A. Yeah.
**Q. Did you work with him to select which districts were brought out -- were taken out?**
A. I thought I did until they printed it.
**Q. And then you didn't get what you wanted?**
A. No.
**Q. Is that what you're saying?**
A. No.
**Q. To whom did you give population?**
A. To the next district over, which would have been Representative Clarke. I think I gave Representative Clarke and Representative Jarman. And, also, they brought Representative Bracy in.
When you're trying to achieve -- this is the point. When you're trying to achieve a balance in terms of racial makeup, normally the



only place you're going to get that balance is from another district.

**Q. Did you have any conversations about race with Mr. Henneman?**

A. I think I had it with Pringle.

**Q. With Mr. Pringle?**

A. Yeah.

**Q. I mean, Representative Pringle?**

A. Yeah.

**Q. Do you recall what that conversation was?**

A. The conversation was that my district had been shifted to a point that when I come out of my street, I'm in somebody else's district.

**Q. Not about race, but about where your house was with relation to your district boundary?**

A. Yeah. Well, they put another legislator across the street from me.

**Q. Oh, really?**

A. Yeah.

**Q. Was there a legislator living across the street from you?**

A. No. No. The district was moved for him to represent that area.

**Q. Was that changed after you raised it as an issue?**

A. No, sir, it wasn't.

**Q. Do I remember correctly that you said that everyone should have an opportunity to select a candidate of choice? Is that -- did you state that earlier?**

A. I said that everyone should have an opportunity to vote for someone that has something in common with that community that they represent.

**Q. Look at Defendant's Exhibit 4, please, sir. That's the 2023 Congressional Plan.**

**Representative Jones, do you know what a community of interest is?**

A. Yes. Explain it to me.

**Q. Well, that was the question I was going to ask you. Can you explain to me what a community of interest is?**

A. I think that's a community where people have a lot in common and, you know, they

-- basically, that's the gist of it. People -- you know, they have a lot in common.

**Q. So could we agree that whether or not a community of interest exists based on your perception?**

MS. SADASIVAN: Objection to form.

A. Based on my perception?

**Q. Yes. You may see a community of interest that someone else may see a different community of interest?**

MS. SADASIVAN: Objection to form.

BY MR. WALKER:

**Q. Would that be fair?**

A. Well, I guess that's like opinions.

**Q. Look at the map there, the 2023 Congressional map. Is there any community of interest that you think the 2023 map should have kept together but did not?**

A. This is not the map that was ordered by the Court.

**Q. Yes, it was. I mean, this was the**

**2023 map that the Court did not approve.**

A. That the Court did not approve?

**Q. Yes, sir.**

A. Okay. It's really difficult for me to see what these are. I'm trying to look at counties and there's nothing legible here.

**Q. I understand. Well, looking at the southern part of the map, Congressional District 1 looks like, to me, it has Mobile County, Baldwin County, Escambia County and Covington County. Does that represent a community of interest to you?**

A. It could be considered one, like many other maps have been presented.

**Q. And Congressional District 2 is a combination of Black Belt counties and Wiregrass counties. What's your opinion of that?**

A. Well, you know, I think that when I look at these maps, I look at places like Washington County. I think it's a community of interest to Mobile County. I think that counties that go up that same realm -- well, you're talking about Clarke County, Monroe



County -- those areas are very well communities of interest to Mobile County.
**Q. Okay.**
A. And here -- in this map -- they are not in this particular map. I would think that you'll find that those counties I spoke of, and a few others, are actually counties that have a lot in common with Mobile County as it relates to them coming to this county, participating in this county.
I know very few people in the Black Belt who does anything in Baldwin County.
**Q. Okay.**
A. In fact, I don't know too many Mobilians that do a lot in Baldwin County. I don't think they have anything in common.
**Q. So as opposed to this map, DX 4, the 2023 Plan, you would prefer to see -- is it fair to say, based on your testimony, a Congressional District in which Mobile is linked with Washington, Clarke, Monroe, Conecuh, Escambia, and Baldwin Counties?**
A. Yes.

MS. SADASIVAN: Objection to form.
A. No, I didn't say Baldwin.
**Q. Not Baldwin?**
A. No.
**Q. Do you know whether the Black Belt can be drawn in one district?**
A. The entire Black Belt?
**Q. Yeah.**
A. I doubt that you could meet your population goals.
**Q. In the community of interest that you've talked about you would exclude Baldwin County?**
A. Yes. You know, I know it looks that way, that Mobile County and Baldwin County might have a lot in common but, quite frankly, they don't. Baldwin County's economy is based on some agriculture and tourism. That's the gist of the economy.
I don't think you find anyone coming from Lowndes County to go to the Grand Hotel. That's -- they come to places where, first of

all, employment is possible. They come to places where they have in common with relatives within those counties.
And people, a lot of people migrate from Black Belt counties to Mobile County. I mean a lot of them. And a lot of them become residents here. Sometimes when you see the reduction in population in some Black Belt counties, it's because they have either relocated to Montgomery or Mobile.
**Q. So your -- I'm sorry. I didn't mean to cut you off.**
A. Because of health care availability, because of jobs availability, because of so many different things that they think would enhance their families. That's why they do that.
**Q. You're talking about Black people and a Black community of interest; is that fair?**
A. For the most part. But they're not the only ones that come.
**Q. I agree with that. But the community of interest that you've talked about -- when you're saying these counties should be linked**

**with Mobile and Baldwin County should not, is primarily a Black community of interest. And people moving from the Black Belt, you're talking about Black people; is that correct?**
A. Not just that, but cultural differences. Baldwin County has a different culture makeup than Mobile County, where a lot of those counties really don't. You know, it doesn't look like it when you're downtown Mobile.
Mobile has a pretty good size agriculture industry, north part of the county, south area of the county. While we're known for seafood, we also do a lot of agriculture in this county. And a lot of those folk come for that purpose.
**Q. Would you agree that there is a white community of interest that links Mobile and Baldwin County?**
MS. SADASIVAN: Objection to form.
A. Well, let me put it this way: I think there's a link but the link has to do with

economics more than anything else.
**Q. Is economics not one of the considerations for a community of interest?**
A. Oh, sure. But the economics side of it, it's not that Baldwin County provides an economic, it's that they work in Mobile.
**Q. Well, if we were to go stand by the Causeway in the morning, would we see a lot of cars coming in from Baldwin County?**
A. You have a whole lot coming in; very few going out.
**Q. People coming from Baldwin County to Mobile?**
A. To Mobile.
**Q. And that's a community of interest, or at least one factor and one is not?**
A. It's one and the same that happens between the two. But when it comes to recruiting industry, Baldwin County is not a part of recruiting industry in Mobile County.
**Q. It's not an industrial county?**
A. No, but sometimes the county is not. But the way they get industry -- the way you

become competitive, you partnership with areas that feed off of that particular county. That doesn't happen here. I tried to make that happen; it just didn't happen.
**Q. I'm not sure I understand what you just said.**
A. What I mean is that if you're going to be competitive and competing throughout the world for major industries, that the only way you're going to be competitive is you've got to develop partnerships for the region. Those partnerships require some investment to make you competitive.
I don't know of a project for the last 20 years that Baldwin County has invested in but they benefit from it. Because, the thing is, most of the executives who run companies in Mobile live in Baldwin County.
So, you know, all I'm saying to you is that it's a different kind of situation than people coming for quality-of-life kind of issues and coming to live here.
And I think that what you're seeing

now, the City of Mobile has started expanding to a point where most of those areas that were at one time rural areas and underpopulated are now being developed all out west Mobile and even some in the northwest.
**Q. Is that Black population growth or white population growth?**
A. It's both. But mostly now there's a typification going on downtown Mobile, those folks don't have anywhere to move but west.
**Q. You mean Black people who are replaced by white typification and downtown Montgomery are moving west?**
MS. SADASIVAN: Objection to form.
A. Mobile. Because that's the only places the houses are being built.
**Q. Okay. I understand.**
A. Not for any other reason other than that's the only place that houses is being built. All of the public housing in Mobile have been demolished and most of it you can't build there now because of the flood plan. So those

folks now have to move west.
I think if you go right past our airport, there are 750 houses being built right now.
**Q. Are parts of Mobile and the Black Belt a community of interest?**
A. Oh, yeah. Oh, yeah. But they --
**Q. And that's for reasons that you've talked about, that people from the Black Belt -- Black people from the Black Belt come to Mobile for health care, for jobs?**
A. For health care, for jobs, to relocate. I mean, sure. And vice-versa. People from Mobile do spend quite a bit of time back and forth in the Black Belt.
**Q. And why is that?**
A. Because that's where they're from. That's where they were born and raised.
**Q. What percentage of Mobile's Black population came from the Black Belt in the last generation or two?**
MS. SADASIVAN: Objection to form.



A. I don't know that anyone keeps up with that data.

**Q. So you don't know?**

A. No.

**Q. Are parts of Mobile and Montgomery a community Of interest?**

A. I would say not. Different -- I mean, it's completely different. Montgomery -- actually, Montgomery more with Birmingham than I would Mobile.

**Q. Oh, don't say that.**

A. The reason I'll say that is that Montgomery is really -- as a city, is propped up by the state, you know. All those new buildings that came from the Retirement System of Alabama, if it wasn't for them, they wouldn't be there.

But as a result of that, they draw a lot of people in, a lot of lawyers, a lot of --

**Q. For the record, I was born in Montgomery.**

A. But, you know, they do. And the other thing is that the legislature is there, the state capital is there. It's a hub.

Mobile is somewhat of a different kind of hub. We're kind of the people in the state that we have recreation, we have water, we have Mardi Gras, we have all kinds of sporting events, just like Birmingham but completely different.

We have very few headquarters offices in Mobile. Very few.

**Q. Are there parts of Mobile that have more in common with Montgomery than with the rest of Mobile County?**

MS. SADASIVAN: Objection to form.

A. I would say maybe downtown.

**Q. Why is that?**

A. Because of the -- downtown Mobile, if you'll note, the reason we built that building, which is Government Plaza across the street, because it has the City, the County and the State Government all under one roof.

So it's real convenient for the citizens here. They go there and you can see just about anybody you wanted to go see. And

then a couple of blocks down the street is the legislative office.

So, you know, yes, we have that in common.

**Q. Do parts of Mobile have more in common with the Black Belt than the rest of Mobile County?**

MS. SADASIVAN: Objection to form.

A. I would say, yeah, parts. Yeah, I agree with that.

**Q. What parts and why?**

A. I would say that those parts of Mobile County where people in the Black Belt come and settle because of jobs that's here. And as I talked about earlier, the port, Airbus, Austal Shipbuilding. All those folks, they've got a lot of employees. Austal started with 400 employees in Mobile. They've got 4,000 now.

And so it's growing and as it grows, it needs more employees and so they recruit them from all over.

**Q. Do parts of Montgomery have more in**

**common with Mobile than with Prattville?**

A. No, I don't think they have more in common than with Prattville. Prattville really is Montgomery.

**Q. Do you have any information about the intent of the legislature in drawing the 2023 Congressional map?**

MS. SADASIVAN: Objection to form.

A. The intent of the legislature?

**Q. Yes.**

A. Well, I'm hesitant to say the intent was of the entire legislature because there are a whole lot of folk in the legislature who have very little knowledge about drawing the maps and what took place in there.

So I don't know if it's the intent of the entire legislature but it was probably the intent of those who participated in the leadership of reapportionment.

**Q. And who would those people be?**

A. It would be the chairs and -- who I think were the people who direct the staff and

consultants.

**Q. So the chairs where Senator Livingston in 2023 and Representative Pringle?**

A. Right.

**Q. Do you have any information about the intent of Senator Livingston in drawing the 2023 map?**

A. I don't have any information about the intent of either because I'm sure we wouldn't have had an open conversation about their intent.

**Q. Do you have any intent about -- do you have any information about the intent of any individual member of the legislature in drawing the 2023 map?**

MS. SADASIVAN: Objection to form.

A. No.

**Q. Do you have any information about the intent of the Governor in signing the 2023 map into law?**

A. No, I don't. Anything I told you about that would be strictly speculation.

**Q. Look at Defendant's Exhibit 6, please. And this is the Court-Ordered Congressional Plan. Do you understand that this was drawn by a special master?**

A. Yeah, that's what I'm told.

**Q. Did you have an understanding of what the special master was supposed to do?**

A. I don't know specifically what his charge was.

**Q. Do you know Richard Allen?**

A. No.

**Q. What do you think of this plan, the Court-Ordered Congressional Plan, Defendant's Exhibit 6?**

A. What do I think about the Court-Ordered --

**Q. Yes, sir. I'm asking your opinion of this plan.**

A. I think it's -- I think it's probably the plan that gives the most opportunity to achieve the purpose.

**Q. I couldn't hear the last part of what you said.**

A. It gives the best opportunity to achieve the purpose.

**Q. Of?**

A. Of Black representation in the Congress.

**Q. In other words, you believe that under this plan there can be two Black members of Congress from Alabama?**

A. Yes, I believe that.

**Q. And that would be CD 7 and CD 2?**

A. Seven and, yeah, two.

**Q. Does this plan respect the community of interest that you've talked about?**

A. I think it does.

**Q. Well, doesn't it split Mobile up?**

A. It splits Mobile up slightly but, I mean, we deal with this every day. Most of the districts in the House of Representatives, the state is split.

**Q. If you'll look at Mobile County in this map, you'll see that there's an island in the northeast of Mobile that's not included in District 2.**

**Do you see that?**

A. Yes.

**Q. How would you describe the population of that area?**

A. I'm not sure what that area is, looking at the map.

**Q. Well, look at the southern part of Mobile County, which is not included in section 2 -- excuse me -- Congressional District 2. How would you describe the population of that part of the county?**

A. The southern part of the -- it's -- it has a mix population.

**Q. Is it predominantly white?**

A. I think it is.

**Q. Is it predominantly Republican?**

MS. SADASIVAN: Objection to form.

A. I don't know what -- let me just say this: The south end of the county is a part of the county where the seafood industry is so it's not just white and Black. There are some other folk who live down there, who work and

process --
**Q. You mean Vietnamese?**
A. Vietnamese and -- what are they? I'm not sure they're all Vietnamese.
**Q. Well, I didn't mean to say they all were Vietnamese.**
A. I'm talking about the different races.
**Q. Well, look at the part of CD 2 that comes into Mobile County. Is that predominantly Black population?**
A. That comes into Mobile County?
**Q. Yes, sir.**
MS. SADASIVAN: Objection to form.
A. That's the northern part of the county. I think we spoke to that several times this morning.
**Q. Do you know whether or not this part of CD 2 that comes into Mobile County grabs a majority of the Mobile County Black population?**
MS. SADASIVAN: Objection to form.
A. Like I said, it's difficult for me to

tell just what areas you're talking about here, but it has a substantial number of the Black population.
**Q. I represent to you that it includes Saraland, Satsuma, Mount Vernon, and Creola.**
**Does that help you with your answer?**
A. Okay. If it includes those, Saraland is not predominantly Black. If it includes --
**Q. I'm sorry. I misunderstood. These are in District 1? Forgive me. Scratch that.**
**Do you believe that if the State of Alabama can -- do you believe that if the State of Alabama can draw a Congressional District with a Black majority, it should do so?**
MS. SADASIVAN: Objection to form.
A. Sure.
**Q. Do you believe that if the State of Alabama can draw a Congressional District with a Black majority, it's required to do so?**
MS. SADASIVAN: Objection to form.
A. Well, I mean, you guys are lawyers. I

don't know what's required under the law. But to me, it's -- it would be a lot fairer plan than the others I've seen.
**Q. Who represents you in Congress today?**
A. Jerry Carl.
**Q. Do you know Mr. Carl?**
A. Quite well.
**Q. How do you know him?**
A. He was on the County Commission after me. He's a business man here, too.
**Q. Have you ever contacted him as your congressman?**
A. Sure. I've talked to him several times.
**Q. Would you mind telling me what you contacted him about?**
A. Well, there was somebody in my district who had some military issues, trying to get a VA, and things like that.
**Q. Was he responsive?**
A. He had his office, I think -- his office here -- actually, the young man went to his office and they gave him some direction on

where he needed to go.
**Q. So he was responsive?**
MS. SADASIVAN: Objection to form.
A. He was responsive to my call. I know him personally.
**Q. Was he responsive to the young man you were trying to help?**
MS. SADASIVAN: Objection to form.
A. I understand he was.
**Q. Who represented your district before Mr. Carl?**
A. Before Mr. Carl -- who was there before him? I think it may have been Joe Bonner.
**Q. And did you know Mr. Bonner?**
A. I know him well.
**Q. Was he responsive to you any time you asked him for something?**
MS. SADASIVAN: Objection to form.
A. Yes. He was responsive to me. Now, I



don't know about anybody else. I was the mayor of the city during that time.

**Q. You had a good working relationship with him?**

A. Yeah.

**Q. Is there any federal legislation that you wanted Representative Carl to support that he did not?**

MS. SADASIVAN: Objection to form.

A. Yes.

**Q. What would that be?**

A. The bridge across the bay that we just got funded for. Nobody from Alabama supported it.

**Q. Really?**

A. No. Because it was a bipartisan piece of legislation. In Washington, everybody in Alabama voted against it. But when we got funds, they had a big celebration over that. And everybody was there but the one person who supported it, Terri Sewell. She couldn't get here. But all the rest of them voted against

it, and were in live and living color over there in that building.

**Q. When the dollar's on the table, everybody is happy to come.**

A. That's right. You're right.

**Q. Has there been, in recent years, any federal legislation that you wanted to pass other than what you just talked about?**

**Well, that did pass -- it did not pass.**

MS. SADASIVAN: Objection to form.

A. Oh, sure. The John Lewis Voting Rights Act. I've got to get my list. It's several of them I didn't want them to vote for it and there were some I wanted them to vote for. I mean, that --

**Q. Well, the fact that a congressman doesn't always vote your way doesn't mean that she or he is not responsive, does it?**

MS. SADASIVAN: Objection to form.

A. Well, let me say this: I'm probably

not the best person to ask, because for the last 26 years I was in that building across the street. I was either the president of the county commissioner or the mayor of the city. So I'm not a good person to ask about whether they dealt with me.

**Q. The members of the Alabama Delegation -- going back to the bill we were just talking about. Do you know whether or not they specifically supported funding for the bridge even if they couldn't support the bipartisan act?**

MS. SADASIVAN: Objection to form.

A. From my experience in the legislature, if you vote against it, you certainly, by no means, can be considered a supporter.

**Q. What was the bill? Do you recall what the bill was?**

A. It was a bipartisan infrastructure bill. And there was more in it than the bridge. A lot of other things were in it. They voted against the bill.

**Q. What level of federal spending did that bill create, if you recall?**

MS. SADASIVAN: Objection to form.

A. It was one of the largest allotments that Alabama had gotten in a long time. I can't remember the exact figure but it was a lot of money. Millions. Millions. That has been -- it's been -- we've been trying to do this for 15, 20 years.

**Q. Let me ask you a question.**

**So off the record.**

(A DISCUSSION WAS HELD OFF THE RECORD.)

BY MR. WALKER:

**Q. What does the term "candidate of choice" mean to you?**

A. Candidate of choice? When I look at that, I look at people looking for someone that can represent them, that they've got confidence in, that's going to do what's best for that district and will be always available to them, and someone that they can talk to about whatever problems that might come up in a particular



district.

**Q. What does it mean for an election to be racially polarized, do you know?**

MS. SADASIVAN: Objection to form.

A. I started to ask you. Do you know how long I've been doing this? What it means to be racially polarized.

**Q. Yes, sir.**

A. It means that every election, that's what it means.

**Q. Maybe you can be more specific.**

A. Yeah. It's something that you really have to deal with. And I think we've made some progress in that, but that is a real issue.

**Q. When you say we've made some progress, what do you mean?**

A. I mean that -- I can recall when we operated the City of Mobile under the Three-Commissioner System and the Three-Commissioner System was not by districts, so they're large. So nobody in the Black community ever had an opportunity to run. And

that was up until 1985. That's when it changed.

**Q. Was that Dillard? Was Dillard the lawsuit that changed that?**

A. It was Bolden v The City of Mobile. And it went on for years -- 10, 12 years before they actually came up with districts.

So, you know, the polarization of voting has been something that's happened here for a long time, even longer than Montgomery.

**Q. Do you have any information about racial appeals being used in political campaigns in Alabama?**

MS. SADASIVAN: Objection to form.

A. Racial --

**Q. Appeals being used in political campaigns in Alabama?**

A. Racial appeals?

**Q. Yes, appeals to race.**

A. I don't have any specific information about that. I'm sure that's happened.

**Q. The declaration that you signed, who wrote this declaration?**

MS. SADASIVAN: Objection to form.

A. Who wrote it?

**Q. Yes, sir.**

A. I did.

**Q. Are you registered to vote?**

A. I am. You know, y'all would have done kicked me out if I wasn't.

**Q. You've been registered, I guess, since you turned 18?**

A. Oh, yeah.

**Q. Have you ever had any problem updating your registration for any reason?**

A. No.

**Q. Do you know of anybody who's had a problem registering to vote?**

A. I know of, yes. Yes, I do.

**Q. Tell me about that, please, sir.**

A. So let me preface that by saying, before I even got in political office, I was a community activist to register people to vote. And I know that as of today we still have some issues with that. For instance, it's difficult

to register people who are incarcerated who have not been convicted, who have the right to vote. That's difficult throughout the State of Alabama.

And it all depends on whether the sheriff works with you in doing that. If he doesn't, they just don't get a chance to vote.

**Q. Have there any legislation introduced into the legislature to address that issue?**

A. There have been attempts at it but the problem with that is that it's really kind of cloaked in: We don't have the facilities to do that, we don't have the personnel to do that.

Nobody denies they have a right to do it, but it's throughout the state. That's an issue.

The other thing is when you actually put impediments to the process, then that, in my opinion, denies people the right to vote.

**Q. Are you aware of any impediments today to people in Alabama other than being held in jail pending trial?**

A. You know, it became an issue at one



time with people who were in convalescent homes, who were all in their right mind, in their 80s and 90s, that when we came up with the law about who could assist them, it became a problem. Because everybody assumed that if somebody is in a nursing home, they've got a family. Not necessarily.

**Q. Well, I think you're talking about assisting with voting and I'm talking about registering to vote.**

A. Or registered.

**Q. Okay. Do you know -- I'm sorry. Go ahead.**

A. But, I mean, it's certainly not like it was at one time. It's certainly a lot more open than it was. But registering -- I think I just heard in the State of Texas, I think they took a million people off the voting rolls so --

**Q. I'm not interested in Texas.**

A. But on the subject of registered to vote, it's a lot better and, you know, certainly more convenient than it was several years ago.

**Q. Have you ever voted absentee in**

**Alabama?**

A. I think I voted absentee once.

**Q. Did you have any difficulty doing that?**

A. No, I didn't.

**Q. Are there ways in which voting in Alabama is hard for you because of your race?**

MS. SADASIVAN: Objection to form.

A. Well, as I said, I'm probably not the right person to ask that question because the Board of Registry is right above my office.

I don't think that's been an issue here for some time. I'm just speaking for the Mobile area.

**Q. When you decide which candidate you personally support, how important is race?**

A. Well, it's important to the point where I want someone who -- if they're representing my community, I want them to have something in common with me. And so that -- you know, at that level.

And I think I spoke to you earlier

that, you know, I always, with Alabama and on the county commission for 18 years.

But once people respect each other and agree to work together above all political consideration, then the citizens are the ones who benefit from that. So that's the process that we did. So it can happen. Sometimes in certain situations it rarely does.

But trust me when you leave the local level and go to Montgomery, that's a different animal.

MR. WALKER: Give us just a second. Let's go off the record.

(A RECESS WAS TAKEN FROM 11:52 A.M. TO 11:55 A.M.)

MR. WALKER: I don't think I have any further questions for you.

MS. SADASIVAN: No redirect.

MR. WALKER: Does anybody who is viewing remotely have any questions for Representative Jones?

THE WITNESS: I don't see a lot of people on here.

MR. PENN: None from me, no.

MS. SADASIVAN: He's my colleague.

MR. WALKER: Okay.

Hearing none, this deposition is terminated.

Thank you so much for coming in today, sir.

THE WITNESS: Thank you.

(THE DEPOSITION OF REPRESENTATIVE SAM JONES CONCLUDED AT 11:56 A.M.)



CERTIFICATE

STATE OF ALABAMA)
COUNTY OF MOBILE)

I do hereby certify that the foregoing proceedings were taken down by me and transcribed using computer-aided transcription and that the foregoing is a true and correct transcript of said proceedings.

I further certify that I am neither of counsel nor of kin to any of the parties, nor am I in anywise interested in the result of said cause.

I further certify that I am duly licensed by the Alabama Board of Court Reporting as a Certified Court Reporter.

This 9th day of September, 2024.

Delia G. Camp

DELIA G. CAMP, CCR
ALABAMA - ACCR #299
(EXPIRATION DATE: 9-30-24)
COURT REPORTER, NOTARY PUBLIC
STATE OF ALABAMA AT LARGE

My commission expires December 7, 2027.

