STEVE LIVINGSTON
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
1–4

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF ALABAMA

3    SOUTHERN DIVISION

4

5    NO. 2:21-CV-01530-AMM

6

7    EVAN MILLIGAN, et al.,

8    Plaintiffs,

9    Vs.

10   WES ALLEN, et al.,

11   Defendants.

12

13

14   VIDEOTAPED REMOTE DEPOSITION OF:

15   STEVE LIVINGSTON

16   August 9, 2023

17   11:43 A.M.

18

19

20

21   REPORTED BY:

22   Cindy C. Jenkins, CCR

23

24

25

**Page 2**

1    S T I P U L A T I O N S

2

3    IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of Steve

6    Livingston may be taken before Cindy C.

7    Jenkins, Commissioner, via Zoom Video

8    Conference, on the 9th day of August, 2023.

9

10   IT IS FURTHER STIPULATED AND AGREED

11   that the signature to and the reading of the

12   deposition by the witness is waived, the

13   deposition to have the same force and effect

14   as if full compliance had been had with all

15   laws and rules of Court relating to the taking

16   of depositions.

17

18

19

20

21

22

23

24

25

**Page 3**

1    S T I P U L A T I O N S

2    (continued)

3

4    IT IS FURTHER STIPULATED AND AGREED

5    that it shall not be necessary for any

6    objections except as to form or leading

7    questions, and that counsel for the parties

8    may make objections and assign grounds at the

9    time of the trial, or at the time said

10   deposition is offered in evidence or prior

11   thereto.

12

13   IT IS FURTHER STIPULATED AND AGREED

14   that the notice of filing of the deposition by

15   the Commissioner is waived.

16

17

18

19

20

21

22

23

24

25

**Page 4**

1    A P P E A R A N C E S

2

APPEARING ON BEHALF OF THE MILLIGAN

3    PLAINTIFFS:

NAACP LEGAL DEFENSE & EDUCATIONAL FUND

4    Mr. Deuel Ross

Mr. Tanner Lockhead

5    700 14th Street, Northwest

Suite 600

6    Washington, DC 20005

dross@naacpldf.org

7

NAACP LEGAL DEFENSE

8    & EDUCATIONAL FUND, INC.

Ms. Brittany Carter

9    40 Rector Street, 5th Floor

New York, New York 10006

10   212-965-2200

11   AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Mr. Davin M. Rosborough

12   125 Broad Street

New York, New York 10004

13   drosborough@aclu.org

14   APPEARING ON BEHALF OF THE CASTER PLAINTIFFS:

ELIAS LAW GROUP LLP

15   Mr. Joe Posimato

250 Massachusetts Avenue, Northwest

16   Suite 400

Washington, D.C. 20001

17   jposimato@elias.law

18   APPEARING ON BEHALF OF THE COCHAIRS; RANDY

HINAMAN, STEVE LIVINGSTON, and CHRIS PRINGLE:

19   BALCH & BINGHAM

Mr. Dorman Walker

20   105 Tallapoosa Street

Suite 200

21   Montgomery, Alabama 36104

dwalker@balch.com

22

23

24

25



STEVE LIVINGSTON
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023

5—8

Page 5

1          APPEARANCES
           (continued)
2
3   APPEARING ON BEHALF OF THE SECRETARY OF STATE,
    WES ALLEN:
4        OFFICE OF THE ATTORNEY GENERAL
         Mr. Jim Davis
5        Assistant Attorney General
         501 Washington Avenue
6        Montgomery, Alabama 36130
         jim.davis@alabamaag.gov
7
8   VIDEOGRAPHER:
9        Mr. Bailey Diaz
10
11  ALSO PRESENT:
12       Ms. Joelle Miller
13       Ms. Donna Loftin
14       Mr. Chris Pringle
15
16
17
18
19
20
21
22
23
24
25

Page 6

1            I N D E X
2   WITNESS                           PAGE
3   STEVE LIVINGSTON
4   Examination by Mr. Rosborough       9
5
6           INDEX OF EXHIBITS
7   NUMBER                            PAGE

8   Exhibit 1                          12
9   Exhibit 2                          29
10  Exhibit 3                          37
11  Exhibit 4                          41
12  Exhibit 5                          49
13  Exhibit 6                          60
14  Exhibit 7                          63
15  Exhibit 8                          66
16  Exhibit 9                          72
17  Exhibit 10                         74
18  Exhibit 11                         79
19  Exhibit 12                         83
20  Exhibit 13                         89
21  Exhibit 14                         92
22  Exhibit 15                        100
23  Exhibit 16                        102
24
25

Page 7

1              PROCEEDINGS
2   AUGUST 9, 2023              11:43 A.M.
3          THE VIDEOGRAPHER:  Good morning.
4   We're now on the record.  The time is now is
5   11:43 a.m. on Wednesday, August 9th, 2023.
6   This begins the videotaped deposition of Steve
7   Livingston taken in the matter of Evan
8   Milligan, et al., vs. Wes Allen, et al., the
9   case number of which is 2:21-CV-01530-AMM.
10  The videographer today is Bailey Diaz.  Our
11  court reporter is Cindy Jenkins, both
12  representing Esquire Deposition Solutions.
13          Counsel, would you please announce
14  your name for the record and whom you
15  represent after which the court reporter will
16  swear in the witness.
17          MR. ROSBOROUGH:  Sure.  Good
18  morning -- good morning there.  Good afternoon
19  where I am.  This is Davin Rosborough
20  representing the Milligan plaintiffs.
21          MR. DAVIS:  Jim Davis representing
22  the defendant, Alabama Secretary of State, Wes
23  Allen.
24          MR. ROSS:  Deuel Ross also for the
25  Milligan plaintiffs.

Page 8

1          MR. WALKER:  Dorman Walker
2   representing Senator Steve Livingston.
3   There's no one else in the room with us.
4          MR. POSIMATO:  Hi.  This is Joe
5   Posimato on behalf of the Caster plaintiffs.
6          MR. LOCKHEAD:  This is Tanner
7   Lockhead also on behalf of the Milligan
8   plaintiffs.
9          MS. CARTER:  This is Brittany
10  Carter on behalf of the Milligan plaintiffs.
11          MR. ROSBOROUGH:  And, again, I'll
12  note that Joelle Miller, who is an intern with
13  our office is also on the line listening in.
14  Also represent.
15          COURT REPORTER:  I'll also note
16  that Mr. Pringle is also present; is that
17  correct?
18          MR. WALKER:  I believe he is.
19          COURT REPORTER:  Okay.  Thank you.
20          STEVE LIVINGSTON
21  being first duly sworn, was examined and
22  testified as follows:
23          MR. WALKER:  Madam Court Reporter?
24          COURT REPORTER:  Yes, sir.
25          MR. WALKER:  It looks like



Page 9

1  Ms. Loftin is also present just for the
2  record.
3      COURT REPORTER:  Yes, thank you.
4  I have her listed as also present.  Thank you
5  so much.  All set, Counsel, when you're ready
6  to go on the record.
7  EXAMINATION BY MR. ROSBOROUGH:
8      Q.    Good morning, Senator Livingston,
9  how are you today?
10     A.    Good morning, sir.  How are you?
11     Q.    Good.  You understand that you're
12  testifying under oath right now; correct?
13     A.    Yes, sir.
14     Q.    Okay.  Is there anything that
15  might prevent you from either understanding my
16  questions or answering truthfully today?
17     A.    No, sir.
18     Q.    Have you been deposed before?
19     A.    Yes, sir.
20     Q.    And when was that?
21     A.    Business lawsuits in the past.
22  I don't remember the years or time frames.
23  Sorry.
24     Q.    Okay.  Have you ever been deposed
25  in relation to your duties as a senator?

Page 10

1      A.    No, sir.
2      Q.    Okay.  I'm just going to make sure
3  we're in agreement on a few basic ground rules
4  today before we jump in.  Obviously I'll be
5  asking you some questions.  If you don't
6  understand a question, just let me know.  If
7  I -- if you answer the question I'm going to
8  assume that you understood the question; is
9  that fair?
10     A.    Yes, sir.
11     Q.    Okay.  And also Ms. Jenkins, the
12  court reporter, is here typing everything that
13  you and I are saying and will type anything
14  that anyone on the zoom conference says.  So
15  it's important that only one person speaks at
16  a time; therefore, please allow me to finish
17  my questions and sentences even if you think
18  you anticipate what I might -- where I may be
19  going, and I will do the best -- do the best
20  to do the same with you before jumping into
21  the next question, if that sounds all right to
22  you?
23     A.    Thank you.
24     Q.    Okay.  Okay.  Senator Livingston,
25  without disclosing the content of any

Page 11

1  discussions with your attorney, what did you
2  do to prepare for your deposition today?
3      A.    We had a brief conversation this
4  morning.  We had expected additional time.  I
5  think it was a little time error or confusion
6  about what time we actually started this
7  morning, so...
8      Q.    Okay.  Did you meet with anyone
9  other than Mr. Walker in preparation for your
10  deposition?
11     A.    No, sir.
12     Q.    Did you discuss your testimony
13  today with anyone who was not an attorney?
14     A.    No, sir.
15     Q.    Okay.  Did you review any
16  documents in preparation for your deposition
17  today?
18     A.    Some, yes, sir.
19     Q.    Do you recall which documents you
20  reviewed?
21     A.    Most would have been the
22  interrogatories and the -- what's the word
23  I'm looking for?  Requests for production the
24  last couple of days.
25     Q.    Okay.  And are you referring to

Page 12

1  the responses to the interrogatories that your
2  counsel produced to us on your behalf
3  yesterday?
4      A.    Yes, sir.
5      Q.    Okay.  Did you do anything else to
6  prepare for your deposition that we haven't
7  covered?
8      A.    No, sir.
9      Q.    Okay.  We just mentioned, I
10  believe, that you recently responded to
11  written questions known as interrogatories
12  from the plaintiffs in this case; is that
13  correct?
14     A.    Yes, sir, I think so.
15         MR. ROSBOROUGH:  Okay.  Can we
16  please pull up Exhibit 1?
17     Q.    Senator Livingston, are you able
18  to see the screen okay?
19         (Whereupon, Exhibit 1 was marked
20          for identification.)
21         THE WITNESS:  Yes, sir.
22     Q.    (By Mr. Rosborough) We'll just
23  sort of give you a bird's eye view.  I'm not
24  going to ask you any particular question about
25  these at that time moment.  But if we could



Page 13

1  just scroll down really quickly and see if you
2  can affirm that these are the interrogatory
3  responses to which you were referring?
4      A.   They look so, yes.
5      Q.   Okay.  And is that your signature
6  on the bottom?
7      A.   Yes, sir.
8      Q.   Okay.  And to the best of your
9  knowledge, these are still your true and
10  accurate responses?
11     A.   Yes, sir.
12         MR. ROSBOROUGH:  Okay.  We can
13  take that down.  Thank you.
14     Q.   Senator, where are you from in
15  Alabama?
16     A.   I reside in Scottsboro, Alabama,
17  which is the northeast corner of Alabama.
18     Q.   All right.  And you represent
19  Senate District 8; is that correct?
20     A.   Yes, sir, I do.
21     Q.   Have you lived in other parts of
22  Alabama before?
23     A.   Some brief times in Huntsville,
24  Birmingham back in college days and
25  Tuscaloosa in college days.

Page 14

1      Q.   Okay.  Have you ever lived in the
2  Gulf Coast area?
3      A.   No, sir, I have not.
4      Q.   Okay.  Have you ever lived in the
5  area you consider as being part of the Black
6  Belt of Alabama?
7      A.   No, sir.
8      Q.   Okay.  Senator, when approximately
9  were you appointed as cochair of the joint
10  reapportionment committee?
11     A.   I don't remember the date.  It
12  would have been last year at the end of the
13  legislative session approximately.
14     Q.   Okay.  Just for our -- purposes of
15  brevity and mutual understanding, if I refer
16  to the committee, will you understand that
17  to -- me to be referring to the joint
18  reapportionment committee?
19     A.   Yes, sir.
20     Q.   Okay.  Before your appointment as
21  cochair, did you serve on the committee?
22     A.   I did, yes, sir.
23     Q.   When were you initially appointed
24  to the committee?
25     A.   I honestly don't remember, sir.

Page 15

1  I'm sorry.
2      Q.   That's all right.  You can only
3  testify to the best of your recollection.
4          How about this, were you a member
5  of the committee during the 2021 redistricting
6  process?
7      A.   I was a member during that time
8  frame, yes, sir.
9      Q.   Okay.  Were you a member -- strike
10  that.  We can move on from there.
11         When did you learn that you were
12  going to be appointed as cochair of the
13  committee?
14     A.   Roughly the end of last year's
15  legislative session, 2022's legislative
16  session.
17     Q.   Okay.  Do you have any
18  understanding of why you were chosen to serve
19  as cochair?
20     A.   No, sir.
21     Q.   All right.  I'd like to switch
22  gears and start talking about maps.  That's
23  why we're here after all.
24         At what point after the Supreme --
25  well, let me step back.  If I refer to the

Page 16

1  Supreme Court's decision generally, will you
2  understand me to be referring to the decision
3  in this case, the Allen v. Milligan case?
4      A.   Yes, sir.
5      Q.   Okay.  So at what point did you
6  begin your work as cochair as -- looking at
7  the possibility of a new congressional
8  districting map after the Supreme Court's
9  decision?
10     A.   I would assume it would have
11  been the week following the Court decision
12  that the chairs got together with the
13  attorneys and discussed what -- some decision
14  of a plan and how we needed to be prepared
15  going forward.
16     Q.   Okay.  And without asking you to
17  discuss the content of the conversation with
18  the attorneys, what attorneys are you
19  referring to?
20     A.   It would have been -- Dorman
21  Walker would have been the attorney.  That
22  would have been the only one present at that
23  meeting.
24     Q.   Okay.  After that initial meeting,
25  what were your next steps as -- in your role



STEVE LIVINGSTON
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
17—20

Page 17

1   as cochair?
2       A.    We established a meeting of the
3   cochairs, the attorney, I think Mr. Hinaman
4   was in that room the next time.  And then
5   from there, we established the steps of
6   moving forward until we knew what the dates
7   were that we were given by the -- by the
8   governor for the special session.
9       Q.    Okay.  And when you say "we," who
10  specifically are you referring to?
11      A.    So that would have Chairman
12  Pringle, Dorman, and then probably Randy --
13  Mr. Hinaman would have been at one of these
14  meetings.  Other than that -- it would have
15  been that.  And likely Donna Loftin would
16  have been there also as supervisor of the
17  reapportionment office.
18      Q.    Okay.  Did you consult with anyone
19  else about the process at that point who was
20  not in the meeting?
21      A.    I'm sorry.  You dropped a little
22  bit.  Can you repeat that?
23      Q.    Oh, I'm sorry.  Sure.  Sure.
24          Other than the people who were in
25  the meeting, do you recall consulting with

Page 18

1   anyone else about the process moving forward?
2       A.    No, sir.
3       Q.    All right.  What were your next
4   steps in the process of looking at new maps
5   after that -- after that meeting with you and
6   Mr. Walker and Representative Pringle and
7   Mr. Hinaman?
8       A.    I'm not sure I can recall that
9   to be honest with you.  It was a pressed time
10  frame, and I just don't recall.  I'm sorry.
11      Q.    From that first meeting, were
12  there any specific next steps set out for any
13  of the participates?
14      A.    So the legislature had gone down
15  to a -- a term committee, which you remember
16  would have been three members of the senate
17  and then three members of the house with
18  Chairman Pringle and I being cochair.  I
19  think we had a meeting of that and asked
20  the -- it would have been the lieutenant
21  governor and the speaker of the house to
22  recreate the full standing committee back to
23  the membership.  And then we would have a
24  meeting of that membership and discussed the
25  guidelines there and the public hearings that

Page 19

1   we were going to have as we moved in towards
2   the special session date.
3       Q.    Do you recall from the meeting
4   that you had with representative
5   Representative Pringle and Mr. Walker and
6   Mr. Hinaman if anyone gave Mr. Hinaman a
7   charge leaving the meeting in terms of
8   starting work on a new map?
9       A.    I don't remember exactly, no,
10  sir.
11      Q.    Okay.  Do you recall how the map
12  drawing process itself got started?
13      A.    I do not, sir.  I'm sorry.
14      Q.    Okay.  Tell me about the first
15  meeting that the full reconstituted
16  reapportionment committee had to the best of
17  your recollection.
18      A.    The meeting was called to order.
19  We had to elect -- reelect cochairs, which
20  Representative Pringle was elected, and I was
21  elected as cochairs from that full
22  membership.  We had conversation about the,
23  again, the public hearings that we wanted to
24  have, the process of submitting maps to the
25  reapportionment office so they could be

Page 20

1   populated, the last date of what they could
2   be submitted.  I think it was a week or ten
3   days prior, is that correct, Dorman?  I
4   forgotten.  So a week or ten days prior to
5   the start of the legislative session so they
6   could be populated on the computer.
7       Q.    Okay.  Did you discuss in
8   enactment of redistricting guidelines at that
9   meeting?
10      A.    Yes, we did.  Yes, sir.
11      Q.    And what do you recall about that
12  discussion?
13      A.    There was some conversation
14  about whether they needed to changed or not.
15  Ultimately the committee voted not to change
16  them.
17      Q.    Okay.  And what was your view in
18  that regard as to whether or not the
19  guidelines needed to be changed from the 2021
20  guidelines?
21      A.    My view?
22      Q.    Yes, sir.
23      A.    I guess my view is a committee's
24  view because they elected not to change them.
25      Q.    Okay.  Did you have -- did you



STEVE LIVINGSTON                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.                21–24

Page 21

1  have another view other than the committee
2  view at that time?
3      A.    No, sir.
4      Q.    All right.  At that point in
5  time -- well, let me step back.
6          How did Mr. Hinaman come to be
7  involved in the map drawing process?
8      A.    He has been the demographer
9  for -- or I guess that's the terminology --
10 for the state for some time and was brought
11 in to -- to help us with the maps as we moved
12 forward.
13     Q.    At the point before any public
14 hearings started, was there anyone else
15 besides Mr. Hinaman brought in to help either
16 draw or evaluate maps?
17     A.    Not that I'm aware of.
18     Q.    Okay.  When did -- let me ask.
19 Are you familiar with Dr. M.V. Hood, III,
20 better known as Trey Hood from the University
21 of Georgia?
22     A.    Just that I understood he
23 provided performance analysis for us.
24     Q.    Do you have an understanding of
25 when he became involved in the process?

Page 22

1      A.    No, sir, I really don't know
2  when he got involved in the process.
3      Q.    Do you recall a point in time when
4  any instructions were given to Mr. Hinaman to
5  start working on a map or maps?
6      A.    I do not specifically, no, sir.
7      Q.    Do you recall, putting aside any
8  particular time frame, any particular
9  instructions that were given to Mr. Hinaman
10 about drawing a new map?
11     A.    I do not personally, no, sir.
12     Q.    Okay.  Were you involved in any
13 conversations with Mr. Hinaman about the
14 drawing of a new map or maps?
15     A.    There was a lot of conversation
16 about a lot of different maps.  And just to
17 be fair, they all kind of run together until
18 you sit down and look at them individually.
19     Q.    Okay.  And we will definitely do
20 that.  Broadly, at this point in time,
21 before -- before the public hearings, do you
22 recall providing any input to Mr. Hinaman
23 about what you wanted to see in a map?
24     A.    Individually or as a committee?
25     Q.    Let's start with individually.

Page 23

1      A.    I did not individually.  I think
2  the committee may have offered some
3  guidelines or some guidance to him as maps
4  were being submitted.
5      Q.    And do you recall what guidelines
6  or guidance were given to Mr. Hinaman at that
7  time?
8      A.    I think they asked him to abide
9  by the guidelines that were adopted by the
10 committee and move forward from there.
11     Q.    Okay.  Do you recall if any
12 instructions were given to Mr. Hinaman in
13 regards to the -- either the District Court or
14 the Supreme Court's order in this case?
15     A.    I think the word "opportunity"
16 was mentioned, yes.
17     Q.    Okay.  What do you recall about
18 the -- what was said to Mr. Hinaman regarding
19 the word opportunity?
20     A.    I think that the -- it was
21 expressed to him that the Court's ordered us
22 to look at an opportunity district --
23 districts.
24     Q.    Okay.  And at that point in time,
25 what was your understanding of what that

Page 24

1  meant?
2      A.    That's very vague.
3      Q.    Okay.  At this point in time, do
4  you have an understanding of what that term
5  means?
6      A.    It's still very vague.
7      Q.    All right.  Despite the vagueness,
8  how -- what is -- even if vague, what is your
9  understanding of what the term "opportunity
10 district" means in this context?
11     A.    Would you repeat that for me,
12 please?
13     Q.    Sure.  Sure.
14          Even if vague or uncertain, what
15 is your understanding of that term opportunity
16 district means this context?
17     A.    As I understand it, the Courts
18 have ordered us to provide two opportunity
19 districts, minority -- majority minority
20 opportunity districts.
21     Q.    And what is your sense of what it
22 means to provide two minority opportunity
23 districts?
24     A.    Again, that's very vague.  And I
25 think it's to a matter of interpretation.



Page 25

1    Q.    Do you have an interpretation?
2    A.    I do not, sir.
3    Q.    And let me go back.  Okay.
4         Do you -- without revealing any
5    conversations with counsel, do you -- did you
6    hear from others as to -- who were involved
7    with the process as to where their conception
8    of having two minority opportunity districts
9    are?
10   A.    Are you in reference to
11   committee members, sir, or outsiders or --
12   Q.    Let's start with committee
13   members.  That would be great.
14   A.    Our committee members expressed
15   some interest and some, I think, again, they
16   were very vague at the definition of what it
17   was while our minority members were pretty
18   specific about they thought it meant that we
19   had to draw two majority minority districts,
20   not opportunity districts.
21   Q.    Okay.  Under your conception of
22   opportunity districts, would having a second
23   district where African American voters would
24   not have won across a series of previous
25   statewide elections qualify as an opportunity

Page 26

1    district?
2    A.    Could I ask you to repeat that
3    for me?
4    Q.    Sure.  Let's say that there is
5    analysis where the second district, which is
6    supposed to be a minority opportunity
7    district, that that -- that that is
8    reconfigured to run past election results and
9    those results show that in all, let's say,
10   seven of the elections run, minority or
11   African American particularly preferred
12   candidates would have lost.  Does that, in
13   your definition, qualify as an opportunity
14   district?
15   A.    If there were high enough
16   percentages -- if they had been well-funded
17   and a well-known candidate, in some
18   instances, yes.
19   Q.    Is there a particular threshold
20   for how close prior races would need to be
21   such that you believed a well-funded and
22   well-known candidate preferred by African
23   American voters might make that a race that
24   they could win?
25   A.    I do not have a number, no, sir.

Page 27

1    Q.    Okay.  If there's a history of
2    African American preferred congressional
3    candidates not being well-funded, does that --
4    did that factor into your decision at all?
5         MR. WALKER:  Objection to form.
6    If you understand the question, you may answer
7    it.
8         THE WITNESS:  I don't understand
9    the question, so...
10   Q.    (By Mr. Rosborough) Let me
11   actually ask something a little different.  I
12   think that wasn't a great question.  Where did
13   your belief come from that an opportunity
14   district meant even if African American
15   preferred candidates would have lost in all of
16   the previous reconstituted race, if analyzed,
17   if -- it was nonetheless an opportunity
18   district if a black preferred candidate was
19   well-funded and well-known?  Where did that
20   belief stem from?
21   A.    I'm going to tell you this came
22   from back home.  I live in a community of
23   about 15,000 people with the African American
24   population of less than 5 percent.  And our
25   election cycle there in the city, we -- we

Page 28

1    had an African American female beat a sitting
2    city council president handily, and we had an
3    African American male beat a sitting school
4    board candidate, not so handily, by one vote.
5    I think it's about the person and the
6    candidate.
7    Q.    Okay.  And with these two African
8    American candidates, do you have any idea
9    whether those candidates were preferred by a
10   majority of African American voters in the
11   area?
12   A.    I think so and probably by white
13   voters also.
14   Q.    Okay.  And what's your basis of
15   belief that these two African American
16   candidates were also the candidates who were
17   preferred by African American voters?
18   A.    Because they won pretty handily
19   in a relatively small minority district, less
20   than 5 percent.
21   Q.    Okay.  Do you have any other basis
22   for your belief about an opportunity district
23   being one in which it would require an African
24   American preferred candidate to be well-funded
25   and well-known, any other sources for that



STEVE LIVINGSTON
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
29–32

Page 29

1  belief?
2      A.   No, sir.
3          MR. ROSBOROUGH:  Okay.  Can we
4  pull up what we've marked as Exhibit No. 2,
5  please.
6          (Whereupon, Exhibit 2 was marked
7          for identification.)
8          MR. ROSBOROUGH:  Yeah, if we
9  can enlarge that a little maybe, the text.
10  There we go.  Perfect.  Thank you.
11     Q.   Feel free to take a minute to look
12  at that Senator Livingston.  But once you've
13  had chance to look at that, can you let me
14  know if you recognize this what appears to be
15  e-mail?
16     A.   Yes, sir.
17     Q.   Okay.  And what is this e-mail?
18     A.   I think that was actually a text
19  message that came to me from State Party
20  Chairman *John Waugh asking me to have a
21  meeting with -- what's his name?  Having a
22  phone call, not a meeting, Dale Oldham is
23  what that came from.
24     Q.   Okay.  Do you remember when you
25  got this message?

Page 30

1      A.   No, sir, I do not.  It's been a
2  few weeks ago.
3      Q.   Okay.  Did you end up -- well, to
4  the best of your understanding was Mr. Oldham
5  retained as counsel to -- well, let me back
6  up.  To the best of your knowledge, is
7  Mr. Oldham one of your counsel?
8      A.   No, sir.
9      Q.   Okay.  Did you ever have a
10  conversation with Mr. Oldham?
11     A.   No, sir, I did not.
12     Q.   And why not?
13         MR. WALKER:  I'm going to assert
14  privilege here and instruct the witness not to
15  answer to the extent that his response would
16  include any advice that I gave him.
17     Q.   (By Mr. Rosborough) Okay.
18         Let me revise that question then.
19  So without revealing any conversations you had
20  with Mr. Walker, are you able to say outside
21  of any conversations why you chose not to meet
22  with Mr. Oldham?
23     A.   I was advised by counsel not to
24  meet with him.
25     Q.   Okay.  And are you aware of

Page 31

1  whether Mr. Oldham played any role in this
2  redistricting process?
3      A.   No, sir, I am not.
4          MR. ROSBOROUGH:  Okay.  We can
5  take that down.
6      Q.   Before we move on, I want to
7  ask -- come back and ask a couple of questions
8  about the two races that you referred to where
9  you said there had been two African American
10  candidates who had won local races.  What
11  specific races are you referring to, Senator
12  Livingston, just so the record is clear?
13     A.   City council race and a city
14  school board race.
15     Q.   And this is in Scottsboro?
16     A.   Yes, sir.
17     Q.   Okay.  And do you know if any
18  statistical analysis of racially polarized
19  voting or otherwise were performed to
20  determine candidate of choice by race in
21  either of those races?
22     A.   No, sir.
23     Q.   Okay.  I'm sorry.  Do you recall
24  the names of those candidates who won?
25     A.   The candidates?

Page 32

1      Q.   Yes.  Yes, sir.
2      A.   The city council was Nita
3  Tolliver.
4      Q.   Okay.
5      A.   And the school board was Gary
6  Speers, Dr. Gary Speers.
7      Q.   And do you know if these were
8  partisan or nonpartisan races?
9      A.   Nonpartisan races.
10     Q.   Nonpartisan.  Okay.
11         And do you know the race of the --
12  of their opponents?
13     A.   The two opponents?
14     Q.   Yes, sir.
15     A.   They were both white.  They were
16  both white; one male, one female.
17     Q.   Okay.
18     A.   The black female beat a white
19  male and the black male beat a white female.
20     Q.   Okay.  I'd like to switch gears
21  and talk about the July 13th, 2023 committee
22  meeting and public hearing.  Just to help
23  refresh your memory, this was the Thursday
24  before the special session started.  Do you
25  recall that meeting generally?



STEVE LIVINGSTON                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.                33–36

Page 33

1    A.    I recall it, yes, sir.
2    Q.    Okay.  At that point during that
3  meeting, the only maps that had been
4  introduced publicly were maps that were
5  submitted by members of the public and the
6  plaintiffs in various cases.  Is that your
7  understanding?
8    A.    I don't recall, but likely, yes.
9    Q.    Okay.  What was the status of the
10  committee majorities map drawing efforts at
11  that point in time?
12    A.    The committee majority?
13    Q.    Well, let's take a step back.  At
14  the point of that Thursday meeting, what was
15  your involvement in any maps that were being
16  drafted, whether or not they were finished?
17    A.    I don't think there were any
18  maps finished on that Thursday.  I think we
19  were waiting to take public input before we
20  came through with a map and brought it
21  forward.
22    Q.    Was Mr. Hinaman working on drafts
23  of maps at that point?
24    A.    I don't remember if Mr. Hinaman
25  was there on that Thursday or not to be

Page 34

1  honest.
2    Q.    Do you recall if anyone else --
3  I'm sorry.  Go ahead and finish.
4    A.    I don't -- I just don't recall
5  if he was -- if he was in Montgomery on that
6  date, I'm sorry.
7    Q.    That's all right.
8        Are you aware of whether
9  Mr. Hinaman was working on maps at that point
10  in time, whether or not he was in Montgomery?
11    A.    I don't know whether he was in
12  Montgomery or not.  But I feel sure that he
13  was trying to work on some maps, yes.
14    Q.    Okay.  And at that point in time,
15  do you know of any specific guidance he had
16  been given on the maps he was drawing?
17    A.    The guidance he had given were
18  the guidelines that we had adopted at the
19  committee.
20    Q.    Okay.  The Thursday, July 13th
21  hearing was the second public hearing that had
22  occurred; is that correct?
23    A.    I believe that's correct, yes,
24  sir.
25    Q.    Okay.  After that hearing, how, if

Page 35

1  at all, did Mr. Hinaman take account of public
2  input that was received during those hearings?
3    A.    I can't answer that question.
4    Q.    How, if at all, did you take
5  account for input received during those two
6  public hearings?
7    A.    We had a court reporter -- a
8  reporter there that was online taking all of
9  the information down and providing that and
10  provided it to the committee.  It was taken.
11  And we had conversations about it and --
12  afterwards, but it was somewhat brief.
13    Q.    Okay.  What do you recall about
14  the conversation, the brief conversation you
15  mentioned afterwards about the testimony?
16    A.    I think that was about the same
17  time frame we had the large number of maps
18  that had been submitted online because
19  Thursday was the deadline -- I believe that
20  Thursday was the deadline.  I believe that's
21  right.  But we had had a large number of maps
22  submitted online by any number of folks,
23  including some from Paris, France.  So I
24  don't remember the conversation, I apologize.
25    Q.    That's all right.

Page 36

1        Did public input you received at
2  either of those hearings change any of the
3  guidance that were given to either Mr. Hinaman
4  or anyone else working on a map?
5    A.    I don't think so, no, sir.
6    Q.    Do you recall at the beginning of
7  the public portion of that hearing several
8  individuals were called up to speak about
9  communities of interest?
10    A.    Yes, sir.
11    Q.    And I think I'm speaking
12  specifically, I believe the first few were
13  Mike Schmitz, who is the former mayor of
14  Dothan, and Jeff Brannon, the CEO of Flowers
15  Hospital.  Do you recall that?
16    A.    Yes, sir.
17    Q.    Did you have a role in calling
18  those witnesses to come testify at the public
19  hearing?
20    A.    I did not.  I was told by a
21  committee member that he wanted to have them
22  come to testify, that they thought the
23  Wiregrass was significant as a community of
24  interest.
25    Q.    Okay.



Page 37

1          MR. ROSBOROUGH: Can we pull up
2   exhibit No. 3, please?
3          (Whereupon, Exhibit 3 was marked
4          for identification.)
5     Q.    (By Mr. Rosborough) Is this a text
6   message you received, Senator Livingston?
7     A.    Yes, sir, it is.
8     Q.    And who is that text message from?
9     A.    That's from committee member
10  Senator Chasteen.
11    Q.    Okay. Was Senator Chasteen the
12  one who asked for Mr. Schmitz and Mr. Brannon
13  to be called as witnesses?
14         MR. WALKER: I'm going to assert
15  legislative privilege and immunity here.
16  Apparently this was an inadvertent disclosure
17  of a communication from Senator Chasteen which
18  we would ask to be returned. And I will
19  instruct the witness not the answer any
20  questions about what Senator Chasteen told
21  him.
22         MR. ROSBOROUGH: Okay. We can
23  pull that down for the moment then. Thank
24  you.
25         MR. WALKER: Thank you.

Page 38

1          MR. ROSBOROUGH: And obviously
2   we'll reserve our rights to challenge that
3   assertion of privilege. But we can -- we can
4   move past that for the moment.
5          MR. WALKER: Certainly.
6          MR. ROSBOROUGH: Okay.
7     Q.    Senator Livingston, separate and
8   apart from any conversation you had with
9   Senator Chasteen, did you have any other
10  understanding of why Mr. Schmitz and
11  Mr. Brannon appeared to testify first and
12  second at the hearing?
13    A.    Would you repeat that for me,
14  please?
15    Q.    Sure. Separate and apart -- I'm
16  not asking you about you any conversations you
17  had Senator Chasteen. Separate and apart from
18  those, do you have any understanding of why
19  Mr. Schmitz and Mr. Brannon were called as
20  witnesses to testify first and second at that
21  hearing?
22    A.    I do not, sir, I'm sorry.
23    Q.    Separate and apart from
24  Mr. Schmitz and Mr. Brannon, did you have any
25  role in asking any other specific witnesses to

Page 39

1   come and testify at the hearing?
2     A.    No, sir.
3     Q.    Are you aware of whether Cochair
4   Pringle had any role in having any specific
5   witnesses come and testify at that hearing?
6     A.    I am not, sir.
7     Q.    Okay. Let's move on and talk a
8   little bit about the committee guidelines I
9   think you referenced. Am I correct that at
10  the July 13th committee meeting that we've
11  been speaking about, the committee voted to
12  readopt the 2021 legislative redistricting
13  guidelines?
14    A.    Yes, sir.
15    Q.    Okay. Was there any prior
16  discussion that you were involved in whether
17  to readopt those guidelines or change the
18  guidelines?
19    A.    No, sir.
20    Q.    Why did you choose to readopt the
21  prior guidelines personally?
22    A.    They seemed to serve us well. I
23  don't remember the conversation around it to
24  be honest. So...
25    Q.    Okay. Do you recall that, I

Page 40

1   believe it was Representative England, offered
2   an amendment to the guidelines at that
3   meeting?
4     A.    Yes, sir, he did.
5     Q.    Okay. And does it sound correct
6   that the guidelines -- the amendment that he
7   offered specifically concerned instructions
8   about compliance with the Court's order and
9   Voting Rights Act?
10    A.    I don't remember what it
11  contained, no, sir I'm sorry.
12    Q.    Okay.
13         Did you vote against
14  Representative England's amendment?
15    A.    Yes, sir.
16    Q.    Why did you choose to vote against
17  that amendment?
18    A.    It didn't feel like it was
19  necessary.
20    Q.    And why was that?
21    A.    We felt like the guidelines were
22  accurate as they were.
23         MR. ROSBOROUGH: Let's pull up
24  Exhibit 4, please.
25         (Whereupon, Exhibit 4 was marked



STEVE LIVINGSTON                                            August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.                        41–44

Page 41

1          for identification.)
2          MR. ROSBOROUGH:  Tanner, if you
3  could slowly scroll down there.
4       Q.    (By Mr. Rosborough)  So
5  Representative -- I'm sorry, Senator
6  Livingston, do those appear to be the 2021
7  guidelines which the committee reenacted as
8  guidelines for the 2023 process?
9       A.    It looks like that, yes, sir.
10      Q.    Okay.
11          MR. ROSBOROUGH:  Let's scroll down
12  to page 3 of the guidelines if we can.
13      Q.    Okay.  And can you see, Senator
14  Livingston, the guideline on the -- toward the
15  top half of the page that's marked with small
16  Roman numeral 6 above G.
17      A.    Yes, sir.
18      Q.    Okay.  And just so it's clear,
19  that -- that guideline reads, In establishing
20  legislative districts, the reapportionment
21  committee shall give due consideration to all
22  the criteria herein.  However, priority is to
23  be given to the compelling state interest
24  requiring equality of population among
25  districts and compliance with the Voting

Page 42

1  Rights Act of 1965 as amended should the
2  requirements of those criteria conflict with
3  any other criteria.  Did I read that
4  correctly?
5       A.    Yes, sir.
6       Q.    What is your understanding of that
7  provision in the legislative guidelines?
8       A.    That we paid attention to
9  compactness, communities of interest, not
10  having candidates to challenge themselves --
11  or challenge each other, as the case may be.
12      Q.    Okay.  And what about that
13  paragraph references to you communities of
14  interest, compactness, and avoid pairing of
15  incumbents?
16      A.    Would you repeat that again?
17      Q.    Sure.  I believe that you said
18  that -- and please correct me if I'm wrong --
19  that you understood that paragraph to refer to
20  the importance of compactness, respect for
21  communities of interest, and not pairing
22  incumbents.  Did I get your prior statement
23  correct there?
24      A.    Yes, sir.
25      Q.    Okay.  So what about this

Page 43

1  provision suggests those as the three most
2  important factors to you?
3       A.    I'm missing your question.  I'm
4  sorry.
5       Q.    Sure.  Well, you referred to --
6  you referred to three factors that I think you
7  just confirmed, which were not pairing
8  incumbents, communities of interest, and
9  compactness.  But I don't see any of those
10  words in that paragraph.  So my question to
11  you is:  What about that paragraph conveyed to
12  you that those three considerations were the
13  most important considerations?
14      A.    I'm still not following your
15  question.  My apologies.
16      Q.    Sure.
17          Well, that paragraph that we just
18  read states in part that priority is to be
19  given to requiring equality of population and
20  compliance with the Voting Rights Act should
21  those requirements conflict with any other
22  criteria.  Am I correct in generally
23  summarizing that paragraph?
24      A.    Okay.  Yes, sir.
25      Q.    Okay.  But then you referenced to

Page 44

1  me several other criteria, I believe;
2  communities of interest, compactness, and not
3  pairing incumbents.  And so I'm wondering -- I
4  don't see those factors mentioned in that
5  paragraph.  So what about population equality
6  and compliance with the Voting Rights Act to
7  you suggest that compliance with those three
8  factors you mentioned are most important?
9       A.    I'm not sure I know how to
10  answer that question, sir.  I'm sorry.
11  Obviously, we were -- deviation was plus or
12  minus one on the plans we had.  The Voting
13  Rights Act, I think it deals --
14      Q.    And I'm sorry.
15      A.    I'm not sure I know how to
16  answer that.
17      Q.    Well, without revealing any
18  conversations you had with counsel, how did
19  you understand compliance with the voting
20  rights of 1965 -- with the Voting Rights Act
21  of 1965 in the context of --
22      A.    I haven't had that communication
23  with counsel.
24      Q.    Okay.  I just want to make sure I
25  understand because I'm just -- I'm just



Page 45

1 following up here because I was a little --
2 I'm a little confused by your answer.
3         In referencing population equality
4 and compliance with the Voting Rights Act,
5 you -- you know, and I asked you about how you
6 understood those -- how you understood this
7 passage, which said that those two factors
8 should take precedence if they conflict with
9 any other criteria. In response, you
10 mentioned communities of interest,
11 compactness, and not pairing incumbents.
12         And so what I'm trying to ask you
13 is: I'm not seeing the link between that
14 paragraph and those three factors. And --
15 which you obviously believe is there, which is
16 fine. But I'm just trying to understand why
17 you believe there's a link between population
18 equality and Voting Rights Act compliance and
19 the factors of communities of interest, not
20 pairing incumbents, and compactness.
21         A.    Well, the three things that were
22 mentioned were part of our plan or the
23 guidelines in addition to that. And I think
24 that says -- excuse me, compelling state
25 interest. So...

Page 46

1         Q.    Okay. So is it your understanding
2 that not pairing incumbents -- let's break the
3 three down. Is it your understanding that not
4 pairing incumbents is of co-equal or higher
5 importance than compliance with the Voting
6 Rights Act under your guidelines?
7         MR. WALKER:  I'm sorry, Davin.
8 Would you -- would you repeat the question?
9         Q.    (By Mr. Rosborough) Of course.
10         So I'm just going to go through
11 the three factors you mentioned, which you
12 said were the key factors in the plan, I
13 believe. Is it your understanding that under
14 these legislative guidelines not pairing
15 incumbents has either equal or greater
16 importance to complying with the Voting Rights
17 Act?
18         A.    I think we thought we were
19 complying with the Voting Rights Act, sir.
20         Q.    And why did you think you were
21 complying with the Voting Rights Act?
22         A.    A lot has happened in a short
23 time frame, sir. And I can't remember
24 everything. And I just apologize.
25         Q.    Well, let me ask you a different

Page 47

1 question because I don't mean to keep us on
2 this particular topic forever, and I do want
3 to talk about some of the plans in particular.
4         Is it your understanding that by
5 drawing a map that does not pair incumbents,
6 complies with communities of interest, and is
7 reasonably compact, that you are complying
8 with the Voting Rights Act?
9         A.    We thought the plans that we did
10 put together using those provided that
11 compliance with the Voting Rights Act, yes.
12         Q.    Okay. I think we're on the same
13 page. Let me just confirm. So it was your
14 understanding in using these guidelines that
15 so long as the plan enacted did not pair
16 incumbents, was reasonably compact, and
17 respected communities of interest, that it
18 would be compliant with the Voting Rights Act,
19 do I have that right?
20         A.    Not totally. But, you know, I
21 would say that we -- by doing this, we
22 were -- we thought we were in compliance by
23 not discriminating or pushing or packing.
24         Q.    What do you mean by pushing or
25 packing?

Page 48

1         A.    Piling African Americans into a
2 district.
3         Q.    Okay. What role did that in the
4 consideration of race play in drawing the 2023
5 plan?
6         A.    I think we tried to draw it race
7 neutral.
8         Q.    So is it correct that in drawing
9 the 2023 plan, you did not consider race?
10         A.    I said we tried to draw it race
11 neutral, yes, sir.
12         Q.    I'm just trying to make sure
13 because that term can mean different things to
14 different people. What do you mean by saying,
15 we tried to draw it race neutral?
16         A.    When drawing the maps, we didn't
17 have that flag, whatever it is, turned on.
18         Q.    Okay. So just to confirm, in
19 drawing the -- or let me put it this way. In
20 evaluating the plans that you wanted to put
21 forward for the 2023 map, you were not looking
22 at race as you evaluated those plans; is that
23 correct?
24         A.    That's correct.
25         Q.    Okay. I'd like to do maybe one



Page 49

1 more exhibit.  Take a few more minutes and
2 then we can take a short break if that's a
3 good time.  Does that work, maybe we go five
4 more minutes or so and take a break?
5      A.    Yes, sir.
6      Q.    Okay.
7           MR. ROSBOROUGH:  All right.
8 Tanner, would you mind pulling up Exhibit 5,
9 please.
10          MR. LOCKHEAD:  It's coming.  One
11 second.
12          MR. ROSBOROUGH:  No rush.  I
13 appreciate it.  No, I'm sorry.  That's not
14 mine.  My fault.  Let's see.  This is the PI
15 opinion and order.  If you don't have it
16 ready, I can pull it up here.
17          MR. LOCKHEAD:  I've got it.  Sorry
18 about that.
19          MR. ROSBOROUGH:  No.  No problem.
20          (Whereupon, Exhibit 5 was marked
21           for identification.)
22      Q.    (By Mr. Rosborough) Okay.
23          Senator Livingston, can you see
24 what's up there, what we'll mark as Exhibit 5?
25      A.    Yes, sir.

Page 50

1      Q.    Okay.  Do you recognize this
2 document?  You can just pause there for one
3 second.
4      A.    Yes, sir.
5      Q.    Okay.  And what do you understand
6 this to be?
7      A.    It's the -- it's the Singleton
8 vs. Merrill which turned into cases -- is it
9 the three judge opinion?
10      Q.    Sure.  Sure.  Yeah, I'm sorry.  I
11 don't mean to make this a memory test.  That's
12 not why we're here.
13          Do you recognize -- does it seem
14 correct to you that this is -- and it's quite
15 a long document.  But this is the preliminary
16 injunction ordered by the three judge district
17 court in this case?
18      A.    I would assume it is, yes, sir.
19 I don't know.
20      Q.    Okay.  I'll represent to you that
21 that's what that is for purposes of our
22 questioning.  And I only have, I think, one
23 specific question about it.  I'm not going to
24 take you through -- it's a 225-page document.
25 So if we could scroll down to page 6, please.

Page 51

1 Okay.  So I'm looking at the first full
2 paragraph here.  And I'm just going to read
3 this paragraph.  And you can tell me if I read
4 it correctly.  And then I've got a question
5 for you about it.  "The legislature enjoys
6 broad discretion and may consider a wide range
7 of remedial plans.  As the legislature
8 considers such plans, it should be mindful of
9 the practical reality based on the ample
10 evidence of intensely racially polarized
11 voting adduced during the preliminary
12 injunction proceedings that any remedial plan
13 will need to include two districts in which
14 black voting either comprise a voting age
15 majority or something quite close to it."  Did
16 I read that correctly?
17      A.    Yes, sir.
18      Q.    Senator Livingston, are you
19 familiar with that guidance from the Court in
20 this case?
21      A.    That's actually the first time
22 that's been pointed out to me in a paragraph.
23      Q.    Okay.  In more general terms, are
24 you familiar that the Court provided that
25 guidance?

Page 52

1      A.    Yes, sir.
2      Q.    Okay.  How, if at all, did you or
3 the committee account for that guidance in
4 drawing the 2023 plan?
5      A.    It would be something quite
6 close to it.
7      Q.    Okay.  So is it your testimony
8 that the enacted plan, SB-5, which has a
9 second congressional district approximately
10 under 40 percent black voting age population
11 qualifies as something quite close to a
12 majority of black voting age population?
13      A.    It was the committee's -- the
14 committee that decided that, yes, sir.
15      Q.    Okay.  And how did the committee
16 make that decision?
17      A.    This is -- this is the plan that
18 was brought forward in the end and was
19 compromised upon.
20      Q.    And we'll talk a little bit more.
21 But what did you mean when you say that this
22 plan was a compromise?
23      A.    Well, you had -- the house had a
24 plan, and the senate had a plan, and this was
25 a compromised plan that could be passed.



Page 53

1    Q.   As you were considering these
2  different plans and ultimately coming to a
3  plan that passed, did you have an
4  understanding of what it means for black
5  voters to have an opportunity to elect a
6  candidate of -- a representative of their
7  choice in a district?
8    A.   Yes, sir, I think.
9    Q.   Okay.  And what was your
10  understanding?
11    A.   I'll go back to what we talked
12  about a little while ago about having a
13  quality candidate that's funded.
14    Q.   Okay.  All right.  Give me one
15  second.  I think this may be a good time to
16  take a break.  But let me just -- so just to
17  clarify a couple of things, was it your
18  view -- when you said a quality candidate that
19  was funded, can you tell me what you -- what
20  you mean by that?
21    A.   I'll go back to the incident in
22  my hometown where you have two candidates
23  that were, you know, African Americans that
24  defeated well-funded candidates that were in
25  place in front of them.  So...

Page 54

1    Q.   And how did you define -- in
2  your -- I think you said quality candidate.
3  What did you mean by that?
4    A.   Somebody who has respect, I
5  would assume, and -- of his fellow peers.
6    Q.   Okay.  And what do -- and just you
7  what do you mean by that, has respect of their
8  peers?
9    A.   I'm sorry?
10    Q.   I'm sorry.  Could you just clarify
11  what you mean by that, when you said someone
12  who has respect of their fellow peers?
13    A.   Again, a quality candidate.
14  Somebody that has the respect of, not just
15  necessarily their peers, but their
16  constituents.
17    Q.   Okay.  So is it your understanding
18  that in the prior statewide races over the
19  past decade that there have not been black
20  preferred candidates who have funding and the
21  respect of their peers?
22    A.   And several whites also.
23    MR. ROSBOROUGH:  Okay.  I think
24  now is a good time for us to take a break.
25  Should we do -- do you want to do ten minutes,

Page 55

1  or do you want to do a longer break so you can
2  get some food?
3    MR. WALKER:  Ten is fine for us.
4    MR. ROSBOROUGH:  Ten.  All right.
5  So I see that it's 12:47 central time.  We'll
6  come back at 12:57 central, if that works.
7    MR. WALKER:  Thank you.
8    THE VIDEOGRAPHER:  The time is
9  12:47 p.m.  We're going off the record.
10    (A short break was taken.)
11    THE VIDEOGRAPHER:  The time is
12  1:13 p.m.  We're back on the record.
13    Q.   (By Mr. Rosborough) Okay.
14    Senator Livingston, I want to come
15  back quickly to a couple of things we were
16  discussing earlier before moving on and then
17  talking about some specific maps.
18    Am I correct that you said earlier
19  you understood the Court to require creation
20  of two opportunity districts for minority
21  voters; is that accurate?
22    A.   Yes, sir.
23    Q.   Okay.  In your view, how did
24  consideration of communities of interest,
25  compactness, and not pairing incumbents ensure

Page 56

1  that you followed that guidance?
2    A.   As we tried to develop a map
3  that was part of the committee, those played
4  a role in being able to develop what would
5  end up being two into one that was
6  competitive.
7    Q.   And if I'm correct, you said that
8  race did not play a role in the development of
9  your plan; correct?
10    A.   I think I stated that earlier.
11  And I was corrected when we off the role
12  (sic) a little bit that it was part of the --
13  it was on -- it was on -- and that we weren't
14  paying attention to it, as the case may be.
15  But it was developed that way.
16    Q.   Okay.  So it would be accurate --
17  would it be accurate to say that, while racial
18  figures may have been up on the screen as the
19  maps were drawn or shown, you were personally
20  not paying attention to race?
21    A.   Yes, sir.
22    Q.   Okay.  Other than compactness,
23  communities of interest, and not pairing
24  incumbents, were there other considerations
25  you took account of in deciding on a new



Page 57

1  congressional districting plan?
2      A.    I would have to say committee
3  members were offering advice.
4      Q.    Do you recall any specific advice?
5          MR. WALKER:  I'm going to assert
6  privilege as to communications or statements
7  made by members of the reapportionment
8  committee that have not waived the privilege
9  immunity and instruct the witness not to
10  answer to that extent.
11      Q.    (By Mr. Rosborough)  Okay.
12        So Senator Livingston, if you can
13  answer that question without divulging
14  conversations you had other committee members,
15  you can go ahead.
16      A.    I do not recall, sir.
17      Q.    Okay.  Let's talk about the
18  legislative special session.  The committee
19  had its first meeting during the special
20  session on the first day of the session on
21  Monday, July 17th; is that correct?
22      A.    I really -- I honestly don't
23  remember.  It was all a whirlwind.
24      Q.    All right.  At the first meeting
25  of the committee during this special session,

Page 58

1  do you recall that a number of new plans were
2  introduced?
3      A.    I think there were several plans
4  offered, yes, sir.
5      Q.    Okay.  Does the community of
6  interest plan ring a bell to you?
7      A.    I believe it was the one that
8  was originally introduced, yes, sir.
9      Q.    Okay.  And what about the
10  opportunity plan, does that ring a bell to
11  you?
12      A.    I remember it, yes.
13      Q.    Do you recall any other plans that
14  were discussed at the hearing?
15      A.    Not the names, but I know there
16  were several offered that same day.
17      Q.    Okay.  Let's talk about the
18  community of interest plan.  What was --
19  what's your understanding of the origin of the
20  community of interest plan?
21      A.    I believe that was the map that
22  was designed by Randy Hinaman.
23      Q.    And what was your involvement in
24  the development of that plan, if any?
25      A.    Very little.

Page 59

1      Q.    Are you aware of who else was
2  involved in developing that plan?
3      A.    There were several, I think that
4  may have played a role.  But I don't
5  remember.
6      Q.    Are you aware of what instructions
7  were given to Mr. Hinaman in the drawing the
8  community of interest plan?
9      A.    No, sir.
10      Q.    Do you recall when a full draft of
11  that plan was complete?
12      A.    I do not remember, no, sir.
13      Q.    Do you recall any feedback given
14  to Mr. Hinaman after seeing an initial draft
15  of that plan?
16      A.    I do not recall that, no, sir.
17      Q.    Do you recall if Mr. Hinaman made
18  any changes to the community of interest plan
19  after he first showed it to you or other
20  committee members?
21      A.    I do not know that.
22          MR. ROSBOROUGH:  If we could pull
23  up Exhibit 6, please.
24      Q.    Senator Livingston, you'll see
25  this exhibit has two pages.  There's a map and

Page 60

1  then there's some statistics at the bottom.
2  Do you see that?
3      A.    Yes, sir.
4      Q.    Okay.  Let's go up to the top at
5  the moment, the first page.  Does this appear
6  to be the community of interest plan that we
7  were just discussing?
8          (Whereupon, Exhibit 6 was marked
9          for identification.)
10          THE WITNESS:  That's the label,
11  yes.
12      Q.    (By Mr. Rosborough)  Okay.  And is
13  it correct that this plan was worked on by
14  Mr. Hinaman, you, Mr. Pringle, Dr. Trey Hood,
15  and a couple of attorneys?
16      A.    Yes, sir, that sounds familiar.
17      Q.    Okay.  What were your priorities.
18  You mentioned community of interest as one of
19  the key priorities in developing a new plan.
20  What particular communities of interest were
21  you considering?
22      A.    We considered the three.  One
23  was going to be the Gulf Coast, one of the
24  Wiregrass would be a community of interest,
25  and one would be the Black Belt being



Page 61

1 consolidated into two districts rather than
2 three.
3      Q.    Okay.  And how did the committee
4 decide on prioritizing those three communities
5 of interest?
6      A.    How did the committee?  How did
7 the committee form that?
8      Q.    Yes, sir.
9      A.    It -- we had members of each of
10 the three areas that were a part of our
11 committee, and they all expressed interest.
12      Q.    Okay.  The community of interest
13 plan that you're seeing here was the first
14 plan passed out at the committee, is that
15 correct, to the best of your recollection?
16      A.    The best of my recollection,
17 yes, sir.
18      Q.    Okay.
19      A.    I can't remember which one came
20 out first.
21      Q.    And to the best of your
22 recollection, this community of interest plan
23 also passed the full house of representatives;
24 is that correct?
25      A.    Yes, sir.

Page 62

1      Q.    Okay.  In looking at the lines
2 here, does the community of interest plan keep
3 the Gulf Coast counties together in one
4 district?
5      A.    Yes, sir.
6      Q.    Does the community of interest
7 plan put the Black Belt in two districts
8 rather than three?
9      A.    Yes, sir.
10      Q.    And does the community of interest
11 plan keep together what you consider to be the
12 Wiregrass other than part of Covington County?
13      A.    Yes, sir.
14      Q.    Did you or do you consider this
15 plan to have met the committee's goals in
16 terms of communities of interest?
17      A.    Initially, yes, sir.
18      Q.    Okay.  You said initially.  Did
19 that change at any point in time?
20      A.    I'm not sure.  I don't -- I
21 don't think it has, no, sir.
22      Q.    Okay.  Dr. Hood performed a
23 performance or functionality analysis
24 regarding this plan; is that accurate?
25      A.    I assume, yes, sir.  I don't

Page 63

1 remember.
2      MR. ROSBOROUGH:  Let's pull up
3 Exhibit 7, please.
4      (Whereupon, Exhibit 7 was marked
5      for identification.)
6      Q.    (By Mr. ^ Attyname) All right.
7      Senator Livingston, does this look
8 familiar to you?
9      A.    Yes, sir.
10      Q.    And what do you recognize this as?
11      A.    It's a different format.  But it
12 seems like it might be the functionality or
13 whatever -- the performance test.
14      Q.    Okay.  And you were -- you
15 attended the deposition of Mr. Hinaman earlier
16 today?
17      A.    Yes, sir.
18      Q.    And do you recall this analysis
19 being discussed during that deposition?
20      A.    Yes, sir.
21      Q.    And you -- do you agree that in
22 the four races analyzed here, which are the
23 2020 presidential race, the 2020 U.S. Senate,
24 2018 governor, 2018 attorney general, that in
25 two of those four races black preferred

Page 64

1 candidates won, and in the other two, white
2 preferred candidates won; is that correct?
3      A.    Yes, sir.
4      Q.    Okay.  Did you have any assessment
5 of how this plan performed in remedying the
6 likely Voting Rights Act violation identified
7 by the Court?
8      A.    Would you repeat that for me,
9 please?
10      Q.    Sure.  Did you have any assessment
11 of how then this community of interest plan
12 performed in terms of remedying the likely
13 Voting Rights Act violation found by the
14 Court?
15      A.    No, sir.
16      Q.    Okay.  Do you believe this plan
17 would have provided a fair opportunity for
18 African American voters to elect preferred
19 candidates in the second district?
20      A.    It might have, yes, sir.
21      Q.    Okay.  And why is that in your
22 view?
23      A.    I think it shows two of each
24 winning.
25      Q.    And why, if at all, does that



Page 65

1  matter in your assessment?
2      A.   It's 50/50.
3      Q.   Okay.  I'm sorry.  Would
4  somebody -- I thought I heard somebody else
5  say something in the room.  Can I -- was
6  anything else just -- was there anyone in the
7  room just trying to speak?
8          MR. WALKER:  Are you talking about
9  in the room where we are?
10         MS. ROSBOROUGH:  Yes.
11         MR. WALKER:  No.  No.  Nobody -- I
12  did not say anything.
13         MR. ROSBOROUGH:  Okay.
14         MR. WALKER:  And there's no one
15  else -- Davin, there's no one else in the
16  room.
17         MR. ROSBOROUGH:  Okay.  I just
18  wanted to make sure.  All right.  We can take
19  this down.  Thank you.
20     Q.   (By Mr. Rosborough) So Senator
21  Livingston, at some point, is it correct that
22  you switched your focus from this community of
23  interest plan to other plans?
24     A.   The committee members changed
25  focus, yes, sir.

Page 66

1      Q.   Okay.  And why, in your view, did
2  committee members change focus from the
3  community of interest plan to other plans?
4      A.   I can't answer what brought them
5  to where they got to.  I just know they
6  moved, and when -- they moved.
7      Q.   And what about you personally, did
8  anything in particular spark your decision to
9  move your focus from the community of interest
10  plan to other plans?
11     A.   The committee moved, and I was
12  going to be left behind.
13     Q.   Okay.  You didn't have any
14  independent reason for switching your focus to
15  other plans other than that's where the
16  majority of the committee was?
17     A.   I did not, no, sir.  I did not,
18  no, sir.
19     Q.   Okay.
20         MR. ROSBOROUGH:  Can we pull up
21  Exhibit 8, please?
22         (Whereupon, Exhibit 8 was marked
23             for identification.)
24     Q.   (By Mr. Rosborough) Have you seen
25  this news article before?

Page 67

1      A.   No, sir.
2      Q.   Okay.  If we can scroll down in
3  this article to another page, please.  Okay.
4  So in this third page -- this article is from
5  July 20th.  So this would have been, I think,
6  the Thursday of the special session.  The
7  article says, "Livingston said senate
8  republicans began working on their own map
9  because the committee 'got some information'
10  that led them to prioritize 'compactness and
11  communities of interest being as important as
12  the black voting age population.'"  What did
13  you mean by that, Senator Livingston?
14     A.   The committee members had
15  received some additional information they
16  thought they should go in the direction of
17  compactness, communities of interest, and
18  making sure that congressmen are not paired
19  against each other, congressmen or women are
20  not paired against each other.
21     Q.   And who did it receive that
22  information from?
23     A.   I don't know that, sir.
24     Q.   How did you first learn about that
25  information?

Page 68

1      A.   When we got ready to pass the
2  other plan, that -- it was a large hiccup.
3      Q.   Is it your understanding that this
4  information came from people in Washington?
5      A.   I don't know where it came from.
6      Q.   Why did you find this information
7  reliable?
8      A.   There were -- I was -- I was a
9  single member left.
10     Q.   Do you know who received this
11  information on the committee?
12     A.   I do not.
13     Q.   How did you first learn about this
14  information then?
15     A.   It was a committee conversation.
16     Q.   Do you recall who mentioned it?
17     A.   I do not, no, sir.
18     Q.   Do you have any idea at all who or
19  what type of figure was the source of this
20  information, even if you're not certain?
21     A.   No, sir.
22         MR. ROSBOROUGH:  Okay.  We can
23  take this down.
24     Q.   Senator Singleton -- I'm sorry,
25  Senator Livingston, do you recall



Page 69

1  the opportunity --
2      A.    We look a lot a like.
3      Q.    Do you recall the opportunity plan
4  as another plan that was introduced in the
5  committee during the special session?
6      A.    I remember it was submitted, I
7  think, electronically.  I don't remember who
8  by.
9      Q.    Okay.  Is it correct that Senator
10  Dan Roberts mailed the plan in?
11     A.    It may have been, yes, sir.
12     Q.    Okay.  Do you recall when you
13  first saw this plan?
14     A.    I do not, no, sir.
15     Q.    Do you recall providing any
16  feedback regarding this plan?
17     A.    I don't know.  I do not, no,
18  sir.
19         MR. ROSBOROUGH:  Okay.  Can we
20  pull back up Exhibit No. 1, which is Senator
21  Livingston's interrogatory responses, please.
22  And I'd like to -- if you could scroll down to
23  No. 3, interrogatory No. 3 and the response.
24     Q.    So interrogatory No. 3 says,
25  describe the role played with respect to

Page 70

1  legislative remedial plans -- to the
2  legislative remedial plans by each individual
3  and/or entity identified in interrogatories
4  No. 1 or 2.  Your response then lists the four
5  different plans discussed.  And under
6  opportunity plan, it says, Chris Brown
7  authored the plan and Senator Dan Roberts
8  delivered it to the reapportionment office; is
9  that correct?
10     A.    That's what it says, yes, sir.
11     Q.    Okay.  And who is Chris Brown?
12     A.    Mr. Brown is a political
13  consultant in Birmingham, Alabama.
14     Q.    Okay.  Is he the owner of Red
15  State Strategies?
16     A.    I believe that's the company,
17  yes, sir.
18     Q.    How did he come -- how did
19  Mr. Brown come to be involved in the map
20  drawing process?
21     A.    I have no idea.
22     Q.    When did you fist learn of
23  Mr. Brown's involvement in the process?
24     A.    I don't remember, sir.
25     Q.    How did you come to learn that

Page 71

1  Chris Brown authored this plan?
2      A.    I think maybe Senator Roberts
3  told us that.
4      Q.    Okay.  Do you have any
5  understanding of whether Mr. Brown was
6  retained by any individual or entity to draw
7  this plan?
8      A.    Not that I'm aware of, no, sir.
9      Q.    Do you have any understanding of
10  any guidance or instructions given to
11  Mr. Brown in drawing this plan?
12     A.    No, sir.
13     Q.    Did you have any belief one way or
14  another about where this plan would provide a
15  fair opportunity to black voters to elect a
16  preferred candidate in the second district?
17     A.    I assume you're still on the
18  opportunity plan?
19     Q.    Yes, sir.  Thank you for
20  clarifying.
21     A.    No, sir.
22     Q.    You had no view one way or the
23  other?
24     A.    No, sir.
25     Q.    Okay.

Page 72

1         MR. ROSBOROUGH:  Can we put up
2  Exhibit 9.  Let's put back up Exhibit 9.
3  Actually, no, I'm sorry.  I'm sorry.  We had
4  that up already.  Is that correct?  Did we put
5  up exhibit 9 yet?  I lost track there.
6         COURT REPORTER:  I am going to
7  verify.
8         MR. ROSBOROUGH:  I think maybe we
9  didn't.  So let's put it up.  Let's go ahead
10  and put it up as Exhibit 9.
11         COURT REPORTER:  We didn't.
12         MR. ROSBOROUGH:  Okay.  Thank you.
13  Sorry.  I lost track there.
14         (Whereupon, Exhibit 9 was marked
15          for identification.)
16     Q.    Are Senator Livingston, do you
17  recognize this as the opportunity plan that we
18  were just discussing?
19     A.    That's the label I see at the
20  top, yes, sir.
21     Q.    Okay.  And do you recall how this
22  plan differed from the community of interest
23  plan?
24     A.    Not unless they're side by side,
25  no, sir.



STEVE LIVINGSTON
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023

73—76

Page 73

1    Q.    Okay.  Does it sound correct to
2   you that the black voting age population in
3   the second congressional district in the
4   opportunity plan was approximately 38 percent?
5    A.    I do not remember the numbers,
6   no, sir.
7    Q.    Okay.  You don't remember one way
8   or the other, is that correct?
9    A.    No.  I don't remember those
10  numbers, no, sir.
11   Q.    Okay.  All right.
12        So if we take a look -- I don't
13  know if you can zoom in at all more.  If not,
14  we'll live with it.  Thank you.
15        So let's look at the second
16  congressional district in the opportunity
17  plan.  Am I correct that the second district
18  in this plan includes the whole counties of --
19  well, let me ask you:  Can you identify for me
20  which counties are listed -- are included in
21  CD-2 under this plan in whole or part?
22   A.    It looks like Houston, Geneva,
23  Coffee, Dale, Henry, Barber, Pike, Crenshaw,
24  Montgomery, Bullock, Russell, Macon, and
25  Elmore.

Page 74

1    Q.    Okay.  And does it appear there
2   might be a little piece of Elmore that's
3   included in congressional district 3?
4    A.    Yes, sir.
5    Q.    Okay.
6        MR. ROSBOROUGH:  All right.  You
7   can take that down.  Thank you.
8    Q.    Senator Livingston, do you recall
9   introducing a plan in the senate known as the
10  Livingston 2 plan?
11   A.    Yes, sir.
12        MR. ROSBOROUGH:  Let's go ahead
13  and bring up Exhibit 10.
14        MR. WALKER:  I'm sorry, Davin,
15  what exhibit is this?
16        MR. ROSBOROUGH:  Oh, I'm sorry.
17  This is Exhibit 10.
18        MR. WALKER:  10.  I just couldn't
19  hear you.
20        MR. ROSBOROUGH:  Yes, no problem.
21        (Whereupon, Exhibit 10 was marked
22        for identification.)
23   Q.    Senator, do you recognize this as
24  the Livingston plan 2?
25   A.    I think, yes, sir.

Page 75

1    Q.    Okay.  Do you know why this is
2   named Livingston congressional plan 2?
3    A.    Because I think I brought it to
4   the floor.
5    Q.    Okay.
6    A.    Or committee.  I don't remember
7   which -- if it went to the committee first.
8    Q.    This plan was quite similar in a
9   number of respects to the opportunity plan we
10  just looked at; correct?
11   A.    I think you said that, yes, sir.
12   Q.    Okay.  And specifically, if we can
13  sort of zoom in to congressional district 2,
14  congressional district 2 in the Livingston 2
15  plan and the opportunity plan appear to be
16  identical; is that correct?
17   A.    I assume you've seen them
18  side-by-side.  I haven't, so...
19   Q.    Well, if we go through, it has the
20  full counties of Geneva, Houston, Coffee,
21  Dale, Henry, Crenshaw, Pike, Barber,
22  Montgomery, Bullock, Russell, Macon, and most
23  of Elmore except that little piece there; is
24  that accurate?
25   A.    Yes, sir.

Page 76

1    Q.    And those -- that appears to be
2   the same configuration of district 2 in the
3   opportunity plan?
4    A.    Yes, sir, I think you are
5   correct.
6        MR. ROSBOROUGH:  Okay.  And if we
7   scroll down to the second page.  Thank you.
8    Q.    And we look at the black voting
9   age population in that last column of
10  district 2, we see it is 38.31 percent.  Does
11  that seem right?
12   A.    That's what it looks like, yes,
13  sir.
14   Q.    Okay.  What is the relationship --
15  we just -- we just saw that congressional
16  district 2 is identical between the
17  opportunity plan and the Livingston 2.  What
18  is the relationship between those two plans?
19   A.    Again, I'd have to look at them
20  side-by-side.  I think there are some
21  differences, but I just don't remember.
22   Q.    Is the Livingston 2 plan basically
23  the opportunity plan with some certain changes
24  made to it?
25   A.    I would say probably fairly

ESQUIRE
DEPOSITION SOLUTIONS

Page 77

1  similar, yes, sir.
2      Q.    Okay.  Do you recall why changes
3  were made to the opportunity plan such that it
4  turned into Livingston 2?
5      A.    I don't really remember.  I
6  would say tweaks and compactness and
7  communities of interest and zero deviation,
8  making sure and less precincts being split.
9      Q.    Okay.  I believe --
10         MR. ROSBOROUGH:  And you can take
11  that down, Tanner.  Thank you.
12      Q.    (By Mr. Rosborough) You testified
13  a few minutes ago that you had no view one way
14  or the other as to the opportunity plan, about
15  whether it would allow black voters a fair
16  opportunity to elect candidates of choice in a
17  second district; correct?
18      A.    Was that a question?  I'm sorry.
19      Q.    Oh, I'm sorry.  Is that correct?
20      A.    Would you repeat your question
21  if that was a question?  I'm sorry.
22      Q.    I will.  I will.
23         Am I correct that a few minutes
24  ago -- I'm sorry.  I'm hearing an echo.
25         Okay.  Am I correct that a few

Page 78

1  minutes ago, you testified that you did not
2  know one way or the other about whether the
3  opportunity plan would allow black voters a
4  fair chance to elect candidates of choice in a
5  second district; am I correct about that?
6      A.    Yes.
7      Q.    Okay.  So I posed the same
8  question to you for this plan.  Did you have a
9  view one way or the other as to whether this
10  plan would allow black voters a fair chance to
11  elect candidates of choice in two districts?
12      A.    I think it provided a better
13  opportunity than the opportunity plan.
14      Q.    And what is the basis of that
15  belief?
16      A.    The tweaks that we made in
17  areas.
18      Q.    Okay.  What particular tweaks are
19  you thinking of here?
20      A.    I saw so many maps, sir, I don't
21  remember.  I'm sorry.
22      Q.    Okay.
23         MR. ROSBOROUGH:  Let's pull up
24  Exhibit 11, please.
25         (Whereupon, Exhibit 11 was marked

Page 79

1      for identification.)
2      Q.    (By Mr. Rosborough) Okay.  Senator
3  Livingston, have you seen this article before?
4  It is a July 18th article from 1819 News?
5      A.    I have -- I have not seen it,
6  no, sir.
7      Q.    Okay.  You are quoted in this
8  article in a few places.  And I want to ask
9  you about those.  So let's -- perfect.  Stop
10  right there.
11         At the top of that page, you are
12  quoted as saying -- well let's set some
13  context first.  So the title of this article
14  is House and Senate Committee Narrow
15  Redistricting Plans to Two.  Do you recall
16  that this is the point where the senate had
17  passed the Livingston 2 plan, the house had
18  passed the communities of interest plan, and
19  there had not yet between a resolution between
20  the two plans?  Does that sound right to you?
21      A.    Yes, sir.
22      Q.    Okay.  I believe in referring then
23  to the Livingston plan 2, you say -- you're
24  quoted as saying, "This plan is based on
25  neutral principles promoting communities of

Page 80

1  interest in the Gulf, Black Belt and
2  Wiregrass, ensuring that the state's
3  long-terms principles of compact districts is
4  given a fuller and fairer effect."  Is that
5  quote accurate to the best of your knowledge?
6      A.    Yes, sir, I think so.
7      Q.    Okay.  What did you mean by that?
8      A.    I think it's self-explanatory.
9      Q.    Okay.  So you say first that "The
10  plan is based on neutral principles promoting
11  communities of interest in the Gulf, Black
12  Belt and Wiregrass."  I think we've talked
13  about that.  But then you say, "Ensuring that
14  the state's long-term principles of compact
15  districts is given a fuller and fairer
16  effect."  What did you particularly mean by
17  the compact districts giving a fuller and
18  fairer effect?
19      A.    I think that in Livingston 2 we
20  made the districts a little more compact,
21  providing -- I've forgotten what the two
22  categories are in compactness and communities
23  of interest.  But providing higher scores.
24      Q.    Okay.  So to the best of your
25  recollection, were the main differences



Page 81

1 between the opportunity plan and Livingston 2
2 improve compactness in the Livingston 2 plan?
3     A.    I believe that's correct.
4 But I -- I believe that's correct.
5     Q.    Okay.  And then you go on to
6 say -- or I should say you're quoted as
7 saying, "While the plan is not graded based on
8 race, the result is fairly applied with these
9 neutral principles and the black voting age
10 population in district 2, which was in the
11 existing map" -- "which was in the existing
12 map was like around 30 percent, is now 38.8
13 percent in this plan.  District 7 preserves a
14 core which is 50.43 percent black voting age
15 population.  This plan complies with the
16 Voting Rights Act."  Does that appear to be an
17 accurate quotation of what you said?
18     A.    Yes, sir.
19     Q.    Okay.  What did you mean when you
20 said "The plan is not graded based on race"?
21     A.    It goes back to we were looking
22 at the principles of compactness, communities
23 of interest, and not putting the
24 candidates -- competing candidates against
25 each other.  And the benefit would be the --

Page 82

1 the improvement in the BVAP.
2     Q.    So when you say "this plan
3 complies with the Voting Rights Act," was
4 it -- was your understanding of that based on
5 those three principles you just discussed,
6 communities of interest, compactness, and no
7 pairing incumbents?
8     A.    And the improvement of the BVAP.
9     Q.    And improvement of the BVAP, okay.
10         Do you recall any sort of
11 performance or functionality analysis such as
12 the one that Mr. Hood performed on the
13 earlier -- Dr. Hood, I'm sorry, performed on
14 the earlier plan being run on this plan?
15     A.    I think there was one run that
16 we were able to produce on Friday, yes, sir.
17     Q.    Okay.  Okay.  So after this plan
18 passed the senate, Livingston 2 and
19 communities of interest passed the house, what
20 happened next in the legislative process?
21         MR. ROSBOROUGH:  And I'm sorry.
22 You can pull that down.  Thanks.
23         THE WITNESS:  So what happened
24 next in the legislative process?
25     Q.    (By Mr. Rosborough) Yes, sir.

Page 83

1     A.    I guess we started making
2 sausage at that point in time.
3     Q.    Can you say a little bit more
4 about that?
5     A.    Making sausage?  That's what
6 they describe the legislative process as, as
7 making sausage.  And we had two different
8 bills, and we had to come to some compromise
9 in between them to pass one.
10     Q.    Okay.  And was the result of that
11 sausage making the Livingston 3 plan which was
12 introduced and passed out of the conference
13 committee?
14     A.    Yes, sir.
15     Q.    Okay.
16         MR. ROSBOROUGH:  Can we pull up
17 Exhibit 12, please.
18         (Whereupon, Exhibit 12 was marked
19         for identification.)
20         MR. ROSBOROUGH:  Thank you.
21     Q.    (By Mr. Rosborough) Okay.
22         Senator Livingston, does this
23 appear to be the Livingston congressional
24 plan 3 that passed out of the conference
25 committee?

Page 84

1     A.    Yes, sir.
2     Q.    Okay.  How would you characterize
3 this plan in contrast to Livingston 2?
4     A.    The primary changes are down in
5 district 2.  You added -- I can't really see
6 them.  But you added two counties to the west
7 there.
8     Q.    Would that be Lowndes and Butler?
9     A.    I think that's correct, yes,
10 sir. It's awful small.  And the district 3,
11 Etowah County was put back whole and added
12 into the third congressional district.  The
13 remainder of Blount was put into the fourth
14 congressional district.  And in the fifth
15 congressional district, Lawrence County was
16 added into the fifth congressional district.
17 Otherwise, it was just -- changes were made
18 in deviation to make it -- make it whole.
19 That brought back even higher scores in
20 compactness and communities of interest than
21 we had before.
22     Q.    Okay.  What were the reasons to
23 the best of your recollection for these
24 changes that you just described?
25     A.    Again, I just stated, we brought



Page 85

1  back higher community of interest and
2  compactness scores than there was in the
3  Polsby-Popper and the Reock scores.
4      Q.    Okay.  I think I understand in
5  terms of compactness.  How did this improve
6  off the previous maps in terms of communities
7  of interest?
8      A.    We actually added what would be
9  considered one up in the fifth congressional
10  district between Lawrence and Morgan
11  Counties.  Lawrence County being the old farm
12  belt there, and Morgan being the industrial
13  county where the gins used to be in the day,
14  so --
15      Q.    Okay.  Any other -- I'm sorry
16  about that.  I didn't mean to interrupt you.
17      A.    That's all.
18      Q.    Okay.  Were there any other
19  changes made to improve the community of
20  interest configurations from previous plans?
21      A.    We maintained the Black Belt in
22  two districts and obviously the Wiregrass and
23  the Gulf Coast community of interest.
24      Q.    Did the -- did that initial plan,
25  the community of interest plan equally comply

Page 86

1  in terms of those three communities of
2  interest?
3      A.    I think the Gulf Coast did and
4  the Wiregrass did and the Black Belt, yes.
5  The north Alabama with Lawrence County and
6  Morgan County being similar -- did not -- was
7  not included in that.
8      Q.    Okay.  I believe in your
9  interrogatory response, you named a number of
10  different senators who contributed to the
11  input of the plan's design.  Senator Barefoot,
12  Senator Bell, Senator Chasteen, yourself,
13  Senator Orr, Senator Roberts, Senator
14  Scofield, and Senator Williams.  Do you recall
15  amongst all these different contributions what
16  your particular role was?
17      MR. WALKER:  Let me caution the
18  witness that I have asserted the legislative
19  immunity and privilege on behalf of other
20  members of the reapportionment committee.  And
21  in his answer, if he can answer the question
22  without saying what other members said.
23      Q.    (By Mr. Rosborough) Right.
24      And just to be clear, my question
25  at the moment was just about your particular

Page 87

1  role, Senator Livingston.
2      A.    My role as chair was to get a
3  plan out that we thought was fair and did
4  what the Court said.  We focused on
5  communities of interest, compactness, and not
6  putting incumbents against each other.
7      Q.    Okay.  Okay.
8      What were the areas, if you
9  recall, that you needed to compromise on with
10  the house plan?  Was that primarily in the
11  north part of the state, or were there other
12  areas?
13      A.    I apologize.  But without
14  looking at both maps, I couldn't tell you.
15  So -- obviously one of the compromises we had
16  to have was in making Etowah County whole.
17  Past that, I don't remember.
18      Q.    Okay.  Do you remember any
19  differences of opinion between yourself and
20  Representative Pringle as to the boundaries of
21  a compliant plan?
22      A.    Would you repeat that for me,
23  please?
24      Q.    Sure.  Obviously, there was a
25  house map that passed and a senate map that

Page 88

1  passed.  Do you recall what differences there
2  were between you and Representative Pringle
3  that needed to be resolved in a final plan?
4      A.    Obviously Chairman Pringle was
5  very, very interested in his community of
6  interest map.  I don't remember any -- the
7  differences, no.
8      Q.    Okay.  But you -- and I don't want
9  to put words your mouth, so tell me if I'm
10  incorrect on this.  But I believe that you
11  testified that you had been supportive of the
12  community of interest maps, but went along with
13  this other chain of maps, which was
14  opportunity to Livingston 2 to Livingston 3
15  because of outside input; is that correct?
16      A.    I don't think I said outside
17  influence.  I think I said my committee
18  members.
19      Q.    Okay.  So it was other committee
20  members that no longer were supportive of the
21  community of interest plan; is that correct?
22      A.    Yes, sir.
23      Q.    And your understanding is that
24  that was because of outside information they
25  received?



Page 89

1    A.    I don't know what the
2  information they received.
3    Q.    Okay.  Do you understand --
4  without revealing the contents of
5  conversations, do you have an understanding of
6  why the other senate members of the committee
7  no longer supported the community of interest
8  plan?
9    A.    I don't know why -- why that
10  changed.
11         MR. ROSBOROUGH:  All right.  Can
12  we pull up Exhibit 13, please.
13         (Whereupon, Exhibit 13 was marked
14         for identification.)
15    Q.    (By Mr. Rosborough) Senator
16  Livingston, do you recognize this document?
17    A.    I have seen it before, yes, sir.
18    Q.    Does this appear to be the
19  analysis Dr. Hood performed on the
20  Livingston 3 plan which was ultimately the
21  plan enacted in senate bill 5?
22    A.    It doesn't identify itself as
23  that.  But it looks familiar, yes, sir.
24    Q.    Okay.  And did you see Dr. Hood's
25  analysis before the plan passed the

Page 90

1  legislature during the special session?
2    A.    Yes, sir.
3    Q.    Okay.  And under this analysis in
4  senate district -- I'm sorry -- in
5  congressional district 2 in the seven races
6  analyzed, black preferred candidates would
7  have lost all seven of those races; is that
8  correct?
9    A.    I think that's what that shows,
10  yes, sir.
11    Q.    Okay.  And that also shows that
12  black preferred candidates would have lost by
13  an average of about a little under eight
14  points; is that correct?
15    A.    I see on the percentage on
16  there.  It's 46.6 out on the end of CD-2.
17  That's an average.
18    Q.    Oh, I'm sorry.  I think I meant to
19  say about seven points.  It's 46.6 percent for
20  the black preferred candidate and 53.4 for the
21  white preferred candidate.  Does that seem
22  accurate?
23    A.    Yes, sir, I see that.
24    Q.    Okay.  How did this analysis
25  factor into your decision to support this

Page 91

1  plan, if at all?
2    A.    Again, it's 46.6 percent
3  opportunity if you've got the right candidate
4  and the right funding.
5    Q.    If this had been 43 percent
6  average, would that have been an opportunity
7  district in your mind?
8    A.    If you're talking about CD-2,
9  average 43 percent?
10    Q.    Yes.
11    A.    I don't think so.
12    Q.    Okay.  Where do you sort of
13  draw -- where do you draw the line in
14  considering what average -- for a black
15  preferred candidate for prior elections, what
16  average would make this an opportunity
17  district?
18    A.    I don't have a number for that,
19  sir.
20    Q.    Nut somewhere above 43 percent,
21  but 46.6 percent qualifies; is that fair?
22    A.    I think that would be fair, yes,
23  sir.
24         MR. ROSBOROUGH:  Okay.  All right.
25  We can take that down.  Actually, can we pull

Page 92

1  up Exhibit 14, please.
2    Q.    Okay.  Senator Livingston, this is
3  an article from the Alabama Reflector from
4  July 21st, 2023 with the title Alabama
5  Legislative Passes Controversial Congressional
6  Map.  Have you seen this article before?
7    A.    No, sir, I have not.
8         (Whereupon, Exhibit 14 was marked
9         for identification.)
10    Q.    (By Mr. Rosborough) I'm asking
11  about this article because you are quoted in
12  it.  If we could scroll down to, I believe,
13  page 3.  There we go.
14         And you understand this article is
15  referring to the plan that ultimately passed,
16  which was Livingston 3 and ultimately passed
17  as senate bill 5?
18    A.    Yes, sir.
19    Q.    Okay.  All right.
20         If you see, you are quoted in this
21  article as saying -- well, it refers to you, I
22  should say, as noting that republicans
23  prioritize compactness and communities of
24  interest which led to a 40 percent black
25  district.  Livingston said there was not a



Page 93

1  conscious attempt to reach that number.  And
2  then you're specifically quoted as saying,
3  There are three legs.  And in the suit, the
4  Court's order are -- those are two of the
5  three legs.  Does that appear to be an
6  accurate quote?
7      A.    I don't remember saying that,
8  but I'm sure they got it recorded.
9      Q.    Okay.  Okay.
10         What do you mean there were three
11  legs, and in the suit, the Court's order and
12  these are two of the three legs?
13      A.    I would assume that I'm talking
14  about compactness and communities of
15  interest.
16      Q.    Okay.  And then what is the third
17  leg, is that the Court's order?
18      A.    I would say that would be the --
19      Q.    Okay.  And you talked a good
20  amount about how compactness and communities
21  of interest played into the map, but what
22  about the Court's order, what role did that
23  play for you?
24      A.    So the Court's order was to
25  give -- to create two opportunity districts.

Page 94

1  And I think that's what we tried to do with
2  this.
3         MR. ROSBOROUGH:  I'd like to
4  scroll down toward the bottom.  Further down.
5  Keep going.  Okay.  There we go.  All right.
6      Q.    So toward the bottom of the
7  article, the last -- these -- the last couple
8  paragraphs on the page shown says, they say,
9  The week-long session drew national attention.
10  Republicans have a slim majority in the U.S.
11  House that could shift with the loss of five
12  seats.  Livingston said Friday he had spoken
13  with U.S. House Speaker Kevin McCarthy, R.
14  California.  He said, "I'm interested in
15  keeping my majority," Livingston said.  "That
16  was basically his conversation.  He's just
17  telling us to do what we can do.  We did the
18  best we could."
19         What do you recall about your
20  conversation with Speaker McCarthy?
21      A.    Just a brief conversation that
22  he expressed exactly what I said there.
23      Q.    Okay.  And when you said at the
24  end, "We did the best we could," what did you
25  mean by that?

Page 95

1      A.    I think -- I think we made a
2  valid attempt at making it fair and equal for
3  everybody.
4      Q.    Okay.  And he said, "I'm
5  interested in keeping my majority."  When you
6  said, "We did the best we could," are you
7  referring to passing what you think is a fair
8  map while keeping a republican majority?
9      A.    I think we passed a fair map
10  that satisfied the Court's requirements of
11  opportunity districts.
12      Q.    And I understand that.  I'm just
13  wondering what -- how your response, "We did
14  the best we could" in response to Speaker
15  McCarthy's statement, "I'm interested in
16  keeping my majority," what the relationship
17  between those two are?
18      A.    I think you'd have to go back
19  and ask whoever the -- wrote the article.
20  I'm not sure they were in the same sentence
21  or even meant to be tied together.  But they
22  are tied together there.
23      Q.    Okay.  How, if at all, did helping
24  Speaker McCarthy keep a republican majority in
25  the house, how, if at all, did that play into

Page 96

1  your efforts here?
2      A.    They really didn't play into our
3  efforts.  You know, they really didn't.
4      Q.    Okay.  Are you just speaking for
5  yourself, or are you speaking to other
6  committee members?
7      A.    I would speak for myself there.
8      Q.    Okay.  Would you say that you
9  consider it fair and equal for black preferred
10  candidates to win zero elections in
11  congressional district 2 as drawn in the new
12  plan?
13      A.    Would you repeat the question
14  for me, please?
15      Q.    Would you consider it fair and
16  equal for black preferred candidates to win
17  zero elections in the newly drawn
18  congressional district 2?
19      A.    No, sir, I don't think.  I think
20  they have an opportunity to win there.
21      Q.    And you think they have an
22  opportunity to win even though all of the
23  analysis you saw showed that they would have
24  not have won a single election had that
25  district been drawn in the past?



STEVE LIVINGSTON                                      August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.              97–100

Page 97

1     A.    I think if you go back and look
2   at the numbers that were in there, some of
3   those candidates were very weak.
4     Q.    Were there any candidates run in
5   those races that you did not consider very
6   weak?
7     A.    I'd have to look at it again to
8   be honest with you.  But, yes, sir, I think
9   there were some that were not weak.
10    Q.    But those candidates that were not
11  weak nonetheless would have lost in the second
12  district; correct?
13    A.    I think that's correct, yes,
14  sir.  Again, I'd have to look at it.
15    Q.    Okay.  Which of those prior
16  candidates do you think were weak?
17    A.    I don't remember, sir.  I don't
18  see that in front of me.  So I don't know
19  who -- that was '20 and -- 2018 and 2020
20  data; right?
21    Q.    2018 and 2020 data.  I think there
22  might have been some 2016 data in the
23  analysis.
24    A.    You know, just to be perfectly
25  honest with you, this was three weeks of, you

Page 98

1   know, trying to get this together and to get
2   it to the Court, so...
3           MR. ROSBOROUGH:  Okay.  We can
4   pull this down.  We're getting close -- we're
5   getting close to wrapping up on my end.
6     Q.    So let me just confirm then, you
7   didn't -- can you think of any candidates in
8   the past other than Doug Jones who you would
9   consider -- well, let me rephrase that.
10          One of those elections was Doug
11  Jones, correct, where he lost to Senator
12  Tuberville in 2020 and would have lost in that
13  second congressional district under the
14  analysis; is that correct?
15    A.    Well, some of the analysis -- it
16  probably wasn't on this map, but some of the
17  analysis showed him winning the second
18  congressional district.
19    Q.    Well, let's pull back up --
20    A.    Maybe not in that one.
21    Q.    Yeah.  Let's just go ahead and
22  pull back up really quickly Exhibit 13 if you
23  don't mind.  It will be easy.  Again, I'm
24  really not trying to do this as a memory test.
25  I know it was a fast session.

Page 99

1     A.    I would have withheld that.  I'm
2   sorry.
3     Q.    No, that's all right.
4           So if we look at district 2 in the
5   Senate 2020 race, that was the Doug Jones
6   versus Tommy Tuberville race; correct?
7     A.    Yes, sir, I think so.
8     Q.    Okay.  And that was in a
9   presidential year where there's generally
10  higher turnout; is that correct?
11    A.    Yes, sir.
12    Q.    And in that race in this new
13  congressional district 2 under the enacted
14  plan, Senator Tuberville would have beaten
15  Doug Jones -- former Senator Jones by
16  4 percentage points; is that accurate?
17    A.    Yes, sir, that's what I see.
18    Q.    Okay.  Would you consider Senator
19  Jones a weak candidate?
20    A.    No, sir, I would not.
21    Q.    Would you consider him to be more
22  well-funded than most other democratic
23  candidates in recent years?
24    A.    Yes, sir.
25    Q.    So despite being well-known, a

Page 100

1   former incumbent, and well-funded, Senator
2   Jones would have lost to Senator Tuberville by
3   4 points in this district; correct?
4     A.    Yes, sir.
5           MR. ROSBOROUGH:  Okay.  You can
6   take that down.  Okay.  Can we just -- I'm
7   getting close to wrapping up, Senator
8   Livingston.  I appreciate your time.  I've got
9   a few more minutes.
10          Can we please pull up Exhibit 15?
11    Q.    Okay.  Senator Livingston, do you
12  recognize this document?
13          (Whereupon, Exhibit 15 was marked
14          for identification.)
15          THE WITNESS:  Yes, sir.
16    Q.    (By Mr. Rosborough) And what is
17  it?
18    A.    I think that's the final bill
19  that was passed SB-5 as enacted and stamped.
20  And I think if I remember from earlier
21  conversation has got the governor's signature
22  on the bottom of the front page.
23          MR. ROSBOROUGH:  Okay.  All right.
24  And if we could scroll up to, I think it's
25  maybe the second page.  Scroll up one page



Page 101

1 more. There we go.
2    Q.   Okay. So section one of the bill
3 sets out a number of -- well, line 15 right
4 there says, "The legislature finds and
5 declares the following." And then it sets out
6 a number of statements over the next several
7 pages. If you scroll down all the way until
8 we get to section 2, I believe, which is an
9 actual description of the districts; is that
10 correct?
11    A.   I'll take your word for it.
12 It's very difficult to see here.
13    Q.   Okay. Are you generally familiar
14 with the fact that there are what are titled
15 legislative findings that take up about, you
16 know, five or so pages in the bill?
17    A.   Yes, sir.
18    Q.   Okay. And do you recall in your
19 responses to the interrogatories that when you
20 were asked to identify each individual and/or
21 entity who participated in the drafting of the
22 statement of legislative intent accompanying
23 the congressional districting map, you said
24 all information and belief, Eddie LaCour, do
25 you recall that?

Page 102

1    A.   Yes, sir.
2    Q.   When -- are these sections of the
3 bill what you were referring to in that
4 answer?
5    A.   Yes, sir.
6    MR. ROSBOROUGH: All right. We
7 can -- well, let me just -- we can take that
8 down. That's fine.
9    Q.   Do you -- without revealing any
10 conversations with counsel, do you have any
11 understanding of why those findings were
12 included in the bill?
13    A.   I do not, sir.
14    Q.   Okay. Senator Livingston, did
15 you -- do you recall preparing or receiving
16 any talking points regarding the enacted plan
17 or any draft plans during the special session?
18    A.   Yes, sir.
19    MR. ROSBOROUGH: Okay. Can we
20 pull up Exhibit 16, please?
21    (Whereupon, Exhibit 16 was marked
22        for identification.)
23    Q.   (By Mr. Rosborough) Okay.
24    And if we can just sort of slowly
25 scroll down and give you a chance to look

Page 103

1 over. I am happy to go slower if you need.
2 Just let us know. But do these appear to be
3 the talking points that you just mentioned?
4    A.   Yes, sir.
5    Q.   Okay. Who prepared these talking
6 point?
7    A.   I think they came from Eddie
8 LaCour.
9    Q.   Okay. And do you recall when you
10 received them?
11    A.   That, I do not remember, no,
12 sir.
13    Q.   Do you recall discussing these
14 talking points with anyone?
15    A.   No, sir.
16    Q.   Did you rely on these talking
17 point during legislative hearings?
18    A.   Some of them I did, yes, sir.
19    MR. ROSBOROUGH: Okay. Okay.
20 Give me one sec. I'm just going to take one
21 sec if you don't mind the awkward the pause.
22 Okay. We can take that down.
23    If we can just take a five-minute
24 break. I think that's probably all the
25 questions I have. But I just want a second to

Page 104

1 confer with my cocounsel. Does that work? We
2 can take five and come back at 3:27.
3    MR. WALKER: Davin, would you mind
4 if we took a little bit longer than five, say
5 maybe ten or so minutes?
6    MR. ROSBOROUGH: Oh, sure, that's
7 fine. We can take ten.
8    MR. WALKER: Okay.
9    MR. ROSBOROUGH: Well, actually,
10 how about this? You know what, I feel pretty
11 comfortable those are all of my questions. So
12 let me see if Mr. Posimato from the Caster
13 plaintiffs or anyone else wants to -- anyone
14 else has any questions because it may be -- if
15 not, we can just end this and take a longer
16 break.
17    MR. POSIMATO: This is Joe
18 Posimato from the Caster plaintiffs. The
19 Caster team doesn't have any further
20 questions.
21    MR. DAVIS: Nothing from the
22 secretary of state.
23    COURT REPORTER: Okay. No other
24 questions, Counsel?
25    MR. ROSBOROUGH: Nothing else from



STEVE LIVINGSTON
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
105–106

Page 105

1  me.
2          COURT REPORTER:  Okay.
3          THE VIDEOGRAPHER:  Counsel, is it
4  going to be the same orders for this witness?
5          MR. ROSS:  Same orders for this
6  witness, yes, thank you.
7          MR. POSIMATO:  For the Caster
8  plaintiffs, I think my colleague had ordered a
9  transcript, but not a rush transcript from the
10  last deposition.  We would actually like to
11  amend that.  Can we actually have rush
12  transcript for the Milligan plaintiffs for all
13  of these depositions?
14          COURT REPORTER:  Yes, sir.
15          MR. POSIMATO:  Thank you so much.
16          COURT REPORTER:  Okay.  You can
17  take us off, I believe, Bailey.
18          THE VIDEOGRAPHER:  No further
19  questions.  The time is 2:24 p.m. on August
20  9th, 2023.  We are going off the record.
21   (The deposition concluded at 2:24 p.m.)
22
23
24
25

Page 106

1            C E R T I F I C A T E
2
3  STATE OF ALABAMA)
4  CALHOUN COUNTY)
5
6          I hereby certify that the above
7  proceedings were taken down by me and
8  transcribed by me using computer-aided
9  transcription, and that the above is a true
10  and correct transcript of the said proceedings
11  given by said witness.
12          I further certify that I am neither
13  of counsel nor of kin to the parties to the
14  action, nor am I in anywise interested in the
15  result of said cause.
16          I further certify that I am duly
17  licensed by the Alabama Board of Court
18  Reporting as a Certified Court Reporter as
19  evidenced by the ACCR number found below.
20
21          COMMISSIONER - NOTARY PUBLIC
22
23          
24          CINDY C. JENKINS, CSR
25          ACCR #470 - Exp. 9/30/2023