Case 2:21-cv-01530-AMM    Document 459-20    Filed 02/24/25    Page 1 of 29    FILED

2025 Feb-24 PM 10:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
1–4

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF ALABAMA

3    SOUTHERN DIVISION

4

5    NO. 2:21-CV-01530-AMM

6

7    EVAN MILLIGAN, et al.,

8        Plaintiffs,

9    vs.

10    WES ALLEN, et al.,

11        Defendants.

12

13

14    VIDEOTAPED REMOTE DEPOSITION OF:

15    CHRISTOPHER P. PRINGLE

16    August 9, 2023

17    3:04 P.M.

18

19

20

21    REPORTED BY:

22        Cindy C. Jenkins, CCR

23

24

25

**Page 2**

1    S T I P U L A T I O N S

2

3        IT IS STIPULATED AND AGREED by and

4    between the parties through their respective

5    counsel, that the deposition of Christopher P.

6    Pringle may be taken before Cindy C. Jenkins,

7    Commissioner, via Zoom Video Conference, on

8    the 9th day of August, 2023.

9

10        IT IS FURTHER STIPULATED AND AGREED

11    that the signature to and the reading of the

12    deposition by the witness is waived, the

13    deposition to have the same force and effect

14    as if full compliance had been had with all

15    laws and rules of Court relating to the taking

16    of depositions.

17

18

19

20

21

22

23

24

25

**Page 3**

1    S T I P U L A T I O N S

2    (continued)

3

4        IT IS FURTHER STIPULATED AND AGREED

5    that it shall not be necessary for any

6    objections except as to form or leading

7    questions, and that counsel for the parties

8    may make objections and assign grounds at the

9    time of the trial, or at the time said

10    deposition is offered in evidence or prior

11    thereto.

12

13        IT IS FURTHER STIPULATED AND AGREED

14    that the notice of filing of the deposition by

15    the Commissioner is waived.

16

17

18

19

20

21

22

23

24

25

**Page 4**

1    A P P E A R A N C E S

2

3    APPEARING ON BEHALF OF THE MILLIGAN
     PLAINTIFFS:

4        NAACP LEGAL DEFENSE & EDUCATIONAL FUND
         Mr. Deuel Ross

5        Mr. Tanner Lockhead
         700 14th Street, Northwest

6        Suite 600
         Washington, DC 20005

7        dross@naacpldf.org

8        NAACP LEGAL DEFENSE
         & EDUCATIONAL FUND, INC.

9        Ms. Brittany Carter
         40 Rector Street, 5th Floor

10       New York, New York 10006
         212-965-2200

11   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
         Mr. Davin M. Rosborough

12       125 Broad Street
         New York, New York 10004

13       drosborough@aclu.org

14   APPEARING ON BEHALF OF THE CASTER PLAINTIFFS:
         ELIAS LAW GROUP, LLP

15       Ms. Makeba Rutahindurwa
         Mr. Joseph Posimato

16       250 Massachusetts Avenue, Northwest
         Suite 400

17       Washington, D.C. 20001
         jjasrasaria@elias.law

18

19   APPEARING ON BEHALF OF THE COCHAIRS; RANDY
     HINAMAN, STEVE LIVINGSTON, and CHRIS PRINGLE:
         BALCH & BINGHAM

20       Mr. Dorman Walker
         105 Tallapoosa Street

21       Suite 200
         Montgomery, Alabama 36104

22       dwalker@balch.com

23

24

25



CHRISTOPHER P. PRINGLE                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.                        5—8

Page 5

```
1              APPEARANCES
              (continued)
2
3  APPEARING ON BEHALF OF THE SECRETARY OF STATE,
    WES ALLEN:
4        OFFICE OF THE ATTORNEY GENERAL
         Mr. Jim Davis
5        Assistant Attorney General
         501 Washington Avenue
6        Montgomery, Alabama 36130
         jim.davis@alabamaag.gov
7
8  VIDEOGRAPHER:
9        Mr. Bailey Diaz
10
11 ALSO PRESENT:
12       Ms. Joelle Miller
13       Ms. Donna Loftin
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
1                I N D E X
2  WITNESS                                  PAGE
3  CHRISTOPHER P. PRINGLE
4  Examination by Mr. Lockhead                8
5
6
7           INDEX OF EXHIBITS
8  NUMBER                                   PAGE
9  Exhibit A                                 17
10 Exhibit C                                 48
11 Exhibit D                                 52
12 Exhibit F                                 57
13 Exhibit G                                 77
14 Exhibit H                                 85
15 Exhibit I                                 88
16 Exhibit J                                 89
17 Exhibit K                                 96
18 Exhibit L                                106
19 Exhibit O                                108
20 Exhibit X                                 61
21 Exhibit Y                                 62
22 Exhibit Z                                102
23
24
25
```

Page 7

```
1              PROCEEDINGS
2  AUGUST 9, 2023              3:04 P.M.
3        THE VIDEOGRAPHER:  Good afternoon.
4  We are now on the record.  The time is
5  3:04 p.m. on Wednesday, August 9th, 2023.
6  This begins the videotaped deposition of Chris
7  Pringle taken in the matter of Evan Milligan,
8  et. al., vs. Wes Allen, et al., the case
9  number of which is 2:21-CV-01530-AMM.  The
10 videographer today is Bailey Diaz.  Our court
11 reporter is Cindy Jenkins, both representing
12 Esquire Deposition Solutions.
13        Counsel, will you please announce
14 your name for the record and whom you
15 represent, after which the court reporter will
16 swear in the witness.
17        MR. LOCKHEAD:  This is Tanner
18 Lockhead on behalf of Milligan plaintiffs from
19 the Legal Defense Fund.
20        MR. DAVIS:  Jim Davis for the
21 defendant, Secretary of State, Wes Allen.
22        MR. WALKER:  Dorman Walker
23 representing defendant, Chris Pringle.
24        MR. ROSBOROUGH:  Davin Rosborough
25 also for the Milligan plaintiffs.
```

Page 8

```
1        MS. CARTER:  Brittany Carter for
2  the Milligan plaintiffs.
3        MR. POSIMATO:  This is Joseph
4  Posimato on behalf of the Caster plaintiffs.
5        MS. RUTAHINDURWA:  Makeba
6  Rutahindurwa on behalf of the Caster
7  plaintiffs.
8        MR. ROSBOROUGH:  We also have
9  Deuel Ross here on behalf of the Milligan
10 plaintiffs and Joelle Miller who is a legal
11 intern with the Legal Defense Fund.
12        CHRIS PRINGLE,
13 being first duly sworn, was examined and
14 testified as follows:
15 EXAMINATION BY MR. LOCKHEAD:
16    Q.   Good afternoon.  My name is Tanner
17 Lockhead, and I represent the Milligan
18 plaintiffs in this case.  And I'll be taking
19 your deposition this afternoon.
20        Would you mind starting by stating
21 your full name for the record?
22    A.   Christopher Paul Pringle.
23    Q.   And Mr. Pringle, you understand
24 that you're testifying under oath?
25    A.   I do.
```



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
9–12

Page 9

1    Q.    Okay.  Is there anything that
2  might prevent you from understanding my
3  questions or answering truthfully today?
4    A.    Only the audio on this feed.
5  Prevent me from hearing you.  It doesn't
6  prevent me from telling the truth.
7    Q.    That's fair.  If I cut out at any
8  point, just let me know.  And Mr. Pringle, are
9  you currently represented by an attorney?
10    A.    Dorman Walker.
11    Q.    So Mr. Pringle, you were last
12  deposed in this case on December 17th, 2021;
13  is that correct?
14    A.    I believe so, yes.
15    Q.    Have you testified in any trial or
16  deposition since your prior deposition in this
17  case?
18    A.    No.
19    Q.    Okay.  I'll just go over some of
20  the key rules of road just as a refresher if
21  that's all right.  So I'll ask questions.  If
22  you don't understand a question, just let me
23  know.  If you answer a question, I'll assume
24  that you understood the question; is that
25  fair?

Page 10

1    A.    Yes.
2    Q.    Also, of course, the court
3  reporter is here, as you may have already
4  noticed, and there's a video recording.  So
5  it's important that just one person speak at a
6  time.  So just please -- I ask that you allow
7  me to finish my questions, and I'll do my best
8  to make sure you're able to finish your
9  answers before jumping into the next question;
10  is that all right?
11    A.    Yes.
12    Q.    Great.  So without disclosing the
13  content of any discussions with your attorney,
14  what did you do to prepare for your deposition
15  today?
16    A.    Nothing.
17    Q.    Did you meet with any of your
18  attorneys?
19    A.    I talked to Dorman on the phone.
20    Q.    Okay.  Only once or multiple
21  times?
22    A.    Two or three times.
23    Q.    Okay.  Did you meet with anyone
24  who was not an attorney in preparation for the
25  deposition today?

Page 11

1    A.    No.
2    Q.    Okay.  Did you review any
3  documents?
4    A.    No.  I turned all of mine over.
5    Q.    Did you review any documents in
6  the course of turning them over for the
7  deposition?
8    A.    Not really.
9    Q.    Okay.  Have you discussed the
10  deposition with anyone?
11    A.    No.
12    Q.    Okay.
13    A.    Just I told my girlfriend -- I
14  told my girlfriend I have one.
15    Q.    So fair to say nobody from the
16  State of Alabama affiliated with state
17  legislature?
18    A.    No.
19    Q.    Okay.  Who first told you that
20  your deposition had been requested in this
21  case?
22    A.    Dorman.
23    Q.    Okay.  And are you being
24  compensated by anyone for being here today in
25  this deposition?

Page 12

1    A.    I'm losing so much money right
2  now it's not even funny.  No.
3    Q.    And do you expect to be
4  compensated in any way to testify at trial in
5  this matter?
6    A.    No.
7    Q.    So Representative Pringle, since
8  your prior deposition in this case in 2021,
9  have you been involved in any other lawsuits,
10  any other depositions?
11    A.    No.
12    Q.    Okay.  So let's go ahead and
13  transition to your time in the legislature.
14  What is your current role in Alabama
15  legislature?
16    A.    State representative house
17  district 101 and speaker pro tempore of the
18  Alabama house.
19    Q.    Are you currently on any
20  committees?
21    A.    Numerous.
22    Q.    Which ones?
23    A.    I am cochairman of the
24  legislative council.  I'm cochairman of
25  reapportionment.  I'm on the elections



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
13–16

Page 13

1   committee. I'm on the Mobile County
2   legislative delegation committee. I'm on the
3   contract review committee. I can't even name
4   them all.
5       Q.   So for purposes of brevity,
6   throughout this deposition when I refer to the
7   redistricting committee, what I mean by that
8   is the reapportionment committee. Can we
9   agree to that? Is that fair?
10      A.   That's perfectly fine.
11      Q.   Okay. You said you served as
12  cochairman of the reapportionment committee
13  during the 2021 redistricting cycle; is that
14  correct?
15      A.   Correct.
16      Q.   And you also served as cochair
17  during the 2023 redistricting cycle as well;
18  is that correct?
19      A.   Correct.
20      Q.   Okay. Representative Pringle, how
21  did you come to be the cochair in 2021?
22      A.   I was elected by my peers.
23      Q.   And what about in 2023?
24      A.   Elected by my peers.
25      Q.   Would you mind just quickly

Page 14

1   walking me through your responsibilities as
2   cochair of that committee?
3       A.   I'm the house cochair. So when
4   the house side of it meets, I chair that
5   committee. When the full committee meets,
6   sometimes I chair it, sometimes Livingston
7   will chair it.
8       Q.   Okay. And what does that involve,
9   chairing?
10      A.   We go through the agenda. You
11  run the meeting.
12      Q.   Did your responsibilities as chair
13  change from the 2021 cycle through to the 2023
14  cycle, or would you say they're about the
15  same?
16      A.   About the same.
17      Q.   Okay. Okay. So let's go ahead
18  and jump into the thing. So are you aware of
19  the Supreme Court's decision in Allen vs.
20  Milligan?
21      A.   Yes, sir.
22      Q.   Okay. Did you read that decision?
23      A.   Not in its entirety, no.
24      Q.   Did you read it in part?
25      A.   Parts of it, yes, sir.

Page 15

1       Q.   Okay. That decision was issued on
2   June 8th, 2023, does that sound right?
3       A.   Yes, sir.
4       Q.   Okay. How did you become aware of
5   that decision?
6       A.   The news.
7       Q.   Did you speak to anybody about it?
8       A.   Well, I'm sure I called Dorman
9   very quickly to find out.
10      Q.   Did you speak to anybody else?
11      A.   You know, probably a thousand
12  people have talked to me about that decision.
13      Q.   Okay. Well, let's maybe take
14  it --
15      A.   I can't remember.
16      Q.   Did you speak -- Representative
17  Pringle, am I coming through okay?
18      A.   You're breaking up, but go
19  ahead.
20      Q.   Okay. Did you speak with Governor
21  Ivey about the decision?
22      A.   No.
23      Q.   What about other members of the
24  Alabama congressional delegation?
25      A.   Yes.

Page 16

1       Q.   And who was that?
2       A.   Jerry Carl, Mike Rogers.
3       Q.   Any others?
4       A.   No.
5       Q.   Did you speak with Senator
6   Tuberville?
7       A.   No.
8       Q.   Or a member of his staff?
9       A.   No.
10      Q.   What about any folks at the NRGC
11  (sic), the national republican redistricting
12  trust?
13      A.   Not since 2021.
14           MR. LOCKHEAD: Okay.
15           Let's go ahead if it's all right
16  and pull up what's been marked as Exhibit A.
17  I think that Davin is going to help out with
18  that.
19           THE WITNESS: Somebody's going to
20  have to help me because I don't see anything.
21           Oh, wait a minute. There we go.
22  Thank you.
23      Q.   (By Mr. Lockhead) Representative
24  Pringle, can you see that all right?
25      A.   Yes.



CHRISTOPHER P. PRINGLE                          August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.              17–20

Page 17

1      (Whereupon, Exhibit A was marked
2      for identification.)
3      Q.    (By Mr. ^ Attyname) Representative
4  Pringle, what -- do you recognize this
5  document?
6      A.    Yes.
7      Q.    And what is it?
8      A.    It's a lawsuit.
9      Q.    Do you know which lawsuit?
10     A.    The Milligan vs. Merrill.
11     Q.    And this is the preliminary
12  injunction memorandum issued from the three
13  judge court in the Milligan case; is that your
14  understanding?
15     A.    That's my understanding, yes.
16     Q.    Okay.  Representative Pringle, are
17  you familiar with the guidance given by the
18  Court in this case concerning what's required
19  in order to remedy a likely Voting Rights Act
20  violation under section 2?
21     A.    Either two majority minority
22  districts or something close to it.  They
23  were providing (inaudible) for a protected
24  class of citizens to elect a candidate of
25  their choosing.

Page 18

1      Q.    So you're familiar with that
2  guidance given by the Court concerning what
3  was required of the map?
4      A.    Yes, sir.
5          MR. LOCKHEAD:  Okay.  Can we
6  scroll to page 6, and if we could zoom in a
7  little bit.
8      Q.    Representative Pringle, I'm going
9  to start to read at the paragraph that begins
10  with the legislature.  Do you see that
11  paragraph?
12     A.    Yes.
13     Q.    Okay.  "The legislature enjoys
14  board discretion and may consider a wide range
15  of remedial plans.  As the legislature
16  considers such plans, it should be mindful of
17  the practical reality based on the ample
18  evidence of intensely racially polarized
19  voting adduced during the preliminary
20  injunction proceedings that any remedial plan
21  will need to include two districts in which
22  black voters either comprise a voting age
23  majority or something quite close to it."  Did
24  I read that correctly?
25     A.    Yes, sir.

Page 19

1      Q.    And you were familiar with this
2  passage; correct?
3      A.    Yes.
4      Q.    In fact, I think you recited it
5  from memory; is that fair?
6      A.    I'm familiar with it.
7      Q.    What role, if any, did this
8  passage from the preliminary injunction order
9  play in your consideration of these new maps
10  during the 2023 redistricting cycle?
11     A.    That we were charged with
12  drawing a map that would provide an
13  opportunity for the black voters to elect a
14  candidate of their choosing.
15     Q.    Did you have an understanding of
16  what was required in order for that
17  opportunity to comply with the opportunity as
18  its expressed in this paragraph?
19     A.    An opportunity for blacks to
20  elect a candidate of their choosing.
21     Q.    Okay.  So as you were considering
22  plans, did you have an understanding of what
23  it means for black voters to have an
24  opportunity to elect a representative of their
25  choice?

Page 20

1      A.    Ask me that again, please.
2      Q.    Sure.  Tell me what you
3  understand -- what it means to provide black
4  voters with an opportunity to elect a
5  candidate of their choice.
6      A.    You know, a district which they
7  have the ability to elect or defeat somebody
8  of their choosing.  I have no magic number on
9  that.
10     Q.    Sure.  Does it turn on the ability
11  to elect for you?
12     A.    Yes.  Ability.
13     Q.    So in thinking through this
14  decision, other than with your counsel, of
15  course, did you have discussions with anyone
16  about what it means for black voters to have
17  an opportunity to elect a representative of
18  their choice in a district?
19     A.    Not that I recall.
20     Q.    Okay.  Not other members of the
21  legislature?
22     A.    Not that I recall.
23     Q.    Okay.  So you did not -- cannot
24  recall an example of any discussion with the
25  legislature regarding what it means to create



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.
August 09, 2023
21–24

Page 21

1 an opportunity district?
2    A.    Not -- not that I can recall.
3    Q.    Okay.  Let's go ahead and turn to
4 the 2023 process itself.
5    So Representative Pringle, at what
6 point did you first begin working on a new map
7 after the Supreme Court decision?
8    A.    Probably within a matter of days
9 after the Supreme Court handed down the
10 ruling in June.
11    Q.    And who did you consult in that
12 process?
13    A.    My attorney Dorman Walker and
14 Randy Hinaman and my cochairman Steve
15 Livingston.
16    Q.    Did you speak with anyone else at
17 that stage when you were beginning to draft
18 maps, other legislators or members of the
19 congressional delegation or others?
20    A.    Not that I recall.
21    Q.    Okay.  Did you speak with
22 Congresswoman Terry Sewell or any of her
23 staff?
24    A.    No, sir.
25    Q.    What about Speaker McCarthy?

Page 22

1    A.    I had a very, very brief
2 conversation with him one Sunday afternoon as
3 I was returning from New Orleans, yes.
4    Q.    What did you discuss with Speaker
5 McCarthy?
6    A.    The one time I met him in his
7 office, I asked if he remembered meeting me
8 several years ago.  But mostly he just -- he
9 just was concerned about keeping his majority
10 and wanted us to keep than in mind.  But it
11 was not in any way -- it was very congenial
12 call.  He was -- he was not asking us to do
13 anything other than just keep in mind that he
14 has a very tight majority.  It was a very
15 pleasant phone call.  He was not being
16 insistent on trying to get us to do something
17 we shouldn't at all.
18    Q.    How did that factor into your
19 consideration of maps, if at all, during the
20 process?
21    A.    Well, I mean, you know, my
22 overriding principle is complying with what
23 the United States Supreme Court told me to
24 do.
25    Q.    So is fair to say not at all?

Page 23

1    A.    You know, it's -- like I said,
2 my overriding principle is what the United
3 States Supreme Court told us to do.  They --
4 they told us draw a map, and that's what I
5 tried to do.
6    Q.    So you said you spoke with Speaker
7 McCarthy.  Did you speak with anyone else that
8 you can recall during this stage when you were
9 first working on the map after the decision?
10    A.    You know, I've had 10,000
11 conversations.  People stop me on the street
12 asking me about it.  So what specific
13 questions do you want to talk about?
14    Q.    Well, how about let's -- what
15 about with other folks, either, again, in the
16 Alabama congressional delegation or other
17 officials in Alabama.  Any of those folks?
18    A.    You know, naturally I had a
19 conversation with Brian Rell, Robert
20 Aderholt's chief of staff.  I've talked to
21 Jerry Carl's chief of staff.  I had a very
22 brief conversation with Barry Moore's county
23 director in the hallway at the very, very,
24 very end of the special session.  And then,
25 of course, John Waugh called me from the

Page 24

1 state party.  That's really all I can
2 remember right now.
3    Q.    What did your conversation with
4 Mr. Waugh, what did you discuss?
5    A.    He said that he was going to
6 retain some attorney -- I can't remember his
7 name -- that he was available for me to talk
8 to should I desire to talk to him.
9    Q.    Okay.  What do you think prompted
10 that?
11    A.    You'd have to ask him.
12    Q.    What about Barry Moore, you
13 mentioned you spoke with the chief of staff;
14 is that right?
15    A.    District director, Bill Harris.
16    Q.    District director.
17    A.    It was like a five second
18 conversation in the hall.  I just said, wish
19 y'all the best of luck.
20    Q.    Did you speak with Mr. Ed LaCour?
21    A.    He was in the several meetings,
22 yes.
23    Q.    Okay.
24    A.    I'm sorry.  I forgot to mention
25 him.  He was definitely in the



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
25–28

Page 25

1  reapportionment office while we were there.
2      Q.    Okay.  Maybe if it's all right, I
3  realize it was a wild time, but if you want to
4  take just maybe a second and think if there
5  other folks again from congressional
6  delegations, officials in Alabama, that come
7  to mind.
8      A.    Well, naturally, I mean, I had a
9  conversation with the speaker of the house
10  and the pro tempore of the senate.  But they
11  were brief.  Just updates on what we were
12  working on.
13      Q.    Okay.  Okay.  Let's jump forward.
14          Did you retain any map drawers or
15  consultants at this stage when you were
16  beginning to draft maps in the 2023 cycle?
17      A.    Randy Hinaman.
18      Q.    Did you decide to retain
19  Mr. Hinaman, or was that someone else?
20      A.    I mean, he was already -- he was
21  already part of the process and has been part
22  of the process since the early '90s as far as
23  I know.
24      Q.    So did you retain him new, or was
25  this an existing agreement?  Walk me through

Page 26

1  what happened in 2023.
2      A.    Mr. Hinaman, if I'm not -- is
3  part of the -- the -- he works with Dorman
4  Walker.  And Dorman was already present when
5  I -- when I came on-board.
6      Q.    Did Dorman recommend him to you
7  for the 2023 session?
8      A.    We've -- we've always worked
9  together.
10      Q.    So did he recommend him or not?
11      A.    He was -- he's always been
12  there.
13      Q.    Okay.  Is there anyone else that
14  served as a map drawer?
15      A.    For other me or for others?
16      Q.    Or for the committee.
17      A.    No.  Well, Eddie LaCour worked
18  as a map drawer at some point in time.
19      Q.    Okay.  And what did he do as a map
20  drawer?
21      A.    Drew maps.
22      Q.    Do you remember how many or which
23  ones?
24      A.    No.
25      Q.    Would you have a guess for how

Page 27

1  many?
2      A.    No.
3      Q.    Was it a substantial number or
4  like one?
5      A.    You know, you asked about a map.
6  There could have been -- as y'all argued in
7  court, there could be a trillion different
8  maps depending on how you do it.  If you
9  point and click on any -- any census block,
10  that's a new map.  You can get into the
11  trillions doing it.  So, you know, one map
12  could have 50 different versions of it or 100
13  different versions or a thousand different
14  versions.  So...
15      Q.    Did he approach you with a
16  particular map on any given occasion?
17      A.    No.
18      Q.    So how did you know that he draw
19  maps?
20      A.    He was in the room with his
21  computer across from me in reapportionment
22  working on maps.
23      Q.    So let's maybe talk about that.
24  We'll come back to that maybe in a bit.  But
25  let's talk about that meeting in particular.

Page 28

1  Did this happen in advance of the first
2  meeting of the reapportionment committee, or
3  when was that meeting?
4      A.    Probably soon after the Supreme
5  Court handed down their ruling.
6      Q.    Do you know who called that
7  meeting together?
8      A.    I would -- if I remember
9  correctly, it would have been Senator
10  Livingston and myself.  Again, the process of
11  trying to comply with the Supreme Court
12  ruling.
13      Q.    And in that respect, did
14  Mr. LaCour primarily serve as a mapper drawer
15  or an attorney?
16      A.    Initially as an attorney.
17      Q.    What about after that?
18      A.    I lost contact with Mr. LaCour
19  at the very beginning of the special session
20  and never saw or communicated with him again.
21  He was upstairs meeting with the senators in
22  a different room working with them to draw
23  what ultimately became the Livingston plans.
24      Q.    Understood.  What about Dr. Hood,
25  was he involved as a consultant at any stage?



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023

29–32

Page 29

1    A.    Dr. Hood, I believe, is the man
2  in Georgia that was giving us the performance
3  analysis on the plans.  I never met him.
4  I've never seen him.  I never talked to him.
5    Q.    Did you see those performance
6  analyses?
7    A.    I saw them on my plan, yes.  I
8  did see the Livingston one, but it was at the
9  very end.
10    Q.    Okay.  So you mentioned that
11  Mr. Hinaman had worked with the committee
12  before; is that correct?
13    A.    Yes.
14    Q.    Okay.
15    A.    And so had Mr. Walker.
16    Q.    So Mr. Hinaman helped produce the
17  2021 congressional map; is that correct?
18    A.    Correct.
19    Q.    Okay.  Can you talk me through the
20  decision to keep on Mr. Hinaman after that map
21  was ultimately found to be likely a violation
22  of the Voting Rights Act.
23    A.    Mr. Hinaman has drawn numerous
24  plans over the years, many of which have been
25  challenged and successfully defended, some of

Page 30

1  which have been challenged and had to be
2  redrawn.  So I consider him to be an
3  extremely intelligent and competent person in
4  drawing maps and very knowledgeable.
5    Q.    And that wasn't a factor?
6    A.    What?
7    Q.    His involvement in the 2021
8  redistricting process.
9    A.    No.  He's a very experienced and
10  knowledgeable person.
11    Q.    So let's go back just to make sure
12  that I have the time line good to go.  You
13  mentioned that you met with Mr. Hinaman before
14  the special session; is that right?
15    A.    Yes.
16    Q.    Okay.  When was that?
17    A.    Probably sometime shortly after
18  the Supreme Court ruling we began meeting and
19  talking.
20    Q.    How often did you have those
21  meetings with Mr. Hinaman would you guess?
22    A.    It depends on the day and the
23  week.
24    Q.    Do you have an estimate?
25    A.    No.  Sorry.

Page 31

1    Q.    Was it every other day or every
2  month?
3    A.    You know, sometimes we'd meet
4  four times a day, and sometimes we might go a
5  couple of days without talking.
6    Q.    Okay.  Can you talk me through
7  what you instructed Mr. Hinaman to do during
8  the map drawing stage at that point?
9    A.    Follow the guideline and comply
10  with what the Supreme Court told us.
11    Q.    Did you take notes during any of
12  those meetings with Mr. Hinaman?
13    A.    I'm not a note taker.
14    Q.    Is that a no?
15    A.    No.  Yeah, that's a no.
16    Q.    So you said you tasked him
17  following guideline and complying with the
18  Supreme Court order; is that correct?
19    A.    Yes, sir.
20    Q.    Is there anything else?
21    A.    Not that I can think of right
22  now.
23    Q.    When you instructed Mr. Hinaman to
24  draw the maps with the -- compliance with the
25  court decision and also the guidelines in

Page 32

1  mind, did you instruct him to draw a map with
2  two majority black districts or something
3  close to it in particular?
4    A.    I just told him to follow the
5  guidelines and comply with what the Supreme
6  Court told us.  And that was to draw two
7  districts which had the ability to elect a
8  black candidate.
9    Q.    So you did instruct Mr. Hinaman to
10  draw a map with two districts where black
11  voters have an opportunity to elect a
12  candidate of their choice; is that fair?
13    A.    I don't think I ever put it that
14  succinctly.  I think I said we need to -- we
15  need to follow the guidelines in the Supreme
16  Court ruling.
17    Q.    Did you explain in any other terms
18  what an opportunity to elect means?
19    A.    No.
20    Q.    What about an opportunity
21  district?
22    A.    No.
23    Q.    Okay.  Did you provide Mr. Hinaman
24  with any materials?
25    A.    A computer.



CHRISTOPHER P. PRINGLE                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.                        33–36

Page 33

1    Q.   Anything else?
2    A.   I mean, he just used the
3  reapportionment computer, the state computer.
4    Q.   What about information, did you
5  provide any data or other types of information
6  for his process and work?
7    A.   I personally did not, no.
8    Q.   Do you know who might have
9  provided information of that type?
10   A.   The computer in the
11  reapportionment office.
12   Q.   Do you know if he received letters
13  from either of the Voting Rights Act
14  plaintiffs or other organizations that were
15  submitted to the redistricting committee?
16   A.   Did I?
17   Q.   Actually, let's come back to that.
18  Let's skip forward.
19        What about information from public
20  hearings, was any of that -- was there any
21  information gathered from public hearings that
22  you or others that you know of gave to
23  Mr. Hinaman to draw his map?
24   A.   He was -- all of that
25  information was made available to him.

Page 34

1    Q.   When did Mr. Hinaman provide you
2  with a first draft of a congressional map
3  related to the 2023 redistricting process?
4    A.   I couldn't tell you the date.
5  There was so many different variations.  The
6  map was -- as I told somebody, I said, right
7  now, that map looks like colored sand on a
8  vibrating plate.  It just changes by the
9  second, so...
10   Q.   What about the community of
11  interest plan?  When I say the word community
12  of interest plan, do you know what I'm
13  referring to?
14   A.   That's the plan that I
15  eventually introduced, yes.
16   Q.   When did Mr. Hinaman, if ever,
17  present to you the community of interest plan
18  the first time?
19   A.   A version, it was called -- I
20  don't even remember what it was called before
21  that.  But you remember we didn't finalize --
22  we couldn't finalize anything until after
23  that July -- what was it, July -- Friday,
24  July the 7th date?  When was the final day to
25  be turned in?  No, it was Friday, July the --

Page 35

1  it was July the 14th was the final day -- the
2  final day that plans could be submitted.
3    Q.   But you saw drafts of that plan
4  before that; is that right?
5    A.   I saw different versions of
6  plans, yes.  Trying to come up with that
7  something that we thought would comply with
8  the Court order.
9    Q.   And what feedback did you give to
10  him to instruct him about how to better comply
11  with the Court order by tweaking the map?
12   A.   I allowed -- I did not get
13  involved in the minutia of tweaking the maps.
14   Q.   So did you provide him any
15  feedback at all when he came to you with the
16  draft?
17   A.   I just said do you think this
18  would comply with the Court order based on
19  you and the legal counsel's opinion?
20   Q.   Would you direct him to ask the
21  attorney only or what -- I'm just trying to
22  get a sense of what the conversations were
23  like.
24   A.   It was -- I don't get involve
25  minutia.  I just tell you upfront.  I mean,

Page 36

1  my job is to pass a plan on the floor of the
2  house.  I hire professionals to draw it.
3    Q.   And you defer to them?
4    A.   Yes.  I mean, that's the reason
5  why you hire lawyers and professionals.
6    Q.   Do you think it's your job to have
7  a view of what an opportunity district might
8  be?
9    A.   Yeah, the one that gives the
10  opportunity for minorities to elect or defeat
11  a candidate of their choosing.
12   Q.   Is that something that sort of you
13  consider your responsibility to communicate
14  what that is to the map drawer or not as much?
15   A.   I mean, Randy is a very
16  intelligent man and does an excellent job.
17  And Dorman is a very, very experienced
18  attorney.  So that's a -- that's a no, I
19  suppose.  You know, I hire professional
20  people, and I let them do their jobs.
21   Q.   Okay.  Did you ever personally
22  recommend any particular changes to any draft
23  that Mr. Hinaman gave to you of the community
24  of interest plan?
25   A.   No.



Page 37

1    Q.    Did any of the drafts that
2    Mr. Hinaman presented to you contain two
3    majority black districts?
4        A.    I can't remember specifically
5    what -- what the numbers were as they went
6    through the process, no.
7        Q.    If he had, what would your
8    response have been?
9        A.    Did we comply with what the
10   Court wanted? Did we comply with our
11   guidelines? And if it is, in fact, a racial
12   gerrymander.
13       Q.    So there's a third factor, not
14   just the first two?
15       A.    To figure out, you know, are we
16   breaking communities up along racial lines?
17   Are we breaking counties along racial lines?
18       Q.    So if the draft plan contained two
19   majority minority districts, the inquiry would
20   become does this constitute racial
21   gerrymandering? But if does not contain two
22   majority minority districts, then you would
23   not ask the question about racial
24   gerrymandering; is that fair?
25       A.    I would ask racial

Page 38

1    gerrymandering any way.
2        Q.    What about if Mr. Hinaman had
3    presented you with a map containing one
4    majority black district and one district with
5    a 45 percent black voting age population,
6    would your response have been similar or
7    different?
8        A.    I hate to speculate on that.
9        Q.    In your view, would that comply
10   with what the Court required in this case?
11       A.    I hate to speculate.
12       Q.    Would you have voted for it?
13       A.    I would hate to speculate on
14   what I would do.
15       Q.    Let's jump forward and talk about
16   Mr. Hood briefly. You said Dr. Trey Hood was
17   involved in the 2023 redistricting process; is
18   that right?
19       A.    I heard his name as a person who
20   was doing the analysis on the plans,
21   performance analysis.
22       Q.    But you didn't --
23       A.    That's all.
24       Q.    -- instruct him to do any of that
25   analysis; is that right?

Page 39

1        A.    Correct.
2        Q.    Do you know anyone who did
3    instruct him to perform that analysis?
4        A.    I would just assume it would
5    be Dorman, but I don't know.
6        Q.    Did you ask Dorman to contact
7    Mr. Hood for that purpose?
8        A.    No.
9        Q.    Did you ever meet with Dr. Hood
10   between the --
11       A.    No.
12       Q.    So you did not meet with
13   Mr. Hood --
14       A.    I told you. I've never seen
15   him -- I've never --
16       COURT REPORTER: I'm so sorry. I
17   didn't hear the whole question. Can you
18   repeat that question, Mr. Lockhead, please?
19       MR. LOCKHEAD: Sure. I know we're
20   getting used to the court reporter. But I
21   appreciate you.
22       Q.    (By Mr. Lockhead) So, just to
23   clarify, Representative Pringle, did you ever
24   meet with Dr. Trey Hood between June 8th when
25   the Milligan decision was released and the end

Page 40

1    of the special session?
2        A.    I've never seen him or spoken to
3    him.
4        Q.    Okay. Did you ever review any
5    analysis, I'll call it performance analysis,
6    produced by Dr. Hood regarding your community
7    of interest plan?
8        A.    Yes.
9        Q.    And when did you receive that
10   analysis?
11       A.    I believe it was after the
12   reapportionment committee meeting on Monday,
13   was it July 17th? Yeah.
14       Q.    Did you know it was coming?
15       A.    I was waiting for it, yes.
16       Q.    How did you know it was coming?
17       A.    Because I knew, since we passed
18   that plan out of committee, we were going to
19   request it.
20       Q.    Who requested it?
21       A.    I would assume it was Dorman.
22       Q.    But there was an understanding
23   that he would request it?
24       A.    I never spoke to the man. So I
25   assume Dorman had requested it, and it came



Page 41

1  in.
2     Q.    Do you know why it was requested?
3     A.    So we could discuss whether the
4  plan performed or not.
5     Q.    Okay.  When you received his
6  analysis, what was your reaction to it?
7     A.    I thought it proved that the
8  community of interest plan would comply with
9  what the Supreme Court ordered and would
10  provide an opportunity for minority citizens
11  to elect a candidate of their choosing.
12     Q.    One moment.  Sorry.
13     A.    That's fine.
14     Q.    Okay.  If we can -- actually, I'm
15  going to skip by that.
16        So the performance analysis that
17  you received from -- from Dr. Hood, do you
18  recall what it said?
19     A.    That democratic candidates would
20  have the opportunity to win in elections.
21  Not guaranteed, but they have an opportunity.
22     Q.    Was it significant that black
23  preferred candidates won two out or four
24  elections in the second congressional district
25  under Dr. Hood's performance analysis?

Page 42

1     A.    To me, it was, yes.
2     Q.    What if black preferred candidates
3  had won one out of four?
4     A.    Mine had two out of four, so it
5  gave it a 50/50 shot.
6     Q.    If it had been less, would that
7  fail to be an opportunity district?
8     A.    It wasn't my plan.
9     Q.    What if it had been?  I accept
10  it's a hypothetical.  But if it had been just
11  one of four --
12     A.    Listen.  I've drawn majority
13  minority districts that turned around an
14  elect white men to them.  So I don't know how
15  you can -- they were democrats, but they were
16  majority minority districts that elected
17  white men to them.  And we've got an
18  African -- we have a black republican member
19  of the legislature elected in a majority
20  white district just like we've had blacks
21  elected out of majority white districts.
22  So...
23     Q.    I suppose I may just have it
24  unclear.  If the performance analysis revealed
25  that candidates of any race preferred by black

Page 43

1  voters won only one out of four elections that
2  were analyzed, would that suggest that the
3  opportunity district provided a fair
4  opportunity for black voters to elect a
5  candidate of their choice or not?
6     A.    Mine -- I provided them two.
7  Not one, two.  Two out of four.
8     Q.    What if it had resulted in zero
9  out of four?
10     A.    You know, it didn't.
11     Q.    Let's go ahead and jump to the
12  public hearing on June 29th.
13        Representative Pringle, do you
14  recall a public hearing regarding the remedial
15  congressional districting proposals held on
16  June 29th?
17     A.    Yes.
18     Q.    Who organized that hearing?
19     A.    That would be me and Senator
20  Livingston.
21     Q.    And what was the purpose of that
22  hearing?
23     A.    What that the first one?  The
24  29th.
25     Q.    That's the one on June 29th.

Page 44

1     A.    That was the first one; correct?
2     Q.    That's right.
3     A.    Yeah.  That was -- that was to
4  begin the process of taking input from the
5  public on what they would like to see in the
6  plans and announce how people could submit
7  plans to the reapportionment committee.  And
8  also, once again, put the guidelines out
9  before the committee so we could vote on them
10  again.  We had to adopt them because the last
11  set of guidelines, just like the committee
12  chairmanships had to be redone because that
13  quadrant they're adopted under ended.
14     Q.    Did you attend that hearing?
15     A.    I believe I chaired it.
16     Q.    Do you recall individuals at that
17  hearing offering testimony or comment?
18     A.    Oh, yes.
19     Q.    Do you recall any individuals
20  testifying about the need for a second
21  district in which minority voters could elect
22  a candidate of their choice?
23     A.    I believe the attorneys for the
24  plaintiffs did an excellent job of preparing
25  their people to come to the microphone and





Page 45

1  read very well written prepared texts, yes.
2      Q.    Is it your position that folks who
3  requested there be two districts where black
4  preferred candidates could prevail is the
5  product of plaintiff's attorneys and not
6  community input?
7      A.    The ones I saw were clearly
8  reading talking points that I remember.
9  There might have been one two that came in
10  just in passing speeches, but the majority of
11  them were reading prepared scripts, yes,
12  which is fine.  You know, that's the process.
13  They came in.  They were the plaintiffs.
14  They had well-written positions, and they
15  delivered them to the committee.  And we
16  listened.
17      Q.    Did that reduce the weight that
18  you accorded that testimony?
19      A.    The what?
20      Q.    Did that reduce in any way the
21  weight that you accorded to that testimony?
22      A.    No.
23      Q.    Do you remember -- actually
24  scratch that.  I'll rephrase.
25          Were there any witnesses who you

Page 46

1  had a relationship with before the public
2  hearing that you knew who came to testify or
3  offer public comment?
4      A.    I knew Dr. Joe Reed and the
5  gentleman from Blakeley State Park, the
6  historian.  I never met him personally, but
7  he came on my request to talk about Mobile
8  and Baldwin being a community of interest and
9  being together for generations.
10      Q.    And why did you request his
11  testimony?
12      A.    Because he's a well-known
13  historian that's written extensively about
14  the history of the Gulf Coast and Mobile and
15  Baldwin County.
16      Q.    Did you request the testimony of
17  anyone who spoke the need for two districts in
18  which minority voters could elect a candidate
19  of their choice?
20      A.    No.
21      Q.    Let's turn to the guidelines.  You
22  mentioned those earlier.  I think that's
23  right; is that right?
24      A.    Yes.
25      Q.    Okay.  And in particular, I want

Page 47

1  to talk about the reapportionment committee
2  meeting that was held on July 27th.  Do you
3  recall that meeting?
4      A.    Yes.
5      Q.    Okay.  Did you do anything to
6  prepare for it?
7      A.    Put together an agenda.
8      Q.    Did you talk to anybody about it
9  ahead of time, I assume?
10      A.    Not particularly.  We just made
11  a list of what we needed to talking about.
12      Q.    Okay.  What happened at that
13  meeting, as you remember it?
14      A.    If I remember correctly, we
15  adopted the guidelines and then presented
16  plans.
17      Q.    Let's turn to the guidelines
18  themselves.
19          MR. LOCKHEAD:  And I'm going to
20  ask you to display what's been marked as
21  Exhibit C at page 104.
22          MR. ROSBOROUGH:  Give my one
23  second.  I'm trying to locate that.
24      Q.    (By Mr. Lockhead) Representative
25  Pringle, do you see a document displayed on

Page 48

1  your screen with the title reapportionment
2  committee redistricting guidelines?
3      A.    Yes.
4          (Whereupon, Exhibit C was marked
5          for identification.)
6      Q.    (By Mr. Lockhead) And the date
7  below it, is that May 5th, 2021?
8      A.    Yes.
9      Q.    Do you recognize this document?
10      A.    Those are basically the same
11  guidelines the democrats adopted in the 1990s
12  because I served on this committee in 1998
13  and remember basically the same exact
14  committee guidelines from when the democrats
15  were the super majority and originally
16  drafted them, yes.
17      Q.    Are these also the guidelines from
18  2023 just reenacted from 2021?
19      A.    They're basically the same ones
20  from the 1990s and enacted by the democrats,
21  yes.  They've not been changed.  They've been
22  tweaked a little bit, but not much at all.
23  Substantially exactly the same.
24      Q.    Why do you think that they've
25  stayed almost exactly the same since the '90s?



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023

49–52

Page 49

1    A.    Well, I mean, I hate to say
2 this, but obviously the democrats did a good
3 job when they drew them in the '90s.
4    Q.    Why do you hate to say that?
5    A.    Because I'm a republican. You
6 know, I just -- you know, they cover all the
7 bases.
8    Q.    Did you see any need to revisit
9 them or amend them for purposes of the 2023
10 redistricting cycle?
11    A.    We always look to see if the
12 Court has changed anything or if they need --
13 if the law has been changed and we need to
14 tweak them.
15    Q.    Was that the case between 2021 and
16 2023 when you readopted them?
17    A.    I don't think -- the guidelines
18 are fine.
19    Q.    Do you expect when folks draw maps
20 or present them to the legislature that those
21 maps comply with these guidelines?
22    A.    I don't know. I can't answer
23 what other people do.
24    Q.    But it's important if they do
25 generally; is that fair?

Page 50

1    A.    They should, yes. They also
2 should comply with the 14th amendment and the
3 Voting Rights Act too.
4        MR. LOCKHEAD:  If we can, let's go
5 ahead and take down Exhibit C and then bring
6 up what's been marked as Exhibit D.  Actually,
7 let's pause.  Let's not bring that up quite
8 yet.
9    Q.    Representative Pringle, how
10 commonly would you say folks offer amendments
11 to the redistricting guidelines?
12    A.    How commonly?  I'm sure when you
13 go through the reapportionment process,
14 somebody's always going to offer an amendment
15 of some sort.  I remember back in '98 I
16 offered an amendment that said we could not
17 do -- we could not reduce the number of
18 minority districts in the legislature in
19 redistricting.  We had to maintain all the
20 minority seats and Senator Smitherman tabled
21 my motion.
22    Q.    I'm sorry.  Could you explain a
23 little bit more?  So just walk me through that
24 process.
25    A.    Back in probably it was 2000

Page 51

1 when we were doing it, I know I offered an
2 amendment to the guidelines that clearly
3 stated we could not reduce the number of
4 majority minority districts in the State of
5 Alabama.  And Senator Smitherman tabled my
6 motion.  So you've always got some -- some
7 amendment being offered to them at some point
8 in time.
9    Q.    Why did you offer that amendment?
10    A.    Because I thought it was
11 important we retained the number of majority
12 minority districts in the State of Alabama we
13 had.
14    Q.    Is that something you still think
15 is important today?
16    A.    Yes.  I mean, I've drawn
17 majority minority districts that have elected
18 white men to them.  So we try.  But we can't
19 guarantee outcomes.  No matter what we draw,
20 the voters will ultimately decide who they
21 want to elect.
22    Q.    Why is it important to you that
23 districts be drawn majority minority?
24    A.    Because we had majority minority
25 districts for the legislature, and we're

Page 52

1 trying to maintain the number of minority
2 districts we have.
3        MR. LOCKHEAD:  Let's go ahead and
4 pull up Exhibit D if we can.
5        (Whereupon Exhibit D was marked
6        for identification.)
7    Q.    (By Mr. Lockhead) Representative
8 Pringle, do you see the document on your
9 screen here that's titled, proposed amendment
10 to reapportionment committee guidelines?
11    A.    Yes.
12    Q.    Do you recognize this?
13    A.    That was offered by
14 Representative England.
15    Q.    Okay.  Do you recall considering
16 this appointment during the process for
17 considering the guidelines in 2023?
18    A.    Yes.
19    Q.    Do you recall the vote on this
20 amendment?
21    A.    No.
22    Q.    Did you vote for it or against it?
23    A.    I voted against it.
24    Q.    And why is that?
25    A.    Because, if you read our



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
53–56

Page 53

1  guidelines, it automatically says we must
2  comply with the 14th amendment of the
3  Constitution and the 1965 Voting Rights Act.
4  And I saw no need for this.  The guidelines
5  already say that we have to comply with the
6  14th amendment and the Voting Rights Act.
7      Q.    Would you say that this is a fair
8  understanding of what the 14th amendment and
9  Voting Rights Act requires of you?
10     A.    Repeat your question.
11     Q.    Sure.  Would you say that this
12  amendment accurately reflects what the Voting
13  Rights Act and 14th amendment requires of you,
14  so it was simply redundant?
15     A.    Yes.
16         MR. LOCKHEAD:  All right.  We can
17  go ahead and take that down.
18     Q.    Now, I want to talk a little bit
19  about communities of interest, if we can.
20  First, what is the Wiregrass?
21     A.    That would be the southeast
22  corner of the State of Alabama.  Down in --
23  anchored over in Dothan.
24     Q.    What counties are in it?
25     A.    Oh, Lord.  Henry, Houston,

Page 54

1  Geneva, Pike.  I can't remember them all now.
2  I'm sorry.
3      Q.    What about the Gulfport (sic)
4  region, what's that?
5      A.    Gulfport is in Mississippi.
6      Q.    Would you say that it's -- go
7  ahead.
8      A.    You said the Gulfport region.
9  Gulfport is in Mississippi.  You mean the
10  Gulf Coast region?
11     Q.    That's right.
12     A.    Just a technicality.
13     Q.    I'm not from Alabama, you can
14  tell.
15     A.    It's a community of interest.  I
16  mean, we've been linked together for
17  generations.  I mean, you have to remember,
18  we're boarded on the west by Mississippi.
19  We're boarded on the east by Florida.  And to
20  the south is the Gulf of Mexico.  We're
21  squeezed in just one little geographic area
22  the State of Alabama.  Because of that, we're
23  inextricably linked together through history
24  and through culture.  I mean, who else has a
25  Mardi Gras parade in the state of Alabama

Page 55

1  outside of Mobile and Baldwin County?  And we
2  have a major bridge that's going to be built
3  because so many of the people in Mobile and
4  Baldwin County, they live in one county and
5  work in the other.  The Mobile Ballet is
6  housed in Daphne, Alabama, which is in
7  Baldwin County.  We are inextricably linked
8  together as a community of interest.  40
9  percent of the employees at Austal USA live
10  in Baldwin County.  I think Airbus is about
11  the same.  The major employers here live
12  in -- you know, people cross the bay
13  constantly for work, for school.  The
14  University of South Alabama has a campus in
15  Baldwin County.  It's main campus is in
16  Mobile, but it has a branch in Baldwin
17  County.
18     Q.    You mentioned two statistics in
19  particular; one about Airbus and another about
20  a different company.  What was that second
21  company?
22     A.    Airbus and Austal, the ship
23  builders.
24     Q.    Do you recall when you received
25  information about the proportion of employees

Page 56

1  that work across that particular region?  How
2  did you learn that?
3      A.    I read in the Lagniappe
4  Newspaper when the county was debating on
5  giving a $10 million tax break to Airbus or
6  Austal, one of the two.  And the comment was
7  that some of the county commissioners and
8  city council members were concerned because
9  such a large percentage of the people who
10  work there lived in Baldwin County.  I'll
11  tell you, the most interesting -- if you read
12  the paper down here, the chairman of the
13  Baldwin County Democratic Conference is
14  quoted as saying Mobile and Baldwin County
15  are communities of interest and should not be
16  divided in a congressional district.  And
17  that's the chairman of the Baldwin County
18  ADC.
19     Q.    And what about the Black Belt,
20  what counties are in that?
21     A.    They're about 18 counties.
22  Wilcox, Monroe, Lowndes, Macon County,
23  Crenshaw, Butler.  I can't name them all.
24  I'm sorry.  I'm not good at Alabama
25  geography.  I should be better.



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
57—60

Page 57

1    Q.    Would you say the Black Belt is a
2  historic community of interest?
3    A.    I would say, yeah.  I mean,
4  they -- they have a lot in common, yes, they
5  do.  You know, I work for Southern
6  Timberland.  So I've traveled all through
7  Wilcox -- I work in Wilcox County all the
8  time.  And, in fact, I've got a project in
9  Wilcox right now that I'm working on.  So I'm
10  up there a lot.
11    Q.    Let's -- if we can, Representative
12  Pringle, move to the second public hearing
13  held on July 13th.  Do you recall a hearing on
14  that day?
15    A.    I recall hearings.  I don't
16  remember the dates.
17         MR. LOCKHEAD:  If we can, let's
18  pull up what's been marked as Exhibit F.
19         THE WITNESS:  What date is this?
20    Q.    (By Mr. Lockhead) July 13th.
21         (Whereupon, Exhibit F was marked
22         for identification.)
23    Q.    Representative Pringle, do you see
24  a document on your screen?
25    A.    Yes.

Page 58

1    Q.    That appears to been an agenda.
2    A.    Yes.
3    Q.    Do you recognize this?
4    A.    Yes.
5    Q.    What is it?
6    A.    It's the agenda for the July
7  13th reapportionment committee meeting.
8    Q.    Okay.  And do you see agenda item
9  5-B?
10    A.    "Plans being discussed today
11  are," yes.
12    Q.    And those four plans, could you
13  briefly read those out?
14    A.    *ERA plans remedial map, CLC
15  map, singleton congressional plan 3, and
16  hatcher remedial congress plan 1.
17    Q.    Were those the only four maps that
18  were discussed at this hearing?
19    A.    Yes, sir.  That was the very
20  beginning of the process, yes.
21         MR. LOCKHEAD:  Okay.  We can go
22  ahead and take down that exhibit.
23    Q.    Did you submit any plans for
24  purposes of this hearing?
25    A.    No.

Page 59

1    Q.    And why not?
2    A.    Well, I was taking public input
3  on what they wanted, and I don't know how I
4  could produce a plan until I finished hearing
5  from the public.
6    Q.    Why do you think that the plans
7  were considered at this hearing, the other
8  four?  Had they not been sufficiently publicly
9  vetted?
10    A.    Well, those are the plaintiffs'
11  plans.  They didn't have to have public
12  hearings when they drew theirs.  Theirs were
13  all drawn off campus.  I have no clue who
14  drew them.  I don't know what consultant was
15  hired or what lawyer was hired to draw those
16  plans, and they didn't have to take public
17  input.  They could do whatever they wanted.
18    Q.    And this was the second hearing;
19  correct?  So there was a hearing before this,
20  so there was an opportunity for public input
21  on plans that you may have participated in
22  drafting?
23    A.    Well, the first part was just to
24  get the process started.  And this one, we
25  had some plans that had been submitted, so we

Page 60

1  knew we were going to have a lot.  So we
2  started going through them.
3    Q.    Did you suggest to anyone that
4  they not put forward a plan at this hearing?
5    A.    No.
6    Q.    Did you discuss the decision about
7  whether to put forward your community of
8  interest plan at this hearing?  Did you
9  discuss that decision with anyone?
10    A.    I did not have a plan ready at
11  the time.
12    Q.    Do you recall any witnesses who
13  spoke at the public portion of that hearing?
14    A.    Not off the top of my head, no.
15    Q.    I'll represent to you that I
16  believe Mike Schmitz, major of Dothan, Jeff
17  Brannon, local businessman spoke.  Do you --
18  do those names sound familiar?
19    A.    Now that you bring them up, yes.
20    Q.    Did you have relationships with
21  either of those folks beforehand?
22    A.    No.
23    Q.    Did you speak to anybody about
24  testifying at that hearing?
25    A.    Like I said, gentleman from



Page 61

1  Blakeley State Park, or Blakeley Park, I
2  asked to come because of his expertise and
3  history of Mobile and Baldwin County. But I
4  talked to him on the phone. And I laid eyes
5  on him about five minutes before that meeting
6  started for the first time in my life, and
7  I've not seen or spoken to him since.
8      Q.    Okay. Do you recall a plan
9  titled, the extended Black Belt plan that was
10  considered during the course of this hearing?
11      A.    No.
12          MR. LOCKHEAD: Okay. If we can,
13  let's go ahead and pull up the exhibit marked
14  extended Black Belt.
15          (Whereupon, Exhibit X was marked
16              for identification.)
17      Q.    (By Mr. ^ Attyname) Representative
18  Pringle, do you see that on your screen, a
19  document titled -- if we can go zoom in a
20  little bit.
21          THE WITNESS: I can see it.
22      Q.    -- title expanded Black Belt plan.
23  Do you recognize this?
24      A.    I believe I've seen it before,
25  but that's all.

Page 62

1      Q.    Where do you believe you saw it
2  before?
3      A.    I believe I saw it in one of the
4  committee meetings.
5      Q.    Do you know who drew it?
6      A.    No.
7          MR. LOCKHEAD: Okay. You can go
8  ahead and take that down. Likewise, let's
9  pull up the plan called Russell split plan.
10          (Whereupon, Exhibit Y was marked
11              for identification.)
12      Q.    (By Mr. Lockhead) Representative
13  Pringle, do you see this document here map
14  titled Russell split plan?
15      A.    Yes.
16      Q.    Do you recognize this?
17      A.    I have seen it before, yes.
18      Q.    And what is it?
19      A.    It's a plan, I believe -- it's a
20  variation of a plan drawn by Randy Hinaman.
21      Q.    How do you know this plan was
22  drawn by Randy Hinaman?
23      A.    I just remember him talking
24  about it. Plus I watched him on his
25  interview.

Page 63

1      Q.    Which interview was that?
2      A.    This one. His deposition.
3      Q.    Great. And for the record, you
4  attended the entire duration of Mr. Hinaman's
5  deposition earlier today; is that correct?
6      A.    Not the entirety of it, no.
7      Q.    How much of it would you say?
8      A.    I'd say 90 percent maybe.
9      Q.    Okay.
10      A.    I was --
11      Q.    Did you speak to Mr. Hinaman about
12  this plan?
13      A.    Not that I remember specifically
14  about it, no.
15      Q.    Do you recall mentioning that this
16  was submitted by a member of the public?
17      A.    No.
18          MR. LOCKHEAD: Okay. We can take
19  that down.
20      Q.    All right. So, more generally,
21  can you talk about how you accounted for
22  public input at this meeting in the course of
23  coming to ground on a 2023 congressional map?
24      A.    I'm not sure what you're asking
25  me. I'm sorry.

Page 64

1      Q.    Did public input from this meeting
2  affect in any way your decisionmaking for
3  creating a new map in 2023?
4      A.    I mean, yeah, I found it quite
5  fascinating the plaintiffs turning on each
6  other and fighting and to watch the
7  democratic members of the committee fight
8  amongst themselves over which plan they
9  wanted based on their own personal political
10  agendas.
11      Q.    Did that affect the way that you
12  drew your map?
13      A.    I wouldn't say that, no.
14      Q.    So is it fair to say that nothing
15  from this public hearing contributed to the
16  way that you either drew your map or advanced
17  maps in the course of your work as cochair
18  with the redistricting committee?
19      A.    Well, the public hearings made
20  perfectly clear that people wanted a district
21  they thought that blacks could elect a
22  candidate of their choosing. That's the
23  reason I drew the map -- Randy and I drew the
24  map we came up with.
25          MR. LOCKHEAD: Okay. If we can,



CHRISTOPHER P. PRINGLE                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.                      65–68

Page 65

1  can we take maybe a five-minute break?  Are
2  folks all right with that?  We've been going
3  for a minute.  Let's go off the record.
4          MR. WALKER:  Hey, Tanner, when do
5  you want to come back?
6          MR. LOCKHEAD:  Let's come back at
7  5:15?  Does that sound okay to everybody?
8          MR. WALKER:  Okay.
9          MR. LOCKHEAD:  Is that okay with
10  you, Representative Pringle?
11          THE WITNESS:  That's fine.
12          MR. LOCKHEAD:  All right.  Sounds
13  good.  Or sorry, 4:15.
14          THE VIDEOGRAPHER:  The time is
15  4:10 p.m.  We're going off the record.
16          (A short break was taken.)
17          THE VIDEOGRAPHER:  The time is
18  4:18 p.m.  We're back on the record.
19      Q.    (By Mr. Lockhead) Representative
20  Pringle, I want to turn to the committee
21  meeting that was held on July 17th.  The
22  reapportionment committee held a committee
23  meeting on July 17; is that correct?
24      A.    Yes.
25      Q.    Okay.  Do you know what the

Page 66

1  purpose of that meeting was?
2      A.    It was to pass a plan out of the
3  committee so we could introduce it that day
4  into the special session that we were about
5  to go into.
6      Q.    Did you take any notes at that
7  meeting?
8      A.    I'm not a note taker.  I mean,
9  anything I wrote down was on the agenda that
10  I turned over.
11      Q.    Okay.
12      A.    But it was very limited.
13          MR. LOCKHEAD:  All right.  Let's
14  go ahead and pull up what's been marked as
15  Exhibit C at page 35.
16          And actually, I'd like to make a
17  quick note that the prior two exhibits, one
18  previously called extended Black Belt, let's
19  mark that as Exhibit X.  The other is the
20  Russell split plan, let's call that Exhibit Y.
21  And now let's turn to what's been marked as
22  Exhibit C at 35.
23      Q.    Okay.  Representative Pringle, did
24  you introduce a proposal of a Congressional
25  redistricting plan at the committee meeting on

Page 67

1  July 17th?
2      A.    It was referred to as the
3  community of interest plan, yes.
4      Q.    Okay.  And who drew that plan?
5      A.    Randy Hinaman.
6      Q.    All right.  If you could turn to
7  your screen, do you see a document --
8          MR. WALKER:  Tanner? Hello?
9          MR. LOCKHEAD:  Hello?  My
10  apologies.  Let's go off the record.
11          THE VIDEOGRAPHER:  The time is
12  4:21 p.m.  We're going off the record.
13          (A short discussion was held.)
14          THE VIDEOGRAPHER:  The time is
15  4:28 p.m.  We're back on the record.
16      Q.    (By Mr. Lockhead) Okay.
17          Representative Pringle, on your
18  screen, do you see a map that's titled Pringle
19  congressional plan?
20      A.    Yes.
21      Q.    Do you recognize this map?
22      A.    Yes.
23      Q.    And what is it?
24      A.    It's the plan that I introduced
25  in the Alabama House.  It was commonly

Page 68

1  referred to in committee meetings as the
2  community of interest plan.
3      Q.    For this community of interest
4  plan, do you recall what the black voting age
5  population in is congressional district 2?
6      A.    No.
7          MR. LOCKHEAD:  Okay.  Let's scroll
8  I believe one up from the map itself.  Let's
9  go to page 58.
10      Q.    Representative Pringle, do you see
11  in front of you a piece of paper that says
12  population summary with the plan name
13  community of interest?
14      A.    Yes.
15      Q.    Do you recognize this document?
16      A.    Yes.
17      Q.    And what is it?
18      A.    It was what I had before me
19  because I remember writing Bill Cooper's name
20  on it.  I can't remember who he is, but I
21  wrote his name.  I think that was the name --
22  anyway, yes, that's mine.
23      Q.    So does this describe the
24  population summary of the community of
25  interest plan that you introduced?



Page 69

1    A.    Yes.
2    Q.    Do you see for district 2 the
3    black voting age population of approximately
4    42 percent?
5    A.    42.45, yes.
6    Q.    And that's for congressional
7    district 2; correct?
8    A.    Correct.
9    Q.    Do you recall if there was any
10   racial polarization analysis that was
11   completed on this community of interest plan?
12   A.    I don't recall a racial
13   polarization analysis.  But I do recall a
14   performance analysis on voting.
15   Q.    Okay.  That performance analysis
16   was completed by Dr. Hood; is that correct?
17   A.    I believe so, yes.
18       MR. LOCKHEAD:  Okay.  Let's pull
19   up that performance analysis which is still at
20   Exhibit C at page 62.
21   Q.    Representative Pringle, do you see
22   a document in front of you with the header
23   community of interest plan?
24   A.    Yes.
25   Q.    Do you recognize this document?

Page 70

1    A.    Yes.
2    Q.    And what is it?
3    A.    It's the performance analysis
4    that was given on my -- on my plan.
5    Q.    Okay.  So this contain analysis
6    for four elections; 2020 presidential, 2020
7    senate, 2018 governor, and 2018 attorney
8    general; is that correct?
9    A.    Correct.
10   Q.    Okay.  Why were those the
11   elections that were chosen in particular for
12   the performance analysis?
13   A.    I really couldn't tell you.  I
14   didn't do it.
15   Q.    And what did the analysis reveal
16   about the plan, in your own words?
17   A.    In my own words, if the
18   democrats feel that a viable candidate is
19   funded, they win this election -- they can
20   win that district.
21   Q.    Okay.  So in CD-2, of the four
22   elections that were analyzed in this
23   performance analysis, in how many of those
24   four did the black preferred candidate win?
25   A.    Two.

Page 71

1    Q.    And you believe this plan provides
2    fair opportunity for black voters to elect a
3    candidate of their choice in a second
4    congressional district?
5    A.    Yes.
6    Q.    Okay.  Is a district where black
7    voters preferred candidate has a one in four
8    chance of being elected an opportunity
9    district?
10   A.    Not -- not my plan.
11   Q.    I understand it's not your plan.
12   But is it your view that a district where
13   black voters preferred candidate has a one in
14   four chance of being elected an opportunity
15   district?
16   A.    I believe my community of
17   interest is the one that does that.
18   Q.    You believe your community of
19   interest plan has a one in four chance of
20   election or is an opportunity --
21   A.    No.  I believe my -- mine is the
22   one that provides the minorities -- blacks
23   the opportunity to elect a candidate of their
24   choosing.  That's the reason why I supported
25   it.

Page 72

1    Q.    Okay.  Do you recall the
2    opportunity plan as another plan that was
3    introduced in committee on the 17th?
4    A.    Yes.
5    Q.    Did you know about that plan
6    before the 17th?
7    A.    Yes.
8    Q.    When did you learn about it?
9    A.    When Senator Dan Roberts brought
10   a thumb drive into the committee room
11   claiming that all of our numbers were wrong,
12   that his consultant, Chris Brown, had drawn a
13   plan that had the right numbers, and we
14   needed to use his plan because everything we
15   had done was wrong.
16   Q.    And what was the basis for that
17   view?
18   A.    He had the wrong denominator in
19   his plan.  So when he changed it to the
20   correct denominator, his plan linked exactly
21   with ours.
22   Q.    And when you say "his plan," are
23   you referring to the opportunity plan?
24   A.    That was drawn by Chris Brown
25   and brought by Dan Roberts, yes.



Page 73

1    Q.    Did you -- at what point was it
2    discovered that they, in fact, had the
3    incorrect data?
4    A.    About two minutes after Randy
5    Hinaman started looking at it.  He -- he
6    discovered the problem very quickly.
7    Q.    Could you say just a word about
8    what that problem was?  What do you mean by
9    denominator?
10    A.    He was using, I think, the total
11    population denominator and not the black
12    voting age population denominator.
13    Apparently -- I'm just going to tell you.
14    Randy said this.  Apparently Maptitude
15    automatically defaults back to total
16    population and not BVAP population, so...
17    Q.    So it's your understanding then
18    that the plan, the opportunity plan, was just
19    created using incorrect information, and then
20    once it was presented to Mr. Hinaman, he
21    recognized that and expressed that to the
22    sponsors and to you?
23    A.    Yes.  And they changed the
24    denominator, and that's the numbers that
25    everybody saw.  But Dan Roberts -- Senator

Page 74

1    Roberts came in saying all of our plans were
2    wrong, that all of our numbers were --
3    MR. WALKER:  Chris --
4    THE WITNESS:  I'm sorry.  I
5    should --
6    MR. LOCKHEAD:  Let's go ahead and
7    pull up what's been marked as Exhibit C.
8    Q.    And Representative Pringle, I'm
9    sorry, just to confirm, is anyone speaking to
10    you in the room?
11    A.    No.  I'm alone.
12    Q.    What about on the phone?
13    A.    No.
14    Q.    Okay.
15    A.    You see me looking at the phone,
16    it's my employees blowing me up at work
17    because I haven't been there all day.
18    Q.    I know the feeling.
19    A.    No, you're getting paid.
20    MR. LOCKHEAD:  Okay.  Let's go to
21    Exhibit C at page 59.
22    Q.    Okay.  Now, Representative
23    Pringle, do you see this document in front of
24    you with, plan name, label opportunity?  Do
25    you see that?

Page 75

1    A.    Yes.
2    Q.    Do you recognize this document?
3    A.    I'm sure I've seen it.
4    Q.    And what is it?
5    A.    It's -- it's something you put
6    up labeled opportunity.
7    Q.    Okay.  I'll represent to you that
8    this is the population summary for the
9    Livingston opportunity plan.  If you look in
10    district 2 at the BVAP population, do you see
11    that number on the right side?
12    A.    38.31 percent.
13    Q.    Okay.
14    And is this the population
15    summary, this data that reflects the map as it
16    was initially drawn by Senator Roberts?
17    A.    I could not answer that.
18    Q.    Okay.  Was this pre or post error
19    correction?
20    A.    I could not answer that.
21    Q.    Okay.  Who is Chris Brown?
22    A.    He's a reapportionment political
23    consultant in Birmingham.
24    Q.    Okay.  Do you know who retained
25    him?

Page 76

1    A.    No.
2    Q.    Do you know what he was instructed
3    to do?
4    A.    No.
5    Q.    Who was he working with?
6    A.    Don't know.
7    Q.    Was he working with Senator
8    Roberts, if they put this plan together?
9    A.    I couldn't answer that.
10    Q.    Okay.
11    Are you aware of any racial
12    polarization analysis done on this map prior
13    to the redistricting committee hearing or
14    meeting or at any point?
15    A.    No.
16    Q.    Was there any analysis you're
17    aware of how this map would have performed in
18    prior elections?
19    And by that, I mean, the ability
20    of black voters to elect a candidate of their
21    choice in two congressional districts?
22    A.    No.
23    MR. LOCKHEAD:  Okay.  Let's go
24    ahead and pull up what's been marked as
25    Exhibit G.



Page 77

1          (Whereupon, Exhibit G was marked
2      for identification.)
3      Q.    (By Mr. Lockhead) Representative
4  Pringle, do you see a document here titled
5  defendant, Steve Livingston's responses to
6  plaintiff's third set of interrogatories?
7      A.    Yes.
8      Q.    Do you recognize this?
9      A.    Never seen it before.
10     Q.    Okay.  I'll represent to this that
11  was interrogatories submitted by Steve
12  Livingston in this case.
13          MR. LOCKHEAD:  If we could scroll
14  down to interrogatory No. 7.  Okay.  And if we
15  could zoom in a little bit.
16          THE WITNESS:  Can you scroll a
17  little bit?  Down.  I mean up.  I'm sorry.
18  The other way.
19     Q.    Okay.  Interrogatory No. 7, do you
20  see the paragraph that starts with, identify
21  all memoranda?
22     A.    Yes.
23     Q.    Okay.  So just to quickly read
24  that paragraph, this interrogatory asks to
25  identify all memoranda, reports, analyses,

Page 78

1  evaluation, or other documents relied upon in
2  evaluating the legislative remedial plans and
3  the VRA Plaintiff's remedial plan considered
4  by the joint legislative reapportionment
5  committee including, but not limited to, the
6  extent to which the plans provide black voters
7  the opportunity to elect their preferred
8  candidates and any performance functionality
9  or racially polarized voting analysis.  Do you
10  see that?
11     A.    Yes.
12     Q.    Did I read that correctly?
13     A.    Yes.
14     Q.    Let's scroll down.  Do you see
15  here for -- the opportunity plan at No. 2?
16     A.    Yes.
17     Q.    Does that read, I considered the
18  map, related population data and the
19  performance report for Dr. Hood?  Do you see
20  that?
21     A.    Yes.  Yes, I see it.
22     Q.    Do you know what the performance
23  report of Dr. Hood is referring to?
24     A.    Not in this instance, no.
25     Q.    Did you ever see that performance

Page 79

1  report for this version of the -- for this
2  map?
3      A.    No.
4      Q.    Okay.  Is that something that you
5  would find helpful in assessing whether this
6  map was compliant with the Voting Rights Act?
7      A.    If I had seen it, possibly, yes,
8  but I never saw it.
9      Q.    Okay.
10     A.    I saw -- I never saw one.
11     Q.    Did you ask for one?
12     A.    No.
13     Q.    Why not?
14     A.    I didn't ask for it.
15     Q.    Do you know why not?
16     A.    No.
17     Q.    Okay.  Do you believe that this
18  plan -- the opportunity plan provides a fair
19  opportunity to black voters to elect preferred
20  candidates in the second congressional
21  district?
22     A.    I don't know the answer to that
23  question.
24     Q.    And why is that?
25     A.    Because I never -- never looked

Page 80

1  or studied the opportunity plan.
2          MR. LOCKHEAD:  Okay.  Let's go
3  ahead and pull that down.  Thank you, Davin.
4      Q.    Okay.  So next the house of
5  representatives held a hearing on
6  redistricting on July 19th; is that correct?
7      A.    The house?  Or they had the bill
8  on the floor of the house?
9      Q.    Bill on the floor.  Does that
10  sound right?
11     A.    Yeah.  Yeah.  They had my bill
12  on the floor of the house on the 19th.
13     Q.    Okay.  Did you prepare at all for
14  that day?
15     A.    Yes.
16     Q.    How so?
17     A.    Gathered my little file and went
18  down to the floor.
19     Q.    Do you recall what was in your
20  little file?
21     A.    Not much.  I had the quote
22  that I -- about the Voting Rights Act, what
23  the Court ruled, two majority districts or
24  something close thereof that provided an
25  opportunity.  And I had my map.  And I had



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
81–84

Page 81

1 that analysis that was given to me. Then I
2 had the population analysis.
3    Q.   Okay. I want to ask were there
4 any other documents that you reviewed in
5 preparation for that proceeding on the floor?
6    A.   Not that I recall.
7         MR. LOCKHEAD: Okay. Let's go
8 ahead and pull up Exhibit C one more time.
9 Thanks, Davin.
10   Q.   Let's go to page 115.
11   A.   Yes.
12   Q.   All right. Senator Livingston
13 (sic), do you see a document here that begins
14 with the bullet point, the plaintiff's
15 consistently supported?
16   A.   You mean Representative Pringle?
17   Q.   I'm sorry. Apologies,
18 Representative Pringle. It's been a long day.
19 Let me start again.
20   A.   Yes. And I do recall seeing
21 this, but I didn't have it on the floor with
22 me that day.
23   Q.   Okay. So you recognize this
24 document?
25   A.   Yes. I remember seeing it.

Page 82

1         MR. LOCKHEAD: Let's scroll, if we
2 can, to the next page.
3    Q.   Do you recognize this page as
4 well?
5    A.   Again, it's a document I
6 remember glancing at.
7    Q.   What is this document?
8    A.   I don't know. It was some
9 talking points that were prepared.
10   Q.   Okay. When did you first see this
11 document?
12   A.   I don't remember. Sometime
13 during the special session.
14   Q.   Do you recall if it was after the
15 committee held its meeting on the 17th?
16   A.   I don't recall exactly when.
17 I'm sorry.
18   Q.   Who shared this with you?
19   A.   I don't remember.
20   Q.   Do you know who prepared it?
21   A.   No.
22   Q.   Do you have any guesses about who
23 prepared it?
24   A.   If I want me to flat guess, I
25 would guess Eddie LaCour, but I can't

Page 83

1 guarantee that at all.
2    Q.   And what's the basis for that
3 guess?
4    A.   Just looks like something he
5 would write.
6    Q.   And why is that?
7    A.   It's his style.
8    Q.   What about it?
9    A.   Just very legal.
10        MR. LOCKHEAD: Let's go to page
11 117 of this same exhibit, Exhibit C.
12   Q.   Representative Pringle, do you see
13 a document here that begins with the 2023 plan
14 as a communities of interest plan that's
15 crossed out in what appears to be a red pen?
16   A.   Yes.
17        MR. LOCKHEAD: And can we scroll
18 to -- slowly through page 120 of the PDF?
19   Q.   All right. Representative
20 Pringle, do you recognize this document?
21   A.   No.
22   Q.   Have you seen it before?
23   A.   Not that I remember.
24        MR. LOCKHEAD: Okay. Let's now go
25 to page 121, also Exhibit C.

Page 84

1    Q.   All right. Do you see here at the
2 top of the page responses to possible
3 questions?
4    A.   Yes.
5    Q.   Do you recognize this document?
6    A.   No. Not unless -- I don't
7 recognize this page, no.
8    Q.   Okay. And take time to read it.
9 I recognize I'm throwing a lot of pieces of
10 paper at you. But so you do not -- you do not
11 recognize this document?
12   A.   I do not recognize it, no. Not
13 at this time.
14   Q.   Do you know what it is?
15   A.   Responses to possible questions.
16   Q.   Did you review that document
17 before the hearing? I assume not?
18   A.   No, I don't remember seeing
19 this. I don't remember reading it.
20        MR. LOCKHEAD: Let's go back up to
21 page 115, if we can.
22   Q.   So this document here, this is the
23 document that you represented may have been
24 drafted by Eddie LaCour. Did you review this
25 document in advance of the hearing on the



Page 85

1  floor?
2      A.    No.  I might have looked at it,
3  but I didn't study it.
4      Q.    Okay.  And talk me through your
5  decision not to study this in advance of going
6  to the floor.
7      A.    I didn't feel the need to --
8  need to.
9      Q.    Why is that?
10     A.    I didn't feel I needed to study
11 it.
12          MR. LOCKHEAD:  Okay.  Let's go
13 ahead and pull that down.  Thanks, Davin.
14     Q.    Next -- so the Senate passed a
15 slightly different map, the Livingston 2 plan
16 that was introduced by Senator Livingston, is
17 that correct, to your understanding?
18     A.    Yes, to my understanding.
19          MR. LOCKHEAD:  Okay.  Let's pull
20 up Exhibit H, if we can.
21          (Whereupon, Exhibit H was marked
22          for identification.)
23     Q.    All right.  And Representative
24 Pringle, do you recognize this document here
25 titled Livingston congressional plan 2, 2023?

Page 86

1      A.    Yes.
2      Q.    What is it?
3      A.    That's the plan that Senator
4  Livingston passed out of the senate and sent
5  it to the house.
6      Q.    And the Livingston plan, what is
7  the relationship between the Livingston plan
8  and the opportunity plan we reviewed a moment
9  ago?
10     A.    I couldn't tell you.
11     Q.    Do you know if the Livingston plan
12 relied on corrected data?  This reflects
13 correct data, is that correct, unlike the
14 version that you suggested had incorrect data?
15     A.    I would assume so, yes.  But I
16 don't know.
17     Q.    Okay.  Okay.  So regarding CD-2,
18 do you see that in the bottom right?
19     A.    Yes.
20     Q.    Okay.  Do you recall any changes
21 in CD-2 between the Livingston 2 plan and the
22 opportunity plan?
23     A.    No.
24     Q.    Okay.  Do you recall any
25 discussion about whether, though, CD-2 should

Page 87

1  be the same composition between those two
2  plans?
3      A.    No.
4          MR. LOCKHEAD:  Okay.  Let's zoom
5  in, if we can, on CD-2.  Thank you so much.
6  Just one moment.  Okay.  Thank you so much.
7      Q.    So let's do this instead.
8          Representative Pringle, do you
9  have any reason to doubt that this is the same
10 as the congressional district 2 in the
11 opportunity plan?
12     A.    I played no part in either one
13 of them, so I don't know.
14          MR. LOCKHEAD:  Okay.  Let's go
15 ahead and take down this exhibit.  Thanks,
16 Davin.  Hopefully we can just move forward.
17 We'll be speedy.
18     Q.    Okay.  Representative Pringle, you
19 were a member of the conference committee that
20 was tasked with reconciling the plans that
21 were passed by both the house and the senate;
22 is that right?
23     A.    Correct.
24          MR. LOCKHEAD:  Okay.  Let's go
25 ahead and pull up Exhibit I.

Page 88

1          (Whereupon Exhibit I was marked
2          for identification.)
3      Q.    (By Mr. Lockhead)  Do you recognize
4  this document?
5      A.    I believe that's what came out
6  of the conference committee, yes.
7      Q.    Okay.  And so this document is
8  titled Livingston congressional plan 3 or SBA
9  (sic), is that a correct alternative name for
10 this plan as you understand it?
11     A.    I thought it was SB-5.
12     Q.    I'm sorry.  SB-5, I apologize.
13     A.    That's fine.
14     Q.    Is that right?
15     A.    What was your question again?
16     Q.    The Livingston congressional
17 plan 3 you see here on the screen, that is the
18 map that was ultimately enacted by the
19 legislature; is that correct?
20     A.    I believe so, yes.
21     Q.    Okay.  Also known as SB-5?
22     A.    Yes.
23     Q.    Okay.  Okay.
24          MR. LOCKHEAD:  Give me one moment.
25 Okay.  Let's pull up what's been marked as



Page 89
1  Exhibit J. Thanks, Davin.
2          (Whereupon, Exhibit J was marked
3          for identification.)
4      Q.    (By Mr. Lockhead) All right.
5  Representative Pringle, I want to the turn to
6  be text of SB-5 as it was reported from
7  conference committee and ultimately passed by
8  the legislature.  Do you see the document here
9  entitled SB-5 enrolled?
10     A.    Yes.
11     Q.    Okay.  And do you recognize this
12  document?
13     A.    Yes.
14     Q.    Do you -- what is it?
15     A.    I mean, that was the copy of the
16  bill they handed to me on the floor of the
17  house when -- that bill came up before the
18  house.
19         MR. LOCKHEAD:  Okay.  Can we
20  scroll to the bottom, please?  Great.
21     Q.    And Representative Pringle, I'll
22  represent to you that this is the enacted
23  legislation, the text of SB-5.  Do you see
24  there the signature, the relevant signatures?
25     A.    Yes.

Page 90
1          MR. LOCKHEAD:  Okay.  Let's scroll
2  up to the second page of the text of SB-5.
3  Great.
4      Q.    If you could, please look at
5  line 15.
6      A.    Yes.
7      Q.    The sentence says, the legislature
8  finds and declares the following.  Do you see
9  that?
10     A.    Yes.
11         MR. LOCKHEAD:  Okay.  And then if
12  we could slowly scroll for the next couple
13  pages.
14     Q.    And as we do so, Representative
15  Pringle, just take a look.
16         MR. LOCKHEAD:  Let's go a few
17  pages down.  Okay.  Thank you so much.
18     Q.    Representative Pringle, these are
19  the legislature findings; is that right?
20     A.    That's what was written in the
21  bill, yes.
22     Q.    Okay.  Do you know who drafted the
23  statement of legislative intent and findings
24  here?
25     A.    No, sir.

Page 91
1      Q.    Did you know that these would be
2  put in the bill?
3      A.    No, sir.
4      Q.    Did the redistricting committee
5  solicit anyone to draft these findings?
6      A.    No, sir.
7      Q.    Do you know why they're in here?
8      A.    No.
9      Q.    Remind me, have you ever seen
10  another redistricting bill contain similar
11  language like this, these findings?
12     A.    Not to my knowledge, no.
13     Q.    What about identified communities
14  of interest?
15     A.    No, not to my knowledge.  Not
16  that I can remember.
17     Q.    Not that you can remember.
18         Okay.  This statement of
19  legislative intent does not include any
20  reference to VRA compliance, is that correct,
21  to your knowledge?
22     A.    I couldn't say.  I didn't write
23  them.  I had nothing to do with that.
24     Q.    Okay.
25         MR. LOCKHEAD:  Let's scroll to the

Page 92
1  findings recognizing three communities of
2  interest; Black Belt, Gulf Coast, and
3  Wiregrass, which should be starting in this
4  area.  Great.
5      Q.    So I'll represent to you that
6  these findings recognize three communities of
7  interest, the Black Belt, the Gulf Coast and
8  the Wiregrass.  Do you see the definition of
9  the Black Belt here starting on the top of
10  page 5, the Black Belt is characterized?
11     A.    I see the paragraph, yes.
12     Q.    Okay.  Okay.
13         Let's go to the section that
14  describes -- scratch that.  Let's do this
15  instead.
16         Remind me again, Representative
17  Pringle, you -- you had not seen this before
18  this was enacted; that's right?
19     A.    The first time I saw that was
20  Friday morning on the floor of the house when
21  the senate bill was brought up.  I turned and
22  asked the clerk to give me a copy of the
23  bill.
24     Q.    Do you think it's necessary for
25  the bill to include this?



CHRISTOPHER P. PRINGLE                                         August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.                           93–96

Page 93

1    A.    That's a senate bill.  You need
2 to talk to the senators.
3    Q.    Well, this was the bill that was
4 ultimately passed out of the house; is that
5 right?
6    A.    It was sent to the house from
7 the senate.
8    Q.    Did you vote for it?
9    A.    Yes.
10    Q.    Did you think it was necessary
11 when you decided to vote for it?
12    A.    Yes.  I thought it was necessary
13 for us to pass a bill.
14    Q.    Okay.  Do these conflict with the
15 redistricting principles that were adopted in
16 2023?
17    A.    I had very quick -- some of them
18 looks like they are, some of the
19 redistricting principles.  But there's other
20 stuff added, and I haven't analyzed what was
21 added to it.
22    Q.    Okay.  Could legislators have
23 satisfied the criteria that are enumerated in
24 SB-5 without knowing what those criteria were
25 beforehand?

Page 94

1    A.    Explain the question.
2    Q.    In other words, there are -- you
3 said that these are not identical with the
4 guidelines; is that correct?
5    A.    I don't believe so, but I
6 haven't analyzed them line for line.
7    Q.    Okay.  And you would need to see
8 the guidelines in order to know how to comply
9 with the guidelines; is that right?
10    A.    I would like to compare the two.
11        MR. LOCKHEAD:  Okay.  Let's go
12 ahead and take this down.  Okay.  Let's pull
13 up the exhibit we just looked at, which is
14 Exhibit I, the map version of SB-5.
15        MR. ROSBOROUGH:  Sorry, one
16 second.
17    Q.    (By Mr. Lockhead) Okay.
18        Representative Pringle, this is
19 the map of SB-5 we were just reviewing; is
20 that right?
21    A.    I believe that's the final
22 version, yes.
23        MR. LOCKHEAD:  Okay.  Let's scroll
24 down one page and rotate it if we can.
25    Q.    Do you see this page here titled

Page 95

1 Livingston congressional plan 3 population
2 summary?
3    A.    Yes.
4    Q.    And do you recognize this to be
5 the statistics that were calculated based on
6 the map SB-5?
7    A.    I believe that's what I saw
8 Friday morning on the floor, yes.
9    Q.    Okay.  Can you read for me, the
10 BVAP that's contained in CD-2?
11    A.    Let me ask -- is this the -- is
12 this the bill, or is this conference
13 committee report or analysis?
14    Q.    So I'll represent to you that this
15 is the analysis that was performed on the map
16 here, Livingston 3.
17    A.    Okay.  I see it.  Go ahead.
18    Q.    So here do you see the BVAP in
19 CD-2?
20    A.    39.93.
21    Q.    Okay.  And you mentioned earlier
22 that you saw a performance analysis of SB-5;
23 is that correct?
24    A.    On that Friday morning, yes.
25    Q.    Okay.  And that was performed by

Page 96

1 Dr. Hood?
2    A.    I believe so, yes.
3    Q.    Okay.  I want to ask about what
4 that analysis showed.
5        MR. LOCKHEAD:  So if we could pull
6 up Exhibit K.
7        (Whereupon Exhibit K was marked
8        for identification.)
9    Q.    (By Mr. Lockhead) Do you recognize
10 this document here?
11    A.    I believe I've seen it, yes.
12    Q.    And what is it?
13    A.    It's a -- it's a voting analysis
14 of the plan.
15    Q.    Is this the analysis that you were
16 referring to earlier that you saw just before?
17    A.    I believe it is, but I've looked
18 at so many documents.  I would assume that
19 was what I saw Friday morning on the floor,
20 yes.
21    Q.    So here we have a performance
22 analysis of seven elections; is that correct?
23 Do you see that?
24    A.    Yes.
25    Q.    Okay.  Here, looking at each of



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
97–100

Page 97

1  these seven elections, black preferred
2  candidates lost all seven elections in the new
3  opportunity district of congressional district
4  2; is that correct?
5      A.    According to that, yes.
6      Q.    So, in fact, this analysis shows
7  that black preferred candidates never won in
8  this new opportunity district; is that fair?
9      A.    What I'm seeing on this
10  analysis, that is correct.
11      Q.    Okay.  Were all members of the
12  conference aware of this analysis?
13      A.    I believe so, yes.
14      Q.    Were members of the legislature to
15  the best of your knowledge?
16      A.    I couldn't answer that question.
17      Q.    Okay.
18      A.    I did not see it until literally
19  that morning.
20      Q.    In your view, is a district where
21  black preferred candidates win zero of seven
22  elections an opportunity district?
23      A.    I'm not an attorney, so I'm
24  going to leave that to the Courts.
25      Q.    What about in your not legal view,

Page 98

1  but just in your personal view, does that
2  constitute a real opportunity to elect a
3  candidate of choice in zero of seven
4  elections?
5      A.    You're asking me to speculate.
6  And I just don't want to speculate.
7      Q.    Just not to speculate.  I mean,
8  is --
9      A.    I just -- I'm not going to
10  speculate.
11      Q.    So let's understand -- you know,
12  would you say that there was a meaningful
13  difference in opportunity between the
14  performance analysis that you see here for
15  SB-5 and the performance analysis that
16  accompanied your plan, the community of
17  interest plan?
18      A.    I think my house plan was far
19  superior to any other plan.
20      Q.    Would you say it provided a
21  greater opportunity to elect candidates of
22  choice for black voters than this bill, SB-5?
23      A.    I believe my plan complied with
24  what the Court asked us to do, yes.
25      Q.    So that's a yes?

Page 99

1      A.    I believe my plan complied with
2  the Court order, yes, sir.
3      Q.    So let's understand the
4  decisionmaking process in the conference
5  committee given the options that were on the
6  table.  So first was the community of interest
7  plan, your plan, originally passed by the
8  house with a BVAP and CD-2 of 42.4 percent.
9  Does that sound right?
10      A.    Yes, sir.
11      Q.    Okay.  And that map occasionally
12  performs for black preferred candidates, is
13  that right, two of four elections thereabout?
14      A.    According to that analysis, yes.
15      Q.    Okay.  And the next was the
16  Livingston 2 plan which was originally passed
17  by the senate.  Does that sound right?
18      A.    Yes.
19      Q.    Okay.  And that plan, the BVAP and
20  CD-2 was 38.3 percent.  Does that sound
21  correct to you?
22      A.    Yes, sir.
23      Q.    Okay.  And then ultimately what
24  was enacted and what came out conference
25  committee was SB-5, and the BVAP in

Page 100

1  congressional district 2 and SB-5 was 39.9
2  percent; is that correct?
3      A.    It sounds correct.
4      Q.    Okay.  And that map never
5  performed for black preferred candidates in
6  the second congressional district according to
7  the performance analysis we just viewed; is
8  that fair?
9      A.    Yes, sir.
10      Q.    Okay.  So in CD-2, your community
11  of interest plan had a BVAP of 42 percent.
12  Livingston 2 had a BVAP of 38 percent.  And
13  SB-5 basically split the difference at 39.9.
14  Does that sound fair to you?
15      A.    About correct, yes, sir.
16      Q.    Okay.  Why did you take that
17  approach?
18      A.    Again, I drew a plan that I
19  thought would comply with what the Courts
20  ordered us to do.  But I was only the
21  chairman of the house.  What I could get
22  passed at the house, I could not get passed
23  at the Senate.  The Senate made it perfectly
24  clear they were not going to pass my plan,
25  they were going to pass their plan.  And we



Page 101

1  made the decision that it was more
2  important -- we had to pass something and not
3  just go to Montgomery and completely fail and
4  not pass a plan.  So the decision was we
5  couldn't pass the house plan, so we had to
6  pass the senate plan.
7      Q.    And what's the significance of the
8  39.9 BVAP in SB-5, just that it passed?
9      A.    That's what the senate came up
10  with, and they were not going to allow us to
11  pass the house plan.
12     Q.    Do you know why they chose that
13  number?
14     A.    You're going to have to talk to
15  Senator Livingston and Eddie LaCour.
16     Q.    Did they mention anything to you?
17     A.    No.
18     Q.    Okay.  Let's go ahead and --
19     A.    Well, let me say -- let me
20  rephrase that.  Senator Livingston came to me
21  towards the end and said, we're going to take
22  your plan and substitute my bill and pass
23  your plan with my map in it.  And I said, no
24  we're not.  If you want to pass a senate
25  plan, you're going to pass the senate on the

Page 102

1  senate bill number, and you're not going to
2  put my name on it.  You're going -- it's not
3  going to be a house bill number, it's going
4  to be a senate bill number, that's what we're
5  going to pass.
6      Q.    And why didn't you want your name
7  on it?
8      A.    Because I thought my plan was a
9  better plan.
10     Q.    In terms of its compliance with
11  the Voting Rights Act?
12     A.    Exactly.
13     MR. LOCKHEAD:  Let's, if we can,
14  pull up the exhibit labeled Birmingham Watch.
15     COURT REPORTER:  I'm sorry,
16  Counsel.  Are you going to label this an
17  exhibit letter?
18     MR. LOCKHEAD:  Let's call this
19  Exhibit Z.
20     (Whereupon, Exhibit Z was marked
21      for identification.)
22     Q.    (By Mr. Lockhead) Okay.
23     Representative Pringle, do you see
24  a document here, a news article, with the
25  title, Alabama House Senate Approved Separate

Page 103

1  Congressional Maps?
2      A.    Yes.
3      Q.    Do you recognize this article?
4      A.    No.
5      Q.    Did you read it before?
6      A.    No.
7      MR. LOCKHEAD:  Okay.  Let's scroll
8  in and then -- I'm sorry.  Zoom in and scroll
9  down, if we can.
10     Q.    Okay.  I'm going to read the
11  paragraph starting, Livingston said.  Do you
12  see that paragraph?
13     A.    Yes.
14     Q.    Okay.  So "Livingston said senate
15  republicans began working on their own map
16  because the committee 'got some information'
17  that led them to prioritize 'compactness and
18  communities of interest being as important as
19  the black voting age population.'  Livingston,
20  who did not say where the information came
21  from, said that he had not heard concerns from
22  senators about districts being over 40 percent
23  black."  Did I read that right?
24     A.    Yes, sir.
25     Q.    Okay.  Do you know what "some new

Page 104

1  information" refers to?
2      A.    No, sir.  I was not privy to it.
3      Q.    Was there any information that you
4  received that you think this could refer to,
5  even if you're not sure exactly?
6      A.    No, sir.  After the initial
7  meeting, I never met with the republican
8  members of the committee from the senate.
9  They met in a different room on a different
10  floor.
11     MR. LOCKHEAD:  Okay.  We can go
12  ahead and take this down.  Thanks, Davin.
13     Q.    Okay.  So I want to go back just
14  very briefly to when you were presented with
15  the two maps in conference committee, SB -- so
16  the community of interest plan and the
17  Livingston plan.
18     Can you just talk about the way
19  that the performance across the two districts
20  factored into your decision in terms of which
21  plan to support?
22     A.    In conference committee?
23     Q.    Correct?
24     A.    There was no two bills in
25  conference committee.  There was only one.



Page 105

1    Q.    And that was SB-5 that was
2    ultimately passed out of conference?
3    A.    Yes.
4    Q.    Was there --
5    A.    We voted to nonconcur and send
6    it to conference.
7    Q.    Once SB-5 was passed out of
8    conference and then back to the floor, did you
9    speak with anyone about whether to support
10   SB-5?
11   A.    No.  We just went back
12   downstairs and passed it.
13   Q.    Did you speak with anyone outside
14   the legislature, any members of the
15   congressional delegation about whether to pass
16   or support SB-5 before you cast your vote?
17   A.    No.
18   Q.    Did anyone try to contact you
19   about that?
20   A.    No.  It all happened so fast.  I
21   mean, you have to remember, this was -- from
22   the time we passed SB-5 and voted to
23   nonconcur and go to conference, it probably
24   wasn't an hour before we passed the
25   conference committee report and went home.

Page 106

1    Q.    Great.
2          MR. LOCKHEAD:  Let's go ahead and
3    pull up Exhibit L.  I promise we're getting
4    close.
5          (Whereupon Exhibit L was marked
6          for identification.)
7    Q.    Do you see here a news article
8    with the headline, Alabama's Redistricting
9    Brawl Rehashes Bitter Fight Over Voting
10   Rights?  Do you see that?
11   A.    I see the headline, yes.
12   Q.    Do you recognize this article?
13   A.    No.
14   Q.    Have you read it before?
15   A.    No.
16         MR. LOCKHEAD:  Okay.  Let's scroll
17   down to page 3.
18   Q.    Okay.  I'm going to start reading
19   the paragraph here starting with, I believe.
20   A.    Yes.
21   Q.    Okay.  So "I believe this map is
22   an opportunity map and would comply with
23   section 2 of the Voting Rights Act, said house
24   speaker *Pro Tem, Chris Pringle, the
25   republican who cochaired the Alabama

Page 107

1    redistricting committee, said of the candidate
2    of their choosing.  And when pushed added,
3    when you add function on top of that, it could
4    work."  This was in reference to SB-5; is that
5    correct?
6    A.    No.  That was in reference to
7    my -- my bill.
8    Q.    Okay.  And when you said that --
9    when you add function on top of that, what do
10   you mean by adding function?
11   A.    The results that showed that
12   democrats could win the second congressional
13   district under my plan.
14         MR. LOCKHEAD:  Okay.  We can go
15   ahead and take that down.  Thanks, Davin.
16   Q.    Representative Pringle, did you
17   attend a recent meeting in Montgomery of the
18   Alabama republican party?
19   A.    No.
20   Q.    Have you attended one there
21   recently at all, Montgomery?
22   A.    Not since 1990.
23   Q.    Okay.  So you weren't there when
24   Representative Barry Moore spoke or Attorney
25   General Marshall or Paul Reynolds; is that

Page 108

1    right?
2    A.    Correct.
3    Q.    Okay.  And likewise, you were not
4    present at that meeting for the comments of
5    David Boucher; is that correct?
6    A.    At the state executive committee
7    meeting?
8    Q.    That's right.
9    A.    I was not present at all.  I
10   have a company to run.  I was working.
11         MR. LOCKHEAD:  Let's go ahead and
12   pull up Exhibit O.
13         (Whereupon Exhibit O was marked
14         for identification.)
15   Q.    (By Mr. Lockhead) You see a news
16   article on your screen with the headline,
17   Representative Terry Sewell, Alabama
18   shamelessly ignores U.S. Supreme Court?  Do
19   you see that headline?
20   A.    Yes.
21   Q.    Do you recognize this article?
22   A.    I believe I've seen it before,
23   yes.
24   Q.    Okay.  Are you aware that House
25   Speaker Ledbetter said that the map, SB-5



CHRISTOPHER P. PRINGLE
EVAN MILLIGAN, et al. vs WES ALLEN, et al.

August 09, 2023
109–112

Page 109

1  gives a "good shot" in the Supreme Court where
2  "the ruling was 5/4.  So there's just one
3  justice that needed to see something
4  different?"  Do you recall that quote from
5  this article?
6      A.    No, I do not.
7      Q.    Okay.  Let's go to -- go to it, if
8  we can.  Okay.  So here at the top of the
9  page, I'll read it again.  So -- quote -- do
10  you see the sentencing beginning "if you think
11  about"?
12      A.    Yes.
13      Q.    Okay.  So I'll represent to this
14  is a quote from House Speaker Nathaniel
15  Ledbetter where he says, "If you think about
16  where we were, the Supreme Court ruling was
17  five to four.  So there's just one judge that
18  needed to see something different.  And I
19  think the movement that we have and what we've
20  come to compromise on today gives us a good
21  shot," House Speaker Nathaniel Ledbetter said.
22  Do you see that quote?
23      A.    Yes, I see the quote.
24      Q.    Do you agree that the legislature
25  is attempting to get a justice to see

Page 110

1  something differently?
2      A.    You know, I don't believe -- I'm
3  not.
4      Q.    You don't believe so?
5      A.    I don't want to speak on behalf
6  of 140 members of the legislature.  I know
7  that I'm not.
8          I'm trying to comply with what
9  the Supreme Court ruled.
10      Q.    Did Speaker Ledbetter ever express
11  that sentiment to you privately?
12      A.    No.
13      Q.    What about --
14      A.    But you got to -- you just read
15  a quote from me a minute ago, and they had it
16  attributed to the wrong piece of legislation.
17  So you see how accurate our press is.
18      Q.    Are you --
19      A.    I don't know if he ever said
20  that.  So I don't know.
21      Q.    Are you surprised by it?
22      A.    Well, I don't know if he said it
23  or not.  I wasn't there.
24      Q.    Do you agree that a judge would
25  need to see something differently for SB-5 to

Page 111

1  be upheld?
2      A.    I couldn't answer that.  I'm not
3  an attorney.
4      Q.    Okay.
5          MR. LOCKHEAD:  Let's go ahead and
6  take down the exhibit.  I think that's about
7  it from us.  Let's briefly go off the record
8  if we can.
9          THE VIDEOGRAPHER:  The time is
10  5:19 p.m.  We're going off the record.
11          (A short break was taken.)
12          THE VIDEOGRAPHER:  The time is
13  5:20 p.m.  We are back on the record.
14          MR. LOCKHEAD:  Milligan plaintiffs
15  have no further questions at this time.
16          And I'll pass the witness in case
17  counsel for any of the parties wishes to ask
18  any further questions.
19          MS. RUTAHINDURWA:  No questions
20  from the Caster plaintiffs.  Thank you.
21          MR. WALKER:  This is Dorman
22  Walker.  No questions.
23          MR. DAVIS:  No questions from the
24  Secretary of State.
25          THE VIDEOGRAPHER:  Counsel, is it

Page 112

1  going to be the same orders for this witness?
2          MR. LOCKHEAD:  Yes, please.
3          THE VIDEOGRAPHER:  Just to go off
4  the record with no question, the time is
5  5:21 p.m. on August 9th, 2023.  We are going
6  off the record.
7    (The deposition concluded at 5:21 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



CHRISTOPHER P. PRINGLE                                    August 09, 2023
EVAN MILLIGAN, et al. vs WES ALLEN, et al.                            113

Page 113

```
 1              C E R T I F I C A T E
 2
 3    STATE OF ALABAMA)
 4    CALHOUN COUNTY)
 5
 6         I hereby certify that the above
 7    proceedings were taken down by me and
 8    transcribed by me using computer-aided
 9    transcription, and that the above is a true
10    and correct transcript of the said proceedings
11    given by said witness.
12         I further certify that I am neither
13    of counsel nor of kin to the parties to the
14    action, nor am I in anywise interested in the
15    result of said cause.
16         I further certify that I am duly
17    licensed by the Alabama Board of Court
18    Reporting as a Certified Court Reporter as
19    evidenced by the ACCR number found below.
20
21         COMMISSIONER - NOTARY PUBLIC
22
23
24         CINDY C. JENKINS, CSR
25              ACCR #470 - Exp. 9/30/2023
```

