FILED
2025 Mar-17  PM 04:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **BOBBY SINGLETON**, *et al.*,<br>    **Plaintiffs**,<br><br>    **v.**<br><br>**WES ALLEN**, *et al.*,<br>    **Defendants.** | **Case No. 2:21-cv-1291-AMM**<br><br>**THREE-JUDGE COURT** |
| **EVAN MILLIGAN**, *et al.*,<br>    **Plaintiffs**,<br><br>    **v.**<br><br>**WES ALLEN**, *et al.*,<br>    **Defendants.** | **Case No. 2:21-cv-1530-AMM**<br><br>**THREE-JUDGE COURT** |
| **MARCUS CASTER**, *et al.*,<br>    **Plaintiffs**,<br><br>    **v.**<br><br>**WES ALLEN**, *et al.*,<br>    **Defendants.** | **Case No. 2:21-cv-1536-AMM** |

### STATE DEFENDANTS' JOINT PROPOSED
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLES OF CONTENTS

TABLES OF CONTENTS .................................................................2

INTRODUCTION ..........................................................................5

BACKGROUND ..........................................................................16

I.     PARTIES ............................................................................16

II.    EXPERTS ...........................................................................19

III.   RELEVANT FACTUAL AND PROCEDURAL HISTORY ......................25

    A. The 2021 Plan for Congressional Districts ..............................25

    B. *Allen v. Milligan* ..........................................................28

    C. The 2023 Plan for Congressional Districts ..............................30

DISCUSSION .............................................................................37

I.     THE 2023 PLAN DOES NOT VIOLATE SECTION 2 OF
THE VOTING RIGHTS ACT ....................................................37

    A. Plaintiffs have not satisfied the *Gingles* preconditions ............37

       1. *Gingles* 1. Plaintiffs' maps are not reasonably configured ...............37

       2. *Gingles* 1. Plaintiffs' maps subordinate Alabama's traditional
districting principles to race ...............................................76

       3. *Gingles* 2 and 3: white bloc voting in Alabama is not "legally
significant." ..............................................................99

    B. The "totality of circumstances" confirms that the 2023 Plan does not
violate Section 2. .......................................................114

       1. Senate Factor 2: Racial polarization in Alabama is a product of
political partisanship, not racial bias. ...................................119

2. Senate Factor 7: Black Democrats have achieved electoral success. ............................................................................159

3. Senate Factors 1, 3, and 5: Plaintiffs have not proven that Alabama's distant history of racial discrimination has made the political process less open for black Alabamians today. .................161

4. Senate Factor 4: No formal slating process exists in Alabama.........188

5. Senate Factor 6: Plaintiffs have not shown that political campaigns in Alabama are characterized by racial appeals. ...............................188

6. Senate Factor 8: Elected officials are responsive to minority needs……………………………………………………………………………191

7. Senate Factor 9: The policies underlying the 2023 Plan are not "tenuous." ..................................................................................214

8. Proportionality ................................................................................216

C. Section 2 can no longer constitutionally authorize race-based redistricting. ..........................................................................................220

D. Section 2 is not privately enforceable. ....................................................226

II. THE 2023 PLAN IS NOT THE PRODUCT OF INTENTIONAL, INVIDIOUS DISCRIMINATION AGAINST BLACK ALABAMIANS. ...........................................................................229

A. The Court presumes the Legislature acted in good faith........................232

B. Plaintiffs have not proven discriminatory effects. .................................235

C. *Singleton* Plaintiffs' intentional vote dilution theory fails as a matter of law. ....................................................................................................236

D. *Milligan* Plaintiffs submit no direct evidence of intentional discrimination. ........................................................................................238

E. *Milligan* Plaintiffs' additional evidence fails to establish a claim under *Arlington Heights*. ........................................................................244

1. Past discrimination is not evidence of a present-day intent to discriminate. ....................................................................245

2. The sequence of events leading to the passage of the 2023 Plan does not lead to the inference of discriminatory intent....................253

3. The Legislature did not depart from the usual process of enacting legislation. ...............................................................267

4. Contemporary statements by legislators reveal no ulterior motive to harm black Alabamians................................................273

5. Any disparate impact caused by the 2023 Plan was neither foreseeable nor foreseen...................................................276

6. The Legislature did not refuse to consider alternative plans that would lessen any potentially discriminatory impact........................279

F. Obvious alternatives other than invidious racial discrimination explain the enactment of the 2023 Plan...................................282

G. Even if Plaintiffs had established intentional discrimination, the Legislature would have enacted the 2023 Plan. ....................................295

H. The Court will not activate the §3(c) pocket trigger. ............................296

III.    THE LEGISLATURE DID NOT RACIALLY GERRYMANDER THE 2023 PLAN. ........................................................299

CONCLUSION.................................................................308

CERTIFICATE OF SERVICE .............................................310

## INTRODUCTION

In November 2021, Alabama enacted a congressional redistricting plan that Plaintiffs swiftly challenged. They said that "[a]t the heart of" their case under §2 of the Voting Rights Act was "Alabama's treatment of the Black Belt."[1] In Plaintiffs' view, the 2021 Plan impermissibly "split the Black Belt across four districts" and "Montgomery across two districts," "while maintaining in a single district the majority-White" Gulf Coast community of "Baldwin and Mobile Counties."[2] They argued that §2 did not permit Alabama's "'inconsistent treatment'"[3] of these communities, *i.e.*, uniting the Gulf Coast while splintering the majority-black community in the Black Belt.[4,5] This Court granted a preliminary injunction under §2, and the Supreme Court affirmed.

In 2023, Alabama responded with new legislation that ended this "inconsistent treatment." The 2023 Plan places the Black Belt counties into only two districts, the fewest number of districts possible without violating population equality

---

[1] Br. of *Milligan* Respondents 5, *Allen v. Milligan*, No. 21-1086 (U.S. filed July 11, 2022) ("*Milligan* Br."); *see also* Br. of *Caster* Respondents 15-16, *Allen v. Caster*, No. 21-1087 (U.S. filed July 11, 2022) ("*Caster* Br.") (describing 2021 Plan's adherence to district lines, dating back to 1970s plan that "splintered the Black Belt among Districts 1, 2, 3, and 7.").

[2] *Milligan* Br. 12, 20-21.

[3] *Milligan* Br. 38-39 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994)).

[4] *Caster* Br. 36; *see also id.* at 35 (challenging "double standard"); *Caster* DE56 at 9 ("striking … how HB 1 cracks Alabama's Black population in the historic Black Belt").

[5] "DE" refers to docket entries in the relevant case. "DX", "CX", "MX", and "SX" refer to the Defendant's Exhibits, *Caster* Exhibits, *Milligan* Exhibits, and *Singleton* Exhibits, respectively. Pin cites align with ECF pagination unless otherwise noted.

requirements.[6] Montgomery County is made whole. And by departing substantially from existing district lines, the 2023 Plan achieved all that while also keeping communities of interest in Alabama's Gulf Coast and Wiregrass regions together to the fullest extent possible, minimizing county splits statewide, and making districts across the map more compact. The "inconsistent treatment" of the old plan is gone. And because of these changes, District 7's Black Voting Age Population (BVAP) in the 2023 Plan is 50.65% (compared to 55.26% in the 2021 Plan), while District 2's BVAP increased to 39.93% (from 30.12% in the 2021 Plan). But Plaintiffs now challenge this plan too under §2 and the Equal Protection Clause.

As six Justices on the Supreme Court have noted, there is "considerable disagreement and uncertainty regarding the nature and contours of a vote dilution claim."[7] But the State Defendants and Plaintiffs would appear to have some common ground based on certain arguments Plaintiffs' counsel have articulated. For instance, while representing NAACP chapters in this case and others, counsel for the *Milligan* Plaintiffs have argued that:

---

[6] DX9 at 12-13.

[7] *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (quoting *id.* at 883 (Roberts, C.J., dissenting); *Allen*, 599 U.S. at 68 (Thomas, J., dissenting) ("If there is any 'area of law notorious for its many unsolved puzzles,' this is it.").

- A congressional plan in Alabama in which District 7's BVAP is "around 50%," District 2's BVAP is "almost 40%," and Montgomery County is kept whole is a "race-neutral plan" in which "Black voters are no longer artificially denied electoral influence in a second district."[8]

- The Equal Protection Clause forbids states from using race to break up an "economically integrated coastal community" in a plan that would place residents of the "heavily Black" parts of that community in a congressional "district anchored more than 100 miles away in" another large city.[9]

- One ground for finding a plan lawful and *not* race-predominant is if the plan unites a community of interest "influenced by French colonialism" where "early French settlement resulted in" distinctive cultural influences for a region that includes "White and Black people."[10]

- It would be error for a federal court considering a redistricting challenge to "overrid[e] the Legislature's preferred communities of interest" and thereby "usurp[] the Legislature's prerogative to privilege certain interests and instead substitute[] its own judgment that others should have mattered more."[11]

- The racial makeup of even a noncompact district "does not 'rule out' that incumbent protection and safeguarding shared interests"—rather than race— "primarily drove the district's specific configuration."[12]

But now that the 2023 Plan cures the "inconsistent treatment" of the 2021 Plan and has the precise BVAPs in Districts 2 and 7 that Plaintiffs claimed would ensure that "Black voters are no longer artificially denied electoral influence in a second district,"[13] Plaintiffs say that consistent treatment isn't enough. Inconsistent treatment in their *favor* is their new demand: the Gulf Coast must be treated *worse*

---

[8] *Milligan* DE69 at 36.

[9] Br. of S.C. St. Conf. NAACP at 16-17, *Alexander v. S.C. Conf. of the NAACP*, No. 22- (U.S. filed Aug. 11, 2023) ("S.C. NAACP Br.").

[10] *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 844 (M.D. La. 2024).

[11] Reply Br. for *Robinson* Respondents, *Louisiana v. Callais*, Case No. 24-109, at 7 (U.S. filed Feb. 20, 2025) (citing *Vance v. Bradley*, 440 U.S. 93, 110-11 (1979)).

[12] *Id.* at 34.

[13] *Milligan* DE69 at 36.

than the Black Belt by "exiling many … residents—particularly in heavily Black [Mobile]—from their economically integrated coastal community," placing "thousands more Black [Mobilians]" in "a district anchored more than [160] miles away in [Montgomery]."[14] This new demand for inconsistent treatment cannot be squared with §2 or binding precedent interpreting the statute.

There is no §2 violation unless "it is shown that the political processes leading to nomination or election in the State … are not equally open to participation by" a racial group "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[15] "[N]othing" in §2 "establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."[16]

Likewise, nothing in *Allen v. Milligan* said the measure of a redistricting plan's compliance with §2 reduces to counting its majority-minority districts. Instead, *Allen* focused on the "intensely local appraisal" of the 2021 Plan and pinpointed that Gulf Coast counties were united while Black Belt counties were split, which likely had "a disparate effect on account of race."[17] In response, the State replaced that plan with the 2023 Plan, removing these potentially discriminatory

---

[14] S.C. NAACP Br. at 16-17.
[15] 52 U.S.C. §10301(b).
[16] *Id.*
[17] *Allen*, 599 U.S. at 19-22.

effects by unifying the Black Belt. There is no further requirement that §2 plaintiffs "be placed in a majority-minority district" in the 2023 Plan.[18] Under *Allen*, the new 2023 Plan need not "achiev[e] proportionality" while "flouting traditional criteria."[19]

But under Plaintiffs' view of §2, "traditional districting principles" including compactness, whole counties, and "maintaining communities of interest,"[20] must yield to the goal of creating a second majority-minority district. That explains their approach to *Gingles* 1, by which each of their proposed alternatives can—and does—sacrifice one, two, or all three of the principles just mentioned to avoid "dilution." But that approach cannot prove dilution "on account of race." 52 U.S.C. §10301(a). Only "[d]eviation from [a] map" that advances the legitimate non-racial interests of the 2023 Plan could "show[] it is possible that the State's map has a disparate effect on account of race."[21] An illustrative plan that, for example, drew an additional majority-black district by sacrificing contiguity would not be able to prove that the 2023 Plan's failure to have such a district was "on account of race." Likewise, the plans Plaintiffs adduced fail for sacrificing other traditional redistricting principles, something "§ 2 never requires."[22]

---

[18] *Shaw v. Hunt*, 517 U.S. 899, 917 n.9 (1996).
[19] *Allen*, 599 U.S. at 28.
[20] *LULAC v. Perry*, 548 U.S. 399, 433 (2006).
[21] *Allen*, 599 U.S. at 26 (emphasis deleted).
[22] *Id.* at 30 (cleaned up).

For similar reasons, each of Plaintiffs' plans fails to satisfy *Gingles* 1 because race predominates in each plan's lines. The problem here is *not* that Plaintiffs' "maps were created with an express target."[23] The problem is that given Alabama's demographics, the target resulted in "a direct and significant impact on the drawing of at least some of" the "boundaries" in each plan.[24] Any time a racial target is used, the demographics of a jurisdiction and the level of the target will determine whether the target has "a direct and significant impact" on district lines. For example, in Alabama, a target of at least 10% BVAP for each congressional district would have little impact, and as *Milligan* Plaintiffs have explained, "race-neutral maps" could "result[] in District 2 plans with BVAPs as high as almost 40%."[25] But, in Alabama, Plaintiffs higher target required them to "subordinate[] traditional race-neutral districting principles … to racial considerations."[26]

Plaintiffs have also failed to prove legally significant white bloc voting, and thus fail under step three of *Gingles*. While most black voters in Alabama favor Democrats, most white voters favor Republicans, and Republicans usually win where they outnumber Democrats, the evidence does not show that "racial bloc voting is operating at such a level" that a §2 remedy is "necessary for black-preferred

---

[23] *Id.* at 33.
[24] *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 274 (2015).
[25] *Milligan* DE69 at 36.
[26] *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

candidates to win." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 212 (4th Cir. 2024). Rather, in Alabama today, black-preferred candidates can win in crossover districts. Plaintiffs thus cannot show legally significant white bloc voting.

Plaintiffs have also failed to prove that black Alabamians "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[27] Plaintiffs' Senate Factor evidence comes up short. Their recent evidence of purported discrimination involves mostly laws that federal courts deemed to be *not* discriminatory. And while Plaintiffs' point to Alabama's history of discrimination and current socioeconomic disparities between black and white Alabamians, they simply assume that the first caused the second, while ignoring that similar or even greater disparities exist in States beyond the South and with very different histories. More fundamentally, black and white Alabamians alike are allowed to register, vote, and participate with the political party of their choice. The State's political processes are "equally open."[28]

Following a full trial on at-large elections, Judge Watkins concluded in 2020 that "Alabama today is a vastly different place than it was even a half-century ago,"[29] and that "what appears to be bloc voting on account of race is instead the result of

---

[27] 52 U.S.C. §10301(b).
[28] *Id.*
[29] *Ala. NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1293 (M.D. Ala. 2020).

political or personal affiliation of different racial groups with different candidates."[30] The same is true of Alabama five years later. "[B]laming election losses … on vote dilution is merely a 'euphemism for political defeat at the polls.'"[31]

But if a §2 violation follows when (1) *Gingles* 1 is satisfied by an illustrative plan that puts race before compactness, counties, and/or communities of interest; (2) *Gingles* 2 and 3 are satisfied whenever most black voters vote Democrat, most white voters vote Republican, and Republicans win too many elections; and (3) despite clear gains in black voter mobilization and participation over the last forty years, the totality of the circumstances shows a violation everywhere there are socioeconomic disparities among racial groups and some history of discrimination (which in Plaintiffs' view is everywhere),[32] then at least one thing is clear about §2: There is "no end … in sight" to its demands for race-based districting.[33] And because "race-based redistricting cannot extend indefinitely into the future,"[34] §2 can no longer be applied to redistricting consistent with our color-blind Constitution.

Plaintiffs' constitutional claims show precisely why the Supreme Court has recognized the legislative presumption of good faith, lest "plaintiffs … transform

---

[30] *Id.* at 1316 (quoting *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000)).

[31] *Id.* (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971)).

[32] *See* Tr. 2675 (arguing that "similar gaps in other states are also borne of discrimination … throughout the United States").

[33] *SFFA v. Harvard*, 600 U.S. 181, 213 (2023).

[34] *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring).

federal courts into weapons of political warfare" to seek "victories that eluded them in the political arena."[35] The presumption "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions."[36] So while Plaintiffs repeatedly point to a reference to "French and Spanish colonial heritage" of the Gulf as evidence of the Legislature's French supremacist views, courts must instead draw the inference that the Legislature was merely recognizing cultural influences in a region that flow from its unique history—no different than when the Supreme Court recognized "our Anglo-American heritage,"[37] the Eleventh Circuit noted how Congress "legislates against the background of Anglo-Saxon common law,"[38] or the Louisiana NAACP recently defended its illustrative plan based on a "community" with both "White and Black people" that was "influenced by French colonialism."[39] Our country's Anglo-Saxon colonial heritage belongs to all Americans, just as the French and Spanish heritage of the Gulf Coast belongs to all its residents, regardless of race.

More fundamentally, there are numerous explanations for the 2023 Plan that are far *more* plausible than Plaintiffs' assertions that race drove the districting decisions. The 2023 Plan's lines clearly advance compactness, preserve long-

---

[35] *Alexander v. S.C. NAACP*, 602 U.S. 1, 11 (2024) (internal quotation marks omitted).
[36] *Id.* at 10.
[37] *See Roper v. Simmons*, 543 U.S. 551, 561 (2005).
[38] *United States v. Vereen*, 920 F.3d 1300, 1310 (11th Cir. 2019) (Marcus, J.).
[39] *See Nairne*, 715 F. Supp. 3d at 845 (identifying a "community" with both "White and Black people" that was "influenced by French colonialism").

recognized communities of interest, and protect incumbents among other non-racial goals. And Plaintiffs point to political reasons why a Republican legislature would seek to draw six Republican-leaning districts instead of five. Because "nothing rules out" these constitutionally permissible "possibilit[ies]," Plaintiffs' claims fail.[40]

Finally, there is the argument that the 2023 Plan defies this Court and violates the Equal Protection Clause because the Legislature enacted the plan after the Court's 2022 preliminary injunction order without including two districts likely to favor Democrats. That contention fails for at least four reasons.

First, this Court barred the Secretary from using the 2021 Plan; it did not order the Legislature to enact any particular map. The Court's order was not violated.

Second, the 2023 Legislature did not simply pass the same plan with minor tweaks and try to evade federal court review.[41] Rather, the changes between the 2021 Plan and 2023 Plan were significant, curing the "inconsistent treatment" that was (once) "at the heart" of Plaintiffs' case. And the law was passed in time for this Court to preliminarily assess it before the 2024 elections. That is respect, not defiance.

Third, "[p]reliminary injunctions … do not conclusively resolve legal disputes,"[42] and no one would suggest defiance (much less racism) if Defendants had litigated the 2021 Plan to final judgment. It thus makes no sense to fault the State

---

[40] *Alexander*, 602 U.S. at 20.
[41] *Contra* Tr. 2559.
[42] *Lackey v. Stinnie*, 145 S.Ct. 659, 667 (2025).

for curing the alleged "inconsistent treatment" in that plan at an earlier stage and before going to trial.

Fourth, even if Plaintiffs' view of §2 is correct, the suggestion that the law in this area is *so* clear that any other interpretation could only be driven by racial animus is as baseless as it is divisive. The "case law in this area is notoriously unclear and confusing."[43] It is thus perfectly plausible that the Legislature believed it could remedy a likely §2 violation by "eliminat[ing] racial disparities"—*i.e.*, inconsistent treatment of the Gulf Coast and the Black Belt—"through race-neutral means" rather than "racial targets or quotas" that "might raise more difficult constitutional questions."[44] Or that Judge Watkins's findings in 2020 about the equal openness of at-large elections for appellate judges[45] suggested that Alabama's single-member districts for Congress were equally open too.[46] Or that Justice Kavanaugh was right to question whether "the authority to conduct race-based redistricting can[] extend indefinitely into the future."[47] Even if these arguments ultimately prove unavailing, it is neither defiant nor racist to enact a law based on them and then test them in federal court. Plaintiffs' contrary assertion cannot overcome the presumption of good faith.

---

[43] *Merrill*, 142 S. Ct. at 881 (2022) (Kavanaugh, J., concurring).

[44] *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015).

[45] *Ala. NAACP*, 612 F. Supp. 3d at 1290-91.

[46] *See Growe v. Emison*, 507 U.S. 25, 40 (1993) ("It would be peculiar to conclude that a vote-dilution challenge to the (more dangerous) multimember district requires a higher threshold showing than a vote-fragmentation challenge to a single-member district.").

[47] *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring).

# BACKGROUND[48]

## I.    Parties

### *State Defendants*

1.    Hon. Wes Allen is the Alabama Secretary of State and the chief elections official for the State of Alabama. Secretary Allen is sued in his official capacity. *Milligan* DE436 ¶59; *see also* Ala. Code §17-1-3.[49]

2.    Secretary Allen provides uniform guidance for election activities in the State and issues certificates of election to members of Congress from Alabama. Ala. Code §§ 17-1-3, 17-12-21. Secretary Allen also has responsibility for certifying the names of Primary and General Election candidates for the Alabama congressional seats. *Milligan* DE436 ¶60; Ala. Code §§ 17-13-5(b), 17-9-3(b).

3.    Senator Steve Livingston and Representative Chris Pringle are, respectively, Senate Chair and House Chair of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"). Ala. Code § 29-2-51. They are sued in the *Milligan* case, *see Milligan* DE1 & DE329, and they intervened as defendants in the *Caster* and *Singleton* cases in their official capacities as Chairs of the Committee, *Caster* DE60; *Singleton* DE25. Sen. Livingston was substituted as a

---

[48] "Because the issue of vote dilution in § 2 cases presents intertwined questions of fact and law, to spare the reader repetition, the findings of fact and conclusions of law are not set out in separate sections. They are, though, set out with particularity." *Ala. NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1248 (M.D. Ala. 2020).

[49] *Milligan* DE436 and *Caster* DE342 are references to a Joint Statement of Stipulated Facts to which the *Milligan* Plaintiffs, *Caster* Plaintiffs, and State Defendants have agreed.

defendant in these cases following the retirement of Sen. Jim McClendon, who, with Rep. Pringle, had chaired the Committee during its 2021 Congressional redistricting efforts. *Milligan* DE436 ¶61.

### Singleton Plaintiffs

4.    Plaintiffs in the *Singleton* case are Senator Bobby Singleton, Senator Rodger Smitherman, Eddie Billingsley, Leonette Slay, Darryl Andrews, and Andrew Walker. *Singleton* DE229 ¶¶9-12.

5.    Plaintiff Singleton is a black registered voter who resides in Hale County and within CD7 of the 2023 Plan. SX22. Senator Singleton currently serves as Minority Leader of the Alabama Senate, representing Senate District 24, which encompasses part of Tuscaloosa County as well as Hale, Greene, Sumter, Marengo, and Choctaw counties. Tr. 2362:18-2363:1.

6.    Plaintiff Smitherman is a black registered voter who resides in Jefferson County and within CD 7 of the 2023 Plan. SX24.

7.    Plaintiff Slay is a white registered voter who resides in Jefferson County and within CD6 in the 2023 Plan. SX23. She resides in CD7 under the Court's Plan. Tr. 896:9-14.

8.    Plaintiffs Andrews and Walker are black registered voters who reside in Montgomery County and within CD2 of both the 2023 Plan and the Court's Plan. SX21, SX25.

17

### *Milligan Plaintiffs*

9.     Plaintiffs in the *Milligan* case are Evan Milligan, Shalela Dowdy, Letetia Jackson, Khadidah Stone, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP. *Milligan* DE329 ¶¶18-26.

10.    The four individual Plaintiffs are black Alabamians and lawfully registered voters. *Milligan* DE436 ¶¶1-15.

11.    Plaintiffs Milligan and Stone reside in Montgomery County, Alabama. *Id.* Under the Congressional plan enacted by the Alabama Legislature in 2023 (the "2023 Plan") and under the Court's Plan, Milligan and Stone reside in Congressional District 2. *Id.* ¶¶3, 15.

12.    Plaintiff Alabama NAACP is the state conference of the National Association for the Advancement of Colored People, Inc. *Id.* ¶17.

13.    Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in Birmingham, Alabama and describes itself as a multi-faith, multi-racial, non-profit membership organization that engages people to building a strong, supportive, engaged community and a more just society for all people. *Id.* ¶22.

### *Caster Plaintiffs*

14.    Plaintiffs in the *Caster* case are Marcus Caster, Lakeisha Chestnut, Bobby Lee DeBose, Benjamin Jones, Rodney Allen Love, Manasseh Powell, Ronald Smith, and Wendell Thomas. *Caster* DE271 at 1.

15. All eight are black Alabamians and lawfully registered voters. *Caster* DE342 at 5-8.

16. Under the "2023 Plan", Plaintiffs Caster, DuBose, and Love resided in CD7. *Id.* ¶¶29, 37, 45. Under the Court's Plan, Caster resides in CD2; DuBose and Love still reside in CD7. *Id.*

17. Plaintiff Chestnut resided in CD1 under the 2023 Plan. *Id.* ¶33. She resides in CD2 under the Court's Plan. *Id.*

18. Plaintiffs Jones, Powell, Smith, and Thomas reside in CD2 under both the 2023 Plan and the Court's Plan. *Id.* ¶¶41, 49, 53, 57.

## II.    Experts

### *State Defendants' Experts*

19. Dr. Christopher Bonneau is a Professor of Political Science at the University of Pittsburgh. Tr. 1660:1-2. He received his B.A. in Political Science, Theology, and Humanities from Valparaiso University, an M.A. in Political Science from Ball State University, an M.A. in Political Science from Michigan State University, and a Ph.D. in Political Science from Michigan State University. Tr. 1660:7-12; DX1 at 3. The State Defendants retained Dr. Bonneau to consider whether black candidates in Alabama elections tend to perform worse than white candidates on account of their race, DX1 at 2. Dr. Bonneau examined similar questions when testifying for the State in the case challenging Alabama's "at-large,

statewide method for electing its Supreme Court." *Alabama NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1243 (M.D. Ala. 2020). Dr. Bonneau was admitted without objection as an expert "in American political science, election analysis, and political science research methodology." Tr. 1665:10-16.

20.    Dr. Adam Carrington is an Associate Professor of Political Science at Ashland University. Tr. 1546:20-23. Previously, he was an Associate Professor of Politics at Hillsdale College, where he taught for ten years. DX3 at 1; Tr. 1547:1-5. He holds an M.A. and Ph.D. in Political Science from Baylor University. DX3 at 1; Tr. 1547:10-12. His scholarship focuses on political institutions, particularly the presidency, Congress, the judiciary, and political parties. Tr. 1547:13-19. He has published and taught about party politics and the American South. Tr. 1548:15-17; 1549:1-13; DX3 at 1. The State Defendants retained Dr. Carrington to analyze the shift in the South generally, and Alabama particularly, from voting reliably Democratic to reliably Republican over the course of the second half of the twentieth century. Tr. 1549:14-22. Dr. Carrington focused his report on partisan shift among white Southerners because it was that demographic that "caused and cemented the partisan shift" in the South. Tr. 1555. Dr. Carrington was admitted as an expert "in political science, political parties and the partisan shift in the American South." Tr. 1550:25-1551:22; 1553:7-16.

21.     Dr. M.V. (Trey) Hood III is a professor at the University of Georgia in the Department of Political Science. DX7 at 2. He holds a Master's degree in Political Science from Texas A&M University (1993) and a Ph.D. in Political Science from Texas Tech University (1997). *Id*. The State Defendants retained Dr. Hood to analyze black voting patterns, sociodemographic disparities in Alabama and elsewhere, white support for minority candidates, and the change in black political metrics over time. *Id*. Dr. Hood was admitted without objection as an expert "in political science specifically in the areas of electoral politics, racial politics, election administration, and southern politics, [in] empirical social science research, and for the matters discussed in his report." Tr. 1875:21-1876:4.

22.     Dr. Wilfred Reilly is a professor at Kentucky State University. Tr. 2161:11-14. He earned a J.D. from the University of Illinois in 2005 and a Ph.D. from Southern Illinois University in 2015. Tr. 2161:20-25; DX8 at 2. The State Defendants retained Dr. Reilly to analyze the existence of "shared commonalities" between the City of Mobile and the Black Belt counties of Alabama (and whether these are characteristics that the city does not share with Mobile County or Baldwin County), evaluate historical ties between Mobile and the Black Belt, and consider whether disparities in rates of voter registration and voter turnout between black and white Alabamians are best explained as a result of past or present racial discrimination or other factors unrelated to racial discrimination. DX8 at 5-6.

Dr. Reilly was admitted without objection as an expert "in political science, with a focus on public law, international and race relations in political theory, statistics, group comparisons, methodology and research methods, and socioeconomic gaps and their causes." Tr. 2164:16-24.

23.    Dr. Sean Trende is a Senior Elections Analyst for Real Clear Politics and lecturer at Ohio State University. Tr. 1970:23-25. He earned a B.A. in History and Political Science from Yale University, a Master's degree in Applied Statistics and a Ph.D. in Political Science from Ohio State University, and a Master's degree in Political Science and Juris Doctor from Duke University. Tr. 1971:6-1972:6. In 2021, he served as a special master to redraw the district lines for the Commonwealth of Virginia's House of Delegates and Senate as well as United States Congressional delegation. DX10 at 6. The same year, he worked as a Voting Rights Act expert for the Arizona Independent Redistricting Commission. *Id*. at 7; Tr. 1974:1-2. And in 2019, he was appointed by the Supreme Court of Belize to address malapportionment issues in Belize's electoral divisions. DX10 at 6-7. The State Defendants retained Dr. Trende to evaluate the Illustrative Congressional Districts submitted by Plaintiffs' experts William Cooper and Dr. Moon Duchin, the plans enacted by the Alabama Legislature in 2021 and 2023, and the map adopted by this Court. DX10 at 7. Dr. Trende was admitted without objection as an expert in redistricting. Tr. 1975:5-9.

### *Singleton Experts*

24.     Dr. Volney (Rob) Riser is a Professor of History at the University of West Alabama. SX33 at 2. Dr. Riser received his M.A. (2000) and Ph.D. (2005) in American History from the University of Alabama. *Id.* The *Singleton* Plaintiffs retained Dr. Riser to describe the role of race, politics, and law in the South and Alabama in the nineteenth and early-twentieth centuries. Tr. 750:9-12.

25.     Dr. Kari Frederickson is a Professor of History at the University of Alabama. SX31 at 2. Dr. Frederickson received her B.A. from the University of Wisconsin, an M.A. in History from the University of Wisconsin, and a Ph.D. in American History from Rutgers University. Tr. 803:8-13. The *Singleton* Plaintiffs retained Dr. Frederickson to opine on the role of race in politics in the South and Alabama in the twentieth century. Tr. 805:7-10.

### *Milligan Experts*

26.     Dr. Moon Duchin is a Professor of Mathematics and Public Policy at Cornell University. Tr. 279:20-22. She holds a M.S. (1999) and a Ph.D. (2005) in Mathematics from the University of Chicago. MX8. The *Milligan* Plaintiffs retained Dr. Duchin to consider whether it is possible to draw a congressional plan in Alabama with a second majority-black district. Tr. 281:16-21.

27.     Dr. Baodong Liu is a professor in the Department of Political Science at the University of Utah. MX13 at 2. He has a M.A. in Political Science from

Oklahoma State University (1995) and a Ph.D. in Political Science from the University of New Orleans (1999). *Id.* at 22. The *Milligan* Plaintiffs retained Dr. Liu to ascertain whether voting in Alabama is racially polarized, and to determine whether racially polarized voting ("RPV") has resulted in the defeat of black-preferred candidates in Alabama Congressional elections. *Id.* at 1.

28.    Dr. Traci Burch is an associate professor of political science at Northwestern University and serves as a research professor at the American Bar Foundation. MX6 at 3. Dr. Burch received her B.A. in History from Princeton University and her Ph.D. in Government and Social Policy from Harvard University. *Id*. Plaintiffs retained Dr. Burch to opine on "Senate Factor Five": the extent to which socioeconomic disparities caused by historical discrimination affect black Alabamians' ability to participate effectively in the political process. Tr. 927:14-24.

29.    Dr. Joseph Bagley is an assistant professor of history at Georgia State University. Tr. 1278:4-7. He received his B.A. and M.A. in History from Auburn University and his Ph.D. from Georgia State. MX4 at 34. Plaintiffs retained Dr. Bagley to collect and collate "Senate factors" evidence.

### Caster Experts

30.    William Cooper has a B.A. in Economics from Davidson College. CX1 at 1. The *Caster* Plaintiffs retained Mr. Cooper to determine whether the African

American population in Alabama is sufficiently large and compact to create two majority-black congressional districts. *Id.* at 5.

31.    Dr. Maxwell Palmer is a Professor of Political Science at Boston University. Tr. 482:19-21. He holds a Ph.D. in Political Science from Harvard University (2014). Tr. 482:15-18. The *Caster* Plaintiffs retained Dr. Palmer to opine on the extent to which voting is racially polarized in parts of Alabama and to evaluate the performance of majority-BVAP districts in the *Caster* Plaintiffs' illustrative maps. CX3 at 2.

## III.    Relevant Factual and Procedural History

### A.    The 2021 Plan for Congressional Districts

32.    In 2021, Alabama enacted a congressional map that largely retained existing district lines.

33.    Because the 2021 Plan prioritized core retention, the eighteen core Black Belt counties that had been split among three districts in the 2021 Plan remained split among those three districts. Montgomery County was also split between Districts 2 and 7.

34.    Three sets of Plaintiffs filed lawsuits challenging Alabama's 2021 congressional redistricting plan.

35.    The *Milligan* Plaintiffs challenged the 2021 Plan as a violation of Section 2 of the Voting Rights Act and the Equal Protection Clause. *Milligan* DE1.

36.    The *Caster* Plaintiffs challenged the 2021 Plan as a violation of Section 2 of the Voting Rights Act. *Caster* DE3.

37.    The *Singleton* Plaintiffs challenged the 2021 Plan as a violation of the Equal Protection Clause. *Singleton* DE15.

38.    "At the heart of" the *Milligan* Plaintiffs' case were allegations the 2021 Plan "crack[ed]" "two of the State's principal majority-Black communities of interest—the Black Belt and the City of Montgomery." *Milligan* Appellees' Br. 1, *Allen v. Milligan*. They argued that "'[c]racking' occurs where 'a State has split minority neighborhoods that would have been grouped into a single district if the State had employed the same line-drawing standards in minority neighborhoods as it used elsewhere.'" *Id.* at 29 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994)) (cleaned up). And this purportedly discriminatory "cracking" was present in the 2021 Plan, they contended, because that plan continued "a pattern of splitting two majority-Black communities of interest—the Black Belt and the City of Montgomery," while it "prioritized keeping together White people of 'French and Spanish colonial heritage' in Baldwin and Mobile Counties." *Id.* at 1.

39.    The *Caster* Plaintiffs similarly argued "HB 1 cracks Alabama's Black population in the historic Black Belt" while their "Illustrative Plans unite the Black Belt." *Caster* DE56 at 9; DE84 at 17.

40.    In challenging the 2021 Plan, the *Milligan* and *Caster* Plaintiffs introduced 11 illustrative plans purporting to show that a "reasonably configured" majority-minority district could be drawn to better unify the Black Belt, even if it meant sacrificing another community along the Gulf Coast. They argued that "the Black Belt better fits the Legislature's definition of 'community of interest,' so splitting it into as few districts as possible should be the priority over keeping the Gulf Coast counties together, and one way to split the Black Belt less is to split the Gulf Coast counties." *Singleton v. Merrill*, 582 F. Supp. 3d. 924, 1012 (N.D. Ala. 2022); *see also id.* at 1015 (finding this was a "legitimate reason to split Mobile and Baldwin Counties consistent with traditional redistricting criteria").

41.    The State Defendants argued that Plaintiffs' proposed second majority-minority district in their illustrative plans was not reasonably configured because it was too sprawling and split a community of interest in the Gulf Coast.

42.    This Court concluded that those illustrative plans, along with evidence on the other *Gingles* factors, likely established a §2 violation and preliminarily enjoined the Secretary of State from using the 2021 Plan in the then-upcoming 2022 elections. *Singleton*, 582 F. Supp. at 936.

43.    The Supreme Court stayed the preliminary injunction, *Milligan*, 142 S. Ct. at 879, and then affirmed this Court's decision preliminarily enjoining use of the 2021 Plan, *Allen v. Milligan*, 599 U.S. 1, 42 (2023).

**B.**    *Allen v. Milligan*

44.    In *Allen*, the Supreme Court opined on when a Plaintiffs' illustrative plans sufficed to show a likely §2 violation in the 2021 Plan. First, §2 required "'an intensely local appraisal'" of the challenged plan. *Id.* at 19. Second, the plan must be compared to Plaintiffs' alternatives to vet whether the State inconsistently applied redistricting criteria; deviation could mean "a disparate effect on account of race" "is *possible*." *Id.* at 26. Third, the "State's adherence to a previously used districting plan" (that is, prioritizing "core retention") would not "defeat a §2 claim." *Id.* at 22. But fourth, "§2 never requires adoption of districts that violate traditional redistricting principles," and the Constitution does not allow "flouting traditional criteria" in search of "achieving proportionality." *Id.* at 28-30 (cleaned up).

45.    Applying those ground rules to the 2021 Plan, the Court concluded that Plaintiffs' plans were on par with the State's according to the traditional criteria. *See id.* at 20-21; *see also id.* at 44 n.2 (Kavanaugh, J., concurring) ("it is important that at least some of the plaintiffs' proposed alternative maps respect county lines at least as well as Alabama's redistricting plan").

46.    On compactness, the Court affirmed the finding that Plaintiffs' maps "perform[ed] generally better on average" or were "roughly as compact" as the 2021 Plan. *Id.* at 20.

28

47.    On communities of interest, Plaintiffs' maps were "reasonably configured because," while they split the Gulf Coast, "they joined together a different community of interest" in the Black Belt, which the 2021 Plan had split. *Id.* at 21. Crucially, there would "be a split community of interest in both" the State's 2021 Plan and Plaintiffs' alternatives. *Id.*

48.    Four Justices rejected Alabama's argument that race predominated in the *Caster* Plaintiffs' expert's illustrative plans, without addressing the *Milligan* expert's illustrative plans. *Id.* at 32-33 (op. of Roberts, C.J.); *see id.* at 62-64 (Thomas, J., dissenting). The opinion reasoned that the *Caster* plans were race-conscious but not race-predominant. *Id.* at 32-33 (op. of Roberts, C.J.).

49.    The Court understood those illustrative plans as treating the Black Belt as "a '*historical* feature' of the State," to be "defined by its 'historical boundaries,'" "not a demographic one.'" *Id.* at 32 n.5.

50.    *Allen* noted that this Court "treated the Black Belt as a community of interest for the same reason"—that is, based on historical boundaries and not demographics. *Id.*

51.    The Majority did "not diminish or disregard" the concern "that § 2 may impermissibly elevate race in the allocation of political power within the States." *Id.* at 41-42. "It simply [held] that a faithful application of [the Court's] precedents and

a fair reading of the record[,]" which was hastily assembled during preliminary injunction proceedings, "d[id] not bear them out here." *Id.* at 42.

52.    In his concurrence, Justice Kavanaugh opined that "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Id.* at 45. He noted, however, that "Alabama did not raise that temporal argument in this Court, and" he thus did "not consider it at th[at] time." *Id.*

### C.    The 2023 Plan for Congressional Districts

53.    On June 15, 2023, one week after the Supreme Court's decision, the State Defendants informed this Court of their understanding "that the Alabama Legislature intend[ed] to enact a new congressional redistricting plan that w[ould] repeal and replace the 2021 Plan, which would obviate the need for a trial" on the legality of the 2021 Plan. *Milligan* DE166 at 2.

54.    Governor Kay Ivey called a Special Session on June 27, 2023. *Milligan* DE173 at 1. The Session's goal was to pass new congressional redistricting legislation. *Id.* at 1-2. The Session began on July 17, 2023. *Id.* at 1.

55.    The Reapportionment Committee was incredibly active just before and during the Special Session.

56.    The Legislature received testimony on communities of interest and took documentary evidence. MX72; *Milligan* DE266-1 through 266-23.

57.    The resulting legislation, Ala. Act No. 2023-563 (the "Act"), DX58, identified the Black Belt, Gulf Coast, and Wiregrass as distinct communities of interest that should be kept together to the fullest extent possible. Ala. Code §17-14-70.1(4)(d).

58.    With that new legislative record before it, the Legislature passed, and the Governor signed into law, new redistricting legislation that repealed the 2021 Plan and replaced it with the 2023 Plan. The 2023 Plan departed from existing district lines to unify the Black Belt to the greatest extent possible consistent with other redistricting criteria, split the minimum number of county lines necessary to equalize population among districts, and make the map significantly more compact through changes to each district. Ala. Code §17-14-70.1(3)-(4); DX9 at 9-13.

59.    The Act includes legislative findings that describe the principles the Legislature chose to give effect in the plan and how they were prioritized.

60.    The Act states "[t]he Legislature's intent in adopting the congressional plan … to comply with federal law, including the U.S. Constitution and the Voting Rights Act of 1965, as amended." Ala. Code §17-14-70.1(2).

61.    The legislative findings discuss the traditional principles given effect in the 2023 Plan including "minimal population deviation," contiguity, districts

"composed of reasonably compact geography," minimizing splits of county lines, maintaining communities of interest, and avoiding pairing of incumbents. *Id.* §17-14-70.1(3).

62.    Subsection 17-14-70.1(4) elaborates on the Legislature's approach to communities of interest, specifying that the 2023 Plan keeps together the Black Belt, the Gulf Coast, and the Wiregrass regions to the fullest extent possible. *Id.* §17-14-70.1(4)(a).

63.    The Act states that these regions fit the definition of a community of interest, meaning "a defined area of the state that may be characterized by, among other commonalities, shared economic interests, geographic features, transportation infrastructure, broadcast and print media, educational institutions, and historical or cultural factors." *Id.* §17-14-70.1(4)(a).

64.    Keeping each community "together to the fullest extent possible" means that "[i]f it is necessary to divide a community of interest between congressional districts to promote other traditional districting principles like compactness, contiguity, or equal population, division into two districts is preferable to division into three or more districts." *Id.* §17-14-70.1(4)(c)-(d).

65.    The Act then details the counties that make up the Black Belt, Gulf Coast, and Wiregrass communities of interest along with legislative findings about each region.

66.    First, the Act explains that the Black Belt "shall be placed into two reasonably compact districts," which is "the fewest number of districts in which this community of interest can be placed." *Id.* §17.14-70.1(4)(e)(4). Placing the Black Belt into two districts was a change from the 2021 Plan, which followed earlier redistricting plans in placing the core 18 Black Belt counties into three or more districts.

67.    Under the 2023 Plan, the core 18 Black Belt counties are kept together in two districts. The western core Black Belt counties are kept together in CD7, while the eastern core Black Belt counties are kept together in CD2. Not a single core Black Belt county is split between districts, and Montgomery County is kept whole in CD2. The Gulf Coast counties are kept together in CD1. And all but one of the nine Wiregrass counties are kept together in CD2. The ninth (Covington County) is necessarily split between CD1 and CD2 to allow CD1 to meet equal population and contiguity requirements without having to split counties in the Black Belt. Ala. Code § 17-14-70.1(g)(3); DX9 at 13.

68.    As a result of unifying Montgomery County in CD2, CD7's Black Voting Age Population (BVAP) in the 2023 Plan is 50.65% (compared to 55.25% in the 2021 Plan). CD2's BVAP increases to 39.93% (from 30.12% in the 2021 Plan). MX11 at 5.

69.    The demographics of the 2023 Plan resemble the *Milligan* Plaintiffs'
suggestion that "[a] neutral plan" would have a "BVAP in District 7 … around 50%"
and in District 2 "almost 40%," such "that Black voters are no longer artificially
denied electoral influence in a second district." *Milligan* DE69 at 36.

70.    The *Milligan* and *Caster* Plaintiffs submitted their own proposal to the
Redistricting Committee, the VRA Plaintiffs' Remedial Map. *Milligan* DE200-7
at 2.

71.    Like the 2023 Plan, the VRA Plaintiffs' Remedial Map would have
unified the Black Belt into two districts. *Id*. But, unlike the 2023 Plan, Plaintiffs'
proposal would have split counties as far west as Mobile County and as far east as
Houston County, dividing those counties and the bottom half of the State between
CD1 and CD2 on race-based lines. *Id.* at 4. The Legislature rejected this plan.

72.    The *Singleton* Plaintiffs, with still-pending racial gerrymandering
claims, testified to the Legislature that the *Milligan* and *Caster* Plaintiffs' proposed
plan would likely violate the Equal Protection Clause for being *too* race-based.
MX72 at 72:14-23. In their words, they did not "believe it's going to be able to pass
strict scrutiny…[b]ecause it splits counties along racial lines to achieve a racial target
of 50 percent plus one." *Id.*

73.    Prior to the Special Session, Defendants explained that if a new plan
was enacted, the only question that would remain before this Court is whether that

plan violated federal law anew. *Caster* DE180-1 at 44-45. This Court agreed that if the State enacted new legislation, then "the parties would be able to present to [this Court] whatever evidence went to the question of the new map," distinguishing those proceedings from remedial proceedings for a court-drawn plan. *Id.* at 49.

74.    After Alabama enacted the 2023 Plan, Plaintiffs returned to this Court to object. This Court then told the parties that "th[e] remedial hearing" regarding those objections "will be limited in scope" and "limited to the essential question whether the 2023 Plan complies with the order of this Court, affirmed by the Supreme Court, and with Section Two of the Voting Rights Act." *Milligan* DE203 at 3-4.

75.    At no point as part of their "objections" filed with this Court did the *Milligan* or *Caster* Plaintiffs present any new illustrative plans.

76.    Defendants explained that the 2023 Plan was a direct response to Plaintiffs' arguments that the Black Belt must be unified into two congressional districts. MX72. Defendants explained how the 2023 Plan accomplishes that goal without sacrificing the Gulf Coast and Wiregrass communities of interest, county splits, or compactness. *Id.* Defendants submitted evidence from the legislative record, government records, as well as declarations and expert testimony regarding the communities of interest and the treatment of those communities and other neutral

districting criteria in the 2023 Plan. MX72-73; DX9, DX58, DX227-234, DX236, DX239, DX248-250; *Milligan* DE224-1; *Milligan* DE266.

77.    The *Milligan* and *Caster* Plaintiffs sought a new preliminary injunction, arguing that the "2023 Plan [did] not remedy the Section 2 violation because it fail[ed] to create an additional district in which Black voters have an opportunity to elect a candidate of their choice." *Singleton v. Allen*, 690 F.Supp.3d 1226, 1245 (N.D. Ala. 2023). We found that the 2023 Plan likely did not remedy the §2 violation and preliminarily enjoined the Secretary from conducting any elections with the 2023 Plan. *Id.* at 1238.

78.    The three Plaintiff groups then each amended their complaints to challenge the 2023 Plan. *Singleton* DE229; *Milligan* DE329; *Caster* DE271. The State Defendants filed separate motions to dismiss each of the three complaints. *Singleton* DE233; *Milligan* DE331; *Caster* DE273. We denied the motions to dismiss, and the cases proceeded to trial. *Singleton* DE247; *Milligan* DE372; *Caster* DE291.

79.    An 11-day trial was held in February 2025. A total of 13 expert witnesses (eight for the three groups of Plaintiffs, and five for the State Defendants) and 10 lay witnesses provided testimony in person. We also admitted prior testimony from 21 additional lay witnesses. *Singleton* DE299; *Milligan* DE459; *Caster* DE370.

## DISCUSSION

## I.    The 2023 Plan Does Not Violate Section 2 of the Voting Rights Act.

### A.    Plaintiffs have not satisfied the *Gingles* preconditions.

80.    To satisfy the three preconditions to a vote dilution claim brought under Section 2 of the Voting Rights Act, Plaintiffs must prove "(1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) that the minority group is politically cohesive, and (3) that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Bartlett v. Strickland*, 556 U.S. 1, 8-9 (2009) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)). Plaintiffs have failed to establish the first and third preconditions.

### 1.    *Gingles* 1. Plaintiffs' maps are not reasonably configured.

81.    The first *Gingles* precondition serves as a "gatekeeping mechanism" to prevent claims touting unreasonably configured alternative districts from passing further. *Dillard v. Baldwin Cnty. Comm'rs*, 376 F.3d 1260, 1268 (11th Cir. 2004). Reasonableness under *Gingles* 1 is not merely in the eye of the beholder. Were it so, the "ascertainable and objective standards" enforced by the first *Gingles* precondition would give way to a veritable "Pandora's Box" of meritless §2 claims based on "vague, subjective criteria." *Id.* at 1268.

82.    For an alternative district to be "reasonably configured," it must "comport[] with traditional districting criteria." *Allen*, 599 U.S. at 18. And because

the §2 inquiry is "an intensely local appraisal," the relevant traditional districting criteria are those embedded in the challenged plan. *Id.* at 19-20. The inquiry therefore is necessarily comparative.

83.    In *Allen*, the Supreme Court held that the *Milligan* and *Caster* Plaintiffs satisfied *Gingles* 1 because, in the Court's view, their illustrative plans performed as well as Alabama's 2021 Plan on traditional criteria.

84.    In contrast, no illustrative plan presented in these cases demonstrates that there is a "reasonably configured" alternative remedy that would respect the Legislature's neutral districting principles "at least as well as Alabama's [2023] redistricting plan." *Allen*, 599 U.S. at 44 n.2 (Kavanaugh, J., concurring); *accord id.* at 18-22.

85.    And for numerous reasons, each of Plaintiffs' alternative plans "are palpable racial gerrymanders." *Allen*, 599 U.S. at 59 (Thomas, J., dissenting). By connecting what Plaintiffs call "Black Mobile," *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1305 (N.D. Ala. 2023), to the eastern Black Belt in CD2, and by cramming the map's leftover counties into CD1, Plaintiffs subordinate Alabama's "traditional race-neutral districting principles" "to racial considerations." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). The only State-sanctioned maps that resemble Plaintiffs' in any way—the 2011 and 2021 State Board of Education Plan—do not give

Plaintiffs a *race-neutral* justification for linking "Black Mobile" to the eastern Black Belt.

### i.  The Court defers to the Legislature's evidence-based findings.

86.    The "intensely local appraisal" demanded by §2 requires us to look to Alabama's traditional districting principles. *Allen*, 599 U.S. at 19. The text of Alabama's 2023 congressional districting law and the contours of the 2023 Plan communicate the principles important to Alabama. *See* Ala. Code §17-14-70.1; *see also supra* Background III.C

87.    "Reapportionment … 'is primarily the duty and responsibility of the State[s],' not the federal courts." *Allen*, 599 U.S. at 29 (alteration in original). The States thus have broad discretion to pursue legitimate non-racial districting principles. *See Abbott v. Perez*, 585 U.S. 579, 603 (2018) ("[F]ederal-court review of districting litigation represents a serious intrusion on the most vital of local functions. In assessing the sufficiency of a challenge to a districting plan, a court must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus. And the good faith of the state legislature must be presumed.") (cleaned up); *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) ("districting" is within the "legislature's sphere of competence").

88.    Maintaining "nonracial communities of interest" is unquestionably a "traditional districting principle." *LULAC v. Perry*, 548 U.S. 399, 433 (2006)

(quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)). "Preservation of political subdivisions promotes efficient representation, empowers a constituency's ability to organize productively, and serves as a deterrent to partisan gerrymandering." *Wesch v. Hunt*, 785 F. Supp. 1491, 1498 (S.D. Ala. 1992) (three-judge court) (citations omitted).

89.     Defining communities of interest and articulating how they ought to be maintained fall within the "exercise of political judgment" reserved for the political branches, here, the Alabama Legislature. *Miller*, 515 U.S. at 915.

90.     Accordingly, we will not "substitute our judgment for the reasonable conclusion of a legislative body." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 212 (1997). Rather, the "factfinding process" of the Alabama Legislature is "entitled to a presumption of regularity and deferential review by the judiciary." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989).

91.     The Louisiana NAACP articulated this view extensively before the Supreme Court this year in *Louisiana v. Callais*. The Louisiana NAACP argued in its reply brief (filed February 20, 2025) that the Western District of Louisiana "erred in overriding the Legislature's preferred communities of interest." Reply Br. for *Robinson* Respondents, *Louisiana v. Callais*, Case No. 24-109, at 7 (U.S. filed Feb. 20, 2025).

92.    Some of the same lawyers who appear for the Alabama NAACP here (including lead counsel) argued to the Supreme Court:

> the district court exceeded its proper role when it usurped the Legislature's prerogative to privilege certain interests and instead substituted its own judgment that others should have mattered more. *See Vance v. Bradley*, 440 U.S. 93, 110-11 (1979) ("The District Court's responsibility for making 'findings of fact' certainly does not authorize it … to reject the legislative judgment.") (cleaned up).

*Id.*

93.    Here, they argue just the opposite, going so far as to cite Alabama's legislative findings as "direct evidence" of intentional and invidious discrimination against black Alabamians. *See infra* Discussion II.D.

94.    We agree with the position they take before the Supreme Court, which adheres to principles of judicial review and to precedent.

95.    "Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents"; thus, proof about a legislature's purpose must go to "the legislature as a whole." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021). "The best evidence of [such] purpose is the statutory text adopted by both Houses and submitted to the [Governor]." *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991).

96.    Federal courts must "follow the policies and preferences of the State, as expressed in [the] statut[e]." *Upham v. Seamon*, 456 U.S. 37, 41 (1982). "The only

limits on judicial deference to state apportionment policy" are "the substantive constitutional and statutory standards to which such state plans are subject." *Id.*

97.    So long as the policies espoused in the text are "based on findings supported by evidence," we will inquire no further. *Turner Broad.*, 520 U.S. at 196; *see also Seastrunk v. Burns*, 772 F.2d 143, 151 (5th Cir. 1985) ("It is the legislature's function to make decisions of basic political policy. Thus … absent a choice that is either unconstitutional or otherwise illegal under federal law, federal courts must defer to that legislative judgment.").

98.    This deference is warranted "in part because the institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." *Turner Broad*, 520 U.S. at 195 (collecting cases).

99.    And "[w]hen the state takes the opportunity to cure a Section 2 violation and enacts a new election plan, that legislative remedy is" still "owed substantial deference." *Whitest v. Crisp Cnty. Sch. Dist.*, 601 F. Supp. 3d 1338, 1344 (M.D. Ga. 2022). The principle applies all the more when the Legislature has acted following only a preliminary injunction, for "[s]uch relief is … 'customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'" *Lackey v. Stinnie*, 145 S.Ct. 659, 667 (2025) (quoting *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

100.    These principles hold even if lawyers advised lawmakers on how to comply with the law. Indeed, it is common for legislators to get advice from lawyers about bills that they submit to the Legislature. *See, e.g., Abbott*, 585 U.S. at 608 ("The attorney general advised the Legislature to adopt the interim plans because he thought that was the 'best way to remedy the violations found by the D.C. court.'"); *Anderson v. CBS, Inc.*, 31 B.R. 161, 162 n.1 (Bankr. N.D. Ga. 1982) ("reports of the hearings indicate that the Attorney General representatives advised the members of the congressional committees"); *United States v. Taylor*, 178 F. Supp. 352, 355 (E.D. Wis. 1959) ("It is clear that the Executive Department and the Attorney General who drew the bill advised Congress of the intent to cover all stolen property."); Tr. 2366 (Sen. Singleton testifying that he speaks with lawyers about proposed legislation and that State lawyers frequently evaluate bills before they are introduced); MX72 at 20:17-21:8 (Rep. Pringle telling unidentified participant at July 27, 2023, public hearing that suggested changes to the Guidelines would be reviewed by lawyers "to make sure they're compliant with the Constitution and Section 2"); Reply Br. for *Robinson* Respondents, *Louisiana v. Callais*, No. 24-109, at 19 (U.S. filed Feb. 20, 2025) ("During the 2024 Special Session, the Legislature received advice from the State's Attorney General about the requirements of federal law and the effect of the

*Robinson* rulings."); *id.* at 20 ("the Legislature was not required to disregard the Attorney General's advice").[50]

101.   Indeed, because "public officials are duty-bound to understand and respect constitutional, judicial and statutory limitations on their authority[,] … their access to candid legal advice directly and significantly serves the public interest." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007).

102.   As discussed in the following paragraphs, the legislative findings accompanying the 2023 Plan are "based on substantial evidence" and are given effect in the map. *Turner Broad.*, 520 U.S. at 195. We will not second-guess them.

### The Black Belt

103.   "Alabama's Black Belt region is a community of interest composed of the following 18 core counties: Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox." Ala. Code §17-14-70.1(4)(e).

---

[50] The Voting Rights Act itself was proposed by the Johnson Administration, with Attorney General Katzenbach testifying as to its meaning and urging its passage. *See, e.g.*, Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 8-23 (1965); *Morris v. Gressette*, 432 U.S. 491, 503 (1977) ("Cognizant of the problem, Attorney General Katzenbach suggested that the declaratory judgment procedure 'could be improved by applying it only to those laws which the Attorney General takes exception to within a given period of time.' Senate Hearings 237. The legislation was changed to incorporate this suggestion."); *Allen v. State Bd. of Elections*, 393 U.S. 544, 566 (1969) ("During the Senate hearings on the bill, Senator Fong expressed concern that the word 'procedure' was not broad enough to cover various practices that might effectively be employed to deny citizens their right to vote. In response, the Attorney General said he had no objection to expanding the language of the section, as the word 'procedure' 'was intended to be all-inclusive of any kind of practice.'").

104. Clarke, Conecuh, Escambia, Monroe, and Washington counties are sometimes included within the definition of the Black Belt. *Id.*

105. The Black Belt "is characterized by its rural geography, fertile soil, and relative poverty, which have shaped its unique history and culture." As Plaintiffs and the Supreme Court stated, it is a "'historical feature' of the State, not a demographic one" and "is defined by its 'historical boundaries'—namely, the group of "rural counties plus Montgomery County in the central part of the state.'" *Allen*, 599 U.S. at 32 n.5.

106. Mobile County is not one of these "rural counties plus Montgomery County," *id.*, or one of the "sometimes" Black Belt counties. Rather, the "sometimes" Black Belt counties of Washington, Clarke, and Monroe separate Mobile from any "core" Black Belt county.

107. Plaintiffs would stretch CD2 from "Black Mobile" all the way to the eastern Black Belt counties, *Singleton*, 690 F. Supp. 3d at 1305, but their own evidence confirms the Legislature's findings that no community of interest encompasses those distinct and geographically distant regions.

108. For example, *Caster* Plaintiff Dr. Marcus Caster, a former Mobile County resident, testified that he doesn't know "anything" about people living in the eastern Black Belt—not the demographics, industries, or health care facilities. PI Hrg. Tr. 1640:18-1642:2.

109.   Nor is Jefferson County one of the "core" or "sometimes" Black Belt counties. One cannot drive from the Black Belt to Jefferson County without leaving the Black Belt altogether.

110.   The Legislature found further that because "the Black Belt counties cannot be combined within one district without causing other districts to violate the principle of equal population among districts, the 18 core Black Belt counties shall be placed into two reasonably compact districts, the fewest number of districts in which this community of interest can be placed." Ala. Code §17-14-70.1(4)(e).

111.   In the 2023 Plan, all 18 "core" Black Belt counties and four of the five "sometimes" Black Belt counties are kept whole in two districts: CD2 and CD7.

112.   The Legislature's findings with respect to the Black Belt are supported by substantial evidence.

**The Gulf Coast**

113.   The Legislature also identified "Alabama's Gulf Coast region" as "a community of interest composed of Mobile and Baldwin Counties." *Id.* §17-14-70.1(4)(f).

114.   The 2023 Plan keeps both Gulf Coast counties together in CD1.

115.   Both the record before the 2023 Legislature and the evidentiary record before this Court robustly support the Legislature's long-running recognition of the Gulf Coast counties of Mobile and Baldwin as a community of interest based on

their substantial economic interdependence and cooperation, unique economy, and distinct culture.

116.    Plaintiffs concede that Mobile County and Baldwin County currently have a shared interest in Gulf Coast-related tourism. *Compare* Ala. Code §17-14-70.1(4)(f)(2) ("Over the past half-century, Baldwin and Mobile Counties have grown even more alike as the tourism industry has grown and the development of highways and bay-crossing bridges have made it easier to commute between the two counties."), *with* Tr. 1302:7-10, 1417:19-22 (Bagley acknowledging that the "shared interest in tourism between Mobile and Baldwin," while "a relatively recent phenomenon," "is not without foundation"); *see also* MX3 at 5 (Bagley 2d. Supp. Decl.) (similar); Tr. 33-34, 36:2, 38:14, 99:6 (Dowdy); Tr. 2591 (Singleton Plaintiffs' counsel "conced[ing] that there is some level of a community of interest"); Tr. 206-07 (Mr. Cooper agreeing that the Gulf Coast is a community of interest).

117.    Plaintiffs concede that both Gulf Coast counties celebrate Mardi Gras, Tr. 76:14-15, 94 (Dowdy), Tr. 253 (Clopton), Tr. 1178-80 (Milligan), Tr. 1467-68 (Bagley), evidencing the *shared* cultural heritage that the Legislature found supported the Gulf community of interest, *see* Ala. Code §17-14-70.1 (4)(f)(9); *see id.* ("Mardi Gras is observed as a state holiday only in Mobile and Baldwin Counties (citing Ala. Code §1-3-8(c) (1975)).

118.   Plaintiffs concede that Mobile County and Baldwin County share the unique characteristic of being the only two coastal counties in Alabama. Tr. 405:24–406:8 (Caster).

119.   Plaintiffs concede that the University of South Alabama has campuses in both Mobile County and Baldwin County. *See* Ala. Code §17-14-70.1(4)(f)(7); MX3 at 6 (Bagley writing off this fact because "its student enrollment was 60 percent white and 22 percent Black").

120.   Plaintiffs concede that thousands of those who work at the Port of Mobile live in Baldwin County. Ala. Code §17-14-70.1(4)(f)(6); MX3 at 5.

121.   Plaintiffs concede that "Mobile and Baldwin Counties also work together as part of the South Alabama Regional Planning Commission, a regional planning commission recognized by the state for more than 50 years." Ala. Code §17-14-70.1(4)(f)(10); MX3 at 6.

122.   *Milligan* Plaintiff and Mobile resident Shalela Dowdy testified, "Baldwin County is literally located to the immediate east of Mobile," "right next door." Tr. 33. Dowdy spends time in Baldwin County "every few months," and has visited the county's beaches "as a tourist" and has "competed in Baldwin County as an athlete." Tr. 33.

123.   Fundamentally, Plaintiffs, their experts, and counsel do not actually dispute (and some begrudgingly admit) that Mobile and Baldwin Counties form a

community of interest. Mr. Cooper, for example, understands that there "are economic and community characteristics in the Gulf Coast counties of Baldwin and Mobile," and that Mobile and Baldwin, "[t]aken together, … are known as a combined statistical area, which means that at least 15 percent of the population in the two combined counties has some activity, employment related, with the opposite county." Tr. 207:2-9. In Mr. Cooper's words, there are "obvious connections." Tr. 207:21.

124.    Dr. Bagley opines only that the Gulf Coast is not an "inviolable" community of interest, a concept he does not define, and which implicitly recognizes that Mobile and Baldwin counties *are* a community of interest—violable or not. MX3 at 1; *see also* Tr. 2591 (*Singleton* counsel conceding as much); Tr. 2663:22 (*Caster* counsel: the Gulf Coast "may well be" a community of interest); Tr. 1441:6-8 (Dr. Bagley acknowledged grouping Mobile and Baldwin counties together as "metropolitan Mobile" in his book *The Politics of White Rights*).

125.    Separate from Plaintiffs' concessions, we find that the Legislature had before it substantial personal testimony and documentary evidence supporting its conclusion that the Gulf Coast community of interest exists and encompasses Mobile and Baldwin counties. That evidence includes the following:

- the shared history of the two counties, MX72 at 80:17-81:19; 81:4-82:6 (public hearing testimony of historian);

- a 2021 statement from a Democratic State Representative expressing her preference that the two "Gulf Coast counties remain in the same congressional district because government, business and industry in the two counties work well together—with our congressman—for the common good of the two counties," DX232 at 3;

- the link between the two counties created by Port of Mobile, which supported 312,896 jobs for fiscal year 2021, with tens of thousands of workers coming from Baldwin County, DX227[51];

- the growth in Baldwin County industry spurred by the Port's success and made possible by hundreds of millions of dollars in recent federal funding, DX228;

- the Gulf Coast's economic development projects, including the Bay Bridge, led by the 50-year-old South Alabama Regional Planning Commission (SARPC), DX239, *see also* Ala. Code §11-85-51(b);

- the regional importance of the University of South Alabama and the Coast Guard Aviation Training Center, *Milligan* DE259-1 at 71-73; and,

- the inter-county public transportation options provided by the two counties for their residents, *see* DX233[52], DX234[53].

126.   The legislative finding of a Gulf Coast community of interest defined by Mobile and Baldwin counties is obviously supported by substantial evidence.

127.   In addition, the Court has received testimony from several Gulf Coast residents, including Mobile City Council President C.J. Small, MX459-23, Alabama

---

[51] Also available at https://www.alports.com/wp-content/uploads/2022/10/Alabama-Port-Authority_2021-Economic-Impact_FullReport.pdf (last accessed March 5, 2025).

[52] Also available at Baldwin County, AL; BRATS Public Bus Transportation; Fares, Routes, & Scheduling at Baylinc Route at https://baldwincountyal.gov/departments/brats/public-bus-transportation/fares-routes-scheduling (last accessed March 5, 2025).

[53] Also available at Mobile, Alabama; *Baylinc Connects Mobile-Baldwin County Public Transit Systems* (Nov. 5, 2007), at https://www.cityofmobile.org/news/baylinc-connects-mobile-baldwin-county-public-transit-systems/ (last accessed March 5, 2025).

Department of Labor Senior Manager Derrick Turner,[54] and Baldwin County Economic Development Alliance President Lee Lawson, DX248.[55]

128.   Plaintiffs' lay witness C.J. Small, a black man, is the President of the Mobile City Council and for twelve years has represented District 3 on the City Council. He describes the Gulf Coast as comprising Mobile and Baldwin counties. MX459-23 at 42:12. He contrasted the Gulf Coast and Black Belt in terms of economic opportunity, testifying that the Gulf Coast has it, while the Black Belt does not. *Id.* at 52:4-10. He also noted that Mobile and Baldwin counties share broadcast and print media, *id.* at 65, share a culture of celebrating Mardi Gras, *id.* at 69-70, and stand to benefit from the Mobile Airport Authority, *id.* at 70:7-71:8, while the Black Belt does not.

129.   Councilman Small owns a business with offices in both counties, goes to the doctor in Baldwin County, and shops in Baldwin County. In contrast, he does not travel to the eastern Black Belt Counties; he does not even know where Barbour and Russell counties are. *Id.* at 48.

---

[54] The Alabama Department of Labor has since been renamed the Alabama Department of Workforce. *See* Ala. Code § 25-2-1.2. Reference herein to the Department of Labor should be considered synonymous with the Department of Workforce.

[55] *See* Tr. 2302, 2488-89, 2490-91 (admitted without objection).

130.    Under the Court's Plan, councilman Small's district is split between CDs 1 and 2. *Id.* at 93. Under the 2023 Plan, his council district is wholly within CD1.

131.    Derrick Turner, a black man, lives in Daphne (Baldwin County) and works in Mobile for the Alabama Department of Labor where he holds the title of Senior Manager. *Milligan* DE 459-26 at 9:3-10, 27:4-6, 44-45. He testified by deposition. For twenty years he has been commuting from Baldwin County to Mobile to work for the Department. *Id.* His job responsibilities include assisting job seekers with finding employment, leading public outreach efforts, and connecting employers with open positions to qualified applicants. *Id.* 31:14-32:7.

132.    He has worked closely with the Mobile, Bay Minette, and Foley Career Centers (the latter two sitting in Baldwin County). *Id.* 45:20-47:9. He has observed common clientele between these three career centers, which make up part of the same career center region. *Id.* 53:8-54:3, 14-25; 83-84.

133.    Lee Lawson, President of Baldwin County Economic Development Alliance, testified about the "unique interdependence of Baldwin and Mobile Counties." DX248 ¶3. The community revolves around Mobile Bay, the intercoastal waterway between Mobile and Baldwin counties. The major thoroughfares of I-10, I-65, and Highway 98 allow 60,000 residents of Baldwin and Mobile counties to commute to each other's counties for work every single day. *Id.* ¶5. A full quarter of

Baldwin County's workforce is employed in Mobile. *Id.* ¶8. And Mobile businesses train their employees in Baldwin too. *Id.* ¶9. Baldwin residents often go to Mobile for shopping, healthcare, or Mardi Gras. *Id.* ¶¶11, 13. Lawson noted further that Mobile is home to the University of South Alabama, which it draws its students from the Gulf Coast region and "has a satellite campus in Baldwin County."

134.    Commuting patterns analyzed by Dr. Reilly revealed a stronger relationship between Mobile and Baldwin County than between Mobile and any Black Belt county. Tr. 2169:12-18.

135.    Using 2021 data published by the Alabama Department of Labor,[56] Dr. Reilly demonstrated that there is considerable commuter traffic between Mobile and Baldwin counties. Twenty-nine percent of Mobile County workers reside outside of Mobile County. DX8 at 7. Of that 29%, Baldwin County is by far the largest contributor, supplying 12.8% of Mobile County workers. *Id.* Less than 22% of Mobile County residents commute outside of the county to work, yet of those who do, over one-third commute to Baldwin County, making up around 17% of the Baldwin County workforce. Tr. 2207:16-24; *see also* DX314.

136.    Around 45% of Baldwin County residents commute outside of Baldwin County for work, and nearly half of those residents—or 24.8% of all Baldwin

---

[56] The Department of Labor data is taken directly from the U.S. Census. *Milligan* DE459-17 at 20-21.

County workers—are commuting into Mobile County. *See* DX293 at 11; DX8 at 7 n.14.

137.   Montgomery County was the only Black Belt county found among the top ten labor destinations for Mobile County residents, with just 1.60% of Mobile County residents working there. DX8 at 9; DX314 at 13 (revealing that more Mobile County residents (2.5%) work in Jefferson County than Montgomery County). *See also* Tr. 77:3-80:18 (Dowdy agreeing that fewer than 1.5% of Butler, Crenshaw, Macon, or Russell county residents commute to Mobile County for work); Tr. 473:25-474:21 (Bullock County Commissioner—and *Caster* Plaintiff—Ronald Smith unaware of people in his community who frequently travel to Mobile for work). The 2021 data published by the Alabama Department of Labor did not display *any* sizable commuting patterns between Mobile County on the one hand and Barbour, Pike, Crenshaw, Butler, Lowndes, Bullock, Macon, Elmore, or Russell counties on the other. DX314 at 12–13.

138.   Population statistics cited by Dr. Reilly also indicate that Mobile County and Baldwin County are far more similar to each other than to counties in the Black Belt. Tr. 2171:4-14.

139.   Mobile County has a population of approximately 411,640 people, compared to 253,507 for Baldwin County. With the exception of Montgomery

County (226,361), no county in the Black Belt has a population of more than 60,000 people. DX8 at 11.

140.    Similarly, and again with the exception of Montgomery County, counties in the Black Belt tend to be very sparsely populated, particularly as compared to Mobile County and Baldwin County. Mobile County contains 337 people per square mile, while Baldwin County contains 150 people per square mile. Tr. 2171:4-10; DX8 at 11. Second to Montgomery among the Black Belt counties is Russell County, with 92.3 people per square mile. DX8 at 11. After Russell, the next most densely populated Black Belt county is Pike County, with just 49.1 people per square mile. *Id.*

141.    Per capita income in Mobile County and Baldwin County are each over $30,000; no counties in the Black Belt with the exception of Montgomery County featured a per capita income of greater than $30,000. Tr. 2171:17-21; DX8 at 11.

142.    Analyzing unemployment and "Help Wanted" data published in 2022 by the Alabama Department of Labor, Dr. Reilly demonstrated that job openings in Mobile and Mobile County are highly similar to jobs in Baldwin County. Seven of the top 10, and nine of the top 12 positions were identical in Mobile and Baldwin counties, whereas Black Belt county jobs tended to be focused more on factory and agricultural jobs. Tr. 2174:23-2175:14; DX8 at 12-13.

143.   Contrary to Plaintiffs' assertion that "[Dr. Reilly's] statistics, including median income and common professions, actually support plaintiffs' position that the City of Mobile and the Black Belt share many common interests," Tr. 2549:17-20, these statistics demonstrate at best a tenuous connection between Mobile and the Black Belt (especially the eastern Black Belt), while offering evidence of significant similarities between Mobile and Baldwin counties.

144.   In an attempt to sever the connection between Mobile and Baldwin counties, Plaintiffs try to cast Baldwin County as an isolated region sharing little to nothing in common with *any* part of the State. To that end, Dr. Caster testified, "Baldwin County is like an entity of their own," suggesting Baldwin County is not considered to be a part of any community of interest in Alabama. Tr. 406:13-17.

145.   Dr. Caster even suggested that Baldwin County is a sundown community. Tr. 398:10-399:7. But the weight of testimony from other Plaintiffs suggests just the opposite: Shalela Dowdy testified that she visits friends, has traveled to the beaches, and grew up competing in athletics in Baldwin County. Tr. 33. Mr. Ronald Smith testified that when he travels to the Gulf Coast for county commission conferences, he and his family love to shop in the Foley, Baldwin County area. Tr. 474:12-15, 476:14-477:3. Dr. Marcus Caster himself testified he has traveled to the Baldwin County beaches. Tr. 398:10-14.

146.   Given the record before the Legislature and before the Court, there can be no dispute that the 2023 Plan's stated goal of keeping the Gulf Coast together is a legitimate one, and §2 does not (and cannot) require the State to disregard that legitimate race-neutral purpose in redistricting. *Allen*, 599 U.S. at 30.

**The Wiregrass**

147.   The 2023 Plan also has the stated purpose of keeping the Wiregrass region together to the fullest extent possible. The Legislature defined the Wiregrass community of interest as comprising nine counties: Barbour, Coffee, Covington, Crenshaw, Dale, Geneva, Henry, Houston, and Pike. Ala. Code § 17-14-70.1(4)(g)(1).

148.   All nine Wiregrass counties are kept whole in CD2, except for Covington County, which is necessarily split between CD1 and Cd2 to allow CD1 to meet equal population and contiguity requirements without splitting a Black Belt county or moving other Black Belt counties out of the western Black Belt district.

149.   As Dr. Bagley notes, multiple historians have recognized the Wiregrass as comprising the same nine counties identified by the Legislature. MX3 at 8. And Dr. Bagley himself recognizes the Wiregrass, while constraining his definition to just six of those counties. *Id.* To be sure, he says the Wiregrass is not an "inviolable" community of interest. *Id.* at 1. But, again, that simply confirms that it is a community of interest.

150.    "The Wiregrass region is characterized by rural geography, agriculture, and a major military base" and "is home to Troy University's flagship campus in Troy and its campus in Dothan." Ala. Code §17-14-70.1(g).

151.    In addition, the Court has received testimony from three witnesses regarding the existence and importance of the Wiregrass as a community of interest: Mike Schmitz (who also testified to the Reapportionment Committee), Jeff Williams, and Brad Kimbro. Each provided a declaration and gave two depositions. *See Milligan* DE458, 459-10, 459-11, 459-21, 459-22, 459-27, 459-28; DX249; DX250; DX251.[57]

152.    During their 2024 depositions, each was clear that the Legislature's 2023 map better respected the Wiregrass than the Court's Plan, even though Rep. Barry Moore was on track to win the Court's CD1. *Milligan* DE459-22 at 72:14-73:4 (Schmitz); DE459-28 at 36:17-38:1 (Williams); DE459-28 at 39:5-42:18; DE459-28 at 45:19-46:13; DE459-28 at 64:22-65:9; DE459-11 at 100:21-101:20 (Kimbro); DE459-11 at 104:5-106:5.

153.    Schmitz attended the July 13, 2023, Reapportionment Committee meeting "in order to share [his] views on the importance of keeping Dothan and Houston County … in line with Montgomery and the counties in between and along the southeastern border of Alabama." DX249 ¶2. His testimony "emphasized the

---

[57] *See also* Tr. 2302:2-19 (admitted without objection).

importance of keeping the Wiregrass together to protect Fort Novosel and Maxwell Air Force Base and to help communities throughout the Wiregrass continue to thrive economically." DX249 ¶5.

154.   Schmitz stepped up to testify because he saw a map stretching the Wiregrass Congressional District all the way to Mobile County and Baldwin County, and he called Senator Donnie Chesteen and Representative Steve Clouse to express concern. *Milligan* DE459-21 at 19:15-20:18. Senator Chesteen encouraged Schmitz to testify at the Committee hearing to make his concerns known. *Milligan* DE459-21 at 19:15-20:21; *id.* at 27:20-28:5. "In [Schmitz's] opinion, if the Wiregrass is split up and moved west, Dothan and Houston County will lose our voice and lose our vote." DX249 ¶10; *see also Milligan* DE459-21 at 24:22-25:8. That's because the areas have different interests, and the population of the Gulf Coast counties dwarfs the population of the Wiregrass. *Milligan* DE459-22 at 20:19-25:10; *id.* at 31:3-33:1; *id.* at 35:7-38:18; *id.* at 72:23-73:12.

155.   Schmitz's opinion is well informed. He has been in the automobile business in Dothan more than 35 years and served as Dothan's Mayor from 2009 until 2017. DX249 ¶3. He is a Civilian Aide to the Secretary of the Army, meaning he is a community leader tasked with "advis[ing] and support[ing] Army leaders."[58] DX249 ¶4 (quoting www.army.mil/casa). He "ha[s] a 20-year relationship with Fort

---

[58] Schmitz's views are his own. DX249 ¶1.

Novosel, where the U.S. Army Aviation Center of Excellence is located, and about a four-year relationship with Maxwell." DX249 ¶6. In 2023, he "flew over Fort Novosel with Sen. Tuberville and Fort Novosel officials to familiarize the Senator with the operations there." DX249 ¶6. Since then, Fort Novosel's new Commanding General has relayed that the Fort has a $4 billion impact on the Wiregrass. *Milligan* DE459-22 at 31:15-22.

156.   Schmitz has also "been involved in economic development efforts" which has made him "very protective of the Wiregrass." DX249 ¶7. As he explains it, "Most of our communities are small and, when we stand alone, cannot succeed. We have created partnerships that have lasted for 50 and 100 years and helped all of our communities grow, and the City of Dothan works with smaller communities to help them create jobs because we know that what benefits them benefits everyone." DX249 ¶7; *see also Milligan* DE459-22 at 20:12-18 ("Well, the number one issue for me southeast Alabama—we worked together for many years. We're small towns, most of us. And I wanted to keep us together from Dothan all the way up to Montgomery. That was because we worked together, we collaborated together, we do economic development together."); *id.* at 21:21-22:8; *id.* at 24:21-25:10; *id.*at 35:18-37:17.

157.   Schmitz has nothing against Mobile County; he just sees it as different than the Wiregrass. *Milligan* DE459-22 at 20:19-21:10; *id.* at 22:13-24:8; *id.* at

38:11-18; *id.* at 48:6-10; *id.*at 56:20-57:10. "[T]hey have different interests than we do. I mean, they—they're bay. They have a ship-building place. They build airplanes. We're farmers. We're medical people. We have Fort Novosel." *Milligan* DE459-22 at 20:19-21:2; *id.* at 32:19-33:1. During his 2024 deposition, Plaintiffs argued that Mobile County had a comparable amount of farmland to Dothan's Houston County, *Milligan* DE459-22 at 79:15-81:9, but overstated the number of acres Mobile County has, *compare id.* at 80:9-18 *with id.* at 84:1-15, and failed to consider that Mobile County is substantially larger than Houston County, *id.* at 86:2-11.

158.    Williams and Kimbro echoed similar themes to Schmitz. Williams is "a commercial banker dealing with large businesses and government entities" and explains that "to be successful, [he] must understand [his] client's businesses to a high degree." DX251 ¶5; *see also Milligan* DE459-27 at 27:23-28:14. He also has a military background and is involved in the community with the Dothan Area Chamber of Commerce and the Dothan Housing Authority—both of which serve the region—and previously with the Rotary Club. DX251 ¶¶2, 6-8; *see also Milligan* DE459-27 at 28:2-4; DE459-27 at 28:15-23; DE459-28 at 19:12-21:21, 60:17-61:9.

159.    Williams testified "[t]he counties of Coffee, Dale, Henry, Houston, and Geneva have a long history of working together and are inter-dependent for the good of the region. These counties share similar culture, interests, geography, industries,

and economics." DX251 ¶9. He testified to the importance of Fort Novosel to the Wiregrass, and that the Wiregrass' other economic drivers are healthcare, agriculture, and education. DX251 ¶¶12-15; *Milligan* DE459-28 at 26:21-28:3.

160.    Williams further recognized the population advantage that Mobile has and how that impacts representation. DX251 ¶¶10-11, 17; *Milligan* DE459-28 at 34:17-35:15; *Milligan* DE459-28 at 40:11-22; *Milligan* DE459-28 at 45:1-11; *Milligan* DE459-28 at 45:18-46:13; *Milligan* DE459-28 at 47:12-17. A map placing the Wiregrass in the same Congressional District with Mobile "very much concerned" Williams because Mobile "is a completely different geography and culture" and they have "different types of industry and so forth." *Milligan* DE459-27 at 40:8-13; *see also* DE459-28 at 23:10-24:3, 26:7-11, 34:17-35:18, 40:11-17, 45:1-11.

161.    At deposition, Plaintiffs tried to establish that the organization of Williams' bank supported Plaintiffs' preference for splitting the Gulf Coast. *Milligan* DE459-28 at 18:6-19. While the bank assigns Mobile County and Baldwin County as separate markets due to their large populations, *Milligan* DE459-28 at 18:6-13, 60:4-16, those markets are co-extensive with the counties, *id.* at 49:13-51:8. The bank's regions—made up of multiple markets—combine the Dothan market with Florida. *Id.* at 16:6-8. And, fundamentally, banks are organized to perform different

functions than Congress. *Id.* at 59:3-60:16. The bank's organizational structure is irrelevant to this litigation, and Plaintiffs' argument to the contrary is non-serious.

162.   Brad Kimbro, who has spent the better part of five decades in the Wiregrass, works at Wiregrass Electric Cooperative, which primarily serves Houston, Geneva, Coffee, Dale, and Covington counties. DX250 ¶¶2-3. At the time of his declaration, he was the Immediate Past Chairman of the Dothan Area Chamber of Commerce, which he says should be renamed the Wiregrass Chamber of Commerce due to its regional focus and membership. DX250 ¶4; *see also Milligan* DE459-11 at 87:23-89:4.

163.   Kimbro describes the Wiregrass as "a community of small communities" who, "[b]y working collaboratively, … have accomplished more than [they] could accomplish alone" and who "have seen successes for one county benefit other counties." DX250 ¶5; *see also Milligan* DE459-11 at 25:1-28:9. As examples, Kimbro offered the collaborative efforts to bring I.S.A. Corporation and HudsonAlpha Institute for Biotechnology to the Wiregrass, as well as collaborative efforts to ensure an educated workforce and push for infrastructure developments. DX250 ¶¶6-12; *see also Milligan* DE459-11 at 26:18-33:5, 36:3-46:11, 89:5-22.

164.   Kimbro also echoed the importance of Fort Novosel to the Wiregrass community, DX250 ¶13; *Milligan* DE459-11 at 46:20-51:10, and testified to shared media and festival experiences, DX250 ¶¶14-15; *Milligan* DE459-11 at 51:16-52:8,

91:8-93:20. Finally, Kimbro recognized that Mobile and Baldwin counties are "another region of the state" in that they have "different interests than the Wiregrass because they have a port, they have a beach, just different things." *Milligan* DE459-11 at 105:5-9.

165.  The legislative findings with respect to the Wiregrass community of interest are supported by substantial evidence, and the record before this Court further establishes the Wiregrass as a community of interest.

166.  The bottom line is that the Legislature, exercising its "political judgment," *Miller*, 515 U.S. at 915, declared that the Black Belt, the Gulf Coast, and the Wiregrass "communities of interest … shall be kept together *to the fullest extent possible*." Ala. Code 17-14-70.1(4)(d) (emphasis added).[59] That policy of defining and uniting the State's regional communities, clearly given effect in the 2023 Plan, is well-supported by the evidence.

### ii. Plaintiffs' maps violate Alabama's traditional districting principles.

167.  In "case after case," the Supreme Court has emphasized that §2 "never requires adoption of districts that violate traditional redistricting principles." *Allen*,

---

[59] Based on a poor and selective reading of the text, Dr. Duchin suggests that it is "not literally possible" to adhere to the letter of the law because the Wiregrass and Black Belt counties cannot be kept together in a single district, given their populations. Tr. 298:1-8. She ignores the phrase "shall be kept together *to the fullest extent possible*," Ala. Code §17-14-70.1(4)(d), along with the provision declaring that "the Black Belt counties cannot be combined within one district without causing other districts to violate the principle of equal population," *Id.* §17-14-70.1(4)(e)(4).

599 U.S. at 29 n.4 & 30. Such districts are not "reasonably configured," *id.* at 18, and cannot "demonstrate the existence of a proper remedy" for the alleged §2 violation, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999).

168.   The application of the State's traditional criteria in a *Gingles* 1 plan is supposed to "impose[] meaningful constraints on proportionality." *Allen*, 599 U.S. at 26 & n.4. To do so, a plaintiff's illustrative plan must respect the State's traditional districting principles "at least as well as" those principles are given effect in the State's plan, *Allen*, 599 U.S. at 44 n.2 (Kavanaugh, J., concurring); otherwise it reveals nothing about a possible "disparate effect on account of race" in the State's plan, *id.* at 26. At best, it reveals effects on account of the prioritization of traditional criteria.

169.   Although we held that Plaintiffs' old illustrative plans were reasonably configured when compared to the 2021 Plan, they no longer pass the *Gingles* 1 test when compared to the 2023 Plan. Plaintiffs' new plans fare no better.

170.   The Court is not judging a "beauty contest," *Bush v. Vera*, 517 U.S. 952, 977-78 (1996); it is determining whether the 2023 Plan "has a disparate effect on account of race." *Allen*, 599 U.S. at 26.

171.   The concept of redistricting "beauty contests" originated in *Vera*, when the plurality said that a *State's* plan need not survive *plaintiff's experts'* "beauty contests," given the Supreme Court's "longstanding recognition of the importance

in our federal system of each State's sovereign interest in implementing its redistricting plan." 517 U.S. at 977-78.

172.   In *Allen*, the Court said it needn't "conduct a 'beauty contest'" because "[t]here would be a split community of interest in both" the *2021 Plan* and Plaintiffs' alternatives. 599 U.S. at 21. In other words, no "beauty contest" was required because some of Plaintiffs' maps performed "at least as well as Alabama's" 2021 Plan on traditional districting principles. *Id.* at 44 n.2 (Kavanaugh, J., concurring); *see also Abrams*, 521 U.S. at 91 (Section 2 analysis of Georgia's plan required accounting for "Georgia's traditional districting policies.").

173.   Plaintiffs' map drawers, Mr. Cooper and Dr. Duchin, agree that their maps should respect *Alabama*'s traditional districting principles, not some other State's. Tr. 299:5-9 (Duchin); Tr. 194:15, 205:15-16 (Cooper). But, by their own admission, they cannot articulate the line between reasonably and unreasonably compact, between an acceptable number of county splits and too many, or, for example, between respecting and disrespecting a community of interest. *See, e.g.,*125:13-16 (Cooper acknowledging no "bright-line rule" for compact vs. non-compact); Tr. 324:22 (Duchin: "Definitely no bright line").

174.   Without "ascertainable and objective standards" of reasonableness by which to judge Plaintiffs' illustrative maps, *Dillard*, 376 F.3d at 1268, the *Gingles* 1

inquiry necessarily devolves into a "ballpark" game where "close enough is good enough." *See, e.g.*, Tr. 190:18-22.

175.   Thus, *Gingles* 1 must be a comparative exercise. And any sort of "good enough" test that allows an illustrative plan to suffice even though it is objectively worse on non-racial districting principles than the plan plaintiffs are challenging is utterly unpredictable for any Legislature trying to determine whether race-based districting is required or whether race-neutral districting will do. Is one extra county split reasonable? Or two? Ten? How many communities of interest can be sacrificed? How much more sprawling can the new districts be? "It is vital" when intervening in "the legislative process of apportionment" that courts "act only in accord with especially clear standards." *Rucho*, 588 U.S. at 703-04. Plaintiffs' approach to *Gingles* 1 lacks that required clarity.

176.   As confirmed when compared to the 2023 Plan, each of Plaintiffs' illustrative plans violates Alabama's traditional districting principles.

### a. Plaintiffs' Old Maps

177.   We can no longer conclude that Plaintiffs' old maps are "reasonably configured" when every one of them splits the Gulf Coast counties, and has more sprawling districts, more county splits, or both. Moreover, every plan also splits the Black Belt into more districts than the 2023 Plan.

178.    Fundamentally, the old plans reveal nothing about the 2023 Plan because they "fail[] to incorporate Alabama's own districting guidelines, including keeping together communities of interest." *Allen*, 599 U.S. at 34. If that's not right, then "traditional districting criteria" are doing no work to "limit[] any tendency of the VRA to compel proportionality" in the 2023 Plan. *Id.* at 28 & n.4. ("we have rejected districting plans that would bring States closer to proportionality when those plans violate traditional districting criteria").

179.    Before it can be held to violate §2, the 2023 Plan requires the same (1) "intensely local appraisal," and (2) comparison with at least one illustrative plan on par with the 2023 Plan on neutral criteria. *Id.* at 19, 26. Only then can a court identify any "inconsistent" application of redistricting principles with a discriminatory effect. *De Grandy*, 512 U.S. at 1015.

180.    The Court accordingly examines how the 2023 Plan's application of the State's neutral criteria deviates from that of Plaintiffs' plans. *See, e.g.*, *Allen*, 599 U.S. at 20 (observing Plaintiffs' plans "perform[ed] generally better on average than did [the 2021 Plan]" with respect to compactness); *id.* at 21 (comparing State's splitting of Black Belt with Plaintiffs' splitting of Gulf Coast); *id.* at 26 (discussing relevance of "[d]eviation from" illustrative plans); *see also Abrams*, 521 U.S. at 91 (Section 2 analysis of Georgia's plan required accounting for "Georgia's traditional districting policies.").

181.   Shown below, none of Plaintiffs' old plans measure up to the 2023 Plan on the "traditional districting principles" that States retain "discretion to apply." *Vera*, 517 U.S. at 978 (plurality).[60]

| | 2023 Plan | Duchin A | Duchin B | Duchin C | Duchin D | Cooper 1 | Cooper 2 | Cooper 3 | Cooper 4 | Cooper 5 | Cooper 6 | Cooper 7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Districts w/ 18 Core Black Belt Counties** | 2 | 3 | 4 | 3 | 3 | 4 | 4 | 3 | 4 | 4 | 5 | 3 |
| **Districts with Gulf Coast Counties** | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| **Districts with Wiregrass Counties** | 2 | 2 | 3 | 2 | 2 | 2 | 2 | 3 | 2 | 3 | 3 | 3 |
| **Districts with Montgomery County** | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 1 | 2 | 2 | 1 | 1 |
| **County Splits** | 6 | 9 | 7 | 9 | 6 | 6 | 7 | 6 | 6 | 6 | 7 | 5 |
| **Reock Average** | 0.411 | 0.363 | 0.358 | 0.335 | 0.384 | 0.320 | 0.327 | 0.324 | 0.325 | 0.283 | 0.306 | 0.400 |
| **Reock Least Compact District** | 0.285 (CD1) | 0.192 (CD1) | 0.185 (CD1) | 0.185 (CD1) | 0.190 (CD1) | 0.188 (CD1) | 0.187 (CD1) | 0.185 (CD1) | 0.185 (CD1) | 0.171 (CD1) | 0.212 (CD1) | 0.186 (CD1) |
| **Polsby Popper Average** | 0.282 | 0.256 | 0.282 | 0.255 | 0.249 | 0.180 | 0.176 | 0.183 | 0.214 | 0.183 | 0.159 | 0.211 |
| **Polsby Popper Least Compact District** | 0.185 (CD6) | 0.129 (CD1) | 0.156 (CD1) | 0.149 (CD2) | 0.132 (CD1) | 0.134 (CD7) | 0.115 (CD2) | 0.124 (CD4) | 0.131 (CD6) | 0.112 (CD7) | 0.098 (CD6) | 0.129 (CD7) |

[60] **Red** cells denote a metric that is **worse** than that of the 2023 Plan.
**Gray** cells denote a metric that is **neither worse nor better** than that of the 2023 Plan.
The lone **green** cell denotes the metric that is **better** than that of the 2023 Plan.
*See generally* DX10; CX1; MX8.

182.    None of Plaintiffs' old plans put the Black Belt into fewer than *three* districts. That alone disqualifies them.

183.    Nor is there a "split community of interest" in both the 2023 Plan and Plaintiffs' old plans. *Allen*, 599 U.S. at 21. Rather, *both* the Gulf Coast and Black Belt are kept together in the 2023 Plan to the maximum extent possible, but *neither* is kept together as well in any of Plaintiffs' old plans. So too with the Wiregrass. In short, Plaintiffs old plans split the Gulf Coast and the Wiregrass and the Black Belt more than the 2023 Plan.

184.    Further, none of the old plans are as compact as the 2023 Plan.

185.    Also, each of Plaintiffs' old plans fails to match the 2023 Plan on county splits, compactness, or both. As an aside, Alabama's non-negotiable principle of minimizing county splits to six is neither arbitrary nor *untraditional* because six splits of county lines is the minimum number necessary to achieve minimum population deviation among the districts, and that principle is given effect in the 2023 Plan.

186.    The only plan to have one less county split (Cooper 7) does not have minimum population deviation, CX1 at 43, splits 17 more VTDs than the 2023 Plan, *id.* at 50, and goes on to split the Gulf Coast, Wiregrass, *and* the Black Belt more than the 2023 Plan. Also, it's less compact.

187.   In short, these underperforming alternative plans are not evidence of racial vote dilution in the 2023 Plan any more than an illustrative plan that sacrificed contiguity to district together distant minority populations could prove racial vote dilution. The State's departure from these maps doesn't show anything relevant to the §2 inquiry other than perhaps that disparate impacts from the 2023 Plan are on account of traditional principles, rather than "on account of race." *Cf. Johnson v.* 997, 1015 (1994) ("[S]ome dividing by district lines and combining within them is virtually inevitable and befalls any population group of substantial size.").

### b.  Plaintiffs' New Maps

188.   *Milligan* and *Caster* Plaintiffs came forward with three new maps: Duchin E, Cooper 8, and Cooper 9. They also offer the Special Master's Remedial Plan 1 and the VRA Plaintiffs' Remedial Plan (drawn by Dr. Duchin, *see* MX10, and submitted to the Redistricting Committee) as *Gingles* 1 alternative maps.[61] As shown below, these plans fail to respect Alabama's traditional districting principles "as well as" the 2023 Plan. *Allen*, 599 U.S. at 44 n.2 (Kavanaugh, concurring).[62]

---

[61] The Special Master's first plan is the only one of his three plans to include a version of CD2 with a BVAP above 50%. Special Master Plans 2 and 3 do not satisfy the "majority-minority rule" of *Gingles* 1—that black Alabamians "make up more than 50 percent of the voting-age population" in CD2. *Strickland*, 556 U.S. at 18; *see* MX11 at 4 (SM2 with BVAP of 48.49% and SM3 with BVAP of 48.69%). Thus, CD2 in SM2 and SM3 is a "crossover district." *Id.* at 13. Because "§2 does not require crossover districts," SM2 and SM3 are not evidence of vote dilution. *Id.* at 23.

[62] **Red** cells denote a metric that is **worse** than that of the 2023 Plan.
  **Gray** cells denote a metric that is **neither worse nor better** than that of the 2023 Plan.
  The two **green** cells denote a metric that is **better** than that of the 2023 Plan.
  *See generally* DX10; CX2; MX11.

| | 2023 Plan | Duchin E | Cooper 8 | Cooper 9 | Special Master 1 | VRA Plaintiffs Remedial Plan |
|---|---|---|---|---|---|---|
| **Districts w/ 18 Core Black Belt Counties** | 2 | 2 | 3 | 4 | 2 | 2 |
| **Districts with Gulf Coast Counties** | 1 | 2 | 2 | 2 | 2 | 2 |
| **Districts with Wiregrass Counties** | 2 | 2 | 2 | 2 | 2 | 2 |
| **County Splits** | 6 | 6 | 6 | 5 | 7 | 7 |
| **Reock Average** | 0.411 | 0.348 | 0.33 | 0.43 | 0.352 | 0.318 |
| **Reock Least Compact District** | 0.285 (CD1) | 0.19 (CD1) | 0.21 (CD1) | 0.26 (CD1) | 0.19 (CD1) | 0.19 (CD1) |
| **Polsby Popper Average** | 0.282 | 0.273 | 0.20 | 0.27 | 0.231 | 0.195 |
| **Polsby Popper Least Compact District** | 0.185 (CD6) | 0.15 (CD2) | 0.12 (CD2) | 0.17 (CD3) | 0.15 (CD1) | 0.11 (CD6) |

189.    No one disputes, given equal population requirements, that the Black Belt must be placed into at least two districts. *See, e.g.*, Tr. 200:13-17. Only Duchin E, Special Master 1, and the VRA Plaintiffs' Remedial Plan place the Black Belt into two congressional districts, the minimum number possible. Duchin E sacrifices the Gulf Coast, Wiregrass, and compactness to do so. The same goes for Special Master 1 and the VRA Plaintiffs' Remedial Plan, except that those two plans *also* split Houston County in order to bring Dothan into CD2.

### Duchin E



190. Duchin E splits the Gulf Coast community of interest while the 2023 Plan does not. The 2023 Plan keeps eight out of nine Wiregrass Counties in one district, while Duchin E cuts the Wiregrass community of interest virtually in half, placing Barbour, Crenshaw, Henry, and Pike in CD2 and leaving Covington, Coffee, Dale, Geneva, and Houston in CD1. Duchin E is also less compact on average than the 2023 Plan and its least compact district is less compact than the 2023 Plan's least compact district.

191. Despite purporting to prioritize compactness in Duchin E, Tr. 289, the non-compactness of CD2 in Duchin E is historic. Using the Reock and Polsby Popper metrics, Duchin E's CD2 is less compact than CD2 in every Enacted Plan going back over half-a-century to 1972. CX10 at 50-51. And using the Convex Hull metric, it is the least compact of *all* districts during that same time span. *Id.* at 52.

**VRA Plaintiffs' Remedial Plan & Special Master 1**



192.   CD1 and CD2 in the VRA Plaintiffs' Remedial Plan (left) and Special Master 1 are virtually identical to those districts in Duchin E, except that they both split Houston County by placing Dothan in CD2. Thus, in addition to the community of interest and compactness deficiencies they share with Duchin E, they also split more counties than the 2023 Plan.

193.   None of these three plans are on par with the 2023 Plan in terms of compactness, respect for communities of interest, and, in the case of the latter two plans, county splits. Thus, they do not get to enter the "beauty contest" and cannot constitute evidence of vote dilution. *Allen*, 599 U.S. at 21. "Deviation" from these three deficient maps does not show that "it is possible that the State's map has a disparate effect on account of race." *Id.* at 26.

### Cooper 8

194.   Cooper 8 splits the Black Belt into three districts (CD2, CD3, and CD7). And it splits the Gulf Coast and divides Wiregrass region between CD1 and CD2. It's also less compact than the 2023 Plan. In fact, using the Reock, Polsby-Popper, and Convex-Hull metrics, CD2 in Cooper 8 is less compact than every state-drawn version of CD2 since 1972. DX10 at 47, 49, 51 (Figs. 24, 26, 28). Put simply, it can't compete.



### Cooper 9

195.   Cooper 9's Reock compactness average is slightly better than the 2023 Plan's (and has one less county split), but only because Cooper 9 splits the Black Belt into *four* districts (CD1, CD2, CD3, CD7), splits the Gulf Coast and Wiregrass, morphs CD4 and CD5 at the top of the State into boxes,[63] splits 18 more VTDs than the 2023 Plan, CX2 at 12, and does not achieve minimum population deviation, *id.* at 9. And like CD2 in Cooper 8, CD2 in Cooper 9 is less compact than every



---

[63] Dramatically altering CD4 and CD5 to improve their compactness has the "masking effect" of covering up less compact districts elsewhere while boosting the plan-wide compactness average. Tr. 1991:17-24.

state-drawn version of CD2 since 1972. *Compare* CX2 at 51 (providing compactness scores) *with* DX10 at 47, 49, 51 (Figs. 24, 26, 28).

196.    To overcome these deficiencies, Plaintiffs may not play a game of whack-a-mole. The "exacting requirements" of the preconditions would be illusory if Plaintiffs could cobble together bits and pieces from any number of their fatally flawed illustrative plans to satisfy *Gingles* 1. For example, Plaintiffs tout Cooper 7's and Cooper 9's compactness scores as sufficient to show that these plans are reasonably configured. Tr. 2528. But Plaintiffs ignore that those plans unnecessarily chop up Alabama's important communities of interest in violation of Alabama's traditional principles. What Plaintiffs have not done is produce a *single* illustrative plan that contains a second majority-minority district without violating at least one of Alabama's traditional districting principles.

197.    In conclusion, we emphasize that §2 compliance is not at war with the application of traditional districting criteria. In complying with the Voting Rights Act, States are free to "avoid strict scrutiny altogether by respecting their own traditional districting principles." *Vera*, 517 U.S. at 978 (plurality).

**2.    *Gingles* 1. Plaintiffs' maps subordinate Alabama's traditional districting principles to race.**

198.    Section 2 "never requires adoption of districts" that subordinate traditional race-neutral districting principles to racial considerations. *Allen*, 599 U.S. at 30; *see also Miller*, 515 U.S. at 916. Such districts are racial gerrymanders and

cannot "demonstrate the existence of a proper remedy" for the alleged §2 violation. *Burton*, 178 F.3d at 1199.

199.   A district is racially gerrymandered where "race was the criterion that … could not be compromised," *Alexander v. S.C. NAACP*, 602 U.S. 1, 7 (2024), and "race-neutral considerations came into play only after the race-based decision had been made," *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017).

200.   Here, the record is replete with both direct and circumstantial evidence that "betray[s]" Plaintiffs' "aim of segregating voters on the basis of race." *Alexander*, 602 U.S. at 35.

### i. Direct evidence abounds that race was the predominant motivating factor for Dr. Duchin and Mr. Cooper.

201.   Dr. Duchin's and Mr. Cooper's preliminary injunction hearing testimony and trial testimony are saturated with "express acknowledgment[s] that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8. This "direct evidence" "amounts to a confession of error" that race predominated in the design of Plaintiffs' alternative plans, old and new. *Id.*; *see also Cooper v. Harris*, 581 U.S. 285, 310-16 (2017) (discussing "direct evidence of racial predominance" similar to the that presented here); *Bush v. Vera*, 517 U.S. 952, 969 (1996).

202.   Dr. Duchin, when describing her approach, stated, "[A]fter … what I took to be nonnegotiable principles of population balance and seeking two majority-

black districts, *after that*, I took contiguity as a requirement and compactness as paramount." PI Hrg. Tr. 577:17-20 (emphasis added).

203.    In furtherance of her "nonnegotiable" principle of "seeking two majority-black districts," *id.*, Dr. Duchin confirmed that she would "periodically check to see if [she was] crossing that threshold" because she would "need to cross that threshold in order to submit the map to the Court." Tr. 288:10-19.

204.    If, when drawing her maps, Dr. Duchin saw that an intended majority-black district was dropping below 50% BVAP, she would generally change course in an attempt to hit the threshold. Tr. 328:19-24.

205.    She also stated that prioritization of race-neutral criteria kicked in after she had achieved her "nonnegotiable" goals. PI Hrg. Tr. 577:20-23 ("I took, for example, county integrity to take precedence over the level of BVAP *once that level was past 50 percent*.") (emphasis added). *Compare id. with Alexander*, 602 U.S. at 22 (State's map drawer "considered the relevant racial data only *after* he had drawn the Enacted Map").

206.    When asked whether "an express goal of [hers was] to keep the Black Belt counties in majority-black districts to the extent she could," she answered, "Yes." Then when asked whether that was "part of the reason why [her] compactness scores for CD1 and CD2 were lower," she answered again, "That's right." PI Hrg. Tr. 664:17-24.

207.   When asked whether she split VTDs on the basis of race, she said, "I did sometimes look at race of those blocks, but really, *only to make sure that I was creating two districts over 50 percent*. Beyond ensuring crossing that 50 percent line, there was no further consideration of race in choosing blocks within the split VTDs." PI Hrg. Tr. 573:3-8 (emphasis added).

208.   When asked whether it would be "fair to say that the principle of splitting fewer counties was subordinated to the principle of getting two majority-black districts in Alabama," she answered, "It's true that I regard the federal requirements of population balance and minority electoral opportunity to be *nonnegotiable* and, therefore, higher ranked." PI Hrg. Tr. 635:1-6 (emphasis added).

209.   And when asked whether she thought "one reason that there are nine splits in counties in [her] plan as opposed to six splits in counties [in the enacted plan] … was because of the weight [she] gave to the criteria of ensuring two majority-black congressional districts," she said, "*There's no question*. And I have consistently acknowledged that I took minority electoral opportunity to be a nonnegotiable principle sought in these plans." PI Hrg. Tr. 647:12-20 (emphasis added).

210.   Dr. Duchin testified that she considers "racial fairness" to be a traditional districting principle. Tr. 342:1-6.

211.   Mr. Cooper, for his part, believes "the non-dilution of minority voting strength" is a traditional redistricting principle. Tr. 156:7-10.

212.   Mr. Cooper also considers "the black population in Alabama" to constitute a "historical and cultural community of interest." Tr. 199:8-19.

213.   When asked whether he had a "nonracial reason for splitting Mobile County," he answered, "it is split because you probably do need to split it to create a second majority-black district." Tr. 212:6-9, 16-17.

214.   And when thrice asked by the Court "to what extent [he] considered race in drawing the nine illustrative plans," Mr. Cooper gave increasingly telling answers. Tr. 232:2-3. Initially, he acknowledged that race is "in the background." Tr. 232:4. Then he stated that he associated the Black Belt with black people. Tr. 232:23. And when pressed a third time, he stated that he used "a little green dot" to indicate every precinct in the State that is "30 percent or more black." Tr. 233.

215.   No one disputes that Dr. Duchin and Mr. Cooper "purposefully established a racial target: African-Americans should make up no less than a majority of the voting-age population" in two congressional districts. *Cooper*, 581 U.S. at 299. And we do not hold that the target alone established predominance. After all, a very low racial target might not affect lines at all, while a very high one almost certainly would, depending on an area's demographics. But here, the direct evidence of the racial target and the evidence discussed below confirm that the

contours of Dr. Duchin's and Mr. Cooper's maps were "motivated by a predominant, overriding desire to assign black populations" to CD2 "and thereby permit the creation of a [second] majority-black district." *Miller*, 515 U.S. at 917. This is textbook racial gerrymandering.

### ii. Plaintiffs' maps are slight variations on the same gerrymandered theme.

216.    Each of Plaintiffs' illustrative plans, old and new, along with the VRA Plaintiffs' Remedial Plan of 2023 and Special Master 1, are slight variations on the same gerrymandered theme: (1) Jefferson County is split along racial lines, joining its black voters with black voters from the western Black Belt to maintain CD7's majority-black status; and (2) Mobile County is split along racial lines, joining its black voters with black voters in Montgomery County and the eastern Black Belt to create a second majority-black district. *See* Tr. 341:15-16 (Dr. Duchin acknowledging as much); Tr. 1981 (Dr. Trende).[64] One consistent and inevitable consequence of this design is that CD1 serves no discernable purpose other than to prop up CD2's majority-black status; the contours of the former are entirely dependent on the race-based shape of the latter. In other words, in addition to sacrificing traditional districting principles for race, Plaintiffs subordinate CD1 to their goal of creating one more majority-black district.

---

[64] Again, the Special Master's first plan is the only one of his three plans to include a version of CD2 with a BVAP above 50%. Because the BVAP of CD2 in SM2 and SM3 is below 50%, SM2 and SM3 are not evidence of vote dilution. *See Strickland*, 556 U.S. at 23.



**Cooper 1**  **Cooper 2**  **Cooper 3**

**Cooper 4**  **Cooper 5**  **Cooper 6**

**Cooper 7**  **Cooper 8**  **Cooper 9**



**VRA Plaintiff's Remedial Plan**

217.    Every single map splits Jefferson County and (more importantly for present purposes) Mobile County along racial lines. And every map connects the Mobile split with Black Belt counties east of Montgomery when forming CD2. Many maps take CD2 all the way to the Georgia border. The minimal differences between these plans amounts to nothing more than "racial tinkering," *Miller*, 515 U.S. at 919, in service of the ultimate aim of hitting "an announced racial target," *Cooper*, 581 U.S. at 300.

### a.  Jefferson County is split along racial lines in Plaintiffs' illustrative maps.

218.    Plaintiffs' illustrative maps separate voters in Jefferson County based on race between majority-black CD7 and majority-white CD4 and CD6. In Dr. Duchin's plans, "almost all of the high BVAP precincts are included in District 7 and the remaining two districts are left with almost no minority precincts in them or parts of precincts." Tr. 2017:5-10. Dr. Trende's choropleth maps shown below are "useful for seeing when maps carve out areas of highly concentrated BVAPs." DX10 at 77, 73-74.



219.   Dr. Duchin attempted to rebut Dr. Trende's conclusion that she split counties on racial lines, *see* DX10 at 64, 73, by submitting a demonstrative graphic supposedly picturing a split in Jefferson County near Bessemer. Tr. 312:3-9. The image *actually* showed Duchin E's split of Clarke County, which divides the county between two majority-black districts (CD2 and CD7). Tr. 545. Plaintiffs have not rebutted Dr. Trende's opinion that Dr. Duchin split Jefferson County along racial lines.

220.   The way in which Jefferson County is split in Cooper 1 through 9 is of a piece with the splits in Duchin A through E. Tr. 2015:18-22, 2017:5-10; *see also* DX10 at 66 (Dr. Trende noting that "[o]ccasionally a precinct with a BVAP in excess of 20% is allowed to slip out of District 7 and into 6, but those occasions are rare"). We include below two representative examples. *See also* DX10 at 66-68.



Cooper 3                    Cooper 7

221.   Given the late submission of Cooper 9, Dr. Trende was unable to generate a choropleth image for its split of Jefferson County. However, Dr. Trende

found that the split resembles the way Jefferson County is split in Mr. Cooper's other maps. Tr. 2016:11-16. CD7 in Cooper 9 "is carefully drawn to cut through Jefferson County and sort precincts by race." DX10 at 66.

222.    We recall that Mr. Cooper's map drawing process places a green dot on every precinct with at least a 30% BVAP. *See* Tr. 163:8-14. For Jefferson County, the inescapable conclusion is that Mr. Cooper observed a concentration of green-dotted precincts and then drew almost all of them into CD7, raising its BVAP above 50%.

223.    At trial, Mr. Cooper attempted to offer an alternative explanation. When asked whether his split of Jefferson County in Cooper 9 "reflects the oddly configured boundaries of municipalities in Jefferson County," he answered, "Yes." Tr. 145:2-5; *see also* CX2 at 30 (pictured below).



224.    The Court does not credit this explanation. Dr. Trende, when presented

with the above graphic during cross-examination, was able to perceive quickly that

District 7 splits the municipalities of "Graysville, Gardendale, Pinson, Clay,

Trussville, Irondale," and others "on racial lines." Tr. 2110:2-15. As Dr. Trende

observed, "He's not following city lines." Tr. 2110:20. The precision with which

Mr. Cooper splits Jefferson County on racial lines cannot be explained away by

reference to municipal boundaries; indeed municipalities too are split in Cooper 9

along racial lines.

### b. Mobile County is split along racial lines in Plaintiffs' illustrative maps.

225.  That Plaintiffs sacrificed traditional districting criteria for the sake of racial preferences is most clearly revealed by the way every one of Plaintiffs' illustrative plans splits Mobile County and with it Alabama's distinctive Gulf Coast region into two districts along racial lines.

226.  Under Plaintiffs' illustrative plans, voters in Mobile and Baldwin counties would be divided between two congressional districts for the first time in over 50 years, and Mobile County would be split between separate congressional districts for the first time in the State's history.

227.  When attacking the 2021 Plan, *Milligan* Plaintiffs argued that the Plan's "'inconsistent treatment' of Black and White communities [wa]s 'significant evidence' of a § 2 violation." *Milligan* Appellees' Br.39, *Allen v. Milligan* (quoting *De Grandy*, 512 U.S. at 1015). According to *Milligan* Plaintiffs, "Defendants chose to preserve one set of communities of interest—most or all of which are majority white—at the expense of respecting majority-Black communities of interest like the Black Belt and Montgomery County." *Milligan* DE94 (Reply iso PI) at 15.

228.  Plaintiffs, however, do not hesitate to split majority-white Mobile County while keeping majority-black Montgomery County whole. And their splits of Mobile County closely follow racial lines, as confirmed by Dr. Trende's

choropleth maps. We include below two representative examples. *See also* DX10 at 69-71, 75-76.



Mobile County, Cooper 7 (left) and Duchin E (right). DX10 at 71, 76.

229.   Even in lower resolution, the choropleth images plainly show the race-focused natured of the Mobile County split. *See* Tr. 2101:17-2102:5 (Dr. Trende opining that choropleths are "all that is necessary to conclude that Jefferson and Mobile counties are split along racial lines"). Indeed, the splits correlate "almost perfectly with race." Tr. 2103:18-22.

230.   First off, Mr. Cooper clearly gets his green dots, as he did when splitting Jefferson County. Tr. 2017:11-19.

231.   Second, the precision with which Dr. Duchin captures heavily black precincts while avoiding heavily white precincts especially catches our attention. CD2's lines carefully skirt around a predominantly white precinct, nearly enveloping it, while advancing in a pincer movement to collect the higher BVAP precincts surrounding it.

232.   We have a hard time believing Dr. Duchin's testimony that she prioritized compactness in Duchin E, *see* Tr. 289:15-17, when she is perfectly willing to sacrifice compactness in Mobile to grab black voters while avoiding white ones. Furthermore, despite compactness being "the top priority" in this map, *id.*, Duchin E is *not* the most compact of her five plans; in fact, it is the *least* compact plan by Convex Hull. DX10 at 36-37.

233.   In sum, CD2 in every illustrative plan offered is a "'textbook example' of race-based districting" akin to North Carolina's racially predominate plans at issue in *Cooper v. Harris*, where the General Assembly dampened respect for traditional principles in order to achieve the "racial target" of creating majority-BVAP districts. 581 U.S. at 299. In *Cooper*, hitting the target meant sacrificing "county or precinct lines" a bit, resulting in "a district with stark racial borders." *Id.* at 300.

234.   Illustrative CD2 is this and more. It subordinates numerous districting criteria, most notably the integrity of Mobile County and the Gulf Coast, to the

50%+1 BVAP target and produces "boundaries amplifying divisions between blacks and whites." *Id.* at 300-01. Against this evidence of racial predominance, a map drawer saying "I considered race just enough but not too much" cannot bring the plan within constitutional bounds. If that were acceptable, then the maps drawn in *Cooper*—ultimately declared unconstitutional—should have been acceptable. North Carolina subordinated traditional districting principles to race only "sometimes," when it interfered with "'the more important thing' … to create a majority-minority district." 581 U.S. at 300.

235.   No State could constitutionally enact one of Plaintiffs' plans. When a State tried in *Cooper*, the plan was resoundingly rejected.

### c. The State Board of Education Plans do not provide a race-neutral reason to excise "Black Mobile" from Mobile County.

236.   Plaintiffs point to Alabama's State Board of Education Plan to justify their decision to split Mobile County along racial lines, separate the Gulf Coast counties into two districts, and join black voters in Mobile with black voters in Montgomery and the eastern Black Belt counties. Tr. 2527:20-23 & 2529:9-12 (*Caster* counsel), 2588:19-23 & 2593:18-23 (*Singleton* counsel); Tr. 348:18-21 (Dr. Duchin); CX1 at 17-19; CX11 at 15-20; MX8 at 10; MX10 at 1 (VRA Plaintiffs' Remedial Plan "followed the split of Mobile County from the State Board of Education map as closely as possible").

237.    Dr. Trende's unrebutted testimony explains the State Board of Education Plans cannot give Plaintiffs a *race-neutral* justification for excising "Black Mobile" from Mobile County.

238.    Dr. Trende examined the history of the State Board of Education Plan. DX10 at 56-64; Tr. 2024:24-2025:8. In conducting his analysis, he considered the State's preclearance submissions for the 2000s and 2010s State Board of Education Plans, the Plans' shapefiles, and relevant court cases. Tr. 2025:9-21.

239.    The State Board of Education's first plan with two majority-black districts arose from the *Sahag v. Mitchell* litigation in 1996. Tr. 2025:22-25; DX10 at 57-58. The *Sahag* Map (pictured right) had eight districts total; Districts 4 and 5 were majority-black. Tr. 2026:6-10. District 4 contained a large portion of Jefferson County, and District 5 covered much of the Black Belt. *Id.* District 1 was identical to District 1 in the 2023 Plan. There is no majority-black district in the *Sahag* plan linking black voters in Mobile with black voters in Montgomery and the eastern Black Belt. Tr. 2026:11-16.



240.   After the 2000 Census, the majority-black districts (4 and 5) were significantly underpopulated by around 40,000 to 60,000 each. Tr. 2026:21-2027:5.

The State's preclearance submission reflected a concern about its obligations under §5 of the VRA to avoid retrogression. Tr. 2027:8-24; DX10 at 57. Instead of adding population only in Jefferson County, District 4 expanded into Bibb and Hale counties as well. DX10 at 57, 59. District 5 picked up Crenshaw County and additional parts of Montgomery County. *Id.* As in the *Sahag* Plan, there was no majority-black district linking black voters in Mobile with black voters in Montgomery and the eastern Black Belt. Tr. 2027:16-18.



241.   The 2010 Census revealed that Districts 4 and 5 had become even more underpopulated: between 80,000 and 90,000 each. Tr. 2027:25-2028:5. The State's preclearance submission again reflected a concern about retrogression. Tr. 2027:22-24; DX10 at 57. The Legislature had very few options to maintain the districts' BVAP. DX10 at 57; Tr.2028:8-21. "[T]here were very few areas of Black voting strength left near District 4, which meant it would have to push further into District 5." DX10 at 60. District 4 took the heavily black precincts in Tuscaloosa County from District 7, but it also took Greene and Pickens Counties from District 5—

leaving District 5 even more underpopulated (needing to pick up 111,415 to achieve ideal population). Tr. 2029:3-11; DX10 at 60-61.

242.   For District 5 to maintain its majority-black status, "there [we]ren't many options available other than stretching down into Mobile." Tr. 2029:1-2. Though black population existed near the Georgia border in Russell and Barbour counties, "pushing in that direction would mean cutting District 2 in half," leaving too little population in South Alabama to form two districts. DX10 at 61; Tr. 2093:1-2094:9. The 2010s State Board of Education Plan was the first plan to link black voters in Mobile with black voters in Montgomery and the eastern Black Belt. Tr. 2029:12-15. News articles included in the preclearance submission showed that the move was controversial. Tr. 2029:16-2030:1.



243.   During the 2020 redistricting cycle, the "lines were smoothed out a bit" and each district retained at least 70% of its core; "Districts 1, 2, 4, and 8 retained over 90% of their previous cores." DX10 at 61. The map "again carefully carv[ed] out Black precincts in the Montgomery, Mobile and Birmingham areas." *Id.*

244.   Dr. Trende concluded that District 5 in the in the SBOE Plan "appears to have a unique history that is not necessarily based upon any expression of a common interest between Montgomery and Mobile. Instead, its history appears to be based upon the existence and understanding of what section 5 of the VRA required … and inertia." DX10 at 56-57.



245.   Given what we know from the *ALBC* litigation about the State's former "mechanically numerical view as to what counts as forbidden retrogression," we can safely say that race likely predominated in the drawing of the 2010s State Board of Education Plan. *See ALBC v. Alabama*, 575 U.S. 254, 277 (2015).; *see also id.* at 259-260 ("Alabama believed that, to avoid retrogression under §5, it was required to maintain roughly the same black population percentage in existing majority-minority districts."); *id.* at 265 ("the legislature's redistricting committee, in order to satisfy what it believed the Voting Rights Act required, deliberately chose additional black voters to move into underpopulated majority-minority districts"); *id.* at 265 ("evidence … that the legislature had deliberately moved black voters into these majority-minority districts … in order to prevent the percentage of minority voters in each district from

declining"); *ALBC*, 231 F. Supp. at 1033 (finding that "race predominated in 14 of the 36" State House and Senate districts from the 2012 Plan).[65]

246.   The bottom line is that the State Board of Education Plans do not give Plaintiffs a *race-neutral* reason to connect the heavily black portion of Mobile County with Montgomery and beyond. Which brings us to the final, fatal flaw in the illustrative plans: Plaintiffs' subordinate CD1 to their racial target.

### d.  Plaintiffs' CD1 is unexplainable on grounds other than race.

247.   Plaintiffs have no explanation other than race for the shape and demographics of CD1 in their illustrative maps. It serves no purpose other than to collect the counties leftover from the racial gerrymandering of CD2. Plaintiffs' maps stretch CD1 from Mobile County (minus the portion they crop into CD2) across the southern border of the State all the way to Houston County and the Georgia border.

248.   The result is that CD2 "kind of squashes District 1 and turns it into a lengthy, distended district itself, some of the least compact districts that have ever been drawn in Alabama." Tr. 1994:4-11.

249.   Plaintiffs' cookie-cutter versions of CD1 neither unite nor respect a community of interest recognized by the Legislature. Instead, Illustrative CD1 splits

---

[65] We do not suggest, however, the 2021 State Board of Education was racially gerrymandered, as its contours are easily explained by "core district retention," *Alexander*, 602 U.S. at 26-27, and that question is not even before us.

both the Gulf Coast and the Wiregrass by linking the heavily white portions of Mobile and Baldwin counties with the southern Wiregrass counties.

250.   Plaintiffs put on no evidence that these distinct regions share important interests in common. To the contrary, Plaintiff Letetia Jackson confirmed that residents of Houston County in the southeast have far more in common with northern Wiregrass counties and some eastern Black Belt counties (which Plaintiffs place in CD2) than they do with Baldwin County.

251.   A longtime Wiregrass resident, Ms. Letetia Jackson testified that she has only been to Baldwin County "a couple of times" in her life, and that she does not personally know anyone who lives in Baldwin County. Tr. 738. In her experience, residents of Dothan have more in common with residents of Barbour County, where she has family, than with residents of Baldwin County. Tr. 739. In fact, to get from Dothan to Eufaula in Barbour County is a 45-minute "straight shot" drive. Tr. at 738.

252.   Plaintiffs do what no State can: break up "*nonracial* communities of interest" like the Gulf Coast and Wiregrass regions to "combine[] … farflung segments of a racial group." *LULAC*, 548 U.S. at 433 (emphasis added).

*       *       *

253.   Plaintiffs' illustrative districts were "obviously drawn for the purpose of separating voters by race," *Shaw v. Reno*, 509 U.S. 630, 645 (1993), subordinating

the State's traditional redistricting principles to Plaintiffs' own "predominant, overriding desire to create [two] majority-black districts," *Abrams v. Johnson*, 521 U.S. 74, 81 (1997).

254. Because Plaintiffs' illustrative maps are "unexplainable on grounds other than race," they cannot serve as evidence that the 2023 Plan has the effect of diluting minority voting strength *on account of race*. *Alexander*, 602 U.S. at 10. Without a viable alternative map, Plaintiffs' §2 claims must be rejected.

### 3.    *Gingles* 2 and 3: white bloc voting in Alabama is not "legally significant."

255. At *Gingles* steps 2 and 3, the "purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56.

### i.  We give minimal weight to Plaintiffs' observation of *statistical* racially polarized voting.

256. Plaintiffs' evidence shows that black Alabamians in the challenged areas are politically cohesive. And Plaintiffs' two racially polarized voting (RPV) experts—Dr. Baodong Liu (*Milligan*) and Dr. Maxwell Palmer (*Caster*)—also opine that white voters typically do not support the black-preferred candidate, and that the white-preferred candidates generally win elections. Tr. 487:13-488:6 (Palmer);

Tr. 498:19-24 (Palmer); Tr. 574:4-8 (Liu). Given the inherent limitations with Liu's and Palmer's methodology, we are careful not to ascribe much weight to these observations or read more into the data than is warranted.

257.    Both experts employ a methodology known as "Ecological Inference" (EI). As Dr. Palmer admitted, however, this methodology begins with a baseline assumption that "on average, voters of a racial group will vote similarly to other voters of that racial group." Tr. 527:8-12l; *see also* Tr. 1714:25-1715:3, 1716:9-19 (Bonneau); Tr. 565:2-566:3, 635:11-22 (Liu). While courts have accepted RPV testimony that relies upon an EI methodology, we agree with Dr. Bonneau that EI is "a tool that comes with assumptions. It's not the only tool. And [we should] not rely on it to the … exclusion of other possible relevant evidence." Tr. 1860:13-17 (Bonneau).

258.    We also note that Dr. Liu's and Dr Palmer's analyses contain a significant "inferential limitation," DX1 ¶25, a limitation that Plaintiffs' experts themselves acknowledge. Tr. 526:25-527:4 (Palmer); 619:2-17 (Liu).

259.    Dr. Bonneau testified that the RPV analyses performed by Liu and Palmer showed only that black voters and white voters typically preferred different political candidates at the polls, but "[their] analysis must end there; [they] cannot provide an explanation for why BPCs [black-preferred candidates] lose. This is, even if we were to grant that EI is 100% accurate in recovering individual-level behavior

from aggregate data, that data would still not tell us *why* we observe what we observe." DX1, ¶25. Because Liu's and Palmer's RPV analyses did not control for political party or (in Liu's case) race, we draw limited conclusions from their analyses. Tr. 1725:6-1726:24. *See also Ala. NAACP*, 612 F. Supp. 3d at 1291.

260.    Liu and Palmer agreed that their RPV analyses did not reach the question of *why* voters voted the way they did. Dr. Palmer acknowledged that his RPV analysis did not say anything about the motivations of voters, Tr. 526:25-527:4, and agreed that because his RPV analysis was limited simply to detecting whether RPV existed, he did not analyze or control for any variables other than the race of voters that might affect the outcome of election results. Tr. 530:11-532:4. Dr. Liu also agreed that his analysis did not reach the question of voter motivation. Tr. 567:24-568:7; 619:2-17.

261.    The inability to control for party is no minor limitation, *see infra* Discussion I.B.1, because every expert to offer an opinion on the subject agreed that black voters in Alabama and across the nation support the Democratic Party very strongly. Tr. 529:2-11 (Palmer); 624:21-625:25 (Liu); 1835:24-1836:25 (Bonneau); DX7 at 3-6 (noting that "In summary, black support for Democratic candidates across these jurisdictions [21 total states] could be characterized as close to monolithic.").

262.   Dr. Palmer agreed that the outcome of an RPV analysis usually turned on whether white voters preferred Republican candidates. If a majority of white voters preferred Republican candidates, as he found they usually did in Alabama, Dr. Palmer stated he would expect to find RPV; and if a majority of white voters preferred Democratic candidates, Dr. Palmer stated he would not expect to find RPV. Tr. 529:15-530:10.

263.   As such, Liu's and Palmer's *racial* polarization analysis could just as easily be labeled a *political* polarization analysis.

264.   As Dr. Bonneau noted, "in Table 1 of Dr. Liu's report, in all 9 elections he analyzes, the Black candidate represented the Democratic Party, and the white candidate represented the Republican Party," DX1 ¶32—a point that Dr. Liu (begrudgingly) admitted. Tr. 627:20-629:14, 629:15-630:11.

265.   Notably, in the only primary election that Dr. Liu analyzed in his May 2024 report (2020 Democratic primary for CD1, MX16 at 7), and thus the only election that truly controlled for political party, black voter support for the black candidate (James Averhart) came in at just over 50%, compared to other elections where black voter support for the black candidate was over 90%. Tr. 1721:9-1722:6 (Bonneau); Tr. 655:10-656:23 (Liu). In other words, in the only election where Dr. Liu controlled for political party, the black-preferred candidate became far less clear. Tr. 1722:14-17. Dr. Liu also did not report the full racial breakdown of votes

received by all candidates, so he did not provide a full picture of polarization in the election. Tr. 1722:18-22. Dr. Liu did not analyze the runoff election *at all* on the basis that the two featured candidates were *both* minorities. Tr. 659:15-24 (Liu); 1722:4-9, 23-25 (Bonneau).

266.   Dr. Liu further did not follow up by analyzing whether black and white voters might have supported Kiani Gardner—the plurality candidate in the first round of the primary—at similar levels. Tr. 657:7-658:12. And he testified that had he found that 52% of white voters and 40% of black voters voted for Kiani Gardner, he still would have considered the election to be racially polarized. Tr. 658:13-20.

267.   In the two 2022 General Elections that Dr. Liu analyzed featured three candidates, including a white candidate who was neither a Republican nor Democrat (MX16 at 6). Dr. Liu did not analyze the vote breakdown between the two white candidates to determine whether white voters simply split their vote between the candidates, or instead strongly preferred the Republican candidates (Barry Moore and Beatrice Nichols). Dr. Liu, in other words, focused solely on the race of the candidates, without considering any impact their party affiliation might have. Tr. 649:8-653:12 (Liu) (2022 election, CD2); 653:13-654:14 (Liu) (2022 election, CD7).

268.   While Palmer's and Liu's analyses both fail to control for the effect of political party on voter behavior[66]—"the single biggest determinant of vote choice in American politics," DX1 ¶31—Dr. Liu in particular exacerbates this issue by relying nearly exclusively on *biracial* General Elections to demonstrate RPV. Tr. 569:9-25; 619:22-24.[67]

269.   Dr. Liu excluded elections featuring candidates of the same race, despite the fact that black and white voters were still casting votes in those elections and identifying the candidates of their choice. Tr. 621:21-622:7. This "leads to selection bias and potentially erroneous conclusions." DX1 ¶36; *see also Ala. NAACP*, 612 F. Supp. 3d at 1280 (citing Dr. Bonneau for same).

270.   The simple fact that the black candidate in every General Election that Dr. Liu analyzed was also a Democrat, DX1, ¶32; Tr. 627:20-629:14 (Liu); Tr. 629:15-630:11 (Liu), means that Dr. Liu did not control either for party or for race. His analysis of racially polarized races would be entirely co-extensive with an analysis of politically polarized races.

---

[66] Dr. Liu and Dr. Palmer also do not control for other important determinants of voter choice, such as candidate quality, campaign spending, and candidate name recognition. Tr. 661:23–662:8 (Liu); 530:11–25, 531:4-532:4 (Palmer).

[67] One potential exception to this was Dr. Liu's analysis of the 2020 presidential election, which Dr. Liu confusingly categorized as biracial on the basis of the *vice-presidential* candidates. Despite being a uniracial election, though, this election showed the same patterns of RPV that Dr. Liu found throughout his report, which indicates that factors outside of the candidate's race are likely driving election results in Alabama. Tr. 662:9-663:3. *See also* Tr. 1720:14-1721:8 (Bonneau).

271.   Plainly, a biracial election featuring a black Democrat against a white Republican does not control for party. Such elections can give the false impression of "what appears to be bloc voting on account of race," when it may instead "be the result of political or personal affiliation of different racial groups with different candidates." *Solomon*, 221 F.3d at 1225.[68]

272.   Dr. Liu claims to have limited his analysis to biracial elections because those were the only elections that could reveal black and white voters "true preferences." Tr. 620:7. He testified that he understood this as a "necessary condition" of RPV analysis. Tr. 619:25-620:24. As he put it in his report: "The reason to select only biracial elections is because these elections satisfy the necessary conditions for Black and non-Black voters to have an opportunity to vote for the candidate of their choice, which is not available in uniracial elections involving only white candidates (or involving only Black candidates)." MX16 at 5-6.

273.   This exclusive reliance appeared based on the remarkable assumption that black voters cannot have preference when a black candidate is not on the ballot. Tr. 1720:6-13. This ignores that black voters appear to uniformly prefer Democratic candidates, regardless of the candidate's race. Tr. 1717:23-1720:12.

---

[68] Despite acknowledging that uniracial elections occur frequently, Dr. Liu was evasive and confrontational when asked whether racially polarized voting in *uniracial* elections would indicated that some factor *other than the race of the candidate* was driving voter choices. Tr. 622:8-624:20.

274.    Given the limitations and inherent assumptions baked into Plaintiffs' RPV evidence, we are careful not to give undue weight or to draw the an inference of racial bias in the electorate. Nor do we suggest that the electoral system is diluting the voting strength of minority voters from the mere statistical fact that in Alabama white voters tend to support Republican candidates and black voters tend to support Democratic candidates.

### ii.  Plaintiffs adduce no evidence of "legally significant" RPV.

275.    Even if we credit Liu and Palmer's testimony regarding the statistical presence of RPV, we note that the Fourth Circuit has recently distinguished "racial bloc voting that is legally significant" as opposed to "statistically significant." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 212 (4th Cir. 2024) (cleaned up); *see also LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc).[69]

276.    "[I]n the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Gingles*, 478 U.S. at 48 n.15.

---

[69] At the hurried preliminary injunction stage, the State Defendants focused their *Gingles* 2 and 3 arguments on Plaintiffs' mixing and matching of different minority groups to satisfy *Gingles* 1 versus *Gingles* 2 and 3. *See Milligan* DE102 ¶¶511-516. And after the case returned from the Supreme Court, the State Defendants did not dispute (for purposes of those 2023 proceedings only) this Court's "earlier findings about the *Gingles* 2 and 3 preconditions." *Milligan* DE267 ¶204. Nor did the Supreme Court in *Allen v. Milligan* "opine on the evidence necessary to carry the plaintiffs' burden" to prove legally significant white bloc voting. *Pierce*, 97 F.4th at 216 (citing *Allen*, 599 U.S. at 22). With the benefit of a full trial record, and the Fourth Circuit's persuasive decision in *Pierce*, the State Defendants dispute that legally significant white bloc voting exists in the challenged areas. *See Milligan* DE445 (Pretrial Order) at 11.

277.    Here, it is important to recall that §2 does not "require the creation of crossover districts in the first instance." *Strickland*, 556 U.S. at 24. And "[i]n areas with substantial crossover voting, § 2 plaintiffs" cannot "establish the third *Gingles* precondition." *Cooper v. Harris*, 581 U.S. 285, 306 (2017) (quotations omitted).

278.    Thus, as the Fourth Circuit has noted, "courts have repeatedly rejected arguments that Section 2 required North Carolina to draw majority-minority districts when the State lacked evidence that such districts were necessary for black-preferred candidates to win." *Pierce*, 97 F.4th at 217.

279.    "The key inquiry under *Gingles*' third factor, then, is whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, *if no remedial district were drawn*." *Id.* at 212 (cleaned up) (emphasis added).

280.    As the Eastern District of North Carolina held, Plaintiffs must demonstrate that "black voters' candidates of choice 'would usually be defeated without a VRA remedy'"—that is, "unless BVAP in the contested districts exceeds 50% plus one vote." *Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195, 230 (E.D.N.C. 2024) (quoting *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C. 2016)).

281.    The *Pierce* court discussed that one probative way of demonstrating legally significant racial bloc voting is to conduct what some call a "district

effectiveness analysis, which is a district-specific evaluation used to determine the minority voting-age population level at which a district becomes effective in providing a realistic opportunity for voters of that minority group to elect candidates of their choice." *Pierce*, 97 F.4th at 213 (cleaned up).[70]

282.    If the analysis "yield[s] a 'minority voting-age population level' below 50% which provides 'a realistic opportunity for … voters of that minority group to elect candidates of their choice,'" then "legally significant racially polarized voting does not exist" in the challenged area. *Id.* at 232 (quoting *Covington*, 316 F.R.D. at 168 n.46).

283.    This approach also tethers the *Gingles* 3 inquiry to §2's focus on both opportunity to elect and opportunity to participate in the political process. Shortly after §2 was amended, there were still many jurisdictions in which a minority group's turnout was depressed alongside white voters favoring other candidates at high rates. In those places, courts found a need for a majority or even "a super-majority of the respective minority groups in order to give the minorities a reasonable and fair opportunity to elect candidates of their choice." *Ketchum v. Byrne*, 740 F.2d 1398, 1414 (7th Cir. 1984). Indeed, in the 1980s, the Department of

---

[70] "The results of such an assessment do not cease being probative for the third *Gingles* precondition simply because the litigation roles are reversed—*i.e.,* here it is Plaintiffs, not the State Defendants, who advocate for a majority-minority district drawn on the basis of race." *Pierce*, 97 F.4th at 217-18.

Justice maintained "[a] guideline of 65% of total population … as representing the proportion of minority population reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice. This figure is derived by augmenting a simple majority with an additional 5% for young population, 5% for low voter registration and 5% for low voter turn-out, for a total increment of 15%." *Id.* at 1415.

284.   And consider, for instance, the circumstances surrounding Alabama's 1992 congressional map that was at issue in *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992) (three-judge court). One proposed plan included two majority-black districts with black populations of 59% and 62%, but even the party who submitted the plan doubted whether black Alabamians would have an "opportunity to elect candidates of their choice in these districts." 785 F. Supp. at 1496.

285.   In other words, because of a continued disparity in black voter political participation, even if two majority-black districts were drawn well above the 50% threshold, it was doubtful that such districts would be sufficient to provide black Alabamians with an "opportunity to elect candidates of their choice in these districts." 785 F. Supp. at 1496.

286.   Now, black registration is over 90%, DX7 at 23, and there are no "barriers keeping African Americans from participating in the political process as voters" in "present-day Alabama." *Ala. NAACP*, 612 F. Supp. 3d at 1290.

287.   No longer does a district require a black population of at least 65% to be considered an "opportunity district." *See Wesch*, 785 F. Supp. at 1495-97. To the contrary, "[v]oter turnout and registration rates now approach parity" and "minority candidates hold office at unprecedented levels." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009).

288.   Due to increased registration, turnout, and political participation among black voters (and crossover voting by white voters) in Alabama, the historic need for majority- or even large-majority-black districts in order to ensure black voters an "opportunity to elect" has substantially lowered. And with that change, the point at which white bloc voting becomes "legally significant" has risen. Put differently, because the third *Gingles* precondition is focused on the interplay between white bloc voting and election outcomes—and not merely on the presence of white bloc voting itself—the "legal significance" of white voting patterns has decreased commensurate with the mobilization of black voters and the showing a Plaintiff has to make to establish its significance has correspondingly increased. This makes sense; as we get further away from the initial, stated need for race -based redistricting, it becomes harder to justify imposing it.

289.   This follows naturally from *Strickland* and other cases discussing the intersection of §2 and the Equal Protection Clause. *Strickland* stated that in "areas with substantial crossover voting it is unlikely that the plaintiffs would be able to

establish" *legally significant* white bloc voting. 556 U.S. at 24. "In those areas"—

where districts below 50% BVAP could perform due to white crossover voting—

"majority-minority districts would not be required in the first place." *Id.* Nor would

crossover districts be required.

290.    The Supreme Court applied that rule against North Carolina in *Cooper*

*v. Harris*, where plaintiffs challenged two majority-minority congressional districts

as racial gerrymanders. 581 U.S. at 296. The Court held that North Carolina's §2

defense failed at the third *Gingles* precondition where "electoral history" showed

that black voters could elect their preferred candidates at "less than a majority." *Id.*

at 302. Because of "substantial crossover voting," "majority-minority districts would

not be required" under §2. *Id.* at 306 (quoting *Strickland*, 556 U.S. at 24).

291.    In the parallel constitutional challenge to North Carolina's State House

and Senate districts, the three-judge district court in *Covington v. North Carolina*

likewise rejected the State's §2 defense at *Gingles*'s third step. The district court

found dispositive the General Assembly's failure to analyze "whether majority bloc

voting existed at such a level that the candidate of choice of African-American voters

would usually be defeated *without a VRA remedy.*" 316 F.R.D. at 168 (emphasis

added).

292.    And most recently, again in North Carolina, §2 plaintiffs failed to prove

legally significant white bloc voting in the northeastern portion of the State in part

because their evidence did not "show that black voters' candidates of choice cannot win elections unless BVAP in the contested districts exceeds 50% plus one vote." *Pierce*, 713 F. Supp. 3d at 230.

293.  That approach to Gingles 3 "provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with § 2." *Strickland*, 556 U.S. at 18.

294.  Applied here, the record shows that white bloc voting in the challenged areas is not "legally significant" because there is enough white crossover voting to obviate the need for court-ordered majority-minority districts.

295.  Dr. Liu and Dr. Palmer did not identify "the level of BVAP" in illustrative CD2 "below which black voters' candidates of choice stop winning elections and start losing them." *Pierce*, 713 F. Supp. 3d at 231; Tr. 664:1-665:14 (Liu); MX16 at 10-15; Tr. 532:5-16 (Palmer); CX3 at 7-9. Nor did they testify "that the African-American voters' candidate of choice would usually be defeated unless" CD2 were drawn "to be *majority*-black." *Covington*, 316 F.R.D. at 171 (emphasis added).

296.  That the Legislature *could* have drawn a crossover district but did not is of no consequence. States may draw a crossover district "in the exercise of lawful discretion"; but "§2 does not require crossover districts." *Strickland*, 556 U.S. at 23-24.

297.   So long as additional majority-minority districts are not "necessary for black-preferred candidates to win," legally significant white bloc voting is absent. *Pierce*, 97 F.4th at 217.

298.   That is the case here, where—using one obvious example—CD2 has performed for black voters even though they are not a majority of the district's voting-age population. In the 2024 General Elections, Shomari Figures (the black preferred candidate) received 54.6% of the vote, *Milligan* DE436 ¶151, to Caroleene Dobson's 45.4%—a 5.91% margin of victory—even though CD2's BVAP is 48.69%, *id.* at 34 (Table 5); *see also* MX11 at 4. This real-world outcome comports with the Special Master's assessment that black-preferred candidates would typically win in similar crossover districts. *Milligan* DE295 at 32 (Table 4 showing an average margin of victory of 8.2% for CD2 in Special Master 2 with a BVAP of 48.49% and an average margin of victory of 10.3% for Special Master 3 with a BVAP of 48.69%). And we recall that "[t]he *Milligan, Caster*, and *Singleton* Plaintiffs all support[ed] the adoption of Remedial Plan 3," *Singleton v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 6567895, at *17 (N.D. Ala. Oct. 5, 2023).

299.   This proves that a majority-minority district is not necessary for the electoral success of the black candidate of choice.

300.   To be sure, Plaintiffs and some courts have taken a different approach, focusing on whether the "minority-preferred candidates will usually fail … without

a different district configuration." *Robinson v. Ardoin*, 86 F.4th 574, 596 (5th Cir. 2023). But that approach to *Gingles* 3 provides no clear standard for when legally significant racially polarized voting is present and would produce strange results. For example, if a district were 51% white VAP and 49% black VAP, with white voters favoring Republican candidates 51% of the time and black voters favoring Democrats 51% of the time (and all voters voting in every election), Plaintiffs might say that racially polarized voting is present. But if that same district featured white voters voting Republican 85% of the time, and black voters voting for Democrats 90% of the time, thus electing Democrats in each election, racially polarized voting would *not* be present.

301.   And, then again, if in that district, Republicans successfully won over more black voters, such that 20% of them began favoring the GOP and electing Republicans in each election, racially polarized voting would again be present, despite there being *less* racially polarized voting. That makes little sense and leaves both legislatures and courts without a meaningful standard.

**B.    The "totality of circumstances" confirms that the 2023 Plan does not violate Section 2.**

302.   Only if Plaintiffs satisfy *Gingles*'s three preconditions does the Court then "consider[] whether, 'on the totality of circumstances,' minorities have been denied an 'equal opportunity' to 'participate in the political process and to elect

representatives of their choice.'" *Abrams*, 521 U.S. at 91 (quoting 52 U.S.C. §10301).

303.   "[T]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." *Chisom v. Roemer*, 501 U.S. 380, 397 (1991); *accord Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994). This language in §2 was "intended to 'codify' the results test employed in *Whitcomb v. Chavis* and *White v. Regester*." *Chisom*, 501 U.S. at 394 n.21. Thus, "it is to *Whitcomb* and *White* that [courts] should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2." *Gingles*, 478 U.S. at 97 (O'Connor, J., concurring in the judgment).

304.   In *Whitcomb*, the Supreme Court reversed a finding of vote dilution given the absence of "evidence and findings that [black] residents had less" "opportunity to participate in and influence the selection of candidates and legislators." *Id.* at 149, 153. The Court made clear what "opportunity to participate" meant by describing what plaintiffs failed to prove:

> We have discovered nothing in the record or in the court's findings in-
> dicating that poor [blacks] were not allowed [1] to register or vote,
> [2] to choose the political party they desired to support, [3] to partici-
> pate in its affairs or [4] to be equally represented on those occasions
> when legislative candidates were chosen. Nor did the evidence purport
> to show or the court find that inhabitants of the ghetto were [5] regularly

excluded from the slates of both major parties, thus denying them the chance of occupying legislative seats.

*Id.* at 149-50.

305.   Had "the Democrats won all of the elections or even most of them," noted the Court, plaintiffs likely "would have had no justifiable complaints about representation." *Id.* at 152. The alleged denial of equal opportunity was "a mere euphemism for political defeat at the polls." *Id.*

306.   Two years later, *White v. Regester* applied the *Whitcomb* test to affirm the finding of vote dilution in Dallas County and Bexar County, Texas. 412 U.S. 755, 766-69 (1973).[71]

307.   As the Court recounted in *Gingles*, lower courts had "derived" certain "factors … from the analytical framework of *White*." *Gingles*, 478 U.S. at 36 n.4. These factors would later find their way into the Senate Judiciary Committee Report in 1982 and become known as the Senate factors. They delineated types of evidence that might shed light on whether the *Whitcomb* standard was satisfied. But they do not answer "the question … what it *means* to provide equal opportunity," *Brnovich*, 594 U.S. at 676 n.15. Nor do they say how much evidence is required, or even what is being proven. Thus, *Whitcomb* provides courts considering the "the totality of

---

[71] *See* James F. Blumstein, *Racial Gerrymandering and Vote Dilution: Shaw v. Reno in Doctrinal Context*, 26 RUTGERS L.J. 517, 538 (1995) ("With respect to vote dilution, *Whitcomb* set the foundation. Two years later, *White v. Regester* applied the *Whitcomb* standard ….").

circumstances" a standard that measures whether those circumstances are relevant. Otherwise, the Senate factors are just boxes to check for their own sake.

308.    At the preliminary injunction stage, the State Defendants argued that the totality of circumstances revealed that "racially neutral cause[s]" better explained black preferred candidates' relative lack of success in Alabama. But we found that they came with "very little evidence," *id.* at 1019, and mustered "only lawyer argument" in response to the testimony offered by Plaintiffs' experts, *id.* at 1021.

309.    After full discovery and a trial, the State Defendants come with the goods: four experts of their own and "substantial" evidence that "black-preferred candidates lose because they are running as Democrats in a red State." *Ala. NAACP*, 612 F. Supp. 3d at 1291.

310.    Just five years ago, the Middle District of Alabama, after acknowledging that "[r]ace has undoubtedly been a dominant factor in Alabama elections in the past," found that "[t]oday, though, the evidence of African-American voter registration and turnout indicates that Alabama's appellate judicial elections are equally open to participation by Plaintiffs and the protected class of voters." *Id.* at 1316.

311.    With the benefit of a trial record akin to that in *Alabama NAACP v. Alabama*, we now agree.

312.   "Electoral losses that are attributable to partisan politics do not implicate the protections of § 2." *Clements*, 999 F.2d at 863.

313.   Thus, "to be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that *depends on race or color*, not on account of some other racially neutral cause." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (emphasis added).

314.   Plaintiffs have not carried their "ultimate burden" to prove that, under the totality of circumstances, the political process is not equally open to black Alabamians. *Askew v. City of Rome*, 127 F.3d 1355, 1375 (11th Cir. 1997). Federal courts at all levels have recognized that "[t]hings have changed in the South," *Nw. Austin*, 557 U.S. at 202, and Alabama is no different, *see Ala. NAACP v. Alabama*, 612 F. Supp. 3d 1232 (M.D. Ala. 2020).

315.   A "comprehensive, not limited, canvassing of relevant facts," *De Grandy*, 512 U.S. at 1011, strongly suggests that black Alabamians' relative difficulty "elect[ing] representatives of their choice" does not depend on "race or color," 52 U.S.C. §10301. Instead, any such difficulty appears to be the predictable result of bloc-voting for Democrat candidates in "one of the most Republican states in the entire South." *Ala. NAACP*, 612 F. Supp. 3d at 1291.

1. **Senate Factor 2: Racial polarization in Alabama is a product of political partisanship, not racial bias.[72]**

316.   The second Senate factor looks at "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37.

317.   At first blush, this factor appears redundant with the second and third *Gingles* preconditions. But that's not the case. "There, the inquiry focused solely on 'how' black and white voters voted. The focus now, at the totality-of-circumstances stage, is on evidence of causation, which looks to 'why' voters cast their ballots for certain candidates." *Ala. NAACP*, 612 F. Supp. 3d. at 1291.

318.   During the 2022 preliminary injunction proceedings, the State Defendants urged us, as they do again here, to find that the "pattern of racially polarized voting" "is attributable to politics rather than race." *Singleton*, 582 F. Supp. 3d at 1018-19. But in 2022, the State Defendants brought only "very little evidence"—just "[o]ne election of one Black Republican"—that politics, not race, lies at the root of racially polarized voting. *Id.* at 1019.

319.   The State Defendants now come with a panoply of evidence akin to that considered by the Middle District of Alabama in *Alabama NAACP v. Alabama*, which found that the State's "politics, not race" evidence was "substantial."

---

[72] We discuss the Senate factors in the same order as in our 2022 preliminary injunction decision. *See Singleton*, 582 F. Supp. 3d at 1018.

612 F. Supp. 3d at 1291, 1306. That "evidentiary record" included "trial testimony from two expert witnesses, one of whom conducted a multivariate regression statistical analysis." *Singleton*, 582 F. Supp. 3d at 1019. Such a record is no longer "absent here." *Id.*

320.    "[T]o be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that *depends on race or color*, not on account of some other racially neutral cause." *Solomon*, 221 F.3d at 1225 (emphasis added).

321.    Thus, "what appears to be bloc voting on account of race [which is the inevitable result of satisfying the three *Gingles* preconditions], may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Ala. NAACP*, 612 F. Supp. 3d at 1291 (quoting *Solomon*, 221 F.3d at 1225) (alteration in original).

322.    If "black-preferred candidates lose because they are running as Democrats in a red State," and not because they are black, then there is no bloc voting *on account of race* and no illegal vote dilution for §2 to remedy. *Id.*; *see also Clements*, 999 F.2d at 854 ("The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates. Rather, § 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats.").

323.   During closing arguments, *Caster* counsel invoked *City of Carrollton NAACP v. Stallings*, 829 F.2d 1457 (11th Cir. 1987), *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc), and *Askew v. City of Rome*, 127 F.3d 1355 (11th Cir. 1997), when declaring that "Section 2 plaintiffs need not prove that racial polarization is driven by racial bias." Tr. 2530-31. *Caster* counsel, however, overlooked *Solomon*, the Eleventh Circuit's most recent en banc word on the subject. 221 F.3d 1218.

324.   *Carrollton*, decided less than two years after the Supreme Court decided *Thornburg v. Gingles*, criticized the district court's rejection of the plaintiffs' expert's use of a bivariate regression analysis to prove racially polarized voting. 829 F.2d at 1558. The district court "erred when it ruled that the plaintiffs' statistical proof was lacking because the plaintiffs' expert witness did not examine election returns" for specific municipal and statewide elections. *Id.* It is true that the Eleventh Circuit *quoted* the *Gingles* plurality's statement that "Plaintiffs need not prove causation or intent in order to prove a prima facie case of racial bloc voting and defendants may not rebut that case with evidence of causation or intent." *Id.* (quoting *Gingles*, 478 U.S. at 74). But *Carrollton* neither adopts that language as a holding nor applied it to decide the appeal; that language is not the law in the Eleventh Circuit today, *see infra*; and, in any event, the *Carrollton* discussion was

limited to the second and third *Gingles* preconditions, not the totality of circumstances more broadly.

325.   The fractured en banc decision in *Nipper* came next. Writing for himself, Judge Tjoflat's opinion stated that "racial discrimination … remains the cornerstone of section 2 claims; to be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of … race or color, not on account of some other racially neutral cause." 39 F.3d at 1515.

326.   A few years later, in *Askew*, the Eleventh Circuit stated that it did "not understand the law to require Plaintiffs to prove racism determines the voting choices of the white electorate in order to succeed in a voting rights case." 127 F.3d at 1355. Still, the court considered it "necessary to evaluate the level of racism in the electorate" and found that "ideology and other legitimate voting criteria predominate in the minds of Rome's white voters." *Id.* at 1383. "The Court, therefore, [could not] say that those black candidates who have not been elected were defeated by racism," *id.*, and went on to conclude that "Rome is not sufficiently racially polarized to warrant the conclusion that the Voting Rights Act has been violated." *Id.* at 1385.

327.   Finally, the en banc Eleventh Circuit in *Solomon* adopted Judge Tjoflat's earlier statement from *Nipper* as the law of the circuit. When explaining why proof of the three *Gingles* preconditions "does not end the inquiry," the court held that "[o]ther circumstances may indicate that both the degree and *nature* of the

bloc voting weigh against an ultimate finding of minority exclusion from the political process." *Id.* at 1225 (emphasis added). If the *nature* of "what appears to be bloc voting on account of race" is instead "the result of personal affiliation of different racial groups with different candidates," then plaintiffs cannot "prevail on a claim of vote dilution under section 2." *Id.*

328.   The en banc court then held that "[t]o be *actionable*, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Id.* (emphasis added).

329.   Thus, Plaintiffs must prove that black-preferred candidates are losing elections *on account of race* and not on account of politics, ideological differences, or some other "racially neutral cause." *Id.*

330.   *Even if*, for the sake of argument, the burden of making this showing does not fall on Plaintiffs' shoulders, the State Defendants have proven that politics better explains bloc voting than racism in the electorate.

331.   With the applicable law clarified, we turn now to the parties' arguments and evidence.

332.   Plaintiffs claim that black-preferred candidates, all of whom are Democrats, regularly and consistently lose outside of majority-black districts. This, by itself, "does not prove a lack of electoral opportunity but a lack of whatever else

123

it takes to be successful in politics …. Section 2 does not bridge that gap—nor should it." *Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995); *see also Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) (Section 2 "is a balm for racial minorities, not political ones—though the two often coincide.").

333.    To support their allegations of racially polarized voting, Plaintiffs submit the expert reports of Dr. Liu and Dr. Palmer, whose conclusions are almost entirely limited to identifying the statistical *existence* of racially polarized voting, not its *cause*. But the second Senate factor supports a §2 claim only insofar as racial polarization approximates racial bias in voting, and because correlation is not causation, Plaintiffs need more than ecological inferences to support their claims.

334.    Dr. Palmer, for instance, acknowledged that his RPV analysis did not say anything about the motivations of voters. Tr. 526:25-527:4. Because his RPV analysis was limited simply to detecting whether RPV existed, he did not analyze or control for any variables other than the race of voters that might affect the outcome of election results. Tr. 530:11-25. And he acknowledged that the support a candidate received in an election could be influenced by matters beyond either the race of the voter or of the candidate. Tr. 531:4-532:4. And Dr. Liu likewise acknowledged that his RPV did not answer the question of why particular racial groups might vote the way they do. Tr. 567:24-568:7; 619:2-17.

335. The State Defendants have presented substantial evidence that a majority of white voters in Alabama vote for someone other than the minority-preferred candidate not for racial reasons, but for partisan and ideological ones. Thus, Plaintiffs' alleged denial of equal opportunity is a "a mere euphemism for political defeat at the polls." *Clements*, 999 F.2d at 859 (quoting *Whitcomb*, 403 U.S. at 153).

336. As set out below, the evidence shows, and, the Court finds, that (1) black candidates face no penalty at the polls for being black; (2) black and white voters in Alabama tend to vote for parties, not for candidates; (3) the relative weakness of the Democratic Party contributes significantly to the failure of black Alabamians to elect their candidates of choice; and (4) white Alabamians, like white Southerners generally, vote overwhelmingly Republican for ideological, not racial, reasons.

### i. RPV alone is not evidence of racial bias in the electorate.

337. As an initial matter, a comparison of racial voting patterns in Alabama with those nationally emphasizes the import of looking beyond "'how' black and white voters voted" to "'why' voters cast their ballots for certain candidates." *Ala. NAACP*, 612 F. Supp. 3d at 1291.

338. Dr. Hood examined black voting patterns in Alabama and in a group of 20 comparator States: Arkansas, Connecticut, Delaware, Florida, Georgia, Illinois,

Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, and Virginia. DX7 at 3. He chose these twenty States because they each had a black population of 10% or greater, which Dr. Hood determined was a useful cutoff point because States with a lower black population may have had too few respondents in the survey data from which to draw conclusive inferences. *Id.*; Tr. 1877:11-22. This comparison group included States scattered across the U.S. geographically and included both politically red and blue States. Tr. 1877:25-1878:9.

339.    Dr. Hood was able to make inferences about voting patterns using survey data collected by the National Exit Polls and the Cooperative Election Studies (CES). These polls conducted from 2008-2022 analyzed two-party contested elections for President, Governor, U.S. Senate, and U.S. House (where available). DX7 at 3-6; Tr. 1878:10-14. This data showed that both in Alabama and across all 20 of the comparison States, black voters' support for Democratic candidates, on average, exceeds 90%. DX7 at 5-6. This pattern transcended both geographic region and party control at the state level. *Id.*; Tr. 1882:11-17.

340.    Indeed, every expert to offer an opinion on the subject agreed that black voters across the nation, just like in Alabama, support the Democratic Party very strongly. Tr. 529:2-11 (Palmer); 624:21-625:25 (Liu); 1835:24-1836:25 (Bonneau);

DX7 at 3-6 (noting that "black support for Democratic candidates across these jurisdictions [21 total states] could be characterized as close to monolithic").

341.   In fact, Dr. Bonneau conducted several different bivariate correlation analyses to test this in Alabama elections and repeatedly found a very high correlation between the percentage of black voters in a district and the relative performance of Democratic candidates within that district. He conducted an analysis demonstrating this in Alabama Supreme Court elections since 2010, DX1 ¶¶11–12, Tr. 1678:2-1679:6, 1681:23-1682:2; Alabama Supreme Court elections since 2000, DX1 ¶37, Tr. 1682:3-18; 2022 Alabama Senate elections, DX1 ¶31; and all 2022 statewide elections in each Congressional district under the 2023 Plan, as correlated with the black voting age population of each district using 2020 census data. DX1 ¶22, Tr. 1692:4-1694:17, 1810: 3-9.[73] In all cases, Dr. Bonneau said that this led him to conclude that black voters in Alabama were voting for Democratic candidates at very high rates.

342.   The point being that the mere statistical fact that in Alabama white voters tend to support Republican candidates and black voters tend to support

---

[73] While Plaintiffs' counsel questioned Dr. Bonneau's reliance on county-level data, he testified that this type of analysis was sufficient to provide a high-level view of the relationship between the number of black voters in a district and the performance of Democratic candidates within that district. Tr. 1816:11-17.

Democratic candidates is not itself evidence of racial bias in the electorate or suggestive of an electoral system diluting the voting strength of minority voters.

343.   The State Defendants' evidence demonstrates that black voters' "close to monolithic" support for Democratic candidates is a national phenomenon, not just an Alabama one. DX7 at 6.

344.   Thus, voting is necessarily "racially polarized" as a bare statistical matter in any jurisdiction where a majority of white voters tend to support Republican candidates. Dr. Palmer, for instance, agreed that the black-preferred candidate in all 17 statewide elections that he analyzed—regardless of the candidate's race—was a Democrat, Tr. 528:23-529:1, which was consistent with national trends, Tr. 529:2-11.

345.   As such, Dr. Palmer agreed that the outcome of an RPV analysis usually turned on whether or not white voters preferred Republican candidates. If a majority of white voters preferred Republican candidates, as he found they usually did in Alabama, Dr. Palmer stated he would expect to find RPV; and if a majority of white voters preferred Democratic candidates, Dr. Palmer stated he would not expect to find RPV. Tr. 529:15-530:10. Put differently, Dr. Palmer's *racial* polarization analysis could just as easily be labeled a *political* polarization analysis.

346.   For his part, Dr. Liu agreed that the black-preferred candidate in every election he analyzed was a Democrat; that this was generally true in Alabama; and

that it comported with black voter preferences nationally. Tr. 626:1-12. And he nonetheless begrudgingly admitted that the white-preferred candidate in every general election he analyzed and in which he found RPV was very likely a Republican, Tr. 627:20-629:14. At a minimum, he stated that the white-preferred candidates in the elections that he analyzed were not candidates of the Democratic Party, and that he was not aware of a third-party with a major presence in Alabama. Tr. 629:15-630:11.[74] Dr. Liu also ultimately agreed that if white voters preferred *Democratic* candidates, he would *not* expect to find RPV in a general election. 630:21-635:6.

347.    Such analyses, though, do not provide evidence that black voters face political defeat *on account of race*: the heart of the §2 inquiry.

### ii. Black candidates face no penalty at the polls for being black.

348.    Alabama is "a ruby red state—one of the most Republican states in the entire South," and, as the Middle District recently recognized, this reality "has made it virtually impossible for Democrats—of any race—to win statewide in Alabama in the past two decades." *Ala. NAACP*, 612 F. Supp. 3d at 1291 (quotation omitted).

---

[74] In Dr. Liu's effort to disclaim the obvious fact that his RPV analyses also showed *political* polarization, he went so far as to testify that he *did not know* whether his report relied on official election results, despite agreeing that the official results would include the party affiliation of each candidate for office. Tr. 637:24-639:9. He could not, for instance, identify Rep. Barry Moore's party affiliation. Tr. 639:10-640:14. He could not even identify the election results for the 2022 General Elections, Tr. 640:22-647:14, or confirm whether his analysis had relied on them, Tr. 637:24-639:6, despite including data for those election results in his report and having claimed to rely on the election results. Tr. 566:4-17; MX16 at 6, 9.

349.  "Since 2008, while all black Democrats have lost their statewide races [in Alabama], so have all white Democrats, with the exception of Doug Jones (2017 special U.S. Senate election)." *Id.*

350.  The Middle District found that "the notion that African-American candidates lose solely because of their skin color is not supported by the evidence. There is a strong case that party, not race, is driving election results in Alabama …." *Id.* at 1293.

351.  Dr. Bonneau, a political scientist who testified for the State Defendants in *Alabama NAACP v. Alabama* as well, reviewed the 2022 State House and Senate election results and, using a multivariate regression model, concluded that black Democratic candidates outperformed white democratic candidates—although all Democrats tended to perform poorly. Dr. Bonneau did not see any evidence to suggest that black candidates performed more poorly on account of their race. DX1 ¶¶14-16; Tr. 1683:1-18.

352.  Specifically, "Black Democrats who lost contested seats for the State House averaged 29.1% of the vote in the counties in which they ran, while white Democrats averaged 23.7%." DX 1 ¶14. And "Black Democrats who lost contested seats" for the Senate "averaged 32.1% of the vote in the counties in which they ran, while white Democrats averaged 24.9%." DX 1 ¶15. Put differently, Dr. Bonneau found that, of the elections he analyzed, black Democratic candidates received an

average of about 6% higher vote share than white Democratic candidates. Tr. 1683:6-11; 1684:22-25.[75]

353.  Dr. Bonneau also analyzed Alabama's partisan Supreme Court elections. DX1 ¶¶1-2, 5-12. Dr. Bonneau stated that much of his scholarly career has focused on judicial elections, his specific focus has been on studying the similarities between judicial elections and non-judicial elections across a variety of factors, which has required Dr. Bonneau to extensively analyze non-judicial elections. Tr. 1664:1-1665:9. A cornerstone of his scholarly work has been arguing that that partisan judicial elections feature the same characteristics as other partisan elections. Tr. 1664:20-1665:9; 1671:6-20.

354.  In his analysis of Alabama Supreme Court elections, DX1 ¶¶1-2, 5-12, Dr. Bonneau found that in the 1980s and '90s, while Alabama was still a Democrat-aligned state, black candidates to the Alabama Supreme Court had experienced electoral success running as Democrats. DX1 ¶2. Specifically, Dr. Bonneau analyzed the elections of Oscar Adams and Ralph Cook, two black judges who were elected to the Alabama Supreme Court in the 1980s and '90s as Democrats before Republicans gained control of the Alabama Supreme Court in 2000. *Id.*;

---

[75] Although, this analysis was across multiple districts, Dr. Bonneau noted that all elections were down ballot elections for the same office, in the same election year. Tr. 1683:19-1684:21; 1851:5-23; 1852:14-20. And Dr. Bonneau also noted that he elsewhere conducted an analysis of straight-ticket voting for the 2022 general elections, and that the significant majority of votes in that election were cast by straight-ticket, meaning the idiosyncrasies of individual, down-ballot elections were necessarily not influencing the decisions of the majority of voters.

Tr. 1668:16-24; 1669:20-1670:15. Democrats in Alabama experienced wide electoral success in Alabama in the 1980s and '90s, and, therefore, so did black-preferred candidates. Tr. 1835:24-1837:17.

355.   Since Republicans gained control of the Alabama Supreme Court in 2000, however, no black candidates have been elected to the court, but during that same time only one Democrat, Sue Bell Cobb, has been elected to the court. Tr. 1670:13-1671:2; DX1 ¶¶5-6; *see also Ala. NAACP*, 612 F. Supp. 3d at 1247, 1280-81, 1291. Every other Democrat to run, including five black candidates, has lost. Tr. 1637:23-1674:5; DX1 ¶¶5-6. And since 2012, the Democratic Party has not contested many Supreme Court elections, likely believing the elections were unwinnable. Tr. 1672:14-1673:6.

356.   And for Supreme Court elections in 2000 and 2006 specifically, Dr. Bonneau demonstrated that black Democratic candidates to the court did not, on average, perform any worse than white Democratic candidates to the court—though all but one Democrat lost those elections. In fact, in 2000, the black candidates received slightly higher vote shares than their white Democratic counterparts (DX1 at 6-7), suggesting that black candidates to the Alabama Supreme Court were not penalized on account of their race. Tr. 1674:6-1676:7.[76]

---

[76] Dr. Boneau acknowledged that, after submitting his report, he became aware of one paragraph in his report, ¶13, that was affected by two errors: 1) miscoding one candidate as black

357. And while Plaintiffs' counsel insinuated that the results of these elections might simply have been the result of an incumbency advantage, Dr. Bonneau noted that Alabama does not print incumbency on its ballots, Tr. 1737:7-1738:25, and that the two black Democratic incumbents, Cook and England, had out-performed their white Democratic counterparts, in any case. Tr. 1739:24-1740:6; 1837:18-1839:18. Finally, Dr. Bonneau testified the so-called incumbency advantage in Alabama's Supreme Court elections since 2000 was almost entirely co-extensive with a general Republican advantage, and that any advantage gained from incumbency would generally not trump political party. Tr. 1839:19-1840:16.[77]

---

who was white, and 2) miscoding three general elections as contested that were not. Tr. 1679:7-1680:6. Once the error was corrected, there was only a single black candidate remaining in the analysis, however. Dr. Bonneau noted that you could not take an average from a single data point, and that he would not have conducted the analysis had he realized at the time that it involved the analysis of only a single election. Tr. 1680:5-23; 1849:24-1851:4. Dr. Palmer likewise acknowledged that Anita Kelly was a Democrat and that one data point was insufficient from which to draw broader conclusions. Tr. 537:11-540:10. He also did not analyze whether the election featuring Anita Kelly was in any way representative of judicial elections generally. *Id.* These errors had no impact on any other analyses in Dr. Bonneau's report—only paragraph 13. Tr. 1680:24-1681:22; 1849:15-23.

[77] Dr. Bonneau was also asked whether he analyzed whether there was a substantial swing in racial group voting for candidates of particular races that might be invisible in election results. While Dr. Bonneau agreed that he did not conduct this specific analysis, he also stated that this was highly unlikely after factors such as straight-ticket voting were taken into account. Tr. 1741:2-20. Further, while Dr. Bonneau testified that he had not specifically addressed the "racial bias of white voters," he had opined that black candidates were not penalized on account of their race. He testified that this conclusion was based on the total election results and the fact that black and white Democrats all performed similarly. Put differently, he saw no evidence that there was any wide-spread racial bias on the part of voters. If there were, Dr. Bonneau would expect it to have been reflected in the overall election results. Instead, there was no indication that black voters were supporting white democrats at significantly lower rates than they supported black democrats, and

358.  "From these results, it reasonably can be inferred that white Democratic voters give equal or greater support to black Democratic candidates as they do to white Democratic candidates." *Ala. NAACP*, 612 F. Supp. 3d at 1292. This, in turn, "suggests that black candidates are not penalized" in Alabama elections "by their race alone." *Id.*

359.  Dr. Bonneau, when testifying in *Alabama NAACP v. Alabama*, did not examine "an election with an African-American Republican." *Id.* Here, he does. DX1 ¶18. Kenneth Paschal, a black Republican, won election to represent District 73—anchored by Shelby County—in the Alabama House of Representatives. Paschal defeated a white Republican in the primary, and then proceeded to defeat a white Democrat by nearly 50 percentage points in the general election. He won in a majority-white VAP district in Shelby County and has since successfully run for reelection without opposition. Dr. Bonneau stated that Rep. Paschal would necessarily have won these elections with significant white voter support, given the demographics of the district. Kenneth Paschal then won re-election in 2022 without any opposition. Tr. 1688:12-1689:12.

---

no indication that white voters were supporting black democrats at significantly lower rates than white democrats. In fact, several analyses showed the contrary. Tr. 1840:18-1842:18. Dr. Palmer's RPV analysis, for instance, did not find any significant variation in support for candidates by black or white voters based on the candidate's race. Tr. 1844:1-9.

360.    Similarly, Dr. Bonneau also analyzed the democratic primary election for House District 74 in 2022, in which a white democratic candidate won the primary over a black democrat in a majority black district. Tr. 1685:23-1687:3.

361.    Dr. Bonneau analyzed these primary elections because biracial primaries control for the political party of the two candidates to analyze the potential effect of candidate race on election results. He agreed that primary elections had their own flaws, such as lower turnout, but broadly speaking, he stated that they were useful for controlling for political party. Tr. 1686:14-1688:3.

362.    In theory, some nonpartisan elections can control for party, but often times they do not. Tr. 1723:18-1725:5.

363.    For example, in both his May and July 2024 reports, Dr. Liu includes two nonpartisan mayoral runoff elections—Montgomery 2019 and 2023. MX16 at 10; MX17 at 8. The two Montgomery elections featured the same black candidate, Steven L. Reed. *Id.* From this analysis, Dr. Liu posited in his July 2024 Rebuttal Report that the RPV he observed in his other reports was *caused* by the race of the candidate and their party affiliation. MX17 at 8.[78]

---

[78] Dr. Liu also cited some CNN exit polling from the 2008 and 2010 General Elections for the proposition that white Alabamian Democrats prefer white Democratic candidates over black Democratic candidates. Tr. 576-78. These polls are no longer publicly available. Regardless, Dr. Carrington rebutted Dr. Liu's conclusion by recalling that President Obama was the first *successful* presidential candidate to espouse many of the "New Left" positions unpopular with white Southerners of either political party in the 2000s. Tr. 1580-81, 1600 (discussing exit polling).

364.   Dr. Liu admitted that these elections were low turnout, off-cycle elections, and that he did not know whether the candidates had previously run for office in partisan elections, or whether their partisan affiliation was otherwise known to voters. Tr. 672:14-674:14.

365.   Dr. Bonneau, on the other hand, testified that Dr. Liu's reliance on two mayoral elections in Montgomery in 2019 and 2023 to ostensibly control for the effects of political party was misleading. Tr. 1723:2-17. That's because nonpartisan elections are often nonpartisan in name only. Tr. 1823:22-1824:1 He has conducted research on precisely this question to reach this conclusion. Tr. 1723:18-1724:1. He analyzed the candidates involved in the mayoral elections and testified that Steven Reed had previously held office as a Democrat; that David Woods had previously run for office as a Republican; and that Steven Reed ran as an incumbent in 2023. Tr. 1724:2-25. Dr. Bagley also confirmed on cross-examination that Steven Reed, the Mayor of Montgomery, is the son of the "very influential" Joe Reed, "an organizer of [the] black caucus." Tr. 1445. This undermines Dr. Liu's conclusions because the prior partisan affiliation of a candidate is often known to voters in low-turnout elections, because voters in low-turnout elections tended to be higher information and more politically engaged than average voters. Tr. 1824:22-1825:8; *see also* Tr. 1725:1-5.

366.   The Court credits Dr. Bonneau's opinion that primary elections better control for party than nonpartisan elections. The Court finds further that the 2019 and 2023 Montgomery mayoral elections do not sufficiently control for political party, given the identity of one of the candidates running.

367.   For his part, Dr. Palmer analyzed the 2018 results for the Governor's and Lieutenant Governor's elections to suggest that RPV might be explained by the race of the candidates in those elections. But Dr. Palmer admitted that he did not conduct any other analysis of those elections or the candidates involved—including whether or not Walt Maddox had been a popular mayor of Tuscaloosa prior to running for governor as the Democratic candidate. Tr. 1854:25-1856:22.

368.   Further, Dr. Bonneau noted that comparing just the 2018 Governor's and Lieutenant Governor's elections was misleading, because when all 2018 statewide elections analyzed in Dr. Palmer's report (CX3, Table 1) were compared, the variation of white voter support for various democratic candidates did not appear to vary based on the candidate's race. Indeed, Dr. Bonneau stated he could not discern any predictable pattern based on the 2018 general election results that would indicate that white voters supported white Democrats at higher rates than they supported black Democrats. Instead, he could determine that black voters overwhelmingly preferred Democratic candidates.

369.  Dr. Hood also examined the willingness of white Republican voters to vote for minority Republican candidates. Dr. Hood has published research on this issue of white Republican support for minority Republican candidates, and he has reviewed other peer-reviewed research on the topic. DX7 at 21; DX372. No study found that white voters discriminated against black candidates; to the contrary, several of the studies concluded that white conservative voters support minority Republican candidates at equal or greater rates compared to non-Hispanic white Republican candidates. *Id*.[79]

370.  Additionally, Dr. Hood found that, given the racial makeup of Rep. Paschal's district, he did not see how it would be possible for Rep. Paschal to win elective office without the substantial support of white voters. Tr. 1894:1-4.[80] In his next election, Rep. Paschal ran unopposed, suggesting that his constituents were satisfied with his service. Tr. 1894:14-24. Rep. Paschal's victory in the primary election is especially probative because primary elections, by definition, control for party. Tr. 1722:10-17, 1954:10-14.

---

[79] Plaintiffs' attempts to undermine Dr. Hood's work in this area either misunderstand his work or take it out of context. For example, while true that Dr. Hood's article on this subject did not analyze primary elections, it analyzed general elections in which a minority Republican candidate was the nominee—meaning the candidate had necessarily won or ran unopposed in a Republican primary. *Compare* Tr. 1912:24-1913:10, *with* 1954:4-14. Additionally, although Plaintiffs imply that Dr. Hood's survey of previous research within his peer-reviewed article on this topic somehow rendered his conclusion here inconsistent, they fail to acknowledge that his article cited that work as a backdrop that his article sought to improve upon and update. Tr. 1956:8-1957:9.

371.   Dr. Hood then compared the vote share that Dr. Ben Carson—a 2016 black Republican presidential candidate—received among the states in which he competed in the 2016 Republican Presidential Primary before dropping out after Super Tuesday. DX7 at 20. In the 15 primaries and caucuses in which Carson participated, his vote share ranged from 2.31% in New Hampshire to 10.8% in Alaska. *Id.* His vote share in Alabama was 10.24%—the second highest of any contest.

372.   We previously noted in 2022 that "Black Republican candidate, Ben Carson, received far less support than the white Republican candidate, Donald Trump." *Singleton*, 582 F. Supp. 3d at 1019. With the benefit of the 15-State comparison the State Defendants provide of Ben Carson's vote share, we now draw no negative inference about "white support for a Black Republican candidate" from this primary election. *Id.*[81]

373.   Drs. Bonneau, Palmer, and Liu also examined the 2024 Republican congressional primary for CD2. Tr. 1690:22-1691:12 (Bonneau); 534:19-537:13 (Palmer); 670:13-671:7 (Liu). And while Dr. Liu testified that this showed that white voters were *not* willing to support minority candidates, Tr. 670-71, he also

---

[81] Dr. Liu criticized Dr. Hood's analysis of the 2016 Republican presidential primary for not including an RPV analysis. Tr. 533-34. But he admitted that he had no critique of the analyses Dr. Hood *did* perform. *Id.* Dr. Palmer offered similar testimony. Tr. 533:24–534:25.

acknowledged, that there was only one seat available in that crowded election. Tr. 670:10-24. *See also* Tr. 1690:22-1691:12 (Bonneau).

374.    Neither Dr. Liu nor Dr. Palmer examined the quality of the candidates relative to one another. MX17 at 4; CX3 at 2-3. According to records filed with the Federal Election Commission,[82] Republican Dick Brewbaker had received more than $1.7 million by March 27, 2024, and Republican Caroleene Dobson had received more than $1.2 million by the same date. DX266 at 3; DX270 at 2; DX275 at 2. For both Brewbaker and Dobson, the lion's share of their receipts was from loans they made to their campaigns. DX270 at 2; DX275 at 2. The other two white Republicans, Greg Albritton and Hampton Harris, had nearly $190,000 and nearly $60,000, respectively, and had also made loans to their campaigns. DX266 at 3, 4; DX267 at 2; DX281 at 2.

375.    Four Black Republicans were listed with the FEC for the CD2 Primary at the time the records were downloaded. Wallace Gilberry—who dropped out of the contest before the election, Tr. 1690:25-1691:6—had receipts of $165,335.64 through January 31, 2024. DX266 at 3; DX278 at 2. Karla DuPriest, Stacey T. Shepperson, and Belinda Thomas provided no information to the FEC for the reporting period. DX266 at 5; DX276 at 2; DX287 at 2; DX289 at 2.

---

[82] Plaintiffs withdrew their objections to DX266 through DX272, DX275 through DX284, and DX287 through DX289. *Milligan* DE462 at 2-3.

376.   The candidates with the third and fourth highest receipts overall—behind Brewbaker and Dobson—were black Democrats, namely Representative Anthony Daniels at $457,305.84 through March 27, 2024, and Shomari Figures at $415,893.47 through March 31, 2024, including a $50,000 loan. DX266 at 3; DX272 at 2; DX277 at 2.

377.   Further, Dr. Liu acknowledged that a black candidate had won the Republican primary in CD7. Tr. 670:25-671:7.[83] And Dr. Palmer accepted that of the two Republican congressional primaries that featured black candidates, a black candidate had won one (half) of them. Tr. 534:19-537:13.

378.   Also, Bill Lewis, a black Republican, was appointed to the circuit court by a Republican governor in 2017; was subsequently elected without opposition; and has since been appointed by a Republican governor to the Alabama Court of Civil Appeals. Dr. Bonneau noted that the fact that Judge Lewis was uncontested in his primary and general elections to the circuit court suggested that neither Republican nor Democratic candidates believed they could defeat him. Tr. 1689:19-1690:15. This also suggests that Republican voters, the majority of whom are white, "are satisfied with Judge Lewis such that no one decided to try and unseat him." DX1 ¶19.

---

[83] That candidate, Chris Horn, did not ultimately compete in the general election because he had withdrawn from the contest. Tr. 670:25-671:7. Nonetheless, he received the most votes in the Republican primary contest.

379.    The record also contains testimony from three black Republicans—Bill McCollum and Valerie Branyon from Fayette County, Alabama, and Cedric Coley from Montgomery—each of whom testified during the *Alabama NAACP v. Allen* Senate redistricting trial. *Milligan* DE441-6 (McCollum), 441-2 (Branyon), 441-3 (Coley).

380.    Bill McCollum was born in 1949 and experienced racial discrimination when running for Fayette County Sheriff in 1974. *Senate* Tr. 1354, 1362-65.[84] He moved away for work, and upon returning to Fayette County in the late 1990s, got involved in politics again, this time as a Republican. *Senate* Tr. 1354-57, 1365-68, 1370-71. Since his return, McCollum has run for various political offices in Fayette County without experiencing any race-related hostility. *Senate* Tr. 1365. He beat a white Republican in the primary for Fayette County Sheriff in 2002. *Senate* Tr. 1367.[85]

381.    When running to replace a Democrat on the Fayette County Board of Education in 2024, McCollum received support from the County Republican Party

---

[84] To avoid confusion with other cases, citations to "Senate Tr." refer to the November 2024 trial transcript in the *Alabama NAACP v. Allen* State Senate redistricting trial, portions of which have been admitted into the evidentiary record in these cases, *see Milligan* DE439 (Order); *Milligan* DE441-1 through DE441-8 (transcripts of designated witnesses).

[85] *Milligan* Plaintiffs' counsel stated during closing arguments that McCollum lost against a convicted felon white Democrat when Fayette County was majority Republican. Tr. 2254:12-16. Not so. At the time of the 2002 election, Fayette County was majority Democratic, and the winning candidate was a long-time and well-known member of the community, who had made a political comeback after being pardoned by the State for a felony conviction well over a decade prior. *Norris v. Fayette Cnty. Comm'n*, 143 So. 3d 659 (Ala. 2013); *see also Senate* Tr. 1357, 1371-72.

and the Alabama Republican Party, and he garnered 48% of the General Election vote. *Senate* Tr. 1355, 1358-59, 1360-61. White Republicans volunteered on his campaign, the local party paid for newspaper advertisements, and the State party sent out mailers supporting his election. *Senate* Tr. 1360-62.

382.   For 15 years or more, McCollum has been the county party Vice Chair (and does not want to be Chair), and he has served on the State Executive Committee. *Senate* Tr. 1356-58. Although his most recent race was unsuccessful, McCollum testified that black Republican Tierre Agnew was elected to the County Board of Education in a 98% white district in 2022 and that a serving black city councilwoman was elected from a majority white district in a non-partisan election. *Senate* Tr. 1360, 1369.

383.   While McCollum testified to experiencing racial discrimination in the early 1970s, *Senate* Tr. 1362-65, 1374, 1382-83, he also testified to the "moral growth" since then, *Senate* Tr. 1369; *see also Senate* Tr. 1366-67.

384.   Valerie Branyon was elected to the Fayette County Commission in 2024, defeating incumbent John Underwood, a black Democrat. *Senate* Tr. 849-50. She received support from the County Republican Party and the State Republican Party, as well as white individuals. *Senate* Tr. 855-58, 860-61. The State Party paid for three mailers and U.S. Representative Aderholt, who is a white Republican, recorded a robocall supporting her candidacy. *Senate* Tr. 858-59, 861.

385.   In 2020, she was encouraged by John Acker, who is white, and Bill McCollum to run for County Commission District 6. *Senate* Tr. 863. Acker even offered to pay for her campaign. *Id.* She defeated a white Republican in the primary but lost a close race to incumbent John Underwood in the General Election. *Senate* Tr. 861-62. Branyon ran against Underwood because she felt that he was not serving his constituents; he was a long-term incumbent in a district drawn to elect black candidates, but what matters is the quality of the candidate, not the color of their skin. *Senate* Tr. 852-53, 878, 887; *Milligan* DE459-2 at 96:16-97:14, 98:22-102:4, 116:25-117:3 (deposition testimony).

386.   Branyon learned about her community's transportation needs during her 2020 campaign and helped establish a citywide bus system. *Senate* Tr. 863-66, 884-85; *see also Milligan* DE459-2 at 43:11-19 (deposition testimony about poor people in Fayette County being black and white). Branyon testified that race relations were better today than in the past. *Senate* Tr. 869-70, 879-81, 886-87; *see also Milligan* DE459-2 at 9:9-13:15, 57:23-62:17.

387. Cedric Coley has been involved with the Montgomery County Republican Party since 2016. *Senate* Tr. 1319 (*see Milligan* Doc. 441-1). He describes the racial makeup of the local party as 75% white and 25% minority. *Senate* Tr. 1320. He has felt welcomed by the leadership of the local party, and he was himself elected as a member at-large for the Executive Committee. *Senate*

Tr. 1320-21. The Chairman of the local party also appointed him to the position of "elections chair." *Senate* Tr. 1321.[86]

388.    Cedric Coley testified that he helped Kenneth Paschal win his election to the Alabama Legislature, *Senate* Tr. 1342:19-1343:7, contrary to *Milligan* counsel's statement that "every black Republican who [Coley] helped to run for the state legislature had lost." Tr. 2554:10-11.

389.    These examples of black Republicans winning elections and receiving support from white Republicans as well as from the local and State Party apparatus itself suggest that white Republicans are not motivated to vote for or against a candidate based on the color of his skin. What matters more to most Alabama voters, the evidence shows, is the party banner under which a candidate is running.

### iii. Black and white voters in Alabama tend to vote for parties, not for candidates.

390.    Alabama conducts partisan elections for seats in the State Legislature. "Partisan elections lead to partisan results." *Ala. NAACP*, 612 F. Supp. at 1295. Alabama also permits straight-ticket voting. Ala. Code §17-6-35. "Straight-ticket voting only exacerbates the phenomenon of partisan-driven elections results." *Ala.*

---

[86] During the November 2024 *Ala. NAACP v. Allen* trial, Plaintiffs' counsel confronted Mr. Coley with some of his social media posts in an apparent attempt to attack his good judgment. *Senate* Tr. 1335. One in particular contains a call to vote Republican as well as a gesture—the "OK" gesture—that has been associated with white supremacy. *Senate* Tr. 1349-50. Mr. Coley adamantly denied he ever intended to advocate white supremacy and earlier testified that he petitioned the Governor to retire the flying of the Confederate flag on State Capitol grounds. *Senate* Tr. 1340.

*NAACP*, 612 F. Supp. at 1296. That's because when a voter casts a straight-ticket ballot, he is voting for a team, not for an individual player. Tr. 1694:18-1695:22 (Bonneau). The voter's decision is necessarily based on the candidate's party affiliation and not on an individual characteristic, such as race. *Id.*

391.   Dr. Bonneau analyzed straight-ticket voting to study the effects of political party affiliation on elections in Alabama. Alabama is one of only seven states to permit straight-ticket voting. DX1 at 3-4; DX2 at 4-7; Tr. 1694:18-1695:22; 1842:23-1843:25. Voters who make use of straight-ticket voting are necessarily not conducting individualized analyses of candidates or campaigns. They aren't worried about the name recognition of a candidate, or their particular campaign ads, or their race, or anything else. They are simply voting for a particular party, regardless of any unique circumstances in any individual election. Tr. 1695:23-1696:8.

392.   Dr. Bonneau found that about two-thirds of all Alabama voters in the 2018, 2020, and 2022 general elections had voted by straight-ticket, demonstrating that they were voting for a party, not any individual candidate. DX1 ¶3; Tr. 1696:9-1697:7. He testified that, including his analyses in his July 2024 Rebuttal report, DX2 at 4-7, "both Republicans and Democrats [in Alabama] overwhelmingly use straight-ticket voting option. And so they're voting not for individual candidates; they're voting for parties." Tr. 1703:1-4. Thus, as recognized by the Middle District

a few years ago, over "two-thirds of the Alabama electorate is voting for a *party*, not necessarily for particular *candidates*." *Ala. NAACP*, 612 F. Supp. 3d at 1296.

393.    Dr. Bonneau stated that this meant that, for example, in Alabama in the 2022 general election, any Republican candidate—regardless of any other factors influencing their particular election received 45.6% of the total vote simply for having an "R" next to their name. In other words, a Republican candidate in Alabama in 2022 was 90% of the way (or more) to being elected simply by being a Republican, regardless of how good or bad their individual campaign had been. Tr. 1697:8-1698:4; DX1 ¶3.

394.    Further, in response to a criticism from Dr. Liu that straight-ticket voting was predominantly used by Republican voters, Dr. Bonneau testified that the percentages he reports in Table 1 of his June 2024 Report (DX1 at 5) were percentages of the total votes cast. Dr. Liu misunderstood Dr. Bonneau's straight-ticket voting analysis and was wrong to suggest that straight-ticket voting was an increasingly Republican phenomenon in Alabama. The drop in the percentage of total votes being cast for Democrats by straight-ticket could be explained by fewer votes being cast for Democrats overall, and did not necessarily mean that a smaller percentage of Democratic voters was making use of straight-ticket voting. Tr. 1698:5-1699:1.

395.    Dr. Bonneau subsequently conducted an analysis examine this question in his rebuttal report. In Table 2 (DX2 at 7), Dr. Bonneau reported the percentage of straight-ticket votes, broken down by the votes cast at the top of the ticket for each political party rather than total votes. When breaking votes down this way, Dr. Bonneau found that—contrary to Dr. Liu's suggestion—the percentage of votes that Democratic candidates received via straight-ticket actually increased from 2018 to 2022 and consistently outpaced the percentage of Republican votes received via straight-ticket.    Tr. 1699:2-1700:23.[87]    This    analysis    further    corroborated Dr. Bonneau's initial findings.

396.    Dr. Bonneau also responded to Dr. Liu's statement that there was no evidence that black voters were making use of straight-ticket voting. Dr. Bonneau first highlighted that he had conducted several bivariate correlation analyses that all suggested that black voters in Alabama were voting overwhelming for the Democratic Party, and that when these analyses were paired with the fact that most Democratic voters were casting their ballots by straight-ticket, he could infer that

---

[87] Dr. Bonneau testified that using the elections at the top of the ticket—in these cases, gubernatorial and presidential elections—as a proxy for total votes cast for each political party was reasonable because the elections at the top of the ticket usually drive turnout and receive the largest number of votes. Tr. 1701:15-1702:3. In fact, Dr. Bonneau testified that it is more common for voters to "roll off" and fail to cast votes in elections further down the ticket, and so, if anything, using the elections featured at the top of the ballot might actually *understate* the importance of straight-ticket voting to elections further down the ballot. Put differently, candidates in down-ballot elections are likely receiving a larger percentage of their vote share from straight-ticket voting than what Dr. Bonneau's analysis would report. Tr. 1702:4-25.

straight-ticket voting on the Democratic side was being driven by black voters. 1703:12-1704:1.

397. Similarly, Dr. Bonneau noted that Dr. Palmer's own RPV analyses showed almost no variation in black voter support for Democratic candidates, regardless of individual factors that might impact an election. That was consistent with his own analyses showing that black voters in Alabama were making substantial use of straight-ticket voting. Tr. 1713:18-1714:12.

398. Dr. Palmer himself testified that he had previously conducted an analysis of straight-ticket voting as an expert witness in another case and had found that straight-ticket voting was predominantly used by minority voters. Tr. 1704:2-19 (Bonneau); *see also* Tr. 541:11-19 (Palmer).

399. Finally, Dr. Bonneau noted that he had analyzed straight-ticket voting, broken down by voter race, in the 2022 gubernatorial election as part of his rebuttal report, DX2 at 4-5, and from this analysis it was reasonable to estimate that at least 65.4% of all black voters who voted for the Democratic candidate for governor in 2022 did so via straight-ticket, which would represent over 60% of all votes cast by black voters in the election. If anything, this estimation likely *underestimated* the percentage of black voters who cast their ballots via straight-ticket, because it assumed that every single non-black voter who voted for Yolanda Flowers did so

via straight-ticket.[88] His analysis provided an estimated *floor* for the percentage of black voters making use of straight-ticket voting; it did not suggest a ceiling. Tr. 1711:19-1713:17.

400.    In sum, "many straight-ticket voters are likely not looking at down-ticket candidates' qualifications (or, for that matter, their races or even their names), but merely under what party banner they are running." *Ala. NAACP*, 612 F. Supp. 3d at 1296. Given that most voters are not even *evaluating* a candidate's race when they cast their vote, this is highly compelling evidence that black voters' candidates of choice are losing on account of party affiliation, not their race.

### iv. The relative weakness of the Democratic Party contributes significantly to the failure of black Alabamians to elect their candidates of choice.

401.    The Court also heard evidence confirming that "the Alabama Democratic Party is significantly weaker than its Republican counterpart," which "makes it even harder for *any* Democratic candidate—white or black—to get elected." *Ala. NAACP*, 612 F. Supp. 3d at 1293. Five years ago, Judge Watkins

---

[88] To conduct his analysis, DX2 at 3-4, Dr. Bonneau focused on the top of the ballot because those elections nearly always received the most total votes. Tr. 1705:8-11. He noted that the first two columns—total votes cast for the Democratic candidate, and then straight-ticket Democratic votes cast—were publicly available statistics, included with official election results. Tr. 1705:12-1706:9. He then stated that black voter turnout had not been reported by the Alabama Secretary of State for 2022, but that the estimate of black voter turnout used in this analysis was based on black voter turnout in 2018 and 2020, which had been relatively stable between 24.2% and 25.6%. The estimate of 25% was meant to be just that—a reasonable approximation—and that the use of slightly higher or lower turnout rate would not affect his overall conclusions from the analysis. Tr. 1706:10-1707:12.

described the Party as "on life support." *Id.* The Party's health does not appear to have improved since then. Senator Singleton first ran for office in 2002 as a Democrat. Tr. 2366. At that time, the Alabama Democratic Party had strong leadership and ran candidates in nearly every vacancy. Tr. 2366-67. But today, according to Senator Singleton, the Democratic Party has weakened significantly due to conflicts among the party's leadership. Tr. 2367. In Plaintiff Leonette Slay's words, the Alabama Democratic Party is in "disarray." Tr. 912-13. The downside for "individual candidates" running as Democrats is that "the lack of a cogent organization and fundraising abilities has hindered their individual campaign efforts," requiring the candidates "to really go it alone." Tr. 913.

### v. White Alabamians, like white Southerners generally, vote overwhelmingly Republican for ideological, not racial, reasons.

402.   Finally, partisanship is not a proxy for race in Alabama. The State Defendants' evidence suggests that white Alabamians who vote Republican are motivated to do so for ideological reasons, not racial ones. White voters are the appropriate focus because it is their voting behavior, as that of the majority group, that allegedly causes black-preferred candidates to lose elections. *See Uno*, 72 F.3d at 981 (holding that "plaintiffs cannot prevail on a VRA §2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus").

403.    For most of the 20th century, Alabama was a one-party State, like every other State in the South, with the Democratic party dominant. But in 2010 Republicans won a majority in both houses of the State Legislature, around the same time that other southern state legislatures switched from Democratic to Republican. Tr. 1616-17, 1630. The undisputed reason was the gradual shift by white southern voters from the Democratic party to the Republican party.

404.    The issues motivating this partisan shift are relevant to assessing *why* white Alabamians support Republican candidates today. If "conservative ideology, not race," better explains party preference, then black Democrats can hardly be said to lose elections to Republican opponents on account of race. *Ala. NAACP*, 612 F. Supp. 3d at 1300.

405.    Dr. Carrington, a political scientist, examined how the development of the Republican and Democratic parties in the 20th and 21st centuries contributed to the partisan shift in the American South, including in Alabama, from reliably Democratic to dependably Republican. DX3.

406.    He concluded that after the Civil Rights era of the 1960s and 1970s, the two parties' respective positions on non-racial issues—namely, economics, foreign policy, religion, abortion, and LGBTQ rights—better account for the partisan shift in the South than the parties' positions, if any, on racial issues. DX3 at 23-36.

407.    For example, the development of the parties on the issue of abortion into discernible "pro-life" and "pro-choice" camps provides a persuasive non-racial explanation for why white conservative Alabamians tend to support the Republican party. Dr. Carrington testified that the "Democratic Party is understood to be the pro-choice party." Tr. 1573:9-10. "The Republican Party," in contrast, "is seen as what's called the pro-life party, meaning it favors significant restrictions, if not an outright ban, on abortion." Tr. 1573:15-17. This "stark" division between the parties on the issue of abortion has been clear to voters as far back as the 1980s. DX3 at 32. Black Republican Valerie Branyon sees the division, affiliating with the Republican Party in part because she opposes abortion. *Senate* Tr. 851:17-25, *available at Milligan* DE441-2.

408.    Dr. Carrington's opinion is that the parties' respective positions on the non-racial issue of abortion "contributed" to the partisan shift in the South, and in "Alabama in particular." Tr. 1154:10-25.[89]

---

[89] Plaintiffs attempt to undermine this conclusion, in part, by taking Dr. Hood's scholarly work out of context. Although Dr. Hood expressed no opinion in this case on partisan realignment, Plaintiffs quoted selective portions of his work on cross-examination to argue that race explains partisan realignment in the South. *See, e.g.*, Tr. 1930:9-25. But as Dr. Hood explained, what he was discussing there was not causal—*i.e.*, racially motivated—but rather descriptive. Tr. 1953:2-9. Ideological overcrowding in the southern Democratic party prevented white conservatives and moderates from achieving non-racial policy goals, which precipitated their decades-long realignment to the Republican Party as a mechanism to achieve those policy goals. Tr. 1950-6-1953:13.

409. Dr. Carrington also examined "data showing that a significant number of people vote on the basis of abortion," including a 2014 Pew Research survey revealing Alabama to have "the lowest support for legalized abortion in the entire nation." DX3 at 33. Dr. Carrington also found relevant the 2018 "sanctity of unborn life" amendment to the Alabama Constitution ratified by Alabamians by a 59-41% margin. DX3 at 33. "Because voters must approve constitutional amendments on a statewide basis, the results of voting on those amendments provide a snapshot into Alabamians' ideology." *Ala. NAACP*, 612 F. Supp. 3d at 1300.

410. Here, that snapshot shows an ideologically pro-life populace. Where white pro-life Alabamians decide to vote for a Republican candidate, there is no reason to insinuate that race has anything to do with their decision. *Id.* at 1301.

411. The Court credits Dr. Carrington's opinion that the parties' respective positions on the non-racial issue of abortion contributed to the partisan shift in the South, and in "Alabama in particular." Tr. 1575:9.

412. Similarly, the State Defendant's evidence shows that Alabamians have traditional views about marriage and family. DX3 at 34-36. Those views align more closely with the Republican Party than with Democratic Party. The Court credits Dr. Carrington's conclusion that, like "with abortion, the party development on this issue opened up a significant gap between the majority of Southern voters and the Democratic Party while the GOP better aligned with those voters." DX3 at 36.

413.   According to a 2014 Pew survey, a majority of Alabamians opposed same-sex marriage and believed that homosexuality "should be discouraged." DX3 at 36. "Alabama was the state with the least support for legal recognition of same-sex marriage in the entire country according to the Pew study." DX3 at 36.

414.   In 2006, Alabamians passed by an 81-19% margin the Sanctity of Marriage amendment to the Alabama Constitution, which declared that a "marriage contracted between individuals of the same sex is invalid in this state." DX3 at 36. The Court agrees with Dr. Carrington that these trends provide yet another example of a non-racial issue better explaining voting patterns than race.

415.   Dr. Bagley's critique of Dr. Carrington's conclusions with respect to these non-racial social issues falls flat. Dr. Bagley notes that black Alabamians also hold strong views on many of the same social issues, like religion, abortion, and marriage. Tr. 1361-62. He also understands that the two parties take distinct stances on these issues, and he thinks that Alabama voters are smart enough to know the parties' positions on this issue and others. Tr. 1450:8. Still, he concludes that Dr. Carrington narrative "may tell us a little bit about the sort of national picture of what [white] voters are doing in terms of coming over to the Republican Party, it's not very helpful, I don't think, for us in terms of explaining the racial dynamics of partisan realignment in, specifically, Alabama." Tr. 1362:10-14. He surmises, then, that race must explain why white Alabamians tend to vote Republican while black

Alabamians do not, even though both groups tend to agree on many social and moral positions the Republican party takes. Tr. 1360.

416.   Dr. Bagley ignores the obvious, non-racial answer. Two people can agree on one issue but disagree on another—the issue that ends up creating the partisan divide. Here, while white and black Alabamians might agree to a large extent on a number of social issues, white Alabamians are voting for the political party that espouses those same views. What matters here is the evidence that white Alabamians are voting consistent with their non-racial, conservative ideology, as Dr. Carrington discusses. DX3 at 36.

417.   Dr. Frederickson and Dr. Burch contend, in contrast, that all issues are racial, Tr. 1043:23-1044:10, and thus race and civil rights are the *only* factors relevant to partisan realignment in the South since 1960. Tr. 1039:23-1040:5.

418.   Dr. Frederickson, as a historian, is not comfortable offering any conclusions about race and politics in the south past the 1980s. Tr. 852:7-9. She has not researched that issue for the more recent decades. Tr. 852:15-16. Dr. Frederickson is not comfortable opining "about voter choice," which also is not "an area of [her] expertise." Tr. 853:3-7; 854:2-4. And she does not offer any opinions about party positions after the year 2000. Tr. 853:14. Moreover, Dr. Frederickson, when responding to Dr. Carrington's report, did not review any the sources relied upon by Dr. Carrington. Tr. 860:24-25. For the relevant time

period she does examine (1960s-1980s), Dr. Frederickson believes that the issue of school prayer, women's rights, family values, the Equal Rights Amendment, and abortion are all in some way related to race. Tr. 856:12, 858:1-4.

419. When answering *Milligan* Plaintiffs' counsel's questions, Dr. Frederickson briefly opined about the issue of "heterosexuality" and how, in her view, it relates to "manhood," "the gender dynamic," and "the racial dynamic." Tr. 845:20-23. But she then admitted on cross that the issue of "heterosexuality" and LGBTQ+ rights are not within her "area of expertise." Tr. 848:9-15. Dr. Frederickson then testified that while family and gender issues "moved to the forefront" ahead of racial issues by the 1990s, those very family and gender issues were themselves "related to race." Tr. 859-60.

420. Dr. Burch, for her part, testified that economic anxiety is explained by racial attitudes and racial anxieties whether considering black or white Americans; more specifically, Dr. Burch's position is "that being concerned about the price of eggs and the way that you weight concerns about the price of eggs are related to … racial threat and racial anxiety." Tr. 1043:23-1044:10. This highly pessimistic view of what motivates people rests upon the notion that people are not in fact motivated by what they say is important to them, but by some hidden, perhaps subconscious, view about race.

421.   In light of the more persuasive evidence to the contrary, the Court does not credit Dr. Burch's or Dr. Frederickson's conclusions that all issues are, in some way, racial issues. While historical voting patterns are informative, the ultimate question is not why some voters switched to the Republican party in the '80s or '90s, but why they are voting as they do now.

422.   Dr. Bagley conceded that he did not interview any Republican voters in Alabama when arriving at his conclusions and he is not offering an opinion that Republican voters today are motivated by racial bias. Tr. 1443:15, 1447-1448:5. Dr. Bagley also did not investigate whether white voters in Alabama, who tend to support Republican candidates, do so for racial reasons. Tr. 1447:9-14, 1447:25-1448:2. Dr. Bagley thinks that Alabama voters are smart enough to know what positions the political parties take on specific issues like abortion and Second Amendment freedoms. Tr. 1450:8.

423.   In sum, consistent with the Middle District's conclusions in 2020, we find that the State Defendants have "presented evidence—bearing on the totality of circumstances—of reasons why black-preferred candidates are losing that are unrelated to race. The State Defendants' evidence is not conclusive, but it well supports the idea that African Americans are not losing … elections 'on account of race or color.'" *Ala. NAACP*, 612 F. Supp. 3d 1305-06 (quoting 52 U.S.C. §10301(a)). This factor "weighs heavily in favor of the State." *Id.* at 1306.

## 2. Senate Factor 7: Black Democrats have achieved electoral success.

424. Section 2 explains that "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" in evaluating a §2 claim's sufficiency. 52 U.S.C. § 10301(b). Consistent with the statutory text, the seventh Senate factor examines "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.

425. "Alabama has made remarkable progress in the election of people of color to public office in the last fifty years." *Ala. NAACP*, 612 F. Supp. 3d at 1315. The State Defendants' expert Dr. Hood examined the number and percentage of black legislators elected to each chamber of the Alabama Legislature at three points in history: 1965, 1981, and 2024. DX7 at 22. In 1965, there were no black legislators in Alabama. In 1981, there were 3 in the Senate (8.6%) and 13 in the House (12.4%). Today there are 7 in the Senate (20%) and 26 in the House (24.8%). *Id.* And a quarter of the State Board of Education's members are black. *See* ALABAMA STATE DEP'T OF EDUC., STATE BD. OF EDUC., https://www.alabamaachieves.org/state-board-of-education/ (last visited March 4, 2025).

426. For districted elections, the fact that 32 of the 33 black Alabamians currently serving in the Alabama Legislature were elected from majority-black districts gives us no pause. *See Milligan* DE436 ¶155. That's because every one of

those 32 legislators ran as a Democrat. "The remaining black Alabamian serving in the Legislature is a Republican who was elected from a majority-White district." *Id.*; *see also* DX1 ¶18. And from 2008 to 2022, Democratic support among black voters in Alabama, on average, exceeded 93%. DX7 at 5. Thus, these facts suggest only that black candidates running as Democrats can and do win elections in districts where a majority of voters support the Democratic Party. And as discussed *supra* Discussion I.B.1, we have seen that black Republicans, while not numerous, can and do win districted elections.

427.   We also have testimony before us that Plaintiff Ronald Smith was a long-term commissioner in Bullock County, that Black Republican Tierre Agnew was recently elected in a nearly all-white school board district in Fayette County, and that William Green, who is black, took over as Mayor in majority-white Enterprise when Kenneth Boswell vacated the position. Green continues to hold the office nearly eight years later. Tr. 460-61 (Smith); *Senate* Tr. 1360, 1369 (Agnew); *Milligan* DE459-1 at 17:7-19 (Green).

428.   As for statewide elections, we must remember that Alabama is "a ruby red state—one of the most Republican states in the entire South." *Ala. NAACP*, 612 F. Supp. 3d at 1291 (quotation omitted). As the Middle District recently recognized, this reality "has made it virtually impossible for Democrats—of any race—to win statewide in Alabama in the past two decades." *Id.* (quotation omitted).

So "while all black Democrats [since 2008] have lost their statewide races [in Alabama], so have all white Democrats, with the exception of Doug Jones (2017 special U.S. Senate election)." *Ala. NAACP*, 612 F. Supp. 3d at 1291. And losing elections, by itself, "does not prove a lack of electoral opportunity but a lack of whatever else it takes to be successful in politics .... Section 2 does not bridge that gap—nor should it." *Uno*, 72 F.3d at 981; *see also Baird*, 976 F.2d at 361 (Section 2 "is a balm for racial minorities, not political ones—though the two often coincide.").

429.    The *Singleton* Plaintiffs and the State Defendants stipulated to the tremendous success of black judicial 2018, 2020, and 2022 elections in Jefferson County, the home of Birmingham and within the Northern District of Alabama. *Singleton* DE294. The candidates were often unopposed and received about 97% of the vote. *Id.* Each and every one ran as a Democrat. *Id.* While the *Milligan* and *Caster* Plaintiffs did not join the stipulation, these facts are judicially noticeable, and we take notice.

430.    This Senate factor evidence, suggesting nothing more than partisan politics, favors Alabama.

> **3.    Senate Factors 1, 3, and 5: Plaintiffs have not proven that Alabama's distant history of racial discrimination has made the political process less open for black Alabamians today.**

431.    The first Senate factor examines "the extent of any history of official discrimination in the state … that touched the right of the members of the minority

group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36-37.

432.   Similarly, the third factor examines "the extent to which the state … has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Id.* at 37.

433.   And the fifth factor looks at "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Id.*

434.   Plaintiffs' evidence in support of these three factors falls generally into two buckets: (1) stories of official discrimination in Alabama's distant past; and, (2) socioeconomic gaps between white and black Alabamians today. The State Defendants' dispute the relevance of distant history, pointing to the political realities today. Plaintiffs have not demonstrated that existing socioeconomic gaps are due to that history.

### i.   Alabama has overcome its history.

435.   We begin by remembering that the Voting Rights Act was enacted "to enforce" the rights guaranteed by the Fifteenth Amendment. 79 Stat. 437. That amendment is "not designed to punish for the past." *Shelby County v. Holder*,

570 U.S. 529, 552-53 (2013). Moreover, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980); *see also GBM v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021) ("it cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws about voting"). We therefore proceed with "caution against allowing the old, outdated intentions of previous generations to taint Alabama's ability to enact voting legislation." *GBM*, 992 F.3d at 1332.

436.    In an effort to prove Alabama's history of discrimination, Plaintiffs offer the testimony of historian Dr. Bagley along with the personal testimony of those among the Plaintiff groups old enough to remember instances of official discrimination from the 1960s and 1970s.

437.    Dr. Bagley's opinions on this topic are often irrelevant, overstated, missing significant context, or all of the above. Below are several examples of this pattern.

438.    Dr. Bagley's citations to federal observers and DOJ objections to State and local preclearance submissions are irrelevant and stale. MX1 at 10-13, 22. Tr. 1391 (Bagley admitting that he did not analyze whether any federal observer reported instances of racial discrimination). The last sustained objection to a State law was in 1994, thirty years ago. Moreover, given the State's burden of proof under

the former preclearance scheme, DOJ's refusals to preclear based on a law's retrogressive effect are not, without more, evidence of intentional discrimination.[90] *See League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023).

439.   Dr. Bagley's proffered examples of State-sponsored discrimination after 1965 are incredibly sparse.

440.   He discusses the 2010 redistricting cycle as one, which culminated in the *Alabama Legislative Black Caucus v. Alabama* litigation. MX1 at 14-16; *see also* MX4 at 17-19. Dr. Bagley's discussion is erroneous in the details and the big picture.

441.   He asserts that Thomas Hofeller, a "gerrymander whiz," was a key player in designing the State's plans, but conceded on cross that he has no evidence Hofeller was drawing maps or even communicating with the State's map drawer. Tr. 1379.

442.   Despite the racial tones with which Dr. Bagley tells this story, Senator Singleton characterized the resulting congressional plan as "*political* packing." MX1 at 16 (emphasis added).

---

[90] Under preclearance, the entity seeking preclearance had to somehow prove a negative—that the law did not retrogress. *See* 28 C.F.R. 51.52(a). Thus, an objection by DOJ does not necessarily constitute a finding that the proposed change is in fact discriminatory in purpose. *See* 28 C.F.R. 51.52(c).

443.   Dr. Bagley suggests that the State attempted to bypass "Section 5 administrative review under the Obama Administration Justice Department." *Id.* He had to concede on cross that the State had actually "obtained administrative preclearance from the Department of Justice." DX73; *see also* Tr. 1385; DX74.[91]

444.   Dr. Bagley discussed the ensuing litigation challenging the State's House and Senate Plans. *See Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017). While the *ALBC* court found that racial considerations predominated in "14 of the 36" state districts at issue, *id.* at 1033, Dr. Bagley omits a critical detail: the Alabama Legislature drew these 14 districts in a race-conscious manner to "avoid retrogressing the ability of black voters to elect candidates of their choice," *id.* at 1032. That is, the Alabama Legislature had a mistaken understanding of its responsibilities to obtain preclearance, not any ill racial intent. The court made no finding of "invidious discriminatory purpose," and it took the Supreme Court to step in and provide more guidance regarding how to comply with both the VRA and Equal Protection Clause. *See ALBC v. Alabama*, 989 F. Supp. 2d 1227, 1288 (M.D. Ala. 2013), *vacated*, 575 U.S. 254 (2015).

---

[91] Dr. Bagley also suggests that Sen. Scott Beason, who had allegedly made racist remarks on a wiretap, was involved to some degree. MX1 at 16. But Dr. Bagley does not suggest that Sen. Beason "was a sponsor" of the bill that became the 2010s Plan and provides "no evidence as to … what bill he was discussing" when he made allegedly racist remarks. *GBM*, 992 F.3d at 1323 (discussing and discounting similar allegations about Beason's role in crafting legislation). *See also* DX258 (describing official repercussions taken by Senate leadership against Sen. Beason).

445. As Justice Thomas recounted in his *ALBC* dissent, "the 2006 amendments to §5 … created an inflexible definition of 'retrogression' that Alabama understandably took as requiring it to maintain the same percentages of minority voters in majority-minority districts." *ALBC*, 575 U.S. at 302. Judge Thompson appears to have had a similar understanding of §5 many decades earlier, describing a plan that reduced a district "from 89% black to 67% black" as one with a "large retrogression[] in black voting strength." *Burton v. Hobbie*, 543 F. Supp. 235, 244-45 & n.3 (M.D. Ala. 1982) (three-judge court) (Thompson, J., dissenting).

446. Thus, Alabama's attempt to comply with federal law and preserve minority voting power—though under a mistaken view of §5's preclearance requirements—does not tend to suggest a "history of official discrimination … that touche[s] the right of the members of the minority group to register, to vote, or otherwise to participate in the political process." *Gingles*, 478 U.S. at 36. Especially when the State's inability to walk that tightrope was sorely disputed by members of the federal judiciary.

447. Dr. Bagley portrays *People First of Alabama v. Merrill* as involving evidence of recent discrimination against black Alabamians. MX1 at 17-18. *People First* concerned a discriminatory *effect*, not intent, challenge against valid voting laws *as applied* to the 2020 elections during the COVID-19 pandemic. 491 F. Supp. 3d 1076 (N.D. Ala. 2020). The district "court emphasize[d] that its

decision d[id] not undermine the validity of the Challenged Provisions outside of the COVID-19 pandemic or beyond the November 3 [2020] election," and the court thus "grant[ed] only narrowly tailored relief to address the additional burdens facing a limited class of voters who are particularly susceptible to complications from contracting COVID-19." *Id.* at 1093. Even that injunction, however, was stayed by the Supreme Court, and then the case became moot following the 2020 election, so the decision was never tested on appeal. *See Merrill v. People First of Alabama*, 141 S. Ct. 25 (2020).

448.   Dr. Bagley also testified about purported "findings of discrimination against Black residents of the Black Belt in areas where septic systems have long been failing and residents cited for noncompliance at the same time." MX5 at 5; *see also* MX1 at 21. Likewise, Dr. Burch testified about the "lack of access to quality sanitation in the Black Belt" and suggested that "drainage in sewage in the Black Belt can be difficult because of the kinds of soil." Tr. 966:5-19. She also testified about Lowndes County and investigations by DOJ and HHS related to "issues of safe wastewater disposal and management." *Id.*

449.   The Court was presented with rebuttal testimony from Dr. Karen Landers, Chief Medical Officer for the Alabama Department of Public Health, who testified during the November 2024 trial concerning a challenge to Alabama's Senate districts and whose testimony has been admitted in these cases. *Senate*

Tr. 1294-96, 1306-07; *see also* DX27; *Milligan* DE439. Dr. Landers testified that a memorandum of understanding entered into between the Alabama Department of Public Health and DOJ contained no admission of liability and no finding of noncompliance with federal law. *Senate* Tr. 1307; *see also* DX257 at 2 ("This Agreement does not constitute an admission of noncompliance…; nor does this Agreement constitute a finding of noncompliance by the United States."). She testified further that there had been no evidence of a hookworm outbreak in the region. *Senate* Tr. 1299:19-1300:10. *Contra* MX1 at 21. She then explained the various ways that ADPH was working hard to help the residents of Lowndes County with sewage issues. *Senate* Tr. 1301-02. The Court credits Dr. Landers's testimony.

450.    Dr. Bagley casts the so-called "Lid Bill," which regulated property taxes, as white supremacist legislation. MX1 at 25-26. In *Lynch v. Alabama*, Judge Lynwood Smith heard the constitutional challenge to the Lid Bill and, in a lengthy and thorough opinion, found that "Plaintiffs have proven a disparity in funding among the State's public school systems, but not a disparity along racial lines." 2011 WL 13186739, at *340 (N.D. Ala. Nov. 7, 2011), *aff'd in part, vacated in part sub nom. I.L. v. Alabama*, 739 F.3d 1273 (11th Cir. 2014). The court rejected Plaintiffs' intentional discrimination claims on the merits. In Dr. Bagley's words, the *Lynch* court determined that "a historical antipathy to taxation," not racial animus, "was

what was the primary motivating factor in terms of enacting the lid bills."
Tr. 1404:19-22.

451.    Dr. Bagley opines that the passage of the 2023 Plan itself is evidence
of discrimination against black Alabamians. For the reasons discussed *infra* Section
II, it is not. He points as well to the injunctions entered against the 2021 and 2023
Plans. Those decisions reflected our determination, based on the limited record
available at the time, that those laws likely violated § 2. *See Singleton*,
690 F. Supp. 3d at 1237, 1318. The challenge to the 2021 Plan was mooted by the
enactment of the 2023 Plan, and we today conclude—as a final, not preliminary,
matter—the 2023 Plan does not violate §2. Our preliminary rulings carry little
weight now.[92]

452.    Plaintiffs also decry recent absentee ballot legislation, Ala. Act No.
2024-33 (frequently referred to as SB1), as evidence of discrimination against black
Alabamians. *See, e.g.*, Tr. 1284-85 (Dr. Bagley); MX4 at 29. But as their own
witness, Ms. Valtoria Jackson, acknowledged, there has been "quite a bit of
miscommunication about [SB1]." Tr. 1104:7-16.

---

[92] We expressly reserved ruling on the constitutional claims of intentional discrimination
brought by *Singleton* and *Milligan* Plaintiffs. *Id.* at 1321. Because there was no finding of "intentional discrimination" in those two decisions, they have little relevance to this inquiry. *League*,
66 F.4th at 922.

453.   SB1 is a law "enacted to prevent absentee ballot fraud." *Alabama State Conference of the NAACP v. Marshall*, 746 F. Supp. 3d 1203, 1213 (N.D. Ala. 2024). The pre-enforcement challenge to SB1 is ongoing. Five of the six claims in that lawsuit have already been dismissed for failure to state a claim. *Id.* at 1251-52.

454.   The *Marshall* court entered a preliminary injunction "only as to Section 208 blind, disabled, or illiterate voters." *Alabama State Conference of NAACP v. Marshall*, 2024 WL 4282082, at *6 (N.D. Ala. 2024). The injunction was unrelated to race as it applied to "*all* voters with disabilities." *Id.* at *1-2 (emphasis in original). Whether SB1 even has a discriminatory *effect* on black Alabamians was not an issue put before the court. The defendants in *Marshall* have appealed the preliminary injunction, and that appeal is also ongoing. *Milligan* DE451 at 10.

455.   The *Marshall* court found "insufficient evidence that any current procedures" in Alabama's elections "were adopted or maintained for discriminatory reasons." *Marshall*, 612 F. Supp. 3d at 1307. Further, the court emphasized, when rejecting the plaintiffs' free speech claims, that "[a]*ssisting voters* is not prohibited by the text of any of the challenged provisions." *Id.* at 1225 (citing Ala. Code §17-11-4(b)(1) ("Any applicant may receive assistance in filling out the application as he or she desires, but each application shall be manually signed by the applicant.")). The court also found, when dismissing the plaintiffs' vagueness challenge, that none of the text's operative terms "are complicated terms," and that "each have plain and

ordinary meanings that are clearly understandable to persons of ordinarily intelligence." *Id.* at 1241.

456. In sum, nothing Plaintiffs have described shows that the State has engaged in recent and "pervasive purposeful discrimination" against black Alabamians. *United States v. Marengo Cnty. Comm'n*, 731 F.3d 1546, 1567 (11th Cir. 1984).

### ii. Plaintiffs have not shown that past discrimination is the cause of present socioeconomic gaps.

457. Before we can assume that present-day socioeconomic disparities experienced by black Alabamians "hinder their ability to participate effectively in the political process," we must first find that socioeconomic gaps today are in fact the "effects of discrimination." *Gingles*, 478 U.S. at 37. In other words, Plaintiffs must prove that racial discrimination best explains the gaps.

458. Socioeconomic disparities exist everywhere, between all sorts of groups, and for all kinds of reasons. The only gaps §2 is interested in are those caused by past purposeful discrimination. Plaintiffs have failed to prove that socioeconomic disparities experienced by black Alabamians today are the effects of past racial discrimination.[93]

---

[93] When objecting to Plaintiffs' original request for a preliminary injunction in 2022, the State Defendants made the different argument that "plaintiffs cannot demonstrate a causal connection between the disparate socio-economic status and depressed political participation of Black Alabamians, and that racial parity in rates of voter registration and turnout means that those plaintiffs

459.   Plaintiffs offer the expert testimony of Dr. Bagley and Dr. Burch, and the lay testimony of named Plaintiffs and fact witnesses.

460.   Dr. Burch purports to identify "disparities in socioeconomic status between Black and White Alabamians that have been shown to affect voter registration and turnout." MX6 at 2. Although Dr. Burch identifies these gaps, she provides no analysis demonstrating that past official discrimination caused these gaps. All she can tell us is that disparities in both socioeconomic factors and turnout exist.

461.   Dr. Burch offered similar opinions in *Pierce v. North Carolina State Board of Elections*. Tr. 1044:14-20. There, the district court dismissed her findings almost out of hand at the preliminary injunction stage because they "contain[ed] no statistical analysis demonstrating that race discrimination by North Carolina caused the socioeconomic disparities." 713 F. Supp. 3d at 235. Dr. Burch did not correct that glaring omission when submitting her report in this case.

462.   Dr. Bagley, like Dr. Burch, identifies a number of disparities while simply *assuming* that they must be caused by "past and continuing racism and

---

cannot demonstrate depressed political participation." *Singleton*, 582 F. Supp. 3d at 1022. We considered that argument "too formulaic" and rejected it. *Id.* The State Defendants now take a step back and submit substantial evidence that the present-day socioeconomic gaps themselves are *not* "the lasting effects of discrimination" with which §2 is concerned. *Id.* And they continue to argue that parity in registration and turnout rates, among other factors, show that this factor favors Defendants.

discrimination." MX1 at 17; *see also* Tr. 1397:15-17 (Dr. Bagley could think of "no other explanation" for gaps than the "history of discrimination").[94]

463.   The Court does not credit Drs. Bagley's and Burch's Senate factor five evidence for the simple reason that they have not plausibly connected the dots between present disparities and past discrimination. They simply take as a given that a causal relationship exists. *See also* Tr. 2675:16-19 (*Caster* Plaintiffs' counsel assuming that gaps in Alabama and elsewhere must be caused by a "history of discrimination specifically against African-Americans").

464. Further, the State Defendants have undermined Plaintiffs' presupposition that historical discrimination in Alabama must be the cause of present-day gaps in Alabama by showing that these very same disparate outcomes occur everywhere in the nation and are more plausibly explained by non-racial variables.

465.   Dr. Hood compared the size of socioeconomic gaps present in Alabama with those in the 20 other States with a black population larger than 10% of the total population. DX7 at 7-20. Specifically, he examined: educational attainment (both high school equivalent and bachelor's degree), food stamp rates, median household income, per capita income, poverty, home ownership, unemployment, infant

---

[94] Dr. Bagley also did not inquire how Alabama fared compared to other States regarding these gaps. Tr. 1398.

mortality, vehicle ownership, health insurance, internet access, and incarceration rates. *Id.* Dr. Hood concluded that any racial disparity between the white and black populations that is present in Alabama is also present in each of the 20 other States. DX7 at 20. In fact, the gaps are often larger in northern States, and nowhere did black residents fare better than white residents on any individual metric surveyed. *Id.*

466.   Plaintiffs' attempt to redirect this inquiry from disparities to the fact that black Alabamians rank lower on these metrics on average than black residents of the 20 comparison states overlooks that white Alabamians likewise rank lower compared to white comparison-state residents. DX7 at 8-19; Tr. 1014:21-25; 1889:3-24; 1947:9-1948:6. Dr. Hood's focus on the disparity measure in each state thus provides a more accurate point of comparison by controlling for local factors that affect both black and white residents of a particular state (*e.g.*, the cost of living).

467.   On 10 of the 13 measures that Dr. Hood analyzed, the disparity rate for Alabama was narrower (better) than the average disparity rate calculated for the comparison States. DX7 at 20. And Alabama's disparity rate was never the largest (worst). *Id.*

468.   If the root cause of socioeconomic gaps is past official discrimination, we would expect to see starker gaps in States where racial discrimination was historically more prominent. Tr. 782-84. One might compare States where slavery

was legal before the Civil War to States where it was not, or States that were members of the former Confederacy, or "Jim Crow" States, or States that were covered by §5 of the VRA, to those States not in those categories. The fact that larger racial gaps exist in States that were not former slave States, did not have Jim Crow laws, and were not covered by §5 of the VRA seriously undermines Plaintiffs' assumption that racial disparities in Alabama are the effect of official discrimination.

469.    This comparison of Alabama's racial socioeconomic disparities to those of other States does not contravene the "intensely local appraisal" required by §2. First, the *Gingles* Court applied that appraisal to "the design and impact of the contested electoral mechanisms," 478 U.S. at 79, not to socioeconomic disparities allegedly attributable to a State's history. Second, the national comparison helps make sense of the local data. Performing the "local appraisal" in a vacuum would fall short of the "comprehensive, not limited, canvassing of relevant facts" mandated by §2. *De Grandy*, 512 U.S. at 1011.

470.    Dr. Reilly also noted that socioeconomic gaps among racial groups are present throughout the country. For example, when it comes to income, Asian workers on average consistently out-earn white workers, and white workers consistently out-earn black workers. Tr. 2187:24-2188:9; DX8 at 48. Some, like Drs. Bagley and Burch, would say that such racial gaps can only be explained by systemic racism. *See* MX1 at 17. Dr. Reilly disagrees. Tr. 2188:2-14, 2208:2-11.

Others touting the fringe theory of "genetic determinism" believe that performance gaps result from genetic differences between racial groups. Dr. Reilly disavows this view. Tr. 2310:25-2311:18, 2313:6-12.

471. Dr. Reilly concludes that a combination of numerous non-racial variables better explain these gaps. Tr. 2189:18-2190:4. Using the household income example again, Dr. Reilly and others have found that age, region, education, standardized test scores, and family structure together directly contribute to the income gap. Tr. 2189:18-4. When accounting for these non-racial factors, Dr. Reilly concludes that historical racism would not be a predictor of socioeconomic gaps between black and white citizens in former Jim Crow states such as Alabama. Tr. 2208:20-2209:17. Different socioeconomic gaps were not identifiable in states that were slave states versus states that were not slave states; in fact, slightly larger gaps are found in northeastern states. Tr. 2338:10-16.

472. Turning to the metrics more indicative of political participation, Dr. Burch examined voter registration in Alabama and estimated, based on 2022 data, that the statewide registration rate is about 89 percent for white residents and 84 percent for black residents. MX6 at 6-7 & n.15.[95] In 2018, the registration gap was less than one percent, at 88.4% of whites and 88% of blacks. MX6 at 7.

---

[95] Dr. Burch calculates the registration rates by dividing *citizenship* estimates by race into the Secretary of State's registration totals. MX6 at 6-7 & n.15.

Dr. Duchin looked at the racial makeup of the registered voter population in her illustrative plans A through D and found that in each plan, black voters make up a higher percentage of active voters and registered voters than they do the BVAP percentage. Tr. 320-330; MX9 at 2. This comports with what the Middle District ultimately found in 2020 with respect to political participation gaps. "Voter registration and turnout rates among African-Americans and whites have reached parity," and "[t]he level of black participation in the political process is not depressed." *Ala. NAACP*, 612 F. Supp. 3d at 1290.

473.    Moreover, there is nothing unduly difficult about registering to vote in Alabama, as Plaintiffs' witness Ronald Smith (and others) testified. Tr. 463-65; *accord* Tr. 740 (L. Jackson); *Senate* Tr. 1368 (Bill McCollum); *Senate* Tr. 869 (Valerie Branyon); *Senate* Tr. 1311-12 (Cedric Coley). Plaintiff Letetia Jackson, whose community service aims at encouraging "infrequent black women voters" to vote, Tr. 710-11, only knows one individual personally who, as of the date of her trial testimony, is eligible to vote but has not yet registered. Tr. 740.

474.    Today's parity in voter registration rates follows an ever-improving historical trend. Dr. Hood analyzed black voter registration rates in Alabama at three points in time: 1965, when the VRA was passed; 1982, when §2 was amended; and

2024. The black voter registration rate increased from 23.5% in 1965 to 57.7% in 1982 and on to 95.2% in 2024.[96] DX7 at 23.

475.    Plaintiffs suggest that parity is irrelevant because registration is only one of the first steps toward full political participation. While Dr. Hood agrees that registration is "a necessary condition that must occur before empowerment occurs," he also observes that when a "critical mass" of a particular group are registered, "that gives them the ability to participate." Tr. 1935:10-25. The trend in Alabama of registration parity following decades of an upward trend in registration rates thus provides a useful measure of increased ability to participate in the political process. While Plaintiffs may disagree, they still have provided no evidence, nor do they even suggest, that black Alabamians are unable to participate in the party of their choosing or vote in elections.

476.    In search of a more sizeable gap, Dr. Burch turns to voter turnout rates. She identifies a statewide turnout gap of around 3% in 2018 and 10% in 2020 between white and black Alabamians. MX6 at 7-8. Looking at the 24 counties that Dr. Burch examined (the Black Belt counties plus Mobile County) as a group, this turnout gap was 2% in 2018 and 7% in 2020—less than the statewide turnout gap. MX6 at 8-9. And in 10 instances, black turnout *met or exceeded* white turnout in

---

[96] Dr. Hood calculates registration rates by dividing data by race into the Secretary of State's registration totals. DX7 at 23.

those counties: Bullock County in 2020, Greene County in 2018 and 2020, Hale County in 2018, Mobile County in 2018, Perry County in 2018 and 2020, Russell County in 2018, and Sumter County in 2018 and 2020. *Id*. at 8-10.

477.    Dr. Burch has not connected these voter turnout numbers to past discrimination. At trial, she acknowledged that black turnout exceeded white turnout in Greene County while disavowing any suggestion that there had been less historic or present racial discrimination in Greene County. Tr. 992:12-23. Still, she conceded that some other factors besides racial discrimination may be playing a role in those turnout numbers such as mobilization, media exposure, party identification, political interests of the voter, and contest competitiveness. *Id.* 992:24-993:24. Further, she acknowledged that a meta-analysis (a study aggregating other study results) upon which she relied found that race does *not* have a statistically significant effect on voter turnout and that higher levels of education in a community do *not* correspond to higher levels of turnout. Tr. 1038:25-1039:16.

478.    The State Defendants' evidence confirms these non-racial explanations.

479.    First, Drs. Reilly and Burch agree that education may affect voter turnout, and that racial gaps in educational attainment exist in Alabama. DX8 at 6; MX6 at 11.

480.    However, Dr. Burch's own evidence calls into question the severity and causation of this gap. For instance, black adults in Washington County hold high

school diplomas at rates that meet or exceed that of white adults not only in Washington County but also in 16 more of the 24 counties that Dr. Burch examined: Barbour, Butler, Choctaw, Clarke, Conecuh, Crenshaw, Dallas, Escambia, Greene, Hale, Mobile, Monroe, Perry, Pickens, Russell, and Wilcox. MX6 at 15. Similarly, black adults in Macon County have rates of bachelor's degree attainment that meet or exceed those of white adults in 11 of those 24 counties: Barbour, Butler, Choctaw, Clarke, Conecuh, Crenshaw, Escambia, Monroe, Pickens, Russell, and Washington Counties. *Id.* at 16. And black adults in Montgomery County likewise meet or exceed white adults on that very metric in 16 of 24 counties: those just listed plus Dallas, Hale, Macon, Marengo, and Wilcox. *Id.*

481.    Of the remaining gaps, Dr. Burch again assumes they result from past and present discrimination. MX6 at 12. Dr. Reilly, however, has analyzed evidence pointing toward more benign, commonsense explanations.

482.    Dr. Reilly reviewed the average SAT scores of white, black, and Asian students. He found that white students on average have performed better educationally than black students in every State in the nation, as well as nearly every county in the nation. DX8 at 19.

483.    But Asian students generally outperform both black *and* white students, DX8 at 18-20, as do black Nigerian American students, Tr. 2196:4-6. If educational attainment gaps themselves are explained by racism, that would implausibly indicate

that white Americans experienced more historical discrimination than Asian and black Nigerian Americans. Tr. 2196:7-12.

484.   A better, and more intuitive, explanation for these score gaps is study time. Studies have shown, for example, that white students tend to study and prep for school more than black students—but less than East Asian and other immigrant students. DX8 at 28. And the study time gap is itself better explained by non-racial factors, such as parental expectations. Tr. 2197:17-23.

485.   Other than education, age can be a good indicator of voter turnout. In general, older voters are more likely to cast a ballot than younger voters. In Alabama and nationally, the black population tends to be much younger, on average, than the white population. Tr. 2191:16-22. The modal age for a black man is 27 years old while the modal age for a white man is 58. DX8 at 29; Tr. 2191:20-22, 2306:11-19.

486.   Also, felony conviction rates naturally affect voter turnout. The Asian population tends to have fewer felony convictions than the white population, Tr. 2201:10-16, and the white population tends to have fewer felony convictions than the black population. DX8 at 23-24. In Alabama, some felonies result in disenfranchisement. According to Dr. Burch, 14.7% of black Alabamians have a disenfranchising felony conviction compared to 8.6% of the total voting eligible population. MX6 at 34. And despite this gap in eligibility to register and vote,

registration and turnout rates remain at or near parity: just a .5% registration gap and 3% turnout gap in 2018. MX6 at 6-9.

487. Plaintiffs have not shown that these differences in felony conviction rates are the result of discrimination in the criminal justice system. Dr. Bagley conceded that he does not contend the State discriminates against black felons *vis-à-vis* white felons when enforcing its felon disenfranchisement statute. Tr. 1396. *Cf.* MX1 at 20. In fact, in *Thompson v. Sec'y of State for the State of Ala.*, the Eleventh Circuit *upheld* Alabama's felon disenfranchisement law as having been purged of any "racially discriminatory motives." 65 F.4th 1288, 1298 (11th Cir. 2023).

488. Rather, the data show that black Americans are more likely to be both offenders and victims of violent crime. FBI data reflect that black offenders in Alabama were arrested for far more violent crimes than Dr. Burch reported (and committed over twice as many violent crimes as well). *See* DX15; DX17; Tr. 1019:1-18, 1021:23-1022:1.[97] And the black victim crime rate is at least 2.4 times the white victim crime rate. DX8 at 28; DX17. Likewise, this data exposes the flaws in Dr. Burch's focus on total arrests and prison admissions because violent offenders (who are more likely to be black) often receive longer prison sentences than non-

---

[97] Dr. Burch conflates FBI terminology, specifically "crimes against persons" with "violent crimes," when attempting to demonstrate that racial discrimination "influenced" racial disparities in the criminal justice system. *Compare* MX6 at 35, *with* DX15 at 3, *and* Tr. 1019:1-18.

violent offenders (who are more likely to be white). *Id.*; DX16 at 12.[98] It is thus unsurprising that black offenders make up a greater proportion of Alabama's prison population given that they make up a greater proportion of Alabama's violent offenders. *Id.* And, indeed, Dr. Burch conceded that all arrests do not end in equal periods of incarceration (or even in incarceration at all). Tr. 1018:7-15.

489.    Moreover, Dr. Reilly compared incarceration gaps among the 50 States and found that in every state, black persons are overrepresented in prisons in proportion to their percent of the overall population. Tr. 2204:16-23. But while every State has an incarceration rate gap between white and black prisoners, the gap in Alabama is smaller than the gap in *every other state* in the country except for Hawaii. Tr. 2203:24-25; DX8 at 23-24. Thus, if an incarceration gap is evidence that a State is treating black and white offenders differently, Alabama has the second-most equitable criminal justice system in the nation, bested only by the Aloha State. Tr. 2204:24-2205:7.[99]

---

[98] Dr. Burch's assertion that "Black people still receive longer sentences than White people in Alabama" is not supported by the study in her citation, which did not consider the duration of the incarceration (or control for crime severity beyond the first charge in cases with multiple charges) and is based on pre-2010 data at any rate despite Dr. Burch's focus on 2022 arrest and incarceration statistics. *See* MX6 at 36 & n.105.

[99] Dr. Bagley contends that the effects of historic discrimination appear in Alabama's incarceration rates. MX1 at 19-20. But he acknowledged that a similar pattern of overrepresentation appears in federal prisons, and he conceded that he did not compare Alabama's incarceration rates or prison conditions, including healthcare, to those of other states. Tr. 1399.

490.   Family stability also correlates significantly with civic participation. DX8 at 5. The rate of fatherlessness is about 40% for white Americans, about 52% for Hispanic Americans, and 69% for African Americans. Tr. 2192:8-12.

491.   Finally, Plaintiffs did not present a lay witness whose political participation was hampered by past discrimination. Instead, witnesses such as Ronald Smith, Letetia Jackson, Janice Malone, and State Defendants' witness Bill McCollum—each of whom is old enough to have attended segregated schools—are all extremely politically active.[100]

492.   Ronald Smith, for example, has experienced no barriers preventing him from voting or being involved with the party of his choice: the Democratic Party. Tr. 466-67, 469. Governor Siegelman (who is white) appointed Mr. Smith to the Bullock County Commission. Tr. 460-61. And a representative (who is white) of the State Republican party even approached Mr. Smith in an attempt to persuade him to switch parties. Tr. 469-70. Also, black Alabamians appear to have no trouble securing political office in Bullock County. Tr. 470-471 (Mr. Smith listing numerous members of county government who are black).

493.   In sum, the Court credits Dr. Hood's and Dr. Reilly's testimony that socioeconomic gaps in Alabama are comparable to other States and are better

---

[100] Dr. Marcus Caster, similarly, testified, "There has not been anything to prohibit me from participate as far as the Democratic Party is concerned." Tr. 411:25-412:24.

explained by non-racial factors rather than official discrimination. Conversely, the Court does not credit Dr. Bagley's and Dr. Burch's mere identification of socioeconomic disparities as probative of vote dilution in the challenged areas. Critically, Plaintiffs' experts failed to analyze or explain whether or how these gaps are caused by discrimination.

494.    The Court finds it important to reocunt the many mistakes and mischaracterizations in Dr. Burch's testimony that further undermine the credibility of her opinions.

495.    First, Dr. Burch cites *Madison v. Commissioner, Alabama Department of Corrections*, 677 F.3d 1333 (11th Cir. 2012), in support of her assertion that "[p]rosecutors in Alabama have been found to use peremptory strikes against potential Black jurors in a racially discriminatory manner." MX6 at 36 & n.104. Neither the Eleventh Circuit nor the district court on remand found any such thing. *See Madison*, 761 F.3d 1240, 1255 (11th Cir. 2014). When confronted about this inaccuracy at trial, she acknowledged it but defended her citation to the case because "it came up," "was discussed at trial," "[a]nd then there was a long series of appeals and the like." Tr. 1029:6-10. But at no stage of that litigation did any court *find* that peremptory strikes were used in a racially discriminatory manner as Dr. Burch asserted in her report.

496.   Second, Dr. Burch invokes Alabama's requirement that voters present photo ID as evidence of racial disparities in voting, citing to a portion of the district court's opinion in *Greater Birmingham Ministries v. Merrill*. MX6 at 36 n.107 (citing 284 F. Supp. 3d 1253, 1269 (N.D. Ala. 2018)). She ignores both the fact that the State provides free IDs to all who qualify, and the district court's and Eleventh Circuit's finding that the photo ID requirement had neither a discriminatory purpose nor effect. *Id.* at 1279-1283; *GBM*, 992 F.3d at 1337.[101]

497.   Third, Dr. Burch cites the costs of notarization as a racially disparate obstacle to voting absentee, referencing a report she submitted in *People First*, 491 F. Supp. 3d at 1179. MX6 at 37 n.111. She failed to acknowledge, however, that the court in *People First* ultimately found that "plaintiffs failed to prove that the notary aspect of the witness requirement imposes even a slight burden on them, during or outside of the pandemic." 491 F. Supp. 3d at 1179.

498.   Next, Dr. Burch contends that "school funding matters for student achievement" but engineers her preferred conclusion that per-pupil expenditures in Black Belt districts are less than the state average by excluding federal dollars. MX6 at 17. Although she attempts to justify this exclusion on the theory that federal

---

[101] A number of other witnesses from Plaintiffs' stable likewise charged the State's photo ID requirement as discriminating against black Alabamians. Tr. 446 (Smith); Tr. 726 (L. Jackson); Tr. 1102-03 (V. Jackson). These accusations are entirely unfounded and have been conclusively resolved in the State's favor. *See GBM*, 992 F.3d at 1337.

dollars may come with restrictions, she acknowledged at trial that federal and state expenditures may ultimately overlap—even for things like teacher salaries or transportation costs at the core of educational spending. Tr. 1002:6-15. And one of Dr. Burch's own sources found that Black Belt school districts, on average, spend $800 more per student than non-Black Belt schools. Tr. 1003:21-1004:4; MX108 at 2.

499.   Finally, Dr. Burch writes that "[a] study by the University of Alabama finds that lower test scores between Black and White students in Alabama result in part from a lack of qualified math and science teachers." MX6 at 17 & n.47. Both articles focus on disparities between residents of the Black Belt and residents elsewhere in Alabama with no discussion (or even mention) of differences between black and white students. *Compare id.*, *with* MX107, *and* MX108

500.   Ultimately, we find that Plaintiffs' "generalized assertion[s] of past discrimination in a particular … region [are] not adequate" to support their §2 claim. *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996). Doubly so where, as here, "[o]vert discriminatory election devices have long been eliminated" and "[v]oter registration and turnout rates among African-Americans and whites have reached parity." *Ala. NAACP*, 612 F. Supp. 3d at 1290 (citing *Shelby County*, 570 U.S. at 535, 548).

501.   While nothing can erase Alabama's distant history of official discrimination, the past is not the present. Just five years ago, the *Alabama NAACP*

court concluded, after a full §2 vote dilution trial, that "Plaintiffs simply ha[d] not shown that, in present-day Alabama, there [were] any barriers keeping African Americans from participating in the political process as voters." 612 F. Supp. 3d at 1290.

502.    We agree, and find dispositive Plaintiffs' inability to tie Alabama's distant history of discrimination to current socioeconomic conditions.

503.    Senate factors 1, 3, and 5 weigh in favor of the State.

### 4.    Senate Factor 4: No formal slating process exists in Alabama.

504.    Slating is "a process in which some influential non-governmental organization selects and endorses a group or 'slate' of candidates, rendering the election little more than a stamp of approval for the candidates selected." *Brnovich*, 594 U.S. at 672 n.13 (citation omitted).

505.    The Court continues to agree with the parties "that because there is not a slating process for Alabama's congressional elections, Senate Factor 4 is not relevant." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1023 n.11 (N.D. Ala. 2022).

### 5.    Senate Factor 6: Plaintiffs have not shown that political campaigns in Alabama are characterized by racial appeals.

506.    Based on the preliminary record, we observed "*some* evidence" of "racial appeals" in political campaigns in Alabama, but we were unable to "determine whether these examples indicate that racial appeals occur frequently,

regularly, occasionally, or rarely." *Singleton*, 582 F. Supp. 3d at 1024 (emphasis added).

507.  We specifically noted the absence in the record of "any systematic or statistical evaluation of the extent to which political campaigns are characterized by racial appeals." *Id.*

508.  Plaintiffs still have not provided us with such an evaluation, or anything that would allow us to conclude that Alabama's political campaigns are "*characterized*" by racial appeals. *Gingles*, 478 U.S. at 37 (emphasis added). *See* Tr. 1405:20 (Dr. Bagley admitting as much); Tr. 852:6 (Dr. Frederickson admitting as much).

509.  Plaintiffs identify a few appeals that were (1) not made as part of a political campaign, (2) not from campaigns "in the area," *Wright v. Sumter Cnty. Bd. of Elections*, 979 F.3d 1282, 1296 (11th Cir. 2020), or (3) over which "reasonable people could disagree … whether they were racial appeals at all," *Rose v. Raffensperger*, 619 F. Supp. 3d 1241, 1266 (N.D. Ga. 2022), *rev'd on other grounds*, 87 F.4th 469 (11th Cir. 2023), or some combination of the lot. *See* Tr. 2382 (Sen. Singleton agreeing that reasonable people can disagree about the appropriate response to controversial issues like immigration and historical monuments, including confederate monuments).

510.    Those that occurred outside the context of a political race do not qualify as campaign racial appeals, by definition, and have little if any "signaling effect to voters." *Ala. NAACP*, 612 F. Supp. 3d at 1311. And very few were "intrinsically racial." *Id.* The ads and statements of the "subtle," or, as Dr. Bagley puts it, "colormasked" variety, MX4 at 26, come with "no evidence that voters saw them that way," *Ala. NAACP*, 612 F. Supp. 3d at 1311.

511.    Contrast Plaintiffs' smattering of mostly innocuous ads with the situation described by the Supreme Court in *White v. Regester*—the decision from which Senate factor six's language was taken. In 1970s Dallas County, Texas, the "white-dominated" Democratic Party mechanism deployed "racial campaign tactics in white precincts to *defeat* candidates who had the overwhelming support of the black community." 412 U.S. at 767 (emphasis added). In other words, Dallas County Democrats were using racial appeals to stir up white voters against Democratic candidates preferred by black voters.

512.    Senate factor six is geared at uncovering "[e]vidence of racism" like that. *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984). But nothing like that appears in the record. And the best Plaintiffs can offer still does "not demonstrate a pattern, practice, or routine of racial appeals across the election landscape." *Ala. NAACP*, 612 F. Supp. 3d at 1311.

513.   Just a couple election cycles ago the Middle District of Alabama concluded that "[t]here is no evidence that Alabama political campaigns *generally* … are characterized by racial appeals." *Ala. NAACP*, 612 F. Supp. 3d at 1311. Plaintiffs' evidence, comprising a few pages from Dr. Bagley's reports and a few more untested evidentiary exhibits, reveals no change since then.

514.   The Court gives this factor "no weight." *Id.* at 1316.

### 6.   Senate Factor 8: Elected officials are responsive to minority needs.

515.   The eighth factor asks "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. What meager, unsubstantiated evidence Plaintiffs have offered of this "highly subjective" factor, H.R. Rep. No. 97-227 at 30 (1981), Defendants have thoroughly rebutted. This factor weighs in favor of the Defendants.

516.   First, Plaintiffs' cite to the "lack of responsiveness" finding from our September 9, 2023, order preliminarily enjoining Alabama's 2023 Congressional Plan. Tr. 2678 at 1-3. We stated that the State's "view" that "the Legislature could remedy the vote dilution we found without providing the remedy we said was required" "illustrates the lack of political will to respond to the needs of Black voters in Alabama in the way that we ordered." *Singleton v. Allen*, 690 F. Supp. 3d at 1316-17.

517.    "Redistricting is never easy," especially considering the "competing hazards of liability" posed by the race-neutral Constitution and §2. *Abbott v. Perez*, 585 U.S. 579, 585, 587 (2018). For many of the same reasons discussed at length *infra* Section II and summarized below, we no longer consider the Legislature's good faith effort to remedy the defects observed in the 2021 Plan while complying with the Constitution as unresponsive to the needs of black Alabamians.

518.    The Supreme Court has said that remedying violations in "disparate-impact cases should concentrate on the elimination of the offending practice." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 544 (2015). There is a colorable argument that the 2023 Plan attempted to do just that by uniting Black Belt counties into two compact districts and keeping Montgomery whole—treating them as well as other communities of interest that were preserved in the 2021 Plan.

519.    Moreover, at least eight Justices in *Allen* agreed that race cannot predominate in an illustrative map,[102] while only four expressly held that race did not predominate in some of *Caster* Plaintiffs' maps.[103] Plus, five Justices questioned the constitutionality of continued race-based districting under §2.[104]

---

[102] *See Allen*, 599 U.S. at 33 (plurality); *id.* at 59 (Thomas, J., dissenting).
[103] *See id.* at 32-33 (plurality).
[104] *See id.* at 45 (Kavanaugh, J., concurring) (citing *id.* at 88 (Thomas, J., dissenting)).

520.   Plaintiffs have a certain view of what §2 requires, and we preliminarily agreed with them. But for the State to embrace a different view does not necessarily communicate a purpose of discriminating against black Alabamians or refusing to respond to their needs.

521.   To the contrary, the very disagreement points to an additional obvious alternative explanation—other than race—for the Legislature's actions: the fear that it would be engaging in unconstitutional race-based sorting by adopting one of the *Milligan*, *Caster*, or *Singleton* Plaintiffs' preferred plans. *See Fusilier v. Landry*, 963 F. 3d 447, 464-65 (5th Cir. 2020) ("The choice to evade claims of racial gerrymandering … does not reveal discriminatory intent."). Even if that fear is not ultimately vindicated, it is well-founded.

522.   The Court is mindful that, when challenging the 2021 congressional plan, *Milligan* Plaintiffs put on expert evidence that a "race-neutral plan" would decrease CD7's BVAP to "around 50%," increase CD2's BVAP to "almost 40%," and would keep Montgomery County whole. *See Milligan* DE69 at 36, 68-4 ¶¶25, 27, 28, 41. And when requesting relief for their gerrymandering claim, *Milligan* Plaintiffs argued that a plan with CD7 "around 50%" BVAP and CD2 at "almost 40%" would be a plan in which "Black voters are no longer artificially denied electoral influence in a second district." *Milligan* DE69 at 36.

523.   Replacing a plan that had split two majority-black communities of interest with one in "Black voters are no longer artificially denied electoral influence in a second district," *Milligan* DE69 at 36, suggests responsiveness to black voters, not a lack thereof.

524.   Moreover, the Legislature could reasonably have thought that going beyond the *maximum* BVAP possible for CD2 in a "race-neutral plan" would constitute racial gerrymandering, or would at least invite a racial gerrymandering lawsuit. *See Milligan* DE68-4 ¶41. After all, the *Singleton* Plaintiffs had already argued that the State's 2021 plan was a racial gerrymander for having even one majority-BVAP district. *See Singleton*, 582 F. Supp. 3d at 951-52.

525.   The Legislature's decision to enact the 2023 plan, which contains demographics that *Milligan* Plaintiffs had previously said would remedy purported "artificial[] deni[al]" of "electoral influence in a second district," appears to be driven by the Legislature's desire to cure "inconsistent treatment" alleged by Plaintiffs in this litigation while avoiding racial gerrymandering liability.

526.   Consider the plight of nearby Louisiana. Following the 1990 census, Louisiana enacted a plan containing a second majority-black congressional district. *Hays v. State of La.*, 936 F. Supp. 360, 363 (W.D. La. 1996). During the ensuing years, a federal court thrice held that the plan violated the Equal Protection Clause. *Id.* at 362. Following the 2020 Census, Louisiana enacted a plan with one majority-

black district, but that violated §2 for not containing a second. *Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022). The State enacted a new congressional map with a second majority-black district, and one week later was sued for racial gerrymandering. *Callais v. Landry*, 732 F. Supp. 3d 574 (W.D. La. 2024). The court held that race predominated in Louisiana's new plan, notwithstanding the State's argument that the plan merely reflected the racial remedy ordered by the *Robinson* court. *Id.* at 606. The case is now pending before the Supreme Court,[105] which will again wade into an area of the law that has proven "notoriously unclear and confusing." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring).

527.    *Milligan* Plaintiffs' expert Dr. Bagley opined that "the state's response to the COVID-19 crisis" demonstrated a lack of responsiveness to black Alabamians. MX1 at 29.

528.    The Court received responsive testimony from Dr. Karen Landers, Chief Medical Officer (CMO) for the Alabama Department of Public Health (ADPH). *See Milligan* DE439-5; *see also Senate* Tr. 1266-68. Dr. Landers testified that she worked with the previous ADPH CMO, Dr. Mary McIntyre, who was an African American woman, on the State's COVID-19 response. *Senate* Tr. 1267:20-

---

[105] *See Louisiana v. Callais*, No. 24-109 (U.S. filed June 18, 2024; probable jurisdiction noted Nov. 4, 2024).

1268:2; 1277:18-1278:5. Dr. Landers further testified that "racial discrimination is not a part of any factor of Alabama Department of Public Health providing care to the people in the state of Alabama. *Senate* Tr. 1293:21-24.

529.   Dr. Landers also testified that she participated directly in the State's outreach to the minority community during the pandemic. In her words, "I actually did some of that myself personally in the minority community. I was invited to a number of events, which I attended at churches, at colleges, at health fairs, or health-related situations. … I participated on Facebook live in a number of discussions and consultations related to communicating to minority communities, as well as the entire population." *Senate* Tr. 1278:14-23.

530.   Dr. Landers stated that the rollout of the COVID-19 vaccine was based "solely upon the guidance of the CDC" and that "race was not a factor that was given to us as part of the allocation from the CDC." *Senate* Tr. 1281:20-25; 1283:7-9. Dr. Landers also addressed efforts to communicate with the minority community, stating, "I worked with [Dr. McIntyre] in reaching out to groups that were very heavily invested in the minority communities, such as faith-based organizations, such as HBCUs, other groups that were advocates in the community or leaders in the community, the Black Mayors Association is one group here in Alabama, that we worked with." *Senate* Tr. 1284:6-13; *see also* DX27, DX28, DX29, DX30, DX31, DX32, and DX33.

531.   As a medical doctor who has worked for ADPH since 1982 in various roles, including her current position as CMO, Dr. Landers also described the various programs to improve public health in the State including outreach to the minority communities. *Senate* Tr. 1266:18-19; 1267:10-19; 1276:6-1277:13.

532.   Dr. Landers defined the "medically underserved" in Alabama as "persons who may live in rural areas of Alabama, areas that may not have physicians or nurse practitioners available, areas that may not have hospitals currently operating or providing medical services within that county or community such that persons have to travel to larger regions to receive medical care." *Senate* Tr. 1269:10-16. Dr. Landers has spent her career working with the "medically underserved" in Alabama, including with children as a primary care pediatrician. *Senate* Tr. 1269:16-1270:14. She served all children that came into ADPH, including minority children. *Senate* Tr. 1270:15-18.

533.   Dr. Landers identified other ADHP programs—the provision of vaccines to adults and children, the Family Planning Program, a cancer detection program, and a Well Woman program—that served all populations in the State, including minorities, irrespective of their ability to pay. *Senate* Tr. 1271:14-1272:16.

534.   Dr. Landers also described ADPH's Office of Minority Health as operating "to provide information and education to underserved populations and focus-

ing some education specifically related to health conditions that might be more prevalent in minority populations, such as information on diabetes, information on hypertension, [and] information on obesity." *Senate* Tr. 1273:15-22. Dr. Landers also described the functions of ADPH's Office of Rural Health and "Operation WIPE OUT," which is part of ADPH's family health services, serving all of the State's population, including minorities. *Senate* Tr. 1272:18-1273:13; 1274:7-1275:25.

535.  We credit Dr. Landers' personal testimony, based on her medical and professional knowledge and experience serving the needy in Alabama, and find that, based on this record, the State does not appear unresponsive in the least to the medical needs of black Alabamians.

536.  Dr. Bagley incorporates by reference the socioeconomic disparities from earlier in his report. MX1 at 30. Failure to "close the gaps" by state lawmakers is not evidence of a dismissive posture toward black Alabamians, lest §2 mutate into "an affirmative-action program" for political minorities. *Shaw*, 517 U.S. at 910.

537.  Nor is the Legislature's failure to enact certain Democratic policy items, such as Medicaid expansion, nor Alabama's Republican Congressmen's refusal to vote for the one-trillion-dollar infrastructure bill. *See* MX1 at 30-31; *see also* Tr. 1407 (Bagley acknowledging that "[t]here could be" nonracial reasons that a State might decide not to expand Medicaid). The decision whether to expand the State's participation in a massive federal welfare program is a paradigmatic *political*,

rather than racial, decision. It is in no way surprising or dubious that a politically conservative State declined the administrative costs and tax increases that Medicaid's expansion would likely have required. Dr. Bagley's accusation would suggest that whenever a "white majority" Republican legislature fails to legislate in a way preferred by Democrats, then the legislature must have done so *because* many Democrats are black. That line of reasoning, if condoned, threatens to "transform federal courts into weapons of political warfare," waged with baseless accusations of racism. *Alexander*, 602 U.S. at 11. The Court declines to go there.

538.   Dr. Bagley also opines that Alabama "has closed numerous drivers' license offices in predominantly Black areas, drawing censure from the U.S. Department of Transportation." MX1 at 30.

539.   The (very) temporary closure of selected driver's license field offices was driven by staffing issues, not discrimination, as Colonel Jon Archer, the Director of Public Safety at the Alabama Law Enforcement Agency, thoroughly explained during the *Alabama NAACP* trial.

540.   In early 2015, about 1.2 million driver's licenses and nondriver's IDs were issued in Alabama though about a dozen ALEA district offices, 63 ALEA field offices, 122 county partner offices (*e.g.,* probate offices), and online. *Senate* Tr. 892-93 (*see Milligan* DE441-1). The 31 field offices that were suspended accounted for approximately 2.1% of all driver's license transactions, and the suspension lasted

only 30 days. *Senate* Tr. 899-902, 904; DX222 (DX128 in the *Ala. NAACP* trial);

DX224 (DX256 in the *Ala. NAACP* trial).

541.    The suspended field offices had limited hours of operation, and staffing

the offices would have required pulling from larger offices, had the extra staff been

available. *Senate* Tr. 895-96, 898-99, 902-04; DX223 (DX131 in the *Ala. NAACP*

trial). As Col. Archer testified, ALEA's financial position "was in dire straits" and

the goal was to better utilize the limited staff available to serve the public. *Senate*

Tr. 897-99. Citizens still had the option to go to an ALEA district office, another

field office, a county partner office, or online. *Senate* Tr. 904.

542.    The Court received into evidence amended MX74, available at *Milligan*

DE460-2, which is an excerpt from the impeachment investigation of former

Alabama Governor Robert Bentley.[106] The excerpt concerns Bentley's personal

relationship with Rebekah Mason and briefly speaks to the driver's license office

closures. The excerpt clearly states that the closures were determined "through the

use of an objective metric based on processed transactions per year[,]" except that

Bentley wanted one Senator's district "removed from the closure list." MX74 at 4.

That is consistent with Mason's political objectives. *See id.* ("It was [ALEA

Secretary Spencer] Collier's understanding that Mason intended the plan to be rolled

---

[106] The Parties reached an agreement where only a portion of the full report was admitted into evidence. The *Milligan* Plaintiffs offered to file the amended exhibit and did so. Tr. 2406:22-2407:24; *Milligan* DE460-2.

out in a way that had limited impact on Governor Bentley's political allies[.]").
While the excerpt indicates that then-Secretary Collier was "concerned about a
Voting Rights Act violation[,]" *id.*, nothing further to explain his concern is
addressed. Further, there was never any finding of a VRA violation, and Plaintiffs
have produced no evidence to the contrary.

543.    The excerpt states, "Ultimately, the decision to close the offices was
reversed, in part, after the state litigated the issue with the U.S. Department of
Transportation, which had claimed that the closures had a disproportionate impact
on minority communities." MX74 at 4. As Col. Archer testified, the closures had
been reversed before any agreement was reached with the U.S. DOT. *Senate* Tr. 904,
916-17. Moreover, the agreement was reached without litigation or any admission
of liability. DX224 at 1, 8. The Agreement did not address elections. DX224. Also,
the agreement has expired, *id.* at 8; *Senate* Tr. 906, and, as of the November 2024
*Ala. NAACP* trial, ALEA was providing services at least at the level that was
required by the agreement, *Senate* Tr. 907.

544.    On cross, Col. Archer was asked about a separate agreement that ALEA
entered into with the U.S. Department of Justice concerning the National Voter
Registration Act of 1993. *Senate* Tr. 918; DX225. That agreement concerns
incorporating voter registration into the process for issuing driver's licenses and
nondriver's IDs. DX225. The United States alleged that the State was not in

compliance with the Motor Voter provision of the NVRA, DX225, but said nothing about how long the United States alleged the State had failed to comply. That agreement, too, has expired. *Senate* Tr. 921-22; DX225 at 14-22.

545.   The record contains several other examples demonstrating the responsiveness of elected officials, including: Senator Katie Britt's opposition to the temporary erasure by the U.S. Airforce of videos commemorating the Tuskegee Airmen, to which Dr. Caster responded, "I was so proud of what she did. I was definitely proud of what she did … And I was excited when I saw it." Tr. 510:22-411:5; and the Secretary of State's efforts with the Alabama Department of Human Resources and community organizations to assist underserved communities in Montgomery obtain proper voter identifications and birth certificates. Tr. 1117:11–1119:21.

546.   Finally, we received substantial testimony from Kenneth Boswell, Director of the Alabama Department of Community and Economic Affairs (ADECA), describing the numerous ways in which the State, through ADECA, is affirmatively responsive to the needs of Alabamians of all races, especially low-income individuals and families. Director Boswell testified by deposition and the Court admitted several documents related to ADECA's work responding to the needs of Alabama citizens.[107]

---

[107] Tr. 2302:2-19; Tr. 2482:10-2483:13; *see also Milligan* DE458 at 2 (setting out deposition designations and seven exhibits to be admitted, namely DX349, DX353, DX356, DX357, DX363, DX366, and DX370).

547.    Director Boswell was born in 1958 and grew up in Elba, Alabama. *Milligan* DE459-1 at 12:14-24. He attended integrated schools beginning no later than second grade. *Milligan* DE459-1 at 14:14-15:10. After high school, he served in the National Guard and worked in the private sector, including insurance and real estate development. *Milligan* DE459-1 at 15:24-16:14. He served on the Enterprise, Alabama city council from 2000 to 2003, and then served as the Mayor of Enterprise from 2003 until 2017. *Milligan* DE459-1 at 16:15-21. In May 2017, he took over as ADECA's Director, having been appointed by Governor Kay Ivey. *Milligan* DE459-1 at 16:17-19; *Milligan* DE459-1 at 18:9-17. When Director Boswell vacated the Enterprise Mayor's office in 2017, William E. Cooper, who is black, became Mayor and he continues to serve today. *Milligan* DE459-1 at 17:7-19. Director Boswell estimates that Enterprise is 65% or 70% white, *Milligan* DE459-1 at 16:22-17:6, and he is pretty close, *QuickFacts: Enterprise city, Alabama*, *available at* https://www.census.gov/quickfacts/fact/table/enterprisecityalabama/PST045223 (last accessed March 6, 2025) (66.3% white).

548.    ADECA's "primary mission" is to "make Alabama better every day through the grant process." *Milligan* DE459-1 at 19:14-16; *Milligan* DE459-1 at 21:13-16. Some of the money is State money, *Milligan* DE459-1 at 82:4-6, but most is federal money granted in compliance with federal requirements, *Milligan* DE459-1 at 22:12-23:24; *Milligan* DE459-1 at 82:10-13.

549. **Broadband.** "Just a few short years ago, Alabama ranked near the bottom of the list in high-speed internet access. Now we have set the standard as a national leader in the rate and effectiveness in which we have expanded broadband infrastructure." DX370 at 1. "This is the result of deliberate, targeted allocations from the Legislature, leadership from Governor Kay Ivey, investments from private partners, and ADECA funding projects that provide the best possible service and outcomes …." DX370 at 1. Governor Ivey's goal "is to ensure that every single Alabamian will have the ability to access high-speed internet." DX370 at 1; *see also Milligan* DE459-1 at 22:22-23:2. ADECA's broadband work is focused on rural areas, which exist in all 67 counties. *Milligan* DE459-1 at 32:25-33:15.

550. Alabama has shown a strong commitment to broadband expansion in several ways. In 2021, ADECA's Alabama Digital Expansion Division was created though legislation "to focus exclusively on broadband expansion in the state." DX349 at 5. ADECA created the Alabama Community Broadband Technical Assistance Program "to provide planning support and technical assistance to local communities." DX349 at 5. The agency held "meetings in all 67 counties and with Historically Black Colleges and Universities and tribal governments." DX349 at 5. And, working with 57 broadband internet service providers, ADECA developed "a statewide map identifying the areas that lack high-speed internet" in order to "identify the top-priority areas for expansion." DX349 at 5; DX353 at 1. The map

provides more accurate data than what is available through the Federal Communications Commission, and thus helps the State make the case for broadband funding for which it would otherwise appear to be ineligible. DX353 at 2.

551. In terms of money, "[i]n 2018, Gov. Ivey signed the Alabama Broadband Accessibility Act, establishing the Alabama Broadband Accessibility Fund." DX349 at 5. "In total, grants totaling $82 million have been awarded through [the Fund] since 2018, supporting 107 projects. Once all projects are complete, more than 72,000 households, businesses, and community institutions will have access to high-speed internet access." DX349 at 5.

552. "In September 2022, Gov. Ivey awarded $82.45 million in American Rescue Plan Act money to the Alabama Fiber Network Inc., a corporation made up of several rural electric cooperatives and one generation/transmission electric cooperative" to create a "broadband network connecting almost 3,000 miles of existing and new fiber infrastructure across in the state within a three-year period." DX349 at 5.

553. Senator Singleton testified that Alabama Fiber Network has the Governor's support and bipartisan support in the Legislature, that he thinks it will

enhance education and revolutionize healthcare, and that he is optimistic it will stimulate economic development in the State and in the Black Belt. Tr. 2368:6-22.[108]

554.   "In February 2024, Governor Ivey awarded grants totaling $148.3 million to support 66 broadband expansion projects in 48 counties" using monies that were part of the American Rescue Plan Act. DX349 at 5. "Once completed, the projects will extend access to 53,892 households, businesses, and community institutions." DX349 at 5.

555.   Also in February 2024, "Governor Ivey awarded grants totaling $188.4 million to support 21 projects to add 4,287 miles of … fiber. The projects also fund fiber connectivity to community anchor institutions such as colleges and universities, rural hospitals and government facilities. In total, the projects will have connected almost 800 anchor institutions." DX349 at 5. This money comes from the State's American Rescue Plan Act funds. DX349 at 5.

556.   According to its most recent annual report, ADECA is expecting approximately $1.4 billion for broadband expansion in 2025 as part of Broadband Equity, Access and Deployment (BEAD). DX349 at 5. BEAD funding "is to be prioritized for fiber projects." DX370 at 2-3.

---

[108] Senator Singleton wrote DX352, an article about Alabama Fiber Network. Tr. 2367:15-24. The *Milligan* and *Caster* Plaintiffs object to DX352 coming in on hearsay grounds, and the Court reserved ruling. Tr. 2375:2-3276:5. The *Singleton* Plaintiffs did not object, and the article is not hearsay as to them, Fed. R. Evid. 801(d)(2) (statement of a party opponent).

557.   Finally, on broadband, during COVID, ADECA was able "to spend dollars on Alabama broadband connectivity for students." *Milligan* DE459-1 at 31:8-11. They "focus[ed] on low to moderate income levels that did not and could not afford internet" and "operated with what they call cell on wheels." *Milligan* DE459-1 at 31:11-15. Additionally, with help from internet service providers, ADECA "provided …those low to moderate income level people with money to pay for their internet services as well as all the devices to do with that." *Milligan* DE459-1 at 31:15-20. It was important to ADECA to help all low-to-moderate income children, irrespective of race, be able to "actively participate and be able to do their schoolwork and not be left behind." *Milligan* DE31:20-32:2.

558.   **Community Development Block Grants.** Another way Alabama is responsive to the needs of its citizens though ADECA is the CDBG program, which "has played a significant role in improving numerous municipalities and counties since its inception[.]" DX349 at 6. "[F]unded through the U.S. Department of Housing and Urban Development, [it] supplies grants for the projects that serve lifelines of communities such as water, sewer, roads, economic development and downtown revitalization." DX349 at 6. Two primary aspects of this program in Alabama are the competitive awards and economic development awards. DX349 at 6; *see also Milligan* DE459-1 at 23:15-24; *Milligan* DE459-1 at 56:8-58:16.

559.   "CDBG competitive awards are issued annually to assist towns, cities and counties with projects, mainly infrastructure, that they might not otherwise be able to undertake without outside financial assistance." DX349 at 6 (emphasis omitted). "Grant allocations are determined by various factors, including the number of low and moderate-income families benefitting from a project and the project's urgency and necessity." DX349 at 6; *see also Milligan* DE459-1 at 43:16-44:6 (explaining that the State's HUD application is written broadly "so that we can try to help as many people as we possibly can").

560.   "CDBG Economic Development awards have been instrumental in bringing new jobs and fostering economic growth in Alabama. These awards help usher in new companies and industries by providing funds for sewer, water, road, and other major infrastructure needs." DX349 at 6 (emphasis omitted).

561.   In May 2024, ADECA announced that "[a] $175,000 grant awarded by Gov. Kay Ivey will enable a Sumter County company to expand and provide additional jobs." DX363 at 1. The CDBG "will support infrastructure needed for Southwest Paper Sales Inc., to expand and add 20 employees over the next three years." DX363 at 1. Specifically, the "funds will be used to refurbish a rail line that links Southwest Paper Sales facility to the main rail line." DX363 at 1.

562.   In June 2023, ADECA announced "[a] $500,000 grant has been awarded by Gov. Kay Ivey for industrial site development for a new Tier I

automotive supplier [(Samkee)] plant to employ 170 Macon County workers." DX366 at 1. The "funds will be used to expand water and sewer service to Samkee and Tuskegee Commerce Park" in support of the $128 million plant that Samkee is building at the Park. DX366 at 1. The project is expected to lead to future development in Tuskegee and Macon County. DX366 at 1.

563. **Federal Initiatives.** Pictured below (DX349 at 8), ADECA's Federal Initiatives and Recreation Division includes, *inter alia*, the Appalachian Regional Commission, the Delta Regional Authority, and the Southeast Crescent Regional Commission. DX349 at 8.



564. ***ARC.*** The Appalachian Regional Commission, which covers Hale, Macon, and Pickens counties, covers 37 Alabama counties and parts of 12 other States. DX349 at 8. In May 2024, ADECA announced that ARC funds would be combined with an earlier CDBG grant "to construct a needed entrance to Regional East Alabama Logistics (REAL) Park" in order to "help bring jobs to Macon County." DX356 at 1.

565. Likewise, in September 2023, ADECA announced "[a] $360,000 ARC grant to the Utilities Board of the city of Tuskegee to provide site preparation for the

construction of an electrical substation in the industrial park where Samkee is locating" and "[a] $462,524 grant, also from ARC, [which] will enable the city of Tuskegee to make improvements along Mizell Road where Samkee will be located." DX357 at 1. This is all in addition to the CDBG grant discussed *supra*. DX357 at 1.

566.   ***DRA.*** Hale, Macon, and Pickens counties, along with most of the Black Belt, are covered by the Delta Regional Authority. *Compare* DX58 at 4-5 (list of Black Belt counties in Alabama Act No. 2023-563) *with* DX349 (map above). The DRA "seeks to improve the quality of life in the Mississippi River Delta and Alabama's Black Belt Region." DX349 at 8. "Over the years, DRA has contributed to the creation of jobs, better education and training opportunities, improved infrastructure and upgrades of health-care services." DX349 at 8.

567.   For example, "[t]he city of Selma was awarded $2 million to help in its recovery from a tornado in January 2023 that devastated parts of the town. In Lowndes County, the town of Hayneville received $761,000 to improve the town's wastewater treatment lagoon while the town of Lowndesboro was awarded about $500,000 to upgrade its water system." DX349 at 8.

568.   ***SCRC.*** Congress established the Southeast Crescent Regional Commission in 2008, but did not fund it until recently. DX349 at 8. SCRC covers the counties that were not covered by the ARC or DRA. DX349 at 8. Within the Black Belt, the SCRC covers only Montgomery, Crenshaw, and Pike counties.

*Compare* DX58 at 4-5 (list of Black Belt counties in Alabama Act No. 2023-563) *with* DX349 (map above). Crenshaw County and Pike County are majority white. *Milligan* DE436 at ¶¶80 and 91 (stipulated facts in *Milligan* and *Caster*).

*569.* **Other.** Through ADECA, Alabama is responsive to the needs of Alabamians in additional ways as well. For instance, ADECA's Energy Division manages three assistance programs to help low-income individuals and families. DX349 at 10. "*The Low-Income Home Energy Assistance Program* partners with community action agencies to help residents with temporary assistance for high energy bills in the hot summer months and cold winter months." DX349 at 10. "*Community Services Block Grants* provide emergency assistance and offer programs to help families and low-income people obtain self-sufficiency." DX349 at 10. "*The Weatherization Assistance Program* provides improvements to homes of qualified persons to help them conserve energy and save on utility costs" DX349 at 10. Additionally, during the COVID pandemic and through 2024, ADECA's Energy Division also oversaw a water assistance program funded through the U.S. Department of Health and Human Services. DX349 at 10.

*    *    *

570. In the end, we contrast the story painted by Plaintiffs with that describing 1970s Dallas County, Texas. *See White v. Regester*, 412 U.S. 755, 767 (1973) (noting that the Democratic Party did not "exhibit good-faith concern for the

political or other needs and aspirations of the [black] community"). In the case leading to the Supreme Court's decision in *White v. Regester*, the district court recounted evidence of "a recurring poor performance on the part of the Dallas County delegation concerning the representation of black interests in the Texas House of Representatives":

> State legislators from Dallas County, elected county-wide, led the fight for segregation legislation during the decade of the 1950's. Indeed, the record reveals that during the late 1950's not one member of the Dallas County delegation voted against certain segregation measures introduced in the Texas House. Moreover, it has been shown that hostility toward the black community is still an integral part of Dallas County politics.

*Graves v. Barnes*, 343 F. Supp. 704, 726 (W.D. Tex. 1972). This is what "a significant lack of responsiveness" looks like—active hostility toward the black community and segregationist legislation.

571.    Thankfully, the record in this case paints nowhere near so dismal a picture. In sum, the Court does not find that the 2023 congressional plan, the failure to vote in favor of trillion-dollar federal legislation, or the mere existence of socioeconomic disparities, amounts to evidence of "a significant lack of responsiveness … to the particularized needs" of black Alabamians.

572.    This factor weighs in favor of Defendants.

### 7. Senate Factor 9: The policies underlying the 2023 Plan are not "tenuous."

573. The final Senate factor asks "whether the policy underlying the use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 36-37.

574. Here, the 2023 Plan advances "traditional districting principles such as compactness, "maintaining communities of interest and traditional boundaries," *LULAC v. Perry*, 548 U.S. 399, 433 (2006). Thus, it "is the very opposite of tenuous: It is weighty." *Ala. NAACP*, 612 F. Supp. 3d at 1316. We find several sufficient, non-tenuous justifications for the challenged law.

575. *First*, the 2023 Plan gave effect to the Legislature's legitimate policy of respecting Alabama's traditional districting principles. *See supra* Discussion I.A.1.

576. *Second*, the 2023 Plan reflects the Legislature's good faith efforts of complying simultaneously with §2 of the Voting Rights Act and the Equal Protection Clause of the 14th Amendment. *See supra* Background III.C; *infra* Discussion II.E.2. "Under our cases, the States retain a flexibility that federal courts enforcing § 2 lack, … insofar as deference is due to their reasonable fears of, and to their reasonable efforts to avoid, § 2 liability." *Vera*, 517 U.S. at 978.

577. In enacting the 2023 Plan, the State did so against the well-trodden "competing hazards of liability," *Abbott*, 585 U.S. at 587, with dueling claims from

the *Singleton* Equal Protection Clause Plaintiffs and the *Milligan* and *Caster* § 2 Plaintiffs (as well as the threat of additional litigation).

578.   As in every State, Alabama could not remedy a likely § 2 violation with a plan that itself violated the Equal Protection Clause or other federal or State law. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 299 (2017) (racial gerrymandering liability after legislators "repeatedly told their colleagues that District 1 had to be majority-minority, so as to comply with the VRA"); *see also Callais v. Landry*, 732 F. Supp. 3d 574 (W.D. La. 2024) (racial gerrymandering liability after court ordered Louisiana to add second majority-black district to comply with §2).

579.   Last redistricting cycle, Alabama was found to have violated the Equal Protection Clause after it had attempted to comply with the preclearance requirement found in §5 of the VRA. *See ALBC v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017).

580.   Plaintiffs here then used that Equal Protection Clause violation, induced by §5 of the VRA, as evidence of a "recent instance[] of official discrimination" warranting §2 VRA liability. *Singleton*, 582 F. Supp. 3d at 1020 (citing *ALBC*, 231 F. Supp. 3d at 1348-49).

581.   States must be particularly wary of "violations of the fourteenth or fifteenth amendment," lest attempts to comply with § 2 create the risk of bail-in under § 3 of the VRA. 52 U.S.C. § 10302(c).

582.   The safest route past these "competing hazards of liability," *Abbott*, 585 U.S. at 587, was for the Legislature to satisfy §2 by answering Plaintiffs' neutral call to "employ[] the same line-drawing standards in minority [communities of interest] as it used elsewhere," *Milligan* Appellees' Br. 29, *Allen v. Milligan*. There was no need to prioritize racial quotas over "nonracial communities of interest." *LULAC v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*). Section 2 "never requires" that. *Allen*, 599 U.S. at 30.

583.   *Third*, as Plaintiffs have argued, legislators had a desire to "protect … congressional incumbents," Tr. 2564, which the 2023 Plan did for all incumbents—Republican and Democrat. Even if that is viewed a partisan goal, "evidence that the Enacted Congressional Plan was drawn to further partisan goals is a sufficient, non-tenuous justification for this Senate Factor." *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1286 (N.D. Ga. 2023).

584.   This factor "weighs heavily in favor of the State." *Ala. NAACP*, 612 F. Supp. 3d at 1316.

### 8.    Proportionality

585.   Whether "minority voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population," while "a relevant fact in the totality of circumstances," is due very little weight here. *De Grandy*, 512 U.S. at 1000.

586.   First of all, single-member districting "usually results in less-than-proportionate representation for all political minorities." Christopher S. Elmendorf, *Making Sense of Section 2: Of Biased Votes, Unconstitutional Elections, and Common Law Statutes*, 160 U. Pa. L. Rev. 377, 401 (2012). Proportionality will often elude a map drawer who adheres to traditional redistricting criteria; absent racial calibrations, maps reflect real-world geography and demography inconsistent with proportionality. Voters are not dispersed "in an absolutely gray uniformity." *Vieth v. Jubelirer*, 541 U.S. 267, 343 (2004) (Souter, J., dissenting); *see Davis v. Bandemer*, 478 U.S. 109, 159 (1986) (O'Connor, J., concurring in judgment (if there is a "preference for proportionality, the legitimacy of districting itself is called into question")).

587.   Second, the absence of proportionality does not, by itself, give rise to concern. As Dr. Duchin testified, even dramatic disproportionality may be "merely … a matter of … political geography." PI Hrg. Tr. 612 (*Milligan* DE105-2); *see also id.* (explaining that though "about a third of Massachusetts voters select a Republican in statewide contests … it's literally impossible to draw" even one of Massachusetts' nine congressional districts to favor Republicans due to "where people live").

588.   Thus, any discussion of proportionality must grapple with Alabama's geographic and demographic realities. *See Bandemer*, 478 U.S. at 159 (O'Connor, J., concurring in judgment). Black voters are concentrated in the State's four largest

cities: Huntsville, Birmingham, Montgomery, and Mobile. MX10 at 9. None of these geographically dispersed cities includes enough black Alabamians to constitute a majority of a single congressional districts. *See id.* The next largest group of black voters is dispersed across the State's sprawling and sparsely populated Black Belt. *Id.* at 10 ("The Black Belt includes 8 of the 10 least populous counties in the state, each with under 13,000 residents."). All 18 Black Belt counties together, even including urban Montgomery, still have only about 300,000 black Alabamians—fewer than the majority of a congressional district. *Id.* That Alabama's 2023 Plan includes only one majority-black district simply reflects where Alabamians reside and the State's race-neutral districting principles, not discriminatory effects *on account of race*.

589.   Third, because "two million 'race-blind' plans" did not yield even one map with proportional representation, we draw no inference against the 2023 Plan's inclusion of one majority-black district and another 40% BVAP district. *Allen*, 599 U.S. at 33-34. Without injecting race into the map drawing process, proportionality is nigh impossible to achieve. Considering a lack of proportionality as indicative in any way of vote dilution would "promote and perpetuate efforts to devise majority-minority districts even in circumstances where they may not be necessary to achieve equal political and electoral opportunity." *De Grandy*, 512 U.S. at 1019-

20. The negative inference called for by Plaintiffs would create "an irresistible inducement to create [race-based] districts." *Id.* at 1020; *see also id.* at 1020 n.17.

590.   Fourth, we recall that in *Abrams v. Johnson*, the Supreme Court affirmed the district court's plan that resulted in an eleven-district congressional map for Georgia that included only one majority-black district, despite the fact that black Georgians comprised 27% of the State's population. 521 U.S. at 103.

591.   Finally, we are especially reticent to weigh this factor in Plaintiffs' favor, lest we contradict the spirit, if not the letter, of §2's textual prohibition against using proportionality as a baseline. 52 U.S.C. §10301(b) ("nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population").

592.   We give this factor little to no weight.

*       *       *

593.   Following full consideration of the *Gingles* preconditions and a robust examination of the totality of the circumstances, we conclude that Plaintiffs have not proven their §2 claims, and judgment is due to be entered in favor of the State Defendants.

594.   Fundamentally, Plaintiffs have not proven that black Alabamians have been excluded "from effective participation in political life," *White*, 412 U.S. at 769, or "denied access to the political system," *Whitcomb*, 403 U.S. at 155. Access to the

219

political system means being "allowed to register," "vote," "choose [a] political party," and "participate in its affairs." *Whitcomb*, 403 U.S. at 149. That standard is commanded by §2's text and Supreme Court precedents. The demolition of barriers to equal access to elections should be cause for celebration, not grounds for an expanded §2 that violates a State's traditional districting principles and divides voters between black and white electoral districts whenever "Democrats … suffer[] the disaster of losing too many elections." *Whitcomb*, 403 U.S. at 153.

595.    Alternatively, as set out below, we also conclude that §2 can no longer require race-based redistricting and that the statute is not privately enforceable by the Plaintiffs.

### C.    Section 2 can no longer constitutionally authorize race-based redistricting.

596.    Because Plaintiffs' §2 claims fail on the merits, this Court need not opine on whether §2 can continue to authorize race-based districting, and the canon of "constitutional avoidance" would caution against resolving this constitutional concern. *See United States v. Hansen*, 599 U.S. 762, 781 (2023). But were it necessary to address this issue, the Court would agree with the State Defendants' position that §2 can no longer constitutionally authorize race-based redistricting.

597.    Put more finely, the State Defendants have persuasively argued that §2 of the VRA was not violated here. The State Defendants have alternatively argued, though, that even if §2 could have authorized race-based redistricting in the past,

race-based redistricting justified by §2 no longer passes Constitutional muster today. *See Singleton*, 690 F. Supp. 3d at 1317-18 (citing *Milligan* DE220 at 59-60); *see also Milligan* DE374 at 28-29; *Caster* DE294 at 17-18; *Singleton* DE248 at 12-13; *Milligan* DE445 at 12.

598.   Justice Kavanaugh's concurring opinion in *Allen v. Milligan* rejected the argument "that § 2, as construed by *Gingles* to require race-based redistricting in certain circumstances, exceeds Congress's remedial or preventive authority under the Fourteenth and Fifteenth Amendments." *Allen*, 599 U.S. at 45. But he left open the question whether (as Justice Thomas opined in dissent), "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Id.* (citing *id.* at 88 (Thomas, J., dissenting)).

599.   Justice Kavanaugh, however, noted that "Alabama did not raise that temporal argument in this Court, and I therefore would not consider it at this time." *Id.*

600.   On remand, the State Defendants raised the "temporal argument." *See Singleton*, 690 F. Supp. 3d at 1317-18 (citing *Milligan* DE220 at 59-60); *see also Milligan* DE374 at 28-29; *Caster* DE294 at 17-18; *Singleton* DE248 at 12-13; *Milligan* DE445 at 12.

601. Having had time to consider this argument fully, we hold that under the current legal framework, "no end is in sight" to §2's race-based demands when it comes to redistricting, so §2's application to redistricting "must … be invalidated under the Equal Protection Clause of the Fourteenth Amendment." *Students For Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 213 (2023) (*SFFA*).

602. Every racial classification by the government is either unconstitutional or on its way to that end. Those that are not outright prohibited are allowed only to the degree "necessary" "to further compelling governmental interests." *Id.* at 207. That is because even the race-based actions our Constitution permits are "dangerous," *Grutter v. Bollinger*, 539 U.S. 306, 342 (2003), and thus *must* be limited "in scope and duration," *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989) (plurality).

603. Moreover, "even if a racial classification is otherwise narrowly tailored to further a compelling governmental interest, a 'deviation from the norm of equal treatment of all racial and ethnic groups' must be 'a temporary matter'—or stated otherwise, must be 'limited in time.'" *SFFA*, 600 U.S. at 311 (Kavanaugh, J., concurring) (quoting *City of Richmond*, 488 U.S. at 510 (plurality)).

604. Since the VRA was amended in 1982, "things have changed dramatically" in the South "in large part *because of* the Voting Rights Act." *Shelby County v. Holder*, 570 U.S. 529, 547-48 (2013). "By any measure, the Act has

accomplished its original purposes with great success." *Petteway v. Galveston County*, 111F.4th 596, 612 (5th Cir. 2024) (en banc).

605.   No longer are districts with a "bare black supermajority" accused of preserving "white hegemony." *Dilliard v. City of Greensboro*, 213 F.3d 1347, 1351 (11th Cir. 2000). No longer does a district require a black population of at least 65% to be considered an "opportunity district." *See Wesch v. Hunt*, 785 F. Supp. 1491, 1495-97 (S.D. Ala. 1992) (three-judge court). To the contrary, "[v]oter turnout and registration rates now approach parity," blatant "discriminatory evasions of federal decrees are rare," and "minority candidates hold office at unprecedented levels." *Nw. Austin*, 557 U.S. at 202.

606.   Take, for example, black voter registration rates in Alabama. When the VRA was enacted, black registration sat at a meager 23.5%. DX7 at 23. By 1982, black registration had risen to 57.7%. *Id.* And today, black registration is over 90%. *Id.* There are no "barriers keeping African Americans from participating in the political process as voters" in "present-day Alabama." *Ala. NAACP*, 612 F. Supp. 3d at 1290. Indeed, Dr. Caster, for example, testified that he has "been able to participate" in the political process. Tr. 411:25–412:24 ("There has not been anything to prohibit me from participating as far as the Democratic Party is concerned. The only thing that would have been prohibiting me was the fact that I was – I have other

duties and obligations, things that I was doing as far as my work, as far as my son being involved in sports.").

607.    If despite these undisputed advances, Plaintiffs have satisfied §2 here—and we find that they have not—that would suggest the statute is "ageless in [its] reach into the past, and timeless in [its] ability to affect the future." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986).

608.    A Senate factors expert will always be able to declare that valid voting devices upheld in federal court "can still create dilution" "whether or not [those] particular devices are discriminatory, in and of themselves." Tr. 2684:22-24. For the foreseeable future, there is likely to be at least some evidence of "race-based gaps … with respect to the health, wealth, [or] well-being of American citizens." *SFFA*, 600 U.S. at 384 (Jackson, J., dissenting). And such disparities "may make it virtually impossible for a State to devise rules that do not have some disparate impact." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 677 (2021).

609.    Meanwhile, §2 plaintiffs will always have incentives to argue that "particular issues of public policy should be classified as advantageous to some group defined by race." *Schuette v. BAMN*, 572 U.S. 291, 309 (2014) (plurality).

610.    Thus, under Plaintiffs' approach to §2, there is "no end is in sight" to §2's race-based demands in the context of redistricting. *SFFA*, 600 U.S. at 213.

611. A statutory remedy for old violations of the Constitution cannot be elevated above the Constitution itself. *See Shelby County*, 570 U.S. at 557 ("[W]hile any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions.").

612. While it may have been Constitutional at one point in time for Congress to authorize race-based redistricting to address past discrimination, those interests cannot justify continuing race-based government action today.

613. Section 2 cannot be used as a tool to perpetuate present-day race-based districting to redress long past race-based discrimination. That would violate "both the letter and spirit of a constitutional provision whose central command is equality." *Croson*, 488 U.S. at 505-06. Such remedies must have a "logical end point." *SFFA*, 600 U.S. at 221.

614. Thus, were we to reach the issue, we would agree with the State Defendants that §2 can no longer authorize race-based redistricting by States or courts. The statute's continued demands that government actors impose government authority based on racial classifications is no longer valid "under the Equal Protection Clause of the Fourteenth Amendment." *SFFA*, 600 U.S. at 213.[109]

---

[109] This Court is not opining, nor did the State Defendants present an argument that §2, writ large, is unconstitutional. This holding relates only to whether §2 *today* can authorize race-based redistricting. And it is necessarily specific to the redistricting context, rather than other voting laws, as any race-based districting is likely to be "zero-sum. A benefit provided to some" racial group "but not to others" likely "advantages the former group at the expense of the latter." *SFFA*,

615.   As the dissent in *SFFA* recognized, "drawing district lines that comply with the Voting Rights Act may require consideration of race" that is "[j]ust like" the "consideration of race" needed to "achiev[e] racial diversity in higher education." *Id.* at 361 n.34 (Sotomayor, J., dissenting). It follows that "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring). Four decades later, the statute can no longer justify a State or court "pick[ing] winners and losers based on the color of their skin." *SFFA*, 600 U.S. at 229.

### D.     Section 2 is not privately enforceable.

616.   Congress has not *expressly* authorized private persons to sue under §2 of the Voting Rights Act of 1965, as it did one year earlier in the Civil Rights Act of 1964, 42 U.S.C. §2000a-3(a).

617.   And the question whether §2 contains an *implied* private right of action has never been presented to the Supreme Court. *See Brnovich*, 594 U.S. at 690

---

600 U.S. at 218-19; *see also Allen*, 599 U.S. at 99 (Alito, J., dissenting) ("[T]he creation of major-ity-minority districts is something of a zero-sum endeavor, giving an advantage to one minority group may disadvantage others."). In contrast, a law that, for example, expands early voting might disproportionality benefit one racial group more than another, but "race is not a negative factor" in the government action. *SFFA*, 600 U.S. at 219.

(Gorsuch, J., concurring). "Lower courts," including the Eleventh Circuit, "have treated this as an open question." *Id.*

618.   Sometimes "a private right of action can be implied" from the text, so long as "the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga*, 536 U.S. at 283 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). And sometimes Plaintiffs can enforce statutory rights under 42 U.S.C. §1983. *Id.* Those two "inquiries overlap in one meaningful respect"—"whether Congress *intended to create a federal right.*" *Id.*

619.   Unless a federal statute creates new "substantive private rights," *Sandoval*, 532 U.S. at 290, it does not secure privately enforceable rights, *see Gonzaga*, 536 U.S. at 285.

620.   Congress does not create substantive rights when enforcing the provisions of the Fourteenth and Fifteenth Amendments. *City of Boerne v. Flores*, 521 U.S. 507, 527 (1997) ("Any suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case law.").

621.   The VRA is Fifteenth Amendment enforcement legislation. *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966). As such, it created only "new remedies," not new rights. *Id.* at 308, 315, 329-31. Therefore, §2—one of its "remedial portions"—is not privately enforceable. *Id.* at 316.

227

622.   Furthermore, §2 did not create the right to be free from racial vote dilution. Protecting an existing right is not creating a new one, and the right to an undiluted vote is a constitutional right recognized by the Supreme Court before the VRA was enacted. *See Reynolds v. Sims*, 377 U.S. 533, 558 (1964).

623.   Nor did §2 create a new right to be free from dilutive *effects* in voting. In 1982, Congress amended §2 by replacing the language "to deny or abridge" with the language "in a manner which results in a denial or abridgement" to reflect its determination "that a 'results' test was necessary to enforce the fourteenth and fifteenth amendments." *Jones v. City of Lubbock*, 727 F.2d 364, 375 (5th Cir. 1984). But §2 did not and could not create new substantive rights, because even prophylactic remedies cannot "substantively redefine the States' legal obligations." *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 728 (2003).

624.   This is not just semantics; the "distinction between rights and remedies is fundamental." *Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372, 384 (1918). Only "a violation of a federal *right*, not merely a violation of federal *law*," is actionable under §1983. *Gonzaga*, 536 U.S. at 282.

625.   Because the VRA creates new remedies, not new rights, it should be no surprise that the VRA "lists only one plaintiff who can enforce § 2: the Attorney General." *Ark. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1208 (8th Cir. 2023). As the Court concluded in *Katzenbach*, "After enduring nearly a century of

widespread resistance to the Fifteenth Amendment, Congress has marshalled an array of potent weapons against the evil, with authority in the Attorney General to employ them effectively." *Katzenbach*, 383 U.S. at 337.

626.   Consistent with Congress's remedial power, the VRA's text does not display a congressional intent to create privately enforceable rights. For this reason too, judgment will be entered in favor of the State Defendants on the Plaintiffs' Section 2 claims.

## II.   The 2023 Plan Is Not the Product of Intentional, Invidious Discrimination Against Black Alabamians.

627.   *Milligan* and *Singleton* Plaintiffs argue not only that the 2023 Plan *results* in illegal vote dilution, but that it was "conceived … as a purposeful device to further racial discrimination" in violation of the Fourteenth Amendment to the U.S. Constitution. *Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (cleaned up).

628.   Their theories of intentional vote dilution are related but somewhat distinct. *Milligan* Plaintiffs contend "that the 2023 Plan intentionally perpetuated the discriminatory effects of the 2021 Plan." *Milligan* DE445 at 9. *Singleton* Plaintiffs claim that the Legislature enacted the 2023 Plan "in order to destroy otherwise effective crossover districts." *Singleton* DE288 at 10.

629.   *Milligan* Plaintiffs go further and ask the Court to retain jurisdiction and require the State Defendants to submit future Congressional redistricting plans

for preclearance review under §3(c) of the VRA, which is codified at 52 U.S.C. §10302. *Milligan* DE329 at 77. *Singleton* Plaintiffs do not.[110]

630.  To succeed on their Fourteenth Amendment intentional vote dilution claims, *Milligan* and *Singleton* Plaintiffs must prove that the Alabama Legislature enacted the 2023 Plan "as a purposeful device to minimize or cancel out the voting potential" of black Alabamians. *Miller*, 515 U.S. at 911 (quotation marks omitted).[111]

631.  In other words, Plaintiffs must "show that the legislature relied on race for an *invidious* reason: to harm a racial group's ability to elect the group's preferred candidates." *Tenn. NAACP v. Lee*, 746 F. Supp. 3d 473, 502 (M.D. Tenn. 2024) (three-judge court) (per curiam).

632.  Plaintiffs "cannot prove this invidious reason merely by showing that the legislature knew that the revised map would have such harmful effects on the racial group. Rather, the legislature must have drawn the map 'because of, not

---

[110] The Court notes that during closing arguments, counsel for *Singleton* Plaintiffs repeatedly stated that, if they prevailed under §2, "the constitutional claim should not be reached." Tr. 2600:20.

[111] Separate from the Fourteenth Amendment claim, the *Singleton* Plaintiffs' Fifteenth Amendment vote dilution claim fails as a matter of law, and they have abandoned the claim. "[N]either the Supreme Court nor the Eleventh Circuit currently recognizes vote dilution as a cognizable claim under the Fifteenth Amendment." *Lowery v. Deal*, 850 F. Supp. 2d 1326, 1331 (N.D. Ga. 2012) (citing *Osborn v. Cox*, 369 F.3d 1283, 1288 (11th Cir. 2004)). The *Singleton* Plaintiffs abandoned their Fifteenth Amendment claim by failing to include it in the pretrial order. *Singleton* DE288 at 9-10. *See Morro v. City of Birmingham*, 117 F.3d 508, 515-16 (11th Cir. 1997) ("We have not hesitated to back up district courts when they put steel behind the terms of pretrial orders and hold parties to them.").

merely in spite of, those adverse effects.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009)).

633.    If Plaintiffs make this showing, "the burden shifts" to the State Defendants "to demonstrate that the [2023 Plan] would have been enacted" even had the Legislature not been motivated by racial animus. *GBM*, 992 F.3d at 1321 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).

634.    Compounding this "demanding" "burden of proof," *Easley v. Cromartie*, 532 U.S. 234, 241 (2001), is the fact that even when dealing with a small number of decisionmakers, "[p]roving the motivation behind official action is often a problematic undertaking," *Hunter*, 471 U.S. at 228. In trying to prove the intent of a body the size of the Alabama Legislature, "the difficulties in determining the actual motivations of the various legislators that produced a given decision increase." *Id.*[112]

635.    It is not enough to prove the motives of only a handful of the bill's backers, for "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Brnovich.*, 594 U.S. at 689. Instead, Plaintiffs must show

---

[112] The Court takes judicial notice that the Alabama Legislature consists of 35 Senators and 105 Representatives, for a total of 140 voting Members. *See* The Alabama Legislature: House Members, *available at* https://alison.legislature.state.al.us/house-leaders-members?tab=1 (last visited March 12, 2025); The Alabama Legislature: Senate Members, *available at* https://alison.legislature.state.al.us/senate-leaders-members?tab=1 (last visited March 12, 2025); Ala. Const. art. IV, § 50 ("The legislature shall consist of not more than thirty-five senators, and not more than one hundred and five members of the house of representatives, to be apportioned among the several districts and counties, as prescribed in this Constitution; provided that in addition to the above number of representatives, each new county hereafter created shall be entitled to one representative."); Fed. R. Evid. 201 (Judicial Notice of Adjudicative Facts).

"that the legislature as a whole was imbued with racial motives." *Id.* Making that showing is not merely difficult, it's "near-impossible." *GBM*, 992 F.3d at 1324.

636.   The Court rejects *Milligan* and *Singleton* Plaintiffs' intentional vote dilution claims. Plaintiffs have adduced no direct evidence of discrimination, and their circumstantial evidence falls far short of proving that the Legislature, as a whole, passed the 2023 Plan to harm black Alabamians. Numerous non-racial reasons better explain the Legislature's action.  Even assuming Plaintiffs established a *prima facie* case of discrimination, the State Defendants have shown that the Legislature would have enacted the 2023 Plan nonetheless.

### A.    The Court presumes the Legislature acted in good faith.

637.   "[W]hen a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam) (quoting *Abbott*, 585 U.S. at 603).

638.   This presumption applies through *each* stage of litigation, *see Miller*, 515 U.S. at 916-17, including after a predecessor redistricting plan has been subject to "findings of discriminatory intent by" a district court, *Perez v. Abbott*, 274 F. Supp. 3d 624, 649 (W.D. Tex. 2017); *see Abbott*, 585 U.S. at 603-05.

639.   The presumption that a Legislature acts for legitimate rather than discriminatory reasons serves important ends: it reminds courts to exercise caution

before intruding "on the most vital of local functions"; it rightly recognizes that redistricting is a "complex" and "difficult subject for legislatures"; it is sensitive to the fact that legislators are "almost always … aware of racial demographics"; and it keeps the burden of proof on the Plaintiffs. *Miller*, 515 U.S. at 915-16. Moreover, "this presumption reflects the Federal Judiciary's due respect for the judgment of state legislators, who are similarly bound by an oath to follow the Constitution" and it encourages restraint before "declaring that the legislature engaged in 'offensive and demeaning' conduct[.]" *Alexander*, 602 U.S. at 11.

640.    Without this safeguard, federal courts are more easily "transformed into weapons of political warfare" by "the losers in the redistricting process"—an "often-unstated danger" that invites "illegitimate invasions" into "a traditional domain of state authority." *Cooper*, 581 U.S. at 291 (Alito, J., concurring in part); *accord Alexander*, 602 U.S. at 11.

641.    The Court notes that *Milligan* Plaintiffs have made inconsistent statements about whether this presumption even applies to claims of intentional vote dilution. *Compare Milligan* DE360 at 3-4 *with* Tr. 2584:14. To dispel any doubt, it absolutely does. As we held earlier in this case, "[t]he presumption of the legislature's good faith, detailed at length in *Alexander*, applies in all districting cases in which a plaintiff alleges discriminatory intent, including both racial

gerrymandering and vote dilution cases." *Singleton v. Allen*, 740 F. Supp. 3d 1138, 1149 (N.D. Ala. 2024).

642.   Just last year, the Supreme Court deployed the presumption in *Alexander v. South Carolina NAACP* to reverse a finding that South Carolina's congressional districting plan was the product of a racial gerrymander. 602 U.S. at 6. The presumption "ensures that" strict scrutiny is only applied where "race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Id.* at 10.

643.   Previously, in *Abbott v. Perez*, the Supreme Court reversed a finding of intentional discrimination made in a challenge to Texas's districting plan because the district court failed to give effect to the  presumption at trial, and instead found that the legislature, when enacting a 2013 remedial plan, had not sufficiently addressed problems contained in the originally-enjoined 2011 plan. *Abbott*, 585 U.S. at 610-12. Following "the guidance in *Arlington Heights* virtually to a tee," *id.* at 642 (Sotomayor, J., dissenting), the district court devoted several pages of analysis to evidence of racial discrimination, *see generally Perez v. Abbott*, 274 F. Supp. 3d 624, 645-52 (W.D. Tex. 2017), including evidence that the predecessor plan bore "the taint of discriminatory intent," *id.* at 648, discriminatory "effects continu[ed]," *id.* at 649, and "the Legislature pushed the redistricting bills through quickly in a special session" without "consider[ing]" certain alternatives, *id.* Even so, the

Supreme Court held that this evidence was not "strong enough to overcome the presumption of legislative good faith." *Abbott*, 585 U.S. at 610.

644.   It is thus clear that the numerous "constitutional interests," advanced by the presumption are implicated whether a plaintiff is alleging that a legislature's secret motives for a facially neutral law are racial vote dilution or racial gerrymandering. *Alexander*, 602 U.S. at 11.

**B.    Plaintiffs have not proven discriminatory effects.**

645.   Any "successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." *GBM*, 992 F.3d at 1321.

646.   To show the "discriminatory effects" of intentional vote dilution, plaintiffs in the Eleventh Circuit must "sufficiently alleg[e] the *Gingles* preconditions," *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018) (three-judge court), and "also establish a discriminatory effect under the totality of the circumstances." *Ga. State Conf. of NAACP v. State*, 269 F. Supp. 3d 1266, 1279 (N.D. Ga. 2017) (three-judge court).

647.   This rule finds its origins in *Johnson v. DeSoto County Board of Commissioners*, where the Eleventh Circuit, assuming discriminatory intent was present, rejected plaintiffs' intentional vote dilution claim for failing to "establish that an alternative system of districting could exist whereby the black-minority vote

could elect its preferred candidates"—in other words, the plaintiffs couldn't satisfy *Gingles*. 204 F.3d 1335, 1346 (11th Cir. 2000); *see also Ga. State Conf. of NAACP*, 269 F. Supp. 3d at 1280-81 (rejecting intentional vote dilution claims where the allegations failed to meet the *Gingles* preconditions); *Lowery v. Deal*, 850 F. Supp. 2d 1326, 1336 (N.D. Ga. 2012) (same); *Broward Citizens for Fair Dists. v. Broward Cnty.*, 2012 WL 1110053, at *9 (S.D. Fla. April 3, 2012) (same); *Tyson v. Town of Homer*, 2021 WL 8893039, at *9 (N.D. Ga. July 2, 2021) (same); *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1340-48 (S.D. Fla. 2002) (three-judge court) (same in pre-*Rucho* political gerrymandering case).

648.    As discussed *supra* Discussion I, the 2023 Plan does not have the effect of diluting black voting strength. Thus, *Milligan* and *Singleton* Plaintiffs' intentional vote dilution claims necessarily fail because they have not proven discriminatory effects. But, even assuming they have, they would still fail to establish a prima facie case of discriminatory intent. *See infra* Discussion II.C-F.

**C.    *Singleton* Plaintiffs' intentional vote dilution theory fails as a matter of law.**

649.    *Singleton* Plaintiffs' intentional vote dilution claim rests upon dictum from the plurality decision in *Bartlett v. Strickland*, 556 U.S. 1 (2009), and Plaintiffs misapply the dictum.

650.    The *Singleton* Plaintiffs focus on the line: "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective

crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Id.* at 24.

651.   From this, Plaintiffs argue that the Legislature's refusal to adopt their map containing two "effective" crossover districts constitutes intentional, bad faith vote dilution.

652.   First, the Singleton Plan does not achieve minimum population deviation and departs widely from the 2023 Plan's lines, retaining only 51% of CD2's core, 49% of CD3's core, 49% of CD6's core, and 44% of CD7's core. *See* DX93 at 2. The "obvious alternative explanations" of population equality and core retention better explain the Legislature's decision not to enact the *Singleton* Plan than an invidious racial motive. *Iqbal*, 556 U.S. at 682.

653.   Second, even construing *Strickland*'s dictum as articulating a fact pattern suggestive of intentional vote dilution, the Legislature never "*destroy[ed] otherwise effective crossover districts*"; it merely adopted a plan other than the one Plaintiffs' preferred. *Strickland*, 556 U.S. at 24 (emphasis added).

654.   Furthermore, the *Singleton* Plaintiffs' claim, and the evidence they have mustered to support it, fails to establish discriminatory *effects*. Showing the availability of crossover districts does not establish the preconditions necessary for a claim of vote dilution. *Strickland*, 446 U.S. at 23.

655.   Accordingly, the Legislature's choice to forego a plan with more crossover districts has no legally cognizable discriminatory effect upon the minority group. *See Ga. State Conf. of NAACP*, 269 F. Supp. 3d at 1280-81 (dismissing the plaintiffs' intentional vote dilution claim after finding no allegations that "the relevant 'minority group' [was] sufficiently large to constitute a majority").

### D.   *Milligan* Plaintiffs submit no direct evidence of intentional discrimination.

656.   *Milligan* Plaintiffs have not presented a single "express acknowledgement," "confession," *Alexander*, 602 U.S. at 8, or statement showing that any Legislator who voted for the 2023 Plan "did so for a racist reason." *Tenn. NAACP*, 746 F. Supp. 3d at 503. That is likely dispositive, as the Supreme Court "has never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Alexander*, 602 U.S. at 8.

657.   Plaintiffs flag as their "strongest evidence," Tr. 2577:19, 2578:3, the single reference to the Gulf Coast community's "distinct culture stemming from its French and Spanish colonial heritage" in the legislative findings accompanying the 2023 Plan. Ala. Code §17-14-70.1(f)(9). They read this as "an explicit reference to the white people in that area." Tr. 2566:21-22, 2578:3-4.[113]

---

[113] During closing argument, counsel for *Milligan* Plaintiffs suggested in rebuttal that "[the Solicitor General's] argument … in front of this Court in 2023" was "direct evidence" of intentional discrimination. Tr. 2579:19-21. We decline to construe advocacy as evidence of a Legislature's intent to discriminate for several reasons, including that "statements and arguments of counsel are not evidence." *United States v. Smith*, 918 F.2d 1551, 1562 (11th Cir. 1990).

658.    The Court emphatically rejects any interpretation of this phrase as a preference for, or focus on, white Alabamians. Such a divisive reading skips over the *actual* focus of the finding—the region's "distinct culture," not its racial makeup. No one disputes that the Gulf Coast's culture has been shaped to a significant degree by the influence of early French and Spanish colonial settlements. While many of those settlers may have been white Europeans, the regional culture that developed is shared by residents of all races. *See* Ala. Code §§17-14-70.1(3)(f), 17-14-70.1(4)(f); *Barnhart v. Ingalls*, 275 So.3d 1112, 1117 n.1 (Ala. 2018) (citing Ala. Code §1-3-8(c)) ("Mardi Gras is observed as a State holiday only in Mobile and Baldwin Counties, and State offices in those locales are accordingly closed on that holiday.").

659.    The Legislature's observation that this culture is distinct, in many ways, from others that took shape elsewhere in the State in no way communicates a preference for Frenchmen, Spaniards, or white people of any nationality.

660.    Nor is the Legislature's reference out of the ordinary. Courts routinely note the influence of colonial-era traditions—including French, Spanish, and English—upon parts, or even all of, present-day America. *See, e.g.*, *United States v. Vereen*, 920 F.3d 1300, 1310 (11th Cir. 2019) (Marcus, J.) (Congress "legislates against the background of Anglo-Saxon common law.") (quoting *United States v. Bailey*, 444 U.S. 394, 414 (1980)); *Roper v. Simmons*, 543 U.S. 551, 561 (2005) (appealing to "civilized standards of decency" expressed "by other nations that share

our Anglo-American heritage"); *In re Morgan*, 286 B.R. 678, 681 (Bankr. E.D. Wis. 2002) (recounting that community property "was adopted by eight of the United States before statehood, principally from their Spanish and French heritage"); *Ellison v. Conoco*, 950 F.2d 1195, 1208 (5th Cir. 1992) (acknowledging "Louisiana's French civil law heritage" and "the French understanding"); *Opdyke Inv. Co. v. Norris Grain Co.*, 413 Mich. 354, 364-65 (1982) (referencing Louisiana's "French civil-law heritage"); *Wyly's Est. v. Comm'r*, 610 F.2d 1282, 1287 (5th Cir. 1980) (noting that "the Texas community system of marital property is derived from the Spanish Civil Law, a heritage of Spanish-Mexican sovereignty"); *United States v. Candalaria-Gonzalez*, 547 F.2d 291, 294 (5th Cir. 1977) (recalling that "the presumption of innocence … is fundamental to Anglo-Saxon concepts of fair trial"); *Melancon v. McKeithen*, 345 F. Supp. 1025, 1029 (E.D. La.) (Wisdom, J.) (three-judge court) (narrating that "Louisiana jurists, influenced by their French and Spanish legal heritage, never accepted the civil jury's findings as sacrosanct").

661.   Just because Congress "legislates against the background of Anglo-Saxon common law" does not mean that Congress legislates for Englishmen or their descendants alone. *Vereen*, 920 F.3d at 1310. Nor does the historical fact that the "Anglo-Saxon tradition of criminal justice" is "embodied in the United States Constitution" mean that our criminal law jurisprudence is for only the descendants of the English or Saxons. *Bailey*, 444 U.S. at 414. Recognizing the connection

between colonial-era history and certain cultural elements of modern America does not espouse white identity or white preference.

662. For the Alabama Legislature to draw the connection between the Gulf Coast's "distinct culture" and the region's "French and Spanish colonial heritage" is par for the course and simply credits the cultural roots shared by all—black, white, and other—residents of Mobile and Baldwin counties.

663. This should not even be controversial. Fact and expert witnesses from Plaintiffs and the State Defendants alike confirm that Mardi Gras—undoubtedly one aspect of the Gulf's French colonial heritage—is celebrated by Gulf residents regardless of race. Tr. 76:14-15 (Dowdy); Tr. 253 (Clopton); Tr. 1178-80 (Milligan); Tr. 1467-68 (Bagley); *Milligan* DE459-23 at 69-70 (Small); DX248 ¶¶11, 13 (Lawson). It is not just descendants of French colonizers who enjoy King Cake, parades, beads, and Moon Pies.

664. Still, Plaintiffs argue that the Legislature's reference to "French and Spanish colonial heritage" is akin to the Lieutenant Governor of Georgia's mandate in 1981 that "'mountain people' be maintained in one district," *Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982), or a Texas State Representative's testimony that "his ideal district went further north because the area was 'more Anglo and more conservative,'" *Perez v. Abbott*, 250 F. Supp. 3d 123, 148 (W.D. Tex. 2017); *see* Tr. 2578.

665.   In *Busbee*, the Lieutenant Governor "felt that uniting the [mountain counties]—where there are few blacks—was more important than keeping the cohesive black community in south Fulton and DeKalb counties together." 594 F. Supp. at 502. His determination to preserve communities of interest "in white residential areas but not in black residential areas," the court found, was "indicative of racially discriminatory intent." *Id.* at 517.

666.   Here, in contrast, the Alabama Legislature never exalted any "white community" as "more important" than a "cohesive black community." *Id.* at 502. To the contrary, the 2023 Plan respects the Black Belt, Wiregrass, and Gulf Coast communities equally, placing each in as few districts as permitted by the principle of population equality. Further, the reference to the Gulf Coast community's "distinct culture stemming from its French and Spanish colonial heritage" plainly includes all residents of the region—white, black, American Indian, Asian, and anyone else. Ala. Code §17-14-70.1(f)(9).

667.   Nor did the Alabama Legislature place Mobile and Baldwin together to make CD1 "more Anglo." *Perez*, 250 F. Supp. 3d at 148. It did so out of respect for the counties' shared cultural and economic ties, which are felt by Gulf Coast residents of all races. Ala. Code §17-14-70.1(f).

668.   And we infer no bad faith from the Legislature's decision to include findings about the Black Belt, Wiregrass, and Gulf Coast, but not about communities

lying elsewhere in the State. The "obvious alternative explanation," *Iqbal*, 556 U.S. at 682, for this decision is that the 2021 Plan had been enjoined under §2 in large part because of the Legislature's "'inconsistent treatment' of Black and White communities" in the southern part of the State. *Milligan* Appellees' Br.39, *Allen v. Milligan* (quoting *De Grandy*, 512 U.S. at 1015).

669.   The 2021 Plan's treatment of communities north of Montgomery was not at issue, so the 2023 Legislature had no reason to articulate its intent with respect to those communities. The contours of the 2023 Plan bear this out; the district lines in the southern part of the State change dramatically from the 2021 Plan, while those in the northern part of the State do not. We will not infer bad faith from silence.

670.   In the end, the Court finds Plaintiffs' insistence on equating the Gulf Coast's French and Spanish culture with white identity to be disingenuous. Just last year in its successful §2 challenge to Louisiana's state legislative districts, the Louisiana NAACP put on expert evidence of a distinct community of interest among the Red River Parishes "*influenced by French colonialism* because early French settlement resulted in French being the dominant language and Catholicism becoming the dominant faith in the territory among White and Black people." *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 844 (M.D. La. 2024) (emphasis added).

671.   We seriously doubt the Louisiana NAACP, by seeking to unite a "community … influenced by French colonialism," intended to promote white

identity politics. *Id.* Which makes it all the more remarkable, and troubling, that many of those same lawyers argue now that any mention of the Gulf Coast's French colonial heritage is "direct evidence" of the Alabama Legislature's intent to harm black people.

672.   Ultimately, the "only direct evidence brought to our attention suggests that the [2023] Legislature's intent was legitimate." *Abbott*, 585 U.S. at 608.

### E.   *Milligan* **Plaintiffs' additional evidence fails to establish a claim under** *Arlington Heights*.

673.   The Supreme Court has articulated a "multiple factor approach" to guide the analysis of determining whether a state law was enacted with a discriminatory intent. *GBM*, 992 F.3d at 1321 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). These factors include: "[1] the historical background; [2] the specific sequence of events leading up to [the law's] passage; [3] procedural and substantive departures; [4] the contemporary statements and actions of key legislators; [5] the foreseeability of the disparate impact; [6] knowledge of that impact[;] and [7] the availability of less discriminatory alternatives." *Id.* at 1322.[114]

---

[114] One factor often included in the list is "the impact of the challenged law." *GBM*, 992 F.3d at 1322. In the context of an intentional vote dilution claim, we consider this factor subsumed entirely under the "discriminatory effects" prong, discussed *supra* Discussion II.B.

1.    **Past discrimination is not evidence of a present-day intent to discriminate.**

674.    The Eleventh Circuit "has rejected the argument that 'a racist past is evidence of current intent.'" *League*, 66 F.4th at 923. Nevertheless, the backbone of Plaintiffs' argument is Alabama's history and instances of past conduct. The Court, as well as all Parties to this case, recognize and are aware of Alabama's "racist past." *See id*. But this Court also recognizes and is aware that Plaintiffs are asking the Court to draw a negative inference from the past without presenting evidence of a present-day intention to discriminate.

675.    "[A]pplying principles of equal sovereignty," we refuse to "penalize the [2023] legislature for Alabama's racist past." *GBM*, 992 F.3d at 1325. Instead, we must "look at the precise circumstances surrounding the passing of the … law," *id.*, all while remembering that the "allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott*, 585 U.S. at 603; *see also GBM*, 992 F.3d at 1325 (It "cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws about voting.").

676.    *Milligan* Plaintiffs again offer the testimony of historian Dr. Bagley, this time as an expert in divining legislative intent. His report begins by weaving a twenty-page narrative of what he deems "the state's history of discrimination, especially as to redistricting." MX4 at 2-21.

245

677.   Because his story is "unconnected to the passage of the actual law in question" (the 2023 Plan), we find his testimony largely irrelevant. *GBM*, 992 F.3d at 1325.

678.   Still, *Milligan* Plaintiffs argue that "Alabama has never stopped discriminating against black voters," Tr. 2684-85, and attempt to draw an unbroken line of discrimination from as far back as Alabama's 1875 congressional map, through the Jim Crow era, through the decades surrounding the passage of the Voting Rights Act of 1965, through the redistricting cycles of 1990, 2000, and 2010, through the 2021 Plan preliminarily enjoined by this Court, and, finally, to the 2023 Plan. *See* Tr. 1303-25.

679.   Plaintiffs essentially posit a time-traveling "cat's paw" theory, in which the 2023 Legislature channeled, ratified, or adopted the racist intent of past Legislatures. *See Brnovich*, 594 U.S. at 689. But because the "cat's paw theory has no application to legislative bodies," Plaintiffs' argument fails. *Id.*

680.   For the sake of both brevity and relevance, we pick up Plaintiffs' centuries-spanning narrative in 1972, when Alabama's congressional districting plan placed Mobile and Baldwin counties in the same district. MX4 at 7. Plaintiffs contend that the Legislature's purpose of combining these two counties while splitting southern Alabama into three districts "was to continue cracking the black vote." Tr. 1311-12.

681.   We skip ahead to the *Wesch v. Hunt* litigation following the 1990 census, which resulted in Alabama sending its first black representative to Congress since Reconstruction. *See* MX4 at 9-15. According to Dr. Bagley, the *Wesch* court adopted a slight variation of Sen. Larry Dixon's map, which allegedly "gather[ed] most of the blacks in one district … to help the other districts." Tr. 1320-21. Dixon's plan, along with the *Wesch* court's version, kept Mobile and Baldwin counties together in one district. In contrast, plans that were ultimately rejected by the *Wesch* court "paired Black population in Mobile and Montgomery to create another" majority-minority district. MX4 at 15.

682.   Plaintiffs argue that the 2001, 2011 and 2021 Legislatures likewise kept Mobile and Baldwin counties together and split southern Alabama into three districts for the purpose of cracking the black vote. Tr. 2548-49.

683.   In summary, according to Plaintiffs, the pre-1972 congressional districting plans split the Gulf Coast counties for the purpose of cracking the black vote, and the 1972 Plan combined the Gulf Coast counties for that same nefarious purpose. That purpose was apparently, in the Plaintiffs' view, carried forward through the 1992 court-imposed plan.

684.   Fast forward to today, where Plaintiffs insist that the 2023 Plan retains the same allegedly invidious purpose from previous maps because it too has only

one majority-black district, just like the court-imposed 1992 Plan, and places Mobile and Baldwin counties together, just like the 1972 Plan. Tr. 2581:7-10.

685.   If it is "near-impossible" to determine the intent of a legislature, this conspiracy theory does not cut it. *GBM*, 992 F.3d at 1324.

686.   The thesis of this theory is that the 2023 Legislature intended to harm black voters by ratifying elements of previous plans themselves imbued with racially discriminatory motives.

687.   The ratification theory of intentional discrimination "requires a conscious, deliberate choice by the decision-making body." *Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1363 (N.D. Fla. 2024) (citing *Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir. 1998)); *see also Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006).

688.   "This may be shown with evidence that the decision-makers themselves 'agreed with' the discriminatory motives. … Or it may be demonstrated with evidence that the decision-makers knowingly chose a particular course of action for the purpose of giving effect to the discriminatory motives." *Common Cause Fla.*, 726 F. Supp. 3d at 1363 (first quoting *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1174 n.12 (11th Cir. 2001), then *Hallmark Dev. v. Fulton County*, 466 F.3d 11276, 1284 (11th Cir. 2006)).

689.    But even if the prior law is tainted, the is no requirement that the "legislature needed to affirmatively intend to eliminate the discriminatory intent behind" the predecessor law upon replacing it. *Thompson v. Sec'y of State for the State of Alabama*, 65 F.4th 1288, 1300 (11th Cir. 2023). "Even if the Alabama legislature" had enacted the 2023 Plan "for 'strictly housekeeping' purposes … that is sufficient to eliminate the discriminatory taint" Plaintiffs allege was in prior maps. *Id.* All that is required is "deliberative process and … a substantial change," both of which occurred here, as the 2023 Plan was enacted by the Legislature, and has substantial differences from past plans. *Id.* The Eleventh Circuit has "rejected the proposition that a state legislature must demonstrate an intent to remove the discriminatory intent of previous provisions" even "when re-enacting a law," *id.* at 1298, so, *a fortiori,* there was no obligation on the Legislature to do more than it did when enacting a new redistricting law with new lines and based on new Census numbers.

690.    A "contrary rule would put lawmakers in an unacceptable position." *Matthews v. Columbia County*, 294 F.3d 1294, 1298 (11th Cir. 2002).

691.    "A well-intentioned lawmaker who votes for the legislation—even when he votes in the knowledge that others are voting for it for an unconstitutional reason and even when his unconstitutionally motivated colleague influences his vote—does not automatically ratify or endorse the unconstitutional motive." *Id.*

692.   As discussed *infra*, *Milligan* Plaintiffs have come forward with no evidence that any legislator voted for the 2023 Plan "for the purpose of giving effect to the discriminatory motives" supposedly infecting prior plans. *Common Cause Fla.*, 726 F. Supp. 3d at 1363.

693.   The "absence of *any* evidence that *any* member of the [Alabama] Legislature, much less a majority of its members, was actually motivated by racial discrimination in passing the Enacted Map dooms the plaintiffs' case for ratification." *Common Cause*, 726 F. Supp. 3d at 1365.

694.   The flip side of the ratification coin is Plaintiffs' position that the 2023 Legislature was obligated to "expiate its predecessor's bad intent." *Abbott*, 585 U.S. at 605.

695.   That fundamental legal error served as grounds for reversal in *Abbott v. Perez*. There, the district court "referred repeatedly to the 2013 Legislature's duty to expiate its predecessor's bad intent." *Id.* The district court reasoned that discriminatory effects persisted "because the Legislature engaged in no deliberative process to remove any such taint, and in fact intended any such taint to be maintained but be safe from remedy." *Id.* at 605. The court viewed the law enacted by the 2013 Legislature to be a "litigation strategy designed to insulate the 2011 or 2013 plans from further challenge." *Id.* at 592.

696.   This "approach," declared the Supreme Court, "was fundamentally flawed and demands reversal." *Id.* at 607. Why? Because it "disregarded the presumption of legislative good faith and improperly reversed the burden of proof." *Id.* at 607. Neither of those "basic principles" are "changed by a finding of past discrimination" because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* at 603.

697.   Here, Plaintiffs would place the burden on the Legislature to "'cure' the earlier Legislature's 'taint,'" *id.* at 605, by splitting Mobile and Baldwin counties and further redrawing southern Alabama's districts. The Constitution does not place the burden on the Legislature to prove its own good faith, so Plaintiffs' claim fails.

698.   Even pretending *Abbott* and *Thompson* were never decided, Plaintiffs have not shown that invidious discrimination infected the 1992 Plan or that some of the plan's contours were intentionally maintained with the same discriminatory purpose following the 2000, 2010, and 2020 censuses.

699.   The 1992 Map was imposed by a federal court and has never been held to be the product of intentional discrimination. *See Wesch*, 785 F. Supp. 1491.

700.   Similarly, no court invalidated the 2002 and 2011 Plans. This Court preliminarily enjoined the 2021 Plan solely on statutory grounds. *Singleton*, 582 F. Supp. 3d at 1034.

701.   Finally, putting aside *Abbott* and assuming *arguendo* a federal court enshrined invidious discrimination into the 1992 Plan, Plaintiffs still have not proven the 2023 Legislature intentionally "perpetuated" any past discrimination against black voters.

702.   "[I]ntent as volition or intent as awareness of consequences" does not rise to the level of discriminatory purpose. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). The most Plaintiffs have shown is that the Legislature chose to enact the 2023 Plan while "aware" of the districts' "racial demographics." *Miller*, 515 U.S. at 916. That's not enough.

703.   In sum, actions by the 1875 or 1972 Legislatures, a federal court in 1992, or the 2001, 2011, or 2021 Legislatures do not taint the actions of the 2023 Legislature. Even if there were a finding of past discrimination, the "burden of proof" would not change. *Abbott*, 585 U.S. at 603.

704.   The ultimate question remains whether a discriminatory intent has been proved in a given case," meaning that "what matters" in this case is the intent of the Legislature that enacted the 2023 Plan. *Id.* at 603, 605.

705.   That intent cannot be shown by the 2023 Legislature's "failure" to meet its non-existing obligation to "purge" subjective intent, if it existed, from previous redistricting plans. *Id.* at 603.

706.   Giving credence to Plaintiffs' repudiated theory would "reverse the presumption that a State's laws are constitutional and plunge federal courts into far-reaching expeditions regarding the sins of the past in order to question the laws of today." *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1226 (11th Cir. 2005) (en banc).

### 2.     The sequence of events leading to the passage of the 2023 Plan does not lead to the inference of discriminatory intent.

707.   Plaintiffs characterize the sequence of events following this Court's January 2022 Order preliminarily enjoining the 2021 Plan as outright "defiance" by the Legislature against the federal judiciary, *see* MX4 at 22-29, because the 2023 Plan did not "include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Singleton*, 582 F. Supp.3d at 1033.

708.   Out of "due respect for the judgment of state legislators, who are similarly bound by an oath to follow the Constitution," *Alexander*, 602 U.S. at 11, we do not take so cynical a view.

709.   First, State Defendants complied with the orders of the Court, which were to refrain from using the 2021 and 2023 Plans in any election while those plans were enjoined. *See generally Singleton*, 582 F. Supp. 3d 924. Only after the Supreme Court stayed the preliminary injunction against the 2021 Plan did the State conduct an election under that Plan. After the Supreme Court subsequently affirmed this Court, the State has not used the 2021 Plan in any election.

710.    Instead, the State Defendants presented the Court with the 2023 Plan, *Milligan* DE272. We preliminarily found the 2023 Plan to be an insufficient remedy, enjoined its use, and directed the Special Master to draw a remedial map. *Caster v. Allen*, No. 2:21-CV-1536-AMM, 2023 WL 6005545 (N.D. Ala. Sept. 5, 2023). In compliance with this Court's order, no election was held under the 2023 Plan, but instead, elections were held under the 2023 Special Master's Map *Milligan* DE272.

711.    At no point did the State Defendants seek to evade this Court's jurisdiction or make use of an enjoined district map.

712.    Second, this Court acknowledges the procedural posture of this case when the Legislature was tasked with remedying the 2021 Plan—the Parties were in the preliminary injunction phase. The State Defendants remained entitled to a full, final trial on the merits. The State Defendants were not required to waive that right in order to participate in the remedial phase.[115] In fact, the Supreme Court has repeatedly "cautioned against improperly equating 'likelihood of success' with 'success' and treating preliminary injunctions as tantamount to decisions on the underlying merits." *Lackey v. Stinnie*, 145 S.Ct. 659, 667 (2025) (cleaned up). Even if, for

---

[115] The State Defendants were entitled to a trial on the merits of all arguments up to and including, for instance, an argument that "the authority to conduct race-based districting cannot extend indefinitely into the future," *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring). Indeed, the Legislature retains "not just the right but the duty to make its own informed judgment on the meaning and force of the Constitution." *City of Boerne v. Flores*, 521 U.S. 507, 535 (1997). We may have preliminarily disagreed with the Legislature that the 2023 Plan complies with §2, *see Singleton*, 690 F. Supp. 3d 1226, but the presumption of good faith would not be a "presumption" if it kicked in only after a federal court agreed with the legislature's views.

the sake of argument, the Legislature should have treated our preliminary injunction "as tantamount to [a] decision[] on the underlying merits," we will not infer defiance from the Legislature's belief that it had some latitude to try and make sense of a "notoriously unclear and confusing" area of the law. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).

713.   Third, while we do not claim to know the mind of the Legislature, we nonetheless acknowledge the possibility that the Legislature understood the language of this Court's order in light of what it claimed to be, a practical reading of the evidence from the preliminary hearing stage:

> The Legislature enjoys broad discretion and may consider a wide range of remedial plans. As the Legislature considers such plans, it should be mindful of the practical reality, based on the ample evidence of intensely racially polarized voting adduced during the preliminary injunction proceedings, that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it.

*Singleton*, 582 F. Supp. 3d at 1034. And while it is also apparent the Legislature understood the practical data differently from the Court at that time—such as, that Baldwin County and Mobile County were a true community of interest that should be kept together in a single district—the Court declines to characterize that difference as "defiance" or infer discriminatory intent from it. The Legislature passed its

255

plan, presented by the State Defendants; the Court disagreed at that time that it remedied any likely VRA violations, and preliminarily enjoined it; and the 2023 Plan has never been used in an election.

714.   As such, we disagree with the Plaintiffs' characterization of the events leading up the passage of the 2023 Plan as "defiance." Nevertheless, this Court also notes that the questions of procedural "defiance" and "discriminatory intent," while both weighty, are also analytically distinct. And the particular question before this Court in deciding the merits of this case at this moment concern whether or not the Legislature intentionally discriminated against black Alabamians in passing the 2023 Plan. The answer is no.

715.   The record tells a more innocuous story reflecting the Legislature's good faith efforts to grapple with the following: (1) the purportedly discriminatory effects in the 2021 Plan identified during the preliminary-injunction proceedings; (2) the intervening decision by the Supreme Court clarifying some aspects of the law; and (3) the principle that state legislators, like members of the federal judiciary, are "bound by an oath to follow the Constitution." *Alexander*, 602 U.S. at 11.

716.    Importantly, the Legislature did all this during a special session called by the Governor of Alabama, which gave this Court ample time to review their work before the next election.[116]

717.    For context, we provide a refresher of what led to the 2022 PI Order.

718.    In 2021, Alabama enacted a congressional map that largely retained existing district lines. *See Allen*, 599 U.S. at 21. Because the 2021 Plan prioritized core retention, the eighteen core Black Belt counties that had been split between three districts in the 2011 Plan remained split between those three districts. Montgomery County was split between Districts 2 and 7.

719.    *Milligan* Plaintiffs challenged the 2021 Plan under §2 and the Constitution. "At the heart of" the *Milligan* Plaintiffs' case was how the 2021 Plan allegedly "crack[ed]" "two of the State's principal majority-Black communities of interest—the Black Belt and the City of Montgomery." *Milligan* Appellees' Br.1, *Allen v. Milligan*.

720.    Plaintiffs explained that "'[c]racking' occurs where 'a State has split minority neighborhoods that would have been grouped into a single district if the State had employed the same line-drawing standards in minority neighborhoods as it used elsewhere.'" *Id.* at 29 (quoting *De Grandy*, 512 U.S. at 1015) (cleaned up).

---

[116] For that reason and many others, this is not a situation where Defendants or the Legislature were attempting to avoid this Court's jurisdiction. *See* Tr. 2623; *see also Ener v. Martin*, 987 F.3d 1328, 1331-32 (11th Cir. 2021).

721.   And this "cracking" was present in the 2021 Plan, Plaintiffs argued, because that plan continued "a pattern of splitting two majority-Black communities of interest—the Black Belt and the City of Montgomery," while keeping Baldwin and Mobile Counties together. *Id.* at 1.

722.   The crux of the problem *Milligan* Plaintiffs identified was that "Defendants chose to preserve one set of communities of interest—most or all of which are majority white—at the expense of respecting majority-Black communities of interest like the Black Belt and Montgomery County." *Milligan* DE94 (Reply iso PI) at 15.

723.   We agreed that Plaintiffs were likely to prevail on their §2 claim and preliminarily enjoined the Secretary of State from conducting any congressional elections under the 2021 Plan. *See Singleton*, 582 F. Supp. 3d 924.

724.   The Supreme Court stayed our order pending appeal in February 2022 and then affirmed our decision in June 2023 in an opinion that focused extensively on the *Gingles* 1 inquiry. *See Allen*, 599 U.S. at 18.

725.   The Supreme Court deployed the following ground rules to determine whether Plaintiffs' illustrative plans sufficed to show a likely §2 violation in the 2021 Plan. First, §2 required "'an intensely local appraisal'" of the challenged plan. 599 U.S. at 19.

726.    Second, the plan must be compared to Plaintiffs' alternatives to vet whether the State inconsistently applied redistricting criteria; deviation would mean "a disparate effect on account of race" "is *possible*." *Id.* at 26.

727.    Third, the "State's adherence to a previously used districting plan" (that is, prioritizing "core retention") would not "defeat a §2 claim." *Id.* at 21-22.

728.    But fourth, "§2 never requires adoption of districts that violate traditional redistricting principles." *Id.* at 30 (cleaned up).

729.    Applying those ground rules to the 2021 Plan, the Supreme Court concluded that Plaintiffs' plans were on par with the State's according to the traditional criteria. *See id.* at 20-22; *see also id.* at 44 n.2 (Kavanaugh, J., concurring) ("it is important that at least some of the plaintiffs' proposed alternative maps respect county lines at least as well as Alabama's redistricting plan").

730.    On compactness, the Supreme Court affirmed the finding that Plaintiffs' maps "perform[ed] generally better on average" or were "roughly as compact" as the 2021 Plan. *Id.* at 20.

731.    On political subdivisions, "some of plaintiffs' proposed maps split the same number of county lines as (or even fewer county lines than)" the 2021 Plan. *Id.*

732.    On communities of interest, Plaintiffs' maps were "reasonably configured because," the Supreme Court concluded, while they split the Gulf Coast,

"they joined together a different community of interest" in the Black Belt, which 2021 Plan had split. *Id.* at 21. Crucially, there would "be a split community of interest in both" the State's 2021 Plan and Plaintiffs' alternatives. *Id.*

733.   Four Justices rejected Alabama's argument that race predominated in the *Caster* Plaintiffs' expert's illustrative plans, without addressing the *Milligan* expert's illustrative plans. *Id.* at 31-33 (op. of Roberts, C.J.); *see id.* at 63 (Thomas, J., dissenting). The opinion reasoned that the *Caster* plans were race-conscious but not race-predominant. *Id.* at 31-32 (op. of Roberts, C.J.).

734.   The Court understood those illustrative plans as treating the Black Belt as "a '*historical* feature' of the State," to be "defined by its 'historical boundaries,'" "not a demographic one.'" *Id.* at 32 n.5. *Allen* noted that this Court "treated the Black Belt as a community of interest for the same reason"—that is, based on historical boundaries and not demographics. *Id.*

735.   The majority did "not diminish or disregard" the concern "that §2 may impermissibly elevate race in the allocation of political power within the States," *id.* at 42, and reaffirmed that it is unconstitutional for race to predominate in a redistricting plan, even for purposes of complying with the Voting Rights Act. *Id.* at 26-28.

736.   Justice Thomas, for the four dissenters, agreed with the plurality that "plaintiffs could not prove the first precondition of their statewide vote-dilution

claim … by drawing an illustrative map in which race was predominant." *Id.* at 59. In the dissent's view, "the illustrative maps here are palpable racial gerrymanders." *Id.* The dissent noted the "manifest absence of any nonracial justification for the new District 1," while there was a "clear intent to ensure that *both* Districts 2 and 7 hit their preordained racial targets." *Id.*

737.    On June 15, 2023, one week after the Supreme Court's decision, the State Defendants informed the Court of their understanding "that the Alabama Legislature intend[ed] to enact a new congressional redistricting plan that w[ould] repeal and replace the 2021 Plan." *Milligan* DE166 (Notice of Intent) at 2.

738.    On June 27, 2023, the Governor called a special session of the Legislature to that end. *See Milligan* DE436 ¶120.

739.    The Legislature considered testimony on communities of interest and took documentary evidence. *See supra* Discussion I.A.1.i.

740.    With the legislative record before it, the Legislature passed, and the Governor signed into law, new redistricting legislation that repealed the 2021 Plan and replaced it with the 2023 Plan. The 2023 Plan departed from existing district lines to place the Black Belt counties into only two districts, the fewest number of districts possible without violating population equality requirements, and made Montgomery County whole in one district. No Black Belt county is split between districts.

741.   To accomplish these goals, the Legislature deemphasized the traditional principle of core retention.

742.   By departing from existing district lines, the 2023 Plan achieved all that while making CD2 more competitive and also keeping communities of interest in Alabama's Gulf Coast and Wiregrass regions together to the fullest extent possible, minimizing county splits statewide, and making districts across the map more compact.

743.   In short, the Legislature fixed the "inconsistent treatment" that marred the old plan. *Milligan* Appellees' Br.39, *Allen v. Milligan* (quoting *De Grandy*, 512 U.S. at 1015).

744.   While Plaintiffs call this "defiance," we are sympathetic to the Legislature's plight of trying to make sense of a "notoriously unclear and confusing" area of the law, *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring), while trying to thread the needle between the "competing hazards of liability" created by the race-blind Constitution and §2, *Abbott*, 585 U.S. at 587.

745.   Specifically, we see a good faith effort to enact a redistricting plan in light of *Allen*'s discussion of *Gingles* 1 while simultaneously protecting the rights of all Alabamians not to be segregated on the basis of race.

746.   Indeed, the Legislature could have been aware that when the *Milligan* Plaintiffs sought to enjoin Alabama's 2021 Plan as a racial gerrymander, they

described three features a "race-neutral plan" would likely exhibit: (1) District 7's BVAP would need to decrease to "around 50%"; (2) District 2's BVAP would need to increase to "almost 40%"; and (3) Montgomery County would need to be kept whole. *Milligan* DE69 at 36. Plaintiffs said such a map would ensure "that Black voters are no longer artificially denied electoral influence in a second district." *Id.* It should come as no surprise to the Plaintiffs, then, that a map enacted by the 2023 Legislature on a race-neutral basis produced a plan with the same features the Plaintiffs had projected and demanded.

747.   Insistent on their narrative, Plaintiffs point to a few cases they contend depict an analogous level of "defiance." *See* Tr. 2568 (counsel for *Milligan* Plaintiffs saying these are "the closest you are going to get").

748.   In *Kirksey v. Board of Supervisors of Hinds County, Mississippi*, 554 F.2d 139 (5th Cir. 1977), the former Fifth Circuit reversed a district court's decision to adopt a redistricting plan proposed by the county Board of Supervisors as unconstitutional on the ground that it "perpetuates an existing denial of access by the racial minority to the political process." *Id.* at 142.

749.   The court stated, unequivocally: "Where a plan, though itself racially neutral, carries forward intentional and purposeful discriminatory denial of access that is already in effect, it is not constitutional. Its benign nature cannot insulate the

redistricting government entity from the existent taint." *Kirksey v. Bd. of Sup'rs of Hinds Cnty., Miss.*, 554 F.2d 139, 147-48 (5th Cir. 1977).

750.   This erroneous concept of discriminatory intent was rejected virtually verbatim by *Abbott v. Perez*, 585 U.S. at 605 (The Legislature had no "duty to expiate its predecessor's bad intent" or "remove any such taint.").

751.   Next Plaintiffs point to *McMillan v. Escambia County, Florida*, 559 F. Supp. 720 (1983), *North Carolina v. Covington*, 585 U.S. 969 (2018), and *Jacksonville NAACP v. City of Jacksonville*, 2022 WL 17751416 (M.D. Fla. Dec. 19, 2022).

752.   These three cases are inapposite because they arose in the remedial posture following a finding of intentional discrimination (either intentional vote dilution or racial gerrymandering). In *Covington*, for example, the Supreme Court concluded that a racially gerrymandered plan that unconstitutionally "segregated" voters "on the basis of race" could not be replaced with nearly identical lines that still segregated voters. 585 U.S. at 971. To the extent these cases have any application here, it is that Alabama, unlike North Carolina, Escambia County, and Jacksonville, *departed from* its past district lines and practices to remove the 2021 Plan's discriminatory effects. *See Allen*, 599 U.S. at 21.[117]

---

[117] Also, the district court's analysis in *Jacksonville NAACP*, which failed to mention the presumption of legislative good faith even once, is called into serious question by *Alexander. See*

753.    Regardless, in none of those three cases did the court determine that the jurisdiction's failure to remedy the prior constitutional violation amounted either to defiance or invidious racial discrimination.

754.    A final point. Casebooks contain infamous examples of *actual* defiance of federal law backed by judicial decree, none perhaps more prominent than *Cooper v. Aaron*, 358 U.S. 1 (1958). There, in response to the Supreme Court's decision in *Brown v. Board of Education*, Arkansas amended its "State Constitution flatly commanding the Arkansas General Assembly to oppose 'in every Constitutional manner the Un-constitutional desegregation decisions of … the United States Supreme Court.'" *Id.* at 8-9. The General Assembly, in turn, passed a law "relieving school children from compulsory attendance at racially mixed schools." *Id.* at 9. That's defiance.

755.    Justice Marshall, writing in dissent in *Payne v. Tennessee*, cited *Cooper v. Aaron* when describing the Tennessee Supreme Court's affirmance of Pervis Payne's death sentence as "open defiance of our precedents." 501 U.S. 808, 845, 855 (1991) (Marshall, J., dissenting). Those precedents—*Booth v. Maryland* and *South Carolina v. Gathers*—had held "that the Eighth Amendment bars the admission of victim impact evidence during the penalty phase of a capital trial." *Payne*, 501 U.S.

---

*Jacksonville NAACP v. City of Jacksonville*, 2023 WL 119425, at *4 (11th Cir. 2023) (Newsom, J., dissenting) ("Nor does the district court's order so much as suggest that it presumed city officials' good faith … in adopting the remedial plan.").

at 811. And the Tennessee Supreme Court did indeed describe "the unfairness of the rule pronounced by" *Booth* and *Gathers* as "an affront to the civilized members of the human race." *Id.* at 855. The majority took the opportunity to overrule those two decisions. *Id.*

756.   Here, in contrast, there is no way the 2023 Plan—enacted "to comply with federal law, including the U.S. Constitution and the Voting Rights Act of 1965, as amended," and passed in time for judicial review before it was ever used—could conceivably be considered "open defiance," *Payne*, 501 U.S. at 845. Just the opposite. With the 2023 Plan, the Alabama Legislature remedied the "inconsistent treatment" of majority-black and majority-white communities that had caused to the 2021 Plan's discriminatory effects, while also protecting the rights of *all* Alabamians not to be segregated on the basis of race.

757.   Aside from *Cooper v. Aaron*, we imagine some hypothetical scenarios of what defiance might look like, specifically in the redistricting context. *First*, if a State conducted elections under a redistricting map enjoined as violative of federal law, that would rightly be called "defiant." Here, in contrast, the Alabama Legislature repealed the defective map and passed a new one with ample time for this Court to conduct judicial review before the 2024 elections.

758.   *Second*, a State might replace an enjoined redistricting plan with a virtually identical one. Following *Gomillion v. Lightfoot*, had the Legislature passed

a new law tweaking the shape of the City of Tuskegee from "an uncouth twenty-eight-sided figure" to a twenty-*seven*-sided figure, we might say that smacks of defiance. *See* 364 U.S. 339, 340 (1960). Again, that is not what happened here. After *Allen v. Milligan*, the Legislature departed significantly from previous district lines in order to remedy the discriminatory effects identified in the 2021 Plan.

759.   In sum, "the specific sequence events leading up to the passage of the [2023 Plan] does not lead to the obvious inference of discriminatory intent." *GBM*, 992 F.3d at 1324.

### 3.    The Legislature did not depart from the usual process of enacting legislation.

760.   The "Legislature did not depart from normal procedures to pass" the 2023 Plan, "but followed roughly the same procedures as had the Legislature" in 2021, 2011, and 2001. *ALBC*, 989 F. Supp. 2d at 1289.

761.   The only notable difference is that the 2023 Plan was passed during a special session called by the Governor one week after the Supreme Court's decision in *Allen v. Milligan*. *See Milligan* DE436 ¶120. Far from suggesting a nefarious intent, the special session allowed this Court to evaluate the 2023 Plan with time to spare before deadlines approached for the 2024 elections.

762.   Likewise, any accusations of discrimination based on brevity are unfounded. *See Abbott*, 585 U.S. at 610 ("[W]e do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an

267

inference that is strong enough to overcome the presumption of legislative good faith."). Indeed, we even noted in our 2022 Order (with no suggestion of bad faith) that "the legislature enacted the [2021] Plan in a matter of days last fall." *Singleton*, 582 F. Supp. 3d at 1034.

763.    Rather, the course by which the Legislature arrived at the 2023 Plan resembles the usual sausage-making process of political compromise.

764.    On July 17, 2023, the Legislature began a Special Session. *See Milligan* DE436 ¶120.

765.    For this Special Session, State Defendants Senator Steve Livingston and Representative Chris Pringle were the Chairs of the Permanent Legislative Committee on Reapportionment. *Id.* ¶121. The Committee had 22 members: 7 black legislators, who are all Democrats, and 15 white legislators, who are all Republicans. *Id.*

766.    Before the 2023 Special Session, the Committee held public hearings on June 27 and July 13, during which members of the public, the Legislature, and parties to these cases participated. *Id.* ¶122; *see also* MX72 (July 27, 2023, Reapportionment Comm. Hr'g Tr.); MX73 (July 13, 2023, Reapportionment Comm. Hr'g Tr.).[118]

---

[118] At the July 13 hearing, Dorman Walker, as hearing officer and counsel to the Committee, added to the record documents he had been "asked to put into the record" relating to a community

767.    During the public hearings, the Committee received and heard public comment on the "VRA Plaintiffs' Remedial Plan" from the *Milligan* and *Caster* Plaintiffs and the plans put forward by Senators Singleton and Smitherman. *Milligan* DE436 ¶124.

768.    At the public hearing on July 13, 2023, the Committee voted to re-adopt the 2021 Legislative Redistricting Guidelines. *Id.* ¶123.

769.    On the first day of the Special Session, Representative Pringle introduced a plan designated as the "Community of Interest" plan and Senator Livingston introduced the "Opportunity Plan." *Id.* ¶¶125, 128.

770.    On July 20, 2023, the House passed the "Community of Interest" Plan, and the Senate passed the "Opportunity Plan." *Id.* ¶130.

771.    The next day, a six-person bicameral Conference Committee passed Senate Bill 5—a modified version of the Opportunity Plan. *Id.* ¶131.

772.    That same day, SB5 was passed by both Chambers of the Legislature entirely along party lines and signed into law by Governor Ivey. At that point, it became the 2023 Plan. *Id.* ¶133.

---

of interest between Baldwin and Mobile Counties. CX25 at 140:10-144:25; *see also* DX227-245. Walker also submitted and read into the record a letter from *Singleton* counsel Jim Blacksher, CX25 at 144:11-147:17, and a letter from the Attorney General that he read into the record, CX25 at 147:19-153:15. Earlier in the hearing, *Milligan* counsel Deuel Ross summarized for the Committee his letter stating arguments of the *Milligan* Plaintiffs. *See* CX25 at 59:7-61:10.

773.   The 2023 Plan is accompanied by legislative findings. *See* Ala. Code §17-14-70.1. While Plaintiffs have argued that State lawyers wrote the findings, they have not shown that it is unusual for State lawyers to advise State officials regarding State laws. *See Abbott*, 585 U.S. at 608 ("The attorney general advised the Legislature to adopt the interim plans because he thought that was the 'best way to remedy the violations found by the D.C. court.'"); *see also supra* Discussion I.A.1.i.

774.   To the contrary, Senator Singleton testified that he speaks with lawyers about proposed legislation and that state lawyers frequently evaluate bills before they are introduced. Tr. 2366; *see also* Tr. 1430:5-8 (Dr. Bagley acknowledging that it is "relatively common" for a legislator to ask for help from an attorney when drafting a bill); MX72 at 20:17-21:8 (Rep. Pringle telling unidentified participant at July 27, 2023, public hearing that suggested changes to the Guidelines would be reviewed by lawyers "to make sure they're compliant with the Constitution and Section 2"); Tr. 2365 (Sen. Singleton admitting that he rarely drafts any of the bills he sponsors).

775.   Indeed, the Alabama Legislature has a Legislative Services Agency whose Legal Division "is the principal bill drafting and legal research office serving the Legislature of the State of Alabama." *See* Legislative Services Agency Legal Division, *available at* https://alison.legislature.state.al.us/lsa-legal-division (last visited March 3, 2025).

776.   Plaintiffs then draw special attention to a single, insignificant difference between the Committee's Redistricting Guidelines and the legislative findings accompanying the 2023 Plan.

777.   Paragraph II(f) of the Guidelines states: "Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution." CX42.

778.   Similarly, the legislative findings state that the "Legislature's intent in adopting the congressional plan in this act … is to comply with federal law, including the U.S. Constitution and the Voting Rights Act of 1965, as amended." Ala. Code §17-14-70.1(2).

779.   This attempt to read racism between the lines cannot overcome the presumption of good faith, especially because including the phrase would be entirely redundant with the legislature's stated intent "to comply with federal law, including the … Voting Rights Act." The absence of superfluous language gives us no pause.

780.   Another legitimate reason for the Legislature's decision could have been how the prior language was interpreted by Dr. Duchin during the preliminary injunction proceedings. As we recounted, "Dr. Duchin testified that she relied heavily on the Legislature's redistricting guidelines, and she took the creation of two

majority-Black districts … as a 'nonnegotiable principle' sought in her illustrative plan, along with equal population among districts." *Singleton*, 582 F. Supp. 3d at 962. "She further testified that 'after' population balance and minority opportunity to elect, she 'took contiguity and compactness to be highest ranked following the Alabama guidelines' based on the way that those principles are expressed in those guidelines." *Id.* In other words, she read the Guidelines as putting a race-based goal *before* race-neutral goals like contiguity and compactness based on the provision of the Guidelines that "Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the Constitution." *Id.* But reading the Guidelines in that way would run headlong into the Supreme Court's racial gerrymandering jurisprudence, which explains that "[r]ace may predominate even when a reapportionment plan respects traditional principles … if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only *after* the race-based decision had been made.'" *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189 (2017) (quoting *Miller*, 515 U.S. at 907).

781. Moreover, elevating the goal of drawing an additional majority-minority district to the status of traditional districting principle would render the *Gingles* 1 analysis meaningless. The point of *Gingles* 1 is to see if an additional

majority-minority district can be drawn consistent with traditional districting principles. "Deviation from that map shows it is *possible* that the State's map has a disparate effect on account of race." *Allen*, 599 U.S. at 26. But deviation from an illustrative map that puts race before traditional districting principles cannot offer that same proof.

782.   And if drawing additional majority-minority districts is the "non-negotiable" districting principle that comes before non-racial principles, the test will always be satisfied until maximization is obtained. After all, if one puts race before even *contiguity*, there are no limits on what sort of maps can be drawn.

783.   Thus, "we cannot rule out" an attempt to clarify the meaning of the Guidelines "as another plausible explanation for the difference between the" Guidelines and the Legislative Findings. *Alexander*, 602 U.S. at 27.

784.   In sum, we have not been presented with any procedural, much less *substantive*, departures constituting evidence of invidious discrimination. *See GBM*, 992 F.3d at 1322.

### 4.   Contemporary statements by legislators reveal no ulterior motive to harm black Alabamians.

785.   None of the "contemporary statements and actions of key legislators" relied upon by Plaintiffs "show a *racially* discriminatory intent." *League*, 66 F.4th at 931. If these "isolated statement[s]" relied on by Plaintiffs tell us anything about

the intent of those who supported the 2023 Plan, it's that they passed the plan for traditional or partisan reasons. *Id.* at 932.

786.    Dr. Bagley reports Senator Ledbetter, for example, as saying that the 2023 Plan gave the Legislature a "good shot" at convincing a fifth Supreme Court Justice that the plan did not violate §2. MX4 at 27. Whether a reference to Justice Kavanaugh's statement that "the authority to conduct race-based districting cannot extend indefinitely into the future," *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring), or something else, this statement neither states nor suggests an invidious, racial motive.

787.    Then there's Baldwin County Rep. Matt Simpson's statement at the Fairhope Yacht Club that "it would not surprise me if we have seven Republican congressmen." MX4 at 24. Similarly, Rep. Pringle is said to have described one of the *Singleton* Plaintiffs' whole county plans as "the Republican opportunity plan," noting it did not contain a single majority-black district. *Id.* Presuming good faith, these "statements by Republicans that they desired to gain seats … speak to partisan, not racial, motives." *ALBC*, 989 F. Supp. 2d at 1289.

788.    And given the partisan implications of the 2023 Plan, it is no surprise that Democratic legislators "condemned the Enacted Map …. Significantly, though, not one legislator said or did anything to suggest, much less support an inference, that *any* legislator voted for the Enacted Map *because* they shared or intended to

effectuate any racially discriminatory motive ….” *Common Cause*, 726 F. Supp. 3d at 1366.

789.   Next, Dr. Bagley maligns Sen. Livingston by suggesting a text message he sent to consultant Chris Brown contained a racist pejorative by referring to Montgomery as “Monkey Town.” MX4 at 26.

790.   Senator Singleton, a black Democrat who has known Sen. Livingston for years and interacts with him in the Senate (and even gave him a bear hug at the end of the last Special Session), did not consider there to be anything racist about Sen. Livingston’s reference to Montgomery as “Monkey Town.” Tr. 2373-74. In fact, Senator Singleton has never heard Senator Livingston make a remark to himself or anyone else that he would consider racist. Tr. 2374.

791.   On that same thread, Brown texts Livingston, “I’ve worked a map with CD2 with [41.56%] BVAP. Running the performance now. This map is workable. Not ideal for Moore. But winnable.” MX63 at 2. Sen. Livingston’s only response is “Thanks.” *Id.*

792.   All this shows is that a non-legislator—likely concerned both with partisan outcomes and this Court’s earlier statement about “voting-age majority or something quite close to it”—was trying his hand at drawing a politically feasible and compliant map. *See Milligan* DE459-3 at 89-100 (Brown deposition designations).

793.    The evidence simply fails to "disentangle race and politics," which Plaintiffs must do if they "wish[] to prove that the legislature was motivated by race as opposed to partisanship." *Alexander*, 602 U.S. at 6.

794.    And, separately, this factor does very little work for Plaintiffs, given the political reality that "[o]ne senator does not speak for all the supporters of" the 2023 Plan. *League*, 66 F.4th at 932. No single legislator's intent is "*the* legally dispositive intent of the entire body of the Alabama legislature on that law." *GBM*, 992 F.3d at 1324-25. That's because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *O'Brien*, 391 U.S. at 384.

795.    In brief, the "statements made by … Alabama legislators at issue in this case are not 'smoking gun' evidence of discriminatory intent." *GBM*, 992 F.3d at 1325.

###    5.    Any disparate impact caused by the 2023 Plan was neither foreseeable nor foreseen.

796.    Assuming the 2023 Plan has the discriminatory *effect* of diluting black voting strength, *see supra* Discussion II.B, Plaintiffs have not proven that this effect was either foreseeable or foreseen by the Legislature.

797.    First of all, based on *Milligan* Plaintiffs' earlier representations in this case, the Legislature had every reason to believe the 2023 Plan would be "race-neutral" in effect.

798.    Plaintiffs in 2022 told this Court that a map with effectively *the same* BVAP numbers for CD2 and CD7 would make the 2021 Plan "race-neutral," in which "Black voters are no longer artificially denied electoral influence in a second district." *Milligan* DE69 at 36. This "race-neutral plan," argued Plaintiffs, would decrease CD7's BVAP to "around 50%," increase CD2's BVAP to "almost 40%," and would keep Montgomery County whole. *Id.*

799.    When the Legislature enacted a race-neutral plan containing such features, we will presume it did not foresee that plan as having any racially discriminatory effect.

800.    Secondly, Dr. Hood's performance analysis of CD2 in the 2023 Plan did not reveal to the Legislature a discriminatory effect *on account of race*. All it showed, on its face, is "political defeat at the polls," *Whitcomb*, 403 U.S. at 153—"the result of political or personal affiliation of different racial groups with different candidates." *Solomon*, 221 F.3d at 1225. Without much more, election results alone do not suggest that racial discrimination is "causing minority electoral defeats," *Ala. NAACP*, 612 F. Supp. 3d at 1260, or, in other words, that those defeats are the *effects* of discrimination.

277

801.  Further, Plaintiffs have not shown that any legislator other than those on the designated conference committee saw Dr. Hood's analysis. *See Milligan* DE459-13 at 89-90 & DE459-20 at 95-96. "Because it is unclear how many legislators even had access to or considered the information, it cannot support a finding of discriminatory intent." *League*, 66 F.4th at 940.

802.  Plaintiffs have argued that statements by Democratic legislators "should have put legislators on notice that all the challenged provisions would have a disparate impact on black voters." *League*, 66 F.4th at 940. "But the concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent." *Id.*

803.  Finally, even assuming some discriminatory effect was foreseeable and, in fact, foreseen, this would show nothing more than "intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279. That is not enough.

804.  Suppose a legislature passed an employment law benefiting military veterans, knowing full well that 98% of the State's veterans were male. *Id.* at 270. To prove intentional discrimination, a plaintiff would have to show "that this preference for veterans was originally devised or subsequently re-enacted *because* it would accomplish the collateral goal of keeping women in a stereotypic and predefined place." *Id.* at 279 (emphasis added).

805.   Or suppose a Legislature maintained a capital punishment statute, knowing that statistical studies suggested the statute produced racial disparities in which defendants received the death penalty. *McCleskey v. Kemp*, 481 U.S. 279, 291 (1987). Knowledge of a likely effect would not be enough. A plaintiff seeking to show invidious discrimination "would have to prove that the … Legislature enacted or maintained the death penalty statute *because of* an anticipated racially discriminatory effect." *Id.* at 298.

806.   Here, the most Plaintiffs have shown is that the Legislature enacted the 2023 Plan "in spite of its adverse effects upon an identifiable group" (assuming those effects exist and were foreseen). *Feeney*, 442 U.S. at 279 (cleaned up). That falls far short of demonstrating racial animus.

### 6.    The Legislature did not refuse to consider alternative plans that would lessen any potentially discriminatory impact.

807.   Plaintiffs argue that the Legislature could have adopted any number of alternative districting plans that would lessen the alleged discriminatory impact of the 2023 Plan. They point to the numerous illustrative plans produced earlier in this case, the "VRA Plaintiffs' Remedial Plan," the whole county plans submitted by the *Singleton* Plaintiffs, and even to the "Community of Interest" Plan that passed the House.

808.   This argument fails for two independent reasons. First, Plaintiffs have "failed to identify viable alternatives to the [2023 Plan] that would have achieved the *same* objectives." *League*, 66 F.4th at 941 (emphasis added).

809.   "Without an alternative map, it is difficult to defeat our starting presumption that the legislature acted in good faith. This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10.

810.   Plaintiffs have not identified a *viable* alternative map presented to the Legislature—one that would have accomplished all (or even most of) the Legislature's non-racial goals, which include: (1) population equality; (2) keeping the Black Belt, Wiregrass, and Gulf Coast each within the minimal number of districts possible; (3) avoiding incumbency contests; (4) minimizing county splits; (5) prioritizing compactness; and (6) avoiding a gerrymandering suit. *Id.* at 1235. And that's without mentioning a Republican Alabama's Legislature's assumed goal of maintaining six Republicans in the congressional delegation. *Id. See also Baird*, 976 F.2d at 361 ("It cannot be surprising that the party with political control opposes a plan that would ensure the loss of at least one of [its] seats.").

811.   Second, "although the Alabama legislature did not include the alternative option[s] that Plaintiffs would have preferred, we cannot say that the

legislature failed to consider" them. *GBM*, 992 F.3d at 1327; *see also Simpson v. Hutchinson*, 636 F. Supp. 3d 951, 956 (E.D. Ark. 2022) (Because "awareness is not enough," the legislature's "rejection of the two other maps" did not show "a discriminatory purpose.") (citing *Feeney*, 442 U.S. at 279); *see also League*, 66 F.4th at 940 (noting that the "legislative branch is not hamstrung by judicial review to adopt any amendment that a bill's opponents claim would improve it").

812.    The unalarming fact that Democratic legislators were not brought into the "map drawing room," so to speak, suggests only that party politics were at play. Senator Singleton, a Plaintiff and a black Democratic Senator, confirmed as much when answering, "We do it all the time," to the question whether it is common for the Democratic and Republican caucuses to discuss legislation without members of the other party present. Tr. 2373.

813.    Indeed, "a party in power typically develops its plan by itself and that process is not, standing alone, evidence of an intent to discriminate on the basis of race" *ALBC*, 989 F. Supp. 2d at 1273.

814.    In sum, the refusal to include *nonviable* "alternative options that Plaintiffs would have preferred is not evidence of discriminatory intent." *League*, 66 F.4th at 940.

**F.    Obvious alternatives other than invidious racial discrimination explain the enactment of the 2023 Plan.**

815.    Intentional discrimination should not be presumed when there is an "obvious alternative explanation" for the law. *Iqbal*, 556 U.S. at 682. Here, there are at least two obvious and broad reasons for the 2023 Plan other than racial animus: (1) avoiding a racial gerrymandering suit; and (2) achieving partisan goals.

816.    We must "draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10. Applied here, "the presumption of legislative good faith" requires us to give "dispositive" weight to any "possibility" that a racially discriminatory effect "was simply a side effect of the legislature's" non-racial goals, rather than a goal itself. *Id.* at 1241; *see also id.* at 1269 (Kagan, J., dissenting).

817.    As an initial matter, Plaintiffs must prove that "racial discrimination was a substantial or motivating factor" for the enactment of the 2023 Plan, *Hunter*, 471 U.S. at 225; so unless they "disentangle race" from each of the obvious non-racial explanations for the 2023 Plan, their claim fails, *Alexander*, 602 U.S. at 6.

818.    The easiest way to accomplish this feat is to produce an "alternative map," which "can perform the critical task of distinguishing between racial and political motivations," as well as other "districting goals." *Id.* at 18, 34. And "[w]ithout an alternative map, it is difficult for plaintiffs to defeat our starting presumption that the legislature acted in good faith." *Id.* at 10.

819.   We recognize that *Alexander*'s emphasis on an "alternative map" arose in the racial gerrymandering context. Still, we believe it applies logically and necessarily to claims of intentional vote dilution as well. There is no principled reason why it should apply to one Fourteenth Amendment claim of intentional racial discrimination in voting but not the other, even if the Supreme Court has referred to those two as "analytically distinct." *Alexander*, 602 U.S. at 38.

820.   Indeed, the *heightened* showing demanded of a plaintiff bringing an intentional vote dilution claim suggests a *heightened* need for an alternative map. *See also id.* ("A plaintiff pressing a vote-dilution claim cannot prevail *simply* by showing that race played *a* predominant role in the districting process. Rather, such a plaintiff must show that the State enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.") (emphasis added).

821.   Plaintiffs have not attempted to produce or even describe an alternative map that would accomplish the Legislature's non-racial goals "with greater racial balance." *Id.* at 1235.

**Avoiding a Racial Gerrymandering Suit**

822.   Plaintiffs' own expert evidence from earlier in this case and the accusations their lawyers and related parties have leveled against other States' redistricting efforts underscore the most likely explanation for the Legislature's

actions: the desire to avoid a racial gerrymandering suit. *See Fusilier*, 963 F.3d at 464-65 ("The choice to evade claims of racial gerrymandering … does not reveal discriminatory intent."); *see also id.* at 464 ("[A]pplying the presumption of good faith, it seems perfectly reasonable for legislators to be concerned about traditional districting principles and the prejudicial effects of racial gerrymandering.").

823.   Plaintiffs in 2022 told this Court that a map with effectively *the same* BVAP numbers for CD2 and CD7 would make the 2021 Plan "race-neutral," in which "Black voters are no longer artificially denied electoral influence in a second district." *Milligan* DE69 at 36.

824.   This "race-neutral plan" would decrease CD7's BVAP to "around 50%," increase CD2's BVAP to "almost 40%," and would keep Montgomery County whole. *Id.*

825.   The Legislature could have been aware that Plaintiffs' expert, Dr. Imai, ran 10,000 "race-blind simulated plans" and conducted an "outlier analysis of Districts 2 and 7." *Milligan* DE68-4 ¶¶25, 27. He concluded that based solely on CD7's high BVAP, "race was the predominant factor in drawing the district." *Id.* ¶28. He also found that if he lowered CD7's BVAP to 50-51%, the average BVAP for CD2 in a race-blind simulation was 34.5% and the *maximum* was 39.7%. *Id.* ¶41.

826.   Now Plaintiffs accuse the Legislature of intentionally discriminating against black Alabamians by failing to increase CD2's BVAP far beyond the

maximum percentage they once claimed a race-neutral map could possibly contain. The much more likely, indeed the obvious, explanation for the Legislature's choice is the fear that it would violate our color-blind Constitution to do so, or at least that it would invite a racial gerrymandering attack.

827.    That fear is well-founded. The 2021 Plan, which contained one majority-black district, drew *two* racial gerrymandering claims, one from *Singleton* Plaintiffs and one from *Milligan* Plaintiffs. *See Singleton*, 690 F. Supp. 3d at 1236.

828.    The 2023 Plan, drawn to keep Montgomery and the Black Belt whole, and containing one district near 50% BVAP and another near 40% BVAP, still drew a racial gerrymandering claim. *Singleton* DE288 at 10.

829.    And just last year, Louisiana's new congressional map was enjoined as a racial gerrymander after the State (following §2 litigation) added a second majority-black district. *See Callais v. Landry*, 732 F. Supp. 3d 574 (W.D. La. 2024). The case is now pending before the Supreme Court.[119]

830.    Given *Milligan* Plaintiffs' description of what a "race-neutral plan" would look like, their argument cannot be that a map like the 2023 Plan is inherently discriminatory. No, at its core, Plaintiffs' position is that disagreement with them over an area of the law that "is notoriously unclear and confusing," *Merrill*,

---

[119] *See Louisiana v. Callais*, No. 24-109 (U.S. filed June 18, 2024; probable jurisdiction noted Nov. 4, 2024).

142 S. Ct. at 881 (Kavanaugh, J., concurring), and has "engendered considerable disagreement and uncertainty," *id.* at 883 (Roberts, C.J., dissenting), is so beyond that pale that only racial discrimination can explain it. That poisonous presumption of bad faith must not be permitted to seep deeper into our politics and courts, lest it carry us even "further from the goal of a political system in which race no longer matters." *Shaw v. Reno*, 509 U.S. 630, 657 (1993).

831.    It is beyond dispute that "[r]edistricting is never easy," *Abbott*, 585 U.S. at 585, especially when Plaintiffs move the goalposts. Plaintiffs contended the 2021 Plan violated §2 because it kept together majority-white communities in the Gulf Coast and Mobile while "cracking" "majority-Black communities of interest" in the Black Belt and Montgomery. *See Milligan* Appellees' Br.5, 16, 39, *Allen v. Milligan*.

832.    Remedying violations in "disparate-impact cases should concentrate on the elimination of the offending practice." *Texas Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 544. The 2023 Plan did just that by uniting Black Belt counties into two compact districts and keeping Montgomery whole—*i.e.*, giving the Black Belt as much weight as other communities of interest focused on in the 2021 Plan.

833.    And at least eight Justices in *Allen* agreed that race cannot predominate in an illustrative map,[120] while only four expressly held that race did not predominate

---

[120] *See Allen*, 599 U.S. at 33 (plurality) ("The line that we have long drawn is between consciousness and predominance."); *id.* at 59 (Thomas, J., dissenting) (A plaintiff cannot satisfy *Gingles* 1 "by drawing an illustrative map in which race was predominant.").

in some of Mr. Cooper's maps.[121] Plus, concurring and dissenting Justices questioned the constitutionality of continued race-based districting under §2.[122]

834.   The Legislature's good faith belief that drawing a second majority-black district would unconstitutionally segregate voters based on race, and that "the authority to conduct race-based districting cannot extend indefinitely into the future," *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring), are obvious justifications for the 2023 Plan other than invidious discrimination.

835.   Moreover, community-of-interest arguments used by other NAACP state chapters against other States underscore both the legitimate rationales explaining the 2023 Plan and the no-win situation States face when navigating "competing hazards of liability" in redistricting. *Abbott*, 585 U.S. at 587.

836.   The Alabama NAACP (and other *Milligan* Plaintiffs) denigrate the Gulf Coast community, but had the Legislature split that coastal community comprising Mobile and Baldwin Counties to increase the BVAP in District 2, the Legislature would have done precisely what Plaintiffs' lawyers argue in separate litigation violates the Constitution.

837.   In *Alexander*, for instance, the South Carolina NAACP argued in the United States Supreme Court that South Carolina's legislature racially

---

[121] *See id.* at 32-33 (plurality).
[122] *See id.* at 45 (Kavanaugh, J., concurring) (citing *id.* at 88 (Thomas, J., dissenting)).

gerrymandered its congressional map in part by "exiling many more residents—particularly in heavily Black North Charleston—from their ***economically integrated coastal community*** …. As a result, thousands more Black Charlestonians were reassigned to CD6, a district anchored more than 100 miles away in Columbia." Brief for Respondents at 16-17, *Alexander v. S.C. State Conf. of the NAACP* (No. 22-807) (emphasis added). That sounds a lot like breaking up the economically integrated coastal community in Mobile and Baldwin Counties to connect the City of Mobile with Montgomery.

838.    Similarly, the North Carolina NAACP is presently arguing that the split of the North Carolina's "coastal community" is evidence of intentional discrimination. *See* Complaint ¶140, *North Carolina State Conf. of NAACP v. Berger*, 1:23-cv-01104 (M.D.N.C. Dec. 19, 2023), ("In both Senate Districts 1 and 2, Black Belt counties are paired with coastal communities hundreds of miles away …. These coastal communities have different needs and interests from the Black Belt."); *see also id.* ¶191 ("The move itself also created unprecedented consequences, breaking up the coastal congressional district that, for the past three decades, had united Camden and Currituck with other coastal counties to elect a candidate to Congress."). So, again, in North Carolina (like in South Carolina), plaintiffs contend that dividing a coastal community between districts is viewed as evidence of an Equal Protection violation.

839.   The Alabama Legislature's decision not to split the "economically integrated coastal community" of the Gulf Coast further suggests the reason for the 2023 Plan was not intentional discrimination, but rather (1) the desire to keep that community together and (2) the desire to avoid a constitutional challenge, among other legitimate, non-racial reasons.

840.   And we recall again that in *Nairne v. Ardoin*, the Louisiana NAACP put on expert evidence of a distinct community of interest among the Red River Parishes "*influenced by French colonialism.*" 715 F. Supp. 3d 808, 844 (M.D. La. 2024) (emphasis added). In Louisiana, the State's failure to keep this community together contributed to a §2 violation, but in Alabama, the State's efforts to respect this community is apparently "direct evidence" of racial discrimination.

841.   There's an obvious "damned if you do, damned if you don't" nature to this endeavor. The Legislature's good faith efforts to navigate the precarious waters of vote dilution jurisprudence while avoiding racial gerrymandering claims is an obvious alternative to purposeful and invidious discrimination.

**Achieving Partisan Goals**

842.   Plaintiffs also fail to disentangle race from the obvious alternative explanation of "securing partisan advantage." *Rucho v. Common Cause*, 588 U.S. 684, 711 (2019); *see also Simpson v. Hutchinson*, 636 F. Supp. 3d 951, 957 (E.D.

Ark. 2022) (three-judge court) (noting the "possibility" of "a purely partisan motive" and rejecting an intentional vote dilution claim).

843.    Initially, Plaintiffs contend that a Legislature's legitimate partisan goals have "no bearing" on evaluating an intentional discrimination claim. Tr. 2571:23. For this remarkable statement, they cite *LULAC v. Perry*, 548 U.S. 399 (2006). *See* Tr. 2679. The Supreme Court noted there that the Texas Legislature watched from 1996 to 2002 as Republican incumbent Henry Bonilla's support among Latinos "dropped with each successive election." *Id.* at 423. "In response to the growing participation that threatened Bonilla's incumbency, the State divided the cohesive community in Webb County," in essence, "purposely redrawing lines around those who opposed Bonilla." *Id.* at 439, 441. The Court concluded that "the State took away the Latinos' opportunity *because* Latinos were about to exercise it," which, the Court noted in dictum, "bears the mark of intentional discrimination." *Id.* at 440 (emphasis added).

844.    *LULAC*'s reference to discrimination is nothing more than an application of the well-established rule that a legislature cannot use "race as a proxy for political interests," *Alexander*, 602 U.S. at 7 n.1. It in no way suggests that a legislature's legitimate partisan purposes are irrelevant to accusations of an invidious racial purpose.

845.   And on the facts, the 2023 Plan is the opposite of Texas' challenged plan in *LULAC*. Instead of drawing lines around minority communities, the 2023 Plan *unites* them. Specifically, it makes Montgomery County whole and adds Black Belt counties from CD3 into CD2, increasing the BVAP of CD2 by nearly 33% (from about 30% to about 40%).

846.   When other litigants have successfully shown that racial stereotyping was at work, they brought far more proof to the table than Plaintiffs have presented here. For example, in *Bush v. Vera*, the plurality agreed that race was being used as a proxy based on a plethora of damning evidence, including: (1) "the State's own VRA § 5 submission" detailing its "attempt to maximize the voting strength for this black community" by drawing "a safe black district" with a "threshold 50% total black population"; and (2) the fact that "the districting software used by the State provided only racial data at the block-by-block level," which was where the splits occurred. 517 U.S. at 969-70. No such evidence is presented here to disentangle race from politics.

847.   Plaintiffs then accuse members of the Legislature of "protect[ing] white … congressional incumbents." Tr. 2564:19-21. Unwittingly, Plaintiffs home in on another obvious alternative explanation other than race—protecting *all* congressional incumbents, white and black alike. Indeed, in their case before the Supreme Court right now, the Louisiana NAACP argues that the Louisiana

"Legislature's expressed incumbent-protection motivation" explains the elongated shape of the congressional district that the Western District of Louisiana deemed to be a racial gerrymander. Op. Br. for *Robinson* Respondents, *Louisiana v. Callais*, No. 24-109, at 35 (U.S. filed Dec. 19, 2024).

848.   Avoiding "contests between incumbents" is "a legitimate state goal." *Bush v. Vera*, 517 U.S. 952, 964 (1996) (collecting cases); *see also Cromartie*, 532 U.S. at 246-47 ("incumbents might have urged legislatures … to make their seats … as safe as possible"); *id.* at 248 ("the proposed alternative plan would have pitted two incumbents against each other"); *id.* ("But the legislature, for political, not racial, reasons … drew its plan to protect incumbents—a legitimate political goal."). Plaintiffs have not shown that the Legislature was substantially motivated to protect all incumbents out of an invidious, secret intent to harm black voters.

849.   Plaintiffs also make much of the racial composition of the Alabama Legislature's Republican and Democratic caucuses, such that whenever a law is passed along party lines, racial discrimination should be inferred. But "partisan motives are not the same as racial motives," *Brnovich*, 594 U.S. at 689, and a "connection between race and partisan voting patterns is not enough to transform evidence of partisan purpose into evidence of racially discriminatory intent," *League*, 66 F.4th at 931.

850.  Plaintiff Senator Singleton even acknowledged that he would probably object to a map that split Mobile County by sequestering black voters in order to create a *Republican*-leaning district. Tr. 2371:23-2372:13. For the majority-Republican Legislature to object to the racial segregation of Mobile County residents for the purpose of creating a Democratic-leaning district likewise communicates a partisan objective, not racially discriminatory one.

851.  Finally, finding legitimate ways to avoid the adoption of a map that would likely swing an additional congressional district to Democrats is a reasonable (and obvious) non-racial goal for Republican legislators to pursue.

852.  The performance analysis for CD2 conducted by Dr. Hood only reinforces this conclusion. All of the black-preferred candidates in the seven statewide contests in 2018 and 2020 Dr. Hood examined were Democrats. MX30; *see also Milligan* DE459-13 at 90:3-10. "[B]ecause of the tight correlation between race and partisan preferences, this fact does little to show that race, not politics, drove the legislature's choice." *Alexander*, 602 U.S. at 22. These accusations are "strong evidence that the district's" performance for "Black-preferred candidates" "was simply a side effect of the legislature's partisan goal" of sending more Republicans to Congress. *Id.* at 20.

853.  And the statements by various legislators Plaintiffs decry as communicating a discriminatory intent on their face show the, at least, that these

legislators were concerned with political, not racial power. *See, e.g.*, MX4 at 24 ("seven Republican congressmen" and "the Republican opportunity plan"); *id.* at 27 (the 2023 Plan giving the Legislature a "good shot" at convincing a fifth Supreme Court Justice that the plan did not violate §2); *see also Milligan* DE459-13 at 94-96 & DE459-20 at 21-23 (Sen. Livingston and Rep. Pringle testifying that U.S. House Speaker Kevin McCarthy spoke with each of them and expressed his "interest[] in keeping [his] majority" in the House).

854. "[C]ertainly nothing rules out" these constitutionally permissible "possibilit[ies]," which is "dispositive." *Alexander*, 602 U.S. at 20. It would be clear error for us to "credit[] the less charitable conclusion that the legislature's real aim was racial." *Id.* at 22.

855. Plaintiffs suggest that if a majority-white Republican Legislature enacts a plan that advances Republican interests and rejects plans preferred by Democrats, then the Legislature must have done so *because* many Democrats are black. Ratifying that view would create "incentives for those who support or oppose certain policies to cast the debate in terms of racial advantage or disadvantage." *Schuette v. BAMN*, 572 U.S. 291, 309 (2014) (plurality). And that tactic, if allowed to persist, threatens to "transform federal courts into weapons of political warfare," *Alexander*, 602 U.S. at 11, waged with baseless accusations of racism. The presumption of

legislative good faith protects our politics and our courts from such maneuvers by requiring far more to prove intentional discrimination.

### G. Even if Plaintiffs had established intentional discrimination, the Legislature would have enacted the 2023 Plan.

856.   Assuming Plaintiffs have made a prima facie showing of intentional discrimination, "the burden shifts" to Alabama "to demonstrate that the [2023 Plan] would have been enacted" even had the Legislature not been motivated by racial animus. *GBM*, 992 F.3d at 1321 (quoting *Hunter*, 471 U.S. at 228).

857.   Put differently, "the defendant's ultimate liability requires a 'but-for' causal relationship between the unconstitutional motive and the challenged map." *Tenn. NAACP*, 746 F. Supp. 3d at 502.

858.   For each of the obvious alternative reasons for the enactment of the 2023 Plan discussed *supra* Discussion II.F, the State Defendants have shown the Legislature would have enacted the 2023 Plan absent any intent to discriminate against black Alabamians.

859.   For example, assuming one reason for the 2023 Plan was to achieve the "collateral goal" of minimizing the voting potential of black Alabamians, *Feeney*, 442 U.S. at 279, the record shows that the Legislature still would have enacted the 2023 Plan absent such discrimination so that Alabama's congressional delegation would retain its six to one Republican to Democratic composition. MX4 at 24, 27; *Milligan* DE459-13 at 94-96 & DE459-20 at 21-23.

860. Likewise, even if Plaintiffs had shown that the Legislature was substantially motivated by racial animus, the record shows that the Legislature still would have passed the 2023 Plan as an attempt to avoid a racial gerrymandering suit. *Milligan* DE69 at 36.

861. Thus, because any alleged purposeful discrimination was not a "but-for" cause" of the 2023 Plan, Plaintiffs intentional discrimination claim must fail.

## H.    The Court will not activate the §3(c) pocket trigger.

862. Preclearance is "a drastic departure from basic principles of federalism," *Shelby Cnty.*, 570 U.S. at 535, because "it destroys local control of the means of self-government, one of the central values of our polity," *City of Rome v. United States*, 446 U.S. 156, 201 (Powell, J., dissenting).

863. As a deep intrusion on State sovereignty, preclearance could be constitutionally permissible only to the extent jurisdictions engage in "pervasive," "flagrant," "widespread," and "rampant" discrimination. *Shelby Cnty.*, 570 U.S. at 540. Nothing less than those "exceptional conditions," *id.* at 535, could theoretically justify the "implicit command that [a State] engage[s] in presumptively unconstitutional race-based districting." *Miller*, 515 U.S. at 927.

864. For a court to subject a State to preclearance using §3(c)'s "bail-in" provision (also called the "pocket trigger"), a plaintiff must prove, at the bare

minimum, multiple "*violations* of the Fourteenth or Fifteenth Amendment." 52 U.S.C. §10302(c) (emphasis added).

865.  As explained *supra* Discussion II.A-G, Plaintiffs have not proven even *one*. Section 3(c), therefore, cannot apply.

866.  For several additional reasons, we decline to entertain the extraordinary remedy of §3(c) preclearance.

867.  First, §3(c) preclearance is "rarely used" and is "not necessary here" in light of the injunctive relief *Milligan* Plaintiffs seek. *N.C. NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016).

868.  Between 1965 and 2017, federal courts ordered §3(c) preclearance in just 20 jurisdictions, and 18 of those cases involved consent decrees. Edward K. Olds, *More Than "Rarely Used": A Post*-Shelby *Judicial Standard For Section 3 Preclearance*, 117 Colum. L. Rev. 1, 12 (2017). Thus, *before* there has ever been a finding of intentional discrimination, "most jurisdictions have consented to coverage" under §3(c) when threatened with expensive §2 litigation. Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance*, 119 Yale L.J. 1992, 2033-34 (2010). Many of these consent decrees thus may reflect the fact that jurisdictions, "particularly local ones, are financially strapped and may view a preclearance settlement to be in their best interest." Travis

Crum, *An Effects-Test Pocket Trigger?*, Election Law Blog, July 8, 2013, https://electionlawblog.org/?p=52659 (last accessed March 16, 2025).

869.   We see no "pervasive," "flagrant," "widespread," and "rampant" discrimination in this record suggesting that this case justifies deploying this extraordinary and rarely used power. *Shelby Cnty.*, 570 U.S. at 540.

870.   Our refusal to invoke §3(c) preclearance is bolstered by the Supreme Court's repeated recognition that States face a near impossible task when walking the tightrope between using race too much (and risking a violation of the Equal Protection Clause) and using race not enough (and risking a violation of §2). *See Abbott*, 585 U.S. at 587 (citing *Bush*, 517 U.S. at 977); *see also Louisiana v. Callais*, No. 24-109 (U.S. filed June 18, 2024; probable jurisdiction noted Nov. 4, 2024).

871.   And the remedy of preclearance would be especially inappropriate in light of the injunctive relief against the enforcement of the 2023 Plan *Milligan* Plaintiffs' request. *See McCrory*, 831 F.3d at 241 (reversing preclearance order as "not necessary … in light of our injunction").

872.   Finally, we doubt whether §3(c) preclearance is consistent with Article III judicial power. U.S. Const. art. III, §2 (limiting that power to resolving "Cases" or "Controversies"). *See Trump v. Hawaii*, 585 U.S. 667, 716 (2018) (Thomas, J., concurring) ("whether the authority comes from a statute or the

Constitution, district courts' authority to provide equitable relief … must comply with longstanding principles of equity that predate this country's founding").

873.   It is doubtful whether that limited power to craft equitable remedies when deciding cases or controversies permits us to require future Legislatures to submit future, proposed legislation for pre-approval. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (Gorsuch, J., concurring) ("Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit."); *cf. Shelby County*, 470 U.S. at 542 ("The Federal Government does not … have a general right to review and veto state enactments before they go into effect.").[123]

874.   For the sake of avoiding that constitutional concern that this case does not require us to resolve, we reject *Milligan* Plaintiffs' request that we invoke §3(c)'s pocket trigger. *See United States v. Hansen*, 599 U.S. 762, 781 (2023).

## III.   The Legislature Did Not Racially Gerrymander the 2023 Plan.

875.   The *Singleton* Plaintiffs alone claim that the 2023 Plan is a racial gerrymander. *Singleton* DE288 at 10-11.

---

[123] The preclearance mechanism under §5 is distinct from that under §3(c). The former is a matter of Congress's authority to enforce the Fourteenth and Fifteenth Amendments, *see Katzenbach*, 383 U.S. 303; the latter is a matter of judicial remedy. The former, limited in duration and geographic coverage, may have been permitted as proportional and congruent to protect constitutional rights, *see City of Boerne*, 521 U.S. at 533; the latter likely exceeds the federal judiciary's remedial authority.

876. Specifically, they argue that the Legislature "intentionally perpetuate[d] the unconstitutional racial gerrymandering of Jefferson County." *Id.* at 11. The supposed Jefferson County gerrymander originated, Plaintiffs declare, in "the 1992 map that resulted from the *Wesch* consent judgment … because it split seven counties expressly for the purpose of drawing one majority-Black district." *Id.* at 10.

877. As an initial matter, the *Wesch* court imposed a map; there was no consent judgment. The Legislature did not have a plan enacted and precleared in time to use. *Wesch v. Hunt*, 785 F. Supp. 1491, 1495, 1497, 1500 (S.D. Ala. 1992) (three-judge court). The *Wesch* court concluded it had to order a plan, and later explained that preclearance was not needed because the plan was court-decreed. *Id.* at 1497, 1499-1500. The court's plan is unlike the one the Legislature had adopted. *Id.* at 1495 (six plans submitted to the court that differ from the Legislature's), 1499 (adopting one of those plans, with modifications), 1500 (saying the plan it picked was submitted by a plaintiff—not the State). And, the court even explained that, if it had picked the State's plan, that would have required preclearance, for which there was no time. *Id.* at 1501.

878. *Singleton* Plaintiffs' reference to consent is presumably to the fact that the parties agreed that a district that was 65% black could, and should, be drawn. *See Wesch*, 785 F. Supp. at 1498.

879.   In any event, Plaintiffs' theory is foreclosed by Supreme Court precedent, including the recent decision in *Alexander v. South Carolina NAACP*, 602 U.S. 1 (2024).

880.   Like all Equal Protection claims of racial segregation and "[r]ace-based assignments," to prevail on a racial gerrymandering claim, a plaintiff must show that the State treated voters differently "because of" their race, "not merely in spite of" it. *Miller*, 515 U.S. at 912, 916 (quotation marks omitted).

881.   While the shape and demographics of districts might be evidence of a racial gerrymander, no particular shape or demographic profile alone necessarily violates the Constitution because "the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority. It simply imposes an obligation not to create such districts for predominantly racial, as opposed to political or traditional, districting motivations." *Easley v. Cromartie*, 532 U.S. 234, 249 (2001).

882.   Thus, a racial gerrymandering claim requires proof that the Legislature discriminated against voters by classifying them *because* of race. *See Abbott*, 585 U.S. at 585-86 (The "Equal Protection Clause forbids racial gerrymandering, that is, *intentionally* assigning citizens to a district on the basis of race without sufficient justification.") (emphasis added).

883.   Accordingly, when challenging "a facially neutral law" like Alabama's 2023 Plan, Plaintiffs must prove that race was "the *predominant* factor motivating the legislature's districting decision"—in other words, that the law "is unexplainable on grounds other than race." *Cromartie*, 532 U.S. at 241-42.

884.   This standard is "a demanding one." *Id.* at 241. But Plaintiffs think the bar is actually quite low. In their view, claiming that District 7 has the shape and demographics it does is sufficient. It is not.

885.   First, Plaintiffs have not shown that the "statistical disparities" are so stark that they are "'tantamount for all practical purposes to a mathematical demonstration' that the State acted with a discriminatory purpose." *McCleskey*, 481 U.S. at 294 n.12 (quoting *Gomillion*, 364 U.S. at 341).

886.   "Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative" of intentional race-based action, and Plaintiffs have not attempted to demonstrate that dividing Jefferson County where the Legislature chose to is "unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266.

887.   Second, Plaintiffs have not proffered "an alternative map that would have allowed the State to achieve its districting goals" "with greater racial balance." *Alexander*, 602 U.S. at 10, 18.

888.   In *Alexander*, the Supreme Court held that the presumption of legislative good faith, discussed *supra* Discussion II.A, "directs district courts to

draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Id.* (citing *Abbott*, 585 U.S. at 610-12).

889.    Thus, the presumption requires that courts give "dispositive" weight to any "possibility" that a racial outcome "was simply a side effect of the legislature's" non-racial goals, rather than the goal itself. *Id.* at 20; *see also id.* at 69 (Kagan, J., dissenting).

890.    Moreover, courts should not "infer[] bad faith based on the racial effects of a political gerrymander in a jurisdiction," like Alabama, "in which race and partisan preference are very closely correlated." *Id.* at 20-21. *See Bush v. Vera*, 517 U.S. at 968 ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify."). Otherwise, "future litigants and lower courts" could easily "sidestep [the Court's] holding in *Rucho*[124] that partisan-gerrymandering claims are not justiciable in federal court." *Id.* at 21.

891.    In light of these principles, the *Alexander* Court held that the district court "critically erred by failing to draw an adverse inference against the Challengers for not providing a substitute map that shows how the State could have achieved its

---

[124] *Rucho v. Common Cause*, 588 U.S. 684 (2019).

legitimate political objectives … while producing significantly greater racial balance." *Id.* at 34 (quotation marks omitted).

892.   This "adverse inference may be dispositive in many, if not most, cases where the plaintiff lacks direct evidence or some extraordinarily powerful circumstantial evidence such as the 'strangely irregular twenty-eight-sided' district lines in *Gomillion v. Lightfoot*, 364 U. S. 339, 341 (1960), which betrayed the State's aim of segregating voters on the basis of race with 'mathematical' precision, *ibid*." *Id*. at 35.

893.   "Without an alternative map, it is difficult for plaintiffs" alleging race-based districting to "rul[e] out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Id.* at 9-10; *see also id.* at 20 ("And the Challengers cannot point to even one map in the record that would have satisfied the legislature's political aim and had a BVAP above 17%."); *id.* at 25 (Dr. Imai failed to "generat[e] maps" "matching or exceeding the Benchmark Plan's Republican tilt."); *id.* at 34-35 ("When all plaintiffs can muster is meager direct evidence of a racial gerrymander only an alternative map of that kind can carry the day." (quoting *Cooper*, 581 U.S. at 322).

894.   Thus, the South Carolina NAACP plaintiffs' failure to "contro[l] for politics" when generating "tens of thousands of other maps" constituted "a fatal omission." *Id.* at 24, 35, 36.

895.   Just as a district court "must rule out the possibility that politics drove the districting process" "in a case such as this," *id.* at 24, a court must also "rule out core retention as another plausible explanation for the difference between the Enacted Plan" and an alternative plan, *id.* at 27, 33. The same goes for other "key mapmaking factors" like "contiguity and compactness." *Id.* at 27, 31-32.

896.   The absence from the record of such "highly probative evidence" "should be interpreted by district courts as an implicit concession that the plaintiff cannot draw a map that undermines the legislature's defense that the districting lines were 'based on a permissible, rather than a prohibited, ground.'" *Id.* at 35 (quoting *Cooper*, 581 U.S. at 317).

897.   The district court's failure to follow "this basic logic" was clearly erroneous. *Id.*

898.   *Alexander* confirms that the constitutional claims of *Singleton* Plaintiffs must fail because they have not overcome the "presumption that the" Alabama Legislature "acted in good faith" when it enacted the 2023 Plan for Alabama's congressional districts. *Id.* at 6.

899.   Like the *Milligan* Plaintiffs, *Singleton* Plaintiffs come forward with no "[d]irect evidence" such as "a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Id.* at 8.

900.   They must rely on circumstantial evidence. But their "evidence … could plausibly support multiple conclusions" besides racial discrimination. *Id.* at 10. "None of the facts on which" Plaintiffs rely "to infer a racial motive is sufficient to support an inference that can overcome the presumption of legislative good faith." *Id.* at 19-20.

901.   They claim that the 2023 Legislature rejected their preferred alternative plans because they contained two "effective crossover districts." *Singleton* DE288 at 10; *see also* DX134, 141, 203. In other words, their alternative plans contain two reliably Democratic districts, *see* DX106 at 12-13, at which raises partisanship as a plausible alternative for the majority-Republican Legislature's decision.

902.   These maps' failure to "match[] or exceed[] the Benchmark Plan's Republican tilt" means they cannot prove that racial, rather than partisan, motives predominated. *Alexander*, 602 U.S. at 25. None of them contain just *one* reliably Democrat district (thereby "achieving the legislature's political goals") with "significantly greater racial balance." *Id.* at 34, 37.

903.   In short, far from touting "politically practical" alternative plans, Plaintiffs tout a politically *impossible* plans. *Cromartie*, 532 U.S. at 259.

904.   Further, the *Singleton* Plaintiffs' entire racial gerrymandering theory is that the 2023 Plan intentionally preserves the core of District 7 from preceding plans. *Singleton* DE288 at 11. Thus, "we cannot rule out core retention as another plausible

explanation for the difference between the Enacted Plan and the" *Singleton* Plaintiffs' preferred plans. *Alexander*, 602 U.S. at 27.

905.   In this vein, Plaintiffs try to hitch their claim to the 1992 Plan's purported constitutional infirmities. *Singleton* DE288 at 10. The 1992 Plan is irrelevant to Plaintiffs' claim that the 2023 Plan is the product of a racial gerrymander.

906.   Plaintiffs repeat the "fundamentally flawed" idea that the 2023 Legislature had an affirmative duty to remedy a purported racial gerrymander enacted by a previous Legislature—or federal court. *Abbott*, 585 U.S. at 607. *See also supra* Discussion II.E.1.

907.   They call this "perpetuat[ing] an unconstitutional racial gerrymander," *Singleton* DE288 at 11, which begs the question because different demographics on either side of a district line would be relevant only if black and white voters were separated *because of* race.

908.   Whatever a federal court did in 1992 says nothing about what the 2023 Legislature intended when it enacted the 2023 Plan. Even assuming *arguendo* the 1992 Plan was a racial gerrymander, that fact would not come close to showing that in 2023, race was the one factor that could not be compromised, the criterion that overshadowed all others, the predominant motivating force.

## CONCLUSION

The Court will enter a separate final judgment in favor of the State Defendants and against the *Milligan*, *Caster*, and *Singleton* Plaintiffs, will vacate the outstanding preliminary injunction, and will tax costs against the Plaintiffs.

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

*/s/ Soren Geiger*
Soren Geiger (ASB-0336-T31L)
Dylan Mauldin (ASB-3281-Z11M)
  *Assistant Solicitors General*

Richard D. Mink (ASB-4802-M76R)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Scott Woodard (ASB-1001-F94C)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
Matthew R. Duggan (ASB-1512-D00L)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov
Richard.Mink@AlabamaAG.gov

Misty.Messick@AlabamaAG.gov
Scott.Woodard@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov
Matt.Duggan@AlabamaAG.gov

***Counsel for Secretary of State Allen***

Michael P. Taunton (ASB-6833-H00S)
Riley Kate Lancaster (ASB-1002-X86W)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com
RLancaster@Balch.com

***Counsel for Senator Livington and Representative Pringle***

## CERTIFICATE OF SERVICE

I certify that on March 17, 2025, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

*/s/ Soren Geiger*
Counsel for Secretary Allen