# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| EVAN MILLIGAN, *et al.*, | |
| Plaintiffs, | Case No. 2:21-cv-01530-AMM |
| v. | THREE-JUDGE COURT |
| WES ALLEN, *et al.*, | |
| Defendants. | |
| MARCUS CASTER, *et al.*, | |
| Plaintiffs, | |
| v. | Case No.: 2:21-cv-1536-AMM |
| WES ALLEN, in his official capacity as Alabama Secretary of State, | |
| Defendant. | |

## CORRECTED MILLIGAN AND CASTER PLAINTIFFS' PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## **TABLE OF CONTENTS**

INTRODUCTION.................................................................................7

PROPOSED FINDINGS OF FACT..................................................7

I.    THE PARTIES...........................................................................7

 A.    *Milligan* Plaintiffs ........................................................7

 B.    *Caster* Plaintiffs ..........................................................11

 C.    Current and Former Defendants: Secretary of State Allen, Senator Livingston, Representative Chris Pringle, and Senator Jim McClendon ...............................................13

II.   FACTUAL BACKGROUND.................................................16

 A.    The 2020 Census and Alabama's Demographics ...........16

 B.    The Black Belt ..............................................................18

III.  *GINGLES* PRECONDITION 1: VIABILITY OF MAJORITY-MINORITY DISTRICT.................................................20

 A.    Plaintiffs' *Gingles* 1 Experts .......................................20

 B.    Numerosity and Compactness of Black Voters .............24

 C.    Reasonable Configuration .............................................26

 D.    Racial considerations....................................................96

  i.    Dr. Duchin.........................................................96

  ii.   Mr. Cooper .......................................................101

IV.   *GINGLES* PRECONDITION 2 AND 3: RACIALLY POLARIZED VOTING .........................................................109

 A.    Plaintiffs' Experts .......................................................109

 B.    Methodology.................................................................112

    C.    **RPV Analysis**................................................................**114**

         i.    Dr. Palmer .........................................................114

        ii.    Dr. Liu ................................................................117

      iii.    Defendants' Experts ...........................................122

**V.**    **THE TOTALITY OF CIRCUMSTANCES AFFECTING ELECTORAL OPPORTUNITIES FOR BLACK ALABAMIANS.....128**

    A.    **Alabama's History of Discrimination in Voting, Education, Health, Employment, and other Areas (Senate Factors 1, 3, and 5)**................................................................**128**

    B.    **The Extent of Racially Polarized Voting (Senate Factor 2) .........208**

         i.    Degree of racial polarization...................................208

    C.    **Black electoral success in relation to racial makeup of population**..............................................................**210**

         i.    The relationship between race and party identification and alignment.......................................................211

        ii.    Race and Partisanship in Voter Behavior and Candidate Success ................................................232

    D.    **Senate Factor 4: Candidate Slating Processes ...............251**

    E.    **Senate Factor 6: Racial Appeals ......................................255**

    F.    **Senate Factor 7: Lack of Black Electoral Success.........263**

    G.    **Senate Factor 8: Unresponsiveness of Elected Officials to Black voters**..............................................................**265**

         i.    Unresponsiveness of Congressional representatives .............265

        ii.    Unresponsiveness of the State Legislature ............272

**H.  The Legislature's Justifications for Not Drawing a Second Black Opportunity District and Ignoring the Court Order are Tenuous** ..........................................................................**276**

**VI.  THE LEGISLATURE INTENTIONALLY DISCRIMINATED IN ENACTING THE 2023 PLAN** ..................................................**286**

**A.  The Historical Background** ...........................................................**286**

**B.  The Specific Sequence of Events Leading to the Passage of 2023 Plan** ..........................................................................................**294**

    i.  Co-Chairs Livingston and Pringle fully understood what was required by Section 2 and the Court's preliminary injunction. ................................................................................294

    ii.  The Co-Chairs' instructions to Randy Hinaman ...................295

    iii.  Hinaman drafted several possible plans for consideration. ....297

    iv.  The Committee hosted public hearings and readopted the 2021 Guidelines. ....................................................................297

    v.  The Committee considered and passed Representative Pringle's Community of Interest plan over Black legislators' objections. ...........................................................300

    vi.  Senators turned against the COI Plan to pursue a more aggressive plan for preserving power at Black voters' expense. ................................................................................302

    vii.  Senators and State Solicitor General Edmund LaCour drafted the "Livingston Plans" and the "Compromise" SB 5 bill. ..................................................................................305

    viii.  The Legislature knew that the 2023 Plan lacked a second opportunity district and that the Senate's changes to the COI Plan's CD2, which led to the 2023 Plan, would harm Black-preferred candidates' chances. .....................................307

| | | |
|---|---|---|
| | ix. | Mr. LaCour drafted and inserted unprecedented legislative "findings" that were not requested by the Committee's Chairs. ...............................309 |
| | x. | The Legislature passed SB 5 over opposition of Black legislators, and despite the significant reservations of Co-Chair Representative Pringle and the House's support for the alternative Community of Interest Plan. ..................314 |
| C. | | Substantive and Procedural Departures .........................315 |
| D. | | Direct Evidence of Intent and Other Contemporaneous Statements .......................................................318 |

PROPOSED CONCLUSIONS OF LAW ..........................326

VII. JURISDICTIONAL ISSUES.....................................326

| A. | | Plaintiffs Have Standing ......................................326 |
| B. | | Section 2 Creates a Private Right of Action..................329 |

VIII. PLAINTIFFS SATISFIED THE *GINGLES* PRECONDITIONS ......334

| A. | | Plaintiffs Satisfied the First *Gingles* Precondition. ..........335 |
| B. | | Plaintiffs have Satisfied the Second and Third *Gingles* Preconditions.................................................346 |

IX. BASED ON THE TOTALITY OF CIRCUMSTANCES, PLAINTIFFS HAVE PROVEN THAT THE 2023 PLAN VIOLATES SECTION 2 OF THE VRA..............................351

| A. | | Senate Factors 1, 3, and 5 Weigh in Favor of Plaintiffs...............352 |
| | i. | Alabama's Prior History of Pervasive Discrimination in Voting, Education, Employment, Health, and Other Areas ......................................................353 |
| | ii. | Because of Alabama's history of discrimination and continued use of certain voting practices, Black voters |

are less likely to turnout to vote or otherwise participate in the political process. ..........................................359

**B.     Senate Factor 2: Extent of Racially Polarized Voting** ..................371

**C.     Senate Factor 4: Candidate Slating** ...............387

**D.     Senate Factor 6: Racial Appeals** ...................394

**E.     Senate Factor 7: Election to Office in the Jurisdiction** ................396

**F.     Senate Factor 8: Lack of Responsiveness** ........................398

**G.     Senate Factor 9: Tenuousness** ...................402

**X.    INTENTIONAL DISCRIMINATION CLAIM** ...................406

**XI.   IRREPARABLE HARM AND THE EQUITIES** ...............422

**XII.  REMEDY** ...........................................424

**XIII. RETENTION OF JURISDICTION TO ENFORCE THE REMEDIAL PLAN** ...........................427

**XIV.  SECTION 3(C) RELIEF** .....................429

**CONCLUSION** ...........................................438

## INTRODUCTION

The *Milligan* and *Caster* Plaintiffs jointly submit the following proposed findings of fact and conclusions of law regarding the Section 2 vote dilution claim.

The *Milligan* Plaintiffs also submit their proposed findings of fact and conclusions of law regarding their intentional racial discrimination claim.

## PROPOSED FINDINGS OF FACT

### I.    **The Parties**

#### A.    ***Milligan* Plaintiffs**

1.    Plaintiffs Evan Milligan, Shalela Dowdy, Letetia Jackson, and Khadidah Stone are all U.S. citizens who are lawfully registered voters residing in Alabama and self-identify as Black. *Milligan* Doc. 436, *Caster* Doc. 342, Joint Stipulation of Undisputed Facts ("Joint Stip."), Joint Stip. ¶¶ 1-26.

2.    Evan Milligan resides and votes in Montgomery County, Alabama, located in Congressional District 2 ("CD2") under the congressional plan enacted by the Alabama Legislature in 2023 (the "2023 Plan"). Plaintiff Milligan also resides in CD2 under the court-ordered remedial plan (the "Remedial Plan"). Under any of the *Milligan* Plaintiffs' Demonstrative Plans, Plaintiff Milligan would reside in a majority-Black CD2. Joint Stip. ¶¶ 1-4.

3.    Shalela Dowdy resides and votes in the City of Mobile in Mobile County, Alabama, located in CD1 under the 2023 plan. She resides in CD2 of the

Remedial Plan. Under any of the *Milligan* Plaintiffs' Demonstrative Plans, Plaintiff Dowdy would reside in a majority-Black CD2. Joint Stip. ¶¶ 5-8.

4.    Letetia Jackson resides and votes in the City of Dothan, Alabama in Houston County. She resides in CD2 under the 2023 plan and resides in CD1 under the Remedial Plan. Under the *Milligan* Plaintiffs' Demonstrative Plans (Duchin Plan A) and the Special Master Plan 1, Plaintiff Jackson would reside in a majority-Black CD2. Joint Stip. ¶¶ 9-12.

5.    Khadidah Stone resides and votes in Montgomery County, Alabama, located in CD2 under the 2023 plan. She also resides in CD2 under the Remedial Plan. Under any of the *Milligan* Plaintiffs' Demonstrative Plans, Plaintiff Stone would reside in a majority-Black CD2. Joint Stip. ¶¶ 13-16.

6.    Plaintiff the Alabama State Conference of the NAACP ("Alabama NAACP") is the State conference of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest, and considers itself one of the most significant civil rights organizations in Alabama. The Alabama NAACP works to advance its vision of political, educational, social, and economic equality of Black Americans and all other Americans, and it regularly engages in efforts to register and educate voters and encourage Black people to engage in the political process by turning out to vote. Joint Stip. ¶¶ 17-18.

7.    The Alabama NAACP states that two of its central goals are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Joint Stip. ¶ 20. The Alabama NAACP has identified members who are lawfully registered Black voters who reside in Montgomery County and Mobile County as well as other areas of CDs 2 and 7 under the 2023 Plan. These identified members also reside in CD2 under the Remedial Plan. Under any of the Milligan Plaintiffs' Demonstrative Plans, the identified Alabama NAACP members would reside in majority-Black CDs 2 and 7. Joint Stip. ¶¶ 19-21.

8.    The Alabama NAACP is a membership organization and everyone who is a member of a local branch or unit within the State of Alabama is also a member of the Alabama NAACP. Stone[1] Tr. 158:8-159:1 (Simelton). Between 90 and 95 percent of the Alabama NAACP's eligible members are registered to vote. Stone Tr. 160:7-15 (Simelton). Approximately 95 percent of the Alabama NAACP's membership is African American or Black. Stone Tr. 160:24-161:1 (Simelton).

---

[1] "Stone Tr." refers to the trial transcript from *NAACP v. Allen* (f/k/a *Stone v. Allen*), No. 2:21-cv-1531-AMM. This Court agreed that the *Stone* trial testimony and deposition of certain witnesses are a part of the *Milligan* and *Caster* trial records. *Milligan* Doc. 433, 439; *Caster* Doc. 343, 353. The panel has the benefit of both Judge Manasco's impressions of the live demeanor and testimony of these witnesses, but the panel has also independently reviewed and made its own determinations about the *Stone* trial testimony, deposition transcripts, and exhibits. *See, e.g.*, *Georgia v. Reno*, 881 F. Supp. 7, 8 n.1 (D.D.C. 1994) (three-judge court) (adopting a similar procedure); *Hale Cnty. v. United States*, 496 F. Supp. 1206, 1207 (D.D.C. 1980) (three-judge court) (same).

9.     The Alabama NAACP has active branches and members in Montgomery, Mobile, and Houston Counties as well other cities and counties in the Black Belt. Stone Tr. 157:17-158:7, 161:7-162:2, 173:23-174:19 (Simelton); *see also* Trial Tr. 42:21-25 (Dowdy), 236:6-10 (Clopton), 705:23-706:8 (L. Jackson).

10.    Plaintiff GBM was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement and its transformative impact in Birmingham, Alabama, and across the United States. GBM describes itself as a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people. Joint Stip. ¶ 22.

11.    GBM describes itself as dedicated to advancing social justice through political participation across Alabama. GBM states that it actively opposes State laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process. GBM states that, to accomplish its goals, it regularly communicates with its members and works to register, educate, and increase voter turnout and efficacy, particularly among Black, Latinx, and low-income people and people with disabilities. Joint Stip. ¶¶ 23-24.

12.    GBM has both organizational members and individual members. Stone Tr. 488:6-20 (Douglas). GBM has approximately 2,700 individual members, who

join GBM by making a financial donation and a commitment to the principles and values of GBM. Stone Tr. 490:17-491:2 (Douglas). GBM's Board of Directors also has 10 individual member representatives. Stone Tr. 490:12-16 (Douglas).

13.    GBM has identified individual members who are lawfully registered Black voters who reside in Jefferson, Macon, and Montgomery Counties as well as the City of Mobile in CDs 2 and 7 under the 2023 Plan. These identified members also reside in CD2 and CD7 the Remedial Plan. Under any of the *Milligan* Plaintiffs' Demonstrative Plans, these identified GBM members would reside in majority-Black CDs 2 and 7. Joint Stip. ¶¶ 25-26.

14.    Organizational members in the Montgomery area include the Episcopal Diocese of Alabama, the Christian Methodist Episcopal Church, the African American Methodist Episcopal Church ("AME"), and the African Methodist Church Zion, the latter three of which have predominantly African American members. Stone Tr. 488:21-489:13 (Douglas). GBM's organizational members participate in the governance of GBM by providing representatives to serve on the board of directors as well as providing financial and volunteer contributions. Stone Tr. 490:1-6 (Douglas).

### B.    *Caster* **Plaintiffs**

15.    Plaintiffs Marcus Caster, LaKeisha Chestnut, Bobby DuBose, Benjamin Jones, Rodney Love, Manasseh Powell, Ronald Smith, and Wendell

Thomas are all U.S. citizens who are lawfully registered voters residing in Alabama and self-identify as Black. Joint Stip. ¶¶ 27–58.

16.    Marcus Caster resides and votes in Washington County, Alabama, located in CD7 under the 2023 Plan. Mr. Caster resides in CD2 under the Remedial Plan. Under any of the *Caster* Plaintiffs' Illustrative Plans, Mr. Caster would reside in a majority-Black CD2. Joint Stip. ¶¶ 27-30.

17.    Plaintiff LaKeisha Chestnut resides and votes in Mobile County, Alabama. Ms. Chestnut resides in CD1 under the 2023 Plan and in CD2 under the Remedial Plan. Under any of the *Caster* Plaintiffs' Illustrative Plans, Ms. Chestnut would reside in a majority-Black CD2. Joint Stip. ¶¶ 31-34.

18.    Plaintiff Bobby DuBose resides and votes in Jefferson County, Alabama. Mr. DuBose resides in CD7 under both the 2023 Plan and the Remedial Plan. Under any of the *Caster* Plaintiffs' Illustrative Plans, Mr. DuBose would reside in a majority-Black CD7. Joint Stip. ¶¶ 35-38.

19.    Plaintiff Benjamin Jones resides and votes in Montgomery County, Alabama. Mr. Jones resides in CD2 under both the 2023 Plan and the Remedial Plan. Under any of the *Caster* Plaintiffs' Illustrative Plans, Mr. Jones would reside in a majority-Black CD2. Joint Stip. ¶¶ 39-42.

20.    Plaintiff Rodney Love resides and votes in Jefferson County, Alabama. Mr. Love resides in CD7 under both the 2023 Plan and the Remedial Plan. Under

any of the *Caster* Plaintiffs' Illustrative Plans, Mr. Love would reside in a majority-Black CD7. Joint Stip. ¶¶ 43-46.

21.    Plaintiff Manasseh Powell resides and votes in Montgomery County, Alabama. Mr. Powell resides in CD2 under both the 2023 Plan and the Remedial Plan. Under any of the *Caster* Plaintiffs' Illustrative Plans, Mr. Powell would reside in a majority-Black CD2. Joint Stip. ¶¶ 47-50.

22.    Plaintiff Ronald Smith resides and votes in Bullock County, Alabama. Mr. Smith resides in CD2 under both the 2023 Plan and the Remedial Plan. Under any of the *Caster* Plaintiffs' Illustrative Plans, Mr. Smith would reside in a majority-Black CD2. Joint Stip. ¶¶ 51-54.

23.    Plaintiff Wendell Thomas resides and votes in Montgomery County, Alabama. Mr. Thomas resides in CD2 under both the 2023 Plan and the Remedial Plan. Under any of the *Caster* Plaintiffs' Illustrative Plans, Plaintiff Thomas would reside in a majority-Black CD2. Joint Stip. ¶¶ 55-58.

### C.    Current and Former Defendants: Secretary of State Allen, Senator Livingston, Representative Chris Pringle, and Senator Jim McClendon

24.    Defendant Wes Allen is the Alabama Secretary of State and the chief elections official for the State of Alabama. Secretary Allen is sued in his official capacity. Secretary Allen provides uniform guidance for election activities in the State and issues certificates of election to members of Congress from Alabama. Ala.

Code §§ 17-1-3, 17-12-21. Secretary Allen also has responsibility for certifying the names of Primary and General Election candidates for the Alabama congressional seats. Ala. Code §§ 17-13-5(b), 17-9-3(b). Joint Stip. ¶¶ 59-60.

25.    Defendants Sen. Steve Livingston and Rep. Chris Pringle are Senate Chair and House Chair of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"). Ala. Code § 29-2-51. They are sued in *Milligan* and intervened in *Caster* in their official capacities as Chairs of the Committee. Sen. Livingston was substituted as a defendant in these cases following the retirement of Sen. Jim McClendon, who, with Rep. Pringle, presided over the Committee during its 2021 Congressional redistricting efforts. Sen. Livingston and Rep. Pringle presided over the meetings of the Committee in 2023 during which time the "Community of Interest" plan was prepared and developed. Joint Stip. ¶¶ 61-62.

26.    The Committee was tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate, House, and congressional districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52. The Committee also can prepare and propose the redistricting plan required for the State Board of Education. *See* Ala. Code § 16-3-3. Joint Stip. ¶ 63.

27.    The Committee consists of members of the State House and Senate. The Speaker of the House appoints one House member from each of the seven Congressional Districts and four additional House members. The Lieutenant Governor appoints one Senator from each of the seven Congressional Districts and four additional Senators. *See* Ala. Code § 29-2-51(c). Joint Stip. ¶ 64.

28.    All Committee meetings must be open to the public. The Committee Guidelines provide that "All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established." Reapportionment Comm. Redistricting Guidelines, §§ IV, (1) and (4) (May 5, 2021). Joint Stip. ¶ 65.

29.    The Committee does not have final authority over which redistricting plans are adopted. Alabama adopts redistricting plans through legislation. Accordingly, the Committee's work is a recommendation presented to the Alabama Legislature as a bill. As with other legislation, the Legislature can make changes to the legislation, and legislation that passes both Chambers of the Legislature is submitted to the Governor for action. Joint Stip. ¶¶ 66-67.

II.    **Factual Background**

A.    **The 2020 Census and Alabama's Demographics**

30.    The United States Bureau of the Census releases data to the States after each Census for use in redistricting, including population and demographic information for each census block. After the 2020 Census, the Census Bureau provided initial redistricting data to Alabama on August 12, 2021. Joint Stip. ¶¶ 68-70.

31.    As of the 2020 census, 1,364,736 Alabamians, or 27.16% of the total population identified as Black or African American, either alone or in combination with one or more other races or ethnicities. Black alone or in combination, also known as "Any-Part Black," refers to individuals who self-identify as Black on the Census form, regardless of whether the individuals also choose another race or indicated an ethnicity, such as Hispanic. CX1 at 8; CX11 at 5; P.I. Tr.[2] 559:1-10 (Cooper). This constitutes a 6.53% rise in Alabama's Black population since 2010, which comprises 34% of the state's entire population increase between 2010 and 2020. CX1 at 9; CX11 at 6-7.

32.    As of the 2020 census, 1,014,372 of Alabama's Any-Part Black ("Black" or "AP Black") residents are of voting age, constituting 25.9% of voting-

---

[2] "P.I. TR." refers to the transcripts for the preliminary injunction hearings held January 4-12, 2022 in this case.

age population. AP Black Alabamians make up 26.6% of the state's citizen-voting-age population. CX1 at 9; CX11 at 8-9.

33.    All of Alabama's population increase over the last decade is owed to its minority populations: between 2010 and 2020, Alabama's White population fell by 33,051 people, a 1.03% decrease. CX1 at 8-9; CX11 at 6.

34.    As of the 2020 census, the non-Hispanic White population share in Alabama is 63.12% and the corresponding shares of voting-age population and citizen voting-age population are 65.47% and 68.4%, respectively. CX1 at 8-9; CX11 at 5-6, 8-9.

35.    Given Alabama's population as reported in the 2020 decennial census, the ideal size of each of its seven Congressional Districts is 717,754 persons. CX1 at 14.

36.    Under the 2023 Plan, 28.5% of Alabama's AP Black population lives in majority-Black CD7. By contrast, 91.1% of Alabama's non-Hispanic White population lives in one of the six majority-White districts. CX1 ¶ 35.

37.    Under the 2023 Plan, most of the remainder of the AP Black population outside of CD7 is distributed into CD1 (25.63% AP BVAP), CD2 (39.93% AP BVAP), and CD3 (20.7% AP BVAP). Taken together, these three districts have a total AP Black population of 644,899, which is nearly enough total population to

comprise an entire congressional district (89.8% of a congressional district). CX1 ¶ 36; Trial Tr. 113:13-114:9 (Cooper).

**B.    <u>The Black Belt</u>**

38.    Alabama's Black population is centered in the cores of its largest cities, and the rural Black Belt. 2022 P.I. Tr. 561:13-562:11 (Duchin); CX1 at 11; CX11 at 7; MX8 at 9-10 §§ 4.2.1 and 4.2.2.

39.    The four largest cities in Alabama today are Huntsville (population 215,006), Birmingham (population 200,733), Montgomery (population 200,603), and Mobile (population 187,041). Together, they have over 400,000 Black residents, comprising roughly one-third of the Black population in the state. Of these cities, Birmingham, Montgomery, and Mobile are majority-Black, with Black population shares of 69.9%, 60.8%, and 51.5%, respectively. MX8 at 9 § 4.2.1; *see also* CX1 at 11; CX11 at 7.

40.    The Black Belt is named for the region's fertile black soil. The region has a substantial Black population because of the many enslaved people forcibly brought there to work before the Civil War. The Black Belt includes the core counties of Barbour, Bullock, Butler, Choctaw, Crenshaw, Dallas, Greene, Hale, Lowndes, Macon, Marengo, Montgomery, Perry, Pickens, Pike, Russell, Sumter, and Wilcox. Five counties—Clarke, Conecuh, Escambia, Monroe, and Washington

—are sometimes included within the definition of the Black Belt. Joint Stip. ¶¶ 71-73.

41.    About a quarter of Alabama's Black population, or over 300,000 people, live in the 18 core Black Belt counties. MX8 at 10 § 4.2.2.

42.    Barbour County is 48.6% Any-Part Black according to the 2020 Census. Bullock County is 72.3% Any-Part Black according to the 2020 Census. Butler County is 45.9% Any-Part Black according to the 2020 Census. Choctaw County is 42.3% Any-Part Black according to the 2020 Census. Clarke County is 45.5% Any-Part Black according to the 2020 Census. Conecuh County is 45.1% Any-Part Black according to the 2020 Census. Crenshaw County is 25.5% Any-Part Black according to the 2020 Census. Dallas County is 71.5% Any-Part Black according to the 2020 Census. Escambia County is 31.5% Any-Part Black according to the 2020 Census. Greene County is 82.2% Any-Part Black according to the 2020 Census. Hale County is 57.7% Any-Part Black under the 2020 Census. Lowndes County is 71.1% Any-Part Black under the 2020 Census. Joint Stip. ¶¶ 74-85.

43.    Macon County is 80.9% Any-Part Black according to the 2020 Census. Marengo County is 53.8% Any-Part Black according to the 2020 Census. Monroe County is 43.2% Any-Part Black according to the 2020 Census. Montgomery County is 58.5% Any-Part Black according to the 2020 Census. Perry County is 71.1% Any-Part Black according to the 2020 Census. Pike County is 38.5% Any-

Part Black according to the 2020 Census. Pickens County is 40.4% Any-Part Black according to the 2020 Census. Russell County is 46.8% Any-Part Black according to the 2020 Census. Sumter County is 73.9% Any-Part Black according to the 2020 Census. Washington County is 22.8% Any-Part Black according to the 2020 Census. Wilcox County is 71.7% Any-Part Black per the 2020 Census. Joint Stip. ¶¶ 86-96.

### III.    *Gingles* Precondition 1: Viability of Majority-Minority District

### A.    Plaintiffs' *Gingles* 1 Experts

44.    The Court heard testimony and reviewed illustrative plans from Milligan Plaintiffs' demographic expert, Dr. Moon Duchin, and *Caster* Plaintiffs' demographic expert, Mr. William S. Cooper. These experts submitted five and nine plans, respectively, and concluded, based on the 2020 Census, that Alabama's Black population is sufficiently numerous and geographically compact to allow for the creation of two majority-Black congressional districts consistent with traditional redistricting principles. MX8 at 2; MX11 at 3; CX1 ¶¶ 12, 15; Trial Tr. 109:4-20 (Cooper), 313:5-14 (Duchin).

45.    In support of her opinion, Dr. Duchin drew five different plans—four at the preliminary injunction stage and an additional plan in 2024—to demonstrate that Black voters are sufficiently large and geographically compact to form majorities in two reasonably configured districts in a plan that complies with traditional districting principles. Trial Tr. 286:24-287:7; MX8 at 2; MX11 at 8.

46.    Dr. Duchin is a Professor of Mathematics and Public Policy at Cornell University. She holds a Ph.D. from the University of Chicago, has published numerous articles about redistricting topics such as the measurement of compactness, and co-edited a book about interdisciplinary approaches to redistricting. Trial Tr. 279:20-281:1.

47.    The Court accepted Dr. Duchin as an expert without objection in the fields of applied mathematics, quantitative redistricting analysis, and demography and the use of census data. Trial Tr. 281:6-13.

48.    As in the preliminary injunction hearing, Dr. Duchin presented "clear and consistent" opinions, maintained "very high standards and rigorous quality control," and "carefully considered traditional redistricting criteria when she drew her illustrative plans," among positive factors. *Milligan v. Merrill*, 582 F. Supp. 3d 924, 1004–05 (N.D. Ala. 2022) ("*Milligan I*") *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023).

49.    The Court shares this assessment concerning Dr. Duchin's explanation of her newer plan, Plan E, in which Dr. Duchin used one of the plans proposed by the Special Master as a starting point, and pursued compactness as the primary objective in making changes from that plan. *See* MX11 at 1 ("I began with SM2 as a starting point and made refinements with compactness as a paramount priority,

while maintaining other criteria."); Trial Tr. 292:10-11 ("I was altering [the special master] plan with many things in mind, with compactness paramount.")

50.    Similarly, Mr. Cooper developed a total of nine illustrative plans—seven developed in connection with the 2022 preliminary injunction hearing and two more developed in connection with his trial testimony—each containing two majority-Black districts under the AP BVAP metric. PI Tr. 455:18-456:1; CX2 ¶¶ 8, 11-13; Trial Tr. 117:5-12.

51.    Mr. Cooper is a mapping consultant who has drawn maps for a living and provided demographic analysis for nearly 40 years. Trial Tr. 105:21-106:15. He has extensive experience testifying in federal courts on redistricting issues and has testified as an expert witness on redistricting and demographics in 57 cases since the late 1980s. CX1 ¶ 3. Seven of those lawsuits have results in changes to statewide legislative boundaries, and 27 of those cases have led to changes in local election district plans. *Id.* Mr. Cooper has worked on behalf of both plaintiffs and defendants in redistricting cases. PI Tr. 421:24–422:1. In addition to this case, Mr. Cooper has served as a redistricting and demographics expert or redistricting consultant in eight redistricting cases in Alabama, including *Alabama Legislative Black Caucus*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017), and *Chestnut v. Merrill*, No. 2:18-CV-00907-KOB (N.D. Ala. 2019). CX1 ¶¶ 8-10.

52.    The Court accepted Mr. Cooper as an expert in redistricting demographics and census data without objection. Trial Tr. 107:6-16. Just like the Court found in the preliminary injunction hearing—and the Supreme Court highlighted—Mr. Cooper was "highly credible," expressed "clear and consistent" opinions, has "accumulated extensive expertise . . . in redistricting cases, particularly in Alabama," and "worked hard to give 'equal weighting' to all traditional redistricting criteria" in developing his illustrative plans. *Milligan I*, 582 F. Supp. 3d at 1005–06; *Allen v. Milligan*, 599 U.S. 1, 31 (2023).

53.    Regarding Dr. Duchin's first four plans and Mr. Cooper's first seven plans, this Court has twice before found that these experts developed reasonably configured plans in terms of population deviation, contiguity, compactness, respect for traditional political boundaries and subdivisions, protecting important communities of interest, and protecting incumbents where possible. *See Milligan I*, 582 F. Supp. 3d at 1016; *Milligan v. Allen*, 690 F. Supp. 3d 1226, 1302 (N.D. Ala. 2023) ("*Milligan II*").

54.    These prior findings, along with our evaluation of the evidence presented at trial, leads this Court to again find that all Dr. Duchin's and Mr. Cooper's maps are reasonably configured.

**B.**    **Numerosity and Compactness of Black Voters**

55.    The 2023 Plan contains seven districts, only one of which is majority-Black. CD7 has an AP BVAP of 50.65%. Joint Stip. Caster, Doc. 342 ¶¶ 135-137. The next highest AP BVAP in the 2023 Plan is found in CD2, which has a 39.93% AP BVAP. *Id.* ¶¶ 136-137.

56.    In each of the illustrative plans developed by Mr. Cooper and Dr. Duchin, a majority of the voting age population in two districts, Congressional Districts 2 and 7, is AP Black. *See* CX1 ¶¶ 57, 61; CX2 ¶ 13; Trial Tr. 293:2-6 (Cooper); MX9 at 2; MX11 at 4; Trial Tr. 2033:19-2034:4 (Trende). Each of these districts also has a majority of the non-Hispanic single-race Black CVAP and majority-Black registered voter population. Defendants do not dispute these facts. P.I. Tr. 455:18-456:1; CX1 ¶ 61; CX2 ¶ 14; Trial Tr. 293:2-6 (Duchin); MX9 at 2; MX11 at 4.

57.    Mr. Cooper and Dr. Duchin demonstrated that the Black population in Alabama was sufficiently geographically compact to form a majority in two congressional districts.

58.    Mr. Cooper was able to draw multiple congressional plans with two reasonably-configured majority-Black districts consistent with traditional districting criteria. He further determined from the geographic distribution of the Black population in southern Alabama, *see supra* ¶¶ 41-43, and the state's current and

former School Board of Education districting plans, that there is ample Black population concentrated in south and southwest Alabama to comprise a majority of eligible voters in a second, reasonably-configured congressional district. CX1 ¶¶ 38-46.

59.    Dr. Duchin likewise conducted a twofold analysis: first, that the majority-Black districts she drew were themselves compact and reasonably configured; and second, that even in rural areas within the districts, the Black population was "distributed in a fairly consistent way throughout those rural counties." Trial Tr. 296:12-19.

60.    Contrary to a map from Defendants' expert Dr. Trende that implied there was limited Black population between Montgomery and Mobile, Dr. Duchin demonstrated that the Black Belt "is a reasonably homogeneous rural area that's heavily black," further demonstrating geographic compactness of Black Alabamians in the relevant areas of the State. Trial Tr. 308:17-25. When questioned about the basis for his critique of the illustrative plans, Dr. Trende admitted that previous congressional maps enacted by the State of Alabama connect two cities with rural areas in between. Trial Tr. 2152:6-9. He also acknowledged he did not consider whether the Black populations in the rural and urban areas in the second majority-Black district in the illustrative plans constituted a community of interest or shared several characteristics. Trial Tr. 2099:2-15.

61.     All of this reaffirms the Court's prior commonsense "visual assessment of the geographic dispersion of Black population in Alabama, together with statistics about Black population centers in the state," which reflect "that Black voters in Alabama are relatively geographically compact" and how "Dr. Duchin and Mr. Cooper expected that they could easily draw two reasonably configured majority-Black districts." *Milligan I*, 582 F. Supp. 3d at 1011.

## C.     <u>Reasonable Configuration</u>

62.     Regarding Dr. Duchin's first four plans and Mr. Cooper's first seven plans, this Court has twice before found that both experts developed reasonably configured plans in terms of population deviation, contiguity, compactness, respect for traditional political boundaries and subdivisions, protecting important communities of interest, and protecting incumbents where possible. *See Milligan I*, 582 F. Supp. 3d at 1016; *Milligan II*, 690 F. Supp. 3d at 1302.

63.     Mr. Cooper and Dr. Duchin both developed their illustrative plans in accordance with traditional redistricting principles, including population equality, compactness, contiguity, respective for political subdivision boundaries, and respect for communities of interest. CX1 ¶ 58; MX8 at 2.

64.     Mr. Cooper's and Dr. Duchin's understanding and application of these principles was informed by the 2021 Guidelines, which were readopted by the

Reapportionment Committee in 2023. CX1 ¶ 13; Trial Tr. 118:10-119:1 (Cooper); MX8 at 5; PI Tr. 569:14-16 (Duchin); MX24; CX42.

65.    Alabama's 2021 Guidelines create a two-tiered hierarchy of redistricting criteria. MX24; CX42.

66.    In tier-one, the Guidelines instruct that a reapportionment map must: (1) comply with the principle of one-person, one-vote; (2) be contiguous; (3) be reasonably compact; (4) comply "with the Voting Rights Act of 1965;" and (5) may not subordinate "race-neutral districting criteria to considerations of race . . . except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act . . . when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act." MX24 §§ II(a)-(h); CX42 §§ II(a)-(h).

67.    The Guidelines then instruct that the following factors "shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and law of the United States and of the State of Alabama." MX24 § II(j); CX42 § II(j). Those factors include: (1) incumbency protection; (2) respect for communities of interest; (3) preserving the cores of existing districts; and (5) minimizing the number of counties in each district. MX24 § II(j); CX42 § II(j).

68.    As Dr. Duchin explained, these principles can and often do conflict with one another. Thus, the development of a redistricting plan requires making tradeoffs among principles. P.I. Tr. 577:11-578:7. For example, "compactness can be [in tension] with communities of interest. If you have a well-identified community with important shared interests that itself is residentially located in [an] elongated configuration, then you have a choice to make" between "keeping that community whole" and the "compactness of your district." PI Tr. 576:1-16. In sum, "redistricting is all about . . . trade offs." PI Tr. 576:17-21.

69.    Mr. Cooper testified to the same, explaining that "each of [his] illustrative plans balances traditional districting principles in different ways." PI Tr. 474:13-16; *see also id.* at 521:18-22 ("The key to drawing a good plan is to balance . . . ."); CX2 ¶¶ 4-6; Trial Tr. 226:1–7.

70.    Defendants' expert, Dr. Trende, testified to the same, agreeing that "adhering to one redistricting criteria often comes into conflict with other redistricting criteria," and "prioritizing one consideration may come at the expense of another consideration." Trial Tr. 2034:17-2035:2. He also testified that when a mapdrawer is "attempting to balance a host of considerations [] no one consideration may perform at the maximal level it could otherwise perform." Trial Tr. 2035:3-6. And in particular, Dr. Trende agreed that "making trade-offs between traditional redistricting principles like prioritizing communities of interest over compactness[,]

does not necessarily violate any traditional redistricting principle." Trial Tr. 2035:7-11. He further agreed that "keeping [a] community of interest together [can] sometimes result[] in lower compactness scores," and that "there can be times when a community of interest" "trump[s] a concern about district compactness." Trial Tr. 2133:12-23. Dr. Trende also agreed that compliance with the Voting Rights Act trumps other concerns the state may have. Trial Tr. 2157:9-13.

71.    The Guidelines by their terms recognize this reality, providing that complying with the tier-two criteria is a balancing act: "in each instance where" these criteria "conflict, the Legislature shall at its discretion determine which takes priority." But in no circumstance shall they supersede any criterion listed in tier one. Exh. M24 § II(j).

72.    In creating her Plan E in 2024, Dr. Duchin also consulted the "legislative findings" included in the text of SB 5, even though they appeared to her to be "an attempt to lock in specific features of the SB-5 plan under cover of updating the redistricting principles." MX11 at 1. Because of these limitations and because it was "impossible to follow them fully literally," Dr. Duchin kept the priorities in SB 5 in mind as she created Plan E, particularly in prioritizing compactness and allowing more VTD splits in service of stronger compactness. Trial Tr. 290:15-291:22, 299:3-24.

73.    Notably, the Reapportionment Committee readopted the 2021 Redistricting Guidelines just one week before the Legislature enacted SB 5 because, in Senator Livingston's words: the Guidelines "seemed to serve us well" and the "guidelines were accurate as they were." *Milligan* Doc. 459-13; *Caster* Doc. 370-13 ("Livingston Dep.") 39:7-40:22. Indeed, Randy Hinaman, the Legislature's longtime map drawer (and drawer of the enjoined 2021 Plan), was not made aware of any different guidelines, including the "legislative findings" ultimately included in SB 5, when the Co-Chairs instructed him to begin drafting a map in June 2023, *Milligan* Doc. 459-7; *Caster* Doc. 370-7 ("Hinaman 2023 Dep.") 94:11-95:23; Livingston Dep. 23:5-10. The 2021 and 2023 Guidelines were based on, and are similar to, the 2011 and 2002 Guidelines. *Milligan* Doc. 459-19; *Caster* Doc. 370-19, ("Pringle 2021 Dep.") 59:7-60:11. Thus, the Committee Guidelines are better understood to represent Alabama's "traditional" districting principles. In contrast, the principles laid out in SB 5 are, in the words of the Solicitor General, "essentially describing the map" CX46 at 162:12-13, and the characteristics "given effect in the 2023 Plan," CX46 at 38:4-6. They "are not the same principles as those given effect in the 2021 plan." CX46 at 38:7-8. In other words, SB 5's "legislative findings" cannot themselves be considered as the State's traditional districting principles under Defendants' own admissions.

74.    The evidence and testimony in the trial record concerning Dr. Duchin's and Mr. Cooper's prior plans, as well as Dr. Duchin's newer Plan E and Mr. Cooper's Plans 8 and 9, confirm and strengthen the Court's prior findings that the *Milligan* and *Caster* Plaintiffs have satisfied *Gingles* 1 in multiple ways, multiple times over.

### 1.  Population Equality

75.    The Court finds—and Defendants do not dispute—that all of Mr. Cooper's and Dr. Duchin's illustrative plans comply with the principle of one-person, one-vote, including as defined by Alabama's 2023 Guidelines. *See, e.g.*, Trial Tr. 119:8-16 (Cooper); MX8 at 5; MX11 at 3.

### 2.  Contiguity

76.    The Court finds—and Defendants do not dispute—that all of Mr. Cooper's and Dr. Duchin's illustrative plans contain contiguous districts, including as defined by Alabama's 2023 Guidelines. CX1 ¶ 58; Trial Tr. 125:3-5 (Cooper); MX8 at 5; MX11 at 3; Tr. 2066:23-25 (Trende).

### 3.  Compactness

77.    The Court finds that Plaintiffs' illustrative plans are reasonably compact.

78.    The compactness of a redistricting plan is measured using any of as many as 35 different quantitative metrics, some with ancient histories in the field of

mathematics. PI Tr. 590:9-15 (Duchin). The Polsby-Popper score and the Reock score both measure compactness by comparing a district to the most compact geometric shape, the circle. PI Tr. 590:9-591:4 (Duchin); CX1 ¶ 111 nn.20-21; Trial Tr. 126:20-127:11 (Cooper).

79.    There is no dispute that Polsby-Popper and Reock scores are the two most common methods for measuring compactness. CX1 ¶ 111; Trial Tr. 128:7-10 (Cooper).

80.    Compactness is not a single objective measure with a bright-line test. As Dr. Trende agreed "there's no objective standard [for] when a district or a map is objectively compact versus not compact." Trial Tr. 2038:23-2039:1. Accordingly, Dr. Trende did not provide any threshold or standard by which to judge whether a map is reasonably compact. Trial Tr. 2038:18-22. He explained that he was not offering any opinion that any of Plaintiffs' illustrative plans are generally non-compact or that any specific line that either Mr. Cooper or Dr. Duchin drew renders a district non-compact. Trial Tr. 2039:18-2040:20.

a.    *Compactness of Dr. Duchin's Plans*

81.    Dr. Duchin's plans perform well on several different measures of compactness.

82.     Duchin Plan B has an identical Polsby-Popper score to Alabama's 2023 Plan and a better Block Cut Edges score than the 2023 Plan, *compare* MX8 at 6 *with* MX11 at 3.

83.     Duchin Plan E has an average Polsby-Popper score of a little over 27 percent while Alabama's 2023 Plan scores just over 28 percent—less than a percentage point of difference. Trial Tr. 357:18-24. Plan E performs only slightly worse than the 2023 Plan on the Block Cut Edges compactness measure, MX11 at 3.

84.     Defendants' expert Dr. Trende concedes that a number of Dr. Duchin's illustrative plans are more compact than both of Alabama's enacted maps this cycle and the Special Master's map. Trial Tr. 2120:15-2121:1; DX10 at 33-34. Even using the Convex-Hull metric, which Dr. Trende employs but Dr. Duchin did not, Duchin Plans A, B, and C are more compact than each of the 2021 Plan, 2023 Plan, and the Special Master's Plan. DX10 at 34.

85.     Although the Duchin Plans score a bit lower than the 2023 Plan on the Reock metric, the Court credits Dr. Duchin's testimony that the elongated nature of the Black Belt means that any districts attempting to preserve that community are likely to score lower on Reock, due to the way that metric scores compactness. Trial Tr. 305:20-306:7. Moreover—in conducting his analysis comparing Dr. Duchin's illustrative plans to plans nationwide, previous plans enacted by the State of

Alabama, and the Special Master's map—Dr. Trende also found that on the Reock metric, Duchin Plans A, B, D, and E were all more compact than California, a state whose map he described as "reasonable." Trial Tr. 2123:6-24 (Trende); DX10 at 36, 38.

86.    Similarly, in conducting this analysis with the Polsby-Popper measure, Dr. Trende found that all the Duchin Plans were more compact than at least four congressional maps actually enacted by the State of Alabama since 1972, the Special Master's Plan, and the California congressional map, which again Dr. Trende himself described as reasonable. Trial Tr. 2124:3-23 (Trende); DX10 at 36, 39.

87.    Faced with these conclusions based on his own report, Dr. Trende all but admitted that his conclusion with respect to the compactness of Dr. Duchin's Plans was unfounded. Trial Tr. 2125:24-2126:15.

88.    Even looking at the individual districts in the Duchin Plans, none fall below the line of the least compact district Alabama has drawn in recent years under the commonly used Reock or Polsby-Popper measures. *See* DX10 at 50-52. For example, on the Polsby-Popper measure, the least compact district in Duchin Plan B performs better than eight recent districts drawn by Alabama (including one from 2021) and two drawn in the Court-ordered special master plan, and the least compact district in Duchin Plan E performs better than seven recent districts drawn by Alabama and two drawn by the Court-ordered special master plan. *See* DX10 at 51.

89.    To the extent Dr. Trende still held the opinion expressed in his report that some of Dr. Duchin's illustrative districts are not compact, this opinion deserves little weight given that he has previously opined that a congressional district with a Reock score of 0.1615 was reasonably compact, Trial Tr. 2127:9-2128:12 (Trende), and Dr. Duchin's *least* compact district on this metric has a score of 0.1848, DX10 at 50.

90.    Dr. Trende also testified that he did not consider the role that other traditional districting factors beyond compactness may have played in map-drawing choices and did not criticize Dr. Duchin's plans for failing to satisfy any other traditional districting principles. Trial Tr. 2116:4-7. Though he did agree that preserving a community of interest can have tradeoffs with district compactness, and that is a fair reflection of Dr. Duchin's illustrative District 2. Trial Tr. 2135:3-19.

91.    Dr. Duchin's plans also fare well when Dr. Trende attempts to compare them to plans enacted by 37 other states in the 2020 redistricting cycle and Alabama's plans since 1972. In Dr. Trende's look at the 25 worst plans among this subset in terms of Polsby-Popper compactness,[3] three of the five Duchin plans (including Plans B and E) are not present, meaning that they fare in the "better half of the states, according to this comparison." Trial Tr. 304:1-9 (Duchin).

---

[3] The Court notes with caution in considering Dr. Trende's analysis that he generated lower compactness scores for some of Plaintiffs' illustrative plans than did Dr. Duchin, but the same scores as Dr. Duchin for the 2023 plan, with no explanation for why his results were inconsistent in a way that favored Defendants. Trial Tr. 2118:20-2120:9 (Trende).

92.     Dr. Trende criticizes Dr. Duchin's Plans A–D for achieving their "relatively strong [compactness] scores through careful line drawing in the northern portion of the state," where he says are "detached from any need to draw actual VRA-compliant districts" further South in the State. DX10 at 34. But he admits that he did not consider either the Committee's guidelines or the Legislature's findings in SB 5, both of which prioritized compact districts over preservation of prior district cores. Trial Tr. 2126:20-23; MX24 at 1-2; CX42 at 1-2; MX31 at 3; CX19 at 3.

93.     Dr. Trende admits that Duchin Plan E scores well in terms of compactness without making significant changes to the districts in Northern Alabama. But he instead criticizes that plan for achieving greater compactness with more VTD splits. DX10 at 53. But again, Dr. Trende never considered the role of (or even reviewed) the policy announced in SB 5 that prioritized compactness over splits of political subdivisions. Trial Tr. 2140:11-2141:12. But SB 5's own findings were one of the primary reasons why Dr. Duchin prioritized compactness over split VTDs in Plan E. Trial Tr. 290:15-291:16 (Duchin). Nor did Dr. Trende consider how many of these VTD splits affected zero people, despite Dr. Duchin providing evidence that "several of the splits cut off zero-population pieces from oddly shaped precincts." MX12 at 4.

b.  *Compactness of Mr. Cooper's Plans*

94.    As discussed above, one way of examining whether a district in a jurisdiction is "reasonably compact" is by examining previously enacted districts by that jurisdiction. In other words, Alabama's previously enacted congressional districts demonstrate what Alabama generally considers to be "reasonable." Trial Tr. 126:7-12 (Cooper); *see also* CX42 at 3 (2021 Guidelines requiring that "[d]istricts will be composed of . . . reasonably compact geography"); MX22 at 3 (2011 Guidelines requiring same); Trial Tr. 2039:21-25 (Dr. Trende explaining he compared Plaintiffs' illustrative plans to what has been previously drawn in Alabama).

95.    Mr. Cooper prepared tables reflecting the Reock and Polsby-Popper scores for CD2 and CD7 in each of his illustrative plans and every district in each of Alabama's congressional plans dating back to 1992. CX2 ¶ 49, figs.14-15.

96.    As reflected in those tables (reproduced below), Districts 2 and 7 in all nine of Mr. Cooper's illustrative majority-minority districts fall well within the range of compactness scores for congressional districts Alabama has enacted across the past four redistricting cycles, on both the Reock and Polsby-Popper metrics.

**Figure 14**

**Illustrative Plans vs. Alabama Historical Plans - Reock**

| Plan | District | Reock | | Plan | District | Reock |
|------|----------|-------|--|------|----------|-------|
| 2023 Plan | 2 | 0.5832 | | Illustrative Plan 1 | 7 | 0.3657 |
| 2002 Plan | 2 | 0.4877 | | Illustrative Plan 5 | 2 | 0.3646 |
| 2022 Plan | 2 | 0.4837 | | Illustrative Plan 7 | 7 | 0.3594 |
| 1992 Plan | 1 | 0.4795 | | 2002 Plan | 7 | 0.3564 |
| 2023 Plan | 6 | 0.476 | | 2022 Plan | 6 | 0.3559 |
| 2022 Plan | 7 | 0.4744 | | 2002 Plan | 3 | 0.3505 |
| 2012 Plan | 2 | 0.4716 | | Illustrative Plan 4 | 2 | 0.3267 |
| 2024 Special Master Plan | 7 | 0.4705 | | 2012 Plan | 4 | 0.3261 |
| 1992 Plan | 2 | 0.4701 | | 2022 Plan | 4 | 0.3243 |
| 2023 Plan | 3 | 0.4653 | | 2023 Plan | 4 | 0.3169 |
| 2024 Special Master Plan | 3 | 0.4653 | | 2024 Special Master Plan | 4 | 0.3169 |
| 2024 Special Master Plan | 6 | 0.46 | | 2023 Plan | 5 | 0.3167 |
| 2002 Plan | 1 | 0.4495 | | 2024 Special Master Plan | 5 | 0.3167 |
| 2012 Plan | 6 | 0.4476 | | Illustrative Plan 9 | 7 | 0.3103 |
| 2012 Plan | 1 | 0.4345 | | Illustrative Plan 9 | 2 | 0.3079 |
| 2023 Plan | 7 | 0.4335 | | Illustrative Plan 1 | 2 | 0.3026 |
| 2022 Plan | 3 | 0.4203 | | Illustrative Plan 8 | 2 | 0.3001 |
| Illustrative Plan 4 | 7 | 0.4189 | | Illustrative Plan 6 | 2 | 0.2944 |
| 2012 Plan | 7 | 0.4163 | | 1992 Plan | 4 | 0.2901 |
| 2012 Plan | 3 | 0.416 | | 2002 Plan | 4 | 0.2899 |
| 2022 Plan | 1 | 0.4132 | | Illustrative Plan 3 | 7 | 0.2861 |
| 2002 Plan | 6 | 0.4046 | | 2023 Plan | 1 | 0.2854 |
| 1992 Plan | 7 | 0.4013 | | Illustrative Plan 2 | 2 | 0.2829 |
| Illustrative Plan 8 | 7 | 0.3961 | | 2022 Plan | 5 | 0.2479 |
| 1992 Plan | 3 | 0.3953 | | Illustrative Plan 5 | 7 | 0.2267 |
| 1992 Plan | 6 | 0.3894 | | 2002 Plan | 5 | 0.2211 |
| Illustrative Plan 2 | 7 | 0.3873 | | 1992 Plan | 5 | 0.2174 |
| Illustrative Plan 6 | 7 | 0.3849 | | 2024 Special Master Plan | 2 | 0.2049 |
| Illustrative Plan 7 | 2 | 0.3755 | | 2024 Special Master Plan | 1 | 0.1916 |
| Illustrative Plan 3 | 2 | 0.3658 | | 2012 Plan | 5 | 0.1818 |

CX2 ¶ 49, fig.14.

**Figure 15**

**Illustrative Plans vs. Alabama Historical Plans – Polsby-Popper**

| Plan | District | Polsby-Popper | Plan | District | Polsby-Popper |
|---|---|---|---|---|---|
| 2023 Plan | 5 | 0.3708 | 2022 Plan | 7 | 0.1948 |
| 2024 Special Master Plan | 5 | 0.3708 | Illustrative Plan 7 | 2 | 0.1946 |
| 2023 Plan | 2 | 0.3677 | 2022 Plan | 4 | 0.1937 |
| 2023 Plan | 3 | 0.3639 | 2012 Plan | 4 | 0.1871 |
| 2024 Special Master Plan | 3 | 0.3639 | 1992 Plan | 4 | 0.1866 |
| 2022 Plan | 5 | 0.2975 | 2023 Plan | 6 | 0.1842 |
| 2012 Plan | 5 | 0.2634 | Illustrative Plan 4 | 2 | 0.1806 |
| 2022 Plan | 3 | 0.2573 | 2002 Plan | 4 | 0.1678 |
| 2002 Plan | 2 | 0.254 | 2012 Plan | 1 | 0.1613 |
| 2022 Plan | 2 | 0.2498 | 2022 Plan | 6 | 0.1543 |
| 2023 Plan | 7 | 0.2418 | Illustrative Plan 3 | 7 | 0.1528 |
| 1992 Plan | 5 | 0.2355 | 2024 Special Master Plan | 1 | 0.1475 |
| Illustrative Plan 4 | 7 | 0.2351 | Illustrative Plan 1 | 2 | 0.1394 |
| 2023 Plan | 1 | 0.2325 | 2024 Special Master Plan | 2 | 0.139 |
| 2012 Plan | 3 | 0.23 | 2012 Plan | 6 | 0.1349 |
| 2002 Plan | 5 | 0.2235 | Illustrative Plan 1 | 7 | 0.1341 |
| Illustrative Plan 3 | 2 | 0.2193 | 2002 Plan | 1 | 0.1337 |
| 1992 Plan | 1 | 0.2178 | 2012 Plan | 7 | 0.1335 |
| 2012 Plan | 2 | 0.2175 | Illustrative Plan 7 | 7 | 0.1305 |
| 1992 Plan | 3 | 0.2098 | Illustrative Plan 8 | 7 | 0.1288 |
| 2024 Special Master Plan | 7 | 0.209 | Illustrative Plan 8 | 2 | 0.126 |
| 1992 Plan | 2 | 0.2078 | Illustrative Plan 2 | 7 | 0.1256 |
| Illustrative Plan 9 | 2 | 0.2069 | 1992 Plan | 6 | 0.1204 |
| 2024 Special Master Plan | 6 | 0.1997 | Illustrative Plan 2 | 2 | 0.1157 |
| 2002 Plan | 3 | 0.1989 | Illustrative Plan 6 | 2 | 0.1149 |
| Illustrative Plan 5 | 2 | 0.1989 | Illustrative Plan 5 | 7 | 0.1149 |
| 2023 Plan | 4 | 0.1983 | Illustrative Plan 6 | 7 | 0.1073 |
| 2024 Special Master Plan | 4 | 0.1983 | 2002 Plan | 6 | 0.1052 |
| Illustrative Plan 9 | 7 | 0.1962 | 2002 Plan | 7 | 0.1036 |
| 2022 Plan | 1 | 0.195 | 1992 Plan | 7 | 0.0994 |

.

CX2 ¶ 49, fig.15.

97.     This analysis demonstrates that there is nothing unusual—let alone unreasonable—about the compactness scores of Mr. Cooper's illustrative majority-minority districts as compared to all Alabama congressional districts over the past 30-plus years.

98.     For instance, District 2 in Mr. Cooper's Illustrative Plan 7 is more compact on the Reock scale than CDs 1, 4, and 5 in Alabama's 2023 Plan. CX2,

fig.14. And District 2 in Mr. Cooper's Illustrative Plan 9 is more compact on the Polsby-Popper scale than four of the districts Alabama enacted in 2021. CX2, fig.15.

99.    As even Dr. Trende concedes, Trial Tr. 2050:4-8, 2050:24-2051:3, none of Mr. Cooper's illustrative majority-Black districts is an outlier compared to the districts enacted by Alabama over the last 30-plus years. Trial Tr. 131:8-13 (Cooper); *see also* Trial Tr. 2039:13-17 (Dr. Trende testifying that he is "not aware of any requirement that an illustrative majority-minority district needs to perform better on compactness than any specific district in the enacted plan").

100.    Dr. Trende expressed concern about the compactness of Mr. Cooper's majority-White illustrative districts, particularly CD1. DX10 at 42. But CD1 in Mr. Cooper's illustrative maps also falls well within the range of previously enacted districts in Alabama. DX10 at 45. District 1 in Illustrative Plan 9, for instance, is just two one-hundredths of a point less compact on the Reock metric than CD1 under the 2023 Plan, just three one-hundredths of a point less compact on the Polsby-Popper metric than CD1 under the 2023 Plan, and more compact than Alabama's enacted CD1 in its 2021 Plan, 2011 Plan, and 2001 Plan on the Polsby-Popper metric. CX2, figs.14-15; Trial Tr. 226:22-228:25.

101.    Dr. Trende agreed, conceding that CD1 in Mr. Cooper's Illustrative Plan 9 is more compact on the Polsby-Popper score than three of the five CD1s that Alabama itself enacted since 1992. Trial Tr. 2060:12-17. And although Dr. Trende

admitted that CD1 in Cooper Plan 9 is just two one-hundredths of a point less compact than CD1 in the 2023 Plan, he was unable to state whether that was a "meaningful" difference. Trial Tr. 2057:11-2058:20. Nonetheless, Dr. Trende admitted that CD1 in Cooper Plan 9 falls within the range of compactness for districts that Alabama has historically enacted. Trial Tr. 2058:21-24. Thus, to the extent the compactness of surrounding districts bears on the *Gingles* 1 inquiry about whether the minority group is "sufficiently large and [geographically] compact to constitute a majority in [an additional] reasonably configured district," *Milligan,* 599 U.S. 1, Mr. Cooper's illustrative plans plainly satisfy Plaintiffs' burden.

102.    Mr. Cooper's illustrative plans are also reasonably compact on a plan-wide basis. *See* Trial Tr. 134:11-24, 135:2-19, 138:3-11.

103.    In particular, as Dr. Trende conceded, Mr. Cooper's Illustrative Plan 9 is more compact on average than the 2023 Plan on the Reock metric and one-one hundredth of a point less compact on average than the 2023 Plan on the Polsby-Popper metric. CX2 ¶ 31, fig.9; Trial Tr. 2042:19-2043:1 (Trende); *see also* Trial Tr. 116:15-22 (Cooper). He also admitted that Illustrative Plan 9 is more compact on the Polsby-Popper measure than four of the last six congressional plans Alabama itself has enacted. Trial Tr. 2048:20-2049:2 (Trende).

104.    Dr. Trende conceded the same for Illustrative Plan 4 on the Convex Hull measure: Illustrative Plan 4 is more compact on this measure than four of the

last six congressional plans Alabama has enacted placing it "within the range of plans enacted by the state." Trial Tr. 2049:5-12.

105.   Dr. Trende also agreed that Mr. Cooper's Illustrative Plan 7 is reasonably compact as compared to the 2023 Plan. Trial Tr. 2043:2-9. He further conceded that both Cooper Illustrative Plans 7 and 9 are "within the normal range" for compactness. Trial Tr. 2047:20-2048:9.

106.   Under the composite plan-wide compactness measure reported by the Dave's Redistricting Application ("DRA") website, *see* Trial Tr. 135:20-137:19 (Cooper), Illustrative Plan 9 is more compact than all of Alabama's enacted maps since 1992, including the 2023 Plan. CX2 ¶ 39, fig.11. Dr. Trende, who has used the DRA score in his redistricting work in other states, agreed. Trial Tr. 2045:5-10 (Trende).

**Figure 11**

**DRA Compactness Scores (Alabama Plans – 1992-2024)**

| Plan | Composite Score |
|---|---|
| 1992 to 2000 | 36 |
| 2002 to 2010 | 32 |
| 2012 to 2020 | 38 |
| 2021 Enacted (2022) | 38 |
| **2023 Enacted** | **55** |
| **2024 Special Master** | **36** |
| **Illustrative Plan 9** | **59** |

107.  It is clear from Mr. Cooper's analysis and Dr. Trende's concessions, therefore, that it is possible to draw a congressional plan for Alabama that contains two majority-Black districts that is more compact overall than any of Alabama's enacted plans over the last 30 years. Trial Tr. 138:12-17.

108.  Notwithstanding the marginal value of cross-state comparisons, Mr. Cooper's plans—both overall and on a district level—are well within the normal range of compactness across the country. CX2 at 19. For instance, based on the DRA compactness score, Mr. Cooper's Illustrative Plan 9 is more compact than the congressional plans for 23 other states, including two states for which Dr. Trende assisted in preparing their maps. *Id.* Indeed, Dr. Trende admitted that some of Mr. Cooper's plans are more compact than plans in several other states and that not one of the districts in Cooper Illustrative Plan 9 falls within the 80 least compact districts in the country, located across 20 states. Trial Tr. 2047:25-2048:2, 2061:16-23.

### 4.  Respect for Political Subdivisions

109.  The Court finds that the *Milligan* and *Caster* Plaintiffs' illustrative plans demonstrate respect for political subdivision boundaries.

110.  Dr. Duchin's Plans D and E split the same number of counties, six, as the 2023 Plan, and the same or fewer number of municipalities (Plans B and E). MX8 at 5; MX11 at 3.

111.   As demonstrated in the tables reproduced below, Mr. Cooper's illustrative plans contain a similar number or fewer political subdivision splits than the 2023 Plan. CX1 ¶¶ 113-15, fig.28; CX2 ¶¶ 20-21, fig.3.

**Figure 28**

Political Subdivision Splits[22]

|  | Populated VTD Splits | Split Counties | Split Municipalities (excluding unpopulated blocks) |
|---|---|---|---|
| 2023 Plan | 11 | 6 | 32 |
| Special Master Plan | 14 | 6 | 31 |
| Illustrative 1 | 16 | **6** | 38 |
| Illustrative 2 | **13** | 7 | 40 |
| Illustrative 3 | **10** | 6 | 32 |
| Illustrative 4 | **12** | 6 | 35 |
| Illustrative 5 | 20 | **6** | 39 |
| Illustrative 6 | 27 | 7 | 41 |
| Illustrative 7 | 28 | **5** | 32 |
| Illustrative 8 | **12** | 6 | **30** |

**Figure 3**

Political Subdivision Splits[5]

|  | Populated VTD Splits | Split Counties | Split Municipalities (excluding unpopulated blocks) |
|---|---|---|---|
| 2023 Plan | 11 | 6 | 32 |
| Special Master Plan | 14 | 6 | 31 |
| Illustrative Plan 9 | 29 | **5** | **29** |

112.   Mr. Cooper's analysis demonstrates, for instance, that it is possible to draw a congressional map with two majority-Black districts (Illustrative Plan 3) that includes the same number of split counties, the same number of split municipalities,

and fewer VTD splits relative to the 2023 Plan. CX1 ¶ 115, fig.28; Trial Tr. 141:16-142:2.

113. Similarly, Mr. Cooper's analysis demonstrates that it is possible to draw a congressional map with two majority-Black districts (Illustrative Plan 8) that includes the same number of split counties, fewer split municipalities, and one more VTD split relative to the 2023 Plan. CX1 ¶ 115, fig.28; Trial Tr. 142:3-12.

114. Dr. Trende agreed that respect for political subdivisions is a traditional redistricting principle, agreed that Mr. Cooper's plans contain between five and seven county splits, and did not dispute Mr. Cooper's plans split fewer or a similar number of municipalities and VTDs as compared to the 2023 Plan. Trial Tr. 2065:4-14, 2067:1-16 (Trende).

### 5. Communities of Interest

115. It is now beyond dispute that Alabama's Black Belt is a community of interest. *See, e.g.*, MX8 at 10 (Black Belt counties "have a long-shared history from plantation slavery to sharecropping to Jim Crow and up to the present" and as such "constitute very clear communities of interest by the Guidelines definition"). Even SB 5's legislative findings recognize it as a community of interest, noting its "unique history and culture." MX31 at 4-5; CX19 at 4-5.

116. The Parties' primary dispute over communities of interest in this case concerns the extent to which the Black Belt and the City of Mobile form a

community of interest in comparison to Mobile and Baldwin counties, as well as the relative weight that should be accorded the Wiregrass region as a community of interest. Before analyzing that evidence, the Court reviews how the Parties have attempted to define communities of interest.

117. The evidence shows, and there is no dispute, that communities of interest will frequently overlap, and it may be impossible to preserve one community of interest without dividing another. Trial Tr. 2034:17-24 (Trende); *Milligan* Doc. 459-6; *Caster* Doc. 370-6 ("Hinaman 2021 Dep.") at 155 ("[B]ecause there are so many different communities of interest, they're not – I mean, no plan is going to respect all of them. So there are trade-offs."). For example, SB 5's legislative findings acknowledge that the Black Belt and Wiregrass communities both share several counties, and that even SB 5's prioritized communities can be split into two districts. MX31 at 4-5, 8; CX19 at 4-5, 8.

118. As Dr. Duchin further explained, the principle of protecting communities of interest does not mean that an entire congressional district must "form a single community of interest" wherein every person must share a community of interest with every other person in the district. PI Tr. 596:23-597:12. Rather, preserving communities of interest means that communities should be "taken into account when you draw" districts "so that either they're kept whole within a district,

or if it's appropriate, split among several in a way that amplifies their opportunity to be heard by their representatives." *Id.*

119.    Alabama's 2021 Guidelines—readopted in 2023—define communities of interest broadly as "an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts." CX42 at 2–3.

120.    SB 5's findings differed from the Guidelines' definition of "community of interest" in that it removed from the definition shared "ethnic, racial, tribal, social . . . identities," and added similarity of "transportation infrastructure, broadcast and print media, educational institutions." *Compare* CX19 at 3 *with* CX42 at 2–3.

121.    Although both definitions of communities of interest describe different potential shared characteristics, the Court notes that the Solicitor General described the SB 5 legislative findings as "essentially [ ] describing the [2023] map," CX46 at 162:12-13, and that neither Mr. Hinaman nor the Reapportionment Co-Chairs had seen the findings until right before the vote on SB 5, Hinaman 2023 Dep. 94:11-95:23; *Milligan* Doc. 459-20; *Caster* Doc. 370-20 ("Pringle Dep.") 90:18-92:23; Livingston Dep. 101:18-102:13. Given the descriptive, rather than prescriptive, nature of the SB 5 definition, the Court accords lower weight to these criteria in

evaluating the illustrative plans, but doing so would not ultimately change the Court's evaluation that both Dr. Duchin's and Mr. Cooper's plans sufficiently respected communities of interested and did so at least as well as the 2023 Plan if not better.

122. *The Black Belt and the City of Mobile*

123. The Court heard testimony from a number of well-informed fact witnesses and experts on the degree of connection between the Black Belt and Mobile, all of which it gives considerable weight.

124. Representative Sam Jones testified that "the City of Mobile and other nearby communities in Northern Mobile County such as Prichard, Chickasaw, and Mount Vernon, have more similarities and closer ties to much of Alabama's Black Belt than these communities do with Baldwin County." MX200 ¶ 5 (Jones Declaration).

125. Since 2018, Representative Jones has served in the Alabama House of Representatives from House District 99, which includes parts of the City of Mobile and parts of Mobile County outside of the city. MX200 ¶ 2. He was born in Mobile County in 1947, and other than his time in the U.S. Navy from 1967-1976, he has always lived in Mobile. MX200 ¶ 4. Before becoming a member of the Alabama State Legislature, Representative Jones served as the first Black Mayor of the City of Mobile from 2005 until 2013, was a Mobile County Commissioner from 1987

until 2005, and spent approximately 15 years chairing the South Alabama Regional Planning Commission. MX200 ¶ 3.

126.  Plaintiff Dr. Marcus Caster, a lifelong resident of southwestern Alabama, Trial Tr. 371:10-15, similarly testified that Black residents in the Mobile area share more in common with the Black Belt region than they do with Baldwin County. PI Tr. 1636:13-25. Dr. Caster was raised in Mobile County, lives in Washington County, and worked for years in the school systems of both Clarke and Mobile counties. Trial Tr. 369:4-6; 370:1-9; 371:21-372:4; 373:2-15; 375:14-25. He is active in his community both as a high school basketball coach and a founder of several nonprofit organizations serving communities in the Black Belt and Mobile. Trial Tr. 373:24-374:1; 376:14-17.

127.  Plaintiff Evan Milligan considers Montgomery and the Black Belt to share many connections with the City of Mobile. Trial Tr. 1177:4. Mr. Milligan is a Montgomery resident, lived in and attended Montgomery schools from second grade through twelfth grade, and has lived in Montgomery for about 32 years, in total. Trial Tr. 1152:24-25, 1153:17-19. Mr. Milligan gained knowledge about the Black Belt and the City of Mobile through his time in Montgomery, and his extensive work experience as the founding executive director of Alabama Forward, a statewide civic engagement network, and as a community organizer with the Federation of Child Care Centers of Alabama and the Equal Justice Initiative. Trial Tr. 1170:1-1172:12.

128.   Plaintiff Letetia Jackson also provided informative testimony about the Black Belt and its current and historical connection between parts of South Alabama like Mobile and the Black Belt, and Dothan and the Black Belt. Ms. Jackson grew up in Dothan attending segregated schools and has lived in Dothan again since 2002. Tr. 683:2-7, 684:4-9. Her family has deep roots in south Alabama—her great grandmother was enslaved on a plantation in Barbour County, in the Black Belt, and she still has relatives in Barbour County as well as in Pike County, Russell County, and Mobile. Trial Tr. 683:11-20. Ms. Jackson served as a political consultant for several campaigns in Alabama and elsewhere and currently is the convener of the South Alabama Chapter of the Black Women's Roundtable, an organization focused on engaging Black women through leadership development, empowerment, and mentoring. Trial Tr. 706:15-25, 731:18-23.

129.   Robert Clopton, President of the Mobile branch of the NAACP and a self-identified Republican, testified about his extensive knowledge of both Mobile and the Black Belt. Mr. Clopton not only has lived in Mobile for 12 years as well as having lived in Marengo and Clarke Counties in the Black Belt, Trial Tr. 248:3-249:1, 258:16-21, but in his positions as a UPS Business Manager, he was responsible for mapping routes in Mobile and in Clarke, Marengo, Wilcox, Choctaw, Dallas, and Lowndes Counties. Trial Tr. 248:7-24.

130.   Plaintiff Shalela Dowdy also offered very knowledgeable testimony about the connections between the City of Mobile and the Black Belt. Dowdy was born and grew up in Mobile city as well as nearby Prichard. Trial Tr. 17:11-19:5. She eventually left temporarily to attend West Point and serve in the U.S. Army. Trial Tr. 23:18-20. She is currently a member of the Individual Ready Reserves of the U.S. Army and holds the rank of Major. Trial Tr. 16:24-17:1. She has lived in Mobile again since 2019. Trial Tr. 67:9-11, 68:3-9. Major Dowdy currently works as a regional organizer for Black Voters Matter. In that role, she cultivates relationships with partner organizations across southwest Alabama, including Mobile County and counties in the Black Belt like Clarke, Monroe, Conecuh, Butler, Bullock, and Crenshaw. Trial Tr. 40:2-6, 41:10-16. She also is the second vice-president of the Mobile Branch of the NAACP, the founding president of Stand Up Mobile, and a member of Delta Sigma Theta, a historically Black sorority founded in 1913 that advocates on behalf of Black communities. Trial Tr. 42:21-43:3.

131.   Pastor Valtoria Jackson serves at Saint Peter African Methodist Episcopal Church in West Montgomery. Trial Tr. 1074:4-11. She has worked with churches and community organizations that serve poor communities, advocate for livable wages and quality education and healthcare, and facilitate voting through Montgomery, Mobile, and the Black Belt. Trial Tr. 1075:10-14, 1084:11-1087:21.

She has also served those same communities in her work as a nurse and in developing sexual assault programs. Trial Tr. 1077:8-1081:4.

132.   The Court also heard testimony from Janice Malone. Ms. Malone was born and grew up in Mobile, and after some time away, returned in 1992 and has lived there ever since. Trial Tr. 1130:25-1131:24. Ms. Malone is the founding executive director of Vivian's Door, a nonprofit that helps minority businesses grow and reinvest in marginalized communities, and that assists residents that have faced systemic poverty, low venture capital, and discrimination. Trial Tr. 1135:21-1136:5. Vivian's Door works with businesses in south and central Alabama, including the Black Belt. Trial Tr. 1138:10-19. Vivian's Door works with businesses based on the Black Belt, including Monroe, Dallas, Lowndes, Montgomery, Clarke, Barbour, Pike, and Macon counties, among others. Trial Tr. 1150:1-14.

133.   By contrast, Defendants offered no fact witness testimony about any connection or lack thereof between Mobile and the Black Belt, and only one fact witness, Lee Lawson, who offered testimony about the connection between Mobile and Baldwin Counties.

134.   The *Milligan* and *Caster* Plaintiffs also offered testimony by Dr. Joseph Bagley about the role of historical connections between Mobile and the Black Belt on a number of areas of modern life. In sum, Dr. Bagley testified that "a substantial part of Mobile forms a very strong community of interest with the Black Belt," while

"Mobile and Baldwin County, conversely, do not constitute [any] sort of wholly and inviable community of interest." Trial Tr. 1298:9-12.

135.    Dr. Bagley is an Associate Professor of History at Georgia State University with a specialization in 20th and 21st history American politics and law and civil rights, especially in the South and in Alabama, and he grew up in Alabama. Trial Tr. 1277:17-1278:11. He has written a book published by the University of Georgia Press, titled "The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools," among other works. MX4 at 34; CX5 at 33. The Court accepted Dr. Bagley without objection as an expert in Alabama history, among other fields. Trial Tr. 1279:4-11. The Court once again finds Dr. Bagley's testimony credible concerning the relationships from a historical perspective between Mobile, the Black Belt, Baldwin County, and the Wiregrass. *See Milligan II*, 690 F. Supp. 3d at 1298.

136.    Defendants offered expert testimony about the relationships between the Black Belt, Mobile, and Baldwin County from Dr. Wilfred Reilly, an Assistant Professor of Political Sciences at Kentucky State University. Although Defendants purported not to hold out Dr. Reilly "as an expert on communities of interest," Trial Tr. 1266:11-12, Dr. Reilly nonetheless testified to the strength of "historical ties between Mobile and the Black Belt," DX8 at 5, including whether Mobile County is the "true soul-mate of Baldwin County," *id.* at 12, and whether "Mobile has a natural link to the Black Belt region of Alabama," *id.* at 14.

137.  Dr. Reilly's educational background is in "political science, with a focus in international relations, that includes race relations, public law and political theory." Trial Tr. 2161:22-23. He is admittedly not an expert in Southern politics, and none of his academic research has focused on politics in Alabama. Trial Tr. 2212:9-14. The Court accepts some of the limited statistical evidence that Dr. Reilly provided on Alabama communities and looks to what his cited documents themselves state. Otherwise, however, the Court declines to credit Dr. Reilly's testimony in this area based on his lack of relevant expertise and his deeply flawed methodology, as set out in detail below.

138.  The Court finds as follows based on all this testimony and accompanying documentary evidence.

139.  *First*, the *Milligan* and *Caster* Plaintiffs offered thorough and credible evidence about the continuing influence of historical ties between Mobile and the Black Belt, which includes migration patterns and extensive continuing familial connections.

140.  As Dr. Bagley testified, if one studies "Mobile and the Black Belt both now and historically, you can see that there's a very real and significant shared history." Trial Tr. 1299:17-19. The two areas share a direct connection in terms of a shared history of chattel slavery, emancipation, Reconstruction, Redemption, and "the struggle for basic civil and voting rights in the 20th Century." Trial Tr. 1299:20-

24 (Bagley); MX3 at 2-3; CX10 at 2-3. These histories link the regions particularly through the role of migration from the Black Belt to Mobile and the role of the river systems connecting the two regions.

141.  Mobile city was both a primary site of the importation of Africans who would be enslaved by White landowners in the Black Belt and forced to work on their plantations ("up to the illegal importation of enslaved individuals by the crew of the Clotilda in 1860"), and "the export of the cotton grown by the enslaved people in the Black Belt that made Alabama planters among the richest individuals in the union." MX3 at 2; CX10 at 2; *see also* MX2 at 1; CX17 at 1. This connection between Mobile and the Black Belt was in part due to the river networks between the two cities, MX2 at 3, CX17 at 3. As Dr. Bagley explained, "[r]ivers like the Alabama, Tombigbee, Black Warrior, and Mobile have provided transportation connecting Alabama's Black Belt to the Gulf of Mexico for centuries," with "plantation owners and farm owners transport[ing] enslaved Black people up and down these rivers, alongside agricultural products that powered the region's economy." MX5 at 19; CX6 at 19. The use of the rivers to transport goods between the Black Belt and Mobile remains today, with the Port of Mobile "exporting not just timber from the Black Belt, but also soybeans, livestock, cotton, and automobiles (manufactured at the Hyundai assembly plant in Montgomery), and containing "warehousing and shipping facilities that remain essential to storing and

exporting agricultural goods from the Alabama Black Belt." MX5 at 19-20; CX6 at 19-20.

142.    Alabama politicians and the Legislature itself as far back as the late 1800s recognized the City of Mobile and the Black Belt as a part of the same community. For example, Congressman Frederick Bromberg, an influential political leader in Mobile city from the 1870s through the 1920s, recognized Mobile city as a "large town[] in the Black Belt." Trial Tr. 785:3-22, 787:5-9. 788:5-19 (Riser), 1304:11-23 (Bagley); *see also Brown v. Bd. of Educ. of Mobile Cnty.*, 542 F. Supp. 1078, 1087 (S.D. Ala. 1982). Consistent with this widely understood connection, in plans from 1875 to 2021, Alabama itself put Mobile and western Black Belt counties together in a congressional district. Trial Tr. 1310:2-1311:18, 1324:20-1325:24 (Bagley). In maps from 1875 to 1972, Alabama put Mobile and the western Black Belt together in a district but placed Baldwin in a separate one. Trial Tr. 1310:2-1311:18 (Bagley). Similarly, after the 2010 and 2020 censuses, and consistent with their close historical and educational ties, the Legislature itself adopted plans for the State Board of Education that put the City of Mobile together with the Black Belt and separated Mobile and Baldwin County. MX5 at 19; CX6 at 19.

143.    These historical and economic connections between the two areas, combined with violence and economical reprisals directed at Black residents of the Black Belt who sought greater economic and political opportunities from

Reconstruction through to the Civil Rights Movement, MX2 at 2-3, CX17 at 2-3, created "waves of migration from the Black Belt to Mobile." Trial Tr. 1300:3-5 (Bagley).

144.   Representative Jones testified about how that even in recent decades, "a lot of people migrate from Black Belt counties to Mobile County. I mean a lot of them. And a lot of them become residents here. Sometimes when you see the reduction in population in some Black Belt counties, it's because they have either relocated to Montgomery or Mobile. . . . Because of health care availability, because of jobs availability, because of so many different things that they think would enhance their families. That's why they do that." *Milligan* Doc. 459-9; *Caster* Doc. 370-9 ("S. Jones Dep.") 115:4-16.

145.   Because of these migration patterns, there are extensive familial connections between Mobile and the Black Belt. As Representative Jones explained, "[p]eople from Mobile do spend quite a bit of time back and forth in the Black Belt . . . . Because that's where they're from. That's where they were born and raised." S. Jones Dep. 120:14-18. Representative Jones "can't think of a single family who lives on [his] street who don't have origins or relatives in Alabama's Black Belt, places like Wilcox, Lowndes, and Marengo Counties, as do many others [he knows] who live in Mobile." MX200 ¶ 10.

146.   For example, when he lived in the Black Belt, Mr. Clopton traveled from the Black Belt to Prichard to visit his in-laws, Trial Tr. 254:24-255:1, and explained it is very common for people from the city of Mobile to have family in the Black Belt, Trial Tr. 255:2-11.

147.   Dr. Bagley cites additional testimony from Black state legislators during floor debate on S.B. 5, on July 19, 2023, about how their families and friends came to Mobile from the Black Belt and how they still have family in the Black Belt. MX3 at 3-4 (recounting testimony of Reps. Clarke and Drummond of Mobile); CX10 at 3-4.

148.   For decades, the Black Belt has experienced a "hemorrhaging" of Black and white people from the Black Belt into Mobile city. Trial Tr. 1461:9-22 (Bagley).

149.   *Second*, the record provides extensive evidence of close cultural connections between Mobile city and several surrounding communities like Prichard with the Black Belt, through shared traditions and religious and recreational activities, among other things. As Representative Jones testified Mobile city and the Black Belt also share significant cultural ties, some of which result from substantial migration from the Black Belt to Mobile, pastors in both areas serving the other as well, MX200 ¶¶ 7, 10-11, and a Mardi Gras tradition which "has the feel of a family reunion" unlike Baldwin's separate celebration, *id.* ¶ 12.

150.   Pastor Valtoria Jackson also testified about connections between the Black Belt and Mobile based on her work with community and church organizations that provide services to poor people and advocate for livable wages, quality education, and quality healthcare throughout the Black Belt and in Mobile. Trial Tr. 1084:11-1086:5. And as the pastor of an African Methodist Episcopal church in Montgomery, she has attended and organized trips to numerous church conferences in Mobile. *Id.* at 1123:22-1124:3.

151.   Pastor Jackson has observed that the Black community faces similar challenges and disparities in Montgomery, Mobile, and the rural Black Belt in housing, education, access to quality jobs, and healthcare. Trial Tr. 1105:4-1106:7. For instance, she explained that hospital closures in Montgomery, for example, put a strain on hospitals in other areas and that paired with the inability to recruit physicians, create challenges in accessing healthcare services in Montgomery, Mobile, and the rural Black Belt. Trial Tr. 1105:25-1106:8. She also testified that many Black people from the rural Black Belt who struggled to find good jobs would travel or move to Montgomery or Mobile, but even after relocating many continue to work jobs without adequate pay and reside in low-income housing communities. Trial Tr. 1105:11-24.

152.   Mr. Smith testified that "there is a certain section of Mobile that shares the same needs" as the Black Belt, including in areas of economic development, poor infrastructure, and access to affordable healthcare. Trial Tr. 478:11-19.

153.   Mr. Milligan also testified that Montgomery has many religious headquarters based in the city, so "[d]ecisions are made about where itinerate preachers are going to be placed in south Alabama, throughout the Black Belt, in Mobile County." Trial Tr. 1177:20-22.

154.   Other cultural connections abound as well. Mr. Milligan explained that people in the Black Belt and Mobile "value water" and that fishing is a huge pastime, Trial Tr. 1177:4-12. He also testified about his knowledge that people from Black Belt counties like Choctaw, Washington, and Montgomery travel to Mobile for Mardi Gras. Trial Tr. 1179:3-8.

155.   Major Dowdy also explained how friends and family from the Black Belt come to Mobile for Mardi Gras, spring fling, and HBCU games (where two teams from historically Black colleges face off in football). Trial Tr. 38:11-23.

156.   Throughout the Black Belt as well as in Mobile, Ms. Jackson has observed various cultural connections including quilting, similar childhood games, church music—including singing competitions throughout the Black Belt and Mobile—and the culture of cooking and food. Trial Tr. 703:14-23, 704:23-705:22.

157. Relationships also exist in the areas of education, media, and entertainment, including sports leagues. Dr. Caster explained that the high school basketball team that he coached, at Jackson High School in Clarke County, would regularly travel both to Mobile County and throughout the Black Belt to compete. Trial Tr. 374:8-23; 375:6-13; 397:16-398:5. This includes playing teams in the eastern part of the Black Belt in Barbour and Bullock Counties. Trial Tr. 397:19-25. But, despite its geographic proximity, the team rarely traveled to Baldwin County. Trial Tr. 374:24-375:5, 398:6-9. Among other nonprofit organizations founded and operated by Dr. Caster is a youth sports league that serves predominantly Black communities in the Black Belt and Mobile County. Trial Tr. 377:1-14.

158. Mr. Clopton also explained that high schools in the Black Belt play sports against high schools in the city of Mobile. Trial Tr. 258:6-15. Mr. Clopton explained that news stations in Mobile city show news from Black Belt counties, Trial Tr. 258:6-15, and that when he lived in Marengo County, he would get his news from stations in Mobile city, Trial Tr. 258:16-21.

159. Mr. Milligan similarly testified that the media in Montgomery "pretty frequently" reported on Mobile city and the Black Belt, Trial Tr. 1180:23-1181:7, and that, in high school, Mr. Milligan was a member of the Sidney Lanier Marching Band, which traveled to Mobile city every year to participate in Battle of the Bands

and Mardi Gras parades, and had a "big rivalry with LeFlore High School and Vigor" in Mobile. Trial Tr. 1178:3-8.

160.  Mobile City Council member William Carroll testified to spending significant time not only fishing in Greene County in the Western Black Belt, but also frequently travelling to Phenix City (Russell County) in the Eastern Black Belt during football season when his son played high school football. *Milligan* Doc. 459-4; *Caster* Doc. 370-4, ("Carroll Dep.") at 46:3-25.

161.  Third, the record reveals strong economic, transportation, and socioeconomic connections and similarities between Mobile city and the Black Belt.

162.  Representative Jones testified about how the City of Mobile has "attracted job seekers from Alabama's Black Belt for decades," which has "created a regular migration from the Black Belt to Mobile," and has led companies to "actively recruit talent from the Black Belt." MX200 ¶¶ 7-8.

163.  Consistent with Representative Jones's testimony, Dr. Caster, a resident of Washington County in the Black Belt, frequently travels to Mobile County to—for example—visit family, shop, get healthcare services, or celebrate Mardi Gras. Trial Tr. at 397:9-15.

164.   When Mr. Clopton lived and worked in the Black Belt, he visited the City of Mobile to go to the airport there, which was the closest airport to where he lived, as well as to shop. Trial Tr. 254:11-23.

165.   Mr. Clopton also testified about how people from the Black Belt come to Mobile for jobs, including the paper mills like International Paper, Kimberly-Clark, Scott Paper Company, the shipyards, and Airbus. Trial Tr. 255:18-24.

166.   Major Dowdy also spoke to the economic ties between the City of Mobile and with the Black Belt as well, with people from the Black Belt traveling to the city of Mobile for jobs including working at the Port and Airbus. Trial Tr. 77:3-11. She also testified that in her current position with Black Voters Matter, she is assigned to the southwest region of Alabama which includes central and eastern Black Belt counties including Bullock and Crenshaw. Trial Tr. 41:10-12.

167.   Janice Malone testified that her organization, Vivian's Door, works with a range of businesses, including farmers, transportation, manufacturing, health and beauty, and medical companies, in the Black Belt and the City of Mobile. Trial Tr. 1138:10-19. For example, Vivian's Door works with many farmers from the Black Belt who must work full-time jobs in Mobile city to make ends meet, while farming in the Black Belt on the weekends. Mobile provides a larger market for them sell produce. Trial Tr. 1138:20-1139:20. The Black Belt-based businesses that Vivian's Door works with are in Monroe, Dallas, Lowndes, Montgomery, Clarke, Pike, and Macon Counties, among others in the Black Belt. Tr. 1149:18-1150:14.

168.   Beyond these direct economic ties, there are also "significant socioeconomic commonalities between the sort of urban core of Mobile and the Black Belt." Trial Tr. 1300:1-3 (Bagley).

169.   Both Mobile and the Black Belt are experiencing population decline, while Baldwin County has been the fastest growing county in the state and one of the fastest growing in the nation recently. MX5 at 20; CX6 at 20. The Alabama Department of Public Health (ADPH)'s Social Determinants of Health (SDOH) in 2020 also revealed connections between Mobile and the Black Belt, with shared "Income disparities, education, poverty, unemployment, food insecurity, housing, and family social support services need to be addressed as a system to build environments that contribute to wellness and support opportunities for healthy choices." MX5 at 20; CX6 at 20; *see also* Trial Tr. 29:5-18 (Dowdy), 965:3-967:5 (Burch).

170.   *Fourth*, the record reflects extensive ties and similarities between the Black Belt and Mobile in terms of healthcare, infrastructure, and environmental issues.

171.   Plaintiff Ronald Smith, who is from Bullock County, in the Black Belt, testified that parts of Mobile share some of the same needs of his community in the Black Belt, including "[e]conomic development, poor infrastructure," and "affordable healthcare." Trial Tr. 478:11-19.

172.    Like Mr. Smith, Pastor Jackson testified that the Black Belt counties and Mobile share similar concerns about housing, education, access to quality jobs, and healthcare. Trial Tr. 1105:1-1106:7.

173.    Black Belt residents also depend on Mobile for "specialized healthcare or high-level treatment." MX200 ¶ 9.

174.    Mr. Clopton also recounted how people from the Black Belt visit Mobile for healthcare because the Black Belt has inadequate healthcare infrastructure and quality. Trial Tr. 255:25-256:12. In October 1989, Mr. Clopton's pregnant wife traveled to the local hospital in Clarke County in the Black Belt because she was experiencing medical issues, but the doctor, without examining his wife, told the family that he would have to perform an abortion procedure on her. Mr. Clopton and his family then drove to the city of Mobile to a Black doctor who advised his family and did not perform an abortion procedure, allowing his wife to carry her baby to term. Trial Tr. 256:17-257:25.

175.    Major Dowdy also testified to the healthcare connections between Mobile and the Black Belt. There is only one hospital left in the Black Belt, and it is scheduled to close, requiring people in the Black Belt to travel to Mobile or Montgomery for their care. Trial Tr. 30:24-31:6. Black people both in the Black Belt and the City of Mobile suffer from a maternal mortality crisis. Trial Tr. 31:17-21.

176.    Major Dowdy testified that there are many infrastructure issues in both Mobile and the Black Belt: dilapidated buildings; blight in both communities; lack of adequate water infrastructure; and crumbling roads. Trial Tr. 28:16-29:4. For example both Prichard (Mobile County) and Lowndes County lack adequate water infrastructure. Trial Tr. 28:23-29:3. The lack of adequate water infrastructure has led to environmental and health concerns in both Mobile city (Africatown neighborhood) and parts of the Black Belt. Trial Tr. 29:19-30:10.

177.    Additionally, both the City of Mobile and the Black Belt have food deserts. Trial Tr. 29:5-10 (Dowdy) *see also* Trial Tr. 965:3-967:5 (Burch). Major Dowdy testified that she believes the Legislature's refusal to raise the state minimum wage contributes to high levels of poverty in the area. Trial Tr. 29:15-18.

178.    Defendants attack the links between the Eastern Black Belt and Mobile in particular, Trial Tr. 2610:8-11, focusing on the fact that few people commute from places like Macon and Pike Counties to Mobile County, Trial Tr. 79:10-21 (Dowdy). But neither traditional districting principles, nor the State's own Guidelines require that citizens at different ends of a district work or interact each day to form a community of interest, particularly if there are other shared cultural, recreational, and historical interests. Indeed, no one disputes that the eastern and western Black Belt are a community of interest, despite no evidence of people commuting from Greene County to Barbour County. *See* MX31 at 4-5 (SB 5 text recognizing that the

Black Belt is a community of interest and also that the "Black Belt region spans the width of Alabama"); CX19 at 4-5. And the State itself has drawn districts, for example, that include both Lauderdale County in west and Dekalb County in the northeast, with no evidence of any ties whatsoever between them. *See* DX86.

179.   In any event, trial testimony confirms several significant ways in which even the Eastern Black Belt and the City of Mobile share connections, including through shared economic ties, like Ms. Malone's Mobile-based organization Vivian's Door working with farmers in Pike and Macon Counties, Trial Tr. 1149:18-1150:14, Major Dowdy's testimony that people in the eastern Black Belt commute west to Montgomery in the central Black Belt. Trial Tr. 79:10-21, Ms. Letetia Jackson's testimony about experiencing between the eastern Black Belt and Mobile, including similar games, foods, music, churches, and even singing competitions, Trial Tr. 703:14-23, 704:23-705:22, and Dr. Caster's and Mr. Carroll's testimony about Mobile and Eastern Black Belt high school teams competing in sports, Trial Tr. 397:19-25 (Caster); Carroll Dep. 46:3-25.

180.   Based on the foregoing and the full record in this case, this Court finds that the Black Belt and the City of Mobile share cultural, historical, economic, and social commonalities and therefore comprise their own shared, overlapping, historical-socioeconomic community of interest entitled to at least equal respect to a Gulf Coast community of interest.

a. *Mobile and Baldwin Counties*

181.   Defendants' purportedly "non-negotiable" interest in keeping Mobile and Baldwin Counties together, MX31, CX19, even setting aside the tenuousness of this contention, does not alter our analysis. While Mobile and Baldwin share some economic ties due to their proximity to one another, these communities lack many of the other similarities that unite the City of Mobile and the Black Belt.

182.   As Rep. Jones explained, "Baldwin County has a different cultur[al] makeup than Mobile County." S. Jones Dep. 116:6-7. He does not "know too many Mobilians that do a lot in Baldwin County. I don't think they have anything in common." S. Jones Dep. 113:14-16. He explained that despite the superficial appearance of ties, that Mobile County and Baldwin County [look like they] might have a lot in common but, quite frankly, they don't. Baldwin County's economy is based on some agriculture and tourism. That's the gist of the economy." S. Jones Dep. 114:15-20.

183.   Dr. Caster similarly attested that while Mobile County's economy is driven by "blue collar" or "industrial" jobs, Baldwin County's economy is driven by tourism. Trial Tr. 405:11-18. Dr. Caster was raised to avoid travelling through relatively affluent, predominantly white Baldwin County due to an understanding that Black Alabamians from the less affluent, predominantly areas west of the Mobile Delta are unwelcome there. Trial Tr. 398:10-399:7.

184.   As Rep. Jones testified, the City of Mobile serving as "Southern Alabama's industrial center, [and] Baldwin County's economy is driven by tourism, MX200 ¶ 16, and the counties have separate community college systems, *id.*

185.   Dr. Caster testified that unlike the shared youth sports leagues between Mobile and the Black Belt, Baldwin County has its own youth athletics leagues sponsored by the county government. Trial Tr. 377:15-23.

186.   Major Dowdy similarly testified that Baldwin County does not have the same issues facing the Black Belt and the city of Mobile. Trial Tr. 31:22-24; 32:7-9. She correctly noted that Baldwin County is one of the fastest growing areas in the state and has new infrastructure which means that it does not share infrastructure issues like the Black Belt or the city of Mobile. Trial Tr. 31:22-32:4. Additionally, the tourism industry in Baldwin County focuses on the beaches there, Trial Tr. 34:1-18, while the tourism industry in Mobile is focused on Mardi Gras, Trial Tr. 35:21-36:3.

187.   Dr. Bagley agreed that these two counties have not historically been seen as a single tourist destination. Even based on his personal experiences growing up in Alabama, the City of Mobile and Baldwin County were "very distinct tourist destinations." Tourists tend to go "to Mobile to enjoy Mardi Gras" but usually do not go to Baldwin County beaches in the same trip. In fact, as Dr. Bagley explained,

it is only "very, very recently" that the tourist industries in Mobile and Baldwin counties have begun to try to coordinate with one another. Trial Tr. 1302:5-1303:1.

188.   Even with regard to economic ties between Mobile and Baldwin, the evidence of economic connections between Mobile and Baldwin supports a one-directional benefit. According to Rep. Jones, the only link between Baldwin and Mobile is economic, and even there, you have inflow from Baldwin to Mobile, but very little in the other direction. S. Jones Dep. 117:2-14. Rep. Jones "cannot think of a major economic development project in Mobile that [he] was not a part of in the last 24 years," and during his fifteen years as Chair of the Regional Planning Commission, he "cannot think of any economic development ventures where [Mobile] had to provide incentives in which Baldwin participated. Baldwin's economic base is fundamentally different from Mobile's economy." MX200 ¶ 17.

189.   Defendants offered the deposition and written testimony of Lee Lawson, the President of the Baldwin County Economic Development Alliance. *See* DX248. Although Mr. Lawson noted several ways in which Baldwin County's economy was tied to Mobile's, he failed to note any significant ways in which Mobile County depended on Baldwin. *See generally* DX248; *Milligan* Doc. 459-12; *Caster* Doc. 370-12 ("Lawson Dep."). Mr. Lawson also admitted that there are several significant differences between Mobile and Baldwin, including Baldwin's

disproportionate reliance on tourism for its beaches, in contrast to Mobile. Lawson Dep. at 33:21-34:21, 35:13-38:15.

190.   Dr. Bagley also provided compelling testimony about how school desegregation created more divergences between Mobile and Baldwin. He testified that when "any sort of meaningful integration and especially desegregation in the public school systems in Mobile County" began to occur, "white flight increases substantially. And a large portion of that is affluent white families who are able to, for lack of a better word, escape across the bay to the Eastern Shore. And they settle in communities like Spanish Fort, Daphne, Fairhope." Trial Tr. 1301:2-8. Dr. Bagley noted as examples "schools in urban Mobile, like Vigor, which was once an all-white school, [which] experienced a significant violence as a part of desegregation and full integration" and has "become an overwhelmingly black school but also overwhelmingly a school that serves students under Title I," as has Blount. But "if you are looking across the bay, at Daphne, Spanish Fort, and so on, and it's very, very different. Those families are affluent, those schools are, in most cases, overwhelmingly white. And if you go just by the Title I numbers, you can see there's a very stark difference." Trial Tr. 1301:16-1302:4; *see also* MX2 at 3-4; CX17 at 3-4.

191.   Dr. Bagley also detailed how, rather than "the histories of Mobile and Baldwin in congressional districting [reflecting] some inviolable community of

interest in Alabama congressional redistricting, their combination and severance has been historically informed by racial politics." MX5 at 21; CX6 at 21.

192.   Before the 1970s redistricting, Mobile and Baldwin Counties were in separate Congressional Districts, going back to the 1870s. Trial Tr. 1304:24-1305:24 (Bagley). The 1972 plan pairing them together was "very much steeped in, at that time, racial backlash." Trial Tr. 1309:15-21 (Bagley).

193.   There is no evidence that the 1972 decision to place Mobile and Baldwin counties together in a congressional plan did not reflect the Legislature's desire to unite a Gulf port community. Trial Tr. 1309:9-13 (Bagley); *see also* MX3 at 7; CX10 at 7. Rather, the State's purpose in pulling Mobile away from its pairing with more Black Belt Counties and matching it with Baldwin was to continue cracking the Black vote. Trial Tr. 1311:23-1312:1 (Bagley). Indeed, the 1972 Legislature rejected a plan to create two districts where Black voters might have a "fighting chance" to elect their preferred candidates and instead enacted a plan that greatly diminished Black voters' influence in three districts. Trial Tr. 1308:10-1309:21 (Bagley).

194.   Beyond just the differences between the City of Mobile and Baldwin County, record evidence supports a finding that there is a greater relationship between the portions of southern Mobile County that are in fact connected with Baldwin County in both the Court's 2023 remedial plan and Plaintiffs' illustrative

plans; whereas Baldwin County and southern Mobile County share weaker ties to the City of Mobile. For example, the City of Mobile does not have a beach, but southern Mobile County has Dauphin Island, a sandy beach that is similar to the 31 miles of sandy beaches in Baldwin County. Lawson Dep. 37:18-28:15. Southern Mobile County is also known for its seafood industry, S. Jones Dep. 128:7-129:1, while in the City of Mobile, the industries are focused on shipbuilding and manufacturing, *id*. 123:5-17.

195.   Defense expert Dr. Reilly's testimony fails to meaningfully rebut the substantial historical analysis and extensive firsthand experiences of Dr. Bagley and the *Milligan* and *Caster* Plaintiffs' fact witnesses. Thus, the Court accords little weight to Dr. Reilly's testimony about the ties between Mobile and Baldwin County.

196.   None of Dr. Reilly's academic research has focused on the concept of communities of interest in Alabama or anywhere else. Trial Tr. 2212:15-25. He, admittedly, "[does not] have a great deal of experience with communities of interest in the sense of voting." Trial Tr. 2213:13-15. He did not rely on any peer-reviewed studies concerning the identification of communities of interest. Trial Tr. 2215:10-15.

197.   Instead, Dr. Reilly admitted to selecting the metrics of population, population density, per capita income, and the prevalence of crime based on the general idea of a comparable community that would be used by anyone who's a

buyer of real estate, in addition to the *CIA World Factbook*. Trial Tr. 2215:4-9. The *CIA World Factbook* provides basic intelligence on different countries. Trial Tr. 2217:17-19. It does not discuss communities of interest within the United States, let alone communities of interest in the context of congressional redistricting. Trial Tr. 2217:25-2218:5.

198.    Dr. Reilly also did not conduct his analysis according to Alabama's redistricting guidelines. Trial Tr. 2218:19-21. Prior to his deposition on August 30, 2024, Dr. Reilly had not even seen Alabama's redistricting guidelines. Trial Tr. 2218:24-2219:1. In fact, Dr. Reilly disagreed with the inclusion of ethnicity in the guideline's definition of communities of interest, Trial Tr. 2219:7-10, and he did not analyze shared religious traditions, common folklore, or historical migration patterns within the State of Alabama in order to identify communities. Trial Tr. 2219:11-25. He was not aware that Alabama separates much of the City of Mobile from Baldwin in its State Board of Education districts. Trial Tr. 2231:18-21. And his report did not mention education as it relates to communities of interest. Trial Tr. 2231:22-24.

199.    Instead, Dr. Reilly analyzed residency and commuting patterns, Trial Tr. 2220:14-17, which he had never before analyzed in his published academic work. Trial Tr. 2220:18-21.

200.    He conducted this analysis in a piecemeal and incomplete fashion. To determine whether there were commonalities between the county-level regions of

Baldwin and Mobile vis a vis Mobile and the Black Belt counties, he only analyzed the Alabama Department of Labor profiles for Mobile and Baldwin counties. Trial Tr. 2220:22-2221:9. While he testified to "look[ing] at equivalent profiles for the Black Belt counties," that analysis did not exist in his report. Trial Tr. 2221:11-15. Therefore, he did not analyze residency and commuting patterns of Black Belt residents. Trial Tr. 2221:16-19. As such, Dr. Reilly did not dispute that 34 percent of Washington County residents work in Mobile County. Trial 2221:20-25, *see* MX7 at 8; CX8 at 8, or that 16 percent of Clarke County residents work in Mobile. Trial Tr. 2223:8-11; *see* MX7 at 8; CX8 at 8. Given these numbers, he agreed that there is some relationship between the Black Belt counties and the City of Mobile. Trial Tr. 2223:12-17.

201.    In his report, Dr. Reilly opined that the jobs most prevalent for workers in the City of Mobile and Mobile County are very different from those worked in the Black Belt. Trial Tr. 2223:20-23. He analyzed unemployment and help-wanted data from Mobile County, Baldwin County, and Barbour County. Trial Tr. 2224:2-4. He haphazardly selected Barbour County because it "seemed representative and was the first alphabetically" on the list of Black Belt counties. Trial Tr. 2224:12-15. He admitted that he did not analyze all of the Black Belt counties for reasons of "brevity and client billing." Trial Tr. 2225:2-5. He admitted to doing only a half hour of investigation for his analysis of Barbour County. Trial Tr. 2225:9-11.

202. Dr. Reilly assumed that he would find more blue-collar and agrarian jobs in the Black Belt. Trial Tr. 2225:6-8. However, when shown the Alabama Department of Labor's Montgomery County profile at trial, Dr. Reilly admitted that the top ten most common jobs in Montgomery County are, in fact, similar to the top ten most common jobs listed in his report for Mobile County. Trial Tr. 2227:2-2228:1. He did not look at employment data for any Black Belt counties other than Barbour County. Trial Tr. 2226:2-13.

203. Dr. Reilly admitted that connections between areas do not only include where somebody works. Trial Tr. 2343:13-15. He agreed that somebody in Mobile County might own various kinds of property in the Black Belt, and vice versa. Trial Tr. 2343:16-23. He agreed that someone might work in Mobile, live in Mobile, but have come from somewhere in Black Belt and routinely go back into the Black Belt for things like family events, worship events, or any number of reasons that night create a continuing connection. Trial Tr. 2344:3-7. Likewise, people in the Black Belt might have those same connections with people who live in Mobile and Baldwin counties. Trial Tr. 2344:8-12. He agreed it was possible that, if a person living in the Black Belt was going to take a cruise, they might come to Mobile as opposed to going to South Florida. Trial Tr. 2344:13-19. He admitted that, for people living in the Black Belt, a college athletic event might attract them to Mobile as opposed to Baldwin County. Trial Tr. 2348:5-10.

204.   Dr. Reilly did not look at whether people from the Black Belt come to Mobile County more so than Baldwin County for things like medical care. Trial Tr. 2346:5-9. He agreed that medical care might be a substantial interest that one area might share with another. Trial Tr. 2346:10-17. However, he was not aware that people in the Black Belt often routinely have to go to Mobile or Mobile County for any kind of healthcare. Trial Tr. 2347:4-8; *cf., e.g.*, Trial Tr. 30:24-31:6 (Dowdy).

205.   Dr. Reilly also did not dispute that there had been a decline in population in both the City of Mobile and the Black Belt. Trial Tr. 2232:16-19, *see* MX5 at 19; CX6 at 19. And he did not dispute that both the City of Mobile and the Black Belt counties have a shared history of White flight. Trial Tr. 2232:20-23, *see* MX5 at 18; CX6 at 18.

206.   Dr. Reilly failed to demonstrate a well-researched, much less specialized, knowledge about the Black Belt region. His only source for the claim that Clarke, Conecuh, Escambia, Monroe, and Washington counties are "rarely included in the Black Belt region and are more often considered part of Alabama's Southern Coastal Plain," is Wikipedia. Trial Tr. 2230:8-14. He admitted to not knowing the source of the language characterizing Clarke, Conecuh, Escambia, Monroe, and Washington counties as part of "Alabama's Southern Coastal Plain." Trial Tr. 2231:7-14.

207.    Dr. Reilly conducted his analysis with the expectation that, since the Black Belt counties are heavily minority and poor, they might have a higher rate of crime than most tiny agrarian counties. Trial Tr. 2235:4-7. He exclusively analyzed murder rates. Trial Tr. 2235: 8-9. He used murder rates as a proxy for crime rates. *Id.* He did not consider violent crimes overall. Trial Tr. 2235:15-16. He did not consider nonviolent crimes. Trial Tr. 2235:17-18. In his report, he did not cite any sources to support the claim that murder is an appropriate proxy for crime rates when making determinations about crime at the state or local level. Trial Tr. 2236:1-11.

208.    Needless to say, with respect to crime, Dr. Reilly conducted a very limited and skewed analysis. In his report, he cited figures from the Black Belt counties for the proposition that those counties actually had lower homicide numbers than Mobile County. Trial Tr. 2236:12-16. *First*, he listed those numbers on an absolute, not per capita, basis. Trial Tr. 2236: 17-19. *Second*, with the exception of Mobile and Montgomery counties, he reported county homicide totals without either noting separately or incorporating the homicide totals from cities within the counties. Trial Tr. 2238:3-8. This approach artificially deflated the homicide totals in the Black Belt counties so that they appeared less comparable to the City of Mobile.

209.    When correcting for these problems, the data supports much more of a connection between Black Belt counties and Mobile. For example, despite reporting that Macon County only had one homicide in 2022, when including the county seat

of Tuskegee, the number rises to eight homicides. Trial Tr. 2238:9-16 (Reilly). When adjusted on a per capita basis, Macon County has a homicide rate that is closer to Mobile's rate than the homicide rate in Baldwin. *Cf.* DX8 at 9-10.

210.   Dr. Reilly did not dispute Dr. Bagley's finding that the City of Mobile and the Black Belt counties are similar in terms of food insecurity and overall social vulnerability. Trial Tr. 2240:3-15; *see* MX5 at 20; CX6 at 20. He did not dispute that the City of Mobile's per capita income is roughly as far from Baldwin County as it is from the Black Belt. Trial Tr. 2241: 6-23, *see* MX7 at 9; CX8 at 9. He agreed that Mobile City's per capital income is closer to the per capita income of Clarke, Crenshaw, Montgomery, Washington, Butler, Conecuh, Pike, and Russell counties than to the per capita income of Baldwin County. Trial Tr. 2242:8-2243:11.

211.   With regard to analyzing the strength of historical ties between Mobile and the Black Belt, Dr. Reilly is not a historian or an expert on Alabama history. Trial Tr. 2214:7-10, yet he wrote in his report on the Great Migration, Trial Tr. 2214:11-14, and he did not cite any scholarly sources about the effect of the Great Migration on southern states, Trial Tr. 2243:22-25.

212.   Dr. Reilly's analysis of the Great Migration was also rife with inconsistencies and selective reporting. In his examination of "the idea that Mobile has a natural link to the Black Belt region of Alabama because she was populated largely by African American refugees from that region—or, at the very least, those

feeling shared historical abuse," DX8 at 14, he only provided "one figure showing [where] black population declined in Alabama cities as versus black population growth in major norther cities." Trial Tr. 2244:4-8. He did not analyze the effect of intrastate rural to urban migration. *Id.* Yet Dr. Reilly conceded it could be true that, while there was out-of-state migration by Mobile City's black population, black people from the Black Belt could have simultaneously been migrating to Mobile City. Trial Tr. 2244:9-14, *see* MX5 at 19; CX6 at 19.

213.   While the evidence supports some economic ties between Mobile and Baldwin, the record supports a greater connection on a wider range of community of interest factors between Mobile and the Black Belt.

b. *The Wiregrass*

214.   In 2023, reviewing declarations and depositions of a former Mayor of Dothan (Mike Schmitz), a past Chairman of the Dothan Area Chamber of Commerce and current head of Wiregrass Electric (Brad Kimbro), and a commercial banker in Dothan (Jeff Williams), we found that a "a careful review of the testimony" about the Wiregrass primarily concerned attempting "to preserve political advantage," which "cannot support an argument that the community is inseparable." *Milligan II*, 690 F. Supp. 3d at 1309–10. This is particularly true given that the Wiregrass must be paired with other counties for population reasons. Accordingly, we assigned

"very little weight to the argument and evidence about a community of interest in the Wiregrass." *Id.* at 1310.

215.  At trial, Defendants presented identical evidence from the same witnesses, none of which they called to testify live, in addition to designations from their subsequent depositions. *See Milligan* Docs. 459-10, 459-11, 459-21, 459-22, 459-27, 459-28.

216.  The new deposition testimony designated by the parties does not change our preliminary views and instead confirms it. After highlighting the importance of Fort Novosel to the Wiregrass, Mr. Williams could not say that having it in a district with parts of Mobile rather than Montgomery would harm its interests. *Milligan* Doc. 459-28; *Caster* Doc. 370-28 ("2024 Williams Dep.") 25:16-26:12. He also had no reason to believe that Rep. Barry Moore would not prioritize housing development in the Wiregrass and the development of Fort Novosel. *Id.* at 47:18-49:6. Mr. Schmitz gave similar testimony, noting that Rep. Moore was from Enterprise, in the Wiregrass, and so "he gets up knowing who we are and trying to represent us." *Milligan* Doc. 459-22; *Caster* Doc. 370-22 ("2024 Schmitz Dep.") 52:9-20. Mr. Kimbro testified that he preferred that the court-ordered 2024 map keeps Covington County together with other Wiregrass counties, as opposed to the county being split in the State's 2023 map. *Milligan* Doc. 459-11; *Caster* Doc. 370-11 ("2024 Kimbro Dep.") 66:8-69:2.

217.   On that front, it is notable that both the 2023 and 2021 Plans split the Wiregrass into two districts. *See* MX11 at 7.

218.   To the extent that Duchin Plan A, Cooper Illustrative Plan 2, and the Special Master Plan 1 connect the City of Dothan and parts of Wiregrass to the Black Belt, the record evidence supports sufficient cultural and historical connections as well. Dr. Bagley found that "Dothan, like Mobile, has significant historical and socioeconomic connections to the Black Belt." MX3 at 8; CX10 at 8. As both Dr. Bagley and the text of SB 5 itself acknowledge, the Wiregrass (which includes Dothan) and the Black Belt shared three overlapping counties: Barbour, Russell, and Pike. MX3 at 8; CX10 at 8; MX31 at 7; CX19 at 7. And as described *supra* ¶¶ 156, 179, Ms. Letetia Jackson testified to several common cultural links between the City of Mobile, the Black Belt, and Dothan, including music, family, cultural foods, and childhood games. Trial Tr. 703:14-23, 704:23-705:22.

219.   Additionally, the Court once again finds that "the basis for a community of interest in the Wiregrass — essentially in the southeastern corner of the State — is rural geography, a university (Troy), and a military installation (Fort Novosel)," are a "few commonalities [that] do not remotely approach the hundreds of years of shared and very similar demographic, cultural, historical, and political experiences of Alabamians living in the Black Belt." *Milligan II*, 690 F. Supp. 3d at 1309.

220.   This parallels Dr. Bagley's testimony that the Wiregrass is a "little bit of [an] archaic term," as it "previously denoted a much larger region than it would tend to denote now," which is mostly "the Dothan, Ozark, Enterprise metropolitan area," Trial Tr. 1312:9-15, and the broader definition overlaps and includes counties that better fit the Black Belt, Trial Tr. 1312:22-25.

c.  *Experts' Consideration of Communities of Interest*

221.   Mr. Cooper's and Dr. Duchin's illustrative plans, which connect in various ways the City of Mobile with the Black Belt in one majority-Black district, comport with this traditional redistricting criterion.

222.   As Dr. Duchin explained, "communities can be of all sizes and are not necessarily the exact size of congressional districts. . . . [C]ommunities should be taken into account when you draw so that either they're kept whole within a district, or if it's appropriate, split among several in a way that amplifies their opportunity to be heard by their representative." PI Tr. 596:23-597:12. Plaintiffs' plans achieve this goal by giving the Black Belt counties a meaningful voice in two districts where they can elect their preferred candidates. Similarly, Rep. Sam Jones testified that he believes Mobile benefits from having two representatives in Congress rather than just one. MX200 ¶ 22.

223.   Additionally, as Alabama recognizes, communities of interest may include "political subdivisions such as counties, voting precincts, municipalities,

tribal lands and reservations, or school districts." CX42 at 3–4. Our analysis of the illustrative plans' respect for political subdivision boundaries above, *see supra* ¶¶ 109-114, further indicate that the illustrative maps respect these Alabama communities of interest the same as or even better than the 2023 Plan.

224.    Dr. Duchin testified during the preliminary injunction hearing that in creating Plans A–D in 2021, she prioritized "urban cores and the 18 counties that constitute the rural Black Belt" because they "clearly and unambiguously correspond to the language in the guidelines," and also considered counties and municipalities as communities of interest. PI Tr. 598:12-599:12.

225.    This Court found that because Dr. Duchin's (and Mr. Cooper's) plans respect the Black Belt as a community of interest "at least as much as the [2021] Plan does, and likely more, we need not consider how the Districts 2 and 7 might perform in a beauty contest against other plans that also respect communities of interest." *Milligan I*, 582 F. Supp. 3d at 1014. In affirming, the Supreme Court took a similar approach, explaining that "[e]ven if the Gulf Coast did constitute a community of interest, moreover, the District Court found that plaintiffs' maps would still be reasonably configured because they joined together a different community of interest called the Black Belt." *Milligan,* 599 U.S. at 21. None of the record evidence through trial undermines these findings and we reaffirm them.

84

226.   Additionally, "we [did] not find that the 2023 Plan respects communities of interest or county lines better than the Plaintiffs' illustrative maps." *Milligan II*, 690 F. Supp. 3d at 1302. The same remains true today, and particularly when looking at Duchin Plan E, which the Court did not have in the prior stages of the case.

227.   When drawing Plan E, Dr. Duchin referenced the Legislative Findings in SB 5, which named and prioritized three communities of interest, *see* MX11 at 1, so she prioritized those along with urban cores, as well as based on evidence in the case of ties between the Black Belt and Mobile. Trial Tr. 355:13-19, 362:13-23. Had the Legislature delineated other communities of interest, Dr. Duchin testified she certainly would have accounted for those as well, but it did not. Trial Tr. 363:1-4.

228.   In terms of respecting those identified communities of interest, Dr. Duchin testified that these considerations must be balanced against other traditional districting principles, so respect does not always mean that an entire district constitutes a community of interest, that a community of interest can never be split, and that "identified communities of interest often do overlap and represent different kinds of interests." Trial Tr. 354:23-355:12.

229.   Nonetheless, Dr. Duchin kept the entire Black Belt in two districts in her Plan E and split the Wiregrass only once (as did SB 5). MX11 at 2. As to Mobile and Baldwin Counties, Dr. Duchin testified that she did not consider the

Legislature's attempt to essentially mandate a majority-White district including Mobile and Baldwin to be a traditional districting principle. Trial Tr. 298:9-299:7. Nonetheless, she attempted to best respect those two counties by keeping Baldwin with part of Mobile County, and splitting Mobile in a similar way to what the State had done in the State Board of Education Plan, linking much of Mobile City with part of the Black Belt. Trial Tr. 325:2-5, 326:19-327:4, 348:15-21. Dr. Duchin testified that for population equality reasons, splitting a county along the Southern border of the State was necessary, and that the Mobile split seemed logical since the State itself had done it. Trial Tr. 348:15-21.

230.    In opining about the configuration of Plaintiffs' illustrative plans, Defendants' expert Dr. Trende did not consider communities of interest at all. Dr. Trende admitted that he did not do "any analysis of the communities of interest in any of the illustrative district 2s" or "any of plaintiffs' illustrative maps." Trial Tr. 2081:22-25. He did "no analysis to determine what communities of interest are shared between Mongomery and the rest of the Black Belt," "between Mobile and the Black Belt," or "within the Black Belt." Trial Tr. 2081:3-21. He therefore testified that he "[does not] have an opinion" about whether Mr. Cooper's plans respect communities of interest and "[does not] know" whether "the illustrative plans provide better representation to the Black Belt than the enacted plan." Trial Tr. 2080:23-25, 2081:17-21.

231.   Dr. Trende also acknowledged that Alabama has in the past and even today combined Montgomery, Mobile, and rural Black Belt counties in a single district in its State Board of Education Plan (District 5). Trial Tr. 2097:5-8. He agreed that District 5 in the State Board of Education Plan resembles the new majority-minority districts in Plaintiffs' illustrative plans, and offered no opinion that the State Board district was insufficiently compact or that it failed to respect communities of interest. Trial Tr. 2097:16-2098:5.

232.   Even if Mobile and Baldwin Counties have a "shared interest in tourism [and] major fishing, port, and ship-building industries" related to "Mobile Bay and the Gulf of Mexico coastline," CX19 at 4, Plaintiffs' illustrative maps demonstrate that it is possible to both respect any shared interests among the coastal, beach communities in Mobile and Baldwin Counties and respect the shared interests of the City of Mobile and the Black Belt. The two are not mutually exclusive. *See* Trial Tr. 207:22-208:3 (Cooper) ("Why can't you have your cake and eat it too? Why can't you have a majority-black district in south-central Alabama and also have a Gulf Coast district that includes part of Mobile County and all of Baldwin County?").

233.   Based on the extensive record in this case, the Court concludes that Mr. Cooper's and Dr. Duchin's illustrative plans comply with the redistricting criterion of respecting communities of interest.

d. *Incumbency Protection*

234.    Incumbency protection is "not exactly a traditional redistricting principle." PI Tr. 495:5-15 (Cooper). The Constitution only requires congresspersons reside in a state, it does not require them to live in their districts. U.S. Const. Art I, § 2. And many of them do live outside of their districts. MX11 at 6 n.4. Moreover, "incumbents constantly change." PI Tr. 495:14-15 (Cooper). Nevertheless, Mr. Cooper and Dr. Duchin did strive to avoid pairing incumbents where possible.

235.    For instance, Mr. Cooper testified that his Illustrative Plan 5 demonstrated "that you can draw two majority-Black districts for the U.S. House in Alabama and protect all incumbents." PI Tr. 468:9-17. And he explained that each of his remaining plans pair only one set of incumbents (as of January 2022) but nevertheless could be "modified such that" those plans would not pair any incumbents. PI Tr. 483:11-484:12.

236.    Mr. Cooper's Illustrative Plan 5, when drawn in the course of the preliminary injunction phase, did not pair any incumbents, and the remainder of Plaintiffs' illustrative plans paired just two of seven incumbents as a consequence of respecting higher order or conflicting redistricting criteria identified in the State's Redistricting Guidelines such as compactness and county integrity. PI Tr. 669:19-

670:11 (Duchin). Given that Representative Carl lost in the CD1 primary to Representative Moore in 2024, these plans no longer pair incumbents.

237. To put a finer point on the balancing required by conflicting redistricting criteria, Dr. Duchin noted that "two incumbents actually live not only in the same county, but a few highway exits apart," and therefore "to keep those incumbents in different districts," one would have "to split that county." PI Tr. 671:3-10. In any event, Dr. Duchin stated that it was possible, as Mr. Cooper has shown, to "draw a plan that avoided any incumbent pairings and still contain two majority-minority districts without sacrificing the principle of contiguity." PI Tr. 692:24-693:3; *see also* PI Tr. 468:13-17 (Mr. Cooper testified that his Illustrative Plan 5 demonstrated "that you can draw two majority-Black districts for the U.S. House in Alabama and protect all incumbents.").

238. Dr. Trende offered no analysis of incumbent pairings. Trial Tr. 2068:21-23.

e. *Preserving Cores of Prior Districts*

239. Under Alabama's Redistricting Guidelines, the effort to preserve existing district cores does not supersede a map drawer's obligation to comply with the VRA. In affirming this Court's initial preliminary injunction ruling, the Supreme Court discounted the importance of the "core retention metric" because Plaintiffs' illustrative plans will "naturally fare worse because they change where the 2011

district lines were drawn," but prioritizing core retention in the *Gingles* 1 inquiry could improperly allow a State to "immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Milligan,* 599 U.S. at 21–22.

240. Defendants agreed that the Supreme Court made clear that core retention could not "justify splitting majority communities of interest like the Black Belt in Montgomery," and so in 2023, "[c]ore retention takes a back seat to communities of interest like the Black Belt, takes a back seat to trying to make the districts more compact." CX46 at 39:5-13.

241. Moreover, as Dr. Duchin explained it is "impossible to have as high of a core preservation as . . . the newly enacted plans, while also having two majority-black districts" because "it's . . . mathematically impossible to create two majority-black districts without a significant level of population reassignment from one district to another." PI Tr. 600:5-16.

242. Mr. Cooper likewise testified that "core preservation" "cannot supersede the Voting Rights Act" based on his reading of the Guidelines and his understanding of "traditional redistricting principles." PI Tr. 519:2-20. Mr. Cooper further explained that based on his expertise, any plan drawn to remedy a violation of the VRA will require "chang[ing] districts." PI Tr. 480:7-25. Dr. Trende agreed that "by design the first Gingles precondition requires plaintiffs to present plans that

look different than the enacted plan," necessitating "some combination of [areas] that weren't in the same district as the benchmark map." Trial Tr. 2088:14-2089:10 (Trende). In Alabama, this meant that creating majority-Black districts in District 2 and 7 would require "all the districts" in the state "except for District 5" to be altered. Trial Tr. 480:18-481:14 (Cooper).

243.   Consistent with this understanding, Mr. Cooper explained that he retained the cores of existing districts to the extent possible while still creating illustrative plans containing two majority-Black districts in satisfaction of the first *Gingles* precondition. In other words, Mr. Cooper protected as best he could the districts that could be protected while still satisfying *Gingles* 1. *Id*.

244.   Notably, Mr. Cooper's Illustrative Plan 8 closely tracks the Remedial Plan that was in effect for the 2024 congressional elections—and under which Alabama's current congressional delegation was elected—preserving 90.5% of the population in the same district they are in under the Remedial Plan. CX1 ¶ 105; Trial Tr. 115:9-116:11. Mr. Cooper's Illustrative Plan 8 also preserves nearly 80% of the core population in each district under the 2023 Plan. CX1 ¶ 123, fig.31.

245.   Similarly, Dr. Duchin's Plan E uses Special Master Plan 3, which is the Court's Remedial Plan in effect for the 2024 elections, as the starting point. MX11 at 1. Despite core retention having a lower priority, Duchin Plan E retains over 82% of Alabama's 2023 Plan and over 71% of the 2021 Plan. MX11 at 3.

f. *Dr. Trende*

246.  Dr. Trende opined that Plaintiffs' illustrative districts are not reasonably configured. He testified that what makes a district reasonably configured is whether it adheres to traditional redistricting criteria. Trial Tr. 2064:22-25. Yet Dr. Trende analyzed only one such criteria—compactness. Trial Tr. 2065:21-25. Dr. Trende did not consider population equality, contiguity, respect for political subdivisions (other than counties), respect for natural boundaries, communities of interest, or incumbency. *See, e.g.,* Trial Tr. 2065:4-25. As discussed *supra*, Dr. Trende did not dispute any of Mr. Cooper's or Dr. Duchin's conclusions on any of these traditional redistricting principles. *See, e.g.*, Tr. 2082:12-19 (Dr. Trende admitting that he "[does not] offer any basis to dispute Mr. Cooper's or Dr. Duchin's conclusions regarding the consideration of any" other traditional redistricting principle in the illustrative plans). By declining to consider any traditional redistricting criteria besides compactness, Dr. Trende replicates the errors Defendants' preliminary injunction expert, Mr. Bryan, made. *Milligan I*, 582 F. Supp. 3d at 1006.

247.  Even in relation to compactness, the vast majority of Dr. Trende's work was retreading ground that this Court and the Supreme Court has already rejected. Dr. Trende provides numerous tables and pages of testimony and written opinions comparing the compactness scores of Plaintiffs' illustrative plans to the enacted plan,

historical plans, and congressional districting plans from other states. As we and the Supreme Court have repeatedly held, the illustrative plans do not need to "meet or beat" the State's plan on any particular metric to satisfy the requirements of *Gingles I. See Milligan II*, 690 F. Supp. 3d at 1301–03; *Milligan,* 599 U.S. at 21. As a result, the bulk of Dr. Trende's opinions are not helpful to the Court.

248.   Dr. Trende also did not analyze how respect for other traditional redistricting criteria could affect compactness. For example, he did not provide any analysis about how county, city, or voting tabulation district boundaries inform the compactness of any given district, despite acknowledging that irregular VTD and municipality boundaries can decrease compactness. Trial Tr. 2083:16-19, 2041:2-16. Likewise, Dr. Trende did not consider the extent to which natural boundaries, like rivers, mountains, or freeways affect the compactness of a district. Trial Tr. 2083:20-23.

249.   Dr. Trende also declined to analyze any of the other criteria the Legislature included in SB 5. Trial Tr. 2083:11-15. As a result, he did not dispute that (1) all of Mr. Cooper's plans minimized the number of counties in each district on par or better than the 2023 Plan; (2) all of Mr. Cooper's plans place the Black Belt into a similar number of districts as the 2023 Plan; (3) all of Mr. Cooper's plans place 70 to 94 percent of Black Belt counties into a majority-Black district; (4) all

of Mr. Cooper's plans place the Wiregrass counties into a similar number of districts as the 2023 plan. Trial Tr. 2068:1-20.

250.    Dr. Trende's work also is not entitled to much weight as, by and large, his own analyses do not even support his ultimate conclusions. Apparent on the face of his report and admitted time and again in his testimony, Plaintiffs' illustrative districts and plans fall well within the range of reasonably compact congressional districts, whether compared against other Alabama plans or compared against maps nationwide. *See* Trial Tr. 2042:19-2025:1; 2043:2-5; 2048:20-2049:1; 2049:5-12; 2050:4-8, 2050:24-2051:3; 2120:15-2121:1; 2123:6-2125:23; DX10 at 36, 38-40; Trial Tr. 305:2-9 (Duchin). As such, his own analysis did not provide a sound basis for Dr. Trende's conclusions about the purported lack of compactness of the Plaintiffs' illustrative plans or illustrative districts, which Dr. Trende functionally admitted at trial. Trial Tr. 2125:24-2126:15.

251.    Indeed, in his own work elsewhere, Dr. Trende identified a congressional district with a Reock score of 0.1615 as reasonably compact. Trial Tr. 2127:9-2128:12. All of the Duchin and Cooper illustrative districts were more compact on this metric, *see* DX10 at 43, 50, thus straining credulity that Dr. Trende could conclude that any of their districts were not reasonably compact.

252.    Additionally, Dr. Trende chose not to assess the cut edges compactness measure in this case, even though he did assess that measure in the state legislative

case because it was used by Dr. Duchin in this case. Trial Tr. 2117:4-2118:19. This leaves the Court to wonder whether he chose to leave out certain metrics because they did not advance the Defendants' preferred conclusion about compactness. *See, e.g.*, MX12 at 1, 3 (noting Duchin illustrative plans "score well on this measure" and showing Duchin Plan B more compact than the 2023 Plan under the cut edges metric).

253.   Finally, with respect to his compactness analysis, the Court also finds it notable that Dr. Trende generated lower compactness scores for some of Plaintiffs' illustrative plans, but the same scores as Plaintiffs' experts for the 2023 plan, with no explanation for why his results were inconsistent in a way that favored Defendants. Trial Tr. 2118:20-2120:9 (Trende). Unexplained differences in mathematical analysis that favor the party who has hired an expert suggest at least the potential of bias in his work.

254.   Because Dr. Trende analyzed only one of several redistricting criteria relevant to determining whether Plaintiffs' illustrative districts are reasonably configured, and he repeatedly conceded that Plaintiffs' plans overall and on a district level are within the same range of compactness or more compact than both the 2023 Plan and Alabama's historical congressional plans, the Court does not credit Dr. Trende's opinion that Plaintiffs' illustrative districts are not reasonably configured.

D.    **Racial considerations**

255.    The Court finds that neither Mr. Cooper nor Dr. Duchin subordinated traditional redistricting principle in favor of race.

    i.    **Dr. Duchin**

256.    Dr. Duchin testified, and demonstrated through her plans, that a map-drawer need not prioritize race over traditional districting principles to draw a congressional plan in Alabama with two majority-Black districts, and that she did not do so in drawing her plans. Trial Tr. 313:15-20.

257.    Dr. Duchin's trial testimony only strengthened the Court's view that she "consistently and repeatedly refuted the accusation that" she "prioritized race above everything else" in preparing her plans, *Milligan I*, 582 F. Supp. 3d at 1029.

258.    Of particular note, Dr. Duchin explained that when she previously testified that she considered population balance, contiguity, and drawing two majority-Black districts to be "non-negotiable" in drafting the first four plans, she was not referring to her own mapping decisions but rather what she understood the law to require of maps submitted to the Court. Trial Tr. 287:11-288:5. She agreed with the Court that she drew a number of maps in connection with her work in this case pursuant to various trade-offs she had to make with respect to traditional redistricting principles, but was referring to the fact that due to her understanding of *Bartlett*, she only put forward maps to the Court that passed that 50-percent line in a

second district, and that was the sense in which she meant "non-negotiable." Trial Tr. 363:21-364:10.

259.   In creating all five of her plans, Dr. Duchin testified that she might periodically check the BVAP level of the map, but that race never predominated over other decisions as she made mapping decisions. Trial Tr. 288:6-19. Specifically, none of the "micro-level" decisions Dr. Duchin made were driven by race, she did not pursue majority-Black precincts if a district fell below the fifty-percent BVAP line, and her balancing of criteria looked the same regardless of whether the BVAP was above or below that line. Trial Tr. 365:17-366:20.

260.   In creating Plan E, in particular, Dr. Duchin made "many local microscopic choices to pursue compactness" over other factors including race. Trial Tr. 312:23-313:4; *see also* MX11 at 1 ("In drawing this plan, I began with SM2 as a starting point and made refinements with compactness as a paramount priority, while maintaining other criteria.").

261.   In Jefferson County, for example, Dr. Duchin eliminated a hook shape in Jefferson County so that "more of Birmingham, including the northern part and the northern suburbs, is now included in District 7," and created a smoother line between Districts 6 and 7. Trial Tr. 290:4-14. Even Dr. Trende recognized that Dr. Duchin was pursuing compactness in this split, *see* DX10 at 35, agreeing that Duchin Plan E splits VTDs in Jefferson County "in an effort to smooth out the district

boundary," Trial Tr. 2140:11-14 (Trende), thus admitting that race did not predominate in the drawing of that district line. Likewise, Senator Bobby Singleton testified that the *Singleton* Plaintiffs would support an illustrative plan that, like Duchin Plan E, *both* created two majority-Black districts, *and* kept more of Jefferson County together than the Court's Remedial Plan. Trial Tr. 2379:14-24 (Singleton).

262.  Dr. Duchin also credibly testified that in pursuing compactness in Jefferson County, she ended up incidentally including "thousands of white residents on the north of Birmingham and in the northern suburbs into District 7, more than 10,000, in fact," making it "really completely implausible that . . . on the level of dozens of people on that line to the south the decision would be made in a race-conscious way." Trial Tr. 311:21-312:2.

263.  In splitting Mobile County, Dr. Duchin provided two non-racial bases for why and how she did so. First, one of the counties along Alabama's southern border needed to be split to maintain population equality, and second, the State had already split Mobile in a similar way in its State Board of Education plan. Trial Tr. 348:15-21.

264.  Contrary to Dr. Duchin's comprehensive explanations, Dr. Trende's analysis of the relationship between race and districting in Dr. Duchin's plans relied solely on his shading of choropleth maps and his own "eyeball test," even though

the actual lines of his map prevent viewing whether the split VTDs contain any population at all. Trial Tr. 2101:1-2102:1, 2139:9-2140:9 (Trende).

265.  Dr. Trende merely created color coded maps showing the BVAP percentage at the VTD level. Trial Tr. 2100:22-2101:5; 2101:17-20; 2139:15-18 (Trende). But he did not attempt to determine whether the district lines followed some other boundary: particularly following the lines of Alabama's enacted plans or municipal boundaries. Trial Tr. 2106:6-2107:12. Offering no analysis of the myriad other reasons behind the way district lines are drawn, we cannot credit Dr. Trende's assertion that the splits were made along racial lines.

266.  Furthermore, the choropleth maps themselves are not a sufficiently reliable method of analysis. Looking closely at the maps, and the given district lines—a necessary step if one is attempting to draw conclusions at this microlevel—presents numerous problems. On close inspection, the actual lines of his map prevent viewing whether a split VTD contain any population at all. Trial Tr. 2139:9-2140:9 (Trende). Furthermore, the coloring of the VTDs across district lines reflects a choice Dr. Trende made, Trial Tr. 2138:11-15, necessarily making it appear as though the district lines closely follow racial lines. Trial Tr. 310:17-311:12 (Duchin). Whereas, had the maps been shaded at, for example, the census block level, which Dr. Duchin testified would have been a more sound cartographic choice, *id.*, the same pattern may well not appear.

267.   Likewise, with respect to at least Duchin Plan E, Dr. Trende's own testimony is that the district lines at issue were drawn "in an effort to smooth out the district boundary," Trial Tr. 2140:11-14, thus admitting that race did not predominate in the drawing of that district line. *See also* Trial Tr. 309:23-310:15 (Duchin)

268.   Additionally, Dr. Trende's contention that the State Board of Education (SBOE) map does not provide a basis to find a district that connects the cities of Mobile and Montgomery to be reasonably configured is entitled to no weight. Dr. Trende testified that his opinions regarding the SBOE map were based on his assessment of the preclearance submissions and case law. Trial Tr. 2153:15-2154:11.

269.   He further testified that by 2003 it was clear that "the retrogression standard was not based on the BVAP of a district but on the effective exercise of the electoral franchise," something that was clear in both the majority opinion and dissent in *Georgia v. Ashcroft*. Trial Tr. 2154:12-2155:17 (Trende). This was the governing state of the law when the 2010 SBOE map, which was the first one that connected the cities of Mobile and Montgomery, Trial Tr. 2154:1-4, was enacted. As such, there is no basis to conclude that the cities of Mobile and Montgomery were connected due to either the state of the law or even a good faith misunderstanding of the law.

270.    Further, the State chose to keep the cities of Mobile and Montgomery together in the same SBOE district even after Section 5 of the VRA was no longer in operation. Trial Tr. 2156:13-22 (Trende). Dr. Trende summed up his opinions regarding the construction of the relevant SBOE district saying, "All I can say is that [Mobile and Montgomery] were not put together in the district originally, that it's something that evolved over time and occurred first in 2010." Trial Tr. 2156:25-2157:3. This provides no basis to conclude that the State's inclusion of Mobile and Montgomery in a single SBOE district does not provide insight as to what would be considered a reasonably configured district in Alabama.

### ii.    Mr. Cooper

271.    During the preliminary injunction phase, Mr. Cooper testified that race did not "predominate" in the "development of any of [his] illustrative plans" but rather was one of many factors he had to balance in drawing illustrative plans for a Section 2 lawsuit. PI Tr. 441:2-5; *see also id.* at 444:5-13. He testified that he drew the plans to conform to county boundaries, and split counties where necessary to comply with the principle of population equality. PI Tr. 442:9-12. He further testified that when deciding where to split precincts he "tried to follow municipal boundaries or main thoroughfares or census block groups, . . . areas designated by the Census Bureau as having some commonality." PI Tr. 524:5-16. And he made

clear that race did not play a role in these decisions—when he had to split Census blocks he did so only to get to zero deviation. PI Tr. 525:3-11.

272.   The same was true of Mr. Cooper's testimony at trial. He explained that while the *Gingles* 1 inquiry regarding the size and location of the Black population in Alabama meant he was aware of race, his approach in developing his illustrative plans was to "constantly balanc[e] the other traditional redistricting principles." Trial Tr. 120:23-121:6. The objective characteristics of his illustrative plans bear that out. *See supra* ¶ 69. He testified that when he split a county or a VTD in his illustrative plans, he did so on the basis of some "objective feature or line" such a "a major thoroughfare[,] . . . census block groups or census tracts . . . [or] a topographical feature" like a ridge line, river, or valley. Trial Tr. 152:16-153:15. He testified that he never split a VTD in this case for the purpose of bolstering the Black voting age population in a particular district or for the purpose of creating a majority-Black district. Trial Tr. 153:24-154:5.

273.   Mr. Cooper testified that in his opinion race need not predominate over race-neutral criteria to draw a second majority-Black congressional district in Alabama, Trial Tr. 124:3-9, and that race did not predominate in the way he drew any of his illustrative districts in this case, Trial Tr. 124:21-24. Mr. Cooper further testified that at no time was he under the impression that he *had* to achieve two majority-Black districts at all costs, but rather the *Gingles* 1 question he sought to

answer was *whether* he could draw two majority-Black districts consistent with traditional districting principles. Trial Tr. 122:21-123:8. In other instances, where he could not draw a reasonably-configured majority-minority district, he has concluded the answer to the *Gingles* 1 inquiry is no. Trial Tr. 121:7-122:3, 167:6-8; *see also* Trial Tr. 172:19-173:5. In this instance, by contrast, he was able to draw at least nine maps with two reasonably-configured majority-Black districts, allowing him to conclude that "you can draw two majority-black districts in any number of ways that would adhere to traditional redistricting principles and answer t[he] *Gingles* [1] inquiry in the affirmative." Trial Tr. 117:5-12.

274.    Dr. Trende created a series of choropleth maps which show relative BVAP of VTDs in five percentage point increments. *E.g.*, DX10 at 66-77. Based on an eyeball test of these maps, Dr. Trende suggests that the splits of certain counties were "along racial lines." Trial Tr. 2101:1-12. In reaching his conclusion, Dr. Trende admitted that while he looked only at race—and only via these maps—there could have been other, non-racial considerations that informed how counties were split in Plaintiffs' illustrative plans. Trial Tr. 2101:23-2102:1, 2102:18-20. Dr. Trende, however, neglected to examine any traditional redistricting principle. Dr. Trende conceded that he did not consider whether splits followed municipal boundaries, natural boundaries like geography or transportation thoroughfares, county commission districts, schoolboard districts, socioeconomic factors, or historical

splits for counties that were split in prior plans. Trial Tr. 2102:21-25, 2106:6-14, 2108:12-2109:11. Ultimately, Dr. Trende testified that he was not opining that race was a primary factor in the split of any county. Trial Tr. 2113:2-5.

275.    As described above with regard to Dr. Duchin, Dr. Trende's choropleth maps also provide no way to determine how densely populated any VTD is, which he described as a "shortcoming" of this analysis. Trial Tr. 2137:1-9 (Trende). As Dr. Trende explains it, "a precinct with 1 Black resident and no white residents is treated the same under a choropleth map as a precinct with 1,000 Black residents and no white residents." DX10 at 77-78. In other words, both of those precincts would appear to be 100% Black in these maps.

276.    Notably, Mr. Cooper testified that these type of color-coded maps are "foreign" to him, that he "never ever" employs this level of color coding by race in his map drawing, including in developing his illustrative plans in this case, and that he had no "knowledge of the five percentage point Black Voting Age Population range of each VTD" in his illustrative maps. Trial Tr. 143:7-21.

277.    For instance, Dr. Trende provides choropleth depictions of Jefferson County in Mr. Cooper's illustrative maps. DX10 at 66–68. But, as Mr. Cooper testified, his illustrative plans intentionally try to keep together most of the City of Birmingham, and in fact keep much more of Birmingham together than the 2023 Plan. CX1 ¶ 123, fig.31; CX2 ¶ 26, fig.7; Trial Tr. 147:24-148:8. Because

Birmingham is a majority-Black city, *see supra* ¶ 39, it is hardly surprising that trying to keep Birmingham together results in the inclusion of higher-BVAP VTDs in one district. Trial Tr. 148:14-149:1. Indeed, while Dr. Trende's maps focus exclusively on race, Mr. Cooper testified that, when drawing district boundaries in Jefferson County, he considered municipal lines, VTDs, block group boundaries, transportation corridors, topography, population distribution, county commission districts, county school board districts, 2022 State Senate Districts, the 2023 Enacted Plan, the Special Master Plan, and community socio-economic profiles." CX2 ¶ 51; Trial Tr. 146:7-147:1.

278.    Likewise, Dr. Trende asserts that Mr. Cooper's illustrative plans split Mobile County along racial lines in a manner that is "particularly aggressive" in Illustrative Plans 6 and 7. DX10 at 69. But Illustrative Plans 6 and 7 were specifically drawn to keep the City of Mobile whole in District 2. CX1 ¶¶ 91-92, 98; CX2 ¶ 8. Because the City of Mobile has a higher Black population than the rest of Mobile County, *see* MX8 at 9; Trial Tr. 298:16-292:2 (Duchin), the inclusion of higher-BVAP VTDs in District 2 in those maps is entirely consistent with Mr. Cooper's emphasis on keeping the municipality whole. Trial Tr. 151:8-16, 152:5-13; *see also* Trial Tr. 223:1-4 ("I did not split Mobile County along racial lines.") (Cooper). Dr. Trende testified that he didn't consider municipal boundaries in his analysis, that he had no reason to doubt that Mr. Cooper drew the splits of Mobile in these plans to

keep the City of Mobile whole, and that it would not surprise him if the City of Mobile is composed of a lot of high BVAP VTDs. Trial Tr. 2104:11-17, 2105:6-17.

279.   Dr. Trende also provides dot density maps, which purport to show the concentration of Black voters across the state. DX10 at 79-92. Dr. Trende testified that his dot density maps do not inform whether a district is reasonably configured. 2100:4-6. Nonetheless, a visual inspection of these maps shows that where a county is split there are large numbers of Black voters both within and outside of Plaintiffs' illustrative majority-minority districts. DX10 at 76-89. In particular, the splits of Jefferson, Mobile, and Montgomery counties show that Mr. Cooper and Dr. Duchin's maps resulted in significant numbers of Black voters placed both within and outside of the illustrative majority-minority districts. *Id.*

280.   Moreover, Dr. Trende disclaimed any knowledge about whether Black communities that had been joined in Plaintiffs' illustrative majority-minority formed a community of interest based on factors other than race. For example, Dr. Trende admitted that he did not consider whether Black populations in Mobile, the rural Black Belt, and Montgomery share similar economic, social, or historical interests. Trial Tr. 2099:7-15.

281. In short, we do not credit Dr. Trende's conclusion that race predominated in Dr. Duchin's or Mr. Cooper's approach to Jefferson County, Mobile County, or any other area in their illustrative plans.

282.   Additionally, Defendants have previously claimed that Plaintiffs Mr. Milligan and Ms. Stone worked with or were themselves "trained map-drawers" who were unable to draw a two majority-Black district map then cited this point to assert that Dr. Duchin and Mr. Cooper were engaged in racial gerrymandering. *See, e.g.*, *Milligan,* 599 U.S. at 106 (Alito, J., dissenting). But the trial testimony puts this misrepresentation to rest. Mr. Milligan and Ms. Stone participated in a "very cursory training" about the principles of redistricting in 2021, and Mr. Milligan characterized his map-drawing skill as 2.5 on a scale of 1 to 10. Trial Tr. 1196:22-1197:24. Mr. Milligan further explained that neither he nor Ms. Stone were map-drawing experts at all, nor did they consult with a "team" of trained mapmakers. Trial Tr. 1198:4-19.

283.   Finally, and significantly, it bears noting that neither Mr. Trende nor any other defense witness have asserted that the three maps drawn by the Special Master were the products of racial gerrymandering or racial predominance.

284.   Although Dr. Trende examines the Special Master map as part of his report, *see* DX10 at 7, he offers no criticisms of it. He merely notes the strong similarities between Duchin Plan E and the Special Master plans, none of which he identifies as evincing race-based line-drawing. *See* DX10 at 38 (Duchin E "produces versions of Districts 4 and 5 that are almost identical to the versions contained within the Special Master Map and Enacted 2023 Map, and versions of District 1 and 2 that are largely the same as the Special Master Map; some minor adjustments to District

2 push it back over 50% BVAP. The largest changes come to Districts 6 and 7, which are smoothed out and made more compact.").

285.   This Court has already found that the record "simply does not bear out [a] concern" about racial gerrymandering by the Special Master, "[n]or can one fairly assert that the Special Master conducted his work in a way that runs afoul of the Equal Protection Clause." *Milligan v. Allen*, No. 2:21-CV-1291, 2023 WL 6567895, at *16–17 (N.D. Ala. Oct. 5, 2023) ("*Milligan III*").

286.   Rather, it is undisputed that the Special Master's cartographer, David Ely, drafted the Remedial Plan without reference to any illustrative or proposed plan. Joint Stip. ¶ 140. Mr. Ely did not display racial demographic data within the mapping software, Maptitude, while drawing his remedial proposals (including the Remedial Plan) or while he examined proposed remedies submitted by others. Joint Stip. ¶ 143. Instead, Mr. Ely drew his proposals (including the Remedial Plan) based on other nonracial characteristics and criteria related to communities of interest and political subdivisions. Joint Stip. ¶ 143. Mr. Ely accessed median income data from the U.S. Census Bureau's American Community Survey, which can be relevant to the social and economic factors identified in the Legislature's guidelines and findings, when deciding how to divide up Mobile County outside the city of Mobile. Joint Stip. ¶ 144. Mr. Ely also "did not 'target any particular Black population percentage in any district,' but instead 'prioritized following county, voting district

(precinct), and municipal boundaries.'" *Milligan III*, 2023 WL 6567895, at *7 (quoting *Milligan* Doc. 295 at 14).

287.   That Mr. Ely drew three plans with two nearly majority-Black districts, *see* MX11 at 4, by focusing only on uniting identified communities of interest, and without displaying racial data or using a racial target, provides nearly indisputable proof that reasonable *Gingles* I maps can be drawn without race predominating.

288.   The Court finds that Dr. Duchin's and Mr. Cooper's plans are both more-than-sufficient to satisfy the first *Gingles* precondition.

## IV.   *Gingles* **Precondition 2 and 3: Racially Polarized Voting**

### A.   **Plaintiffs' Experts**

289.   The *Caster* and *Milligan* Plaintiffs provided reports and testimony from Dr. Maxwell Palmer and Baodong Liu, concerning the second and third *Gingles* preconditions.

290.   Dr. Palmer is a tenured Associate Professor of Political Science at Boston University. CX3 ¶ 1; CX155; Trial Tr. 482:19-483:1. His research and teaching focuses on American politics and political methodology. CX3 ¶ 1. He teaches courses on American politics, Congress, political methodology, and data science, and his main areas of research are redistricting, voting rights, Congress, and local politics. Tr. 483:2-7. Dr. Palmer has published one book and numerous articles in leading peer-reviewed academic journals, including the *American Political*

*Science Review*, *Journal of Politics*, *Perspectives on Politics*, *British Journal of Political Science*, *Journal of Empirical Legal Studies*, *Political Science, Research and Methods*, *Legislative Studies Quarterly*, and *Urban Affairs Review*. CX3 ¶ 2. He holds an A.B. in Mathematics & Government and Legal Studies from Bowdoin College and a Ph.D. in Political Science from Harvard University. CX155 at 1; Trial Tr. 482:15-18.

291.   Dr. Palmer has testified as an expert witness in a dozen cases involving redistricting or voting restrictions, and he served as the independent racially polarized voting analyst for the Virginia Redistricting Commission in 2021. CX3 ¶ 3. He has been accepted as an expert witness in several redistricting cases, including cases in Alabama, and has provided a racially polarized voting analysis in about nine cases. CX3 ¶ 3; Trial Tr. 483:8-19. Courts have previously credited and relied on his analysis, and no court has rejected or found his testimony to be unreliable. CX3 ¶ 3; Trial Tr. 483:15-22.

292.   At trial, the Court again accepted Dr. Palmer as qualified to testify as an expert in redistricting, political science, and data analysis. Trial Tr. 483:23-484:4. And the Court again accepted Dr. Liu as qualified to testify as an expert in racial polarization analyses, voter behavior, American political behavior, and ecological inference. Trial Tr. 560:20-561:2.

293.    Dr. Baodong Liu is a tenured professor in the Department of Political Science at the University of Utah. MX13. He is also affiliated with the Department of Ethnic Studies, is the director of graduate studies, and is a presidential scholar at the University. Trial Tr. 557:14-17. He holds a master's degree in political science from Oklahoma State University and a Ph.D. from the University of New Orleans. Trial Tr. 557:8-11. Dr. Liu has undertaken extensive research on the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice. MX13 at 1.

294.    Dr. Liu's research on racial bloc voting has won numerous awards, and the results of his research have been widely published in peer-reviewed journals, including, Social Science Quarterly, American Politics Research, Sociological Methods and Research, PS: Political Science and Politics, Urban Affairs Review, Political Behavior, Journal of Urban Affairs, Southeastern Political Review, and American Review of Politics, among other journals. MX13 at 1. He has also published eight scholarly books. MX13 at 1.

295.    Dr. Liu has served as an expert witness in over a dozen cases, MX16 at 35, and courts have routinely relied on Dr. Liu's racial polarization analyses, Trial Tr. 560:8-19. Much of Dr. Liu's expert work has involved racial polarization analyses in Alabama and in Jefferson County in particular. Trial Tr. 559:7-9, 559:23-560:2. In his other work as an expert in Alabama, for example, Dr. Liu found that

racial polarization in elections in Jefferson County was very high, meaning that the pattern of racial block voting was particularly stark and that the evidence supporting the finding was particularly robust. Trial Tr. 560:3-7; 680:15-681:4.

296. The Court has previously found Drs. Palmer and Liu to be credible and qualified to testify as experts regarding redistricting and data analysis. *Milligan I*, 582 F. Supp. 3d at 967, 980–81. The Court again finds Drs. Palmer and Liu credible, their analysis methodologically sound, and their conclusions reliable. The Court credits Dr. Palmer's and Dr. Liu's conclusions.

## B. **Methodology**

297. Both Dr. Liu and Dr. Palmer used a statistical method called Ecological Inference ("EI") to derive estimates of the percentage of Black and White voters in Alabama that voted for each candidate in elections analyzed using publicly available data, including census data. CX3 ¶¶ 10-11; Trial Tr. 491:2-492:2, 492:19-493:21 (Palmer); Trial Tr. 563:7-12 (Liu). EI was developed by Dr. Gary King at Harvard University. Trial Tr. 563:7-12 (Liu).

298. Dr. Liu testified that he uses this method in his academic work almost daily because of its accuracy. Trial Tr. 564:14-19 (Liu). EI requires the use of ecological data, that is election returns data at the precinct level, where voters cast their votes, combined with demographic data from the 2010 and 2020 U.S. Censuses and/or the American Community Survey ("ACS"). PI Tr. 1259:12-1261:3. EI is a

tool that allows scholars to empirically study to "the extent to which racial groups may differ or exhibit sameness in their choice of voting." PI Tr. 1259:12-19. EI does not make any assumptions about racial group voting patterns, i.e. the methodology does not assume racial groups will vote cohesively: the whole purpose of the methodology is to measure whether or not there is cohesion. Trial Tr. 565:4-25 (Liu).

299.    Dr. Palmer selected EI because, in his opinion, it is the best available method for assessing racially polarized voting and because it is regularly used by scholars and experts to examine racially polarized voting. Trial Tr. 492:6-8; 492:16-18; PI Tr. 705-706. Dr. Palmer also testified that EI is regularly used for RPV analyses in litigation and that it has been courts' preferred method for examining RPV. Trial Tr. 492:9-15 (Palmer); PI Tr. 705:23-706:9.

300.    Defendants' expert, Dr. Bonneau, who described himself as not an expert in ecological inference, agreed that ecological inference is the preferred method by the Courts and is the best available method to discern racially polarized voting. Trial Tr. 1858:9-19, 1858:25-1860:5. He could not point to any sources stating that any ecological inference models have a "similarity assumption." Trial Tr. 1812:23-1813:1.

301.    Dr. Bonneau does not know of any empirical methods that would be better at generating racially polarized voting estimates compared to ecological

inference. Trial Tr. 1813:12-15. Dr. Bonneau further characterized ecological inference as "a useful tool." Trial Tr. 1860:13-14.

302.    Dr. M.V. Hood III, another defense expert, also used ecological inference in his racially polarized voting analysis. PI Tr. 1422:12-15; MX18 at 4. This Court again finds that Defendants' critiques of Drs. Liu's and Palmer's methodology is "substantially undercut" because Defendants' own expert, Dr. Hood "found evidence of racially polarized voting" after "employ[ing] the same kinds of methods in his analysis that Drs. Liu and Palmer employed–namely, ecological inference methods." *Milligan I*, 582 F. Supp. 3d at 1017.

303.    In sum, this Court finds that Dr. Palmer's and Dr. Liu's analyses were methodologically sound and rejects the unfounded criticisms of their methodology.

## C.    RPV Analysis

### i.    Dr. Palmer

304.    Dr. Palmer analyzed the extent to which voting is racially polarized in Alabama, including in each of the seven congressional districts in the 2023 map. CX3 ¶¶ 13, 17; Trial Tr. 489:12-490:5. He analyzed 17 statewide elections between 2016 and 2022, including for U.S. President, U.S. Senate, Governor, Lieutenant Governor, Secretary of State, Attorney General, State Auditor, Treasurer, Commissioner of Agriculture and Industries, Chief Justice of the State Supreme

Court, and Associate Justice of the State Supreme Court between 2016 and 2022. CX3 ¶ 9; Trial Tr. 490:20-491:1.

305.   Dr. Palmer also examined racially polarized voting in congressional elections in 2022 under the 2021 map. CX3 ¶ 18; Tr. 497:20-498:3.

306.   Dr. Palmer first examined each racial group's support for each candidate to determine if members of the group vote cohesively in support of a single candidate in each election. CX3 ¶ 12. If a significant majority of the group supported a single candidate, he then identified that candidate as the group's candidate of choice. CX3 ¶ 12. Dr. Palmer next compared the preferences of White voters to the preferences of Black voters. CX3 ¶ 12. Evidence of racially polarized voting is found when Black voters and White voters support different candidates. CX3 ¶ 12.

307.   In every election examined, in each congressional district and the state as a whole, Black voters had clearly identifiable candidates of choice. Trial Tr. 493:22-494:12 (Palmer); CX3 ¶¶ 14-18, figs.1-3, tbls.1-9.

308.   In the 2016-2022 statewide elections, Black voters on average supported their preferred candidates with an estimated vote share of 93%. Trial Tr. 493:22-494:5 (Palmer); CX3 ¶ 14. The 2022 congressional elections also exhibited high and cohesive levels of Black voter support for their preferred candidates. Tr. 497:20-498:3 (Palmer); CX3 ¶ 18, fig.3.

309.   In those same elections, Dr. Palmer also found that White voters consistently vote cohesively against Black preferred candidates, in each congressional district and the state as a whole. Trial Tr. 495:5-15; 496:4-20 (Palmer); CX3 ¶ 15, figs.1, 2, tbls.1-8. On average, Dr. Palmer found that White voters supported Black-preferred candidates with an average of just 14.3% of the vote in statewide elections. CX3 ¶ 15. In other words, White voters on average supported their preferred candidates with an estimated vote share of 85.7%. *Id.* The 2022 congressional elections exhibited similarly high and cohesive levels of white voting against Black-preferred candidates. CX3 ¶ 18, fig.3, tbl.9.

310.   Overall, Dr. Palmer found "a clear pattern of racially polarized voting in Alabama, both statewide and in the individual congressional districts." Trial Tr. 498:22-24 (Palmer).

311.   As a result of this racially polarized voting, candidates preferred by Black voters have consistently lost elections outside of majority-Black CD7. Trial Tr. 500:1-25 (Palmer).

312.   Of the 17 statewide elections, Black-preferred candidates were defeated by White bloc voting in 16 of them. Trial Tr. 500:4-6 (Palmer); CX3 ¶ 15, figs.1, 2, tbls.1-8. The only time the Black-preferred candidate prevailed, the White-preferred candidate was Roy Moore, a uniquely controversial figure in Alabama politics for

various reasons, including that he has been accused of sexual assault and misconduct by several women. CX3 ¶ 23.

313.   As for individual congressional districts, under SB 5, Black preferred candidates never won in CDs 1, 3, 4, 5, and 6, and just once in CD2. In majority-Black CD7, Black-preferred candidates won every election. Tr. 500:11-25 (Palmer); CX3 ¶ 21.

314.   The 2022 congressional elections showed similar results. Of the five districts that had contested elections, the Black-preferred candidate was defeated in every election, except for in majority-Black CD7. Tr. 501:4-11 (Palmer); CX3 ¶ 22.

### ii.    Dr. Liu

315.   Dr. Liu used the results of his EI analysis to first determine whether Black voters vote cohesively with a majority of their support given candidate, and second, to see whether White voters, the majority voters, voted with a majority of their support for a different candidate. Trial Tr. 563:15-564:5; P.I. Tr. 1257:16-24. Only if this empirical evidence showed that a majority of White voters voted for a different candidate than Black voters to defeat the candidate preferred by a majority of Black voters did Dr. Liu determine the election was racially polarized. Trial Tr. 564:2-5.

316.   Dr. Liu primarily analyzed elections involving at least one Black candidate and one White candidate ("biracial elections") because these elections

allow for an assessment of voters' preferences when faced with a choice between a candidate from their own racial group and a candidate outside their racial group. Trial Tr. 569:12-25; MX16 at 4-5. Dr. Liu explained that he and most experts in the field, including Defendant's expert Dr. M.V. Hood, consider these elections most probative to a RPV analysis. Trial Tr. 570:1-7. Dr. Hood even wrote an article in Social Science Quarterly where he stated that in analyzing RPV, the elections that are "more relevant are those that feature a minority candidate from the racial or ethnic group suing the jurisdiction in question." MX14 at 1 & n.1.

317.   First, Dr. Liu analyzed all available biracial congressional elections in the challenged area ("endogenous elections") over the last fifteen years, of which there were 10. Trial Tr. 570:19-572:16; MX16 at 6-7, tbl.1; MX17 at 8. Then, Dr. Liu analyzed all biracial statewide elections and non-congressional elections in the challenged areas ("exogenous elections") over the last fifteen years, of which there were 16, with results limited to the geographic areas under dispute. Trial Tr. 571:1-6, 574:19-24; MX16 at 9, tbl.2.

318.   Dr. Liu's analysis of biracial endogenous elections over the last 15 years demonstrated that Black voters vote cohesively. Trial Tr. 573:5-16. Specifically, Dr. Liu analyzed the 2022 general elections in CD2 and CD7, the 2020 primary and general elections in CD1, the 2020 general elections in CD2 and CD3, the 2018 general elections in CD3 and CD1, and the 2012 and 2010 general elections

in CD7. MX16 at 6-7, tbl.1. In every single one of the endogenous biracial general elections, Black voters' support for the Black candidate above 90 percent. Trial Tr. 573:5-12. The single endogenous election where Black voters' support for the Black candidate was less than 90 percent was a Democratic primary, and the Black candidate still received a majority of Black voters' support. Trial Tr. 573:10-15; MX16 at 6-7, tbl.1.

319.    In contrast, White voters' support for Black candidates in these endogenous elections was mostly in the single digits and teens, with White support for a Black candidate reaching 26.1 percent in only a single Democratic primary. MX16 at 6-7, tbl.1; Trial Tr. 573:19-25. The *only* Black candidate able to win a biracial congressional election in Alabama was Terri Sewell, who ran in CD7, which has been a majority-Black district since 1992. MX16 at 7. Still, Sewell's three contested elections were highly racially polarized. *Id.* In all the other biracial endogenous general elections, the Black-preferred candidate was defeated. Trial Tr. 574: 9-12.

320.    Dr. Liu's findings clearly demonstrated that these elections were "racially polarized at a very high level," in that the pattern of racial block voting was particularly stark and the evidence supporting that finding was particularly robust. Trial Tr. 680:15-681:4. As a result "the racial makeup" of congressional districts in the challenged areas determine whether Black voters have a real opportunity to elect

a candidate of their choice. Trial Tr. 574:1-18. Only if the racial makeup of a district is increased to majority-Black or something quite close to it, do Black voters have a realistic opportunity to elect a candidate of their choice. Trial Tr. 574:13-18.

321.  Consistent with these findings, Dr. Liu's analysis of exogenous statewide elections showed that Black support for Black candidates was overwhelming, ranging from 85-95 percent. Trial Tr. 575:7-16; MX16 at 8-9, tbl.2. Conversely, White voters' support for Black candidates was overwhelmingly minimal in these statewide elections, in single digits or the low teens. MX16 at 9, tbl.2.

322.  In his analysis of relevant biracial exogenous elections, Dr. Liu considered the 2023 and 2019 mayoral runoff elections in Montgomery; the 2022 elections for Governor, U.S. Senate, Attorney General, Secretary of State and Place 5 of the Supreme Court; the 2018 Lieutenant Governor, State Auditor, and Place 1 Public Service Commission elections; the 2014 Lieutenant Governor, Secretary of State and State Auditor elections; and the 2012 and 2008 general presidential elections. MX16 at 9, tbl.2. He also analyzed the 2020 general presidential election between to White candidates where Kamala Harris, a Black woman, was the vice presidential candidate. MX16 at 9, tbl.2.

323.  Dr. Liu considered the nonpartisan Montgomery mayoral runoff elections as part of his analysis of relevant exogenous biracial elections and found

that voting was highly racially polarized in these two runoff elections as well. Trial Tr. 596:9-21; MX16 at 9, tbl.2.

324.    Dr. Liu found also that all Black candidates who ran in statewide races over the last 15 years received less than 40 percent of the total votes cast in the state. MX16 at 8. In five statewide elections in 2022, Dr. Liu found that Black candidates received more than 90 percent of the Black vote share and less than 9 percent of the White vote share. MX16 at 8.

325.    Dr. Liu found that the elections he analyzed demonstrated some of the highest levels of racial polarization that he has seen in his more than 20 years of research. Trial Tr. 576:10-14.

326.    To further corroborate his EI analysis, Dr. Liu looked at exit polls. Trial Tr. 576:15-17. Exit polls are surveys that are conducted immediately after voters cast their vote. Trial Tr. 576:19-20. Because voters do not register by party in Alabama, exit polls also shed light on the votes of self-identified Democrats and Republicans. MX13 at 14. Exit polls are highly accurate but logistically involved and expensive, and thus were not available for every election Dr. Liu analyzed. Trial Tr. 576:20-577:20. Exit poll data was available for the 2008 general and primary and the 2012 general election. MX13 at 14.

327.    The exit poll data confirmed a high degree of racial polarization in voting, and showed that self-identified White Democrats even voted across party

lines for White Republicans when faced with a Black Democrat on the ballot in *general elections*. Trial Tr. 578:11-17, 588:18-591:5.

328.   According to a 2008 exit poll, Barack Obama, a Black Democrat, won 98 percent of Black voters in Alabama, and John McCain, a White Republican, won 88 percent of White voters. John McCain won 51 percent of White Democrats, and Barack Obama won only 47 percent of White Democrats. In the 2012 Presidential election, 84 percent of White voters in Alabama voted for Mitt Romney while White support for President Obama was only 15 percent. Exit polls from the 2008 Presidential Democratic Primary and the 2008 U.S. Senate elections in Alabama revealed a similar pattern of racially polarized voting. In the 2008 Democratic Primary, Hillary Clinton, a White woman, received 72 percent of White voters' support, and Barack Obama received 84 percent of Black voters' support. In the 2008 Senate race, White voter support for Jeff Sessions was 89 percent against Vivian Figures, a Black candidate. Sessions received 58 percent of the White Democratic vote and 96 percent of the White Republican vote. Vivian Figures won 90 percent of all Black voters. MX13 at 14.

### iii.   Defendants' Experts

329.   Defendants' expert Dr. Hood does not dispute any of Dr. Palmer's or Dr. Liu's conclusions regarding racially polarized voting, agreed that voting in Alabama is racially polarized, and concluded from his own analysis that a Black-

preferred candidate is likely to be defeated in a majority-white congressional district. Trial Tr. 1898:14-19, 1944:23-25, 1945:11-17 (Hood). Dr. Hood's own analysis demonstrates that Black voters in Alabama are politically cohesive—in fact, "close to monolithic." Trial Tr. 1900:19-1901:16; *see also* MX18 at 13.

330.    Defendants' expert Dr. Bonneau does not dispute Dr. Palmer's and Dr. Liu's conclusions that there is racially polarized voting in Alabama and that Black voters support different candidates than white voters. Trial Tr. 1726:16-20. His own analysis demonstrates that Black voters vote cohesively for Democratic candidates. Trial Tr. 1747:10-12.

331.    When asked by the Court, Dr. Bonneau agreed that he does not contest that Black voters vote cohesively in Alabama or that white voters ordinarily vote as a block sufficient to defeat those Black voters' choices, conceding the second and third preconditions. Trial Tr. 1862:7-13.

### 3. Performance Analysis of 2023 Plan vs. Illustrative Plans

332.    Both experts also analyzed how Plaintiffs' illustrative plans perform for Black voters compared to the 2023 Plan, using actual election results.

333.    Dr. Palmer analyzed 17 statewide elections between 2016 and 2022 to determine how the Black-preferred candidates in CD2, the proposed remedial district in the 2023 Plan, would perform in election contests. CX9 ¶¶ 15-17.

334.   Dr. Palmer concluded that the average vote share for Black-preferred candidates in CD2 across all 17 elections is 44.5%, sharply below the threshold necessary to win in a two-party election. CX9 ¶ 18.

335.   His analysis further demonstrated that the Black-preferred candidates in CD2 would have been defeated by the White-preferred candidate 94% of the time (in 16 out of 17 contests). CX9 ¶¶ 18, 20.

336.   In the single election in which the Black-preferred candidate prevailed in Dr. Palmer's analysis, the Black-preferred candidate was Doug Jones, and the White-preferred candidate was Roy Moore, a controversial figure in Alabama politics for various reasons, including accusations that he sexually abused or harassed several teenage women. PI Tr. at 718:1-9.

337.   Dr. Palmer also analyzed whether Mr. Cooper's illustrative majority-Black districts would elect Black-preferred candidates using actual election returns. He found that Black-preferred candidates were consistently elected in each of the majority-Black districts examined with an average of 55% of the vote in illustrative district 2 and 62% of the vote in illustrative district 7. Trial Tr. 502:13-16; 503:10-13 (Palmer); CX3 ¶ 25, fig.4, tbls.11-18.

338.   Dr. Liu used recompiled election results from 11 biracial statewide elections between 2014 and 2022 to examine how Black voters' opportunity to elect candidates of their choice differ between the 2023 Plan and Plaintiffs' illustrative

plan drawn by Dr. Duchin. Trial Tr. 579:9-580:11 (Liu). This "effectiveness analysis" demonstrates how different configurations of the district under dispute, create different opportunities for minority voters to elect candidate of their choice. Trial Tr. 578:21-579:5 (Liu).

339.   Like its predecessor, the 2023 Plan contains just one majority-Black district: CD7, which has an AP BVAP of 50.65 percent. Joint Stip. ¶ 135; Trial Tr. 579:22-24. The district with the next highest AP BVAP is CD2, with 39.93 percent. Joint Stip. ¶ 137.

340.   Dr. Liu's analysis of 11 biracial statewide elections revealed that under CD2 of SB 5, the vote-share for Black candidates, who he earlier determined were the Black-preferred candidates, ranged from 37.8 percent to 46.9 percent. MX16 at 11, tbl.3. In each of the 11 election contests, voting was highly racially polarized and the Black-preferred candidate would have been defeated in CD2 of SB 5. MX16 at 11, tbl.3; Trial Tr. 580:15-581:4. In contrast, because CD7 under SB 5 is majority-Black, even though voting was highly racially polarized, the Black preferred candidate would have won all 11 election contests. MX16 at 12, tbl.4; Trial Tr. 581:5-22.

341.   The white-preferred candidate in CD2 in SB 5 will always defeat the Black-preferred candidate in biracial elections under SB 5. Trial Tr. 581:23-582:3.

342.  Dr. Liu also performed an effectiveness analysis of CD2 and CD7 under Milligan Plaintiffs' illustrative plan, Duchin Plan E. MX16 at 12-14, tbls.6-7. Under Duchin Plan E, voting is still highly racially polarized with Black voters supporting their preferred candidates by 90 percent or greater and White voters supporting Black-preferred candidates in the single digits. Trial Tr. 582:15-21. However, in 10 of the 11 statewide biracial elections Dr. Liu analyzed, the Black-preferred candidate would have won election in CD2. Trial Tr. 582:22-583:3; MX16 at 13, tbl.6. Despite clear racial polarization in voting in CD7 of Duchin Plan E, Black-preferred candidates would have won 11 of 11 elections analyzed. Trial Tr. 583:4-10; MX16 at 14, tbl.7.

343.  Comparing SB 5 with Duchin Plan E, Dr. Liu concluded that as a result of the stark racial polarization in voting, only Duchin Plan E gave Black voters a realistic opportunity to elect a candidate of choice in two districts and that Black candidates will likely be unable to win elections outside of majority-Black or near majority Black districts in the analyzed areas. Trial Tr. 583:14-22; MX16 at 10-14.

344.  This Court finds that despite the high degree of electoral cohesion among Black voters, the majority of white voters form a voting bloc to typically defeat all the Black preferred candidates in these elections. SB 5 continues to dilute Black voters' opportunity to elect a candidate of choice in CD2, all but ensuring the defeat of Black-preferred candidates in that district. *Milligan* Plaintiffs' illustrative

plan, Duchin Plan E (as well as Plans A through D before it), however, increases the opportunity of Black voters to elect the candidates of their choice in CD2 and CD7.

345.   Defendants offered no evidence or testimony to dispute the analyses completed by Drs. Palmer and Liu concerning the performance of the 2023 Plan.

346.   In fact, the Alabama Legislature also analyzed the performance of the 2023 Plan in 7 statewide elections in 2018 and 2020. That analysis likewise showed that under SB 5, the average two-party vote-share for Black-preferred candidates in CD2 was 46.6 percent and that the Black-preferred candidate in CD2 would have lost all 7 election contests analyzed by the Legislature. Joint Stip. ¶ 138.

347.   Based on the forgoing, Plaintiffs have met their burden of satisfying the second and third *Gingles* preconditions. The Court finds that voting is racially polarized in the relevant areas of Alabama, including in the Black Belt and the City of Mobile. It is essentially undisputed that Black voters are politically cohesive and that, under the 2023 Plan, the white majority nearly always votes sufficiently as a bloc to enable it to defeat Black voters' preferred candidate, absent one extraordinary circumstance.

## V.     The Totality of Circumstances Affecting Electoral Opportunities for Black Alabamians

### A.     Alabama's History of Discrimination in Voting, Education, Health, Employment, and other Areas (Senate Factors 1, 3, and 5)

348.   Alabama has a long and sordid history of voting-related discrimination that continues to affect the ability of Black people to participate in the political process. Trial Tr. 935:23-940:4 (Burch), 1282:18-1292:10, 1399:25-1401:15 (Bagley); *see also* MX1 at 3-26; CX16 at 3-26; MX3 at 1-15, 29; CX10 at 1-15, 29; MX5 at 1-2; CX6 at 1-2; MX6 at 12-13; CX7 at 12-13; Stone Tr. 174:20-179:16 (Simelton); Stone Tr. 497:21-499:25 (Douglas); Stone Tr. 533:1-545:2 (Bagley).

349.   The *Milligan* and *Caster* Plaintiffs rely on the expert testimony of Dr. Joseph Bagley and Dr. Traci Burch.

350.   Dr. Bagley is an Assistant Professor of History at Georgia State University, where he focuses on "United States constitutional and legal history, politics, and race relations, with a focus on Alabama and Georgia." He received his M.A. and B.A. in history from Auburn University in Alabama, and his Ph.D. in in United States constitutional legal history and 20th and 21st Century American politics and law from Georgia State University. He has published a book on Alabama history and been accepted as an expert in several other voting cases in Alabama and elsewhere. At the trial, he was qualified as an expert in political history, political analysis, race relations, and historical analysis in Alabama without objection. He

was to perform a Senate Factors analysis, based on "common standards of historiography," as well as a comprehensive analysis of the historical and contemporaneous circumstances that led to the 2023 Plan. Trial Tr. 1277:10-1283:7; *see* MX4 at 1-2; CX5 at 1-2.

351.   Dr. Burch is highly respected and well-qualified expert in her fields of discipline. She holds a Ph.D. from Harvard University and is a Professor of Political Science at Northwestern University and a research professor at the American Bar Foundation. She has published a book and numerous peer-reviewed articles about voting and political behavior in the South, conducted surveys, served as an editor or peer reviewer for political science major journals and university presses, including Harvard, Princton, and Oxford, won several awards, and been accepted as an expert in numerous voting cases. Without objection, the Court accepted Dr. Burch as an expert in political and social science and political behavior. Trial Tr. 927:2-8.

352. In formulating her opinions, Dr. Burch relied on sources and methodologies recognized in the field and consistent with her work as a political scientist. Dr. Burch cited compelling data that supports the conclusion that Black Alabamians experiences with discrimination have resulted in contemporary social and economic disparities that negatively impact voter participation. MX6 at 4-5; CX7 at 4-5.

353.    We find that Dr. Bagley and Dr. Burch are highly credible expert witnesses. The Court finds that are their opinions credible, well supported by data, and the result of reliable methodology. Although Dr. Bagley and Dr. Burch were subjected to length cross-examinations at trial, Defendants did not offer any credible expert testimony to rebut their opinions.

354.    In contrast, the Court finds that the Defendant's expert, Dr. Reilly, is not credible. Dr. Reilly claims that contemporary racial disparities in Alabama are not the result of racial discrimination in Alabama because racial disparities exist almost everywhere in the United States. DX8 at 4.

355.    But Dr. Reilly admitted that Black Alabamians have the lowest income and are worse off on other socioeconomic measures as compared to Black residents of several comparison states. Trial Tr. 2251:22-2252:8, *see* MX6 at 21; CX7 at 21; MX7 at 2-3; CX8 at 2-3. He also agreed that Black Alabamians are worse off economically than White Alabamians. Trial Tr. 2252:9-11, *see* MX6 at 37; CX7 at 37.

356.    Notably, Dr. Reilly had "no reason" to attack the sources Dr. Burch use to analyze the existence of racial discrimination in Alabama. Trial Tr. 2252:15-19.

357.    As explained in more detail *infra* ¶¶ 507-537, the Court has other reasons to disregard the testimony of Dr. Reilly.

## i.    Official Discrimination in Voting from the 1870s to the 1960s

358.    Alabama's history of discrimination dates to the State's admission to the union. Before the Civil War, Black people were barred from voting in the state. After the passage of the Reconstruction Acts and Amendments, Alabama was forced to allow Black men access to the franchise, and the 1867 Alabama Constitution granted the right to vote to every male over age 21. This meant that for the first time in history, Black Alabamians voted and held public office. MX1 at 4-5; CX16 at 4-5; *see also* First Amend. Comp. ¶ 120 (*Milligan* Doc. 329); Allen Answer ¶ 120 (*Milligan* Doc. 380); Legislators Answer ¶ 120 (*Milligan* Doc. 381).

359.    In response, White leaders reformed the Democratic party with the intent of "redeeming" the State and re-establishing White supremacy. This was accomplished by using violence to deter Black people from political participation and, once the Redeemers returned to political office, to pass racially discriminatory laws to cement their control. MX1 at 4-5; CX16 at 4-5; P.I. Tr. 1146 (Bagley); *see also* First Amend. Comp. ¶ 121 (*Milligan* Doc. 329); Allen Answer ¶ 121 (*Milligan* Doc. 380); Legislators Answer ¶ 121 (*Milligan* Doc. 381).

360.    Between 1868 and 1872, the Ku Klux Klan maintained an active membership in Alabama's rural areas and suppressed the Black vote by beating and killing Republican leaders, burning their homes, lynching Black Americans, and sending bands of armed White men on horseback to break up Republican political

rallies and intimidate voters. First Amend. Comp. ¶ 122 (*Milligan* Doc. 329); Allen Answer ¶ 122 (*Milligan* Doc. 380); Legislators Answer ¶ 122 (*Milligan* Doc. 381).

361.  In 1874, Democratic candidates were elected to public office in large numbers, mainly due to the party's use of violence against and intimidation of Black voters. On election day, in Eufaula, Alabama, members of a White paramilitary group known as the White League, killed several unarmed Black Republican voters and turned away thousands of voters from the polls. First Amend. Comp. ¶ 123 (*Milligan* Doc. 329); Allen Answer ¶ 123 (*Milligan* Doc. 380); Legislators Answer ¶ 123 (*Milligan* Doc. 381).

362.  The following year, in 1875, the Alabama legislature adopted a new state constitution and passed a series of local laws and ordinances designed to strip Black Americans of the civil rights they briefly enjoyed during Reconstruction. First Amend. Comp. ¶ 124 (*Milligan* Doc. 329); Allen Answer ¶ 124 (*Milligan* Doc. 380); Legislators Answer ¶ 124 (*Milligan* Doc. 381).

363.  Violent intimidation of Black voters continued throughout the 1880s and 1890s, and by the twentieth century White leaders in Alabama had declared Black disfranchisement a policy goal. MX2 at 1-2; CX17 at 1-2; *see also* Trial Tr. 756:19-758:7 (Riser). At the 1901 Constitutional Convention, 155 White male delegates gathered in Montgomery with the express intention to "establish[] White supremacy [in the State]." MX1 at 5; CX16 at 5; P.I. Tr. 1146 (Bagley); *see also*

First Amend. Comp. ¶ 125 (*Milligan* Doc. 329); Allen Answer ¶ 125 (*Milligan* Doc. 380); Legislators Answer ¶ 125 (*Milligan* Doc. 381).

364.    The 1893 Sayre Law and the 1901 Constitution required literacy tests as a prerequisite to voting and mandated payment of an annual $1.50 poll tax, which both were intended to and had the effect of disenfranchising Black voters. Trial Tr. 774:14-775:4, 781:10-783:3 (Riser); *see also United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966); First Amend. Comp. ¶ 126 (*Milligan* Doc. 329); Allen Answer ¶ 126 (*Milligan* Doc. 380); Legislators Answer ¶ 126 (*Milligan* Doc. 381).

365.    The 1901 Constitution decreased the number of Black registered voters in Alabama by about 98%. MX1 at 5; CX16 at 5; *see also* Trial Tr. at 774:15-16 (Riser).

366.    After the 1901 Constitution and the disfranchisement of Black people, the Alabama Democratic Party created a Whites-only primary election to resolve political disputes between different factions of White Democrats. Tr. 776:21-778:1 (Riser). After the United States Supreme Court invalidated White-only primaries in 1944, Alabama passed the "Boswell Amendment" to its Constitution in 1946, adding an "understanding requirement" meant to give registrars broad discretion to deny African Americans the ability to register to vote. MX1 at 6; CX16 at 6; *see also* Trial Tr. 820:10-821:7 (Frederickson). A federal court ruled that this provision was purposely used to counteract the Supreme Court's invalidation of the White primary.

*Davis v. Schnell*, 81 F. Supp. 872, 878-80 (S.D. Ala. 1949) (three-judge court), *aff'd*, 336 U.S. 933 (1949) (mem.).

367. After the Supreme Court outlawed the White primary in 1944, many Alabama counties shifted to at-large elections, the intent of which was to prevent African Americans from electing their candidates of choice. MX1 at 6; CX16 at 6.

368. Alabama's discriminatory voter registration system, combined with continued violent intimidation, successfully suppressed Black voting in the state for several more generations, with no significant federal intervention until the passage of the VRA in 1965. First Amend. Comp. ¶ 128 (*Milligan* Doc. 329); Allen Answer ¶ 128 (*Milligan* Doc. 380); Legislators Answer ¶ 128 (*Milligan* Doc. 381).

369. In 1951, Alabama enacted a law prohibiting single-shot voting in municipal elections, the intent of which was to prevent African Americans from electing their candidates of choice. MX1 at 6; CX16 at 6.

370. In 1957, the Alabama Legislature transformed the boundaries of the city of Tuskegee into a twenty-eight-sided figure designed to fence out African Americans from the city limits and ensure that only White residents could elect city officials. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); MX1 at 8; CX16 at 8; P.I. Tr. 1149 (Bagley).

371. In 1964 and 1965, Dallas County Sheriff Jim Clark, Alabama state troopers, and vigilantes violently assaulted peaceful Black protesters in Selma

attempting to gain access to the franchise. MX1 at 10; CX16 at 10; *see also* First Amend. Comp. ¶ 129 (*Milligan* Doc. 329); Allen Answer ¶ 129 (*Milligan* Doc. 380); Legislators Answer ¶ 129 (*Milligan* Doc. 381).

372.    On March 7, 1965, what is now known as "Bloody Sunday," state troopers viciously and brutally beat unarmed peaceful civil-rights activists crossing the Edmund Pettus Bridge in Selma, Alabama. Bloody Sunday helped pave the way for the passage of the VRA. In 1965, Alabama was declared a "covered" state under Section 4(b) of the Act, which required the state and its political subdivisions to submit all voting changes for preclearance review by the United States Department of Justice or a federal court. MX1 at 10; CX16 at 10; *see also* First Amend. Comp. ¶ 130 (*Milligan* Doc. 329); Allen Answer ¶ 130 (*Milligan* Doc. 380); Legislators Answer ¶ 130 (*Milligan* Doc. 381).

ii.  **Preclearance Coverage and Objections under the VRA**

373.    Between 1965 and 2013, at least 100 voting changes proposed by Alabama state, county or city officials were objected to pursuant to Section 5 of the Voting Rights Act. MX114. This includes at least sixteen objections between 1969 and 2008. MX114; *see also* First Amend. Comp. ¶ 131 (*Milligan* Doc. 329); Allen Answer ¶ 131 (*Milligan* Doc. 380); Legislators Answer ¶ 131 (*Milligan* Doc. 381).

374.    In the wake of *Shelby County v. Holder*, Alabama is the only state where more than one political subdivision has been re-subjected to preclearance

review under Section 3(c) of the VRA. MX5 at 1-2; CX6 at 1-2; *see, e.g.*, *Braxton v. Town of Newbern*, No. 2:23-CV-00127-KD, 2024 WL 3519193, at *3 (S.D. Ala. July 23, 2024) (Town of Newbern, Hale County); *Jones*, 2019 WL 7500528, at *4-5 (Jefferson County school board); *Allen v. City of Evergreen*, No. 13- 0107, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014) (City of Evergreen, Conecuh County). All three of the jurisdictions that have been subject to a Section 3 preclearance order are in the challenged area, including in Hale and Conecuh Counties in the Black Belt.

### iii.   Discrimination in Congressional and State Legislative Maps

375.   In five of the six decennial redistricting cycles between 1960 to 2010, courts or the U.S. Department of Justice found that Alabama's congressional map or state legislative maps discriminated against Black voters in violation of the Constitution or the VRA. MX1 at 8-16; CX16 at 8-16.

376.   Prior to 1960, the Legislature failed to reapportion for fifty years. As a result, Alabama's entire legislative apportionment scheme was struck down in *Reynolds v. Sims*, 377 U.S. 533 (1964), which held "that, as a basic constitutional standard, the Equal Protection Clause requires the seats in both houses of a bicameral state legislature must be apportioned on a population basis[,]" *id*. at 568. On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro

counties with predominantly White counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108–09 (M.D. Ala. 1965). MX1 at 9; CX16 at 9; P.I. Tr. 1149-50 (Bagley).

377.   Following Reynolds and the 1970 Census, a three-judge federal court drew new district lines. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972). The court rejected the proposed map of Alabama Secretary of State Mabel Sanders Amos because of its racially "discriminatory effect" on Black voters. *Id*. at 936; *see* MX1 at 10; CX16 at 10; P.I. Tr. 1150 (Bagley).

378.   In the 1980s, the United States Attorney General denied preclearance under Section 5 of the VRA to maps drawn by the Legislature to redistrict State House and Senate maps because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. MX1 at 11; CX16 at 11. Shortly thereafter, a three-judge court rejected Alabama's proposed interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' black districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 237 (M.D. Ala. 1982). The court later undertook an "examination of [the] merits" of Alabama Act No. 82-629, the Legislature's enacted plan, with the court concluding that "the configuration of certain Black Belt districts [in Act No. 82-629] caused retrogression of black voting strength (particularly in districts 45 and 88)," which included the Black community in Montgomery, "and that there was unnecessary

fragmentation of minority communities." *Burton v. Hobbie*, 561 F. Supp. 1029, 1035 (M.D. Ala. 1983); *see* MX1 at 11; CX16 at 11; P.I. Tr. 1150-1151 (Bagley).

379.    After the 1990 Census, Alabama settled a state court case brought by Black voters under the VRA, which resulted in the creation of new majority-Black districts. MX1 at 12-13; CX16 at 12-13; *see also Brooks v. Hobbie*, 631 So.2d 883 (Ala., 1993).

380.    Regarding the congressional plan, prominent Black political leaders, including State Senator Michael Figures in Mobile, State Senator Earl Hillard in Birmingham, and Joe Reed, a leader of the Alabama Democratic Caucus, the party's Black caucus, were calling for two majority-Black congressional districts that put the Black Belt with the cities of Birmingham and Mobile. MX4 at 9-10; CX5 at 9-10; Trial Tr. 1317:11-1318:20 (Bagley). At the time, the Legislature understood that the VRA required the creation of at least one majority-Black district, but there was disagreement about its location. MX4 at 12-13; CX5 at 12-13; Trial Tr. 1316:19-1317:10 (Bagley).

381.    The Alabama Legislature initially failed to enact a new congressional plan after Governor Guy Hunt refused to call a special session on redistricting because he opposed Joe Reed's plan with two majority-Black districts. MX4 at 10-12; CX5 at 10-12; *see also Wesch v. Hunt,* 785 F. Supp. 1491, 1494–95 (S.D. Ala. 1992), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902, a*nd aff'd sub nom. Figures v.*

*Hunt*, 507 U.S. 901 (1993). Governor Hunt did not want to call a special session if it were to be "dominated by Joe Reed's plan," State Senator Larry Dixon did not want to "ratify the Joe Reed plan," and State Rep. Perry Hooper, Jr. pushed to move redistricting to the courts to avoid "because of the support legislators have given to Joe Reed's plan." MX4 at 12; CX5 at 12. Randy Hinaman, at the time a staffer for Republican CD1 Rep. Sonny Callahan in Mobile, recruited Paul Charles Wesch, another Republican in Mobile County, to be a plaintiff in a lawsuit challenging the state's failure to pass a redistricting plan. MX4 at 12-15; CX5 at 12-15; Trial Tr. 1316:19-1317:10 (Bagley). Mr. Wesch asserted that holding the 1992 election under the old map would violate the one person, one vote rule. *Wesch,* 785 F. Supp. at 1492–93. Several Black voters also intervened in the *Wesch* action as plaintiffs to assert a Section 2 claim. *Id.* at 1493; *see generally* MX4 at 12-15; CX5 at 12-15.

382.    The parties submitted various redistricting plans for the *Wesch* court's consideration. MX4 at 13; CX5 at 13. Mr. Hillard submitted a plan with two majority-Black districts. Trial Tr. 1318:17-20 (Bagley). Mr. Figures meanwhile attacked the *Wesch* plaintiffs' plan (also called the "Dixon-Pierce" plan because it originated with those legislators) because he thought it used the creation of a Black district to "whitewash" an 89% White district based in suburban Birmingham. MX4 at 13; CX5 at 13. The district court ultimately ordered a congressional plan that closely tracked the Dixon-Pierce plan, which created one district with 67.53%

BVAP. *Wesch,* 785 F. Supp. at 1581. The *Wesch* court did not decide whether Section 2 "require[d] the creation of such a district under the circumstances" because the parties stipulated that according to the 1990 census data, the "African American population in the State of Alabama is sufficiently compact and contiguous to comprise a single member significant majority (65% or more) African American Congressional district," and that "a significant majority African American Congressional district should be created." *Id.* at 1498–99. The court found that the new plan created a majority-Black district that "provide[d] African-Americans a reasonable opportunity to elect a candidate of their choice, and d[id] so without the need for extensive gerrymandering." *Id.* at 1499. In the 1992 election, Mr. Hillard won CD7 under the court map and became Alabama's first Black Congressman in 90 years. MX4 at 15; CX5 at 15.

383.    The 1990s were a pivotal point where White candidates accelerated their flight from the Democratic to the Republican party. This pivot came at the same time that Black political leaders began exercising power within the Legislature to draw fairer districts. Trial Tr. 1345:9-1347:16 (Bagley); *see also* MX4 at 12-15; CX5 at 12-15.

384.    In the 1990s and 2000s redistricting cycle, White legislators in both parties tried to manipulate Black voters for political advantage. White Democrats wanted to unpack court-drawn districts with Black populations above 65% to move

Black voters into their own majority-White districts to help Democrats cling to power in the Legislature. And White Republicans wanted to pack Black voters into *more* majority-Black districts so that the surrounding districts had more White voters, which, in Republicans' view, made the districts more likely to elect a Republican. Trial Tr. 1321:7-1322:25, 1345:9-1347:16 (Bagley); *see also* MX4 at 15-16; CX5 at 15-16.

385.    Alabama House Representative Mike Hubbard, part of the leadership in the Republican Alabama legislature, relied on this strategy to flip the Legislature to Republican control. Mr. Hubbard pressured White Democratic legislators to flip parties. White Democrats who failed to switch parties were then targeted by Mr. Hubbard who would make a concerted effort to have Republicans run against and defeat these White Democrats. He commissioned a study and experimented with his strategies in the 2006 and 2008 elections, which culminated in Republicans winning an all-White supermajority of the Legislature in 2010. Trial Tr. 1323:2-1324:1, 1345:17-1346:14 (Bagley); MX1 at 14; CX16 at 14; MX4 at 17; CX5 at 17.

386.    Before the 2010 congressional and state legislative elections, Republican Senate and House leaders plotted to depress Black voter turnout to help Republicans win by keeping a referendum issue that they believed to be popular among Black voters off the ballot. In recorded conversations, prominent Republican leaders in the Legislature, including Senator Dixon and Senator Beason, referred to

Black Alabamians as "illiterates," "Aborigines" and "Indians." Others who were a part of this plot to suppress Black voter turnout in 2010 were Senator Ben Brooks, Senator Jabo Waggoner, Senator Rusty Glover, Senator Paul Sanford, and legislative aid Monica Cooper. *See* Trial Tr. 1320:4-12, 1358:14-1359:2, 1458:2-19 (Bagley).

387.   In 2011, a court found that that these "recordings represent compelling evidence that political exclusion through racism remains a real and enduring problem in this State" and that "racist sentiments" remain "regrettably entrenched in the high echelons of state government." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-47 (M.D. Ala. 2011).

388.   After the 2010 Census, the Legislature enacted a plan that further packed Black voters into state senate and house districts based on racial targets. Black voters and legislators successfully challenged 12 state legislative districts as unconstitutional racial gerrymanders. See *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017); *see* MX4 at 19; CX5 at 19.

389.   This Court has preliminarily enjoined two different congressional plans enacted by the Alabama Legislature. The Court found that both the Legislature's 2021 plan and 2023 plan likely violated Section 2 of the VRA, *see Milligan I*, 582 F. Supp. 3d 924 (N.D. Ala. 2022), and *Milligan II*, 690 F. Supp. 3d 1226 (N.D. Ala. 2023). The 2022 decision was upheld in full by the U.S. Supreme Court, *Milligan,*

599 U.S. at 22, and the 2023 order was left in place after the Court denied a stay, *Allen v. Milligan*, 144 S. Ct. 476 (2023). MX5 at 4; CX6 at 4.

### iv. <u>Official Racial Discrimination in Voting (Senate Factor 1) and Other Voting Practices that May Enhance the Opportunity for Racial Discrimination from the 1990s to Today (Senate Factor 3)</u>

390.  Beyond redistricting, Black Alabamians have successfully challenged other discriminatory voting laws under the VRA and the Constitution. MX1 at 5, 12; CX16 at 5, 12; *see, e.g.*, *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1106–07 (N.D. Ala. 2020) ("*People First*") (declaratory judgment against witness requirement); *Harris v. Siegelman*, 695 F. Supp. 517, 530 (M.D. Ala. 1988) (injunction and declaratory judgment against the discriminatory appointment of poll workers and state law restrictions on voter assistance). For example, the Supreme Court struck down Alabama's intentionally discriminatory misdemeanant disfranchisement law, *Hunter v. Underwood*, 471 U.S. 222 (1985), and a state law that allowed for certain discriminatory annexations, *Pleasant Grove v. United States*, 479 U.S. 462, 466-67 (1987); *see also* MX1 at 5, 12; CX16 at 5, 12; First Amend. Comp. ¶ 131 (*Milligan* Doc. 329); Allen Answer ¶ 131 (*Milligan* Doc. 380); Legislators Answer ¶ 131 (*Milligan* Doc. 381). Further, Alabama has a majority-vote requirement in primaries. If a candidate fails to win a majority of the vote, the top two highest vote getters must face one another in a primary runoff. First Amend.

Comp. ¶ 137 (*Milligan* Doc. 329); Allen Answer ¶ 137 (*Milligan* Doc. 380); Legislators Answer ¶ 137 (*Milligan* Doc. 381).

391.   As described below, from the 1990s to today, this discrimination has continued and includes, among other practices, at-large election systems, restrictions on assistance for low literacy or disabled voters, limited hours and locations for registering and voting, voter purges, and voter misinformation and intimidation.

392.   **At-Large Elections with Numbered Posts.** Recently, federal courts have altered certain at-large voting systems created by the State Legislature to remedy alleged violations of the VRA and the Constitution. In *Jones v. Jefferson County Board of Education*, a district court found that the State Legislature intentionally discriminated in the creation of an at-large multimember district used to elect county school board members in violation of the VRA and Constitution. No. 2:19-cv-01821-MHH, 2019 WL 7500528, at *4 (N.D. Ala. Dec. 16, 2019). In *Alabama State Conference of the NAACP v. City of Pleasant Grove*, a settlement led to a court order requiring changes to the city's voting system to remedy the city's allegedly intentionally discriminatory at-large election system. No. 2:18-cv-02056-LSC, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019); *see* MX1 at 12; CX16 at 12; *see also* First Amend. Comp. ¶ 134 (*Milligan* Doc. 329); Allen Answer ¶ 134 (*Milligan* Doc. 380); Legislators Answer ¶ 134 (*Milligan* Doc. 381).

393.   In the 1990s and 1980s, there was successful Section 2 challenges to the Greensborough city council, *Dillard v. City of Greensboro*, 956 F. Supp. 1576 (M.D. Ala. 1997), the Autauga County school board, *Medders v. Autauga Cnty. Bd. of Educ.*, 858 F. Supp. 1118 (M.D. Ala. 1994), the Barbour County commission, *Straw v. Barbour Cnty.*, 864 F. Supp. 1148 (M.D. Ala. 1994), the Dallas County commission and school board, *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433 (11th Cir. 1988), the Marengo County commission and school board, *United States v. Marengo Cnty. Comm'n*, 643 F. Supp. 232 (S.D.Ala.1986) *aff'd* 811 F.2d 610 (11th Cir.1987), the Montgomery city council, *Buskey v. Oliver*, 565 F. Supp. 1473 (M.D. Ala. 1983), and the Hale County commission, *Hale Cnty. v. United States*, 496 F. Supp. 1206 (D.D.C. 1980).

394.   In 1986, for instance, a court found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986). The court also found that from the late 1800s to the 1980s, Alabama had purposefully manipulated the method of electing local governments to prevent Black citizens from electing their preferred candidates. *Id*.; *see also* P.I. Tr. 1151:12-1152:13 (Bagley); MX1 at 12; CX16 at 12; First Amend. Comp. ¶ 132 (*Milligan* Doc. 329); Allen Answer ¶ 132 (*Milligan* Doc.

380); Legislators Answer ¶ 132 (*Milligan* Doc. 381). Ultimately, a defendant class of 17 county commissions, 28 county school boards, and 144 municipalities were sued for using intentionally discriminatory election systems. About 180 jurisdictions agreed to settlements. Many of these jurisdictions were in the Black Belt. P.I. Tr. 1151:12-1152:13 (Bagley); MX1 at 12; CX16 at 12; *see also* First Amend. Comp. ¶ 133 (*Milligan* Doc. 329); Allen Answer ¶ 133 (*Milligan* Doc. 380); Legislators Answer ¶ 133 (*Milligan* Doc. 381).

395.    **Restrictions on Voter Assistance.** In March 2024, the Alabama Legislature enacted Alabama Senate Bill 1 ("SB 1") relating to absentee ballot applications. SB 1 places certain restrictions on the way people may assist voters with their absentee ballot applications. SB 1's Submission Restriction criminalizes the act of returning a potential voter's absentee ballot application. Ala. Code § 17-11-4(c)(2). The Payment and Gift Provisions criminalize the act of accepting anything of value from or providing anything of value to a third party for distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering a voter's absentee ballot application. *Id*. §§ 17-11-4(d)(1)–(2).

396.    SB 1 was passed at the start of the 2024 election season under the court-ordered remedial plan. As Ms. Letetia Jackson explained, the Legislature enacted SB 1 just as Black Alabamians had won the "right to have a voice, our right to have

a representative to represent us and to advocate for our issues." Trial Tr. 724:12-726:11 (L. Jackson).

397.    Several civil rights groups, including Plaintiffs Alabama NAACP and GBM, filed a lawsuit against the Alabama Attorney General alleging that SB 1 violated the First Amendment to the U.S. Constitution and Section 208 of the VRA. Section 208 directs that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. While the court dismissed the First Amendment claims, it granted a preliminary injunction against SB 1's Submission Restriction and Payment and Gift Provisions to permit voters who are blind, disabled, or unable to read or write, within the meaning of the VRA, to receive assistance from the person of their choice. *Ala. State Conf. of NAACP v. Marshall*, No. 2:24-CV-00420-RDP, 2024 WL 4282082, at *7 (N.D. Ala. Sept. 24, 2024), *stay pending appeal denied* No. 24-13111, 2024 WL 4481489 (11th Cir. Oct. 11, 2024); *see also* Trial Tr. 963:22-964:11 (Burch), 1284:17-1285:9 (Bagley); MX4 at 29; CX5 at 29; MX6 at 36; CX7 at 36.

398.    Congress enacted Section 208 to enforce the "implicit requirement" of the VRA's nationwide ban on literacy tests that voters who struggle with reading or

writing "may not be denied assistance at the polls." S. Rep. 97-417, at 63 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 241; *see also* Trial Tr. 1459:2-12 (Bagley).

399.    Indeed, prior to the VRA's ban on literacy tests, Alabama law required people to complete voter registration forms without assistance. MX4 at 29; CX5 at 29; *see, e.g.*, *Alabama v. United States*, 304 F.2d 583, 587 (5th Cir.), *aff'd*, 371 U.S. 37 (1962). Similarly, in 1970, the U.S. Department of Justice objected under Section 5 to an Alabama law that, like SB 1, required applicants for mail-in absentee voter registration to complete a form without assistance. The Justice Department also objected to Alabama laws restricting in-person assistance for voters. Trial Tr. 1285:17-1286:21 (Bagley); *see also* MX114 at 35, 48. And, in *Harris v. Siegelman*, a court enjoined the intentionally discriminatory Sayre law, which had required those disproportionately Black people with limited literacy to swear an oath before receiving help, and restricted voters to only five-minutes inside the polling booth. 695 F. Supp. 517, 526–28 (describing then-recent "instances where black voters were harassed with the five-minute rule or were refused clearly needed assistance because they did not meet the state's rigorous assistance standard or because the White poll officials arbitrarily decided that assistance was not needed"); *see also* MX1 at 4-5; CX16 at 4-5; Trial Tr. 781:10-783:3 (Riser). These subtle literacy tests were designed to stop Black voters by preying on the sad fact that Black people are

more likely to be illiterate. Trial Tr. 781:10-783:3 (Riser), 1285:17-1286:21 (Bagley).

400.    Today, more Black people than White Alabamians continue to struggle with literacy, which can make it more difficult for Black voters to complete the tasks required to vote without assistance. Trial Tr. 47:3-24 (Dowdy), 724:12-725:1 (L. Jackson), 479:10-23 (Smith), 938:3-11, 942:1-20, 963:16-964:11, 1048:25-1049:23, 1055:17-1056:7 (Burch), 1097:3-1098:14, 1128:6-1129:9 (V. Jackson), 1284:17-1286:21, 1458:20-1459:12 (Bagley), 2252:20-2253:4 (Reilly); *see also* MX4 at 29; CX5 at 29; MX6 at 36; CX7 at 36; Stone Tr. 176:20-177:23 (Simelton); 497:13-499:25 (Douglas); 646:19-23 (Williams). Among all Alabama students, 68.2% of Black students are not proficient in English language arts as compared to only 40.5% of White students who are nonproficient. Trial Tr. 942:2-20 (Burch); *see also* MX6 at 11 n.34; CX7 at 11 n.34. Among adults in 20 of the 24 examined counties (i.e., the 23 Black Belt counties plus Mobile), more than 30% of adults are classified as "low literacy," meaning that are either functionally illiterate or, at best, face difficulties reading or comprehending written material. Trial Tr. 938:3-11 (Burch); MX6 at 11 & n.37; CX7 at 11 & n.37. The data from these disproportionately Black counties is evidence of racial disparities in illiteracy among Alabama adults. Trial Tr. 1048:25-1049:23 (Burch). The high illiteracy rates in Alabama are uncommon in America. Trial Tr. 1055:20-1056:7 (Burch). Unfortunately, SB 1's threat of

criminal prosecution has led some organizers and groups, like GBM, to no longer help people with absentee voting, which makes it harder for Black people who need assistance to vote at all. Trial Tr. 44:25-48:11 (Dowdy); Stone Tr. 647:18-648:12 (Douglas).

401. **Limits on Hours and Locations for Voting and Registration.** Beginning in 2016, the State began enforcing its strict voter ID law. In late 2015, Governor Bentley closed 31 motor vehicle division offices mostly in the Black Belt. After the U.S. Department of Transportation concluded that these closures adversely impacted Black residents and voters in violation of the Civil Rights Act, the State agreed to fully reopen the offices in December 2016. Because people could register to vote and obtain voter ID at these offices, the closures negatively affected Black voters during the 2016 elections. Trial Tr. 1288:22-1291:9 (Bagley); MX5 at 4-5; CX6 at 4-5.

402. Relatedly, in 2016, the Secretary and the Alabama Department of Law Enforcement (ALEA) entered a settlement with the U.S. Department of Justice to bring Alabama into compliance with the requirement of the National Voter Registration Act of 1993 (NVRA) that driver's licenses offices offer opportunities to register to vote. Stone Tr. 918:10-919:23 (Archer). Likewise, in December 2013, the Alabama NAACP and the Secretary entered into a settlement agreement to bring Alabama into compliance with certain NVRA provisions, which required Alabama

to provide opportunities to register to vote for people who visited state welfare offices. Stone Tr. 175:3-176:8 (Simelton); *see also Milligan* Doc. 451 ¶¶ 1-5; *Caster* Doc. 364 ¶¶ 1-5, Joint Consolidated Motion and Request to Enter Stipulated Facts ("Addt'l Stip. Facts"). Because Black people are much more likely to rely on welfare and food stamps, Trial Tr. 958:17-959:9 (Burch), 1886:11-22, 1905:7-12 (Hood); MX6 at 25; CX7 at 25, the State's twenty-year failure to comply with the NVRA likely had a racially disparate impact, Stone Tr. 175:21-176:9 (Simelton). Indeed, data that Alabama submitted to the U.S. Election Assistance Commission that showed the number of voter registration applications submitted to Alabama public assistance offices decreased from 80,096 at the peak in 1995-1996 to just 19,059 in 2009-2010, a reduction of 76%; in contrast, in the same period, the number of initial food stamp applications submitted in Alabama increased by 60% from 368,862 to 581,882. Addt'l Stip. Facts ¶ 1.

403. Alabama also offers neither early in-person voting, nor no-excuse absentee voting. Trial Tr. 48:22-49:4 (Dowdy), 962:14-963:4 (Burch), 1103:10-1104:6 (V. Jackson); *see also* MX6 at 20-21 n. 70; CX7 at 20-21 n. 70. The State's failure to make these methods of voting available contributes to increased wait times for voters at the polls. Black voters are more likely to have lower-income jobs and are less likely to own vehicles than Whites. Trial Tr. 950:12-952:11, 961:16-963:4 (Burch); MX6 at 20-26; CX7 at 20-26. Election Day is not a holiday. Stone Tr.

1338:4-6 (Coley). The limited options for early voting and lack of an Election Day holiday requires some Black voters to choose between voting or other important priorities. *See* Trial Tr. 44:25-49:18 (Dowdy), 962:14-963:4 (Burch), 1101:11-1102:12, 1103:10-1104:6 (V. Jackson); *see also* Stone Tr. 1337:19-1338:3 (Coley). These circumstances and the State's lack of early voting result in Black voters waiting longer to vote than White voters. Trial Tr. 963:10-15 (Burch); MX6 at 36; CX7 at 36.

404. **Voter Purges and Intimidation.** Alabama's recent violation of the 90-day provision of the NVRA also likely had a disparate impact on Black voters. Stone Tr. 177:24-179:16 (Simelton). Before the 2024 elections under the court-ordered plan, the Secretary instructed local election officials to place 3,251 voters in inactive status based on his ill-informed claim that these registrants were likely to be noncitizens. The Secretary also referred these individuals to the Alabama Attorney General for "further investigation and possible prosecution." The Alabama NAACP and the United States challenged this process as happening too close to the 2024 General Election in violation of Section 8 of the NVRA, 52 U.S.C. § 20507(c)(2). In granting a preliminary injunction, the court concluded that the Secretary "(1) blew the [ninety-day] deadline when he announced a purge program to begin eighty-four days before the 2024 General Election, (2) later admitted that his purge list included thousands of United States citizens (in addition to far fewer noncitizens, who are

ineligible to vote), and (3) in any event, referred everyone on the purge list to the Alabama Attorney General for criminal investigation." *Ala. Coal. for Immigrant Just. v. Allen*, No. 2:24-CV-1254-AMM, 2024 WL 4510476, at \*1 (N.D. Ala. Oct. 16, 2024); *see* Addt'l Stip. Facts ¶¶ 11-17 (stipulated facts regarding this purge).

405.   Black citizens were among the voters who were wrongly moved from active status and threatened with criminal prosecution for registering to vote. Stone Tr. 179:4-16 (Simelton).

406.   **Misinformation and Administrative Delays.** From the 1960s to today, White election officials have at times required Black people to needlessly wait for long periods of time for voting-related services or simply failed to provide Black voters with the correct information or forms needed to either vote or run for elected office. In 1974, for example, when Mr. McCollum ran as the first Black candidate for elected office in Fayette County, a White election official in the probate judge's office required him to wait in the hallway for three hours before providing him with the necessary candidate qualifying forms. Stone Tr. 1364:8-25 (McCollum); *see, e.g.*, *Hale Cnty.*, 496 F. Supp. at 1211 (three-judge court) (describing a Black person's experience, similar to Mr. McCollum, of being forced to wait hours to register); *United States v. Parker*, 236 F. Supp. 511, 517 (M.D. Ala. 1964) (describing Montgomery County's practice of requiring Black applicants to "wait in line for unreasonable periods of time" to register). Today, the refusal or

failure of state and local election officials to provide accurate information or timely responses to inquiries can make it more difficult for Black people to vote. MX5 at 2; CX6 at 2; *see, e.g.*, *Braxton v. Town of Newbern*, No. 2:23-CV-00127-KD-N, 2024 WL 3519193, at *2 (S.D. Ala. July 23, 2024) 2024 WL 3519193, at *2 (stipulating that a town's intentionally discriminatory refusal to hold or make any preparations to notify Black voters about municipal elections violated the Fifteenth Amendment and Section 2); *Dillard v. Town of N. Jones*, 717 F. Supp. 1471, 1477 (M.D. Ala. 1989) (finding that a mayor's intentionally discriminatory failure to provide a Black candidate with the proper forms violated Section 2). For example, information barriers can make it more difficult for Black voters to learn about voter registration, voter ID requirements, the hours and locations for voting, and the process whereby people with felony convictions can restore their voting rights. Trial Tr. 949:14-950:9, 961:2-11 (Burch); MX6 at 19-20; CX7 at 19-20; Stone Tr. 643:20-644:13 (Williams); *see also Greater Birmingham Ministries v. Sec'y of State*, 105 F. 4th 1324, 1335 (11th Cir. 2024) (ordering the Secretary to disclose the records of people with felony convictions that disqualified from voting).

### v. **Discrimination in socioeconomic areas, which hinder Black voters' ability to participate effectively (Senate Factor 5).**

407.   Of course, this discrimination in voting parallels Alabama's history of discrimination against Black people in education, employment, and other areas.

408.    Alabama has a long and well-documented history of official and private discrimination which predates the state's admission to the union and has been acknowledged by the federal courts since at least the 1960s. As one federal court explained, Alabama's "unrelenting historical agenda, spanning from the late 1800s to [today], to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." *Dillard*, 640 F. Supp. at 1357; *see also* First Amend. Comp. ¶ 138 (*Milligan* Doc. 329); Allen Answer ¶ 138 (*Milligan* Doc. 380); Legislators Answer ¶ 138 (*Milligan* Doc. 381).

### *Discrimination in Education*

409.    Alabama's history of denying Black people equal access to education persisted long after the Supreme Court's decision in *Brown v. Board of Education*. Trial Tr. 935:13-936:10 (Burch); MX1 at 22-24; CX16 at 22-24; MX6 at 13, 17-19; CX7 at 13, 17-19; *see also* P.I. Tr. 1163:22-1164:15 (Bagley); First Amend. Comp. ¶ 140 (*Milligan* Doc. 329); Allen Answer ¶ 140 (*Milligan* Doc. 380); Legislators Answer ¶ 140 (*Milligan* Doc. 381).

410.    Alabama was the first state ever to be subjected to a statewide injunction prohibiting the state from failing to disestablish its racially dual school system. *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458 (M.D. Ala. 1967), aff'd 389 U.S. 215 (1967). The order resulted from the court's finding that the State Board of Education and Governor George Wallace had wielded its powers to maintain

segregated schools statewide. *Id*. For decades, state officials ignored their duties under the statewide desegregation order. *See Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1128-30 (M.D. Ala. 1997). The state did not satisfy its obligations to remedy the vestiges of segregation under this order until as late as 2007. *Lee v. Lee Cnty. Bd. of Educ.*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007); *see* MX1 at 22-24; CX16 at 22-24; *see also* First Amend. Comp. ¶ 143 (*Milligan* Doc. 329); Allen Answer ¶ 143 (*Milligan* Doc. 380); Legislators Answer ¶ 143 (*Milligan* Doc. 381).

411.  Desegregation litigation continues in Alabama today. Around 40 Alabama school districts remain under desegregation orders today as they still have failed to satisfy their constitutional obligations to integrate schools and eliminate the vestiges of racial discrimination. MX1 at 23-24; CX16 at 23-24; MX6 at 16-18; CX7 at 16-18. Alabama has the most open desegregation orders of any state. Trial Tr. 976:4-7 (Burch); MX7 at 2; CX8 at 2.

412.  For example, in *Stout v. Jefferson County Board of Education*, Black families successfully challenged the intentionally discriminatory attempt of the City of Gardendale, which is 85% White, to form a school district separate from Jefferson County's more racially diverse district. 882 F.3d 988, 1000, 1007-1009 (11th Cir. 2018); *see* Trial Tr. 940:8-941:10 (Burch); *see also* MX1 at 24; CX16 at 24; MX6 at 18; CX7 at 18; P.I. Tr. 1160:7-18 (Bagley); First Amend. Comp. ¶ 141 (*Milligan*

Doc. 329); Allen Answer ¶ 141 (*Milligan* Doc. 380); Legislators Answer ¶ 141 (*Milligan* Doc. 381).

413.    In the last few years, Jefferson and Madison Counties and the City of Huntsville have agreed to consent orders to remedy alleged discrimination against Black students in school discipline and access to advanced courses. Trial Tr. 939:2-941:2 (Burch), 1291:10-1292:10 (Bagley); MX1 at 23; CX16 at 23; MX6 at 18; CX7 at 18; *see also Hereford v. Huntsville Bd. of Educ.*, No. 5:63-CV-00109-MHH, 2015 WL 13398941, at *2-3 & n.4 (N.D. Ala. Apr. 21, 2015), 2017 WL 5483734, at *8 & n.18 (N.D. Ala. Nov. 14, 2017) (City of Huntsville). In 2023, a court found that a bus transportation plan proposed by Chambers County unconstitutionally discriminated against Black students. *See Lee v. Chambers Cnty. Bd. of Educ.*, 693 F. Supp. 3d 1223, 1254 (M.D. Ala. 2023); *see also* MX6 at 18 n.54; CX7 at 18 n.54. In 2000, the State agreed to a consent order to address the lack of access to gifted class for Black students in schools statewide and to improve the quality of predominantly Black schools across the state. MX1 at 22-23; CX16 at 22-23; *see Lee v. Butler Cnty. Bd. of Educ.*, No. 70–T–3099, 2000 WL 33680483, at *2 (M.D. Ala. Aug. 30, 2000). And, as late as the 1990s, some school districts, including Montgomery County, forced Black students to participate in segregated dances and extracurricular activities. Trial Tr. 940:19-22 (Burch); *see, e.g.*, *Godby v. Montgomery Cnty. Bd. of Educ.*, 996 F. Supp. 1390, 1411 (M.D. Ala. 1998); *Lee v.*

*Randolph Cnty. Bd. of Educ.*, 160 F.R.D. 642, 644 (M.D. Ala. 1995); *see also*MX6 at 18 n.52; CX7 at 18 n.52.

414.    Former "segregation academies," which are private schools founded exclusively for White students after the *Brown v. Board* decision, continue to exist in the Black Belt, including Montgomery and Dothan. Today, the student bodies and faculties at these private schools remain 85 to 95 percent White. Trial Tr. 685:16-686:5 (L. Jackson), 1165:11-1165:5 (Milligan).

415.    Through the 1990s, Black adults have faced further systemwide racial discrimination in higher education. See, e.g., *Groves v. Ala. State Bd. of Educ.*, 776 F. Supp. 1518 (M.D. Ala. 1991) (racial discrimination in college testing). In 1991, a federal district court found that Alabama's institutions of higher education remained plagued by the "vestiges of segregation." *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991), *aff'd in part, vacated in part, rev'd in part*, 14 F.3d 1534 (11th Cir. 1994). The court found that Alabama colleges continued to employ discriminatory admissions requirements and mission statements, which led the University of Alabama and Auburn University, as well as other schools, to remain segregated by race. In 1995, the court issued a comprehensive remedial decree that it oversaw for over a decade. 900 F. Supp. 272 (N.D. Ala. 1995); MX1 at 25; CX16 at 25; MX6 at 12 n.41; CX7 at 12 n.41. Alabama did not satisfy its obligations until

as late as 2006. 469 F. Supp. 2d 1016 (N.D. Ala. 2006); *see* Trial Tr. 937:4-15 (Burch), 1459:17-25 (Bagley).

416.    In the 2020-2021 school year, as in previous years, all 75 of the schools labeled "failing" by Alabama were majority-Black schools and Black students made up 91% of those Alabamians who were enrolled in "failing" schools. MX1 at 24-25; CX16 at 24-25; P.I. Tr. 1160:19-1161:3 (Bagley).

417.    Because Alabama only begrudgingly began school desegregation in the 1970s, Dr. Burch noted that about 40% of the state's electorate in the 2020 general election was composed of individuals who were at least school age at a time when Alabama maintained separate and unequal schools for Black and White students statewide. Trial Tr. 936:11-937:3 (Burch); MX6 at 12; CX7 at 12. In fact, most of the fact witnesses attended *de jure* segregated schools. Trial Tr. 242:11-13 (Clopton), 416:20-417:4 (Smith), 683:24-684:9 (L. Jackson), 1094:8-1095:4 (V. Jackson), 1134:4-18 (Malone); *see also* Trial Tr. 1175:25-1177:1 (Milligan); Stone Tr. 152:16-18 (Simelton), 485:23-486:1 (Douglas). That number, however, underestimates the portion of Alabama's electorate affected by state-sponsored discrimination in education. Many large school systems did not desegregate until decades well-after the 1970s. Trial Tr. 1291:10-1292:10 (Bagley). And many Black people who have been the victims of judicially-recognized intentional discrimination

in Alabama school systems are *today* only in their 20s *or younger*. Trial Tr. 941:3-21 (Burch).

### ***Discrimination in Employment***

418.   Black people also experience racial discrimination in employment. For example, the Alabama Department of Transportation has an ignoble and protracted history of systematic discrimination against its Black employees. Stone Tr. 881:21-883:9 (Branyon); *see, e.g.*, *Mercer v. Ala. Dep't of Transp.*, No. 20-13722, 2022 WL 3910604, at *1 (11th Cir. Aug. 31, 2022) (racially discriminatory firing); *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160 (11th Cir. 2010) (racial discrimination in promotions); *Reynolds v. Ala. Dep't of Transp.*, 84 F. Supp. 2d 1339, 1350 (M.D. Ala. 2000) (describing the department's failure to comply with past remedial orders); *Reynolds v. Alab. Dep't of Transp.*, 4 F. Supp. 2d 1068, 1084 (M.D. Ala. 1998) (finding intentional discrimination against a class member, which reflected the department's "total, and continued, disregard for its black employees"); *Reynolds v. Ala. Dep't of Transp.*, 972 F. Supp. 566, 568 and 955 F. Supp. 1441, 1445 (M.D. Ala. 1997) (addressing the department's years long failure to remedy the fact that it had "discriminatorily kept [Black employees] in lower and less desirable classifications"); *see also Williams v. Ala. Dep't of Transp.*, 2007 WL 4728907 (M.D. Ala. 2007) (settling a case after the denial of summary judgment).

419.   Federal court cases have also documented a long history of employment discrimination by other State and local public agencies. MX1 at 19 & n.62; CX16 at 19 & n.62; *see, e.g.*, *Weatherly v. Ala. State Univ.*, 728 F.3d 1263 (11th Cir. 2013) (hostile work environment created by "high-level employees" at a public university); *Ferrill v. Parker Grp., Inc*., 168 F.3d 468, 472 (11th Cir. 1999); *Sims v. Montgomery Cnty. Comm'n*, 119 F.3d 9 (11th Cir. 1997) (table) (affirming class action settlement at 890 F. Supp. 1520); *James v. City of Montgomery*, 99 F.3d 1154 (11th Cir. 1996) (table); *Hall v. Ala. State Univ.*, No. 2:16-CV-593, 2023 WL 6276336 (M.D. Ala. Sept. 26, 2023); *United States v. Jefferson Cnty.*, No. CV-74-S-17, 2013 WL 4482970, at *53 (N.D. Ala. Aug. 20, 2013) (discussing the county's "thirty-year pattern of intentional, willful disobedience" of remedial orders in a racial discrimination case); *Allen v. Ala. State Bd. of Educ*., 190 F.R.D. 602 (M.D. Ala. 2000) (statewide class action settlement for teachers); *United States v. City of Montgomery*, 948 F. Supp. 1553, 1570 (M.D. Ala. 1996) (citywide class action settlement); *Shuford v. Ala. State Bd. of Educ*., 846 F. Supp. 1511 (M.D. Ala. 1994) (statewide class action settlement); *Sims v. Montgomery Cnty. Comm'n*, 766 F. Supp. 1052 (M.D. Ala. 1991) (documenting a liability finding in a Title VII class action).

420.   Discrimination continues in the private sector as well. *See, e.g*., *Ash v. Tyson Foods*, 664 F.3d 883 (11th Cir. 2011); *Goldsmith v. Bagby Elevator Company, Inc*., 513 F.3d 1261, 1275, 1283 (11th Cir. 2008); *Harris v. Reneau, Inc*., No. 2:20-

CV-00849, 2021 WL 3270495 (N.D. Ala. July 30, 2021); *Williams v. Blue Ridge Healthcare Selma LLC*, No. 2:19-CV-1205, 2022 WL 22895986 (N.D. Ala. Sept. 16, 2022); *Equal Emp. Opportunity Comm'n v. Pemco Aeroplex, Inc*., No. CV: 00-AR-2762, 2007 WL 10094745 (N.D. Ala. Apr. 16, 2007) (class action settlement).

421.   In Alabama, about 700 charges of racial discrimination were filed with the Equal Employment Opportunity Commission in each of the fiscal years 2020, 2021, and 2022. Nationally about fifteen percent of those charges are found to have merit. MX6 at 19; CX7 at 19; *see also* Trial Tr. 954:24-955:6 (Burch).

422.   People living in Alabama's Black Belt also face structural barriers to employment, such as a lack of manufacturing jobs in business growth. In the Black Belt counties, very few were above the statewide average of 22.4 businesses per 1,000 residents. Job loss to automation can differentially affect low-skilled workers, especially in the Black Belt. Trial Tr. 955:7-20; MX6 at 19; CX7 at 19. And Black people's lack of high-speed Internet access can limit access to work. Trial Tr. 956:2-8 (Burch); MX6 at 20; CX7 at 20.

423.   Rigorously conducted national studies that controlled for a variety of differences between people, such as education and human capital, continue to demonstrate racial discrimination in employment. For example, resumes with "Black-sounding names" were less likely to get called back than identical resumes with "White-sounding names." Black applicants are also more penalized for having

drug convictions than White applicants. And Black persons without criminal convictions are less likely to get called back by an employer than a White person with a criminal conviction. Race remains a meaningful predictor of Black people's lack of success in the labor market. Trial Tr. 953:19-955:6 (Burch); MX6 at 19-20; CX7 at 19-20.

### *Discrimination in Housing, Transportation, and Health*

424.    Housing discrimination has also continued in Alabama *See, e.g.*, *United States v. Hous. Auth. of Ashland*, No. 1:20-cv-01905, 2022 WL 18674400 (N.D. Ala. Dec. 13, 2022) (settling allegations of a pattern and practice of housing segregation); *Hall v. Lowder Realty Co*., 263 F. Supp. 2d 1352, 1362 (MD Ala. 2003) (describing a jury's determination that a real estate company in Montgomery County engaged in the "severely condemned practice of racial segregation"). In 2024, for example, the U.S. Department of Justice settled a case against a lender in Jefferson County who allegedly engaged in systematic housing discrimination. Trial Tr. 1465:8-17 (Bagley); *see Consumer Fin. Prot. Bureau v. Fairway Indep. Mortg. Corp*., No. 2:24-CV-01405-AMM, 2024 WL 5374887 (N.D. Ala. Dec. 3, 2024).

425.    Pastor Jackson also experienced housing discrimination first-hand. As a child, when Pastor Jackson's parents attempted to buy their first home in Montgomery, his family was unable to purchase it because of the color of their skin. A highway was built through his neighborhood, which displaced her family's side

of the street. After her family moved into a White area, the White neighbors harassed and called the police on the Jackson family. Within two years, however, the neighborhood went from White to Black due to White flight. Trial Tr. 1088:5-1089:8.

426.   Major Dowdy and Ms. Letetia Jackson both grew up in all-Black public housing projects that were the product of discrimination. Trial Tr. 18:2-24 (Dowdy), 691:22-692:2 (L. Jackson). Montgomery, Mobile, and Dothan all built *de jure* segregated all-Black housing projects, which remained all-Black decades afterward. Trial Tr. 18:2-24 (Dowdy), 691:22-692:2 (L. Jackson), 1155:15-1156:3 (Milligan). In Dothan, the Black housing projects had fewer resources and services than the White housing projects. Trial Tr. 699:10-700:24 (L. Jackson). And, despite the need for housing, there are simply no public housing projects at all in parts of the Black Belt, including Wilcox, Clark, and Marengo counties. Trial Tr. 254:2-7 (Clopton).

427.   The lack of adequate or stable housing can directly impact voting. For example, Black people with poor or unstable access to housing opportunities tend to move around. Pastor V. Jackson has seen voters turned away because the address on their photo ID did not match their current residence. Trial Tr. 1102:18-1103:9.

428. Black people face further discrimination in transportation and infrastructure, *see* MX28 (U.S. Department of Transportation's 2016 finding that Alabama discriminated against Black people in violation of the Civil Rights Act by

partially closing driver's license offices); *see also* Stone Tr. 495:15-496:21 (Douglas) (discussing the State's history of intentional discrimination in public transportation funding and infrastructure decision-making), 864:4-23 (Branyon) (discussing the county commission's refusal to fund public transit).

429.   The Black Belt's soil makes drainage and the installation of traditional sewage systems more difficult, which can lead to waterborne illnesses and parasites that are prevalent in Alabama. In Lowndes County, for example, the U.S. Department of Justice and Health and Human Services investigated the county, and the Alabama State Department of Public Health related to issues of safe wastewater disposal and management. Trial Tr. 966:5-19 (Burch). These sewage and sanitation problems are uncommon in America. Trial Tr. 1054:21-25 (Burch); MX32; MX33.

430.   Additionally, Black Alabamians suffer disproportionately from several chronic health problems, including hypertension, diabetes, obesity, and cardiovascular disease, and have less access to health care. Stone Tr. 1290:16-1291:12 (Landers). These worse health outcomes negatively affect Black Alabamians' ability to maintain decent employment and participate in community activities. Stone Tr. 1290:15-25 (Landers); *see also* Stone Tr. 1291:13-1292:20 (Landers) (discussing the State's failure to expand Medicare and ongoing racial disparities in maternal and infant mortality rates).

### ***Discrimination in the Criminal Legal System***

431.   Black people have experienced further racial discrimination in Alabama's legal system. Trial Tr. 947:11-949:11 (Burch); MX6 at 34-35 & n.104; CX7 at 34-35 & n.104. Even today, Black Alabamians continue to face discriminatory exclusion from juries. *See, e.g.*, *Clemons v. City of Saraland*, 334 So. 3d 278, 288 (Ala. Crim. App. 2021); *Battles v. City of Huntsville*, 324 So. 3d 403, 414 (Ala. Crim. App. 2020).

432.   And state prosecutors in the Black Belt and elsewhere have at times systematically excluded Black people from juries. *See, e.g.*, *Adkins v. Warden*, 710 F.3d 1241, 1258 (11th Cir. 2013); *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266–67 & n.3 (11th Cir. 2009); *Trawick v. Allen*, 520 F.3d 1264, 1267–68 & n.5 (11th Cir. 2008); *Bui v. Haley*, 321 F. 3d 1304, 1318 (11th Cir. 2003); *Hall v. Thomas*, 977 F. Supp. 2d 1129 (S.D. Ala. 2013); *Stephens v. Haley*, 823 F. Supp. 2d 1254, 1276–78 (S.D. Ala. 2011); *Rice v. State*, 84 So. 3d 144, 151 (Ala. Crim. App. 2010); *Preachers v. State*, 963 So. 2d 161 (Ala. Crim. App. 2006); *Yancey v. State*, 813 So. 2d 1, 2 (Ala. Crim. App. 2001); *McElemore v. State*, 798 So. 2d 693 (Ala. Crim. App. 2000); *see also Hardin v. City of Gadsden*, 837 F. Supp. 1113, 1123 (N.D. Ala. 1993) (adopting judicial reforms to increase Black participation in juries). This past discrimination in the criminal legal system is significant because penalties, including disfranchisement, can last for decades. Trial Tr. 1049:24-1050:25 (Burch).

433.    Racial disparities in arrest, conviction, and sentencing are also affected by racial discrimination. Studies, including Alabama-specific studies, have shown that, even after taking into account legally relevant factors like criminal history, crime type, and other kinds of case-specific behavioral and jurisdictional facts, racial disparities still exist in bail decisions and sentencing in federal and state courts. After taking those factors into account, the only thing that could explain those racial disparities is racial discrimination. Even in the 1980s, racial disparities in arrests for crimes explained less than half of the Black/White imprisonment gap in Alabama and the relationship between crime and incarceration has declined significantly since the 1980s. Today, the imprisonment gap increasingly *cannot* be explained by racial disparities in the commission of crime. Trial Tr. 944:22-947:1 (Burch); MX6 at 35; CX7 at 35.

434.    Even for people who are arrested or stopped by police without a conviction, contact with the criminal legal system negatively affects people's interest in political participation. It diminishes feelings of governmental trust and belief in individual efficacy, and increases people's feeling of political alienation, which are associated with nonvoting. Trial Tr. 948:15-949:11 (Burch); MX6 at 34; CX7 at 34.

435.    Black Alabamians are also disproportionately impacted by Alabama's felony disfranchisement laws—14.7% of Black adults (and 8.6% of all Alabamians)

cannot vote because of their conviction for a crime of "moral turpitude." Trial Tr. 946:12-19 (Burch); MX6 at 33; CX7 at 33; *see also* Stone Tr. 639:8-643:7 (Williams). These disproportionately Black people with disfranchising felony convictions may seek to restore their voting rights, but the State first requires people to navigate a complex and difficult administrative process. Stone Tr. 642:2-645:11 (Williams).

### *Racial Separation and the Ability to Fundraise from Black Communities*

436.    Because of the history of state-enforced segregation, society in Alabama remains racially segregated. Today, Black and White Alabamians have separate churches, newspapers, radio stations, civic groups, community centers, neighborhoods, and, despite ongoing litigation, even separate schools. *See, e.g.*, Trial Tr. 252:1-253:1 (Clopton), 693:3-694:18 (L. Jackson), 1094:8-10 (V. Jackson); 435:2-21 (Smith); *see also* Stone Tr. 167:8-10, 170:10-12, 171:25-172:21 (Simelton) (*Milligan* Doc. 441-7); Stone Tr. 4891:2-10, 491:12-17 (Douglas) (*Milligan* Doc. 441-4); Stone Tr. 1329:1-5 (Coley) (*Milligan* Doc. 441-3).

437.    Mardi Gras remains segregated on the basis of race, with separate Black and White parades, crews, and balls. Trial Tr. 39:7-19 (Dowdy), 253:9-16 (Clopton), 1180:16-20 (Milligan). This current segregation of Mardi Gras grew out of the historical enforced segregation of the events. *See* Trial Tr. 39:20-40:1 (Dowdy), 1180:16-20 (Milligan), 1468:4-8 (Bagley).

438.   Even though no longer mandated by law, schools also remain largely segregated on the basis of race. Trial Tr. 21:16-22:18 (Dowdy), 245:10-23 (Clopton), 435:2-21 (Smith), 685:16-686:5 (L. Jackson), 1094:8-10 (V. Jackson) 1162:24-25, 1166:2-3, 1168:10-16 (Milligan); *see also* Trial Tr. 939:16-940:4 (Burch), 1291:10-1292:10 (Bagley).

439.   Churches in Alabama also remain segregated on the basis of race. Many Alabama churches continue to be either all-Black or all-white. Trial Tr. 23:3-17 (Dowdy), Tr. 252:1-253:1 (Clopton), Tr. 693:3-11, 701:15-702:6 (L. Jackson), Tr. 1075:1-6 (V. Jackson), 1157:2-1158:12 (Milligan); 425:20-426:2 (Smith); *see also* Stone Tr. 167:8-10, 170:10-12, 171:25-172:21 (Simelton), 488:2-10, 491:12-17 (Douglas), 1329:1-5 (Coley). Black and White churches being separate arose out of state-enforced requirements. Trial Tr. 1158:13-23 (Milligan).

440.   Neighborhoods, civic groups, fraternities, sororities, and community centers today also remain segregated on the basis of race. Trial Tr. 17:11-18:24, 42:21-43:3 (Dowdy), 236:6-23, 250:18-251:3 (Clopton), 377:24-378:3 (Caster); 693:12-13, 695:2-9, 696:14-698:6 (L. Jackson), 1089:10-1090:9 (V. Jackson); 1153:21-1154:11, 1155:1-7 (Milligan).

441.   Public displays of Confederate symbols or other race-based images help to foster this separation. The displays at Mardi Gras park show separate Black and White kings and queens. Trial Tr. 39:7-19 (Dowdy). There is a huge Confederate

flag that is visible for a mile on the 65-interstate near the City of Prattville. Trial Tr. 1648:7-9 (Carrington). Until recently, the Capitol Grounds displayed a Confederate flag. Trial Tr. 1613:23-25 (Carrington); *see also* Stone Tr. 1339:19-1340:4 (Coley).

442.    Even in middle-class neighborhoods, Black neighborhoods tend to have worse infrastructure and resources than comparable White neighborhoods. Trial Tr. 695:10-698:6 (L. Jackson).

443.    These continuing patterns of segregation grew out of historical state-enforced segregation. Trial Tr. 693:21-694:18 (L. Jackson), 1155:10-14 (Milligan), 1465:8-17 (Bagley). For example, Alabama's parks, community centers, restaurants, swimming pools, and recreational facilities were forcibly segregated based on race through the 1970s. Trial Tr. 428:14-430:2 (L. Jackson), 1175:23-1177:1 (Milligan); *see also Gilmore v. City of Montgomery*, 417 U.S. 556 (1974); *Lee v. Autauga Cnty. Bd. of Educ.*, 59 F. Supp. 2d 1199, 1209-10 (M.D. Ala. 1999); *Hendrix v. McKinney*, 460 F. Supp. 626, 635 (M.D. Ala. 1978).

444.    As a result of this social separation, Black candidates for office and civic groups tend to fundraise from the Black community. But it often much more difficult to raise funds from Black people due to the socioeconomic disparities. Trial Tr. 49:19-50:9 (Dowdy), 258:24-259:14 (Clopton), 731:21-733:1 (L. Jackson), 1208:14-22 (Milligan); *see also* Stone Tr. 500:1-501:1 (Douglas) (*Milligan* Doc. 441-4) (stating that Black candidates tend to fundraise from Black communities).

445.   Ms. Malone, in fundraising for her nonprofit, has struggled to raise funds from Black people in the City of Mobile. People give based on their access to disposable income. Because Black people tend to have much less disposable income, they also have less to donate to social causes. Trial Tr. 1140:12-1141:3 (Malone).

446.   This social separation also means that Black Alabamians are less likely than White Alabamians to have personal relationships with political figures, which leaves Black people with less access to political pipelines than white people. Trial Tr. 1208:23-1209:18 (Milligan); Stone Tr. 874:13-15 (Branyon) (*Milligan* Doc. 441-2) (stating that she only knew "a few" Republicans and "not that many" in her district); Stone Tr. 1319:1-13 (Coley) (*Milligan* Doc. 441-3) (discussing the significant impact of his White opponent's name recognition, familial connections, and endorsement from the White incumbent). *cf.* MX6 at 36 (Black Alabamians are less likely than White Alabamians to know their poll worker); CX7 at 36; Trial Tr. 1070:7-10 (V. Jackson) (testifying about rude treatment by poll workers).

447.   This racial separation also means that white and Black people have little social interaction. For example, white candidates for congressional office in Alabama do not regularly hold events in the Black community. Tr. 261:16-262:3 (Mr. Clopton testifying that Rep. Carl and Rep. Byrne never attended any Mobile NAACP events or any events in the Black community in Mobile), 392:4-25 (Caster) (testifying that Rep. Carl and Rep. Byrne never campaigned in his community),

451:25-452:15 (Smith) (testifying that neither Rep. Moore nor Rep. Roby campaigned in community), 722:13-723:6 (L. Jackson) (testifying that Rep. Moore conducts events in areas frequented only by White voters and never attends Black community events), 1108:23-1109:2 (V. Jackson) (testifying Republican candidates never come into her community to put up signs or advertise in Black media), 1141:5-1142:13 (Malone) (testifying that Rep. Carol refused to write her a letter on her behalf because he purportedly did not know her, despite him writing letters for White people), 1207:24-1208:7 (Milligan) (testifying about Rep. Moore not campaigning in areas that were predominantly Black).

### ***The Experiences of Plaintiffs and Fact Witnesses with Discrimination***

448.   In addition to the expert testimony of Drs. Burch and Bagley, each of the Black Alabamians who testified in this trial offered consistent and compelling testimony about the lingering effects of discrimination and past segregation on their communities' ability to effectively participate in the political process. Many of these witnesses experienced official segregation firsthand, and even those who were born after the Jim Crow era identified consistent disparities in areas such as education, employment, healthcare, housing, and transportation that bear direct links to Alabama's segregated past.

449.   *Caster* Plaintiff Mr. Ronald Smith testified at length about his experience growing up under segregation and its lasting effects on his community.

Mr. Smith testified about the disparities in resources in the segregated school system that he attended: while the White school had a microscope and Bunsen burner for each student, the Black school only had two of each. While the White school had enough typewriters for their students, students at the Black school had to learn to type by drawing a keyboard on a piece of cardboard. While "[t]he White kids have the swimming pool," the Black students "had a ditch." Trial Tr. 428:15-429:24.

450.   Mr. Smith has been working to register and assist Black voters in his community since the 1960s. As a young man, Mr. Smith worked to register Black voters following the passage of the Voting Rights Act. Trial Tr. 430:10-14. He recalled observing an instance where White supervisors put Black farm laborers on a bus to work at a location in Georgia on election day. Trial Tr. 430:17-23. He observed firsthand the effects of low literacy rates on voter participation in the Black community when he worked at the polls to assist voters who could not read. Trial Tr. 431:11-14; 432:3-8. And he directly experienced voter intimidation at the hands of poll workers who tried to stop him from helping those voters. Trial Tr.  431:19-25.

451.   Mr. Smith described how the lingering, generational effects of this official discrimination persist today. Because older generations of Black Alabamians were unable to receive adequate education, he explained, their opportunities were limited in the areas of, for example, healthcare and education. *Id.* at 433:20-24. And

that lack of opportunity has predictably reverberated through the present generation. *Id.* at 433:24-434:1. Poor Black communities in the Black belt struggle to recruit qualified teachers, *id.* at 434:10-23, lack adequate funding for predominantly Black public schools, *id.* at 434:24-436:11, and lack the resources and knowledge to advise students through the process of applying to college, *id.* at 436:15-437:7. These disparities limit the types of jobs available to Black Alabamians, which in turn limits their flexibility in finding time to vote. *Id.* at 437:8-19. And of course, when voters struggle with low literacy, that makes it harder for them to participate in the political process. *Id.* at 437:20-438:13.

452.  Mr. Smith further explained from his own experience how a long history of discrimination and disparities in employment, *id.* at 438:14-441:18, healthcare, *id.* at 441:19-443:21, and voting, *id.* at 445:23-448:3 affects the ability of Black Alabamians to participate in the political process in the present day. For example, Black voters who were born in an era of segregated hospitals are more likely to lack the documentation necessary—such as a birth certificate—to get certain forms of identification required to vote. *Id.* at 443:1-21; 446:6-19.

453.  Pastor Valtoria Jackson testified about her own family's experience with housing discrimination: her parents were able to purchase their first home only with the assistance of a White attorney. Trial Tr. 1088:5-13. She further explained that, due to redlining, the homes in her predominantly Black neighborhood have not

appreciated in value at the same rate as comparable homes just a block away in the predominantly White Garden District. *Id.* at 1089:1-9; 1090:2-1091:11.

454.    Pastor Jackson further testified about the poverty and abysmal housing conditions she observed among Black Alabamians in the Black Belt in her experience as a home health care worker and in her volunteer work in the community. *Id.* at 1091:12-1093:1. She described conditions like those of a "third-world country" where "[w]e could see the sky through the roof and dirt floors," *id.* at 1092:10-19, inadequate heating, and even a lack of running water in some of the homes she visited, *id.* at 1091:18-25. And while rural poverty affects both White and Black Alabamians, Pastor Jackson testified that the need she saw was "[f]ive times greater in our black community." *Id.* at 1093:1-5.

455.    Pastor Jackson also testified about the continued de facto segregation of Montgomery's public schools. She observed that, although segregation in schools was formally abolished, the schools her children attended were predominantly Black to nearly the same extent as the segregated schools that her siblings attended in the 1950s and 60s. *Id.* at 1094:20-23. Pastor Jackson has observed significant disparities between predominantly Black and predominantly White schools, in terms of building conditions, overcrowding, and attendance—particularly in Bullock County, where Mr. Smith lives. *Id.* at 1095:5-11. She "saw it repeatedly in our predominantly African American schools where poverty is prevalent, that the children are fighting

just to get food. Some come to school just to eat and other do not come to school because they don't have clean clothes or clothes that fit." *Id.* at 1095:19-24. Pastor Jackson described, for example, one young man who was overheating in the classroom in a sweatshirt in the summertime, because his family lacked running water and it was the only clean clothing he had. *Id.* at 1095:12-18.

456.   Pastor Jackson also echoed Mr. Smith's testimony that Black Belt counties struggle to recruit teachers, *id.* at 1096:2-4; and that "[i]lliteracy is a reality" for the Black Belt communities she serves, *id.* at 1097:17. And like Mr. Smith, she testified that Black Alabamians in the Black Belt struggle to find good-paying jobs, due in part to a lack of access to transportation. *Id.* at 1098:15-1099:20.

457.   Finally, Pastor Jackson testified about disparities in access to health care between White and Black Alabamians in the Black Belt, explaining that many in her community are unable to access preventative healthcare due in part to a lack of reliable transportation. *Id.* at 1099:23-1100:11. And she echoed the testimony of many other witnesses about how the closure of rural hospitals has affected the communities she serves. *Id.* at 1100:15-1101:10.

458.   Pastor Jackson succinctly explained how, in her experience, these disparities impact political participation in the Black community. She testified, "when you're struggling, can't put food on your table, can't afford transportation . . . your concern is not getting to the polls." *Id.* at 1093:8-11. When individuals in her

community struggle with illiteracy they "just are not civically engaged." *Id.* at 1097:17-21. In Pastor Jackson's words: "when you are in a mode of survival and when you are in a mode of being disrespected and you are in a mode of, I would say, community depression," voters become "very discouraged," "los[e] hope," and "just do not take that time" to vote. *Id.* at 1101:18-23.

459.    Dr. Caster, who was born in 1975, identified many of the same disparities in healthcare, education, jobs, and transportation as among the issues most pressing to the Black community in the western Black Belt and Mobile County. Trial Tr. 384:12-17. For example, like Pastor Jackson, Dr. Caster testified about the number of rural healthcare facilities that have closed in the Black Belt, and the disproportionate effect those closures have had on Black Alabamians. *Id.* at 384:24-386:1. He also identified adverse health effects from chemical plant pollution as a unique struggle experienced by Black Alabamians in his community, who are more likely to live in close proximity to chemical plants. *Id.* at 387:10-25. And like Pastor Jackson and Mr. Smith, Dr. Caster—who is a lifelong educator—testified about the lack of resources and poor physical condition of the predominantly Black schools in his community. *Id.* at 389:7-22.

460.    *Milligan* Plaintiff Major Dowdy testified about how her communities are impacted by the vestiges of discrimination and *de jure* segregation. She grew up in the Campground neighborhood, a historically Black neighborhood within the City

of Mobile. Trial Tr. 17:11-19. The Campground once had "Black Wall Street," an avenue with thriving Black businesses that no longer exists due to an urban renewal process that began in the 1970's. Trial Tr. 19:16-20:4. At the time, the City Council had no Black members, which continued until Mobile changed its districts from at-large to single member following the Court's decision in *Bolden v. City of Mobile.* Trial Tr. 20:19-25. Today, the "Down the Bay" neighborhood where she lived as a child is close to majority-Black, but is still segregated-in-fact, with Black and White people going to separate schools, churches, and other institutions. Trial Tr. 21:2-12.

461.   Major Dowdy also testified about how the school system in Mobile still bore the effects of historical segregation. She attended two predominantly Black schools, Bessie C. Fonvielle in Toulminville, and Ella Grant in Pritchard. She also attended a majority White school, Nan Gray Davis in Theodore. The school buildings in the predominantly Black elementary schools were of lower quality compared to the majority-White school. Additionally, teachers at the majority-White school were able to spend more time with their students than the teachers at the Black school. The middle school that Major Dowdy attended, Calloway-Smith Middle School, was 99% Black. Her high school, Murphy High School, was also predominantly Black. The churches that Major Dowdy attended in Mobile were also 99% Black. Other churches in the Mobile area are also almost all-Black. Trial Tr. 21:16-23-23:17.

462.   Major Dowdy also spoke about the rampant poverty her communities experienced in Mobile and the Black Belt. In Mobile, many people do not have cars and rely on the limited public transportation available. There is a lack of adequate water infrastructure and the crumbling roads in Mobile city. Lowndes County has the same poor infrastructure, where residents live off septic tanks. Mobile and the Black Belt are food deserts, and that legislators' refusal to raise the state minimum wage contributes to high levels of poverty in the areas. In Africatown, near the City of Mobile, residents live next to factories that pollute the water, air, and soil, resulting in some of those residents being diagnosed with cancer and other health issues. Trial Tr. 27:24-30:4.

463.   Major Dowdy testified about the widespread lack of healthcare in Mobile and the Black Belt. There is only one hospital in the City of Mobile, which is set to close. Many Black Belt residents have to travel to the Cities of Mobile and Montgomery for medical care, and many people cannot afford health insurance or lack the means to pay for their healthcare. In fact, Major Dowdy testified that she is the oldest of ten siblings, but she is the only one with health insurance because the other members of her family cannot afford it. There is also a maternal mortality crisis in Mobile and parts of the Black Belt due to these issues. Trial Tr. 30:24-31: 21.

464.   Major Dowdy has also seen how political participation is thwarted on many levels for Black Alabamians in her communities. She testified that many Black

residents lack critical resources for voting, including transportation to the polls. Plus, Alabama is one of three states in the United States with no early voting system, which further limits how Black people can vote when they lack other critical resources. Laws like SB1 disproportionately affect Black people, especially elderly Black people who may not understand the technical language of the absentee ballot form, or don't have access to it at all. She has worked on Senate, congressional, and city council races for Black candidates. In her experience, fundraising for Black candidates is difficult in the Black community because many folks are low-income and don't have much to contribute to candidates. Trial Tr. 47:25-50:9.

465.  Ms. Letitia Jackson testified about her experiences growing up in Dothan and attending segregated schools. She spoke about the resources at the all-Black schools being subpar compared to the White students' schools. She recounted that the Black students received the old, hand-me-down books from White schools while White students had new books. While instruments were available for children at the White schools, Black students had to buy their own instruments if they wanted to be in band.  Around 1967, Ms. Letetia Jackson and six other Black students in Dothan integrated Girard Junior High School. Trial Tr. 684:15-690:25.

466.  Ms. Letetia Jackson also testified about how her community still feels the impact of segregation today. Growing up, she noticed many differences in the infrastructure in Black neighborhoods compared to White neighborhoods in Dothan.

For example, there were many structural and environmental hazards located in Black communities, such as landfills, railroad tracks, and even an acid plant that emitted fumes every day. Today, there are still disparities in the infrastructure in her Black neighborhood in Dothan and adjacent White communities. Railroad tracks and landfills are still in her neighborhood, and public services, like street sweepers, do not come through her neighborhood frequently. Moreover, residents still go to segregated churches, attend segregated social clubs, and live in segregated neighborhoods. Trial Tr. 692:6-693:22.

467.    Ms. Letetia Jackson spoke about how poverty and a lack of infrastructure impacts her community members. There is no public transportation in Dothan besides a minibus that requires a 24 hours-in-advance reservation. Ms. Jackson noted that there was a public transportation system prior to court-ordered integration, but after integration, it was shut down. Ms. Jackson testified that this mostly impacts Black residents because where predominantly Black neighborhoods are located is not close by public services. In contrast to adjacent White communities, poor Black residents have little access to large grocery stores, doctor's offices, social security offices, and similar services. Trial Tr. 698:9-700:4.

468.    Ms. Letetia Jackson testified about the lack of healthcare infrastructure in Dothan. Ms. Jackson is the convener of the South Alabama Chapter of the Black Women's Roundtable, which works on access to healthcare, expanding Medicaid,

and affordable housing for impacted residents in communities in Southwest Alabama. Ms. Jackson testified that nearly 15 hospitals have been closed in smaller, predominantly Black communities in Alabama, leaving these individuals without any access to healthcare. This impacts political participation of these voters because if an individual does not have the "basic foundations of healthy living," it is hard for them to do anything else, including being "actively involved and engaged in political activity." Trial Tr. 706:23-710: 13.

469.   Finally, Ms. Letetia Jackson testified about how the resounding effects of official discrimination impacts the political participation of Black residents in her community. In her experience as a political consultant, she noticed that one of the largest challenges faced by Black candidates is their inability to raise money, regardless of their political affiliation. Trial Tr. 731:21-733:1. She also testified that the lack of transportation and broadband internet affects Black Alabamians' ability to participate politically. Trial Tr. 727:13-728:8. In recent years, she has seen the Alabama legislature pass bills that were not responsive to the needs of the Black community. For example, Ms. Jackson was personally impacted by the passage of SB1, which would have prohibited her from assisting her bedbound sister who had limited use of her hands in filling out an absentee ballot. Trial Tr. 723:10-724:11.

470.   Mr. Clopton testified about the discrimination he and his family experienced growing up in the Black Belt. Mr. Clopton grew up in a "sundown area"

in Cullman County, where Black people lived under the threat of violence, including being beaten or lynched. Trial Tr. 237:14-19; 241:18-242:1. He recalled signs in some areas that read "run N-word, run." Trial Tr. 242:2-8. In the 1960s, Black customers were forced to go to the back of certain restaurants to be served. Trial Tr.237:14-238:3. He also testified about the sharecropping system that many Black families, including his own, had dealt with. In Mr. Clopton's situation, a White farmer paid his family little wages and allowed them to live on the land in exchange for working the fields. Trial Tr. 238:5-13. However, the wages were not enough to provide them with basic necessities, so they had to borrow money from the farmer, which resulted in a vicious debt trap that prevented his family, and families in similar situations, from leaving the land. Trial Tr. 240:17-241:14.

471.  Mr. Clopton's experience with school systems in Alabama were similarly rife with discrimination. From first grade to fifth grade, Mr. Clopton attended segregated schools. Trial Tr. 242:11-13. In the All-Black elementary school he attended, there were two grades in one class, they drank water from hoses and used outhouses. Trial Tr. 238:14-240:14; 242:24-245:2. It was only until he attended Hanceville High with White students in 1966 that he saw the difference in treatment. There was only one grade per classroom, new books, indoor bathrooms and radiators. Trial Tr. 242:14-245:2. Even when he attended the University of Alabama

in the 70s, it was racially segregated with little social mixing outside of certain athletic events. Trial Tr. 245:10-23.

472.   In his work with the Mobile NAACP, Mr. Clopton testified about his experiences working with Black candidates and voters and how they were impacted by an official history of discrimination. Trial Tr.  236:11-15. Black candidates have difficulty raising money because Black communities often lack adequate capital to donate to political campaigns. Trial Tr. 259:7-14. Additionally, he testified that laws like SB1 impacts Black seniors heavily, including those who had been brutalized for advocating for civil and voting rights in the Civil Rights movement, because many may not be able to understand the absentee-ballot process. Trial Tr. 262:17-263:10.

473.   Mr. Clopton also spoke about the poverty he witnessed living and working in many areas of the Black Belt. He said that people from the Black Belt would have to visit Mobile for healthcare because there was inadequate healthcare and infrastructure in the Black Belt. Trial Tr. 255:25-256:12. Mr. Clopton shared a traumatizing experience that he personally suffered at the intersection of race and class. In October 1989, Mr. Clopton and his pregnant wife traveled to the local Thomasville hospital in the Black Belt because she was experiencing medical issues. Trial Tr. 255:25-256:12. The doctor, without examining his wife, told the family that he would have to perform an abortion procedure on her. Mr. Clopton and his family then drove over 99 miles to the City of Mobile to a Black doctor who advised his

family and did not perform an abortion procedure, allowing his wife to have a successful pregnancy. Trial Tr. 256:17-257:25.

474.    Ms. Janice Malone is the founder and executive director at Vivian's Door, a nonprofit whose mission is to help minority businesses grow, reinvest in marginalized communities, and assist residents who have been marginalized and face systemic poverty, low venture capital, and racial segregation. Trial Tr. 1135:21-1136:5. Vivian's Door is located in the City of Mobile. Trial Tr. 1136: 13-14. It serves many types of businesses in South and Central Alabama, including the Black Belt, ranging from farmers, transportation companies, manufacturing companies, health and beauty companies, and medical companies. Trial Tr. 1138:10-17. Vivian's Door works with many Black farmers from the Black Belt who must work full-time jobs in Mobile, while farming in the Black Belt on the weekends. Trial Tr. 1138:20-25.

475.    Ms. Malone testified that most, but not all, of the businesses that Vivian's Door serves are Black. Trial Tr. 1136: 6-10. Her Black clients have been denied bank loans for reasons like not having enough capital or the owner not seeming to be someone who could run that business. Trial Tr. 1137: 4-12. Sometimes they were not given cause at all. Trial Tr. 1137: 4-12. She has worked with White clients whose loan applications were approved despite having similar plans to Black clients whose loan applications were denied. Trial Tr. 1138:2-5. Vivian's Door

helped 50 Black farmers reach millions of dollars formerly denied to them in lending dollars from the USDA. Trial Tr. 1139:24-1140:10.

476.    Vivian's Door raises money from the Black community in Mobile, but it's less than 15% of the financial support that Vivian's Door receives because the Black community gives based on their means, and they have less money than others. Trial Tr. 1140:13-1141:3. She has contacted elected officials for fundraising assistance. Tr. 1141:5-7. Specifically, she contacted her former Congressman Jerry Carl for a letter of recommendation for a federal grant, but was denied because he said that it was against his ethics to write the letter without having known Ms. Malone prior to her asking for his recommendation. Trial Tr. 1141:8-24. She felt that this was discrimination because she had, in fact, met Congressman Carl at a business event where he told her that he would help her if she needed it, and had written letters for White people that she knew. Trial Tr. 1141:25-1142:13.

477. Mr. Milligan also testified about the persistence of residential segregation in Montgomery, educational segregation, infrastructure disparities, economic disparities, and health care disparities. Growing up in Montgomery, he lived in Centennial Hill and west Montgomery in predominately – at least 90 percent – Black neighborhoods. Trial Tr. 1153:21-1154:11. Over the last 20 years, Mr. Milligan has noticed an increase in the Black population in Montgomery, which is also reflected in the demographic shifts in areas like Capitol Heights or Cottage Hill

– previously predominately White neighborhoods which are now if not "majority black" then "pretty close to it." Trial Tr. 1155:1-7.

478.    While in high school, Mr. Milligan observed differences in the education opportunities for black students as compared to White students. Trial Tr. 1166:7-11. He testified that there was an "overrepresentation of black people in comparison to the population in the city" when it came to "black students who were in the Department of Youth Services and the alternative schools that students would go to if they had been suspended or expelled from traditional school." Trial Tr. 1168:10-16.0. His Black peers and their families were more often caregivers for individuals with mental health issues or children whose parents were struggling with addiction or criminal justice involvement – "all those things detracted from the time that students could spend prioritizing their studies." Trial Tr. 1167:11-17. Further, many of his black peers began working around the age of 14 or 15 – "not just for allowance money, some of us were working to contribute to household bills and things of that nature." Trial Tr. 1167:3-6.

479.    Overall, these witnesses painted a compelling picture of the many ways in which Black Alabamians continue to bear the effects of discrimination in areas such as education, employment, health, and housing. And they explained, in concrete detail, how lingering disparities in these areas hinder the ability of Black Alabamians to participate effectively in the political process. This testimony, which we find

credible and compelling, further supports the expert testimony of Drs. Burch and Bagley.

### *Racial Disparities in Socioeconomic Areas*

480.   The data confirm what these witnesses have observed: This history of discrimination in voting, education, employment, healthcare, transportation, housing, and the legal system results in racial disparities in educational attainment, income, wealth, employment, health and other areas.

481.   Using the five-year American Community Survey (2021), about 17% of Black Alabamians do not have a high school diploma in the Black Belt counties and Mobile County compared with 11% of White Alabamians. In several counties, the gap is higher: 16% of Black people in Montgomery lack a high-school diploma compared with 6% of White people and 24% of Black people in Bullock County lack a high-school diploma versus only 7% of White people. Across the Black Belt and Mobile County, White people are much more likely to have achieved a bachelor's degree or higher: 27% of White people have a bachelor's degree or higher versus 17% of Black people. Again, this number is much higher in some counties. In Greene County, 31% of White people have a college degree but only 8% of Black people do. In Montgomery County, 46% of White people have a bachelor's degree or higher compared with 24% of Black people. Trial Tr. 932:20-934:17 (Burch); MX6 at 15; CX7 at 15.

482.  Today, more Black than White Alabamians continue to struggle with literacy, which can make it more difficult for Black voters to complete the tasks required to vote without assistance. Trial Tr. 47:3-24 (Dowdy), 479:10-23 (Smith), 724:12-725:1 (L. Jackson), 938:3-11, 942:1-20, 963:16-964:11, 1048:25-1049:23, 1055:17-1056:7 (Burch), 1097:3-1098:14, 1128:6-1129:9 (V. Jackson), 1284:17-1286:21, 1458:20-1459:12 (Bagley), 2252:20-2253:4 (Reilly); *see also* MX4 at 29; CX5 at 29; MX6 at 36; CX7 at 36; Stone Tr. 176:20-177:23 (Simelton), 497:13-499:25 (Douglas); 646:19-23 (Williams). Among all Alabama students, 68.2% of Black students are <u>not</u> proficient in English language arts as compared to only 40.5% of White students who are nonproficient. Trial Tr. 942:2-20 (Burch); *see also* MX6 at 11 n.34; CX7 at 11 n.34. Among adults in 20 of the 24 examined counties (i.e., the 23 Black Belt counties plus Mobile), more than 30% of adults are classified as "low literacy," meaning that are either functionally illiterate or, at best, face difficulties reading or comprehending written material. Trial Tr. 938:3-11 (Burch); MX6 at 11 & n.37; CX7 at 11 & n.37. The data from these disproportionately Black counties is evidence of racial disparities in illiteracy among Alabama adults. Trial Tr. 1048:25-1049:23 (Burch). The high illiteracy rates in Alabama are uncommon in America. Trial Tr. 1055:20-1056:7 (Burch).

483.  Racial discrimination ensured that Black people had less opportunity to go to college at all, and less opportunity to go to more prestigious or higher paying

jobs, which can have the generational effect of concentrating Black people in lower socioeconomic groups with lower turnout rates. Trial Tr. 937:17-938:2 (Burch).

484.    The median household income for Black Alabama households is $36,104 compared with $62,545 for White Alabama households. In the Black Belt and Mobile County, the median White household income was tens of thousands of dollars more than the Black median income. The Black median income in the City of Mobile is similar to the Black median income in the Black Belt counties. Trial Tr. 950:12-952:11 (Burch); MX7 at 8; CX8 at 8; MX6 at 20; CX7 at 20.

485.    Statewide, Black unemployment is more than twice as high as White unemployment. In the Black Belt and Mobile, the Black unemployment rate is 10% while the White unemployment rate is 4%. In some Black Belt counties, the Black-White unemployment gap is even larger. For example, the Black unemployment rate in Pickens County is 14% compared to 2% unemployment for Whites, and in Perry County, the Black unemployment rate is 26% while White unemployment is 5%. Trial Tr. 952:12-953:8 (Burch); MX6 at 23; CX7 at 23.

486.    Statewide Black family poverty is nearly three times as high as White family poverty, even when accounting for government transfers. Twenty-four percent of Black families live below the poverty line in Alabama while only 7% of White families live in poverty. Some Black Belt counties have even starker racial disparities. In Greene County, 40% of Black families are living below the poverty

line versus 5% of White families. In Perry County, 41% of Black families live below the poverty line compared to just 7% of White families. The Black familial poverty rate is 23% in the City of Mobile, which is similar to the 24% Black familial poverty rate in the Black Belt. Trial Tr. 957:3-958:15 (Burch); CX8 at 8; MX6 at 24, tbl.6; CX7 at 24, tbl.6.

487.    Black families in the Black Belt and Mobile are more likely to qualify for and need food assistance with 30% of Black families receiving food assistance compared to 8% of White families. In some Black Belt counties, the disparities in food assistance are even starker. In Greene County, 33% of Black families receive food stamps compared to 3% of White families. In Hale County, 40% of Black families receive food stamps compared to 6% of White families. These disparities are significant because families with fewer resources to contribute toward voting—such as transportation or the ability to take time off—are less able to participate fully in the political process. Trial Tr. 958:23-959:13 (Burch); MX6 at 18; CX7 at 18.

488.    Statewide, 18% of Black Alabamians lack health insurance compared with 14% of White Alabamians. Some Black Belt counties have starker health insurance disparities. For example, 27% of Black people in Butler County lacking health insurance compared to 10% of Whites. Trial Tr. 964:13-21 (Burch); MX6 at 30; CX7 at 30.

489.    Across the Black Belt, there are more likely to be food deserts, which are low-income census tracts in which a significant number or share of residents live more than ten miles from a supermarket. These disparities are significant because families with fewer resources to contribute toward voting—such as transportation or the ability to take time off—are less able to participate fully in the political process. Unlike Baldwin County or the areas of Mobile County outside of the city limits, the City of Mobile itself also has food deserts and residents face food insecurity similar to the Black Belt. Trial Tr. 964:22-967:4 (Burch); MX5 at 19; CX6 at 19; MX6 at 31-32; CX7 at 31-32.

490.    Most counties in the Black Belt lag behind other parts of the state with respect to the number and availability of hospital beds. And some counties— including, Lowndes, Perry and Pickens Counties, do not have a hospital at all. Hospital closures are linked to worse health outcomes, particularly in southwest Alabama. Trial Tr. 967:14-25 (Burch); MX6 at 29; CX7 at 29.

491.    For example, Mr. Milligan has observed disparities with respect to healthcare access. Jackson Hospital in Montgomery filed for bankruptcy because it "provides care for patients who are at or below the federal poverty line and often aren't able to pay out-of-pocket expenses for their healthcare[]" and therefore is not earning money on the "sorts of procedures that help hospitals really stay in business." Trial Tr. 1187:2-19. As Mr. Milligan explained, "the extent to which

people can recover from those hurdles and have access to other opportunities and services, that won't be borne equally or evenly" amongst Black and White Alabamians. Trial Tr. 1219:20-23.

492.    The rate of infant mortality is three times higher for Black infants than it is for White infants, which is an indicator of population health. Life expectancy also varies by race in Alabama with Black women living a year less than White women and Black men living 3.6 years less than White men. Poor health outcomes can lead to lower voter turnout which can be due to disability or impaired functioning or because the resources needed to participate in the political process can be difficult to come by. Trial Tr. 968:1-21 (Burch); MX6 at 30; CX7 at 30.

493.    Statewide, White households are more likely to have a computer at home. MX6 at 20; CX7 at 20. In the Black Belt and Mobile, Black households are less likely to have a computer at home than White households with an average of 17% of Black families lacking a computer in the home compared to 10% of White families. MX6 at 26; CX7 at 26. In some counties, the racial disparity in computers at home is even starker, including in Hale County where 28% of Black families lack a computer in the home compared to 17% of White families. MX6 at 26; CX7 at 26. In the Black Belt and Mobile, 26% of Black households lack access to the internet at home compared to 14% of White households. For example, the Black-White disparity, respectively, is 43% and 26% in Escambia County and 45% and 23% of

Crenshaw County. MX6 at 27; CX7 at 27. A lack of internet and computer access makes it harder to research information about the process of voting and candidates or print a copy of a photo ID to vote. Trial Tr. 959:18-961:11 (Burch); *see also* MX6 at 21, 27-28; CX7 at 21, 27-28.

494.   Statewide, Black Alabamians are more than twice as likely to lack access to a vehicle at home. Trial Tr. 961:16-22 (Burch); MX6 at 20; CX7 at 20. In the Back Belt, Black families are three times as likely to lack a vehicle at home with 12% of Black families compared to 4% of White families. Trial Tr. 962:2-5 (Burch); MX6 at 28; CX7 at 28. Those disparities are starker in some counties with 16% of Black families in Hale County lacking a vehicle at home compared to 3% of White families, or Dallas County where 18% of Black families lack a vehicle at home compared to 2% of White families. Trial Tr. 962:6-13 (Burch); MX6 at 28; CX7 at 28.

### ***Racial Disparities in Political Participation***

495.   These socioeconomic disparities in turn lead to disparities in voting. Both statewide and in the counties at issue, White people vote more often than Black people.

496.   Based on data from the Alabama Secretary of State, American Community Survey (ACS), Current Population Survey (CPS), and Cooperative Elections Survey (CES), in 2022, 2020, and 2018, Black people were less likely to

register and turnout to vote than Whites. This relationship consistently holds in each election cycle. Trial Tr. 969:9-970:12 (Burch); MX6 at 6; CX7 at 6.

497.   In 2022, statewide, the most recent midterm election and state legislative election for which data was available at trial, 89% of non-Hispanic White Alabamians were registered to vote, while only 84% of non-Hispanic Black (alone or in combination) Alabamians were registered to vote. MX6 at 6; CX7 at 6.

498.   The consensus among political scientists is that voter turnout data, rather than registration data, is the best measure of access to the political process because it truly reflects the activity of the voter. In contrast, registration rates often depend on factors beyond the voters' control, such as list maintenance. For example, registration rates may be artificially high because state registration rolls contain "deadwood." Trial Tr. 970:13-20, 993:25-994:24 (Burch); MX6 at 6 n.19; CX7 at 6 n.19.

499.   In addition, while Defendants' expert Dr. Hood reports (without explanation) historical and present-day Black voter registration numbers, DX7 at 23, his scholarship reflects the consensus that high levels of Black voter registration does not alone equate to Black political empowerment but rather precedes Black political empowerment. Trial Tr. 1933:6-1935:25. In other words, the level of Black voter registration is essentially a prerequisite to electoral participation —it is a "necessary condition" for the racial group to achieve political empowerment. *Id*. 1935:24-25.

500.    In the 2020 general election, the last general election for which turnout data by race were reported by the Secretary of State, White turnout as a percentage of the CVAP was 66.3%, compared with Black turnout of 57.0%—a 9.3 percentage point gap statewide. The Secretary of State's 2020 election data also show that statewide, 96.1% of White Alabamians were registered to vote, compared with 93.9% of Black Alabamians. As shown in the table below, turnout disparities also exist between Black and White residents in the Black Belt and Mobile region: in 2020, the White turnout rate in the region was 64%, compared with 57% for Black people in southwest Alabama. Moreover, White turnout was higher in all but four of the counties at issue in this case, going as high as 18 percentage points in Escambia County and 17 percentage points in Barbour County. MX6 at 6 & tbl.1; CX7 at 6 & tbl.1.

*Table 1: Voter Turnout by Race in Alabama 2020 General Election. Source: Alabam... of State Voter Data and 2020 American Community Survey Special Tabulation CVA...*

| COUNTY | BLACK ALONE OR IN COMBO, NOT HISPANIC | WHITE, NOT HISPANIC |
|---|---|---|
| BARBOUR | 47% | 64% |
| BULLOCK | 60% | 60% |
| BUTLER | 55% | 70% |
| CHOCTAW | 71% | 76% |
| CLARKE | 66% | 76% |
| CONECUH | 57% | 61% |
| CRENSHAW | 56% | 67% |
| DALLAS | 61% | 66% |
| ESCAMBIA | 46% | 64% |
| GREENE | 77% | 68% |
| HALE | 68% | 73% |
| LOWNDES | 86% | 94% |
| MACON | 56% | 65% |
| MARENGO | 70% | 82% |
| MOBILE | 57% | 63% |
| MONROE | 61% | 70% |
| MONTGOMERY | 52% | 64% |
| PERRY | 80% | 61% |
| PICKENS | 61% | 66% |
| PIKE | 42% | 55% |
| RUSSELL | 50% | 52% |
| SUMTER | 65% | 63% |
| WASHINGTON | 61% | 77% |
| WILCOX | 73% | 78% |
| REGION TOTAL | 57% | 64% |

501.    In 2020, in the Black Belt and Mobile, White turnout, as a percentage of the White citizen voting-age population under the ACS, was 66.3% compared with 57% Black voter turnout. Trial Tr. 970:22-971:3 (Burch); MX6 at 7; CX7 at 7.

502.    The CPS, a survey conducted by the Census Bureau, estimated in 2020 that White turnout was 63% and Black turnout was 54.9% in this region. Trial Tr. 971:7-18 (Burch); MX6 at 8; CX7 at 8. In 2020, using the Alabama Secretary of State's data, 64% of White voters turned out and 57% of Black voters turned out. In some counties, the racial disparities in 2020 turnout were even higher. For example,

in Barbour County, White turnout was 64% compared to 47% Black turnout, and, in Montgomery County, White turnout was 64% as compared to 52% Black turnout. Trial Tr. 972:1-7 (Burch); MX6 at 8-9; CX7 at 8-9.

503.   These racial disparities persisted in the 2020 general election, despite high levels of mobilization among political campaigns and Black voters. Trial Tr. 1052:21-1053:8 (Burch).

504.   Turnout disparities also characterize the 2018 general election. As calculated using data from the Secretary of State's office, the statewide voter turnout gap persisted: 48.7% of White and 45.4% of Black Alabamians voted in 2018. In the Black Belt and Mobile, White turnout was also higher as shown in the table below. MX6 at 6-8; CX7 at 6-8.

*Voter turnout by race in Alabama 2018 general election. Source: Alabama Secretary of State Voter Data and 2018 ACS special tabulation CVAP.*

| COUNTY | BLACK ALONE OR IN COMBO, NOT HISPANIC | WHITE, NOT HISPANIC |
|---|---|---|
| BARBOUR | 40% | 47% |
| BULLOCK | 45% | 48% |
| BUTLER | 47% | 60% |
| CHOCTAW | 59% | 61% |
| CLARKE | 55% | 65% |
| CONECUH | 50% | 51% |
| CRENSHAW | 48% | 54% |
| DALLAS | 50% | 54% |
| ESCAMBIA | 34% | 47% |
| GREENE | 66% | 55% |
| HALE | 58% | 57% |
| LOWNDES | 63% | 70% |
| MACON | 46% | 51% |
| MARENGO | 56% | 62% |
| MOBILE | 44% | 44% |
| MONROE | 54% | 57% |
| MONTGOMERY | 44% | 51% |
| PERRY | 66% | 48% |
| PICKENS | 52% | 55% |
| PIKE | 34% | 41% |
| RUSSELL | 37% | 35% |
| SUMTER | 55% | 52% |
| WASHINGTON | 51% | 60% |
| WILCOX | 58% | 61% |
| REGION TOTAL | 46% | 48% |

505.   Using the Current Population Survey, the Census Bureau calculates 2018 Turnout in the General Election for Non-Hispanic White adult citizens as 52.6% and 49.9% for Black alone or in combination adult citizens. In 2018 based on the CPS data, voter registration rates were 71.3% (White) and 67.4% (Black). The 2018 registration gap is smaller using the Secretary of State's data. MX6 at 6 & n.20; CX7 at 6 & n.20.

199

506.    According to the CES, White voters have voted at higher rates than Black voters in midterm general elections in 2014 and 2010 as well. MX6 at 6 n.17; CX7 at 6 n.17.

### vi.  Dr. Reilly is not credible.

507.    In attempting to rebut the extensive expert and fact witness testimony regarding the history of racial discrimination in Alabama, and its impact on political participation among Black voters, the State principally relies on Dr. Wilfred Reilly.

508.    The Court declines to credit the testimony of Dr. Reilly. Dr. Reilly's analysis of racial discrimination and disparities in Alabama was partial, selectively informed, and poorly supported by evidence or studies specific to this State.

509.    With respect to contemporary socioeconomic disparities, Dr. Reilly began with educational attainment. But Dr. Reilly analyzed only national disparities in educational performance between Black and White Americans. In his analysis of SAT scores, he examined only national disparities. He did not analyze disparities in Black and White students' SAT scores in Alabama. He did not analyze disparities in Black and White students' SAT scores in any of the counties at issue in this case. And he agreed that some people who take the SAT have paid for classes while others have not, yet his analysis did not account for the economic disparities between Black and White Alabamians discussed above. Trial Tr. 2249:10-2250:6.

510.    Similarly, in his analysis of public and charter school performance, Dr. Reilly did not examine disparities between Black and White students in Alabama. Nor did he examine charter and public school performance disparities between Black and White students in any of the counties at issue in this case. Trial Tr. 2250:11-21.

511.    Despite agreeing that it is possible to do tests to measure the effect of historical and contemporary racial discrimination on SAT testing gaps, he did not conduct such an analysis in this case. Nor did Dr. Reilly cite any studies that conducted such an analysis in Alabama. Trial Tr. 2250:25-2251:17.

512.    Instead, Dr. Reilly attributes Alabama's racial disparities in educational attainment to factors such as family structure, study time, age, and urban residency. Trial Tr. 2253:14-20. But none of his sources specifically examine Alabama.

513.    For example, Dr. Reilly claims that Black students in Alabama may study less for fear of being accused of "acting White" by their peers. Trial Tr. 2254:5-12. But the source that he cites for this hypothesis, DX8 at 28 n.50, is an ethnography of Black high school students at one high school in Washington, D.C. Trial Tr. 2254:19-2255:4. It did not analyze Black students in Alabama and is from 1986—nearly 40 years ago. Trial Tr. 2255:2-4; *see also* Trial Tr. 977:6-978:6 (Burch).

514.    None of the sources that he cites support the claim that the "acting White" hypothesis explains the educational disparities in Alabama, as Dr. Reilly

does not analyze Black students in Alabama, nor the Black Belt or any of other counties at issue in this case. Trial Tr. 2255:11-24.

515.   Rather than peer-reviewed studies, Dr. Reilly repeatedly cited the non-academic memoirs of a law professor, Amy Chua, and a linguist, John McWhorter, to support his claim that "culture" better explains disparities. Trial Tr. 2352:1-23.

516.   Dr. Reilly further opined that one way to find out whether people value achievement is to ask them questions such as if they really like school, how they feel about school, or how many hours a day they study. However, he did not ask Black students in Alabama how they feel about school or how many hours they study. He did not survey Black Alabamians at all. Nor did he cite a single study specifically examining Black Alabamians' views on school. Trial Tr. 2255:25-2256:15.

517.   Indeed, Mr. Milligan testified that, in his experience, the Black community in Alabama places a "very strong emphasis" on education, which arises from Black Alabamians' experiences with the discriminatory denial of educational opportunities. Trial Tr. 1163:15-1164:21. Pastor Valtoria Jackson similarly testified to the importance of education to Black Alabamians, including the concerns about adequate resources for schools. Trial Tr. 1069:14-22, 1073:1-12, 1109:25-1110:7.

518.   Dr. Reilly failed to consider this testimony. Trial Tr. 2255:25-2256:15.

519.   Dr. Reilly did, however, testify that his belief that White and Asian students study more than Black students was based on a blog post published by the

Brookings Institute. But, once again, that post was based solely on national-level data. It did not look specifically at Alabama schools. Trial Tr. 2256:19-2257:6

520.   The Brookings Institute blog post, moreover, hypothesized that racial disparities in study time are partially due to the lack of access to advanced courses for Black students, which Dr. Reilly did not dispute. But Dr. Reilly was not aware that federal courts in Alabama have recently entered orders requiring the school systems in Jefferson County, Huntsville, and Madison County to address their failure to offer Black students' equal access to advanced coursework. Trial Tr. 2257:7-22; *cf.* Trial Tr. 1291:10-1292:10 (Bagley); MX116.

521.   In his report, Dr. Reilly cited his own article to support the claim that the educational achievements of non-White immigrant students in America disproves the prevalence of racial discrimination here. But his article was not peer-reviewed or published in a scholarly journal. It came from a British political magazine. And, again, his article was not about Alabama. Trial Tr. 2257:23-2259:1.

522.   Moreover, Dr. Reilly agreed that newer immigrants, like Nigerians, may not be experiencing the same generational effects of past discrimination as descendants of enslaved Black Americans. He also agreed that different racial minorities, like Asian Americans, faced different types of historical discrimination than the discrimination faced by Black people in Alabama. Trial Tr. 2259:2-2260:5.

523.    Next, Dr. Reilly's analysis of crime disparities also contained many glaring omissions. He only analyzed incarceration rates in his report, despite acknowledging that some racism exists in sentencing, that juries and judges sometimes come to incorrect conclusions, and that, without adjusting for class, Black people accused of crimes tend to have worse lawyers than White people accused of crimes. Trial Tr. 2260:8-21.

524.    Once again, he did not analyze sentencing differences between Black and White Alabamians. He did not analyze racial disparities in Alabama's parole rates, nor Alabama's arrest rates. He did not analyze rates of conviction or prison admissions in Alabama. Trial Tr. 2263:15-2264:9; *see also* MX6 at 34-35; CX7 at 34-35; MX7 at 5-6; CX8 at 5-6.

525.    Dr. Reilly also did not consider the court cases finding that prosecutors in Alabama have, at times, systematically and intentionally struck black people from juries. He did not analyze the impact of felon disenfranchisement laws in Alabama. Trial Tr. 2264:10-16; *see also* MX6 at 34; CX7 at 34-35; MX7 at 5-6; CX8 at 5-6.

526.    In his report, Dr. Reilly opined that age impacted propensity to vote. He reported that the average age at the mode for a Black American is 27 and for a White American is 58. *See* MX8 at 29.

527.    But in his report, he did not provide a citation for these numbers. Trial Tr. 2306:16-22. He did not dispute that modal age is the most common number is a

distribution, while median age represents the number in the middle of a distribution. Trial Tr. 2307:1-7; *see* MX7 at 6-7; CX8 at 6-7. Crucially, he did not cite age data for Black and White people in Alabama. Trial Tr. 2307:14-18.

528.   Dr. Reilly also opined that the out-of-wedlock birth rate might be relevant to "explain[ing] anything from household income differences to the root causes of that [Black/White] crime gap." MX8 at 29. However, he did not provide any data on out-of-wedlock births in Alabama. Trial Tr. 2307:20-22.

529.   He did not cite any evidence linking out-of-wedlock birthrates to median incomes in Alabama. He did not cite any evidence linking out-of-wedlock birthrates to voting in Alabama. He did not engage with the literature on parental involvement, which finds that Black fathers who do not live with their children are still involved with their children sometimes more than White fathers. Nor does Dr. Reilly acknowledge that, if a person is born to unmarried parents, it might not be straightforwardly related to living with a single parent. That is, sometimes a single parent gets married or unmarried parents cohabit, or married parents may divorce. Trial Tr. 979:16-980:11 (Burch), 2307:23-2308:17 (Reilly); *see also* MX7 at 6; CX8 at 6.

530.   There are many aspects that illuminate the relationship between racial disparities and racial discrimination which Dr. Reilly admitted to, but did not include in his report. For example, his research has found that discrimination can contribute

to racial disparities and he agreed that race does play a role in the socioeconomic status of Black people. Trial Tr. 2309:10-18.

531.  Dr. Reilly was surprised to learn that Black voter turnout in Perry County was even higher than White voter turnout. He agreed that one of the explanations for the higher Black turnout could be that, as the electoral majority, Black voters are able to elect candidates of their choice. Trial Tr. 2348:25-2349:23.

532.  Dr. Reilly believes that stereotypes are, "at the generality, pretty accurate." Trial Tr. 2315:2-24. He acknowledged that there is a stereotype that Black people are lazy and Alabamians are not smart. Trial Tr. 2310:6-12. Indeed, following the Civil War, White politicians developed the stereotypes that Black Alabamians were unintelligent, "easily swayed," and "ill-equipped for political participation" to justify Black disenfranchisement. Trial Tr. 844:17-845:1 (Frederickson). Even in 1965, immediately after the passage of the Voting Rights Act and the Civil Rights Acts, national political leaders touted the same racial stereotype about the alleged culture failings of Black people to excuse racial disparities, despite the South's history of systematic racial discrimination. Trial Tr. 846:13-848:8 (Frederickson).

533.  Unfortunately, Dr. Reilly's research in this case appears to rely on similar stereotypes about Black *Americans* in general without examining Black *Alabamians* in particular. For example, he began conducting his analysis of crime rates with the assumption that, since the Black Belt counties are heavily minority,

they would have a higher rate of crime than most tiny agrarian counties. Trial Tr. 2235:4-7. Similarly, much of Dr. Reilly's report cites studies conducted at the national level or in other states concerning other Black communities who lack the same culture or extensive history of discrimination as Black people in the Black Belt or even Alabama. For example, without examining the history of Black Alabamians, Dr. Reilly simply assumed that racial disparities in education in Alabama could be explained by prior studies that had only observed the alleged culture of other Black Americans in other states, cities or regions of the country. Trial Tr. 2254:19-2255:24.

534.   Perhaps the most troubling aspect of Dr. Reilly's opinions is his express adherence to the belief that IQ differences between racial groups are genetic. Dr. Reilly testified to being a culturalist, meaning that cultural variables explain differences in racial group outcomes. In contrast, he identified hereditarianism as a "fairly fringe" position arguing that there are differences in athleticism or IQ between different racial groups that are genetic. Hereditarianism provided the justification for atrocities like Jim Crow and apartheid. Trial Tr. 2310:3-2311:7 (Reilly).

535.   However, in a July 2, 2021, post to his X (formerly Twitter) account, he wrote that, "You could literally pay smart Black people to have kids or boost Black merit immigration, to boost Black IQ, which, given what we do know about biracial scores, probably isn't low-ish for genetic reasons." That is, Dr. Reilly has

espoused the hereditarian—or eugenicist—idea that "literally pay[ing]" only certain Black people to have children is a way to "boost Black IQ." Trial Tr. 2353:17-23.

536.    The Court therefore declines to credit Dr. Reilly's incredible testimony.

537.    In contrast, based on the knowledgeable and extremely well-informed expert opinions of Dr. Bagley, Dr. Burch, and the testimony of the *Milligan* and *Caster* fact witnesses, the Court finds that there is a history of discrimination in voting, education, employment, and other areas, which continue to negatively impact the ability of Black Alabamians to equally participate in the political process.

## B.    <u>The Extent of Racially Polarized Voting (Senate Factor 2)</u>

538.    The second Senate Factor concerns "the extent to which voting in the elections of the state or political subdivision is racially polarized," *Thornburg v. Gingles*, 478 U.S. 30, 37 (1986), which concerns the "degree and nature of the bloc voting," *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) ("*Solomon II*").

539.    The Court examines several sources of evidence from both fact and expert testimony.

### i.    Degree of racial polarization

540.    As explained *supra* during the discussion of the preconditions, the Court finds that voting is highly and consistently racially polarized across the state and in each individual congressional district.

541.   As Dr. Palmer's analysis showed, voting is highly racially polarized in the state. On average, Black voters support their preferred candidates with an estimated vote share of 93%. Trial Tr. 493:22-494:5; CX3 at ¶ 14. White voters cast their ballots decidedly against Black-preferred candidates, supporting them with an average of just 14.3% of the vote in statewide elections, and never more than 26% of the vote. CX3 at ¶ 15.

542.   Similarly, Dr. Liu's analysis of every single endogenous biracial general election from the last 15 years demonstrated that Black voters vote extremely cohesively, with Black voters' support for the Black candidate at more than 90 percent. Trial Tr. 573:5-12; MX16 at 6-7, tbl.1.

543.   In contrast, Dr. Liu found that White support for Black candidates in these endogenous general elections was in the single digits and teens. MX16 at 6-7, tbl.1; Trial Tr. 573:19-25. The *only* Black candidate able to win a biracial congressional election in Alabama was Terri Sewell, who ran in CD7, a majority Black District since 1992. MX16 at 7. Still, Rep. Sewell's three contested elections were highly racially polarized. *Id.* All other elections that featured Black and White candidates, the Black-preferred candidate was defeated. Trial Tr. 574:9-12 (Liu).

544.   As explained above, none of Defendants' experts performed a racially polarized voting analysis themselves or contested the accuracy of Dr. Palmer's or Dr. Liu's analyses, including their results, methodology, or data.

545.    Courts have also repeatedly recognized the high degree of racially polarized voting in Alabama. *See, e.g.*, *Milligan II*, 690 F. Supp. 3d at 1314 (finding that undisputed expert testimony "fully supports the State's stipulation" that "*Gingles* II and III are again satisfied"); *Milligan I*, 582 F. Supp. 3d at 1018 ("voting in Alabama, and in the districts at issue in this litigation, is racially polarized for purposes of the second and third *Gingles* requirements"); *Ala. State Conf. of NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *17 (M.D. Ala. Feb. 5, 2020) (accepting the undisputed statistical evidence proving the existence of racially polarized voting statewide); *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-01821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019) (finding that voting is racially polarized in Jefferson County elections); *McGregor*, 824 F. Supp. 2d at 1345–46 & n.3 (finding that voting is racially polarized across Alabama).

**C.    Black electoral success in relation to racial makeup of population**

546.    Another factor courts have examined in probing the nature and extent of racially polarized voting is the success of Black candidates in relation to the White voting-eligible population in the district. *See, e.g., Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1359 (N.D. Ga. 2023). As discussed *infra* ¶¶ 684-694, except for a handful of very rare exceptions, Black candidates almost never win elections in majority White congressional districts.

547.    For example, in the current Alabama Legislature, all but one Black legislator was elected from a majority-Black district. Joint Stip. ¶ 155; Trial Tr. 1926:10-1927:9 (Hood); CX2 ¶ 63.

548.    Additionally, no Black candidate has ever been elected to Congress from a majority-White district. MX1 at 13; CX16 at 13; *see also* Trial Tr. 1834:13-16 (Bonneau).

> **i.    The relationship between race and party identification and alignment**

549.    Several experts offered by both the Plaintiffs and Defendants spoke to the significant role that civil rights and racial issues played in creating Alabama's current partisan alignment, and the endurance of racial identity and racial issues in influencing party identification.

550.    *Caster* and *Milligan* Plaintiffs' expert historian Dr. Bagley testified about the general consensus that race has been the primary driving factor in the political realignment process in the South, including in Alabama. Trial Tr. 1348:5-1349:16.

551.    *Caster* and *Milligan* Plaintiffs' expert Dr. Burch also testified that the scholarly consensus is that race is very important to parties and partisanship and vote choice and politics at large, Stone Tr. 708:3-16, explaining how the exodus of White voters from the Democratic Party between 1958 and 1980 was driven in significant

part by racial attitudes rather than income or other non-race-related policy preferences, Stone Tr. 708:19-24.

552.   Defense expert Dr. Hood likewise explained that race and civil rights were part of what motivated partisan realignment in the South. Trial Tr. 1902:16-1903:4. In the scholarship that forms the basis of his relevant expertise in this case, Dr. Hood has found "that the growth of southern Republicanism was primarily driven by racial dynamics, not class, demographic factors, or religion, as others have suggested," Trial Tr. 1929:18-22; that "southern politics revolved around the issue of race" at the midpoint of the last century and "still revolves around the issue of race" as of the early 21st Century, Trial Tr. 1930:9-15; and that "[m]uch of the recent work on the American party system has clearly [] underemphasized the crucial and distinctive role that race and racial dynamics have played," Trial Tr. 1931:3-10.

553.   Moving forward in time, Dr. Burch testified about how racial attitudes explained an increasingly large part of candidate choice and partisanship between White voters in the South between 1972 and 2000 more than ideological shifts or other policy preferences. Stone Tr. 708:25-709:4.

554.   In the 1990s and 2000s, this shift accelerated in Alabama, with strategies by Republican party elites like Mike Hubbard to target state legislative districts held by White Democrats, in particular where some voters split tickets and

voted for Republicans in national or statewide races. Trial Tr. 1323:20-1324:1 (Bagley).

555.   The election of Barack Obama caused the electorate to become more polarized along racial lines. Beginning with 2008, minority voters, Black, Latino, and Asian shifted their support towards Democratic presidential candidates, and support for Democratic candidates among White voters decreased. Stone Tr. 709:8-710:4 (Burch).

556.   Dr. Burch found that White respondents who think that the Democratic party is mostly African-American are less favorable towards Democrats overall and more favorable to Republican and take more conservative positions on policy. The idea that parties have racial identities is another indicator that partisanship is increasingly tied to race. Stone Tr. 710:7-23.

557.   Dr. Palmer also testified regarding the inextricable connection between race and party. He explained that "a very long literature in political science going back decades, looking at how voters develop partisan attachments or party preferences and how they make decisions about voting, shows the opposite; that one's background, including race, is a key factor in their politics and their party preferences." Trial Tr. 520:3-8. He went on: "what this means is that one's race has an effect on one's party preferences" because race and party are "fundamentally linked." Trial Tr. 520:9-11. Dr. Palmer explained that "when we see strong support

for Democratic candidates by Black voters, we can't attribute this to party preferences alone but to a mixture of personal and political factors, including race and in which race is going to be an inseparable part." Trial Tr. 520:12-16.

558. Defense expert Dr. Bonneau agreed "you can't properly examine partisanship in Alabama without thinking about the role of race," Trial Tr. 1835:1-4, and that the race of the voter is a driving factor in their political party affiliation, Trial Tr. 1795:8-11. He acknowledged that for some voters, even if they are making choices based on party, race may be a factor in making that party or candidate choice. Trial Tr. 1793:6-16. And he agreed that "evidence shows [in Alabama] that black voters tend to prefer black candidates." Trial Tr. 1823:3-8.

559. In terms of policies, Dr. Bonneau testified that "one of the reasons why black voters overwhelmingly identify as Democrats is because of the history of the Democratic Party supporting the Civil Rights Act and the Voting Rights Act." Trial Tr. 1788:8-12. He also agreed that Black voters also tend to support Democratic candidates because they "believe that the Democratic Party is more open to nominating and electing African-American candidates." Trial Tr. 1788:21-25. Dr. Bonneau further agreed that "the Democratic Party is largely perceived by the African-American community as being a party that better reflects the issues that are important to them," including "equality of housing, affirmative action, equality of

214

jobs, and programs that try to mitigate the vestiges of slavery and Jim Crow." Trial Tr. 1788:13-20.

560.   Dr. Hood similarly testified that, "based on [his] extensive research in this area, [] one explanation as to why black voters tend to support Democratic candidates is that the viewpoints of the Democratic Party are more closely aligned with most black voters," including on civil rights issues. Trial Tr. 1902:16-1903:4. In his scholarship, Dr. Hood has further explained that his study of contemporary opinions in the South regarding Civil War symbolism "support racially motivated explanations for partisan change in the south" and reveal that "[t]oday's racialized partisan cleavage reflects a similar divide over views of a racially charged past." Trial Tr. 1939:1-19; *see also* Trial Tr. 1940:1-10 (noting that it is "undeniable that the successful GOP strategy of attracting southern whites by capturing the conservative position on African-American Civil Rights has ultimately led to the reality that the Republican Party has now become the defender of the very flag that white southerners once raised against the party of Lincoln on bloody battlefields and later in violent skirmishes over black equality").

561.   On a similar note, Defendants' expert Dr. Reilly agreed many Black voters perceive the Republican party as racist. Trial Tr. 2308:21-24.

562.   The Court credits this testimony from each of these witnesses.

563.    The only witness who tried to minimize the role of race in party alignment was defense expert Dr. Adam Carrington, though he admittedly focused only on White voters. Trial Tr. 1555:11-13, 1601:8-13.

564.    The thrust of Dr. Carrington's testimony is his claim that "partisan, nonracial factors as more persuasive to explaining the long-term shift [in partisan alignment], particularly demographic changes, in the south as well as changes in party positions and in coalitions regarding economics, foreign policy, and social issues." Trial Tr. 1554:24-1555:3.

565.    The Court assigns no weight to Dr. Carrington's opinions, however, for several reasons.

566.    *First*, Dr. Carrington lacks the necessary expertise to offer the opinions he does here. Dr. Carrington's self-proclaimed areas of scholarly expertise and the focus of his research are: (i) American political institutions; and (ii) the intersection of religion and politics. Trial Tr. 1582:23-1583:17. His scholarship has predominantly focused on the late 19th century. Trial Tr. 1583:23-1584:3.

567.    Dr. Carrington lacks expertise in the study of the post-Reconstruction politics of the American South. He did not focus on this area during his doctoral studies. Trial Tr. 1583:18-22. He has not published any relevant scholarly work particularly looking at the post-Reconstruction politics of the American South, Tr.

1584:4-1585:4, and he has not taught any courses specifically focused on the politics of the American South. Trial Tr. 1585:5-11.

568.    Moreover, Dr. Carrington has never published any scholarship analyzing the role of race, racial attitudes, or racial appeals on partisan alignment or voter participation. Trial Tr. 1585:20-1586:17. Nor has he taught any courses specifically focused on the role of race in politics. Trial Tr. 1586:18-22.

569.    Dr. Carrington also lacks essential knowledge about Alabama's politics and history. Trial Tr. 1549:25-1550:2. He has never lived or taught in Alabama. Trial Tr. 1645:25-1646:10. He did not attempt to analyze many of Alabama's key political and legal actors from the time period covered in his report. Indeed, he does not even know who many of the key figures from this period are. For example, Dr. Carrington acknowledged that he did not know who Judge Robert Vance is – even though in the November 2024 trial in *Stone* he had testified in the Robert Vance Courthouse. Dr. Carrington was unaware of Judge Vance's prominent role in leading the Alabama Democratic party in the 1960s and 1970s. Trial Tr. 1621:25-1622:11. Likewise, Dr. Carrington acknowledged that in the *Stone* trial, he had speculated that Fred Gray was the founder of an all-White Christian academy. And Dr. Carrington admitted that he still did not know who Mr. Gray is. Trial Tr. 1622:12-24. In fact, Mr. Gray is a renowned civil rights lawyer who, in 1970, became the first Black person elected to the Alabama Legislature since Reconstruction and who litigated various landmark

cases. Trial Tr. 1308:10-20 (Bagley). Dr. Carrington also did not know who Judge U.W. Clemon is – notwithstanding his presence in the courtroom, Trial Tr. 1622:25-1623:4, or who Judge Frank Johnson was. Trial Tr. 1645:11-21. Of course, Judge Clemon was elected in 1974 as one of the first Black State Senators. Judge Clemon was also the first Black federal judge in Alabama. And Judge Johnson was a Republican-appointed judge who is lauded for his role in desegregating Alabama.

570.    *Second*, Dr. Carrington's analysis of the shift of White voters in the South to the Republican Party ignores key evidence and is contradicted by the more reliable testimony of Plaintiffs' experts Drs. Bagley and Burch, and other defense experts including Drs. Bonneau and Hood, and even Dr. Carrington himself. Dr. Bagley and Dr. Burch based their opinions on a wide-ranging consideration of the historical records, political analysis, and survey data specific to Black and White people in Alabama. In contrast, Dr. Carrington focused on national trends and failed to give any consideration to the experiences of Black Alabamians. For example, Dr. Carrington admits that he did not speak to any Black Alabamians, has never visited a Black church in Alabama, and "deliberately chose not to make [an] inquiry" into whether black churches had any influence on politics in the black community. Trial Tr. 1646:22-1647:13; *contra* MX5 at 13-14; CX6 at 13-14.

571.    Although Dr. Carrington takes issue with Plaintiffs' experts for placing too much weight on race as a factor in the political realignment of Southern White

voters, he did not conduct any statistical analysis to measure the relative influence of racial factors versus the nonracial factors he identified played in the political realignment of Southern White voters. Trial Tr. 1598:19-22. Nor did Dr. Carrington analyze the voting patterns of Black voters or how the factors he mentioned in his report impacted Black voters' voting patterns. Trial Tr. 1601:12-14.

572.    To the contrary, Dr. Carrington does not dispute that statistical racially polarized voting existed in Alabama, continues to exist today. Trial Tr. 1596:24-1597:8. He also acknowledges that race has "played a role in the political realignment of White voters in Alabama" and has been a "dominant factor in the South" for "much of the 20th Century." Trial Tr. 1598:4-15. In fact, Dr. Carrington agrees that even up to as recently as the 1980's "race played a meaningful role in Alabama politics," Trial Tr. 1610:14-20, and he acknowledges that "old habits die hard." Trial Tr. 1598:16-17. In opining that race no longer plays a prominent role in Alabama politics, Dr. Carrington did not consider the fact that Alabama was the last state to repeal its anti-miscegenation laws and did not do so until 2000. Trial Tr. 1613:16-22. And when asked what conclusions he would draw from the fact that 25 of the 67 counties in Alabama did not support the Alabama constitutional amendment to remove the anti-miscegenation language, Dr. Carrington responded that he would first "want to know what the argument would have been against it"

before drawing any conclusions, but agreed that one would expect in a race-neutral society that it would have passed overwhelmingly. Trial Tr. 1652:2-1653:4.

573.   Dr. Carrington's testimony regarding racial appeals in Alabama politics fell along the same lines and demonstrated his lack of expertise in Alabama electoral politics. To start, Dr. Carrington appears to take the position that one cannot know whether a statement or symbol is a racial appeal without knowing the politician's intent. For example, Dr. Carrington declined to say whether a politician's use of the Confederate flag in campaign material is a racial appeal without knowing the politician's intent, Trial Tr. 1589:1-6, and he refused to say whether Senator Tuberville's comment that white nationalists are not racists "amounted to a racial appeal," despite acknowledging that "you cannot separate White nationalism from racism," Trial Tr. 1593:11-1594:8. Moreover, Dr. Carrington refused to say whether MX174 – a social media post depicting a white hand making a white power gesture with the phrase "jobs" above it and "Republican" below it on the left side of the image, and a hand that "is a little shade darker" raising a fist with the phrase "Not Mobs" above it and "Democrats" below it on the right-hand side of the image – was a racial appeal. Trial Tr. 1596:4-13. Indeed, Dr. Carrington's opinion about whether the post was a racial appeal would not change even if the post's author knew that the white hand gesture was a white power symbol. Trial Tr. 1596:15-23; *see also* Stone Tr. 1349:23-1350:3 (Coley).



Excerpt of MX174.

574.    Dr. Carrington was aware of the significant role of Lee Atwater in Republican presidential campaigns in the 1980s and Mr. Atwater's admission that politicians used racial appeals through at least the 1970s to motivate White voters in the South. And yet Dr. Carrington's report does not discuss this historical context. Trial Tr. 1589:10-1593:5; *see also* MX5 at 8; CX6 at 8; Trial Tr. 1354:2-1355:23 (Bagley).

575.    While Dr. Carrington identified the rise of modern conservatism as a purportedly non-racial factor in the political realignment of Southern White voters, he repeatedly agreed that conservatism was tied to racial issues. For instance, he admitted that a key element of the modern conservatism movement "was an increase emphasis on states' rights," Tr. 1602:9-13, including a "preference for state control over the voluntariness and pace of integration." Trial Tr. 1602:14-22.

576. Dr. Carrington further admitted that post-1964, segregationists in Alabama would have preferred the Republicans' position on integration than the national Democrats' position, Trial Tr. 1603:14-18, and that Senator Barry Goldwater's 1964 Republican presidential campaign and George Wallace's 1968 Democratic presidential campaign positions in opposing the Civil Rights Act and aggressive federal integration efforts would have increased their appeal to pro-segregationists in Alabama. Trial Tr. 1606:5-1607:1. Of course, Senator Goldwater and Governor Wallace both won Alabama in 1964 and 1968, respectively. Dr. Carrington further conceded that, after the Civil Rights Act, Alabama Democrats, like Governor Wallace, did not adopt the "more aggressive integration position[s]" of the national Democrats and, as a result, there remained Alabama segregationists "that may still have supported Democrats at the state level." Trial Tr. 1607:7-14. Further, as Dr. Fredrickson points out, Dr. Carrington's analysis fails to engage with the role that Wallace's rhetoric of anti-elitism and hostility to federal power (specifically with respect to school integration and fair housing legislation) served as the new language of racial grievance and was rhetoric that was adopted by conservative politicians across the country. S32 at 6.

577. Dr. Carrington's opinions were repeatedly based on incomplete analyses that ignored evidence contradicting his views. Dr. Carrington reported that "[m]etropolitan areas [in Alabama] tended to be more diverse in population and open

to reform, including on matters related to race." DX3 at 16. But Dr. Carrington did not analyze the series of racially motivated bombings in Birmingham, commonly referred to as "Bombingham," Trial Tr. 1610:21-23, the organization of White Citizens' Councils in Alabama's major cities, Trial Tr. 1611:1-6, or the history of violence and unrest in Alabama metropolitan schools as they were integrated, including with respect to Jefferson Davis in Montgomery and Vigor and Murphy in Mobile, Trial Tr. 1612:1-9, when evaluating whether White metropolitan voters in Alabama were more racially progressive. Trial Tr. 1612:14-20.

578.   Dr. Carrington also identified anti-communism as another purportedly "non-racial" factor influencing the political realignment of Southern White voters, despite anti-communism rhetoric often being used to tarnish the Civil Rights Movement. *See* MX5 at 14; CX6 at 14. Dr. Carrington acknowledged that politicians accused Dr. Martin Luther King, Jr. and other Civil Rights leaders of having communist sympathies. Trial Tr. 1614:9-11, 1615:5-7. In fact, Dr. Carrington noted that his own research found that politicians made links between communism and the Civil Rights leaders. Trial Tr. 1615:8-16. In fact, Dr. Carrington noted that segregationists often attempted to associate their views with anti-communism "[t]o find … a nonracial reason to … connect with their overt racial appeals" in order to broaden their public support. Trial Tr. 1614:22-1615:4; *see also* Trial Tr. 1359:5-23

(Bagley). But Dr. Carrington's report fails to mention this connection between anti-communism and anti-Civil Rights. MX5 at 14; CX6 at 14.

579.   Dr. Carrington also fails to account for the fact that White and Black voters align on several key political issues but continue to vote for opposing parties. Dr. Carrington claimed that voters' religiosity and the political parties' respective positions on abortion and LGBTQ rights constituted another "non-racial" factor influencing political realignment in the South.

580.   Dr. Carrington failed to analyze whether Black Alabamians have comparable levels of religious observance as their White counterparts. Trial Tr. 1618:18-23. But he accepted a Pew Research survey's finding that 94% of Black Alabamians identify as Christian and 88% of Black Alabamians see religion as very important. Trial Tr. 1619:2-10. Nor did he dispute surveys, MX7 at 13, CX8 at 13, finding that higher proportions of Black Alabamians identify as evangelical or born-again Christian than White Alabamians. Trial Tr. 1619:23-1620:8. Dr. Carrington failed to account for why Black and White Alabamians have such wildly divergent voting patterns despite Black and White Alabamians having the same levels of religious identification. *See generally* DX3; *contra* MX5 at 14-15; CX6 at 14-15. As Dr. Fredrickson explains in her report, citing to prominent Alabama historian Glenn Feldman, "politics, morality, and race … have a long history of interconnectedness

and overlap in southern minds, manners, and sensibilities – an indelible relationship that resonates strongly into the present." S32 at 8-9.

581.   Dr. Carrington failed to account for how White Alabamians' political views were influenced by their racial views and attitudes. Dr. Carrington himself was aware that Jerry Falwell was inspired to create the Moral Majority moment in part by the Federal Government's decision to rescind the tax-exempt status of Bob Jones University because of its racist refusal to admit Black students or permit interracial dating. This history is absent from his report. Trial Tr. 1617:12-1618:17.

582.   On abortion too, Dr. Carrington did not analyze whether the policy preferences between White and Black Christians differ. Trial Tr. 1621:2-6. But he does not dispute that Black Christians in Alabama hold similar religious views on abortion as White Christians. Trial Tr. 1621:7-12; *see also* Trial Tr. 1360:20-1361:6 (Bagley). In fact, Pew Research survey results found that 48% of Black Alabamians—a plurality—think that abortion "should be illegal in all or most cases." MX5 at 15; CX6 at 15; MX7 at 13; CX8 at 13.

583.   Similarly, on LGBTQ rights, Dr. Carrington did not analyze whether Black Christians in Alabama hold similar views on LGBTQ rights as White Christians, notwithstanding Pew Research surveys finding that 47% of Black Alabamians oppose same-sex marriage and only 45% are in favor. *See* MX5 at 15; CX6 at 15.

584.    Tellingly, in general, Black Alabamians view self-identify as politically and ideologically conservative or moderate. Among Black Alabamians, a substantial majority identify as either conservative (41 percent) or moderate (35 percent), and only 19 percent identify as liberal. MX5 at 15; CX6 at 15; *see also* Trial Tr. 1361:7-15 (Bagley).

585.    *Third*, Dr. Carrington also showed signs of bias. Before being retained in this action, Dr. Carrington wrote an article titled "The Supreme Court's Voting Rights Decision was a Missed Opportunity," in which Dr. Carrington argued that "[the Supreme Court's decision] continued a line of precedent at odds with important constitutional principles" and that the Supreme Court "should have greatly limited its intrusion here on matters of race and redistricting." Trial Tr. 1625:25-1626:24. Specifically, the "missed opportunity" Dr. Carrington referenced was for the Supreme Court to "reunderstand the Voting Rights Act towards precedent that had occurred prior to the 1982 amendment[.]" Trial Tr. 1626:25-1628:7. That is, Dr. Carrington wanted that the Supreme Court to undermine the results standard.

586.    *Fourth*, Dr. Carrington failed to account for much of the relevant scholarship concerning race and politics in the South over the last 75 years or selectively quoted it, which Drs. Bagley, Burch, and Fredrickson showed contradict Dr. Carrington's views and show a greater role of race in the partisan realignment in Alabama. As discussed *supra* ¶ 552, Dr. Hood's scholarship shows the same.

587.    Dr. Carrington cites, for example, to political scientists Merle and Earl Black, who observed, 22 years ago, that "modern southern politics involves more than its obvious racial divisions." DX3 at 7. But he ignores a key component of what these scholars say about Alabama: that the Republican Party's political strategy in the early 2000s had an explicit racial component, which was to "sweep the White conservatives and carry majorities of the White moderates." MX5 at 3; CX6 at 3.

588.    Dr. Carrington also ignores the scholarship of Dr. Patrick Cotter, Professor Emeritus of Political Science at the University of Alabama, who Dr. Bagley explained wrote that, according to the prevailing view in the early 2000s, race was the "most important" of the "social issues" that was driving White Alabama voters to the Republican Party at the time. MX5 at 4; CX6 at 4. Dr. Carrington also ignores the scholarship of Professor Glenn Feldman *Painting Dixie Red: When, Where, and Why the South Became Republican* cited in Dr. Bagley's rebuttal report, which directly analyzes the causes of the southern political realignment and unequivocally concludes, "It is about race – there can be no questioning or minimizing of that basic premise. The South's partisan realignment from Democratic to Republican is about race[.]" MX5 at 3; CX6 at 3. Dr. Hood agrees: in his book *The Rational Southerner: Black Mobilization, Republican Growth, and the Partisan Transformation of the American South*, Dr. Hood concluded that "the growth of southern Republicanism was primarily driven by racial dynamics, not

class, demographic factors, or religion, as others have suggested," and that "Southern politics in the early 21st Century still revolves around the issue of race." Trial Tr. 1929:6-1930:15 (Hood); CX157; *see also* MX7 at 10; CX8 at 10.

589.   This fact has not changed. As the dean of Alabama historians, Professor Wayne Flynt, explained, when Mike Hubbard was running for reelection in 2014: "The most fundamental thing about Alabama is race and they know that. And in a day when you can no longer talk like George Wallace did because 70-80 percent of African Americans are registered to vote and it hurts the state and it hurts you with people like the Business Council of Alabama and corporate types. What you can do is you use Obama as a metaphor and everybody understands what that's about. It's not about Obama and it's not about race in Washington and it's not about race in America. But it's about race in Alabama." MX5 at 11; CX6 at 11.

590.   Dr. Carrington also ignores important Alabama-specific testimony by Dr. Bagley about how the tenuous Democratic coalition began to break down as Black political power grew. By the 2000s, many White Alabamians came to view the state Democratic Party as too heavily controlled by Black political interests. Alabama Republican leaders saw White voters' dissatisfaction as a way to help create a White Republican super-majority, a goal that was realized in 2010. MX5 at 16; CX6 at 16; *see also* Trial Tr. 1345:6-1346:14 (Bagley).

228

591.   Dr. Carrington agrees that the research Dr. Burch cites supports her conclusion that racial identity and racial attitudes shape partisanship and party cohesion and these two phenomena have become increasingly linked since 2008, Trial Tr. 1599:17-1600:8; *see* MX7 at 9-14; CX8 at 9-14, but he fails to meaningfully engage with that body of research in his report. *See generally* DX3. For example, Dr. Burch cites to research conducted by Michael Tesler, and Alan Abramowitz and Jennifer McCoy each finding an increasingly strong relationship between race-related attitudes and partisan alignment beginning with President Obama's 2008 presidential election. MX7 at 11; CX8 at 11. Abramowitz and McCoy's research further found that by 2016, racial resentment was strongly associated with how a voter evaluated candidates even after controlling for other factors. *Id*. Dr. Burch also cited to research conducted by John Sides, Michael Tesler, and Lynn Vavreck finding a rise in the strength of White identity politics in recent years that is becoming increasingly salient to vote choice and is more important than economic anxiety in explaining vote choice. MX7 at 11-12; CX8 at 11-12. Dr. Carrington does not address any of these studies in his report and fails to cite to any research in the last ten years analyzing the impact of racial attitudes or racial identities on voting patterns or partisan affiliation. *See generally* DX3. He also acknowledged that he has not conducted any research of his own "looking into the correlation between

racial resentment and candidate support among White voters after 2008." Trial Tr. 1600:9-13.

592.    In sum, Dr. Carrington's lack of relevant expertise, his bias, and his flawed analysis – which did not include an "intensely local appraisal" of the districts at issue – each seriously undermine the credibility of his testimony. The Court gives no weight to Dr. Carrington's opinions.

593.    Fact witness testimony from knowledgeable Black and White Alabamians familiar with the political process in the state also points to an enduring role of race in influencing partisan alignment.

594.    Contrary to Dr. Carrington's conclusion that religion, rather than race, drives party choices in Alabama, Pastor Jackson's testimony explained the that Black churchgoers in Alabama align more closely with the Republican party on issues such as abortion, and LGBTQ rights. Trial Tr. at 1106:17-1107:18. And yet, those same voters support Democratic Candidates over Republican candidates because of their positions on racial issues such as voting rights and civil rights. *Id.* at 1108:7-17.

595.    Greater Birmingham Ministries Executive Director Scott Douglas testified that in his decades of experience, "race is politics in Alabama," Stone Tr. 493:16, meaning that "from representation in elected bodies to implementation of

public policies, race has been entrenched as a factor in decisions that leaders often make." Stone Tr. 493:18-21.

596.  Sen. Jim McClendon testified that about substantive policy issues that influence partisan alignment on which Black and White voters in Alabama in general have different views, such as on the preservation of confederate monuments, and the prevalence of racial discrimination. *Milligan* Doc. 459-16; *Caster* Doc. 370-16 ("McClendon *Stone* Dep.") 79:22-25, 80:4-11.

597.  Dr. Caster, who has himself run for office as a Democrat, testified that he affiliates with the Democratic party because of the party's "help and support to the African-American community." Trial Tr. 383:13-16. That is so even though he does not agree with everything in the national Democratic platform. Trial Tr. 383:17-19.

598.  Dr. Palmer conducted a review of the six Republican primary elections between 2022 and 2024 that involved at least one White and one Black candidate. Of those, a Black candidate won only once, in majority-Black CD7. CX4 ¶ 9.

599.  In sum, the whole of the evidence points to race as an important factor in driving present-day partisan affiliation in Alabama.

### ii. Race and Partisanship in Voter Behavior and Candidate Success

600.   Finally, there was significant testimony from both fact and expert witnesses bearing on the relative impact of race and partisanship in both candidate selection and success.

601.   Expert testimony from both Plaintiffs' and Defendants' witnesses also revealed the continued salience of race as a factor driving candidate choices.

602.   First, Dr. Liu's analysis of exit polls, primaries, and nonpartisan elections provides evidence that race plays a more important (or at least coequal) role than party in driving racially polarized voting. Dr. Liu explained that to empirically analyze the role of race versus party and to establish a causal relationship, social science requires a controlled comparison meaning that either party or race is held constant. Trial Tr. 585:16-586:4; MX17 at 7.

603.   Dr. Liu examined exit polls from the 2008 general election in Alabama where Black Democrats faced off against White Republicans in the Presidential and Senate races. MX13 at 14. In the Presidential race, White Republican John McCain won a majority (51%) of White Democrats over Black Democrat Barack Obama, won only 47% of White Democrats. *Id.* In the Senate race, White Republican Jeff Sessions won 58% of the vote of White Democrats in his race against Black Democrat Vivian Davis-Figures. *Id.*

604. Regarding primaries, Dr. Liu testified that analyzing these races can help disentangle race and party because the "partisan cue" is held constant in that voters' "have no way to distinguish [ ] candidates b[y] … the difference in the[ir] party affiliation." Trial Tr. 585:5-24.

605. Dr. Liu analyzed Alabama's 2008 presidential Democratic primary using these same exit polls, and found that 72% of White voters selected Hillary Clinton, while 84 percent of Black voters selected Barack Obama. MX13 at 14.

606. Dr. Liu also analyzed how President Obama performed in the 2008 election in each of the seven congressional districts. This election was highly racially polarized in all seven districts, and President Obama only won the majority-Black CD7. MX13 at 13. This is significant because in the same 2008 general election, two White Democrats won in the majority-White CD2 and CD5. Trial Tr. 718:20-720:5 (L. Jackson). That is, White voters remained willing to support White Democrats in congressional district elections as recently as 2008 but not a Black Democrat.

607. Dr. Bonneau did not dispute, let alone even review MX13, Dr. Liu's analysis of the 2008 exit polls and the 2008 races. Trial Tr. 1815:2-10 (Bonneau).

608. Dr. Liu also used EI to analyze RPV in the 2020 Democratic primary in Alabama's CD1, which featured candidates of different racial groups. MX16 at 7. There too, he found racially polarized voting, with over half of Black primary voters

supporting the Black candidate, and only 16.7% of White voters supporting that candidate. MX16 at 7.

609.    The Court also finds probative Dr. Liu's analysis of the Republican Primary in CD2 as evidence of whether White Republicans support Black candidates. In the 2024 CD2 Republican Primary under the Court's remedial plan, eight candidates ran for office: four White candidates and four Black candidates. Trial Tr. 594:18-21; MX17 at 3. According to Alabama's voter file, as many as 95.9 percent of the electorate in this election were non-Hispanic White voters and only 2.4 percent were Black. MX17 at 3. The four Black candidates finished 5th, 6th, 7th and 8th places after the election results were announced and together received only 6.2 percent of the total vote. Trial Tr. 594:25-595:7 (Liu); MX17 at 3. All four Black candidates *combined* performed worse than a young White man who had recently graduated from college with no political experience. Trial Tr. 1292:11-1293:12 (Bagley). In contrast, at least two of the four Black candidates that his young man defeated were experienced Republican politicians or elected officials. *Id*. This evidence demonstrates that in an election driven almost exclusively by White Republican vote choice, there is a clear lack of support for any Black Republican candidates. Trial Tr. 595:14-20 (Liu).

610.    Dr. Liu also looked at the 2024 Republican primary for District 3 of the Montgomery County Commission, which is part of the area under dispute in this

case. Trial Tr. 595:21-596:8. There too, Dr. Liu found that Justin Castanza, a White candidate, running against Cedric Coley, a Black candidate won the Republican nomination with 80.38% of the votes cast. MX17 at 3; Trial Tr. 595:21-596:8.

611.   Dr. Hood pointed to the 2016 Republican primary where Dr. Ben Carson, a Black candidate, received 10.24 percent of the votes cast in Alabama in support of his claim that White voters' support Black Republicans. MX17 at 2. But Dr. Hood did not perform an RPV analysis on this election. *Id.* Dr. Liu's RPV analysis showed that Dr. Carson received about nine percent of the White vote, compared to 31 percent of the Black vote. MX17 at 2; Trial Tr. 593:10- 594:10. Such low White Republican voter support for the Black candidate certainly cannot be regarded as proof of White enthusiasm for a Black conservative candidate. MX17 at 2; Trial Tr. 593:10- 594:10.

612.   Similarly, Dr. Palmer opined that he does not believe any conclusions can be drawn from that fact, in part because Dr. Hood did not do anything to determine if Ben Carson did well in certain parts of the state or if he was the preferred candidate of any group of voters. Trial Tr. 504:14-21 (Palmer); CX4 at ¶ 5. The mere fact that Ben Carson finished in fourth place in a primary election provides no information relevant to determining what role race plays in Alabama elections.

613.   At trial, Dr. Hood conceded that Defendants' counsel had specifically asked him to examine the Ben Carson vote share, that he didn't understand why this

was relevant to the issues in this case, that his report never concluded anything about the extent to which the Ben Carson vote provides evidence of Republican support for minority Republican candidates in Alabama, and, in fact, that a single electoral race is not sufficient evidence to draw conclusions on voting patterns in the state. Trial Tr. 1907:23-1909:4. Dr. Hood also did not examine the racial demographics or turnout of the 2016 presidential Republican primary in Alabama or any other state. Trial Tr. 1909:19-1910:13.

614.    Finally, Dr. Liu considered two Montgomery mayoral elections because "whoever wins the first two places in primary elections, regardless of party affiliation, enters into a runoff in these mayoral elections, if the primary results lead to no majority-vote winner in the first round." MX17 at 8; Trial Tr. 596:9-21. Thus, these elections are also non-partisan. Trial Tr. 681:10-15. As Dr. Liu explained on cross-examination, although these are off-cycle elections, meaning they did not occur during a presidential election, turnout was over 30 percent, much higher than the state house elections considered by Drs. Bonneau and Hood. Trial Tr. 672:20-673:12; 679:16-21.

615.    The persistence of RPV in primaries and non-partisan races, and the striking support of White Democrats for White Republican candidates over Black democrats, provides strong evidence of the persistent role of race in Alabama politics.

616.    Second, as set forth above, *see supra* ¶ 552, Dr. Hood's scholarship on race and politics has repeatedly found that racial dynamics—and not class, religion, or other demographic factors—has primarily driven partisan choices in the South, both in the past and in the present day.

617.    While Dr. Hood's report contains a section purporting to consider the question, "Are White voters willing to vote for minority Republican candidates?," DX7 at 21, Dr. Hood's analysis is almost entirely about elections and candidates outside of Alabama. Moreover, as explained *supra* ¶¶ 552, 560, 588, many of the conclusions Dr. Hood purports to reach in his report are directly at odds with the conclusions he has reached in his scholarship and/or evaporated upon cross examination.

618.    Dr. Hood appears to suggest that White voters are willing to vote for minority Republican candidates based on the fact that Tim Scott won the Republican primary in South Carolina in 2014 and relying on his work, *True Colors*. DX7 at 21. But as Dr. Palmer explained in response to Dr. Hood's analysis, "[a] more complete look at the evidence shows that Black candidates are rarely successful in Republican primaries." CX4 at ¶ 7. Dr. Palmer examined all Republican primary elections in South Carolina between 2012 and 2020 and found that of the 15 instances involving both a White and Black candidate, Black candidates prevailed just twice—one was Tim Scott and the other candidate won with 282 of 479 votes cast. Trial Tr. 505:4-

506:7 (Palmer); CX4 at ¶ 7. In each of the other 13 Republican primaries involving both a Black and White candidate, the White candidate won. Trial Tr. 506:8-11 (Palmer); CX4 at ¶ 7. Dr. Hood concedes that "there may variations in conservative white support for minority Republican nominees on the basis of their specific race or ethnicity," Trial Tr. 1915:5-10, and he makes no specific findings in *True Colors* as to white support for Black Republican candidates, Trial Tr. 1915:19-21, or for Alabama at all, Trial Tr. 1916:1-3

619.   Dr. Palmer conducted a more complete and more relevant analysis, which showed just the opposite. Tr. 507:8-22. In Alabama, between 2022 and 2024 there were six Republican primary elections that involved at least one White and one Black candidate. Of those, a Black candidate won only once, in majority-Black CD7 but dropped out. CX4 ¶ 9. Additionally, as Dr. Hood acknowledges, the Republican Party in Alabama has never nominated a Black candidate for a statewide office, nor has a Black Republican in Alabama won statewide office, Trial Tr. 1967:5-24, and no Black person has ever won a primary in a majority-white congressional district in Alabama, Trial Tr. 1967:25-1968:5.

620.   Dr. Hood next points to Rep. Paschal, a Black Republican, who represents Alabama state House District 73. CX4 at ¶ 8. But even Dr. Hood concedes that this is the only instance he is aware of since Reconstruction in which White voters in Alabama elected a minority Republican candidate, and that House District

73 does not overlap with any of the congressional districts at issue in this litigation. Trial Tr. 1921:7-23. Rep. Paschal came in second in his initial primary election to a White candidate, and then narrowly won a low turnout runoff by 63 votes. Trial Tr. 506:12-507:3 (Palmer); CX4 at ¶ 8. Dr. Palmer opined that "the fact that [one Black candidate] was successful [in one special Republican primary runoff] is not evidence that [White voters] consistent[ly] support minority candidates in Republican primaries in Alabama." CX4 at ¶ 8; Tr. 507:4-7. Dr. Hood does not dispute this conclusion. Trial Tr. 1923:12-20. Dr. Hood also admits that he did not perform any analysis of the racial composition of the electorate in either the primary or general election. Trial Tr. 1922:22-24, 1923:6-11.

621. Similarly, Dr. Liu's RPV analysis showed that turnout in Rep. Paschal's primary election was extremely low. Only 5.3 percent of all voters participated, with just 1.7 percent of the White VAP and only about 5 percent of Black VAP casting a vote in this election. MX17 at 2; Trial Tr. 600:21-601:11. This low-turnout primary is not instructive or representative, even for House District 73 itself, and it says little about whether White voters in Alabama are willing to vote for Black Republican candidates. Trial Tr. 601:6-14; MX17 at 2. Even Dr. Hood does not dispute that one Black candidate's success in one special Republican primary runoff is not evidence that white voters consistently support Black candidates in Republican primaries in Alabama, Trial Tr. 1923:12-22, and that "you

can't make a statewide generalization from single state house election within Alabama," Trial Tr. 1923:23-1924:2.

622. The Court credits these criticisms of Dr. Hood's analysis.

623. Defense expert Dr. Bonneau also purports to provide evidence that there is no racial bias in voting and that partisanship better explains Alabama voting patterns than race. *See* DX1. But upon further examination, the evidence he provides shows nothing of the sort.

624. While Dr. Bonneau concludes that "prior to realignment in Alabama politics from a Democratic majority to a Republican majority, African-Americans not only served on Alabama's Supreme Court, but they also won reelection to that court," DX1 ¶ 2, Dr. Bonneau concedes that this conclusion is based entirely on the election of two Black candidates to the Alabama Supreme Court, both of whom had first been appointed to their seats, across an approximate 20-year period. Trial Tr. 1732:14-1733:3. Dr. Bonneau does not suggest that African Americans had electoral success with respect to any other statewide office during this time frame, and he admitted he is not aware of any other Black candidates who won election to statewide office during this time frame. Trial Tr. 1733:4-20.

625. Dr. Bonneau also purports to analyze whether the race of a candidate affects their electoral success by examining straight-ticket voting data from the 2018, 2020, and 2022 elections in Alabama. DX1 ¶¶ 3-4. He opines that "the prevalence

of straight ticket voting means that most voters are voting for a political party, not a candidate (or candidates)." DX1 ¶ 5. But Dr. Bonneau admits this analysis "does not tell the Court what percentage of black straight-ticket voters are supporting the Democratic Party versus the Republican Party." Trial Tr. 1829:13-17. And he admits that not only were all of the Republican candidates for statewide office in the three elections he analyzed White, but also that he "cannot think of a single election in this century or last century in Alabama where every single Republican candidate for statewide office was not White," Trial Tr. 1832:17-1833:1, and that it is "rare in Alabama to have a black Republican on the general election ballot," Trial Tr. 1833:2-4. Because of this, Dr. Bonneau acknowledged that in Alabama, "if you vote Republican straight ticket, . . . you [are] pretty sure that you're voting for all White candidates." Trial Tr. 1833:5-12. Similarly, in 2022, all of the statewide Democratic candidates were Black, which Dr. Bonneau admits voters may well have known. Trial Tr. 1833:13-16.

626.   Dr. Bonneau next analyzes Alabama Supreme Court elections from 2000 to 2022 and concludes that the results indicate only a partisan disadvantage for all Democrats and not a racial disadvantage for Black candidates. DX1 ¶¶ 6-9. But this analysis also hinges on the election results of just two Black candidates who were first appointed to their seats, Trial Tr. 1738:3-8, and it fails to account for the incumbency advantage they had in their elections that Dr. Bonneau testified should

typically provide a "formidable advantage." Trial Tr. 1740:7-1741:1. Dr. Bonneau also conceded that this analysis "tells us nothing about the racial bias of White voters in these elections," Trial Tr. 1742:10-14 ("There's nothing in this analysis about bias of voters at all."), that this analysis does not allow us to "eliminate race as the reason" behind the defeat of Black candidates, Trial Tr. 1753:5-10, but that this analysis *does* eliminate political party as the reason for Black candidates' defeat, Trial Tr. 1753:14-20.

627.  Dr. Bonneau next examines the differences in spending between Republican and Democratic candidates to the Alabama Supreme Court. DX1 ¶¶ 9-13. Notably, despite the fact that Dr. Bonneau purports to draw conclusions that party is a better explanation for Alabama election results than race, and despite the fact that he apparently believed that candidate spending of Alabama Supreme Court candidates was a relevant piece of information to address that question, Dr. Bonneau chose to examine only the partisan differences in spending and not the racial differences in spending. Trial Tr. 1755:16-1756:5. As a result, by Dr. Bonneau's own admission, his limited analysis of candidate spending in Alabama Supreme Court elections does not "draw[] any conclusions about the extent to which party is a better explanation for voting behavior than race." Trial Tr. 1756:6-23.

628.  Dr. Bonneau next chooses to examine 2022 Alabama state legislative elections in which the Democratic candidates lost. DX1 ¶¶ 14-16. Dr. Bonneau

admits that his analysis of state legislative elections has little relevance to this congressional case. Trial Tr. 1763:6-10. Dr. Bonneau further agrees that state legislative elections vary significantly in several ways but that he failed to address any of those limitations in his comparative analysis across state legislative districts. Trial Tr. 1763:11-1764:8. While Dr. Bonneau claims his analysis of state legislative elections "indicates that race is not the driving force behind vote choice," Trial Tr. 1766:3-8, he admitted that his conclusion might change depending upon the racial demographics of each district and each primary, none of which he chose to examine, Trial Tr. 1767:9-19, 1768:18-1769:6. Dr. Bonneau also conceded that because his analysis of state legislative elections only looks at Democratic candidates, it "provides us no indication of the extent to which party is a driving force behind voter choice." Trial Tr. 1769:10-22.

629.    Additionally, Dr. Bonneau conceded that Dr. Liu's criticisms of his methodology in performing his state legislative analysis were valid. Trial Tr. 1816:8-13. Dr. Bonneau's empirical analysis rests entirely on county-level data, a problem in and of itself because there are only 67 counties in Alabama, which is not large enough to allow for any valid statistical inference. Trial Tr. 605:11-25; MX17 at 4. And Dr. Bonneau admits his state legislative bivariate correlation analysis concerns a limited subset of races, 2022 contested state legislative elections in which the Democrat lost, and that it thus "has a small unit size problem because the number of

243

counties in a given area is sometimes too small to allow statistical inference." Trial

Tr. 1817:18-24. Another problem of Dr. Bonneau's use of county-level data is that

his analysis fell prey to such "double counting" or "double dipping." MX17 at 4. For

example, Dr. Liu pointed out that Dr. Bonneau counted Madison County twice when

analyzing state senate districts, of which Madison County is split into two. Trial Tr.

606:1-17. Dr. Bonneau admits that for these reasons, his analysis "may not be the

best way to look at it." Trial Tr.1816:14-1817:17.

630.   Dr. Bonneau proceeds to analyze two individual primary elections in

two individual house districts along with a single uncontested circuit bench election.

DX1 ¶¶ 17-19. Dr. Bonneau fails to undertake any systematic analysis of how Black

candidates fare in primary elections in Alabama, Trial Tr. 1781:22-24, and even he

agrees that these individual examples tell us very little in and of themselves, Trial

Tr. 1781:14-17, and in any event, because these individual analyses control for party,

none of them "demonstrates the extent to which party is or is not the driving factor

in these election results," Trial Tr. 1775:3-10.

631.   Dr. Bonneau spends just four paragraphs of his expert report analyzing

congressional elections in Alabama, DX1 ¶¶ 20-23, two of which merely reiterate

the undisputed fact that Black voters in Alabama are politically cohesive for

Democratic candidates, *id.* ¶¶ 22-23. Yet even for this analysis, Dr. Bonneau relied

on the wrong data, analyzing the racial makeup of districts under Alabama's 2023

plan against the results of the 2022 elections, which were run on districts enacted in 2021. Trial Tr. 1809:1-1810:20 (Bonneau).

632.    In the remaining two paragraphs, Dr. Bonneau analyzes the Republican primary from CD2 in 2024, in which he agreed on cross-examination that (a) White Republicans received a higher vote share than Black Republicans, (b) the Black Republicans finished at the bottom three in that primary, and (c) one reason for those results could be that White primary voters were penalizing Black candidates on account of race. Trial Tr. 1784:13-1785:22.

633.    In other words, Dr. Bonneau's analyses and conclusions fail on their own terms. In addition, Dr. Palmer assessed several of the opinions and analyses offered by Dr. Bonneau and concluded that he presented no evidence that race does not play a role in voting in Alabama. Trial Tr. 516:24-517:13 (Palmer).

634.    Like Dr. Liu, Dr. Palmer disagreed with Dr. Bonneau's conclusion that Black candidates either outperform or perform as well as White candidates of the same political party in judicial, state legislative and congressional elections in Alabama. CX4 at ¶ 10. To the contrary, Dr. Palmer found no evidence in Dr. Bonneau's analysis that Black candidates outperform White candidates of the same party, and instead found that Black candidates tend to receive fewer voters than White candidates of the same party. CX4 at ¶ 10.

635.   To start, Dr. Palmer found a "major error" in Dr. Bonneau's analysis regarding Democratic candidates for the state supreme court, which Dr. Bonneau admitted to. CX4 at ¶ 13; DX2 at 2. Once Dr. Palmer performed Dr. Bonneau's analysis correctly, he found evidence that White candidates outperformed the Black candidate by over 10 percentage points. Trial Tr. 509:16-510:8 (Palmer); CX4 at ¶ 13. Dr. Palmer explained that "fixing the error in Dr. Bonneau's data demonstrates the exact opposite of Dr. Bonneau's initial conclusion: Black Democratic candidates for the Supreme Court receive significantly lower vote shares, on average, than White Democratic candidates." CX4 at ¶ 13.

636.   Dr. Palmer conducted a further RPV analysis on these six state supreme court elections and found that Black and White voters in each of the elections were sharply polarized, cohesively supporting opposing candidates. Trial Tr. 510:15-511:3 (Palmer); CX4 at ¶ 14. Moreover, for the five elections where the Black-preferred candidate is a White Democrat, on average 21.6% of White voters supported this candidate, while in the one election where the Black-preferred candidate was Black, only 9.5% did so. Trial Tr. 511:3-10 (Palmer); CX4 at ¶ 14. Put differently, White voters supported White Democratic candidates at twice the rate that they supported the one Black Democratic candidate, meaning that the lower vote share the Black candidate received can be attributed to less support from White voters. CX4 at ¶ 14.

637. Turning to Dr. Bonneau's state legislative analysis, Dr. Palmer explained that the results of this analysis are not statistically significant, so it could be that any differences Dr. Bonneau has identified are due to random chance alone and not a statistically meaningful difference in how black and White Democrats performed. Tr. 511:21-512:10 (Palmer); CX4 at ¶ 15.

638. Dr. Palmer also testified that Dr. Bonneau's legislative analysis suffers from a more fundamental flaw. Because the Black and White candidates in this analysis are running in different districts, it is not an apples-to-apples comparison. Trial Tr. 512:11-22 (Palmer). The elections compared are in different parts of the state, involve different candidates and incumbency status, running different campaigns with different electorates and turnout. Trial Tr. 512:11-22; CX4 at ¶ 16. Dr. Bonneau concedes this fact. Trial Tr. 1763:11-1764:8.

639. In response, Dr. Palmer looked at statewide elections in 2018 involving both Black and White Democrats running for office at the same time, which he explained "offer a much better comparison than legislative elections in different parts of the state." CX4 at ¶ 17; Trial Tr. 512:23-513:14 (Palmer). At the top of the ballot, the White Democratic candidate for Governor, Walt Maddox, received 40.4% of the vote, 1.7 percentage points more than Will Boyd, the Black Democratic candidate for Lieutenant Governor. Trial Tr. 513:15-24 (Palmer); CX4 at ¶ 18. Dr. Palmer's ecological inference analysis showed that the difference is due to lower

support for Boyd from White voters. Trial Tr. 513:25-514:11 (Palmer); CX4 at ¶ 18. While Dr. Palmer estimated that 23.9% of White voters supported Maddox, he estimated that only 18.6% of White voters supported Boyd, a statistically significant difference of 5.3 percentage points. Trial Tr. 513:25-514:11 (Palmer); CX4 at ¶ 18. Dr. Palmer found no instance in this analysis where White voters supported Black Democrats at statistically significant higher levels than White Democrats. Trial Tr. 514:12-20 (Palmer).

640.   Dr. Bonneau also discussed two State House elections. At the outset, the population of State House districts is very small (only 48,000 people) while a congressional district has about 760,000 people. State House primary elections also tend to have extremely low turnout. Both factors make it nearly impossible to extrapolate any significant meaning from these two primary races. MX17 at 7-8.

641.   Nonetheless, Dr. Bonneau opined that race was not a factor in a Black candidate losing the District 74 primary election to a White opponent because the district is 55% Black. But Dr. Liu's EI analysis of this election demonstrated that Black voter turnout was as low as 5 percent compared to White voter turnout at 7.1 percent. Thus, that Democratic primary was not an election one can rely on to make valid inferences about RPV in specific congressional districts in the state nor to argue that Black voters do not consider the race of the candidate given their limited participation in this election. MX17 at 7-8; *see also* Trial Tr. 611:18-612:2 (Liu).

642.    Dr. Bonneau reaches a similarly unsupported conclusion about House District 73, which elected a Black Republican, Rep. Kenneth Paschal. Based on that fact alone, Dr. Bonneau concludes that Rep. Paschal's election shows that "voters do make selections based on the candidate's positions as well as their political party affiliation." DX1 ¶ 18. But Dr. Liu found that total turnout in Rep. Paschal's special election in 2021 was only 5.3 percent. White turnout was even lower at 1.7 percent. Dr. Liu explained that this extremely low turnout election says nothing at all about White Alabamians' openness to supporting Black candidates. MX14 at 3.

643.    Dr. Palmer also criticizes Dr. Bonneau because he offers nothing by way of the role of candidates' positions on how voters make decisions. Trial Tr. 515:23-516:5. In short, these two elections offer no evidence to support the conclusion that race does not play a role in Alabama's elections.

644.    Dr. Palmer also criticizes Dr. Bonneau's conclusion that political party is driving the results of congressional elections, not race, because there is a correlation between Democratic vote share and the percent of the population that is Black in each congressional district. Trial Tr. 516:6-23 (Palmer). But that correlation "simply shows that Black voters supported Democratic candidates in these elections, not what factors cause Black voters to choose which candidates to support," which Dr. Bonneau provides no analysis of. CX4 at ¶ 22; Trial Tr. 516:6-23 (Palmer). Dr. Palmer also explains that a single correlation like Dr. Bonneau's with just six data

points is not the standard for reaching conclusions in empirical research in political science, nor for ruling out other explanations. CX4 at ¶ 22.

645.    The Court credits Dr. Palmer's and Dr. Liu's criticisms of Dr. Bonneau's analysis.

646.    Several fact witnesses also testified to how race plays a role in voting.

647.    Contrary to Dr. Carrington's conclusion that religion, rather than race, drives party choices in Alabama, Pastor Jackson's testimony explained the that Black churchgoers in Alabama align more closely with the Republican party on issues such as abortion and LGBTQ rights. Trial Tr. at 1106:17-1107:18. And yet, those same voters support Democratic candidates over Republican candidates because of their positions on racial issues such as voting rights and civil rights. *Id.* at 1108:7-17.

648.    Senator McClendon testified that in his experience, Black voters tend to vote for Black candidates. McClendon *Stone* Dep. 78:9-19. Mr. Bill McCollum, a Black Republican candidate from Fayette County, provided similar testimony. Stone Tr. 1381:23-25.

649.    Similarly, Defendants' witness Ms. Valerie Branyon testified that even though she was a Republican, Black voters including Democrats encouraged her to run and supported her, and that she won her 2024 race for a Fayette County Commission District that was around 50% Black. Stone Tr. 876:10-877:9.

650.   Mr. Derrick Turner, another defense witness, also testified that in his experience as a Black Alabamian, Black people tend to vote for the Black candidate. Turner Dep. 116:3-14 (*Milligan* Doc. 459-26; *Caster* Doc. 370-26).

651.   The record in this case not only supports stark levels of consistent racially polarized voting, but the evidence also overwhelmingly shows that race and racial issues still drive voting choices more than simply partisan preference. As such, Senate Factor 2 weighs strongly in favor of Plaintiffs.

### D.   Senate Factor 4: Candidate Slating Processes

652.   Fact witness testimony—largely from Defendants' own witnesses— demonstrates that the Republican Party is not equally open to Black Republicans, that Black people lack roles in its leadership, and that it is not open to candidates who support issues important to Black voters.

653.   *First*, in Alabama, Black Republican candidates have less success than White Republicans in receiving financial contributions or endorsements from elected officials in Republican primaries.

654.   For example, no incumbent elected officials endorsed Mr. Coley in his 2024 race for Montgomery County Commission. Stone Tr. 1329:24-1330:10. Mr. Coley testified that, when running for office, "it matters" whether a candidate has substantial financial support. Stone Tr. 1319:2-4. He believes the fundraising disparities and endorsements from elected officials factored into his loss to a White

Republican in the 2024 Montgomery County Commission primary. Stone Tr. 1318-2-1319:15.

655.   Although Ms. Branyon received support from the Republican Party after her deposition was taken in August 2024, she did not any receive financial or logistical support from the party in her 2020 race. Stone Tr. 874:7-20; *see* Stone Tr. 858:3-24.

656.   *Second*, Black Alabamians are significantly underrepresented in the Republican Party's leadership. For example, Mr. Coley testified that Black people hold 2 of 30—that is 6.67%—of the seats on the Montgomery County Republican Executive Committee, Stone Tr. 1332:17-24 (Coley), but Black people are 58.5% of the population in Montgomery County, Joint Stip. ¶ 89.

657.   *Third*, the Republican Party is not open to candidates who support issues important to Black voters. It is undisputed that Black voters (but not Whites) are usually very supportive of certain issues, like civil rights enforcement, opposition to symbols of the Confederacy, the public funding of health and transportation, and reform of criminal laws and police. Trial Tr. 716:6-18 (L. Jackson), 1602:9-1603:22 (Carrington), 1939:1-1941:1 (Hood), 2308:21-2309:3 (Reilly); *see also* McClendon *Stone* Dep. 79:22-25, 80:4-11 (McClendon); *Stone* Tr. 154:12-155:12, 162:10-163:3 (Simelton), 497:2-8 (Douglas), 864:6-23 (Branyon), 1338:9-1341:19 (Coley).

658.   Despite both Black voters' interest in these issues and their connection to historical discrimination, Republican politicians have been less interested in addressing these issues. *See* Stone Tr. 864:6-23 (Branyon); Stone Tr. 1338:9-1339:4 1339:19-1341:19 (Coley). For example, every White congressperson in Alabama voted against President Trump's First Step Act, a Republican-led bill to ease racial disparities in federal sentencing. Trial Tr. 716:6-18 (L. Jackson). Every White congressperson in Alabama also voted against the Bipartisan Infrastructure Law, which had broad bipartisan support and funded projects in the Black Belt. Trial Tr. 51:5-25 (Dowdy), 716:19-22 (L. Jackson), 1194:15-1195:2 (Milligan). And the Republican state legislative majority recently passed laws that made it more difficult for cities to remove monuments to the Confederacy, *see* Ala. Memorial Preservation Act, Ala. Code §§ 41-9-230–237. Several Black Republicans testified to their own disappointment in Republicans' lack of support for increased public transit funding and criminal law reform. Stone Tr. 864:4-865:12 (Branyon), 1338:9-1339:4 (Coley).

659.   The Alabama Republican Party is majority White. Stone Tr. 1337:13-15 (Coley). All Alabama congressmen are White and all Republican state legislators, except one, are White. Joint Stip. ¶¶ 154-55. The Party's local leadership is also predominantly White. Stone Tr. 1332:17-24 (Coley).

660.   No Black Republican since Reconstruction has ever been successful in a contested primary for any statewide or federal office. All Republicans who ran for

statewide office in 2022 were White. Dr. Bonneau could not name a single Black Republican who had run in a general election in the 20th or 21st centuries. Trial Tr. 1832:17-1833:4.

661.   Generally, the Republican Party is also perceived as White. For example, 97.2% of Americans think that the typical Republican is White. Trial Tr. 987:19-988:5 (Burch). Moreover, White respondents who think that the Democratic Party is mostly Black are less favorable towards Democrats overall and more favorable to Republicans and take more conservative positions on political issues. MX7 at 13; CX8 at 13; Trial Tr. 987:11-18 (Burch). The Democrats are perceived as the party that supports civil rights and "racial liberalism" while Republicans are associated with "racial conservatism," including greater resistance to government programs to redress racial inequality. MX7 at 9; CX8 at 9; Trial Tr. 985:16-986:15 (Burch); *see also id.* 1602:9-1603:22 (Carrington), 1939:1-1941:1 (Hood), 2308:21-2309:3 (Reilly).

662.   Dr. Palmer conducted an analysis of six Republican primary elections held between 2022 and 2024 that involved at least one White and one Black candidate. Of those, a Black candidate won only once, in majority-Black CD7. CX4 ¶ 9; Trial Tr. 507:8-22.

663.   Except for Mr. Paschal, no other Black Republican has won election to the State House since Reconstruction. Joint Stip. ¶ 155; Trial Tr. 1688:16-21.

664.  In the 2024 Congressional District 2 Republican primary, one Black candidate had held local elected office and a leadership role in the State Republican Party and another held a county appointed position. Trial Tr. 1292:12-1293:12 (Bagley); MX4 at 28; CX5 at 28. Yet, all four Black candidates *combined* received only 6.2% of the vote. Trial Tr. 594:11-595:2 (Liu); MX17 at 3. Every Black candidate was outperformed by a White candidate who had recently graduated college, had never held elected office or a role in the party, and worked as a real estate agent. Trial Tr. 1292:14-21 (Bagley); MX4 at 28; CX5 at 28.

### E.    Senate Factor 6: Racial Appeals

665.  In the last decade, nearly every White candidate or congressman in CD1 and CD2 and in U.S. Senate races in Alabama have employed overt or subtle racial appeals. MX1 at 26-28; CX16 at 26-28; MX4 at 30-31; CX5 at 30-31; Trial Tr. 1293:13-1296:15 (Bagley). Racial appeals tend to drive racially polarized voting. Trial Tr. 1295:21-1296:15 (Bagley).

666.  Indeed, even after the Court adopted the Special Master map, White candidates used racial appeals in the 2024 general and primary elections for the newly redrawn CD2. The use of racial appeals in this election is significant because, even in a remedial district drawn to increase electoral opportunities for Black voters, White candidates did not bother to reach across racial lines. Instead, White

candidates' campaign tactics signaled a desire to win CD2 by relying on heavy White voter turnout in a racially polarized election. Trial Tr. 1295:21-1296:15 (Bagley).

667.   For example, in the 2024 general election in CD2 between Shomari Figures (a Black Democrat) and Caroleene Dobson (a White Republican), the State Republican Party distributed a flyer with the mugshot of a Black man and text that accused Mr. Figures of supporting the release of "dangerous criminals onto Alabama streets like a revolving door." MX64 at 3; *see also* Trial Tr. 56:7-25 (Dowdy).

668.   Also in the 2024 general election, U.S. Senator Tommy Tuberville described Shomari Figures as an "Obama lookalike." CX130 at 5:38-6:10.[4]

669.   During the 2024 Republican primary election, Ms. Dobson touted her opposition to students "learning critical race theory." MX4 at 30-31; CX5 at 30-31; Trial Tr. 1294:21-25 (Bagley); *see also* CX135.[5] "Critical race theory" is a philosophical framework for critiquing the law, but it has become a "catchall phrase" to encompass the teaching of any aspect of America's history of racial discrimination that might make White people feel aggrieved or uncomfortable. Trial Tr. 1294:20-1295:20 (Bagley). Ms. Dobson's opponent in the Republican primary runoff, Dick Brewbaker, a White former state senator, ran a campaign video that featured "former Harvard president Claudine Gay, a Black woman, juxtaposed with images of [his]

---

[4] The Court has reserved on the admissibility of this exhibit over a hearsay objection. Trial Tr. 2418-2421.
[5] The Court has reserved on the admissibility of this exhibit over a hearsay objection. Trial Tr. 2418-2421.

young White relatives brandishing guns." Trial Tr. 1294:5-19 (Bagley); MX4 at 30; CX5 at 30. This video is reminiscent of another recent racial appeal that also juxtaposed images of violence and prominent Black people that "could be understood as a racial appeal." *Milligan I*, 582 F. Supp. 3d at 1024; *see also* Trial Tr. 1294:12-19 (Bagley).

670.    Ahead of the 2024 general election, Montgomery County Republican Party Elections Chair Cedric Coley publicly post a racial appeal on his Instagram page to encourage people to vote Republican. Stone Tr. 1347:22-24 (Coley). One side of the post is a White hand and the Republican elephant logo over a red backdrop with the text "Jobs" and "Vote for civility, vote for prosperity, vote for unity, vote for patriotism, vote Republican." MX174; *see also* Stone Tr. 1349:17-1350:10 (Coley). The White hand is making a gesture that the FBI categorizes as a "White supremacist" symbol. Stone Tr. 1349:23-1350:3 (Coley); *see* MX174. Next to this is the image of a black hand shaped as a fist (an image associated with the phrase "black power") and the Democratic donkey logo placed over a blue background with text reading "Not mobs" and "Walk away from violence, walk away from hypocrisy, walk away from globalist Democrats." MX174; *see also* Stone Tr. 1348:16-1349:16 (Coley).

671.    In July 2023, U.S. Senator Tommy Tuberville said on cable news that White nationalists are "not racists." Trial Tr. 1593:11-14 (Carrington). Also in 2023,

Senator Tuberville stated that he believes "inner-city" teachers are lazy and less qualified, which is a well-known racial trope about Black people. MX4 at 11 n.41; CX5 at 11 n.41.

672.   In early 2021, U.S. Representative Barry Moore used a racial appeal when posting on social media about the January 6, 2021 attack on the U.S. Capitol. MX1 at 29; CX16 at 29; P.I. Tr. 1170:4-8 (Bagley). Mr. Moore posted about the shooting of a rioter by the police and stated that "I understand it was a black police officer that shot the White female veteran. You know that doesn't fit the narrative." MX1 at 28; CX16 at 28.

673.   In the 2020 Republican primary for the U.S. Senate, Bradley Byrne, then-congressional representative for CD1, aired a campaign advertisement in which images of prominent Black political figures appeared in a wood fire. MX1 at 28; CX16 at 28. In the video, as Mr. Byrne stares into the wood fire, the face of former professional quarterback Colin Kaepernick, a Black man, appears in the fire, as Mr. Byrne calls him an "entitled athlete dishonoring" the American flag. MX1 at 28; CX16 at 28. Prominent congressional members of color, including Ilhan Omar, also appear in the fire as Mr. Byrne accuses them of "attacking America" and "cheapening 9/11." MX1 at 28; CX16 at 28; *see also* CX133.

674.   In the 2020 Republican Primary for CD1, Defendant Chris Pringle also employed racial appeals. *See* P.I. Tr. 1170:8-12 (Bagley). During this campaign,

Rep. Pringle ran an ad indicating that voters who are white like him are blamed for all of society's problems, in an appeal to White grievance. MX1 at 28; CX16 at 28; P.I. Tr. 1170:8-12 (Bagley); *see also* MX141. In the advertisement, Rep. Pringle further states that "these days, if you look like me and believe like me, every wrong in society is your fault." CX134.

675.    Alabama's 2017 U.S. Senate election featured racial appeals from both Roy Moore and Doug Jones. MX1 at 27; CX16 at 27; P.I. Tr. 1169:3-18 (Bagley); *see also* Trial Tr. 1594:19-1596:2 (Carrington). During the campaign, Mr. Moore insisted that the United States would be better off without any of the Reconstruction Amendments, including the Thirteenth Amendment, which ended slavery, and the Fifteenth Amendment, which established voting rights for Black men and other people of color. Mr. Moore described the time before the adoption of the Reconstruction Amendments as "great" because "at the time when families were united — even though we had slavery. They cared for one another. People were strong in the families. Our families were strong. Our country had a direction." MX1 at 27; CX16 at 27; P.I. Tr. 1169:3-18 (Bagley); *see also* Trial Tr. 810:3-812:14 (Frederickson), 1594:19-1596:2 (Carrington); MX130 at 3; CX150.

676.    Although different in kind, Doug Jones also highlighted racial issues to attract Black voters in the 2017 U.S. Senate election. MX132. Mr. Jones sent mailers to Black voters highlighting Mr. Moore's allege connections to groups like the Ku

Klux Klan. MX131 at 7. Another mailer argued Moore was "not on our side," and claimed that he led the fight to keep schools segregated. MX131 at 2. A different mailer from Mr. Jones explicitly appealed to Black men, reading: "Think if a black man went after high school girls, anyone would try to make him a senator?" with the face of a Black individual above the words giving a skeptical look. MX131 at 3.

677.    In 2014, Congressman Mo Brooks in CD5 repeatedly claimed that Democrats were waging a "war on whites." MX1 at 27; CX16 at 27; P.I. Tr. 1170:1-3 (Bagley). Mr. Brooks has characterized people who receive food stamps as "slackers" and "welfare queen," a well-known racial stereotype, which suggests that Black women, in particular, are cheating the welfare system. MX1 at 27; CX16 at 27; *see also* MX123 at 2-3. Mr. Brooks also invoked the phrase "bloc vote" to describe Black voters, saying: "They are trying to motivate the African American vote to vote-bloc for Democrats by using every Republican as a racist tool that they can envision." MX1 at 27; CX16 at 27.

678.    Overt and subtle racial appeals are also used outside of congressional races. For example, in the 2022 Attorney General race, incumbent Steve Marshall ran a television advertisement touting himself as "not being afraid of the woke mob,

cancel culture, or liberal radicals," overlaid over photos of Black protesters at a march and a Black protester with a rope around a statue of Andrew Jackson. CX128.[6]

679.  In 2020, State Representative Will Dismukes gave a speech in front of a Confederate flag in Selma honoring Confederate General Nathan Bedford Forrest, who became the first Grand Wizard of the Ku Klux Klan. MX125 at 1-9; MX126 at 2-4; MX127 at 1-3; CX141.[7] Mr. Dismukes also served as a chaplain for the Prattville Dragoons, a Sons of Confederate Veterans group that lobbied to maintain state funding for a Confederate memorial park. MX125 at 1-9; MX126 at 2-4; MX127 at 1-3. Mr. Dismukes also repeatedly used the phrase "Deo vindice," or "God will vindicate," a reference to the Confederacy. MX127 at 4. When asked to apologize for his statements, Mr. Dismukes responded, "it's time for people to stop being so sensitive and apologetic and take a stand before our country is Gone with the Wind," with the latter phrase being a reference to the "Lost Cause of the Confederacy" by way of the popular novel and film. MX126 at 4.

680.  In 2018, state Supreme Court Chief Justice Tom Parker ran a campaign ad in which he stated that he opposed "the leftist mob tr[ying] to destroy our society," overlaid with videos of Black protesters and of Maxine Waters, a Black Congresswoman from California with no involvement in Parker's race. MX1 at 27;

---

[6] The Court has reserved on the admissibility of this exhibit over a hearsay objection. Trial Tr. 2418-2421.
[7] The Court has reserved on the admissibility of this exhibit over a hearsay objection. Trial Tr. 2424.

CX16 at 27; P.I. Tr. 1169:18-25 (Bagley); *see also* CX149. He also ran an ad warning of an "invasion" of immigrants from Mexico. CX148.

681.    In the 2018 gubernatorial race, Kay Ivey ran a campaign advertisement that touted her signing of a law that prohibited taking down Confederate monuments—an issue that deeply divides White and Black Alabamians. She explained in the ad that "we can't change or erase our history, but here in Alabama, we know [that] to get where we're going means understanding where we've been." CX132. During a 2015 Trump rally in Birmingham, a Black protester was punched, kicked, and called "monkey," the n-word, and other racial slurs. CX140.

682.    Defendants offer almost nothing in response. At most, Dr. Carrington claims his analysis touches on Senate Factor 6—racial appeals—but he acknowledges that he did not conduct a "rigorous analysis of contemporary statements by Alabama politicians," and indeed did not review "any other contemporary statements made by other Alabama politicians" other than those identified in Dr. Bagley's reports. Trial Tr. 1588:1-15.

683.    Due to the extensive and consistent use of overt or subtle racial appeals by White congressional candidates in Alabama, Senate Factor 6 favors Plaintiffs.

### F.    Senate Factor 7: Lack of Black Electoral Success

684.    Black Alabamians have been almost entirely unable to succeed in being elected to office unless a majority of the relevant electorate is Black. MX1 at 28-29; CX16 at 28-29; Joint Stip. ¶¶ 154-55; *see also* MX8 at 2.

685.    Although White people are about 64% of the Alabama population and Black Alabamians are about 27% of the population, MX8 at 2, only one of seven (approximately 14%) of Alabama's congressional representatives were Black before the court-ordered plan. MX1 at 28-29; CX16 at 28-29. From 1992 to 2024, White Alabamians were overrepresented in Congress holding over 86% seats. MX1 at 13; CX16 at 13.

686.    It was not until 1992, after the court-ordered creation of a majority-Black CD7, that Earl Hillard became Alabama's first Black congressman since 1877. MX4 at 15; CX5 at 15. From 1992 to 2024, only one Black Alabamian from CD7 served in Congress at any given time. MX1 at 13; CX16 at 13.

687.    Despite running as Democrats and Republicans, no Black Alabamian has ever been elected to Congress from a majority-White district. MX1 at 13; CX16 at 13; *see also* Trial Tr. 1834:13-16 (Bonneau).

688.    Despite running as Democrats and Republicans for President, U.S. Senator, Governor, Attorney General, Secretary of State and other offices, no Black Alabamian has won statewide office since 1994. MX1 at 29; CX16 at 29; MX16 at

9; MX14 at 4. Although Governor Kay Ivey appointed a Black person to the Court of Civil Appeals in early 2024, he has not won an election to this office. Joint Stip. ¶ 153.

689.    No Republican candidate for statewide office in either the Twentieth or Twenty-First century has been Black. Trial Tr. 1832:22-1833:1 (Bonneau).

690.    Only two Black Alabamians have been elected to statewide office. They both ran as incumbents after first being appointed to the Alabama Supreme Court. MX1 at 29; CX16 at 29; *see* Trial Tr. 1834:1-4 (Bonneau). After being appointed, Justice Oscar Adams, Jr. won two consecutive terms in 1982 and 1988, and Justice Ralph Cook won an election in 1994. MX1 at 29; CX16 at 29. In 2000, both Justice Cook and then-recently appointed Justice John England, a Black man, lost to White candidates. MX1 at 29; CX16 at 29. Until 1982, no Black Alabamian had ever won a statewide race. MX1 at 29; CX16 at 29. Since 1994, no Black Alabamian, regardless of party, has won a statewide race. MX1 at 29; CX16 at 29.

691.    Kenneth Paschal is a Black Republican who represents Shelby County in Alabama House of Representatives District 73. Joint Stip. ¶ 155; P.I. Tr. 1394:13-15 (Hood). There are no Black Republicans in the state Senate, nor are there any Black Republicans who have been elected to statewide office. Joint Stip. ¶¶ 154-55.

692.   Mr. Paschal is the only Black Republican elected to the Alabama State legislature since Reconstruction and there has never been a Black Republican elected to the State Senate since Reconstruction. Trial Tr. 1820:14-1821:3 (Bonneau).

693.   Every single Black State Senator in the current Alabama Senate and all but one Black State Representative in the current Alabama House were elected from majority-Black districts. Joint Stip. ¶ 155.

694.   The Court finds that Senate Factor 7 strongly favors Plaintiffs.

## G.   Senate Factor 8: Unresponsiveness of Elected Officials to Black voters

### i.   Unresponsiveness of Congressional representatives

695.   Black Alabamians in the Black Belt and Mobile testified at length to their experiences with the unresponsiveness of the current and former congressional representatives in CD1 and CD2 and the failure of these White congressmen, regardless of political party, to support issues that are important to Black voters.

696.   Black voters in the eastern Black Belt testified to former CD2 Representative Barry Moore avoiding Black constituents. Rep. Moore did not campaign in Black community centers of Montgomery County, Trial Tr.1207:23-1208:7 (Milligan), and Bullock County, Trial Tr. 452:1-15 (Smith).

697.   Ms. Letetia Jackson (who is very active in Dothan and the Black Belt) "never" saw Congressman Moore at Black community events in Dothan. Trial Tr. 723:4-6. Instead, Rep. Moore engaged with White constituents at "country club[s]"

and the "chamber of commerce"—places inaccessible to many Black residents in former CD2. Trial Tr. 722:13-723:3 (L. Jackson). Ms. Jackson also wrote to Rep. Moore, but he returned "form letters" back. Trial Tr. 713:22-25. Despite outreach, Mr. Milligan also could not get Rep. Moore to engage with community groups or grassroots organizations in the eastern Black Belt. Trial Tr. 1207:23-1208:10.

698.    Black voters in the southwest Black Belt and Mobile shared their similar experiences with their CD1 representatives avoiding and ignoring Black constituents as well. Mr. Clopton, a Republican and the president of the local NAACP, never saw former Rep. Jerry Carl or former Rep. Bradley Byrne attend any events in Mobile's Black community. Trial Tr. 261:21-262:3. Ms. Malone felt Rep. Carl discriminated against her when he wrote letters of recommendation for federal grants on behalf of White constituents but refused to write her a similar letter. Trial Tr. 1141:8-1142:13. Ms. Dowdy never saw Rep. Carl in Mobile's Black community. Trial Tr. 50:22-51:4. Instead, Rep. Carl only campaigned in White communities. Trial Tr. 52:25-53:7 (Dowdy). Even when Ms. Dowdy tried four separate times to visit Rep. Carl's Washington D.C. office with Delta Sigma Theta, a historically-Black sorority, and the NAACP, he declined to meet with her or her groups. Trial Tr. 52:1-24.

699.    Dr. Caster echoed this testimony, explaining the ways in which his previous representatives—White Republicans Jerry Carl and Bradley Byrne—failed

to respond to the particularized needs of Black voters in Washington County and the Black Belt more generally. Trial Tr. 391:3-392:3. Like other witnesses, Dr. Caster—himself a former candidate for elected office in the Black Belt counties of Washington, Choctaw, and Clarke—identified housing, better jobs, clean air and water, access to transportation, access to healthcare facilities, better school facilities, and access to broadband internet as particularized needs of his community of rural Black voters. *Id.* at 383:25-390:17.

700.    Representatives Carl and Byrne, Dr. Caster explained, consistently voted against legislation that was targeted at addressing these needs, such as the American Rescue Plan, which provided assistance to individuals who lost their job due to the COVID-19 pandemic, the Build Back Better Act, which contained provisions aimed at reducing pollution in disadvantaged communities, and the 2021 Bipartisan Infrastructure Law, which contained provisions to improve rural access to high speed internet and public transportation. *See* PI Tr. 1629:7-1630:22; 1631:15-1633:1; 1633:20-1635:4. These votes, Dr. Caster testified, were a "disservice to the black community." *Id.* at 1630:22.

701.    Moreover, Dr. Caster testified that neither Congressman Carl nor Congressman Byrne even campaigned in the predominantly Black communities where Dr. Caster lives and works. Trial Tr. 392:4-25.

702.    Under the Court's remedial map put in place in 2023, however, Dr. Caster resides in District 2, which in 2024 elected Black Democrat Shomari Figures to the U.S. House of Representatives. *Id.* at 393:20-24. Congressman Figures, unlike Congressmen Carl and Byrne, "showed up" for Black communities in the district. *Id.* at 394:5. He attended, for example, town hall meetings and a local celebration for the state champion Jackson High School basketball team. *Id.* at 394:4-13. Seeing Congressman Figures actively campaign in his community, Dr. Caster testified, "looked like hope. It looked like promise. It looked like that we had someone that could actually represent us. It looked like that we had someone that we can vote, for the first time, a candidate of our choice." *Id.* at 394:17-20.

703.    In just the short time since Congressman Figures has been in office, Dr. Caster has already seen improvements in responsiveness to the needs of the Black community: Congressman Figures "has focused on trying to get funding to reopen . . . healthcare facilities" in the Black Belt, and spoke out forcefully against efforts to eliminate the history of the Tuskegee Airmen from Air Force training materials. *Id.* at 395:2-19, 396:2-5.

704.    Mr. Smith similarly testified that the White Republicans that previously represented him in Congress—Barry Moore and Martha Roby—"didn't campaign in [his] community," "didn't come to no town hall meeting," and "didn't come to attend to solicit [his] vote." Trial Tr. 452:2-4. These representatives did not knock

on doors to meet voters in Bullock County, where Mr. Smith lives, or visit any churches to meet with voters. *Id.* at 452:8-13. And Congressman Moore, like Congressman Carl, voted against the Bipartisan Infrastructure Law and the Build Back Better Act. *Id.* at 453:18-454:24.

705.   Congressman Figures, on the other hand, attended town hall meetings in Bullock County, knocked on doors, and attended a high school parade and football game. Congressman Figures "spent a huge amount of time asking for your vote and listening to your needs and explaining his platform." Trial Tr. 452:21-453:5 (Smith).

706.   Finally, Pastor Jackson testified that she has "not had a Republican candidate even come into [her] community to even put signs, to even advertise with our African-American media, to even invest in our community prior to being elected, and then after being elected." Trial Tr. 1108:23-1109:2. And she recalled one instance, when she was a teenager, of a White Republican elected official saying directly: "your community doesn't vote for me, why should I do anything for your community?" *Id.* at 1109:3-12.

707.   Black voters across the Black Belt and Mobile also spoke to how White representatives opposed even bipartisan legislation that would benefit southern Alabama's Black communities. Rep. Carl and Rep. Moore both opposed the 2021 Bipartisan Infrastructure law, which increased funding for transportation, internet access, and education in the Black Belt. Trial Tr. 1193:17-1195:2 (Milligan),

715:13-716:22 (L. Jackson), 453:18-454:24 (Smith), 51:5-25 (Dowdy); *see also* S. Jones Dep. 133:6-134:2; 135:18-136:10. Both Rep. Carl and Moore opposed the Bipartisan First Step Act, which President Trump signed in 2018 and touched on Black voters' concerns with inequality in the criminal legal system. Trial Tr. 715:13-716:16 (L. Jackson). Black Republicans have also been disappointed by Republicans' lack of support for criminal legal reform and increased transit funding. Stone Tr. 864:4-865:12 (Branyon); 1338:9-1339:4 (Coley). Rep. Carl and Moore also opposed the John Lewis Voting Rights Act, which would strengthen voting rights protections for everyone, including Black Alabamians. *See* S. Jones Dep. 134:6-17.

708.   White congressional Democrats have also failed to support issues important to Black voters in the Black Belt. Neither Parker Griffith nor Bobby Bright—two White Democrats elected to Congress in 2008—supported the Lily Ledbetter Act, a civil rights law that addressed pay inequality for women. Trial Tr. 716:23-720:8 (L. Jackson). Black Alabamians who "worked really hard to get" these two representatives "elected" were left largely disappointed by their votes. Trial Tr. 720:9-11 (L. Jackson). White Congressmembers' failure to support issues critical to Black people breeds Black voter "apathy." Trial Tr. 720:23-721:4 (L. Jackson).

709. By contrast, both Ms. Jackson and Mr. Milligan viewed the representatives elected by a Black majority in CD7 as more responsive even to Black

voters outside that district. For example, Ms. Jackson preferred contacting Rep. Sewell rather than Rep. Moore because she supports issues important to Black voters. Rep. Sewell sponsored the John Lewis Voting Rights Advancement Act, and supports establishing areas in the Black Belt, like Selma, as historical cultural sites that would bring federal resources and economic development into Black communities. Trial Tr. 714:10-715:5 (L. Jackson), Trial Tr. 1192:17-1194:24 (Milligan). Rep. Sewell was the only member of Alabama's congressional delegation who supported the Bipartisan Infrastructure Bill, Tr. 51:5-25 (Dowdy), Tr. 1193:17-1195:2 (Milligan), the Bipartisan First Step Act, Tr. 715:13-716:3 (L. Jackson), and a bill allowing Centers for Medicare and Medicaid Services to bypass state governments and work directly with local governments in the Black Belt and Mobile, MX1 at 31, CX16 at 31.

710.    CD7's representative before Rep. Sewell was Artur Davis, whose office reached out directly to Black farmers in the Black Belt to ensure they received resources they needed. Trial Tr. 1192:17-1194:24 (Milligan). Rep. Davis supported the Lilly Ledbetter Act, unlike Alabama's White congressional representatives. Tr. 718:10-720:8 (L. Jackson).

711.    Black voters repeatedly emphasized how much more responsive Rep. Figures in the new CD2 is than their former White representatives, including his decision to campaign at predominantly Black events and churches during the 2024

election. Trial Tr. 55:7-17 (Dowdy), 394:3-13 (Caster), 452:19-25 (Smith), 1142:14-1143:4 (Malone), 1192:22-1193:12 (Milligan).

### ii.    Unresponsiveness of the State Legislature

712.    Witnesses from both political parties provided testimony about some of the particularized needs of Black Alabamians and how the Legislature and other elected officials have not only failed to meet them, but actively and consistently opposed efforts to ameliorate them.

713.    Alabama Legislature's unresponsiveness to the transportation needs of Black Alabamians has made it harder for them to vote or meet other basic needs. Trial Tr. 1082:19-1083:24, 1093:6-12 (V. Jackson); 1184:3-1186:9, 1188:25-1190:16 (Milligan); Stone Tr. 501:10-24 (Douglas); 864:6-15 (Branyon). The State severely limits funding for public transportation because of a 1950s constitutional amendment that forbids the use of gas and road taxes to pay for public transit, which came in direct response to the bus desegregation movement. Stone Tr. 501:10-24 (Douglas); *see also* Trial Tr. 1184:3-1186:9 (Milligan).

714.    For example, in Montgomery, people mainly rely on their personal vehicles for transportation. Before the Montgomery Bus Boycott in the 1950s, the bus system used to be more extensive in Montgomery. Today, the ridership of the bus system in Montgomery is approximately 92 to 95% black. In the Black Belt, there is not public transportation available. Trial Tr. 1184:5-1185:7 (Milligan).

715.    Fayette County also fails to provide public transportation services. Stone Tr. 864:6-7 (Branyon). This lack of transportation means that many people cannot get to the grocery store or medical appointments and are charged tremendous amounts of money to access transportation. Stone Tr. 864:8-15 (Branyon). While Black people are only 11% of Fayette County's population[8], Black people are about 50% of those who lack transportation. Stone Tr. 884:9-885:3 (Branyon).

716.    With respect to healthcare, the refusal to expand Medicaid also has disproportionately harmed Black communities and led to the closure of hospitals serving communities in the Black Belt. Trial Tr. 709:9-710:5 (L. Jackson); 1099:21-1101:10 (V. Jackson); 1236:22-1237:1 (Milligan); *see also* Stone Tr. 650:3-651:8 (Williams). Some 300,000 families, who are disproportionately African Americans, have been denied the benefit of Medicaid expansion, which would increase the health care outcomes of those impacted families. Stone Tr. 497:3-8 (Douglas).

717.    Even Dr. Landers, the Secretary's witness, testified to witnessing the positive effects of Medicaid expansion in 1990s and how it began to address disparities for the underserved population in Alabama. Stone Tr. 1297:6-21. Alabama has an opportunity to expand Medicaid further under the ACA; it has not done so. Stone Tr. 1297:22-1298:5 (Landers).

---

[8]    U.S. Census Bureau, *Quick Facts, Fayette County Alabama,* https://www.census.gov/quickfacts/fact/table/fayettecountyalabama/PST045224 (accessed March 17, 2025).

718.   Alabama's Legislature also acted in a disrespectful manner to its Black citizens when it "passed a law eliminating [diversity, equity, and inclusion programs] in the universities and any government-funding agencies." *See* S. Jones Dep. 90:1-22.

719.   The Alabama Legislature defeated legislation that would provide better access for Black people who disproportionately live in poverty to obtain a higher minimum wage. Stone Tr. 649:17-21 (Williams). For example, after GBM and others convinced the Birmingham city council to pass an ordinance raising the minimum wage from $7 and a quarter to $10.10 an hour, Alabama's Legislature passed a law that nullified the Birmingham ordinance and preempted any other city in the state from ever raising the minimum wage. Stone Tr. 494:13-23 (Douglas); 649:22-650:2 (Williams).

720.   Voting legislation has been particularly unresponsive to Black Alabamians' needs. Just last year, the Alabama Legislature passed Senate Bill 1 ("S.B. 1"), which criminalized people who receive any gifts or compensation to help voters with the absentee ballot process. MX4 at 29; CX5 at 29. As a result of historic discrimination, Black Alabamians from across the state, including the Black Belt and Mobile, are more likely to have low literacy skills resulting in a need for assistance to complete absentee voting documents. Trial Tr. 47:3-24 (Dowdy), 479:10-23 (Smith), 724:12-725:1 (L. Jackson), 938:3-11, 942:1-20, 963:16-964:11,

1048:25-1049:23, 1055:17-1056:7 (Burch), 1097:3-1098:14, 1128:6-1129:9 (V. Jackson), 1284:17-1286:21, 1458:20-1459:12 (Bagley); *see also* MX4 at 29; CX5 at 29; MX6 at 36; CX7 at 36; Trial Tr. 2252:20-2253:4 (Reilly). S.B.1 also disproportionately impacts older Black voters. Trial Tr. 262:17-264:9 (Clopton), 724:14-725:1 (L. Jackson); *see also* Stone Tr. 177:19-23 (Simelton), 647:14-648:12; 649:3-13 (Williams). The law prevented organizations from providing the information and assistance to Black voters that they historically afforded. Trial Tr. 44:25-45:25 (Dowdy). Ms. Jackson testified, through tears, that if S.B.1 had been the law in 2020, she could not have helped her bedbound mother who "couldn't walk, and had very little use of her hands" to vote. Trial Tr. 723:7-724:11.

721.    Finally, with respect to redistricting itself, this Court previously found that "the circumstances surrounding the enactment of the 2023 Plan reflect '"a significant lack of responsiveness on the part of elected officials to the particularized needs' of Black voters in Alabama." *Milligan II*, 690 F. Supp. 3d at 1315. The evidence at trial and in the record confirms that finding in several ways, all of which occurred after the Supreme Court affirmed this Court's preliminary injunction against the 2021 Plan, including its order "that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* at 1237. The State Legislature's steadfast refusal to enact a congressional map with a second majority-Black district, in the face of this

Court's explicit order to do so, as affirmed by the Supreme Court, bespeaks a clear lack of responsiveness to the needs of Black Alabamians. Once again, "[w]e infer from the Legislature's decision not to create an additional opportunity district that the Legislature was unwilling to respond to the well-documented needs of Black Alabamians in that way." *Id*. at 1317. As Dr. Caster testified, the Legislature's actions were a "slap in the face" to Black Alabamians. Trial Tr. 401:7.

### H.     The Legislature's Justifications for Not Drawing a Second Black Opportunity District and Ignoring the Court Order are Tenuous

722.    Based on our own analysis and the extensive testimony from Dr. Bagley and others concerning the Legislature's reasons (or lack thereof) for declining to include a second opportunity district in the 2023 Plan, the Court finds that the State's justifications for the 2023 Plan are tenuous at best.

723.    *First*, the lack of transparency and failure to seriously consider the input of Black community members and legislators in developing a remedial plan in 2023 evinces a lack of responsiveness.

724.    The 2023 Plan was neither proposed nor available for comment during the two public hearings the Redistricting Committee held. Joint Stip. ¶ 124. Neither were Representative Pringle's Community of Interest Plan and Senator Livingston's Opportunity Plan, which passed the Alabama House and Senate respectively, ever proposed or made available for comment during the Committee's public hearings. *Id.* ¶¶ 124-130; *see also* MX200 at 6 (Rep. Jones Declaration).

725.   Senator Livingston testified that none of the testimony from the public hearings in 2023 was provided or changed any input given to Randy Hinaman, who was drafting the Community of Interest Plan, or anyone else working on a map. Livingston Dep. 36:1-5.

726.   Representative Pringle expected his Community of Interest Plan to pass both the Alabama House and Senate, Pringle Dep. 98:11-24, but much to his frustration and confusion, "[t]he Senate made it clear they were not going to pass [Pringle's] plan," due to "some information" that Representative Pringle "was not privy to." Pringle Dep. 100:16-104:10.

727.   Even though Senator Livingston was the one who communicated to Representative Pringle that the Community of Interest Plan would not have support in the Senate and that the Senate was proceeding with the Opportunity Plan, Senator Livingston testified vaguely that the decision was based on "some additional information" some Senate committee members received that "thought they should go in the direction of compactness, communities of interest, and making sure that congressman are not paired against each other." Livingston Dep. 67:14-68:21; MX4 at 29; CX5 at 29.

728.   Later discovery revealed, however, that since the previous month, Sen. Livingston had been in communication with an outside consultant, Chris Brown of Red Strategies, who he exchanged text messages with about characteristics of a plan

including its Black Voting Age Population and its effect on Rep. Barry Moore. *See generally* MX63.

729.   Ultimately, "members of the committee from the senate [] met in a different room on a different floor" from where Representative Pringle was, completely excluding the redistricting committee co-chair from the legislative process. Pringle Dep. 104:3-10.

730.   Rep. Sam Jones, a Black Democrat, Reapportionment Committee member, and former Mayor of Mobile, aptly described the 2023 Remedial process as a "lack of transparency." MX200 at 6. The 2023 Plan's original source and cartographer were unknown to its own sponsor, Senator Livingston, when he voted on the Plan, MX180 at 3, CX118 at 3, and Representative Pringle thought his own plan "was far superior" to the 2023 Plan in terms of compliance with the Voting Rights Act. Pringle Dep. 98:11-24, 102:6-12.

731.   A Committee passed S.B.5 on the last day of the 2023 Special Session. Joint Stip. ¶ 131; MX200 at 6 (Jones Decl.). Representative Pringle did not see the bill that became the 2023 Plan, or its legislative findings and the State's performance analysis showing Black voters would consistently lose in the new Congressional District 2, until that morning. Pringle Dep. 92:16-23, 97:6-19. Later that same evening, the 2023 Plan became law. Pringle Dep. 105:1-25 ("It all happened so fast").

732.    The dramatic lack of transparency between the committee's Co-Chairs—let alone the lack of transparency to Black legislators or the public—thwarts any finding of responsiveness for Defendants. Trial Tr. 1296:19-1297:11 (Bagley).

733.    *Second*, the Legislature passed unprecedented legislative findings to accompany the 2023 Plan, drafted by Alabama's Solicitor General and inserted into S.B. 5 at the last minute without either of the Reapportionment Committee Co-Chairs knowing why or ever having seen such "legislative findings" included with a redistricting plan. Livingston Dep. 101:13-102:13; Pringle Dep. 90:18-91:23; MX180 at 6; CX118 at 6.

734.    Besides the unusual origin and unprecedented nature of the legislative findings in S.B. 5, their substance is even more probative on the issue of responsiveness. The findings excluded the statement from the 2021 and 2023 guidelines that "[a] redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength." *Compare* MX24 *with* MX31; *compare* CX42 *with* CX19. While the findings eliminate the requirement of non-dilution, they prioritized "non-negotiable" principles that the 2023 Plan keep three delineated "communities of interest" together and forbade "pairing incumbent[s]," MX31 at 3; CX19 at 3.

735.    Plaintiffs' expert Dr. Duchin offered unrebutted testimony that in her mapdrawing and consulting work across many states and jurisdictions, she had never

seen an absolute requirement that incumbents never be paired together and would not consider it "traditional." Trial Tr. 299:13-19. Such a strict requirement would make it very difficult to draw an additional opportunity district for Black voters.

736.   Dr. Duchin also offered two important observations about S.B. 5's "non-negotiable" principle of keeping the Mobile and Baldwin Counties together, the Wiregrass Counties together, and the Black Belt together. For one, keeping both the Black Belt and Wiregrass together was "not . . . mathematically possible" because "those two communities of interest overlap and, taken together, they have more population than a congressional district can have." Trial Tr. 297:24-298:8.

737.   In stark contrast, because Mobile and Baldwin Counties together make up over 90% of a congressional district in terms of population, "the effect of keeping those counties together is to come close to prescribing a congressional district in the guidelines." Trial Tr. 298:9-15 (Duchin). Importantly for this factor, "the effect is to require a majority-White district that contains all of the City of Mobile, a city that itself contains 100,000 black Alabamians." Trial Tr. 298:25-299:2 (Duchin). When asked by the Court if it is "possible to draw a map that satisfies the findings expressed in S.B. 5 with two opportunity districts," counsel for the Secretary responded that he was "not aware of a way to draw two majority-black districts without going against the legislature's priority of keeping Mobile and Baldwin Counties whole." Trial Tr. 2647:25-2648:6.

738.    SB 5's legislative findings also refer to the prioritized Mobile/Baldwin cluster in terms that explicitly suggest prioritization of a White community and White cultural values, naming the region's "distinct culture stemming from French and Spanish colonial heritage." MX31 at 7; CX19 at 7.

739.    The plain reference to European heritage sent a clear message to Alabama's Black voters. As Major Dowdy put it: "It made me feel as if they, the state, was basically trying to ignore us, erase the heritage that we have and not include us in the process of the map drawing at all." Trial Tr. 63:7-11. Both Major Dowdy and Mr. Milligan questioned the "focus[] on European heritage when black people make up a great percentage of the local community" in the City of Mobile. Trial Tr. 62:12-63:6 (Dowdy); *see also* Trial Tr. 1206:4-21 (Milligan).

740.    The findings exclude Black people as "contributors to the development of Mardi Gras culture," despite "the traditions of the enslaved African people" being a "critical ingredient[]" of Mardi Gras and the southern Alabama coast. Trial Tr. 1206:8-21 (Milligan). Today in Mobile, Mardi Gras remains "very, very segregated" between people of African and European heritage. Trial Tr. 253:9-16 (Clopton).

741.    *Third*, the State in the 2023 August hearing claimed the Legislature could remedy Black Alabamians' vote dilution without providing an additional opportunity district. Aug. 2023 Tr. 164:4-18 (LaCour). As this Court previously found, that decision "clearly . . . illustrates the lack of political will to respond to the

needs of Black voters in Alabama in the way that [the Court] ordered." *Milligan II*, 690 F. Supp. 3d at 1316–17. The Court correctly "infer[red] from the Legislature's decision not to create an additional opportunity district that the Legislature was unwilling to respond to the well-documented needs of Black Alabamians in that way." *Id.* at 1317. Alabama did not retreat from this position at trial, albeit phrasing it in more careful terms. Defense counsel admitted that the 2023 Plan is not Alabama's attempt to comply with the Court's order, but rather it is a way for Alabama to avoid creating an additional Black opportunity district by "find[ing] another argument that would lead the Court to believe a different remedy was appropriate or that there was no Section 2 violation at all." Trial Tr. 2649:9-12.

742.    Other evidence also suggests that the legislative majority was more focused on maintaining political power for White voters than remedying the violation identified by the Court.

743.    Before any drawing began, Randy Hinaman was instructed by the Co-Chairs and their attorney, Dorman Walker, to draw a map with a second district that provides an opportunity for Black voters, but he understood from Mr. Walker and Mr. LaCour that a district in which Black voters could win 50% of the time would suffice. Hinaman 2023 Dep. 68:16-71:17. That process led to the Community of Interest Plan, a map in which Black candidates would have won two of four elections analyzed by Dr. Hood, both of which featured high-profile White Democratic

candidates (Doug Jones and Joseph Siegelman) and thus may not have been representative of Black electoral opportunity. Trial Tr. 1329:10-1331:2, 1331:18-21 (Bagley); MX4 at 24-25; CX5 at 24-25.

744.    But the Legislature apparently believed that even the deeply flawed Community of Interest Plan provided too much opportunity for Black voters. Not only did the Senate (and thus the Legislature) move away from the Community of Interest Plan, it also failed to consider other plans that would have provided greater electoral opportunity to Black candidates but kept Mobile and Baldwin County together, such as the two plans sponsored by the Singleton Plaintiffs. MX4 at 23-25, 27; CX5 at 23-25, 27.

745.    As discussed above, even while Mr. Hinaman was supposedly drafting the Plan to create a second opportunity district, Solicitor General LaCour was working on his own plans, Hinaman 2023 Dep. 89:5-90:10; Pringle Dep. 26:13-18, 28:17-23, and Sen. Livingston was in touch with Mr. Brown of Red State Strategies. MX63.

746.    In text messages between Senator Livingston and Mr. Brown, Sen. Livingston referred to Montgomery as "Monkeytown," MX63 at 1, a name with a history as a racist pejorative. Trial Tr. 1338:16-24 (Bagley).

747.    As early as June 28, 2023, before the Community of Interest Plan was introduced, Senator Livingston was text messaging with Chris Brown. And in those

text message exchanges, there's no discussion of drawing an opportunity plan for Black voters; there's no discussion of electoral opportunity for Black voters; there's no discussion of drawing two majority-Black districts or something quite close to it. Rather, Brown asked Livingston if a 41.6-percent Black Voting Age Population would work and notes that the map is not ideal for Barry Moore, but it is winnable. Trial Tr. 1339:13-21, 1340:11-13 (Bagley); MX63 at 2.

748.    After the 2023 Plan's passage and this Court's injunction, Mr. Brown sent Senator Livingston an article on September 19, 2023 showing that Rep. Pringle submitted his COI Plan to the Special Master. Trial Tr. 1339:22-1340:2 (Bagley); MX63 at 2.

749.    Mr. Brown commented on the article stating that Rep. Pringle is "not a team player. I read this article as an attack on you and the senate." Senator Livingston responds, "yea I saw that" and then "you think?"—expressing his agreement with Mr. Brown. Trial Tr. 1339:22-1340:9 (Bagley); MX63 at 2.

750.    Senator Livingston testified that Chris Brown (via Senator Roberts) drafted the Opportunity Plan, which had several percentage points lower BVAP than Livingston and Brown had discussed, Livingston Dep. 70:25-71:3; CX34, but even when the plan was enacted, Senator Livingston had no belief one way or another about where this plan would provide a fair opportunity to Black voters to elect a preferred candidate in the second district. Livingston Dep. 71:13-21.

751.   Senator Livingston then introduced Livingston 2, which was extremely similar to the Opportunity Plan, including having identical CD1 and 2. Compare CX34, with CX35. Therefore, the "opportunity district" in CD2 was the same as the plan in which Livingston had no view about whether it would provide any opportunity to Black voters. MX4 at 24-25; CX5 at 24-25.

752.   Livingston introduced this plan by saying it is "based on neutral principles promoting communities of interest in the Gulf, Black Belt and Wiregrass, ensuring that the state's long-terms principles of compact districts is given a fuller and fairer effect." Livingston Dep. 79:22-80:8.

753.   After describing the changes between Livingston 2 and the Livingston 3 plan that passed as SB 5 as "making sausage," Livingston Dep. 82:17-83:14, Sen. Livingston referred to the changes (including adding Lowndes and Butler to CD2) as creating "higher community of interest and compactness scores." Livingston Dep. 84:2-85:3. Asked what this plan improved from Livingston 2 in terms of COI, he testified that the 2023 Plan "maintained the Black Belt in two districts and obviously the Wiregrass and the Gulf Coast community of interest," but admitted that the Community of Interest Plan had also accomplished those goals. Livingston Dep. 85:4-86:7.

754.   With an even more fulsome record than in 2023, it is apparent that the Legislature never nurtured the ambition to provide a real opportunity district to

Black voters. To the contrary, the evidence outlined above and in the following section indicates that the Legislature's intent in 2023 was decidedly to avoid compliance with Section 2 of the Voting Rights Act and thus avoid recognition or realization of the rights of Black Alabamians.

755.    Whatever their motive for failing to do so, these facts evince a deeply tenuous (at best) justifications for failing to a draw a second opportunity district, meaning that Factor 9 strongly favors Plaintiffs.

## VI.    The Legislature Intentionally Discriminated in Enacting the 2023 Plan

### A.    The Historical Background

756.    While the Court cannot impute the intent of previous legislatures to the current one, evidence of districting decisions by prior legislatures "are relevant to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of" the current legislature. *Abbott v. Perez*, 585 U.S. 579, 607 (2018).

757.    As Plaintiffs' expert Dr. Bagley demonstrated, though, the "2023 events are an extension of the state's history of discrimination, especially as to redistricting. As Representative Chris England observed, the state's failure to obey this Court and the Supreme Court proved that Alabama was still the 'make me' state when it came to affording Black citizens their rights under the Constitution and the law." MX4 at 2; CX5 at 2.

286

758.   *First*, the insistence of keeping Mobile and Baldwin together while describing the desire to prioritize a majority-White community based on its shared European "colonial heritage" and the effect of creating a majority-White district at the explicit expense of a second opportunity district is part of historical pattern of manipulating the pairing or separation of these two counties for discriminatory reasons.

759.   *Second*, the Legislature's actions are part and parcel of a continuous pattern of whichever party is in power targeting Black voters. Both Democrats and Republicans in Alabama have a long history of manipulating districts based on race to the detriment of Black voters. As Dr. Bagley explained, across time, "in each and every [redistricting] cycle, black citizens, black voters are being manipulated by one party or the other . . . there are elements of discrimination throughout this process that would tend to support, under that first *Arlington Heights* factor, a telling and meaningful history of discrimination." Trial Tr. 1314:12-18.

760.   The drafters of SB 5 assert that Mobile and Baldwin Counties must be kept together in a congressional redistricting plan "owing to [the fact that] Mobile Bay and the Gulf of Mexico coastline . . . comprise a well-known and well-defined community with a long history and unique interests," but this has not always been the case. MX3 at 4, 7; CX10 at 4, 7.

761.  In fact, the history of congressional redistricting in Alabama reflects that the separation of Baldwin and Mobile counties in the 1870s and the unification of these counties in the 1970s were substantially motivated by race. MX3 at 7; CX10 at 7.

762.  During Reconstruction, as enforced by the Union army, Alabama had two majority-Black districts—CD1 and CD2, which were based in the Black Belt and Mobile County. Three Black Alabamians were elected to Congress from 1870 to 1876, but none served concurrently. Alabama's first Black congressman, Benjamin S. Turner won CD1 in 1870. Alabama's second Black congressman, James T. Rapier, won CD2 in 1872. Trial Tr. 1303:12-17 (Bagley); MX4 at 7; CX5 at 7.

763.  Alabamian's third Black congressperson, Rep. Jeremiah Haralson, was elected to CD1 in 1874. Trial Tr. 1303:12-17 (Bagley); MX3 at 7; CX10 at 7. A former slave, Rep. Haralson faced widespread violence and electoral fraud from White residents during his election campaign to CD1. MX3 at 7; CX10 at 7. His election was widely framed as a choice between "the negro party and the White man's party. There is no middle ground between the two. . . . Nigger or no nigger is the question." MX3 at 7; CX10 at 7.

764.  In response to Haralson's victory and the state's election of three Black people to Congress, White Alabama legislators in 1875 set out to "destroy [B]lack

majorities" and gerrymander Rep. Haralson's Mobile-Baldwin district for the express purpose of unseating him. Trial Tr. 1303:18-1304:7 (Bagley); MX3 at 7; CX10 at 7.

765.   To eliminate the two majority-Black congressional districts and unseat Rep. Haralson, the Alabama Legislature created a "shoestring" district that forced the Black candidates, Representatives Haralson and Rapier, to compete in the same district, effectively dividing the Black vote to elect a third White candidate, the Sheriff of Dallas County. Trial Tr. 1303:18-1304:7 (Bagley); MX3 at 7; CX10 at 7. In creating that "shoestring" district, the Legislature split Baldwin County, which was about 50% Black, from Mobile County into CDs 1 and 2. Trial Tr.1303:18-1304:7 (Bagley); MX3 at 7; CX10 at 7. Mobile County, in turn, was united with western Black Belt counties including Marengo, Washington, Clarke, Monroe, and Choctaw counties. Trial Tr. 1310:9-15 (Bagley). Before the Legislature's cracking of Black populations and gerrymandering Mobile and Baldwin County, Alabama's map contained two majority-Black districts. Trial Tr. 1304:8-10, 1311:19-22 (Bagley); MX3 at 7; CX10 at 7.

766.   Historically the 1875 split was widely understood as being done for the purpose of diluting the Black vote. Writing in 1920, the *Cleburn News* noted that "Reasons no longer exist which led to the creation of "shoe-string" districts, extending from the gulf through the black belt, as is the case with the second

congressional district, of which Baldwin County in the southern extremity." MX4 at
7; CX5 at 7. The *News* found that "That gerimander [sic] seemed to be of paramount
importance at a time when 'White' counties were given preponderance in each of
the districts, to overcome the vote in the 'black counties.'" MX4 at 7; CX5 at 7.

767.   From 1875 until 1970, the Alabama Legislature kept Mobile and
Baldwin in separate congressional districts, despite losing two congressional seats
during that time, with a brief exception during the interwar period. Trial Tr. 1305:9-
24 (Bagley); MX4 at 8; CX5 at 8; MX3 at 7; CX10 at 7; MX1 at 8; CX16 at 8.
Beginning with the 1875 plan, the Alabama Legislature continued to unite the City
of Mobile with the western Black Belt. Trial Tr. 1305:5-8 (Bagley).

768.   Following the 1960 U.S. Census, Alabama lost another congressional
seat and was forced by a federal court to address malapportionment in its
congressional delegation. Trial Tr. 1306:2-6 (Bagley); MX1 at 8; CX16 at 8. The
Alabama Legislature repeatedly failed to enact a congressional districting plan, and
as a result, in 1962, Alabama congressional elections were held at large. MX1 at 9;
CX16 at 9; Trial Tr. 1306:7-11 (Bagley). The plan used in 1962 and 1964 was
referred to as the so-called "nine-to-eight" plan, which required candidates be
nominated from the nine congressional districts to stand in an at-large general
primary where the lowest vote-getter would be left off the statewide general election
ballot. MX4 at 3; CX5 at 3. The lowest vote getter turned out to be the representative

from Mobile, Frank Boykin. Trial Tr. 1306:7-11 (Bagley); MX1 at 9; CX16 at 9. The Alabama Supreme Court held that all ballots in the 1962 congressional election had to include a full slate of 8 choices, essentially adding an anti-single shot provision. MX1 at 9; CX16 at 9. In 1964, a federal court held the nine-to-eight plan unconstitutional. The court still allowed the state to use the plan in elections that fall only if the legislature failed to pass a new one, insisting the court would have to intervene thereafter. Trial Tr. 1306:12-14 (Bagley); MX4 at 5; CX5 at 5.

769. Later in 1964, the state adopted a different congressional districting plan, which was again found unconstitutional. Trial Tr. 1306:12-14 (Bagley); MX4 at 6; CX5 at 6. Under the congressional districting plan enacted by the State in 1965, CD1 connected Mobile County with six Black Belt counties, and split Baldwin County and Mobile County into separate congressional districts. Trial Tr. 1305:15-24, 1311:1-9 (Bagley); MX4 at 5, 8; CX5 at 5, 8.

770. In the 1965 plan, Alabama's southern congressional districts – CDs 1, 2, and 3 – had Black populations around 40 percent. Trial Tr. 1306:17-20 (Bagley).

771. The later unification of Baldwin and Mobile counties was similarly motivated by race. After the 1970 Census, Alabama lost another seat in its congressional delegation, requiring it to redistrict from eight to seven districts. Trial Tr. 1306:21-1307:1 (Bagley); MX4 at 7; CX5 at 7.

772.   In the summer of 1971, the Legislature seriously considered several plans. But the Legislature failed to seriously consider the plan presented to the Legislature by Fred Gray. Fred Gray is a legendary civil-rights attorney and was one of the first two Black members of the Alabama Legislature to serve since Reconstruction. MX4 at 7-8; CX5 at 7-8; Trial Tr. 1308:10-20 (Bagley); *see also* MX1 at 10; CX16 at 10.

773.   Representative Gray submitted a congressional plan that would have given Black voters "a fighting chance" to elect a candidate "responsive to their needs" in two districts. His plan would have created two districts where Black voters were around 50 percent of the population in two districts, reflecting the growing Black population at the time. Trial Tr.1308:17-1309:7 (Bagley); MX4 at 7; CX5 at 7. The Legislature did not consider Rep. Gray's proposed plan.

774.   Rather, in the 1972 plan, when the Legislature chose to unite Baldwin County and Mobile County in the same congressional district for the first time since the 19th century, it did so for racial reasons and with racial effects. It did not act to unite a purported community of interest. Instead, the 1972 plan reduced the Black voting age populations of CDs 1, 2, and 3 from around 40% Black under the prior plan to only around 30 percent in all three districts. The Legislature's decision to put Mobile and Baldwin Counties together in a way that significantly dropped the Black population in these districts occurred just as Black people began registering to vote

in significant numbers as a result of the VRA's passage. Trial Tr. 1308:2-1309:13 (Bagley); *see also* MX3 at 7; CX10 at 7.

775.   In maintaining the split of southern Alabama into three congressional districts since 1972, pairing Mobile and Baldwin counties, the Legislature continued to crack the Black vote to prevent the election of a Black Congressperson. Trial Tr. 1311:23-1312:1 (Bagley).

776.   Both the 2021 and 2023 redistricting processes followed this tradition of pairing Mobile and Baldwin counties and splitting Southern Alabama into three districts, which ensured that Black voters only had a realistic opportunity to elect a candidate of choice in a single district. *See* Trial Tr. 1311:23-1312:4 (Bagley).

777.   Third, the same Legislature that passed SB 5 passed SB 1 in 2024, a bill that removed the ability of Alabamians to receive voting assistance from the person of their choice that was preliminary enjoined under Section 208 of the VRA. Addt'l Stip. Facts ¶¶ 6-8; Trial Tr. 1284:17-1285:9 (Bagley). This bill had a racially discriminatory effect, especially on Black people in the Black Belt who use absentee voting more often than others. *See supra* ¶¶ 395-400.

778.   Also, just before the 2024 elections, the Defendant Secretary of State implemented a deeply flawed program to remove over 3,000 people from the active voter rolls in a manner that had a racially discriminatory effect. Stone Tr. 177:24-179:16 (Simelton); *see also* Addt'l Stip. Facts ¶¶ 11-18.

779.   The same Alabama Legislature also attacked diversity, equity, and inclusion efforts, passing SB 129, which requires that DEI offices and initiatives funded by public colleges or government agencies be eliminated. *See* Trial Tr. 246:4-9 (Clopton) (testifying about the Black Student Union at the University of Alabama being disbanded in 2024 due to SB 129), 2376:18-24 (Singleton).

### B.   The Specific Sequence of Events Leading to the Passage of 2023 Plan

i.   *Co-Chairs Livingston and Pringle fully understood what was required by Section 2 and the Court's preliminary injunction.*

780.   Representative Chris Pringle and Senator Steve Livingston served as Co-Chairs of the Permanent Legislative Committee on Reapportionment ("the Committee") during the 2023 special session. Joint Stip. ¶ 121.

781.   Both Representative Pringle and Senator Livingston were aware of the Court's remedial order in this case. Livingston Dep. 51:1–52:1, 55:11–22; Pringle Dep. 17:11–20:12.

782.   When shown this Court's instruction that the "[l]egislature . . . should be mindful . . . that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it," *Milligan I*, 582 F. Supp. 3d at 936 (three-judge court), Senator Livingston testified that his deposition on August 9, 2023, was "actually the first time that's been pointed out to me in a paragraph," Livingston Dep. at 51:21-22.

783.  Nonetheless, when asked about the significance of the Court's order in this case, Senator Livingston testified that "[a]s I understand it, the Courts have ordered us to provide two opportunity districts, minority — majority minority opportunity districts." Livingston Dep. at 24:17-20.

784.  While some members of the Committee "were very vague at the definition" of an opportunity district, the Committee's "minority members were pretty specific about [sic] they thought it meant that we had to draw two majority minority districts, not opportunity districts." Livingston Dep. at 25:14–20.

785.  Representative Pringle was familiar with the guidance in the Court's preliminary injunction order, which required "either two majority minority districts or something close to it," such that "a protected class of citizens [can] elect a candidate of their choosing." Pringle Dep. at 17:21–25. He testified that the Legislature was "charged with drawing a map that would provide an opportunity for the black voters to elect a candidate of their choosing." Pringle Dep. at 19:11–14.

786.  Representative Pringle also confirmed his understanding that whether a district is an "opportunity" district "turns on the ability to elect." Pringle Dep. at 20:2–12.

ii.  *The Co-Chairs' instructions to Randy Hinaman*

787.  After the Supreme Court's decision affirming the Court's preliminary injunction, the Co-Chairs turned to Randy Hinaman, the Legislature's longtime map

drawer (and drawer of the enjoined 2021 Plan) and instructed him to develop new potential congressional plans. Hinaman Dep. (*Milligan* Doc. 261-1) at 19:22–20:12.

788.  Representative Pringle instructed Mr. Hinaman "to follow the [Committee's 2021 Redistricting] Guidelines and the ruling" in *Milligan.* Rep. Pringle further instructed Mr. Hinaman to consider the Black Belt, Gulf, and Wire Grass communities of interest and to minimize county splits." MX181 (Pringle Resp. to Pls.' Third Set of Interrogs., ECF No. 238-3) at 4.

789.  The Committee also told Mr. Hinaman to abide by the 2021 Redistricting Guidelines and "expressed to him that the Court's ordered [the Legislature] to look at an opportunity district." Livingston Dep. at 22:19–23:23.

790.  Mr. Hinaman understood that he was tasked with adding a second opportunity district. Hinaman Dep. at 67:7–19. Specifically, he was instructed by the Chairs to "draw a district that provides the opportunity for African American voters to [ ] elect a candidate of their choice." Hinaman Dep. at 68:22–69:16.

791.  Based on guidance from the Alabama Solicitor General Edmund Lacor, Jr. and Dorman Walker, the Co-Chairs' attorney, Mr. Hinaman understood that an "opportunity district" was one where Black-preferred candidates had a "50/50" chance of winning an election. Hinaman Dep. at 71.

792.  No one instructed Hinaman to try to add a second majority Black district and he did not attempt to do so, Hinaman Dep. at 67:22–68:15, but the Chairs

did instruct him to keep Mobile and Baldwin counties together, Hinaman Dep. at 80:2–12.

     iii.    *Hinaman drafted several possible plans for consideration.*

793.   Mr. Hinaman drew three maps on his own for the Committee to consider: the "Community of Interest" Plan, the "Russell Split" plan, and the "Expanded Black Belt" plan. Hinaman Dep. at 23:11–16, 84:4–87:9.

794.   All three of these plans kept Mobile and Baldwin counties together, kept the counties defined by Defendants as the Wiregrass together except for Covington County, kept the Black Belt in two districts except for the split of Russell County in the "Russell Split" plan, and did not pair incumbents. *See* MX43, MX45, MX46.

795.   All three of the plans maintained CD7 as a majority-BVAP district, and CD2 had BVAPs of 42.5% for the Community of Interest plan, MX44, 43.38% in the Russell Split plan, CX36, and 44.01% in the Expanded Black Belt plan, CX37.

796.   Mr. Hinaman drew the Russell Split and Expanded Black Belt plans just as "options" for the Committee to consider, Hinaman Dep. at 84:15–23, 86:13–87:9, but he understood that his Community of Interest plan was the Chairs' preferred plan and that each Chair would sponsor it in their respective house, Hinaman Dep. at 30:20–31:14.

     iv.    *The Committee hosted public hearings and readopted the 2021 Guidelines.*

797.   On June 8, 2023, the U.S. Supreme Court affirmed the preliminary injunction issued by the district courts in the above-captioned cases against the 2021 Congressional Plan. Joint Stip. ¶ 119

798.   On June 27, 2023, Governor Kay Ivey called a special legislative session to begin on July 17, 2023 at 2:00 p.m. Her proclamation limited the Legislature to redistricting, stating: "Redistricting: The Legislature may consider legislation pertaining to the reapportionment of the State, based on the 2020 federal census, into districts for electing members of the United States House of Representatives." Joint Stip. ¶ 120.

799.   Before the 2023 Special Session, the Committee held pre-session hearings on June 27 and July 13 to receive input from the public on redistricting plans. Joint Stip. ¶ 122.

800.   The Committee Co-Chairs failed to present any of their plans for input at the public hearings, as Representative Pringle said the Community of Interest plan was not yet done. Pringle Dep. at 60:6–11.

801.   The only plans proposed and available for public comment during the pre-session hearings were the "VRA Plaintiffs' Remedial Plan" submitted by the *Milligan* and *Caster* Plaintiffs and two different plans put forward by Senator Singleton and Senator Hatcher. Joint Stip. ¶ 124.

802.   For the June 29 meeting, Representative Pringle asked a historian to come and testify at that hearing regarding the historical connection between Mobile and Baldwin that allegedly makes them a community of interest. Pringle Dep. at 45:23–46:15. He did not ask anyone to speak on behalf of the need for two districts in which Black voters could elect candidates of their choice. Pringle Dep. at 46:16–20.

803.   At the July 13 hearing, Representative England (who is Black) proposed an amendment to the Committee's guidelines that offered specific instructions on remedying the likely VRA violation found by the Court. White legislators voted down this amendment. In rejecting the amendment, Rep. Pringle argued that the amendment would embed "arguments by the counsel for *Milligan* and *Caster* plaintiffs about the U.S. Supreme Court recent decision in *Allen vs. Milligan* and for that reason alone should be rejected." MX4 at 23; CX5 at 23; Trial Tr. 1328:17-1329: 8 (Bagley).

804.   At the Committee public hearing on July 13, 2023, Rep. Pringle moved to re-adopt the 2021 Legislative Redistricting Guidelines ("Guidelines"). The Committee voted (along racial lines) to reject the amendment and re-adopt the State's 2021 Legislative Redistricting Guidelines ("the 2023 Guidelines"). MX4 at 22-23; CX5 at 22-23; *see also* Pringle Dep. at 49:8–14; Joint Stip. ¶ 123.

805.   According to Representative Pringle, "the public hearings made perfectly clear that people wanted a district they thought that Blacks could elect a candidate of their choosing." Pringle Dep. at 64:19–22.

v.   *The Committee considered and passed Representative Pringle's Community of Interest plan over Black legislators' objections.*

806.   On July 17, the first day of the Special Session, Representative Pringle introduced the "Community of Interest" plan (the "COI plan"). Joint Stip. ¶ 125.

807.   The COI Plan had one majority-black district, namely CD7, and one district with a BVAP of 42.25%, namely CD2. Rep. Pringle said the COI Plan maintained the core of existing Congressional Districts. Joint Stip. ¶ 126.

808.   Under the COI Plan, the Committee's performance analysis showed that Black-preferred candidates would have won two of the four statewide races in 2020 and 2022 that were analyzed by the Legislature. Joint Stip. ¶ 127.

| | | CD2 | | CD7 | |
|---|---|---|---|---|---|
| Year | Race | % Dem. | % Rep. | % Dem. | % Rep. |
| 2020 | Pres. | 47.53 | 51.56 | 61.94 | 37.28 |
| 2020 | U.S. Senate | 50.23 | 49.77 | 64.19 | 35.81 |
| 2018 | Gov. | 47.77 | 52.23 | 63.89 | 36.11 |
| 2018 | A.G. | 50.97 | 49.03 | 64.34 | 35.66 |

COMMMUNITY OF INTEREST PLAN

809.   Dr. Melvin Vernon "Trey" Hood III, the State's expert in this case, analyzed the "performance" of CD2 in the COI Plan. Dr. Hood looked at these four

elections, which were between four White candidates, because these races had the highest levels of voter participation in 2018 and 2020. Hinaman Dep. at 53-54.

810.    The purpose of a performance or "functionality" analysis of a district is to try to get an idea of how the analyzed district might or might not perform for a particular racial group in general elections. Trial Tr. 1942:12-1943:21 (Hood).

811.    The four elections that Dr. Hood analyzed for the COI Plan, however, are not representative of Alabama elections in general. Rather, the elections are out of the ordinary because the 2018 Democratic candidate for Attorney General was Joseph Siegelman, the son of a popular Democratic former governor, and the 2020 Democratic candidate for U.S. Senate was Doug Jones, the incumbent Democratic Senator who had won a 2017 special election against a very controversial Republican candidate, Roy Moore. Trial Tr. 1329:23:20-1331:2, 1331:18-21 (Bagley).

812.    Moreover, Dr. Hood himself testified that, in conducting racially polarized voting analyses, the more relevant and probative elections are races that feature a minority candidate from the relevant racial group. Trial Tr. 1944:11-22.

813.    Despite the flawed nature of Dr. Hood's performance analysis of CD2 in the COI Plan, Mr. Hinaman believed that CD2 in the COI plan was an "opportunity" district because White Democrats would have barely won CD2 in two of the four elections analyzed in 2018 and 2020. Mr. Hinaman thought that these

results meant well-known and well-funded Democrats could win CD2 in the COI plan. Hinaman Dep. at 53-54.

814.   The COI Plan kept Mobile and Baldwin together, put the Black Belt in two districts, and kept all the Wiregrass in one district except part of Covington County, which satisfied the 2023 redistricting guidelines and the legislative findings later appended to the enacted Senate Bill 5 ("SB 5"). Livingston Dep. at 62:1–13.

815.   The COI Plan passed out of Committee on July 17 along racial lines, with all Black members of the Committee voting against it. MX4 at 27; CX5 at 27; *see also* Joint Stip. ¶ 127.

      vi.   *Senators turned against the COI Plan to pursue a more aggressive plan for preserving power at Black voters' expense.*

816.   Senator Livingston also introduced a plan on July 17, named the "Opportunity" or "Livingston 1" Plan, in which CD2 had a BVAP of 38.31% and CD7 had a 52.59% BVAP. MX4 at 24-25; CX5 at 24-25; *see also* Joint Stip. ¶¶ 128-29.

817.   Soon after the Committee passed Representative Pringle's COI Plan, the Senate Republican contingent of the Committee moved from supporting that plan to looking at other plans, and Senator Livingston testified he had to move with them or he would "be left behind." Livingston Dep. at 65:20-66:18.

818.   Senator Livingston understood that other Committee members moved on because they had "received some additional information they thought they should

go in the direction of compactness, communities of interest, and making sure that congressmen are not paired against each other," but he did not know where or who this information came from or who received it other than "other committee members." Livingston Dep. at 67:6-68:21.

819.   The Senate majority began working on a plan introduced in Committee on July 17 as the Opportunity Plan, which turned out to have been drafted by outside political consultant and head of Red State Strategies, Chris Brown, and dropped off on a thumb drive to the Reapportionment Office by Senator Dan Roberts. MX4 at 25; CX5 at 25; MX180 at 4-5; CX118 at 4-5; Livingston Dep. at 70:5-71:3; Pringle Dep. at 72:1-15, 75:21-23.

820.   In text messages between Senator Livingston and Mr. Brown—in which Sen. Livingston referred to Montgomery as "Monkeytown," MX63 at 1, a name with a history as a racist pejorative, Trial Tr. 1338:16-24 (Bagley), never do the two discuss a Black opportunity district. Instead, on June 28, 2023, before the Co-Chairs introduce any plans, Mr. Brown asks Senator Livingston if a 41.6-percent BVAP will work, and notes that the map is "not ideal for [Barry] Moore. But winable [sic]." MX63 at 2.

821.   Senator Livingston testified that Chris Brown (via Senator Roberts) drafted the Opportunity Plan, which had several percentage points lower BVAP than Livingston and Brown had discussed, Livingston Dep. 70:25-71:3, CX34, but even

when the plan passed the Senate, Senator Livingston had no belief one way or another about where this plan would provide a fair opportunity to black voters to elect a preferred candidate in the second district. Livingston Dep. 71:13-21.

822.   Senator Livingston "had no view one way or the other" about whether the Opportunity Plan provided a fair opportunity to Black voters to elect a Black-preferred candidate in the second district, *see* Livingston Dep. at 71, nor did Representative Pringle, *see* Pringle Dep. at 79-80.

823.   From this plan, Senator Livingston and a number of other Republican Senators made minor changes and introduced a revised version as Livingston Plan 2, which passed the Senate on July 19. MX4 at 25; CX5 at 25.

824.   Senator Livingston admitted that the Livingston 2 plan appeared to include a version of CD2 identical to the one in the Livingston 1 Plan, Livingston Dep. at 75-76, and that the main differences between the two plans were tweaks to improve compactness, Livingston Dep. at 80-81. Despite having an identical configuration of CD2, he believed Livingston 2 provided a better opportunity than the Livingston 1 Plan through the tweaks they made but could not say why. Livingston Dep. at 78.

825.   Representative Pringle testified that Livingston 2 and the 2023 Plan ultimately enacted in SB 5 advanced through the Senate because he rejected Senator Livingston's request to substitute the COI Plan for Livingston 2 in the House. Pringle

Dep. at 101. Representative Pringle insisted that if Livingston wants to "pass a senate plan, you're going to pass the senate on the senate bill number, and you're not going to put my name on it." Pringle Dep. at 101-02. Pringle testified he didn't want his name on the senate plan because he thought his COI Plan "was a better plan" in terms of VRA compliance. Pringle Dep. at 102.

826.    On July 20, 2023, the House passed the COI Plan along racial lines (with the exception of one Black member of the House) and the Senate passed the Livingston 2 Plan entirely along racial lines. MX4 at 25; CX5 at 25; *see also* Joint Stip. ¶ 130.

### vii.    *Senators and State Solicitor General Edmund LaCour drafted the "Livingston Plans" and the "Compromise" SB 5 bill.*

827.    After the differing bills passed the House and Senate, Senator Livingston testified they "started making sausage"—"we had two different bills, and we had to come to some compromise in between them to pass one" and that resulted in Livingston 3, which was passed out of Conference Committee and ultimately enacted. Livingston Dep. at 83.

828.    Representative Pringle was largely unaware of how SB 5 or the prior senate plan came together. In 2023, he testified that SB 5 appears to have been drawn by Alabama's Solicitor General Edmund LaCour and several senators: Mr. LaCour "was upstairs meeting with the senators in a different room working with them to draw what ultimately became the Livingston plans." Pringle Dep. at 28.

829.   The major changes from Livingston 2 to the final 2023 Plan (which before enactment was called "Livingston 3") were adding Lowndes and Butler to CD2, making Etowah County whole and putting it in CD3, putting the remainder of Blount into CD4, and adding Lawrence to CD5. Livingston Dep. at 84. The conference committee "focused on communities of interest, compactness, and not putting incumbents against each other," Livingston Dep. at 87, and claimed not to have considered race in drawing it, Livingston Dep. at 48.

830.   Even though CD2 in SB 5 had a BVAP under 40 percent, it was the committee's decision that this constituted "something quite close to a majority of black voting age population," and when asked how the committee made that decision, Senator Livingston said: "this is the plan that was brought forward in the end and was compromised upon." Livingston Dep. at 52.

831.   Representative Pringle testified that the BVAP under 40 percent in the 2023 Plan enacted in SB 5 was a splitting of the difference of the BVAPs between the Livingston 2 and COI plans. Pringle Dep. at 100. Regarding any significance of that BVAP number, Rep. Pringle testified that "[y]ou're going to have to talk to Senator Livingston and Eddie LaCour"—"[t]hat's what the senate came up with, and they were not going to allow us to pass the house plan." Pringle Dep. at 101.

832.   Afterwards, on Friday, July 21, a six-person bicameral Conference Committee passed Senate Bill 5 ("SB 5"). The plan was a modified version of the

Opportunity Plan or "Livingston 1" Plan and was referred to as "Livingston 3." Joint

Stip. ¶ 131.

> viii. *The Legislature knew that the 2023 Plan lacked a second opportunity district and that the Senate's changes to the COI Plan's CD2, which led to the 2023 Plan, would harm Black-preferred candidates' chances.*

833. Before its final passage by the whole Legislature, the Legislature

analyzed how the 2023 Plan would perform for Black-preferred candidates in seven

statewide contests in 2018 and 2020. According to this analysis, Black-preferred

candidates would have lost in the new CD2 in all seven elections, representing no

increase in electoral opportunity for Black-preferred candidates from the 2021 Plan.

Under the 2023 Plan, the average two-party vote-share for Black-preferred

candidates in CD2 is 46.6 percent. Joint Stip. ¶ 138(a) & (b); *see also* Pringle Dep.

at 96-97; Livingston Dep. at 90.

| Democrat CD | 2018 AG | 2018 GOV | 2018 LTGOV | 2018 AUD | 2018 SOS | 2020 PRES | 2020 SEN | Average |
|---|---|---|---|---|---|---|---|---|
| 1 | 39.2% | 38.5% | 36.7% | 37.6% | 36.9% | 34.8% | 38.2% | **37.4%** |
| 2 | 48.5% | 45.3% | 46.0% | 46.8% | 46.0% | 45.6% | 48.0% | **46.6%** |
| 3 | 33.3% | 32.6% | 31.2% | 31.8% | 31.5% | 29.3% | 31.9% | **31.6%** |
| 4 | 24.8% | 24.8% | 21.7% | 22.6% | 21.7% | 18.6% | 21.9% | **22.3%** |
| 5 | 39.2% | 38.6% | 36.8% | 38.0% | 37.4% | 36.2% | 39.5% | **37.9%** |
| 6 | 35.6% | 36.2% | 32.8% | 33.7% | 33.2% | 33.4% | 35.9% | **34.4%** |
| 7 | 64.7% | 64.0% | 62.9% | 63.2% | 62.9% | 61.6% | 63.4% | **63.2%** |

| Republican CD | 2018 AG | 2018 GOV | 2018 LTGOV | 2018 AUD | 2018 SOS | 2020 PRES | 2020 SEN | Average |
|---|---|---|---|---|---|---|---|---|
| 1 | 60.8% | 61.5% | 63.3% | 62.4% | 63.1% | 65.2% | 61.8% | **62.6%** |
| 2 | 51.5% | 54.7% | 54.0% | 53.2% | 54.0% | 54.4% | 52.0% | **53.4%** |
| 3 | 66.7% | 67.4% | 68.8% | 68.2% | 68.5% | 70.7% | 68.1% | **68.4%** |
| 4 | 75.2% | 75.2% | 78.3% | 77.4% | 78.3% | 81.4% | 78.1% | **77.7%** |
| 5 | 60.8% | 61.4% | 63.2% | 62.0% | 62.6% | 63.8% | 60.5% | **62.1%** |
| 6 | 64.4% | 63.8% | 67.2% | 66.3% | 66.8% | 66.6% | 64.1% | **65.6%** |
| 7 | 35.3% | 36.0% | 37.1% | 36.8% | 37.1% | 38.4% | 36.6% | **36.8%** |

834.    Representative Pringle saw this analysis on the Friday morning before the final vote on SB 5 and this analysis was available to all members of the Conference Committee as well. Pringle Dep. at 95, 97.

835.    Rep. England told legislators that, in his opinion, the Livingston 3 Plan was noncompliant with the Court's preliminary-injunction order and the Court would reject it. Joint Stip. ¶ 132.

836.    The most salient difference between the COI plan and the enacted 2023 Plan is their treatment of Dallas County. In the enacted 2023 Plan, MX29, Dallas County is wholly in CD7, whereas, in the COI plan, MX43, Dallas County was whole in CD2, which made a significant difference in terms of the BVAP in CD2 and the electoral performance of CD2. Trial Tr. 1335:18-1336:18 (Bagley); *see also* Hinaman Dep. at 49:7-19.

837.    The Legislature knew that removing Dallas County from CD2 in the COI Plan and instead placing it in CD7 (as in the enacted 2023 Plan) would have the effect of eliminating even the appearance of electoral opportunity for Black-preferred candidates. That is, without Dallas County in CD2, Dr. Hood's analysis for the Co-Chairs had shown that the Black-preferred candidates would have lost CD2 in all four of the analyzed 2018 and 2020 elections. Hinaman Dep. at 49-51.

838.    Black voters in Dallas County have a history of political mobilization. It is where the Selma-to-Montgomery march and "Bloody Sunday" took place. And

it is the residence or hometown of stalwart figures in Black politics, such as longtime State Senator Hank Sanders and Terri Sewell, the CD7 congresswoman. Trial Tr. 1335:18-1336:18 (Bagley).

ix.    *Mr. LaCour drafted and inserted unprecedented legislative "findings" that were not requested by the Committee's Chairs.*

839.    SB 5 also included approximately six pages of legislative "findings." MX31 at 2-8; CX19 at 2-8. These findings mention the VRA only to say that it is the "intent" of the Legislature to comply with it, and that the VRA never requires districts that violate traditional districting principles. MX31 at 2; CX19 at 2. This contrasts with the Committee's own 2023 Guidelines, which it readopted the previous week. The 2023 Guidelines stated that "Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended" and a "redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength," MX41 at 1.

840.    SB 5's "findings" declare for the first time several principles that are "non-negotiable for the Legislature": minimal population deviation, contiguity, reasonable compactness, no more than six county splits, the keeping together of communities of interest as specifically described in the findings, and avoidance of pairing incumbents. VRA compliance was not included on this list of "non-negotiable" criteria. MX31 at 3; CX19 at 3.

841.   This contrasts with the 2023 Guidelines, which state that "priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria." MX41 at 3.

842.   In terms of communities of interest, SB 5's findings recognized only three: "the Black Belt, the Gulf Coast, and the Wiregrass." MX31 at 4; CX19 at 4. SB 5's findings also altered the 2021 and 2023 Guidelines' definition of "community of interest" to remove from the definition shared "ethnic, racial, tribal, social . . . identities," and add similarity of "transportation infrastructure, broadcast and print media, educational institutions." *Compare* MX31 at 4, *with* MX24 at 3-4; *compare* CX19 at 4, *with* CX42 at 3-4.

843.   The findings also define the county parameters of each of the three recognized communities of interest (with some counties identified as being in both the Black Belt and Wiregrass). While several pages of findings are devoted to linking Mobile and Baldwin, including reference to its shared "French and Spanish colonial heritage," only five lines are provided to the Black Belt. MX31 at 4-8; CX19 at 4-8.

844.   The SB 5 legislative findings reference the "French and Spanish colonial heritage" or "culture" of the Mobile and Baldwin County cluster four times in one paragraph. But the legislative findings make no mention of the cultural contributions or heritage of African or Black people in the Black Belt, Mobile, or

any other community of interest. Trial Tr. 1456:2-20 (Bagley); *see also* MX31; CX19.

845. The SB 5 legislative findings reference people with "French and Spanish colonial heritage" as meaning racially "White" people. This reference to White people is the only mention of race in SB 5's text. Trial Tr. 1455:14-1456:4 (Bagley); *see also* Trial Tr. 62:12-63:11 (Dowdy), 1178:10-25, 1205:25-1206:21, 1237:5-20 (Milligan).

846. Indeed, Major Shalela Dowdy testified that, as a lifelong City of Mobile resident, there "isn't anything in my day-to-day life and just routinely month to month in Mobile that I see where we place emphasis on French and Spanish Colonial heritage." And that SB 5's focus on "European heritage when black people make up a great percentage of the local community" in Mobile city made her feel as if "the state, was basically trying to ignore us, erase the heritage that we have and not include us in the process of the map drawing at all." Trial Tr. 62:12-63:11. Mr. Milligan similarly testified that "one of the critical ingredients" of the development of Mardi Gras as it exists today in the New World are "the traditions of the enslaved African people that also lived in those communities" near the Gulf, whom SB 5's text does not mention as cultural contributors. Trial Tr. 1206:4-21.

847. In an attempt to rebut the glaring race-based preference of the legislature for preserving a majority-white community of "French-Spanish colonial

heritage," MX31 at 7, by functionally mandating that a majority-white district be drawn, Trial Tr. 298:9-299:7 (Duchin), Defendants contended during closing arguments that this reference of European colonial heritage "can be a biracial influence." Trial Tr. 2652:5-7. They point to the *Nairne* case out of Louisiana and argue that "there was evidence put on by the plaintiffs that the state should be required to protect an interest that is, quote, influenced by French Colonialism." Trial Tr. 2651:25-2652:4. But they miss several key distinctions. First, unlike the Alabama legislature here, the *Nairne* Plaintiffs themselves did not argue that the State must create a district based on French colonial heritage. Rather, the Court noted an expert's analysis that pointed to a shared history among the White and Black people in the Red River Parishes "because early French settlement resulted in French being the dominant language and Catholicism becoming the dominant faith in the territory among White and Black people." *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 845 (M.D. La. 2024). Second, unlike the historical analysis in *Nairne*, Defendants have not offered any historical analysis pointing to a shared multiracial history based on "French Spanish colonial heritage" other than Mardi Gras. But the record shows that even Mardi Gras remains highly racially segregated in Mobile, Trial Tr. 39:7-19 (Dowdy), 253:9-16 (Clopton), 1180:16-20 (Milligan), which grew out of historical enforced segregation, Trial Tr. 39:20-40:1 (Dowdy), 1180:16-20 (Milligan), 1468:4-8 (Bagley). Third, rather than historian's analysis, there is no

dispute that the legislative findings included in SB5 were drafted by Solicitor General LaCour, who seemed to share the understanding of the Mobile/Baldwin pairing as a predominantly white community. During the August 2023 hearing just after the Legislature passed SB5, he explained that after the Milligan Plaintiffs pointed out the discriminatory impact of splitting the Black Belt in four parts while "prioritizing keeping the majority white people of French and Spanish colonial heritage in Baldwin and Mobile together," the 2023 plan "answer[ed] the plaintiffs' call" by making the "Black Belt [ ] no longer fragmented." CX46 at 38:12-24, 40:24-41:2. In other words, rather than disputing that the reference to Mobile/Baldwin's colonial heritage was race-based, the Legislature accepted it and believed it could address it by making fewer splits in the Black Belt.

848. Representative Pringle testified he "does not know" why these "findings" were included in the bill, Pringle Dep. at 91, and that the "first time I saw that was Friday morning on the floor of the House when the Senate bill was brought up," Pringle Dep. at 92. Representative Pringle agreed that "some of them look like they are" in conflict with the redistricting Guidelines adopted the week before. Pringle Dep. at 93.

849. Senator Livingston likewise does not know why the findings were included in the bill and testified that the findings were drafted by Mr. LaCour. Livingston Dep. 101-02; *see also* MX180 at 6.

313

850.   The findings attached to SB 5 were not debated by the Legislature and were not revealed until the members were asked to vote on the bill. Pringle Dep. at 90-92.

851.   Mr. LaCour described these findings as "essentially . . . describing the map" enacted in SB 5. CX46 at 162; Aug. 2023 Tr. 162:12-16.

852.   Representative Pringle has never seen another redistricting bill with similar legislative findings concerning communities of interest. Pringle Dep. at 91.

x.   *The Legislature passed SB 5 over opposition of Black legislators, and despite the significant reservations of Co-Chair Representative Pringle and the House's support for the alternative Community of Interest Plan.*

853.   On July 21, 2023, the final day of the Special Session, SB 5, along with the legislative findings attached thereto, was passed by both houses of the Legislature, along racial lines (with the exception of one Black member of the house). MX4 at 27; CX5 at 27; *see also* Joint Stip. ¶ 133.

854.   Governor Ivey signed the bill that same day. Joint Stip. ¶ 133.

855.   Representative Pringle testified that "[w]hat I could get passed at the house, I could not get passed at the Senate. The Senate made it perfectly clear they were not going to pass my plan, they were going to pass their plan. And we made the decision that it was more important – we had to pass something and not just go to Montgomery and completely fail and not pass a plan." Pringle Dep. at 100-01.

### C.    Substantive and Procedural Departures

856.    The Committee Co-Chairs failed to present any of their plans for input at the public hearings. Pringle Dep. 60:6-11.

857.    Despite the Committee Chairs and their counsel and Solicitor General LaCour asking Mr. Hinaman to draft the plans for consideration in the 2023 Special Session, Senator Livingston had been communicating (apparently without knowledge of his Co-Chair, Committee counsel, or Mr. Hinaman), with another mapdrawer, Chris Brown. *See generally* MX63.

858.    In light of this later evidence, Senator Livingston's testimony under oath that he was unsure of the origin or reason behind the Senate suddenly backing another plan—the very one being drafted by Brown—blinks reality.

859.    It also raises questions about the import of then-U.S. House Speaker Kevin McCarthy's call to Senator Livingston asking him to consider his thin Republican majority in the House. Senator Livingston testified that helping Speaker McCarthy keep a Republican majority in the House "didn't play into our efforts." Livingston Dep. 95-96. Given the use of racial targets in terms of BVAP, this either suggests that race was the real motive, or that Sen. Livingston was being untruthful about using race for partisan ends.

860.    Instead, the only two criteria that Mr. Brown raised with Senator Livingston was whether the BVAP of his proposed plan was at the right level and

315

whether White incumbent Rep. Barry Moore would still have a chance of beating a Black preferred candidate. MX63.

861.   Beyond this surreptitious mapdrawing, the involvement of the Solicitor General both as a mapdrawer and drafter of legislative purpose also reveals a bizarre procedural and substantive departure.

862.   On a procedural level, no redistricting bill in Alabama history contained similar legislative findings. Trial Tr. 1337:10-15 (Bagley). Members of the legislature and Mr. Hinaman himself pointed to the unprecedented nature of the findings. *Id*.

863.   Representative Pringle testified that the findings attached to the bill that became the 2023 Plan were not debated by the Legislature and were not revealed until the members were asked to vote on the bill: "The first time I saw [the Legislative findings] was Friday morning on the floor of the house when the senate bill was brought up. I turned and asked the clerk to give me a copy of the bill." Pringle Dep. 90:18-92:23.

864.   Likewise, Mr. Hinaman testified that he was never given the instructions in the SB 5 findings when the Chairs tasked him with drawing the map and was only aware of them to the extent that they coincided with the Committee Guidelines. Hinaman Dep. 94:11-95:23.

865. Senator Livingston was also unaware of why the legislative findings were included. Livingston Dep. 101:18-102:13.

866. Eddie LaCour, Alabama's Solicitor General, authored the legislative findings, created Senator Livingston's talking points for SB 5, and helped draw the map. Trial Tr. 1337:5-15; MX4 at 29; CX5 at 29.

867. The fact the Solicitor General drafted these findings rather than legislative staff was unprecedented. Trial Tr. 2378:11-15 (Singleton).

868. Substantively, Representative Pringle agreed that "some of [the Legislative findings] look like they are" in conflict with the redistricting Guidelines adopted the week before. Pringle Dep. at 93.

869. Additionally, the findings excluded the statement from the 2021 and 2023 guidelines that "[a] redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength." *Compare* MX24 *with* MX31; compare CX42 *with* CX19.

870. In terms of communities of interest, SB 5's findings recognized only three: "the Black Belt, the Gulf Coast, and the Wiregrass," and altered the Guidelines' definition of "community of interest" to remove from the definition shared "ethnic, racial, tribal, social . . . identities," and add similarity of "transportation infrastructure, broadcast and print media, educational institutions." *Compare* MX31, CX19 *with* MX22.

871.   While several pages of findings are devoted to linking Mobile and Baldwin, including reference to its shared "French and Spanish colonial heritage," only five lines are provided to the Black Belt. MX31 at 4-8; CX19 at 4-8; *see also supra* ¶¶ 843-47.

### D.    Direct Evidence of Intent and Other Contemporaneous Statements

872.   The text of SB 5, the depositions of the Redistricting Committee Co-Chairs and Committee staff, and other contemporaneous statements from defense attorneys and legislators provide compelling evidence of intentional discrimination.

873.   The Legislature's motivations in passing SB 5 are evident from the unprecedented legislative findings in the bill itself. Trial Tr. 1337:12-15 (Bagley); MX4 at 29; CX5 at 29. A majority of the Legislature endorsed these findings by voting for SB5 thereby making their intent explicit. Trial Tr. 1455:10-13 (Bagley). The findings make clear that a majority of the Legislature intentionally discriminated against Black Alabamians.

874.   Nothing in the legislative findings mention drawing a second majority-Black district. Trial Tr. 1430:13-14 (Bagley).

875.   Instead, the SB 5 findings begin by prioritizing the "non-negotiable" principles that the 2023 Plan keep three delineated "communities of interest" together and forbids "pairing incumbent[s]," MX31 at 3; CX19 at 3. Based on her extensive academic and consulting work across many states, Plaintiffs' expert Dr.

Duchin offered the unrebutted testimony that an absolute requirement that incumbents never be paired is unheard of and not a "traditional" districting goal. Trial Tr. 299:13-19.

876.   The SB 5 findings frame the Gulf Port community of interest in racial terms by repeatedly noting its shared "French and Spanish colonial heritage," which is every witness who testified on this issue understood was a reference to "White" people in the region. Trial Tr. 1455:14-1456:4 (Bagley); *see also supra* ¶¶ 843-47.

877.   The findings explicitly recognize three communities of interest: the Black Belt, the Wiregrass, and the Gulf Port region, i.e., Mobile and Baldwin Counties. Trial Tr. 1298:6-19 (Bagley); MX3 at 1; CX10 at 1. However, despite identifying keeping all three identified communities together as a "non-negotiable" goal, SB 5 succeeds only in keeping together the majority-White area of Mobile and Baldwin.

878.   This was the Legislature's intent from the outset. Both Rep. Pringle and Sen. Livingston communicated to Mr. Hinaman the importance of maintaining this White community together, despite this Court's finding that maintaining that community was not as important as remedying the Section 2 violation. MX4 at 29; CX5 at 29.

879.   The text of SB 5 reflects this intent. As Dr. Duchin explained, because Mobile and Baldwin together make up over 90% of a congressional district in terms

of population, "the effect of keeping those counties together is to come close to prescribing a congressional district" in the SB 5 findings. Trial Tr. 298:9-15.

880.   Dr. Duchin also explained that SB 5's "non-negotiable" goal of keeping both the Black Belt and Wiregrass together was "not . . . mathematically possible" because "those two communities of interest overlap and, taken together, they have more population than a congressional district can have." Trial Tr. 297:24-298:8.

881.   Defendants' counsel also conceded that he was "not aware of a way to draw two majority-black districts without going against the legislature's priority of keeping Mobile and Baldwin Counties whole." Trial Tr. 2647:25-2648:6 (Davis).

882.   Thus, the SB 5 legislative findings essentially prevent the creation of a majority-Black district but require "a majority-White district that contains all of the City of Mobile, a city that itself contains 100,000 black Alabamians." SB 5's text is explicit in requiring this dilution of the Black vote. Trial Tr. 298:25-299:2 (Duchin).

883.   In distinct contrast, the SB 5 findings fail to mention a desire to protect Black voters from vote dilution. Tellingly, the SB 5 legislative findings fail to mention Black people at all. Trial Tr. 1430:14-16 (Bagley); *see also supra* ¶¶ 839-47.

884.   The SB 5 findings make no mention the heritage or cultural contributions of African or Black Alabamians. In the text of SB 5, the Legislature

made explicit that its intent was to protect the White people of "French and Spanish colonial heritage" over the Black community. Trial Tr. 1456:17-1457:3 (Bagley).

885.   Next, the comments of Mr. LaCour, the Solicitor General and author of the SB 5 findings, offer significant further direct evidence of discriminatory intent.

886.   Mr. LaCour confirmed that the Legislature's intent was to avoid creating a second opportunity district. Aug. 2023 Tr. 75:5-18 (LaCour) (stating that the Court's order requiring the creation of an additional opportunity district had no relevance to the enacted 2023 Plan). Mr. LaCour made clear that the Legislature's position is that it did not need to add an opportunity district, Aug. 2023 Tr. 75:5-18, so long as the State did not try to use the 2021 plan again, Aug. 2023 Tr. 74:8-18.

887.   The plain implication here is that, notwithstanding the orders of this Court and the Supreme Court, the Legislature set out to devise a plan that essentially would not allow Plaintiffs to meet or beat the 2023 plan on the manufactured redistricting principles identified the SB 5 findings. The statements of counsel to the State at the end of this trial appear to admit as much. Tr. 2647:11-2648:6 (Davis).

888.   Moreover, in speaking to this Court, Mr. LaCour explicitly recognized that the Milligan Plaintiffs had identified the Legislature's decision to prioritize the creation of a district for White people of "French and Spanish colonial heritage" over a district for people in the Black Belt as a core argument against the 2021 Plan. Yet, despite recognizing this racialized conception motivating the unification of Mobile

and Baldwin Counties, the State doubled down on protecting the electoral strength of White voters over the rights of Black people. Aug. 2023 Tr. 38:12-41:2 (LaCour).

889.   Mr. LaCour's statements also reveal the barely hidden pretextual nature of the Legislature's justifications for enacting SB 5.

890.   For example, Mr. LaCour said that the 2023 Plan was the best Alabama could do to create an additional opportunity for Black voters without racial gerrymandering because it prioritized incumbent protection and communities of interest. See Aug. 2023 Tr. 155:24-156:4 (LaCour) ("I think this is as reasonable of an opportunity as you can get without violating traditional districting principles in service of a racial gerrymander. And for that reason, we do think it complies with Section 2 of the Voting Rights Act."); see also Aug. 2023 Tr. 164:4-10 ("District 2 I submit is as close as you are going to get to a second majority-black district without violating . . . the Supreme Court's decision in Allen, which is the supreme law of the land when it comes to interpreting Section 2. So, I think this is as close as you could get without violating the Constitution, without violating Allen vs. Milligan.").

891.   But Mr. LaCour's statement is not true. Senator Livingston and Representative Pringle, the legislators actually charged with creating Alabama's congressional map, both testified to the contrary. That is, both legislators testified that the Community of Interest Plan satisfied SB 5's legislative findings. Livingston Dep. 61:21-64:24; Pringle Dep. 41:5-11, 67:17-71:5. And despite its deep flaws, the

COI Plan did provide Black voters with more electoral opportunity than the enacted 2023 Plan. *Supra* ¶¶ 808, 833. A majority of the State House voted to approve the COI Plan. Joint Stip. ¶ 130. And Rep. Pringle himself submitted the COI Plan to the Special Master as an acceptable remedy. *See* Notice of Submission of Proposed Remedial Plan, In Re Redistricting 2023, No. 2:23-mc-1181 (N.D. Ala. Sept. 11, 2023), Doc. 6. These facts further demonstrate that Mr. LaCour's statements to this Court were not true. There were additional maps available to the Legislature that would have created an additional district in which Black voters could have had a greater opportunity than in SB 5.

892.   Likewise, despite the orders of this Court and the U.S. Supreme Court, Mr. LaCour admitted that the State's position was that they did not need to create an additional opportunity district so long as they draw a plan that complied with traditional redistricting principles. Aug 2023 Tr. 164:13-18 (LaCour). The SB 5 legislative findings, however, do not reflect Alabama's traditional redistricting principles. *Supra* ¶ 73. Mr. LaCour further appeared to concede that what is now Duchin Plan E would satisfy Gingles I as he conceived of it, as it kept the Black Belt in two districts, is similar in terms of compactness, and has the same number of county splits. See *supra* ¶¶ 83, 93, 261; *see also* Aug. 2023 Tr. 164:23-165:2. The existence of Duchin Plan E further demonstrates that Mr. LaCour's assertions that

SB 5 provided the best opportunity to elect possible while still complying with traditional districting principles were untrue.

893.  Mr. LaCour further said to this Court that Alabama's "primary argument here is a statutory in *Gingles I*. Reasonably configured means in light of the principles in the challenged plan, not principles in the ether." Aug. 23 Tr. 70:4-7. But even if Mr. LaCour's assertion was correct, it concedes that the racial predominance analysis remains the same because that analysis would not change due to a new State-drawn plan. The racial predominance analysis tests the intent of the map drawer. Because the Supreme Court already held that race did not predominate in the illustrative maps, the supposed concern offered by Mr. LaCour is mere pretext.

894.  Importantly, key legislators understood that, absent a second majority-Black district, Black candidates would continue to lose in CD2. White legislative leaders knew that absent a majority-minority district a Black candidate would lose and White voters would elect a White Republican instead. Trial Tr. 1342:10-1343:9 (Bagley). For example, in a fall 2021 radio interview, Rep. Pringle referred to one of the *Singleton* plaintiffs' plans that lacked any majority-Black district as the "Republican opportunity plan." According to Rep. Pringle, "[w]ithout being a majority-minority district, you can see where Republicans might be able to win all seven congressional districts." MX4 at 24; CX5 at 24. Speaking at the Fairhope Yacht Club to a Republican women's group the day before the 2023 special session,

Rep. Matt Simpson said, "This is one of those 'be careful what you wish for because you just might get it.'" By that he meant that the plan he believed would pass could lead to an all-White congressional delegation. MX4 at 24; CX5 at 24; Trial Tr. 1341:9-20 (Bagley).

895.   Despite this broad understanding of the need for a majority-Black district, the Legislature never tried to draw such a district. No one instructed the Legislature's map drawer, Mr. Hinaman, to draw a second majority-Black district. Nor did the Co-Chairs ever instruct Mr. Hinaman to adjust the map based on public input, which focused on the need for the creation of a second majority-Black (or close to it) district. Trial Tr. 1337:1-5 (Bagley); MX4 at 29; CX5 at 29.

896.   Senator Livingston understood that SB 5 did not create a real opportunity district. Despite testifying that CD2 in SB 5 created a real opportunity for a well-funded, Black-preferred candidate to win, Livingston quickly admitted that Doug Jones would not have won in SB 5's CD2 in 2020 even though Mr. Jones ran as a well-funded, well-known incumbent. Livingston Dep. 96:15-97:3, 99:4-100:4.

897.   State House Speaker Nathaniel Ledbetter was even more direct in stating the Legislature's strategy: "If you think about where we were, the Supreme Court ruling was 5-4, so there's just one judge that needed to see something different. And I think the movement that we have and what we've come to compromise on

today gives us a good shot." Trial Tr. 1342:18-1343:3 (Bagley); MX4 at 27; CX5 at 27.

* * *

898.   In sum, the direct and circumstantial evidence in this case support a finding that the State Legislature enacted the 2023 Plan with a discriminatory intent.

## PROPOSED CONCLUSIONS OF LAW

### VII.    Jurisdictional Issues

#### A.    Plaintiffs Have Standing

899.   In a racial vote-dilution claim under Section 2 of the Voting Rights Act, an individual has standing to pursue a claim if they are a Black registered voter who resides in a "packed or cracked" district but could be redrawn into a new majority-Black district. *See Nairne v. Ardoin*, No. 3:22-cv-178-SDD-SDJ, 2023 WL 7673856, at *5 (M.D. La. Nov. 14, 2023) ("the relevant standing inquiry" is whether Plaintiffs live in a "a reasonably compact area that could support additional" majority-Black districts); *see also Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1365 (N.D. Ga. 2018) (Plaintiffs alleged sufficient injury where they live in an area "where African-American voters are sufficiently numerous and geographically compact to comprise a majority of voters in at least one additional House district").

900.   Here, individual Plaintiffs Evan Milligan, Khadidah Stone, Benjamin Jones, Manasseh Powell, and Wendell Thomas have standing to challenge vote

dilution in Montgomery County as Black registered voters living in a cracked district. *See supra* ¶¶ 2, 5, 19, 21, 23.

901. Individual Plaintiffs Shalela Dowdy and LaKeisha Chestnut have standing to challenge vote dilution in Mobile County as Black registered voters living in a cracked district. *See supra* ¶¶ 3, 17.

902. Individual Plaintiff Letetia Jackson has standing to challenge vote dilution in Houston County as a Black registered voter living in a cracked district. *See supra* ¶ 4.

903. Individual Plaintiff Marcus Caster has standing to challenge vote dilution in Washington County as a Black registered voter living in a packed district. *See supra* ¶ 16.

904. Individual Plaintiffs Bobby DuBose and Rodney Love have standing to challenge vote dilution in Jefferson County as Black registered voters living in a packed district. *See supra* ¶¶ 18, 20.

905. Individual Plaintiff Ronald Smith has standing to challenge vote dilution in Bullock County as a Black registered voter living in a cracked district. *See supra* ¶ 22.

906. The Court concludes that Plaintiffs Evan Milligan, Shalela Dowdy, Letetia Jackson, Khadidah Stone, Marcus Caster, LaKeisha Chestnut, Bobby DuBose, Benjamin Jones, Rodney Love, Manasseh Powell, Ronald Smith, and

Wendell Thomas have individual standing.

907.   An organization has associational standing if: (1) its "members would otherwise have standing to sue in their own right;" (2) the "interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Alabama NAACP and GBM satisfy the three *Hunt* factors in the challenged regions. *See Greater Birmingham Ministries v. Sec'y of State* ("*GBM*"), 992 F.3d 1299, 1316 (11th Cir. 2021) (holding that both the Alabama NAACP and GBM had standing to assert a §2 claim against an Alabama law when both organizations identified members harmed by the law).

908.   *First*, there is no serious dispute that protecting the right to vote is germane to both organizations' purposes. *See GBM*, 992 F.3d at 1316 (finding that a Section 2 lawsuit was germane to GBM's and the Alabama NAACP's "focus on voter rights and equal opportunity for minority voters"). *Second*, Plaintiffs request prospective injunctive relief that does not require the participation of individual members in the lawsuit. *See id.* (finding that the "voting rights claims asserted" and the "injunctive relief requested" do not "require the participation of the individual members"). *Third*, the Alabama NAACP and GBM have both identified members who are Black registered voters residing in challenged area. *Supra* ¶¶ 7, 13; *see*

*GBM*, 992 F.3d at 1316 (holding that GBM and the Alabama NAACP could assert claims on behalf of its individual members); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008) (permitting the Florida NAACP to assert claims on behalf of its members).

909.    The Court concludes that both Alabama NAACP and GBM have established associational standing.

### B.    Section 2 Creates a Private Right of Action

910.    Plaintiffs have a private right of action to bring their Section 2 claim.[9] The VRA's text and decades of binding precedent correctly foreclose any argument that the VRA lacks a private right of action. *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality opinion) (quoting S. Rep. No. 97-417, at 30 (1982)); *see id*. at 240 (Breyer, J., concurring) (same). The *Milligan* and *Caster* Plaintiffs also brought their claim under 42 U.S.C. § 1983, which provides another basis for this Court's jurisdiction. *Milligan* Doc. 329 ¶ 196; *Caster* Doc. 271 ¶ 129.

911.    Section 2 of the Voting Rights Act is privately enforceable by people like the plaintiffs in this case. In *Morse*, the Supreme Court concluded that "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." 517 U.S. at 232 (omission in original).

---

[9] Plaintiffs incorporate by reference their briefing in opposition to the Secretary's motion to dismiss on this ground. *See Milligan,* Doc. 337 and Caster, Doc. 277.

912.   Furthermore, in 1975, Congress amended the general enforcement mechanism in Section 3 to make explicit that private parties can sue to enforce the VRA. Section 3 originally gave enforcement authority only to the Attorney General of the United States. The 1975 amendments set forth the judicial procedures governing actions by "the Attorney General or an aggrieved person . . . under any statute to enforce the voting guarantees of the fourteenth [and] fifteenth amendment." 52 U.S.C. §§ 10302(a)-(c); *see Morse*, 517 U.S. at 233 (explaining that the 1975 amendments to the VRA recognized that private rights of action were available to enforce the VRA); *Ala. State Conf. of the NAACP v. Alabama*, 949 F.3d 647, 651-52 (11th Cir. 2020), *vacated as moot*, 141 S. Ct. 2618 (2021).[10] Justice Stevens's opinion for the court, Justice Breyer's concurrence, and Justice Thomas's dissent in *Morse* all recognized that the amended Section 3 gives a right of action under the VRA to private parties. *Morse,* 517 U.S. at 233; *see also id.* at 240 (Breyer, J., concurring) (recognizing that, in amending § 3, Congress gave "a private right of action to enforce § 10 [of the VRA], no less than it did to enforce §§ 2 and 5"); *id.* at 289 (Thomas, J., dissenting) ("30 recognizes that private individuals can sue under the Act." (cleaned up)). "A ruling that Section Two does not provide a private right

---

[10] The Eleventh Circuit's decision was vacated by the Supreme Court because the case had become moot, 141 S. Ct. 2618 (2021), but the portion discussing private Section 2 enforcement is consistent with the history of the VRA and the fact that private parties have sued States under Section 2 for decades. *See, e.g., Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254 (2015). (private challenge against the State of Alabama); *LULAC*, 548 U.S. at 407 (private challenge against state officials); *Chisom v. Roemer*, 501 U.S. 380 (1991) (same).

of action would badly undermine the rationale offered by the Court in *Morse*." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. Jan 24, 2022) ("*Milligan I*").

913.    The Eleventh Circuit agrees that the VRA contains a private right of action. *See, e.g.*, *Ala. State Conf. of NAACP*, 949 F.3d at 653; *Ford v. Strange*, 580 F. App'x 701, 705 n.6 (11th Cir. 2014) ("A majority of the Supreme Court has indicated that [S]ection 2 of the [VRA] contains an implied private right of action."). And recent decisions from the Fifth Circuit (which postdate the outlier Eighth Circuit decision on which the Secretary heavily relies) also agree that Section 2 is privately enforceable. *See Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023); *see also Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 452, 410-11 (S.D. Miss. July 2, 2024) ("[F]ind[ing] Chief Judge Smith's dissent in [*Ark. State Conf., of the NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023)] to express the more persuasive analysis."). No other court has adopted the Eighth Circuit's flawed interpretation of the VRA, and precedent forecloses this argument.

914.    Moreover, as this Court previously determined, "accepting the defendants' argument would require the court to ignore decades of controlling Section Two jurisprudence." *Stone v. Allen*, 717 F. Supp. 3d 1161, 1172 (N.D. Ala. 2024). "Since the passage of the Voting Rights Act, federal courts across the country,

including both the Supreme Court and the Eleventh Circuit, have considered numerous Section Two cases brought by private plaintiffs." *Milligan I*, 582 F. Supp. 3d at 1031 (collecting cases). "Congress is undoubtedly aware of [the Court] construing § 2 to apply to districting challenges." *Allen v. Milligan,* 599 U.S. 1, 39 (2023). "Some of those challenges . . . were brought by private parties." *Stone*, 717 F. Supp. 3d at 1173. "[S]tare decisis carries enhanced force when a decision . . . interprets a statute . . . . [because] unlike in a constitutional case, critics of our ruling can take their objections across the street, and Congress can correct any mistake it sees." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015) (citation omitted). "Because Congress has spurned multiple opportunities to reverse the Supreme Court's and lower courts' treatment of private-party-plaintiff Section Two actions, the Supreme Court itself would require a superspecial justification to warrant reversal. No superspecial justification exists here." *Stone*, 717 F. Supp. 3d at 1173 (cleaned up).

915.   Plaintiffs also pled a cause of action to enforce Section 2 rights under the VRA through § 1983. *See Milligan* Doc. 329 ¶ 196; *Caster* Doc. 271 ¶ 129. A "major purpose" of Congress's enactment of § 1983 was to "benefit those claiming deprivations of constitutional and civil rights." *Maine v. Thiboutot*, 448 U.S. 1, 9 (1980); *accord Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 175-76 (2023). This circuit has also held a related voting rights law enforceable

under § 1983. *See Schwier v. Cox*, 340 F.3d 1284, 1294-97 (11th Cir. 2003); *see also Vote.org v. Callanen*, 89 F. 4th 459, 478 (5th Cir. 2023).

916.    And, it is doubtful that *Gonzaga U. v. Doe* applies, as it involved § 1983 enforcement of laws enacted under the Spending Clause, as opposed to the VRA, which was enacted under the Reconstruction Amendments. 536 U.S. 273, 284 (2002); *cf. Schwier*, 340 F.3d at 1291 n.5 (noting the Supreme Court's reluctance to "infer enforceable rights from Spending Clause statutes").

917.    But even under *Gonzaga*, Section 2 is enforceable via Section 1983. To meet *Gonzaga*, plaintiffs must show the "provision in question is 'phrased in terms of the persons benefited' and contains 'rights-creating,' individual-centric language with an 'unmistakable focus on the benefited class.'" *Talevski*, 599 U.S. at 183 (citations omitted). "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284.

918.    Section 2 is enforceable under section 1983 because it meets this test. First, Section 2 contains paradigmatic rights-creating language. The Supreme Court has explicitly held that Section 2's reference to "the right of any citizen," 52 U.S.C. § 10301(a), confirms that the "right to an undiluted vote" does not belong to the "minority as a group," but to the group's "individual members." *Shaw v. Hunt*, 517 U.S. 899, 917 (1996). This "right is presumptively enforceable by § 1983," *Gonzaga*, 536 U.S. at 284, and this presumption can only be rebutted in "exceptional cases."

*Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994). Section 2's plain rights-creating language thus presumptively permits § 1983 enforcement.

919.   In light of this clear guidance from the Supreme Court, and a long history of litigation recognizing a private right of action under the VRA that has been ratified repeatedly by Congress as it reauthorized the VRA, the Secretary's argument that the VRA does not authorize suits by private parties is meritless.

## VIII.   **Plaintiffs Satisfied the *Gingles* Preconditions**

920.   Section 2 of the VRA renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

921.   A single-member congressional district plan that dilutes the voting strength of a minority community may violate Section 2. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 423-42 (2006) ("*LULAC*").

922.   A claim under Section 2 of the VRA alleging racial vote-dilution must satisfy three "preconditions" before the Court analyzes the totality of the circumstances to determine whether there has been a violation: (1) the minority group is "sufficiently large and [geographically] compact to constitute a majority in [an additional] reasonably configured district"; (2) that the minority group "is politically cohesive"; and (3) "that the white majority votes sufficiently as a bloc to

enable it . . . to defeat the minority group's preferred candidate." *Milligan*, 599 U.S. at 18 (cleaned up).

## A.    Plaintiffs Satisfied the First *Gingles* Precondition.

923.    *Gingles* 1 requires a plaintiff to show that the minority group is "sufficiently large and geographically compact to constitute a majority" in more than the existing number of districts. *Gingles*, 478 U.S. at 50. "The first [precondition], focused on geographical compactness and numerosity, is 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Milligan*, 599 U.S. at 18 (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

924.    Plaintiffs typically satisfy *Gingles* 1 by offering a hypothetical redistricting plan for the jurisdiction at issue that contains one or more additional majority-minority districts. *See id*. at 20 (describing plaintiffs' reliance on "illustrative maps—that is, example districting maps that Alabama could enact"). These proposed districts are "not cast in stone"—they are illustrative only. *Clark v. Calhoun Cnty.*, 21 F.3d 92, 95 (5th Cir. 1994) ("*Clark I*"); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (noting that the "ultimate end of the first *Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem").

925.   The Court concludes that Plaintiffs have shown that Alabama's Black population is sufficiently numerous and geographically compact to support the creation of a reasonably configured second majority-Black congressional district.

## 1.    Numerosity

926.   Plaintiffs "asserting § 2 liability must show by a preponderance of the evidence that the [eligible] minority population in the potential election district is greater than 50 percent." *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2006).

927.   Here, Defendants have stipulated that Plaintiffs have satisfied the numerosity prong of the first Gingles precondition. Joint Stip. ¶ 152.

928.   The Court agrees. Based on the foregoing findings of fact, Plaintiffs satisfy the numerosity component of the first *Gingles* precondition because in each of their illustrative districts, the Black VAP (and CVAP) exceeds 50%.

## 2.    Reasonable Configuration

929.   Alabama's defense of the 2023 Plan centers on its contention that Plaintiffs have not shown that the Black population is sufficiently compact to create two reasonably configured majority-Black congressional districts. Defendants appear to contend both that the Black population in the relevant regions is not sufficiently compact enough to form any congressional plan with two majority-Black districts, and also that none of the Plaintiffs' illustrative plans (or the districts

within them) are reasonably configured. The record shows that Plaintiffs have firmly established otherwise.

930.   The Supreme Court explained that to satisfy the first *Gingles* precondition, Plaintiffs must show that the minority group is "sufficiently . . . [geographically] compact to constitute a majority in a reasonably configured district." *Milligan,* 599 U.S. at 18 (internal citation omitted).

931.   To the extent that these two questions are distinct, this Court held in 2021 as to the former that:

> Our visual assessment of the geographic dispersion of Black population in Alabama, together with statistics about Black population centers in the state, suggest to us that Black voters in Alabama are relatively geographically compact. The map reflects that there are areas of the state where much of Alabama's Black population is concentrated, and that many of these areas are in close proximity to each other. Just by looking at the population map, we can see why Dr. Duchin and Mr. Cooper expected that they could easily draw two reasonably configured majority-Black districts. Second, we consider our visual assessment of the majority-Black districts in the Duchin and Cooper plans. We do not see tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find that any District 2 could be considered reasonably compact.

*Milligan I*, 582 F. Supp. 3d at 1011. (internal citations omitted).

932.   Considering this question again in 2023, this Court recognized that "the enactment of the 2023 Plan does not change the map we visually assessed, or the conclusion that we drew from it." *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1303 (N.D. Ala. Sept. 5, 2023) ("*Milligan II*").

933.   The only new evidence presented by Defendants on this front since that ruling comes from their expert Dr. Sean Trende, who opines that Plaintiffs' illustrative plans "stitch[ ] together two populations of Black residents in distinct metropolitan areas, with lightly populated, rural areas in between." DX10 at 93, But the Court declines to credit this superficial analysis, and instead credits not only its own visual analysis, but also the testimony from Dr. Duchin and Mr. Cooper that while the Black Belt does constitute a rural area, it also contains a Black population that is distributed consistently throughout the regions between Montgomery and Mobile that was linked to both cities. *See supra* ¶¶ 58-61.

934.   Having considered the full record including trial testimony, the Court once again holds that—to the extent the inquiries regarding population compactness and reasonable configuration are distinct—Plaintiffs have shown that Alabama's Black population is sufficiently concentrated to draw two reasonably compact districts.

935.   As to the question of reasonably configuration of illustrative districts, the Supreme Court has held that a district is "reasonably configured" if it "comports with traditional districting criteria, such as being contiguous and reasonably compact." *Milligan,* 599 U.S. at 18 (citation omitted).

936.   Plaintiffs satisfied this precondition eighteen months ago. During the preliminary injunction phase, Plaintiffs submitted eleven illustrative plans that

demonstrated the possibility of drawing congressional plans with two majority-Black districts that comported with objective traditional redistricting principles. As a result, this Court found, and the Supreme Court affirmed, "that plaintiffs' illustrative maps 'strongly suggest[ed] that Black voters in Alabama' could constitute a majority in a second, reasonably configured, district." *Milligan,* 599 U.S. at 20 (quoting *Milligan I*, 582 F. Supp. 3d at 1010).

937.   To reach that conclusion, this Court and the Supreme Court rejected Alabama's argument that Plaintiffs' maps were not reasonably configured because of their treatment of certain communities of interest, *id.* (citing *Milligan I*, 582 F. Supp. 3d at 1012-15), and emphasized that *Gingles* 1 did not require either the Court or Plaintiffs "to conduct a 'beauty contest[]' between plaintiffs' maps and the State's." *Id.* (quoting *Milligan I*, 582 F. Supp. 3d at 1012).

938.   Accordingly, Plaintiffs have already established the factual and legal predicates to satisfy the first *Gingles* precondition.

939.   Nevertheless, Alabama argues that because the 2023 Plan purportedly reflects a different balance of the State's newly identified redistricting principles, CX46 at 37:9-38:6, Plaintiffs' illustrative plans cannot be used to satisfy the first *Gingles* precondition. Alabama is wrong for several reasons.

940.   *First*, the Section 2 results claims at issue here are not about the intent of the legislature. *Milligan,* 599 U.S. at 37. Indeed, both this Court and the Supreme

Court have already rejected Alabama's attempt to "require[] plaintiffs to demonstrate that any deviations between the State's enacted plan and race-neutral alternatives 'can be explained *only* by racial discrimination.'" *Id*. The metric for identifying dilution and satisfying *Gingles* 1 cannot turn on how Plaintiffs' plans compare to a state's plan and its purportedly race-blind application of redistricting criteria. *Cf. id*. at 1512-13 (rejecting Alabama's similar simulations argument).

941. *Second*, the question posed by the first *Gingles* precondition is whether a "reasonably compact" district can be drawn around a geographically compact minority group. *LULAC*, 548 U.S. at 435; *see also id.* at 433 ("[T]he first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." (quoting *Bush v. Vera,* 517 U.S. 952, 997 (1996)). And to weigh that question, courts consider "objective factors," *Shaw v. Reno*, 509 U.S. 630, 647 (1993), like contiguity, respect for "existing political subdivisions, such as counties, cities, and towns," and compactness (meaning no "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find [the minority group] sufficiently compact"). *Milligan,* 599 U.S. at 20 (citations omitted). Applying these factors, the Supreme Court affirmed "that plaintiffs' illustrative maps 'strongly suggest[ed] that Black voters in Alabama' could constitute a majority in a second, reasonably configured, district." *Id*. at 20 (citation omitted). Absent a new census showing a dramatic shift in the geographic

340

compactness of Black Alabamians, nothing can change this conclusion, including Alabama's passage of the 2023 Plan.

942.  *Third*, the focus of the *Gingles* 1 compactness inquiry is on whether the plan is "reasonably configured," as measured by whether the plan comports with objective traditional criteria such as compactness and contiguity. *See id*. at 18. There is no accompanying requirement that illustrative plans satisfy a specific criterion at a specific threshold. *Id*. at 21; *see also LULAC*, 548 U.S. at 433 ("[N]o precise rule has emerged governing § 2 compactness.").

943.  This makes good sense. As the Supreme Court has observed, those "redistricting factors a legislature could consider" are "numerous and malleable" and "surprisingly ethereal." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 190 (2017). Requiring Section 2 plaintiffs to justify their illustrative plans against just those districting criteria identified by the state in just the way the state desires would permit states to contrive self-serving criteria designed to ensure that no plaintiff, no matter the degree of vote dilution, could satisfy the *Gingles* test.

944.  Alabama's approach in this case only illustrates the point. Alabama's Solicitor General appended "findings" to the 2023 Plan at the eleventh-hour as a means of reinventing the State's districting criteria and then faulted Plaintiffs' illustrative plans for not abiding by them. CX46 at 156:21-25 (Alabama's counsel explaining its strategy that altering the balance of districting criteria in the 2023 Plan

allegedly permits the State to ignore the Court's order requiring the creation of a second opportunity district); CX46 at 162 (admitting that the findings and redistricting criteria contained in SB 5 are "essentially . . . describing the map").

945.   Fortunately, precedent forecloses that outcome. As the Supreme Court explained, district courts do "not have to conduct a beauty contest[] between plaintiffs' maps and the State's." *Id*. at 21.

946.   Taken to its logical conclusion, SB 5's legislative findings could purport to require Plaintiffs' illustrative plans to retain the core of the existing map to satisfy *Gingles* 1. But the Supreme Court has already rejected the notion that "a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Milligan,* 599 U.S. at 22.

947.   For this reason, Alabama's hand-waving regarding the Supreme Court's statement that "§ 2 never require[s] adoption of districts that violate traditional redistricting principles" is of no moment. *Id.* at 30. The Supreme Court did not mean that a Section 2 claim can be defeated whenever a state identifies a criterion on which a plaintiff's illustrative plans fails to beat the state's plan. Otherwise, the Court could not have flatly rejected Alabama's argument that Plaintiffs' Section 2 claim failed because their illustrative plans did not perform well on Alabama's much touted "core retention" criterion. *Id.* at 21; *see also id.* (rejecting

Alabama's arguments on the same score with respect to communities of interest).
Courts cannot entirely defer to ever-shifting state policy preferences when those
preferences perpetuate (and occasionally may be designed to perpetuate) violations
of the Constitution or the VRA. *See Perry v. Perez*, 565 U.S. 388, 393 (2012);
*Upham v. Seamon*, 456 U.S. 37, 43 (1982); *see also LULAC*, 548 U.S. at 441
(rejecting a state policy of incumbency protection because it could "[]not justify the
[plan's] effect on Latino voters").

948.   Rather, the Court was describing the simple proposition that a Section
2 illustrative plan must be "reasonably configured" in that it generally comports with
objective traditional criteria such as compactness, contiguity, political subdivision
splits, and equal population. *See Milligan,* 599 U.S. at 19-20.

949.   Thus, the fact that Alabama has drawn a new plan that it asserts
improves on one or more metrics does nothing to undermine the fact that Plaintiffs'
illustrative plans show that the minority group is geographically compact and
numerous enough to comprise a majority of the voting age population in a
reasonably configured district. We are once again "careful to avoid the beauty
contest that a great deal of [Alabama's] testimony and argument seemed designed to
try to win." *Milligan I*, 582 F. Supp. 3d at 1012.

950.   At bottom, Defendants' argument that Plaintiffs' illustrative plans
violate baseless bright-line tests for compliance with Defendants' preferred

redistricting criteria says nothing about the extent to which the illustrative districts are "reasonably configured." Indeed, "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles." *Chen v. City of Houston*, 206 F.3d 502, 519 (5th Cir. 2000); *see also Wright*, 301 F. Supp. 3d at 1326 (approving "far from perfect" illustrative plan as satisfying the first *Gingles* precondition). Contrary to Defendants' assertions, the first *Gingles* precondition does not require an illustrative plan to be superlative in any one of traditional redistricting criteria—let alone maximize all of them.

951.    Even if there were any doubt on this point, however, as detailed above, several of Plaintiffs' illustrative plans do indeed meet or beat the State's 2023 Plan on traditional districting criteria, making Defendants' argument pointless.

952.    Finally, Alabama's argument that the passage of the 2023 Plan means race predominated in the drawing of Plaintiffs' illustrative plans is deeply confused. This Court already rejected that argument. *See Milligan*, 582 F. Supp. 3d at 1029 ("reject[ing]" Defendants' argument that Plaintiffs' illustrative plans "prioritize race above all race-neutral traditional redistricting principles"). And the Supreme Court affirmed. *See also Milligan,* 599 U.S. at 29-33. Moreover, the Court held that, "under certain circumstances," the Constitution *does* "authorize[] race-based redistricting as a remedy" for VRA violations. *Id*. at 41. Alabama fails to explain how the 2023 Plan's passage could inform whether race predominated in the drawing of Plaintiffs'

illustrative plans eighteen months ago or why the 2023 Plan prevents a complete remedy in this case.

953.   The three new illustrative plans developed after enactment of the 2023 Plan—Mr. Cooper's Illustrative Plans 8 and 9 and Dr. Duchin's Plan E—only confirm that there remain multiple additional ways to draw two reasonably-configured majority-Black congressional districts in Alabama, including by prioritizing core retention of the Remedial Map in place for the 2024 elections (Illustrative Plan 8), prioritizing compactness (Illustrative Plan 9), or prioritizing compactness while also uniting more of Jefferson County in a single district (Plan E). Defendants cannot plausibly contend that race predominated in the configuration of any of these new illustrative plans.

954.   In short, the Supreme Court, and this Court, have already found that Black Alabamians are sufficiently geographically compact to draw reasonably configured congressional plans with two majority-Black districts. *Id.* at 1504. The Supreme Court has also affirmed that "the effects test of § 2 as interpreted in *Gingles*" can "authorize[] race-based redistricting as a remedy for state districting maps that violate § 2." *Id.* at 1516-17. The passage of the 2023 Plan does nothing to upset that conclusion.

*   *   *

955.   Based upon the foregoing findings of fact and conclusions of law, the Court holds that Plaintiffs have established the first *Gingles* precondition. *See supra* Findings of Fact § III.

## B.    Plaintiffs have Satisfied the Second and Third *Gingles* Preconditions

956.   The second and third *Gingles* preconditions require that "the minority group [ ] be able to show that it is politically cohesive, and that "the White majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Milligan,* 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 52).

957.   The second precondition concerns "the political cohesiveness of the minority group," and is used to "show[] that a representative of its choice would in fact be elected." *Id*. at 18–19. Plaintiffs can establish minority cohesiveness by showing that "a significant number of minority group members usually vote for the same candidates." *Solomon v. Liberty Cnty.* 899 F.2d 1012, 1019 (11th Cir. 1990) (Kravitch, J., concurring); *see also Gingles*, 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the meaning of § 2." (internal citations omitted)).

958.   The third precondition reveals whether "'the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." *Milligan,*

599 U.S. at 19. "[A] White bloc vote that normally will defeat the combined strength of minority support plus White 'crossover' votes rises to the level of legally significant White bloc voting." *Gingles*, 478 U.S. at 56.

959.   "As a part of these preconditions, plaintiffs do not have to prove that race is the sole or predominant cause of the voting difference between the minority and majority voting blocs, nor must plaintiffs disprove that other race-neutral reasons, such as partisanship, are causing the racial bloc voting." *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1264 (N.D. Ga. 2023). In *Solomon II*, the Eleventh Circuit properly placed inquiries about whether "the degree and nature of the bloc voting weigh against an ultimate finding of minority exclusion from the political process" outside the preconditions and into the totality analysis. 221 F.3d at 1225.[11]

960.   This conclusion follows from *Gingles* itself, where "seven justices. . . agreed that proof of the second and third prerequisites does not require showing the

---

[11] Other circuits agree with this approach as well. *See United States v. Charleston Cnty.*, 365 F.3d 341, 348 (4th Cir. 2004) ("[E]xpanding the inquiry into the third Gingles precondition to ask not merely whether, but also why, voters are racially polarized . . . would convert the threshold test into precisely the wide-ranging, fact-intensive examination It is meant to precede."); *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 493 (2d Cir. 1999) ("ratify[ing] the approach taken by the district court to consider the political partisanship argument under the 'totality of circumstances' analysis rather than as part of the third Gingles precondition"); *Milwaukee Branch of the NAACP v. Thompson*, 116 F.3d 1194, 1199 (7th Cir. 1997) (agreeing that courts should "postpone this kind of inquiry to their consideration of the totality of the circumstances"); *Sanchez v. Colorado*, 97 F.3d 1303, 1313 (10th Cir. 1996) ("at the threshold, we are simply looking for proof of the correlation between the race of the voter and the defeat of the minority's preferred candidate.").

cause(s) of racial polarization." *Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-cv-05338-ELB-SCJ-SDG, 2023 WL 7093025, at *19 (N.D. Ga. Oct. 26, 2023) (three-judge court). The three-justice plurality portion of *Gingles* held that it "only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." 478 U.S. at 63. Justice O'Connor's concurrence, joined by three other justices, similarly agreed that as to the preconditions, defendants cannot rebut "statistical evidence of divergent racial voting patterns . . . by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race." *Id.* at 100 (O'Connor, J., concurring).

961.   Courts rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate. *See, e.g.*, *Gingles*, 478 U.S. at 52–54; *Nipper v. Smith*, 39 F.3d 1494, 1505 n.20 (11th Cir. 1994) (citing *Nipper v. Chiles*, 795 F. Supp. 1525, 1533 (M.D. Fla. 1992)).

962.   The ecological inference or "EI" method "is currently the 'gold standard' for use in racial bloc voting analyses." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1305 (M.D. Ga. 2018), *aff'd,* 979 F.3d 1282 (11th Cir. 2020); *see also Nairne*, 715 F. Supp. 3d at 860 ("Experts agree and courts recognize that EI produces the most reliable estimates"); *Alpha Phi Alpha Fraternity, Inc.*, 700 F. Supp. 3d at 1264 ("Courts have recognized ecological

inference ("EI") as an appropriate analysis for determining whether a plaintiff has satisfied the second and third *Gingles* preconditions." (citation omitted)).

963.  As was true during the preliminary injunction proceedings, there is again no serious dispute that Black voters are "politically cohesive," nor that the challenged districts' White majority votes "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate." *Cooper v. Harris*, 581 U.S. 285, 301 (2017).

964.  The Court credited the testimony of both the *Caster* plaintiffs' *Gingles* II and III expert, Dr. Palmer, and *Milligan* plaintiffs' *Gingles* II and III expert, Dr. Liu, during the preliminary injunction proceedings and, as detailed *supra* ¶¶ 304-28, does so again now.

965.  Dr. Palmer's testimony emphasized the clarity, consistency, and starkness of racial polarization in Alabama. He described the patterns of racial polarization as "clear" and "sharp" with Black voters being "extremely cohesive" "in every election" and White voters being "highly cohesive in opposition to the black-preferred candidate." Trial Tr. at 494:1-12 (Palmer). Indeed, in statewide elections between 2016 and 2022 Dr. Palmer found that Black voters supported their preferred candidates "with [a]n average 93[%] of their votes," while "White voters supported the Black-preferred candidate[s] with only about 14[%] of their votes." Trial Tr. 494:1-9 (Palmer). Dr. Palmer also explained that the high level of racial

polarization, along with White bloc voting, consistently led to Black-preferred candidates' defeats. *Supra* ¶¶ 311-14.

966.   Dr. Liu reached the same conclusions, and the Court similarly credited his determination, based on his analysis of over two dozen endogenous and exogenous elections in Alabama over fifteen years, that these elections were "racially polarized at a very high level," with a stark pattern of racial block voting and robust evidence supporting the finding. Trial Tr. 680:15-681:4. Similarly, the evidence reflects that only if the racial makeup of a district is increased to majority-Black or something quite close to it, do Black voters have a realistic opportunity to elect a candidate of their choice. Trial Tr. 574:13-18 (Liu).

967.   Defendants' expert Dr. Hood does not dispute the racially polarized voting analyses and conclusions of Dr. Palmer and Dr. Liu. Trial Tr. 1898:14-19. In fact, he readily agreed that his own analysis demonstrated that Black voters in Alabama are politically cohesive and explained that he was statistically confident that the candidate of choice for Black voters was the Democratic candidate. Trial Tr. 1882:7-10, 1883:16-21, 1901:9-16. Dr. Hood also easily agreed that Black-preferred candidates are likely to be defeated in a majority-White congressional district due to racially polarized voting. Trial Tr. 1944:23-25, 1945:11-17.

968.   Defendants' expert Dr. Bonneau also does not dispute Dr. Palmer and Dr. Liu's conclusions that there is racially polarized voting in Alabama and that

Black and White voters support different candidates. Trial Tr. 1726:16-20, 1708:2-19. Dr. Bonneau further does not contest that Black voters vote cohesively in Alabama or that White voters ordinarily vote as a block sufficient to defeat Black voters' choices. Trial Tr. 1862:7-13.

969.  In short, Drs. Palmer and Liu's analyses clearly demonstrate high levels of cohesiveness among Black Alabamians and consistent White bloc voting leading to near universal defeat of Black-preferred candidates across the state and in each individual congressional district outside of majority-Black CD7. Alabama does not dispute these facts. The Court finds that Plaintiffs have satisfied the second and third *Gingles* preconditions.

## IX.    Based on the Totality of Circumstances, Plaintiffs Have Proven That The 2023 Plan Violates Section 2 of the VRA.

970.  Beside the *Gingles* preconditions, a plaintiff "must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Milligan*, 599 U.S. at 18.

971.  To undertake the totality-of-the-circumstances determination, courts use the nine factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the VRA, i.e., the "Senate Factors." *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015). But courts are not limited to considering these factors, nor is there

a requirement that "any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* (internal quotations omitted).

972. The two "most important" factors are: racially polarized voting (Senate Factor 2) and a lack of Black electoral success (Senate Factor 7). *Thornburg v. Gingles*, 478 U.S. 30, 48 n.15 (1986); *see also Fayette*, 775 F.3d at 1347 n.9. Here, their undisputed presence alone "point[s] commandingly" in Plaintiffs' favor. *Id.*

## A. <u>Senate Factors 1, 3, and 5 Weigh in Favor of Plaintiffs</u>

973. Senate Factor 1 asks the extent to which Alabama has "any history of official discrimination" that "touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process," *Gingles*, 478 U.S. at 36-37 (citation omitted); Senate Factor 3 asks whether Alabama uses "voting practices or procedures that may enhance the opportunity for discrimination," *id.* at 37; and Senate Factor 5 asks whether Black people "bear the effects of discrimination in such areas as education, employment[,] and health, which hinder their ability to participate effectively in the political process," *id*.

974. Under the results test, "the source of past pervasive discrimination does not change its impact on present-day black access," *McIntosh Cnty. Branch of the NAACP v. City of Darien* ("*McIntosh NAACP*"), 605 F.2d 753, 759 & n.5 (5th Cir. 1979), and so "pervasive private discrimination should be considered, because such discrimination can contribute to the inability of blacks to assert their political

influence and to participate equally in public life." *United States v. Marengo Cnty. Comm'n* ("*Marengo Cnty.*"), 731 F.2d 1546, 1568 & n.37 (11th Cir. 1984).

975.   The Court analyzes Senate Factors 1, 3, and 5 together because "much of the evidence that is probative of one of them is probative of more than one of them." *Milligan I*, 582 F. Supp. 3d at 1020; *accord Miss. State Conf. of NAACP*, 739 F. Supp. 3d at 443 (S.D. Miss. 2024) (same); *Alpha Phi Alpha Fraternity, Inc.*, 700 F. Supp. 3d 1136, 1268 (N.D. Ga. 2023) (same).

### i.    Alabama's Prior History of Pervasive Discrimination in Voting, Education, Employment, Health, and Other Areas

976.   In the Section 2 context, the Senate Factors "expressly include an historical focus." *Milligan I*, 582 F. Supp. at 1020. Historical evidence is "relevant to whether the political process today is 'equally open' to minority voters" because it may "prove that black voters are still affected by unequal access to the political process." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 81 F.4th 1328, 1333 (11th Cir. 2023) (Pryor, C.J., with Grant and Brasher, JJ., concurring in the denial of rehearing en banc). While relatively recent history tends to be more relevant, even history "stretching back to Reconstruction" gives context to the Senate Factor analysis. *LULAC*, 548 U.S. at 440 (noting Texas's) (citation omitted); *accord Milligan*, 599 U.S. at 14 (considering Alabama's history beginning in Reconstruction as well as the specific circumstances from the 1990s onward).

977. Every single Black Alabamian who testified at trial offered a powerful reminder of either the palpable recency of past discrimination or the ways in which official discrimination personally touched their lives.[12] Every Black fact witness who testified has personally experienced or observed discrimination in voting, *supra* ¶¶ 450, 464, 469; *see also* Trial Tr. 878:2-18 (Branyon), education, *supra* ¶¶ 449, 455, 459, 461, 465, 471, 478, housing, *supra* ¶¶ 453, 459, 460, 477, employment, *supra* ¶¶ 452, 470, or other areas, *see, e.g.*, Trial Tr. 695:10-696:81137:1-1138:513 (Malone), Stone Tr. 1363:14-1364:25, 1374:6-14 (McCollum). Witnesses also suffered racist harassment, Trial Tr. 1159:3-1160:11, 1088:5-1089:9, 1210:1-1212:6 (Milligan), Stone Tr. 880:1-881:14 (Branyon), 1339:19-1340:4 (Coley), including the humiliation of Alabama's continued publicly funded veneration of the Confederacy, *supra* ¶¶ 658, 679; *see also* Trial Tr. 810:3-812:14 (Frederickson), 1613:23-25, 1648:7-14 (Carrington), 1939:12-18 (Hood), 2376:18-2377:18 (Singleton), McClendon *Stone* Dep. 79:22-80:11.

978. If Alabama's history of segregated schools, enacting laws that have prevented Black persons from voting, and discrimination in state employment is sufficiently recent for multiple witnesses to have firsthand experience with that

---

[12] The fact that some Alabama residents, like Mr. Simelton, Tr. 152:9-20, and Mr. Douglas, Tr. 485:23-486:1, were "educated in other . . . States also maintaining segregated and unequal school systems" is a "matter of no legal significance." *Cf. Gaston Cnty. v. United States*, 395 U.S. 285, 293 n.9 (1969) (discussing a literacy test's discriminatory effect in a particular county). "[T]he source of past pervasive discrimination does not change its impact on present-day black access." *McIntosh NAACP*, 605 F.2d at 759 & n.5; *see also Marengo Cnty.*, 731 F.2d at 1568 n.37 (similar).

history, then it seems "insufficiently distant" for the Court to disregard it here. *Milligan I*, 582 F. Supp. 3d at 1020. "The racial bias of Alabama's former leaders and White citizens, while certainly 'outdated,' unfortunately still affects Black Alabamians' health and socioeconomic status today." *People First*, 491 F. Supp. 3d at 1174. "[P]ast discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process." *Marengo Cnty.*, 731 F.2d at 1567.

979.   Thus, the Court will consider past discrimination to the extent that it offers context, but the Court gives more weight to evidence after 1990. *See Milligan,* 599 U.S. at 14 (recounting the State's redistricting history since the 1990s); *Miss. State Conf. of NAACP*, 739 F.Supp.3d at 446-47 (beginning the Senate Factors analysis in 1990).

980.   "Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented." *Milligan*, 599 U.S. at 22 (citation omitted). Alabama's "unrelenting historical agenda" from the nation's founding through at least the modern Civil Rights Movement was to "keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." *Dillard*, 640 F. Supp. at 1357–60 (recounting the State's efforts from the 1950s to the 1980s to "discriminate against black persons in all . . . areas of their

lives," including education, employment, recreational and cultural facilities, transportation, healthcare, and the legal system).

981.   In the 1950s and 1960s, Alabama placed various barriers in the way of Black voters, *supra* ¶¶ 369-372, 375, including discriminatory redistricting plans, *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), *Sims*, 247 F. Supp. 96 (M.D. Ala. 1965) (three-judge court), overtly racist plots by state officials, *United States v. McLeod*, 699 385 F.2d 734, 750-51 (5th Cir. 1967), *United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965), flagrant efforts to stop Black persons from holding office, *Hadnott v. Amos*, 394 U.S. 358 (1969), restrictions on assistance for those disproportionately Black voters who were illiterate, *Alabama v. United States*, 304 F.2d 583, 587 (5th Cir.), *aff'd*, 371 U.S. 37 (1962), *Gilmore v. Greene Cnty. Democratic Party Exec. Comm.*, 435 F.2d 487, 491-92 (5th Cir. 1970), *United States v. Atkins*, 323 F.2d 733, 736 (5th Cir. 1963), *United States v. Penton*, 212 F. Supp. 193, 197 (M.D. Ala. 1962), fees related to voting, *United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966) (three-judge court), and state laws requiring at-large elections with numbered posts, *Dillard*, 640 F. Supp. at 1357-58 (M.D. Ala. 1986); *Bolden v. Mobile*, 542 F. Supp. 1050, 1068 (S.D. Ala. 1982); *Hale Cnty.*, 496 F. Supp. at 1218-19 (D.D.C. 1980) (three-judge court); *Hendrix v. McKinney*, 460 F. Supp. 626, 630 (M.D. Ala. 1978); *see also Smith v. Paris*, 257 F. Supp. 901 (M.D. Ala. 1966), *aff'd* 386 F.2d

979 (5th Cir. 1967); *United States v. Democratic Exec. Comm. of Barbour Cnty.*, 288 F. Supp. 943 (M.D. Ala. 1968).

982.   "But history did not stop in 1960." *Milligan*, 599 U.S. at 40. Very recent history reveals a similar pattern of Alabama officials violating the rights of Black voters, *supra* ¶¶ 390-406, including through discriminatory redistricting plans, *Allen v. Milligan*, 599 U.S. 1 (2023); *Milligan II*, 690 F. Supp. 3d 1226 (N.D. Ala. 2023) (three-judge court); *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala 2017) (three-judge court); *Allen v. City of Evergreen*, No. 13-107, 2013 WL 1163886, at *1 (S.D. Ala. Mar. 20, 2013), *final judgment* 2014 WL 12607819 (S.D. Ala. Jan. 13, 2014), overtly racist plots by state legislators, *United States v. McGregor*, 824 F. Supp. 2d at 1345–48 (M.D. Ala. 2011), flagrant attempts to stop Black people from holding office, *Braxton v. Town of Newbern*, No. 2:23-CV-00127, 2024 WL 3519193 (S.D. Ala. July 23, 2024); *United States v. City of Calera*, No. CV-08-BE-1982, 2008 WL 11512029 (N.D. Ala. Oct. 29, 2008), *modified*, 2009 WL 10730411 (N.D. Ala. Oct. 23, 2009), restrictions on assistance for those disproportionately Black voters who are illiterate, *Ala. State Conf. of the NAACP v. Marshall*, No. 2:24-CV-00420, 2024 WL 4282082 (N.D. Ala. Sept. 24, 2024); *see supra* ¶¶ 395-400, fees related to voting, *People First*, 491 F. Supp. 3d at 1106–07; *see also* MX6 at 36; CX7 at 36, and state laws requiring at-large elections with numbered posts, *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-01821, 2019 WL

7500528 (N.D. Ala. Dec. 16, 2019); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371 (N.D. Ala. Oct. 11, 2019).

983.    Troublingly, several of these very recent cases include at least some evidence of intentional discrimination by state or local officials. *See, e.g.*, *Braxton*, 2024 WL 3519193, at *2 (local); *People First*, 491 F. Supp. 3d at 1173 (state); *Jones*, 2019 WL 7500528, at *4 (state); *McGregor*, 824 F. Supp. 2d at 1345–47 (state); *Allen*, 2014 WL 12607819, at *2 (local).

984.    Since 1982, more than 50 voting changes proposed by the State or its local subdivisions were blocked or altered under Section 5 of the VRA because of their potential discriminatory purpose or effect. *See generally* MX114. These include objections to Alabama congressional plans and state legislative plans. *Supra* ¶¶ 375-389.

985.    Alabama's use of majority-vote requirements in primaries, *supra* ¶ 390, is a classic dilutive practice that may impede Black electoral success. *See, e.g.*, *Gingles*, 478 U.S. at 39 (addressing majority-vote requirements).

986.    Moreover, this discrimination in voting parallels Alabama's recent history of public and private discrimination against Black people in education, employment, housing, transportation, and other areas. *See supra* ¶¶ 407-494.

987.    The Secretary does not dispute much of this recent evidence. None of the State's experts questioned this history. And, of course, this Court itself found

358

that both the State's 2021 and 2023 congressional plans likely violated Section 2. This Court's prior findings and the numerous other recent judicial or administrative findings of discrimination in voting are sufficient to satisfy Factors 1 and 3. *Supra* ¶¶ 390-406. Furthermore, the undisputed evidence of present-day racial disparities in socioeconomic status, *supra* ¶¶ 480-494, in combination with the undisputed evidence of racial disparities in turnout, *supra* ¶¶ 495-506, are sufficient to satisfy Senate Factor 5.

> **ii.    Because of Alabama's history of discrimination and continued use of certain voting practices, Black voters are less likely to turnout to vote or otherwise participate in the political process.**

988.    "[D]isproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation." *Wright*, 979 F.3d at 1304 (alterations adopted and quotation omitted). For that reason, "[w]here these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." *Id*. "Once lower socio-economic status of blacks has been shown, there is no need to show the causal link of this lower status on political participation." *See United States v. Dallas Cnty. Comm'n*, 739 F.2d 1529, 1537 (11th Cir. 1984) ("*Dallas I*").

989.    Nonetheless, the Secretary: (1) asks the Court to disregard some of Plaintiffs' evidence, particularly, information related to voter turnout and evidence concerning the disparate racial impact of certain recent voting-related practices; (2) argues, through Dr. Hood, that racial disparities in various socioeconomic areas are not unique to Alabama and, therefore, cannot be a basis for Section 2 liability; and, (3) through Dr. Reilly and (to a lesser extent) Dr. Carrington who claim that factors, like culture, age, campaign expenditures, and partisanship, better explain the causes of ongoing racial disparities in socioeconomic status, political participation, and electoral success than Alabama's history of past or present racial discrimination.

990.    The Court rejects each of these contentions.

991.    *First*, the Court credits Plaintiffs' reliance on voter turnout to measure electoral inequality as well as Plaintiffs' consideration of certain voting practices that "may enhance the opportunity for discrimination." *Gingles*, 478 U.S. at 37.

992.    Turnout is plainly a better measure of electoral participation than voter registration. The Court credits Dr. Burch's testimony that voter turnout is the best measure of political participation, *supra* ¶ 498. Where, as here, Black and White registration are disparate but not drastically separated, "the combination of somewhat lower registration rates and lower turnout rates may show that the effects of past discrimination still linger." *Dallas I*, 739 F.2d at 1538; *see also Wright*, 979 F.3d at 1307 (affirming VRA violation where there was a racial disparity in turnout

rates but not in registration rates). The Supreme Court has already affirmed this Court's finding of a likely Section 2 violation based on substantially the same evidence, *Milligan,* 599 U.S. at 22, despite Alabama raising this same defense, *Milligan I*, 582 F. Supp. 3d at 1022 (rejecting Alabama's argument that near parity in voter registration meant that Plaintiffs could not satisfy Senate Factor 5).

993. In addition, while Defendants' expert Dr. Hood reports (without explanation) historical and present-day Black voter registration numbers, DX7 at 23, his scholarship reflects the consensus that even high levels of Black voter registration does not alone equate to Black political empowerment but rather precedes Black political empowerment. Trial Tr. 1933:6-1935:25. In other words, the level of Black voter registration is essentially a prerequisite to electoral participation —it is a "necessary condition" for the racial group to achieve political empowerment. *Id*. 1935:24-25.

994. Plaintiffs also satisfy Senate Factor 3, which does not require them to prove that each identified practice itself violates Section 2. *See White v. Regester,* 412 U.S. 755, 766 (1973) (holding that majority-vote and number-place laws "enhanced the opportunity for discrimination," even though these laws were "neither in themselves improper nor invidious"); *Alpha Phi Alpha Fraternity, Inc.*, 700 F. Supp. 3d at 1272 (finding that a certain practice satisfied Factors 1 and 3, despite a prior ruling that these practices did not themselves violate Section 2). It is enough to

show that the practices "*may* enhance the *opportunity* for discrimination," *Gingles*, 478 U.S. at 37 (emphasis added); *see also id*. at 40 (finding Factor 3 satisfied where a state had a "majority vote requirement for primary elections," despite "acknowledging that no black candidate . . . had failed to win solely because of this requirement"); *Rogers v. Lodge*, 458 U.S. 613, 625 (1982) (finding that Factors 1 and 3 were met where, among other things, a property requirement had "made it difficult for blacks to serve as chief registrar").

995.   Based on the evidence of the disparate impact of SB 5 as well as the recent driver's license office closings and NVRA violations, *supra* ¶¶ 402, 428, Senate Factor 3 also strongly weighs in favor of the *Milligan* and *Caster* Plaintiffs. For example, SB1 plainly has had a disparate impact on Black voters who are more likely to need help to vote, *supra* ¶¶ 400, 720; *cf. Marengo Cnty.*, 731 F. 2d at 1570 (finding that a county's failure to "assist those [voters] who need assistance" enhanced the opportunity for discrimination). "The massive differentials between black and White educational and literacy levels" are also "irrefutable evidence of the effects of the segregated school system on generations of [ ] black citizens." *Id*. at 1573; *see Hale Cnty.*, 496 F. Supp. at 1214. And the essentially undisputed evidence is that the driver's license closings and NVRA violations also had a disparate impact, *supra* ¶¶ 402, 428; *cf. also Marengo Cnty.*, 731 F. 2d at 1570 (holding that a county's

limited hours and locations for registration "exacerbated the deficiencies in black participation").

996.   *Second*, the Secretary relies on evidence from Dr. Hood's report to assert that, because Black voters in various other states are also poorer or less educated than white voters in those states, racial disparities in Alabama do not prove a Section 2 violation. But this misses the point of the Section 2 analysis in every way. Section 2 involves an "intensely local appraisal of the electoral mechanism at issue." *Milligan,* 599 U.S. at 19 (internal quotation and citation omitted). Racial disparities in other states are therefore irrelevant. Indeed, no court has ever relied on similar expert testimony.

997.   Notably, Defendants ignore that northern states, like California, Connecticut, and New York, have their own repugnant histories of discrimination.[13] *See* Trial Tr. 973:23-976:9 (Dr. Burch explaining that racial discrimination exists in other states but it is "particularly egregious" in Alabama), 2248:15-2249:3 (Dr. Reilly agreeing that other states discriminated against Black people but noting that

---

[13] For example, Connecticut, New York, Massachusetts, and Maryland all have both past and more recent histories of discrimination against Black people in education, voting, housing, and other areas. *See, e.g.*, *Clerveaux*, 984 F.3d at 243–44; *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 611–12 (2d Cir. 2016); *United States v. City of Yonkers*, 96 F.3d 600, 618-19 (2d Cir. 1996); *Bridgeport Coal. of Fair Representation v. City of Bridgeport*, 26 F.3d 271, 277 (2d. Cir. 1994), *vacated on other grounds*, 512 U.S. 1283 (1994); *Baltimore Cnty. Branch of the NAACP v. Baltimore Cnty.*, No. 21-cv-03232, 2022 WL 657562, at *12-13 (D. Md. Feb. 22, 2022); *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 562–63 (S.D.N.Y. 2013); *Coal. for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 977 F. Supp. 2d 507, 544 (D. Md. 2013); *Black Pol. Task Force*, 300 F. Supp. 2d at 313–14 (three-judge court).

New York and Connecticut are not "as racist as Alabama"). Moreover, people educated in segregated schools in Alabama or other southern states often migrated to the North. *See* Stone Tr. 152:9-20 (Simelton), 485:23-486:1 (Douglas). And thus, racial disparities in northern states are also in part attributable to discrimination by Alabama and other "conventionally racist" states.[14]

998.    Regardless, the evidence still shows that Black Alabamians rank the lowest (or near the lowest) in most socioeconomic categories, including income and education, even as compared to *both* white people *and* other *Black people* in different states. Trial Tr. 1014:6-1015:4 (Burch), Trial Tr. 2251:22-2252:8 (Reilly).

999.    *Third*, and finally, the Court affords no weight to Dr. Reilly's testimony that racial disparities in education, employment, voting, and other areas should be attributed to alleged cultural differences between Black people and other groups.

1000. Dr. Reilly's qualifications, reporting, and testimony were all much less credible and thorough than those of Plaintiffs' experts, Dr. Burch and Dr. Bagley. Dr. Reilly offered little to no basis for his opinions. Dr. Reilly is also considerably

---

[14] Indeed, in renewing the VRA and enacting the national ban on literacy tests in 1970, Congress had "before it this country's history of discriminatory educational opportunities in *both the North and the South*." *Oregon v. Mitchell*, 400 U.S. 112, 133 (1970) (opinion of Black, J.) (emphasis added). In reenacting the VRA, Congress heard "[e]xtensive testimony" that "racial minorities have long received inferior educational opportunities throughout the United States," and Congress accepted as "common knowledge" the reality of "interstate migration of such persons, particularly of Negroes from the Southern States." *Id*. at 233-35 (Brennan, J., concurring); *see also id*. at 283-84 (Stewart, J., concurring) (holding that the national literacy test ban "facilitates the free movement of citizens from one State to another" and "underlines [Congress's] awareness" that the "evil" of racial discrimination "in varying degrees manifests itself in every part of the country").

less credentialed than Plaintiffs' experts. He lacks the academic record or peer-reviewed publications of Plaintiffs' experts on topics that he testified about. For example, Dr. Reilly agreed that none of his academic research focused on politics in Alabama, nor is his research about Alabama at all. Indeed, none of his work has focused specifically on the political environment below the Mason-Dixon line. He is not an expert on Southern politics generally, nor on Alabama politics in particular.

1001. Dr. Reilly's testimony also repeatedly applied broad generalizations or stereotypes about Black Americans *in general* to discuss Black Alabamians *in particular*, *supra* ¶¶ 507-537, and admitted to publicly espousing views that (at best) flirt with racial eugenics, *supra* ¶¶ 534-535; *see Buck v. Davis*, 580 U.S. 100, 119-21 (2017) (declining to credit expert testimony based on racial stereotypes); *United States v. Bahena–Cardenas*, 411 F.3d 1067, 1078-79 (9th Cir. 2005) (same); *Jinro America Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1007 (9th Cir. 2001) (same); *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 586-87 (S.D.N.Y. 2013) (same). For example, Dr. Reilly cited to national studies or studies of different Black communities in other states in different time periods to reach his conclusions about Black people in Alabama's Black Belt today. *Supra* ¶¶ 509-521, 524, 526, 533. Yet he was unaware of more recent judicial opinions and peer-reviewed studies specific to Alabama. *Supra* ¶¶ 520, 525. Rather than engage with this evidence, answer straightforward questions, or otherwise explain the obvious flaws in his analysis, Dr. Reilly was

often defensive, needlessly evasive, or unprofessional during *Milligan* counsel's cross-examination. *See, e.g.*, Trial Tr. 2224:7-2225:5, 2311:22-2312:20, 2315:2-24, 2353:17-2355:2.

1002.   At bottom, Dr. Reilly's conclusions about the purported "culture" of all African Americans nationwide as an explanation for the extreme racial disparities in Alabama's Black Belt rang hollow. For example, Dr. Reilly testified that sentencing disparities between Black and White people are explained by different crimes Black and White individuals commit. Trial Tr. 2205:16-2206:24. But he did not consider sentencing differences between Black and White Alabamians in his report, Trial Tr. 943:23-945:15 (Burch); 2262:18-20 (Reilly). Nor did he have a meaningful response to academic studies that control for racial differences in criminal behavior and find that these differences *do not* explain the racial gap in incarceration rates *in Alabama*. Trial Tr. 2268:11-2269:4 (Reilly); *see also* Trial Tr. 1051:6-1052:7(Burch).

1003.   Finally, the Court rejects Dr. Reilly's testimony for an additional reason. His unsupported testimony about Black people as culturally or morally inferior, *supra* ¶¶ 513-520, 523-529, 532-535, and, thus, less ambitious and more crime prone than other groups often bore an uncomfortable resemblance to "powerful racial stereotypes." *Buck v. Davis*, 580 U.S. 100, 121 (2017); *see also Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality opinion); *Turner v. Fouche*, 396 U.S. 346, 359-60 (1970); *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276 (11th

Cir. 2018). Expert testimony along these lines is inherently "bizarre and objectionable." *Buck*, 580 U.S. at 119 (criticizing reliance on expert testimony that black people are "violence prone"); *cf. also Peña-Rodriguez v. Colorado*, 580 US 206, 211 (2017) (criticizing a jury's reliance on generalized beliefs about "Mexican" culture); *Floyd*, 959 F. Supp. 2d at 587 (rejecting expert testimony that "echoe[d] the stereotype that black men are more likely to engage in criminal conduct than others"). Courts cannot and will not credit such testimony particularly where, as here, the expert largely bases his highly generalized conclusions on outdated or non-academic sources and national, rather than Alabama-specific, data. *See, e.g.*, Trial Tr. 2215:10-15; 2216:11-2217:9; 2218:15-18; 2235:19-2236:11 (Reilly), Tr. 697:19-698:3, 701:5-16 (Burch); *see Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (rejecting expert opinion based on "unreliable sources"); *Clark v. Calhoun Cnty., Miss.*, 88 F.3d 1393, 1399 (1996) ("*Clark II*") (rejecting, in a VRA case, expert conclusions that were based on "political science literature, not an intensely local appraisal of the social and political climate" of the relevant jurisdiction) (citation omitted).

1004.    Troublingly, Alabama politicians themselves have long relied on these same stereotypes about the purported moral or cultural failings of Black people to justify the persistence of disparities, *supra* ¶ 532, or excuse discrimination. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 230 (1985) (noting that Alabama officials

367

identified Black people as "corrupt and ignorant"); *McGahee v. Ala. Dep't of Corrections*, 560 F.3d 1252, 1265 (11th Cir. 2009) (rejecting Alabama's baseless claim that certain Black prospective jurors were struck because of their perceived "low intelligence" because it was "historically tied to racism"); *People First*, 491 F. Supp. 3d at 1106 (finding that state senators had promoted certain voting restrictions based on their stated belief that "only Black voters engaged in voter fraud"); *McGregor*, 824 F. Supp. 2d at 1345-47 (finding that state legislators had devised a "racist" scheme based on their stated belief that Black voters are prone to accepting bribes), *Dillard*, 640 F. Supp. at 1357 (quoting a state political leader who described Black people as prone to "criminal attitudes"); *Knight v. Alabama,* 787 F. Supp. 1030, 1104 (N.D. Ala. 1991) (quoting state officials who had opposed desegregation in the 1960s based on their belief that "profound psychological and cultural differences, including differences in aptitudes," between Black and White people were the cause of racial disparities rather than the State's own history of systematic racial discrimination against Black people), *aff'd in part, rev'd in part on other grounds*, 14 F.3d 1534 (11th Cir. 1994).

1005. Dr. Reilly's thin credentials, inconsistent testimony, poorly supported opinions, and apparent bias render his conclusions unreliable.

1006. Defense expert Dr. Carrington conceded he was not offering any relevant conclusions related to Senate Factors 1, 3, or 5, Trial Tr. 1586:23-158713.

He did not evaluate whether Alabama has passed any laws after 1965 that were intentionally discriminatory against Black Alabamians, nor did he evaluate whether any such laws had a discriminatory effect on Black Alabamians. Trial Tr. 1587:14-22.

1007. Alabama's argument that racial disparities in campaign expenditures or name recognition might explain Black voters' lack of electoral success fails to grasp that these disparities, too, are a result of discrimination. Past discrimination has resulted in socioeconomic disparities and the development of separate and insular societies. *See supra* ¶¶ 436-447. That is, Black people tend to only know and interact with other Black people who themselves tend to be poorer than white people in Alabama. *Supra* ¶¶ 444-447. Black communities then are "not be able to provide the candidates of their choice with the same level of financial support that Whites can provide theirs." *Gingles*, 478 U.S. at 70. Expensive elections make it harder for Black candidates to self-fund their campaigns or raise money from other Black people who are more likely to have lower incomes than White people. *See supra* ¶¶ 444-445; *see, e.g.*, *Wright*, 979 F. 2d at 1296 (noting that a "more expensive" election "presents a particular barrier for African-American candidates"); *Marengo*, 731 F. 2d at 1571 (finding that the expense of at-large races "contributes to dilution" because "blacks earn, on the average, less than half of the amount that Whites earn").

1008. Similarly, Alabama's history of state-enforced segregation has created two separate societies. *See supra* ¶¶ 436-447. Today, Black and white Alabamians have separate churches, civic groups, fraternities, sororities, community centers, neighborhoods, and, despite ongoing litigation, even separate schools. *See supra* ¶¶ 436-440. Black people's "continued separation from the dominant White society" can "help[] reduce black voting strength and participation in government." *McMillan v. Escambia Cnty., Fla*., 748 F. 2d 1037, 1044 (5th Cir. 1984);[15] *accord White*, 412 U.S. at 768 (affirming that a minority group's "cultural and language" insularity made "participation in [the majority] community processes extremely difficult"). Among other things, this separation can make it "especially difficult for African-American candidates" to raise money from the majority White community or otherwise "reach out to and communicate with the predominantly White electorate." *United States v. Charleston Cnty.,* 316 F. Supp. 2d 268, 291 (D.S.C. 2003), *aff'd,* 365 F.3d 341 (4th Cir. 2004); *see supra* ¶¶ 443-47. This social segregation means that the white electorate has "little interaction with most [minority] candidates" and, therefore, the "opportunity to become known as a person and to be trusted with

---

[15] *McMillan* was decided by a non-unit panel of the former Fifth Circuit and is therefore binding on this Court. *See McMillan*, 748 F. 2d at 1037 n.* (citing Section 9(1) of Public Law 96-452); *Stein v. Reynolds Sec., Inc*., 667 F.2d 33, 34 (11th Cir. 1982) (explaining that a decision after October 1, 1981 "made by a non-unit panel of the Former Fifth, the full en banc court of the Former Fifth, or Unit B panel of the Former Fifth Circuit" is "binding precedent" in the Eleventh Circuit).

public office is not equal." *See Stabler v. Cnty. of Thurston*, 129 F. 3d 1015, 1023 (8th Cir. 1997).

1009. Accordingly, because Black people in Alabama have experienced extensive discrimination in voting (Senate Factors 1 and 3) and discrimination in various other areas, which impacts their ability to participate in the political process (Senate Factor 5), these Senate Factors together all weigh heavily in favor of Plaintiffs and support a finding of dilution. *See Milligan I*, 582 F. Supp. 3d at 1022.

## B.     Senate Factor 2: Extent of Racially Polarized Voting

1010. Senate Factor 2 considers "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37.

1011. This inquiry is broader, but not entirely distinct from, the questions posed by the second and third *Gingles* preconditions in that high levels of racially polarized voting create an inference of the "second factor weigh[ing] heavily in [the plaintiffs'] favor." *Wright*, 979 F.3d at 1305; *Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 291 (5th Cir. 1996) ("The results of the statistical analyses in this case create a strong presumption in favor of a finding of black political cohesion and racial bloc voting."); *Miss. State Conf. of NAACP*, 739 F.Supp.3d at 451 ("the extent of the polarization between races across Mississippi provides at least circumstantial evidence that the divide is based on race.").

1012. This makes good sense, as "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting," *Marengo Cnty.*, 731 F.2d at 1567, and "[o]ne may suspect vote dilution from political famine," *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994).

1013. Senate Factor 2 does allow inquiry into racially polarized voting beyond its mere existence, and the Court may consider evidence of both "the degree and nature of the bloc voting" including the intensity of the polarization and the role of "political or personal affiliation of different racial groups with different candidates." *Solomon II*, 221 F.3d at 1225.

1014. In line with the broader inquiry, courts may and have considered such evidence as the extent of the polarization, *see, e.g.*, *Wright*, 979 F.3d at 1305, success of Black candidates in primary elections, *see, e.g., Gingles*, 478 U.S. at 59; *Fayette Cnty.*, 775 F. 2d at 1340 n.5; the respective roles of partisanship and race in terms of the degree to which racial identity, issues, and politics inform partisan affiliation, *see, e.g.*, *Miss. State Conf. of NAACP*, 739 F.Supp.3d at 454; *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 871 (M.D. La. 2024); *Alpha Phi Alpha Fraternity Inc.*, 700 F. Supp. 3d at 1359, and candidate selection and success based on race and party, *see Alpha Phi Alpha Fraternity, Inc.*, 700 F. Supp. 3d at 1360; *see also Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 495-96 (2d Cir. 1999); *Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1292 (M.D. Ala. 2020).

1015. Contrary to Defendants' position, "[n]either the Supreme Court nor the Eleventh Circuit has ever held" that Plaintiffs' must "prove racism determines the voting choices of the White electorate" *Askew*, 127 F.3d at 1382, or prove but-for "racial causation" in voting patterns, *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 231-32 (2d Cir. 2021).

1016. Defendants appear to contend that to prove that the vote dilution is "on account of race or color" that Plaintiffs must prove that "White Republican voters in Alabama are choosing their candidates out of racial bias." Trial Tr. 2618:8-13 (Defs.' Argument). The Court disagrees, for several reasons.

1017. *First*, the Supreme Court's decision in *Milligan* closed the door on this argument. The *Milligan* Court reaffirmed that Section 2 "turns on the presence of discriminatory effects, not discriminatory intent," explaining that "Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color." *Milligan*, 599 U.S. at 25. In the context of a Section 2 vote-dilution case, this means lack of equal opportunity "when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter." *Id.* In other words, Plaintiffs must provide evidence of the role of race and racial discrimination in the political system interacting with racially polarized voting and the districting scheme at issue, but it

need not prove but-for causation let alone racial bias. *See id.; see also Clerveaux*, 984 F.3d at 231-32 (explaining that "the unique context of the Voting Rights Act and Congress's clear desire not to require a showing of racial animus indicate that 'on account of race or color' should not be interpreted to require but-for causation" and that "Section 2 claims do not rise or fall on racial causation."). To the extent that "Alabama suggests there is only one circumstance that matters"—whether race is the sole or primary factor driving voter choice—that "single-minded view of § 2 cannot be squared with the VRA's demand that courts employ a more refined approach." *Milligan*, 599 U.S. at 26 (cleaned up).

1018. *Second*, even before *Milligan*, the Eleventh Circuit explained that circumstances such as "both the degree and nature of the bloc voting" may "*weigh against* an ultimate finding of minority exclusion from the political process," *Solomon II*, 221 F.3d at 1225 (emphasis added), rather than singlehandedly dictating an outcome—a position that would be at odds with the totality of circumstances test.

1019. As *Alabama State Conference of the NAACP v. Alabama*, the case cited by Defendants several times in the Pretrial Order, *Milligan* Doc. 445 at 11, *Caster* Doc. 357 at 11, explained that *Solomon* "indicates that a state's evidence of non-racial causes is to be considered, *alongside all other relevant factors* bearing on the existence or not of vote dilution, at the totality-of-circumstances stage." 612 F. Supp. 3d at 1259 (emphasis added). Indeed, consistent with the precedent and the statutory

"totality of circumstances" inquiry, 52 U.S.C. § 10301(b), that court correctly held that its Senate Factor 2 analysis was "not conclusive." 612 F. Supp. 3d at 1306-07; *see Gingles*, 478 U.S. at 45 (holding that the totality analysis does not require that "any particular" factor "be proved").

1020. *Third*, Plaintiffs do not bear the weight "of negating all nonracial reasons possibly explaining" racially polarized voting and Black electoral defeat. *Teague,* 92 F.3d at 295; *see also Nipper*, 39 F.3d at 1513 (plurality op.) ("A defendant in a vote dilution case may always attempt to rebut the plaintiff's claim by introducing evidence of objective, non-racial factors."). Even the Secretary's most-favored case does not call for Plaintiffs to affirmatively disprove partisan politics playing some role in the electoral process or that race plays the only or predominant role. *See Ala. State Conf. of NAACP v*, 612 F. Supp. 3d at 1260 ("At the totality-of-circumstances stage, the State may introduce evidence that nonracial factors, such as partisan politics or party affiliation, are causing minority electoral defeats."); *see also Nipper*, 39 F.3d at 1526 & n.64 (plurality op.); *Lopez v. Abbott*, 339 F. Supp. 3d 589, 604 (S.D. Tex. 2018) ("plaintiffs do not bear the burden in the first instance to eliminate factors other than race as influencing voters.").

1021. Even in the context of intentional discrimination cases, which the results claim is not, Plaintiffs may meet their burden by showing that the discriminatory purpose was "*a* motivating factor" and not necessarily the

"'dominant' or 'primary' one." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (emphasis added); *see also Milligan*, 599 U.S. at 37 ("Demonstrating discriminatory intent, we have long held, does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purpose.") (cleaned up).

1022. Because the evidence here shows that race not only continues to play *some* meaningful role in the political process in polarized voting in Alabama but still plays a *significant* one, this factor weighs heavily in favor Plaintiffs under even the most stringent standard urged by the Secretary.

1023.  *First*, in terms of the degree and consistency of RPV, the evidence here creates a strong presumption in favor of Plaintiffs. *See supra* ¶¶ 289-347. This Court has already determined that "voting in Alabama is clearly and intensely racially polarized" with Black support for Black candidates "overwhelmingly in the 90[%] range," "and that the Black-preferred candidate was defeated in every election except" in majority-Black districts. *Milligan I*, 582 F. Supp. 3d at 1017. The evidence at trial only confirmed that. On average, Dr. Palmer found that White voters supported Black-preferred candidates with an average of just 14.3% of the vote in statewide elections. CX3 ¶ 15; *see also Wright*, 979 F.3d at 1305 (affirming a finding that elections in Sumter County were "highly polarized," where "over 85% of African American voters voted for the same candidate" and less than 10% of White

voters voted for the same candidate in ten of twelve elections analyzed); *Miss. State Conf. of NAACP*, 739 F.Supp.3d at 441 (finding "racial polarization among voters in Mississippi is quite high" where "Black-preferred candidates are consistently unable to win elections unless running in a majority-minority district" and "[w]hite voters are also cohesive in voting for candidates that usually defeat the black-preferred candidates").

1024. *Second*, other quantitative analysis and direct evidence in the record shows that race continues to play a significant role in both voting patterns and candidate success regardless of partisanship.

1025. *Milligan* Plaintiffs' expert Dr. Liu provided evidence of racially polarized voting in every primary he analyzed as well as in non-partisan mayoral races, meaning race had to have had at least some role apart from party. Trial Tr. 596:9-21; MX16 at 7, 9, tbl.2. Dr. Liu also provided evidence of two races in which majorities White Democrats in Alabama supported White Republicans over Black Democrats. MX16 at 11. *See, e.g.*, *Gingles*, 478 U.S. at 59-60 (finding "overwhelming" polarization where White Democrats voted against Black candidates in both primaries and general elections); *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1556-58 (11th Cir. 1987) (finding racial polarization based on the results of a biracial presidential primary election).

1026. Plaintiffs' expert Dr. Palmer provided evidence that White Democrats were less likely to support Black Democratic candidates than White Democratic candidates. Analyzing the State Supreme court elections on which Dr. Bonneau ran a regression analysis, Dr. Palmer found that White voters supported White Democratic candidates at twice the rate that they supported the one Black Democratic candidate, meaning that the lower vote share the Black candidate received can be attributed to less support from White voters. CX4 at ¶ 14. Similarly, he found that in 2018, 23.9% of White voters supported the White Democratic candidate for Governor, while only 18.6% of White voters supported the Black Democratic candidate for Lieutenant Governor, a statistically significant difference of 5.3 percentage points. Tr. 513:25-514:11 (Palmer); CX4 at ¶ 18.

1027. Dr. Bonneau even admitted that it is absolutely possible that both race and party affect voters' choices in Alabama, Tr. 1531:14-19, was not testifying that "political parties have replaced race in driving voting choices in Alabama," and agreed that "that the race of the candidate may be an important factor affecting voter choice," Tr. 1494:3-9. Dr. Bonneau speculated that voters might know the partisan affiliation of certain candidates even in nonpartisan races. Tr. 1457:20-24. But former candidates in nonpartisan municipal elections testified that these races do not involve running under party banners, Stone Tr. 500:1-7 (Douglas); 1333:4-9 (Coley), and that the parties do not offer support, Stone Tr. 1333:4-17 (Coley).

1028. The evidence also revealed a number of recent elections in which Black Republicans lost primaries to White Republicans, and the Secretary's witnesses Ms. Branyon, Mr. Coley, and Mr. McCollum testified to others. *See* Stone Tr. 874:7-875:11 (Branyon), 1370:1-1372:11 (McCollum), 1329:13-1330:12, 1335:21-23, 1342:19-1343:15 (Coley). In the 2024 congressional elections, for example, four Black candidates, including a Black elected official who is a former member of the State Republican Party's leadership, won fewer votes than one White recent college graduate and finished at the bottom of an eight-person race with only a collective 6.2% of the vote. Trial Tr. 594:25-595:7; MX17 at 3; *see, e.g.*, *Fayette Cnty.*, 775 F. 3d at 1340 n.5 (noting that voting was "racially polarized" in a county where three Black candidates, including the vice chairman of the local Republican Party, lost in a primary election to "one White candidate, who was a newly registered voter"). Where, as here, no Black candidate, regardless of political party, can win elections, Senate Factor 2 points "commandingly" in favor of the Plaintiffs. *Id*. at 1347 n.9.

1029. This undercuts any argument that Black candidates are losing primarily because they are running as Democrats regardless of their race.

1030. Further, the Court notes the testimony from Defendants' witnesses Ms. Branyon and Mr. McCollum, both Black Republican candidates, about receiving support from Black Democrats (in the case of Ms. Branyon), and about Black voters generally supporting Black candidates party aside (from Mr. McCollum). Stone Tr.

876:10-877:9 (Branyon), 1381:21-24 (McCollum). Senator McClendon, who has many years of political experience himself apart from leading the State Senate mapdrawing process, also testified that that in his experience, Black voters tend to vote for Black candidates. McClendon *Stone* Dep. 78:9-19.

1031. Nor does Dr. Bonneau's analysis provide any affirmative probative evidence that partisanship dominated racial consideration in the voting choices of Alabamians, and Dr. Bonneau was not offering any causal opinions about voting patterns. Trial Tr. 1828:5-10.

1032. Even when he does perform analysis that might have some nexus to voting choices, it does not advance the narrative that party dominates race in Alabama. Dr. Bonneau's analysis of straight-ticket voting as a source of partisanship overriding race falls short because every single Republican candidate for statewide office in the elections he analyzed was White, and he agreed that Republican straight-ticket voters may know that the candidates they are voting for are all White. Trial Tr. 1832:7-1833:12. Similarly, he acknowledged that all 2022 Democratic statewide candidates were Black. Trial Tr. 1833:13-16. And his analysis "does not tell the Court what percentage of black straight-ticket voters are supporting the Democratic Party versus the Republican Party." Trial Tr. 1829:13-17.

1033. On that topic, Dr. Bonneau's admissions regarding the lack of success of Black Republicans further undercut the Secretary's argument. He concedes that it

is rare to have a Black Republican on the general election ballot in Alabama, that he is not aware of a Black candidate winning a contested Republican primary election for statewide office, and that the race of the candidate could be a reason why Black Republicans underperform White Republicans. Trial Tr. 1792:10-1793:5

1034. Additionally, there is no dispute that no Black candidates from either party has won statewide office in the current century in Alabama, and in the previous one, only two candidates prevailed—both in State Supreme Court races where they were first appointed and ran as incumbents. Dr. Bonneau also admitted that in the only three Alabama State Supreme Court elections in which incumbents lost in a 22-year period, two of the losses were Black candidates, and one was a White Republican who was defeated by a White Democrat. Trial Tr. 1738:6-1740:20.

1035. Dr. Bonneau also admitted that from his analysis of Alabama state supreme court elections, he cannot eliminate race as the reason Black Democrats perform worse than White Democrats, and while race may be a factor, party cannot be since the analysis compared White Democrats to Black Democrats. Trial Tr. 1753:5-20.

1036. Third, assessing "the success of Black candidates in reference to different percentages of [W]hite voters" can provide "good evidence that partisanship is not the best logical explanation of racial voting patterns." *Alpha Phi Alpha Fraternity, Inc.*, 700 F. Supp. 3d at 1277; *see also Miss. State Conf. of NAACP*,

739 F.Supp.3d at 452 (citing the fact that "black legislative candidates in Mississippi have had virtually no success in federal or state elections outside majority-black districts" as evidence in favor of the plaintiffs under Senate Factor 2). Under Senate Factor 2, evidence that "White bloc voting was targeted against black candidates"—that is, that Whites vote more heavily against Black candidates than White candidates of the same party—can show that race, rather than party, is driving voting behavior. *See Ruiz v. City of Santa Maria*, 160 F. 3d 543, 553 (9th Cir. 1998) (collecting cases).

1037. As discussed above, Dr. Liu's 2008 exit poll and 2024 CD2 Republican primary analyses and Dr. Palmer's 2018 statewide election analysis provide evidence that White Alabamians are less likely to vote for Black candidates to the same or similar office than White candidates, regardless of party.

1038. Fourth, courts have considered evidence about why Black and White voters align with different parties to see what role race plays, if any. *See Nairne*, 715 F. Supp. 3d at 871 ("The historical realignment of Black voters from voting Republican to voting Democrat undercuts the argument that the vote is polarized along party lines and not racial lines."); *see also Miss. State Conf. of NAACP*, 739 F.Supp.3d at 453 (criticizing the defense expert for acknowledging that it is "possible for political affiliation to be motivated by race," but "never examin[ing] the political positions of the two state parties — or any candidates — to determine

whether race factored into partisan voting"); *Alpha Phi Alpha Fraternity, Inc.*, 700 F. Supp. 3d at 1278 ("The history provided to the Court shows the complicated history between the current Republican Party and Black citizens," and "even Defendant's expert agreed that candidate choices and Black political alignment with the Democratic party is not just based on the party label").

1039. Here, Plaintiffs elicited testimony from both their own witnesses and Defendants' that reveal the significant ways in which race has informed historically and still drives partisan affiliation for many Alabama voters. As discussed above, Dr. Bagley offered detailed, credible testimony about the circumstances in Alabama about how racial issues drove partisan realignment, including the Alabama legislature, citing efforts by Mike Hubbard to target White Democratic districts. *See supra* ¶¶ 385, 554.

1040. Critically, as detailed in the Court's factual findings, the Secretary's own expert Dr. Hood also testified that "southern politics revolved around the issue of race" at the midpoint of the last century and "still revolves around the issue of race" as of the early 21st Century, Trial Tr. 1930:9-15, and that "[m]uch of the recent work on the American party system has clearly then underemphasized the crucial and distinctive role that race and racial dynamics have played," Trial Tr. 1931:3-10. As Dr. Hood explained, "I think it goes without saying that race is a big part of the political scheme of the south, you know, because, again, the underlying party

compositions based on groups -- to a large extent, those groups are race." Trial Tr. 1948:22-25.

1041. Dr. Bonneau agreed "you can't properly examine partisanship in Alabama without thinking about the role of race," Trial Tr. 1834:25-1835:7, and that the race of the voter is a driving factor in their political party affiliation, Trial Tr. 1795:8-11. He acknowledged that for some voters, even if they are making choices based on party, race may be a factor in making that party or candidate choice. Trial Tr. 1793:6-16. And he agreed that "evidence shows [in Alabama] that black voters tend to prefer black candidates." Trial Tr. 1823:3-8.

1042. Similarly, Dr. Reilly cited perceptions of racial appeals or racism in the Republican Party as a deterrent to Black voters. Trial Tr. 2308:21-2309:3.

1043. Senator McClendon, who led the Reapportionment Committee efforts to enact the challenged map, testified that Black and White voters in Alabama in general have different views on issues that can affect partisan affiliation, such as the preservation of confederate monuments and the prevalence of racial discrimination. McClendon *Stone* Dep. 79:22-25, 80:4-11.

1044. Only the Secretary's expert Dr. Carrington offered testimony about what he characterized as non-racial reasons that he believed drove White partisan affiliation more than race. But Dr. Carrington did not analyze Black voting patterns, nor how the "nonracial" issues he identified impacted Black voters. Trial Tr. 1601:8-

14. As discussed above, Dr. Carrington's failure to consider why the factors he claimed moved White voters toward the Republican Party failed to move Black voters despite many Black voters sharing similar religiosity and views on social issues not only undermines the force of the opinions but also points to a significant role of race in partisan alignment.

1045. The strong weight of the evidence supports race as a major factor in Alabama's partisan alignment.

1046. In sum, the Court finds ample evidence that regardless of the role partisanship may play for some voters, race still plays a significant role in the polarization of Alabama voters.

1047. As such, this case is entirely distinguishable from the judicial elections case relied upon by the Secretary, *Alabama State Conference of the NAACP v. Alabama*, 612 F. Supp. 3d 1232 (M.D. Ala. 2020), for at least a few salient reasons.

1048. *First*, the court there found that "White Democratic primary voters appear to give equal support to black Democratic candidates" in judicial elections, which "suggests that black candidates are not penalized in appellate judicial elections by their race alone." *Ala. State Conf. of the NAACP*, 612 F. Supp. 3d at 1292.

1049. That finding is absent, and indeed contradicted, here. Dr. Bonneau performed the same regression analysis here that he performed there, in this case

across 2010-2022 Alabama State Supreme Court elections. But here, Dr. Bonneau admitted that he had miscoded his data, and that the corrected regression analysis showed that Black Democratic candidates for the Supreme Court performed worse than White Democratic candidates. Trial Tr. 1753:5-10. In any event, unlike in the judicial elections case, Dr. Bonneau agreed here that we cannot eliminate race as the reason Black Democrats perform worse than White Democrats. Trial Tr. 1753:5-20.

1050. *Second*, the court in the judicial elections case pointed to evidence that "that an African-American Republican could win statewide in Alabama," *Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1292 (referring to testimony by a defense witness and plaintiff's expert). Defendants adduced no such evidence here. Instead, Dr. Bonneau admitted that the election of even the one Black Republican to the State Legislature was "very unusual," Trial Tr. 1820:14-1821:14, that he could not draw a broad conclusion from it, and that he was unaware of any other Black Republicans who have won a legislative election since Reconstruction. Trial Tr. 1820:25-1821:3.

1051. *Third*, the judicial elections court found it "noteworthy that roughly two-thirds of the Alabama electorate is voting for a party, not necessarily for particular candidates." *Ala. State Conf. of NAACP,* 612 F. Supp. 3d at 1296. Here, however, Dr. Bonneau admitted that in Alabama, "if you vote Republican straight ticket, . . . you [are] pretty sure that you're voting for all White candidates." Trial Tr. 1833:5-12.

1052. *Fourth*, in the judicial elections case and unlike here, as to whether "party is a proxy for race," the court there found that almost all of plaintiffs' evidence came from one rebuttal expert who it found "did not consider facts specific to Alabama judicial elections that speak to the results of those elections," and who "considers no evidence specific to partisan realignment on Alabama's appellate courts," *Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1299-1302, particularly ignoring key testimony and evidence about the role of tort reform.

1053. In sum, here, Plaintiffs provided extensive fact and expert testimony about the role race has played in party choice, and it is the Secretary who proffered an expert, Dr. Carrington, who overgeneralizes and fails to analyze Alabama-specific history.

1054. Senate Factor 2 strongly favors Plaintiffs.

## C.    Senate Factor 4: Candidate Slating

1055. Under Senate Factor 4, courts ask, "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37 (internal quotation marks omitted).

1056. "In jurisdictions where there is an influential official or unofficial slating organization, the ability of minorities to participate in that slating organization and to receive its endorsement may be of paramount importance." *Marengo Cnty.*, 731 F.2d at 1569. Evidence of structural barriers to the slating

processes includes (1) racial inequalities in political endorsements or supports from the slating group, *White*, 412 U.S. at 766-67; (2) a lack minority representation in the slating group, *Rogers*, 458 U.S. at 625; *White*, 412 U.S. at 766-67; *Marengo Cnty.*, 731 F.2d at 1569; and (3) evidence that the slating group does "not need the support of the [minority] community to win" and does "not therefore exhibit good-faith concern for the political and other needs and aspirations of [that] community," *White*, 412 U.S. at 767; *see also Clerveaux*, 984 F.3d at 242-43; *Solomon I*, 865 F.2d 1566, 1582 (11th Cir.1988), *reh'g en banc* 899 F.2d 1012 (11th Cir. 1990).

1057. Here, there is considerable evidence that the Alabama Republican Party does not equally support Black Republicans, that the Alabama Republican Party is a White-dominated group, and that the party is not receptive to Black Republican candidates who support issues important to the Black community in Alabama.

1058. *First*, it is undisputed that Black Republican candidates have had significantly less success than White Republicans in receiving financial contributions or endorsements from elected officials in Republican primaries. *See Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.* ("*Mo. NAACP*"), 894 F.3d 924, 940-41 (8th Cir. 2018). For example, Mr. Coley is a Black Republican who received no endorsements from incumbent Republican commissioners in his 2024 campaign for the Montgomery County Commission. Stone Tr. 1329:24-1330:1. Mr. Coley testified that his lack of party support and inability to

competitively fundraise factored into his primary election losses to White Republicans. *Supra* ¶ 654. Ms. Branyon, another Black Republican defense witness, received no financial or logistical support from the Republican Party in her 2020 county commission race. *Supra* ¶ 655. She only began receiving support from the Republican Party after her deposition in this case. *Supra* ¶ 655; *see Gingles*, 478 U.S. at 76 (explaining that the "pendency" of litigation can "work[] a one-time advantage for black candidates in the form of unusual organized political support by White leaders concerned to forestall" Section 2 relief); *Davis v. Chiles*, 139 F. 3d 1414, 1417 n.2 (11th Cir. 1998) (same). These trial defense witnesses' experiences match the experiences of other Black Republicans who received and spent significantly less in campaign contributions than White candidates in Republican primaries in 2024 for Congressional District 2. *See* DX266.

1059. The lack of Black representation in the party's leadership, and the segregated nature of Alabama churches, civic groups, and social clubs, *see supra* ¶¶ 436-440, contribute to Black Republicans having a harder time raising funds, experiencing less name recognition, and having fewer political connections. Stone Tr. 874:13-15 (Branyon testifying that she knew only "a few" Republicans and "not that many" in her district); Stone Tr. 1319:1-13 (the White opponent of Mr. Coley relied on familial connections and the endorsement from the White incumbent); *see also* Stone Tr. 500:1-501:1 (Douglas) (Black candidates tend to fundraise from

Black people). Black people's lack of "existing political ties or other institutional support" from White groups is evidence of racial inequalities in the slating process. *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 434-35 (S.D.N.Y. 2010); *see Clerveaux*, 984 F. 3d at 239-41; *Perkins*, 675 F.2d at 209-10, *Charleston*, 316 F. Supp. 2d at 292-94; *Williams v. City of Dallas*, 734 F. Supp. 1317, 1381-83 (N.D. Tex. 1990).

1060. The predictable result of this lack of endorsement or financial and logistical support for Black Republicans is that they have largely been unable to win primaries for federal, statewide, or state legislative offices. The State Republican Party is predominantly White. *See supra* ¶¶ 656, 659. No Black Republican since Reconstruction has ever been successful in a contested primary for any statewide or federal office. *Supra* ¶¶ 619, 660. And so, no Black Republican has ever won statewide office. *Supra* ¶¶ 619, 660. Indeed, the record is replete with evidence demonstrating the failure of White voters to support Black Republicans in primaries for Senate, Congressional, and state offices. *See, e.g.*, *supra* ¶¶ 660-64. Except for one person, Rep. Paschal, no other Black Republican has won a race for the State House since Reconstruction. *Supra* ¶ 665. This near total lack of electoral success in primaries among Black Republicans strongly "suggest[s] a lack of opportunity" in access to the slating process. *See Cofield v. City of LaGrange*, 969 F. Supp. 749, 777 (N.D. Ga. 1997).

1061. White Republican electoral support for Black candidates in primaries remains low regardless of candidate quality. In the 2024 Republican primary in CD2, for example, four Black candidates ran—including candidates who had held local elected office, appointed government positions, and leadership roles in the State Republican Party—yet all four Black candidates *combined* received only 6.2% of the vote. *Supra* ¶ 664. These more qualified Black candidates performed worse than a White, recent college graduate who had never held any elected office or role in the party and worked as a real estate agent. *Id.*; *see Fayette*, 775 F. 3d at 1340, 1347 & nn.5 and 9 (concluding that the Senate Factors pointed "commandingly" in the plaintiffs' favor where a "newly registered" White voter defeated the "vice-chairman of the County Republican Party" in a primary election).

1062. *Second*, Alabama Republicans are a "white-dominated organization." *White*, 412 U.S. at 767. There is a near total lack of Black representation in the Alabama Republican Party's leadership, including in the regions at issue in this case; the Alabama Republican Party is majority White; Republican leaders are mostly White; all Republican state legislators, except one, are White; all Republican candidates who ran for statewide office in 2022 were White; and the Republican Party is generally perceived as White. *Supra* ¶¶ 659-61; *see White*, 412 U.S. at 766-67 (finding it significant that a "white-dominated" group slated and sponsored winning candidates). For example, Black people hold only two of thirty seats

(6.67%) on the Montgomery County Republican Executive Committee, despite comprising 58.5% of the population in Montgomery County. *See supra* ¶ 656; *see, e.g.*, *Marengo Cnty.*, 731 F.2d at 1569 (noting that Black people held only 7 of the 34 seats on the dominant party's leadership, despite Black people being half a county's population); *Lodge v. Buxton*, 639 F. 2d 1358, 1379 (5th Cir. 1981)[16] (finding inequitable access to the slating process where Black people held only 1 of the 24 party's executive seats, but were half of the county population), *aff'd in relevant part Rogers*, 458 U.S. at 625.

1063. Further, the sad reality is that the person appointed by the State Republican Party chair to a taskforce to "open up the party" to more people, Stone Tr. 1322:10-1324:14 (Coley), publicly posted offensive racial appeals to vote against Vice President Kamala Harris, a Black candidate, and that associated her with well-known symbols of Black activism, as well as with "riots" and "mobs," while associating Alabama Republicans with a "White supremacist" gesture. *Supra* ¶ 670; *see White*, 412 U.S. at 767 (discounting a dominated slating group's support for some Black candidates where, as here, the group had used "racial campaign tactics").

1064. Black voters have obtained representation in the State Democratic Party but only because of extensive litigation over many decades. *See, e.g.*, Trial Tr.

---

[16] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit issued before October 1, 1981.

1345:17-1346:14 (Dr. Bagley describing "attempts to manipulate black population in redistricting by both parties"); 1927:10-1928:6 (Dr. Hood agreeing that "most of the changes in black representation in Alabama over the last few decades resulted from litigation," including "litigation related to the creation and retention of majority-Black districts"); *see, e.g., Hadnott v. Amos*, 394 U.S. 358 (1969); *Gilmore v. Greene Cnty. Democratic Party Exec. Comm.*, 435 F.2d 487 (5th Cir. 1970); *Foster v. Jones*, No. 03-0574, 2004 WL 7344991 (S.D. Ala. June 17, 2004); *Henderson v. Harris*, 804 F. Supp. 288 (M.D. Ala. 1992) (three-judge court); *Henderson v. Graddick*, 641 F. Supp. 1192 (M.D. Ala. 1986) (three-judge court); *Harris v. Graddick*, 615 F. Supp. 239 (M.D. Ala. 1985); *Harris v. Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984); *MacGuire v. Amos*, 343 F. Supp. 119 (M.D. Ala. 1972) (three-judge court); *United States v. Democratic Exec. Comm. of Barbour Cnty., Ala.*, 288 F. Supp. 943 (M.D. Ala. 1968); *Smith v. Paris*, 257 F. Supp. 901 (M.D. Ala. 1966), *aff'd*, 386 F.2d 979 (5th Cir. 1967); *Gray v. Main*, 291 F. Supp. 998 (M.D. Ala. 1966); *United States v. Exec. Comm. of Democratic Party of Dallas Cnty.*, 254 F. Supp. 537 (S.D. Ala. 1966); *see also Hawthorne v. Baker*, 750 F. Supp. 1090, 1092 (M.D. Ala. 1990) (three-judge court), *vacated*, 499 U.S. 933 (1991) (mem.); *Harper v. Vance*, 342 F. Supp. 136 (N.D. Ala. 1972) (three-judge court).

1065. *Third*, the Republican Party is not open to candidates who support issues important to Black voters. Black voters in Alabama are strongly supportive of

certain issues, like addressing racial discrimination, condemning the Confederacy, increasing funding for public transportation, and reforming drug laws and policing. *See supra* ¶ 658; *accord Gingles*, 478 U.S. at 66-67 (noting that Black voters' support for certain candidates can be driven by a shared experience with discrimination and poverty); *Clerveaux*, 984 F. 3d at 237-38. Despite the close relationship between Black voters' interest in these issues and past discrimination, Alabama Republicans have not actively supported these issues, even when national Republicans have been willing to support these same issues. *See supra* ¶ 658.

1066. Thus, Senate Factor 4 weighs in favor of Plaintiffs. The evidence— including a lack of Republican financial or voter support for Black Republicans in primary elections, the State party's White-dominated nature, and Alabama Republicans' opposition to racial issues that are important to Black voters—proves that the present slating process hinders Black voters' ability to elect their preferred-candidates. *See, e.g.*, *White*, 412 U.S. at 766-67; *Clerveaux*, 984 F. 3d at 239-40.

### D.    Senate Factor 6: Racial Appeals

1067. Senate Factor 6 "[asks] whether political campaigns [in the area are] characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 36; *see also id*. 45. Evidence of overt "racism" or other racial appeals "can be very significant if it is present. But its absence should not weigh heavily against a plaintiff proceeding

under the results test of section 2." *Marengo Cnty.*, 731 F.2d at 1571 (internal citation omitted).

1068. The Court finds Senate Factor 6 weighs heavily in favor of the Plaintiffs. Dr. Bagley offered several examples of racial campaign appeals in his expert report, some of which he testified about at trial. A reasonable person could interpret Dr. Bagley's examples, and others presented at trial, *see supra* ¶¶ 666-82, as racial appeals. *See Milligan*, 582 F. Supp. at 1023 (evaluating racial appeals based on the perception of a "reasonable viewer"). These overt and subtle appeals generally stem from the public or campaign statements from elected officials or candidates for federal or local offices both statewide and within challenged jurisdictions. *See supra* PFOF Section VI.E.

1069. To the extent Dr. Carrington sought to opine on "overt or subtle racial appeals" under Senate Factor 6, *Gingles*, 478 U.S. at 37, he did not conduct a "rigorous analysis of any contemporary statements by Alabama politicians" and indeed, did not review "any other contemporary statements made by other Alabama politicians" other than those raised in Dr. Bagley's report. Trial Tr. 1588:1-15 (Carrington).

1070. Instead, Dr. Carrington appears to take the position that one cannot know whether a statement or symbol is a racial appeal without knowing the politician's specific intent, even if it includes a politician's use of Confederate flag,

Trial Tr. 1589:1-6, or comments that White nationalists are not racists, Trial Tr. 1593:11-1594:8, or images of White supremacist gestures, Trial Tr. 1596:4-13.

1071. But that is not the law. The "focus" of the racial appeal analysis "must be the minority's perception of the action." *Sanchez*, 97 F.3d at 1323; *see, e.g.*, *Stout*, 882 F.3d at 1014 (affirming that a subtly coded campaign flyer conveyed a "message of inferiority" to Black people, despite the creators of the flyer denying any overt racial motives); *Milligan I*, 582 F. Supp. 3d at 1023 (concluding that a "reasonable viewer might . . . perceive[]" a particular Alabama campaign commercial was a racial appeal, despite the candidate who created the commercial testifying that he did not intend it to be a racial appeal).

1072. The record after trial presents even more extensive evidence of racial appeals than the preliminary record, including in campaigns for the offices at issue. Thus, Senate Factor 6 also weighs in favor of Plaintiffs.

### E.    Senate Factor 7: Election to Office in the Jurisdiction

1073. Senate Factor 7 concerns "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.

1074. "If members of the minority group have not been elected to public office, it is of course evidence of vote dilution." *Marengo Cnty.*, 731 F.2d at 1571.

1075. In the preliminary-injunction stage, this Court had "little difficulty finding that Senate Factor 7 weighs heavily in favor of the" Plaintiffs based on three factors, all of which are still present after trial. *Milligan I*, 582 F. Supp. 3d at 1019.

1076. *First*, Black candidates never won an election to Congress in Alabama outside of a majority-minority district (or one quite close to it), a fact that remains true today. MX1 at 13; CX16 at 13; *see also* Trial Tr. 1834:13-16 (Bonneau).

1077. *Second*, "[n]o Black person has won statewide office in Alabama" since 1994 and "[t]here are currently no African-American statewide officials in Alabama," *Milligan I*, 582 F. Supp. 3d at 1019 (internal citation omitted). The same remains true today and is reflected in the record. MX1 at 29; CX16 at 29; *see* Trial Tr. 1834:1-4 (Bonneau); *see also Alpha Phi Alpha Fraternity, Inc.*, 700 F. Supp. 3d at 1284 (finding Senate Factor 7 weighed heavily in favor of Plaintiffs even though "Black candidates have achieved some success in statewide elections following 2000," as only four have been elected to statewide partisan office since Reconstruction).

1078. *Third*, this Court found that the "overwhelming majority of African-American representatives in the Alabama Legislature come from majority-minority districts," which "were created to comply with the Voting Rights Act or the Constitution." *Milligan I*, 582 F. Supp. 3d at 1019 (internal citation omitted). The record is the same after trial, *supra* ¶¶ 684-93. This is the same type of factual

scenario the Eleventh Circuit finds important in evaluating Senate Factor 7. *See Wright*, 979 F.3d at 1305-06 (11th Cir. 2020) (holding that Senate Factor 7 "weighed heavily" in the plaintiffs' favor where the only Black elected officials had won in "single-member districts where African Americans make up a majority of the voting-age population"); *City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1559-60 (11th Cir. 1987) (same).

1079. "Thirty-two (32) out of thirty-three (33) Black Alabamians currently serving in the Alabama Legislature were elected from majority-Black districts." Joint Stip. ¶ 155.

1080. Senate Factor 7 weighs heavily in favor of Plaintiffs.

### F.    **Senate Factor 8: Lack of Responsiveness**

1081. This factor considers whether "elected officials are unresponsive to the [minority's] particularized needs." *Gingles*, 478 U.S. at 45. "Unresponsiveness is considerably less important under the results test," though it can show that "minorities have insufficient political influence to ensure that their desires are considered by those in power," *Marengo Cnty.*, 731 F.2d at 1572.

1082. "[E]xamples of a lack of responsiveness include shortfalls in funding for education and the failure to expand Medicaid, the redistricting plan itself, and the failure of some White legislators to participate in black-community events." *Miss. State Conf. of NAACP*, 739 F.Supp.3d at 463. Unresponsiveness may also

include the "failure to respond to complaints of racial discrimination, failure to identify concerns of the minority community, scarcity of outreach sessions in the minority community, [and] failure to respond to unequal school resources and disparate discipline and educational opportunities . . . ." *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 413 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux*, 984 F.3d 213 (2d Cir. 2021) (internal citations omitted).

1083. The record here is even stronger than before based on extensive witness testimony that White congressional representatives in the Mobile and Black Belt areas outside of majority-Black CD7 have failed to participate in Black community events or respond to particular concerns that are important to the Black community. *See* Stone Tr. 165:13-17, 180:20-22 (Simelton); Trial Tr. 50:22-53:7 (Dowdy), 261:21-262:3 (Clopton), 392:4-25 (Caster), 452:8-13 (Smith), 722:13-723:6 (L. Jackson), 1207:23-1208:10 (Milligan). *See Miss. State Conf. of NAACP*, 739 F.Supp.3d at 463.

1084. Public transportation provides a potent example of lack of responsiveness. Alabama's constitutional ban on using certain funding sources for transportation originated with the State's reaction to the Civil Rights Movement's efforts to integrate public buses. Stone Tr. 501:10-24 (Douglas). This issue remains important for Black Alabamians in Montgomery who experience a deficient public transportation system, Trial Tr. 1082:19-1083:24 (V. Jackson); Trial Tr. 1184:3-

1186:9, 1188:25-1190:16 (Milligan), and the same issues affect rural Fayette County, Stone Tr. 864:4-15 (Branyon).

1085. The lack of responsiveness concerns not only inaction, but also new legislation that disproportionately denies, disregards, or compounds the needs of Black Alabamians. For instance, the State Legislature recently killed the efforts of Birmingham and developing movements in Montgomery in Huntsville to raise the city's minimum wage. Stone Tr. 649:14-21 (Williams); 494:11-23 (Douglas).

1086. The Legislature also recently enacted SB1, which had a racially disparate impact on Black Alabamians, who are most in need of assistance. *See, e.g.*, Trial Tr. 47:3-24 (Dowdy), 724:12-725:1 (L. Jackson), 479:10-23 (Smith), 938:3-11, 942:1-20, 963:16-964:11, 1048:23-1049:23, 1055:17-1056:7 (Burch), 1097:3-1098:14, 1128:6-1129:9 (V. Jackson), 1284:17-1286:21, 1458:20-1459:12 (Bagley), 2252:20-2253:4 (Reilly); *see also* MX4 at 29; CX5 at 29; MX6 at 36; CX7 at 36.

1087. The Legislature's refusal to accept federal funding to expand Medicaid also disproportionately harms Black communities and denies them benefits that would help them obtain better employment and participate more easily in political and other community activities. *See supra* ¶¶ 468, 709, 716-17; *see also* Stone Tr. 497:3-8 (Douglas); Stone Tr. 1297:6-21, 1297:22-1298:5 (Landers); *see Miss. State Conf. of NAACP*, 739 F. Supp. 3d at 463 (finding unresponsiveness in a state's refusal to expand Medicaid coverage).

1088. With respect to redistricting itself, this Court previously found that the circumstances surrounding the enactment of the 2023 Plan reflect "a significant lack of responsiveness on the part of elected officials to the particularized needs" of Black voters in Alabama." *Milligan II*, 690 F. Supp. 3d at 1315. We have already detailed the facts confirming that the Legislative majority never harbored an ambition to comply with our order that "any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id*. at 1237.

1089. Rather, the Defendants believed it could defeat Plaintiffs' Section 2 claim by ignoring this Court's order—and thus refusing to in fact increase in Black electoral opportunity—by reshuffling their redistricting priorities and trying to have the Supreme Court reconsider the case. Aug. 2023 Tr. at 75:5-18. And Defendants confirmed again at trial "the legislature was hoping to find an argument -- that it could find another way to comply with Section 2 that did not involve sending another Democrat to Congress," regardless of the effect of that plan on Black voters, "that record that we presented supports a finding that the legislature was more interested in political power than racial power and was hoping to find an alternative argument." Trial Tr. 2621:9-13, 2623:24-2624:2. In other words, Legislature was willing to disregard creating a meaningful opportunity district and target Black voters to pursue their political goals.

1090. Senate Factor 8 weighs in favor of the Plaintiffs.

## G. <u>Senate Factor 9: Tenuousness</u>

1091. Although the tenuousness factor "is less important under the results test," it is not irrelevant, as "the tenuousness of the justification for a state policy may indicate that the policy is unfair." *Marengo Cnty.,* 731 F.2d at 1571.

1092. Under Senate Factor 9, a plan need not be an "egregiously flawed plan, the equivalent of a political gerrymander of squeezing the minority into as few districts as possible" for its justifications to be tenuousness. *Miss. State Conf. of NAACP*, 739 F.Supp.3d at 463. Instead, if there is no "specific, non-tenuous justification[] for why black-majority districts were not created in the" challenged areas then "this factor weighs in favor of the Plaintiffs." *Id*.

1093. "[E]vidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." *Gingles*, 478 U.S. at 45. This is particularly true in two specific contexts.[17]

---

[17] Notably, while unresponsiveness and tenuousness are "important" circumstantial evidence of intentional discrimination, their presence is "less important under the results test" because "even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process." *Marengo Cnty.*, 731 F.2d at 1571-72 (citation omitted).

1094. *First*, a districting plan may be tenuous where the policies it is based on, even if legitimate in the abstract, serve to entrench racial vote dilution or evince a lack of responsiveness to members of the minority community. *See LULAC*, 548 U.S. at 441 (citing the tenuousness factor in explaining that using incumbency protection to exclude "voters from the district simply because they are likely to vote against the officeholder . . . cannot justify the effect on Latino voters"); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 348 (N.D.N.Y. 2015) (finding fault where the drawers weighed factors like incumbency protection while ignoring the "possible dilution of minority voting strength, especially when members of the minority community vocally raised the issue"); *see also Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) ("[M]any devices employed to preserve incumbencies are necessarily racially discriminatory.").

1095. That aspect of tenuousness presents itself strongly here, where Defendants have elevated incumbency protection to a "non-negotiable" factor in its findings, MX31 at 2, CX19 at 2, and where Sen. Livingston testified that this was one of the three primary factors considered in drawing the new map, Livingston Dep. at 47-48. Protection of incumbents thus functions in the same manner as core retention did in the 2021 Plan, in that adhering to it could "immunize from challenge a new racially discriminatory redistricting plan simply" because it refused to

substantially change key boundaries to benefit an incumbent representative. *Milligan*, 599 U.S. at 22.

1096. *Second*, aspects of the process leading to the enactment may highlight inconsistent treatment that make the asserted policies themselves tenuous or pretextual for other unstated goals like preserving political power in spite of continued racial vote dilution. *See Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021) (finding that decisionmakers went to "extraordinary lengths to preserve th[e] [challenged] system to maintain political power" despite its discriminatory effect); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 281 F. Supp. 2d 436, 455 (N.D.N.Y. 2003) (finding tenuousness where a county's "assorted goals" in redistricting failed to create new opportunity districts).

1097. The findings of fact on Senate Factor 9 set forth above, as well as the findings of fact regarding the Legislature's discriminatory intent in enacting the 2023 Plan, confirm the tenuous, pretextual nature of the Legislature's and Defendants' statements regarding the policy behind enactment of the 2023 Plan.

1098. Here, Defendants were aware that the Black community and Black legislators wanted them to draw a second majority-minority district or something close to it, Livingston Dep. 25:14-20; Pringle 2023 Dep. 64:19-22 ("the public hearings made perfectly clear that people wanted a district they thought that blacks could elect a candidate of their choosing"), Defendants knew well that the Court's

finding of intense racial polarization required such a district to provide Black voters with an opportunity to elect, *see supra* ¶¶ 781-86, and Defendants knew that Black legislators were comfortable with splitting Mobile and Baldwin Counties, Jones Decl., MX200 ¶ 22.

1099. Indeed, before voting on SB 5, legislators were aware that Black-preferred candidates would not have won in the 2023 Plan's CD2 in any of the seven elections analyzed by the Legislature's own expert, Dr. Hood. Joint Stip. ¶ 138; *see also supra* ¶¶ 833-34; Livingston Dep. 89:15-90:23; Pringle Dep. 95:5-97:13.

1100. Defendants' attempt to use legislative "findings" as the basis for defining communities of interest when they admit these findings were "essentially . . . describing the map" enacted in SB 5, are circular and pretextual. CX46 at 162:12-18. Defendants' assertion of avoiding racial gerrymandering also lacks any substantive basis, where both this Court and the Supreme Court held that Plaintiffs' illustrative maps were reasonably configured, *Milligan*, 599 U.S. at 20. Thus, the Legislature could have drawn any number of opportunity districts that avoid racial gerrymandering concerns simply by referencing any of the Plaintiffs' eleven illustrative plans. *Cf. Milligan I*, 582 F. Supp. 3d at 1034 (noting that "the Legislature has not just one or two, but at least eleven illustrative remedial plans to consult" to devise a proper remedy to the likely violation); *cf. also Milligan*, 599 U.S. at 20 (affirming that "plaintiffs adduced eleven illustrative maps—that is, example

districting maps that *Alabama could enact*—each of which contained two majority-black districts that comported with traditional districting criteria") (emphasis added).

\* \* \*

1101. Based on the findings as to the *Gingles* preconditions and the Senate Factors, Plaintiffs have shown that the 2023 Plan interacts "with bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State," rendering Black votes "unequal to a vote by a nonminority voter." *Milligan*, 599 U.S. at 25. As such, Plaintiffs have proven a violation of Section 2 of the Voting Rights Act.[18]

## X.    <u>Intentional Discrimination Claim</u>

1102. The Court has already "infer[red] from the Legislature's decision not to create an additional opportunity district that the Legislature was unwilling to respond to the well-documented needs of Black Alabamians in that way." *Milligan II*, 690 F. Supp. 3d at 1317. The relevant evidence proves that this "unwillingness" was wholly deliberate.

1103. A redistricting plan violates the Fourteenth and Fifteenth Amendments if it is enacted with a discriminatory purpose and has a discriminatory effect. *See*

---

[18] The Court's conclusion as to the ultimate violation of Section 2 is further informed by its findings on discriminatory intent. Those findings pertain directly to Senate Factor 9 and the totality of circumstances more broadly. Specifically, the Court concludes that SB5 bears the mark of intentional discrimination, weighing in favor of Plaintiffs under the totality of circumstances. *See infra* n.20. But the Court notes that these findings only compound and reinforce the Section 2 violation; they are not necessary to the Court's ultimate conclusion as to the Section 2 violation.

*Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38-39 (2024). Similarly, a redistricting plan also violates Section 2 of the VRA if discrimination was one of the State's purposes for enacting it. *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991).

1104. Although both intentional discrimination and racial gerrymandering claims arise under the Equal Protection Clause of the Fourteenth Amendment, a "vote-dilution claim is 'analytically distinct' from a racial-gerrymandering claim and follows a 'different analysis.'" *Alexander*, 602 U.S. at 38.

1105. In a vote dilution case, a plaintiff is not required to show that "race played a predominant role" in redistricting; rather, "such a plaintiff must show that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'" *Id*. at 38-39 (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). "Demonstrating discriminatory intent, [the Supreme Court] ha[s] long held, 'does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purpose[ ].'" *Milligan,* 599 U.S. at 37.

1106. Where racial discrimination was "a motivating factor" in the State's decision, that alone is sufficient to show that the State engaged in unconstitutional discrimination. *Foster v. Chatman*, 578 U.S. 488 (2016) (quoting *Arlington Heights*, 429 U.S. 252, 266 (1977)). This is because "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated

solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265.

1107. Assessing a legislature's intent in enacting a law is "a complex task requiring a 'sensitive inquiry into such circumstantial and direct evidence as may be available.'" *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 488 (1997) (quoting *Arlington Heights*, 429 U.S. at 266).

1108. "[D]iscriminatory intent need not be proved by direct evidence." *Rogers*, 458 U.S. at 618. "Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Indeed, the Supreme Court has repeatedly found intentional discrimination based on circumstantial evidence alone in voting cases, *see North Carolina v. Covington*, 585 U.S. 969, 977 (2018); *LULAC*, 548 U.S. at 440; *City of Pleasant Grove v. United States*, 479 U.S. 462, 466-67 (1987), and other cases, *see, e.g.*, *Flowers v. Mississippi*, 588 U.S. 284, 315 (2019); *Foster*, 578 U.S. at 512-13; *cf. also Alexander*, 602 U.S. at 8 (noting that the Court has "kept the door open" to proving unconstitutional racial gerrymandering via circumstantial evidence alone).

1109. Accordingly, intent can be inferred from all the "relevant circumstances that bear upon the issue of racial discrimination." *Flowers*, 588 U.S. at 302. That is, even without direct evidence, "objective evidence" may still "strongly" suggest an

intent. *Bush v. Vera*, 517 U.S. 952, 970 (1996). "Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor." *In re Employment Discrimination Litigation Against State of Ala.*, 198 F.3d 1305, 1321 (11th Cir.1999) (quoting *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring)).

1110. Moreover, "ill will, enmity, or hostility are not prerequisites of intentional discrimination" *Ferrill*, 168 F.3d at 473 n.7. Rather, a defendant can be liable for intentional discrimination even when the "defendant [] acts with no racial animus." *Id*. For example, a governor who "wants to forbid black people" from his state "not because they're black but because he's afraid of them" has "of course" engaged in intentional discrimination. *Exodus Refugee Immigr., Inc. v. Pence*, 838 F.3d 902, 904-05 (7th Cir. 2016) (Posner, J.); *see also Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 725 (S.D. Tex. 2017) (finding that a city engaged in intentional racial discrimination and explaining that the "court need not and does not find that individual lawmakers were motivated by reasons of personal dislike or bias against Latinos because of their ethnicity or race"). As Judge Kozinski also once explained:

> The lay reader might wonder if there can be intentional discrimination without an invidious motive. Indeed there can. A simple example may help illustrate the point. Assume you are an anglo homeowner who lives in an all-White neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house

> to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Garza v. Cnty. of L.A.*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 222-23, 233 (4th Cir. 2016) ("*McCrory*").

1111. Based on the foregoing principles, the Supreme Court has identified several factors that provide direct or circumstantial evidence of intentional discrimination, including the challenged law's "impact on different racial groups"; the "relevant legislative history," such as contemporary statements of key legislators or other decisionmakers; the "historical background and the sequence of events leading" to the challenged law's enactment; and "any departures from the normal legislative process." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021).

1112. Significantly here, the statements of key legislators and decisionmakers "may be highly relevant," *Arlington Heights*, 429 U.S. at 268, especially where, as here, contemporary statements clearly indicate the role of race, *see, e.g.*, *Foster*, 578 U.S. at 501; *Stout*, 882 F.3d at 1006-07.

1113. Likewise, the "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno*, 520 U.S. at 488. Where "a clear pattern,

410

unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face," the "evidentiary inquiry is then relatively easy." *Arlington Heights*, 429 U.S. at 266. That is, an action clearly designed with the "essential inevitable effect" of discriminating based on race is unconstitutional on its face. *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960).

1114. Here, there is both strong circumstantial and direct evidence that the Legislature intentionally enacted SB5 to dilute the voting strength of Black people.

1115. From the outset, Senator Livingston and Rep. Pringle, the Redistricting Committee Co-Chairs, never attempted to draw two majority Black districts or anything quite close to it. *Supra* ¶¶ 791-92. Rather, on the misguided advice of Mr. LaCour and Mr. Walker, the Co-Chairs set out to draw a new district with as near as possible to 40% BVAP but did not meaningfully increase Black electoral opportunity. *Supra* ¶¶ 830-31; *see* SX18[19] (Attorney General Marshall falsely claiming that the *Milligan* and *Caster* Plaintiffs were amenable to a new district with a 40% BVAP regardless of whether that district actually increased Black voters' electoral opportunity); MX54 (Talking Points, drafted by Mr. LaCour, which repeat the same misstatement of the positions of the *Milligan* and *Caster* Plaintiffs); *see also* Pringle Dep. at 100:10-15 (testifying that the Legislature landed on a 39%

---

[19] Admitted only for the limited purpose of showing that this document was before the Legislature.

BVAP for CD2 in SB5 based on "splitting the difference" between two plans but not an analysis of Black electoral opportunity).

1116. The Co-Chairs' initial map drawing efforts produced the COI Plan, which Rep. Pringle sponsored in the House. *Supra* ¶¶ 806-815. To remake CD2 in the COI Plan, the Legislature's cartographer, Mr. Hinaman, placed the eastern Black Belt with the predominantly White counties identified as the "Wire Grass." *Supra* ¶¶ 793-96, 814; MX 43; MX181 at 4. The western Black Belt was placed with parts of Jefferson County in a bare majority-Black CD7. MX43, MX44. And Mobile and Baldwin Counties were put together based on their purported "French and Spanish Colonial heritage." *Supra* ¶¶ 738, 844-45. Although passed by the House, the Senate rejected the COI Plan, replacing it with Senator Livingston's plans that eventually evolved into SB5. *Supra* ¶¶ 816-832.

1117. Tellingly, the BVAPs in the CD2s of the COI Plan and all three Livingston plans (including SB5) were around 40%, *supra* ¶¶ 807, 816, 824, 831—hitting the State's racial target with "almost surgical precision." *McCrory*, 831 F.3d at 214.

1118. Mr. Hinaman, the State's cartographer, and Co-Chairs knew that the existence of an opportunity district turned on its electoral performance. *Supra* ¶¶ 813, 836-37; *see, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 617-19 (2018) (explaining that Section 2 requires the creation of "performing districts"). And yet, the Legislature

and its staff worked to draw a configuration of CD2 that would—even under the COI Plan—offer only the shallow appearance of an opportunity district. *Supra* ¶¶ 791-92, 806-813.

1119. The Legislature knew that the COI Plan would not provide an adequate remedy under Section 2. In fact, based on the State's own performance analysis, the COI Plan produced a CD2 that no Black candidates could win, and that two White Democrats would have barely won in 2018 and 2020. *Supra* ¶¶ 808, 811, 813.

1120. Unwilling to accept even this meager amount of Black electoral access, however, the Senate abandoned the COI Plan and looked to another plan. *Supra* ¶¶ 816-826. The plan developed by the Senate and ultimately passed by the Legislature was SB5. The primary difference between the CD2 in SB5 and that in the COI Plan is the placement of Dallas County. *Supra* ¶¶ 836-37. Under the COI Plan, Dallas County is in CD2. Under SB5, Dallas County is in CD7. *Supra* ¶ 836. The Legislature knew that this change would eliminate even the scant Black electoral opportunity available in the COI Plan. *Supra* ¶ 837. That is, the Legislature's own analysis of the elections showed that removing Dallas County from CD2 under the COI Plan would eliminate the possibility of even White Democrats winning there. *Supra* ¶ 837; *cf. Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (lead op. of Kennedy, J., with Roberts, C.J., Alito, J.) ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that

would raise serious questions under both the Fourteenth and Fifteenth Amendments.").

1121. The Legislature's abandonment of the COI Plan for SB5 did not represent a considered good faith effort to enact a map to remedy the likely Section 2 violation identified by this Court and affirmed by the Supreme Court. Under SB5 (Livingston 3) and its predecessors (Livingston plans 1 and 2), each of the candidates preferred by Black voters would have lost CD2 in every single election, except the 2017 special U.S. Senate race featuring the controversial Roy Moore. *Supra* ¶¶ 333-341.

1122. The Co-Chairs and Mr. Hinaman testified that the Legislature reviewed and had access to electoral performance data throughout the process. *Supra* ¶¶ 808, 833. Thus, there is no question that the Legislature knew the consequences of its actions.

1123. None of the Legislature's purportedly "good faith" justifications explain its refusal to draw a second opportunity district. Such an absence of a legitimate and non-racial reason for a law is probative of discriminatory purpose, "particularly if the factors usually considered by the decision makers strongly favor a decision contrary to the one reached." *Arlington Heights,* 429 U.S. at 267. The evidence in this case demonstrates no legitimate nonracial reason for SB5's enactment and the State's refusal to comply with this Court's lawful order.

414

1124. Defendants have repeatedly asserted that SB5 was designed to satisfy the Court's order without engaging in racial gerrymandering. But the Court already found that it was possible to draw two opportunity districts without engaging in racial gerrymandering. *Supra* ¶¶ 283-87, 893.

1125. SB5 contains legislatives findings, which designate "non-negotiable" redistricting criteria, including prioritizing certain communities of interest and compactness and avoiding incumbent pairings. MX31. Although not mentioned in the SB5 findings, defense counsel in closing arguments also raised partisanship as a nonracial pretext. Trial Tr. 2621:9-13, 2623:24-2624:2 (Defs.' closing).

1126. Each of these justifications are pretextual or fail as a matter of law.

1127. With respect to SB5's legislative priorities, these findings themselves provide an "express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8. SB5 is explicit that the Legislature sought to keep together Mobile and Baldwin Counties together because the population's "French and Spanish colonial heritage," which the undisputed evidence shows is a reference to White people. *Supra* ¶¶ 738-40, 844-47. The SB5 legislative findings offer clear evidence of the intent of the entire Legislature. *See, e.g.*, *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985) (relying on the legislative statement in an Alabama bill to discern intent). By focusing on the text of SB5 itself, the Court looks to the declared intent of the "legislature as a whole" and does not make the legal error of relying on a

"cat's paw" theory of liability. *See Brnovich*, 594 U.S. at 689-90 (explaining that the "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents").

1128. "Ancestry can be a proxy for race. It is that proxy here." *Rice v. Cayetano*, 528 U.S. 495, 514 (2000). Here, the SB5 findings are explicit in the State's intent to "prioritize" the voting strength of persons of "French and Spanish colonial heritage" who the Legislature believed to possess a community of interest. MX31 at 7; *see supra* ¶¶ 844-47. The State's own evidence also focused on protecting the electoral strength and influence of this White ethnic community, *see supra* ¶¶ 189, 214; *Milligan I*, 582 F. Supp. 3d at 1015, but did so at the expense of complying with the Court's order. This overtly racial goal is evidence of intentional discrimination. *See, e.g.*, *Perez v. Abbott*, 250 F. Supp. 3d 123, 146-49 (W.D. Tex. 2017) (three-judge court) (finding that a state engaged in intentional discrimination in part based on a legislator's comment that he wanted a "more Anglo and more conservative" district); *Major v. Treen*, 574 F. Supp. 325, 333-34 & n.39 (E.D. La. 1983) (three-judge court) (finding that a governor's opposition to the creation of a majority-Black district was "evidence that race played a role in the confection" of a district). Alabama's refusal to adopt a consistent policy with respect to protecting the voting strength of certain racialized communities, along with the State's open refusal to draw a second Black opportunity district, is also strong evidence of

intentional discrimination. *See Busbee v. Smith*, 549 F. Supp. 494, 517 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983) (mem.) (finding intentional discrimination based in part on a key legislator's refusal to draw majority-Black districts and a state policy of protecting a White community).

1129. Moreover, Mr. Hinaman drew their plans without reference to the public comments at the 2023 hearings, the documents that Mr. Walker put into the record, or the SB5 legislative findings; rather, the only guidance that was given to Mr. Hinaman was comply with the 2021 committee redistricting guidelines. Livingston Dep. at 33-36. Mr. Brown also began working on the Livingston plans that became SB5 in June 2023 before the start of the hearings. *See supra* ¶ 747; MX63.

1130. Equally telling is that, as Dr. Duchin testified, SB5's prioritizing the Gulf Coast cluster and elevating incumbent protection and core retention to "non-negotiables" essentially mandated the dilution of the vote of Black residents of Mobile city and require creation of at least six majority-White districts—the primary discriminatory feature of the 2021 plan. *Supra* ¶¶ 736-37, 877-82. Thus, the "inevitable" effects of following the non-negotiable priorities in SB5 are "tantamount for all practical purposes" to "mathematical[ly]" requiring racial discrimination against Black voters. *Gomillion*, 364 U.S. at 341.

1131. Indeed, the SB5 findings do not mention the non-dilution of the minority vote. *Supra* ¶ 734. That is, SB5 appears to disclaim any requirement that a plan to avoid the dilution of the Black vote, while prioritizing protecting incumbents above all other criteria save the manufactured "community" clusters.

1132. Although Senator Livingston testified that the Senate was simply trying to balance increasing the BVAP of CD2 with prioritizing compactness, incumbency protection, and communities of interest, his explanations for the district were not credible. Livingston Dep. 82. Senator Livingston, Rep. Pringle, and Mr. Hinaman and the majority of the House all believed that the COI Plan met SB5's purported objectives and other priorities in the SB5 legislative findings. *Supra* ¶¶ 814, 891. The Legislature also had before it the Singleton plan, CX30; *see also* MX4 at 24, which likewise achieved these same purported goals *and* significantly increased Black electoral opportunity as compared to both the 2021 plan, and the COI plan. *See* Special Master Report, *Milligan* Doc. 295 at 33; Exhibit 15 to Special Master Report, *Milligan* Doc. 296-15 at 3-5.

1133. Senator Livingston's testimony that his plans provided any opportunity for Black voters was not credible, as no Black preferred candidate (including Mr. Jones and Mr. Siegelman) would have won the district outside of the highly unusual 2017 special election. *Supra* ¶¶ 333-341. His testimony that a well-funded and well-respected candidate could win was also not credible—Livingston himself testified

that Senator Jones was such a candidate in 2020, *supra* ¶ 89; but the State's own data showed that Senator Jones would have lost in CD2 by 6.9 percentage points. Joint Stip. ¶ 138(b). Senator Livingston's denial of using racial data to shape CD2 is also not credible insofar as his text messages with Mr. Brown demonstrate that the Legislature was checking the BVAP and performance in earlier draft plans. MX63.

1134. The State's defenses that the Legislature enacted SB5 based on concerns about partisanship and incumbent protection also fail on multiple levels. Trial Tr. 2621:9-13, 2623:24-2624:2 (Davis). Partisanship and incumbent protection are not defenses to a Section 2 results or intentional discrimination claim. *See LULAC*, 548 U.S. at 449-40 (concluding that a plan violated Section 2 and bore the "mark of intentional discrimination, despite the state defending the plan as designed to protect an incumbent and maintain partisan advantage); *Hunter*, 471 U.S. at 230 (finding that a discriminatory law enacted by Alabama to disenfranchise both Black as well as certain White political opponents was unconstitutional, and rejecting Alabama's contrary arguments); *cf. also Cooper v. Harris*, 581 U.S. 285, 308 n.7 (2017) (explaining that, even in racial gerrymandering cases, the "sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics" (citing *Miller*, 515 U.S. at 914)).

1135. Notably, the Co-Chairs both denied any partisan motive. Senator Livingston testified that he received a phone call from U.S. House Speaker

McCarthy, in which the Speaker expressing concerns about keeping the Republican majority in the U.S. House. Livingston Dep. at 95-96. But Sen. Livingston testified that this phone call "really  didn't play" any role in the drawing of SB5. Livingston Dep. at 95-96. Representative Pringle similarly testified that, although Speaker McCarthy also called him and asked him to keep in mind that Republicans had a very tight majority in Congress, Mr. Pringle said that this concern did not factor into his consideration of maps. Pringle Dep. at 22-23.

1136. Nonetheless, defense counsel's closing statement that, rather than give Black voters the additional opportunity district this Court (and the Supreme Court) required, the  Legislature was hoping to "find another way to comply with Section 2 that did not involve sending another Democrat to Congress," despite knowing the effect its decision on Black voters," Trial Tr. 2621:9-13, 2623:24-2624:2 (Davis), is significant insofar as it comes "as close to a smoking gun as we are likely to see in modern times." *McCrory*, 831 F.3d at 226. His statement makes clear that the State of Alabama's "very justification for a challenged statute hinges explicitly on race—specifically its concern that African Americans, who had overwhelmingly voted for Democrats," should not have "too much access to the franchise." *Id*. (discussing a state's similar admission that it had cut early voting for the purpose of curtailing its use in "disproportionately black" and "disproportionately Democratic" counties).

1137. Mr. LaCour's similar admission in 2023 that the Legislature could comply with the Court's order by enacting a new map "without adding a second opportunity district" evinces a similar intent. Aug. 2023 Tr. 75:5-18 (LaCour).

1138. "In essence," as in *LULAC*, 548 U.S. at 440, defense counsel's statements serve as compelling admissions that the State was attempting to devise a plan that "took away [Black voters'] opportunity because [they] were about to exercise it." As in *LULAC*, "[t]his bears the mark of intentional discrimination." *Id*.

1139. In sum, the Court finds that the Legislature intentionally enacted SB5 in violation of Section 2 and the Constitution. Overt racial statements, the process in which SB5 was passed, the State's conscious minimizing of Black voting strength, historical discrimination, and the absence of a legitimate non-racial reason for the 2023 Plan's enactment mandates the conclusion that SB5 has a discriminatory purpose. *See supra* ¶¶ 756-898. Alabama intentionally cracked the large and contiguous community of interest that exists in the Black Belt and Mobile by splitting it across three districts (CD1, CD2, and CD7) to deliberately stop Black voters from electing their candidates of choice.[20] Because it results from a

---

[20] Even if this Court again declines to directly decide the intent claim, the *Milligan* Plaintiffs respectfully ask that this Court at least find that Alabama's 2023 Plan "bears the mark of intentional discrimination" as a part of the Section 2 totality of circumstances analysis. *See, e.g*., *LULAC*, 548 U.S. at 440-41 (finding that Texas's actions bore the "mark of intentional discrimination"); *Perez v. Texas,* No. 11-CA-360, 2012 WL 13124275, at *3 (W.D. Tex. Mar. 19, 2012) (three-judge court) (finding that a state "may have focused on race to an impermissible degree" in redistricting); *Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291, 314-15 (D. Mass. 2004) (three-judge court)

discriminatory intent, SB5 "has no legitimacy at all under our Constitution." *Stout*, 882 F.3d at 1014 (quoting *Richmond v. United States*, 422 U.S. 358, 378 (1975)).

## XI.   **Irreparable Harm and the Equities**

1140. Voting is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). It "is the beating heart of democracy" and therefore "is of the most fundamental significance under our constitutional structure." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019) (citations omitted). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555.

1141. "Courts routinely deem restrictions on fundamental voting rights irreparable injur[ies]." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also, e.g., Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (similar). This reflects the irrefutable reality that "[o]nce an election occurs, there can be no do-over and no redress." *League of Women Voters of N.C.*, 769 F.3d at 247. That is certainly the case for Section 2 violations. *Dillard*, 640 F. Supp. at 1363 (concluding a Section 2 vote-dilution violation was "clearly" an irreparable harm). The Section 2 harm inflicted on

---

(finding that a state "knew what it was doing" where "race was used as a tool to ensure the protection of incumbents"). This much more limited finding may still allow Plaintiffs to show the continued need for the VRA in the face of Alabama's ongoing challenge to its constitutionality.

Plaintiffs, once realized, "cannot be undone through monetary remedies." *Id*.; *see also Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010).

1142. The *Milligan* and *Caster* Plaintiffs' requested permanent injunction of the 2023 Plan would protect their voting rights. A permanent injunction would provide Plaintiffs and other Black voters with an equal opportunity to participate in elections in the Court's Remedial Plan under districts drawn in accordance with the VRA in which Black Alabamians' votes are not unlawfully diluted. And because the VRA "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination," *Chisom*, 501 U.S. at 403 (citation omitted), "many courts have prevented elections from occurring" under illegal plans, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 361 F. Supp. 3d 1296, 1301 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

1143. Vindicating and "protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("*Cox*").

1144. The public interest is thus "best served" through an injunction that would "ensur[e] . . . that all citizens . . . have an equal opportunity to elect the representatives of their choice." *Fayette Cnty.*, 118 F. Supp. 3d at 1349-50 (quoting *Cox*, 408 F.3d at 1355); *see also United States v. Alabama*, 691 F.3d 1269, 1301

(11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest.").

## XII.    **Remedy**

1145. The Court hereby permanently enjoins Defendants from qualifying candidates and conducting any forthcoming elections under 2023 Plan.

1146. When a plan is declared unlawful, a state is typically given the first opportunity to draw a plan that remedies the Section 2 violation by enacting a plan. *Milligan II*, 690 F. Supp. 3d at 1237 ("[F]ederal law dictates that the Alabama Legislature should have the first opportunity to draw a remedial plan."). Here, that required—as this Court has repeatedly stated—a plan that included either an additional majority-Black district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice. *Id*.; *see also Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion); *Cooper v. Harris*, 581 U.S. 285, 306 (2017).

1147. The Legislature was given that opportunity, first in January of 2022 and again in the summer of 2023. Instead of passing a plan that remedied the violation this Court found likely existed, which the Supreme Court affirmed, Alabama passed SB 5. Of course, SB 5 contains a plan that Defendants fully concede did not include a second opportunity district. Trial Tr. 2622:16-17 (Davis) ("SB-5 did not present

two districts that were either majority-black or something close to it"); Aug. 2023 Tr. 159–64 (LaCour).

1148. The Legislature did this despite the Court's instruction that "[a]s the Legislature consider[ed] [remedial] plans, it should be mindful of the practical reality, based on the ample evidence of intensely racially polarized voting adduced during the preliminary injunction proceedings, that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Milligan I*, 582 F. Supp. 3d at 936. The Supreme Court fully affirmed that preliminary injunction. *Milligan,* 599 U.S. at 17.

1149. Yet the State defied this Court's (and the Supreme Court's) order. The State asserted that notwithstanding this Court's preliminary injunction order and the Supreme Court's affirmance, the Legislature was not required to include an additional opportunity district in the 2023 Plan. Aug. 2023 Tr. 159-64 (LaCour). At trial, Alabama's counsel again defended the state's defiance of this Court's order. Trial Tr. 2622:2-2624:3; Trial Tr. 2647:13-2649:16 (Davis). And as explained *supra* ¶¶ 332-341, the 2023 Plan plainly failed to provide the required "realistic opportunity" for Black voters to elect candidates of their choice. *Milligan II*, 690 F. Supp. 3d at 1294-95.

1150. In short, in refusing to actually remedy the violation found by this Court and affirmed by the Supreme Court, the Legislature squandered its opportunity to

enact a remedial map. Given the Legislature's prior failure to provide a full and fair remedy, the Court declines to offer Alabama yet another bite at the apple. *See North Carolina v. Covington*, 585 U.S. 969, 977 (2018) (affirming the district court's determination that "'providing the [legislature] with a second bite at the apple' risked 'further draw[ing] out these proceedings and potentially interfer[ing] with the [] election cycle"); *Milligan II*, 690 F. Supp. 3d at 1320 (declining to provide the Alabama Legislature with a "second bite at the apple" after this Court enjoined the 2023 Plan); *see also Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978, 1170 (S.D. Ohio), *vacated on other grounds Chabot v. Ohio A. Philip Randolph Inst.*, 140 S. Ct. 102 (2019) (recognizing its "own duty to cure" the violation if "the State fails in its task to enact a remedial plan" and its "discretion not to give the State 'a second bite at the apple.'"); *see also Common Cause v. Rucho*, 318 F. Supp. 3d 777, 943 (M.D.N.C. 2018), *vacated and remanded on other grounds*, 588 U.S. 684 (2019) ("When a court finds a remedial districting plan also violates the Constitution, courts generally do not afford a legislature a second 'bite-at-the-apple' to enact a constitutionally compliant plan.").

1151. The Court orders Defendants to administer future congressional elections under the Court's 2023 Remedial Plan. As the Court previously found, this plan satisfies all constitutional and statutory requirements while hewing as closely

as reasonably possible to the Alabama Legislature's 2023 Plan. *Milligan III*, 2023 WL 6567895, at *17.

1152. Accordingly, the Court will enter a final judgment that permanently enjoins Defendants from qualifying candidates and conducting any forthcoming elections under SB 5, and that requires the continued use of the Court's 2023 Remedial Plan. This Court will retain jurisdiction to implement, enforce, and amend this permanent injunction and the remedial order as shall be necessary and just.

## XIII.    Retention of Jurisdiction to Enforce the Remedial Plan

1153. The Court relies on its inherent equitable power to retain jurisdiction to permit Plaintiffs to bring a new challenge to any post-2030 census plan before this Court. *See Jeffers*, 740 F. Supp. at 602 (declining to impose Section 3(c) review, but retaining jurisdiction until 60 days after the adoption of any new plan to permit any new challenges to come before the same panel).

1154. For example, in *Smith v. Clark*, the Mississippi Legislature in 2002 failed despite multiple opportunities to pass a congressional districting plan and submit it for preclearance, 189 F. Supp. 2d at 531, and the court rejected the authority of a Mississippi state court to draw the map instead, 189 F. Supp. at 556, which the Supreme Court affirmed, *Branch v. Smith*, 538 U.S. 254 (2003). A three-judge federal court drew the map, and then retained jurisdiction "to implement, enforce, and amend this order as shall be necessary and just." *Id.* at 559. After the 2010

Decennial Census, the Mississippi Legislature once again failed to pass on a timely basis a congressional redistricting plan, and the same panel exercised its continuing jurisdiction and ordered a new congressional districting plan, modifying the prior judgment under Federal Rule of Civil Procedure 60(b)(5). *Smith v. Hosemann*, 852 F. Supp. 2d 757, 767 (S.D. Miss. 2011). The Panel retained jurisdiction through that cycle, and vacated the judgment only upon the enactment of a congressional districting plan by the Mississippi Legislature in January 2022. *Smith v. Hosemann*, No. 3:01-cv-00855-HTW-DCB, 2022 WL 2168960, at *1 (S.D. Miss. May 23, 2022).

1155. Although Mississippi was covered by Section 5 of the Voting Rights Act's preclearance requirement, courts in non-covered jurisdictions have made similar rulings. Federal courts in Colorado and Missouri retained jurisdiction to enforce congressional districting plans that they entered after the state legislatures failed to timely pass plans following the 1980 Decennial Census. *See Shayer v. Kirkpatrick*, 541 F. Supp. 922, 935 (W.D. Mo.), *aff'd sub nom. Schatzle v. Kirkpatrick*, 456 U.S. 966 (1982) (ordering that the court "retain jurisdiction to implement, enforce, and amend this judgment as shall be meet and just and in accordance with the 1980 census figures"); *Carstens v. Lamm*, 543 F. Supp. 68, 100 (D. Colo. 1982) (ordering that the court "retains jurisdiction to implement, enforce and amend this order as shall be necessary and just").

## XIV.   Section 3(c) Relief

1156.  Based on this Court's finding of intentional discrimination, the *Milligan* Plaintiffs have requested that this Court order relief under Section 3(c) of the Voting Rights Act. 52 U.S.C. § 10301(c).

1157.  Section 3(c) provides that if the court finds violations of the Fourteenth or Fifteenth Amendment "justifying equitable relief have occurred within the territory of such State or political subdivision," the court may "retain jurisdiction for such period as it may deem appropriate" and exercise preclearance power over new laws related to voting or to the specific voting practice at issue. 52 U.S.C. § 10302(c)

1158.  "To trigger bail-in, § 3(c) requires that (a) violations of the Fourteenth or Fifteenth Amendments (b) justifying equitable relief (c) have occurred (d) within the State or its political subdivisions." *Perez v. Abbott*, 390 F. Supp. 3d 803, 813–14 (W.D. Tex. 2019). This standard requires "violations of Fourteenth and Fifteenth Amendment protections against intentional racial discrimination in voting." *Id.*

1159.  The "remedy of preclearance" is discretionary and not mandatory. *See Jeffers v. Clinton*, 740 F. Supp. 585, 600 (E.D. Ark. 1990) *aff'd* 498 US 1019 (1991) (mem.). Section 3(c) relief is most appropriate in those cases or situations that most reflect the same "'exceptional conditions' Congress confronted when the [VRA] was enacted." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 944 (11th Cir. 2023) (quoting *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013)).

1160. Thus, the three "exceptional conditions," *id*., that are most relevant to whether to impose Section 3(c) preclearance are: (1) whether the identified constitutional "violations"[21] have been either egregious, repeated, or persistent, *see South Carolina v. Katzenbach*, 383 U.S. 301 (1966); (2) whether existing remedial orders have been sufficient to remedy the violations, *see, e.g.*, *Jeffers*, 740 F. Supp. at 601 (holding that existing decrees had remedied many past violations in related to voting but that a "series of majority-vote statutes passed for the purpose of suppressing black political success . . . demand[ed] strong action"); and (3) whether the identified violation is likely "to recur," including whether "political developments, independent of [the case], make recurrence more or less likely," *id.*

1161. First, the primary "exceptional condition[,]" *Shelby Cnty.*, 570 U.S. at 535, present in 1965 which necessitated the establishment of the preclearance regime was the covered states' engagement in the "extraordinary stratagem" of contriving

---

[21]    Despite the statute's reference to "violations," Section 3(c) relief does not require proof of multiple violations. 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise... words importing the plural include the singular. . . . ."). Still, it is undisputed that there have been multiple recent constitutional violations that have "occurred within the territory" of Alabama. 52 U.S.C. § 10302(c); *see, e.g.*, *Braxton v. Town of Newbern*, No. 2:23-CV-00127, 2024 WL 3519193, at *3 (S.D. Ala. July 23, 2024); *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-CV-01821, 2019 WL 7500528, at *3-5 (N.D. Ala. Dec. 16, 2019); *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017); *Allen v. City of Evergreen, Alabama*, No. CV 13-0107, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014); *cf. also Tennessee v. Lane*, 541 U.S. 509, 527 & n.16 (2004); *Jeffers v. Clinton*, 740 F. Supp. 585, 600 (E.D. Ark. 1990) ("The statute does not say that the State or its officials must be guilty of the violations, but only that the violations must 'have occurred *within the territory*' of the State."). Moreover, "any statute that violates the Fifteenth Amendment necessarily violates countless citizens' Fifteenth Amendment rights." Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance*, 119 Yale L.J. 1992, 2038 n.88 (2010).

new schemes for the "purpose of perpetuating voting discrimination in the face of adverse federal court decrees." *Katzenbach*, 383 U.S. at 334-35; *see also United States v. Duke*, 332 F.2d 759, 768-70 (5th Cir. 1963) (explaining that similar circumstances were necessary for a court to impose the "freezing" principle—the judicially created precursor to preclearance). The problem that Congress sought to address with the preclearance remedy was that, "[e]ven when favorable decisions have finally been obtained, some of the States affected have merely switched to discriminatory devices not covered by the federal decrees or have enacted difficult new tests designed to prolong the existing disparity." *Katzenbach*, 383 U.S. at 314.

1162. This condition is present here. Alabama did not draw a district in which Black voters could elect a preferred representative for over 100 years, until litigation forced its hand in 1992. *See* Joint Stip. ¶ 14. Even then, the Department of Justice objected to the 1990s plan, because outside of CD7, Alabama fragmented "the remainder of the state's concentrated black population." MX3 at 15; CX10 at 15.

1163. Rather than remedy that violation, for decades, the State enacted a series of redistricting plans that continued to dilute Black voting power. When this Court found that the 2021 plan constituted a likely violation of Section 2, "we do not regard the question whether the *Milligan* plaintiffs are substantially likely to prevail on the merits of their Section Two claim as a close one," but declined to make findings on intent. *Milligan I*, 582 F. Supp. 3d at 1026. We did, however, require

431

that any new map remedy the likely violation of Section 2 we identified, and explain that "the evidence of racially polarized voting adduced . . . suggests that any remedial plan will need to include two districts in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* at 1033.

1164. After the Supreme Court affirmed in full, *see Allen v. Milligan*, 599 U.S. 1 (2023), this Court provided the Legislature ample opportunity to devise its own plan to remedy the violation. Instead, the State enacted a new plan that deliberately perpetuated the prior dilution. Even then, although we declined to issue a finding on intent, we explained that we were "struck by the extraordinary circumstance we face" where "the State enacted a map that the State readily admits does not provide the remedy we said federal law requires" and "disturbed by the evidence that the State delayed remedial proceedings but ultimately did not even nurture the ambition to provide the required remedy." *Milligan II*, 690 F. Supp. 3d at 1239.

1165. With a full trial and several years of litigation in the books, the record has shed light on even more evidence that the State deliberately attempted to evade this Court's order and prevent Black Alabamians from exercising political power in a second congressional district and we have now found that Alabama intentionally discriminated against its Black residents in enacting the 2023 Plan.

1166. We will not recount our intent findings again, but we are particularly struck by two new admissions that arose at trial. First, testimony from Senator Livingston about his cluelessness about the origins of the map that led to the 2023 Plan in this case cannot be reconciled with months of text messages he exchanged with an outside political operative and map-drawer. *Supra* ¶¶ 727-30, 816-25. Second, the further admission at trial that the Legislature was trying to "find another way to comply with Section 2 that did not involve sending another Democrat to Congress," regardless of the effect of Black voters, provides more evidence that the Legislature will continue its defiance in the absence of Section 3(c) relief. Trial Tr. 2621:9-13, 2623:24-2624:2 (Davis).

1167. This persistent, repeated and egregious failure to provide a second opportunity district to Black voters in Alabama despite this Court's (and the Supreme Court's) orders requiring just that demand strong remedial action. *See McMillan v. Escambia Cnty.*, 559 F. Supp. 720, 723-24 (N.D. Fla. 1983) (retaining jurisdiction under Section 3(c) and denying preclearance to a county's remedial plan that failed to create any new opportunity districts). The State's deliberate actions cannot be excused by clever wordplay or a desire to provide a remedy in form but not in substance. Preclearance relief is necessary here to ensure that this Court meets its own "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future."

*See Louisiana v. United States*, 380 U.S. 145, 154-55 (1965) (affirming a "freezing" order that barred a state from adopting any new voting tests absent judicial review where the state had sought to replace one discriminatory device with a similar one); *cf. also Covington*, 585 U.S. at 976 (affirming an order designed to remedy a state's adoption of "new districts [that] were mere continuations of the old, gerrymandered districts"); *United States v. Virginia,* 518 U.S. 515, 547 (1996) (ordering relief where a state "chose not to eliminate, but to leave untouched," an unconstitutional policy).

1168. Second, past remedial action—the 1992 Section 5 objection, the 2021 preliminary injunction and the subsequent 2023 preliminary injunction with its findings that stopped just short of an intent finding—have been insufficient to remedy the dilution of the Black vote in the Black Belt and the City of Mobile over several years (if not decades). *See Jeffers*, 740 F. Supp. 585 (ordering Section 3 relief in response to a state's repeated passage of intentionally discriminatory rules). Alabama has yet to act to remedy the violation, despite a preliminary injunction from this Court, a Supreme Court decision, and a second injunction. Alabama's refusal to comply strongly militates in favor of the imposition of preclearance relief. *See Katzenbach*, 383 U.S. at 328 (finding preclearance relief necessary where "case-by-case litigation" had proven "inadequate" to overcome "persistent discrimination").

1169. Indeed, Section 3(c) relief is often used in response to egregious discriminatory policies that have persisted over long periods of time without any

good faith effort by the jurisdiction to remedy the identified violation. *See NAACP v. Gadsden Cnty. Sch. Bd.*, 589 F. Supp. 953, 958 (N.D. Fla. 1984) (imposing Section 3(c) preclearance relief to address a jurisdiction's longtime maintenance of an unconstitutional election system); *see also Braxton v. Town of Newbern*, No. 2:23-cv-00127, 2024 WL 3519193, at *3 (S.D. Ala. July 23, 2024) (approving a consent order, which imposed Section 3(c) relief to remedy a jurisdiction's longstanding maintenance of an unconstitutional system); *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-01821, 2019 WL 7500528, at *3-5 (N.D. Ala. Dec. 16, 2019) (same).

1170. In contrast, courts have repeatedly declined to impose Section 3(c) relief where a state "promptly" enacts a remedial statute that substantially addresses the violation. *See, e.g., Veasey v. Abbott*, 888 F.3d 792, 804 (5th Cir. 2018); *McCrory*, 831 F.3d at 239-41; *Perez v. Abbott*, 390 F. Supp. 3d 803, 813 (W.D. Tex. 2019) (three-judge court).

1171. This case looks firmly more like the former than the latter, given both the course of events here and the stark admission from the two Co-Chairs and defense counsel that the Legislature did not intend to comply with the Court's orders in substance. *See supra* ¶ 1166.

1172. Third, the violation is extremely likely to recur. Indeed, the actions of the Legislature, the Secretary of State, the State Solicitor General, and the State Attorney General in *this case* all make clear that the State was "unwilling" to enact

435

a plan to remedy the 2021 violation. *Milligan II*, 690 F. Supp. 3d at 1317. Nothing has demonstrated that the State's "unwilling[ness]" is likely to change after the 2030 census. *Id*. It is clear that the Legislature in 2030 will again seek to reset the field, perhaps by announcing a new set of "traditional" redistricting principles then forcing plaintiffs to start at square one. *Cf. Beer v. United States,* 425 U.S. 130, 140 (1976) (explaining that preclearance review "was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down.").

1173. As such, the Court imposes Section 3(c) preclearance review until 60 days after the Alabama Legislature enacts a congressional plan under the 2030 census or a period of approximately seven years. This Court will enter a judgment that requires Defendants, or their successors in office, to submit any congressional plan for review under Section 3(c). No other state or local changes will be subjected to preclearance review. Rather, this relief is limited to the nature of the violation at issue in this case and tailored to a reasonable time period to prevent future violations without extending indefinitely. *See, e.g.*, *Patino v. Pasadena*, 230 F. Supp. 3d 667, 729-30 (S.D. Tex. 2017) (imposing preclearance for five years); *Allen v. City of Evergreen*, 2014 WL 12607819, at *2 (seven years). Indeed, the earliest iterations of the VRA imposed preclearance review only for increments of five and seven years. *See City of Rome v. United States*, 446 U.S. 156 (1980) (upholding the

constitutionality of the 1975 renewal, which imposed preclearance review for seven

years); *Georgia v. United States*, 411 U.S. 526, 533 (1973) (upholding preclearance

review for a period of five years); *Katzenbach*, 383 U.S. at 334 (same for five years).

## **<u>CONCLUSION</u>**

For the foregoing reasons, the *Milligan* and *Caster* Plaintiffs respectfully request that the Court adopt their proposed findings of fact and conclusions of law on the Section 2 results claims.

The *Milligan* Plaintiffs separately respectfully request that the Court enter their proposed findings of fact and conclusions of law on the Fourteenth Amendment intentional discrimination claim. The *Milligan* Plaintiffs further request that the Court enter remedial relief under Section 3(c) in the form of requiring Alabama to submit its congressional redistricting plans for preclearance review for seven years.

Finally, regardless of whether this Court enters a Section 3(c) order or not, *Milligan* and *Caster* Plaintiffs further respectfully request that this Court retain jurisdiction over this case to enforce the Remedial Plan unless and until the State adopts a new congressional plan following the 2030 Census. *See supra* ¶¶ 1153-55.

The *Milligan* and *Caster* Plaintiffs again appreciate the Court and its staff for their time and the attention and consideration that has given to this important case.

DATED this 19th day of March 2025,

*/s/ Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE
& EDUCATIONAL FUND, INC.
700 14th Street NW Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Dayton Campbell-Harris*+
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
dcampbell-harris@aclu.org
tlee@aclu.org
slakin@aclu.org

Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Colin Burke*
Victor Olofin*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
cburke@naacpldf.org

Respectfully submitted,

*/s/ Abha Khanna*
Abha Khanna*
Elias Law Group LLP
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
(206) 656-0177
AKhanna@elias.law

Lalitha D. Madduri*
Richard A. Medina*
Qizhou Ge*
Elias Law Group LLP
250 Massachusetts Ave, Suite 400
Washington, D.C. 20001
(202) 968-4490
LMadduri@elias.law
RMedina@elias.law
AGe@elias.law

Richard P. Rouco
(AL Bar. No. 6182-R76R)
Quinn, Connor, Weaver, Davies & Rouco
LLP
Two North Twentieth
2-20th Street North, Suite 930
Birmingham, AL 35203
Phone: (205) 870-9989
Fax: (205) 803-4143
RRouco@qcwdr.com

***Attorneys for Caster Plaintiffs***
**Admitted Pro Hac Vice*

vofolfin@naacpldf.org

*/s/ Sidney Jackson*
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS, CHILDS, PANTAZIS,
FISHER & GOLDFARB
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

Michael Turrill*
Harmony R. Gbe*
James W. Ettinger*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars Suite 1400 Los
Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com
jay.ettinger@hoganlovells.com

Alison Mollman
Laurel Hattix
AMERICAN CIVIL LIBERTIES UNION OF
ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
lhattix@aclualabama.org

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

Jessica L. Ellsworth*
Shelita M. Stewart*
Amanda N. Allen*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW Washington,
DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com
amanda.n.allen@hoganlovells.com

**Counsel for Milligan Plaintiffs**
*Admitted Pro Hac Vice*