FILED
2025 Jun-16  PM 05:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

|  |  |
|---|---|
| **EVAN MILLIGAN, *et al.*,** <br> **Plaintiffs,** <br><br> **v.** <br><br> **WES ALLEN, *et al.*,** <br> **Defendants.** | **Case No. 2:21-cv-1530-AMM** <br><br> **THREE-JUDGE COURT** |

### STATE DEFENDANTS' SUPPLEMENTAL BRIEF ON *MILLIGAN* PLAINTIFFS' REQUEST FOR RELIEF UNDER SECTION 3(C) OF THE VOTING RIGHTS ACT

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................2

INTRODUCTION ......................................................................3

BACKGROUND .......................................................................5

ARGUMENT ..........................................................................10

    I. Section 3(c) relief is not warranted without pervasive, flagrant, rampant, and widespread discrimination, including multiple recent constitutional violations by the jurisdiction to be covered......................10

    A. Section 3(c) is not triggered because Plaintiffs failed to show multiple constitutional violations justifying equitable relief. .............10

    B. Preclearance is inappropriate and unconstitutional absent pervasive, flagrant, rampant, and widespread voting discrimination that makes case-by-case litigation inadequate. ...........18

    II. The Court should not retain jurisdiction as an exercise of "inherent equitable power."....................................................................25

**CONCLUSION**...................................................................30

**CERTIFICATE OF SERVICE** ........................................................33

## INTRODUCTION

Like the preclearance remedy in Section 5 of the Voting Rights Act, preclearance under Section 3(c) is an "extraordinary measure[] to address an extraordinary problem." *Shelby County v. Holder*, 570 U.S. 529, 534 (2013), and is not appropriate in this case. Congress justified this "drastic departure from basic principles of federalism," by relying on "the 'exceptional conditions' Congress confronted when the law was enacted" in 1965. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 944 (11th Cir. 2023) (quoting *Shelby County*, 570 U.S. at 535).

Section 3(c) preclearance is justified only when plaintiffs prove conditions similar to those that originally justified Section 5. *See, e.g., Shelby County*, 570 U.S. at 547-50 (comparing conditions in 1965 to conditions in 2004). They must show that a jurisdiction is committing multiple constitutional violations that reflect pervasive, flagrant, widespread, and rampant discrimination in a way that allows the jurisdiction to "stay one step ahead of the federal courts." *Beer v. United States*, 425 U.S. 130, 140 (1976). Only those "extraordinary" circumstances of a jurisdiction changing its voting laws so rapidly and frequently as to be practically unreviewable before causing irreparable harm can justify the "extraordinary" remedy of Section 3(c) preclearance.

That does not describe the situation here for multiple reasons. First, the State has not been held liable for multiple violations. The 2023 Plan is the only state law or policy in more than a decade found to violate the Constitution. And while the 2012 plans for the state house and senate were enjoined for including racially gerrymandered districts, the State was found guilty only of using race too much to maintain opportunity districts for black voters, not for trying to intentionally dilute their votes. Such findings cannot support preclearance. *See Ala. Leg. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1288 (M.D. Ala. 2013) ("*ALBC I*"); *Ala. Leg. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1043 (M.D. Ala. 2017) ("*ALBC II*") (readopting findings and conclusions not disturbed on appeal).

Second, there is no need for the extraordinary remedy of preclearance where litigation has proven adequate to prevent the use of the plan this Court found to be intentionally dilutive. The 2023 Plan was enacted with time for the Court to conduct preliminary injunction proceedings and then later oversee discovery and a full trial. There was no intent to evade judicial review of the kind that motivated Congress in 1965; it was fully expected that this Court would rule on the 2023 Plan's lawfulness, and, if necessary, enjoin its use prior to the 2024 elections. There is no reason to predict otherwise moving forward.

That is particularly true in light of Defendants' recent representations to the Court. DE493, ¶¶ 3-5; DE497, ¶¶1-2. State Defendants have agreed to forgo any

rights that they may have to attempt to draw a congressional district map as part of remedial proceedings in this case and agreed to use the Special Master's Remedial Plan 3 (the "SM Plan"), without waiving and subject to their right to appeal, and have further represented their good faith intentions to not pass any other additional congressional district maps before receiving the 2030 census data or otherwise participate in mid-cycle redistricting. DE493, ¶¶ 3-5; DE497, ¶1. In the Parties' Joint Status Report, and in the interest of making clear that Defendants would not contest making their representations legally enforceable, Defendants further stated:

> [T]hey will not challenge on appeal the duration of an injunction that requires the Secretary of State to use the SM Plan for the 2026, 2028, and 2030 congressional elections (as well as all special or other congressional elections prior to the adoption of a new congressional district map based on 2030 census data).

DE497, ¶2.

These representations underscore that there is no risk that a normal judicial remedy will be insufficient to cure the violations found, and they further obviate the risk of the type "repeat offense" that might justify the Section 3(c) relief.

## BACKGROUND

**A. Statutory Background.** In 1965, Congress faced a century of failed attempts to enforce the right to vote. *Brnovich v. DNC*, 594 U.S. 647, 655-56 (2021). Unlike today, voting discrimination was still "pervasive, flagrant, widespread, and rampant." *Shelby County*, 570 U.S. at 554. What started as "coordinated intimidation

and violence" evolved into "more subtle methods … to deny blacks the right to vote." *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 218-19 (2009) (Thomas, J., concurring in judgment in part and dissenting in part). States deployed devices designed to exclude blacks from voting, while lowering those requirements for whites or exempting them altogether. *See South Carolina v. Katzenbach*, 383 U.S. 301, 311 (1966); *id.* at 312-13 & n. 12.

Critically, the federal courts could not keep up. When faced with a decision "favorable" to black voters, States invented new discriminatory measures "to prolong the existing [registration] disparity." *Id.* at 314. Though Congress had empowered the Justice Department to sue in 1957, *id.* at 313, combating voting discrimination was like "playing a game of whack-a-mole," *Brnovich*, 594 U.S. at 697 (Kagan, J., dissenting), for the States stayed "one step ahead of the federal courts," *Beer*, 425 U.S. at 140.

This "extraordinary stratagem" of "unremitting" attempts to "perpetuat[e] voting discrimination" largely achieved its goal. *Katzenbach*, 383 U.S. at 335. From the mid-1950s to the mid-60s, rates of black voter registration hardly improved, remaining "roughly 50 percentage points or more" behind that of whites. *Id.* at 313. Case-by-case litigation was "inadequate to combat" this "widespread and persistent discrimination in voting." *Id.* at 328.

Congress responded to those "exceptional conditions" by passing the Voting Rights Act (the "VRA"). *Id.* at 334. The VRA is known for its "broad remedies," but Section 5 preclearance was one of the "most extraordinary." *United States v. Bd. of Comm'rs of Sheffield, Ala.*, 435 U.S. 110, 141 (1978) (Stevens, J., dissenting). Section 5 "suspen[ded] … all new voting regulations pending review by federal authorities." *Katzenbach*, 383 U.S. at 315. Under Section 4(b), the coverage formula for Section 5, preclearance was "aimed at areas where voting discrimination ha[d] been most flagrant." *Id.* at 315. Congress did so by applying Section 5 to jurisdictions that used "tests and devices for voter registration" and had a voting rate in the previous election "at least 12 points below the national average." *Id.* at 330; *see also id.* (explaining that tests and devices had a "long history" of "perpetrating … evil" and a "low voting rate" signaled "widespread disenfranchisement").

But Congress recognized that the coverage formula was not perfect. Jurisdictions could abandon their past discriminatory practices yet still be covered. These jurisdictions were therefore permitted to seek bail-out from preclearance. *See Katzenbach*, 383 U.S. at 318. And other jurisdictions might not be covered despite rampant discrimination. Thus, Congress enacted Section 3(c) so that courts could bail into preclearance jurisdictions "missed by section 5's formula." Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance*, 119 Yale L.J. 1992, 1997 (2010).

In 1966, the Supreme Court upheld Section 5 and Section 4(b)'s coverage formula. *See Katzenbach*, 383 U.S. at 329-33, 334-36. The Court explained that "exceptional conditions can justify" legislation that is "not otherwise appropriate." *Id.* at 334. Under the "unique circumstances" present in 1965—"unremitting and ingenious" violations of the right to vote that made case-by-case litigation inadequate—Congress could "shift the advantage of time and inertia" to citizens by freezing state law. *See id.* at 309, 328, 335. Still, by 2013, "no one c[ould] fairly say" that covered jurisdictions saw "anything approaching the pervasive, flagrant, widespread, and rampant discrimination," *Shelby County*, 570 U.S. at 554 (quotations omitted), that the Court "relied upon" to uphold Section 5, *Northwest Austin*, 557 U.S. at 202.

Like Section 5, Section 3(c) "imposes substantial federalism costs" by barring new state legislation "however innocuous" pending judicial review. *Id.* Therefore, preclearance under Section 3(c) should be judged by the same standard as Section 5; it may be constitutionally applied only in light of voting discrimination so rampant that case-by-case litigation cannot safeguard the right to vote.

**B. Procedural History.** On May 8, 2025, this Court found that the State had intentionally diluted the voting strength of black voters when it enacted the 2023 Plan. DE490:541-42. Defendants have since agreed that, barring success on appeal, the SM Plan—which the State used in the 2024 congressional elections in

compliance with the Court's preliminary injunction order—will remain in place at least until redistricting can occur with data from the 2030 census. *See* DE493, ¶¶2-3; DE497, ¶2. State Defendants have no intentions to pass additional congressional district maps or participate in mid-cycle redistricting before the 2030 census data is released. DE493, ¶2.

Before the 2023 Plan, the last time the State was found to have committed a voting-related constitutional violation was in 2012 when it enacted redistricting plans for the state house and senate that included twelve districts challenged as racial gerrymanders. *See* DE490, 404-07; *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348 (M.D. Ala. 2017). There was, however, no finding of intentional dilution as to those 2012 Acts. Rather, the district court "conclude[d] that an invidious discriminatory purpose was not a motivating factor in the creation of the Acts." *ALBC I*, 989 F. Supp. 2d at 1288.[1] Among its findings, the court noted that "the Acts draw as many majority-black districts as possible within an overall deviation in population of 2 percent and leave many of the majority-black districts underpopulated." *Id.*

---

[1] The *ALBC* district court "readopted those portions of our previous final judgment that decided the claim of vote dilution brought under section 2 and the claim of intentional discrimination brought under section 2, the Fourteenth Amendment, and the Fifteenth Amendment" because the Supreme Court's did not address those rulings. *ALBC*, 231 F. Supp. 3d at 1043.

# ARGUMENT

## I.    Section 3(c) relief is not warranted without pervasive, flagrant, rampant, and widespread discrimination, including multiple recent constitutional violations by the jurisdiction to be covered.

Section 3(c) permits courts to subject jurisdictions to preclearance upon a finding of "violations" of the "the fourteenth or fifteenth amendment justifying equitable relief." 52 U.S.C. §10302(c). A plaintiff who succeeds in an intentional discrimination case is not automatically entitled to preclearance. Instead, this "rarely used" remedy has been reserved for jurisdictions that have taken "systematic and deliberate attempts to reduce black political opportunity." *Conway Sch. Dist. v. Wilhoit*, 854 F. Supp. 1430, 1442 (E.D. Ark. 1994).

To trigger Section 3(c), Plaintiffs must show multiple unremedied violations of the Constitution's voting guarantees. And even upon that extraordinary showing, preclearance is inappropriate and unconstitutional unless the State has engaged in such widespread and persistent discrimination that case-by-case litigation is inadequate to protect the right to vote. Plaintiffs clear neither hurdle.

### A.    Section 3(c) is not triggered because Plaintiffs failed to show multiple constitutional violations justifying equitable relief.

**1.** A district court must find *multiple* constitutional violations affecting the right to vote before bailing a jurisdiction into preclearance. 52 U.S.C. § 10302(c) (referring, in the plural, to "*violations* of the fourteenth or fifteenth amendment" (emphasis added)); *see also* DE485, 429 (Plaintiffs agreeing that only "intentional

racial discrimination in voting" will "trigger bail-in" (quoting *Perez v. Abbott*, 390 F. Supp. 3d 803, 813-14 (W.D. Tex. 2019)). Although plural nouns may include the singular in some statutes, *see* DE485, 430 at n.21 (quoting 1 U.S.C. § 1), that is not the case for Section 3(c)'s reference to "violations" for two reasons.

First, Congress legislates against background principles, including historic understandings of the judicial power. Preclearance has never been an *expected* remedy for any constitutional violation of any constitutional right. *See Shelby County*, 570 U.S. at 542-43, 546. Instead, it is a "drastic departure" from "basic principles of federalism" and "equal sovereignty" designed to "address an extraordinary problem." *Id.* at 534; *cf. Northwest Austin*, 557 U.S. at 204, 205-06 (narrowly construing preclearance statute).

Second, preclearance seeks to avoid irreparable harm, *i.e.*, the prospect that a jurisdiction will make election law changes with such frequency or spontaneity as to evade the normal exercise of the judicial power. *Shelby County*, 570 U.S. at 545 ("Case-by-case litigation had proved inadequate to prevent such racial discrimination in voting…."). The required showing must be consonant with that aim. Because one violation on its own does not generally suggest an intent to evade judicial review, it is more plausible that when Congress wrote "violations," 52 U.S.C. § 10302(c), it meant there must be "more than one violation" to impose such an intrusive remedy. *Jeffers v. Clinton*, 740 F. Supp. 585, 600 (E.D. Ark. 1990) ("We

also think that more than one violation must be shown. The statute uses the plural ('violations'), and it would be strange if a single infringement could subject a State to such strong medicine.").

The prerequisite violations also must "justify[] equitable relief." 52 U.S.C. § 10302(c). It is a bedrock tenet of equity that the plaintiff must prove a present threat of irreparable harm, not a past injury. *See, e.g., City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). But to pose a threat, the violations offered to support Section 3(c) bail-in must be ones that were not or could not be remedied. *See Jeffers*, 740 F. Supp. at 596. Otherwise, they do not suggest a likelihood of future irreparable harm. And here, Plaintiffs have now stated that adequate relief to a dilutive plan can be provided without resort to preclearance. *See* DE497, ¶3 ("Plaintiffs in the above actions agree that an injunction barring the Secretary of State from administering Alabama's congressional elections according to the 2023 Plan and ordering him to administer congressional elections according to the SM Plan, in accordance with the previous paragraph, **is a full remedy** to the Section 2 violation identified by this Court in the May 8, 2025 Order.") (emphasis added). When complete relief is available from the federal courts without preclearance, there is no "whack-a-mole" problem of persistent efforts to evade review. *Brnovich*, 594 U.S. at 697 (Kagan, J., dissenting). Fully remedied past violations do not justify the extraordinarily intrusive remedy of preclearance. *Jeffers*, 740 F. Supp. at 596.

Because relief under Section 3(c) is reserved for such extreme circumstances, it is seldom analyzed and even less often employed by courts. *See e.g., N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016) (providing a brief, two-sentence explanation as to why it declined to grant Section 3(c) relief against North Carolina); *Jeffers,* 740 F. Supp. at 600 ("We are aware of no reported case discussing the standards for imposing preclearance."). Indeed, it appears only one court has involuntarily subjected an entire state to preclearance. *See Jeffers v. Clinton*, 740 F. Supp. at 599-02. That court did not purport to define "exhaust[ively]" the test for all "future cases," but asked, among other questions:

> Have the violations been persistent and repeated? Are they recent or distant in time? Are they the kinds of violations that would likely be prevented, in the future, by preclearance? Have they already been remedied by judicial decree or otherwise? How likely are they to recur? Do political developments, independent of this litigation, make recurrence more or less likely?

*Id.* at 601. None of these factors for Section 3(c) relief are satisfied here.

**2.** Plaintiffs' request for Section 3(c) preclearance fails. With respect to the parties before the Court, Plaintiffs identify only one constitutional violation—this Court's finding that intentional discrimination motivated the 2023 Plan, which is the *only* state-wide violation Plaintiffs identify from the last ten years. That single violation, even if affirmed on appeal, would not be enough. *See id.* (noting to consider whether violations are "persistent and repeated"); 52 U.S.C. § 10302(c) (referring to "violations").

The remaining three violations Plaintiffs cite do not come close to warranting statewide preclearance for federal congressional redistricting. DE485:430 n.21. First and foremost, those cases involved local jurisdictions with completely different actors and different motives acting beyond any direct control by Defendants here. It would be inequitable to bail-in the State on this basis, punishing it for the actions of nonparties[2] (who themselves did not escape judicial review in the way Congress was worried about 60 years ago). Those violations by local jurisdictions "should … not be used as a trigger for bail-in relief" against the State. *Perez*, 390 F. Supp. 3d at 817.

Second, even if those cases were relevant, their procedural posture greatly reduces any weight they might have, as all three opinions followed a stipulation between the parties as to the constitutional claims.[3] *See Jeffers*, 740 F. Supp. at 600

---

[2] For example, *Braxton v. Town of Newbern*, No. 2:23-cv-00127, 2024 WL 3519193 (S.D. Ala. July 23, 2024), involved a jurisdiction with a total population of 133 people covering 1.2 square miles. *See* U.S. Census Bureau, Newbern town, Alabama, *available at*: https://data.census.gov/profile/Newbern_town,_Alabama?g=160XX00US0153784. Finding voting discrimination in a town of just over a hundred people does not prove that "voting discrimination … persists on a pervasive scale" across the entire State and cannot justify imposing state-wide preclearance. *Shelby Cnty.*, 570 U.S. at 538. In *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-01821, 2019 WL 7500528, (N.D. Ala. Dec. 16, 2019), the court focused on the legislature's discriminatory intent in 1975, but, in 2019, the "parties share[d] the goal" of leaving the discriminatory scheme behind. *See id.* at *1, *3. Plaintiffs' last case concerned city council maps enacted in 2012 and 2001. *Allen v. City of Evergreen, Alabama*, No. CV 13-0107-CG-M, 2014 WL 12607819, at *1 (S.D. Ala. Jan. 13, 2014). None of these examples warrant a presumption that the state legislature will act with discriminatory intent in the 2030s.

[3] *Braxton*, 2024 WL 3519193 (stipulating to the alleged constitutional violations in a memorandum of understanding); *Jones*, 2019 WL 7500528 (stipulating to the same in a joint motion for entry of consent order); *Evergreen*, 2014 WL 12607819, at *1 (entering a joint proposed order stipulating that "limited coverage of voting changes under Section 3 [was] appropriate").

(noting that a final judgment entered into by stipulation is "a circumstance which reduces its weight as a precedent").

Another reason those violations are irrelevant to this case is that preclearance for congressional districts would have done nothing to cure them. *See Jeffers*, 740 F. Supp. at 601 (noting that whether violations would likely be prevented by preclearance should be a Section 3(c) factor to consider). None of those cases involved congressional districts. *See supra* n.3. To the extent those cases disclose discrimination by a local official somewhere in Alabama, Plaintiffs have not explained how preclearance would provide any relief for past discrimination, nor how it would prevent the same kind of violations in the future. Plaintiffs cannot do so because the creation of a majority-minority congressional district in the southern part of the State has little to do with a local school board hundreds of miles north.

This is in sharp contrast to *Jeffers*. There, the Eastern District of Arkansas found *multiple violations using the same kind of device*, and it tailored the scope of its preclearance remedy to fit the injury. 740 F. Supp. 593-95, 601 (subjecting majority-vote requirements to preclearance because "whenever black candidates used th[e] system successfully," those requirements were a "swift and certain" response to "close off … black political victory"). Here, Plaintiffs cite violations in other contexts by nonparties that do not support their request for unrelated relief. Particularly where the violations in many of those cases have long "been remedied,"

they do not "now … justify[] equitable relief." *Jeffers*, 740 F. Supp. at 596. Plaintiffs cite "no evidence of any continuing discriminatory effect on minority voters" relating to any of these lawsuits. *Perez*, 390 F. Supp. 3d at 816. They offer at most "[a] record of scattered infringement of the right to vote," which "is not a constitutionally acceptable substitute" for evidence of "the extreme circumstances warranting" preclearance. *Northwest Austin*, 557 U.S. at 229 (Thomas, J., concurring in part and dissenting in part).

Plaintiffs cite only one constitutional violation of the State rather than a locality: *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 1026 (M.D. Ala. 2017). But in that case, the district court determined that the legislature had *no* invidious discriminatory purpose. *See ALBC I*, 989 F. Supp. 2d at 1288; *ALBC II*, 231 F. Supp. at 1043 (readopting findings and conclusions not disturbed on appeal). Without intentional discrimination, the violation is irrelevant for Section 3(c) purposes. *Perez*, 390 F. Supp. 3d at 813-14 ("[T]riggering violations for bail-in relief *must* be violations of Fourteenth and Fifteenth Amendment protections against *intentional voting discrimination*." (emphasis added)). This is because Section "3(c) aims to remedy voting changes that have the purpose and effect 'of denying or abridging the right to vote on account of race or color.'" *Id.* at 814. *Shaw* claims, however, require "only an improper focus on race" rather than "a racially discriminatory purpose." *Id.* at 813. For instance, jurisdictions risk using race too

much when they attempt to comply with the VRA and then face *Shaw* claims, but Congress did not craft preclearance to deter overcompliance with its statutory mandates; the remedy is designed to stop discriminatory denials of the right to vote. For this reason, "a *Shaw*-type Fourteenth Amendment claim, without a finding of racially discriminatory purpose, is not a finding that supports bail-in relief." *Id.* at 814. The *ALBC* district court found no discriminatory purpose, so it does not reflect an extraordinary need for an extraordinary remedy.

Ultimately, the only finding cognizable under Section 3(c) is this Court's determination that intentional discrimination motivated the 2023 Plan—something that is not "likely ... to recur." *See Jeffers*, 740 F. Supp. at 601. In fact, if Defendants' statements and concessions are credited, it would be *impossible* for the same to recur given State Defendants' agreement (subject to appellate rights) to keep the SM Plan in place and forgo passing any additional congressional plans before 2030 census data is released. DE493, ¶¶2-3; DE497, ¶2. Because Plaintiffs can point solely to this Court's finding regarding the 2023 Plan, and they admit that the harms the Court found in that plan can be remedied without preclearance, DE497, ¶3, Section 3(c) relief is inappropriate.

**B.**     **Preclearance is inappropriate and unconstitutional absent pervasive, flagrant, rampant, and widespread voting discrimination that makes case-by-case litigation inadequate.**

The very existence of a preclearance requirement raises "serious constitutional questions." *Northwest Austin*, 557 U.S. at 204. In *Shelby County*, the Supreme Court reiterated that preclearance is not only "uncommon" but "not … appropriate" absent the "exceptional and unique conditions" existing when Congress passed the VRA in 1965. 570 U.S. at 555 (cleaned up). Thus, when Plaintiffs say that preclearance is "*most* appropriate" when conditions are "the same" as those "Congress confronted" in the 1960s, DE485, 429 (emphasis added), they are almost correct. That is the *only* scenario in which preclearance may be appropriate and constitutional. *See Shelby County*, 570 U.S. at 555. The Court should apply Section 3(c) consistent with the Supreme Court's preclearance guidance found in *Shelby County* and *Northwest Austin*. *See League of Women Voters of Fla.*, 66 F.4th at 944; *Perez*, 390 F. Supp. 3d at 819, 821.

**1.** Preclearance is an "intrusion into sensitive areas of state and local policymaking" and inflicts "substantial 'federalism costs.'" *Lopez v. Monterey Cnty.*, 525 U.S. 266, 282 (1999) (quoting *Miller v. Johnson*, 515 U.S. 900, 926 (1995)); *accord Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 480 (1997). For in an "extraordinary departure from the traditional course of relations between the States and the Federal Government," *Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491, 500-

01 (1992), preclearance "freez[es] elections procedures … unless the changes can be shown to be nondiscriminatory," *Beer*, 425 U.S. at 140. Though the federal government has no "general right to review and veto state enactments before they go into effect," preclearance grants courts that unique power and intrudes upon the State's "broad" election powers and primary "duty and responsibility" of districting. *Shelby County*, 570 U.S. at 542-43.

Normally, a "finding of past discrimination" does not shift the "burden of proof" or negate "the presumption of legislative good faith." *Abbott*, 585 U.S. at 603. Once a State is subject to preclearance, however, the State is presumed guilty until proven innocent. The "encroachment on state sovereignty is significant and undeniable." *Sheffield*, 435 U.S. at 141 (Stevens, J., dissenting). Without a level of discrimination like the extraordinary circumstances Congress faced in the 1960s—discrimination so rampant that ordinary litigation is incapable of protecting the right to vote—preclearance under Section 3(c) is not an appropriate exercise of remedial authority. *See City of Boerne v. Flores,* 521 U.S. 507, 520, 525-26 (1997); *cf. Northwest Austin*, 557 U.S. at 224-26 (Thomas, J., concurring in judgment in part and dissenting in part).

As shown in the following chart, and similar to the evidence considered by the Supreme Court in *Shelby County*, 570 U.S. at 547-48, the record reveals the stark

difference between the conditions in Alabama when Section 3(c) was enacted compared to today:

| Conditions | Alabama in 1965 | Alabama Today |
|---|---|---|
| Black Voter Registration Rate[4] | 1965: 23.5% | 2024: 95.2% |
| Black State Senators[5] | 1965: 0.0% | 2024: 20.0% |
| Black State House Representatives[6] | 1965: 0.0% | 2024: 24.8% |
| Existence of Poll Taxes[7] | 1965: Yes | 2024: No |
| Existence of Literacy Tests[8] | 1965: Yes | 2024: No |

**2.** Plaintiffs have not identified flagrant voting discrimination similar to the 1960s that makes ordinary case-by-case litigation inadequate to remedy alleged violations. Their argument is centered solely on the 2023 Plan, but preclearance is not proper upon a finding of a single constitutional violation. *See supra* §I.A; *see also Shelby County*, 570 U.S. at 555 (rejecting argument that "preclearance … should be upheld into the future 'unless there is no or almost no evidence of unconstitutional action by States.'"). Rather than concede that their argument for

---

[4] DX7 at 23 (noting Black voter registration rates from 1965-2024); *see also Shelby County v. Holder*, 570 U.S. 529, 548 (2013) (citing S.Rep. No. 109–295, p. 11 (2006); H.R.Rep. No. 109–478, at 12).

[5] DX7 at 22; DE481, 159.

[6] *Id.*

[7] Tr. 1377:13–1378:2.

[8] *Id.*

preclearance is all about this case, Plaintiffs repackage the single violation to look like multiple violations. *See, e.g.*, DE485:433. This also fails.

The 2023 Plan is not the product of a scheme from "over 100 years" ago, (DE485, 431), attempting to perpetuate voting discrimination before *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims,* 377 U.S. 533 (1964) even made such claims cognizable. *See Katzenbach*, 383 U.S. at 334-35. If there were a violation for failing to draw a majority-black district, that was remedied in 1992, and a majority-black district in that part of the State has been maintained for over 30 years. *See* DX68; Tr. 177:13-16. *Cf. Jeffers*, 740 F. Supp. at 601 (describing violations from 16 years prior to be "a thing of the past").

The Department of Justice's early-1990s preclearance objection does not show a repeated violation either. *Contra* DE485:431. DOJ conducted only a "limited review" and under "extreme time constraints" before expressing its view that Alabama should draw two majority-black districts. *See* Letter from John R. Dunne, Assistant Attorney General, Department of Justice, to Jimmy Evans, Alabama Attorney General (Mar. 27, 1992).[9] But that determination, of course, was not binding then, it is not binding on this Court now, *Miller*, 515 U.S. at 922, and some States at that time that did not resist DOJ's "maximization agenda" were deemed to

---

[9]    *Available    at    https://www.justice.gov/sites/default/files/crt/leg-acy/2014/05/30/AL-1880.pdf.

have violated the Constitution. *cf. Abrams v. Johnson*, 521 U.S. 74, 81 (1997). A DOJ objection is not a constitutional "violation[]." 52 U.S.C. §10302(c).

More probative is the fact that DOJ did not object in 2000 or 2010 after the Supreme Court had rejected its "maximization policy." *Miller*, 515 U.S. at 925. And no private plaintiff ever had the confidence in the DOJ's view to test the theory in court until almost 30 years later. Perhaps the claim that succeeded in this matter would have failed at an earlier time, with different census data.

Any equitable remedy should rest on firmer ground—court findings, not speculation. But here there has been only a single finding of a constitutional violation stemming from the State's drawing of congressional districts in 2023.

The State's actions after the Court's preliminary injunction order in this case were nothing like the "extraordinary stratagem" that justified the VRA. *Contra* DE485:430. The State drew a new map known as the 2023 Plan using traditional districting principles to repeal the 2021 Plan after a preliminary finding of liability. DE166, 2; DX9 at 9–13. After the Court enjoined the 2023 Plan and ordered the State to use its remedial map, the SM Plan, *Singleton v. Allen,* 690 F.Supp.3d 1226, 1238 (N.D. Ala. 2023), the State complied. DE481:254; DE272. Now, the State has agreed (barring success on appeal) to continue using the SM Plan through 2030 and until it obtains new census data. DE497. The Court found a constitutional violation,

but not "unremitting … defiance" of the right to vote, *Katzenbach*, 383 U.S. at 309, or a "persistent, repeated, and egregious" violation, *contra* DE485:433.

Plaintiffs thus have failed to rebut the presumption that ordinary litigation is adequate to the protect the right to vote. In this case, litigation has resulted in an injunction against the challenged map. *Singleton*, 690 F. Supp. 3d at 1238. Now, unless the State prevails on appeal, it will use the court-drawn SM Plan for the next three election cycles, which includes two districts that are likely to elect the black preferred candidate. *See* DE493; DE497.

Litigation has proven adequate in other cases too. In 1992, for instance, Alabama was ordered by a court to draw a majority-black district. *See Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992). Since then, Alabama has maintained a majority-black District 7 in all subsequent districting plans, including the 2021 Plan that was not subject to preclearance. *See* DX68; Tr. 177:13–16. "[A]nd in every election since 1992," District 7 "has elected a Black Democrat." DE490:3. In a State engaging in the kind of discrimination Congress contemplated when enacting Section 3(c), one would expect to see at a minimum some retrogression. By contrast, the record reveals that white and black Alabamians have similar voter registration and turnout rates. MX6 at 6-9 & n.15; DX7 at 23. Judicial review in the early 1990s sufficed to remedy the alleged injuries and has continued to do so for over thirty years.

Likewise, the Plaintiffs have agreed that any dilution in the 2023 Plan can be completely cured with preclearance. *See* DE497:2 ("Plaintiffs . . . agree that an injunction barring the Secretary of State from administering Alabama's congressional elections according to the 2023 Plan and ordering him to administer congressional elections according to the SM plan . . . is a **full remedy** to the Section 2 violation identified by this Court") (emphasis added); *see also McCrory*, 831 F.3d at 241 (holding that Section 3 preclearance was "not necessary [there] in light of [the court's] injunction"). When the Court preliminarily enjoined the 2023 Plan, the State deployed the court-drawn SM Plan in the next elections as instructed by the Court. DE272. And it will continue doing so until it must redistrict with new census data, should Plaintiffs prevail on appeal. DE493; DE497.

Not only does the Court's injunction prohibiting the use of the 2023 Plan remedy Plaintiffs' constitutional claim without a need for preclearance, but also, the parties' concessions, particularly Defendants', underscore that the violation found by this Court is unlikely to recur. *See supra* at 18. The notion that a "violation is extremely likely to recur" (DE485, 435) with a "different legislature" more than five years from now offends the presumption of good faith, *cf. Abbott*, 585 U.S. at 603-05, and ignores the capacity of normal litigation to protect the right to vote.

If Plaintiffs are concerned that a future cycle's districting plan violates the Constitution, they will have the opportunity to bring non-frivolous challenges

through litigation—just like any other plaintiff. The future violation they fear is not a subtle or novel discriminatory device that may appear without warning. It is a statewide congressional map, which will not be written into law in secret, let alone used for elections without time for public scrutiny and, if warranted, judicial review. Unnecessary to avoid irreparable harm in these circumstances, preclearance would be an abuse of equitable discretion.

* * *

In Alabama today, voting discrimination is nothing like the discrimination that existed in the 1960s. For example, when the VRA was originally passed and upheld as a valid exercise of congressional power, the black voter registration rate in Alabama was around 20%. DX7 at 23; DE481:178; *Katzenbach*, 383 U.S. at 313. By 2004 it was at 72.9%. DX7 at 23; DE481:178; *Shelby County*, 570 U.S. at 548. And in 2024 it was at 95.2%. DX7 at 23; DE481:178; DE324:288. Alabama today has two black congressmen, thirty-three black state legislators, and a black supreme court justice. As demonstrated in the chart above, *supra* at 20, the conditions in Alabama are vastly different from what they once were. The conditions justifying Section 3(c) 60 years ago no longer exist, so preclearance is inappropriate.

## II.    The Court should not retain jurisdiction as an exercise of "inherent equitable power."

Plaintiffs request the Court exercise its "inherent equitable power" to "retain jurisdiction to permit Plaintiffs to bring a new challenge to any post-2030 census

plan before this Court." DE485:427. Plaintiffs demand virtually the same relief under Section 3(c). *Id.* at 429, 435 (asking this Court to "retain jurisdiction" to police "change after the 2030 census"). But Congress set forth the circumstances in which courts may subject States to preclearance. And if Section 3(c) is an "extraordinary" and "unfamiliar" remedy, it follows that courts lack the power to achieve roughly the same result as an exercise of equitable power. *Shelby County*, 570 U.S. at 545.

Nothing here demands a departure from the ordinary. The ordinary way to end a case (including a constitutional case against a state officer) is a judgment, an order resolving any post-judgment motions, and, if there is no appeal, the judgment becoming final. If a plaintiff secures a favorable judgment but the defendant fails to comply, the plaintiff has options: He or she can move to enforce the judgment, Fed. R. Civ. P. 70(a); move for contempt, Fed. R. Civ. P. 70(e); or move to modify the judgment, Fed. R. Civ. P. 60(b), if there has been "a significant change either in factual conditions or in law," *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992).

Plaintiffs ask for something entirely different. They anticipate "bring[ing] a new challenge" in "approximately seven years," so they demand this Court exercise its equitable authority to hold the case until that time. DE485 at 427 & 436. To be sure, courts sometimes issue injunctions that "remain in force for many years," especially in "institutional reform litigation." *Horne v. Flores*, 557 U.S. 433, 447-48

(2009). But even those injunctions, which raise their own constitutional concerns, *id.* at 448-50, are still "remedial in nature" and seek "to restore" the plaintiffs to their rightful position, *Milliken v. Bradley*, 433 U.S. 267, 280 (1977). Courts exercise ongoing jurisdiction "to supervise" these structural reforms. *Missouri v. Jenkins*, 515 U.S. 70, 126 (1995) (Thomas, J., concurring) (citing cases involving prisons, mental hospitals, and public housing). Plaintiffs here, by contrast, ask the Court to keep the case alive for hypothetical future claims they might want this Court to hear. There is generally no equitable basis for the Court to do that.

While "equity is flexible," it still must be "confined within the broad boundaries of traditional equitable relief." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). Plaintiffs have not shown "the relief [they] request[] here was traditionally accorded by courts of equity." *Id.* at 319. Before 1965, preclearance was "unprecedented," and the federal courts have no "general right to review and veto state laws before they go into effect." *Shelby County*, 570 U.S. at 535, 542. A court's jurisdiction is ordinarily confined to remedying existing or imminent injuries. The request for continuing jurisdiction goes beyond that; it seeks to ensure that *this* Court can adjudicate a speculative, *future* dispute that may (or may not) occur in the next decade over a state law that has not even been drafted. At this stage, the Court cannot be sure that it would even have jurisdiction to hear whatever claims Plaintiffs may decide to bring.

Consequently, there is nothing "traditional" about the requested relief—a kind of prophylactic jurisdiction over a hypothetical case-or-controversy. And there would be nothing traditional about such intrusion onto state sovereignty. *See, e.g.*, *Horne*, 557 U.S. at 448 (citing "sensitive federalism concerns" at play in sustained litigation over "areas of core state responsibility"); *Jenkins*, 495 U.S. at 51 ("[O]ne of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions."); *id.* at 88; *Freeman v. Pitts*, 503 U.S. 467, 489-90 (1992) (similar); *Rizzo v. Goode*, 423 U.S. 362, 379 (1976) ("[A]ppropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief[.]").

The requested remedy would be virtually unprecedented. Plaintiffs cite two cases in which district courts retained jurisdiction to "implement, enforce, and amend" their districting orders. DE485, 427-28. But again, that is fundamentally distinct from retaining jurisdiction for the sole purpose of hearing *new* claims based on a *new* law that will not be enacted for at least six years. The one case Plaintiffs cite where a court imposed anything like that is *Jeffers*. But *Jeffers* was written before *Grupo Mexicano* emphasized the role of history and tradition in delimiting the scope of equity. And *Jeffers* never explained how "inherent equitable power" includes a remedy unquestionably "in the nature of preclearance." 740 F. Supp. at 602. Plaintiffs do not try to fill the gap. And even if *Jeffers* were right about the

scope of equitable power, the court decided to retain jurisdiction in 1990 to hear challenges in 1991—a much more modest result than what Plaintiffs seek here. *Id.*

Plaintiffs' request more closely resembles an attempt to "relate" a future case over a hypothetical future law to closed cases involving the 2023 Plan. But trying to relate a new case to a closed case is looked at with suspicion in Alabama district courts. *See Boe v. Marshall*, 767 F. Supp. 3d 1226, 1257 (M.D. Ala. 2025) (citing *In re Vague*, No. 2:22-mc-3977-LCB (M.D. Ala. Oct. 3, 2023) at Doc. 70). Where a separate case "is closed and there is no other action to which [the purportedly 'related' case] is related," then transferring a case would not "accomplish any substantial savings of judicial resources." *Irish Lesbian & Gay Org. v. Giuliani*, 918 F. Supp. 728, 730 (S.D.N.Y. 1996). Reassigning a case where the allegedly related case has concluded will not help avoid "duplicative discovery, overlapping briefing schedules, conflicting pretrial proceedings, or other sources of potential inefficiency." *Id.*; *see also, e.g.*, *Ill. Extension Pipeline Co. v. Thomas*, 2015 WL 1867777, at *1 (C.D. Ill. Apr. 22, 2015) (finding "no basis to transfer the case" where "[a]ll of the alleged related cases cited by the Plaintiff have been terminated"). But what such a move does accomplish—whether through an erroneous "related" designation or Plaintiffs' "retention of jurisdiction" request—is evasion of "the courts' random case-assignment procedures." *Boe*, 767 F. Supp. 3d at 1233. And "[e]very court considering attempts to manipulate the random assignment of judges

29

has considered it to constitute a disruption of the orderly administration of justice." *In re BellSouth Corp.*, 334 F.3d 941, 959 (11th Cir. 2003).

Any challenge to a redistricting plan for the 2030s will need to be judged by its particular "consequences" under "the totality of the circumstances" at that time. *Voinovich v. Quilter*, 507 U.S. 147, 155 (1993). This is "an intensely local appraisal." *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986). It is impossible in 2025 to predict with any precision the census data, the contours of a future state redistricting plan, and the nature of a future challenge. Plaintiffs invite the Court to speculate that a future case *might* be related to this one. The Court should reject Plaintiffs' request for that novel remedy.

If new "conditions" arise that call for the creation of new remedies, then that is a job for Congress. *Grupo Mexicano*, 527 U.S. at 322. Due to conditions in the 1950s and 1960s, Congress did just that, enacting Section 3(c) as new authority to "retain jurisdiction" over *future* voting-rights cases. But Plaintiffs are not entitled to that relief, and they may not circumvent that congressional scheme to obtain preclearance by another name.

## CONCLUSION

The Court should not grant relief under Section 3(c) of the Voting Rights Act or otherwise retain jurisdiction.

30

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

*/s/ James W. Davis*
James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Richard D. Mink (ASB-4802-M76R)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Scott Woodard (ASB-1001-F94C)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
Matthew R. Duggan  (ASB-1512-D00L)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama  36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Richard.Mink@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Scott.Woodard@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov
Matt.Duggan@AlabamaAG.gov

**Counsel for Secretary of State Allen**

*/s/ Michael P. Taunton*
Michael P. Taunton (ASB-6833-H00S)
Riley Kate Lancaster (ASB-1002-X86W)
BALCH & BINGHAM LLP

1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com
RLancaster@Balch.com

***Counsel for Senator Livingston and Representative Pringle***

## CERTIFICATE OF SERVICE

I certify that on June 16, 2025, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

/s/ James W. Davis
Counsel for Secretary Allen