FILED

2025 Jun-25  PM 10:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| EVAN MILLIGAN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WES ALLEN, *et al.*,<br><br>Defendants. | Case No.: 2:21-cv-1530-AMM<br><br>THREE-JUDGE COURT |

## ***MILLIGAN*** **PLAINTIFFS' RESPONSE IN SUPPORT OF THEIR REQUEST FOR SECTION 3(C) RELIEF**

# TABLE OF CONTENTS

I.    THE FLAGRANT AND EVASIVE NATURE OF ALABAMA'S FOURTEENTH AMENDMENT VIOLATIONS CALL FOR RELIEF UNDER SECTION 3(C) OF THE VOTING RIGHTS ACT. .....................4

   A.    Section 3(c) Requires Findings of Discriminatory Intent in One Case, Not Multiple Cases. ....................................................................................4

   B.    The Limited Time and Scope of Plaintiffs' Bail-in Request Does Not Require Proof that Discrimination Today Is Identical to that in 1965, But Current Conditions Bear Many Similarities to that Era..............11

   C.    Alabama's Record of Flagrant Discrimination in Congressional Redistricting in this Case and Earlier Confirms that Ordinary Case-by-Case Litigation has Proven Inadequate. ...........................................19

II.   ALTERNATIVELY, THIS COURT SHOULD EXERCISE ITS INHERENT EQUITABLE POWER TO RETAIN JURISDICTION OVER CHALLENGES TO ALABAMA'S POST-2030 REDISTRICTING PLANS. ..........................................................................23

CONCLUSION....................................................................................28

In Section 3(c) of the Voting Rights Act (VRA), Congress provided that if a court in "any proceeding" finds a violation of the Fourteenth or Fifteenth Amendment "justifying equitable relief," the court "shall retain jurisdiction for such period as it may deem appropriate" to prevent new voting laws from going into effect before being subjected to preclearance. 52 U.S.C. § 10302(c).

Congress designed Section 3(c) as a backstop "to insure against the erection of new discriminatory voting barriers by States or political subdivisions which have already been found to have discriminated." S. Rep. 89-162, 1965 U.S.C.C.A.N. 2508, 2558. That is precisely the risk here given Alabama's conduct during this redistricting cycle. This risk forms the basis of Plaintiffs' limited request to require Alabama to preclear only congressional plans and only those enacted through the 2030 census cycle or a period of roughly seven years.

Incredibly, in opposing Plaintiffs' request,[1] Alabama asks this Court to ignore the plain text and the purpose behind Section 3(c) and to impose limitations that Congress never contemplated. Alabama hyperbolically tries to analogize Plaintiffs' limited request to the all-encompassing Section 5 preclearance regime, which "suspend[ed] *all* changes to state election law — however innocuous — until they have been precleared by federal authorities in Washington, D.C." *Nw. Austin Mun.*

---

[1]    Plaintiffs adopt and incorporate by reference the arguments about their request for Section 3(c) relief and retention of jurisdiction from their Post-Trial Brief. ECF No. 429 ¶¶ 1156-1173.

*Util. Dist. v. Holder*, 557 US 193, 202 (2009). These arguments do not reflect the purpose of Section 3(c) or the actual relief requested here, and ignore Alabama's continued discriminatory acts.

First, neither the text of the VRA, nor its legislative history support Alabama's position that Section 3(c) requires Plaintiffs to prove multiple violations akin to the flagrant discrimination present in 1965. Rather, the VRA permits courts to impose Section 3(c) relief in "any proceeding." 52 U.S.C. § 10302(c). And congressionally mandated principles of statutory construction require the parties to understand the VRA's use of the term "violations," *id.*, to encompass the singular, 1 U.S.C. § 1. Congress created Section 3(c) to capture "so-called 'pockets of discrimination'" outside of those States where discrimination ran rampant in 1965. H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2454. That is, Section 3(c)'s whole purpose is to impose more limited preclearance review *only* on those States or jurisdictions *without* the same egregious histories as Alabama in 1965. Tellingly then, only one court in sixty years has adopted Alabama's narrow interpretation of Section 3(c).

Even if Section 3(c) requires proof of an egregious history and multiple violations (and it does not), Alabama has an "extensive history of repugnant racial and voting-related discrimination is undeniable and well documented." *Allen v. Milligan*, 599 U.S. 1, 22 (2023) (citation omitted). And Alabama recently continued to commit multiple constitutional violations. *Singleton v. Allen* ("*Milligan*"), No.

2:21-CV-01291, 2025 WL 1342947, at *158-60 (N.D. Ala. May 8, 2025) (three-judge court). Numerous "judicial precedents illuminate a pervasive and protracted history of official discrimination," including "multiple cases" that "were issued in the last ten years by federal judges who remain in service today." *Id.* at *159.

Still, Alabama protests that equitable relief under Section 3(c) is not appropriate here because "[i]n Alabama today, voting discrimination is nothing like the discrimination that existed in the 1960s." Defs.' Br. 25. Yet, with respect to statewide redistricting, this Court has already expressly found that Alabama's evasive and discriminatory actions in 2023 mirrored its similar actions in the 1960s:

> We reject in the strongest possible terms the State's attempt to finish its intentional decision to dilute minority votes with a veneer of regular legislative process. On the rare occasion that federal law directs federal courts to intrude in a process ordinarily reserved for state politics, there is nothing customary or appropriate about a state legislature's deliberate decision to ignore, evade, and strategically frustrate requirements spelled out in a court order. This is not the first time the Alabama Legislature has purposefully refused to satisfy a federal court order about redistricting even after the Supreme Court affirmed that order. *See generally Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965) (three-judge court: Rives, Thomas, and Johnson, JJ.) (per curiam). We hope it will be the last time.

*Milligan*, 2025 WL 1342947, at *7.

For these reasons and those offered below, Plaintiffs satisfy both the statutory and equitable requirements needed for the Court to impose a Section 3(c) remedy. In the alternative, the Court should employ its inherent authority to retain jurisdiction

over this case until 60 days after Alabama enacts a post-2030 census congressional redistricting plan to enforce its orders and hear any new challenges from Plaintiffs.

**I.    The Flagrant and Evasive Nature of Alabama's Fourteenth Amendment Violations Call for Relief Under Section 3(c) of the Voting Rights Act.**

      **A. Section 3(c) Requires Findings of Discriminatory Intent in One Case, Not Multiple Cases.**

Alabama contends that Section 3(c) requires proof that "a jurisdiction is committing multiple constitutional violations" to justify bail-in, Defs.' Br. 3, and that the "State has not been held liable for multiple violations," *id.* at 4. This argument fails on the law and the facts.

On the law, the plain text of Section 3(c) refers to a court ordering bail-in "in any proceeding" in which the court "finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision." 52 U.S.C. § 10302(c). This reference to a single proceeding belies Alabama's argument that Section 3(c)'s reference to "violations" means that a single constitutional violation will not suffice. Defs.' Br. 10.

As Alabama acknowledges, Defs.' Br. 11, Congress itself instructs courts to understand any reference to "violations" in the plural is inclusive of the singular: "in determining the meaning of any Act of Congress, unless the context indicates otherwise . . . . words importing the plural include the singular." 1 U.S.C. § 1. Without reference to any caselaw or statute, Alabama argues that this Court should

ignore Congress and instead assume that it is "more plausible" that Congress meant Section 3(c) to require proof of multiple violations. Defs.' Br. 11. In seeking to overcome Congress's presumption that the plural includes the singular "unless the context dictates otherwise," 1 U.S.C. § 1, however, "'[c]ontext' . . . means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts," *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993). The relevant "context" does not include a general sense that one interpretation is "more plausible." *See United States v. Paauwe*, 968 F.3d 614, 618–19 (6th Cir. 2020) ("The use of a plural noun . . . typically does not exclude the singular version of that noun, unless the provision explicitly says otherwise.").

Additionally, the strong weight of authority supports the textualist view that one or more constitutional violations in a single case suffices to bail-in a jurisdiction. Other than one case, every other court to consider the issue has held that a jurisdiction is subject to Section 3(c) bail-in based on a single violation—as construed by Alabama. *See Perez v. Abbott*, 390 F. Supp. 3d 803, 818 (W.D. Tex. 2019) (concluding that the finding that a 2011 congressional plan violated the Fourteenth Amendment was "sufficient to trigger bail-in as a potential remedy"); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 729–30 (S.D. Tex. 2017) (imposing Section 3(c) relief where city "officials intentionally discriminated against Latinos"

by enacting a dilutive voting plan); *NAACP v. Gadsden Cnty. Sch. Bd.*, 589 F. Supp. 953, 958–59 (N.D. Fla. 1984) (imposing Section 3(c) relief for a violation involving an at-large school board scheme); *McMillan v. Escambia Cnty.*, 559 F. Supp. 720, 728 (N.D. Fla. 1983) (explaining that Section 3(c) "applies to situations such as the one found here—in which a court has found in a suit a violation of the fourteenth or fifteenth amendments justifying equitable relief").[2] The only case to take a different view about the number of violations considered the issue in only two sentences and failed to contend with the Dictionary Act or any prior cases. *Jeffers v. Clinton*, 740 F. Supp. 585, 600 (E.D. Ark. 1990) (three-judge court); *cf. League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1177 (N.D. Fla. 2022) (explaining that there are several "reasons to doubt" that Section 3(c) requires proof of multiple violations), *rev'd in part on other grounds sub nom. League of Women Voters of Fla., Inc. v. Fla. Sec'y of State,* 66 F.4th 905, 944 (11th Cir. 2023).

Additionally, although the U.S. Department of Justice takes a different position here, Doc. 499 at 9, it has previously agreed that Section 3(c) is "best read

---

[2]     This includes every single one of the various cases where courts ordered Section 3(c) bail-in via a consent decree. *See, e.g.*, *Braxton v. Town of Newbern*, No. 2:23-CV-00127-KD, 2024 WL 3519193, at *3 (S.D. Ala. July 23, 2024); *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-CV-01821-MHH, 2019 WL 7500528, at *5 (N.D. Ala. Dec. 16, 2019); *Allen v. City of Evergreen*, No. CV 13-0107-CG, 2014 WL 12607819, at *1 (S.D. Ala. Jan. 13, 2014); Consent Decree at 5, *United States v. Vill. of Port Chester*, No. 06-15173, ECF No. 119 (S.D.N.Y. Dec. 22, 2009); *Blackmoon v. Charles Mix Cnty.*, No. CIV. 05-4017, 2007 WL 10085163, at *1 (D.S.D. Dec. 4, 2007); *Kirkie v. Buffalo Cnty.*, No. 03-CV-3011, 2004 WL 7397275, at *1 (D.S.D. Feb. 12, 2004); *Garza v. Cnty. of L.A.*, No. 88-5143 (C.D. Cal. Apr. 25, 1991).

to require proof of only a single constitutional violation," Statement of Interest of United States, *Perez v. State of Texas*, No. 5:11-cv-360, Doc. 827 at 4 n.2 (W.D. Tex. July 25, 2013) (attached as Ex. A). The scholar cited by Alabama in its brief agrees with this reading. *See* Travis Crum, *The Voting Rights Act's Secret Weapon: Pocket Trigger Litigation and Dynamic Preclearance*, 119 Yale L.J. 1992, 2007 n.88 (2010) (explaining that an interpretation of Section 3(c) that requires multiple violations "runs counter to statutorily mandated rules of construction").

Finally, even if Section 3(c) requires multiple findings of discriminatory intent, the record and recent Alabama history allow for such a finding here. This Court's finding that Alabama violated the Constitution was premised on Alabama's manipulation of district lines to violate the rights of tens of thousands of Black voters in Dallas County and statewide, as well as the multiple individual and organizational plaintiffs in this case. *Milligan*, 2025 WL 1342947, at *200, *204, *213. "[A]ny statute that violates the Fifteenth Amendment necessarily violates countless citizens' Fifteenth Amendment rights." Crum, *The Voting Rights Act's Secret Weapon*, 119 Yale L.J. at 2007 n.88. This is because the "right to an undiluted vote does not belong to the 'minority as a group,' but rather to 'its individual members.'" *LULAC v. Perry*, 548 U.S. 399, 437 (2006) (quoting *Shaw v. Hunt*, 517 U.S. 899, 917 (1996)).

Violations by localities are also relevant to the remedy here. *Cf.* Defs.' Br. 14. This is because Section 3(c) asks whether "violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred *within* the territory of such State." 52 U.S.C. § 10302(c) (emphasis added). In *Jeffers*, for example, the court correctly read this text to mean that "both State and local violations of the voting guarantees of the Fourteenth and Fifteenth Amendments must be taken into account." 740 F. Supp. at 600. Indeed, local violations committed by relatively small counties and cities were the predicate for Congress subjecting the entirety of Alabama to preclearance in 1965. [3] *See South Carolina v. Katzenbach*, 383 U.S. 301, 312 (1966); *see also Tennessee v. Lane*, 541 U.S. 509, 527 n.16 (2004) (explaining that "much of the evidence in *South Carolina v. Katzenbach*, 383 U.S. 301, 312-315 (1966) . . . involved the conduct of county and city officials, rather than the States").

Alabama admits that multiple courts have recently found local constitutional violations but attempts to downplay their significance because these cases ended in

---

[3]     *See Katzenbach*, 383 U.S. at 314–15 ("In Dallas County, of which Selma is the seat, there were four years of litigation by the Justice Department and two findings by the federal courts of widespread voting discrimination.); S. Rep. 89-162, 1965 U.S.C.C.A.N. 2508, 2547 (referring to eight cases decided against local jurisdictions in Alabama of "discriminatory use of tests and devices"); *id.* at 2550 ("Court orders have also been evaded or disregarded in . . . Dallas, Perry, Bullock, and Macon Counties in Alabama"). The State was only joined as a party in these local cases under the strict state liability provisions of the Civil Rights Act of 1957. 52 U.S.C. § 10101(c); *see, e.g.*, *United States v. Alabama*, 362 U.S. 602, 602-03 & n.2 (1960) (explaining that Alabama was joined as a party in a case against Macon County); *United States v. Penton*, 212 F. Supp. 193, 195 (M.D. Ala. 1962) (same in Montgomery County).

consent orders.[4] Defs.' Br. 14. Alabama's position, however, ignores that "because consent decrees are entered by the court and are judicially enforceable, they function like any other court order or judgment." *Rowe v. Jones*, 483 F.3d 791, 797 (11th Cir. 2007). Moreover, these consent orders were entered only after courts found likely constitutional violations in contested preliminary injunction proceedings. *See Braxton v. Stokes*, No. 2:23-00127-KD, 2024 WL 2116057, at *1 (S.D. Ala. May 10, 2024) ("Plaintiffs are likely to succeed on the merits of their constitutional claim"); *Allen v. City of Evergreen*, No. 13-107, 2013 WL 1163886, at *1 (S.D. Ala. Mar. 20, 2013) (three-judge court) ("Plaintiffs' evidence of the presence of indicia of discrimination . . . is neither rebutted nor distinguished by the defendants.").

Nothing in Section 3(c)'s text precludes consideration of consent orders. Rather, Congress identified the entry of a consent order "resulting in any abandonment of a voting practice" as sufficient evidence of ongoing discrimination to preclude a State from bailing out of preclearance. 52 U.S.C. § 10303(a)(1)(B).

---

[4] The court's finding in *Stout v. Jefferson County Board of Educ*ation that the City of Gardendale intentionally discriminated in seceding from Jefferson County also implicated Black voters' rights. 882 F.3d 988, 994 (11th Cir. 2018). The secession would have changed the method for selecting the board members who governed city schools. Before the secession, the city schools were controlled by the elected county board—where Black voters had some representation. 250 F. Supp. 3d 1092, 1141 (N.D. Ala. 2017). But, after the secession, the new Gardendale board would have been appointed by the all-White city council—which was elected at-large by a majority White electorate. *Id.* at 1141; *see Robinson v. Ala. State Dept. of Educ*., 652 F. Supp. 484, 485 (M.D. Ala. 1987) (three-judge court) (recognizing that a school secession may result in voting discrimination).

9

Even if this Court were to require proof of state-level violations, Alabama state officials have also committed multiple recent constitutional violations. *See, e.g.*, *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-01821-MHH, 2019 WL 7500528 (N.D. Ala. Dec. 16, 2019); *Ala. Legis. Black Caucus v. Alabama* ("*ALBC*"), 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017); *United States v. McGregor*, 824 F. Supp. 2d 1339, 1346–47 (M.D. Ala. 2011). In *McGregor*, the Court found multiple Alabama state legislators engaged in "political manipulation motivated by racism" and that their behavior constituted "compelling evidence that political exclusion through racism remains a real and enduring problem in this State." *Id.* Alabama does not dispute this violation. *Milligan*, 2025 WL 1342947, at *158-59.

Alabama tries distinguishing *Jones v. Jefferson County Board of Education* as "focused on the legislature's discriminatory intent in 1975." Defs.' Br. 14 n.2. But this argument ignores that the Alabama Legislature maintained this discriminatory plan until as late as 2022. *Jones*, 2019 WL 7500528, at *4.

With respect to the *Shaw* violation in *ALBC*, Plaintiffs acknowledge that these claims are "analytically distinct" from a vote dilution claim. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Yet *Shaw* claims still require proof that legislatures "are motivated by a racial purpose or object," *id*. at 913. And *Shaw*-type constitutional violations can serve to demonstrate that "state officials continued in their efforts to restrict or dilute African American voting strength." *N.C. State Conf. of the NAACP*

*v. McCrory*, 831 F. 3d 204, 225 (4th Cir. 2016). Alabama then is simply wrong—a *Shaw*-type claim does require proof of a racial intent, which can occur even without racism. *Cf.* Defs.' Br. 16; *see also Milligan*, 2025 WL 1342947, at *196 (declining to accuse legislators of "racism"). There is no reason to ignore the finding in *ALBC*, 231 F. Supp. 3d at 1348-49, that Alabama violated the constitutional rights of thousands of Black voters across multiple districts.

Accordingly, whether Section 3(c) requires proof of one or many violations *or* multiple state or local violations, the facts here satisfy all the proposed standards.

### B. <u>The Limited Time and Scope of Plaintiffs' Bail-in Request Does Not Require Proof that Discrimination Today Is Identical to that in 1965, But Current Conditions Bear Many Similarities to that Era.</u>

Alabama avers that Plaintiffs "have not identified flagrant voting discrimination similar to the 1960s" that would justify 3(c) bail-in. Defs.' Br. 20.

But Alabama's conduct this cycle alone shows the necessity for bail-in relief. The primary "exceptional condition[,]" *Shelby County v. Holder*, 570 U.S. 529, 535 (2013), present in 1965 which Congress saw as necessitating the preclearance regime were the covered States' engagement in the "extraordinary stratagem" of contriving new schemes for the "purpose of perpetuating voting discrimination in the face of adverse federal court decrees," *Katzenbach*, 383 U.S. at 334-35. The problem that Congress sought to address with the preclearance remedy was that, "[e]ven when favorable decisions have finally been obtained," the States "merely switched to

discriminatory devices not covered by the federal decrees." *Id*. at 314. To Congress, the paradigmatic cases justifying the need for preclearance were the grandfather clause, *Lane v. Wilson*, 307 U.S. 268 (1939), and white primary cases, in which courts repeatedly struck down different versions of the same law in the same state. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 211–13 (1996) (explaining the long history of Texas's white primary cases and that preclearance sought "to end this evasion once and for all").

This is exactly what occurred in this case. Alabama sought to "ignore, evade, and strategically frustrate" attempts to remedy racial discrimination. *Milligan*, 2025 WL 1342947, at *7. Alabama departed from the norm of complying with a court order (as affirmed by the Supreme Court) and instead deliberately schemed to enact a slightly modified map "to make the discriminatory vote dilution that [the Court] identified impossible to remedy." *Id.* at *203.

Alabama contends that for the Court to impose preclearance on the State for congressional redistricting through 2032, the Court must find "conditions similar to those that originally justified Section 5" in 1965. Defs.' Br. 3. But no other Section 3(c) cases granting relief—especially the type of time- and scope-limited relief sought here—have made such a finding. Rather, other courts have imposed preclearance after finding that a jurisdiction engaged in similar evasion or repeated wrongdoing.

12

For example, despite Alabama's attempt to distinguish it, Defs.' Br. 15, *Jeffers* supports bail-in here. In *Jeffers*, the court dealt with Arkansas's use of majority-vote requirements to stifle Black political power and found it impossible to "ignore the pattern formed by" the legislature repeatedly passing laws "in an attempt to close off [an] avenue of black political victory." *Id.* at 594-95. The *Jeffers* court imposed bail-in even though it did not find that the Arkansas Legislature passed the original majority-vote requirement law with discriminatory intent. Rather, the court there found that bail-in was necessary because the legislature kept amending that law to include more offices after some Black candidates began experiencing some electoral success. *Id.* at 601. So too, here. Despite this Court not finding discriminatory intent in the 2021 plan, Alabama amended its maps to stymie the election of two Black candidates in the face of multiple court orders.

Similarly, in *McMillan v. Escambia County*, the court retained jurisdiction and denied preclearance under Section 3(c) where, as here, the county attempted to bypass a prior order by proposing "remedial" plans that made "not even a pretense of affording any district" in which Black voters could elect a preferred candidate. 559 F. Supp. at 726. Likewise, in *Patino v. City of Pasadena*, the court bailed-in a city because its 2013 plan intentionally discriminated against Latino voters. 230 F. Supp. 3d at 730. There, as here, the city enacted a plan that failed to recognize a minority group's electoral strength in a manner that was intentionally designed to

13

skirt the VRA. *See id.* at 722–23, 727 (finding that the mayor had waited to pass a new discriminatory plan until after *Shelby County* to evade preclearance review).

The record here meets or beats that in *Jeffers*, *McMillian*, and *Patino*. This Court described "how the Legislature intended the 2023 Plan to discriminate against Black Alabamians: by perpetuating vote dilution and making it impossible to remedy," *Milligan*, 2025 WL 1342947, at *205, and "how far the Legislature was willing to travel from the norm in service of its intention not only to refuse a remedy for the likely vote dilution we found, but to prevent a remedy altogether," *id.* at *206.

In contrast, Alabama's conduct is quite different from that of other States in several recent cases where courts declined to impose preclearance. In both *Perez v. Abbott*, 390 F. Supp. 3d 803, 820 (W.D. Tex. 2019), and *Veasey v. Abbott*, 888 F.3d 792, 804 (5th Cir. 2018), "the State acted promptly to adopt the interim plans to remedy any potential violations," and there were "no findings of discriminatory intent or Fourteenth Amendment violations" concerning these interim remedial plans," *Perez*, 390 F. Supp. 3d at 820; *see also Veasey*, 888 F.3d at 804 (finding that Texas's prompt enactment of a valid Section 2 remedy precluded the use of bail-in).

Alabama also cites *League of Women Voters of Florida Inc. v. Florida Secretary of State* ("*LWV*"), 66 F.4th 905, 944 (11th Cir. 2023) and *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016), as cases showing why bail-in is inappropriate here. Defs.' Br. 3, 13, 18, 24. In *LWV*, however,

the Eleventh Circuit reversed the district court's finding of intent, 66 F.4th at 944, and in *McCrory*, 831 F.3d at 241, there was no record of defiance or attempts "to prevent a remedy altogether," as exists here. *Milligan*, 2025 WL 1342947, at *206. Rather, the North Carolina legislature at least passed a revision to the challenged law that partially ameliorated its discriminatory effects. *See McCrory*, 831 F.3d at 219.

Aside from this precedent, Alabama's proposed standard would ignore the text of Section 3(c). Unlike Section 4, Section 3(c) does not require a court to find evidence of certain conditions, like low turnout and literacy tests, as a precondition to bailing in a subset of state laws for a limited period of time. 52 U.S.C. §10303(b). Unlike Section 4, Section 3(c) was "designed to prevent a political subdivision found in violation of the constitution from performing an end run around and circumventing the court's holding by enacting a new voting plan that was no worse than the one in effect at the time the suit was instituted." *McMillan*, 559 F. Supp. at 729. That is the limited request that Plaintiffs here make as to congressional plans.

Misapprehending the purpose of Section 3(c) and its differences from Section 4, Alabama heavily relies on *Shelby County v. Holder*, 570 U.S. 529 (2013). While the Court struck down the Section 4 formula, it explicitly declined to rule out the potential of a different coverage formula. *Id.* at 557. And *Shelby County* does not touch Section 3(c) at all. This is because preclearance review under Sections 4 and 5 as compared to bail-in under Section 3(c) "have strikingly different triggers," with

the latter requiring "a violation of the Fourteenth or Fifteenth Amendment." Crum, *The Voting Rights Act's Secret Weapon*, 119 Yale L.J. at 2009. Thus, unlike the formula criticized and struck down in *Shelby County*, Section 3(c) *always* seeks "to remedy [a] problem" based on "current conditions," *Shelby Cnty.*, 570 U.S. at 557.

Still, even comparing the 2020 congressional cycle and 1965, unfortunate similarities abound. Most notably, this Court has already rightfully compared the Legislature's defiance and attempts to avoid providing equal opportunities to Black Alabamians in congressional representation to 1965. *See Milligan*, 2025 WL 1342947, at *7 (citing *Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965)). But even beyond this stark comparator, other indicia of discrimination tie these eras together.

This Court recognized that "at least some legislators actually knew . . . that without Dallas County in District 2, Black-preferred candidates would have no chance of winning in that District," yet chose to enact such a district anyway. *Id.* at *204. Dallas County and Selma were similarly a focus of Congress in 1965 when it enacted the VRA. As the House Report explained: "The litigation in Dallas County took more than 4 years to open the door to the exercise of constitutional rights conferred almost a century ago." *Katzenbach*, 383 U.S. at 315 (citing H.R. Rep. No. 439, 89th Cong., 1st Sess., 11 (1965)). And, as in 1965, when discrimination by jurisdictions throughout the Black Belt and other areas at issue in this case were a primary cause for subjecting Alabama to preclearance, *see* S. Rep. 89-162, 1965

16

U.S.C.C.A.N. 2508, 2547, 2550, three Alabama jurisdictions, including two in the Black Belt, have been bailed-in under 3(c) in the last 11 years because of egregious acts of discrimination, *see Braxton*, 2024 WL 3519193, at *3 (Town of Newbern, Hale County); *Jones*, 2019 WL 7500528, at *4- 5 (Jefferson County school board); *Allen*, 2014 WL 12607819, at *2 (City of Evergreen, Conecuh County).

In terms of election of Black candidates to office, only through litigation commenced decades after 1965 did a federal court draw a district that allowed for the election of the first Black congressperson in over 90 years. *Wesch v. Hunt*, 785 F. Supp. 1491, 1497–1500 (S.D. Ala. 1992) (three-judge court). Even today:

> Black candidates have enjoyed zero success in statewide elections in Alabama since 1994 (when a single Black person was elected to the Alabama Supreme Court after a previous appointment), and only three Black candidates have ever been elected to any statewide office since Reconstruction. Similarly, Black candidates have enjoyed near-zero success in legislative elections outside of opportunity districts: thirty-two of the thirty-three Black Alabamians currently serving in the 140-person Legislature were elected from majority-Black districts created to comply with federal law.

*Milligan*, 2025 WL 1342947, at *5. So, while Alabama does have many more Black representatives today, that success is primarily due to VRA litigation and still requires majority-Black districts in nearly all cases. *Id*. at *153.

Additionally, although the State also claims it has eliminated the literacy test and poll tax, Defs.' Br. 20, this only underscores the problem with a reliance on those terms as they existed in 1960, since new discriminatory devices and tests replace the

old and have the same effect of prolonging existing disparities. *Katzenbach*, 383 U.S. at 314. Alabama continues to enact laws that operate as a literacy test primarily for Black people. Just last year, the Alabama legislature enacted a bill that placed restrictions on the way people can receive assistance with voting by absentee ballot. The law criminalized third parties who provide that assistance in certain circumstances. Black voters were forced to sue, and a federal court enjoined provisions of the law under Section 208 of the VRA. *Ala. State Conf. of NAACP v. Marshall*, No. 2:24-CV-00420-RDP, 2024 WL 4282082, at *7 (N.D. Ala. Sept. 24, 2024), *stay pending appeal denied* No. 24-13111, 2024 WL 4481489 (11th Cir. Oct. 11, 2024). Section 208 was designed to enforce the "implicit requirement" of the VRA's nationwide ban on literacy tests that illiterate voters "may not be denied assistance at the polls." S. Rep. 97-417, 1982 U.S.C.C.A.N. 177, 241. The injunction permits voters who are blind, disabled, or who cannot read or write to continue to receive help from the person of their choice. *Marshall*, 2024 WL 4282082, at *7.

Alabama's law, although repackaged and renamed, operated as a literacy test for many Black Alabamians. "Many rural Black Belt residents struggle with illiteracy," and "[i]lliteracy primarily burdens Black Alabamians." *Milligan*, 2025 WL 1342947, at *136. Indeed, "Black Alabamians' lower educational attainment and higher rates of illiteracy are directly traceable to segregated public schools and dilapidated schools in predominantly Black areas." *Id.* at *162. "[R]acial disparities

in family poverty, internet access, and access to transportation hamper voting participation due to an inability to read ballots, learn about candidates, absentee vote, locate voting information, and travel to polls." *Id.* at *163.

This Court does not need to find that conditions present in Alabama now are identical to those in 1965 to impose the limited bail-in requested here. But even a cursory inquiry highlights many startling similarities between these periods.

### C. Alabama's Record of Flagrant Discrimination in Congressional Redistricting in this Case and Earlier Confirms that Ordinary Case-by-Case Litigation has Proven Inadequate.

Alabama contends that Plaintiffs have failed to rebut Alabama's manufactured and entirely atextual "presumption that ordinary litigation is adequate to the protect the right to vote." Defs.' Br. 23. The record says otherwise.

First, to the extent Alabama seeks to invent an atextual presumption against Section 3(c) bail-in, nothing in the text of the VRA supports its position. *Cf.* Defs. Br. at 23. The use of "shall" in Section 3(c) strongly suggests the opposite—that a court *must* impose Section 3(c) preclearance once it identifies a constitutional violation. *See* 52 U.S.C. § 10302(c) ("If . . . the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State . . . , the court . . . *shall* retain jurisdiction . . . .") (emphasis added). Congress's use of the "word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016).

19

Second, even if Plaintiffs were required to prove that ordinary litigation is inadequate to protect the right to vote, Alabama's bad-faith conduct in this case and earlier reveals that "case-by-case litigation" has proven "inadequate" to overcome "persistent discrimination." *Katzenbach*, 383 U.S. at 328. Far from the "ordinary" case, Plaintiffs succeeded in obtaining relief only after two preliminary injunction hearings, two trips to the Supreme Court, and a three-week trial. *See Milligan*, 2025 WL 1342947, at *3 (noting this case's "unusual posture" and protracted nature). The "extremely unusual nature of this case" proves that it took far more than ordinary case-by-case litigation to secure the rights of Black voters here. *Id*. at *209-10. "If it were normal, there would be other cases like this one: where a state legislature — faced with a federal court order declaring that its electoral plan unlawfully dilutes minority votes and requiring a plan that provides an additional opportunity district — responded with a plan that the state concedes does not provide that district." *Id*.

Tellingly, the closest cases that this Court could find involved Alabama's own defiant conduct in 1965, *see id*. at *7 (citing *Sims*, 247 F. Supp. 96), blatant discrimination related to the grandfather clause, and a case where another court ordered bail-in, *see id*. at *210 (citing *Lane v. Wilson*, 307 U.S. 268 (1939) and *McMillan*, 559 F. Supp. 720). And so, bail-in is necessary to dissuade Alabama from engaging in this type of conduct through the 2030 census.

20

Alabama also asks this Court to ignore evidence that earlier advocacy and proceedings proved inadequate to secure the relief that Plaintiffs obtain here. Defs.' Br. 21-22. Alabama posits—without evidence—that the Justice Department's 1992 objection under Section 5 to Alabama's failure to draw a second majority Black district was "not binding" on Alabama. *Id*. This is wrong. A Section 5 objection was an "administrative finding of discrimination," *Regents of the University of California v. Bakke*, 438 U.S. 265, 305 (1978), which had the *binding* effect of forbidding Alabama from enforcing its enacted 1992 plan, 52 U.S.C. § 10304(a).

Moreover, Alabama, Defs.' Br. 21, asks this Court to disregard its findings that "long-term history of redistricting" in the trial "record undeniably reflects a series of official actions taken for invidious purposes." *Milligan*, 2025 WL 1342947, at *197. But the undisputed record includes evidence that from 1970 through today, Alabama rejected Black people's repeated calls to draw two majority-Black districts, despite the feasibly of creating two reasonably configured districts. *Id*. at *58–59; *cf. Jeffers*, 740 F. Supp. at 594-95 (finding that a state's 16-year "pattern" of passing majority-vote laws was a "deliberate attempt to reduce black political opportunity").

Alabama also avers that "State Defendants have no intentions to pass additional congressional district maps or participate in mid-cycle redistricting before the 2030 census data is released." Defs.' Br. 9. And it contends that "Plaintiffs have now stated that adequate relief to a dilutive plan can be provided without resort to

21

preclearance." *Id.* at 12. Alabama cites a status report in which Plaintiffs agreed that "an injunction barring the Secretary of State from administering Alabama's congressional elections according to the 2023 Plan and ordering him to administer congressional elections according to the [Special Master] Plan . . . is a full remedy to the Section 2 violation." *Id.* (citing ECF No. 497 ¶ 3). But Plaintiffs have not (and do not) concede that a court order maintaining the current map through 2030 is sufficient to remedy the *Fourteenth Amendment* violation, and Plaintiffs' bail-in request includes the 2030 congressional redistricting cycle as well—which their status report did not address.

As to the 2030 cycle, Defendants argue that the record does not "warrant a presumption that the state legislature will act with discriminatory intent in the 2030s," Defs. Br. at 14 n.2, and contend that presuming that "different legislature" may enact a discriminatory plan "more than five years from now offends the presumption of good faith," *id.* at 24. But Alabama's argument would mean that no court could impose bail-in that extends beyond the current legislature, imposing a limit found nowhere in the statute. And if one cannot presume how future Alabama legislatures may act, it undermines the import of Alabama's representation that it does not intend to redistrict before 2030. The new Legislature and Secretary who will take office next year would not be bound by that representation or promise from past officials.

In any case, if the findings in this case (together with those in other cases) are insufficient to call into question Alabama's atextual presumption-of-good-faith rule when it comes to congressional redistricting, it is unclear what would do so.

## II. **Alternatively, This Court Should Exercise Its Inherent Equitable Power to Retain Jurisdiction Over Challenges to Alabama's Post-2030 Redistricting Plans.**

Based on its findings that Alabama repeatedly violated the VRA, the Constitution, this Court's prior order, and rulings of the U.S. Supreme Court in the 2020 cycle, Plaintiffs request that this Court exercise its inherent equitable power to retain jurisdiction over challenges to Alabama's congressional maps through the next census cycle. Alabama charges that this is "virtually the same relief [as] under Section 3(c)," Defs.' Br. 26, and implies that the Court retaining jurisdiction would be unjust or improper, *id.* at 30. Plaintiffs' request, however, would not require Alabama to preclear its plan with a court or the Justice Department. It would instead ensure that a court with sufficient familiarity with its troubling course of conduct this cycle would have the first opportunity to hear any challenge.

When Defendants systematically refuse to obey court orders, district courts have broad equitable authority to remedy persistent legal violations. *See United States v. Virginia*, 518 U.S. 515, 547 (1996) (requiring the district court to retain jurisdiction to order further relief where a state "chose not to eliminate, but to leave untouched," an unconstitutional policy); *Louisiana v. United States*, 380 U.S. 145,

23

154–55 (1965) (affirming an order that barred a state from adopting any new voting tests absent judicial review where the state had sought to replace one discriminatory device with a similar one); *cf. also North Carolina v. Covington*, 585 U.S. 969, 976 (2018) (affirming an order where the court retained jurisdiction to remedy a state's adoption of "new districts [that] were mere continuations" of an unconstitutional plan). District courts have an inherent equitable power to modify injunctions to adapt to changed circumstances.

Defendants argue, however, that Plaintiffs' request is a departure from the ordinary, and that the Court lacks an equitable basis for retention. Defs.' Br. 25–29. Their brief argues that Plaintiffs ask for "*this* Court [to] adjudicate a speculative, *future* dispute that may (or may not) occur in the next decade over a state law that has not even been drafted." *Id.* at 27. Plaintiffs' request, however, is not for the Court to retain jurisdiction because there could possibly be challenges to hypothetical future redistricting plans. Rather, Plaintiffs seek to assure compliance with the court orders and constitutional rights that Alabama willfully disregarded.

Defendants also try to distinguish Plaintiffs' request from cases where courts retain jurisdiction for years by arguing that Plaintiffs are not asking for relief that is remedial in nature or asking the court to supervise structural reforms. Defs.' Br. 26–27. But the retention of jurisdiction to hear challenges into the next cycle is precisely what is needed to achieve durable relief. Indeed, Alabama itself concedes that the

24

Court should retain jurisdiction to enforce the order for essentially the same period. *Cf.* ECF No. 497 ¶ 2.

*Jeffers* demonstrates this principle in the context of redistricting cases. As Defendants note, the *Jeffers* court retained jurisdiction over claims brought against census maps enacted post-judgement. 740 F. Supp. at 602. *Jeffers* noted the court's authority to retain jurisdiction to entertain challenges to the changed circumstances of a new redistricting plan were "appropriate under the facts of [the] case"—of relevance there, defendants' pattern of enacting state laws that systematically reduced Black citizens' political opportunity. *Id.* at 595. Similarly, as discussed *supra*, the facts here dictate an appropriate equitable remedy.

*Jeffers* is not unique. Courts have long retained jurisdiction over court-ordered plans through the next census cycle and heard later challenges to new plans.[5] The panel in *Sims* retained jurisdiction over its 1965 order until after the 1970 census.

---

[5]    *See, e.g.*, *Blacks United For Lasting Leadership, Inc. v. City of Shreveport*, 571 F.2d 248, 251 (5th Cir. 1978) (noting that the district court retained jurisdiction over its court-ordered plan and heard a later challenge after a new census); *Simon v. Landry*, 419 F.2d 1329 (5th Cir. 1969); *Smith v. Clark*, 189 F. Supp. 2d 548, 559 (S.D. Miss. 2002), *aff'd sub nom. Branch v. Smith*, 538 U.S. 254 (2003) (retaining jurisdiction over a court-ordered map until the 2010 census); *Smith v Hoseman*, 852 F. Supp. 2d 757, 763 (S.D. Miss. 2011) (same until the 2020 census); *Shayer v. Kirkpatrick*, 541 F. Supp. 922, 935 (W.D. Mo.) (until 1990), *aff'd sub nom. Schatzle v. Kirkpatrick*, 456 U.S. 966 (1982); *LeBlanc v. Rapides Par. Police Jury*, 315 F. Supp. 783, 788 (W.D. La. 1969); *Fain v. Caddo Par. Police Jury*, 312 F. Supp. 54, 58 (W.D. La. 1969); *Skolnick v. Ill. State Electoral Bd.*, 307 F. Supp. 691, 698 (N.D. Ill. 1969); *Wells v. Rockefeller*, 273 F. Supp. 984, 992 (S.D.N.Y.), *aff'd* 389 U.S. 421 (1967); *Connor v. Johnson*, 265 F. Supp. 492, 499 (S.D. Miss. 1967); *see also Connor v. Winter*, 519 F. Supp. 1337, 1342 (S.D. Miss. 1981) (summarizing this case's extensive history where the court heard challenges to multiple post-1970 state plans).

*Sims v. Amos*, 336 F. Supp. 924, 931 (M.D. Ala. 1972) (three-judge court); *see also Clark v. Putnam Cnty.*, 293 F.3d 1261, 1264-65 (11th Cir. 2002) (noting that the district court retained jurisdiction to hear subsequent challenges after a new census); *Dillard v. City of Greensboro*, 74 F. 3d 230, 231 (11th Cir. 1996) (similar).

Defendants also cite *Boe v. Marshall*, 767 F. Supp. 3d 1226, 1257 (M.D. Ala. 2025), to characterize Plaintiffs' request for relief as analogous to judge-shopping through manipulating case assignments. Defs.' Br. 29. This argument strains credulity. Asking the Court to ensure adherence to its own prior orders and address new claims arising out of the same pattern of conduct has no factual nexus to the conduct of individual attorneys sanctioned in *Boe.* Even when a case is closed, the district court maintains the authority to supervise its injunction. "[A] court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances intro an instrument of wrong." *League of United Latin American Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 436 (5th Cir. 2011) (citing *United States v. Swift & Co.*, 286 U.S. 106, 114–15 (1932)). Courts regularly use that authority in the redistricting context.[6]

---

[6]    *See, e.g.*, *Whitest v. Crisp Cnty. Sch. Dist.*, 601 F. Supp. 3d 1338, 1349 (M.D. Ga. 2022), *aff'd*, No. 22-11826, 2023 WL 8627498 (11th Cir. Dec. 13, 2023); *Adamson v. Clayton Cnty. Elections & Registration Bd.*, 876 F. Supp. 2d 1347, 1359 (N.D. Ga. 2012); *Wright v. City of Albany*, 306 F. Supp. 2d 1228, 1240 (M.D. Ga. 2003); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 219 F. Supp. 3d 949, 962 (E.D. Mo. 2016).

Because a challenge to the 2030 cycle would involve the "same principal defendant, the same cause of action, and similar factual allegations," the panel could appropriately decide to hear the case even. *In re BellSouth Corp.*, 334 F. 3d 941, 950 (11th Cir. 2003) (addressing allegations of "judge shopping"); *see Valentine v. Collier*, No. 4:20-CV-1115, 2020 WL 1685122, at *2 (S.D. Tex. Apr. 6, 2020) (denying a motion to randomly assign a case to a new judge where a subsequent proceeding related to an earlier one); *see also* S.D. Ala. Civil L.R. 13(c).

The Court's retention of jurisdiction is far different from preclearance. Unlike preclearance, Plaintiffs would bear the burden of proving to this panel that any post-2030 map violated Section 2 or the Constitution. Absent a preliminary injunction, Alabama would be free to implement its map. Moreover, Plaintiffs are only asking the Court to retain jurisdiction over the parties, claims, and issues related to this case. If Plaintiffs here lost standing, or a new separate case was filed, or the post-2030 map did not involve the regions at issue here, then the panel could not hear the case.

The inherent equitable power of courts allows for supervision over remedial relief when appropriate under the facts of the case. This Court is well within its mandate to retain jurisdiction to prevent violations of its own orders, the VRA, and Fourteenth Amendment arising from Alabama's disregard for such orders and laws.

27

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court order Alabama to submit all future congressional redistricting plans for preclearance under Section 3(c) until 60 days after Alabama's enactment of a plan after the 2030 census. Alternatively, Plaintiffs ask the Court to retain jurisdiction for the same time period.

Respectfully submitted this 25th day of June 2025.

*/s/ Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Colin Burke*
Victor Olofin*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
cburke@naacpldf.org

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*
Harmony A. Gbe*
James Ettinger*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400

/s/ Sidney M. Jackson
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
(205) 341-0498
sjackson@wigginschilds.com

Davin M. Rosborough*
Theresa J. Lee*
Dayton Campbell-Harris*+
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
tlee@aclu.org
dcampbell-harris@aclu.org

Alison Mollman (ASB-8397-A33C)
Laurel Hattix (ASB-4592-E20I)
AMERICAN CIVIL LIBERTIES
UNION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org

Shelita M. Stewart*
Jessica L. Ellsworth*
Amanda Allen
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW

Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com

Washington, D.C. 20004
(202) 637-5600
shelita.stewart@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

**_Counsel for Milligan Plaintiffs_**
*_Admitted Pro Hac Vice_*
_+ Practice limited to federal court_

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2025, I filed the above document on this Court's CM/ECF system, which caused the document to be served on all counsel of record.

/s/ Deuel Ross
Counsel for *Milligan* Plaintiffs