FILED

2025 Jun-25 PM 10:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| SHANNON PEREZ, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:11-cv-360 |
| | ) | (OLG-JES-XR) |
| v. | ) | Three-Judge Court |
| | ) | [Lead Case] |
| STATE OF TEXAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

|  |  |  |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES (MALC), | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:11-cv-361 |
| | ) | (OLG-JES-XR) |
| v. | ) | Three-Judge Court |
| | ) | [Consolidated Case] |
| STATE OF TEXAS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

|  |  |  |
|---|---|---|
| TEXAS LATINO REDISTRICTING TASK FORCE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:11-cv-490 |
| | ) | (OLG-JES-XR) |
| v. | ) | Three-Judge Court |
| | ) | [Consolidated Case] |
| RICK PERRY, | ) | |
| | ) | |
| Defendant. | ) | |

|  |  |  |
|---|---|---|
| MARGARITA V. QUESADA, et al., | ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) | Civil Action No. 5:11-cv-592 |
| v. | ) | (OLG-JES-XR) |
|  | ) | Three-Judge Court |
| RICK PERRY, et al., | ) | [Consolidated Case] |
|  | ) |  |
| Defendants. | ) |  |

|  |  |  |
|---|---|---|
| JOHN T. MORRIS, | ) |  |
|  | ) |  |
| Plaintiff, | ) | Civil Action No. 5:11-cv-615 |
|  | ) | (OLG-JES-XR) |
| v. | ) | Three-Judge Court |
|  | ) | [Consolidated Case] |
| STATE OF TEXAS, et al. | ) |  |
|  | ) |  |
| Defendants. | ) |  |

|  |  |  |
|---|---|---|
| EDDIE RODRIGUEZ, et al., | ) |  |
|  | ) |  |
| Plaintiffs, | ) | Civil Action No. 5:11-cv-635 |
|  | ) | (OLG-JES-XR) |
| v. | ) | Three-Judge Court |
|  | ) | [Consolidated Case] |
| RICK PERRY, et al. | ) |  |
|  | ) |  |
| Defendants. | ) |  |

**STATEMENT OF INTEREST OF THE UNITED STATES WITH RESPECT TO SECTION 3(C) OF THE VOTING RIGHTS ACT**

Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), is a vital remedial provision through which federal courts can protect the rights of minority voters by imposing a preclearance requirement on jurisdictions where intentional racial discrimination in voting has occurred. Because the State of Texas is no longer subject to the preclearance provisions of Section 5 of the Voting Rights Act through the formula in Section 4(b), Section 3(c) relief is available against the State. This Court must now determine whether intentional discrimination motivated the State's 2011 Congressional and State House redistricting plans in order to adjudicate Plaintiffs' requests for such relief. As discussed below, Section 3(c) relief is warranted in this case because existing evidence establishes intentional voting discrimination and other proceedings provide overwhelming evidence of constitutional violations in and by the State.

## I. THE UNITED STATES' INTEREST

The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517 to address Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), and the possible impact of that provision on this case. *See* Order (ECF No. 772); *see also* 28 U.S.C. § 517 (authorizing the Attorney General to attend to the interests of the United States in any pending suit). In light of the United States' enforcement responsibilities with regard to racial discrimination in voting and the Attorney General's obligation to review proposed voting changes in jurisdictions that are covered under Section 3(c), *see* 42 U.S.C. § 1973a(c), the United States has a strong interest in ensuring that this provision of the Voting Rights Act is interpreted and applied appropriately.

The United States has a particular interest in the application of Section 3(c) in this case. In defending the judicial preclearance action filed by the State of Texas under Section 5 of the Voting Rights Act, *see Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated*, 570 U.S. ___, 2013 WL 3213539 (U.S. June 27, 2013), the United States took

1

the position that the State failed to establish that its 2011 Congressional and State House

redistricting plans were not adopted with a discriminatory purpose, *see* U.S. Post-Trial Br., *Texas*

*v. United States*, No. 1:11-cv-1303 (D.D.C. Feb. 6, 2012) (ECF No. 203), and the United States

avers that the evidence presented in that case proves that those redistricting plans are

intentionally discriminatory regardless of which party bears the burden of proof.  Those same

plans are the subject of Plaintiffs' challenge in this case under Section 2 of the Voting Rights

Act, 42 U.S.C. § 1973, and the intentional discrimination underlying those plans is the core of

Plaintiffs' requests for Section 3(c) relief.  *See, e.g.*, NAACP Proposed 2d Am. Compl. (ECF No.

776-2).

## II.  <u>SECTION 3(C) OF THE VOTING RIGHTS ACT</u>

Section 3(c) of the Voting Rights Act provides:

> If in any proceeding instituted by the Attorney General or an
> aggrieved person under any statute to enforce the voting
> guarantees of the fourteenth and fifteenth amendment in any State
> or political subdivision the court finds that violations of the
> fourteenth or fifteenth amendment justifying equitable relief have
> occurred within the territory of such State or political subdivision,
> the court, in addition to such relief as it may grant, shall retain
> jurisdiction for such period as it may deem appropriate and during
> such period no voting qualification or prerequisite to voting or
> standard, practice, or procedure with respect to voting different
> from that in force or effect at the time the proceeding was
> commenced shall be enforced unless and until [preclearance is
> granted by the court or the Attorney General declines to interpose
> an objection].

42 U.S.C. § 1973a(c); *see also* H.R. Rep. 89-439 at 13 (1965) ("Section 3 of the bill makes

additional remedies available to deal with denials or abridgments of the right to vote in so-called

'pockets of discrimination'—areas outside the States and subdivisions to which the prohibitions

of section 4 are in effect.").  Thus, under Section 3(c), a court can "bail in" a jurisdiction,

subjecting it to a preclearance regime akin to that under Section 5. *See* 28 C.F.R. § 51.8. Since the adoption of the Voting Rights Act in 1965, courts in at least 18 different cases have ordered relief under Section 3(c), requiring jurisdictions not covered through Section 4's formula to obtain preclearance of some or all proposed voting changes. These cases have led to the coverage of two states—Arkansas, *see Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990) (three-judge court), and New Mexico, *see Sanchez v. Anaya*, No. 82-0067 (D.N.M. Dec. 17, 1984)—as well as twelve counties, two cities, and two school districts.[1] Once covered, these jurisdictions, like the jurisdictions covered by Sections 4(b) and 5, typically have sought administrative preclearance for voting changes from the Attorney General, rather than seeking judicial preclearance from the federal district court.

To trigger Section 3(c) coverage, the Attorney General or an aggrieved person must establish that a violation of the voting guarantees of the Fourteenth or Fifteenth Amendments has occurred within the jurisdiction. *See* 42 U.S.C. § 1973a(c). As a practical matter, this requires a finding of intentional voting discrimination. *See Jeffers*, 740 F. Supp. at 591-92; *Brown v. Bd. of Sch. Comm'rs*, 542 F. Supp. 1078, 1101-03 (S.D. Ala. 1982); *see also Rogers v. Lodge*, 458 U.S.

---

[1] *See Blackmoon v. Charles Mix Cnty.*, No. 05-CV-4017 (D.S.D. Dec. 4, 2007); *Kirkie v. Buffalo Cnty.*, No. 03-CV-3011 (D.S.D. Feb. 10, 2004); *United States v. Bernalillo Cnty.*, No. 93-156-BB/LCS (D.N.M. Apr. 22, 1998); *United States v. Alameda Cnty.*, No. C95-1266 (N.D. Cal. Jan. 22, 1996); *United States v. Cibola Cnty.*, No. 93-1134 (D.N.M. Apr. 21, 1994); *United States v. Socorro Cnty.*, No. 93-1244 (D.N.M. Apr. 11, 1994); *Garza v. Cnty. of Los Angeles*, No. 88-5143 (C.D. Cal. Apr. 25, 1991); *United States v. Sandoval Cnty.*, No. 88-1457 (D.N.M. May 17, 1990); *United States v. McKinley Cnty.*, 86-0029-C (D.N.M. Jan. 13, 1986); *Woodring v. Clarke*, No. 80-4569 (S.D. Ill. Oct. 31, 1983) (Alexander County); *McMillan v. Escambia Cnty.*, No. 77-0432 (N.D. Fla. Dec. 3, 1979); *United States v. Thurston Cnty.*, No. 78-0-380 (D. Neb. May 9, 1979); *United States v. Vill. of Port Chester*, No. 06-15173 (S.D.N.Y. Dec. 22, 2006); *Brown v. Bd. of Comm'rs*, No. CIV-1-87-388 (E.D. Tenn. Jan. 18, 1990) (City of Chattanooga); *Cuthair v. Moteczuma-Cortez Sch. Dist. No. RE-1*, No. 89-C-964 (D. Col. Apr. 8, 1990); *NAACP v. Gadsden Cnty. Sch. Bd.*, 589 F. Supp. 953 (N.D. Fla. Mar. 6, 1984).

613, 617-20 (1982).[2]  A court must also find that the constitutional violation justifies equitable relief.

Once a court makes such a finding, Section 3(c) authorizes a district court to require preclearance of all voting changes.  *See* 42 U.S.C. § 1973a(c) (applying to any "voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting"); *cf*. *Allen v. State Bd. of Elections*, 393 U.S. 544, 565 (1969) ("The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race.").[3]  Imposing a preclearance requirement for all voting changes is warranted when there is a demonstrated history of intentional discrimination and the potential for backsliding through creative changes in voting procedures.  *Cf. South Carolina v. Katzenbach*, 383 U.S. 301, 328 (1966) (describing preclearance as "shift[ing] the advantage of time and inertia from the perpetrators of the evil to its victims."); H.R. Rep. 94-196, at 57-58 (1975) (describing preclearance as a remedy "to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as

---

[2] Although Section 3(c) uses the plural term "violations of the fourteenth or fifteenth amendment justifying equitable relief . . . within the territory of such State or political subdivision" to describe the trigger, 42 U.S.C. § 1973a(c), the provision is best read to require proof of only a single constitutional violation.  *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise, . . . words importing the plural include the singular."); *see also McMillan v. Escambia Cnty.*, 559 F. Supp. 720, 728 (N.D. Fla. 1983) ("Section 1973a(c) applies to situations such as the one found here—in which a court has found in a suit *a violation* of the fourteenth or fifteenth amendments justifying equitable relief." (emphasis added)); cases cited *supra* note 1 (applying coverage after a single constitutional violation).  *But see Jeffers*, 740 F. Supp. at 600 ("[I]t would be strange if a single infringement could subject a State to such strong medicine.").  The Court need not reach this issue in this case, both because of the multiple constitutional violations at issue in this litigation and the State of Texas's history of intentional discrimination against minority voters.

[3] In some cases, courts have exercised discretion to limit relief to a particular subset of voting changes. *See, e.g., Jeffers*, 740 F. Supp. at 601-02 (requiring preclearance for any voting changes related to the imposition of a majority-vote requirement in general elections, and retaining jurisdiction to review challenged redistricting plans for the State House and State Senate); *United States v. Vill. of Port Chester*, No. 06-15173 (S.D.N.Y. Dec. 15, 2006).

the old ones had been struck down"). The duration of the preclearance remedy is subject to the court's discretion. *See* 42 U.S.C. § 1973a(c) (providing that the court "shall retain jurisdiction for such period as it may deem appropriate").

Notably, a request for relief under Section 3(c) need not be the primary focus of a complaint. *See Jeffers*, 740 F. Supp. at 591-92 (holding that constitutional violations with respect to voting practices that were not "the principal focus of the complaint" satisfied Section 3(c)). Texas's argument to the contrary lacks a firm grounding in the statutory text. *See* Tex. Br. 17-18 (ECF No. 824). As the three-judge court properly held in *Jeffers*, the phrase "violations of the fourteenth or fifteenth amendment justifying equitable relief" in Section 3(c) is not limited to the conduct that was the focus of the plaintiff's complaint. 740 F. Supp. at 592. No such limitation appears anywhere in the text of Section 3(c). *See* 42 U.S.C. § 1973a(c); *Jeffers,* 740 F. Supp. at 592 (noting that reading the statute in such a "crabbed" manner would be "inconsistent with its broad remedial purpose").

Section 3(c) does not require that other equitable relief actually has been granted regarding the constitutional violations underpinning a bail-in, since the statutory text specifies only that there must be constitutional violations "justifying," but not necessarily resulting in, equitable relief. 42 U.S.C. § 1973c(a); *see also Jeffers*, 740 F. Supp. at 595 & n.7, 600.[4] Indeed, to the extent that Section 3(c) requires a court to find that equitable relief is justified, the

---

[4] Nothing in the statute's text supports Texas's argument that Section 3(c) relief can be imposed only after a final judgment of intentional discrimination. *See* Tex. Br. 9-12. So long as "the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred," the court can impose relief under Section 3(c). 42 U.S.C. § 1973a(c). There is no statutory basis to exclude findings of intentional discrimination made in support of a preliminary injunction under Rule 65(a) or partial final judgment under Rule 54(b). While Section 3(a) references both "interlocutory orders" and "final judgments," 42 U.S.C. § 1973a(a), Section 3(c) does not refer to one at the expense of the other, as Texas infers. *See* Tex. Br. 10-11. Section 3(c) refers to neither. *See* 42 U.S.C. § 1973a(c).

preclearance remedy in Section 3(c) can be that relief. Moreover, a court must take into account "both State and local violations of the voting guarantees of the Fourteenth and Fifteenth Amendments," *Jeffers*, 740 F. Supp. at 600, because the text of Section 3(c) requires only that violations have occurred "within the territory" of the jurisdiction. 42 U.S.C. § 1973a(c).

Texas's assertion that *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), renders Section 3(c) constitutionally suspect, Tex. Br. at 3, 9, 18-20, ignores the central logic of the decision. *Shelby County* held only that the coverage formula in Section 4(b) of the Voting Rights Act, as reauthorized by the Voting Rights Act Reauthorization and Amendments Act of 2006, is unconstitutional and "can no longer be used as a basis for subjecting jurisdictions to preclearance" under Section 5 of the Act. 133 S. Ct. at 2631. The Court concluded that the coverage formula no longer "makes sense in light of current conditions," *id.* at 2629, but the Court indicated specifically that it was issuing "no holding on [Section] 5 itself, only on the coverage formula," *id.* at 2631, and did not address Section 3(c). The trigger for Section 3(c) relief is far different than the coverage formula in Section 4(b). The trigger is geographically focused and dependent on a judicial finding of a recent constitutional violation.

## III.    SECTION 3(C) APPLIED TO THIS LITIGATION

For this Court to impose relief under Section 3(c), two basic conditions must be met. First, the request for relief must be made in a "proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision." 42 U.S.C. § 1973a(c). In this case, plaintiffs filed an action under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, to enforce the guarantees of the Fourteenth and Fifteenth Amendments against racial discrimination in voting in the State of Texas, among other claims. Second, a court must conclude that "violations

of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision." 42 U.S.C. § 1973a(c). Although this Court has not yet made such findings regarding the State's 2011 redistricting plans, the evidence presented to this Court—as well as the substance of the decision in *Texas v. United States* and other instances of discrimination in voting in Texas—demonstrates that such constitutional violations have occurred within the State.[5]

For the reasons set out below, this Court has jurisdiction to hear plaintiffs' request for relief under Section 3(c). While Plaintiffs can effectively present the evidence already admitted before this Court, the Attorney General is uniquely positioned to describe the evidence presented in *Texas v. United States* and other instances of intentional discrimination in Texas. The Attorney General avers that the Court should impose Section 3(c) coverage on the State of Texas as to all voting changes for a ten-year period following the entry of a coverage order, and should consider extending the bail-in period beyond 10 years in the event of further discriminatory acts. This preclearance requirement would apply to any voting qualification or voting-related standard, practice, or procedure that the State enacts or seeks to administer that differs "from that

---

[5] Texas's contention that a court can order bail-in only after providing some other relief to the plaintiff, *see* Tex. Br. 3, 6-7, once again contradicts the text of the statute, which expressly authorizes a court to require preclearance of voting changes regardless of whether the court grants any additional relief. Congress could have authorized a federal court to order bail-in "in addition to granting other relief"; instead, Congress authorized a federal court to order bail-in "in addition to such relief as it *may* grant." 42 U.S.C. 1973a(c) (emphasis added). We note that this Court has already entered equitable relief in response to Plaintiffs' claims in this case, in ordering implementation of interim redistricting plans, premised in part on this Court's findings that in several districts there were "not insubstantial" claims of racially discriminatory purpose. *See* Order (ECF No. 690); Order (ECF No. 691).

in force or effect at the time th[is] proceeding was commenced." 42 U.S.C. § 1973a(c). The instant litigation commenced on May 9, 2011.

### A. This Court Maintains Jurisdiction to Consider Additional Relief for Claims Against Texas's 2011 Redistricting Plans.

Plaintiffs in this litigation have principally requested that this Court "[d]eclare the existing plans for election of the Texas House of Representatives and Texas Congressional seats to be in violation of the Voting Rights Act and unconstitutional and enjoin their use in any future elections." *E.g.*, Perez 3d Am. Compl., Request for Relief ¶ B (ECF No. 53).[6] Since 1975, and until the Supreme Court's decision in *Shelby County*, Texas had been covered under Section 4(b) of the Voting Rights Act and was therefore subject to the preclearance requirements of Section 5. The question of relief under Section 3(c) therefore never arose, as coverage subjecting Texas to the preclearance requirements set forth in Section 5 existed already.[7] However, now that the Supreme Court has struck down the Section 4(b) coverage formula and thereby relieved Texas from the requirement to comply with Section 5, *see Shelby County*, 133 S. Ct. at 2631, the question of additional relief under Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), predictably has arisen.

Texas argues primarily that this Court lacks jurisdiction to impose Section 3(c) relief as a remedy for intentional discrimination underlying the State's 2011 redistricting plans because those plans have now been repealed and can no longer serve as the basis for the findings of violations of the Fourteenth or Fifteenth Amendment. *See* Tex. Br. at 4. It is axiomatic that a

---

[6] This Court has not yet granted the Perez Plaintiffs' request for leave to file a Fourth Amended Complaint.

[7] This explains the relatively few cases in which relief under Section 3(c) has been imposed to date, as Section 4(b) subjected those jurisdictions with the most egregious histories of racial discrimination to a preclearance requirement.

case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (internal quotation marks and citations omitted). A case is not moot if the court can grant even a "partial remedy." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992); *see also, e.g.*, *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 327-28 (2000) (holding that a preclearance action under Section 5 of the Voting Rights Act was not moot even though the districts at issue would not be used in any future elections); *United States v. McLeod*, 385 F.2d 734, 752-53 (5th Cir. 1967) (holding that the "mere cessation of unlawful activity" concerning minority voting rights does not "render a case moot" when additional remedies are available).[8]

This case is not moot because the availability of the Section 3(c) remedy allows this Court to grant relief to the Plaintiffs if they prevail on their claims. In this case, Plaintiffs have pled constitutional violations regarding the 2011 State House and Congressional plans.[9] The prayers for relief in Plaintiffs' complaints are broad enough to encompass requests for relief under Section 3(c), through either requests for compliance with preclearance requirements or requests for further just and proper relief. *See, e.g.*, MALC 2d Am. Compl., Prayer ¶¶ A, G (ECF No. 50); LULAC Am. Compl., Prayer ¶ C (ECF No. 78). Moreover, in light of *Shelby*

---

[8] *See also Harris v. City of Houston*, 151 F.3d 186, 188, 191 n.6 (5th Cir. 1998) (noting that a plaintiff "could have preserved his suit by requesting" additional relief, "as opposed to resting completely on the request for injunctive relief" against an event that had by that point occurred); *FTC v. Gibson Prods. of San Antonio, Inc.*, 569 F.2d 900, 903 (5th Cir. 1978) (holding that substantial compliance with subpoenas did not moot enforcement action because further relief would be available in the event that subpoenas were invalid).

[9] Texas's argument that the plaintiff who initiated the litigation must still be "aggrieved" by the practice that initially prompted the lawsuit, *see* Tex. Br. at 4, 6, is inconsistent with the language of Section 3(c). The provision merely requires that the relevant proceeding have been "*instituted* by the Attorney General or an aggrieved person." 42 U.S.C. § 1973c(a) (emphasis added); *see also Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 870 (2011) (holding that "aggrieved" denotes an individual within the zone of interest sought to be protected by the provision and making no reference to temporal limitations).

*County*, Plaintiffs now have sought to amend their complaints to clarify their requests for Section 3(c) relief. *See, e.g.*, NAACP Mot. for Leave to Amend (ECF No. 776); NAACP Proposed 2d Am. Compl. ¶ 61, Prayer ¶ C (ECF No. 776-2); MALC Mot. for Leave to Amend (ECF No. 779); MALC Proposed 3d Am. Compl., Prayer ¶ C (ECF No. 779-1). These requests for Section 3(c) relief are sufficient to preserve this Court's jurisdiction.

In *Blackmoon v. Charles Mix County*, 505 F. Supp. 2d 585 (D.S.D. 2007), the court addressed closely analogous circumstances regarding Section 3 of the Voting Rights Act. After modifying the jurisdiction's redistricting plan to remedy a successful malapportionment claim, the court nonetheless denied a defendant jurisdiction's motion to dismiss as moot plaintiffs' claims that the prior redistricting plan was racially discriminatory. *See id.* at 593. The court concluded that if plaintiffs prevailed on their race discrimination claim, they might be entitled to relief under Section 3 of the Voting Rights Act, and the possibility of further relief precluded mootness. *See id.*[10]

A similar result is warranted here. Had Texas not been covered under Section 4(b)'s formula, this Court likely would have already adjudicated Plaintiffs' claims of intentional discrimination and addressed the issue of Section 3(c) coverage. Should this Court impose Section 3(c) relief, the redistricting plans enacted by Texas in 2013 will be subject to review under Section 3(c)'s preclearance process. *See* 42 U.S.C. § 1973a(c) (requiring preclearance for

[10] *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam), is not to the contrary. In that case, the Court addressed only the district court's finding that the county's at-large election system violated the Fourteenth Amendment. It vacated and remanded the case for consideration of whether the method of election violated the newly amended Section 2 of the Voting Rights Act, and it noted that a finding of liability under Section 2 "would moot the constitutional issues presented by the case." *Id.* But the Court expressly refused to reach the issue of remedy. *See id.* at 51 n.4 (noting that the Court was not reaching the issue of remedy); *id.* at 52 n.6 (same). Thus the Court's statement that a finding of liability would moot the constitutional issues refers to issues of liability, not remedy.

any voting practice "different from that in force or effect at the time the proceeding was commenced"). Texas should not be permitted to avoid Section 3(c) review of future voting changes only because Section 4(b) once required that it be subject to Section 5. While there was once no need for this Court to consider Section 3(c), the issue is now plainly ripe, and these facts are precisely what Section 3(c) was intended to address. Intentional discrimination has occurred within a jurisdiction now not subject to Section 5, and preclearance review will prevent that jurisdiction from enforcing new rules to perpetuate voting discrimination. *Cf. South Carolina*, 383 U.S. at 335.

Texas's interpretation of when Section 3(c) relief would become moot would render the provision a nullity, effectively permitting a defendant to avoid bail-in by abandoning a challenged practice at any time up to the moment of final judgment. *See* Tex. Br. 4-5, 13-14. The jurisdiction could then adopt a slightly modified discriminatory practice, necessitating the filing of a new complaint. This cycle of discrimination would create the type of gamesmanship the preclearance requirements embodied in both Section 5 and Section 3(c) were designed to end.

**B. Violations of the Fourteenth and Fifteenth Amendments Justifying Equitable Relief Have Occurred in the State of Texas.**

The evidence before this Court establishes that Texas enacted its 2011 Congressional and State House redistricting plans with the intent to discriminate against minority voters, in violation of Section 2 of the Voting Rights Act and the voting guarantees of the Fourteenth and Fifteenth Amendments to the U.S. Constitution. This Court may consider testimony and evidence offered during its prior hearings; depositions and other documentary evidence previously offered in *Texas v. United States*, No. 1:13-cv-1303 (D.D.C), *see* Order at 2 (ECF No.

772); and sworn trial testimony given in *Texas v. United States*.  *Cf.* Fed. R. Civ. P. 32(a)(4)(E), (a)(8).[11]  As noted below, aside from the 2011 statewide redistricting plans, there is also substantial evidence of recent discrimination in violation of Sections 2 and 5 of the Voting Rights Act and the voting guarantees of the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

Although this Court should consider Plaintiffs' claims against the 2011 Congressional and State House plans, it need not issue an opinion that addresses all challenged aspects of those plans, since the 2013 plans eliminate the need to redraw either map.  Rather, once this Court finds any constitutional violation justifying equitable relief, the requirement for imposing relief under Section 3(c) has been met, and further analysis of the 2011 plans is unnecessary.

### 1.  The 2011 Congressional Plan

In *Texas v. United States*, a three-judge court of the U.S. District Court for the District of Columbia unanimously concluded that Texas had not met its burden of showing no discriminatory purpose when it enacted the 2011 Congressional redistricting map, Plan C185.  *See* 887 F. Supp. 2d at 159-62.  As the D.C. court noted, the United States and defendant-intervenors in that litigation "provided more evidence of discriminatory intent than [the Court had] space, or need, to address."  *Id.* at 161 n.31.  The evidence in that case—as well as that presented to this Court—provides a sufficient basis for this Court to conclude that Texas had a discriminatory purpose when it enacted the 2011 Congressional redistricting plan.

In the U.S. District Court for the District of Columbia, the United States presented several categories of circumstantial evidence under the framework set out in *Village of Arlington*

---

[11] To the extent this Court concludes that any such testimony is inadmissible, the Court should permit the presentation of additional testimony concerning the adoption of the 2011 Plans.

*Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-68 (1977). *See Texas v. United States*, 887 F. Supp. 2d at 159. First, the evidence established that "substantial surgery" had been performed on each of the black ability to elect districts in Texas, removing "economic engines" and Congressional district offices in a manner that "could not have happened by accident," and that "[n]o such surgery was performed on the districts of Anglo incumbents." *Id.* at 159-60; *see also id.* at 160 (rejecting Texas's proffered explanation: "coincidence"). The parties then established Texas's "history of failures to comply with the [Voting Rights Act]," the exclusion of minority members of Congress and state legislators from effective participation in the redistricting process, and procedural and substantive departures from the normal decision-making process. *Id.* at 160-61. The D.C. court deemed this evidence sufficient to preclude the State from establishing the absence of discriminatory intent and noted that the court's silence concerning potential discriminatory intent in District 23 and the Dallas-Fort Worth Metroplex reflected only the lack of need to address those additional areas. *See id.* at 161 & n.31.

In fact, the United States presented substantial additional evidence of discriminatory intent in District 23 and the Metroplex. The contours of District 23 reflect a concerted effort to minimize Hispanic voter registration and turnout levels while preserving Hispanic population majorities—a purely superficial victory for Hispanic voters. *See* DX 304, Notice of Filing Def. Ex. List (ECF No. 615); *see also* DX 294, Notice of Filing Def. Ex. List (ECF No. 615) (request by the map-drawer for necessary information). Precincts are deliberately split along the border of Congressional District 23 without political data, in a manner that establishes a statistically significant racial bias. *See* DX 320 at 56 tbl. 21, Notice of Filing Def. Ex. List (ECF No. 615). District 23 divided Maverick County and the City of Eagle Pass just after the Hispanic community there had become more politically active, *see* Trial Tr. at 112:24-113:1, 116:17-

13

117:19, *Texas v. United States*, No. 1:12-cv-1303 (D.D.C. Jan. 18 p.m.) (Ex. 1), and even the

State's expert admitted before this Court that he would "not recommend changing the 23rd in the

way in which it was changed." Trial Tr. at 1839:1-24, 1879:21-22.

      The 2011 Congressional redistricting plan split the African-American and Hispanic

communities of the Dallas-Fort Worth Metroplex into four separate Anglo-controlled

Congressional districts: Districts 6, 12, 26, and 33. DX 320 ¶¶ 148-152 & tbls. 16-17, Notice of

Filing Def. Ex. List (ECF No. 615). The lightning-bolt shape of District 26 illustrates a

particularly egregious configuration, capturing much of the Hispanic population of Tarrant

County—from both whole and partial precincts—and appending that population to primarily

Anglo Denton County. *See* DX 630, Notice of Filing Def. Ex. List (ECF No. 615); DX 887 at

74-82, 185-88, Notice of Filing Def. Ex. List (ECF No. 615). To prevent the emergence of a

new district in the Metroplex in which minority voters would have the ability to elect

representatives of their choice, the State increased the combined black and Hispanic voting-age

population of District 30—the sole minority ability district in the region—from an already

concentrated 81.1% to a remarkable 85.9%. *See* DX 858 at 2, Notice of Filing Def. Ex. List

(ECF No. 615) (2011 plan data); DX 859 at 2, Notice of Filing Def. Ex. List (ECF No. 615)

(benchmark plan data). Therefore, Congressional districts in the Dallas-Fort Worth area provide

additional evidence of discriminatory intent underlying Plan C185—more of the evidence of

intentional discrimination that the D.C. court had neither "space, [n]or time, to address." 887 F.

Supp. 2d at 161 n.31.

### 2. The 2011 State House Plan

      Because the D.C. court determined that the State of Texas had failed to establish that its

2011 redistricting plan for the Texas House of Representatives would not have had a

retrogressive effect, the court did not analyze whether Texas had established that the plan did not intentionally discriminate against minority voters. *See Texas v. United States*, 887 F. Supp. 2d at 177-78. Nonetheless, the United States and defendant-intervenors presented sufficient evidence to prove that the 2011 House redistricting map—Plan H283—was enacted with discriminatory intent in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution. *See id.* at 177 (cataloging substantial "record evidence" concerning the State's purpose).

The United States first established the basic fact that Texas had failed to create any new House districts in which minority voters would have the ability to elect their preferred candidates of choice, despite dramatic growth in the State's Hispanic population in the decade preceding redistricting. *See id.* at 177-78. The United States next showed that in House District 117, map-drawers had used a "deliberate, race-conscious method to manipulate not simply the Democratic vote but, more specifically, the *Hispanic* vote," namely by "switching high-turnout for low-turnout Hispanic voters, hoping to keep the [Spanish Surname Voter Registration] level just high enough to pass muster under the [Voting Rights Act] while changing the district into one that performed for Anglo voters." *Id.* at 178; *see also id.* at 238-40 (findings of fact). Moreover, the United States established that the lead House map-drawer offered "incredible testimony" that "reinforces evidence suggesting mapdrawers cracked [precincts] along racial lines to dilute minority voting power" and "suggests that Texas had something to hide in the way it used racial data to draw district lines." *Id.* at 178; *see also id.* at 232-34, 240-41 (findings of fact). *See generally id.* at 229-35 (findings of fact concerning House redistricting process).

The United States and other parties presented substantial additional unrebutted evidence of discriminatory intent that the D.C. court ultimately had no need to address. *See* U.S. Br. at 3-

12 (ECF No. 630). The most damning evidence relates to House District 41, where Texas used race as a proxy for partisanship and drew the district with the intent to minimize minority voting strength in an effort to eliminate minority voters' ability to elect their candidates of choice. The State of Texas's redistricting reports specifically showed that in the absence of partisan data, map-drawers split Hidalgo County precincts 25, 47, 48, 88, 95, and 103 along stark racial lines, to exclude from House District 41 certain neighborhoods containing far greater concentrations of Hispanic voters. *See* DX 886 at 71, 75-77, Notice of Filing Def. Ex. List (ECF No. 615); *see also* DX 787, Notice of Filing Def. Ex. List (ECF No. 615) (RedAppl screen captures). Representative Aaron Peña—the Anglo-preferred incumbent on whose behalf map-drawers crafted District 41—admitted in his deposition that he lacked sufficient local knowledge to provide political information at the sub-precinct level and denied asking that the precincts be split. *See* Joint Deposition Designations at 1058-71, *Texas v. United States*, No. 1:12-cv-1303 (Peña Dep. at 154:2-173:24, Oct. 19, 2011) (Ex. 2).

The configurations in Plan H283 for Nueces and Harris Counties provide additional evidence of intent driven by racial discrimination, rather than partisanship. In Nueces County, the State deliberately eliminated House District 33—a district in which minority voters had the ability to elect representatives of their choice that was then represented by a Hispanic Republican—and protected the Anglo incumbent in District 32 by crafting a hook-shaped extension to pack Hispanic voters and potential Hispanic challengers (Republican and Democrat) into District 34. *See* DX 510 at 2, Notice of Filing Def. Ex. List (ECF No. 615); DX 737 at 13-15, Notice of Filing Def. Ex. List (ECF No. 615) (Pre-Filed Direct Testimony of Abel Herrero); Trial Tr. at 110:20-112:8, *Texas v. United States*, No. 1:12-cv-1303 (D.D.C. Jan. 17 a.m.) (Ex. 3).

In Harris County, the State deviated from established procedures by excluding every minority legislator in the delegation from the redistricting process for the express purpose of protecting incumbents from minority population growth—resulting in the elimination of a district represented by the Texas House's sole Vietnamese member rather than the district of a senior Anglo Democrat. *See* Trial Tr. at 53:19-55:18, 68:10-22, *Texas v. United States*, No. 1:12-cv-1303 (D.D.C. Jan. 19 p.m.) (Ex. 4); DX 738 at 12-14, 19-22, Notice of Filing Def. Ex. List (ECF No. 615) (Pre-Filed Direct Testimony of Scott Hochberg).

In sum, the evidence convincingly establishes that the State of Texas enacted its 2011 House redistricting plan with discriminatory intent.[12]

### 3. Other Violations of the Fourteenth and Fifteenth Amendments

As noted above, for purposes of Section 3(c), the relevant evidence of discrimination is not limited to the precise practices that were challenged in the lawsuit. *See Jeffers*, 740 F. Supp. at 591-92 (holding that constitutional violations with respect to voting practices that were not "the principal focus of the complaint" satisfied Section 3(c)). In this case, Texas's pervasive history of voting discrimination against its African-American and Hispanic citizens is long-standing and well-documented. As recently as 2006, the Supreme Court held that the State's Congressional redistricting plan "undermined the progress of a racial group that has been subject to significant voting-related discrimination." *LULAC v. Perry*, 548 U.S. 399, 438 (2006). The Court concluded that the State's division of a cohesive Hispanic community just as it "was

---

[12] Although the United States did not oppose preclearance of Texas's 2011 State Senate plan, intervenors did oppose preclearance, and the District Court denied preclearance of that plan after concluding that Texas had not met its burden of showing no discriminatory purpose when it enacted the 2011 Senate redistricting map. *See Texas v. United States*, 887 F. Supp. 2d at 162, 166.

becoming more politically active" bore "the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 438-39.

In every redistricting cycle since 1970, courts have similarly found that one or more of Texas's statewide redistricting plans violated the voting guarantees of the Constitution or provisions of the Voting Rights Act.[13]  Likewise, since Texas became a covered jurisdiction under Section 5 pursuant to the 1975 amendments to the Voting Rights Act, the Attorney General has interposed an objection to at least one of the State's redistricting plans in each decennial redistricting cycle.[14]

Overall, the Attorney General has frequently interposed objections to a broad spectrum of voting changes proposed by the State and its political subdivisions.[15]  Since 1976, the Department has issued 207 Section 5 objections to proposed electoral changes in Texas (188 related to changes enforced by Texas political subdivisions, 19 by the State itself).  On numerous occasions, the Attorney General determined that the State or its political subdivisions were unable to demonstrate that proposed voting changes were adopted without a discriminatory purpose.  *See generally* 42 U.S.C. § 1973c(a)-(c).  Examples in the last three years alone include:

- A 2012 objection to a Galveston County redistricting plan for Commissioners Court.  The Attorney General concluded that the county had not met its burden with regard to discriminatory purpose, citing (1) a failure to adopt set redistricting criteria, (2) the

---

[13] *See, e.g.*, *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 570 U.S. ___, 2013 WL 3213539 (U.S. June 27, 2013); *LULAC v. Perry*, 548 U.S. 399 (2006); *Balderas v. State of Texas*, No. 6:01CV158, 2001 WL 36403750 (E.D. Tex. Nov. 14, 2001) (three-judge court) (per curiam); *Bush v. Vera*, 517 U.S. 952 (1996); *Terrazas v. Slagle*, 789 F. Supp. 828 (W.D. Tex. 1991) (three-judge court), *aff'd sub nom.*, *Richards v. Terrazas*, 505 U.S. 1214 (1992); *Upham v. Seamon*, 456 U.S. 37 (1982); *Terrazas v. Clements*, 537 F. Supp. 514 (N.D. Tex. 1982) (three-judge court) (per curiam); *McDaniel v. Sanchez*, 452 U.S. 130 (1981); *White v. Regester*, 412 U.S. 755 (1973); *White v. Weiser*, 412 U.S. 783 (1973).

[14] *See* DX 277-86, Notice of Filing Def. Ex. List (ECF No. 615) (DOJ Objection Letters).

[15] U.S. Dep't of Justice, *Section 5 Objections Texas*, *at* http://www.justice.gov/crt/about/vot/sec_5/tx_obj2.php (last visited July 17, 2013) (listing Section 5 objections in Texas).

deliberate exclusion from the redistricting process of the sole minority-preferred Commissioner, and (3) the discriminatory impact of the voting change on minority groups.[16]

- A 2012 objection to a Nueces County redistricting plan for Commissioners Court. The Attorney General concluded that the county had not met its burden with regard to discriminatory purpose after it intentionally moved Anglo voters into a district in which Hispanic voters previously had the ability to elect their preferred candidates of choice and moved Hispanic voters out of that district, over the vocal opposition of Hispanic citizens.[17]

- A 2010 objection to Runnels County's Spanish-language election procedures. The Attorney General concluded that the county had not met its burden with regard to discriminatory purpose after the county proposed replacing bilingual poll officials in each precinct with a single bilingual assistor available by phone, admitted rapid growth in the county's Hispanic population, and failed to provide a credible explanation for the proposed change.[18]

- A 2010 objection to Gonzales County's Spanish-language election procedures. The Attorney General concluded that the county had not met its burden with regard to discriminatory purpose after the county proposed replacing bilingual poll workers in ten of the county's eighteen voting precincts with "best efforts" to place bilingual workers in seven of fifteen precincts, noting county officials' "openly expressed hostility toward complying with the language minority provisions of the Voting Rights Act."[19]

Moreover, as the Supreme Court has recognized, a jurisdiction's historical practices can provide relevant circumstantial evidence from which a court can infer that more recent conduct was motivated by discriminatory purpose. *See Rogers*, 458 U.S. at 625 (holding that evidence of past discrimination is relevant to drawing an inference of purposeful discrimination); *City of Rome v. United States*, 446 U.S. 156, 177 (1980) ("[E]lectoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful

---

[16] Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Justice, to an attorney for Galveston County, Texas (Mar. 5, 2012), *available at* http://www.justice.gov/crt/about/vot/sec_5/ltr/l_030512.php.

[17] Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Justice, to attorneys for Nueces County, Texas (Feb. 7, 2012), *available at* http://www.justice.gov/crt/about/vot/sec_5/ltr/ l_020712.php.

[18] Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Justice, to the Runnels County Clerk (June 28, 2010), *available at* http://www.justice.gov/crt/about/vot/sec_5/ltr/l_062810.php.

[19] Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Justice, to an attorney for Gonzales County, Texas (Mar. 10, 2010), *available at* http://www.justice.gov/crt/about/vot/sec_5/ltr/ l_031210.php.

discrimination.").  Therefore, Texas's present-day discrimination must be considered in the

context of its robust history of voting discrimination against racial minorities, which dates back

to Reconstruction.  *See generally White v. Regester*, 412 U.S. 755, 766-69 (1973) (recounting

"the history of official racial discrimination in Texas"); *Vera v. Richards*, 861 F. Supp. 1304,

1317 (S.D. Tex. 1994) (three-judge court) (noting that "Texas has a long, well-documented

history of discrimination that has touched upon the rights of African-Americans and Hispanics to

register, to vote, or to participate otherwise in the electoral process"), *aff'd sub nom. Bush v.

Vera*, 517 U.S. 952 (1996).  As the Supreme Court has recognized, Texas's pervasive history of

discrimination has included efforts to prevent African-American and Hispanic voters from

participating equally in the electoral process, with State officials promptly enacting new

discriminatory measures shortly after established laws were struck down.  *LULAC*, 548 U.S. at

439-40 (quoting *Vera*, 861 F.Supp. at 1317).  These discriminatory election practices have

included State constitutional amendments and codified laws that levied poll taxes, established

all-white primaries, created restrictive voter-registration time periods, diluted minority voting

strength through the use of racial gerrymandering, and even barred the election of minority

officeholders.  *See LULAC*, 548 U.S. at 439-40.[20]

---

[20] *See also, e.g.*, *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971) (three-judge court) (striking down newly instituted annual voter-registration system), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974); *United States v. Texas*, 252 F. Supp. 234 (W.D. Tex. 1966) (barring use of a poll tax as a voting requirement), *aff'd*, 384 U.S. 155 (1966); *Terry v. Adams*, 345 U.S. 461 (1953) (striking down all-white "Jaybird primary"); *Smith v. Allwright*, 321 U.S. 649 (1944) (striking down white primary); *Grovey v. Townsend*, 295 U.S. 45 (1935) (permitting exclusion of African Americans from Democratic primary based on purported lack of state action); *Nixon v. Condon*, 286 U.S. 73 (1932) (striking down State-authorized white primary); *Nixon v. Herdon*, 273 U.S. 536 (1927) (striking down State-mandated white primary).  *See generally* Robert Brischetto et al., *Texas*, *in Quiet Revolution in the South: The Impact of the Voting Rights Act 1965-1990*, at 233-70 (Chandler Davidson & Bernard Grofman eds., 1994).

**D. This Court Should Impose Section 3(c) Preclearance.**

Upon finding that the 2011 Congressional or State House redistricting plan was intentionally discriminatory, this Court should grant relief pursuant to Section 3(c) of the Voting Rights Act.  As set forth above, the prerequisites to Section 3(c) relief have been met, and Texas's pattern of intentional discrimination in voting warrants the imposition of a preclearance requirement under Section 3(c).  As in *Jeffers*, the violations in this case are "persistent and repeated," otherwise likely to recur, and of the type "likely [to] be prevented, in the future, by preclearance."  740 F. Supp. at 601.

This Court should issue an order requiring Section 3(c) preclearance review of all voting changes that the State of Texas enacts or seeks to administer during the ten-year period following the issuance of such order.  This coverage period is no longer or shorter than necessary here to ensure that preclearance will be applied to decennial redistricting and the accompanying reconfiguration of precincts.  During that period, no "voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced," *i.e.*, May 9, 2011, that the State of Texas enacts or seeks to administer could be implemented unless and until this Court concludes that the proposed change does not have the purpose or effect of denying or abridging the right to vote based on race, color, or language minority status, or such change has been submitted for review by the Attorney General and the Attorney General fails to interpose an objection within sixty days of the submission. 42 U.S.C. § 1973a(c).  If at any point during the ten-year period following such order this Court finds that the State has not met its statutory burden under Section 3 or the Attorney General objects to a proposed change (and such objection is not overturned by a decision of this Court), this Court should consider extending the bail-in period beyond the

21

original 10 years.  *Cf.* 42 U.S.C. § 1973b(a)(5) (requiring termination of a bailout from Section

4(b) coverage in the event of discriminatory acts within a ten-year period); *id.* § 1973b(a)(1)(D)

(barring bailout in the event of a denial of judicial preclearance or imposition of a Section 5

objection not overturned by a court).

IV.    **CONCLUSION**

For the reasons set out above, this Court maintains jurisdiction to consider requests for

relief under Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), and should grant such

relief in this case.

Date:  July 25, 2013

Respectfully submitted,

ROBERT PITMAN                               JOCELYN SAMUELS
United States Attorney                          Acting Assistant Attorney General
Western District of Texas                       Civil Rights Division

*/s/ Jaye Allison Sitton*
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
BRYAN SELLS
JAYE ALLISON SITTON
DANIEL J. FREEMAN
MICHELLE A. MCLEOD
Attorneys
Voting Section, Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 353-0099

22

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2013, I served a true and correct copy of the foregoing via the Court's ECF system on the following counsel of record:

David R. Richards
Richards Rodriguez & Skeith, LLP
davidr@rrsfirm.com

Richard E. Grey III
Gray & Becker, P.C.
rick.gray@graybecker.com

*Counsel for Perez Plaintiffs
and Plaintiff-Intervenors Pete Gallego and
Filemon Vela Jr.*

Luis Roberto Vera, Jr.
Law Offices of Luis Roberto Vera, Jr. &
    Associates
lrvlaw@sbcglobal.net

George Joseph Korbel
Texas Rio Grande Legal Aid, Inc.
gkorbel@trla.org

*Counsel for Plaintiff League of United Latin
American Citizens*

John T. Morris
johnmorris1939@hotmail.com

*Pro Se Plaintiff*

Nina Perales
Marisa Bono
Nicolas Espiritu
Karolina J. Lyznik
Mexican American Legal Defense
    and Education Fund
nperales@maldef.org
mbono@maldef.org
klyznik@maldef.org
nespiritu@maldef.org

Mark Anthony Sanchez
Robert W. Wilson
Gale, Wilson & Sanchez, PLLC
masanchez@gws-law.com
rwwilson@gws-law.com

*Counsel for Plaintiff Latino Redistricting
Task Force*

Jose Garza
Law Office of Jose Garza
garzpalm@aol.com

Mark W. Kiehne
Ricardo G. Cedillo
Davis, Cedillo & Mendoza
mkiehne@lawdcm.com
rcedillo@lawdcm.com

Joaquin G. Avila
Seattle University School of Law
avilaj@seattleu.edu

Cynthia B. Jones
Jones Legal Group, LLC
jones.cynthiab@gmail.com

*Counsel for Plaintiff Mexican American
Legislative Caucus*

Karen M. Kennard
City of Austin Law Department
karen.kennard@ci.austin.tx.us

Max Renea Hicks
Law Office of Max Renea Hicks
rhicks@renea-hicks.com

Manuel Escobar, Jr.
Manuel G. Escobar Law Office
escobarm1@aol.com

Marc Erik Elias
Abha Khanna
Perkins Coie LLP
akhanna@perkinscoie.com
melias@perkinscoie.com

S. Abraham Kuczaj, III
Stephen E. McConnico
Sam Johnson
Scott Douglass & McConnico, LLP
akuczaj@scottdoug.com
smcconnico@scottdoug.com
sjohnson@scottdoug.com

David Escamilla
Travis County Ass't Attorney
david.escamilla@co.travis.tx.us

*Counsel for Rodriguez Plaintiffs*

Gerald Harris Goldstein
Donald H. Flanary, III
Goldstein, Goldstein and Hilley
ggandh@aol.com
donflanary@hotmail.com

Paul M. Smith
Michael B. DeSanctis
Jessica Ring Amunson
Caroline D. Lopez
Jenner & Block LLP
psmith@jenner.Com
mdesanctis@jenner.Com
jamunson@jenner.Com
clopez@jenner.com

J. Gerald Hebert
Law Office of Joseph Gerald Hebert
hebert@voterlaw.com

Jesse Gaines
Law Office of Jesse Gaines
gainesjesse@ymail.com

*Counsel for Quesada Plaintiff-Intervenors*

Rolando L. Rios
Law Offices of Rolando L. Rios
rrios@rolandorioslaw.com

*Counsel for Plaintiff-Intervenor Henry Cuellar*

Gary L. Bledsoe
Law Office of Gary L. Bledsoe
garybledsoe@sbcglobal.net

Victor L. Goode
NAACP
vgoode@naacpnet.org

Robert Notzon
Law Office of Robert Notzon
robert@notzonlaw.com

Anita Sue Earls
Allison Jean Riggs
Southern Coalition for Social Justice
allison@southerncoalition.org
anita@southerncoalition.org

*Counsel for Plaintiff-Intervenor Texas State
Conference of NAACP Braches*

Chad W. Dunn
K. Scott Brazil
Brazil & Dunn
4201 FM 1960 West, Suite 530
Houston, TX 77068
(281) 580-6310
chad@brazilanddunn.com
scott@brazilanddunn.com

*Counsel for Plaintiff-Intervenor Texas
Democratic Party*

John K. Tanner
John Tanner Law Office
3743 Military Rd. NW
Washington, DC 20015

*Counsel for Plaintiff-Intervenor Texas
Legislative Black Caucus*

Hector De Leon
Benjamin S. De Leon
De Leon & Washburn, P.C.
hdeleon@dwlawtx.com
bdeleon@dwlawtx.com

Eric Christopher Opiela
Eric Opiela PLLC
eopiela@ericopiela.com

Christopher K. Gober
Michael Hilgers
Gober Hilgers PLLC
cgober@goberhilgers.com
mhilgers@goberhilgers.com

James Edwin Trainor, III
Beirne, Maynard & Parsons, LLP
ttrainor@bmpllp.com

Joseph M. Nixon
Beirne Maynard & Parsons LLP
jnixon@bmpllp.com

*Counsel for Plaintiff-Intervenors Joe Barton
et al.*

David Mattax
Patrick K. Sweeten
Angela V. Colmenero
Matthew Frederick
Ana M. Jordan
Jennifer Settle Jackson
Office of the Texas Attorney General
david.mattax@oag.state.tx.us
patrick.sweeten@texasattorneygeneral.gov
angela.colmenero@
texasattorneygeneral.gov
matthew.frederick@
texasattorneygeneral.gov
ana.jordan@oag.state.tx.us
Jennifer.jackson@texasattorneygeneral.gov

*Counsel for Defendants State of Texas and
Rick Perry and Defendant-Intervenors
David Dewhurst, Joe Strauss, and John
Steen*

Donna Garcia Davidson
Donna G. Daviddson Law Firm
donna@dgdlawfirm.com

Frank M. Reilly
Potts & Reilly, LLP
reilly@pottsreilly.com

*Counsel for Defendant-Intervenors Steve
Munisteri*

Kent M. Adams
Lewis, Brisbois, Bisgaard, & Smith LLP
kadams@lbbslaw.com

*Counsel to Defendant-Intervenor Sarah M.
Davis*

Clarkson F. Brown
Bexar County District Attorney's Office,
101 W Nueva, Suite 5049
San Antonio, TX 78205
(210) 335-2150
clarkb@bexar.org

*Counsel for Amicus Curiae Bexar County*

Ned Bennet Sandlin
Texas Municipal League
bennett@tml.org

*Counsel for Amicus Curiae Texas Municipal
League*

Manuel A. Pelaez-Prada
Pelaez Prada, PLLC
mpp@lonestaradr.com

*Counsel for Amicus Curiae San Antonio
Hispanic Chamber of Commerce*

*/s/ Jaye Allison Sitton*
JAYE ALLISON SITTON
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 353-0099
jaye.sitton@usdoj.gov