FILED
2026 May-07  PM 04:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

EVAN MILLIGAN, et al.,

*Plaintiffs*,

v.

WES ALLEN, et al.,

*Defendants*.

No. 2:21-cv-01530-AMM

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY

Alabama's May 19 statewide primary election is well underway. By March 25, officials had "deliver[ed] [ballots] to the absentee election manager[s]." Ala. Code § 17–11–12 (2025). By April 4, officials had sent absentee ballots to uniformed and overseas citizens. 52 U.S.C. § 20310. Since March 25, numerous absentee voters have cast their ballots. Ala. Code § 17–11–5 (2025). In adopting Alabama's arguments and granting a stay of this Court's injunction in 2022, Justice Kavanaugh determined that it would have taken "heroic efforts" for Alabama to implement a new map with "just seven weeks" *before* the start of voting. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). Yet no amount of effort could accommodate changes to an existing plan when people have voting been for over a month and there are now less than two weeks until the last day of voting. *Cf. Abbott*

1

*v. League of United Latin American Citizens*, 146 S. Ct. 418, 419 (chastising a district court that "improperly inserted itself into an active primary campaign, causing much confusion").

There is no "emergency" in this case. The Supreme Court has had Alabama's Jurisdictional Statement in hand for months. And the Court so far has not acted on Alabama's recent request to expedite its ruling. All parties stipulated that the court-ordered remedial map ("Remedial Map") was drawn race-blind. The Remedial Map has been in place for two years. People have been voting for over a month. No court has deemed the Remedial Plan to be an illegal racial gerrymander. And no court has overturned—or is likely to overturn—this Court's findings that Alabama's 2023 map violated the Constitution and Section 2. Every court to evaluate this case on the merits, including the Supreme Court, has refused to side with Alabama. Indeed, both this Court and the Supreme Court declined to stay relief in 2023 when Alabama made nearly the same arguments that it makes today. *See Allen v. Milligan*, 144 S. Ct. 476 (2023); *Singleton v. Allen*, 691 F. Supp. 3d 1343, 1354-55 (N.D. Ala. 2023). Finally, Alabama seeks a stay not to preserve the *status quo* but to give Alabama the "same opportunity as other States" to conduct elections using a new map. Defs.' Emergency Mot. to Stay ("Mot."), Doc. 520 at 2. But granting a stay in this case would unquestionably be wrong—harming voters, election officials, and all candidates.

2

Alabama has offered no basis for a stay. This Court's order rests on Alabama's violations both of Fourteenth Amendment and Section 2 of the Voting Rights Act ("VRA")—a fact conspicuously absent from Alabama's motion. In *Louisiana v. Callais*, the Supreme Court did not address constitutional claims and the Court repeatedly stated that it had "not overruled *Allen*." No. 24–109, 2026 WL 1153054, at *18 (U.S. Apr. 29, 2026). The reasoning underlying *Allen* still governs here, including the Court's holding that Alabama could draw a constitutional remedial plan. *Allen v. Milligan*, 599 U.S. 1, 30-31 (2023) (plurality). This Court has likewise repeatedly rejected Alabama's false claim that its decision "turn[ed] on Alabama's position that §2 could not be constitutionally read to require the State to enact a map with two majority-black districts (or close to it)." Mot. at 6; *see, e.g.*, Doc. 490 at 43-44[1] (rejecting this argument).

In any event, unlike in *Callais*, Alabama itself stipulated that the Remedial Plan—as well as the Special Master's other two plans—were drawn "race blind," using only "nonracial characteristics," and without using race as a criterion. Doc. 490 at 71-72. This Court also found that the Remedial Map and the Special Master maps contained constitutionally permissible Section 2 remedies. Doc. 490 at 544-45. The record evidence also shows that "randomized algorithms" found "plans with

---

[1]    Pin cites are to the file-stamped "blue" page numbers at the top of the docket entry rather than the internal pagination at the bottom of the opinion.

two majority-black districts in literally thousands of different ways." *Allen*, 599 U.S. at 34 n.7. This Court agreed that extensive quantitative and qualitative evidence showed that race, far more than party, drives voting in Alabama. Doc. 490 at 400-01. Further, as the Court acknowledged, Alabama "did not defend its [2021] map on the ground that it was drawn to achieve a political objective." *Callais*, 2026 WL 1153054, at *18. Defendants Pringle and Livingston also denied any partisan motives in 2023. Doc. 490 at 90, 92, 536. And, unlike *Callais*, 2026 WL 1153054, at *18, Alabama has a recent history of intentional discrimination in voting, Doc. 490 at 407, including this Court's findings about Alabama's 2023 Plan, *id*. at 13-14.

This Court has already declined to issue a stay. Nothing in the Supreme Court's decision in *Callais* warrants one now, when ballots are already being cast.

## ARGUMENT

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citations omitted). The issuance of a stay is "an exercise of judicial discretion," based upon "the circumstances of the particular case." *Id*; *see also* Fed. R. Civ. P. 62.

When a movant seeks a stay of an order pending appeal, this Court considers (1) whether the movant has a "strong" likelihood of success on the merits; (2)

whether the movant faces irreparable harm absent a stay; (3) whether the stay will substantially injure Plaintiffs or other interested parties; and (4) whether the public interest favors a stay. *Nken*, 556 U.S. at 434. Defendants bear the burden of establishing that "circumstances justify an exercise of th[e court's] discretion." *Id*. at 433–34.

## I. Even After *Callais*, Alabama is Unlikely to Succeed on the Merits of its Appeal.

This Court's injunction rests on two independent bases: a violation of Section 2 and a violation of the Fourteenth Amendment. Alabama cannot show a likelihood of overturning either violation on appeal. The Section 2 claim rests on significant judicial findings that satisfy the updated standard but that were absent in *Callais* itself. And *Callais* did not address or revise the standards governing this Court's findings on Plaintiffs' Fourteenth Amendment intentional discrimination claim based on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

### A. The Fourteenth Amendment Claim Remains Likely to Succeed on Appeal.

Defendants' assertion that this Court's intentional-discrimination holding turned on Alabama's position that Section 2 could not be constitutionally read to require the State to enact a map with two majority-Black districts, Mot. at 6, is belied by the record and this Court's careful explication of the constitutional violation it

identified. This Court explained in great detail how the Legislature "intentionally refused to create an additional Black-opportunity district for the purpose of entrenching what it knew from federal court orders was very likely discriminatory vote dilution." Doc. 490 at 530. And in any event, Defendants' argument is irrelevant because the Supreme Court in *Callais* took great pains to make clear that its decision did not overrule their affirmance of this Court's determination that Alabama's congressional districting plan likely violated Section 2 in *Allen*. *Callais*, slip op. at 36. Thus, nothing in the Supreme Court's decision in *Callais* makes Alabama's "deliberate decision to ignore, evade, and strategically frustrate requirements spelled out in a court order" affirmed by the Supreme Court for the purpose of diluting Black voting power any less a violation of the Fourteenth Amendment today. Doc. 490 at 17-18, 516-517; *see also* Roberts, C.J., "2024 Year End Report on the Federal Judiciary," (Dec. 31, 2024) (noting the need to "soundly reject[]" the "dangerous" suggestions of "elected officials from across the political spectrum" who "have raised the specter of open disregard for federal court rulings").

And contrary to Defendant's assertions, this Court's finding that Alabama violated the Fourteenth Amendment was based on a "constellation of departures from the norm," including the Legislature's statutory findings which "were meant to prevent a federal court from drawing a remedial district" and themselves made clear that the 2023 map was "an intentional official effort to entrench [ ] vote dilution."

6

Doc. 490 at 495–96, 514. Moreover, Alabama's 2023 legislative criteria, contrary to Defendants' post-hoc assertion, Mot. at 7, are explicitly racial in that they exalt and extol the Gulf Coast "majority-White community of interest above all other communities of interest (and above all other traditional districting principles)." Doc. 490 at 512, 515. As this Court noted, the legislative findings justifying the 2023 map's focus on "the singular reference to the [French and Spanish colonial] heritage of th[is] majority-White" region simultaneously "delet[ed] [] any description" of the Black Belt's heritage, and "eliminate[d] the [prior] express requirement that a plan not dilute minority voting strength." Doc. 490 at 14, 515. Moreover, this Court pointed out that the Legislature has repeatedly split Mobile and Baldwin Counties in creating maps for the State Board of Education districts in Alabama, and the Legislature did so at the same time it drew the first enjoined plan in 2021. *Id.* at 356.

Moreover, Alabama's legislative redistricting guidelines contain no reference to partisanship, and there was "precious little evidence" that any legislator considered partisan advantage in 2023. Doc. 490 at 536. No legislators testified to partisan goals. *Id.* at 536-37. Both Co-Chairs of the Legislative Redistricting Committee denied that calls from a national Republican leader had influenced their decision to enact Alabama's 2023 plan. *Id*. at 536. But, even if Alabama had sought to protect the Gulf Coast and pursue partisan goals (which it did not), it could have enacted either the Community of Interest Plan, which Defendant Pringle and the

Alabama House supported, *id*. at 48, or the Singleton Plan. Both the Singleton Plan and the Community of Interest Plan put the Black Belt in two districts while keeping Mobile and Baldwin counties together in one. *Id*. at 97-98, 566. And the Community of Interest Plan, Doc. 296-14 at 3, and the Singleton Plan, Doc. 296-15 at 15, likely would not have changed the partisan makeup of Alabama's congressional delegation.

In sum, this Court's determination that Alabama violated the Fourteenth Amendment in 2023 turned on robust evidence regarding Alabama's intentional actions to dilute the votes of Black voters in the state, and these findings are not disturbed by the Supreme Court's decision regarding §2 in *Callais*.

B. Under the *Callais* Standard, Plaintiffs are Still Likely to Succeed on their Section 2 claim.

In *Callais*, the Court revised the first *Gingles* precondition, which requires plaintiffs to submit illustrative maps with an additional opportunity district. *Callais*, 2026 WL 1153054, at *15. Under the revised standard, (1) "plaintiffs cannot use race as a districting criterion"; and (2) the "illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals." *Id*. This Court already concluded that Plaintiffs satisfy these requirements.

With respect to the first prong, Plaintiffs "far surpassed their burden" by submitting more than a dozen reasonably configured districts without the improper use of race. Doc. 490 at 368–69. This Court did not err in crediting the "extensive

8

evidence that [Plaintiffs' experts] took great care to avoid that fault." *Id.* Moreover, compliance with Section 2 is a compelling state interest that permits the limited use of race, 2026 WL 1153054, at *4, and so the Court's decision in *Allen*, 599 U.S. at 34 n.7, gave some leeway to use race in a non-predominate, narrowly tailored way.

Further, the parties stipulated that the Special Master's plans were drawn only with "nonracial characteristics" as the Special Master's expert "did not display racial demographic data within the mapping software." *Id.* at 545. Thus, even ignoring Plaintiffs' maps, the Court correctly held that the Special Master maps are "compelling evidence that two reasonably configured Black-opportunity districts easily can be drawn in Alabama" even where an expert "did not consider race when he prepared plans." *Id.* at 7-8. The Court correctly ruled that the Special Master plans "satisfied all constitutional and statutory requirements while hewing as closely as possible to the 2023 Plan." *Id.* at 70.

With respect to the second prong, this Court concluded that "Plaintiffs' illustrative plans often do meet or beat the 2023 Plan" on Alabama's own stated criteria. Doc. 490 at 335. The Special Master plans also meet or beat Alabama on the State's proffered criteria. *Id.* at 70-72. Again, no legislators testified to partisan goals. *Id.* at 536-37. Plaintiffs therefore had no duty to meet goals that Alabama itself never tried to advance. *See Callais*, 2026 WL 1153054, at *18 (acknowledging that, like

with the 2023 map, Alabama "did not defend its [2021] map on the ground that it was drawn to achieve a political objective").

*Callais* also requires that plaintiffs "disentangle" race and political affiliation in analyzing voting patterns. 2026 WL 1153054, at *15. Here, this Court found that Plaintiffs showed that race, much more than partisanship, drives polarization. This Court found there is an "overwhelming" quantitative and qualitative "evidentiary record about the importance of race in Alabama politics." Doc. 490 at 399.

For example, Alabama's own expert admitted that "race remains the dominant political influence" in the State. Doc. 490 at 393. Another one of Alabama expert's "agreed that [Plaintiffs'] ecological inference analysis established 'that White voters in Alabama support White Democrats more than they support Black Democrats,'" *id*. at 374. Further, in several *general* elections, White Democrats supported White Republicans over Black Democrats. *Id*. at 143, 397. In recent primaries for Democrats, *id*. at 143, and Republicans, *id*. at 299–30, White voters supported White candidates over Black ones. For example, in remedial District Two's 2024 Republican primary, four Black Republicans "together received only 6.2% of the total vote," finishing behind four White candidates. *Id*. at 397. A young, White political novice got more votes than all four Black candidates combined. *Id*. at 159. The Court also had evidence showing racial polarization in nonpartisan municipal

elections. *Id*. at 142. Thus, this Court did not err in finding that the evidence was sufficient to show that race, not party, drives racially polarized voting in Alabama.

Moreover, while Black and White Alabamians both consider themselves to be ideologically conservative and they hold similar views on issues like religion, same-sex marriage, and abortion, *id*. at 167, their voting patterns do not reflect their shared values. *Id.* at 400. Rather, there was testimony that racially polarized voting occurs because White Republicans *and* Democrats do not support racial issues important to Black voters. For example, the Court heard testimony that White politicians, regardless of party, had not met with the NAACP to discuss civil rights issues. Doc. 490 at 202. Congressmen Parker Griffith and Bobby Bright—two White Democrats elected in 2008—voted against a civil rights law that Black people had supported to address pay inequalities for Black and other women. Trial Tr. 716:23-720:8 (L. Jackson). And every White Republican congressman in Alabama voted against President Trump's First Step Act, a law that the Republican Congress passed to ease racial disparities in federal sentencing. Trial Tr. 716:6-18 (L. Jackson). Thus, unlike in *Callais*, this Court's findings did not rely a mere recognition that "issues discussed by [the Democratic] party appealed to black voters. 2026 WL 1153054, at *17.

Finally, on the totality of circumstances, the Supreme Court criticized the lack of recent evidence of intentional discrimination in Louisiana. *Id*. at *18. Here, however, this Court found that Alabama had both a "pervasive and protracted

11

history" of discrimination and multiple findings of intentional racial discrimination "issued in the last ten years." Doc. 490 at 407. For example, in 2011, a federal court found that Alabama State legislators had conspired to depress Black voter turnout by keeping a referendum issue popular among Black voters (whom the Senators called "Aborigines" and "illiterates") off the ballot. *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345–47 (M.D. Ala. 2011). And, in 2017, Black voters and legislators successfully challenged twelve state legislative districts as unconstitutional racial gerrymanders. *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1140, 1348-49 (M.D. Ala. 2017). And this Court found that several local at-large voting systems created by the Legislature had recently been enjoined to address "their alleged racially discriminatory purpose or effect." Doc. 490 at 405.

## II.   The Equities Require Defendants' Stay Request be Denied.

### A. Plaintiffs and the Public Will Suffer Irreparable Harm from a Stay.

At this late stage, Alabama requests permission from this Court to disregard the Remedial Plan that has been in place since October 2023. The Remedial Plan effectively set the rules of the road for the 2026 election. *See Frank v. Walker*, 574 U.S. 929 (2014) (vacating an appellate court's stay of a district court's injunction when absentee ballots had already gone out pursuant to that injunction). Granting a stay would change those rules and amount to the Court "improperly insert[ing] itself into an active primary campaign, causing much confusion," *Abbott*, 146 S. Ct. at

419. It could result in the invalidation of thousands of votes already properly cast by eligible Alabamians in an *ongoing election*. Just weeks ago, the Supreme Court prevented—in a case where voting was still weeks away—"'[l]ate judicial tinkering' that 'can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others.'" *Malliotakis v. Williams*, 146 S. Ct. 809, 811 (Alito, J., concurring) (quoting *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J. concurring)). But that is precisely what Alabama asks this Court to do by revoking the operative Remedial Plan and reverting to the 2023 plan in the middle of voting.

*Callais* itself is instructive. There, the Supreme Court stayed, on *Purcell* grounds, a court-ordered change in the operative congressional map almost six months *before* the next relevant election. *See Robinson v. Callais*, 144 S. Ct. 1171 (2024). The election here is *ongoing* making it indisputable that a stay would constitute the type of "judicial tinkering" that animates *Purcell* concerns. *See Merrill*, 142 S. Ct. at 881 (Kavanaugh, J. concurring).[2]

---

[2]     Alabama points to the Supreme Court's decision in *Callais* to send down the judgement before the time under Supreme Court Rule 45.3 passed. Mot. at 2 (citing *Callais v. Louisiana*, No. 25A1197 (U.S. May 4, 2026)). Alabama asserts that the Court did this "in light of upcoming elections[.]" First, the Supreme Court did not purport to apply the *Nken* factors relevant to the stay at issue here. The timing of the issuance of a judgement is not be governed by the same standard. Second, nowhere in the Court's decision does it mention upcoming elections. Instead, the Court noted that the only party to oppose the motion for expedited issuance failed to "express[] any intent to ask this Court to reconsider its judgment" making it unnecessary to wait the full 32 days under Rule 45.3. Order, *Callais v. Louisiana*, No. 25A1197 (U.S. May 4, 2026). And the Supreme Court did so after it had already declared Louisiana's map unconstitutional after intensive inquiry—not where, as here, the Court has previously granted relief to Plaintiffs.

And even worse, judicial intervention now would result in the disfranchisement of any Alabama voters who have already returned their absentee ballots marking their choice for Congress. Under state law, absentee ballots for the May primary were "deliver[ed] to the absentee election manager[s]" no later than March 25, Ala. Code § 17-11-12 (2025), and election managers have since provided those ballots to qualified voters, upon receipt of a valid application for an absentee ballot, Ala. Code § 17-11-5 (2025). And Alabama election officials began mailing out absentee ballots on or before April 4 as required under the Uniformed and Overseas Citizen Absentee Voting Act. 52 U.S.C. § 20310. Moreover, any Alabama law purporting to create a new congressional plan at this late hour is time-barred by the Alabama Constitution. Ala. Const. Art. IV, § 111.08. The Alabama Constitution requires that a bill enacted in a general election year and relating to the conduct of elections must be in place six months before the general election. *Id.* Because Alabama's general election is on November 3, 2026, the Legislature would violate this state constitutional prohibition even if it could enact a new plan today.

As the State has repeatedly represented in this litigation, no changes to an existing districting plan can be made so proximate to an election, particularly one that is well underway. *Cf. Abbott*, 146 S. Ct. 418, 419. Judicial intervention at this point will disenfranchise voters who already cast their ballots, cause mass confusion, and raise serious constitutional concerns by changing voting rules after voting has

already begun. *See Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 580 (11th Cir. 1995).

B. <u>Granting a Stay on the Eve of an Election Is Contrary to the Public Interest.</u>

By Alabama's own words, a "district court's order" granting a stay "at this late hour" would "inflict[] grave harm on the public interest[.]" Emergency App. for Administrative Stay & Stay or Injunctive Relief Pending Appeal to the Supreme Court of the United States, No. 21A375, *Merrill v. Milligan* at 38 (Jan. 28, 2022).

Just four years ago, Alabama successfully argued that this Court's preliminary injunction should be stayed two weeks ahead of the candidate qualifying period because "'[i]t is best for candidates and voters to know significantly in advance of the petition period who may run where.'" *Id*. (citation omitted). Alabama's qualifying period for this cycle ended on January 23, 2026—over three months ago.

Alabama then (successfully) argued that a stay of the qualifying period would not help because "congressional candidates would have only about a week to assess any new map . . . and decide whether to enter a congressional race in which absentee voting will begin the following month." *Id*. at 40. Here, absentee voting has unquestionably begun, and, if a late-breaking stay is granted, congressional candidates would have only 12 days from today until the primary Election Day itself.

And as Alabama stated "[b]y ordering radically new districts days before the candidate qualifying deadline and less than two months before absentee voting is to

15

begin, the district court's decision squarely implicates *Purcell*." *Id*. If it is inappropriate to order a new map days before the candidate qualifying period and "just seven weeks" from Election Day, *id*. at 879 (Kavanaugh, J. concurring), then it is even more so here "on the eve of an election" when the candidate qualifying period closed months ago and the primary election is just nine days away, *Republican Nat'l Committee v. Democratic Nat'l Committee*, 589 U.S. 423, 424 (2020).

Accordingly, the public interest weighs decisively against the grant of a stay.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court deny Alabama's motion for a stay of the injunction.

Respectfully submitted this 7th of May 2026.

*/s/ Deuel Ross*
Deuel Ross*
Victor Olofin*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Colin Burke*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.

*/s/ Sidney Jackson*
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

Davin M. Rosborough*
Theresa J. Lee*
Dayton Campbell-Harris*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES

16

40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*
Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
tlee@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Paul Rand (ASB-5595-O99N)
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

***Counsel for Milligan Plaintiffs***

-
Janette Louard*
Anthony Ashton*
Anna Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE (NAACP)
4805 Mount Hope Drive

Baltimore, MD 21215
(410) 580-5777
jlouard@naacpnet.org

***Counsel for Plaintiff Alabama State Conference of the NAACP***
*\* Admitted Pro Hac Vice*