FILED
2026 May-15  AM 11:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| EVAN MILLIGAN, et al., | |
| *Plaintiffs*, | |
| v. | No. 2:21-cv-01530-AMM |
| WES ALLEN, et al., | |
| *Defendants*. | |

**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION**

Earlier this week, Plaintiffs filed a motion for a temporary restraining order to immediately reinstate the court-ordered remedial map ("Remedial Map") that has been the *status quo* in Alabama for *three* years. *See* Pls.' Mot. for Temporary Restraining Order ("Mot."), Doc. 527 (May 12, 2026). Plaintiffs acted in response to the Supreme Court vacating this Court's decision after trial and remanding it "for further consideration in light of *Louisiana v. Callais*, 608 U.S. _ (2026)." *Allen v. Caster* ("*Caster*"), No. 25-243, 2026 WL 1282800, at *1 (U.S. May 11, 2026). For the reasons explained in that motion, Mot. at 5-15, and the subsequent submission, Doc. 529, Plaintiffs require immediate relief. *See News Am. Mktg. In-Store, LLC v. Emmel*, 429 F. App'x 851, 857 (11th Cir. 2011) (vacating and remanding a district

1

court order but finding it "necessary and proper" to continue a "temporary injunction to preserve the status quo while this case is on remand").

The imminent irreparable harm and equities alone merit immediate relief. The Remedial Map "has been the status quo since [the Court] and the Supreme Court declined to stay it in September 2023, and pursuant to the orders of this Court, the Secretary used [the ordered] districting map for Alabama's 2024 congressional elections and is using it for the 2026 congressional elections that are occurring now." Order Denying Stay at 5, Doc. 525; *see also* Order at 3, *Ala. State Conf. of NAACP v. Allen*, No. 25-13007 (11th Cir. May 11, 2026), ECF No. 72-2 (denying vacatur and stay of injunction regarding Alabama State Senate districts and noting that "mail-in voting has already begun in Alabama" under the court-ordered state senate map). During this time, Alabamians voted and labored under the understanding that the Remedial Map would be used in the 2026 election. For months, election officials and candidates laid plans, spent money, and engaged voters based on the Remedial Map's districts. And, for seven weeks, Alabama voters cast ballots under the Remedial Map.

That Alabama officials now want to return to the unconstitutional 2023 Plan does not change the status quo. Rather, Defendants' chaotic decision to schedule a new primary, set a new candidate filing deadlines for next week, and require officials statewide to put the 2023 Plan to use in three months calls out for maintaining the

actual status quo. Unlike the Remedial Map, *no one* has ever voted under the 2023 Plan, no candidates have ever run for office under it, and no election officials have ever had to implement it. The equities and principles of judicial estoppel require relief for Plaintiffs and the public. Judicial estoppel prevents parties from "playing fast and loose with the courts" especially where "judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (citation modified); *cf. Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (adopting Alabama's claim that it would have taken "heroic efforts" to impose a new map "just seven weeks" before the start of voting).

The Supreme Court's order vacating and remanding this case for further proceedings in light of *Callais* does not change this calculus. Rather, "[a]s with all vacaturs of this kind from this Court, the District Court remains free on remand to decide for itself whether *Callais* has any bearing on its Fourteenth Amendment analysis or if its prior reasoning is unaffected by that decision." *Caster*, 2026 WL 1282800, at *3 (Sotomayor, J., dissenting). Such a vacatur is "'limited in nature' . . . and its effect is 'not to nullify all prior proceedings.'" *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996) (quoting *United States v. M.C.C. of Fla., Inc.*, 967 F.2d 1559, 1562 (11th Cir. 1992)). It "is neither an outright reversal nor an invitation to reverse." *Gonzalez v. Justs. of Mun. Ct. of Bos.*, 420 F.3d 5, 7 (1st Cir. 2005).

Indeed, this Court's decision rested upon two independent grounds, one of which—a finding of intentional racial discrimination based on a voluminous trial record—is untouched by *Callais*. Plaintiffs therefore are certain to prevail once again on the merits of their constitutional claim. For that reason—and because Plaintiffs, election officials, and countless other voters will suffer uncertainty, confusion, and irreparable harm absent immediate relief—Plaintiffs respectfully ask this Court to restore the Remedial Map to preserve the status quo, at least until it can fully consider the merits. This is precisely what the Supreme Court has permitted in other instances where a state has sought to reinstate an enjoined voting rule on the eve of an election. *See Moore v. Harper*, 142 S. Ct. 1089 (2022); *Frank v. Walker*, 574 U.S. 929, 929 (2014). For example, in *Moore v. Brown*, after the Supreme Court vacated and remanded a prior court-ordered remedial plan in light of *Mobile v. Bolden*, 446 U.S. 55 (1980), the district court entered a new injunction to maintain the status quo of the court-order remedial plan ahead of an impending election. 448 U.S. 1335, 1338 (1980). Because it was too late to restore Alabama's plan, Justice Powell declined to stay the new injunction. *Id*. at 1340-41.

Here, the merits of Plaintiffs' intentional discrimination claim are unchanged on remand. *Callais* did not disturb the law on intentional racial discrimination claims under the Fourteenth Amendment. Nothing in *Callais* affects this Court's finding that the Alabama Legislature's 2023 Plan "purposefully deprived Black Alabamians

4

of the same opportunity to elect a candidate of their choice that White Alabamians enjoy . . . on the basis of race." *Singleton v. Allen* ("*Singleton II*"), 782 F. Supp. 3d 1092, 1356 (N.D. Ala. 2025). Nothing in *Callais* affects this Court's factual finding rejecting "in the strongest possible terms the State's attempt to finish its intentional decision to dilute minority votes with a veneer of regular legislative process." *Id*. at 1118. Nothing in *Callais* changes the Court's finding that "[w]hen the Legislature enacted the 2023 Plan, there was no lack of clarity that an additional opportunity district was necessary in Alabama" and that regardless of whether the Supreme Court might eventually alter the standard in the future, as it did in *Callais*, "at that moment in time, . . . there was no basis for those legislators to believe that they could ignore [the Court's] affirmed ruling . . . ." *Id*. at 1352. And nothing in *Callais* changes the fact that Defendants stipulated (and this Court found) that the Remedial Plan was "prepared race-blind" in accordance with Alabama's redistricting guidelines and "without reference to any illustrative or proposed plan." *Id*. at 1357–78.

Moreover, even under the revised *Callais* standard, Plaintiffs remain likely to succeed on the merits of their Section 2 claim. In 2021, Alabama "did not defend its map on the ground that it was drawn to achieve a political objective." *Callais*, 2026 WL 1153054, at *18. The same is true with respect to the 2023 Plan. Neither the Legislative Redistricting Committee's guidelines, nor the 2023 Plan's legislative findings reference partisanship as a goal. Both Representative Pringle and Senator

Livingston, Defendants here, testified under oath that they did not act on a call from a national Republican leader to consider the 2023 Plan's partisan implications. *Id*. at 1153-54. Livingston testified that the call "really didn't play into [his] efforts." *Id*.

Moreover, to the extent Alabama relies on the last-minute addition of incumbency protection as a "non-negotiable" principle for evidence of partisan intent, this assertion conflicts with Representative Pringle's testimony that he had supported the Community of Interest Plan, even though the "Black-preferred [Democrat] would win two out of four modeled elections." *Id*. at 1154; *see Singleton v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 6567895, at *6 (N.D. Ala. Oct. 5, 2023) (noting that, even after the 2023 Plan's passage, Representative Pringle submitted the Community of Interest Plan to the Special Master). At the outset of the 2023 process, "both Representative Pringle and Senator Livingston preferred [the Community of Interest] plan . . . and would sponsor it in their respective chambers." *Singleton II*, 782 F. Supp. 3d at 1341. Even after the 2023 Plan's passage, Livingston understood that any plan needed to provide two opportunity districts. *Cf. id*. at 1306.

Because, even after *Callais*, Plaintiffs remain likely to succeed on the merits of their constitutional and Section 2 claims, the Court should protect the *status quo* and enter a new injunction to restore the Remedial Plan pending further proceedings.

**ARGUMENT**

To obtain a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) that the equities favor Plaintiffs; and (4) that the injunction favors the public interest. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F. 3d 1349, 1354 (11th Cir. 2005).

**I. The Court Should Grant Plaintiffs' Motion Because They Face Irreparable Harm Without Relief and the Public Interest and the Equities Weigh Strongly in their Favor.**

**A. Plaintiffs Face Irreparable Harm Absent a Preliminary Injunction.**

The loss of constitutional rights is presumed to be an irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). "[D]iscriminatory voting procedures in particular are the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief." *Singleton v. Merrill* ("*Singleton I*"), 582 F. Supp. 3d 924, 1026 (N.D. Ala. 2022) (collecting cases). "Voting is the beating heart of democracy," and a "fundamental political right, because it is preservative of all rights." *Id*. at 1027 (quoting *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019) (internal quotation marks omitted) (alterations accepted)). And "'once the election occurs, there can be no do-over and no redress' for voters whose rights were violated and votes were diluted." *Id*. (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th

Cir. 2014)). Plaintiffs face this harm absent an injunction.

Alabama seeks now to force Plaintiffs to vote under a plan that this Court has already concluded violates Plaintiffs' right to Equal Protection. *See Singleton II*, 782 F. Supp. 3d at 1116–17. As this Court determined, Alabama "enacted [the 2023] map for the purpose of discriminating against minority voters." *Id.* at 1357. That conclusion was not "particularly complex or close," *id.* at 1356, and this Court's reasons for reaching that conclusion remain wholly undisturbed, *see Allen*, 2026 WL 1282800, at *1 (vacating judgment solely for purposes of "further consideration in light of *Louisiana v. Callais*," which did not address the standard for intentional racial discrimination claims based on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)). That alone weighs strongly in favor of a preliminary injunction.

"To the extent that a citizen's right to vote is debased, he is that much less a citizen." *Reynolds v. Sims*, 377 U.S. 533, 590 (1964). Because the 2023 Plan constitutes "an intentional effort to dilute Black Alabamians' voting strength," *Singleton II*, 782 F. Supp. 3d at 1116, it is Plaintiffs—not Alabama—who would suffer from "offensive and demeaning" conduct, *Miller v. Johnson*, 515 U.S. 900, 912 (1995), that "bears an uncomfortable resemblance to political apartheid," *Shaw v. Reno*, 509 U.S. 630, 647 (1993), if an injunction is not granted.

Moreover, granting a preliminary injunction to preserve the congressional

districts approved by this Court is the only way to prevent the disenfranchisement of the thousands of Alabama voters who have already returned their absentee ballots. Courts have long recognized that the denial of "the opportunity to vote in an election" constitutes "an irreparable harm." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1272 (11th Cir. 2020); *see also Singleton I*, 582 F. Supp. 3d at 1026–27 (same). Mid-election rule changes also "raise serious due process concerns" because they would "result in invalidating the votes of individuals who cast ballots in reliance on previously established rules." *Griffin v. N.C. State Bd. of Elections*, 781 F. Supp. 3d 411, 435 (E.D.N.C. 2025); *see also Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 580 (11th Cir. 1995) (finding a substantive due process violation where "plaintiffs have demonstrated fundamental unfairness" in election procedures due to a ruling that occurred after voting).

Voters have been casting votes for over a month,[1] and every relevant deadline under state and federal law has long since passed. Absent an injunction, Alabama is poised to invalidate already-cast ballots.

B. **The Equities and Public Interest Weigh Strongly in Favor of an Injunction.**

1. *Keeping the Remedial Plan in place serves the public interest by avoiding electoral chaos.*

---

[1]Absentee    Voting    for    Primary    Election,    Madison    Cnty.,    Ala., https://www.madisoncountyal.gov/Home/Components/Calendar/Event/7268/57?curm=4.

Denying Plaintiffs' motion will mean that Alabama's congressional elections will proceed under conditions of "significant cost, confusion, [and] hardship." *Merrill*, 142 S. Ct. at 881–82 (Kavanaugh, J., concurring). Alabama's May 19 primary election is *four days away*, and election officials have been mailing absentee ballots since April 4 as required under the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA"). 52 U.S.C. § 20301 *et seq*. Absentee ballots for this election were "deliver[ed] to the absentee election manager[s]" at the latest by March 25, Ala. Code § 17-11-12, who have since provided those ballots to qualified voters, including in-person, Ala. Code § 17-11-5.

Preservation of the status quo is essential here, as changing the maps today will "caus[e] much confusion." *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025). If implementing a new map four months before a primary and before the close of the candidate-qualifying period amounted to impermissible "disruption" and "unanticipated and unfair consequences for candidates, political parties, and voters," *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring), allowing the 2023 Plan to go into effect mid-election would wreak electoral chaos. The Secretary's Office previously testified that reassigning voters in one county alone would take "about three months," which would make compliance with UOCAVA's 45-day requirement impossible here. See Sec'y of State 30(b)(6) Dep. at 164:18-22.

10

The Supreme Court has declined multiple times to reinstate a state's map or election law when primaries were already ongoing and ballots had gone out. In *Frank*, 574 U.S. at 929, the Supreme Court vacated an appellate court's stay and reinstated a district court's injunction against a state election law when ballots had already been printed and mailed under that injunction. Recently, in *Moore v. Harper*, 142 S. Ct. 1089 (2022), the Court left in place a court-ordered map, declining to reinstate North Carolina's map even though it had accepted granted certiorari. The Court explained that it was "too late for federal courts to order that the district lines be changed" in March "for the [] primary and general elections, just as it was too late for the federal courts to do so in the Alabama redistricting case last month." *Id.* (Kavanaugh, J., concurring in denial of stay). Justice Kavanaugh thus analogized *Moore*—where the state sought reinstatement of its maps—to *Milligan*—where the plaintiffs sought to change the state's map. *Id.*

The crux of the *Purcell* principle during an ongoing election and actual voting is that, no matter if it is the State or Court that seeks to alter the status quo, such a change comes too late to avoid significant harm to voters.

### 2. Defendants are Barred by Judicial Estoppel from Requesting this Relief

The Secretary's emphatic warnings about the disastrous implications of changing a districting map even months before an election also belie his position today. Under the doctrine of judicial estoppel, the Secretary's deliberately

inconsistent statements to this Court and others preclude his requested relief.

Judicial estoppel is an "equitable doctrine," "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc) (quoting *New Hampshire*, 532 U.S. at 749–50 (2021)). Namely, "a party should not be allowed to gain an advantage by litigation on one theory," and then seek an "advantage by pursuing an incompatible theory." *Id.* at 1180–81. "[J]udicial estoppel prevents parties from playing fast and loose with the courts." *New Hampshire*, 532 U.S. at 750 (citation modified).

When applying judicial estoppel, courts "typically" consider: first, whether "a party's later position" is "clearly inconsistent with its earlier position"; second, "whether the party has succeeded in persuading a court to accept that party's earlier position," such that accepting the later inconsistent position would create "the perception" that one of the courts "was misled"; and third, "whether the party" asserting an inconsistent position would derive an unfair advantage . . . if not estopped." *Id.* at 750–51. If judicial estoppel applies anywhere, it is here.

The Secretary now asks for "clearly inconsistent" relief, *id.* at 750—namely, a late order from this Court reinstating a *different* map for that same election *in the middle of the ongoing primary*. He previously "succeeded in persuading [this] court to accept [his] earlier position . . . ." *Id.* The Court, the special master, and Plaintiffs

expended substantial resources to proceed according to the Secretary's timeline, and the Court ordered the remedial map precisely on the date urged by the Secretary. *See* Inj., Order, and Court-Ordered Remedial Map, ECF No. 322 (Nov. 17, 2025). Accepting Defendant's "inconsistent position . . . would create the perception that . . . [the] court was misled." *New Hampshire*, 532 U.S. at 750 (citation modified). It cannot be true that a new map is not administrable within six months of an election *and* that a new map can be imposed in the middle of voting. The Secretary "would derive an unfair advantage" by being permitted to reverse course based solely on whether delay serves his political goals. *Id.* at 751.

In early 2022, this Court preliminarily enjoined the use of Alabama's 2021 congressional map and began the process of implementing remedial maps. At that time, the Secretary found it beneficial to oppose late-breaking judicial intervention to change Alabama's congressional districts. The Secretary insisted that a court order resulting in changed districts "roughly two months before absentee voting begins . . . will cause irreparable harm to Alabama, its aspiring congressional representatives, and the voters they seek to represent." Doc. 110 at 23. The Secretary warned that "[e]njoining the State from using the 2021 Map throws the current election into chaos and leaves almost no time for maps to be redrawn," and noted specific difficulties—district reassignments, the impossibility of sending out UOCAVA ballots with only three months' notice, candidates signature gathering, and "all sorts

of activities" that must occur before voting began. *See id.* at 18–22. For those reasons, the Secretary argued, the Court should not have entered an order that changed districts "where an election was imminent and the election process had already begun." *Id.* at 22 (internal quotation marks omitted).

The Secretary pressed these claims all the way to the Supreme Court and argued, in an emergency application, that equitable factors should bar any court order that modifies electoral districts within months of an election. *See* Emergency App. for Admin. Stay at 38–40, *Merrill v. Milligan*, No. 21A375 (U.S., Jan. 28, 2022) ("*Milligan* Stay App."); *see* Reply in Supp. of *Milligan* Stay App. at 24–26, *Merrill v. Milligan*, No. 21A375 (U.S. Feb. 2, 2022). "Federal courts ordinarily don't change election rules at the eleventh hour," he argued, and the Court's order imposing "new districts days before the candidate qualifying deadline and less than two months before absentee voting is to begin" would "result in voter confusion and consequent incentive to remain away from the polls." *Milligan* Stay App. at 39; *see* Reply in Supp. of *Milligan* Stay App. at 25–26 (rolling out parade of horribles). Again, the Secretary's arguments are "clearly inconsistent" with his current position that the 2023 Plan should be inserted mid-election. *New Hampshire*, 532 U.S. at 750.

Ultimately, the Secretary "succeeded in persuading [the Supreme Court] to accept [his] earlier position."*Id.* at 750. It intervened to prevent any change in maps for the 2022 elections. *See Merrill v. Milligan*, 142 S. Ct. 879 (2022). And the

Secretary "would derive an unfair advantage" from succeeding under these inconsistent positions. *New Hampshire*, 532 U.S. at 751. Based on Defendants' prior arguments, Plaintiffs were harmed by a stay of a later-affirmed injunction granting them their requested relief. *See Allen v. Milligan*, 599 U.S. 1, 10 (2023). It would be unfair to deal Plaintiffs further harm in this matter based on contradictory arguments.

As the Secretary warned this Court, "'the election machinery wheels [are] in full rotation,' and can't be stopped without grave damage to the public." Doc. 110 at 23 (citation omitted). This provides yet another reason that the equities support granting the preliminary injunction.

**3.** *Alabama's Attempt to Revert to the 2023 Plan Likely Violates State Law.*

The Alabama Legislature's passage of a bill (HB 1) "which authorizes a special primary '[i]n the event' that "a federal court, by issuing a judgment or by vacating an injunction, permits the reinstatement of the last legislatively enacted State Senate Districts." At the heart of that bill is not just the "special primary," but that it "permits the reinstatement of the last legislatively enacted Congressional districts . . . in the 2026 General Election." Allowing the 2023 Plan to go into place would violate the Alabama Constitution.

In 2022, voters approved an amendment to the Alabama Constitution providing that the "implementation date for any bill enacted by the Legislature in a calendar year in which a general election is to be held and relating to the conduct of

the general election shall be at least six months before the general election." Ala. Const. § 111.08. Here, HB 1 authorizes a reversion to the 2023 Plan as of May 8, 2026—the day it was passed, given that HB 1 stated that the "act shall be effective immediately." But the General Election occurs on November 3, 2026, making the implementation date for HB 1 less than "six months before the general election." Ala. Const. § 111.08.

Because HB 1 has an implementation date less than six months before the general election, it violates the Alabama Constitution as it "relat[es] to the conduct of the general election." *Id.* A law "relates to" something if, "'in the normal sense of the phrase, if it has a connection with or reference to'" that thing. *HealthAmerica v. Menton*, 551 So. 2d 235, 238 (Ala. 1989) (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987)). By its text, HB1 "relate[s] to the conduct of the general election" because it explicitly "permits the reinstatement of the last legislatively enacted Congressional districts . . . in the 2026 General Election." Thus, not only does it "have a connection" to the General Election, *see HealthAmerica*, 551 So. 2d at 238—it directly regulates the General Election by dictating a new map be used.

Denying this motion would leave Alabama voters in a constitutional quagmire, and even "heroic efforts . . . would not be enough to avoid chaos and confusion." *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).

**C. Alabama Would Not Be Harmed by Foregoing the 2023 Plan.**

16

Alabama, in contrast, suffers "no harm from the state's nonenforcement" of an intentionally discriminatory map. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012). As explained infra, *Callais* did nothing to disturb this Court's constitutional holding. Nor did it "overrule[] *Allen*." *Louisiana v. Callais*, No. 24-109, 2026 WL 1153054, at *18 (Apr. 29, 2026).  The result: the 2023 Plan was—and remains—unlawful.

*     *     *

Plaintiffs face irreparable harm absent an injunction, and the equitable and public interest considerations strongly favor Plaintiffs as well.

## II.    Even after *Callais,* the Trial and Remedial Records Are Sufficient to Sustain the Court's Ruling that the 2023 Plan Violates the Constitution.

As Plaintiffs explain in their motion for temporary restraining order, Mot. at 10-13, this Court correctly determined that Alabama's 2023 Plan violated the Fourteenth Amendment based on robust evidence that, after the Supreme Court found a Section 2 violation, the Alabama Legislature had the "deliberate decision to double down on the dilution of Black Alabamians' votes." *Singleton II*, 782 F. Supp. 3d at 1340. This intentional discrimination finding was based on a "constellation" of evidence. *Id*. at 1345.

Here, the Legislature's findings, which were "the product of a vote of the entire body," *id*. at 1348, are replete with explicit admissions that the Legislature intended to (and did in fact) subject predominately Black and White communities to

disparate treatment based on the race or ethnicity of their residents, *id*. at 1343-45; *cf. Flowers v. Mississippi*, 588 U.S. 284, 315 (2019) (finding that "dramatically disparate" treatment was evidence of intent). The Legislature's findings are explicitly racial in that they justify "the exaltation of this majority-White community of interest above all other communities of interest (and above all other traditional districting principles)" based on "the singular reference to the heritage of th[is] majority-White community." *Singleton II*, 782 F. Supp. 3d at 1345. The Legislature's "findings exalt and extol one community of interest above others, describing the community of interest in the Gulf Coast for pages," emphasizing "the 'French and Spanish colonial heritage' of one community of interest (the Gulf Coast) while remaining silent on the heritage of all other communities of interest in Alabama (including the Black Belt)[,]" and "describing the longstanding and well-grounded community of interest in the Black Belt in [just] a couple of short paragraphs." *Id*. at 1344.

While the Legislature chose to prioritize and note the Gulf Coast's heritage, it simultaneously "eliminated from the findings any reference to nondilution of minority voting strength," and failed to mention the Black Belt's "heritage of enslavement." *Id*.; *cf. Allen*, 599 U.S. at 21 (noting that many Black Belt residents have a "lineal connection to 'the many enslaved people brought there to work in the antebellum period'") (citation modified). The Legislature's "inconsistent treatment"

18

of these Black and White communities is "significant evidence" of a § 2 violation, *Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994), and its selective reference to ethnicity supports the conclusion that the 2023 Plan was "an intentional official effort to entrench [ ] vote dilution," *Singleton II*, 782 F. Supp. 3d at 1345.

While this Court gave great weight to the "presumption of legislative good faith," it correctly declined to apply that presumption as "free passes for state legislatures to evade court orders or invisibility cloaks that obscure searching judicial review." *Id*. at 1355; *see also Flowers*, 588 U.S. at 313–15 (examining the State's actions to test the veracity of the assertion of good faith); *Foster v. Chatman*, 578 U.S. 488, 513–14 (2016) (rejecting the State's assertion that it had not engaged in discrimination where the evidence "plainly belie[d] the State's claim"). This Court found that the "heavy presumption of good faith in favor of the Legislature[,]" *Singleton II*, 782 F. Supp. 3d at 1337, was overcome by the evidence that Alabama "intentionally t[ook] steps to make [a majority-Black district] mathematically impossible," *id*. at 1355. The 2023 Plan sought to "crack the Black vote in South Alabama [so as to] submerge much of the Black Belt in one majority-White district and submerge the Black Alabamians in Mobile in a different majority-White district[,]" and, in doing so, intentionally discriminated in violation of the Fourteenth Amendment. *Id*. at 1338.

Moreover, the Legislature has repeatedly split Mobile and Baldwin counties in creating maps for the State Board of Education districts, and the Legislature did so at the same time it first drew a congressional plan in 2021. *Id*. at 1274. Indeed, the Legislature split the Mobile and Baldwin counties into separate districts from 1875 until 1972. *Id*. at 1182. And this Court credited unrebutted expert testimony that, in the 1970s, Alabama reunited Baldwin and Mobile counties for the racial purpose of limiting the political influence of Black voters. *Id*. at 1273-74; *see also id*. at 1181-82. This Court correctly gave "very little weight" to Alabama's expert who warned against splitting the Mobile and Baldwin counties based on websites like Wikipedia and Reddit. *Id*. at 1287-88.

The Supreme Court distinguished this case from *Callais* because, in *Allen*, "the State did not defend its map on the ground that it was drawn to achieve a political objective." *Callais*, 2026 WL 1153054, at \*18. The Legislature's findings do not mention partisanship, *Singleton II*, 782 F. Supp. 3d at 1366-76, and no legislators (including Defendants Pringle and Livingston) testified to partisan motives, *id*. at 1354-55.

Indeed, in private text messages between Defendant Senator Livington and a political consultant, the political consultant focused on the racial makeup of the 2023 Plan's District Two (asking the Senator if a BVAP of 41.6% would "work"), not the district's partisan composition. *Id*. at 1153; *see also id*. (Senator Livingston referring

to Montgomery as "monkey town"). For that reason, Senator Livingston and the consultant's overt focus on racial targets undermines Senator Livingston's testimony that the Legislature "'tried to draw [the 2023 Plan] race neutral,'" or that "he was not looking at race as he evaluated potential plans." *Id*. at 1151.

Furthermore, even if Alabama had sought to protect the Gulf Coast and pursue partisan goals (which it did not), it could have enacted either the Community of Interest Plan, which the Alabama House passed in 2023 with the support of Defendant Pringle, *id*. at 1149-50, or the Singleton Plan. Both the Singleton Plan, and the Community of Interest Plan put the Black Belt in two districts while keeping Mobile and Baldwin counties together in one. And the Community of Interest Plan would have maintained the partisan makeup of Alabama congressional delegation. *See* Ex. 14 at 3, Special Master Rep. & Recommendation, Doc. 296-14 (showing that, on average, Republicans would have won the revised District Two by a margin of over six points). These facts informed this Court that "the Legislature did not accidentally stumble into a racially discriminatory districting plan." *Singleton II*, 782 F. Supp. 3d at 1343. Alabama's 2023 Plan arose from intentional racial discrimination, not partisan preference.

Alabama engaged in well-documented defiance of this Court's orders, the Supreme Court's decision, and the Constitution itself. As this Court explained in great detail, the Legislature "intentionally refused to create an additional Black-

21

opportunity district for the purpose of entrenching what it knew from federal court orders was very likely discriminatory vote dilution." *Id*. at 1356. Nothing in the *Callais* decision makes Alabama's "deliberate decision to ignore, evade, and strategically frustrate requirements spelled out in a court order" for the purpose of diluting Black voting power any less a violation of the Fourteenth Amendment today. *Id*. at 1118; *see also* John Roberts, C.J., 2024 Year End Report on the Federal Judiciary at 8 (Dec. 31, 2024) (noting the need to "soundly reject[]" the "dangerous" suggestions of "elected officials from across the political spectrum" who "have raised the specter of open disregard for federal court rulings").

Accordingly, Alabama should not be permitted to defy this Court's orders, enact a plan that expressly prioritizes a White community based on its "heritage" over a Black one, and then still be allowed to upend an ongoing election to use that unconstitutional plan. This Court should keep the status quo of the Remedial Map.

III.  **The Trial and Remedial Records Show that Plaintiffs Remain Highly Likely to Prevail on their Section 2 Claim Under the *Callais* Standard.**

The record in this case also satisfies the Supreme Court's "update[s to] the Gingles framework" from *Callais*. 2026 WL 1153054, at *14.

In terms of illustrative maps under the first *Gingles* precondition, the Court now requires that plaintiffs: (1) draw the maps without consulting racial data during the drawing process; and (2) meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals." *Id*.

22

at 15. In terms of the second and third *Gingles* preconditions, *Callais* requires that plaintiffs: "show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Id.* Finally, under the totality of circumstances inquiry, the focus of the inquiry now concerns evidence about "present-day intentional racial discrimination regarding voting," including "current data" and "'current political conditions' that shed light on current intentional discrimination." *Id.* at \*16.

These new requirements may be difficult to meet in many cases, but "things are different" in Alabama. *Singleton II*, 782 F. Supp. 3d at 1302.

### A. Plaintiffs' Maps Clear the First Gingles Precondition under *Callais*.

*4. Plaintiffs' Illustrative Maps Meet the State's "Legitimate Districting Objectives," Including Any "Stated Political Goals."*

Plaintiffs meet the first *Gingles* precondition under the new *Callais* requirements of meeting "all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals." *Callais*, 2026 WL 1153054, at \*15.

*First*, Plaintiffs' illustrative plans met all the Legislature's goals as stated in its redistricting guidelines adopted at the start of the 2023 special session in which it drew the 2023 Plan. Defendant Pringle, the Reapportionment Committee Co-Chair, testified that the guidelines "cover all the bases"—that is, they comprehensively list the legislature's goals. *Singleton II*, 782 F. Supp. 3d at 1154. The guidelines stated that equal population, contiguity, reasonable compactness, and

compliance with state and federal law were the highest priorities, *see id.* at 1359–65, and listed additional factors to be "observed to the extent that they do not subordinate" the enumerated top priorities or violate federal or state law, *id.* This Court found that Plaintiffs had "offered at least one illustrative plan that contains only equipopulous and contiguous districts that are reasonably geographically compact; respects existing political subdivisions; [and] protects important and overlapping communities of interest." *Id.* at 1280.

Specifically, this Court recognized that even Alabama's own expert, Dr. Trende, "admitted that some Duchin Plans outperform the 2023 Plan" on compactness," *id.* at 1266, that multiple Duchin plans split "6 counties or fewer," meeting or beating the 2023 Plan, *id.* at 1268, that the Duchin Plans "respect communities of interest" applying "the Legislature's definition," *id.* at 1269.

Notably, the guidelines include *not a single* reference to partisanship. Although Defendants have argued that this map was motivated by partisan goals, the record contradicts that claim. Again, Representative Pringle and Senator Livingston testified about the call from then-Speaker McCarthy that they did not act "on those conversations, or even that they seriously considered acting on them." *Id.* at 1354; *see also id.* at 1153. Moreover, to the extent Alabama relies on the last-minute addition of incumbency protection as a "non-negotiable" principle for evidence of partisan intent, this assertion conflicts with Representative Pringle's testimony that

24

he had supported the Community of Interest Plan, even though the "Black-preferred [Democrat] candidate would win two out of four modeled elections." *Id.* at 1154. Livingston similarly supported the Community of Interest Plan at the outset. *Id.* at 1152. And the consultant who drafted the 2023 Plan with Livingston had sent texts suggesting that a district that was "[n]ot ideal for [incumbent Congressman] Moore" remained "workable" for the Legislature because it was "win[n]able" for Moore. *Id.* at 1153. But the same was true for Moore under the Community of Interest Plan.

Moreover, this Court found that Alabama had said that the reference to "'incumbents,' . . . means all incumbents, including Congresswoman Sewell, who is a Democrat," *id.* at 1355, thus undercutting a partisan motive. To the extent Alabama cites stray comments from a member or two of the Legislature about wanting to pursue a partisan goal, those isolated statements would provide "no evidence that the legislature as a whole was imbued with [partisan] motives." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021).

*Second*, to the extent that Alabama relies on the "legislative findings" inserted on the morning that the Legislature passed the 2023 Plan without the prior knowledge of Representative Pringle or Senator Livingston, those standards do not undercut Plaintiffs' illustrative maps. And this Court made findings of fact that the last-minute assertion of these goals—elevating the Gulf Coast community above others and making incumbent protection "non-negotiable"—contradicted the

legislature's "stated political goals" in the redistricting Guidelines and, viewed in light of reams of other unrebutted evidence, were a pretextual means "to discriminate against Black Alabamians." *Singleton II*, 782 F. Supp. 3d at 1348.

As discussed above, these late-breaking "non-negotiable" requirements were not present in the Committee redistricting guidelines and were only inserted into the process as "legislative findings" by Alabama's then-Solicitor General hours before the 2023 Plan's passage. Those "findings were not requested by the Committee chairs, who did not know why they were placed in the bill, had never seen them before (and thus, had never studied them), and had never seen anything like them in any redistricting legislation." *Id.* at 1343. Besides the unusual way they appeared and their lack of precedence in Alabama, the contents of the findings make clear that they were not employed as actual political goals but rather bore the indicia of discrimination.

As to the elevation of three communities of interest above others—the Gulf Coast, the Black Belt, and the Wiregrass—Dr. Duchin provided unrebutted testimony that it was "mathematically impossible" to keep all three of these communities together, and any map-drawer would be forced to choose between splitting the Wiregrass or Black Belt but not the Gulf Coast, despite the supposed prioritization of all three. *Id.* at 1171–72. And this was not a racially neutral choice: Again, the Court's findings highlight the legislature's explicit privileging of the

26

"French and Spanish Colonial heritage" of the Gulf Coast counties, in contrast to its "silence about the heritage of the Black Belt, which is one of enslavement." *Id.* at 1345. Moreover, by prioritizing the Gulf Coast counties over others, this criterion "come[s] close to prescribing" a majority-White congressional district in the Gulf Coast "as a matter of mathematical necessity"—a district that would "submerge[ ]" the City of Mobile." *Id.* at 1272. The Court also found that the Legislature had manipulated the placement of Selma and Dallas County—the birthplace of the Voting Rights Act—to further its goals. *Id*. at 1342. Together, this direct and circumstantial evidence "plainly belie[s]" any argument that the Legislature prioritized the Gulf Coast region "in a 'color-blind' manner." *Foster*, 578 U.S. at 513 (rejecting a state's assertions of good faith); *see also Flowers*, 588 U.S. at 311 (finding disparate treatment based on an objective analysis of the circumstances was evidence of "discriminatory intent" despite a state asserting a non-racial motive).

As to incumbency, this Court recognized—even before *Callais*—that protecting incumbents can be a legitimate districting consideration. *Singleton II*, 782 F. Supp. 3d at 1276; *see also Callais*. 2026 WL 1153054, at *13. But the record here shows that—while a legitimate districting factor in the abstract—the Legislature sought to use incumbent protection to "immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." *Allen*, 599 U.S. at 21–22. The insistence in the "legislative

findings" that no incumbents be paired whatsoever contradicted the Legislature's actual 2023 guidelines used to draw the map, which made incumbent protection a lower-level priority. *Singleton II*, 782 F. Supp. 3d at 159–65. In doing so, the Legislature's findings ensured that the map could not split the Gulf Coast counties, thereby intentionally "submerg[ing] much of the Black Belt in one majority White district and submerg[ing] the Black Alabamians in Mobile in a different majority-White district," *id.* at 1338—preventing any connection between Mobile and the Black Belt despite their many "meaningful connections," *id.* at 1270.

Finally, to the extent that Alabama now argues any illustrative map must meet all of its redistricting goals without compromise, the record shows that this is not possible and did not occur in *any map*—not the 2023 Plan, not the Community of Interest Plan, and not Plaintiffs' plan. This is because every expert, including Alabama's expert, "along with the State's longtime cartographer, testified that redistricting always involves tradeoffs between traditional districting principles." *Id.* at 1267. For that reason, it is enough that Plaintiffs' maps are "comparably consistent" with the enacted plan. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024) (citation modified); *cf. also Flowers*, 588 U.S. at 311–12 (comparators need only be "similar").

Alabama's attempts to re-engineer its districting priorities to match the *Callais* guidelines and to ignore the racial factors baked into Alabama's communities of

priority reveal that they were neither "stated political goals" nor "legitimate" ones.

> 5. *The Record Contains Multiple Complaint Maps that Were Drawn Race-Blind.*

*Callais* also established that, "in *drawing* illustrative maps, plaintiffs cannot use race as a districting criterion." 2026 WL 1153054, at *15. That, of course, does not mean a mapdrawer may *never* look at race, or else no plaintiff could ever meet the standard set in *Bartlett v. Strickland*, that plaintiffs must pass a strict racial threshold as part of their proof under the first *Gingles* precondition: A "party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." 556 U.S. 1, 19–20 (2009) (plurality). *Bartlett* remains the law after *Callais*, which reaffirmed the baseline requirement that plaintiffs must show "a community of minority voters [that is] sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais*, 2026 WL 1153054, at *15. Thus, while *Callais* forbids the "use [of] race as a districting criterion," an illustrative map still must meet *Bartlett*'s majority-minority requirement for remedial districts. *Id.* As the Supreme Court explained in *Milligan*, "[t]he very reason a plaintiff adduces a map at the first step of *Gingles* is precisely because of its racial composition—that is, because it creates an additional majority-minority district that does not then exist." 599 U.S. at 34 n.7.

As this Court found, Dr. Duchin "testified without contradiction," *id.*, "that

29

she 'just did not look at race'" as a criterion during her process for drawing illustrative maps. *Singleton II*, 782 F. Supp. 3d at 1168. Rather, she only viewed racial data after drawing her illustrative map to determine if it "cross[ed] that threshold in order to submit the map to the Court—*i.e.*, comply with *Bartlett*. *Id.*

Illustrating how these imperatives can be reconciled, the Supreme Court endorsed the propriety of checking the racial demographics of a map *after* drawing it just two years ago in *Alexander*, 602 U.S. at 22. There, it criticized the district court for placing "too much weight on the fact that several legislative staffers . . . viewed racial data at some point during the redistricting process," and found no constitutional issue with the map-drawer "consider[ing] the relevant racial data only *after* he had drawn the Enacted Map." *Id.* at 22. The same is true here.

Indeed, the Supreme Court already recognized in *Milligan*—which, again, it did "not overrule[ ]" in *Callais*, 2026 WL 1153054, at *18—that Plaintiffs' expert, Dr. Duchin, had used "randomized algorithms" that "found plans with two majority-black districts in literally thousands of different ways," which meant it was "certainly possible" to draw reasonably configured illustrative maps "in a race-blind manner." *Milligan*, 599 U.S. at 34 n.7; *see also Callais*, 2026 WL 1153054, at *13 (citing *Milligan* approvingly for this proposition).

Moreover, the evidence from the remedial phase of this case offers additional examples of acceptable "race blind" maps. The Special Master presented the Court

with three plans "prepared race-blind," with the map-drawer not "display[ing] racial demographic data while drawing districts or examining others' proposed remedial plans within the mapping software," *Singleton II*, 782 F. Supp. 3d at 1142.

The record shows that Plaintiffs have already satisfied the "race-blind" *Gingles* I requirement many times over.

**D. Under the *Callais* Standard, Plaintiffs' Still Satisfy Gingles II and III.**

*Callais* does not disturb this Court's careful findings that voting patterns in Alabama are "starkly and intensely racially polarized[.]" *Id*. at 189.

In *Callais*, the Court required that plaintiffs "provide an analysis that controls for party affiliation." 2025 WL 1153054, at \*15. Accordingly, the Court faulted the *Robinson* court for relying *exclusively* on an inter-party racial block voting analysis. *Id*. at \*17. Under the updated *Callais* standard, plaintiffs must provide evidence of both intra-party and inter-party racial bloc voting to meet their burden under *Gingles* II and III. Plaintiffs here did. And this Court correctly credited the "overwhelming" evidence of "the importance of race in Alabama politics[.]" *Singleton II*, 782 F. Supp. 3d at 1292.

As *Callais* instructed, this Court found "intra-party racial-bloc voting pattern[s]" indicating that Black Alabamians "have 'less opportunity' than their majority counterparts because of race, not just because of partisan affiliation." *Callais*, 2026 WL 1153054, at \*15 (quoting 52 U.S.C. § 10301(b)). Alabama's

31

expert concurred that "race remains the primary driver of party politics" in the South today. *Singleton II*, 782 F. Supp. 3d at 1292. Another "agreed that [Plaintiffs' expert's] ecological inference analysis established 'that White voters in Alabama support White Democrats more than they support Black Democrats[.]'" *Id*. at 1282.

Further, in several *general* elections, White Democrats supported White Republicans over Black Democrats. *Id*. at 1291-92. In recent primaries for Democrats, *id*. at 1178-79, and Republicans, *id*. at 1291-92; *see also id*. at 1219-20, White voters supported White candidates over Black candidates. For instance, in the 2024 Republican primary for remedial congressional district 2 (in which 95.9% of the voters were White), the four Black candidates combined only received 6.2% of the vote. *Id*. at 1291-92; *see also id*. at 1178. All four of the Black candidates finished behind a young White candidate with far less political experience. *Id*. at 1185-86. The record also includes evidence that voting remains racially polarized in nonpartisan elections. *Id*. at 1178. Accordingly, this Court had ample basis to conclude that, even after controlling for party, race best explains voting in Alabama.

In addition to showing intra-party racially polarized voting, this Court correctly found that, despite White and Black Alabamians sharing similar views on many issues, that agreement was not reflected in their respective voting records. *See, e.g.*, *id*. at 1189. The undisputed evidence is that most Black Alabamians self-identify as Christian, oppose same-sex marriage and abortion, and identify as ideologically

32

conservative (41 percent) or moderate (35 percent) . *Id*.; *see also Milligan* Pls.' Proposed Findings of Fact & Concl. of Law Br. at 224-26 ¶ 580-84, Doc. 485.

This Court therefore correctly concluded that race, rather than policy differences, drives polarization. *Singleton II*, 782 F. Supp. 3d at 1293. The Court found that, if policy issues rather than race drove polarization, Black Alabamians would "cast their votes for Republican candidates – particularly conservative Christian Republican candidates – far more than the evidence tells us that they do." *Id*. Indeed, on policy issues, White candidates—regardless of party—refused to meet with the Alabama NAACP to discuss civil-rights issues. *Id*. at 1203. Unlike Black Democrats, the White Democrats elected to Congress from Alabama failed to support civil rights bills as recently as 2009. *Milligan* Pls.' Proposed Findings of Fact & Concl. of Law Br. at 270 ¶ 708, Doc. 485. And every White Republican in the Alabama congressional delegation voted against the First Step Act—a 2018 law passed by a Republican-controlled congress and signed by President Trump intended to reduce racial disparities in sentencing. *Id.* at 269-70 ¶ 707. Black Republicans had also supported this reform and so were disappointed in White Republican politicians' failure to support it and other issues important to Black people. *Id*. at 251 ¶ 658.

Accordingly, because White politicians across parties have declined to support issues important to Black voters, polarized voting in Alabama cannot be explained by the parties' policies. Thus, Plaintiffs more than met their burden under *Callais*.

33

**B. Based on recent instances of intentional discrimination and current conditions in Alabama, Plaintiffs Provided Objective Evidence that Alabama politics remains infused with Racial Discrimination.**

The same is true regarding this Court's analysis of the totality of circumstances. This Court relied on multiple findings of intentional discrimination "issued in the last ten years by federal judges who remain in service today" and a "pervasive and protracted history of official discrimination" evidenced by cases running "well into the present era." *Singleton II*, 782 F. Supp. 3d at 1296-97.

For example, in 2011, a federal court found that Alabama State legislators had conspired to depress Black voter turnout by keeping a referendum issue popular among Black voters (whom the Senators called "Aborigines") off the ballot. *Id.* (citing *United States v. McGregor*, 824 F. Supp. 2d 1339 (M.D. Ala. 2011)). And, in 2017, Black voters and legislators successfully challenged twelve state legislative districts as unconstitutional racial gerrymanders. *Id.* (citing *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017)). This Court found that several local voting systems created by the Legislature had recently been enjoined to address "their alleged racially discriminatory purpose or effect." *Id.* And there have been other recent local instances of intentional discrimination in voting, which resulted in three jurisdictions being bailed back into preclearance under Section 3. *Id.* at 1298.

This is in sharp contrast to the Supreme Court's criticism in *Callais* that there was an absence of any recent evidence of intentional discrimination in Louisiana.

34

2026 WL 1153054, at *17-18; *cf. Robinson v. Ardoin*, 605 F. Supp. 3d 759, 846-47 (M.D. La. 2022) (identifying a single consent decree from the last ten years as evidence of recent discrimination).

In this case, this Court made findings based on "current data" about "current political conditions." *Callais*, 2026 WL 1153054, at *16 (quoting *Shelby County v. Holder*, 570 U.S. 529, 552-53 (2013). And so, this Court's concern in *Callais* about the use of "decades-old data relevant to decades-old problems" is not present here. *Id.* at *19 (quoting *Shelby County*, 570 U.S. at 553). In Alabama, unlike in Louisiana, this Court noted that, in the last decade, there have been findings of intentional racial discrimination in education in Jefferson County, Madison County, and elsewhere. *Singleton II*, 782 F. Supp. 3d at 1296, 1299 (citing S*tout ex rel. Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1000, 1009 (11th Cir. 2018) (Pryor, C.J.)). And the Court credited testimony that nearly half (38.6%) of voters in the 2020 election were school-age in 1970 when Alabama still maintained separate and unequal schools. *Id.* at 1300. Indeed, multiple courts ordered Alabama to remedy the vestiges of unconstitutional discrimination that remained prevalent across its schools into the 1990s and 2000s. *Id.* at 1296-97.

These findings of ongoing intentional discrimination in voting and education directly resulted in current conditions, including that "in the Black Belt" where the "illiteracy rate[] [is] as high as 30 percent." *Id.* at 1299-1300. This Court also found

that neglect from politicians of both political parties had resulted in Black Belt residents continuing to face "[s]qualid living conditions," a "lack of proper sewage disposal" in the Black Belt resulted in "entire households at a time" suffered from E. Coli and hookworm; that in some counties, children cannot play outside after it rains; and "[b]asic communication infrastructure such as broadband internet access – and even cell service – [being] unavailable in many parts of the rural Black Belt[.]" *Id*. at 1270-71.

Living conditions and health disparities for Black people living in the Black Belt are nothing short of dire. Black communities in the Black Belt live in "primitive conditions," "suffer unusual health difficulties and lack of even the most basic services."  *Id*. at 1299. A United Nations Report deemed the "extreme poverty conditions in the Black Belt" to be "very uncommon in the First World," and that residents "lacked proper sewage and drinking water systems and had unreliable electricity[.]" *Id*.

Thus, this Court relied on current data and current conditions that resulted from recent intentional discrimination to find that these circumstances resulted in a political system not equally open to Black Alabamians in the Black Belt.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion enjoining the use of the unconstitutional 2023 Plan, re-instituting the status quo Court-ordered

36

Plan, and requiring the Secretary to certify and canvass the results from the May 19 primary.

Respectfully submitted this 12th day of May 2026.

/s/ Deuel Ross
Deuel Ross*
Victor Olofin*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Colin Burke*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*

/s/ Davin M. Rosborough
Davin M. Rosborough*
Theresa J. Lee*
Dayton Campbell-Harris*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
tlee@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

/s/ Sidney Jackson
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

Alison Mollman (ASB-8397-A33C)
Paul Rand (ASB-5595-O99N)
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org

37

Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

prand@aclualabama.org

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

*Counsel for Plaintiffs*

Janette Louard*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE (NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
jlouard@naacpnet.org

*Counsel for Plaintiff Alabama State Conference of the NAACP*

*\* Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, a copy of the foregoing has been served

on all counsel of record through the Court's CF/ECF system.


*/s/ Deuel Ross*
*Attorney for Plaintiffs*