FILED

2026 May-19  AM 11:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

EVAN MILLIGAN, et al.,

*Plaintiffs*,

v.

WES ALLEN, et al.,

*Defendants*.

No. 2:21-cv-01530-AMM

**PLAINTIFFS' REPLY IN SUPPORT A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION**

*Callais* does not undermine the Court's finding of intentional racial discrimination, and Plaintiffs Section 2 claim survives as well. Alabama's scattershot arguments to the contrary cannot overcome this reality. Rather than accept the evidence, Alabama composes an orchestra of handwaving and distraction to try to run out the clock. It protests (at 1) having "to litigate this case at breakneck speed," but this scenario is entirely one of its own making. In attempting to walk back its breathless protests about new maps within four months of a primary, only to try to subject its own citizens to much more confusion this month, this is the chaos it has wrought. The Court should decline that invitation and grant Plaintiffs' motion.

1

**I. Alabama Has Failed to Undermine Plaintiffs' Showing that They Are Substantially Likely To Succeed on the Merits of their Intentional Discrimination Claim Post-*Callais*.**

**A. Alabama Misstates the Applicable Legal Standards.**

Alabama's attempt to rewrite the record of its discriminatory actions in 2023 rests upon two false legal premises—the first concerning the proper standard for proving intentional discrimination under the Fourteenth Amendment, and the second on the relationship between racial gerrymandering and intentional discrimination claims.

First, both the Supreme Court and Eleventh Circuit have consistently reaffirmed that courts must analyze claims of intentional racial vote dilution under the Fourteenth Amendment using "the familiar approach outlined in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–268 (1977)." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687–88 (2021); *see League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023) ("In determining whether a 'law has both a discriminatory intent and effect,' we rely on the guidance in *Village of Arlington Heights . . . .*").

"Demonstrating discriminatory intent, [the Supreme Court has] long held, 'does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purpose[],'" *Allen v. Milligan*, 599 U.S. 1, 37 (2023) (quoting *Arlington Heights*, 429 U.S. at 265), or even "that racial discrimination was a

2

'dominant' or 'primary' motive, only that it was a motive." *United States v. Dallas Cnty. Comm'n*, 739 F. 2d 1529, 1541 (11th Cir. 1984) (citing *Arlington Heights*, 429 U.S. at 265–66).

Despite this clarity, Alabama (at 43–45) persists in peddling its misreading of *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335 (11th Cir. 2000). Alabama argues (at 45) that Plaintiffs "must at least first show vote dilution under the *Callais* standard" to prevail under the Fourteenth Amendment. This misreads *Johnson* and Eleventh Circuit caselaw, and, even if this was a reasonable read of what *Johnson* meant twenty-six years ago, it has been abrogated by subsequent Supreme Court precedent.

The *Johnson* Court's discriminatory intent holding rested upon its finding that Plaintiffs failed "to show that the inequality of opportunity results from the county's current electoral system"—i.e., that "Plaintiffs have failed to establish causation." *Johnson*, 204 F.3d at 1345. In dicta, the court questioned, in "the absence of Supreme Court direction," if "vote dilution can be established under the Constitution when the pertinent record has not proved vote dilution under the more permissive section 2." *Id.* at 1344–45. But the court concluded that it "need not resolve this question today." *Id.* at 1345. The Supreme Court has since provided guidance, however, on this very question. In *Brnovich*, 594 U.S. at 687–88, the Court reaffirmed *Arlington Heights* as the proper standard. And even in *dicta*, *Johnson* did not require plaintiffs

to prove a Section 2 results claim and then discriminatory intent to prevail. Rather, it explained that to "show an 'actual discriminatory effect,' Plaintiffs must additionally demonstrate that there was 'some cognizable injury to' minority voters"—not that the injury was itself a Section 2 violation. *Johnson*, 204 F.3d at 1344 n.18;[1] *cf. also Reno v. Bossier Par. Sch. Bd.* ("*Bossier II*"), 528 U.S. 320, 332 (2000) (holding, in a Section 5 case, that a challenger who proves discriminatory intent is "spared the necessity" of proving "effect—which, in vote-dilution cases, is often a complex undertaking").

Alabama (at 45) also contends that plaintiffs proceeding under an intentional racial discrimination theory must prove both intent and effect. But it ignores that *Arlington Heights* accounts for this: The "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Par. Sch. Bd.* ("*Bossier I*"), 520 U.S. 471, 4878–8 (1997). As such, the Eleventh Circuit recently emphasized that it relies on *Arlington Heights* "in determining whether a 'law has both a

---

[1] Other courts have also noted that *Johnson*'s "reasoning strongly suggests that that requirement is strictly statutory, so inapplicable to" constitutional intent claims. *See*, *e.g.*, *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 164 (W.D. Tex. 2022) (three-judge court). And the Court's later holding in *Johnson* conflicts with binding earlier precedent, which recognizes that a "showing of intent is sufficient to constitute a violation of section 2." *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (5th Cir. 1984). As a non-unit decision of the Former Fifth Circuit, *id*. at 1038 n.*, *McMillan* remains binding here. Section 9(1) of Public Law 96-452 (Oct. 14, 1980); *see also Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (explaining that post-1981 decisions from "a non-unit panel of the Former Fifth" are treated "as binding precedent which [the lower courts] have to follow absent Eleventh Circuit en banc consideration").

discriminatory intent and effect.'" *League of Women Voters of Fla.*, 66 F.4th at 922. Thus, in intentional discrimination cases, the Courts have emphasized that "[d]isproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Washington v. Davis*, 426 U.S. 229, 242 (1976); *see Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1222 n.17 (11th Cir. 2005) (en banc) ("*One factor* relevant to the intent inquiry is whether the law being challenged has an impact that bears more heavily on one race than another." (emphasis added)).

On a more fundamental level, the "Supreme Court has explained that official actions motivated by a discriminatory purpose 'ha[ve] no legitimacy at all under our Constitution.'" *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1014 (11th Cir. 2018) (quoting *City of Richmond v. United States*, 422 U.S. 358, 378 (1975)). As Justice Alito recently wrote, "under our decision in *Arlington Heights* . . . all a party must show in order to rely on disparate impact as circumstantial evidence of discriminatory intent is that" the challenged policy "reduced one racial group's" opportunities and "increased [those of] another racial group[]." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 145 S. Ct. 15, 17 (2024) (Alito, J., dissenting from the denial of certiorari); *see also Sargent v. Sch. Dist. of Philadelphia*, 165 F.4th 727, 749 (3d Cir. 2026) ("We will not sanction new exceptions to the Equal Protection Clause's mandate simply because a court

5

determines one racial group is, in its view, sufficiently successful."). Thus, the effect needed to prove a constitutional violation is not necessarily the same effect needed to show a VRA violation. *See Bartlett v. Strickland*, 556 U.S. 1, 20 (2009) (plurality opinion) (citing *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990)).

Alabama's argument (at 45) that to prevail under their Fourteenth Amendment claim, "Plaintiffs must at least first show vote dilution under the *Callais* standard" would render the equal protection clause useless in the vote-dilution context. Requiring a "more onerous impact showing" under *Arlington Heights* like the one necessary under Section 2 *"*would eliminate the distinction between discriminatory results claims under § 2 of the Voting Rights Act and discriminatory intent claims under § 2 and the Constitution." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 231 n.8 (4th Cir. 2016). Constitutional claims are more demanding in the sense that they require proof of discriminatory intent, and not just effects "evidence giving rise to a strong inference of intentional discrimination." *Louisiana v. Callais*, 146 S. Ct. 1131, 1156 (2026). But neither the Supreme Court nor the Eleventh Circuit has required proof of a Section 2 violation within a Fourteenth Amendment case. In fact, the plurality in *Bartlett v. Strickland*[2], explained that its "holding does not apply

---

[2] Nor does *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1366 (N.D. Ga. 2018) support this point. That court analyzed what was necessary "to bring both intent and effects claims under Section 2 of the Voting Rights Act," not under the Fourteenth Amendment. And while the court in *Georgia State Conference of NAACP v. State*, 269 F. Supp. 3d 1266, 1281 (N.D. Ga. 2017), reluctantly embraces this view, that court appears to be the only one to do so. But as explained *supra*, Plaintiffs here readily meet the Gingles preconditions and totality post-*Callais*.

to cases in which there is intentional discrimination against a racial minority," and that "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments," 556 U.S. at 24.

Second, Alabama appears to argue (at 43) that because *Callais* adjudicated a racial gerrymandering claim under the Fourteenth Amendment, it necessarily affected Plaintiffs' Fourteenth Amendment claim under *Arlington Heights*. But as this Court has already recognized, a "different line of authority applies to the "analytically distinct" claims" racial gerrymandering and intentional discrimination." *Singleton v. Allen*, 782 F. Supp. 3d 1092, 1163 (N.D. Ala. 2025) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)); *see also Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38 (2024) (same). Rather than upsetting that distinction, *Callais* confirms it.

The *Callais* majority explained how the Court approached intentional discrimination cases against redistricting plans "by building on the framework from other racial-discrimination cases under the Equal Protection Clause" using *Arlington Heights*. 146 S. Ct. at 1146. But the "Court modified this framework for racial gerrymandering cases." *Id.* at 1147. And *Callais* addressed a claim under that latter type of claim and framework, *see id.*, not the type Plaintiffs brought here and on which the Court granted judgment.

*Callais* changes nothing about this Court's use of the proper *Arlington Heights* framework to analyze Plaintiffs' intentional discrimination claim. Nor does it change the way the Court analyzed the evidence under it.

### B. Alabama Cherry-Picks the Evidence and Ignores the Overwhelming Evidence of the Legislature's Race-Based, Discriminatory Choices.

It is puzzling that Alabama cites (at 1) the "eleven trial days," 2,600-page transcript, "live testimony from twenty-three witnesses," and "571-page opinion replete with factual findings and legal conclusions," as a reason to pump the breaks and start this case anew. Instead, this only highlights this Court's "special vantage point . . . to conduct an intensely local appraisal" based on a record it knows well. *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997) (citation modified). Like Section 2 cases, intentional discrimination cases also turn on "a blend of history and an intensely local appraisal of the design and impact" of the challenged plan. *White v. Regester*, 412 U.S. 755, 769 –70 (1973); *see also Rogers v. Lodge*, 458 U.S. 613, 622 (1982) (same).

Here, Plaintiffs proved and the Court made final findings that "every one of the *Arlington Heights* and Circuit factors suggests that the Plaintiffs have rebutted the presumption of legislative good faith, and that the Legislature acted with discriminatory intent when it passed the 2023 Plan." *Singleton*, 782 F. Supp. at 1350. Yes, the Court must reexamine the evidence in light of *Callais*. But no, *Callais* did not change the standard for analyzing Fourteenth Amendment intentional

discrimination claims. And though Plaintiffs bear the burden of proof and persuasion, their burden here is lighter than the one they already met at trial—to be entitled to a preliminary injunction, Plaintiffs need only show "a substantial likelihood of success on the merits." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F. 3d 1349, 1354 (11th Cir. 2005).

Alabama's attempt to rebut Plaintiffs' showing falls into three primary categories. *First*, Alabama reinvokes the presumption of good faith and types of evidence required, largely attempting to import doctrines and holdings distinct to the racial-gerrymandering context into this "analytically distinct" claim. *Second*, Alabama again attempts to hide the extensive evidence of racial motives and impacts and launder them through political or partisan goals that the Court already rejected. *Third*, it asks the Court to pretend that Alabama was dealing with the *Callais* standard in 2023 when it passed its discriminatory map, rather than manipulating the map and their purported justifications for it to continue to suppress Black voting strength.

### 1. Plaintiffs Overcame the Presumption of Good Faith and Provided Sufficient Direct and Circumstantial Evidence of Discriminatory Purpose and Effects to Prevail.

Alabama contends (at 49–51) that Plaintiffs cannot overcome the presumption of good faith entitled to the Legislature based on evidence from 2023, and that even if it could, it requests (at 66–67) that the Court "consider the 2026 legislation as a

ratification or reenactment of the 2023 Plan by a new Legislature under new circumstances after a new deliberative process that clearly involved partisan and political motives." This reasoning fails in several ways.

As to the 2023 evidence, Alabama's primary contention (at 51) is that Plaintiffs "lack direct evidence of racial discrimination," such as "an 'express acknowledgement'" or "'confession,'" (quoting *Alexander*, 602 U.S. at 8), or evidence "proving that the Legislature adopted the 2023 Plan 'for a racist reason . . . .'" (quoting *Tenn. NAACP v. Lee*, 746 F. Supp. 3d 473, 503 (M.D. Tenn. 2024)). These contentions rest on legal errors and factual omissions.

Nothing in *Callais* has changed the black-letter principle that "discriminatory intent need not be proved by direct evidence," but rather "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Rogers*, 458 U.S. at 618. Alabama once again attempts to inject an "evidentiary standard that even our purposeful discrimination cases eschew." *Milligan*, 599 U.S. at 38. Alabama cites *Alexander* and other racial gerrymandering cases for this proposition, but the evidence relevant to those cases are distinct—focused on whether, for whatever reason, "race drove the mapping of district lines." 602 U.S. at 11. And, in any event, even *Alexander* recognizes that such a "showing can be made through some combination of direct and circumstantial evidence." *Id.* at 8.

Similarly, nothing in *Callais* changes the principle that Plaintiffs need not

provide direct evidence of "racism." Much more often, "the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor." *In re Employment Discrimination Litigation Against State of Ala.*, 198 F.3d 1305, 1321 (11th Cir. 1999). "[R]acial animus and intent to discriminate are not synonymous" and thus "proof of ill will, enmity, or hostility are not prerequisites of intentional discrimination." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472–73 n.7 (11th Cir.1999); *see also Flowers v. Mississippi*, 588 U.S. 284, 299 (2019) (holding that *Batson* violations depend on the intent to exclude Black jurors without referencing "racist" motives); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring in part) ("[I]ntentional [racial] discrimination without an invidious motive" can single out voters for racially disparate treatment).

On the facts, nothing in *Callais* undercuts this Court's finding that Plaintiffs *did* provide direct evidence of discriminatory intent: it "regard[ed] both the 2023 legislative findings and the contemporaneous public comments by legislators as including direct evidence." *Singleton*, 782 F. Supp. 3d at 1347. Not only are "the legislative findings are the product of a vote of the entire body," but "they establish both that and how the Legislature intended the 2023 Plan to discriminate against Black Alabamians." *Id.* at 1348; *see also Wallace v. Jaffree*, 472 U.S. 38, 56–57 (1985) (citing a statement inserted into a bill as direct evidence of legislative intent).

Alabama's attempt (at 50–51) to analogize this case to *Abbott v. Perez*, 585 U.S. 579 (2018), succeeds for neither 2023 nor 2026. As to the former, this Court did not make the mistake of the *Perez* district court, in which the latter "imposed on the State the obligation of proving that the 2013 Legislature had "ensure[d] that the 2013 plans cured any taint from the [discriminatory] 2011 plans." 585 U.S. at 605. Here, there was no finding of discriminatory intent against the 2021 legislature let alone one that was carried forward to 2023. Rather, *all* the evidence of discriminatory intent comes from the 2023 legislative session and the weeks leading up to it itself. *See Singleton*, 782 F. Supp. 3d at 1339–57.

Alabama's contention (at 66–67) that this Court should be evaluating the actions of the 2026 legislature is even weaker. First, and more significantly, Alabama's 2026 Legislature did not either re-enact the 2023 Plan or otherwise modify it. The only action the 2026 Legislature took with regard to the 2023 Plan was one of timing. It could not pass a new map or reimpose the 2023 Plan without vacatur of the injunction—it only ensured that if such vacatur occurred by a certain time, it would attempt to nullify the current primary election and allow the 2023 Plan to go back into place this year rather than for 2028.[3] In contrast, in *Abbott*, the Texas

---

[3] *See* Anna Barrett & Andrea Tinker, *Alabama Lawmakers Advance Primary Bills as Protests Erupt in Committees*, Ala. Reflector (May 7, 2026), https://alabamareflector.com/2026/05/07/alabama-lawmakers-advance-primary-bills-as-protests-erupt-in-committees/ (quoting the sponsor of the legislation, Alabama State Senator Greg Albritton, that the bill "does nothing more than set up a conditional procedure, a means whereby the state of Alabama can comply with court orders and

legislature's 2013 plan sought to address several VRA rulings by enacting the court's own remedial map, which substantial revised Texas' 2011 plan. 585 U.S. at 604–05 ("The 2013 Texas Legislature *did not* reenact the plan previously passed by its 2011 predecessor.") (emphasis added). Here, Alabama has made no changes at all to the 2023 plan. *See id*. at 604 (distinguishing *Abbott* from *Hunter v. Underwood*, 471 U.S. 222 (1985) where, as here, subsequent Alabama legislatures had failed to modify an intentionally discriminatory law). Second, unlike in *Abbott*, where there was an intervening election, *see* 585 U.S. at 604, Alabama's 2026 Legislature *is* its 2023 Legislature, save a few individuals who have left office and been replaced.

This Court's findings rebutting the "strong presumption of legislative good faith" were neither rooted to anything changed by *Callais* nor were they a close call. *Singleton*, 782 F. Supp. 3d at 1117. Rather, the Court found that "it would be unthinkable for us to hold that a state legislature that purposefully took calculated steps to make a court-required remedy impossible to provide, for the purpose of entrenching minority vote dilution, acted in good faith." *Id.*

    2. *Racial, Not Partisan, Politics Drove the Legislature's Actions, Which* Callais *Does Not Wash Clean.*

Alabama claims (at 44) that "[g]iven *Callais*'s reaffirmance that States are free to weigh partisan and political goals as they see fit, Plaintiffs here can neither

---

with law"—"[n]othing will occur with this bill when it passes, until or unless there's continued action in the courts.").

overcome the presumption of legislative good faith nor demonstrate intentional vote dilution." Most of this argument relies on the assertion (at 52) that the "Legislature's desire to keep the Gulf Coast community of interest together in a single district in the same way it has done for the past 50 years is a quintessential political goal," and the demand (at 52) "that this Court must 'accept the Legislature's effective designation of [the Gulf Coast] as unsplittable' and 'its designation of it as superlative' to other factors." But the actual record teems with racial motives and choices that a political fig leaf cannot cover.

First, the *legislative process* leading to the enactment of the 2023 Plan was largely focused on how to manipulate Black Voting-Age Population to achieve a result that would appear to provide opportunity for Black voters but would in fact shut them out of it. This kicked off with text messages between Senator Livingston and outside consultant Chris Brown, in which Brown described for the Livingston the maps he was working on for him, and focused on the Black Voting-Age Population (BVAP) of the CD 2, asking Livingston if "41.6 BVAP" would work, and noting that the "map is workable. Not ideal for [Barry] Moore. But win[n]able." *Singleton*, 782 F. Supp. 3d at 1153. Ultimately, it was a map drawn by Brown and sponsored by Livingston, the "Opportunity Plan," which had lowered the BVAP to 38.3% in CD 2 and formed the basis for the 2023 Plan. *Id.* at 1149. That map changed little from the time of introduction to passage in the Senate as the "Livingston 2

14

Plan," *id.* at 1328, including as to the BVAP of CD 2.

But this plan drawn by Brown and sponsored by Livingston was quite different from the plan that Representative Pringle had believed was the consensus plan of the Co-Chairs. *Id.* at 1326. That plan, the "Community of Interest (COI) plan," had CD 2 "with a BVAP of 42.25%," under which 'Committee's performance analysis showed that Black-preferred candidates would have won two of the four' modeled elections." *Id.* at 1149. Senator Livingston testified that members shifted their interest away from the COI Plan based on "additional information" that created "a 'large hiccup,' but he did not know what it was, he did not know where it had come from, and he did not know who received it." *Id.* at 1341. This Court found that given what came out about Sen. Livingston's messages with Chris Brown, and given that "Senator Livingston was a major stakeholder in congressional redistricting in Alabama, and was apparently so influential that he ultimately navigated the Legislature to the bill it eventually passed," that "[i]t strains credulity to say that the Committee co-chair was in the dark about all of this and cannot recall anything about it." *Id.*

Unlike the COI Plan, both the Opportunity Plan and the 2023 Plan had "Alabama's most well-known and nationally prominent" majority-Black community of Selma and surrounding Dallas County "placed entirely in District 7." *Id.* at 1342. The Court found that "least some legislators actually knew from Dr. Hood's earlier

15

performance analysis of the Community of Interest Plan that without Dallas County in District 2, Black-preferred candidates would have no chance of winning in that District." *Id.* at 1347.

Ultimately, the 2023 Plan was focused on BVAP: Representative Pringle testified that the Plan developed "during the reconciliation process between the House and Senate split the difference between the District 2 BVAP in the Community of Interest Plan (42.4%) and Livingston 2 Plan (38.3%), to reach a BVAP of 39.9%." *Id.* at 1155.

Therefore, even if there was a partisan goal here—despite that being something "that the evidence does not bear out here," *id.* at 1355—the Legislature used race "as a proxy for political characteristics, a racial stereotype" that implicates the Fourteenth Amendment. *Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality op.). This is because the use of race as a means of "sorting of voters" in districting "remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper v. Harris*, 581 U.S. 285, 308 n.7 (2017). This is why *Callais* provides deference to a State's "legitimate districting objectives" and "specified political goals" only includes goals, or means to achieve them, "not prohibited by the Constitution." 146 S. Ct. at 1159.

Second, Alabama defends (at 52) the 2023 Plan based by arguing that "Legislature's desire to keep the Gulf Coast community of interest together in a

16

single district in the same way it has done for the past 50 years is a quintessential political goal."[4] But it fails to contend with the racialized nature of that decision, ignoring the import of the "legislative findings" or attempting to claim (at 55) that these are "non-racial communities of interest," despite the reality in Alabama laid out in the record. But nothing in *Callais* undermines several key findings from direct evidence that the decision to exalt the Gulf Coast above all other and the way it was done, was indeed racial.

First, Alabama contends (at 55) that, after *Callais*, the Constitution forbids a "a demand for intentional race-based redistricting based on something other than a §2 violation," but ignores that this is precisely what it engineered through its "legislative findings": Alabama's "requirement to keep Mobile and Baldwin Counties whole and together 'comes close to prescribing' a majority-White district on the Gulf Coast . . . as a matter of mathematical necessity," and one that would "submerge[ ]" the majority-Black City of Mobile within it." *Singleton*, 782 F. Supp. 3d at 1172.

---

[4] Alabama argues (at 53) that "[i]n addition to the political goal identified above, maintaining a unified Gulf Coast in 2023 *would have* served multiple *other* traditional districting principles such as (1) preserving the core of a district in use for half a century, (2) protecting incumbents, and (3) maintaining the integrity of political subdivisions like the City of Mobile and Mobile County." (first emphasis added, second in original). But the Supreme Court has explained that the "inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189–90 (2017).

17

Second, if there were any doubt about whether this was an intentional racial choice, the legislative findings leave none. Those "findings describe the 'French and Spanish colonial heritage' of one community of interest (the Gulf Coast) while remaining silent on the heritage of all other communities of interest in Alabama (including the Black Belt)." *Id.* at 1344. References to heritage or "[a]ncestry can be a proxy for race. It is that proxy here." *Rice v. Cayetano*, 528 U.S. 495, 514 (2000).

This is both "unusual" and "especially pointed in a voting rights case where one of the allegations is that the majority-White community of interest in the Gulf Coast is being used to entrench race-based discrimination against the majority-Black community of interest in the Black Belt, which shares a heritage of enslavement." *Singleton*, 782 F. Supp. 3d at 1344. Alabama contends (at 54) it paid more notice to the Gulf Coast in the findings because of "the short shrift that it had just been given as a community of interest from the federal courts." That could explain the length of the findings, but not their exaltation of European heritage in one region, and the failure to even mention the continuing impact of enslavement and Jim Crow in the Black Belt.[5]

Third, the Legislature's consideration and rejection of the COI Plan directly

---

[5] Alabama also insists (at 54 n.14) that its description of the Gulf Coast's "French and Spanish colonial heritage" is a "routine" reference to "colonial-era traditions" that courts consistently make. But the examples they provide are all references not to "colonial cultures," which were inherently racialized, but to "colonial" sources of common law and civil law, referencing their roots in European law.

18

undermine Alabama's argument. That Plan kept both Gulf Coast Counties whole and together and did not pair any incumbents. The key differences were that, under the COI Plan, Dallas County's placement ensured that Black-preferred candidates would have occasionally won in CD 2, whereas, in the 2023 Plan, they would have lost every time. Because "when the Legislators were asked why the Senators moved away from the Community of Interest Plan, both professed not to know, and neither testified that they did it (or even might have done it) to benefit Republicans." *Id.* at 1354–55. In the absence of a partisan defense, the motive had to have been racial.

Moreover, Alabama's desire to preserve "the core of a district for half of a century" (at 53) with a unified Mobile and Baldwin Counties also provides additional racial motive, this Court found that the two counties were originally united "to prevent the reelection of a Black incumbent and, 100 years later, reunited in for similar racial reasons." *Id*. at 1273–74.

### 3. Callais *Does Not Retroactively Retract the Legislature's Discriminatory Motives or Impose New Evidentiary Requirements for Intent Claims.*

Alabama also insists that *Callais* now gives greater credence to their prior arguments that "its desire to avoid a racial gerrymandering claim explains the 2023 Plan." *Id.* at 1353. It thus asks this Court to revise the actual motive analysis in light of a purported legal guess that it believes the Supreme Court later confirmed. This is not how intent analysis works, though, and in any case, they are wrong that *Callais* confirms that the race-blind *Milligan* remedial map is unconstitutional.

19

First, the Court already found that there was "no evidence that the Legislature was specifically concerned about potential gerrymandering liability when it enacted the 2023 Plan" and that the "only evidence in the record suggests they were not." *Id.* at 1353.

Second, any such view would have been illogical at the time. The Supreme Court had just affirmed the propriety of a similar district, so "there at that moment in time . . . there was no basis for those legislators to believe that they could ignore our affirmed ruling just to receive a second bite at the apple only a few weeks later." *Id.* at 1352.

Third, Alabama's argument (at 57) that the Court should look "at what happened in Louisiana," where the "fact that it had adopted a remedial plan pursuant to a district court's order that it remedy a §2 violation did not insulate it from liability for unconstitutional racial sorting in *Callais*," misses the extreme differences between the maps. Unlike the Alabama map, where the Supreme Court had just held the "District Court correctly found that black voters could constitute a majority in a second district that was 'reasonably configured," *Milligan*, 599 U.S. at 19, the *Callais* court found that the "unusual shape of the district" in Louisiana "reflects an effort to incorporate as much of the dispersed Black population as was necessary to create a majority-Black district." *Callais v. Landry*, 732 F. Supp. 3d 574, 604 (W.D. La. 2024), *aff'd sub nom. Louisiana v. Callais*, 146 S. Ct. 1131 (2026).

20

Fourth, Alabama also contends (at 69) that Plaintiffs must produce "an alternative map that achieves all the State's objectives—including partisan advantage and any of the State's other political goals," and do so "regardless whether the case is brought pursuant to the Fourteenth Amendment or the VRA." But the Supreme Court has only imposed this requirement in the racial gerrymandering and Section 2 contexts at issue in *Callais*. It would make no sense to require a complete disentanglement of race and party, when under *Arlington Heights* and its progeny, a plaintiff need not "prove that the challenged action rested solely on racially discriminatory purpose[]." *Milligan*, 599 U.S. at 37. Even if politics played some role (which Defendants themselves denied under oath), the existing proof that race was a motivating factor proves that the action had "no legitimacy at all under our Constitution." *Stout by Stout*, 882 F.3d at 1014; *accord Milligan* 599 U.S. at 37.

*Callais* does not change the standard or the record in this case. Plaintiffs are extremely likely to succeed on the merits of their intentional discrimination claim.

## II. Regardless of the *Callais* Updates to the Gingles Standard, the Trial Record Still Shows that Plaintiffs are Substantially Likely to Succeed Under Section 2.

### A. Alabama Fails to Rebut Plaintiffs' Evidence that Dr. Duchin Did Not use Race While Drawing Her *Gingles* 1 Maps and that at Least Some Plans Met All of the State's Legitimate, Stated Goals.

First, Alabama broadly insists (at 28) that Dr. Duchin "acknowledged that race was considered in their map-drawing process." But Dr. Duchin testified, and the

21

Court found, that she "did not look at race" when drawing her illustrative maps. *Singleton*, 782 F. Supp. 3d at 1167, 1260. As explained in Plaintiffs' opening brief, Dr. Duchin's references to looking at race concerned viewing racial data after drawing her illustrative map to determine if it "cross[ed] that threshold in order to submit the map to the Court" in compliance with *Bartlett*. *Id.* at 1168. *Callais* did not prohibit viewing racial statistics after drawing to comply with *Bartlett*, but rather that "in *drawing* illustrative maps, plaintiffs cannot use race as a districting criterion." *Callais*, 146 S. Ct. at 1159. This principle avoids a conflict with the Supreme Court's recent decision in *Alexander*, which *Callais* relied upon, where the Court found no constitutional issue with the map-drawer "consider[ing] the relevant racial data only *after* he had drawn the Enacted Map." *Alexander*, 602 U.S. at 22. Indeed, "there is nothing nefarious about [an expert cartographer's] awareness of the State's racial demographics" and thus it is "entirely unsurprising" if a cartographer has a "wealth of knowledge about who lives in which part of the State." *Id.* at 37.

Second, Alabama's argument (at 29–33) that Dr. Duchin's maps failed to satisfy the State's criteria, in violation of *Callais*, once again misses a key point and evidence. *Callais* requires that a plaintiff meet "the State's *legitimate* districting objectives, including traditional districting criteria and the State's *specified* political goals." 146 S. Ct. at 1159 (emphasis added). But as Representative Pringle testified, the State's specified guidelines were the Redistricting Guidelines that have "stayed

22

almost exactly the same since the '90s," because, while he "hates to say it," "obviously the democrats did a good job when they drew them," and "they cover all the bases." *Singleton*, 782 F. Supp. 3d at 1154; Pringle 2023 Dep. at 48–49. As Plaintiffs explained in their opening brief, Dr. Duchin's maps met or beat all of the Legislature's priority guidelines including compactness and respect for political subdivisions.

The Legislature used these guidelines to draw the 2023 Plan and the COI Plan. *Singleton*, 782 F. Supp. 3d at 1151, 1203. While the legislative findings provide significant evidence of the intent of the 2023 plan, *id*. at 1347, as Alabama's counsel candidly admitted, the legislative findings "essentially . . . describ[e] the [2023] map," CX46, Aug. 2023 Tr. 162:12-16.

Alabama contends (at 34) that her failure to keep Mobile and Baldwin in one district and protect incumbents means she did not meet the State's goals. But as Plaintiffs explained above and in their opening brief, those goals were meant to dilute Black voting power and thus are not "legitimate" districting principles as the Legislature applied them.

## B. Plaintiffs offered sufficient evidence to disentangle race and party.

Alabama argues (at 35), that "*Callais* held that a §2 plaintiff 'must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation'" (quoting *Callais*, 146 S. Ct. at 1159), and that Plaintiffs did not do so. The record

23

shows otherwise in several ways, none of which Alabama addresses.

First, this Court found several general elections where White Democrats supported White Republicans over Black Democrats, *Singleton*, 782 F. Supp. 3d at 1291–92, which is as compelling evidence as exists for racial bloc voting unexplainable by party, *see Callais*, 146 S. Ct. at 1159 (citing *Gingles*, 478 U.S. at 59). Second, two nonpartisan Montgomery mayoral runoff elections in 2019 and 2023 are further evidence demonstrating that "race, rather than party, drove the election outcomes." *Id.* at 1178. Third, the Court found strong evidence of polarization from white-dominated Republican primaries, including in remedial CD 2 itself, where the four Black candidates "together received only 6.2% of the total vote," compared to the white candidates receiving the other 93.8% of votes. *Id.* at 1292. Fourth, Alabama's own expert, Dr Hood, agrees that "[r]ace, especially the Black-White dichotomy, is the largest dividing line between the Republican and Democratic parties in the region," *id.* at 1179, and that his own research found that politics in Alabama "in the early 21st Century still revolves around the issue of race," *id.* at 1245. Similarly, another of Alabama's experts, Dr. Bonneau, "conceded that Dr. Palmer's ecological inference analysis showed that 'White voters in Alabama support White Democrats more than they support Black Democrats,'" which could be "an indication that race is the driving force behind vote choice," *id.* at 1249.

This is the same kind of evidence that the Court cited in *Callais* as sufficient

to demonstrate "intra-party" bloc voting. 146 S. Ct. at 1159. The Court in *Callais* approved of this type of evidence from *Gingles* that Black and White bloc voting in biracial general and primary elections. *Id.* at 1159 (citing *Gingles*, 478 U.S. at 59).

The Court has today, just as it did last year, "an overwhelming evidentiary record about the importance of race in Alabama politics, both historically and today," such that it "denies reality . . . to say that at the end of the day, all of that is just party politics." *Id.* at 1292. The record shows that, in Alabama, "racial bloc voting that cannot be explained by partisan affiliation." *Callais*, 146 S. Ct. at 1159.

## C. Plaintiffs showed extensive present-day intentional racial discrimination in voting.

Finally, Alabama claims that this Court paid too much attention to historical evidence in its finding of racial vote dilution under the totality of circumstances. But again, it ignores the extensive evidence of recent intentional discrimination in voting in Alabama that was not at all present in the *Callais* record. Just some of that evidence includes:

- Federal courts ruling against Alabama's at-large voting systems created by the Legislature with discriminatory purpose or effect. *See e.g., Jones v. Jefferson Cnty. Bd. of Educ.*, No. 19-CV-01821, 2019 WL 7500528, at *2, *4 (N.D. Ala. Dec. 16, 2019); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019).

- "Since the decision in *Shelby County v. Holder*, federal courts have ordered more than one political subdivision in Alabama to be bailed back into preclearance review under Section 3(c) of the Voting Rights Act." *Singleton*, 782 F. Supp. 3d at 1296.

25

- "After the 2010 census, Black voters and legislators successfully challenged twelve state legislative districts as unconstitutional racial gerrymanders." *Id.* at 1297.

- A federal court just in 2011 finding that several White "Alabama State Senators conspired to depress Black voter turnout by keeping a referendum issue popular among Black voters (whom the Senators called "Aborigines") off the ballot." *Id.*

All this evidence shows "a pervasive and protracted history of official discrimination in voting rights in Alabama" that has "run well into the present era." *Id.*

## III.    The Equities Require this Court to maintain the status quo and reject Alabama's Brazen Attempt to Sow Uncertainty during the Ongoing 2026 Elections.

The Supreme Court's remand to this Court revisit its injunction in light of *Callais* does not change the fact that the Remedial Map is the status quo for voters, candidates, and election administrators in Alabama. Here, denying Plaintiffs' request for emergency relief would cause disruption and "upset[ ] the legitimate expectations" that "candidates, election officials, and voters have relied on" in the ongoing primary election and the three years leading up to it. *Malliotakis v. Williams*, 146 S.Ct. 809, 810 (2026) (Alito, J., concurring).

### A. The Balance of Equities and *Purcell* caselaw weigh in favor of Plaintiffs' request to maintain the Status Quo of the Remedial Map.

Since September 2023, when the Supreme Court declined to stay this Court's injunction, *Allen v. Milligan*, 144 S. Ct. 476 (2023), the Remedial Map has been the

*status quo* in Alabama. The Secretary administered the last congressional elections in 2024 under it. The ballots used for the 2026 congressional primary elections culminating today employ the Remedial Map. For the entire primary season, voters, election officials, and candidates have been anticipated using the Remedial Map. And even in its attempt to change that narrative, the Secretary's office admits that voter re-assignment to its 2023 Plan cannot even *begin* until May 27. Doc. 530-1 (Elrod Decl.) ¶ 56.

The concerns animating *Purcell* require lower courts to consider the equities of making changes to election administration which can "lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill v. Milligan*, 142 S.Ct. 879, 881 (2022) (Kavanaugh, J., concurring). This includes when the issue is whether to discard a remedial map in the middle of an election.

First, Alabama fails to distinguish *Frank v. Walker*, 574 U.S. 929 (2014) and *Moore v. Harper*, 142 S. Ct. 1089 (2022). Indeed, *Frank* involved nearly this exact scenario. There, as here, the district court had enjoined a state election law well before the next election. There, as here, in the months leading up to Election Day, voters, election officials, candidates, and the ballots themselves operated under the injunction. Although the State succeeded in receiving a stay from the appellate court, the Supreme Court sided with the plaintiffs in granting judicial relief which restored

the prior status quo of the district court injunction. The Court granted the requested relief despite the injunction running contrary to state law. Despite Alabama's suggestion (at 79 n.19), in *Frank*, the Supreme Court applied *Purcell* exactly as Plaintiffs ask this Court to—provide judicial relief to maintain the status quo and avoid continued chaos and confusion for voters and election officials.

Second, nothing in *League of Women Voters of Florida v. Florida Secretary of State* ("*LWV I*") even suggests otherwise. 32 F.4th 1363, 1372 (11th Cir. 2022). There, the State sought *judicial relief* in the form of a stay to maintain the status quo and putting on hold a "late-breaking injunction" against a state law. *Id*. In that case, the Court granted judicial relief to the State without requiring the State to show its position was "clearcut" on the merits. *Id*. But it did not tell the courts to disregard any consideration of the equities or the status quo in evaluating a request for relief. Rather here, as in *LWV I*, a party seeks judicial relief—this time in the form of a preliminary injunction—to protect the status quo of the Remedial Map and put on hold late breaking attempts to enforce an unconstitutional 2023 plan. Regardless of whether *Purcell* is also animated by federalism concerns, Doc. 534 at 81, the concerns about confusion and chaos for voters, candidates, political parties, and election administrators must necessarily be weighed by courts considering the equities of altering the settled expectations of these groups on the eve of an election.

28

In any event, the Supreme Court's more recent decision in *Rose v. Raffensperger* calls into question the Eleventh Circuit's suggestion that the ordinary stay factors are inapplicable in this case. 143 S. Ct. 58 (2022). In *Rose*, the plaintiffs won a Section 2 case against Georgia's public service board and the district court imposed a remedial plan over the State's objection in August of an election year. The Eleventh Circuit granted a stay of that remedial plan. Like Alabama here, the Eleventh Circuit cited *Purcell* and *LWV I* for the proposition that, to receive relief before an election, the plaintiffs had to show that the merits were "clear cut" in their favor. *Rose v. Sec'y, State of Ga.*, No. 22-12593, 2022 WL 3572823, at *2 (11th Cir. Aug. 12, 2022). The Supreme Court reversed, vacating the stay. 143 S. Ct. at 59. The Court explained that where, as here, the State "could not fairly have advanced" a *Purcell* argument "in light of [its] previous representations to the district court that the schedule on which the district court proceeded was sufficient to enable effectual relief as to the November elections." *Id*. Thus, the Court ordered the circuit court to instead apply the "traditional stay factors and a likelihood of success on the merits." *Id*. at 58-59.

Plaintiffs' request is consistent with this *Purcell* caselaw. Here, like in *Rose*, Alabama's claim that *Purcell* applies is inconsistent with its prior representations. *See* PI Br., Doc. 531 at 11-15. Mr. Elrod's declaration makes clear that the Remedial Map *remains* the status quo *today* because *no reassignment* of voters to the 2023

29

plan can or will occur until May 27th. Elrod Decl. ¶¶ 6, 56. Indeed, for the primary occurring today, voters *will* continue to cast ballots under the Remedial Plan (which the Secretary will report and tally but, absent an injunction, will not count). *Id*. ¶¶ 5, 13. And, throughout his declaration, Mr. Elrod makes clear the confusion and chaos already caused by Alabama's effort to upset the public's expectations due to Alabama's attempt to turn to the unconstitutional 2023 plan. *Id*. ¶¶ 1, 54, 62. He candidly admits, for example, that abandoning the Remedial Map's status quo will require election officials "to work tirelessly" on "aggressive" timeline to ensure "with limited problems or errors" from a switch to the 2023 Plan before the August primary. *Id*. ¶ 7. Mr. Elrod also acknowledges that "[l]ocal election officials do not work at the Secretary's direction, *id.* ¶ 38, further weakening his assertion concerning what is possible in implementing the 2023 Plan. Thus, Alabama's efforts to quickly adopt the 2023 Plan will require the exact "heroic efforts" that Alabama once complained would still not solve voter confusion problems in 2022. *Cf.* PI Br., Doc. 531 at 2-3. In contrast, staying the course and keeping the Remedial Map does not require any new effort from state and local election officials or voters other than public communications about what map to use.

Finally, Alabama reads too much (at 80) into the Supreme Court's vacating the injunction and remanding the case to this Court for further consideration in light of *Louisiana v. Callais*. Alabama assumes (at 80) without explanation that the Court

"had to consider the equities to issue equitable relief to the State." But the Court's vacatur and remand did not require it to reach a decision on the equities or which plan would go forward for 2026. Unlike a stay or another equitable remedy at the Supreme Court's disposal, 28 U.S.C. § 2106 confers the broad ability to grant, vacate, and remand ("GVR") even where eventual reversal is not probable. Among the "virtues" of GVR is that it "assists the court below by flagging a particular issue that it does not appear to have fully considered, [and] assists [the Supreme] Court by procuring the *benefit* of the lower court's insight *before* [the Supreme Court] rule[s] on the merits." *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (emphasis added). If the justices had wanted to discuss the equities in its GVR order, they would have done so. *See, e.g.*, *Moore*, 142 S. Ct. at 1089 (Kavanaugh, J., concurring) (weighing the equities in denying a stay). This is especially true where, as here, the dissent expressly raised the propriety of this Court providing interim relief for the 2026 elections. *See Allen v. Caster*, No. 25-243, 2026 WL 1282800, at *3 (U.S. May 11, 2026) (Sotomayor, J., dissenting).

Contrary to Alabama's assertions, it is one thing to say that a point requires further thought, with the benefit of a germane Supreme Court opinion, and quite another to suggest a presumption that a different result should obtain given that opinion. Since "GVR orders are premised on matters that [the Court] ha[s] reason to believe the court below did not fully consider," the standard for issuing GVR orders

31

is "somewhat more liberal" than the usual standard "under which relief is granted only upon a showing that a grant of certiorari and eventual reversal are probable." *Lawrence*, 516 U.S. at 167. Here, if Plaintiffs had little chance of success in the eyes of the Supreme Court, then the Court would have had no need to remand and solicit the insight of this Court on the impact of *Callais*. In *Lawrence*, the Court clarified that GVR is an efficient way for the Court to obtain the views of the lower courts on the effect of a new decision, whatever those views might be. *Id.*; *see also Caster*, 2026 WL 1282800, at *3 (Sotomayor, J., dissenting) ("[T]he District Court remains free on remand to decide for itself whether *Callais* has any bearing on its Fourteenth Amendment analysis or if its prior reasoning is unaffected by that decision.").

Indeed, the Court granted, vacated and remanded every other case arising under Section 2 of the Voting Rights Act for further consideration in light of *Callais* in short order, even where the relevant States did not indicate an intent to redistrict and where the issues presented only involved the existence of a private right of action. *See Bd. of Election Comm'rs v. NAACP,* No. 25-234, 608 U.S. ___ (2026); *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 25-253, 608 U.S. ___ (2026).

Accordingly, the equities continue to weigh heavily in favor of Plaintiffs and the maintenance of the status quo in 2026 pending further proceedings in this case.

**B. Defendants Cannot Meaningfully Contest Judicial Estoppel.**

32

Alabama tries to distance itself from its past successful representations to the Supreme Court about the difficulty of making last minute changes to redistricting plans. Alabama now claims (at 82) that, in 2022 and 2023, the primary concern was that it could not "predict what a remedial map would look like." This argument is both non-sensical and unsupported by the record, and also conflicts with Alabama's much broader claim in 2022 that changes to a map near election deadlines would have "inflict[ed] grave harm on the public interest[.]" Emergency Appl. for Administrative Stay & Stay or Injunctive Relief Pending Appeal to the Supreme Court of the United States, No. 21A375, *Merrill v. Milligan* at 38 (Jan. 28, 2022) ("Emergency App.").

First, none of Alabama's arguments regarding election timing in 2022 or 2023 were predicated on "predict[ing] what a remedial map would look like." Doc. 534 at 86. Instead, Alabama's successful stay application urged judicial relief because it was two months away from issuing absentee ballots, four months away from a primary election and the State lacked sufficient time to reassign voters to new districts. Emergency App. at 39. Here, absentee ballots were issued two months ago, UOCAVA ballots were issued last month, and the primary election is *today*.

Alabama's only answer is the baseless claim that the "2023 Plan will be easier to implement" because the "Plan is well-known." Doc. 534 at 83. This is simply false. *No person* has *ever* voted under the 2023 plan; *no election administrator* has

33

*ever* conducted elections or even assigned voters to precincts based on the 2023 plan; and *no candidate* has *ever* qualified, raised money, contacted voters, or otherwise had to run for office under the 2023 Plan. And, again, Mr. Elrod is clear that Alabama seeks to implement the 2023 plan on an "aggressive" timeline that will require "tireless" work and could lead to "problems or errors" during the election. Elrod Decl. ¶ 7.

These indisputable facts make clear that the 2023 Plan is not "well-known" and will be far from "eas[y]" to implement. *Cf.* Doc. 534 at 83. Nothing supports the State's claim that election officials have the miraculous ability to quickly implement the untested 2023 Plan but would struggle to stay the course under the Remedial Map. Doc. 530 at 2–3. Based on Alabama's own representations in this litigation, implementing the 2023 Plan would be more burdensome on election administrators than the status quo of the Remedial Map. For example, the State previously represented that counties often need as much as three to four months to complete voter reassignment when switching maps and that a "rushed" redistricting process has led to mistakes, including voters being assigned the wrong districts. Ex. A, Sec'y of State 30(b)(6) Dep. of J. Elrod at 87:19–88:3, 154:12–20, 109:20–111:6. But if Plaintiffs are granted an injunction, registrars will not have to conduct any reassignment at all. Ex. A at 186:21–187:1 (Mr. Elrod explaining that if no changes are made to any districts, then voter reassignment is not necessary). Here, allowing

the State to escape its prior representations in service of a convenient litigation position would impose a grave burden on voters who could be mistakenly reassigned and would, in any event, not even be notified by the State that their districts have changed. *Id.* at 248:12–21. This harm, previously recognized by the State in considering the equities of late-breaking changes to maps, weighs in favor of Plaintiffs now. Alabama is judicially estopped from representing otherwise.

### C. This Court May Consider Account for the Illegality of Alabama's Actions under State Law in Deciding Whether to Exercise Its Equitable Powers.

Alabama wrongheadedly insists that this Court must close its eyes to the state-law implications of the newly enacted HB 1, which cancelled the primaries and reinstates the 2023 plan. That understanding, however, turns the law on its head. In assessing the balance of equities, federal courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) (citing *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 542 (1987)).

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)). Plaintiffs point to HB 1's tenuous legality under state law as an equitable consideration rather than an independent state-law claim. Alabama simply cannot be

harmed by the issuance of a preliminary injunction when it "has no interest in enforcing a state law that is unconstitutional[.]" *Hispanic Interest Coal. of Ala. v. Governor of Ala..*, 691 F.3d 1236, 1249 (11th Cir. 2020); *see also Honeyfund.com Inc. v. Governor of Fla.*, 94 F.4th 1272, 1283 (11th Cir. 2024) (Defendant had "no legitimate interest in enforcing an unconstitutional law.").

Alabama also cites (at 86) *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984), to assert that federal courts may not "instruct state officials on how to conform their conduct to state law." The Court in *Pennhurst* held that the Eleventh Amendment to the U.S. Constitution prohibited courts from adjudicating pendent state-law claims against states without their consent. *Pennhurst State Sch. & Hosp.*, 465 U.S. at 121. But *Pennhurst* is inapposite: Plaintiffs do not assert a state-law claim, much less demand "instruct[ion]" of state officials. Instead, Plaintiffs point out that HB 1 violates the Alabama Constitution as an equitable concern for this Court to weigh in deciding whether to issue a preliminary injunction. *Cf Romero–Barcelo*, 456 U.S. at 312 (describing federal court's equitable powers as "flexible" and "within their sound discretion").

Alabama next erroneously argues (at 86) that HB 1 does not connect with or reference the general election. They are incorrect. The text of HB 1 explicitly "references" the 2026 General Election Date. HB 1 operates "[i]n the event" "a federal court, by issuing a judgment or by vacating an injunction, permits the

reinstatement of the last legislatively enacted congressional districts, as enacted by Act 2023-563 of the 2023 Second Special Session, to be used in the 2026 General Election[.]" By its own terms then, it references the "2026 General Election." *See HealthAmerica v. Menton*, 551 So. 2d 235, 238 (Ala. 1989) (determining that something "relates to" another thing "'in the normal sense of the phrase, if it has a connection with or reference to'" said thing).

And the mention of the general election is no mere throwaway line: The legal operability of HB 1 depends on—or "has a connection with" *Id.* (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987))—the 2026 General Election. And because HB 1 both references and has a connection with the 2026 General Election, it must conform to Alabama's constitutional requirement to be enacted six months before the general election. *See* Ala. Const. § 111.08. And HB 1's failure to comply with Alabama's constitution necessarily means Alabama will not be harmed by its enjoinment.

This Court should reject Alabama's attempt to twist the equities in its favor after it has itself sown confusion, after Alabama has taken contrary legal stances in the past (which were relied upon by the Supreme Court), and while Alabama devises yet another set of legal quagmires to delay relief to Plaintiffs. The equities unquestionably cut clearly in favor of Plaintiffs.

## CONCLUSION

The Court should reject Alabama's heated rhetoric and sweeping assertions in favor of the record and evidence this Court knows all too well. Because all factors of the preliminary injunction standard favor Plaintiffs, Plaintiffs respectfully request that the Court grant the motion.

Respectfully submitted this 19th day of May 2026.

/s/ Deuel Ross
Deuel Ross*
Victor Olofin*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Colin Burke*
NAACP LEGAL DEFENSE &
    EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Jessica L. Ellsworth*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Michael Turrill*
Harmony A. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400

/s/ Davin M. Rosborough
Davin M. Rosborough*
Theresa J. Lee*
Dayton Campbell-Harris*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
tlee@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

/s/ Sidney Jackson
Sidney M. Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS CHILDS PANTAZIS
    FISHER & GOLDFARB, LLC
301 19th Street North
Birmingham, AL 35203
Phone: (205) 341-0498
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

Alison Mollman (ASB-8397-A33C)
Paul Rand (ASB-5595-O99N)
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
prand@aclualabama.org

Blayne R. Thompson*
HOGAN LOVELLS US LLP

Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

***Counsel for Plaintiffs***

Janette Louard\*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE (NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
jlouard@naacpnet.org

***Counsel for Plaintiff Alabama State Conference of the NAACP***
*\* Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2026, a copy of the foregoing has been served on all counsel of record through the Court's CF/ECF system.

*/s/ Deuel Ross*
*Attorney for Plaintiffs*