FILED

2026 May-19  AM 11:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

**86**

MS. CARTER: Okay. I'd like to ask the court reporter to mark Exhibit #3. It's the declaration of Clay S. Helms.

MR. DAVIS: The court reporter has marked the exhibit, and the witness has it in front of him.

MS. CARTER: Thank you.

Q. (Ms. Carter, continuing:) Mr. Elrod, you've seen this -- have you seen this document before?

A. Yes.

Q. Okay. So for the record, this document was filed on December 23rd, 2021, and it says that there were substantial obstacles to changing congressional districts at a -- at a late date. So I'd like to discuss each of those obstacles identified.

So on page 3, paragraph 6, the first obstacle that Mr. Helms identifies is reassigning a county's registered voters to the correct precinct and districts.

So how -- how long does that -- does

**87**

that kind of reassignment process usually take?

A. It depends on the extent of the changes for each of those districts that are mentioned there. But the -- the redistricting process as a whole can typically take a county several months to -- to complete.

Q. Who completes that step?

A. The step that's referred to in paragraph 6 is completed by the board of registrars.

Q. And the board of registrars is able to complete that step when there is a change in a district map?

MR. DAVIS: Object to the form.

A. Using the map, they will make the appropriate reassignment.

Q. Okay. On -- on page 4, paragraph 9, it states that the reassignment process can take the county's board of registrars three to four months to complete. How was that estimate of three to four months made?

(Witness reviewing document)

**88**

A. Based on what I know, that determination was based on conversations with registrars.

Q. Are county registrars already trained to conduct reassignments or does it require additional training?

A. They are trained, but, again, as we were talking about earlier, the length of the service of a registrar can vary significantly. So the training process is one that is more ongoing for the registrar's office because redistricting is not something that they do on a regular basis. And with any given redistricting cycle, you may have at least one or more registrars who are unfamiliar with that process because they were not in the office for the last time it was conducted.

Part of the training that we offer to registrars does include jurisdictions and reassignment processes, but the depth to which that goes varies depending on how close to a redistricting cycle it is. So we do make other resources and guides available to help registrars either

**89**

familiarize or refamiliarize themselves with the redistricting process when they have to make those assignments.

Q. And so reassigning isn't a part of the -- what they do on a regular basis, but assigning voters to precincts and districts is a part of what they do on a regular basis, correct?

A. To an extent.

Q. What -- what is the extent?

A. Whenever someone registers to vote, their address is what puts them in the appropriate district. If someone is registering at an address that already exists in the voter registration database, then that street file has already been tagged with the appropriate districts where it needs to be placed. If someone is registering at a new address that is new to the VR system, then the registrars will have to create a new street segment and do the assignment manually.

So it's not necessarily accurate to say that registrars are doing the assignment process themselves on a more

106

Q. Okay. But if base files don't have to be -- If this doesn't happen to be, you know, one of the periods where they decide to charge for base files, this is just a regular reassignment process and they're already contracted with the entity, there wouldn't be unexpected costs, right?

MR. DAVIS: Object to the form.

A. Again, I don't know all the stipulations of their contract. I do know, from my experience of talking with vendors like this, the maintenance costs that they charge these counties is based on the amount of data that they're processing. If, through the reassignment process, they ended up having more data than they currently have that the vendor is working with on their behalf, then there could be unexpected costs. But I don't know that because, again, we don't hold the contract with that vendor.

MR. DAVIS: Ms. Carter, can I interrupt just for a moment to talk about the schedule?

107

MS. CARTER: Sure.

MR. DAVIS: Are you okay to keep going for a while, or are you ready for a break?

THE WITNESS: Yeah, I'm good right now.

MR. DAVIS: Okay. We're -- When do you plan for the next break? We're okay to keep going for a little bit at least.

MS. CARTER: I was just going to ask one more question, because I was thinking the same thing.

MR. DAVIS: Yeah. Okay. Perfect. Perfect.

MS. CARTER: Yes. Thank you.

Q. (Ms. Carter, continuing:) So final question before break -- or maybe a couple, but related.

So paragraph 9 says that the -- So we discussed these ten counties that have contracted with entities. Paragraph 7 says that there are 12 counties that use

108

GIS systems, and then paragraph 9 says that there are 45 counties that perform the process manually.

Have these 45 counties contracted with entities to assist them in the past?

A. As far as I'm aware, no.

Q. And what is the manual reassignment process?

A. Similar to what I was describing a moment ago, where the registrars use paper maps that are typically provided by their county commission. They use those maps to identify and determine the changes. Those maps typically are large table-sized maps that have every street in the county on them. And in order to identify those changes, the registrars are pouring over those maps usually with a pen and magnifying glass making marks to determine where any splits or additional precinct parts are.

That's -- that's what we mean when we refer to the manual process. They're not using individual address points on an electronic map to determine the location

109

of the address. They're using physical maps in order to determine where the location is.

MS. CARTER: All right. Thank you. I'm happy to take a break now.

MR. DAVIS: Sounds great. Why don't -- Is it okay if we make this our lunch break?

MS. CARTER: Yes, definitely.

(Recess from 11:47 a.m. to 12:31 p.m.)

Q. (Ms. Carter, continuing:) So sticking for just a minute longer on the Clay Helms' declaration that we were discussing when we broke. The -- So I think -- I'm sorry. So there's also an issue of mistaken reassignments that he talks about.

Have -- have mistaken reassignments happened before with reassigning congressional districts?

A. I'm not aware.

Q. Are you aware if there were mistaken assignments during the 2021 redistricting

**154**

the very end.  There's a document titled County Responses on Redistricting Timeframe.

And let me know when you're there.  I don't want to rush you.

A. I'm there.

Q. Okay.  What is that -- this -- this document?

A. This is a document that I prepared to help us give a response to the Court for this case.

Q. Okay.  Is Barbour County listed as responding that they will need a few months at least to complete reassignment?

A. That's what they said, yes.

Q. Well, where did that estimate come from?

A. I talked to the registrars in that county.

Q. Okay.  So you -- you spoke to registrars outside of the survey process?

A. Yes.

Q. How did you go about preparing this document, County Responses on Redistricting Timeframe?

A. These counties are based on the counties that were included in the proposed plans

**155**

as having split congressional districts.

Q. Which proposed plans?

A. Both of them.  There were two proposed splits that -- I was given a list of counties that were potentially going to be split if one of these plans was implemented, and that's where these counties came from.

Q. Okay.  So earlier when you were looking at -- earlier when we were looking at Moon Duchin's expert report, there were maps -- there were four maps there, Plan A, Plan B, Plan C, Plan D.  So what two plans are you talking about?

A. I don't know which specific plans these counties reflect.  As we were preparing the response, I was advised to reach out to registrars to find out how long it would take them to redraw congressional lines.  And the list of targeted counties came from counties that were included in these proposed splits.

Q. Okay.  So you were -- you were -- So you -- you came up with this list of counties because you were advised -- these

**156**

were the -- these were the list of counties that you were advised to look into?

A. Correct.

Q. Who advised you about -- about these specific counties?

A. Clay Helms.

Q. And was he advising you based on the responses in the redistricting survey?

A. No.  No, this survey has nothing to do with the redistricting survey.

Q. This document has nothing to do with the redistricting survey?

A. Correct.

Q. Okay.  And you said that -- So -- so let's talk, then, about how it is that -- that you arrived at these estimates.

So of -- so of all the counties that -- that are listed on this document, you only summarized the results of 11 because these were the ones that are split in certain plans?

A. Correct.

Q. And -- Okay.  Okay.  And you don't know exactly which plans?

**157**

A. No.

Q. So since this is different from the survey, what was -- what did Mr. Helms advise you based on?

A. This document was prepared to help us respond to the court order.  And after meeting with Mr. Helms and members of the Attorney General's Office, it was determined that we needed to talk to some of the counties to get an idea of how long this process takes and what kind of system and resources they use to conduct redistricting.  So the list of counties was determined based on some of the proposed splits that we had available at the time.

Q. Okay.  What court order are you talking about?

A. I'm going to look back in my binder to refer to that one.

Q. Okay.

(Witness reviewing document)

A. The response where those notes were incorporated was in response to a set of interrogatories, the first set.  I don't